**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

|  |  |  |
|---|---|---|
| In re: | § § § | **Chapter 11** |
| **FIELDWOOD ENERGY LLC, *et al.*,** | § § | **Case No. 18-_____ (___)** |
| Debtors.[1] | § § § | **(Joint Administration Requested)** |

**DISCLOSURE STATEMENT FOR JOINT PREPACKAGED CHAPTER 11
PLAN OF FIELDWOOD ENERGY LLC AND ITS AFFILIATED DEBTORS**

**WEIL, GOTSHAL & MANGES LLP**
Alfredo R. Pérez
700 Louisiana Street, Suite 1700
Houston, Texas 77002
Telephone: (713) 546-5000
Facsimile: (713) 224-9511

**WEIL, GOTSHAL & MANGES LLP**
Matthew S. Barr (*pro hac vice* pending)
Ray C. Schrock, P.C. (*pro hac vice* pending)
Jessica Liou (*pro hac vice* pending)
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007

*Proposed Counsel for the Debtors and
Debtors in Possession*

Dated:     February 14, 2018
            Houston, Texas

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, as applicable, are:  Dynamic Offshore Resources NS, LLC (0158); Fieldwood Energy LLC (6778); Fieldwood Holdings LLC (9264); Fieldwood Energy Inc. (4991); Fieldwood Energy Offshore LLC (4494); Fieldwood Onshore LLC (3489); Fieldwood SD Offshore LLC (8786); FW GOM Pipeline, Inc. (8440); GOM Shelf LLC (8107); Bandon Oil and Gas GP, LLC (9172); Bandon Oil and Gas, LP (9266); Fieldwood Energy SP LLC (1971); Galveston Bay Pipeline LLC (5703); and Galveston Bay Processing LLC (0422).  The Debtors' primary mailing address is 2000 W. Sam Houston Parkway, S., Suite 1200, Houston, TX 77042.



THIS SOLICITATION OF VOTES (THE "<u>SOLICITATION</u>") IS BEING CONDUCTED TO OBTAIN SUFFICIENT VOTES TO ACCEPT THE PREPACKAGED PLAN ATTACHED HERETO AS <u>EXHIBIT A</u> (THE "<u>PLAN</u>") *BEFORE* THE FILING OF VOLUNTARY PETITIONS UNDER CHAPTER 11 OF TITLE 11 OF THE UNITED STATES CODE (THE "<u>BANKRUPTCY CODE</u>").  BECAUSE THE CHAPTER 11 CASES HAVE NOT YET BEEN COMMENCED, THE DISCLOSURE STATEMENT HAS NOT BEEN APPROVED BY THE BANKRUPTCY COURT AS CONTAINING "ADEQUATE INFORMATION" WITHIN THE MEANING OF SECTION 1125(a) OF THE BANKRUPTCY CODE.  AFTER THE COMMENCEMENT OF THE CHAPTER 11 CASES, THE DEBTORS EXPECT TO PROMPTLY SEEK ORDERS OF THE BANKRUPTCY COURT (a) APPROVING THE DISCLOSURE STATEMENT AS CONTAINING "ADEQUATE INFORMATION," (b) APPROVING THE SOLICITATION OF VOTES AS BEING IN COMPLIANCE WITH SECTIONS 1125 AND 1126(b) OF THE BANKRUPTCY CODE, AND (c) CONFIRMING THE PLAN.

AS TO HOLDERS OF ALLOWED SLTL CLAIMS (AS DEFINED IN THE PLAN), THE SOLICITATION IS BEING MADE BEFORE THE PETITION DATE ONLY TO SUCH HOLDERS THAT ARE "ACCREDITED INVESTORS" WITHIN THE MEANING OF RULE 501(a) OF REGULATION D OF THE SECURITIES ACT.

THE VOTING DEADLINE TO ACCEPT OR REJECT THE PLAN IS 5:00 P.M. (PREVAILING CENTRAL TIME) ON MARCH 14, 2018 UNLESS EXTENDED BY THE DEBTORS.

THE RECORD DATE FOR DETERMINING WHICH HOLDERS OF CLAIMS OR INTERESTS MAY VOTE ON THE PLAN IS FEBRUARY 12, 2018 (THE "<u>RECORD DATE</u>").

---

**RECOMMENDATION BY THE DEBTORS**

The board of directors of Fieldwood Holdings LLC and each of the governing bodies for each of the affiliated debtors have (as of the date hereof) unanimously approved the transactions contemplated by the Solicitation and the Plan and recommend that all creditors whose votes are being solicited submit ballots to accept the Plan.

Subject to the terms and provisions of the restructuring support agreement dated as of February 14, 2018 (as may be amended, restated, or modified, the "**Restructuring Support Agreement**"), the following parties have agreed to vote in favor of the Plan:

- Parties representing approximately 74.9% in principal amount of claims under the first lien term loan agreement, dated September 30, 2013, between Fieldwood Energy LLC and the lenders thereunder
- Parties representing approximately 71.6% in principal amount of claims under the first lien last-out term loan agreement, dated May 27, 2016, between Fieldwood Energy LLC and the lenders thereunder
- Parties representing, in the aggregate, approximately 88% in principal amount of claims under (a) the second lien term loan agreement, dated September 30, 2013, between Fieldwood Energy LLC and the lenders thereunder and (b) the sponsor second lien term loan agreement, dated May 27, 2016, between Fieldwood Energy LLC and the lenders thereunder

---

**PARTIES SHOULD NOT CONSTRUE THE CONTENTS OF THE DISCLOSURE STATEMENT AS PROVIDING ANY LEGAL, BUSINESS, FINANCIAL, OR TAX ADVICE AND SHOULD CONSULT WITH THEIR OWN ADVISERS BEFORE CASTING A VOTE WITH RESPECT TO THE PLAN.**

**THE ISSUANCE OF AND THE DISTRIBUTION UNDER THE PLAN OF THE NEW EQUITY INTERESTS PURSUANT TO SECTIONS 4.6(a)(i) AND 4.10(a) OF THE PLAN WILL BE EXEMPT FROM REGISTRATION UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE "SECURITIES ACT") AND ANY OTHER APPLICABLE SECURITIES LAWS PURSUANT TO SECTION 1145 OF THE BANKRUPTCY CODE. THESE SECURITIES MAY BE RESOLD WITHOUT REGISTRATION UNDER THE SECURITIES ACT OR OTHER FEDERAL SECURITIES LAWS PURSUANT TO THE EXEMPTION PROVIDED BY SECTION 4(a)(1) OF THE SECURITIES ACT, UNLESS THE HOLDER IS AN "UNDERWRITER" WITH RESPECT TO SUCH SECURITIES, AS THAT TERM IS DEFINED IN SECTION 1145(b) OF THE BANKRUPTCY CODE. SUCH SECTION 1145 EXEMPT SECURITIES GENERALLY MAY BE RESOLD WITHOUT REGISTRATION UNDER STATE SECURITIES LAWS PURSUANT TO VARIOUS EXEMPTIONS PROVIDED BY THE RESPECTIVE LAWS OF THE SEVERAL STATES.**

**THE ISSUANCE AND SALE OF THE NEW EQUITY INTERESTS PURSUANT TO THE RIGHTS OFFERING AND TO THE BACKSTOP PARTIES UNDER THE BACKSTOP COMMITMENT AGREEMENT (INCLUDING THE NEW EQUITY INTERESTS COMPRISING THE BACKSTOP COMMITMENT PREMIUM) IS BEING**

MADE IN RELIANCE ON THE EXEMPTION FROM REGISTRATION SET FORTH IN SECTION 4(a)(2) OF THE SECURITIES ACT AND REGULATION D THEREUNDER. SUCH SECURITIES WILL BE CONSIDERED "RESTRICTED SECURITIES" AND MAY NOT BE TRANSFERRED EXCEPT PURSUANT TO AN EFFECTIVE REGISTRATION STATEMENT OR UNDER AN AVAILABLE EXEMPTION FROM THE REGISTRATION REQUIREMENTS OF THE SECURITIES ACT, SUCH AS, UNDER CERTAIN CONDITIONS, THE RESALE PROVISIONS OF RULE 144 OF THE SECURITIES ACT.

THE AVAILABILITY OF THE EXEMPTION UNDER SECTION 1145 OF THE BANKRUPTCY CODE OR ANY OTHER APPLICABLE SECURITIES LAWS WILL NOT BE A CONDITION TO THE OCCURRENCE OF THE EFFECTIVE DATE.

THE SECURITIES ISSUED PURSUANT TO THE PLAN HAVE NOT BEEN APPROVED OR DISAPPROVED BY THE SECURITIES AND EXCHANGE COMMISSION (THE "SEC") OR BY ANY STATE SECURITIES COMMISSION OR SIMILAR PUBLIC, GOVERNMENTAL, OR REGULATORY AUTHORITY, AND NEITHER THE SEC NOR ANY SUCH AUTHORITY HAS PASSED UPON THE ACCURACY OR ADEQUACY OF THE INFORMATION CONTAINED IN THE DISCLOSURE STATEMENT OR UPON THE MERITS OF THE PLAN. ANY REPRESENTATION TO THE CONTRARY IS A CRIMINAL OFFENSE.

THE RESTRUCTURING UNDER THE PLAN CONTEMPLATES THAT FIELDWOOD ENERGY LLC WILL ACQUIRE CERTAIN PURCHASED ASSETS AS DESCRIBED IN SECTION I(A) OF THIS DISCLOSURE STATEMENT, AND THE DISCLOSURE STATEMENT INCLUDES INFORMATION REGARDING THE PURCHASED ASSETS AND, AMONG OTHER THINGS, ESTIMATES OF THE DEBTORS' PROVEN RESERVES, PROVEN AND PROBABLE RESERVES, AND PROVEN AND PROBABLE AND POSSIBLE RESERVES, AS WELL AS PROJECTIONS OF *PRO FORMA* EBITDA, CAPITAL EXPENDITURES, UNLEVERED FREE CASH FLOW AND NET LEVERAGE, GIVING EFFECT TO ACQUISITION OF THE PURCHASED ASSETS. THE PURCHASED ASSETS ARE NOT UNDER THE CONTROL OF THE DEBTORS, THE FINANCIAL AND OTHER INFORMATION RELATING TO THE PURCHASED ASSETS THAT HAS BEEN PROVIDED OR MADE AVAILABLE TO THE DEBTORS IS NOT THE INFORMATION THAT WOULD BE INCLUDED IN AN OFFERING OF SECURITIES UNDER THE SECURITIES ACT, AND THE DEBTORS' AUDITORS HAVE NOT REVIEWED OR APPROVED THE INFORMATION INCLUDED IN THIS DISCLOSURE STATEMENT REGARDING THE PURCHASED ASSETS. ALTHOUGH THE DEBTORS HAVE CONDUCTED CUSTOMARY DILIGENCE IN GOOD FAITH REGARDING THE PURCHASED ASSETS, AND HAVE PROVIDED SUCH INFORMATION, ESTIMATES, AND PROJECTIONS IN GOOD FAITH USING DILIGENCE AND ASSUMPTIONS THAT THE DEBTORS' MANAGEMENT BELIEVES TO BE REASONABLE AND APPROPRIATE, THE DEBTORS ARE NOT ABLE TO INDEPENDENTLY VERIFY THE ACCURACY OR COMPLETENESS OF THE FINANCIAL AND OTHER INFORMATION REGARDING THE PURCHASED ASSETS TO THE SAME EXTENT AS IF SUCH ASSETS HAD BEEN OWNED AND UNDER THE CONTROL OF THE DEBTORS. ACCORDINGLY,

THE INFORMATION IN THIS DISCLOSURE STATEMENT INCLUDES OR IS BASED (IN WHOLE OR IN PART) UPON THE EXPECTED FINANCIAL PERFORMANCE OF THE PURCHASED ASSETS, AND SHOULD BE CONSIDERED CAREFULLY IN LIGHT OF THESE LIMITATIONS, AND MAY INCREASE THE INHERENT UNCERTAINTIES INVOLVED IN THE PREPARATION OF PROJECTIONS, ESTIMATES AND FORWARD-LOOKING INFORMATION, AND THE DEBTORS AND REORGANIZED DEBTORS CANNOT ASSURE THAT SUCH PROJECTIONS WILL BE REALIZED AS SO DESCRIBED HEREIN. THE DEBTORS DID NOT PREPARE SUCH PROJECTIONS TO COMPLY WITH THE GUIDELINES FOR PROSPECTIVE FINANCIAL STATEMENTS PUBLISHED BY THE AMERICAN INSTITUTE OF CERTIFIED PUBLIC ACCOUNTANTS AND THE RULES AND REGULATIONS OF THE SEC.

CERTAIN STATEMENTS CONTAINED IN THE DISCLOSURE STATEMENT, INCLUDING STATEMENTS INCORPORATED BY REFERENCE, PROJECTED FINANCIAL INFORMATION (SUCH AS THAT REFERRED TO IN THE PRECEDING PARAGRAPH AND UNDER THE CAPTION "FINANCIAL PROJECTIONS" ELSEWHERE IN THIS DISCLOSURE STATEMENT) AND OTHER FORWARD-LOOKING STATEMENTS, ARE BASED ON ESTIMATES AND ASSUMPTIONS. THERE CAN BE NO ASSURANCE THAT SUCH STATEMENTS WILL BE REFLECTIVE OF ACTUAL OUTCOMES. FORWARD-LOOKING STATEMENTS SHOULD BE EVALUATED IN THE CONTEXT OF THE ESTIMATES, ASSUMPTIONS, UNCERTAINTIES, AND RISKS DESCRIBED HEREIN.

FURTHERMORE, READERS ARE CAUTIONED THAT ANY FORWARD-LOOKING STATEMENTS HEREIN, INCLUDING ANY PROJECTIONS, ARE SUBJECT TO A NUMBER OF ASSUMPTIONS, RISKS, AND UNCERTAINTIES, MANY OF WHICH ARE BEYOND THE CONTROL OF THE DEBTORS, INCLUDING THE IMPLEMENTATION OF THE PLAN. IMPORTANT ASSUMPTIONS AND OTHER IMPORTANT FACTORS THAT COULD CAUSE ACTUAL RESULTS TO DIFFER MATERIALLY AND INCLUDE, BUT ARE NOT LIMITED TO, THOSE FACTORS, RISKS AND UNCERTAINTIES DESCRIBED IN MORE DETAIL UNDER THE HEADING "CERTAIN RISK FACTORS TO BE CONSIDERED" BELOW, AS WELL AS THE VOLATILITY IN COMMODITY PRICES FOR CRUDE OIL AND NATURAL GAS, THE PRESENCE OR RECOVERABILITY OF ESTIMATED RESERVES, THE ABILITY TO REPLACE RESERVES, ENVIRONMENTAL RISKS, DRILLING AND OPERATING RISKS, EXPLORATION AND DEVELOPMENT RISKS, COMPETITION, GOVERNMENT REGULATION OR OTHER ACTIONS, THE ABILITY OF MANAGEMENT TO EXECUTE ITS PLANS TO MEET ITS GOALS AND OTHER RISKS INHERENT IN THE DEBTORS' BUSINESSES. PARTIES ARE CAUTIONED THAT THE FORWARD-LOOKING STATEMENTS SPEAK AS OF THE DATE MADE, ARE BASED ON THE DEBTORS' CURRENT BELIEFS, INTENTIONS AND EXPECTATIONS, AND ARE NOT GUARANTEES OF FUTURE PERFORMANCE. ACTUAL RESULTS OR DEVELOPMENTS MAY DIFFER MATERIALLY FROM THE EXPECTATIONS EXPRESSED OR IMPLIED IN THE FORWARD-LOOKING STATEMENTS, AND THE DEBTORS UNDERTAKE NO OBLIGATION TO UPDATE ANY SUCH STATEMENTS. THE DEBTORS AND

REORGANIZED DEBTORS, AS APPLICABLE, DO NOT INTEND AND UNDERTAKE NO OBLIGATION TO UPDATE OR OTHERWISE REVISE ANY FORWARD-LOOKING STATEMENTS, INCLUDING ANY PROJECTIONS CONTAINED HEREIN, TO REFLECT EVENTS OR CIRCUMSTANCES EXISTING OR ARISING AFTER THE DATE HEREOF OR TO REFLECT THE OCCURRENCE OF UNANTICIPATED EVENTS OR OTHERWISE, UNLESS INSTRUCTED TO DO SO BY THE BANKRUPTCY COURT.

HOLDERS OF ALLOWED GENERAL UNSECURED CLAIMS WILL NOT BE IMPAIRED BY THE PLAN AND, AS A RESULT, THE RIGHT TO RECEIVE PAYMENT IN FULL ON ACCOUNT OF EXISTING OBLIGATIONS IS NOT ALTERED BY THE PLAN.  DURING THE CHAPTER 11 CASES, THE DEBTORS INTEND TO OPERATE THEIR BUSINESSES IN THE ORDINARY COURSE AND WILL SEEK AUTHORIZATION FROM THE BANKRUPTCY COURT TO MAKE PAYMENT IN FULL ON A TIMELY BASIS TO ALL TRADE CREDITORS, CUSTOMERS, AND EMPLOYEES OF ALL UNDISPUTED AMOUNTS DUE BEFORE AND DURING THE CHAPTER 11 CASES.

NO INDEPENDENT AUDITOR OR ACCOUNTANT HAS REVIEWED OR APPROVED THE FINANCIAL PROJECTIONS OR THE LIQUIDATION ANALYSIS HEREIN.

THE DEBTORS HAVE NOT AUTHORIZED ANY PERSON TO GIVE ANY INFORMATION OR ADVICE, OR TO MAKE ANY REPRESENTATION, IN CONNECTION WITH THE PLAN OR THE DISCLOSURE STATEMENT.

THE STATEMENTS CONTAINED IN THE DISCLOSURE STATEMENT ARE MADE AS OF THE DATE HEREOF UNLESS OTHERWISE SPECIFIED.  THE TERMS OF THE PLAN GOVERN IN THE EVENT OF ANY INCONSISTENCY WITH THE SUMMARIES IN THE DISCLOSURE STATEMENT.

THE INFORMATION IN THE DISCLOSURE STATEMENT IS BEING PROVIDED SOLELY FOR PURPOSES OF VOTING TO ACCEPT OR REJECT THE PLAN OR OBJECTING TO CONFIRMATION.  NOTHING IN THE DISCLOSURE STATEMENT MAY BE USED BY ANY PARTY FOR ANY OTHER PURPOSE.

ALL EXHIBITS TO THE DISCLOSURE STATEMENT ARE INCORPORATED INTO AND ARE A PART OF THE DISCLOSURE STATEMENT AS IF SET FORTH IN FULL HEREIN.

**THE PLAN PROVIDES THAT HOLDERS OF IMPAIRED CLAIMS ENTITLED TO VOTE (A) WHO DO NOT SUBMIT A BALLOT VOTING TO ACCEPT OR REJECT THE PLAN AND DO NOT OPT OUT OF THE RELEASE, (B) WHO VOTE TO ACCEPT THE PLAN, OR (C) WHO VOTE TO REJECT THE PLAN BUT DO NOT OPT OUT OF THE RELEASE PROVISIONS OF THE PLAN ARE DEEMED TO HAVE GRANTED THE RELEASES THEREIN. THE PLAN ALSO PROVIDES THAT HOLDERS OF CLAIMS OR INTERESTS THAT ARE UNIMPAIRED UNDER THE PLAN, WHERE THE APPLICABLE CLAIMS OR INTERESTS HAVE BEEN FULLY PAID OR OTHERWISE SATISFIED IN ACCORDANCE WITH THE PLAN, ARE DEEMED TO HAVE GRANTED THE RELEASES THEREIN.**

I. INTRODUCTION .................................................................................................................1
    A.    Restructuring Support Agreement ........................................................................3
    B.    Backstop Commitment Agreement .......................................................................3
    C.    Asset Purchase Transaction ..................................................................................4

II. SUMMARY OF PLAN TREATMENT .............................................................................7

III. OVERVIEW OF DEBTORS' OPERATIONS ...............................................................10
    A.    Overview of Debtors' Businesses .......................................................................10
    B.    Directors and Officers .........................................................................................12
    C.    Regulation of Debtors' Business and Decommissioning Obligations .................13
          1.    Obligations to United States Government ...............................................13
          2.    Obligations to Third Parties, including Apache .....................................13
    D.    Debtors' Capital Structure ...................................................................................15
          1.    Prepetition Indebtedness .........................................................................15
          2.    Interests in Fieldwood Holdings .............................................................18

IV. KEY EVENTS LEADING TO COMMENCEMENT OF CHAPTER 11 CASES...............18

V. ANTICIPATED EVENTS DURING CHAPTER 11 CASES ............................................21
    A.    Commencement of Chapter 11 Cases and First Day Motions ............................21
          1.    Debtor in Possession Financing ..............................................................21
          2.    Cash Management System .......................................................................22
          3.    Trade Creditors .......................................................................................22
          4.    Taxes .......................................................................................................22
          5.    Utilities ....................................................................................................22
          6.    Insurance and Surety ...............................................................................22
          7.    Employee Wages and Benefits................................................................23
    B.    Other Procedural Motions and Retention of Professionals .................................23
    C.    Motion to Authorize Hedging Program ...............................................................23
    D.    Confirmation Hearing and Rights Offering Procedures.......................................23
    E.    Timetable for Chapter 11 Cases ..........................................................................24

VI. OTHER MATTERS.........................................................................................................24

VII. SUMMARY OF PLAN ..................................................................................................24
    A.    Administrative Expenses and Priority Claims.....................................................24
          1.    Treatment of Administrative Expense Claims .......................................24
          2.    Treatment of Fee Claims.........................................................................25

<u>Table of Contents</u>

|  |  |  |  |
|---|---|---|---|
|  | 3. | Treatment of DIP Facility Claims | 25 |
|  | 4. | Payment of Fees and Expenses under DIP Facility Order | 26 |
|  | 5. | Treatment of Priority Tax Claims | 26 |
| B. |  | Classifications of Claims and Interests | 26 |
|  | 1. | Classification in General | 26 |
|  | 2. | Formation of Debtor Groups for Convenience Only | 27 |
|  | 3. | Summary of Classification of Claims and Interests | 27 |
|  | 4. | Special Provision Governing Unimpaired Claims | 27 |
|  | 5. | Separate Classification of Other Secured Claims | 28 |
|  | 6. | Elimination of Vacant Classes | 28 |
|  | 7. | Voting; Presumptions; Solicitation | 28 |
|  | 8. | Cramdown | 28 |
|  | 9. | No Waiver | 28 |
| C. |  | Treatment of Claims and Interests | 29 |
|  | 1. | Class 1: Priority Non-Tax Claims | 29 |
|  | 2. | Class 2: Other Secured Claims | 29 |
|  | 3. | Class 3: RBL Claims. | 29 |
|  | 4. | Class 4: FLTL Claims | 29 |
|  | 5. | Class 5: FLLO Claims | 30 |
|  | 6. | Class 6: SLTL Claims | 30 |
|  | 7. | Class 7: General Unsecured Claims | 30 |
|  | 8. | Class 8: Intercompany Claims | 30 |
|  | 9. | Class 9: Existing Holdings Interests | 30 |
|  | 10. | Class 10: Existing Energy Inc. Interests | 31 |
|  | 11. | Class 11: Intercompany Interests | 31 |
| D. |  | Means for Implementation | 31 |
|  | 1. | Compromise and Settlement of Claims, Interests, and Controversies | 31 |
|  | 2. | Continued Corporate Existence | 31 |
|  | 3. | Corporate Action | 32 |
|  | 4. | Asset Purchase Transaction | 33 |
|  | 5. | Plan Funding | 33 |
|  | 6. | Cancellation of Existing Securities and Agreements | 33 |
|  | 7. | Cancellation of Certain Existing Security Interests | 34 |
|  | 8. | Officers and Boards of Directors | 34 |
|  | 9. | Management Incentive Plan | 34 |
|  | 10. | Authorization, Issuance, and Delivery of New Equity Interests | 34 |
|  | 11. | Exit LC Credit Agreement | 35 |

<u>Table of Contents</u>

|  | 12. | Exit First Lien Term Loan Facility and Exit Second Lien Term Loan Facility | 35 |
|  | 13. | New Intercreditor Agreements | 36 |
|  | 14. | Rights Offering | 36 |
|  | 15. | Intercompany Interests; Corporate Reorganization. | 37 |
|  | 16. | Restructuring Transactions | 37 |
|  | 17. | Restructuring Expenses | 37 |
|  | 18. | Separability | 37 |
| E. | | Distributions | 37 |
|  | 1. | Distributions Generally | 37 |
|  | 2. | No Postpetition Interest on Claims | 38 |
|  | 3. | Date of Distributions | 38 |
|  | 4. | Distribution Record Date | 38 |
|  | 5. | Disbursing Agent | 38 |
|  | 6. | Delivery of Distributions | 39 |
|  | 7. | Unclaimed Property | 39 |
|  | 8. | Satisfaction of Claims | 39 |
|  | 9. | Manner of Payment under Plan | 39 |
|  | 10. | Fractional Shares and De Minimis Cash Distributions | 39 |
|  | 11. | No Distribution in Excess of Amount of Allowed Claim | 40 |
|  | 12. | Allocation of Distributions between Principal and Interest | 40 |
|  | 13. | Exemption from Securities Laws | 40 |
|  | 14. | Setoffs and Recoupments | 41 |
|  | 15. | Rights and Powers of Disbursing Agent | 41 |
|  | 16. | Withholding and Reporting Requirements | 41 |
| F. | | Procedures for Resolving Claims | 42 |
|  | 1. | Disputed Claims Process | 42 |
|  | 2. | Estimation of Claims | 43 |
|  | 3. | Claim Resolution Procedures Cumulative | 43 |
|  | 4. | No Distributions Pending Allowance | 43 |
|  | 5. | Distributions after Allowance | 43 |
| G. | | Executory Contracts and Unexpired Leases | 44 |
|  | 1. | General Treatment | 44 |
|  | 2. | Determination of Cure Disputes and Deemed Consent | 44 |
|  | 3. | Rejection Damages Claims | 45 |
|  | 4. | Survival of the Debtors' Indemnification Obligations | 45 |
|  | 5. | Compensation and Benefit Plans | 45 |
|  | 6. | Insurance Policies | 46 |

Case 20-33948 Document 1607-18 Filed in TXSB on 02/06/16/21 Page 11 of 528
Case 18-30648 Document 34-18 Filed in TXSB on 02/15/18 Page 11 of 528
Table of Contents

| | | | |
|---|---|---|---|
| H. | | Conditions Precedent to Occurrence of Effective Date | 46 |
| | 1. | Conditions Precedent to Effective Date | 46 |
| | 2. | Waiver of Conditions Precedent | 47 |
| | 3. | Effect of Failure of a Condition | 48 |
| I. | | Effect of Confirmation | 48 |
| | 1. | Binding Effect | 48 |
| | 2. | Vesting of Assets | 48 |
| | 3. | Discharge of Claims against and Interests in Debtors | 49 |
| | 4. | Pre-Confirmation Injunctions and Stays | 49 |
| | 5. | Injunction against Interference with Plan | 49 |
| | 6. | Plan Injunction | 49 |
| | 7. | Releases | 50 |
| | 8. | Exculpation | 55 |
| | 9. | Injunction Related to Releases and Exculpation | 57 |
| | 10. | Subordinated Claims | 57 |
| | 11. | Retention of Causes of Action and Reservation of Rights | 57 |
| | 12. | Ipso Facto and Similar Provisions Ineffective | 58 |
| | 13. | Indemnification and Reimbursement Obligations | 58 |
| J. | | Retention of Jurisdiction | 58 |
| | 1. | Retention of Jurisdiction | 58 |
| K. | | Miscellaneous Provisions | 60 |
| | 1. | Exemption from Certain Transfer Taxes | 60 |
| | 2. | Dates of Actions to Implement the Plan | 60 |
| | 3. | Amendments | 61 |
| | 4. | Revocation or Withdrawal of the Plan | 61 |
| | 5. | Severability | 61 |
| VIII. | | TRANSFER RESTRICTIONS AND CONSEQUENCES UNDER FEDERAL SECURITIES LAWS | 62 |
| A. | | 1145 Securities | 62 |
| B. | | Private Placement | 63 |
| IX. | | CERTAIN TAX CONSEQUENCES OF PLAN | 65 |
| A. | | Consequences to Debtors | 66 |
| | 1. | Cancellation of Debt | 66 |
| | 2. | Limitation of NOL Carryforwards and Other Tax Attributes | 67 |
| B. | | Consequences to Holders of Certain Claims | 67 |
| | 1. | Holders of FLTL Claims and FLLO Claims | 68 |

Case 20-33948 Document 1604-18 Filed in TXSB on 02/06/16/21 Page 12 of 528
Case 18-30648 Document 834-18 Filed in TXSB on 02/15/18 Page 12 of 528

Table of Contents

|  |  |  |  |
|---|---|---|---|
| 2. | Holders of SLTL Claims | ........................................................ | 71 |
| 3. | Character of Gain or Loss | ...................................................... | 73 |
| 4. | Distributions in Discharge of Accrued Interest or OID | ........... | 74 |
| 5. | Information Reporting and Backup Withholding | ..................... | 74 |

**X. CERTAIN RISK FACTORS TO BE CONSIDERED** ............................................. 75

A. Certain Bankruptcy Law Considerations ......................................... 75

| 1. | General | ............................................................................. | 75 |
| 2. | Risk of Non-Confirmation of the Plan | ................................... | 75 |
| 3. | Non-Consensual Confirmation | ............................................... | 75 |
| 4. | Risk of Non-Occurrence of the Effective Date | ...................... | 76 |
| 5. | Risk of Termination of the Restructuring Support Agreement | ... | 76 |
| 6. | Conversion into Chapter 7 Cases | .......................................... | 76 |

B. Additional Factors Affecting the Value of Reorganized Debtors ....... 76

| 1. | Claims Could Be More than Projected | ................................... | 76 |
| 2. | Projections and Other Forward-Looking Statements Are Not Assured, and Actual Results May Vary | ............................... | 77 |
| 3. | Post-Effective Date Indebtedness | .......................................... | 77 |

C. Factors Relating to Securities to Be Issued under Plan ...................... 77

| 1. | Market for Securities | ........................................................... | 77 |
| 2. | Potential Dilution | ............................................................... | 77 |
| 3. | Significant Holders | .............................................................. | 78 |
| 4. | Equity Interests Subordinated to Reorganized Debtors' Indebtedness | ..................................................................... | 78 |
| 5. | Implied Valuation of New Equity Interests Not Intended to Represent Trading Value of New Equity Interests | ................ | 78 |
| 6. | No Intention to Pay Dividends | .............................................. | 78 |

D. Factors Relating to Rights Offering ................................................. 79

| 1. | Debtors Could Modify Rights Offering Procedures | ............... | 79 |
| 2. | Bankruptcy Court Might Not Approve Rights Offering Procedures | ... | 79 |
| 3. | Backstop Commitment Agreement Could Be Terminated | ....... | 79 |

E. Additional Factors ......................................................................... 79

| 1. | Purchase Agreement Could Be Terminated | ............................ | 79 |
| 2. | Debtors Could Withdraw Plan | .............................................. | 79 |
| 3. | Debtors Have No Duty to Update | .......................................... | 79 |
| 4. | No Representations Outside the Disclosure Statement Are Authorized | ......................................................................... | 80 |
| 5. | No Legal or Tax Advice Is Provided by the Disclosure Statement | ... | 80 |
| 6. | No Admission Made | ............................................................. | 80 |

XI. VOTING PROCEDURES AND REQUIREMENTS ........................................................80

    A.     Voting Deadline ........................................................................80

    B.     Voting Procedures ....................................................................81

    C.     Parties Entitled to Vote ............................................................81

          1.     Fiduciaries and Other Representatives ...................................83

          2.     Agreements Upon Furnishing Ballots .....................................83

          3.     Change of Vote .................................................................83

    D.     Waivers of Defects, Irregularities, etc. .....................................83

    E.     Further Information, Additional Copies .....................................84

XII. CONFIRMATION OF PLAN .............................................................................84

    A.     Confirmation Hearing ..............................................................84

    B.     Objections to Confirmation .......................................................84

    C.     Requirements for Confirmation of Plan ......................................85

          1.     Acceptance of Plan ............................................................86

          2.     Best Interests Test .............................................................87

          3.     Feasibility ......................................................................87

          4.     Valuation Analysis ...........................................................89

XIII. ALTERNATIVES TO CONFIRMATION  AND CONSUMMATION OF PLAN ............90

    A.     Alternative Plan of Reorganization ...........................................90

    B.     Sale under Section 363 of the Bankruptcy Code ..........................90

    C.     Liquidation under Chapter 7 of Bankruptcy Code ........................90

XIV. CONCLUSION AND RECOMMENDATION ..........................................................1

**Exhibit A**:    Plan

**Exhibit B**:    Restructuring Support Agreement

**Exhibit C**:    Organizational Chart

**Exhibit D**:    Liquidation Analysis

**Exhibit E**:    Financial Projections

**Exhibit F**:    Rights Offering Procedures

**Exhibit G**:    Purchase Agreement

**Exhibit H**:    Term Sheet for Apache Decommissioning Agreement Amendment

# I.
## INTRODUCTION

Fieldwood Energy LLC ("**Fieldwood Energy**") and its debtor affiliates[2] (collectively, the "**Debtors**") submit this disclosure statement (as may be amended, the "**Disclosure Statement**") in connection with the Solicitation of votes on the *Joint Prepackaged Chapter 11 Plan of Fieldwood Energy LLC and Its Affiliated Debtors* dated February 14, 2018 attached hereto as **Exhibit A**. The Debtors anticipate filing voluntary petitions for relief under chapter 11 in the United States Bankruptcy Court for the Southern District of Texas (the "**Bankruptcy Court**") on or about February 15, 2018. Capitalized terms used in the Disclosure Statement, but not defined herein, have the meanings ascribed to them in the Plan. To the extent any inconsistencies exist between the Disclosure Statement and the Plan, the Plan will govern.

The Plan is the result of extensive good faith discussions between the Debtors and their key economic stakeholders, including holders of the Debtors' first and second lien indebtedness and the Debtors' equity sponsor. The Plan encompasses a comprehensive restructuring of the Debtors' balance sheet and the purchase of certain offshore assets that complement and enhance the Debtors' asset base and operations. Specifically, the proposed restructuring contemplates (a) reducing the current debt on the Debtors' balance sheet by approximately $1.6 billion, (b) raising capital through a $525 million rights offering (the "**Rights Offering**"), and (c) acquiring deepwater oil and gas assets located in the Gulf of Mexico from Noble Energy, Inc. ("**Seller**") for a purchase price of $480 million, subject to customary price adjustments. The Debtors will use the proceeds of the Rights Offering to, among other things, fund the acquisition, fund the costs and expenses of these chapter 11 cases, and for working capital after emergence from chapter 11.

The Debtors believe that upon consummation of the Plan and the transactions contemplated thereby, the post-emergence enterprise will have the ability to withstand the challenges and volatility of the energy industry and succeed as a leading operator in the Gulf of Mexico.

The Plan provides for the following treatment of claims and equity interests:

- Holders of claims under the credit agreement, dated September 30, 2013, between Fieldwood Energy and the lenders thereunder (the "**Prepetition RBL Lenders**") will have their claims, if any, paid in cash in full. This facility is composed solely of undrawn but outstanding letters of credit, and on the Effective Date, the Debtors will enter into a new letter of credit facility (the "**Exit LC Facility**") to replace the facility previously provided by the Prepetition RBL Lenders.

- Holders of claims under the first lien term loan agreement, dated September 30, 2013, between Fieldwood Energy and the lenders thereunder (the "**Prepetition**

---

[2] The debtor affiliates and the last four digits of their federal tax identification numbers are Dynamic Offshore Resources NS, LLC (0158); Fieldwood Energy LLC (6778); Fieldwood Holdings LLC (9264); Fieldwood Energy Inc. (4991); Fieldwood Energy Offshore LLC (4494); Fieldwood Onshore LLC (3489); Fieldwood SD Offshore LLC (8786); FW GOM Pipeline, Inc. (8440); GOM Shelf LLC (8107); Bandon Oil and Gas GP, LLC (9172); Bandon Oil and Gas, LP (9266); Fieldwood Energy SP LLC (1971); Galveston Bay Pipeline LLC (5703); and Galveston Bay Processing LLC (0422).

First Lien Term Lenders") will receive their pro rata share of a $1.143 billion first lien last out term loan facility (the "**Exit First Lien Term Loan Facility**") and cash for all accrued and unpaid interest payable through the Effective Date.

- Holders of claims under the first lien last-out term loan agreement, dated May 27, 2016, between Fieldwood Energy and the lenders thereunder (the "**Prepetition FLLO Lenders**") will receive their pro rata share of a $518 million second lien term loan facility (the "**Exit Second Lien Term Loan Facility**") and cash for all accrued and unpaid interest payable through the Effective Date.

- Holders of claims under the (a) second lien term loan agreement, dated September 30, 2013, between Fieldwood Energy and the lenders thereunder (the "**Prepetition Second Lien Term Lenders**") and (b) sponsor second lien term loan agreement, dated May 27, 2016, between Fieldwood Energy and the lenders thereunder (the "**Prepetition Sponsor Second Lien Term Lenders**"), will receive in the aggregate their pro rata share of (x) 20.25% of new common stock issued by Fieldwood Energy Inc. ("**Energy Inc.**" and such new common stock, the "**New Equity Interests**") and (y) the right to purchase an additional 75% of the New Equity Interests offered pursuant to the $525 million Rights Offering (such right, the "**Subscription Right**"), in each case the New Equity Interests subject to dilution by a management incentive plan. The management incentive plan will provide for the issuance of awards of an aggregate of 10% of New Equity Interests in the form of options and restricted stock units, which will dilute all other New Equity Interests issued pursuant to the Plan, pursuant to the Rights Offering, and under the Backstop Commitment Agreement.

  As discussed below, the Rights Offering will be backstopped by certain Prepetition Second Lien Term Lenders and Prepetition Sponsor Second Lien Term Lenders (in such capacity, the "**Backstop Parties**") pursuant to the backstop commitment agreement attached to the Restructuring Support Agreement as **Exhibit E** (as may be amended, restated, or modified, the "**Backstop Commitment Agreement**"). In consideration for backstopping the Rights Offering, the Backstop Parties will receive 4.5% of the New Equity Interests (the "**Backstop Commitment Premium**") to be issued on the Effective Date, subject to dilution by a management incentive plan.

- Holders of allowed general unsecured claims will be paid cash in full in the ordinary course of business.

- Fieldwood Holdings LLC ("**Fieldwood Holdings**"), as the sole holder of equity of Energy Inc., will receive 0.25% of the New Equity Interests to be issued on the Effective Date, subject to dilution by a management incentive Plan.

- Holders of Fieldwood Holdings' equity are unimpaired. After the Effective Date, Fieldwood Holdings will be dissolved and the New Equity Interests owned by Fieldwood Holdings will be distributed to holders of the equity of Fieldwood Holdings, which includes certain affiliates of Riverstone Holdings LLC

(collectively, "**Riverstone**"), in accordance with Fieldwood Holdings' organizational documents and applicable law. All remaining assets of Fieldwood Holdings will vest in Reorganized Energy Inc.

### A. Restructuring Support Agreement

In connection with negotiation of the Plan and before the Petition Date, the Debtors entered into the Restructuring Support Agreement, a copy of which is annexed hereto as **Exhibit B**, with the following parties: (a) Prepetition First Lien Term Lenders holding approximately 74.9% of the FLTL Claims, (b) Prepetition FLLO Lenders holding approximately 71.6% of the FLLO Claims, (c) Prepetition Second Lien Term Lenders and Prepetition Sponsor Second Lien Term Lenders holding approximately 88% of the SLTL Claims ((a) through (c) collectively, the "**Consenting Creditors**"), and (d) Riverstone, as holder of substantially all the equity of Fieldwood Holdings.

The Restructuring Support Agreement provides that the parties thereto will support the Plan and the restructuring transactions contemplated thereby, subject to the terms and provisions of the Restructuring Support Agreement. In addition, in the Restructuring Support Agreement, the Debtors have agreed to move forward expeditiously with confirmation and consummation of the Plan, and to be subject to certain milestones which, if not achieved, enable the Consenting Creditors to terminate the Restructuring Support Agreement. The relevant milestones include, among others: (a) entry of an order by the Bankruptcy Court confirming the Plan no later than 75 days after the Petition Date, and (b) the occurrence of the Effective Date under the Plan the earlier of June 30, 2018 and 20 days after the date on which the Bankruptcy Court enters an order confirming the Plan.

### B. Backstop Commitment Agreement

In connection with negotiation of the Plan, the Debtors have entered into the Backstop Commitment Agreement. The Backstop Commitment Agreement generally provides as follows:

- The Backstop Parties agree to backstop the purchase of 100% of the New Equity Interests to be issued pursuant to the Rights Offering.

- In consideration of the foregoing, the Backstop Parties will receive the Backstop Commitment Premium.

- The Backstop Parties will be entitled to have all of their reasonable and documented fees and expenses paid by the Debtors, including the reasonable fees and expenses of their attorneys and advisors.

- The Backstop Parties will be entitled to a termination fee payment in an amount equal to the Backstop Commitment Premium, payable in cash, under certain circumstances if the Backstop Commitment Agreement is terminated. Payment of such termination fee will only be made after consummation of an alternate transaction.

C.    **Asset Purchase Transaction**

The restructuring under the Plan contemplates that Fieldwood Energy will acquire certain assets from Seller pursuant to the *Purchase and Sale Agreement*, dated February 14, 2018, between Fieldwood Energy and the Seller (including all schedules, exhibits, instruments, and other documents delivered in connection therewith, and as may be amended, restated, or modified, the "**Purchase Agreement**"), attached hereto as **Exhibit G**.  Pursuant to the Purchase Agreement, Seller will sell certain deepwater assets located in the Gulf of Mexico (as such assets are identified in the Purchase Agreement, the "**Purchased Assets**") to Fieldwood Energy for a purchase price of $480 million, subject to customary price adjustments (including contingency payments) in accordance with the Purchase Agreement.  Fieldwood Energy intends to use a portion of the proceeds from the Rights Offering to fund obligations under the Purchase Agreement.

The Debtors believe that the Purchased Assets will provide accretive value to the Debtors through operational efficiencies and synergies with the Debtors' existing assets and through the elimination of redundant costs.  The Purchased Assets have material organic growth opportunities, including a significant near-term development project, which if successfully developed could result in a significant increase in the total amount of proved reserves associated with the Purchased Assets.  The Purchased Assets also include significant physical equipment inventory and prospect inventory on 45 primary term leases.  As set forth in the financial projections below, the Debtors expect that development of the Purchased Assets will provide significant free cash flow for the Reorganized Debtors.

The Purchase Agreement otherwise generally provides as follows:

- Acquisition of the Purchased Assets is subject to various closing conditions, including (a) the performance of various pre-closing covenants and agreements, (b) the accuracy of representations and warranties, (c) absence of major casualty events, and (d) approval of the Plan by the Bankruptcy Court.

- Fieldwood Energy is required to provide a $30 million good faith deposit (the "**Deposit**"), which will be applied towards the purchase price of the Purchased Assets upon consummation of the acquisition thereof.  On February 14, 2018, and in connection with execution of the Purchase Agreement, Fieldwood Energy provided Seller with an initial $5 million good faith deposit and, upon approval by the Bankruptcy Court, will provide an additional $25 million deposit in accordance with the Purchase Agreement.  Seller will be entitled to retain the Deposit under certain circumstances if the Purchase Agreement is terminated, including if Fieldwood Energy fails to meet certain milestones towards confirmation and consummation of the Plan.

- Upon consummation of the Asset Purchase Transaction, Seller will retain and indemnify Reorganized Fieldwood Energy for certain liabilities associated with owning and operating the Purchased Assets before January 1, 2018 (subject, in certain cases, to a *de minimis* standard, a cap on total liability, and also retention of certain liabilities arising before consummation of the Asset Purchase

Transaction). Reorganized Fieldwood Energy will assume and indemnify Seller for liabilities associated with owning and operating the Purchased Assets after January 1, 2018 (and, in certain cases, with respect to periods before January 1, 2018). Additionally, Reorganized Fieldwood Energy will assume liability for future environmental remediation and obligations related to plugging and abandoning wells and decommissioning facilities. In connection with the assumption of this plugging and abandonment and decommissioning liability and to secure its obligations with respect thereto, Reorganized Fieldwood Energy will be required to post an aggregate of approximately $240 million[3] of surety bonds for the benefit of Seller and an additional prior owner of certain of the Purchased Assets.

The Debtors' estimates of their "proven" reserves (known in the industry as "**1P**"), "proven and probable" reserves (known in the industry as "**2P**"), and "proven and probable and possible" reserves (known in the industry as "**3P**"), after consummation of the Asset Purchase Transaction, and which have been reviewed by third party reserve engineers, is outlined as follows:

| Net Reserves[4] | | | | | |
|---|---|---|---|---|---|
| | Oil (MMBbl) | Gas (BCF) | NGL (MMBbl) | Total (MMBoe) | PV-10 ($MM) |
| 1P Reserves | 140 | 631 | 23 | 268 | $2,569 |
| 2P Reserves | 180 | 814 | 31 | 347 | $3,714 |
| 3P Reserves | 220 | 992 | 38 | 423 | $4,661 |

Upon the acquisition of the Purchased Assets, the Reorganized Debtors are projected to have the following pro forma financial metrics[5] for the years 2018 through 2022:

---

[3] If certain assets are excluded from the Purchased Assets as referred to in note 5 below, the Debtors estimate that the surety bond requirements of Reorganized Fieldwood Energy will be reduced by approximately $100 million.

[4] Pro forma reserves are based on (a) the Debtors' unaudited midyear July 1, 2017 reserve report using October 31, 2017 strip pricing and (b) the Seller's January 1, 2018 Netherland Sewell & Associates, Inc. (NSAI) report using November 29, 2017 strip pricing.

[5] The financial metrics reflected herein assume all Purchased Assets are delivered upon consummation of the Asset Purchase Transaction. An asset representing approximately $30 million in estimated 2018 cash flow and greater than $100 million in future decommissioning obligations is subject to certain third-party rights, which if not received by specified dates contained in the Purchase Agreement would result in a $30 million upward adjustment to the purchase price due and payable in the third quarter of 2018.

Case 18-30648 Document 34-1 Filed in TXSB on 02/15/18 Page 19 of 528



**EBITDA**
(in millions)



**Capital Expenditure**
(in millions)

6





## II.
## SUMMARY OF PLAN TREATMENT

The following table summarizes: (1) the treatment of Claims and Interests under the Plan; (2) which Classes are impaired by the Plan; (3) which Classes are entitled to vote on the Plan; and (4) the estimated recoveries for holders of Claims and Interests.[6]  The table is qualified in its entirety by reference to the full text of the Plan.  For a more detailed summary of the terms and provisions of the Plan, see section VI – Summary of the Plan below.  A detailed discussion of the

---

[6] Any Claim or Interest in a Class that is considered vacant under Section 3.5 of the Plan will receive no distribution.

analysis underlying the estimated recoveries, including the assumptions underlying such analysis, is set forth in the Valuation Analysis in section XII(C)(4) – Valuation Analysis below.

| Class and Designation | Treatment | Impairment and Entitlement to Vote | Estimated Allowed Amount and Approx. Percentage Recovery |
|---|---|---|---|
| Administrative Expenses Excluding Fee Claims | Paid in full in cash. | N/A | Estimated Percentage Recovery: 100% |
| Fee Claims | Paid in full in cash. | N/A | Estimated Percentage Recovery: 100% |
| DIP Facility Claims | Paid in full in cash or otherwise satisfied in a manner acceptable to holder of the claim. | N/A | Estimated Percentage Recovery: 100% |
| Priority Tax Claims | Paid in full in cash or otherwise treated consistent with the provisions of section 1129(a)(9) of the Bankruptcy Code. | N/A | Estimated Percentage Recovery: 100% |
| 1 (Priority Non-Tax Claims) | Paid in full in cash or otherwise treated consistent with the provisions of section 1129(a)(9) of the Bankruptcy Code. | Unimpaired<br><br>(**Not entitled** to vote because presumed to accept) | Estimated Allowed Amount: $2,000,000<br><br>Estimated Percentage Recovery: 100% |
| 2 (Other Secured Claims) | Each holder of an Allowed Other Secured Claim will receive, on account of such Allowed Claim, at the option of the Reorganized Debtors: (a) Cash in an amount equal to the Allowed amount of such Claim, (b) reinstatement or such other treatment sufficient to render such holder's Allowed Other Secured Claim Unimpaired pursuant to section 1124 of the Bankruptcy Code, or (c) such other recovery necessary to satisfy section 1129 of the Bankruptcy Code. | Unimpaired<br><br>(**Not entitled** to vote because presumed to accept) | Estimated Allowed Amount: $0<br><br>Estimated Percentage Recovery: 100% |
| 3 (RBL Claims) | Each holder of an Allowed RBL Claim will be paid in full in cash. | Unimpaired<br><br>(**Not entitled** to vote because presumed to accept) | Estimated Allowed Amount: $554,768<br><br>Estimated Percentage Recovery: 100% |
| 4 (FLTL Claims) | On the Effective Date, each holder of an Allowed FLTL Claim shall receive (a) on account of the outstanding principal amount of such Claim, its Pro Rata share of the lending commitments arising under the Exit First Lien Term Loan Facility, secured by a first-priority lien on (i) substantially all of the property of the Reorganized Debtors that secured the FLTL Claims pursuant to the Prepetition First Lien Term Loan Agreement and the other applicable Loan Documents (as defined in the Prepetition First Lien Term Loan Agreement) and (ii) substantially all of the Purchased Assets, in each case, on the terms and subject | Impaired<br><br>(**Entitled** to vote) | Estimated Allowed Amount: $1,151,591,744<br><br>Estimated Percentage Recovery: 100% |

| Class and Designation | Treatment | Impairment and Entitlement to Vote | Estimated Allowed Amount and Approx. Percentage Recovery |
|---|---|---|---|
| | to the limitations set forth in the Exit First Lien Credit Agreement, on a "last-out" basis, and (b) on account of all accrued and unpaid interest payable through the Effective Date and for all reasonable and documented expenses and other amounts payable under the Prepetition First Lien Term Loan Agreement, payment in Cash. | | |
| 5 (FLLO Claims) | On the Effective Date, each holder of an Allowed FLLO Claim shall receive (a) on account of the outstanding principal amount of such Claim, its Pro Rata share of the lending commitments arising under the Exit Second Lien Term Loan Facility, secured by a second-priority (in respect of the Exit LC Facility and the Exit First Lien Term Loan Facility) lien on (i) substantially all of the property of the Reorganized Debtors pursuant to the Prepetition FLLO Claims and the other applicable Loan Documents (as defined in the Prepetition FLLO Term Loan Agreement) and (ii) substantially all of the Purchased Assets, in each case, on the terms and subject to the limitations set forth in the Exit Second Lien Credit Agreement and (b) on account of accrued and unpaid interest payable through the Effective Date and for all reasonable and documented expenses and other amounts payable under the Prepetition FLLO Credit Agreement, payment in Cash. | Impaired<br><br>(**Entitled** to vote) | Estimated Allowed Amount: $534,678,024<br><br>Estimated Percentage Recovery: 100% |
| 6 (SLTL Claims) | On the Effective Date, each holder of an Allowed SLTL Claim shall receive its Pro Rata share of (a) New Equity Interests representing, in the aggregate, 20.25% of the New Equity Interests issued on the Effective Date, and (b) 100% of the Subscription Rights to acquire 75% of the New Equity Interests for $525 million in accordance with the Rights Offering Procedures, in each case the New Equity Interests subject to dilution by a management incentive plan. | Impaired<br><br>(**Entitled** to vote) | Estimated Allowed Amount: $1,696,819,601<br><br>Estimated Percentage Recovery: 8.35% |
| 7 (General Unsecured Claims) | The Debtors shall continue to pay or dispute each General Unsecured Claim in the ordinary course of business as if the Chapter 11 Cases had never been commenced. | Unimpaired<br><br>(**Not entitled** to vote because presumed to accept) | Estimated Allowed Amount: $160,000,000[7]<br><br>Estimated Percentage Recovery: 100% |
| 8 (Intercompany Claims) | On or after the Effective Date, all Intercompany Claims will be paid, adjusted, continued, settled, reinstated, discharged, or eliminated, in each case to the extent determined to be appropriate by the Debtors or Reorganized Debtors, as applicable, in their sole discretion. All Intercompany Claims between any Debtor and a non-Debtor affiliate will be Unimpaired under the Plan. | Unimpaired<br><br>(**Not entitled** to vote because presumed to accept) | Estimated Allowed Amount: $0<br><br>Estimated Percentage Recovery: 100% |

---

[7] This estimate includes management fees accrued and payable to Riverstone pursuant to arms'-length prepetition management services agreements.

| Class and Designation | Treatment | Impairment and Entitlement to Vote | Estimated Allowed Amount and Approx. Percentage Recovery |
|---|---|---|---|
| 9 (Existing Holdings Interests) | As soon as practicable following the distributions of New Equity Interests on the Effective Date, Fieldwood Holdings shall liquidate and dissolve pursuant to applicable law and the Reorganized Debtors shall provide for the distribution of Fieldwood Holdings' New Equity Interests (received pursuant to Section 4.10(a) of the Plan) to the holders of Existing Holdings Interests in the priorities set forth in Fieldwood Holdings' organizational documents and applicable law. Any other assets of Fieldwood Holdings (which there is expected to be none) shall vest in Reorganized Energy Inc. | Unimpaired<br><br>(**Not entitled** to vote because presumed to accept) | Estimated Allowed Amount: N/A<br><br>Estimated Percentage Recovery: N/A |
| 10 (Existing Energy Inc. Interests) | On the Effective Date, the Existing Energy Inc. Interests shall be cancelled without further action by or order of the Bankruptcy Court.<br><br>Each holder of an Allowed Existing Energy Inc. Interest shall receive its Pro Rata share of New Equity Interests representing, in the aggregate, 0.25% of the New Equity Interests issued on the Effective Date (subject to dilution by the Management Incentive Plan). | Impaired<br><br>(**Not entitled** to vote because presumed to accept) | Estimated Allowed Amount: N/A<br><br>Estimated Percentage Recovery: N/A |
| 11 (Intercompany Interests) | On the Effective Date, all Intercompany Interests will be treated as set forth in Section 5.15 of the Plan. | Unimpaired<br><br>(**Not entitled** to vote because presumed to accept) | Estimated Allowed Amount: N/A<br><br>Estimated Percentage Recovery: N/A |

# III.
# OVERVIEW OF DEBTORS' OPERATIONS

## A.    Overview of Debtors' Businesses

Fieldwood Energy was established in December 2012 as a portfolio company of certain energy funds of Riverstone, a private energy and power-focused investment firm. Fieldwood Energy was initially capitalized in September 2013 in connection with the acquisition of Gulf of Mexico shelf assets[8] from Apache. In early 2014, Fieldwood Energy completed an acquisition of certain Gulf of Mexico assets from Sandridge Energy, Inc.[9] Since then, the Debtors have completed additional smaller bolt-on transactions, and have, in the aggregate, completed approximately $5 billion in acquisitions, making Fieldwood Energy the largest oil and gas exploration and production company in the Outer Continental Shelf of the Gulf of Mexico.

---

[8] Debtor GOM Shelf LLC also was acquired in this acquisition. The majority of Fieldwood Energy's employees are former Apache employees who came to Fieldwood Energy in connection with this transaction.

[9] The following Debtors were acquired in this acquisition: Dynamic Offshore Resources NS, LLC, Fieldwood Energy Offshore LLC, Fieldwood Onshore LLC, Fieldwood SD Offshore LLC, FW GOM Pipeline, Inc., Bandon Oil and Gas GP, LLC, Bandon Oil and Gas, LP, Fieldwood Energy SP LLC, Galveston Bay Pipeline LLC, and Galveston Bay Processing LLC.

The Debtors, as an integrated enterprise, maintain a robust acquisition program pursuant to which they attempt to identify underworked assets, motivated sellers, and circumstances in which they can mitigate pricing risk. Once they acquire assets, the Debtors' operating strategy is to pursue a balanced mix of lower risk development opportunities alongside their exploration program and to optimize their production efforts without lowering safety and compliance standards. By focusing on controlling fixed operating costs and eliminating redundant operations, the Debtors can maximize profits from any incremental production results. The following map illustrates the locations of the Debtors' oil and natural gas properties:



As of the date hereof, the Debtors have over 500 operated platforms spread across over two million gross acres. The Debtors have approximately 700 employees and, on a daily basis, over 2,500 additional contractor personnel on their facilities. In 2017, the Debtors produced on average approximately 75,000 barrels of oil equivalent per day. This average production was lower in 2017 compared to 2016 as a result of unique downtime issues related to multiple named windstorms in the Gulf of Mexico, various pipeline shut-ins that were outside the Debtors' control, and lack of available capital to enhance production. In a typical year, the Debtors employ multiple lift boats, helicopters, drilling rigs, and various marine vessels to support operations, which support for producing fields, workovers, recompletions, ongoing maintenance, drilling, and decommissioning activities. The Debtors believe that they have a deep inventory of higher risk-higher return exploration opportunities as well as many lower risk development opportunities. The Debtors develop their inventory in an opportunistic manner based on, among other things, access to infrastructure, current commodity prices, lease expirations, and availability and cost of equipment.

Additionally, as the largest facility, pipeline, and well owner in the Gulf of Mexico shelf, the Debtors have one of the most extensive well plugging and abandonment ("**P&A**") and decommissioning programs. The Debtors maintain a robust staff specifically dedicated to managing P&A and decommissioning operations including estimating future liabilities on current and acquired properties. Additionally, the Debtors perform all well P&A work in-house using Debtors-owned spreads and specialized employees at rates favorable to current market

rates. In a typical year, the Debtors will plug and abandon hundreds of wells and will decommission approximately half of all facilities decommissioned in the Gulf of Mexico shelf. The Debtors view their approach to P&A and decommissioning operations as a strength and a differentiating factor from their peers and a successful strategy to mitigate liabilities when acquiring other assets.

The Debtors pride themselves on being an industry leader in establishing vigorous systems to manage their risk associated with offshore Gulf of Mexico operations effectively, and are committed to maintaining safe and efficient operations, with the paramount goal of protecting the environment, personnel, and their facilities. To mitigate risk and support the Debtors' daily operations, the Debtors maintain a robust multi-tier insurance program. The Debtors' current energy package policy includes insurance coverage for pollution as well as third party pollution liabilities, control of well, and property damage from operational and windstorm risk. In addition, the Debtors require each of their contractors working on their facilities to maintain insurance coverage appropriate for the services provided and to name the Debtors as additional insured parties for the risks associated with the operations as well as to provide contractual indemnification to the Debtors for injuries or death to their personnel or for damage to their equipment.

### B. Directors and Officers

The Debtors are controlled by a board of directors at Fieldwood Holdings, although each separate Debtor may be either a member-managed or manager-managed limited liability company or a corporation with a one-person or two-person board of directors. Fieldwood Holdings' current board of directors is composed of the following directors: (1) G.M. McCarroll, (2) Pierre F. Lapeyre, Jr., (3) David M. Leuschen, (4) N. John Lancaster, (5) Brett Staffieri, (6) Alan J. Carr, and (7) John T. Rynd. Messrs. Alan J. Carr and John T. Rynd are independent directors. The Debtors' senior management is composed of the following individuals:

| Name | Position |
| --- | --- |
| G.M. McCarroll | President and Chief Executive Officer |
| Michael Dane | Senior Vice President and Chief Financial Officer |
| Richard Black | Senior Vice President and General Counsel |
| John Smith | Senior Vice President, Land and Business Development |
| Gary Janik | Senior Vice President, Asset Management |
| John Seeger | Senior Vice President, Decommissioning and Deepwater Operations |
| Paul Gluth | Senior Vice President, Production and Construction |

The composition of each board of directors of a Reorganized Debtor will be disclosed in accordance with 11 U.S.C. § 1129(a)(5) before the Confirmation Hearing.

## C.    Regulation of Debtors' Business and Decommissioning Obligations

The Debtors are subject to the local, state, and federal laws and regulations in the jurisdictions where they operate. The laws and regulations that impact the Debtors' operations include those relating to the operation of wells and facilities (including platforms, pipelines, and gathering or processing units), environmental protection, health and safety, and oil and natural gas exploration and development.

The Debtors' operations in the Gulf of Mexico include a substantial number of oil and gas leases situated in federal waters and issued by the U.S. Department of the Interior. Operation of these leases is subject to regulation by Bureau of Ocean Energy Management ("**BOEM**") and the Bureau of Safety and Environmental Enforcement ("**BSEE**") and requires compliance with BOEM and BSEE regulations and orders issued pursuant to various federal laws, including the Outer Continental Shelf Lands Act. For offshore operations, lessees must obtain BOEM approval for exploration, development and production plans before the commencement of such operations. In addition to permits required from other agencies such as the U.S. Environmental Protection Agency, lessees must obtain a permit from BSEE before commencing drilling and must comply with regulations governing, among other things, engineering and construction specifications for production facilities, safety procedures, P&A of wells, and removal of infrastructure facilities.

### 1.    Obligations to United States Government

To cover the various obligations of lessees, such as the cost to plug and abandon wells and decommission and remove platforms and pipelines at the end of production on a lease, BOEM generally requires that lessees post surety bonds or other acceptable financial assurances that such obligations will be met unless BOEM exempts the lessee from such requirements. As of the Petition Date, the Debtors have obtained approximately $184 million in surety bonds for the benefit of BOEM to secure the Debtors' P&A obligations. For properties acquired from third parties, BOEM may require surety bonds but also may rely on adequate assurances that the obligations are covered based on the contractual arrangement between the parties.

### 2.    Obligations to Third Parties, including Apache

Pursuant to BOEM regulations, the Debtors are jointly and severally liable for their P&A obligations with all current and prior operators in the chain of title who were owners at the time and after any facilities and wells were put in place. Therefore, in connection with many of their acquisitions of oil and gas properties, the Debtors have entered into various arrangements with the sellers that establish how the decommissioning of the subject oil and gas properties will be addressed in compliance with BOEM regulations, including (as discussed below) with Apache.

#### (a)    Obligations to Third Parties Excluding Apache

As stated, the Debtors have entered into various arrangements with third parties to cover P&A obligations assumed or that may arise during the Debtors' ownership of any acquired assets. In connection with the P&A obligations to third parties (other than Apache), the Debtors have obtained approximately $162 million in surety bonds and have deposited less than $20 million into escrow, in each case for the benefit of such third parties.

13

(b)  Obligations to Apache

In 2013, the Debtors purchased a significant portfolio of oil and gas properties from Apache and agreed to assume decommissioning liabilities for certain properties that Apache previously owned and operated (the purchased portfolio together with the owned and operated properties, the "**Apache Properties**").  The Debtors' decommissioning obligations with respect to the Apache Properties are governed by the provisions of the *Decommissioning Agreement* dated September 30, 2013 (as amended, the "**Decommissioning Agreement**").

Under the Decommissioning Agreement, the Debtors and Apache must agree to a three-year rolling decommissioning plan in connection with the Apache Properties.  If the Debtors fail to perform the decommissioning as prescribed, Apache may perform the decommissioning itself and seek reimbursement from the Debtors.  If the Debtors fail to reimburse Apache, then Apache may then seek reimbursement first from proceeds held in two trusts in which Apache holds beneficial interests (each an "**Apache Trust**" and together, the "**Apache Trusts**"), and then from certain letters of credit issued for its benefit and described below.  Any amounts collected by Apache under the letters of credit exceeding its reimbursement expenses are required to be deposited into the Apache Trusts.

Under the Decommissioning Agreement and related documents, the Debtors provided Apache with the following security and credit support relating to decommissioning of the Apache Properties:

- Approximately $498 million in letters of credit;

- The conveyance of net profits interests into the Apache Trusts;

- A first-priority springing lien on the assets of the Apache Trusts upon certain conditions; and

- A third-priority lien over the Apache Properties triggered upon a default under the Decommissioning Agreement.

Each month, the Debtors are obligated to deposit a portion of the net profits generated by certain of the Apache Properties into the Apache Trusts.  Certain funds in the Apache Trusts are used to reimburse the Debtors each month for decommissioning work performed on the Apache Properties, and other funds in the Apache Trusts continue to accrue until the amounts therein equal approximately $300 million.  As the Debtors decommission the Apache Properties, funds in the Apache Trust and the amount of the letters of credit may be reduced if they together exceed 125% of the Debtors' remaining decommissioning obligations under the Decommissioning Agreement.  Under this decommissioning program, the Debtors have performed almost $1 billion of decommissioning work with respect to the Apache Properties, and have plugged and abandoned over 775 wells, 200 pipelines, and 250 platforms and other facilities.

In connection with the restructuring contemplated under the Plan, the Debtors and Apache have reached an agreement (the "**Apache Agreement**") regarding an amendment to the

Decommissioning Agreement (such amendment, the "**Apache Decommissioning Agreement Amendment**"), the terms and provisions of which are reflected in the term sheet attached hereto as **Exhibit H**. The material terms of the Apache Agreement are as follows:

- The Debtors will have the right to replace up to $150 million of letters of credit with an equivalent amount of surety bonds in form and substance acceptable to Apache;

- Apache will release its third-priority lien over the Apache Properties;

- The Debtors will be relieved of certain financial covenants under the Decommissioning Agreement;

- The Debtors will take assignment of record title to the Apache Properties not previously assigned to the Debtors; and

- The Debtors will spend $100 million on decommissioning in 2018, and will spend $80 million per year for each of years 2019 through 2022. Any unspent amounts will be deposited into an Apache Trust in accordance with the Apache Decommissioning Agreement Amendment.

The Apache Agreement was negotiated in good faith and at arm's length, after extensive negotiations. The Debtors believe that the terms of the Apache Agreement are fair and reasonable under the circumstances, especially in view of the Debtors' prepetition obligations under the Decommissioning Agreement. Specifically, the Debtors believe that the compromises under the Apache Agreement will increase the Debtors' financial flexibility and ability to raise future capital, in exchange for agreeing to perform P&A and decommissioning of the Apache Properties at levels that are substantially similar to prepetition levels. Based on the financial projections attached hereto as **Exhibit E**, the Debtors anticipate that the Reorganized Debtors will be able to perform all obligations in connection with the Apache Agreement.

### D. Debtors' Capital Structure

#### 1. Prepetition Indebtedness

As of the date of the Disclosure Statement, the Debtors' significant funded prepetition indebtedness is approximately $3.286 billion (plus accrued and unpaid interest and other expenses), which consists of the following:

| Name | Principal Amount (approximate) | Lien Priority and Collateral |
|---|---|---|
| RBL Claims | $148 million letter of credit facility | First lien on substantially all of the Debtors' assets |
| FLTL Claims | $1,143 million | First lien on substantially all of the Debtors' assets |
| FLLO Claims | $518 million | First lien on substantially all of the Debtors' assets, subject to prior payment of other first lien indebtedness |

| Name | Principal Amount (approximate) | Lien Priority and Collateral |
|------|-------------------------------|------------------------------|
| SLTL Claims | $1,626 million | Second lien on substantially all of the Debtors' assets |
| **Total** | $3,286 million plus $148 million of undrawn letters of credit issued under the Prepetition RBL Facility | |

    (a)    <u>RBL Claims</u>

The Debtors are parties to the *Credit Agreement*, dated September 30, 2013 Lenders (as amended, the "**Prepetition RBL Credit Agreement**"), between Fieldwood Energy as borrower, Citibank N.A. ("**Citibank**") as administrative agent and collateral agent (in such capacity, the "**Prepetition RBL Agent**"), and the Prepetition RBL Lenders. All of the remaining Debtors are guarantors under the Prepetition RBL Facility. The Prepetition RBL Credit Agreement establishes a letter of credit facility that matures in September 2018 (the "**Prepetition RBL Facility**"), pursuant to which approximately $148 million in letters of credit remain outstanding but are undrawn as of the date hereof, plus any applicable interest, fees, and other amounts (the "**RBL Claims**"). Substantially all of the letters of credit under the Prepetition RBL Facility are issued in favor of Apache. The RBL Claims are secured by a first-priority lien on substantially all of the Debtors' property and proceeds thereof (the "**Collateral**") in favor of the Prepetition RBL Agent and the Prepetition RBL Lenders.

The borrowing base under the Prepetition RBL Credit Agreement is redetermined by the Prepetition RBL Agent on a semi-annual basis and such redeterminations become effective in April and October of each year; however, the borrowing base was fixed at $1.3 billion until May 2018 pursuant to an amendment to the Prepetition RBL Credit Agreement in 2016.

    (b)    <u>FLTL Claims</u>

Certain of the Debtors are parties to the *First Lien Term Loan Agreement*, dated September 30, 2013 (as amended, the "**Prepetition First Lien Term Loan Agreement**"), between Fieldwood Energy as borrower, Citibank as administrative agent and collateral agent (in such capacity, the "**Prepetition First Lien Term Loan Agent**"), the other banks and financial institutions party thereto, and the Prepetition First Lien Term Lenders. Pursuant to the Prepetition First Lien Term Loan Agreement, the Debtors are obligated on approximately $1.14 billion, composed of (a) approximately $755 million of principal amount of senior first-lien secured term loans outstanding as of the Petition Date, and (b) approximately $388 million of "Reserve Based Term Loans" (as defined in the Prepetition First Lien Term Loan Agreement) outstanding as of the Petition Date, plus any applicable interest, fees, and other amounts (collectively, the "**FLTL Claims**").

The FLTL Claims are secured by a first-priority lien on the Collateral and are *pari passu* with the Prepetition RBL Facility.

(c)     FLLO Claims

Certain of the Debtors are parties to the *First Lien Last Out Term Loan Agreement*, dated May 27, 2016 (as amended, the "**Prepetition FLLO Credit Agreement**"), between Fieldwood Energy as borrower, Cortland Capital Market Services LLC ("**Cortland**") as administrative agent and collateral agent (in such capacity, the "**Prepetition FLLO Agent**"), the other banks and financial institutions party thereto, and the Prepetition FLLO Lenders, pursuant to which the Debtors issued term loans in the principal amount of approximately $518 million, all of which remain outstanding as of the Petition Date, plus any applicable interest, fees, and other amounts (the "**FLLO Claims**").  The FLLO Claims are secured by a first-priority lien on the Collateral, but are subordinate in right of payment to the RBL Claims and FLTL Claims.

(d)     SLTL Claims

Certain of the Debtors are parties to the *Second Lien Term Loan Agreement*, dated September 30, 2013 (as amended, the "**Prepetition Second Lien Credit Agreement**"), between Fieldwood Energy as borrower, Cortland as successor administrative agent and collateral agent (in such capacity, the "**Prepetition Second Lien Term Loan Agent**"), the other banks and financial institutions party thereto, and the Prepetition Second Lien Term Lenders, pursuant to which approximately $846 million in principal amount of second lien term loans are outstanding as of the Petition Date, plus any applicable interest, fees, and other amounts (the "**Prepetition Second Lien Term Loans**").  The Prepetition Second Lien Term Loans are secured by a second-priority lien on the Collateral.

Certain of the Debtors are also parties to the *Sponsor Second Lien Term Loan Agreement*, dated May 27, 2016 (as amended, the "**Prepetition Sponsor Second Lien Credit Agreement**"), between Fieldwood Energy as borrower, Cortland as administrative agent and collateral agent (in its capacity as such, the "**Prepetition Sponsor Second Lien Term Loan Agent**"), the other banks and financial institutions party thereto, and the Prepetition Sponsor Second Lien Term Lenders, pursuant to which approximately $781 million in principal amount of second lien term loans are outstanding as of the Petition Date, plus any applicable interest, fees, and other amounts (the "**Prepetition Sponsor Second Lien Term Loans**" and together with the Prepetition Second Lien Term Loans, the "**SLTL Claims**").  The Prepetition Sponsor Second Lien Term Loans are secured by a second-priority lien on the Collateral, which lien is *pari passu* with the liens securing the Prepetition Second Lien Term Loans.

(e)     Intercreditor Agreements

The rights of the Debtors' prepetition secured parties with respect to the Collateral are governed by three intercreditor agreements (collectively, the "**Intercreditor Agreements**"):

(i)      the rights of the pari passu first lien secured parties as to each other are governed by the *Pari Passu Intercreditor Agreement*, dated September 30, 2013, between Fieldwood Holdings, Energy Inc., Fieldwood Energy, and Citibank as the agent on behalf of the first lien secured parties;

(ii)     the rights of the first lien secured parties as to the remaining secured parties are governed by the *Intercreditor Agreement*, dated September 30, 2013, between

(w) Citibank as the Prepetition RBL Agent and Prepetition First Lien Term Loan Agent, (x) Cortland as successor Prepetition FLLO Agent, Prepetition Second Lien Term Loan Agent, and Prepetition Sponsor Second Lien Term Loan Agent, (y) Apache as a party in interest, and (z) Fieldwood Holdings, Energy Inc., and Fieldwood Energy; and

(iii)    the rights of the second lien secured parties as to each other are governed by the *Pari Passu Intercreditor Agreement*, dated May 27, 2016, between Cortland as Prepetition Second Lien Term Loan Agent and Prepetition Sponsor Second Lien Term Loan Agent, and Fieldwood Energy.

The Intercreditor Agreements govern, among other things, the priority of distribution of the Collateral and proceeds thereof between the prepetition secured parties.

### 2.    Interests in Fieldwood Holdings

Fieldwood Holdings was formed in late 2012 as the holding company for Fieldwood Energy, and is owned by Riverstone and its affiliates and members of management of Fieldwood Energy. Pursuant to its governing documents, equity ownership of Fieldwood Holdings is represented by Series A unit, of which 97.963% is held by Riverstone V FW Holdings Sub, LLC and 2.037% is held by non-Debtor Fieldwood Management LLC. The Debtors, from time to time, have granted profit participation rights as part of certain employees' prepetition compensation arrangements. The profit participation rights are out of the money and will not receive any distribution under the Plan.

Each of the Debtors other than Fieldwood Holdings is directly or indirectly wholly-owned by Fieldwood Holdings. The Debtors also own two wholly-owned immaterial non-Debtor affiliates incorporated in Delaware. A chart illustrating the Debtors' organizational structure as of the Petition Date is attached hereto as **Exhibit C**.

### IV.
### KEY EVENTS LEADING TO
### COMMENCEMENT OF CHAPTER 11 CASES

As is well-documented, the distressed market conditions in the oil and gas industry have negatively impacted all levels of the industry, including on upstream companies that produce oil and gas. As evidenced by the regular chapter 11 filings or other announcements of debt restructurings in the industry, the impact of the volatility of the commodity markets on the Debtors' businesses is clear. Notably, natural gas prices have been depressed for a significant period of time and the precipitous decline in crude oil prices since 2014 has been virtually unprecedented, with prices well below what anyone in the business could have reasonably anticipated, resulting in a substantial decline in revenue, reserves and asset values across the spectrum. For example, in 2014, the West Texas Intermediate ("**WTI**") spot price averaged approximately $93 per barrel ("**Bbl**"). In contrast, in 2015, the WTI spot price averaged approximately $48 per Bbl, and in 2016, the WTI spot price dropped at one point to below $27 per Bbl. In 2017, the WTI spot price stabilized at around $50 Bbl, and crossed $60 Bbl at the end of 2017, but has not returned to its 2014 values.

The Debtors, of course, have not been immune to these adverse market conditions and the impact on their reserves, cash flow, borrowing capacity and ability to service their outstanding indebtedness. As with many of their peers, this drastic and prolonged drop in prices and the severe dislocations it caused to the Debtors' operations have put the Debtors in a stressed liquidity situation for an extended period of time.

The Debtors took several steps to try to address their capital structure and liquidity needs without a comprehensive in-court restructuring before commencing these chapter 11 cases. Through vendor cost reduction initiatives, business optimization, and general efficiencies, the Debtors have significantly reduced their cash operating cost structure. For example, the Debtors reduced their 2017 operating expenses by approximately 33% relative to 2014, including a reduction in lease operating expenses from approximately $692 million in 2014 to approximately $472 million in 2017. Also, the Debtors refinanced certain of their secured debt facilities in 2016, which set the Debtors' borrowing base at $1.3 billion through May 2018 and relieved some of the covenant pressure under the applicable credit agreements. Before that, the Debtors refinanced a portion of their letters of credit obligations to Apache by using letters of credit backed by surety bonds or contracts similar to surety bonds. Also, the Debtors acquired P&A spreads so that they could perform all well P&A work in-house at favorable costs.

Despite these efforts, however, and the stabilization of oil prices in 2017, it became apparent that the Debtors' revenue and cash flow generating capacity would not be sufficient to service their outstanding debt on a long-term basis and to maintain the liquidity necessary to operate their businesses and preserve their long-term viability and enterprise value. Thus, the Debtors determined that a de-leveraging transaction was necessary to right-size their balance sheet and position them for long term success. In August and September 2017, respectively, the Debtors retained Weil, Gotshal and Manges LLP as counsel and Evercore Group LLC as investment banker to explore strategic alternatives and assist them in developing and implementing a comprehensive plan to restructure their balance sheet, whether in court or out-of-court. In October 2017, the Debtors retained Opportune LLP as financial advisor to assist them in preparing their operations for a potential chapter 11 restructuring as part of their contingency plan.

After retaining advisors, the Debtors began to reach out to their major creditor constituencies to negotiate a deleveraging transaction. The Debtors executed non-disclosure agreements with (a) the advisors to Riverstone, (b) the advisors to an ad hoc group of lenders holding FLTL Claims, FLLO Claims, and SLTL Claims (the "**Cross-Holder Group**"), (c) the advisors to an ad hoc group of lenders holding FLTL Claims (the "**First Lien Group**"), and (d) certain members of each of the foregoing principal economic constituencies. The Debtors also established a data room to facilitate providing diligence to the lenders and advisors that executed non-disclosure agreements, held a number of diligence calls with management, and participated in a number of in-person meetings to discuss a potential prepackaged restructuring. The Debtors and their advisors solicited offers for postpetition financing from parties both inside and outside their capital structure. The Debtors and their advisors also solicited proposals for refinancing transactions from multiple parties and considered them appropriately.

In September 2017, because of the support received from key constituencies, it became clear that the appropriate course of action was for the Debtors to agree with their stakeholders on a

restructuring plan that would be implemented as a prepackaged chapter 11 restructuring and that more time was needed to negotiate a fully consensual plan. To extend the Debtors' liquidity runway and facilitate further out-of-court negotiations with the Debtors' key constituencies, Riverstone determined that it would be in the best interest of the Debtors for Riverstone to elect to defer the payment date for Riverstone's portion of the interest payment due September 29, 2017. Accordingly, Riverstone agreed to exchange all of its Prepetition Second Lien Term Loans, approximately $781 million in principal amount, for a corresponding amount of Prepetition Sponsor Second Lien Term Loans, and thereafter elected to defer receiving its portion of the September 29 interest payment approximating $17 million.

After the Debtors paid the remaining interest due September 29, 2017, they continued negotiating with the Cross-Holder Group and First Lien Group. The Debtors also began engaging other key constituents, such as the Prepetition RBL Lenders, Apache, and Seller.

Before the terms of a restructuring could be agreed upon, the Debtors were facing yet another possible interest payment on December 29, 2017 in the amount of approximately $62 million. Without the liquidity to make the full interest payment and with the specter of a potential chapter 11 filing, the Debtors and certain of their secured lenders agreed on terms for a forbearance and waivers in connection with the interest payment in furtherance of facilitating out-of-court discussions. On December 29, 2017, the Debtors entered into certain forbearance and waiver agreements with their secured lenders, pursuant to which the Prepetition FLLO Lenders, the Prepetition Second Lien Term Lenders, and the Prepetition Sponsor Second Lien Term Lenders agreed to forbear until January 31, 2018, from the exercise of remedies in connection with the Debtors' failure to make a portion of the December 29, 2017 interest payments, and the Prepetition First Lien Term Lenders and Prepetition RBL Lenders agreed to temporarily waive any payment cross-defaults under their respective facilities.

On January 31, 2018, the Prepetition FLLO Lenders, the Prepetition Second Lien Term Lenders, and the Prepetition Sponsor Second Lien Term Lenders agreed to further extend their forbearances and waivers to February 15, 2018. The extensions provided sufficient time for the parties to reach a comprehensive deal. On February 14, 2018, the Debtors, the Consenting Creditors and Consenting Sponsor signed the Restructuring Support Agreement, and on same day, the Debtors commenced the solicitation of votes on the Plan.

During the course of negotiations with their creditors, the Debtors determined that they could benefit from acquiring the Purchased Assets, including through operational efficiencies and synergies with the Debtors' existing assets and through the elimination of redundant costs. The Purchased Assets consist of highly productive, cash flowing assets in deepwater Gulf of Mexico. The Purchased Assets also have material organic opportunities, including a significant near-term development project, which, if successful and after substantial capital investment, could result in a significant increase in the total amount of proved reserves associated with the Purchased Assets. The Debtors concluded that the acquisition and development of the Purchased Assets would provide them significant free cash flow that could help facilitate and support the already ongoing discussions to restructure the Debtors' balance sheet.

The Debtors determined that they would fund the Asset Purchase Transaction through the Rights Offering, which would also be used to pay off the DIP Facility, fund Plan distributions, and serve

the Debtors' working capital needs on a post-emergence basis. Both Riverstone and the members of the Cross-Holder Group expressed interest in participating in the Rights Offering and negotiated its terms extensively with the Debtors.

The Debtors believe that the de-leveraging transaction contemplated by the Restructuring Support Agreement and the Plan is the best approach for relieving the Debtors from the constraints that currently restrict their continued growth and success. Not only will the contemplated transaction lower the Debtors' debt obligations, it will also significantly improve their asset base. The restructuring will allow the Debtors to emerge as a stronger company with a healthy balance sheet that can focus on expansion rather than on managing burdensome debt payments. Most importantly, the Debtors will have the capital needed to invest in their business to continue competing effectively in the Gulf of Mexico, support thousands of jobs in the communities in which they operate, and maintain high-quality, safe and reliable operations.

# V.
# ANTICIPATED EVENTS
# DURING CHAPTER 11 CASES

In accordance with the Restructuring Support Agreement, the Debtors anticipate filing voluntary petitions for relief under chapter 11 of the Bankruptcy Code on or about February 15, 2018. The filing of the petitions will commence the Chapter 11 Cases, at which time the Debtors will be afforded the benefits and become subject to the limitations of the Bankruptcy Code.

The Debtors intend to continue operating their businesses in the ordinary course during the pendency of the Chapter 11 Cases as they have been doing before the Petition Date. To facilitate the efficient and expeditious implementation of the Plan through the Chapter 11 Cases, and to minimize disruptions to the Debtors' operations on the Petition Date, the Debtors intend to seek to have the Chapter 11 Cases assigned to the same bankruptcy judge and administered jointly and to file various motions seeking important and urgent relief from the Bankruptcy Court. Such relief, if granted, will assist in the administration of the Chapter 11 Cases; however, there can be no assurance that the requested relief will be granted by the Bankruptcy Court.

### A. Commencement of Chapter 11 Cases and First Day Motions

On the Petition Date, the Debtors intend to file multiple motions seeking various relief from the Bankruptcy Court and authorizing the Debtors to maintain their operations in the ordinary course. Such relief is designed to ensure a seamless transition between the Debtors' prepetition and postpetition business operations, facilitate a smooth reorganization through the Chapter 11 Cases, and minimize any disruptions to the Debtors' operations. The following is a brief overview of the relief the Debtors intend to seek on the Petition Date to maintain their operations in the ordinary course.

### 1. Debtor in Possession Financing

To address their working capital needs and fund their reorganization efforts, on or immediately after the Petition Date, the Debtors intend to seek Bankruptcy Court approval of an agreement with certain Prepetition Second Lien Term Lenders (in their capacities as providers of postpetition financing, collectively, the "**DIP Lenders**") to receive a $60 million debtor-in-

possession multi-draw term loan (the "**DIP Term Loan**"). The proposed order seeking approval of the DIP Term Loans also reflects an agreement between and among the Debtors and their prepetition secured parties regarding the consensual use of Cash Collateral (as defined in the Bankruptcy Code), and the terms of adequate protection to be provided to such parties.

### 2.    Cash Management System

The Debtors maintain a centralized cash management system designed to receive, monitor, aggregate, and distribute cash among the various Debtors (and non-Debtors). On the Petition Date, the Debtors intend to seek authority from the Bankruptcy Court to continue using their existing cash management system, bank accounts, and related business forms, as well as to continue their intercompany arrangements to avoid disruption in the Debtors' operations and facilitate the efficient administration of the Chapter 11 Cases.

### 3.    Trade Creditors

In the ordinary course of business, the Debtors rely upon a variety of vendors and service providers. Pursuant to the Plan, the Debtors intend to pay all of their obligations to such vendors and service providers in full. However, certain vendors or service providers may seek to terminate or alter the terms of their agreements with the Debtors if the Debtors fail to honor their obligations as they become due. To avoid the detrimental effects of potential actions taken by the Debtors' vendors and service providers, and to minimize any disruption to the Debtors' operations, on the Petition Date, the Debtors intend to seek authority from the Bankruptcy Court to satisfy their obligations to vendors and service providers in the ordinary course.

### 4.    Taxes

Pursuant to the Plan, the Debtors intend to pay all taxes and fees in full. To minimize any disruption to the Debtors' operations and ensure the efficient administration of the Chapter 11 Cases, on the Petition Date, the Debtors intend to seek authority from the Bankruptcy Court to pay all taxes, fees, and similar charges and assessments, whether arising pre- or postpetition, to the appropriate taxing, regulatory, or other governmental authority in the ordinary course of the Debtors' businesses.

### 5.    Utilities

In the ordinary course of business, the Debtors incur certain expenses related to the essential utility services such as electricity, gas, water, and telecommunications. On the Petition Date, the Debtors intend to seek approval of procedures to provide such utility providers with adequate assurance that the Debtors will continue to honor their obligations in the ordinary course.

### 6.    Insurance and Surety

In connection with the operation of the Debtors' businesses, the Debtors maintain various insurance policies designed to protect their property, assets, key personnel, and business operations. The types of insurance policies maintained by the Debtors include general liability, excess liability, directors' and officers' liability, fiduciary liability, workers' compensation, and property, crime, automobile, pollution, and cyber liability coverage. Similarly, in the ordinary

course of business, the Debtors are required to provide surety bonds to certain third parties to secure the Debtors' payment or the enforcement of certain obligations to governmental units or contract counterparties, in each case related to plugging, abandonment, and decommissioning obligations in connection with offshore properties.

The maintenance of certain insurance coverage and surety bonds is essential to the Debtors' operations and is required by laws, various regulations, financing agreements and contracts. The Debtors believe that the satisfaction of their insurance and surety obligations, whether arising pre- or postpetition, is necessary to maintain the Debtors' relationships with third parties and the uninterrupted operation of the Debtors' business. Accordingly, on the Petition Date, the Debtors intend to file a motion seeking authority from the Bankruptcy Court to continue to honor their insurance and surety obligations in the ordinary course.

### 7. Employee Wages and Benefits

The Debtors' businesses are labor intensive and rely upon various employees and independent contractors in various jurisdictions. Generally, members of the Debtors' workforce rely upon their compensation to meet their daily living expenses. To minimize the uncertainty and potential distractions associated with the Chapter 11 Cases and the potential disruption of the Debtors' operations resulting therefrom, on the Petition Date, the Debtors intend to seek authority from the Bankruptcy Court to continue to honor their obligations to their workforce in the ordinary course of business, including (a) the payment of pre- and postpetition wages, salaries, and reimbursable employee expenses, (b) the payment of pre- and postpetition wages of their supplemental workforce, including independent contractors, (c) the payment of pre- and postpetition accrued and unpaid employee benefits, and (d) the continuation of certain of the Debtors' benefit and incentive programs and policies.

### B. Other Procedural Motions and Retention of Professionals

The Debtors intend to file various motions that are common to chapter 11 cases of similar size and complexity as the Chapter 11 Cases, including applications to retain various professionals to assist the Debtors in the Chapter 11 Cases.

### C. Motion to Authorize Hedging Program

In the ordinary course of business, the Debtors have historically entered into financial derivative contracts primarily to hedge the Debtors' exposure to commodity price risks to their cash flows. To that end, shortly after commencement of the Chapter 11 Cases, the Debtors intend to file a motion requesting that the Bankruptcy Court permit the Debtors to, among other things, enter into and perform under new postpetition financial derivative contracts, and grant hedge counterparties superpriority administrative expense claims *pari passu* with the superpriority administrative expense claims provided under the DIP Facility Order and first priority liens on substantially all of the Debtors' assets *pari passu* with the Debtors' first lien indebtedness.

### D. Confirmation Hearing and Rights Offering Procedures

The Debtors intend to file a motion requesting that the Bankruptcy Court schedule a hearing to consider (a) the adequacy of the Disclosure Statement and the Solicitation in connection

herewith, (b) confirmation of the Plan, and (c) approval of the Rights Offering Procedures. The Debtors anticipate that notice of this hearing will be published and mailed to all known holders of Claims and Interests at least 28 days before the date by which objections must be filed with the Bankruptcy Court.

### E. Timetable for Chapter 11 Cases

In accordance with the Restructuring Support Agreement, the Debtors have agreed to proceed with the implementation of the Plan through the Chapter 11 Cases. Among the milestones contained in the Restructuring Support Agreement is the requirement that the Bankruptcy Court enter the order confirming the Plan by within 75 days of the Petition Date. The Restructuring Support Agreement also requires that the Effective Date occur by the earlier of June 30, 2018 and 20 days after the Bankruptcy Court enters an order confirming the Plan. Although the Debtors will request that the Bankruptcy Court approve a timetable consistent with the Restructuring Support Agreement, there can be no assurance that the Effective Date will occur on such timetable. Achieving the various milestones under the Restructuring Support Agreement is crucial to successfully reorganizing the Debtors.

## VI.
## OTHER MATTERS

Fieldwood Energy is the indirect owner of economic interests in approximately 10% of Fieldwood Energy E&P Mexico, S. de R.L. de C.V. ("**Fieldwood Mexico**"), with the remaining 90% owned primarily by Riverstone V FW Holdings, LLC and its affiliates. Fieldwood Mexico will not be a debtor in the Chapter 11 Cases. Fieldwood Mexico is the designated operator of the undeveloped Ichalkil and Pokoch fields in Mexico and splits all costs and profits equally with its Mexican partner, PetroBal, S.A.P.I. de C.V. Fieldwood Energy manages Fieldwood Mexico pursuant to various service agreements on arms' length terms. The Plan provides that Fieldwood Energy will continue managing Fieldwood Mexico consistent with any prepetition agreements.

## VII.
## SUMMARY OF PLAN

This section of the Disclosure Statement summarizes the Plan, a copy of which is annexed hereto as **Exhibit A**. This summary is qualified in its entirety by reference to the Plan.

### A. Administrative Expenses and Priority Claims

#### 1. Treatment of Administrative Expense Claims

Except to the extent that a holder of an Allowed Administrative Expense Claim other than a Fee Claim agrees to a different treatment, on the Effective Date or as soon thereafter as is reasonably practicable (but in no event later than 30 days after the Effective Date), the holder of such Allowed Administrative Expense Claim shall receive, on account of such Allowed Claim, Cash in an amount equal to the Allowed amount of such Claim; *provided*, that Allowed Administrative Expense Claims representing liabilities incurred in the ordinary course of business by the Debtors, as debtors in possession, shall be paid by the Debtors or the Reorganized Debtors, as applicable, in the ordinary course of business, consistent with past practice and in accordance

with the terms and subject to the conditions of any orders or agreements governing, instruments evidencing, or other documents establishing, such liabilities.

2.      **Treatment of Fee Claims**

All Professional Persons seeking awards by the Bankruptcy Court of compensation for services rendered or reimbursement of expenses incurred through and including the Effective Date under sections 327, 328, 330, 331, 503(b)(2), 503(b)(3), 503(b)(4), 503(b)(5), or 1103 of the Bankruptcy Code shall (a) file, on or before the date that is forty five (45) days after the Effective Date, their respective applications for final allowances of compensation for services rendered and reimbursement of expenses incurred and (b) be paid in full, in Cash, in such amounts as are Allowed by the Bankruptcy Court or authorized to be paid in accordance with the order(s) relating to or allowing any such Fee Claim.  On the Effective Date, the Debtors shall establish and fund the Fee Escrow Account.  The Debtors shall fund the Fee Escrow Account with Cash equal to the Professional Persons' good faith estimates of the Fee Claims.  Funds held in the Fee Escrow Account shall not be considered property of the Debtors' Estates or property of the Reorganized Debtors, but shall revert to the Reorganized Debtors only after all Fee Claims allowed by the Bankruptcy Court have been irrevocably paid in full.  The Fee Escrow Account shall be held in trust for Professional Persons retained by the Debtors and for no other parties until all Fee Claims Allowed by the Bankruptcy Court have been paid in full.  Fees owing to the applicable Professional Persons shall be paid in Cash to such Professional Persons from funds held in the Fee Escrow Account when such Claims are Allowed by an order of the Bankruptcy Court or authorized to be paid under the Order Establishing Procedures for Interim Compensation and Reimbursement of Expenses of Professionals; provided, however, that the Reorganized Debtors' obligations with respect to Fee Claims shall not be limited by nor deemed limited to the balance of funds held in the Fee Escrow Account.  To the extent that funds held in the Fee Escrow Account are insufficient to satisfy the amount of accrued Fee Claims owing to the Professional Persons, such Professional Persons shall have an Allowed Administrative Expense Claim for any such deficiency, which shall be satisfied in accordance with Section 2.1 of the Plan.  No Liens, claims, or interests shall encumber the Professional Fee Escrow in any way.

Any objections to Fee Claims shall be served and filed (a) no later than twenty one (21) days after the filing of the final applications for compensation or reimbursement or (b) such later date as ordered by the Bankruptcy Court upon a motion of the Reorganized Debtors.

3.      **Treatment of DIP Facility Claims**

In full and final satisfaction, settlement, release, and discharge of, and in exchange for, each Allowed DIP Facility Claim (subject to the last sentence of Section 2.3 of the Plan), each such Allowed DIP Facility Claim (a) shall be paid in full in Cash by the Debtors on the Effective Date equal to the Allowed amount of such DIP Facility Claim and all commitments under the DIP Facility Loan Agreement shall terminate, or (b) shall be otherwise satisfied by the Debtors in a manner acceptable to the DIP Facility Agent, any affected lender under the DIP Facility Loan Agreement, or any other holder of a DIP Facility Claim, as applicable, in accordance with the Restructuring Support Agreement.  Upon the indefeasible payment or satisfaction in full in Cash, or other satisfactory treatment, of the DIP Facility Claims (other than any DIP Facility Claims

based on the Debtors' contingent obligations under the DIP Facility Loan Agreement for which no claim has been made) in accordance with the terms of the Plan, on the Effective Date, all Liens granted to secure such obligations shall be terminated and of no further force and effect. The Debtors' contingent or unliquidated obligations under the DIP Facility Loan Agreement, to the extent not indefeasibly paid in full in Cash on the Effective Date or otherwise satisfied by the Debtors in a manner reasonably acceptable to the DIP Facility Agent, any affected lender under the DIP Facility Loan Agreement, or any other holder of a DIP Facility Claim, as applicable, shall survive the Effective Date and shall not be released or discharged pursuant to the Plan or Confirmation Order, notwithstanding any provision hereof or thereof to the contrary.

At the direction and at the option of any DIP Facility Lender that is also a Backstop Party or a Related Fund (as defined in the Backstop Commitment Agreement) of any Backstop Party, and for administrative convenience, the cash to be received by such DIP Facility Lender on account of principal pursuant to Section 2.3 of the Plan shall be applied towards the obligations of such Backstop Party or Related Fund under the Backstop Commitment Agreement, and upon such application the principal amount of all loans of such DIP Facility Lender under the DIP Facility Loan Agreement shall be deemed paid and satisfied in full.

### 4. Payment of Fees and Expenses under DIP Facility Order

On the later of (a) the Effective Date and (b) the date on which such fees, expenses or disbursements would be required to be paid under the terms of the DIP Facility Order, the Debtors or Reorganized Debtors (as applicable) shall pay all fees, expenses and disbursements of (x) the DIP Facility Agent, and (y) any accrued and unpaid fees and expenses as of the Effective Date required to be paid under or pursuant to the applicable DIP Facility Order. All payments of fees, expenses, or disbursements pursuant to the Plan shall be subject in all respects to the terms of the applicable DIP Facility Order.

### 5. Treatment of Priority Tax Claims

Except to the extent that a holder of an Allowed Priority Tax Claim agrees to a different treatment, on the Effective Date or as soon thereafter as is reasonably practicable, the holder of such Allowed Priority Tax Claim shall receive, on account of such Allowed Priority Tax Claim, Cash in an amount equal to the Allowed amount of such Claim or otherwise receive treatment consistent with the provisions of section 1129(a)(9) of the Bankruptcy Code; *provided*, that Allowed Priority Tax Claims representing liabilities incurred in the ordinary course of business by the Debtors, as debtors in possession, shall be paid by the Debtors or the Reorganized Debtors, as applicable, in the ordinary course of business, consistent with past practice and in accordance with the terms and subject to the conditions of any orders or agreements governing, instruments evidencing, or other documents establishing, such liabilities.

### B. Classifications of Claims and Interests

### 1. Classification in General

A Claim or Interest is placed in a particular Class for all purposes, including voting, confirmation, and distribution under the Plan and under sections 1122 and 1123(a)(1) of the Bankruptcy Code; *provided*, that a Claim or Interest is placed in a particular Class for the

purpose of receiving distributions pursuant to the Plan only to the extent that such Claim or Interest is an Allowed Claim or Allowed Interest in that Class and such Claim or Interest has not been satisfied, released, or otherwise settled prior to the Effective Date.

### 2.    Formation of Debtor Groups for Convenience Only

The Plan groups the Debtors together solely for the purpose of describing treatment under the Plan, confirmation of the Plan, and making Plan Distributions in respect of Claims against and Interests in the Debtors under the Plan. Such groupings shall not affect any Debtor's status as a separate legal entity, change the organizational structure of the Debtors' business enterprise, constitute a change of control of any Debtor for any purpose, cause a merger or consolidation of any legal entities, or cause the transfer of any Assets; and, except as otherwise provided by or permitted under the Plan, all Debtors shall continue to exist as separate legal entities.

### 3.    Summary of Classification of Claims and Interests

The following table designates the Classes of Claims against and Interests in the Debtors and specifies which Classes are: (a) Impaired and Unimpaired under the Plan; (b) entitled to vote to accept or reject the Plan in accordance with section 1126 of the Bankruptcy Code; and (c) deemed to accept or reject the Plan:

| Class | Type of Claim or Interest | Impairment | Entitled to Vote |
|-------|---------------------------|------------|------------------|
| Class 1 | Priority Non-Tax Claims | Unimpaired | No (Presumed to accept) |
| Class 2 | Other Secured Claims | Unimpaired | No (Presumed to accept) |
| Class 3 | RBL Claims | Unimpaired | No (Presumed to accept) |
| Class 4 | FLTL Claims | Impaired | Yes |
| Class 5 | FLLO Claims | Impaired | Yes |
| Class 6 | SLTL Claims | Impaired | Yes |
| Class 7 | General Unsecured Claims | Unimpaired | No (Presumed to accept) |
| Class 8 | Intercompany Claims | Unimpaired | No (Presumed to accept) |
| Class 9 | Existing Holdings Interests | Unimpaired | No (Presumed to accept) |
| Class 10 | Existing Energy Inc. Interests | Impaired | No (Presumed to accept) |
| Class 11 | Intercompany Interests | Unimpaired | No (Presumed to accept) |

### 4.    Special Provision Governing Unimpaired Claims

Except as otherwise provided in the Plan, nothing under the Plan will affect the rights of the Debtors or the Reorganized Debtors, as applicable, in respect of any Unimpaired Claim, including all rights in respect of legal and equitable defenses to, or setoffs or recoupments against, any such Unimpaired Claims.

### 5. Separate Classification of Other Secured Claims

Although all Other Secured Claims have been placed in one Class for purposes of nomenclature within the Plan, each Other Secured Claim, to the extent secured by a Lien on Collateral different from the Collateral securing a different Other Secured Claim, shall be treated as being in a separate sub-Class for the purposes of voting to accept or reject the Plan and receiving Plan Distributions.

### 6. Elimination of Vacant Classes

Any Class that, as of the commencement of the Confirmation Hearing, does not have at least one holder of a Claim or Interest that is Allowed in an amount greater than zero for voting purposes who votes on the Plan shall be considered vacant, deemed eliminated from the Plan for purposes of voting to accept or reject the Plan, and disregarded for purposes of determining whether the Plan satisfies section 1129(a)(8) of the Bankruptcy Code with respect to such Class.

### 7. Voting; Presumptions; Solicitation

(a) <u>Acceptance by Certain Classes</u>. Only holders of Allowed Claims and Interests in Classes 4, 5, and 6 are entitled to vote to accept or reject the Plan. An Impaired Class of Claims will have accepted the Plan if (i) the holders of at least two-thirds (2/3) in amount of the Allowed Claims actually voting in such Class have voted to accept the Plan and (ii) the holders of more than one-half (1/2) in number of the Allowed Claims actually voting in such Class have voted to accept the Plan. Holders of Claims in Classes 4, 5, and 6, will receive ballots containing detailed voting instructions.

(b) <u>Presumed Acceptance by Certain Classes</u>. Holders of Claims and Interests in Classes 1, 2, 3, 7, 8, 9, and 11 are conclusively deemed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code. In addition, although holders of Interests in Class 10 are impaired under the Plan, such holders are presumed to be proponents of the Plan, and are deemed to accept. Accordingly, all such holders are not entitled to vote to accept or reject the Plan.

### 8. Cramdown

If any Class is deemed to reject the Plan or is entitled to vote on the Plan and does not vote to accept the Plan, the Debtors may (a) seek confirmation of the Plan under section 1129(b) of the Bankruptcy Code or (b) amend or modify the Plan in accordance with the terms hereof and the Bankruptcy Code. If a controversy arises as to whether any Claims or Interests, or any class of Claims or Interests, are impaired, the Bankruptcy Court shall, after notice and a hearing, determine such controversy on or before the Confirmation Date.

### 9. No Waiver

Nothing contained in the Plan shall be construed to waive a Debtor's or other entity's right to object on any basis to any Claim.

### C.     Treatment of Claims and Interests

**1.    Class 1:  Priority Non-Tax Claims**

The legal, equitable, and contractual rights of the holders of Allowed Priority Non-Tax Claims are unaltered by the Plan. Except to the extent that a holder of an Allowed Priority Non-Tax Claim agrees to different treatment, on the later of the Effective Date and the date that is ten (10) Business Days after the date such Priority Non-Tax Claim becomes an Allowed Claim, or as soon thereafter as is reasonably practicable, each holder of an Allowed Priority Non-Tax Claim shall receive, on account of such Allowed Claim, at the option of the Reorganized Debtors: (a) Cash in an amount equal to the Allowed amount of such Claim or (b) other treatment consistent with the provisions of section 1129(a)(9) of the Bankruptcy Code.

**2.    Class 2:  Other Secured Claims**

The legal, equitable, and contractual rights of the holders of Allowed Other Secured Claims are unaltered by the Plan. Except to the extent that a holder of an Allowed Other Secured Claim agrees to different treatment, on the later of the Effective Date and the date that is ten (10) Business Days after the date such Other Secured Claim becomes an Allowed Claim, or as soon thereafter as is reasonably practicable, each holder of an Allowed Other Secured Claim shall receive, on account of such Allowed Claim, at the option of the Reorganized Debtors: (a) Cash in an amount equal to the Allowed amount of such Claim, (b) reinstatement or such other treatment sufficient to render such holder's Allowed Other Secured Claim Unimpaired pursuant to section 1124 of the Bankruptcy Code, or (c) such other recovery necessary to satisfy section 1129 of the Bankruptcy Code.

**3.    Class 3:  RBL Claims.**

On the Effective Date, holders of Allowed RBL Claims shall receive payment in full, in Cash and the existing commitments shall be terminated.

**4.    Class 4:  FLTL Claims**

On the Effective Date, all of the FLTL Claims shall be cancelled and discharged. On the Effective Date, each holder of an Allowed FLTL Claim shall receive (a) on account of the outstanding principal amount of such Claim, its Pro Rata share of the lending commitments arising under the Exit First Lien Term Loan Facility, secured by a first-priority lien on (i) substantially all of the property of the Reorganized Debtors that secured the FLTL Claims pursuant to the Prepetition First Lien Term Loan Agreement and the other applicable Loan Documents (as defined in the Prepetition First Lien Term Loan Agreement) and (ii) substantially all of the Purchased Assets, in each case, on the terms and subject to the limitations set forth in the Exit First Lien Credit Agreement, on a "last-out" basis, and (b) on account of all accrued and unpaid interest payable through the Effective Date and for all reasonable and documented expenses and other amounts payable under the Prepetition First Lien Term Loan Agreement, payment in Cash.

5.    **Class 5:  FLLO Claims**

On the Effective Date, all of the FLLO Claims shall be cancelled and discharged.  On the Effective Date, each holder of an Allowed FLLO Claim shall receive (a) on account of the outstanding principal amount of such Claim, its Pro Rata share of the lending commitments arising under the Exit Second Lien Term Loan Facility, secured by a second-priority (in respect of the Exit LC Facility and the Exit First Lien Term Loan Facility) lien on (i) substantially all of the property of the Reorganized Debtors that secured the FLLO Claims pursuant to the Prepetition FLLO Term Loan Agreement and the other applicable Loan Documents (as defined in the Prepetition FLLO Term Loan Agreement) and (ii) substantially all of the Purchased Assets, in each case, on the terms and subject to the limitations set forth in the Exit Second Lien Credit Agreement and (b) on account of accrued and unpaid interest payable through the Effective Date and for all reasonable and documented expenses and other amounts payable under the Prepetition FLLO Credit Agreement, payment in Cash.

6.    **Class 6: SLTL Claims**

On the Effective Date, all of the SLTL Claims shall be cancelled and discharged.  On the Effective Date, each holder of an Allowed SLTL Claim shall receive, on account of its Allowed SLTL Claims, its Pro Rata share of (a) New Equity Interests representing, in the aggregate, 20.25% of the New Equity Interests issued on the Effective Date, and (b) 100% of the Subscription Rights to acquire 75% of the New Equity Interests for $525 million in accordance with the Rights Offering Procedures, in each case the New Equity Interests subject to dilution by the Management Incentive Plan.

7.    **Class 7: General Unsecured Claims**

The legal, equitable, and contractual rights of the holders of Allowed General Unsecured Claims are unaltered by the Plan.  Except to the extent that a holder of an Allowed General Unsecured Claim agrees to different treatment, on and after the Effective Date, the Debtors shall continue to pay or dispute each General Unsecured Claim in the ordinary course of business as if the Chapter 11 Cases had never been commenced.

8.    **Class 8:  Intercompany Claims**

On or after the Effective Date, all Intercompany Claims shall be paid, adjusted, continued, settled, reinstated, discharged, or eliminated, in each case to the extent determined to be appropriate by the Debtors or Reorganized Debtors, as applicable, in their sole discretion.  All Intercompany Claims between any Debtor and a non-Debtor affiliate shall be Unimpaired under the Plan.

9.    **Class 9:  Existing Holdings Interests**

Existing Holdings Interests are Unimpaired.  As soon as practicable following the distributions of New Equity Interests on the Effective Date, Fieldwood Holdings shall liquidate and dissolve pursuant to applicable law, and the Reorganized Debtors shall provide for the distribution of Fieldwood Holdings' New Equity Interests (received pursuant to Section 4.10(a) of the Plan) to the holders of Existing Holdings Interests in the priorities set forth in Fieldwood Holdings'

organizational documents and applicable law. Any other assets of Fieldwood Holdings (which there is expected to be none) shall vest in Reorganized Energy Inc.

### 10. Class 10: Existing Energy Inc. Interests

On the Effective Date, the Existing Energy Inc. Interests shall be cancelled without further action by or order of the Bankruptcy Court, and each holder of an Allowed Existing Energy Inc. Interest shall receive its Pro Rata share of New Equity Interests representing, in the aggregate, 0.25% of the New Equity Interests issued on the Effective Date (subject to dilution by the Management Incentive Plan).

The Existing Energy Inc. Interests are Impaired. However, Fieldwood Holdings, as the sole holder of Existing Energy Inc. Interests, is a Debtor in these cases and a proponent of the Plan. Accordingly, the Existing Energy Inc. Interests shall be conclusively deemed to accept the Plan, and the votes of such holder shall not be solicited with respect to such Allowed Existing Energy Inc. Interests.

### 11. Class 11: Intercompany Interests

On the Effective Date, all Intercompany Interests will be treated as set forth in Section 5.15 of the Plan (and described in Section D.15 below).

### D. Means for Implementation

### 1. Compromise and Settlement of Claims, Interests, and Controversies

Pursuant to section 363 and 1123(b)(2) of the Bankruptcy Code and Bankruptcy Rule 9019 and in consideration for the distributions and other benefits provided pursuant to the Plan, the provisions of the Plan shall constitute a good faith compromise of Claims, Interests, and controversies relating to the contractual, legal, and subordination rights that a creditor or an Interest holder may have with respect to any Allowed Claim or Interest or any distribution to be made on account of such Allowed Claim or Interest. The entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of the compromise or settlement of all such Claims, Interests, and controversies, as well as a finding by the Bankruptcy Court that such compromise or settlement is in the best interests of the Debtors, their Estates, and holders of such Claims and Interests, and is fair, equitable, and reasonable.

### 2. Continued Corporate Existence

(a)    Except as otherwise provided in the Plan, the Debtors shall continue to exist after the Effective Date as Reorganized Debtors in accordance with the applicable laws of the respective jurisdictions in which they are incorporated or organized and pursuant to the New Corporate Governance Documents. On or after the Effective Date, without prejudice to the rights of any party to a contract or other agreement with any Reorganized Debtor, each Reorganized Debtor may, in its sole discretion, take such action as permitted by applicable law and the New Corporate Governance Documents, as such Reorganized Debtor may determine is reasonable and appropriate, including, without limitation, causing: (i) a Reorganized Debtor to be merged into another Reorganized Debtor or an affiliate of a Reorganized Debtor; (ii) a

Reorganized Debtor to be dissolved; (iii) the legal name of a Reorganized Debtor to be changed; or (iv) the closure of a Reorganized Debtor's Chapter 11 Case on the Effective Date or any time thereafter, and such action and documents are deemed to require no further action or approval (other than any requisite filings required under the applicable state, provincial and federal or foreign law).

(b)     On the Effective Date or as soon thereafter as is reasonably practicable, the Reorganized Debtors may take all actions as may be necessary or appropriate to effect any transaction described in, approved by, or necessary or appropriate to effectuate the Plan, including, without limitation: (i) the execution and delivery of appropriate agreements or other documents of merger, consolidation, restructuring, conversion, disposition, transfer, dissolution, or liquidation containing terms that are consistent with the terms of the Plan and the Plan Documents and that satisfy the requirements of applicable law and any other terms to which the applicable entities may agree; (ii) the execution and delivery of appropriate instruments of transfer, assignment, assumption, or delegation of any Asset, property, right, liability, debt, or obligation on terms consistent with the terms of the Plan and having other terms to which the applicable parties agree; (iii) the filing of appropriate certificates or articles of incorporation or formation and amendments thereto, reincorporation, merger, consolidation, conversion, or dissolution pursuant to applicable law; (iv) the Restructuring Transactions; and (v) all other actions that the applicable entities determine to be necessary or appropriate, including, without limitation, making filings or recordings that may be required by applicable law.

(c)     On the Effective Date or as soon thereafter as is reasonably practicable, Fieldwood Holdings shall file with the Office of the Secretary of State of Delaware a certificate of dissolution which may be executed by an officer of Fieldwood Holdings without the necessity of the approval of the board of directors of Fieldwood Holdings or the holders of Interests in Fieldwood Holdings, and upon such filing shall be deemed dissolved for all purposes and without the necessity of any other action by Fieldwood Holdings.  From and after the Effective Date, Fieldwood Holdings shall not be required to file any documents, or take any other action or receive any approval to withdraw business operations in any state where Fieldwood Holdings previously conducted its business operations.  If any of the foregoing is inconsistent or conflicts with any preexisting organizational or related documents of Fieldwood Holdings, such documents are deemed amended by the Plan to permit and authorize Fieldwood Holdings to take the actions contemplated herein.

### 3.     Corporate Action

Upon the Effective Date, all actions contemplated by the Plan shall be deemed authorized and approved in all respects, including (a) the assumption of executory contracts and unexpired leases as provided herein, (b) the selection of the managers, directors, or officers for the Reorganized Debtors, (c) the distribution of the New Equity Interests, (d) the entry into or execution of the Exit LC Documents, Exit First Lien Documents, and Exit Second Lien Documents, (e) the consummation of the Asset Purchase Transaction, and (g) all other actions contemplated by the Plan (whether to occur before, on, or after the Effective Date), in each case in accordance with and subject to the terms hereof.  All matters provided for in the Plan involving the corporate or limited liability company structure of the Debtors or the Reorganized Debtors, and any corporate or limited liability company action required by the Debtors or the

Reorganized Debtors in connection with the Plan shall be deemed to have occurred and shall be in effect, without any requirement of further action by the Security holders, directors, managers, or officers of the Debtors or the Reorganized Debtors.

On or (as applicable) before the Effective Date, the appropriate directors, officers, and managers of the Debtors or the Reorganized Debtors, as applicable, shall be authorized and directed to issue, execute, and deliver the agreements, documents, securities, and instruments contemplated by the Plan (or necessary or desirable to effect the transactions contemplated by the Plan). The authorizations and approvals contemplated by this Section 5.3 shall be effective notwithstanding any requirements under non-bankruptcy law.

### 4. Asset Purchase Transaction

The Plan and the Confirmation Order shall authorize the Asset Purchase Transaction pursuant to section 363 of the Bankruptcy Code under the terms and conditions of the Purchase Agreement.

Subject to and in connection with the occurrence of the Effective Date, the Debtors and Seller shall take all such actions as may be necessary or appropriate to effect the Asset Purchase Transaction on the terms and subject to the conditions set forth in the Purchase Agreement. Without limiting the generality of the immediately preceding sentence, upon the satisfaction or waiver of each of the conditions set forth in Section 9.1 of the Plan and the applicable conditions of the Purchase Agreement, on the Effective Date the Debtors and Seller shall take or cause to be taken all actions, including making appropriate filings or recordings, that may be required by applicable law in connection with the Asset Purchase Transaction.

In the event of any conflict whatsoever between the terms of the Plan and the Purchase Agreement with respect to the Asset Purchase Transaction, the terms of the Purchase Agreement shall control, and the Plan shall be deemed to incorporate in their entirety the terms, provisions, and conditions of the Purchase Agreement.

### 5. Plan Funding

Plan Distributions of Cash shall be funded from the Debtors' Cash on hand as of the applicable date of such Plan Distribution and from the proceeds of the Rights Offering.

### 6. Cancellation of Existing Securities and Agreements

Except for the purpose of evidencing a right to a distribution under the Plan and except as otherwise set forth in the Plan, or in any Plan Document, on the Effective Date, all agreements, instruments, and other documents evidencing any prepetition Claim or Interest (other than certain Intercompany Interests that are not modified by the Plan) and any rights of any holder in respect thereof shall be deemed cancelled and of no force or effect. The holders of or parties to such cancelled instruments, Securities, and other documentation shall have no rights arising from or related to such instruments, Securities, or other documentation or the cancellation thereof, except the rights provided for pursuant to the Plan.

7. **Cancellation of Certain Existing Security Interests**

Upon the full payment or other satisfaction of an Allowed Other Secured Claim, or promptly thereafter, the holder of such Allowed Other Secured Claim shall deliver to the Debtors or Reorganized Debtors, as applicable, any Collateral or other property of a Debtor held by such holder, together with any termination statements, instruments of satisfaction, or releases of all security interests with respect to its Allowed Other Secured Claim that may be reasonably required to terminate any related financing statements, mortgages, mechanics' or other statutory liens, or lis pendens, or similar interests or documents.

8. **Officers and Boards of Directors**

(a)      On the Effective Date, the New Board shall consist of seven members. G.M. McCarroll shall serve as a member of the New Board.  The remaining members of the New Board shall be allocated in accordance with the Governance Term Sheet attached to the Restructuring Support Agreement as **Exhibit J**.  The composition of the boards of directors or managers, as applicable, of each Reorganized Debtor shall be identified no later than the Confirmation Hearing or otherwise in accordance with section 1129(a)(5) of the Bankruptcy Code.

(b)      Except to the extent that a member of the board of directors or managers, as applicable, of a Debtor continues to serve as a director or manager of such Reorganized Debtor on the Effective Date, the members of the board of directors or managers, as applicable, of each Debtor prior to the Effective Date, in their capacities as such, shall have no continuing obligations to the Reorganized Debtors on or after the Effective Date and each such director or manager shall be deemed to have resigned or shall otherwise cease to be a director or manager of the applicable Debtor on the Effective Date.  Commencing on the Effective Date, each of the directors or managers, as applicable, of each of the Reorganized Debtors shall serve pursuant to the terms of the applicable organizational documents of such Reorganized Debtor and may be replaced or removed in accordance with such organizational documents.

9. **Management Incentive Plan**

On the Effective Date, the New Board shall adopt the Management Incentive Plan.  The Management Incentive Plan will provide for the issuance of awards of an aggregate of 10% of New Equity Interests in the form of options and restricted stock units, which will dilute the Backstop Commitment Premium and all New Equity Interests issued pursuant to the Plan, pursuant to the Rights Offering, and under the Backstop Commitment Agreement.

10. **Authorization, Issuance, and Delivery of New Equity Interests**

On the Effective Date, Reorganized Energy Inc. is authorized to issue or cause to be issued and shall issue the New Equity Interests for distribution in accordance with the terms of the Plan without the need for any further corporate or shareholder action.

## 11. Exit LC Credit Agreement

On the Effective Date, the Reorganized Debtors shall enter into the Exit LC Credit Agreement. The Exit LC Credit Agreement shall constitute legal, valid, binding and authorized joint and several obligations of the applicable Reorganized Debtors, enforceable in accordance with its terms and such obligations shall not be enjoined or subject to discharge, impairment, release, avoidance, recharacterization, or subordination under applicable law, the Plan or the Confirmation Order. On the Effective Date, all letters of credit issued under the Prepetition RBL Credit Agreement, to the extent Allowed, shall be deemed issued or reissued, as applicable, under the Exit LC Credit Agreement in accordance with the terms and conditions of the Exit LC Credit Agreement. On the Effective Date, all Liens and security interests granted pursuant to, or in connection with, the Exit LC Credit Agreement: shall (i) be reaffirmed and ratified by the applicable Reorganized Debtors and continue in full force and effect pursuant to the Exit LC Credit Agreement, and (ii) be deemed granted by the Reorganized Debtors pursuant to the Exit LC Credit Agreement. On the Effective Date, all Liens and security interests granted pursuant to, or in connection with the Exit LC Credit Agreement, as applicable, (including any Liens and security interests granted on the Purchased Assets) (x) shall be valid, binding, perfected, enforceable Liens and security interests in the property described in the Exit LC Credit Agreement and the other "Loan Documents" (as defined therein), with the priorities established in respect thereof under applicable non-bankruptcy law and the applicable New Intercreditor Agreements, and (y) shall not be enjoined or subject to discharge, impairment, release, avoidance, recharacterization, or subordination under any applicable law, the Plan, or the Confirmation Order. Pursuant to section 1141(d)(4) of the Bankruptcy Code, the Debtors and the Reorganized Debtors have waived any discharge of the Claims and obligations arising under the Prepetition RBL Credit Agreement as modified by the Exit LC Credit Agreement.

## 12. Exit First Lien Term Loan Facility and Exit Second Lien Term Loan Facility

On the Effective Date, the Exit First Lien Documents and Exit Second Lien Documents shall be executed and delivered by the Reorganized Debtors substantially in the form contained in the Plan Supplement, and the Reorganized Debtors shall be authorized to execute, deliver, and enter into such documents without the need for any further action. The Exit First Lien Term Loan Facility and Exit Second Lien Term Loan Facility shall constitute legal, valid, binding and authorized joint and several obligations of the Reorganized Debtors, enforceable in accordance with their terms, and such obligations shall not be enjoined or subject to discharge, impairment, release, avoidance, recharacterization, or subordination under applicable law, the Plan or the Confirmation Order. On the Effective Date, all Liens and security interests granted pursuant to, or in connection with, the Prepetition First Lien Credit Agreement and Prepetition FLLO Credit Agreement shall (i) be reaffirmed and ratified by the Reorganized Debtors and continue in full force and effect pursuant to the Exit First Lien Credit Agreement and Exit Second Lien Credit Agreement, as applicable, and (ii) be deemed granted by the Reorganized Debtors pursuant to the Exit First Lien Credit Agreement and Exit Second Lien Credit Agreement, as applicable. On the Effective Date, all Liens and security interests granted pursuant to, or in connection with the Exit First Lien Credit Agreement and Exit Second Lien Credit Agreement, as applicable, (including any Liens and security interests granted on the Purchased Assets) (x) shall be valid, binding, perfected, enforceable Liens and security interests in the property subject to a security interest

granted by the applicable Reorganized Debtors pursuant to the Exit First Lien Credit Agreement and Exit Second Lien Credit Agreement and the "Loan Documents" (as defined in each of the Exit First Lien Credit Agreement and the Exit Second Lien Credit Agreement), as applicable, with the priorities established in respect thereof under applicable non-bankruptcy law and the applicable New Intercreditor Agreement, and (y) shall not be enjoined or subject to discharge, impairment, release, avoidance, recharacterization, or subordination under any applicable law, the Plan, or the Confirmation Order.

### 13. New Intercreditor Agreements

On the Effective Date, the Reorganized Debtors, the Exit LC Facility Agent, the Exit First Lien Term Loan Agent, and the Exit Second Lien Term Loan Agent shall enter into the applicable New Intercreditor Agreement substantially in the forms contained in the Plan Supplement.

### 14. Rights Offering

(a)     <u>Terms</u>.  After the Petition Date, the Debtors will commence the Rights Offering in accordance with the procedures substantially in the form attached hereto as **Exhibit F**.  On the Effective Date, the Debtors shall consummate the Rights Offering.  The Rights Offering shall be fully backstopped by the Backstop Parties in accordance with and subject to the terms and conditions of the Backstop Commitment Agreement.  The right to participate in the Rights Offering may not be sold, transferred, or assigned, except in the circumstances described in the Backstop Commitment Agreement.

(b)     <u>Purpose</u>.  On the Effective Date, the proceeds of the Rights Offering shall be used:  (i) to fund the Asset Purchase Transaction, including the Purchaser's obligations under the Purchase Agreement; (ii) to provide the Reorganized Debtors with additional liquidity for working capital and general corporate purposes; (iii) to fund Allowed Administrative Expense Claims payable on or after the Effective Date; (iv) to pay in Cash in full the DIP Facility Claims; and (v) to fund Plan Distributions.

(c)     <u>Backstop Commitment</u>.    In   accordance   with   the   Backstop Commitment Agreement and subject to the terms and conditions thereof, each of the Backstop Parties has agreed, severally but not jointly, to purchase, on or prior to the Effective Date, its respective Backstop Commitment Percentage (as defined in the Backstop Commitment Agreement) of the Unsubscribed Shares (as defined in the Backstop Commitment Agreement).

(d)     <u>Backstop Commitment Premium</u>.    In exchange for providing the backstop commitment for the Rights Offering, the Backstop Parties shall receive the Backstop Commitment Premium of 4.5% of the New Equity Interests (issued at the same price as the New Equity Interests offered in the Rights Offering).  The Backstop Commitment Premium shall be deemed fully earned upon the execution of the Backstop Commitment Agreement; *provided* that if the Effective Date does not occur, then the Backstop Commitment Premium shall be payable, in Cash, to the extent provided in Section 13 of the Backstop Commitment Agreement.

15.     **Intercompany Interests; Corporate Reorganization.**

On the Effective Date and without the need for any further corporate action or approval of any board of directors, board of managers, management, or shareholders of any Debtor or Reorganized Debtor, as applicable, the certificates and all other documents representing the Intercompany Interests shall be deemed to be in full force and effect.

16.     **Restructuring Transactions**

On the Effective Date or as soon as reasonably practicable thereafter, the Debtors or Reorganized Debtors, as applicable, may take all actions consistent with the Plan and the Restructuring Support Agreement as may be necessary or appropriate to effect any transaction described in, approved by, contemplated by, or necessary to effectuate the Restructuring Transactions under and in connection with the Plan.

17.     **Restructuring Expenses**

The Restructuring Expenses incurred, or estimated to be incurred, up to and including the Effective Date shall be paid in full in Cash on the Effective Date (to the extent not previously paid during the course of the Chapter 11 Cases) in accordance with, and subject to, the terms of the Restructuring Support Agreement, without any requirement to file a fee application with the Bankruptcy Court, without the need for itemized time detail, and without any requirement for Bankruptcy Court review or approval. All Restructuring Expenses to be paid on the Effective Date shall be estimated prior to and as of the Effective Date and such estimates shall be delivered to the Debtors at least two (2) Business Days before the anticipated Effective Date (or such shorter period as the Debtors may agree); *provided*, *that* such estimate shall not be considered an admission or limitation with respect to such Restructuring Expenses.  On the Effective Date, final invoices for all Restructuring Expenses incurred prior to and as of the Effective Date shall be submitted to the Debtors.  In addition, the Debtors and the Reorganized Debtors (as applicable) shall continue to pay pre- and post-Effective Date, when due and payable in the ordinary course, Restructuring Expenses related to implementation, consummation and defense of the Plan whether incurred before, on, or after the Effective Date.

18.     **Separability**

Notwithstanding the combination of separate plans of reorganization for the Debtors set forth in the Plan for purposes of economy and efficiency, the Plan constitutes a separate chapter 11 plan for each Debtor.  Accordingly, if the Bankruptcy Court does not confirm the Plan with respect to one or more Debtors, it may still confirm the Plan with respect to any other Debtor that satisfies the confirmation requirements of section 1129 of the Bankruptcy Code.

E.     **Distributions**

1.     **Distributions Generally**

The Disbursing Agent shall make all Plan distributions to the appropriate holders of Allowed Claims and Allowed Interests in accordance with the terms of the Plan.

## 2. No Postpetition Interest on Claims

Except as otherwise set forth in the Plan, the Plan Documents, or the Confirmation Order, postpetition interest shall accrue, and shall be paid, on any Claims in the ordinary course of business in accordance with any applicable law, agreement, document, or Final Order, as the case may be, as if the Chapter 11 Cases had never been commenced.

## 3. Date of Distributions

Unless otherwise provided in the Plan, any distributions and deliveries to be made under the Plan shall be made on the Effective Date or as soon thereafter as is practicable.

## 4. Distribution Record Date

(a)     As of the close of business on the Distribution Record Date, the various lists of holders of Claims in each Class, as maintained by the Debtors or their agents, shall be deemed closed, and there shall be no further changes in the record holders of any Claims after the Distribution Record Date. Neither the Debtors nor the Disbursing Agent shall have any obligation to recognize any transfer of a Claim occurring after the close of business on the Distribution Record Date. In addition, with respect to payment of any Cure Amounts or disputes over any Cure Amounts, neither the Debtors nor the Disbursing Agent shall have any obligation to recognize or deal with any party other than the non-Debtor party to the applicable executory contract or unexpired lease, even if such non-Debtor party has sold, assigned, or otherwise transferred its Claim for a Cure Amount.

(b)     Notwithstanding anything in the Plan to the contrary, in connection with any distribution under the Plan to be effected through the facilities of the Depository Trust Company ("**DTC**") (whether by means of book-entry exchange, free delivery, or otherwise), the Debtors and the Reorganized Debtors, as applicable, shall be entitled to recognize and deal for all purposes under the Plan with holders of New Equity Interests to the extent consistent with the customary practices of DTC used in connection with such distributions. All New Equity Interests to be distributed under the Plan shall be issued in the names of such holders or their nominees in accordance with DTC's book-entry exchange procedures or on the books and records of a transfer agent; *provided*, that such New Equity Interests will only be issued in accordance with DTC book-entry procedures if the same are permitted to be held through DTC's book-entry system and the Reorganized Debtors, in their sole discretion, deems such method of distribution advisable.

## 5. Disbursing Agent

All distributions under the Plan shall be made by the Disbursing Agent on and after the Effective Date as provided in the Plan. The Disbursing Agent shall not be required to give any bond or surety or other security for the performance of its duties. The Reorganized Debtors shall use all commercially reasonable efforts to provide the Disbursing Agent (if other than the Reorganized Debtors) with the amounts of Claims and the identities and addresses of holders of Claims, in each case, as set forth in the Debtors' or Reorganized Debtors' books and records. The Reorganized Debtors shall cooperate in good faith with the applicable Disbursing Agent (if other

than the Reorganized Debtors) to comply with the reporting and withholding requirements outlined in section 6.16 of the Plan.

**6.      Delivery of Distributions**

Subject to section 6.4(b) of the Plan, the Disbursing Agent shall issue or cause to be issued, the applicable consideration under the Plan and, subject to Bankruptcy Rule 9010, shall make all distributions to any holder of an Allowed Claim as and when required by the Plan at:  (a) the address of such holder on the books and records of the Debtors or their agents; or (b) at the address in any written notice of address change delivered to the Debtors or the Disbursing Agent, including any addresses included on any transfers of Claim filed pursuant to Bankruptcy Rule 3001.  In the event that any distribution to any holder is returned as undeliverable, no distribution or payment to such holder shall be made unless and until the Disbursing Agent has been notified of the then-current address of such holder, at which time or as soon thereafter as reasonably practicable such distribution shall be made to such holder without interest.

**7.      Unclaimed Property**

One year from the later of: (a) the Effective Date and (b) the date that is ten Business Days after the date a Claim is first Allowed, all distributions payable on account of such Claim shall be deemed unclaimed property under section 347(b) of the Bankruptcy Code and shall revert to the Reorganized Debtors or their successors or assigns, and all claims of any other Person (including the holder of a Claim in the same Class) to such distribution shall be discharged and forever barred.  The Reorganized Debtors and the Disbursing Agent shall have no obligation to attempt to locate any holder of an Allowed Claim other than by reviewing the Debtors' books and records and the Bankruptcy Court's filings.

**8.      Satisfaction of Claims**

Unless otherwise provided in the Plan, any distributions and deliveries to be made on account of Allowed Claims under the Plan shall be in complete and final satisfaction, settlement, and discharge of and exchange for such Allowed Claims.

**9.      Manner of Payment under Plan**

Except as specifically provided in the Plan, at the option of the Debtors or the Reorganized Debtors, as applicable, any Cash payment to be made under the Plan may be made by a check or wire transfer or as otherwise required or provided in applicable agreements or customary practices of the Debtors.

**10.      Fractional Shares and De Minimis Cash Distributions**

No fractional New Equity Interests shall be distributed.  When any distribution would otherwise result in the issuance of a number of New Equity Interests that is not a whole number, the New Equity Interests subject to such distribution shall be rounded to the next higher or lower whole number as follows:  (a) fractions equal to or greater than 1/2 shall be rounded to the next higher whole number, and (b) fractions less than 1/2 shall be rounded to the next lower whole number. The total number of New Equity Interests to be distributed on account of Allowed SLTL Claims,

and Existing Energy Inc. Interests, and pursuant to the Rights Offering, the Backstop Commitment Agreement, or the Backstop Commitment Premium shall be adjusted as necessary to account for the rounding provided for in the Plan. No consideration shall be provided in lieu of fractional shares that are rounded down. Neither the Reorganized Debtors nor the Disbursing Agent shall have any obligation to make a distribution that is less than one (1) New Equity Interests or $100.00 in Cash. Fractional New Equity Interests that are not distributed in accordance with the Plan shall be returned to, and ownership thereof shall vest in, Reorganized Energy Inc.

### 11. No Distribution in Excess of Amount of Allowed Claim

Notwithstanding anything to the contrary in the Plan, no holder of an Allowed Claim shall receive, on account of such Allowed Claim, Plan Distributions in excess of the Allowed amount of such Claim (plus any postpetition interest on such Claim solely to the extent permitted by section 6.2 of the Plan).

### 12. Allocation of Distributions between Principal and Interest

Except as otherwise provided in the Plan and subject to section 6.2 of the Plan, to the extent that any Allowed RBL Claim, Allowed FLTL Claim, Allowed FLLO Claim, or Allowed SLTL Claim entitled to a distribution under the Plan is comprised of indebtedness and accrued but unpaid interest thereon, such distribution shall be allocated first to the principal amount (as determined for federal income tax purposes) of the Claim and then to accrued but unpaid interest.

### 13. Exemption from Securities Laws

The issuance of and the distribution under the Plan of the New Equity Interests pursuant to Sections 4.6(a)(i) and 4.10(a) of the Plan shall be exempt from registration under the Securities Act and any other applicable securities laws to the fullest extent permitted by section 1145 of the Bankruptcy Code. These securities may be resold without registration under the Securities Act or other federal securities laws pursuant to the exemption provided by section 4(a)(1) of the Securities Act, unless the holder is an "underwriter" with respect to such securities, as that term is defined in section 1145(b) of the Bankruptcy Code. In addition, such section 1145 exempt securities generally may be resold without registration under state securities laws pursuant to various exemptions provided by the respective laws of the several states.

The issuance and sale of the New Equity Interests pursuant to the Rights Offering, and to the Backstop Parties under the Backstop Commitment Agreement (including the New Equity Interests comprising the Backstop Commitment Premium), is being made in reliance on the exemption from registration set forth in section 4(a)(2) of the Securities Act and Regulation D thereunder. Such securities will be considered "restricted securities" and may not be transferred except pursuant to an effective registration statement or under an available exemption from the registration requirements of the Securities Act, such as, under certain conditions, the resale provisions of Rule 144 of the Securities Act.

### 14. Setoffs and Recoupments

Each Reorganized Debtor, or such entity's designee as instructed by such Reorganized Debtor, may, pursuant to section 553 of the Bankruptcy Code or applicable nonbankruptcy law, offset or recoup against any Allowed Claim and the distributions to be made pursuant to the Plan on account of such Allowed Claim any and all claims, rights, and Causes of Action that a Reorganized Debtor or its successors may hold against the holder of such Allowed Claim after the Effective Date to the extent such setoff or recoupment is either (a) agreed in amount among the relevant Reorganized Debtor(s) and holder of the Allowed Claim or (b) otherwise adjudicated by the Bankruptcy Court or another court of competent jurisdiction; *provided*, that neither the failure to effect a setoff or recoupment nor the allowance of any Claim hereunder shall constitute a waiver or release by a Reorganized Debtor or its successor of any claims, rights, or Causes of Action that a Reorganized Debtor or its successor or assign may possess against such holder.

### 15. Rights and Powers of Disbursing Agent

(a)     Powers of Disbursing Agent.   The Disbursing Agent shall be empowered to:  (i) effect all actions and execute all agreements, instruments, and other documents necessary to perform its duties under the Plan; (ii) make all applicable distributions or payments provided for under the Plan; (iii) employ professionals to represent it with respect to its responsibilities; and (iv) exercise such other powers (A) as may be vested in the Disbursing Agent by order of the Bankruptcy Court (including any order issued after the Effective Date) or pursuant to the Plan or (B) as deemed by the Disbursing Agent to be necessary and proper to implement the provisions of the Plan.

(b)     Expenses Incurred on or After the Effective Date.  Except as otherwise ordered by the Bankruptcy Court and subject to the written agreement of the Reorganized Debtors, the amount of any reasonable fees and expenses incurred by the Disbursing Agent on or after the Effective Date (including, without limitation, taxes) and any reasonable compensation and expense reimbursement Claims (including, without limitation, for reasonable attorneys' and other professional fees and expenses) made by the Disbursing Agent shall be paid in Cash by the Reorganized Debtors.

### 16. Withholding and Reporting Requirements

In connection with the Plan and all instruments issued in connection therewith and distributed thereon, the Reorganized Debtors and any other distributing party shall comply with all applicable withholding and reporting requirements imposed by any federal, state or local taxing authority, and all Plan Distributions under the Plan shall be subject to any such withholding or reporting requirements.  In the case of a non-Cash Plan Distribution that is subject to withholding, the distributing party may request a holder of an Allowed Claim or Interest to complete and return a Form W-8 or W-9, as applicable, to each such holder, and any other applicable forms.  If such form is requested and not submitted to the distributing party within 10 days of the request, the distributing party may, in its discretion, either (a) withhold an appropriate portion of such distributed property and sell such withheld property to generate Cash necessary to pay over the withholding tax, or (b) require the intended recipient of such distribution to

provide the withholding agent with an amount of Cash sufficient to satisfy such withholding tax as a condition to receiving such distribution. If such form is requested and submitted to the distributing party within 10 days of the request, the distributing party may withhold an appropriate portion of such distributed property and sell such withheld property to generate Cash necessary to pay over the withholding tax; provided that, the distributing party shall first notify the intended recipient of such contemplated sale and offer the intended recipient a reasonable opportunity to provide sufficient Cash to satisfy such withholding tax in lieu of such sale. The distributing party shall have the right, but not the obligation, not to make a Plan Distribution until its withholding obligation is satisfied pursuant to the preceding sentences. If an intended recipient of a non-Cash Plan Distribution has agreed to provide the withholding agent with the Cash necessary to satisfy the withholding tax pursuant to this section and such person fails to comply before the date that is 180 days after the request is made, the amount of such Plan Distribution that was not distributed shall irrevocably revert to the applicable Reorganized Debtor and such Claim in respect of such Plan Distribution shall be discharged and forever barred from assertion against such Reorganized Debtor or its respective property. Any amounts withheld pursuant to the Plan shall be deemed to have been distributed to and received by the applicable recipient for all purposes of the Plan. The distributing party may require a holder of an Allowed Claim or Interest to complete and return a Form W-8 or W-9, as applicable to each such holder, and any other applicable forms.

Notwithstanding the above, each holder of an Allowed Claim or Interest that is to receive a Plan Distribution under the Plan shall have the sole and exclusive responsibility for the satisfaction and payment of any tax obligations imposed on such holder by any governmental unit, including income, withholding, and other tax obligations, on account of such Plan Distribution.

    F.    **Procedures for Resolving Claims**

        1.    **Disputed Claims Process**

Notwithstanding section 502(a) of the Bankruptcy Code, and except as otherwise set forth in the Plan, holders of Claims need not file proofs of Claim with the Bankruptcy Court, and the Reorganized Debtors and holders of Claims shall determine, adjudicate, and resolve any disputes over the validity and amounts of such Claims in the ordinary course of business as if the Chapter 11 Cases had not been commenced. The holders of Claims shall not be subject to any claims resolution process in the Bankruptcy Court in connection with their Claims and shall retain all their rights under applicable non-bankruptcy law to pursue their Claims against the Debtors or Reorganized Debtors in any forum with jurisdiction over the parties. Except for (a) proofs of Claim asserting damages arising out of the rejection of an executory contract or unexpired lease by any of the Debtors pursuant to Section 8.3 of the Plan and (b) proofs of Claim that have been objected to by the Debtors before the Effective Date, upon the Effective Date, any filed Claim, regardless of the time of filing, and including Claims filed after the Effective Date, shall be deemed withdrawn. To the extent not otherwise provided in the Plan, the deemed withdrawal of a proof of Claim is without prejudice to such claimant's rights under Section 7.1 of the Plan to assert its Claims in any forum as though the Debtors' Chapter 11 Cases had not been commenced. From and after the Effective Date, the Reorganized Debtors may satisfy, dispute, settle, or otherwise compromise any Claim without approval of the Bankruptcy Court.

Except insofar as a Claim is Allowed under the Plan, only the Debtors or the Reorganized Debtors shall be entitled to object to Claims. Any objections to Claims shall be served and filed (a) on or before the ninetieth (90th) day following the later of (i) the Effective Date and (ii) the date that a proof of Claim is filed or amended or a Claim is otherwise asserted or amended in writing by or on behalf of a holder of such Claim, or (b) such later date as ordered by the Bankruptcy Court upon motion filed by the Debtors or the Reorganized Debtors.

### 2. Estimation of Claims

The Reorganized Debtors may at any time request that the Bankruptcy Court estimate any contingent, unliquidated, or Disputed Claim pursuant to section 502(c) of the Bankruptcy Code, regardless of whether the Debtors had previously objected to or otherwise disputed such Claim or whether the Bankruptcy Court has ruled on any such objection. The Bankruptcy Court shall retain jurisdiction to estimate any Claim at any time during litigation concerning any objection to any Claim, including, without limitation, during the pendency of any appeal relating to any such objection. In the event that the Bankruptcy Court estimates any contingent, unliquidated, or Disputed Claim, the amount so estimated shall constitute either the Allowed amount of such Claim or a maximum limitation on such Claim, as determined by the Bankruptcy Court. If the estimated amount constitutes a maximum limitation on the amount of such Claim, the Reorganized Debtors may pursue supplementary proceedings to object to the allowance of such Claim.

### 3. Claim Resolution Procedures Cumulative

All of the objection, estimation, and resolution procedures in the Plan are intended to be cumulative and not exclusive of one another. Claims may be estimated and subsequently settled, compromised, withdrawn, or resolved in accordance with the Plan by any mechanism approved by the Bankruptcy Court.

### 4. No Distributions Pending Allowance

If an objection, motion to estimate, or other challenge to a Claim is filed, no payment or distribution provided under the Plan shall be made on account of such Claim unless and until (and only to the extent that) such Claim becomes an Allowed Claim.

### 5. Distributions after Allowance

To the extent that a Disputed Claim ultimately becomes an Allowed Claim, distributions (if any) shall be made to the holder of such Allowed Claim in accordance with the provisions of the Plan. As soon as practicable after the date on which the order or judgment of the Bankruptcy Court allowing any Disputed Claim becomes a Final Order, the Disbursing Agent shall provide to the holder of such Claim the distribution (if any) to which such holder is entitled under the Plan as of the Effective Date, without any interest to be paid on account of such Claim unless required by the Bankruptcy Code.

### G. Executory Contracts and Unexpired Leases

#### 1. General Treatment

As of and subject to the occurrence of the Effective Date and the payment of any applicable Cure Amount, all executory contracts and unexpired leases shall be deemed assumed, unless such contract or lease (a) was previously assumed or rejected by the Debtors, pursuant to Final Order of the Bankruptcy Court, (b) previously expired or terminated pursuant to its own terms or by agreement of the parties thereto, (c) is the subject of a motion to reject filed by the Debtors on or before the Confirmation Date, or (d) is specifically designated as a contract or lease to be rejected on the Schedule of Rejected Contracts; provided, that the Requisite Second Lien Term Lenders and Requisite Sponsor Second Lien Term Lenders consent with respect to the Debtors' rejection of such contracts and leases. Subject to the occurrence of the Effective Date, entry of the Confirmation Order by the Bankruptcy Court shall constitute approval of the assumptions or rejections provided for in the Plan pursuant to sections 365(a) and 1123 of the Bankruptcy Code. Each executory contract and unexpired lease assumed pursuant to the Plan shall vest in and be fully enforceable by the applicable Reorganized Debtor in accordance with its terms, except as modified by the provisions of the Plan, any Final Order of the Bankruptcy Court authorizing and providing for its assumption, or applicable law.

Subject to resolution of any dispute regarding any Cure Amount, all Cure Amounts shall be satisfied by the Debtors or Reorganized Debtors, as the case may be, upon assumption or assignment, as applicable, of the underlying contracts and unexpired leases. Assumption or assignment, as applicable, of any executory contract or unexpired lease pursuant to the Plan, or otherwise, shall result in the full release and satisfaction of any Claims or defaults, subject to satisfaction of the Cure Amount, whether monetary or nonmonetary, arising under any assumed executory contract or unexpired lease at any time before the effective date of the assumption or assumption and assignment, as applicable. Any proofs of Claim filed with respect to an executory contract or unexpired lease that has been assumed or assigned shall be deemed disallowed and expunged, without further notice to or action, order or approval of the Bankruptcy Court or any other Entity, upon the deemed assumption of such contract or unexpired lease.

#### 2. Determination of Cure Disputes and Deemed Consent

Any monetary amounts by which any executory contract or unexpired lease to be assumed under the Plan is in default shall be satisfied, under section 365(b)(1) of the Bankruptcy Code, by the Debtors or Reorganized Debtors, as applicable, upon assumption thereof. Following the Petition Date, the Debtors shall have served a notice on parties to executory contracts and unexpired leases to be assumed reflecting the Debtors' intention to assume the contract or lease in connection with the Plan and setting forth the proposed Cure Amount (if any). If a counterparty to any executory contract or unexpired lease that the Debtors or Reorganized Debtors, as applicable intend to assume does not receive such a notice, the proposed Cure Amount for such executory contract or unexpired lease shall be deemed to be zero dollars ($0).

If there is a dispute regarding (a) any Cure Amount, (b) the ability of the Debtors to provide adequate assurance of future performance (within the meaning of section 365 of the Bankruptcy

Code) under the contract or lease to be assumed, or (c) any other matter pertaining to assumption, such dispute shall be heard by the Bankruptcy Court prior to such assumption being effective. The Debtors reserve the right to reject any executory contract or unexpired lease not later than thirty (30) days after the entry of a Final Order resolving any such dispute. Any counterparty to an executory contract or unexpired lease that fails to object timely to the notice of the proposed assumption and assignment of such executory contract or unexpired lease or the relevant Cure Amount within fourteen (14) days of the filing thereof, shall be deemed to have assented to such assumption, assignment, and/or Cure Amount and shall be forever barred, estopped, and enjoined from challenging the validity of such assumption or the amount of such Cure Amount thereafter.

### 3. Rejection Damages Claims

Any counterparty to a contract or lease that is identified on the Schedule of Rejected Contracts or is otherwise rejected by the Debtors must file and serve a proof of Claim on the applicable Debtor that is party to the contract or lease to be rejected no later than thirty (30) days after the later of (a) the Confirmation Date or (b) the effective date of rejection of such executory contract or unexpired lease.

### 4. Survival of the Debtors' Indemnification Obligations

Any obligations of the Debtors pursuant to their corporate charters, by-laws, limited liability company agreements, memorandum and articles of association, or other organizational documents to indemnify current and former officers, directors, members, managers, agents, or employees with respect to all present and future actions, suits, and proceedings against the Debtors or such officers, directors, members, managers, agents, or employees based upon any act or omission for or on behalf of the Debtors shall not be discharged, impaired, or otherwise affected by the Plan; *provided*, that the Reorganized Debtors shall not indemnify officers, directors, members, or managers, as applicable, of the Debtors for any claims or Causes of Action arising out of or relating to any act or omission that is a criminal act or constitutes intentional fraud, gross negligence, or willful misconduct. All such obligations shall be deemed and treated as executory contracts to be assumed by the Debtors under the Plan and shall continue as obligations of the Reorganized Debtors. Any claim based on the Debtors' obligations under the Plan shall not be a Disputed Claim or subject to any objection, in either case, by reason of section 502(e)(1)(B) of the Bankruptcy Code.

### 5. Compensation and Benefit Plans

All employment and severance agreements and policies, and all compensation and benefits plans, policies, and programs of the Debtors applicable to their respective employees, retirees, consultants, contractors, and non-employee directors, including, without limitation, all savings plans, retirement plans, healthcare plans, disability plans, severance benefit plans, incentive plans, and life and accidental death and dismemberment insurance plans, are deemed to be, and shall be treated as, executory contracts under the Plan and, on the Effective Date, shall be assumed pursuant to sections 365 and 1123 of the Bankruptcy Code and, in the case of employment agreements, modified and assumed as agreed between the Debtors, the Requisite Second Lien Term Lenders, and the Requisite Sponsor Second Lien Term Lenders.

### 6. Insurance Policies

(a)     All insurance policies to which any Debtor is a party as of the Effective Date, including the D&O Policy, shall be deemed to be and treated as executory contracts and shall be assumed by the applicable Debtors or Reorganized Debtor and shall continue in full force and effect thereafter in accordance with their respective terms. All other insurance policies shall vest in the Reorganized Debtors. Coverage for defense and indemnity under the D&O Policy shall remain available to all individuals within the definition of "Insured" in the D&O Policy.

(b)     In addition, after the Effective Date, all officers, directors, agents, or employees who served in such capacity at any time before the Effective Date shall be entitled to the full benefits of any D&O Policy (including any "tail" policy) for the full term of such policy regardless of whether such officers, directors, agents, and/or employees remain in such positions after the Effective Date, in each case, to the extent set forth in such policies.

### H.     Conditions Precedent to Occurrence of Effective Date

### 1.     Conditions Precedent to Effective Date

The Effective Date will not occur unless all of the following conditions precedent have been satisfied:

(a)     the Plan Supplement, including the Plan Documents, has been filed;

(b)     the Bankruptcy Court has entered the Confirmation Order in form and substance reasonably acceptable to the Debtors, the Requisite First Lien Term Lenders, the Requisite Second Lien Term Lenders, and the Requisite Sponsor Second Lien Term Lenders, and such Confirmation Order shall have become a Final Order;

(c)     the amendments to certain employment agreements to be assumed under Section 8.5 of the Plan shall have been executed and assumed;

(d)     the Restructuring Support Agreement shall not have been terminated by the Debtors or any of the Restructuring Support Parties and shall be in full force and effect;

(e)     the conditions to closing under the Purchase Agreement have been satisfied or waived in accordance with the terms thereof, and the Purchase Agreement is in full force and effect and binding on all parties thereto;

(f)     the conditions to effectiveness of the Backstop Commitment Agreement have been satisfied or waived in accordance with the terms thereof, and the Backstop Commitment Agreement is in full force and effect and binding on all parties thereto;

(g)     the conditions to effectiveness of the Exit LC Credit Agreement have been satisfied or waived in accordance with the terms thereof, and the Exit LC Credit Agreement is in full force and effect and binding on all parties thereto;

46

(h)     the conditions to effectiveness of the Exit First Lien Credit Agreement have been satisfied or waived in accordance with the terms thereof, and the Exit First Lien Credit Agreement is in full force and effect and binding on all parties thereto;

(i)     the conditions to effectiveness of the Exit Second Lien Credit Agreement have been satisfied or waived in accordance with the terms thereof, and the Exit Second Lien Credit Agreement is in full force and effect and binding on all parties thereto;

(j)     each of the New Intercreditor Agreements shall have been executed and delivered by each of the parties thereto;

(k)     the Debtors shall have implemented the Restructuring Transactions and all other transactions contemplated by the Plan and the Restructuring Support Agreement in a manner consistent in all respects with the Plan and Restructuring Support Agreement;

(l)     all governmental and third-party approvals and consents, including Bankruptcy Court approval, necessary in connection with the transactions provided for in the Plan have been obtained, are not subject to unfulfilled conditions, and are in full force and effect, and all applicable waiting periods have expired without any action having been taken by any competent authority that would restrain, prevent, or otherwise impose materially adverse conditions on such transactions;

(m)     the Amended Certificate of Incorporation of Reorganized Energy Inc. has been filed with the appropriate governmental authority;

(n)     the Debtors shall have paid in full in Cash all Restructuring Expenses incurred, or estimated to be incurred, through the Effective Date; and

(o)     the Debtors, together with the Subscription Agent (as defined in the Rights Offering Procedures), shall have received proceeds of at least $525 million for the issuance of the New Equity Interests (including, for the avoidance of doubt, any DIP Facility Claims which are credited against any Backstop Party's funding amount).

2.     **Waiver of Conditions Precedent**

(a)     Each of the conditions precedent to the occurrence of the Effective Date may be waived in writing by the Debtors, the Requisite First Lien Term Lenders, the Requisite Second Lien Term Lenders, and the Requisite Sponsor Second Lien Term Lenders. If any such condition precedent is waived pursuant to the Plan and the Effective Date occurs, each party agreeing to waive such condition precedent shall be estopped from withdrawing such waiver after the Effective Date or otherwise challenging the occurrence of the Effective Date on the basis that such condition was not satisfied, the waiver of such condition precedent shall benefit from the "equitable mootness" doctrine, and the occurrence of the Effective Date shall foreclose any ability to challenge the Plan in any court. If the Plan is confirmed for fewer than all of the Debtors, only the conditions applicable to the Debtor or Debtors for which the Plan is confirmed must be satisfied or waived for the Effective Date to occur.

(b)     The stay of the Confirmation Order pursuant to Bankruptcy Rule 3020(e) shall be deemed waived by and upon the entry of the Confirmation Order, and the Confirmation Order shall take effect immediately upon its entry.

### 3.     Effect of Failure of a Condition

If the conditions listed in Section 9.1 of the Plan are not satisfied or waived in accordance with Section 9.2 of the Plan on or before the first Business Day that is more than sixty (60) days after the date on which the Confirmation Order is entered or by such later date reasonably acceptable to the Requisite First Lien Term Lenders, the Requisite Second Lien Term Lenders, and the Requisite Sponsor Second Lien Term Lenders and as set forth by the Debtors in a notice filed with the Bankruptcy Court prior to the expiration of such period, the Plan shall be null and void in all respects and nothing contained in the Plan or the Disclosure Statement shall (a) constitute a waiver or release of any Claims by or against or any Interests in the Debtors, (b) prejudice in any manner the rights of any Person, or (c) constitute an admission, acknowledgement, offer, or undertaking by the Debtors, any of the other Restructuring Support Parties, or any other Person.

## I.     <u>Effect of Confirmation</u>

### 1.     Binding Effect

Except as otherwise provided in section 1141(d)(3) of the Bankruptcy Code, and subject to the occurrence of the Effective Date, on and after the entry of the Confirmation Order, the provisions of the Plan shall bind every holder of a Claim against or Interest in any Debtor and inure to the benefit of and be binding on such holder's respective successors and assigns, regardless of whether the Claim or Interest of such holder is Impaired under the Plan and whether such holder has accepted the Plan.

### 2.     Vesting of Assets

Except as otherwise provided in the Plan, or any Plan Document, on and after the Effective Date, all Assets of the Estates, including all claims, rights, and Causes of Action and any property acquired by the Debtors under or in connection with the Plan, the Rights Offering, and the Asset Purchase Transaction (including the Purchased Assets), shall vest in each respective Reorganized Debtor free and clear of all Claims, Liens, charges, other encumbrances, and Interests.  Subject to the terms of the Plan, on and after the Effective Date, the Reorganized Debtors may operate their businesses and may use, acquire, and dispose of property and prosecute, compromise, or settle any Claims (including any Administrative Expense Claims) and Causes of Action without supervision of or approval by the Bankruptcy Court and free and clear of any restrictions of the Bankruptcy Code or the Bankruptcy Rules other than restrictions expressly imposed by the Plan or the Confirmation Order.  Without limiting the foregoing, the Reorganized Debtors may pay the charges that they incur on or after the Effective Date for Professional Persons' fees, disbursements, expenses, or related support services without application to the Bankruptcy Court.

3. **Discharge of Claims against and Interests in Debtors**

Upon the Effective Date and in consideration of the distributions to be made under the Plan, except as otherwise provided in the Plan or in the Confirmation Order, each holder (as well as any trustee or agent on behalf of such holder) of a Claim or Interest, where such Claim or Interest has been fully paid or otherwise satisfied in accordance with the Plan, and any affiliate of such holder shall be deemed to have forever waived, released, and discharged the Debtors, to the fullest extent permitted by section 1141 of the Bankruptcy Code, of and from any and all Claims, Interests, rights, and liabilities that arose prior to the Effective Date. Except as otherwise provided in the Plan, upon the Effective Date, all such holders of Claims and Interests and their affiliates shall be forever precluded and enjoined, pursuant to sections 105, 524, and 1141 of the Bankruptcy Code, from prosecuting or asserting any such discharged Claim against or terminated Interest in any Debtor or any Reorganized Debtor.

4. **Pre-Confirmation Injunctions and Stays**

Unless otherwise provided in the Plan, all injunctions and stays arising under or entered during the Chapter 11 Cases, whether under sections 105 or 362 of the Bankruptcy Code or otherwise, and in existence on the date of entry of the Confirmation Order, shall remain in full force and effect until the later of the Effective Date and the date indicated in the order providing for such injunction or stay.

5. **Injunction against Interference with Plan**

Upon the entry of the Confirmation Order, all holders of Claims and Interests and all other parties in interest, along with their respective present and former affiliates, employees, agents, officers, directors, and principals, shall be enjoined from taking any action to interfere with the implementation or the occurrence of the Effective Date, *provided*, that the foregoing shall not enjoin any Restructuring Support Party from exercising any of its rights or remedies under the Restructuring Support Agreement in accordance with the terms thereof.

6. **Plan Injunction**

(a) Except as otherwise provided in the Plan, in the Plan Documents, or in the Confirmation Order, as of the entry of the Confirmation Order but subject to the occurrence of the Effective Date, all Persons who have held, hold, or may hold Claims or Interests will be, with respect to any such Claim or Interest, permanently enjoined after the entry of the Confirmation Order from: (i) commencing, conducting, or continuing in any manner, directly or indirectly, any suit, action, or other proceeding of any kind (including, without limitation, any proceeding in a judicial, arbitral, administrative, or other forum) against or affecting, directly or indirectly, a Debtor, a Reorganized Debtor, or an Estate or the property of any of the foregoing, or any direct or indirect transferee of any property of, or direct or indirect successor in interest to, any of the foregoing Persons mentioned in this subsection (i) or any property of any such transferee or successor; (ii) enforcing, levying, attaching (including, without limitation, any prejudgment attachment), collecting, or otherwise recovering in any manner or by any means, whether directly or indirectly, any judgment, award, decree, or order against a Debtor, a Reorganized Debtor, or an Estate or its property, or any direct or indirect transferee of any

property of, or direct or indirect successor in interest to, any of the foregoing Persons mentioned in this subsection (ii) or any property of any such transferee or successor; (iii) creating, perfecting, or otherwise enforcing in any manner, directly or indirectly, any encumbrance of any kind against a Debtor, a Reorganized Debtor, or an Estate or any of its property, or any direct or indirect transferee of any property of, or successor in interest to, any of the foregoing Persons mentioned in this subsection (iii) or any property of any such transferee or successor; (iv) acting or proceeding in any manner, in any place whatsoever, that does not conform to or comply with the provisions of the Plan, and the Plan Documents, to the full extent permitted by applicable law; and (v) commencing or continuing, in any manner or in any place, any action that does not comply with or is inconsistent with the provisions of the Plan, and the Plan Documents; *provided*, that nothing contained in the Plan shall preclude such Persons who have held, hold, or may hold Claims against or Interests in a Debtor, a Reorganized Debtor, or an Estate from exercising their rights and remedies, or obtaining benefits, pursuant to and consistent with the terms of the Plan and the Plan Documents; *provided, further*, that nothing contained in the Plan will enjoin any Restructuring Support Party from exercising any of its rights or remedies under the Restructuring Support Agreement in accordance with the terms thereof.

(b) By accepting distributions pursuant to the Plan, each holder of an Allowed Claim or Interest shall be deemed to have affirmatively and specifically consented to be bound by the Plan, including, without limitation, the injunctions set forth in the Plan.

7. **Releases**

Under the Plan, Released Parties will receive various releases, as set out in further detail below. For the purpose of the Plan, Released Parties will be defined to mean collectively, and in their capacities as such: (a) the Debtors; (b) the Debtors' other non-Debtor affiliates; (c) the Restructuring Support Parties; (d) the Backstop Parties; (e) the Prepetition RBL Lenders; (f) the Prepetition RBL Agent; (g) the Prepetition First Lien Term Lenders; (h) the Prepetition First Lien Term Loan Agent; (i) the Prepetition FLLO Lenders; (j) the Prepetition FLLO Agent; (k) the Prepetition Sponsor Second Lien Term Lenders; (l) the Prepetition Sponsor Second Lien Term Loan Agent; (m) the Prepetition Second Lien Term Lenders; (n) the Prepetition Second Lien Term Loan Agent; (o) the DIP Facility Lenders; (p) the DIP Facility Agent; (q) Riverstone V FW Holdings Sub, LLC; and (r) Fieldwood Management LLC; and with respect to each of the foregoing entities, such entities' predecessors, successors, assigns, subsidiaries, affiliates, managed accounts and funds, and all of their respective current and former officers and directors, principals, shareholders (regardless of whether such interests are held directly or indirectly), members, partners, managers, employees, subcontractors, agents, advisory board members, financial advisors, attorneys, accountants, investment bankers, consultants, representatives, investment managers, investment advisors, management companies, fund advisors, and other professionals, and such entities' respective heirs, executors, estates, servants, and nominees, in each case in their capacity as such, and any and all other persons or entities that may purport to assert any cause of action derivatively, by or through the foregoing entities; *provided*, that any holder of a Claim or Interest that opts out of granting the releases set forth in the Plan shall not be included in the definition of "Released Parties."

Before the Petition Date, the independent members of Fieldwood Holdings' board of directors requested that counsel investigate whether the Debtors hold any claims or causes of action

against Riverstone or any officers or directors of the Debtors. Based on this investigation, which included voluntary document production, informal interviews with Riverstone employees, and analysis by the Debtors' advisors, the independent directors concluded that no material claims or causes of action exist. Accordingly, the independent directors determined, in their judgment, that the cost of pursuing any claims or causes of action would likely exceed any hypothetical risk-adjusted benefit to the Debtors.

(a)     <u>Releases by the Debtors.</u>  **AS OF THE EFFECTIVE DATE AND TO THE FULLEST EXTENT ALLOWED BY APPLICABLE LAW, EXCEPT FOR THE RIGHTS AND REMEDIES THAT REMAIN IN EFFECT FROM AND AFTER THE EFFECTIVE DATE TO ENFORCE THE PLAN AND THE PLAN DOCUMENTS, FOR GOOD AND VALUABLE CONSIDERATION, THE ADEQUACY OF WHICH IS HEREBY CONFIRMED, INCLUDING, WITHOUT LIMITATION, THE SERVICE OF THE RELEASED PARTIES TO FACILITATE THE EXPEDITIOUS REORGANIZATION OF THE DEBTORS AND THE IMPLEMENTATION OF THE RESTRUCTURING, AND EXCEPT AS OTHERWISE PROVIDED IN THE PLAN, THE PLAN DOCUMENTS, OR IN THE CONFIRMATION ORDER, THE RELEASED PARTIES ARE DEEMED EXPRESSLY, CONCLUSIVELY, ABSOLUTELY, UNCONDITIONALLY, IRREVOCABLY AND FOREVER RELEASED, ACQUITTED AND DISCHARGED BY THE DEBTORS, THE REORGANIZED DEBTORS, AND THE ESTATES, IN EACH CASE ON BEHALF OF THEMSELVES AND THEIR RESPECTIVE SUCCESSORS, PREDECESSORS, ASSIGNS, SUBSIDIARIES, AFFILIATES AND REPRESENTATIVES AND ANY AND ALL OTHER PERSONS OR ENTITIES THAT MAY PURPORT TO ASSERT ANY CAUSE OF ACTION DERIVATIVELY, BY OR THROUGH THE FOREGOING ENTITIES, FROM ANY AND ALL CLAIMS, INTERESTS, OBLIGATIONS, SUITS, JUDGMENTS, DAMAGES, DEMANDS, DEBTS, RIGHTS, CAUSES OF ACTION, LOSSES, REMEDIES, OR LIABILITIES WHATSOEVER, INCLUDING ANY DERIVATIVE CLAIMS OR CAUSES OF ACTION, ASSERTED OR ASSERTABLE ON BEHALF OF THE DEBTORS, THE REORGANIZED DEBTORS, OR THEIR ESTATES, WHETHER LIQUIDATED OR UNLIQUIDATED, FIXED OR CONTINGENT, MATURED OR UNMATURED, KNOWN OR UNKNOWN, FORESEEN OR UNFORESEEN, EXISTING OR HEREINAFTER ARISING, IN LAW, EQUITY, CONTRACT, TORT, OR OTHERWISE, BY STATUTE, VIOLATIONS OF FEDERAL OR STATE SECURITIES LAWS OR OTHERWISE (COLLECTIVELY, THE "RELEASED CLAIMS") THAT THE DEBTORS, THE REORGANIZED DEBTORS, OR THEIR ESTATES WOULD HAVE BEEN LEGALLY ENTITLED TO ASSERT IN THEIR OWN RIGHT (WHETHER INDIVIDUALLY OR COLLECTIVELY) OR ON BEHALF OF THE HOLDER OF ANY CLAIM OR INTEREST OR OTHER PERSON OR ENTITY, BASED ON OR RELATING TO, OR IN ANY MANNER ARISING FROM OR IN CONNECTION WITH, IN WHOLE OR IN PART, THE DEBTORS, THE CHAPTER 11 CASES, THE DEBTORS' RESTRUCTURING EFFORTS, THE NEGOTIATION, FORMULATION OR PREPARATION OF ANY TRANSACTIONS OR DOCUMENTS IN CONNECTION THEREWITH, THE DEBTORS' INTERCOMPANY TRANSACTIONS, ANY PREFERENCE, FRAUDULENT TRANSFER, OR OTHER AVOIDANCE CLAIM ARISING PURSUANT TO CHAPTER 5 OF THE BANKRUPTCY CODE OR APPLICABLE LAW, THE PURCHASE, SALE, OR RESCISSION OF THE**

PURCHASE OR SALE OF ANY SECURITY OF THE DEBTORS OR THE REORGANIZED DEBTORS, THE SUBJECT MATTER OF, OR THE TRANSACTIONS OR EVENTS GIVING RISE TO, ANY CLAIM OR INTEREST THAT IS TREATED IN THE PLAN, THE BUSINESS OR CONTRACTUAL ARRANGEMENTS AND ANY OTHER TRANSACTION OR ARRANGEMENT BETWEEN ANY DEBTOR, REORGANIZED DEBTOR, OR ESTATE AND ANY RELEASED PARTY (INCLUDING, WITHOUT LIMITATION, THE PREPETITION RBL CREDIT AGREEMENT, THE PREPETITION FIRST LIEN TERM LOAN AGREEMENT, THE PREPETITION FLLO CREDIT AGREEMENT, THE PREPETITION SECOND LIEN TERM LOAN AGREEMENT, AND THE PREPETITION SPONSOR SECOND LIEN TERM LOAN AGREEMENT), THE RESTRUCTURING, THE RESTRUCTURING OF ANY CLAIM OR INTEREST BEFORE OR DURING THE CHAPTER 11 CASES, THE RESTRUCTURING TRANSACTIONS, THE NEGOTIATION, FORMULATION, OR PREPARATION OF THE DISCLOSURE STATEMENT, THE RESTRUCTURING SUPPORT AGREEMENT, THE ASSET PURCHASE TRANSACTION, THE PURCHASE AGREEMENT, AND THE PLAN AND RELATED AGREEMENTS, INSTRUMENTS, TERM SHEETS AND OTHER DOCUMENTS (INCLUDING THE PLAN DOCUMENTS), THE SOLICITATION OF VOTES WITH RESPECT TO THE PLAN, THE BACKSTOP COMMITMENT AGREEMENT, OR THE RIGHTS OFFERING, OR ANY OTHER ACT OR OMISSION, TRANSACTION, AGREEMENT, EVENT, OR OTHER OCCURRENCE TAKING PLACE OR ARISING ON OR BEFORE THE EFFECTIVE DATE RELATED OR RELATING TO ANY OF THE FOREGOING, IN EACH CASE OTHER THAN CLAIMS OR CAUSES OF ACTION ARISING OUT OF OR RELATED TO ANY ACT OR OMISSION OF A RELEASED PARTY THAT IS A CRIMINAL ACT OR CONSTITUTES INTENTIONAL FRAUD, GROSS NEGLIGENCE, OR WILLFUL MISCONDUCT, AS DETERMINED BY A FINAL ORDER.

ENTRY OF THE CONFIRMATION ORDER BY THE BANKRUPTCY COURT SHALL CONSTITUTE THE BANKRUPTCY COURT'S APPROVAL, PURSUANT TO BANKRUPTCY RULE 9019, OF THE RELEASES IN SECTION 10.7(a) OF THE PLAN (the "<u>DEBTOR RELEASES</u>"), WHICH INCLUDES BY REFERENCE EACH OF THE RELATED PROVISIONS AND DEFINITIONS UNDER THE PLAN, AND FURTHERMORE, SHALL CONSTITUTE THE BANKRUPTCY COURT'S FINDING THAT THE DEBTOR RELEASES ARE: (I) IN EXCHANGE FOR THE GOOD AND VALUABLE CONSIDERATION PROVIDED BY THE RELEASED PARTIES, (II) A GOOD FAITH SETTLEMENT AND COMPROMISE OF THE RELEASED CLAIMS RELEASED BY THE DEBTORS, THE REORGANIZED DEBTORS AND THE ESTATES, (III) IN THE BEST INTERESTS OF THE DEBTORS, THE ESTATES AND ALL HOLDERS OF CLAIMS AND INTERESTS, (IV) FAIR, EQUITABLE AND REASONABLE, (V) GIVEN AND MADE AFTER DUE NOTICE AND OPPORTUNITY FOR HEARING AND (VI) A BAR TO ANY OF THE DEBTORS, THE REORGANIZED DEBTORS, OR THE ESTATES ASSERTING ANY CLAIM OR CAUSE OF ACTION RELEASED PURSUANT TO THE DEBTOR RELEASE.

(b)    <u>Releases by Holders of Claims and Interests</u>.    AS OF THE EFFECTIVE DATE AND TO THE FULLEST EXTENT ALLOWED BY APPLICABLE

LAW, EXCEPT FOR THE RIGHTS AND REMEDIES THAT REMAIN IN EFFECT
FROM AND AFTER THE EFFECTIVE DATE TO ENFORCE THE PLAN AND THE
PLAN DOCUMENTS, FOR GOOD AND VALUABLE CONSIDERATION, THE
ADEQUACY OF WHICH IS HEREBY CONFIRMED, INCLUDING, WITHOUT
LIMITATION, THE SERVICE OF THE RELEASED PARTIES TO FACILITATE THE
EXPEDITIOUS REORGANIZATION OF THE DEBTORS AND THE
IMPLEMENTATION OF THE RESTRUCTURING, AND EXCEPT AS OTHERWISE
PROVIDED IN THE PLAN, THE PLAN DOCUMENTS, OR IN THE CONFIRMATION
ORDER, THE RELEASED PARTIES ARE DEEMED EXPRESSLY, CONCLUSIVELY,
ABSOLUTELY, UNCONDITIONALLY, IRREVOCABLY AND FOREVER RELEASED
ACQUITTED AND DISCHARGED BY THE (I) THE HOLDERS OF ALL CLAIMS AND
INTERESTS WHO VOTE TO ACCEPT THE PLAN, (II) HOLDERS OF CLAIMS OR
INTERESTS THAT ARE UNIMPAIRED UNDER THE PLAN, WHERE THE
APPLICABLE CLAIMS OR INTERESTS HAVE BEEN FULLY PAID OR OTHERWISE
SATISFIED IN ACCORDANCE WITH THE PLAN, (III) HOLDERS OF CLAIMS OR
INTERESTS WHOSE VOTE TO ACCEPT OR REJECT THE PLAN WAS SOLICITED
BUT WHO DID NOT VOTE EITHER TO ACCEPT OR TO REJECT THE PLAN AND
DID NOT OPT OUT OF GRANTING THE RELEASES SET FORTH IN THE PLAN,
(IV) HOLDERS OF CLAIMS OR INTERESTS WHO VOTED TO REJECT THE PLAN
BUT DID NOT OPT OUT OF GRANTING THE RELEASES SET FORTH IN THE
PLAN, (V) THOSE HOLDERS OF CLAIMS OR INTERESTS WHO ARE UNIMPAIRED
UNDER THE PLAN AND DO NOT TIMELY OBJECT TO THE RELEASES SET
FORTH IN THE PLAN, (VI) THE PREPETITION RBL AGENT, (VII) THE
PREPETITION FIRST LIEN TERM LOAN AGENT, (VIII) THE PREPETITION FLLO
AGENT, (XI) THE PREPETITION SECOND LIEN TERM LOAN AGENT, (X) THE
PREPETITION SPONSOR SECOND LIEN TERM LOAN AGENT, (XI) THE
PREPETITION RBL LENDERS, (XII) THE PREPETITION FIRST LIEN TERM
LENDERS, (XIII) THE PREPETITION FLLO LENDERS, (XIV) THE PREPETITION
SECOND LIEN TERM LENDERS, (XV) THE PREPETITION SPONSOR SECOND
LIEN TERM LENDERS, (XVI) THE DIP FACILITY AGENT, (XVII) THE DIP
FACILITY LENDERS, (XVIII) THE CONSENTING SPONSOR, (XIX) RIVERSTONE V
FW HOLDINGS SUB, LLC, AND (XX) FIELDWOOD MANAGEMENT LLC, AND
WITH RESPECT TO EACH OF THE FOREGOING ENTITIES, SUCH ENTITIES'
PREDECESSORS, SUCCESSORS, ASSIGNS, SUBSIDIARIES, AFFILIATES,
MANAGED ACCOUNTS AND FUNDS, AND ALL OF THEIR RESPECTIVE
CURRENT AND FORMER OFFICERS AND DIRECTORS, PRINCIPALS,
SHAREHOLDERS (REGARDLESS OF WHETHER SUCH INTERESTS ARE HELD
DIRECTLY OR INDIRECTLY), MEMBERS, PARTNERS, MANAGERS, EMPLOYEES,
SUBCONTRACTORS, AGENTS, ADVISORY BOARD MEMBERS, FINANCIAL
ADVISORS, ATTORNEYS, ACCOUNTANTS, INVESTMENT BANKERS,
CONSULTANTS, REPRESENTATIVES, INVESTMENT MANAGERS, INVESTMENT
ADVISORS, MANAGEMENT COMPANIES, FUND ADVISORS, AND OTHER
PROFESSIONALS, AND SUCH ENTITIES' RESPECTIVE HEIRS, EXECUTORS,
ESTATES, SERVANTS, AND NOMINEES, IN EACH CASE IN THEIR CAPACITY AS
SUCH, AND ANY AND ALL OTHER PERSONS OR ENTITIES THAT MAY PURPORT
TO ASSERT ANY CAUSE OF ACTION DERIVATIVELY, BY OR THROUGH THE

FOREGOING ENTITIES (COLLECTIVELY, THE "<u>RELEASING PARTIES</u>"), FROM ANY AND ALL CLAIMS, INTERESTS, OBLIGATIONS, SUITS, JUDGMENTS, DAMAGES, DEMANDS, DEBTS, RIGHTS, CAUSES OF ACTION, LOSSES, REMEDIES, OR LIABILITIES WHATSOEVER, INCLUDING ANY DERIVATIVE CLAIMS OR CAUSES OF ACTION, ASSERTED OR ASSERTABLE ON BEHALF OF THE DEBTORS, THE REORGANIZED DEBTORS OR THEIR ESTATES, WHETHER LIQUIDATED OR UNLIQUIDATED, FIXED OR CONTINGENT, MATURED OR UNMATURED, KNOWN OR UNKNOWN, FORESEEN OR UNFORESEEN, EXISTING OR HEREINAFTER ARISING, IN LAW, EQUITY, CONTRACT, TORT, OR OTHERWISE, BY STATUTE, VIOLATIONS OF FEDERAL OR STATE SECURITIES LAWS OR OTHERWISE THAT SUCH HOLDERS OR THEIR AFFILIATES WOULD HAVE BEEN LEGALLY ENTITLED TO ASSERT IN THEIR OWN RIGHT (WHETHER INDIVIDUALLY OR COLLECTIVELY) OR ON BEHALF OF THE HOLDER OF ANY CLAIM OR INTEREST OR OTHER PERSON OR ENTITY, BASED ON OR RELATING TO, OR IN ANY MANNER ARISING FROM OR IN CONNECTION WITH, IN WHOLE OR IN PART, THE DEBTORS, THE CHAPTER 11 CASES, THE DEBTORS' RESTRUCTURING EFFORTS, THE NEGOTIATION, FORMULATION OR PREPARATION OF ANY TRANSACTIONS OR DOCUMENTS IN CONNECTION THEREWITH, THE DEBTORS' INTERCOMPANY TRANSACTIONS, ANY PREFERENCE, FRAUDULENT TRANSFER, OR OTHER AVOIDANCE CLAIM ARISING PURSUANT TO CHAPTER 5 OF THE BANKRUPTCY CODE OR APPLICABLE LAW, THE PURCHASE, SALE, OR RESCISSION OF THE PURCHASE OR SALE OF ANY SECURITY OF THE DEBTORS OR THE REORGANIZED DEBTORS, THE SUBJECT MATTER OF, OR THE TRANSACTIONS OR EVENTS GIVING RISE TO, ANY CLAIM OR INTEREST THAT IS TREATED IN THE PLAN, THE BUSINESS OR CONTRACTUAL ARRANGEMENTS AND ANY OTHER TRANSACTION OR ARRANGEMENT BETWEEN ANY DEBTOR, REORGANIZED DEBTOR, OR ESTATE AND ANY RELEASED PARTY (INCLUDING, WITHOUT LIMITATION, THE PREPETITION RBL CREDIT AGREEMENT, THE PREPETITION FIRST LIEN TERM LOAN AGREEMENT, THE PREPETITION FLLO CREDIT AGREEMENT, THE PREPETITION SECOND LIEN TERM LOAN AGREEMENT, AND THE PREPETITION SPONSOR SECOND LIEN TERM LOAN AGREEMENT), THE RESTRUCTURING, THE RESTRUCTURING OF ANY CLAIM OR INTEREST BEFORE OR DURING THE CHAPTER 11 CASES, THE RESTRUCTURING TRANSACTIONS, THE NEGOTIATION, FORMULATION, OR PREPARATION OF THE DISCLOSURE STATEMENT, THE RESTRUCTURING SUPPORT AGREEMENT, THE ASSET PURCHASE TRANSACTION, THE PURCHASE AGREEMENT, THE PLAN AND RELATED AGREEMENTS, INSTRUMENTS, TERM SHEETS AND OTHER DOCUMENTS (INCLUDING THE PLAN DOCUMENTS), THE SOLICITATION OF VOTES WITH RESPECT TO THE PLAN, THE BACKSTOP COMMITMENT AGREEMENT, OR THE RIGHTS OFFERING, OR ANY OTHER ACT OR OMISSION, TRANSACTION, AGREEMENT, EVENT, OR OTHER OCCURRENCE TAKING PLACE OR ARISING ON OR BEFORE THE EFFECTIVE DATE RELATED OR RELATING TO ANY OF THE FOREGOING, IN EACH CASE OTHER THAN CLAIMS OR CAUSES OF ACTION ARISING OUT OF OR RELATED TO ANY ACT OR OMISSION OF A RELEASED PARTY THAT IS A

CRIMINAL ACT OR CONSTITUTES INTENTIONAL FRAUD, GROSS NEGLIGENCE, OR WILLFUL MISCONDUCT, AS DETERMINED BY A FINAL ORDER.

ENTRY OF THE CONFIRMATION ORDER BY THE BANKRUPTCY COURT SHALL CONSTITUTE THE BANKRUPTCY COURT'S APPROVAL, PURSUANT TO BANKRUPTCY RULE 9019, OF THE RELEASES IN SECTION 10.7(b) OF THE PLAN (THE "THIRD-PARTY RELEASE"), WHICH INCLUDES, BY REFERENCE, EACH OF THE RELATED PROVISIONS AND DEFINITIONS UNDER THE PLAN, AND, FURTHER, SHALL CONSTITUTE THE BANKRUPTCY COURT'S FINDING THAT THE THIRD-PARTY RELEASE IS (I) CONSENSUAL, (II) ESSENTIAL TO THE CONFIRMATION OF THE PLAN, (III) GIVEN IN EXCHANGE FOR THE GOOD AND VALUABLE CONSIDERATION PROVIDED BY THE RELEASED PARTIES, (IV) A GOOD FAITH SETTLEMENT AND COMPROMISE OF THE CLAIMS RELEASED BY THE THIRD-PARTY RELEASE, (V) IN THE BEST INTERESTS OF THE DEBTORS AND THEIR ESTATES, (VI) FAIR, EQUITABLE AND REASONABLE, (VII) GIVEN AND MADE AFTER DUE NOTICE AND OPPORTUNITY FOR HEARING, AND (VIII) A BAR TO ANY OF THE RELEASING PARTIES ASSERTING ANY CLAIM OR CAUSE OF ACTION RELEASED PURSUANT TO THE THIRD-PARTY RELEASE.

(c)     **Release of Liens.**  Except as otherwise specifically provided in the Plan or in any contract, instrument, release, or other agreement or document contemplated under or executed in connection with the Plan, including the Exit LC Facility Documents, the Exit First Lien Documents, the Exit Second Lien Documents, and the Apache Decommissioning Agreement Amendment, on the Effective Date and concurrently with the applicable distributions made pursuant to the Plan and, in the case of a Secured Claim, satisfaction in full of the portion of the Secured Claim that is Allowed as of the Effective Date, all mortgages, deeds of trust, Liens, pledges, or other security interests against any property of the estates shall be fully released and discharged, and all of the right, title, and interest of any holder of such mortgages, deeds of trust, Liens, pledges, or other security interests shall revert to the Reorganized Debtors and their successors and assigns, in each case, without any further approval or order of the Bankruptcy Court and without any action or filing being required to be made by the Debtors.  In addition and for the avoidance of doubt, on the Effective Date, all of Apache's mortgages, deeds of trust, Liens, pledges, or other security interests against any property of the estates of the Debtors or Reorganized Debtors shall be fully released and discharged, except for (i) any liens on property in The Fieldwood Decommissioning Trust A, a Delaware statutory trust, (ii) the "Recharacterization Mortgages" as defined in the Decommissioning Agreement dated September 30, 2013 between Apache, Fieldwood Energy LLC and GOM Shelf LLC, and (iii) any other mortgages, deeds of trust, Liens, pledges, or other security interests expressly preserved in the Apache Decommissioning Agreement Amendment.

8.     **Exculpation**

Under the Plan, Exculpated Parties will receive various releases and exculpation, as set out in further detail below.  For the purpose of the Plan, Exculpated Parties will be defined to mean, collectively, and in each case in their capacities as such during the Chapter 11 Cases: (a) the

Debtors, (b) the Reorganized Debtors, (c) the Disbursing Agent, (d) the Restructuring Support Parties, (e) the Exit First Lien Term Loan Agent, (f) the Exit First Lien Term Loan Lenders, (g) the Exit Second Lien Term Loan Agent, (h) the Exit Second Lien Term Loan Lenders, (i) the Exit LC Facility Agent, (j) the Exit LC Facility Lenders, (k) the DIP Facility Agent, (l) the DIP Facility Lenders and (m) the Backstop Parties, and in respect to the entities referenced in clauses (a) through (m) hereof, such entities' predecessors, successors, assigns, subsidiaries, affiliates, managed accounts and funds, and all of their respective current and former officers and directors, principals, shareholders (regardless of whether such interests are held directly or indirectly), members, partners, managers, employees, subcontractors, agents, advisory board members, financial advisors, attorneys, accountants, investment bankers, consultants, representatives, investment managers, investment advisors, management companies, fund advisors, and other professionals, and such entities' respective heirs, executors, estates, servants, and nominees, in each case in their capacity as such.

**TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, NO EXCULPATED PARTY SHALL HAVE OR INCUR, AND EACH EXCULPATED PARTY IS HEREBY RELEASED AND EXCULPATED FROM, ANY CLAIM, INTEREST, OBLIGATION, SUIT, JUDGMENT, DAMAGE, DEMAND, DEBT, RIGHT, CAUSE OF ACTION, LOSS, REMEDY, OR LIABILITY FOR ANY CLAIM IN CONNECTION WITH OR ARISING OUT OF THE ADMINISTRATION OF THE CHAPTER 11 CASES; THE NEGOTIATION AND PURSUIT OF THE EXIT LC CREDIT AGREEMENT, THE EXIT FIRST LIEN CREDIT AGREEMENT, THE EXIT SECOND LIEN CREDIT AGREEMENT, THE DIP FACILITY LOAN AGREEMENT, THE NEW BY-LAWS, THE MANAGEMENT INCENTIVE PLAN, THE BACKSTOP COMMITMENT AGREEMENT, THE DISCLOSURE STATEMENT, THE RESTRUCTURING SUPPORT AGREEMENT, THE RESTRUCTURING TRANSACTIONS, THE ASSET PURCHASE TRANSACTION, THE PURCHASE AGREEMENT, AND THE PLAN (INCLUDING THE PLAN DOCUMENTS), OR THE SOLICITATION OF VOTES FOR, OR CONFIRMATION OF, THE PLAN; THE FUNDING OF THE PLAN; THE OCCURRENCE OF THE EFFECTIVE DATE; THE ADMINISTRATION OF THE PLAN OR THE PROPERTY TO BE DISTRIBUTED UNDER THE PLAN; THE CONDUCTING OF THE RIGHTS OFFERING; THE ISSUANCE OF SECURITIES UNDER OR IN CONNECTION WITH THE PLAN; OR THE TRANSACTIONS IN FURTHERANCE OF ANY OF THE FOREGOING; OTHER THAN CLAIMS OR CAUSES OF ACTION ARISING OUT OF OR RELATED TO ANY ACT OR OMISSION OF AN EXCULPATED PARTY THAT IS A CRIMINAL ACT OR CONSTITUTES INTENTIONAL FRAUD, GROSS NEGLIGENCE, OR WILLFUL MISCONDUCT, BUT IN ALL RESPECTS SUCH ENTITIES SHALL BE ENTITLED TO REASONABLY RELY UPON THE ADVICE OF COUNSEL WITH RESPECT TO THEIR DUTIES AND RESPONSIBILITIES PURSUANT TO THE PLAN. THE EXCULPATED PARTIES AND EACH OF THEIR RESPECTIVE AFFILIATES, AGENTS, DIRECTORS, OFFICERS, EMPLOYEES, ADVISORS, AND ATTORNEYS HAVE ACTED IN COMPLIANCE WITH THE APPLICABLE PROVISIONS OF THE BANKRUPTCY CODE WITH REGARD TO THE SOLICITATION AND DISTRIBUTION OF SECURITIES PURSUANT TO THE PLAN AND, THEREFORE, ARE NOT, AND ON ACCOUNT OF SUCH DISTRIBUTIONS SHALL NOT BE, LIABLE AT ANY TIME FOR THE VIOLATION OF ANY APPLICABLE LAW, RULE,**

**OR REGULATION GOVERNING THE SOLICITATION OF ACCEPTANCES OR REJECTIONS OF THE PLAN OR SUCH DISTRIBUTIONS MADE PURSUANT TO THE PLAN, INCLUDING THE ISSUANCE OF SECURITIES THEREUNDER.  THIS EXCULPATION SHALL BE IN ADDITION TO, AND NOT IN LIMITATION OF, ALL OTHER RELEASES, INDEMNITIES, EXCULPATIONS, AND ANY OTHER APPLICABLE LAW OR RULES PROTECTING SUCH EXCULPATED PARTIES FROM LIABILITY.**

### 9.    Injunction Related to Releases and Exculpation

The Confirmation Order shall permanently enjoin the commencement or prosecution by any Person or entity, whether directly, derivatively, or otherwise, of any Claims, obligations, suits, judgments, damages, demands, debts, rights, Causes of Action, losses, or liabilities released pursuant to the Plan, including, without limitation, the claims, obligations, suits, judgments, damages, demands, debts, rights, Causes of Action, and liabilities released or exculpated in the Plan.

### 10.    Subordinated Claims

The allowance, classification, and treatment of all Allowed Claims and Interests and the respective distributions and treatments thereof under the Plan take into account and conform to the relative priority and rights of the Claims and Interests in each Class in connection with any contractual, legal, and equitable subordination rights relating thereto, whether arising under general principles of equitable subordination, sections 510(a), 510(b), or 510(c) of the Bankruptcy Code, or otherwise.  Pursuant to section 510 of the Bankruptcy Code, the Debtors reserve the right to reclassify any Allowed Claim or Interest in accordance with any contractual, legal, or equitable subordination relating thereto.

### 11.    Retention of Causes of Action and Reservation of Rights

Except as otherwise provided in the Plan, including, without limitation, Sections 10.5, 10.6, 10.7, 10.8, and 10.9, nothing contained in the Plan or the Confirmation Order shall be deemed to be a waiver or relinquishment of any rights, claims, Causes of Action, rights of setoff or recoupment, or other legal or equitable defenses that the Debtors had immediately prior to the Effective Date on behalf of the Estates or of themselves in accordance with any provision of the Bankruptcy Code or any applicable nonbankruptcy law, including, but not limited to, rights, claims, Causes of Action, rights of setoff, offset, recoupment or other legal or equitable defenses against any holder of Existing Energy Inc. Interests or Existing Holdings Interests that arise on account of such holders' objection to, or support of, and objection to the Plan.  The Reorganized Debtors shall have, retain, reserve, and be entitled to assert all such claims, Causes of Action, rights of setoff or recoupment, and other legal or equitable defenses as fully as if the Chapter 11 Cases had not been commenced, and all of the Debtors' legal and equitable rights in respect of any Unimpaired Claim may be asserted after the Confirmation Date and Effective Date to the same extent as if the Chapter 11 Cases had not been commenced.

## 12. Ipso Facto and Similar Provisions Ineffective

Any term of any prepetition policy, prepetition contract, or other prepetition obligation applicable to a Debtor shall be void and of no further force or effect with respect to any Debtor to the extent that such policy, contract, or other obligation is conditioned on, creates an obligation of the Debtor as a result of, or gives rise to a right of any entity based on any of the following: (a) the insolvency or financial condition of a Debtor; (b) the commencement of the Chapter 11 Cases; (c) the confirmation or consummation of the Plan, including any change of control that will occur as a result of such consummation; or (d) the Restructuring.

## 13. Indemnification and Reimbursement Obligations

For purposes of the Plan, (a) the obligations of the Debtors to indemnify and reimburse their directors, members, managers, or officers that were directors, members, managers, or officers, respectively, on or subsequent to the Petition Date shall be assumed by the Reorganized Debtors and (b) indemnification obligations of the Debtors arising from services as officers, members, managers, and directors during the period from and after the Petition Date shall be Administrative Expense Claims. In addition, after the Effective Date, the Reorganized Debtors shall not terminate or otherwise reduce the coverage under any directors', members', managers', and officers' insurance policies (including any "tail policy") in effect as of the Petition Date, and all members, managers, directors and officers of the Debtors who served in such capacity at any time prior to the Effective Date shall be entitled to the full benefits of any such policy for the full term of such policy regardless of whether such members, managers, directors, and/or officers remain in such positions after the Effective Date to the extent set forth in such policies.

## J. Retention of Jurisdiction

## 1. Retention of Jurisdiction

Pursuant to sections 105(c) and 1142 of the Bankruptcy Code and notwithstanding entry of the Confirmation Order and the occurrence of the Effective Date, on and after the Effective Date, the Bankruptcy Court shall retain exclusive jurisdiction, pursuant to 28 U.S.C. §§ 1334 and 157, over all matters arising in or related to the Chapter 11 Cases for, among other things, the following purposes:

(a) to hear and determine applications for the assumption or rejection of executory contracts or unexpired leases and any disputes over Cure Amounts resulting therefrom;

(b) to determine any motion, adversary proceeding, application, contested matter, and other litigated matter pending on or commenced after the entry of the Confirmation Order;

(c) to hear and resolve any disputes arising from or related to (i) any orders of the Bankruptcy Court granting relief under Bankruptcy Rule 2004 or (ii) any protective orders entered by the Bankruptcy Court in connection with the foregoing;

(d)　　to ensure that distributions to holders of Allowed Claims are accomplished as provided in the Plan and the Confirmation Order;

(e)　　to consider Claims or the allowance, classification, priority, compromise, estimation, or payment of any Claim, including any Administrative Expense Claim;

(f)　　to enter, implement, or enforce such orders as may be appropriate in the event that the Confirmation Order is for any reason stayed, reversed, revoked, modified, or vacated;

(g)　　to issue and enforce injunctions, enter and implement other orders, and take such other actions as may be necessary or appropriate to restrain interference by any Person or other entity with the consummation, implementation, or enforcement of the Plan, the Confirmation Order, or any other order of the Bankruptcy Court;

(h)　　to hear and determine any application to modify the Plan in accordance with section 1127 of the Bankruptcy Code to remedy any defect or omission or reconcile any inconsistency in the Plan, the Disclosure Statement, or any order of the Bankruptcy Court, including the Confirmation Order, in such a manner as may be necessary to carry out the purposes and effects thereof;

(i)　　to hear and determine all Fee Claims;

(j)　　to resolve disputes concerning any reserves with respect to Disputed Claims or the administration thereof;

(k)　　to hear and determine disputes arising in connection with the interpretation, implementation, or enforcement of the Plan, the Confirmation Order, any transactions or payments in furtherance of either, or any agreement, instrument, or other document governing or related to any of the foregoing;

(l)　　to take any action and issue such orders, including any such action or orders as may be necessary after entry of the Confirmation Order or the occurrence of the Effective Date, as may be necessary to construe, enforce, implement, execute, and consummate the Plan, including any release, exculpation, or injunction provisions set forth in the Plan, or to maintain the integrity of the Plan following the occurrence of the Effective Date;

(m)　　to determine such other matters and for such other purposes as may be provided in the Confirmation Order;

(n)　　to hear and determine matters concerning state, local, and federal taxes in accordance with sections 346, 505, and 1146 of the Bankruptcy Code (including any requests for expedited determinations under section 505(b) of the Bankruptcy Code);

(o)　　to hear and determine any other matters related to the Chapter 11 Cases and not inconsistent with the Bankruptcy Code or title 28 of the United States Code;

(p)     to resolve any disputes concerning whether a Person or entity had sufficient notice of the Chapter 11 Cases, the Disclosure Statement, any solicitation conducted in connection with the Chapter 11 Cases, any bar date established in the Chapter 11 Cases, or any deadline for responding or objecting to a Cure Amount, in each case, for the purpose for determining whether a Claim or Interest is discharged hereunder or for any other purpose;

(q)     to recover all Assets of the Debtors and property of the Estates, wherever located;

(r)     to resolve all disputes related to the Purchase Agreement to the fullest extent permitted by law; and

(s)     to enter a final decree closing each of the Chapter 11 Cases.

### K.     Miscellaneous Provisions

#### 1.     Exemption from Certain Transfer Taxes

Pursuant to section 1146 of the Bankruptcy Code, (a) the issuance, transfer or exchange of any securities, instruments or documents, (b) the creation of any Lien, mortgage, deed of trust or other security interest, (c) all sale transactions consummated by the Debtors and approved by the Bankruptcy Court on and after the Confirmation Date through and including the Effective Date, including any transfers effectuated under the Plan (including the Asset Purchase Transaction), (d) any assumption, assignment, or sale by the Debtors of their interests in unexpired leases of nonresidential real property or executory contracts pursuant to section 365(a) of the Bankruptcy Code, (e) the grant of collateral under the Exit LC Credit Agreement, Exit First Lien Credit Agreement, or Exit Second Lien Credit Agreement and (f) the issuance, renewal, modification or securing of indebtedness by such means, and the making, delivery or recording of any deed or other instrument of transfer under, in furtherance of, or in connection with, the Plan, including, without limitation, the Confirmation Order, shall not be subject to any document recording tax, stamp tax, conveyance fee or other similar tax, mortgage tax, real estate transfer tax, mortgage recording tax, Uniform Commercial Code filing or recording fee, regulatory filing or recording fee, sales tax, use tax or other similar tax or governmental assessment.  Consistent with the foregoing, each recorder of deeds or similar official for any county, city or Governmental Unit in which any instrument hereunder is to be recorded shall, pursuant to the Confirmation Order, be ordered and directed to accept such instrument without requiring the payment of any filing fees, documentary stamp tax, deed stamps, stamp tax, transfer tax, intangible tax or similar tax.

#### 2.     Dates of Actions to Implement the Plan

In the event that any payment or act under the Plan is required to be made or performed on a date that is not a Business Day, then the making of such payment or the performance of such act may be completed on or as soon as reasonably practicable after the next succeeding Business Day but shall be deemed to have been completed as of the required date.

3.    **Amendments**

(a)    <u>Plan Modifications</u>.    The Plan may be amended, modified, or supplemented by the Debtors in the manner provided for by section 1127 of the Bankruptcy Code or as otherwise permitted by law, without additional disclosure pursuant to section 1125 of the Bankruptcy Code, except as otherwise ordered by the Bankruptcy Court, subject to the written consent of the Requisite Second Lien Term Lenders, Requisite Sponsor Second Lien Term Lenders and the other Requisite Creditors (in the case of the Requisite Creditors, solely to the extent such amendments, modifications and supplements materially and adversely affect in any respect any rights or treatment of such Requisite Creditors under the Plan) in accordance with the Restructuring Support Agreement.  In addition, after the Confirmation Date, so long as such action does not materially and adversely affect the treatment of holders of Allowed Claims pursuant to the Plan, the Debtors, with the consent of the Requisite Second Lien Term Lenders and Requisite Sponsor Second Lien Term Lenders, may remedy any defect or omission or reconcile any inconsistencies in the Plan or the Confirmation Order with respect to such matters as may be necessary to carry out the purposes of effects of the Plan, and any holder of a Claim or Interest that has accepted the Plan shall be deemed to have accepted the Plan as amended, modified, or supplemented.

(b)    <u>Certain Technical Amendments</u>.    Consistent with the Restructuring Support Agreement, prior to the Effective Date, the Debtors may make appropriate technical adjustments and modifications to the Plan without further order or approval of the Bankruptcy Court; *provided*, that such technical adjustments and modifications do not materially and adversely affect in any respect the treatment of holders of Claims or Interests under the Plan.

4.    **Revocation or Withdrawal of the Plan**

The Debtors reserve the right to revoke or withdraw the Plan prior to the Effective Date as to any or all of the Debtors.  If, with respect to a Debtor, the Plan has been revoked or withdrawn prior to the Effective Date, or if confirmation or the occurrence of the Effective Date as to such Debtor does not occur on the Effective Date, then, with respect to such Debtor: (a) the Plan shall be null and void in all respects; (b) any settlement or compromise embodied in the Plan (including the fixing or limiting to an amount any Claim or Interest or Class of Claims or Interests), assumption or rejection of executory contracts or unexpired leases affected by the Plan, and any document or agreement executed pursuant to the Plan shall be deemed null and void; and (c) nothing contained in the Plan shall (i) constitute a waiver or release of any Claim by or against, or any Interest in, such Debtor or any other Person; (ii) prejudice in any manner the rights of such Debtor or any other Person; or (iii) constitute an admission of any sort by any Debtor or any other Person.

5.    **Severability**

If, prior to the entry of the Confirmation Order, any term or provision of the Plan is held by the Bankruptcy Court to be invalid, void, or unenforceable, the Bankruptcy Court, at the request of the Debtors, shall have the power to alter and interpret such term or provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void, or unenforceable, and such term or provision will then be

applicable as altered or interpreted. Notwithstanding any such holding, alteration, or interpretation by the Bankruptcy Court, the remainder of the terms and provisions of the Plan shall remain in full force and effect and shall in no way be affected, impaired, or invalidated by such holding, alteration, or interpretation. The Confirmation Order shall constitute a judicial determination and shall provide that each term and provision of the Plan, as it may have been altered or interpreted in accordance with this section, is valid and enforceable pursuant to its terms.

# VIII.
## TRANSFER RESTRICTIONS AND
## CONSEQUENCES UNDER FEDERAL SECURITIES LAWS

As to holders of Allowed SLTL Claims, the Solicitation is being made before the Petition Date only to such holders that are "accredited investors" within the meaning of Rule 501(a) of Regulation D of the Securities Act.

### A.   1145 Securities

The issuance of and the distribution under the Plan of the New Equity Interests pursuant to Sections 4.6(a)(i) and 4.10(a) of the Plan (the "**1145 Securities**") will be exempt from registration under section 5 of the Securities Act and any other applicable securities laws pursuant to section 1145 of the Bankruptcy Code.

Section 1145 of the Bankruptcy Code generally exempts from registration under the Securities Act the offer or sale under a chapter 11 plan of a security of the debtor, of an affiliate participating in a joint plan with the debtor, or of a successor to the debtor under a plan, if such securities are offered or sold in exchange for a claim against, or an interest in, the debtor or such affiliate, or principally in such exchange and partly for cash. Section 1145 of the Bankruptcy Code also exempts from registration the offer of a security through any right to subscribe sold in the manner provided in the prior sentence, and the sale of a security upon the exercise of such right. In reliance upon this exemption, the 1145 Securities will be exempt from the registration requirements of the Securities Act, and state and local securities laws. These securities may be resold without registration under the Securities Act or other federal or state securities laws pursuant to the exemption provided by section 4(a)(1) of the Securities Act, unless the holder is an "underwriter" with respect to such securities, as that term is defined in section 1145(b) of the Bankruptcy Code. In addition, such 1145 Securities generally may be resold without registration under state securities laws pursuant to various exemptions provided by the respective laws of the several states.

Section 1145(b) of the Bankruptcy Code defines "underwriter" for purposes of the Securities Act as one who, except with respect to ordinary trading transactions, (a) purchases a claim with a view to distribution of any security to be received in exchange for the claim, (b) offers to sell securities issued under a plan for the holders of such securities, (c) offers to buy securities issued under a plan from persons receiving such securities, if the offer to buy is made with a view to distribution or (d) is an issuer, as used in section 2(a)(11) of the Securities Act, with respect to such securities, which includes control persons of the issuer.

Notwithstanding the foregoing, control person underwriters may be able to sell securities without registration pursuant to the resale limitations of Rule 144 of the Securities Act which, in effect, permit the resale of securities received by such underwriters pursuant to a chapter 11 plan, subject to applicable volume limitations, notice and manner of sale requirements, and certain other conditions.  Parties who believe they may be statutory underwriters as defined in section 1145 of the Bankruptcy Code are advised to consult with their own legal advisers as to the availability of the exemption provided by Rule 144.

### B.    Private Placement

The issuance and sale of the New Equity Interests pursuant to the Rights Offering and to the Backstop Parties under the Backstop Commitment Agreement (including the New Equity Interests comprising the Backstop Commitment Premium) is being made in reliance on the exemption from registration set forth in section 4(a)(2) of the Securities Act and Regulation D thereunder (the "**4(a)(2) Securities**").  Such securities will be considered "restricted securities", will bear customary legends and transfer restrictions, and may not be transferred except pursuant to an effective registration statement or under an available exemption from the registration requirements of the Securities Act.

Rule 144 provides a limited safe harbor for the public resale of restricted securities if certain conditions are met. These conditions vary depending on whether the holder of the restricted securities is an "affiliate" of the issuer.  Rule 144 defines an affiliate as "a person that directly, or indirectly through one or more intermediaries, controls, or is controlled by, or is under common control with, such issuer."

A non-affiliate of an issuer that is not subject to the reporting requirements of Section 13 or 15(d) of the Securities Exchange Act of 1934 (the "**Exchange Act**") and who has not been an affiliate of the issuer during the 90 days preceding such sale may resell restricted securities after a one-year holding period whether or not there is current public information regarding the issuer.

An affiliate of an issuer that is not subject to the reporting requirements of Section 13 or 15(d) of the Exchange Act may resell restricted securities after the one-year holding period if at the time of the sale certain current public information regarding the issuer is available. An affiliate must also comply with the volume, manner of sale and notice requirements of Rule 144.  First, the rule limits the number of restricted securities (plus any unrestricted securities) sold for the account of an affiliate (and related persons) in any three-month period to the greater of 1% of the outstanding securities of the same class being sold or, if the class is listed on a stock exchange, the average weekly reported volume of trading in such securities during the four weeks preceding the filing of a notice of proposed sale on Form 144 or if no notice is required, the date of receipt of the order to execute the transaction by the broker or the date of execution of the transaction directly with a market maker. Second, the manner of sale requirement provides that the restricted securities must be sold in a broker's transaction, directly with a market maker or in a riskless principal transaction (as defined in Rule 144). Third, if the amount of securities sold under Rule 144 in any three month period exceeds 5,000 shares or has an aggregate sale price greater than $50,000, an affiliate must file or cause to be filed with the SEC three copies of a notice of proposed sale on Form 144, and provide a copy to any exchange on which the securities are traded.

The Debtors believe that the Rule 144 exemption will not be available with respect to any 4(a)(2) Securities (whether held by non-affiliates or affiliates) until at least one year after the Effective Date. Accordingly, unless transferred pursuant to an effective registration statement or another available exemption from the registration requirements of the Securities Act, nonaffiliated holders of 4(a)(2) Securities will be required to hold their 4(a)(2) Securities for at least one year and, thereafter, to sell them only in accordance with the applicable requirements of Rule 144, pursuant to the an effective registration statement or pursuant to another available exemption from the registration requirements of applicable securities laws.

\* \* \* \* \*

*Legends*. To the extent certificated or issued by way of direct registration on the records of the issuer's transfer agent, certificates evidencing the New Equity Interests held by holders of 10% or more of the outstanding New Equity Interests, or who are otherwise underwriters as defined in section 1145(b) of the Bankruptcy Code, and all New Equity Interests issued in the Rights Offering will bear a legend substantially in the form below:

> THE SECURITIES REPRESENTED BY THIS CERTIFICATE WERE ORIGINALLY ISSUED ON [DATE OF ISSUANCE], HAVE NOT BEEN REGISTERED UNDER THE UNITED STATES SECURITIES ACT OF 1933, AS AMENDED (THE "ACT"), OR ANY OTHER APPLICABLE STATE SECURITIES LAWS, AND MAY NOT BE SOLD OR TRANSFERRED IN THE ABSENCE OF AN EFFECTIVE REGISTRATION STATEMENT UNDER THE ACT OR AN AVAILABLE EXEMPTION FROM REGISTRATION THEREUNDER.

The Debtors and Reorganized Debtors, as applicable, reserve the right to reasonably require certification, legal opinions or other evidence of compliance with Rule 144 as a condition to the removal of such legend or to any resale of the 4(a)(2) Securities. The Debtors and Reorganized Debtors, as applicable, also reserve the right to stop the transfer of any 4(a)(2) Securities if such transfer is not in compliance with Rule 144, pursuant to an effective registration statement or pursuant to another available exemption from the registration requirements of applicable securities laws. All persons who receive 4(a)(2) Securities will be required to acknowledge and agree that (a) they will not offer, sell or otherwise transfer any 4(a)(2) Securities except in accordance with an exemption from registration, including under Rule 144 under the Securities Act, if and when available, or pursuant to an effective registration statement, and (b) the 4(a)(2) Securities will be subject to the other restrictions described above.

In any case, recipients of securities issued under the Plan are advised to consult with their own legal advisers as to the availability of any such exemption from registration under state law in any given instance and as to any applicable requirements or conditions to such availability.

BECAUSE OF THE COMPLEX, SUBJECTIVE NATURE OF THE QUESTION OF WHETHER A PARTICULAR PERSON MAY BE AN UNDERWRITER OR AN AFFILIATE AND THE HIGHLY FACT-SPECIFIC NATURE OF THE AVAILABILITY OF EXEMPTIONS FROM REGISTRATION UNDER THE SECURITIES ACT, INCLUDING

THE EXEMPTIONS AVAILABLE UNDER SECTION 1145 OF THE BANKRUPTCY CODE AND RULE 144 UNDER THE SECURITIES ACT, NONE OF THE DEBTORS MAKE ANY REPRESENTATION CONCERNING THE ABILITY OF ANY PERSON TO DISPOSE OF THE SECURITIES TO BE ISSUED UNDER OR OTHERWISE ACQUIRED PURSUANT TO THE PLAN. THE DEBTORS RECOMMEND THAT POTENTIAL RECIPIENTS OF THE SECURITIES TO BE ISSUED UNDER OR OTHERWISE ACQUIRED PURSUANT TO THE PLAN CONSULT THEIR OWN COUNSEL CONCERNING WHETHER THEY MAY FREELY TRADE SUCH SECURITIES AND THE CIRCUMSTANCES UNDER WHICH THEY MAY RESELL SUCH SECURITIES.

## IX.
## CERTAIN TAX CONSEQUENCES OF PLAN

The following discussion is a summary of certain U.S. federal income tax consequences of the consummation of the Plan to the Debtors and to certain holders of Claims. The following summary does not address the U.S. federal income tax consequences to holders of Claims who are Unimpaired or otherwise entitled to payment in full in Cash under the Plan, or who are deemed to reject to Plan. In addition, the following discussion does not address the U.S. federal income tax consequences with respect to SLTL Claims held by Riverstone (the "**Sponsor SLTL Claims**"), since it is the Debtors' understanding that Riverstone has engaged counsel to advise it on the consequences of the Plan to it.

The discussion of U.S. federal income tax consequences below is based on the Internal Revenue Code of 1986, as amended (the "**Tax Code**"), U.S. Treasury regulations, judicial authorities, published positions of the Internal Revenue Service ("**IRS**"), and other applicable authorities, all as in effect on the date of the Disclosure Statement and all of which are subject to change or differing interpretations (possibly with retroactive effect). The U.S. federal income tax consequences of the contemplated transactions are complex and subject to significant uncertainties. The Debtors have not requested an opinion of counsel or a ruling from the IRS with respect to any of the tax aspects of the contemplated transactions, and the discussion below is not binding upon the IRS or the courts. No assurance can be given that the IRS would not assert, or that a court would not sustain, a different position than any position discussed herein.

This summary does not address foreign, state, or local tax consequences of the contemplated transactions, nor does it address the U.S. federal income tax consequences of the transactions to special classes of taxpayers (*e.g.*, non-U.S. taxpayers, small business investment companies, regulated investment companies, real estate investment trusts, investment trusts, banks and certain other financial institutions, insurance companies, tax-exempt organizations, retirement plans, individual retirement and other tax-deferred accounts, holders that are, or hold their Claims through, S corporations, partnerships or other pass-through entities for U.S. federal income tax purposes, persons whose functional currency is not the U.S. dollar, dealers in securities or foreign currency, traders that mark-to-market their securities, and persons whose Claims are part of a straddle, hedging, constructive sale, or conversion transaction). In addition, this discussion does not address the Medicare tax on certain investment income, legislation commonly referred to as the Foreign Account Tax Compliance Act or U.S. federal taxes other than income taxes, nor does it apply to any person that acquires New Equity Interests or Subscription Rights in the secondary market.

Unless otherwise indicated, this discussion assumes that all Claims, the Exit First Lien Term Loan Facility, the Exit Second Lien Term Loan Facility, the New Equity Interests and the Subscription Rights are held as "capital assets" (generally, property held for investment) within the meaning of section 1221 of the Tax Code and that the various debt and other arrangements to which the Debtors are a party will be respected for U.S. federal income tax purposes in accordance with their respective forms.

*The following summary of certain U.S. federal income tax consequences is for informational purposes only and is not a substitute for careful tax planning and advice based upon the individual circumstances of a holder of Claims or New Equity Interests. All holders of Claims and New Equity Interests are urged to consult their own tax advisors for the U.S. federal, state, local, non-U.S., and other tax consequences applicable under the Plan.*

## A. Consequences to Debtors

Fieldwood Holdings is treated as a partnership for U.S. federal income tax purposes. As a partnership, Fieldwood Holdings is not itself subject to U.S. federal income tax; instead, the members of Fieldwood Holdings are subject to tax in respect of their respective distributive shares of each item of income, gain, loss, deduction and credit of Fieldwood Holdings. Fieldwood Holdings is a holding company which owns all of the stock of Energy Inc.

Energy Inc. is a corporation and thus a separate taxable entity for U.S. federal income tax purposes. Each of the other Debtors is a direct or indirect subsidiary of Energy Inc., and (other than FW GOM Pipeline, Inc.) is treated as a disregarded entity for U.S. federal income tax purposes. As disregarded entities, such Debtors are not themselves subject to U.S. federal income tax; instead, any income tax consequences are treated as borne by Energy Inc.

As of the Petition Date, neither Energy Inc. nor FW GOM Pipeline, Inc. had a material amount of net operating loss ("**NOL**") carryforwards. Energy Inc. has an aggregate tax basis in its assets that, based on the Valuation Analysis (see Section XII.C.4), is substantially in excess of fair market value. The amount of any such NOL carryforwards and other tax attributes remain subject to audit and adjustment by the IRS.

As discussed below, in connection with the Plan, the amount of Energy Inc.'s NOL carryforwards will be eliminated and the tax basis in its assets will be significantly reduced and potentially subject to certain limitations.

### 1. Cancellation of Debt

In connection with the implementation of the Plan, Energy Inc. is expected to incur a significant amount of cancellation of debt ("**COD**") for U.S. federal income tax purposes. Given that Fieldwood Holdings is not primarily liable with respect to any Claims impaired by the Plan, it is not anticipated that Fieldwood Holdings will recognize any COD income.

In general, the Tax Code provides that a corporate debtor in a bankruptcy case must reduce certain of its tax attributes—such as NOL carryforwards and current year NOLs, capital loss carryforwards, tax credits, and tax basis in assets—by the amount of any COD incurred pursuant to a confirmed chapter 11 plan. The amount of COD incurred is generally the amount by which

the indebtedness discharged exceeds the value of any consideration given in exchange therefor. Certain statutory or judicial exceptions may apply to limit the amount of COD incurred for U.S. federal income tax purposes. If advantageous, a corporate debtor can elect to reduce the basis of depreciable property prior to any reduction in its NOL carryforwards or other tax attributes. Any reduction in tax attributes in respect of COD generally does not occur until after the determination of the debtor's net income or loss for the taxable year in which the COD is incurred.

As a result of the COD expected to be incurred by Energy Inc. and attendant attribute reduction, any existing NOL carryforwards and, NOLs incurred through the end of the taxable year in which the Plan goes effective, should be eliminated and the tax basis in its assets will be significantly reduced. It is anticipated that, following such reduction, Energy Inc.'s aggregate tax basis in its assets will be roughly equal to their aggregate fair market value.

## 2. Limitation of NOL Carryforwards and Other Tax Attributes

Following the Effective Date, any remaining NOL carryforwards and certain other tax attributes (collectively, "**Pre-Change Losses**") will be subject to limitation under section 382 of the Tax Code. Any such limitation applies in addition to, and not in lieu of, the use of attributes or the attribute reduction that results from COD incurred in connection with the Plan. As a result, the Debtors do not anticipate that any material amount of Pre-Change Losses will remain and thus will be affected by such limitation.

Under section 382 of the Tax Code, if a corporation undergoes an "ownership change" and the corporation does not qualify for (or elects out of) a special bankruptcy exception, the amount of its Pre-Change Losses that may be utilized to offset future taxable income or tax liability is subject to an annual limitation. The issuance of the New Equity Interests pursuant to the Plan will result in an "ownership change" of Energy Inc. and FW GOM Pipeline, Inc. In general, the amount of the annual limitation to which a corporation that undergoes an ownership change will be subject is generally equal to the product of (1) the fair market value of the stock of the corporation *immediately before* the ownership change (with certain adjustments) multiplied by (2) the "long term tax exempt rate" in effect for the month in which the ownership change occurs (*e.g.*, 1.97% for ownership changes occurring in February 2018). For a corporation in bankruptcy that undergoes an ownership change pursuant to a confirmed bankruptcy plan, the fair market value of the stock of the corporation is generally determined immediately *after* (rather than before) the ownership change, but subject to certain adjustments; in no event, however, can the stock value for this purpose exceed the pre-change gross value of the corporation's assets. Any unused annual limitation may be carried forward and therefore available to be utilized in a subsequent taxable year.

## B. Consequences to Holders of Certain Claims

This summary discusses the U.S. federal income tax consequences to holders of FLTL Claims, FLLO Claims and SLTL Claims (other than Sponsor SLTL Claims). Unless otherwise noted, the discussion below applies only to U.S. Holders. As used herein, the term "**U.S. Holder**" means a beneficial owner of Claims, New Equity Interests or Subscription Rights that is for U.S. federal income tax purposes:

- an individual who is a citizen or resident of the United States;

- a corporation, or other entity taxable as a corporation for U.S. federal income tax purposes, created or organized in or under the laws of the United States, any state thereof or the District of Columbia;

- an estate the income of which is subject to U.S. federal income taxation regardless of its source; or

- a trust, if a court within the United States is able to exercise primary jurisdiction over its administration and one or more U.S. persons have authority to control all of its substantial decisions, or if the trust has a valid election in effect under applicable U.S. Treasury regulations to be treated as a U.S. person.

If a partnership or other entity or arrangement taxable as a partnership for U.S. federal income tax purposes holds Claims, the Exit First Lien Term Loan Facility, the Exit Second Lien Term Loan Facility, the New Equity Interests or the Subscription Rights, the tax treatment of a partner in such partnership generally will depend upon the status of the partner and the activities of the partnership. If you are a partner in such a partnership holding any of such instruments, you should consult your own tax advisor.

## 1. Holders of FLTL Claims and FLLO Claims

Pursuant to the Plan, on the Effective Date, holders of FLTL Claims will receive their respective pro rata shares of the Exit First Lien Facility, and holders of FLLO Claims will receive their respective pro rata shares of the Exit Second Lien Term Facility, and in each case holders will receive cash for all accrued and unpaid interest payable through the Effective Date, in complete and final satisfaction of their Claims.

For U.S. federal income tax purposes, a purported exchange of a new debt instrument for an existing debt instrument will be treated as an exchange only if the terms of the new debt instrument compared to the existing debt instrument constitute a "significant modification." The applicable U.S. Treasury regulations concerning modification of debt instruments generally provide that an exchange occurs depending on the legal rights or obligations that are altered and the degree to which they are altered. The following discussion assumes that the terms of the Exit First Lien Term Loan Facility and the Exit Second Lien Term Facility will constitute a "significant modification" as compared to the terms of the prepetition FLTL and FLLO facilities, respectively, and thus will be treated as an exchange of the FLTL Claims and the FLLO Claims for a new term loan governed by the terms the Exit First Lien Term Loan Facility and the Exit Second Lien Term Loan Facility, respectively (the "**New Loan Obligations**").

### (a) Gain or Loss

The Debtors believe that the receipt of cash and New Loan Obligations under the various exit facilities in exchange for the FLTL Claims and the FLLO Claims will be a fully taxable transaction to the holders. Accordingly, in general, a U.S. Holder of FLTL Claims and FLLO Claims should recognize gain or loss in an amount equal to the difference, if any, between the (i)

issue price (as defined below) of the New Loan Obligations received in satisfaction of its Claims (other than any consideration received in respect of a Claim for accrued but unpaid interest and possibly accrued original issue discount ("**OID**")), and (ii) the holder's adjusted tax basis in its Claims (other than any tax basis attributable to accrued but unpaid interest and possibly accrued OID). *See* B.3— "Character of Gain or Loss," below. A holder will have ordinary interest income to the extent of any cash received in respect of accrued but unpaid interest not previously included in income. *See* B.4— "Distributions in Discharge of Accrued Interest or OID," below.

The "**issue price**" of any series of New Loan Obligations under the Plan depends on whether, at any time during the 31-day period ending 15 days after the Effective Date, such New Loan Obligations or the FLTL Claims or FLLO Claims exchanged therefor are considered traded on an "established market." Pursuant to applicable U.S. Treasury regulations, an "established market" need not be a formal market. It is sufficient if there is a readily available sales price for an executed purchase or sale of New Loan Obligations in such series or the FLTL Claims or FLLO Claims exchanged therefor, or if there is one or more "firm quotes" or "indicative quotes" with respect to a series of New Loan Obligations or the FLTL Claims or FLLO Claims exchanged therefor, in each case, as such terms are defined in applicable U.S. Treasury regulations. If any of the New Loan Obligations received are considered traded on an established market, the issue price of such series of New Loan Obligations for U.S. federal income tax purposes will equal their fair market value as of the Effective Date. If any series of New Loan Obligations is not considered traded on an established market but the FLTL Claims or FLLO Claims exchanged therefor are so treated, the issue price of such series of New Loan Obligations for U.S. federal income tax purposes will be based on the fair market value of the Claims exchanged therefor. Alternatively, if the FLTL Claims or FLLO Claims exchanged therefor are also not considered traded on an established market, the issue price of such series of New Loan Obligations for U.S. federal income tax purposes generally will be their stated principal amount. Energy Inc. is required to determine whether any series of New Loan Obligations or the FLTL Claims or FLLO Claims exchanged therefor are traded on an established market and make such determination available to holders in a commercially reasonable fashion, including by electronic publication, within 90 days of the Effective Date. The Debtors intend to make this information available on their website. If Energy Inc. determines that any series of New Loan Obligations or the FLTL Claims or FLLO Claims exchanged therefor are traded on an established market, such determination and the determination of issue price will be binding on a holder unless such holder discloses, on a timely-filed U.S. federal income tax return for the taxable year that includes the Effective Date, that such holder's determination is different from Energy Inc.'s determination, the reasons for such holder's different determination and, if applicable, how such holder determined the fair market value. There can be no assurance whether a trading market will or will not arise in respect of the FLTL Claims, the FLLO Claims or the New Loan Obligations between now and 15 days after the Effective Date. Accordingly, each holder of the FLTL Claims or FLLO Claims exchanged for New Loan Obligations is urged to consult its tax advisor regarding such determination and the gain or loss that such holder may recognize upon implementation of the Plan.

(b)        Payments of Stated Interest on the New Loan Obligations

Payments of stated interest on New Loan Obligations generally should be taxable to a U.S. Holder as ordinary interest income at the time such payments are accrued or are received (in accordance with the holder's regular method of tax accounting).

(c)        Accrual of Original Issue Discount on the New Loan Obligations

The New Loan Obligations may be treated as issued with OID. A debt instrument generally has OID if its "stated redemption price at maturity" exceeds its "issue price" (as described in (a) above) by more than a *de minimis* amount. A New Loan Obligation's "stated redemption price at maturity" for this purpose would include all principal and interest payable over the term of the New Loan Obligation, other than "qualified stated interest," *i.e.,* stated interest that is unconditionally payable at least annually at a constant rate in cash or property (other than debt of the issuer). The stated interest payable on the New Loan Obligations should be considered qualified stated interest for this purpose.

If the New Loan Obligations are issued with OID, a U.S. Holder of a New Loan Obligation generally will be required to include OID in gross income as it accrues over the term of the loan in accordance with the constant yield to maturity method, regardless of whether the U.S. holder is a cash or accrual method taxpayer, and regardless of whether and when the holder receives cash payments of interest on the obligation. The yield to maturity of the New Loan Obligation is the rate that, when used in computing the present value of all payments to be made on a note, produces an amount equal to the issue price of the New Loan Obligation in accordance with applicable Treasury regulations. Accordingly, a U.S. Holder could be treated as receiving interest income in advance of a corresponding receipt of cash. Any OID that a holder includes in income will increase the holder's adjusted tax basis in the New Loan Obligation. A U.S. Holder generally will not be required to include separately in income cash payments (other than in respect of qualified stated interest) received on the New Loan Obligation; instead, such payments will reduce the holder's adjusted tax basis in the New Loan Obligation by the amount of the payment.

The amount of OID includible in income for a taxable year by a U.S. Holder generally equals the sum of the daily portions of OID that accrue on a New Loan Obligation for each day during the taxable year on which such holder holds the New Loan Obligation, whether reporting on the cash or accrual basis of accounting for U.S. federal income tax purposes. The daily portion is determined by allocating to each day of an accrual period (generally, the period between interest payments or compounding dates) a pro rata portion of the OID allocable to such accrual period. The amount of OID that will accrue during an accrual period is the product of the "adjusted issue price" of the New Loan Obligation at the beginning of the accrual period multiplied by the yield to maturity of the New Loan Obligation less the amount of any qualified stated interest allocable to such accrual period. The "adjusted issue price" of a New Loan Obligation at the beginning of an accrual period will equal its issue price, increased by the aggregate amount of OID that has accrued on the New Loan Obligation in all prior accrual periods, and decreased by any payments made during all prior accrual periods on the New Loan Obligation other than qualified stated interest.

Pursuant to recent legislation, for taxable years beginning after December 31, 2017 (and for taxable years beginning after 2018 in the case of debt issued with OID), an accrual method taxpayer that reports revenues on an applicable financial statement generally must recognize income for U.S. federal income tax purposes no later than the taxable year in which such income is taken into account as revenue in the applicable financial statement. It is unclear how this rule applies to debt instruments issued with OID, including whether it would apply to alter the accrual and inclusion of OID described above. Accordingly, this rule could potentially require such a taxpayer to recognize income for U.S. federal income tax purposes with respect to the New Loan Obligations prior to the time such income would otherwise have been recognized.

The rules regarding the determination of issue price and OID and the application of recent legislation with respect to OID are complex. Accordingly, each holder of the FLTL Claims and FLLO Claims is urged to consult its tax advisor regarding the possible application of the OID rules and recent legislation to the New Loan Obligations.

## 2. Holders of SLTL Claims

Pursuant to the Plan, on the Effective Date, holders of SLTL Claims will receive New Equity Interests and Subscription Rights in complete and final satisfaction of their Claims. As indicated above, the following discussion is not directed at holders of Sponsor SLTL Claims.

The U.S. federal income tax consequences of the Plan to holders of SLTL Claims depend, in part, on whether the SLTL Claims constitute a "security" of Energy Inc. for U.S. federal income tax purposes. The term "security" is not defined in the Tax Code or in the U.S. Treasury regulations issued thereunder and has not been clearly defined by judicial decisions. The determination of whether a particular debt obligation constitutes a "security" depends on an overall evaluation of the nature of the debt, including whether the holder of such debt obligation is subject to a material level of entrepreneurial risk and whether a continuing proprietary interest is intended. A significant factor considered in determining whether a particular debt obligation is a security is its original term. In general, debt obligations issued with a weighted average maturity at issuance of less than five (5) years do not constitute securities, whereas debt obligations with a weighted average maturity at issuance of ten (10) years or more constitute securities. Such determination is generally made at the time the debt is issued. In the present case, the SLTL Claims were debt obligations of Fieldwood Energy, a partnership for U.S. federal income tax purposes, at the time of issuance and only became debt obligations of Energy Inc. in 2017. Accordingly, whether the SLTL Claims are considered "securities" of Energy Inc. is uncertain. Unless otherwise indicated, the following discussion assumes that the SLTL Claims are *not* "securities" of Energy Inc. Holders of SLTL Claims are urged to consult their own tax advisors regarding the appropriate status for U.S. federal income tax purposes of such Claims.

### (a) Gain or Loss

In general, a U.S. Holder of SLTL Claims will recognize gain or loss in an amount equal to the difference, if any, between (i) the aggregate fair market value of New Equity Interests and Subscription Rights received in satisfaction of its Claims (other than any consideration received in respect of a Claim for accrued but unpaid interest and possibly accrued OID), and (ii) the U.S. Holder's adjusted tax basis in its Claims (other than any tax basis attributable to accrued but

unpaid interest and possibly accrued OID). *See* B.3— "Character of Gain or Loss," below. A U.S. Holder will have ordinary interest income to the extent of any consideration allocable to accrued but unpaid interest not previously included in income. *See* B.4— "Distributions in Discharge of Accrued Interest or OID," below.

Although not free from doubt, the Debtors believe that the better view is that a Subscription Right should be treated as a "warrant" and, thus, a holder should be treated as receiving the Subscription Rights in exchange for its Claim, with the exercise of the Subscription Rights treated for U.S. federal income tax purposes as the exercise of warrants to acquire the underlying New Equity Interests. Alternatively, given that the Subscription Rights must be exercised prior to the Effective Date, the receipt and exercise of the Subscription Rights pursuant to the Plan could be viewed as an integrated transaction pursuant to which part of the underlying New Equity Interests are treated as acquired directly in satisfaction of a holder's Claims and part are treated as acquired for Cash. Unless otherwise indicated, the discussion herein assumes that the Subscription Rights are viewed as warrants. Regardless of the characterization of the Subscription Rights, a U.S. Holder of Subscription Rights generally would not recognize additional gain or loss upon the exercise of such Subscription Rights beyond the gain or loss recognized in respect of the exchange of such holder's Claim. If the Subscription Rights are treated as warrants, a U.S. Holder's tax basis in the Subscription Rights should be equal to the fair market value of such Subscription Rights on the Effective Date.

A U.S. Holder's tax basis in the New Equity Interests received upon exercise of its Subscription Rights should generally be equal to the sum of (i) the amount paid, if any, for such New Equity Interests and (ii) the U.S. Holder's tax basis, if any, in the Subscription Rights or, alternatively, under an integrated transaction analysis, in any New Equity Interests that are treated as acquired directly in full satisfaction of the holder's Claim. A U.S. Holder's holding period in the New Equity Interests received upon exercise of the Subscription Rights should begin on the day such rights are exercised or, alternatively under an integrated transaction analysis, on the day after such U.S. Holder is treated as receiving the New Equity Interests.

A U.S. Holder of SLTL Claims will have a tax basis in New Equity Interests received in satisfaction of its Claims equal to the fair market value of such interests, and a holding period that begins on the day after the Effective Date.

In the event that the SLTL claims are treated as "securities" for U.S. federal income tax purposes, the receipt of New Equity Interests and Subscription Rights in exchange for SLTL Claims would qualify as a "reorganization exchange" which generally serves to defer the recognition of any taxable gain or loss by the U.S. Holder. Nevertheless, even within an otherwise tax-free exchange, a U.S. Holder would have interest income to the extent of any exchange consideration allocable to accrued but unpaid interest not previously included in income (see "Distributions in Discharge of Accrued Interest," below). In a reorganization exchange, the U.S. Holder's aggregate tax basis in the New Equity Interests and Subscriptions Rights received should equal such holder's aggregate adjusted tax basis in the SLTL Claims exchanged therefor, increased by any interest income recognized in the exchange. The U.S. Holder's holding period therein would include its holding period in the SLTL Claims exchanged therefor, except to the extent of any exchange consideration received in respect of accrued but unpaid interest (and possibly OID). In addition, any accrued market discount taint (see

discussion of "Character of Gain or Loss" below) would carry over to the New Equity Interests and Subscription Rights received.

(b)     Disposition of New Equity Interests

Unless a nonrecognition provision applies, and subject to the discussion below, a U.S. Holder generally will recognize capital gain or loss upon the sale or exchange of the New Equity Interests in an amount equal to the difference between (i) the sum of the cash and the fair market value of any property received from such disposition and (ii) the U.S. Holder's adjusted tax basis in the New Equity Interests held. Any such gain or loss generally should be long-term capital gain or loss if the U.S. Holder has held its New Equity Interests for more than one year at that time. A reduced tax rate on long-term capital gain may apply in respect of New Equity Interests held by non-corporate holders. The deductibility of capital losses is subject to significant limitations.

In general, any gain recognized by a U.S. Holder upon a disposition of the New Equity Interests (or any stock or property received for such New Equity Interests in a later tax-free exchange) received in exchange for its Claim will be treated as ordinary income for U.S. federal income tax purposes to the extent of (i) any ordinary loss deductions previously claimed as a result of the write-down of the Claim, decreased by any income (other than interest income) recognized by the U.S. Holder upon exchange of the Claim, and (ii) with respect to a cash-basis holder and in addition to clause (i) above, any amounts which would have been included in its gross income if the U.S. Holder's Claim had been satisfied in full but which was not included by reason of the cash method of accounting.

### 3.      Character of Gain or Loss

Where gain or loss is recognized by a U.S. Holder, the character of such gain or loss as long-term or short-term capital gain or loss or as ordinary income or loss will be determined by a number of factors, including the tax status of the U.S. Holder, whether the Claim constitutes a capital asset in the hands of the U.S. Holder and how long it has been held, whether the Claim was acquired at a market discount, and whether and to what extent the U.S. Holder previously claimed a bad debt deduction.

A holder that purchased its Claims from a prior holder at a "market discount" (relative to the principal amount of the Claims at the time of acquisition) may be subject to the market discount rules of the Tax Code. A holder that purchased its Claim from a prior holder will be considered to have purchased such Claim with "market discount" if the holder's adjusted tax basis in its Claim is less than the adjusted issue price of such Claim by at least a *de minimis* amount. Under these rules, gain recognized on the exchange of Claims (other than in respect of a Claim for accrued but unpaid interest) generally will be treated as ordinary income to the extent of the market discount accrued (on a straight line basis or, at the election of the holder, on a constant yield basis) during the holder's period of ownership, unless the holder elected to include the market discount in income as it accrued. If a holder of Claims did not elect to include market discount in income as it accrued and, thus, under the market discount rules, was required to defer all or a portion of any deductions for interest on debt incurred or maintained to purchase or carry its Claims, such deferred amounts would become deductible at the time of the exchange.

### 4. Distributions in Discharge of Accrued Interest or OID

In general, to the extent that any consideration received pursuant to the Plan by a U.S. Holder of a Claim is received in satisfaction of interest accrued during its holding period, such amount will be taxable to the U.S. Holder as interest income (if not previously included in the U.S. Holder's gross income). Conversely, a U.S. Holder may be entitled to recognize a deductible loss to the extent any accrued interest or amortized OID was previously included in its gross income and is not paid in full. However, the IRS has privately ruled that a holder of a "security" of a corporate issuer, in an otherwise tax-free exchange, could not claim a current deduction with respect to any unpaid OID. Accordingly, it is also unclear whether, by analogy, a U.S. Holder of a Claim that does not constitute a "security" would be required to recognize a capital loss, rather than an ordinary loss, with respect to previously included OID that is not paid in full.

The Plan provides that, except as otherwise provided therein, consideration received in respect of a Claim is generally allocable first to the principal amount of the Claim (as determined for U.S. federal income tax purposes) and then, to the extent of any excess, to any Claim for accrued but unpaid interest. There is no assurance that the IRS will respect such allocation for U.S. federal income tax purposes. Holders are urged to consult their tax advisors regarding the allocation of consideration received under the Plan, as well as the deductibility of accrued but unpaid interest (including OID) and the character of any loss claimed with respect to accrued but unpaid interest (including OID) previously included in gross income for U.S. federal income tax purposes.

### 5. Information Reporting and Backup Withholding

Payments of interest (including accruals of OID) or dividends and any other reportable payments, possibly including amounts received pursuant to the Plan and payments of proceeds from the sale, retirement or other disposition of the exchange consideration, may be subject to "backup withholding" if a recipient of those payments fails to furnish to the payor certain identifying information and, in some cases, a certification that the recipient is not subject to backup withholding. Backup withholding is not an additional tax. Any amounts deducted and withheld generally should be allowed as a refund or credit against that recipient's U.S. federal income tax, provided that appropriate proof is timely provided under rules established by the IRS. Furthermore, certain penalties may be imposed by the IRS on a recipient of payments who is required to supply information but who does not do so in the proper manner. Backup withholding generally should not apply with respect to payments made to certain exempt recipients, such as corporations and financial institutions. Information may also be required to be provided to the IRS concerning payments, unless an exemption applies. Holders of FLTL Claims, FLLO Claims and SLTL Claims should consult their tax advisors regarding their qualification for exemption from backup withholding and information reporting and the procedures for obtaining such an exemption.

U.S. Treasury regulations generally require disclosure by a taxpayer on its U.S. federal income tax return of certain types of transactions in which the taxpayer participated, including, among other types of transactions, certain transactions that result in the taxpayer's claiming a loss in excess of certain thresholds. Holders of FLTL Claims, FLLO Claims and SLTL Claims should consult their tax advisors regarding these regulations and whether the contemplated transactions under the Plan would be subject to these regulations and require disclosure on their tax returns.

*The foregoing summary has been provided for informational purposes only and does not discuss all aspects of U.S. federal income taxation that may be relevant to a particular holder's circumstances and income tax situation. All holders are urged to consult their tax advisors concerning the federal, state, local, non-U.S., and other tax consequences applicable under the Plan.*

## X.
## CERTAIN RISK FACTORS TO BE CONSIDERED

Before voting to accept or reject the Plan, holders of Claims and Interests should read and carefully consider the risk factors set forth below, in addition to the information set forth in the Disclosure Statement together with any attachments, exhibits, or documents incorporated by reference hereto. The factors below should not be regarded as the only risks associated with the Plan or its implementation.

### A.     Certain Bankruptcy Law Considerations

#### 1.     General

Although the Debtors believe that the Chapter 11 Cases will be of short duration and will not be materially disruptive to their businesses, the Debtors cannot be certain that this will be the case. Although the Plan is designed to minimize the length of the Chapter 11 Cases, it is impossible to predict with certainty the amount of time that one or more of the Debtors may spend in bankruptcy or to assure parties in interest that the Plan will be confirmed. Even if confirmed on a timely basis, bankruptcy cases to confirm the Plan could have an adverse effect on the Debtors' business. Among other things, it is possible that bankruptcy proceedings could adversely affect the Debtors' relationships with their key customers and employees. The cases will also involve additional expense and may divert some of the attention of the Debtors' management away from business operations.

#### 2.     Risk of Non-Confirmation of the Plan

Although the Debtors believe that the Plan will satisfy all requirements necessary for confirmation by the Bankruptcy Court, there can be no assurance that the Bankruptcy Court will reach the same conclusion or that modifications to the Plan will not be required for confirmation or that such modifications would not necessitate re-solicitation of votes. Moreover, the Debtors can make no assurances that they will receive the requisite votes for acceptance to confirm the Plan. Even if all Voting Classes vote in favor of the Plan or the requirements for "cramdown" are met with respect to any Class that rejected the Plan, the Bankruptcy Court could decline to confirm the Plan if it finds that any of the statutory requirements for Confirmation are not met. If the Plan is not confirmed, it is unclear what distributions holders of Claims or Interests ultimately would receive with respect to their Claims or Interests in a subsequent plan of reorganization.

#### 3.     Non-Consensual Confirmation

If any impaired class of claims or equity interests does not accept or is deemed not to accept a plan of reorganization, a bankruptcy court may nevertheless confirm such plan at the proponent's

request if at least one impaired class has voted to accept the plan (with such acceptance being determined without including the vote of any "insider" in such class), and as to each impaired class that has not accepted the plan, the bankruptcy court determines that the plan "does not discriminate unfairly" and is "fair and equitable" with respect to the dissenting impaired classes. If any Class votes to reject the Plan, then these requirements must be satisfied with respect to such rejecting Classes. The Debtors believe that the Plan satisfies these requirements.

### 4. Risk of Non-Occurrence of the Effective Date

Although the Debtors believe that the Effective Date will occur soon after the Confirmation Date, there can be no assurance as to the timing of the Effective Date. If the conditions precedent to the Effective Date set forth in the Plan have not occurred or have not been waived as set forth in Article IX of the Plan, then the Confirmation Order may be vacated, in which event no distributions would be made under the Plan, the Debtors and all holders of Claims or Interests would be restored to the status quo as of the day immediately preceding the Confirmation Date, and the Debtors' obligations with respect to Claims and Interests would remain unchanged.

### 5. Risk of Termination of the Restructuring Support Agreement

The Restructuring Support Agreement contains certain provisions that give the Requisite Creditors (as defined in the Restructuring Support Agreement) the ability to terminate the Restructuring Support Agreement if various conditions are satisfied. As noted above, termination of the Restructuring Support Agreement could result in protracted Chapter 11 Cases, which could significantly and detrimentally impact the Debtors' relationships with vendors, suppliers, employees, and major customers.

### 6. Conversion into Chapter 7 Cases

If no plan of reorganization can be confirmed, or if the Bankruptcy Court otherwise finds that it would be in the best interest of holders of Claims and Interests, the Chapter 11 Cases may be converted to cases under chapter 7 of the Bankruptcy Code, pursuant to which a trustee would be appointed or elected to liquidate the Debtors' assets for distribution in accordance with the priorities established by the Bankruptcy Code. See Section XII.C hereof, as well as the Liquidation Analysis attached hereto as **Exhibit D**, for a discussion of the effects that a chapter 7 liquidation would have on the recoveries of holders of Claims and Interests.

### B. Additional Factors Affecting the Value of Reorganized Debtors

### 1. Claims Could Be More than Projected

There can be no assurance that the estimated Allowed amount of Claims in certain Classes will not be significantly more than projected, which in turn, could cause the value of distributions to be reduced substantially. Inevitably, some assumptions will not materialize, and unanticipated events and circumstances may affect the ultimate results. Therefore, the actual amount of Allowed Claims may vary materially from the Debtors' projections and feasibility analysis.

## 2. Projections and Other Forward-Looking Statements Are Not Assured, and Actual Results May Vary

Certain of the information contained in the Disclosure Statement is, by nature, forward-looking, and contains estimates and assumptions, which might ultimately prove to be incorrect, and projections, which may be materially different from actual future experiences. There are uncertainties associated with any projections and estimates, and they should not be considered assurances or guarantees of the amount of funds or the amount of Claims in the various Classes that might be allowed.

## 3. Post-Effective Date Indebtedness

Following the Effective Date, the Reorganized Debtors will have approximately $1,660 million of secured funded indebtedness composed of the Exit First Lien Term Loan Facility and Exit Second Lien Term Loan Facility, and will also have approximately $147.8 million of letters of credit issued under the Exit LC Facility. The Reorganized Debtors' ability to service their debt obligations will depend, among other things, on their future operating performance, which depends partly on economic, financial, competitive, and other factors beyond the Reorganized Debtors' control. The Reorganized Debtors may not be able to generate sufficient cash from operations to meet their debt service obligations as well as fund necessary capital expenditures and investments in sales and marketing. In addition, if the Reorganized Debtors need to refinance their debt, obtain additional financing, or sell assets or equity, they may not be able to do so on commercially reasonable terms, if at all.

## C. Factors Relating to Securities to Be Issued under Plan

## 1. Market for Securities

There is currently no market for the New Equity Interests, and there can be no assurance as to the development or liquidity of any market for any such securities.

The Reorganized Debtors are under no obligation to list the New Equity Interests on any national securities exchange. Therefore, there can be no assurance that any of the foregoing securities will be tradable or liquid at any time after the Effective Date. If a trading market does not develop or is not maintained, holders of the foregoing securities may experience difficulty in reselling such securities or may be unable to sell them at all. Even if such a market were to exist, such securities could trade at prices higher or lower than the estimated value set forth in the Disclosure Statement depending upon many factors including prevailing interest rates, markets for similar securities, industry conditions, and the performance of, and investor expectations for the Reorganized Debtors. Accordingly, holders of these securities may bear certain risks associated with holding securities for an indefinite period of time.

## 2. Potential Dilution

The ownership percentage represented by the New Equity Interests distributed on the Effective Date under the Plan, distributed pursuant to the Rights Offering, and distributed as the Backstop Commitment Premium, will be subject to dilution from the equity issued in connection with the Management Incentive Program, any other shares that may be issued post-emergence, and the

conversion of any options, warrants, convertible securities, exercisable securities, or other securities that may be issued post-emergence.

### 3. Significant Holders

Certain holders of SLTL Claims are expected to acquire a significant ownership interest in the New Equity Interests pursuant to the Plan, the Backstop Commitment Agreement, and the Rights Offering. If such holders were to act as a group, such holders would be in a position to control the outcome of all actions requiring stockholder approval, including the election of directors, without the approval of other stockholders. This concentration of ownership could also facilitate or hinder a negotiated change of control of the Reorganized Debtors and, consequently, have an impact upon the value of the New Equity Interests.

### 4. Equity Interests Subordinated to Reorganized Debtors' Indebtedness

In any subsequent liquidation, dissolution, or winding up of the Reorganized Debtors, the New Equity Interests would rank below all debt claims against the Reorganized Debtors. As a result, holders of the New Equity Interests will not be entitled to receive any payment or other distribution of assets upon the liquidation, dissolution, or winding up of the Reorganized Debtors until after all the Reorganized Debtors' obligations to their debt holders have been satisfied.

### 5. Implied Valuation of New Equity Interests Not Intended to Represent Trading Value of New Equity Interests

The valuation of the Reorganized Debtors is not intended to represent the trading value of New Equity Interests in public or private markets and is subject to additional uncertainties and contingencies, all of which are difficult to predict. Actual market prices of such securities at issuance will depend upon, among other things: (a) prevailing interest rates; (b) conditions in the financial markets; (c) the anticipated initial securities holdings of prepetition creditors, some of whom may prefer to liquidate their investment rather than hold it on a long-term basis; and (d) other factors that generally influence the prices of securities. The actual market price of the New Equity Interests is likely to be volatile. Many factors, including factors unrelated to the Reorganized Debtors' actual operating performance and other factors not possible to predict, could cause the market price of the New Equity Interests to rise and fall. Accordingly, the implied value, stated herein and in the Plan, of the securities to be issued does not necessarily reflect, and should not be construed as reflecting, values that will be attained for the New Equity Interests in the public or private markets.

### 6. No Intention to Pay Dividends

Reorganized Energy Inc. may not pay any dividends on the New Equity Interests. As a result, the success of an investment in the New Equity Interests will depend entirely upon any future appreciation in the value of the New Equity Interests. There is, however, no guarantee that the New Equity Interests will appreciate in value or even maintain their initial value.

### D. Factors Relating to Rights Offering

#### 1. Debtors Could Modify Rights Offering Procedures

The Debtors may modify the procedures governing the Rights Offering, with the approval of the Required Backstop Parties (as defined in the Backstop Commitment Agreement), to, among other things, adopt additional detailed procedures if necessary in the Debtors' business judgment. Such modifications may adversely affect the rights of those participating in the Rights Offering.

#### 2. Bankruptcy Court Might Not Approve Rights Offering Procedures

The Bankruptcy Court's approval of the Rights Offering Procedures is crucial to consummating the restructuring contemplated by the Plan. Failure to obtain the Bankruptcy Court's approval of the Rights Offering Procedures could prevent the Debtors from consummating the Plan and the transactions contemplated thereby.

#### 3. Backstop Commitment Agreement Could Be Terminated

The Backstop Commitment Agreement contains certain provisions that give the parties the ability to terminate the Backstop Commitment Agreement if various conditions are not satisfied. Termination of the Backstop Commitment Agreement could result in termination of the Restructuring Support Agreement and prevent the Debtors from consummating the Plan.

### E. Additional Factors

#### 1. Purchase Agreement Could Be Terminated

The Purchase Agreement contains certain provisions that give the parties thereto the ability to terminate the Purchase Agreement if various conditions are not satisfied. Termination of the Purchase Agreement could prevent the Debtors from consummating the Plan. Under certain conditions in connection with the termination of the Purchase Agreement, the Seller may be eligible to retain certain good faith deposits required under the Purchase Agreement.

#### 2. Debtors Could Withdraw Plan

Subject to the terms of, and without prejudice to, the rights of any party to the Restructuring Support Agreement, the Plan may be revoked or withdrawn prior to the Confirmation Date by the Debtors.

#### 3. Debtors Have No Duty to Update

The statements contained in the Disclosure Statement are made by the Debtors as of the date hereof, unless otherwise specified herein, and the delivery of the Disclosure Statement after that date does not imply that there has been no change in the information set forth herein since that date. The Debtors have no duty to update the Disclosure Statement unless otherwise ordered to do so by the Bankruptcy Court.

### 4. No Representations Outside the Disclosure Statement Are Authorized

No representations concerning or related to the Debtors, the Chapter 11 Cases, or the Plan are authorized by the Bankruptcy Court or the Bankruptcy Code, other than as set forth in the Disclosure Statement.

Any representations or inducements made to secure your vote for acceptance or rejection of the Plan that are other than those contained in, or included with, the Disclosure Statement should not be relied upon in making the decision to vote to accept or reject the Plan.

### 5. No Legal or Tax Advice Is Provided by the Disclosure Statement

The contents of the Disclosure Statement should not be construed as legal, business, or tax advice. Each holder of a Claim or Interest should consult their own legal counsel and accountant as to legal, tax, and other matters concerning their Claim or Interest.

The Disclosure Statement is not legal advice to you. The Disclosure Statement may not be relied upon for any purpose other than to determine how to vote on the Plan or object to confirmation of the Plan.

### 6. No Admission Made

Nothing contained herein or in the Plan will constitute an admission of, or will be deemed evidence of, the tax or other legal effects of the Plan on the Debtors or holders of Claims or Interests.

## XI.
## VOTING PROCEDURES AND REQUIREMENTS

Before voting to accept or reject the Plan, each holder of a claim in a Voting Class as of the Record Date (an "**Eligible Holder**") should carefully review the Plan attached hereto as **Exhibit A**. All descriptions of the Plan set forth in the Disclosure Statement are subject to the terms and conditions of the Plan.

### A. Voting Deadline

All Eligible Holders have been sent a Ballot together with the Disclosure Statement. Such holders should read the Ballot carefully and follow the instructions contained therein. Please use only the Ballot that accompanies the Disclosure Statement to cast your vote.

The Debtors have engaged Prime Clerk LLC as their voting agent (the "**Voting Agent**") to assist in the transmission of voting materials and in the tabulation of votes with respect to the Plan. **FOR YOUR VOTE TO BE COUNTED, YOUR VOTE MUST BE RECEIVED BY THE VOTING AGENT AT THE ADDRESS SET FORTH BELOW ON OR BEFORE THE VOTING DEADLINE OF 5:00 P.M. (PREVAILING CENTRAL TIME) ON MARCH 14, 2018, UNLESS EXTENDED BY THE DEBTORS.**

IF A BALLOT IS DAMAGED OR LOST, YOU MAY CONTACT THE VOTING AGENT AT THE NUMBER SET FORTH BELOW TO RECEIVE A REPLACEMENT BALLOT. ANY BALLOT THAT IS EXECUTED AND RETURNED BUT WHICH DOES NOT INDICATE A VOTE FOR ACCEPTANCE OR REJECTION OF THE PLAN WILL NOT BE COUNTED.

IF YOU HAVE ANY QUESTIONS CONCERNING VOTING PROCEDURES, YOU MAY CONTACT THE VOTING AGENT AT:

**Prime Clerk LLC**
**Telephone: 855-631-5346 (toll free) or 917-460-0913 (domestic)**
**E-mail: fieldwoodinfo@primeclerk.com (with "Fieldwood" in the subject line)**

Additional copies of the Disclosure Statement are available upon request made to the Voting Agent, at the telephone numbers or e-mail address set forth immediately above.

### B.     Voting Procedures

The Debtors are providing copies of the Disclosure Statement (including all exhibits and appendices), related materials, and a Ballot (collectively, a "**Solicitation Package**") to record holders in the Voting Classes.

Eligible Holders in the Voting Classes should provide all of the information requested by the Ballot, and should (a) complete and return all Ballots received in the enclosed, self-addressed, postage-paid envelope provided with each such Ballot to the Voting Agent, or electronically via e-mail to fieldwoodballots@primeclerk.com with "Fieldwood" in the subject line, or (b) submit a Ballot electronically via the E-Ballot voting platform on Prime Clerk's website by visiting https://cases.primeclerk.com/fieldwoodballots, clicking on the "Submit E-Ballot" link, and following the instructions set forth on the website.

**HOLDERS ARE STRONGLY ENCOURAGED TO SUBMIT THEIR BALLOTS VIA THE E-BALLOT PLATFORM**.

### C.     Parties Entitled to Vote

Under the Bankruptcy Code, only holders of claims or interests in "impaired" classes are entitled to vote on a plan. Under section 1124 of the Bankruptcy Code, a class of claims or interests is deemed to be "impaired" under a plan unless: (1) the plan leaves unaltered the legal, equitable, and contractual rights to which such claim or interest entitles the holder thereof; or (2) notwithstanding any legal right to an accelerated payment of such claim or interest, the plan cures all existing defaults (other than defaults resulting from the occurrence of events of bankruptcy) and reinstates the maturity of such claim or interest as it existed before the default.

If, however, the holder of an impaired claim or interest will not receive or retain any distribution under the plan on account of such claim or interest, the Bankruptcy Code deems such holder to have rejected the plan, and, accordingly, holders of such claims and interests do not actually vote on the plan. If a claim or interest is not impaired by the plan, the Bankruptcy Code deems the holder of such claim or interest to have accepted the plan and, accordingly, holders of such claims and interests are not entitled to vote on the Plan.

A vote may be disregarded if the Bankruptcy Court determines, pursuant to section 1126(e) of the Bankruptcy Code, that it was not solicited or procured in good faith or in accordance with the provisions of the Bankruptcy Code.

The Bankruptcy Code defines "acceptance" of a plan by a class of: (1) Claims as acceptance by creditors in that class that hold at least two-thirds (2/3) in dollar amount and more than one-half (1/2) in number of the Claims that cast ballots for acceptance or rejection of the Plan; and (2) Interests as acceptance by interest holders in that class that hold at least two-thirds (2/3) in amount of the Interests that cast ballots for acceptance or rejection of the Plan.

The claims in the following classes are impaired under the Plan and entitled to vote to accept or reject the Plan:

- Class 4 – FLTL Claims

- Class 5 – FLLO Claims

- Class 6 – SLTL Claims

An Eligible Holder should vote on the Plan by completing a Ballot in accordance with the instructions therein and as set forth above.

All Ballots must be signed by the Eligible Holder, or any person who has obtained a properly completed Ballot proxy from the Eligible Holder by the Record Date. Unless otherwise ordered by the Bankruptcy Court, Ballots that are signed, dated, and timely received, but on which a vote to accept or reject the Plan has not been indicated, will not be counted. The Debtors, in their sole discretion, may request that the Voting Agent attempt to contact such voters to cure any such defects in the Ballots. Any Ballot marked to both accept and reject the Plan will not be counted. If you return more than one Ballot voting different claims, the Ballots are not voted in the same manner, and you do not correct this before the Voting Deadline, those Ballots will not be counted. An otherwise properly executed Ballot that attempts to partially accept and partially reject the Plan will likewise not be counted.

The Ballots provided to Eligible Holders will reflect the principal amount of such Eligible Holder's Claim; however, when tabulating votes, the Voting Agent may adjust the amount of such Eligible Holder's Claim by multiplying the principal amount by a factor that reflects all amounts accrued between the Record Date and the Petition Date including interest.

Under the Bankruptcy Code, for purposes of determining whether the requisite votes for acceptance have been received, only Eligible Holders who actually vote will be counted. The failure of a holder to deliver a duly executed Ballot to the Voting Agent will be deemed to constitute an abstention by such holder with respect to voting on the Plan and such abstentions will not be counted as votes for or against the Plan.

Except as provided below, unless the Ballot is timely submitted to the Voting Agent before the Voting Deadline together with any other documents required by such Ballot, the Debtors may, in their sole discretion, reject such Ballot as invalid, and therefore decline to utilize it in connection with seeking confirmation of the Plan.

1. **Fiduciaries and Other Representatives**

If a Ballot is signed by a trustee, executor, administrator, guardian, attorney-in-fact, officer of a corporation, or another, acting in a fiduciary or representative capacity, such person should indicate such capacity when signing and, if requested, must submit proper evidence satisfactory to the Debtors of authority to so act. Authorized signatories should submit the separate Ballot of each Eligible Holder for whom they are voting.

2. **Agreements Upon Furnishing Ballots**

The delivery of an accepting Ballot pursuant to one of the procedures set forth above will constitute the agreement of the creditor with respect to such Ballot to accept: (a) all of the terms of, and conditions to, this Solicitation; and (b) the terms of the Plan including the injunction, releases, and exculpations set forth in Sections 10.5, 10.6, 10.7, 10.8, and 10.9 therein. All parties in interest retain their right to object to confirmation of the Plan pursuant to section 1128 of the Bankruptcy Code, subject to any applicable terms of the Restructuring Support Agreement.

3. **Change of Vote**

Subject to the provisions of the Restructuring Support Agreement, any party who has previously submitted to the Voting Agent before the Voting Deadline a properly completed Ballot may revoke such Ballot and change its vote by submitting to the Voting Agent before the Voting Deadline a subsequent, properly completed Ballot voting for acceptance or rejection of the Plan.

D. **Waivers of Defects, Irregularities, etc.**

Unless otherwise directed by the Bankruptcy Court, all questions as to the validity, form, eligibility (including time of receipt), acceptance, and revocation or withdrawals of Ballots will be determined by the Voting Agent or the Debtors, as applicable, in their sole discretion, which determination will be final and binding. The Debtors reserve the right to reject any and all Ballots submitted by any of their respective creditors not in proper form, the acceptance of which would, in the opinion of the Debtors or their counsel, as applicable, be unlawful. The Debtors further reserve their respective rights to waive any defects or irregularities or conditions of delivery as to any particular Ballot. The interpretation (including the Ballot and the respective instructions thereto) by the applicable Debtor, unless otherwise directed by the Bankruptcy Court, will be final and binding on all parties. Unless waived, any defects or irregularities in connection with deliveries of Ballots must be cured within such time as the Debtors (or the Bankruptcy Court) determines. Neither the Debtors nor any other person will be under any duty to provide notification of defects or irregularities with respect to deliveries of Ballots nor will any of them incur any liabilities for failure to provide such notification. Unless otherwise directed by the Bankruptcy Court, delivery of such Ballots will not be deemed to have been made until such irregularities have been cured or waived. Ballots previously furnished (and as to which any irregularities have not theretofore been cured or waived) will be invalidated.

### E. Further Information, Additional Copies

If you have any questions or require further information about the voting procedures for voting your claims or about the packet of material you received, or if you wish to obtain an additional copy of the Plan, the Disclosure Statement, or any exhibits to such documents, please contact the Voting Agent.

**XII.**
**CONFIRMATION OF PLAN**

### A. Confirmation Hearing

Section 1128(a) of the Bankruptcy Code requires the Bankruptcy Court to hold a confirmation hearing upon appropriate notice to all required parties. On, or as promptly as practicable after, the Petition Date, the Debtors will request that the Bankruptcy Court schedule the Confirmation Hearing. Notice of the Confirmation Hearing will be provided to all known creditors and equity holders or their representatives. The Confirmation Hearing may be adjourned from time to time by the Bankruptcy Court without further notice except for the announcement of the continuation date made at the Confirmation Hearing, at any subsequent continued Confirmation Hearing, or pursuant to a notice filed on the docket for the Chapter 11 Cases.

### B. Objections to Confirmation

Section 1128(b) of the Bankruptcy Code provides that any party in interest may object to the confirmation of a plan. Any objection to confirmation of the Plan must be in writing, must conform to the Bankruptcy Rules and the Local Rules, must set forth the name of the objector, the nature and amount of the Claims held or asserted by the objector against the Debtors' estates or properties, the basis for the objection and the specific grounds therefore, and must be filed with the Bankruptcy Court, with a copy to the chambers of the United States Bankruptcy Judge appointed to the Chapter 11 Cases, together with proof of service thereof, and served upon the following parties, including such other parties as the Bankruptcy Court may order.

a) **Debtors** at
Fieldwood Energy LLC
2000 W. Sam Houston Parkway S., Suite 1200
Houston, Texas 77042
Attn:   G.M. McCarroll
Michael Dane
Tommy Lamme, Esq.

b) **Counsel to Debtors** at
Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, New York 10153
Attn:   Matthew S. Barr, Esq. (Matt.Barr@Weil.com)
Ray C. Schrock, P.C. (Ray.Schrock@Weil.com)
Jessica Liou, Esq. (Jessica.Liou@Weil.com)

-and-

Weil, Gotshal & Manges LLP
700 Louisiana Street, Suite 1700
Houston, Texas 77002
Attn:    Alfredo R. Pérez, Esq. (Alfredo.Perez@Weil.com)

c) **Office of the U.S. Trustee** at
Office of the U.S. Trustee for the Southern District of Texas
515 Rusk Street, Suite 3516
Houston, Texas 77002

d) **Counsel to the First Lien Group** at
O'Melveny & Myers LLP
Times Square Tower, 7 Times Square
New York, New York 10036
Attn:    George Davis, Esq. (gdavis@omm.com)
         Daniel Shamah, Esq. (dshamah@omm.com)

e) **Counsel to Cortland Capital Market Services LLC** at

Davis Polk & Wardwell LLP
450 Lexington Avenue
New York, New York 10017
Attn:    Damian Schaible, Esq. (Damian.Schaible@davispolk.com)
         Darren Klein, Esq. (Darren.Klein@davispolk.com)
         Natasha Tsiouris, Esq. (Natasha.Tsiouris@davispolk.com)

f) **Counsel to Riverstone,** in its capacity as Consenting Sponsor and holder of SLTL
Claims, at
Vinson & Elkins LLP
666 Fifth Avenue, 26th Floor
New York, New York 10103
Attn:    David S. Meyer, Esq. (DMeyer@velaw.com)
         Jessica C. Peet, Esq. (JPeet@velaw.com)

> **UNLESS AN OBJECTION TO CONFIRMATION IS TIMELY SERVED AND FILED, IT MAY NOT BE CONSIDERED BY THE BANKRUPTCY COURT.**

### C.    Requirements for Confirmation of Plan

The Bankruptcy Court will confirm the Plan only if all of the requirements of section 1129 of the Bankruptcy Code are met.  Among the requirements for confirmation are that the Plan is (1) accepted by all impaired Classes of Claims and Interests entitled to vote or, if rejected or deemed rejected by an impaired Class, that the Plan "does not discriminate unfairly" and is "fair

and equitable" as to such Class; (2) in the "best interests" of the holders of Claims and Interests impaired under the Plan; and (3) feasible.

### 1. Acceptance of Plan

Under the Bankruptcy Code, a Class accepts a chapter 11 plan if (1) holders of two-thirds (2/3) in amount and (2) with respect to holders of Claims, more than a majority in number of the allowed claims in such class (other than those designated under section 1126(e) of the Bankruptcy Code) vote to accept the Plan. Holders of Claims or Interests that fail to vote are not counted in determining the thresholds for acceptance of the Plan.

If any impaired Class of Claims or Interests does not accept the Plan (or is deemed to reject the Plan), the Bankruptcy Court may still confirm the Plan at the request of the Debtors if, as to each impaired Class of Claims or Interests that has not accepted the Plan (or is deemed to reject the Plan), the Plan "does not discriminate unfairly" and is "fair and equitable" under the so-called "cram down" provisions set forth in section 1129(b) of the Bankruptcy Code. The "unfair discrimination" test applies to classes of claims or interests that are of equal priority and are receiving different treatment under the Plan. A chapter 11 plan does not discriminate unfairly, within the meaning of the Bankruptcy Code, if the legal rights of a dissenting class are treated in a manner consistent with the treatment of other classes whose legal rights are substantially similar to those of the dissenting class and if no class of claims or interests receives more than it legally is entitled to receive for its claims or interests. The test does not require that the treatment be the same or equivalent, but that such treatment be "fair." The "fair and equitable" test applies to classes of different priority and status (*e.g.*, secured versus unsecured; claims versus interests) and includes the general requirement that no class of claims receive more than 100% of the allowed amount of the claims in such class. As to the dissenting class, the Plan sets different standards that must be satisfied for the Plan to be confirmed, depending on the type of claims or interests in such class. The following sets forth the "fair and equitable" test that must be satisfied as to each type of class for a plan to be confirmed if such class rejects the Plan:

- **Secured Creditors**. Each holder of an impaired secured claim either (a) retains its liens on the property, to the extent of the allowed amount of its secured claim, and receives deferred cash payments having a value, as of the effective date of the plan, of at least the allowed amount of such secured claim, (b) has the right to credit bid the amount of its claim if its property is sold and retains its lien on the proceeds of the sale, or (c) receives the "indubitable equivalent" of its allowed secured claim.

- **Unsecured Creditors**. Either (a) each holder of an impaired unsecured claim receives or retains under the plan, property of a value, as of the effective date of the plan, equal to the amount of its allowed claim or (b) the holders of claims and interests that are junior to the claims of the dissenting class will not receive any property under the plan.

- **Interests**. Either (a) each equity interest holder will receive or retain under the plan property of a value equal to the greater of (i) the fixed liquidation preference or redemption price, if any, of such equity interest and (ii) the value of the equity

interest or (b) the holders of interests that are junior to the interests of the dissenting class will not receive or retain any property under the plan.

The Debtors believe the Plan satisfies the "fair and equitable" requirement with respect to any rejecting Class.

**IF ALL OTHER CONFIRMATION REQUIREMENTS ARE SATISFIED AT THE CONFIRMATION HEARING, THE DEBTORS WILL ASK THE BANKRUPTCY COURT TO RULE THAT THE PLAN MAY BE CONFIRMED ON THE GROUND THAT THE SECTION 1129(b) REQUIREMENTS HAVE BEEN SATISFIED.**

### 2. Best Interests Test

As noted above, with respect to each impaired class of claims and equity interests, confirmation of a plan requires that each such holder either: (a) accept the plan; or (b) receive or retain under the plan property of a value, as of the effective date of the plan, that is not less than the value such holder would receive or retain if the debtors were liquidated under chapter 7 of the Bankruptcy Code. This requirement is referred to as the "best interests test."

This test requires a bankruptcy court to determine what the holders of allowed claims and allowed equity interests in each impaired class would receive from a liquidation of the debtor's assets and properties in the context of a liquidation under chapter 7 of the Bankruptcy Code. To determine if a plan is in the best interests of each impaired class, the value of the distributions from the proceeds of the liquidation of the debtor's assets and properties (after subtracting the amounts attributable to the aforesaid claims) is then compared with the value offered to such classes of claims and equity interests under the plan.

The Debtors believe that under the Plan all holders of impaired Claims and Interests will receive property with a value not less than the value such holder would receive in a liquidation under chapter 7 of the Bankruptcy Code. The Debtors' belief is based primarily on: (a) consideration of the effects that a chapter 7 liquidation would have on the ultimate proceeds available for distribution to holders of impaired Claims and Interests; and (b) the Liquidation Analysis attached hereto as **Exhibit D.**

The Debtors believe that any liquidation analysis is speculative, as it is necessarily premised on assumptions and estimates which are inherently subject to significant uncertainties and contingencies, many of which would be beyond the control of the Debtors. The Liquidation Analysis provided in **Exhibit D** is solely for the purpose of disclosing to holders of Claims and Interests the effects of a hypothetical chapter 7 liquidation of the Debtors, subject to the assumptions set forth therein. There can be no assurance as to values that would actually be realized in a chapter 7 liquidation nor can there be any assurance that a bankruptcy court will accept the Debtors' conclusions or concur with such assumptions in making its determinations under section 1129(a)(7) of the Bankruptcy Code.

### 3. Feasibility

Section 1129(a)(11) of the Bankruptcy Code requires that a debtor demonstrate that confirmation of a plan is not likely to be followed by liquidation or the need for further financial

reorganization. For purposes of determining whether the Plan meets this requirement, the Debtors have analyzed their ability to meet their obligations under the Plan. As part of this analysis, the Debtors have prepared the consolidated financial projections for the Reorganized Debtors (collectively with the reserve information, development of schedules, and financial information, the "**Financial Projections**") for fiscal years 2018 through 2022 (the "**Projection Period**"). The Financial Projections, and the assumptions on which they are based, are annexed hereto as **Exhibit E**. Based upon such Financial Projections, the Debtors believe they will have sufficient resources to make all payments required pursuant to the Plan and that confirmation of the Plan is not likely to be followed by liquidation or the need for further reorganization. Moreover, article XI hereof sets forth certain risk factors that could impact the feasibility of the Plan.

As set forth in the Financial Projections, commodity pricing is based on futures prices for crude oil and natural gas traded on the New York Mercantile Exchange ("**NYMEX**") as of January 10, 2018. With respect to crude oil price assumptions, the Debtors' management ("**Management**") estimates an average $3.14 per barrel discount to NYMEX pricing for crude oil plus an average Light Louisiana Sweet ("**LLS**") premium of $3.19 per barrel above the West Texas Intermediate ("**WTI**"). With respect to natural gas price assumptions, Management estimates an average $0.14 per MMBtu discount to NYMEX for natural gas price realizations. With respect to natural gas liquids ("**NGLs**") price assumptions, Management estimates average price realizations equal to 25% of NYMEX pricing for WTI crude oil, based primarily on historical differentials. Management's estimates are consistent with their prepetition and industry practices, and the Debtors believe that they are reasonable under the circumstances. Further detail is provided in the Financial Projections.

The Debtors do not, as a matter of course, publish their business plans or strategies, projections or anticipated financial position. Accordingly, the Debtors do not anticipate that they will, and disclaim any obligation to, furnish updated business plans or Financial Projections to parties in interest after the Confirmation Date, or to include such information in documents required to be filed with the SEC or otherwise make such information public, unless required to do so by the SEC or other regulatory bodies. In connection with the planning and development of the Plan, the Financial Projections were prepared by the Debtors, with the assistance of their professionals, to present the anticipated impact of the Plan. The Financial Projections assume that the Plan will be implemented in accordance with its stated terms. The Financial Projections are based on forecasts of key economic variables and may be significantly impacted by, among other factors, oil and natural gas prices, expectations regarding future commodity prices, the level of activity of oil and natural gas exploration, development, and production domestically and internationally, demand for drilling services, competition and supply of competing rigs, changes in the political environment of the countries in which the Debtors operate, regulatory changes, and a variety of other factors. Consequently, the estimates and assumptions underlying the Financial Projections are inherently uncertain and are subject to material business, economic, and other uncertainties. Therefore, such Financial Projections, estimates, and assumptions are not necessarily indicative of current values or future performance, which may be significantly less or more favorable than set forth herein.

The Financial Projections should be read in conjunction with the assumptions, qualifications, and explanations set forth in the Disclosure Statement, the Plan, and the Plan Supplement, in their

entirety, and the historical consolidated financial statements (including the notes and schedules thereto).

4.  **Valuation Analysis**

The Plan and the Restructuring Transactions in connection therewith represent the culmination of extensive multi-month negotiations to obtain the capital commitments necessary for the Debtors to reorganize and execute their post-chapter 11 business plan.  As described above, the Plan contemplates that Prepetition Second Lien Term Lenders will receive (a) 20.25% of the New Equity Interests issued by Reorganized Energy Inc., and (b) the right to invest $525 million through the Rights Offering to acquire 75.0% of the New Equity Interests issued by Reorganized Energy Inc., in each case subject to dilution by the Management Incentive Plan.  In addition, the Backstop Parties are backstopping the full amount of the Rights Offering, subject to the terms and provisions of the Backstop Commitment Agreement.

The Debtors and Evercore believe that the valuation implied by the Restructuring Transactions is currently the best measure of the Reorganized Debtors' value given the facts and circumstance of these cases, which include:

- A substantial capital infusion is necessary for the Debtors to reorganize and the Restructuring Transactions provide for that necessary capital;

- Significant new capital would be difficult to obtain without the equitization of the Prepetition Second Lien Term Loans;

- The terms of the Rights Offering are the result of robust, good faith, arms' length, and comprehensive negotiations between the Debtors, their prepetition secured parties, Riverstone, and each of their financial and legal advisors.

- Very few relevant comparable transactions given (a) the Debtors' large capital needs and (b) the contemporaneous consummation of the Asset Purchase Transaction along with the balance sheet restructuring.

After giving effect to the distributions of New Equity Interests contemplated under Sections 4.6(a) and 4.10(a) of the Plan, consummation of the Asset Purchase Transaction, the New Equity Interests to be issued pursuant to the Rights Offering, and the Backstop Put Option Premium, the Reorganized Debtors will have an implied equity value of approximately $700 million.  This equity value results in a total enterprise value for the Reorganized Debtors of approximately $2.25 billion based on:

- Projected net debt at emergence of approximately $1,550 million, which is composed of a $1,143 million Exit First Lien Term Facility and a $518 million Exit Second Lien Term Facility, less cash on the balance sheet upon emergence of $110 million.

Evercore's view as to the value of the Reorganized Debtors based on consummation of the Restructuring Transactions and the post-reorganization capital structure does not constitute a

89

recommendation as to how to vote on the Plan and does not constitute an opinion as to the fairness from a financial point of view of the consideration to be received under the Plan or of the terms and provisions of the Plan.

## XIII.
## ALTERNATIVES TO CONFIRMATION
## AND CONSUMMATION OF PLAN

The Debtors have evaluated several alternatives to the Plan. After studying these alternatives, the Debtors have concluded that the Plan is the best alternative and will maximize recoveries to parties in interest, assuming confirmation and consummation of the Plan. If the Plan is not confirmed and consummated, the alternatives to the Plan are: (A) the preparation and presentation of an alternative reorganization; (B) the a sale of some or all of the Debtors' assets pursuant to section 363 of the Bankruptcy Code; or (C) a liquidation under chapter 7 of the Bankruptcy Code.

### A.    Alternative Plan of Reorganization

If the Plan is not confirmed, the Debtors (or if the Debtors' exclusive period in which to file a plan of reorganization has expired, any other party in interest) could attempt to formulate a different plan. Such a plan might involve either: (a) a reorganization and continuation of the Debtors' businesses or (b) an orderly liquidation of their assets. The Debtors, however, believe that the Plan, as described herein, enables their creditors to realize the most value under the circumstances.

### B.    Sale under Section 363 of the Bankruptcy Code

If the Plan is not confirmed, the Debtors could seek from the Bankruptcy Court, after notice and hearing, authorization to sell their assets under section 363 of the Bankruptcy Code. Holders of Claims in Classes 2, 3, 4, 5, and 6 and the DIP Facility Lenders would be entitled to credit bid on any property to which their security interest is attached to the extent of the value of such security interest, and to offset their Claims against the purchase price of the property. In addition, the security interests in the Debtors' assets held by holders of Claims in Classes 2, 3, 4, 5, and 6 and the DIP Facility Lenders would attach to the proceeds of any sale of the Debtors' assets to the extent of their secured interests therein. Upon analysis and consideration of this alternative, the Debtors do not believe a sale of its assets under section 363 of the Bankruptcy Code would yield a higher recovery for the holders of Claims under the Plan.

### C.    Liquidation under Chapter 7 of Bankruptcy Code

If no plan can be confirmed, the Chapter 11 Cases may be converted to cases under chapter 7 of the Bankruptcy Code in which a trustee would be elected or appointed to liquidate the assets of the Debtors for distribution to their creditors in accordance with the priorities established by the Bankruptcy Code. The effect that a chapter 7 liquidation would have on the recovery of holders of Allowed Claims and Interests is set forth in the Liquidation Analysis attached hereto as **Exhibit D.**

The Debtors believe that liquidation under chapter 7 would result in smaller distributions to creditors than those provided for in the Plan because of, among other things, the delay resulting from the conversion of the Chapter 11 Cases, the additional administrative expenses associated with the appointment of a trustee and the trustee's retention of professionals who would be required to become familiar with the many legal and factual issues in the  Chapter 11 Cases, and the loss in value attributable to an expeditious liquidation of the Debtors' assets as required by chapter 7.

# XIV.
## CONCLUSION AND RECOMMENDATION

The Debtors believe the Plan is in the best interests of all stakeholders and urge the holders of Claims in Classes 4, 5, and 6 to vote in favor thereof.

Dated: February 14, 2018
　　　　Houston, Texas

Respectfully submitted,

FIELDWOOD ENERGY LLC, and its undersigned affiliates

Name: G.M. McCarroll
Title:  Authorized Officer

DYNAMIC OFFSHORE RESOURCES NS, LLC
FIELDWOOD HOLDINGS LLC
FIELDWOOD ENERGY INC.
FIELDWOOD ENERGY OFFSHORE LLC
FIELDWOOD ONSHORE LLC
FIELDWOOD SD OFFSHORE LLC
FW GOM PIPELINE, INC.
GOM SHELF LLC
BANDON OIL AND GAS GP, LLC
BANDON OIL AND GAS, LP
FIELDWOOD ENERGY SP LLC
GALVESTON BAY PIPELINE LLC
GALVESTON BAY PROCESSING LLC

**Exhibit A**

**Plan**

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

|  | § |  |
|---|---|---|
| **In re:** | § | **Chapter 11** |
|  | § |  |
| **FIELDWOOD ENERGY LLC**, *et al.*, | § | **Case No. 18-_____ (___)** |
|  | § |  |
|  | § | **(Joint Administration Requested)** |
| **Debtors.**[1] | § |  |

## JOINT PREPACKAGED CHAPTER 11 PLAN OF
## FIELDWOOD ENERGY LLC AND ITS AFFILIATED DEBTORS

**WEIL, GOTSHAL & MANGES LLP**
Alfredo R. Pérez
700 Louisiana Street, Suite 1700
Houston, Texas 77002
Telephone: (713) 546-5000
Facsimile: (713) 224-9511

**WEIL, GOTSHAL & MANGES LLP**
Matthew S. Barr (*pro hac vice* pending)
Ray C. Schrock, P.C. (*pro hac vice* pending)
Jessica Liou (*pro hac vice* pending)
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007

*Proposed Counsel for the Debtors
and Debtors in Possession*

Dated: February 14, 2018
      Houston, Texas

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, as applicable, are: Dynamic Offshore Resources NS, LLC (0158); Fieldwood Energy LLC (6778); Fieldwood Holdings LLC (9264); Fieldwood Energy Inc. (4991); Fieldwood Energy Offshore LLC (4494); Fieldwood Onshore LLC (3489); Fieldwood SD Offshore LLC (8786); FW GOM Pipeline, Inc. (8440); GOM Shelf LLC (8107); Bandon Oil and Gas GP, LLC (9172); Bandon Oil and Gas, LP (9266); Fieldwood Energy SP LLC (1971); Galveston Bay Pipeline LLC (5703); and Galveston Bay Processing LLC (0422). The Debtors' primary mailing address is 2000 W. Sam Houston Parkway, S., Suite 1200, Houston, TX 77042.

# Table of Contents

**ARTICLE I.    Definitions and Interpretation.** ..........................................................1

    1.1       Definitions. ..............................................................................1

    1.2       Interpretation; Application of Definitions; Rules of Construction. .................16

    1.3       Reference to Monetary Figures. ..............................................16

    1.4       Consent Rights of Restructuring Support Parties. ..........................16

    1.5       Controlling Document. ...........................................................16

**ARTICLE II.    Administrative Expense Claims, Fee Claims, DIP Facility Claims, and Priority Tax Claims.** ....................................................................17

    2.1       Treatment of Administrative Expense Claims. .................................17

    2.2       Treatment of Fee Claims. ........................................................17

    2.3       Treatment of DIP Facility Claims. ............................................18

    2.4       Payment of Fees and Expenses under DIP Facility Order. .............................18

    2.5       Treatment of Priority Tax Claims. ...............................................19

**ARTICLE III.    Classification of Claims and Interests.** ........................................19

    3.1       Classification in General. ........................................................19

    3.2       Formation of Debtor Groups for Convenience Only. .....................................19

    3.3       Summary of Classification of Claims and Interests. ......................................19

    3.4       Special Provision Governing Unimpaired Claims. .........................................20

    3.5       Separate Classification of Other Secured Claims. ..........................................20

    3.6       Elimination of Vacant Classes. ..................................................20

    3.7       Voting; Presumptions; Solicitation. .............................................20

    3.8       Cramdown. ...........................................................................21

    3.9       No Waiver. ............................................................................21

**ARTICLE IV.    Treatment of Claims and Interests.** ............................................21

    4.1       Class 1:  Priority Non-Tax Claims. ...........................................21

| | | |
|---|---|---|
| 4.2 | Class 2: Other Secured Claims. | 21 |
| 4.3 | Class 3: RBL Claims. | 22 |
| 4.4 | Class 4: FLTL Claims. | 22 |
| 4.5 | Class 5: FLLO Claims. | 23 |
| 4.6 | Class 6: SLTL Claims. | 23 |
| 4.7 | Class 7: General Unsecured Claims. | 24 |
| 4.8 | Class 8: Intercompany Claims. | 24 |
| 4.9 | Class 9: Existing Holdings Interests. | 24 |
| 4.10 | Class 10: Existing Energy Inc. Interests. | 25 |
| 4.11 | Class 11: Intercompany Interests. | 25 |
| 4.12 | Treatment of Vacant Classes. | 25 |
| **ARTICLE V.** | **Means for Implementation.** | **25** |
| 5.1 | Compromise and Settlement of Claims, Interests, and Controversies. | 25 |
| 5.2 | Continued Corporate Existence. | 26 |
| 5.3 | Corporate Action. | 27 |
| 5.4 | Asset Purchase Transaction. | 27 |
| 5.5 | Plan Funding. | 27 |
| 5.6 | Cancellation of Existing Securities and Agreements. | 28 |
| 5.7 | Cancellation of Certain Existing Security Interests. | 28 |
| 5.8 | Officers and Boards of Directors. | 28 |
| 5.9 | Management Incentive Plan. | 28 |
| 5.10 | Authorization, Issuance, and Delivery of New Equity Interests. | 29 |
| 5.11 | Exit LC Credit Agreement. | 29 |
| 5.12 | Exit First Lien Term Loan Facility and Exit Second Lien Term Loan Facility. | 29 |
| 5.13 | New Intercreditor Agreements. | 30 |

5.14        Rights Offering. .................................................................................30

5.15        Intercompany Interests; Corporate Reorganization. ........................31

5.16        Restructuring Transactions. ..............................................................31

5.17        Restructuring Expenses......................................................................31

5.18        Separability. ......................................................................................31

**ARTICLE VI.**   **Distributions. ..........................................................................32**

6.1        Distributions Generally......................................................................32

6.2        Postpetition Interest on Claims. ........................................................32

6.3        Date of Distributions.........................................................................32

6.4        Distribution Record Date. .................................................................32

6.5        Disbursing Agent. .............................................................................32

6.6        Delivery of Distributions. .................................................................33

6.7        Unclaimed Property. .........................................................................33

6.8        Satisfaction of Claims. ......................................................................33

6.9        Manner of Payment under Plan..........................................................33

6.10        Fractional Shares and De Minimis Cash Distributions......................34

6.11        No Distribution in Excess of Amount of Allowed Claim...............34

6.12        Allocation of Distributions between Principal and Interest. ............34

6.13        Exemption from Securities Laws.......................................................34

6.14        Setoffs and Recoupments..................................................................35

6.15        Rights and Powers of Disbursing Agent............................................35

6.16        Withholding and Reporting Requirements. .......................................35

**ARTICLE VII.**   **Procedures for Resolving Claims. .........................................36**

7.1        Disputed Claims Process....................................................................36

7.2        Estimation of Claims.........................................................................37

| 7.3 | Claim Resolution Procedures Cumulative. | 37 |
| 7.4 | No Distributions Pending Allowance. | 37 |
| 7.5 | Distributions after Allowance. | 38 |
| **ARTICLE VIII.** | **Executory Contracts and Unexpired Leases.** | **38** |
| 8.1 | General Treatment. | 38 |
| 8.2 | Determination of Cure Disputes and Deemed Consent. | 39 |
| 8.3 | Rejection Damages Claims. | 39 |
| 8.4 | Survival of the Debtors' Indemnification Obligations. | 39 |
| 8.5 | Compensation and Benefit Plans. | 40 |
| 8.6 | Insurance Policies. | 40 |
| 8.7 | Reservation of Rights. | 40 |
| **ARTICLE IX.** | **Conditions Precedent to the Occurrence of the Effective Date.** | **41** |
| 9.1 | Conditions Precedent to the Effective Date. | 41 |
| 9.2 | Waiver of Conditions Precedent. | 42 |
| 9.3 | Effect of Failure of a Condition. | 42 |
| **ARTICLE X.** | **Effect of Confirmation.** | **43** |
| 10.1 | Binding Effect. | 43 |
| 10.2 | Vesting of Assets. | 43 |
| 10.3 | Discharge of Claims against and Interests in the Debtors. | 43 |
| 10.4 | Pre-Confirmation Injunctions and Stays. | 44 |
| 10.5 | Injunction against Interference with Plan. | 44 |
| 10.6 | Plan Injunction. | 44 |
| 10.7 | Releases. | 45 |
| 10.8 | Exculpation. | 50 |
| 10.9 | Injunction Related to Releases and Exculpation. | 50 |

10.10     Subordinated Claims. ...................................................................................51

10.11     Retention of Causes of Action and Reservation of Rights. ...........................51

10.12     Ipso Facto and Similar Provisions Ineffective. .............................................51

10.13     Indemnification and Reimbursement Obligations. .........................................51

**ARTICLE XI.     Retention of Jurisdiction. .................................................................52**

11.1     Retention of Jurisdiction. ...............................................................................52

**ARTICLE XII.     Miscellaneous Provisions. ................................................................54**

12.1     Exemption from Certain Transfer Taxes. .......................................................54

12.2     Request for Expedited Determination of Taxes. .............................................54

12.3     Dates of Actions to Implement Plan. ..............................................................54

12.4     Amendments. ..................................................................................................54

12.5     Revocation or Withdrawal of Plan. ................................................................55

12.6     Severability. ....................................................................................................55

12.7     Governing Law. ..............................................................................................56

12.8     Immediate Binding Effect. ..............................................................................56

12.9     Successors and Assigns. ..................................................................................56

12.10     Entire Agreement. ..........................................................................................56

12.11     Computing Time. ............................................................................................56

12.12     Exhibits to Plan. .............................................................................................56

12.13     Notices. ...........................................................................................................56

12.14     Reservation of Rights. ....................................................................................58

Each of Dynamic Offshore Resources NS, LLC; Fieldwood Energy LLC, Fieldwood Holdings LLC, Fieldwood Energy Inc., Fieldwood Energy Offshore LLC, Fieldwood Onshore LLC, Fieldwood SD Offshore LLC, FW GOM Pipeline, Inc., GOM Shelf LLC, Bandon Oil and Gas GP, LLC, Bandon Oil and Gas, LP, Fieldwood Energy SP LLC, Galveston Bay Pipeline LLC, and Galveston Bay Processing LLC (each, a "*Debtor*" and collectively, the "*Debtors*") proposes the following joint prepackaged chapter 11 plan of reorganization pursuant to section 1121(a) of the Bankruptcy Code. Capitalized terms used herein shall have the meanings set forth in section 1.1 below.

## ARTICLE I.  DEFINITIONS AND INTERPRETATION.

### 1.1  *Definitions.*

The following terms shall have the respective meanings specified below:

*Administrative Expense Claim* means any Claim for costs and expenses of administration of the Chapter 11 Cases pursuant to sections 327, 328, 330, 365, 503(b), 507(a)(2), or 507(b) of the Bankruptcy Code (other than DIP Facility Claims), including, (a) the actual and necessary costs and expenses incurred after the Petition Date and through the Effective Date of preserving the Estates and operating the businesses of the Debtors; (b) Fee Claims; and (c) all fees and charges assessed against the Estates pursuant to sections 1911 through 1930 of chapter 123 of title 28 of the United States Code.

*Allowed* means, with respect to any Claim or Interest (a) as to which the Debtors and the holder of the Claim agree to the amount of the Claim or a court of competent jurisdiction has determined the amount of the Claim by Final Order; (b) any Claim or Interest that is compromised, settled, or otherwise resolved pursuant to the authority of the Debtors or Reorganized Debtors, as applicable, in a Final Order of the Bankruptcy Court; (c) any Claim that is listed in the Schedules, if any are filed, as liquidated, non-contingent and undisputed; or (d) any Claim or Interest expressly allowed hereunder; *provided* that, the Reorganized Debtors shall retain all claims and defenses with respect to Allowed Claims that are reinstated or otherwise Unimpaired pursuant to the Plan; *provided further* that, no Claim shall be "Allowed" if it is subject to disallowance in accordance with section 502(d) of the Bankruptcy Code.

*Amended By-Laws* means, with respect to a Reorganized Debtor, such Reorganized Debtor's amended or amended and restated by-laws or operating agreement, a substantially final form of which shall be contained in the Plan Supplement to the extent they contain material changes to the existing documents.

*Amended Certificate of Incorporation* means, with respect to each Reorganized Debtor, such Reorganized Debtor's amended or amended and restated certificate of incorporation or certificate of formation, a substantially final form of which shall be contained in the Plan Supplement to the extent they contain material changes to the existing documents.

*Apache* means, collectively, (a) Apache Corporation, (b) Apache Shelf, Inc., (c) Apache Deepwater LLC and (d) Apache Shelf Exploration LLC.

***Apache Decommissioning Agreement Amendment*** means an amendment to the *Decommissioning Agreement* dated September 30, 2013 between Apache, Fieldwood Energy LLC, and GOM Shelf LLC, a substantially final form of which shall be contained in the Plan Supplement, and which shall be in form and substance substantially consistent with the term sheet attached as **Exhibit H** to the Disclosure Statement and in form and substance reasonably acceptable to the Debtors, Apache, the Requisite Second Lien Term Lenders and Requisite Sponsor Second Lien Term Lenders.

***Asset*** means all of the right, title, and interest of a Debtor in and to property of whatever type or nature (including, without limitation, real, personal, mixed, intellectual, tangible, and intangible property).

***Asset Purchase Transaction*** means the Purchaser's purchase from Seller of the Purchased Assets, pursuant to the Plan and the Purchase Agreement.

***Backstop Commitment Agreement*** means that certain Backstop Commitment Agreement entered into by Fieldwood Holdings LLC, Fieldwood Energy Inc. and the Backstop Parties before the Petition Date in the form attached to the Restructuring Support Agreement as **Exhibit E** thereof, with such modifications as are permitted under the Restructuring Support Agreement.

***Backstop Commitment Premium*** means the Backstop Commitment Premium (as defined in the Backstop Commitment Agreement) to be paid to the Backstop Parties on the Effective Date in the form of New Equity Interests pursuant to the Backstop Commitment Agreement.

***Backstop Parties*** means those parties that agree to backstop the Rights Offering pursuant to the Backstop Commitment Agreement, each in its respective capacity as such.

***Bankruptcy Code*** means title 11 of the United States Code, as amended from time to time, as applicable to these Chapter 11 Cases.

***Bankruptcy Court*** means the United States Bankruptcy Court for the Southern District of Texas having jurisdiction over the Chapter 11 Cases and, to the extent of any reference made under section 157 of title 28 of the United States Code or the Bankruptcy Court is determined not to have authority to enter a Final Order on an issue, the unit of such District Court having jurisdiction over the Chapter 11 Cases under section 151 of title 28 of the United States Code.

***Bankruptcy Rules*** means the Federal Rules of Bankruptcy Procedure as promulgated by the United States Supreme Court under section 2075 of title 28 of the United States Code, as amended from time to time, applicable to the Chapter 11 Cases, and any local rules of the Bankruptcy Court.

***Business Day*** means any day other than a Saturday, a Sunday or any other day on which banking institutions in New York, New York are authorized or required by law or executive order to close.

**Cash** means legal tender of the United States of America.

**Cause of Action** means any action, claim, cross-claim, third-party claim, cause of action, controversy, demand, right, Lien, indemnity, contribution, guaranty, suit, obligation, liability, debt, damage, judgment, account, defense, remedy, offset, power, privilege, proceeding, license and franchise of any kind or character whatsoever, known, unknown, contingent or non-contingent, matured or unmatured, suspected or unsuspected, liquidated or unliquidated, disputed or undisputed, foreseen or unforeseen, direct or indirect, choate or inchoate, secured or unsecured, assertable directly or derivatively (including, without limitation, under alter ego theories), whether arising before, on, or after the Petition Date, in contract or in tort, in law or in equity or pursuant to any other theory of law.  For the avoidance of doubt, Cause of Action includes: (a) any right of setoff, counterclaim or recoupment and any claim for breach of contract or for breach of duties imposed by law or in equity; (b) the right to object to Claims or Interests; (c) any claim pursuant to section 362 or chapter 5 of the Bankruptcy Code; (d) any claim or defense including fraud, mistake, duress and usury and any other defenses set forth in section 558 of the Bankruptcy Code; and (e) any claims under any state or foreign law, including, without limitation, any fraudulent transfer or similar claims.

**Chapter 11 Case** means, with respect to a Debtor, such Debtor's case under chapter 11 of the Bankruptcy Code commenced on the Petition Date in the Bankruptcy Court, jointly administered with all other Debtors' cases under chapter 11 of the Bankruptcy Code.

**Claim** means a "claim," as defined in section 101(5) of the Bankruptcy Code, against any Debtor.

**Class** means any group of Claims or Interests classified under the Plan pursuant to section 1122(a) of the Bankruptcy Code.

**Collateral** means any Asset of an Estate that is subject to a Lien securing the payment or performance of a Claim, which Lien is not invalid and has not been avoided under the Bankruptcy Code or applicable nonbankruptcy law.

**Confirmation Date** means the date on which the Clerk of the Bankruptcy Court enters the Confirmation Order.

**Confirmation Hearing** means the hearing to be held by the Bankruptcy Court regarding confirmation of the Plan, as such hearing may be adjourned or continued from time to time.

**Confirmation Order** means the order of the Bankruptcy Court confirming the Plan pursuant to section 1129 of the Bankruptcy Code, which order shall be in form and substance reasonably acceptable to the Debtors, the Requisite First Lien Term Lenders, the Requisite Second Lien Term Lenders, and the Requisite Sponsor Second Lien Term Lenders.

**Consenting Creditors** has the meaning set forth in the Restructuring Support Agreement.

**Consenting Second Lien Term Lenders** has the meaning set forth in the Restructuring Support Agreement.

**Consenting Sponsor** has the meaning set forth in the Restructuring Support Agreement.

**Cure Amount** means the payment of Cash or the distribution of other property (as the parties may agree or the Bankruptcy Court may order) as necessary to (a) cure a monetary default by the Debtors in accordance with the terms of an executory contract or unexpired lease of the Debtors and (b) permit the Debtors to assume such executory contract or unexpired lease under section 365(a) of the Bankruptcy Code.

**D&O Policy** means any insurance policy, including tail insurance policies, for directors', members', trustees', and officers' liability maintained by the Debtors and in effect or purchased as of the Petition Date.

**Debtor** has the meaning set forth in the introductory paragraph of the Plan.

**Debtor in Possession** means, with respect to a Debtor, that Debtor in its capacity as a debtor in possession pursuant to sections 1101, 1107(a), and 1108 of the Bankruptcy Code.

**DIP Facility** means the secured multi-draw term loan facility approved in the DIP Facility Order.

**DIP Facility Agent** means Cortland Capital Market Services LLC, solely in its capacity as administrative agent under the DIP Facility Loan Agreement, its successors, assigns, or any replacement agent appointed pursuant to the terms of the DIP Facility Loan Agreement.

**DIP Facility Claim** means a Claim held by the DIP Facility Lenders or the DIP Facility Agent arising under or relating to the DIP Facility Loan Agreement or the DIP Facility Order, including any and all fees, interests, and accrued but unpaid interest and fees arising under the DIP Facility Loan Agreement.

**DIP Facility Lenders** means the lenders party to the DIP Facility Loan Agreement.

**DIP Facility Loan Agreement** means the Senior Secured Debtor-in-Possession Term Loan Credit Agreement to be dated after the Petition Date, by and among Fieldwood Energy LLC, as borrower, the DIP Facility Agent, and the DIP Facility Lenders, with any amendments, modifications or supplements thereto as permitted by the DIP Facility Order.

**DIP Facility Order** means (a) the *Interim Order (I) Authorizing Debtors (A) to Obtain Postpetition Financing Pursuant to 11 U.S.C. §§ 105, 361, 362, 363(b), 364(c)(1), 364(c)(2), 364(c)(3), 364(d)(1) and 364(e) and (b) to Utilize Cash Collateral Pursuant to 11 U.S.C. § 363, (II) Granting Adequate Protection to Prepetition Secured Parties Pursuant to 11 U.S.C. §§ 361, 362, 363, 364 and 507(b) and (III) Scheduling Final Hearing Pursuant to Bankruptcy Rules 4001(a) and (c)* and (b) a Final Order entered by the Bankruptcy Court

authorizing the Debtors to enter into the DIP Facility Loan Agreement and access the DIP Facility, with such modifications as are permitted under the Restructuring Support Agreement.

*Disbursing Agent* means any entity in its capacity as a disbursing agent under section 6.5 hereof, including any Debtor or Reorganized Debtor, as applicable, that acts in such a capacity.

*Disclosure Statement* means the Disclosure Statement for the Plan, as supplemented from time to time, which is prepared and distributed in accordance with sections 1125, 1126(b), or 1145 of the Bankruptcy Code, Bankruptcy Rules 3016 and 3018, or other applicable law.

*Disputed* means, with respect to a Claim, (a) any Claim, which Claim is disputed under section 7.1 of the Plan or as to which the Debtors have interposed and not withdrawn an objection or request for estimation that has not been determined by a Final Order; (b) any Claim, proof of which was required to be filed by order of the Bankruptcy Court but as to which a proof of claim was not timely or properly filed; (c) any Claim that is listed in the Schedules, if any are filed, as unliquidated, contingent or disputed, and as to which no request for payment or proof of claim has been filed; or (d) any Claim that is otherwise disputed by any of the Debtors or Reorganized Debtors in accordance with applicable law or contract, which dispute has not been withdrawn, resolved or overruled by a Final Order. To the extent the Debtors dispute only the amount of a Claim, such Claim shall be deemed Allowed in the amount the Debtors do not dispute, if any, and Disputed as to the balance of such Claim.

*Distribution Record Date* means, except as otherwise provided in the Plan, the Effective Date.

*DTC* means the Depository Trust Company, a limited-purpose trust company organized under the New York State Banking Law.

*Effective Date* means the date which is the first Business Day selected by the Debtors in consultation with the Requisite Second Lien Term Lenders and Requisite Sponsor Second Lien Term Lenders, on which (a) all conditions to the effectiveness of the Plan set forth in Section 9.1 of the Plan have been satisfied or waived in accordance with the terms of the Plan and (b) no stay of the Confirmation Order is in effect.

*Estate* means the estate of a Debtor created under section 541 of the Bankruptcy Code.

*Exculpated Parties* means, collectively, and in each case in their capacities as such during the Chapter 11 Cases: (i) the Debtors, (ii) the Reorganized Debtors, (iii) the Disbursing Agent, (iv) the Restructuring Support Parties, (v) the Exit First Lien Term Loan Agent, (vi) the Exit First Lien Term Loan Lenders, (vii) the Exit Second Lien Term Loan Agent, (viii) the Exit Second Lien Term Loan Lenders, (ix) the Exit LC Facility Agent, (x) the Exit LC Facility Lenders, (xi) the DIP Facility Agent, (xii) the DIP Facility Lenders and (xiii) the Backstop Parties, and in respect to the entities referenced in clauses (i) through (xiii) hereof, such entities' predecessors, successors, assigns, subsidiaries, affiliates, managed accounts and funds, and all of their respective current and former officers and directors, principals, shareholders

(regardless of whether such interests are held directly or indirectly), members, partners, managers, employees, subcontractors, agents, advisory board members, financial advisors, attorneys, accountants, investment bankers, consultants, representatives, investment managers, investment advisors, management companies, fund advisors, and other professionals, and such entities' respective heirs, executors, estates, servants, and nominees, in each case in their capacity as such.

*Existing Energy Inc. Interests* means all Interests in Fieldwood Energy Inc.

*Existing Holdings Interests* means all Interests in Fieldwood Holdings.

*Exit First Lien Credit Agreement* means that certain Amended and Restated First Lien Last-Out Term Loan Agreement, to be dated as of the Effective Date, by and among Reorganized Energy LLC, Reorganized Energy Inc., the Exit First Lien Term Loan Agent, and the Exit First Lien Term Loan Lenders, the form of which shall be contained in the Plan Supplement, and which shall otherwise be in form and substance substantially consistent with the Exit First Lien Term Sheet.

*Exit First Lien Documents* means, collectively, the Exit First Lien Credit Agreement and all other "Loan Documents" (as defined therein) required to be delivered by Reorganized Energy LLC and any other Reorganized Debtor to the Exit First Lien Term Loan Agent on the Effective Date, in each case, which shall otherwise be (a) in form and substance substantially consistent with the Exit First Lien Term Sheet, (b) in form and substance reasonably acceptable to the Debtors and the Exit First Lien Term Loan Agent and (c) in form and substance reasonably acceptable to the Requisite First Lien Lenders, the Requisite Second Lien Term Lenders, and Requisite Sponsor Second Lien Term Lenders.

*Exit First Lien Term Loan Agent* means the administrative agent under the Exit First Lien Credit Agreement.

*Exit First Lien Term Loan Facility* means the term loan facility arising pursuant to the Exit First Lien Credit Agreement, consisting of commitments for term loans in an aggregate principal amount of approximately $1.143 billion.

*Exit First Lien Term Loan Lenders* means the lenders party to the Exit First Lien Credit Agreement.

*Exit First Lien Term Sheet* means that certain term sheet attached to the Restructuring Support Agreement as **Exhibit C** that sets forth the principal terms of the Exit First Lien Term Loan Facility.

*Exit LC Credit Agreement* means the credit agreement to be dated as of the Effective Date, by and among Reorganized Energy LLC, as borrower, the Exit LC Facility Agent, and the Exit LC Facility Lenders, the form of which shall be contained in the Plan Supplement, and which shall otherwise be in form and substance substantially consistent with the Exit LC Facility Term Sheet.

*Exit LC Facility* means the letter of credit facility established under the Exit LC Credit Agreement.

*Exit LC Facility Agent* means the administrative agent under the Exit LC Credit Agreement.

*Exit LC Facility Documents* means, collectively, the Exit LC Credit Agreement and all other "Loan Documents" (as defined therein) required to be delivered by Reorganized Energy LLC and any other Reorganized Debtor to the Exit LC Facility Agent on the Effective Date, in each case, which shall otherwise be (a) in form and substance substantially consistent with the Exit LC Facility Term Sheet, (b) in form and substance reasonably acceptable to the Debtors and the Exit LC Facility Agent, (c) in form and substance reasonably acceptable to the Requisite Second Lien Term Lenders, and the Requisite Sponsor Second Lien Term Lenders, and (d) to the extent such documents materially and adversely affect their economic treatment under the Plan, in form and substance reasonably acceptable to the Requisite First Lien Term Lenders.

*Exit LC Facility Lenders* means the lenders party to the Exit LC Credit Agreement.

*Exit LC Facility Term Sheet* means that certain term sheet attached to the Restructuring Support Agreement as **Exhibit B** that sets forth the principal terms of the Exit LC Facility.

*Exit Second Lien Credit Agreement* means that certain Amended and Restated Second Lien Term Loan Agreement, to be dated as of the Effective Date, by and among Reorganized Energy LLC, as borrower, the Exit Second Lien Term Loan Agent, and the Exit Second Lien Term Lenders, the form of which shall be contained in the Plan Supplement, and which shall otherwise be in form and substance substantially consistent with the Exit Second Lien Term Sheet.

*Exit Second Lien Documents* means, collectively, the Exit Second Lien Credit Agreement and all other "Loan Documents" (as defined therein) required to be delivered by Reorganized Energy LLC and any other Reorganized Debtor to the Exit Second Lien Term Loan Agent on the Effective Date, in each case, which shall otherwise be (a) in form and substance substantially consistent with the Exit Second Lien Term Sheet, (b) in form and substance reasonably acceptable to the Debtors and the Exit Second Lien Term Loan Agent, (c) in form and substance reasonably acceptable to the Requisite Second Lien Term Lenders, and the Requisite Sponsor Second Lien Term Lenders, and (d) to the extent such documents materially and adversely affect their economic treatment under the Plan, in form and substance reasonably acceptable to the Requisite First Lien Term Lenders.

*Exit Second Lien Term Loan Agent* means the administrative agent under the Exit Second Lien Credit Agreement.

*Exit Second Lien Term Loan Facility* means the term loan facility arising under the Exit Second Lien Credit Agreement, consisting of commitments for term loans in an aggregate principal amount of approximately $518 million.

*Exit Second Lien Term Loan Lenders* means the lenders party to the Exit Second Lien Credit Agreement.

*Exit Second Lien Term Sheet* means that certain term sheet attached to the Restructuring Support Agreement as **Exhibit D** that sets forth the principal terms of the Exit Second Lien Credit Agreement.

*Fee Claim* means a Claim for professional services rendered or costs incurred on or after the Petition Date through the Effective Date by Professional Persons.

*Fee Escrow Account* means an interest-bearing account in an amount equal to the total estimated amount of Fee Claims and funded by the Debtors on the Effective Date.

*Fieldwood Holdings* means Fieldwood Holdings LLC.

*Fieldwood Holdings LLC Agreement* means that certain Amended and Restated Limited Liability Company Agreement of Fieldwood Holdings LLC, dated as of September 30, 2013.

*Final Order* means an order, ruling, or judgment of the Bankruptcy Court (or other court of competent jurisdiction) that: (a) is in full force and effect; (b) is not stayed; and (c) is no longer subject to review, reversal, vacatur, modification, or amendment, whether by appeal or by writ of *certiorari; provided*, that the possibility that a motion under Rules 50 or 60 of the Federal Rules of Civil Procedure or any analogous Bankruptcy Rule (or any analogous rules applicable in such other court of competent jurisdiction) may be filed relating to such order, ruling, or judgment shall not cause such order, ruling, or judgment not to be a Final Order.

*FLLO Claim* means any Claim arising under the Prepetition FLLO Credit Agreement.

*FLTL Claim* means any Claim arising under the Prepetition First Lien Term Loan Agreement.

*General Unsecured Claim* means any Claim, other than an RBL Claim, FLTL Claim, FLLO Claim, SLTL Claim, Other Secured Claim, Administrative Expense Claim, Priority Tax Claim, Priority Non-Tax Claim, DIP Facility Claim, or Intercompany Claim that is not entitled to priority under the Bankruptcy Code or any Final Order of the Bankruptcy Court.

*Impaired* means, with respect to a Claim, Interest, or a Class of Claims or Interests, "impaired" within the meaning of such term in section 1124 of the Bankruptcy Code.

*Intercompany Claim* means any Claim against a Debtor held by another Debtor.

*Intercompany Interest* means an Interest in a Debtor other than Fieldwood Holdings or Fieldwood Energy Inc. held by another Debtor or an affiliate of a Debtor.

*Interest* means any equity security (as defined in section 101(16) of the Bankruptcy Code) of a Debtor, including all ordinary shares, units, common stock, preferred

stock, membership interest, partnership interest or other instrument evidencing any fixed or contingent ownership interest in any Debtor, whether or not transferable, including any option, warrant, or other right, contractual or otherwise, to acquire any such interest in a Debtor, that existed immediately before the Effective Date.

*Lien* has the meaning set forth in section 101(37) of the Bankruptcy Code.

*Management Incentive Plan* means the post-restructuring management incentive plan to be adopted by the New Board on the Effective Date, a substantially final form of which will be filed with the Plan Supplement, and shall be (a) consistent in form and substance with the term sheet attached as **Exhibit F** to the Restructuring Support Agreement and (b) in form and substance reasonably acceptable to the Requisite Second Lien Term Lenders and Requisite Sponsor Second Lien Term Lenders.

*New Board* means the initial board of directors of Reorganized Energy Inc.

*New Corporate Governance Documents* means (a) the Amended By-Laws, (b) the Amended Certificate of Incorporation, (c) the shareholders agreement and (d) any other applicable material governance and/or organizational documents of the Reorganized Debtors, which, in each case, shall be in form and substance reasonably acceptable to the Requisite Second Lien Term Lenders and Requisite Sponsor Second Lien Term Lenders, and, solely to the extent materially and adversely impacting the rights of the Requisite First Lien Term Lenders as an appointer of a Director of Reorganized Energy Inc., such documents shall be in form and substance reasonably acceptable to the Requisite First Lien Term Lenders.

*New Equity Interests* means the shares of common stock, par value $0.001 per share, of Reorganized Energy Inc. to be issued (a) on the Effective Date, (b) upon implementation of the Management Incentive Plan, or (c) as otherwise permitted pursuant to the New Corporate Governance Documents of Reorganized Energy Inc., in each case subject to the terms of the Amended Certificate of Incorporation and Amended By-Laws of Reorganized Energy Inc.

*New Intercreditor Agreements* means (i) that certain Intercreditor Agreement, to be dated as of the Effective Date, by and among the Exit LC Facility Agent and the Exit First Lien Term Loan Agent, and (ii) that certain Intercreditor Agreement, to be dated as of the Effective Date, by and among the Exit LC Facility Agent, Exit First Lien Term Loan Agent, Exit Second Lien Term Loan Agent, and the Reorganized Debtors, the form of which shall be contained in the Plan Supplement and reasonably acceptable to the Requisite First Lien Term Lenders, the Requisite Second Lien Term Lenders, and the Requisite Sponsor Second Lien Term Lenders.

*Other Secured Claim* means any Secured Claim against a Debtor other than an RBL Claim, FLTL Claim, FLLO Claim, SLTL Claim, or a DIP Facility Claim.

*Person* means an individual, corporation, partnership, joint venture, association, joint stock company, limited liability company, limited liability partnership, trust, estate, unincorporated organization, governmental unit (as defined in section 101(27) of the Bankruptcy Code), or other entity (as defined in section 101(15) of the Bankruptcy Code).

**Petition Date** means, with respect to a Debtor, the date on which such Debtor commenced its Chapter 11 Case.

**Plan** means this joint prepackaged chapter 11 plan, including all appendices, exhibits, schedules, and supplements hereto (including, without limitation, any appendices, schedules, and supplements to the Plan contained in the Plan Supplement), as may be modified from time to time in accordance with the Bankruptcy Code, the terms hereof, and the terms of the Restructuring Support Agreement.

**Plan Distribution** means the payment or distribution of consideration to holders of Allowed Claims and Allowed Interests under the Plan.

**Plan Document** means any of the documents, other than the Plan, to be executed, delivered, assumed, or performed in connection with the occurrence of the Effective Date, including, without limitation, the documents to be included in the Plan Supplement, the Exit LC Credit Agreement, the Exit First Lien Credit Agreement, the Exit Second Lien Credit Agreement, the New Intercreditor Agreements, the New Corporate Governance Documents, and the Management Incentive Plan, subject to the consent rights regarding material documents set forth in the Restructuring Support Agreement and as may be modified consistent with the Restructuring Support Agreement.

**Plan Supplement** means a supplemental appendix to the Plan containing, among other things, substantially final forms (in each case, subject to the consent rights set forth in the Restructuring Support Agreement and as may be modified consistent with the Restructuring Support Agreement) of the Exit LC Credit Agreement (exclusive of all ancillary documents), the Exit First Lien Credit Agreement (exclusive of all ancillary documents), the Exit Second Lien Credit Agreement (exclusive of all ancillary documents), the New Intercreditor Agreements, the Apache Decommissioning Agreement Amendment, the New Corporate Governance Documents, the slate of directors to be appointed to the New Board and, with respect to the members of the New Board, information required to be disclosed in accordance with section 1129(a)(5) of the Bankruptcy Code, and the Management Incentive Plan; *provided*, that, through the Effective Date, the Debtors shall have the right to amend documents contained in, and exhibits to, the Plan Supplement in accordance with the terms of the Restructuring Support Agreement. The Plan Supplement shall be filed with the Bankruptcy Court not later than five (5) calendar days before the deadline to object to the Plan.

**Prepetition First Lien Term Lenders** means the Lenders (as defined in the Prepetition First Lien Term Loan Agreement) holding Prepetition First Lien Term Loans immediately prior to the Effective Date.

**Prepetition First Lien Term Loan Agent** means Citibank, N.A., solely in its capacity as administrative agent under the Prepetition First Lien Term Loan Agreement.

**Prepetition First Lien Term Loan Agreement** means that certain First Lien Term Loan Agreement, dated as of September 30, 2013, by and among Fieldwood Energy LLC, as borrower, the Lenders thereunder and as defined therein, the Prepetition First Lien Term Loan Agent, and the other parties thereto, as in effect immediately prior to the Effective Date.

**Prepetition First Lien Term Loans** means the Loans (under and as defined in the Prepetition First Lien Term Loan Agreement) outstanding immediately prior to the Effective Date.

**Prepetition FLLO Agent** means Cortland Capital Market Services LLC, solely in its capacity as successor administrative agent under the Prepetition FLLO Credit Agreement.

**Prepetition FLLO Credit Agreement** means that certain First Lien Last-Out Term Loan Agreement, dated as of May 27, 2016 (as amended), by and among Fieldwood Energy LLC, as borrower, the Lenders thereunder and as defined therein, the Prepetition FLLO Agent, and the other parties thereto as in effect immediately prior to the Effective Date.

**Prepetition FLLO Lenders** means the Lenders (as defined in the Prepetition FLLO Credit Agreement) holding Prepetition FLLO Loans immediately prior to the Effective Date.

**Prepetition FLLO Loans** means the Loans (under and as defined in the Prepetition FLLO Credit Agreement) outstanding immediately prior to the Effective Date.

**Prepetition RBL Agent** means Citibank, N.A., as administrative agent, solely in its capacity as administrative agent under the Prepetition RBL Credit Agreement.

**Prepetition RBL Credit Agreement** means that certain Credit Agreement, dated as of September 30, 2013 (as amended), by and among Fieldwood Energy LLC, as borrower, the Prepetition RBL Agent, the Lenders thereunder and as defined therein and the other parties thereto, as in effect immediately prior to the Effective Date.

**Prepetition RBL Facility** means the revolving credit facility arising under the Prepetition RBL Credit Agreement.

**Prepetition RBL Lenders** means the Lenders (as defined in the Prepetition RBL Credit Agreement) party to the Prepetition RBL Credit Agreement immediately prior to the Effective Date.

**Prepetition Second Lien Term Lenders** means the Lenders (as defined in the Prepetition Second Lien Term Loan Agreement) holding Prepetition Second Lien Term Loans immediately prior to the Effective Date.

**Prepetition Second Lien Term Loan Agent** means Cortland Capital Market Services LLC, solely in its capacity as successor administrative agent under the Prepetition Second Lien Term Loan Agreement.

**Prepetition Second Lien Term Loan Agreement** means that certain Second Lien Term Loan Agreement, dated as of September 30, 2013 (as amended), by and among Fieldwood Energy LLC, as borrower, the Lenders thereunder and as defined therein, the Prepetition Second Lien Term Loan Agent, and the other parties thereto, as in effect immediately prior to the Effective Date.

**Prepetition Second Lien Term Loans** means the Loans (under and as defined in the Prepetition Second Lien Term Loan Agreement) outstanding immediately prior to the Effective Date.

**Prepetition Sponsor Second Lien Term Lenders** means the Lenders (as defined in the Prepetition Sponsor Second Lien Term Loan Agreement) holding Prepetition Sponsor Second Lien Term Loans immediately prior to the Effective Date.

**Prepetition Sponsor Second Lien Term Loan Agent** means Cortland Capital Market Services LLC, solely in its capacity as administrative agent under the Prepetition Sponsor Second Lien Term Loan Agreement.

**Prepetition Sponsor Second Lien Term Loan Agreement** means that certain Second Lien Term Loan Agreement, dated as of May 27, 2016 (as amended), by and among Fieldwood Energy LLC, as borrower, the Lenders thereunder and as defined therein, the Prepetition Sponsor Second Lien Term Loan Agent, and the other parties thereto, as in effect immediately prior to the Effective Date.

**Prepetition Sponsor Second Lien Term Loans** means the Loans (under and as defined in the Prepetition Sponsor Second Lien Term Loan Agreement) outstanding immediately prior to the Effective Date.

**Priority Non-Tax Claim** means any Claim (other than a DIP Facility Claim, an Administrative Expense Claim, or a Priority Tax Claim) that is entitled to priority in payment as specified in section 507(a) of the Bankruptcy Code.

**Priority Tax Claim** means any Claim of a governmental unit (as defined in section 101(27) of the Bankruptcy Code) of the kind entitled to priority in payment under sections 502(i) and 507(a)(8) of the Bankruptcy Code.

**Professional Person** means any Person retained by order of the Bankruptcy Court in connection with these Chapter 11 Cases pursuant to sections 327, 328, 330, 331, 503(b), or 1103 of the Bankruptcy Code, excluding any ordinary course professional retained pursuant to an order of the Bankruptcy Court.

**Pro Rata** means the proportion that an Allowed Claim or Interest in a particular Class bears to the aggregate amount of Allowed Claims or Interests in that Class.

**Purchase Agreement** means that certain Purchase and Sale Agreement, dated as of February 14, 2018, by and among Fieldwood Energy LLC and Seller, attached to the Disclosure Statement as **Exhibit G**, which shall be reasonably acceptable to the Requisite Second Lien Term Lenders and Requisite Sponsor Second Lien Term Lenders, including all schedules, exhibits, instruments and other documents to be delivered pursuant thereto or in connection therewith.

**Purchased Assets** means the "Assets" (as defined in the Purchase Agreement) acquired by Purchaser pursuant to the Purchase Agreement.

*Purchaser* means Fieldwood Energy LLC.

*RBL Claim* means any Claims arising under the Prepetition RBL Credit Agreement.

*Released Parties* means, collectively, and in each case in their capacities as such: (i) the Debtors; (ii) the Debtors' other non-Debtor affiliates; (iii) the Restructuring Support Parties; (iv) the Backstop Parties; (v) the Prepetition RBL Lenders; (vi) the Prepetition RBL Agent; (vii) the Prepetition First Lien Term Lenders; (viii) the Prepetition First Lien Term Loan Agent; (ix) the Prepetition FLLO Lenders; (x) the Prepetition FLLO Agent; (xi) the Prepetition Sponsor Second Lien Term Lenders; (xii) the Prepetition Sponsor Second Lien Term Loan Agent; (xiii) the Prepetition Second Lien Term Lenders; (xiv) the Prepetition Second Lien Term Loan Agent; (xv) the DIP Facility Lenders; (xvi) the DIP Facility Agent; (xvii) Riverstone V FW Holdings Sub, LLC; and (xviii) Fieldwood Management LLC; and with respect to each of the foregoing entities, such entities' predecessors, successors, assigns, subsidiaries, affiliates, managed accounts and funds, and all of their respective current and former officers and directors, principals, shareholders (regardless of whether such interests are held directly or indirectly), members, partners, managers, employees, subcontractors, agents, advisory board members, financial advisors, attorneys, accountants, investment bankers, consultants, representatives, investment managers, investment advisors, management companies, fund advisors, and other professionals, and such entities' respective heirs, executors, estates, servants, and nominees, in each case in their capacity as such, and any and all other persons or entities that may purport to assert any cause of action derivatively, by or through the foregoing entities; *provided*, that any holder of a Claim or Interest that opts out of granting the releases set forth in the Plan shall not be included in the definition of "Released Parties."

*Reorganized Debtors* means the Debtors, as reorganized as of the Effective Date in accordance with the Plan.

*Reorganized Energy Inc.* means Fieldwood Energy Inc., as reorganized on the Effective Date in accordance with the Plan.

*Reorganized Energy LLC* means Fieldwood Energy LLC, as reorganized on the Effective Date in accordance with the Plan.

*Requisite Creditors* has the meaning set forth in the Restructuring Support Agreement.

*Requisite First Lien Term Lenders* has the meaning set forth in the Restructuring Support Agreement.

*Requisite FLLO Term Lenders* has the meaning set forth in the Restructuring Support Agreement.

*Requisite Second Lien Term Lenders* has the meaning set forth in the Restructuring Support Agreement.

*Requisite Sponsor Second Lien Term Lenders* has the meaning set forth in the Restructuring Support Agreement.

*Restructuring* means the financial restructuring of the Debtors, the principal terms of which are set forth in the Plan and the Plan Supplement.

*Restructuring Expenses* means the reasonable and documented fees and expenses incurred by the Restructuring Support Parties in connection with the Restructuring, as provided in the Restructuring Support Agreement, the DIP Facility Order, and the Backstop Commitment Agreement, including, without limitation, the fees and expenses of O'Melveny & Myers LLP, Jackson Walker LLP, Houlihan Lokey Capital, Inc., Davis Polk & Wardwell LLP, Haynes & Boone LLP, PJT Partners LP, Vinson & Elkins LLP, and Perella Weinberg Partners LP (in each case, as counsel or financial advisor to certain of the Restructuring Support Parties), payable in accordance with the terms of the applicable engagement or fee letters executed with such parties and without the requirement for the filing of retention applications, fee applications, or any other applications in the Chapter 11 Cases, which shall be Allowed as Administrative Expense Claims upon incurrence and shall not be subject to any offset, defense, counterclaim, reduction, or credit.

*Restructuring Support Agreement* means that certain Restructuring Support Agreement, dated as of February 14, 2018, by and among Fieldwood Holdings, certain other affiliates of Fieldwood Holdings specified therein, and the Restructuring Support Parties, attached hereto as **Exhibit A**, as the same may be amended, restated, or otherwise modified in accordance with its terms.

*Restructuring Support Parties* means, collectively, the Consenting Creditors and the Consenting Sponsor.

*Restructuring Transactions* means one or more transactions pursuant to section 1123(a)(5)(D) of the Bankruptcy Code to occur on the Effective Date or as soon as reasonably practicable thereafter, that may be necessary or appropriate to effect any transaction described in, approved by, contemplated by, or necessary to effectuate the Plan, including (a) the Asset Purchase Transaction, (b) the Rights Offering, (c) the consummation of the transactions provided for under or contemplated by the Restructuring Support Agreement; (d) the execution and delivery of appropriate agreements or other documents (including the Plan Documents) containing terms that are consistent with or reasonably necessary to implement the terms of the Plan and the Restructuring Support Agreement and that satisfy the requirements of applicable law; (e) the execution and delivery of appropriate instruments (including the Plan Documents) of transfer, assignment, assumption, or delegation of any property, right, liability, duty, or obligation on terms consistent with the terms of the Plan and the Restructuring Support Agreements; (f) enter into the Apache Decommissioning Agreement Amendment; and (g) all other actions that the Debtors or Reorganized Debtors, as applicable, determine are necessary or appropriate and consistent with the Restructuring Support Agreement.

*Rights Offering* means that certain rights offering pursuant to which each holder of Allowed SLTL Claims is entitled to receive Subscription Rights to acquire New Equity Interests in accordance with the Rights Offering Procedures.

14

*Rights Offering Procedures* means the procedures for the implementation of the Rights Offering approved by the Bankruptcy Court and substantially in the form attached to the Restructuring Support Agreement as **Exhibit I**.

*Schedule of Rejected Contracts* means the schedule of executory contracts and unexpired leases to be rejected by the Debtors pursuant to the Plan, if any, as the same may be amended, modified, or supplemented from time to time and which shall otherwise be in form and substance reasonably acceptable to the Requisite Second Lien Term Lenders and Requisite Sponsor Second Lien Term Lenders.

*Schedules* means, the schedules of Assets and liabilities, statements of financial affairs, lists of holders of Claims and Interests and all amendments or supplements thereto filed by the Debtors with the Bankruptcy Court, if any.

*Secured Claim* means a Claim to the extent (a) secured by a Lien on property of a Debtor's Estate, the amount of which is equal to or less than the value of such property (i) as set forth in the Plan, (ii) as agreed to by the holder of such Claim and the Debtors, or (iii) as determined by a Final Order in accordance with section 506(a) of the Bankruptcy Code or (b) subject to any setoff right of the holder of such Claim under section 553 of the Bankruptcy Code.

*Securities Act* means the Securities Act of 1933, as amended.

*Security* means any "security" as such term is defined in section 101(49) of the Bankruptcy Code.

*Seller* means Noble Energy, Inc.

*SLTL Claim* means any Claim arising under the Prepetition Second Lien Term Loan Agreement or the Prepetition Sponsor Second Lien Term Loan Agreement.

*Subscription Rights* means the subscription rights to acquire New Equity Interests offered in accordance with the Rights Offering Procedures.

*Tax Code* means the Internal Revenue Code of 1986, as amended from time to time.

*Unimpaired* means, with respect to a Claim, Interest, or Class of Claims or Interests, not "impaired" within the meaning of such term in section 1124 of the Bankruptcy Code.

*U.S. Trustee* means the United States Trustee for Region 7.

*Voting Deadline* means March 14, 2018 at 5:00 p.m. Prevailing Central Time, or such date and time as may set by the Bankruptcy Court.

### 1.2 *Interpretation; Application of Definitions; Rules of Construction.*

Unless otherwise specified, all section or exhibit references in the Plan are to the respective section in or exhibit to the Plan, as the same may be amended, waived, or modified from time to time in accordance with the terms hereof and the Restructuring Support Agreement. The words "herein," "hereof," "hereto," "hereunder," and other words of similar import refer to the Plan as a whole and not to any particular section, subsection, or clause contained therein and have the same meaning as "in the Plan," "of the Plan," "to the Plan," and "under the Plan," respectively. The words "includes" and "including" are not limiting. The headings in the Plan are for convenience of reference only and shall not limit or otherwise affect the provisions hereof. For purposes herein: (a) in the appropriate context, each term, whether stated in the singular or plural, shall include both the singular and plural, and pronouns stated in the masculine, feminine, or neuter gender shall include the masculine, feminine, and the neuter gender; (b) any reference herein to a contract, lease, instrument, release, indenture, or other agreement or document being in a particular form or on particular terms and conditions means that the referenced document shall be substantially in that form or substantially on those terms and conditions; (c) the rules of construction set forth in section 102 of the Bankruptcy Code shall apply; and (d) any term used in capitalized form herein that is not otherwise defined but that is used in the Bankruptcy Code or the Bankruptcy Rules shall have the meaning assigned to that term in the Bankruptcy Code or the Bankruptcy Rules, as the case may be.

### 1.3 *Reference to Monetary Figures.*

All references in the Plan to monetary figures shall refer to the legal tender of the United States of America unless otherwise expressly provided.

### 1.4 *Consent Rights of Restructuring Support Parties.*

Notwithstanding anything herein to the contrary, any and all consent rights of the Restructuring Support Parties set forth in the Restructuring Support Agreement with respect to the form and substance of this Plan, the Plan Supplement and any other Plan Documents, including any amendments, restatements, supplements, or other modifications to such documents, and any consents, waivers, or other deviations under or from any such documents, shall be incorporated herein by this reference and fully enforceable as if stated in full herein.

### 1.5 *Controlling Document.*

In the event of an inconsistency between the Plan and the Plan Supplement, the terms of the relevant document in the Plan Supplement shall control unless otherwise specified in such Plan Supplement document. In the event of an inconsistency between the Plan and any other instrument or document created or executed pursuant to the Plan, or between the Plan and the Disclosure Statement, the Plan shall control. The provisions of the Plan and of the Confirmation Order shall be construed in a manner consistent with each other so as to effectuate the purposes of each; *provided*, that if there is determined to be any inconsistency between any provision of the Plan and any provision of the Confirmation Order that cannot be so reconciled, then, solely to the extent of such inconsistency, the provisions of the Confirmation Order shall

govern, and any such provisions of the Confirmation Order shall be deemed a modification of the Plan.

## ARTICLE II.    ADMINISTRATIVE EXPENSE CLAIMS, FEE CLAIMS, DIP FACILITY CLAIMS, AND PRIORITY TAX CLAIMS.

### 2.1    *Treatment of Administrative Expense Claims.*

Except to the extent that a holder of an Allowed Administrative Expense Claim other than a Fee Claim agrees to a different treatment, on the Effective Date or as soon thereafter as is reasonably practicable (but in no event later than 30 days after the Effective Date), the holder of such Allowed Administrative Expense Claim shall receive, on account of such Allowed Claim, Cash in an amount equal to the Allowed amount of such Claim; *provided*, that Allowed Administrative Expense Claims representing liabilities incurred in the ordinary course of business by the Debtors, as Debtors in Possession, shall be paid by the Debtors or the Reorganized Debtors, as applicable, in the ordinary course of business, consistent with past practice and in accordance with the terms and subject to the conditions of any orders or agreements governing, instruments evidencing, or other documents establishing, such liabilities.

### 2.2    *Treatment of Fee Claims.*

(a)    All Professional Persons seeking awards by the Bankruptcy Court of compensation for services rendered or reimbursement of expenses incurred through and including the Effective Date under sections 327, 328, 330, 331, 503(b)(2), 503(b)(3), 503(b)(4), 503(b)(5), or 1103 of the Bankruptcy Code shall (a) file, on or before the date that is forty five (45) days after the Effective Date, their respective applications for final allowances of compensation for services rendered and reimbursement of expenses incurred and (b) be paid in full, in Cash, in such amounts as are Allowed by the Bankruptcy Court or authorized to be paid in accordance with the order(s) relating to or allowing any such Fee Claim.  On the Effective Date, the Debtors shall establish and fund the Fee Escrow Account.  The Debtors shall fund the Fee Escrow Account with Cash equal to the Professional Persons' good faith estimates of the Fee Claims.  Funds held in the Fee Escrow Account shall not be considered property of the Debtors' Estates or property of the Reorganized Debtors, but shall revert to the Reorganized Debtors only after all Fee Claims allowed by the Bankruptcy Court have been irrevocably paid in full.  The Fee Escrow Account shall be held in trust for Professional Persons retained by the Debtors and for no other parties until all Fee Claims Allowed by the Bankruptcy Court have been paid in full.  Fees owing to the applicable Professional Persons shall be paid in Cash to such Professional Persons from funds held in the Fee Escrow Account when such Claims are Allowed by an order of the Bankruptcy Court or authorized to be paid under the Order Establishing Procedures for Interim Compensation and Reimbursement of Expenses of Professionals; provided, however, that the Reorganized Debtors' obligations with respect to Fee Claims shall not be limited by nor deemed limited to the balance of funds held in the Fee Escrow Account.  To the extent that funds held in the Fee Escrow Account are insufficient to satisfy the amount of accrued Fee Claims owing to the Professional Persons, such Professional Persons shall have an Allowed Administrative Expense Claim for any such deficiency, which shall be

satisfied in accordance with Section 2.1 of the Plan. No Liens, claims, or interests shall encumber the Professional Fee Escrow in any way.

(b)    Any objections to Fee Claims shall be served and filed (a) no later than twenty one (21) days after the filing of the final applications for compensation or reimbursement or (b) such later date as ordered by the Bankruptcy Court upon a motion of the Reorganized Debtors.

### 2.3    *Treatment of DIP Facility Claims.*

In full and final satisfaction, settlement, release, and discharge of, and in exchange for, each Allowed DIP Facility Claim (subject to the last sentence of this Section 2.3), each such Allowed DIP Facility Claim (a) shall be paid in full in Cash by the Debtors on the Effective Date equal to the Allowed amount of such DIP Facility Claim and all commitments under the DIP Facility Loan Agreement shall terminate, or (b) shall be otherwise satisfied by the Debtors in a manner acceptable to the DIP Facility Agent, any affected lender under the DIP Facility Loan Agreement, or any other holder of a DIP Facility Claim, as applicable, in accordance with the Restructuring Support Agreement.  Upon the indefeasible payment or satisfaction in full in Cash, or other satisfactory treatment, of the DIP Facility Claims (other than any DIP Facility Claims based on the Debtors' contingent obligations under the DIP Facility Loan Agreement for which no claim has been made) in accordance with the terms of the Plan, on the Effective Date, all Liens granted to secure such obligations shall be terminated and of no further force and effect.  The Debtors' contingent or unliquidated obligations under the DIP Facility Loan Agreement, to the extent not indefeasibly paid in full in Cash on the Effective Date or otherwise satisfied by the Debtors in a manner reasonably acceptable to the DIP Facility Agent, any affected lender under the DIP Facility Loan Agreement, or any other holder of a DIP Facility Claim, as applicable, shall survive the Effective Date and shall not be released or discharged pursuant to the Plan or Confirmation Order, notwithstanding any provision hereof or thereof to the contrary.

At the direction and at the option of any DIP Facility Lender that is also a Backstop Party or a Related Fund (as defined in the Backstop Commitment Agreement) of any Backstop Party, and for administrative convenience, the cash to be received by such DIP Facility Lender on account of principal pursuant to Section 2.3 of the Plan shall be applied towards the obligations of such Backstop Party or Related Fund under the Backstop Commitment Agreement, and upon such application the principal amount of all loans of such DIP Facility Lender under the DIP Facility Loan Agreement shall be deemed paid and satisfied in full.

### 2.4    *Payment of Fees and Expenses under DIP Facility Order.*

On the later of (a) the Effective Date and (b) the date on which such fees, expenses or disbursements would be required to be paid under the terms of the DIP Facility Order, the Debtors or Reorganized Debtors (as applicable) shall pay all fees, expenses and disbursements of (w) the DIP Facility Agent, and (x) any accrued and unpaid fees and expenses as of the Effective Date required to be paid under or pursuant to the applicable DIP Facility Order.  All payments of fees, expenses, or disbursements pursuant to this section shall be subject in all respects to the terms of the applicable DIP Facility Order.

**2.5**    *Treatment of Priority Tax Claims.*

Except to the extent that a holder of an Allowed Priority Tax Claim agrees to a different treatment, on the Effective Date or as soon thereafter as is reasonably practicable, the holder of such Allowed Priority Tax Claim shall receive, on account of such Allowed Priority Tax Claim, Cash in an amount equal to the Allowed amount of such Claim or otherwise receive treatment consistent with the provisions of section 1129(a)(9) of the Bankruptcy Code; *provided*, that Allowed Priority Tax Claims representing liabilities incurred in the ordinary course of business by the Debtors, as Debtors in Possession, shall be paid by the Debtors or the Reorganized Debtors, as applicable, in the ordinary course of business, consistent with past practice and in accordance with the terms and subject to the conditions of any orders or agreements governing, instruments evidencing, or other documents establishing, such liabilities.

# ARTICLE III.    CLASSIFICATION OF CLAIMS AND INTERESTS.

**3.1**    *Classification in General.*

A Claim or Interest is placed in a particular Class for all purposes, including voting, confirmation, and distribution under the Plan and under sections 1122 and 1123(a)(1) of the Bankruptcy Code; *provided*, that a Claim or Interest is placed in a particular Class for the purpose of receiving distributions pursuant to the Plan only to the extent that such Claim or Interest is an Allowed Claim or Allowed Interest in that Class and such Claim or Interest has not been satisfied, released, or otherwise settled prior to the Effective Date.

**3.2**    *Formation of Debtor Groups for Convenience Only.*

The Plan groups the Debtors together solely for the purpose of describing treatment under the Plan, confirmation of the Plan, and making Plan Distributions in respect of Claims against and Interests in the Debtors under the Plan. Such groupings shall not affect any Debtor's status as a separate legal entity, change the organizational structure of the Debtors' business enterprise, constitute a change of control of any Debtor for any purpose, cause a merger of consolidation of any legal entities, or cause the transfer of any Assets; and, except as otherwise provided by or permitted under the Plan, all Debtors shall continue to exist as separate legal entities.

**3.3**    *Summary of Classification of Claims and Interests.*

The following table designates the Classes of Claims against and Interests in the Debtors and specifies which Classes are: (a) Impaired and Unimpaired under the Plan; (b) entitled to vote to accept or reject the Plan in accordance with section 1126 of the Bankruptcy Code; and (c) deemed to accept or reject the Plan:

| **Class** | **Type of Claim or Interest** | **Impairment** | **Entitled to Vote** |
|---|---|---|---|
| Class 1 | Priority Non-Tax Claims | Unimpaired | No (Deemed to accept) |
| Class 2 | Other Secured Claims | Unimpaired | No (Deemed to accept) |

| Class | Type of Claim or Interest | Impairment | Entitled to Vote |
|---|---|---|---|
| Class 3 | RBL Claims | Unimpaired | No (Deemed to accept) |
| Class 4 | FLTL Claims | Impaired | Yes |
| Class 5 | FLLO Claims | Impaired | Yes |
| Class 6 | SLTL Claims | Impaired | Yes |
| Class 7 | General Unsecured Claims | Unimpaired | No (Deemed to accept) |
| Class 8 | Intercompany Claims | Unimpaired | No (Deemed to accept) |
| Class 9 | Existing Holdings Interests | Unimpaired | No (Deemed to accept) |
| Class 10 | Existing Energy Inc. Interests | Impaired | No (Deemed to accept) |
| Class 11 | Intercompany Interests | Unimpaired | No (Deemed to accept) |

### 3.4 *Special Provision Governing Unimpaired Claims.*

Except as otherwise provided in the Plan, nothing under the Plan shall affect the rights of the Debtors or the Reorganized Debtors, as applicable, in respect of any Unimpaired Claims, including all rights in respect of legal and equitable defenses to, or setoffs or recoupments against, any such Unimpaired Claims.

### 3.5 *Separate Classification of Other Secured Claims.*

Although all Other Secured Claims have been placed in one Class for purposes of nomenclature within the Plan, each Other Secured Claim, to the extent secured by a Lien on Collateral different from the Collateral securing a different Other Secured Claim, shall be treated as being in a separate sub-Class for the purposes of voting to accept or reject the Plan and receiving Plan Distributions.

### 3.6 *Elimination of Vacant Classes.*

Any Class that, as of the commencement of the Confirmation Hearing, does not have at least one holder of a Claim or Interest that is Allowed in an amount greater than zero for voting purposes who votes on the Plan shall be considered vacant, deemed eliminated from the Plan for purposes of voting to accept or reject the Plan, and disregarded for purposes of determining whether the Plan satisfies section 1129(a)(8) of the Bankruptcy Code with respect to such Class.

### 3.7 *Voting; Presumptions; Solicitation.*

(a) **Acceptance by Certain Classes**. Only holders of Allowed Claims or Interests in Classes 4, 5, and 6 are entitled to vote to accept or reject the Plan. An Impaired Class of Claims shall have accepted the Plan if (a) the holders of at least two-thirds (2/3) in amount of the Allowed Claims actually voting in such Class have voted to accept the Plan and (b) the holders of more than one-half (1/2) in number of the Allowed Claims actually voting in such Class have voted to accept the Plan. Holders of Claims or Interests in Classes 4, 5, and 6 shall receive ballots containing detailed voting instructions.

(b) **Deemed Acceptance by Classes**. Holders of Claims and Interests in Classes 1, 2, 3, 7, 8, 9, and 11 are conclusively deemed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code. In addition, although holders of Interests in Class 10 are impaired under the Plan, such holders are presumed to be proponents of the Plan, and are deemed to accept. Accordingly, all such holders are not entitled to vote to accept or reject the Plan.

### 3.8 *Cramdown.*

If any Class is deemed to reject the Plan or is entitled to vote on the Plan and does not vote to accept the Plan, the Debtors may (a) seek confirmation of the Plan under section 1129(b) of the Bankruptcy Code or (b) amend or modify the Plan in accordance with the terms hereof and the Bankruptcy Code. If a controversy arises as to whether any Claims or Interests, or any class of Claims or Interests, are impaired, the Bankruptcy Court shall, after notice and a hearing, determine such controversy on or before the Confirmation Date.

### 3.9 *No Waiver.*

Nothing contained in the Plan shall be construed to waive a Debtor's or other entity's right to object on any basis to any Claim.

## ARTICLE IV.    TREATMENT OF CLAIMS AND INTERESTS.

### 4.1 *Class 1:  Priority Non-Tax Claims.*

(a) **Treatment**: The legal, equitable, and contractual rights of the holders of Allowed Priority Non-Tax Claims are unaltered by the Plan. Except to the extent that a holder of an Allowed Priority Non-Tax Claim agrees to different treatment, on the later of the Effective Date and the date that is ten (10) Business Days after the date such Priority Non-Tax Claim becomes an Allowed Claim, or as soon thereafter as is reasonably practicable, each holder of an Allowed Priority Non-Tax Claim shall receive, on account of such Allowed Claim, at the option of the Reorganized Debtors: (i) Cash in an amount equal to the Allowed amount of such Claim or (ii) other treatment consistent with the provisions of section 1129(a)(9) of the Bankruptcy Code.

(b) **Impairment and Voting**:  Allowed Priority Non-Tax Claims are Unimpaired. In accordance with section 1126(f) of the Bankruptcy Code, the holders of Allowed Priority Non-Tax Claims are conclusively presumed to accept the Plan and are not entitled to vote to accept or reject the Plan, and the votes of such holders shall not be solicited with respect to such Allowed Priority Non-Tax Claims.

### 4.2 *Class 2:  Other Secured Claims.*

(a) **Treatment**: The legal, equitable, and contractual rights of the holders of Allowed Other Secured Claims are unaltered by the Plan. Except to the extent that a holder of an Allowed Other Secured Claim agrees to different treatment, on the later of the Effective Date and

the date that is ten (10) Business Days after the date such Other Secured Claim becomes an Allowed Claim, or as soon thereafter as is reasonably practicable, each holder of an Allowed Other Secured Claim shall receive, on account of such Allowed Claim, at the option of the Reorganized Debtors: (i) Cash in an amount equal to the Allowed amount of such Claim, (ii) reinstatement or such other treatment sufficient to render such holder's Allowed Other Secured Claim Unimpaired pursuant to section 1124 of the Bankruptcy Code, or (iii) such other recovery necessary to satisfy section 1129 of the Bankruptcy Code.

(b)      **Impairment and Voting**:  Allowed Other Secured Claims are Unimpaired.  In accordance with section 1126(f) of the Bankruptcy Code, the holders of Allowed Other Secured Claims are conclusively presumed to accept the Plan and are not entitled to vote to accept or reject the Plan, and the votes of such holders shall not be solicited with respect to such Allowed Other Secured Claims.

### 4.3      *Class 3:  RBL Claims.*

(a)      **Treatment**: On the Effective Date, holders of Allowed RBL Claims shall receive payment in full, in Cash and the existing commitments shall be terminated.

(b)      **Impairment and Voting**:  RBL Claims are Unimpaired.  Holders of Allowed RBL Claims are not entitled to vote on the Plan.

(c)      **Allowance**: The RBL Claims shall be deemed Allowed on the Effective Date in the aggregate face amount of the then outstanding letters of credit issued under the RBL Credit Agreement, plus any unreimbursed amounts thereunder, and any accrued and unpaid interest payable on such unreimbursed amounts thereunder through the Effective Date, plus any fees, charges, including any and all reasonable and documented expenses and other amounts payable under the Prepetition RBL Credit Agreement.

### 4.4      *Class 4:  FLTL Claims.*

(a)      **Treatment**:  On the Effective Date, all of the FLTL Claims shall be cancelled and discharged.  On the Effective Date, each holder of an Allowed FLTL Claim shall receive (i) on account of the outstanding principal amount of such Claim, its Pro Rata share of the lending commitments arising under the Exit First Lien Term Loan Facility, secured by a first-priority lien on (x) substantially all of the property of the Reorganized Debtors that secured the FLTL Claims pursuant to the Prepetition First Lien Term Loan Agreement and the other applicable Loan Documents (as defined in the Prepetition First Lien Term Loan Agreement) and (y) substantially all of the Purchased Assets, in each case, on the terms and subject to the limitations set forth in the Exit First Lien Credit Agreement, on a "last-out" basis, and (ii) on account of all accrued and unpaid interest payable through the Effective Date and for all reasonable and documented expenses and other amounts payable under the Prepetition First Lien Term Loan Agreement, payment in Cash.

(b)      **Impairment and Voting**:  FLTL Claims are Impaired.  Holders of Allowed FLTL Claims are entitled to vote on the Plan.

(c) **Allowance**: The FLTL Claims shall be deemed Allowed on the Effective Date in the aggregate principal amount of $1,142,688,815, plus (i) any accrued and unpaid interest thereon payable through the Effective Date, and (ii) any fees, charges, including any and all reasonable and documented expenses and other amounts payable under the Prepetition First Lien Term Loan Agreement.

### 4.5 _Class 5:  FLLO Claims._

(a) **Treatment**:  On the Effective Date, all of the FLLO Claims shall be cancelled and discharged.  On the Effective Date, each holder of an Allowed FLLO Claim shall receive (i) on account of the outstanding principal amount of such Claim, its Pro Rata share of the lending commitments arising under the Exit Second Lien Term Loan Facility, secured by a second-priority (in respect of the Exit LC Facility and the Exit First Lien Term Loan Facility) lien on (x) substantially all of the property of the Reorganized Debtors that secured the FLLO Claims pursuant to the Prepetition FLLO Term Loan Agreement and the other applicable Loan Documents (as defined in the Prepetition FLLO Term Loan Agreement) and (y) substantially all of the Purchased Assets, in each case, on the terms and subject to the limitations set forth in the Exit Second Lien Credit Agreement and (ii) on account of accrued and unpaid interest payable through the Effective Date and for all reasonable and documented expenses and other amounts payable under the Prepetition FLLO Credit Agreement, payment in Cash.

(b) **Impairment and Voting**:  FLLO Claims are Impaired.  Holders of Allowed FLLO Claims are entitled to vote on the Plan.

(c) **Allowance**: The FLLO Claims shall be deemed Allowed on the Effective Date in the aggregate principal amount of $517,500,000, plus (i) any accrued and unpaid interest thereon payable through the Effective Date, and (ii) any fees, charges, including any and all reasonable and documented expenses and other amounts payable under the Prepetition FLLO Credit Agreement.

### 4.6 _Class 6:  SLTL Claims._

(a) **Treatment**:  On the Effective Date, all of the SLTL Claims shall be cancelled and discharged.  On the Effective Date, each holder of an Allowed SLTL Claim shall receive, on account of its Allowed SLTL Claims, its Pro Rata share of (i) New Equity Interests representing, in the aggregate, 20.25% of the New Equity Interests issued on the Effective Date, and (ii) 100% of the Subscription Rights to acquire 75% of the New Equity Interests for $525 million in accordance with the Rights Offering Procedures, in each case the New Equity Interests subject to dilution by the Management Incentive Plan.

(b) **Impairment and Voting**:  SLTL Claims are Impaired.  Holders of Allowed SLTL Claims are entitled to vote on the Plan.

(c) **Allowance**:  The SLTL Claims shall be deemed Allowed on the Effective Date in the aggregate principal amount of $1,626,219,212, plus (i) any accrued and unpaid interest thereon payable through the Petition Date, and (ii) any fees, charges, including any and all reasonable and documented expenses and other amounts payable under the Prepetition

Second Lien Term Loan Agreement or the Prepetition Sponsor Second Lien Term Loan Agreement.

### 4.7 *Class 7: General Unsecured Claims.*

(a) **Treatment**: The legal, equitable, and contractual rights of the holders of Allowed General Unsecured Claims are unaltered by the Plan. Except to the extent that a holder of an Allowed General Unsecured Claim agrees to different treatment, on and after the Effective Date, the Debtors shall continue to pay or dispute each General Unsecured Claim in the ordinary course of business as if the Chapter 11 Cases had never been commenced.

(b) **Impairment and Voting**: Allowed General Unsecured Claims are Unimpaired. In accordance with section 1126(f) of the Bankruptcy Code, the holders of Allowed General Unsecured Claims are conclusively presumed to accept the Plan and are not entitled to vote to accept or reject the Plan, and the votes of such holders shall not be solicited with respect to such Allowed General Unsecured Claims.

### 4.8 *Class 8: Intercompany Claims.*

(a) **Treatment**: On or after the Effective Date, all Intercompany Claims shall be paid, adjusted, continued, settled, reinstated, discharged, or eliminated, in each case to the extent determined to be appropriate by the Debtors or Reorganized Debtors, as applicable, in their sole discretion. All Intercompany Claims between any Debtor and a non-Debtor affiliate shall be Unimpaired under the Plan.

(b) **Impairment and Voting**: All Allowed Intercompany Claims are deemed Unimpaired. In accordance with section 1126(f) of the Bankruptcy Code, the holders of Allowed Intercompany Claims are conclusively presumed to accept the Plan and are not entitled to vote to accept or reject the Plan, and the votes of such holders shall not be solicited with respect to such Allowed Intercompany Claims.

### 4.9 *Class 9: Existing Holdings Interests.*

(a) **Treatment**: Existing Holdings Interests are Unimpaired. As soon as practicable following the distributions of New Equity Interests on the Effective Date, Fieldwood Holdings shall liquidate and dissolve pursuant to applicable law, and the Reorganized Debtors shall provide for the distribution of Fieldwood Holdings' New Equity Interests (received pursuant to Section 4.10(a) of the Plan) to the holders of Existing Holdings Interests in the priorities set forth in Fieldwood Holdings' organizational documents and applicable law. Any other assets of Fieldwood Holdings shall vest in Reorganized Energy Inc.

(b) **Impairment and Voting**: Existing Holdings Interests are Unimpaired. In accordance with section 1126(f) of the Bankruptcy Code, holders of Existing Holdings Interests are conclusively presumed to accept the Plan and are not entitled to vote to accept or reject the Plan, and the votes of such holders shall not be solicited with respect to Existing Holdings Interests.

**4.10** *Class 10:  Existing Energy Inc. Interests.*

(a)  **Treatment**:  On the Effective Date, the Existing Energy Inc. Interests shall be cancelled without further action by or order of the Bankruptcy Court, and each holder of an Allowed Existing Energy Inc. Interest shall receive its Pro Rata share of New Equity Interests representing, in the aggregate, 0.25% of the New Equity Interests issued on the Effective Date (subject to dilution by the Management Incentive Plan).

(b)  **Impairment and Voting**:  The Existing Energy Inc. Interests are Impaired.  However, Fieldwood Holdings, as the sole holder of Existing Energy Inc. Interests, is a Debtor in these cases and a proponent of the Plan.  Accordingly, the Existing Energy Inc. Interests shall be conclusively deemed to accept the Plan, and the votes of such holder shall not be solicited with respect to such Allowed Existing Energy Inc. Interests.

**4.11** *Class 11:  Intercompany Interests.*

(a)  **Treatment**:  Intercompany Interests are Unimpaired.  On the Effective Date, all Intercompany Interests shall be treated as set forth in section 5.15 of the Plan.

(b)  **Impairment and Voting**:  Intercompany Interests are Unimpaired.  In accordance with section 1126(f) of the Bankruptcy Code, the holders of Allowed Intercompany Interests are conclusively presumed to accept the Plan and are not entitled to vote to accept or reject the Plan, and the votes of such holders shall not be solicited with respect to such Allowed Intercompany Interests.

**4.12** *Treatment of Vacant Classes.*

Any Claim or Interest in a Class that is considered vacant under section 3.6 of the Plan shall receive no Plan Distribution.

**ARTICLE V.**  **MEANS FOR IMPLEMENTATION.**

**5.1** *Compromise and Settlement of Claims, Interests, and Controversies.*

Pursuant to section 363 and 1123(b)(2) of the Bankruptcy Code and Bankruptcy Rule 9019 and in consideration for the distributions and other benefits provided pursuant to the Plan, the provisions of the Plan shall constitute a good faith compromise of Claims, Interests, and controversies relating to the contractual, legal, and subordination rights that a creditor or an Interest holder may have with respect to any Allowed Claim or Interest or any distribution to be made on account of such Allowed Claim or Interest.  The entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of the compromise or settlement of all such Claims, Interests, and controversies, as well as a finding by the Bankruptcy Court that such compromise or settlement is in the best interests of the Debtors, their Estates, and holders of such Claims and Interests, and is fair, equitable, and reasonable.

**5.2** _**Continued Corporate Existence.**_

(a)      Except as otherwise provided in the Plan, the Debtors shall continue to exist after the Effective Date as Reorganized Debtors in accordance with the applicable laws of the respective jurisdictions in which they are incorporated or organized and pursuant to the New Corporate Governance Documents.  On or after the Effective Date, without prejudice to the rights of any party to a contract or other agreement with any Reorganized Debtor, each Reorganized Debtor may, in its sole discretion, take such action as permitted by applicable law and the New Corporate Governance Documents, as such Reorganized Debtor may determine is reasonable and appropriate, including, without limitation, causing:  (i) a Reorganized Debtor to be merged into another Reorganized Debtor or an affiliate of a Reorganized Debtor; (ii) a Reorganized Debtor to be dissolved; (iii) the legal name of a Reorganized Debtor to be changed; or (iv) the closure of a Reorganized Debtor's Chapter 11 Case on the Effective Date or any time thereafter, and such action and documents are deemed to require no further action or approval (other than any requisite filings required under the applicable state, provincial and federal or foreign law).

(b)      On the Effective Date or as soon thereafter as is reasonably practicable, the Reorganized Debtors may take all actions as may be necessary or appropriate to effect any transaction described in, approved by, or necessary or appropriate to effectuate the Plan, including, without limitation:  (i) the execution and delivery of appropriate agreements or other documents of merger, consolidation, restructuring, conversion, disposition, transfer, dissolution, or liquidation containing terms that are consistent with the terms of the Plan and the Plan Documents and that satisfy the requirements of applicable law and any other terms to which the applicable entities may agree; (ii) the execution and delivery of appropriate instruments of transfer, assignment, assumption, or delegation of any Asset, property, right, liability, debt, or obligation on terms consistent with the terms of the Plan and having other terms to which the applicable parties agree; (iii) the filing of appropriate certificates or articles of incorporation or formation and amendments thereto, reincorporation, merger, consolidation, conversion, or dissolution pursuant to applicable law; (iv) the Restructuring Transactions; and (v) all other actions that the applicable entities determine to be necessary or appropriate, including, without limitation, making filings or recordings that may be required by applicable law.

(c)      On the Effective Date or as soon thereafter as is reasonably practicable, Fieldwood Holdings shall file with the Office of the Secretary of State of Delaware a certificate of dissolution which may be executed by an officer of Fieldwood Holdings without the necessity of the approval of the board of directors of Fieldwood Holdings or the holders of Interests in Fieldwood Holdings, and upon such filing shall be deemed dissolved for all purposes and without the necessity of any other action by Fieldwood Holdings.  From and after the Effective Date, Fieldwood Holdings shall not be required to file any documents, or take any other action or receive any approval to withdraw business operations in any state where Fieldwood Holdings previously conducted its business operations.  If any of the foregoing is inconsistent or conflicts with any preexisting organizational or related documents of Fieldwood Holdings, such documents are deemed amended by the Plan to permit and authorize Fieldwood Holdings to take the actions contemplated herein.

**5.3    _Corporate Action._**

(a)    Upon the Effective Date, all actions contemplated by the Plan shall be deemed authorized and approved in all respects, including (a) the assumption of executory contracts and unexpired leases as provided herein, (b) the selection of the managers, directors, or officers for the Reorganized Debtors, (c) the distribution of the New Equity Interests, (d) the entry into or execution of the Exit LC Documents, Exit First Lien Documents, and Exit Second Lien Documents, (e) the consummation of the Asset Purchase Transaction, and (g) all other actions contemplated by the Plan (whether to occur before, on, or after the Effective Date), in each case in accordance with and subject to the terms hereof.  All matters provided for in the Plan involving the corporate or limited liability company structure of the Debtors or the Reorganized Debtors, and any corporate or limited liability company action required by the Debtors or the Reorganized Debtors in connection with the Plan shall be deemed to have occurred and shall be in effect, without any requirement of further action by the Security holders, directors, managers, or officers of the Debtors or the Reorganized Debtors.

(b)    On or (as applicable) before the Effective Date, the appropriate directors, officers, and managers of the Debtors or the Reorganized Debtors, as applicable, shall be authorized and directed to issue, execute, and deliver the agreements, documents, securities, and instruments contemplated by the Plan (or necessary or desirable to effect the transactions contemplated by the Plan).  The authorizations and approvals contemplated by this Section 5.3 shall be effective notwithstanding any requirements under non-bankruptcy law.

**5.4    _Asset Purchase Transaction._**

(a)    The Plan and the Confirmation Order shall authorize the Asset Purchase Transaction pursuant to section 363 of the Bankruptcy Code under the terms and conditions of the Purchase Agreement.

(b)    Subject to and in connection with the occurrence of the Effective Date, the Debtors and Seller shall take all such actions as may be necessary or appropriate to effect the Asset Purchase Transaction on the terms and subject to the conditions set forth in the Purchase Agreement. Without limiting the generality of the immediately preceding sentence, upon the satisfaction or waiver of each of the conditions set forth in Section 9.1 of the Plan and the applicable conditions of the Purchase Agreement, on the Effective Date the Debtors and Seller shall take or cause to be taken all actions, including making appropriate filings or recordings, that may be required by applicable law in connection with the Asset Purchase Transaction.

(c)    In the event of any conflict whatsoever between the terms of the Plan and the Purchase Agreement with respect to the Asset Purchase Transaction, the terms of the Purchase Agreement shall control, and the Plan shall be deemed to incorporate in their entirety the terms, provisions, and conditions of the Purchase Agreement.

**5.5    _Plan Funding._**

Plan Distributions of Cash shall be funded from the Debtors' Cash on hand as of the applicable date of such Plan Distribution and from the proceeds of the Rights Offering.

### 5.6 *Cancellation of Existing Securities and Agreements.*

Except for the purpose of evidencing a right to a distribution under the Plan and except as otherwise set forth in the Plan, or in any Plan Document, on the Effective Date, all agreements, instruments, and other documents evidencing any prepetition Claim or Interest (other than certain Intercompany Interests that are not modified by the Plan) and any rights of any holder in respect thereof shall be deemed cancelled and of no force or effect. The holders of or parties to such cancelled instruments, Securities, and other documentation shall have no rights arising from or related to such instruments, Securities, or other documentation or the cancellation thereof, except the rights provided for pursuant to the Plan.

### 5.7 *Cancellation of Certain Existing Security Interests.*

Upon the full payment or other satisfaction of an Allowed Other Secured Claim, or promptly thereafter, the holder of such Allowed Other Secured Claim shall deliver to the Debtors or Reorganized Debtors, as applicable, any Collateral or other property of a Debtor held by such holder, together with any termination statements, instruments of satisfaction, or releases of all security interests with respect to its Allowed Other Secured Claim that may be reasonably required to terminate any related financing statements, mortgages, mechanics' or other statutory Liens, or lis pendens, or similar interests or documents.

### 5.8 *Officers and Boards of Directors.*

(a)   On the Effective Date, the New Board shall consist of seven members. G.M. McCarroll shall serve as a member of the New Board. The remaining members of the New Board shall be allocated in accordance with the Governance Term Sheet attached to the Restructuring Support Agreement as **Exhibit J**. The composition of the boards of directors or managers, as applicable, of each Reorganized Debtor shall be identified no later than the Confirmation Hearing or otherwise in accordance with section 1129(a)(5) of the Bankruptcy Code.

(b)   Except to the extent that a member of the board of directors or managers, as applicable, of a Debtor continues to serve as a director or manager of such Reorganized Debtor on the Effective Date, the members of the board of directors or managers, as applicable, of each Debtor prior to the Effective Date, in their capacities as such, shall have no continuing obligations to the Reorganized Debtors on or after the Effective Date and each such director or manager shall be deemed to have resigned or shall otherwise cease to be a director or manager of the applicable Debtor on the Effective Date. Commencing on the Effective Date, each of the directors or managers, as applicable, of each of the Reorganized Debtors shall serve pursuant to the terms of the applicable organizational documents of such Reorganized Debtor and may be replaced or removed in accordance with such organizational documents.

### 5.9 *Management Incentive Plan.*

On the Effective Date, the New Board shall adopt the Management Incentive Plan.

### 5.10 _Authorization, Issuance, and Delivery of New Equity Interests._

On the Effective Date, Reorganized Energy Inc. is authorized to issue or cause to be issued and shall issue the New Equity Interests for distribution in accordance with the terms of the Plan without the need for any further corporate or shareholder action.

### 5.11 _Exit LC Credit Agreement._

On the Effective Date, the Reorganized Debtors shall enter into the Exit LC Credit Agreement. The Exit LC Credit Agreement shall constitute legal, valid, binding and authorized joint and several obligations of the applicable Reorganized Debtors, enforceable in accordance with its terms and such obligations shall not be enjoined or subject to discharge, impairment, release, avoidance, recharacterization, or subordination under applicable law, the Plan or the Confirmation Order. On the Effective Date, all letters of credit issued under the Prepetition RBL Credit Agreement, to the extent Allowed, shall be deemed issued or reissued, as applicable, under the Exit LC Credit Agreement in accordance with the terms and conditions of the Exit LC Credit Agreement. On the Effective Date, all Liens and security interests granted pursuant to, or in connection with, the Exit LC Credit Agreement: shall (i) be reaffirmed and ratified by the applicable Reorganized Debtors and continue in full force and effect pursuant to the Exit LC Credit Agreement, and (ii) be deemed granted by the Reorganized Debtors pursuant to the Exit LC Credit Agreement. On the Effective Date, all Liens and security interests granted pursuant to, or in connection with the Exit LC Credit Agreement, as applicable, (including any Liens and security interests granted on the Purchased Assets) (x) shall be valid, binding, perfected, enforceable Liens and security interests in the property described in the Exit LC Credit Agreement and the other "Loan Documents" (as defined therein), with the priorities established in respect thereof under applicable non-bankruptcy law and the applicable New Intercreditor Agreements, and (y) shall not be enjoined or subject to discharge, impairment, release, avoidance, recharacterization, or subordination under any applicable law, the Plan, or the Confirmation Order. Pursuant to section 1141(d)(4) of the Bankruptcy Code, the Debtors and the Reorganized Debtors have waived any discharge of the Claims and obligations arising under the Prepetition RBL Credit Agreement as modified by the Exit LC Credit Agreement.

### 5.12 _Exit First Lien Term Loan Facility and Exit Second Lien Term Loan Facility._

On the Effective Date, the Exit First Lien Documents and Exit Second Lien Documents shall be executed and delivered by the Reorganized Debtors substantially in the form contained in the Plan Supplement, and the Reorganized Debtors shall be authorized to execute, deliver, and enter into such documents without the need for any further action. The Exit First Lien Term Loan Facility and Exit Second Lien Term Loan Facility shall constitute legal, valid, binding and authorized joint and several obligations of the Reorganized Debtors, enforceable in accordance with their terms, and such obligations shall not be enjoined or subject to discharge, impairment, release, avoidance, recharacterization, or subordination under applicable law, the Plan or the Confirmation Order. On the Effective Date, all Liens and security interests granted pursuant to, or in connection with, the Prepetition First Lien Credit Agreement and Prepetition FLLO Credit Agreement shall (i) be reaffirmed and ratified by the Reorganized Debtors and continue in full force and effect pursuant to the Exit First Lien Credit Agreement and Exit

Second Lien Credit Agreement, as applicable, and (ii) be deemed granted by the Reorganized Debtors pursuant to the Exit First Lien Credit Agreement and Exit Second Lien Credit Agreement, as applicable. On the Effective Date, all Liens and security interests granted pursuant to, or in connection with the Exit First Lien Credit Agreement and Exit Second Lien Credit Agreement, as applicable, (including any Liens and security interests granted on the Purchased Assets) (x) shall be valid, binding, perfected, enforceable Liens and security interests in the property subject to a security interest granted by the applicable Reorganized Debtors pursuant to the Exit First Lien Credit Agreement and Exit Second Lien Credit Agreement and the "Loan Documents" (as defined in each of the Exit First Lien Credit Agreement and the Exit Second Lien Credit Agreement), as applicable, with the priorities established in respect thereof under applicable non-bankruptcy law and the applicable New Intercreditor Agreements, and (y) shall not be enjoined or subject to discharge, impairment, release, avoidance, recharacterization, or subordination under any applicable law, the Plan, or the Confirmation Order.

### 5.13 _New Intercreditor Agreements._

On the Effective Date, the Reorganized Debtors, the Exit LC Facility Agent, the Exit First Lien Term Loan Agent, and the Exit Second Lien Term Loan Agent shall enter into the applicable New Intercreditor Agreement substantially in the forms contained in the Plan Supplement.

### 5.14 _Rights Offering._

(a) Terms. After the Petition Date, the Debtors will commence the Rights Offering in accordance with the Rights Offering Procedures. On the Effective Date, the Debtors shall consummate the Rights Offering. The Rights Offering shall be fully backstopped by the Backstop Parties in accordance with and subject to the terms and conditions of the Backstop Commitment Agreement. The right to participate in the Rights Offering may not be sold, transferred, or assigned, except in the circumstances described in the Backstop Commitment Agreement.

(b) Purpose. On the Effective Date, the proceeds of the Rights Offering shall be used: (i) to fund the Asset Purchase Transaction, including the Purchaser's obligations under the Purchase Agreement; (ii) to provide the Reorganized Debtors with additional liquidity for working capital and general corporate purposes; (iii) to fund Allowed Administrative Expense Claims payable on or after the Effective Date; (iv) to pay in Cash in full the DIP Facility Claims; and (v) to fund Plan Distributions.

(c) Backstop Commitment. In accordance with the Backstop Commitment Agreement and subject to the terms and conditions thereof, each of the Backstop Parties has agreed, severally but not jointly, to purchase, on or prior to the Effective Date, its respective Backstop Commitment Percentage (as defined in the Backstop Commitment Agreement) of the Unsubscribed Shares (as defined in the Backstop Commitment Agreement).

(d) Backstop Commitment Premium. In exchange for providing the backstop commitment for the Rights Offering, the Backstop Parties shall receive the Backstop

Commitment Premium of 4.5% of the New Equity Interests (issued at the same price as the New Equity Interests offered in the Rights Offering). The Backstop Commitment Premium shall be deemed fully earned upon the execution of the Backstop Commitment Agreement; *provided* that if the Effective Date does not occur, then the Backstop Commitment Premium shall be payable, in Cash, to the extent provided in Section 13 of the Backstop Commitment Agreement.

### 5.15 *Intercompany Interests; Corporate Reorganization.*

On the Effective Date and without the need for any further corporate action or approval of any board of directors, board of managers, management, or shareholders of any Debtor or Reorganized Debtor, as applicable, the certificates and all other documents representing the Intercompany Interests shall be deemed to be in full force and effect.

### 5.16 *Restructuring Transactions.*

On the Effective Date or as soon as reasonably practicable thereafter, the Debtors or Reorganized Debtors, as applicable, may take all actions consistent with the Plan and the Restructuring Support Agreement as may be necessary or appropriate to effect any transaction described in, approved by, contemplated by, or necessary to effectuate the Restructuring Transactions under and in connection with the Plan.

### 5.17 *Restructuring Expenses.*

The Restructuring Expenses incurred, or estimated to be incurred, up to and including the Effective Date shall be paid in full in Cash on the Effective Date (to the extent not previously paid during the course of the Chapter 11 Cases) in accordance with, and subject to, the terms of the Restructuring Support Agreement, without any requirement to file a fee application with the Bankruptcy Court, without the need for itemized time detail, and without any requirement for Bankruptcy Court review or approval. All Restructuring Expenses to be paid on the Effective Date shall be estimated prior to and as of the Effective Date and such estimates shall be delivered to the Debtors at least two (2) Business Days before the anticipated Effective Date (or such shorter period as the Debtors may agree); *provided*, that such estimate shall not be considered an admission or limitation with respect to such Restructuring Expenses. On the Effective Date, final invoices for all Restructuring Expenses incurred prior to and as of the Effective Date shall be submitted to the Debtors. In addition, the Debtors and the Reorganized Debtors (as applicable) shall continue to pay pre- and post-Effective Date, when due and payable in the ordinary course, Restructuring Expenses related to implementation, consummation and defense of the Plan whether incurred before, on, or after the Effective Date.

### 5.18 *Separability.*

Notwithstanding the combination of separate plans of reorganization for the Debtors set forth in the Plan for purposes of economy and efficiency, the Plan constitutes a separate chapter 11 plan for each Debtor. Accordingly, if the Bankruptcy Court does not confirm the Plan with respect to one or more Debtors, it may still confirm the Plan with respect to any other Debtor that satisfies the confirmation requirements of section 1129 of the Bankruptcy Code.

**ARTICLE VI.**     **DISTRIBUTIONS.**

      6.1     *Distributions Generally.*

      The Disbursing Agent shall make all Plan Distributions to the appropriate holders of Allowed Claims and Allowed Interests in accordance with the terms of the Plan.

      6.2     *Postpetition Interest on Claims.*

      Except as otherwise set forth in the Plan, the Plan Documents, or the Confirmation Order, postpetition interest shall accrue, and shall be paid, on any Claims in the ordinary course of business in accordance with any applicable law, agreement, document, or Final Order, as the case may be, as if the Chapter 11 Cases had never been commenced.

      6.3     *Date of Distributions.*

      Unless otherwise provided in the Plan, any distributions and deliveries to be made under the Plan shall be made on the Effective Date or as soon thereafter as is practicable.

      6.4     *Distribution Record Date.*

      (a)     As of the close of business on the Distribution Record Date, the various lists of holders of Claims in each Class, as maintained by the Debtors or their agents, shall be deemed closed, and there shall be no further changes in the record holders of any Claims after the Distribution Record Date.  Neither the Debtors nor the Disbursing Agent shall have any obligation to recognize any transfer of a Claim occurring after the close of business on the Distribution Record Date.  In addition, with respect to payment of any Cure Amounts or disputes over any Cure Amounts, neither the Debtors nor the Disbursing Agent shall have any obligation to recognize or deal with any party other than the non-Debtor party to the applicable executory contract or unexpired lease, even if such non-Debtor party has sold, assigned, or otherwise transferred its Claim for a Cure Amount.

      (b)     Notwithstanding anything in the Plan to the contrary, in connection with any distribution under the Plan to be effected through the facilities of DTC (whether by means of book-entry exchange, free delivery, or otherwise), the Debtors and the Reorganized Debtors, as applicable, shall be entitled to recognize and deal for all purposes under the Plan with holders of New Equity Interests to the extent consistent with the customary practices of DTC used in connection with such distributions.  All New Equity Interests to be distributed under the Plan shall be issued in the names of such holders or their nominees in accordance with DTC's book-entry exchange procedures or on the books and records of a transfer agent; *provided*, that such New Equity Interests will only be issued in accordance with DTC book-entry procedures if the same are permitted to be held through DTC's book-entry system and the Reorganized Debtors, in their sole discretion, deems such method of distribution advisable.

      6.5     *Disbursing Agent.*

      All distributions under the Plan shall be made by the Disbursing Agent on and after the Effective Date as provided herein.  The Disbursing Agent shall not be required to give

any bond or surety or other security for the performance of its duties. The Reorganized Debtors shall use all commercially reasonable efforts to provide the Disbursing Agent (if other than the Reorganized Debtors) with the amounts of Claims and the identities and addresses of holders of Claims, in each case, as set forth in the Debtors' or Reorganized Debtors' books and records. The Reorganized Debtors shall cooperate in good faith with the applicable Disbursing Agent (if other than the Reorganized Debtors) to comply with the reporting and withholding requirements outlined in section 6.16 of the Plan.

### 6.6 *Delivery of Distributions.*

Subject to section 6.4(b) of the Plan, the Disbursing Agent shall issue or cause to be issued, the applicable consideration under the Plan and, subject to Bankruptcy Rule 9010, shall make all distributions to any holder of an Allowed Claim as and when required by the Plan at: (a) the address of such holder on the books and records of the Debtors or their agents; or (b) at the address in any written notice of address change delivered to the Debtors or the Disbursing Agent, including any addresses included on any transfers of Claim filed pursuant to Bankruptcy Rule 3001. In the event that any distribution to any holder is returned as undeliverable, no distribution or payment to such holder shall be made unless and until the Disbursing Agent has been notified of the then-current address of such holder, at which time or as soon thereafter as reasonably practicable such distribution shall be made to such holder without interest.

### 6.7 *Unclaimed Property.*

One year from the later of: (a) the Effective Date and (b) the date that is ten Business Days after the date a Claim is first Allowed, all distributions payable on account of such Claim shall be deemed unclaimed property under section 347(b) of the Bankruptcy Code and shall revert to the Reorganized Debtors or their successors or assigns, and all claims of any other Person (including the holder of a Claim in the same Class) to such distribution shall be discharged and forever barred. The Reorganized Debtors and the Disbursing Agent shall have no obligation to attempt to locate any holder of an Allowed Claim other than by reviewing the Debtors' books and records and the Bankruptcy Court's filings.

### 6.8 *Satisfaction of Claims.*

Unless otherwise provided herein, any distributions and deliveries to be made on account of Allowed Claims under the Plan shall be in complete and final satisfaction, settlement, and discharge of and exchange for such Allowed Claims.

### 6.9 *Manner of Payment under Plan.*

Except as specifically provided herein, at the option of the Debtors or the Reorganized Debtors, as applicable, any Cash payment to be made under the Plan may be made by a check or wire transfer or as otherwise required or provided in applicable agreements or customary practices of the Debtors.

### 6.10 _Fractional Shares and De Minimis Cash Distributions._

No fractional New Equity Interests shall be distributed. When any distribution would otherwise result in the issuance of a number of New Equity Interests that is not a whole number, the New Equity Interests subject to such distribution shall be rounded to the next higher or lower whole number as follows: (a) fractions equal to or greater than 1/2 shall be rounded to the next higher whole number, and (b) fractions less than 1/2 shall be rounded to the next lower whole number. The total number of New Equity Interests to be distributed on account of Allowed SLTL Claims, and Existing Energy Inc. Interests, and pursuant to the Rights Offering, the Backstop Commitment Agreement, or the Backstop Commitment Premium shall be adjusted as necessary to account for the rounding provided for herein. No consideration shall be provided in lieu of fractional shares that are rounded down. Neither the Reorganized Debtors nor the Disbursing Agent shall have any obligation to make a distribution that is less than one (1) New Equity Interests or $100.00 in Cash. Fractional New Equity Interests that are not distributed in accordance with this section shall be returned to, and ownership thereof shall vest in, Reorganized Energy Inc.

### 6.11 _No Distribution in Excess of Amount of Allowed Claim._

Notwithstanding anything to the contrary in the Plan, no holder of an Allowed Claim shall receive, on account of such Allowed Claim, Plan Distributions in excess of the Allowed amount of such Claim (plus any postpetition interest on such Claim solely to the extent permitted by section 6.2 of the Plan).

### 6.12 _Allocation of Distributions between Principal and Interest._

Except as otherwise provided in the Plan and subject to section 6.2 of the Plan, to the extent that any Allowed RBL Claim, Allowed FLTL Claim, Allowed FLLO Claim, or Allowed SLTL Claim entitled to a distribution under the Plan is comprised of indebtedness and accrued but unpaid interest thereon, such distribution shall be allocated first to the principal amount (as determined for federal income tax purposes) of the Claim and then to accrued but unpaid interest.

### 6.13 _Exemption from Securities Laws._

(a). The issuance of and the distribution under this Plan of the New Equity Interests pursuant to Sections 4.6(a)(i) and 4.10(a) of this Plan shall be exempt from registration under the Securities Act and any other applicable securities laws to the fullest extent permitted by section 1145 of the Bankruptcy Code. These securities may be resold without registration under the Securities Act or other federal securities laws pursuant to the exemption provided by section 4(a)(1) of the Securities Act, unless the holder is an "underwriter" with respect to such securities, as that term is defined in section 1145(b) of the Bankruptcy Code. In addition, such section 1145 exempt securities generally may be resold without registration under state securities laws pursuant to various exemptions provided by the respective laws of the several states.

(b). The issuance and sale of the New Equity Interests pursuant to the Rights Offering, and to the Backstop Parties under the Backstop Commitment Agreement (including the New Equity Interests comprising the Backstop Commitment Premium), is being made in reliance

on the exemption from registration set forth in section 4(a)(2) of the Securities Act and Regulation D thereunder. Such securities will be considered "restricted securities" and may not be transferred except pursuant to an effective registration statement or under an available exemption from the registration requirements of the Securities Act, such as, under certain conditions, the resale provisions of Rule 144 of the Securities Act.

### 6.14  *Setoffs and Recoupments.*

Each Reorganized Debtor, or such entity's designee as instructed by such Reorganized Debtor, may, pursuant to section 553 of the Bankruptcy Code or applicable nonbankruptcy law, offset or recoup against any Allowed Claim and the distributions to be made pursuant to the Plan on account of such Allowed Claim any and all claims, rights, and Causes of Action that a Reorganized Debtor or its successors may hold against the holder of such Allowed Claim after the Effective Date to the extent such setoff or recoupment is either (a) agreed in amount among the relevant Reorganized Debtor(s) and holder of the Allowed Claim or (b) otherwise adjudicated by the Bankruptcy Court or another court of competent jurisdiction; *provided*, that neither the failure to effect a setoff or recoupment nor the allowance of any Claim hereunder shall constitute a waiver or release by a Reorganized Debtor or its successor of any claims, rights, or Causes of Action that a Reorganized Debtor or its successor or assign may possess against such holder.

### 6.15  *Rights and Powers of Disbursing Agent.*

(a)  Powers of Disbursing Agent.  The Disbursing Agent shall be empowered to:  (i) effect all actions and execute all agreements, instruments, and other documents necessary to perform its duties under the Plan; (ii) make all applicable distributions or payments provided for under the Plan; (iii) employ professionals to represent it with respect to its responsibilities; and (iv) exercise such other powers (A) as may be vested in the Disbursing Agent by order of the Bankruptcy Court (including any Final Order issued after the Effective Date) or pursuant to the Plan or (B) as deemed by the Disbursing Agent to be necessary and proper to implement the provisions of the Plan.

(b)  Expenses Incurred on or After the Effective Date.  Except as otherwise ordered by the Bankruptcy Court and subject to the written agreement of the Reorganized Debtors, the amount of any reasonable fees and expenses incurred by the Disbursing Agent on or after the Effective Date (including, without limitation, taxes) and any reasonable compensation and expense reimbursement Claims (including, without limitation, for reasonable attorneys' and other professional fees and expenses) made by the Disbursing Agent shall be paid in Cash by the Reorganized Debtors.

### 6.16  *Withholding and Reporting Requirements.*

In connection with the Plan and all instruments issued in connection therewith and distributed thereon, the Reorganized Debtors and any other distributing party shall comply with all applicable withholding and reporting requirements imposed by any federal, state or local taxing authority, and all Plan Distributions under the Plan shall be subject to any such withholding or reporting requirements. In the case of a non-Cash Plan Distribution that is

subject to withholding, the distributing party may request a holder of an Allowed Claim or Interest to complete and return a Form W-8 or W-9, as applicable to each such holder, and any other applicable forms. If such form is requested and not submitted to the distributing party within 10 days of the request, the distributing party may, in its discretion, either (a) withhold an appropriate portion of such distributed property and sell such withheld property to generate Cash necessary to pay over the withholding tax, or (b) require the intended recipient of such distribution to provide the withholding agent with an amount of Cash sufficient to satisfy such withholding tax as a condition to receiving such distribution. If such form is requested and submitted to the distributing party within 10 days of the request, the distributing party may withhold an appropriate portion of such distributed property and sell such withheld property to generate Cash necessary to pay over the withholding tax; provided that, the distributing party shall first notify the intended recipient of such contemplated sale and offer the intended recipient a reasonable opportunity to provide sufficient Cash to satisfy such withholding tax in lieu of such sale. The distributing party shall have the right, but not the obligation, not to make a Plan Distribution until its withholding obligation is satisfied pursuant to the preceding sentences. If an intended recipient of a non-Cash Plan Distribution has agreed to provide the withholding agent with the Cash necessary to satisfy the withholding tax pursuant to this section and such person fails to comply before the date that is 180 days after the request is made, the amount of such Plan Distribution that was not distributed shall irrevocably revert to the applicable Reorganized Debtor and such Claim in respect of such Plan Distribution shall be discharged and forever barred from assertion against such Reorganized Debtor or its respective property. Any amounts withheld pursuant to the Plan shall be deemed to have been distributed to and received by the applicable recipient for all purposes of the Plan. The distributing party may require a holder of an Allowed Claim or Interest to complete and return a Form W-8 or W-9, as applicable to each such holder, and any other applicable forms.

Notwithstanding the above, each holder of an Allowed Claim or Interest that is to receive a Plan Distribution under the Plan shall have the sole and exclusive responsibility for the satisfaction and payment of any tax obligations imposed on such holder by any governmental unit, including income, withholding, and other tax obligations, on account of such Plan Distribution.

## ARTICLE VII.    PROCEDURES FOR RESOLVING CLAIMS.

### 7.1    *Disputed Claims Process.*

(a)    Notwithstanding section 502(a) of the Bankruptcy Code, and except as otherwise set forth in the Plan, holders of Claims need not file proofs of Claim with the Bankruptcy Court, and the Reorganized Debtors and holders of Claims shall determine, adjudicate, and resolve any disputes over the validity and amounts of such Claims in the ordinary course of business as if the Chapter 11 Cases had not been commenced. The holders of Claims shall not be subject to any claims resolution process in the Bankruptcy Court in connection with their Claims and shall retain all their rights under applicable non-bankruptcy law to pursue their Claims against the Debtors or Reorganized Debtors in any forum with jurisdiction over the parties. Except for (a) proofs of Claim asserting damages arising out of the rejection of an

executory contract or unexpired lease by any of the Debtors pursuant to Section 8.3 of the Plan and (b) proofs of Claim that have been objected to by the Debtors before the Effective Date, upon the Effective Date, any filed Claim, regardless of the time of filing, and including Claims filed after the Effective Date, shall be deemed withdrawn.  To the extent not otherwise provided in the Plan, the deemed withdrawal of a proof of Claim is without prejudice to such claimant's rights under Section 7.1 of the Plan to assert its Claims in any forum as though the Debtors' Chapter 11 Cases had not been commenced.  From and after the Effective Date, the Reorganized Debtors may satisfy, dispute, settle, or otherwise compromise any Claim without approval of the Bankruptcy Court.

(b)     Except insofar as a Claim is Allowed under the Plan, only the Debtors or the Reorganized Debtors shall be entitled to object to Claims.  Any objections to Claims shall be served and filed (a) on or before the ninetieth (90th) day following the later of (i) the Effective Date and (ii) the date that a proof of Claim is filed or amended or a Claim is otherwise asserted or amended in writing by or on behalf of a holder of such Claim, or (b) such later date as ordered by the Bankruptcy Court upon motion filed by the Debtors or the Reorganized Debtors.

### 7.2     *Estimation of Claims.*

The Reorganized Debtors may at any time request that the Bankruptcy Court estimate any contingent, unliquidated, or Disputed Claim pursuant to section 502(c) of the Bankruptcy Code, regardless of whether the Debtors had previously objected to or otherwise disputed such Claim or whether the Bankruptcy Court has ruled on any such objection.  The Bankruptcy Court shall retain jurisdiction to estimate any Claim at any time during litigation concerning any objection to any Claim, including, without limitation, during the pendency of any appeal relating to any such objection.  In the event that the Bankruptcy Court estimates any contingent, unliquidated, or Disputed Claim, the amount so estimated shall constitute either the Allowed amount of such Claim or a maximum limitation on such Claim, as determined by the Bankruptcy Court.  If the estimated amount constitutes a maximum limitation on the amount of such Claim, the Reorganized Debtors may pursue supplementary proceedings to object to the allowance of such Claim.

### 7.3     *Claim Resolution Procedures Cumulative.*

All of the objection, estimation, and resolution procedures in the Plan are intended to be cumulative and not exclusive of one another.  Claims may be estimated and subsequently settled, compromised, withdrawn, or resolved in accordance with the Plan by any mechanism approved by the Bankruptcy Court.

### 7.4     *No Distributions Pending Allowance.*

If an objection, motion to estimate, or other challenge to a Claim is filed, no payment or distribution provided under the Plan shall be made on account of such Claim unless and until (and only to the extent that) such Claim becomes an Allowed Claim.

**7.5** *Distributions after Allowance.*

To the extent that a Disputed Claim ultimately becomes an Allowed Claim, distributions (if any) shall be made to the holder of such Allowed Claim in accordance with the provisions of the Plan. As soon as practicable after the date on which the order or judgment of the Bankruptcy Court allowing any Disputed Claim becomes a Final Order, the Disbursing Agent shall provide to the holder of such Claim the distribution (if any) to which such holder is entitled under the Plan as of the Effective Date, without any interest to be paid on account of such Claim unless required by the Bankruptcy Code.

## ARTICLE VIII.    EXECUTORY CONTRACTS AND UNEXPIRED LEASES.

**8.1** *General Treatment.*

As of and subject to the occurrence of the Effective Date and the payment of any applicable Cure Amount, all executory contracts and unexpired leases shall be deemed assumed, unless such contract or lease (a) was previously assumed or rejected by the Debtors, pursuant to Final Order of the Bankruptcy Court, (b) previously expired or terminated pursuant to its own terms or by agreement of the parties thereto, (c) is the subject of a motion to reject filed by the Debtors on or before the Confirmation Date, or (d) is specifically designated as a contract or lease to be rejected on the Schedule of Rejected Contracts, *provided*, that the Requisite Second Lien Term Lenders and Requisite Sponsor Second Lien Term Lenders consent with respect to the Debtors' rejection of such contracts and leases. Subject to the occurrence of the Effective Date, entry of the Confirmation Order by the Bankruptcy Court shall constitute approval of the assumptions or rejections provided for in the Plan pursuant to sections 365(a) and 1123 of the Bankruptcy Code. Each executory contract and unexpired lease assumed pursuant to the Plan shall vest in and be fully enforceable by the applicable Reorganized Debtor in accordance with its terms, except as modified by the provisions of the Plan, any Final Order of the Bankruptcy Court authorizing and providing for its assumption, or applicable law.

Subject to resolution of any dispute regarding any Cure Amount, all Cure Amounts shall be satisfied by the Debtors or Reorganized Debtors, as the case may be, upon assumption or assignment, as applicable, of the underlying contracts and unexpired leases. Assumption or assignment, as applicable, of any executory contract or unexpired lease pursuant to the Plan, or otherwise, shall result in the full release and satisfaction of any Claims or defaults, subject to satisfaction of the Cure Amount, whether monetary or nonmonetary, arising under any assumed executory contract or unexpired lease at any time before the effective date of the assumption or assumption and assignment, as applicable. Any proofs of Claim filed with respect to an executory contract or unexpired lease that has been assumed or assigned shall be deemed disallowed and expunged, without further notice to or action, order or approval of the Bankruptcy Court or any other Entity, upon the deemed assumption of such contract or unexpired lease.

### 8.2 *Determination of Cure Disputes and Deemed Consent.*

Any monetary amounts by which any executory contract or unexpired lease to be assumed under the Plan is in default shall be satisfied, under section 365(b)(1) of the Bankruptcy Code, by the Debtors or Reorganized Debtors, as applicable, upon assumption thereof. Following the Petition Date, the Debtors shall have served a notice on parties to executory contracts and unexpired leases to be assumed reflecting the Debtors' intention to assume the contract or lease in connection with the Plan and setting forth the proposed Cure Amount (if any). If a counterparty to any executory contract or unexpired lease that the Debtors or Reorganized Debtors, as applicable intend to assume does not receive such a notice, the proposed Cure Amount for such executory contract or unexpired lease shall be deemed to be zero dollars ($0).

If there is a dispute regarding (a) any Cure Amount, (b) the ability of the Debtors to provide adequate assurance of future performance (within the meaning of section 365 of the Bankruptcy Code) under the contract or lease to be assumed, or (c) any other matter pertaining to assumption, such dispute shall be heard by the Bankruptcy Court prior to such assumption being effective. The Debtors reserve the right to reject any executory contract or unexpired lease not later than thirty (30) days after the entry of a Final Order resolving any such dispute. Any counterparty to an executory contract or unexpired lease that fails to object timely to the notice of the proposed assumption and assignment of such executory contract or unexpired lease or the relevant Cure Amount within fourteen (14) days of the filing thereof, shall be deemed to have assented to such assumption, assignment, and/or Cure Amount and shall be forever barred, estopped, and enjoined from challenging the validity of such assumption or the amount of such Cure Amount thereafter.

### 8.3 *Rejection Damages Claims.*

Any counterparty to a contract or lease that is identified on the Schedule of Rejected Contracts or is otherwise rejected by the Debtors must file and serve a proof of Claim on the applicable Debtor that is party to the contract or lease to be rejected no later than thirty (30) days after the later of (a) the Confirmation Date or (b) the effective date of rejection of such executory contract or unexpired lease.

### 8.4 *Survival of the Debtors' Indemnification Obligations.*

Any obligations of the Debtors pursuant to their corporate charters, by-laws, limited liability company agreements, memorandum and articles of association, or other organizational documents to indemnify current and former officers, directors, members, managers, agents, or employees with respect to all present and future actions, suits, and proceedings against the Debtors or such officers, directors, members, managers, agents, or employees based upon any act or omission for or on behalf of the Debtors shall not be discharged, impaired, or otherwise affected by the Plan; *provided*, that the Reorganized Debtors shall not indemnify officers, directors, members, or managers, as applicable, of the Debtors for any claims or Causes of Action arising out of or relating to any act or omission that is a criminal act or constitutes intentional fraud, gross negligence, or willful misconduct. All such obligations shall be deemed and treated as executory contracts to be assumed by the Debtors under the Plan

and shall continue as obligations of the Reorganized Debtors. Any claim based on the Debtors' obligations under the Plan shall not be a Disputed Claim or subject to any objection, in either case, by reason of section 502(e)(1)(B) of the Bankruptcy Code.

### 8.5    *Compensation and Benefit Plans.*

All employment and severance agreements and policies, and all compensation and benefits plans, policies, and programs of the Debtors applicable to their respective employees, retirees, consultants, contractors, and non-employee directors, including, without limitation, all savings plans, retirement plans, healthcare plans, disability plans, severance benefit plans, incentive plans, and life and accidental death and dismemberment insurance plans, are deemed to be, and shall be treated as, executory contracts under the Plan and, on the Effective Date, shall be assumed pursuant to sections 365 and 1123 of the Bankruptcy Code and, in the case of employment agreements, modified and assumed as agreed between the Debtors, the Requisite Second Lien Term Lenders, and the Requisite Sponsor Second Lien Term Lenders.

### 8.6    *Insurance Policies.*

(a)    All insurance policies to which any Debtor is a party as of the Effective Date, including the D&O Policy, shall be deemed to be and treated as executory contracts and shall be assumed by the applicable Debtors or Reorganized Debtor and shall continue in full force and effect thereafter in accordance with their respective terms. All other insurance policies shall vest in the Reorganized Debtors. Coverage for defense and indemnity under the D&O Policy shall remain available to all individuals within the definition of "Insured" in the D&O Policy.

(b)    In addition, after the Effective Date, all officers, directors, agents, or employees who served in such capacity at any time before the Effective Date shall be entitled to the full benefits of any D&O Policy (including any "tail" policy) for the full term of such policy regardless of whether such officers, directors, agents, and/or employees remain in such positions after the Effective Date, in each case, to the extent set forth in such policies.

### 8.7    *Reservation of Rights.*

(a)    Neither the exclusion nor the inclusion by the Debtors of any contract or lease on any exhibit, schedule, or other annex to the Plan or in the Plan Supplement, nor anything contained in the Plan, shall constitute an admission by the Debtors that any such contract or lease is or is not an executory contract or unexpired lease or that the Debtors or the Reorganized Debtors or their respective affiliates has any liability thereunder.

(b)    Except as explicitly provided in the Plan, nothing in the Plan shall waive, excuse, limit, diminish, or otherwise alter any of the defenses, claims, Causes of Action, or other rights of the Debtors or the Reorganized Debtors under any executory or non-executory contract or unexpired or expired lease.

(c)    Nothing in the Plan shall increase, augment, or add to any of the duties, obligations, responsibilities, or liabilities of the Debtors or the Reorganized Debtors, as applicable, under any executory or non-executory contract or unexpired or expired lease.

40

(d)     If there is a dispute regarding whether a contract or lease is or was executory or unexpired at the time of its assumption under the Plan, the Debtors or Reorganized Debtors, as applicable, shall have thirty (30) days following entry of a Final Order resolving such dispute to alter their treatment of such contract or lease.

## ARTICLE IX.     CONDITIONS PRECEDENT TO THE OCCURRENCE OF THE EFFECTIVE DATE.

### 9.1     *Conditions Precedent to the Effective Date.*

The Effective Date shall not occur unless all of the following conditions precedent have been satisfied:

(a)     the Plan Supplement, including the Plan Documents, has been filed;

(b)     the Bankruptcy Court has entered the Confirmation Order in form and substance reasonably acceptable to the Debtors, the Requisite First Lien Term Lenders, the Requisite Second Lien Term Lenders, and the Requisite Sponsor Second Lien Term Lenders and such Confirmation Order shall have become a Final Order;

(c)     the Restructuring Support Agreement shall not have been terminated by the Debtors or any of the Restructuring Support Parties and shall be in full force and effect;

(d)     the amendments to certain employment agreements to be assumed under Section 8.5 of the Plan shall have been executed and assumed;

(e)     the conditions to closing under the Purchase Agreement have been satisfied or waived in accordance with the terms thereof, and the Purchase Agreement is in full force and effect and binding on all parties thereto;

(f)     the conditions to effectiveness of the Backstop Commitment Agreement have been satisfied or waived in accordance with the terms thereof, and the Backstop Commitment Agreement is in full force and effect and binding on all parties thereto;

(g)     the conditions to effectiveness of the Exit LC Credit Agreement have been satisfied or waived in accordance with the terms thereof, and the Exit LC Credit Agreement is in full force and effect and binding on all parties thereto;

(h)     the conditions to effectiveness of the Exit First Lien Credit Agreement have been satisfied or waived in accordance with the terms thereof, and the Exit First Lien Credit Agreement is in full force and effect and binding on all parties thereto;

(i)     the conditions to effectiveness of the Exit Second Lien Credit Agreement have been satisfied or waived in accordance with the terms thereof, and the Exit Second Lien Credit Agreement is in full force and effect and binding on all parties thereto;

(j)     each of the New Intercreditor Agreements shall have been executed and delivered by each of the parties thereto;

(k)     the Debtors shall have implemented the Restructuring Transactions and all other transactions contemplated by the Plan and the Restructuring Support Agreement in a manner consistent in all respects with the Plan and Restructuring Support Agreement;

(l)     all governmental and third-party approvals and consents, including Bankruptcy Court approval, necessary in connection with the transactions provided for in the Plan have been obtained, are not subject to unfulfilled conditions, and are in full force and effect, and all applicable waiting periods have expired without any action having been taken by any competent authority that would restrain, prevent, or otherwise impose materially adverse conditions on such transactions;

(m)     the Amended Certificate of Incorporation of Reorganized Energy Inc. has been filed with the appropriate governmental authority;

(n)     the Debtors shall have paid in full in Cash all Restructuring Expenses incurred, or estimated to be incurred, through the Effective Date; and

(o)     the Debtors, together with the Subscription Agent (as defined in the Rights Offering Procedures), shall have received proceeds of at least $525 million for the issuance of the New Equity Interests (including, for the avoidance of doubt, any DIP Facility Claims which are credited against any Backstop Party's funding amount).

## 9.2     *Waiver of Conditions Precedent.*

(a)     Each of the conditions precedent to the occurrence of the Effective Date may be waived in writing by the Debtors, the Requisite First Lien Term Lenders, the Requisite Second Lien Term Lenders, and the Requisite Sponsor Second Lien Term Lenders.  If any such condition precedent is waived pursuant to this section and the Effective Date occurs, each party agreeing to waive such condition precedent shall be estopped from withdrawing such waiver after the Effective Date or otherwise challenging the occurrence of the Effective Date on the basis that such condition was not satisfied, the waiver of such condition precedent shall benefit from the "equitable mootness" doctrine, and the occurrence of the Effective Date shall foreclose any ability to challenge the Plan in any court.  If the Plan is confirmed for fewer than all of the Debtors, only the conditions applicable to the Debtor or Debtors for which the Plan is confirmed must be satisfied or waived for the Effective Date to occur.

(b)     The stay of the Confirmation Order pursuant to Bankruptcy Rule 3020(e) shall be deemed waived by and upon the entry of the Confirmation Order, and the Confirmation Order shall take effect immediately upon its entry.

## 9.3     *Effect of Failure of a Condition.*

If the conditions listed in Section 9.1 of the Plan are not satisfied or waived in accordance with Section 9.2 of the Plan on or before the first Business Day that is more than sixty (60) days after the date on which the Confirmation Order is entered or by such later date

reasonably acceptable to the Requisite First Lien Term Lenders, the Requisite Second Lien Term Lenders, and the Requisite Sponsor Second Lien Term Lenders and as set forth by the Debtors in a notice filed with the Bankruptcy Court prior to the expiration of such period, the Plan shall be null and void in all respects and nothing contained in the Plan or the Disclosure Statement shall (a) constitute a waiver or release of any Claims by or against or any Interests in the Debtors, (b) prejudice in any manner the rights of any Person, or (c) constitute an admission, acknowledgement, offer, or undertaking by the Debtors, any of the other Restructuring Support Parties, or any other Person.

# ARTICLE X.      EFFECT OF CONFIRMATION.

## 10.1   *Binding Effect.*

Except as otherwise provided in section 1141(d)(3) of the Bankruptcy Code, and subject to the occurrence of the Effective Date, on and after the entry of the Confirmation Order, the provisions of the Plan shall bind every holder of a Claim against or Interest in any Debtor and inure to the benefit of and be binding on such holder's respective successors and assigns, regardless of whether the Claim or Interest of such holder is Impaired under the Plan and whether such holder has accepted the Plan.

## 10.2   *Vesting of Assets.*

Except as otherwise provided in the Plan, or any Plan Document, on and after the Effective Date, all Assets of the Estates, including all claims, rights, and Causes of Action and any property acquired by the Debtors under or in connection with the Plan, the Rights Offering, and the Asset Purchase Transaction (including the Purchased Assets), shall vest in each respective Reorganized Debtor free and clear of all Claims, Liens, charges, other encumbrances, and Interests. Subject to the terms of the Plan, on and after the Effective Date, the Reorganized Debtors may operate their businesses and may use, acquire, and dispose of property and prosecute, compromise, or settle any Claims (including any Administrative Expense Claims) and Causes of Action without supervision of or approval by the Bankruptcy Court and free and clear of any restrictions of the Bankruptcy Code or the Bankruptcy Rules other than restrictions expressly imposed by the Plan or the Confirmation Order. Without limiting the foregoing, the Reorganized Debtors may pay the charges that they incur on or after the Effective Date for Professional Persons' fees, disbursements, expenses, or related support services without application to the Bankruptcy Court.

## 10.3   *Discharge of Claims against and Interests in the Debtors.*

Upon the Effective Date and in consideration of the distributions to be made under the Plan, except as otherwise provided in the Plan or in the Confirmation Order, each holder (as well as any trustee or agent on behalf of such holder) of a Claim or Interest, where such Claim or Interest has been fully paid or otherwise satisfied in accordance with the Plan, and any affiliate of such holder shall be deemed to have forever waived, released, and discharged the Debtors, to the fullest extent permitted by section 1141 of the Bankruptcy Code, of and from any and all Claims, Interests, rights, and liabilities that arose prior to the Effective Date. Except as

otherwise provided in the Plan, upon the Effective Date, all such holders of Claims and Interests and their affiliates shall be forever precluded and enjoined, pursuant to sections 105, 524, and 1141 of the Bankruptcy Code, from prosecuting or asserting any such discharged Claim against or terminated Interest in any Debtor or any Reorganized Debtor.

### 10.4 *Pre-Confirmation Injunctions and Stays.*

Unless otherwise provided in the Plan, all injunctions and stays arising under or entered during the Chapter 11 Cases, whether under sections 105 or 362 of the Bankruptcy Code or otherwise, and in existence on the date of entry of the Confirmation Order, shall remain in full force and effect until the later of the Effective Date and the date indicated in the order providing for such injunction or stay.

### 10.5 *Injunction against Interference with Plan.*

Upon the entry of the Confirmation Order, all holders of Claims and Interests and all other parties in interest, along with their respective present and former affiliates, employees, agents, officers, directors, and principals, shall be enjoined from taking any action to interfere with the implementation or the occurrence of the Effective Date, *provided,* that the foregoing shall not enjoin any Restructuring Support Party from exercising any of its rights or remedies under the Restructuring Support Agreement in accordance with the terms thereof.

### 10.6 *Plan Injunction.*

(a)      Except as otherwise provided in the Plan, in the Plan Documents, or in the Confirmation Order, as of the entry of the Confirmation Order but subject to the occurrence of the Effective Date, all Persons who have held, hold, or may hold Claims or Interests are, with respect to any such Claim or Interest, permanently enjoined after the entry of the Confirmation Order from: (i) commencing, conducting, or continuing in any manner, directly or indirectly, any suit, action, or other proceeding of any kind (including, without limitation, any proceeding in a judicial, arbitral, administrative, or other forum) against or affecting, directly or indirectly, a Debtor, a Reorganized Debtor, or an Estate or the property of any of the foregoing, or any direct or indirect transferee of any property of, or direct or indirect successor in interest to, any of the foregoing Persons mentioned in this subsection (i) or any property of any such transferee or successor; (ii) enforcing, levying, attaching (including, without limitation, any prejudgment attachment), collecting, or otherwise recovering in any manner or by any means, whether directly or indirectly, any judgment, award, decree, or order against a Debtor, a Reorganized Debtor, or an Estate or its property, or any direct or indirect transferee of any property of, or direct or indirect successor in interest to, any of the foregoing Persons mentioned in this subsection (ii) or any property of any such transferee or successor; (iii) creating, perfecting, or otherwise enforcing in any manner, directly or indirectly, any encumbrance of any kind against a Debtor, a Reorganized Debtor, or an Estate or any of its property, or any direct or indirect transferee of any property of, or successor in interest to, any of the foregoing Persons mentioned in this subsection (iii) or any property of any such transferee or successor; (iv) acting or proceeding in any manner, in any place whatsoever, that does not conform to or comply with the provisions of the Plan, and the Plan Documents, to the full extent permitted by applicable law; and (v) commencing or continuing, in any manner or in any place, any action that does not comply with or is inconsistent

44

with the provisions of the Plan and the Plan Documents; *provided*, that nothing contained in the Plan shall preclude such Persons who have held, hold, or may hold Claims against, or Interests in, a Debtor, a Reorganized Debtor, or an Estate from exercising their rights and remedies, or obtaining benefits, pursuant to and consistent with the terms of the Plan and the Plan Documents; *provided, further*, that nothing contained in the Plan shall enjoin any Restructuring Support Party from exercising any of its rights or remedies under the Restructuring Support Agreement in accordance with the terms thereof.

(b)     By accepting distributions pursuant to the Plan, each holder of an Allowed Claim or Interest shall be deemed to have affirmatively and specifically consented to be bound by the Plan, including, without limitation, the injunctions set forth in Section 10.6 of the Plan.

### 10.7   *Releases.*

(a)     ***RELEASES BY THE DEBTORS*. AS OF THE EFFECTIVE DATE AND TO THE FULLEST EXTENT ALLOWED BY APPLICABLE LAW, EXCEPT FOR THE RIGHTS AND REMEDIES THAT REMAIN IN EFFECT FROM AND AFTER THE EFFECTIVE DATE TO ENFORCE THE PLAN AND THE PLAN DOCUMENTS, FOR GOOD AND VALUABLE CONSIDERATION, THE ADEQUACY OF WHICH IS HEREBY CONFIRMED, INCLUDING, WITHOUT LIMITATION, THE SERVICE OF THE RELEASED PARTIES TO FACILITATE THE EXPEDITIOUS REORGANIZATION OF THE DEBTORS AND THE IMPLEMENTATION OF THE RESTRUCTURING, AND EXCEPT AS OTHERWISE PROVIDED IN THE PLAN, THE PLAN DOCUMENTS, OR IN THE CONFIRMATION ORDER, THE RELEASED PARTIES ARE DEEMED EXPRESSLY, CONCLUSIVELY, ABSOLUTELY, UNCONDITIONALLY, IRREVOCABLY AND FOREVER RELEASED, ACQUITTED AND DISCHARGED BY THE DEBTORS, THE REORGANIZED DEBTORS, AND THE ESTATES, IN EACH CASE ON BEHALF OF THEMSELVES AND THEIR RESPECTIVE SUCCESSORS, PREDECESSORS, ASSIGNS, SUBSIDIARIES, AFFILIATES AND REPRESENTATIVES AND ANY AND ALL OTHER PERSONS OR ENTITIES THAT MAY PURPORT TO ASSERT ANY CAUSE OF ACTION DERIVATIVELY, BY OR THROUGH THE FOREGOING ENTITIES, FROM ANY AND ALL CLAIMS, INTERESTS, OBLIGATIONS, SUITS, JUDGMENTS, DAMAGES, DEMANDS, DEBTS, RIGHTS, CAUSES OF ACTION, LOSSES, REMEDIES, OR LIABILITIES WHATSOEVER, INCLUDING ANY DERIVATIVE CLAIMS OR CAUSES OF ACTION, ASSERTED OR ASSERTABLE ON BEHALF OF THE DEBTORS, THE REORGANIZED DEBTORS, OR THEIR ESTATES, WHETHER LIQUIDATED OR UNLIQUIDATED, FIXED OR CONTINGENT, MATURED OR UNMATURED, KNOWN OR UNKNOWN, FORESEEN OR UNFORESEEN, EXISTING OR HEREINAFTER ARISING, IN LAW, EQUITY, CONTRACT, TORT, OR OTHERWISE, BY STATUTE, VIOLATIONS OF FEDERAL OR STATE SECURITIES LAWS OR OTHERWISE (COLLECTIVELY, THE "RELEASED CLAIMS") THAT THE DEBTORS, THE REORGANIZED DEBTORS, OR THEIR ESTATES WOULD HAVE BEEN LEGALLY ENTITLED TO ASSERT IN THEIR OWN RIGHT (WHETHER INDIVIDUALLY OR COLLECTIVELY) OR ON BEHALF OF THE HOLDER OF ANY CLAIM OR INTEREST OR OTHER PERSON OR ENTITY, BASED ON OR RELATING TO, OR IN ANY MANNER ARISING FROM OR IN**

CONNECTION WITH, IN WHOLE OR IN PART, THE DEBTORS, THE CHAPTER 11 CASES, THE DEBTORS' RESTRUCTURING EFFORTS, THE NEGOTIATION, FORMULATION OR PREPARATION OF ANY TRANSACTIONS OR DOCUMENTS IN CONNECTION THEREWITH, THE DEBTORS' INTERCOMPANY TRANSACTIONS, ANY PREFERENCE, FRAUDULENT TRANSFER, OR OTHER AVOIDANCE CLAIM ARISING PURSUANT TO CHAPTER 5 OF THE BANKRUPTCY CODE OR APPLICABLE LAW, THE PURCHASE, SALE, OR RESCISSION OF THE PURCHASE OR SALE OF ANY SECURITY OF THE DEBTORS OR THE REORGANIZED DEBTORS, THE SUBJECT MATTER OF, OR THE TRANSACTIONS OR EVENTS GIVING RISE TO, ANY CLAIM OR INTEREST THAT IS TREATED IN THE PLAN, THE BUSINESS OR CONTRACTUAL ARRANGEMENTS AND ANY OTHER TRANSACTION OR ARRANGEMENT BETWEEN ANY DEBTOR, REORGANIZED DEBTOR, OR ESTATE AND ANY RELEASED PARTY (INCLUDING, WITHOUT LIMITATION, THE PREPETITION RBL CREDIT AGREEMENT, THE PREPETITION FIRST LIEN TERM LOAN AGREEMENT, THE PREPETITION FLLO CREDIT AGREEMENT, THE PREPETITION SECOND LIEN TERM LOAN AGREEMENT, AND THE PREPETITION SPONSOR SECOND LIEN TERM LOAN AGREEMENT), THE RESTRUCTURING, THE RESTRUCTURING OF ANY CLAIM OR INTEREST BEFORE OR DURING THE CHAPTER 11 CASES, THE RESTRUCTURING TRANSACTIONS, THE NEGOTIATION, FORMULATION, OR PREPARATION OF THE DISCLOSURE STATEMENT, THE RESTRUCTURING SUPPORT AGREEMENT, THE ASSET PURCHASE TRANSACTION, THE PURCHASE AGREEMENT, AND THE PLAN AND RELATED AGREEMENTS, INSTRUMENTS, TERM SHEETS AND OTHER DOCUMENTS (INCLUDING THE PLAN DOCUMENTS), THE SOLICITATION OF VOTES WITH RESPECT TO THE PLAN, THE BACKSTOP COMMITMENT AGREEMENT, OR THE RIGHTS OFFERING, OR ANY OTHER ACT OR OMISSION, TRANSACTION, AGREEMENT, EVENT, OR OTHER OCCURRENCE TAKING PLACE OR ARISING ON OR BEFORE THE EFFECTIVE DATE RELATED OR RELATING TO ANY OF THE FOREGOING, IN EACH CASE OTHER THAN CLAIMS OR CAUSES OF ACTION ARISING OUT OF OR RELATED TO ANY ACT OR OMISSION OF A RELEASED PARTY THAT IS A CRIMINAL ACT OR CONSTITUTES INTENTIONAL FRAUD, GROSS NEGLIGENCE, OR WILLFUL MISCONDUCT, AS DETERMINED BY A FINAL ORDER.

ENTRY OF THE CONFIRMATION ORDER BY THE BANKRUPTCY COURT SHALL CONSTITUTE THE BANKRUPTCY COURT'S APPROVAL, PURSUANT TO BANKRUPTCY RULE 9019, OF THE RELEASES IN SECTION 10.7(a) OF THE PLAN (the "<u>DEBTOR RELEASES</u>"), WHICH INCLUDES BY REFERENCE EACH OF THE RELATED PROVISIONS AND DEFINITIONS UNDER THE PLAN, AND FURTHER, SHALL CONSTITUTE THE BANKRUPTCY COURT'S FINDING THAT THE DEBTOR RELEASES ARE: (I) IN EXCHANGE FOR THE GOOD AND VALUABLE CONSIDERATION PROVIDED BY THE RELEASED PARTIES, (II) A GOOD FAITH SETTLEMENT AND COMPROMISE OF THE RELEASED CLAIMS RELEASED BY THE DEBTORS, THE REORGANIZED DEBTORS AND THE ESTATES, (III) IN THE BEST INTERESTS OF THE DEBTORS, THE ESTATES AND ALL HOLDERS OF CLAIMS AND INTERESTS, (IV) FAIR, EQUITABLE AND REASONABLE, (V) GIVEN

AND MADE AFTER DUE NOTICE AND OPPORTUNITY FOR HEARING, AND (VI) A BAR TO ANY OF THE DEBTORS, THE REORGANIZED DEBTORS, OR THE ESTATES ASSERTING ANY CLAIM OR CAUSE OF ACTION RELEASED PURSUANT TO THE DEBTOR RELEASE.

(b) *RELEASES BY HOLDERS OF CLAIMS AND INTERESTS*. AS OF THE EFFECTIVE DATE AND TO THE FULLEST EXTENT ALLOWED BY APPLICABLE LAW, EXCEPT FOR THE RIGHTS AND REMEDIES THAT REMAIN IN EFFECT FROM AND AFTER THE EFFECTIVE DATE TO ENFORCE THE PLAN AND THE PLAN DOCUMENTS, FOR GOOD AND VALUABLE CONSIDERATION, THE ADEQUACY OF WHICH IS HEREBY CONFIRMED, INCLUDING, WITHOUT LIMITATION, THE SERVICE OF THE RELEASED PARTIES TO FACILITATE THE EXPEDITIOUS REORGANIZATION OF THE DEBTORS AND THE IMPLEMENTATION OF THE RESTRUCTURING, AND EXCEPT AS OTHERWISE PROVIDED IN THE PLAN, THE PLAN DOCUMENTS, OR IN THE CONFIRMATION ORDER, THE RELEASED PARTIES ARE DEEMED EXPRESSLY, CONCLUSIVELY, ABSOLUTELY, UNCONDITIONALLY, IRREVOCABLY AND FOREVER RELEASED ACQUITTED AND DISCHARGED BY THE (I) THE HOLDERS OF ALL CLAIMS AND INTERESTS WHO VOTE TO ACCEPT THE PLAN, (II) HOLDERS OF CLAIMS OR INTERESTS THAT ARE UNIMPAIRED UNDER THE PLAN, WHERE THE APPLICABLE CLAIMS OR INTERESTS HAVE BEEN FULLY PAID OR OTHERWISE SATISFIED IN ACCORDANCE WITH THE PLAN, (III) HOLDERS OF CLAIMS OR INTERESTS WHOSE VOTE TO ACCEPT OR REJECT THE PLAN WAS SOLICITED BUT WHO DID NOT VOTE EITHER TO ACCEPT OR TO REJECT THE PLAN AND DID NOT OPT OUT OF GRANTING THE RELEASES SET FORTH IN THE PLAN, (IV) HOLDERS OF CLAIMS OR INTERESTS WHO VOTED TO REJECT THE PLAN BUT DID NOT OPT OUT OF GRANTING THE RELEASES SET FORTH IN THE PLAN, (V) THOSE HOLDERS OF CLAIMS OR INTERESTS WHO ARE UNIMPAIRED UNDER THE PLAN AND DO NOT TIMELY OBJECT TO THE RELEASES SET FORTH IN THE PLAN, (VI) THE PREPETITION RBL AGENT, (VII) THE PREPETITION FIRST LIEN TERM LOAN AGENT, (VIII) THE PREPETITION FLLO AGENT, (XI) THE PREPETITION SECOND LIEN TERM LOAN AGENT, (X) THE PREPETITION SPONSOR SECOND LIEN TERM LOAN AGENT, (XI) THE PREPETITION RBL LENDERS, (XII) THE PREPETITION FIRST LIEN TERM LENDERS, (XIII) THE PREPETITION FLLO LENDERS, (XIV) THE PREPETITION SECOND LIEN TERM LENDERS, (XV) THE PREPETITION SPONSOR SECOND LIEN TERM LENDERS, (XVI) THE DIP FACILITY AGENT, (XVII) THE DIP FACILITY LENDERS, (XVIII) THE CONSENTING SPONSOR, (XIX) RIVERSTONE V FW HOLDINGS SUB, LLC, AND (XX) FIELDWOOD MANAGEMENT LLC, AND WITH RESPECT TO EACH OF THE FOREGOING ENTITIES, SUCH ENTITIES' PREDECESSORS, SUCCESSORS, ASSIGNS, SUBSIDIARIES, AFFILIATES, MANAGED ACCOUNTS AND FUNDS, AND ALL OF THEIR RESPECTIVE CURRENT AND FORMER OFFICERS AND DIRECTORS, PRINCIPALS, SHAREHOLDERS (REGARDLESS OF WHETHER SUCH INTERESTS ARE HELD DIRECTLY OR INDIRECTLY), MEMBERS, PARTNERS, MANAGERS, EMPLOYEES, SUBCONTRACTORS, AGENTS, ADVISORY BOARD MEMBERS, FINANCIAL ADVISORS, ATTORNEYS, ACCOUNTANTS, INVESTMENT BANKERS,

CONSULTANTS, REPRESENTATIVES, INVESTMENT MANAGERS, INVESTMENT ADVISORS, MANAGEMENT COMPANIES, FUND ADVISORS, AND OTHER PROFESSIONALS, AND SUCH ENTITIES' RESPECTIVE HEIRS, EXECUTORS, ESTATES, SERVANTS, AND NOMINEES, IN EACH CASE IN THEIR CAPACITY AS SUCH, AND ANY AND ALL OTHER PERSONS OR ENTITIES THAT MAY PURPORT TO ASSERT ANY CAUSE OF ACTION DERIVATIVELY, BY OR THROUGH THE FOREGOING ENTITIES (COLLECTIVELY, THE "RELEASING PARTIES"), FROM ANY AND ALL CLAIMS, INTERESTS, OBLIGATIONS, SUITS, JUDGMENTS, DAMAGES, DEMANDS, DEBTS, RIGHTS, CAUSES OF ACTION, LOSSES, REMEDIES, OR LIABILITIES WHATSOEVER, INCLUDING ANY DERIVATIVE CLAIMS OR CAUSES OF ACTION, ASSERTED OR ASSERTABLE ON BEHALF OF THE DEBTORS, THE REORGANIZED DEBTORS OR THEIR ESTATES, WHETHER LIQUIDATED OR UNLIQUIDATED, FIXED OR CONTINGENT, MATURED OR UNMATURED, KNOWN OR UNKNOWN, FORESEEN OR UNFORESEEN, EXISTING OR HEREINAFTER ARISING, IN LAW, EQUITY, CONTRACT, TORT, OR OTHERWISE, BY STATUTE, VIOLATIONS OF FEDERAL OR STATE SECURITIES LAWS OR OTHERWISE THAT SUCH HOLDERS OR THEIR AFFILIATES WOULD HAVE BEEN LEGALLY ENTITLED TO ASSERT IN THEIR OWN RIGHT (WHETHER INDIVIDUALLY OR COLLECTIVELY) OR ON BEHALF OF THE HOLDER OF ANY CLAIM OR INTEREST OR OTHER PERSON OR ENTITY, BASED ON OR RELATING TO, OR IN ANY MANNER ARISING FROM OR IN CONNECTION WITH, IN WHOLE OR IN PART, THE DEBTORS, THE CHAPTER 11 CASES, THE DEBTORS' RESTRUCTURING EFFORTS, THE NEGOTIATION, FORMULATION OR PREPARATION OF ANY TRANSACTIONS OR DOCUMENTS IN CONNECTION THEREWITH, THE DEBTORS' INTERCOMPANY TRANSACTIONS, ANY PREFERENCE, FRAUDULENT TRANSFER, OR OTHER AVOIDANCE CLAIM ARISING PURSUANT TO CHAPTER 5 OF THE BANKRUPTCY CODE OR APPLICABLE LAW, THE PURCHASE, SALE, OR RESCISSION OF THE PURCHASE OR SALE OF ANY SECURITY OF THE DEBTORS OR THE REORGANIZED DEBTORS, THE SUBJECT MATTER OF, OR THE TRANSACTIONS OR EVENTS GIVING RISE TO, ANY CLAIM OR INTEREST THAT IS TREATED IN THE PLAN, THE BUSINESS OR CONTRACTUAL ARRANGEMENTS AND ANY OTHER TRANSACTION OR ARRANGEMENT BETWEEN ANY DEBTOR, REORGANIZED DEBTOR, OR ESTATE AND ANY RELEASED PARTY (INCLUDING, WITHOUT LIMITATION, THE PREPETITION RBL CREDIT AGREEMENT, THE PREPETITION FIRST LIEN TERM LOAN AGREEMENT, THE PREPETITION FLLO CREDIT AGREEMENT, THE PREPETITION SECOND LIEN TERM LOAN AGREEMENT, AND THE PREPETITION SPONSOR SECOND LIEN TERM LOAN AGREEMENT), THE RESTRUCTURING, THE RESTRUCTURING OF ANY CLAIM OR INTEREST BEFORE OR DURING THE CHAPTER 11 CASES, THE RESTRUCTURING TRANSACTIONS, THE NEGOTIATION, FORMULATION, OR PREPARATION OF THE DISCLOSURE STATEMENT, THE RESTRUCTURING SUPPORT AGREEMENT, THE ASSET PURCHASE TRANSACTION, THE PURCHASE AGREEMENT, THE PLAN AND RELATED AGREEMENTS, INSTRUMENTS, TERM SHEETS AND OTHER DOCUMENTS (INCLUDING THE PLAN DOCUMENTS), THE SOLICITATION OF VOTES WITH RESPECT TO THE

48

PLAN, THE BACKSTOP COMMITMENT AGREEMENT, OR THE RIGHTS OFFERING, OR ANY OTHER ACT OR OMISSION, TRANSACTION, AGREEMENT, EVENT, OR OTHER OCCURRENCE TAKING PLACE OR ARISING ON OR BEFORE THE EFFECTIVE DATE RELATED OR RELATING TO ANY OF THE FOREGOING, IN EACH CASE OTHER THAN CLAIMS OR CAUSES OF ACTION ARISING OUT OF OR RELATED TO ANY ACT OR OMISSION OF A RELEASED PARTY THAT IS A CRIMINAL ACT OR CONSTITUTES INTENTIONAL FRAUD, GROSS NEGLIGENCE, OR WILLFUL MISCONDUCT, AS DETERMINED BY A FINAL ORDER.

ENTRY OF THE CONFIRMATION ORDER BY THE BANKRUPTCY COURT SHALL CONSTITUTE THE BANKRUPTCY COURT'S APPROVAL, PURSUANT TO BANKRUPTCY RULE 9019, OF THE RELEASES IN SECTION 10.7(b) OF THE PLAN (THE "**THIRD-PARTY RELEASE**"), WHICH INCLUDES, BY REFERENCE, EACH OF THE RELATED PROVISIONS AND DEFINITIONS UNDER THE PLAN, AND, FURTHERMORE, SHALL CONSTITUTE THE BANKRUPTCY COURT'S FINDING THAT THE THIRD-PARTY RELEASE IS (I) CONSENSUAL, (II) ESSENTIAL TO THE CONFIRMATION OF THE PLAN, (III) GIVEN IN EXCHANGE FOR THE GOOD AND VALUABLE CONSIDERATION PROVIDED BY THE RELEASED PARTIES, (IV) A GOOD FAITH SETTLEMENT AND COMPROMISE OF THE CLAIMS RELEASED BY THE THIRD-PARTY RELEASE, (V) IN THE BEST INTERESTS OF THE DEBTORS AND THEIR ESTATES, (VI) FAIR, EQUITABLE AND REASONABLE, (VII) GIVEN AND MADE AFTER DUE NOTICE AND OPPORTUNITY FOR HEARING, AND (VIII) A BAR TO ANY OF THE RELEASING PARTIES ASSERTING ANY CLAIM OR CAUSE OF ACTION RELEASED PURSUANT TO THE THIRD-PARTY RELEASE.

(c)     *Release of Liens*.  Except as otherwise specifically provided in the Plan or in any contract, instrument, release, or other agreement or document contemplated under or executed in connection with the Plan, including the Exit LC Facility Documents, the Exit First Lien Documents, the Exit Second Lien Documents, and the Apache Decommissioning Agreement Amendment, on the Effective Date and concurrently with the applicable distributions made pursuant to the Plan and, in the case of a Secured Claim, satisfaction in full of the portion of the Secured Claim that is Allowed as of the Effective Date, all mortgages, deeds of trust, Liens, pledges, or other security interests against any property of the estates shall be fully released and discharged, and all of the right, title, and interest of any holder of such mortgages, deeds of trust, Liens, pledges, or other security interests shall revert to the Reorganized Debtors and their successors and assigns, in each case, without any further approval or order of the Bankruptcy Court and without any action or filing being required to be made by the Debtors.  In addition and for the avoidance of doubt, on the Effective Date, all of Apache's mortgages, deeds of trust, Liens, pledges, or other security interests against any property of the estates of the Debtors or Reorganized Debtors shall be fully released and discharged, except for (i) any liens on property in The Fieldwood Decommissioning Trust A, a Delaware statutory trust, (ii) the "Recharacterization Mortgages" as defined in the Decommissioning Agreement dated September 30, 2013 between Apache, Fieldwood Energy LLC and GOM Shelf LLC, and (iii) any other mortgages, deeds of trust, Liens, pledges, or other security interests expressly preserved in the Apache Decommissioning Agreement Amendment.

### 10.8   *Exculpation.*

TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, NO EXCULPATED PARTY SHALL HAVE OR INCUR, AND EACH EXCULPATED PARTY IS HEREBY RELEASED AND EXCULPATED FROM, ANY CLAIM, INTEREST, OBLIGATION, SUIT, JUDGMENT, DAMAGE, DEMAND, DEBT, RIGHT, CAUSE OF ACTION, LOSS, REMEDY, OR LIABILITY FOR ANY CLAIM IN CONNECTION WITH OR ARISING OUT OF THE ADMINISTRATION OF THE CHAPTER 11 CASES; THE NEGOTIATION AND PURSUIT OF THE EXIT LC CREDIT AGREEMENT, THE EXIT FIRST LIEN CREDIT AGREEMENT, THE EXIT SECOND LIEN CREDIT AGREEMENT, THE DIP FACILITY LOAN AGREEMENT, THE NEW BY-LAWS, THE MANAGEMENT INCENTIVE PLAN, THE BACKSTOP COMMITMENT AGREEMENT, THE DISCLOSURE STATEMENT, THE RESTRUCTURING SUPPORT AGREEMENT, THE RESTRUCTURING TRANSACTIONS, THE ASSET PURCHASE TRANSACTION, THE PURCHASE AGREEMENT, AND THE PLAN (INCLUDING THE PLAN DOCUMENTS), OR THE SOLICITATION OF VOTES FOR, OR CONFIRMATION OF, THE PLAN; THE FUNDING OF THE PLAN; THE OCCURRENCE OF THE EFFECTIVE DATE; THE ADMINISTRATION OF THE PLAN OR THE PROPERTY TO BE DISTRIBUTED UNDER THE PLAN; THE CONDUCTING OF THE RIGHTS OFFERING; THE ISSUANCE OF SECURITIES UNDER OR IN CONNECTION WITH THE PLAN; OR THE TRANSACTIONS IN FURTHERANCE OF ANY OF THE FOREGOING; OTHER THAN CLAIMS OR CAUSES OF ACTION ARISING OUT OF OR RELATED TO ANY ACT OR OMISSION OF AN EXCULPATED PARTY THAT IS A CRIMINAL ACT OR CONSTITUTES INTENTIONAL FRAUD, GROSS NEGLIGENCE, OR WILLFUL MISCONDUCT, BUT IN ALL RESPECTS SUCH ENTITIES SHALL BE ENTITLED TO REASONABLY RELY UPON THE ADVICE OF COUNSEL WITH RESPECT TO THEIR DUTIES AND RESPONSIBILITIES PURSUANT TO THE PLAN. THE EXCULPATED PARTIES AND EACH OF THEIR RESPECTIVE AFFILIATES, AGENTS, DIRECTORS, OFFICERS, EMPLOYEES, ADVISORS, AND ATTORNEYS HAVE ACTED IN COMPLIANCE WITH THE APPLICABLE PROVISIONS OF THE BANKRUPTCY CODE WITH REGARD TO THE SOLICITATION AND DISTRIBUTION OF SECURITIES PURSUANT TO THE PLAN AND, THEREFORE, ARE NOT, AND ON ACCOUNT OF SUCH DISTRIBUTIONS SHALL NOT BE, LIABLE AT ANY TIME FOR THE VIOLATION OF ANY APPLICABLE LAW, RULE, OR REGULATION GOVERNING THE SOLICITATION OF ACCEPTANCES OR REJECTIONS OF THE PLAN OR SUCH DISTRIBUTIONS MADE PURSUANT TO THE PLAN, INCLUDING THE ISSUANCE OF SECURITIES THEREUNDER. THIS EXCULPATION SHALL BE IN ADDITION TO, AND NOT IN LIMITATION OF, ALL OTHER RELEASES, INDEMNITIES, EXCULPATIONS, AND ANY OTHER APPLICABLE LAW OR RULES PROTECTING SUCH EXCULPATED PARTIES FROM LIABILITY.

### 10.9   *Injunction Related to Releases and Exculpation.*

The Confirmation Order shall permanently enjoin the commencement or prosecution by any Person or entity, whether directly, derivatively, or otherwise, of any Claims,

obligations, suits, judgments, damages, demands, debts, rights, Causes of Action, losses, or liabilities released pursuant to the Plan, including, without limitation, the claims, obligations, suits, judgments, damages, demands, debts, rights, Causes of Action, and liabilities released or exculpated in the Plan.

### 10.10 *Subordinated Claims.*

The allowance, classification, and treatment of all Allowed Claims and Interests and the respective distributions and treatments thereof under the Plan take into account and conform to the relative priority and rights of the Claims and Interests in each Class in connection with any contractual, legal, and equitable subordination rights relating thereto, whether arising under general principles of equitable subordination, sections 510(a), 510(b), or 510(c) of the Bankruptcy Code, or otherwise. Pursuant to section 510 of the Bankruptcy Code, the Debtors reserve the right to reclassify any Allowed Claim or Interest in accordance with any contractual, legal, or equitable subordination relating thereto.

### 10.11 *Retention of Causes of Action and Reservation of Rights.*

Except as otherwise provided in the Plan, including, without limitation, Sections 10.5, 10.6, 10.7, 10.8 and 10.9, nothing contained in the Plan or the Confirmation Order shall be deemed to be a waiver or relinquishment of any rights, claims, Causes of Action, rights of setoff or recoupment, or other legal or equitable defenses that the Debtors had immediately prior to the Effective Date on behalf of the Estates or of themselves in accordance with any provision of the Bankruptcy Code or any applicable nonbankruptcy law, including, but not limited to, rights, claims, Causes of Action, rights of setoff, offset, recoupment or other legal or equitable defenses against any holder of Existing Energy Inc. Interests or Existing Holdings Interests that arise on account of such holders' objection to, or support of, and objection to the Plan. The Reorganized Debtors shall have, retain, reserve, and be entitled to assert all such claims, Causes of Action, rights of setoff or recoupment, and other legal or equitable defenses as fully as if the Chapter 11 Cases had not been commenced, and all of the Debtors' legal and equitable rights in respect of any Unimpaired Claim may be asserted after the Confirmation Date and Effective Date to the same extent as if the Chapter 11 Cases had not been commenced.

### 10.12 *Ipso Facto and Similar Provisions Ineffective.*

Any term of any prepetition policy, prepetition contract, or other prepetition obligation applicable to a Debtor shall be void and of no further force or effect with respect to any Debtor to the extent that such policy, contract, or other obligation is conditioned on, creates an obligation of the Debtor as a result of, or gives rise to a right of any entity based on any of the following: (a) the insolvency or financial condition of a Debtor; (b) the commencement of the Chapter 11 Cases; (c) the confirmation or consummation of the Plan, including any change of control that shall occur as a result of such consummation; or (d) the Restructuring.

### 10.13 *Indemnification and Reimbursement Obligations.*

For purposes of the Plan, (a) the obligations of the Debtors to indemnify and reimburse their directors, members, managers, or officers that were directors, members, managers, or officers, respectively, on or subsequent to the Petition Date shall be assumed by the

Reorganized Debtors and (b) indemnification obligations of the Debtors arising from services as officers, members, managers, and directors during the period from and after the Petition Date shall be Administrative Expense Claims. In addition, after the Effective Date, the Reorganized Debtors shall not terminate or otherwise reduce the coverage under any directors', members', managers', and officers' insurance policies (including any "tail policy") in effect as of the Petition Date, and all members, managers, directors and officers of the Debtors who served in such capacity at any time prior to the Effective Date shall be entitled to the full benefits of any such policy for the full term of such policy regardless of whether such members, managers, directors, and/or officers remain in such positions after the Effective Date to the extent set forth in such policies.

## ARTICLE XI.    RETENTION OF JURISDICTION.

### 11.1    *Retention of Jurisdiction.*

Pursuant to sections 105(c) and 1142 of the Bankruptcy Code and notwithstanding entry of the Confirmation Order and the occurrence of the Effective Date, on and after the Effective Date, the Bankruptcy Court shall retain exclusive jurisdiction, pursuant to 28 U.S.C. §§ 1334 and 157, over all matters arising in or related to the Chapter 11 Cases for, among other things, the following purposes:

(a)    to hear and determine applications for the assumption or rejection of executory contracts or unexpired leases and any disputes over Cure Amounts resulting therefrom;

(b)    to determine any motion, adversary proceeding, application, contested matter, and other litigated matter pending on or commenced after the entry of the Confirmation Order;

(c)    to hear and resolve any disputes arising from or related to (i) any orders of the Bankruptcy Court granting relief under Bankruptcy Rule 2004 or (ii) any protective orders entered by the Bankruptcy Court in connection with the foregoing;

(d)    to ensure that distributions to holders of Allowed Claims are accomplished as provided in the Plan and the Confirmation Order;

(e)    to consider Claims or the allowance, classification, priority, compromise, estimation, or payment of any Claim, including any Administrative Expense Claim;

(f)    to enter, implement, or enforce such orders as may be appropriate in the event that the Confirmation Order is for any reason stayed, reversed, revoked, modified, or vacated;

(g)    to issue and enforce injunctions, enter and implement other orders, and take such other actions as may be necessary or appropriate to restrain interference by any Person

or other entity with the consummation, implementation, or enforcement of the Plan, the Confirmation Order, or any other order of the Bankruptcy Court;

(h)     to hear and determine any application to modify the Plan in accordance with section 1127 of the Bankruptcy Code to remedy any defect or omission or reconcile any inconsistency in the Plan, the Disclosure Statement, or any order of the Bankruptcy Court, including the Confirmation Order, in such a manner as may be necessary to carry out the purposes and effects thereof;

(i)     to hear and determine all Fee Claims;

(j)     to resolve disputes concerning any reserves with respect to Disputed Claims or the administration thereof;

(k)     to hear and determine disputes arising in connection with the interpretation, implementation, or enforcement of the Plan, the Confirmation Order, any transactions or payments in furtherance of either, or any agreement, instrument, or other document governing or related to any of the foregoing;

(l)     to take any action and issue such orders, including any such action or orders as may be necessary after entry of the Confirmation Order or the occurrence of the Effective Date, as may be necessary to construe, enforce, implement, execute, and consummate the Plan, including any release, exculpation, or injunction provisions set forth in the Plan, or to maintain the integrity of the Plan following the occurrence of the Effective Date;

(m)     to determine such other matters and for such other purposes as may be provided in the Confirmation Order;

(n)     to hear and determine matters concerning state, local, and federal taxes in accordance with sections 346, 505, and 1146 of the Bankruptcy Code (including any requests for expedited determinations under section 505(b) of the Bankruptcy Code);

(o)     to hear and determine any other matters related to the Chapter 11 Cases and not inconsistent with the Bankruptcy Code or title 28 of the United States Code;

(p)     to resolve any disputes concerning whether a Person or entity had sufficient notice of the Chapter 11 Cases, the Disclosure Statement, any solicitation conducted in connection with the Chapter 11 Cases, any bar date established in the Chapter 11 Cases, or any deadline for responding or objecting to a Cure Amount, in each case, for the purpose for determining whether a Claim or Interest is discharged hereunder or for any other purpose;

(q)     to recover all Assets of the Debtors and property of the Estates, wherever located;

(r)     to resolve all disputes related to the Purchase Agreement to the fullest extent permitted by law; and

(s)     to enter a final decree closing each of the Chapter 11 Cases.

# ARTICLE XII.    MISCELLANEOUS PROVISIONS.

### 12.1    *Exemption from Certain Transfer Taxes.*

Pursuant to section 1146 of the Bankruptcy Code, (a) the issuance, transfer or exchange of any securities, instruments or documents, (b) the creation of any Lien, mortgage, deed of trust or other security interest, (c) all sale transactions consummated by the Debtors and approved by the Bankruptcy Court on and after the Confirmation Date through and including the Effective Date, including any transfers effectuated under the Plan (including the Asset Purchase Transaction), (d) any assumption, assignment, or sale by the Debtors of their interests in unexpired leases of nonresidential real property or executory contracts pursuant to section 365(a) of the Bankruptcy Code, (e) the grant of collateral under the Exit LC Credit Agreement, Exit First Lien Credit Agreement, or Exit Second Lien Credit Agreement and (f) the issuance, renewal, modification or securing of indebtedness by such means, and the making, delivery or recording of any deed or other instrument of transfer under, in furtherance of, or in connection with, the Plan, including, without limitation, the Confirmation Order, shall not be subject to any document recording tax, stamp tax, conveyance fee or other similar tax, mortgage tax, real estate transfer tax, mortgage recording tax, Uniform Commercial Code filing or recording fee, regulatory filing or recording fee, sales tax, use tax or other similar tax or governmental assessment.  Consistent with the foregoing, each recorder of deeds or similar official for any county, city or Governmental Unit in which any instrument hereunder is to be recorded shall, pursuant to the Confirmation Order, be ordered and directed to accept such instrument without requiring the payment of any filing fees, documentary stamp tax, deed stamps, stamp tax, transfer tax, intangible tax or similar tax.

### 12.2    *Request for Expedited Determination of Taxes.*

The Debtors will have the right to request an expedited determination under section 505(b) of the Bankruptcy Code with respect to tax returns filed, or to be filed, for any and all taxable periods ending after the Petition Date through the Effective Date.

### 12.3    *Dates of Actions to Implement Plan.*

In the event that any payment or act under the Plan is required to be made or performed on a date that is not a Business Day, then the making of such payment or the performance of such act may be completed on or as soon as reasonably practicable after the next succeeding Business Day but shall be deemed to have been completed as of the required date.

### 12.4    *Amendments.*

(a)    Plan Modifications.    The Plan may be amended, modified, or supplemented by the Debtors in the manner provided for by section 1127 of the Bankruptcy Code or as otherwise permitted by law, without additional disclosure pursuant to section 1125 of the Bankruptcy Code, except as otherwise ordered by the Bankruptcy Court, subject to the written consent of the Requisite Second Lien Term Lenders, Requisite Sponsor Second Lien Term Lenders and the other Requisite Creditors (in the case of the Requisite Creditors, solely to the extent such amendments, modifications and supplements materially and adversely affect in any respect any rights or treatment of such Requisite Creditors under the Plan) in accordance

with the Restructuring Support Agreement.  In addition, after the Confirmation Date, so long as such action does not materially and adversely affect the treatment of holders of Allowed Claims pursuant to the Plan, the Debtors, with the consent of the Requisite Second Lien Term Lenders and Requisite Sponsor Second Lien Term Lenders, may remedy any defect or omission or reconcile any inconsistencies in the Plan or the Confirmation Order with respect to such matters as may be necessary to carry out the purposes of effects of the Plan, and any holder of a Claim or Interest that has accepted the Plan shall be deemed to have accepted the Plan as amended, modified, or supplemented.

(b)     Certain Technical Amendments.    Consistent with the Restructuring Support Agreement, prior to the Effective Date, the Debtors may make appropriate technical adjustments and modifications to the Plan without further order or approval of the Bankruptcy Court; *provided*, that such technical adjustments and modifications do not materially and adversely affect in any respect the treatment of holders of Claims or Interests under the Plan.

### 12.5   *Revocation or Withdrawal of Plan.*

The Debtors reserve the right to revoke or withdraw the Plan prior to the Effective Date as to any or all of the Debtors.  If, with respect to a Debtor, the Plan has been revoked or withdrawn prior to the Effective Date, or if confirmation or the occurrence of the Effective Date as to such Debtor does not occur on the Effective Date, then, with respect to such Debtor: (a) the Plan shall be null and void in all respects; (b) any settlement or compromise embodied in the Plan (including the fixing or limiting to an amount any Claim or Interest or Class of Claims or Interests), assumption or rejection of executory contracts or unexpired leases affected by the Plan, and any document or agreement executed pursuant to the Plan shall be deemed null and void; and (c) nothing contained in the Plan shall (i) constitute a waiver or release of any Claim by or against, or any Interest in, such Debtor or any other Person; (ii) prejudice in any manner the rights of such Debtor or any other Person; or (iii) constitute an admission of any sort by any Debtor or any other Person.

### 12.6   *Severability.*

If, prior to the entry of the Confirmation Order, any term or provision of the Plan is held by the Bankruptcy Court to be invalid, void, or unenforceable, the Bankruptcy Court, at the request of the Debtors, shall have the power to alter and interpret such term or provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void, or unenforceable, and such term or provision shall then be applicable as altered or interpreted.  Notwithstanding any such holding, alteration, or interpretation by the Bankruptcy Court, the remainder of the terms and provisions of the Plan shall remain in full force and effect and shall in no way be affected, impaired, or invalidated by such holding, alteration, or interpretation.  The Confirmation Order shall constitute a judicial determination and shall provide that each term and provision of the Plan, as it may have been altered or interpreted in accordance with this section, is valid and enforceable pursuant to its terms.

### 12.7 *Governing Law.*

Except to the extent that the Bankruptcy Code or other federal law is applicable or to the extent that a Plan Document provides otherwise, the rights, duties, and obligations arising under the Plan and the Plan Documents shall be governed by, and construed and enforced in accordance with, the internal laws of the State of New York, without giving effect to the principles of conflicts of laws thereof (other than section 5-1401 and section 5-1402 of the New York General Obligations Law).

### 12.8 *Immediate Binding Effect.*

Notwithstanding Bankruptcy Rules 3020(e), 6004(h), 7062, or otherwise, upon the occurrence of the Effective Date, the terms of the Plan and the Plan Documents shall be immediately effective and enforceable and deemed binding upon and inure to the benefit of the Debtors, the Reorganized Debtors, the holders of Claims and Interests, the Released Parties, and each of their respective successors and assigns.

### 12.9 *Successors and Assigns.*

The rights, benefits, and obligations of any entity named or referred to in the Plan shall be binding on and shall inure to the benefit of any heir, executor, administrator, successor, or permitted assign, if any, of each such entity.

### 12.10 *Entire Agreement.*

On the Effective Date, the Plan, the Plan Supplement, and the Confirmation Order shall supersede all previous and contemporaneous negotiations, promises, covenants, agreements, understandings, and representations on such subjects, all of which have become merged and integrated into the Plan.

### 12.11 *Computing Time.*

In computing any period of time prescribed or allowed by the Plan, unless otherwise set forth in the Plan or determined by the Bankruptcy Court, the provisions of Bankruptcy Rule 9006 shall apply.

### 12.12 *Exhibits to Plan.*

All exhibits, schedules, supplements, and appendices to the Plan (including the Plan Supplement) are incorporated into and are a part of the Plan as if set forth in full in the Plan.

### 12.13 *Notices.*

All notices, requests, and demands hereunder shall be in writing (including by facsimile transmission) and, unless otherwise provided herein, shall be deemed to have been duly given or made only when actually delivered or, in the case of notice by facsimile transmission, when received and telephonically confirmed, addressed as follows:

if to the Debtors or Reorganized Debtors:

> FIELDWOOD ENERGY LLC
> 2000 W. Sam Houston Parkway, S., Suite 1200,
> Houston, TX 77042
> Attn: G.M. McCarroll, President, Chief Executive Officer and
> Mike Dane, Senior Vice President and Chief Financial Officer
>
> – and –
>
> WEIL, GOTSHAL & MANGES LLP
> 700 Louisiana Street, Suite 1700
> Houston, Texas 77002
> Attn: Alfredo R. Pérez, Esq.
> Telephone: (713) 546-5000
> Facsimile: (713) 224-9511
>
> – and –
>
> WEIL, GOTSHAL & MANGES LLP
> 767 Fifth Avenue
> New York, New York 10153
> Attn: Matthew S. Barr, Esq., Ray C. Schrock, P.C., and Jessica Liou, Esq.
> Telephone: (212) 310-8000
> Facsimile: (212) 310-8007
>
> *Attorneys for the Debtors*

if to the Consenting First Lien Term Lenders:

> O'MELVENY & MYERS LLP
> Times Square Tower, 7 Times Square
> New York, New York 10036
> Attn: George A. Davis, Esq. and Daniel S. Shamah, Esq.
> Telephone: (212) 326-2000
> Facsimile: (212) 326-2061
>
> *Attorneys for the Consenting First Lien Term Lenders*

if to the Consenting Second Lien Term Lenders:

> DAVIS POLK & WARDWELL LLP
> 450 Lexington Avenue
> New York, New York 10017
> Attn:  Damian Schaible, Darren Klein and Natasha Tsiouris, Esq.
> Telephone:  (212) 450-4000
> Facsimile:  (212) 701-5361
>
> *Attorneys for the Consenting Second Lien Term Lenders*

if to the Consenting Sponsor Second Lien Term Lenders or the Consenting Sponsor:

> VINSON & ELKINS LLP
> 666 Fifth Avenue, 26th Floor
> New York, New York 10103
> Attn: David S. Meyer, Esq. and Jessica C. Peet, Esq.
> Telephone: (212) 237-0000
> Facsimile: (212) 237-0100
>
> *Attorneys for the Consenting Sponsor Second Lien Term Lenders and the*
> *Consenting Sponsor*

After the occurrence of the Effective Date, the Reorganized Debtors have authority to send a notice to entities that to continue to receive documents pursuant to Bankruptcy Rule 2002, such entities must file a renewed request to receive documents pursuant to Bankruptcy Rule 2002; *provided*, that the U.S. Trustee need not file such a renewed request and shall continue to receive documents without any further action being necessary.  After the occurrence of the Effective Date, the Reorganized Debtors are authorized to limit the list of entities receiving documents pursuant to Bankruptcy Rule 2002 to the U.S. Trustee and those entities that have filed such renewed requests.

## 12.14    *Reservation of Rights.*

Except as otherwise provided herein, the Plan shall be of no force or effect unless the Bankruptcy Court enters the Confirmation Order.  None of the filing of the Plan, any statement or provision of the Plan, or the taking of any action by the Debtors with respect to the Plan shall be or shall be deemed to be an admission or waiver of any rights of the Debtors with respect to any Claims or Interests prior to the Effective Date.

Dated: February 14, 2018
      Houston, Texas

Respectfully submitted,

FIELDWOOD ENERGY LLC, and its undersigned affiliates

Name: G.M. McCarroll
Title:  Authorized Officer

DYNAMIC OFFSHORE RESOURCES NS, LLC
FIELDWOOD HOLDINGS LLC
FIELDWOOD ENERGY INC.
FIELDWOOD ENERGY OFFSHORE LLC
FIELDWOOD ONSHORE LLC
FIELDWOOD SD OFFSHORE LLC
FW GOM PIPELINE, INC.
GOM SHELF LLC
BANDON OIL AND GAS GP, LLC
BANDON OIL AND GAS, LP
FIELDWOOD ENERGY SP LLC
GALVESTON BAY PIPELINE LLC
GALVESTON BAY PROCESSING LLC

Signature Page to Plan

**Exhibit A**

**Restructuring Support Agreement**

## **Restructuring Support Agreement**

See Exhibit B to Disclosure Statement

**Exhibit B**

**Restructuring Support Agreement**

## RESTRUCTURING SUPPORT AGREEMENT

This RESTRUCTURING SUPPORT AGREEMENT (as amended, supplemented or otherwise modified from time to time in accordance with the terms hereof, this "**Agreement**"), dated as of February 14, 2018, is entered into by and among:

(i) Fieldwood Holdings LLC ("**Holdings**"), Fieldwood Energy LLC ("**FWE**"), Fieldwood Energy Inc. (f/k/a Fieldwood Managing Member LLC) ("**Energy Inc.**"), Fieldwood Onshore LLC, Galveston Bay Pipeline LLC, Galveston Bay Processing LLC, Fieldwood SD Offshore LLC, Fieldwood Energy Offshore LLC, Fieldwood Energy SP LLC, Dynamic Offshore Resources NS, LLC, Bandon Oil and Gas GP, LLC, Bandon Oil and Gas, LP, GOM Shelf LLC, and FW GOM Pipeline, Inc., each such entity a subsidiary of Holdings (collectively, the "**Company**");

(ii) Riverstone V FW Holdings Sub, LLC (the "**Consenting Sponsor**");

(iii) the undersigned lenders, or investment advisors or managers for the account of lenders, party to that certain First Lien Term Loan Credit Agreement, dated as of September 30, 2013, among FWE, Citibank, N.A. as administrative agent (the "**Prepetition First Lien Term Agent**"), the lenders holding Loans (as defined therein) that are not Reserve Based Term Loans (as defined therein; such Loans that are not Reserve Based Term Loans, the "**Prepetition FLTL Loans**") party thereto from time to time (the "**Prepetition First Lien Term Lenders**" and the undersigned Prepetition First Lien Term Lenders, together with their respective successors and permitted assigns and any subsequent Prepetition First Lien Term Lender that becomes party hereto in accordance with the terms hereof, the "**Consenting First Lien Term Lenders**") and the other agents party thereto from time to time (as amended from time to time including pursuant to (a) that certain Amendment No. 1 to First Lien Term Loan Agreement dated as of February 25, 2014 and (b) that certain Amendment No. 2 to First Lien Term Loan Agreement dated as of May 27, 2016, the "**Prepetition First Lien Term Loan Agreement**");

(iv) the undersigned lenders, or investment advisors or managers for the account of lenders, holding Loans that are Reserve Based Term Loans under the Prepetition First Lien Term Loan Agreement (the "**Prepetition RBTL Loans**" and together with the Prepetition FLTL Loans, the "**Prepetition First Lien Term Loans**", and the lenders Prepetition RBTL Loans party hereto, the "**Prepetition RBTL Lenders**" and together with the Prepetition First Lien Term Lenders, the "**Combined Prepetition FLTL Lenders**" and the undersigned Prepetition RBTL Lenders, together with their respective successors and permitted assigns and any subsequent Prepetition RBTL Lenders that becomes party hereto in accordance with the terms hereof, the "**Consenting RBTL Lenders**");

(v) the undersigned lenders, or investment advisors or managers for the account of lenders, party to that certain First Lien Last-Out Term Loan Agreement dated as of May 27, 2016 (as amended from time to time, the "**Prepetition FLLO Credit Agreement**" and the loans thereunder, the "**Prepetition FLLO Loans**"), among FWE, Cortland Capital Market Services LLC, as administrative agent and collateral agent thereunder (the "**Prepetition FLLO Agent**"), the lenders from time to time party thereto (the "**Prepetition FLLO Lenders**" and the undersigned Prepetition FLLO Lenders, together with their respective successors and permitted

assigns and any subsequent Prepetition FLLO Term Lender that becomes party hereto in accordance with the terms hereof, the "***Consenting FLLO Term Lenders***");

(vi) the undersigned lenders, or investment advisors or managers for the account of lenders, party to that certain Second Lien Term Loan Agreement dated as of September 30, 2013 (as amended from time to time including pursuant to (a) that certain Amendment No. 1 to Second Lien Term Loan Agreement dated as of February 25, 2014, (b) that certain Amendment No. 2 and Limited Waiver to Second Lien Term Loan Agreement dated as of May 27, 2016 and (c) that certain Amendment No. 3 and Limited Waiver to Second Lien Term Loan Agreement dated as of May 27, 2016, the "***Prepetition Second Lien Credit Agreement***" and the loans outstanding thereunder the "***Prepetition Second Lien Term Loans***"), among FWE, Cortland Capital Market Services LLC, as administrative agent and collateral agent thereunder (in such capacity, the "***Prepetition Second Lien Term Agent***"), and the lenders from time to time party thereto (the "***Prepetition Second Lien Term Lenders***" and the undersigned Prepetition Second Lien Term Lenders, together with their respective successors and permitted assigns and any subsequent Prepetition Second Lien Term Lender that becomes party hereto in accordance with the terms hereof, the "***Consenting Second Lien Term Lenders***"); and

(vii) the undersigned lenders, or investment advisors or managers for the account of lenders, party to that certain Sponsor Second Lien Term Loan Agreement, dated as of May 27, 2016 (the "***Prepetition Sponsor Second Lien Credit Agreement***" and the loans outstanding thereunder the "***Prepetition Sponsor Second Lien Term Loans***" and together with the Prepetition Second Lien Term Loans, the "***Prepetition SLT Loans***") by and among FWE, as borrower, Cortland Capital Markets Services LLC, as successor administrative agent and successor collateral agent, the other banks and financial institutions party thereto, and the lenders party thereto (in such capacity, the "***Prepetition Sponsor Second Lien Term Lenders***", and together with the Prepetition Second Lien Term Lenders, the "***Combined Prepetition SLTL Lenders***" and the undersigned Prepetition Sponsor Second Lien Term Lenders, together with their respective successors and permitted assigns and any subsequent Prepetition Sponsor Second Lien Term Lender that becomes party hereto in accordance with the terms hereof, the "***Consenting Sponsor Second Lien Term Lenders***", and together with the Consenting First Lien Term Lenders, the Consenting RBTL Lenders, the Consenting FLLO Term Lenders, and the Consenting Second Lien Term Lenders, the "***Consenting Creditors***").

The Company, each Consenting Creditor, the Consenting Sponsor, and any subsequent person or entity that becomes a party hereto in accordance with the terms hereof are referred herein as the "***Parties***" and individually as a "***Party***."  Capitalized terms used but not defined herein shall have the meanings ascribed to them in the Plan (as defined below) attached hereto as **Exhibit A** (including any schedules and exhibits attached thereto).

When a reference is made in this Agreement to a Section, Exhibit or Schedule, such reference shall be to a Section, Exhibit or Schedule, respectively, of or attached to this Agreement unless otherwise indicated.  Unless the context of this Agreement otherwise requires, (a) words using the singular or plural number also include the plural or singular number, respectively, (b) the terms "hereof," "herein," "hereby" and derivative or similar words refer to this entire Agreement, (c) the words "include," "includes" and "including" when used herein shall be deemed in each case to be followed by the words "without limitation," and (d) the word

"or" shall not be exclusive and shall be read to mean "and/or." The Parties agree that they have been represented by legal counsel during the negotiation and execution of this Agreement and, therefore, waive the application of any law, regulation, holding or rule of construction providing that ambiguities in an agreement or other document shall be construed against the party drafting such agreement or document.

## RECITALS

WHEREAS, the Parties have agreed to enter into certain transactions (the "*Restructuring Transactions*") in furtherance of a global restructuring of the Company's capital structure (the "*Restructuring*") which is anticipated to be effected through a prepackaged plan of reorganization (as may be amended or modified from time to time, the "*Plan*"), a solicitation of votes therefor (the "*Solicitation*") pursuant to the Bankruptcy Code (as defined below), and the commencement by the Company of voluntary cases (the "*Chapter 11 Cases*") under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101-1532 (the "*Bankruptcy Cod*e"), in the United States Bankruptcy Court for the Southern District of Texas (the "*Bankruptcy Court*");

WHEREAS, the Restructuring Transactions include: (i) entry into an Exit LC Facility (the "*Exit LC Facility*") in an aggregate amount of approximately $150 million, on the terms set forth in the LC Term Sheet attached hereto as **Exhibit B**, (ii) entry into an Exit First Lien Term Facility (the "*Exit First Lien Term Facility*") in an aggregate amount of approximately $1,143 million, on the terms set forth in the Exit First Lien Term Sheet attached hereto as **Exhibit C**; (iii) entry into an Exit Second Lien Term Facility (the "*Exit Second Lien Term Facility*" and together with the Exit LC Facility and the Exit First Lien Term Facility, the "*Exit Facilities*") in an aggregate amount of approximately $518 million, on the terms set forth in the Exit Second Lien Term Sheet attached hereto as **Exhibit D**; (iv) the conversion of the Prepetition Second Lien Term Loans and Prepetition Sponsor Second Lien Term Loans to new equity in the Company; (v) an offering of new equity to each eligible holder of the Company's Prepetition Second Lien Term Loans and Prepetition Sponsor Second Lien Term Loans to raise approximately $525 million (the "*Rights Offering*") backstopped by certain of the Consenting Creditors (collectively, the "*Backstop Parties*") on the terms described in the Backstop Commitment Agreement attached hereto as **Exhibit E** (the "*Backstop Agreement*"); (vi) the grant of a new Management Incentive Plan on the terms described in the MIP Term Sheet attached hereto as **Exhibit F** (the "*Management Incentive Plan*"), and (vii) the acquisition of certain offshore assets on the terms and conditions set forth in that certain Purchase and Sale Agreement (the "*Purchase Agreement*"), dated as of February 14, 2018, by and among FWE and the seller thereunder (the "*Sale Transaction*");

WHEREAS, as of the date hereof, the Consenting Sponsor, directly or indirectly, holds approximately 98% of the Capital Stock;

WHEREAS, as of the date hereof, the Consenting First Lien Term Lenders and Consenting RBTL Lenders hold, in the aggregate, approximately 74.9% of the aggregate outstanding principal amount of the Prepetition First Lien Term Loans;

**WHEREAS,** as of the date hereof, the Consenting FLLO Term Lenders hold, in the aggregate, approximately 71.6% of the aggregate outstanding principal amount of the Prepetition FLLO Term Loans;

**WHEREAS,** as of the date hereof, the Consenting Second Lien Term Lenders hold, in the aggregate, approximately 76.8% of the aggregate outstanding principal amount of the Prepetition Second Lien Term Loans;

**WHEREAS,** as of the date hereof, the Consenting Sponsor Second Lien Term Lenders hold 100% of the aggregate outstanding principal amount of the Prepetition Sponsor Second Lien Term Loans;

**WHEREAS,** as of the date hereof, the Consenting Sponsor Second Lien Term Lenders hold, in the aggregate, approximately 48.5% of the aggregate outstanding principal amount of the Prepetition SLT Loans, approximately 100% of which are held by the Consenting Sponsor Second Lien Term Lenders;

**WHEREAS**, certain of the Consenting Second Lien Term Lenders and certain of the Consenting Sponsor Second Lien Term Lenders (in such capacity, each Consenting Second Lien Term Lender and Consenting Sponsor Second Lien Term Lender which has indicated that it elects to provide a DIP Commitment (as defined below) below its name on the signature page hereto, a "***DIP Commitment Party***") have agreed to commit to provide the DIP Facility (as defined below) (such commitment, in each case, a "***DIP Commitment***"), and the Company and the Consenting Creditors have reached an agreement for the consensual use of Cash Collateral (as defined in the Bankruptcy Code), in each case on the terms set forth on the DIP Term Sheet (as defined below) attached hereto as **Exhibit G**;

**WHEREAS**, the Parties desire to express to each other their mutual support and commitment in respect of the matters discussed in the Plan and hereunder.

**NOW, THEREFORE**, in consideration of the premises and the mutual covenants and agreements set forth herein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties, intending to be legally bound, agree as follows:

1.     <u>**Certain Definitions**</u>.

As used in this Agreement, the following terms have the following meanings:

(a)     "***Capital Stock***" means the issued and outstanding shares of capital stock of Holdings or any option thereon or any right or interest therein.

(b)     "***Claims***" means all claims arising under the Loans or any option thereon or any right or interest therein or any other claims against or interests in the Company.

(c)     "***Closing***" means the consummation of the Plan.

(d)    "**Confirmation Order**" means the order of the Bankruptcy Court approving the Disclosure Statement and confirming the Plan in the Chapter 11 Cases.

(e)    "**Consenting Class**" means any of the following groups:  the Combined Prepetition FLTL Lenders, the Prepetition FLLO Term Lenders or the Combined Prepetition SLTL Lenders, as applicable.

(f)    "**Consenting Party Counsel**" means (i) O'Melveny & Myers LLP and Jackson Walker LLP, as counsel to certain of the Prepetition First Lien Term Lenders, (ii) Davis Polk & Wardwell LLP and Haynes & Boone LLP, as counsel to the Second Lien Term Agent and (iii) Vinson & Elkins LLP and Latham & Watkins LLP, as counsel to the Consenting Sponsor and the Prepetition Sponsor Second Lien Term Lenders.

(g)    "**Consenting Second Lien Creditor**" means any Consenting Second Lien Term Lender or any Consenting Sponsor Second Lien Term Lender.

(h)    "**Consenting Sponsor Consent Right**" means the Consenting Sponsor's right to consent to or approve Definitive Documents (as defined below), which right shall apply solely to the extent such Definitive Documents, (i) adversely, and with respect to the New Equity Interests, disproportionately (as compared to the Combined Prepetition SLTL Lenders receiving New Equity Interests) affect in any material respect any of the rights or benefits proposed to be granted to, or received by, the Consenting Sponsor pursuant to the Plan, or (ii) adversely affect in any material respect any obligation the Consenting Sponsor may have pursuant to the Plan, in each case, which consent shall not be unreasonably withheld, conditioned or delayed.

(i)    "**DIP Credit Agreement**" means the credit agreement evidencing the DIP Facility.

(j)    "**DIP Facility**" means the debtor-in-possession facility to be provided to the Company in accordance with the terms, and subject in all respects to the conditions, as set forth in the DIP Credit Agreement and pursuant to the terms and conditions of interim and final orders of the Bankruptcy Court.

(k)    "**DIP Term Sheet**" means the term sheet describing the terms of the DIP Facility attached hereto as **Exhibit G**.

(l)    "**Disclosure Statement**" means the disclosure statement in respect of the Plan attached hereto as **Exhibit H**, including all exhibits and schedules thereto, as approved or ratified by the Bankruptcy Court pursuant to section 1125 of the Bankruptcy Code.

(m)    "**Effective Date**" means the date upon which all conditions to the effectiveness of the Plan have been satisfied or waived in accordance with the terms thereof and the Plan becomes effective.

(n)    "**Interest**" means any equity interest (as defined in section 101(16) of the Bankruptcy Code) of a Debtor, including all ordinary shares, units, common stock, preferred stock, membership interest, partnership interest or other instrument, evidencing any fixed or contingent ownership interest in any Debtor, whether or not transferable, including any option,

warrant, or other right, contractual or otherwise, to acquire any such interest in a Debtor, that existed immediately before the Effective Date.

(o)    "*Loans*" means, as the context may require, the Prepetition First Lien Term Loans, the Prepetition RBTL Loans, the Prepetition FLLO Term Loans, the Prepetition Second Lien Term Loans and the Prepetition Sponsor Second Lien Term Loans.

(p)    "*Loan Documents*" means, as the context may require, the "Loan Documents" as defined in each of the Prepetition First Lien Term Loan Agreement, the Prepetition FLLO Credit Agreement, the Prepetition Second Lien Credit Agreement, and the Prepetition Sponsor Second Lien Credit Agreement.

(q)    "*Prepetition Credit Agreements*" means the Prepetition First Lien Term Loan Agreement, the Prepetition FLLO Credit Agreement, the Prepetition Second Lien Credit Agreement, and the Prepetition Sponsor Second Lien Credit Agreement.

(r)    "*Requisite Creditors*" means (i) the Requisite First Lien Term Lenders, (ii) the Requisite RBTL Lenders, (iii) the Requisite FLLO Term Lenders, (iv) the Requisite Second Lien Term Lenders and (v) the Requisite Sponsor Second Lien Term Lenders.

(s)    "*Requisite First Lien Term Lenders*" means, as of the date of determination, Consenting First Lien Term Lenders holding at least a majority of the outstanding Prepetition FLTL Loans held by the Consenting First Lien Term Lenders as of such date.

(t)    "*Requisite FLLO Term Lenders*" means, as of the date of determination, Consenting FLLO Term Lenders holding at least a majority of the outstanding Prepetition FLLO Term Loans held by the Consenting FLLO Lenders as of such date.

(u)    "*Requisite RBTL Lenders*" means, as of the date of determination, Consenting RBTL Lenders holding at least a majority of the outstanding Prepetition RBTL Loans held by the Consenting RBTL Lenders as of such date.

(v)    "*Requisite Second Lien Term Lenders*" means, as of the date of determination, Consenting Second Lien Term Lenders holding at least a majority of the outstanding Prepetition Second Lien Term Loans held by the Consenting Second Lien Term Lenders as of such date.

(w)    "*Requisite Sponsor Second Lien Term Lenders*" means, as of the date of determination, Consenting Sponsor Second Lien Term Lenders holding at least a majority of the outstanding Prepetition Sponsor Second Lien Term Loans as of such date.

(x)    "*Securities Act*" means the Securities Act of 1933, as amended.

(y)    "*Support Effective Date*" means the earliest date on which counterpart signature pages to this Agreement shall have been executed and delivered by (i) the Company, (ii) Consenting First Lien Term Lenders holding at least 50%, in aggregate principal amount outstanding as of such date, of the Prepetition FLTL Loans, (iii) Consenting RBTL Lenders holding at least 50%, in aggregate principal amount outstanding as of such date, of the Prepetition RBTL Loans, (iv) Consenting FLLO Term Lenders holding at least 50%, in

aggregate principal amount outstanding as of such date, of the Prepetition FLLO Term Loans, (v) Consenting Second Lien Term Lenders holding at least 50%, in aggregate principal amount outstanding as of such date, of the Prepetition Second Lien Term Loans, (vi) Consenting Sponsor Second Lien Term Lenders holding at least 48.5%, in aggregate principal amount outstanding as of such date, of the Prepetition Second Lien Term Loans and (vii) the Consenting Sponsor.

(z)      "*Support Period*" means the period commencing on the Support Effective Date and ending on the earlier of the (i) date on which this Agreement is terminated in full with respect to all parties in accordance with <u>Section 7</u> hereof and (ii) the Effective Date.

## 2.      **Bankruptcy Process; Plan of Reorganization.**

(a)      <u>The Plan</u>.  The Plan is expressly incorporated herein and made a part of this Agreement.  The terms and conditions of the Restructuring are set forth in the Plan; <u>provided</u> that the Plan is supplemented by the terms and conditions of this Agreement.  In the event of any inconsistencies between the terms of this Agreement and the Plan, the terms of the Plan shall govern.

(b)      The definitive documents (the "***Definitive Documents***") with respect to the Restructuring shall include this Agreement, the Plan, the Disclosure Statement and any material documents (including any material related orders, agreements, instruments, schedules or exhibits) that are described in or contemplated by this Agreement and the Plan and necessary or desirable to implement the Restructuring, including, without limitation:

(i)      the motion seeking approval by the Bankruptcy Court of the Disclosure Statement, the Solicitation procedures and materials and the Confirmation Order;

(ii)      the Exit Facilities;

(iii)      the DIP Facility, including a motion seeking authority to enter into the DIP Facility, and an interim order (the "***Interim DIP Order***") and a final order (the "***Final DIP Order***" and together with the Interim DIP Order, the "***DIP Orders***") of the Bankruptcy Court approving the same;

(iv)      the first day motions, second day motions and orders of the Bankruptcy Court approving any first day motions or second day motions;

(v)      the Plan, Disclosure Statement, the Backstop Agreement and the Rights Offering Procedures attached hereto as **<u>Exhibit I</u>**;

(vi)      the supplement to the Plan (the "***Plan Supplement***"), including, without limitation (x) the amended organizational and governance documents governing the reorganized Company, (y) the shareholders agreement governing reorganized Energy Inc. (the "***Governance Documents***"), in each case consistent with the Governance Term Sheet attached hereto as **<u>Exhibit J</u>**; and

(vii)      any other documents, instruments, schedules or exhibits described in, related to, contemplated in, or necessary to implement, each of the foregoing.

Each of the Definitive Documents shall (1) contain terms and conditions consistent in all material respects with this Agreement and (2) otherwise be in form and substance reasonably acceptable in all respects to the Company, the Requisite Second Lien Term Lenders, the Requisite Sponsor Second Lien Term Lenders and, solely to the extent materially and adversely affecting the economic treatment under the Plan of the applicable Consenting Class of the Requisite First Lien Term Lenders, Requisite RBTL Lenders and Requisite FLLO Term Lenders, the Requisite First Lien Term Lenders, Requisite RBTL Lenders and Requisite FLLO Term Lenders. Notwithstanding anything to the contrary in this Agreement, (A) any documentation relating to the DIP Facility, a motion seeking authority to enter into the DIP Facility, and the Interim DIP Order and the Final DIP Order of the Bankruptcy Court approving the same shall contain terms and conditions consistent in all respects with this Agreement and otherwise be in form and substance acceptable to the DIP Commitment Parties, (B) any amendments, modifications or otherwise to the Backstop Agreement and the Rights Offering Procedures shall be in form and substance acceptable to the Requisite Second Lien Term Lenders and the Requisite Sponsor Second Lien Term Lenders, (C) solely to the extent materially and adversely impacting the rights of the Requisite First Lien Term Lenders as an appointer of a Director of the Company, the Governance Documents shall be in form and substance reasonably acceptable to the Requisite First Lien Term Lenders, (D) any documentation relating to the Exit First Lien Facility shall be in form and substance reasonably acceptable to the Requisite First Lien Term Lenders and (E) the Plan, Disclosure Statement and the Confirmation Order shall be in form and substance reasonably acceptable to the Requisite First Lien Term Lenders.

(c)     <u>Commencement of the Chapter 11 Cases</u>.  The Company hereby agrees that, as soon as reasonably practicable, but in no event later than two (2) days after the Support Effective Date, the Company will commence Solicitation of votes on the Plan.  Provided that the Support Effective Date has occurred, the Company further agrees that, as soon as reasonably practicable, but in no event later than February 18, 2018 (the "*Outside Petition Date*") (the date on which such filing occurs, the "***Commencement Date***"), the Company shall file with the Bankruptcy Court voluntary petitions for relief under chapter 11 of the Bankruptcy Code and any and all other documents necessary to commence the Chapter 11 Cases of the Company.

(d)     <u>Filing of the Plan and Disclosure Statement</u>.  No later than the close of business on the next business day following the Commencement Date, the Company shall file the Plan along with the Disclosure Statement.

(e)     <u>Confirmation of the Plan</u>.  The Company shall use its commercially reasonable efforts to obtain confirmation of the Plan as soon as reasonably practicable following the Commencement Date in accordance with the Bankruptcy Code and on terms consistent with this Agreement, and each Consenting Creditor and the Consenting Sponsor shall use its commercially reasonable efforts to cooperate fully in connection therewith.

(f)     <u>DIP Financing and Cash Collateral</u>.  No later than the close of business on the next business day following the Commencement Date, the Parties shall file a motion with the Bankruptcy Court seeking entry of the DIP Orders.

### 3.  **Agreements of the Consenting Creditors.**

(a)  <u>Voting; Support</u>.  Each Consenting Creditor agrees that, for the period commencing on the date of this Agreement and ending on the earlier of (x) the expiration of the Support Period and (y) the date upon which this Agreement is validly terminated pursuant to the terms hereof with respect to such Consenting Creditor, such Consenting Creditor (acting severally and not jointly with the other Consenting Creditors) shall:

(i)  (A) timely vote or cause to be voted its Claims to accept the Plan by delivering its duly executed and completed ballot or ballots, as applicable, accepting the Plan on a timely basis following commencement of the Solicitation, (B) not change or withdraw such vote (or cause or direct such vote to be changed or withdrawn); <u>provided</u>, <u>however</u>, that such vote may, upon written notice to the Company and the other Parties, be revoked (and, upon such revocation, deemed void *ab initio*) by any Consenting Creditor at any time following the expiration of the Support Period or upon termination of this Agreement pursuant to the terms hereof with respect to such Consenting Creditor;

(ii)  timely vote (or cause to be voted) its Claims or Interests against any plan, plan proposal, restructuring proposal, offer of dissolution, winding up, liquidation, sale or disposition, reorganization, merger or restructuring of the Company other than the Plan (each, an "***Alternative Restructuring***");

(iii)  not directly or indirectly, through any person or entity (including any administrative agent or collateral agent), seek, solicit, propose, support, assist, engage in negotiations in connection with or participate in the formulation, preparation, filing or prosecution of any Alternative Restructuring or take any other action that would reasonably be expected to prevent, interfere with, delay or impede the Solicitation, approval of the Disclosure Statement, or the confirmation and consummation of the Plan and the Restructuring;

(iv)  not direct any administrative agent or collateral agent (as applicable) to take any action inconsistent with such Consenting Creditor's obligations under this Agreement, and, if any applicable administrative agent or collateral agent takes any action inconsistent with such Consenting Creditor's obligations under this Agreement, such Consenting Creditor shall use its commercially reasonable efforts to request that such administrative agent or collateral agent cease and refrain from taking any such action;

(v)  support and take all actions necessary or reasonably requested by the Company to facilitate the Solicitation of the Plan, obtain approval of the Disclosure Statement, and confirmation and consummation of the Plan and the Restructuring; and

(vi)  to the extent any legal or structural impediment arises that would prevent, hinder, or delay the consummation of the Restructuring, negotiate in good faith appropriate additional or alternative provisions to address any such impediments.

(b)    <u>Rights of Consenting Creditors Unaffected</u>.  Nothing contained herein shall limit:

(i)    the rights of a Consenting Creditor under any applicable bankruptcy, insolvency, foreclosure or similar proceeding, including appearing as a party in interest in any matter to be adjudicated in order to be heard concerning any matter arising in the Bankruptcy Cases, in each case, so long as the exercise of any such right is consistent with this Agreement and such Consenting Creditor's obligations hereunder;

(ii)    the ability of a Consenting Creditor to purchase, sell, or enter into any transactions in connection with its Claims or Interests, in compliance with the terms hereof and applicable law;

(iii)    subject to the terms and obligations hereof and applicable law, any right of a Consenting Creditor under the Prepetition Credit Agreements, any other applicable agreement, instrument or document that gives rise to a Consenting Creditor's Claims or Interests, as applicable, or constitute a waiver or amendment of any provision of any such agreement, instrument or document;

(iv)    subject to any confidentiality provisions in this Agreement and the Prepetition Credit Agreements, the ability of a Consenting Creditor to consult with any other Parties or entities; or

(v)    the ability of a Consenting Creditor to enforce any right, remedy, condition, consent or approval requirement under this Agreement or under any of the Definitive Documents.

(c)    <u>Transfers</u>.  Each Consenting Creditor agrees that, for the period commencing on the date of this Agreement and ending on the earlier of (x) the expiration of the Support Period and (y) the date upon which this Agreement is validly terminated pursuant to the terms hereof with respect to such Consenting Creditor, such Consenting Creditor shall not sell, transfer, loan, issue, pledge, hypothecate, assign or otherwise dispose of (each, a "***Transfer***"), directly or indirectly, in whole or in part, any of its Claims or any option thereon or any right or interest therein or any other Claims against or Interests in the Company (including grant any proxy or deposit any Claims against or Interests in the Company into a voting trust or entry into a voting agreement with respect thereto), unless the transferee thereof either (A) is a Consenting Creditor or (B) prior to such Transfer, agrees in writing for the benefit of the Parties to become a Consenting Creditor and to be bound by all of the terms of this Agreement applicable to Consenting Creditors (including with respect to any and all claims or interests it already may hold against or in the Company prior to such Transfer) by executing a joinder agreement, a form of which is attached hereto as **Exhibit K** (a "***Joinder Agreement***"), and delivering an executed copy thereof within two (2) business days of such execution, to (i) Weil, Gotshal & Manges LLP ("***Weil***"), as counsel to the Company, and (ii) Consenting Party Counsel, in which event (x) the transferee (including the Consenting Creditor transferee, if applicable) shall be deemed to be a Consenting Creditor hereunder to the extent of such transferred rights and obligations and (y) the transferor shall be deemed to relinquish its rights (and be released from its obligations) under this Agreement to the extent of such transferred rights and obligations.  Each Consenting Creditor agrees that any Transfer of any Claim or interest that does not comply with the terms and

procedures set forth herein shall be deemed void *ab initio*, and the Company and each other Consenting Creditor shall have the right to enforce the voiding of such Transfer.

(d)     Additional Claims or Interests.  Nothing in this Agreement shall be construed to preclude a Consenting Creditor from (i) acquiring additional Claims, (ii) holding or acquiring any other claims against the Company entitled to vote on the Plan, (iii) holding or acquiring any Interests in the Company entitled to vote on the Plan or (iv) Transferring any Claims; provided, that, in each case, each such Consenting Creditor shall promptly notify Weil and each such Consenting Creditor agrees that such additional Claims or other claims or Interests shall be subject to this Agreement, and that, for so long as this Agreement has not been terminated pursuant to the terms hereof with respect to such Consenting Party, it shall vote (or cause to be voted) any such additional Claims or other claims or Interests entitled to vote on the Plan (to the extent still held by it or on its behalf at the time of such vote), in a manner consistent with Section 3(a) hereof.

(e)     Additional Lenders.  Any Prepetition Second Lien Term Lender may, at any time after the Support Effective Date, become a party to this Agreement as a Consenting Second Lien Term Loan Lender (an "*Additional Consenting Second Lien Term Loan Lender*") by executing a joinder agreement substantially in the form attached hereto as **Exhibit K**, pursuant to which such Additional Consenting Second Lien Term Loan Lender shall be bound by the terms of this Agreement as a Consenting Second Lien Term Loan Lender hereunder.

(f)     Forbearance.  For the period commencing on the date of this Agreement and ending on the earlier of (x) the expiration of the Support Period and (y) the date upon which this Agreement is validly terminated pursuant to the terms hereof with respect to such Consenting Party, each Consenting Creditor and the Consenting Sponsor agree, to forbear from the exercise of its rights (including any right of set-off) or remedies it may have under the Loan Documents, as applicable, and under applicable U.S. or foreign law or otherwise, in each case, with respect to any breaches, defaults, events of defaults or potential defaults by the Company; provided that, in accordance with the applicable Prepetition Credit Agreements, the accrual of interest (including default interest, if any) shall be unaffected by the terms hereof and continue during the Support Period with respect to the Prepetition FLLO Loans, the Prepetition Second Lien Term Loans and the Prepetition Sponsor Second Lien Term Loans.  Each Consenting Creditor and the Consenting Sponsor further agree that if any applicable administrative agent or collateral agent takes any action inconsistent with any such Consenting Creditor's or the Consenting Sponsor's (as applicable) obligations under this Agreement, such Consenting Creditor or the Consenting Sponsor (as applicable) shall use commercially reasonable efforts to cause such administrative agent or collateral agent to cease and refrain from taking such actions.

(g)     Treatment Under the Plan.  Each Consenting Creditor agrees, during the Support Period (and including the Effective Date), that to the extent it is a DIP Commitment Party, without the consent of the Requisite Second Lien Term Lenders and the Requisite Sponsor Second Lien Term Lenders, it will not accept treatment under the Plan in respect of its DIP Facility claims other than (A) payment in full in cash on the Effective Date or (B) the application of any cash to be received on account of such Consenting Creditor's DIP Facility claims towards such Consenting Creditor's obligations in respect of the Rights Offering in accordance with the Backstop Agreement or the Rights Offering subscription agreement.

(h) <u>DIP Commitments</u>.  Subject to the termination rights set forth in <u>Section 7</u> and subject to the conditions set forth in the DIP Term Sheet, each of the DIP Commitment Parties, severally and not jointly, agrees to provide (or cause any of its designees to provide) its allocable share of the DIP Commitment as set forth in **Exhibit L** attached hereto on the Closing Date on the terms and conditions substantially as set forth in the DIP Term Sheet.  For the avoidance of doubt, upon termination or expiration of this Agreement in accordance with its terms, the commitment of the DIP Commitment Parties made pursuant to this Section 3(h) to enter into the DIP Credit Agreement and provide its allocable share of the DIP Commitment as set forth in **Exhibit L** shall terminate; <u>provided</u>, <u>however</u>, that upon the closing of the DIP Credit Agreement, the DIP Credit Agreement shall govern the DIP Commitments and any termination thereof.

4. **Agreements of the Consenting Sponsor.**

(a) <u>Voting; Support</u>.  The Consenting Sponsor agrees that, for the duration of the Support Period, it shall:

(i) (A) timely vote or cause to be voted its Claims and Interests to accept the Plan by delivering its duly executed and completed ballot or ballots, as applicable, accepting the Plan on a timely basis following commencement of the Solicitation, (B) not change or withdraw such vote (or cause or direct such vote to be changed or withdrawn); provided, however, that such vote may, upon written notice to the Company and the other Parties, be revoked (and, upon such revocation, deemed void *ab initio*) by the Consenting Sponsor at any time following the expiration of the Support Period or upon termination of this Agreement pursuant to the terms hereof;

(ii) timely vote (or cause to be voted) its Claims or Interests against any Alternative Restructuring;

(iii) not directly or indirectly, through any person or entity (including any administrative agent or collateral agent), seek, solicit, propose, support, assist, engage in negotiations in connection with or participate in the formulation, preparation, filing or prosecution of any Alternative Restructuring or take any other action that is inconsistent with or that would reasonably be expected to prevent, interfere with, delay or impede the Solicitation, approval of the Disclosure Statement, or the confirmation and consummation of the Plan and the Restructuring;

(iv) not request or be entitled to (A) any management or similar fees payable by the Company and hereby waives the right to receive payment on account of any such fees except as otherwise provided in this Agreement or any Definitive Document or (B) any dividends, distributions, or other payments in respect of its Claims and Interests, except as otherwise provided in this Agreement or any Definitive Document;

(v) support and take all actions necessary or reasonably requested by the Company to facilitate the Solicitation of the Plan, obtain approval of the Disclosure Statement, and confirmation and consummation of the Plan and the Restructuring; and

(vi)     to the extent any legal or structural impediment arises that would prevent, hinder, or delay the consummation of the Restructuring, negotiate in good faith appropriate additional or alternative provisions to address any such impediment.

(b)     Transfers.  The Consenting Sponsor agrees that, for the duration of the Support Period, it shall not, directly or indirectly, sell, transfer, assign or otherwise dispose of any of its Claims against, or Interests in, the Company (including grant any proxy or deposit any Claims against or Interests in the Company into a voting trust or entry into a voting agreement with respect thereto).

**5.**     **Agreements of the Parties.**

(a)     Covenants.  Each Party agrees that, for the period commencing on the date of this Agreement and ending on the earlier of (x) the expiration of the Support Period and (y) the date upon which this Agreement is validly terminated pursuant to the terms hereof with respect to such Party, such Party shall use its commercially reasonable efforts to:

(i)     support and take all commercially reasonable actions necessary to facilitate the approval of the Disclosure Statement, the Solicitation and confirmation and consummation of the Plan (it being understood that the Parties shall not be required to incur any out of pocket cost or expense, or any liability in connection therewith); and

(ii)     provide reasonably prompt written notice (in accordance with Section 21 hereof) to the Company between the date hereof and the Effective Date of (A) the occurrence, or failure to occur, of any event of which any person in a managing capacity of such Party has actual knowledge, and which occurrence or failure would be likely to cause any covenant of such Party contained in this Agreement not to be satisfied in any material respect or (B) any failure of such Party to comply, in any material respect, with or satisfy any covenant, condition or agreement to be complied with or satisfied by it under this Agreement or the Backstop Agreement.

(b)     Hedging.  Notwithstanding anything to the contrary in this Agreement, each Party agrees that the Company may enter into new commodity price hedging arrangements in the ordinary course of business consistent with the Company's past practices and interest rate hedging arrangements consistent with industry practices and, in each case, not for speculative purposes.

**6.**     **Agreements of the Company**.

(a)     Covenants.  The Company agrees that, for the duration of the Support Period, the Company shall, and shall cause each of its subsidiaries included in the definition of Company, to:

(i)     use commercially reasonable efforts to (A) obtain approval of the Plan and consummate the Restructuring, including timely filing any objection or opposition to any motion filed with the Bankruptcy Court seeking the entry of an order modifying or terminating the Company's exclusive right to file and/or solicit acceptances of a plan of reorganization, directing the appointment of an examiner with expanded powers or a

trustee, converting the Chapter 11 Cases or for relief that (1) is inconsistent with this Agreement in any respect or (2) would, or would reasonably be expected to, frustrate the purposes of this Agreement, including by preventing the consummation of the Restructuring, (B) obtain orders of the Bankruptcy Court in respect of the Restructuring and (C) support the release and exculpation provisions contained in the Plan;

(ii)    (A) seek entry of the DIP Orders and, if necessary, timely file a formal written response in opposition to any objection filed with the Bankruptcy Court by any person or entity with respect to entry of the DIP Orders or with respect to any adequate protection proposed to be granted or granted to the Requisite Creditors pursuant to the DIP Orders, (B) subject to professional responsibilities, prosecute and defend any appeals related to the Restructuring, (C) execute and deliver any other required agreements to effectuate and consummate the Restructuring and (D) operate its business in the ordinary course, taking into account the Restructuring;

(iii)    provide reasonably prompt written notice (in accordance with Section 21 hereof) to the Consenting Creditors between the date hereof and the Effective Date of (A) the occurrence, or failure to occur, of any event of which the Company has actual knowledge which occurrence or failure would be likely to cause (1) any covenant of the Company contained in this Agreement not to be satisfied in any material respect or (2) any condition precedent contained in the Plan not to timely occur or become impossible to satisfy, (B) receipt of any notice from any third party alleging that the consent of such party is or may be required in connection with the transactions contemplated by the Restructuring, (C) receipt of any material notice, including from any governmental unit with jurisdiction, of any proceeding commenced, or, to the actual knowledge of the Company, threatened against the Company, relating to or involving or otherwise affecting in any respect the transactions contemplated by the Restructuring, (D) any failure of the Company to comply, in any material respect, with or satisfy any covenant, condition or agreement to be complied with or satisfied by it hereunder and (E) receipt of any notice from the seller under the Purchase Agreement alleging a default or event of default thereunder;

(iv)    subject to compliance with all applicable confidentiality agreements or obligations, provide to the Consenting Creditors and/or their respective professionals, upon reasonable advance notice to the Company, (A) reasonable access to the respective management and advisors of the Company for the purposes of evaluating the Company's finances and operations and participating in the planning process with respect to the Restructuring, (B) prompt access to any information provided to any existing or prospective financing sources (including lenders under any exit financing) and (C) timely and reasonable responses to all diligence requests;

(v)    not amend or modify, or file a pleading seeking authority to amend or modify, the Definitive Documents or any other document related to the DIP Facility or the Restructuring in a manner that is inconsistent with this Agreement;

(vi)    use commercially reasonable efforts to obtain any and all required regulatory and/or third-party approvals for the Restructuring embodied in the Plan, if any;

14

(vii)    not take any action that is inconsistent with, or is intended or is reasonably likely to interfere with, consummation of the Restructuring, in each case, to the extent consistent with, upon the advice of counsel, the fiduciary duties of the boards of directors, managers, members or partners, as applicable, of each Company; provided that the Company shall not be obligated to agree to any modification of any document that is inconsistent with the Plan;

(viii)    provide draft copies of all material motions or applications and other documents (including all first day and second day motions and orders of the Bankruptcy Court approving any first day motions or second day motions, the Plan, the Disclosure Statement, ballots and other Solicitation materials in respect of the Plan and any proposed amended version of the Plan or the Disclosure Statement, and a proposed confirmation order) the Company intends to file with the Bankruptcy Court to the Consenting Party Counsel at least two (2) business days prior to the date when the Company intends to file any such pleading or other document (provided that if delivery of such motions, orders or materials (other than the Plan, the Disclosure Statement, a confirmation order or adequate protection order) at least two (2) business days in advance is not reasonably practicable, such motion, order or material shall be delivered as soon as reasonably practicable prior to filing), and shall consult in good faith with such counsel regarding the form and substance of any such proposed filing with the Bankruptcy Court;

(ix)    pay all the reasonable and documented fees and expenses, subject to the terms of any applicable engagement letter or reimbursement letter, as the case may be, of (a) Consenting Party Counsel, (b) Houlihan Lokey Capital, Inc., as financial advisor to the Consenting First Lien Term Lenders, (c) PJT Partners, LP, as financial advisor to the Second Lien Agent on behalf of the Consenting Second Lien Term Lenders and (d) Perella Weinberg Partners LP, as financial advisor to the Consenting Sponsor Second Lien Term Lenders; provided that the Company shall pay any accrued but unpaid amounts owing under such engagement and/or fee letters to the extent required under the terms thereof upon the termination of this Agreement, but shall not be responsible for any fees and expenses incurred after termination; provided further that any invoices shall not be required to contain individual time detail; and

(x)    not amend, alter, supplement, restate or otherwise modify the Purchase Agreement without the prior written consent of the Requisite Second Lien Term Lenders and the Requisite Sponsor Second Lien Term Lenders.

(b)    <u>Automatic Stay</u>.  The Company acknowledges and agrees and shall not dispute that after the commencement of the Chapter 11 Cases, the giving of notice of termination of this Agreement by any Party pursuant to this Agreement shall not be a violation of the automatic stay of section 362 of the Bankruptcy Code (and the Company hereby waives, to the fullest extent permitted by law, the applicability of the automatic stay to the giving of such notice); provided that nothing herein shall prejudice any Party's rights to argue that the giving of notice of default or termination was not proper under the terms of this Agreement.

7. **Termination of Agreement**.

(a)     This Agreement shall terminate two (2) business days following the delivery of notice, delivered in accordance with Section 21 hereof: (i) from the Requisite Second Lien Term Lenders or the Requisite Sponsor Second Lien Term Lenders to the other Parties at any time after and during the continuance of any Consenting Second Lien Creditor Termination Event (as defined below), (ii) from the Company to the other Parties at any time after and during the continuance of a Company Termination Event (as defined below), (iii) from the Requisite FLLO Term Lenders or the Requisite RBTL Term Lenders to the other Parties at any time after and during the continuance of any Consenting Creditor Termination Event (as defined below), (iv) from the Requisite First Lien Term Lenders to the other Parties at any time after and during the continuance of any Consenting First Lien Term Lender Termination Event or (v) from the Consenting Sponsor to the other Parties at any time after and during the continuance of any Consenting Sponsor Termination Event (as defined below); provided, that termination by any of the Requisite FLLO Term Lenders, the Requisite RBTL Term Lenders or the Requisite First Lien Term Lenders, as applicable, shall only be effective as to such applicable Consenting Class. Notwithstanding any provision to the contrary in this Section 7, no Party may exercise any of its respective termination rights as set forth herein if such Party has failed to perform or comply in all material respects with the terms and conditions of this Agreement (unless such failure to perform or comply arises as a result of another Party's actions or inactions), with such failure to perform or comply causing, or resulting in, the occurrence of the Consenting Creditor Termination Event, Consenting Second Lien Creditor Termination Event, Company Termination Event or Consenting Sponsor Termination Event. In addition, this Agreement shall terminate automatically on the Effective Date of the Plan.

(b)     A "Consenting Second Lien Creditor Termination Event" shall mean any of the following:

(i)     the breach by the Company, the Consenting Sponsor, the Requisite First Lien Term Lenders, the Requisite Second Lien Term Lenders or the Requisite Sponsor Second Lien Term Lenders of any of the undertakings, representations, warranties or covenants of such Party set forth herein in any material respect which remains uncured for a period of five (5) business days after the receipt of written notice of such breach pursuant to Section 7(a) and 21 hereof (as applicable);

(ii)     the issuance by any governmental authority, including any regulatory authority or court of competent jurisdiction, of any ruling, judgment or order enjoining the consummation of or rendering illegal the Plan or the Restructuring, and either (A) such ruling, judgment or order has been issued at the request of or with the acquiescence of the Company, or (B) in all other circumstances, such ruling, judgment or order has not been stayed, reversed or vacated within fifteen (15) days after such issuance;

(iii)     if the Company shall not have complied with each of the following milestones (the "*Milestones*"):

(1)     if the Company shall not have commenced the Solicitation in accordance with section 1126(b) of the Bankruptcy Code on or before February 15, 2018;

(2)     if, as of 11:59 p.m. prevailing Eastern Time on the Outside Petition Date, as such date may be extended with the consent of the Requisite Creditors, the Chapter 11 Cases shall not have been filed;

(3)     if, as of 11:59 p.m. prevailing Eastern Time on the date that is five (5) days after the commencement date, the Interim DIP Order has not been entered by the Bankruptcy Court;

(4)     if, as of 11:59 p.m. prevailing Eastern Time on the date that is thirty (30) days after the commencement date, the Final DIP Order has not been entered by the Bankruptcy Court;

(5)     if, as of 11:59 p.m. prevailing Eastern Time on the date that is seventy-five (75) days after the commencement date, the Confirmation Order has not been entered by the Bankruptcy Court;

(6)     if, as of 11:59 p.m. prevailing Eastern Time on the date that is twenty (20) days after the entry by the Bankruptcy Court of the Confirmation Order, the Effective Date shall not have occurred;

(iv)     as of 11:59 p.m. prevailing Eastern Time on June 30, 2018, the Effective Date shall not have occurred;

(v)     the termination of the Backstop Agreement in accordance with its terms;

(vi)     the Company withdraws the Plan or Disclosure Statement, or the Company files any motion or pleading with the Bankruptcy Court that is not consistent with this Agreement or the Plan and such motion or pleading has not been withdrawn prior to the earlier of (A) two (2) business days after the Company receives written notice from the Requisite Creditors (in accordance with Section 21 hereof) that such motion or pleading is inconsistent with this Agreement or the Plan and (B) entry of an order of the Bankruptcy Court approving such motion or pleading;

(vii)     the Company files any motion for the (A) conversion of one or more of the Chapter 11 Cases to a case under chapter 7 of the Bankruptcy Code, (B) appointment of an examiner with expanded powers beyond those set forth in section 1106(a)(3) and (4) of the Bankruptcy Code or a trustee or receiver in one or more of the Chapter 11 Cases or (C) dismissal of one or more of the Chapter 11 Cases;

(viii)     the Bankruptcy Court enters an order (A) directing the appointment of an examiner with expanded powers or a trustee in the Chapter 11 Cases, (B) converting any of the Chapter 11 Cases to cases under chapter 7 of the Bankruptcy Code, or (C) dismissing any of the Chapter 11 Cases;

(ix)     the Company (A) files any motion seeking to avoid, disallow, subordinate or recharacterize any claim, lien, or interest held by any Consenting Creditor arising under or relating to the Prepetition First Lien Term Loan Agreement, the Prepetition FLLO Credit Agreement, the Prepetition Second Lien Credit Agreement or the

Prepetition Sponsor Second Lien Credit Agreement or (B) shall have supported any application, adversary proceeding or cause of action referred to in the immediately preceding clause (A) filed by a third party, or consents (without the consent of the Requisite Second Lien Term Lenders and the Requisite Sponsor Second Lien Term Lenders) to the standing of any such third party to bring such application, adversary proceeding or cause of action;

(x)    on or after the date hereof, the Company engages in any merger, consolidation, disposition, acquisition, investment, dividend, incurrence of indebtedness or other similar transaction outside of the ordinary course of business other than (A) the commencement of the Chapter 11 Cases, (B) as permitted under the DIP Facility, (C) with the consent of the Requisite Second Lien Term Lenders and the Requisite Sponsor Second Lien Term Lenders or (D) pursuant to the Sale Transaction;

(xi)    the Bankruptcy Court grants relief that (A) is inconsistent with this Agreement in any material respect or (B) would, or would reasonably be expected to, materially frustrate the purposes of this Agreement, including by preventing the consummation of the Restructuring, unless the Company has sought a stay of such relief within five (5) business days after the date of such issuance, and such order is stayed, reversed or vacated within ten (10) business days after the date of such issuance;

(xii)    the Company files, propounds or otherwise supports any plan of reorganization other than the Plan;

(xiii)    on the date that an order is entered by the Bankruptcy Court or a court of competent jurisdiction denying confirmation of the Plan or refusing to approve the Disclosure Statement;

(xiv)    the failure of the Company to comply with the DIP Order, including failure to make adequate protection payments when due, which remains uncured for a period of five (5) business days after the receipt of written notice of such event, or is not otherwise waived in accordance with the terms thereof;

(xv)    the occurrence of an "Event of Default" (as defined in the DIP Credit Agreement) under the DIP Facility that has not been waived or timely cured in accordance therewith and the resulting acceleration of the obligations or termination of lending commitments under the DIP Facility;

(xvi)    the termination of this Agreement as to the Consenting Sponsor, the Consenting Sponsor Second Lien Term Lenders or the Consenting Second Lien Term Lenders;

(xvii)    the termination of the Purchase Agreement by any party thereto;

(xviii)  the Company makes any payment to the Consenting Sponsor, other than as provided in this Agreement or any agreements relating to the Restructuring; or

(xix)    the entry by the Company into any material non-ordinary course transaction or payment by the Company of any material non-ordinary course payment inconsistent with this Agreement or the Plan, including entry into any new key employee incentive plan or key employee retention plan or similar arrangement, or any new or amended agreement regarding executive compensation.

(c)    A "Company Termination Event" shall mean any of the following:

(i)    the breach by one or more of the Consenting Creditors, of any of the undertakings, representations, warranties or covenants of the Consenting Creditors set forth herein in any material respect which remains uncured for a period of five (5) business days after the receipt of written notice of such breach pursuant to Sections 7(a) and 21 hereof (as applicable), but only if the non-breaching Consenting Creditors in the applicable class hold less than 66⅔% the aggregate principal amount of Claims in such Class; provided that a breach by the Consenting Sponsor shall not give rise to a Company Termination Event;

(ii)    the board of directors, managers, members or partners, as applicable, of the Company reasonably determines in good faith based upon the advice of outside counsel that continued performance under this Agreement would be inconsistent with the exercise of its fiduciary duties under applicable law; provided, that the Company provides notice of such determination to the Consenting Creditors within five (5) business days after the date thereof;

(iii)    the issuance by any governmental authority, including any regulatory authority or court of competent jurisdiction, of any ruling, judgment or order enjoining the consummation of or rendering illegal the Plan or the Restructuring, and such ruling, judgment or order has not been stayed, reversed or vacated within fifteen (15) days after such issuance;

(iv)    as of 11:59 p.m. prevailing Eastern Time on February 15, 2018, the Support Effective Date shall not have occurred;

(v)    as of 11:59 p.m. prevailing Eastern Time on the date that is twenty (20) days after the entry of the Confirmation Order by the Bankruptcy Court, the Effective Date shall not have occurred;

(vi)    as of 11:59 p.m. prevailing Eastern Time on June 30, 2018, the Effective Date shall not have occurred;

(vii)    the Bankruptcy Court enters an order (A) directing the appointment of an examiner with expanded powers or a trustee in the Chapter 11 Cases, (B) converting any of the Chapter 11 Cases to cases under chapter 7 of the Bankruptcy Code, or (C) dismissing any of the Chapter 11 Cases; or

(viii)    the termination of the Backstop Agreement in accordance with its terms.

(d) A "Consenting Creditor Termination Event" shall mean any of the following:

(i) the issuance by any governmental authority, including any regulatory authority or court of competent jurisdiction, of any ruling, judgment or order enjoining the consummation of or rendering illegal the Plan or the Restructuring, and either (A) such ruling, judgment or order has been issued at the request of or with the acquiescence of the Company, or (B) in all other circumstances, such ruling, judgment or order has not been stayed, reversed or vacated within fifteen (15) days after such issuance; or

(ii) the Bankruptcy Court enters an order (A) directing the appointment of an examiner with expanded powers or a trustee in the Chapter 11 Cases, (B) converting any of the Chapter 11 Cases to cases under chapter 7 of the Bankruptcy Code, or (C) dismissing any of the Chapter 11 Cases.

(e) A "Consenting First Lien Term Lender Termination Event" shall mean any of the following:

(i) the breach by the Company, the Consenting Sponsor, the Requisite Second Lien Term Lenders or the Requisite Sponsor Second Lien Term Lenders of any of the undertakings, representations, warranties or covenants of such Party set forth herein in any material respect which remains uncured for a period of five (5) business days after the receipt of written notice of such breach pursuant to Sections 7(a) and 21 hereof (as applicable);

(ii) the issuance by any governmental authority, including any regulatory authority or court of competent jurisdiction, of any ruling, judgment or order enjoining the consummation of or rendering illegal the Plan or the Restructuring, and either (A) such ruling, judgment or order has been issued at the request of or with the acquiescence of the Company, or (B) in all other circumstances, such ruling, judgment or order has not been stayed, reversed or vacated within fifteen (15) days after such issuance;

(iii) the Company withdraws the Plan or Disclosure Statement, or the Company files any motion or pleading with the Bankruptcy Court that is not consistent with this Agreement or the Plan and such motion or pleading (A) materially and adversely impacts or would reasonably be expected to materially and adversely impact the economic treatment under the Plan of the Consenting First Lien Term Lenders and (B) has not been withdrawn prior to the earlier of (x) two (2) business days after the Company receives written notice from the Requisite Creditors (in accordance with Section 21 hereof) that such motion or pleading is inconsistent with this Agreement or the Plan and (y) entry of an order of the Bankruptcy Court approving such motion or pleading;

(iv) as of 11:59 p.m. prevailing Eastern Time on the Outside Petition Date, as such date may be extended with the consent of the Requisite Creditors, the Chapter 11 Cases shall not have been filed;

(v)  as of 11:59 p.m. prevailing Eastern Time on the date that is seventy-five (75) days after the commencement date, the Confirmation Order has not been entered by the Bankruptcy Court;

(vi)  as of 11:59 p.m. prevailing Eastern Time on the date that is twenty (20) days after the entry by the Bankruptcy Court of the Confirmation Order, the Effective Date shall not have occurred;

(vii)  as of 11:59 p.m. prevailing Eastern Time on June 30, 2018, the Effective Date shall not have occurred;

(viii)  the Company files any motion for the (A) conversion of one or more of the Chapter 11 Cases to a case under chapter 7 of the Bankruptcy Code, (B) appointment of an examiner with expanded powers beyond those set forth in section 1106(a)(3) and (4) of the Bankruptcy Code or a trustee or receiver in one or more of the Chapter 11 Cases or (C) dismissal of one or more of the Chapter 11 Cases;

(ix)  the Bankruptcy Court enters an order (A) directing the appointment of an examiner with expanded powers or a trustee in the Chapter 11 Cases, (B) converting any of the Chapter 11 Cases to cases under chapter 7 of the Bankruptcy Code, or (C) dismissing any of the Chapter 11 Cases;

(x)  the Company (A) files any motion seeking to avoid, disallow, subordinate or recharacterize any claim, lien, or interest held by any Consenting First Lien Term Lender arising under or relating to the Prepetition First Lien Term Loan Agreement or (B) shall have supported any application, adversary proceeding or cause of action referred to in the immediately preceding clause (A) filed by a third party, or consents (without the consent of any affected Consenting First Lien Term Lender) to the standing of any such third party to bring such application, adversary proceeding or cause of action;

(xi)  on or after the date hereof, the Company engages in any material merger, consolidation, disposition, acquisition, investment, dividend, incurrence of indebtedness or other similar transaction outside of the ordinary course of business other than (A) the commencement of the Chapter 11 Cases, (B) as permitted under the DIP Facility, (C) with the consent of the Requisite First Lien Term Lenders, such consent not to be unreasonably withheld or (D) pursuant to the Sale Transaction;

(xii)  the Company files, propounds or otherwise supports any plan of reorganization other than the Plan and such plan of reorganization materially and adversely impacts or would reasonably be expected to materially and adversely impact the economic treatment under the Plan of the Consenting First Lien Term Lenders;

(xiii)  the Bankruptcy Court grants relief that (A) is inconsistent with this Agreement in any material respect or (B) would, or would reasonably be expected to, materially frustrate the purposes of this Agreement, including by preventing the consummation of the Restructuring, unless the Company has sought a stay of such relief within five (5) business days after the date of such issuance, and such order is stayed, reversed or vacated within ten (10) business days after the date of such issuance, and any

such relief described in clause (A) or (B) materially and adversely impacts or would reasonably be expected to materially and adversely impact the economic treatment under the Plan of the Consenting First Lien Term Lenders;

(xiv)   on the date that an order is entered by the Bankruptcy Court or a court of competent jurisdiction denying confirmation of the Plan or refusing to approve the Disclosure Statement;

(xv)   the termination of this Agreement as to the Consenting FLLO Term Lenders, Consenting RBTL Lenders, Consenting Second Lien Term Lenders and Consenting Sponsor Second Lien Term Lenders;

(xvi)   the valid termination by the seller under the Purchase Agreement in accordance with the terms thereof;

(xvii)   the Company makes any payment to the Consenting Sponsor other than as provided in this Agreement or any agreements relating to the Restructuring; or

(xviii)   the entry by the Company into any material non-ordinary course transaction or payment by the Company of any material non-ordinary course payment inconsistent with this Agreement or the Plan, including entry into any new key employee incentive plan or key employee retention plan or similar arrangement, or any new or amended agreement regarding executive compensation.

(f)   A "Consenting Sponsor Termination Event" shall mean any of the following:

(i)   the breach by any of the other Parties hereto, of any of the undertakings, representations, warranties or covenants of such Party set forth herein in any material respect which remains uncured for a period of five (5) business days after the receipt of written notice which breach adversely affects the treatment of the Consenting Sponsor under the Plan and remains uncured for a period of five (5) days after the receipt of written notice of such breach pursuant to Sections 7(a) and 21 hereof;

(ii)   the Company files any motion or pleading with the Bankruptcy Court that is inconsistent with this Agreement or the Plan, in each case, that materially adversely impacts or would reasonably be expected to materially adversely impact the Consenting Sponsor;

(iii)   the issuance by any governmental authority, including any regulatory authority or court of competent jurisdiction, of any ruling, judgment or order enjoining the consummation of or rendering illegal the Plan or the Restructuring, and either (A) such ruling, judgment or order has been issued at the request of or with the acquiescence of the Company, or (B) in all other circumstances, such ruling, judgment or order has not been stayed, reversed or vacated within fifteen (15) days after such issuance; or

(iv)   the Bankruptcy Court enters an order (A) directing the appointment of an examiner with expanded powers or a trustee in the Chapter 11 Cases, (B) converting any of the Chapter 11 Cases to cases under chapter 7 of the Bankruptcy Code, (C) dismissing

any of the Chapter 11 Cases, or (D) that has a material and adverse impact on the rights or treatment of the Consenting Sponsor in this Agreement.

(g)    <u>Mutual Termination</u>.  This Agreement may be terminated by mutual agreement of the Company, the Consenting Sponsor and the Requisite Creditors upon the receipt of written notice delivered in accordance with <u>Section 21</u> hereof.

(h)    <u>Effect of Termination</u>.  Subject to the proviso contained in <u>Section 7(a)</u> hereof, upon the termination of this Agreement in accordance with this <u>Section 7</u>, and except as provided in <u>Section 15</u> hereof, this Agreement shall forthwith become void and of no further force or effect and each Party shall, except as provided otherwise in this Agreement, be immediately released from its liabilities, obligations, commitments, undertakings and agreements under or related to this Agreement and shall have all the rights and remedies that it would have had and shall be entitled to take all actions, whether with respect to the Restructuring or otherwise, that it would have been entitled to take had it not entered into this Agreement, including all rights and remedies available to it under applicable law; <u>provided</u>, <u>however</u>, that in no event shall any such termination relieve a Party from liability for its breach or non-performance of its obligations hereunder prior to the date of such termination.  Upon a termination of this Agreement, each Consenting Creditor and the Consenting Sponsor may, upon written notice to the Company and the other Parties, revoke its vote or any consents given prior to such termination, whereupon any such vote or consent shall be deemed, for all purposes, to be null and void *ab initio* and shall not be considered or otherwise used in any manner by the Parties in connection with the Restructuring and this Agreement.  If this Agreement has been terminated as to any Consenting Creditor or the Consenting Sponsor in accordance with <u>Section 7</u> hereof at a time when permission of the Bankruptcy Court shall be required for a change or withdrawal (or cause to change or withdraw) of its vote to accept the Plan, the Company shall not oppose any attempt by such Consenting Creditor or the Consenting Sponsor to change or withdraw (or cause to change or withdraw) such vote at such time, subject to all remedies available to the Company at law, equity, or otherwise, including those remedies set forth in <u>Section 14</u> hereof.

(i)    If the Restructuring Transactions are not consummated, nothing herein shall be construed as a waiver by any Party of any or all of such Party's rights and the Parties expressly reserve any and all of their respective rights.  Pursuant to Federal Rule of Evidence 408 and any other applicable rules of evidence, this Agreement and all negotiations relating hereto shall not be admissible into evidence in any proceeding other than a proceeding to enforce its terms.

**8.    <u>Definitive Documents; Good Faith Cooperation; Further Assurances</u>**

Each Party hereby covenants and agrees to cooperate with each other in good faith in connection with, and shall exercise commercially reasonable efforts with respect to the pursuit, approval, negotiation, execution, delivery, implementation and consummation of the Plan and the Restructuring, as well as the negotiation, drafting, execution and delivery of the Definitive Documents.  Furthermore, subject to the terms hereof, each of the Parties shall take such action as may be reasonably necessary or reasonably requested by the other Parties to carry out the purposes and intent of this Agreement, including making and filing any required regulatory filings, and shall refrain from taking any action that would frustrate the purposes and intent of this Agreement.

9.    **Representations and Warranties**.

(a)    Each Party, severally and not jointly, represents and warrants to the other Parties that the following statements are true, correct and complete as of the date hereof (or as of the date a Consenting Creditor becomes a party hereto):

(i)    such Party is validly existing and in good standing under the laws of its jurisdiction of incorporation or organization, and has all requisite corporate, partnership, limited liability company or similar authority to enter into this Agreement and carry out the transactions contemplated hereby and perform its obligations contemplated hereunder; and the execution and delivery of this Agreement and the performance of such Party's obligations hereunder have been duly authorized by all necessary corporate, limited liability company, partnership or other similar action on its part;

(ii)    the execution, delivery and performance by such Party of this Agreement does not and will not (A) violate any material provision of law, rule or regulation applicable to it or any of its subsidiaries or its charter or bylaws (or other similar governing documents) or those of any of its subsidiaries, or (B) conflict with, result in a breach of or constitute (with due notice or lapse of time or both) a default under any material contractual obligation to which it or any of its subsidiaries is a party except, in the case of the Company, for the filing of the Chapter 11 Cases;

(iii)    the execution, delivery and performance by such Party of this Agreement does not and will not require any material registration or filing with, consent or approval of, or notice to, or other action, with or by, any federal, state or governmental authority or regulatory body, except such filings as may be necessary and/or required by the SEC or other securities regulatory authorities under applicable securities laws; and

(iv)    this Agreement is the legally valid and binding obligation of such Party, enforceable against it in accordance with its terms, except as enforcement may be limited by bankruptcy, insolvency, reorganization, moratorium or other similar laws relating to or limiting creditors' rights generally or by equitable principles relating to enforceability or a ruling of the Bankruptcy Court.

(b)    Each Consenting Creditor and the Consenting Sponsor severally (and not jointly) represents and warrants to the Company that, as of the date hereof (or as of the date such Consenting Creditor becomes a party hereto), such Consenting Creditor (i) is the beneficial owner of the principal amount of each Loan or number and class of Capital Stock set forth below its name on the signature page hereto (or below its name on the signature page of a Joinder Agreement for any Consenting Creditor that becomes a party hereto after the date hereof) and does not beneficially own any other loans or Capital Stock, and/or (ii) has, with respect to the beneficial owners of such Loans or Capital Stock, (A) sole investment or voting discretion with respect thereto, (B) full power and authority to vote on and consent to matters concerning such Loans or Capital Stock or to exchange, assign and transfer such Loans or Capital Stock, and (C) full power and authority to bind or act on the behalf of, such beneficial owners.

(c)     Each Consenting Creditor and the Consenting Sponsor severally (and not jointly) makes the representations and warranties set forth in <u>Section 22(c)</u> hereof, in each case, to the other Parties.

(d)     The Consenting Sponsor represents and warrants to the Company that it holds of record and owns beneficially the number of shares and class of Capital Stock set forth below its name on its signature page to this Agreement, free and clear of any restrictions on transfer, liens or options, warrants, purchase rights, contracts, commitments, claims and demands (other than restrictions on transfer set forth in the organizational documents of Holdings arising under applicable securities laws) and that such equity interests constitute approximately 98% of the Capital Stock.

(e)     The Company represents and warrants that, as of the date hereof, Holdings has no assets, other than its ownership of 100% of the Capital Stock of Energy Inc. or as set forth in its governing documents, and no material liabilities, other than its obligations as a guarantor under the Company's current letters of credit facility, and is not a party to, or beneficiary under, any agreements, contracts, licenses, franchises, permits, certificates, approvals or other similar authorizations other than as required by applicable law, rule, or regulation, or which have been entered into with its members or Energy Inc.

**10.     <u>Disclosure; Publicity</u>.**

The Company shall submit drafts to Consenting Party Counsel of any press releases that constitute disclosure of the existence or terms of this Agreement or any amendment to the terms of this Agreement at least one (1) business day prior to making any such disclosure.  Except as required by applicable law or otherwise permitted under the terms of any other agreement between the Company and any Consenting Creditor, no Party or its advisors shall disclose to any person (including, for the avoidance of doubt, any other Party), other than advisors to the Company, the principal amount or percentage of any Loans or any other Claims against, or Interests in, the Company held by any Consenting Creditor, in each case, without such Consenting Creditor's consent; <u>provided</u>, <u>however</u>, that (i) if such disclosure is required by law, subpoena, or other legal process or regulation, the disclosing Party shall afford the relevant Consenting Creditor a reasonable opportunity to review and comment in advance of such disclosure and shall take all reasonable measures to limit such disclosure (the expense of which, if any, shall be borne by the relevant Consenting Creditor) and (ii) the foregoing shall not prohibit the disclosure of the aggregate percentage or aggregate principal amount of Loans held by all the Consenting Creditors, collectively, on a facility by facility basis.  Notwithstanding the provisions in this <u>Section 10</u>, any Party may disclose, to the extent consented to in writing by a Consenting Creditor, such Consenting Creditor's individual holdings.

**11.     <u>Amendments and Waivers</u>.**

(a)     Other than as set forth in <u>Section 11(b)</u>, this Agreement, including any exhibits or schedules hereto, may not be waived, modified, amended or supplemented except with the written consent of the Company, the Requisite Second Lien Term Lenders, the Requisite Sponsor Second Lien Term Lenders and the other Requisite Creditors (in the case of the other Requisite Creditors, (i) solely to the extent such amendments, modifications and supplements

materially and adversely affect in any respect any rights under the Plan or this Agreement of such other Requisite Creditors and (ii) such consent not to be unreasonably withheld, conditioned or delayed) and the Consenting Sponsor (in the case of the Consenting Sponsor, such consent shall be limited solely to the Consenting Sponsor Consent Right);

(b)     Notwithstanding Section 11(a):

(i)     any waiver, modification, amendment or supplement to this Section 11 shall require the written consent of all of the Parties;

(ii)     any modification, amendment or change to the definition of "Requisite First Lien Term Lenders", "Requisite FLLO Term Lenders", "Requisite Second Lien Term Lenders" and "Requisite Sponsor Second Lien Term Lenders" shall require the written consent of each individual Consenting Creditor included in such definition;

(iii)     any change, modification or amendment to this Agreement or the Plan that treats or affects any Consenting Creditor in a manner that is materially and adversely disproportionate, on an economic or non-economic basis, to the manner in which any of the other Consenting Creditors are treated (after taking into account each of the Consenting Creditors' respective holdings and interests in the Company and the recoveries contemplated by the Plan (as in effect on the date hereof)) shall require the written consent of such Consenting Creditor; and

(iv)     any change, modification or amendment to this Agreement or the Plan that does not materially and adversely affect in any respect any rights of a Consenting Creditor, shall not require the consent of such Consenting Creditor but, for the avoidance of doubt, shall require the consent of the Requisite Second Lien Term Lenders and the Requisite Sponsor Second Lien Term Lenders.

(c)     In the event that an adversely affected Consenting Creditor ("**Non-Consenting Creditor**") does not consent to a waiver, change, modification or amendment to this Agreement requiring the consent of each Consenting Creditor, but such waiver, change, modification or amendment receives the consent of Consenting Creditors (i) owning at least 66⅔% of the outstanding relevant Claims or Capital Stock of the applicable Class of which such Non-Consenting Creditor is a member, and (ii) representing at least a majority in number of claimants in such Class, this Agreement shall be deemed to have been terminated only as to such Non-Consenting Creditors, but this Agreement shall continue in full force and effect in respect to all other members of the Consenting Class who have so consented.

12.     **Effectiveness**.

This Agreement shall become effective and binding upon each Party upon the execution and delivery by such Party of an executed signature page hereto and shall become effective and binding on all Parties on the Support Effective Date; provided, however, that signature pages executed by Consenting Creditors shall be delivered to (a) other Consenting Creditors and the Consenting Sponsor in a redacted form that removes the details of such Consenting Creditors' holdings and (b) the Company, Weil, Consenting Party Counsel in an unredacted form (to be held by Weil and Consenting Party Counsel on a professionals' eyes only-basis).

13. **GOVERNING LAW; JURISDICTION; WAIVER OF JURY TRIAL**.

(a)    This Agreement shall be construed and enforced in accordance with, and the rights of the parties shall be governed by, the law of the State of New York, without giving effect to the conflict of laws principles thereof.

(b)    Each of the Parties irrevocably agrees that any legal action, suit or proceeding arising out of or relating to this Agreement brought by any party or its successors or assigns shall be brought and determined in any federal or state court in the Borough of Manhattan in the City of New York ("*NY Courts*") and each of the Parties hereby irrevocably submits to the exclusive jurisdiction of the aforesaid courts for itself and with respect to its property, generally and unconditionally, with regard to any such proceeding arising out of or relating to this Agreement or the Restructuring Transactions.  Each of the Parties agrees not to commence any proceeding relating hereto or thereto except in the NY Courts other than proceedings in any court of competent jurisdiction to enforce any judgment, decree or award rendered by any NY Courts.  Each of the Parties further agrees that notice as provided herein shall constitute sufficient service of process and the Parties further waive any argument that such service is insufficient.  Each of the Parties hereby irrevocably and unconditionally waives, and agrees not to assert, by way of motion or as a defense, counterclaim or otherwise, in any proceeding arising out of or relating to this Agreement or the Restructuring Transactions, (i) any claim that it is not personally subject to the jurisdiction of the NY Courts for any reason, (ii) that it or its property is exempt or immune from jurisdiction of any such court or from any legal process commenced in such courts (whether through service of notice, attachment prior to judgment, attachment in aid of execution of judgment, execution of judgment or otherwise) and (iii) that (A) the proceeding in any such court is brought in an inconvenient forum, (B) the venue of such proceeding is improper or (C) this Agreement, or the subject matter hereof, may not be enforced in or by such courts.  Notwithstanding the foregoing, during the pendency of the Chapter 11 Cases, all proceedings contemplated by this Section 13(b) shall be brought in the Bankruptcy Court.

(c)    EACH PARTY HEREBY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN ANY LEGAL PROCEEDING DIRECTLY OR INDIRECTLY ARISING OUT OF OR RELATING TO THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY (WHETHER BASED ON CONTRACT, TORT OR ANY OTHER THEORY).  EACH PARTY (I) CERTIFIES THAT NO REPRESENTATIVE, AGENT OR ATTORNEY OF ANY OTHER PARTY HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PARTY WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER AND (II) ACKNOWLEDGES THAT IT AND THE OTHER PARTIES HAVE BEEN INDUCED TO ENTER INTO THIS AGREEMENT BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS SECTION.

14. **Specific Performance/Remedies**.

It is understood and agreed by the Parties that money damages would not be a sufficient remedy for any breach of this Agreement by any Party and each non-breaching Party shall be entitled to specific performance and injunctive or other equitable relief (including attorneys' fees and costs) as a remedy of any such breach, without the necessity of proving the inadequacy of

money damages as a remedy, including an order of the Bankruptcy Court requiring any Party to comply promptly with any of its obligations hereunder. Each Party also agrees that it will not seek, and will waive any requirement for, the securing or posting of a bond in connection with any Party seeking or obtaining such relief.

15.     **Survival**.

Notwithstanding the termination of this Agreement pursuant to Section 7 hereof, the agreements and obligations of the Parties in this Section 15, and Sections 7(i), 10, 12, 13, 14, 16, 17, 18, 19, 20, 21 and 22 hereof (and any defined terms used in any such Sections) shall survive such termination and shall continue in full force and effect in accordance with the terms hereof; provided, however, that any liability of a Party for failure to comply with the terms of this Agreement shall survive such termination.

16.     **Headings**.

The headings of the sections, paragraphs and subsections of this Agreement are inserted for convenience only and shall not affect the interpretation hereof or, for any purpose, be deemed a part of this Agreement.

17.     **Successors and Assigns; Severability; Several Obligations**.

This Agreement is intended to bind and inure to the benefit of the Parties and their respective successors, permitted assigns, heirs, executors, administrators and representatives; provided, however, that nothing contained in this Section 17 shall be deemed to permit Transfers of the Loans or claims arising under the Loans other than in accordance with the express terms of this Agreement. If any provision of this Agreement, or the application of any such provision to any person or entity or circumstance, shall be held invalid or unenforceable in whole or in part, such invalidity or unenforceability shall attach only to such provision or part thereof and the remaining part of such provision hereof and this Agreement shall continue in full force and effect so long as the economic or legal substance of the transactions contemplated hereby is not affected in any manner materially adverse to any Party. Upon any such determination of invalidity, the Parties shall negotiate in good faith to modify this Agreement so as to effect the original intent of the Parties as closely as possible in a reasonably acceptable manner in order that the transactions contemplated hereby are consummated as originally contemplated to the greatest extent possible. The agreements, representations and obligations of the Parties are, in all respects, ratable and several and neither joint nor joint and several.

18.     **No Third-Party Beneficiaries**.

Unless expressly stated herein, this Agreement shall be solely for the benefit of the Parties and no other person or entity shall be a third-party beneficiary hereof.

19.     **Prior Negotiations; Entire Agreement**.

This Agreement, including the exhibits and schedules hereto (including the Plan) constitutes the entire agreement of the Parties, and supersedes all other prior negotiations, with respect to the subject matter hereof and thereof, except that the Parties acknowledge that any

confidentiality agreements (if any) heretofore executed between the Company and each Consenting Creditor shall continue in full force and effect.

**20.** **Counterparts**.

This Agreement may be executed in several counterparts, each of which shall be deemed to be an original, and all of which together shall be deemed to be one and the same agreement. Execution copies of this Agreement may be delivered by electronic mail, or otherwise, which shall be deemed to be an original for the purposes of this paragraph.

**21.** **Notices**.

All notices hereunder shall be deemed given if in writing and delivered, if contemporaneously sent by electronic mail, courier or by registered or certified mail (return receipt requested) to the following addresses:

(1)     If to the Company, to:

Fieldwood Energy LLC
2000 W. Sam Houston Parkway, S. Suite 1200
Houston, Texas 77042
Attention:  G. M. McCarroll and Michael Dane

With a copy to:

Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, NY 10153
Attention:  Matt Barr, Esq.
            (matt.barr@weil.com)
            Jessica Liou, Esq.
            (jessica.liou@weil.com)
            - and -
            Gavin Westerman, Esq.
            (gavin.westerman@weil.com)

(2)     If to a Consenting RBTL Lender, Consenting FLLO Term Lender, Consenting Second Lien Term Lender, or a transferee thereof, to the addresses set forth below following the Consenting Creditor's signature (or as directed by any transferee thereof), as the case may be, with copies to:

Davis Polk & Wardwell LLP
450 Lexington Avenue
New York, NY 10017
Attention:  Damian Schaible, Esq.
            (damian.schaible@davispolk.com)
            Darren Klein, Esq.

(darren.klein@davispolk.com)
-and-
Natasha Tsiouris, Esq.
(natasha.tsiouris@davispolk.com)

(3)      If to the Consenting First Lien Term Lenders, or a transferee thereof, to the addresses set forth below such Consenting First Lien Term Lender's signature (or as directed by any transferee thereof), as the case may be, with copies to:

O'Melveny & Myers LLP
Times Square Tower, 7 Times Square
New York, NY 10036
Attention:  George A. Davis, Esq.
                 (gdavis@omm.com)
                 -and-
                 Daniel S. Shamah, Esq.
                 (dshamah@omm.com)

(4)      If to the Consenting Sponsor Second Lien Term Lenders or the Consenting Sponsor, to:

Vinson & Elkins LLP
666 Fifth Avenue, 26th Floor
New York, NY 10103-0040
Tel: (212) 237-0000
Fax: (212) 237-0100
Attention:  David S. Meyer, Esq.
                 (dmeyer@velaw.com)
                 -and-
                 Jessica C. Peet, Esq.
                 (jpeet@velaw.com)

Any notice given by delivery, mail or courier shall be effective when received.  Any notice given by electronic mail shall be effective upon oral, machine or electronic mail (as applicable) confirmation of transmission.

**22.      No Solicitation; Representation by Counsel; Adequate Information.**

(a)      This Agreement is not and shall not be deemed to be a solicitation for votes in favor of the Plan in the Chapter 11 Cases from the Creditors.  The acceptances of the Consenting Creditors with respect to the Plan will not be solicited until such Consenting Creditor has received the Disclosure Statement and related ballots and solicitation materials.

(b)      Each Party acknowledges that it has had an opportunity to receive information from the Company and that it has been represented by counsel in connection with this Agreement and the transactions contemplated hereby.  Accordingly, any rule of law or any legal

decision that would provide any Party with a defense to the enforcement of the terms of this Agreement against such Party based upon lack of legal counsel shall have no application and is expressly waived.

(c)     Each Consenting Creditor and the Consenting Sponsor acknowledges, agrees and represents to the other Parties that it (i) is a "qualified institutional buyer" as such term is defined in Rule 144A of the Securities Act or a non-US person participating in the offering outside the United States in reliance on Regulation S under the Securities Act, (ii) is an "accredited investor" as such term is defined in Rule 501 of Regulation D of the Securities Act, (iii) understands that if it is to acquire any securities, as defined in the Securities Act, pursuant to the Restructuring Transactions, such securities have not been registered under the Securities Act and that such securities are, to the extent not acquired pursuant to section 1145 of the Bankruptcy Code, being offered and sold pursuant to an exemption from registration contained in the Securities Act, based in part upon such Consenting Creditor's or Consenting Sponsor's, as applicable, representations contained in this Agreement and cannot be sold unless subsequently registered under the Securities Act or an exemption from registration is available and (iv) has such knowledge and experience in financial and business matters that such Consenting Creditor or the Consenting Sponsor, as applicable, is capable of evaluating the merits and risks of the securities to be acquired by it (if any) pursuant to the Restructuring Transactions and understands and is able to bear any economic risks with such investment.

[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]

IN WITNESS WHEREOF, the Parties hereto have caused this Agreement to be executed and delivered by their respective duly authorized officers, solely in their respective capacity as officers of the undersigned and not in any other capacity, as of the date first set forth above.

**FIELDWOOD HOLDINGS LLC**
**FIELDWOOD ENERGY LLC**
**FIELDWOOD ENERGY INC.**

By: _____
    Name:  G. M. McCarroll
    Title:   President and Chief Executive Officer

**FIELDWOOD ENERGY OFFSHORE LLC**
**FIELDWOOD ENERGY SP LLC**
**BANDON OIL AND GAS, LP**
**BANDON OIL AND GAS GP, LLC**
**FIELDWOOD SD OFFSHORE LLC**
**FIELDWOOD ONSHORE LLC**
**GALVESTON BAY PROCESSING LLC**
**GALVESTON BAY PIPELINE LLC**
**DYNAMIC OFFSHORE RESOURCES NS, LLC**
**GOM SHELF LLC**
**FW GOM PIPELINE, INC.**

By: _____
     Name: G. M. McCarroll
     Title:  President

Consenting Lenders' Signature Pages Intentionally Omitted

**<u>EXHIBIT A</u>**
**CHAPTER 11 PLAN**

See Exhibit A to
Disclosure Statement

**<u>EXHIBIT B</u>**
**LC TERM SHEET**

Attached.

PROJECT PELICAN
$147.8 MILLION SENIOR SECURED REVOLVING CREDIT FACILITY
"EXIT LC FACILITY TERM SHEET"

SUMMARY OF PRINCIPAL TERMS AND CONDITIONS[1]

| | |
|---|---|
| **EXISTING CREDIT FACILITY:** | The Borrower's (as defined below) senior secured revolving credit facility (the "***Prepetition RBL Facility***") provided by Citibank, N.A., as administrative agent, certain lenders party thereto from time to time and the other agents party thereto from time to time pursuant to that certain Credit Agreement dated as of September 30, 2013 (as amended, supplemented or otherwise modified from time to time, the "***Prepetition RBL Credit Agreement***"). |
| **BORROWER/HOLDINGS:** | Fieldwood Energy LLC, a Delaware limited liability company (the "***Borrower***"), all of the outstanding equity interests of which will, as of the Closing Date, be owned directly by Fieldwood Energy Inc., a Delaware corporation ("***Holdings***"). |
| **AGENT:** | An administrative agent reasonably acceptable to the LC Facility Lenders and the Borrower (the "***Administrative Agent***"). |
| **LENDERS:** | Riverstone Global Energy and Power Fund V (FT), L.P., together with any assignees thereof (collectively, the "***LC Facility Lenders***"). |
| **ISSUING BANKS** | Financial institutions meeting the definition of "Issuing Bank" as defined in the Decommissioning Agreement and reasonably acceptable to the LC Facility Lenders and the Borrower. |
| **FACILITY:** | A senior secured first lien "first-out" letter of credit facility (the "***LC Facility***", the funding commitments thereunder the "***LC Funding Commitments***" and the letter of credit issuance commitments thereunder, the "***LC Issuance Commitments***"), that shall become effective on the effective date of the Plan (the "***Closing Date***"). The LC Issuance Commitments shall be in an initial aggregate amount of $147.8 million and the LC Funding Commitments shall be in an initial aggregate principal amount equal to the product of (i) the face amount of the Closing Date Secured LCs (as defined below) outstanding on the Closing Date and (ii) the cash collateralization percentage required by the Issuing Banks with respect to the Secured LCs (the "***Required Cash Collateral Percentage***"). The LC Facility shall be secured (i) on a pari passu basis with the First Lien Term Facility and the Permitted Hedge Obligations, but will (together with the Permitted Hedge Obligations) rank ahead of the First Lien Term Facility, on |

---

[1] All capitalized terms used but not defined herein have the meanings given to them in the Restructuring Support Agreement (the "***Restructuring Support Agreement***") to which this Term Sheet is attached, including the term sheet for the $1.143 billion senior secured term loan facility attached to the Restructuring Support Agreement as Exhibit C (the "***Exit FLTL Term Sheet***"). In the event any such capitalized term is subject to multiple and differing definitions, the appropriate meaning thereof for purposes of this Term Sheet shall be determined by reference to the context in which it is used.

a "first-out" basis, in the payment waterfall in the applicable Intercreditor Agreement (as defined below) and (ii) on a senior basis to the Exit SLTL Facility.

**FIRST LIEN TERM FACILITY:**     A senior secured amended and restated first lien "last-out" term loan facility (the "***First Lien Term Facility***" and the commitments thereunder, the "***First Lien Term Commitments***") that shall become effective on the Closing Date. The First Lien Term Commitments shall be in an aggregate principal amount of $1.143 billion which shall be secured (i) on a *pari passu* basis with the LC Facility and the Permitted Hedge Obligations, but will rank behind the LC Facility and the Permitted Hedge Obligations, on a "last-out" basis, in the payment waterfall in the applicable Intercreditor Agreement and (ii) on a senior basis to the Exit SLTL Facility.

**PURPOSE:**     The proceeds of any loans borrowed under the LC Facility ("***LC Facility Loans***") will be used solely to reimburse draws under and/or cash collateralize letters of credit secured, backstopped or otherwise supported by the LC Facility (such letters of credit, "***Secured LCs***" and the issuer of any Secured LC, an "***Issuing Bank***").

**AVAILABILITY:**     Letters of Credit:  The LC Issuance Commitments shall be fully available on the Closing Date and until the Maturity Date for the issuance by the Issuing Banks of replacement letters of credit in respect of the existing letters of credit identified on <u>Annex I</u> hereto (such existing letters of credit, the "***Specified Letters of Credit***" and such replacement letters of credit, the "***Closing Date Secured LCs***").

LC Facility Loans: The LC Funding Commitments shall be fully available on the Closing Date until the Maturity Date. Upon the drawing of any Secured LC by the beneficiary thereof, unless such draw is immediately reimbursed by the Borrower, the LC Facility Lenders will, subject to the conditions of the LC Facility Documentation, make LC Facility Loans on the Borrower's account in the amount of the applicable letter of credit draw, the proceeds of which shall be funded directly to the applicable Issuing Bank. In addition, the LC Facility Lenders may, in their discretion, at any time following the eighteen month anniversary of the Closing Date and in minimum amounts to be agreed, make LC Facility Loans for the Borrower's account to cash collateralize Secured LCs; provided that the aggregate amount of outstanding LC Facility Loans shall not at any time exceed the LC Funding Commitments.

**CASH COLLATERAL**     Any cash collateral for the Secured LCs shall be maintained in a blocked, interest bearing deposit account established by and in the name of the Borrower, but under the "control" of the Administrative Agent (the "***Cash Collateral Account***") pursuant

to a control agreement in form and substance reasonably acceptable to the Administrative Agent. The cash or deposit account balances may, at the discretion of the Borrower, be invested in Permitted Investments (to be defined in a manner agreed by the Borrower and the LC Facility Lenders). Any interest or other amounts earned on such cash collateral shall be applied to offset amounts due in respect of interest on the LC Facility Loans and the Letter of Credit Fees.

**INTEREST RATES AND FEES:**  LC Facility Loans: Adjusted LIBOR plus 4.50% per annum, payable quarterly to the Administrative Agent for the account of each LC Facility Lender with respect to any outstanding LC Facility Loans.

Letter of Credit Fee: 4.50% per annum, payable quarterly to the Administrative Agent for the account of each LC Facility Lender with respect to any outstanding Secured LCs to the extent undrawn (or, if drawn, to the extent unreimbursed) and not cash collateralized.

Fronting Fee: In an amount required by the applicable Issuing Banks, payable quarterly to the Administrative Agent for the account of each Issuing Bank.

Upfront Fee: Payable on the Closing Date in an amount equal to 2.0% of the LC Funding Commitments on the Closing Date less the amount of the Commitment Fee set forth below paid by the Borrower.

Commitment Fee: $500,000 payable upon execution of the Restructuring Support Agreement.

Alternative Transaction Fee: $1,000,000 payable upon the closing of an alternative refinancing of the Specified Letters of Credit.

Default Rate: 2% per annum on any overdue amounts during the existence of a payment default.

The interest rate applicable to LC Facility Loans and the Letter of Credit Fee may be increased by up to 1.00% after the eighteen month anniversary of the Closing Date to the extent necessary to achieve successful syndication of the LC Facility.

**FINAL MATURITY:**  The LC Facility will mature three years after the Closing Date (the "*Maturity Date*"). Unless alternative arrangements satisfactory to the Issuing Banks have been made, the Borrower shall cash collateralize all Secured LCs outstanding on the Maturity Date at the Required Cash Collateral Percentage.

| | |
|---|---|
| **GUARANTEES:** | All obligations of the Borrower under the LC Facility will be jointly and severally unconditionally guaranteed on a first lien secured basis (the "***Guarantees***") by the same Guarantors (as defined in the Exit FLTL Term Sheet) that guarantee the First Lien Term Facility. |
| **SECURITY:** | The obligations of the Borrower under the LC Facility and the Guarantees will be secured by liens on the same Collateral (as defined in the Exit FLTL Term Sheet) securing the First Lien Term Facility. |
| **INTERCREDITOR AGREEMENTS** | The lien priority, relative rights and other creditors' rights issues between and among the holders of the LC Facility, the holders of the loans under the Exit FLTL Facility and the holders of the loans under the Exit SLTL Facility will be set forth in one or more intercreditor agreements (the "***Intercreditor Agreements***") reasonably satisfactory to the Borrower and the Administrative Agent. |
| **MANDATORY PREPAYMENTS:** | None. |
| **VOLUNTARY PREPAYMENTS:** | Prepayments of borrowings under the LC Facility will be permitted at any time without premium or penalty, subject to customary notice requirements; provided that the LC Issuance Commitments and the LC Funding Commitments may not be terminated or reduced by the Borrower prior to the Maturity Date without the consent of the LC Facility Lenders and the Issuing Banks, so long as, after giving effect to such termination or reduction, the aggregate face amount of Secured LCs outstanding shall not exceed the remaining LC Issuance Commitments and the aggregate amount of LC Facility Loans shall not exceed the remaining LC Funding Commitments, respectively, and in either case, the LC Funding Commitments shall not at any time be less than an amount equal to the product of (a) the face amount of all Secured LCs outstanding at such time and (b) the Required Cash Collateral Percentage with respect to such Secured LCs. |
| **DOCUMENTATION:** | The definitive documentation for the LC Facility (the "***LC Facility Documentation***") will be documented under a single credit agreement, will be consistent with the terms set forth in this Exit LC Facility Term Sheet, with respect to operative letter of credit provisions will be substantially identical to the Prepetition RBL Credit Agreement (provided that the LC Facility Lenders shall be required to acquire a 100% participation in each Secured LC from the applicable Issuing Bank), with respect to representations, covenants and events of default, will be substantially consistent with those contained in the First Lien Term Facility, and will reflect the post-bankruptcy status of Borrower and the Guarantors, taking into account the nature of the assets, operations and condition of the Borrower post-emergence, and will not include |

any terms and provisions related to a borrowing base, delivery of reserve reports, reserve-based loan reporting requirements and, in each case, requirements associated therewith.

| | |
|---|---|
| **ASSIGNMENTS/PARTICIPATIONS:** | Lenders will be permitted to make assignment and sell participation in respect of the LC Funding Commitments and the LC Facility Loans in minimum amounts and integral multiples to be agreed. |
| **CONDITIONS TO CLOSING:** | The closing of the LC Facility and the making of the initial extensions of credit thereunder, will be subject to satisfaction of conditions precedent substantially identical to the conditions precedent to the effectiveness of the First Lien Term Facility as set forth on Annex II to the Exit FLTL Term Sheet as well as the following conditions: |
| | (a) the making of satisfactory arrangements with the issuers of the Specified Letters of Credit; and |
| | (b) the execution and delivery by each Issuing Bank of all LC Facility Documentation to which it is a party. |
| **GOVERNING LAW AND FORUM:** | New York |
| **COUNSEL TO ADMINISTRATIVE AGENT:** | Vinson & Elkins LLP |

*ANNEX I*

## SPECIFIED LETTERS OF CREDIT

| Issuer | Letter of Credit No. | Face Amount | Expiration Date |
|---|---|---|---|
| Bank of America, N.A. | 3129195 | $72,995,948 | 9/30/18 |
| JPMorgan Chase Bank, N.A. | CTCS-764290 | $74,605,349 | 9/30/18 |
| Citibank, N.A. | 69601415 | $200,000 | 7/1/18 |

**EXHIBIT C**
**EXIT FIRST LIEN TERM SHEET**

Attached.

**EXHIBIT C**

**PROJECT PELICAN**
**$1.143 BILLION SENIOR SECURED TERM LOAN FACILITY**
**"EXIT FLTL TERM SHEET"**

**SUMMARY OF PRINCIPAL TERMS AND CONDITIONS[1]**

**CERTAIN PREPETITION DEBT FACILITIES AND INSTRUMENTS:**

The Borrower's (as defined below) senior secured first lien revolving credit facility (the "*Prepetition RBL Facility*") provided by Citibank, N.A., as administrative agent (the "*Prepetition RBL Agent*"), certain lenders party thereto from time to time (the "*Prepetition RBL Lenders*") and the other agents party thereto from time to time pursuant to that certain Credit Agreement dated as of September 30, 2013 (as amended, supplemented or otherwise modified from time to time, including pursuant to (i) that certain Amendment No. 1 to Credit Agreement dated as of February 25, 2014, (ii) that certain Amendment No. 2 to Credit Agreement dated as of April 8, 2015, and (iii) that certain Amendment No. 3 to Credit Agreement dated as of May 27, 2016, the "*Prepetition RBL Credit Agreement*").

The Borrower's senior secured first lien term loan facility (the "*Prepetition First Lien Term Loan Facility*") pursuant to that certain First Lien Term Loan Credit Agreement, dated as of September 30, 2013, among the Borrower, Citibank, N.A. as administrative agent (the "*Prepetition First Lien Term Agent*"), the lenders party thereto from time to time (the "*Prepetition First Lien Term Lenders*") and the other agents party thereto from time to time (as amended from time to time including pursuant to (i) that certain Amendment No. 1 to First Lien Term Loan Agreement dated as of February 25, 2014 and (ii) that certain Amendment No. 2 to First Lien Term Loan Agreement dated as of May 27, 2016, the "*Prepetition First Lien Term Loan Agreement*") consisting of reserve-based term loans due 2020 (the "*Prepetition RBTL Loans*") and first lien term loans due 2018 (the "*Prepetition FLTL Loans*" and together with the Prepetition RBTL Loans, the "*Prepetition First Lien Term Loans*").

The Borrower's senior secured first lien "last out" term loan facility (the "*Prepetition FLLO Facility*") pursuant to that certain First Lien Last-Out Term Loan Agreement dated as of May 27, 2016, among the Borrower, Cortland Capital Market Services LLC, as administrative agent and collateral agent thereunder (the "*Prepetition FLLO Agent*"), and the lenders from time to time party thereto (the "*Prepetition FLLO Lenders*") (as amended from time to time, the "*Prepetition FLLO Credit Agreement*") (and the loans thereunder, the "*Prepetition FLLO Loans*").

The Borrower's senior secured second lien term loan facility (the "*Prepetition Second Lien Facility*") pursuant to that certain Second Lien

---

[1] All capitalized terms used but not defined herein have the meanings given to them in the Restructuring Support Agreement to which this Term Sheet is attached, including the other exhibits attached to such Restructuring Support Agreement. In the event any such capitalized term is subject to multiple and differing definitions, the appropriate meaning thereof for purposes of this *Exhibit C* shall be determined by reference to the context in which it is used.

Case 20-33948 Document 1697-18 Filed in TXSB on 06/16/21 Page 219 of 528
Case 18-30648 Document 34 Filed in TXSB on 02/15/18 Page 213 of 525

C-2

Term Loan Agreement dated as of September 30, 2013, among the Borrower, Cortland Capital Market Services LLC, as administrative agent and collateral agent thereunder (the "*Prepetition Second Lien Term Agent*"), and the lenders from time to time party thereto (as amended from time to time including pursuant to (i) that certain Amendment No. 1 to Second Lien Term Loan Agreement dated as of February 25, 2014, (ii) that certain Amendment No. 2 and Limited Waiver to Second Lien Term Loan Agreement dated as of May 27, 2016 and (iii) that certain Amendment No. 3 and Limited Waiver to Second Lien Term Loan Agreement dated as of May 27, 2016, the "*Prepetition Second Lien Credit Agreement*") (the loans outstanding under the Prepetition Second Lien Credit Agreement, "*Prepetition Second Lien Term Loans*").

The Borrower's senior secured second lien term loan facility (the "*Prepetition Sponsor Second Lien Facility*") pursuant to that certain Credit Agreement dated as of May 27, 2016 among the Borrower, Cortland Capital Market Services LLC, as administrative agent and collateral agent thereunder (the "*Prepetition Sponsor Second Lien Term Agent*") and the lenders from time to time party thereto (as amended from time to time, including pursuant to that certain Amendment No 1 to the Sponsor Second Lien Credit Agreement dated as of September 29, 2017, the "*Prepetition Sponsor Second Lien Credit Agreement*") (the loans outstanding under the Prepetition Sponsor Second Lien Credit Agreement, the "*Prepetition Sponsor Second Lien Term Loans*").

**BORROWER/HOLDINGS:** Fieldwood Energy LLC, a Delaware limited liability company (the "*Borrower*"), all of the outstanding equity interests of which will, as of the Closing Date (as defined below), be owned directly by Fieldwood Energy Inc., a Delaware corporation ("*Holdings*").

**AGENT:** Wells Fargo Bank, National Association, will act as sole administrative agent and collateral agent (collectively, in such capacities, the "*First Lien Term Loan Agent*", and as used in this *Exhibit C*, the "*Administrative Agent*").

**LENDERS:** The Prepetition First Lien Term Lenders that elect to provide a commitment in respect of the First Lien Term Facility (defined below) (collectively, the "*First Lien Term Lenders*").

**EXIT FIRST LIEN TERM FACILITY:** A senior secured amended and restated first lien "last-out" term loan facility (the "*First Lien Term Facility*" and the loans under such First Lien Term Facility, the "*First Lien Term Loans*") that shall become effective on the effective date of the Plan (the "*Plan Effective Date*") provided by each First Lien Term Lender based on pro rata allocation of term loan commitments under the Prepetition First Lien Term Facility (collectively, the "*First Lien Term Commitments*") such that the aggregate amount of the First Lien Term Commitments shall be in an amount equal to an aggregate principal amount of $1.143 billion, which First Lien Term Facility shall be secured (i) on a *pari passu* basis with

the Exit LC Facility (as defined below) and the Permitted Hedge Obligations (as defined below), but will rank behind the Exit LC Facility and the Permitted Hedge Obligations, on a "last-out" basis, in the payment waterfall in the applicable Intercreditor Agreement (as defined below) and (ii) on a senior basis to the Exit SLTL Facility (as defined below).

**INCREMENTAL TERM FACILITIES:**

The Borrower shall be entitled, on one or more occasions, to incur separate classes of additional term loans or increases in existing term loans (the "***Incremental Term Loans***") under the First Lien Term Facility or incur additional *pari passu* secured, junior secured or unsecured term loans under a new term loan facility (each, an "***Incremental Term Facility***") (or any secured or unsecured notes or loans issued in lieu of (and subject to the conditions set forth in this paragraph and in the next succeeding paragraph; provided that in no event shall such notes or loans be guaranteed by entities that are not guarantors under the First Lien Term Facility and in no event shall such secured notes or loans be secured by assets other than the Collateral) any Incremental Term Loans ("***Incremental Equivalent Debt***")), so long as, (a) if such Incremental Term Facility (or Incremental Equivalent Debt) is secured by a lien on the Collateral that is *pari passu* with the lien securing the First Lien Term Facility, (i) the Total Net Leverage Ratio (to be defined in a manner consistent with the First Lien Term Facility Documentation Principles (as defined below)), calculated on a *pro forma* basis after giving effect to such Incremental Term Loans (or Incremental Equivalent Debt) and the use of the proceeds therefrom (it being understood that the proceeds from such Incremental Term Facility (or any Incremental Equivalent Debt) shall not be used for netting indebtedness for purposes of calculating the Total Net Leverage Ratio pursuant to this paragraph), does not exceed 2.00:1.00 and (ii) the proceeds of such Incremental Term Facility (or Incremental Equivalent Debt) are used solely to finance acquisitions or similar investments; provided that the Borrower may not incur any such *pari passu* Incremental Term Loans (or Incremental Equivalent Debt) prior to the six month anniversary of the Closing Date, (b) if such Incremental Term Facility (or Incremental Equivalent Debt) is secured by a lien on the Collateral that is junior to the lien securing the First Lien Term Facility, the Total Net Leverage Ratio, calculated on a *pro forma* basis after giving effect to such Incremental Term Loans (or Incremental Equivalent Debt) and the use of the proceeds therefrom (it being understood that the proceeds from such Incremental Term Facility (or any Incremental Equivalent Debt) shall not be used for netting indebtedness for purposes of calculating the Total Net Leverage Ratio pursuant to this paragraph), does not exceed 2.50:1.00 or (c) if such Incremental Term Facility (or Incremental Equivalent Debt) is unsecured, the Total Net Leverage Ratio, calculated on a *pro forma* basis after giving effect to such Incremental Term Loans (or Incremental Equivalent Debt) and the use of the proceeds therefrom (it being understood that the proceeds from such Incremental Term Facility (or

Case 20-23348 Document 1634-18 Filed in TXSB on 06/16/21 Page 221 of 528
Case 18-30648 Document 34 Filed in TXSB on 02/26/18 Page 221 of 528

C-4

any Incremental Equivalent Debt) shall not be used for netting indebtedness for purposes of calculating the Total Net Leverage Ratio pursuant to this paragraph), does not exceed 3.00:1.00.

At the time of the incurrence of any Incremental Term Facility (or, in the case of clauses (ii) and (iii) below, Incremental Equivalent Debt): (i)(A) no event of default exists or would exist after giving effect thereto and (B) the representations and warranties contained in the First Lien Term Facility Documentation shall be true and correct in all material respects (or, in the case of any such representation that is qualified by materiality, in all respects) immediately prior to, and after giving effect to, the incurrence of such Incremental Term Loans, (ii) the maturity date of the Incremental Term Loans (or Incremental Equivalent Debt) shall be no earlier than the maturity date of the First Lien Term Facility, (iii) the weighted average life to maturity of the Incremental Term Loans (or Incremental Equivalent Debt) shall be no shorter than the remaining weighted average life to maturity of the First Lien Term Facility, (iv) all fees and expenses owing in respect of such increase to the Administrative Agent and the First Lien Term Lenders providing such Incremental Term Loans shall have been paid, (v) the Incremental Term Loans shall have the same guarantors as, and if secured, shall be secured on a *pari passu* or more junior basis by the same collateral securing, the First Lien Term Facility, (vi) any Incremental Term Loans shall be on the terms and pursuant to documentation to be determined and to the extent not consistent with the First Lien Term Facility (except to the extent permitted by clauses (ii) through (v) above) such terms and documentation shall be reasonably satisfactory to the Administrative Agent (it being understood that no consent of the Administrative Agent shall be required for terms and conditions that are more restrictive than those set forth in the existing First Lien Term Facility Documentation to the extent the existing First Lien Term Facility receives the benefit of such provisions or to the extent such provisions are only applicable after the latest maturity of any then-existing First Lien Term Loans) (the requirements described in clauses (ii) and (iii) above, the "***Required Debt Terms***"), and (vii) with respect to Incremental Term Loans the all-in-yield (but excluding any amendment fees, arrangement fees or similar fees payable to any lead arranger (or its affiliates) in connection with the commitment or syndication of any such indebtedness and any other fees not paid or payable generally to all lenders in the primary syndication) (whether in the form of interest rate margins, original issue discount, upfront fees (with original issue discount and upfront fees being equated to an interest rate assuming a 4-year life to maturity (or, if shorter, the remaining life) on a straight line basis) or a "floor", with such increased amount being equated to interest margin for purposes of determining any increase to the applicable interest margin (*provided* that such differential between interest rate floors shall be equated to the applicable all-in-yield only to the extent an increase in the interest rate floor under the existing First Lien Term Facility would cause an increase in the interest rate then in effect thereunder) (the "***Effective Yield***") under the First Lien Term Facility and including any amendment to the applicable margin on the

Case 20-33948 Document 1604-18 Filed in TXSB on 06/16/21 Page 222 of 528
Case 18-30648 Document 34-18 Filed in TXSB on 02/15/18 Page 222 of 528

C-5

First Lien Term Loans that became effective subsequent to the Closing Date but prior to the time of the addition of such Incremental Term Facility) applicable to any Incremental Term Facility will be determined by the Borrower and the lenders providing such Incremental Term Facility, but will not be more than 0.50% higher than the corresponding all-in-yield (after giving effect to interest rate margins (including any "floors"), original issue discount and upfront fees) for the existing First Lien Term Facility, unless the interest rate margins with respect to the existing First Lien Term Facility are increased by an amount equal to the difference between the Effective Yield with respect to such Incremental Term Facility and the corresponding Effective Yield on the existing First Lien Term Facility minus 0.50% (the "**MFN Protection**"); *provided* that the MFN Protection shall only apply to any Incremental Term Facility, Incremental Equivalent Debt, or Permitted Ratio Debt (as defined below) in the form of term loans that ranks *pari passu* with the First Lien Term Facility; *provided, further,* that Incremental Term Loans may provide for mandatory prepayments on a *pro rata* basis or less than *pro rata* basis, and the Borrower shall be permitted to voluntarily prepay any class of term loans on a better than *pro rata* basis as compared to any other class of term loans. The Borrower may seek commitments in respect of Incremental Term Loans from existing First Lien Term Lenders (each of which shall be entitled to agree or decline to participate in its sole discretion) and additional banks, financial institutions and other institutional lenders who will become First Lien Term Lenders in connection therewith, subject to the Administrative Agent's consent to the extent such consent would be required in connection with an assignment thereto under the heading "*Assignments and Participations*" below.

**EXIT LC FACILITY:** A senior secured first lien "first-out" letter of credit facility (the "***Exit LC Facility***", the funding commitments thereunder, the "***LC Funding Commitments***" and the letter of credit issuance commitments thereunder the "***LC Issuance Commitments***") that shall become effective on the Plan Effective Date. The LC Issuance Commitments shall be in an aggregate principal amount of $147.8 million and the LC Funding Commitments shall be in an aggregate amount equal to the product of (a) the face amount of the letters of credit issued under the Exit LC Facility on the Plan Effective Date and (b) the cash collateralization percentage required by the issuing banks with respect to such letters of credit, which Exit LC Facility shall be secured (i) on a *pari passu* basis with the First Lien Term Facility and the Permitted Hedge Obligations, but will (together with the Permitted Hedge Obligations) rank ahead of the First Lien Term Facility, on a "first-out" basis, in the payment waterfall in the applicable Intercreditor Agreement and (ii) on a senior basis to the Exit SLTL Facility.

**REFINANCING FACILITY:** The First Lien Term Facility Documentation will permit the Borrower to refinance First Lien Term Loans from time to time, in whole, with one or more new term loan facilities (each, a "***Refinancing Term Facility***") under the First Lien Term Facility Documentation with the consent of

Case 20-33948 Document 1637-18 Filed in TXSB on 06/16/21 Page 223 of 528
Case 18-30648 Document 34-18 Filed in TXSB on 02/16/18 Page 223 of 528

C-6

the Borrower and the institutions providing such Refinancing Term Facility or with (x) one or more series of senior unsecured notes and (y) one or more series of senior secured notes that will be secured by the Collateral on a *pari passu* or junior basis with the First Lien Term Facility, which will be subject to customary intercreditor arrangements in a form to be agreed (any such notes under clause (x) or (y), "***Refinancing Notes***"); *provided* that (i) any Refinancing Term Facility or Refinancing Notes shall not mature prior to the maturity date of, or have a shorter weighted average life to maturity than, the loans under the First Lien Term Facility being refinanced, (ii) any Refinancing Notes are not subject to any amortization prior to final maturity or are subject to the same amortization schedule as the loans under the First Lien Term Facility being refinanced and are not subject to mandatory redemption or prepayment (except customary asset sales or change of control provisions), (iii) the other terms and conditions of such Refinancing Term Facility or Refinancing Notes (excluding pricing and optional prepayment or redemption terms) are, when taken as a whole, not materially more favorable to the investors or lenders providing such Refinancing Term Facility or Refinancing Notes, as applicable, than those applicable to the First Lien Term Facility being refinanced (except for covenants or other provisions applicable only to periods after the latest final maturity date of the First Lien Term Facility existing at the time of such refinancing or to the extent such terms and conditions are added for the benefit of the existing First Lien Term Facility), (iv) except to the extent otherwise permitted under the First Lien Term Facility Documentation, the aggregate principal amount of any Refinancing Term Facility or Refinancing Notes shall not exceed the aggregate principal amount of the indebtedness and commitments being refinanced or replaced therewith, plus accrued and unpaid interest, penalties, premiums, fees, commissions, underwriting discounts and expenses related thereto, (v) the proceeds of such Refinancing Term Facility or Refinancing Notes shall be applied, substantially concurrently with the incurrence thereof, to the *pro rata* prepayment of outstanding loans under the applicable First Lien Term Facility being so refinanced, (vi) any Refinancing Term Facility or Refinancing Notes that is *pari passu* with the First Lien Term Facility being refinanced in right of payment and security shall share ratably in any mandatory prepayment of the First Lien Term Loans unless the Borrower and the lenders or holders in respect of such Refinancing Term Facility or Refinancing Notes elect lesser payments, and (vii) any Refinancing Term Facility and Refinancing Notes will (A) have the same guarantors and rank on the same or more junior basis in right of payment as the tranche being refinanced or replaced and (B) be secured by the Collateral with the same or more junior priority as the tranche being refinanced or replaced, or be unsecured (and to the extent subordinated in right of payment or security, subject to a customary subordination and intercreditor agreement, as applicable).

**PURPOSE:**

The proceeds of any First Lien Term Loans will be deemed used by the Borrower, on the Plan Effective Date (the "***Closing Date***") to refinance

Case 20-33948 Document 1604-18 Filed in TXSB on 06/16/21 Page 224 of 528
Case 18-30648 Document 34-1 Filed in TXSB on 02/16/18 Page 224 of 525

C-7

certain prepetition indebtedness of the Borrower and its subsidiaries, including without limitation the entirety of the Prepetition First Lien Term Loans, pay fees and expenses in connection therewith and to finance other general corporate purposes of the Borrower and its subsidiaries and, after the Closing Date, to finance the working capital needs and other general corporate purposes of the Borrower and its subsidiaries.

**AVAILABILITY:** The full amount of the First Lien Term Facility (or such lesser amount as the Borrower shall request) must be drawn in a single drawing on the Closing Date; amounts borrowed thereunder that are repaid or prepaid may not be reborrowed.

**INTEREST RATES AND FEES:** As set forth on ***Annex I*** hereto.

**DEFAULT RATE:** At any time when a payment event of default under the First Lien Term Facility exists, any overdue principal or interest (after giving effect to any grace periods) payable under or in respect of the First Lien Term Facility not paid when due shall, upon the election of the Required Lenders, bear interest at the applicable interest rate plus 2% per annum. Other overdue amounts (after giving effect to any grace periods) shall, upon the election of the Required Lenders, bear interest at the interest rate applicable to ABR loans plus 2% per annum.

**FINAL MATURITY:** The First Lien Term Facility will mature on the date that is four years after the Closing Date (the "***First Lien Term Loan Maturity Date***"); provided that the First Lien Term Facility Documentation shall provide the right for individual First Lien Term Lenders to agree to extend the maturity date of all or a portion of the outstanding loans under the First Lien Term Facility upon the request of the Borrower and without the consent of any other First Lien Term Lender; it being understood that each First lien Term Lender under the applicable tranche or tranches of the First Lien Term Facility that are being extended shall have the opportunity to participate in such extension on the same terms and conditions as each other First Lien Term Lender in such tranche or tranches (it further being understood that no existing First Lien Term Lender will have any obligation to commit to any such extension).

**GUARANTEES:** All obligations of the Borrower under the First Lien Term Facility will be jointly and severally unconditionally guaranteed (the "***Guarantees***") by Holdings and by each existing and subsequently acquired or organized direct or indirect wholly-owned domestic restricted subsidiary of the Borrower (the "***Subsidiary Guarantors***" and, together with Holdings, the "***Guarantors***"; the Guarantors and the Borrower collectively, the "***Loan Parties***"); provided that Guarantors shall not include (unless at the option of the Borrower (and, in the case of a non-domestic subsidiary, with the consent of the Administrative Agent), such subsidiary is designated as a Guarantor by the Borrower) (a) unrestricted subsidiaries, (b) immaterial subsidiaries (to be defined in a manner to be

Case 20-33948 Document 1634-18 Filed in TXSB on 06/16/21 Page 225 of 528
Case 18-30648 Document 34-18 Filed in TXSB on 02/15/18 Page 223 of 525

C-8

agreed upon based on assets or revenue and consistent with the First Lien Term Facility Documentation Principles), (c) any subsidiary that is prohibited by applicable law, rule or regulation (in each case, for so long as such prohibition or restriction remains in effect) or by any contractual obligation existing on the Closing Date (or, if later, the date it becomes a restricted subsidiary so long as any such restriction in any contract is not entered into in contemplation of such subsidiary becoming a subsidiary) from guaranteeing the First Lien Term Facility or which would require governmental (including regulatory) consent, approval, license or authorization to provide such Guarantee unless such consent, approval, license or authorization has been received, (d) any direct or indirect domestic subsidiary (i) substantially all the assets of which consist of the equity or debt of one or more direct or indirect subsidiary of the Borrower organized under the laws of any jurisdiction other than the United States, any state thereof or the District of Columbia (a "*Foreign Subsidiary*"), (ii) that is treated as a disregarded entity or partnership for U.S. federal income tax purposes and that holds equity of one or more Foreign Subsidiaries (an entity described in either (i) or (ii) a "*FSHCO*") or (iii) of a Foreign Subsidiary or a FSHCO, (e) any subsidiaries where the provision of a guaranty would result in material adverse tax consequences as reasonably determined by the Borrower, (f) any acquired restricted subsidiary to the extent that any Assumed Acquisition Debt (as defined below) incurred in connection therewith prohibits such subsidiary (or any restricted subsidiary thereof that guarantees such indebtedness) from becoming a Guarantor for so long as such prohibition exists or (g) any other domestic subsidiary with respect to which, in the reasonable judgment of the Administrative Agent and the Borrower, the cost or other consequences of providing the guarantee of, or granting liens to secure, the obligations under the First Lien Term Facility are excessive in view of the benefits to be obtained by the First Lien Term Lenders from such Guarantee (each of the subsidiaries set forth in the foregoing clause (a) through clause (g) being "*Excluded Subsidiaries*"); provided, that any subsidiary of the Borrower that is a borrower or guarantor in respect of the Exit LC Facility or the Exit SLTL Facility shall be a borrower or guarantor under the First Lien Term Facility.

**SECURITY:**   The obligations of the Borrower under the First Lien Term Facility and the Guarantees will be secured by (x) perfected first-priority security interests in substantially all of the assets of the Loan Parties (subject to certain exceptions set forth below and in the First Lien Term Facility Documentation), whether owned on the Closing Date or thereafter acquired (collectively, the "*Collateral*") including, but not limited to: (i) a perfected first-priority pledge of all the equity interests of the Borrower, (ii) oil and gas properties subject to a lien securing the Prepetition First Lien Term Loan Facility, (iii) substantially all of the property of the Loan Parties acquired in connection with 'Project Jazz' and (iv) a perfected first-priority pledge of all the equity interests held by the Borrower or any Subsidiary Guarantor in any restricted subsidiary (limited to no more than 65% of the outstanding voting interests and 100% of the outstanding non-voting equity interests of any Foreign

Case 20-33948 Document 1634-18 Filed in TXSB on 06/16/21 Page 226 of 528
Case 18-30648 Document 34-18 Filed in TXSB on 02/15/18 Page 226 of 525

C-9

Subsidiary or FSHCO).

Notwithstanding anything to the contrary, the Collateral shall exclude certain property of the Loan Parties to be mutually agreed including, without limitation, the following: (i) motor vehicles and other assets subject to certificates of title) and commercial tort claims below a threshold to be agreed, (ii) "margin stock" (within the meaning of Regulation U) and pledges and security interests prohibited by applicable law, rule or regulation or agreements with any governmental authority or which would require governmental (including regulatory) consent, approval, license or authorization to provide such security interest unless such consent, approval, license or authorization has been received, in each case, after giving effect to the applicable anti-assignment provisions of the UCC, (iii) equity interests in any entities other than wholly-owned domestic restricted subsidiaries to the extent not permitted by the terms of such entities' organizational or joint venture documents, (iv) assets to the extent a security interest in such assets could result in an investment in "United States property" by a controlled foreign corporation within the meaning of Section 957 of the Internal Revenue Code of 1986, as amended (or any similar law or regulation in any applicable jurisdiction) or otherwise result in a material adverse tax consequence, as reasonably determined by the Borrower, it being understood that no more than 65% of the outstanding voting equity interests and 100% of the outstanding non-voting equity interests of any Foreign Subsidiaries or FSHCO shall be included in the Collateral, (v) any lease, license or other agreement or any property subject to a purchase money security interest or similar arrangement to the extent that a grant of a security interest therein would violate or invalidate such lease, license or agreement, purchase money or similar arrangement or create a right of termination in favor of any other party thereto (other than the Borrower or a Guarantor) after giving effect to the applicable anti-assignment provisions of the UCC, other than proceeds and receivables thereof, the assignment of which is expressly deemed effective under the UCC notwithstanding such prohibition, (vi) any letter of credit rights (other than to the extent a lien thereon can be perfected by filing a UCC-1 financing statement), (vii) any assets over which the granting of security interests in such assets would be prohibited by an enforceable contractual obligation binding on the assets that existed at the time of the acquisition thereof and was not created or made binding on the assets in contemplation or in connection with the acquisition of such assets, applicable law or regulation (in each case, except to the extent such prohibition is unenforceable after giving effect to applicable provisions of the UCC, other than proceeds thereof, the assignment of which is expressly deemed effective under the UCC notwithstanding such prohibitions) or to the extent that such security interests would require obtaining the consent of any Governmental Authority and such consent has not been obtained or would result in materially adverse tax consequences as reasonably determined by the Borrower in writing delivered to the Administrative Agent, (viii) any right, title or interest in any license, contract or agreement or any right, title or interest

Case 20-33948 Document 1603-18 Filed in TXSB on 06/16/21 Page 227 of 528
Case 18-30648 Document 34-18 Filed in TXSB on 02/15/18 Page 22 of 525

C-10

thereunder to the extent, but only to the extent, that such a grant would violate the terms of applicable law or of such license, contract or agreement, or result in a breach of the terms of, or constitute a default under, any such license, contract or agreement or if the contract or agreement in which such lien is granted prohibits or requires the consent of any person (other than the Loan Parties) as a condition to the creation of any other security interest on such equipment or asset (other than to the extent that any such term would be rendered ineffective pursuant to Section 9-406, 9-407, 9-408 or 9-409 UCC or any other applicable law or regulation (including Title 11 of the United States Code) or principles of equity); provided that, immediately upon the ineffectiveness, lapse or termination of any such provision, the Collateral shall include all such rights and interests as if such provision had never been in effect, (ix) those assets as to which the Administrative Agent and the Borrower reasonably agree that the cost of obtaining such a security interest or perfection thereof are excessive in relation to the benefit to the First Lien Term Lenders of the security to be afforded thereby, (x) equity interests in (A) immaterial subsidiaries (other than a guarantor) (or any person that is not a subsidiary which, if a subsidiary would constitute an immaterial subsidiary) and (B) any acquired subsidiary that is subject to the limitations of an Assumed Acquisition Debt incurred in connection therewith, (xi) other equity interests to be agreed giving due consideration to the First Lien Term Facility Documentation Principles, (xii) intellectual property requiring filing in a jurisdiction outside of the United States and any "intent-to-use" trademark applications prior to the filing of a "Statement of Use", "Amendment to Allege Use" or similar notice with respect thereto, to the extent, if any, that, and solely during the period, if any, in which, the grant of a security interest therein would impair the validity or enforceability of such intent-to-use trademark application under applicable federal law, (xiii) except with respect to Guarantors that are non-U.S. entities, if any, actions outside of the United States in order to create or perfect any security interest in any asset located outside of the United States, and foreign law security or pledge agreements or foreign intellectual property filings, searches or schedules, (xiv) the Trust A NPI, the Trust A Account and any amount held therein, any interest in Trust A or the Letters of Credit (each as defined in the Apache Decommissioning Agreement) (or any personal property re-characterization thereof), (xv) oil and gas properties that in the aggregate represent less than 5% of the PV-9 of the Loan Parties' total proved reserves and (xvi) other exceptions to be mutually agreed upon (the foregoing described in clauses (i) through (xvi) are, collectively, the "***Excluded Assets***").

Notwithstanding anything to the contrary, no Loan Party shall be required, nor shall the Administrative Agent be authorized, (i) to perfect the above-described pledges, security interests and mortgages by any means other than by (A)(1) filings pursuant to the UCC in the office of the secretary of state (or similar central filing office) of the relevant States and (2) filings in the applicable real estate records with respect to real properties included in the Collateral or fixtures relating to such real

Case 20-33948 Document 1637-18 Filed in TXSB on 06/16/21 Page 228 of 528
Case 18-30648 Document 34-18 Filed in TXSB on 02/15/18 Page 228 of 528

C-11

properties, (B) filings in the USPTO and/or USCO, as applicable, with respect to intellectual property as expressly required in the First Lien Term Facility Documentation, (C) mortgages in respect of oil and gas properties and fee-owned real property included in the Collateral and (D) subject to the Intercreditor Agreements referred to below, delivery to the Administrative Agent of all stock certificates, intercompany notes and other instruments (to the extent such intercompany note or other instrument is in an amount in excess of an amount to be agreed) to be held in its possession, in each case as expressly required in the First Lien Term Facility Documentation, (ii) to enter into any control agreement with respect to any deposit account, securities account or commodities account, (iii) to take any action (other than the actions listed in clause (D) above) with respect to any assets located outside of the United States, or (iv) to take any actions in any jurisdiction other than the United States (or any political subdivision thereof) or enter into any collateral documents governed by the laws of any country other than the United States.

| | |
|---|---|
| **INTERCREDITOR AGREEMENTS:** | Subject to the First Lien Term Facility Documentation Principles, the lien priority, relative rights and other creditors' rights issues between and among the holders of the Exit LC Facility, the holders of the First Lien Term Loans and the holders of the loans under the Exit SLTL Facility will be set forth in one or more intercreditor agreements (the "***Intercreditor Agreements***") reasonably satisfactory to the Borrower and the Administrative Agent. |
| **MANDATORY PREPAYMENTS:** | (a)      100% of the net cash proceeds of Asset Sales (to be defined consistent with the First Lien Term Facility Documentation Principles) of the type described in clause (f)(iii) of  the section titled "*Negative Covenants*" below; *provided*, that the Borrower shall have the right to reinvest 100% of such net cash proceeds if such proceeds are reinvested within 12 months; *provided*, *however*, that, in the event the aggregate amount of such net cash proceeds shall exceed $100 million during the term of the First Lien Term Facility, the Borrower agrees to prepay an aggregate principal amount of First Lien Term Loans equal to 50% of such excess net cash proceeds and shall have the right to reinvest the remaining 50% of such excess net cash proceeds in accordance with the terms of this clause (a); and |
| | (b)      100% of the net cash proceeds of issuances, offerings or placements of debt obligations of Holdings and its restricted subsidiaries (except the net cash proceeds of any permitted debt (other than the proceeds of any Refinancing Term Facility or Refinancing Notes)). |
| | The above-described mandatory prepayments will be without premium or penalty (but subject to reimbursement of applicable lenders' redeployment costs in the case of a prepayment of Adjusted LIBOR borrowings other than on the last day of the relevant interest period). |
| | Any First Lien Term Lender may elect not to accept its pro rata portion |

Case 20-33948 Document 1603-18 Filed in TXSB on 06/16/21 Page 229 of 528
Case 18-30648 Document 34-18 Filed in TXSB on 02/15/18 Page 223 of 525

C-12

of any mandatory prepayment (each, a "**Declining Lender**"), but, in the case of *clause (b)* above, solely to the extent the relevant prepayment does not represent a refinancing of the First Lien Term Facility. Any prepayment amount declined by a Declining Lender may be retained by the Borrower (such retained amounts, the "**Declined Proceeds**").

Mandatory prepayments required under the First Lien Term Facility Documentation may, if required pursuant to the terms of any other indebtedness secured *pari passu* with the First Lien Term Facility, be applied to the First Lien Term Loans and such other *pari passu* indebtedness, in each case on a ratable basis based on the outstanding principal amounts thereof.

**VOLUNTARY PREPAYMENTS:**

Prepayments of borrowings under the First Lien Term Facility (other than, for the avoidance of doubt, any reduction of First Lien Term Loans in connection with a permitted assignment thereof to an Affiliated Lender (to be defined in a manner consistent with the First Lien Term Facility Documentation Principles) will be permitted at any time, in minimum principal amounts to be agreed upon, subject to customary notice requirements (subject to reimbursement of the First Lien Term Lenders' redeployment costs (other than lost profits) in the case of a prepayment of Adjusted LIBOR borrowings other than on the last day of the relevant interest period) and subject to a prepayment premium in the amount of (i) if on or prior to the six month anniversary of the Closing Date, 1.00% of the total amount of the First Lien Term Loans so prepaid and (ii) if after the six month anniversary of the Closing Date, 0.00% of the total amount of the First Lien Term Loans so prepaid.

**UNRESTRICTED SUBSIDIARIES:**

The First Lien Term Facility Documentation will contain provisions pursuant to which, subject to certain limitations consistent with the First Lien Term Facility Documentation Principles, the Borrower will be permitted to designate any existing or subsequently acquired or organized subsidiary of the Borrower as an "unrestricted subsidiary" and subsequently re-designate any such unrestricted subsidiary as a restricted subsidiary.

**DOCUMENTATION:**

The definitive documentation for the First Lien Term Facility (the "**First Lien Term Facility Documentation**") will be documented under a single credit agreement, will contain the terms set forth in this **Exhibit C** and, to the extent not covered by this **Exhibit C**, will be substantially consistent with the Prepetition First Lien Term Loan Agreement, with changes and modifications in a manner appropriate to reflect post-bankruptcy status of Borrower and the Guarantors, taking into account the nature of the assets, operations and condition of the Borrower post-emergence, including changes and modifications to remove any terms and provisions related to a borrowing base, delivery of reserve reports, reserve-based loan reporting requirements and, in each case, requirements associated therewith (collectively, for purposes of this **Exhibit C**, the "**First Lien Term Facility Documentation Principles**"). The First Lien Term Facility Documentation will be negotiated in good faith within a reasonable time period to be determined based on the

Case 20-33948 Document 1637-18 Filed in TXSB on 06/16/21 Page 230 of 528
Case 18-30648 Document 34-18 Filed in TXSB on 02/15/18 Page 230 of 525

C-13

expected Closing Date.

For purposes of calculating Consolidated EBITDA, Consolidated Total Assets and financial ratios, *pro forma* effect will be given to acquisitions and other investments (other than in the ordinary course of business), material dispositions and certain other specified transactions on a basis consistent with the First Lien Term Facility Documentation Principles.

**REPRESENTATIONS AND WARRANTIES:**    The First Lien Term Facility Documentation shall contain usual and customary representations and warranties for financings of this type and consistent with the First Lien Term Facility Documentation Principles.

**CONDITIONS PRECEDENT:**    The closing of the First Lien Term Facility will be subject to satisfaction of the following: (a) all of the representations and warranties in the First Lien Term Facility Documentation shall be true and correct in all material respects (or if qualified by materiality or material adverse effect, in all respects) as of the date of such extension of credit, or if such representation speaks as of an earlier date, as of such earlier date; (b) no default or event of default under the First Lien Term Facility shall have occurred and be continuing or would result from such extension of credit; (c) delivery of a customary borrowing notice and (d) the occurrence of those conditions listed on Annex II hereto.

**AFFIRMATIVE COVENANTS:**    The First Lien Term Facility Documentation shall contain usual and customary affirmative covenants for financings of this type and consistent with the First Lien Term Facility Documentation Principles.

The Borrower agrees to establish a segregated account (the "***Jazz Account***") to be funded on a monthly basis with 75% of operating cash flow from a specified Jazz field (which has been identified to certain of the Prepetition First Lien Term Lenders' advisors as "Swordfish") which amounts shall be used to pay for any P&A liabilities for such field. Borrower shall provide quarterly reporting with respect to the Jazz Account in form reasonably acceptable to the Administrative Agent, commencing with the fiscal quarter ending in the second fiscal quarter after the Closing Date.

The Borrower agrees that, so long as Franklin Resources, Inc. shall hold at least 25% of the aggregate amount of the loans and commitments under the First Lien Term Facility, it shall be entitled to appoint one member to the board of directors of Holdings.

**NEGATIVE COVENANTS:**    The First Lien Term Facility Documentation shall contain negative covenants (to be applicable to the Borrower and its restricted subsidiaries and, with respect to the passive holding company covenant only, Holdings) consistent with the First Lien Term Facility Documentation Principles, subject to the following and other exceptions including (x) a Cumulative Credit Basket (to be defined in a manner consistent with the First Lien Term Facility Documentation Principles) that may be used for dividends and other restricted payments (including, without limitation,

restricted debt payments) and (y) other exceptions consistent with the First Lien Term Facility Documentation Principles to be mutually agreed (including certain dollar baskets growing based off of a percentage of Consolidated EBITDA) (a "**Builder Component**"):

(a)      limitations on dividends on, and redemptions and repurchases of, equity interests and other restricted payments ("**Restricted Payments**") (which shall permit, among other exceptions, (i) Restricted Payments in an amount not to exceed the Cumulative Credit Basket so long as (x) no event of default exists at the time of the declaration thereof or would result therefrom and (y) after giving effect to such Restricted Payment the *pro forma* Total Net Leverage Ratio would not exceed 2.00:1.00, (ii) a general Restricted Payments basket in an amount not to exceed the greater of an amount to be agreed and a Builder Component (the "**Restricted Payment General Basket**"), so long as no event of default has occurred and is continuing or would result therefrom, a general basket and (iii) Restricted Payments, made as tax distributions to Holdings (or a direct or indirect parent) in an amount equal to Holdings' (or such parent's) tax obligations paid on the income of Borrower and its subsidiaries);

(b)      limitations on cash prepayments, redemptions, and repurchases ("**Specified Prepayments**") of Subordinated Indebtedness (to be defined in a manner consistent with the First Lien Term Facility Documentation Principles) (which shall permit, among other exceptions, (i) regularly scheduled cash interest payments and payments of fees, expenses and indemnification obligations, (ii) Specified Prepayments of Subordinated Indebtedness; *provided* that (x) no payment or bankruptcy event of default has occurred and is then continuing or would result therefrom and (y) the First Lien Net Leverage Ratio (as defined below) on a pro forma basis after such prepayment, redemption or repurchase does not exceed 2.00:1.00, and (iii) a general Specified Prepayments basket in an amount not to exceed the greater of an amount to be agreed and a Builder Component, so long as no event of default has occurred and is continuing or would result therefrom);

(c)      limitations on liens (which shall permit, among other exceptions, (i) liens securing Permitted Ratio Debt (as defined below), Incremental Term Loans and/or Incremental Equivalent Debt, in each case, other than to the extent incurred under the unsecured indebtedness component of the definition thereof, (ii) liens securing the Exit LC Facility and any Permitted Hedge Obligations on a *pari passu* "first-out" basis, (iii) liens securing the Exit SLTL Facility on a junior basis, (iv) liens on assets owned by, and on the equity of non-Loan Parties securing permitted debt of, non-Loan Parties, (v) liens securing Assumed Acquisition Debt (secured only by acquired assets and not incurred in anticipation thereof), (vi) liens securing debt permitted under clause (e) (iv) below, (vii) a general lien basket securing debt in an amount not to exceed an amount to equal the general debt basket in clause (e)(v) below (including a Builder Component), (viii) liens arising under the Apache

Decommissioning Agreement and in connection with any Letter of Credit (as defined in the Apache Decommissioning Agreement) required to be delivered pursuant to the Apache Decommissioning Agreement and (ix) other liens so long as (x) in the case of any *pari passu* liens, the Borrower is in pro forma compliance with a Total Net Leverage Ratio of 2.00:1.00 and (y) in the case of any junior liens, the Borrower is in pro forma compliance with a Total Net Leverage Ratio of 2.50:1.00;

(d)  limitations on Investments (to be defined in a manner consistent with the First Lien Term Facility Documentation Principles) (which shall permit, among other exceptions, (i) investments in any Subsidiary Guarantors, (ii) intercompany investments in connection with cash management in the ordinary course of business, (iii) investments in any Similar Business (to be defined as mutually agreed) in an aggregate amount not to exceed $300 million and 5% of total assets, (iv) a general basket for investments not to exceed $300 million and 5% of total assets, (v) additional investments in joint ventures not to exceed $100 million, (vi) re-organizations and other activities related to tax planning and reorganization so long as, after giving effect thereto, the security interest of the First Lien Term Lenders in the Collateral, taken as a whole, is not materially impaired and (vii) other investments so long as no event of default then exists or would result therefrom and the Borrower is in pro forma compliance with a Total Net Leverage Ratio of 2.00:1.00; *provided*, if any investment is made in any person pursuant to clause (iii), (iv) or (v) that becomes the Borrower or a Subsidiary Guarantor after the date of such investment, such investment shall thereafter be deemed to have been made pursuant to clause (i) and not clause (iii), (iv) or (v), as applicable; *provided*, *further*, that investments in unrestricted subsidiaries shall not exceed $100 million in the aggregate at any time outstanding and shall be limited to investments made of the nature that are customary in the oil and gas business;

(e)  limitations on debt, guarantees and hedging arrangements (which shall permit, among other exceptions, (i) debt (x) assumed in connection with any acquisition or similar investment (and not incurred in contemplation thereof) so long as the Total Net Leverage Ratio does not exceed 2.00:1.00 (debt incurred under this clause (i) being, "***Assumed Acquisition Debt***"), or (y) constituting adjustments of purchase price or "earn outs" entered into in connection with acquisitions, (ii) purchase money indebtedness and capital leases (including any indebtedness incurred in connection with sale-leaseback transactions) outstanding on the Closing Date and additional purchase money indebtedness and capital leases (including any indebtedness incurred in connection with sale-leaseback transactions) not to exceed the greater of (x) $150 million and (y) 2.5% of consolidated total assets of the Borrower, (iii) other indebtedness so long as (x) in the case of indebtedness that is secured by a lien on the Collateral ranking *pari passu* with the liens securing the First Lien Term Facility, the *pro forma* Total Net Leverage Ratio does not exceed 2.00:1.00, (y) in the case of indebtedness that is secured by a lien on the Collateral ranking junior to

Case 20-33948 Document 1604-18 Filed in TXSB on 06/16/21 Page 233 of 528
Case 18-30648 Document 34-1 Filed in TXSB on 02/15/18 Page 233 of 528

C-16

the liens securing the First Lien Term Facility, the *pro forma* Total Net Leverage Ratio does not exceed 2.50:1.00, and (z) in the case of unsecured debt, the *pro forma* Total Net Leverage Ratio does not exceed 3.00:1.00 (debt incurred under this clause (iii) being, "***Permitted Ratio Debt***"); *provided* that (1) if such Permitted Ratio Debt is secured by a lien on the Collateral that is *pari passu* with the liens securing the First Lien Term Facility, then the proceeds of the Permitted Ratio Debt shall be used solely to finance acquisitions or similar investments and shall not be incurred prior to the six month anniversary of the Closing Date, (2) any Permitted Ratio Debt consisting of term loans secured by a lien on the Collateral ranking *pari passu* with the liens securing the First Lien Term Facility shall be subject to the MFN Protection and (3) any Permitted Ratio Debt shall be subject to the Required Debt Terms, (iv) debt in respect of hedge agreements entered into in the ordinary course of business and not for speculative purposes, (v) a general debt basket not to exceed the greater of an amount to be agreed and a Builder Component (the "***General Debt Basket***"), (vi) debt in respect of the Exit LC Facility, (vii) debt in respect of an exit second lien term facility in an aggregate principal amount not to exceed $518 million (the "***Exit SLTL Facility***"), (viii) debt incurred in respect of any Letters of Credit (as defined in the Apache Decommissioning Agreement) required to be issued pursuant to the Apache Decommissioning Agreement, (ix) in the case of the foregoing clauses (i) through (iii) and (v) through (viii) Permitted Refinancing Debt in respect thereof and (x) debt arising under the Apache Decommissioning Agreement;

(f)      limitations on Asset Sales (including sale leasebacks and sales of equity of subsidiaries) (which Asset Sales shall permit, among other exceptions, any conveyance, sale, lease, sale and leaseback, assignment transfer or other disposition so long as (i) such disposition is made fair market value, (ii) not less than 75% of such the consideration for such disposition shall be in the form of cash (subject to customary qualifications for non-cash consideration, including that any liabilities assumed by the transferee or that are otherwise cancelled or terminated in connection with such disposition shall be deemed to be cash) and (iii) the Borrower shall make a mandatory prepayment of any net cash proceeds received by it as and to extent required pursuant to the section titled "*Mandatory Prepayments*" above);

(g)      limitations on transactions with affiliates;

(h)      limitations on restrictions on ability of restricted subsidiaries to pay dividends or make distributions and limitations on negative pledge agreements (subject to customary exceptions for debt permitted to be incurred by the covenant described under clause (e) above);

(i)      passive nature of Holdings' business (or the business of any subsidiary of Holdings that owns, directly or indirectly, equity interests of the Borrower) and inability of Holdings' to incur indebtedness;

Case 20-33948 Document 1603-18 Filed in TXSB on 06/16/21 Page 234 of 528
Case 18-30648 Document 34 Filed in TXSB on 02/15/18 Page 234 of 525

C-17

(j)      restrictions on amendments to the documentation governing the Exit Second Lien Term Facility, any other permitted junior debt, the Apache Decommissioning Agreement and any similar documentation entered into in connection with the Jazz acquisition; and

(k)      restrictions on hedging and swap agreements (other than agreements with counterparties having a rating of BBB- or Baa3 or better or an investment grade-rated participant ("*Eligible Counterparties*") the net notional volumes for which do not exceed in the aggregate, as of the date of the latest hedging transaction, 75% of the reasonably anticipated oil and natural gas production from PDP reserves as forecast based upon the Company's most recent reserve report and/or business plan, as applicable (and including PDP with respect to oil and gas properties to be acquired pursuant to a permitted transaction)) (the obligations under such agreements, the "*Permitted Hedge Obligations*"); *provided*, the Company shall enter into within 90 days of the Closing Date and, thereafter, maintain hedging and swap agreements with Eligible Counterparties with respect to at least 25% of the rolling 12 month oil and natural PDP (i) initially, as set forth in the Company's most recent reserve report as of the Closing Date and (ii) thereafter, tested semi-annually, based off the Company's most recent reserve report as of such date.

| | |
|---|---|
| **FINANCIAL COVENANT:** | Maximum total net leverage coverage ratio (the "*Total Net Leverage Ratio*") of no greater than 4.00:1.00. The Total Net Leverage Ratio shall be tested as of the last day of each fiscal quarter of the Borrower, commencing with the first full fiscal quarter ending after the Closing Date. |

Maximum first lien senior secured net leverage coverage ratio (the "*First Lien Net Leverage Ratio*") of no greater than:  (i) 2.50:1.00 for the first two fiscal quarters ending after the Closing Date and (ii) 2.25:1.00 for each fiscal quarter ending thereafter.  The First Lien Net Leverage Ratio shall be tested as of the last day of each fiscal quarter of the Borrower, commencing with the first full fiscal quarter ending after the Closing Date.

Asset coverage ratio to be calculated as follows: (i) numerator based on the proved PV-10 value (which for the avoidance of doubt shall be burdened by all P&A obligations) calculated using strip prices (with the final year of the forward curves held constant and adjusted for basis differentials) plus the present value of hedges, plus any outstanding letters of credit securing P&A obligations where such letters of credit are junior to the first lien senior secured indebtedness (ii) denominator based on total first lien senior secured indebtedness as of the immediately preceding Test Date less unrestricted and restricted cash (the "*Asset Coverage Ratio*"), with the Asset Coverage Ratio required to be no less than 1.75:1.00. The Asset Coverage Ratio shall be tested, and each component of such calculation shall be measured as of the last day of the second and fourth fiscal quarter of the Borrower, commencing with the

Case 20-33948 Document 1687-18 Filed in TXSB on 06/16/21 Page 235 of 528
Case 18-30648 Document 34 Filed in TXSB on 02/16/18 Page 235 of 528

C-18

fiscal quarter ending in the second fiscal quarter after the Closing Date (each a "**Test Date**"). The proved PV-10 value shall be based on an audited reserve report for one of the two annual tests and based on internal company analysis for the other test, in each case in form and substance reasonably satisfactory to the Administrative Agent.

The First Lien Term Facility Documentation will include customary equity cure provisions consistent with the First Lien Term Facility Documentation Principles.

**EVENTS OF DEFAULT:**     The First Lien Term Facility Documentation shall contain usual and customary events of default (with customary materiality thresholds and grace periods) for financings of this type and consistent with the First Lien Term Facility Documentation Principles.

**VOTING:**     Amendments and waivers of the First Lien Term Facility Documentation will require the approval of First Lien Term Lenders (other than Defaulting Lenders (as defined below)) holding more than 50% of the aggregate amount of the loans and commitments under the First Lien Term Facility (the "**Required Lenders**") (with amendments and waivers also requiring customary class votes), except that (a) the consent of each First Lien Term Lender directly affected thereby (but not the Required Lenders, other than in the case of clause (a)(ii), which shall require the consent of each First Lien Term Lenders increasing its commitments as well as the consent of the Required Lenders) shall be required with respect to: (i) modifications to *pro rata* payment, pro rata sharing or payment waterfall provisions (other than for purposes of any amendment that would extend the final maturity date of any First Lien Term Loans and certain other exceptions, in each case, on terms to be agreed upon), (ii) increases in the commitment of such First Lien Term Lenders, (iii) reductions or forgiveness of principal, interest, premiums, fees, or reimbursement obligations payable to such First Lien Term Lenders (it being understood that any change in any definition applicable to any ratio used in the calculation of such rate of interest or fees) (or any component definition thereof) shall not constitute a reduction in any rate of interest or any fee) and (iv) extensions of final maturity or scheduled amortization of the loans or commitments of such First Lien Term Lenders or of the date for payment to such First Lien Term Lenders of any interest, premiums, fees or any reimbursement obligation and (b) the consent of each First Lien Term Lenders shall be required with respect to (i) modifications to voting requirements or percentages and (ii) releases of all or substantially all of the value of the Guarantees, or all or substantially all of the Collateral.

The Borrower or the Administrative Agent shall, subject to usual and customary conditions (including, in the case of clauses (a) and (d) below, any applicable prepayment premium), have the right to replace a First Lien Term Lenders or terminate the commitment of a First Lien Term Lenders on a non-*pro rata* basis (a) in connection with amendments and waivers requiring the consent of all First Lien Term Lenders or of all

Case 20-33948 Document 1627-18 Filed in TXSB on 06/16/21 Page 236 of 528
Case 18-30648 Document 34-18 Filed in TXSB on 02/15/18 Page 236 of 528

C-19

First Lien Term Lenders directly affected thereby so long as the consent of the Required Lenders has been obtained, (b) if such First Lien Term Lenders asserts a claim for any funding protection, whether for increased costs, taxes, required indemnity payments or otherwise, (c) if such First Lien Term Lenders is a Defaulting Lender, or (d) if such First Lien Term Lenders elects not to participate in any "amend and extend" transaction.

**DEFAULTING LENDERS:**  The First Lien Term Facility Documentation shall contain customary provisions relating to "defaulting" First Lien Term Lenders ("***Defaulting Lenders***") consistent with the First Lien Term Facility Documentation Principles.

**COST AND YIELD PROTECTION:**  The First Lien Term Facility Documentation shall contain customary provisions relating to cost and yield protection consistent with the First Lien Term Facility Documentation Principles.

**ASSIGNMENTS AND PARTICIPATIONS:**  The First Lien Term Lenders will be permitted to assign (other than to Disqualified Lenders (as such term shall be defined as mutually agreed)) First Lien Term Loans under the First Lien Term Facility with the consent of the Borrower and the Administrative Agent, in each case, not to be unreasonably withheld or delayed (it being understood that (i) the withholding of consent by the Borrower to any assignment to a Disqualified Lender shall be deemed reasonable and (ii) the Borrower will be deemed to have consented to an assignment of First Lien Term Loans if it has not responded to a request for consent to such assignment within 10 business days after receipt of written request therefor); *provided* that such consent shall not be required, (i) if such assignment of any loan or commitment under the First Lien Term Facility is made to another First Lien Term Lender or an affiliate or approved fund of any First Lien Term Lenders or (ii) in the case of the Borrower, if a payment or bankruptcy event of default has occurred and is continuing. Each assignment will be in the minimum amount of and in integral multiples of $1,000,000 or, if less, all of such First Lien Term Lender's remaining loans and commitments of the applicable class.

The First Lien Term Lenders will have the right to participate their commitments and loans to other persons (other than any natural persons, Specified Equity Holders (to be defined in a manner consistent with the First Lien Term Facility Documentation Principles), Holdings, the Borrower, or any of their respective subsidiaries, any Affiliated Lender and any Disqualified Lenders (to the extent that a list (together with any supplements thereto) of Disqualified Lenders has been made available to the First Lien Term Lenders)). Participants shall have the same benefits as the First Lien Term Lenders with respect to yield protection and increased cost provisions, subject to customary limitations and restrictions. Voting rights of participants shall be limited solely to those matters set forth in clauses (i) and (ii) under the first paragraph under the heading "Voting" with respect to which the affirmative vote of the First

Case 20-33948 Document 1604-18 Filed in TXSB on 06/16/21 Page 237 of 528
Case 18-30648 Document 34-18 Filed in TXSB on 02/15/18 Page 23 of 525

C-20

Lien Term Lenders from which it purchased its participation would be required. Pledges of loans in accordance with applicable law shall be permitted without restriction. The Administrative Agent shall have no responsibility to ensure that the foregoing limitations as to participations are observed by the First Lien Term Lenders.

Assignments of First Lien Term Loans to Specified Equity Holders and their respective affiliates or Holdings, the Borrower or any of their respective subsidiaries shall be permitted on terms and subject to limitations consistent with the First Lien Term Facility Documentation Principles (except that such assignments shall be permitted so long as no payment or bankruptcy event of default shall exist); *provided*, that (i) for any Required Lender vote, Debt Fund Affiliates (to be defined as mutually agreed) may not, in the aggregate, account for more than 49.9% of the amounts included in determining whether the Required Lenders have consented to the relevant amendment, waiver or other action and (ii) for any Required Lender vote, non-Debt Fund Affiliates may not, in the aggregate, account for more than 30% of the amounts included in determining whether the Required Lenders have consented to the relevant amendment, waiver or other action.

**REPLACEMENT OF ADMINISTRATIVE AGENT:**  The Administrative Agent may resign or, if it or a controlling affiliate thereof becomes subject to a bankruptcy or insolvency event, be removed by the Borrower or the Required Lenders, in each case upon 10 days' notice by the applicable parties and, in each case, subject to the appointment of a successor administrative agent. Such successor shall be appointed by the Required Lenders and approved by the Borrower, which approval shall not be unreasonably withheld; *provided* that such approval shall not be required during the continuance of a payment or bankruptcy event of default. The Borrower shall have no obligation to pay any fee to any successor that is greater than or in addition to the fees payable to the Administrative Agent on the Closing Date.

**EXPENSES AND INDEMNIFICATION:**  The Borrower will indemnify the Administrative Agent, the First Lien Term Lenders, their respective affiliates, successors and assigns and the officers, directors, employees, agents, advisors, and representatives of each of the foregoing (each, an "***Indemnified Person***"), within 30 days after receipt of a written request together with customary backup documentation in reasonable detail, from and against any and all reasonable and documented (in reasonable detail) out-of-pocket costs, expenses (including reasonable fees, disbursements and other charges of counsel (limited to one counsel for all Indemnified Persons, taken as a whole and, if reasonably necessary a single local counsel for all Indemnified Persons taken as a whole in each relevant material jurisdiction (which may be a single local counsel acting in multiple material jurisdictions) (unless there is an actual or perceived conflict of interest in which case each such Indemnified Person may, with the consent of the Borrower (not to be unreasonably withheld or delayed), retain its own counsel))), damages, losses and liabilities of such Indemnified Person arising out of or relating to any claim or any

litigation or other proceeding (regardless of whether such Indemnified Person is a party thereto and regardless of whether such matter is initiated by a third party or by Holdings, the Borrower or any of their respective affiliates or equity holders) that relates to the Transactions, including the financing contemplated hereby; *provided* that no Indemnified Person will be indemnified for any cost, expense or liability from (i) its willful misconduct, bad faith or gross negligence (as determined by a court of competent jurisdiction in a final and non-appealable decision), (ii) a material breach of the obligations of an Indemnified Person or any Indemnified Person's controlled affiliates under the First Lien Term Facility Documentation (as determined by a court of competent jurisdiction in a final and non-appealable decision) or (iii) any proceeding that is brought by an Indemnified Person against any other Indemnified Person (other than an agent under the definitive documentation acting in its capacity as such or any claims arising out of an act or omission on the part of the Borrower or any of its affiliates, to all of which this indemnity shall be applicable). In addition, if the Closing Date occurs, the Borrower shall pay (a) all reasonable and documented out-of-pocket expenses (including, without limitation, reasonable fees, disbursements and other charges of one primary counsel and, if reasonably necessary, a single local counsel in each appropriate jurisdiction (which may include a single special counsel acting in multiple jurisdictions)) of the Administrative Agent in connection with the preparation and administration of the definitive documentation, and amendments, modifications and waivers thereto, and (b) all reasonable and documented out-of-pocket expenses (including, without limitation, if reasonably necessary, fees, disbursements and other charges of one primary counsel and, if reasonably necessary, a single local counsel in each appropriate jurisdiction (which may include a single special counsel acting in multiple jurisdictions)) of the Administrative Agent and the First Lien Term Lenders for enforcement costs and documentary taxes associated with the First Lien Term Facility.

**CONFIDENTIALITY:** The First Lien Term Facility Documentation will contain customary confidentiality provisions with respect to information regarding Holdings, the Borrower, their respective subsidiaries, their business, operations, assets and related matters, which shall in any event prohibit disclosure of any confidential information to competitors.

**GOVERNING LAW AND FORUM:** New York.

**COUNSEL TO ADMINISTRATIVE AGENT:** [_____].

| | |
|---|---|
| **INTEREST RATES:** | The interest rates under the First Lien Term Facility will be as follows: |

At the option of the Borrower, Adjusted LIBOR <u>plus</u> 5.25% or ABR <u>plus</u> 4.25% (the "***Initial Rate***"), with such rate to automatically increase 300 basis points in the event that the Debt Rating (as defined below) falls below B3 or B- for at least one full fiscal quarter and so long as it remains below such rating.

"***Debt Rating***" means, as of any date of determination, the rating as determined by either S&P or Moody's (collectively, the "***Debt Ratings***"), as applicable, of the Borrower's first lien senior secured long-term debt; *provided* that (i) until the date that an initial Debt Rating shall be determined, the Initial Rate shall apply, (ii) if the respective Debt Ratings issued differ then the rate applicable to the lower of such Debt Ratings shall apply and (iii) if the Borrower has only one Debt Rating, the rate for such Debt Rating shall apply. If either the rating system of S&P or Moody's shall change in a manner that directly and materially impacts the pricing or if both S&P and Moody's shall cease to be engaged in the business of rating debt, then in either case, the Borrower and the Required Lenders shall negotiate in good faith to amend the references to the Debt Rating(s) to reflect such changed rating system or to replace such rating system with an alternative measurement scheme, as applicable, and pending the effectiveness of any such amendment, the ratings of such rating agency most recently in effect prior to such change or cessation shall be employed in determining the pricing.

The Borrower may elect interest periods of one, two, three or six months (or 12 months or a shorter period if available to all First Lien Term Lenders) (each, an "***Interest Period***") for Adjusted LIBOR borrowings.

Calculation of interest shall be on the basis of the actual number of days elapsed over a 360-day year (or 365- or 366-day year, as the case may be, in the case of ABR loans based on the Prime Rate) and interest shall be payable (i) in the case of ABR loans, quarterly in arrears and (ii) in the case of Adjusted LIBOR loans at the end of each interest period and, in any event, at least every three months.

"***ABR***" is the Alternate Base Rate, which is the highest of (i) the Administrative Agent's Prime Rate, (ii) the Federal Funds Effective Rate <u>plus</u> 1/2 of 1.0% and (iii) one-month Adjusted LIBOR <u>plus</u> 1.0%.

"***Adjusted LIBOR***" is the London interbank offered rate (or a comparable successor rate which rate is reasonably approved by the Administrative Agent and the Borrower and applied in a manner consistent with market practice) for eurodollar deposits for a period equal to the applicable Interest Period appearing on the LIBOR01 Page that displays the Intercontinental Exchange Benchmark Administration Interest Settlement Rate for deposits in Dollars with a term equivalent to such Interest Period,; *provided* that Adjusted LIBOR will at all times be adjusted for statutory reserves and shall be deemed to be not less than 1.00%.

PROJECT PELICAN

SUMMARY OF CONDITIONS PRECEDENT

The borrowing under the First Lien Term Facility shall be subject only to the following conditions precedent:

1.  A final non-appealable order of the Bankruptcy Court confirming the Plan in form and substance reasonably satisfactory to the Administrative Agent, which shall not have been reversed, vacated, amended, supplemented or otherwise modified in any manner that could reasonably be expected to adversely affect the interest of the First Lien Term Lenders (the "**Confirmation Order**") and authorizing the Borrower to execute, deliver and perform under all documents contemplated under the First Lien Term Facility Documentation shall have been entered and shall have become a final order of the Bankruptcy Court.

2.  The execution and delivery by each of the Loan Parties of (i) the First Lien Term Facility Documentation (including the Intercreditor Agreements (which may be limited to an acknowledgement by the Loan Parties)), (ii) customary legal opinions, customary evidence of authorization, customary officer's certificates, good standing certificates (to the extent applicable) in the jurisdiction of organization of each Loan Party, (iii) a solvency certificate substantially in the form of **_Annex III_** hereto executed by the chief financial officer or other officer of equivalent duties and (iv) all documents and instruments required to create and perfect the Administrative Agent's security interests in the Collateral under the First Lien Term Facility, which shall be, if applicable, in proper form for filing.

3.  The Administrative Agent shall have received (a) audited consolidated balance sheets and related statements of income and cash flows of the Borrower and its subsidiaries for the three most recently completed fiscal years ended at least 105 days before the Closing Date (the receipt of such financial statements for 2015 and 2016 being acknowledged by the First Lien Term Lenders) and (b) unaudited consolidated balance sheets and related statements of income, stockholders' equity and cash flows of the Borrower and its subsidiaries for each subsequent fiscal quarter (other than fiscal year end) ended at least 60 days before the Closing Date.

4.  The Administrative Agent shall have received *pro forma* financial statements consisting of a *pro forma* consolidated balance sheet and *pro forma* consolidated statements of income as of and for the twelve month period ending on the last day of the recently completed four fiscal quarter period ended at least 60 days before the Closing Date.

5.  The Administrative Agent shall have received, at least 3 business days prior to the Closing Date, all documentation and other information required by regulatory authorities under applicable "know your customer" and anti-money laundering rules and regulations, including, without limitation, the PATRIOT Act, that has been requested in writing by the First Lien Term Lenders at least 10 business days prior to the Closing Date.

6.  All fees required to be paid on the Closing Date pursuant to the Fee Letter and this Term Sheet and reasonable and documented out-of-pocket expenses (including legal expenses) required to be paid on the Closing Date pursuant to this Term Sheet, to the extent invoiced at least 3 business days prior to the Closing Date, shall, upon the initial borrowing of the First Lien Term Facility, have been paid.

7.  The representations and warranties of the Loan Parties set forth in the First Lien Term Facility Documentation shall be true and correct in all material respects (or, in the case of any such representation that is qualified by materiality, in all respects).

8.   No default or event of default shall exist or would result from the consummation of the Transactions.

*Annex III*

# FORM OF SOLVENCY CERTIFICATE

[____][__], 20[__]

This Solvency Certificate is being executed and delivered pursuant to Section [__] of that certain [●] (the "***Credit Agreement***"; the terms defined therein being used herein as therein defined).

I, [_____], a Financial Officer (or other officer of equivalent duties) of the Borrower (after giving effect to the Transactions), in such capacity and not in an individual capacity, hereby certify on behalf of the Borrower as follows:

      1.      The sum of the debt and liabilities (subordinated, contingent or otherwise) of the Borrower and its subsidiaries, on a consolidated basis, does not exceed the fair value of the present assets of the Borrower and its subsidiaries, on a consolidated basis.

      2.      The capital of the Borrower and its subsidiaries, on a consolidated basis, is not unreasonably small in relation to their business as conducted or contemplated to be conducted on the date hereof.

      3.      The Borrower and its subsidiaries, on a consolidated basis, have not incurred and do not intend to incur, or believe that they will incur, debts or other liabilities, including current obligations, beyond their ability to pay such debts or other liabilities as they become due (whether at maturity or otherwise).

      4.      In reaching the conclusions set forth in this Solvency Certificate, the undersigned has (i) reviewed the Credit Agreement and other Loan Documents referred to therein and such other documents deemed relevant and (ii) made such other investigations and inquiries as the undersigned has deemed appropriate.  The undersigned is familiar with the financial performance and prospects of the Borrower and its subsidiaries.

**Annex III**

IN WITNESS WHEREOF, I have executed this Solvency Certificate on the date first written above.

[FIELDWOOD ENERGY LLC]

By: _____

Name:

Title:

**EXHIBIT D**
**EXIT SECOND LIEN TERM SHEET**

Attached.

**EXHIBIT D**

PROJECT PELICAN

PROJECT PELICAN
$518.0 MILLION SENIOR SECURED SECOND LIEN TERM LOAN FACILITY
"EXIT SLTL TERM SHEET"

SUMMARY OF PRINCIPAL TERMS AND CONDITIONS[1]

| | |
|---|---|
| CERTAIN PREPETITION DEBT FACILITIES AND INSTRUMENTS: | The Borrower's (as defined below) senior secured first lien revolving credit facility provided by Citibank, N.A., as administrative agent, certain lenders party thereto from time to time and the other agents party thereto from time to time pursuant to that certain Credit Agreement dated as of September 30, 2013 (as amended, supplemented or otherwise modified from time to time, including pursuant to (i) that certain Amendment No. 1 to Credit Agreement dated as of February 25, 2014, (ii) that certain Amendment No. 2 to Credit Agreement dated as of April 8, 2015, and (iii) that certain Amendment No. 3 to Credit Agreement dated as of May 27, 2016). |

The Borrower's senior secured first lien term loan facility (the "***Prepetition First Lien Term Loan Facility***") pursuant to that certain First Lien Term Loan Credit Agreement, dated as of September 30, 2013, among the Borrower, Citibank, N.A. as administrative agent, the lenders party thereto from time to time and the other agents party thereto from time to time (as amended from time to time including pursuant to (i) that certain Amendment No. 1 to First Lien Term Loan Agreement dated as of February 25, 2014 and (ii) that certain Amendment No. 2 to First Lien Term Loan Agreement dated as of May 27, 2016) consisting of reserve-based term loans due 2020 and first lien term loans due 2018.

The Borrower's senior secured first lien "last out" term loan facility (the "***Prepetition FLLO Facility***") pursuant to that certain First Lien Last-Out Term Loan Agreement dated as of May 27, 2016, among the Borrower, Cortland Capital Market Services LLC, as administrative agent and collateral agent thereunder, and the lenders from time to time party thereto (the "***Prepetition FLLO Lenders***").

The Borrower's senior secured second lien term loan facility pursuant to that certain Second Lien Term Loan Agreement dated as of September 30, 2013, among the Borrower, Cortland Capital Market Services LLC, as administrative agent and collateral agent thereunder, and the lenders from time to time party thereto (as amended from time to time including pursuant to (i) that certain Amendment No. 1 to Second Lien Term Loan Agreement dated as of February 25, 2014, (ii) that certain Amendment No. 2 and Limited Waiver to Second Lien Term Loan Agreement dated as of May 27, 2016 and (iii) that certain Amendment No. 3 and Limited

---

[1] All capitalized terms used but not defined herein have the meanings given to them in the Restructuring Support Agreement (the "***Restructuring Support Agreement***") to which this Term Sheet is attached, including the term sheet for the $1.143 billion senior secured term loan facility attached to the Restructuring Support Agreement as ***Exhibit C*** (the "***Exit FLTL Term Sheet***") and the other exhibits attached to such Restructuring Support Agreement. In the event any such capitalized term is subject to multiple and differing definitions, the appropriate meaning thereof for purposes of this ***Exhibit D*** shall be determined by reference to the context in which it is used.

Waiver to Second Lien Term Loan Agreement dated as of May 27, 2016, the "***Prepetition Second Lien Credit Agreement***") (the loans outstanding under the Prepetition Second Lien Credit Agreement, "***Prepetition Second Lien Term Loans***").

The Borrower's senior secured second lien term loan facility pursuant to that certain Credit Agreement dated as of May 27, 2016 among the Borrower, Cortland Capital Market Services LLC, as administrative agent and collateral agent thereunder and the lenders from time to time party thereto (as amended from time to time, including pursuant to that certain Amendment No 1 to the Sponsor Second Lien Credit Agreement dated as of September 29, 2017).

**BORROWER/HOLDINGS:** Fieldwood Energy LLC, a Delaware limited liability company (the "***Borrower***"), all of the outstanding equity interests of which will, as of the Closing Date (as defined below), be owned directly by Fieldwood Energy Inc., a Delaware corporation ("***Holdings***").

**AGENT:** [●], will act as sole administrative agent and collateral agent (collectively, in such capacities, the "***Second Lien Term Loan Agent***", and as used in this ***Exhibit D***, the "***Administrative Agent***").

**LENDERS:** The Prepetition FLLO Lenders that elect to provide a commitment in respect of the Second Lien Term Facility (defined below) (collectively, the "***Second Lien Term Lenders***").

**EXIT SECOND LIEN TERM FACILITY:** A senior secured amended and restated second lien term loan facility (the "***Second Lien Term Facility***" and the loans under such Second Lien Term Facility, the "***Second Lien Term Loans***") that shall become effective on the effective date of the Plan (the "***Plan Effective Date***") provided by each Second Lien Term Lender based on pro rata allocation of term loan commitments under the Prepetition FLLO Facility (collectively, the "***Second Lien Term Commitments***") such that the aggregate amount of the Second Lien Term Commitments shall be in an amount equal to an aggregate principal amount of $518.0 million, which Second Lien Term Facility shall be secured on a junior basis to the Exit LC Facility (as defined below), the Permitted Hedge Obligations (as defined in the Exit FLTL Term Sheet) and the First Lien Term Facility (as defined below).

**INCREMENTAL SECOND LIEN TERM FACILITIES:** The Borrower shall be entitled, on one or more occasions, to incur separate classes of additional term loans or increases in existing term loans (the "***Incremental Second Lien Term Loans***") under the Second Lien Term Facility or incur additional *pari passu* secured, junior secured or unsecured term loans under a new term loan facility (each, an "***Incremental Second Lien Term Facility***") (or any secured or unsecured notes or loans issued in lieu of (and subject to the conditions set forth in this paragraph and in the next succeeding paragraph; provided that in no event shall such notes or loans be guaranteed by entities that are not guarantors under the Second Lien Term

Facility and in no event shall such secured notes or loans be secured by assets other than the Collateral) any Incremental Second Lien Term Loans ("***Incremental Equivalent Debt***")), so long as, (a) if such Incremental Second Lien Term Facility (or Incremental Equivalent Debt) is secured by a lien on the Collateral that is *pari passu* with the lien securing the Second Lien Term Facility, the Total Net Leverage Ratio (to be defined in a manner consistent with the Second Lien Term Facility Documentation Principles (as defined below)), calculated on a *pro forma* basis after giving effect to such Incremental Second Lien Term Loans (or Incremental Equivalent Debt) and the use of the proceeds therefrom (it being understood that the proceeds from such Incremental Second Lien Term Facility (or any Incremental Equivalent Debt) shall not be used for netting indebtedness for purposes of calculating the Total Net Leverage Ratio pursuant to this paragraph), does not exceed 2.50:1.00, (b) if such Incremental Second Lien Term Facility (or Incremental Equivalent Debt) is secured by a lien on the Collateral that is junior to the lien securing the Second Lien Term Facility, the Total Net Leverage Ratio, calculated on a pro forma basis after giving effect to such Incremental Second Lien Term Loans (or Incremental Equivalent Debt) and the use of the proceeds therefrom (it being understood that the proceeds from such Incremental Second Lien Term Facility (or any Incremental Equivalent Debt) shall not be used for netting indebtedness for purposes of calculating the Total Net Leverage Ratio pursuant to this paragraph), does not exceed 2.50:1.00 or (c) if such Incremental Second Lien Term Facility (or Incremental Equivalent Debt) is unsecured, the Total Net Leverage Ratio, calculated on a pro forma basis after giving effect to such Incremental Second Lien Term Loans (or Incremental Equivalent Debt) and the use of the proceeds therefrom (it being understood that the proceeds from such Incremental Term Facility (or any Incremental Equivalent Debt) shall not be used for netting indebtedness for purposes of calculating the Total Net Leverage Ratio pursuant to this paragraph), does not exceed 3.00:1.00.

At the time of the incurrence of any Incremental Second Lien Term Facility (or, in the case of clauses (ii) and (iii) below, Incremental Equivalent Debt): (i)(A) no event of default exists or would exist after giving effect thereto and (B) the representations and warranties contained in the Second Lien Term Facility Documentation shall be true and correct in all material respects (or, in the case of any such representation that is qualified by materiality, in all respects) immediately prior to, and after giving effect to, the incurrence of such Incremental Second Lien Term Loans, (ii) the maturity date of the Incremental Second Lien Term Loans (or Incremental Equivalent Debt) shall be no earlier than the maturity date of the Second Lien Term Facility, (iii) the weighted average life to maturity of the Incremental Second Lien Term Loans (or Incremental Equivalent Debt) shall be no shorter than the remaining weighted average life to maturity of the Second Lien Term Facility, (iv) all fees and expenses owing in respect of such increase to the Administrative Agent and the Second Lien Term Lenders providing such Incremental Second Lien Term Loans shall have

Case 20-33948 Document 1607-18 Filed in TXSB on 06/16/21 Page 248 of 528
Case 18-30648 Document 34-18 Filed in TXSB on 02/15/18 Page 248 of 525

D-4

been paid, (v) the Incremental Second Lien Term Loans shall have the same guarantors as, and if secured, shall be secured on a *pari passu* or more junior basis by the same collateral securing, the Second Lien Term Facility, (vi) any Incremental Second Lien Term Loans shall be on the terms and pursuant to documentation to be determined and to the extent not consistent with the Second Lien Term Facility (except to the extent permitted by clauses (ii) through (v) above) such terms and documentation shall be reasonably satisfactory to the Administrative Agent (it being understood that no consent of the Administrative Agent shall be required for terms and conditions that are more restrictive than those set forth in the existing Second Lien Term Facility Documentation to the extent the existing Second Lien Term Facility receives the benefit of such provisions or to the extent such provisions are only applicable after the latest maturity of any then-existing Second Lien Term Loans) (the requirements described in clauses (ii) and (iii) above, the "**Required Debt Terms**"), and (vii) with respect to Incremental Term Loans the all-in-yield (but excluding any amendment fees, arrangement fees or similar fees payable to any lead arranger (or its affiliates) in connection with the commitment or syndication of any such indebtedness and any other fees not paid or payable generally to all lenders in the primary syndication) (whether in the form of interest rate margins, original issue discount, upfront fees (with original issue discount and upfront fees being equated to an interest rate assuming a 4-year life to maturity (or, if shorter, the remaining life) on a straight line basis) or a "floor", with such increased amount being equated to interest margin for purposes of determining any increase to the applicable interest margin (*provided* that such differential between interest rate floors shall be equated to the applicable all-in-yield only to the extent an increase in the interest rate under the existing Second Lien Term Facility would cause an increase in the interest rate then in effect thereunder) (the "**Effective Yield**") under the Second Lien Term Facility and including any amendment to the applicable margin on the Second Lien Term Loans that became effective subsequent to the Closing Date but prior to the time of the addition of such Incremental Second Lien Term Facility) applicable to any Incremental Second Lien Term Facility will be determined by the Borrower and the lenders providing such Incremental Second Lien Term Facility, but will not be more than 0.50% higher than the corresponding all-in-yield (after giving effect to interest rate margins (including any "floors"), original issue discount and upfront fees) for the existing Second Lien Term Facility, unless the interest rate margins with respect to the existing Second Lien Term Facility are increased by an amount equal to the difference between the Effective Yield with respect to such Incremental Second Lien Term Facility and the corresponding Effective Yield on the existing Second Lien Term Facility minus 0.50% (the "**Second Lien MFN Protection**"); *provided* that the Second Lien MFN Protection shall only apply to any Incremental Second Lien Term Facility, Incremental Equivalent Debt or Permitted Ratio Debt (to be defined in the Second Lien Term Facility Documentation in a manner consistent with the Exit FLTL Term Sheet) in the form of term loans that ranks *pari passu* with the Second Lien Term Facility; *provided, further,* that Incremental

Case 20-33948 Document 1607-18 Filed in TXSB on 06/16/21 Page 249 of 528
Case 18-30648 Document 34-18 Filed in TXSB on 02/15/18 Page 249 of 528

D-5

Second Lien Term Loans may provide for mandatory prepayments of the Incremental Second Lien Term Loans on a *pro rata* basis or less than *pro rata* basis, and the Borrower shall be permitted to voluntarily prepay any class of term loans on a better than *pro rata* basis as compared to any other class of term loans. The Borrower may seek commitments in respect of Incremental Second Lien Term Loans from existing Second Lien Term Lenders (each of which shall be entitled to agree or decline to participate in its sole discretion) and additional banks, financial institutions and other institutional lenders who will become Second Lien Term Lenders in connection therewith, subject to the Administrative Agent's consent to the extent such consent would be required in connection with an assignment thereto under the heading "*Assignments and Participations*" below.

The Borrower may seek commitments in respect of Incremental Second Lien Term Loans from existing Second Lien Term Lenders (each of which shall be entitled to agree or decline to participate in its sole discretion) and additional banks, financial institutions and other institutional lenders who will become Second Lien Term Lenders in connection therewith, subject to the Administrative Agent's consent to the extent such consent would be required in connection with an assignment thereto under the heading "Assignments and Participations" below.

**EXIT LC FACILITY:** A senior secured first lien "first-out" letter of credit facility (the "***Exit LC Facility***", the funding commitments thereunder, the "***LC Funding Commitments***" and the letter of credit issuance commitments thereunder the "***LC Issuance Commitments***") that shall become effective on the Plan Effective Date. The LC Issuance Commitments shall be in an aggregate principal amount of $147.8 million and the LC Funding Commitments shall be in an aggregate amount equal to the product of (a) the face amount of the letters of credit issued under the Exit LC Facility on the Plan Effective Date and (b) the cash collateralization percentage required by the issuing banks with respect to such letters of credit, which Exit LC Facility shall be secured (i) on a *pari passu* basis with the First Lien Term Facility and the Permitted Hedge Obligations, but will (together with the Permitted Hedge Obligations) rank ahead of the First Lien Term Facility, on a "first-out" basis, in the payment waterfall in the applicable Intercreditor Agreement and (ii) on a senior basis to the Second Lien Term Facility.

**EXIT FIRST LIEN TERM FACILITY:** A senior secured amended and restated first lien "last-out" term loan facility (the "***First Lien Term Facility***" and the lenders thereunder, the "***First Lien Term Lenders***") that shall become effective on the Plan Effective Date provided by each First Lien Term Lender based on pro rata allocation of term loan commitments under the Prepetition First Lien Term Facility (collectively, the "***First Lien Term Commitments***" and the loans in respect thereof, the "***First Lien Term Loans***"). The First Lien Term Commitments shall be in an aggregate principal amount of $1.143 billion, which First Lien Term Facility shall be secured (i) on a

Case 20-33948 Document 1634-18 Filed in TXSB on 06/16/21 Page 250 of 528
Case 18-30648 Document 34-18 Filed in TXSB on 02/15/19 Page 250 of 528

D-6

*pari passu* basis with the Exit LC Facility and the Permitted Hedge Obligations, but will rank behind the Exit LC Facility and Permitted Hedge Obligations, on a "last-out" basis, in the payment waterfall, in the applicable Intercreditor Agreements (as defined below) and (ii) on a senior basis to the Second Lien Term Facility.

**REFINANCING SECOND LIEN FACILITY:**    The Second Lien Term Facility Documentation will permit the Borrower to refinance Second Lien Term Loans from time to time, in whole or part, with one or more new term loan facilities (each, a "***Second Lien Refinancing Term Facility***") under the Second Lien Term Facility Documentation with the consent of the Borrower and the institutions providing such Second Lien Refinancing Term Facility or with (x) one or more series of senior unsecured notes and (y) one or more series of senior secured notes that will be secured by the Collateral on a *pari passu* or junior basis with the Second Lien Term Facility, which will be subject to customary intercreditor arrangements in a form to be agreed (any such notes under clause (x) or (y), "***Second Lien Refinancing Notes***"); *provided* that (i) any Second Lien Refinancing Term Facility or Second Lien Refinancing Notes shall not mature prior to the maturity date of, or have a shorter weighted average life to maturity than, the loans under the Second Lien Term Facility being refinanced, (ii) any Second Lien Refinancing Notes are not subject to any amortization prior to final maturity or are subject to the same amortization schedule as the loans under the Second Lien Term Facility being refinanced and are not subject to mandatory redemption or prepayment (except customary asset sales or change of control provisions), (iii) the other terms and conditions of such Second Lien Refinancing Term Facility or Second Lien Refinancing Notes (excluding pricing and optional prepayment or redemption terms) are, when taken as a whole, not materially more favorable to the investors or lenders providing such Second Lien Refinancing Term Facility or Second Lien Refinancing Notes, as applicable, than those applicable to the Second Lien Term Facility being refinanced (except for covenants or other provisions applicable only to periods after the latest final maturity date of the Second Lien Term Facility existing at the time of such refinancing or to the extent such terms and conditions are added for the benefit of the existing Second Lien Term Facility), (iv) except to the extent otherwise permitted under the Second Lien Term Facility Documentation, the aggregate principal amount of any Second Lien Refinancing Term Facility or Second Lien Refinancing Notes shall not exceed the aggregate principal amount of the indebtedness and commitments being refinanced or replaced therewith, plus accrued and unpaid interest, penalties, premiums, fees, commissions, underwriting discounts and expenses related thereto, (v) the proceeds of such Second Lien Refinancing Term Facility or Second Lien Refinancing Notes shall be applied, substantially concurrently with the incurrence thereof, to the *pro rata* prepayment of outstanding loans under the applicable Second Lien Term Facility being so refinanced, (vi) any Second Lien Refinancing Term Facility or Second Lien Refinancing Notes that is *pari passu* with the Second Lien Term Facility being refinanced in right of payment and security shall

share ratably in any mandatory prepayment of the Second Lien Term Loans unless the Borrower and the lenders or holders in respect of such Second Lien Refinancing Term Facility or Second Lien Refinancing Notes elect lesser payments, and (vii) any Second Lien Refinancing Term Facility and Second Lien Refinancing Notes will (A) have the same guarantors and rank on the same or more junior basis in right of payment as the tranche being refinanced or replaced and (B) be secured by the Collateral with the same or more junior priority as the tranche being refinanced or replaced, or be unsecured (and to the extent subordinated in right of payment or security, subject to a customary subordination and intercreditor agreement, as applicable).

**PURPOSE:** The proceeds of any Second Lien Term Loans will be deemed used by the Borrower, on the Plan Effective Date (the "***Closing Date***") to refinance certain prepetition indebtedness of the Borrower and its subsidiaries, including without limitation the entirety of the Prepetition Second Lien Term Loans, pay fees and expenses in connection therewith and to finance other general corporate purposes of the Borrower and its subsidiaries and, after the Closing Date, to finance the working capital needs and other general corporate purposes of the Borrower and its subsidiaries.

**AVAILABILITY:** The full amount of the Second Lien Term Facility (or such lesser amount as the Borrower shall request) must be drawn in a single drawing on the Closing Date; amounts borrowed thereunder that are repaid or prepaid may not be reborrowed.

**INTEREST RATES AND FEES:** As set forth on ***Annex I*** hereto.

**DEFAULT RATE:** At any time when a payment event of default under the Second Lien Term Facility exists, any overdue principal or interest (after giving effect to any grace periods) payable under or in respect of the Second Lien Term Facility not paid when due shall, upon the election of the Required Lenders, bear interest at the applicable interest rate plus 2% per annum. Other overdue amounts (after giving effect to any grace periods) shall, upon the election of the Required Lenders, bear interest at the interest rate applicable to ABR loans plus 2% per annum.

**FINAL MATURITY:** The Second Lien Term Facility will mature on the date that is five years after the Closing Date (the "***Second Lien Term Loan Maturity Date***"); *provided* that the Second Lien Term Facility Documentation shall provide the right for individual Second Lien Term Lenders to agree to extend the maturity date of all or a portion of the outstanding loans under the Second Lien Term Facility upon the request of the Borrower and without the consent of any other Second Lien Term Lender; it being understood that each Second lien Term Lender under the applicable tranche or tranches of the Second Lien Term Facility that are being extended shall have the opportunity to participate in such extension on the same terms and conditions as each other Second Lien Term Lender

Case 20-33948 Document 1604-18 Filed in TXSB on 06/16/21 Page 252 of 528
Case 18-30648 Document 34-18 Filed in TXSB on 02/15/18 Page 252 of 525

D-8

in such tranche or tranches (it further being understood that no existing Second Lien Term Lender will have any obligation to commit to any such extension).

**GUARANTEES:**     All obligations of the Borrower under the Second Lien Term Facility will be jointly and severally unconditionally guaranteed on a second lien secured basis (the "***Second Lien Guarantees***") by the same Guarantors (as defined in the Exit FLTL Term Sheet) that guarantee the First Lien Term Facility.

**SECURITY:**     The obligations of the Borrower under the Second Lien Term Facility and the Second Lien Guarantees will be secured by a perfected second lien security interest in the same Collateral (as defined in the Exit FLTL Term Sheet) that secures the First Lien Term Facility, excluding for the avoidance of doubt, Excluded Assets (as defined in the Exit FLTL Term Sheet).

The second lien pledges, security interests and mortgages on the Collateral shall be created and perfected on terms, and pursuant to documentation that will be separate from but substantially similar to the First Lien Term Facility Documentation, with appropriate modifications to reflect the second lien status of the Second Lien Term Facility.

**INTERCREDITOR AGREEMENTS:**     Subject to the Second Lien Term Facility Documentation Principles, the lien priority, relative rights and other creditors' rights issues between and among the holders of the Exit LC Facility and the holders of the First Lien Term Loans the holders of the Second Lien Term Loans and will be set forth in one or more intercreditor agreements (the "***Intercreditor Agreements***") reasonably satisfactory to the Borrower and the Administrative Agent.

**MANDATORY PREPAYMENTS:**     (a)     100% of the net cash proceeds of Asset Sales (to be defined consistent with the Second Lien Term Facility Documentation Principles) of the type described in clause (f)(iii) of the section titled "*Negative Covenants*" in the Exit FLTL Term Sheet (subject to the right of the Borrower to reinvest 100% of such net cash proceeds if such proceeds are reinvested within 12 months; and

(b)     100% of the net cash proceeds of issuances, offerings or placements of debt obligations of Holdings and its restricted subsidiaries (except the net cash proceeds of any permitted debt (other than the proceeds of any Second Lien Refinancing Term Facility or Second Lien Refinancing Notes)).

The above-described mandatory prepayments will be without premium or penalty (but subject to reimbursement of applicable lenders' redeployment costs in the case of a prepayment of Adjusted LIBOR borrowings other than on the last day of the relevant interest period).

Notwithstanding anything to the contrary set forth above, no mandatory prepayment of the Second Lien Term Loans shall be required until

Case 20-33948 Document 1634-18 Filed in TXSB on 06/16/21 Page 253 of 528
Case 18-30648 Document 34-1 Filed in TXSB on 02/18/18 Page 253 of 525

D-9

amounts outstanding under the First Lien Term Facility and any other debt secured on a *pari passu* basis with the First Lien Term Facility requiring such mandatory prepayments have been paid in full, other than with (x) Declined Proceeds (as defined in the Exit FLTL Term Sheet) and (y) proceeds of permitted refinancing debt in respect of the Second Lien Term Facility.

Any Second Lien Term Lender may elect not to accept its pro rata portion of any mandatory prepayment (each, a "**Declining Second Lien Lender**"), but, in the case of *clause (b)* above, solely to the extent the relevant prepayment does not represent a refinancing of the Second Lien Term Facility. Any prepayment amount declined by a Declining Second Lien Lender may be retained by the Borrower.

Mandatory prepayments required under the Second Lien Term Facility Documentation may, if required pursuant to the terms of any other indebtedness secured *pari passu* with the Second Lien Term Facility, be applied to the Second Lien Term Loans and such other *pari passu* indebtedness, in each case on a ratable basis based on the outstanding principal amounts thereof.

**VOLUNTARY PREPAYMENTS:** Prepayments of borrowings under the Second Lien Term Facility (other than, for the avoidance of doubt, any reduction of Second Lien Term Loans in connection with a permitted assignment thereof to an Affiliated Lender (to be defined in a manner consistent with the Second Lien Term Facility Documentation Principles) will be permitted at any time, in minimum principal amounts to be agreed upon, subject to customary notice requirements (subject to reimbursement of the Second Lien Term Lenders' redeployment costs (other than lost profits) in the case of a prepayment of Adjusted LIBOR borrowings other than on the last day of the relevant interest period) and, subject to a prepayment premium in the amount of (i) if on or prior to the six month anniversary of the Closing Date, 1.00% of the total amount of the Second Lien Term Loans so prepaid and (ii) if after the six month anniversary of the Closing Date, 0.00% of the total amount of the Second Lien Term Loans so prepaid.

**UNRESTRICTED SUBSIDIARIES:** The Second Lien Term Facility Documentation will contain unrestricted subsidiary provisions substantially consistent with the corresponding provisions set forth in the First Lien Term Facility Documentation.

**DOCUMENTATION:** The definitive documentation for the Second Lien Term Facility (the "**Second Lien Term Facility Documentation**") will be documented under a single credit agreement, will contain the terms set forth in this **Exhibit D** and, to the extent not covered by this **Exhibit D**, will be substantially consistent with the First Lien Term Facility Documentation (as defined in the Exit FLTL Term Sheet) (the "**Second Lien Term Facility Documentation Principles**"). The Second Lien Term Facility Documentation will be negotiated in good faith within a reasonable time period to be determined based on the expected Closing Date.

For purposes of calculating Consolidated EBITDA, Consolidated Total

Case 20-33948 Document 1603-18 Filed in TXSB on 06/16/21 Page 254 of 528
Case 18-30648 Document 34-18 Filed in TXSB on 02/15/18 Page 254 of 528

D-10

Assets and financial ratios, *pro forma* effect will be given to acquisitions and other investments (other than in the ordinary course of business), material dispositions and certain other specified transactions on a basis consistent with the Second Lien Term Facility Documentation Principles.

**REPRESENTATIONS AND WARRANTIES:**  The Second Lien Term Facility Documentation will contain representations and warranties substantially consistent with the corresponding provisions set forth in the First Lien Term Facility Documentation.

**CONDITIONS PRECEDENT:**  The closing of the Second Lien Term Facility will be subject to satisfaction of the following: (a) all of the representations and warranties in the Second Lien Term Facility Documentation shall be true and correct in all material respects (or if qualified by materiality or material adverse effect, in all respects) as of the date of such extension of credit, or if such representation speaks as of an earlier date, as of such earlier date; (b) no default or event of default under the Second Lien Term Facility shall have occurred and be continuing or would result from such extension of credit; (c) delivery of a customary borrowing notice; and (d) the occurrence of those conditions listed on Annex II hereto.

**AFFIRMATIVE COVENANTS:**  The Second Lien Term Facility Documentation will contain affirmative covenants substantially consistent with the corresponding provisions set forth in the First Lien Term Facility Documentation, with appropriate modifications to reflect the second lien status of the Second Lien Term Facility.

**NEGATIVE COVENANTS:**  The negative covenants shall be substantially consistent with the corresponding provisions set forth in the First Lien Term Facility Documentation, with (i) appropriate modifications to reflect the second lien status of the Second Lien Term Facility, (ii) monetary baskets and thresholds set at an additional cushion of 15% against the applicable basket or threshold in the First Lien Term Loan Documentation and (iii) any debt that is incurred as Permitted Ratio Debt (as defined in the Exit FLTL Term Sheet) that is permitted to be secured by a lien on the Collateral that is senior to the lien securing the Second Lien Term Facility shall be required to be secured on a *pari passu* basis with the First Lien Term Facility.

**FINANCIAL COVENANT:**  None.

**EVENTS OF DEFAULT:**  The Second Lien Term Facility Documentation will contain events of default substantially consistent with the corresponding provisions set forth in the Exit FLTL Term Sheet, with (i) appropriate modifications to reflect the second lien status of the Second Lien Term Facility and (ii) cross-acceleration (instead of cross-default) and cross-payment event of default at maturity to the LC Facility and the First Lien Term Facility.

Case 20-33948 Document 1603-18 Filed in TXSB on 06/16/21 Page 255 of 528
Case 18-30648 Document 34-1 Filed in TXSB on 02/15/18 Page 255 of 525

D-11

| | |
|---|---|
| **VOTING:** | The Second Lien Term Facility Documentation will contain voting provisions substantially consistent with the corresponding provisions set forth in the First Lien Term Facility Documentation. |
| **COST AND YIELD PROTECTION:** | The Second Lien Term Facility Documentation will contain provisions for increased costs and loss of yield substantially consistent with the corresponding provisions set forth in the First Lien Term Facility Documentation. |
| **ASSIGNMENTS AND PARTICIPATIONS:** | The Second Lien Term Facility Documentation will contain provisions for assignments of and participations in the Second Lien Term Loans substantially consistent with the corresponding provisions set forth in the First Lien Term Facility Documentation. |
| **REPLACEMENT OF ADMINISTRATIVE AGENT:** | The Second Lien Term Facility Documentation will contain provisions for replacement of the Administrative Agent substantially consistent with the corresponding provisions set forth in the First Lien Term Facility Documentation. |
| **EXPENSES AND INDEMNIFICATION:** | The Second Lien Term Facility Documentation will contain provisions for expenses and indemnification substantially consistent with the corresponding provisions set forth in the First Lien Term Facility Documentation. |
| **CONFIDENTIALITY:** | The Second Lien Term Facility Documentation will contain confidentially provisions substantially consistent with the corresponding provisions set forth in the First Lien Term Facility Documentation. |
| **GOVERNING LAW AND FORUM:** | New York. |
| **COUNSEL TO ADMINISTRATIVE AGENT:** | Davis Polk & Wardwell LLP. |

**INTEREST RATES:**     The interest rates under the Second Lien Term Facility will be as follows:

At the option of the Borrower, Adjusted LIBOR <u>plus</u> 7.25% or ABR <u>plus</u> 6.25%, with such rate to automatically increase 300 basis points in the event that the Debt Rating (as defined in the Exit FLTL Term Sheet) falls below B3 or B- for at least one full fiscal quarter and so long as it remains below such rating.

The Borrower may elect interest periods of one, two, three or six months (or 12 months or a shorter period if available to all Second Lien Term Lenders) (each, an "***Interest Period***") for Adjusted LIBOR borrowings.

Calculation of interest shall be on the basis of the actual number of days elapsed over a 360-day year (or 365- or 366-day year, as the case may be, in the case of ABR loans based on the Prime Rate) and interest shall be payable (i) in the case of ABR loans, quarterly in arrears and (ii) in the case of Adjusted LIBOR loans at the end of each interest period and, in any event, at least every three months.

"***ABR***" is the Alternate Base Rate, which is the highest of (i) the per annum rate publicly quoted from time to time by The Wall Street Journal as the "Prime Rate" in the United States, (ii) the Federal Funds Effective Rate <u>plus</u> 1/2 of 1.0% and (iii) one-month Adjusted LIBOR <u>plus</u> 1.0%.

"***Adjusted LIBOR***" is the London interbank offered rate (or a comparable successor rate to be determined in the Second Lien Term Facility Documentation) for eurodollar deposits for a period equal to the applicable Interest Period appearing on the LIBOR01 Page that displays the Intercontinental Exchange Benchmark Administration Interest Settlement Rate for deposits in Dollars with a term equivalent to such Interest Period,; *provided* that Adjusted LIBOR will at all times be adjusted for statutory reserves and shall be deemed to be not less than 1.00%.

*Annex II*

PROJECT PELICAN

SUMMARY OF CONDITIONS PRECEDENT

The borrowing under the Second Lien Term Facility shall be subject only to the following conditions precedent:

1.    A final non-appealable order of the Bankruptcy Court confirming the Plan in form and substance reasonably satisfactory to the Administrative Agent, which shall not have been reversed, vacated, amended, supplemented or otherwise modified in any manner that could reasonably be expected to adversely affect the interest of the Second Lien Term Lenders (the "***Confirmation Order***") and authorizing the Borrower to execute, deliver and perform under all documents contemplated under the Second Lien Term Facility Documentation shall have been entered and shall have become a final order of the Bankruptcy Court.

2.    The execution and delivery by each of the Loan Parties of (i) the Second Lien Term Facility Documentation (including the Intercreditor Agreements (which may be limited to an acknowledgement by the Loan Parties)), (ii) customary legal opinions, customary evidence of authorization, customary officer's certificates, good standing certificates (to the extent applicable) in the jurisdiction of organization of each Loan Party, (iii) a solvency certificate substantially in the form of ***Annex III*** hereto executed by the chief financial officer or other officer of equivalent duties and (iv) all documents and instruments required to create and perfect the Administrative Agent's security interests in the Collateral under the Second Lien Term Facility, which shall be, if applicable, in proper form for filing.

3.    The Administrative Agent shall have received (a) audited consolidated balance sheets and related statements of income and cash flows of the Borrower and its subsidiaries for the three most recently completed fiscal years ended at least 105 days before the Closing Date (the receipt of such financial statements for 2015 and 2016 being acknowledged by the Second Lien Term Lenders) and (b) unaudited consolidated balance sheets and related statements of income, stockholders' equity and cash flows of the Borrower and its subsidiaries for each subsequent fiscal quarter (other than fiscal year end) ended at least 60 days before the Closing Date.

4.    The Administrative Agent shall have received *pro forma* financial statements consisting of a *pro forma* consolidated balance sheet and *pro forma* consolidated statements of income as of and for the twelve month period ending on the last day of the recently completed four fiscal quarter period ended at least 60 days before the Closing Date.

5.    The Administrative Agent shall have received, at least 3 business days prior to the Closing Date, all documentation and other information required by regulatory authorities under applicable "know your customer" and anti-money laundering rules and regulations, including, without limitation, the PATRIOT Act, that has been requested in writing by the Second Lien Term Lenders at least 10 business days prior to the Closing Date.

6.    All fees required to be paid on the Closing Date pursuant to the Fee Letter and this Term Sheet and reasonable and documented out-of-pocket expenses (including legal expenses) required to be paid on the Closing Date pursuant to this Term Sheet, to the extent invoiced at least 3 business days prior to the Closing Date, shall, upon the initial borrowing of the Second Lien Term Facility, have been paid.

7.    The representations and warranties of the Loan Parties set forth in the Second Lien Term Facility Documentation shall be true and correct in all material respects (or, in the case of any such representation that is qualified by materiality, in all respects).

Case 18-30648 Document 34-1 Filed in TXSB on 02/19/18 Page 258 of 525

8.   No default or event of default shall exist or would result from the consummation of the Transactions.

*Annex III*

# FORM OF SOLVENCY CERTIFICATE

[_____][__], 20[__]

This Solvency Certificate is being executed and delivered pursuant to Section [__] of that certain [●] (the "***Credit Agreement***"; the terms defined therein being used herein as therein defined).

I, [_____], a Financial Officer (or other officer of equivalent duties) of the Borrower (after giving effect to the Transactions), in such capacity and not in an individual capacity, hereby certify on behalf of the Borrower as follows:

       1.      The sum of the debt and liabilities (subordinated, contingent or otherwise) of the Borrower and its subsidiaries, on a consolidated basis, does not exceed the fair value of the present assets of the Borrower and its subsidiaries, on a consolidated basis.

       2.      The capital of the Borrower and its subsidiaries, on a consolidated basis, is not unreasonably small in relation to their business as conducted or contemplated to be conducted on the date hereof.

       3.      The Borrower and its subsidiaries, on a consolidated basis, have not incurred and do not intend to incur, or believe that they will incur, debts or other liabilities, including current obligations, beyond their ability to pay such debts or other liabilities as they become due (whether at maturity or otherwise).

       4.      In reaching the conclusions set forth in this Solvency Certificate, the undersigned has (i) reviewed the Credit Agreement and other Loan Documents referred to therein and such other documents deemed relevant and (ii) made such other investigations and inquiries as the undersigned has deemed appropriate.  The undersigned is familiar with the financial performance and prospects of the Borrower and its subsidiaries.

IN WITNESS WHEREOF, I have executed this Solvency Certificate on the date first written above.

[FIELDWOOD ENERGY LLC]

By: _____
Name:
Title:

**<u>EXHIBIT E</u>**
**BACKSTOP COMMITMENT AGREEMENT**

Attached.

Execution Version

BACKSTOP COMMITMENT AGREEMENT

AMONG

FIELDWOOD HOLDINGS LLC,

FIELDWOOD ENERGY INC.

AND

THE BACKSTOP PARTIES PARTY HERETO

Dated as of February 14, 2018

# TABLE OF CONTENTS

PAGE

Section 1.   THE RIGHTS OFFERING. ................................................................2

Section 2.   THE BACKSTOP COMMITMENTS. ...................................................4

Section 3.   TRANSFER OF BACKSTOP COMMITMENT....................................6

Section 4.   BACKSTOP PARTY DEFAULT. .........................................................7

Section 5.   REPRESENTATIONS AND WARRANTIES OF THE ISSUER AND THE COMPANY. ....................................................................................7

Section 6.   REPRESENTATIONS AND WARRANTIES OF THE BACKSTOP PARTIES............16

Section 7.   ADDITIONAL COVENANTS OF THE COMPANY...............................18

Section 8.   ADDITIONAL COVENANTS OF THE BACKSTOP PARTIES. .............26

Section 9.   SUPPORT OF PLAN. .........................................................................26

Section 10.  CONDITIONS TO THE OBLIGATIONS OF THE BACKSTOP PARTIES. ................27

Section 11.  CONDITIONS TO THE OBLIGATIONS OF THE COMPANY. ..............29

Section 12.  SURVIVAL OF REPRESENTATIONS AND WARRANTIES. ................30

Section 13.  TERMINATION. ................................................................................30

Section 14.  INDEMNIFICATION OBLIGATIONS. .................................................33

Section 15.  NOTICES...........................................................................................35

Section 16.  SURVIVAL. ........................................................................................37

Section 17.  ASSIGNMENT; THIRD PARTY BENEFICIARIES. ..............................37

Section 18.  COMPLETE AGREEMENT. ...............................................................37

Section 19.  GOVERNING LAW; SUBMISSION TO JURISDICTION; SELECTION OF FORUM; WAIVER OF TRIAL BY JURY......................................37

Section 20.  COUNTERPARTS. .............................................................................37

Section 21.  ACTION BY, OR CONSENT OR APPROVAL OF, THE BACKSTOP PARTIES. ........................................................................................38

Section 22.  AMENDMENTS AND WAIVERS. .......................................................38

Section 23.  SPECIFIC PERFORMANCE.................................................................38

Section 24.  OTHER INTERPRETIVE MATTERS.....................................................38

i

# INDEX OF DEFINED TERMS

| Term | Section |
|---|---|
| Accredited Investor | Section 1(a) |
| Affiliate | 3(b) |
| Affiliate Agreement | 5(q) |
| Agreement | Preamble |
| Alternative Restructuring | Section 9(b) |
| Alternate Transaction | Section 7(k)(1) |
| Alternate Transaction Proposal | Section 7(k)(2) |
| Antitrust Laws | Section 7(g) |
| Backstop Commitment Percentage | Recitals |
| Backstop Commitments | Section 2(a)(ii) |
| Backstop Commitment Premium | 2(c) |
| Backstop Funding Deadline | 1(g)(v) |
| Backstop Funding Notice | 1(g) |
| Backstop Parties | Preamble |
| Backstop Party | Preamble |
| Backstop Party Shares | 6(d) |
| Backstop Transfer Notice | 3(a) |
| Bankruptcy Code | Recitals |
| Bankruptcy Court | Recitals |
| Business Day | 1(d)(3) |
| Business Plan | Section 7(h)(iii) |
| Chapter 11 Cases | Recitals |
| Chosen Courts | 19 |
| Company | Preamble |
| Company Board | Section 7(k)(1) |
| Company Disclosure Letter | Section 5 |
| Confirmation Order | Recitals |
| Control | 3(b) |
| Debtors | Recitals |
| Defaulting Backstop Party | Section 4 |
| Disclosure Statement | 7(a) |
| Eligible Claims | 1(a) |
| Eligible Holder | 1(a) |
| Environmental Law | 5(n) |
| Funding Account | Section 1(g)(iv) |
| Financial Statements | Section 5(i) |
| Funding Amount | Section 1(g)(iii) |
| Hazardous Materials | 5(n) |
| HSR Act | Section 7(g) |
| Indemnified Claim | 14(b) |
| Indemnified Person | 14(a) |
| Intellectual Property Rights | 5(p) |
| Issuer | Recitals |

ii

| Term | Section |
|------|---------|
| Knowledge of the Company | Section 5(k) |
| Legend | Section 7(e) |
| Lien | Section 5(v)(i) |
| Losses | 14(a) |
| Material Adverse Effect | 5(f) |
| Material Contract | Section 5(y) |
| Net Funding Amount | Section 1(g)(iv) |
| Outside Date | 13(a) |
| Parties | Preamble |
| Party | Preamble |
| Per Share Price | Recitals |
| Permitted Lien | Section 5(v)(i) |
| Permitted Transferee | 3(a) |
| Person | Section 5(l) |
| Petition Date | Recitals |
| Plan | Recitals |
| Plan Effective Date | Recitals |
| Reference Date | Section 5(h) |
| Related Fund | 3(b) |
| Required Backstop Parties | Recitals |
| Rights Offering Amount | Recitals |
| Rights Offering Procedures | Section 1 |
| Rights Offering Shares | Recitals |
| Rights Offering Subscription Form | 1(d)(1) |
| Riverstone | Recitals |
| RSA | Recitals |
| Securities Act | 6(d) |
| Second Lien Credit Agreements | Recitals |
| SLTL Claim | Recitals |
| Subscription Agent | Section 1(d)(1) |
| Subscription Expiration Deadline | 1(d)(3) |
| Subscription Record Date | Recitals |
| Superior Transaction | Section 7(k)(1) |
| Superior Proposal | Section 7(k)(2) |
| Taxes | 5(u)(i) |
| Transaction Expenses | Section 2(d) |
| Unsubscribed Shares | Recitals |

#90500902v12

# BACKSTOP COMMITMENT AGREEMENT

This BACKSTOP COMMITMENT AGREEMENT (including exhibits and schedules attached hereto and incorporated herein, this "**Agreement**"), dated as of February 14, 2018 is made by and among Fieldwood Energy Inc., a Delaware corporation (the "**Issuer**"), Fieldwood Holdings LLC, a Delaware limited liability company (the "**Company**"), and the ultimate parent of the Issuer and each of the other Debtors (as defined below), on behalf of itself and the other Debtors, on the one hand, and the Backstop Parties set forth on **Schedule 1** hereto (each referred to herein, individually, as a "**Backstop Party**" and, collectively, as the "**Backstop Parties**"), on the other hand. The Company and each Backstop Party is referred to herein, individually, as a "**Party**" and, collectively, as the "**Parties**". Capitalized terms used but not defined herein shall have the meanings ascribed to such terms in the Plan (as defined below).

WHEREAS, the Debtors, certain of the Backstop Parties and certain of the Debtors' other creditors and interest holders have entered into a Restructuring Support Agreement, dated as of February 14, 2018 (such agreement, as may be amended, restated, supplemented or otherwise modified from time to time, including all the exhibits thereto, the "**RSA**"), which provides for the restructuring of the Company's capital structure and financial obligations pursuant to a "prepackaged" plan of reorganization (as it may be amended, modified or supplemented from time to time as provided in the RSA, the "**Plan**"). The Company and certain of its subsidiaries as set forth on **Schedule 2** (collectively, the "**Debtors**") will file voluntary petitions for relief (the "**Chapter 11 Cases**") under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101, et seq. (the "**Bankruptcy Code**"), in the United States Bankruptcy Court for the Southern District of Texas (the "**Bankruptcy Court**") (the date of such filings being referred to herein as the "**Petition Date**") and will seek confirmation of the Plan;

WHEREAS, subject to the Bankruptcy Court's entry of an order confirming the Plan (the "**Confirmation Order**"), consummation of the Plan, and the other conditions specified in Section 10 and Section 11 hereof, prior to or on the effective date of the Plan (the "**Plan Effective Date**") the Issuer will offer and sell the New Equity Interests issued pursuant to the Rights Offering and this Agreement (excluding New Equity Interests issued as the Backstop Commitment Premium (as defined below)) representing approximately 75% of the New Equity Interests issued by the Issuer on the Plan Effective Date (prior to taking into account the Management Incentive Plan) (the "**Rights Offering Shares**") *pro rata* to all Eligible Holders (as defined below) of claims under the Prepetition Second Lien Credit Agreement and the Prepetition Sponsor Second Lien Credit Agreement (the "**Second Lien Credit Agreements**", and each claim under such agreements, an "**SLTL Claim**") at an aggregate purchase price of $525 million (the "**Rights Offering Amount**") at $23.33 per share (the "**Per Share Price**") (subject to adjustment pursuant hereto) which may be subscribed for by all Eligible Holders (as defined below) of Eligible Claims (as defined below) on or before February 9, 2018 (the "**Subscription Record Date**");

WHEREAS, in order to facilitate the Plan and the Rights Offering, pursuant to this Agreement, and subject to the terms, conditions and limitations set forth herein, (A)

the Company has agreed to consummate the Plan and (B) each Backstop Party, severally and not jointly, has agreed to purchase from the Issuer, on the Plan Effective Date, (i) all Rights Offering Shares allocated to such Backstop Party based on its ownership of Eligible Claims (and on the ownership of Eligible Claims owned by certain of its Related Funds as provided on **Schedule 1**), and (ii) such Backstop Party's percentage (its "**Backstop Commitment Percentage**"), as set forth on **Schedule 1** opposite such Backstop Party's name, of all Rights Offering Shares that are not purchased by other Eligible Holders (as defined below) of Eligible Claims pursuant to the Rights Offering (the "**Unsubscribed Shares**");

WHEREAS, as consideration for their respective Backstop Commitments, the Backstop Parties will receive, on the Plan Effective Date, the Backstop Commitment Premium (as defined below);

WHEREAS, for purposes of this Agreement, "**Required Backstop Parties**" shall mean (i) Backstop Parties holding at least 50% in aggregate amount of the Backstop Commitments of all Backstop Parties (excluding the "Riverstone Entities" as set forth on **Schedule 1** and their Permitted Transferees that are Related Funds (collectively, "**Riverstone**") and any Defaulting Backstop Parties (as defined below) and, in each case, their corresponding Backstop Commitments), (ii) Backstop Parties holding at least 50% in aggregate amount of the Backstop Commitments of all Backstop Parties (excluding any Defaulting Backstop Parties and their corresponding Backstop Commitments) and (iii) Riverstone, so long as Riverstone continues to hold at least 45% of the aggregate amount of the Backstop Commitments of all Backstop Parties.

NOW, THEREFORE, in consideration of the foregoing, and the representations, warranties and covenants set forth herein, and other good and valuable consideration, the Company and the Backstop Parties agree as follows:

Section 1.  THE RIGHTS OFFERING.  The Rights Offering will be conducted in accordance with the Rights Offering Procedures attached as Exhibit I to the RSA (the "**Rights Offering Procedures**") and as follows:

(a)  Pursuant to the RSA and the Plan, each holder of an SLTL Claim that is an "accredited investor" as defined in Rule 501(a) under the Securities Act  (an "**Accredited Investor**") (each such holder, an "**Eligible Holder**") before the Subscription Record Date will receive Subscription Rights with respect to their claims under the Second Lien Credit Agreements held or beneficially held by such Eligible Holder as of the Subscription Record Date (such claims being, "**Eligible Claims**") to subscribe for its *pro rata* share (measured as the principal and accrued and unpaid interest amount of Eligible Claims held by such Eligible Holder as compared to the aggregate principal and accrued and unpaid interest amount relating to such Eligible Claims held by all Eligible Holders) of the Rights Offering Shares, subject to certain other customary representations and warranties.

2

(b)     Subject to the terms and conditions of this Agreement, the Issuer hereby undertakes to offer Rights Offering Shares for subscription by Eligible Holders of Eligible Claims pursuant to the RSA and the Plan as set forth in this Agreement.

(c)     The Issuer will issue Subscription Rights to purchase the Rights Offering Shares at the Per Share Price.  Each Eligible Holder of Eligible Claims as of the Subscription Record Date will receive a Subscription Right to subscribe for its *pro rata* share of the Rights Offering Shares at the Per Share Price.

(d)     (1) The Issuer will provide, or cause to be provided, to each Eligible Holder of Eligible Claims a subscription form (the "**Rights Offering Subscription Form**"), whereby each Eligible Holder of Eligible Claims may exercise its Subscription Rights in whole or in part, *provided* that such Eligible Holder of Eligible Claims (i) timely and properly executes and delivers its Rights Offering Subscription Form (with accompanying IRS Form W-9 or appropriate IRS Form W-8, as applicable) and Subscription Agreement to the subscription agent for the Rights Offering selected by the Company (the "**Subscription Agent**") in advance of the Subscription Expiration Deadline (as defined below) and (ii) (A) if such Eligible Holder is not a Backstop Party, such Eligible Holder pays the aggregate purchase price of the Rights Offering Shares elected to be purchased by the Eligible Holder of Eligible Claims by wire transfer of immediately available funds prior to the Subscription Expiration Deadline to an account established by the Subscription Agent for the Rights Offering or (B) if such Eligible Holder is a Backstop Party, such Backstop Party pays the aggregate purchase price of its Rights Offering Shares and those Rights Offering Shares to be purchased by such Backstop Party, as provided on **Schedule 1,** pursuant to certain Subscription Rights allocated to certain of its Related Parties in accordance with Section 1(g).

(2) In advance of the Subscription Expiration Deadline, (A) the Issuer shall deliver to each Backstop Party a notice setting forth such Backstop Party's allocation of Rights Offering Shares for which it may exercise its Subscription Rights and (B) each Backstop Party shall timely and properly exercise its rights to purchase its allocated portion of the Rights Offering Shares, pursuant to the procedures set forth in the preceding clause (1) and the Rights Offering Procedures, subject to payment in accordance with Section 1(g).  For the avoidance of doubt, each Backstop Party shall fully exercise all Subscription Rights allotted to it for the purchase of the Rights Offering Shares (including, for the avoidance of doubt, those Rights Offering Shares to be purchased by such Backstop Party, as provided on **Schedule 1,** pursuant to certain Subscription Rights allocated to certain of its Related Parties).

(3) For purposes of this Agreement, the "**Subscription Expiration Deadline**" means 5:00 p.m. New York City time on such date that is specified in the Rights Offering Procedures or such other date as the Company or the Issuer, subject to the approval of the Required Backstop Parties, may specify in a notice provided to the Eligible Holders of Eligible Claims before 9:00 a.m. New York City time on the Business Day before the then-effective Subscription Expiration Deadline. For purposes of this Agreement, "**Business Day**" means any day of the year on which national banking

institutions in New York City are open to the public for conducting business and are not required or authorized to close.

(e)     The Issuer will issue the Rights Offering Shares to the Eligible Holders of Eligible Claims with respect to which Subscription Rights were validly exercised by such Eligible Holders of Eligible Claims upon the Plan Effective Date. The portion of Rights Offering Shares issued to an Eligible Holder who elects to acquire such Rights Offering Shares shall be rounded down to the nearest whole share.

(f)     If the Subscription Agent for any reason does not receive from an Eligible Holder of Eligible Claims both a timely and duly completed Rights Offering Subscription Form and timely payment for the Rights Offering Shares being purchased by such Eligible Holder of Eligible Claims, the Rights Offering Procedures shall provide that, unless otherwise approved by the Issuer and the Required Backstop Parties, such Eligible Holder of Eligible Claims shall be deemed to have relinquished and waived its right to participate in the Rights Offering.

(g)     As soon as reasonably practicable following the Subscription Expiration Deadline, but, in any event, no later than eight (8) Business Days prior to the Plan Effective Date, the Issuer will deliver to each Backstop Party by email delivery a written notice (the "**Backstop Funding Notice**") of: (i) the number of Rights Offering Shares that such Backstop Party has subscribed to purchase pursuant to such Backstop Party's Rights Offering Subscription Form (including, for the avoidance of doubt, those Rights Offering Shares to be purchased by such Backstop Party, as provided on **Schedule 1,** pursuant to certain Subscription Rights allocated to certain of its Related Parties) and the aggregate purchase price therefor; (ii) the aggregate number of Unsubscribed Shares, if any, and the aggregate purchase price therefor; (iii) the aggregate number of Unsubscribed Shares to be issued and sold by the Issuer to such Backstop Party based upon each Backstop Party's Backstop Commitment Percentage and the aggregate purchase price therefor (together with the amounts referenced in (i), such Backstop Party's "**Funding Amount**"); (iv) wire instructions for a segregated account  (the "**Funding Account**"), which will be an escrow account held in an agreed upon, nationally recognized financial institution if the Required Backstop Parties so request, to which such Backstop Party shall deliver an amount equal to its Funding Amount, less the amount of any cash to which such Backstop Party or a Related Fund of such Backstop Party is entitled to receive under the Plan with respect to the Loans (as defined in the DIP Credit Agreement) if, in accordance with the Plan, such Backstop Party or a Related Fund of such Backstop Party directed that such amount be credited against the Funding Amount of such Backstop Party (such amount, the "**Net Funding Amount**"); and (v) the estimated deadline for delivery of the Funding Amount which shall be three (3) Business Days before the expected Plan Effective Date (the "**Backstop Funding Deadline**").  Each Backstop Party shall deliver and pay its applicable Funding Amount by wire transfer in immediately available funds in U.S. dollars into the Funding Account.  If this Agreement is terminated pursuant to Section 13 after such delivery, such funds shall be released, without any interest accrued thereon, promptly following such termination.

Section 2.     THE BACKSTOP COMMITMENTS.

4

(a)     On the basis of the representations and warranties contained herein, but subject to the conditions set forth in Section 10, each of the Backstop Parties, severally and not jointly, agrees to:

(i)     subscribe for, in accordance with Section 1(d)(2), and purchase, in accordance with Section 1(g), the Rights Offering Shares allocated to such Backstop Party at the aggregate purchase price therefor based upon the Per Share Price; and

(ii)     purchase, in accordance with Section 1(g), its Backstop Commitment Percentage of the Unsubscribed Shares at the aggregate purchase price therefor based upon the Per Share Price (together with its commitment pursuant to Section 2(a)(i), the "**Backstop Commitments**").

(b)     Each Backstop Party's Backstop Commitment Percentage shall be allocated *pro rata* based on (a) each Backstop Party's (together with those of certain of its Related Parties as provided on **Schedule 1**)  aggregate amount of claims for principal and accrued and unpaid interest under the Second Lien Credit Agreements *divided by* (b) the aggregate amount of such claims under the Second Lien Credit Agreements owned by all Backstop Parties  (together with those of certain of their respective Related Parties as provided on **Schedule 1**), in each case on the date the RSA is executed.

(c)     On the basis of the representations and warranties herein contained, as consideration for the Backstop Commitments and the other undertakings of the Backstop Parties herein, the Issuer will pay to the Backstop Parties, in the aggregate, on the Plan Effective Date, a nonrefundable aggregate premium in an amount equal to 6% of the Rights Offering Amount (the "**Backstop Commitment Premium**"), which Backstop Commitment Premium shall be deemed fully earned by the Backstop Parties upon the execution of this Agreement, in the form of shares of New Equity Interests (issued at the Per Share Price), which shall be allocated among the Backstop Parties *pro rata* based on each Backstop Party's Backstop Commitment Percentage; *provided* that, if the Plan Effective Date does not occur, then, the Backstop Commitment Premium shall be payable, in cash, to the extent provided in Section 13..

(d)     Subject to the entry of the Confirmation Order, which order shall approve this Section 2(d), on the Plan Effective Date, the Company or the Issuer, as applicable, will reimburse or pay, as the case may be, all of the reasonable and documented fees and expenses (collectively, "**Transaction Expenses**"), subject to the terms of any applicable engagement letter or reimbursement letter, as the case may be, of Davis Polk & Wardwell LLP as counsel to the applicable Backstop Parties, Vinson & Elkins LLP and Latham & Watkins LLP as counsel to Riverstone, PJT Partners, LP as financial advisor to the applicable Backstop Parties, Perella Weinberg Partners LP as financial advisor to Riverstone; *provided* that the Company shall pay any accrued but unpaid amounts owing under such engagement and/or fee letters to the extent required under the terms thereof upon the termination of this Agreement, but shall not be responsible for any fees and expenses incurred after termination; *provided further* that any invoices shall not be required to contain individual time detail.

5

(e)     On the Plan Effective Date, the Backstop Parties will purchase, and the Issuer will sell to the Backstop Parties, only such amount of Rights Offering Shares and Unsubscribed Shares as is listed in the Backstop Funding Notice, without prejudice to the rights of the Issuer or the Backstop Parties to seek later an upward or downward adjustment if the amount of Rights Offering Shares or Unsubscribed Shares in such Backstop Funding Notice is inaccurate and in such event, the respective obligations to fund additional purchase price or issue additional Rights Offering Shares or Unsubscribed Shares shall survive notwithstanding such Backstop Funding Notice.

(f)     Delivery of the Unsubscribed Shares and Rights Offering Shares will be made by the Issuer to the respective Backstop Parties on the Plan Effective Date upon the release of the Net Funding Amount of each Backstop Party from the Funding Account, upon which time such funds shall be delivered to the Issuer by wire transfer of immediately available funds to the account specified by the Issuer to the Backstop Parties at least twenty four (24) hours in advance.

(g)     Delivery of the shares in connection with the Backstop Commitment Premium will be made by the Issuer to the respective Backstop Parties on the Plan Effective Date.

Section 3.     TRANSFER OF BACKSTOP COMMITMENT.

(a)     Each Backstop Party's Backstop Commitment shall only be transferable, in whole or in part, to a Permitted Transferee (as defined below); *provided* that the transferring Backstop Party shall give notice of its intent to transfer its Backstop Commitment (other than to a Related Fund (as defined below)), whether in whole or in part, ("**Backstop Transfer Notice**") to the non-transferring Backstop Parties and such non-transferring Backstop Parties shall have a right, but not an obligation, for a period of ten (10) days following receipt of the Backstop Transfer Notice to purchase its *pro rata* share thereof based on the proportion of its Backstop Commitment to the aggregate amount of Backstop Commitments of all non-transferring Backstop Parties purchasing such transferring Backstop Party's Backstop Commitment, on the terms described in the Backstop Transfer Notice. If such non-transferring Backstop Parties do not elect to purchase all of the Backstop Commitment offered in the Backstop Transfer Notice, then the transferring Backstop Party shall have the right to complete such transfer to any third party who is a Permitted Transferee on terms and conditions that are at least as favorable in the aggregate to such transferring Backstop Party as the terms and conditions set forth in the Backstop Transfer Notice. Any Permitted Transferee of the Backstop Commitment shall agree in writing to be bound by the representations, warranties, covenants and obligations of such transferring Backstop Party under this Agreement and the RSA and shall, as a condition of such transfer, provide the Company and the non-transferring Backstop Parties with evidence reasonably satisfactory to them that such transferee is reasonably capable of fulfilling such obligations, including such financial information as may reasonably be requested by the Company or its representatives demonstrating the ability of the Permitted Transferee to fund the entire amount of its existing Backstop Commitment plus the amount of the Backstop Commitment transferred to such Permitted

#90500902v12

Transferee. "**Permitted Transferee**" means (i) a Related Fund or (ii) any other Backstop Party.

(b)     Notwithstanding the foregoing, a Backstop Party may assign its Backstop Commitment (including its Subscription Rights), to any fund, account or investment vehicle that is controlled, managed, advised or sub-advised by such Backstop Party, an Affiliate thereof or the same investment manager, advisor or subadvisor as the Backstop Party or an Affiliate of such investment manager, advisor or subadvisor (each, a "**Related Fund**") without submitting a Backstop Transfer Notice, in which case such Related Fund transferee shall agree in writing to be bound by the representations, warranties, covenants and obligations of such transferring Backstop Party under this Agreement and the RSA, shall make the representations set forth in Section 6 hereof as of the date of such transfer as if it was a Backstop Party, and shall, as a condition of such transfer, provide the Company and the non-transferring Backstop Parties with evidence reasonably satisfactory to them that such transferee is reasonably capable of fulfilling such obligations. In such event, the assigning Backstop Party shall remain fully obligated for its Backstop Commitment. For purposes of this Agreement, (i) "**Affiliate**" shall mean with respect to any specified Person (as defined below), any other Person that, at the time of determination, directly or indirectly through one or more intermediaries, Controls (as defined below), is Controlled by or is under common Control with such specified Person and (ii) "**Control**" shall mean, as to any Person, the power to direct or cause the direction of the management and policies of such Person, whether through the ownership of voting securities, by contract or otherwise. The terms "Controlled by," "Controlled" and "under common Control with" shall have correlative meanings.

Section 4.     BACKSTOP PARTY DEFAULT.  Any Backstop Party that fails to timely fund its Backstop Commitment or fully exercise all Subscription Rights held by it in the Rights Offering (a "**Defaulting Backstop Party**") will be liable for the consequences of its breach and the parties hereto can enforce rights of money damages and/or specific performance upon the failure to timely fund by the Defaulting Backstop Party.  Each of the non-defaulting Backstop Parties shall have the right, but not the obligation, to assume its *pro rata* share of such Defaulting Backstop Party's Backstop Commitment, based on the proportion of its Backstop Commitment to the aggregate amount of Backstop Commitments of all non-defaulting Backstop Parties assuming such Defaulting Backstop Party's Backstop Commitment.  No Defaulting Backstop Party shall be entitled to any portion of the Backstop Commitment Premium.

Section 5.     REPRESENTATIONS AND WARRANTIES OF THE ISSUER AND THE COMPANY.  Except as set forth in the Disclosure Letter delivered to the Backstop Parties on the date hereof (the "**Company Disclosure Letter**"), each of the Issuer and the Company represents and warrants to, and agrees with, the Backstop Parties as set forth below. Except for representations, warranties and agreements that are expressly limited as to their date, each representation, warranty and agreement is made as of the date hereof.

(a)     *Organization and Qualification*.  Each of the Company and its subsidiaries is duly organized, validly existing and in good standing under the laws of its respective

7

jurisdiction of incorporation or organization and has the requisite power and authority to own, lease and operate its properties and to carry on its business as now conducted. Each of the Company and its subsidiaries is duly qualified or authorized to do business and is in good standing under the laws of each jurisdiction in which it owns or leases real property or in which the conduct of its business or the ownership of its properties requires such qualification or authorization, except where the failure to be so qualified, authorized or in good standing would not be reasonably likely to result in a Material Adverse Effect.

(b)     *Power and Authority*.

(i)     Each of the Company and the Issuer has the requisite corporate power and authority to enter into, execute and deliver this Agreement and, subject to entry of the Confirmation Order and consummation of the Plan, to perform its obligations hereunder, including, with respect to the Issuer, to issue the Subscription Rights and the Rights Offering Shares. Each of the Company and the Issuer has taken all necessary corporate action required for the due authorization, execution, delivery and performance by it of this Agreement, including, with respect to the Issuer, the issuance of the Subscription Rights and the Rights Offering Shares.

(ii)     The Company has the requisite corporate power and authority to file the Plan with the Bankruptcy Court and, subject to entry of the Confirmation Order and consummation of the Plan, to perform its obligations thereunder, and will have taken all necessary corporate action required for the due authorization, execution, delivery and performance by it of the Plan.

(c)     *Execution and Delivery; Enforceability*.

(i)     This Agreement has been duly and validly executed and delivered by each of the Company and the Issuer, and, subject to entry of the Confirmation Order and consummation of the Plan, constitutes or will constitute the valid and binding obligations of the Company and the Issuer, enforceable against the Company and the Issuer in accordance with its terms.

(ii)     Upon the entry of the Confirmation Order and consummation of the Plan, the Plan will constitute the valid and binding obligation of the Company, enforceable against it in accordance with its terms.

(d)     *Authorized Capital*. Upon the Plan Effective Date, the authorized capital of the Issuer shall be consistent with the terms of the Plan and Disclosure Statement (as defined below) and the issued and outstanding Rights Offering Shares of the Issuer shall be consistent with the terms of the Plan and Disclosure Statement.

(e)     *Issuance*. The distribution of the Subscription Rights and, subject to entry of the Confirmation Order and consummation of the Plan, the issuance of the Rights Offering Shares, including the New Equity Interests subscribed for by the Backstop Parties in the Rights Offering, the Unsubscribed Shares and the shares issued pursuant to

the Backstop Commitment Premium, will have been duly and validly authorized and, when the Rights Offering Shares are issued and delivered against payment therefor in the Rights Offering or to the Backstop Parties hereunder, will be duly and validly issued and outstanding, fully paid, non-assessable and free and clear of all Taxes, liens, pre-emptive rights, rights of first refusal, subscription and similar rights, except as set forth herein, and other than liens pursuant to applicable securities laws.

(f)     *No Conflict*.  The distribution of the Subscription Rights, and, subject to entry of the Confirmation Order and consummation of the Plan, the sale, issuance and delivery of the Rights Offering Shares upon exercise of the Subscription Rights, the consummation of the Rights Offering by the Issuer, the sale, issuance and delivery of the Unsubscribed Shares pursuant to the terms hereof, and the execution and delivery (or, with respect to the Plan, the filing with the Bankruptcy Court) by the Company of this Agreement and the Plan and compliance by it with all of the provisions hereof and thereof and the consummation of the transactions contemplated hereby and thereby: (i) will not conflict with or result in a breach or violation of, any of the terms or provisions of, or constitute a default under (with or without notice or lapse of time, or both), or result, except to the extent expressly provided in or contemplated by the Plan, in the acceleration of, or the creation of any lien under, any indenture, mortgage, deed of trust, loan agreement or other agreement or instrument to which the Company or any of its subsidiaries is a party or by which the Company or any of its subsidiaries is bound or to which any of their properties or assets is subject; (ii) will not result in any violation of the provisions of the organizational documents of the Company or any of its subsidiaries; and (iii) assuming the accuracy of the Backstop Parties' representations and warranties in Section 6, will not result in any violation of, or any termination or material impairment of any rights under, any statute or any license, authorization, injunction, judgment, order, decree, rule or regulation of any court or governmental agency or body having jurisdiction over the Company or any of its subsidiaries or any of their respective properties, except in any such case described in clause (i) or clause (iii), as would not, individually or in the aggregate, reasonably be expected to result in a Material Adverse Effect.  "**Material Adverse Effect**" means any fact, event, change, effect, development, circumstance, or occurrence that, individually or in the aggregate, has had or would reasonably be expected to have a material adverse effect on: (a) the business, operations, properties, assets or financial condition of the Company and its subsidiaries, in each case, taken as a whole; or (b) the ability of the Company or any of its subsidiaries, in each case taken as a whole, to perform their obligations under this Agreement, the Plan or the RSA; *provided*, that, for the purposes of clause (a), none of the following, either alone or in combination, will constitute a Material Adverse Effect: (A) any change in the United States or foreign economies or securities or financial markets in general (including any decline in the price of securities generally or any market or index); (B) any change that generally affects any industry in which the Company or its subsidiaries operate; (C) general business or economic conditions in any of the geographical areas in which the Company or its subsidiaries operate; (D) national or international political or social conditions, including any change arising in connection with, hostilities, acts of war, sabotage or terrorism or military actions or any escalation or material worsening of any such hostilities, acts of war, sabotage or terrorism or military actions, whether

9

commenced before or after the date hereof and whether or not pursuant to the declaration of a national emergency or war; (E) the occurrence of any act of God or other calamity or force majeure event (whether or not declared as such), including any civil disturbance, embargo, natural disaster, fire, flood, hurricane, tornado, or other weather event; (F) any changes in applicable Laws or U.S. GAAP (or other relevant accounting rules); (G) any change resulting from the filing or pendency of or emergence from the Chapter 11 Cases, actions taken in connection with the Chapter 11 Cases, or any reasonably anticipated effects of such filing, pendency, emergence or actions, or from any action approved by the Bankruptcy Court; (H) any change resulting from the public announcement of the Chapter 11 Cases or the entry into this Agreement, compliance with terms of this Agreement or the consummation of the transactions contemplated hereby; (I) any change resulting from the taking of any action taken by the Company and its subsidiaries after the date hereof with the prior consent of the Required Backstop Parties; or (J) any effects or changes arising from or related to the breach of this Agreement by Backstop Parties; *provided further,* that the exceptions set forth in clauses (A) through (E) of this definition shall not be regarded as exceptions to clause (a) of this definition solely to the extent that any such described event has a disproportionately adverse impact on the Company and its subsidiaries, taken as a whole, as compared to other companies in the industries in which the Company and its subsidiaries operate.

(g)     *Consents and Approvals.*  Assuming the accuracy of the Backstop Parties' representations and warranties in Section 6, no consent, approval, authorization, order, registration or qualification of or with any court or governmental agency or body having jurisdiction over the Company or any of its subsidiaries is required for the distribution of the Subscription Rights, the sale, issuance and delivery of the Rights Offering Shares upon exercise of the Subscription Rights, the issuance, sale and delivery of Unsubscribed Shares to the Backstop Parties hereunder, the consummation of the Rights Offering by the Issuer and the execution and delivery by the Company of this Agreement or the Plan and compliance by them with all of the provisions hereof and thereof (including payment of the Backstop Commitment Premium and Transaction Expenses of the Backstop Parties as required in Section 2(d) herein) and the consummation of the transactions contemplated hereby and thereby, except (i) the entry of the Confirmation Order, (ii) filings, if any, pursuant to the HSR Act and the expiration or termination of all applicable waiting periods thereunder or any applicable notification, authorization, approval or consent under any other Antitrust Laws in connection with the transactions contemplated by this Agreement, (iii) the filing of any other corporate documents in connection with the transactions contemplated by this Agreement with applicable state filing agencies, (iv) such consents, approvals, authorizations, registrations or qualifications as may be required under foreign securities laws, federal securities laws or state securities or Blue Sky laws in connection with the offer and sale of the Rights Offering Shares, Unsubscribed Shares and the Backstop Commitment Premium and (v) such consents, approvals, authorizations, registrations or qualifications the absence of which would not, individually or in the aggregate, reasonably be expected to result in a Material Adverse Effect.

(h)     *No Undisclosed Material Liabilities*. There are no liabilities or obligations of the Company or any of its subsidiaries of any kind whatsoever, whether accrued,

10

contingent, absolute, determined or determinable, other than: (i) liabilities or obligations disclosed and provided for in the Financial Statements (as defined below), (ii) liabilities or obligations incurred in the ordinary course of business since the date of the most recent balance sheet presented in the Financial Statements (as defined below) (the "**Reference Date**") or (iii) liabilities or obligations which would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect.

(i)     *Financial Statements*.  The financial statements and the related notes thereto of the Company and its consolidated subsidiaries for the period ended September 30, 2017 (the "**Financial Statements**") present fairly in all material respects the consolidated financial position of the Company and its subsidiaries as of the dates indicated and the results of their operations and their cash flows for the periods specified. The Financial Statements have been prepared in conformity with U.S. GAAP as applied to a non-reporting issuer throughout the periods covered thereby.

(j)     *No Violation*.  The Company and its subsidiaries are not, except as a result of the Chapter 11 Cases, in violation of any law or statute or any judgment, order, rule or regulation of any court or arbitrator or governmental or regulatory authority, except for any such default or violation that would not, individually or in the aggregate, reasonably be expected to result in a Material Adverse Effect; *provided* that this Section 5(j) shall not constitute a representation or warranty as to any violation of or liability under, or compliance with, any Environmental Law, which matters are exclusively covered under Section 5(n).

(k)     *Legal Proceedings*.  Other than the Chapter 11 Cases and any adversary proceedings or contested motions commenced in connection therewith, and other than as set forth in the Company Disclosure Letter, there are no legal, governmental or regulatory investigations, actions, suits or proceedings pending or, to the Knowledge of the Company, threatened, in each case, to which the Company and its subsidiaries is or may be a party or to which any property of the Company and its subsidiaries is or may be the subject that, individually or in the aggregate would reasonably be expected to result in a Material Adverse Effect. For the purposes of this Agreement "**Knowledge of the Company**" shall mean the actual knowledge of G. M. McCarroll and Michael T. Dane.

(l)     *No Broker's Fees*. Other than this Agreement, neither the Company nor any of its subsidiaries is a party to any contract, agreement or understanding with any other individual, firm, corporation (including any non-profit corporation), partnership, limited liability company, joint venture, associate, trust, Governmental Entity or other entity or organization (each a "**Person**"), other than Evercore Group L.L.C., that would give rise to a valid claim against it or the Backstop Parties for a brokerage commission, finder's fee or like payment in connection with the offering and sale of the Subscription Rights, the Rights Offering Shares or the Backstop Party Shares.

(m)     *Absence of Certain Changes*.  Since the Reference Date, no change, event, circumstance effect, development, occurrence or state of facts has occurred or exists that has had or is reasonably expected to have, individually or in the aggregate, a Material Adverse Effect.

(n)    *Environmental*.  Except as to matters that would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect: (i) no written notice, claim, demand, request for information, order, complaint or penalty has been received by the Company or any of its subsidiaries, and there are no judicial, administrative or other actions, suits or proceedings pending or, to the Knowledge of the Company, threatened which allege a violation of or liability under any Environmental Laws, in each case relating to the Company or any of its subsidiaries, (ii) the Company and each of its subsidiaries is in compliance with Environmental Law and has obtained, maintains in full force and effect, and is in compliance with all material permits, licenses and other approvals currently required under any Environmental Law for conduct of its business as presently conducted by the Company and each of its subsidiaries, and (iii) to the Knowledge of the Company, no Hazardous Materials have been released by the Company or any of its subsidiaries at any location in a manner that would reasonably be expected to give rise to any cost, liability or obligation of the Company or any of its subsidiaries under any Environmental Laws. For purposes of this Agreement, "**Environmental Law**" means all applicable foreign, federal, state and local conventions, treaties, protocols, laws, statutes, rules, regulations, ordinances, orders and decrees in effect on the date hereof relating in any manner to contamination, pollution or protection of the environment or exposure to hazardous or toxic substances, materials or wastes, and "**Hazardous Materials**" means all materials, substances, chemicals, or wastes (or combination thereof) that is listed, defined, designated, regulated or classified as hazardous, toxic, radioactive, dangerous, a pollutant, a contaminant, petroleum, oil ,or words of similar meaning or effect under any Environmental Law.

(o)    *Insurance*. The Company and each of its subsidiaries, as applicable, has insured its respective properties and assets against such risks and in such amounts as are consistent with past practice or are customary for similarly situated companies engaged in similar businesses. All premiums due and payable in respect of material insurance policies maintained by the Company and its subsidiaries have been paid. As of the date hereof, to the Knowledge of the Company, neither the Company nor any of its subsidiaries has received written notice from any insurer or agent of such insurer with respect to any material insurance policies of the Company or any of its subsidiaries of cancellation or termination of such policies, other than such notices which are received in the ordinary course of business or for policies that have expired in accordance with their terms.

(p)    *Intellectual Property*. Except, in each case, where the failure of such statement to be correct would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect, (i) the Company and its subsidiaries own, or possess the right to use, all of the patents, patent rights, trademarks, service marks, trade names, copyrights, licenses, domain names, and any and all applications or registrations for any of the foregoing (collectively, "**Intellectual Property Rights**") that are reasonably necessary for the operation of their respective businesses, without conflict with the rights of any other person, (ii) to the Knowledge of the Company, neither the Company and its subsidiaries nor any Intellectual Property Right, proprietary right, product, process, method, substance, part, or other material now employed, sold or

offered by the Company and its subsidiaries, is infringing upon, misappropriating or otherwise violating any valid Intellectual Property Rights of any person, and (iii) no claim or litigation regarding any of the foregoing is pending or, to the Knowledge of the Company, threatened.

(q)     *No Undisclosed Relationship*.  Except for employment relationships and compensation, benefits and travel advances in the ordinary course of business or as disclosed in Section 5(q) of the Company Disclosure Letter, neither the Company nor any of its subsidiaries is a party to any agreement with, or involving the making of any payment or transfer of assets to, Riverstone V FW Holdings Sub, LLC or any of its Affiliates, any other stockholder beneficially owning greater than 5% of the Company or any officer or director of the Company or any of its subsidiaries (each, an "**Affiliate Agreement**").

(r)     *Money Laundering Laws*.  The operations of the Company and its subsidiaries are, and have been at all times since January 1, 2014, conducted in compliance in all material respects with applicable financial recordkeeping and reporting requirements of the U.S. Currency and Foreign Transactions Reporting Act of 1970, the money laundering statutes of all jurisdictions in which the Company and its subsidiaries operate (and the rules and regulations promulgated thereunder) and any related or similar laws and there has been no material legal proceeding by or before any governmental entity or any arbitrator involving the Company or any of its subsidiaries with respect to such laws is pending or, to the Knowledge of the Company, threatened.

(s)     *Sanctions Laws*.  Neither the Company and its subsidiaries nor, to the Knowledge of the Company, any of their respective directors, officers, employees or other Persons acting on their behalf with express authority to so act are currently subject to any U.S. sanctions administered by the Office of Foreign Assets Control of the U.S. Treasury Department. The Company and its subsidiaries will not directly or indirectly use the proceeds of the Rights Offering, or lend, contribute or otherwise make available such proceeds to any subsidiary, joint venture partner or other Person, for the purpose of financing the activities of any Person that, to the Knowledge of the Company and its subsidiaries, is currently subject to any U.S. sanctions administered by the Office of Foreign Assets Control of the U.S. Treasury Department.

(t)     *Foreign Corrupt Practices Act*. To the Knowledge of the Company, there have been no actual or alleged material violations of the Foreign Corrupt Practices Act of 1977, as amended, nor any applicable anti-corruption or anti-bribery laws in any jurisdiction other than the United States, in each case, since January 1, 2014, by the Company and its subsidiaries or any of their respective officers, directors, agents, distributors, employees or any other Person acting on behalf of the Company or any of its subsidiaries.

(u)     *Taxes*.

(i)     The Company and each of its subsidiaries have paid all material amounts of income, gross receipts, license, payroll, employment, excise,

severance, occupation, premium, windfalls profits, customs duties, capital stock, franchise, profits, withholding, unemployment, disability, real property, personal property, sales, use, transfer, registration, value added, alternative or add-on minimum, estimated or other taxes levied by a governmental authority, including interest and penalties thereon ("**Taxes**") imposed on it or its assets, business or properties, or, to the extent not yet due, such Taxes have been accrued and fully provided for in accordance with generally accepted accounting principles. The Company and each of its subsidiaries has timely filed all income and other material returns, information statements or reports required to be filed with any governmental authority with respect to Taxes.

(ii)     There are no material Liens for Taxes on any asset of the Company or its subsidiaries other than liens for Taxes not yet delinquent or for Taxes contested in good faith by appropriate proceedings.

(iii)     The Company and its subsidiaries have no liability for any material amount of Taxes of any other Person or entity, either by operation of law, by contract or as a transferee or successor. The Company and its subsidiaries are not a party to any material Tax allocation or Tax sharing agreement with any third party (other than an agreement entered into in the ordinary course of business consistent with past practice (such as a lease or a license) or the principal purpose of which is not the sharing, assumption or indemnification of Tax).

(iv)     As of the date hereof, there is no outstanding audit, assessment, dispute or claim concerning any material Tax liability of the Company and its subsidiaries (taken as a whole), and the Company and its subsidiaries have not received from any governmental authority any written notice regarding any contemplated or pending audit, examination or other administrative proceeding or court proceeding concerning any material amount of Taxes imposed thereon.

(v)     All material Taxes that the Company and its subsidiaries (taken as a whole) were (or was) required by law to withhold or collect in connection with amounts paid or owing to any employee, independent contractor, creditor, stockholder or other third party have been duly withheld or collected, and have been timely paid to the proper authorities to the extent due and payable.

(vi)     None of the Company and any of its subsidiaries has been included in any "consolidated," "unitary" or "combined" Tax Return provided for under any law with respect to Taxes for any taxable period for which the statute of limitations has not expired (other than a group of which the Company and/or its current or past subsidiaries are or were the only members).

(vii)     None of the Company and any of its subsidiaries has been either a "distributing corporation" or a "controlled corporation" in a distribution occurring during the last five years in which the parties to such distribution treated the distribution as one to which Section 355 of the Internal Revenue Code of 1986, as amended (the "**Code**"), is applicable.

14

(viii)    None of the Company and any of its subsidiaries has been requested in writing, and, to the Knowledge of the Company, there are no claims against the Company or any of its subsidiaries, to pay any liability for Taxes of any Person (other than the Company or its subsidiaries) that are material to the Company and its subsidiaries taken as a whole, arising from the application of Treasury Regulation Section 1.1502-6 or any analogous provision of state, local or foreign law, or as a transferee or successor.

(ix)    Neither the consummation of the Plan nor the issuance of Rights Offering Shares will result in any material degrouping charges for Tax purposes with respect to the Company or its subsidiaries.

(v)    *Title to Property*.

(i)    *Personal Property*.  Except as would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect, (A) the Company and its subsidiaries have good title to, free and clear of any and all Liens (other than Permitted Liens), or a valid leasehold interest in, all personal properties, machinery, equipment and other tangible assets of the business necessary for the conduct of the business as presently conducted by the Company and its subsidiaries and (B) such properties, (x) are in the possession or control of the Company or its subsidiaries; and (y) are in good and operable condition and repair, reasonable wear and tear excepted. For purposes of this Agreement, "**Lien**" and "**Permitted Liens**" shall have the respective meanings given to those terms in the DIP Credit Agreement.

(ii)    *Leased Real Property*.  The Company and its subsidiaries have complied with all obligations under all leases to which it is a party that have not been rejected in the Chapter 11 Cases, except where the failure to comply would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect, and all such leases are in full force and effect (except to the extent subject to applicable to bankruptcy, insolvency, fraudulent conveyance, reorganization, moratorium, and similar laws affecting creditors' rights generally and to general principles of equity), except leases in respect of which the failure to be in full force and effect would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect. The Company and its subsidiaries enjoy peaceful and undisturbed possession under all such leases, other than leases in respect of which the failure to enjoy peaceful and undisturbed possession would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect.

(w)    *Labor Relations*. There is no labor or employment-related legal proceeding pending or, to the Knowledge of the Company, threatened against the Company or any of its subsidiaries, by or on behalf of any of their respective employees or such employees' labor organization, works council, workers' committee, union representatives or any other type of employees' representatives appointed for collective bargaining purposes, or by

15

any Governmental Entity, that has had or would reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect.

(x) *Licenses and Permits*. The Company and its subsidiaries possess all licenses, certificates, permits and other authorizations issued by, and have made all declarations and filings with, the appropriate Governmental Entities that are necessary for the ownership or lease of their respective properties and the conduct of their business as presently conducted by the Company and its subsidiaries, in each case, except as would not have and would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect. Except as would not have and would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect, the Company and its subsidiaries (i) have not received written notice of any revocation or modification of any such license, certificate, permit or authorization or (ii) have no reason to believe that any such license, certificate, permit or authorization will not be renewed in the ordinary course.

(y) *Material Contracts*.

(i) All Material Contracts are valid, binding and enforceable by and against the Company and its subsidiaries, as applicable (except to the extent enforceability may be limited by applicable bankruptcy, insolvency, fraudulent conveyance, reorganization, moratorium, and similar laws affecting creditors' rights generally and to general principles of equity), except where the failure to be valid, binding or enforceable would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect, and no written notice to terminate, in whole or part, any Material Contract has been delivered to the Company and its subsidiaries except where such termination would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect. Other than as a result of the filing of the Chapter 11 Proceedings, neither the Company and its subsidiaries nor, to the Knowledge of the Company and its subsidiaries, any other party to any Material Contract, is in default or breach under the terms thereof except, in each case, for such instances of default or breach that would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect.  For purposes of this Agreement, "**Material Contract**" means any contract necessary for the operation of the business of the Company and its subsidiaries as presently conducted by the Company and its subsidiaries that is a "material contract" (as such term is defined in Item 601(b)(10) of Regulation S-K or required to be disclosed on a current report on Form 8-K).

Section 6.    REPRESENTATIONS AND WARRANTIES OF THE BACKSTOP PARTIES. Each of the Backstop Parties severally represents and warrants to, and agrees with, the Company and the Issuer as set forth below. Each representation, warranty and agreement is made as of the date hereof.

(a) *Formation*.  Such Backstop Party has been duly organized or formed, as applicable, and is validly existing as a corporation or other entity in good standing under the applicable laws of its jurisdiction of organization or formation.

(b)      *Power and Authority*.  Such Backstop Party has the requisite power and authority to enter into, execute and deliver this Agreement and to perform its obligations hereunder and has taken all necessary action required for the due authorization, execution, delivery and performance by it of this Agreement.

(c)      *Execution and Delivery*.  This Agreement has been duly and validly executed and delivered by such Backstop Party and constitutes its valid and binding obligation, enforceable against such Backstop Party in accordance with its terms.

(d)      *Securities Laws Compliance*.  The New Equity Interests subscribed for by the Backstop Parties in the Rights Offering, the Unsubscribed Shares and the shares issued pursuant to the Backstop Commitment Premium (collectively, the "**Backstop Party Shares**") will not be offered for sale, sold or otherwise transferred by such Backstop Party except pursuant to an effective registration statement under the Securities Act of 1933 and the rules and regulations of the SEC thereunder (the "**Securities Act**") or in a transaction exempt from or not subject to registration under the Securities Act and any applicable state securities laws.

(e)      *Purchase Intent*.  Such Backstop Party is acquiring the Backstop Party Shares for its own account or for the accounts for which it is acting as investment advisors or manager, and not with a view to distributing or reselling such Backstop Party Shares or any part thereof.  Such Backstop Party understands that such Backstop Party must bear the economic risk of this investment indefinitely, unless the Backstop Party Shares are registered pursuant to the Securities Act and any applicable state securities or Blue Sky laws or an exemption from such registration is available, and further understands that it is not currently contemplated that any Backstop Party Shares will be registered at the time of issuance.

(f)      *Investor Status*.  Such Backstop Party is an Accredited Investor.  Such Backstop Party understands that the Backstop Party Shares are being offered and sold to such Backstop Party in reliance upon specific exemptions from the registration requirements of United States federal and state securities laws and that each of the Company and the Issuer is relying upon the truth and accuracy of, and such Backstop Party's compliance with, the representations, warranties, agreements, acknowledgments and understandings of such Backstop Party set forth herein in order to determine the availability of such exemptions and the eligibility of such Backstop Party to acquire Backstop Party Shares. Such Backstop Party has such knowledge and experience in financial and business matters such that it is capable of evaluating the merits and risks of its investment in the Rights Offering Shares and the Unsubscribed Shares. Such Backstop Party understands and is able to bear any economic risks associated with such investment (including the necessity of holding such shares for an indefinite period of time). Except for the representations and warranties expressly set forth in this Agreement, such Backstop Party has independently evaluated the merits and risks of its decision to enter into this Agreement and disclaims reliance on any representations or warranties, either express or implied, by or on behalf of the Company or the Issuer. Such Backstop Party acknowledges that it has been afforded the opportunity to ask questions and receive

17

answers concerning the Company and its subsidiaries and to obtain additional information that it has requested to verify the accuracy of the information contained herein.

(g)     *Consents and Approvals*.  Assuming the accuracy of the Company's representations and warranties in Section 5, no consent, approval, authorization, order, registration or qualification of or with any court or governmental agency or body having jurisdiction over such Backstop Party or any of its properties is required for the purchase of the Backstop Party Shares by the Backstop Parties hereunder and the execution and delivery by such Backstop Party of this Agreement and performance of and compliance by it with all of the provisions hereof and thereof (and the consummation of the transactions contemplated hereby and thereby), except (i) the entry of the Confirmation Order, (ii) filings, if any, pursuant to the HSR Act and the expiration or termination of all applicable waiting periods thereunder or any applicable notification, authorization, approval or consent under any other Antitrust Laws in connection with the transactions contemplated by this Agreement, (iii) the filing of any other corporate documents in connection with the transactions contemplated by this Agreement with applicable state filing agencies, (iv) such consents, approvals, authorizations, registrations or qualifications as may be required under foreign securities laws, federal securities laws or state securities or Blue Sky laws in connection with the offer and sale of the Rights Offering Shares, Unsubscribed Shares and the Backstop Commitment Premium and (v) such consents, approvals, authorizations, registrations or qualifications the absence of which would not, individually or in the aggregate, reasonably be expected to result in a material adverse effect on the ability of such Backstop Party to perform its obligations under this Agreement.

(h)     *Sufficiency of Funds*.  Such Backstop Party will have sufficient immediately available funds to make and complete the payment of the aggregate purchase price for its New Equity Interests subscribed for in the Rights Offering and its Backstop Commitment Percentage of the Unsubscribed Shares on the Backstop Funding Deadline.

(i)     *No Brokers Fee*.  Such Backstop Party is not a party to any contract with any Person that would give rise to a valid claim against any of the Debtors for a brokerage commission, finder's fee or like payment in connection with the Rights Offering or the sale of the Rights Offering Shares or the Unsubscribed Shares.

Section 7.     ADDITIONAL COVENANTS OF THE COMPANY.  The Company agrees with the Backstop Parties as follows:

(a)     *Plan and Disclosure Statement*. The Company shall: (i) file as soon as practicable after the Petition Date, the Plan and a related disclosure statement (the "**Disclosure Statement**") with the Bankruptcy Court, each in form and substance reasonably acceptable to the Required Backstop Parties or as otherwise approved pursuant to the terms of the RSA, it being understood that the Plan and Disclosure Statement distributed to creditors on February 14, 2018 are reasonably acceptable to the Required Backstop Parties and consistent in all material respects with the RSA; and (ii) seek the entry of a Confirmation Order by the Bankruptcy Court, in form and substance reasonably acceptable to the Required Backstop Parties and the Company, pursuant to the terms set

18

forth in the RSA. The Company will, not later than two (2) Business Days prior to the filing thereof, provide draft copies of all Restructuring Documents (as defined in the RSA) to counsel to the Backstop Parties; *provided*, that if two (2) Business Days in advance is not reasonably practicable, such Restructuring Document shall be delivered as soon as reasonably practicable prior to filing.

(b)     *Support of the Plan*. The Company agrees that, for the duration of the Support Period (as defined in the RSA), the Company shall, and shall cause each of its subsidiaries included in the definition of "Company" in the RSA to use commercially reasonable efforts to (i) obtain approval of the Plan and consummate the Restructuring (as defined in the RSA), including timely filing any objection or opposition to any motion filed with the Bankruptcy Court seeking the entry of an order modifying or terminating the Company's exclusive right to file and/or solicit acceptances of a plan of reorganization, directing the appointment of an examiner with expanded powers or a trustee, converting the Chapter 11 Cases or for relief that (A) is inconsistent with the RSA in any respect or (B) would, or would reasonably be expected to, frustrate the purposes of the RSA, including by preventing the consummation of the Restructuring and (ii) obtain orders of the Bankruptcy Court in respect of the Restructuring.

(c)     *Rights Offering*.  The Issuer shall effectuate the Rights Offering in accordance with the Plan and the Rights Offering Procedures.

(d)     *Form D and Blue Sky*. The Issuer shall timely file a Form D with the SEC with respect to the Backstop Party Shares, to the extent required under Regulation D of the Securities Act.  The Company or the Issuer shall, on or before the Plan Effective Date, take such action as the Company or the Issuer shall reasonably determine is necessary in order to obtain an exemption for, or to qualify for sale or issuance to the Backstop Parties the Backstop Party Shares under applicable securities and "blue sky" Laws of the states of the United States (or to obtain an exemption from such qualification) and any applicable foreign jurisdictions. The Company or the Issuer, as applicable, shall timely make all filings and reports relating to the offer and sale of the Backstop Party Shares required under applicable securities and "blue sky" Laws of the states of the United States following the Plan Effective Date. The Company or the Issuer, as applicable, shall pay all fees and expenses in connection with satisfying its obligations under this Section 7(d).

(e)     *Share Legend*. Each certificate evidencing New Equity Interests issued hereunder, including any New Equity Interests that may be issued in satisfaction of the Backstop Commitment Premium, and each certificate issued in exchange for or upon the transfer of any such shares, shall be stamped or otherwise imprinted with a legend (the "**Legend**") in substantially the following form:

"THE SECURITIES REPRESENTED BY THIS CERTIFICATE WERE ORIGINALLY ISSUED ON [DATE OF ISSUANCE], HAVE NOT BEEN REGISTERED UNDER THE UNITED STATES SECURITIES ACT OF 1933, AS AMENDED (THE "ACT"), OR ANY OTHER APPLICABLE STATE SECURITIES LAWS, AND MAY NOT BE SOLD OR TRANSFERRED IN THE ABSENCE OF AN EFFECTIVE

19

REGISTRATION STATEMENT UNDER THE ACT OR AN AVAILABLE
EXEMPTION FROM REGISTRATION THEREUNDER."

In the event that any such shares are uncertificated, such shares shall be subject
to a restrictive notation substantially similar to the Legend in the stock ledger or other
appropriate records maintained by the Issuer or agent and the term "Legend" shall
include such restrictive notation.

(f)     *Unsubscribed Shares*.  The Company, in consultation with counsel for the
Backstop Parties, shall determine the amount of Unsubscribed Shares, if any, and, in good
faith, provide a Backstop Funding Notice that accurately reflects the amount of
Unsubscribed Shares as so determined and to provide to the Backstop Parties a
certification by the Subscription Agent of the Unsubscribed Shares or, if such certification
is not available, such written backup to the determination of the Unsubscribed Shares as
the Backstop Parties may reasonably request.

(g)     *Approvals*.  Except as set forth in this Agreement or with the prior written
consent of the Required Backstop Parties, during the period from the date of this
Agreement to the earlier of the Plan Effective Date and the date on which this Agreement
is terminated in accordance with its terms, the Company and each of its subsidiaries shall
use reasonable efforts to reasonably promptly take all actions and prepare and file all
necessary documentation (including by reasonably cooperating with the Backstop Parties
as to the appropriate time of filing such documentation and its content) and to effect all
applications that are necessary in connection with seeking any governmental approval,
exemption or authorization from any governmental authority under any Antitrust Laws
that are necessary to consummate and make effective the transactions contemplated by
this Agreement. The Company shall reasonably promptly notify the Backstop Parties (and
furnish to them copies of, if requested) of any communications from governmental
authorities and shall not participate in any meeting with any such authority unless it
consults with the Backstop Parties in advance to the extent permitted by applicable law
and gives the Backstop Parties a reasonable opportunity to attend and participate thereat.
The Company and each of its subsidiaries shall not take any action that is intended or
reasonably likely to materially impede or delay the ability of the parties hereto to obtain
any necessary approvals required for the transactions contemplated by this Agreement.

For purposes of this Agreement, "**Antitrust Laws**" means the Hart Scott
Rodino Antitrust Improvements Act of 1976, as amended, and the rules and regulations
promulgated thereunder (the "**HSR Act**") and any similar law enforced by any
governmental antitrust entity of any jurisdiction regarding pre-acquisition notifications
for the purpose of competition reviews of mergers and acquisitions, the Sherman Act, as
amended, the Clayton Act, as amended, the Federal Trade Commission Act, as amended,
and all other applicable laws that are designed or intended to prohibit, restrict or regulate
actions or transactions having the purpose or effect of monopolization or restraint of trade
or lessening of competition through merger or acquisition or effectuating foreign
investment.

#90500902v12

(h)     *Conduct of Business*.  Except as set forth in the Plan, the RSA, herein or with the prior consent of the Required Backstop Parties, the Company shall, and shall cause its subsidiaries to, (i) except to the extent inconsistent with the Bankruptcy Code or the DIP Credit Agreement (as defined in the RSA), carry on its business in the ordinary course, (ii) use commercially reasonable efforts to preserve intact their material business organization, (iii) use commercially reasonable efforts to keep available the services of their current senior executive officers and key employees, and (iv) use commercially reasonable efforts to preserve their material relationships with customers, suppliers, licensors, licensees, distributors and others having material business dealings with the Company or its subsidiaries in connection with its business. Except (i) as set forth in Section 7(h) of the Company Disclosure Letter, (ii) with the prior consent of the Required Backstop Parties or (iii) as expressly provided in the Plan, the RSA or herein from and after the date hereof until the Plan Effective Date, the Company shall not, and shall cause its subsidiaries not to, other than in the ordinary course of business:

(i)     enter into any acquisition, merger with or other change of control of another business to the extent prohibited under the DIP Credit Agreement as in effect on the date hereof, in each case without giving effect to any amendments or waivers thereto and regardless of whether or not such DIP Credit Agreement remains in effect;

(ii)     dispose of any material asset to the extent prohibited under the DIP Credit Agreement as in effect on the date hereof, in each case without giving effect to any amendments or waivers thereto and regardless of whether or not such DIP Credit Agreement remains in effect;

(iii)     give effect to any material changes to the Company's business plan underlying the Financial Projections attached as Exhibit E to the Disclosure Statement (the "**Business Plan**");

(iv)     give effect to the termination of one or more related contracts that, in the aggregate, results in a reduction of $30 million or more of the Company's revenue on an annualized basis, other than as described in the Business Plan, unless such contract is replaced with a similar contract which provides a substantially similar amount of revenue;

(v)     enter into one or more related contracts that, in the aggregate, would result in $30 million or more of the Company's revenue on an annualized basis, other than as described in the Business Plan, unless such contracts replace existing, similar contracts which provide a substantially similar amount of revenue;

(vi)     enter into any material amendment of or waiver of any material right of the Company by the Company under the Purchase Agreement; *provided* that if the Required Backstop Parties have not provided a response within two (2) Business Days following a request by the Company for consent pursuant to this Section 7(h)(vi), consent will be deemed given;

21

(vii)     enter into any new key employee incentive plan or key employee retention plan or similar arrangement, or any new or amended agreement regarding executive compensation;

(viii)     give effect to a material capital expenditure contracted for following the date hereof in an amount greater than $10 million that is not expressly contemplated in the Business Plan or if such capital expenditure is expressly prohibited under the DIP Credit Agreement as in effect on the date hereof, without giving effect to any amendments or waivers thereto and whether or not the DIP Credit Agreement remains in effect;

(ix)     enter into any Affiliate Agreements, except to the extent not prohibited by the DIP Credit Agreement as in effect on the date hereof, without giving effect to any amendments or waivers thereto and whether or not such DIP Credit Agreement remains in effect;

(x)     declare, set aside or pay any dividends or purchase, redeem, or otherwise acquire, except in connection with the Plan, any shares of its capital stock, except to the extent not prohibited by the DIP Credit Agreement as in effect on the date hereof, without giving effect to any amendments or waivers thereto and whether or not such DIP Credit Agreement remains in effect;

(xi)     issue, deliver, grant, sell, pledge or otherwise encumber any of its capital stock or any convertible securities into its capital stock or any of its assets, except to the extent required by the DIP Credit Agreement, to the extent required by the Bankruptcy Court or to the extent not prohibited by the DIP Credit Agreement as in effect on the date hereof, without giving effect to any amendments or waivers thereto and whether or not such DIP Credit Agreement remains in effect;

(xii)     make, change or rescind any material election relating to Taxes, except elections consistent with past practice, except to the extent not prohibited by the DIP Credit Agreement as in effect on the date hereof, without giving effect to any amendments or waivers thereto and whether or not such DIP Credit Agreement remains in effect;

(xiii)     become a party to, establish, adopt, amend or terminate any collective bargaining agreement or other agreement with a labor union, works council or similar organization;

(xiv)     amend its articles of incorporation, bylaws or other similar organizational documents (whether by merger, consolidation or otherwise), other than as contemplated by this Agreement, the Plan, the RSA or the other transactions contemplated thereby or as approved by the Bankruptcy Court;

(xv)     make any loans, advances or capital contributions to, or investments in, any other Person, other than in the ordinary course of business,

#90500902v12

except to the extent not prohibited by the DIP Credit Agreement as in effect on the date hereof, without giving effect to any amendments or waivers thereto and whether or not such DIP Credit Agreement remains in effect;

(xvi)     settle, or offer or propose to settle, any material litigation, investigation, arbitration, proceeding or other claim involving or against the Company or any of its subsidiaries, except to the extent not prohibited by the DIP Credit Agreement as in effect on the date hereof, without giving effect to any amendments or waivers thereto and whether or not such DIP Credit Agreement remains in effect (it being understood and acknowledged that any litigation pending as of the date hereof which is not listed on Section 5(k) of the Company Disclosure Letter shall be deemed to be not material)[1], or

(xvii)     except as permitted above, agree, resolve or commit to do any of the foregoing.

(i)     *Access to Information*.  The Company and each of its subsidiaries shall (i) afford the Backstop Parties and their respective representatives, upon the reasonable request and notice of at least three (3) Business Days and no more than once every two (2) week period from the date hereof until the Plan Effective Date, a status call with senior management of the Company and its subsidiaries and (ii) during such period, furnish promptly to such parties all reasonable information concerning the Company and its subsidiaries' business and properties as may reasonably be requested by any such party, such information to be consistent with the information required to be provided pursuant to the DIP Credit Agreement, and directly related to a stated purpose for such request, *provided* that the foregoing shall not require the Company (x) to permit any inspection, or to disclose any information, that in the reasonable judgment of the Company would cause the Company to violate any of its obligations with respect to confidentiality to a third party, (y) to disclose any legally privileged information of the Company, or (z) to violate any applicable laws or orders.

(j)     *Further Assurances*.  Without in any way limiting any other obligation of the Company and its subsidiaries in this Agreement, the Company and its subsidiaries shall use commercially reasonable efforts to take or cause to be taken all actions, and do or cause to be done all things, reasonably necessary, and as any Backstop Party may reasonably request, in order to consummate and make effective the transactions contemplated by this Agreement. The Company furthermore agrees that it shall perform, and cause its subsidiaries to perform, any and all of its covenants, agreements and obligations under this Agreement and not take any actions that would be inconsistent with such obligations.

(k)     *Alternate Transactions*.

---

[1] Schedule to list "None."

(1) From the date of this Agreement until the earlier of the termination of this Agreement in accordance with its terms and the Plan Effective Date, (A) the Company and its subsidiaries shall, and shall instruct and direct their respective representatives to, immediately cease and terminate any ongoing solicitation, discussions and negotiations with respect to any Alternate Transaction (as defined below), and (B) the Company and its subsidiaries shall not, and the Company and its subsidiaries shall instruct and direct their respective representatives not to, directly or indirectly, initiate, solicit, engage in or participate in any discussions, inquiries or negotiations in connection with any proposal or offer relating to an Alternate Transaction, afford access to the business, properties, assets, books or records of or provide any non-public information relating to the Company or any of its subsidiaries to, otherwise cooperate in any way with, or knowingly assist, participate in, facilitate or encourage any effort by any Person that is seeking to make, or has made, an Alternate Transaction proposal. It is agreed that any violation of the restrictions on the Company set forth in this Section 7(k) by any subsidiary of the Company or any representative of the Company or any of its subsidiaries shall be deemed a breach of this Section 7(k) by the Company. "**Alternate Transaction**" means any transaction with respect to a reorganization, restructuring, merger, consolidation, share exchange, rights offering, equity investment, business combination, recapitalization or similar transaction (including the sale of all or substantially all of the assets of the Company and its subsidiaries) involving the Company or any other Debtors that is inconsistent with the Rights Offering, the Backstop Commitment, the RSA, this Agreement or the Plan. "**Superior Transaction**" means a transaction that the board of directors of the Company (the "**Company Board**") determines in good faith, based on the advice of its financial and legal advisors: (x) would be in the best interests of the Company, its creditors and equity holders as a whole, including, but not limited to the Backstop Parties, and (y) would reasonably be expected to provide a recovery (but, with respect to any creditor constituent, not in excess of its claim) to holders of SLTL Claims at least as favorable as the recovery set forth in the Plan.

(2) Notwithstanding the foregoing clause (a)(1), if following the date of this Agreement (i) the Company or any of its subsidiaries receives a bona fide unsolicited proposal or offer (whether written or unwritten) for an Alternate Transaction (an "**Alternate Transaction Proposal**") from any Person not solicited by the Company or its subsidiaries in violation of this Section 7(k) in any material respect that the Company Board has determined in good faith, after consultation with its outside counsel and independent financial advisor, that such Alternate Transaction Proposal constitutes, or could reasonably be expected to result in, a Superior Transaction and that failure of the Company Board to pursue such Alternate Transaction Proposal would reasonably be expected to be inconsistent with the Company Board's fiduciary duties under applicable Laws (a "**Superior Proposal**"), the Company may, in response to such Superior Proposal: (x) furnish non-public information in response to a request therefor by such Person if such Person has executed and delivered to the Company a confidentiality agreement on terms no less favorable than any Backstop Party confidentiality agreement and if the Company also promptly (and in any event within 24 hours after the time such information is provided to such Person) makes such information available to the Backstop Parties; and (y) engage or participate in discussions and negotiations with such

24

Person regarding such Superior Proposal. The Company shall also notify the Backstop Parties promptly if the Company Board determines that an Alternate Transaction Proposal is a Superior Proposal no later than 24 hours following such determination.

(3) The Company shall notify the Backstop Parties promptly (and, in any event, within 24 hours) if any Alternate Transaction Proposals are received by, any non-public information is requested from, or any discussions or negotiations are sought to be initiated or continued with, it or its subsidiaries or its or its subsidiaries' representatives with respect to any Alternate Transaction Proposal, indicating, in connection with such notice, the identity of the parties and the material terms and conditions of any Alternate Transaction Proposal (including, if applicable, copies of any and all written inquiries, requests, proposals or offers, including any draft of proposed agreements received or sent by the Company, also within 24 hours) and, thereafter, the Company shall keep the Backstop Parties reasonably informed of the status and terms of any such Alternate Transaction Proposals (including any amendments thereto) and the status of any such discussions or negotiations, including any change in the Company's intentions as previously notified. None of the Company or any of its subsidiaries shall, after the date of this Agreement, enter into any confidentiality or similar agreement that would prohibit it from providing such information to the Backstop Parties.

(4) Prior to the earlier of the occurrence of the Plan Effective Date and the termination of this Agreement in accordance with its terms, the Company Board may approve a Superior Proposal not solicited in violation of this Section 7(k) that the Company Board has determined in good faith, after consultation with its outside legal counsel and its independent financial advisor, constitutes a Superior Transaction, if and only if, (i) prior to taking such action the Company Board determines in good faith, after consultation with its outside legal counsel, that failure to take such action would reasonably be expected to be inconsistent with the Company Board's fiduciary duties under applicable Laws; (ii) the Company Board notifies the Backstop Parties in writing at least four (4) Business Days in advance that it intends to take such action or that the Company intends to terminate this Agreement pursuant to Section 13(c) which notice shall specify the identity of the Person making such Superior Proposal and all of the material terms and conditions of such Superior Proposal and attach the most current version of any proposed transaction agreement (and any related agreements) providing for such Superior Proposal; (iii) after providing such notice and prior to taking any such action or terminating this Agreement pursuant to Section 13(b), the Company shall, and shall cause its representatives to, negotiate in good faith with the Backstop Parties during the four (4) Business Day period to make such adjustments to the terms and conditions of this Agreement and the other transaction agreements as would permit the Company Board not to take such action or terminate this Agreement; and (iv) following the end of such four (4) Business Day period, the Company Board shall have determined in good faith, after consultation with its outside legal counsel and independent financial advisor, and after taking into account any changes to this Agreement and the other transaction agreements proposed by the Backstop Parties, that the Superior Proposal continues to constitute a Superior Transaction assuming such changes agreed to by the Backstop Parties were to be given effect.

(5) With respect to any Alternate Transaction that is premised, whether directly or indirectly, on one or more asset sales under Section 363 of the Bankruptcy Code or pursuant to a chapter 11 plan, each Backstop Party and/or the respective agents under the Second Lien Credit Agreements (including the collateral agent under and as defined in the Second Lien Credit Agreements) shall (in the manner provided for in the Second Lien Credit Agreement Documents) have the right to "credit bid" (whether pursuant to Section 363(k) of the Bankruptcy Code or otherwise) all (or such lesser portion as they may determine under the Second Lien Credit Agreements) of the maximum amount of Eligible Claims (including all principal, premium, interest (at the default rate to the extent applicable under the Second Lien Credit Agreements and irrespective of whether permissible under the Bankruptcy Code), penalties, fees, charges, expenses, indemnifications, reimbursements, damages, and all other amounts and liabilities payable under the Second Lien Credit Agreements) notwithstanding any provision of the Bankruptcy Code or any applicable Law (including Section 363(k) of the Bankruptcy Code) to the contrary, subject only to any applicable term or condition of the Second Lien Credit Agreements, to the extent that such term or condition is found to be enforceable.

Section 8.    ADDITIONAL COVENANTS OF THE BACKSTOP PARTIES.  Each of the Backstop Parties agrees with the Company, severally and not jointly, as follows:

(a)    *Approvals*.  Except as set forth in this Agreement or with the prior written consent of the Company, during the period from the date of this Agreement to the earlier of the Plan Effective Date and the date on which this Agreement is terminated in accordance with its terms, the Backstop Parties shall use reasonable efforts to reasonably promptly take all actions and prepare and file all necessary documentation (including by reasonably cooperating with the Company as to the appropriate time of filing such documentation and its content) and to effect all applications that are necessary in connection with seeking any governmental approval, exemption or authorization from any governmental authority under any Antitrust Laws, that are necessary to consummate and make effective the transactions contemplated by this Agreement. Each Backstop Party shall reasonably promptly notify the Company (and furnish to it copies of, if requested) of any communications from governmental authorities and shall not participate in any meeting with any such authority unless it consults with the Company in advance to the extent permitted by applicable law and gives the Company a reasonable opportunity to attend and participate thereat.  The Backstop Parties shall not take any action that is intended or reasonably likely to materially impede or delay the ability of the parties hereto to obtain any necessary approvals required for the transactions contemplated by this Agreement.

Section 9.    SUPPORT OF PLAN.  Each Backstop Party agrees that, for the duration of the Support Period, such Backstop Party shall:

(a)    (i) timely vote or cause to be voted its SLTL Claims to accept the Plan by delivering its duly executed and completed ballot or ballots, as applicable, accepting the Plan on a timely basis following commencement of the Solicitation (as defined in the RSA), (ii) not change or withdraw such vote (or cause or direct such vote to be changed or withdrawn); *provided*, however, that such vote may, upon written notice to the

26

Company and the other parties, be revoked (and, upon such revocation, deemed void ab initio) by any Backstop Party at any time following the expiration of the Support Period or upon termination of the RSA pursuant to the terms hereof with respect to such Backstop Party;

(b)     timely vote (or cause to be voted) its SLTL Claims against any plan, plan proposal, restructuring proposal, offer of dissolution, winding up, liquidation, sale or disposition, reorganization, merger or restructuring of the Company other than the Plan (each, a "**Alternative Restructuring**");

(c)     not directly or indirectly, through any person or entity (including any administrative agent or collateral agent), seek, solicit, propose, support, assist, engage in negotiations in connection with or participate in the formulation, preparation, filing or prosecution of any Alternative Restructuring or take any other action that would reasonably be expected to prevent, interfere with, delay or impede the Solicitation, approval of the Disclosure Statement, or the confirmation and consummation of the Plan and the Restructuring;

(d)     support and take all actions necessary or reasonably requested by the Company to facilitate the Solicitation of the Plan, obtain approval of the Disclosure Statement, and confirmation and consummation of the Plan and the Restructuring; and

(e)     to the extent any legal or structural impediment arises that would prevent, hinder, or delay the consummation of the Restructuring, negotiate in good faith appropriate additional or alternative provisions to address any such impediments.

Section 10.   CONDITIONS TO THE OBLIGATIONS OF THE BACKSTOP PARTIES.  The obligations of the Backstop Parties to purchase Rights Offering Shares and Unsubscribed Shares pursuant to their respective Backstop Commitments on the Plan Effective Date are subject to the satisfaction of the following conditions (unless waived by the Required Backstop Parties), except where the failure to satisfy any such condition results solely from the failure by any Backstop Party to comply with this Agreement:

(a)     *Plan and Confirmation Order*.  The Plan, as approved, and the Confirmation Order, as entered by the Bankruptcy Court and which shall have become a Final Order, shall each be consistent in all material respects with the RSA or otherwise with such amendments, modifications or changes that are reasonably acceptable to the Required Backstop Parties.

(b)     *Conditions to the Plan*.  The conditions to the occurrence of the Plan Effective Date set forth in the Plan and the Confirmation Order shall have been satisfied or waived by the Company in accordance with the terms of the Plan, and the Plan Effective Date shall have occurred or be deemed to have occurred.

(c)     *Asset Purchase Transaction*. Substantially contemporaneous with the transactions contemplated hereunder, the Company shall have consummated the Asset Purchase Transaction pursuant to the Purchase Agreement, in the form attached as Exhibit

G to the Disclosure Statement with only such material amendments and waivers of material rights of the Company that have been reasonably approved (or deemed to be approved) by the Required Backstop Parties in accordance with this Agreement.

(d)     *Rights Offering*. The Issuer shall have commenced the Rights Offering, the Rights Offering shall have been conducted in all material respects in accordance with this Agreement and the Rights Offering Procedures, and the Subscription Expiration Deadline shall have occurred.

(e)     *Approvals*. All terminations or expirations of waiting periods imposed by any Governmental Entity required under the HSR Act or any other Antitrust Laws, shall have occurred and all other notifications, consents, authorizations and approvals required to be made or obtained from any Governmental Entity under any Antitrust Law shall have been made or obtained for the transactions contemplated by this Agreement.

(f)     *Backstop Funding Notice*. The Backstop Parties shall have received a Backstop Funding Notice in accordance with Section 1(g).

(g)     *Valid Issuance*. The Rights Offering Shares shall be, upon (i) payment of the aggregate purchase price as provided herein and (ii) the Plan Effective Date, validly issued and outstanding, and free and clear of all Taxes, liens, pre-emptive rights, rights of first refusal, subscription and similar rights, except as set forth herein, and other than liens pursuant to applicable securities laws.

(h)     *No Restraint*. No judgment, injunction, decree or other legal restraint shall be in effect that prohibits the consummation of the Restructuring.

(i)     *Representations and Warranties*.

(i)     The representations and warranties of the Company contained in Sections 5(a), (b), (c),(d), (e) and (f)(ii) qualified as to materiality shall be true and correct, and those not so qualified shall be true and correct in all material respects on and as of the Plan Effective Date as if made on and as of the Plan Effective Date (or, to the extent made as of a specific date, as of such date); and

(ii)     all other representations and warranties of the Company contained in Section 5 shall be true and correct (without giving effect to any qualification set forth therein as to "materiality", "Material Adverse Effect" or other qualifications based on the word "material" or similar phrases) on and as of the Plan Effective Date as if made on and as of the Plan Effective Date (or, to the extent made as of a specific date, as of such date), except, where the failure of such representations and warranties to be so true and correct does not have, and would not reasonably be expected to have, a Material Adverse Effect.

(j)     *Covenants*. The Company and the Issuer shall have performed and complied in all material respects with all obligations and agreements required in this Agreement to be performed or complied with by it prior to the Plan Effective Date.

#90500902v12

(k)    *Backstop Commitment Premium.*  All premiums and other amounts, including the Backstop Commitment Premium, required to be paid or reimbursed by the Company or the Issuer, as applicable, to the Backstop Parties as of the Plan Effective Date shall have been so paid or reimbursed.

(l)    *Material Adverse Effect*.  Since the Reference Date, there shall not have occurred, and there shall not exist, any change, event, circumstance, effect, development, occurrence or state of facts that constitutes, individually or in the aggregate, a Material Adverse Effect.

(m)    *Officer's Certificate*.  The Backstop Parties shall have received on and as of the Plan Effective Date a certificate of the chief executive officer or chief financial officer of the Company, in his or her capacity as such and not in his or her individual capacity, confirming that the conditions set forth in Section 10(i), Section 10(j) and Section 10(l) have been satisfied.

Section 11.   CONDITIONS TO THE OBLIGATIONS OF THE COMPANY.  The obligations of the Company pursuant to this Agreement are subject to satisfaction of the following conditions (unless waived by the Company), except where the failure to satisfy any such condition is the result of a failure by the Company to comply with this Agreement:

(a)    *Plan and Confirmation Order*.  The Plan, as approved, and the Confirmation Order, as entered by the Bankruptcy Court, and which shall have become a Final Order, shall each be consistent in all material respects with the RSA or otherwise with such amendments, modifications or changes that are reasonably acceptable to the Required Backstop Parties and the Company.

(b)    *Conditions to the Plan*. The conditions to the occurrence of the Plan Effective Date set forth in the Plan and the Confirmation Order shall have been satisfied or waived by the Company in accordance with the terms of the Plan, and the Plan Effective Date shall have occurred or be deemed to have occurred.

(c)    *Rights Offering*. The Rights Offering shall have been conducted and the Subscription Expiration Deadline shall have occurred.

(d)    *Net Funding Amount.*  Each Backstop Party shall have wired its Net Funding Amount into the bank account so designated by the Company.

(e)    *Approvals*. All terminations or expirations of waiting periods imposed by any Governmental Entity required under the HSR Act or any other Antitrust Laws, shall have occurred and all other notifications, consents, authorizations and approvals required to be made or obtained from any Governmental Entity under any Antitrust Law shall have been made or obtained for the transactions contemplated by this Agreement.

(f)    *Representations and Warranties.* The representations and warranties of the Backstop Parties set forth in this Agreement qualified as to materiality shall be true and

29

correct, and those not so qualified shall be true and correct in all material respects, in each case, on and as of the Plan Effective Date as if made on and as of the Plan Effective Date (or, to the extent given as of a specific date, as of such date).

(g)     *Covenants*.  The Backstop Parties shall have performed and complied in all material respects with all obligations and agreements required by this Agreement to be performed or complied with by the Backstop Parties on or prior to the Plan Effective Date.

(h)     *No Restraint*.  No judgment, injunction, decree or other legal restraint shall be in effect that prohibits the consummation of the Restructuring.

Section 12.   SURVIVAL OF REPRESENTATIONS AND WARRANTIES.  The representations and warranties made in this Agreement will not survive the Plan Effective Date. Covenants and agreements that by their terms are to be satisfied after the Plan Effective Date shall survive until satisfied in accordance with their terms, subject to termination pursuant to Section 13.

Section 13.   TERMINATION.

(a)     *Termination*.  This Agreement may be terminated by (i) by the mutual written consent of the Company and the Required Backstop Parties or (ii) either the Company or any Backstop Party if the Plan Effective Date has not occurred on or prior to June 30, 2018 (the "**Outside Date**"), subject to the extension of such Outside Date by mutual agreement of the Required Backstop Parties and the Company.

(b)     *Termination by the Company*.  The Company may terminate this Agreement by written notice to each Backstop Party upon the occurrence and during the continuance of any of the following:

(i)     any Backstop Party shall have breached any representation, warranty, covenant or other agreement made by such Backstop Party in this Agreement, and such breach or inaccuracy would, individually or in the aggregate, result in a failure of a condition set forth in Section 11(d), Section 11(f) or Section 11(g), if continuing on the Plan Effective Date, being satisfied and such breach or inaccuracy is not cured by such Backstop Party by the earlier of (1) the tenth (10th) Business Day after the giving of notice thereof to such Backstop Party by the Company and (2) the Outside Date; *provided* that the Company shall not have the right to terminate this Agreement pursuant to this Section if it is then in breach of any representation, warranty, covenant or other agreement hereunder that would result in the failure of any condition set forth in Section 10 being satisfied; and *provided, further*, that prior to the Company being permitted to terminate the Agreement under this Section each of the other non-breaching Backstop Parties shall have the right, but not the obligation, to assume its *pro rata* share of such breaching Backstop Party's Backstop Commitment, based on the proportion of its Backstop Commitment to the aggregate amount of Backstop Commitments of all non-breaching Backstop

30

Parties assuming such breaching Backstop Party's Backstop Commitment, in which case the Company shall not have the right to terminate this Agreement pursuant to this Section;

    (ii)    the Company Board reasonably determining in good faith based upon the advice of outside counsel that failing to enter into a Superior Transaction would be inconsistent with the exercise of its fiduciary duties under applicable law;

    (iii)    the issuance by any governmental authority, including any regulatory authority or court of competent jurisdiction, of any ruling, judgment or order enjoining the consummation of or rendering illegal the Restructuring; or

    (iv)    the RSA has been terminated in accordance with its terms, except under Section 7(b)(i) thereunder as a result of a breach of the RSA by the Company or the other Debtors.

    (c)    *Termination by the Required Backstop Parties*.  The Required Backstop Parties may terminate this Agreement by written notice to the Company upon the occurrence and during the continuance of any of the following:

    (i)    the Company or the Issuer shall have breached any representation, warranty, covenant or other agreement made thereby in this Agreement, and such breach or inaccuracy would, individually or in the aggregate, result in a failure of a condition set forth in Section 10(g), Section 10(i) or Section 10(j), if continuing on the Plan Effective Date, being satisfied and such breach or inaccuracy is not cured by such Debtor by the earlier of (1) the tenth (10th) Business Day after the giving of notice thereof to the Company by the Backstop Parties and (2) the Outside Date; *provided* that the Backstop Parties shall not have the right to terminate this Agreement pursuant to this Section if any Backstop Party is then in breach of any representation, warranty, covenant or other agreement hereunder that would result in the failure of any condition set forth in Section 11 being satisfied;

    (ii)    (A) the Debtors file any pleading, motion or document with the Bankruptcy Court seeking approval of an Alternate Transaction, (B) the Bankruptcy Court approves or authorizes an Alternate Transaction request at the request of any party in interest, or (C) the Company, its subsidiaries or any of its Affiliates enters into any Contract or written agreement in principle providing for the consummation of any Alternate Transaction;

    (iii)    the issuance by any governmental authority, including any regulatory authority or court of competent jurisdiction, of any ruling, judgment or order enjoining the consummation of or rendering illegal the Restructuring;

    (iv)    the valid termination of the Purchase Agreement in accordance with the terms thereof;

31

(v)    the RSA has been terminated in accordance with its terms or through a willful or material breach by the Company or the other Debtors of their obligations under the RSA;

(vi)    the occurrence of an "Event of Default" (as defined under the DIP Credit Agreement) that has not been waived or timely cured in accordance therewith and the resulting acceleration of the obligations or termination of lending commitments under the DIP Facility; or

(vii)    any of the Chapter 11 Cases shall have been dismissed or converted to a case under chapter 7 of the Bankruptcy Code, or the Bankruptcy Court has entered an order in any of the Chapter 11 Cases appointing an examiner or trustee with expanded powers to oversee or operate the Debtors in the Chapter 11 Cases.

(d)    *Effect of Termination*.  Subject to Section 16, upon termination of this Agreement, each party hereto shall be released from its commitments, undertakings and agreements under or related to this Agreement and shall have the rights and remedies that it would have had and shall be entitled to take all actions, whether with respect to the transactions contemplated hereby or otherwise, that it would have been entitled to take had it not entered into this Agreement. Notwithstanding anything contained herein, if this Agreement is terminated as a result of a breach of this Agreement by a party hereto, such party shall not be released and shall remain liable for any damages resulting from such termination.

(e)    *Termination Payment*.  If (x) this Agreement is terminated in accordance with  **Section13)b)(ii (or Section 13(c)(ii) ,or )y (the Company** enters into a definitive agreement to consummate or consummates an Alternate Transaction within six months of a termination of this Agreement (A) by the Company pursuant to Section 13(b)(iv) (but only in connection with a termination of the RSA by the Company (other than a termination of the RSA by the Company in connection with a Company Termination Event (as defined in the RSA) under clauses (i), (iii), (vi), (vii) or (viii) of the definition thereof) without the prior written consent of the Required Backstop Parties); or (B) by the Required Backstop Parties pursuant to (1) Section 13(c)(i), (2) Section 13(c)(iv) (but only in connection with a termination of the Purchase Agreement by, or with the mutual agreement of, the Company without the prior written consent of the Required Backstop Parties) or (3) Section 13(c)(v) (but only in connection with a termination of the RSA by the Company (other than a termination of the RSA by the Company in connection with a Company Termination Event (as defined in the RSA) under clauses (i), (iii), (vi), (vii) or (viii) of the definition thereof) without the prior written consent of the Required Backstop Parties),  then, no later than 2 Business Days following the consummation of the applicable Alternative Transaction, the Company shall pay or cause to be paid to the Backstop Parties that are not Defaulting Backstop Parties (pro rata in accordance with their Backstop Commitment Percentages, excluding the Backstop Commitment Percentage of any Defaulting Backstop Party) a non-refundable cash payment in an aggregate amount equal to the cash equivalent of the Backstop Commitment Premium (plus any Transaction Expenses).

32

Section 14.   INDEMNIFICATION OBLIGATIONS.

(a)     *Company Indemnity*. The Company and the Issuer shall indemnify and hold harmless each Backstop Party and its Affiliates, equity holders, members, partners, general partners, managers and its and their respective representatives and controlling persons (each, an "**Indemnified Person**") from and against any and all losses, claims, damages, liabilities and costs and expenses (other than Taxes of the Backstop Parties except to the extent otherwise provided for in this Agreement) (collectively, "**Losses**") that any such Indemnified Person may incur or to which any such Indemnified Person may become subject arising out of or in connection with this Agreement, the Plan and the transactions contemplated hereby and thereby, including the Backstop Commitments, the Rights Offering, the payment of the Backstop Commitment Premium or the use of the proceeds of the Rights Offering, the Transaction Expenses or any claim, challenge, litigation, investigation or proceeding relating to any of the foregoing, regardless of whether any Indemnified Person is a party thereto, whether or not such proceedings are brought by the Company, the Issuer or their equity holders, Affiliates, creditors or any other Person, and reimburse each Indemnified Person upon demand for reasonable documented (with such documentation subject to redaction to preserve attorney client and work product privileges) legal or other third party expenses incurred in connection with investigating, preparing to defend or defending, or providing evidence in or preparing to serve or serving as a witness with respect to, any lawsuit, investigation, claim or other proceeding relating to any of the foregoing (including in connection with the enforcement of the indemnification obligations set forth herein), irrespective of whether or not the transactions contemplated by this Agreement or the Plan are consummated or whether or not this Agreement is terminated; *provided*, that the foregoing indemnity will not, as to any Indemnified Person, apply to Losses (i) as to any Defaulting Backstop Party or any Indemnified Person related thereto, caused by such default by such Backstop Party, or (ii) to the extent they are found by a final, non-appealable judgment of a court of competent jurisdiction to arise from the bad faith, willful misconduct or gross negligence of such Indemnified Person.

(b)     *Indemnification Procedure*.  Promptly after receipt by an Indemnified Person of notice of the commencement of any claim, challenge, litigation, investigation or proceeding (an "**Indemnified Claim**"), such Indemnified Person will, if a claim is to be made hereunder against the Indemnifying Party in respect thereof, notify the Indemnifying Party in writing of the commencement thereof; *provided*, that (A) the omission to so notify the Indemnifying Party will not relieve the Indemnifying Party from any liability that it may have hereunder except to the extent it has been materially prejudiced by such failure and (B) the omission to so notify the Indemnifying Party will not relieve the Indemnifying Party from any liability that it may have to such Indemnified Person otherwise than on account of this Section 14. In case any such Indemnified Claims are brought against any Indemnified Person and it notifies the Indemnifying Party of the commencement thereof, the Indemnifying Party will be entitled to participate therein, and, at its election by providing written notice to such Indemnified Person, the Indemnifying Party will be entitled to assume the defense thereof, with counsel reasonably acceptable to such Indemnified Person; *provided*, that if the parties (including

33

any impleaded parties) to any such Indemnified Claims include both such Indemnified Person and the Indemnifying Party and based on advice of such Indemnified Person's counsel there are legal defenses available to such Indemnified Person that are different from or additional to those available to the Indemnifying Party, such Indemnified Person shall have the right to select separate counsel to assert such legal defenses and to otherwise participate in the defense of such Indemnified Claims. Upon receipt of notice from the Indemnifying Party to such Indemnified Person of its election to so assume the defense of such Indemnified Claims with counsel reasonably acceptable to the Indemnified Person, the Indemnifying Party shall not be liable to such Indemnified Person for expenses incurred by such Indemnified Person in connection with the defense thereof or participation therein (other than reasonable costs of investigation) unless (i) such Indemnified Person shall have employed separate counsel (in addition to any local counsel) in connection with the assertion of legal defenses in accordance with the proviso to the immediately preceding sentence (it being understood, however, that the Indemnifying Party shall not be liable for the expenses of more than one separate counsel representing the Indemnified Persons who are parties to such Indemnified Claims (in addition to one local counsel in each jurisdiction in which local counsel is required)), (ii) the Indemnifying Party shall not have employed counsel reasonably acceptable to such Indemnified Person to represent such Indemnified Person within a reasonable time after the Indemnifying Party has received notice of commencement of the Indemnified Claims from, or delivered on behalf of, the Indemnified Person, (iii) after the Indemnifying Party assumes the defense of the Indemnified Claims, the Indemnified Person determines in good faith that the Indemnifying Party has failed or is failing to defend such claim and provides written notice of such determination, and such failure is not reasonably cured within ten (10) Business Days of receipt of such notice, or (iv) the Indemnifying Party shall have authorized in writing the employment of counsel for such Indemnified Person. Notwithstanding anything herein to the contrary, the Company shall have sole control over any Tax controversy or Tax audit and shall be permitted to settle any liability for Taxes of the Company.

(c) *Settlement of Indemnified Claims*. The Indemnifying Party shall not be liable for any settlement of any Indemnified Claims effected by such Indemnified Person without the written consent of the Indemnifying Party. If any settlement of any Indemnified Claims is consummated with the written consent of the Indemnifying Party or if there is a final judgment for the plaintiff in any such Indemnified Claims, the Indemnifying Party agrees to indemnify and hold harmless each Indemnified Person from and against any and all Losses by reason of such settlement or judgment to the extent such Losses are otherwise subject to indemnification by the Indemnifying Party hereunder in accordance with, and subject to the limitations of, this Section 14. The Indemnifying Party shall not, without the prior written consent of an Indemnified Person (which consent shall be granted or withheld, conditioned or delayed in the Indemnified Person's sole discretion), effect any settlement of any pending or threatened Indemnified Claims in respect of which indemnity or contribution has been sought hereunder by such Indemnified Person unless (i) such settlement includes an unconditional release of such Indemnified Person in form and substance satisfactory to such Indemnified Person from all liability on the claims that are the subject matter of such Indemnified Claims and (ii)

34

such settlement does not include any statement as to or any admission of fault, culpability or a failure to act by or on behalf of any Indemnified Person.

(d)    *Contribution*.  If for any reason the foregoing indemnification is unavailable to any Indemnified Person or insufficient to hold it harmless from Losses that are subject to indemnification pursuant to Section 14(a), then the Indemnifying Party shall contribute to the amount paid or payable by such Indemnified Person as a result of such Loss in such proportion as is appropriate to reflect not only the relative benefits received by the Indemnifying Party, on the one hand, and such Indemnified Person, on the other hand, but also the relative fault of the Indemnifying Party, on the one hand, and such Indemnified Person, on the other hand, as well as any relevant equitable considerations. It is hereby agreed that the relative benefits to the Indemnifying Party, on the one hand, and all Indemnified Persons, on the other hand, shall be deemed to be in the same proportion as (i) the total value received or proposed to be received by the Company pursuant to the issuance and sale of the New Equity Interests in the Rights Offering contemplated by this Agreement and the Plan, bears to (ii) the Backstop Commitment Premium paid or proposed to be paid to the Backstop Parties. The Indemnifying Parties also agree that no Indemnified Person shall have any liability based on their comparative or contributory negligence or otherwise to the Indemnifying Parties, any Person asserting claims on behalf of or in right of any of the Indemnifying Parties, or any other Person in connection with an Indemnified Claim.

(e)    *Treatment of Indemnification Payments*. All amounts paid by an Indemnifying Party to an Indemnified Person under this Section 14 shall, to the extent permitted by applicable law, be treated for all Tax purposes as adjustments to the purchase price for the New Equity Interests subscribed for by the Backstop Parties in the Rights Offering and the Unsubscribed Shares purchased by such Indemnified Person. The provisions of this Section 14 are an integral part of the transactions contemplated by this Agreement and without these provisions the Backstop Parties would not have entered into this Agreement, and the obligations of the Company under this Section 14 shall constitute allowed administrative expenses of the Debtors' estate under Sections 503(b) and 507 of the Bankruptcy Code and are payable without further order of the Bankruptcy Court, and the Company may comply with the requirements of this Section 14 without further order of the Bankruptcy Court.

Section 15.   NOTICES.  All notices and other communications under this Agreement shall be in writing and shall be deemed given (a) when delivered personally by hand (with written confirmation of receipt), (b) when sent by facsimile (with written confirmation of transmission), (c) five (5) days after being deposited with the United States Post Office, by registered or certified mail, postage prepaid, (d) one (1) Business Day following the day sent by overnight courier (with written confirmation of receipt), or (e) when sent by electronic mail (with acknowledgment received), in each case at the following addresses and facsimile numbers (or to such other address or facsimile number as a party hereto may have specified by like notice):

If to Backstop Parties, to each of the undersigned Backstop Parties at the addresses listed on the signatures pages hereto,

with a copy to:

Davis Polk & Wardwell LLP
450 Lexington Avenue
New York, NY 10017
Attention:    Damian S. Schaible
              Stephen Salmon
Email:        damian.schaible@davispolk.com
              stephen.salmon@davispolk.com

and

Vinson & Elkins LLP
666 Fifth Avenue, 26th Floor
New York, NY 10103-0040
Tel: (212) 237-0000
Fax: (212) 237-0100
Attention:    David S. Meyer
              Jessica C. Peet
Email:        dmeyer@velaw.com
              jpeet@velaw.com

and

If to the Company, to:

Fieldwood Energy Inc.
c/o Fieldwood Energy LLC
2000 W. Sam Houston Parkway, S. Suite 1200
Houston, Texas 77042
Attention:  G. M. McCarroll and Michael Dane

with a copy to (which shall not constitute notice):

Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, NY 10153
Attention:  Matt Barr, Esq.
            (matt.barr@weil.com)
            Gavin Westerman, Esq.
            (gavin.westerman@weil.com)
            - and -
            Mariel Cruz, Esq.
            (mariel.cruz@weil.com)

36

#90500902v12

Section 16.   SURVIVAL.  Notwithstanding the termination of this Agreement, the agreements and obligations of the parties hereto in Section 13(d) and Sections 14 through Section 22 shall survive such termination and shall continue in full force and effect for the benefit of the parties hereto in accordance with the terms hereof.

Section 17.   ASSIGNMENT; THIRD PARTY BENEFICIARIES.  Neither this Agreement nor any of the rights, interests or obligations under this Agreement may be assigned by any of the parties hereto without the prior written consent of the other parties hereto. Notwithstanding the previous sentence, the Backstop Parties' obligations hereunder may be assigned, delegated or transferred, in whole or in part, by any Backstop Party to any Permitted Transferee (in accordance with Section 3).

Section 18.   COMPLETE AGREEMENT.  This Agreement (including the Exhibits, the Schedules, and the other documents and instruments referred to herein) constitutes the entire agreement of the parties hereto and supersedes all prior agreements, arrangements or understandings, whether written or oral, among the parties hereto with respect to the subject matter of this Agreement, except that the parties hereto acknowledge that any confidentiality agreements heretofore executed among the parties hereto will continue in full force and effect.

Section 19.   GOVERNING LAW; SUBMISSION TO JURISDICTION; SELECTION OF FORUM; WAIVER OF TRIAL BY JURY.  This Agreement, and all claims or causes of action (whether in contract or tort) that may be based upon, arise out of or relate to this Agreement (including the exhibits and schedules hereto), or the negotiation, execution, termination, performance or nonperformance of this Agreement (including the exhibits and schedules hereto), shall be governed by and construed in accordance with the laws of the State of New York applicable to contracts made and performed in such State, without regard to any conflict of laws principles thereof. Each party hereto agrees that it shall bring any action or proceeding in respect of any claim based upon, arising out of, or related to this agreement, any provision hereof or any of the transactions contemplated hereby, in the United States District Court for the Southern District of New York or any New York State court sitting in the Borough of Manhattan of New York City (the "**Chosen Courts**"), and solely in connection with claims arising under this Agreement or the transactions that are the subject of this Agreement (a) irrevocably submits to the exclusive jurisdiction of the Chosen Courts, (b) waives any objection to laying venue in any such action or proceeding in the Chosen Courts and (c) waives any objection that the Chosen Courts are an inconvenient forum or do not have jurisdiction over any party hereto; *provided* that upon the commencement of the Chapter 11 Cases, the Bankruptcy Court shall be the sole Chosen Court. Each party hereto agrees that a judgment in any such dispute may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by law. EACH PARTY HERETO WAIVES ANY RIGHT TO TRIAL BY JURY IN ANY ACTION, MATTER OR PROCEEDING BASED UPON, ARISING OUT OF, OR RELATED TO THIS AGREEMENT, ANY PROVISION HEREOF OR ANY OF THE TRANSACTIONS CONTEMPLATED HEREBY.

Section 20.   COUNTERPARTS.  This Agreement may be executed in any number of counterparts, all of which will be considered one and the same agreement and will

37

become effective when counterparts have been signed by each of the parties hereto and delivered to the other parties hereto (including via facsimile or other electronic transmission), it being understood that each party need not sign the same counterpart.

Section 21.   ACTION BY, OR CONSENT OR APPROVAL OF, THE BACKSTOP PARTIES. Whenever this Agreement refers to any action to be taken by, or any consent or approval to be given by, the Backstop Parties, unless otherwise expressly provided in any particular instance, such reference shall be deemed to require the action, consent or approval of the Required Backstop Parties.

Section 22.   AMENDMENTS AND WAIVERS.

(a)      This Agreement may be amended, modified or supplemented and the terms and conditions of this Agreement may be waived, only by a written instrument signed by the Company and the Required Backstop Parties and subject, to the extent required after the Petition Date, to the approval of the Bankruptcy Court; *provided* that any modification of, or amendment or supplement to, this Agreement that would have the effect of (i) materially and adversely affecting any Backstop Party in a manner that is disproportionate to any other Backstop Party, (ii) increasing the aggregate purchase price to be paid by all of the Backstop Parties in respect of the Backstop Party Shares, (iii) increasing or decreasing any Backstop Party's Commitment Percentage (as set forth on **Schedule 1**) (other than as a result of a permitted transfer to which such Backstop Party is a party), or (iv) modifying this Section 22, shall require the prior written consent of each Backstop Party.

(b)      No delay on the part of any party hereto in exercising any right, power or privilege pursuant to this Agreement will operate as a waiver thereof, nor will any waiver on the part of any party hereto of any right, power or privilege pursuant to this Agreement, nor will any single or partial exercise of any right, power or privilege pursuant to this Agreement, preclude any other or further exercise thereof or the exercise of any other right, power or privilege pursuant to this Agreement. The rights and remedies provided pursuant to this Agreement are cumulative and are not exclusive of any rights or remedies which any party hereto otherwise may have at law or in equity.

Section 23.   SPECIFIC PERFORMANCE.  The parties hereto acknowledge and agree that any breach of the terms of this Agreement would give rise to irreparable harm for which money damages would not be an adequate remedy and, accordingly, the parties hereto agree that in addition to any other remedies, each party hereto will be entitled to enforce the terms of this Agreement by a decree of specific performance without the necessity of proving the inadequacy of money damages as a remedy and without the necessity of posting bond.

Section 24.   OTHER INTERPRETIVE MATTERS.

(a)      Unless otherwise expressly provided, for purposes of this Agreement, the following rules of interpretation shall apply: (i) when calculating the period of time before which, within which or following which any act is to be done or step taken pursuant to

38

this Agreement, the date that is the reference date in calculating such period shall be excluded and, if the last day of such period is a non-Business Day, the period in question shall end on the next succeeding Business Day; (ii) any reference in this Agreement to $ shall mean U.S. dollars; (iii) all exhibits and schedules annexed hereto or referred to herein are hereby incorporated in and made a part of this Agreement as if set forth in full herein and any capitalized terms used in any Exhibit or Schedule but not otherwise defined therein shall be defined as set forth in this Agreement; (iv) words imparting the singular number only shall include the plural and vice versa; (v) the words such as "herein," "hereinafter," "hereof," and "hereunder" refer to this Agreement as a whole and not merely to a subdivision in which such words appear unless the context otherwise requires; (vi) the word "including" or any variation thereof means "including, without limitation" and shall not be construed to limit any general statement that it follows to the specific or similar items or matters immediately following it; (vii) the division of this Agreement into Sections and other subdivisions and the insertion of headings are for convenience of reference only and shall not affect or be utilized in construing or interpreting this Agreement; and (viii) all references in this Agreement to any "Section" are to the corresponding Section of this Agreement unless otherwise specified.

(b)     The parties hereto have participated jointly in the negotiation and drafting of this Agreement and, in the event an ambiguity or question of intent or interpretation arises, this Agreement shall be construed as jointly drafted by the parties hereto and no presumption or burden of proof shall arise favoring or disfavoring any party hereto by virtue of the authorship of any provision of this Agreement.

[Signature Page Follows]

#90500902v12

IN WITNESS WHEREOF, the Parties hereto have executed this Agreement as of the date first written above.

FIELDWOOD HOLDINGS LLC
FIELDWOOD ENERGY INC.

By: _____
    Name:  G. M. McCarroll
    Title:   President and Chief Executive Officer

Backstop Parties' Signature Pages Intentionally Omitted

**Schedule 1**

## Backstop Commitment Percentages

Intentionally Omitted

Schedule 2

**Debtor Entities**

| Name of Entity | Jurisdiction |
| --- | --- |
| Dynamic Offshore Resources NS, LLC | Texas |
| Fieldwood Energy LLC | Delaware |
| Fieldwood Holdings LLC | Delaware |
| Fieldwood Energy Inc. | Delaware |
| Fieldwood Energy Offshore LLC | Delaware |
| Fieldwood Onshore LLC | Delaware |
| Fieldwood SD Offshore LLC | Delaware |
| FW GOM Pipeline, Inc. | Delaware |
| GOM Shelf LLC | Delaware |
| Bandon Oil and Gas GP, LLC | Delaware |
| Bandon Oil and Gas, LP | Delaware |
| Fieldwood Energy SP LLC | Louisiana |
| Galveston Bay Pipeline LLC | Delaware |
| Galveston Bay Processing LLC | Delaware |

**<u>EXHIBIT F</u>**
**MANAGEMENT INCENTIVE PLAN TERM SHEET**

Attached.

**Fieldwood Energy LLC**

**Post-Emergence Management Incentive Plan Term Sheet**

The following describes the principal terms of the management incentive plan (the "<u>Plan</u>") to be adopted by Fieldwood Energy LLC (the "<u>Company</u>"), in connection with its chapter 11 plan of reorganization (the "<u>Plan of Reorganization</u>"), and the initial grant of awards on or promptly following the Company's emergence from the Plan of Reorganization (the "<u>Emergence Awards</u>").  This term sheet does not contain all of the terms and conditions of the Plan.

**<u>TERMS OF THE PLAN</u>**

| Category | Terms |
|---|---|
| **Effective Date** | The Plan will be effective on, and the Emergence Awards under the Plan will be granted on or promptly following[1], the effective date of the Plan of Reorganization (the "<u>Effective Date</u>"). |
| **Administration** | The Compensation Committee of the Board of Directors of the reorganized Company (the "<u>Compensation Committee</u>"), if one is formed, or the Board of Directors of the reorganized Company (the "<u>Board</u>"), as applicable, shall administer the Plan and make all determinations with respect to any awards granted under the Plan (the "<u>Awards</u>"), other than as specified in this Plan term sheet.  Other than the Emergence Awards, the Compensation Committee or the Board, as applicable, shall have the right to make all determinations with respect to Awards, in consultation with the Chief Executive Officer of the Company (the "<u>CEO</u>"). |
| **Participants** | Officers and employees of the reorganized Company. |
| **Award Pool** | • 10% of the outstanding equity securities of the reorganized Company, on a fully diluted basis (including shares issuable under the Plan) as of the Effective Date will be available for grant under the Plan (the "<u>Award Pool</u>"). <br><br>• If any outstanding Award expires or is forfeited, cancelled or otherwise terminated, the equity underlying such Award will again become available for grant under the Plan. <br><br>• Equity capitalization of the Company to be established with a number of shares large enough to provide flexibility for granting multiple Awards under the Plan. |
| **Plan Awards** | The Plan will be an "omnibus" incentive plan which will permit the Compensation Committee or Board, as applicable, to grant various types of equity awards, including: stock options (ISOs and NQSOs), stock appreciation rights, restricted stock, restricted stock units and other stock-based awards.  Emergence Awards shall be granted in accordance with the terms set forth herein. |
| **Anti-dilution / Adjustment** | Awards will be subject to customary adjustment provisions for changes in capitalization or other corporate events, including, for example, a debt recapitalization (but not including equity infusions into the Company based on fair market value). |

---

[1] Emergence Awards should be granted as close to the Effective Date as possible to properly reflect fair market market of the equity securities for purposes of the option strike price.

| Category | Terms |
|----------|-------|
| **Restrictive Covenants** | • As a condition to receiving Emergence Awards, Emergence Award recipients will be required to enter into customary restrictive covenants, including (i) a non-compete as described below, (ii) a non-solicit as described below, (iii) perpetual non-disparagement and (iv) perpetual confidentiality.<br><br>• Notwithstanding the foregoing:<br><br>   o The CEO shall be subject to the same restrictive covenants as set forth in his employment agreement currently in place, provided that (i) the geographic scope of the non-compete shall be the Gulf of Mexico region, including those portions of such region in the United States and/or Mexico, (ii) the "Restriction Period" as defined in his employment agreement shall be two years and (iii) the restrictive covenants shall also include a perpetual mutual non-disparagement covenant.<br><br>   o Three other senior managers (each of whom is currently party to an employment agreement with the Company) shall be subject to the same restrictive covenants as set forth in their employment agreement currently in place, provided that (i) the geographic scope of the non-compete shall be the Gulf of Mexico region, including those portions of such region in the United States and/or Mexico, (ii) the "Restriction Period" as defined in their employment agreements shall be one year and (iii) the restrictive covenants shall also include a perpetual mutual non-disparagement covenant.<br><br>   o Other Emergence Award receipents, as determined by the CEO to pose a competitive risk, shall be subject to a non-compete and non-solicit during their term of employment and for six months thereafter. |
| **Call Rights** | Awards and the shares of Company common stock underlying all Awards will be subject to a call right in the event of a termination of employment for any reason or a material restrictive covenant breach, with a call price of fair market value; *provided* that in the event of a termination for cause or a restrictive covenant breach, the call price will be the lower of cost and fair market value. |

**TERMS OF EMERGENCE AWARDS**

| Category | Terms |
|----------|-------|
| **Emergence Award Pool** | The Award Pool will be 10% on a fully-diluted basis, of which 9% shall be granted as Emergence Awards (the "Emergence Award Pool") upon the Effective Date as the types of awards set forth below (and in such proportions). Of the Emergence Awards, 3.5% shall be granted to the CEO and the remaining 5.5% shall be granted to other recipients as determined by the CEO.<br><br>In the event the entire Award Pool (including forfeitures) is not fully allocated to participants at the time of a Liquidity Event (as defined below), the remainder of the Award Pool will be allocated to participants in a manner determined by the Compensation Committee or the Board, as applicable, in consultation with the CEO. |
| **Form of** | • The Emergence Award Pool will be 9% on a fully-diluted basis. |

| Category | Terms |
|---|---|
| **Emergence Awards** | • Of the 9%, 2.7% will be granted in the form of restricted stock units ("RSUs") with service-based vesting (as described below) as Emergence Awards. RSUs are based on the value of the Company's common stock, and will include dividend equivalent rights.<br><br>• Of the 9%, 6.3% will be granted in the form of non-qualified stock options ("Options") with service-based vesting (as described below) as Emergence Awards. The exercise price will be equal to the fair market value of the common stock of the Company at the time of grant (the value of the Company shall be $2,250,000,000). Each Option will have a term of exercise of 10 years. |
| **Vesting of Emergence Awards** | Subject to the continued employment of the participant on the vesting date (and certain exceptions as provided below), the Emergence Awards will become vested as follows:<br><br>• 25% will vest on the Effective Date<br><br>• 25% will vest on the first anniversary of the Effective Date<br><br>• 25% will vest on the second anniversary of the Effective Date<br><br>• 25% will vest on the third anniversary of the Effective Date<br><br>Emergence Awards will also become fully vested upon (i) a Liquidity Event, (ii) a termination of employment by the Company without "cause" (this clause (ii) is only applies to the four senior managers with employment agreements) and (iii) a termination of employment due to the participant's death or permanent disability. In addition, if there is an initial public offering of the reorganized Company's equity securities, 50% of the then unvested Emergence Awards shall become vested.<br><br>Upon a termination for any reason other than as set forth herein, all unvested Emergence Awards at such termination date will be cancelled, forfeited and terminated, and the equity underlying such Emergence Award will again become available for grant under the Plan. |
| **Payment of Emergence Awards Upon a Liquidity Event** | Emergence Awards are payable upon the occurrence of a Liquidity Event, based on the value of the consideration attributable to the Company's common stock in the Liquidity Event, subject to any contingencies, holdbacks, escrows, and deferred payments as applicable to other shareholders of the Company. All payments will be made in cash or marketable securities received in the Liquidity Event transaction.<br><br>"Liquidity Event" definition to be based on final equity structure, but shall generally be defined to include a sale of stock, sale of assets, corporate merger or reorganization, in which one or more of the principal stockholders of the Company has liquidated at least a majority of their interest in the Company, but will not include an initial public offering of the Company.<br><br>The grant, vesting and payment of the Emergence Awards will be designed to comply with the requirements of IRC Section 409A. |

**EXHIBIT G**
**DIP TERM SHEET**

Attached.

EXHIBIT G

**FIELDWOOD ENERGY LLC**
**DIP FACILITY TERM SHEET**

This term sheet (the "**DIP Facility Term Sheet**") sets forth the principal terms of a secured debtor-in-possession credit facility (the "**DIP Facility**"; the credit agreement evidencing the DIP Facility, the "**DIP Credit Agreement**" and, together with the other definitive documents governing the DIP Facility, the "**DIP Documents**," each of which shall be in form and substance acceptable to the DIP Facility Borrower (as defined below), the DIP Facility Agent and the DIP Lenders (each as defined herein)). The DIP Credit Agreement otherwise shall be in form and substance substantially consistent with this DIP Facility Term Sheet and shall be entered into with the DIP Facility Borrower (as defined below), certain of its subsidiaries, Fieldwood Holdings LLC and Fieldwood Energy Inc. in connection with their respective cases under chapter 11 (the "**Chapter 11 Cases**"; the debtors and debtors-in-possession thereunder, the "**Debtors**" and each a "**Debtor**") of title 11 of the United States Code (the "**Bankruptcy Code**"). The DIP Facility will be subject to the approval of the Bankruptcy Court (as defined herein) and consummated in the Chapter 11 Cases in the United States Bankruptcy Court for the Southern District of Texas (the "**Bankruptcy Court**"), in accordance with (i) the DIP Orders (as defined herein) of the Bankruptcy Court authorizing the Debtors to enter into the DIP Facility and (ii) the DIP Documents to be executed by the Debtors.

| SUMMARY OF PRINCIPAL TERMS | |
|---|---|
| **DIP Facility Borrower** | Fieldwood Energy LLC, as a debtor and debtor-in-possession (the "**DIP Facility Borrower**"). |
| **Guarantors** | Fieldwood Holdings LLC, Fieldwood Energy Inc. (formerly known as Fieldwood Managing Member LLC) and all domestic subsidiaries of the DIP Facility Borrower, subject to certain exceptions to be agreed (including with respect to GOM P&A Services LLC and Fieldwood Offshore LLC), each as a debtor and debtor-in-possession (the "**Guarantors**" and, together with the DIP Facility Borrower, the "**Loan Parties**"), it being understood and agreed that each subsidiary of the DIP Facility Borrower that is an obligor under any of the Prepetition Facilities described below shall be a Guarantor. |
| **DIP Facility Agent** | Cortland Capital Markets Services LLC, as administrative agent and collateral agent (in such capacities, the "**DIP Facility Agent**") |
| **DIP Lenders** | Funds managed or advised by the entities specified on Schedule L to the Restructuring Support Agreement to which this DIP Facility Term Sheet is attached (the "**Restructuring Support Agreement**"), including Riverstone Investment Group (together with its affiliates, the "**Sponsor**"), each of which is a lender under the Prepetition Second Lien Term Loan Agreement (as defined below) or the Prepetition Sponsor Second Lien Term Loan Agreement (as defined below) on the Petition Date (as defined below), or an affiliate or designee of any of the foregoing (collectively, the "**Specified Lenders**"), as lenders under the DIP Facility (in such capacities, collectively, the "**DIP Lenders**"). |
| | The Specified Lenders are allocated DIP Commitments as set forth in Schedule L to the Restructuring Support Agreement. |
| **Amount & Type** | A multiple-draw senior secured debtor-in-possession US dollar term loan credit facility in an aggregate principal amount not to exceed $60 million (the commitments under the DIP Facility, the "**DIP Commitments**"; the loans under |

Case 20-33948 Document 1637-18 Filed in TXSB on 06/16/21 Page 315 of 528
Case 18-30648 Document 574-18 Filed in TXSB on 02/15/18 Page 315 of 528

G-2

| | the DIP Facility, the "**DIP Loans**"), subject to the terms and conditions of this DIP Facility Term Sheet and the DIP Documents. The borrowing of DIP Loans shall permanently decrease the DIP Commitments, and any DIP Loans repaid may not be reborrowed. |
| --- | --- |
| | From and after the Bankruptcy Court's entry of the Interim DIP Order (as defined below) and upon satisfaction of all other applicable conditions precedent described below, the DIP Facility Borrower may make up to two draws of DIP Loans in an aggregate amount up to $30 million, with any such draw to be made available in increments of $15 million. |
| | From and after the Bankruptcy Court's entry of the Final DIP Order (as defined below) and upon satisfaction of all other applicable conditions precedent, up to the full remaining amount of the DIP Facility shall be made available in incremental draws of $15 million on any date prior to the Confirmation Date (as defined below). The DIP Commitments will automatically terminate on the earlier of the DIP Termination Date and the date on which any Chapter 11 plan for the reorganization of the DIP Facility Borrower or any other Debtor is confirmed. |
| **Use of Proceeds** | For general corporate and working capital purposes, including to (i) pay required debt service on the DIP Loans, (ii) pay the fees, costs and expenses of the DIP Agent and the DIP Lenders, (iii) pay fees and expenses of professionals associated with the Chapter 11 Cases and (iv) provide Adequate Protection (as defined below). |
| **DIP Termination Date** | The earliest of (i) the date falling six months after the commencement of the Chapter 11 Cases (such commencement date, the "**Petition Date**"), (ii) the effective date of any Chapter 11 plan for the reorganization of the DIP Facility Borrower or any other Debtor, (iii) the consummation of a sale or other disposition of all or substantially all assets of the Debtors under Bankruptcy Code section 363, (iv) the date of acceleration of the DIP Loans and termination of the DIP Commitments upon and during the continuance of an event of default under the DIP Facility and (v) 30 days after the date of entry of the Interim DIP Order (or such later date as agreed to by the Required DIP Lenders (as defined below)), unless the Final DIP Order has been entered by the Bankruptcy Court on or prior to such date (such earliest date, the "**DIP Termination Date**"). |
| **Interest Rate** | 10.0% per annum. |
| | During the continuance of an event of default, all overdue amounts under the DIP Facility will bear interest at a rate equal to 2% per annum, plus the otherwise applicable rate. |
| **Amortization** | None. |
| **Mandatory Prepayments** | Subject to the terms of the DIP Orders and the prior payment (or cash collateralization) in full of the loans (or letters of credit, as applicable) outstanding under the Prepetition RBL Credit Agreement (as defined below) and the Prepetition First Lien Term Loan Agreement (as defined below), mandatory prepayments under the DIP Facility shall be required with 100% of the net cash proceeds from (a) issuance of any indebtedness (with exceptions for permitted |

2

Case 20-33948 Document 1637-18 Filed in TXSB on 06/16/21 Page 316 of 528
Case 18-30648 Document 34-18 Filed in TXSB on 02/15/18 Page 316 of 528

G-3

| | |
|---|---|
| | indebtedness) and (b) sales or other dispositions (including casualty events) of any assets (excluding sales of inventory in the ordinary course of business and other customary exceptions to be mutually agreed). |
| **Voluntary Prepayments** | Amounts outstanding under the DIP Facility may be voluntarily repaid at any time without premium or penalty. |
| **Interim DIP Order** | The interim order approving the DIP Facility, which shall be in form and substance acceptable to the Required DIP Lenders and the Debtors (the "**Interim DIP Order**"), shall, among other things, authorize and approve (i) the borrowing and making of the DIP Loans in an amount up to $30 million, (ii) the granting of the super-priority claims and liens against the Debtors and their assets in accordance with this DIP Facility Term Sheet and the DIP Documents, (iii) the payment of all reasonable and documented fees and expenses (including the fees and expenses of outside counsel and financial advisors) required to be paid to the DIP Facility Agent and the DIP Lenders as described in "Fees and Expenses Indemnification" by the Debtors, to the extent invoiced at least two business days prior to the Closing Date (or any later date reasonably acceptable to the DIP Facility Borrower), (iv) the use of cash collateral, *provided* that the Adequate Protection (as defined below) shall be granted in accordance with the terms set forth in this DIP Facility Term Sheet and (v) the payment of the Upfront Fees (as defined below), which payment shall not be subject to reduction, setoff or recoupment. |
| **Final DIP Order** | The final order approving the DIP Facility, which shall be substantially in the same form as the Interim DIP Order (with such modifications as are necessary to convert the Interim DIP Order into a final order) and in form and substance acceptable to the Required DIP Lenders and the Debtors (the "**Final DIP Order**" and, together with the Interim DIP Order, the "**DIP Orders**")), shall, among other things, authorize and approve the DIP Facility Borrower to draw the full amount of the DIP Commitments. |
| **Prepetition Facilities**[1] | "**Prepetition RBL Credit Agreement**" – that certain Credit Agreement, dated as of September 30, 2013, and the "Secured Parties" thereunder the "**Prepetition RBL Secured Parties**." <br><br> "**Prepetition First Lien Term Loan Agreement**" – that certain First Lien Term Loan Agreement, dated as of September 30, 2013, the "Secured Parties" thereunder the "**Prepetition FLTL Secured Parties**" (the Prepetition FLTL Secured Parties together with the Prepetition RBL Secured Parties, the "**Unprimed Prepetition Secured Parties**"). <br><br> "**Prepetition FLLO Credit Agreement**" – that certain First Lien Last-Out Term Loan Agreement, dated as of May 27, 2016 and the "Secured Parties" thereunder the "**Prepetition FLLO Secured Parties**." <br><br> "**Prepetition Second Lien Term Loan Agreement**" – that certain Second Lien Term Loan Agreement, dated as of September 30, 2013, the "Secured Parties" thereunder the "**Prepetition Second Lien Secured Parties**" and the administrative agent thereunder, the "**Prepetition Second Lien Agent**"). |

---

[1] In each case, as amended, supplemented or otherwise modified prior to the date hereof.

3

Case 20-33948 Document 1634-18 Filed in TXSB on 06/16/21 Page 317 of 528
Case 18-30648 Document 34-18 Filed in TXSB on 02/15/18 Page 31 of 525

G-4

| | |
|---|---|
| | "**Prepetition Sponsor Second Lien Term Loan Agreement**" – that certain Sponsor Second Lien Term Loan Agreement, dated as of May 27, 2016, and the "Secured Parties" thereunder the "**Prepetition Sponsor Second Lien Secured Parties**" and, together with the Prepetition FLLO Secured Parties and the Prepetition Second Lien Secured Parties, the "**Primed Prepetition Secured Parties**" (together with the Unprimed Prepetition Secured Parties, the "**Prepetition Secured Parties**").<br><br>Collectively, the agreements described above are referred to herein as the "**Prepetition Credit Agreements**," and the secured obligations thereunder, collectively, the "**Prepetition Secured Obligations**" and all "Collateral" securing such Prepetition Secured Obligations, the "**Prepetition Collateral**". |
| **Apache Decommissioning Agreement**[2] | "**Apache Decommissioning Agreement**" – that certain Decommissioning Agreement, dated as of September 30, 2013, by and among Apache Corporation, a Delaware corporation ("**APA**"), Apache Shelf, Inc., a Delaware corporation ("**APSH**"), Apache Deepwater LLC, a Delaware limited liability company ("**APDW**"), Apache Shelf Exploration LLC, a Delaware limited liability company (together with APA, APSH and APDW, the "**Sellers**" or the "**Apache Secured Parties**"), the DIP Facility Borrower and GOM Shelf LLC. |
| **DIP Collateral** | All present and after acquired property (whether tangible, intangible, real, personal or mixed) of the Loan Parties, wherever located, including, without limitation, all accounts, inventory, equipment, capital stock in subsidiaries of the Loan Parties, including, for the avoidance of doubt, any equity or other interests in the Loan Parties' non-Debtor and/or jointly-owned subsidiaries, investment property, instruments, chattel paper, real estate, leasehold interests, contracts, patents, copyrights, trademarks and other general intangibles, and all products and proceeds thereof, subject to customary exclusions and excluding (i) any causes of action under Bankruptcy Code sections 502(d), 544, 545, 547, 548, 549, 550 or 553 or any other avoidance actions under the Bankruptcy Code or applicable non-bankruptcy law but, subject to entry of the Final DIP Order, including the proceeds thereof, and (ii) the Trust A NPI, the Trust A Account, any interest in Trust A or the Letters of Credit (each as defined in the Decommissioning Agreement) (the collateral described in clause (ii), the "**Apache Collateral**") (collectively, the "**DIP Collateral**" and the liens on the DIP Collateral securing the DIP Facility, the "**DIP Liens**"). |
| **Priority Under the DIP Facility** | All obligations of the DIP Facility Borrower and the Guarantors to the DIP Lenders and to the DIP Facility Agent (collectively, the "**DIP Obligations**") shall, subject to the Carve-Out (as defined below), at all times:<br><br>a. be entitled to superpriority administrative expense claim status in the Chapter 11 Case of such Loan Party;<br><br>b. be secured by a perfected first priority security interest and lien on the DIP Collateral of each Loan Party to the extent such DIP Collateral |

---

[2] As amended, supplemented or otherwise modified prior to the date hereof.

4

Case 20-33948 Document 1634-18 Filed in TXSB on 06/16/21 Page 318 of 528
Case 18-30648 Document 34-18 Filed in TXSB on 02/15/18 Page 318 of 525

G-5

is not subject to valid, perfected and unavoidable liens as of the Petition Date (subject to customary exclusions); and

c.    except as otherwise provided below with respect to the existing liens of the Primed Prepetition Secured Parties and Apache Secured Parties, be secured by a junior perfected security interest and lien on the DIP Collateral of each Loan Party to the extent such DIP Collateral is subject to (i) valid, perfected and unavoidable liens in favor of third parties (including the Unprimed Prepetition Secured Parties) that were in existence immediately prior to the Petition Date and permitted under the Prepetition Credit Agreements, (ii) valid and unavoidable permitted liens in favor of third parties that were in existence immediately prior to the Petition Date that were perfected subsequent to the Petition Date as permitted by Section 546(b) of the Bankruptcy Code ((i) and (ii) together, the "**Other Senior Liens**") and (iii) valid and perfected liens in favor of hedge counterparties in connection with hedging transactions entered into by the Debtors on a post-petition basis in accordance with an acceptable hedge motion (the "**Hedging Liens**"; the Hedging Liens together with the Other Senior Liens, the "**Permitted Prior Liens**"), subject as to priority to such liens in favor of such third parties; and

d.    pursuant to Section 364(d)(1) of the Bankruptcy Code, be secured by a perfected priming security interest and lien on the DIP Collateral (which DIP Collateral, for the avoidance of doubt, excludes the Apache Collateral) of each Loan Party to the extent such DIP Collateral is subject to existing liens that secure the Prepetition Secured Obligations of the Primed Prepetition Secured Parties and the obligations of the Apache Secured Parties.

The "**Carve-Out**" shall be usual and customary for similar debtor-in-possession financings and shall be in an amount equal to: (i) all fees required to be paid to the Clerk of the Bankruptcy Court and to the U.S. Trustee, (ii) all reasonable fees and expenses incurred by a chapter 7 trustee under section 726(b) of the Bankruptcy Code in an amount not to exceed $100,000, and (iii) to the extent allowed by the Bankruptcy Court at any time, and whether allowed before or after delivery of a Trigger Notice, (A) all allowed and unpaid claims for fees, costs, disbursements and expenses of professionals whose retention by the Debtors is approved by the Bankruptcy Court pursuant to Sections 327, 328, or 363 of the Bankruptcy Code (collectively, the "**Professional Fees**") incurred at any time on or prior to the delivery of a Trigger Notice, plus (B) Professional Fees incurred after the delivery of a Trigger Notice in an amount not to exceed $5,000,000, of professionals retained by the Debtors (the "**Carve-Out Cap**"), in each case subject to the limits imposed by the DIP Orders or otherwise on Professional Fees permitted to be incurred in connection with any permitted investigation of the claims, liens and defenses against any Prepetition Secured Party.

"**Trigger Notice**" shall mean a written notice delivered by the DIP Facility Agent describing the event of default that is alleged to continue under the DIP Documents (or, after the payment in full of the DIP Obligations, delivered by the administrative agents under the Prepetition Credit Agreements (the "**Prepetition Agents**") describing the reason for termination of the use of cash collateral);

5

Case 20-33948 Document 1034-18 Filed in TXSB on 06/16/21 Page 319 of 528
Case 18-30648 Document 34 Filed in TXSB on 02/15/18 Page 319 of 528

G-6

| | *provided* that under no circumstances shall any success, completion or similar fee be payable from the Carve-Out following delivery of a Trigger Notice.<br><br>For the avoidance of doubt, (x) the DIP Liens shall not be secured by the Apache Collateral nor prime any unavoidable, valid and properly perfected lien existing as of the Petition Date in respect of the Apache Collateral and (y) the DIP Liens shall prime the liens of the Apache Secured Parties on the shared Prepetition Collateral. |
|---|---|
| **Adequate Protection** | Pursuant to Sections 361, 363(c), 363(e) and 364(d)(1) of the Bankruptcy Code, as protection in respect of (x) the incurrence of the DIP Facility, (y) the imposition of the automatic stay, and (z) the Debtors' use of the Prepetition Collateral including cash collateral, the Debtors and the DIP Lenders agree, subject to Bankruptcy Court approval, to the following forms of adequate protection (the "**Adequate Protection**"):<br><br>Unprimed Prepetition Secured Parties:<br><br>(a) accrued and unpaid reasonable and documented fees and expenses incurred prior to the Petition Date owed to: (i) Willkie Farr & Gallagher as sole counsel and RPA Advisors as sole financial advisor for the Prepetition RBL Secured Parties and (ii) O'Melveny & Myers and, if reasonably necessary, one local counsel as counsel to the Prepetition FLTL Secured Parties and Houlihan Lokey as sole financial advisor for the Prepetition FLTL Secured Parties and, if requested, one counsel for the administrative agent under the Prepetition First Lien Term Loan Agreement;<br><br>(b) when due, current payment of all reasonable and documented fees and out-of-pocket expenses payable to: (i) Willkie Farr & Gallagher as sole counsel and RPA Advisors as sole financial advisor for the Prepetition RBL Secured Parties and (ii) O'Melveny & Myers and, if reasonably necessary, one local counsel as counsel to the Prepetition FLTL Secured Parties and Houlihan Lokey as sole financial advisor for the Prepetition FLTL Secured Parties and, if requested, one counsel for the administrative agent under the Prepetition First Lien Term Loan Agreement;<br><br>(c) to the extent of diminution in value of their Prepetition Collateral, as provided in the Bankruptcy Code, (i) replacement liens on the DIP Collateral to secure the Unprimed Prepetition Secured Party Adequate Protection Claims, senior to all other liens on the DIP Collateral except the Carve-Out and Permitted Prior Liens (the "**Unprimed Prepetition Secured Party Adequate Protection Liens**"), (ii) allowed superpriority claims as provided for in sections 503(b) and 507(b) of the Bankruptcy Code (the "**Unprimed Prepetition Secured Party Adequate Protection Claims**") and (iii) current payment in cash of post-petition interest (or letter of credit fees, as applicable) to the Unprimed Petition Secured Parties at the non-default rates provided therein, *provided*, that if the letters of credit are drawn during the pendency of the Chapter 11 Cases, then amounts funded by the Prepetition RBL Secured Parties shall bear interest at the default rate.<br><br>Prepetition FLLO Secured Parties:<br><br>(a) to the extent of diminution in value of their Prepetition Collateral, as provided in the Bankruptcy Code, (i) replacement liens on the DIP Collateral to secure the FLLO Secured Party Adequate Protection Claims (the "**FLLO Secured Party** |

WEIL:\96421014\11\45327.0003
#90481485v27

Case 20-33948 Document 1634-18 Filed in TXSB on 06/16/21 Page 320 of 528
Case 18-30648 Document 34 Filed in TXSB on 02/26/18 Page 320 of 528

G-7

**Adequate Protection Liens**"), senior to all other liens on the DIP Collateral except (w) the Carve-Out, (x) the Permitted Prior Liens, (y) the liens of the Unprimed Prepetition Secured Parties (including the adequate protection liens granted in accordance with this DIP Facility Term Sheet) and (z) the DIP Liens, (ii) current payment in cash of post-petition interest to the FLLO Secured Parties at the non-default rates provided therein and (iii) payment at emergence of accrued and unpaid prepetition interest to the FLLO Secured Parties at the default rate provide therein;

(b) to the extent of diminution in value of their Prepetition Collateral, as provided in the Bankruptcy Code, allowed superpriority claims as provided for in sections 503(b) and 507(b) of the Bankruptcy Code (the "**FLLO Secured Party Adequate Protection Claims**");

(c) financial reporting and other reports and notices delivered by the DIP Facility Borrower under the DIP Facility; and

(d) the Milestones (as defined below) may be amended, modified or extended, in each case, as to the Prepetition FLLO Secured Parties only by (i) order of the Bankruptcy Court or (ii) the prior written consent of the Required FLLO Secured Parties (which shall mean Prepetition FLLO Secured Parties holding greater than 50% of the outstanding principal amount of loans under the Prepetition FLLO Term Loan Agreement).

Prepetition Second Lien Secured Parties:

(a) all accrued and unpaid fees and disbursements owed to the Prepetition Second Lien Agent, including all fees and expenses of counsel and other professionals of the Prepetition Second Lien Agent (including Davis Polk & Wardwell LLP, PJT Partners LP and any local counsel or other advisor retained by the Prepetition Second Lien Agent) incurred prior to the Petition Date;

(b) when due, current payment of all fees and expenses payable to the Prepetition Second Lien Agent, including all fees and expenses of counsel and other professionals of the Prepetition Second Lien Agent (including Davis Polk & Wardwell LLP, PJT Partners LP and any local counsel or other advisor retained by the Prepetition Second Lien Agent);

(c) to the extent of diminution in value of their Prepetition Collateral, as provided in the Bankruptcy Code, replacement liens on the DIP Collateral to secure the Second Lien Credit Agreement Secured Party Adequate Protection Claims (the "**Second Lien Secured Party Adequate Protection Liens**"), senior to all other liens on the DIP Collateral except (i) the Carve-Out, (ii) the Permitted Prior Liens, (iii) the liens of the Unprimed Prepetition Secured Parties (including the adequate protection liens granted thereto in accordance with this DIP Facility Term Sheet), (iv) the DIP Liens and (v) the liens of the FLLO Secured Parties (including the FLLO Secured Party Adequate Protection Liens), and ranking *pari passu* with the Sponsor Second Lien Secured Party Adequate Protection Liens;

(d) to the extent of diminution in value of their Prepetition Collateral, as provided in the Bankruptcy Code, allowed superpriority claims as provided for in sections

7

Case 20-33948 Document 1604-18 Filed in TXSB on 06/16/21 Page 321 of 528
Case 18-30648 Document 34-18 Filed in TXSB on 02/26/18 Page 321 of 528

G-8

503(b) and 507(b) of the Bankruptcy Code (the "**Second Lien Secured Party Adequate Protection Claims**");

(e) financial reporting and other reports and notices delivered by the DIP Facility Borrower under the DIP Facility; and

(f) the Milestones (as defined below) may be amended, modified or extended, in each case, as to the Prepetition Second Lien Secured Parties only by (i) order of the Bankruptcy Court or (ii) the prior written consent of the Required Second Lien Secured Parties (which shall mean Prepetition Second Lien Secured Parties holding greater than 50% of the outstanding principal amount of loans under the Prepetition Second Lien Term Loan Agreement).

Prepetition Sponsor Second Lien Secured Parties:

(a) accrued and unpaid reasonable and documented fees and expenses incurred prior to the Petition Date owed to the Prepetition Sponsor Second Lien Secured Parties, including the fees and disbursements of Vinson & Elkins LLP as sole counsel to the Prepetition Sponsor Second Lien Secured Parties and Perella Weinberg L.P. as sole financial advisor to the Prepetition Sponsor Second Lien Secured Parties;

(b) when due, current payment of all reasonable and documented fees and out-of-pocket expenses payable to the Prepetition Sponsor Second Lien Secured Parties, including the fees and disbursements of Vinson & Elkins LLP as sole counsel to the Prepetition Sponsor Second Lien Secured Parties and Perella Weinberg L.P. as sole financial advisor to the Prepetition Sponsor Second Lien Secured Parties;

(c) to the extent of diminution in value of their Prepetition Collateral, as provided in the Bankruptcy Code, replacement liens on the DIP Collateral to secure the Sponsor Second Lien Secured Party Adequate Protection Claims (the "**Sponsor Second Lien Secured Party Adequate Protection Liens**"), senior to all other liens on the DIP Collateral except (i) the Carve-Out, (ii) the Permitted Prior Liens, (iii) the liens of the Unprimed Prepetition Secured Parties (including the adequate protection liens granted thereto in accordance with this DIP Facility Term Sheet), (iv) the DIP Liens and (v) the liens of the FLLO Secured Parties (including the FLLO Secured Party Adequate Protection Liens), and ranking *pari passu* with the Second Lien Secured Party Adequate Protection Liens; and

(d) to the extent of diminution in value of their Prepetition Collateral, as provided in the Bankruptcy Code, allowed superpriority claims as provided for in sections 503(b) and 507(b) of the Bankruptcy Code (the "**Sponsor Second Lien Secured Party Adequate Protection Claims**").

(e) the Milestones (as defined below) may be amended, modified or extended, in each case, as to the Prepetition Sponsor Second Lien Secured Parties only by (i) order of the Bankruptcy Court or (ii) the prior written consent of the Required Sponsor Second Lien Secured Parties (which shall mean Prepetition Sponsor Second Lien Secured Parties holding greater than 50% of the outstanding principal amount of loans under the Prepetition Sponsor Second Lien Term Loan Agreement).

WEIL:\96421014\11\45327.0003
#90481485v27

Case 20-33948 Document 1604-18 Filed in TXSB on 06/16/21 Page 322 of 528
Case 18-30648 Document 34-18 Filed in TXSB on 02/16/18 Page 322 of 528

G-9

| | In addition, the DIP Orders shall provide for customary prepetition secured lender protections, including, but not limited to, waivers regarding Sections 506(c) and 552(b) of the Bankruptcy Code, the equitable doctrine of marshaling, limitations on the use of collateral and stipulations in respect of the validity of prepetition liens and obligations, in each case, as such may pertain to the claims and liens of the Prepetition Secured Parties. |
| --- | --- |
| | For the avoidance of doubt, the Unprimed Prepetition Secured Party Adequate Protection Claims, the FLLO Secured Party Adequate Protection Claims, the Second Lien Secured Party Adequate Protection Claims, and the Sponsor Second Lien Secured Party Adequate Protection Claims shall in all cases have the same relative priority as the Unprimed Prepetition Secured Party Adequate Protection Liens, the FLLO Secured Party Adequate Protection Liens, the Second Lien Secured Party Adequate Protection Liens, and the Sponsor Second Lien Secured Party Adequate Protection Liens, respectively. |
| **Milestones** | The DIP Documents shall require compliance with the following milestones (the "**Milestones**"): <br><br> • No later than 1 day after the Petition Date, filing of a motion, in form and substance satisfactory to the DIP Lenders, seeking approval of the DIP Facility. <br><br> • No later than 5 days after the Petition Date, entry of the Interim DIP Order. <br><br> • No later than 30 days after the Petition Date, entry of the Final DIP Order. <br><br> • No later than 90 days after the Petition Date, approval of an Acceptable Disclosure Statement and approval of the Acceptable Plan (the "**Confirmation Date**"). <br><br> • No later than 20 days after the Confirmation Date, effectiveness of the Acceptable Plan. |
| **Events of Default** | Usual and customary for financings of this type. |
| **Conditions Precedent to Closing** | Usual and customary for financings of this type, including, without limitation: (i) execution and delivery of the DIP Credit Agreement and the other DIP Documents evidencing the DIP Facility; (ii) the Petition Date shall have occurred, and the DIP Facility Borrower and each Guarantor shall be a debtor and a debtor-in-possession; (iii) the Debtors shall have filed a prepackaged plan of reorganization in the form attached to the Restructuring Support Agreement as Exhibit A with such changes as are acceptable to the Required DIP Lenders (an "**Acceptable Plan**") and a disclosure statement relating thereto in the form attached to the Restructuring Support Agreement as Exhibit H with such changes as are acceptable to the Required DIP Lenders (an "**Acceptable Disclosure Statement**"); (iv) entry of the Interim DIP Order; and (v) delivery of a Budget (as defined below) reasonably acceptable to the Required DIP Lenders. The date on which the closing conditions are satisfied is referred to herein as the "**Closing Date**". |
| **Conditions Precedent to the Extension of each DIP Loan** | Conditions precedent customarily found in loan documents for similar debtor-in-possession financings and including, without limitation: (i) no default or event of default; (ii) accuracy of representations and warranties in all material respects; (iii) the Interim DIP Order or the Final DIP Order, as applicable, shall |

9

Case 20-33948 Document 1607-18 Filed in TXSB on 06/16/21 Page 323 of 528
Case 18-30648 Document 34-18 Filed in TXSB on 02/15/18 Page 323 of 528

G-10

| | |
|---|---|
| | be in full force and effect and shall not have been vacated or reversed, shall not be subject to a stay, and shall not have been modified or amended in any respect without the consent of the Required DIP Lenders and (iv) delivery of a customary notice of borrowing. |
| **Covenants** | Affirmative and negative covenants usual and customary for financings of this type. |
| **Financial Covenants** | Budget variance covenant, tested bi-weekly requiring, in each case for the prior four-week period (a "**Test Period**") (i) the negative variance (as compared to the approved Budget) of the aggregate receipts of the Debtors not to exceed 15% and (ii) the positive variance (as compared to the approved Budget) of the aggregate operating disbursements (excluding professional fees and expenses and adequate protection payments) made by the Debtors not to exceed 15%.<br><br>For purposes of testing the budget variance covenant, any positive variance (in the case of receipts) or negative variance (in the case of disbursements) against the applicable approved Budget during any two-week period prior to a Test Period may be carried forward into such Test Period.<br><br>The first Test Period for which the budget variance covenant will be tested shall be the four-week period ending two weeks after the Closing Date, it being understood that the budgeted amounts for the two-week period prior to Closing Date shall be deemed to be the actual reported amounts for such period.<br><br>"**Budget**" means, a rolling 13-week cash flow forecast delivered on or prior to the Closing Date and every four weeks thereafter, setting forth the Debtors' projected cash receipts and cash disbursements during such 13-week period (i) initially, covering the period commencing on or about the Closing Date and (ii) thereafter, commencing on the first day of each four-week period thereafter. Any updates to the Budget delivered after the Closing Date shall be reasonably acceptable to the Required DIP Lenders (it being understood that if the Required DIP Lenders have not objected to an updated Budget within five Business Days after delivery thereof, the Required DIP Lenders shall be deemed to have approved such updated Budget). |
| **Representations and Warranties** | Representations and warranties usual and customary for financings of this type. |
| **Voting** | Amendments and waivers of the DIP Facility will require the approval of DIP Lenders holding more than 50% of the outstanding DIP Commitment and DIP Loans (the "**Required DIP Lenders**"), subject to customary exceptions for certain provisions which shall require the consent of each affected DIP Lender or all DIP Lenders and customary protections for the DIP Facility Agent. |
| **Fees and Expenses Indemnification** | Loan Parties obligated under the DIP Facility shall pay all reasonable, documented out-of-pocket fees, costs and expenses incurred or accrued by the DIP Facility Agent and the DIP Lenders, including, without limitation, the reasonable and documented fees and expenses of Davis Polk & Wardwell LLP as primary counsel to the DIP Facility Agent and a single local counsel in the State of Texas and PJT Partners as financial advisor to the DIP Facility Agent, in each case, associated with the syndication of the DIP Facility and the preparation, |

WEIL:\96421014\11\45327.0003
#90481485v27

Case 20-33948 Document 1604-18 Filed in TXSB on 06/16/21 Page 324 of 528
Case 18-30648 Document 34-18 Filed in TXSB on 02/15/18 Page 324 of 525

G-11

|  | negotiation, execution, delivery and administration of the DIP Loan Documents and any amendment or waiver with respect thereto.<br><br>The Loan Parties will indemnify the DIP Facility Agent and DIP Lenders, and hold them harmless from and against all reasonable, documented out-of-pocket costs, expenses and liabilities arising out of or relating to the transactions contemplated hereby, except solely for gross negligence, willful misconduct of such indemnified party or willful and material breach by such indemnified party of the DIP Documents to the extent determined by a court of competent jurisdiction in a final and non-appealable judgment. |
|---|---|
| **Upfront Fees** | An upfront fee in an amount equal to 3.00% of the DIP Commitments shall be due and payable to the DIP Lenders in cash on the Closing Date ratably based on their respective DIP Commitments on the Closing Date (the "**Upfront Fee**"). |
| **Unused Commitment Fees** | An unused commitment fee equal to 1.00% per annum on the actual daily amount of the unused DIP Commitments shall be paid on a monthly basis to the DIP Lenders in cash ratably based on their respective DIP Commitments. |
| **Assignments and Participations** | Usual and customary for financings of this type. |
| **Governing Law** | The laws of the State of New York (excluding the laws applicable to conflicts or choice of law), except as governed by the Bankruptcy Code. |
| **Miscellaneous** | The DIP Documents will include yield protection provisions usual and customary for financings of this type. |
| **Counsel to DIP Facility Agent** | Davis Polk & Wardwell LLP. |

WEIL:\96421014\11\45327.0003
#90481485v27

**<u>EXHIBIT H</u>**
**DISCLOSURE STATEMENT**

Intentionally Omitted

**EXHIBIT I**
**RIGHTS OFFERING PROCEDURES**

Attached.

# FIELDWOOD ENERGY INC.

## RIGHTS OFFERING PROCEDURES

The Subscription Rights and shares of common stock, par value $0.01 per share ("**New Equity Interests**" or "**New Common Stock**"), of Fieldwood Energy Inc., a Delaware company (the "**Issuer**") are being distributed and issued without registration under the Securities Act of 1933, as amended (the "**Securities Act**"), in reliance upon the exemption provided by Section 4(a)(2) thereof and/or Regulation D promulgated thereunder.

None of the Subscription Rights or New Equity Interests issuable upon exercise of such rights distributed pursuant to these Rights Offering Procedures have been or will be registered under the Securities Act, nor any state or local law requiring registration for offer and sale of a security. The Subscription Rights are not detachable from the Allowed Claims (as defined below) and may not be sold, transferred, assigned, pledged, hypothecated, participated, donated or otherwise encumbered or disposed of, directly or indirectly (including through derivatives, options, swaps, forward sales or other transactions in which any person receives the right to own or acquire any current or future interest in the Subscription Rights, the New Equity Interests, the SLTL Claims and any related claims), except as set forth in Section 6 herein.

None of the New Equity Interests have been registered under the Securities Act, nor any State or local law requiring registration for offer or sale of a security, and no New Equity Interests may be sold or transferred except pursuant to an effective registration statement or exemption from registration under the Securities Act.

The Rights Offering is being conducted in good faith and in compliance with the Bankruptcy Code. In accordance with Section 1125(e) of the Bankruptcy Code, a debtor or any of its agents that participate, in good faith and in compliance with the applicable provisions of the Bankruptcy Code, in the offer, issuance, sale, or purchase of a security offered or sold under the plan of the debtor, or of an affiliate participating in a joint plan with the debtor, or of a newly organized successor to the debtor under the plan, is not liable, on account of such participation, for violation of any applicable law, rule, or regulation governing the offer, issuance, sale or purchase of securities.

Each of the New Equity Interests issued upon exercise of a Subscription Right, and each book-entry position or certificate issued in exchange for or upon the transfer, sale or assignment of any such New Equity Interest, shall be deemed to contain or be stamped or otherwise imprinted with, as applicable, a legend in substantially the following form:

"**THE SECURITIES REPRESENTED BY THIS CERTIFICATE WERE ORIGINALLY ISSUED ON [ISSUANCE DATE], HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE "ACT"), OR ANY OTHER APPLICABLE STATE SECURITIES LAWS, AND MAY NOT BE SOLD**

1

OR TRANSFERRED IN THE ABSENCE OF AN EFFECTIVE REGISTRATION STATEMENT UNDER THE ACT OR AN AVAILABLE EXEMPTION FROM REGISTRATION THEREUNDER."

February 23, 2018

WEIL:\96428839\8\45327.0003

Eligible Claimants (as defined below) should note the following times relating to the Rights Offering:

| Date | Calendar Date | Event |
|------|---------------|-------|
| Subscription Record Date………………………. | February 22, 2018 | The date and time mutually agreed between the Company and the Required Backstop Parties (as defined in the Backstop Commitment Agreement (as defined below)) for the determination of the holders entitled to participate in the Rights Offering. |
| Subscription Commencement Date.. | February 23, 2018 | Commencement of the Rights Offering. |
| Subscription Expiration Deadline … | 5:00 p.m. New York City Time on March 14, 2018 | The deadline for Eligible Claimants to subscribe for New Equity Interests. Eligible Claimant's rights offering subscription exercise form (the "**Rights Offering Subscription Form**") (with accompanying IRS Form W-9 or appropriate IRS Form W-8, as applicable) and executed subscription agreement (the "**Subscription Agreement**") must be received by Prime Clerk LLC (the "**Subscription Agent**") by the Subscription Expiration Deadline. Eligible Claimants who are not Backstop Parties must deliver the Aggregate Purchase Price (as defined below) by the Subscription Expiration Deadline. Eligible Claimants who are Backstop Parties must deliver |

WEIL:\96428839\8\45327.0003



|  | the Aggregate Purchase Price (as defined below) by the deadline specified, and in the form and manner set forth, in the Backstop Commitment Agreement. |
| --- | --- |

**Terms used and not defined herein shall have the meaning assigned to them in the Plan (as defined below).**

WEIL:\96428839\8\45327.0003

To Eligible Claimants:

Fieldwood Holdings LLC (the "**Company**") and certain of its directly- and indirectly-owned subsidiaries, as chapter 11 debtors and debtors in possession (such subsidiaries, together with the Company, the "**Debtors**"),[1] are seeking to implement a proposed financial restructuring of their existing funded debt and certain other obligations pursuant to the Joint Prepackaged Chapter 11 Plan of Fieldwood Energy LLC and its Affiliated Debtors, filed with the Court on February [•], 2018 [BCR No. [•]] (as it may be amended, modified or supplemented from time to time, the "**Plan**").

The New Equity Interests, with an aggregate purchase price of $525 million, may be subscribed for by Eligible Claimants. Each holder of SLTL Claims (as defined in the Plan) on the Subscription Record Date (as defined below) that is an Accredited Investor (each such holder, an "**Eligible Holder**") will receive Subscription Rights with respect to the SLTL Claims held or beneficially held[2] by such Eligible Holder as of the Subscription Record Date (such SLTL Claims, "**Allowed Claims**" and an Eligible Holder of Allowed Claims, an "**Eligible Claimant**") to subscribe for its pro rata share (measured as the principal and accrued and unpaid interest amount of all Allowed Claims held by such Eligible Claimant as compared to the aggregate principal and accrued and unpaid interest amount of Allowed Claims held by all Eligible Holders) of the New Equity Interests, provided that it (i) timely and properly executes and delivers its Rights Offering Subscription Form (with accompanying IRS Form W-9 or appropriate IRS Form W-8, as applicable) and Subscription Agreement, and makes certain customary representations and warranties set forth therein, to the Subscription Agent in advance of the Subscription Expiration Deadline and (ii) timely pays the applicable Aggregate Purchase Price.

No Eligible Claimant shall be entitled to participate in the Rights Offering unless the Aggregate Purchase Price for the New Equity Interests it subscribes for is received by the Subscription Agent (i) in the case of an Eligible Claimant that is not a Backstop Party, by the Subscription Expiration Deadline, and (ii) in the case of an Eligible Claimant that is a Backstop Party, by the deadline and in the form and manner specified in the Backstop Commitment Agreement (the "**Backstop Funding Deadline**"). No interest is payable on any advanced funding of the Aggregate Purchase Price. If the Rights Offering is terminated for any reason, your Aggregate Purchase Price will be returned to you promptly. No interest will be paid on any returned Aggregate Purchase Price.

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, as applicable, are:  Dynamic Offshore Resources NS, LLC (0158); Fieldwood Energy LLC (6778); Fieldwood Holdings LLC (9264); Fieldwood Energy Inc. (4991); Fieldwood Energy Offshore LLC (4494); Fieldwood Onshore LLC (3489); Fieldwood SD Offshore LLC (8786); FW GOM Pipeline, Inc. (8440); GOM Shelf LLC (8107); Bandon Oil and Gas GP, LLC (9172); Bandon Oil and Gas, LP (9266); Fieldwood Energy SP LLC (1971); Galveston Bay Pipeline LLC (5703); and Galveston Bay Processing LLC (0422).  The Debtors' primary mailing address is 2000 W. Sam Houston Parkway S., Suite 1200, Houston, TX  77042. The location of the Debtors' headquarters is 2000 W. Sam Houston Parkway S., Suite 1200, Houston, TX  77042.

[2] For these purposes, SLTL Claims held or beneficially owned, shall include only those Allowed Claims that are properly reflected in Item 4 of Exhibit C to the Rights Offering Subscription Procedures.

WEIL:\96428839\8\45327.0003

**In order to participate in the Rights Offering, you must complete all the steps outlined below. If all of the steps outlined below are not completed by the Subscription Expiration Deadline or the Backstop Funding Deadline, as applicable, you shall be deemed to have forever and irrevocably relinquished and waived your right to participate in the Rights Offering.**

## 1. Rights Offering

Eligible Claimants have the right, but not the obligation, to participate in the Rights Offering. Only Eligible Claimants as of the Subscription Record Date may participate in the Rights Offering.

Subject to the terms and conditions set forth in the Plan, these Rights Offering Procedures and the Subscription Agreement, each Eligible Claimant is entitled to subscribe for up to one New Equity Interest per $75.41 of Allowed Claims, at a purchase price of $23.33 per share (the "***Per Share Purchase Price***"). For each Eligible Claimant, the total amount of New Equity Interests to be purchased *multiplied by* the Per Share Purchase Price, is referred to herein as the "***Aggregate Purchase Price.***"[3]

Eligible Claimants will be subject to restrictions under the Securities Act on their ability to resell the New Equity Interests, as discussed in more detail in Article VIII of the Disclosure Statement, entitled "Transfer Restrictions and Consequences Under Federal Securities Laws."

**SUBJECT TO THE TERMS AND CONDITIONS OF THE SUBSCRIPTION AGREEMENT, AND THE BACKSTOP COMMITMENT AGREEMENT IN THE CASE OF ANY BACKSTOP PARTY, ALL SUBSCRIPTIONS SET FORTH IN THE SUBSCRIPTION AGREEMENT ARE IRREVOCABLE.**

## 2. The Backstop

The Rights Offering will be backstopped by the Backstop Parties. Each of the Backstop Parties, severally and not jointly, has agreed, pursuant to the Backstop Commitment Agreement by and among the Company, certain of the Company's subsidiaries, and the Backstop Parties party thereto, dated as of February 14, 2018 (as amended and supplemented from time to time) (the "***Backstop Commitment Agreement***"), to purchase all New Equity Interests that are not purchased by other Eligible Claimants pursuant to the Rights Offering, in accordance with the percentages set forth in Schedule 1 to the Backstop Commitment Agreement. As consideration for their undertakings in the Backstop Commitment Agreement, the Backstop Parties will receive the Backstop Commitment Premium (as defined in the Backstop Commitment Agreement) set

---

[3] The Per Share Purchase Price has been determined on the assumption that 30,000,000 shares of New Common Stock will be issued and outstanding on the Effective Date of the Plan. The Issuer may, in its sole discretion in accordance with the Plan, determine to issue a greater or lesser number of shares of New Common Stock on the Effective Date of the Plan, in which case (i) the number of shares of New Common Stock subject to this rights offering (the "***Rights Offering Shares***") shall be proportionately adjusted and (ii) the Per Share Purchase Price will be adjusted to be equal to the quotient obtained by dividing $525,000,000 by the number of Rights Offering Shares, as so adjusted.

6

forth in the Backstop Commitment Agreement.  Pursuant to the Backstop Commitment Agreement, each Backstop Party has agreed to fully exercise all Subscription Rights allotted to it for the purchase of the New Equity Interests. Furthermore, and notwithstanding anything else to the contrary herein, pursuant to the Backstop Commitment Agreement, certain of the Backstop Parties shall have the right, and have agreed with the Company, to exercise Subscription Rights that will be allotted to certain of its related funds and assigned by such related funds to such Backstop Party, in accordance with Schedule 1 to the Backstop Commitment Agreement.

3.      **Subscription Period**

The Rights Offering will commence on the Subscription Commencement Date and will expire at the Subscription Expiration Deadline.  Each Eligible Claimant intending to purchase New Equity Interests in the Rights Offering must affirmatively elect to exercise its Subscription Rights in the manner set forth in the Rights Offering Subscription Form by the Subscription Expiration Deadline.

Any exercise of Subscription Rights after the Subscription Expiration Deadline will not be allowed and any purported exercise received by the Subscription Agent after the Subscription Expiration Deadline, regardless of when the documents or payment relating to such exercise were sent, will not be honored, except that the Company shall have the discretion, with the consent of the Required Backstop Parties, to allow any exercise of Subscription Rights after the Subscription Expiration Deadline.

The Subscription Expiration Deadline may be extended with the consent of the Required Backstop Parties or as required by law.

4.      **Delivery of Subscription Agreement**

Each Eligible Claimant may exercise all or any portion of such Eligible Claimant's Subscription Rights, subject to the terms and conditions of the Subscription Agreement. In order to facilitate the exercise of the Subscription Rights, beginning on the Subscription Commencement Date, the Subscription Agent will send a Subscription Agreement to each Eligible Claimant together with appropriate instructions for the proper completion, due execution, and timely delivery of the executed Subscription Agreement and the payment of the applicable Aggregate Purchase Price for its New Equity Interests.

5.      **Exercise of Subscription Rights**

(a)      In order to validly exercise its Subscription Rights, each Eligible Claimant that is not a Backstop Party must:

i.      return a duly executed Subscription Agreement along with a duly completed and executed Rights Offering Subscription Form (with accompanying IRS Form W-9 or appropriate IRS Form W-8, as applicable) to the Subscription Agent, so that such documents are actually received by the Subscription Agent by the Subscription Expiration Deadline; and

7

ii.     promptly upon returning its Subscription Agreement and Rights Offering Subscription Form to the Subscription Agent, but in no event later than the Subscription Expiration Deadline, pay the applicable Aggregate Purchase Price to the Subscription Agent by wire transfer **ONLY** of immediately available funds in accordance with the instructions included in Item 5 of the Rights Offering Subscription Form.

(b)    In order to validly exercise its Subscription Rights, each Eligible Claimant that is a Backstop Party must:

i.    return a duly executed Subscription Agreement along with a duly completed and executed Rights Offering Subscription Form (with accompanying IRS Form W-9 or appropriate IRS Form W-8, as applicable) to the Subscription Agent, so that such documents are actually received by the Subscription Agent by the Subscription Expiration Deadline; and

ii.    no later than the Backstop Funding Deadline, pay the applicable Aggregate Purchase Price (in accordance with the terms and conditions and in the form and manner set forth in the Backstop Commitment Agreement), to the Subscription Agent by wire transfer **ONLY** of immediately available funds in accordance with the instructions included in Item 5 of the Rights Offering Subscription Form.

All Eligible Claimants must deliver their completed Rights Offering Subscription Form (with accompanying IRS Form W-9 or appropriate IRS Form W-8, as applicable), completed Subscription Agreement, and (with respect to the Eligible Claimants that are not Backstop Parties) payment of the applicable Aggregate Purchase Price payable for the New Equity Interests elected to be purchased by such Eligible Claimant directly to the Subscription Agent on or before the Subscription Expiration Deadline. In all cases, Eligible Claimants that are Backstop Parties must deliver their payment of the applicable Aggregate Purchase Price payable for the New Equity Interests elected to be purchased by such Eligible Claimant directly to the Subscription Agent no later than the Backstop Funding Deadline.

In the event that the funds received by the Subscription Agent from any Eligible Claimants do not correspond to the Aggregate Purchase Price payable for the New Equity Interests elected to be purchased by such Eligible Claimant, the number of the New Equity Interests deemed to be purchased by such Eligible Claimant will be the lesser of (a) the number of the New Equity Interests elected to be purchased by such Eligible Claimant and (b) a number of the New Equity Interests determined by dividing the amount of the funds received on account by the Per Share Purchase Price.

The cash paid to the Subscription Agent in accordance with these Rights Offering Procedures (and with respect to the Backstop Parties, the Backstop Commitment Agreement) will be deposited and held by the Subscription Agent in a segregated account held in an agreed upon financial institution until distributed in connection with the settlement of the Rights Offering on the Effective Date. The Subscription Agent may not use such cash for any other

purpose prior to the Effective Date and may not encumber or permit such cash to be encumbered with any lien or similar encumbrance. The cash held by the Subscription Agent hereunder shall not be deemed part of the Debtors' bankruptcy estates.

### 6.   Transfer Restriction; Revocation

The Subscription Rights are not detachable from the Allowed Claims and may not be sold, transferred, assigned, pledged, hypothecated, participated, donated or otherwise encumbered or disposed of, directly or indirectly (including through derivatives, options, swaps, forward sales or other transactions in which any person receives the right to own or acquire any current or future interest in the Subscription Rights, the New Equity Interests, the SLTL Claims and any related claims) (collectively, "*transfer* or "*transferred*"), except that an Eligible Claimant that is a party to the Backstop Commitment Agreement may transfer any portion or all of its Subscription Rights separate and independent from its Allowed Claim to a Related Fund (as defined in the Backstop Commitment Agreement).

Any transfer or assignment following the Subscription Record Date of the corresponding Allowed Claim (except, with respect to (i) the settlement of Allowed Claims held on the Subscription Record Date or (ii) Allowed Claims held by an Eligible Claimant that is a party to the Backstop Commitment Agreement in accordance with the Backstop Commitment Agreement) shall void the Subscription Right, and neither such Eligible Claimant nor the purported transferee will receive any New Equity Interests otherwise purchasable on account of such transferred Subscription Rights.

However, in connection with the exercise of the Subscription Rights, the person exercising such Subscription Rights shall have the right to designate the receipt of the New Equity Interests to another person that is a Related Fund, an Accredited Investor or a custodian (such person shall deliver an IRS Form W-9 or appropriate IRS Form W-8, as applicable) by completing Exhibit A to the Rights Offering Subscription Form. Any such designation and delivery of New Equity Interests shall be subject to compliance with applicable securities laws relating to the transfer of restricted securities.

Once an Eligible Claimant has properly exercised its Subscription Rights, subject to the terms and conditions of the Subscription Agreement and the Backstop Commitment Agreement in the case of any Backstop Party, such exercise will be irrevocable.

### 7.   Return of Payment

If the Rights Offering is not consummated, any cash paid to the Subscription Agent will be returned, without interest, to the applicable Eligible Claimant as soon as reasonably practicable, but in no event later than five Business Days after the date on which the Rights Offering is terminated.

### 8.   Settlement of the Rights Offering and Distribution of the New Equity Interests

9

The Debtors intend that the New Equity Interests will be issued on or as soon as practicable after the effective date of the Plan directly to the Eligible Claimants and/or to any Related Fund, Accredited Investor or custodian that an Eligible Claimant so designates in the Rights Offering Subscription Form in accordance with Section 6 above.

**9.     Fractional Shares**

No fractional rights or New Equity Interests will be issued in the Rights Offering. All share allocations (including each Eligible Claimant's New Equity Interests) will be calculated and rounded down to the nearest whole share. No consideration shall be provided in lieu of fractional shares that are rounded down.

**10.     Validity of Exercise of Subscription Rights**

All questions concerning the timeliness, viability, form, and eligibility of any exercise of Subscription Rights will be determined in good faith by the Debtors and, if necessary, subject to a final and binding determination by the Bankruptcy Court. The Debtors may waive or reject any defect or irregularity in, or permit such defect or irregularity to be corrected within such time as they may determine in good faith, the purported exercise of any Subscription Rights. Subscription Agreements will be deemed not to have been received or accepted until all irregularities have been waived or cured within such time as the Debtors determine in good faith.

*Before exercising any Subscription Rights, Eligible Claimants should read the Disclosure Statement and the Plan for information relating to the Debtors and the risk factors to be considered.*

**11.     Modification of Procedures**

With the prior written consent of the Required Backstop Parties, the Debtors reserve the right to modify these Rights Offering Procedures, or adopt additional procedures consistent with these Rights Offering Procedures, to effectuate the Rights Offering and to issue the New Equity Interests; *provided*, *however*, that the Debtors shall provide prompt written notice to each Eligible Claimant of any material modification to these Rights Offering Procedures made after the Subscription Commencement Date. In so doing, and subject to the consent of the Required Backstop Parties, the Debtors may execute and enter into agreements and take further action that the Debtors determine in good faith are necessary and appropriate to effectuate and implement the Rights Offering and the issuance of the New Equity Interests. Nothing in this paragraph shall be construed so as to permit the Debtors to modify the terms of any executed and delivered Subscription Agreement without the consent of the Eligible Claimant that is a party thereto.

The Debtors may undertake procedures to confirm that each participant in the Rights Offering is in fact an Eligible Claimant, including, but not limited to, requiring additional certifications by such participant to that effect and other diligence measures, if any, as the Debtors deem reasonably necessary.

**12.     Inquiries and Transmittal of Documents; Subscription Agent**

The Rights Offering Instructions attached hereto should be read carefully and strictly followed by the Eligible Claimants.

Questions relating to the Rights Offering should be directed to the Subscription Agent at the following phone numbers: 917-460-0913 (international) or 855-631-5346 (domestic, toll free) or via email to fieldwoodsubscription@primeclerk.com with "Fieldwood Energy Inc. Rights Offering" in the subject line.

The risk of non-delivery of all documents and payments to the Subscription Agent is on the Eligible Claimants electing to exercise its Subscription Rights and not the Debtors or the Subscription Agent.

WEIL:\96428839\8\45327.0003

## FIELDWOOD ENERGY INC.

### RIGHTS OFFERING INSTRUCTIONS FOR ELIGIBLE CLAIMANTS

**Terms used and not defined herein or in the Subscription Agreement shall have the meaning assigned to them in the Plan.**

**To elect to participate in the Rights Offering, you must follow the instructions set out below:**

1. **Insert** the principal amount of the Allowed Claims that you held as of the Subscription Record Date in Item 1 of your Rights Offering Subscription Form.

2. **Confirm** whether you are a Backstop Party pursuant to the representation in Item 3 of your Rights Offering Subscription Form.

3. **Confirm** whether you are an Eligible Holder pursuant to the representation in Item 4 of your Rights Offering Subscription Form.

4. **Complete** the calculation in Item 2a of your Rights Offering Subscription Form, which calculates the maximum number of New Equity Interests available for you to purchase. Such amount must be rounded down to the nearest whole share.

5. **Complete** the calculation in Item 2b of your Rights Offering Subscription Form, which calculates the Aggregate Purchase Price for the New Equity Interests that you elect to purchase.

6. **Complete** the wire refund information requested in Item 6, which will be used by the Subscription Agent in the event a refund is due.

7. **Complete** Item 7 and provide the information needed for the registration of the New Equity Interests. If you are designating a Related Fund, other party that is an Accredited Investor or a custodian to receive any (or all) of your New Equity Interests, please complete Exhibit A to the Rights Offering Subscription Form.

8. **Read, complete, and sign** the certification in Item 8 of your Rights Offering Subscription Form.

9. **Read and countersign** the Subscription Agreement. Such execution shall indicate your acceptance and approval of the terms and conditions set forth therein.

10. **Read, complete, and sign** an IRS Form W-9 if you are a U.S. person. If you are a non-U.S. person, read, complete, and sign an appropriate IRS Form W-8. These forms may be obtained from the IRS at its website: www.irs.gov.

11. **Return** your signed Subscription Agreement and Rights Offering Subscription Form

12

(with accompanying IRS Form W-9 or appropriate IRS Form W-8, as applicable) to the Subscription Agent prior to the Subscription Expiration Deadline either via email (in PDF or other standard format) to fieldwoodsubscription@primeclerk.com or to the following physical address via first class mail, hand delivery, or overnight mail:

> **Fieldwood Energy Inc. Rights Offering Processing**
> **c/o Prime Clerk, LLC**
> **830 Third Avenue, 3rd Floor**
> **New York, NY 10022**

12. **<u>Arrange for full payment</u>** of the Aggregate Purchase Price by wire transfer of immediately available funds, calculated in accordance with Item 5 of your Rights Offering Subscription Form. An Eligible Claimant that is not a Backstop Party should follow the payment instructions as provided in the Rights Offering Subscription Form. An Eligible Claimant that is a Backstop Party should follow the payment instructions in the written notice delivered by the Debtors to the Backstop Parties in accordance with the Backstop Commitment Agreement (a "***Backstop Funding Notice***").

---

**The Subscription Expiration Deadline is 5:00 p.m. New York City Time on March 14, 2018.**

**Eligible Claimants that are not Backstop Parties should follow the delivery and payment instructions provided in the Rights Offering Subscription Form. Eligible Claimants that are Backstop Parties should follow the payment instructions in the Backstop Funding Notice.**

**Eligible Claimants that are not Backstop Parties must deliver the appropriate funding directly to the Subscription Agent no later than the Subscription Expiration Deadline. Eligible Claimants that are Backstop Parties must deliver the appropriate funding directly to the Subscription Agent no later than the Backstop Funding Deadline.**

---

13

**<u>EXHIBIT J</u>**
**GOVERNANCE TERM SHEET**

Attached.

**FIELDWOOD HOLDINGS LLC CHAPTER 11 RESTRUCTURING**

**CORPORATE GOVERNANCE TERM SHEET**

**This term sheet is not an offer with respect to any securities or a solicitation of acceptances of a Chapter 11 Plan within the meaning of Section 1125 of the U.S. Bankruptcy Code of 1986 (the "*Bankruptcy Code*"). Any such offer or solicitation will comply with all applicable securities laws and provisions of the Bankruptcy Code. Nothing contained in this term sheet shall be an admission of fact or liability or, until the occurrence of the agreement effective date on the terms described herein and in the RSA (defined below), deemed binding on any of the parties hereto.**

This term sheet ("*Term Sheet*") describes the post-effective corporate governance in connection with the restructuring (the "*Restructuring*") of Fieldwood Holdings LLC, a Delaware limited liability company ("*Fieldwood*"). This Term Sheet is not binding, is subject to material change and is being distributed for discussion purposes only. This Term Sheet is not a commitment to provide financing or engage in any transaction.

Capitalized terms used in this Term Sheet but not defined herein shall have the meanings set forth in the Restructuring Support Agreement, dated February 14, 2018 (the "*RSA*").

| | |
|---|---|
| **Reorganized Issuer** | Fieldwood Energy Inc., a Delaware corporation (the "*Company*") |
| **Classes of Stock** | One class of common stock (the "*Common Stock*"). |
| **Board of Directors** | Initial board (the "*New Board*") to consist of seven directors, (i) one director shall be the CEO, (ii) three directors to be selected by Riverstone (as defined in the Backstop Agreement) (the "*Sponsor*"), (iii) two directors to be selected by the Specified Stockholders (as defined below) and (iv) one director to be selected by Franklin Resources, Inc. or one of its affiliates (collectively, "*Franklin*") who is an employee of Franklin. All decisions of the New Board may be taken by a simple majority of the directors. |
| | The size of the New Board shall be established as seven. Pursuant to the stockholders agreement, all holders of common stock will agree to vote their shares to elect as director: |
| | • the individual then serving as chief executive officer of the Company; |
| | • (I) so long as Barings LLC, Brown University, Eaton Vance Management, Halcyon Capital Management LP, Highland Capital Management, L.P., Invesco Senior Secured Management, Inc., Mudrick Capital Management, L.P., and Symphony Asset Management LLC (collectively, the "*Specified Stockholders*") collectively hold at least 15% of the Common Stock outstanding at emergence, two directors nominated by the holders of a majority of the common stock held by the Specified Stockholders and (II) so long as the Specified Stockholders collectively hold more than 5% but less than 15% of the Common Stock outstanding at emergence, one director nominated by the holders of a majority of the common stock held by the Specified Stockholders; |
| | • (I) so long as the Sponsor holds at least 25% of the Common Stock |

outstanding at emergence, three directors nominated by the Sponsor, (II) so long as the Sponsor holds at least 15% but less than 25% of the Common Stock outstanding at emergence, two directors nominated by the Sponsor, and (III) so long as the Sponsor holds at least 5% but less than 15% of the Common Stock outstanding at emergence, one director nominated by the Sponsor;

- so long as Franklin holds at least 25% of the aggregate amount of loans and commitments under the Exit First Lien Term Facility of the Company, one director nominated by Franklin who is an employee of Franklin; and

- in the event Franklin holds less than 25% of the aggregate amount of loans and commitments under the Exit First Lien Term Facility of the Company and so long as the Specified Stockholders collectively hold at least 5% of the Common Stock outstanding at emergence, one director (who shall be independent and a non-employee of the Company, the Sponsor, any Specified Stockholder or any affiliate of the foregoing) proposed by the Sponsor (so long as the Sponsor holds at least 5% of the Common Stock outstanding at emergence) and approved by the holders of a majority of the Common Stock held by the Specified Stockholders.

Stockholders will agree to vote to remove any director that has been designated by a party at the direction of the designating party. Any vacancies on the New Board caused by the resignation, removal, death or incapacity of any director designated by any designating party shall be filled only by an individual designated by the respective designating party. For the avoidance of doubt, when a party no longer has the right to designate a seat, such seat will be filled by a majority vote of all stockholders, other than the seat to be filled by the board member designated by Franklin in accordance with the provisions above.

The Specified Stockholders shall be entitled to appoint a single board observer so long as they collectively hold at least 5% of the Common Stock outstanding at emergence.

The rights to designate members of the New Board and board observers shall not be transferrable by the Sponsor or a Specified Stockholder; *provided, however*, that the Sponsor or a Specified Stockholder may transfer all or any of its board designation rights in connection with a sale of all or substantially all of the Common Stock held at emergence by the Sponsor or such Specified Stockholder (or pursuant to which all or potentially all of the Common Stock held by the such party at emergence would have been transferred but for the exercise of tagalong rights).

| | |
|---|---|
| **Stockholder Consent Rights** | The Company shall not, and shall not permit any of its subsidiaries to:<br><br>- enter, amend or renew an agreement with (i) any affiliate of the Company or (ii) any owner of 5 % or more of the Common Stock, or an affiliate of such owner (a "***Related Party***"), excluding any agreement, amendment or renewal pursuant to a compensation and benefits agreement with a director, officer or other employee of the Company and any of its subsidiaries entered into in the ordinary course of business (and other similar, customary exclusions for intra-company matters) (a "***Related Party Agreement***"), unless such agreement, amendment or |

| | renewal is approved by the holders of a majority of the Common Stock other than the Related Party and any of its affiliates; or |
| | • amend any of the organizational documents of the Company or any of its subsidiaries in a manner that is materially and disproportionately adverse to one or more holders of Common Stock unless approved by such holder(s) of Common Stock. |
| | The Company shall not, and shall not permit any of its subsidiaries to: |
| | • amend any of the organizational documents of the Company in any manner, or any of the organizational documents its subsidiaries in any material manner, unless approved by (i) a majority of all holders of the Common Stock and (ii) a majority of all holders of Common Stock other than Sponsor or any of its affiliates. |
| | So long as the Sponsor holds at least 35% of the Common Stock outstanding, the Company shall not, and shall not permit any of its subsidiaries to, take any of the following actions without the approval of the Sponsor: |
| | • during the two-year period following the emergence (the "**Consent Period**"), consummate a Sale Event (as defined below); |
| | • at any time following the Consent Period, consummate a Sale Event other than any Sale Event that results in a price per share of Common Stock at least equal to the one implied by the Plan equity valuation, plus an 8% IRR; |
| | • consummate a public offering pursuant to a registration statement filed with the SEC (other than a Qualified IPO (as defined below) based upon a price per share of Common Stock at least equal to the one implied by the Plan equity valuation plus an 8% IRR); |
| | • prior to a Qualified IPO, a listing of the Common Stock on a national securities exchange or over-the-counter market (other than an OTC Pink quotation) or registration of the Common Stock under the Exchange Act; |
| | • hiring or termination of the CEO or CFO; |
| | • change the size of the New Board; |
| | • acquire or dispose of any assets in each case involving consideration payable or receivable by the Company or its subsidiaries in excess of $100 million (except for a Sale Event); |
| | • (i) Any payment or declaration of any dividend or other distribution or (ii) entering into any recapitalization transaction or incurring indebtedness, in each case, the primary purpose of which is to pay a dividend; or |
| | • Entering into any joint venture arrangements in excess of $100mm in committed liabilities. |
| | The Sponsor shall be permitted to transfer its stockholder consent rights in connection with a sale of all or substantially all of the Common Stock held by Sponsor at emergence (or pursuant to which all or substantially all of the Common Stock held by the Sponsor at emergence would have been transferred but for the exercise of tag-along rights by Key Holders). |
| **Preemptive Rights** | Each holder of shares of Common Stock in excess of 0.5% of the Common Stock then outstanding (each, a "**Key Holder**") will, collectively with its affiliates (including any funds managed by such Key Holder or its affiliates), have the right to participate on a *pro rata* basis in any issuance by the Company of any capital stock or securities exchangeable or exercisable for or convertible into its |

| | |
|---|---|
| | capital stock, except for Excluded Issuances (for the avoidance of doubt, a Key Holder may allocate its aggregate preemptive rights among its affiliates, including any funds managed by such Key Holder or its affiliates, in its sole discretion). "*Excluded Issuances*" means (x) Common Stock that is issued as consideration as part of a bona fide acquisition by the Company (but not, for the avoidance of doubt, in an equity financing transaction to raise funds to finance any such acquisition); (y) employee equity awards or capital stock issued upon the exercise, conversion or exchange of outstanding securities; and (z) any SEC-registered public offering following a Qualified IPO. For the avoidance of doubt, a stockholder shall not be deemed to own 0.5% or less of the Common Stock then outstanding solely due to dilution by virtue of Excluded Issuances. |
| **Transfer Restrictions** | The Company shall use commercially reasonable efforts to have the Common Stock admitted to quotation on the OTC Pink market – No information tier as soon as practicable following emergence, but in any event no earlier than 60 days following emergence. |
| | The Common Stock will be freely transferrable, subject to the following restrictions: |
| | <ul><li>the number of holders of record shall not exceed the number that would trigger the requirements for the Company to become required to file with the Securities and Exchange Commission (the "*SEC*") under the Exchange Act of 1934, as amended (the "*Exchange Act*");</li><li>no transfers that do not comply with U.S. federal or state securities laws or other applicable securities law; and</li><li>transferees must become parties to the stockholders agreement.</li></ul> |
| | There will be no rights of first refusal over transfers by shareholders in favor of either the Company or other shareholders (including the Sponsor). |
| **Drag-Along Rights** | Following the Consent Period, if requested by the holders of a majority of the outstanding Common Stock in connection with a Sale Event[1] (the applicable stockholders entitled to initiate such Sale Event, the "*Dragging Holders*"), all holders of Common Stock shall be required to sell their Common Stock on the same terms and the same per-interest consideration as the Dragging Holders and, if a stockholder vote is required, vote in favor of such transaction and waive all appraisal or dissenter rights in connection therewith; *provided, however*, that if the Sponsor is not a Dragging Holder, and at such time the Sponsor holds at least 35% of the Common Stock, the Sponsor shall not be required to sell its Common Stock or vote in favor of such transaction unless the Sale Event results in a price per share of Common Stock at least equal to the one implied by the Plan equity value plus an 8% IRR. |
| **Tag-Along Rights** | Key Holders will have tag-along rights for a transfer or series of related transfers by the Sponsor for more than 10% of any of the outstanding Common Stock; *provided* such tag-along rights shall not apply to (x) a transfer as part of an |

---

[1] "*Sale Event*" means: (i) A merger or consolidation (other than one in which holders of the voting power of the Company own a majority by voting power of the outstanding shares of the surviving or acquiring corporation); (ii) a sale, lease, transfer, exclusive license or other disposition of all or substantially all of the assets of the Company; ((i) or (ii), a "*Deemed Liquidation Event*"); or (iii) a transaction or series of related transactions in which a person, or a group of related persons, acquires from stockholders of the Company shares of capital stock representing more than fifty percent (50%) of the outstanding voting power of the Company.

| | underwritten public offering pursuant to an SEC registration statement for which piggyback registration rights apply, (y) a transfer to any affiliate of the Sponsor, including any fund managed by the investment manager or advisor of the Sponsor or an affiliate thereof, or (z) pursuant to the drag-along rights. |
|---|---|
| **Information Rights/Sale Support Rights** | The Company to (i) provide any Key Holder that is not a competitor with annual and quarterly financial statements, including a "short form" MD&A, (ii) hold a quarterly earnings call with such Key Holders in connection with the delivery of the financial statements, and (iii) subject to applicable securities laws and customary confidentiality obligations, make available disclosure to Key Holders and prospective acquirers of Common Stock from Key Holders (that are not competitors of the Company, as reasonably determined by the Company pursuant to a process to be agreed between the parties hereto pursuant to the definitive documentation) comparable to any disclosure required to be delivered to lenders under any credit agreement. |
| | In furtherance of the foregoing, so long as the Company is not required to file public reports with the SEC, the Company shall use commercially reasonable efforts to assist any Key Holder with a transfer of its Common Stock subject to applicable securities laws and customary confidentiality obligations, providing reasonable access to its financial and operating data and any other information reasonably appropriate for a proposed transferee (that is not a competitor of the Company, as reasonably determined by the Company pursuant to a process to be agreed between the parties hereto pursuant to the definitive documentation) to conduct a reasonable and customary due diligence review. For the avoidance of doubt, such information shall be limited to the information required to be provided in the immediately preceding paragraph. |
| **Automatic Termination of Stockholders Agreement Upon IPO** | If the Company, subject to the Stockholder Consent Rights described above, consummates (i) an underwritten, SEC-registered initial public offering of Common Stock with gross primary proceeds of at least $250 million (any such offering immediately following which the Common Stock is quoted or listed for trading on the Nasdaq or NYSE, a "***Qualified IPO***"), or (ii) any other SEC-registered initial public offering of Common Stock, and in the case of (i) or (ii) immediately following such offering the Common Stock is quoted or listed for trading on the Nasdaq or NYSE, the board designation rights, stockholder consent rights, preemptive rights, drag-along rights, tag-along rights, information rights and sale support rights shall automatically terminate (through the automatic termination of the Stockholders Agreement at such time). |
| **Registration Rights** | As will be provided in a registration rights agreement, all Key Holders will have customary shelf registration rights, demand and piggyback rights following an initial public offering or other Exchange Act registration. Demand rights will be tied to minimum ownership and proceeds thresholds, as well as a maximum number of exercises. |
| **Exclusive Forum** | Charter and bylaws to designate Delaware as exclusive forum for stockholder litigation. |
| **Stockholders Agreement** | All holders of the Common Stock shall be party to the Stockholders Agreement as a precondition to receiving any of the Common Stock. |

## EXHIBIT K
## FORM OF JOINDER AGREEMENT FOR CONSENTING CREDITORS

This Joinder Agreement to the Restructuring Support Agreement, dated as of February 14, 2018 (as amended, supplemented or otherwise modified from time to time, the "Agreement"), by and among the Company (as defined in the Agreement), and, among others, the holders of the principal amounts outstanding under the [Prepetition RBTL Loans/Prepetition FLTL Loans/Prepetition FLLO Term Loans/Prepetition Second Lien Term Loans/Prepetition Sponsor Second Lien Term Loans] (together with their respective successors and permitted assigns, the "Consenting Creditors" and each, a "Consenting Creditor") is executed and delivered by _____ (the "Joining Party") as of [●]. Each capitalized term used herein but not otherwise defined shall have the meaning set forth in the Agreement.

1. Agreement to be Bound. The Joining Party hereby agrees to be bound by all of the terms of the Agreement, a copy of which is attached to this Joinder Agreement as Annex I (as the same has been or may be hereafter amended, restated or otherwise modified from time to time in accordance with the provisions hereof). The Joining Party shall hereafter be deemed to be a "Consenting Creditor" and a "Party" for all purposes under the Agreement and with respect to any and all Claims held by such Joining Party.

2. Representations and Warranties. With respect to [the aggregate principal amount of Prepetition RBTL Loans/Prepetition FLTL Loans/Prepetition FLLO Term Loans/Prepetition Second Lien Term Loans/Prepetition Sponsor Second Lien Term Loans], in each case, set forth below its name on the signature page hereto, the Joining Party hereby makes the representations and warranties of the Consenting Creditors set forth in Section 9 of the Agreement to each other Party to the Agreement.

3. Governing Law. This Joinder Agreement shall be governed by and construed in accordance with the internal laws of the State of New York, without regard to any conflict of laws provisions which would require the application of the law of any other jurisdiction.

[Signature Page Follows]

IN WITNESS WHEREOF, the Joining Party has caused this Joinder to be executed as of the date first written above.

**[CONSENTING CREDITOR]**

By:_____
Name:
Title:

**<u>CONSENTING CREDITOR</u>**

[●]

By: [●]

Name: [●]

Title: [●]

Principal Amount of Prepetition FLTL Loans:  $_____

Principal Amount of Prepetition RBTL Loans:  $_____

Principal Amount of Prepetition FLLO Term Loans:  $_____

Principal Amount of Prepetition Second Lien Term Loans:   $_____

Principal Amount of Prepetition Sponsor Second Lien Term Loans:   $_____

<u>Notice Address</u>:
[●]

Fax: [●]
Attention: [●]
Email: [●]

Acknowledged:

**[●]**

By:_____
Name:
Title:

**EXHIBIT L**
**DIP COMMITMENTS**

Intentionally Omitted

## SCHEDULE 1

**Restructuring Subsidiaries**

| |
|---|
| Dynamic Offshore Resources NS, LLC |
| Fieldwood Energy LLC |
| Fieldwood Holdings LLC |
| Fieldwood Energy Inc. |
| Fieldwood Energy Offshore LLC |
| Fieldwood Onshore LLC |
| Fieldwood SD Offshore LLC |
| FW GOM Pipeline, Inc. |
| GOM Shelf LLC |
| Bandon Oil and Gas GP, LLC |
| Bandon Oil and Gas, LP |
| Fieldwood Energy SP LLC |
| Galveston Bay Pipeline LLC |
| Galveston Bay Processing LLC |

**Exhibit C**

**Organizational Chart**



**Exhibit D**

**Liquidation Analysis**

## Liquidation Analysis

**Introduction:**

Under the "best interests of creditors" test set forth in section 1129(a)(7) of the Bankruptcy Code,[1] the Bankruptcy Court may not confirm a plan of reorganization unless the plan provides each holder of an allowed claim or interest that does not otherwise vote in favor of the plan with property of a value, as of the effective date of the plan, that is not less than the amount that such holder would receive or retain if the debtor was liquidated under chapter 7 of the Bankruptcy Code. To demonstrate that the proposed Plan satisfies the "best interests of creditors" test, the Debtors, with the assistance of their restructuring advisor, Opportune LLP ("**Opportune**"), have prepared the following hypothetical liquidation analysis (the "**Liquidation Analysis**"), which is based upon certain assumptions discussed in the Disclosure Statement and in the accompanying notes to the Liquidation Analysis.

The Liquidation Analysis sets forth an estimated range of recovery values for each Class of Claims or Interests upon disposition of assets pursuant to a hypothetical chapter 7 liquidation. As illustrated by the Liquidation Analysis, holders of Claims or Interests in Impaired Classes would receive a lower recovery in a hypothetical liquidation than they would under the Plan. Further, no holder of a Claim or Interest would receive or retain property under the Plan of a value that is less than such holder would receive in a chapter 7 liquidation. Accordingly, and as set forth in greater detail below, the Debtors believe that the Plan satisfies the "best interests of creditors" test set forth in section 1129(a)(7) of the Bankruptcy Code.

**Statement of Limitations:**

The determination of the costs of, and proceeds from, the hypothetical liquidation of the Debtors' assets in a chapter 7 case is an uncertain process involving the extensive use of significant estimates and assumptions that, although considered reasonable by the Debtors based upon their business judgment and input from their advisors, are inherently subject to significant business, economic, and competitive uncertainties and contingencies beyond the control of the Debtors, their management and their advisors. Inevitably, some assumptions in the Liquidation Analysis would likely not materialize in an actual chapter 7 liquidation, and unanticipated events and circumstances could materially affect the ultimate results in an actual chapter 7 liquidation, including, without limitation, the uncertainty of the currently volatile oil and gas pricing environment. The Liquidation Analysis was prepared for the sole purpose of generating a reasonable good faith estimate of the proceeds that would be generated if the Debtors' assets were liquidated in accordance with chapter 7 of the Bankruptcy Code. The Liquidation Analysis is not intended and should not be used for any other purpose. The underlying financial information in the Liquidation Analysis was not compiled or examined by independent accountants. NEITHER THE DEBTORS NOR THEIR ADVISORS MAKE ANY REPRESENTATION OR WARRANTY THAT THE ACTUAL RESULTS WOULD OR WOULD NOT, IN WHOLE OR IN PART, APPROXIMATE THE ESTIMATES AND ASSUMPTIONS REFLECTED IN THE

---

[1] Capitalized terms used but not otherwise defined in herein have the meanings set forth in the *Joint Prepackaged Chapter 11 Plan of Fieldwood Energy LLC and Its Affiliated Debtors* (the "**Plan**"), filed contemporaneously herewith.

LIQUIDATION ANALYSIS. ACTUAL RESULTS COULD VARY MATERIALLY FROM ESTIMATES PROVIDED HEREIN.

THE RECOVERIES SHOWN IN THE LIQUIDATION ANALYSIS DO NOT CONTEMPLATE A SALE OR SALES OF THE DEBTORS' ASSETS ON A GOING CONCERN BASIS. THIS ASSUMPTION IS MADE BECAUSE OF THE DEBTORS' ASSESSMENT THAT, IN THE WAKE OF A CHAPTER 7 FILING, THE CONSEQUENT DISRUPTIONS TO THE DEBTORS' BUSINESSES AND RESULTANT ATTRITION, THE LIKELIHOOD THAT THE DEBTORS OR SUBSTANTIAL BUSINESS UNITS OF THE DEBTORS CAN CONTINUE OPERATIONS, ESPECIALLY IN A MANNER THAT YIELDS MATERIAL POSITIVE INCREMENTAL CASH FLOW, IS LOW. WHILE THE DEBTORS MAKE NO ASSURANCES, IT IS POSSIBLE THAT PROCEEDS RECEIVED FROM GOING CONCERN SALE(S) WOULD BE MORE THAN IN A HYPOTHETICAL CHAPTER 7 LIQUIDATION, THE COSTS ASSOCIATED WITH THE SALE(S) COULD BE LESS, FEWER CLAIMS COULD BE ASSERTED AGAINST THE BANKRUPTCY ESTATES, AND/OR CERTAIN ORDINARY COURSE CLAIMS COULD BE ASSUMED BY THE BUYER(S).

In preparing the Liquidation Analysis, the Debtors estimated Allowed Claims based upon a review of liabilities recorded on the Debtors' financial statements. In addition, the Liquidation Analysis includes estimates for Claims which could be asserted and allowed in a chapter 7 liquidation, including chapter 7 administrative claims such as wind down costs and trustee fees. To date, a Bankruptcy Court has not estimated or otherwise fixed the total amount of Allowed Claims used for purposes of preparing the Liquidation Analysis. Therefore, the Debtors' estimate of Allowed Claims set forth in the Liquidation Analysis should not be relied on for any other purpose, including determining the value of any distribution to be made on account of Allowed Claims and Interests under the Plan. NOTHING CONTAINED IN THE LIQUIDATION ANALYSIS IS INTENDED TO BE OR CONSTITUTES A CONCESSION OR ADMISSION OF THE DEBTORS. THE ACTUAL AMOUNT OF ALLOWED CLAIMS IN THE CHAPTER 11 CASES COULD MATERIALLY DIFFER FROM THE ESTIMATED AMOUNTS SET FORTH IN THE LIQUIDATION ANALYSIS.

**Methodology:**

The Liquidation Analysis has been prepared assuming that the Debtors' file for chapter 7 (the "**Chapter 7 Liquidation**") on February 15, 2018 (the "**Chapter 7 Filing Date**"). Except as otherwise noted herein, the Liquidation Analysis is based upon the unaudited consolidating balance sheets of the Debtors as of December 31, 2017, and those values, in total, are assumed to be representative of the Debtors' approximate assets and liabilities as of the Chapter 7 Filing Date. It is assumed that on the Chapter 7 Filing Date, the Bankruptcy Court will appoint a chapter 7 trustee (the "**Chapter 7 Trustee**") who would liquidate the Debtors' estates and distribute the cash proceeds, net of liquidation-related costs, to creditors in accordance with the Bankruptcy Code and any other applicable law. There can be no assurance that the recoveries realized from the liquidation would, in fact, approximate the amounts reflected in the Liquidation Analysis. Under section 704 of the Bankruptcy Code, a trustee must, among other duties, collect and convert the property of the estate as expeditiously as possible (generally at distressed prices), taking into account the best interests of stakeholders.

Value in liquidation is assumed to be driven by, among other things: (a) the accelerated time frame in which the business units are marketed and sold; (b) negative partner and vendor reaction; (c) the loss of key personnel; (d) acceleration of security for decommissioning costs and/or liabilities associated with certain assets; and (e) the general forced nature of the sale.

**Global Notes and Assumptions:**

The Liquidation Analysis should be read in conjunction with the following notes and assumptions:

1. The Liquidation Analysis assumes that the Debtors would be liquidated in a jointly administered proceeding. Because all Debtors are either borrowers or guarantors on more than $3.3 billion of funded debt, it is assumed that distributions would be made on a consolidated basis, in accordance with section 726 of the Bankruptcy Code.

2. **Dependence on unaudited financial statements.** Proceeds available for recovery are based upon the unaudited financial statements and balance sheets of the Debtors as of December 31, 2017, unless otherwise noted. Cash balances have been rolled forward through to February 15, 2018, the Chapter 7 Filing Date.

3. **Chapter 7 liquidation costs and length of the liquidation process.** The Liquidation Analysis assumes that the Chapter 7 Liquidation would take approximately 4-6 months in order to pursue sales of substantially all the remaining oil and gas assets, monetize and collect receivables as well as other assets on the balance sheet, and otherwise administer and close the estates. It is assumed that commodity prices remain consistent over the course of the 4-6 month wind-down period. In an actual liquidation, the wind down process and time periods could be longer, thereby likely reducing creditor recoveries further. For example, extending the duration of the process to liquidate and allow Claims, including priority, contingent, litigation, rejection, and other Claims could substantially delay the timing and reduce the amounts of the distributions of asset proceeds to creditors due to, among other things, increased administrative costs. Accordingly, there can be no assurance that the values reflected in the Liquidation Analysis would be realized if the Debtors were, in fact, to undergo such liquidation.

   Pursuant to section 726 of the Bankruptcy Code, the allowed administrative expenses incurred by the Chapter 7 Trustee, including expenses associated with selling the Debtors' assets, would be entitled to payment in full prior to any distributions to Priority Claims. The estimates used in the Liquidation Analysis for these expenses include estimates for operational expenses and certain legal, accounting and other professionals, as well as an assumed 3% fee payable to a Chapter 7 Trustee based on the amount of liquidated assets. It is assumed that chapter 7 administrative and priority claims, post-chapter 7 expenses and professional fees, and Chapter 7 Trustee fees are entitled to payment in full prior to any distribution to holders of any other claims.

4. **Distribution of Net Proceeds.** Priority Claim amounts and other such claims that may arise in a liquidation scenario would be paid in full from the liquidation proceeds before the balance of those proceeds will be made available to pay General Unsecured Claims. Under the absolute priority rule, no junior creditor would receive any distribution until all senior creditors are paid in full, and no equity holder would receive any distribution until all creditors are paid in full. The assumed distributions to creditors as reflected in the Liquidation Analysis are estimated in accordance with the absolute priority rule.

5. **Additional Claims.** The cessation of business in a liquidation is likely to trigger certain administrative and priority Claims that otherwise would not exist under a plan of reorganization absent a liquidation. These types of administrative and priority Claims have not been accounted for in the Liquidation Analysis but it is important to note these will need to be paid in full before any balance of liquidation proceeds would be available to pay General Unsecured Claims.

   Examples of these kinds of Claims include various potential employee Claims (for such items as severance and potential Worker Adjustment and Retraining Notification Act claims), tax liabilities, Claims related to further rejection of unexpired leases and executory contracts, new bonding or letters of credit for plugging and abandoning ("**P&A**") liabilities, litigation claims, and other potential allowed claims. These additional Claims could be significant; some may be administrative expenses, others may be entitled to priority in payment over General Unsecured Claims. The most significant of these Claims would be the P&A liabilities due to the offshore nature of the Debtors' operations and the respective BOEM and BSEE regulations, and such obligations to the extent the P&A occurs post-petition and during the liquidation period may be administrative expenses.

6. **Preference or fraudulent transfers.** No recovery or related litigation costs have been attributed to any potential avoidance actions under the Bankruptcy Code, including potential preference or fraudulent transfer actions due to, among other issues, the costs of such litigation, the uncertainty of the outcome, and anticipated disputes regarding these matters.

7. **Litigation Costs.** Additional costs for potential litigation have not been incorporated in the Liquidation Analysis.

8. This liquidation analysis does not consider any adequate protection claims that secured creditors could assert in a Chapter 7 scenario on account of their collateral's diminution in value.

**Conclusion:**

The Debtors have determined, based on the following analysis, that upon the Effective Date, the Plan will provide all creditors and equity holders with a recovery (if any) that is not less than what they would otherwise receive pursuant to a liquidation of the Debtors under chapter 7

of the Bankruptcy Code, and as such believe that the Plan satisfies the requirement of section 1129(a)(7) of the Bankruptcy Code.

The following Liquidation Analysis should be reviewed with the accompanying notes.

**Fieldwood Energy LLC, et al.**
Liquidation Analysis

*($ in thousands)*

| | Notes | Net Book Value | Low $ | Low % | High $ | High % |
|---|---|---|---|---|---|---|
| **Assets:** | | | | | | |
| Cash and Cash Equivalents | A | $ 10,000 | $ 10,000 | 100% | $ 10,000 | 100% |
| Restricted Cash | B | 204,881 | - | 0% | - | 0% |
| Accounts Receivable | C | 133,380 | 117,357 | 88% | 124,208 | 93% |
| Other Current Assets | D | 53,698 | 12,259 | 23% | 15,938 | 30% |
| Oil and Gas Properties | E | 1,864,739 | 830,000 | n/a | 1,160,000 | n/a |
| Other Property & Equipment | F | 18,225 | 1,823 | 10% | 3,645 | 20% |
| Other Non-Current Assets | G | 62,121 | 4,648 | 7% | 6,971 | 11% |
| **Gross Liquidation Proceeds** | | | $ 976,086 | | $ 1,320,762 | |
| | | | | | | |
| **Liquidation Adjustments:** | | | | | | |
| Net Wind-Down Expenses of Trustee | H | | (56,400) | | (37,600) | |
| Trustee Fees | I | | (28,983) | | (39,323) | |
| Trustee Legal & Financial Advisors | J | | (28,983) | | (26,215) | |
| **Subtotal** | | | $ (114,365) | | $ (103,138) | |
| | | | | | | |
| **Net Liquidation Proceeds Available for Distribution** | | | $ 861,721 | | $ 1,217,624 | |

*($ in thousands)*

| | Notes | Low Scenario Claims Est. | Low Scenario Recovery ($) | Low Scenario % | High Scenario Claims Est. | High Scenario Recovery ($) | High Scenario % | Ch. 11 Plan Est. Recovery % |
|---|---|---|---|---|---|---|---|---|
| Administrative Claims | K | $ - | $ - | 0% | $ - | $ - | 0% | 100% |
| Class 1 – Priority Non-Tax Claims | L | - | - | 0% | - | - | 0% | 100% |
| First Lien Secured Claims | | | | | | | | |
| Class 2 – Other Secured Claims | M | 65,000 | 46,019 | 71% | 65,000 | 65,000 | 100% | 100% |
| Class 3 – RBL Claims | N | 555 | 393 | 71% | 555 | 555 | 100% | 100% |
| Class 4 – FLTL Claims | O | 1,151,592 | 815,309 | 71% | 1,151,592 | 1,151,592 | 100% | 100% |
| Class 5 – FLLO Claims | P | 534,678 | - | 0% | 534,678 | 477 | 0.1% | 100% |
| Total, First Lien Secured Claims | | 1,751,825 | 861,721 | | 1,751,825 | 1,217,624 | | |
| Class 6 – SLTL Claims | Q | 1,696,820 | - | 0% | 1,696,820 | - | 0% | 8.35% |
| Class 7 – General Unsecured Claims | R | 450,426 | - | 0% | 115,000 | - | 0% | 8.35% |
| Intercompany Claims and Equity Interests: | | | | | | | | |
| Class 8 – Intercompany Claims | S | - | - | 0% | - | - | 0% | - |
| Class 9 – Existing Holdings Interests | T | - | - | n/a | - | - | n/a | - |
| Class 10 – Existing Energy Inc. Interests | T | - | - | n/a | - | - | n/a | - |
| Class 11 – Intercompany Interests | U | - | - | n/a | - | - | n/a | - |
| Total Interco. Claims and Equity Interests | | - | - | | - | - | | |
| Total | | $ 3,899,070 | $ 861,721 | | $ 3,563,644 | $ 1,217,624 | | |

**Specific Notes to the Liquidation Analysis:**

*Gross Liquidation Proceeds –*

A.   **Cash and Cash Equivalents**

- The liquidation proceeds of cash and cash equivalents for all entities holding cash is estimated to be 100% of the pro forma balance. The pro forma balance as of February 15, 2018 is based on the latest business plan projections with adjustments for the timing of professional fee and other payments.

B.   **Restricted Cash**

- Restricted Cash includes amounts held in escrow in connection with certain statutory and contractual obligations to various government authorities and contract counterparties. Currently $189 million is held in a trust pursuant to a decommissioning agreement with Apache, to secure the Debtors' plugging and abandonment obligations under this agreement and approximately $16 million secures the debtors compliance with certain other plugging and abandonment obligations. In the Liquidation Analysis, it is assumed that the beneficial interest in these assets would be transferred to the buyer of the oil and gas properties as part of an assumption of plugging and abandonment liabilities. If the plugging and abandonment liabilities were not assumed by the buyer of the oil and gas properties, the Restricted Cash would likely be claimed by the applicable contract counterparty as reimbursement for completing the obligations. Accordingly, under either scenario, in the Chapter 7 Liquidation, there would be no recovery on these assets.

C.   **Accounts Receivable**

- The analysis of accounts receivable relates to the sale of oil and gas, amounts due from joint interest billing partners, and other receivables. For the purposes of the Liquidation Analysis, the accounts receivable balances are assumed to have a blended recovery of approximately 88% to 93%.

D.   **Other Current Assets**

- Other current assets primarily include prepaid expenses, professional retainers and inventory. In a liquidation, professional retainers are assumed to be recoverable after satisfying pre-petition fees and expenses. Prepaid expenses and inventory were assumed to have a partial recovery. Other current assets are assumed to have a blended recovery of approximately 23% to 30%.

E.   **Oil and Gas Properties**

- The gross sale proceeds assumed realizable from the valuation of the oil and gas properties were based on the income approach via the discounted cash flow method. The reserve reports utilized are run as of January 1, 2018 (effective date of February

15, 2018) using the New York Mercantile Exchange strip as of January 10, 2018 for the commodity price forecasts. Adjustments were made to the reserve report for risking, general and administrative expenses, and federal income taxes. The projected cash flows were discounted to present value using a 10.0% discount rate. Additional adjustments were made for general & administrative expenses, plugging and abandonment expenses, and lease operating expenses that are not included in the reserve report.

- The market approach, via the precedent transaction method, was not considered a satisfactory valuation approach given the limited number of comparable transactions that have occurred in the Gulf of Mexico since commodity prices declined in late 2014.
- The valuation conducted for the Liquidation Analysis indicates a range of approximately $830 million to $1,160 million. The valuation of oil and gas properties does not take into account BOEM (Bureau of Ocean Energy Management) and BSEE (Bureau of Safety and Environmental Enforcement) considerations, which could negatively impact the consideration received in a liquidation scenario.

**F. Other Property & Equipment**

- Other property and equipment includes office furniture, computer equipment, software licenses, vehicle leases, leasehold improvements and various other equipment. Given the nature of these assets, they are estimated to have a recovery of approximately 10% to 20%.

**G. Other Non-Current Assets**

- Other non-current assets consist of deferred financing costs, long-term contractual receivables, equity investments in foreign affiliates of the debtors and deposits held by vendors. In the Chapter 7 Liquidation, there would be a minimal recovery on these assets which are estimated to have a blended recovery of approximately 7% to 11%.

*Liquidation Adjustments –*

**H. Net Wind-Down Expenses of Trustee**

- The Liquidation Analysis assumes the chapter 7 liquidation process will take 4-6 months to complete. Corporate payroll and administrative costs during the liquidation are based on the assumption that certain limited functions would be required during the liquidation process for an orderly wind-down of the business and sale and transfer of oil and gas assets. Examples of such costs incurred during a chapter 7 liquidation would include, without limitation, expenses associated with salary or hourly compensation and retention programs to maintain wind-down personnel, rent, and utilities. The Liquidation Analysis includes the cost of an employee retention program equal to 50% of the total employee compensation during the wind-down period. The Liquidation Analysis does not incorporate any severance costs from the termination of employees.

**I.** **Trustee Fees**

- Compensation for the Chapter 7 Trustee would be limited to fee guidelines in section 326(a) of the Bankruptcy Code. The Debtors have assumed Chapter 7 Trustee fees of approximately 3% of the gross proceeds from the liquidation (excluding cash).

**J.** **Trustee Legal & Financial Advisors**

- Compensation for the Chapter 7 Trustee's professionals (counsel and other legal, financial, and professional services) during the Chapter 7 Liquidation is estimated to be between 2% and 3% of the total proceeds from the liquidation (excluding cash).

*Claims –*

**K.** **Administrative Claims**

- The Debtors estimate there would be no administrative claims during the liquidation period.

**L.** **Priority Non-Tax Claims (Class 1)**

- The Debtors estimate there would be no priority non-tax claims during the liquidation period.

**M.** **Other Secured Claims (Class 2)**

- The Debtors believe there will be Trade Claims in which the claim holder may be able to assert lien rights under applicable law. The holders of claims will be required to provide evidence they can assert lien rights under applicable law in connection with the claims reconciliation process. The Liquidation Analysis assumes that approximately $65 million of Trade Claims successfully assert lien rights, although this estimate may be higher based on the counterparties ability to assert liens. Recovery on these claims is estimated at 71% to 100%.

**N.** **RBL Claims (Class 3)**

- Pursuant to the Decommissioning Agreement dated September 30, 2013 (the "**Decommissioning Agreement**") with Apache Corporation ("**Apache**"), the Debtors provided a $148 million letter of credit facility. In the Liquidation Analysis, it is assumed that the full amount of the facility remains undrawn, prior to the Chapter 7 Filing Date.
- RBL Claims include approximately $555,000 of unpaid fees through the Chapter 7 Filing Date. The recovery on the RBL Claims is estimated to be 71% to 100%.

**O. FLTL Claims (Class 4)**

- Pursuant to the Prepetition First Lien Term Loan Agreement, the Debtors are obligated on approximately $1.14 billion, composed of (a) approximately $900 million of principal amount of senior first-lien secured term loans (the "**Prepetition FLTL Loans**"), of which $755 million remains outstanding as of the date hereof, and (b) approximately $388 million of reserve-based term loans (the "**Prepetition RBTL Loans**" and together with the Prepetition FLTL Loans, the "**Prepetition First Lien Term Loans**"), of which the full amount remains outstanding as of the date hereof.
- In the Liquidation Analysis, the FLTL Claims include approximately $8.9 million of accrued interest through the Chapter 7 Filing date. The recovery on the FLTL Claims is estimated to be 71% to 100%.

**P. FLLO Claims (Class 5)**

- FLLO Claims consist of approximately $518 million of loans secured by a first-priority lien on the Collateral, but are subordinate in right of payment to RBL Claims and FLTL Claims. In the Liquidation Analysis, the FLLO Claims include approximately $17.2 million of accrued interest through the Chapter 7 Filing Date. The recovery on the FLLO Claims is estimated to be 0% to 0.1%.

**Q. SLTL Claims (Class 6)**

- SLTL Claims consist of approximately $1.63 billion of loans secured by a second-priority lien on the Collateral. In the Liquidation Analysis, the SLTL Claims include approximately $71 million of accrued interest through the Chapter 7 Filing Date. The Liquidation Analysis projects an estimated recovery of 0% on these claims.

**R. General Unsecured Claims (Class 7)**

- The General Unsecured Claims consist of all other unsecured claims, including

  o Due to the Other Secured Claims, RBL Claims and FLTL Claims being impaired in the low case scenario, it is assumed that Class 2, Class 3 and Class 4 claim holders would assert a deficiency Claim for the balance of approximately $355 million.
  o Claims for plugging and abandonment obligations, by 3rd parties other than Apache are estimated to be $0. In this Liquidation Analysis, it is assumed that the buyers of the oil and gas properties will accept responsibilities for plugging and abandonment obligations related to the assets acquired. The beneficial interest in any cash held in escrow as security for these contingent obligations will be transferred to the buyers as well.
  o Pre-petition unsecured liabilities that the Debtors do not anticipate will have liens asserted against them, are classified as general unsecured claims for purposes of this Liquidation Analysis. This pool of claims is estimated to be approximately $95 million.

o In the high case scenario, it is assumed that the Other Secured Claims, RBL Claims, and FLTL Claims receive a 100% recovery on their secured claims and assert a claim for post-petition interest. These claims are estimated to be approximately $20 million.

o The Liquidation Analysis projects an estimated recovery of 0% for General Unsecured Claims.

**S.    Intercompany Claims (Class 8)**

- The Liquidation Analysis does not account for any Intercompany Claims existing on the Chapter 7 Filing Date, but reserves the right to update estimates if new information were to arise.

**T.    Existing Holdings Interests & Existing Energy Inc. Interests (Class 9 & 10)**

- The Liquidation Analysis does not account for any Equity Interests existing on the Chapter 7 Filing Date, but reserves the right to update estimates if new information were to arise.

**U.    Intercompany Interests (Class 11)**

- The Liquidation Analysis does not account for any Intercompany Equity Interests existing on the Chapter 7 Filing Date, but reserves the right to update estimates if new information were to arise.

**<u>Exhibit E</u>**

**Financial Projections**

# Financial Projections

The Debtors believe that the Plan[1] is feasible as required by section 1129(a)(11) of the Bankruptcy Code, because Confirmation is not likely to be followed by liquidation or the need for further financial reorganization of the Debtors or any successor to the Debtors. In connection with the preparation and development of the Plan and for purposes of determining whether the Plan will satisfy this feasibility standard, the Debtors have analyzed the ability of the Reorganized Debtors to satisfy their financial obligations while maintaining sufficient liquidity and capital resources.

In connection with negotiating the Plan, the Asset Purchase Transaction and other elements of the Restructuring Transactions, and preparing the Disclosure Statement, the Debtors' senior management team ("**Management**") prepared financial projections (the "**Financial Projections**") for fiscal years 2018 through 2022 (the "**Projection Period**"). The Financial Projections are based on a number of assumptions made by Management with respect to the future performance of the Reorganized Debtors' operations.

THESE FINANCIAL PROJECTIONS WERE NOT PREPARED WITH A VIEW TOWARD COMPLIANCE WITH PUBLISHED GUIDELINES OF THE UNITED STATES SECURITIES AND EXCHANGE COMMISSION OR GUIDELINES ESTABLISHED BY THE AMERICAN INSTITUTE OF CERTIFIED PUBLIC ACCOUNTANTS FOR PREPARATION AND PRESENTATION OF PROSPECTIVE FINANCIAL INFORMATION.

ALTHOUGH MANAGEMENT HAS PREPARED THE FINANCIAL PROJECTIONS IN GOOD FAITH AND BELIEVES THE ASSUMPTIONS TO BE REASONABLE, THE DEBTORS AND THE REORGANIZED DEBTORS CAN PROVIDE NO ASSURANCE THAT SUCH ASSUMPTIONS WILL BE REALIZED. AS DESCRIBED IN DETAIL IN THE DISCLOSURE STATEMENT, A VARIETY OF RISK FACTORS COULD AFFECT THE REORGANIZED DEBTORS' FINANCIAL RESULTS AND MUST BE CONSIDERED. ACCORDINGLY, ANY REVIEW OF THE FINANCIAL PROJECTIONS SHOULD TAKE INTO ACCOUNT THE RISK FACTORS SET FORTH IN THE DISCLOSURE STATEMENT AND THE ASSUMPTIONS DESCRIBED HEREIN, INCLUDING ALL RELEVANT QUALIFICATIONS AND FOOTNOTES.

<u>General Assumptions</u>:

### A. Methodology

Management developed a business plan for the Projection Period based on forecasted production estimates of the Reorganized Debtors' oil and gas reserves, estimated commodity pricing, and estimated future incurred operating, capital expenditure and overhead costs. The production estimates are based on, among other things, Management's best efforts to forecast the decline curves for existing proved developed producing wells, as well as new wells brought online during the Projection Period. The actual production from new and existing wells could vary considerably from the assumptions used to prepare the production forecast contained herein.

---

[1] Capitalized terms used but not otherwise defined in herein have the meanings set forth in the *Joint Prepackaged Chapter 11 Plan of Fieldwood Energy LLC and Its Affiliated Debtors* (the "**Plan**"), filed contemporaneously herewith.

**B. Presentation**

The Financial Projections are presented on a consolidated basis and assume consummation of the Asset Purchase Transaction described in the Disclosure Statement.

**C. Emergence Date**

Emergence from the Chapter 11 Cases is assumed to occur on May 1, 2018 (the "**Assumed Effective Date**").

**Financial Projection Assumptions:**

**A. Production**

Oil and gas production volumes are estimates based on decline curves for existing producing wells and wells scheduled to be drilled and completed during the Projection Period. The actual production from new and existing wells could vary considerably from the assumptions used to prepare the production forecast contained herein.

**B. Commodity Pricing**

Commodity pricing is based on futures prices for crude oil and natural gas traded on the New York Mercantile Exchange ("**NYMEX**") as of January 10, 2018. With respect to crude oil price assumptions, Management estimates an average $3.13/barrel discount to NYMEX pricing for crude oil plus an average Light Louisiana Sweet ("**LLS**") premium of $3.19/barrel above the West Texas Intermediate ("**WTI**"). With respect to natural gas price assumptions, Management estimates an average $0.14/MMBtu discount to NYMEX for natural gas price realizations. With respect to natural gas liquids ("**NGLs**") price assumptions, Management estimates average price realizations equal to 25% of NYMEX pricing for WTI crude oil, based primarily on historical differentials. Management's estimates are consistent with their prepetition and industry practices, and the Debtors believe that they are reasonable under the circumstances.

| | NYMEX Strip Pricing as of January 10, 2018 | | | | |
| --- | --- | --- | --- | --- | --- |
| | For the Years Ending December 31, | | | | |
| *Commodity* | **2018E** | **2019E** | **2020E** | **2021E** | **2022E** |
| WTI - Crude Oil ($/Bbl) | $62.23 | $57.96 | $54.97 | $53.25 | $52.54 |
| LLS - Crude Oil ($/Bbl) | 66.05 | 61.02 | 58.02 | 56.30 | 55.59 |
| HHUB - Natural Gas ($/MMBtu) | 2.85 | 2.80 | 2.82 | 2.85 | 2.88 |

**C. Operating Expenses**

Operating expenses, including lease operating expenses, production taxes, transportation expenses, repair and maintenance expenses, insurance expenses and workover expenses are based on Management estimates.

**D. General and Administrative Costs ("G&A")**

G&A is primarily composed of personnel costs, rent and corporate overhead necessary to manage the business and comply with regulatory requirements. Projected G&A is based on current development plans.

**E. Earnings Before Interest, Taxes, Depreciation and Amortization ("EBITDA")**

Despite falling crude oil prices, EBITDA is anticipated to increase over the Projection Period primarily due to the anticipated drilling, completion and workover program in the business plan, the Asset Purchase Transaction, and the reduction in operating expenses driven primarily through a continued decommissioning program.

**F. Capital Expenditures**

Drilling and completions development costs over the Projection Period are projected to range from $154 million to $323 million per year, and $1.2 billion in total.

Recompletion capital expenditures over the Projection Period are projected to range from $68 million to $100 million per year, and $417 million in total.

Facilities, land and seismic capital expenditures over the Projection Period are projected to range from $6 million to $12 million per year, and $44 million in total.

Plugging and abandonment costs over the Projection Period are projected to range from $90 million to $266 million, and $762 million in total.[2] The plugging and abandonment costs are shown before amounts required to be deposited into, and amounts expected to be received from, the Apache Trust pursuant to the Apache Agreement. Net deposits to the Apache Trust over the Projection Period are expected to total $105 million.

**G. Cash Taxes**

The Debtors are treated as a C-Corporation for income tax purposes. Accordingly, the Debtors may incur tax liabilities at the company level. During the Projection Period, cash taxes are forecast to range from zero to $57 million per year, and $96 million in total.

**H. Changes in Working Capital**

Management projects a $17 million increase in net working capital over the Projection Period, with a maximum change in any given year of $32 million. The changes in working capital are primarily driven by material changes in capital expenditures over the period and the difference in timing between incurrence and payment or receipt.

**I. Capital Structure and Liquidity**

The Financial Projections assume (a) a new $148 million undrawn first lien first-out letter of credit facility (the "**Exit LC Facility**" with a premium of 4.5%; (b) a $1,143 million first lien last-out term loan (the "**Exit First Lien Term Facility**") with a rate of L + 5.25% (1.00% LIBOR floor); and (c) a $518 million second lien term loan (the "**Exit Second Lien Term Facility**") with a rate of L + 7.25%.

---

[2] If certain assets are excluded from the Purchased Assets as described in note 5 of the Disclosure Statement, the Debtors estimate total plugging and abandonment costs will be reduced by approximately $100 million.

Management expects to have approximately $110 million of liquidity on the Assumed Effective Date, consisting entirely of balance sheet cash, after giving effect to (a) $525 million from the Rights Offering, (b) the $480 million purchase price for oil and gas assets from Seller, subject to customary closing adjustments, and (c) one-time expenses related to the restructuring.

## Reorganized Debtors' Financial Projections[*]

| | Year Ended December 31, | | | | |
|---|---|---|---|---|---|
| | **2018E**[1] | **2019E** | **2020E** | **2021E** | **2022E** |
| **Net Production** | | | | | |
| Oil (Bbld) | 58,597 | 57,306 | 72,674 | 72,355 | 67,720 |
| Gas (Mcfd) | 179,543 | 210,787 | 256,225 | 271,683 | 284,427 |
| NGLs (Boed) | 4,899 | 6,160 | 9,774 | 10,511 | 10,187 |
| **Oil Equivalent (Boed)** | **93,420** | **98,598** | **125,152** | **128,146** | **125,312** |
| **Realized Prices** | | | | | |
| Oil ($/Bbl) | $62.96 | $57.94 | $54.87 | $53.14 | $52.44 |
| Gas ($/Mcf) | 2.95 | 2.90 | 2.91 | 2.94 | 2.98 |
| NGL ($/Bbl) | 15.53 | 14.49 | 13.74 | 13.31 | 13.14 |
| Net Revenue | $1,568 | $1,468 | $1,776 | $1,746 | $1,655 |
| Less: Direct Operating Expenses | (463) | (450) | (453) | (417) | (379) |
| Less: Transportation Expenses | (51) | (50) | (52) | (52) | (50) |
| Less: Repair & Maintenance and Workover Expenses | (80) | (78) | (70) | (59) | (54) |
| Less: Insurance Expenses | (40) | (40) | (40) | (39) | (39) |
| Less: General & Administrative Expense | (38) | (37) | (37) | (36) | (35) |
| **EBITDA** | **$896** | **$813** | **$1,125** | **$1,143** | **$1,098** |
| Less: Cash Taxes | - | - | (9) | (57) | (30) |
| Less: Capital Expenditures[2,3] | (355) | (436) | (372) | (280) | (398) |
| Less: P&A | (150) | (113) | (90) | (142) | (266) |
| Less: Apache Trust Payments/Distributions[4] | (34) | (35) | (41) | (3) | 7 |
| Change in Working Capital | (32) | 22 | (28) | (11) | 31 |
| **Unlevered Free Cash Flow** | **$324** | **$252** | **$586** | **$651** | **$443** |
| Less: Cash Interest[5] | (153) | (158) | (162) | (163) | (164) |
| **Levered Free Cash Flow** | **$171** | **$93** | **$424** | **$488** | **$279** |
| | | | | | |
| **Key Metrics:** | | | | | |
| First Lien Debt | $1,143 | $1,143 | $1,143 | $1,143 | $1,143 |
| Net First Lien Debt | 1,050 | 957 | 533 | 45 | NM |
| Total Debt | $1,660 | $1,660 | $1,660 | $1,660 | $1,660 |
| Net Total Debt | 1,568 | 1,475 | 1,050 | 562 | 283 |
| First Lien Leverage Ratio | 1.3x | 1.4x | 1.0x | 1.0x | 1.0x |
| Total Leverage Ratio | 1.9 | 2.0 | 1.5 | 1.5 | 1.5 |
| LTM EBITDA / Interest Expense | 5.9 | 5.1 | 7.0 | 7.0 | 6.7 |
| Net First Lien Leverage Ratio | 1.2x | 1.2x | 0.5x | 0.0x | NM |
| Net Total Leverage Ratio | 1.7 | 1.8 | 0.9 | 0.5 | 0.3 |
| Cash / Liquidity | $92 | $186 | $610 | $1,098 | $1,377 |

(1) Presented as if the Asset Purchase Transaction and the restructuring transaction occurred on January 1, 2018.
(2) Includes capitalized G&A.
(3) Includes contingent payments related to the Asset Purchase Transaction.
(4) Includes payments and distributions related to the Apache Agreement.
(5) 2018 Cash Interest includes period from May 1, 2018 to December 31, 2018 annualized

[*] If certain assets are excluded from the Purchased Assets as described in note 5 of the Disclosure Statement, the Debtors estimate that cumulative cash flows will be slightly more positive over the Projection Period, and that there will be minimal impact to liquidity at the end of the Projection Period.

**Exhibit F**

**Rights Offering Procedures**

# FIELDWOOD ENERGY INC.

## RIGHTS OFFERING PROCEDURES

The Subscription Rights and shares of common stock, par value $0.01 per share ("**New Equity Interests**" or "**New Common Stock**"), of Fieldwood Energy Inc., a Delaware company (the "**Issuer**") are being distributed and issued without registration under the Securities Act of 1933, as amended (the "**Securities Act**"), in reliance upon the exemption provided by Section 4(a)(2) thereof and/or Regulation D promulgated thereunder.

None of the Subscription Rights or New Equity Interests issuable upon exercise of such rights distributed pursuant to these Rights Offering Procedures have been or will be registered under the Securities Act, nor any state or local law requiring registration for offer and sale of a security. The Subscription Rights are not detachable from the Allowed Claims (as defined below) and may not be sold, transferred, assigned, pledged, hypothecated, participated, donated or otherwise encumbered or disposed of, directly or indirectly (including through derivatives, options, swaps, forward sales or other transactions in which any person receives the right to own or acquire any current or future interest in the Subscription Rights, the New Equity Interests, the SLTL Claims and any related claims), except as set forth in Section 6 herein.

None of the New Equity Interests have been registered under the Securities Act, nor any State or local law requiring registration for offer or sale of a security, and no New Equity Interests may be sold or transferred except pursuant to an effective registration statement or exemption from registration under the Securities Act.

The Rights Offering is being conducted in good faith and in compliance with the Bankruptcy Code. In accordance with Section 1125(e) of the Bankruptcy Code, a debtor or any of its agents that participate, in good faith and in compliance with the applicable provisions of the Bankruptcy Code, in the offer, issuance, sale, or purchase of a security offered or sold under the plan of the debtor, or of an affiliate participating in a joint plan with the debtor, or of a newly organized successor to the debtor under the plan, is not liable, on account of such participation, for violation of any applicable law, rule, or regulation governing the offer, issuance, sale or purchase of securities.

Each of the New Equity Interests issued upon exercise of a Subscription Right, and each book-entry position or certificate issued in exchange for or upon the transfer, sale or assignment of any such New Equity Interest, shall be deemed to contain or be stamped or otherwise imprinted with, as applicable, a legend in substantially the following form:

"**THE SECURITIES REPRESENTED BY THIS CERTIFICATE WERE ORIGINALLY ISSUED ON [ISSUANCE DATE], HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE "ACT"), OR ANY OTHER APPLICABLE STATE SECURITIES LAWS, AND MAY NOT BE SOLD**

OR TRANSFERRED IN THE ABSENCE OF AN EFFECTIVE REGISTRATION
STATEMENT UNDER THE ACT OR AN AVAILABLE EXEMPTION FROM
REGISTRATION THEREUNDER."

February 23, 2018

Eligible Claimants (as defined below) should note the following times relating to the Rights Offering:

| Date | Calendar Date | Event |
|---|---|---|
| Subscription Record Date………………………. | February 22, 2018 | The date and time mutually agreed between the Company and the Required Backstop Parties (as defined in the Backstop Commitment Agreement (as defined below)) for the determination of the holders entitled to participate in the Rights Offering. |
| Subscription Commencement Date.. | February 23, 2018 | Commencement of the Rights Offering. |
| Subscription Expiration Deadline … | 5:00 p.m. New York City Time on March 14, 2018 | The deadline for Eligible Claimants to subscribe for New Equity Interests. Eligible Claimant's rights offering subscription exercise form (the "**Rights Offering Subscription Form**") (with accompanying IRS Form W-9 or appropriate IRS Form W-8, as applicable) and executed subscription agreement (the "**Subscription Agreement**") must be received by Prime Clerk LLC (the "**Subscription Agent**") by the Subscription Expiration Deadline.<br><br>Eligible Claimants who are not Backstop Parties must deliver the Aggregate Purchase Price (as defined below) by the Subscription Expiration Deadline.<br><br>Eligible Claimants who are Backstop Parties must deliver |



|  | the Aggregate Purchase Price (as defined below) by the deadline specified, and in the form and manner set forth, in the Backstop Commitment Agreement. |
|--|--|

**Terms used and not defined herein shall have the meaning assigned to them in the Plan (as defined below).**

To Eligible Claimants:

Fieldwood Holdings LLC (the "**Company**") and certain of its directly- and indirectly-owned subsidiaries, as chapter 11 debtors and debtors in possession (such subsidiaries, together with the Company, the "**Debtors**"),[1] are seeking to implement a proposed financial restructuring of their existing funded debt and certain other obligations pursuant to the Joint Prepackaged Chapter 11 Plan of Fieldwood Energy LLC and its Affiliated Debtors, filed with the Court on February [•], 2018 [BCR No. [•]] (as it may be amended, modified or supplemented from time to time, the "**Plan**").

The New Equity Interests, with an aggregate purchase price of $525 million, may be subscribed for by Eligible Claimants. Each holder of SLTL Claims (as defined in the Plan) on the Subscription Record Date (as defined below) that is an Accredited Investor (each such holder, an "**Eligible Holder**") will receive Subscription Rights with respect to the SLTL Claims held or beneficially held[2] by such Eligible Holder as of the Subscription Record Date (such SLTL Claims, "**Allowed Claims**" and an Eligible Holder of Allowed Claims, an "**Eligible Claimant**") to subscribe for its pro rata share (measured as the principal and accrued and unpaid interest amount of all Allowed Claims held by such Eligible Claimant as compared to the aggregate principal and accrued and unpaid interest amount of Allowed Claims held by all Eligible Holders) of the New Equity Interests, provided that it (i) timely and properly executes and delivers its Rights Offering Subscription Form (with accompanying IRS Form W-9 or appropriate IRS Form W-8, as applicable) and Subscription Agreement, and makes certain customary representations and warranties set forth therein, to the Subscription Agent in advance of the Subscription Expiration Deadline and (ii) timely pays the applicable Aggregate Purchase Price.

No Eligible Claimant shall be entitled to participate in the Rights Offering unless the Aggregate Purchase Price for the New Equity Interests it subscribes for is received by the Subscription Agent (i) in the case of an Eligible Claimant that is not a Backstop Party, by the Subscription Expiration Deadline, and (ii) in the case of an Eligible Claimant that is a Backstop Party, by the deadline and in the form and manner specified in the Backstop Commitment Agreement (the "**Backstop Funding Deadline**"). No interest is payable on any advanced funding of the Aggregate Purchase Price. If the Rights Offering is terminated for any reason, your Aggregate Purchase Price will be returned to you promptly. No interest will be paid on any returned Aggregate Purchase Price.

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, as applicable, are: Dynamic Offshore Resources NS, LLC (0158); Fieldwood Energy LLC (6778); Fieldwood Holdings LLC (9264); Fieldwood Energy Inc. (4991); Fieldwood Energy Offshore LLC (4494); Fieldwood Onshore LLC (3489); Fieldwood SD Offshore LLC (8786); FW GOM Pipeline, Inc. (8440); GOM Shelf LLC (8107); Bandon Oil and Gas GP, LLC (9172); Bandon Oil and Gas, LP (9266); Fieldwood Energy SP LLC (1971); Galveston Bay Pipeline LLC (5703); and Galveston Bay Processing LLC (0422). The Debtors' primary mailing address is 2000 W. Sam Houston Parkway S., Suite 1200, Houston, TX 77042. The location of the Debtors' headquarters is 2000 W. Sam Houston Parkway S., Suite 1200, Houston, TX 77042.
[2] For these purposes, SLTL Claims held or beneficially owned, shall include only those Allowed Claims that are properly reflected in Item 4 of Exhibit C to the Rights Offering Subscription Procedures.

**In order to participate in the Rights Offering, you must complete all the steps outlined below. If all of the steps outlined below are not completed by the Subscription Expiration Deadline or the Backstop Funding Deadline, as applicable, you shall be deemed to have forever and irrevocably relinquished and waived your right to participate in the Rights Offering.**

1. **Rights Offering**

Eligible Claimants have the right, but not the obligation, to participate in the Rights Offering. Only Eligible Claimants as of the Subscription Record Date may participate in the Rights Offering.

Subject to the terms and conditions set forth in the Plan, these Rights Offering Procedures and the Subscription Agreement, each Eligible Claimant is entitled to subscribe for up to one New Equity Interest per $75.41 of Allowed Claims, at a purchase price of $23.33 per share (the "***Per Share Purchase Price***"). For each Eligible Claimant, the total amount of New Equity Interests to be purchased *multiplied by* the Per Share Purchase Price, is referred to herein as the "***Aggregate Purchase Price.***"[3]

Eligible Claimants will be subject to restrictions under the Securities Act on their ability to resell the New Equity Interests, as discussed in more detail in Article VIII of the Disclosure Statement, entitled "Transfer Restrictions and Consequences Under Federal Securities Laws."

**SUBJECT TO THE TERMS AND CONDITIONS OF THE SUBSCRIPTION AGREEMENT, AND THE BACKSTOP COMMITMENT AGREEMENT IN THE CASE OF ANY BACKSTOP PARTY, ALL SUBSCRIPTIONS SET FORTH IN THE SUBSCRIPTION AGREEMENT ARE IRREVOCABLE.**

2. **The Backstop**

The Rights Offering will be backstopped by the Backstop Parties. Each of the Backstop Parties, severally and not jointly, has agreed, pursuant to the Backstop Commitment Agreement by and among the Company, certain of the Company's subsidiaries, and the Backstop Parties party thereto, dated as of February 14, 2018 (as amended and supplemented from time to time) (the "***Backstop Commitment Agreement***"), to purchase all New Equity Interests that are not purchased by other Eligible Claimants pursuant to the Rights Offering, in accordance with the percentages set forth in Schedule 1 to the Backstop Commitment Agreement. As consideration for their undertakings in the Backstop Commitment Agreement, the Backstop Parties will receive the Backstop Commitment Premium (as defined in the Backstop Commitment Agreement) set

---

[3] The Per Share Purchase Price has been determined on the assumption that 30,000,000 shares of New Common Stock will be issued and outstanding on the Effective Date of the Plan. The Issuer may, in its sole discretion in accordance with the Plan, determine to issue a greater or lesser number of shares of New Common Stock on the Effective Date of the Plan, in which case (i) the number of shares of New Common Stock subject to this rights offering (the "***Rights Offering Shares***") shall be proportionately adjusted and (ii) the Per Share Purchase Price will be adjusted to be equal to the quotient obtained by dividing $525,000,000 by the number of Rights Offering Shares, as so adjusted.

forth in the Backstop Commitment Agreement.  Pursuant to the Backstop Commitment Agreement, each Backstop Party has agreed to fully exercise all Subscription Rights allotted to it for the purchase of the New Equity Interests. Furthermore, and notwithstanding anything else to the contrary herein, pursuant to the Backstop Commitment Agreement, certain of the Backstop Parties shall have the right, and have agreed with the Company, to exercise Subscription Rights that will be allotted to certain of its related funds and assigned by such related funds to such Backstop Party, in accordance with Schedule 1 to the Backstop Commitment Agreement.

3.      **Subscription Period**

The Rights Offering will commence on the Subscription Commencement Date and will expire at the Subscription Expiration Deadline.  Each Eligible Claimant intending to purchase New Equity Interests in the Rights Offering must affirmatively elect to exercise its Subscription Rights in the manner set forth in the Rights Offering Subscription Form by the Subscription Expiration Deadline.

Any exercise of Subscription Rights after the Subscription Expiration Deadline will not be allowed and any purported exercise received by the Subscription Agent after the Subscription Expiration Deadline, regardless of when the documents or payment relating to such exercise were sent, will not be honored, except that the Company shall have the discretion, with the consent of the Required Backstop Parties, to allow any exercise of Subscription Rights after the Subscription Expiration Deadline.

The Subscription Expiration Deadline may be extended with the consent of the Required Backstop Parties or as required by law.

4.      **Delivery of Subscription Agreement**

Each Eligible Claimant may exercise all or any portion of such Eligible Claimant's Subscription Rights, subject to the terms and conditions of the Subscription Agreement. In order to facilitate the exercise of the Subscription Rights, beginning on the Subscription Commencement Date, the Subscription Agent will send a Subscription Agreement to each Eligible Claimant together with appropriate instructions for the proper completion, due execution, and timely delivery of the executed Subscription Agreement and the payment of the applicable Aggregate Purchase Price for its New Equity Interests.

5.      **Exercise of Subscription Rights**

(a)      In order to validly exercise its Subscription Rights, each Eligible Claimant that is not a Backstop Party must:

i.      return a duly executed Subscription Agreement along with a duly completed and executed Rights Offering Subscription Form (with accompanying IRS Form W-9 or appropriate IRS Form W-8, as applicable) to the Subscription Agent, so that such documents are actually received by the Subscription Agent by the Subscription Expiration Deadline; and

ii.       promptly upon returning its Subscription Agreement and Rights Offering Subscription Form to the Subscription Agent, but in no event later than the Subscription Expiration Deadline, pay the applicable Aggregate Purchase Price to the Subscription Agent by wire transfer **ONLY** of immediately available funds in accordance with the instructions included in Item 5 of the Rights Offering Subscription Form.

(b)     In order to validly exercise its Subscription Rights, each Eligible Claimant that is a Backstop Party must:

i.      return a duly executed Subscription Agreement along with a duly completed and executed Rights Offering Subscription Form (with accompanying IRS Form W-9 or appropriate IRS Form W-8, as applicable) to the Subscription Agent, so that such documents are actually received by the Subscription Agent by the Subscription Expiration Deadline; and

ii.      no later than the Backstop Funding Deadline, pay the applicable Aggregate Purchase Price (in accordance with the terms and conditions and in the form and manner set forth in the Backstop Commitment Agreement), to the Subscription Agent by wire transfer **ONLY** of immediately available funds in accordance with the instructions included in Item 5 of the Rights Offering Subscription Form.

All Eligible Claimants must deliver their completed Rights Offering Subscription Form (with accompanying IRS Form W-9 or appropriate IRS Form W-8, as applicable), completed Subscription Agreement, and (with respect to the Eligible Claimants that are not Backstop Parties) payment of the applicable Aggregate Purchase Price payable for the New Equity Interests elected to be purchased by such Eligible Claimant directly to the Subscription Agent on or before the Subscription Expiration Deadline. In all cases, Eligible Claimants that are Backstop Parties must deliver their payment of the applicable Aggregate Purchase Price payable for the New Equity Interests elected to be purchased by such Eligible Claimant directly to the Subscription Agent no later than the Backstop Funding Deadline.

In the event that the funds received by the Subscription Agent from any Eligible Claimants do not correspond to the Aggregate Purchase Price payable for the New Equity Interests elected to be purchased by such Eligible Claimant, the number of the New Equity Interests deemed to be purchased by such Eligible Claimant will be the lesser of (a) the number of the New Equity Interests elected to be purchased by such Eligible Claimant and (b) a number of the New Equity Interests determined by dividing the amount of the funds received on account by the Per Share Purchase Price.

The cash paid to the Subscription Agent in accordance with these Rights Offering Procedures (and with respect to the Backstop Parties, the Backstop Commitment Agreement) will be deposited and held by the Subscription Agent in a segregated account held in an agreed upon financial institution until distributed in connection with the settlement of the Rights Offering on the Effective Date. The Subscription Agent may not use such cash for any other

purpose prior to the Effective Date and may not encumber or permit such cash to be encumbered with any lien or similar encumbrance. The cash held by the Subscription Agent hereunder shall not be deemed part of the Debtors' bankruptcy estates.

**6.      Transfer Restriction; Revocation**

The Subscription Rights are not detachable from the Allowed Claims and may not be sold, transferred, assigned, pledged, hypothecated, participated, donated or otherwise encumbered or disposed of, directly or indirectly (including through derivatives, options, swaps, forward sales or other transactions in which any person receives the right to own or acquire any current or future interest in the Subscription Rights, the New Equity Interests, the SLTL Claims and any related claims) (collectively, "*transfer* or "*transferred*"), except that an Eligible Claimant that is a party to the Backstop Commitment Agreement may transfer any portion or all of its Subscription Rights separate and independent from its Allowed Claim to a Related Fund (as defined in the Backstop Commitment Agreement).

Any transfer or assignment following the Subscription Record Date of the corresponding Allowed Claim (except, with respect to (i) the settlement of Allowed Claims held on the Subscription Record Date or (ii) Allowed Claims held by an Eligible Claimant that is a party to the Backstop Commitment Agreement in accordance with the Backstop Commitment Agreement) shall void the Subscription Right, and neither such Eligible Claimant nor the purported transferee will receive any New Equity Interests otherwise purchasable on account of such transferred Subscription Rights.

However, in connection with the exercise of the Subscription Rights, the person exercising such Subscription Rights shall have the right to designate the receipt of the New Equity Interests to another person that is a Related Fund, an Accredited Investor or a custodian (such person shall deliver an IRS Form W-9 or appropriate IRS Form W-8, as applicable) by completing Exhibit A to the Rights Offering Subscription Form. Any such designation and delivery of New Equity Interests shall be subject to compliance with applicable securities laws relating to the transfer of restricted securities.

Once an Eligible Claimant has properly exercised its Subscription Rights, subject to the terms and conditions of the Subscription Agreement and the Backstop Commitment Agreement in the case of any Backstop Party, such exercise will be irrevocable.

**7.      Return of Payment**

If the Rights Offering is not consummated, any cash paid to the Subscription Agent will be returned, without interest, to the applicable Eligible Claimant as soon as reasonably practicable, but in no event later than five Business Days after the date on which the Rights Offering is terminated.

**8.      Settlement of the Rights Offering and Distribution of the New Equity Interests**

The Debtors intend that the New Equity Interests will be issued on or as soon as practicable after the effective date of the Plan directly to the Eligible Claimants and/or to any Related Fund, Accredited Investor or custodian that an Eligible Claimant so designates in the Rights Offering Subscription Form in accordance with Section 6 above.

### 9. Fractional Shares

No fractional rights or New Equity Interests will be issued in the Rights Offering. All share allocations (including each Eligible Claimant's New Equity Interests) will be calculated and rounded down to the nearest whole share. No consideration shall be provided in lieu of fractional shares that are rounded down.

### 10. Validity of Exercise of Subscription Rights

All questions concerning the timeliness, viability, form, and eligibility of any exercise of Subscription Rights will be determined in good faith by the Debtors and, if necessary, subject to a final and binding determination by the Bankruptcy Court. The Debtors may waive or reject any defect or irregularity in, or permit such defect or irregularity to be corrected within such time as they may determine in good faith, the purported exercise of any Subscription Rights. Subscription Agreements will be deemed not to have been received or accepted until all irregularities have been waived or cured within such time as the Debtors determine in good faith.

*Before exercising any Subscription Rights, Eligible Claimants should read the Disclosure Statement and the Plan for information relating to the Debtors and the risk factors to be considered.*

### 11. Modification of Procedures

With the prior written consent of the Required Backstop Parties, the Debtors reserve the right to modify these Rights Offering Procedures, or adopt additional procedures consistent with these Rights Offering Procedures, to effectuate the Rights Offering and to issue the New Equity Interests; *provided*, *however*, that the Debtors shall provide prompt written notice to each Eligible Claimant of any material modification to these Rights Offering Procedures made after the Subscription Commencement Date. In so doing, and subject to the consent of the Required Backstop Parties, the Debtors may execute and enter into agreements and take further action that the Debtors determine in good faith are necessary and appropriate to effectuate and implement the Rights Offering and the issuance of the New Equity Interests. Nothing in this paragraph shall be construed so as to permit the Debtors to modify the terms of any executed and delivered Subscription Agreement without the consent of the Eligible Claimant that is a party thereto.

The Debtors may undertake procedures to confirm that each participant in the Rights Offering is in fact an Eligible Claimant, including, but not limited to, requiring additional certifications by such participant to that effect and other diligence measures, if any, as the Debtors deem reasonably necessary.

### 12. Inquiries and Transmittal of Documents; Subscription Agent

The Rights Offering Instructions attached hereto should be read carefully and strictly followed by the Eligible Claimants.

Questions relating to the Rights Offering should be directed to the Subscription Agent at the following phone numbers: 917-460-0913 (international) or 855-631-5346 (domestic, toll free) or via email to fieldwoodsubscription@primeclerk.com with "Fieldwood Energy Inc. Rights Offering" in the subject line.

The risk of non-delivery of all documents and payments to the Subscription Agent is on the Eligible Claimants electing to exercise its Subscription Rights and not the Debtors or the Subscription Agent.

# FIELDWOOD ENERGY INC.

## RIGHTS OFFERING INSTRUCTIONS FOR ELIGIBLE CLAIMANTS

**Terms used and not defined herein or in the Subscription Agreement shall have the meaning assigned to them in the Plan.**

**To elect to participate in the Rights Offering, you must follow the instructions set out below:**

1.   **Insert** the principal amount of the Allowed Claims that you held as of the Subscription Record Date in Item 1 of your Rights Offering Subscription Form.

2.   **Confirm** whether you are a Backstop Party pursuant to the representation in Item 3 of your Rights Offering Subscription Form.

3.   **Confirm** whether you are an Eligible Holder pursuant to the representation in Item 4 of your Rights Offering Subscription Form.

4.   **Complete** the calculation in Item 2a of your Rights Offering Subscription Form, which calculates the maximum number of New Equity Interests available for you to purchase. Such amount must be rounded down to the nearest whole share.

5.   **Complete** the calculation in Item 2b of your Rights Offering Subscription Form, which calculates the Aggregate Purchase Price for the New Equity Interests that you elect to purchase.

6.   **Complete** the wire refund information requested in Item 6, which will be used by the Subscription Agent in the event a refund is due.

7.   **Complete** Item 7 and provide the information needed for the registration of the New Equity Interests. If you are designating a Related Fund, other party that is an Accredited Investor or a custodian to receive any (or all) of your New Equity Interests, please complete Exhibit A to the Rights Offering Subscription Form.

8.   **Read, complete, and sign** the certification in Item 8 of your Rights Offering Subscription Form.

9.   **Read and countersign** the Subscription Agreement. Such execution shall indicate your acceptance and approval of the terms and conditions set forth therein.

10.  **Read, complete, and sign** an IRS Form W-9 if you are a U.S. person. If you are a non-U.S. person, read, complete, and sign an appropriate IRS Form W-8. These forms may be obtained from the IRS at its website: www.irs.gov.

11.  **Return** your signed Subscription Agreement and Rights Offering Subscription Form

(with accompanying IRS Form W-9 or appropriate IRS Form W-8, as applicable) to the Subscription Agent prior to the Subscription Expiration Deadline either via email (in PDF or other standard format) to fieldwoodsubscription@primeclerk.com or to the following physical address via first class mail, hand delivery, or overnight mail:

**Fieldwood Energy Inc. Rights Offering Processing**
**c/o Prime Clerk, LLC**
**830 Third Avenue, 3rd Floor**
**New York, NY 10022**

12.     **Arrange for full payment** of the Aggregate Purchase Price by wire transfer of immediately available funds, calculated in accordance with Item 5 of your Rights Offering Subscription Form. An Eligible Claimant that is not a Backstop Party should follow the payment instructions as provided in the Rights Offering Subscription Form. An Eligible Claimant that is a Backstop Party should follow the payment instructions in the written notice delivered by the Debtors to the Backstop Parties in accordance with the Backstop Commitment Agreement (a "***Backstop Funding Notice***").

**The Subscription Expiration Deadline is 5:00 p.m. New York City Time on March 14, 2018.**

**Eligible Claimants that are not Backstop Parties should follow the delivery and payment instructions provided in the Rights Offering Subscription Form. Eligible Claimants that are Backstop Parties should follow the payment instructions in the Backstop Funding Notice.**

**Eligible Claimants that are not Backstop Parties must deliver the appropriate funding directly to the Subscription Agent no later than the Subscription Expiration Deadline. Eligible Claimants that are Backstop Parties must deliver the appropriate funding directly to the Subscription Agent no later than the Backstop Funding Deadline.**

**FIELDWOOD ENERGY INC.**

_____

**SUBSCRIPTION AGREEMENT**

_____

## NOTICES

THIS SUBSCRIPTION AGREEMENT (THE "<u>AGREEMENT</u>") HAS BEEN PREPARED ON A CONFIDENTIAL BASIS SOLELY FOR THE BENEFIT OF ELIGIBLE CLAIMANTS (AS DEFINED HEREIN) IN CONNECTION WITH THE RIGHTS OFFERING BY FIELDWOOD ENERGY INC. (THE "ISSUER") PURSUANT TO THE JOINT PREPACKAGED CHAPTER 11 PLAN OF REORGANIZATION OF FIELDWOOD ENERGY LLC AND ITS AFFILIATED DEBTORS, FILED WITH THE BANKRUPTCY COURT ON [•], 2018 [BCR NO. [•]] (AS MAY BE AMENDED, MODIFIED OR SUPPLEMENTED FROM TIME TO TIME, THE "PLAN"). ANY REPRODUCTION OR DISTRIBUTION OF THIS AGREEMENT OR RETRANSMITTAL OF ITS CONTENTS, IN WHOLE OR IN PART, WITHOUT THE PRIOR WRITTEN CONSENT OF THE ISSUER IS PROHIBITED.

IN MAKING AN INVESTMENT DECISION, INVESTORS MUST RELY ON THEIR OWN EXAMINATION OF THE ISSUER AND THE TERMS OF THE OFFERING, INCLUDING THE MERITS AND RISKS INVOLVED. THESE SECURITIES HAVE NOT BEEN RECOMMENDED, APPROVED OR DISAPPROVED BY THE SECURITIES AND EXCHANGE COMMISSION (THE "SEC"), ANY STATE SECURITIES COMMISSION OR ANY OTHER REGULATORY AUTHORITY. NONE OF THE FOREGOING AUTHORITIES HAVE PASSED UPON, OR ENDORSED THE MERITS OF, THIS OFFERING OR THE ACCURACY OR ADEQUACY OF THE DISCLOSURE STATEMENT WITH RESPECT TO THE PLAN AND ALL EXHIBITS AND SCHEDULES THERETO AND REFERENCES THEREIN THAT RELATE TO THE PLAN, THAT IS PREPARED AND DISTRIBUTED IN ACCORDANCE WITH THE BANKRUPTCY CODE, THE BANKRUPTCY RULES, AND ANY OTHER APPLICABLE LAW (THE "DISCLOSURE STATEMENT"). ANY REPRESENTATION TO THE CONTRARY IS A CRIMINAL OFFENSE.

THE SECURITIES REFERRED TO HEREIN HAVE NOT BEEN REGISTERED WITH THE SEC UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE "SECURITIES ACT") 15 U.S.C. §§ 77A-77AA, OR ANY SIMILAR FEDERAL, STATE OR LOCAL LAW. THE SECURITIES WILL BE OFFERED AND SOLD PURSUANT TO THE EXEMPTION FROM REGISTRATION SET FORTH IN SECTION 4(A)(2) OF THE SECURITIES ACT AND/OR REGULATION D THEREUNDER AND IN COMPLIANCE WITH ANY APPLICABLE STATE OR NON-U.S. SECURITIES LAWS PURSUANT TO REGISTRATION OR EXEMPTION THEREFROM. THIS AGREEMENT IS NOT AN OFFER TO SELL TO OR A SOLICITATION OF AN OFFER TO BUY FROM, NOR WILL ANY SECURITIES BE OFFERED OR SOLD TO, ANY PERSON IN ANY JURISDICTION IN WHICH SUCH OFFER, SOLICITATION, PURCHASE OR SALE WOULD BE UNLAWFUL UNDER THE SECURITIES LAWS OF SUCH JURISDICTION.

NONE OF THE ISSUER OR ANY DEBTOR MAKES ANY REPRESENTATION TO ANY OFFEREE OR PURCHASER OF THE SECURITIES REGARDING THE LEGALITY OF AN INVESTMENT THEREIN BY SUCH OFFEREE OR PURCHASER UNDER APPLICABLE LEGAL INVESTMENT OR SIMILAR LAWS.

PROSPECTIVE INVESTORS SHOULD NOT CONSTRUE THE CONTENTS OF THIS AGREEMENT, THE DISCLOSURE STATEMENT OR ANY PRIOR OR SUBSEQUENT

COMMUNICATIONS FROM THE ISSUER OR ANY OF ITS AGENTS, OFFICERS OR REPRESENTATIVES, AS LEGAL OR TAX ADVICE. EACH OFFEREE SHOULD CONSULT ITS OWN ADVISORS AS TO LEGAL, TAX AND RELATED MATTERS CONCERNING AN INVESTMENT IN THE ISSUER.

THIS INVESTMENT INVOLVES A HIGH DEGREE OF RISK, INCLUDING BUT NOT LIMITED TO, SUCH RISKS LISTED UNDER THE HEADING "CERTAIN RISK FACTORS TO BE CONSIDERED" IN THE DISCLOSURE STATEMENT. IT IS SPECULATIVE AND SUITABLE ONLY FOR PERSONS WHO HAVE SUBSTANTIAL FINANCIAL RESOURCES AND HAVE NO NEED FOR LIQUIDITY IN THIS INVESTMENT. FURTHER, THIS INVESTMENT SHOULD ONLY BE MADE BY THOSE WHO UNDERSTAND OR HAVE BEEN ADVISED WITH RESPECT TO THE TAX CONSEQUENCES OF AND RISK FACTORS ASSOCIATED WITH THE INVESTMENT AND WHO ARE ABLE TO BEAR THE SUBSTANTIAL ECONOMIC RISK OF THE INVESTMENT FOR AN INDEFINITE PERIOD OF TIME. THEREFORE, INVESTORS SHOULD BE AWARE THAT THEY MAY BE REQUIRED TO RETAIN OWNERSHIP OF THE SECURITIES AND TO BEAR THE FINANCIAL RISKS OF THIS INVESTMENT FOR AN INDEFINITE PERIOD OF TIME.

## SUBSCRIPTION AGREEMENT

This Subscription Agreement (this "<u>Agreement</u>"), by and between Fieldwood Energy Inc., a Delaware corporation (the "<u>Issuer</u>"), as contemplated by the Joint Prepackaged Chapter 11 Plan of Reorganization of Fieldwood Energy LLC and its Affiliated Debtors, filed with the Bankruptcy Court (as defined below) on [•], 2018 [BCR No. [•]] (as it may be amended, modified or supplemented from time to time, the "<u>Plan</u>"), and the undersigned (the "<u>Subscriber</u>"), shall be deemed executed as of the date the Issuer executes a counterpart to this Agreement previously executed by the Subscriber.

WHEREAS, the Debtors have filed petitions commencing voluntary cases (the "<u>Chapter 11 Cases</u>") under chapter 11 of Title 11 of the United States Code (the "<u>Bankruptcy Code</u>") with the United States Bankruptcy Court for the Southern District of Texas (the "<u>Bankruptcy Court</u>");

WHEREAS, the Issuer will offer and sell the New Equity Interests (as defined below) issued pursuant to the Rights Offering;

WHEREAS, capitalized terms used but not otherwise defined herein have the meanings set forth in <u>Section</u> 8 hereof or the Rights Offering Procedures;

WHEREAS, the Debtors submitted a Disclosure Statement to certain holders of claims against the Debtors in connection with the solicitation of acceptances of the Plan;

WHEREAS, pursuant to the Plan and the Rights Offering Procedures, each Eligible Claimant will be granted Subscription Rights (as defined below) entitling such Eligible Claimant to purchase one (1) New Equity Interest per $75.41 of Allowed Claims, as calculated in accordance with Item 2a of the Subscriber's Rights Offering Subscription Form;

WHEREAS, the Subscriber has certified that it is an Eligible Claimant as set forth in Items 1 and 4 of the Subscriber's Rights Offering Subscription Form; and

WHEREAS, the Subscriber wishes to subscribe to purchase New Equity Interests as set forth herein on the terms and subject to the conditions of, and in accordance with, the Plan, the Rights Offering Procedures, the Backstop Commitment Agreement and this Agreement.

NOW, THEREFORE, in consideration of the premises and the mutual agreements and covenants herein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Subscriber and the Issuer hereby represent and agree as follows:

1. <u>SUBSCRIPTION</u>.

(a) The Subscriber on behalf of itself or a Related Fund, severally and not jointly, hereby agrees to subscribe for that number of New Equity Interests set forth in Item 2b of the Subscriber's Rights Offering Subscription Form (the "<u>New Equity Interests</u>").

1

(b)     If the Subscriber or a Related Fund is not a Backstop Party (or a Permitted Transferee (as defined in the Backstop Agreement)), the Subscriber will (i) return this Agreement and the Rights Offering Subscription Form no later than the Subscription Expiration Deadline and (ii) pay directly to the Subscription Agent the Aggregate Purchase Price for such New Equity Interests set forth in Item 2b of the Subscriber's Rights Offering Subscription Form, at the time it returns this Agreement to the Subscription Agent, but in no event later than the Subscription Expiration Deadline, by wire transfer only of immediately available funds in accordance with the instructions included in Item 5 of the Subscriber's Rights Offering Subscription Form.  No interest shall be payable under any circumstances on any such payment of the Aggregate Purchase Price.

(c)     If the Subscriber or a Related Fund is a Backstop Party (or a Permitted Transferee), the Subscriber will (i) return this Agreement and the Rights Offering Subscription Form and (ii) pay directly to the Subscription Agent the Aggregate Purchase Price for such New Equity Interests set forth in Item 2b of the Subscriber's Rights Offering Subscription Form in no event later than the deadline and pursuant to the terms and conditions set forth in the Backstop Commitment Agreement by wire transfer only of immediately available funds in accordance with the instructions included in Item 5 of the Rights Offering Subscription Form. No interest shall be payable under any circumstances on any such payment of the Aggregate Purchase Price.

(d)     In the event that the funds received by the Subscription Agent from (i) any Eligible Claimant that is not a Backstop Party do not correspond to the Aggregate Purchase Price payable for the New Equity Interests elected to be purchased by such Eligible Claimant (as set forth in Item 2b of the Subscriber's Rights Offering Subscription Form), the number of New Equity Interests deemed to be purchased by such Eligible Claimant will be the lesser of (i) the number of New Equity Interests elected to be purchased by such Eligible Claimant (set forth in Item 2b of the Subscriber's Rights Offering Subscription Form) and (ii) a number of New Equity Interests determined by dividing the amount of the funds received or deemed to be received by the Per Share Purchase Price.

(e)     If the amount the Subscriber may purchase is reduced pursuant to Section 1(d) hereof, the Subscription Agent will return any funds received by it in excess of the reduced purchase price upon settlement of the Rights Offering.

(f)     Subject to the conditions specified in Section 6, the closing of the issuance of the New Equity Interests contemplated by this Agreement (the "Closing") will take place on the Effective Date pursuant to the Plan.  The date on which the Closing occurs is the "Closing Date."

(g)     In the event the Rights Offering is terminated, any Rights Offering funds shall be returned, without interest, to the Subscriber in accordance with the Rights Offering Procedures, within five Business Days after the date on which the Rights Offering is terminated.

2

2.    REPRESENTATIONS AND WARRANTIES OF THE ISSUER.

The Issuer represents and warrants to the Subscriber as of the date hereof as follows:

(a)    The Issuer is, as of the date hereof, and will be as of the Effective Date, duly organized and validly existing under the laws of the state of Delaware.

(b)    Subject to the entry of the Confirmation Order and occurrence of the Closing, (i) the Issuer will have the requisite corporate power and authority to execute and deliver this Agreement, (ii) the Issuer will have duly authorized all requisite corporate action with respect to this Agreement and the consummation of the transactions contemplated hereby and (iii) this Agreement will have been duly and validly executed and delivered by the Issuer and will constitute the valid and binding obligations of the Issuer, enforceable against such party in accordance with its terms.

(c)    The New Equity Interests, when issued in accordance with the provisions hereof and the Confirmation Order, will be validly issued by the Issuer, and will represent fully paid and nonassessable shares of the Issuer.

(d)    Except for the representations and warranties contained in this Section 2, none of the Issuer nor any other Person makes any express or implied representation or warranty with respect to the Debtors or the Issuer or any other information provided to the Subscriber. None of the Issuer nor any other Person will have or be subject to any liability or indemnification obligation to the Subscriber or any other Person resulting from the distribution to the Subscriber, or use by the Subscriber of, any such information, documents, projections, forecasts or other material made available to the Subscriber.

3.    REPRESENTATIONS AND WARRANTIES OF THE SUBSCRIBER.

The Subscriber represents and warrants to the Issuer, as applicable, on behalf of itself or a Related Fund, severally and not jointly, as of the date hereof as follows:

(a)    The Subscriber is a holder of Allowed Claims of the aggregate amount of Allowed Claims set forth in Item 1 of the Subscriber's Rights Offering Subscription Form as of the date hereof.

(b)    The Subscriber and, if applicable, the relevant Related Fund is an Accredited Investor within the meaning of Rule 501(a) promulgated under Regulation D of the Securities Act of 1933, as it has so certified in Item 4 of the Subscriber's Rights Offering Subscription Form as of the date hereof.

3

(c)     The Subscriber has the requisite corporate or other applicable power and authority to execute and deliver this Agreement and the Rights Offering Subscription Form and to perform its obligations hereunder and thereunder.  This Agreement and the consummation by the Subscriber of the transactions contemplated hereby have been duly authorized by all requisite action.  This Agreement has been duly and validly executed and delivered by the Subscriber and constitutes the valid and binding obligation of the Subscriber, enforceable against the Subscriber in accordance with its terms (subject to applicable bankruptcy, insolvency, fraudulent transfer, reorganization, moratorium and other laws affecting creditors' rights generally and general principles of equity).  Except to the extent the Subscriber is an individual, the Subscriber is a validly existing entity under the laws of the jurisdiction of its incorporation or formation.

(d)     Except as provided under applicable securities laws and subject to the conditions contained in Section 6, this subscription is and shall be irrevocable, except that the Subscriber or Related Fund shall have no obligation hereunder if this Agreement is for any reason rejected, the Rights Offering is for any reason cancelled or this Agreement is terminated pursuant to Section 7.

(e)     No third-party consents or approvals (including governmental consents or approvals) are required to be obtained, made or given in order to permit the Subscriber to execute and deliver this Agreement and to perform its obligations hereunder except for any that will be obtained, made or given on or before the Closing Date or as would not reasonably be expected to have, individually or in the aggregate, a material adverse effect on the Subscriber's ability to consummate the transactions contemplated by this Agreement;

(f)     Neither the execution and delivery of this Agreement by the Subscriber nor the consummation of any of the transactions contemplated hereby will violate or conflict with, or result in a breach of, or constitute a default under (whether upon notice or the passage of time or both) any (i) contract to which the Subscriber is a party or (ii) applicable laws, regulations, orders, judgments and decrees to which the Subscriber is subject, in each case with only such exceptions as would not reasonably be expected to have, individually or in the aggregate, a material adverse effect on the Subscriber's ability to consummate the transactions contemplated by this Agreement;

(g)     The Subscriber is not relying upon any information, representation or warranty by the Debtors or the Issuer, other than as set forth in this Agreement.  The Subscriber has consulted, to the extent deemed appropriate by the Subscriber, with the Subscriber's own advisors as to the financial, tax, legal and related matters concerning an investment in the New Equity Interests and on that basis believes that an investment in the New Equity Interests is suitable and appropriate for the Subscriber.

(h)     The Subscriber is not a party to any contract with any Person (other than, if applicable, the Backstop Commitment Agreement, the RSA, and all other agreements to which it will be a party as contemplated by any of the foregoing agreements or the Plan or Plan Supplement and any contract giving rise to the expense reimbursement thereunder) that would

4

give rise to a valid Claim against the Debtors for a brokerage commission, finder's fee or like payment in connection with the Subscriber's investment in the Issuer.

(i)     The Subscriber or the relevant Related Fund is acquiring the New Equity Interests for its own account with the present intention of holding such securities for purposes of investment, and it has no intention of selling such securities in a public distribution in violation of the federal securities laws or any applicable state securities laws.

(j)     The Subscriber or a Related Fund is not purchasing the New Equity Interests as a result of any advertisement, article, notice or other communication regarding the New Equity Interests published in any newspaper, magazine or similar media or broadcast over television or radio or presented at any seminar or, to Subscriber's or a Related Fund's knowledge, any other general solicitation or general advertisement. Neither the Subscriber nor its affiliates or any person acting on its or any of their behalf has engaged, or will engage, in any form of general solicitation or general advertising (within the meaning of Rule 502(c) under the Securities Act) in connection with the offering of the New Equity Interests in violation of the federal securities laws or any applicable state securities laws.

(k)     No brokerage or finder's fees or commissions are or will be payable by the Subscriber or a Related Fund to any broker, financial advisor or consultant, finder, placement agent, investment banker, bank or other person with respect to the issuance of the New Equity Interests, and the Subscriber has not taken any action that could cause the Issuer to be liable for any such fees or commissions.

(l)     *Legend*. Each certificate representing any New Equity Interests shall be stamped or otherwise imprinted with a legend in substantially the following form:

> "THE SECURITIES REPRESENTED BY THIS CERTIFICATE WERE ORIGINALLY ISSUED ON [DATE OF ISSUANCE], HAVE NOT BEEN REGISTERED UNDER THE UNITED STATES SECURITIES ACT OF 1933, AS AMENDED (THE "*ACT*"), OR ANY OTHER APPLICABLE STATE SECURITIES LAWS, AND MAY NOT BE SOLD OR TRANSFERRED IN THE ABSENCE OF AN EFFECTIVE REGISTRATION STATEMENT UNDER THE ACT OR AN AVAILABLE EXEMPTION FROM REGISTRATION THEREUNDER."

4.     <u>SUBSCRIBER ACKNOWLEDGMENTS</u>.

The Subscriber on behalf of itself or a Related Fund further acknowledges, severally and not jointly, the following as of the date hereof and as of the Closing Date:

(a)     The New Equity Interests purchased pursuant hereto will be initially issued in the name of the Subscriber, a Related Fund or other person that is an Accredited Investor or a custodian, as indicated on the Subscriber's Rights Offering Subscription Form.

(b)     No federal or state agency has made or will make any finding or determination as to the adequacy or accuracy of any information provided to the Subscriber in connection with its consideration of its investment in the New Equity Interests or as to the fairness of the Rights Offering for investment, nor any recommendation or endorsement of the New Equity Interests, except that the Bankruptcy Court has approved the Disclosure Statement. The Subscriber further understands that the New Equity Interests have not been registered under the Securities Act nor qualified under any state securities laws.

(c)     The Subscriber has read and understands this Agreement, the Plan, the Plan Supplement, the Disclosure Statement and the Rights Offering Subscription Form and understands the terms and conditions herein and therein and the risks associated with the Issuer and its business as described in the Disclosure Statement. The Subscriber has, to the extent deemed necessary by the Subscriber, discussed with legal counsel the representations, warranties and agreements that the Subscriber is making herein.

(d)     The Subscriber understands and acknowledges that all calculations, including, to the extent applicable, the calculation of (i) the value of the Subscriber's or any other Eligible Claimant's Allowed Claim or (ii) the Subscriber's or any other Eligible Holder's allocation of New Equity Interests, shall be made in good faith by the Issuer and in accordance with the Rights Offering Procedures and any Allowed Claim amounts included in the Plan, and any disputes regarding such calculations shall be subject to a final and binding determination by the Bankruptcy Court.

(e)     The Disclosure Statement contains financial projections.   The Subscriber acknowledges (i) the limitations and uncertainties inherent in financial projections and that they are not any guarantee or assurance of future performance and (ii) that it is prepared for the substantial economic risks involved in the purchase of the New Equity Interests, including the total loss of its investment. The Debtors are not under any duty to, and will not, update the projections or the risk factors included in the Disclosure Statement prior to or after the Closing Date.

5.     <u>SUBSCRIBER COVENANTS</u>

(a)     The foregoing representations, warranties and acknowledgements of the Subscriber, on behalf of itself or a Related Fund, in <u>Sections 3</u> and <u>4</u> are and will be true on the date hereof and as of the Closing Date, will survive delivery of this Agreement and will not survive the earlier of the Closing or the termination of this Agreement in accordance with its terms. If any of such representations, warranties and acknowledgements is not true prior to acceptance of this Agreement by the Issuer or prior to the Closing Date, the Subscriber will give written notice as promptly as reasonably practicable of such fact to the Issuer, specifying which such representations and warranties are not true and the reasons therefor.

(b)     Except for the representations, warranties and acknowledgements contained in Sections 3 and 4, each of the Subscriber or a Related Fund does not make any express or implied representation, warranty or acknowledgment with respect to the Subscriber or any Related Fund.

6.      CONDITIONS TO CLOSING.

(a)     Conditions to Each Party's Obligations.  The respective obligations of the Subscriber and the Issuer to consummate the transactions contemplated by this Agreement are subject to:

(i)      the Plan's confirmation by the Bankruptcy Court; and

(ii)     the occurrence of the Effective Date substantially contemporaneous with the closing of the transactions hereunder.

(b)     Conditions to Obligations of the Issuer.  The obligations of the Issuer to consummate the transactions contemplated by this Agreement with the Subscriber are subject to the satisfaction or waiver, at or prior to the Closing, of the following conditions:

(i)      all representations, warranties and acknowledgments of the Subscriber in Sections 3 and 4 of this Agreement must be true and correct in all material respects on the Closing Date; and

(ii)     compliance by the Subscriber with the Rights Offering Procedures governing the Rights Offering, including payment by the Subscriber of the Aggregate Purchase Price.

(c)     Conditions to Obligations of the Subscriber.  The obligations of the Subscriber to consummate the transactions contemplated by this Agreement are subject to the satisfaction or waiver, at or prior to the Closing, of the following condition:

(i)      all representations and warranties of the Issuer in Section 2 of this Agreement must be true and correct in all material respects on the Closing Date.

7.      TERMINATION.

Unless the Closing has occurred, this Agreement will terminate automatically and without any further action by any party hereto upon the earlier of (i) termination of the Plan, (ii) termination of the RSA in accordance with its terms, and (iii) termination of the Backstop Commitment Agreement in accordance with its terms.  The Issuer may terminate this Agreement upon written notice to the Subscriber (if it is not a Backstop Party) in the event that the Subscriber has not paid its Aggregate Purchase Price by the Subscription Expiration Deadline. In the event this Agreement is terminated, the Subscription Agent shall return any payments received pursuant to Section 1 of this Agreement, without interest, to the Subscriber

as promptly as reasonably practicable, but in any event, within five (5) Business Days after the date of termination.

This <u>Section 7</u> and <u>Section 9</u> shall survive termination of this Agreement.

8.      INTERPRETATION OF THIS AGREEMENT.

(a)      <u>Terms Defined</u>.  As used in this Agreement, the following terms have the respective meanings set forth below:

"<u>Eligible Claimant</u>": Any Eligible Holder that, with respect to an Eligible Claim, holds or beneficially owns such Allowed Claim.

"<u>Eligible Holder</u>": Any holder of SLTL Claims (as defined in the Backstop Commitment Agreement) that is an Accredited Investor and makes the Subscriber representations and warranties included in this Agreement.

"<u>Person</u>": Has the meaning set forth in section 101(41) of the Bankruptcy Code.

"<u>Per Share Purchase Price</u>": $23.33 per share.

"<u>Rights Offering Subscription Form</u>": The subscription form to be completed by Eligible Claimants pursuant to the Rights Offering Procedures.

"<u>Related Fund</u>": With respect to the Subscriber, any fund, account or investment vehicle that is controlled, managed, advised or sub-advised by (a) the Subscriber, (b) an Affiliate of the Subscriber or (c) the same investment manager, advisor or subadvisor as the Subscriber or an Affiliate of such investment manager, advisor or subadvisor, in each case, which has been designated by the Subscriber to receive the New Equity Interests pursuant to Exhibit A of the Rights Offering Subscription Form.

"<u>Subscription Rights</u>": The non-certificated subscription rights to purchase New Equity Interests in connection with the Rights Offering on the terms and subject to the conditions set forth in the Plan, the Plan Supplement, the Rights Offering Procedures and this Agreement.

"<u>Subscription Agent</u>": Prime Clerk LLC, or any other entity designated as such by the Issuer, in its capacity as a subscription agent in connection with the Rights Offering.

"<u>Subscription Expiration Deadline</u>": 5:00 p.m. New York City Time on March 14, 2018, the date by which the properly completed Agreement and the Aggregate Purchase Price will be required to be delivered to the Subscription Agent as provided in the Rights Offering Subscription Form.

(b)     _Directly or Indirectly_.  Where any provision in this Agreement refers to action to be taken by any Person, or which such Person is prohibited from taking, such provision will be applicable whether such action is taken directly or indirectly by such Person.

(c)     _Governing Law; Jurisdiction_.  THIS AGREEMENT, AND ALL CLAIMS ARISING OUT OF OR RELATING THERETO, WILL BE GOVERNED AND CONSTRUED IN ACCORDANCE WITH THE INTERNAL LAWS OF THE STATE OF NEW YORK WITHOUT REGARD TO ITS CONFLICTS OF LAW PRINCIPLES.  THE SUBSCRIBER HEREBY IRREVOCABLY SUBMITS TO THE JURISDICTION OF, AND VENUE IN, THE UNITED STATES BANKRUPTCY COURT FOR THE SOUTHERN DISTRICT OF TEXAS, AND WAIVES ANY OBJECTION BASED ON _FORUM NON CONVENIENS_.

(d)     _Section Headings_.  The headings of the sections and subsections of this Agreement are inserted for convenience only and shall not be deemed to constitute a part thereof.

(e)     _Construction_.  This Agreement has been freely and fairly negotiated between the parties.  If an ambiguity or question of intent or interpretation arises, this Agreement will be construed as if drafted jointly by the parties and no presumption or burden of proof will arise favoring or disfavoring any party because of the authorship of any provision of this Agreement.  The words "include", "includes", and "including" will be deemed to be followed by "without limitation."  Pronouns in masculine, feminine and neuter genders will be construed to include any other gender, and words in the singular form will be construed to include the plural and vice versa, unless the context otherwise requires.  The words "this Agreement", "herein", "hereof", "hereby", "hereunder" and words of similar import refer to this Agreement as a whole and not to any particular subdivision unless expressly so limited.

9.     _MISCELLANEOUS_.

(a)     _Notices_.

(i)     The Subscriber acknowledges that a completed and signed copy of this Agreement, the Rights Offering Subscription Form, together with payment of the Aggregate Purchase Price (except in the case of a Backstop Party), must be received by the Subscription Agent in accordance with the instructions included herewith by the Subscription Expiration Deadline for the subscription contemplated hereby to be valid.

(ii)     Except as otherwise provided in this Agreement, following execution of this Agreement, all demands, notices, requests, consents and other communications under this Agreement must be in writing (which may be by e-mail, facsimile or other electronic means), sent to all of the notice parties set forth below and deemed given on the same Business Day when delivered if between 8:00 a.m. to 8:00 p.m. New York City Time, or otherwise the next Business Day, at the addresses and facsimile numbers set forth below:

(A)     if to the Subscriber, at its address, e-mail address or facsimile number shown on the Rights Offering Subscription Form, or at such other address or

9

facsimile number as the Subscriber may have furnished the Issuer and the Subscription Agent in writing; and

(B)  if to the Issuer, at (or at such other address, e-mail address or facsimile number as it may have furnished in writing to the Subscriber):

> Fieldwood Energy Inc.
> c/o Fieldwood Energy LLC
> 2000 W. Sam Houston Parkway S., Suite 1200
> Houston, Texas 77042
> Attention:  Michael Dane
> Email: MDane@fwellc.com

with a copy to (which shall not constitute notice):

> Weil, Gotshal & Manges LLP
> 767 Fifth Avenue
> New York, NY 10153
> Attention:  Matt Barr, Esq.
>                 (Matt.Barr@weil.com)
>                 Frank Adams, Esq.
>                 (Frank.Adams@weil.com)

(b)  Expenses and Taxes.  The Issuer will pay, and hold the Subscriber harmless from any and all liabilities (including interest and penalties) with respect to, or resulting from any delay or failure in paying, stamp and other similar taxes (other than income taxes), if any, which may be payable or determined to be payable on the execution and delivery of this Agreement or acquisition of the New Equity Interests pursuant to this Agreement.

(c)  Reproduction of Documents.  This Agreement and all documents relating hereto may not be reproduced or distributed by the Subscriber without the prior written consent of the Issuer.

(d)  Assignment; Successors.  This Agreement is not assignable by the Subscriber without the prior written consent of the Issuer.  This Agreement and the rights, powers and duties set forth herein will inure to the benefit of and be binding upon the successors and permitted assigns of each of the parties.

(e)  Entire Agreement; Amendment and Waiver.  This Agreement constitutes the entire understanding of the parties hereto and supersedes all prior understandings among such parties with respect to the matters covered herein (other than the RSA, the Plan and Backstop Commitment Agreement).  This Agreement may be amended, and

the observance of any term of this Agreement may be waived, with (and only with) the written consent of the Issuer and the Subscriber.

(f)     Severability.  If any provision of this Agreement or the application of such provision to any Person or circumstance is held to be invalid by any court of competent jurisdiction, the remainder of this Agreement or the application of such provision to Persons or circumstances other than those to which it is held invalid will not be affected thereby.

(g)     Counterparts; Facsimile and PDF Signatures.  This Agreement may be executed in one or more counterparts, each of which will be deemed an original and all of which together will be considered one and the same agreement.  The exchange of copies of this Agreement and of signature pages by facsimile or portable document format (PDF) transmission shall constitute effective execution and delivery of this Agreement as to the parties hereto and may be used in lieu of the original Agreement for all purposes.  Signatures of the parties hereto transmitted by facsimile or PDF shall be deemed to be their original signatures for all purposes.

[REMAINDER OF THIS PAGE INTENTIONALLY LEFT BLANK]

Please indicate your acceptance and approval of the foregoing in the space provided below.

ACCEPTED AND APPROVED

as of the____day of_____, 2018

SUBSCRIBER: _____
(Please provide full legal name)

Signature: _____

Name of Signatory: _____

Title: _____

If Backstop Party, check here ☐

Address: _____

City:_____State: _____

Postal Code: _____

Country: _____

Telephone:_____Facsimile: _____

Email Address: _____

If U.S. person, check here and attach IRS Form W-9: ☐ U.S. person

If Non-U.S. person, check here and attach appropriate IRS Form W-8: ☐ Non-U.S. person

ACCEPTED AND APPROVED

as of the____day of_____, 2018

FIELDWOOD ENERGY INC.

_____
Name:
Title:

# FIELDWOOD ENERGY INC.

## RIGHTS OFFERING SUBSCRIPTION FORM FOR USE BY ELIGIBLE CLAIMANTS FOR THE RIGHTS OFFERING IN CONNECTION WITH THE JOINT PREPACKAGED PLAN OF REORGANIZATION OF FIELDWOOD ENERGY LLC AND ITS AFFILIATED DEBTORS

---

### SUBSCRIPTION EXPIRATION DEADLINE

**The Subscription Expiration Deadline is 5:00 p.m. New York City Time on March 14, 2018.**

**Please note that your Rights Offering Subscription Form (with accompanying IRS Form W-9 or appropriate IRS Form W-8, as applicable) and Subscription Agreement must be received by the Subscription Agent along with a wire transfer of the Aggregate Purchase Price (with respect to Eligible Claimants (as defined below) that are not Backstop Parties) to the Subscription Agent by the Subscription Expiration Deadline or the subscription represented by your Rights Offering Subscription Form will not be counted and will be deemed forever relinquished and waived.**

**Eligible Claimants that are Backstop Parties must deliver the appropriate funding directly to the Subscription Agent by the deadline specified in the Backstop Commitment Agreement (the "Backstop Funding Deadline").**

**The New Equity Interests are being distributed and issued without registration under the Securities Act, nor any State or local law requiring registration for offer or sale of a security, pursuant to the exemption set forth in Section 4(a)(2) of the Securities Act and/or Regulation D thereunder and in compliance with any applicable State or local laws pursuant to registration or exemption therefrom, and no New Equity Interests may be sold or transferred except pursuant to an effective registration statement or exemption from registration under the Securities Act or the securities laws of any State.**

**Please consult the Plan, the Disclosure Statement, the Subscription Agreement, the Rights Offering Procedures and the Rights Offering Instructions for additional information with respect to this Rights Offering Subscription Form.**

**The record date for the Rights Offering is February 22, 2018 (the "Subscription Record Date").**

**Terms used and not defined herein shall have the meaning assigned to them in the Rights Offering Procedures.**

---

Each Eligible Claimant is entitled to subscribe for one (1) New Equity Interests per $75.41 of Allowed Claims, subject to the individual limits included in the calculations in Item 2. To subscribe, fill out Items 1, 2a, 2b, 3 (if applicable), 4, 6, and 7 and read, complete and sign Item 8 below. In addition, each Eligible Claimant must complete Exhibit A (if applicable).

If an Eligible Claimant wishes to have the New Equity Interests issued in the name of a (i) Related Fund, (ii) designated party that is an Accredited Investor and designated in accordance with the securities laws, or (iii) custodian (or a party serving in such similar role as custodian), such Eligible Claimant shall complete Exhibit A hereto.

"Related Fund" has the meaning set forth in the Subscription Agreement.

## Item 1.  Amount of Claim.

The undersigned certifies that the undersigned holds or beneficially owns Allowed Claims in the following amount as of the date hereof (insert amount on the lines below) or that the undersigned is the authorized signatory of such Person. The undersigned must complete the certificate attached hereto as Exhibit C and, for these purposes, the undersigned holds or beneficially owns only those Allowed Claims that are properly reflected in Item 4 of Exhibit C hereto.

*Insert amount of Allowed Claims held as of the Subscription Record Date*

$_____

## Item 2.  Rights.

**2a. Calculation of Maximum Number of New Equity Interests**. The maximum number of New Equity Interests for which you may subscribe is calculated as follows:

| _____<br>(Insert Allowed Claims Amount from Item 1 above) | / | 75.41 | = | _____<br>(Maximum Number of New Equity Interests) (Round down to nearest whole number) |
|---|---|---|---|---|

**2b. Aggregate Purchase Price**. By filling in the following blanks, you are indicating that the undersigned Eligible Claimant is interested in purchasing the number of New Equity Interests specified below (specify a number of New Equity Interests, which is not greater than the Maximum Number of New Equity Interests calculated in Item 2a above), on the terms and subject to the conditions set forth in the Subscription Agreement and the Rights Offering Procedures.

2

| _____ (Indicate number of New Equity Interests you elect to purchase) | X | $23.33 | = | $_____ Aggregate Purchase Price |
|---|---|---|---|---|

## Item 3.  Backstop Party Representation.
(*This section is only for Backstop Parties, each of whom is aware of their status as a Backstop Party*).

☐     The undersigned or a Related Fund is a Backstop Party identified in the Backstop Commitment Agreement dated as of February 14, 2018 among Fieldwood Holdings LLC ("Fieldwood"), certain of Fieldwood's subsidiaries, and the Backstop Parties party thereto.

## Item 4.  Eligible Holder Representation.
(*This section is for all parties who wish to participate in the Rights Offering*).

☐     The undersigned and any Related Fund whom the undersigned has designated to receive the New Equity Interests pursuant to Exhibit A hereto, as applicable, is an Eligible Holder (as defined in the Rights Offering Procedures), meaning that such holder (i) has reviewed the definition of Accredited Investor annexed hereto as Exhibit B and is an Accredited Investor within the meaning of Rule 501(a) promulgated under Regulation D of the Securities Act of 1933 and (ii) has made the representations set forth in the Subscription Agreement.

## Item 5.  Payment and Delivery Instructions

Eligible Claimants that did not check the box in Item 3, must submit payment of the Aggregate Purchase Price calculated pursuant to Item 2b to the Subscription Agent by wire transfer ONLY in accordance with the following wire instructions:

*Domestic wire*:

| **Account Name :** | Fieldwood Energy Rights Offering |
|---|---|
| **Bank Account No.:** | 9900000502 |
| **ABA/Routing No.:** | 084106768 |
| **Bank Name:** | Evolve Bank & Trust |
| **Bank Address:** | 6070 Poplar Ave., Suite 100 Memphis, TN 38119 |
| **Reference:** | [Name of Eligible Claimant Subscribing] |

3

*International wire*:

| | |
|---|---|
| **Correspondent/Intermediary Bank SWIFT** | FRNAUS44 |
| **Correspondent/Intermediary Bank Name** | First National Banker's Bank |
| **Correspondent/Intermediary Bank Address** | 7813 Office Park Blvd<br>Baton Rouge, LA 70809 |
| **Beneficiary Account Number** | 084106768 |
| **Beneficiary Name** | Evolve Bank & Trust |
| **Beneficiary Address** | 6070 Poplar Ave., Suite 200<br>Memphis, TN 38119 |
| **Memo, Special Instructions, Originator to Beneficiary Information, Bank to Bank Information** | Fieldwood Energy Rights Offering<br>Account #: 9900000502<br>[Name of Eligible Claimant Subscribing] |

**For Eligible Claimants Not Backstop Partie**s. Eligible Claimants that are not Backstop Parties must deliver their subscription payment (along with their completed Rights Offering Subscription Form (with accompanying IRS Form W-9 or appropriate IRS Form W-8, as applicable) and properly executed Subscription Agreement) to the Subscription Agent by the Subscription Expiration Deadline.

**For Backstop Parties.** Eligible Claimants that are Backstop Parties must deliver payment of the Aggregate Purchase Price directly to the Subscription Agent pursuant to the wire instructions above no later than the Backstop Funding Deadline.

## Item 6. Refund Information

Please use the chart below to provide the appropriate wire information in the event the Subscription Agent must refund of any (or all) of your subscription payment.

| | |
|---|---|
| Account Name: | |
| Bank Account No.: | |
| ABA/Routing No.: | |
| Bank Name: | |
| Bank Address: | |
| Reference: | |

**Item 7. Registration Information for New Equity Interests**

**PLEASE COMPLETE THE <u>SECTIONS BELOW</u> IF NEW EQUITY INTERESTS ARE TO BE ISSUED TO THE ELIGIBLE CLAIMANT.**

**IF THE ELIGIBLE CLAIMANT IS DESIGNATING ANY RELATED FUND, OTHER ACCREDITED INVESTOR, OR CUSTODIAN TO RECEIVE THE NEW EQUITY INTERESTS ON ITS BEHALF, PLEASE COMPLETE <u>EXHIBIT A</u> TO THIS RIGHTS OFFERING SUBSCRIPTON FORM.**

"Related Fund" has the meaning set forth in the subscription agreement.

Please indicate on the lines provided below the Registration Name of the Eligible Claimant in whose name the New Equity Interests should be issued:

Registration Line 1:_____

Registration Line 2 (if needed):_____

Address 1:_____

Address 2:_____

Address 3:_____

Address 4:_____

Telephone:_____

Email:_____

**Item 8.  Certification.**

The undersigned certifies that: (i) the undersigned or a Related Fund whom the undersigned has designated to receive the New Equity Interests pursuant to Exhibit A is an Eligible Holder as set forth in Item 4 above and in the Subscription Agreement, (ii) the undersigned is an Eligible Claimant of the Allowed Claim amount set forth in Item 1 above, (iii) the undersigned received a copy of the Plan, the Disclosure Statement, the Subscription Agreement and the Rights Offering Procedures and (iv) the undersigned understands that the exercise of its rights under the Rights Offering is subject to all the terms and conditions set forth in the Plan, the Subscription Agreement and the Rights Offering Procedures.

The undersigned acknowledges that, by executing the Subscription Agreement and this Rights Offering Subscription Form, the undersigned Eligible Claimant has elected to subscribe for the number of New Equity Interests designated under Item 2b above and will be bound to pay for the New Equity Interests it has subscribed for and that it may be liable to the Debtors to the extent of any nonpayment.

Date: _____

Name of Eligible Claimant: _____

U.S. Federal Tax EIN/SSN (optional for Non-U.S. persons): _____

If Non-U.S. person, check here and attach appropriate IRS Form W- 8 ☐

If U.S. person, check here and attach IRS Form W-9 ☐

Signature: _____

Name of Signatory: _____

Title: _____

Telephone Number: _____

Fax: _____

Email: _____

**PLEASE RETURN THIS RIGHTS OFFERING SUBSCRIPTION FORM (WITH ACCOMPANYING IRS FORM W-9 OR APPROPRIATE IRS FORM W-8, AS APPLICABLE) AND THE SUBSCRIPTION AGREEMENT TO THE SUBSCRIPTION AGENT.**

**PLEASE COMPLETE <u>EXHIBIT A</u> IF YOU ARE DESIGNATING ANY RELATED FUND(S), OTHER PARTY THAT IS AN ACCREDITED INVESTOR, OR A CUSTODIAN TO RECEIVE THE NEW EQUITY INTERESTS.**

**EACH ELIGIBLE CLAIMANT MUST COMPLETE <u>EXHIBIT C</u>.**

PLEASE NOTE: NO SUBSCRIPTION WILL BE VALID UNLESS THIS RIGHTS OFFERING SUBSCRIPTION FORM AND THE SIGNED SUBSCRIPTION AGREEMENT, ALONG WITH THE APPROPRIATE FUNDS (SOLELY WITH RESPECT TO ELIGIBLE CLAIMANTS THAT ARE NOT BACKSTOP PARTIES) ARE VALIDLY SUBMITTED TO THE SUBSCRIPTION AGENT BY THE SUBSCRIPTION EXPIRATION DEADLINE. FORMS MAY BE SUBMITTED TO THE PHYSICAL ADDRESS BELOW OR VIA EMAIL AT FIELDWOODSUBSCRIPTION@PRIMECLERK.COM.

FIELDWOOD ENERGY INC. RIGHTS OFFERING PROCESSING
C/O PRIME CLERK, LLC
830 THIRD AVENUE, 3RD FLOOR
NEW YORK, NY 10022

ELIGIBLE CLAIMANTS THAT ARE BACKSTOP PARTIES MUST DELIVER THE APPROPRIATE FUNDING DIRECTLY TO THE SUBSCRIPTION AGENT NO LATER THAN THE BACKSTOP FUNDING DEADLINE.

**EXHIBIT A**

**Special Delivery Instructions**

**IF THERE IS MORE THAN ONE DESIGNEE, COMPLETE A SEPARATE FORM FOR <u>EACH</u> DESIGNEE.**
**YOU MUST SPECIFY THE NUMBER OF NEW EQUITY INTERESTS FOR <u>EACH</u> DESIGNEE.**

**Please complete ONLY if New Equity Interests are to be issued in the name of a Related Fund, designated party that is an Accredited Investor and designated in accordance with the securities laws, or a custodian (or a party serving in such similar role as custodian) (each, in its capacity as custodian of the Eligible Claimant) rather than the Eligible Claimant. Any such Related Fund(s) or designated party must also complete an IRS Form W-8 or IRS Form W-9, as applicable. Any such custodian should complete the items below, as applicable.**

Issue New Equity Interests in the name of: _____

Number of New Equity Interests:_____

Name: _____

U.S. Federal Tax EIN/SSN (optional for Non-U.S. persons): _____

If Non-U.S. person, check here and attach appropriate IRS Form W- 8 ☐

If U.S. person, check here and attach IRS Form W-9 ☐

**A. Please indicate on the lines provided below the Registration Name of the designee in whose name the New Equity Interests should be issued:**

Registration Line 1:_____

Registration Line 2:_____
(if needed)

Address 1:_____

Address 2:_____

Address 3:_____

Address 4:_____

Telephone:_____

Email: _____

**B. Wire information in the event a refund is needed:**

| | |
|---|---|
| Account Name: | |
| Bank Account No.: | |
| ABA/Routing No.: | |
| Bank Name: | |
| Bank Address: | |
| Reference: | |

"Accredited Investor" as defined in Rule 501 of Regulation D of the Securities Act shall mean any person who comes within any of the following categories, at the time of the sale of the securities to the person:

(1)    Any bank as defined in Section 3(a)(2) of the Securities Act of 1933 (the "Act"), or any savings and loan association or other institution as defined in Section 3(a)(5)(A) of the Act whether acting in its individual or fiduciary capacity; any broker or dealer registered pursuant to Section 15 of the Securities Exchange Act of 1934, as amended; any insurance company as defined in Section 2(a)(13) of the Act; any investment company registered under the Investment Company Act of 1940 or a business development company as defined in Section 2(a)(48) of that Act; any Small Business Investment Company licensed by the U.S. Small Business Administration under Section 301(c) or (d) of the Small Business Investment Act of 1958; any plan established and maintained by a state, its political subdivisions, or any agency or instrumentality of a state or its political subdivisions for the benefit of its employees, if such plan has total assets in excess of $5,000,000; any employee benefit plan within the meaning of the Employee Retirement Income Security Act of 1974 if the investment decision is made by a plan fiduciary, as defined in Section 3(21) of such act, which is either a bank, savings and loan association, insurance company, or registered investment adviser, or if the employee benefit plan has total assets in excess of $5,000,000 or, if a self-directed plan, with investment decisions made solely by persons that are Accredited Investors;

(2)    Any private business development company as defined in Section 202(a)(22) of the Investment Advisers Act of 1940;

(3)    Any organization described in Section 501(c)(3) of the Internal Revenue Code, corporation, Massachusetts or similar business trust, or partnership, not formed for the specific purpose of acquiring the securities offered, with total assets in excess of $5,000,000;

(4)    Any director, executive officer, or general partner of the issuer of the securities being offered or sold, or any director, executive officer, or general partner of a general partner of that issuer;

(5)    Any natural person whose individual net worth, or joint net worth with that person's spouse, exceeds $1,000,000;

(i) Except as provided in clause (ii) paragraph (5), for purposes of calculating net worth under this paragraph (5):

(A) The person's primary residence shall not be included as an asset;

(B) Indebtedness that is secured by the person's primary residence, up to the estimated fair market value of the primary residence at the time of the sale of securities, shall not be included as a liability (except that if the amount of such indebtedness outstanding at the time of sale of securities exceeds the amount outstanding 60 days before such time, other than as a result of the acquisition of the primary residence, the amount of such excess shall be included as a liability); and

(C) Indebtedness that is secured by the person's primary residence in excess of the estimated fair market value of the primary residence at the time of the sale of securities shall be included as a liability;

(ii) Clause (i) of this paragraph (5) will not apply to any calculation of a person's net worth made in connection with a purchase of securities in accordance with a right to purchase such securities, provided that:

(A) Such right was held by the person on July 20, 2010;

(B) The person qualified as an Accredited Investor on the basis of net worth at the time the person acquired such right; and

(C) The person held securities of the same issuer, other than such right, on July 20, 2010.

(6) Any natural person who had an individual income in excess of $200,000 in each of the two most recent years or joint income with that person's spouse in excess of $300,000 in each of those years and has a reasonable expectation of reaching the same income level in the current year;

(7) Any trust, with total assets in excess of $5,000,000, not formed for the specific purpose of acquiring the securities offered, whose purchase is directed by a sophisticated person as described in Rule 506(b)(2)(ii) under the Act; and

(8) Any entity in which all of the equity owners are Accredited Investors.

**EXHIBIT C**

**FIELDWOOD ENERGY INC. (THE "COMPANY") REQUIRES THAT EACH ELIGIBLE CLAIMANT PROVIDE THE INFORMATION REQUESTED BELOW IN CONNECTION WITH THE RIGHTS OFFERING. THE INFORMATION PROVIDED HEREIN SHALL BE USED BY THE COMPANY IN DETERMINING THE ALLOCATION OF SUBSCRIPTION RIGHTS AND FOR NO OTHER PURPOSE. TO THE EXTENT THAT THE INFORMATION PROVIDED HEREIN RESULTS IN THE PURCHASE AND SALE OF NEW EQUITY INTERESTS TO AN ELIGIBLE CLAIMANT TO WHICH SUCH ELIGIBLE CLAIMANT IS NOT ENTITLED IN CONNECTION WITH THE RIGHTS OFFERING, THE COMPANY MAY UNWIND SUCH TRANSACTION. THE DEBTORS AGREE THAT IN THE EVENT THAT ANY INFORMATION PROVIDED BY ANY ELIGIBLE CLAIMANT IS INCORRECT IN ANY RESPECT, THE ONLY CLAIM, CAUSE OF ACTION, OR REMEDY AVAILABLE TO THE DEBTORS IS THE UNWINDING OF THE PURCHASE AND SALE OF NEW EQUITY INTERESTS AS SET FORTH ABOVE.**

**Statement of Beneficial Ownership**

To:    Prime Clerk, LLC
        Re: Fieldwood Energy Inc. Rights Offering Processing
        830 Third Avenue, 3rd Floor
        New York, NY 10022
        Email: fieldwoodsubscription@primeclerk.com
        To Confirm: 917-460-0913 (international) or 855-631-5346 (domestic, toll free)

The undersigned Eligible Claimant[1] is, and was as of February 22, 2018 (the "Subscription Record Date"), either directly or through the below listed entities, each of which is a fund, account or investment vehicle controlled, managed, advised or sub-advised by the undersigned, an affiliate of the undersigned or the same investment manager, advisor or subadvisor of the undersigned or an affiliate of such investment manager, advisor or subadvisor (each such entity, a "Related Fund"), the beneficial owner of the Allowed Claims listed under Item 4 below. In response to the Company's request for information, the undersigned Eligible Claimant submits that, as of the Subscription Record Date (a) it or a Related Fund is the holder of record of the Allowed Claims listed in Item 1 below, (b) that it or a Related Fund is a beneficial holder but not the holder of record of the Allowed Claims listed in Item 2 below, and (c) that it or a Related Fund is not the beneficial holder of the Allowed Claims listed in Item 3 below, and that the other information provided below is true and correct.

---

[1] Capitalized terms not otherwise defined herein are given the meanings ascribed to them in the Rights Offering Procedures filed with the Bankruptcy Court on February [•], 2018 [ECF No. [•]] (the "Rights Offering Procedures").

1.  For SLTL Claims listed on the books and records of the agent bank as of the Subscription Record Date

| Legal Entity Name | SLTL Claims Held |
|---|---|
|  |  |
|  |  |
|  |  |

2.  For SLTL Claims relating to open purchases of SLTL Claims which have not closed as of the Subscription Record Date

| Legal Entity Name | Trade Counterparty | Amount of SLTL Claim | Date of Trade |
|---|---|---|---|
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |

3.  For SLTL Claims relating to open sales of SLTL Claims which have not closed as of the Subscription Record Date

| Legal Entity Name | Trade Counterparty | Amount of SLTL Claim | Date of Trade |
|---|---|---|---|
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |

4.  Aggregate SLTL Claims Beneficially Held by Eligible Claimant

| Legal Entity Name | Total SLTL Claims Beneficially Held (Item 1 + Item 2 – Item 3) |
|---|---|
|  |  |
|  |  |
|  |  |
| **Total** |  |

The undersigned agrees that it will timely submit any documentation reasonably requested by the Company in support of the information provided above.

Date: _____, 2018

Eligible Claimant:_____

By:_____
Name:
Title:

# Exhibit G

**Purchase Agreement**

**PURCHASE AND SALE AGREEMENT**

**By and between**

**NOBLE ENERGY, INC.,**

**as Seller,**

**and**

**FIELDWOOD ENERGY LLC,**

**as Purchaser,**

**Dated February 14, 2018**

# TABLE OF CONTENTS

**Page**

Article 1      DEFINITIONS ................................................................................1

     Section 1.1    Certain Definitions .................................................................1
     Section 1.2    Interpretation ......................................................................22

Article 2      PURCHASE AND SALE ...............................................................23

     Section 2.1    Purchase and Sale ...............................................................23
     Section 2.2    Purchase Price .....................................................................23
     Section 2.3    Deposit ................................................................................23
     Section 2.4    Adjustments to Unadjusted Purchase Price .......................24
     Section 2.5    Ordinary Course Pre-Effective Date Costs Paid and Revenues
                     Received Post-Closing ........................................................25
     Section 2.6    Procedures ..........................................................................26
     Section 2.7    Allocation of Purchase Price ..............................................27
     Section 2.8    Contingency Payments .......................................................28

Article 3      TITLE MATTERS ........................................................................28

     Section 3.1    General Disclaimer of Title Warranties and Representations....28
     Section 3.2    Special Warranties of Title in the Conveyances .................29

Article 4      REPRESENTATIONS AND WARRANTIES OF SELLER ...............29

     Section 4.1    Existence and Qualification ................................................30
     Section 4.2    Power ..................................................................................30
     Section 4.3    Authorization and Enforceability .......................................30
     Section 4.4    No Conflicts ........................................................................30
     Section 4.5    Litigation ............................................................................30
     Section 4.6    Bankruptcy .........................................................................31
     Section 4.7    Taxes and Assessments ......................................................31
     Section 4.8    Compliance with Laws ......................................................31
     Section 4.9    Contracts ............................................................................31
     Section 4.10   Payments for Production ...................................................32
     Section 4.11   Imbalances .........................................................................32
     Section 4.12   Consents and Preferential Purchase Rights........................32
     Section 4.13   Outstanding Capital Commitments .....................................32
     Section 4.14   Insurance ............................................................................32
     Section 4.15   Wells ...................................................................................32
     Section 4.16   Royalties and Expenses......................................................33
     Section 4.17   Environmental Disclosures.................................................33
     Section 4.18   Employee Benefits ..............................................................33
     Section 4.19   Employment Matters ..........................................................33
     Section 4.20   Governmental Authorizations .............................................34
     Section 4.21   Foreign Person ...................................................................34
     Section 4.22   Suspense Funds ..................................................................34

#5618848.7
#5618848.12

# TABLE OF CONTENTS
(continued)

**Page**

Section 4.23    Liability for Brokers' Fees ..................................................34

Article 5       REPRESENTATIONS AND WARRANTIES OF PURCHASER ......................35

   Section 5.1    Existence and Qualification .................................................35
   Section 5.2    Power ....................................................................35
   Section 5.3    Authorization and Enforceability ...........................................35
   Section 5.4    No Conflicts .............................................................35
   Section 5.5    Consents, Approvals or Waivers ............................................35
   Section 5.6    Litigation ...............................................................36
   Section 5.7    Bankruptcy ...............................................................36
   Section 5.8    Financing ................................................................36
   Section 5.9    Investment Intent ........................................................36
   Section 5.10    Qualification ...........................................................36
   Section 5.11    Independent Evaluation ..................................................36

Article 6       DISCLAIMERS AND ACKNOWLEDGEMENTS ..........................................37

   Section 6.1    General Disclaimers ......................................................37
   Section 6.2    Environmental Disclaimers ................................................38
   Section 6.3    Calculations, Reporting and Payments .....................................39
   Section 6.4    Changes in Prices; Well Events ...........................................39
   Section 6.5    Limited Duties ...........................................................40

Article 7       COVENANTS OF THE PARTIES ..................................................40

   Section 7.1    Access ...................................................................40
   Section 7.2    Operation of Business ....................................................42
   Section 7.3    Operatorship of the Assets ...............................................43
   Section 7.4    Closing Efforts ..........................................................43
   Section 7.5    Notice to Holders of Consent and Preferential Purchase Rights ............44
   Section 7.6    Consents to Assignment ...................................................44
   Section 7.7    Preferential Rights ......................................................46
   Section 7.8    Casualty Loss and Condemnation ...........................................47
   Section 7.9    Notifications ............................................................47
   Section 7.10    Affiliate Transactions ..................................................48
   Section 7.11    Liability for Brokers' Fees .............................................48
   Section 7.12    Confidentiality .........................................................48
   Section 7.13    Press Releases ..........................................................49
   Section 7.14    [INTENTIONALLY DELETED] .................................................49
   Section 7.15    FERC Regulated Transport and Retained Marketing Contracts ...............49
   Section 7.16    Suspense Funds ..........................................................51
   Section 7.17    Regulatory Filings ......................................................52
   Section 7.18    Employee Matters ........................................................52
   Section 7.19    Seismic Licenses ........................................................53

#5618848.7
#5618848.12

TABLE OF CONTENTS
(continued)

**Page**

Section 7.20    Further Assurances.................................................................54
Section 7.21    Financial Statements .............................................................54
Section 7.22    DOOs and OSFRs .................................................................55
Section 7.23    Additional Security ...............................................................55
Section 7.24    Excluded Wells .....................................................................55
Section 7.25    Contingency Payments .........................................................57
Section 7.26    Troubadour Assets ................................................................57

Article 8        CONDITIONS TO CLOSING ...............................................57

Section 8.1     Conditions of Seller to Closing............................................57
Section 8.2     Conditions of Purchaser to Closing .....................................58

Article 9        CLOSING ..............................................................................60

Section 9.1     Time and Place of Closing....................................................60
Section 9.2     Obligations of Seller at Closing...........................................60
Section 9.3     Obligations of Purchaser at Closing ....................................61
Section 9.4     Closing Payment and Post-Closing Adjustments .................63

Article 10       TAX MATTERS.....................................................................65

Section 10.1    Tax Returns; Proration of Taxes ..........................................65
Section 10.2    Post-Closing Actions Which Affect Seller's Tax Liability .....66
Section 10.3    Refunds .................................................................................67
Section 10.4    Transfer Taxes and Recording Fees.....................................67
Section 10.5    Deposit Tax Treatment .........................................................67
Section 10.6    Matters Specific to the Tax Partnerships ..............................67
Section 10.7    Conflict .................................................................................68

Article 11       TERMINATION AND AMENDMENT .................................68

Section 11.1    Termination............................................................................68
Section 11.2    Effect of Termination ...........................................................70

Article 12       INDEMNIFICATION; LIMITATIONS..................................71

Section 12.1    Assumption ...........................................................................71
Section 12.2    Seller's Indemnification Rights ............................................72
Section 12.3    Purchaser's Indemnification Rights .....................................73
Section 12.4    Survival; Limitation on Actions...........................................74
Section 12.5    Exclusive Remedy and Certain Limitations .........................76
Section 12.6    Indemnification Actions........................................................79
Section 12.7    Express Negligence/Conspicuous Manner ...........................81

#5618848.7
#5618848.12

TABLE OF CONTENTS
(continued)

Page

Article 13    MISCELLANEOUS .................................................................................81

Section 13.1    Notices ...........................................................................................81
Section 13.2    Expenses; Filings, Certain Governmental Approvals and Removal
of Names ........................................................................................83
Section 13.3    Records ..........................................................................................83
Section 13.4    Governing Law ...............................................................................84
Section 13.5    Forum Selection; Waiver of Jury Trial .........................................84
Section 13.6    Headings and Construction ...........................................................85
Section 13.7    Waivers ...........................................................................................85
Section 13.8    Severability ....................................................................................85
Section 13.9    Assignment .....................................................................................85
Section 13.10   Entire Agreement ...........................................................................86
Section 13.11   Amendment .....................................................................................86
Section 13.12   No Third-Person Beneficiaries ......................................................86
Section 13.13   Limitation on Damages ..................................................................86
Section 13.14   Deceptive Trade Practices Act ......................................................87
Section 13.15   Time of the Essence; Calculation of Time .....................................87
Section 13.16   Counterparts ...................................................................................87

#5618848.7
#5618848.12

**EXHIBITS:**

| | |
|---|---|
| Exhibit A | Oil and Gas Properties, Facilities and Rights of Way |
| Exhibit A-1 | Leases |
| Exhibit A-2 | Wells |
| Exhibit A-3 | PUD Locations |
| Exhibit A-4 | Facilities |
| Exhibit A-5 | Rights-of-Way |
| Exhibit A-6 | FERC Regulated Transport |
| Exhibit A-7 | FCC Licenses |
| Exhibit B-1 | Form of Omnibus Conveyance |
| Exhibit B-2 | Form of Recordable Conveyance – Louisiana |
| Exhibit B-3 | Form of Recordable Conveyance – Mississippi |
| Exhibit C | Form of Affidavit of Non-Foreign Status |
| Exhibit D | Form of Letter in Lieu |
| Exhibit E | Additional Security |
| Exhibit F | Form of Transition Services Agreement |
| Exhibit G | Form of Limited Agency Agreement |
| Exhibit H-1 | Form of BOEM Bond |
| Exhibit H-2 | Form of Noble Performance Bond |
| Exhibit I | Form of NAESB and Form of Oil Purchase Agreement |
| Exhibit J | Form of Assignment and Assumption Agreement |
| Exhibit K | Backstop Commitment Agreement |
| Exhibit L | Plan |
| Exhibit M | RSA |

**SCHEDULES:**

| | |
|---|---|
| Schedule 1.1 | Excluded Assets |
| Schedule 1.2 | Knowledge Persons |
| Schedule 2.7 | Allocation of Unadjusted Purchase Price |
| Schedule 2.8 | Contingency Well Forecast |
| Schedule 4.4 | Conflicts |
| Schedule 4.5 | Litigation |
| Schedule 4.7 | Taxes |
| Schedule 4.8 | Compliance with Laws |
| Schedule 4.9(a) | Material Contracts |
| Schedule 4.9(b) | Certain Material Contract Matters |
| Schedule 4.10 | Payments for Production |
| Schedule 4.11 | Imbalances |
| Schedule 4.12 | Required Consents and Preferential Rights |
| Part 1 | PHA Required Consents |
| Part 2 | Marketing Required Consents |
| Part 3 | Other Consents |
| Part 4 | Neptune Consent |

TABLE OF CONTENTS
(continued)

**Page**

| | |
|---|---|
| Schedule 4.13 | Outstanding Capital Commitments |
| Schedule 4.14 | Insurance |
| Schedule 4.15 | Wells |
| Schedule 4.16 | Royalties and Expenses |
| Schedule 4.17 | Environmental Matters |
| Schedule 4.19(d) | Employee Matters |
| Schedule 4.20 | Governmental Authorizations |
| Schedule 4.22 | Suspense Funds |
| Schedule 7.15 | Retained Marketing Contracts |
| Schedule 7.26 | Troubadour Assets |

#5618848.7
#5618848.12

## PURCHASE AND SALE AGREEMENT

This PURCHASE AND SALE AGREEMENT (this "Agreement"), is dated as of February 14, 2018 ("Execution Date"), by and between Noble Energy, Inc., a Delaware corporation ("Seller") and Fieldwood Energy LLC, a Delaware limited liability company ("Purchaser"). Seller and Purchaser are sometimes referred to collectively as the "Parties" and individually as a "Party".

## RECITALS:

Seller desires to sell and Purchaser desires to purchase those certain interests in oil and gas properties, rights and related assets that are defined and described as "Assets" herein.

NOW, THEREFORE, in consideration of the premises and of the mutual promises, representations, warranties, covenants, conditions and agreements contained herein, and for other valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties agree as follows:

## ARTICLE 1
## DEFINITIONS

Section 1.1 **Certain Definitions**. As used herein:

(a) "Accounting Principles" is defined in Section 2.4(d).

(b) "Accounting Referee" is defined in Section 9.4(b).

(c) "Adjusted Purchase Price" is defined in Section 2.2(a).

(d) "Affiliate" means, with respect to any Person, a Person that directly or indirectly controls, is controlled by or is under common control with such Person, with control in such context meaning the ability to direct the management or policies of a Person through ownership of voting shares or other securities, pursuant to a written agreement, or otherwise. For purposes of this Agreement, Purchaser's Affiliates shall not include Riverstone Holdings LLC or any portfolio companies of, or managed by, Riverstone V FW Holdings, L.P. and/or Riverstone Holdings LLC (other than Purchaser and its subsidiaries).

(e) "Allocated Value" means, with respect to each of the Oil and Gas Properties, the portion of the Unadjusted Purchase Price allocated to such Oil and Gas Property as set forth on Schedule 2.7, as such amount shall be increased or decreased by the portion of each adjustment to the Unadjusted Purchase Price under Section 2.4(b), Section 2.4(c) and Section 2.4(d) attributable to such Oil and Gas Property.

(f) "Apache" means, collectively, (i) Apache Corporation, (ii) Apache Shelf, Inc., (iii) Apache Deepwater LLC, (iv) Apache Shelf Exploration LLC and (v) an Affiliate of any of the foregoing.

(g) "Assets" mean all of Seller's rights, titles and interests in and to the following (but reserving unto Seller and excluding from the Assets any and all Excluded Assets):

(i) the oil and gas leases, operating rights, record title interests, carried interests, royalties, overriding royalty interests, net profits interests, and other rights to Hydrocarbons in place and mineral servitudes as to all lands described on Exhibit A-1, whether legal or equitable, vested or contingent, and whether or not the same are expired or terminated (collectively, the "Leases"), together with all pooled, communitized or unitized acreage which includes all or part of any Leases (the "Units"), and all tenements, hereditaments and appurtenances belonging to the Leases and Units (collectively the "Lands");

(ii) any and all Hydrocarbon, water, $CO_2$, injection wells or other wells located on, under or within the Lands shown on Exhibit A-2 attached hereto (the "Wells" and together with the Leases and Units, the "Oil and Gas Properties"), in each case whether producing or non-producing, or temporarily Plugged and Abandoned, in each case limited to the Wells set forth on Exhibit A-2, but for the sake of clarity, excluding all wells on, under or within the Lands which are permanently Plugged and Abandoned prior to the Closing Date which are retained by Seller as Excluded Assets (subject to Purchaser's obligations set forth in Section 7.24);

(iii) all platforms, facilities, processing systems, buildings, compressors, meters, tanks, machinery, tools, personal property, equipment (including spars, trees, PLETs, jumpers, flowlines, risers, umbilicals, control assemblies, and production handling equipment), boats, vehicles, fixtures, improvements and other real, immovable, personal, movable and mixed property that is located on or appurtenant to the Leases, the Lands, Rights of Way or Wells or primarily used in connection with the Wells and the operation of the Leases (whether located on or appurtenant to the Leases, the Lands, Rights of Way or Wells or stored at a different location (onshore or offshore) by Seller, its Affiliates and/or any Third Party), and such flowlines, pipelines, gathering lines and/or pipeline capacity which are primarily used in connection the Lease, Well or Unit operations or the production, transportation or processing of Hydrocarbons produced from the Oil and Gas Properties and including all facilities identified on Exhibit A-4 (the "Facilities");

(iv) the Proprietary Seismic Data;

(v) all surface fee interests, easements, right-of-use easements, licenses, servitudes, rights-of-way, surface leases and other rights to use the surface or seabed appurtenant to, and used or held primarily for use in connection with, the ownership or operation of any or all of the properties, rights, titles, and interests described in clauses (i) through (iii) and (vi) of this definition, including the property described on Exhibit A-5 (the "Rights of Way");

(vi)     All environmental and other governmental (whether federal, state or local) permits, licenses, orders, authorizations, franchises and related instruments or rights relating to the ownership, operation or use of the properties, rights, titles, and interests described in clauses (i) through (iii), (v) and (viii) of this definition (the "Permits")

(vii)     Each FERC Regulated Transport, to the extent the required capacity release waiver(s) (if any) are obtained as contemplated pursuant to Section 7.15;

(viii)     all Hydrocarbons in, on, under or that may be produced from or attributable to the Leases, Units or Wells on or after the Effective Date, including all oil, condensate and scrubber liquids inventories and ethane, propane, iso-butane, nor-butane and gasoline inventories of Seller from the Oil and Gas Properties in storage or constituting linefill as of the Effective Date, and all Imbalances as of the Effective Date;

(ix)     the FCC Licenses;

(x)     all Suspense Funds, to the extent provided in Section 7.16;

(xi)     subject to Section 7.15(h), all currently existing contracts, agreements and instruments that relate primarily to the ownership or operation of any or all of the Oil and Gas Properties (to the extent applicable to the Oil and Gas Properties) or any other properties, rights, titles, and interests described in the clauses of this definition of "Assets," including operating agreements, unitization, pooling, and communitization agreements, declarations and orders, area of mutual interest agreements, joint venture agreements, farmin and farmout agreements, exchange agreements, purchase and sale agreements and other contracts in which Seller acquired interests in any other Assets, transportation agreements, agreements for the sale and purchase of Hydrocarbons and processing agreements and the contracts that are deemed to constitute "Assets", but excluding any contracts, agreements and instruments included within the definition of "Excluded Assets," and provided that the defined term "Contracts" shall not include, except as otherwise stated herein, the Leases and other instruments constituting Seller's chain of title to the Leases (subject to such exclusion and proviso, the "Contracts");

(xii)     subject to Section 13.3, the originals of the Records which relate solely to the Assets and copies of the Records which relate to both the Assets and any Excluded Asset;

(xiii)     inventory, equipment, machinery, tools and other personal property, to the extent located on the Facilities or if located elsewhere, held for use in connection with the Oil and Gas Properties or the Facilities or charged to the joint account pursuant to the applicable Contracts prior to the Closing

including, on-site personal computers and similar devices, including all applicable software, tubulars and those items listed on Exhibit A-4;

(xiv) Seller-owned SCADA equipment and all automation systems including meters and related telemetry, licensed radio frequencies and associated communications infrastructure including towers, antennas, data links and network circuits to the extent used in connection with the Oil and Gas Properties and Facilities or for the production of Hydrocarbons therefrom;

(xv) all cash, deposits, escrow accounts, guarantees, letters of credit, treasury securities, surety bonds and other forms of credit assurances or credit support provided by a Third Party for the benefit of Seller and/or its Affiliates for financial assurance for the obligations and liabilities arising out of or related to the Assets, including, but not limited to, the Plugging and Abandonment Obligations arising out of or related to the Assets, in each case, to the extent and only to the extent such credit assurances and credit support are (A) transferrable by Seller without any expense to Seller not advanced or reimbursed by Purchaser and (B) not subject to material restrictions on transfer (the "Third Party Credit Support") however, subject to Seller's obligations in Section 7.6(c);

(xvi) any agreements and memberships relating solely to well containment/control, clean-up of spills or other pollution, or the gathering of data relating to certifications required to be made to Governmental Authorities primarily with respect to the Assets, including United States Department of the Interior Minerals Management Service Notice to Lessees No. 2010-05; BOEM Notice to Lessees Nos. 2010-N06, 2010-N10, and 2010-G05; and 30 C.F.R. § 250.103, or any successor or finalized Law or guidance document, in each case, to the extent and only to the extent such agreements and memberships are (A) transferrable by Seller without any expense to Seller not advanced or reimbursed by Purchaser and (B) not subject to material restrictions on transfer that cannot be waived after Seller's commercially reasonable efforts to obtain such waiver. In the event any agreements or memberships described herein above cannot be transferred to Purchaser at the Closing, such contracts and/or memberships shall be deemed Excluded Assets for all purposes under this Agreement.

Notwithstanding anything herein to the contrary, the defined term "Assets" expressly excludes any and all Excluded Assets.

(h) "Assignment and Assumption Agreement" is defined in Section 9.2(j).

(i) "Assumed Obligations" is defined in Section 12.1.

(j) "Backstop Commitment Agreement" means that certain Backstop Commitment Agreement entered into by Purchaser on February 14, 2018, attached hereto as Exhibit K.

#5618848.7
#5618848.12

(k)    "<u>Bankruptcy Code</u>" means title 11 of the United States Code, 11 U.S.C. §§ 101-1532.

(l)    "<u>Bankruptcy Court</u>" means the United States Bankruptcy Court for the Southern District of Texas.

(m)    "<u>Barrel</u>" means 42 United States standard gallons of 231 cubic inches per gallon at sixty (60) degrees Fahrenheit.

(n)    "<u>BOEM</u>" means the United States Department of the Interior, Bureau of Ocean Energy Management, as a successor agency to (a) the Bureau of Ocean Energy Management, Regulation and Enforcement and (b) the Minerals Management Service, or any subsequent successor agency.

(o)    "<u>BOEM Bond</u>" is defined in <u>Exhibit E</u>.

(p)    "<u>BSEE</u>" means the United States Department of the Interior, Bureau of Safety and Environmental Enforcement, as a successor agency to (a) the Bureau of Ocean Energy Management, Regulation and Enforcement and (b) the Minerals Management Service, or any subsequent successor agency.

(q)    "<u>Business Day</u>" means any day other than a Saturday, a Sunday, or a day on which banks are closed for business in New York, New York or Houston, Texas, United States of America.

(r)    "<u>Capacity</u>" is defined in <u>Section 7.15(d)</u>.

(s)    "<u>Casualty Loss</u>" is defined in <u>Section 7.8(b)</u>.

(t)    "<u>Chapter 11 Case</u>" is defined in <u>Section 11.1(c)(i)</u>.

(u)    "<u>Claim Notice</u>" is defined in <u>Section 12.6(b)</u>.

(v)    "<u>Closing</u>" is defined in <u>Section 9.1</u>.

(w)    "<u>Closing Date</u>" is defined in <u>Section 9.1</u>.

(x)    "<u>Closing Payment</u>" is defined in <u>Section 9.4(a)</u>.

(y)    "<u>Code</u>" means the United States Internal Revenue Code of 1986, as amended.

(z)    "<u>Company Employees</u>" means those individuals who, as of the Execution Date, (A) are employed by Seller or its Affiliates, (B) render material services primarily with respect to the Assets, and (C) are made available by Seller for potential employment with Purchaser.

(aa)    "Company Contractors" means those individuals who, as of the Execution Date, individually render material services on an exclusive or substantially full-time basis to Seller or its Affiliate primarily with respect to the Assets either directly or through a third-party service provider.

(bb)    "Confidential Information" means all information, documents, instruments, data with respect to the Assets whether disclosed orally, visually, in writing or in other tangible form, and any and all nonpublic or proprietary information of any nature (including prices, trade secrets, technological know-how, data and all other nonpublic or proprietary concepts, methods of doing business, ideas, materials or information), and all information derived from any nonpublic or proprietary information.

(cc)    "Confidentiality Agreement" means that certain Confidentiality Agreement dated as of March 15, 2017 by and among Seller and Fieldwood Energy Offshore LLC, as amended from time to time.

(dd)    "Confirmation Order" is defined in Section 9.3(r).

(ee)    "Contingency Payment" is defined in Section 2.8(a).

(ff)    "Contingency Wells" is defined in Section 2.8(a).

(gg)    "Conveyances" is defined in Section 9.2(a).

(hh)    "Customary Consents" means any and all consents, approvals, authorizations or permits of, or filings with or notifications to, any Governmental Authorities or any other Person which are required to be obtained, made or complied with for or in connection with the sale, assignment or transfer of Assets (i) that are not required prior to the assignment of any such interests, assets or properties or interests or are customarily obtained subsequent to the sale or conveyance or (ii) that do not constitute a Required Consent.

(ii)    "Cut-Off Date" means the date that is two (2) years after the Closing Date.

(jj)    "Damages" is defined in Section 12.5(b).

(kk)    "Defensible Title" means that aggregate title of Seller in and to the Oil and Gas Properties which, as of the Closing Date and subject to Permitted Encumbrances:

(i)    as to each applicable Subject Formation, entitles Seller to receive a Net Revenue Interest in the case of any Lease, Unit, Well or PUD Location not less than the Net Revenue Interest percentage shown for such Lease, Unit, Well or PUD Location as to such Subject Formation in Exhibit A-2 or Exhibit A-3, in any case, except, subject to Section 7.2, (1) any decreases in connection with those operations in which Seller may elect after the Execution Date to be a non-consenting co-owner, (2) any decreases resulting from reversion of interest to co-owners with respect to operations in which such co-owners elect, after the Execution Date, not to consent, (3) any decreases resulting from the establishment

-6-

or amendment, after the Execution Date, of pools or units, (4) any decreases required to allow other Working Interest owners to make up past underproduction or pipelines to make up past under deliveries, and (5) any as otherwise expressly stated in Exhibit A;

(ii)     as to each applicable Subject Formation as to any Lease, Unit, Well or PUD Location, obligates Seller to bear a Working Interest no greater than the Working Interest shown for such Lease, Unit, Well or PUD Location as to such Subject Formation in Exhibit A-2 or Exhibit A-3 with respect to such Lease, Unit or Well or PUD Location, except (A) as stated in Exhibit A and (B) any increases resulting from contribution requirements with respect to defaulting co-owners under applicable operating agreements or applicable Law and increases that are accompanied by at least a proportionate increase in Seller's Net Revenue Interest in such Subject Formation; and

(iii)     is free and clear of Liens, other than Permitted Encumbrances.

(ll)     "Deposit" is defined in Section 2.3(a).

(mm)     "Disclosure Schedules" means the aggregate of all schedules that set forth exceptions, disclosures or otherwise relate to or are referenced in any of the representations or warranties of Seller set forth in ARTICLE 4.

(nn)     "Disclosure Statement" means the Disclosure Statement for Joint Prepackaged Chapter 11 Plan of Fieldwood Energy LLC and its Affiliated Debtors related to the Chapter 11 Cases.

(oo)     "Dispute" is defined in Section 13.5(a).

(pp)     "DTPA" is defined in Section 13.14.

(qq)     "Effective Date" means 12:01 a.m. Central Standard Time on January 1, 2018.

(rr)     "Employee Plans" means employee benefit plans and programs, including (i) all retirement, savings, and other pension plans; (ii) all health, severance, insurance, disability, and other employee welfare plans; and (iii) all bonus, deferred compensation, incentive compensation, stock option or equity or equity-based, termination pay, retention, unemployment compensation, vacation pay, change in control, fringe benefit or other benefit plans, programs, policies or arrangements, whether or not subject to ERISA and whether covering one Person or more than one Person, that are maintained by Seller or any Affiliate, including an ERISA Affiliate, with respect to Company Employees or to which Seller or any Affiliate, including an ERISA Affiliate, contributes on behalf of Company Employees.

(ss)     "End Date" is defined in Section 11.1(b).

(tt)    "Environmental Laws" means, as the same have been amended to the Closing Date, the Comprehensive Environmental Response, Compensation and Liability Act, 42 U.S.C. § 9601 et seq. ("CERCLA"); the Resource Conservation and Recovery Act, 42 U.S.C. § 6901 et seq.; the Federal Water Pollution Control Act, 33 U.S.C. § 1251 et seq.; the Clean Air Act, 42 U.S.C. § 7401 et seq.; the Hazardous Materials Transportation Act, 49 U.S.C. § 5101 et seq.; the Toxic Substances Control Act, 15 U.S.C. §§ 2601 through 2629; the Oil Pollution Act, 33 U.S.C. § 2701 et seq.; the Emergency Planning and Community Right to Know Act, 42 U.S.C. § 11001 et seq.; and the Safe Drinking Water Act, 42 U.S.C. §§ 300f through 300j, in each case as amended in effect as of the Closing Date, and all similar Laws in effect as of the Closing Date of any Governmental Authority having jurisdiction over the property in question addressing pollution or protection of the environment or biological resources.

(uu)    "Environmental Liabilities" means any and all Damages, remediation, obligations, liabilities, environmental response costs, costs to cure, cost to investigate or monitor, restoration costs, costs of remediation or removal, settlements, penalties, fines, and attorneys' and consultants fees and expenses arising out of or related to any violations or non-compliance with any Environmental Laws,  including any contribution obligation under CERCLA or any other Environmental Law or matters incurred or imposed pursuant to any claim or cause of action by a Governmental Authority or other Person, attributable to any environmental liabilities, any Release of Hazardous Substances, or any other environmental condition with respect to the ownership or operation of the Assets, including conditions of Facilities not in compliance with Laws promulgated by BOEM, BSEE or United States Coast Guard.

(vv)    "ERISA" means the Employee Retirement Income Security Act of 1974, as amended.

(ww)    "ERISA Affiliate" means any other Person that is required to be treated as a single employer with Seller under Section 414 of the Code or Section 4001(a)(14) of ERISA.

(xx)    "Exchange Act" is defined in Section 7.21(a).

(yy)    "Execution Date" is defined in the introductory paragraph hereof.

(zz)    "Excluded Assets" means:

(i)    all right, title and interest to the properties and assets (i) set forth on Schedule 1.1;

(ii)    the Excluded Records;

(iii)    such copies of the Records retained by Seller in accordance with Section 13.3(b);

(iv)    Assets excluded from this Agreement pursuant to Section 7.6 or Section 7.7;

(v) all trade credits, all accounts (subject to Section 1.1(g)(xv)), receivables and all other proceeds, income or revenues attributable to the Assets with respect to any period of time prior to the Effective Date;

(vi) all personal property of Seller or any Affiliates of Seller that is not included within the definition of "Assets", including all personal computers and associated peripherals, cell phones, office equipment and all radio (excluding Seller-owned SCADA equipment and the FCC Licenses) and telephone equipment;

(vii) Subject to Seller's obligations as set forth in Section 7.6, contracts, agreements and instruments whose transfer is prohibited by a Required Consent or subjected to payment of a fee or other consideration by an agreement with a Person other than an Affiliate of Seller, or by applicable Law, and for which no consent to transfer has been received or for which Purchaser has not agreed in writing to pay the fee or other consideration, as applicable;

(viii) Subject to Seller's obligations as set forth in Section 7.6, Permits and other appurtenances for which transfer is prohibited by a Required Consent or subjected to payment of a fee or other consideration by an agreement with a Person other than an Affiliate of Seller, or by applicable Law, and for which no consent to transfer has been received or for which Purchaser has not agreed in writing to pay the fee or other consideration, as applicable;

(ix) all indemnity rights, rights under any Contracts and all claims of Seller or any Affiliate of Seller against any Third Party to the extent such claims arose or are attributable to, periods prior to the Effective Date (including claims for adjustments or refunds) or for which Seller is liable for payment or required to indemnify Purchaser under Section 10.1 or ARTICLE 12 (in each case whether or not such claims are pending or threatened as of the Execution Date or the Closing Date);

(x) all of Seller's proprietary computer software, patents, trade secrets, copyrights, logos, trademarks, trade names, and other intellectual property;

(xi) all proceeds of Hydrocarbons produced and sold from the Assets with respect to all periods prior to the Effective Date;

(xii) any Tax refund (whether by payment, credit, offset or otherwise, and together with any interest thereon) in respect of any Taxes for which Seller is liable for payment or required to indemnify Purchaser under Section 10.1 or ARTICLE 12;

(xiii) any claims of Seller or any Affiliate of Seller for any refunds of or loss of carry forwards with respect to (A) severance Tax abatements with respect to all taxable periods or portions thereof prior to the Effective Date, (B) income or franchise Taxes or (C) any Taxes attributable to any Excluded Assets;

(xiv)  all claims, rights and interests of Seller or an Affiliate of Seller (A) under any policy or agreement of insurance or indemnity agreement, (B) under any bond or security instrument (subject to Section 1.1(g)(xv)), or (C) to any insurance or condemnation proceeds or awards arising, in each case, from acts, omissions or events, or damage to or destruction of Asset prior to the Effective Date;

(xv)  all audit rights and claims for reimbursements from Third Parties for any and all Property Costs, overhead or joint account reimbursements and revenues associated with all joint interest audits and other audits of any (A) Excluded Assets or (B) Property Costs under any Contracts or under Law covering periods prior to the Effective Date, or for which Seller is, in whole or in part, entitled to receive under Section 2.4 below, or for which a decrease to the Unadjusted Purchase Price occurs under Section 2.4(d);

(xvi)  drilling rigs, work over rigs and, tools and other equipment, in each case owned by Third Parties (and any obligation to acquire the same), brought onto a well site temporarily for purposes of drilling, reworking or maintaining a well;

(xvii)  subject to Purchaser's post-Closing obligations set forth in Section 7.24, all wells which are located on the Oil and Gas Properties that are permanently Plugged and Abandoned as of the Closing Date (the "Excluded Wells"), as well as any facilities which are located on the Oil and Gas Properties that are decommissioned as of the Closing Date;

(xviii) whether or not relating to the Assets: (i) master service agreements, procurement agreements, engineering and procurement contracts, drilling contracts or similar service contracts and any work orders thereunder or relating thereto; and (ii) agreements for the purchase and sale of Hydrocarbons, including NAESB or GISB master agreements and any confirmations thereunder, and any other production marketing arrangements, whether or not applicable to the Assets, except the transferred Hydrocarbon sales agreements listed on Schedule 4.9(a);

(xix)  those certain purchase and sale agreements between Seller and its predecessors in interest listed on Schedule 1.1 (Excluded Assets); and

(xx)  all Hedges.

(aaa)  "Excluded Records" means any and all:

(i)  originals of the Records which relate solely to the Excluded Assets;

(ii)  corporate, financial, Tax and legal data and records of Seller that relate primarily to Seller's business generally (whether or not relating to the

Assets), or to businesses of Seller and any Affiliate of Seller other than the exploration and production of Hydrocarbons;

      (iii)    data, software and records to the extent disclosure or transfer is prohibited or subjected to payment of a fee, penalty or other consideration by any license agreement or other agreement with a Person other than Affiliates of Seller, or by applicable Law, and for which no Required Consent to transfer has been received or for which Purchaser has not agreed in writing to pay such fee, penalty or other consideration, as applicable;

      (iv)    legal records and legal files of Seller, including all work product of and attorney-client communications with Seller's legal counsel or any other documents or instruments that may be protected by an attorney-client privilege, but excluding any title opinions covering the Oil and Gas Properties;

      (v)    data, correspondence, materials, descriptions and records relating to the auction, marketing, sales negotiation or sale of the Assets, including the existence or identities of any prospective inquirers, bidders or prospective purchasers of any of the Assets, any bids received from and records of negotiations with any such prospective purchasers and any analyses of such bids by any Person;

      (vi)    Employee-related or employee benefit-related files or records including, without limitation, medical records;

      (vii)    data and records relating primarily to the other Excluded Assets; and

      (viii)    those original data, software and records and copies of any Records retained or made by Seller pursuant to Section 13.3(b).

(bbb)    "Excluded Wells" is defined in Section 1.1(zz)(xvii).

(ccc)    "FCC Licenses" means the FCC licenses described on Exhibit A-7.

(ddd)    "FERC" means the Federal Energy Regulatory Commission.

(eee)    "FERC Order" is defined in Section 7.15(f).

(fff)    "FERC Regulated Transport" means those transportation agreements set forth on Exhibit A-6 for which Seller shall seek FERC approval in order for Seller to transfer to Purchaser in accordance with Section 7.15.

(ggg)    "Final Order" means an order or judgment of the Bankruptcy Court, or other court of competent jurisdiction with respect to the subject matter, (i) which has not been reversed, stayed, modified, amended, enjoined, set aside, annulled or suspended and (ii) with respect to which no stay shall have been issued in connection with any notice of appeal or petition for certiorari filed.

(hhh) "Foreign Person" is defined in Section 4.21.

(iii) "Fundamental Representations" means the representations and warranties of Seller set forth in Section 4.1 through Section 4.3, Section 4.4, Section 4.6, Section 4.21, and Section 4.23.

(jjj) "Governmental Authority" means any court, tribunal, arbitrator, authority, agency, commission, official or other instrumentality of the United States, any foreign country or any domestic or foreign state, county, city, tribal, quasi-governmental entity or other political subdivision or authority exercising or entitled to exercise any administrative, executive, judicial, legislative, regulatory or taxing authority or power.

(kkk) "Governmental Authorizations" is defined in Section 4.20.

(lll) "Hazardous Substances" means any pollutant, contaminant, dangerous or toxic substance, hazardous or extremely hazardous substance or chemical, or otherwise hazardous material or waste defined as "hazardous waste", "hazardous substance" or "hazardous material" under applicable Environmental Laws, including chemicals, pollutants, contaminants, wastes, toxic substances, which are classified as hazardous, toxic, radioactive, or otherwise are regulated by, or form the basis for Liability under, any applicable Environmental Law including hazardous substances under CERCLA.

(mmm) "Hedge" means any future derivative, swap, collar, put, call, cap, option or other contract that is intended to benefit from, relate to, or reduce or eliminate the risk of fluctuations in interest rates, basis risk or the price of commodities, including Hydrocarbons or securities, to which Seller or any Oil and Gas Property is bound.

(nnn) "Hire Date" is defined in Section 7.18(a).

(ooo) "Hired Employee" is defined in Section 7.18(a).

(ppp) "HSR Act" means the Hart-Scott-Rodino Antitrust Improvements Act of 1976, as amended.

(qqq) "Hydrocarbons" means oil and gas and other hydrocarbons produced or processed in association therewith (whether or not such item is in liquid or gaseous form), or any combination thereof, and any minerals (whether in liquid or gaseous form) produced in association therewith, including all crude oil, gas, casinghead gas, condensate, natural gas liquids, and other gaseous or liquid hydrocarbons (including ethane, propane, iso-butane, nor-butane, gasoline, and scrubber liquids) of any type and chemical composition.

(rrr) "Imbalance" means any over-production, under-production, over-delivery, under-delivery or similar imbalance of Hydrocarbons produced from or allocated to the Assets, regardless of whether such over-production, under-production, over-delivery, under-delivery or similar imbalance arises at the wellhead, pipeline, gathering system, transportation system, processing plant or other location, including any imbalances under

-12-

gas balancing or similar agreements, imbalances under processing agreements and imbalances under gathering or transportation agreements.

(sss) "Indemnified Person" is defined in Section 12.6(a).

(ttt) "Indemnifying Party" is defined in Section 12.6(a).

(uuu) "Initial Deposit" is defined in Section 2.3(a).

(vvv) "Knowledge" means, with respect to either Party, the actual conscious knowledge of only those officers of such Party named on Schedule 1.2; provided, however, that with respect to Section 4.11, Section 4.16, Section 4.17 and Section 4.20, "Knowledge" shall require investigation or inquiry of the appropriate personnel of the applicable Party.

(www) "Laws" means all laws, statutes, rules, regulations, ordinances, orders, decrees, requirements, judgments and codes of Governmental Authorities.

(xxx) "Lease" is defined in Section 1.1(g)(i).

(yyy) "Lien" means any lien, mortgage, pledge, collateral assignment or security interest, of any kind (including any agreement to give any of the foregoing, any conditional sale or other title retention agreement) and any option, trust or other preferential arrangement having the practical effect of any of the foregoing.

(zzz) "Limited Agency Agreement" is defined in Section 9.2(h).

(aaaa) "Marketing Required Consents" is defined in Section 7.6(b).

(bbbb) "Material Adverse Effect" means any event, change or circumstance that results in a material adverse effect on the ownership, operation or financial condition of the Assets as currently operated as of the Execution Date; provided, however, that "Material Adverse Effect" shall not include material adverse effects resulting from (i) general changes in Hydrocarbon prices; (ii) changes in condition or developments generally applicable to the oil and gas industry in the United States or any area or areas where the Assets are located, (iii) economic, financial, credit or political conditions and general changes in markets; (iv) changes in condition or developments generally applicable to the oil and gas industry; (v) acts of God, including hurricanes and storms; (vi) acts or failures to act of Governmental Authorities (where not caused by the willful or negligent acts of Seller); (vii) civil unrest or similar disorder; terrorist acts; or any outbreak of hostilities or war; (viii) any reclassification or recalculation of reserves in the ordinary course of business; (ix) changes in Laws; (x) natural declines in well performance; and (xi) any changes resulting from the announcement of the transactions contemplated hereby or the performance of the covenants set forth herein.

(cccc) "Material Contract" means, to the extent binding on the Oil and Gas Properties or Purchaser's ownership thereof after Closing, any Contract which is one or more of the following types and which, (A) in the case of (i), (ii), (iv), (v), and (vi)

below, can reasonably be expected to result in revenue or receipts per fiscal year in excess of Two Hundred Fifty Thousand Dollars ($250,000); or (B) in the case of (i), (iv), (v), (vi), (vii) and (viii) below, can reasonably be expected to result in expenditures per fiscal year in excess of Two Hundred Fifty Thousand Dollars ($250,000), in each case, net to the aggregate interests of Seller:

  (i)  Contracts with any Affiliate of Seller;

  (ii)  Contracts for the sale, purchase, exchange, or other disposition of Hydrocarbons produced from the Oil and Gas Properties that can reasonably be expected to involve obligations of, or payments in excess of Two Hundred Fifty Thousand Dollars ($250,000) during the current year or any subsequent fiscal year which are not cancelable without penalty to Seller, its Affiliates, or its or their permitted successors and assigns, on at least sixty (60) days prior written notice;

  (iii)  To the extent currently pending, Contracts of Seller to sell, lease, farmout, exchange, or otherwise dispose of all or any part of the Oil and Gas Properties after Closing, but excluding right of reassignment upon intent to abandon an Oil and Gas Property;

  (iv)  Contracts for the gathering, treatment, processing, storage or transportation of Hydrocarbons guaranteed with minimum throughput requirements;

  (v)  Any Hedges;

  (vi)  Contracts that are joint operating agreements, unit operating agreements, unit agreements, exploration agreements, development agreements, area of mutual interest agreements or other similar agreements;

  (vii)  Contracts for the construction and installation of equipment, fixtures or facilities with guaranteed production throughput requirements or demand charges or which cannot be terminated by Seller without penalty on sixty (60) days or less notice; and

  (viii)  Contracts requiring the acquisition or use of any Third Party compressor equipment, drilling units, quarters or any Third Party service equipment arising out of or related to the Assets which cannot be terminated by Seller without penalty on sixty (60) days or less notice.

(dddd) "Neptune Amount" is defined in Section 7.6(d).

(eeee) "Neptune Field" is defined in Exhibit E.

(ffff) "Net Revenue Interest" means, with respect to any Oil and Gas Property, the percentage interest in and to all production of Hydrocarbons produced, saved and sold from or allocated to such Oil and Gas Property, after giving effect to all Royalties.

-14-

(gggg) "Noble Performance Bond" is defined in Exhibit E.

(hhhh) "NORM" means naturally occurring radioactive material, radon gas and asbestos.

(iiii) "Oil and Gas Properties" is defined in Section 1.1(g)(ii).

(jjjj) "OSFRs" is defined in Section 9.3(i).

(kkkk) "other authority" is defined in Section 7.21(a).

(llll) "P&A Obligations" means any and all obligations, liabilities, Damages, losses and claims arising out of or attributable to the payment or performance of all Plugging and Abandonment (including those constituting Assumed Obligations).

(mmmm) "Permitted Encumbrances" means any or all of the following:

(i) all Royalties if the net cumulative effect of such burdens do not, individually or in the aggregate, (A) reduce Seller's Net Revenue Interests in the applicable Oil and Gas Property below that shown in Exhibit A or (B) obligate Seller to bear a Working Interest for any Oil and Gas Property above the percentage shown in Exhibit A for such Oil and Gas Property unless the Net Revenue Interest for such Oil and Gas Property is greater than the Net Revenue Interest set forth on Exhibit A for such Oil and Gas Property in the same proportion as any increase in such Working Interest;

(ii) the terms of any Leases, all Contracts described on Schedule 4.9, and the Rights of Way, unit agreements, pooling agreements, operating agreements, production sales contracts, division orders and other contracts, agreements and instruments applicable to the Assets, including provisions for penalties, suspensions or forfeitures contained therein, to the extent that the terms thereof do not, individually or in the aggregate, detract from the value of or materially interfere with the use, operation or ownership of the Assets (as operated as of Effective Date);

(iii) rights of first refusal, preferential purchase rights and similar rights with respect to the Assets;

(iv) all (A) Customary Consents; (B) Third Party consent requirements and similar restrictions which are not applicable to the sale of the Assets contemplated by this Agreement and (C) and all Third Party consent requirements and similar restrictions with respect to which waivers or consents are obtained from the appropriate Persons prior to the Closing Date or the appropriate time period for asserting the right has expired or which need not be satisfied prior to a transfer;

(v) Liens for Taxes or assessments not yet delinquent or, if delinquent, being contested in good faith by appropriate actions;

(vi)    materialman's, warehouseman's, workman's, carrier's, mechanic's, vendor's, repairman's, employee's, contractor's, operator's Liens, construction Liens and other similar Liens arising in the ordinary course of business for amounts not yet delinquent (including any amounts being withheld as provided by Law), or if delinquent, being contested in good faith by appropriate actions;

(vii)    Liens created under the terms of the Leases, Rights of Way or the Contracts that, in each case, are for amounts not yet delinquent (including any amounts being withheld as provided by Law), or if delinquent, being contested in good faith by appropriate actions;

(viii)    rights of reassignment arising upon the expiration or final intention to abandon or release any of the Assets;

(ix)    all applicable Laws and rights reserved to or vested in any Governmental Authorities (A) to control or regulate any of the Assets in any manner, (B) to assess Tax with respect to the Assets, the ownership, use or operation thereof, or revenue, income or capital gains with respect thereto, (C) by the terms of any right, power, franchise, grant, license or permit, or by any provision of Law, to terminate such right, power, franchise grant, license or permit or to purchase, condemn, expropriate or recapture or to designate a purchaser of any of the Assets, (D) to use such property in a manner which does not materially impair the use of such property for the purposes for which it is currently owned and operated, or (E) to enforce any obligations or duties affecting the Assets to any Governmental Authority, with respect to any franchise, grant, license or permit;

(x)    burdens, obligations and duties under all applicable Laws of any Governmental Authority or under any franchise, grant, ordinance license or permit issued by any Governmental Authority;

(xi)    failure to record Leases or Rights-of-Way issued by any Governmental Authority in the real property, conveyance, or other records of the county in which such Leases are located or adjacent, provided that the instruments evidencing the conveyance of such title to Seller from its immediate predecessor in title are recorded in the BOEM, BSEE or other Governmental Authority that issued any such Lease or Right-of-Way;

(xii)    defects based on the inability to locate an unrecorded instrument of which Purchaser has constructive or inquiry notice by virtue of a reference to such unrecorded instrument in a recorded instrument (or a reference to a further unrecorded instrument in such unrecorded instrument), if no claim has been made under such unrecorded instruments within the last ten (10) years;

(xiii)    any Lien on, burdening or affecting the Assets which is expressly waived, assumed, bonded or otherwise discharged at or prior to Closing;

(xiv)   any Liens, defects, irregularities or other matters set forth or described on <u>Exhibit A</u> or the Disclosure Schedules;

(xv)   any Liens, defects or irregularities which do not, individually or in the aggregate, materially detract from the value of or materially interfere with the use, operation or ownership of the Assets subject thereto or affected thereby;

(xvi)   any Liens, defects, burdens or irregularities which are based solely on (A) a lack of information in Seller's files or of record or (B) references to any document if a copy of such document is not in Seller's files or of record; and

(xvii)   any other Liens, defects, burdens or irregularities consisting of (A) any defect arising out of lack of corporate or entity authorization, unless affirmative evidence shows that such corporate or entity action was not authorized or results in another party's superior claim of title to the Assets; (B) any defect that has been cured by possession; (C) any defect that is cured, released or waived by any Law of limitation or prescription, including adverse possession and the doctrine of laches or which has existed for more than twenty (20) years and no affirmative evidence shows that another Person has asserted a superior claim of title to the Assets; (D) any defect arising from any change in applicable Law after the Execution Date, including changes that would raise the minimum landowner royalty; (E) any Lien or loss of title resulting from Seller's conduct of business in compliance with this Agreement; (F) any defect that affects only which Person has the right to receive royalty payments (rather than the amount of such royalty) and that does not affect the validity of the underlying Oil and Gas Property and (G) future adjustments in acreage, Working Interest and Net Revenue Interest for adjustments in acreage for pooled or unitized Leases.

(nnnn) "<u>Person</u>" means any individual, corporation, partnership, limited liability company, trust, estate, Governmental Authority or any other entity.

(oooo) "<u>Petition for Waiver</u>" is defined in <u>Section 7.15(d)</u>.

(pppp) "<u>PHA Required Consents</u>" is defined in <u>Section 7.6(a)</u>.

(qqqq) "<u>Phase I</u>" is defined in <u>Section 7.1(a)</u>.

(rrrr)   "<u>Plan</u>" means that certain plan of reorganization under chapter 11 of the Bankruptcy Code, dated February 14, 2018, attached hereto as <u>Exhibit L</u> (including all exhibits, appendices, and schedules thereto), as may be amended, supplemented or modified from time to time.

(ssss)   "<u>Plugging and Abandonment</u>" and "<u>Plug and Abandon</u>" and its derivatives mean all plugging, replugging, abandonment, re-plugging and re-abandonment, equipment removal, disposal or restoration associated with the properties and assets included in or burdened by the Assets, including all plugging and abandonment, removal, dismantling, decommissioning, surface and subsurface restoration, site clearance and

disposal of the Wells, Facilities, well cellars, fixtures, platforms, caissons, flowlines, pipelines, structures and personal property of whatever kind located on or under, related to or associated with operations and activities conducted by whomever with respect to the Assets, the flushing, capping, pickling, burial, removal and capping of all associated flowlines, field transmission and gathering lines, pit closures, the restoration of the surface, site clearance, any disposal of related waste materials and Hazardous Substances and obligations to obtain plugging exceptions for any Well with a current plugging exception, all in accordance with all applicable Laws, the terms and conditions of the Leases or similar leasehold interests, beneficial interests, easements and Contracts.

(tttt)    "Property Costs" means all operating expenses paid or payable to Third Parties (including costs of property related insurance historically allocated to the Assets, rentals, shut-in payments, title examination and curative actions attributable to the ownership of the Assets or the production of Hydrocarbons produced from the Assets, but excluding Seller's Taxes, Seller's general and administrative costs and insurance costs that are not property related or historically allocated to the Assets and any business interruption insurance) and capital expenditures (including bonuses, broker fees, and other Lease acquisition costs, costs of drilling and completing wells, and costs of acquiring equipment) incurred in the ownership and operation of the Assets in the ordinary course of business, COPAS overhead costs charged to the Assets under any applicable Contracts, but excluding (without limitation) liabilities, losses, costs, and expenses attributable to: (i) claims, investigations, administrative proceedings, arbitration or litigation directly or indirectly arising out of or resulting from actual or claimed personal injury, illness or death, property damage, environmental damage or contamination, other torts; private rights of action given under any Law, or violation of any Law; (ii) claims of improper calculation or payment of Royalties; (iii) claims for Imbalances; (iv) Casualty Loss; and (v) any claims for indemnification, contribution, or reimbursement from any Third Party with respect to damages of the type described in preceding clauses (i) through (iv) whether such claims are made pursuant to Contract or otherwise. Notwithstanding anything to the contrary set forth in this Agreement, however, Purchaser shall have no liability or responsibility for Property Costs attributable to Seller's bonding or surety obligations. Determination of whether Property Costs are attributable to the period before, on or after the Effective Date shall be based on when services are rendered, when the goods are delivered, or when the work is performed. For clarification, the date an item or work is ordered is not the date of a transaction, but rather the date on which the item ordered is delivered to the job site, or the date on which the work ordered is performed, shall be the relevant date.

(uuuu) "Proprietary Seismic Data" means any and all proprietary Seismic Data owned (but not licensed) by Seller and/or its Affiliates related to the Assets.

(vvvv) "PUD Location" means each proved undeveloped location described on Exhibit A-3 attached hereto, including the Leases (or portion thereof) included in or constituting such location described therein but in each case only as to the applicable Subject Formations described for each such PUD Location on Exhibit A-3.

(wwww)    "Purchaser" is defined in the introductory paragraph hereof.

-18-

(xxxx) "Purchaser Employer" is defined in Section 7.18(a).

(yyyy) "Purchaser Employment Liabilities" is defined in Section 7.18(a).

(zzzz) "Purchaser Group" is defined in Section 12.3.

(aaaaa) "Purchaser's Representatives" is defined in Section 7.1(a).

(bbbbb)    "Receiving Party" is defined in Section 10.5.

(ccccc) "Records" means all books, records, files, data, information, drawings and maps to the extent (and only to the extent) related to the Assets, including electronic copies of all computer records where available, contract files, lease files, well logs, division order files, title opinions and other title information (including abstracts, evidences of rental payments, maps, surveys and data sheets), hazard data and surveys, production records, SEMS Documentation and Procedures, Proprietary Seismic Data, engineering files and environmental records, but excluding, however, in each case, the Excluded Records.

(ddddd)    "Release" means any discharge, emission, spilling, leaking, pumping, pouring, injecting, dumping, burying, leaching, migrating, abandoning or disposing into or through the environment of any Hazardous Substance, including the abandonment or discarding of barrels, containers and other closed receptacles containing any Hazardous Substance.

(eeeee) "Remediate" mean any remedial, removal, response, investigation, monitoring, construction, closure, disposal, testing, integrity testing, or other corrective actions required under applicable Environmental Laws to address a violation of Environmental Law, in each case taking into account permanent or non-permanent remedies or actions, including mechanisms to contain or stabilize Hazardous Substances, including monitoring site conditions, natural attenuation, risk-based corrective action, institutional controls, or other appropriate restrictions on the Oil and Gas Properties, including caps, dikes, encapsulation, and leachate collection systems.

(fffff)   "Replacement Neptune Bond" is defined in Exhibit E.

(ggggg)    "Replacement Neptune Policy" is defined in Exhibit E.

(hhhhh)    "Required Consent" means any consent, approval or authorization that is required to be obtained, made or complied with for or in connection with the sale, assignment or transfer of any Asset, or any interest therein by Seller as contemplated by this Agreement that expressly provides in the applicable agreement or contract that the sale or transfer of such Asset without compliance with the terms of any such agreement or contract would result in voidability, termination or other material impairment of any rights in relation to such Asset or any other Asset or the voidability of the assignment of any Asset contemplated hereunder.

(iiiii)   "Requisite Financial Statement Information" is defined in Section 7.21(a).

(jjjjj)  "Retained Liabilities" is defined in Section 12.3(c).

(kkkkk)  "Retained Marketing Contracts" is defined in Section 7.15(h).

(lllll)  "Rights of Way" is defined in Section 1.1(g)(v).

(mmmmm)  "Royalties" means all royalties, overriding royalties, reversionary interests, net profit interests, production payments, carried interests, non-participating royalty interests, reversionary interests and other royalty burdens and other interests payable out of production of Hydrocarbons from or allocated to the Oil and Gas Properties or the proceeds thereof to Third Parties.

(nnnnn)  "RSA" means that certain Restructuring Support Agreement entered into by Purchaser on February 14, 2018, attached hereto as Exhibit M.

(ooooo)  "Sale Order" is defined in Section 9.3(q).

(ppppp)  "SEC" is defined in Section 7.21(a).

(qqqqq)  "Securities Act" is defined in Section 7.21(a).

(rrrrr)  "Seismic Contract"  means, whether or not related to the Assets, any agreement, contract, or other arrangement related to the acquisition, licensing, sale, modification, or other use or ownership of Seismic Data, and any similar contract, including Seismic Licenses or other contracts providing for the exclusive or non-exclusive use, modification, or disclosure of proprietary Seismic Data.

(sssss)  "Seismic Data" means any and all seismic, geological, geochemical and geophysical data (including core and fluid samples and other engineering, geological and/or geophysical studies (including seismic data, studies and information)), all licensed or proprietary or confidential geologic, seismic, geophysical, and interpretative data, records and analyses, including any and all interpretations, derivative data, and other work products of any of the foregoing and other similar information and records, in each case relating to the Assets or the regional area surrounding the Assets.

(ttttt)  "Seller" is defined in the introductory paragraph above.

(uuuuu)  "Seller Group" is defined in Section 12.2.

(vvvvv)  "Seller Termination Notice" is defined in Section 11.1(c).

(wwwww)  "Seller WARN Liability" is defined in Section 7.18(a)(i).

(xxxxx)  "Seller's Representatives" means, Seller's directors, officers, employees, contractors, agents and advisors (including, financial advisors, attorneys, accountants, and other consultants).

(yyyyy) "SEMS Documentation and Procedures" means all documents and procedures in place by Seller and/or its Affiliates to comply with the Bureau of Safety and Environmental Enforcement's Safety and Environmental Management System (SEMS) 30 CFR 250 Subpart S with respect to the Assets.

(zzzzz) "Straddle Period" is defined in Section 10.1(a)(iii).

(aaaaaa) "Subject Formation" means, for each Unit, Well or PUD Location set forth on Exhibit A-2 or Exhibit A-3, depths, productive formations, strata, or horizons specified for such Unit, Well or PUD Location on Exhibit A-2 or Exhibit A-3 in the column labeled "Subject Formation".

(bbbbbb) "Subsequent Deposit" is defined in Section 2.3(a).

(cccccc) "Suspense Funds" means any and all Royalties held in suspense by Seller at the Closing, and any interest accrued in escrow accounts for such suspended funds.

(dddddd) "Swordfish Field" means the leases, wells and easements listed below and all equipment appurtenant thereto or associated therewith:

Federal Oil and Gas Leases:
OCS G-15441 - Viosca Knoll Block 917
OCS G-15445 - Viosca Knoll Block 962

Wells:
VK 917 01 ST2 (API No. 608164040002)
VK 962 ST 1 (API No. 608164039901)

Easement:
Right-of-Way OCS-G 29151 Segment No. 18649.

(eeeeee) "Target Closing Date" is defined in Section 9.1.

(ffffff) "Taxes" means (i) all taxes, including any foreign, federal, state or local income tax, surtax, remittance tax, presumptive tax, net worth tax, special contribution, production, pipeline transportation tax, freehold mineral tax, value added tax, withholding tax, gross receipts tax, windfall profits tax, profits tax, severance tax, personal property tax, real property tax, sales tax, goods and services tax, service tax, transfer tax, use tax, excise tax, premium tax, stamp tax, motor vehicle tax, entertainment tax, insurance tax, capital stock tax, margin tax, franchise tax, occupation tax, payroll tax, employment tax, unemployment tax, disability tax, alternative or add-on minimum tax and estimated tax; (ii) all interest, penalties, fines, additions to tax, or additional amounts imposed by a Governmental Authority in connection with any item described in subsection (i); and (iii) any liability for any item described in subsections (i) or (ii), that arises by reason of contract, assumption, transferee or successor liability, operation of

-21-

Law (including by reason of participation in a consolidated, combined or unity Tax Return) or otherwise.

(gggggg) "Tax Partnership" means any entity, organization or group deemed to be a partnership within the meaning of section 761 of the Code or any similar federal statute, rule or regulation, and that is not excluded from the application of the partnership provisions of Subchapter K of Chapter 1 of Subtitle A of the Code by reasons of elections made, pursuant to section 761 (a) of the Code and all such similar federal statutes, rules and regulations, to be excluded from the application of all such partnership provisions.

(hhhhhh) "Tax Return" means each Tax return, declaration, report, claim for refund or information return or statement relating to Taxes.

(iiiiii) "Termination Date" is defined in Section 11.1.

(jjjjjj) "Third Party" means any Person other than Seller, Purchaser or any of their respective Affiliates.

(kkkkkk) "Third Party Claim" is defined in Section 12.6(c).

(llllll) "Treasury Regulations" means the income Tax regulations promulgated under the Code.

(mmmmmm) "Troubadour Assets" is defined in Section 7.26.

(nnnnnn) "Unadjusted Purchase Price" is defined in Section 2.2(a).

(oooooo) "Well Intervention Completion Notice" is defined in Section 7.24(b).

(pppppp) "Well Intervention Work Order" is defined in Section 7.24(b).

(qqqqqq) "Working Interest" means, with respect to any Oil and Gas Property, the percentage of costs and expenses associated with the exploration, drilling, development, operation, maintenance and abandonment on or in connection with such Oil and Gas Property required to be borne with respect thereto, but without regard to the effect of any Royalties.

Section 1.2 **Interpretation**. In this Agreement, unless a clear contrary intention appears: (a) the singular number includes the plural number and vice versa; (b) reference to any Person includes such Person's successors and assigns but only if such successors and assigns are not prohibited by this Agreement, and reference to a Person in a particular capacity excludes such Person in any other capacity or individually; (c) reference to any gender includes each other gender; (d) reference to any agreement (including this Agreement), document or instrument means, unless specifically provided otherwise, such agreement, document or instrument as amended or modified and in effect from time to time in accordance with the terms thereof; (e) reference to any Law means, unless specifically provided otherwise, such Law as amended, modified, codified, replaced or reenacted, in whole or in part, and in effect from time to time,

#5618848.7
#5618848.12

including rules and regulations promulgated thereunder and reference to any section or other provision of any Law means, unless specifically provided otherwise, that provision of such Law from time to time in effect and constituting the substantive amendment, modification, codification, replacement or reenactment of such section or other provision; (f) reference in this Agreement to any Article, Section, Appendix, Schedule or Exhibit means such Article or Section hereof or Appendix, Schedule or Exhibit thereto; (g) "hereunder", "hereof", "hereto" and words of similar import shall be deemed references to this Agreement as a whole and not to any particular Article, Section or other provision thereof; (h)"including" (and with correlative meaning "include") means including without limiting the generality of any description preceding such term; (i) "or" is not exclusive; (j) relative to the determination of any period of time, "from" means "from and including" and "to" means "to but excluding"; (k) the Schedules and Exhibits attached to this Agreement shall be construed with and as an integral part of this Agreement to the same extent as if the same had been set forth verbatim herein; provided that in the event a word or phrase defined in this Agreement is expressly given a different meaning in any Schedule or Exhibit, such different definition shall apply only to such Schedule or Exhibit defining such word or phrase independently, and the meaning given such word or phrase in this Agreement shall control for purposes of this Agreement, and such alternative meaning shall have no bearing or effect, on the interpretation of this Agreement; and (l) except as otherwise provided herein, all actions which any Person may take and all determinations which any Person may make pursuant to this Agreement may be taken and made at the sole and absolute discretion of such Person.

## ARTICLE 2
## PURCHASE AND SALE

Section 2.1 **Purchase and Sale**. On the terms and conditions contained in this Agreement, Seller agrees to sell to Purchaser and Purchaser agrees to purchase, accept and pay for the Assets.

Section 2.2 **Purchase Price**.

(a) The purchase price for the Assets shall be Four Hundred and Eighty Million Dollars ($480,000,000) (the "Unadjusted Purchase Price"), adjusted as provided in Section 2.4 (as adjusted, the "Adjusted Purchase Price").

Section 2.3 **Deposit**.

(a) On the Execution Date, Purchaser has deposited an amount equal to Five Million Dollars ($5,000,000) (the "Initial Deposit") with the Seller via wire transfer of immediately available funds to the account or accounts designated in writing by Seller, such Initial Deposit to be held in escrow by Seller in accordance with the terms of this Agreement. No later than March 15, 2018, Purchaser shall deposit an amount equal to Twenty-Five Million Dollars ($25,000,000) (the "Subsequent Deposit") with the Seller via wire transfer of immediately available funds to the account or accounts designated in writing by Seller, such Subsequent Deposit to be held in escrow by Seller in accordance with the terms of this Agreement. As used herein, the "Deposit" means (i) the Initial Deposit or (ii) if the Subsequent Deposit has been deposited with Seller, the Initial Deposit and the Subsequent Deposit, collectively.

(b)    In the event that Closing occurs, then on the Closing Date the entirety of the Deposit shall be retained by Seller and the amount of such Deposit, together with any accrued interest thereon, shall be credited to the Unadjusted Purchase Price.

(c)    If for any reason this Agreement is terminated in accordance with Section 11.1 below, then the Deposit shall be disbursed or retained as provided in Section 11.2 below.

Section 2.4    **Adjustments to Unadjusted Purchase Price**.  The Unadjusted Purchase Price shall be adjusted, without duplication, as follows:

(a)    decreased in accordance with Section 7.7 with respect to any applicable preferential rights to purchase, and Section 7.8 with respect to Casualty Loss;

(b)    decreased by the amount of all Suspense Funds, to the extent such funds are not transferred to Purchaser's control at the Closing;

(c)    adjusted for Imbalances on the Effective Date as follows:

(i)    decreased by the aggregate amount owed by Seller to Third Parties for Imbalances on the basis of, (A) in the case of gaseous Hydrocarbons, on the basis of Three Dollars and no/100 ($3.00) per MMBtu and (B) in the case of liquid Hydrocarbons, on the basis of Forty-Five Dollars and no/100 ($45.00) per barrel, as applicable; and

(ii)    increased by the aggregate amount owed by Third Parties to Seller for Imbalances on the basis of, (A) in the case of gaseous Hydrocarbons, on the basis of Three Dollars and no/100 ($3.00) per MMBtu and (B) in the case of liquid Hydrocarbons, on the basis of Forty-Five Dollars and no/100 ($45.00) per barrel, as applicable;

(d)    without prejudice to any Party's rights under ARTICLE 12, adjusted for proceeds and other income attributable to the Assets, Property Costs and certain other costs attributable to the Assets, and interest as follows:

(i)    decreased by an amount equal to the aggregate amount of the following proceeds to the extent received or receivable by Seller or any Affiliate of Seller:

(1)    amounts earned from the sale, during the period on and after the Effective Date, of Hydrocarbons produced from or attributable to the Oil and Gas Properties during any period on or after the Effective Date (net of any (x) Royalties, (y) gathering, processing and transportation costs paid in connection with sales of Hydrocarbons, and (z) any other Property Costs, that in any such case are deducted by the purchaser of production), and

(2)     other income earned with respect to the Assets or other receipts received or receivable by Seller with respect to the Assets during the period on and after the Effective Date;

(ii)     increased by an amount equal to the amount of all Property Costs, which are incurred in the ownership and operation of the Assets on or after the Effective Date but paid by or on behalf of Seller or any Affiliate of Seller through and including the Closing Date, or by Seller or any Affiliate of Seller after the Closing Date, except in each case (A) any costs already deducted in the determination of proceeds in Section 2.4(d)(i) and (B) Taxes, which are addressed in ARTICLE 10; and

(iii)     increased by the net amount of all prepaid expenses (including property specific prepaid insurance costs; bonuses; rentals; and cash calls to third Person operators) paid by Seller and attributable to periods on, or after, the Effective Date;

provided, the amount of each adjustment to the Unadjusted Purchase Price described in this Section 2.4(d) shall be determined in accordance with the United States generally accepted accounting principles using the accrual method of accounting, consistently applied (the "Accounting Principles");

(e)     decreased in accordance with Section 7.19; and

(f)     if applicable, increased in accordance with Section 7.6(d).

Section 2.5     **Ordinary Course Pre-Effective Date Costs Paid and Revenues Received Post-Closing**.

(a)     With respect to revenues earned or Property Costs incurred with respect to the Assets:

(i)     Seller shall be entitled to all amounts earned from the sale of Hydrocarbons produced from, or attributable to, the Oil and Gas Properties prior to the Effective Date, which amounts are received prior to, on or after Closing (net of any (A) Royalties that are not included in Property Costs; (B) gathering, processing, and transportation costs paid in connection with sales of Hydrocarbons that are not included as Property Costs under Section 2.5(a)(ii); and (C) other Property Costs, that in any such case are deducted by the purchaser of production or are paid by Purchaser), and to all other income earned with respect to the Assets up to but excluding the Effective Date and received prior to, on or after Closing.

(ii)     Seller shall be responsible for and shall pay (and be entitled to any refunds and indemnities with respect to) all Property Costs incurred prior to the Effective Date; provided, however, that Seller's responsibility for the foregoing

shall terminate on the Cut-Off Date unless Seller and/or any of its Affiliates has received notice or an invoice for such costs or expenses prior to the Cut-Off Date.

(iii)    Purchaser shall be entitled to all amounts earned through the sale of Hydrocarbons produced from, or attributable to, the Oil and Gas Properties on and after the Effective Date and to all other income and receipts earned with respect to the Assets on and after the Effective Date and received prior to, on or after Closing; provided, however, Seller shall be entitled to any such amounts that resulted in a decrease to the Unadjusted Purchase Price in Section 2.4(d)(i) as receivables.

(iv)    Purchaser shall be responsible for (and entitled to any refunds and indemnities with respect to) all Property Costs incurred on and after the Effective Date and Purchaser shall be entitled to all amounts received relating to prepaid expenses (including prepaid insurance costs, bonuses; rentals; and cash calls to Third Party operators related to the Assets) attributable to periods prior to, on, or after, the Effective Date.

(b)    Without duplication of any adjustments made pursuant to Section 2.4(d), should Purchaser or any Affiliate of Purchaser receive after Closing any proceeds or other income to which Seller is entitled under Section 2.5, Purchaser shall fully disclose, account for, and promptly remit the same to Seller.  Likewise, should Seller or any Affiliate of Seller receive after the Closing any proceeds or other income to which Purchaser is entitled under Section 2.5, Seller shall fully disclose, account for, and promptly remit the same to Purchaser.

(c)    Without duplication of any adjustments made pursuant to Section 2.4(d), should Purchaser, or any Affiliate of Purchaser, pay after Closing any Property Costs for which Seller is responsible under Section 2.5, Purchaser shall be reimbursed by Seller promptly after receipt of Purchaser's invoice, accompanied by copies of the relevant vendor or other invoice and proof of payment.  For the sake of clarity, after Closing Seller shall not pay any Property Costs for which Purchaser is responsible under Section 2.4 but shall promptly send Purchaser any invoices which are the responsibility of Purchaser under Section 2.4.

(d)    Seller shall have no further responsibility for Property Costs incurred with respect to the Assets, to the extent such amounts have not been paid on or before the Cut-Off Date, unless Seller and/or any of its Affiliates has received notice or an invoice for such costs or expenses prior to the Cut-Off Date.

Section 2.6    **Procedures**.

(a)    All adjustments and payments made pursuant to this ARTICLE 2 shall be without duplication of any other amounts paid or received under this Agreement or any other agreement entered into, or assigned, in connection with this Agreement.

#5618848.7
#5618848.12

(b) For purposes of allocating production (and accounts receivable with respect thereto), under Section 2.4 and Section 2.5, (i) liquid Hydrocarbons shall be deemed to be "from or attributable to" the Oil and Gas Properties when they are produced into the tank batteries related to each Well, and (ii) gaseous Hydrocarbons shall be deemed to be "from or attributable to" the Oil and Gas Properties when they pass through the delivery point sales meters or similar meters at the point of entry into the pipelines through which they are transported; provided, however, Purchaser shall be entitled to pipeline linefill and pack from the Oil and Gas Properties regardless of when produced. Seller shall use reasonable interpolative procedures to arrive at an allocation of production when exact meter readings or gauging or strapping data are not available.

(c) Surface use or damage fees, property related insurance premiums (as described in the definition of "Property Costs") and other Property Costs that are paid periodically shall be prorated based on the number of days in the applicable period falling on or before, or after, the Effective Date.

(d) Seller shall provide to Purchaser, prior to Closing, all data necessary to support any estimated allocation, for purposes of establishing the Hydrocarbon production revenues, Property Costs and other expenses relating to pre and post-Effective Date periods for the Assets.

(e) After Closing, Seller may handle all joint interest audits and other audits of Property Costs covering periods for which Seller is in whole or in part responsible under Section 2.4, provided that Seller shall not agree to any adjustments to previously assessed costs for which Purchaser is liable, or any compromise of any audit claims to which Purchaser would be entitled, without the prior written consent of Purchaser, such consent not to be unreasonably withheld. Each Party shall provide the other Party with a copy of all applicable audit reports and written audit agreements received by such Party and relating to periods for which the other Party is responsible hereunder.

(f) "Earned" and "incurred," as used in Section 2.4(d) and Section 2.5, shall be interpreted in accordance with accounting recognition guidance under the Accounting Principles.

Section 2.7 **Allocation of Purchase Price**. Seller and Purchaser agree that the Allocated Value of the Assets set forth on Schedule 2.7 represent the Parties' good faith allocation of the sum of the Unadjusted Purchase Price for the various Assets for federal and state income Tax purposes, which allocations shall be made in accordance with Section 1060 of the Code and the Treasury Regulations thereunder. The Parties shall agree on a revised Schedule 2.7 to allocate the purchase price (as determined for applicable Tax purposes) no later than the final settlement under Section 9.4. The allocations set forth in Schedule 2.7 (as finally revised) shall be used by Seller and Purchaser as the basis for reporting asset values and other items, including preparing Internal Revenue Service Form 8594, Asset Acquisition Statement (which Form 8594 shall be completed, executed and delivered by each of the Parties as soon as practicable after the Closing but in no event later than thirty (30) days prior to the date such form is required to be filed), and Seller and Purchaser agree to prepare and file all Tax Returns required to be filed by it consistent with such allocations. In the event that the allocations are

disputed by any taxing authority, the Party receiving notice of such dispute shall promptly notify and consult with the other Party and keep the other Party apprised of material developments concerning resolution of such dispute. Seller has accepted such Allocated Values for purposes of this Agreement and the transactions contemplated hereby, but otherwise make no representation or warranty as to the accuracy of such values.

Section 2.8   **Contingency Payments**.

(a)   If during the period of time commencing on the Closing Date and ending on December 31, 2022, inclusive, the average price of crude oil (based on the Louisiana Light Sweet Crude price of oil published by Argus in its daily report under the heading "Americas: US Gulf coast and midcontinent pipeline: LLS" and column "Wtd Avg") for any fiscal quarter equals or exceeds $63.00 per barrel, Purchaser agrees to pay Seller an amount equal to $2.00 per barrel on all crude oil volumes applicable to Seller's Net Revenue Interests produced from the Contingency Wells during such fiscal quarter (each such payment, a "Contingency Payment"); provided, however, that the aggregate amount of all Contingency Payments shall not exceed One Hundred Million Dollars ($100,000,000). "Contingency Wells" means those Wells transferred to Purchaser that are producing on the Closing Date.

(b)   To the extent any Contingency Payment is due to Seller in accordance with Section 2.8(a), Purchaser shall pay, within ten (10) Business Days of Seller's delivery of written notice with supporting documentation that the condition set forth in Section 2.8(a) has been satisfied, the Contingency Payment to Seller by federal funds wire transfer of immediately available funds to an account or accounts designated in writing by Seller to Purchaser.

(c)   Notwithstanding the foregoing, the provisions of this Section 2.8 shall only be effective, and Purchaser shall only be obligated to make the payments under this Section 2.8, if the actual produced crude oil volumes applicable to Seller's Net Revenue Interests from all Contingency Wells in the aggregate equals or exceeds eighty percent (80%) of the amount set forth on Schedule 2.8.

## ARTICLE 3
## TITLE MATTERS

Section 3.1   **General Disclaimer of Title Warranties and Representations**. Except (i) as set forth in Section 3.2 and (ii) for the special warranty of title as set forth in the Conveyances with respect to the Assets, **SELLER DOES NOT MAKE, AND PURCHASER, ON BEHALF OF ITSELF AND EACH MEMBER OF THE PURCHASER GROUP, HEREBY WAIVES, RELEASES AND DISCHARGES EACH MEMBER OF THE SELLER GROUP FROM, ANY WARRANTY OR REPRESENTATION OF ANY MEMBER OF THE SELLER GROUP, EXPRESS, IMPLIED, STATUTORY OR OTHERWISE, WITH RESPECT TO SELLER'S OR ANY OTHER PERSON'S TITLE TO ANY OF THE ASSETS**. Seller's title to all Assets shall be presumed to be Defensible Title unless Purchaser can affirmatively demonstrate that Seller's title to any Asset is less than Defensible Title. Purchaser hereby acknowledges and agrees that the special warranty of

#5618848.7
#5618848.12

Defensible Title set forth in the Conveyances (which shall survive in accordance with the terms of <u>Section 3.2</u>), set forth Purchaser's sole and exclusive remedy with respect to the failure of Seller or any other Person to have title to any of the Assets (whether Defensible Title or otherwise). Except with respect to any breach of Seller's special warranty of Defensible Title set forth in the Conveyances, **PURCHASER RELEASES, REMISES AND FOREVER DISCHARGES EACH MEMBER OF THE SELLER GROUP FROM ANY AND ALL SUITS, LEGAL OR ADMINISTRATIVE PROCEEDINGS, CLAIMS, DEMANDS, DAMAGES, LOSSES, COSTS, LIABILITIES, LOSSES, INTEREST OR CAUSES OF ACTION WHATSOEVER, IN LAW OR IN EQUITY, KNOWN OR UNKNOWN, ATTRIBUTABLE TO ANY PERIODS OF TIME WHICH ANY MEMBER OF THE PURCHASER GROUP MIGHT NOW OR SUBSEQUENTLY MAY HAVE, BASED ON, RELATING TO OR ARISING OUT OF, ANY DEFICIENCY IN TITLE TO ANY OF THE ASSETS**.

Section 3.2    <u>**Special Warranties of Title in the Conveyances**</u>.

(a)    The Conveyances delivered at Closing shall contain a special warranty of Defensible Title by Seller whereby Seller warrants Defensible Title to its interest in the Oil and Gas Properties unto Purchaser against every Person whomsoever lawfully claiming or to claim the same or any part thereof by, through or under Seller but not otherwise, subject, however, to the Permitted Encumbrances. The Conveyances shall assign and convey to Purchaser any warranties and representations of title given by Seller's predecessors in interest with respect to the Assets as well as assign and convey all rights of subrogation and substitute to such representations and warranties with respect to the Assets.

(b)    As a condition to asserting a valid claim for breach of Seller's special warranty of Defensible Title in the Conveyances, no later than the three (3) year anniversary of the Closing Date, Purchaser must furnish Seller a notice setting forth any matters which Purchaser asserts as a breach of the special warranty of Defensible Title set forth in the Conveyances. Seller shall have a reasonable opportunity, but not the obligation, to cure prior to the three (3) year anniversary of the Closing Date any breach asserted by Purchaser pursuant to this <u>Section 3.2</u>. Purchaser agrees to reasonably cooperate with any attempt by Seller to cure any such breach. Purchaser shall be deemed to have waived all breaches of Seller's special warranty of Defensible Title set forth in the Conveyances for which Seller has not received on or before the three (3) year anniversary of the Closing Date a valid notice.

## ARTICLE 4
## REPRESENTATIONS AND WARRANTIES OF SELLER

Subject to the provisions of this <u>ARTICLE 4</u> and the other terms and conditions of this Agreement and the exceptions and matters set forth on the Disclosure Schedules, Seller represents and warrants to Purchaser as of the Execution Date and the Closing Date the matters set out in this <u>ARTICLE 4</u>.

Section 4.1 **Existence and Qualification**. Seller is a corporation, duly formed, validly existing and in good standing under the laws of the state where it is formed (as set forth in the preamble) and is duly qualified to carry on its business in the states where the Assets are located and those other states where it is required to do so.

Section 4.2 **Power**. Seller has the power to enter into and perform this Agreement (and all documents required to be executed and delivered by Seller at Closing) and to consummate the transactions contemplated by this Agreement (and such documents).

Section 4.3 **Authorization and Enforceability**. The execution, delivery and performance of this Agreement (and all documents required to be executed and delivered by Seller at Closing), and the consummation of the transactions contemplated hereby and thereby, have been duly and validly authorized by all necessary corporate action on the part of Seller. This Agreement has been duly executed and delivered by Seller (and all documents required to be executed and delivered by Seller at Closing shall be duly executed and delivered by Seller) and this Agreement constitutes, and at the Closing such documents shall constitute, the valid and binding obligations of Seller, enforceable in accordance with their terms except as such enforceability may be limited by applicable bankruptcy or other similar Laws affecting the rights and remedies of creditors generally as well as to general principles of equity (regardless of whether such enforceability is considered in a proceeding in equity or at law).

Section 4.4 **No Conflicts**. Except as set forth on Schedule 4.4, the execution, delivery and performance of this Agreement by Seller, and the consummation of the transactions contemplated by this Agreement shall not (a) materially violate any provision of the organizational or governing documents of Seller or any agreement or instrument to which it is a party or by which Seller is bound, (b) result in the creation of any Lien on any Asset, (c) result in material default (with due notice or lapse of time or both) or the creation of any Lien or give rise to any right of termination, cancellation or acceleration under any material note, bond, mortgage, indenture, or other financing instrument to which Seller is a party or by which it is bound (which shall not be satisfied, assigned or terminated on or prior to the Closing as a result of the transactions contemplated hereunder), (d) materially violate any judgment, order, ruling, or decree applicable to Seller as a party in interest, (e) materially violate any provision of any agreement or instrument to which Seller is a party or by which Seller is bound, or (f) materially violate any Laws applicable to Seller.

Section 4.5 **Litigation**. Except as set forth on Schedule 4.5, except with respect to Environmental Laws and Environmental Liabilities, which are solely addressed in Section 4.17, there are no claims, demands, actions, suits, or proceedings (including condemnation, expropriation, or forfeiture proceedings) (a) pending before any Governmental Authority or arbitrator against Seller (i) relating to any Asset or Seller's ownership or operation thereof or (ii) seeking to prevent the consummation of the transactions contemplated hereby or (b) to Seller's Knowledge, threatened in writing by any Third Party or Governmental Authority against Seller (i) relating to any Asset or Seller's ownership or operation thereof or (ii) seeking to prevent the consummation of the transactions contemplated hereby.

Section 4.6 **Bankruptcy**. There are no bankruptcy, reorganization or receivership proceedings pending, being contemplated by, or, to the Knowledge of Seller, threatened in writing against, Seller.

Section 4.7 **Taxes and Assessments**. Except as set forth on Schedule 4.7:

(a) All material ad valorem, property, excise, severance, production, sales, use and similar Taxes based upon the operation or ownership of the Assets, but excluding, for the avoidance of doubt, any transfer taxes for which Purchaser is liable under Section 10.4, (collectively "Asset Taxes") that have become due and payable with respect to the Assets have been duly paid, and all material Tax Returns relating to such Asset Taxes required to be filed with respect to the Assets have been duly and timely filed. All such Tax Returns are true, correct and complete in all material respects;

(b) There are not currently in effect any extensions or waivers of any statute of limitations of any jurisdiction regarding the assessment or collection of any material Asset Taxes and no request for such waiver or extension is pending;

(c) There are no claims, assessments, demands, actions, suits, proceedings or audits asserted or now in progress, or to Seller's Knowledge, threatened, against Seller with respect to any material Asset Taxes relating to the Assets;

(d) There are no liens on any of the Assets attributable to any material Asset Taxes except for liens for current period Taxes that are not yet due and payable;

(e) Other than as set forth in Schedule 4.7, none of the Assets is subject to any Tax Partnership agreement or is otherwise treated, or required to be treated, as held in an arrangement requiring a partnership income Tax Return to be filed under Subchapter K of Chapter 1 of Subtitle A of the Code; and

(f) All of the Assets that are subject to any material property Tax have been properly listed and described on the property Tax rolls for all periods prior to and including the Closing Date and no portion of such Assets constitutes omitted property for property Tax.

Section 4.8 **Compliance with Laws**. Except as set forth on Schedule 4.8 and except with respect to Environmental Laws and Environmental Liabilities, which are solely addressed in Section 4.17, and Employment Matters, which are solely addressed in Section 4.19, to the Knowledge of Seller as of the Execution Date, Seller's ownership and operation of the Assets are not in material violation of any applicable Laws.

Section 4.9 **Contracts**.

(a) Schedule 4.9(a) sets forth a complete and accurate list of all Material Contracts.

(b) Except as set forth on Schedule 4.9(b), (i) each Material Contract, constitutes the legal, valid and binding obligation of Seller and, to Seller's Knowledge,

-31-

the other counterparties thereto, in each case in accordance with its terms, subject to applicable bankruptcy, insolvency, fraudulent conveyance, reorganization, moratorium and similar Laws affecting creditors' rights generally and to general principles of equity (regardless of whether enforceability is considered in a proceeding at law or in equity) and (ii) Seller has not received any written notice of Seller's default or breach of any Material Contract, the resolution of which is currently outstanding.

Section 4.10 **Payments for Production**. Except as set forth on Schedule 4.10, Seller is not obligated by virtue of a take or pay payment, advance payment, production payment or other similar payment (other than Royalties established in any Leases, any such obligations set forth in the Contracts set forth on Schedule 4.9 or any such obligations reflected on Exhibit A), to deliver Hydrocarbons, or proceeds from the sale thereof, attributable to Seller's interest in the Oil and Gas Properties at some future time without receiving full payment therefor at or after the time of delivery.

Section 4.11 **Imbalances**. Except as set forth on Schedule 4.11, to the Knowledge of Seller, there are no Imbalances as of the Effective Date.

Section 4.12 **Consents and Preferential Purchase Rights**. Except for Customary Consents and as set forth on Schedule 4.12 which lists each Required Consent, (a) there are no Required Consents which are required to be obtained, made or complied with for or in connection with the sale, assignment or transfer of any Asset, or any interest therein by Seller as contemplated by this Agreement and (b) there are no preferential rights applicable to the sale of Assets by Seller as contemplated by this Agreement.

Section 4.13 **Outstanding Capital Commitments**. Except as set forth on Schedule 4.13, there are no outstanding authorizations for expenditure or similar request or invoice for funding or participation under any Contract which are binding on Seller or the Assets and which Seller reasonably anticipates will individually require expenditures by the owner of the Assets attributable to periods on or after the Effective Date in excess of Two Hundred Fifty Thousand Dollars ($250,000) (net to Seller's Working Interests).

Section 4.14 **Insurance**. Schedule 4.14 lists all material insurance policies maintained by Seller with respect to the Oil and Gas Properties and Facilities.

Section 4.15 **Wells**. Except as described on Schedule 4.15, and to Seller's Knowledge with respect to any Assets not operated by Seller:

(a) all Wells drilled and completed by Seller have been drilled and completed within the limits permitted by all applicable Leases and pooling or unit agreements related to such Leases; and

(b) other than those Wells listed on Exhibit A-2 and wells that have been Plugged and Abandoned in accordance with all applicable Laws, there are no dry holes, or shut in or otherwise inactive wells that are located on lands burdened by the Leases or on lands pooled or unitized therewith that Seller is currently obligated by applicable Law to Plug and Abandon.

Section 4.16   **Royalties and Expenses**.   Except as set forth on <u>Schedule 4.16</u>, to the Knowledge of Seller, (a) all material Royalties have been properly and timely paid (or which constitute Suspense Funds) and (b) all material expenses payable under the terms of the Contracts have been properly and timely paid except, in each case, for such Royalties and expenses as are being currently paid prior to delinquency in the ordinary course of business.

Section 4.17   **Environmental Disclosures**.   Except as set forth on <u>Schedule 4.17</u>, there are no claims, written demand actions, suits or proceedings pending or, to the Knowledge of Seller, threatened, before any Governmental Authority alleging any material violation under any Environmental Law in connection with Seller's ownership or operation of the Oil and Gas Properties or Facilities.

Section 4.18   **Employee Benefits**.

(a)   The Employee Plans that are intended to be qualified under Section 401(a) of the Code have received determination, opinion or advisory letters from the Internal Revenue Service to the effect that such Employee Plans are qualified under Section 401(a) of the Code.

(b)   No event has occurred and no condition exists that would subject the Assets, Purchaser or any of its employee benefit plans to any liability with respect to (i) any Employee Plan that is subject to Section 302 of ERISA, Section 412 of the Code or Title IV of ERISA; or (ii) any Employee Plan that is a "<u>multiemployer plan</u>" within the meaning of Section 3(37) or Section 4001(a)(3) of ERISA.   None of the Assets are or are currently expected to be subject to any Lien arising under Section 430(k) of the Code or Section 303(k) of ERISA.

Section 4.19   **Employment Matters**.

(a)   Seller represents that, as of the Execution Date, it has provided Purchaser with a true and correct list of all Company Employees by name and title. No Company Employee or, to the Seller's Knowledge, Company Contractor is a party to or subject to any contract, agreement, policy, or other legal prohibition with Seller or its Affiliates that would preclude or restrict such Company Employee or Company Contractor from accepting employment with or providing services to Purchaser or an Affiliate or that would limit such Company Employee's or Company Contractor's activities with Purchaser or an Affiliate.

(b)   Seller is not a party to or negotiating any collective bargaining or other agreement with a labor organization representing any of the Company Employees with respect to operation of the Assets.   Since January 1, 2016, there has not been, nor, to Seller's Knowledge, has there been any threat of, any strike, slowdown, work stoppage, lockout, concerted refusal to work overtime or other similar labor activity or dispute affecting the Assets.

(c)   Seller is and for the past two (2) years has been in material compliance with all applicable Laws pertaining to employment and employment practices, including

classification of as an employee or independent contractor, to the extent they relate to the Assets. All Company Contractors are and have been properly treated as independent contractors of Seller and not employees.

(d)     Except as set forth on Schedule 4.19(d), there are no claims, demands, investigations, actions, suits, or proceedings against Seller pending, or to the Seller's Knowledge, threatened against Seller, by any Governmental Authority or by or on behalf of any Company Employee or Company Contractor, applicant, individual who provides or has provided services to the Assets, or any classes of the foregoing, alleging or concerning a violation of, or compliance with, any applicable Laws pertaining to employment and employment practices, including classification as an employee or independent contractor.

(e)     The representations and warranties set forth in this Section 4.19 are the Seller's sole and exclusive representations and warranties regarding employment matters.

Section 4.20     **Governmental Authorizations**.  Except as disclosed on Schedule 4.20, Seller has obtained and is maintaining all material federal, state and local governmental licenses, permits, franchises, orders, exemptions, variances, waivers, authorizations, certificates, consents, rights, privileges and applications therefor (the "Governmental Authorizations") that are presently necessary or required for the ownership and operation of the Oil and Gas Properties and Facilities as currently owned and operated (excluding Governmental Authorizations required by Environmental Laws).  To Seller's Knowledge, (i) Seller has operated the Oil and Gas Properties that it operates in all material respects in accordance with the conditions and provisions of such Governmental Authorizations, and (ii) no written notices of material violation have been received by Seller, and no actions suits or proceedings are pending or, to Seller's Knowledge, threatened that would result in any material modification, revocation, termination or suspension of any such Governmental Authority or which would require any material corrective or remediation action by Seller.

Section 4.21     **Foreign Person**.  Seller is not a "foreign person" within the meaning of Section 1445 of the Code.

Section 4.22     **Suspense Funds**.  Schedule 4.22 sets forth a list of all Royalties funds of Third Parties currently being held in suspense or escrow by Seller that are attributable to production from the Assets.

Section 4.23     **Liability for Brokers' Fees**.  Purchaser shall not directly or indirectly have any responsibility, liability or expense, as a result of undertakings or agreements of Seller or its Affiliates, for brokerage fees, finder's fees, agent's commissions or other similar forms of compensation in connection with this Agreement or any agreement or transaction contemplated hereby.

# ARTICLE 5
## REPRESENTATIONS AND WARRANTIES OF PURCHASER

Purchaser represents and warrants to Seller as of the Execution Date and the Closing Date the following:

Section 5.1 **Existence and Qualification**. Purchaser is a limited liability company duly formed, validly existing and in good standing under the laws of the state where it is formed (as set forth in the preamble) and is duly qualified to carry on its business in states where the Assets are located and those other states where it is required to do so.

Section 5.2 **Power**. Purchaser has the limited liability company power to enter into and perform its obligations under this Agreement (and all documents required to be executed and delivered by Purchaser at Closing) and to consummate the transactions contemplated by this Agreement (and such documents).

Section 5.3 **Authorization and Enforceability**. The execution, delivery and performance of this Agreement (and all documents required to be executed and delivered by Purchaser at Closing), and the consummation of the transactions contemplated hereby and thereby, have been duly and validly authorized by all necessary limited liability company action on the part of Purchaser. This Agreement has been duly executed and delivered by Purchaser (and, subject to the Bankruptcy Court's entry of the Sale Order and the Confirmation Order, as applicable, all documents required to be executed and delivered by Purchaser at Closing shall be duly executed and delivered by Purchaser) and this Agreement constitutes, and at the Closing such documents shall constitute, subject to the Bankruptcy Court's entry of the Sale Order and the Confirmation Order, as applicable, the valid and binding obligations of Purchaser, enforceable in accordance with their terms except as such enforceability may be limited by applicable bankruptcy or other similar laws affecting the rights and remedies of creditors generally as well as to general principles of equity (regardless of whether such enforceability is considered in a proceeding in equity or at law).

Section 5.4 **No Conflicts**. The execution, delivery and (as to clauses (iii) and (iv) below, subject to the Bankruptcy Court's entry of the Sale Order and the Confirmation Order, as applicable) performance of this Agreement by Purchaser, and (as to clauses (iii) and (iv) below, subject to the Bankruptcy Court's entry of the Sale Order and the Confirmation Order, as applicable) the consummation of the transactions contemplated by this Agreement, shall not (i) materially violate any provision of the organizational or governing documents of Purchaser or any agreement or instrument to which it is a party or by which it is bound, (ii) result in a material default (with due notice or lapse of time or both) or give rise to any right of termination, cancellation or acceleration under any material note, bond, mortgage, indenture, or other financing instrument to which Purchaser is a party or by which it is bound, (iii) materially violate any judgment, order, ruling, or regulation applicable to Purchaser as a party in interest or (iv) materially violate any Law applicable to Purchaser.

Section 5.5 **Consents, Approvals or Waivers**. Subject to the Bankruptcy Court's entry of the Sale Order and the Confirmation Order, as applicable, and except for Customary Consents and except with respect to Required Consents as represented by Seller pursuant to

-35-

Section 4.12 and disclosed on Schedule 4.12, the execution, delivery and performance of this Agreement by Purchaser shall not be subject to any consent, approval, notice or waiver from any Governmental Authority or other Third Party.

Section 5.6    **Litigation**.    There are no actions, suits or proceedings pending or, to Knowledge of Purchaser, threatened in writing before any Governmental Authority or arbitrator against Purchaser or any Affiliate of Purchaser which are reasonably likely to impair or delay materially Purchaser's ability to consummate the transaction contemplated hereby or perform its obligations hereunder.

Section 5.7    **Bankruptcy**.    Except for the Chapter 11 Case, there are no bankruptcy, reorganization or receivership proceedings pending, being contemplated by or, to the Knowledge of Purchaser, threatened against Purchaser or any Affiliate thereof (whether by Purchaser or any Third Party).

Section 5.8    **Financing**.    Purchaser has sufficient cash, available lines of credit or other sources of immediately available funds (in United States dollars) to enable Purchaser to fund the Initial Deposit on the Execution Date.    Subject to the consummation of the transactions contemplated by the RSA and the Backstop Commitment Agreement and the entry of the Sale Order and Confirmation Order, as applicable, Purchaser will have sufficient cash, available lines of credit or other sources of immediately available funds (in United States dollars) to enable Purchaser (i) to fund the Subsequent Deposit on March 15, 2018, (ii) to pay on the Closing Date the Closing Payment to or on behalf of Seller and (iii) to pay and perform on the Closing Date all other obligations of Purchaser hereunder and the other agreements delivered hereunder by Purchaser.

Section 5.9    **Investment Intent**.    Purchaser is acquiring the Assets for its own account and not with a view to their sale or distribution in violation of the Securities Act of 1933, as amended, the rules and regulations thereunder, any applicable state blue sky Laws, or any other applicable securities Laws.

Section 5.10    **Qualification**.    Purchaser is, or as of the Closing will be, qualified under all applicable Laws to own and operate the Oil and Gas Properties.

Section 5.11    **Independent Evaluation**.    Purchaser is (or its advisors are) sophisticated, experienced and knowledgeable investor in the oil and gas business.    In entering into this Agreement, Purchaser has relied solely upon Purchaser's own expertise in legal, Tax, reservoir engineering and other professional counsel concerning this transaction, the Assets and the value thereof.    Purchaser acknowledges and affirms that (a) it has completed such independent investigation, verification, analysis, and evaluation of the Assets and has made all such reviews and inspections of the Assets as it has deemed necessary or appropriate to enter into this Agreement and (b) at Closing Purchaser shall have completed, or caused to be completed, its independent investigation, verification, analysis, and evaluation of the Assets and made all such reviews and inspections of the Assets as Purchaser has deemed necessary or appropriate to consummate the transaction.    Except for the representations and warranties expressly made by Seller in ARTICLE 4 of this Agreement or the special warranty of title set forth in the Conveyances, Purchaser acknowledges that no member of Seller Group or any other Person has

made or relied upon any representations or warranties, express or implied, as to the financial condition, physical condition, environmental conditions, liabilities, operations, business, prospects of or title to the Assets.  Purchaser understands and acknowledges that neither the United States Securities and Exchange Commission nor any federal, state or foreign agency has passed upon the Assets or made any finding or determination as to the fairness of an investment in the Assets or the accuracy or adequacy of the disclosures made to Purchaser.

## ARTICLE 6
## DISCLAIMERS AND ACKNOWLEDGEMENTS

Section 6.1 **General Disclaimers**.  **EXCEPT AS EXPRESSLY REPRESENTED OTHERWISE IN ARTICLE 3, ARTICLE 4, THE CERTIFICATE OF SELLER TO BE DELIVERED AT THE CLOSING PURSUANT TO SECTION 9.2(f), OR SELLER'S SPECIAL WARRANTY OF DEFENSIBLE TITLE IN THE CONVEYANCES, WITHOUT LIMITING THE GENERALITY OF THE FOREGOING, SELLER DOES NOT MAKE ANY, SELLER EXPRESSLY DISCLAIMS, AND PURCHASER WAIVES AND REPRESENTS AND WARRANTS THAT PURCHASER HAS NOT RELIED UPON, ANY REPRESENTATION OR WARRANTY, EXPRESS OR IMPLIED, IN THIS OR ANY OTHER INSTRUMENT, AGREEMENT OR CONTRACT DELIVERED HEREUNDER OR IN CONNECTION WITH THE TRANSACTIONS CONTEMPLATED HEREUNDER OR THEREUNDER, INCLUDING ANY REPRESENTATION OR WARRANTY, EXPRESS OR IMPLIED AS TO (I) TITLE TO ANY OF THE ASSETS, (II) THE CONTENTS, CHARACTER OR NATURE OF ANY DESCRIPTIVE MEMORANDUM, OR ANY REPORT OF ANY PETROLEUM ENGINEERING CONSULTANT, OR ANY GEOLOGICAL, SEISMIC DATA, RESERVE DATA, RESERVE REPORTS, RESERVE INFORMATION (ANY ANALYSIS OR INTERPRETATION THEREOF) RELATING TO THE ASSETS, (III) THE QUANTITY, QUALITY OR RECOVERABILITY OF HYDROCARBONS IN OR FROM THE ASSETS, (IV) THE EXISTENCE OF ANY PROSPECT, RECOMPLETION, INFILL OR STEP-OUT DRILLING OPPORTUNITIES, (V) ANY ESTIMATES OF THE VALUE OF THE ASSETS OR FUTURE REVENUES GENERATED BY THE ASSETS, (VI) THE PRODUCTION OF PETROLEUM SUBSTANCES FROM THE ASSETS, OR WHETHER PRODUCTION HAS BEEN CONTINUOUS, OR IN PAYING QUANTITIES, OR ANY PRODUCTION OR DECLINE RATES, (VII) SUBJECT TO ARTICLE 12, THE MAINTENANCE, REPAIR, CONDITION, QUALITY, SUITABILITY, DESIGN OR MARKETABILITY OF THE ASSETS, (VIII) INFRINGEMENT OF ANY INTELLECTUAL PROPERTY RIGHT, (IX) ANY OTHER RECORD, FILES OR MATERIALS OR INFORMATION (INCLUDING AS TO THE ACCURACY, COMPLETENESS OR CONTENTS OF THE RECORDS) THAT MAY HAVE BEEN MADE AVAILABLE OR COMMUNICATED TO PURCHASER OR ITS AFFILIATES, OR ITS OR THEIR EMPLOYEES, AGENTS, CONSULTANTS, REPRESENTATIVES OR ADVISORS IN CONNECTION WITH THE TRANSACTIONS CONTEMPLATED BY THIS AGREEMENT OR ANY DISCUSSION OR PRESENTATION RELATING THERETO, OR (X) MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE OR CONFORMITY TO MODELS OR SAMPLES OF MATERIALS OF ANY EQUIPMENT, IT BEING EXPRESSLY**

#5618848.7
#5618848.12

**UNDERSTOOD AND AGREED BY THE PARTIES HERETO THAT EXCEPT AS SET FORTH ABOVE THE ASSETS ARE BEING TRANSFERRED "AS IS, WHERE IS," WITH ALL FAULTS AND DEFECTS, AND THAT PURCHASER HAS MADE OR CAUSED TO BE MADE SUCH INSPECTIONS AS PURCHASER DEEMS APPROPRIATE. PURCHASER SPECIFICALLY DISCLAIMS ANY OBLIGATION OR DUTY BY SELLER OR ANY MEMBER OF THE SELLER GROUP TO MAKE ANY DISCLOSURES OF FACT NOT REQUIRED TO BE DISCLOSED PURSUANT TO THE EXPRESS REPRESENTATIONS AND WARRANTIES SET FORTH HEREIN AND IN THE CONVEYANCES AND PURCHASER EXPRESSLY ACKNOWLEDGES AND COVENANTS THAT PURCHASER DOES NOT HAVE AND WILL NOT HAVE AND WILL NOT ASSERT ANY CLAIM, DAMAGES OR EQUITABLE REMEDIES WHATSOEVER AGAINST ANY MEMBER OF THE SELLER GROUP EXCEPT FOR CLAIMS, DAMAGES AND EQUITABLE REMEDIES AGAINST THE SELLER FOR BREACH OF AN EXPRESS REPRESENTATION, WARRANTY OR COVENANT OF SELLER UNDER THIS AGREEMENT OR SELLER'S SPECIAL WARRANTY OF DEFENSIBLE TITLE IN THE CONVEYANCES.**

Section 6.2 **Environmental Disclaimers**. Purchaser acknowledges that the Assets have been used for exploration, development, production, gathering and transportation of oil and gas and there may be petroleum, produced water, wastes, scale, NORM, Hazardous Substances or other substances or materials located in, on or under the Assets or associated with the Assets. Facilities and sites included in the Assets may contain asbestos, NORM or other Hazardous Substances. NORM may affix or attach itself to the inside of wells, pipelines, materials and equipment as scale, or in other forms. The wells, materials and equipment located on the Assets or included in the Assets may contain NORM and other wastes or Hazardous Substances. NORM containing material and/or other wastes or Hazardous Substances may have come in contact with various environmental media, including water, soils or sediment. Special procedures may be required for the assessment, remediation, removal, transportation or disposal of environmental media, wastes, asbestos, NORM and other Hazardous Substances from the Assets. **NOTWITHSTANDING ANYTHING TO THE CONTRARY IN THIS AGREEMENT OR ANY OTHER AGREEMENT OR INSTRUMENT DELIVERED HEREUNDER, SELLER DOES NOT MAKE, SELLER EXPRESSLY DISCLAIMS, AND PURCHASER WAIVES ANY REPRESENTATION OR WARRANTY, EXPRESS OR IMPLIED, WITH RESPECT TO THE PRESENCE OR ABSENCE OF NORM IN OR ON THE ASSETS IN QUANTITIES TYPICAL FOR OILFIELD OPERATIONS IN THE AREAS WHERE THE ASSETS ARE LOCATED. SELLER AND PURCHASER AGREE THAT, TO THE EXTENT REQUIRED BY APPLICABLE LAW TO BE EFFECTIVE, THE DISCLAIMERS OF CERTAIN REPRESENTATIONS AND WARRANTIES CONTAINED IN THIS __ARTICLE 6__ AND THE REST OF THIS AGREEMENT ARE "CONSPICUOUS" DISCLAIMERS FOR THE PURPOSE OF ANY APPLICABLE LAW. PURCHASER SHALL HAVE INSPECTED, OR WAIVED (AND UPON CLOSING SHALL BE DEEMED TO HAVE WAIVED) ITS RIGHT TO INSPECT, THE ASSETS FOR ALL PURPOSES, AND SATISFIED ITSELF AS TO THEIR PHYSICAL AND ENVIRONMENTAL CONDITION, BOTH SURFACE AND SUBSURFACE, INCLUDING CONDITIONS SPECIFICALLY RELATING TO THE PRESENCE, RELEASE, OR DISPOSAL OF HAZARDOUS SUBSTANCES, SOLID WASTES,**

ASBESTOS, OTHER MAN-MADE FIBERS, AND NORM. PURCHASER IS RELYING SOLELY UPON THE TERMS OF THIS AGREEMENT AND ITS OWN INSPECTION OF THE ASSETS. AS OF CLOSING, PURCHASER HAS MADE ALL SUCH REVIEWS AND INSPECTIONS OF THE ASSETS AND THE RECORDS AS PURCHASER HAS DEEMED NECESSARY OR APPROPRIATE TO CONSUMMATE THE TRANSACTION AND THAT, AT CLOSING, PURCHASER SHALL BE DEEMED TO HAVE KNOWLEDGE OF ALL FACTS CONTAINED IN THE RECORDS OR THAT WOULD HAVE BEEN DISCOVERED BY PURCHASER'S AND PURCHASER'S REPRESENTATIVES' EXERCISE OF REASONABLE CARE AND DUE DILIGENCE IN THE COURSE OF SUCH INVESTIGATION, VERIFICATION, ANALYSIS, AND EVALUATION.

Section 6.3 **Calculations, Reporting and Payments**. PURCHASER ACKNOWLEDGES AND AGREES THAT CLAIMS OR PROCEEDINGS AGAINST SELLER OR TO WHICH SELLER IS OR MAY BECOME A PARTY BEFORE, ON, OR AFTER THE CLOSING MAY HAVE AN EFFECT ON THE CALCULATION OF, AND LIABILITY WITH RESPECT TO, TAXES, ROYALTIES, RENTALS, AND OTHER PAYMENT OBLIGATIONS OF PURCHASER ARISING AFTER THE EFFECTIVE DATE RELATING TO THE ASSETS AND THE ASSUMED OBLIGATIONS AND THE NET REVENUE INTEREST OR WORKING INTEREST WITH RESPECT TO THE ASSETS. NOTWITHSTANDING THAT SELLER HAS RETAINED ANY LIABILITY OR RESPONSIBILITY UNDER THIS AGREEMENT FOR THE PAYMENT OF ANY DAMAGES, LOSSES OR CLAIMS WITH RESPECT TO ANY OF THE FOREGOING, THE RETAINED LIABILITIES AND OTHER LIABILITIES OF SELLER HEREUNDER SHALL NOT INCLUDE, AND PURCHASER HEREBY EXPRESSLY RELEASES THE MEMBERS OF THE SELLER GROUP FROM, ANY LIABILITY OR RESPONSIBILITY ARISING OUT OF OR RELATING TO ANY EFFECT THAT THE OUTCOME OR SETTLEMENT OF ANY SUCH CLAIMS OR PROCEEDINGS MAY HAVE ON THE CALCULATION OF TAXES, ROYALTIES, RENTALS, AND OTHER PAYMENT OBLIGATIONS OF PURCHASER ARISING AFTER THE EFFECTIVE DATE OR THE NET REVENUE INTEREST OR WORKING INTEREST WITH RESPECT TO THE ASSETS. FOR THE AVOIDANCE OF DOUBT, PURCHASER ACKNOWLEDGES AND AGREES THAT PURCHASER CANNOT RELY ON OR FORM ANY CONCLUSIONS FROM SELLER'S METHODOLOGIES FOR THE CALCULATION AND REPORTING OF PRODUCTION, ROYALTIES, AND TAXES ATTRIBUTABLE TO PRODUCTION PRIOR TO THE EFFECTIVE DATE.

Section 6.4 **Changes in Prices; Well Events**. PURCHASER ACKNOWLEDGES THAT IT SHALL ASSUME ALL RISK OF LOSS WITH RESPECT TO: (i) CHANGES IN COMMODITY OR PRODUCT PRICES AND ANY OTHER MARKET FACTORS OR CONDITIONS ON AND AFTER THE EFFECTIVE DATE; (ii) PRODUCTION DECLINES OR ANY ADVERSE CHANGE IN THE PRODUCTION CHARACTERISTICS OR DOWNHOLE CONDITION OF ANY WELL, INCLUDING ANY WELL WATERING OUT, OR EXPERIENCING A COLLAPSE IN THE CASING OR SAND INFILTRATION, FROM AND AFTER THE EXECUTION DATE (SUBJECT TO THE CASUALTY LOSS PROVISIONS CONTAINED HEREIN); AND

(iii) DEPRECIATION OF ANY ASSETS THAT CONSTITUTE PERSONAL PROPERTY THROUGH ORDINARY WEAR AND TEAR.

Section 6.5   **Limited Duties**.   ANY AND ALL DUTIES AND OBLIGATIONS WHICH EITHER PARTY MAY HAVE TO THE OTHER PARTY WITH RESPECT TO OR IN CONNECTION WITH THE ASSETS, THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY ARE LIMITED TO THOSE IN THIS AGREEMENT.   THE PARTIES DO NOT INTEND (a) THAT THE DUTIES OR OBLIGATIONS OF EITHER PARTY, OR THE RIGHTS OF EITHER PARTY, SHALL BE EXPANDED BEYOND THE TERMS OF THIS AGREEMENT ON THE BASIS OF ANY LEGAL OR EQUITABLE PRINCIPLE OR ON ANY OTHER BASIS WHATSOEVER OR (b) THAT ANY EQUITABLE OR LEGAL PRINCIPLE OR ANY IMPLIED OBLIGATION OF GOOD FAITH OR FAIR DEALING OR ANY OTHER MATTER REQUIRES EITHER PARTY TO INCUR, SUFFER OR PERFORM ANY ACT, CONDITION OR OBLIGATION CONTRARY TO THE TERMS OF THIS AGREEMENT AND THAT IT WOULD BE UNFAIR, AND THAT THEY DO NOT INTEND, TO INCREASE ANY OF THE OBLIGATIONS OF ANY PARTY UNDER THIS AGREEMENT ON THE BASIS OF ANY IMPLIED OBLIGATION OR OTHERWISE.

## ARTICLE 7
## COVENANTS OF THE PARTIES

Section 7.1   **Access**.

(a)      Upon execution of this Agreement until the Closing Date, Seller shall give Purchaser, its Affiliates and each of their respective officers, employees, agents, accountants, attorneys, investment bankers, environmental consultants and other authorized representatives ("Purchaser's Representatives") reasonable access to Assets operated by Seller and the Records in Seller's possession during Seller's normal business hours, for the purpose of conducting a confirmatory review of the Assets, but only to the extent that Seller may do so without (i) violating applicable Laws, (ii) waiving any legal privilege of Seller, any of its Affiliates or its counselors, attorneys, accountants or consultants, or (iii) violating any documented obligations to any Third Party and to the extent that Seller has authority to grant such access without breaching any restriction binding on Seller.  Such access shall be granted to Purchaser (i) in the offices of Seller located in Houston, Texas and (ii) the premises of the Oil and Gas Properties.   All investigations and due diligence conducted by Purchaser or any Purchaser's Representative shall be conducted at Purchaser's sole cost, risk and expense and any conclusions made from any examination done by Purchaser or any Purchaser's Representative shall result from Purchaser's own independent review and judgment. Seller shall use commercially reasonable efforts (but without incurring any out-of-pocket costs or expenses, liability or obligations to Seller unless requested by and reimbursed by Purchaser) to obtain permission for Purchaser to gain access to Third Party operated Oil and Gas Properties to inspect the condition of the same.  Seller or its designee shall have the right to accompany Purchaser and Purchaser's Representatives whenever they are on site on the Assets and also to collect split test samples if any are permitted and collected.

#5618848.7
#5618848.12

Purchaser's investigation and review shall be conducted in a manner that minimizes interference with the ownership or operation of the Assets or the business of Seller or co-owners thereof and Purchaser's inspection right with respect to the environmental condition of the Assets shall be limited to conducting a Phase I Environmental Site Assessment in accordance with the American Society for Testing and Materials (A.S.T.M.) Standard Practice Environmental Site Assessments: Phase I Environmental Site Assessment Process (Publication Designation: E1527-13) ("Phase I"). Purchaser shall not be entitled to conduct any Phase II environmental assessments, any invasive or intrusive testing, or sampling on or relating to the Assets without the prior written consent of Seller, such consent to be granted, conditioned or withheld at the sole discretion of Seller. Purchaser shall furnish to Seller, free of costs, a copy of any and all written drafts and final report and test results prepared by or for Purchaser related to any such Phase I, Phase II or further environmental assessment, intrusive testing or sampling on or relating to any of the Assets as soon as reasonably possible after such report is prepared. Purchaser shall obtain all permits necessary to conduct any approved invasive activities from any applicable Governmental Authorities; provided that, upon request, Seller shall provide Purchaser with assistance (at no cost or liability to Seller) as reasonably requested by Purchaser that may be necessary to secure such permits. Seller shall have the right, at its option, to split with Purchaser any samples collected pursuant to approved invasive activities. If the Closing does not occur, Purchaser (i) shall promptly return to Seller or destroy all copies of the Records, reports, summaries, evaluations, due diligence memos and derivative materials related thereto in the possession or control of Purchaser or any of Purchaser's Representatives and (ii) shall keep and shall cause each Purchaser Representative to keep, any and all information obtained by or on behalf of Purchaser confidential in accordance with the terms of the Confidentiality Agreement, except, in each case, as otherwise required by Law.

(b)     Purchaser agrees to indemnify, defend and hold harmless each member of the Seller Group, the other owners of interests in the Oil and Gas Properties, and all such Persons' stockholders, members, officers, directors, employees, agents, lenders, advisors, representatives, accountants, attorneys and consultants from and against any and all claims, damages, obligations, liabilities, losses, costs and expenses (including court costs and reasonable attorneys' fees), including claims, damages, obligations, liabilities, losses, costs and expenses attributable to, arising out of or relating to access to the Records, any offices of Seller, or the Assets prior to the Closing by Purchaser or any Purchaser's Representatives, **EVEN IF SUCH CLAIMS, DAMAGES, LIABILITIES, LOSSES, COSTS AND EXPENSES ARE CAUSED IN WHOLE OR IN PART BY THE NEGLIGENCE (WHETHER SOLE, JOINT OR CONCURRENT), STRICT LIABILITY OR OTHER LEGAL FAULT OF ANY MEMBER OF THE SELLER GROUP (BUT EXCLUDING GROSS NEGLIGENCE OR WILLFUL MISCONDUCT ON THE PART OF SELLER).**

(c)     Upon completion of Purchaser's due diligence, Purchaser shall at its sole cost and expense and without any cost or expense to Seller or its Affiliates, (i) repair all damage done to the Assets caused by Purchaser's due diligence, (ii) restore the Assets to the approximate same or better condition than they were prior to commencement of

Purchaser's due diligence to the extent the need for restoration was caused by Purchaser's due diligence, and (iii) remove all equipment, tools or other property brought onto the Assets in connection with Purchaser's due diligence. Any disturbance to the Assets (including the leasehold associated therewith) caused by Purchaser's due diligence shall be promptly corrected by Purchaser.

(d)     During all periods that Purchaser and/or any of Purchaser's Representatives are on the Assets or Seller's premises, Purchaser shall maintain, at its sole expense and with insurers reasonably satisfactory to Seller, policies of insurance of the types and in the amounts reasonably requested by Seller. Coverage under all insurance required to be carried by Purchaser hereunder shall (i) be primary insurance, (ii) list the members of the Seller Group as additional insureds, (iii) waive subrogation against the members of the Seller Group and (iv) provide for five (5) days prior notice to Seller in the event of cancellation or material modification of the policy or reduction in coverage. The coverage set forth in items (i), (ii) and (iii) in the preceding sentence shall only be to the extent of Purchaser's obligations as set forth in <u>Section 7.1(b)</u> and <u>Section 7.1(c)</u>. Upon request by Seller, Purchaser shall provide evidence of such insurance to Seller prior to entering the Assets.

Section 7.2     **Operation of Business**.

(a)     From the Execution Date until the Closing, Seller shall:

(i)     cause the Assets to be maintained and operated in the ordinary course of business in accordance with Seller's past practices and applicable Law, and maintain Seller's current Asset related insurance policies (or upon renewal thereof, in similar amounts and types to the extent then available on commercially reasonable terms and prices);

(ii)     use commercially reasonable efforts to maintain and keep the Oil and Gas Properties in full force and effect, except where such failure is due to the expiration of any Lease caused by (A) the express non-consent of Purchaser under <u>Section 7.2(b)</u> or (B) lack of production; specifically, Seller shall notify and consult with Purchaser with regard to any proposed action or decision not to act that would result in a non-consent event with respect to any Oil and Gas Property;

(iii)     provide to Purchaser bi-weekly production, drilling/completion, recompletion, workover, safety and inspection, and plugging and abandonment reports;

(iv)     not transfer, sell, hypothecate, encumber, novate or otherwise dispose of any of its Assets, except for (A) sales and dispositions of Hydrocarbons in the ordinary course of business and (B) sales and dispositions of equipment and materials that are surplus, obsolete or replaced upon notice and approval by Purchaser;

(v) not terminate (other than terminations based on expiration without any affirmative action by Seller), novate, materially amend, execute or extend any Contracts, other than the execution or extension of a contract for the sale or exchange of Hydrocarbons terminable on sixty (60) days or shorter notice;

(vi) provide Purchaser with a copy of and not approve, without Purchaser's consent, any individual authorization for expenditure or similar request or invoice for funding or participation under any Contract (other than those described on <u>Schedule 4.13</u>) which are reasonably estimated to require expenditures net to Seller's Working Interest in excess of Two Hundred Fifty Thousand Dollars ($250,000); and

(vii) maintain all material governmental permits and approvals affecting the Assets.

(b) Purchaser's approval of any action restricted by <u>Section 7.2(a)</u> shall not be unreasonably withheld or delayed and shall be considered granted within ten (10) days (unless a shorter time is reasonably required by the circumstances and such shorter time is specified in Seller's notice) of Seller's notice to Purchaser requesting such consent unless Purchaser notifies Seller to the contrary during that period.  Notwithstanding the foregoing provisions of this <u>Section 7.2</u>, in the event of an emergency or risk of loss, damage or injury to any person, property or the environment, Seller may take such action as reasonably necessary and shall notify Purchaser of such action promptly thereafter. Requests for approval of any action restricted by this <u>Section 7.2</u> shall be delivered to either John H. Smith at jsmith@fwellc.com or 713.969.1249 or Michael T. Dane at mdane@fwellc.com or 713.969.1135, each of whom shall have full authority to grant or deny such requests for approval on behalf of Purchaser.

Section 7.3 **Operatorship of the Assets**.  Seller does not make any representation or warranty to Purchaser as to transferability or assignability of operatorship of any Assets.  Seller agrees that as to the Assets operated by Seller, Seller shall take all reasonable actions, including execution of applicable governmental documentation, and shall vote any and all of its voting interests under any applicable Contracts (to the extent permitted under any applicable joint operating agreement) to appoint Purchaser (or its designee) as successor operator of such Assets, effective as of the Closing Date (at Purchaser's sole cost and expense) and to designate and/or appoint Purchaser, to the extent legally possible and permitted under any applicable Contracts as successor operator of such Assets effective as of the Closing Date.

Section 7.4 **Closing Efforts**.  Each of the Parties shall use its commercially reasonable efforts to take all actions and to do all things necessary, proper or advisable to consummate the transactions contemplated by this Agreement, including using its commercially reasonable efforts (a) to ensure that such Party's representations and warranties are true and correct in all material respects on the Closing Date, (b) to ensure that such Party's conditions to the obligations of the other Parties to consummate the Closing are satisfied on or before the Target Closing Date and (c) to obtain, at such Party's expense, all waivers, permits, consents, approvals or other authorizations from Governmental Authorities and to effect all registrations, filings and notices with or to Governmental Authorities, as may be required by applicable Laws for such

Party to consummate the transactions contemplated by this Agreement and to otherwise comply with all applicable Laws in connection with the consummation of the transactions contemplated by this Agreement.

Section 7.5 **Notice to Holders of Consent and Preferential Purchase Rights**. Promptly after the Execution Date (but in any event no later than three (3) Business Days thereafter), Seller shall prepare and send, or cause to be prepared and sent (after reasonable consultation with Purchaser), (a) notices to the holders of any Required Consents, approvals and authorizations (other than Customary Consents) that are set forth on Schedule 4.12 requesting consents to the transactions contemplated by this Agreement and (b) notices to the holders of any applicable preferential rights to purchase or similar rights that are set forth on Schedule 4.12 in compliance with the terms of such rights and requesting waivers of such rights. Seller and Purchaser shall cooperate and use commercially reasonable efforts to cause such consents, approvals and authorizations required to be obtained and delivered prior to Closing and all such preferential rights to purchase to be waived, provided that Seller shall not be required to make payments or undertake obligations to obtain the Required Consents, approvals or authorizations. If prior to Closing, Purchaser discovers any consents, Required Consent or preferential rights to purchase or similar rights that are not set forth on Schedule 4.12 and which are applicable to the Assets, Purchaser shall promptly (but in any event within three (3) Business Days) after discovery provide written notice to Seller of such consents, Required Consents, or preferential rights, whereupon Seller shall promptly thereafter comply with such consents, Required Consent and preferential rights in accordance with this Section 7.5, Section 7.6 and Section 7.7, as applicable.

Section 7.6 **Consents to Assignment**.

(a) With respect to the Required Consents set forth on Part 1 of Schedule 4.12 (the "PHA Required Consents"), Purchaser and Seller shall use commercially reasonable efforts to obtain such PHA Required Consents prior to Closing (which commercially reasonable efforts shall include Purchaser providing adequate credit assurances limited to the Assets to obtain such PHA Required Consents), and it shall be a condition to Closing pursuant to Section 8.1(f) and Section 8.2(g) that such PHA Required Consents are obtained.

(b) With respect to the Required Consents set forth on Part 2 of Schedule 4.12 (the "Marketing Required Consents"), regardless of whether such Marketing Required Consents are obtained by Closing or not, the applicable Contracts subject to such Marketing Required Consents shall (i) not be transferred to the Purchaser at Closing and (ii) shall be held by Seller after Closing along with all other Retained Marketing Contracts in accordance with Section 7.15(h). Notwithstanding the foregoing, following the Closing, the Parties shall continue to use commercially reasonable efforts to obtain the Marketing Required Consents (which commercially reasonable efforts shall include Purchaser providing adequate credit assurances limited to the Assets to obtain such Marketing Required Consents, as applicable). Regardless of whether such Marketing Required Consents are obtained by such date, on July 1, 2018, the Contracts subject to the Marketing Required Consents, along with all other Retained Marketing Contracts, shall be assigned to Purchaser as provided in Section 7.15(h).

(c)     If Seller is unable to transfer a Third Party Credit Support to Purchaser as the result of an un-obtained Required Consent, Seller shall continue to hold such Third Party Credit Support for Purchaser's benefit and account until such Required Consent can be obtained.  Seller shall provide all reasonable assistance to Purchaser to obtain the transfer of all Third Party Credit Support.  In the event such Third Party Credit Support is not transferred to Purchaser and is subsequently released to Seller after Closing, within ten (10) days thereafter, Seller shall pay Purchaser the amount equal to such Third Party Credit Support so released to Seller.

(d)     In no event will the Neptune Field or the Swordfish Field or, in each case, Assets related thereto, be transferred to Purchaser at Closing unless the Required Consent described on Schedule 4.12 – Part 4 (the "Neptune Consent") is satisfied at or prior to Closing, provided that, if the Neptune Consent is satisfied at or prior to Closing, the Neptune Field and the Swordfish Field and, in each case, all Assets related thereto will transfer to Purchaser at Closing and there will be no adjustment to the Unadjusted Purchase Price in connection therewith, other than as set forth elsewhere in this Agreement.  If the Neptune Consent is not satisfied prior to Closing, the Neptune Field and the Swordfish Field and, in each case, all Assets related thereto, shall be excluded from Closing and for purposes of adjustments to the Unadjusted Purchase Price pursuant to Section 2.4 and, in furtherance thereof (subject to the balance of this Section 7.6(d)), (i) such Assets shall be deemed to be deleted from Exhibit A attached hereto and added to Schedule 1.1 attached hereto and (ii) such Assets shall constitute Excluded Assets for all purposes hereunder.  Notwithstanding the foregoing, following the Closing until July 31, 2018 (but not thereafter), the Parties shall continue to use commercially reasonable efforts to obtain and satisfy the Neptune Consent (which commercially reasonable efforts shall include Purchaser providing adequate credit assurances limited to the Assets to obtain the Neptune Consent, if applicable).  If the Neptune Consent is satisfied after the Closing and on or prior to July 31, 2018, then: (A) promptly after the Neptune Consent is satisfied (x) Seller shall convey the Neptune Field and the Swordfish Field, and, in each case, all previously excluded Assets related thereto, to Purchaser, and (y) the Parties shall deliver all instruments and documents that would have been required under the terms hereof to be delivered at Closing with respect to such Assets, including, for the avoidance of doubt, the deliverables described in Section 9.3(m) and Section 9.3(n); (B) the Adjusted Purchase Price shall be determined under Section 9.4(b) giving effect to inclusion of the Neptune Field and the Swordfish Field, and, in each case, all previously excluded Assets related thereto or, if the Adjusted Purchase Price shall have been finally determined pursuant to Section 9.4(b) as of such time as the actions under the forgoing clause (A), then the Adjusted Price shall be re-determined pursuant to Section 9.4(b), *mutatis mutandis*, giving effect to the inclusion of such Assets, and (C) such Assets shall no longer be deemed to be (1) deleted from Exhibit A attached hereto, (2) added to Schedule 1.1 attached hereto or (3) Excluded Assets for any purposes hereunder.  If the Neptune Consent is not satisfied on or prior to July 31, 2018, then (x) the Neptune Field and the Swordfish Field, and, in each case, all previously excluded Assets related thereto will remain Excluded Assets for all purposes hereunder, (y) the Unadjusted Purchase Price shall be adjusted upward by an amount in cash equal to Thirty Million Dollars ($30,000,000) (the "Neptune Amount") and (z) promptly (but in any event no later than

-45-

two (2) Business Days) following July 31, 2018, Purchaser shall pay to Seller an amount in cash equal to the Neptune Amount via wire transfer of immediately available funds to the account or accounts designated in writing by Seller.

Section 7.7    **Preferential Rights**.

(a)    Any preferential purchase right applicable to the Assets must be exercised subject to all terms and conditions set forth in this Agreement, including the successful Closing of this Agreement pursuant to ARTICLE 9 on the dates set forth herein.  The consideration payable under this Agreement for any particular Asset for purposes of preferential purchase right notices shall be the Allocated Value for such Asset, adjusted as set forth herein.

(b)    If any preferential right to purchase any Asset is validly exercised prior to Closing, then (i) the Unadjusted Purchase Price shall be reduced by the Allocated Value of such Oil and Gas Property, (ii) such Oil and Gas Property shall be deemed to be deleted from Exhibit A attached hereto and added to Schedule 1.1 attached hereto, (iii) such Oil and Gas Property shall constitute an Excluded Asset for all purposes hereunder; provided, however, in the event the holder of any preferential right to purchase any Asset validly exercises such preferential right prior to Closing but refuses or fails to consummate the purchase of such Asset by the one hundred twentieth day following Closing, Seller shall convey such Asset to Purchaser effective as of the Effective Date pursuant to a Conveyance and, simultaneously with such conveyance, Purchaser shall pay to Seller the Allocated Value of such Assets (subject to all other applicable adjustments with respect to such Oil and Gas Properties under Section 2.4).

(c)    Should a Third Party fail to validly exercise or waive its preferential right to purchase as to any portion of the Assets prior to the Target Closing Date, and the time for exercise or waiver of such preferential right has not yet expired, then the Closing shall be extended until such preferential rights have been exercised, waived or the time for exercise or waiver of such preferential rights has expired.

(d)    If, prior to the Closing, Seller receives a preferential purchase right notice to acquire additional interest in the Assets from Third Parties, Seller shall promptly notify Purchaser and provide to Purchaser any such notice and all documentation provided therewith. Within the applicable preferential purchase right exercise period, Purchaser shall notify Seller in writing whether it wishes Seller to exercise such preferential purchase right and if so, Seller shall take all actions reasonably necessary to exercise such preferential purchase right. If such preferential purchase right is exercised by Seller in accordance with this Section 7.7(d) herein, all of Seller's title, rights, and obligations associated with the exercise and consummation of such preferential purchase right shall be assigned to Purchaser at the Closing and Seller shall pay all costs associated with the exercise of such preferential purchase rights and the Purchase Price shall be increased by such amounts paid by Seller. If however, Seller exercises such preferential purchase right pursuant to Purchaser's direction and this Agreement is terminated, Seller shall nevertheless assign to Purchaser all of Seller's title, rights, and obligations associated with the exercise and consummation of such preferential purchase right and Purchaser

-46-

shall reimburse Seller for all costs, obligations, liabilities incurred by Seller associated with the exercise and consummation of such preferential purchase right. Further, Purchaser shall be responsible for, shall pay and shall indemnify, defend and hold harmless Seller and each member of the Seller Group from and against all obligations, liabilities, claims, causes of action, and Damages caused by, arising out of, attributable to or resulting from Seller's exercise and consummation of any preferential purchase right at Purchaser's direction pursuant to this Section 7.7.

Section 7.8    **Casualty Loss and Condemnation**.

(a)    Notwithstanding anything herein to the contrary on and after the Effective Date, if Closing occurs, Purchaser shall assume all risk of loss with respect to production of Hydrocarbons through normal depletion (including watering out of any Well, collapsed casing or sand infiltration of any Well) and the depreciation of the Assets due to ordinary wear and tear, in each case, with respect to the Assets.

(b)    Until Closing, Seller shall promptly notify Purchaser if any portion of the Assets are damaged or destroyed, in whole or in part, by fire, explosion, wild well, hurricane, storm, weather events, loop currents, civil unrest or similar disorder; terrorist acts; war or any other hostilities or other casualty or is expropriated or taken in condemnation or under right of eminent domain (each a "Casualty Loss"), and in such event Purchaser and Seller shall, subject to the satisfaction (or waiver) of the conditions to Closing set forth in Section 9.2 and Section 9.3, nevertheless be required to Close. In the event that any such Casualty Loss results in Damages to the Assets in excess of One Hundred Thousand Dollars ($100,000), then Seller shall have the option to: (i) reduce the Unadjusted Purchase Price at Closing by the Parties' mutually agreed estimate of the amount of such Damages (after good faith negotiations), or (ii) promptly commence and diligently repair or restore, or cause to be repaired or restored, the Assets affected by such Casualty Loss to the condition which existed prior to the occurrence of such Casualty Loss, at Seller's sole cost and expense, in which case Purchaser shall grant Seller or Seller's designees reasonable access to the Assets after Closing in order to perform such repair and restoration work; provided that on or after Closing, with Seller's prior written consent, Purchaser may take over such repair and restoration work, and Seller shall reimburse Purchaser for all reasonable, documented costs and expenses relating thereto. In the event that the Parties cannot agree on the amount of such Damages after good faith negotiations, then clause (ii) of this Section 7.8(b) shall apply.

Section 7.9    **Notifications**.  Purchaser shall notify Seller promptly after a discovery by Purchaser that any representation or warranty of Seller contained in this Agreement is, becomes, or will be untrue in any material respect on or before the Closing Date.  Seller shall notify Purchaser promptly after a discovery by Seller that any representation or warranty of Purchaser contained in this Agreement is, becomes or will be untrue in any material respect on or before the Closing Date.  It is understood and agreed that the delivery of any notice required under this Section 7.9 shall not in any manner constitute a waiver by any Party of any conditions precedent to the Closing hereunder.

Section 7.10 **Affiliate Transactions**. At or prior to Closing, Seller (or an Affiliate of Seller, as applicable) shall terminate all unperformed Contracts with Seller's Affiliates, unless waived expressly by Purchaser.

Section 7.11 **Liability for Brokers' Fees**. Each Party hereby agrees to indemnify, defend and hold harmless the other Party, any Affiliate of such other Party, and all such other Party's stockholders, members, officers, directors, employees, agents, lenders, advisors, representatives, accountants, attorneys and consultants from and against any and all claims, obligations, damages, liabilities, losses, costs and expenses (including court costs and reasonable attorneys' fees) arising as a result of undertakings or agreements of any such indemnifying Party prior to Closing, for brokerage fees, finder's fees, agent's commissions or other similar forms of compensation to an intermediary in connection with the negotiation, execution or delivery of this Agreement or any agreement or document contemplated hereunder.

Section 7.12 **Confidentiality**.

(a) Purchaser hereby agrees to keep and to cause Purchaser's Representatives (as defined in the Confidentiality Agreement) to keep such Confidential Information (as defined in the Confidentiality Agreement) confidential pursuant to the terms of the Confidentiality Agreement. Upon the occurrence of Closing, the Confidentiality Agreement shall terminate except Purchaser and its Representatives shall be required to maintain confidentiality of Evaluation Materials (as defined in the Confidentiality Agreement) pertaining to the Excluded Assets. Nothing in this Section 7.12 or otherwise contained in the Confidentiality Agreement shall restrict or limit Purchaser's ability to file or disclose this Agreement, and the Exhibits and Schedules hereto and thereto, and the information derived therefrom, with the Bankruptcy Court or in the Disclosure Statement.

(b) For a period of one (1) year after the Closing Date, Seller hereby agrees to keep and to cause Seller's Representatives to keep such Confidential Information confidential and not to use such Confidential Information for any purpose except as may be authorized in writing by Purchaser or required pursuant to this Agreement. The confidentiality obligation set forth in this Section 7.12 shall not apply to (i) Confidential Information (A) that becomes, through no violation of the provisions of this Section 7.12 by Seller or Seller's Representatives, part of the public domain by publication or otherwise, (B) which is obtained by Seller or Seller's Representatives from a source that is not known to it to be prohibited from disclosing such Confidential Information to Seller or Seller's Representatives by an obligation of confidentiality to Seller, or (C) which is developed independently by Seller or Seller's Representatives without use of the Confidential Information or (ii) disclosures of Confidential Information (x) in the course of any trial or other legal proceeding involving Seller or Seller's Representatives, or (y) as required by any applicable securities Law or other Law (including any subpoena, interrogatory, or other similar requirement for such information to be disclosed) or the rules of any applicable national stock exchange. In any such circumstance outlined in clause (ii) above, Seller shall promptly give Purchaser at least fifteen (15) days written notice of such required disclosure and thereafter disclose only that portion of the Confidential Information as Seller is advised in a written opinion by

counsel that it is reasonably required to disclose and shall exercise its commercially reasonable efforts to obtain reliable assurance that confidential treatment shall be accorded such Confidential Information. Seller, on behalf of itself and Seller's Representatives, acknowledges the competitive and confidential nature of the Confidential Information and that irreparable damage shall result to Purchaser if any Confidential Information is disclosed to any Third Party except as herein permitted hereunder or under the Confidentiality Agreement. It is further understood and agreed that monetary damages would not be a sufficient remedy for any breach of this Section 7.12. Accordingly, it is agreed by Seller that Purchaser shall be entitled to an injunction or injunctions (without the posting of any bond and without proof of actual damages) to prevent breaches or threatened breaches of this Section 7.12 and/or to specific performance of this Section 7.12, provided, however, that Seller is be entitled to dispute whether or not any Confidential Information has been disclosed in violation of this Section 7.12. Seller agrees that equitable relief is not exclusive of other remedies to which Purchaser may be entitled at law or in equity.

Section 7.13 **Press Releases**. From and after the Execution Date, neither Seller nor Purchaser shall make, and Seller and Purchaser each shall cause its respective Affiliates not to make, any press release or public disclosure regarding this Agreement, the contents hereof or the transactions contemplated hereby, or the identities of any Parties hereto without the prior written consent of the other Party which shall not be unreasonably withheld, conditioned or delayed; provided, however, the foregoing shall not restrict disclosures by any Party, or any of its Affiliates (a) to the extent that such disclosures are required by applicable securities or other Laws or the applicable rules of any stock exchange having jurisdiction over a Party or Affiliates of any Party or (b) to Governmental Authorities or any Third Party holding preferential rights to purchase, rights of consent or other rights that may be applicable to the transactions contemplated by this Agreement, as reasonably necessary to provide notices, seek waivers, amendments or terminations of such rights, or seek such consents. Each Party shall each be liable for the compliance of such Party's Affiliates with the terms of this Section 7.13. The Parties will cooperate in good faith to accommodate any request by a Party for a press release or other public disclosure. Nothing in this Section 7.13 or otherwise contained in the Confidentiality Agreement shall restrict or limit Purchaser's ability to file or disclose this Agreement, and the Exhibits and Schedules hereto and thereto, and the information derived therefrom, with the Bankruptcy Court or in the Disclosure Statement.

Section 7.14 **[INTENTIONALLY DELETED]**.

Section 7.15 **FERC Regulated Transport and Retained Marketing Contracts**.

(a) FERC Regulated Agreements. Seller and Purchaser agree that, subject to receipt of all necessary regulatory approvals, including the regulatory approval described in Section 7.15(d) through Section 7.15(h) herein, Seller will assign to Purchaser, upon receipt of regulatory approval, but in any event no earlier than July 1, 2018 (or such earlier date as is permitted by Section 1.2(e) of Exhibit A to the Transition Services Agreement), Seller's FERC Regulated Transport contracts for natural gas transportation further described in Exhibit A-6 attached hereto. Purchaser commits to secure all

regulatory and credit requirements necessary to receive ownership of these Assets no later than July 1, 2018.

(b)  Netback Arrangement.  Effective upon Closing through June 30, 2018 (or such earlier date as is permitted by Section 1.2(e) of Exhibit A to the Transition Services Agreement), Purchaser will deliver to Seller each month, the total quantity of Hydrocarbons available for sale from the Oil and Gas Properties at the physical receipt points agreed by the Parties.  Purchaser will receive  netback sales proceeds that reflect the value received by Seller for all Hydrocarbons sold, less (i) Seller's actual effective fixed transportation fees, and (ii) Seller's actual variable costs (including but not limited to applicable replacement gas purchased on a commercially reasonable basis after consultation with Purchaser (if any), pipeline commodity charges, and fuel).

(c)  NAESB and Oil Purchase Agreement.  For purposes of the Hydrocarbon purchases and sales pursuant to Section 7.15(b), Purchaser and Seller shall execute a NAESB and an oil purchase agreement in forms substantially similar to those which are attached hereto as Exhibit I at Closing. Purchaser and Seller agree to exercise commercially reasonable efforts to facilitate the transactions contemplated herein.

(d)  Petition for Waiver.  With respect to the FERC Regulated Transport, upon satisfaction of the conditions set forth in Section 7.15(h) below, and, if possible, not more than ten (10) Business Days following Execution Date, the Seller and Purchaser shall jointly submit FERC a Petition for Temporary Waivers of Capacity Release Regulations and Related Pipeline Tariff Provisions ("Petition for Waiver"), pursuant to which the Seller and Purchaser will seek waivers of applicable (i) capacity release regulations and (ii) related tariff provisions of the transporters' FERC tariffs. The Petition for Waiver shall seek authorization for Seller to permanently release that portion of Seller's rights and obligations in and to the capacity under the FERC Regulated Transport ("Capacity") to be effective no later than July 1, 2018.

(e)  Transporter Consent.  Seller shall use its commercially reasonable efforts to obtain from each transporter with which it has a service agreement for such FERC Regulated Transport the transporter's consent or agreement not to oppose the waivers requested in the Petition for Waiver and the permanent release of Capacity as provided herein.

(f)  Permanent Release.  Following receipt of a final FERC order granting the Petition for Waiver (the "FERC Order"), effective July 1, 2018 (or such earlier date as is permitted by Section 1.2(e) of Exhibit A to the Transition Services Agreement), Seller shall effect a permanent release of the Capacity to be released hereunder in accordance with the pertinent provisions of each applicable transporter's FERC tariff (to the extent FERC has not granted waiver of such provisions in the FERC Order). Prior to Seller effecting such permanent release of Capacity, Purchaser shall post such credit support, if any, as each applicable transporter shall require in order to be able to accept the released capacity no later than July 1, 2018 (or such earlier date as is permitted by Section 1.2(e) of Exhibit A to the Transition Services Agreement). After the issuance of the FERC Order, Purchaser shall execute a new firm transportation service agreement with each

respective transporter for which a permanent release of Capacity is sought on the same terms and conditions as are set forth in the firm transportation service agreement of Seller.

(g)     Termination of Seller's Obligations.   Both Seller and Purchaser shall use commercially reasonable efforts to obtain the agreement of each respective transporter to terminate the rights, obligations and liabilities of Seller upon execution of each new firm transportation service agreement by Purchaser accepting the released Capacity as set forth herein; provided, that any rights, obligations, and liabilities arising prior to the permanent release of such Capacity shall not be affected. If all of Seller's Capacity under a firm transportation service agreement is permanently released hereunder, the Parties shall each use commercially reasonable efforts to obtain the agreement of the respective transporter that such transportation service agreement of Seller shall terminate without any further liability of Seller to the transportation service agreement when any and all obligations and liabilities arising prior to the permanent release of the Capacity under such transportation service agreement are satisfied or otherwise extinguished.

(h)     Retained Marketing Contracts. Seller's Contracts for marketing, gathering, transportation and processing described on Schedule 7.15 attached hereto, but specifically not including any FERC Regulated Transport, (the "Retained Marketing Contracts") shall not be transferred to the Purchaser at Closing and shall be held by Seller after Closing for the performance of Marketing Services pursuant to the terms of the Transition Services Agreement. On July 1, 2018 (or earlier, as permitted by Section 1.2(e) of Exhibit A to the Transition Services Agreement), Seller and Purchaser shall deliver an executed assignment together with any other required instruments and other documents to transfer the Retained Marketing Contracts to Purchaser. Purchaser commits to secure adequate credit requirements limited to the Assets as necessary to receive ownership of the Retained Marketing Contracts no later than July 1, 2018 (or such earlier date as is permitted by Section 1.2(e) of Exhibit A to the Transition Services Agreement).  In the event that either Party discovers any additional Contract that the Parties agree should have been included as a Retained Marketing Contract, Schedule 7.15 shall be amended to add such Contract.

Section 7.16   **Suspense Funds**.  Purchaser acknowledges that Suspense Funds may exist that are associated with the Oil and Gas Properties.  On or before the Closing Date, Seller or its Affiliates shall assign and transfer any Suspense Funds to Purchaser.  Notwithstanding anything contained in this Agreement to the contrary, if Closing occurs, Purchaser, from and after Closing, accepts sole responsibility for and agrees to pay all costs and expenses associated with Suspense Funds to the extent that the Suspense Funds delivered to Purchaser include such amounts (including any additional fines, penalties or interest (i) that accrue prior to Closing to the extent, but only to the extent, that the Suspense Funds delivered to Purchaser include such amounts and (ii) that may accrue after Closing).  Seller shall provide to Purchaser detailed information in its possession with respect to (A) potential payees of such Suspense Funds, (B) the reason for payment of such Suspense Funds and (C) the time period during which such Suspense Funds accrued.

Section 7.17 **Regulatory Filings**. Purchaser and Seller shall, and shall cause their respective Affiliates to (a) make or cause to be made the filings required of such Party or any of its Affiliates (and, in the case of Seller and any of its respective Affiliates) under any Laws with respect to the transactions contemplated by this Agreement and to pay any fees due by such Party in connection with such filings, as promptly as is reasonably practicable, and in any event within ten (10) Business Days after the Execution Date (with the understanding that Purchaser and Seller shall each pay one-half of all HSR Act filings fees), (b) cooperate with the other Parties and furnish all information in such Party's possession that is necessary in connection with such other Party's filings, (c) use commercially reasonable efforts to cause the expiration or termination of the notice or waiting periods under the HSR Act and, if applicable, any other Laws with respect to the transactions contemplated by this Agreement as promptly as is reasonably practicable, (d) promptly inform the other Party of (and, at the other Party's reasonable request, supply to such other Party) any communication (or other correspondence or memoranda) from or to, and any proposed understanding or agreement with, any Governmental Authority in respect of such filings, (e) consult and cooperate with the other Party in connection with any analyses, appearances, presentations, memoranda, briefs, arguments and opinions made or submitted by or on behalf of any Party in connection with all meetings, actions, discussions and proceedings with Governmental Authorities relating to such filings, including, subject to applicable Law, permitting the other Party to review in advance any proposed written communication between it and any Governmental Authority, (f) comply, as promptly as is reasonably practicable, with any requests received by such Party or any of its Affiliates under the HSR Act and any other Laws for additional information, documents or other materials, (g) use commercially reasonable efforts to resolve any objections as may be asserted by any Governmental Authority with respect to the transactions contemplated by this Agreement, and (h) use reasonable efforts to contest and resist any action or proceeding instituted (or threatened in writing to be instituted) by any Governmental Authority challenging the transactions contemplated by this Agreement as in violation of any Law. If a Party or any of its Affiliates intends to participate in any meeting or discussion with any Governmental Authority with respect to such filings or the transactions contemplated by this Agreement, it will give the other Party reasonable prior notice of, and an opportunity to participate in, such meeting or discussion. Purchaser agrees to take any and all commercially reasonable steps and to make any and all commercially reasonable undertakings necessary to avoid or eliminate each and every impediment under any antitrust, competition, or trade regulation Law that may be asserted by any Governmental Authority with respect to the transactions contemplated by this Agreement so as to enable the Closing to occur as soon as reasonably practicable.

Section 7.18 **Employee Matters**.

(a) In connection with the transactions contemplated hereunder, Purchaser shall have the option, but not the obligation, to make, or to cause one of its Affiliates to make, offers of employment to any of the Company Employees. As soon as practicable after the Execution Date, Purchaser shall notify Seller of the identity of any Company Employee Purchaser desires to interview for potential employment with Purchaser or an Affiliate after the Closing and Seller shall make reasonable efforts to facilitate any such interviews. In the event Purchaser elects to make offers of employment to any Company Employees, no less than fifteen (15) days prior to the Closing, Purchaser or one of its

Affiliates (the "Purchaser Employer") shall make such written offer of employment, to be effective as of 12:01 a.m. on the day following the last day that such individual provides Services (as defined in the Transition Services Agreement) pursuant to the Transition Services Agreement (the "Hire Date"), on such terms and conditions as Purchaser shall determine in its sole discretion, to those Company Employees Purchaser desires to employ following the Closing and the conclusion of the individual providing Services, as defined in the Transition Services Agreement, and shall provide Seller a list of those Company Employees to whom an employment offer was extended. Each offer of employment shall (x) be in writing, (y) provide the Company Employee at least three (3) Business Days to either accept or reject such offer, and (z) be subject only to the occurrence of the Closing and the Company Employee's continued employment with Seller until the Hire Date and satisfaction of Purchaser Employer's standard on-boarding process and procedures relating to pre-employment screening. At least five (5) Business Days prior to the Closing Date, Purchaser shall deliver to Seller a list reflecting each Company Employee to whom employment was offered who accepted Purchaser Employer's offer of employment and each Company Employee to whom employment was offered who rejected Purchaser Employer's offer of employment. Any Company Employee who accepts an offer of employment from Purchaser Employer and commences employment with Purchaser Employer on the Hire Date is referred to as a "Hired Employee." Conditioned on the occurrence of the Closing, Seller shall accept the resignation of all Hired Employees no later than 11:59 p.m. on the day before the Hire Date. Purchaser shall be responsible for all liabilities with respect to (i) any Hired Employee arising on or after the Hire Date, and (ii) the employment selection and hiring process as it relates to any Company Employee (collectively, the "Purchaser Employment Liabilities"), provided that the Purchaser Employment Liabilities shall not include, and Seller shall be solely responsible for complying with, and any liabilities under, the Worker Adjustment and Retraining Notification Act resulting from the Closing or any actions taken by Seller post-Closing (the "Seller WARN Liability").

(b)     For a period beginning on the Closing Date and ending on the two (2) year anniversary of the Closing Date, except as expressly permitted under this Section 7.18, neither Party shall, without the other Party's prior written consent, directly or indirectly solicit, encourage or otherwise induce any employee of the other Party or any Affiliate of the other Party to leave the employment of the other Party or any Affiliate of the other Party or become the employee or contractor of the other Party or any Affiliate of the other Party. Notwithstanding the foregoing, each Party shall not be prohibited from hiring or contracting for the services of any employee of the other Party or any Affiliate of the other Party who has terminated his or her employment relationship with the other Party or any Affiliate of the other Party without solicitation or inducement from Purchaser. A general advertisement by a Party from employment that is not targeted at any employee of the other Party or any Affiliate of the other Party or any group of employees of the other Party or any Affiliate of the other Party shall not constitute a breach of the obligations of Purchaser under this Section 7.18(b).

Section 7.19   **Seismic Licenses**. Prior to the Closing, Seller shall use commercially reasonable efforts, and Purchaser shall use commercially reasonable efforts to assist Seller, to

obtain termination or cancellation of all Seismic Contracts that constitute licenses or permits of Seismic Data by which Seller or any Asset is bound that would require the consents or the payment of any amounts as a result of the consummation of the transactions contemplated hereunder ("Seismic Licenses"). To the extent that Seller or any Affiliate of Seller or Purchaser or an Affiliate of Purchaser is required to pay to any Third Party any amount in connection with (a) the transfer of the Seismic Licenses to Purchaser or (b) the acquisition of Seismic Data if (and only if) the cost of such acquisition would be no greater than the cost to transfer the respective Seismic License, Purchaser shall pay any such amounts to the applicable Third Party and the Purchase Price shall be decreased by an amount equal to the lesser of (i) fifty percent (50%) of the aggregate of all such amounts, consideration and fees paid to such Third Party or (ii) Ten Million Dollars ($10,000,000). For the avoidance of doubt, with respect to any Seismic License that is terminated or cancelled by Seller, Seller shall retain for its own benefit all Seismic Data and other Records that Seller is entitled to retain under such Seismic License after its termination or cancellation. Similarly, with respect to any Seismic License that is not terminated or cancelled hereunder, the Seller shall retain for its own benefit all Seismic Data and other Records that Seller is entitled to retain under such Seismic License.

Section 7.20 **Further Assurances**. After Closing, Seller and Purchaser each agree to take such further actions and to execute, acknowledge and deliver all such further documents as are reasonably requested by the other for carrying out the purposes of this Agreement or of any document delivered pursuant to this Agreement.

Section 7.21 **Financial Statements**.

(a) Seller acknowledges that Purchaser and/or its Affiliates may be required to or may deem it advisable to provide financial statements and/or other financial information, including statements of revenues and direct operating expenses, for one or more years or interim periods relating to the business of the Assets in documents filed with the Bankruptcy Court or, after Closing, the BOEM or the Securities and Exchange Commission ("SEC") or any other regulatory body or regime or stock exchange in which Purchaser and/or its Affiliates may be subject ("other authority") or in the Disclosure Statement or, after Closing, offering documents for private financing and that such financial statements may be required to be audited in accordance with applicable auditing standards and/or to comply with the applicable requirements of the Securities Act of 1933, as amended (the "Securities Act"), applicable requirements of the Securities Exchange Act of 1934, as amended (the "Exchange Act"), and the rules and regulations promulgated thereunder, including Regulation S-X, and applicable administrative guidance and interpretations (formal and informal, written or oral) of the SEC and its staff in respect thereof (the "Requisite Financial Statement Information").

(b) Seller shall, shall cause its Affiliates and shall use commercially reasonable efforts to cause Seller Representatives to promptly, upon Purchaser's request: (i) reasonably cooperate with Purchaser, its Affiliates and Purchaser Representatives in connection with Purchaser's (or its Affiliate's) preparation of the Requisite Financial Statement Information and Purchaser's and its Affiliate's compliance with their financial, or other reporting requirements and audits, including those required under or advisable in respect of the Bankruptcy Code, the Securities Act or the Exchange Act, applicable to

#5618848.7
#5618848.12

any solicitation in the Chapter 11 Cases or, after Closing, any public or private offering of securities of or debt issuance by Purchaser or any Affiliate of Purchaser, including the filing by Purchaser or such Affiliate with the SEC of one or more registration statements to register any securities of Purchaser or such Affiliate under the Securities Act or reports required to be filed by Purchaser or such Affiliate under the Exchange Act; (ii) to the extent practicable, provide Purchaser, its Affiliates and Purchaser Representatives with reasonable access to Seller's officers, managers, employees, agents and representatives who were responsible for preparing or maintaining the financial records and work papers and other supporting documents relating to the Assets and/or the business of the Assets as may reasonably be deemed necessary by Purchaser or Purchaser Representatives to prepare the Requisite Financial Statement Information and to comply with its audit requirements; (iii) provide reasonable access to information with respect to the Assets and the business of the Assets in connection with Purchaser's or its Affiliate's preparation of responses to any inquiries by regulatory authorities and auditors, including the SEC and any applicable stock exchange, in each case as reasonably requested by Purchaser and its Affiliates; and (iv) make available to Purchaser, its Affiliates and Purchaser Representatives during Seller's normal business hours upon reasonable prior notice, and permit to be copied, any and all books, records, information and documents that are attributable to the Assets or the business of the Assets in any of Seller's or any of its Affiliates' custody, possession or control as may be reasonably requested by Purchaser, its Affiliates or Purchaser Representatives in order for Purchaser or Purchaser Representatives to prepare the Requisite Financial Statement Information or otherwise comply with applicable law or Bankruptcy Court, SEC or stock exchange requirements, audit requirements or requirements of other authorities.

(c)    Purchaser shall be responsible, and obligated to reimburse Seller, for all reasonable out-of-pocket costs and expenses incurred by Seller associated with obtaining the Requisite Financial Statement Information or otherwise complying with Seller's obligations under this <u>Section 7.21</u>.

Section 7.22    **DOOs and OSFRs**.  Until the Closing Date, Seller shall use commercially reasonable efforts to obtain (with respect to Assets operated by Seller), and after Closing, Seller shall use commercially reasonable efforts to assist Purchaser with obtaining, all (a) change of operator forms or designation of operator forms or any other forms or filings required by any Governmental Authority to effect the transfer operatorship of such Assets to Purchaser after Closing, executed by all required Third Parties, designating Purchaser (or such Third Party as may have been selected as operator under any applicable Contract) as operator of such Assets and (b) OSFRs executed in triplicate by all required Third Parties with respect to each Lease and Covered Offshore Facility (as defined by 30 C.F.R. § 253.3), as applicable.

Section 7.23    **Additional Security**.  Purchaser shall comply with the obligations set forth on <u>Exhibit E</u>.

Section 7.24    **Excluded Wells**.

(a)    After Closing, if either Party becomes aware of information that indicates that the Plugging and Abandonment with respect to any Excluded Well is no longer in

compliance with applicable Laws, requirements of Governmental Authority, the Leases or the Contracts, such Party shall provide written notice to the other Party and the Parties shall cooperate in determining how to cause such Excluded Well to become in compliance, subject to the other provisions of this Section 7.24; provided, however, in the event that Parties do not agree on how to cause such Excluded Well to become in compliance, then Purchaser shall proceed with such well intervention work only to the extent required by Governmental Authorities or in the case of an emergency. Purchaser shall diligently perform, in a good and workmanlike manner, all Plugging and Abandonment work with respect to any such Excluded Well as necessary to bring such Excluded Well into compliance with applicable Laws, requirements of Governmental Authority, the Leases or the Contracts; provided, however, Seller shall remain responsible to reimburse Purchaser promptly for all reasonable documented costs and expenses with respect to any such well intervention work performed by Purchaser. **PURCHASER AND ITS AFFILIATES SHALL NOT BE LIABLE TO SELLER OR ITS AFFILIATES FOR, AND SELLER SHALL INDEMNIFY AND DEFEND PURCHASER AND ITS AFFILIATES AGAINST, LOSSES SUSTAINED OR LIABILITIES INCURRED IN THE PERFORMANCE OF ALL PLUGGING AND ABANDONMENT WORK WITH RESPECT TO ANY EXCLUDED WELL (BUT EXCLUDING LOSSES AND LIABILITIES ATTRIBUTABLE TO PURCHASER'S OR PURCHASER'S AFFILIATES' GROSS NEGLIGENCE OR WILLFUL MISCONDUCT)**.

(b)     At least thirty (30) days prior to commencement of any such well intervention work concerning any Excluded Well, Purchaser shall provide Seller with written notice of such required work and (i) a listing of the specific Excluded Well for which Purchaser believes such well intervention work is necessary and reasonable particulars supporting such belief, (ii) a reasonably detailed work program which outlines the work to be done on the applicable Excluded Well, (iii) an estimated itemized breakdown of the costs and expenses to be charged for such well intervention work and (iv) a cash call notice and invoice for work to be performed ("Well Intervention Work Order"). Within thirty (30) days of receipt of the Well Intervention Work Order, Seller shall pay (or cause to be paid) to Purchaser all undisputed amounts set forth on such Well Intervention Work Order by a wire transfer of immediately available funds to the account set forth in the Well Intervention Work Order. Purchaser shall commence the well intervention work set forth in the Well Intervention Work Order as soon as reasonably practicable; provided however, in the event of an emergency or risk of loss, damage or injury to any person, property or the environment, Purchaser may at any time take such action as reasonably necessary, in its sole discretion and at Seller's sole cost and expense, and shall notify Seller of such action promptly thereafter. Upon completion of the well intervention work set forth in any Well Intervention Work Order, Purchaser will provide to Seller a final written statement setting forth (x) evidence that such work has been completed, (y) invoices and/or billing statements outlining in reasonable detail the work actually done and the costs and expenses of such work actually performed and (z) in the event that such costs and expenses exceed or are less than the amount set forth in the cash call notice and invoice in the applicable Well Intervention Work Order, a cash call and invoice for such excess costs and expense or a notice of such excess payment and refund,

as applicable (each a "Well Intervention Completion Notice"). Within thirty (30) days of receipt of a Well Intervention Completion Notice, Seller shall pay (or cause to be paid) to Purchaser the undisputed amount of any excess costs or expense by a wire transfer of immediately available funds to the account set forth in the Well Intervention Completion Notice or, if a refund, Purchaser shall pay Seller the amount of any such refund as designated by Seller.

Section 7.25 **Contingency Payments**. If the condition to the Purchaser's payment of the Contingency Payments set forth in Section 2.8(a) is satisfied, Purchaser shall deliver each such Contingency Payment to Seller in accordance with Section 2.8(b).

Section 7.26 **Troubadour Assets**. The MC 699 Troubadour well (API No. 608174122000) located in the MC 699 Troubadour field and the other Troubadour assets as set forth in Schedule 7.26 (collectively, the "Troubadour Assets") are Excluded Assets that will not be included in the "Assets" at Closing and will continue to constitute Excluded Assets after Closing for all purposes. Notwithstanding the foregoing, Purchaser shall have the exclusive option, until the end of the primary term of the Troubadour lease identified on Schedule 7.26, to elect in writing to purchase the Troubadour Assets for one dollar ($1.00) and the assumption of a set of assumed obligations for the Troubadour Assets substantially similar to the "Assumed Obligations" for the Assets hereunder. In any such acquisition, Seller shall also retain a set of retained liabilities for the Troubadour Assets substantially similar to the "Retained Liabilities" for the Assets hereunder. Such acquisition shall be made pursuant to conveyances that are substantially similar to the Form of Omnibus Conveyance attached hereto as Exhibit B-1 and the form of Recordable Conveyance-Louisiana attached hereto as Exhibit B-2, with appropriate modifications necessary to (a) tailor those conveyance forms to the Troubadour Assets and the assumed obligations and retained liabilities with respect thereto and (b) remove all references to this Agreement.

## ARTICLE 8
## CONDITIONS TO CLOSING

Section 8.1 **Conditions of Seller to Closing**. The obligations of Seller to consummate the transactions contemplated by this Agreement (except for the obligations of Seller to be performed prior to the Closing and obligations that survive termination of this Agreement), including the obligations of Seller to consummate the Closing, are subject, at the option of Seller, to the satisfaction on or prior to Closing of each of the conditions set forth in this Section 8.1, unless waived in writing by Seller:

    (a)     Representations. The representations and warranties of Purchaser set forth in ARTICLE 5 shall be true and correct in all material respects as of the Execution Date and as of the Closing Date as though made on and as of the Closing Date (other than representations and warranties that refer to a specified date, which need only be true and correct on and as of such specified date);

    (b)     Performance. Purchaser shall have performed and observed, in all material respects, all covenants and agreements to be performed or observed by Purchaser under this Agreement prior to or on the Closing Date;

(c)  No Action.  On the Closing Date, no injunction, order or award restraining, enjoining or otherwise prohibiting the consummation of the transactions contemplated by this Agreement, or granting substantial damages in connection therewith, shall have been issued and remain in force, and no suit, action, or other proceeding (excluding (i) any appeal of the Confirmation Order or the Sale Order absent a stay of the order pending the appeal or (ii) any such matter initiated by Seller or any Affiliate of Seller) shall be pending before any Governmental Authority or body of competent jurisdiction seeking to enjoin or restrain or otherwise prohibit the consummation of the transactions contemplated by this Agreement or recover substantial damages from Seller;

(d)  Governmental Consents.  All material consents and approvals of and notices to any Governmental Authority (including any under the HSR Act) required to be obtained by Purchaser for the transfer of the Assets from Seller to Purchaser as contemplated under this Agreement, except Customary Consents and any consents required to assign the FCC Licenses to Purchaser, shall have been granted (or delivered in the case of notices), or the applicable waiting period (including any under the HSR Act) shall have expired, or early termination of the waiting period shall have been granted

(e)  Casualty Losses.  The amount of all Casualty Losses does not equal or exceed an amount equal to twenty percent (20%) of the Unadjusted Purchase Price;

(f)  PHA Required Consents.  All PHA Required Consents shall have been obtained;

(g)  Closing Deliverables.  Purchaser shall (i) have delivered to Seller the officer's certificate described in Section 9.3(f), and (ii) be ready, willing and able to deliver to Seller at the Closing the other documents and items required to be delivered by Purchaser under Section 9.3;

(h)  Sale Order.  The Sale Order shall have become a Final Order in form and substance reasonably acceptable to Seller;

(i)  Confirmation Order.  The Confirmation Order  shall have become a Final Order in form and substance reasonably acceptable to Seller; and

(j)  Plan.  The Plan shall have become effective in accordance with its terms.

Section 8.2  **Conditions of Purchaser to Closing**.  The obligations of Purchaser to consummate the transactions contemplated by this Agreement (except for the obligations of Purchaser to be performed prior to the Closing and obligations that survive termination of this Agreement), including the obligations of Purchaser to consummate the Closing, are subject, at the option of Purchaser, to the satisfaction on or prior to Closing of each of the conditions set forth in this Section 8.2, unless waived in writing by Purchaser:

#5618848.7
#5618848.12

(a)    Representations.  Each representation and warranty of Seller set forth in ARTICLE 3 and ARTICLE 4 (other than Seller's representations and warranties set forth in Section 4.17) shall be true and correct in all respects (without regard to any Material Adverse Effect or other materiality qualifier) as of the Execution Date and as of the Closing Date as though made on and as of the Closing Date (other than representations and warranties that refer to a specified date, which need only be true and correct on and as of such specified date), except to the extent the failure of such representations or warranties to be true and correct in all respects, would not, individually or in the aggregate, result in a Material Adverse Effect;

(b)    Environmental Representations. The representations and warranties of Seller set forth in Section 4.17 shall be true and correct in all respects (without regard to any Material Adverse Effect or other materiality qualifier) as of the Execution Date and as of the Closing Date as though made on and as of the Closing Date, except to the extent the failure of such representations or warranties to be true and correct in all respects, would not, individually or in the aggregate, result in a Material Adverse Effect;

(c)    Performance.  Seller shall have performed and observed, in all material respects, each covenant and agreement to be performed or observed by Seller under this Agreement prior to or on the Closing Date;

(d)    No Action.   On the Closing Date, no injunction, order or award restraining, enjoining or otherwise prohibiting the consummation of the transactions contemplated by this Agreement, or granting substantial damages in connection therewith, shall have been issued and remain in force and no suit, action, or other proceeding (excluding (i) any appeal of the Confirmation Order or the Sale Order absent a stay of the order pending the appeal or (ii) any such matter initiated by Purchaser or any Affiliate of Purchaser) shall be pending or threatened in writing before any Governmental Authority or body of competent jurisdiction seeking to enjoin or restrain or otherwise prohibit the consummation of the transactions contemplated by this Agreement or recover damages from Purchaser resulting therefrom;

(e)    Governmental Consents.   All material consents and approvals of and notices to any Governmental Authority (including any under the HSR Act) required to be obtained by Seller for the transfer of the Assets from Seller to Purchaser as contemplated under this Agreement, except Customary Consents and any consents required to assign the FCC Licenses to Purchaser, shall have been granted (or delivered in the case of notices), or the applicable waiting period (including any under the HSR Act) shall have expired, or early termination of the waiting period shall have been granted;

(f)    Casualty Losses.  The amount of all Casualty Losses does not equal or exceed an amount equal to twenty percent (20%) of the Unadjusted Purchase Price;

(g)    PHA Required Consents. All PHA Required Consents shall have been obtained;

-59-

(h)    <u>Closing Deliverables</u>.  Seller shall (i) have delivered to Purchaser the officer's certificate described in <u>Section 9.2(f)</u>, and (ii) be ready, willing and able to deliver to Purchaser at the Closing the other documents and items required to be delivered by Seller under <u>Section 9.2</u>;

(i)    <u>Sale Order</u>.  The Sale Order shall have become a Final Order;

(j)    <u>Confirmation Order</u>.  The Confirmation Order shall have become a Final Order; and

(k)    <u>Plan</u>.  The Plan shall have become effective in accordance with its terms.

## ARTICLE 9
## CLOSING

Section 9.1   **Time and Place of Closing**.  The consummation of the purchase and sale of the Assets contemplated by this Agreement (the "<u>Closing</u>") shall, unless otherwise agreed to in writing by Purchaser and Seller, take place at the offices of Bracewell LLP located at 711 Louisiana St., Suite 2300, Houston, Texas at 10:00 a.m., local time, no later than April 16, 2018 (the "<u>Target Closing Date</u>"), or if all conditions in <u>ARTICLE 8</u> to be satisfied prior to or at Closing have not yet been satisfied or waived, as soon thereafter as such conditions have been satisfied or waived or such deliverables can be delivered, subject to the provisions of <u>ARTICLE 11</u>.  The date on which the Closing occurs is referred to herein as the "<u>Closing Date</u>".  All actions to be taken and all documents and instruments to be executed and delivered at Closing shall be deemed to have been taken, executed and delivered simultaneously and, except as permitted hereunder, no such actions shall be deemed taken nor any document and instruments executed or delivered until all actions have been taken and all documents and instruments have been executed and delivered.

Section 9.2   **Obligations of Seller at Closing**.  At the Closing, upon the terms and subject to the conditions of this Agreement, and subject to the simultaneous performance by Purchaser of its obligations pursuant to <u>Section 9.3</u>, Seller shall deliver or cause to be delivered to Purchaser, among other things, the following:

(a)    Conveyances of the Assets in the forms attached hereto as <u>Exhibit B-1</u>, <u>Exhibit B-2</u>, and <u>Exhibit B-3</u> (the "<u>Conveyances</u>"), duly executed by Seller, in sufficient duplicate originals to allow, with respect to the Conveyances in the forms described on <u>Exhibit B-2</u>, and <u>Exhibit B-3</u>, recording in all appropriate jurisdictions and offices;

(b)    Assignments in form required by federal, state or tribal agencies for the assignment of any federal, state or tribal Oil and Gas Properties, duly executed by the Seller, in sufficient duplicate originals to allow recording in all appropriate offices, including BOEM form MMS-150 and form MMS-151, as applicable, executed in triplicate with respect to each Lease issued by the government of the United States of America;

#5618848.7
#5618848.12

(c)      With respect to Assets operated by Seller, change of operator forms or designation of operator forms or any other forms or filing required by any Governmental Authority to effect the transfer operatorship of such Assets to Purchaser executed by Seller, designating Purchaser (or such Third Party as may have been selected as operator under any applicable Contract) as operator of such Assets;

(d)      Executed certificates in the form attached hereto as Exhibit C as required in Treasury Regulation § 1.1445-2(b)(2);

(e)      Letters-in-lieu of transfer orders with respect to the Oil and Gas Properties duly executed by Seller in the form attached hereto as Exhibit D;

(f)      A certificate duly executed by an authorized officer of Seller, dated as of the Closing, certifying on behalf of Seller that the conditions set forth in Section 8.2(a), Section 8.2(b) and Section 8.2(c) have been fulfilled;

(g)      A transition services agreement in substantially the form attached hereto as Exhibit F ("Transition Services Agreement"), duly executed by Seller, in sufficient duplicate originals as may be reasonably requested by Purchaser;

(h)      A limited agency agreement in the form attached hereto as Exhibit G ("Limited Agency Agreement") (subject to and as determined in accordance with the Transition Services Agreement), duly executed by Seller, in sufficient duplicate originals as may be reasonably requested by Purchaser;

(i)      A NAESB and an oil purchase agreement to be entered into in connection with Section 7.15(c) duly executed by Seller, in sufficient duplicate originals as may be reasonably requested by Purchaser;

(j)      An assignment and assumption agreement in the form attached hereto as Exhibit J ("Assignment and Assumption Agreement"), duly executed by Seller;

(k)      A conveyance of the Boxer Pipeline described on Exhibit A-4 (the "Boxer Pipeline") duly executed by Seller's subsidiary, Samedan Pipe Line Corporation, a Delaware corporation, to Purchaser, in a form substantially similar to the form of Recordable Conveyance-Louisiana attached hereto as Exhibit B-2, with appropriate modifications necessary to tailor such conveyance form to the Boxer Pipeline and Samedan Pipe Line Corporation; and

(l)      All other documents and instruments reasonably requested by Purchaser from Seller that are necessary to transfer the Assets to Purchaser.

Section 9.3      **Obligations of Purchaser at Closing**.  At the Closing, upon the terms and subject to the conditions of this Agreement, and subject to the simultaneous performance by Seller of its obligations pursuant to Section 9.2, Purchaser shall deliver or cause to be delivered to Seller, among other things, the following:

(a)     A wire transfer of the Closing Payment in same-day funds to the Persons and accounts designated in the preliminary settlement statement described in Section 9.4(a);

(b)     Conveyances, duly executed by Purchaser, in sufficient duplicate originals to allow recording in all appropriate jurisdictions and offices;

(c)     Assignments, duly executed by Purchaser, in form required by federal, state or tribal agencies for the assignment of any federal, state or tribal Oil and Gas Properties, duly executed by Purchaser, in sufficient duplicate originals to allow recording in all appropriate offices;

(d)     With respect to Assets operated by Seller, change of operator forms or designation of operator forms or any other forms or filing required by any Governmental Authority to effect the transfer operatorship of such Assets to Purchaser, executed by Purchaser, and designating Purchaser (or such Third Party as may have been selected as operator under any applicable Contract) as operator of such Assets;

(e)     Letters-in-lieu of transfer orders with respect to the Oil and Gas Properties duly executed by Purchaser in the form attached hereto as Exhibit D;

(f)     A certificate, duly executed by an authorized officer of Purchaser, dated as of the Closing, certifying on behalf of Purchaser that the conditions set forth in Section 8.1(a) and Section 8.1(b) have been fulfilled;

(g)     a Transition Services Agreement, duly executed by Purchaser, in sufficient duplicate originals as may be reasonably requested by Seller;

(h)     All forms required by any Governmental Authority relating to the assignments of the Assets and relating to the assumption of operations by Purchaser, where applicable, including BOEM form MMS 1123 designating Purchaser, or the current operator of any applicable Assets, as operator;

(i)     All oil spill financial responsibility forms required by the BOEM or BSEE to be submitted with respect to the Assets, including BOEM forms MMS-1016 and MMS-1017 ("OSFRs"), executed in triplicate with respect to Purchaser (and any applicable Affiliate of Purchaser) and each Lease and Covered Offshore Facility (as defined by 30 C.F.R. § 253.3), as applicable;

(j)     Evidence of qualification issued by the applicable Governmental Authorities for Purchaser to own, and, with respect to Assets currently operated by Seller, operate the Assets;

(k)     A Limited Agency Agreement (subject to and as determined in accordance with the Transition Services Agreement), duly executed by Purchaser, in sufficient duplicate originals as may be reasonably requested by Seller;

(l)     The Noble Performance Bond or the BOEM Bond or both (in each case, subject to and as determined in accordance with <u>Exhibit E</u>), in each case, duly executed and delivered by the Surety (as defined therein) and Purchaser and BOEM (if applicable);

(m)     If the Neptune Consent has been satisfied at or prior to Closing, the Replacement Neptune Bond (subject to and as determined in accordance with <u>Exhibit E</u>), duly executed and delivered by the surety and Purchaser;

(n)     If the Neptune Consent has been satisfied at or prior to Closing, the Replacement Neptune Policy (subject to and as determined in accordance with <u>Exhibit E</u>);

(o)     A NAESB and an oil purchase agreement to be entered into in connection with <u>Section 7.15(c)</u> duly executed by Purchaser, in sufficient duplicate originals as may be reasonably requested by Purchaser;

(p)     An Assignment and Assumption Agreement, duly executed by Purchaser, in sufficient duplicate originals as may be reasonably requested by Seller;

(q)     An entered order of the Bankruptcy Court, in form and substance reasonably acceptable to Seller and to Purchaser, authorizing and approving, among other things, the sale of the Assets on the terms and conditions set forth herein (the "<u>Sale Order</u>");

(r)     An entered order of the Bankruptcy Court, in form and substance reasonably acceptable to Seller and to Purchaser, confirming the Plan (the "<u>Confirmation Order</u>");

(s)     A conveyance of the Boxer Pipeline duly executed by Purchaser, in a form substantially similar to the form of Recordable Conveyance-Louisiana attached hereto as <u>Exhibit B-2</u>, with appropriate modifications necessary to tailor such conveyance form to the Boxer Pipeline and Samedan Pipe Line Corporation; and

(t)     All other documents and instruments reasonably requested by Seller from Purchaser that are necessary to transfer the Assets to Purchaser.

Section 9.4     **Closing Payment and Post-Closing Adjustments**.

(a)     Not later than five (5) Business Days prior to the Closing Date, Seller shall prepare and deliver to Purchaser, a preliminary settlement statement setting forth (i) the estimated Adjusted Purchase Price for the Assets after giving effect to all adjustments set forth in <u>Section 2.4</u>, (ii) the Persons, accounts and amounts of disbursements that Seller designates to receive the Closing Payment and (iii) the wiring instructions for all such payments and disbursements.  The dollar amount to be payable by Purchaser to Seller at the Closing (the "<u>Closing Payment</u>") shall be equal to the remainder of (A) the estimate of the Adjusted Purchase Price delivered in accordance with this <u>Section 9.4(a)</u> minus (B) the Deposit.

(b)     As soon as reasonably practicable after the Closing but not later than the one hundred twentieth day following Closing, Seller shall prepare and deliver to Purchaser a draft statement setting forth the final calculation of the Adjusted Purchase Price and showing the calculation of each adjustment under Section 2.4, based on the most recent actual figures for each adjustment.  Seller shall, provide Purchaser with access to all documentation supporting the final figures.  As soon as reasonably practicable but not later than the thirtieth (30th) day following receipt of Seller's statement hereunder, Purchaser shall deliver to Seller a written report containing any changes that Purchaser proposes be made in such statement.  The Parties shall undertake to agree on the final statement of the Adjusted Purchase Price no later than one hundred fifty (150) days after the Closing Date.  In the event that the Parties cannot reach agreement as to the final statement of the Adjusted Purchase Price within such period of time, payment on the undisputed items shall be made and any Party may refer the items of adjustment which are in dispute or the interpretation or effect of this Section 9.4 to a nationally-recognized independent accounting firm or consulting firm mutually acceptable to both Purchaser and Seller (the "Accounting Referee"), for review and final determination by arbitration.  The Accounting Referee shall conduct the arbitration proceedings in Houston, Texas in accordance with the Commercial Arbitration Rules of the American Arbitration Association, to the extent such rules do not conflict with the terms of this Section 9.4(b).  The Accounting Referee's determination shall be made within fifteen (15) days after submission of the matters in dispute and shall be final and binding on all Parties, without right of appeal.  In determining the amount of any adjustment to the Adjusted Purchase Price, the Accounting Referee shall be bound by the terms of Section 2.4 and may not increase the Adjusted Purchase Price more than the increase proposed by Seller nor decrease the Adjusted Purchase Price more than the decrease proposed by Purchaser, as applicable.  The Accounting Referee shall act as an expert for the limited purpose of determining the specific disputed aspects of Adjusted Purchase Price adjustments submitted by any Party and may not award damages, interest (except to the extent expressly provided for in this Section 9.4(b)) or penalties to any Party with respect to any matter.  Seller and Purchaser shall each bear their own legal fees and other costs of presenting its case.  Seller shall bear one half and Purchaser shall bear one half of the fees, costs and expenses of the Accounting Referee.  Within five (5) Business Days after the earlier of (i) the expiration of Purchaser's ten (10) day review period without delivery of any written report or (ii) the date on which the Parties or the Accounting Referee finally determine the Adjusted Purchase Price, (A) Purchaser shall pay to Seller the amount by which the Adjusted Purchase Price exceeds the Closing Payment or (B) Seller shall pay to Purchaser the amount by which the Closing Payment exceeds the Adjusted Purchase Price, as applicable.

(c)     Purchaser shall assist Seller in preparation of the final statement of the Adjusted Purchase Price under Section 9.4(b) by furnishing invoices, receipts, reasonable access to personnel and such other assistance as may be requested by Seller to facilitate such process post-Closing.

(d)     All payments made or to be made under this Agreement to Seller shall be made by electronic transfer of immediately available funds to Seller to such bank and

#5618848.7
#5618848.12

account as may be specified by Seller in writing. All payments made or to be made hereunder to Purchaser shall be by electronic transfer of immediately available funds to such bank and account as may be specified by Purchaser in writing.

## ARTICLE 10
## TAX MATTERS

Section 10.1 **Tax Returns; Proration of Taxes**.

(a) <u>Tax Returns and Allocation of Taxes</u>. Except as provided otherwise in this Agreement:

(i) Seller shall be responsible for preparing and timely filing all Tax Returns required by applicable Law to be filed before the Closing Date; provided, however, as to any Tax Returns for the Tax Partnerships, Seller shall be responsible for preparing and timely filing all Tax Returns required by applicable law with respect to any taxable period ending before or as of the Closing Date, regardless of such Tax Return's required due date;

(ii) Purchaser shall be responsible for preparing and timely filing all Tax Returns required by applicable Law to be filed on or after the Closing Date;

(iii) Excluding the Tax Returns for the Tax Partnerships for which Seller is obligated above to prepare and file, Purchaser shall prepare or cause to be prepared all Tax Returns for any taxable period that begins before and ends on or after the Effective Date (the "<u>Straddle Period</u>") and for any taxable period that ends before the Effective Date, in each case that are due after Closing on a basis consistent with past practice and shall deliver a draft of such Tax Return to Seller at least thirty (30) days prior to the due date for filing such Tax Returns for Seller's review and comments, and Purchaser shall not file such Tax Return without Seller's prior written consent (not to be unreasonably withheld). Seller shall be responsible for the Taxes allocated to the portion of the Straddle Period that ends before the Effective Date and Purchaser shall be responsible for the Taxes allocated to the portion of the Straddle Period that begins on or after the Effective Date. Taxes relating to a Straddle Period shall be allocated as follows: (x) Taxes that are attributable to the severance or production of Hydrocarbons shall be allocated to the period in which the severance or production giving rise to such severance or production Taxes occurred, (y) Taxes that are either (i) based upon or related to income or receipts, or (ii) imposed in connection with any sale or other transfer or assignment of property (real or personal, tangible or intangible), shall be deemed equal to the amount that would be payable if the taxable period ended before the Effective Date; provided that exemptions, allowances or deductions that are calculated on an annual basis (including depreciation and amortization deductions) shall be allocated between the period ending before the Effective Date and the period beginning on the Effective Date in proportion to the number of days in each period; and (z) Taxes that are imposed on a periodic basis with respect to the assets shall be deemed to be the amount of

such Taxes for the entire Straddle Period (or, in the case of such Taxes determined on an arrears basis, the amount of such Taxes for the immediately preceding period), multiplied by a fraction the numerator of which is the number of calendar days in the portion of the period ending before the Effective Date or beginning on or after the Effective Date, as applicable, and the denominator of which is the number of calendar days in the entire period;

(iv)     Seller shall be allocated and be responsible for all Asset Taxes allocated to any taxable period (or portion thereof) ending before the Effective Date and Purchaser shall be allocated and be responsible for all Asset Taxes allocated to any taxable period (or portion thereof) beginning on or after the Effective Date. If Seller has paid any Asset Taxes allocated to a taxable period (or portion thereof) beginning on or after the Effective Date, Purchaser shall reimburse Seller for such Asset Taxes within ten (10) days after a written notice provided by Seller; and

(v)     Control of any legal or administrative proceedings concerning any Taxes with respect to the Assets, and entitlement to any refunds or awards concerning any such Taxes with respect to such Assets, shall rest with the Party responsible for payment therefor under this Section 10.1, provided, that Seller and Purchaser shall jointly control any legal or administrative proceedings with respect to any Straddle Period.

(b)     Seller's Income Taxes.  Notwithstanding anything herein to the contrary, Purchaser shall not be liable for any income, franchise, margin or similar Taxes of Seller.

(c)     Tax Returns of the relevant Tax Partnerships.

(i)     To the extent Seller does not prepare any Tax Returns for a relevant Tax Partnership for any taxable period (or portion thereof) ending on or before the Closing Date, Seller shall have the right to review all such Tax Returns of the relevant Tax Partnership that are filed by the Tax Partnership after the Closing for any taxable periods(or portion thereof) ending on or before the Closing Date, and such Tax Returns shall not be filed without Seller's prior written consent (not to be unreasonably withheld);

(ii)     For any taxable period of a relevant Tax Partnership that includes the Closing Date, the Tax Partnership's items of income, gain, loss, deduction and credits for such taxable period shall be allocated between Seller and Purchaser using the interim-closing-of-the-book method as of the Closing Date.

Section 10.2   **Post-Closing Actions Which Affect Seller's Tax Liability**.

(a)     Except to the extent required by applicable Laws, Purchaser shall not, and shall not permit its Affiliates to, take any action on or after the Closing Date which could increase Seller's liability for Taxes (including any liability of such Seller to indemnify Purchaser for Taxes under this Agreement).

#5618848.7
#5618848.12

(b)     Except to the extent required by applicable Laws, Purchaser shall not, and shall not permit its Affiliates to, amend any Tax Return with respect to a taxable period for which Seller may be liable to indemnify Purchaser for Taxes under Section 10.1.

Section 10.3     **Refunds**.  Seller and Purchaser each agree to pay to the other Party any refund received (whether by payment, credit, offset, or otherwise, and together with any interest thereon) after the Closing by such Party or its Affiliates in respect of any Taxes for which the other Party is liable or required to indemnify such Party under Section 10.1.  Seller and Purchaser shall cooperate in order to take all necessary steps to claim any such refund.  Any such refund received by Seller or Purchaser, or any of their respective Affiliates, shall be paid to Seller or Purchaser, as applicable, within thirty (30) days after such refund is received.  Each of Seller and Purchaser agree to notify the other Party within ten (10) days following the discovery of a right to claim any such refund and upon the receipt of any such refund.  In the event that any of Seller or Purchaser receive written notification from the other Party that such Party has the right to claim a refund to which such other Party is entitled hereunder, such Party shall, at the sole expense of such other Party, take any actions that are reasonably required to claim such refund as promptly as practicable after receipt of such notification and shall furnish to such other Party, if requested in writing by such other Party, all information, records, and assistance reasonably necessary to verify the amount of such refund.

Section 10.4     **Transfer Taxes and Recording Fees**.  Purchaser shall be liable for, timely pay and shall indemnify the Seller Group for, any sales and use Taxes, conveyance, transfer and recording fees and real estate transfer stamps, document fees or Taxes (including any related interest, penalties or legal costs) that may be imposed on any transfer of the Assets made in connection with the transactions contemplated under this Agreement.  If required by applicable Law, Seller shall, in accordance with applicable Law, calculate and remit any sales or similar Taxes that are required to be paid as a result of the transfer of the Assets to Purchaser and Purchaser shall promptly reimburse the Seller therefor.  If Seller receives notice that any sales and/or use Taxes are due, Seller shall promptly forward such notice to Purchaser for handling.

Section 10.5     **Deposit Tax Treatment**.  For federal and state income Tax purposes, Seller and Purchaser agree to treat the Deposit in accordance with Treasury Regulation Section 1.468B-7.  Accordingly, Purchaser shall be treated as the owner of the Deposit pursuant to Treasury Regulation Section 1.468B-7(c) and Purchaser shall take into account all items of income, gain, loss and deduction with respect to the Deposit for federal and state income Tax purposes until the Deposit is released from escrow and paid to the receiving party (the "Receiving Party").  Upon release of all or a portion of the Deposit from escrow, the Receiving Party of such Deposit or portion thereof shall be individually liable for payment (and shall indemnify the other parties for losses incurred by the Receiving Party's nonpayment) of all Taxes payable with respect to such Deposit or portion thereof received and all related Tax reporting duties.

Section 10.6     **Matters Specific to the Tax Partnerships**.  As to the Tax Partnerships of which Seller is a partner as of the date of this Agreement, the following is agreed:

(a)     Seller shall use commercially reasonable best efforts to make, or cause to be made, an election under Section 754 of the Code with respect to each of the Tax

Partnerships specified on Schedule 4.7, to the extent that such an election is not already in place with respect to such Tax Partnership.

(b)     Attached hereto as Exhibit 10.6 are true and correct copies of the tax partnership agreements that as of the date of this Agreement apply to and control with respect to the Tax Partnerships of which Seller is a partner.

(c)     From the Execution Date through, and including, the Closing Date, Seller will use commercially reasonable efforts to assist and cooperate with Purchaser to obtain the agreement of the other partners to the Tax Partnerships, other than Purchaser, to terminate for purposes of Section 708(b)(1)(A) of the Code each of the Tax Partnerships and Purchaser shall reimburse Seller for all reasonable Third Party out-of-pocket expenses, if any, associated with providing such assistance.

Section 10.7     **Conflict**.     In the event of a conflict among the provisions of this ARTICLE 10 and any other provision of this Agreement, this ARTICLE 10 shall control.

## ARTICLE 11
## TERMINATION AND AMENDMENT

Section 11.1     **Termination**.     This Agreement may be terminated at any time prior to Closing:

(a)     by the mutual prior written consent of Seller and Purchaser;

(b)     by Seller or Purchaser upon written notice to the other Party, if Closing has not occurred on or before May 30, 2018 (the "End Date"); provided that a Party shall not be entitled to terminate this Agreement under this Section 11.1(b) if the Closing has failed to occur as a result of such Party's material breach or failure of any of such Party's representations, warranties or covenants hereunder (including the failure to perform the obligations of such Party to Close the transactions contemplated hereunder if and when required); or

(c)     by Seller upon written notice to Purchaser, upon the occurrence of any of the following events; provided that, prior to Seller delivering any written notice to Purchaser to terminate this Agreement pursuant to Section 11.1(c)(vi) (a "Seller Termination Notice"), Seller shall deliver written notice to Purchaser at least three (3) Business Days prior to the date on which Seller delivers a Seller Termination Notice, which notice shall identify the specific event that has occurred giving rise to Seller's right to terminate this Agreement and that Seller intends to deliver a Seller Termination Notice to Purchaser:

(i)     Purchaser has not commenced a voluntary reorganization case under chapter 11 of the Bankruptcy Code ("Chapter 11 Case") on or before February 15, 2018;

(ii)     an examiner (with expanded powers beyond those set forth in section 1106(a)(3) and (4) of the Bankruptcy Code), or a trustee or receiver shall have been appointed in the Chapter 11 Case;

(iii)     the RSA, the Backstop Commitment Agreement or the DIP Financing (as defined in the RSA and the Plan) terminates for any reason;

(iv)     any party to the RSA files any motion or pleading with the Bankruptcy Court that is inconsistent with this Agreement, the RSA, the Plan or the Backstop Commitment Agreement and such motion or pleading has not been withdrawn or is not otherwise denied by the Bankruptcy Court within ten (10) Business Days of receipt of notice by such party that such motion or pleading is inconsistent with this Agreement, the RSA, the Plan or the Backstop Commitment Agreement;

(v)     the conversion or dismissal of the Chapter 11 Case, unless such conversion or dismissal, as applicable, is made with the prior written consent of Seller;

(vi)     any party to the RSA amends, or otherwise modifies, or files a pleading seeking authority to amend or otherwise modify, the Plan, the RSA or the Backstop Commitment Agreement without the prior written consent of Seller, which consent shall not be unreasonably withheld; provided, that the Parties agree that it shall be reasonable for Seller to withhold consent, and Seller may withhold consent, to any amendment or other modification (a) to the RSA or Backstop Commitment Agreement or (b) to the Plan (i) that is inconsistent with this Agreement, (ii) that would prohibit, prevent or otherwise impair the ability of Purchaser in performing its obligations under this Agreement, (iii) that affects the treatment of any party to the RSA or Apache without the prior written consent of such party, (iv) that impairs a previously unimpaired class without the prior written consent of the parties necessary for that class to be an accepting class under section 1126 of the Bankruptcy Code, or (v) that increases the projected net leverage of the Reorganized Debtors (as defined in the Plan) by more than 0.25x for any year from 2018 through 2022 above that projected net leverage disclosed in the Purchaser's Disclosure Statement;

(vii)     either the Confirmation Order or the Sale Order (or both) have not been entered with the Bankruptcy Court on or before April 30, 2018;

(viii)     the Bankruptcy Court has not approved the payment of the Subsequent Deposit to Seller and the terms of Article 11 of this Agreement on terms reasonably acceptable to Seller on or before March 15, 2018;

(ix)     Purchaser has not paid the Subsequent Deposit to Seller on or before March 15, 2018 (in accordance with the terms of Section 2.3(a)) and Seller shall have provided Purchaser at least one (1) Business Day's written notice that Seller shall not have received the Subsequent Deposit;

(x)     the Bankruptcy Court enters an order in the Chapter 11 Case terminating the Purchaser's exclusive right to file a plan of reorganization pursuant to section 1121 of the Bankruptcy Code and such order is not withdrawn or modified to reinstate such exclusive right by within ten (10) Business Days after such order has been entered; or

(xi)     any or all of the conditions set forth in Section 8.1(h), Section 8.1(i) or Section 8.1(j) have not occurred on or prior to May 30, 2018.

The date of any permitted termination of this Agreement under this Section 11.1 shall be the "Termination Date"

Section 11.2     **Effect of Termination**.

(a)     If this Agreement is terminated pursuant to Section 11.1, this Agreement shall become void and of no further force or effect (except for the provisions of ARTICLE 1, Section 2.3, Section 5.11, Section 7.1(b), Section 7.1(d), Section 7.7(d), Section 7.12, Section 7.13, ARTICLE 11, Section 13.1, Section 13.2(a) and Section 13.4 through Section 13.16, all of which shall survive and continue in full force and effect indefinitely).     The Confidentiality Agreement shall survive any termination of this Agreement.

(b)     In the event that Purchaser has a right to terminate this Agreement pursuant to Section 11.1(b) because (i) all conditions precedent to the obligations of Seller set forth in Section 8.1 have been satisfied or waived by Seller and (ii) the Closing has not occurred solely as a result of the material breach or failure of any of Seller's representations, warranties or covenants hereunder, including, if and when required, any of Seller's obligations to consummate the transactions contemplated hereunder at Closing, then Purchaser shall promptly elect in writing to be entitled, as the sole and exclusive remedy of the Purchaser Group against any member of the Seller Group for the failure to consummate the transactions contemplated hereunder at Closing, to either (A) exercise any rights to specific performance of this Agreement that Purchaser may be entitled to at law or in equity or (B) (i) terminate this Agreement, (ii) receive the entirety of the Deposit for the sole account and use of Purchaser, and (iii) seek actual damages at law as a result of such termination; provided, however, notwithstanding the foregoing subclause (iii), in the event that Purchaser seeks actual damages at law for any termination under this clause (B), the aggregate liability of Seller for such damages under ARTICLE 11 (in addition to return of the Deposit to Purchaser pursuant to subclause (ii) of this clause (B)) or otherwise under this Agreement from and after the termination of this Agreement shall not exceed an amount equal to the amount of the Deposit, and Purchaser hereby waives, relinquishes and releases Seller from any liability or Damages in excess of such amount.

(c)     In the event that (i) Seller has elected to terminate this Agreement under Section 11.1(b), (ii) all conditions precedent to the obligations of Purchaser set forth in Section 8.2 have been satisfied or waived by Purchaser and (iii) the Closing has not occurred solely as a result of the material breach or failure of any of Purchaser's

-70-

representations, warranties or covenants hereunder, including, if and when required, any of Purchaser's representations, warranties or covenants hereunder, including Purchaser's obligations to consummate the transactions contemplated hereunder at Closing, then Seller shall receive the entirety of the Deposit for the sole account and use of Seller and Seller's retention of the Deposit shall constitute liquidated damages hereunder, which remedy shall be the sole and exclusive remedy available to Seller for any such failure of Purchaser. Seller and Purchaser acknowledge and agree that (A) Seller's actual damages upon the event of such a termination are difficult to ascertain with any certainty, (B) the Deposit is a fair and reasonable estimate by the Parties of such aggregate actual damages of Seller and (C) such liquidated damages do not constitute a penalty.

(d)     In the event that Seller has elected to terminate this Agreement under Section 11.1(c), then Seller shall receive the entirety of the Deposit for the sole account and use of Seller and Seller's retention of the Deposit shall constitute liquidated damages hereunder, which remedy shall be the sole and exclusive remedy available to Seller for any such failure of Purchaser. Seller and Purchaser acknowledge and agree that (A) Seller's actual damages upon the event of such a termination are difficult to ascertain with any certainty, (B) the Deposit is a fair and reasonable estimate by the Parties of such aggregate actual damages of Seller and (C) such liquidated damages do not constitute a penalty.

(e)     In the event that this Agreement is terminated under Section 11.1 and Seller is not entitled or required to retain the Deposit under Section 11.2(c) or Section 11.2(d), Purchaser shall be entitled to receive the entirety of the Deposit for the account of Purchaser.

(f)     Promptly, but in no event later than three (3) Business Days after the Termination Date, Seller shall disburse via wire transfer of immediately available funds the entirety of the Deposit to the Purchaser, if Purchaser is entitled to receive the Deposit as provided in this Section 11.2. If Seller is entitled to receive the Deposit as provided in this Section 11.2, then Seller shall retain the entirety of the Deposit.

## ARTICLE 12
## INDEMNIFICATION; LIMITATIONS

Section 12.1     **Assumption**.  Subject to Closing and without limiting Purchaser's rights to indemnity under this ARTICLE 12, from and after the Closing Date, Purchaser assumes and hereby agrees to fulfill, perform, pay and discharge (or cause to be fulfilled, performed, paid or discharged) all of the obligations, liabilities and Damages, known or unknown, with respect to the ownership, use and operation of the Assets (a) which arise out of actions or omissions, are attributable to periods, or are incurred on or after the Effective Date, including obligations, liabilities and Damages: (i) relating to the furnishing of makeup gas according to the terms of applicable gas sales, gathering or transportation Contracts and all obligations with respect to Imbalances; (ii) with respect to Royalties and Suspense Funds, including any reporting and/or mis-reporting, payment and/or mis-payment of such Royalties or Suspense Funds; (iii) constituting or related to Environmental Liabilities related to the Assets, including liabilities and obligations to clean-up, restore or Remediate the Assets, ground water, surface water, soil in

accordance with applicable Contracts and Laws, including any obligations to assess, Remediate, remove and dispose of NORM, asbestos, mercury, drilling fluids and chemicals, and produced waters and Hydrocarbons, or other Environmental Liabilities with respect to the Assets; (iv) applicable to or imposed on the lessee, owner, or operator under the Leases and Contracts, or as required by Laws; and (v) Tax matters which are the responsibility of Purchaser pursuant to ARTICLE 10; and (b) regardless of whether such obligations or liabilities arise out of actions or omissions, are attributable to periods, or are incurred prior to, on or after the Effective Date: (i) constituting or relating to any and all P&A Obligations related to the Assets; (ii) subject to the terms of ARTICLE 3 and the special warranty of title in the Conveyances, arising from, or relating to, title defects, deficiencies, or other title matters, whether arising or relating to periods of time before, on, or after the Effective Date; (iii) caused by, arising out of, or resulting from, the conveyance or transfer of any Asset without an applicable consent to such conveyance or transfer, other than a Required Consent; (iv) subject to the terms of Section 7.8, all risk of loss with respect to production of Hydrocarbons through normal depletion (including watering out of any Well, collapsed casing or sand infiltration of any Well) and the depreciation of the Assets due to ordinary wear and tear, in each case, with respect to the Assets; (v) continuing under any agreements pursuant to which Seller or its Affiliates purchased the Assets prior to the Closing; and (vi) constituting Purchaser Employment Liabilities (all of the foregoing obligations and liabilities set forth in this Section 12.1, subject to the exclusions of the proviso immediately below, herein being referred to as the "Assumed Obligations"); provided, however, that the Assumed Obligations do not include any Damages for which Seller is obligated to indemnify any member of the Purchaser Group under Section 12.3, but only to the extent and for the periods Seller is obligated hereunder to provide such indemnity under this ARTICLE 12.

Section 12.2 **Seller's Indemnification Rights**. Subject to the terms hereof, from and after the Closing Date, Purchaser shall be responsible for, shall pay and shall indemnify, defend and hold harmless Seller, each Affiliate of Seller, and each of such Person's respective shareholders, members, officers, directors, managers, employees, agents, lenders, advisors, representatives, accountants, attorneys and consultants ("Seller Group") from and against all obligations, liabilities, claims, causes of action, and Damages caused by, arising out of, attributable to or resulting from:

      (a)    Purchaser's breach of any of Purchaser's covenants or agreements contained in this Agreement or in any agreement, instrument or document delivered by Purchaser hereunder;

      (b)    any breach of any representation or warranty made by Purchaser contained in ARTICLE 5 of this Agreement or in the certificate delivered at Closing pursuant to Section 9.3(f); or

      (c)    any of the Assumed Obligations;

**EVEN IF ANY SUCH DAMAGES ARE CAUSED IN WHOLE OR IN PART BY THE NEGLIGENCE (WHETHER GROSS, SOLE, JOINT, ACTIVE, PASSIVE, COMPARATIVE OR CONCURRENT), STRICT LIABILITY OR OTHER LEGAL FAULT OF ANY INDEMNIFIED PERSON, INVITEES OR THIRD PARTIES**, but

excepting in each case Damages against which Purchaser would be entitled to indemnification under <u>Section 12.3</u> at the time the applicable Claim Notice is presented by Purchaser.

Section 12.3 **Purchaser's Indemnification Rights**. Subject to the terms hereof, from and after the Closing Date, Seller shall be responsible for, shall pay and shall indemnify Purchaser, the Affiliates of Purchaser and each of their respective shareholders, members, officers, directors, managers, employees, agents, lenders, advisors, representatives, accountants, attorneys and consultants ("<u>Purchaser Group</u>") from and against all obligations, liabilities, claims, causes of action, and Damages caused by, arising out of, attributable to or resulting from:

(a) the failure or breach of Seller's covenants or agreements contained in this Agreement or in any agreement, instrument or document delivered by Seller hereunder;

(b) any failure or breach of any representation or warranty made by Seller contained in <u>ARTICLE 4</u> of this Agreement, or in the certificate delivered at Closing pursuant to <u>Section 9.2(f)</u>;

(c) other than those obligations, liabilities and Damages specifically assumed by Purchaser under <u>Section 12.1(b)</u> (other than <u>Section 12.1(b)(v)</u>), any obligations, liabilities and Damages, known or unknown, related to or arising out of the ownership and operation of the Assets that arise out of, are attributable to, or incurred, prior to the Effective Date (except Environmental Liabilities with respect to the condition of the Facilities under subpart (c)(iii) below, which shall be the Closing Date) (collectively, the "<u>Retained Liabilities</u>"), including:

(i) death, personal injury or Third Party property damage, including any claim for indemnification, contribution or reimbursement from any Third Party with respect to damages associated therewith;

(ii) Royalties and Suspense Funds, including any reporting and/or mis-reporting, payment and/or mis-payment of such Royalties or Suspense Funds;

(iii) Environmental Liabilities relating to the Assets, including liabilities and obligations to clean-up, restore or Remediate the Assets, ground water, surface water, soil in accordance with applicable Contracts and Laws, including any obligations to assess, Remediate, remove and dispose of NORM, asbestos, mercury, drilling fluids and chemicals, and produced waters and Hydrocarbons;

(iv) fines or penalties imposed or assessed by any Governmental Authorities arising out of or attributable to any violations of Law, including Environmental Law, with respect to Seller's ownership or operation of the Oil and Gas Properties;

(v) all obligations imposed on the lessee, owner, or operator under the Leases and Contracts, or as required by Laws; and

-73-

(vi)     all obligations relating to the furnishing of makeup gas according to the terms of applicable gas sales, gathering or transportation Contracts; and

(d)     Retained Liabilities shall also include the following obligations, liabilities and Damages, known or unknown, with respect to the ownership, use or operations of the Assets, regardless of whether such obligations, liabilities or Damages arise out of, are attributable to, or incurred prior to, on or after the Effective Date:

(i)     all obligations, liabilities and Damages arising from or relating to (A) the Employee Plans, (B) the Seller's or its Affiliates' engagement of the Company Contractors, (C) Seller's employees other than the Company Employees; (C) the Company Employees other than with respect to the Purchaser Employment Liabilities; and (D) the Seller WARN Liability;

(ii)     Tax obligations of Seller set forth in <u>ARTICLE 10</u>;

(iii)     all obligations, liabilities and Damages arising from or relating to Excluded Assets; and

(iv)     Obligations set forth in any notice or invoice received by Seller and/or any of its Affiliates before the Cut-Off Date for Property Costs relating to the Assets for periods prior to the Effective Date.

Section 12.4     **Survival; Limitation on Actions**.

(a)     Subject to <u>Section 12.4(b)</u> and <u>Section 12.4(c)</u>: (i) the representation in <u>Section 4.17</u> and the corresponding representations and warranties given in the certificates delivered by Seller at Closing pursuant to <u>Section 9.2(f)</u> shall not survive the Closing and shall terminate on the Closing Date; (ii) the Fundamental Representations of Seller and the corresponding representations and warranties given in the certificates delivered by Seller at Closing pursuant to <u>Section 9.2(f)</u> shall survive the Closing without time limit; (iii) all other representations and warranties of Seller set forth herein (other than those set forth in <u>Section 4.7</u>, <u>Section 4.17</u> or which constitute a Fundamental Representation) and the corresponding representations and warranties given in the certificates delivered by Seller pursuant to <u>Section 9.2(f)</u> shall each survive the Closing and shall terminate on the date twelve (12) months after the Closing Date; (iv) the representations and warranties in <u>Section 4.7</u> shall survive Closing until the expiration of the relevant statutes of limitations; (v) the covenants and agreements of Seller set forth in <u>Section 12.3(c)</u> (other than Seller's indemnification obligations under <u>Section 12.3(c)(ii)</u> and <u>Section 12.3(c)(iv)</u>) shall survive the Closing and terminate on the date two (2) years after the Closing Date; (vi) Seller's indemnification obligations under <u>Section 12.3(c)(ii)</u> and <u>Section 12.3(c)(iv)</u> shall survive the Closing and terminate on the date six (6) years after the Closing Date; (vii) the covenants and agreements of Seller to be performed on or prior to Closing shall each survive the Closing and terminate on the date two (2) years after the Closing Date; (viii) subject to the above, all covenants and agreements of Seller hereunder that are to be performed after Closing, including Seller's indemnification obligations under <u>Section 12.3(d)</u>, shall survive the Closing indefinitely; and (ix) the

covenants, representations and warranties of Purchaser set forth in this Agreement, the corresponding representations and warranties given in the certificates delivered by Purchaser at Closing pursuant to Section 9.3(f) and any other agreement, instrument or document delivered by Purchaser in connection herewith shall survive the Closing indefinitely. Except as may otherwise be provided herein, the remainder of this Agreement shall survive Closing without time limit. Representations, warranties, covenants and agreements set forth in this Agreement and any other agreement, instrument or document delivered in connection herewith shall be of no further force and effect, and Seller shall not have any obligations hereunder, after the applicable date of their expiration, provided that there shall be no termination of any bona fide claim validly asserted pursuant to a valid Claim Notice pursuant to this Agreement with respect to such a representation, warranty, covenant or agreement prior to the expiration or termination date thereof.

(b)     All rights of each member of the Purchaser Group under Section 12.3(a) and Section 12.3(b) shall terminate as of the termination date of each respective representation, warranty, covenant or agreement of Seller as set forth herein that is subject to indemnification, except in each case as to matters for which a specific written Claim Notice has been validly delivered to Seller on or before the earlier of such termination date or the date otherwise required to be delivered hereunder.

(c)     Except for Seller's obligations under Section 12.3(d), and subject to Section 13.13 and notwithstanding anything to the contrary contained elsewhere in this Agreement, Seller shall not have any liability or be required to indemnify Purchaser (i) under this ARTICLE 12 (other than under (w) Section 12.3(a) with respect to Seller's covenants and agreements set forth in Section 2.5, Section 7.11, Section 9.4, and ARTICLE 10, (x) Section 12.3(c)(ii), (y) Section 12.3(c)(iv) and (z) Section 12.3(d)) for Damages relating to or arising out of any individual event, matter or occurrence for which a Claim Notice is delivered by Purchaser and for which Seller admits (or it is otherwise finally determined) that Seller has an obligation to indemnify Purchaser pursuant to Section 12.3 unless the amount of such Damages exceeds Fifty Thousand Dollars ($50,000.00), (ii) under Section 12.3(b) for any and all Damages for which Claim Notices are delivered by Purchaser and for which Seller admits (or it is otherwise finally determined) that Seller has an obligation to indemnify Purchaser pursuant to Section 12.3 unless the aggregate amount of all such Damages exceed three percent (3%) of the Unadjusted Purchase Price (and then only to the extent such Damages exceed three percent (3%) of such sum) and (iii) under this Agreement (other than under (x) Section 12.3(a) with respect to Seller's covenants and agreements set forth in Section 2.5, Section 7.11, Section 9.4, and ARTICLE 10, and (y) Section 12.3(d)), or any of the agreements, instruments, documents delivered in connection with the transactions contemplated hereunder for aggregate Damages in excess of fifteen percent (15%) of the Unadjusted Purchase Price.  Subject to Section 13.13, the liability of Purchaser pursuant to Section 12.2 shall be without limit. Notwithstanding the foregoing, this Section 12.4(c) shall not limit indemnification for breaches of Seller's Fundamental Representations or breaches of Seller's special warranty of Defensible Title in the Conveyances.

(d)    Seller and Purchaser each acknowledge and agree that except as expressly set forth in <u>ARTICLE 11</u>, (i) the payment of money, as limited by the terms of this Agreement, shall be adequate compensation for breach of any representation, warranty, covenant or agreement contained herein or for any other claim arising in connection with or with respect to the transactions contemplated by this Agreement and (ii) Purchaser and Seller hereby waives any and all rights to rescind, cancel, terminate, revoke or void this Agreement or any of the transactions contemplated hereby.

Section 12.5    <u>**Exclusive Remedy and Certain Limitations**</u>.

(a)    Notwithstanding anything to the contrary contained in this Agreement, from and after Closing, Purchaser's and Purchaser Group's sole exclusive remedy against any member of the Seller Group and Seller's and Seller's Group's sole exclusive remedy against any member of the Purchaser Group, in each case, with respect to the negotiation, performance and consummation of the transactions contemplated hereunder, any breach of the representations, warranties, covenants and agreements of any member of the Seller Group or Purchaser Group, as applicable, contained herein, the affirmations of such representations, warranties, covenants and agreements contained in the certificates delivered by any member of the Seller Group at Closing pursuant to <u>Section 9.2(f)</u> or the certificates delivered by any member of the Purchaser Group at Closing pursuant to <u>Section 9.3(f)</u>, as applicable, or contained in any other agreement, contract or instrument delivered hereunder by or on behalf of any member of the Seller Group or Purchaser Group, as applicable, are the rights set forth in <u>Section 12.3</u> and <u>Section 12.2</u>, as applicable, as limited by the terms of this <u>ARTICLE 12</u>.   Except for the remedies contained in this <u>ARTICLE 12</u>, upon Closing, Purchaser and Seller each waive, release, remise and forever discharge, and shall cause each member of the Purchaser Group and Seller Group, as applicable, to waive, release, remise and forever discharge, each member of the Seller Group or Purchaser Group, as applicable, from any and all Damages, suits, legal or administrative proceedings, claims, demands, losses, costs, obligations, liabilities, interest, charges or causes of action whatsoever, in law or in equity, known or unknown, which any member of the Purchaser Group or Seller Group, as applicable, might now or subsequently may have, based on, relating to or arising out of the negotiation, performance and consummation of this Agreement or the transactions contemplated hereunder or any member of the ownership, use or operation of the Assets, or the condition, quality, status or nature of the Assets, **INCLUDING RIGHTS TO CONTRIBUTION UNDER CERCLA OR ANY OTHER ENVIRONMENTAL LAW, BREACHES OF STATUTORY AND IMPLIED WARRANTIES, NUISANCE OR OTHER TORT ACTIONS, RIGHTS TO PUNITIVE DAMAGES, COMMON LAW RIGHTS OF CONTRIBUTION, ANY RIGHTS UNDER INSURANCE POLICIES ISSUED OR UNDERWRITTEN BY ANY MEMBER OF THE PURCHASER GROUP AND ANY RIGHTS UNDER AGREEMENTS AMONG ANY MEMBERS OF THE SELLER GROUP, EVEN IF CAUSED IN WHOLE OR IN PART BY THE NEGLIGENCE (WHETHER GROSS, SOLE, JOINT, ACTIVE, PASSIVE, COMPARATIVE OR CONCURRENT), STRICT LIABILITY OR OTHER LEGAL FAULT OF ANY RELEASED PERSON, INVITEES OR THIRD PARTIES**.  Without limiting the generality of the immediately

#5618848.7
#5618848.12

preceding sentence, Purchaser and Seller agree, and shall cause each member of the Purchaser Group or Seller Group, as applicable, to agree, that from and after Closing the sole and exclusive remedies of the Purchaser Group with respect to any member of the Seller Group's breach of representations, warranties, covenants and agreements herein or in the other agreements and instruments delivered in connection with the transactions contemplated hereunder and thereunder shall be the rights to indemnity under Section 12.1 and Section 12.2, as limited by the terms of this ARTICLE 12. No Party or Person is asserting the accuracy, completeness, or truth of any representation and warranty set forth in this Agreement; rather the Parties have agreed that should any representation or warranty of any Party prove inaccurate, incomplete or untrue, the other Party shall have the specific rights and remedies herein specified as the exclusive remedy therefor, but that no other rights, remedies or causes of action (whether in Law or in equity or whether in contract or in tort or otherwise) are permitted to any Party hereto as a result of the failure, breach, inaccuracy, incompleteness or untruth of any such representation and warranty.

(b)    "Damages" for purposes of this ARTICLE 12, shall mean the amount of any actual loss, cost, costs of settlement (but only to the extent the Indemnified Person complied with the terms of Section 12.6), damage, expense, claim, award or judgment incurred or suffered by any Indemnified Person arising out of or resulting from the indemnified matter, whether attributable to personal injury or death, property damage, contract claims, torts or otherwise, including reasonable fees and expenses of attorneys, consultants, accountants or other agents and experts reasonably incident to matters indemnified against, and the costs of investigation and/or monitoring of such matters, and the costs of enforcement of the indemnity; provided, however, that "Damages" shall not include any adjustment for Taxes that may be assessed on payments under this ARTICLE 12.  **Notwithstanding the foregoing, neither Purchaser nor Seller shall be entitled to indemnification under this ARTICLE 12 for, and Damages shall not include, (i) loss of profits, whether direct or consequential, or other consequential damages suffered by the Party (whether on its own behalf or on behalf of any member of the Seller Group or Purchaser Group, as applicable) claiming indemnification, or any punitive damages (other than loss of profits, consequential damages or punitive damages suffered by any Third Party for which responsibility is allocated among the Parties), or (ii) any diminution of value or increase in liability, loss, cost, expense, claim, award or judgment to the extent such increase is caused by the actions or omissions of any Indemnified Person after the Closing Date.**

(c)    Any claim for indemnity under this ARTICLE 12 by any current or former Affiliate, stockholder, member, officer, director, employee, agent, lender, advisor, representative, accountant, attorney and consultant of any Party must be brought and administered by the applicable Party to this Agreement.  No Indemnified Person other than Seller and Purchaser shall have any rights against either Seller or Purchaser under the terms of this ARTICLE 12 except as may be exercised on its behalf by Purchaser or Seller, as applicable, pursuant to this ARTICLE 12.  Seller and Purchaser may elect to exercise or not exercise indemnification rights under this Section on behalf of the other

-77-

Indemnified Persons affiliated with it in its sole discretion and shall have no liability to any such other Indemnified Person for any action or inaction under this Section.

(d)     Without prejudice to those other sections herein, the provisions of Section 12.3 and Section 12.4 shall not apply in respect of any obligations of Seller as to (i) Tax matters, other than Section 4.7, which are exclusively covered by ARTICLE 2 and ARTICLE 10, or (ii) claims for Property Costs, which are covered exclusively by Section 2.4, Section 2.5 and Section 9.4.

(e)     The amount of any Damages for which Purchaser or any member of the Purchaser Group is entitled to indemnity under this ARTICLE 12 shall be reduced by the amount of insurance or other Third Party proceeds, reimbursements or claims received by Purchaser or applicable member of the Purchaser Group if a claim were properly pursued under the relevant insurance arrangements with respect to such Damages.  Purchaser shall use commercially reasonable efforts to pursue and prosecute any and all claims against Third Parties for which Purchaser or any member of the Purchaser Group is entitled to indemnity from Seller under this ARTICLE 12.  In the event that any member of the Purchaser Group receives funds or proceeds from any insurance carrier or any other Third Party with respect to any Damages, Purchaser shall, regardless of when received by such member of the Purchaser Group, be promptly pay to the Seller such funds or proceeds to the extent of any funds previously paid by Seller or its Affiliates with respect to such Damages.

(f)     Each Indemnified Person shall make reasonable efforts to mitigate or minimize all Damages upon and after becoming aware of any event or condition which would reasonably be expected to give rise to any Damages that are indemnifiable hereunder.  If an Indemnified Person fails to so mitigate any indemnifiable Damages under the preceding sentence, such Indemnified Person shall have no right to indemnity hereunder  with respect to such Damages and the Indemnifying Party shall have no liability for any portion of such Damages that reasonably could have been avoided, reduced or mitigated had the Indemnified Person made such efforts.

(g)     The Parties shall treat, for Tax purposes, any amounts paid or received under this ARTICLE 12 as an adjustment to the Adjusted Purchase Price.

(h)     Except to the extent of claims and rights expressly included as part of the Assets, nothing in this Agreement is intended to limit or otherwise waive any recourse Seller may have against any Person that is not a member of the Seller Group for any Damages, obligations or liabilities that may be incurred with respect to ownership or operation of the Assets, the Assumed Obligations or the Retained Liabilities.

(i)     To the extent of the indemnification obligations in this Agreement, Purchaser and Seller hereby waive for themselves and their respective successors and assigns, including any insurers, any rights to subrogation for losses for which such Party is liable or against which such Party indemnifies any other Person under this Agreement. If required by applicable insurance policies, each Party shall obtain a waiver of such subrogation from its insurers.

#5618848.7
#5618848.12

Section 12.6 **Indemnification Actions**. All claims for indemnification under ARTICLE 12 shall be asserted and resolved as follows:

(a) For purposes of this ARTICLE 12, the term "Indemnifying Party" when used in connection with particular Damages shall mean the Person(s) having an obligation to indemnify another Person(s) with respect to such Damages pursuant to this ARTICLE 12, and the term "Indemnified Person" when used in connection with particular Damages shall mean a Person(s) having the right to be indemnified with respect to such Damages pursuant to this ARTICLE 12 (including, for the avoidance of doubt, those Persons identified in Section 12.4(c)).

(b) To make claim for indemnification, defense or reimbursement under this ARTICLE 12, an Indemnified Person shall notify the Indemnifying Party of its claim, including the specific details (including supporting documentation of the alleged Damages and such Indemnified Person's good faith estimate of the applicable claim) of and specific basis under this Agreement for its claim (the "Claim Notice").

(c) In the event that any claim for indemnification set forth in any Claim Notice is based upon a claim by a Third Party against the Indemnified Person (a "Third Party Claim"), the Indemnified Person shall provide its Claim Notice promptly after the Indemnified Person has actual knowledge of the Third Party Claim and shall enclose a copy of all papers (if any) served with respect to the Third Party Claim; provided that the failure of any Indemnified Person to give notice of a Third Party Claim as provided in this Section 12.6 shall not relieve the Indemnifying Party of its obligations under this ARTICLE 12 except to the extent such failure results in insufficient time being available to permit the Indemnifying Party to effectively defend against the Third Party Claim or otherwise prejudices the Indemnifying Party's ability to defend against the Third Party Claim. In the event that the claim for indemnification is based upon an alleged inaccuracy or breach of a representation, warranty, covenant or agreement, the Claim Notice shall specify the representation, warranty, covenant or agreement that was allegedly inaccurate or breached.

(d) In the case of a claim for indemnification based upon a Third Party Claim, the Indemnifying Party shall have thirty (30) days from its receipt of the Claim Notice to notify the Indemnified Person whether it admits or denies its obligation to defend the Indemnified Person against such Third Party Claim under this ARTICLE 12. The Indemnified Person is authorized, prior to and during such thirty (30) day period, to file any motion, answer or other pleading that it shall deem necessary or appropriate to protect its interests or those of the Indemnifying Party and that is not prejudicial to the Indemnifying Party. If the Indemnifying Party fails to notify the Indemnified Person within such thirty (30) day period regarding whether the Indemnifying Party admits or denies its obligation to defend the Indemnified Person, then until such date as the Indemnifying Party admits or it is finally determined by an non-appealable judgment that such obligation exists, the Indemnified Person may file any motion, answer or other pleading, settle any Third Party Claim or take any other action that the Indemnified Person deems necessary or appropriate to protect its interest, regardless of whether the Indemnifying Party is prejudiced or adversely impacted by any such actions.

#5618848.7
#5618848.12

(e)     If the Indemnifying Party admits its indemnity obligations under this ARTICLE 12 with respect to any Third Party Claim, then such Indemnifying Party shall have (i) the right and obligation to diligently prosecute and control the defense, at its sole cost and expense, the Third Party Claim and (ii) have full control of such defense and proceedings, including any compromise or settlement thereof unless the compromise or settlement includes the payment of any amount by, the performance of any obligation by, or the limitation of any right or benefit of, the Indemnifying Party, in which event such settlement or compromise shall not be effective without the consent of the Indemnified Person, which shall not be unreasonably withheld or delayed.  Indemnifying Party, if requested by the Indemnifying Party, the Indemnified Person agrees at the cost and expense of the Indemnifying Party to cooperate in contesting any Third Party Claim which the Indemnifying Party elects to contest; provided, however, that the Indemnified Person shall not be required to bring any counterclaim or cross-complaint against any Person.  The Indemnified Person may participate in, but not control, any defense or settlement of any Third Party Claim controlled by the Indemnifying Party pursuant to this Section 12.6(e) provided that the Indemnified Person may file initial pleadings as described in the last sentence of paragraph (c) above if required by court or procedural rules to do so within the thirty (30) day period in paragraph (c) above.  An Indemnifying Party shall not, without the written consent of the Indemnified Person, settle any Third Party Claim or consent to the entry of any judgment with respect thereto that (A) does not result in a final resolution of the Indemnified Person's liability with respect to the Third Party Claim (including, in the case of a settlement, an unconditional written release of the Indemnified Person from all further liability in respect of such Third Party Claim) or (B) may materially and adversely affect the Indemnified Person (other than as a result of money damages covered by the indemnity).

(f)     If the Indemnifying Party does not admit its obligation or admits its obligation but fails to diligently defend or settle the Third Party Claim, then the Indemnified Person shall have the right, but not the obligation, to defend and control the defense against the Third Party Claim (at the sole cost and expense of the Indemnifying Party, if the Indemnified Person is entitled to indemnification hereunder), with counsel of the Indemnified Person's choosing, subject to the right of the Indemnifying Party to admit its obligation to indemnify the Indemnified Person and assume the defense of the Third Party Claim at any time prior to settlement or final determination thereof.  If the Indemnifying Party has not yet admitted its obligation to indemnify the Indemnified Person, the Indemnified Person shall send written notice to the Indemnifying Party of any proposed settlement and the Indemnifying Party shall have the option for ten (10) days following receipt of such notice to (i) admit in writing its obligation for indemnification with respect to such Third Party Claim and (ii) if its obligation is so admitted, assume the defense of the Third Party Claim, including the power to reject the proposed settlement. If the Indemnified Person settles any Third Party Claim over the objection of the Indemnifying Party after the Indemnifying Party has timely admitted its obligation for indemnification in writing and assumed the defense of the Third Party Claim, the Indemnified Person shall be deemed to have waived any right to indemnity with respect to the Third Party Claim.

#5618848.7
#5618848.12

(g)     In the case of a claim for indemnification not based upon a Third Party Claim, (a "Direct Claim") shall be asserted by giving the Indemnifying Party reasonably prompt Claim Notice thereof, but in any event not later than thirty (30) days after the Indemnified Person becomes aware of the events that gave rise to such Direct Claim. Such Claim Notice by the Indemnified Person shall describe the Direct Claim in reasonable detail, shall include copies of all available material written evidence thereof and shall indicate the estimated amount, if reasonably practicable, of Damages that have been or may be sustained by the Indemnified Person.  The Indemnifying Party shall have sixty (60) days from its receipt of the Claim Notice to (i) cure the Damages complained of, (ii) admit its obligation to provide indemnification with respect to such Damages or (iii) dispute the claim for such Damages.  If the Indemnifying Party does not notify the Indemnified Person within such sixty (60) day period that it has cured the Damages or that it disputes the claim for such Damages, the Indemnifying Party shall be conclusively deemed obligated to provide indemnification hereunder with respect to such Direct Claim.

Section 12.7  **Express Negligence/Conspicuous Manner**.  **WITH RESPECT TO THIS AGREEMENT, BOTH PARTIES AGREE THAT THE PROVISIONS SET OUT IN THIS ARTICLE 12 COMPLY WITH THE REQUIREMENT, KNOWN AS THE EXPRESS NEGLIGENCE RULE, TO EXPRESSLY STATE IN A CONSPICUOUS MANNER TO AFFORD FAIR AND ADEQUATE NOTICE THAT THIS AGREEMENT HAS PROVISIONS REQUIRING PURCHASER TO BE RESPONSIBLE FOR THE NEGLIGENCE (WHETHER GROSS, SOLE, JOINT, ACTIVE, PASSIVE, COMPARATIVE OR CONCURRENT), STRICT LIABILITY, OR OTHER FAULT OF MEMBERS OF THE SELLER GROUP. PURCHASER REPRESENTS TO SELLER INDEMNIFIED PERSON (1) THAT PURCHASER HAS CONSULTED AN ATTORNEY CONCERNING THIS AGREEMENT OR, IF IT HAS NOT CONSULTED AN ATTORNEY, THAT PURCHASER WAS PROVIDED THE OPPORTUNITY AND HAD THE ABILITY TO SO CONSULT, BUT MADE AN INFORMED DECISION NOT TO DO SO, AND (2) THAT PURCHASER FULLY UNDERSTANDS ITS OBLIGATIONS UNDER THIS AGREEMENT**.

## ARTICLE 13
## MISCELLANEOUS

Section 13.1  **Notices**.  Any notice, election, consent, request, instruction, correspondence or other document to be given hereunder by any Party to another (herein collectively called "Notice") shall be in writing and delivered in person, or by courier service requiring acknowledgement of receipt, or mailed by certified mail, postage prepaid and return receipt requested, or by facsimile or electronic mail, as follows:

To Seller:                    Noble Energy, Inc.
                              1001 Noble Energy Way
                              Houston, Texas 77070
                              Attention: VP of Business Development
                              Email: Chris.Klawinski@nblenergy.com

#5618848.7
#5618848.12

with a copy (that shall not constitute Notice) to:

Noble Energy, Inc.
1001 Noble Energy Way
Houston, Texas 77070
Attention: John Zabaneh
Email: John.Zabaneh@nblenergy.com

with a copy (that shall not constitute Notice) to:

Bracewell LLP
711 Louisiana Street, Suite 2300
Houston, Texas 77002
Attention:     J.J. McAnelly
Telephone:   (713) 221-1194
Facsimile:    (713) 221-3241
Email: james.mcanelly@bracewell.com

To Purchaser:

Fieldwood Energy LLC
2000 W. Sam Houston Pkwy S., Suite 1200
Houston, Texas 77042
Suite 1200
Attn: John H. Smith
Phone: 713 969 1249
Email: jsmith@fwellc.com

with a copy (that shall not constitute Notice) to:

Fieldwood Energy LLC
2000 W. Sam Houston Pkwy S., Suite 1200
Houston, Texas 77042
Suite 1200
Attn: Thomas R. Lamme
Phone: 713 969 1107
Facsimile: 713 969 1099
Email: TLamme@fwellc.com

Notice given by personal delivery or courier shall be effective upon actual receipt. Notice given by mail shall be effective upon actual receipt or, if not actually received, the fifth Business Day following deposit with the U.S. Post Office. Notice given by facsimile shall be effective upon actual receipt if received during the recipient's normal business hours, or at the beginning of the recipient's next Business Day after receipt if not received during the recipient's normal business hours. Notice given by electronic mail shall be effective following confirmation of receipt by return email, including an automated confirmation of receipt. If a date specified herein for giving any notice or taking any action is not a Business Day (or if the period during which any notice is required to be given or any action taken expires on a date which is not a Business Day), then the date for giving such notice or taking such action (and the expiration date of such period during which notice is required to be given or action taken) shall be the next day which is a Business Day. Any Party may change any address to which Notice is to be given to it by giving Notice as provided above of such change of address.

Section 13.2    **Expenses; Filings, Certain Governmental Approvals and Removal of Names**.

(a)    All expenses incurred by Seller in connection with or related to the authorization, preparation or execution of this Agreement, and the Exhibits and Schedules hereto and thereto, and all other matters related to the Closing, including all fees and expenses of counsel, accountants and financial advisers employed by Seller, shall be borne solely and entirely by Seller, and all such expenses incurred by Purchaser shall be borne solely and entirely by Purchaser.

(b)    All required transfer fees, transfer payments, documentary, filing and recording fees and expenses in connection with the filing and recording of the assignments (including the Conveyances), conveyances or other instruments required to convey title to the Assets to Purchaser shall be borne by solely Purchaser. Promptly after the Closing Purchaser shall record all assignments of Assets executed at the Closing in the records of the applicable Governmental Authority. Promptly after the Closing, Purchaser and Seller shall, (i) if applicable, send notices to vendors supplying goods and services for the Assets and to the operator of such Assets of the assignment of such Assets to Purchaser, (ii) actively pursue the unconditional approval of all Customary Consents and approval of all applicable Governmental Authorities of the assignment of the Assets to Purchaser and (iii) actively pursue all other consents and approvals that may be required in connection with the assignment of the Assets to Purchaser, that, in each case, shall not have been obtained prior to the Closing. Purchaser obligates itself to take any and all action required by any Governmental Authority in order to obtain such unconditional approval, including the posting of any and all bonds or other security that may be required in excess of its existing lease, pipeline or area-wide bond.

(c)    Upon the occurrence of Closing, as promptly as practicable after the designation of operator is approved by the BOEM, Purchaser shall eliminate the names "Noble Energy, Inc.", "Noble" and any variants thereof from the Assets acquired pursuant to this Agreement and, except with respect to such grace period for eliminating existing usage, shall have no right to use any logos, trademarks or trade names belonging to Seller or any of its Affiliates.

Section 13.3    **Records**.

(a)    No later than thirty (30) days after Closing, Seller shall make available the Records that are in the possession of Seller for pickup or copying, as applicable, during normal business hours, subject to Section 13.3(b). Seller may retain, at Seller's sole cost and expense, copies of any and all Records.

(b)    Seller may retain the originals of those Records relating to Tax and accounting matters and provide Purchaser, at its request, (i) with copies of such Records that pertain to non-income Tax matters solely related to the Assets or (ii) if such Records are necessary for Purchaser to adequately prepare Tax Returns or to contest a legal or administrative proceeding pursuant to ARTICLE 10.

(c)     Purchaser shall preserve and keep a copy of all Records in Purchaser's possession for a period of at least seven years after the Closing Date. After such seven year period, before Purchaser shall dispose of any such Records, Purchaser shall give Seller at least ninety (90) days' Notice to such effect, and Seller shall be given an opportunity, at Seller's cost and expense, to remove and retain all or any part of such Records as Seller may select. From and after Closing, Purchaser shall provide to Seller reasonable access to such books and records as remain in Purchaser's possession relating to the Assets and access to the Assets (subject to Seller's execution of an access agreement acceptable to Purchaser) in connection with matters relating to the ownership or operations of the Assets on or before the Closing Date, any Retained Liabilities or any claims or disputes relating to this Agreement or with any Third Parties.

Section 13.4     **Governing Law**.  This Agreement and the documents delivered pursuant hereto and the legal relations between the Parties shall be governed by, construed and enforced in accordance with the Laws of the State of Texas, without regard to principles of conflicts of Laws that would direct the application of the Laws of another jurisdiction.

Section 13.5     **Forum Selection; Waiver of Jury Trial**.

(a)     Except as to any dispute, controversy, matters or claim arising out of or in relation to or in connection with the allocation of the Purchase Price pursuant to Section 2.4 or Section 9.4 (which shall be resolved exclusively in accordance with Section 9.4(b)), any dispute, controversy, matter or claim between the Parties arising out of this Agreement or any of the transactions contemplated thereby (each, subject to such exceptions, a "Dispute"), that cannot be resolved among the Parties, will be instituted exclusively in (i) the Bankruptcy Court so long as the Chapter 11 Cases remain open and (ii) prior to commencement of, or after the close of, the Chapter 11 Cases or in the event that the Bankruptcy Court determines that it does not have jurisdiction, in the courts of the State of Texas in and for Harris County or the United States District Court for the Southern District of Texas, Houston Division (together with the Bankruptcy Court, the "Chosen Courts", and each Party hereby irrevocably consents to the exclusive jurisdiction of such Chosen Courts in connection with any Dispute, litigation or proceeding arising out of this Agreement or any of the transactions contemplated thereby.  All Disputes among any the Parties to this Agreement and the transactions contemplated hereby shall have exclusive jurisdiction and venue only in the Chosen Courts as provided in the preceding sentence.  Each Party waives any objection which it may have pertaining to improper venue or forum non-conveniens to the conduct of any litigation or proceeding in the Chosen Courts.  Each Party agrees that any and all process directed to it in any such proceeding or litigation may be served upon it by notice as given in accordance with Section 14.01.

(b)     EACH OF THE PARTIES HEREBY VOLUNTARILY AND IRREVOCABLY WAIVES TRIAL BY JURY IN ANY LITIGATION, ACTION OR OTHER PROCEEDING BROUGHT IN CONNECTION WITH THIS AGREEMENT.

(c)     The Parties agree that a dispute under this Agreement may raise issues that are common with one or more of the other documents executed by the Parties in

-84-

connection herewith (the "Transaction Documents") or which are substantially the same or interdependent and interrelated or connected with issues raised in a related dispute, controversy, or claim between or among the Parties and their Affiliates. Accordingly, any Party to a new Dispute under this Agreement may elect in writing within fifteen (15) days after the initiation of a new Dispute to refer such new Dispute for resolution by the applicable court together with any existing Dispute arising under this Agreement or any other Transaction Documents. If the applicable court does not determine to consolidate such new Dispute with the existing Dispute within thirty (30) days of receipt of written request, then the new Dispute shall not be consolidated, and the resolution of the new Dispute shall proceed separately.

Section 13.6 **Headings and Construction**. The headings and captions herein are inserted for convenience of reference only and are not intended to govern, limit or aid in the construction of any term or provision hereof. The rights and obligations of each Party shall be determined pursuant to this Agreement. Seller and Purchaser have each had the opportunity to exercise business discretion in relation to the negotiation of the details and terms of the transaction contemplated hereby. This Agreement is the result of arm's length negotiations from equal bargaining positions. It is the intention of the Parties that every covenant, term and provision of this Agreement shall be construed simply according to its fair meaning and not strictly for or against any Party (notwithstanding any rule of law requiring an agreement to be strictly construed against the drafting Party) and no consideration shall be given or presumption made, on the basis of who drafted this Agreement or any particular provision thereof, it being understood that the Parties are sophisticated and have had adequate opportunity and means to exercise business discretion in relation to the negotiation of the details of the transaction contemplated hereby and retain counsel to represent their interests and to otherwise negotiate the provisions of this Agreement.

Section 13.7 **Waivers**. Any failure by any Party to comply with any of its obligations, agreements or conditions herein contained may be waived by the Party to whom such compliance is owed by the application of the express terms hereof of by an instrument signed by the Party to whom compliance is owed and expressly identified as a waiver, but not in any other manner. Except as otherwise expressly provided herein, no waiver of, or consent to a change in or modification of, any of the provisions of this Agreement shall be deemed or shall constitute a waiver of, or consent to a change in or modification, other provisions hereof (whether or not similar), nor shall such waiver constitute a continuing waiver unless otherwise expressly provided herein.

Section 13.8 **Severability**. It is the intent of the Parties that the provisions contained in this Agreement shall be severable. Should any provisions, in whole or in part, be held invalid as a matter of Law, such holding shall not affect the other portions of this Agreement, and such portions that are not invalid shall be given effect without the invalid portion.

Section 13.9 **Assignment**. Except for an assignment to an Affiliate, no Party shall assign (including by change of control, merger, consolidation, or stock purchase) or otherwise transfer all or any part of this Agreement, nor shall any Party delegate any of its rights or duties hereunder (including by change of control, merger, consolidation, or stock purchaser) to any Third Party, without the prior written consent of the other Party and any transfer or delegation

#5618848.7
#5618848.12

made without such consent shall be null and void. Unless expressly agreed to in writing by the Parties, no permitted assignment of any Party's rights or duties hereunder shall relieve or release any Party from the performance of such Party's rights or obligations hereunder and the assigning Party shall be fully liable to the other Parties for the performance of all such rights and duties. To the extent Purchaser directly or indirectly assigns, transfers, conveys or otherwise disposes, by operation of law or otherwise, of all or any interests in any of the Assets, each Person receiving such interest shall, and Purchaser shall cause each such Person, to assume and be liable hereunder to Seller with respect to the Assumed Obligations arising out of or attributable to such Assets. Subject to the foregoing, this Agreement shall be binding upon and inure to the benefit of the Parties hereto and their respective permitted successors and assigns.

Section 13.10 **Entire Agreement**. This Agreement, the Confidentiality Agreement and the documents to be executed and delivered hereunder hereto constitute the entire agreement among the Parties pertaining to the subject matter hereof, and supersede all prior agreements, understandings, negotiations and discussions, whether oral or written, of the Parties pertaining to the subject matter hereof.

Section 13.11 **Amendment**. This Agreement may be amended or modified only by an agreement in writing signed by Seller and Purchaser and expressly identified as an amendment or modification.

Section 13.12 **No Third-Person Beneficiaries**. Nothing in this Agreement shall entitle any Person other than Purchaser and Seller to any claim, cause of action, remedy or right of any kind, except the rights and obligations expressly provided to the Persons described in Section 7.1 and Section 12.5(c). Notwithstanding the foregoing: (a) the Parties reserve the right to amend, modify, terminate, supplement, or waive any provision of this Agreement or this entire Agreement without the consent or approval of any other Person (including the other Indemnified Persons who are part of the Seller Group or Purchaser Group); and (b) no Party hereunder shall have any direct liability to any permitted Third Party beneficiary, nor shall any permitted Third Party beneficiary have any right to exercise any rights hereunder for such Third Party beneficiary's benefit except to the extent such rights are brought, exercised and administered by a Party hereto in accordance with Section 12.5(c) above.

Section 13.13 **Limitation on Damages**. NOTWITHSTANDING ANYTHING TO THE CONTRARY CONTAINED HEREIN (BUT SUBJECT TO THE PROVISO IN THIS SECTION 13.13), NO PERSON SHALL BE ENTITLED TO LOST PROFITS, INDIRECT, CONSEQUENTIAL, SPECIAL OR PUNITIVE DAMAGES IN CONNECTION WITH THIS AGREEMENT AND THE TRANSACTIONS CONTEMPLATED HEREBY AND EACH OF PURCHASER AND SELLER, FOR ITSELF AND ON BEHALF OF THEIR RESPECTIVE MEMBERS OF THE PURCHASER GROUP AND SELLER GROUP, RESPECTIVELY, HEREBY EXPRESSLY WAIVES ANY RIGHT TO LOST PROFITS, INDIRECT, CONSEQUENTIAL, SPECIAL OR PUNITIVE DAMAGES IN CONNECTION WITH THIS AGREEMENT AND THE TRANSACTIONS CONTEMPLATED HEREBY, OTHER THAN LOSS OF PROFITS, CONSEQUENTIAL DAMAGES OR PUNITIVE DAMAGES SUFFERED BY ANY THIRD PARTY FOR WHICH RESPONSIBILITY IS ALLOCATED AMONG THE PARTIES UNDER THE TERMS HEREOF; PROVIDED

THAT, NOTHING IN THIS **SECTION 13.13** SHALL PRECLUDE THE RECOVERY BY PURCHASER OF DIRECT DAMAGES MEASURED BY THE BENEFIT OF THE BARGAIN THAT PURCHASER CALCULATES IN WHOLE OR IN PART BY REFERENCE TO ACTUAL OR PROJECTED PROFITS, BUT ONLY IN SO FAR AS SUCH MEASURE OF DAMAGES IS A DIRECT DAMAGE IN ACCORDANCE WITH APPLICABLE LAW.

Section 13.14 **Deceptive Trade Practices Act**. Purchaser certifies that it is not a "consumer" within the meaning of the Texas Deceptive Trade Practices Consumer Protection Act, Subchapter E of Chapter 17, Sections 17.41, et seq., of the Texas Business and Commerce Code, (as amended, the "DTPA"). Purchaser covenants, for itself and for and on behalf of any successor or assignee, that if the DTPA is applicable to this Agreement, (a) Purchaser is a "business consumer" as that term is defined in the DTPA, (b) **AFTER CONSULTATION WITH ATTORNEYS OF PURCHASERS OWN SELECTION, PURCHASER HEREBY VOLUNTARILY WAIVES AND RELEASES ALL OF PURCHASER'S RIGHTS AND REMEDIES UNDER THE DTPA AS APPLICABLE TO SELLER AND SELLER'S SUCCESSORS AND ASSIGNS AND (c) PURCHASER SHALL DEFEND AND INDEMNIFY THE SELLER GROUP FROM AND AGAINST ANY AND ALL CLAIMS OF OR BY ANY MEMBER OF THE PURCHASER GROUP OR ANY OF THEIR SUCCESSORS AND ASSIGNS OR ANY OF ITS OR THEIR AFFILIATES BASED IN WHOLE OR IN PART ON THE DTPA ARISING OUT OF OR IN CONNECTION WITH THIS AGREEMENT**.

Section 13.15 **Time of the Essence; Calculation of Time**. Time is of the essence in this Agreement. If the date specified in this Agreement for giving any notice or taking any action is not a Business Day (or if the period during which any notice is required to be given or any action taken expires on a date that is not a Business Day), then the date for giving such notice or taking such action (and the expiration date of such period during which notice is required to be given or action taken) shall be the next day that is a Business Day.

Section 13.16 **Counterparts**. This Agreement may be executed in multiple counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument. Facsimile, .pdf or other electronic transmission of copies of signatures shall constitute original signatures for all purposes of this Agreement and any enforcement hereof.

[Remainder of Page Intentionally Left Blank. Signature Pages to Follow]

#5618848.7
#5618848.12

IN WITNESS WHEREOF, this Agreement has been signed by each of the Parties as of the Execution Date.

**SELLER:**

NOBLE ENERGY, INC.

By: _____
Name:  Christopher E. Klawinski
Title:   Vice President

PURCHASER:

FIELDWOOD ENERGY LLC

By: _____
Name: G. M. McCarroll
Title:    President and Chief Executive Officer

# EXHIBITS

Exhibit A               Oil and Gas Properties, Facilities and Rights of Way
Exhibit A-1             Leases
Exhibit A-2             Wells
Exhibit A-3             PUD Locations
Exhibit A-4             Facilities
Exhibit A-5             Rights-of-Way
Exhibit A-6             FERC Regulated Transport
Exhibit A-7             FCC Licenses
Exhibit B-1             Form of Omnibus Conveyance
Exhibit B-2             Form of Recordable Conveyance – Louisiana
Exhibit B-3             Form of Recordable Conveyance – Mississippi
Exhibit C               Form of Affidavit of Non-Foreign Status
Exhibit D               Form of Letter in Lieu
Exhibit E               Additional Security
Exhibit F               Form of Transition Services Agreement
Exhibit G               Form of Limited Agency Agreement
Exhibit H-1             Form of BOEM Bond
Exhibit H-2             Form of Noble Performance Bond
Exhibit I               Form of NAESB and Form of Oil Purchase Agreement
Exhibit J               Form of Assignment and Assumption Agreement
Exhibit K               Backstop Commitment Agreement
Exhibit L               Plan
Exhibit M               RSA

#5618848.7
#5618848.12

## DISCLOSURE SCHEDULES

Neither these Schedules nor any disclosure made in or by virtue of them constitutes or implies any representation, warranty, or covenant by Seller not expressly set out in the Agreement, and neither these Schedules nor any such disclosure has the effect of, or may be construed as, adding to, broadening, deleting from or revising the scope of any of the representations, warranties, or covenants of Seller in the Agreement. The fact that any item of information is contained herein is not an admission of liability under any applicable law, or that such information is material, but rather is intended only to qualify the representations, warranties and covenants in the Agreement and to set forth other information required by the Agreement. Neither the specification of any dollar amount in any representation, warranty or covenant contained in the Agreement nor the inclusion of any specific item in these Schedules is intended to imply that such amount, or a higher or lower amount, or the item so included, or any other item, is or is not material. The information set forth on the Schedules shall not be used as a basis for interpreting the terms "material", "materially", "materiality", "Material Adverse Effect", or any similar qualification in the Agreement. Neither the specification of any item or matter in any representation, warranty or covenant contained in the Agreement nor the inclusion of any specific item in these Schedules is intended to imply that such item or matter, or another item or matter, is or is not in the ordinary course of business, and no party shall use the setting forth or the inclusion of any such item or matter in any dispute or controversy between or among the parties to the Agreement as to whether any obligation, item or matter described or not described herein or included or not included in these Schedules is or is not in the ordinary course of business for purposes of the Agreement.

Headings have been inserted in these Schedules for reference only and do not amend the descriptions of the disclosed items set forth in the Agreement. Where a reference is made to a section or exhibit, such reference shall be to a section of or exhibit to the Agreement unless otherwise indicated. Whenever the words "include," "includes," or "including" are used in these Schedules, they shall be deemed to be followed by the words "without limitation," whether or not they are in fact followed by those words or words of like import.

The following Schedules constitute Disclosure Schedules:

**EXHIBITS:**

| | |
|---|---|
| Exhibit A | Oil and Gas Properties, Facilities and Rights of Way |
| Exhibit A-1 | Leases |
| Exhibit A-2 | Wells |
| Exhibit A-3 | PUD Locations |
| Exhibit A-4 | Facilities |
| Exhibit A-5 | Rights-of-Way |
| Exhibit A-6 | FERC Regulated Transport |
| Exhibit A-7 | FCC Licenses |
| Exhibit B-1 | Form of Omnibus Conveyance |
| Exhibit B-2 | Form of Recordable Conveyance – Louisiana |
| Exhibit B-3 | Form of Recordable Conveyance – Mississippi |
| Exhibit C | Form of Affidavit of Non-Foreign Status |

| | |
|---|---|
| Exhibit D | Form of Letter in Lieu |
| Exhibit E | Additional Security |
| Exhibit F | Form of Transition Services Agreement |
| Exhibit G | Form of Limited Agency Agreement |
| Exhibit H-1 | Form of BOEM Bond |
| Exhibit H-2 | Form of Noble Performance Bond |
| Exhibit I | Form of NAESB and Form of Oil Purchase Agreement |
| Exhibit J | Form of Assignment and Assumption Agreement |
| Exhibit K | Backstop Commitment Agreement |
| Exhibit L | Plan |
| Exhibit M | RSA |

**SCHEDULES:**

| | |
|---|---|
| Schedule 1.1 | Excluded Assets |
| Schedule 1.2 | Knowledge Persons |
| Schedule 2.7 | Allocation of Unadjusted Purchase Price |
| Schedule 2.8 | Contingency Well Forecast |
| Schedule 4.4 | Conflicts |
| Schedule 4.5 | Litigation |
| Schedule 4.7 | Taxes |
| Schedule 4.8 | Compliance with Laws |
| Schedule 4.9(a) | Material Contracts |
| Schedule 4.9(b) | Certain Material Contract Matters |
| Schedule 4.10 | Payments for Production |
| Schedule 4.11 | Imbalances |
| Schedule 4.12 | Required Consents and Preferential Rights |
|     Part 1 | PHA Required Consents |
|     Part 2 | Marketing Required Consents |
|     Part 3 | Other Consents |
|     Part 4 | Neptune Consent |
| Schedule 4.13 | Outstanding Capital Commitments |
| Schedule 4.14 | Insurance |
| Schedule 4.15 | Wells |
| Schedule 4.16 | Royalties and Expenses |
| Schedule 4.17 | Environmental Matters |
| Schedule 4.19(d) | Employee Matters |
| Schedule 4.20 | Governmental Authorizations |
| Schedule 4.22 | Suspense Funds |
| Schedule 7.15 | Retained Marketing Contracts |
| Schedule 7.26 | Troubadour Assets |

**Exhibit H**

**Term Sheet for Apache Decommissioning Agreement Amendment**

EXECUTION VERSION

## Apache Decommissioning Agreement Amendment Term Sheet

February 14, 2018

This Term Sheet (this "Term Sheet") is by and among Apache Corporation, Apache Shelf, Inc. and Apache Deep Water LLC (together "Apache"), on the one hand, and Fieldwood Energy LLC and GOM Shelf LLC (together, "Fieldwood") on the other. Apache and Fieldwood shall each be referred to herein as a "Party" and collectively, as the "Parties".

**WHEREAS**, Fieldwood and certain affiliates (collectively, the "Company") are, contemporaneously herewith, entering into a Restructuring Support Agreement with the Consenting Sponsor and Consenting Creditors[1] whereby the parties thereto have agreed, among other things, to the material terms of the Restructuring Transactions to be effected through the Plan and the commencement by the Company of voluntary cases (the "Chapter 11 Cases") under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101-1532 (the "Bankruptcy Code"), in the United States Bankruptcy Court for the Southern District of Texas (the "Bankruptcy Court").

**WHEREAS**, on January 15, 2018 Fieldwood presented a business plan to Apache's financial advisors, Parkman Whaling ("**PW**"). Apache has relied upon the representations made to PW with respect to the business plan (the "**Business Plan**") on which Fieldwood's Plan is to be based.

In furtherance of the Company's restructuring efforts, the Parties have agreed as follows:

1. <u>Definitive Documentation</u>. Following the execution of this Term Sheet, the Parties agree to cooperate with each other in good faith in connection with, and use commercially reasonable efforts with respect to pursuit, approval, negotiation, drafting, and execution (subject to confirmation by the Bankruptcy Court of the Plan) of all documents and agreements (the "**Amendment Documentation**") as required to effectuate the Decommissioning Amendments described on <u>Exhibit A</u> hereto on or before March 7, 2018.[2] The Amendment Documentation will contain terms, conditions, representations, warranties, and covenants, each customary for the transactions described in, and consistent with the terms of, <u>Exhibit A</u>. Notwithstanding the foregoing, in the event that the Parties shall not have reached agreement with respect to the Amendment Documentation by the deadline above, the Parties shall not, as a result thereof, be relieved of their obligations hereunder and shall continue to be obligated to negotiate promptly, earnestly, and in good faith to reach agreement with respect to the Amendment Documentation, subject to Paragraph 3 of this Term Sheet. <u>Exhibit A</u> is expressly incorporated herein and made a part of this Term Sheet.

2. <u>Binding Agreement</u>. This Term Sheet is fully binding on the Parties, with such changes, if any, as the Parties may mutually agree in the Amendment Documentation. The Parties acknowledge that this Term Sheet is entered into for valuable consideration (the receipt and sufficiency of which is hereby acknowledged) and is intended to be, and shall be,

---

[1] Terms used and not defined herein have the meanings ascribed in the Restructuring Support Agreement.

[2] The deadline for filing the Plan Supplement in the Chapter 11 Cases.

unless otherwise expressly set forth herein, the legal and binding obligation of each Party, enforceable in accordance with its terms.

3. <u>Termination</u>. This Term Sheet may be terminated (i) by mutual written agreement of the Parties, (ii) by Apache upon the occurrence of an Apache Termination Event, and (iii) by Fieldwood upon the occurrence of a Fieldwood Termination Event. In addition to the foregoing and notwithstanding anything to the contrary herein, this Term Sheet shall automatically terminate upon the effectiveness of the Amendment Documentation, and shall thereupon be superseded in its entirety by such Amendment Documentation.

4. "<u>Apache Termination Event</u>" shall mean any of the following:

 (i) A breach by Fieldwood of any of the binding undertakings set forth herein in any material respect which remains uncured for a period of two (2) business days after receipt of written notice of such breach;

 (ii) the termination by the Company of the Restructuring Support Agreement;

 (iii) the termination of the Restructuring Support Agreement as to the Consenting Sponsor, the Consenting Sponsor Second Lien Term Lenders and the Consenting First Lien Term Lenders;

 (iv) if the Company shall not have complied with each of the Milestones, and such failure to comply materially and adversely affects the Business Plan or binding agreements herein;

 (v) the issuance by any governmental authority, including any regulatory authority or court of competent jurisdiction, of any ruling, judgment or order enjoining the consummation of or rendering illegal the Term Sheet, Plan or the Restructuring, and either (A) such ruling, judgment or order has been issued at the request of or with the acquiescence of the Company, or (B) in all other circumstances, such ruling, judgment or order has not been stayed, reversed or vacated within fifteen (15) days after such issuance;

 (vi) the Company withdraws the Plan or Disclosure Statement, or the Company files any motion or pleading with the Bankruptcy Court that is not consistent with this Term Sheet, the Restructuring Support Agreement, or the Plan and such motion or pleading has not been withdrawn prior to the earlier of (A) two (2) business days after Fieldwood receives written notice from Apache that such motion or pleading is inconsistent with this Term Sheet or the Plan and (B) entry of an order of the Bankruptcy Court approving such motion or pleading;

 (vii) the Company files any motion for the (A) conversion of one or more of Fieldwood's chapter 11 cases to a case under chapter 7 of the Bankruptcy Code, (B) appointment of an examiner with expanded powers beyond those set forth in section 1106(a)(3) and (4) of the Bankruptcy Code or a trustee or receiver in one or more of Fieldwood's chapter 11 cases or (C) dismissal of one or more of Fieldwood's chapter 11 cases;

(viii)   the Bankruptcy Court enters an order (A) directing the appointment of an examiner with expanded powers or a trustee in Fieldwood's chapter 11 cases, (B) converting any of Fieldwood's chapter 11 cases to cases under chapter 7 of the Bankruptcy Code, or (C) dismissing any of Fieldwood's chapter 11 cases;

(ix)   on the date that an order is entered by the Bankruptcy Court or a court of competent jurisdiction denying confirmation of the Plan or refusing to approve the Disclosure Statement; or

(x)   the valid termination by the seller under the Purchase Agreement in accordance with the terms thereof.

5.   A "Fieldwood Termination Event" shall mean any of the following:

(i)   a breach by Apache of any of the binding undertakings set forth herein in any material respect which remains uncured for a period of two (2) business days after receipt of written notice of such breach;

(ii)   the termination of the Restructuring Support Agreement as to the Consenting Sponsor, the Consenting Sponsor Second Lien Term Lenders and the Consenting First Lien Term Lenders;

(iii)   the issuance by any governmental authority, including any regulatory authority or court of competent jurisdiction, of any ruling, judgment or order enjoining the consummation of or rendering illegal the Plan or the Restructuring, and such ruling, judgment or order has not been stayed, reversed or vacated within fifteen (15) days after such issuance; or

(iv)   the Bankruptcy Court enters an order (A) directing the appointment of an examiner with expanded powers or a trustee in Fieldwood's chapter 11 cases, (B) converting any of Fieldwood's chapter 11 cases to cases under chapter 7 of the Bankruptcy Code, or (C) dismissing any of Fieldwood's chapter 11 cases.

6.   Effect of Termination.  Upon the termination of this Term Sheet, this Term Sheet shall forthwith become void and of no further force or effect and each Party shall be immediately released from its liabilities, obligations, commitments, undertakings and agreements under or related to this Term Sheet and shall have all the rights and remedies that it would have had and shall be entitled to take all actions, whether with respect to the Restructuring or otherwise, that it would have been entitled to take had it not entered into this Term Sheet, including all rights and remedies available to it under applicable law; provided, however, that in no event shall any such termination relieve a Party from liability for its breach or non-performance of its obligations hereunder prior to the date of such termination.  If the Restructuring Transactions are not consummated, nothing herein shall be construed as a waiver by any Party of any or all of such Party's rights and the Parties expressly reserve any and all of their respective rights.  Pursuant to Federal Rule of Evidence 408 and any other applicable rules of evidence, this Term Sheet and all negotiations relating hereto shall not be admissible into evidence in any proceeding other than a proceeding to enforce its terms.

3

7.   <u>Apache Consent Rights</u>.   Apache shall be entitled to the Apache Consent Right.   The "**Apache Consent Right**" means Apache's right to consent to or approve Definitive Documents, which right shall apply solely to the extent such Definitive Documents (i) describe the Apache Decommissioning Agreement, related agreements or the Amendment Documentation, or (ii) affect any of the terms proposed under this Term Sheet. Any such Definitive Document will be provided by Fieldwood not less than three (3) business days before Fieldwood intends to file such documents with the Bankruptcy Court. Apache's approval of such documents shall not be unreasonably withheld.   Each Definitive Document (regardless of whether it affects any of the terms proposed under this Term Sheet) shall contain terms and conditions consistent in all respects with this Term Sheet.

8.   <u>Effectiveness</u>.   This Term Sheet will become effective and binding upon each Party upon the execution and delivery by such Party of an executed signature page hereto; provided, however, that the terms of the Decommissioning Amendments and other matters set forth on <u>Exhibit A</u> are subject in all respects to consummation of the Plan.

9.   <u>Entire Agreement; Amendments</u>.   Subject to and at such time as the Amendment Documentation is executed and delivered, this Term Sheet and the Confidentiality Agreement, dated as of November 27, 2017, by and between Apache Corporation and Fieldwood Energy LLC shall collectively constitute the entire agreement among the Parties with respect to the subject matter hereof and supersede all other prior agreements and understandings, both written and oral, among the Parties with respect to the subject matter thereof.   This Agreement may not be amended, changed, supplemented or otherwise modified except by an instrument in writing specifically designated as an amendment hereto or replacement hereof, signed on behalf of each Party.

10.   <u>Specific Performance</u>.   It is understood and agreed that money damages may not be a sufficient remedy for any breach or threatened breach of the binding provisions of this Term Sheet and that the Parties shall be entitled to seek specific performance and injunctive or other equitable relief as a remedy for any such breach or threatened breach. Such remedy or remedies shall not, however, be deemed to the exclusive remedy or remedies for breach or threatened breach of this Term Sheet, but shall be in addition to all other remedies available at law or equity to the Parties.

WEIL:\96441968\10\45327.0003

11.  <u>Notices</u>.  All notices hereunder shall be deemed given if in writing and delivered, if contemporaneously sent by electronic mail, courier or by registered or certified mail (return receipt requested) to the following addresses:

    (1)    If to the Company, to:

    Fieldwood Energy LLC
    2000 W. Sam Houston Parkway S., Suite 1200
    Houston, Texas 77042
    Attention:  G. M. McCarroll and Michael Dane

    With a copy to:

    Weil, Gotshal & Manges LLP
    767 Fifth Avenue
    New York, NY 10153
    Attention:  Alfredo R. Pérez, Esq.
              (alfredo.perez@weil.com)
              Matt Barr, Esq.
              (matt.barr@weil.com)
              Jessica Liou, Esq.
              (jessica.liou@weil.com)

    (2)    If to Apache, to the address set forth below Apache's signature, with copies to:

    Andrews Kurth Kenyon LLP
    600 Travis, Suite 4200
    Houston, Texas
    Attention:  Robin Russell, Esq.
              (rrussell@akllp.com)
              -and-
              Timothy ("Tad") A. Davidson II, Esq.
              (taddavidson@akllp.com)

12.  <u>Governing Law</u>.  This Agreement shall be governed by and construed in accordance with the Laws of the State of Texas, without regard to the Laws that might be applicable under conflicts of laws principles.  Without limiting any Party's right to appeal any order of the Bankruptcy Court, (i) the Bankruptcy Court shall retain exclusive jurisdiction to enforce the terms of this Agreement and to decide any dispute which may arise or result from, or be connected with, this Agreement or any breach or default hereunder and (ii) any and all proceedings related to the foregoing shall be filed and maintained only in the Bankruptcy Court, and all the Parties hereby expressly and irrevocably consent to and submit to the exclusive jurisdiction and venue of the Bankruptcy Court.  To the maximum extent permitted by law, each Party irrevocably and unconditionally waives any right to trial by jury in any forum in respect of this Agreement and covenants that neither it nor any of its

affiliates or Representatives will assert (whether as plaintiff, defendant or otherwise) any right to such trial by jury.

*[Balance of Page Intentionally Left Blank]*

IN WITNESS WHEREOF, the Parties have executed this Term Sheet as of the date first written above.

**FIELDWOOD ENERGY LLC**

Name: Michael T. Dane
Title: Senior Vice President and Chief Financial Officer

**GOM SHELF LLC**

Name: Michael T. Dane
Title: Vice President

[Signature Page to Letter Agreement]

**APACHE CORPORATION**

Name: Steve Riney
Title: EVP & CFO

2000 Post Oak Boulevard, Suite 100
Houston, Texas 77056-4400
Attn: P. Anthony Lannie, General Counsel

**APACHE SHELF, INC.**

Name: Steve Riney
Title: EVP & CFO

**APACHE DEEP WATER LLC**

Name: Steve Riney
Title: EVP & CFO

[Signature Page to Letter Agreement]

## Exhibit A


### FIELDWOOD ENERGY LLC AND GOM SHELF LLC
### APACHE DECOMMISSIONING AMENDMENT TERM SHEET

FEBRUARY [●], 2018

This Exhibit A to the Term Sheet sets forth the principal terms of (i) proposed amendments to that certain Decommissioning Agreement by and among Apache Corporation, Apache Shelf, Inc. and Apache Deep Water LLC (together "*Apache*"), on the one hand, and Fieldwood Energy LLC and GOM Shelf LLC (together, "*Fieldwood*"), on the other, dated effective September 30, 2013 (the "*Decommissioning Agreement*"), (ii) proposed amendments to other agreements between Fieldwood and Apache where amendment is necessary to effectuate the terms set forth herein (collectively, the "*Decommissioning Amendments*") and (iii) proposed treatment of all other contracts between Apache and Fieldwood.

| Decommissioning Amendments | |
|---|---|
| **General** | Unless otherwise indicated below, each of the Decommissioning Amendments will be effective on the Closing Date.[3] |
| | Fieldwood and Apache agree to consummate the Decommissioning Amendments in accordance with the Bankruptcy Code, and otherwise cooperate and use commercially reasonable efforts to negotiate, draft, and execute all documents and agreements as required to effectuate the Decommissioning Amendments. |
| | Any final agreement with respect to the Decommissioning Amendments shall be subject to the negotiation of definitive documentation. The definitive documentation will contain terms, conditions, representations, warranties, and covenants, each customary for the transactions described herein and consistent with the terms of this Decommissioning Term Sheet. |
| **Expense Reimbursement** | Fieldwood will pay all reasonable and documented fees and expenses of Andrews Kurth Kenyon LLP. Invoices shall not be required to contain individual time detail. Fieldwood agrees to pay fees related to the engagement of Parkman Whaling totaling $825,000 as well as $25,000 on a monthly basis beginning in March 2018 and ending on the Closing Date. |

---

[3] The Closing Date will be consummation of the Plan.

| Decommissioning Amendments | |
|---|---|
| **P&A and Other Obligations** | Fieldwood will continue to perform the P&A Obligations required under and in accordance with the Decommissioning Agreement, as modified in accordance with this Decommissioning Term Sheet, on the Applicable Properties, subject to the following: all P&A Obligations with respect to Pending Abandoned Properties (Exhibit N to the PSA) will be completed in the ordinary course consistent with Fieldwood's previous plans shared with Apache.<br><br>All obligations to perform Permanently Abandoned Properties Decommissioning under Section 2.5 of the Decommissioning Agreement will remain in effect. |
| **Decommissioning Plan** | The Decommissioning Agreement will be amended to provide that Fieldwood will commit to minimum annual spend levels of $100 million in 2018 and $80 million in each of 2019, 2020, 2021, and 2022 (the "***Required Spend***") to perform plugging and abandonment activities ("***P&A***") on properties that were purchased by Fieldwood from Apache (the "***Decommission Properties***") under a mutually agreed five-year Decommissioning Plan, as the parties may agree to update and modify each December for the upcoming year(s) by mutual agreement, and the parties agree to meet annually to consider such modifications; provided that Apache will not request, propose or otherwise require a plan for 2018 through 2022 that provides for a total annual P&A spend in excess of the applicable Required Spend.<br><br>By January 15th of each calendar year beginning 2019 and ending 2023, Fieldwood will deliver to Apache a statement in reasonable detail depicting the total annual spend on the Decommission Properties in the preceding year. To the extent the Required Spend is not expended on P&A by Fieldwood each year on the Decommission Properties, Fieldwood shall deposit into Trust A the difference between the Required Spend each year and its actual P&A expenditures on the Decommission Properties for such year (the "***Unspent Required Spend Amount***") by January 31st of each year. Any Unspent Required Spend Amount shall be in addition to payments with respect to the Trust A NPI and the Houston Hall accounts (described below).<br><br>On the terms and conditions of this paragraph, Fieldwood will have continued access to seek reimbursement from Trust A up to amounts received by Trust A from the Trust A-1 NPI, unless and until Fieldwood defaults on its obligation to fund any Unspent Required Spend Amount ("***Funding Default***"). In order to be funded, each request for reimbursement must be accompanied by a certification signed by the CEO and CFO of Fieldwood certifying that the |

WEIL:\96441968\10\45327.0003

| Decommissioning Amendments |
|---|
| Required Spend on P&A work on the Decommission Properties for the remainder of the applicable year will be performed and spent or, if not, then stating the amount of Unspent Required Spend Amounts that will need to be deposited for such year. If Unspent Required Spend Amounts will need to be deposited for such year, then Fieldwood may only withdraw amounts in excess of such projected Unspent Required Spend Amounts until Fieldwood has funded, through the Trust A-1 NPI or otherwise, the projected Unspent Required Spend Amounts. Upon a Funding Default, Fieldwood may not seek any further Trust A reimbursements until the earlier of such time as (i) the Trust A-1 NPI has funded the Unspent Required Spend Amounts in total or (ii) the Required Trust A Amount (as modified below) is achieved, at which time the Funding Default shall terminate. |
| On January 31, 2023 and assuming Fieldwood is not in a Funding Default, the Trust A-1 NPI shall be assigned to Fieldwood. In the event of a Funding Default, the Trust A-1 NPI shall continue until the earlier of such time as (i) the Trust A-1 NPI has funded all Unspent Required Spend Amounts or (ii) the Required Trust A Amount (as modified below) is achieved, at which time the Trust A-1 NPI shall be assigned to Fieldwood. |
| The amount required by clause (A) of the definition of the Required Trust A Amount in the Decommissioning Agreement shall be increased by (i) the cumulative amount of all Unspent Required Spend Amounts and (ii) by the $5.8 million currently held in a separate account for the benefit of BOEM relating to the former Hall Houston assets, upon termination of that separate Hall Houston account, at which time such amount shall be deposited into Trust A. |
| All P&A costs will be credited against the Required Spend at actual cost only and all Fieldwood owned equipment charges shall be consistent with those charges for the first 6 months of 2017. |

A-3

| Decommissioning Amendments | |
|---|---|
| **Trust B and Trust B NPI and the new Trust A-1 NPI** | On the Closing Date, Trust B will terminate, and 50% of the Trust B NPI will be released and assigned to Fieldwood. The other 50% of the Trust B NPI will be assigned to Trust A and will be amended to (i) be renamed as the Trust A-1 NPI and (ii) delete the debit that was permitted under Section 3.3(b) of the Trust B NPI Conveyance. Except for (a) the amendment contemplated above, (b) the circumstances under which Fieldwood's may withdraw Trust A-1 NPI funds from Trust A (as describe above), and (c) the withdrawal restrictions described above, the Trust A-1 NPI shall be the same as the Trust A NPI in all other terms and characteristics. Following the amendments and assignments described above, all covenants and other provisions, including Article V of the Decommissioning Agreement and other agreements related to Trust B, will terminate. Upon termination, Trust B will be dissolved in accordance with its terms. |
| **Letters of Credit/Credit Support** | Fieldwood will continue to maintain the same amount of letters of credit as to which Apache is currently a beneficiary;[4] provided that Fieldwood may replace up to $148.7 million of letters of credit with an equal amount of surety bonds in a form and from a surety both acceptable to Apache in its sole discretion (such form to be included as an exhibit to the Decommissioning Amendment). |
| **Security Interests** | The Trust B Security Interest and the third-lien Mortgages delivered in connection with the PSA shall each be released and cancelled. Apache shall retain the Trust A Recharacterization Mortgage and the security interests granted in Trust A pursuant to the Trust A Trust Agreement. The Trust A-1 NPI will be secured by new recharacterization mortgage having the same priority as the Trust A NPI Recharacterization Mortgage, with corresponding revisions to the Decommissioning Agreement to add a provision equivalent to Section 6.7 relative to the new Trust A-1 NPI. The Plan shall specifically provide for such termination and retention, as applicable, and for the addition of the Trust A-1 NPI Recharacterization Mortgage. |
| **Covenants** | The Debt Incurrence Covenants (Sections 6.3 and 6.11) and Additional Trust B Funding provisions (Section 5.3) of the Decommissioning Agreement will terminate and the certification required by Section 6.10 will be amended accordingly. |

---

[4] The current L/C Facility will likely be replaced as part of Fieldwood's Plan of Reorganization; logistics to be discussed.

WEIL:\96441968\10\45327.0003

| Decommissioning Amendments | |
|---|---|
| **L/C Issuing Bank** | Decommissioning Amendment to include one or more additional Issuing Banks acceptable to Apache in its sole discretion. |
| **Purchase and Sale Agreement** | The guaranty obligations set forth in Section 6.20(e) of the Purchase and Sale Agreement will terminate. Fieldwood shall take record title to any and all properties sold to Fieldwood by Apache pursuant to the Purchase and Sale Agreement. |
| Other Agreements and Amendments | |
| **Assumed Agreements** | All existing agreements between Apache and Fieldwood will be assumed pursuant to the Plan including, without limitation, the Decommissioning Agreement (as amended as contemplated herein), the Master Facilities Agreement, the Briar Lake Sublease, the Joint Exploration Agreement and the Letter Agreement ("Letter Agreement") regarding Settlement of Transition Services Agreement and Resolution of certain outstanding disputes, dated January 9, 2015. Apache may pursue any and all rights and remedies at law and in equity should Fieldwood default in its obligations to Apache under any and all agreements between the parties. |
| **Effectiveness** | The transactions contemplated by this Decommissioning Term Sheet and as set forth in definitive documentation shall become effective on the consummation of Fieldwood's plan of reorganization in the Chapter 11 Cases. Except to the extent expressly amended pursuant to the terms of this Decommissioning Term Sheet, the Decommissioning Agreement and all other agreements will remain in full force and effect, unamended by the Decommissioning Term Sheet or the Chapter 11 Cases. |

A-5