**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

|  |  |  |
|---|---|---|
| In re: | § | **Chapter 11** |
|  | § |  |
| **FIELDWOOD ENERGY LLC,** *et al.*, | § | **Case No. 20-33948 (MI)** |
|  | § |  |
| Debtors.[1] | § | **(Jointly Administered)** |
|  | § |  |

**NOTICE OF FILING OF SECOND AMENDED PLAN SUPPLEMENT**
**IN CONNECTION WITH FOURTH AMENDED JOINT CHAPTER 11**
**PLAN OF FIELDWOOD ENERGY LLC AND ITS AFFILIATED DEBTORS**

**PLEASE TAKE NOTICE THAT**:

1. Commencing on August 3, 2020, Fieldwood Energy LLC and its debtor affiliates in the above-captioned cases, as debtors and debtors in possession (collectively, the "**Debtors**"), each filed a voluntary case under chapter 11 of title 11 of the United States Code (the "**Bankruptcy Code**") in the United States Bankruptcy Court for the Southern District of Texas (the "**Bankruptcy Court**").

2. On April 15, 2021, the Bankruptcy Court entered the *Amended Order (I) Approving Disclosure Statement and Form and Manner of Notice of Disclosure Statement Hearing; (II) Establishing Solicitation and Voting Procedures; (III) Scheduling Confirmation Hearing; (IV) Establishing Notice and Objection Procedures for Confirmation of the Proposed Plan; (V) Approving Notice and Objection Procedures for the Assumption of Executory Contracts and Unexpired Leases; (VI) Approving Procedures for Objections to the Assignment and Transfer*

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, as applicable, are:  Dynamic Offshore Resources NS, LLC (0158); Fieldwood Energy LLC (6778); Fieldwood Energy Inc. (4991); Fieldwood Energy Offshore LLC (4494); Fieldwood Onshore LLC (3489); Fieldwood SD Offshore LLC (8786); Fieldwood Offshore LLC (2930); FW GOM Pipeline, Inc. (8440); GOM Shelf LLC (8107); Bandon Oil and Gas GP, LLC (9172); Bandon Oil and Gas, LP (9266); Fieldwood Energy SP LLC (1971); Galveston Bay Pipeline LLC (5703); and Galveston Bay Processing LLC (0422).  The Debtors' primary mailing address is 2000 W. Sam Houston Parkway S., Suite 1200, Houston, TX  77042.



*of Property of the Estate; and (VII) Granting Related Relief* [Docket No. 1286] (the "**Disclosure Statement Order**").

3. On April 15, 2021, the Debtors filed the *Fourth Amended Joint Chapter 11 Plan of Fieldwood Energy LLC and Its Affiliated Debtors* [Docket No. 1284] (the "**Plan**").[2]

4. On May 27, 2021, the Debtors filed the *Notice of Filing of Plan Supplement in Connection with Fourth Amended Joint Chapter 11 Plan of Fieldwood Energy LLC and its Affiliated Debtors* [Docket No. 1394].

5. On June 15, 2021, the Debtors filed the *Notice of Filing of Amended Plan Supplement in Connection with Fourth Amended Joint Chapter 11 Plan of Fieldwood Energy LLC and its Affiliated Debtors* [Docket No. 1562].

6. In accordance with the Plan and Disclosure Statement Order, the Debtors hereby file initial or further revised drafts of the following documents as part of the Plan Supplement:

| | |
|---|---|
| **Exhibit G** | **NewCo Organizational Documents** |
| **Exhibit K** | **New Intercreditor Agreement** |
| **Exhibit M** | **GUC/SLTL Form Warrant Agreement** |
| **Exhibit O** | **Oil and Gas Lease Schedules** |
| | **O1 – Leases, Rights of Way and Rights of Use and Easement Related to Purchased Oil & Gas Lease Interests** |
| | **O2 – Leases, Rights of Way and Rights of Use and Easement Related to FWE I Oil & Gas Lease Interests** |
| | **O5 – Leases, Rights of Way and Rights of Use and Easement Related to Abandoned Properties** |

---

[2] Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to such terms in the Plan.

7.     The documents contained in the Plan Supplement are integral to, and are considered part of, the Plan.  If the Plan is approved, the documents contained in this Plan Supplement will be approved by the Bankruptcy Court pursuant to the Confirmation Order.

8.     The Debtors reserve all rights to amend, modify, or supplement the Plan Supplement, and any of the documents contained therein, in accordance with the terms of the Plan.  If material amendments or modifications are made to any of these documents, the Debtors will file a blackline with the Bankruptcy Court marked to reflect the same.

9.     A hearing to consider confirmation of the Plan is currently scheduled to begin on **Friday, June 18, 2021 at 9:30 a.m. (Prevailing Central Time)** before the Bankruptcy Court (the "**Confirmation Hearing**"). The Confirmation Hearing may be adjourned from time to time, without further notice other than by filing a notice on the Bankruptcy Court's docket indicating such adjournment and/or announcement of the adjourned date(s) at the Confirmation Hearing.

10.     As of the date hereof, the Debtors are still in the process of negotiating and finalizing certain of the documents contained in the Plan Supplement with the Ad Hoc Group of Secured Lenders, Ad Hoc Group of Prepetition SLTL Lenders, the Creditors' Committee, Apache, Chevron U.S.A. Inc. ("**Chevron**"), Eni Petroleum US LLC ("**Eni**"), and Hunt Oil Company ("**Hunt**"), and various other parties in interest.  The Debtors, Ad Hoc Group of Secured Lenders, Ad Hoc Group of Prepetition SLTL Lenders, the Creditors' Committee, Apache, Chevron, Eni, and Hunt, reserve all of their respective rights with respect to any applicable form of documents filed herewith, including any applicable consent rights in the Restructuring Support Agreement.

11.     Copies of the exhibits contained in this Plan Supplement, and all documents filed in these chapter 11 cases are available free of charge by visiting

3

https://cases.primeclerk.com/fieldwoodenergy/.  You may also obtain copies of the pleadings by visiting the Bankruptcy Court's website at https://ecf.txsb.uscourts.gov in accordance with the procedures and fees set forth therein.

*[Remainder of Page Intentionally Left Blank]*

WEIL:\98021424\2\45327.0005

Dated: June 16, 2021
      Houston, Texas

                                            */s/  Alfredo R. Pérez*

WEIL, GOTSHAL & MANGES LLP
Alfredo R. Pérez (15776275)
Clifford W. Carlson (24090024)
700 Louisiana Street, Suite 1700
Houston, Texas 77002
Telephone:  (713) 546-5000
Facsimile:  (713) 224-9511
Email:  Alfredo.Perez@weil.com
           Clifford.Carlson@weil.com

-and-

WEIL, GOTSHAL & MANGES LLP
Matthew S. Barr (admitted *pro hac vice*)
Jessica Liou (admitted *pro hac vice*)
767 Fifth Avenue
New York, New York 10153
Telephone:  (212) 310-8000
Facsimile:  (212) 310-8007
Email: Matt.Barr@weil.com
        Jessica.Liou@weil.com

*Attorneys for Debtors*
*and Debtors in Possession*

## Certificate of Service

I hereby certify that on June 16, 2021, a true and correct copy of the foregoing document was served by the Electronic Case Filing System for the United States Bankruptcy Court for the Southern District of Texas.

                                                  */s/  Alfredo R. Pérez*
                                                  Alfredo R. Pérez

**<u>Exhibit G</u>**

**NewCo Organizational Documents**



# Delaware

Page 1

## The First State

I, JEFFREY W. BULLOCK, SECRETARY OF STATE OF THE STATE OF
DELAWARE, DO HEREBY CERTIFY THE ATTACHED IS A TRUE AND CORRECT
COPY OF THE CERTIFICATE OF INCORPORATION OF "MAKO NEWCO INC.",
FILED IN THIS OFFICE ON THE FOURTH DAY OF JUNE, A.D. 2021, AT
2:42 O`CLOCK P.M.

Jeffrey W. Bullock, Secretary of State

State of Delaware
Secretary of State
Division of Corporations
Delivered 02:42 PM 06/04/2021
FILED 02:42 PM 06/04/2021
SR 20212358355 - File Number 5963978

# CERTIFICATE OF INCORPORATION

## OF

## MAKO NEWCO INC.

\* \* \*

FIRST:   The name of the corporation is Mako Newco Inc. (the "**Corporation**").

SECOND:  The address of its registered office in the State of Delaware is 251 Little Falls Drive, City of Wilmington, County of New Castle, Delaware 19808.  The name of its registered agent at such address is Corporation Service Company.

THIRD:  The purpose of the Corporation is to engage in any lawful act or activity for which corporations may be organized under the General Corporation Law of the State of Delaware as the same exists or may hereafter be amended ("**Delaware Law**").

FOURTH:  The total number of shares of stock which the Corporation shall have authority to issue is 1,000, and the par value of each such share is $0.01, amounting in the aggregate to $10.00.

FIFTH: The name and mailing address of the incorporator are:

| Name | Mailing Address |
| --- | --- |
| Kelsey D. Stevens | Davis Polk & Wardwell LLP<br>450 Lexington Avenue<br>New York, New York 10017 |

SIXTH:  The Board of Directors shall have the power to adopt, amend or repeal the bylaws of the Corporation.

SEVENTH:  Election of directors need not be by written ballot unless the bylaws of the Corporation so provide.

EIGHTH:  The Corporation expressly elects not to be governed by Section 203 of Delaware Law.

NINTH:   (1) A director of the Corporation shall not be liable to the Corporation or its stockholders for monetary damages for breach of fiduciary duty as a director to the fullest extent permitted by Delaware Law.

(2)(a)     Each person (and the heirs, executors or administrators of such person) (including, without limitation, Drivetrain Agency Services, LLC, in its capacity as the FLTL Subagent (as defined below)) who was or is a party or is threatened to be made a party to, or is involved in any threatened, pending or completed action, suit or proceeding, whether civil, criminal, administrative or investigative, or who otherwise incurs any losses, liabilities, damages, penalties, obligations, judgments, suits, claims, causes of actions, costs, expenses (including fees and disbursements of legal counsel) by reason of the fact that such person is or was a director or officer of the Corporation, or an owner of shares of the Corporation or is or was serving at the request of the Corporation as a director or officer of another corporation, partnership, joint venture, trust or other enterprise, shall be indemnified and held harmless by the Corporation to the fullest extent permitted by Delaware Law.  The right to indemnification conferred in this ARTICLE NINTH shall also include the right to be paid by the Corporation the expenses incurred in connection with any such proceeding in advance of its final disposition to the fullest extent authorized by Delaware Law or in connection with any other actions taken by it related to the Corporation.  The right to indemnification conferred in this ARTICLE NINTH shall be a contract right.

(b)     The Corporation may, by action of its Board of Directors, provide indemnification to such of the directors, employees, agents and owners of shares of the Corporation (including, without limitation, Drivetrain Agency Services, LLC, in its capacity as the FLTL Subagent (as defined below)) to such extent and to such effect as the Board of Directors shall determine to be appropriate and authorized by Delaware Law.

(3)     The Corporation shall have power to purchase and maintain insurance on behalf of any person who is or was a director, officer, employee or agent of the Corporation, or is or was serving at the request of the Corporation as a director, officer, employee or agent of another corporation, partnership, joint venture, trust or other enterprise against any expense, liability or loss incurred by such person in any such capacity or arising out of such person's status as such, whether or not the Corporation would have the power to indemnify such person against such liability under Delaware Law.

(4)     The rights and authority conferred in this ARTICLE NINTH shall not be exclusive of any other right which any person may otherwise have or hereafter acquire.

(5)     Neither the amendment nor repeal of this ARTICLE NINTH, nor the adoption of any provision of this Certificate of Incorporation or the bylaws of the Corporation, nor, to the fullest extent permitted by Delaware Law, any modification of law, shall adversely affect any right or protection of any person granted pursuant hereto existing at, or arising out of or related to any event, act or omission that occurred prior to, the time of such amendment, repeal, adoption or

#94056736v5

modification (regardless of when any proceeding (or part thereof) relating to such event, act or omission arises or is first threatened, commenced or completed).

TENTH: The Corporation reserves the right to amend this Certificate of Incorporation in any manner permitted by Delaware Law and all rights and powers conferred herein on stockholders, directors and officers, if any, are subject to this reserved power.

ELEVENTH: To the extent Drivetrain Agency Services, LLC (or any of its officers, directors or employees) is an officer, director or owner of shares of the Corporation, it is understood that it is acting not individually or personally but solely as the sub-agent (the "FLTL Sub-Agent") under that certain Amended and Restated First Lien Term Loan Agreement, originally dated as of April 11, 2018 (as amended, restated, amended and restated, supplemented or otherwise modified prior to the date hereof, the "FLTL Credit Agreement"), among, inter alia, Fieldwood Energy, LLC, Fieldwood Energy, Inc., the lenders party thereto from time to time and Cantor Fitzgerald Securities, as administrative agent and collateral agent, in the exercise of the powers and authority conferred and vested in it pursuant to that certain First Lien Term Loan Sub-Agent Appointment Agreement by and among Fieldwood Energy LLC, Fieldwood Energy Inc., Cantor Fitzgerald Securities and the FLTL Sub-Agent, and nothing herein contained shall be construed as creating any liability on Drivetrain Agency Services, LLC (or any of its officers, directors or employees), individually or personally, including for the payment of any indebtedness or expenses of the Corporation or the breach of, or failure to perform, any obligation, representation, warranty or covenant made or undertaken by the Corporation whether by or through attempted piercing of the corporate veil, by or through a claim by or on behalf of any person against Drivetrain Agency Services, LLC (or any of its officers, directors or employees), by the enforcement of any assessment or by any legal or equitable proceeding or by virtue of any applicable law, whether in contract, tort or otherwise.

#94056736v5

IN WITNESS WHEREOF, the undersigned has executed this Certificate of Incorporation this _4_ day of _June_, 2021.

_Kelsey Stevens_
Kelsey D. Stevens
Incorporator

*[Signature Page to Certificate of Incorporation of Mako Newco Inc.]*

# BYLAWS

# OF

# MAKO NEWCO INC.

\* \* \* \* \*

## ARTICLE 1
## OFFICES

Section 1.01. *Registered Office.*  The registered office of the Mako Newco Inc. (the "**Corporation**") shall be in the City of Wilmington, County of New Castle, State of Delaware.

Section 1.02. *Other Offices.*  The Corporation may also have offices at such other places both within and without the State of Delaware as the Board of Directors may from time to time determine or the business of the Corporation may require.

Section 1.03. *Books.*  The books of the Corporation may be kept within or without the State of Delaware as the Board of Directors may from time to time determine or the business of the Corporation may require.

## ARTICLE 2
## MEETINGS OF STOCKHOLDERS

Section 2.01. *Time and Place of Meetings.*  All meetings of stockholders shall be held at such place, either within or without the State of Delaware, on such date and at such time as may be determined from time to time by the Board of Directors (or the Chairman in the absence of a designation by the Board of Directors).

Section 2.02. *Annual Meetings.*  Unless directors are elected by written consent in lieu of an annual meeting as permitted by the General Corporation Law of the State of Delaware as the same exists or may hereafter be amended ("**Delaware Law**"), an annual meeting of stockholders shall be held for the election of directors and to transact such other business as may properly be brought before the meeting as may be designated by the Board of Directors from time to time.  Stockholders may, unless the certificate of incorporation otherwise provides, act by written consent to elect directors; *provided*, *however*, that if such consent is less than unanimous, such action by written consent may be in lieu of holding an annual meeting only if all of the directorships to which directors could be elected at an annual meeting held at the effective time of such action are vacant and are filled by such action.

Section 2.03.  *Special Meetings.*  Special meetings of stockholders may be called by the Board of Directors or the Chairman of the Board of Directors and shall be called by the Secretary at the request in writing of holders of record of a majority of the outstanding capital stock of the Corporation entitled to vote.  Such request shall state the purpose or purposes of the proposed meeting.

Section 2.04.  *Notice of Meetings and Adjourned Meetings; Waivers of Notice.*  (a)  Whenever stockholders are required or permitted to take any action at a meeting, a written notice of the meeting shall be given which shall state the place, if any, date and hour of the meeting, the means of remote communications, if any, by which stockholders and proxy holders may be deemed to be present in person and vote at such meeting, and, in the case of a special meeting, the purpose or purposes for which the meeting is called.  Unless otherwise provided by Delaware Law, such notice shall be given not less than 10 nor more than 60 days before the date of the meeting to each stockholder of record entitled to vote at such meeting.  Unless these bylaws otherwise require, when a meeting is adjourned to another time or place (whether or not a quorum is present), notice need not be given of the adjourned meeting if the time, place, if any, and the means of remote communications, if any, by which stockholders and proxy holders may be deemed to be present in person and vote at such meeting, are announced at the meeting at which the adjournment is taken.  At the adjourned meeting, the Corporation may transact any business which might have been transacted at the original meeting.  If the adjournment is for more than 30 days, or after the adjournment a new record date is fixed for the adjourned meeting, a notice of the adjourned meeting shall be given to each stockholder of record entitled to vote at the meeting.

(b)  A written waiver of any such notice signed by the person entitled thereto, or a waiver by electronic transmission by the person entitled to notice, whether before or after the time stated therein, shall be deemed equivalent to notice.  Attendance of a person at a meeting shall constitute a waiver of notice of such meeting, except when the person attends the meeting for the express purpose of objecting, at the beginning of the meeting, to the transaction of any business because the meeting is not lawfully called or convened.  Business transacted at any special meeting of stockholders shall be limited to the purposes stated in the notice.

Section 2.05.  *Quorum.*  Unless otherwise provided under the certificate of incorporation or these bylaws and subject to Delaware Law, the presence, in person or by proxy, of the holders of a majority of the outstanding capital stock of the Corporation entitled to vote at a meeting of stockholders shall constitute a quorum for the transaction of business.  If, however, such quorum shall not be present or represented at any meeting of the stockholders, a majority in voting interest of the stockholders present in person or represented by proxy may adjourn the meeting, without notice other than announcement at the meeting, until a

quorum shall be present or represented.  At such adjourned meeting at which a quorum shall be present or represented any business may be transacted which might have been transacted at the meeting as originally notified.

Section 2.06.  *Voting.*  (a)  Unless otherwise provided in the certificate of incorporation and subject to Delaware Law, each stockholder shall be entitled to one vote for each outstanding share of capital stock of the Corporation held by such stockholder.  Any share of capital stock of the Corporation held by the Corporation shall have no voting rights.  Except as otherwise provided by law, the certificate of incorporation or these bylaws, in all matters other than the election of directors, the affirmative vote of the majority of the shares of capital stock of the Corporation present in person or represented by proxy at the meeting and entitled to vote on the subject matter shall be the act of the stockholders.

(b)  Each stockholder entitled to vote at a meeting of stockholders or to express consent or dissent to a corporate action in writing without a meeting may authorize another person or persons to act for such stockholder by proxy, appointed by an instrument in writing, subscribed by such stockholder or by his attorney thereunto authorized, or by proxy sent by cable, telegram or by any means of electronic communication permitted by law, which results in a writing from such stockholder or by his attorney, and delivered to the secretary of the meeting.  No proxy shall be voted after three (3) years from its date, unless said proxy provides for a longer period.

(c)  In determining the number of votes cast for or against a proposal or nominee, shares abstaining from voting on a matter will not be treated as a vote cast.

Section 2.07.  *Action by Consent.*  (a)  Unless otherwise provided in the certificate of incorporation and subject to the proviso in Section 2.02, any action required to be taken at any annual or special meeting of stockholders, or any action which may be taken at any annual or special meeting of stockholders, may be taken without a meeting, without prior notice and without a vote, if a consent or consents in writing, setting forth the action so taken, shall be signed by the holders of outstanding capital stock having not less than the minimum number of votes that would be necessary to authorize or take such action at a meeting at which all shares entitled to vote thereon were present and voted and shall be delivered to the Corporation by delivery to its registered office in Delaware, its principal place of business, or an officer or agent of the Corporation having custody of the book in which proceedings of meetings of stockholders are recorded.  Delivery made to the Corporation's registered office shall be by hand or by certified or registered mail, return receipt requested.  Prompt notice of the taking of the corporate action without a meeting by less than unanimous written consent shall be given to those stockholders who have not consented in writing and who, if the action had been taken at a meeting, would have been entitled to

3

notice of the meeting if the record date for such meeting had been the date that written consents signed by a sufficient number of stockholders to take the action were delivered to the Corporation as provided in Section 2.07(b).

(b)     Every written consent shall bear the date of signature of each stockholder who signs the consent, and no written consent shall be effective to take the corporate action referred to therein unless, within 60 days of the earliest dated consent delivered in the manner required by this section and Delaware Law to the Corporation, written consents signed by a sufficient number of holders to take action are delivered to the Corporation by delivery to its registered office in Delaware, its principal place of business or an officer or agent of the Corporation having custody of the book in which proceedings of meetings of stockholders are recorded.  Delivery made to the Corporation's registered office shall be by hand or by certified or registered mail, return receipt requested.

Section 2.08.  *Organization.*  At each meeting of stockholders, the Chairman of the Board of Directors, if one shall have been elected, or in the Chairman's absence or if one shall not have been elected, the director designated by the vote of the majority of the directors present at such meeting, shall act as chairman of the meeting.  The Secretary (or in the Secretary's absence or inability to act, the person whom the chairman of the meeting shall appoint secretary of the meeting) shall act as secretary of the meeting and keep the minutes thereof.

Section 2.09.  *Order of Business.*  The order of business at all meetings of stockholders shall be as determined by the chairman of the meeting.

ARTICLE 3
DIRECTORS

Section 3.01.  *General Powers.*  Except as otherwise provided in Delaware Law or the certificate of incorporation, the business and affairs of the Corporation shall be managed by or under the direction of the Board of Directors.

Section 3.02.  *Number, Election and Term Of Office.*   (a) The number of directors which shall constitute the whole Board of Directors shall be fixed from time to time by resolution of the Board of Directors but shall not be less than one. The directors shall be elected at the annual meeting of the stockholders by written ballot, except as provided in Section 2.02 and Section 3.12 herein, and each director so elected shall hold office until such director's successor is elected and qualified or until such director's earlier death, resignation or removal.  Directors need not be stockholders.

(b)  Subject to the rights of the holders of any series of preferred stock to elect additional directors under specific circumstances, directors shall be elected by a plurality of the votes of the shares of capital stock of the Corporation present

4

in person or represented by proxy at the meeting and entitled to vote on the election of directors.

Section 3.03. *Quorum and Manner of Acting.* Unless the certificate of incorporation or these bylaws require a greater number, a majority of the total number of directors shall constitute a quorum for the transaction of business, and the affirmative vote of a majority of the directors present at a meeting at which a quorum is present shall be the act of the Board of Directors. When a meeting is adjourned to another time or place (whether or not a quorum is present), notice need not be given of the adjourned meeting if the time and place thereof are announced at the meeting at which the adjournment is taken. At the adjourned meeting, the Board of Directors may transact any business which might have been transacted at the original meeting. If a quorum shall not be present at any meeting of the Board of Directors the directors present thereat shall adjourn the meeting, from time to time, without notice other than announcement at the meeting, until a quorum shall be present.

Section 3.04. *Time and Place of Meetings.* The Board of Directors shall hold its meetings at such place, either within or without the State of Delaware, and at such time as may be determined from time to time by the Board of Directors (or the Chairman in the absence of a determination by the Board of Directors).

Section 3.05. *Annual Meeting.* The Board of Directors shall meet for the purpose of organization, the election of officers and the transaction of other business, as soon as practicable after each annual meeting of stockholders, on the same day and at the same place where such annual meeting shall be held. Notice of such meeting need not be given. In the event such annual meeting is not so held, the annual meeting of the Board of Directors may be held at such place either within or without the State of Delaware, on such date and at such time as shall be specified in a notice thereof given as hereinafter provided in Section 3.07 herein or in a waiver of notice thereof signed by any director who chooses to waive the requirement of notice.

Section 3.06. *Regular Meetings.* After the place and time of regular meetings of the Board of Directors shall have been determined and notice thereof shall have been once given to each member of the Board of Directors, regular meetings may be held without further notice being given.

Section 3.07. *Special Meetings.* Special meetings of the Board of Directors may be called by the Chairman of the Board or the President and shall be called by the Chairman of the Board, President or Secretary on the written request of any director. Notice of special meetings of the Board of Directors shall be given to each director at least 24 hours before the date of the meeting in such manner as is determined by the Board of Directors, which required notice shall be

deemed to be waived by a director's attendance at a meeting (unless solely for the purpose of objecting to the lack of required notice).

Section 3.08. *Committees.* The Board of Directors may designate one or more committees, each committee to consist of one or more of the directors of the Corporation. The Board of Directors may designate one or more directors as alternate members of any committee, who may replace any absent or disqualified member at any meeting of the committee. In the absence or disqualification of a member of a committee, the member or members present at any meeting and not disqualified from voting, whether or not such member or members constitute a quorum, may unanimously appoint another member of the Board of Directors to act at the meeting in the place of any such absent or disqualified member. A quorum of any committee of the Board of Directors shall consist of a majority of the Board of Directors (with directors for quorum purposes counted in accordance with the certificate of incorporation). Any such committee, to the extent provided in the resolution of the Board of Directors, shall have and may exercise all the powers and authority of the Board of Directors in the management of the business and affairs of the Corporation, and may authorize the seal of the Corporation to be affixed to all papers which may require it; but no such committee shall have the power or authority in reference to any of the following matters: (a) approving or adopting, or recommending to the stockholders, any action or matter expressly required by Delaware Law to be submitted to the stockholders for approval or (b) adopting, amending or repealing any bylaw of the Corporation. Each committee shall keep regular minutes of its meetings and report the same to the Board of Directors when required.

Section 3.09. *Action by Consent.* Unless otherwise restricted by the certificate of incorporation or these bylaws, any action required or permitted to be taken at any meeting of the Board of Directors or of any committee thereof may be taken without a meeting, if all members of the Board or committee, as the case may be, consent thereto in writing or by electronic transmission, and the writing or writings or electronic transmission or transmissions, are filed with the minutes of proceedings of the Board or committee. Such filing shall be in paper form if the minutes are maintained in paper form and shall be in electronic form if the minutes are maintained in electronic form.

Section 3.10. *Telephonic Meetings.* Unless otherwise restricted by the certificate of incorporation or these bylaws, members of the Board of Directors, or any committee designated by the Board of Directors, may participate in a meeting of the Board of Directors, or such committee, as the case may be, by means of conference telephone or other communications equipment by means of which all persons participating in the meeting can hear each other, and such participation in a meeting shall constitute presence in person at the meeting.

6

Section 3.11.  *Resignation.*  Any director may resign at any time by giving notice in writing or by electronic transmission to the Board of Directors or to the Secretary of the Corporation.  The resignation of any director shall take effect upon receipt of notice thereof or at such later time as shall be specified in such notice; and unless otherwise specified therein, the acceptance of such resignation shall not be necessary to make it effective.

Section 3.12.  *Vacancies.*  Unless otherwise provided in the certificate of incorporation, vacancies and newly created directorships resulting from any increase in the authorized number of directors elected by all the stockholders having the right to vote as a single class may be filled by a majority vote of the directors then in office, although less than a quorum, or by a sole remaining director.  Whenever the holders of any class or classes of stock or series thereof are entitled to elect one or more directors by the certificate of incorporation, vacancies and newly created directorships of such class or classes or series may be filled by a majority vote of directors elected by such class or classes or series thereof then in office, or by a sole remaining director so elected.  Each director so chosen shall hold office until his or her successor is elected and qualified, or until his or her earlier death, resignation or removal.  If there are no directors in office, then an election of directors may be held in accordance with Delaware Law.  Unless otherwise provided in the certificate of incorporation, when one or more directors shall resign from the Board of Directors, effective at a future date, the directors then in office shall, by majority vote, have the power to fill such vacancy or vacancies, the vote thereon to take effect when such resignation or resignations shall become effective, and each director so chosen shall hold office as provided in the filling of other vacancies.

Section 3.13.  *Removal.*  Any director or the entire Board of Directors may be removed, with or without cause, at any time by the affirmative vote of the holders of a majority of the voting power of the outstanding capital stock of the Corporation then entitled to vote at any election of directors and the vacancies thus created may be filled in accordance with Section 3.12 herein.

Section 3.14.  *Compensation.*  Unless otherwise restricted by the certificate of incorporation or these bylaws, the Board of Directors shall have authority to fix the compensation of directors, including fees and reimbursement of expenses.

ARTICLE 4
OFFICERS

Section 4.01.  *Principal Officers.*  The principal officers of the Corporation shall be a President, a Treasurer and a Secretary who shall have the duty, among other things, to record the proceedings of the meetings of stockholders and directors in a book kept for that purpose.  The Corporation may

also have such other principal officers, including one or more Controllers, as the Board of Directors may in its discretion appoint.  One person may hold the offices and perform the duties of any two or more of said offices.

Section 4.02.  *Election, Term of Office and Remuneration.*  The principal officers of the Corporation shall be elected annually by the Board of Directors at the annual meeting thereof.  Each such officer shall hold office until his or her successor is elected and qualified, or until his or her earlier death, resignation or removal.  The remuneration of all officers of the Corporation shall be fixed by the Board of Directors.  Any vacancy in any office shall be filled in such manner as the Board of Directors shall determine.

Section 4.03.  *Subordinate Officers.*  In addition to the principal officers enumerated in Section 4.01 herein, the Corporation may have one or more Assistant Treasurers, Assistant Secretaries and Assistant Controllers and such other subordinate officers, agents and employees as the Board of Directors may deem necessary, each of whom shall hold office for such period as the Board of Directors may from time to time determine.  The Board of Directors may delegate to any principal officer the power to appoint and to remove any such subordinate officers, agents or employees.

Section 4.04.  *Removal.*  Except as otherwise permitted with respect to subordinate officers, any officer may be removed, with or without cause, at any time, by resolution adopted by the Board of Directors.

Section 4.05.  *Resignations.*  Any officer may resign at any time by giving written notice to the Board of Directors (or to a principal officer if the Board of Directors has delegated to such principal officer the power to appoint and to remove such officer).  The resignation of any officer shall take effect upon receipt of notice thereof or at such later time as shall be specified in such notice; and unless otherwise specified therein, the acceptance of such resignation shall not be necessary to make it effective.

Section 4.06.  *Powers and Duties.*  The officers of the Corporation shall have such powers and perform such duties incident to each of their respective offices and such other duties as may from time to time be conferred upon or assigned to them by the Board of Directors.

ARTICLE 5
CAPITAL STOCK

Section 5.01.  *Certificates For Stock; Uncertificated Shares.*  The shares of the Corporation shall be uncertificated, provided that the Board of Directors of the Corporation may provide by resolution or resolutions that some or all of any or all classes or series of its stock shall be certificated shares.  Except as otherwise

provided by law, the rights and obligations of the holders of uncertificated shares and the rights and obligations of the holders of shares represented by certificates of the same class and series shall be identical. Every holder of stock represented by certificates shall be entitled to have a certificate signed by, or in the name of the Corporation by any two authorized officers of the Corporation representing the number of shares registered in certificate form. Any or all of the signatures on the certificate may be a facsimile. In case any officer, transfer agent or registrar who has signed or whose facsimile signature has been placed upon a certificate shall have ceased to be such officer, transfer agent or registrar before such certificate is issued, it may be issued by the Corporation with the same effect as if such person were such officer, transfer agent or registrar at the date of issue. The Corporation shall not have power to issue a certificate in bearer form.

Section 5.02. *Transfer Of Shares.* Shares of the stock of the Corporation may be transferred on the record of stockholders of the Corporation by the holder thereof or by such holder's duly authorized attorney upon surrender of a certificate therefor properly endorsed or upon receipt of proper transfer instructions from the registered holder of uncertificated shares or by such holder's duly authorized attorney and upon compliance with appropriate procedures for transferring shares in uncertificated form, unless waived by the Corporation.

Section 5.03. *Authority for Additional Rules Regarding Transfer.* The Board of Directors shall have the power and authority to make all such rules and regulations as they may deem expedient concerning the issue, transfer and registration of certificated or uncertificated shares of the stock of the Corporation, as well as for the issuance of new certificates in lieu of those which may be lost or destroyed, and may require of any stockholder requesting replacement of lost or destroyed certificates, bond in such amount and in such form as they may deem expedient to indemnify the Corporation, and/or the transfer agents, and/or the registrars of its stock against any claims arising in connection therewith.

Section 5.04. *FLTL Sub-Agent.* To the extent Drivetrain Agency Services, LLC (or any of its officers, directors or employees) is an officer, director or owner of shares of the Corporation, it is understood that it is acting not individually or personally but solely as the sub-agent (the "FLTL Sub-Agent") under that certain Amended and Restated First Lien Term Loan Agreement, originally dated as of April 11, 2018 (as amended, restated, amended and restated, supplemented or otherwise modified prior to the date hereof, the "FLTL Credit Agreement"), among, inter alia, Fieldwood Energy, LLC, Fieldwood Energy, Inc., the lenders party thereto from time to time and Cantor Fitzgerald Securities, as administrative agent and collateral agent, in the exercise of the powers and authority conferred and vested in it pursuant to that certain First Lien Term Loan Sub-Agent Appointment Agreement by and among Fieldwood Energy LLC, Fieldwood Energy Inc., Cantor Fitzgerald Securities and the FLTL Sub-Agent, and nothing herein contained shall be construed as creating any liability on Drivetrain Agency

9

Services, LLC (or any of its officers, directors or employees), individually or personally, including for the payment of any indebtedness or expenses of the Corporation or the breach of, or failure to perform, any obligation, representation, warranty or covenant made or undertaken by the Corporation whether by or through attempted piercing of the corporate veil, by or through a claim by or on behalf of any person against Drivetrain Agency Services, LLC (or any of its officers, directors or employees), by the enforcement of any assessment or by any legal or equitable proceeding or by virtue of any applicable law, whether in contract, tort or otherwise.

ARTICLE 6
GENERAL PROVISIONS

Section 6.01. *Fixing the Record Date.* (a) In order that the Corporation may determine the stockholders entitled to notice of or to vote at any meeting of stockholders or any adjournment thereof, the Board of Directors may fix a record date, which record date shall not precede the date upon which the resolution fixing the record date is adopted by the Board of Directors, and which record date shall not be more than 60 nor less than 10 days before the date of such meeting. If no record date is fixed by the Board of Directors, the record date for determining stockholders entitled to notice of or to vote at a meeting of stockholders shall be at the close of business on the day next preceding the day on which notice is given, or, if notice is waived, at the close of business on the day next preceding the day on which the meeting is held. A determination of stockholders of record entitled to notice of or to vote at a meeting of stockholders shall apply to any adjournment of the meeting; *provided* that the Board of Directors may fix a new record date for the adjourned meeting.

(b) In order that the Corporation may determine the stockholders entitled to consent to corporate action in writing without a meeting, the Board of Directors may fix a record date, which record date shall not precede the date upon which the resolution fixing the record date is adopted by the Board of Directors, and which date shall not be more than 10 days after the date upon which the resolution fixing the record date is adopted by the Board of Directors. If no record date has been fixed by the Board of Directors, the record date for determining stockholders entitled to consent to corporate action in writing without a meeting, when no prior action by the Board of Directors is required by Delaware Law, shall be the first date on which a signed written consent setting forth the action taken or proposed to be taken is delivered to the Corporation by delivery to its registered office in Delaware, its principal place of business, or an officer or agent of the Corporation having custody of the book in which proceedings of meetings of stockholders are recorded. Delivery made to the Corporation's registered office shall be by hand or by certified or registered mail, return receipt requested. If no record date has been fixed by the Board of Directors and prior action by the Board of Directors is required by Delaware Law,

10

the record date for determining stockholders entitled to consent to corporate action in writing without a meeting shall be at the close of business on the day on which the Board of Directors adopts the resolution taking such prior action.

(c)     In order that the Corporation may determine the stockholders entitled to receive payment of any dividend or other distribution or allotment of any rights or the stockholders entitled to exercise any rights in respect of any change, conversion or exchange of stock, or for the purpose of any other lawful action, the Board of Directors may fix a record date, which record date shall not precede the date upon which the resolution fixing the record date is adopted, and which record date shall be not more than 60 days prior to such action.  If no record date is fixed, the record date for determining stockholders for any such purpose shall be at the close of business on the day on which the Board of Directors adopts the resolution relating thereto.

Section 6.02.  *Dividends*.  Subject to limitations contained in Delaware Law and the certificate of incorporation, the Board of Directors may declare and pay dividends upon the shares of capital stock of the Corporation, which dividends may be paid either in cash, in property or in shares of the capital stock of the Corporation.

Section 6.03.  *Year*.  The fiscal year of the Corporation shall commence on January 1 and end on December 31 of each year.

Section 6.04.  *Corporate Seal*.  The corporate seal shall have inscribed thereon the name of the Corporation, the year of its organization and the words "Corporate Seal, Delaware".  The seal may be used by causing it or a facsimile thereof to be impressed, affixed or otherwise reproduced.

Section 6.05.  *Voting of Stock Owned by the Corporation*.  The Board of Directors may authorize any person, on behalf of the Corporation, to attend, vote at and grant proxies to be used at any meeting of stockholders of any corporation (except this Corporation) in which the Corporation may hold stock.

Section 6.06.  *Amendments*.  These bylaws or any of them, may be altered, amended or repealed, or new bylaws may be made, by the stockholders either by written consent or at any annual or special meeting thereof or by the Board of Directors.



# Delaware

Page 1

The First State

I, JEFFREY W. BULLOCK, SECRETARY OF STATE OF THE STATE OF

DELAWARE, DO HEREBY CERTIFY THE ATTACHED IS A TRUE AND CORRECT

COPY OF THE CERTIFICATE OF INCORPORATION OF "MAKO HOLDING

INC.", FILED IN THIS OFFICE ON THE FOURTH DAY OF JUNE, A.D.

2021, AT 2:43 O`CLOCK P.M.

Jeffrey W. Bullock, Secretary of State

5963981  8100
SR# 20212358386

Authentication: 203369663
Date: 06-04-21

You may verify this certificate online at corp.delaware.gov/authver.shtml

State of Delaware
Secretary of State
Division of Corporations
Delivered 02:42 PM 06/04/2021
FILED 02:43 PM 06/04/2021
SR 20212358386 - File Number 5963981

# CERTIFICATE OF INCORPORATION

## OF

## MAKO HOLDING INC.

\* \* \*

FIRST:   The name of the corporation is Mako Holding Inc. (the "**Corporation**").

SECOND:  The address of its registered office in the State of Delaware is 251 Little Falls Drive, City of Wilmington, County of New Castle, Delaware 19808.  The name of its registered agent at such address is Corporation Service Company.

THIRD:  The purpose of the Corporation is to engage in any lawful act or activity for which corporations may be organized under the General Corporation Law of the State of Delaware as the same exists or may hereafter be amended ("**Delaware Law**").

FOURTH:  The total number of shares of stock which the Corporation shall have authority to issue is 1,000, and the par value of each such share is $0.01, amounting in the aggregate to $10.00.

FIFTH: The name and mailing address of the incorporator are:

| Name | Mailing Address |
| --- | --- |
| Mako Newco Inc. | 410 Park Avenue, Suite 900 New York, NY 10022 |

SIXTH:  The Board of Directors shall have the power to adopt, amend or repeal the bylaws of the Corporation.

SEVENTH:  Election of directors need not be by written ballot unless the bylaws of the Corporation so provide.

EIGHTH:  The Corporation expressly elects not to be governed by Section 203 of Delaware Law.

NINTH:  (1) A director of the Corporation shall not be liable to the Corporation or its stockholders for monetary damages for breach of fiduciary duty as a director to the fullest extent permitted by Delaware Law.

(2)(a)     Each person (and the heirs, executors or administrators of such person) (including, without limitation, Drivetrain Agency Services, LLC, in its capacity as the FLTL Subagent (as defined below)) who was or is a party or is threatened to be made a party to, or is involved in any threatened, pending or completed action, suit or proceeding, whether civil, criminal, administrative or investigative, or who otherwise incurs any losses, liabilities, damages, penalties, obligations, judgments, suits, claims, causes of actions, costs, expenses (including fees and disbursements of legal counsel) by reason of the fact that such person is or was a director or officer of the Corporation, or an owner of shares of the Corporation or is or was serving at the request of the Corporation as a director or officer of another corporation, partnership, joint venture, trust or other enterprise, shall be indemnified and held harmless by the Corporation to the fullest extent permitted by Delaware Law.  The right to indemnification conferred in this ARTICLE NINTH shall also include the right to be paid by the Corporation the expenses incurred in connection with any such proceeding in advance of its final disposition to the fullest extent authorized by Delaware Law or in connection with any other actions taken by it related to the Corporation.  The right to indemnification conferred in this ARTICLE NINTH shall be a contract right.

(b)     The Corporation may, by action of its Board of Directors, provide indemnification to such of the directors, employees, agents and owners of shares of the Corporation (including, without limitation, Drivetrain Agency Services, LLC, in its capacity as the FLTL Subagent (as defined below)) to such extent and to such effect as the Board of Directors shall determine to be appropriate and authorized by Delaware Law.

(3)     The Corporation shall have power to purchase and maintain insurance on behalf of any person who is or was a director, officer, employee or agent of the Corporation, or is or was serving at the request of the Corporation as a director, officer, employee or agent of another corporation, partnership, joint venture, trust or other enterprise against any expense, liability or loss incurred by such person in any such capacity or arising out of such person's status as such, whether or not the Corporation would have the power to indemnify such person against such liability under Delaware Law.

(4)     The rights and authority conferred in this ARTICLE NINTH shall not be exclusive of any other right which any person may otherwise have or hereafter acquire.

(5)     Neither the amendment nor repeal of this ARTICLE NINTH, nor the adoption of any provision of this Certificate of Incorporation or the bylaws of the Corporation, nor, to the fullest extent permitted by Delaware Law, any modification of law, shall adversely affect any right or protection of any person granted pursuant hereto existing at, or arising out of or related to any event, act or omission that occurred prior to, the time of such amendment, repeal, adoption or

#94311989v3

modification (regardless of when any proceeding (or part thereof) relating to such event, act or omission arises or is first threatened, commenced or completed).

TENTH: The Corporation reserves the right to amend this Certificate of Incorporation in any manner permitted by Delaware Law and all rights and powers conferred herein on stockholders, directors and officers, if any, are subject to this reserved power.

ELEVENTH: To the extent Drivetrain Agency Services, LLC (or any of its officers, directors or employees) is an officer, director or owner of shares of the Corporation, it is understood that it is acting not individually or personally but solely as the sub-agent (the "**FLTL Sub-Agent**") under that certain Amended and Restated First Lien Term Loan Agreement, originally dated as of April 11, 2018 (as amended, restated, amended and restated, supplemented or otherwise modified prior to the date hereof, the "**FLTL Credit Agreement**"), among, inter alia, Fieldwood Energy, LLC, Fieldwood Energy, Inc., the lenders party thereto from time to time and Cantor Fitzgerald Securities, as administrative agent and collateral agent, in the exercise of the powers and authority conferred and vested in it pursuant to that certain First Lien Term Loan Sub-Agent Appointment Agreement by and among Fieldwood Energy LLC, Fieldwood Energy Inc., Cantor Fitzgerald Securities and the FLTL Sub-Agent, and nothing herein contained shall be construed as creating any liability on Drivetrain Agency Services, LLC (or any of its officers, directors or employees), individually or personally, including for the payment of any indebtedness or expenses of the Corporation or the breach of, or failure to perform, any obligation, representation, warranty or covenant made or undertaken by the Corporation whether by or through attempted piercing of the corporate veil, by or through a claim by or on behalf of any person against Drivetrain Agency Services, LLC (or any of its officers, directors or employees), by the enforcement of any assessment or by any legal or equitable proceeding or by virtue of any applicable law, whether in contract, tort or otherwise.

#94311989v3

IN WITNESS WHEREOF, the undersigned has executed this Certificate of Incorporation this _4_ day of June, 2021.

**MAKO NEWCO INC.**

By: _____
      Name:   Tim Daileader
      Title:    President

[*Signature Page to Certificate of Incorporation of Mako Holding Inc.*]

# BYLAWS

## OF

## MAKO HOLDING INC.

\* \* \* \* \*

## ARTICLE 1
## OFFICES

Section 1.01.  *Registered Office.*  The registered office of the Mako Holding Inc. (the "**Corporation**") shall be in the City of Wilmington, County of New Castle, State of Delaware.

Section 1.02.  *Other Offices.*  The Corporation may also have offices at such other places both within and without the State of Delaware as the Board of Directors may from time to time determine or the business of the Corporation may require.

Section 1.03.  *Books.*  The books of the Corporation may be kept within or without the State of Delaware as the Board of Directors may from time to time determine or the business of the Corporation may require.

## ARTICLE 2
## MEETINGS OF STOCKHOLDERS

Section 2.01.  *Time and Place of Meetings.*  All meetings of stockholders shall be held at such place, either within or without the State of Delaware, on such date and at such time as may be determined from time to time by the Board of Directors (or the Chairman in the absence of a designation by the Board of Directors).

Section 2.02.  *Annual Meetings.*  Unless directors are elected by written consent in lieu of an annual meeting as permitted by the General Corporation Law of the State of Delaware as the same exists or may hereafter be amended ("**Delaware Law**"), an annual meeting of stockholders shall be held for the election of directors and to transact such other business as may properly be brought before the meeting as may be designated by the Board of Directors from time to time.  Stockholders may, unless the certificate of incorporation otherwise provides, act by written consent to elect directors; *provided*, *however*, that if such consent is less than unanimous, such action by written consent may be in lieu of holding an annual meeting only if all of the directorships to which directors could be elected at an annual meeting held at the effective time of such action are vacant and are filled by such action.

Section 2.03. *Special Meetings.* Special meetings of stockholders may be called by the Board of Directors or the Chairman of the Board of Directors and shall be called by the Secretary at the request in writing of holders of record of a majority of the outstanding capital stock of the Corporation entitled to vote. Such request shall state the purpose or purposes of the proposed meeting.

Section 2.04. *Notice of Meetings and Adjourned Meetings; Waivers of Notice.* (a) Whenever stockholders are required or permitted to take any action at a meeting, a written notice of the meeting shall be given which shall state the place, if any, date and hour of the meeting, the means of remote communications, if any, by which stockholders and proxy holders may be deemed to be present in person and vote at such meeting, and, in the case of a special meeting, the purpose or purposes for which the meeting is called. Unless otherwise provided by Delaware Law, such notice shall be given not less than 10 nor more than 60 days before the date of the meeting to each stockholder of record entitled to vote at such meeting. Unless these bylaws otherwise require, when a meeting is adjourned to another time or place (whether or not a quorum is present), notice need not be given of the adjourned meeting if the time, place, if any, and the means of remote communications, if any, by which stockholders and proxy holders may be deemed to be present in person and vote at such meeting, are announced at the meeting at which the adjournment is taken. At the adjourned meeting, the Corporation may transact any business which might have been transacted at the original meeting. If the adjournment is for more than 30 days, or after the adjournment a new record date is fixed for the adjourned meeting, a notice of the adjourned meeting shall be given to each stockholder of record entitled to vote at the meeting.

(b) A written waiver of any such notice signed by the person entitled thereto, or a waiver by electronic transmission by the person entitled to notice, whether before or after the time stated therein, shall be deemed equivalent to notice. Attendance of a person at a meeting shall constitute a waiver of notice of such meeting, except when the person attends the meeting for the express purpose of objecting, at the beginning of the meeting, to the transaction of any business because the meeting is not lawfully called or convened. Business transacted at any special meeting of stockholders shall be limited to the purposes stated in the notice.

Section 2.05. *Quorum.* Unless otherwise provided under the certificate of incorporation or these bylaws and subject to Delaware Law, the presence, in person or by proxy, of the holders of a majority of the outstanding capital stock of the Corporation entitled to vote at a meeting of stockholders shall constitute a quorum for the transaction of business. If, however, such quorum shall not be present or represented at any meeting of the stockholders, a majority in voting interest of the stockholders present in person or represented by proxy may adjourn the meeting, without notice other than announcement at the meeting, until a

quorum shall be present or represented. At such adjourned meeting at which a quorum shall be present or represented any business may be transacted which might have been transacted at the meeting as originally notified.

Section 2.06. *Voting.* (a) Unless otherwise provided in the certificate of incorporation and subject to Delaware Law, each stockholder shall be entitled to one vote for each outstanding share of capital stock of the Corporation held by such stockholder. Any share of capital stock of the Corporation held by the Corporation shall have no voting rights. Except as otherwise provided by law, the certificate of incorporation or these bylaws, in all matters other than the election of directors, the affirmative vote of the majority of the shares of capital stock of the Corporation present in person or represented by proxy at the meeting and entitled to vote on the subject matter shall be the act of the stockholders.

(b) Each stockholder entitled to vote at a meeting of stockholders or to express consent or dissent to a corporate action in writing without a meeting may authorize another person or persons to act for such stockholder by proxy, appointed by an instrument in writing, subscribed by such stockholder or by his attorney thereunto authorized, or by proxy sent by cable, telegram or by any means of electronic communication permitted by law, which results in a writing from such stockholder or by his attorney, and delivered to the secretary of the meeting. No proxy shall be voted after three (3) years from its date, unless said proxy provides for a longer period.

(c) In determining the number of votes cast for or against a proposal or nominee, shares abstaining from voting on a matter will not be treated as a vote cast.

Section 2.07. *Action by Consent.* (a) Unless otherwise provided in the certificate of incorporation and subject to the proviso in Section 2.02, any action required to be taken at any annual or special meeting of stockholders, or any action which may be taken at any annual or special meeting of stockholders, may be taken without a meeting, without prior notice and without a vote, if a consent or consents in writing, setting forth the action so taken, shall be signed by the holders of outstanding capital stock having not less than the minimum number of votes that would be necessary to authorize or take such action at a meeting at which all shares entitled to vote thereon were present and voted and shall be delivered to the Corporation by delivery to its registered office in Delaware, its principal place of business, or an officer or agent of the Corporation having custody of the book in which proceedings of meetings of stockholders are recorded. Delivery made to the Corporation's registered office shall be by hand or by certified or registered mail, return receipt requested. Prompt notice of the taking of the corporate action without a meeting by less than unanimous written consent shall be given to those stockholders who have not consented in writing and who, if the action had been taken at a meeting, would have been entitled to

3

notice of the meeting if the record date for such meeting had been the date that written consents signed by a sufficient number of stockholders to take the action were delivered to the Corporation as provided in Section 2.07(b).

(b)     Every written consent shall bear the date of signature of each stockholder who signs the consent, and no written consent shall be effective to take the corporate action referred to therein unless, within 60 days of the earliest dated consent delivered in the manner required by this section and Delaware Law to the Corporation, written consents signed by a sufficient number of holders to take action are delivered to the Corporation by delivery to its registered office in Delaware, its principal place of business or an officer or agent of the Corporation having custody of the book in which proceedings of meetings of stockholders are recorded.  Delivery made to the Corporation's registered office shall be by hand or by certified or registered mail, return receipt requested.

Section 2.08.  *Organization.*  At each meeting of stockholders, the Chairman of the Board of Directors, if one shall have been elected, or in the Chairman's absence or if one shall not have been elected, the director designated by the vote of the majority of the directors present at such meeting, shall act as chairman of the meeting.  The Secretary (or in the Secretary's absence or inability to act, the person whom the chairman of the meeting shall appoint secretary of the meeting) shall act as secretary of the meeting and keep the minutes thereof.

Section 2.09.  *Order of Business.*  The order of business at all meetings of stockholders shall be as determined by the chairman of the meeting.

## ARTICLE 3
## DIRECTORS

Section 3.01.  *General Powers.*  Except as otherwise provided in Delaware Law or the certificate of incorporation, the business and affairs of the Corporation shall be managed by or under the direction of the Board of Directors.

Section 3.02.  *Number, Election and Term Of Office.*   (a) The number of directors which shall constitute the whole Board of Directors shall be fixed from time to time by resolution of the Board of Directors but shall not be less than one. The directors shall be elected at the annual meeting of the stockholders by written ballot, except as provided in Section 2.02 and Section 3.12 herein, and each director so elected shall hold office until such director's successor is elected and qualified or until such director's earlier death, resignation or removal.  Directors need not be stockholders.

(b)  Subject to the rights of the holders of any series of preferred stock to elect additional directors under specific circumstances, directors shall be elected by a plurality of the votes of the shares of capital stock of the Corporation present

4

in person or represented by proxy at the meeting and entitled to vote on the election of directors.

Section 3.03. *Quorum and Manner of Acting.* Unless the certificate of incorporation or these bylaws require a greater number, a majority of the total number of directors shall constitute a quorum for the transaction of business, and the affirmative vote of a majority of the directors present at a meeting at which a quorum is present shall be the act of the Board of Directors. When a meeting is adjourned to another time or place (whether or not a quorum is present), notice need not be given of the adjourned meeting if the time and place thereof are announced at the meeting at which the adjournment is taken. At the adjourned meeting, the Board of Directors may transact any business which might have been transacted at the original meeting. If a quorum shall not be present at any meeting of the Board of Directors the directors present threat shall adjourn the meeting, from time to time, without notice other than announcement at the meeting, until a quorum shall be present.

Section 3.04. *Time and Place of Meetings.* The Board of Directors shall hold its meetings at such place, either within or without the State of Delaware, and at such time as may be determined from time to time by the Board of Directors (or the Chairman in the absence of a determination by the Board of Directors).

Section 3.05. *Annual Meeting.* The Board of Directors shall meet for the purpose of organization, the election of officers and the transaction of other business, as soon as practicable after each annual meeting of stockholders, on the same day and at the same place where such annual meeting shall be held. Notice of such meeting need not be given. In the event such annual meeting is not so held, the annual meeting of the Board of Directors may be held at such place either within or without the State of Delaware, on such date and at such time as shall be specified in a notice thereof given as hereinafter provided in Section 3.07 herein or in a waiver of notice thereof signed by any director who chooses to waive the requirement of notice.

Section 3.06. *Regular Meetings.* After the place and time of regular meetings of the Board of Directors shall have been determined and notice thereof shall have been once given to each member of the Board of Directors, regular meetings may be held without further notice being given.

Section 3.07. *Special Meetings.* Special meetings of the Board of Directors may be called by the Chairman of the Board or the President and shall be called by the Chairman of the Board, President or Secretary on the written request of any director. Notice of special meetings of the Board of Directors shall be given to each director at least 24 hours before the date of the meeting in such manner as is determined by the Board of Directors, which required notice shall be

5

deemed to be waived by a director's attendance at a meeting (unless solely for the purpose of objecting to the lack of required notice).

Section 3.08. *Committees.* The Board of Directors may designate one or more committees, each committee to consist of one or more of the directors of the Corporation. The Board of Directors may designate one or more directors as alternate members of any committee, who may replace any absent or disqualified member at any meeting of the committee. In the absence or disqualification of a member of a committee, the member or members present at any meeting and not disqualified from voting, whether or not such member or members constitute a quorum, may unanimously appoint another member of the Board of Directors to act at the meeting in the place of any such absent or disqualified member. A quorum of any committee of the Board of Directors shall consist of a majority of the Board of Directors (with directors for quorum purposes counted in accordance with the certificate of incorporation). Any such committee, to the extent provided in the resolution of the Board of Directors, shall have and may exercise all the powers and authority of the Board of Directors in the management of the business and affairs of the Corporation, and may authorize the seal of the Corporation to be affixed to all papers which may require it; but no such committee shall have the power or authority in reference to any of the following matters: (a) approving or adopting, or recommending to the stockholders, any action or matter expressly required by Delaware Law to be submitted to the stockholders for approval or (b) adopting, amending or repealing any bylaw of the Corporation. Each committee shall keep regular minutes of its meetings and report the same to the Board of Directors when required.

Section 3.09. *Action by Consent.* Unless otherwise restricted by the certificate of incorporation or these bylaws, any action required or permitted to be taken at any meeting of the Board of Directors or of any committee thereof may be taken without a meeting, if all members of the Board or committee, as the case may be, consent thereto in writing or by electronic transmission, and the writing or writings or electronic transmission or transmissions, are filed with the minutes of proceedings of the Board or committee. Such filing shall be in paper form if the minutes are maintained in paper form and shall be in electronic form if the minutes are maintained in electronic form.

Section 3.10. *Telephonic Meetings.* Unless otherwise restricted by the certificate of incorporation or these bylaws, members of the Board of Directors, or any committee designated by the Board of Directors, may participate in a meeting of the Board of Directors, or such committee, as the case may be, by means of conference telephone or other communications equipment by means of which all persons participating in the meeting can hear each other, and such participation in a meeting shall constitute presence in person at the meeting.

Section 3.11.  *Resignation.*  Any director may resign at any time by giving notice in writing or by electronic transmission to the Board of Directors or to the Secretary of the Corporation.  The resignation of any director shall take effect upon receipt of notice thereof or at such later time as shall be specified in such notice; and unless otherwise specified therein, the acceptance of such resignation shall not be necessary to make it effective.

Section 3.12.  *Vacancies.*  Unless otherwise provided in the certificate of incorporation, vacancies and newly created directorships resulting from any increase in the authorized number of directors elected by all the stockholders having the right to vote as a single class may be filled by a majority vote of the directors then in office, although less than a quorum, or by a sole remaining director.  Whenever the holders of any class or classes of stock or series thereof are entitled to elect one or more directors by the certificate of incorporation, vacancies and newly created directorships of such class or classes or series may be filled by a majority vote of directors elected by such class or classes or series thereof then in office, or by a sole remaining director so elected.  Each director so chosen shall hold office until his or her successor is elected and qualified, or until his or her earlier death, resignation or removal.  If there are no directors in office, then an election of directors may be held in accordance with Delaware Law.  Unless otherwise provided in the certificate of incorporation, when one or more directors shall resign from the Board of Directors, effective at a future date, the directors then in office shall, by majority vote, have the power to fill such vacancy or vacancies, the vote thereon to take effect when such resignation or resignations shall become effective, and each director so chosen shall hold office as provided in the filling of other vacancies.

Section 3.13.  *Removal.*  Any director or the entire Board of Directors may be removed, with or without cause, at any time by the affirmative vote of the holders of a majority of the voting power of the outstanding capital stock of the Corporation then entitled to vote at any election of directors and the vacancies thus created may be filled in accordance with Section 3.12 herein.

Section 3.14.  *Compensation.*  Unless otherwise restricted by the certificate of incorporation or these bylaws, the Board of Directors shall have authority to fix the compensation of directors, including fees and reimbursement of expenses.

## ARTICLE 4
## OFFICERS

Section 4.01.  *Principal Officers.*  The principal officers of the Corporation shall be a President, a Treasurer and a Secretary who shall have the duty, among other things, to record the proceedings of the meetings of stockholders and directors in a book kept for that purpose.  The Corporation may

also have such other principal officers, including one or more Controllers, as the Board of Directors may in its discretion appoint.  One person may hold the offices and perform the duties of any two or more of said offices.

Section 4.02.  *Election, Term of Office and Remuneration.*  The principal officers of the Corporation shall be elected annually by the Board of Directors at the annual meeting thereof.  Each such officer shall hold office until his or her successor is elected and qualified, or until his or her earlier death, resignation or removal.  The remuneration of all officers of the Corporation shall be fixed by the Board of Directors.  Any vacancy in any office shall be filled in such manner as the Board of Directors shall determine.

Section 4.03.  *Subordinate Officers.*  In addition to the principal officers enumerated in Section 4.01 herein, the Corporation may have one or more Assistant Treasurers, Assistant Secretaries and Assistant Controllers and such other subordinate officers, agents and employees as the Board of Directors may deem necessary, each of whom shall hold office for such period as the Board of Directors may from time to time determine.  The Board of Directors may delegate to any principal officer the power to appoint and to remove any such subordinate officers, agents or employees.

Section 4.04.  *Removal.*  Except as otherwise permitted with respect to subordinate officers, any officer may be removed, with or without cause, at any time, by resolution adopted by the Board of Directors.

Section 4.05.  *Resignations.*  Any officer may resign at any time by giving written notice to the Board of Directors (or to a principal officer if the Board of Directors has delegated to such principal officer the power to appoint and to remove such officer).  The resignation of any officer shall take effect upon receipt of notice thereof or at such later time as shall be specified in such notice; and unless otherwise specified therein, the acceptance of such resignation shall not be necessary to make it effective.

Section 4.06.  *Powers and Duties.*  The officers of the Corporation shall have such powers and perform such duties incident to each of their respective offices and such other duties as may from time to time be conferred upon or assigned to them by the Board of Directors.

ARTICLE 5
CAPITAL STOCK

Section 5.01.  *Certificates For Stock; Uncertificated Shares.*  The shares of the Corporation shall be uncertificated, provided that the Board of Directors of the Corporation may provide by resolution or resolutions that some or all of any or all classes or series of its stock shall be certificated shares.  Except as otherwise

provided by law, the rights and obligations of the holders of uncertificated shares and the rights and obligations of the holders of shares represented by certificates of the same class and series shall be identical. Every holder of stock represented by certificates shall be entitled to have a certificate signed by, or in the name of the Corporation by any two authorized officers of the Corporation representing the number of shares registered in certificate form. Any or all of the signatures on the certificate may be a facsimile. In case any officer, transfer agent or registrar who has signed or whose facsimile signature has been placed upon a certificate shall have ceased to be such officer, transfer agent or registrar before such certificate is issued, it may be issued by the Corporation with the same effect as if such person were such officer, transfer agent or registrar at the date of issue. The Corporation shall not have power to issue a certificate in bearer form.

Section 5.02. *Transfer Of Shares.* Shares of the stock of the Corporation may be transferred on the record of stockholders of the Corporation by the holder thereof or by such holder's duly authorized attorney upon surrender of a certificate therefor properly endorsed or upon receipt of proper transfer instructions from the registered holder of uncertificated shares or by such holder's duly authorized attorney and upon compliance with appropriate procedures for transferring shares in uncertificated form, unless waived by the Corporation.

Section 5.03. *Authority for Additional Rules Regarding Transfer.* The Board of Directors shall have the power and authority to make all such rules and regulations as they may deem expedient concerning the issue, transfer and registration of certificated or uncertificated shares of the stock of the Corporation, as well as for the issuance of new certificates in lieu of those which may be lost or destroyed, and may require of any stockholder requesting replacement of lost or destroyed certificates, bond in such amount and in such form as they may deem expedient to indemnify the Corporation, and/or the transfer agents, and/or the registrars of its stock against any claims arising in connection therewith.

Section 5.04. *FLTL Sub-Agent.* To the extent Drivetrain Agency Services, LLC (or any of its officers, directors or employees) is an officer, director or owner of shares of the Corporation, it is understood that it is acting not individually or personally but solely as the sub-agent (the "**FLTL Sub-Agent**") under that certain Amended and Restated First Lien Term Loan Agreement, originally dated as of April 11, 2018 (as amended, restated, amended and restated, supplemented or otherwise modified prior to the date hereof, the "**FLTL Credit Agreement**"), among, inter alia, Fieldwood Energy, LLC, Fieldwood Energy, Inc., the lenders party thereto from time to time and Cantor Fitzgerald Securities, as administrative agent and collateral agent, in the exercise of the powers and authority conferred and vested in it pursuant to that certain First Lien Term Loan Sub-Agent Appointment Agreement by and among Fieldwood Energy LLC, Fieldwood Energy Inc., Cantor Fitzgerald Securities and the FLTL Sub-Agent, and nothing herein contained shall be construed as creating any liability on Drivetrain Agency

9

Services, LLC (or any of its officers, directors or employees), individually or personally, including for the payment of any indebtedness or expenses of the Corporation or the breach of, or failure to perform, any obligation, representation, warranty or covenant made or undertaken by the Corporation whether by or through attempted piercing of the corporate veil, by or through a claim by or on behalf of any person against Drivetrain Agency Services, LLC (or any of its officers, directors or employees), by the enforcement of any assessment or by any legal or equitable proceeding or by virtue of any applicable law, whether in contract, tort or otherwise.

ARTICLE 6
GENERAL PROVISIONS

Section 6.01.  *Fixing the Record Date.*  (a)  In order that the Corporation may determine the stockholders entitled to notice of or to vote at any meeting of stockholders or any adjournment thereof, the Board of Directors may fix a record date, which record date shall not precede the date upon which the resolution fixing the record date is adopted by the Board of Directors, and which record date shall not be more than 60 nor less than 10 days before the date of such meeting.  If no record date is fixed by the Board of Directors, the record date for determining stockholders entitled to notice of or to vote at a meeting of stockholders shall be at the close of business on the day next preceding the day on which notice is given, or, if notice is waived, at the close of business on the day next preceding the day on which the meeting is held.  A determination of stockholders of record entitled to notice of or to vote at a meeting of stockholders shall apply to any adjournment of the meeting; *provided* that the Board of Directors may fix a new record date for the adjourned meeting.

(b)  In order that the Corporation may determine the stockholders entitled to consent to corporate action in writing without a meeting, the Board of Directors may fix a record date, which record date shall not precede the date upon which the resolution fixing the record date is adopted by the Board of Directors, and which date shall not be more than 10 days after the date upon which the resolution fixing the record date is adopted by the Board of Directors.  If no record date has been fixed by the Board of Directors, the record date for determining stockholders entitled to consent to corporate action in writing without a meeting, when no prior action by the Board of Directors is required by Delaware Law, shall be the first date on which a signed written consent setting forth the action taken or proposed to be taken is delivered to the Corporation by delivery to its registered office in Delaware, its principal place of business, or an officer or agent of the Corporation having custody of the book in which proceedings of meetings of stockholders are recorded.  Delivery made to the Corporation's registered office shall be by hand or by certified or registered mail, return receipt requested.  If no record date has been fixed by the Board of Directors and prior action by the Board of Directors is required by Delaware Law,

the record date for determining stockholders entitled to consent to corporate action in writing without a meeting shall be at the close of business on the day on which the Board of Directors adopts the resolution taking such prior action.

(c)    In order that the Corporation may determine the stockholders entitled to receive payment of any dividend or other distribution or allotment of any rights or the stockholders entitled to exercise any rights in respect of any change, conversion or exchange of stock, or for the purpose of any other lawful action, the Board of Directors may fix a record date, which record date shall not precede the date upon which the resolution fixing the record date is adopted, and which record date shall be not more than 60 days prior to such action.  If no record date is fixed, the record date for determining stockholders for any such purpose shall be at the close of business on the day on which the Board of Directors adopts the resolution relating thereto.

Section 6.02.  *Dividends.*  Subject to limitations contained in Delaware Law and the certificate of incorporation, the Board of Directors may declare and pay dividends upon the shares of capital stock of the Corporation, which dividends may be paid either in cash, in property or in shares of the capital stock of the Corporation.

Section 6.03.  *Year.*  The fiscal year of the Corporation shall commence on January 1 and end on December 31 of each year.

Section 6.04.  *Corporate Seal.*  The corporate seal shall have inscribed thereon the name of the Corporation, the year of its organization and the words "Corporate Seal, Delaware".  The seal may be used by causing it or a facsimile thereof to be impressed, affixed or otherwise reproduced.

Section 6.05.  *Voting of Stock Owned by the Corporation.*  The Board of Directors may authorize any person, on behalf of the Corporation, to attend, vote at and grant proxies to be used at any meeting of stockholders of any corporation (except this Corporation) in which the Corporation may hold stock.

Section 6.06.  *Amendments.*  These bylaws or any of them, may be altered, amended or repealed, or new bylaws may be made, by the stockholders either by written consent or at any annual or special meeting thereof or by the Board of Directors.

# Delaware

Page 1

### The First State

I, JEFFREY W. BULLOCK, SECRETARY OF STATE OF THE STATE OF DELAWARE, DO HEREBY CERTIFY THE ATTACHED IS A TRUE AND CORRECT COPY OF THE CERTIFICATE OF FORMATION OF "MAKO BUYER LLC", FILED IN THIS OFFICE ON THE FOURTH DAY OF JUNE, A.D. 2021, AT 2:45 O`CLOCK P.M.



Jeffrey W. Bullock, Secretary of State

5963987  8100
SR# 20212358525

Authentication: 203369775
Date: 06-04-21

You may verify this certificate online at corp.delaware.gov/authver.shtml

State of Delaware
Secretary of State
Division of Corporations
Delivered 02:42 PM 06/04/2021
FILED 02:45 PM 06/04/2021
SR 20212358525 - File Number 5963987

# CERTIFICATE OF FORMATION

## OF

## MAKO BUYER LLC

This Certificate of Formation of Mako Buyer LLC (the "**Company**") is being duly executed and filed by the undersigned as an authorized person, to form a limited liability company pursuant to the provisions of the Delaware Limited Liability Company Act (6 *Del. C.* §18-201, *et seq.*).

FIRST:  The name of the limited liability company formed hereby is Mako Buyer LLC.

SECOND:  The address of the registered office of the Company in the State of Delaware is c/o Corporation Service Company, 251 Little Falls Drive, City of Wilmington, County of New Castle, Delaware 19808.

THIRD:  The name and address of the registered agent for service of process on the Company in the State of Delaware is Corporation Service Company, 251 Little Falls Drive, City of Wilmington, County of New Castle, Delaware 19808.

FOURTH:  To the extent Drivetrain Agency Services, LLC (or any of its officers, directors or employees) is an officer, director or member of the Company, it is understood that it is acting not individually or personally but solely as the sub-agent (the "**FLTL Sub-Agent**") under that certain Amended and Restated First Lien Term Loan Agreement, originally dated as of April 11, 2018 (as amended, restated, amended and restated, supplemented or otherwise modified prior to the date hereof, the "**FLTL Credit Agreement**"), among, inter alia, Fieldwood Energy, LLC, Fieldwood Energy, Inc., the lenders party thereto from time to time and Cantor Fitzgerald Securities, as administrative agent and collateral agent, in the exercise of the powers and authority conferred and vested in it pursuant to that certain First Lien Term Loan Sub-Agent Appointment Agreement by and among Fieldwood Energy LLC, Fieldwood Energy Inc., Cantor Fitzgerald Securities and the FLTL Sub-Agent, and nothing herein contained shall be construed as creating any liability on Drivetrain Agency Services, LLC (or any of its officers, directors or employees), individually or personally, including for the payment of any indebtedness or expenses of the Company or the breach of, or failure to perform, any obligation, representation, warranty or covenant made or undertaken by the Company whether by or through attempted piercing of the corporate veil, by or through a claim by or on behalf of any person against Drivetrain Agency Services, LLC (or any of its officers, directors or employees), by the enforcement of any assessment or by any legal or equitable proceeding or by virtue of any applicable law, whether in contract, tort or otherwise.

IN WITNESS WHEREOF, the undersigned has executed this Certificate of Formation this _____4th_____ day of June, 2021.

**MAKO INTERMEDIATE INC.,**
its sole member

By: _____
    Name:   Tim Daileader
    Title:   President

*[Signature Page to Certificate of Formation of Mako Buyer LLC]*

# LIMITED LIABILITY COMPANY AGREEMENT

## OF

## MAKO BUYER LLC

This Limited Liability Company Agreement (this "**Agreement**") of Mako Buyer LLC dated as of June 4, 2021 is entered into by Mako Intermediate Inc. (the "**Initial Member**") as the sole member (the Initial Member and any other person who, at such time, is admitted to the Company (as defined below) as a member in accordance with the terms of this Agreement, being a "**Member**").

The Member, by execution of this Agreement, hereby forms a limited liability company pursuant to and in accordance with the Delaware Limited Liability Company Act (6 *Del.C.* §18-101, *et seq*.), as amended from time to time (the "**Act**"), and hereby agrees as follows:

1.  *Name*.  The name of the limited liability company formed hereby is Mako Buyer LLC (the "**Company**").

2.  *Filing of Certificates*.  The Member, as an authorized person, within the meaning of the Act, shall execute, deliver and file, or cause the execution, delivery and filing of, all certificates required or permitted by the Act to be filed in the Office of the Secretary of State of the State of Delaware and any other certificates, notices or documents required or permitted by law for the Company to qualify to do business in any jurisdiction in which the Company may wish to conduct business.

3.  *Purposes*.  The purpose of the Company is to engage in any lawful act or activity for which limited liability companies may be formed under the Act.

4.  *Powers*.  In furtherance of its purposes, but subject to all of the provisions of this Agreement, the Company shall have and may exercise all the powers now or hereafter conferred by Delaware law on limited liability companies formed under the Act. The Company shall have the power to do any and all acts necessary, appropriate, proper, advisable, incidental or convenient to or for the protection and benefit of the Company, and shall have, without limitation, any and all of the powers that may be exercised on behalf of the Company by the Member.

5.  *Principal Business Office*.  The principal business office of the Company shall be located at such location as may hereafter be determined by the Member.

6.  *Registered Office; Registered Agent*.  The address of the registered office and the name and address of the registered agent of the Company in the

State of Delaware is c/o Corporation Service Company, 251 Little Falls Drive, City of Wilmington, County of New Castle, Delaware 19808.

7. *Member*. The name and the mailing address of the Member is as follows:

| Name | Address |
|------|---------|
| Mako Intermediate Inc. | 410 Park Avenue, Suite 900<br>New York, NY 10022 |

8. *Limited Liability*. Except as required by the Act, the debts, obligations and liabilities of the Company, whether arising in contract, tort or otherwise, shall be solely the debts, obligations and liabilities of the Company, and the Member shall not be obligated personally for any such debt, obligation or liability of the Company solely by reason of being a member of the Company.

9. *Capital Contributions*. The Member is deemed admitted as the member of the Company upon its execution and delivery of this Agreement. The Member may, but is not obligated to make any capital contribution to the Company.

10. *Allocation of Profits and Losses*. The Company's profits and losses shall be allocated solely to the Member.

11. *Distributions*. Subject to the limitations of Section 18-607 of the Act and any other applicable law, distributions shall be made to the Member at the times and in the aggregate amounts determined by the Member.

12. *Management*. In accordance with Section 18-402 of the Act, management of the Company shall be vested in the Member. The Member shall have the power to do any and all acts necessary, convenient or incidental to or for the furtherance of the purposes described herein, including all powers, statutory or otherwise, possessed by members of a limited liability company under the laws of the State of Delaware. The Member has the authority to bind the Company.

13. *Exculpation and Indemnification*. (a) To the fullest extent permitted by the laws of the State of Delaware and except in the case of bad faith, gross negligence or willful misconduct, no Member shall be liable to the Company or any other Member for any loss, damage or claim incurred by reason of any act or omission performed or omitted by such Member in good faith on behalf of the Company and in a manner reasonably believed to be within the scope of the authority conferred on such Member by this Agreement.

(b) Except in the case of bad faith, gross negligence or willful misconduct, each person (and the heirs, executors or administrators of such person) (including, without limitation, Drivetrain Agency Services,

2

LLC, in its capacity as the FLTL Subagent (as defined below)) who was or is a party or is threatened to be made a party to, or is involved in any threatened, pending or completed action, suit or proceeding, whether civil, criminal, administrative or investigative, or who otherwise incurs any losses, liabilities, damages, penalties, obligations, judgments, suits, claims, causes of actions, costs, expenses (including fees and disbursements of legal counsel) by reason of the fact that such person is or was a Member shall be indemnified and held harmless by the Company to the fullest extent permitted by the laws of the State of Delaware for directors and officers of corporations organized under the laws of the State of Delaware. Any indemnity under this Section 13 shall be provided out of and to the extent of Company assets only, and no Member shall have personal liability on account thereof.

14.  *Assignments*.  The Member may at any time assign in whole or in part its limited liability company interest in the Company.  Upon any transfer, in whole or in part, of the Member's limited liability company interest in the Company, the transferee shall be, without the requirement of any further action, admitted as a Member with respect to the limited liability company interest so transferred and shall be deemed bound by all of the terms and provisions of this Agreement. If the Member transfers all of its interest in the Company pursuant to this Section 14 and the Member is, at the time of such transfer, the sole Member of the Company, the transferee of such limited liability company interests shall be admitted as a Member of the Company upon such transfer and the Company shall continue without dissolution.

15.  *Resignation*.  The Member may at any time resign from the Company.  If the Member resigns pursuant to this Section 15, an additional Member shall be admitted to the Company, subject to Section 16 hereof, upon its execution of an instrument signifying its agreement to be bound by the terms and conditions of this Agreement.  Such admission shall be deemed effective immediately prior to the resignation, and, immediately following such admission, the resigning Member shall cease to be a member of the Company.

16.  *Admission of Additional Members*.  Subject to Section 14, one or more additional members of the Company may be admitted to the Company with the consent of the Member.  Prior to the admission of any such additional members to the Company, the Member shall amend this Agreement to make such changes as the Member shall determine to reflect the fact that the Company shall have such additional member(s).

17.  *Dissolution*.  (a) The Company shall dissolve and its affairs shall be wound up upon the first to occur of:  (i) the written consent of the Member or (ii) the entry of a decree of judicial dissolution under Section 18-802 of the Act.

(b)  In the event of dissolution, the Company shall conduct only such activities as are necessary to wind up its affairs (including the sale of

3

the assets of the Company in an orderly manner), and the assets or proceeds from the sale of the assets of the Company shall be applied in the manner, and in the order of priority, set forth in Section 18-804 of the Act.

18.     *Tax Treatment*.  The Member intends that the Company make an election under Treas. Reg. Sec. 301.7701-3 effective as of the date of its formation and shall thereafter be treated as a corporation for U.S. federal and, if applicable, state and local income tax purposes, and neither the Company nor the Member shall take any action or make any election that is inconsistent with such tax treatment.

19.     *Separability of Provisions*.  If any provision of this Agreement or the application thereof is held by a court of competent jurisdiction or other authority to be invalid, void or unenforceable to any extent, the remainder of this Agreement and the application of such provisions shall remain in full force and effect and shall in no way be affected, impaired or invalidated.

20.     *Entire Agreement*.  This Agreement constitutes the entire agreement of the Member with respect to the subject matter hereof.

21.     *Governing Law*.  This Agreement shall be governed by, and construed under, the laws of the State of Delaware (without regard to conflict of laws principles).

22.     *Amendments*.  Subject to the requirements set forth in Section 14, this Agreement may not be modified, altered, supplemented or amended except pursuant to a written agreement executed and delivered by the Member.

23.     *Sole Benefit of Member*.  Other than as set forth in Section 14, the provisions of this Agreement are intended solely to benefit the Member and, to the fullest extent permitted by applicable law, shall not be construed as conferring any benefit upon any creditor of the Company (and no such creditor shall be a third-party beneficiary of this Agreement), and the Member shall have no duty or obligation to any creditor of the Company to make any contributions or payments to the Company.

24.     *Effectiveness*.  This Agreement shall become effective when the Member shall have executed and delivered the Agreement to the Company.

25.     *FLTL Sub-Agent*.  To the extent Drivetrain Agency Services, LLC (or any of its officers, directors or employees) is an officer, director or Member of the Company, it is understood that it is acting not individually or personally but solely as the sub-agent (the "**FLTL Sub-Agent**") under that certain Amended and Restated First Lien Term Loan Agreement, originally dated as of April 11, 2018 (as amended, restated, amended and restated, supplemented or otherwise modified prior to the date hereof, the "**FLTL Credit Agreement**"), among, inter alia, Fieldwood Energy, LLC, Fieldwood Energy, Inc., the lenders party thereto from time to time and Cantor Fitzgerald Securities, as administrative agent and

4

collateral agent, in the exercise of the powers and authority conferred and vested in it pursuant to that certain First Lien Term Loan Sub-Agent Appointment Agreement by and among Fieldwood Energy LLC, Fieldwood Energy Inc., Cantor Fitzgerald Securities and the FLTL Sub-Agent, and nothing herein contained shall be construed as creating any liability on Drivetrain Agency Services, LLC (or any of its officers, directors or employees), individually or personally, including for the payment of any indebtedness or expenses of the Company or the breach of, or failure to perform, any obligation, representation, warranty or covenant made or undertaken by the Company whether by or through attempted piercing of the corporate veil, by or through a claim by or on behalf of any person against Drivetrain Agency Services, LLC (or any of its officers, directors or employees), by the enforcement of any assessment or by any legal or equitable proceeding or by virtue of any applicable law, whether in contract, tort or otherwise.

[*The remainder of this page is intentionally left blank*]

5

IN WITNESS WHEREOF, the undersigned, intending to be legally bound hereby, has duly executed this Agreement as of the date first written above.

**MAKO INTERMEDIATE INC.,**
its sole member

By: _____
    Name:   Tim Daileader
    Title:    President

*[Signature Page for Mako Buyer LLC Limited Liability Company Agreement]*



# Delaware

Page 1

### The First State

I, JEFFREY W. BULLOCK, SECRETARY OF STATE OF THE STATE OF

DELAWARE, DO HEREBY CERTIFY THE ATTACHED IS A TRUE AND CORRECT

COPY OF THE CERTIFICATE OF FORMATION OF "MAKO BUYER 2 LLC",

FILED IN THIS OFFICE ON THE FOURTH DAY OF JUNE, A.D. 2021, AT

2:46 O`CLOCK P.M.

Jeffrey W. Bullock, Secretary of State

State of Delaware
Secretary of State
Division of Corporations
Delivered 02:42 PM 06/04/2021
FILED 02:46 PM 06/04/2021
SR 20212358564 - File Number 5963991

# CERTIFICATE OF FORMATION

## OF

## MAKO BUYER 2 LLC

This Certificate of Formation of Mako Buyer 2 LLC (the "**Company**") is being duly executed and filed by the undersigned as an authorized person, to form a limited liability company pursuant to the provisions of the Delaware Limited Liability Company Act (6 *Del. C.* §18-201, *et seq.*).

FIRST: The name of the limited liability company formed hereby is Mako Buyer 2 LLC.

SECOND: The address of the registered office of the Company in the State of Delaware is c/o Corporation Service Company, 251 Little Falls Drive, City of Wilmington, County of New Castle, Delaware 19808.

THIRD: The name and address of the registered agent for service of process on the Company in the State of Delaware is Corporation Service Company, 251 Little Falls Drive, City of Wilmington, County of New Castle, Delaware 19808.

FOURTH: To the extent Drivetrain Agency Services, LLC (or any of its officers, directors or employees) is an officer, director or member of the Company, it is understood that it is acting not individually or personally but solely as the sub-agent (the "**FLTL Sub-Agent**") under that certain Amended and Restated First Lien Term Loan Agreement, originally dated as of April 11, 2018 (as amended, restated, amended and restated, supplemented or otherwise modified prior to the date hereof, the "**FLTL Credit Agreement**"), among, inter alia, Fieldwood Energy, LLC, Fieldwood Energy, Inc., the lenders party thereto from time to time and Cantor Fitzgerald Securities, as administrative agent and collateral agent, in the exercise of the powers and authority conferred and vested in it pursuant to that certain First Lien Term Loan Sub-Agent Appointment Agreement by and among Fieldwood Energy LLC, Fieldwood Energy Inc., Cantor Fitzgerald Securities and the FLTL Sub-Agent, and nothing herein contained shall be construed as creating any liability on Drivetrain Agency Services, LLC (or any of its officers, directors or employees), individually or personally, including for the payment of any indebtedness or expenses of the Company or the breach of, or failure to perform, any obligation, representation, warranty or covenant made or undertaken by the Company whether by or through attempted piercing of the corporate veil, by or through a claim by or on behalf of any person against Drivetrain Agency Services, LLC (or any of its officers, directors or employees), by the enforcement of any assessment or by any legal or equitable proceeding or by virtue of any applicable law, whether in contract, tort or otherwise.

IN WITNESS WHEREOF, the undersigned has executed this Certificate of Formation this __4th__ day of June, 2021.

**MAKO BUYER LLC**,
its sole member

By: Mako Intermediate Inc.,
its sole member

By: _____
Name:    Tim Daileader
Title:    President

*[Signature Page to Certificate of Formation of Mako Buyer 2 LLC]*

# LIMITED LIABILITY COMPANY AGREEMENT

## OF

## MAKO BUYER 2 LLC

This Limited Liability Company Agreement (this "**Agreement**") of Mako Buyer 2 LLC dated as of June 4, 2021 is entered into by Mako Buyer LLC (the "**Initial Member**") as the sole member (the Initial Member and any other person who, at such time, is admitted to the Company (as defined below) as a member in accordance with the terms of this Agreement, being a "**Member**").

The Member, by execution of this Agreement, hereby forms a limited liability company pursuant to and in accordance with the Delaware Limited Liability Company Act (6 *Del.C.* §18-101, *et seq.*), as amended from time to time (the "**Act**"), and hereby agrees as follows:

1.  *Name.*  The name of the limited liability company formed hereby is Mako Buyer 2 LLC (the "**Company**").

2.  *Filing of Certificates.*  The Member, as an authorized person, within the meaning of the Act, shall execute, deliver and file, or cause the execution, delivery and filing of, all certificates required or permitted by the Act to be filed in the Office of the Secretary of State of the State of Delaware and any other certificates, notices or documents required or permitted by law for the Company to qualify to do business in any jurisdiction in which the Company may wish to conduct business.

3.  *Purposes.*  The purpose of the Company is to engage in any lawful act or activity for which limited liability companies may be formed under the Act.

4.  *Powers.*  In furtherance of its purposes, but subject to all of the provisions of this Agreement, the Company shall have and may exercise all the powers now or hereafter conferred by Delaware law on limited liability companies formed under the Act. The Company shall have the power to do any and all acts necessary, appropriate, proper, advisable, incidental or convenient to or for the protection and benefit of the Company, and shall have, without limitation, any and all of the powers that may be exercised on behalf of the Company by the Member.

5.  *Principal Business Office.*  The principal business office of the Company shall be located at such location as may hereafter be determined by the Member.

6.  *Registered Office; Registered Agent.*  The address of the registered office and the name and address of the registered agent of the Company in the

State of Delaware is c/o Corporation Service Company, 251 Little Falls Drive, City of Wilmington, County of New Castle, Delaware 19808.

7. *Member*. The name and the mailing address of the Member is as follows:

| Name | Address |
|---|---|
| Mako Buyer LLC | 410 Park Avenue, Suite 900 New York, NY 10022 |

8. *Limited Liability*. Except as required by the Act, the debts, obligations and liabilities of the Company, whether arising in contract, tort or otherwise, shall be solely the debts, obligations and liabilities of the Company, and the Member shall not be obligated personally for any such debt, obligation or liability of the Company solely by reason of being a member of the Company.

9. *Capital Contributions*. The Member is deemed admitted as the member of the Company upon its execution and delivery of this Agreement. The Member may, but is not obligated to make any capital contribution to the Company.

10. *Allocation of Profits and Losses*. The Company's profits and losses shall be allocated solely to the Member.

11. *Distributions*. Subject to the limitations of Section 18-607 of the Act and any other applicable law, distributions shall be made to the Member at the times and in the aggregate amounts determined by the Member.

12. *Management*. In accordance with Section 18-402 of the Act, management of the Company shall be vested in the Member. The Member shall have the power to do any and all acts necessary, convenient or incidental to or for the furtherance of the purposes described herein, including all powers, statutory or otherwise, possessed by members of a limited liability company under the laws of the State of Delaware. The Member has the authority to bind the Company.

13. *Exculpation and Indemnification*. (a) To the fullest extent permitted by the laws of the State of Delaware and except in the case of bad faith, gross negligence or willful misconduct, no Member shall be liable to the Company or any other Member for any loss, damage or claim incurred by reason of any act or omission performed or omitted by such Member in good faith on behalf of the Company and in a manner reasonably believed to be within the scope of the authority conferred on such Member by this Agreement.

(b) Except in the case of bad faith, gross negligence or willful misconduct, each person (and the heirs, executors or administrators of such person) (including, without limitation, Drivetrain Agency Services,

2

LLC, in its capacity as the FLTL Subagent (as defined below)) who was or is a party or is threatened to be made a party to, or is involved in any threatened, pending or completed action, suit or proceeding, whether civil, criminal, administrative or investigative, or who otherwise incurs any losses, liabilities, damages, penalties, obligations, judgments, suits, claims, causes of actions, costs, expenses (including fees and disbursements of legal counsel) by reason of the fact that such person is or was a Member shall be indemnified and held harmless by the Company to the fullest extent permitted by the laws of the State of Delaware for directors and officers of corporations organized under the laws of the State of Delaware. Any indemnity under this Section 13 shall be provided out of and to the extent of Company assets only, and no Member shall have personal liability on account thereof.

14.     *Assignments*.  The Member may at any time assign in whole or in part its limited liability company interest in the Company.  Upon any transfer, in whole or in part, of the Member's limited liability company interest in the Company, the transferee shall be, without the requirement of any further action, admitted as a Member with respect to the limited liability company interest so transferred and shall be deemed bound by all of the terms and provisions of this Agreement. If the Member transfers all of its interest in the Company pursuant to this Section 14 and the Member is, at the time of such transfer, the sole Member of the Company, the transferee of such limited liability company interests shall be admitted as a Member of the Company upon such transfer and the Company shall continue without dissolution.

15.     *Resignation*.  The Member may at any time resign from the Company.  If the Member resigns pursuant to this Section 15, an additional Member shall be admitted to the Company, subject to Section 16 hereof, upon its execution of an instrument signifying its agreement to be bound by the terms and conditions of this Agreement.  Such admission shall be deemed effective immediately prior to the resignation, and, immediately following such admission, the resigning Member shall cease to be a member of the Company.

16.     *Admission of Additional Members*.  Subject to Section 14, one or more additional members of the Company may be admitted to the Company with the consent of the Member.  Prior to the admission of any such additional members to the Company, the Member shall amend this Agreement to make such changes as the Member shall determine to reflect the fact that the Company shall have such additional member(s).

17.     *Dissolution*.  (a) The Company shall dissolve and its affairs shall be wound up upon the first to occur of:  (i) the written consent of the Member or (ii) the entry of a decree of judicial dissolution under Section 18-802 of the Act.

(b)     In the event of dissolution, the Company shall conduct only such activities as are necessary to wind up its affairs (including the sale of

3

the assets of the Company in an orderly manner), and the assets or proceeds from the sale of the assets of the Company shall be applied in the manner, and in the order of priority, set forth in Section 18-804 of the Act.

18. *Tax Treatment*.  The Member intends that the Company shall be treated as an entity that is disregarded as separate from the Member for U.S. federal and, if applicable, state and local income tax purposes, and neither the Company nor the Member shall take any action or make any election that is inconsistent with such tax treatment.

19. *Separability of Provisions*.  If any provision of this Agreement or the application thereof is held by a court of competent jurisdiction or other authority to be invalid, void or unenforceable to any extent, the remainder of this Agreement and the application of such provisions shall remain in full force and effect and shall in no way be affected, impaired or invalidated.

20. *Entire Agreement*.  This Agreement constitutes the entire agreement of the Member with respect to the subject matter hereof.

21. *Governing Law*.  This Agreement shall be governed by, and construed under, the laws of the State of Delaware (without regard to conflict of laws principles).

22. *Amendments*.  Subject to the requirements set forth in Section 14, this Agreement may not be modified, altered, supplemented or amended except pursuant to a written agreement executed and delivered by the Member.

23. *Sole Benefit of Member*.  Other than as set forth in Section 14, the provisions of this Agreement are intended solely to benefit the Member and, to the fullest extent permitted by applicable law, shall not be construed as conferring any benefit upon any creditor of the Company (and no such creditor shall be a third-party beneficiary of this Agreement), and the Member shall have no duty or obligation to any creditor of the Company to make any contributions or payments to the Company.

24. *Effectiveness*.  This Agreement shall become effective when the Member shall have executed and delivered the Agreement to the Company.

25. *FLTL Sub-Agent*.  To the extent Drivetrain Agency Services, LLC (or any of its officers, directors or employees) is an officer, director or Member of the Company, it is understood that it is acting not individually or personally but solely as the sub-agent (the "**FLTL Sub-Agent**") under that certain Amended and Restated First Lien Term Loan Agreement, originally dated as of April 11, 2018 (as amended, restated, amended and restated, supplemented or otherwise modified prior to the date hereof, the "**FLTL Credit Agreement**"), among, inter alia, Fieldwood Energy, LLC, Fieldwood Energy, Inc., the lenders party thereto from time to time and Cantor Fitzgerald Securities, as administrative agent and collateral agent, in the exercise of the powers and authority conferred and vested

4

in it pursuant to that certain First Lien Term Loan Sub-Agent Appointment Agreement by and among Fieldwood Energy LLC, Fieldwood Energy Inc., Cantor Fitzgerald Securities and the FLTL Sub-Agent, and nothing herein contained shall be construed as creating any liability on Drivetrain Agency Services, LLC (or any of its officers, directors or employees), individually or personally, including for the payment of any indebtedness or expenses of the Company or the breach of, or failure to perform, any obligation, representation, warranty or covenant made or undertaken by the Company whether by or through attempted piercing of the corporate veil, by or through a claim by or on behalf of any person against Drivetrain Agency Services, LLC (or any of its officers, directors or employees), by the enforcement of any assessment or by any legal or equitable proceeding or by virtue of any applicable law, whether in contract, tort or otherwise.

*[The remainder of this page is intentionally left blank]*

IN WITNESS WHEREOF, the undersigned, intending to be legally bound hereby, has duly executed this Agreement as of the date first written above.

**MAKO BUYER LLC**,
its sole member

By: Mako Intermediate Inc.,
its sole member

By: _____
    Name:   Tim Daileader
    Title:    President

[*Signature Page for Mako Buyer 2 LLC Limited Liability Company Agreement*]

# Delaware

Page 1

## The First State

I, JEFFREY W. BULLOCK, SECRETARY OF STATE OF THE STATE OF DELAWARE, DO HEREBY CERTIFY THE ATTACHED IS A TRUE AND CORRECT COPY OF THE CERTIFICATE OF INCORPORATION OF "MAKO INTERMEDIATE INC.", FILED IN THIS OFFICE ON THE FOURTH DAY OF JUNE, A.D. 2021, AT 2:44 O`CLOCK P.M.



Jeffrey W. Bullock, Secretary of State

5963985  8100

SR# 20212358461

Authentication: 203369726

Date: 06-04-21

You may verify this certificate online at corp.delaware.gov/authver.shtml

State of Delaware
Secretary of State
Division of Corporations
Delivered 02:42 PM 06/04/2021
FILED 02:44 PM 06/04/2021
SR 20212358461 - File Number 5963985

# CERTIFICATE OF INCORPORATION

## OF

## MAKO INTERMEDIATE INC.

* * *

FIRST:   The name of the corporation is Mako Intermediate Inc. (the "**Corporation**").

SECOND:  The address of its registered office in the State of Delaware is 251 Little Falls Drive, City of Wilmington, County of New Castle, Delaware 19808.  The name of its registered agent at such address is Corporation Service Company.

THIRD:  The purpose of the Corporation is to engage in any lawful act or activity for which corporations may be organized under the General Corporation Law of the State of Delaware as the same exists or may hereafter be amended ("**Delaware Law**").

FOURTH:  The total number of shares of stock which the Corporation shall have authority to issue is 1,000, and the par value of each such share is $0.01, amounting in the aggregate to $10.00.

FIFTH: The name and mailing address of the incorporator are:

| Name | Mailing Address |
| --- | --- |
| Mako Holding Inc. | 410 Park Avenue, Suite 900 New York, NY 10022 |

SIXTH:  The Board of Directors shall have the power to adopt, amend or repeal the bylaws of the Corporation.

SEVENTH:  Election of directors need not be by written ballot unless the bylaws of the Corporation so provide.

EIGHTH:  The Corporation expressly elects not to be governed by Section 203 of Delaware Law.

NINTH:   (1) A director of the Corporation shall not be liable to the Corporation or its stockholders for monetary damages for breach of fiduciary duty as a director to the fullest extent permitted by Delaware Law.

(2)(a)     Each person (and the heirs, executors or administrators of such person) (including, without limitation, Drivetrain Agency Services, LLC, in its capacity as the FLTL Subagent (as defined below)) who was or is a party or is threatened to be made a party to, or is involved in any threatened, pending or completed action, suit or proceeding, whether civil, criminal, administrative or investigative, or who otherwise incurs any losses, liabilities, damages, penalties, obligations, judgments, suits, claims, causes of actions, costs, expenses (including fees and disbursements of legal counsel) by reason of the fact that such person is or was a director or officer of the Corporation, or an owner of shares of the Corporation or is or was serving at the request of the Corporation as a director or officer of another corporation, partnership, joint venture, trust or other enterprise, shall be indemnified and held harmless by the Corporation to the fullest extent permitted by Delaware Law.   The right to indemnification conferred in this ARTICLE NINTH shall also include the right to be paid by the Corporation the expenses incurred in connection with any such proceeding in advance of its final disposition to the fullest extent authorized by Delaware Law or in connection with any other actions taken by it related to the Corporation.   The right to indemnification conferred in this ARTICLE NINTH shall be a contract right.

(b)     The Corporation may, by action of its Board of Directors, provide indemnification to such of the directors, employees, agents and owners of shares of the Corporation (including, without limitation, Drivetrain Agency Services, LLC, in its capacity as the FLTL Subagent (as defined below)) to such extent and to such effect as the Board of Directors shall determine to be appropriate and authorized by Delaware Law.

(3)     The Corporation shall have power to purchase and maintain insurance on behalf of any person who is or was a director, officer, employee or agent of the Corporation, or is or was serving at the request of the Corporation as a director, officer, employee or agent of another corporation, partnership, joint venture, trust or other enterprise against any expense, liability or loss incurred by such person in any such capacity or arising out of such person's status as such, whether or not the Corporation would have the power to indemnify such person against such liability under Delaware Law.

(4)     The rights and authority conferred in this ARTICLE NINTH shall not be exclusive of any other right which any person may otherwise have or hereafter acquire.

(5)     Neither the amendment nor repeal of this ARTICLE NINTH, nor the adoption of any provision of this Certificate of Incorporation or the bylaws of the Corporation, nor, to the fullest extent permitted by Delaware Law, any modification of law, shall adversely affect any right or protection of any person granted pursuant hereto existing at, or arising out of or related to any event, act or omission that occurred prior to, the time of such amendment, repeal, adoption or

2

#94312071v3

modification (regardless of when any proceeding (or part thereof) relating to such event, act or omission arises or is first threatened, commenced or completed).

TENTH: The Corporation reserves the right to amend this Certificate of Incorporation in any manner permitted by Delaware Law and all rights and powers conferred herein on stockholders, directors and officers, if any, are subject to this reserved power.

ELEVENTH: To the extent Drivetrain Agency Services, LLC (or any of its officers, directors or employees) is an officer, director or owner of shares of the Corporation, it is understood that it is acting not individually or personally but solely as the sub-agent (the "**FLTL Sub-Agent**") under that certain Amended and Restated First Lien Term Loan Agreement, originally dated as of April 11, 2018 (as amended, restated, amended and restated, supplemented or otherwise modified prior to the date hereof, the "**FLTL Credit Agreement**"), among, inter alia, Fieldwood Energy, LLC, Fieldwood Energy, Inc., the lenders party thereto from time to time and Cantor Fitzgerald Securities, as administrative agent and collateral agent, in the exercise of the powers and authority conferred and vested in it pursuant to that certain First Lien Term Loan Sub-Agent Appointment Agreement by and among Fieldwood Energy LLC, Fieldwood Energy Inc., Cantor Fitzgerald Securities and the FLTL Sub-Agent, and nothing herein contained shall be construed as creating any liability on Drivetrain Agency Services, LLC (or any of its officers, directors or employees), individually or personally, including for the payment of any indebtedness or expenses of the Corporation or the breach of, or failure to perform, any obligation, representation, warranty or covenant made or undertaken by the Corporation whether by or through attempted piercing of the corporate veil, by or through a claim by or on behalf of any person against Drivetrain Agency Services, LLC (or any of its officers, directors or employees), by the enforcement of any assessment or by any legal or equitable proceeding or by virtue of any applicable law, whether in contract, tort or otherwise.

#94312071v3

IN WITNESS WHEREOF, the undersigned has executed this Certificate of Incorporation this _4_ day of June, 2021.

**MAKO HOLDING INC.**

By: _____
 Name: Tim Daileader
 Title: President

# BYLAWS

## OF

## MAKO INTERMEDIATE INC.

\* \* \* \* \*

## ARTICLE 1
## OFFICES

Section 1.01. *Registered Office.* The registered office of the Mako Intermediate Inc. (the "**Corporation**") shall be in the City of Wilmington, County of New Castle, State of Delaware.

Section 1.02. *Other Offices.* The Corporation may also have offices at such other places both within and without the State of Delaware as the Board of Directors may from time to time determine or the business of the Corporation may require.

Section 1.03. *Books.* The books of the Corporation may be kept within or without the State of Delaware as the Board of Directors may from time to time determine or the business of the Corporation may require.

## ARTICLE 2
## MEETINGS OF STOCKHOLDERS

Section 2.01. *Time and Place of Meetings.* All meetings of stockholders shall be held at such place, either within or without the State of Delaware, on such date and at such time as may be determined from time to time by the Board of Directors (or the Chairman in the absence of a designation by the Board of Directors).

Section 2.02. *Annual Meetings.* Unless directors are elected by written consent in lieu of an annual meeting as permitted by the General Corporation Law of the State of Delaware as the same exists or may hereafter be amended ("**Delaware Law**"), an annual meeting of stockholders shall be held for the election of directors and to transact such other business as may properly be brought before the meeting as may be designated by the Board of Directors from time to time. Stockholders may, unless the certificate of incorporation otherwise provides, act by written consent to elect directors; *provided*, *however*, that if such consent is less than unanimous, such action by written consent may be in lieu of holding an annual meeting only if all of the directorships to which directors could be elected at an annual meeting held at the effective time of such action are vacant and are filled by such action.

Section 2.03.  *Special Meetings.*  Special meetings of stockholders may be called by the Board of Directors or the Chairman of the Board of Directors and shall be called by the Secretary at the request in writing of holders of record of a majority of the outstanding capital stock of the Corporation entitled to vote.  Such request shall state the purpose or purposes of the proposed meeting.

Section 2.04.  *Notice of Meetings and Adjourned Meetings; Waivers of Notice.*  (a)  Whenever stockholders are required or permitted to take any action at a meeting, a written notice of the meeting shall be given which shall state the place, if any, date and hour of the meeting, the means of remote communications, if any, by which stockholders and proxy holders may be deemed to be present in person and vote at such meeting, and, in the case of a special meeting, the purpose or purposes for which the meeting is called.  Unless otherwise provided by Delaware Law, such notice shall be given not less than 10 nor more than 60 days before the date of the meeting to each stockholder of record entitled to vote at such meeting.  Unless these bylaws otherwise require, when a meeting is adjourned to another time or place (whether or not a quorum is present), notice need not be given of the adjourned meeting if the time, place, if any, and the means of remote communications, if any, by which stockholders and proxy holders may be deemed to be present in person and vote at such meeting, are announced at the meeting at which the adjournment is taken.  At the adjourned meeting, the Corporation may transact any business which might have been transacted at the original meeting.  If the adjournment is for more than 30 days, or after the adjournment a new record date is fixed for the adjourned meeting, a notice of the adjourned meeting shall be given to each stockholder of record entitled to vote at the meeting.

(b)  A written waiver of any such notice signed by the person entitled thereto, or a waiver by electronic transmission by the person entitled to notice, whether before or after the time stated therein, shall be deemed equivalent to notice.  Attendance of a person at a meeting shall constitute a waiver of notice of such meeting, except when the person attends the meeting for the express purpose of objecting, at the beginning of the meeting, to the transaction of any business because the meeting is not lawfully called or convened.  Business transacted at any special meeting of stockholders shall be limited to the purposes stated in the notice.

Section 2.05.  *Quorum.*  Unless otherwise provided under the certificate of incorporation or these bylaws and subject to Delaware Law, the presence, in person or by proxy, of the holders of a majority of the outstanding capital stock of the Corporation entitled to vote at a meeting of stockholders shall constitute a quorum for the transaction of business.  If, however, such quorum shall not be present or represented at any meeting of the stockholders, a majority in voting interest of the stockholders present in person or represented by proxy may adjourn the meeting, without notice other than announcement at the meeting, until a

quorum shall be present or represented.  At such adjourned meeting at which a quorum shall be present or represented any business may be transacted which might have been transacted at the meeting as originally notified.

Section 2.06.  *Voting.*  (a)  Unless otherwise provided in the certificate of incorporation and subject to Delaware Law, each stockholder shall be entitled to one vote for each outstanding share of capital stock of the Corporation held by such stockholder.  Any share of capital stock of the Corporation held by the Corporation shall have no voting rights.  Except as otherwise provided by law, the certificate of incorporation or these bylaws, in all matters other than the election of directors, the affirmative vote of the majority of the shares of capital stock of the Corporation present in person or represented by proxy at the meeting and entitled to vote on the subject matter shall be the act of the stockholders.

(b)  Each stockholder entitled to vote at a meeting of stockholders or to express consent or dissent to a corporate action in writing without a meeting may authorize another person or persons to act for such stockholder by proxy, appointed by an instrument in writing, subscribed by such stockholder or by his attorney thereunto authorized, or by proxy sent by cable, telegram or by any means of electronic communication permitted by law, which results in a writing from such stockholder or by his attorney, and delivered to the secretary of the meeting.  No proxy shall be voted after three (3) years from its date, unless said proxy provides for a longer period.

(c)  In determining the number of votes cast for or against a proposal or nominee, shares abstaining from voting on a matter will not be treated as a vote cast.

Section 2.07.  *Action by Consent.*  (a)  Unless otherwise provided in the certificate of incorporation and subject to the proviso in Section 2.02, any action required to be taken at any annual or special meeting of stockholders, or any action which may be taken at any annual or special meeting of stockholders, may be taken without a meeting, without prior notice and without a vote, if a consent or consents in writing, setting forth the action so taken, shall be signed by the holders of outstanding capital stock having not less than the minimum number of votes that would be necessary to authorize or take such action at a meeting at which all shares entitled to vote thereon were present and voted and shall be delivered to the Corporation by delivery to its registered office in Delaware, its principal place of business, or an officer or agent of the Corporation having custody of the book in which proceedings of meetings of stockholders are recorded.  Delivery made to the Corporation's registered office shall be by hand or by certified or registered mail, return receipt requested.  Prompt notice of the taking of the corporate action without a meeting by less than unanimous written consent shall be given to those stockholders who have not consented in writing and who, if the action had been taken at a meeting, would have been entitled to

notice of the meeting if the record date for such meeting had been the date that written consents signed by a sufficient number of stockholders to take the action were delivered to the Corporation as provided in Section 2.07(b).

(b)     Every written consent shall bear the date of signature of each stockholder who signs the consent, and no written consent shall be effective to take the corporate action referred to therein unless, within 60 days of the earliest dated consent delivered in the manner required by this section and Delaware Law to the Corporation, written consents signed by a sufficient number of holders to take action are delivered to the Corporation by delivery to its registered office in Delaware, its principal place of business or an officer or agent of the Corporation having custody of the book in which proceedings of meetings of stockholders are recorded. Delivery made to the Corporation's registered office shall be by hand or by certified or registered mail, return receipt requested.

Section 2.08. *Organization.* At each meeting of stockholders, the Chairman of the Board of Directors, if one shall have been elected, or in the Chairman's absence or if one shall not have been elected, the director designated by the vote of the majority of the directors present at such meeting, shall act as chairman of the meeting. The Secretary (or in the Secretary's absence or inability to act, the person whom the chairman of the meeting shall appoint secretary of the meeting) shall act as secretary of the meeting and keep the minutes thereof.

Section 2.09. *Order of Business.* The order of business at all meetings of stockholders shall be as determined by the chairman of the meeting.

## ARTICLE 3
## DIRECTORS

Section 3.01. *General Powers.* Except as otherwise provided in Delaware Law or the certificate of incorporation, the business and affairs of the Corporation shall be managed by or under the direction of the Board of Directors.

Section 3.02. *Number, Election and Term Of Office.* (a) The number of directors which shall constitute the whole Board of Directors shall be fixed from time to time by resolution of the Board of Directors but shall not be less than one. The directors shall be elected at the annual meeting of the stockholders by written ballot, except as provided in Section 2.02 and Section 3.12 herein, and each director so elected shall hold office until such director's successor is elected and qualified or until such director's earlier death, resignation or removal. Directors need not be stockholders.

(b)  Subject to the rights of the holders of any series of preferred stock to elect additional directors under specific circumstances, directors shall be elected by a plurality of the votes of the shares of capital stock of the Corporation present

4

in person or represented by proxy at the meeting and entitled to vote on the election of directors.

Section 3.03. *Quorum and Manner of Acting.* Unless the certificate of incorporation or these bylaws require a greater number, a majority of the total number of directors shall constitute a quorum for the transaction of business, and the affirmative vote of a majority of the directors present at a meeting at which a quorum is present shall be the act of the Board of Directors. When a meeting is adjourned to another time or place (whether or not a quorum is present), notice need not be given of the adjourned meeting if the time and place thereof are announced at the meeting at which the adjournment is taken. At the adjourned meeting, the Board of Directors may transact any business which might have been transacted at the original meeting. If a quorum shall not be present at any meeting of the Board of Directors the directors present thereat shall adjourn the meeting, from time to time, without notice other than announcement at the meeting, until a quorum shall be present.

Section 3.04. *Time and Place of Meetings.* The Board of Directors shall hold its meetings at such place, either within or without the State of Delaware, and at such time as may be determined from time to time by the Board of Directors (or the Chairman in the absence of a determination by the Board of Directors).

Section 3.05. *Annual Meeting.* The Board of Directors shall meet for the purpose of organization, the election of officers and the transaction of other business, as soon as practicable after each annual meeting of stockholders, on the same day and at the same place where such annual meeting shall be held. Notice of such meeting need not be given. In the event such annual meeting is not so held, the annual meeting of the Board of Directors may be held at such place either within or without the State of Delaware, on such date and at such time as shall be specified in a notice thereof given as hereinafter provided in Section 3.07 herein or in a waiver of notice thereof signed by any director who chooses to waive the requirement of notice.

Section 3.06. *Regular Meetings.* After the place and time of regular meetings of the Board of Directors shall have been determined and notice thereof shall have been once given to each member of the Board of Directors, regular meetings may be held without further notice being given.

Section 3.07. *Special Meetings.* Special meetings of the Board of Directors may be called by the Chairman of the Board or the President and shall be called by the Chairman of the Board, President or Secretary on the written request of any director. Notice of special meetings of the Board of Directors shall be given to each director at least 24 hours before the date of the meeting in such manner as is determined by the Board of Directors, which required notice shall be

deemed to be waived by a director's attendance at a meeting (unless solely for the purpose of objecting to the lack of required notice).

Section 3.08. *Committees.*  The Board of Directors may designate one or more committees, each committee to consist of one or more of the directors of the Corporation.  The Board of Directors may designate one or more directors as alternate members of any committee, who may replace any absent or disqualified member at any meeting of the committee.  In the absence or disqualification of a member of a committee, the member or members present at any meeting and not disqualified from voting, whether or not such member or members constitute a quorum, may unanimously appoint another member of the Board of Directors to act at the meeting in the place of any such absent or disqualified member.  A quorum of any committee of the Board of Directors shall consist of a majority of the Board of Directors (with directors for quorum purposes counted in accordance with the certificate of incorporation).  Any such committee, to the extent provided in the resolution of the Board of Directors, shall have and may exercise all the powers and authority of the Board of Directors in the management of the business and affairs of the Corporation, and may authorize the seal of the Corporation to be affixed to all papers which may require it; but no such committee shall have the power or authority in reference to any of the following matters: (a) approving or adopting, or recommending to the stockholders, any action or matter expressly required by Delaware Law to be submitted to the stockholders for approval or (b) adopting, amending or repealing any bylaw of the Corporation.  Each committee shall keep regular minutes of its meetings and report the same to the Board of Directors when required.

Section 3.09. *Action by Consent.*  Unless otherwise restricted by the certificate of incorporation or these bylaws, any action required or permitted to be taken at any meeting of the Board of Directors or of any committee thereof may be taken without a meeting, if all members of the Board or committee, as the case may be, consent thereto in writing or by electronic transmission, and the writing or writings or electronic transmission or transmissions, are filed with the minutes of proceedings of the Board or committee.  Such filing shall be in paper form if the minutes are maintained in paper form and shall be in electronic form if the minutes are maintained in electronic form.

Section 3.10. *Telephonic Meetings.*  Unless otherwise restricted by the certificate of incorporation or these bylaws, members of the Board of Directors, or any committee designated by the Board of Directors, may participate in a meeting of the Board of Directors, or such committee, as the case may be, by means of conference telephone or other communications equipment by means of which all persons participating in the meeting can hear each other, and such participation in a meeting shall constitute presence in person at the meeting.

Section 3.11.  *Resignation.*  Any director may resign at any time by giving notice in writing or by electronic transmission to the Board of Directors or to the Secretary of the Corporation.  The resignation of any director shall take effect upon receipt of notice thereof or at such later time as shall be specified in such notice; and unless otherwise specified therein, the acceptance of such resignation shall not be necessary to make it effective.

Section 3.12.  *Vacancies.*  Unless otherwise provided in the certificate of incorporation, vacancies and newly created directorships resulting from any increase in the authorized number of directors elected by all the stockholders having the right to vote as a single class may be filled by a majority vote of the directors then in office, although less than a quorum, or by a sole remaining director.  Whenever the holders of any class or classes of stock or series thereof are entitled to elect one or more directors by the certificate of incorporation, vacancies and newly created directorships of such class or classes or series may be filled by a majority vote of directors elected by such class or classes or series thereof then in office, or by a sole remaining director so elected.  Each director so chosen shall hold office until his or her successor is elected and qualified, or until his or her earlier death, resignation or removal.  If there are no directors in office, then an election of directors may be held in accordance with Delaware Law.  Unless otherwise provided in the certificate of incorporation, when one or more directors shall resign from the Board of Directors, effective at a future date, the directors then in office shall, by majority vote, have the power to fill such vacancy or vacancies, the vote thereon to take effect when such resignation or resignations shall become effective, and each director so chosen shall hold office as provided in the filling of other vacancies.

Section 3.13.  *Removal.*  Any director or the entire Board of Directors may be removed, with or without cause, at any time by the affirmative vote of the holders of a majority of the voting power of the outstanding capital stock of the Corporation then entitled to vote at any election of directors and the vacancies thus created may be filled in accordance with Section 3.12 herein.

Section 3.14.  *Compensation.*  Unless otherwise restricted by the certificate of incorporation or these bylaws, the Board of Directors shall have authority to fix the compensation of directors, including fees and reimbursement of expenses.

## ARTICLE 4
## OFFICERS

Section 4.01.  *Principal Officers.*  The principal officers of the Corporation shall be a President, a Treasurer and a Secretary who shall have the duty, among other things, to record the proceedings of the meetings of stockholders and directors in a book kept for that purpose.  The Corporation may

also have such other principal officers, including one or more Controllers, as the Board of Directors may in its discretion appoint.  One person may hold the offices and perform the duties of any two or more of said offices.

Section 4.02.  *Election, Term of Office and Remuneration.*  The principal officers of the Corporation shall be elected annually by the Board of Directors at the annual meeting thereof.  Each such officer shall hold office until his or her successor is elected and qualified, or until his or her earlier death, resignation or removal.  The remuneration of all officers of the Corporation shall be fixed by the Board of Directors.  Any vacancy in any office shall be filled in such manner as the Board of Directors shall determine.

Section 4.03.  *Subordinate Officers.*  In addition to the principal officers enumerated in Section 4.01 herein, the Corporation may have one or more Assistant Treasurers, Assistant Secretaries and Assistant Controllers and such other subordinate officers, agents and employees as the Board of Directors may deem necessary, each of whom shall hold office for such period as the Board of Directors may from time to time determine.  The Board of Directors may delegate to any principal officer the power to appoint and to remove any such subordinate officers, agents or employees.

Section 4.04.  *Removal.*  Except as otherwise permitted with respect to subordinate officers, any officer may be removed, with or without cause, at any time, by resolution adopted by the Board of Directors.

Section 4.05.  *Resignations.*  Any officer may resign at any time by giving written notice to the Board of Directors (or to a principal officer if the Board of Directors has delegated to such principal officer the power to appoint and to remove such officer).  The resignation of any officer shall take effect upon receipt of notice thereof or at such later time as shall be specified in such notice; and unless otherwise specified therein, the acceptance of such resignation shall not be necessary to make it effective.

Section 4.06.  *Powers and Duties.*  The officers of the Corporation shall have such powers and perform such duties incident to each of their respective offices and such other duties as may from time to time be conferred upon or assigned to them by the Board of Directors.

ARTICLE 5
CAPITAL STOCK

Section 5.01.  *Certificates For Stock; Uncertificated Shares.*  The shares of the Corporation shall be uncertificated, provided that the Board of Directors of the Corporation may provide by resolution or resolutions that some or all of any or all classes or series of its stock shall be certificated shares.  Except as otherwise

8

provided by law, the rights and obligations of the holders of uncertificated shares and the rights and obligations of the holders of shares represented by certificates of the same class and series shall be identical. Every holder of stock represented by certificates shall be entitled to have a certificate signed by, or in the name of the Corporation by any two authorized officers of the Corporation representing the number of shares registered in certificate form. Any or all of the signatures on the certificate may be a facsimile. In case any officer, transfer agent or registrar who has signed or whose facsimile signature has been placed upon a certificate shall have ceased to be such officer, transfer agent or registrar before such certificate is issued, it may be issued by the Corporation with the same effect as if such person were such officer, transfer agent or registrar at the date of issue. The Corporation shall not have power to issue a certificate in bearer form.

Section 5.02. *Transfer Of Shares.* Shares of the stock of the Corporation may be transferred on the record of stockholders of the Corporation by the holder thereof or by such holder's duly authorized attorney upon surrender of a certificate therefor properly endorsed or upon receipt of proper transfer instructions from the registered holder of uncertificated shares or by such holder's duly authorized attorney and upon compliance with appropriate procedures for transferring shares in uncertificated form, unless waived by the Corporation.

Section 5.03. *Authority for Additional Rules Regarding Transfer.* The Board of Directors shall have the power and authority to make all such rules and regulations as they may deem expedient concerning the issue, transfer and registration of certificated or uncertificated shares of the stock of the Corporation, as well as for the issuance of new certificates in lieu of those which may be lost or destroyed, and may require of any stockholder requesting replacement of lost or destroyed certificates, bond in such amount and in such form as they may deem expedient to indemnify the Corporation, and/or the transfer agents, and/or the registrars of its stock against any claims arising in connection therewith.

Section 5.04. *FLTL Sub-Agent.* To the extent Drivetrain Agency Services, LLC (or any of its officers, directors or employees) is an officer, director or owner of shares of the Corporation, it is understood that it is acting not individually or personally but solely as the sub-agent (the "**FLTL Sub-Agent**") under that certain Amended and Restated First Lien Term Loan Agreement, originally dated as of April 11, 2018 (as amended, restated, amended and restated, supplemented or otherwise modified prior to the date hereof, the "**FLTL Credit Agreement**"), among, inter alia, Fieldwood Energy, LLC, Fieldwood Energy, Inc., the lenders party thereto from time to time and Cantor Fitzgerald Securities, as administrative agent and collateral agent, in the exercise of the powers and authority conferred and vested in it pursuant to that certain First Lien Term Loan Sub-Agent Appointment Agreement by and among Fieldwood Energy LLC, Fieldwood Energy Inc., Cantor Fitzgerald Securities and the FLTL Sub-Agent, and nothing herein contained shall be construed as creating any liability on Drivetrain Agency

9

Services, LLC (or any of its officers, directors or employees), individually or personally, including for the payment of any indebtedness or expenses of the Corporation or the breach of, or failure to perform, any obligation, representation, warranty or covenant made or undertaken by the Corporation whether by or through attempted piercing of the corporate veil, by or through a claim by or on behalf of any person against Drivetrain Agency Services, LLC (or any of its officers, directors or employees), by the enforcement of any assessment or by any legal or equitable proceeding or by virtue of any applicable law, whether in contract, tort or otherwise.

ARTICLE 6
GENERAL PROVISIONS

Section 6.01. *Fixing the Record Date.* (a) In order that the Corporation may determine the stockholders entitled to notice of or to vote at any meeting of stockholders or any adjournment thereof, the Board of Directors may fix a record date, which record date shall not precede the date upon which the resolution fixing the record date is adopted by the Board of Directors, and which record date shall not be more than 60 nor less than 10 days before the date of such meeting. If no record date is fixed by the Board of Directors, the record date for determining stockholders entitled to notice of or to vote at a meeting of stockholders shall be at the close of business on the day next preceding the day on which notice is given, or, if notice is waived, at the close of business on the day next preceding the day on which the meeting is held. A determination of stockholders of record entitled to notice of or to vote at a meeting of stockholders shall apply to any adjournment of the meeting; *provided* that the Board of Directors may fix a new record date for the adjourned meeting.

(b) In order that the Corporation may determine the stockholders entitled to consent to corporate action in writing without a meeting, the Board of Directors may fix a record date, which record date shall not precede the date upon which the resolution fixing the record date is adopted by the Board of Directors, and which date shall not be more than 10 days after the date upon which the resolution fixing the record date is adopted by the Board of Directors. If no record date has been fixed by the Board of Directors, the record date for determining stockholders entitled to consent to corporate action in writing without a meeting, when no prior action by the Board of Directors is required by Delaware Law, shall be the first date on which a signed written consent setting forth the action taken or proposed to be taken is delivered to the Corporation by delivery to its registered office in Delaware, its principal place of business, or an officer or agent of the Corporation having custody of the book in which proceedings of meetings of stockholders are recorded. Delivery made to the Corporation's registered office shall be by hand or by certified or registered mail, return receipt requested. If no record date has been fixed by the Board of Directors and prior action by the Board of Directors is required by Delaware Law,

10

the record date for determining stockholders entitled to consent to corporate action in writing without a meeting shall be at the close of business on the day on which the Board of Directors adopts the resolution taking such prior action.

(c)     In order that the Corporation may determine the stockholders entitled to receive payment of any dividend or other distribution or allotment of any rights or the stockholders entitled to exercise any rights in respect of any change, conversion or exchange of stock, or for the purpose of any other lawful action, the Board of Directors may fix a record date, which record date shall not precede the date upon which the resolution fixing the record date is adopted, and which record date shall be not more than 60 days prior to such action.  If no record date is fixed, the record date for determining stockholders for any such purpose shall be at the close of business on the day on which the Board of Directors adopts the resolution relating thereto.

Section 6.02.  *Dividends.*  Subject to limitations contained in Delaware Law and the certificate of incorporation, the Board of Directors may declare and pay dividends upon the shares of capital stock of the Corporation, which dividends may be paid either in cash, in property or in shares of the capital stock of the Corporation.

Section 6.03.  *Year.*  The fiscal year of the Corporation shall commence on January 1 and end on December 31 of each year.

Section 6.04.  *Corporate Seal.*  The corporate seal shall have inscribed thereon the name of the Corporation, the year of its organization and the words "Corporate Seal, Delaware".  The seal may be used by causing it or a facsimile thereof to be impressed, affixed or otherwise reproduced.

Section 6.05.  *Voting of Stock Owned by the Corporation.*  The Board of Directors may authorize any person, on behalf of the Corporation, to attend, vote at and grant proxies to be used at any meeting of stockholders of any corporation (except this Corporation) in which the Corporation may hold stock.

Section 6.06.  *Amendments.*  These bylaws or any of them, may be altered, amended or repealed, or new bylaws may be made, by the stockholders either by written consent or at any annual or special meeting thereof or by the Board of Directors.

**Exhibit K**

**New Intercreditor Agreement**

*Current Draft 6/15/21*
*Subject to further review and comment*

INTERCREDITOR AGREEMENT

dated as of

[   ], 2021

among

GOLDMAN SACHS BANK USA,
as First Lien Term Facility Agent and Applicable First Lien Agent,

CANTOR FITZGERALD SECURITIES,
as Second Lien Term Facility Agent and Applicable Second Lien Agent,

[HOLDINGS],
[BORROWER]

and

THE SUBSIDIARIES OF [BORROWER] NAMED HEREIN

# TABLE OF CONTENTS

**Page**

ARTICLE I DEFINITIONS ................................................................................................ 1

    **SECTION 1.01.**    **Construction; Certain Defined Terms.** ..................................... 1

ARTICLE II PRIORITIES AND AGREEMENTS WITH RESPECT TO COLLATERAL ...... 15

    **SECTION 2.01.**    **Priority of Claims** ................................................................. 15
    **SECTION 2.02.**    **Actions With Respect to Collateral; Prohibition on Contesting Liens.** ............................................................... 17
    **SECTION 2.03.**    **No Duties of Senior Representatives; Provision of Notice.** ................................................................................ 19
    **SECTION 2.04.**    **No Interference; Payment Over; Reinstatement** ................... 21
    **SECTION 2.05.**    **Automatic Release of Junior Liens** .................................... 23
    **SECTION 2.06.**    **Certain Agreements With Respect to Bankruptcy or Insolvency Proceedings** .................................................. 23
    **SECTION 2.07.**    **Reinstatement** .................................................................... 29
    **SECTION 2.08.**    **Insurance** .......................................................................... 29
    **SECTION 2.09.**    **Refinancings** ..................................................................... 29
    **SECTION 2.10.**    **Amendments to Credit Documents; Notices of Default** ......... 30
    **SECTION 2.11.**    **Possessory Collateral Agent as Gratuitous Bailee for Perfection** ....................................................................... 31

ARTICLE III EXISTENCE AND AMOUNTS OF LIENS AND OBLIGATIONS ................. 34

ARTICLE IV CONSENT OF GRANTORS ........................................................................ 35

ARTICLE V MISCELLANEOUS ..................................................................................... 35

    **SECTION 5.01.**    **Notices** .............................................................................. 35
    **SECTION 5.02.**    **Waivers; Amendment** ........................................................ 37
    **SECTION 5.03.**    **Parties in Interest** .............................................................. 37
    **SECTION 5.04.**    **Survival of Agreement** ...................................................... 38
    **SECTION 5.05.**    **Counterparts** ..................................................................... 38
    **SECTION 5.06.**    **Severability** ...................................................................... 38
    **SECTION 5.07.**    **Governing Law; Jurisdiction; Consent to Service of Process** ............................................................................ 38
    **SECTION 5.08.**    **WAIVER OF JURY TRIAL** ............................................. 39
    **SECTION 5.09.**    **Headings** ........................................................................... 39
    **SECTION 5.10.**    **Conflicts** ........................................................................... 39
    **SECTION 5.11.**    **Provisions Solely to Define Relative Rights** ....................... 39
    **SECTION 5.12.**    **Agent Capacities** .............................................................. 40
    **SECTION 5.13.**    **Supplements** ..................................................................... 40
    **SECTION 5.14.**    **Requirements For Consent and Acknowledgment** ................ 40
    **SECTION 5.15.**    **Intercreditor Agreements** ................................................... 41
    **SECTION 5.16.**    **Other Junior Intercreditor Agreements** ............................... 41

# TABLE OF CONTENTS
### (continued)

**Page**

**SECTION 5.17.**     **Further Assurances**.................................................................... 42

US 8016171v.9 **Error! Unknown document property name.**
WEIL:\98021004\1\45327.0007

**EXHIBITS:**

Exhibit A-1 Consent and Acknowledgment (Other First Lien Obligations)

Exhibit A-2 Consent and Acknowledgment (Other Second Lien Obligations)

This INTERCREDITOR AGREEMENT (this "*Agreement*") is dated as of [ ], 2021, among GOLDMAN SACHS BANK USA ("*Goldman Sachs*"), as the First Lien Term Facility Agent and the Applicable First Lien Agent, CANTOR FITZGERALD SECURITIES ("*Cantor*"), as the Second Lien Term Facility Agent and the Applicable Second Lien Agent, [BORROWER] (the "*Company*"), [HOLDINGS] ("*Holdings*"), the Subsidiaries of the Company named herein, and each Other First Lien Obligations Agent and each Other Second Lien Obligations Agent from time to time party hereto. Capitalized terms used but not defined in the preamble and the recitals to this Agreement have the meanings set forth in Section 1.01(b) below.

This Agreement governs the relationship between the First Lien Obligations Secured Parties as a group, on the one hand, and the Second Lien Obligations Secured Parties as a group, on the other hand.

In consideration of the mutual agreements herein contained and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Applicable First Lien Agent (for itself and on behalf of the First Lien Term Facility Secured Parties and any Other First Lien Obligations Secured Party), the Applicable Second Lien Agent (for itself and on behalf of the Second Lien Term Facility Secured Parties and any Other Second Lien Obligations Secured Party), the Company and the Subsidiaries of the Company party hereto hereby agree as follows:

## ARTICLE I

## DEFINITIONS

**SECTION 1.01.** **Construction; Certain Defined Terms.**

(a) The definitions of terms herein shall apply equally to the singular and plural forms of the terms defined. Whenever the context may require, any pronoun shall include the corresponding masculine, feminine and neuter forms. The words "include", "includes" and "including" shall be deemed to be followed by the phrase "without limitation". The word "will" shall be construed to have the same meaning and effect as the word "shall". Unless the context requires otherwise, (i) any definition of or reference to any agreement, instrument, other document, statute or regulation herein shall be construed as referring to such agreement, instrument, other document, statute or regulation as from time to time amended, supplemented or otherwise modified, (ii) any reference herein to any Person shall be construed to include such Person's successors and assigns, but shall not be deemed to include the Subsidiaries of such Person unless express reference is made to such Subsidiaries, (iii) the words "herein", "hereof and "hereunder", and words of similar import, shall be construed to refer to this Agreement in its entirety and not to any particular provision hereof, (iv) all references herein to Articles, Sections and Annexes shall be construed to refer to Articles, Sections and Annexes of this Agreement and (v) unless otherwise expressly qualified herein, the words "asset" and "property" shall be construed to have the same meaning and effect and to refer to any and all tangible and intangible assets and properties, including cash, securities, accounts and contract rights.

(b) As used in this Agreement, the following terms have the meanings specified below:

Error! Unknown document property name.
WEIL:\98021004\1\45327.0007

"**Applicable First Lien Agent**" means the First Lien Term Facility Agent until it shall have notified in writing the Applicable Second Lien Agent, the Second Lien Term Facility Agent (if not acting as the Applicable Second Lien Agent), any Other First Lien Obligations Agent and any Other Second Lien Obligations Agent that another Representative has become the Applicable First Lien Agent for the First Lien Obligations Secured Parties, as appointed pursuant to a Pari Passu First Lien Intercreditor Agreement or other First Lien Obligations Documents.

"**Applicable Possessory Collateral Agent**" means, prior to the Discharge of Senior Secured Obligations, the Applicable First Lien Agent, and, thereafter, the Applicable Second Lien Agent.

"**Applicable Second Lien Agent**" means the Second Lien Term Facility Agent until it shall have notified in writing the Applicable First Lien Agent, the First Lien Term Facility Agent (if not acting as the Applicable First Lien Agent), any Other First Lien Obligations Agent and any Other Second Lien Obligations Agent, that another Representative has become the Applicable Second Lien Agent for the Second Lien Obligations Secured Parties, as appointed pursuant to a Pari Passu Second Lien Intercreditor Agreement or other Second Lien Obligations Documents.

"**Bankruptcy Case**" has the meaning set forth in Section 2.06(b).

"**Bankruptcy Code**" means Title 11 of the United States Code.

"**Business Day**" means any day excluding Saturday, Sunday and any other day on which banking institutions in New York City or Houston, Texas are authorized by law or other governmental actions to close.

"**Class**" (a) when used with respect to any Obligations, refers to whether such Obligations are First Lien Term Facility Obligations, Other First Lien Obligations, Second Lien Term Facility Obligations or Other Second Lien Obligations and (b) when used with respect to any Secured Party, refers to whether such Secured Party is a holder of Obligations of any particular Class of Obligations.

"**Collateral**" means all assets and properties subject to Liens in favor of any Secured Party created by any of the First Lien Term Facility Security Documents, the Second Lien Term Facility Security Documents, each Other First Lien Obligations Security Document and each Other Second Lien Obligations Security Document, as applicable, to secure the First Lien Term Facility Obligations, the Second Lien Term Facility Obligations, any Series of Other First Lien Obligations or any Series of Other Second Lien Obligations, as applicable.

"**Collateral Agent**" means any of the First Lien Term Facility Agent, the Second Lien Term Facility Agent, each Other First Lien Obligations Agent and each Other Second Lien Obligations Agent, or all of the foregoing, as the context may require.

"**Common Collateral**" means, with respect to any two or more Classes or Series of Obligations, the portion of the Collateral granted to secure each of such Classes or Series of Obligations.

"**Company**" has the meaning set forth in the preamble hereto.

-2-

"**_Comparable Junior Obligations Collateral Documents_**" means, in relation to any Common Collateral subject to any Lien created under any Senior Secured Obligations Collateral Document, those Junior Secured Obligations Documents that create a Lien on the same Common Collateral, granted by the same Grantor.

"**_Consent and Acknowledgment_**" means, as applicable, either (a) an instrument in form and substance substantially similar to Exhibit A-1 hereto, pursuant to which any Other First Lien Obligations Secured Party, through its Representative, acknowledges this Agreement and consents to be bound by the terms hereof in accordance with Section 5.14 or (b) an instrument in form and substance substantially similar to Exhibit A-2 hereto, pursuant to which any Other Second Lien Obligations Secured Party, through its Representative, acknowledges this Agreement and consents to be bound by the terms hereof in accordance with Section 5.14, in case of each of clauses (a) and (b), acknowledged and confirmed by the Applicable First Lien Agent, the Applicable Second Lien Agent, and the Company (on behalf of itself and its Subsidiaries party to this Agreement) for purposes of this Agreement.

"**_Default_**" means a "Default" or any other event or condition that with notice or passage of time, or both, would become an event of default (however defined) under or as defined in the applicable First Lien Obligations Documents and/or the applicable Second Lien Obligations Documents, as the context may require.

"**_DIP Financing_**" has the meaning set forth in Section 2.06(b).

"**_Discharge_**" means, with respect to any First Lien Obligations and any Second Lien Obligations, except to the extent otherwise provided herein with respect to the reinstatement or continuation of any such First Lien Obligations and any such Second Lien Obligations, the payment in full in cash or immediately available funds (except for contingent indemnities and cost and reimbursement obligations to the extent no claim has been made) of all such First Lien Obligations and all such Second Lien Obligations then outstanding, if any, and, with respect to letters of credit or letter of credit guaranties outstanding under the agreements or instruments (the "**_Relevant Instruments_**") governing such First Lien Obligations or such Second Lien Obligations, as the case may be, delivery of cash collateral or backstop letters of credit in respect thereof in a manner reasonably satisfactory to the issuing lenders under such Relevant Instruments and the Applicable First Lien Agent or Applicable Second Lien Agent, as the case may be, in each case after or concurrently with the termination of all commitments to extend credit thereunder, and the termination of all commitments of "secured parties" under the Relevant Instruments; _provided_ that the Discharge of any First Lien Obligations and any Second Lien Obligations shall not be deemed to have occurred if such payments are made with the proceeds of other First Lien Obligations or other Second Lien Obligations that constitute an exchange or replacement for or a refinancing of such First Lien Obligations or such Second Lien Obligations, as the case may be. In the event that any Obligations are modified and such Obligations are paid over time or otherwise modified under Section 1129 of the Bankruptcy Code pursuant to a confirmed and consummated Plan of Reorganization, such Obligations shall be deemed to be discharged only when the final payment is made, in cash or immediately available funds or in the form of consideration otherwise provided for in such Plan of Reorganization, in respect of such Indebtedness and any obligations pursuant to such new Indebtedness shall have been satisfied. The term "**_Discharged_**" shall have a corresponding meaning.

"**_Enforcement Action_**" means an action under applicable law to:

        (a)    foreclose, execute, levy, or collect on, take possession or control of, sell or otherwise realize upon (judicially or non-judicially), or lease, license, or otherwise dispose of (whether publicly or privately), Common Collateral, or otherwise exercise or enforce remedial rights with respect to Common Collateral under any of the First Lien Obligations Documents or the Second Lien Obligations Documents (including by way of set-off, recoupment, notification of a public or private sale or other disposition pursuant to the New York UCC or other applicable law, notification to account debtors, notification to depositary banks under deposit account control agreements, notification to securities intermediaries under securities accounts, notification to commodities intermediaries under commodities accounts, or exercise of rights under landlord consents, if applicable),

        (b)    solicit bids from third Persons to conduct the liquidation or disposition of Common Collateral or to engage or retain sales brokers, marketing agents, investment bankers, accountants, appraisers, auctioneers, or other third Persons for the purposes of valuing, marketing, promoting or selling Common Collateral,

        (c)    receive a transfer of Common Collateral in satisfaction of Indebtedness or any other obligation secured thereby,

        (d)    otherwise enforce a security interest or exercise another right or remedy, as a secured creditor or otherwise, pertaining to the Common Collateral at law, in equity, or pursuant to the First Lien Obligations Documents or the Second Lien Obligations Documents (including the commencement of applicable legal proceedings or other actions with respect to Common Collateral to facilitate the actions described in the preceding clauses or in clauses (e) or (f) below, and exercising voting rights in respect of equity interests comprising Common Collateral),

        (e)    effect the disposition of Common Collateral by any Grantor after the occurrence and during the continuation of an Event of Default under the First Lien Obligations Documents or the Second Lien Obligations Documents with the consent of the applicable Collateral Agent, or

        (f)    to commence any Insolvency or Liquidation Proceeding against any Grantor.

        For the avoidance of doubt, "Enforcement Action" shall not include any forbearance from the exercise of all or any remedies by any First Lien Obligations Secured Party.

        "**_Event of Default_**" means an "Event of Default" under and as defined in, or any condition or event that would give any Secured Party the right to exercise remedies under, the applicable First Lien Obligations Documents and/or Second Lien Obligations Documents, as the context may require.

        "**_First Lien Obligations_**" means (i) the First Lien Term Facility Obligations, (ii) the Other First Lien Obligations, and (iii) solely for purposes of the definition of "Discharge" and Section 2.12, all obligations under any DIP Financing provided by any First Lien Obligations Secured Parties.

-4-

"**First Lien Obligations Documents**" means, collectively, the First Lien Term Facility Documents and the Other First Lien Obligations Documents.

"**First Lien Obligations Secured Parties**" means each First Lien Term Facility Secured Party and each Other First Lien Obligations Secured Party.

"**First Lien Obligations Security Documents**" means the First Lien Term Facility Security Documents and each Other First Lien Obligations Security Document.

"**First Lien Term Facility**" means (i) the Third Amended and Restated First Lien Term Loan Agreement of even date herewith, among Holdings, the Company, the lenders and agents party thereto from time to time and the First Lien Term Facility Agent, as amended, restated, amended and restated, supplemented, waived, replaced (whether or not upon termination, and whether with the original lenders or otherwise), restructured, repaid, refunded, refinanced or otherwise modified from time to time in accordance with its terms and the terms hereof and of any Pari Passu First Lien Intercreditor Agreement, as applicable, including any agreement or indenture extending the maturity thereof, refinancing, replacing or otherwise restructuring all or any portion of the Indebtedness under such agreement or agreements or indenture or indentures or any successor or replacement agreement or agreements or indenture or indentures or increasing the amount loaned or issued thereunder or altering the maturity thereof (except to the extent any such refinancing, replacement or restructuring is designated by the Company to not be included in the definition of "First Lien Term Facility") and (ii) whether or not the facility referred to in clause (i) remains outstanding, if designated by the Company to be included in the definition of "First Lien Term Facility" and subject to the satisfaction of the requirements set forth in Section 5.14, one or more (A) debt facilities providing for revolving credit loans, term loans, receivables financing (including through the sale of receivables to lenders or to special purpose entities formed to borrow from lenders against such receivables) or letters of credit, (B) debt securities, indentures or other forms of debt financing (including convertible or exchangeable debt instruments or bank guarantees or bankers' acceptances) or (C) instruments or agreements evidencing any other Indebtedness, in each case, with the same or different borrowers or issuers and, in each case, as amended, supplemented, modified, extended, restructured, renewed, refinanced, restated, amended and restated, replaced or refunded in whole or in part from time to time.

"**First Lien Term Facility Agent**" means the administrative agent and the collateral agent for the First Lien Term Facility Secured Parties, together with its successors or co-agents in substantially the same capacity as may from time to time be appointed. As of the date hereof, Goldman Sachs shall be the First Lien Term Facility Agent.

"**First Lien Term Facility Documents**" means the documentation in respect of the First Lien Term Facility, the First Lien Term Facility Security Agreements and the other "Loan Documents" or comparable terms as defined in the First Lien Term Facility.

"**First Lien Term Facility Mortgages**" means all "Mortgages" as defined in the First Lien Term Facility.

"**First Lien Term Facility Obligations**" means all "Loan Obligations" (as such term is defined in the First Lien Term Loan Agreement referred to in clause (i) of the definition of

the First Lien Term Facility) of the Company and other obligors outstanding under, and all other obligations in respect of, the First Lien Term Facility or any other First Lien Term Facility Documents.

"**First Lien Term Facility Secured Parties**" means, at any time, the Persons holding any First Lien Term Facility Obligations and the successors and permitted assigns thereof, including the First Lien Term Facility Agent and each other "Secured Party" as defined in any applicable First Lien Term Facility Document, including each counterparty to any Hedge Agreement or any provider of cash management services, the obligations of which are First Lien Term Facility Obligations.

"**First Lien Term Facility Security Agreements**" means (a) the Collateral Agreement of even date herewith, among the Company, each grantor party thereto and the First Lien Term Facility Agent and (b) such other security agreements and pledge agreements entered into from time to time in respect of the First Lien Term Facility, in each case, as amended, supplemented, restated, amended and restated or otherwise modified from time to time in accordance with their respective terms and the terms hereof and of any Pari Passu First Lien Intercreditor Agreement.

"**First Lien Term Facility Security Documents**" means the First Lien Term Facility Security Agreements, the First Lien Term Facility Mortgages and any other documents now existing or entered into after the date hereof that create Liens on any assets or properties of any Grantor to secure any First Lien Term Facility Obligations.

"**Grantor**" means Holdings, the Company and each Subsidiary of the Company that shall have granted any Lien in favor of any Collateral Agent on any of its assets or properties to secure any of the Obligations.

"**Hedge Agreement**" means (a) any and all rate swap transactions, basis swaps, credit derivative transactions, forward rate transactions, commodity swaps, commodity options, forward commodity contracts, equity or equity index swaps or options, bond or bond price or bond index swaps or options or forward bond or forward bond price or forward bond index transactions, interest rate options, forward foreign exchange transactions, cap transactions, floor transactions, collar transactions, currency swap transactions, cross-currency rate swap transactions, currency options, spot contracts, fixed-price physical delivery contracts, whether or not exchange traded, or any other similar transactions or any combination of any of the foregoing (including any options to enter into any of the foregoing), whether or not any such transaction is governed by or subject to any master agreement, and (b) any and all transactions of any kind, and the related confirmations, which are subject to the terms and conditions of, or governed by, any form of master agreement published by the International Swaps and Derivatives Association, Inc., any International Foreign Exchange Master Agreement or any other master agreement (any such master agreement, together with any related schedules, a "**Master Agreement**"), including any such obligations or liabilities under any Master Agreement. Notwithstanding the foregoing, agreements or obligations to physically sell any commodity at any index-based price shall not be considered Hedge Agreements.

"**Holdings**" has the meaning set forth in the preamble hereto.

US 8016171v.9 Error! Unknown document property name.
WEIL:\98012004\1\45327.0007

"**Indebtedness**" means and includes all obligations that constitute "Indebtedness", "Debt" or other comparable terms as defined in the applicable First Lien Obligations Documents or Second Lien Obligations Documents.

"**Insolvency or Liquidation Proceeding**" means (a) any voluntary or involuntary case or proceeding under the Bankruptcy Code with respect to any Grantor, (b) any other voluntary or involuntary insolvency, reorganization or bankruptcy case or proceeding, or any receivership, liquidation, reorganization or other similar case or proceeding with respect to any Grantor or with respect to any of its assets, (c) any liquidation, dissolution, reorganization or winding up of any Grantor whether voluntary or involuntary and whether or not involving insolvency or bankruptcy or (d) any assignment for the benefit of creditors or any other marshalling of assets and liabilities of any Grantor.

"**Junior Claims**" means, with respect to the Collateral securing the First Lien Obligations, the Second Lien Obligations, to the extent secured by such Collateral.

"**Junior DIP Financing Conditions**" means, with respect to any DIP Financing provided by any Junior Secured Obligations Secured Parties in accordance with Section 2.06(b)(i)(z):

(a)     the amount of the DIP Financing (including commitments thereunder) does not exceed the lesser of (i) $100,000,000 and (ii) 100% of the aggregate principal amount of debt for borrowed money constituting Second Lien Obligations outstanding immediately prior to such DIP Financing;

(b)     the DIP Financing does not include any "roll up", repayment or Refinancing of Second Lien Obligations, or any extension of Liens, administrative claims or other claims for the benefit of the Second Lien Obligations that are not subordinated to the Liens for the benefit of the First Lien Obligations and the First Lien Obligations;

(c)     the Liens on the Common Collateral securing such DIP Financing rank junior to the Liens on the Common Collateral securing the First Lien Obligations and do not afford the lenders thereunder a claim that is equal or senior in priority to any adequate protection claims of the First Lien Obligations Secured Parties in respect of their interests in the Common Collateral;

(d)     any superpriority claims granted to the Second Lien Obligations Secured Parties in connection with such DIP Financing as adequate protection are subordinated (as set forth in Section 2.01) to the superpriority claims granted in the Insolvency or Liquidation Proceeding to, or for the benefit of, the First Lien Obligations Secured Parties;

(e)     the First Lien Obligations Secured Parties retain their right to object to such DIP Financing on the grounds that it is not on commercially reasonable terms;

(f)     the terms of the DIP Financing do not compel the Grantors to seek confirmation of a specific plan of reorganization for which all or substantially all of the material terms are set forth in the DIP Financing documentation or a related document;

(g)      the DIP Financing documentation does not require or purport to govern or control the timing or terms of any sale of Collateral (other than a customary asset sale negative covenant); and

(h)      the DIP Financing is otherwise subject to and not inconsistent with the terms of this Agreement.

"***Junior Representative***" means, with respect to the Collateral securing the First Lien Obligations, each Second Lien Obligations Agent.

"***Junior Secured Obligations***" means, with respect to the Collateral securing the First Lien Obligations, the Second Lien Obligations.

"***Junior Secured Obligations Collateral***" means, with respect to any Obligations, the Common Collateral in respect of which such Obligations constitute Junior Claims.

"***Junior Secured Obligations Documents***" means, with respect to the Collateral securing the First Lien Obligations, the Second Lien Obligations Documents.

"***Junior Secured Obligations Secured Parties***" means, with respect to the Collateral securing the First Lien Obligations, the Second Lien Obligations Secured Parties.

"***Lien***" means, with respect to any asset, any mortgage, lien, pledge, charge, security interest or similar encumbrance of any kind in respect of such asset, whether or not filed, recorded or otherwise perfected under applicable law (including any conditional sale or other title retention agreement, any lease in the nature thereof, any option or other agreement to sell or give a security interest in and any filing of or agreement to give any financing statement under the Uniform Commercial Code (or equivalent statutes) of any jurisdiction).

"***Mortgages***" means the First Lien Term Facility Mortgages, the Second Lien Term Facility Mortgages, any Other First Lien Obligations Mortgage and any Other Second Lien Obligations Mortgage.

"***New York UCC***" means the Uniform Commercial Code as from time to time in effect in the State of New York.

"***obligations***" means any principal, interest (including interest accruing during the period of any bankruptcy, insolvency, receivership or other similar proceedings, regardless of whether allowed or allowable in any such proceeding), penalties, fees, indemnifications, reimbursements (including reimbursement obligations with respect to letters of credit and bankers' acceptances), damages and other liabilities payable under the documentation governing any Indebtedness.

"***Obligations***" means the First Lien Obligations and the Second Lien Obligations.

"***Other First Lien Obligations***" means obligations of Holdings, the Company and the other Grantors (other than the First Lien Term Facility Obligations) that are equally and ratably secured with the First Lien Term Facility Obligations and are designated by the Company as

-8-

"Other First Lien Obligations"; *provided* that the requirements set forth in Section 5.14 shall have been satisfied.

"***Other First Lien Obligations Agent***" means, with respect to any Series of Other First Lien Obligations or any separate facility within such Series, the Person elected, designated or appointed as the administrative agent and/or collateral agent, trustee or similar representative of such Series or such separate facility within such Series by or on behalf of the holders of such Series of Other First Lien Obligations or such separate facility within such Series, and its respective successors in substantially the same capacity as may from time to time be appointed.

"***Other First Lien Obligations Credit Document***" means (a) any instruments, agreements or documents evidencing debt facilities, providing for revolving credit loans, term loans, receivables financing (including through the sale of receivables to lenders or to special purpose entities formed to borrow from lenders against such receivables) or letters of credit, (b) debt securities, indentures and/or other forms of debt financing (including convertible or exchangeable debt instruments or bank guarantees or bankers' acceptances) or (c) instruments or agreements evidencing any other Indebtedness, in each case to the extent that (i) the obligations in respect thereof constitute Other First Lien Obligations and (ii) the Representative with respect thereto has duly executed and delivered the applicable Consent and Acknowledgment.

"***Other First Lien Obligations Documents***" means, collectively, the Other First Lien Obligations Credit Documents and the Other First Lien Obligations Security Documents related thereto.

"***Other First Lien Obligations Mortgages***" means all mortgages, trust deeds, deeds of trust, deeds to secure debt, assignments of leases and rents, and other security documents relating to any Real Estate Asset in favor of an Other First Lien Obligations Agent for the benefit of the applicable Other First Lien Obligations Secured Parties.

"***Other First Lien Obligations Secured Parties***" means, collectively, the holders of any Other First Lien Obligations who have directly or indirectly through their respective Other First Lien Obligations Agents, become party to and bound by this Agreement pursuant to a Consent and Acknowledgment in accordance with the provisions of Section 5.14 hereof.

"***Other First Lien Obligations Security Documents***" means, collectively, the security agreements or any other documents now existing or entered into after the date hereof that create Liens on any assets or properties of any Grantor to secure any Other First Lien Obligations.

"***Other Second Lien Obligations***" means obligations of Holdings, the Company and the other Grantors (other than the Second Lien Term Facility Obligations) that are equally and ratably secured with the Second Lien Term Facility Obligations and are designated by the Company as "Other Second Lien Obligations" (including any interest and fees accruing after the commencement of bankruptcy or insolvency proceedings whether or not allowed in such bankruptcy or insolvency proceeding); *provided* that the requirements set forth in Section 5.14 shall have been satisfied.

"***Other Second Lien Obligations Agent***" shall mean, with respect to any Series of Other Second Lien Obligations or any separate facility within such Series, the Person elected,

-9-

designated or appointed as the administrative agent and/or collateral agent, trustee or similar representative of such Series or such separate facility within such Series by or on behalf of the holders of such Series of Other Second Lien Obligations or such separate facility within such Series, and its respective successors in substantially the same capacity as may from time to time be appointed.

"***Other Second Lien Obligations Credit Document***" means (a) any instruments, agreements or documents evidencing debt facilities, providing for revolving credit loans, term loans, receivables financing (including through the sale of receivables to lenders or to special purpose entities formed to borrow from lenders against such receivables) or letters of credit, (b) debt securities, indentures and/or other forms of debt financing (including convertible or exchangeable debt instruments or bank guarantees or bankers' acceptances) or (c) instruments or agreements evidencing any other Indebtedness, in each case to the extent that (i) the obligations in respect thereof constitute Other Second Lien Obligations and (ii) the Representative with respect thereto has duly executed and delivered the applicable Consent and Acknowledgment.

"***Other Second Lien Obligations Documents***" means, collectively, the Other Second Lien Obligations Credit Documents and the Other Second Lien Obligations Security Documents related thereto.

"***Other Second Lien Obligations Mortgages***" means all mortgages, trust deeds, deeds of trust, deeds to secure debt, assignments of leases and rents, and other security documents relating to any Real Estate Asset in favor of an Other Second Lien Obligations Agent for the benefit of the Other Second Lien Obligations Secured Parties.

"***Other Second Lien Obligations Secured Parties***" means, collectively, the holders of any Other Second Lien Obligations who have directly or indirectly through their respective Other Second Lien Obligations Agents, become party to and bound by this Agreement pursuant to a Consent and Acknowledgment in accordance with the provisions of Section 5.14 hereof.

"***Other Second Lien Obligations Security Documents***" means, collectively, the security agreements or any other documents now existing or entered into after the date hereof that create Liens on any assets or properties of any Grantor to secure any Other Second Lien Obligations.

"***Pari Passu First Lien Intercreditor Agreement***" means any intercreditor agreement entered into among the First Lien Term Facility Agent and each Other First Lien Obligations Agent to govern the relationship among the First Lien Obligations Secured Parties with respect to any of the Collateral (including all or any portion of the Common Collateral), as the case may be, as amended, supplemented, restated, amended and restated, replaced or otherwise modified from time to time in accordance with its terms.

"***Pari Passu Second Lien Intercreditor Agreement***" means any intercreditor agreement entered into among the Second Lien Term Facility Agent and each Other Second Lien Obligations Agent to govern the relationship among the Second Lien Obligations Secured Parties with respect to any of the Collateral (including all or any portion of the Common Collateral), as

-10-

the case may be, as amended, supplemented, restated, amended and restated, replaced or otherwise modified from time to time in accordance with its terms.

"**Permitted Remedies**" means, with respect to any Second Lien Obligations Secured Party:

(i)     filing a claim or statement of interest with respect to such Obligations; *provided* that an Insolvency or Liquidation Proceeding has been commenced by or against any Grantor;

(ii)     taking any action (not adverse to the Liens on the Common Collateral securing any Senior Secured Obligations, the priority status thereof, or the rights of the Applicable First Lien Agent or any of the Senior Secured Obligations Secured Parties to exercise rights, powers and/or remedies in respect thereof) in order to create, perfect, preserve or protect (but not enforce) its Lien on any of the Collateral;

(iii)     filing any necessary or appropriate responsive or defensive pleadings in opposition to any motion, claim, adversary proceeding or other pleading made by any person objecting to or otherwise seeking the disallowance of the claims or Liens of the Junior Secured Obligations Secured Parties, including any claims secured by the Common Collateral, or otherwise make any agreements or file any motions or objections pertaining to the claims of the Junior Secured Obligations Secured Parties, in each case in a manner not inconsistent with the terms of this Agreement;

(iv)     filing any pleadings, objections, motions or agreements which (x) assert rights or interests available to unsecured creditors of the Grantors or (y) subject to Section 2.06(c), in the case of a sale or other disposition of any Common Collateral free and clear of its Liens or other claims under Section 363 of the Bankruptcy Code, assert rights or interests available to secured creditors of the Grantors, in each case arising under either any Insolvency or Liquidation Proceeding or applicable non-bankruptcy law, and in each case not inconsistent with the terms of this Agreement or applicable law (including the bankruptcy laws of any applicable jurisdiction);

(v)     voting on any Plan of Reorganization (except voting in favor of any Plan of Reorganization that (A) is not accepted by the requisite affirmative vote of all classes composed of the claims of the First Lien Obligations Secured Parties or (B) does not provide for the Discharge of all First Lien Obligations), filing any proof of claim, making other filings and making any arguments, objections, and motions (including in support of or opposition to, as applicable, the confirmation or approval of any Plan of Reorganization) that are, in each case, not inconsistent with the terms of this Agreement;

(vi)     taking any Enforcement Action after the termination of the Standstill Period; and

(vii)     exercising any other rights and remedies as an unsecured creditor against any Grantor (other than initiating or joining in an involuntary case or proceeding under the Bankruptcy Code or any other Federal, state or foreign bankruptcy, insolvency, receivership or similar law) in accordance with applicable law and in a manner not inconsistent with the terms of this Agreement; <u>provided</u> that in no event may any Junior Secured Obligations Secured Party take

any action as an unsecured creditor which such Second Lien Secured Party would not be permitted to take hereunder as a secured creditor (including under Sections 2.02, 2.04 and 2.06).

"**Person**" means any natural person, corporation, business trust, joint venture, association, company, partnership, limited liability company or government, individual or family trusts, or any agency or political subdivision thereof.

"**Plan of Reorganization**" means any plan of reorganization, plan of liquidation, agreement for composition, or other type of plan of arrangement proposed in or in connection with any Insolvency or Liquidation Proceeding.

"**Possessory Collateral**" means the Common Collateral in the possession or control of any Collateral Agent (or its agents or bailees), to the extent that possession or control thereof perfects a Lien thereon under the Uniform Commercial Code of any jurisdiction.

"**Possessory Collateral Agent**" means, with respect to any Possessory Collateral, the Collateral Agent having possession or control (including through its agents or bailees) thereof.

"**Proceeds**" means all "proceeds" as defined in Article 9 of the UCC, and additionally includes (a) any additional or replacement Collateral provided during any Insolvency or Liquidation Proceeding and (b) any payment, distribution, plan treatment or property received in an Insolvency or Liquidation Proceeding (including any Reorganization Securities).

"**Real Estate Asset**" means, at any time of determination, any interest (fee, leasehold or otherwise) then owned by any Grantor in any real property.

"**Refinance**" means to amend, restate, amend and restate, supplement, waive, replace (whether or not upon termination, and whether with the original parties or otherwise), restructure, repay, refund, refinance or otherwise modify from time to time (including by means of any agreement or indenture extending the maturity thereof, refinancing, replacing or otherwise restructuring all or any portion of the obligations under such agreement or agreements or indenture or indentures or any successor or replacement agreement or agreements or indenture or indentures or increasing the amount loaned or issued thereunder or altering the maturity thereof). "**Refinanced**" and "**Refinancing**" shall have correlative meanings.

"**Reorganization Securities**" means any debt or equity securities of a Grantor that are issued or distributed to a Secured Party pursuant to a Plan of Reorganization or similar dispositive restructuring plan in respect of or on account of a claim of such Secured Party.

"**Representative**" means (a) in the case of the First Lien Term Facility Obligations, the First Lien Term Facility Agent, (b) in the case of the Second Lien Term Facility Obligations, the Second Lien Term Facility Agent, (c) in the case of any Series of Other First Lien Obligations, each Other First Lien Obligations Agent of such Series, (d) in the case of any Series of Other Second Lien Obligations, each Other Second Lien Obligations Agent of such Series, (e) in the case of the First Lien Obligations, the Applicable First Lien Agent and (f) in the case of the Second Lien Obligations, the Applicable Second Lien Agent.

"**Second Lien Obligations**" means (i) the Second Lien Term Facility Obligations and (ii) the Other Second Lien Obligations.

"**Second Lien Obligations Agents**" means the Second Lien Term Facility Agent and each Other Second Lien Obligations Agent.

"**Second Lien Obligations Documents**" means, collectively, the Second Lien Term Facility Documents and the Other Second Lien Obligations Documents.

"**Second Lien Obligations Secured Parties**" means each Second Lien Term Facility Secured Party and each Other Second Lien Obligations Secured Party.

"**Second Lien Obligations Security Documents**" means the Second Lien Term Facility Security Documents and each Other Second Lien Obligations Security Document.

"**Second Lien Term Facility**" means (i) the Second Amended and Restated Second Lien Term Loan Agreement of even date herewith, among Holdings, the Company, the lenders and agents party thereto from time to time and the Second Lien Term Facility Agent, as amended, restated, amended and restated, supplemented, waived, replaced (whether or not upon termination, and whether with the original lenders or otherwise), restructured, repaid, refunded, refinanced or otherwise modified from time to time in accordance with its terms and the terms hereof and of any Pari Passu Second Lien Intercreditor Agreement, as applicable, including any agreement or indenture extending the maturity thereof, refinancing, replacing or otherwise restructuring all or any portion of the Indebtedness under such agreement or agreements or indenture or indentures or any successor or replacement agreement or agreements or indenture or indentures or increasing the amount loaned or issued thereunder or altering the maturity thereof (except to the extent any such refinancing, replacement or restructuring is designated by the Company to not be included in the definition of "Second Lien Term Facility") and (ii) whether or not the facility referred to in clause (i) remains outstanding, if designated by the Company to be included in the definition of "Second Lien Term Facility" and subject to the satisfaction of the requirements set forth in Section 5.14, one or more (A) debt facilities providing for revolving credit loans, term loans, receivables financing (including through the sale of receivables to lenders or to special purpose entities formed to borrow from lenders against such receivables) or letters of credit, (B) debt securities, indentures or other forms of debt financing (including convertible or exchangeable debt instruments or bank guarantees or bankers' acceptances) or (C) instruments or agreements evidencing any other Indebtedness, in each case, with the same or different borrowers or issuers and, in each case, as amended, supplemented, modified, extended, restructured, renewed, refinanced, restated, amended and restated, replaced or refunded in whole or in part from time to time.

"**Second Lien Term Facility Agent**" means the administrative agent and the collateral agent for the Second Lien Term Facility Secured Parties, together with its successors or co-agents in substantially the same capacity as may from time to time be appointed. As of the date hereof, Cantor shall be the Second Lien Term Facility Agent.

"**Second Lien Term Facility Documents**" means the documentation in respect of the Second Lien Term Facility, the Second Lien Term Facility Security Agreements and the other "Loan Documents" or comparable terms as defined in the Second Lien Term Facility.

"**Second Lien Term Facility Mortgages**" means all "Mortgages" as defined in the Second Lien Term Facility.

"**Second Lien Term Facility Obligations**" means all "Loan Obligations" (as such term is defined in the Second Lien Term Loan Agreement referred to in clause (i) of the definition of the Second Lien Term Facility) of the Company and other obligors outstanding under, and all other obligations in respect of, the Second Lien Term Facility or any other Second Lien Term Facility Documents.

"**Second Lien Term Facility Secured Parties**" means, at any time, the Persons holding any Second Lien Term Facility Obligations and the successors and permitted assigns thereof, including the Second Lien Term Facility Agent and each other "Secured Party" as defined in any applicable Second Lien Term Facility Document, including each counterparty to any Hedge Agreement or any provider of cash management services, the obligations of which are Second Lien Term Facility Obligations.

"**Second Lien Term Facility Security Agreements**" means (a) the Collateral Agreement of even date herewith, among the Company, Holdings, each other grantor party thereto and the Second Lien Term Facility Agent and (b) such other security agreements and pledge agreements entered into from time to time in respect of the Second Lien Term Facility, in each case, as amended, supplemented, restated, amended and restated, or otherwise modified from time to time in accordance with their respective terms and the terms hereof and of any Pari Passu Second Lien Intercreditor Agreement.

"**Second Lien Term Facility Security Documents**" means the Second Lien Term Facility Security Agreements, the Second Lien Term Facility Mortgages and any other documents now existing or entered into after the date hereof that create Liens on any assets or properties of any Grantor to secure any Second Lien Term Facility Obligations.

"**Secured Parties**" means, collectively, the First Lien Obligations Secured Parties and the Second Lien Obligations Secured Parties.

"**Senior Claims**" means, with respect to any Collateral securing the Second Lien Obligations, the First Lien Obligations.

"**Senior Representative**" means, with respect to any Collateral securing the Second Lien Obligations, the Applicable First Lien Agent.

"**Senior Secured Obligations**" means with respect to any Collateral securing the Second Lien Obligations, the First Lien Obligations.

"**Senior Secured Obligations Collateral**" means, with respect to any Obligations, the Common Collateral in respect of which such Obligations constitute Senior Claims.

"**Senior Secured Obligations Collateral Documents**" means each Senior Secured Obligations Document pursuant to which a Lien is now or hereafter granted securing any Senior Secured Obligations or under which rights or remedies with respect to such Liens are at any time governed.

-14-

"**Senior Secured Obligations Documents**" means, with respect to any Collateral securing the Second Lien Obligations the First Lien Obligations Documents.

"**Senior Secured Obligations Secured Parties**" means, with respect to any Collateral securing the Second Lien Obligations, the First Lien Obligations Secured Parties.

"**Series**" means, as applicable,

(a)     each of the First Lien Term Facility Obligations and each series of Other First Lien Obligations, each of which shall constitute a separate Series of the Class of Senior Secured Obligations constituting First Lien Obligations except that, in the event any two or more series of such Other First Lien Obligations (i) are secured by identical Collateral held by a common Collateral Agent and (ii) the Company designates such other First Lien Obligations to constitute a single Series, such series of Other First Lien Obligations shall collectively constitute a single Series.  The First Lien Obligations Secured Parties with respect to each Series of First Lien Obligations shall constitute a separate Series of First Lien Obligations Secured Parties; and

(b)     each of the Second Lien Term Facility Obligations and each series of Other Second Lien Obligations, each of which shall constitute a separate Series of the Class of Senior Secured Obligations constituting Second Lien Obligations except that, in the event any two or more series of such Other Second Lien Obligations (i) are secured by identical Collateral held by a common Collateral Agent and (ii) the Company designates such Other Second Lien Obligations to constitute a single Series, such series of Other Second Lien Obligations shall collectively constitute a single Series.  The Second Lien Obligations Secured Parties with respect to each Series of Second Lien Obligations shall constitute a separate Series of Second Lien Obligations Secured Parties.

"**Standstill Period**" has the meaning set forth in Section 2.02 of this Agreement.

"**Subsidiary**" has the meaning set forth in the First Lien Term Facility and/or the Second Lien Term Facility.

## ARTICLE II

## PRIORITIES AND AGREEMENTS WITH RESPECT TO COLLATERAL

**SECTION 2.01.     Priority of Claims**.  (a) Anything contained herein or in any of the First Lien Obligations Documents or the Second Lien Obligations Documents to the contrary notwithstanding, if an Event of Default has occurred and is continuing, and any Collateral Agent is taking an Enforcement Action in respect of any Collateral (whether in an Insolvency or Liquidation Proceeding or otherwise), or any distribution is made in respect of any Collateral or on account of any Obligations in any Insolvency or Liquidation Proceeding with respect to any Grantor, all Proceeds thereof (subject, in the case of any such distribution, to Section 2.06 hereof) shall be applied as follows:

(i)     FIRST, to the Applicable First Lien Agent for distribution in accordance with the First Lien Obligations Documents and any Pari Passu First Lien Intercreditor Agreement until the Discharge of all First Lien Obligations;

-15-

(ii) SECOND, to the Applicable Second Lien Agent for distribution in accordance with the Second Lien Obligations Documents and any Pari Passu Second Lien Intercreditor Agreement until the Discharge of all Second Lien Obligations; and

(iii) THIRD, to the Company or as the Company or a court of competent jurisdiction may direct.

(b) [Reserved].

(c) It is acknowledged that (i) the aggregate amount of any First Lien Obligations may, subject to the limitations set forth in the applicable First Lien Obligations Documents and the Second Lien Term Facility Documents as in effect on the date of this Agreement, be Refinanced from time to time, all without affecting the priorities set forth in Section 2.01(a) or the provisions of this Agreement defining the relative rights of the First Lien Obligations Secured Parties vis-a-vis the Second Lien Obligations Secured Parties and (ii) a portion of the First Lien Obligations and/or the Second Lien Obligations consists or may consist of Indebtedness that is revolving in nature, and the amount thereof that may be outstanding at any time or from time to time may be increased or reduced and subsequently reborrowed. The priorities provided for herein shall not be altered or otherwise affected by any such Refinancing of either the Second Lien Obligations (or any part thereof) or the First Lien Obligations (or any part thereof), by the release of any Collateral or of any guarantees for any First Lien Obligations or any Second Lien Obligations or by any action that any Representative or Secured Party may take or fail to take in respect of any Collateral.

(d) Notwithstanding (1) the date, time, method, manner or order of grant, attachment, filing, recordation, or perfection of any Liens securing the First Lien Obligations or of any Liens securing the Second Lien Obligations, in each case, granted on the Collateral, (2) any provision of the Uniform Commercial Code of any jurisdiction, or any other applicable law or the First Lien Term Facility Documents, the Second Lien Term Facility Documents, any Other First Lien Obligations Document or any Other Second Lien Obligations Document, (3) any defect or deficiencies in, or failure to perfect, setting aside, recharacterization, or avoidance of any such Liens, (4) the exchange of a security interest in any Collateral for a security interest in other Collateral, (5) the commencement of an Insolvency or Liquidation Proceeding, or (6) any other circumstance whatsoever:

(i) (A) the Liens on the Common Collateral securing any First Lien Obligations will rank senior and prior to any Liens on the Common Collateral securing the Second Lien Obligations and (B) the Liens on the Common Collateral securing any Second Lien Obligations will rank junior and subordinate to any Liens on the Common Collateral securing the First Lien Obligations;

(ii) the Applicable First Lien Agent, on behalf of itself and the First Lien Obligations Secured Parties, hereby agrees that the Liens securing the First Lien Obligations shall be of equal priority; *provided*, *however*, that the foregoing shall not be construed to alter the relative rights or priorities of the various Series of First Lien Obligations Secured Parties against each

-16-

other Series of First Lien Obligations Secured Parties, which rights and priorities shall be governed by any Pari Passu First Lien Intercreditor Agreement or other First Lien Obligations Documents, as applicable; and

(iii)     the Applicable Second Lien Agent, on behalf of itself and the Second Lien Obligations Secured Parties, hereby agree that the Liens securing the Second Lien Obligations shall be of equal priority; *provided*, *however*, that the foregoing shall not be construed to alter the relative rights or priorities of the various Series of Second Lien Obligations Secured Parties against each other Series of Second Lien Obligations, which rights and priorities shall be governed by any Pari Passu Second Lien Intercreditor Agreement or other Second Lien Obligations Documents, as applicable.

**SECTION 2.02.      Actions With Respect to Collateral; Prohibition on Contesting Liens**.

(a)     Each of the Applicable First Lien Agent and the Applicable Second Lien Agent, on behalf of itself, each relevant Representative and the relevant Secured Parties, acknowledges and agrees that, until the Discharge of all of the Senior Secured Obligations of a particular Class, and subject to the provisions herein with respect to rights of such Junior Secured Obligations Secured Party after the expiration of the Standstill Period (i) only the Applicable First Lien Agent shall act or refrain from acting with respect to the Senior Secured Obligations Collateral of such Class and then only on the instructions of the applicable Senior Representative (given in accordance with the Senior Secured Obligations Documents), (ii) no Collateral Agent shall follow any instructions with respect to such Senior Secured Obligations Collateral from any Junior Representative, any of the Junior Secured Obligations Secured Parties or the Applicable Second Lien Agent, (iii) none of the Applicable Second Lien Agent, any Junior Representative or any Junior Secured Obligations Secured Party shall, nor shall any of them instruct any Collateral Agent to, commence any Enforcement Action, in respect of any Senior Secured Obligations Collateral, whether under any First Lien Term Facility Security Document, any Second Lien Term Facility Security Document, any Other First Lien Obligations Security Documents or any Other Second Lien Obligations Security Documents, as applicable, applicable law or otherwise, it being agreed that (A) only the Applicable First Lien Agent, acting in accordance with the First Lien Term Facility Security Documents, the Other First Lien Obligations Security Documents, the Second Lien Term Facility Security Documents or the Other Second Lien Obligations Security Documents, as applicable, shall be entitled to take any Enforcement Actions, or to cause any Collateral Agent to do so and (B) notwithstanding the foregoing, the Applicable Second Lien Agent and each Junior Representative may take Permitted Remedies and (iv) the Applicable Second Lien Agent, on behalf of itself, each Junior Representative and the other Junior Secured Obligations Secured Parties, hereby agrees not to exercise any right of subrogation it or any of them may acquire as a result of any payment hereunder until the Discharge of the Senior Secured Obligations has occurred.  The Applicable First Lien Agent and each Senior Representative may deal with the Senior Secured Obligations Collateral as if they had a senior Lien on such Collateral; *provided* that, (A) with respect to the First Lien Obligations Secured Parties, the provisions of any Pari Passu First Lien Intercreditor Agreement and the applicable First Lien Obligations Documents shall also be complied with and (B) with respect to the Second Lien Obligations Secured Parties, the provisions of any Pari Passu Second Lien Intercreditor Agreement and the applicable Second

-17-

Lien Obligations Documents shall also be complied with; *provided further*, that to the extent of any disposition of any Collateral in connection with such Enforcement Action, the Lien securing the Junior Secured Obligations shall remain on the Proceeds of such Collateral disposed of in connection with such Enforcement Action subject to the relative priorities described in Section 2.01 unless and until such Proceeds are applied to the Obligations in accordance with Section 2.01(a). Furthermore, each of the Applicable First Lien Agent and the Applicable Second Lien Agent, on behalf of itself, each relevant Representative and the relevant Secured Parties, acknowledges and agrees that none of the Applicable Second Lien Agent, any Junior Representative or any other Junior Secured Obligations Secured Party will contest, protest or object to any Enforcement Action brought by any Senior Representative or any other Senior Secured Obligations Secured Party relating to the Senior Secured Obligations Collateral, in each case to the extent brought, made or taken in accordance with applicable law; *provided*, *however*, that the applicable Junior Secured Obligations Secured Party may exercise any of all such rights or remedies after the date which is one hundred eighty (180) days after each Senior Representative has received written notice that an Event of Default has occurred under the Second Lien Obligations Documents and the applicable Secured Parties have demanded the repayment in full of all applicable Obligations (the "***Standstill Period***"); *provided* that if at any time during the continuance of the Standstill Period in respect of any Series of Junior Secured Obligations such demand for repayment (or cash collateralization, as the case may be) has been withdrawn under the Junior Secured Obligations Documents relating to such Series of Junior Secured Obligations, no Junior Secured Obligations Secured Party in respect of such Series of Junior Secured Obligations may take any Enforcement Action in respect of the Common Collateral prior to the expiration of a new Standstill Period in respect of such Series of Junior Secured Obligations commenced by the receipt of written notice by the Senior Representative of the occurrence of a new Event of Default under the Junior Secured Obligations Documents relating to such Series of Junior Secured Obligations; *provided*, further, that in no event shall any Junior Secured Obligations Secured Party take any Enforcement Action if, notwithstanding the expiration of the Standstill Period, any Senior Representative or any other Senior Secured Obligations Secured Party shall have commenced during the Standstill Period and be diligently pursuing in good faith an Enforcement Action with respect to all or a substantial portion of the Common Collateral; *provided*, *further*, that prior to taking any Enforcement Action or action to commence or petition for any Insolvency or Liquidation Proceeding after the end of the Standstill Period, the applicable Junior Representative shall give the Senior Representative written notice of the intention of the Junior Representative or any other Junior Secured Obligations Secured Party to exercise such rights and remedies, including specifying the rights and remedies that it intends to exercise, which notice may be sent prior to the end of the Standstill Period.

(b)     (i) Each Junior Secured Obligations Secured Party agrees that it will not (and hereby waives any right to) contest or support any other Person in contesting, in any proceeding (including any Insolvency or Liquidation Proceeding), the perfection, priority, validity or enforceability of a Lien held by or on behalf of any Senior Secured Obligations Secured Party in all or any part of the Collateral, or the provisions of this Agreement; *provided* that nothing in this Agreement shall be construed to prevent or impair the rights of any Junior Secured Obligations Secured Party or Junior Secured Obligations Secured Party to enforce this Agreement.

(ii)     Each Senior Secured Obligations Secured Party agrees that it will not (and hereby waives any right to) contest or support any other Person in

-18-

contesting, in any proceeding (including any Insolvency or Liquidation Proceeding), the perfection, priority, validity or enforceability of a Lien held by or on behalf of any of the Junior Secured Obligations Secured Parties in all or any part of the Collateral, or the provisions of this Agreement; *provided* that nothing in this Agreement shall be construed to prevent or impair the rights of any Senior Secured Obligations Secured Party or Senior Secured Obligations Secured Party to enforce this Agreement.

(c)     The parties hereto agree to execute, acknowledge and deliver a memorandum of Intercreditor Agreement, together with such other documents in furtherance hereof or thereof, in each case, in proper form for recording in connection with any Mortgages and in form and substance reasonably satisfactory to each of the Collateral Agents, in those jurisdictions where such recording is reasonably recommended or requested by local real estate counsel and/or the title insurance company, or as otherwise deemed reasonably necessary or proper by the parties hereto.

(d)     Nothing in this Agreement shall be construed to in any way limit or impair the right of (i) any Secured Party to bid for or purchase the Common Collateral in any Insolvency or Liquidation Proceeding or at any private or judicial foreclosure upon such Common Collateral initiated by any of them; <u>provided</u> that, no such bid by any Second Lien Obligations Secured Party may include a "credit bid" in respect of any Second Lien Obligations unless the net cash proceeds of such bid are otherwise sufficient to cause the Discharge of the First Lien Obligations and are applied to cause the Discharge of the First Lien Obligations, in each case, at the closing of such bid, or (ii) any Junior Secured Obligations Secured Party's right to receive any remaining Proceeds of Common Collateral after the Discharge of the Senior Secured Obligations.

(e)     Nothing in this Agreement shall prohibit the receipt by any Junior Secured Obligations Secured Party of the required payments and other amounts owed in respect of the Junior Secured Obligations as set forth in the applicable Junior Secured Obligations Documents so long as such receipt is not the result of any Enforcement Action with respect to the Common Collateral in contravention of this Agreement; <u>provided</u> that, for purposes of clarification, any receipt of the Proceeds of any Common Collateral or any distribution on account of or in respect of Second Lien Obligations after the commencement of any Insolvency or Liquidation Proceeding or in, or pursuant to, any confirmed Plan of Reorganization that (i) was not accepted by the requisite affirmative vote of all classes composed of the claims of the First Lien Obligations Secured Parties or (ii) did not otherwise result in the Discharge of all First Lien Obligations on the effective date of such Plan of Reorganization shall be subject to Section 2.01(a) and Section 2.04(c).

**SECTION 2.03.**     <u>**No Duties of Senior Representatives; Provision of Notice**</u>.

(a)     Each of the Applicable Second Lien Agent, Junior Representatives and other Junior Secured Obligations Secured Parties acknowledges and agrees that: (i) none of the Applicable First Lien Agent, Senior Representatives or any other Senior Secured Obligations Secured Party shall have any duties or other obligations to the Applicable Second Lien Agent, the Junior Representatives or the Junior Secured Obligations Secured Parties with respect to any

-19-

Common Collateral, other than (x) as gratuitous bailee for perfection with respect to Common Collateral in its possession and (y) to transfer to the Applicable Second Lien Agent any Proceeds of any such Collateral that constitutes Common Collateral remaining in its possession following any sale, transfer or other disposition of such Collateral (in each case, unless the Junior Secured Obligations have been Discharged prior to or concurrently with such sale, transfer, disposition, payment or satisfaction) and the Discharge of the Senior Secured Obligations (or as otherwise required hereby), or if any Senior Representative or any other Senior Secured Obligations Secured Party shall be in possession of all or any part of such Collateral after the Discharge of the Senior Secured Obligations, such Collateral or any part thereof remaining, in each case without any representation or warranty on the part of such Senior Representative or any other Senior Secured Obligations Secured Party; (ii) in furtherance of the foregoing, until the Discharge of the Senior Secured Obligations shall have occurred, the Applicable First Lien Agent shall be entitled, for the benefit of the Senior Secured Obligations Secured Parties, to sell, transfer or otherwise dispose of or deal with such Collateral as provided herein and in the applicable Senior Secured Obligations Documents, and without any consultation with, or the consent of, the Junior Secured Obligations Secured Parties; and (iii) without limiting the foregoing, none of the Applicable First Lien Agent, Senior Representatives or any other Senior Secured Obligations Secured Party shall have any duty or obligation first to marshal or realize upon any type of Collateral (or any other collateral securing the Senior Secured Obligations), in any manner that would maximize the return to the Junior Secured Obligations Secured Parties, notwithstanding that the order and timing of any such realization, sale, disposition or liquidation may affect the amount of proceeds actually received by the Junior Secured Obligations Secured Parties from such realization, sale, disposition or liquidation. Each of the Applicable Second Lien Agent, Junior Representatives and other Junior Secured Obligations Secured Parties waives any claim it or any other Junior Secured Obligations Secured Party may now or hereafter have against the Applicable First Lien Agent, any Senior Representative or any other Senior Secured Obligations Secured Party (or their representatives) arising out of (i) any actions which the Applicable First Lien Agent, such Senior Representative or any such other Senior Secured Obligations Secured Party takes or omits to take in accordance with the relevant Senior Secured Obligations Documents or any other agreement related thereto and applicable law or to the collection of the Senior Secured Obligations or the valuation, use, protection or release of any security for the Senior Secured Obligations, (ii) any election by the Applicable First Lien Agent, any Senior Representative or any other Senior Secured Obligations Secured Party, in any proceeding instituted under the Bankruptcy Code, of the application of Section 1111(b) of the Bankruptcy Code or (iii) subject to Section 2.06, any borrowing by, or grant of a security interest or administrative expense priority under Section 364 of the Bankruptcy Code by, Holdings, the Company or any of its Subsidiaries, as debtor-in-possession.

(b)     The First Lien Term Facility Agent shall, after obtaining actual knowledge that it no longer qualifies as the Applicable First Lien Agent, notify the Company and the other Representatives of the same.

(c)     The Second Lien Term Facility Agent shall, after obtaining actual knowledge that it no longer qualifies as the Applicable Second Lien Agent, notify the Company and the other Representatives of the same.

(d)     The parties hereto agree that, so long as the Discharge of First Lien Obligations has not occurred, none of the Grantors shall, or shall permit any of their respective

subsidiaries to, grant or permit any Lien on any asset to secure any Second Lien Obligation unless it has granted, or substantially concurrently therewith grants, a Lien on such asset to secure the First Lien Obligations. To the extent that the provisions of the immediately preceding sentence are not complied with for any reason, without limiting any other right or remedy available to any applicable Secured Party with respect to the Common Collateral, each First Lien Obligations Secured Party and each Second Lien Obligations Secured Party agrees, that any amounts received by or distributed to any such Person pursuant to or as a result of any Lien granted in contravention of this Section 2.03(d) shall be subject to the terms of this Agreement, including Section 2.04.

      **SECTION 2.04.**     **No Interference; Payment Over; Reinstatement**. (a) Each of the Applicable Second Lien Agent, Junior Representatives and other Junior Secured Obligations Secured Parties agrees that (i) it will not take or cause to be taken any action, the purpose or effect of which is, or could be, to make any Lien securing any Junior Secured Obligations pari passu with, or to give such Junior Secured Obligations Secured Party any preference or priority relative to, any Lien securing any Senior Secured Obligations with respect to the Common Collateral securing the Senior Claims or any part thereof, (ii) it will not challenge or question in any proceeding the validity or enforceability of any Senior Secured Obligations Document or the validity, attachment, perfection or priority of any Lien under the Senior Secured Obligations Documents, or the validity or enforceability of the priorities, rights or duties established by or other provisions of this Agreement, (iii) it will not take or cause to be taken any action the purpose or intent of which is, or could be, to interfere, hinder or delay, in any manner, whether by judicial proceedings or otherwise, any Enforcement Action by the Applicable First Lien Agent, any Senior Representative or any other Senior Secured Obligations Secured Party, (iv) it shall not have any right to (A) direct the Applicable First Lien Agent, any Senior Representative or any other Senior Secured Obligations Secured Party to exercise any right, remedy or power with respect to any Common Collateral or (B) consent to the exercise by the Applicable First Lien Agent, any Senior Representative or any other Senior Secured Obligations Secured Party of any right, remedy or power with respect to any Common Collateral, (v) it will not institute any suit or assert in any suit, bankruptcy, insolvency or other proceeding any claim against the Applicable First Lien Agent, any Senior Representative or any other Senior Secured Obligations Secured Party seeking damages from or other relief by way of specific performance, instructions or otherwise with respect to, and none of the Applicable First Lien Agent, any Senior Representative or any other Senior Secured Obligations Secured Party shall be liable for, any action taken or omitted to be taken by the Applicable First Lien Agent, any Collateral Agent, any Senior Representative or other Senior Secured Obligations Secured Party with respect to any Enforcement Action taken with respect to the Common Collateral, (vi) it will not seek, and hereby waives any right, to have any Collateral or any part thereof marshaled upon any foreclosure or other disposition of such Collateral and (vii) it will not attempt, directly or indirectly, whether by judicial proceedings or otherwise, to challenge the enforceability of any provision of this Agreement; *provided* that nothing in this Agreement shall be construed to prevent or impair the rights of any Secured Party to enforce this Agreement in accordance with its terms.

      (b)     Each of the Applicable First Lien Agent, Senior Representatives and other Senior Secured Obligations Secured Parties agrees that (i) it will not challenge or question in any proceeding the validity or enforceability of any Junior Secured Obligations Document or the validity, attachment, perfection or priority of any Lien under the Junior Secured Obligations Documents, or the validity or enforceability of the priorities, rights or duties established by or other

provisions of this Agreement, (ii) it will not take or cause to be taken any action the purpose or intent of which is, or could be, to interfere, hinder or delay, in any manner, whether by judicial proceedings or otherwise, any Enforcement Action by the Applicable Second Lien Agent, any Junior Representative or any other Junior Secured Obligations Secured Party permitted under this Agreement, (iii) it shall not have any right to (A) direct the Applicable Second Lien Agent, any Junior Representative or any other Junior Secured Obligations Secured Party to exercise any right, remedy or power with respect to any Common Collateral or (B) consent to the exercise by the Applicable Second Lien Agent, any Junior Representative or any other Junior Secured Obligations Secured Party of any right, remedy or power with respect to any Common Collateral permitted under this Agreement, (iv) it will not institute any suit or assert in any suit, bankruptcy, insolvency or other proceeding any claim against the Applicable Second Lien Agent, any Junior Representative or any other Junior Secured Obligations Secured Party seeking damages from or other relief by way of specific performance, instructions or otherwise with respect to, and none of the Applicable Second Lien Agent, any Junior Representative or any other Junior Secured Obligations Secured Party shall be liable for, any action taken or omitted to be taken by the Applicable Second Lien Agent, any Collateral Agent, any Junior Representative or other Junior Secured Obligations Secured Party with respect to any Enforcement Action taken with respect to the Common Collateral permitted under this Agreement, (v) it will not seek, and hereby waives any right, to have any Collateral or any part thereof marshaled upon any foreclosure or other disposition of such Collateral and (vi) it will not attempt, directly or indirectly, whether by judicial proceedings or otherwise, to challenge the enforceability of any provision of this Agreement; provided that nothing in this Agreement shall be construed to prevent or impair the rights of any Secured Party to enforce this Agreement in accordance with its terms.

(c)     Each of the Applicable Second Lien Agent, Junior Representatives and other Junior Secured Obligations Secured Parties hereby agrees that if it shall obtain possession of any Senior Secured Obligations Collateral or shall realize any Proceeds or any payment in respect of any such Collateral, pursuant to any First Lien Term Facility Security Document, Second Lien Term Facility Security Document, Other First Lien Obligations Security Document or Other Second Lien Obligations Security Document, or by the exercise of any rights available to it or any of them under applicable law or in any Insolvency or Liquidation Proceeding or through any other Enforcement Action, at any time prior to the Discharge of the Senior Secured Obligations, then it shall hold such Collateral, Proceeds or payment in trust for the Senior Secured Obligations Secured Parties and transfer such Collateral, Proceeds or payment, as the case may be, to the Applicable First Lien Agent or other applicable Representative reasonably promptly after obtaining actual knowledge (or notice from the Applicable First Lien Agent or other applicable Representative) that it is in possession of such Collateral, Proceeds or payment.  Each of the Applicable Second Lien Agent, Junior Representatives and other Junior Secured Obligations Secured Parties agrees that, if at any time it receives notice or obtains actual knowledge that all or part of any payment with respect to any Senior Secured Obligations previously made shall be rescinded for any reason whatsoever, it shall promptly, to the extent permitted by applicable law, pay over to the Applicable First Lien Agent or other applicable Representative any payment received by it and then in its possession or under its control in respect of any Senior Secured Obligations Collateral and shall promptly turn over any Senior Secured Obligations Collateral then held by it over to the Applicable First Lien Agent or other applicable Representative, and the provisions set forth in this Agreement shall be reinstated as if such payment had not been made, until the Discharge of the Senior Secured Obligations has occurred. Each of the Applicable Second Lien Agent, Junior Representatives and

-22-

other Junior Secured Obligations Secured Parties hereby agrees that if it shall receive any payment or other distribution on account of or in respect of any Second Lien Obligations after the commencement of any Insolvency or Liquidation Proceeding or in, or pursuant to, any confirmed Plan of Reorganization that (i) was not accepted by the requisite affirmative vote of all classes composed of the claims of the First Lien Obligations Secured Parties or (ii) did not otherwise result in the Discharge of all First Lien Obligations on the effective date of such Plan of Reorganization, such Junior Secured Obligations Secured Party shall hold such payment or distribution in trust for the Senior Secured Obligations Secured Parties and transfer such payment or distribution to the Applicable First Lien Agent reasonably promptly thereafter to be applied in accordance with this Agreement.

SECTION 2.05.　**Automatic Release of Junior Liens**.　(a) Each of the Applicable Second Lien Agent, each other Second Lien Obligations Agent and each other Second Lien Obligations Secured Party agrees that in the event of a sale, transfer or other disposition of any Common Collateral, including in connection with an Enforcement Action with respect to such Common Collateral that results in the release by the First Lien Obligations Secured Parties of the Lien held by the First Lien Obligations Secured Parties on such Common Collateral (regardless of whether or not an Event of Default has occurred and is continuing under the Second Lien Obligations Documents at the time of such sale, transfer or other disposition), the Lien held by each Second Lien Obligations Secured Party on such Common Collateral shall be automatically released; *provided* that the Proceeds from any such disposition of Common Collateral are applied (x) in connection with any exercise of rights or remedies in respect of the Common Collateral, in accordance with Section 2.01(a) and (y) otherwise, in accordance with the First Lien Obligations Documents and the Second Lien Obligations Documents; *provided*, *further*, that (i) notwithstanding the foregoing, the Second Lien Obligations Secured Parties shall be entitled to any Proceeds of a sale, transfer or other disposition under this clause (a) that remain after Discharge of the First Lien Obligations, and the Liens on such remaining Proceeds securing the Second Lien Obligations shall not be automatically released pursuant to this Section 2.05(a) and (ii) any such sale, transfer or other disposition of Common Collateral, other than in connection with an Enforcement Action, must be permitted under the Second Lien Obligations Documents and be made to a Person that is not a Grantor in order for the Lien held by each Second Lien Obligations Secured Party on such Common Collateral to be released pursuant to this Section 2.05.

(b)　Each of the Applicable Second Lien Agent, Junior Representatives and other Junior Secured Obligations Secured Parties agrees to execute and deliver (at the sole cost and expense of the Grantors) all such authorizations and other instruments as shall reasonably be requested by the Applicable First Lien Agent or any Senior Representative acting on behalf of the relevant Senior Secured Obligations Secured Parties to evidence and confirm any release of Junior Secured Obligations Collateral provided for in this Section 2.05.

SECTION 2.06.　**Certain Agreements With Respect to Bankruptcy or Insolvency Proceedings**.　(a) Until the Discharge of the First Lien Obligations, this Agreement shall continue in full force and effect notwithstanding the commencement of any proceeding under the Bankruptcy Code or any other Federal, state or foreign bankruptcy, insolvency, receivership or similar law by or against the Company or any of its Subsidiaries.　Without limiting the generality of the foregoing, the provisions of this Agreement are intended to be and shall be enforceable as a "subordination agreement" under Section 510(a) of the Bankruptcy Code.

-23-

(b)     If Holdings, the Company or any of its Subsidiaries shall become subject to a case (a "***Bankruptcy Case***") under the Bankruptcy Code, if, prior to the Discharge of the First Lien Obligations, a Senior Representative desires to permit the use of cash collateral or to permit Holdings, the Company and/or any of its Subsidiaries to obtain financing under Section 363 or Section 364 of the Bankruptcy Code or under any other similar law ("***DIP Financing***") either secured by a Lien on, or constituting the proceeds of, Common Collateral, then, subject to clause (iii) below, the Junior Secured Obligations Secured Parties hereby agree:

(i)     not to object to such use of cash collateral or DIP Financing so long as:

(A)     the aggregate principal amount (including commitments thereunder) of the DIP Financing plus the aggregate principal amount of debt for borrowed money constituting First Lien Obligations that remain outstanding after giving effect to any such DIP Financing (including any Refinancing or "roll-up" of First Lien Obligations), does not exceed 200% of the greater of (x) the aggregate principal amount of debt for borrowed money constituting First Lien Obligations outstanding immediately prior to such DIP Financing and (y) the aggregate principal amount of debt for borrowed money constituting First Lien Obligations that could be incurred immediately prior to such DIP Financing pursuant to the First Lien Obligations Documents and the Second Lien Obligations Documents;

(B)     the Junior Secured Obligations Secured Parties retain the right to object to any ancillary agreements or arrangements regarding the cash collateral use or the DIP Financing that are inconsistent with the provisions of this Agreement;

(C)     the terms of the DIP Financing or cash collateral order do not compel the Grantors to seek confirmation of a specific plan of reorganization for which all or substantially all of the material terms are set forth in the DIP Financing documentation, the cash collateral order or a related document; and

(D)     the Junior Secured Obligations Secured Parties retain the benefit of their Liens on the Common Collateral, including Proceeds thereof arising after the commencement of such Bankruptcy Case (to the extent provided for under applicable law), with the same priority vis-à-vis the Senior Secured Obligations (other than with respect to any DIP Financing Liens granted thereto) as existed prior to the commencement of such Bankruptcy Case; and

(ii)   to the extent the Liens on the Common Collateral securing the Senior Secured Obligations are subordinated or pari passu with such DIP Financing, to subordinate its Liens on the Common Collateral to the Liens granted to the lenders providing such DIP Financing (and all obligations relating thereto, including any "carve-out" from the Common Collateral granting administrative priority status or

Lien priority to secure the payment of fees and expenses of the United States Trustee or professionals retained by any debtor or creditors' committee agreed to by the applicable Senior Representative or the Senior Secured Obligations Secured Parties) and to any adequate protection Liens granted to the Senior Secured Obligations Secured Parties on the same basis as the Liens on such Common Collateral securing the Senior Secured Obligations are subordinated to such DIP Financing (with the same priority vis a vis the Senior Secured Obligations Secured Parties as existed prior to the commencement of such Bankruptcy Case) or to confirm the priorities with respect to such Common Collateral as set forth herein, as applicable; and

(iii)     notwithstanding anything to the contrary contained in this Agreement, the Junior Secured Obligations Secured Parties may propose, without the consent of any Senior Secured Obligations Secured Party, and the Company and its Subsidiaries may incur, any DIP Financing provided by any Junior Secured Obligations Secured Parties so long as (i) such DIP Financing expressly requires and causes the Discharge of all First Lien Obligations then outstanding to occur on or prior to the effective date and initial funding of such DIP Financing or (ii)(1) the Junior DIP Financing Conditions are satisfied and (2) the First Lien Obligations Secured Parties have declined or failed to timely submit a good faith proposal for a DIP Financing on or prior to the earlier of (x) the date that is thirty (30) Business Days after a written, signed request to propose a DIP Financing from the Company and (y) the date that is twenty (20) Business Days after the first day hearing with respect to any voluntary or involuntary case or proceeding under the Bankruptcy Code with respect to any Grantor.

(c)     Each of the Applicable Second Lien Agent, Junior Representatives and other Junior Secured Obligations Secured Parties agrees that prior to the Discharge of the Senior Secured Obligations it will not object to or otherwise contest, and will, in the case of clause (iv) below, be deemed to have consented pursuant to Section 363(f) of the Bankruptcy Code to:  (i) any motion for relief from the automatic stay or from any injunction against foreclosure or enforcement in respect of the Senior Secured Obligations made by the Applicable First Lien Agent, any Senior Representative or any other Senior Secured Obligations Secured Party; (ii) any lawful exercise by any holder of Senior Claims of the right to credit bid Senior Claims in any sale in foreclosure of Collateral that is Senior Secured Obligations Collateral with respect to such Senior Claims; (iii) any other request for judicial relief made in any court by the Applicable First Lien Agent, any Senior Representative or any other Senior Secured Obligations Secured Party relating to the lawful enforcement of any Lien on the Senior Secured Obligations Collateral; or (iv) any lawful sale or other disposition of any Senior Secured Obligations Collateral (or any portion thereof) under Section 363 of the Bankruptcy Code or any other applicable provision of the Bankruptcy Code if the Senior Secured Obligations Secured Parties of any Series or the relevant Senior Representative acting on their behalf shall have consented to such sale or disposition of such Senior Secured Obligations Collateral and the applicable order approving such sale or disposition provides that, to the extent the sale is to be free and clear of Liens, the Liens securing the Senior Secured Obligations and the Junior Secured Obligations will attach to the Proceeds of

-25-

the sale on the same basis of priority as the Liens securing such Obligations on the assets being sold, in accordance with this Agreement.[1]

(d)     Each of the Applicable Second Lien Agent, Junior Representatives and other Junior Secured Obligations Secured Parties agree that it will not seek relief from the automatic stay or any other stay in any insolvency or liquidation proceeding with respect to Senior Secured Obligations Collateral without the prior consent of the Applicable First Lien Agent; however, that in the event that the Senior Representative and the other applicable Senior Secured Obligations Secured Parties are seeking or have obtained relief from the automatic stay with respect to any Collateral, the Junior Representative may join the Senior Representative in seeking corresponding relief from the automatic stay with respect to such Collateral and, upon obtaining such relief, may join such Senior Representative in (but not exercise any control over) any foreclosure or other enforcement action commenced by any of the Senior Secured Obligations Secured Parties against any Collateral; provided that nothing in this Section 2.06(d) shall limit the Permitted Remedies of the Junior Secured Obligations Secured Parties; provided, further, that (i) no such action by the Junior Representative could reasonably be expected to interfere materially with such foreclosure or enforcement action and (ii) no Junior Secured Obligations Secured Party may receive any Proceeds thereof unless expressly permitted herein.

(e)     Each of the Applicable Second Lien Agent, Junior Representatives and other Junior Secured Obligations Secured Parties hereby agrees that it will not object to and will not otherwise contest (or support any other Person contesting): (i) any request by the Applicable First Lien Agent or any Senior Secured Obligations Secured Party (or any Senior Representative acting on its behalf) for adequate protection with respect to the applicable Senior Secured Obligations Collateral or (ii) any objection by the Applicable First Lien Agent or any Senior Secured Obligations Secured Party (or any Senior Representative acting on its behalf) to any motion, relief, action or proceeding based on the Applicable First Lien Agent or any Senior Secured Obligations Secured Party (or any Senior Representative acting on its behalf) claiming a lack of adequate protection with respect to the applicable Senior Secured Obligations Collateral. Notwithstanding the foregoing, in any Insolvency or Liquidation Proceeding, (I)(x) if the Senior Secured Obligations Secured Parties (or any subset thereof) are granted adequate protection in the form of a Lien on additional or replacement collateral ('**Senior Adequate Protection Liens**"), then the Applicable Second Lien Agent may seek or request adequate protection in the form of a Lien on such additional or replacement collateral ("**Junior Adequate Protection Liens**"), so long as, such Junior Adequate Protection Lien is subordinated to the Senior Adequate Protection Liens, on the same basis as the other Liens securing Junior Secured Obligations on the Common Collateral are subordinated to the Liens on Common Collateral securing the Senior Secured Obligations under this Agreement and (y) each of the Applicable Second Lien Agent, Junior Representatives and Junior Secured Obligations Secured Parties hereby agrees that in the event the Applicable Second Lien Agent or Junior Secured Obligations Secured Party seeks or requests adequate protection and such adequate protection is granted in the form of a Junior Adequate Protection Lien on additional or replacement collateral, then the Senior Secured Obligations Secured Parties (or the Applicable First Lien Agent or the relevant Senior Representative(s) acting on their behalf)

---

[1] **Note to DPW**: Section 2.06(c) does not prohibit the 2L from exercising any Permitted Remedies. This Section only provides that the 2L cannot object or otherwise contest any of the actions taken by the 1L that are described in clauses (i) – (iv). Accordingly, carving out Permitted Remedies is not necessary and potentially confusing.

shall also be granted a Senior Adequate Protection Lien on such additional or replacement collateral as adequate protection for the Senior Secured Obligations and any Junior Adequate Protection Lien on such additional or replacement collateral shall be subordinated to the Senior Adequate Protection Liens on such collateral on the same basis as the other Liens securing Junior Secured Obligations are so subordinated to the Liens securing the Senior Secured Obligations under this Agreement, and (II)(x) if the Senior Secured Obligations Secured Parties (or any subset thereof) are granted adequate protection in the form of a superpriority administrative claim, then the Applicable Second Lien Agent and the Junior Secured Obligations Secured Parties may seek or request adequate protection in the form of a superpriority administrative claim, so long as such claim is subordinated to the adequate protection superpriority claim granted to the holders of the applicable Senior Secured Obligations on the same basis as the other claims with respect to the Junior Secured Obligations are subordinated to the claims with respect to the Senior Secured Obligations under this Agreement and (y) each of the Applicable Second Lien Agent, Junior Representatives and Junior Secured Obligations Secured Parties hereby agrees that in the event the Applicable Second Lien Agent or Junior Secured Obligations Secured Party seeks or requests adequate protection and such adequate protection is granted in the form of a superpriority administrative claim, then the Senior Secured Obligations Secured Parties (or the Applicable First Lien Agent or the relevant Senior Representative(s) acting on their behalf) shall be granted a superpriority administrative claim and that any claim granted with respect to the Junior Secured Obligations shall be subordinated to the superpriority administrative claim granted with respect to the Senior Secured Obligations as adequate protection on the same basis as the claims with respect to the Junior Secured Obligations are so subordinated to the claims with respect to the Senior Secured Obligations under this Agreement. Without limiting the generality of the foregoing, to the extent that the Senior Secured Obligations Secured Parties are granted adequate protection in the form of payments in the amount of current post-petition fees and expenses, and/or other cash payments, then the Junior Representative, for itself and on behalf of each Junior Secured Obligations Secured Parties under its Second Lien Debt Facility, shall not be prohibited from seeking adequate protection in the form of payments in the amount of current post-petition incurred fees and expenses, and/or other cash payments (as applicable). Notwithstanding anything herein to the contrary, the First Lien Obligations Secured Parties shall not be deemed to have consented to, and expressly retain their rights to object to the grant of adequate protection in the form of cash payments to the Junior Secured Obligations Secured Parties.

(f)     Each of the Applicable Second Lien Agent, Junior Representatives and other Junior Secured Obligations Secured Parties hereby agrees that (i) it will not oppose or seek to challenge any claim by the Applicable First Lien Agent, any Senior Representative or any other Senior Secured Obligations Secured Party for allowance of Senior Secured Obligations consisting of post-petition interest, fees or expenses to the extent of the value of the applicable Senior Secured Obligations Secured Parties' Lien on the Senior Secured Obligations Collateral, without regard to the existence of the Lien of the Junior Secured Obligations Secured Parties on the Senior Secured Obligations Collateral; and (ii) until the Discharge of Senior Secured Obligations has occurred, each Applicable Second Lien Agent, on behalf of itself, the Junior Representatives and the Junior Secured Obligations Secured Parties, will not assert or enforce any claim under Section 506(c) of the Bankruptcy Code senior to or on a parity with the Liens on Senior Secured Obligations Collateral securing the Senior Secured Obligations for costs or expenses of preserving or disposing of any Collateral.

(g)     Each Representative, on behalf of itself and the applicable Secured Parties, acknowledges and intends that:  the grants of Liens pursuant to the Second Lien Obligations Security Documents and the First Lien Obligations Security Documents constitute separate and distinct grants of Liens, and because of, among other things, their differing rights in the Collateral, each of the First Lien Obligations and the Second Lien Obligations are fundamentally different from the other Classes of Obligations and must be separately classified in any Plan of Reorganization proposed or confirmed (or approved) in an Insolvency or Liquidation Proceeding. To further effectuate the intent of the parties as provided in the immediately preceding sentence, if it is held that the claims of any of the First Lien Obligations Secured Parties and/or the Second Lien Obligations Secured Parties in respect of any Collateral constitute claims in the same class (rather than separate classes of secured claims), then the First Lien Obligations Secured Parties and the Second Lien Obligations Secured Parties hereby acknowledge and agree that all distributions from the Common Collateral shall be made as if there were separate classes of First Lien Obligations, and Second Lien Obligations against the Grantors (with the effect being that, to the extent that the aggregate value of the Common Collateral is sufficient (for this purpose ignoring all claims held by the other Secured Parties for whom such Collateral is Junior Secured Obligations Collateral), the Senior Secured Obligations Secured Parties, shall be entitled to receive, in addition to amounts distributed to them in respect of principal, pre-petition interest and other claims, all amounts owing in respect of post-petition interest, fees or expenses that are available from the Senior Secured Obligations Collateral for each of the Senior Secured Obligations Secured Parties (regardless of whether any such claims may or may not be allowed or allowable in whole or in part as against the Company or any of the Grantors in the applicable Insolvency or Liquidation Proceeding(s) pursuant to Section 506(b) of the Bankruptcy Code or otherwise), respectively, before any distribution is made in respect of the Junior Claims from, or with respect to, such Collateral, with the holder of such Junior Claims hereby acknowledging and agreeing to turn over to the respective other Secured Parties amounts otherwise received or receivable by them from, or with respect to, such Collateral to the extent necessary to effectuate the intent of this sentence, even if such turnover has the effect of reducing their aggregate recoveries).

(h)     If, in any Insolvency or Liquidation Proceeding, debt obligations of the reorganized debtor secured by Liens upon any property of the reorganized debtor are distributed pursuant to a Plan of Reorganization or similar dispositive restructuring plan, on account of any Obligations, then, to the extent the debt obligations distributed on account of such Obligations are secured by Liens upon the Common Collateral, the provisions of this Agreement will survive the distribution of such debt obligations pursuant to such plan and will apply with like effect to the debt obligations so distributed, to the Liens securing such debt obligations and the distribution of proceeds thereof.

(i)     Unless and until the Discharge of all First Lien Obligations has occurred and except as otherwise expressly provided in this Section 2.06(i), if a Grantor (or any of its assets) is the subject of an Insolvency or Liquidation Proceeding and if any distribution is received by Second Lien Obligations Agent or any other Second Lien Obligations Secured Party in connection with such Insolvency or Liquidation Proceeding (including any distribution of Reorganization Securities), then such distribution shall, unless such distribution is made under a confirmed Plan of Reorganization of such Grantor that is accepted by the requisite affirmative vote of all classes composed of the claims of the First Lien Obligations Secured Parties or otherwise provides for the Discharge of all First Lien Obligations, be segregated and held in trust and forthwith paid over to

-28-

the Applicable First Lien Agent for the benefit of the First Lien Obligations Secured Parties in the same form as received, with any necessary endorsements or as a court of competent jurisdiction may otherwise direct. Unless and until the Discharge of all First Lien Obligations has occurred, the Second Lien Obligations Agents and each other Second Lien Obligations Secured Party shall be required to turnover to the Applicable First Lien Agent and the Applicable First Lien Agent shall be entitled to apply (or, in the case of non-cash proceeds, hold) in accordance with Section 2.01(a) any cash or non-cash distribution (including of Reorganization Securities) received by the Second Lien Obligations Secured Parties on account of the Second Lien Obligations pursuant to a confirmed Plan of Reorganization of a Grantor irrespective of whether such Plan of Reorganization (or any final order in respect thereof) purports to find that the distribution to the First Lien Obligations Secured Parties pays the First Lien Priority Obligations in full, unless such distribution is made under a confirmed Plan of Reorganization of such Grantor that is accepted by the requisite affirmative vote of all classes composed of the claims of the First Lien Obligations Secured Parties or otherwise provides for the Discharge of all First Lien Obligations. Each Second Lien Obligations Agent irrevocably authorizes and empowers the Applicable First Lien Agent, in the name of each Second Lien Obligations Secured Party, to demand, sue for, collect, and receive any and all such distributions in respect of any Second Lien Obligations to which the First Lien Obligations Secured Parties are entitled hereunder. In furtherance of the foregoing, the Applicable First Lien Agent is hereby authorized to make any such endorsements as agent for the Second Lien Obligations Agents or any such Second Lien Obligations Secured Parties. This authorization is coupled with an interest and is irrevocable until the Discharge of all First Lien Obligations has occurred.

(j)     The provisions of Section 1129(b)(1) of the Bankruptcy Code notwithstanding, the Second Lien Obligations Secured Parties agree that they will not propose, support, or vote in favor of any Plan of Reorganization of a Grantor that (A) is not accepted by the requisite affirmative vote of all classes composed of the claims of the First Lien Obligations Secured Parties or (B) does not otherwise provide for the Discharge of all First Lien Obligations on the effective date of such Plan of Reorganization.

**SECTION 2.07.     Reinstatement**. In the event that any of the Obligations shall have been paid in full and such payment or any part thereof shall subsequently, for whatever reason (including an order or judgment for disgorgement of a preference under the Bankruptcy Code, or any similar law, or the settlement of any claim in respect thereof), be required to be returned or repaid, the terms and conditions of this Article II shall be fully applicable thereto until all such Obligations shall again have been paid in full in cash.

**SECTION 2.08.     Insurance**. As among the Representatives, only the Applicable First Lien Agent will have the right (subject to the rights of the Grantors under the First Lien Term Facility Documents, the Other First Lien Obligations Documents, the Second Lien Obligations Documents and the Other Second Lien Obligations Documents) to adjust or settle any insurance policy or claim covering or constituting the Common Collateral in the event of any loss thereunder and to approve any award granted in any condemnation or similar proceeding affecting the Common Collateral.

**SECTION 2.09.     Refinancings**. The First Lien Term Facility Obligations, the Second Lien Term Facility Obligations, any Series of Other First Lien Obligations, any Series of

-29-

Other Second Lien Obligations and the agreements or indentures governing them may be Refinanced, in each case, without notice to, or the consent (except to the extent a consent is otherwise required to permit the refinancing transaction under any First Lien Term Facility Document, any Second Lien Term Facility Document, any applicable Other First Lien Obligations Document or any applicable Other Second Lien Obligations Document) of any First Lien Term Facility Secured Party, any Second Lien Term Facility Secured Party, any Other First Lien Obligations Secured Party or any Other Second Lien Obligations Secured Party, all without affecting the priorities provided for herein or the other provisions hereof; *provided*, *however*, that the requirements set forth in Section 5.14 shall have been satisfied. In connection with any Refinancing contemplated by this Section 2.09, this Agreement may be amended at the request and sole expense of the Company, and without the consent of any Representative, (a) to add parties (or any authorized agent or trustee therefor) providing any such Refinancing and (b) to confirm that such Refinancing Indebtedness in respect of any Senior Secured Obligations shall have the same rights and priorities in respect of any Common Collateral as the Indebtedness being Refinanced, all on the terms provided for herein immediately prior to such Refinancing.

**SECTION 2.10.** **Amendments to Credit Documents; Notices of Default**.

(a)  Each of the Applicable Second Lien Agent and Junior Representatives agrees that each applicable Junior Secured Obligations Document executed as of the date hereof shall include the following language (or language to similar effect approved by the Applicable First Lien Agent):

> "Notwithstanding anything herein to the contrary, (i) the liens and security interests granted to [applicable Junior Representative] for the benefit of the [applicable Junior Secured Obligations Secured Parties] pursuant to this Agreement and (ii) the exercise of any right or remedy by [applicable Junior Representative] hereunder or the application of proceeds (including insurance proceeds and condemnation proceeds) of any Common Collateral, are subject to the provisions of the Intercreditor Agreement dated as of [  ], 2021 (as amended, restated, amended and restated, supplemented, replaced or otherwise modified from time to time, the "***Intercreditor Agreement***"), among Goldman Sachs Bank USA, as First Lien Term Facility Agent and Applicable First Lien Agent, Cantor Fitzgerald Securities, as Second Lien Term Facility Agent and Applicable Second Lien Agent, [Holdings], [Borrower], and the Subsidiaries of [Borrower] party thereto. In the event of any conflict between the terms of the Intercreditor Agreement and the terms of this Agreement, the terms of the Intercreditor Agreement shall govern."

(b)  In the event that the Applicable First Lien Agent, any Senior Representative or any Senior Secured Obligations Secured Party enters into any amendment, waiver or consent in respect of or replaces any Senior Secured Obligations Collateral Document for the purpose of adding to, or deleting from, or waiving or consenting to any departures from any provisions of, any Senior Secured Obligations Collateral Document or changing in any manner the rights of the

-30-

Applicable First Lien Agent, the applicable Senior Representative or the applicable Senior Secured Obligations Secured Parties, the Company or any other Grantor thereunder (including the release of any Liens on any Senior Secured Obligations Collateral), then such amendment, waiver or consent shall apply automatically to any comparable provision of each Comparable Junior Obligations Collateral Document without the consent of the Applicable Second Lien Agent, any Junior Representative or any Junior Secured Obligations Secured Party and without any action by any of the Applicable Second Lien Agent, Junior Representative or Junior Secured Obligations Secured Party; *provided*, that such amendment, waiver or consent does not materially adversely affect the rights of the Applicable Second Lien Agent, any Junior Representative or any Junior Secured Obligations Secured Party in the Senior Secured Obligations Collateral unless the Senior Secured Obligations Secured Parties that have a security interest in the affected Collateral are also affected in a substantially similar manner (without regard to the fact that the Liens of such Senior Secured Obligations Collateral Document are senior to the Liens of the Comparable Junior Obligations Collateral Document). The relevant Applicable First Lien Agent or Senior Representative shall give written notice of such amendment, waiver or consent to the Applicable Second Lien Agent (which shall forward such notice upon receipt to each relevant Junior Representative); *provided* that the failure to give such notice shall not affect the effectiveness of such amendment, waiver or consent with respect to the provisions of any Comparable Junior Obligations Collateral Document as set forth in this Section 2.10(b).

(c)     Without the prior written consent of the Applicable First Lien Agent, no Second Lien Obligations Document may be amended, supplemented or otherwise modified or entered into to the extent such amendment, supplement or modification, or the terms of any new Second Lien Obligations Document, would be prohibited by, or would require any Grantor to act or refrain from acting in a manner that would violate, any of the terms of this Agreement.

(d)     Without the prior written consent of the Applicable Second Lien Agent, no First Lien Obligations Document may be amended, supplemented or otherwise modified or entered into to the extent such amendment, supplement or modification, or the terms of any new First Lien Obligations Document, would be prohibited by, or would require any Grantor to act or refrain from acting in a manner that would violate, any of the terms of this Agreement.

(e)     In making the determinations required by Section 2.10(c) or (d), the Applicable First Lien Agent or the Applicable Second Lien Agent, as applicable, may rely on an officers' certificate of the Company.

(f)     Each Representative shall promptly notify each other Representative of any notice or declaration of the occurrence of any Default or Event of Default known to it under any First Lien Obligations Document or Second Lien Obligations Document, as the case may be.

SECTION 2.11.     **Possessory Collateral Agent as Gratuitous Bailee for Perfection**. (a) Each Representative, on behalf of itself and the relevant Secured Parties, hereby agrees that:  (i) each Possessory Collateral Agent shall hold the Possessory Collateral that is in its possession or control (or in the possession or control of its agents or bailees) as gratuitous bailee for the benefit of each Secured Party and any assignee solely for the purpose of perfecting the security interest granted in such Possessory Collateral pursuant to the First Lien Term Facility Security Documents, the Second Lien Term Facility Security Documents, the Other First Lien

Obligations Security Documents and the Other Second Lien Obligations Security Documents, subject to the terms and conditions of this Section 2.11; (ii) to the extent any Possessory Collateral is possessed by or is under the control of a Collateral Agent (either directly or through its agents or bailees) other than the Applicable Possessory Collateral Agent, such Collateral Agent shall deliver such Possessory Collateral to (or shall cause such Possessory Collateral to be delivered to) the Applicable Possessory Collateral Agent and shall take all actions reasonably requested in writing by the Applicable Possessory Collateral Agent to cause the Applicable Possessory Collateral Agent to have possession or control of same; and (iii) pending such delivery to the Applicable Possessory Collateral Agent, each other Collateral Agent shall hold any Possessory Collateral as gratuitous bailee for the benefit of each other Secured Party and any assignee, solely for the purpose of perfecting the security interest granted in such Possessory Collateral, if any, pursuant to the applicable First Lien Term Facility Security Documents, Second Lien Term Facility Security Documents, Other First Lien Obligations Security Documents or Other Second Lien Obligations Security Documents, in each case, subject to the terms and conditions of this Section 2.11.

(a) The duties or responsibilities of the Possessory Collateral Agent and each other Collateral Agent under this Section 2.11 shall be limited solely to holding the Possessory Collateral as gratuitous bailee for the benefit of each Secured Party for purposes of perfecting the security interest held by the Secured Parties therein.

(b) The Applicable First Lien Agent hereby agrees that, upon the Discharge of all First Lien Obligations, it shall deliver to the Applicable Second Lien Agent, to the extent that it is legally permitted to do so, the remaining Possessory Collateral (if any) held by it, together with any necessary endorsements (or otherwise allow the Applicable Second Lien Agent to obtain control of such Possessory Collateral) or as a court of competent jurisdiction may otherwise direct. The Company shall take such further action as is required to effectuate the transfer contemplated hereby and shall indemnify the Possessory Collateral Agent for loss or damage suffered by the Possessory Collateral Agent as a result of such transfer except for loss or damage suffered by the Possessory Collateral Agent as a result of its own willful misconduct, gross negligence or bad faith, as determined by the final judgment of a court of competent jurisdiction. None of the First Lien Obligations Secured Parties shall be obligated to follow instructions from the Applicable Second Lien Agent in contravention of this Agreement.

**SECTION 2.12.** **Second Lien Purchase Right.**

(a) Purchase Right.

(i) Without prejudice to the enforcement of the First Lien Obligations Secured Parties' remedies, the First Lien Obligations Secured Parties agree that following (A) the acceleration of all First Lien Obligations in accordance with the terms of the First Lien Obligations Documents or (B) the commencement of an Insolvency or Liquidation Proceeding (each, a "***Purchase Event***"), within thirty (30) days of the Purchase Event, one or more of the Second Lien Obligations Secured Parties (the "***Purchasing Parties***") may irrevocably elect by delivery of written notice to the Applicable First Lien Agent (a "***Purchase Notice***") within such thirty (30) day period, to purchase all, but not less than all, of the aggregate amount

-32-

of outstanding First Lien Obligations outstanding at the time of purchase (including all amounts outstanding or owing under any DIP Financing provided by any of the First Lien Obligations Secured Parties, the "***Purchase Obligations***") for the Purchase Price (as defined below), without warranty or representation or recourse (except for representations and warranties required to be made by assigning lenders pursuant to the Assignment and Acceptance (as such term is defined in the applicable First Lien Obligations Documents)). A Purchase Notice shall: (1) be signed by the Purchasing Parties, (2) state that it is a Purchase Notice pursuant to this Section 2.12, (3) state that each Purchasing Party is irrevocably electing to purchase, in accordance with this Section 2.12, the percentage of all of the Purchase Obligations stated in the Purchase Notice for that Purchasing Party, which percentages must aggregate exactly 100% for all Purchasing Parties, and (4) designates a purchase date (the "***Purchase Date***") on which the purchase will occur, that is at least five (5) but not more than ten (10) Business Days after the Applicable First Lien Agent's receipt of the Purchase Notice. A Purchase Notice will be ineffective if it is received by the Applicable First Lien Agent after the occurrence giving rise to the Purchase Event is waived, cured, or otherwise ceases to exist.

(ii) Upon the Applicable First Lien Agent's receipt of an effective Purchase Notice conforming to this Section 2.12, the Purchasing Parties will be irrevocably obligated to purchase, and the First Lien Obligations Secured Parties will be irrevocably obligated to sell, the Purchase Obligations in accordance with and subject to this Section 2.12.

(iii) The obligations of the First Lien Obligations Secured Parties to sell their respective Purchase Obligations under this Section 2.12 are several and not joint and several. If a First Lien Obligations Secured Party breaches its obligation to sell its Purchase Obligations under this Section 2.12 (a "***Defaulting Creditor***"), no other First Lien Obligations Secured Party will be obligated to purchase the Defaulting Creditor's Purchase Obligations for resale to the Purchasing Parties. A First Lien Obligations Secured Party that complies with this Section 2.12 will not be in default of this Agreement or otherwise be deemed liable for any action or inaction of any Defaulting Creditor.

(iv) Each Grantor hereby consents to any assignment effected to one or more Purchasing Parties pursuant to this Section 2.12.

(b) Purchase Price. The purchase price (the "***Purchase Price***") for the Purchase Obligations will equal the sum of the outstanding First Lien Obligations, including (a) the par principal amount of all loans, advances, or similar extensions of credit included in the Purchase Obligations, and all accrued and unpaid fees and interest thereon through the Purchase Date, (b) all accrued and unpaid fees, expenses, indemnities, and other amounts owed to the First Lien Obligations Secured Parties under the First Lien Obligations Documents on the Purchase Date and (c) amounts according to the good faith estimate of the Applicable First Lien Agent of contingent obligations in respect of claims which are known to the Applicable First Lien Agent or the First Lien Obligations Secured Parties.

(c)     <u>Purchase Closing</u>. On the Purchase Date, (a) the Purchasing Parties will execute and deliver an Assignment and Acceptance or other documentation mutually acceptable to each of the Applicable First Lien Agent and the Purchasing Parties (it being understood that such purchase and the consummation thereof will be effective without the execution of such an Assignment and Acceptance or other documentation by any other First Lien Obligations Secured Party), (b) the Purchasing Parties will pay or cause to be paid the Purchase Price to the Applicable First Lien Agent by wire transfer of immediately available funds, and (c) each of the Purchasing Parties will execute and deliver to the Applicable First Lien Agent a waiver and release of, and covenant not to sue the Applicable First Lien Agent and the First Lien Obligations Secured Parties in respect of, all claims arising out of this Agreement and the transactions contemplated hereby as a result of exercising the purchase option contemplated by this Section 2.12.

(d)     <u>Expiration of Purchase Option</u>. If none of the Second Lien Obligations Secured Parties exercise such right within thirty (30) days of such Purchase Event, the First Lien Obligations Secured Parties shall have no further obligations pursuant to this Section 2.12 for such Purchase Event and may take any further actions in their sole discretion in accordance with the First Lien Obligations Documents and this Agreement.

**SECTION 2.13.     <u>Similar Liens and Agreements</u>**. The Secured Parties intend that the Collateral securing the First Lien Obligations and the Collateral securing the Second Lien Obligations be identical.  In furtherance of the foregoing, the Secured Parties agree:

(a)     to use commercially reasonable efforts to cooperate in determining, upon the reasonable written request of the Applicable First Lien Agent or the Applicable Second Lien Agent, the specific assets included in the Collateral securing their respective Obligations, the steps taken to perfect the Liens thereon and the identity of the applicable Grantors;

(b)     that the Second Lien Obligations Security Documents shall be in all material respects in the same form as the First Lien Obligations Security Documents, other than with respect to the first priority and second priority nature of the Liens created or evidenced thereunder, the identity of the Secured Parties that are parties thereto and other matters contemplated by this Agreement;

(c)     that at no time shall there be any guarantor in respect of the Second Lien Obligations that is not also a guarantor in respect of the First Lien Obligations, and vice versa; and

(d)     that in the event that any Second Lien Obligations Secured Party becomes a judgment lien creditor as a result of its enforcement of its rights as an unsecured creditor, such judgment Lien shall be subject to the terms of this Agreement for all purposes to the same extent as all other Liens securing the Second Lien Obligations are subject to the terms of this Agreement.

## ARTICLE III

## <u>EXISTENCE AND AMOUNTS OF LIENS AND OBLIGATIONS</u>

Whenever a Representative shall be required, in connection with the exercise of its rights or the performance of its obligations hereunder, to determine the existence or amount of any

-34-

Senior Secured Obligations (or the existence of any commitment to extend credit that would constitute Senior Secured Obligations) or Junior Secured Obligations, or the Common Collateral subject to any such Lien, it may request that such information be furnished to it in writing by the other Representatives and shall be entitled to make such determination on the basis of the information so furnished; *provided*, *however*, that if a Representative shall fail or refuse reasonably promptly to provide the requested information, the requesting Representative shall be entitled to make any such determination by such method as it may, in the exercise of its good faith judgment, determine, including by reliance upon a certificate of the Company. Each Representative may rely conclusively, and shall be fully protected in so relying, on any determination made by it in accordance with the provisions of the preceding sentence (or as otherwise directed by a court of competent jurisdiction) and shall have no liability to the Company or any of its Subsidiaries, any Secured Party or any other Person as a result of such determination.

**ARTICLE IV**

**CONSENT OF GRANTORS**

Each Grantor hereby consents to the provisions of this Agreement and the intercreditor arrangements provided for herein and agrees that the obligations of the Grantors under the First Lien Term Facility Security Documents, the Second Lien Term Facility Security Documents, the Other First Lien Obligations Security Documents and the Other Second Lien Obligations Security Documents will in no way be diminished or otherwise affected by such provisions or arrangements (except as expressly provided herein or therein).

**ARTICLE V**

**MISCELLANEOUS**

**SECTION 5.01.     Notices**.  All notices and other communications provided for herein shall be in writing and shall be delivered by hand or overnight courier service, mailed by certified or registered mail, or sent by facsimile and sent to the e-mail address of the applicable recipient specified below (or the email address of a representative of the applicable recipient designated by such recipient from time to time to the parties hereto), as follows:

(a)     if to the Applicable First Lien Agent as of the date hereof, to it at:

> Goldman Sachs Bank USA
> 2001 Ross Avenue
> Suite 2800
> Dallas, Texas 75201
> Attention:  [Borrower], Account Manager
> Email: Brendan.green@gs.com; matt.carter@gs.com; and
> gs-slg-notices@gs.com

With a copy (which shall not constitute notice) to:

> Vinson & Elkins LLP

-35-

Trammell Crow Center
2001 Ross Avenue, Suite 3700
Dallas, TX 75201-2975
Attention: Christopher J. Dewar
Email: cdewar@velaw.com

(b)    if to the Applicable Second Lien Agent as of the date hereof, to it at:

Cantor Fitzgerald Securities
1801 N. Military Trail, Suite 202
Boca Raton, Florida 33431
Attention:    N. Horning (Fieldwood Administrative Agency)
Email:    nhorning@cantor.com

Cantor Fitzgerald Securities
900 West Trade Street, Suite 725
Charlotte, North Carolina 28202
Attention:    B. Young (Fieldwood Administrative Agency)
Email:    byoung@cantor.com

With a copy (which shall not constitute notice) to:

Davis Polk & Wardwell LLP
450 Lexington Avenue
New York, NY 10017
Attention:    Scott Herrig
Email:    scott.herrig@davispolk.com

With a copy (which shall not constitute notice) to:

Shipman & Goodwin LLP
One Constitution Plaza
Hartford, Connecticut 06103
Attention:    N. Plotkin (Fieldwood)
Email:    nplotkin@goodwin.com

(c)    if to the Company, to it at:

[BORROWER]
2000 W. Sam Houston Pkwy. S., Suite 1200
Houston, TX 77042
Attention:  Mike Dane, Chief Financial Officer
Fax:  (713) 969-1099
 Email:  mdane@fwellc.com

-36-

With a copy to (which shall not constitute notice) to:

> Weil, Gotshal & Manges LLP
> 200 Crescent Court, Suite 300
> Dallas, Texas  75201
> Attention:  Courtney S. Marcus
> Fax:  (214) 746-7700
> Email:  courtney.marcus@weil.com; and

(d)  if to any other Grantor, to it in care of the Company as provided in clause (c) above.

Any party hereto may change its address or facsimile number for notices and other communications hereunder by notice to the other parties hereto in accordance with this Section 5.01 (and for this purpose a notice to the Company shall be deemed to be a notice to each Grantor). All notices and other communications given to any party hereto in accordance with the provisions of this Agreement shall be deemed to have been given on the date of receipt (if a Business Day) and on the next Business Day thereafter (in all other cases) (as reflected by the courier's receipt). Receipt by email shall not be deemed to be receipt.

SECTION 5.02.  **Waivers; Amendment**.  (a) No failure or delay on the part of any party hereto in exercising any right or power hereunder shall operate as a waiver thereof, nor shall any single or partial exercise of any such right or power, or any abandonment or discontinuance of steps to enforce such a right or power, preclude any other or further exercise thereof or the exercise of any other right or power.  The rights and remedies of the parties hereto are cumulative and are not exclusive of any rights or remedies that they would otherwise have.  No waiver of any provision of this Agreement or consent to any departure by any party therefrom shall in any event be effective unless the same shall be permitted by clause (b) of this Section, and then such waiver or consent shall be effective only in the specific instance and for the purpose for which given.  No notice or demand on any party hereto in any case shall entitle such party to any other or further notice or demand in similar or other circumstances.

(b)  Subject to the last sentence of Section 2.10(b) and Section 5.14 hereof, neither this Agreement nor any provision hereof may be terminated, waived, amended or modified except pursuant to an agreement or agreements in writing entered into by the Applicable First Lien Agent (as directed by the Representative of each Series of the First Lien Obligations (with the consent of the relevant First Lien Obligations Secured Parties of such Series to the extent required by, and in accordance with, the terms of the applicable First Lien Obligations Documents)), the Applicable Second Lien Agent (as directed by the Representative of each Series of Second Lien Obligations (with the consent of the relevant Second Lien Obligations Secured Parties of such Series to the extent required by, and in accordance with, the terms of the applicable Second Lien Obligations Documents)) and, to the extent such amendment, waiver or modification adversely affects its rights and obligations, the Company.

SECTION 5.03.  **Parties in Interest**.  This Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns, as well as

-37-

the other First Lien Term Facility Secured Parties, the other Second Lien Term Facility Secured Parties, the Other First Lien Obligations Secured Parties and the Other Second Lien Obligations Secured Parties, all of whom are intended to be bound by, and to be third party beneficiaries of, this Agreement.

SECTION 5.04.    **Survival of Agreement**.    All covenants, agreements, representations and warranties made by any party in this Agreement shall be considered to have been relied upon by the other parties hereto and shall survive the execution and delivery of this Agreement.

SECTION 5.05.    **Counterparts**.    This Agreement may be executed in counterparts, each of which shall constitute an original but all of which when taken together shall constitute a single contract. Delivery of an executed signature page to this Agreement by electronic or facsimile transmission shall be as effective as delivery of a manually signed counterpart of this Agreement. The words "execution," "signed," "signature," and words of like import in any shall in each case be deemed to include electronic signatures, signatures exchanged by electronic transmission, or the keeping of records in electronic form, each of which shall be of the same legal effect, validity or enforceability as a manually executed signature or the use of a paper-based recordkeeping system, as the case may be, to the extent and as provided for in any applicable law, including the Federal Electronic Signatures in Global and National Commerce Act, the New York State Electronic Signatures and Records Act, or any other similar state laws based on the Uniform Electronic Transactions Act; *provided*, any Collateral Agent may request, and upon any such request the other parties shall be obligated to provide, manually executed "wet ink" signatures to this Agreement or any related document.

SECTION 5.06.    **Severability**.    Any provision of this Agreement held to be invalid, illegal or unenforceable in any jurisdiction shall, as to such jurisdiction, be ineffective to the extent of such invalidity, illegality or unenforceability without affecting the validity, legality and enforceability of the remaining provisions hereof; and the invalidity of a particular provision in a particular jurisdiction shall not invalidate such provision in any other jurisdiction. The parties shall endeavor in good-faith negotiations to replace the invalid, illegal or unenforceable provisions with valid provisions the economic effect of which comes as close as possible to that of the invalid, illegal or unenforceable provisions.

SECTION 5.07.    **Governing Law; Jurisdiction; Consent to Service of Process**.  (a) This Agreement shall be governed by, and construed in accordance with, the law of the State of New York.

(b)    Each party hereto hereby irrevocably and unconditionally submits, for itself and its property, to the exclusive jurisdiction of the Supreme Court of the State of New York sitting in New York County and of the United States District Court of the Southern District of New York, and any appellate court from any thereof, in any action or proceeding arising out of or relating to this Agreement, or for recognition or enforcement of any judgment, and each of the parties hereto hereby irrevocably and unconditionally agrees that all claims in respect of any such action or proceeding may be heard and determined in such New York State or, to the extent permitted by law, in such Federal court. Each of the parties hereto agrees that a final judgment in any such action or proceeding shall be conclusive and may be enforced in other jurisdictions by suit on the

-38-

judgment or in any other manner provided by law. Nothing in this Agreement shall affect any right that any party hereto may otherwise have to bring any action or proceeding relating to this Agreement in the courts of any jurisdiction.

(c)     Each party hereto hereby irrevocably and unconditionally waives, to the fullest extent it may legally and effectively do so, any objection which it may now or hereafter have to the laying of venue of any suit, action or proceeding arising out of or relating to this Agreement in any court referred to in clause (b) of this Section 5.07. Each of the parties hereto hereby irrevocably waives, to the fullest extent permitted by law, the defense of an inconvenient forum to the maintenance of such action or proceeding in any such court.

(d)     Each party to this Agreement irrevocably consents to service of process in the manner provided for notices in Section 5.01. Nothing in this Agreement will affect the right of any party to this Agreement to serve process in any other manner permitted by law.

### SECTION 5.08.     <u>WAIVER OF JURY TRIAL</u>

. EACH PARTY HERETO HEREBY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN ANY LEGAL PROCEEDING DIRECTLY OR INDIRECTLY ARISING OUT OF OR RELATING TO THIS AGREEMENT. EACH PARTY HERETO (A) CERTIFIES THAT NO REPRESENTATIVE, AGENT OR ATTORNEY OF ANY OTHER PARTY HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PARTY WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER AND (B) ACKNOWLEDGES THAT IT AND THE OTHER PARTIES HERETO HAVE BEEN INDUCED TO ENTER INTO THIS AGREEMENT BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS SECTION.

### SECTION 5.09.     <u>Headings</u>

. Article, Section and Annex headings used herein are for convenience of reference only, are not part of this Agreement and are not to affect the construction of, or to be taken into consideration in interpreting, this Agreement.

### SECTION 5.10.     <u>Conflicts</u>

. In the event of any conflict or inconsistency between the provisions of this Agreement and the provisions of any of the First Lien Term Facility Documents, the Second Lien Term Facility Documents, any Other First Lien Obligations Documents and/or any Other Second Lien Obligations Documents, the provisions of this Agreement shall control.

### SECTION 5.11.     <u>Provisions Solely to Define Relative Rights</u>

. The provisions of this Agreement are and are intended solely for the purpose of defining the relative rights of the First Lien Obligations Secured Parties as a group, on the one hand, and the Second Lien Obligations Secured Parties as a group, on the other hand, in relation to one another. None of Holdings, the Company or any other Grantor shall have any rights or obligations hereunder, except as expressly provided in this Agreement. Nothing in this Agreement is intended

-39-

to or shall impair the obligations of Holdings, the Company or any other Grantor, which are absolute and unconditional, to pay the Obligations as and when the same shall become due and payable in accordance with their terms. Notwithstanding anything to the contrary herein or in any First Lien Term Facility Document, any Second Lien Term Facility Document, any Other First Lien Obligations Document or any Other Second Lien Obligations Document, the Grantors shall not be required to act or refrain from acting pursuant to this Agreement, any First Lien Term Facility Document, any Second Lien Term Facility Document, any Other First Lien Obligations Document or any Other Second Lien Obligations Document, as the case may be, with respect to any Common Collateral in any manner that would cause a default under any First Lien Term Facility Document, any Second Lien Term Facility Document, any Other First Lien Obligations Document or any Other Second Lien Obligations Document.

SECTION 5.12.    **Agent Capacities**.  Except as expressly set forth herein, none of the First Lien Term Facility Agent, the Second Lien Term Facility Agent, the Other First Lien Obligations Agents or the Other Second Lien Obligations Agents shall have any duties or obligations in respect of any of the Collateral, all of such duties and obligations, if any, being subject to and governed by the First Lien Term Facility Documents, the Second Lien Term Facility Documents, the applicable Other First Lien Obligations Documents or the applicable Other Second Lien Obligations Documents, as the case may be.  It is understood and agreed that (i) Goldman Sachs is entering into this Agreement in its capacity as administrative agent and collateral agent under the First Lien Term Loan Agreement referred to in clause (i) of the definition of First Lien Term Facility, and the provisions of Article VIII of the First Lien Term Loan Agreement referred to in clause (i) of the definition of the First Lien Term Facility applicable to Goldman Sachs as administrative agent and collateral agent thereunder shall also apply to Goldman Sachs as the First Lien Term Facility Agent hereunder and (ii) Cantor is entering into this Agreement in its capacity as administrative agent and collateral agent under the Second Lien Term Loan Agreement referred to in clause (i) the definition of Second Lien Term Facility, and the provisions of Article VIII of the Second Lien Term Loan Agreement referred to in clause (i) of the definition of the Second Lien Term Facility applicable to Cantor as administrative agent and collateral agent thereunder shall also apply to Cantor as the Second Lien Term Facility Agent hereunder.

SECTION 5.13.    **Supplements**.  Upon the execution by any Subsidiary of the Company of a supplement hereto in form and substance satisfactory to the Applicable First Lien Agent and the Applicable Second Lien Agent, such Subsidiary shall be a party to this Agreement and shall be bound by the provisions hereof to the same extent as the Company and each Grantor are so bound.

SECTION 5.14.    **Requirements For Consent and Acknowledgment**.  The Company may designate hereunder additional Indebtedness as Other First Lien Obligations, Other Second Lien Obligations or as a Refinancing of the First Lien Obligations of any Series if the incurrence of such obligations is permitted under each of the First Lien Obligations Documents, Second Lien Obligations Documents and this Agreement.  If so permitted, the Company shall (i) notify the Applicable First Lien Agent and the Applicable Second Lien Agent (and the applicable agent shall forward such notice to each Representative then existing) and (ii) cause any Applicable First Lien Agent and the Applicable Second Lien Agent in connection with such Refinancing and the (1) applicable Other First Lien Obligations Agent or (2) applicable Other Second Lien Obligations Agent, as applicable, to execute and deliver to each Representative then existing, a

-40-

Consent and Acknowledgment substantially in the form of Exhibit A-1 or Exhibit A-2, as applicable, hereto. It is understood and agreed that no consent of any of the applicable Secured Parties is required to effect any amendment or supplement hereto that is for the purpose of adding the holders (or their representatives) of Other First Lien Obligations, Other Second Lien Obligations or any Obligations in respect of any Refinancing of any First Lien Obligations or Second Lien Obligations, in each case, as expressly contemplated by (and only to the extent the incurrence thereof is permitted by) the terms of this Agreement. Any such amendment or supplement may make such changes to the terms of this Agreement to the extent that, in the good faith determination of the Applicable First Lien Agent and the Applicable Second Lien Agent, such changes are required to effectuate the foregoing.

**SECTION 5.15.** **Intercreditor Agreements**.

Notwithstanding anything to the contrary contained in this Agreement, each party hereto agrees that the First Lien Obligations Secured Parties (as among themselves) and the Second Lien Obligations Secured Parties (as among themselves) may each enter into intercreditor agreements (or similar arrangements) with the Applicable First Lien Agent or the Applicable Second Lien Agent, respectively, governing the rights, benefits and privileges as among the First Lien Obligations Secured Parties or the Second Lien Obligations Secured Parties, as the case may be, in respect of the Common Collateral, this Agreement, the First Lien Term Facility Documents, the Second Lien Term Facility Documents, any Other First Lien Obligations Document or any Other Second Lien Obligations Document, as the case may be, including as to the application of Proceeds of the Common Collateral, voting rights, control of the Common Collateral and waivers with respect to the Common Collateral, in each case so long as the terms thereof do not violate or conflict with the provisions of this Agreement or any First Lien Obligations Documents or Second Lien Obligations Documents, as the case may be, including without limitation any Pari Passu First Lien Intercreditor Agreement and any Pari Passu Second Lien Intercreditor Agreement. In any event, if a respective intercreditor agreement (or similar arrangement) exists, the provisions thereof shall not be (or be construed to be) an amendment, modification or other change to this Agreement, any First Lien Term Facility Document, any Second Lien Term Facility Document, any Other First Lien Obligations Document or any Other Second Lien Obligations Document, and the provisions of this Agreement, the First Lien Term Facility Documents, the Second Lien Term Facility Documents, any Other First Lien Obligations Documents and any Other Second Lien Obligations Documents shall remain in full force and effect in accordance with the terms hereof and thereof (as such provisions may be amended, supplemented or otherwise modified from time to time in accordance with the terms thereof, including to give effect to any such intercreditor agreement (or similar arrangement)).

**SECTION 5.16.** **Other Junior Intercreditor Agreements**

. In addition, in the event that Holdings, the Company or any Subsidiary incurs any obligations secured by a lien on any Common Collateral that is junior to the First Lien Obligations or the Second Lien Obligations, then the Applicable First Lien Agent and/or the Applicable Second Lien Agent, as the case may be, may enter into an intercreditor agreement with the agent or trustee for the lenders with respect to such secured obligation to reflect the relative lien priorities of such parties with respect to such Collateral and governing the relative rights, benefits and privileges as among such parties in respect of the Common Collateral, including as to application of Proceeds

-41-

of the Common Collateral, voting rights, control of the Common Collateral and waivers with respect to the Common Collateral, in each case so long as such secured obligations are permitted under, and the terms of such intercreditor agreement do not violate or conflict with, the provisions of this Agreement, any First Lien Obligations Documents or any Second Lien Obligations Documents, as the case may be. If any such intercreditor agreement (or similar arrangement) is entered into, the provisions thereof shall not be (or be construed to be) an amendment, modification or other change to this Agreement, any First Lien Obligations Documents or any Second Lien Obligations Documents, and the provisions of this Agreement, the First Lien Obligations Documents and the Second Lien Obligations Documents shall remain in full force and effect in accordance with the terms hereof and thereof (as such provisions may be amended, modified or otherwise supplemented from time to time in accordance with the respective terms thereof, including to give effect to any intercreditor agreement (or similar arrangement)).

      **SECTION 5.17.**     **<u>Further Assurances</u>**.

      Each of the Applicable First Lien Agent, on behalf of itself and each First Lien Obligations Secured Party, and the Applicable Second Lien Agent, on behalf of itself and each Second Lien Obligations Secured Party agree that it and each of them shall take such further action and shall execute and deliver to the other Applicable First Lien Agent or the Applicable Second Lien Agent, as the case may be, and the Secured Parties of the other Class such additional documents and instruments (in recordable form, if requested) as the Applicable First Lien Agent or the Applicable Second Lien Agent, as the case may be, or such Secured Parties may reasonably request to effectuate the terms of, and the Lien priorities contemplated by, this Agreement, all at the sole expense of the Grantors.

      **[Signature Pages Follow.]**

US 8016171v.9 **Error! Unknown document property name.**
WEIL:\98021004\1\45327.0007

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed by their respective authorized officers as of the day and year first above written.

GOLDMAN SACHS BANK USA, as First Lien Term Facility Agent and Applicable First Lien Agent

By: _____
     Name:
     Title:

CANTOR FITZGERALD SECURITIES, as Second Lien Term Facility Agent and Applicable Second Lien Agent

By: _____
     Name:
     Title:

**Signature Page to Intercreditor Agreement**

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed by their respective authorized officers as of the day and year first above written.

[HOLDINGS]

By: _____

    Name:

    Title:


[BORROWER]

By: _____

    Name:

    Title:


[INTERMEDIATE]

By: _____

    Name:

    Title:


[CREDIT BID PURCHASER]

By: _____

    Name:

    Title:


[SUBSIDIARIES]

By: _____

    Name:

    Title:

**Signature Page to Intercreditor Agreement**

**EXHIBIT A-1**

CONSENT AND ACKNOWLEDGMENT[2]
(Other First Lien Obligations)

This CONSENT AND ACKNOWLEDGMENT (this "***Consent***") dated as of [mm] [dd], [yyyy], is executed by [          ], as an Other First Lien Obligations Agent (the "New Agent"), and acknowledged by [          ], as the Applicable First Lien Agent, [          ], as the Applicable Second Lien Agent, [Holdings], and [Borrower] (on behalf of itself and certain of its Subsidiaries).

This Consent is with respect to that certain Intercreditor Agreement, dated as of [          ], 2021 (as the same may be amended, restated, amended and restated,  supplemented or otherwise modified from time to time, the "***Intercreditor Agreement***"), by and among the parties (other than the New Agent) referred to above. Capitalized terms used but not defined herein shall have the meanings assigned thereto in the Intercreditor Agreement.

Reference is made to [describe new indebtedness] with respect to which [new agents] (the "***New Agent***") is acting as [trustee/collateral agent/authorized representative].

The New Agent hereby (a) agrees to be bound by the terms of the Intercreditor Agreement as an Other First Lien Obligations Agent as if it were an Other First Lien Obligations Agent as of the date of the Intercreditor Agreement and (b) represents that it is acting in the capacity of Other First Lien Obligations Agent solely for the Secured Parties under [          ].

This Consent shall be governed by, and construed in accordance with, the law of the State of New York.

[Signature Page Follows.]

---

[2] To be updated in the event of a Refinancing debt.

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed by their respective authorized officers as of the day and year first above written.

[NEW AGENT]

By: _____

Title:

Name:

Acknowledged and Confirmed by, for purposes of the Intercreditor Agreement:

[      ], as Applicable First Lien Agent

By: _____

Title:

Name:

[      ], as Applicable Second Lien Agent

By: _____

Title:

Name:

[HOLDINGS]

[BORROWER], on behalf of itself and its Subsidiaries party to the Intercreditor Agreement

By: _____

Title:

Name:

**EXHIBIT A-2**

CONSENT AND ACKNOWLEDGMENT[3]
(Other Second Lien Obligations)

This CONSENT AND ACKNOWLEDGMENT (this "***Consent***") dated as of [mm] [dd], [yyyy], is executed by [    ], as an Other Second Lien Obligations Agent (the "***New Agent***"), and acknowledged by [    ], as the Applicable First Lien Agent, [   ], as the Applicable Second Lien Agent, [Holdings], and [Borrower] (on behalf of itself and certain of its Subsidiaries).

This Consent is with respect to that certain Intercreditor Agreement, dated as of [   ], 2021 (as the same may be amended, restated, amended and restated, supplemented or otherwise modified from time to time, the "***Intercreditor Agreement***"), by and among the parties (other than the New Agent) referred to above. Capitalized terms used but not defined herein shall have the meanings assigned thereto in the Intercreditor Agreement.

Reference is made to [describe new indebtedness] with respect to which [new agents] (the "***New Agent***") is acting as [trustee/collateral agent/authorized representative].

The New Agent hereby (a) agrees to be bound by the terms of the Intercreditor Agreement as an Other Second Lien Obligations Agent as if it were an Other Second Lien Obligations Agent as of the date of the Intercreditor Agreement and (b) represents that it is acting in the capacity of Other Second Lien Obligations Agent solely for the Secured Parties under [   ].

This Consent shall be governed by, and construed in accordance with, the law of the State of New York.

[Signature Page Follows.]

---

[3] To be updated in the event of a Refinancing debt.

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed by their respective authorized officers as of the day and year first above written.

[NEW AGENT]

By: _____

Title:

Name:

<u>Acknowledged and Confirmed by, for purposes of the Intercreditor Agreement:</u>

[        ], as Applicable Second Lien Agent

By: _____

Title:

Name:

[        ], as Applicable First Lien Agent

By: _____

Title:

Name:

[HOLDINGS]

[BORROWER], on behalf of itself and its Subsidiaries party to the Intercreditor Agreement

By: _____

Title:

Name:

**Exhibit M**

**GUC/SLTL Form Warrant Agreement**

Weil Draft 6/15/21

# WARRANT AGREEMENT

between

[NEWCO],

AS ISSUER

and

AMERICAN STOCK TRANSFER & TRUST COMPANY, LLC,

AS WARRANT AGENT

[●], 2021

#94518622v9
WEIL:\98021395\2\45327.0007

# TABLE OF CONTENTS

PAGE

Section 1.  *Certain Defined Terms* ..................................................................................1
Section 2.  *Appointment of Warrant Agent* .....................................................................5
Section 3.  *Issuance of Warrants; Form, Execution and Delivery* ...................................5
Section 4.  *Transfers* .......................................................................................................7
Section 5.  *Duration and Exercise of Warrants* ..............................................................8
Section 6.  *Anti-Dilution Provisions* .............................................................................12
Section 7.  *Reorganization* ...........................................................................................17
Section 8.  *Covenants of the Company* ..........................................................................18
Section 9.  *Warrant Agent* .............................................................................................18
Section 10.  *Severability* ................................................................................................22
Section 11.  *Holder Not Deemed a Shareholder* ............................................................23
Section 12.  *Notices to Company and Warrant Agent* ....................................................23
Section 13.  *Supplements and Amendments* ...................................................................23
Section 14.  *Termination* ................................................................................................24
Section 15.  *Governing Law and Consent to Forum* ......................................................24
Section 16.  *Waiver of Jury Trial* ..................................................................................25
Section 17.  *Benefits of This Agreement* ........................................................................25
Section 18.  *Counterparts* ..............................................................................................25
Section 19.  *Headings* ....................................................................................................26
Section 20.  *Electronic Transmission* ............................................................................26

EXHIBITS

Exhibit A        Form of Election to Exercise Warrant
Exhibit B        Form of Warrant Assignment

i

This WARRANT AGREEMENT (this "**Agreement**") is dated as of [●], 2021, between [NEWCO], a Delaware corporation (the "**Company**"), as issuer, and AMERICAN STOCK TRANSFER & TRUST COMPANY, LLC, as warrant agent (the "**Warrant Agent**").

W I T N E S S E T H

WHEREAS, pursuant to and in connection with [the *Fourth Amended Joint Chapter 11 Plan of Fieldwood Energy LLC and its Affiliated Debtors,* dated April 15, 2021 [Docket No. 1284], Case No. 20-33948 (MI) (Bankr. S.D. Tex.)] (the "**Plan**") relating to a reorganization under chapter 11 of title 11 of the United States Code (the "**Bankruptcy Code**"), the Company has agreed to issue to the Holders (as defined herein) an aggregate of [●] warrants (the "**Warrants**"), which are exercisable to purchase shares (the "**Shares**") of common stock (the "**Common Stock**"), par value $0.01 per share, of the Company;

WHEREAS, the Company desires the Warrant Agent to act on behalf of the Company, and the Warrant Agent is willing to so act, in connection with the issuance, registration, transfer, exchange, replacement, exercise and cancellation of the Warrants;

WHEREAS, the Warrant Agent, at the request of the Company, has agreed to act as the agent of the Company in connection with the issuance, registration, transfer, exchange, replacement, exercise and cancellation of the Warrants as provided herein;

WHEREAS, the Warrants and the underlying Shares are being offered and sold in reliance on the exemption from the registration requirements of the Securities Act of 1933, as amended (the "**Securities Act**"), and any applicable state securities or "blue sky" laws afforded by Section 1145 of the Bankruptcy Code; and

WHEREAS, the Company desires to enter into this Agreement to set forth the terms and conditions of the Warrants and the rights of the Holders thereof.

NOW, THEREFORE, in consideration of the premises and mutual agreements herein set forth, the parties hereto agree as follows:

Section 1.     *Certain Defined Terms*.  Whenever used in this Agreement, the following words and phrases, unless the context otherwise requires, shall have the meanings specified in this Section.

"**Agreement**" has the meaning specified in the preamble hereof.

"**Appropriate Officer**" means the Chief Executive Officer, President, Chief Financial Officer, Treasurer, Secretary, Assistant Secretary or any Vice President (or higher or equivalent officer) of the Company.

"**Bankruptcy Code**" has the meaning specified in the recitals hereof.

"**Board**" means, as of any date, the Board of Directors of the Company in office on such date.

"**Business Day**" means any day other than a Saturday or Sunday or any other day on which national banking associations in the State of New York generally are closed for commercial banking business.

"**Cashless Exercise**" has the meaning specified in Section 5(d)(i) hereof.

"**Cashless Exercise Period**" has the meaning specified in Section 5(d)(ii) hereof.

"**Charter**" means the Amended and Restated Certificate of Incorporation of the Company (as amended).

"**Common Stock**" has the meaning specified in the recitals hereof.

"**Company**" has the meaning specified in the preamble hereof.

"**Direct Registration Warrants**" has the meaning specified in Section 3(a) hereof.

"**Effective Date**" has the meaning specified in the Plan.

"**Exchange**" means a U.S. national or regional securities exchange.

"**Exercise Date**" means, with respect to an exercise of a Warrant by a Holder, the first date on which such Holder has satisfied the conditions for exercise of such Warrant as set forth in Section 5(c) (unless such conditions are satisfied after 5:00 p.m., New York City time, on a Business Day or on a date that is not a Business Day, in which event the Exercise Date shall be the next following Business Day).

"**Exercise Period**" means the period commencing upon the execution and delivery of this Agreement by the parties hereto and ending on, and including, the Expiration Date.

"**Exercise Price**" has the meaning specified in Section 5(b) hereof.

"**Expiration Date**" has the meaning specified in Section 5(a) hereof.

"**Fair Market Value**" means, as of any date of determination:

(i)      in the case of shares of stock that are listed on an Exchange on such date, the average of the Last Reported Sale Prices for such shares for the 10 consecutive Trading Days immediately preceding such date (or such less number of Trading Days for which such shares were so listed); *provided* that, with respect to any determination of Fair Market Value pursuant to this clause (i), the Company, in its good faith determination, shall make appropriate adjustments to such Last Reported Sale Prices to account for any adjustments to the Exercise Price and Warrant Share Number that

2

become effective, or any event requiring any adjustments to the Exercise Price and Warrant Share Number where the record date, effective date or ex-date, as the case may be, of the event occurs, during such period of consecutive Trading Days;

(ii)        in the case of cash, the amount thereof; and

(iii)       in the case of securities not covered by clause (i) above or any other property, as determined in good faith and in a commercially reasonable manner by the Board.

"**Fair Market Value Notice**" has the meaning specified in Section 5(d)(ii) hereof.

["**Final True-Up Notice**" has the meaning specified in Section 6(h)(ii) hereof.][1]

"**Holder**" means the record holder of a Warrant listed on the Warrant Register.

"**Joinder**" has the meaning specified in the Stockholders Agreement.

"**Last Reported Sale Price**" means, on any day, (i) in the case of shares of stock that are listed on a Principal Exchange on such day, the closing sale price per share (or if no closing sale price is reported, the average of the bid and ask prices or, if more than one in either case, the average of the average bid and the average ask prices) on such day as reported in composite transactions for the Principal Exchange and (ii) in the case of shares of stock that are listed on an Exchange other than a Principal Exchange on such day, the closing sale price per share (or if no closing sale price is reported, the average of the bid and ask prices or, if more than one in either case, the average of the average bid and the average ask prices) on such day as reported in composite transactions for the primary Exchange on which such shares are traded.

"**Marketable Securities**" means any common equity securities (whether voting or non-voting) (including American depositary shares representing common equity securities) listed on a Principal Exchange.

"**Person**" means any natural person, corporation, partnership, limited liability company, firm, association, trust, government, governmental agency, or other entity, whether acting in an individual, fiduciary or other capacity.

"**Plan**" has the meaning specified in the recitals hereof.

"**Principal Exchange**" means each of The New York Stock Exchange, The Nasdaq Global Market and The Nasdaq Global Select Market (or any of their respective successors).

"**Reference Property**" means, in respect of any Reorganization, the kind and amount of shares of stock, other securities or other property or assets (including cash or

---

[1] Insert for GUC Warrants.

any combination thereof) that a holder of a number of Shares (or Units of Reference Property in respect of a prior Reorganization, as applicable) equal to the number of Warrant Shares (or Units of Reference Property in respect of a prior Reorganization, as applicable) obtainable upon exercise of each Warrant immediately prior to such Reorganization would have owned or been entitled to receive.

"**Reorganization**" means any consolidation, merger, statutory share exchange, business combination or similar transaction with a third party, any sale, lease or other transfer to a third party of all or substantially all of the consolidated assets of the Company and its Subsidiaries, or any recapitalization, reclassification or transaction that results in a change of the Common Stock (other than as described in Section 6(a)), in each case, in which the Common Stock is converted into, is exchanged for or becomes the right to receive cash, other securities or other property.

"**Securities Act**" has the meaning specified in the recitals hereof.

"**Shares**" has the meaning specified in the recitals hereof.

["**SLTL Adjustment Notice**" has the meaning specified in Section 6(h)(ii) hereof.][2]

["**SLTL Tranche 2 Warrant Agreement**" means the Warrant Agreement dated as of the date hereof between the Company and the Warrant Agent pertaining to the SLTL Tranche 2 Warrants.][3]

["**SLTL Tranche 2 Warrants**" has the meaning specified in the Plan.][4]

"**Stockholders Agreement**" means the Stockholders Agreement dated as of [___], 2021 by and among the Company and the Stockholders (as defined therein) from time to time party thereto, as amended from time to time.

"**Subsidiary**" means, with respect to any Person, any corporation, partnership, joint venture, limited liability company or other entity (x) of which such Person or a subsidiary of such Person is a general partner or (y) of which a majority of the voting securities or other voting interests, or a majority of the securities or other interests of which having by their terms ordinary voting power to elect a majority of the board of directors or persons performing similar functions with respect to such entity, is directly or indirectly owned by such Person and/or one or more subsidiaries thereof.

"**Trading Day**" means a day on which (i) trading in the Shares (or other security for which a closing sale price must be determined) generally occurs on the Principal Exchange or, if the Shares (or such other security) are not then listed on a Principal

---

[2] Insert for GUC Warrants.

[3] Insert for GUC Warrants.

[4] Insert for GUC Warrants.

4

Exchange, on the principal other Exchange on which the Shares (or such other security) are then listed, and (ii) a Last Reported Sale Price for the Shares (or closing sale price for such other security) is available on such securities exchange; *provided* that if the Shares (or such other security) are not so listed or traded, "**Trading Day**" means a Business Day.

"**Unit of Reference Property**" means, in respect of any Reorganization, the kind and amount of Reference Property that a holder of one Share (or the holder of one Unit of Reference Property in respect of a prior Reorganization, as applicable) is entitled to receive upon the consummation of such Reorganization.

"**Warrant Agent**" has the meaning specified in the preamble hereof and shall include any successor Warrant Agent hereunder.

"**Warrant Agent Office**" has the meaning specified in Section 4(b)(ii) hereof.

"**Warrant Exercise Notice**" has the meaning specified in Section 5(c) hereof.

"**Warrant Register**" has the meaning specified in Section 3(c) hereof.

"**Warrant Shares**" has the meaning specified in Section 3(a) hereof.

"**Warrant Share Number**" has the meaning specified in Section 3(a) hereof.

"**Warrant Statements**" has the meaning specified in Section 3(b) hereof.

"**Warrants**" has the meaning specified in the recitals hereof.

Section 2.     *Appointment of Warrant Agent*.  The Company hereby appoints the Warrant Agent to act as agent for the Company in accordance with the instructions set forth in this Agreement, and the Warrant Agent hereby accepts such appointment, upon the terms and conditions hereinafter set forth.

Section 3.     *Issuance of Warrants; Form, Execution and Delivery*.  (a)  *Issuance of Warrants*.  Pursuant to, and in accordance with, the terms of this Agreement and the Plan, the Company hereby issues the Warrants.  The Warrants shall be, upon issuance, duly authorized and validly issued.  In accordance with Section 4 hereof, as of the date hereof, the Company shall cause to be issued to the applicable registered Holders, one or more Warrants evidenced by an uncertificated, book-entry registration on the books and records of the Warrant Agent (the "**Direct Registration Warrants**").  Each Direct Registration Warrant entitles the Holder, upon proper exercise and payment of the Exercise Price and subject to Section 5(d) and Section 5(i), to receive from the Company one Share (as it may be adjusted from time to time as provided herein, the "**Warrant Share Number**").  The Shares deliverable upon proper exercise of the Warrants are referred to herein as the "**Warrant Shares**."

(b)     *Form of Warrant*.  All Warrants issued pursuant to this Agreement shall be in the form of Direct Registration Warrants reflected on statements issued by the Warrant

5

Agent from time to time to the Holders thereof reflecting such uncertificated, book-entry position (the "**Warrant Statements**"). The Warrant Statements may bear such appropriate insertions, omissions, substitutions and other variations as are required or permitted by this Agreement, and may have such letters, numbers or other marks of identification and such legends or endorsements placed thereon as may be required to comply with the Charter, the Stockholders Agreement, any law or any rules made pursuant thereto or as may be determined, consistently herewith and reasonably acceptable to the Warrant Agent, by any Appropriate Officer. Each Warrant Statement and the Warrant Register shall bear the following legend:

> "THE WARRANTS ARE SUBJECT TO VARIOUS CONDITIONS, INCLUDING CERTAIN RESTRICTIONS ON SALE, DISPOSITION OR TRANSFER AS SET FORTH IN THE STOCKHOLDERS AGREEMENT DATED AS OF [__], 2021 BY AND AMONG [NEWCO] (THE "COMPANY") AND THE STOCKHOLDERS (AS DEFINED THEREIN) FROM TIME TO TIME PARTY THERETO, AS AMENDED FROM TIME TO TIME (THE "STOCKHOLDERS AGREEMENT"). NO REGISTRATION OR TRANSFER OF THE WARRANTS WILL BE MADE ON THE BOOKS OF THE COMPANY OR THE WARRANT AGENT UNLESS AND UNTIL SUCH RESTRICTIONS SHALL HAVE BEEN COMPLIED WITH. THE COMPANY WILL FURNISH WITHOUT CHARGE, UPON WRITTEN REQUEST TO THE COMPANY AT ITS PRINCIPAL PLACE OF BUSINESS, TO EACH HOLDER OF RECORD OF THE WARRANTS, A COPY OF THE STOCKHOLDERS AGREEMENT CONTAINING THE ABOVE-REFERENCED RESTRICTIONS ON TRANSFERS OF SECURITIES."

(c) *Other Matters*. Each Warrant shall be, and shall remain, subject to the provisions of this Agreement and the Stockholders Agreement until such time as no Warrants shall be outstanding in accordance with the terms hereof. Each Holder shall be bound by all of the terms and provisions of this Agreement (a copy of which is available on request to the Secretary of the Company) and any amendments thereto as fully and effectively as if such Holder had signed the same. The Warrant Agent shall keep, at an office designated for such purpose, books (the "**Warrant Register**") in which, subject to such reasonable regulations as it may prescribe, it shall register any Direct Registration Warrants and exchanges and transfers of outstanding Warrants in accordance with the procedures set forth in Section 4 of this Agreement, all in form satisfactory to the Company and the Warrant Agent. The Company may require payment by the applicable Holder of a sum sufficient to cover any stamp or other tax or other governmental charge that may be imposed on the Holder in connection with any such exchange or registration of transfer. The Warrant Agent shall have no obligation to effect an exchange or register a transfer unless and until any payments required by the immediately preceding sentence have been made. The Warrant Agent and the Company may deem and treat the Person in whose name any Warrant is registered on the Warrant Register as the absolute owner of such Warrant, for the purpose of any exercise thereof, any distribution to the Holder thereof and for all other purposes, and neither the Warrant Agent nor the Company shall be affected by notice to the contrary prior to due presentment for registration of transfer

6

or exchange of any Warrant in accordance with the procedures set forth in this Agreement.

Section 4.    *Transfers*.  (a)  *Transfer and Exchange of Direct Registration Warrants*.  When the registered Holder of a Direct Registration Warrant has presented to the Warrant Agent a written request to register the transfer of any Direct Registration Warrant, the Warrant Agent shall register the transfer or make the exchange as requested if such transfer satisfies the provisions of this Agreement and the Stockholders Agreement; *provided* that the Warrant Agent has received a written instruction of transfer in form satisfactory to the Warrant Agent, properly completed and duly executed by the Holder thereof or by his or her attorney, duly authorized in writing.  A party requesting transfer of Warrants must provide any evidence of authority that may be required by the Warrant Agent, including, but not limited to, a signature guarantee from an eligible guarantor institution participating in a signature guarantee program approved by the Securities Transfer Association.

(b)    *Obligations with Respect to Transfers of Warrants*.

(i)    All Direct Registration Warrants issued upon any registration of transfer or exchange shall be the valid obligations of the Company, entitled to the same benefits under this Agreement as the Direct Registration Warrants surrendered upon such registration of transfer or exchange.

(ii)    The Warrant Agent shall, upon receipt of all information required to be delivered hereunder, register the transfer of any outstanding Warrants in the Warrant Register upon the delivery by the registered Holder thereof, at the Warrant Agent Office referred to in Section 12 hereof (the "**Warrant Agent Office**"), duly endorsed, and accompanied by a completed form of assignment substantially in the form attached as Exhibit B (including a duly endorsed Joinder signed by the transferee) and duly signed by the Holder thereof or by the duly appointed legal representative thereof or by his or her attorney, duly authorized in writing, such signature to be guaranteed by a participant in a Medallion Signature Guarantee Program at a guarantee level acceptable to the Warrant Agent.  Upon any such registration of transfer, a new Warrant Statement shall be issued to the transferee.

(iii)    The Warrant Agent shall not undertake the duties and obligations of a transfer agent under this Agreement, including, without limitation, the duty to receive, issue or transfer the Warrant Shares.

(c)    *Holder Acknowledgement*.  Each Holder, by its acceptance of any Warrant under this Agreement, acknowledges and agrees that (i) the Warrants were issued, and the Warrant Shares issuable upon exercise thereof shall be issued, pursuant to the exemption from the registration requirement of Section 5 of the Securities Act provided by Section 1145 of the Bankruptcy Code, and to the extent that a Holder of Warrants (or holder of Warrant Shares) is an "underwriter" as defined in Section 1145(b)(1) of the Bankruptcy Code, such holder shall not sell or transfer any Warrants or Warrant Shares

7

in the absence of an effective registration statement under the Securities Act or an exemption from registration thereunder and (ii) the Company is not, and has no obligation to currently become, a reporting company under the Securities Exchange Act of 1934, as amended, and the Holder's rights to information relating to the Company are limited.

Section 5.    *Duration and Exercise of Warrants*.  (a)  *Expiration Date*.  The Warrants shall expire at 5:00 p.m., New York City time, on [___], 2029 (the "**Expiration Date**"), which is the eighth (8th) anniversary of the Effective Date[, subject to Section 6(h)][5].  After 5:00 p.m., New York City time, on the Expiration Date, the Warrants will become void and of no value, and all rights thereunder and all rights in respect thereof under this Agreement shall cease as of such time.

(b)    *Exercise Price*.  On the Effective Date, the Exercise Price shall be $[●][6] per Warrant Share (as it may be adjusted from time to time as provided herein, the "**Exercise Price**"). If the Company at any time makes a Fair Market Value determination in respect of the Common Stock, it shall also determine at such time whether the Fair Market Value for one Share exceeds the Exercise Price, and the Company shall deliver a written notice to the Holders and the Warrant Agent setting forth the Fair Market Value as promptly as reasonably practicable following such determination.

(c)    *Manner of Exercise*.  Each Warrant may be exercised by the Holder thereof during the Exercise Period as described below.  Subject to the provisions of this Agreement, including the Cashless Exercise provisions contained in Section 5(d) and the adjustments contained in Section 6, each Warrant shall entitle the Holder thereof to purchase from the Company (and the Company shall issue and sell to such Holder), upon proper exercise and payment of the Exercise Price in cash, a number of Warrant Shares equal to the then-applicable Warrant Share Number.  A Holder may exercise any of its Warrants on any Business Day during the Exercise Period by, no later than 5:00 p.m., New York City time, on such Business Day, delivering (A) written notice of such election (a "**Warrant Exercise Notice**") to exercise the applicable Warrants to the Company and the Warrant Agent at the addresses set forth in Section 12 hereof, which Warrant Exercise Notice shall be substantially in the form set forth in Exhibit A; and (B) a duly completed and executed Joinder to the extent required pursuant to Section [5.01] of the Stockholders Agreement for the Person that will hold the Warrant Shares issued pursuant to the Warrant Exercise Notice in the form provided for in the Stockholders Agreement and attached to the Warrant Exercise Notice.  The documents referred to in clauses (A) and (B) of the immediately preceding sentence shall be accompanied by payment in full of the Exercise Price in respect of each Warrant Share to be issued, which

---

[5] Insert for GUC Warrants.

[6] To be: (i) $166.09 strike price for the GUC Warrants, SLTL Tranche 1 Warrants and the GUC "True-Up" Warrants (*see* Section 6(h) below re: GUC "True-Up" Warrants"); (ii) $189.42 strike price for the SLTL Tranche 2 Warrants.

8

shall be made by certified or official bank or bank cashier's check payable to the order of the Company, or by wire transfer to the Warrant Agent in immediately available funds. Such payment shall be in an amount equal to the product of the number of Warrants exercised, as designated in such Warrant Exercise Notice, *multiplied by* the then-applicable Exercise Price, *multiplied by* the Warrant Share Number.

(d)     *Cashless Exercise.*  (i) Notwithstanding any provisions of this Agreement to the contrary, if a Holder elects to exercise any of its Warrants hereunder and either (x) the Shares are listed on an Exchange as of the Exercise Date or (y) the Exercise Date occurs during a Cashless Exercise Period, then, in lieu of paying the aggregate Exercise Price in cash as required by Section 5(c), such Holder shall have the right to instruct the Company in the Warrant Exercise Notice to issue the Warrant Shares issuable upon exercise of such Warrants on a net basis (a "**Cashless Exercise**") such that, without payment of any cash in respect of the aggregate Exercise Price, such Holder shall receive a number of Warrant Shares for each Warrant so exercised equal to the greater of (I) zero and (II) "X" as determined pursuant to the following formula:

$$X = Y \times \frac{A-B}{A}$$

Where:

Y = the Warrant Share Number as of the Exercise Date;

A = the Fair Market Value per Share as of the Exercise Date; and

B = the Exercise Price as of the Exercise Date.

(ii)     Following [_____], 2023 (the second (2nd) anniversary of the Effective Date), the Holders of at least two-thirds of the Warrants then outstanding may request that the Company make a Fair Market Value determination in respect of the Common Stock; *provided* that (x) no more than one such request may be made annually and (y) no more than [two][4][four][8] such requests total may be made during the term of the Warrants; *provided further* that if the Company makes a Fair Market Value determination in respect of the Common Stock at the request of the holders of any warrants other than the Warrants at any time after [_____], 2023, then (A) the Company shall notify the Holders and the Warrant Agent of such determination and such notice shall be deemed to be a Fair Market Value Notice (as defined below) and (B) a Holder request shall be deemed to have been made for purposes of clause (x) of the

---

[7] Insert for GUC Warrants.

[8] Insert for SLTL Tranche 1 Warrants and SLTL Tranche 2 Warrants.

9

immediately preceding proviso [and, if such Fair Market Value determination was made at the request of holders of the [SLTL Tranche 2 Warrants][9][SLTL Tranche 1 Warrants][10] (as defined in the Plan), a Holder request shall be deemed to have been made for purposes of clause (y) of the immediately preceding proviso][11]. The Company shall complete, and shall notify (a "**Fair Market Value Notice**") the Holders and the Warrant Agent of, such Fair Market Value determination within thirty-five (35) Business Days of such request. The period beginning on, and including, the date of any Fair Market Value Notice and ending on, and including, the tenth (10th) Business Day immediately following the date of such Fair Market Value Notice shall be referred to herein as a "**Cashless Exercise Period**". For the avoidance of doubt, if Cashless Exercise applies to any Warrants with an Exercise Date that occurs during a Cashless Exercise Period, then "A" in the formula set forth in Section 5(d)(i) shall be the Fair Market Value per Share specified in the related Fair Market Value Notice.

(iii)　The Warrant Agent shall have no duty or obligation to investigate or confirm whether the Company's determination of the number of Warrant Shares to be issued upon any Cashless Exercise is accurate or correct, nor shall the Warrant Agent have any duty or obligation to take any action with regard to such Cashless Exercise prior to being notified by the Company of the relevant number of Warrant Shares to be issued.

(e)　Any exercise of a Warrant pursuant to the terms of this Agreement shall be irrevocable as of the date of delivery of the applicable Warrant Exercise Notice and shall constitute a binding agreement between the Holder and the Company, enforceable in accordance with its terms (except as such enforceability may be limited by bankruptcy, insolvency or similar laws generally affecting creditor's rights).

(f)　The Warrant Agent shall:

(i)　examine all Warrant Exercise Notices and all other documents delivered to it by or on behalf of Holders as contemplated hereunder to ascertain whether, on their face, such Warrant Exercise Notices and any such other documents have been executed and completed in accordance with their terms;

(ii)　inform the Company of and cooperate with and assist the Company in resolving any reconciliation problems between the Warrant Exercise Notices received and delivery of Warrants to the Warrant Agent's account; and

(iii)　advise the Company, no later than two (2) Business Days after receipt of a Warrant Exercise Notice, of (A) the receipt of such Warrant Exercise Notice and the number of Warrants exercised in accordance with the terms of this

---

[9] Insert for SLTL Tranche 1 Warrants.

[10] Insert for SLTL Tranche 2 Warrants.

[11] Insert for SLTL Tranche 1 Warrants and SLTL Tranche 2 Warrants.

10

Agreement, (B) the number of Warrant Shares to be issued upon exercise of such Warrants (except in the case of Cashless Exercise), (C) the instructions with respect to delivery of the Warrant Shares deliverable upon such exercise, and (D) such other information as the Company shall reasonably require.

(g)     All questions as to the validity, form and sufficiency (including time of receipt) of a Warrant exercise shall be determined by the Company in its reasonable discretion in good faith.  The Warrant Agent shall incur no liability for or in respect of and, except to the extent such liability arises from the Warrant Agent's bad faith, gross negligence or willful misconduct (each as determined by a final, non-appealable order, judgment of a court decree or ruling of competent jurisdiction), shall be indemnified and held harmless by the Company for acting or refraining from acting upon, or as a result of such determination by, the Company.  The Company reserves the right to reject any and all Warrant Exercise Notices not in proper form or for which any corresponding agreement by the Company to exchange would, in the opinion of the Company, be unlawful as determined in good faith in consultation with the Company's legal counsel and the relevant Holder.  Moreover, the Company reserves the absolute right to waive any of the conditions to the exercise of Warrants or defects in Warrant Exercise Notices with regard to any particular exercise of Warrants.  Neither the Company nor the Warrant Agent shall be under any duty to give notice to the Holders of any irregularities in any exercise of Warrants, nor shall they incur any liability for the failure to give such notice; *provided* that the Company and/or the Warrant Agent shall promptly notify a Holder if the Company will not honor a Warrant Exercise Notice from such Holder.

(h)     As soon as reasonably practicable after the Exercise Date for any Warrant, the Company shall issue, or otherwise deliver, in authorized denominations to or upon the order of the Holder, an uncertificated, book-entry interest in the number of Warrant Shares to which such Holder is entitled on the books and records of the Company's transfer agent.  Such Warrant Shares shall be deemed to have been issued and any Person so designated to be named therein shall be deemed to have become a holder of record of such Warrant Shares as of the close of business on the Exercise Date.

(i)     The Company shall not be required to issue fractions of Warrant Shares upon exercise of the Warrants.  All Warrant Shares (including fractions) to be issued upon exercise of the applicable Warrant will be aggregated for purposes of determining whether the exercise would result in the issuance of any fractional Share.  If, after aggregation, the exercise would result in the issuance of a fractional Share, the Company will, at its sole option, either (A) issue such fractional Share, (B) round such fractional Share up to the nearest whole Share and issue such whole Share or (C) in lieu of issuance of any fractional Share, pay the Holder otherwise entitled to such fractional Share an amount in cash equal to the product resulting from multiplying the then-current Fair Market Value per Share by such fraction.

(j)     The Company shall comply with all applicable tax withholding and reporting requirements imposed by any governmental unit, and all distributions, including deemed distributions, pursuant to the Warrants will be subject to applicable withholding and reporting requirements.  Notwithstanding any provision to the contrary, the Company

11

will be authorized to (i) take any actions that may be reasonably necessary or appropriate to comply with such withholding and reporting requirements, (ii) apply a portion of any cash distribution to be made under the Warrants to pay applicable withholding taxes, (iii) liquidate a portion of any non-cash distribution to be made under the Warrants to generate sufficient funds to pay applicable withholding taxes or (iv) establish any other mechanisms the Company believes are reasonable and appropriate, including requiring Holders to submit appropriate tax and withholding certifications (such as IRS Forms W-9 and the appropriate IRS Forms W-8, as applicable) and/or requiring Holders to pay the withholding tax amount to the Company in cash as a condition of receiving the benefit of any anti-dilution adjustment pursuant to Section 6.

(k)     The Warrant Agent shall keep copies of this Agreement and any notices given or received hereunder for a period beginning on the date of this Agreement and ending no earlier than the third anniversary of the Expiration Date.

Section 6.     *Anti-Dilution Provisions*.  The Exercise Price and the Warrant Share Number shall be subject to adjustment from time to time as set forth in this Section 6; *provided* that no single event shall give rise to an adjustment under more than one subsection of this Section 6 (other than in the case of a dividend or other distribution of different types of property, in which case Section 6(a) and Section 6(b) shall apply to the appropriate parts of each such dividend or distribution); *provided further* that any issuance of Warrant Shares upon exercise of the Warrants shall not itself give rise to any adjustment under this Section 6; *provided further* that no adjustment shall be made under this Section 6 if Holders participate (other than in the case of a Share split or Share combination), at the same time and upon the same terms as holders of the Shares and solely as a result of holding the Warrants, in any of the transactions described in this Section 6, without having to exercise their Warrants, as if each Holder held a number of Shares equal to the then-current Warrant Share Number *multiplied by* the number of Warrants held by such Holder.

(a)     *Share Distributions, Subdivisions or Combinations*.  The Exercise Price and Warrant Share Number shall be adjusted pursuant to the formulas below in the event the Company (i) pays a dividend or makes any other distribution with respect to its Shares solely in Shares, (ii) subdivides or reclassifies its outstanding Shares into a greater number of Shares or (iii) combines or reclassifies its outstanding Shares into a smaller number of Shares.  Such adjustments shall become effective (x) in the case of clause (i) above, at the close of business on the record date for such dividend or distribution or (y) in the case of clause (ii) or (iii) above, at the open of business on the effective date of such event. In the event that a dividend or distribution described in clause (i) above is not so paid or made, the Exercise Price and the Warrant Share Number shall be readjusted, effective as of the date when the Board determines not to make such dividend or distribution, as the case may be, to be the Exercise Price and the Warrant Share Number that would be in effect if such dividend or distribution had not been declared.

$$Ua = \quad Ub \ \ x \ \ \frac{Oa}{Ob}$$

12

$$Pa = \quad Pb \ x \ \frac{Ob}{Oa}$$

Where:

Ub = Warrant Share Number immediately before the adjustment

Ua = Warrant Share Number immediately after the adjustment

Pb = Exercise Price immediately before the adjustment

Pa = Exercise Price immediately after the adjustment

Ob = Number of Shares outstanding immediately before the adjustment

Oa = Number of Shares outstanding immediately after the transaction in question

   (b)     *Certain Dividends and Distributions*.  If the Company shall fix a record date for the payment of a dividend or the making of a distribution with respect to the Shares consisting of securities, evidences of indebtedness, assets, cash or rights, options or warrants to purchase securities of the Company (other than (i) any dividends or distributions for which an adjustment is made pursuant to Section 6(a) and (ii) cash dividends up to an aggregate amount per fiscal year equal to 30% of the Company's free cash flow for such fiscal year, as determined by the Board in good faith) to all or substantially all holders of the Shares, the Exercise Price and Warrant Share Number shall be adjusted pursuant to the formulas below.  Such adjustments shall become effective at the close of business on the record date for such dividend or distribution. In the event that such dividend or distribution is not so paid or made, the Exercise Price and the Warrant Share Number shall be readjusted, effective as of the date when the Board determines not to make such dividend or distribution, as the case may be, to be the Exercise Price and the Warrant Share Number that would be in effect if such dividend or distribution had not been declared.

$$Ua = \quad Ub \ x \ \frac{M}{M-D}$$

$$Pa = \quad Pb \ x \ \frac{M-D}{M}$$

Where:

Ub = Warrant Share Number immediately before the adjustment

Ua = Warrant Share Number immediately after the adjustment

Pb = Exercise Price immediately before the adjustment

Pa = Exercise Price immediately after the adjustment

13

M = Fair Market Value of one Share as of the Trading Day immediately preceding the ex-date for such dividend or distribution

D = Fair Market Value of the dividend or distribution made per Share as of the record date for such dividend or distribution; *provided* that, in the case of a cash dividend a portion of which would cause the aggregate amount of cash dividends paid by the Company for any fiscal year to exceed 30% of the Company's free cash flow for such fiscal year, as determined by the Board in good faith, "D" shall be equal to the Fair Market Value of such portion of such dividend made per Share as of the record date for such dividend.

(c)     *Certain Other Events*. The Company may make decreases in the Exercise Price and/or increases in the Warrant Share Number as the Board deems advisable in good faith in order to avoid or diminish any income tax to holders of Shares resulting from any dividend or distribution of stock (or rights to acquire stock) or from any event treated as such for income tax purposes.

(d)     *Exceptions to Adjustments*.  Except as specifically provided for herein, there shall be no adjustment or readjustment to the Exercise Price or the Warrant Share Number.

(e)     *Notice of Adjustment*.  [Subject to Section 6(h),][12] [u][U]pon the occurrence of each adjustment or readjustment of the Exercise Price or the Warrant Share Number, the Company (at its expense) shall promptly compute such adjustment or readjustment in good faith in accordance with the terms hereof  and furnish to (i) the Warrant Agent a certificate, signed by an Appropriate Officer, and (ii) to each Holder a notice, in each case setting forth (A) such adjustment or readjustment and showing in detail the facts upon which such adjustment or readjustment is based and (B) the Exercise Price and the Warrant Share Number at the time in effect; *provided* that the Company shall not be required to deliver any notice to the Holders until the cumulative change in the Exercise Price or the Warrant Share Number exceeds one percent (1%) from (x) the initial Exercise Price or Warrant Share Number, as the case may be, or (y) the Exercise Price or the Warrant Share Number, as the case may be, that the Holders received notice of in the most recent notice provided to them.  The Warrant Agent shall have no duty with respect to any statement filed with it except to keep the same on file and available for inspection by Holders during reasonable business hours.  The Warrant Agent shall not at any time be under any duty or responsibility to any Holder to determine whether any facts exist which may require any adjustment to the Exercise Price or the Warrant Share Number, or with respect to the nature or extent of any adjustment of the Exercise Price or the Warrant Share Number when made or with respect to the method employed in making such adjustment.

(f)     *No Change in Warrant Terms on Adjustment*.  Irrespective of any adjustments in the Exercise Price or the Warrant Share Number, the Warrants theretofore

---

[12] Insert for GUC Warrants.

or thereafter issued may continue to express the same prices and amounts as are stated in the similar Warrants issuable initially, or at some subsequent time, pursuant to this Agreement, and the Exercise Price or the Warrant Share Number, as the case may be, specified thereon shall be deemed to have been so adjusted.

(g)  *Miscellaneous*.  All calculations hereunder shall be made to the nearest one-tenth (1/10th) of a cent or to the nearest one-hundredth (1/100) of a Share, as the case may be. Any provision of this Section 6 to the contrary notwithstanding, no adjustment in the Exercise Price or the Warrant Share Number shall be made if the amount of such adjustment would be less than $0.01 or[, other than an adjustment as provided in Section 6(h),][13] one-tenth (1/10th) of a Share, but any such amount shall be carried forward and an adjustment with respect thereto shall be made at the time of and together with any subsequent adjustment which, together with such amount and any other amount or amounts so carried forward, shall aggregate $0.01 or 1/10th of a Share, or more, or upon exercise of a Warrant if it shall earlier occur. If an adjustment in the Exercise Price made hereunder would reduce the Exercise Price to an amount below $0.01, then such adjustment in the Exercise Price made hereunder shall reduce the Exercise Price to $0.01 and not lower.

(h)  [*Adjustment upon Exercise of SLTL Tranche 2 Warrants*.

(i)  Upon the exercise of a SLTL Tranche 2 Warrant in accordance with the SLTL Tranche 2 Warrant Agreement, the Warrant Share Number shall be increased as follows:

$$N = \quad P \quad x \quad (S + (1.03627 \ x \ T))$$

Where:

N = Warrant Share Number immediately after the adjustment

P = 0.000009%

S = 11,123,704

T = Aggregate number of Shares issued upon exercise of all SLTL Tranche 2 Warrants exercised on or prior to the effective date of the adjustment

(ii)  Such increase of the Warrant Share Number pursuant to this Section 6(h) shall become effective simultaneously with the "Exercise Date" (as such term is defined in the SLTL Tranche 2 Warrant Agreement) of such SLTL Tranche 2 Warrant.  Upon the occurrence of each increase of the Warrant Share Number pursuant to this Section 6(h), the Company (at its expense) shall promptly compute such increase in good faith in accordance with the terms hereof

---

[13] Insert for GUC Warrants.

#94518622v9
WEIL:\98021395\2\45327.0007

(and shall make such adjustments thereto as it determines in good faith are appropriate to account for any adjustment to the Warrant Share Number pursuant to Section 6(a) or 6(b) that occurred prior to the effective date of the adjustment pursuant to this Section 6(h)) and furnish to (A) the Warrant Agent a certificate, signed by an Appropriate Officer, and (B) each Holder a notice ((A) and (B), an "**SLTL Adjustment Notice**"), in each case setting forth (1) such increase in the Warrant Share Number and the calculation upon which such increase is based and (2) the Warrant Share Number after giving effect to such increase; *provided* that the Company shall not be required to deliver any SLTL Adjustment Notice (w) until the cumulative change in the Warrant Share Number immediately after the increase exceed**s** five percent (5%) from the Warrant Share Number immediately before the first such increase (or, if applicable, from the Warrant Share Number set forth in the most recent SLTL Adjustment Notice) or (x) in any event, more than once in any 30-day period; *provided further* that (y) if any Warrant is exercised prior to an SLTL Adjustment Notice having been delivered with respect to any exercise of a SLTL Tranche 2 Warrant, the increase in the Warrant Share Number shall be applied as to such Warrants exercised and (z) if as of the Expiration Date there are any SLTL Tranche 2 Warrants that have been exercised for which an SLTL Adjustment Notice has not previously been delivered at least 30 days prior to the Expiration Date, then upon the Expiration Date the Company shall furnish to (C) the Warrant Agent a certificate, signed by an Appropriate Officer, and (D) each Holder a notice ((C) and (D), a "**Final True-Up Notice**"), in each case setting forth (1) such increase in the Warrant Share Number and the calculation upon which such increase is based and (2) the Warrant Share Number after giving effect to such increase and, notwithstanding Section 5(a), the Warrants may be exercised for 30 days after the date of the Final True-Up Notice (and the Expiration Date shall be extended by such 30-day period).  In addition to the foregoing, the Company shall advise any Holder of any increase in the Warrant Share Number for which an SLTL Adjustment Notice has not been furnished upon the written request of such Holder and upon the exercise of any Warrant by such Holder.  Notwithstanding anything to the contrary herein, any Warrant that is exercised prior to the full exercise of all SLTL Tranche 2 Warrants shall remain outstanding and may be exercised in accordance with the terms hereof, except that the "Warrant Share Number" for purposes of calculating the number of Warrant Shares issuable upon such exercise shall be equal to (i) the Warrant Share Number as of the relevant Exercise Date *minus* (ii) the Warrant Share Number as of the most recent prior date on which such Warrant was exercised (including pursuant to this Section 6(h)). For the avoidance of doubt, (I) the Exercise Price shall not be adjusted upon any exercise of the SLTL Tranche 2 Warrants, (II) the Exercise Price shall continue to be applicable as the price to be paid for one whole Share upon exercise of a Warrant, and (III) to the extent a Warrant represents the right to acquire fractional Shares, a Holder's Warrants may be aggregated to achieve an exercise for whole Shares, subject to Section 5(i).][14]

---

[14] Insert for GUC Warrants.

#94518622v9
WEIL:\98012395\2\45327.0007

Section 7.     *Reorganization.*  (a)  If a Reorganization occurs at any time on or prior to the Expiration Date (or, if later, the settlement date for any exercise of Warrants), then, following the effective time of such Reorganization, a Holder's right to receive Warrant Shares upon exercise of its Warrants shall be converted into the right to receive upon exercise, with respect to each Warrant Share that would have otherwise been deliverable hereunder, one Unit of Reference Property; *provided* that if the Reference Property consists solely of cash, then on the effective date of such Reorganization, each Holder shall receive, in respect of each Warrant such Holder holds, at the same time and upon the same terms as holders of Shares receive the cash in exchange for their Shares, an amount of cash equal to the greater of (i) (x) the amount of cash that such Holder would receive in such Reorganization if such Holder owned, as of the record date for such Reorganization, a number of Shares equal to the Warrant Share Number in effect on such record date, *minus* (y) the Exercise Price in effect on such record date *multiplied by* the Warrant Share Number in effect on such record date and (ii) $0, and upon the Company's delivery of such cash (if any) in respect of such Warrant, such Warrant shall be deemed to have been exercised in full and canceled. With respect to any exercise of Warrants following the effective time of such Reorganization, the number of Units of Reference Property issuable upon exercise of a Warrant shall be calculated pursuant to Section 5 as if each reference therein to a "Share" or a "Warrant Share" referred to a Unit of Reference Property.

(b)     In the case of any Reorganization in which holders of Shares may make an election as between different types of Reference Property, such holders of Shares shall be deemed to have elected to receive (i) first, the maximum amount of Marketable Securities and (ii) for any remaining consideration, the maximum amount of cash. The Company shall not consummate any Reorganization unless the Company first shall have made appropriate provision to ensure that the applicable provisions of this Agreement shall immediately after giving effect to such Reorganization be assumed by and binding on the other party to the Reorganization (or the surviving entity, successor, parent company and/or issuer of such Reference Property, as appropriate) and applicable to any Reference Property deliverable upon the exercise of Warrants, pursuant to a customary assumption agreement in form and substance reasonably satisfactory to the Holders of a majority of the Warrants then outstanding.  Any such assumption agreement shall also include any amendments to this Agreement necessary to effect the changes to the terms of the Warrants described in this Section 7 and preserve the intent of the provisions of this Agreement.  The provisions of this Section 7 shall similarly apply to successive Reorganizations.

(c)     The Company shall notify the Holders and the Warrant Agent of any such proposed Reorganization reasonably prior to the consummation thereof so as to provide the Holders with a reasonable opportunity to confirm compliance with the terms hereof and, if they elect, to exercise the Warrants in accordance with the terms and conditions hereof prior to consummation of the Reorganization; *provided* that in the case of a transaction which requires notice to be given to the holders of the Shares, the Holders and the Warrant Agent shall be provided the same notice given to the holders of the Shares.

17

Section 8.     *Covenants of the Company*.  (a)  *Covenants as to Warrant Shares*. The Company covenants and agrees that all Warrant Shares that may be issued upon the exercise of the rights represented by the Warrants shall, upon issuance, be validly issued and outstanding, fully paid and nonassessable, and free from all taxes (subject to **Error! Reference source not found.**), liens and charges with respect to the issuance thereof and shall not be issued in violation of any applicable law or governmental regulation.  The Company further covenants and agrees that the Company shall at all times prior to the Expiration Date (or any earlier time at which all Warrants have been canceled) have reserved a sufficient number of authorized but unissued Shares to provide for the exercise of all outstanding Warrants.  The Company further covenants and agrees that, if the Shares are at any time listed or traded on a Principal Exchange, the Company shall procure, at its sole expense, the listing of the Shares issuable upon exercise of the Warrants, subject to issuance or notice of issuance, on such Principal Exchange.

(b)     *Notices of Record Date*.  In the event of any taking by the Company of a record of the holders of any class of securities for the purpose of determining the holders thereof who are entitled to receive any distribution of any kind, or any right to subscribe for, purchase or otherwise acquire any Shares or any other securities or property, or to receive any other right or interest of any kind, the Company will mail to the Holders, at least five (5) Business Days prior to such record date, a notice specifying the date on which any such record is to be taken for the purpose of such distribution (other than pursuant to the adjustments provided herein).

Section 9.     *Warrant Agent*.  The Warrant Agent undertakes the duties and obligations imposed by this Agreement upon the terms and conditions set forth in this Section 9.

(a)     *Limitation on Liability*.  The Warrant Agent shall not by any act hereunder be accountable with respect to or be deemed to make any representations as to the validity or authorization of the Warrants, as to the validity, authorization or value (or kind or amount) of any Warrant Shares or other property delivered or deliverable upon exercise of any Warrant, or as to the purchase price of such Warrant Shares or other property.  The Warrant Agent shall not (i) be liable for any recital or statement of fact contained herein or for any action taken, suffered or omitted by the Warrant Agent in good faith in the belief that any document or any signature is genuine or properly authorized, (ii) be responsible for determining whether any facts exist that may require any adjustment of the Exercise Price or the number of Warrant Shares issuable or with respect to the nature or extent of any such adjustments when made, or with respect to the method of adjustment employed, (iii) be responsible for any failure on the part of the Company to issue, transfer or deliver any Warrant Shares or property upon the surrender of any Warrant for the purpose of exercise or to comply with any other of the Company's covenants and obligations contained in this Agreement or (iv) be liable for any action taken, suffered or omitted to be taken in connection with this Agreement, except for its own bad faith, gross negligence or willful misconduct.  The Warrant Agent shall be liable hereunder only for its own bad faith, gross negligence or willful misconduct (which bad faith, gross negligence or willful misconduct must be determined by a final, non-appealable order, judgment, decree or ruling of a court of competent jurisdiction).  Except

18

for the foregoing, notwithstanding anything in this Agreement to the contrary, in no event shall the Warrant Agent be liable for special, indirect, punitive, incidental or consequential loss or damage of any kind whatsoever (including, but not limited to, lost profits).

(b)  *Instructions*.  The Warrant Agent is hereby authorized to accept advice or instructions with respect to the performance of its duties hereunder from an Appropriate Officer and to apply to any such Appropriate Officer for advice or instructions.  The Warrant Agent shall be fully protected and authorized in relying upon the most recent advice or instructions received from any such Appropriate Officer.  The Warrant Agent shall not be liable for any action taken, suffered or omitted by it in accordance with the advice or instructions of any such Appropriate Officer, except to the extent that such action or omission resulted directly from the Warrant Agent's bad faith, gross negligence, or willful misconduct.

(c)  *Agents*.  The Warrant Agent may execute and exercise any of the rights and powers hereby vested in it or perform any duty hereunder either itself or by or through its attorneys, agents or employees, provided reasonable care has been exercised in the selection and in the continued employment of such attorney, agent or employee, provided, further that it shall be liable and responsible for any such attorney, agent or employee.  The Warrant Agent shall not be under any obligation or duty to institute, appear in, or defend any action, suit or legal proceeding in respect hereof, but this provision shall not affect the power of the Warrant Agent to take such action as the Warrant Agent may consider necessary.  The Warrant Agent shall promptly notify the Company in writing of any claim made or action, suit or proceeding instituted against the Warrant Agent arising out of or in connection with this Agreement.

(d)  *Cooperation*.  The Company will perform, execute, acknowledge and deliver or cause to be performed, executed, acknowledged and delivered all such further acts, instruments and assurances as may reasonably be required by the Warrant Agent in order to enable the Warrant Agent to carry out or perform its duties under this Agreement.

(e)  *Agent Only*.  The Warrant Agent shall act solely as agent for the Company in accordance with the terms and conditions hereof and does not assume any obligation or relationship of agency or trust with any Holders.  The Warrant Agent shall not be liable except for the performance of such duties as are specifically set forth herein, and no implied covenants or obligations shall be read into this Agreement against the Warrant Agent, whose duties and obligations shall be determined solely by the express provisions hereof.

(f)  *Right to Counsel*.  The Warrant Agent may at any time consult with legal counsel reasonably satisfactory to it (who may be legal counsel for the Company), and the Warrant Agent shall incur no liability or responsibility to the Company or to any Holder for any action taken, suffered or omitted by the Warrant Agent in good faith in accordance with the opinion or advice of such counsel.

19

(g)     *Compensation*.  The Company agrees to pay the Warrant Agent reasonable compensation for all services rendered by it hereunder and to reimburse the Warrant Agent for its reasonable expenses hereunder (including reasonable and documented fees and out-of-pocket expenses of one legal counsel and one local counsel), and further agrees to indemnify and hold the Warrant Agent and its employees, officers, directors and agents harmless against any and all loss, claims, damages, expenses and liabilities, including, but not limited to, any judgments, costs and such reasonable counsel fees, for any action taken, suffered or omitted by the Warrant Agent and its employees, officers, directors and agents in connection with the acceptance, administration, exercise and performance of its duties under this Agreement and the Warrants, except for any such liabilities that arise as a result of the Warrant Agent's bad faith, gross negligence or willful misconduct (as determined by a court of competent jurisdiction in a final and non-appealable judgment).  Notwithstanding the foregoing, the Company shall not be responsible for any settlement made without its consent, which consent shall not be unreasonably conditioned, withheld or delayed.

(h)     *Accounting and Payment*.  The Warrant Agent shall account promptly to the Company with respect to Warrants exercised and concurrently pay to the Company all moneys received by the Warrant Agent on behalf of the Company on the purchase of Warrant Shares through the exercise of Warrants.  The Warrant Agent shall advise the Company by telephone at the end of each day on which a payment for the exercise of Warrants is received of the amount so deposited to such account.  The Warrant Agent shall as soon as practicable confirm such telephone advice to the Company in writing.

(i)     *No Conflict*.  Subject to applicable law, the Warrant Agent and any stockholder, affiliate, director, officer or employee of the Warrant Agent may buy, sell or deal in any of the Warrants or other securities of the Company or become pecuniarily interested in any transaction in which the Company may be interested, or contract with or lend money to the Company or otherwise act as fully and freely as though it were not Warrant Agent under this Agreement.  Subject to applicable law, nothing herein shall preclude the Warrant Agent from acting in any other capacity for the Company or for any other Person including, without limitation, acting as trustee under an indenture.

(j)     *Resignation; Termination*.  The Warrant Agent may resign its duties and be discharged from all further duties and liabilities hereunder (except liabilities arising as a result of the Warrant Agent's bad faith, gross negligence or willful misconduct) after giving thirty (30) calendar days' prior written notice to the Company.  The Company may remove the Warrant Agent upon thirty (30) calendar days' written notice, and the Warrant Agent shall thereupon in like manner be discharged from all further duties and liabilities hereunder, except as have been caused by the Warrant Agent's bad faith, gross negligence or willful misconduct.  The Company shall cause to be mailed promptly (by first class mail, postage prepaid) to each registered Holder at such Holder's last address as shown on the register of the Company, at the Company's expense, a copy of such notice of resignation or notice of removal, as the case may be.  Upon such resignation or removal the Company shall promptly appoint in writing a new Warrant Agent.  If the Company shall fail to make such appointment within a period of sixty (60) calendar days after it has been notified in writing of such resignation by the resigning Warrant Agent or

after such removal, then the Holder of any Warrant may apply to any court of competent jurisdiction for the appointment of a new Warrant Agent. A resignation or removal of the Warrant Agent and appointment of a successor Warrant Agent will become effective only upon the successor Warrant Agent's acceptance of appointment. Pending appointment of a successor to the Warrant Agent, either by the Company or by such a court, the duties of the Warrant Agent shall be carried out by the Company. Any successor Warrant Agent, whether appointed by the Company or by such a court, shall be a Person, organized under the laws of the United States or of any state thereof and authorized under such laws to conduct a shareholder services business, be subject to supervision and examination by a Federal or state authority, and have a combined capital and surplus of not less than $50,000,000 as set forth in its most recent published annual report of condition; or in the case of such capital and surplus requirement, a controlled affiliate of such a Person meeting such capital and surplus requirement. After acceptance in writing of such appointment by the new Warrant Agent, such successor Warrant Agent shall be vested with the same powers, rights, duties and responsibilities under this Agreement as if it had been originally named herein as the Warrant Agent, without any further assurance, conveyance, act or deed; but if for any reason it shall be necessary or expedient to execute and deliver any further assurance, conveyance, act or deed, the same shall be done at the expense of the Company and shall be legally and validly executed and delivered by the resigning or removed Warrant Agent. Not later than the effective date of any such appointment, the Company shall send notice thereof to the resigning or removed Warrant Agent and shall forthwith cause a copy of such notice to be mailed (by first class, postage prepaid) to each registered Holder at such Holder's last address as shown on the register of the Company. Failure to give any notice provided for in this (j), or any defect in any such notice, shall not affect the legality or validity of the resignation of the Warrant Agent or the appointment of a successor Warrant Agent, as the case may be.

(k)     *Merger, Consolidation or Change of Name of Warrant Agent*. Any corporation into which the Warrant Agent may be merged or converted or with which it may be consolidated, or any corporation resulting from any merger, conversion or consolidation to which the Warrant Agent shall be a party, or any corporation succeeding to all or substantially all of the agency business of the Warrant Agent shall be the successor to the Warrant Agent hereunder without the execution or filing of any document or any further act on the part of any of the parties hereto, provided that such corporation would be eligible for appointment as a successor Warrant Agent under the provisions of Section 9(j).

(l)     *Exclusions*. Unless a court of competent jurisdiction determines by a final, non-appealable order, judgment, decree or ruling that the Warrant Agent's action or inaction constitutes bad faith, gross negligence or willful misconduct on the part of the Warrant Agent, the Warrant Agent shall have no responsibility with respect to the validity of this Agreement or with respect to the validity or execution of any Warrant (except its countersignature thereof); nor shall it be responsible for any breach by the Company of any covenant or condition contained in this Agreement or in any Warrant; nor shall it be responsible or have any duty to make any calculation or adjustment (unless reasonably requested to do so by the Company in writing in a manner consistent with the terms of this Agreement), or to determine when any calculation or adjustment required

21

under the provisions hereof should be made, how it should be made or what it should be, or have any responsibility or liability for the manner, method or amount of any such calculation or adjustment or the ascertaining of the existence of facts that would require any such calculation or adjustment; nor shall it by any act hereunder be deemed to make any representation or warranty as to the authorization or reservation of any Warrant to be issued pursuant to this Agreement or as to whether any Warrant Shares will, when issued, be valid and fully paid and nonassessable.

(m)     *No Liability for Interest*.  The Warrant Agent shall not be under any liability for interest on any monies at any time received by it pursuant to any of the provisions of this Agreement.

(n)     *No Liability for Invalidity*.  The Warrant Agent shall not be under any responsibility with respect to the validity or sufficiency of this Agreement or the execution and delivery hereof (except the due execution and delivery hereof by the Warrant Agent).

(o)     *No Responsibilities for Recitals*.  The recitals contained herein shall be taken as the statements of the Company, and the Warrant Agent assumes no responsibility hereby for the correctness of the same.

(p)     *No Implied Obligations*.  The Warrant Agent shall be obligated to perform such duties as are explicitly set forth herein and no implied duties or obligations shall be read into this Agreement against the Warrant Agent.  The Warrant Agent shall not be under any obligation to take any action hereunder that may involve it in any expense or liability, the payment of which within a reasonable time is not, in its reasonable opinion, assured to it.  The Warrant Agent shall have no duty or responsibility in case of any default by the Company in the performance of its covenants or agreements contained herein or in the case of the receipt of any written demand from a Holder with respect to such default, including, without limiting the generality of the foregoing, any duty or responsibility to initiate or attempt to initiate any proceedings at law or otherwise or, to make any demand upon the Company.

(q)     *Force Majeure*.  In no event shall the Warrant Agent be responsible or liable for any failure or delay in the performance of its obligations under this Agreement arising out of or caused by, directly or indirectly, forces beyond its reasonable control, including, without limitation, strikes, work stoppages, accidents, acts of war or terrorism, civil or military disturbances, nuclear or natural catastrophes or acts of God, and interruptions, loss or malfunctions of utilities, communications or computer (software or hardware) services.

Section 10.     *Severability*.  The determination by a court of competent jurisdiction that any particular provision of this Agreement is unenforceable or invalid will not affect the enforceability of or invalidate the other provisions hereof, and this Agreement will be construed in all respects as if such invalid or unenforceable provisions had never been part hereof and were omitted here from.  Upon such a determination, the parties will negotiate in good faith to modify this Agreement so as to effect the original intent of the

22

parties as closely as possible so that the transactions contemplated hereby be consummated as originally contemplated to the fullest extent possible.

Section 11.  *Holder Not Deemed a Shareholder*.  No Holder of a Warrant, by reason of the ownership of such Warrant, shall be entitled to vote or receive dividends on or be deemed the holder of any Warrant Shares for any purpose, nor shall anything contained in the Warrants be construed to confer upon the Holders, as such, any of the rights of a holder of Shares or any right to vote, give or withhold consent to any Company action (whether any reorganization, issuance of Shares, reclassification of Shares, consolidation, merger, conveyance or otherwise), receive notice of meetings, receive dividends or subscription rights or otherwise, except as set forth in the Stockholders Agreement or herein.  No Holder shall have any right not expressly conferred under, or by applicable law with respect to, this Agreement or the Stockholders Agreement.

Section 12.  *Notices to Company and Warrant Agent*.  All notices, requests or demands authorized by this Agreement to be given or made by the Warrant Agent or by any registered Holder of any Warrant to or on the Company or the Warrant Agent to be effective shall be in writing (including by telecopy), and shall be deemed to have been duly given or made when delivered by hand, or two (2) Business Days after being delivered to a recognized courier (whose stated terms of delivery are two Business Days or less to the destination), or five (5) Business Days after being deposited in the mail, or, in the case of facsimile or email notice, when received, addressed (until another address is filed in writing by the Company with the Warrant Agent) as follows:

[NewCo]
[_____]

If the Company shall fail to maintain such office or agency or shall fail to give such notice of any change in the location thereof, presentation may be made and notices and demands may be served at the principal office of the Warrant Agent.

Any notice pursuant to this Agreement to be given by the Company or by any registered Holder of any Warrant to the Warrant Agent shall be sufficiently given if sent by first-class mail, postage prepaid, or by facsimile or email notice, addressed (until another address is filed in writing by the Warrant Agent with the Company), as follows:

[American Stock Transfer & Trust Company, LLC
6201 15th Avenue
Brooklyn, NY 11219
Attention: Relationship Management for [NewCo]
Email: reorgwarrants@astfinancial.com]

The Warrant Agent maintains the Warrant Agent Office at the above address.

Section 13.  *Supplements and Amendments*.  The Company and the Warrant Agent may from time to time supplement or amend this Agreement (a) without the approval of any Holder in order to cure any ambiguity, manifest error or other mistake in

23

this Agreement, or to correct or supplement any provision contained herein that may be defective or inconsistent with any other provision herein, or to make any other provisions in regard to matters or questions arising hereunder that the Company and the Warrant Agent may deem necessary or desirable and that shall not adversely affect, alter or change the interests of the Holders in any material respect or (b) with the prior written consent of Holders of a majority of the Warrants; *provided* that each amendment and supplement that decreases the Warrant Agent's rights or increases its duties and responsibilities hereunder shall also require the prior written consent of the Warrant Agent. Notwithstanding the foregoing, the consent of each Holder affected in any material respect shall be required for any amendment pursuant to which the Exercise Price would be increased or the number of Warrant Shares purchasable would be decreased (other than pursuant to adjustments provided herein) or the Exercise Period would be shortened. Upon execution and delivery of any supplement or amendment pursuant to this Section 13, such amendment shall be considered a part of this Agreement for all purposes and every Holder of Warrants shall be bound thereby.

Section 14. *Termination*. This Agreement shall terminate on the earlier of (a) such date when all Warrants have been cancelled or exercised with respect to all Warrant Shares subject thereto [(including pursuant to Section 6(h))][15] and (b) the Expiration Date or, if later, upon settlement of all Warrants (i) validly exercised on or prior to the Expiration Date and, except in the case of Cashless Exercise, for which the Exercise Price was timely paid; *provided* that the provisions of Sections 10-20 shall survive such termination.

Section 15. *Governing Law and Consent to Forum*. This Agreement shall be governed by, and construed in accordance with, the laws of the State of Delaware (without giving effect to choice of law principles thereof to the extent that the application of the laws of another jurisdiction would be required thereby); *provided*, *however*, that the foregoing shall not be construed so as to restrict in any manner the ability of the Company to enforce any judgment obtained in any court of competent jurisdiction. Subject to the provisos to the last sentence of this Section 15, each of the parties hereto (a) consents to submit itself to the exclusive personal jurisdiction of the Chancery Court of Delaware and, if such court declines jurisdiction, any Federal district court located in the State of Delaware in the event of any action arising out of or relating to this Agreement or any of the transactions contemplated by this Agreement, (b) agrees that it will not attempt to deny or defeat such personal jurisdiction by motion or other request for leave from any such court, (c) agrees that, except as provided in clause (d) below, it will not bring any action arising out of or relating to this Agreement or any of the transactions contemplated by this Agreement in any court other than the Chancery Court of Delaware and, if such court declines jurisdiction, a Federal district court sitting in the State of Delaware and (d) agrees, to the maximum extent permitted by law, that it will not bring any action arising out of or relating to the Securities Act in any court other than a Federal district court sitting in the State of Delaware and, if such court declines jurisdiction, to another Federal district court. Any person or entity purchasing or

---

[15] Insert for GUC Warrants.

otherwise acquiring any interest in any Company securities shall be deemed to have notice of and consented to this provision.  In any action arising out of or relating to this Agreement or any of the transactions contemplated by this Agreement, each party irrevocably and unconditionally waives and agrees not to assert by way of motion, as a defense or otherwise any claims that it is not subject to the jurisdiction of the above courts, that such action is brought in an inconvenient forum or that the venue of such action is improper; *provided, however,* that, notwithstanding anything to the contrary in this Section 15 or otherwise, the Company shall retain the right to bring any such action arising out of or relating to this Agreement or any of the transactions contemplated hereby, to the extent that the subject matter of such action is contemplated by the Plan or the Disclosure Statement, in the United States Bankruptcy Court for the District of Delaware, and each of the parties hereto (i) consents to submit itself to the exclusive personal jurisdiction of the Chancery Court of Delaware and, if such court declines jurisdiction, any Federal district court located in the State of Delaware in the event of any action arising out of or relating to this Agreement or any of the transactions contemplated by this Agreement, (ii) agrees that it will not attempt to deny or defeat such personal jurisdiction by motion or other request for leave from any such court.

Section 16.  *Waiver of Jury Trial*.  EACH OF THE PARTIES TO THIS AGREEMENT HEREBY IRREVOCABLY WAIVES ALL RIGHT TO A TRIAL BY JURY IN ANY ACTION, PROCEEDING OR COUNTERCLAIM ARISING OUT OF OR RELATING TO THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY.  THE SCOPE OF THIS WAIVER IS INTENDED TO BE ALL-ENCOMPASSING OF ANY AND ALL DISPUTES THAT MAY BE FILED IN ANY COURT AND THAT RELATE TO THE SUBJECT MATTER OF THIS AGREEMENT, INCLUDING, WITHOUT LIMITATION, CONTRACT CLAIMS, TORT CLAIMS (INCLUDING NEGLIGENCE), BREACH OF DUTY CLAIMS, AND ALL OTHER COMMON LAW AND STATUTORY CLAIMS.  THIS SECTION 16 HAS BEEN FULLY DISCUSSED BY EACH OF THE PARTIES HERETO AND THESE PROVISIONS WILL NOT BE SUBJECT TO ANY EXCEPTIONS.  EACH PARTY HERETO HEREBY FURTHER WARRANTS AND REPRESENTS THAT SUCH PARTY HAS REVIEWED THIS WAIVER WITH ITS LEGAL COUNSEL, AND THAT SUCH PARTY KNOWINGLY AND VOLUNTARILY WAIVES ITS JURY TRIAL RIGHTS FOLLOWING CONSULTATION WITH LEGAL COUNSEL.

Section 17.  *Benefits of This Agreement*.  Nothing in this Agreement shall be construed to give to any Person other than the Company, the Warrant Agent and the registered Holders (who are express third party beneficiaries of this Agreement) any legal or equitable right, remedy or claim under this Agreement, and this Agreement shall be for the sole and exclusive benefit of the Company, the Warrant Agent and the registered Holders.

Section 18.  *Counterparts*.  This Agreement may be executed in any number of counterparts and each of such counterparts shall for all purposes be deemed to be an original, and such counterparts shall together constitute but one and the same instrument.

#94518622v9
WEIL:\98021395\2\45327.0007

Section 19.  *Headings*.  The headings of sections of this Agreement have been inserted for convenience of reference only, are not to be considered a part hereof and in no way modify or restrict any of the terms or provisions hereof.

Section 20.  *Electronic Transmission*.  Each of the parties hereto agrees that (a) any consent or signed document transmitted by electronic transmission shall be treated in all manner and respects as an original written document, (b) any such consent or document shall be considered to have the same binding and legal effect as an original document and (c) at the request of any party hereto, any such consent or document shall be re-delivered or re-executed, as appropriate, by the relevant party or parties in its original form.  Each of the parties further agrees that they will not raise the transmission of a consent or document by electronic transmission as a defense in any proceeding or action in which the validity of such consent or document is at issue and hereby forever waives such defense.  For purposes of this Agreement, the term "electronic transmission" means any form of communication not directly involving the physical transmission of paper, that creates a record that may be retained, retrieved and reviewed by a recipient thereof, and that may be directly reproduced in paper form by such a recipient through an automated process.

[*Signature Page Follows*]

26

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed and delivered as of the day and year first above written.

[NEWCO]

By: _____
     Name:
     Title:

*[Signature Page to Warrant Agreement]*

AMERICAN STOCK TRANSFER &
TRUST COMPANY, LLC


By: _____
       Name:
       Title:

*[Signature Page to Warrant Agreement]*

**EXHIBIT A**

**FORM OF ELECTION TO EXERCISE WARRANT**

**TO BE COMPLETED BY REGISTERED HOLDER**

[NEWCO]

Warrants to Purchase Common Stock

(TO BE EXECUTED UPON EXERCISE OF A WARRANT)

Reference is made to that certain Warrant Agreement, dated [●], 2021 (the "**Warrant Agreement**"), by and between [NewCo] (the "**Company**") and American Stock Transfer & Trust Company, LLC (the "**Warrant Agent**"). Capitalized terms used but not defined herein shall have the meanings ascribed to such terms in the Warrant Agreement.

The undersigned hereby irrevocably elects to exercise [●] Warrants representing the right to purchase [●] Shares as calculated pursuant to the Warrant Agreement (the "**Exercise Shares**") at the applicable Exercise Price per Exercise Share.

The undersigned represents, warrants and promises that it has the full power and authority to exercise and deliver the Warrants exercised hereby. Unless the box for Cashless Exercise is checked below, the undersigned represents, warrants and promises that it has delivered or will deliver in payment for such Exercise Shares, $[●] by certified or official bank or bank cashier's check payable to the order of the Company, or by wire transfer in immediately available funds to an account of the Warrant Agent specified in writing by the Warrant Agent for such purpose, no later than 5:00 p.m., New York City time, on the Business Day immediately following the date that this Warrant Exercise Notice is delivered.

☐ Please check if the undersigned, in lieu of paying the aggregate Exercise Price as set forth in the preceding paragraph, elects to exercise the Warrants pursuant to a Cashless Exercise.

Concurrently with the receipt of the Exercise Shares, the undersigned agrees to execute and deliver a Joinder in accordance with Section [5.01] of the Stockholders Agreement.

The undersigned requests that the Exercise Shares purchased hereby be in registered form in the authorized denominations, registered in such names and delivered, all as specified in accordance with the instructions set forth below.

(PLEASE PRINT)
RECIPIENT: _____
CONTACT NAME: _____
ADDRESS: _____
TELEPHONE (INCLUDING INTERNATIONAL CODE): _____
EMAIL: _____
SOCIAL SECURITY OR OTHER TAXPAYER IDENTIFICATION NUMBER (IF APPLICABLE): _____

---

NOTE: THIS EXERCISE NOTICE MUST BE DELIVERED TO THE WARRANT AGENT, PRIOR TO 5:00 P.M., NEW YORK CITY TIME, ON THE EXPIRATION DATE. THE WARRANT AGENT SHALL NOTIFY YOU OF THE ADDRESS, PHONE NUMBER AND FACSIMILE NUMBER WHERE YOU CAN CONTACT THE WARRANT AGENT AND TO WHICH WARRANT EXERCISE NOTICES ARE TO BE SUBMITTED.

---

A-2

_____          _____
(Date)                                     (Signature)

                                           _____
                                           (Print name)

Signature Guaranteed

BY:

Signatures must be guaranteed by a participant in a Medallion Signature Guarantee Program at a guarantee level acceptable to the Company's transfer agent.

A-3

**EXHIBIT B**

FORM OF ASSIGNMENT FOR WARRANTS

(TO BE EXECUTED BY THE REGISTERED HOLDER
IF SUCH HOLDER DESIRES TO TRANSFER A WARRANT)

Reference is made to that certain Warrant Agreement, dated [•], 2020 (the "**Warrant Agreement**"), by and between [NewCo] (the "**Company**") and American Stock Transfer & Trust Company, LLC (the "**Warrant Agent**").  Capitalized terms used but not defined herein shall have the meanings ascribed to such terms in the Warrant Agreement.

FOR VALUE RECEIVED, the undersigned registered holder of Warrants hereby sells, assigns and transfers unto

_____

Name of Assignee

_____

Address of Assignee

_____ Warrants to purchase Shares held by the undersigned, together with all right, title and interest therein, and does irrevocably constitute and appoint _____ attorney, to transfer such Warrants on the books of the Warrant Agent, with full power of substitution.

_____

Signature

_____

Date

_____

Social Security or Other Taxpayer Identification Number of Assignee

SIGNATURE GUARANTEED BY:

_____

Signatures must be guaranteed by a participant in a Medallion Signature Guarantee Program at a guarantee level acceptable to the Company's transfer agent.

B-1

**Exhibit O**

**Oil and Gas Lease Schedules**

**Exhibit O1**

**Leases, Rights of Way and Rights of Use and Easement Related to
Purchased Oil & Gas Lease Interests**

# Purchased Oil & Gas Lease Interests[*]

| Block | Lease | Type | Rights | Date Le Eff | Le Cur Acres (Ac) | Operator | WI | Lease Status | Note[†] |
|-------|-------|------|--------|-------------|-------------------|----------|-----|--------------|---------|
| BS 25 | G31442 | Federal | RT | 2/1/2008 | 2,079 | Tana Exp | 25% | UNIT | |
| BS 25 | SL19718 | SL-LA | WI | 7/9/2008 | 154 | Tana Exp | 25% | Active | |
| BS 45 | SL15683 | SL-LA | WI A | 4/14/1997 | – | Southern Oil of Louisiana | 38% | UNIT | [2] |
| BS 52 | SL17675 | SL-LA | WI A | 12/16/2002 | – | Southern Oil of Louisiana | 38% | UNIT | [3] |
| BS 52 | SL17860 | SL-LA | WI | 8/18/2003 | – | Southern Oil of Louisiana | 15% | UNIT | |
| EC 345 | G15156 | Federal | ORRI | 8/1/1995 | 2,500 | Talos ERT | 1% | PROD (production ceased 4/28/20) | |
| EW 1009 | G34878 | Federal | RT | 8/1/2013 | 5,760 | Fieldwood En | 50% | UNIT | |

---

[*]  The Debtors and the Consenting FLTL Lenders reserve the right to amend, modify, or supplement this schedule subject to any consent rights under the Restructuring Support Agreement.

[1]  Represents leases in which the Credit Bid Purchaser is to acquire all of the Debtors' right, title and interest in such lease (less and except the right, title and interest acquired by FWE from Apache and/or held by GOM Shelf); as to all remaining leases on this schedule (except those referenced in footnotes [5]-[7] below), the Credit Bid Purchaser is to obtain all of the Debtors' right, title and interest in such leases.

[2]  This lease has different ownership in 4 different portions, and a Seller (Fieldwood Offshore) has a working interest (37.5%) in only one of these 4 portions.

[3]  This lease has different ownership in 3 different portions, and a Seller (Fieldwood Offshore) has a working interest (37.5%) in only one of these 3 portions.

[4]  Fieldwood Energy Offshore has two ORRIs: a 1.225% ORRI from assignment filed with BOEM 2/09/2015 and another 3.43% (or 49% of 7%) ORRI that is granted each year.  However, as to the SS 005 ST01 well, its combined ORRI is only 3.92% until 5.8 million barrels of oil equivalent from this well.

[5]  The Credit Bid Purchaser to acquire record title solely as to the W/2 and SE/4 of the block. The record title and the Debtors' operating rights solely as to the NE/4 of the block are to be abandoned.

[6]  FWE I is to acquire solely the operating rights as to the NE/4 of this block; the Credit Bid Purchaser is to obtain the Debtors' overriding royalty interest in this lease; and the Debtors' remaining interests in this lease are to be abandoned.

[7]  Represents leases where the Credit Bid Purchaser is to acquire solely the Debtors' overriding royalty interests; the Debtors' remaining interests in these leases are to be abandoned.

**Legend**:  OP 1- Operating Rights 1; OP 2 - Operating Rights 2; OP 3 - Operating Rights 3; OP 4 - Operating Rights 4; OP 5 - Operating Rights 5; OP 6 - Operating Rights 6; ORRI - Overriding Royalty Interest; RT A - Record Title A; RT B - Record Title B; WI - Working Interest; WI A - Working Interest A

| Block | Lease | Type | Rights | Date Le Eff | Le Cur Acres (Ac) | Operator | WI | Lease Status | Note[†] |
|-------|-------|------|--------|-------------|-------------------|----------|-----|--------------|---------|
| EW 1010 | G34879 | Federal | RT | 8/1/2013 | 5,760 | Fieldwood En | 50% | UNIT | |
| EW 1011 | G34880 | Federal | RT | 8/1/2013 | 1,500 | Fieldwood En | 50% | UNIT | |
| EW 789 | G35805 | Federal | ORRI | 7/1/2016 | 5,760 | Walter O&G | 1% | UNIT | |
| EW 790 | G33140 | Federal | OP 1 | 7/1/2009 | 5,753 | Fieldwood En | 100% | UNIT | |
| EW 790 | G33140 | Federal | OP 2 | 7/1/2009 | 5,753 | Fieldwood En | 100% | UNIT | |
| EW 790 | G33140 | Federal | ORRI | 7/1/2009 | 5,753 | Walter O&G | 1% | UNIT | |
| EW 790 | G33140 | Federal | ORRI | 7/1/2009 | 5,753 | Walter O&G | 1% | UNIT | |
| EW 828 | G35806 | Federal | RT | 6/1/2016 | 3,731 | Fieldwood En Off | 100% | PRIMARY | |
| EW 834 | G27982 | Federal | ORRI | 7/1/2006 | 5,760 | Walter O&G | 1% | UNIT | |
| EW 835 | G33707 | Federal | ORRI | 5/1/2010 | 364 | Walter O&G | 1% | UNIT | |
| GC 039 B | G36476 | Federal | RT | 9/1/2013 | 450 | Fieldwood En | 50% | PRIMARY | |
| GC 040 | G34536 | Federal | RT | 11/1/2012 | 5,760 | Fieldwood En | 50% | UNIT | |
| GC 041 | G34537 | Federal | RT | 10/1/2012 | 1,783 | Fieldwood En | 50% | UNIT | |
| GC 064 | G34539 | Federal | RT | 8/1/2012 | 5,760 | Fieldwood En Off | 49% | PROD | |
| GC 065 | G05889 | Federal | OP | 7/1/1983 | 5,760 | Fieldwood En Off | 49% | UNIT | |
| GC 108 | G14668 | Federal | OP | 7/1/1994 | 5,760 | Fieldwood En Off | 49% | UNIT | |
| GC 109 | G05900 | Federal | OP | 7/1/1983 | 5,760 | Fieldwood En Off | 49% | UNIT | |
| GC 153 | G36814 | Federal | RT | 11/1/2019 | 5,760 | Fieldwood En | 100% | PRIMARY | |
| GC 198 | G36021 | Federal | RT | 6/1/2017 | 5,760 | Fieldwood En Off | 100% | PRIMARY | |
| GC 200 | G12209 | Federal | OP | 5/1/1990 | 5,760 | Fieldwood En Off | 53% | UNIT | |
| GC 200 | G12209 | Federal | RT | 5/1/1990 | 5,760 | Fieldwood En Off | 100% | UNIT | |
| GC 201 | G12210 | Federal | ORRI | 5/1/1990 | 5,760 | LLOG Exp Off | 5% | UNIT | |
| GC 201 | G12210 | Federal | RT | 5/1/1990 | 5,760 | Fieldwood En Off | 100% | UNIT | [5] |
| GC 238 | G26302 | Federal | ORRI | 7/1/2004 | 5,760 | Talos ERT | 3% | PROD | |
| GC 238 | G26302 | Federal | OP | 7/1/2004 | 5,760 | BHP Billiton Pet GOM | 40% | PROD | |

| Block | Lease | Type | Rights | Date Le Eff | Le Cur Acres (Ac) | Operator | WI | Lease Status | Note[†] |
|-------|-------|------|--------|-------------|-------------------|----------|-----|--------------|------|
| GC 243 | G20051 | Federal | ORRI | 7/1/1998 | 5,760 | Walter O&G | 5% | PROD | [4] |
| GC 244 | G11043 | Federal | RT | 5/1/1989 | 5,760 | Fieldwood En Offshore | 100% | UNIT | |
| GC 282 | G16727 | Federal | OP | 9/1/1996 | 5,760 | BHP Billiton Pet GOM | 25% | PROD | |
| GC 282 | G16727 | Federal | ORRI | 9/1/1996 | 5,760 | Talos ERT | 2% | PROD | |
| GC 39 A | G34966 | Federal | RT | 9/1/2013 | 540 | Fieldwood En | 50% | UNIT | |
| GC 39 A | G34966 | Federal | OP | 9/1/2013 | 540 | Fieldwood En | 50% | UNIT | |
| GC 679 | G21811 | Federal | OP 2 | 7/1/2000 | 5,760 | Fieldwood En | 43% | PROD | |
| GC 679 | G21811 | Federal | RT | 7/1/2000 | 5,760 | Fieldwood En | 38% | PROD | |
| GC 768 | G21817 | Federal | OP 1 | 6/1/2000 | 5,760 | Anadarko Pet | 50% | PROD | |
| GC 768 | G21817 | Federal | OP 2 | 6/1/2000 | 5,760 | Fieldwood En | 43% | PROD | |
| GC 768 | G21817 | Federal | RT | 6/1/2000 | 5,760 | Fieldwood En | 100% | PROD | |
| GI 110 | G13943 | Federal | RT | 8/1/1993 | 5,000 | Fieldwood En | 50% | UNIT | [1] |
| GI 116 | G13944 | Federal | RT | 7/1/1993 | 5,000 | Fieldwood En | 50% | UNIT | [1] |
| GI 116 | G13944 | Federal | OP | 7/1/1993 | 5,000 | Fieldwood En | 50% | UNIT | [1] |
| S/2 GI 32 | 00174 | Federal | RT | 7/17/1948 | 2,500 | GOM Shelf | 25% | UNIT | [1] |
| S/2 GI 32 | 00174 | Federal | OP 1 | 7/17/1948 | 2,500 | BP E&P | 25% | UNIT | [1] |
| S/2 GI 32 | 00174 | Federal | OP 2 | 7/17/1948 | 2,500 | GOM Shelf | 25% | UNIT | [1] |
| E/2 GI 39 | 00126 | Federal | RT | 4/21/1947 | 2,500 | GOM Shelf | 25% | UNIT | [1] |
| E/2 GI 39 | 00126 | Federal | OP 1 | 4/21/1947 | 2,500 | BP E&P | 25% | UNIT | [1] |
| E/2 GI 39 | 00126 | Federal | OP 2 | 4/21/1947 | 2,500 | GOM Shelf | 25% | UNIT | [1] |
| W/2 GI 39 | 00127 | Federal | RT | 4/21/1947 | 2,500 | GOM Shelf | 25% | UNIT | [1] |
| W/2 GI 39 | 00127 | Federal | OP 1 | 4/21/1947 | 2,500 | BP E&P | 25% | UNIT | [1] |
| W/2 GI 39 | 00127 | Federal | OP 2 | 4/21/1947 | 2,500 | GOM Shelf | 25% | UNIT | [1] |
| E/2 GI 40 | 00128 | Federal | RT | 4/21/1947 | 5,000 | GOM Shelf | 25% | UNIT | [1] |
| GI 40 | 00128 | Federal | OP 1 | 4/21/1947 | 5,000 | BP E&P | 25% | UNIT | [1] |
| GI 40 | 00128 | Federal | OP 2 | 4/21/1947 | 5,000 | GOM Shelf | 25% | UNIT | [1] |
| E/2 GI 41 | 00129 | Federal | RT | 4/21/1947 | 2,500 | GOM Shelf | 25% | UNIT | [1] |
| E/2 GI 41 | 00129 | Federal | OP 1 | 4/21/1947 | 2,500 | BP E&P | 25% | UNIT | [1] |
| E/2 GI 41 | 00129 | Federal | OP 2 | 4/21/1947 | 2,500 | GOM Shelf | 25% | UNIT | [1] |

| Block | Lease | Type | Rights | Date Le Eff | Le Cur Acres (Ac) | Operator | WI | Lease Status | Note[†] |
|---|---|---|---|---|---|---|---|---|---|
| W/2 GI 41 | 00130 | Federal | OP 1 | 4/21/1947 | 2,500 | BP E&P | 25% | UNIT | [1] |
| W/2 GI 41 | 00130 | Federal | OP 2 | 4/21/1947 | 2,500 | GOM Shelf | 25% | UNIT | [1] |
| W/2 GI 41 | 00130 | Federal | RT | 4/21/1947 | 2,500 | GOM Shelf | 25% | UNIT | [1] |
| GI 42 | 00131 | Federal | RT | 4/21/1947 | 5,000 | GOM Shelf | 25% | UNIT | [1] |
| GI 42 | 00131 | Federal | OP 1 | 4/21/1947 | 5,000 | BP E&P | 25% | UNIT | [1] |
| GI 42 | 00131 | Federal | OP 2 | 4/21/1947 | 5,000 | GOM Shelf | 25% | UNIT | [1] |
| GI 43 | 00175 | Federal | RT | 7/17/1948 | 5,000 | GOM Shelf | 25% | UNIT | [1] |
| GI 43 | 00175 | Federal | OP 1 | 7/17/1948 | 5,000 | BP E&P | 25% | UNIT | [1] |
| GI 43 | 00175 | Federal | OP 2 | 7/17/1948 | 5,000 | GOM Shelf | 25% | UNIT | [1] |
| N/2 GI 44 | 00176 | Federal | RT | 7/17/1948 | 2,500 | GOM Shelf | 25% | UNIT | [1] |
| N/2 GI 44 | 00176 | Federal | OP 1 | 7/17/1948 | 2,500 | BP E&P | 25% | UNIT | [1] |
| N/2 GI 44 | 00176 | Federal | OP 2 | 7/17/1948 | 2,500 | GOM Shelf | 25% | UNIT | [1] |
| GI 46 | 00132 | Federal | RT | 4/21/1947 | 5,000 | GOM Shelf | 25% | UNIT | [1] |
| GI 46 | 00132 | Federal | OP 1 | 4/21/1947 | 5,000 | BP E&P | 25% | UNIT | [1] |
| GI 46 | 00132 | Federal | OP 2 | 4/21/1947 | 5,000 | GOM Shelf | 25% | UNIT | [1] |
| GI 47 | 00133 | Federal | RT | 4/21/1947 | 5,000 | GOM Shelf | 25% | UNIT | [1] |
| GI 47 | 00133 | Federal | OP 1 | 4/21/1947 | 5,000 | BP E&P | 25% | UNIT | [1] |
| GI 47 | 00133 | Federal | OP 2 | 4/21/1947 | 5,000 | GOM Shelf | 25% | UNIT | [1] |
| GI 48 | 00134 | Federal | RT | 4/21/1947 | 5,000 | GOM Shelf | 25% | UNIT | [1] |
| GI 48 | 00134 | Federal | OP 1 | 4/21/1947 | 5,000 | BP E&P | 25% | UNIT | [1] |
| GI 48 | 00134 | Federal | OP 2 | 4/21/1947 | 5,000 | GOM Shelf | 25% | UNIT | [1] |
| N/2 GI 52 | 00177 | Federal | RT | 7/17/1948 | 2,500 | GOM Shelf | 25% | UNIT | [1] |
| N/2 GI 52 | 00177 | Federal | OP 2 | 7/17/1948 | 2,500 | BP E&P | 25% | UNIT | [1] |
| HI 176 | G27509 | Federal | ORRI | 1/1/2006 | 5,760 | Castex Off | 3% | PROD | |
| MC 110 | G18192 | Federal | RT | 8/1/1997 | 5,760 | Talos | 8% | PROD | [1] |
| MC 110 | G18192 | Federal | OP | 8/1/1997 | 5,760 | Talos | 8% | PROD | [1] |
| MC 118 | G35963 | Federal | RT | 8/1/2017 | 5,760 | Chevron USA | 5% | PRIMARY | |
| MC 119 | G36537 | Federal | RT | 7/1/2019 | 5,760 | Chevron USA | 5% | PRIMARY | |
| MC 162 | G36880 | Federal | RT | 8/1/2020 | 5,760 | Chevron USA | 5% | PRIMARY | |
| MC 163 | G36538 | Federal | RT | 7/1/2019 | 5,760 | Chevron USA | 5% | PRIMARY | |
| MC 171 | G34428 | Federal | RT | 12/1/2012 | 5,760 | Fieldwood En | 100% | PRIMARY | |

4

| Block | Lease | Type | Rights | Date Le Eff | Le Cur Acres (Ac) | Operator | WI | Lease Status | Note† |
|-------|-------|------|--------|-------------|-------------------|----------|-----|-------------|-------|
| MC 172 | G34429 | Federal | RT | 12/1/2012 | 5,760 | Fieldwood En | 100% | PRIMARY | |
| MC 206 | G36540 | Federal | RT | 7/1/2019 | 5,760 | Chevron USA | 5% | PRIMARY | |
| MC 297 | G34434 | Federal | RT | 11/1/2012 | 5,760 | Fieldwood En | 70% | PRIMARY | |
| MC 380 | G36544 | Federal | RT | 7/1/2019 | 5,760 | Fieldwood En | 100% | PRIMARY | |
| MC 424 | G36545 | Federal | RT | 7/1/2019 | 5,760 | Fieldwood En | 100% | PRIMARY | |
| MC 435 | G36772 | Federal | RT | 11/1/2019 | 5,760 | Fieldwood En | 100% | PRIMARY | |
| MC 436 | G36773 | Federal | RT | 11/1/2019 | 5,760 | Fieldwood En | 100% | PRIMARY | |
| MC 474 | G35825 | Federal | RT | 7/1/2016 | 5,760 | BP E&P | 24% | PRIMARY | |
| MC 518 | G35828 | Federal | RT | 7/1/2016 | 5,760 | BP E&P | 24% | PRIMARY | |
| MC 519 | G27278 | Federal | RT | 7/1/2005 | 5,760 | BP E&P | 65% | PROD | |
| MC 519 | G27278 | Federal | OP 2 | 7/1/2005 | 5,760 | Fieldwood En | 49% | PROD | |
| MC 519 | G27278 | Federal | OP 3 | 7/1/2005 | 5,760 | Fieldwood En | 49% | PROD | |
| MC 519 | G27278 | Federal | OP 4 | 7/1/2005 | 5,760 | BP E&P | 26% | PROD | |
| MC 519 | G27278 | Federal | OP 5 | 7/1/2005 | 5,760 | BP E&P | 26% | PROD | |
| MC 519 | G27278 | Federal | OP 6 | 7/1/2005 | 5,760 | BP E&P | 26% | PROD | |
| MC 562 | G19966 | Federal | RT | 7/1/1998 | 5,760 | BP E&P | 13% | PROD | |
| MC 563 | G21176 | Federal | OP 2 | 7/1/1999 | 5,760 | Fieldwood En | 23% | PROD | |
| MC 563 | G21176 | Federal | ORRI | 3/17/1999 | 5,760 | Kosmos En GOM Op | 0% | PROD | |
| MC 691 | G36400 | Federal | RT | 12/1/2018 | 5,760 | Fieldwood En | 50% | PRIMARY | |
| MC 697 | G28021 | Federal | RT | 4/1/2006 | 540 | Fieldwood En | 54% | UNIT | |
| MC 698 | G28022 | Federal | RT | 7/1/2006 | 5,760 | Fieldwood En | 54% | UNIT | |
| MC 742 | G32343 | Federal | RT B | 9/1/2008 | 1,440 | Fieldwood En | 54% | UNIT | |
| MC 742 | G32343 | Federal | RT A | 9/1/2008 | 4,320 | Fieldwood En | 100% | UNIT | |
| MC 743 | G36401 | Federal | RT | 11/1/2018 | 5,760 | Chevron USA | 25% | PRIMARY | |
| MC 782 | G33757 | Federal | RT | 7/1/2010 | 5,760 | Fieldwood En | 45% | PROD | |
| MC 789 | G36557 | Federal | RT | 7/1/2019 | 5,760 | Fieldwood En | 100% | PRIMARY | |
| MC 793 | G33177 | Federal | ORRI | 7/1/2009 | 5,760 | Walter O&G | 1% | UNIT | |
| MC 904 | G36566 | Federal | RT | 7/1/2019 | 5,760 | Fieldwood En | 59% | PRIMARY | |
| MC 905 | G36405 | Federal | RT | 11/1/2018 | 5,760 | Fieldwood En | 59% | PRIMARY | |
| MC 948 | G28030 | Federal | RT | 7/1/2006 | 5,760 | Fieldwood En | 59% | UNIT | |
| MC 949 | G32363 | Federal | RT | 7/1/2008 | 5,760 | Fieldwood En | 59% | UNIT | |
| MC 992 | G24133 | Federal | RT A | 7/1/2002 | 5,760 | Fieldwood En | 53% | UNIT | |
| MC 992 | G24133 | Federal | RT B | 7/1/2002 | 5,760 | Fieldwood En | 59% | UNIT | |

| Block | Lease | Type | Rights | Date Le Eff | Le Cur Acres (Ac) | Operator | WI | Lease Status | Note[†] |
|-------|-------|------|--------|-------------|-------------------|----------|-----|-------------|---------|
| MC 993 | G24134 | Federal | RT A | 7/1/2002 | 5,760 | Fieldwood En | 45% | UNIT | |
| MC 993 | G24134 | Federal | RT B | 7/1/2002 | 5,760 | Fieldwood En | 59% | UNIT | |
| MP 316 | G36231 | Federal | RT | 7/1/2018 | 5,000 | Fieldwood En Off | 50% | PRIMARY | |
| SM 149 | G02592 | Federal | RT | 5/1/1974 | 2,500 | Fieldwood En | 50% | PROD | [1] |
| SM 149 | G02592 | Federal | OP | 5/1/1974 | 2,500 | Fieldwood En | 50% | PROD | [1] |
| SM 149 | G02592 | Federal | ORRI | 5/1/1974 | 2,500 | Fieldwood En | 4% | PROD | [1] |
| SM 40 | G13607 | Federal | RT | 8/1/1992 | 5,000 | Fieldwood En Off | 100% | TERMIN | |
| SM 41 | G01192 | Federal | OP 1 | 6/1/1962 | 5,000 | Fieldwood En Off | 100% | PROD | [1] |
| SM 48 | 00786 | Federal | ORRI | 2/24/1960 | 5,000 | Fieldwood En | 3% | PROD (production ceased 8/16/20) | [1] |
| SP 61 | G01609 | Federal | ORRI | 7/1/1967 | 5,000 | Fieldwood En | 19% | UNIT | [6] |
| SS 301 | G10794 | Federal | RT | 5/1/1989 | 5,000 | Fieldwood En Off | 65% | SOP extension request pending | [1] |
| SS 301 | G10794 | Federal | OP 1 | 5/1/1989 | 5,000 | Fieldwood En Off | 100% | SOP extension request pending | [1] |
| SS 313 | G36362 | Federal | RT | 11/01/2018 | 5,000 | Fieldwood En | 100% | PRIMARY | |
| SS 358 | G36122 | Federal | RT | 11/01/2017 | 5,000 | Fieldwood En Off | 100% | PRIMARY | |
| SS 79 | G15277 | Federal | RT | 8/1/1995 | 5,000 | Fieldwood En Off | 33% | PROD | |
| SS 79 | G15277 | Federal | OP 1 | 8/1/1995 | 5,000 | Fieldwood En Off | 51% | PROD | |
| ST 287 | G24987 | Federal | RT | 5/1/2003 | 5,000 | Fieldwood En | 100% | PROD | |
| ST 287 | G24987 | Federal | OP 1 | 5/1/2003 | 5,000 | Fieldwood En | 100% | PROD | |
| ST 287 | G24987 | Federal | OP 2 | 5/1/2003 | 5,000 | Fieldwood En | 50% | PROD | |
| ST 308 | G21685 | Federal | RT | 6/1/2000 | 5,000 | Fieldwood En | 100% | PROD | |

| Block | Lease | Type | Rights | Date Le Eff | Le Cur Acres (Ac) | Operator | WI | Lease Status | Note[†] |
|-------|-------|------|--------|-------------|-------------------|----------|-----|--------------|---------|
| ST 308 | G21685 | Federal | OP 1 | 6/1/2000 | 5,000 | Fieldwood En | 100% | PROD | |
| ST 308 | G21685 | Federal | OP 2 | 6/1/2000 | 5,000 | Fieldwood En | 50% | PROD | |
| ST 53 | G04000 | Federal | RT | 3/1/1979 | 5,000 | Fieldwood En | 50% | PROD | [1] |
| ST 53 | G04000 | Federal | OP 1 | 3/1/1979 | 5,000 | Fieldwood En | 50% | PROD | [1] |
| ST 53 | G04000 | Federal | OP 2 | 3/1/1979 | 5,000 | Fieldwood En | 50% | PROD | [1] |
| ST 67 | 00020 | Federal | CONT | 4/25/1947 | 5,000 | Fieldwood En | 20% | UNIT | [1] |
| VR 229 | G27070 | Federal | RT A | 5/1/2005 | 1,250 | Fieldwood En Off | 50% | PROD | |
| VR 229 | G27070 | Federal | RT B | 5/1/2005 | 3,750 | Fieldwood En Off | 50% | PROD | |
| VR 362 | G10687 | Federal | RT | 6/1/1989 | 5,000 | Fieldwood En Off | 100% | UNIT (production ceased 8/22/20) | |
| VR 362 | G10687 | Federal | OP | 6/1/1989 | 5,000 | Fieldwood En Off | 83% | UNIT (production ceased 8/22/20) | |
| VR 363 | G09522 | Federal | RT | 5/1/1988 | 5,000 | Fieldwood En | 100% | UNIT (production ceased 8/22/20) | |
| VR 363 | G09522 | Federal | OP 1 | 5/1/1988 | 5,000 | Fieldwood En Off | 100% | UNIT (production ceased 8/22/20) | |
| VR 363 | G09522 | Federal | OP 2 | 5/1/1988 | 5,000 | Fieldwood En | 100% | UNIT (production ceased 8/22/20) | |
| VR 363 | G09522 | Federal | OP 3 | 5/1/1988 | 5,000 | Fieldwood En | 50% | UNIT (production ceased 8/22/20) | |

7

| Block | Lease | Type | Rights | Date Le Eff | Le Cur Acres (Ac) | Operator | WI | Lease Status | Note[†] |
|---|---|---|---|---|---|---|---|---|---|
| VR 371 | G09524 | Federal | RT | 7/1/1988 | 5,000 | Fieldwood En Off | 100% | PROD | |
| VR 371 | G09524 | Federal | OP | 7/1/1988 | 5,000 | Fieldwood En Off | 83% | PROD | |
| VR 78 | G04421 | Federal | RT | 11/1/1980 | 5,000 | Fieldwood En | 100% | PROD | |
| VR 78 | G04421 | Federal | OP | 11/1/1980 | 5,000 | Fieldwood En | 81% | PROD | |
| WD 57, WD 79, WD 80 | G01449 | Federal | ORRI | 5/1/1966 | 3,125 | Fieldwood En Off | 3% | UNIT | [7] |
| S/2 WD 67 | 00179 | Federal | RT | 7/17/1948 | 2,500 | GOM Shelf | 25% | UNIT | [1] |
| S/2 WD 67 | 00179 | Federal | OP 1 | 7/17/1948 | 2,500 | BP E&P | 25% | UNIT | [1] |
| S/2 WD 67 | 00179 | Federal | OP 2 | 7/17/1948 | 2,500 | GOM Shelf | 25% | UNIT | [1] |
| S/2 WD 68 | 00180 | Federal | RT | 7/17/1948 | 1,833 | GOM Shelf | 25% | UNIT | [1] |
| S/2 WD 68 | 00180 | Federal | OP 1 | 7/17/1948 | 1,833 | BP E&P | 25% | UNIT | [1] |
| S/2 WD 68 | 00180 | Federal | OP 2 | 7/17/1948 | 1,833 | GOM Shelf | 25% | UNIT | [1] |
| WD 69 | 00181 | Federal | RT | 7/17/1948 | 3,665 | GOM Shelf | 25% | UNIT | [1] |
| WD 69 | 00181 | Federal | OP 1 | 7/17/1948 | 3,665 | BP E&P | 25% | UNIT | [1] |
| WD 69 | 00181 | Federal | OP 2 | 7/17/1948 | 3,665 | GOM Shelf | 25% | UNIT | [1] |
| WD 70 | 00182 | Federal | RT | 7/17/1948 | 5,000 | GOM Shelf | 25% | UNIT | [1] |
| WD 70 | 00182 | Federal | OP 1 | 7/17/1948 | 5,000 | BP E&P | 25% | UNIT | [1] |
| WD 70 | 00182 | Federal | OP 2 | 7/17/1948 | 5,000 | GOM Shelf | 25% | UNIT | [1] |
| WD 71 | 00838 | Federal | RT | 4/1/1960 | 5,000 | GOM Shelf | 25% | UNIT | [1] |
| WD 71 | 00838 | Federal | OP 1 | 4/1/1960 | 5,000 | BP E&P | 25% | UNIT | [1] |
| WD 71 | 00838 | Federal | OP 2 | 4/1/1960 | 5,000 | GOM Shelf | 25% | UNIT | [1] |
| WD 79, WD 80 | G01874 | Federal | ORRI | 12/1/1968 | 3,438 | Fieldwood En Off | 3% | UNIT | [7] |
| WD 80 | G01989 | Federal | ORRI | 8/1/1970 | 1,875 | Fieldwood En Off | 3% | UNIT | [7] |

| Block | Lease | Type | Rights | Date Le Eff | Le Cur Acres (Ac) | Operator | WI | Lease Status | Note[†] |
|---|---|---|---|---|---|---|---|---|---|
| WD 80 | G02136 | Federal | ORRI | 1/1/1972 | 938 | Fieldwood En Off | 3% | UNIT | [7] |
| WD 94 | 00839 | Federal | RT | 5/1/1960 | 5,000 | GOM Shelf | 25% | PROD | [1] |
| WD 94 | 00839 | Federal | OP 1 | 5/1/1960 | 5,000 | GOM Shelf | 25% | PROD | [1] |
| WD 95 | G01497 | Federal | RT | 12/1/1966 | 5,000 | GOM Shelf | 25% | PROD | [1] |
| WD 95 | G01497 | Federal | OP 1 | 12/1/1966 | 5,000 | GOM Shelf | 25% | PROD | [1] |
| WD 95 | G01497 | Federal | OP 2 | 12/1/1966 | 5,000 | GOM Shelf | 25% | PROD | [1] |
| WD 96 | G01498 | Federal | RT | 12/1/1966 | 3,665 | GOM Shelf | 25% | PROD | [1] |
| WD 96 | G01498 | Federal | OP 1 | 12/1/1966 | 3,665 | BP E&P | 25% | PROD | [1] |
| WD 96 | G01498 | Federal | OP 2 | 12/1/1966 | 3,665 | GOM Shelf | 25% | PROD | [1] |
| - | 5749 | SL-TX | WI | - | - | Fieldwood SD Offshore | 100% | UNIT | |
| - | 5797 | SL-TX | WI | - | - | Fieldwood SD Offshore | 100% | TERMIN | |
| - | 23017 | SL-MS | ORRI | | | Tellus Operating Group LLC | 1% | UNIT | |
| - | 24318 | SL-TX | WI | - | - | Fieldwood Onshore | 100% | TERMINATED | |
| - | 106158 | SL-TX | WI | - | - | Fieldwood Energy Offshore LLC | 100% | TERMIN | |
| - | 106159 | SL-TX | WI | - | - | Fieldwood Energy Offshore LLC | 100% | TERMIN | |
| - | 114921 | SL-TX | WI | - | - | Fieldwood Energy Offshore LLC | 100% | TERMIN | |
| - | 170650 | SL-MS | ORRI | | | Whiting Oil & Gas | 1% | UNIT | |
| - | 172915 | SL-TX | WI | - | - | Fieldwood SD Offshore | 100% | ACTIVE | |
| - | 172916 | SL-TX | WI | - | - | Fieldwood SD Offshore | 100% | ACTIVE | |

| Block | Lease | Type | Rights | Date Le Eff | Le Cur Acres (Ac) | Operator | WI | Lease Status | Note[†] |
|---|---|---|---|---|---|---|---|---|---|
| - | 178537 | SL-TX | WI | - | - | Fieldwood | 100% | TERMINATED | |
| - | 183756 | SL-TX | WI | - | - | Fieldwood | 100% | TERMINATED | |
| - | 185633 | SL-TX | WI | - | - | Fieldwood Onshore | 100% | TERMINATED | |
| - | 186891 | SL-TX | WI | - | - | Fieldwood Onshore | 100% | ACTIVE | |
| - | 191681 | SL-TX | WI | - | - | Fieldwood SD Offshore | 100% | ACTIVE | |
| - | 207398 | SL-TX | WI | - | - | Fieldwood | 90% | ACTIVE | |
| - | 227360 | SL-TX | WI | - | - | Fieldwood Onshore | 74% | ACTIVE | |
| - | 230140 | SL-MS | ORRI | | | Black Jack Oil Co Inc | 1% | UNIT | |
| - | 230150 | SL-MS | ORRI | | | Wilcox Energy Co | 1% | UNIT | |
| - | 231240 | SL-MS | ORRI | | | Wilcox Energy Co | 1% | UNIT | |
| - | 234082 | SL-TX | WI | - | - | Fieldwood Onshore | 100% | TERMINATED | |
| - | 255675 | SL-TX | WI | - | - | Fieldwood Onshore | 100% | TERMINATED | |
| - | 5752 | SL-TX | WI | - | - | Fieldwood Onshore | 100% | TERMINATED | |
| - | 140960 | SL-TX | WI | - | - | Fieldwood SD Offshore | 100% | TERMINATED | |
| - | 165888 | SL-TX | WI | - | - | Fieldwood Onshore | 100% | TERMINATED | |
| - | 186892 | SL-TX | WI | - | - | Fieldwood Onshore | 100% | TERMINATED | |
| - | 176012 | SL-TX | WI | - | - | Fieldwood Onshore | 100% | TERMINATED | |
| - | 179673 | SL-TX | WI | - | - | Fieldwood Onshore | 100% | TERMINATED | |

10

| Block | Lease | Type | Rights | Date Le Eff | Le Cur Acres (Ac) | Operator | WI | Lease Status | Note† |
|-------|-------|------|--------|-------------|-------------------|----------|-----|--------------|-------|
| - | 188919 | SL-TX | WI | - | - | Fieldwood Onshore | 100% | TERMINATED | |
| - | 188921 | SL-TX | WI | - | - | Fieldwood Onshore | 100% | TERMINATED | |
| - | 269151 | SL-TX | WI | - | - | Fieldwood Onshore | 100% | TERMINATED | |

11

## Credit Bid Purchaser ROW

| SEGMENT NUMBER | COMPANY NAME | ORG AREA | ORG BLOCK | ORG NAME | REC AREA | REC BLOCK | REC NAME | SIZE | PRODUCT | STATUS | ROW NUMBER | FW LEASE | NOTE[3] |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 20200 | Fieldwood Energy, LLC | GC | 39 | K2 SUTA | GC | 40 | K1 SUTA | 5 | UBEH | Active | G29427 | G34966 | |
| 20202 | Fieldwood Energy, LLC | GC | 40 | K1 PLET | ST | 308 | | 8 | BLKO | Proposed | G29427 | G34966 | |
| 20203 | Fieldwood Energy, LLC | GC | 40 | K1 PLET | ST | 308 | Start Up Flange | 12 | CSNG | Proposed | G29427 | G34966 | |
| 8255 | Fieldwood Energy Offshore LLC | GC | 65 | A | GC | 19 | A | 12 | OIL | Out of Service | G09349 | G05889 | |
| 11260 | Fieldwood Energy Offshore LLC | GC | 65 | A | GC | 19 | A | 16 | OIL | Out of Service | G17685 | G05889 | |
| 20195 | Fieldwood Energy Offshore LLC | GC | 65 | A | GC | 200 | SUTA | 3 | UMB | Proposed | G29424 | G12209 | |
| 20221 | Fieldwood Energy Offshore LLC | GC | 156 | Mid-Line PLET A-1 | GC | 156 | Md-Line PLET A-2 | 8 | BLKO | Proposed | G29417 | G12209 | |
| 20197 | Fieldwood Energy Offshore LLC | GC | 156 | PLET 2 | GC | 156 | A-2 PLET | 8 | BLKO | Out of Service | G28820 | G12209 | |
| 20155 | Fieldwood Energy Offshore LLC | GC | 156 | Mid-Lne PLET A-2 | GC | 65 | A | 8 | BLKO | Out of Service | G29417 | G12209 | |
| 20183 | Fieldwood Energy Offshore LLC | GC | 200 | SUTA | GC | 244 | TROIKA SUTA | 5 | UMB | Proposed | G29420 | G11043 | |
| 11393 | Fieldwood Energy, LLC | GC | 200 | SS Manifold | GC | 65 | A | 10 | BLKO | Out of Service | G17737 | G12210 | |
| 11394 | Fieldwood Energy, LLC | GC | 200 | SSMANIFO | GC | 65 | A | 24 | CSNG | Out of Service | G17737 | G12210 | |
| 11395 | Fieldwood Energy, LLC | GC | 200 | SSMANIFO | GC | 65 | A | 5 | UMB | Out of Service | G17737 | G12210 | |
| 11396 | Fieldwood Energy, LLC | GC | 200 | SSMANIFO | GC | 65 | A | 10 | BLKG | Out of Service | G17738 | G12210 | |
| 11397 | Fieldwood Energy, LLC | GC | 200 | SSMANIFO | GC | 65 | A | 24 | CSNG | Out of Service | G17738 | G12210 | |
| 11410 | Fieldwood Energy, LLC | GC | 200 | SSMANIFO | GC | 65 | A | 5 | UMB | Out of Service | G17738 | G12210 | |
| 11959 | Fieldwood Energy Offshore LLC | GC | 200 | SSMANIFO | GC | 65 | A | 2 | UMB | Out of Service | G17737 | G12210 | |
| 12141 | Fieldwood Energy Offshore LLC | GC | 200 | SSMANIFO | GC | 65 | A | 5 | UMB | Out of Service | G17738 | G12210 | |
| 20196 | Fieldwood Energy Offshore LLC | GC | 200 | PLET-1 | GC | 156 | PLET-2 | 8 | BLKO | Proposed | G29425 | G12210 | |
| 20222 | Fieldwood Energy Offshore LLC | GC | 244 | PLEM A | GC | 156 | Mid-Line PLET A-1 | 8 | BLKO | Proposed | G28809 | G11043 | |
| 9084 | GOM Shelf, LLC | GI | 43 | AS | GI | 19 | F/S | 10 | OIL | Active | G12304 | 00175 | [1] |
| 19097 | Fieldwood Energy, LLC | MC | 698 | RGL PLET 1 | MC | 736 | A Thunderhawk | 8 | BLKO | Out of Service | G29295 | G28022 | |

[1]   FWE I is to obtain 75% of the Debtors' interests in Segment 9084, 50% of the Debtors' interest in Segments 4647 and 5890 and 79.666% of the Debtors' interest in Segment 17265, and the Credit Bid Purchaser is to obtain the Debtors' remaining interests in those four pipeline segments.

| SEGMENT NUMBER | COMPANY NAME | ORG AREA | ORG BLOCK | ORG NAME | REC AREA | REC BLOCK | REC NAME | SIZE | PRODUCT | STATUS | ROW NUMBER | FW LEASE | NOTE[3] |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 19149 | Fieldwood Energy, LLC | MC | 698 | RGL PLET 1 | MC | 736 | A Thunderhawk | 8 | BLKO | Out of Service | G29295 | G28022 | |
| 19296 | Fieldwood Energy, LLC | MC | 698 | RGL PLET 1 | MC | 736 | A Thunderhawk | 12 | CSNG | Out of Service | G29294 | G28022 | |
| 19364 | Fieldwood Energy, LLC | MC | 698 | RGL PLET 1 | MC | 736 | A | 12 | CSNG | Out of Service | G29295 | G28022 | |
| 19362 | Fieldwood Energy, LLC | MC | 724 | Gulfstar 1 Spar | MC | 948 | UTA1 | 8 | UMB | Out of Service | G29287 | G28030 | |
| 19334 | Fieldwood Energy, LLC | MC | 736 | A Thunderhawk | MC | 692 | SUTA | 5 | UMBH | Out of Service | G29299 | G28022 | |
| 19283 | Fieldwood Energy, LLC | MC | 736 | A Thunderhawk | MC | 698 | BBD SUTA | 6 | UMB | Out of Service | G29295 | G28022 | |
| 19297 | Fieldwood Energy, LLC | MC | 736 | A Thunderhawk | MC | 692 | North Plet | 1 | LIFT | Out of Service | G29299 | G28022 | |
| 19282 | Fieldwood Energy, LLC | MC | 736 | A Thunderhawk | MC | 782 | Dan 1 STUA 1 | 6 | UBEH | Out of Service | G29294 | G33757 | |
| 19154 | Fieldwood Energy, LLC | MC | 948 | PLET NPL3 HUB | MC | 724 | Gulfstar 1 SPAR | 8 | BLKO | Out of Service | G28736 | G28030 | |
| 19155 | Fieldwood Energy, LLC | MC | 948 | PLET SPL2 HUB | MC | 724 | Gulfstar 1 SPAR | 8 | BLKO | Out of Service | G29287 | G28030 | |
| 19365 | Fieldwood Energy, LLC | MC | 948 | PLET NPL3 HUB | MC | 767 | ILS NPL1 | 12 | CSNG | Out of Service | G28736 | G28030 | |
| 19374 | Fieldwood Energy, LLC | MC | 948 | PLET NPL3 HUB | MC | 948 | PLET SPL2 HUB | 8 | BLKO | Out of Service | G28736 | G28030 | |
| 19432 | Fieldwood Energy, LLC | MC | 948 | PLET SPL2 | MC | 768 | ILS SPL1 | 12 | CSNG | Out of Service | G29287 | G28030 | |
| 14292 | Fieldwood Energy, LLC | SM | 40 | JA | SM | 40 | 10"SSTI | 6 | OIL | Out of Service | G28816 | G13607 | |
| 14293 | Fieldwood Energy, LLC | SM | 40 | B | SM | 40 | JA | 6 | BLKO | Out of Service | G28817 | G13607 | |
| 14294 | Fieldwood Energy, LLC | SM | 40 | B | SM | 40 | JA | 6 | BLKO | Out of Service | G28818 | G13607 | |
| 14295 | Fieldwood Energy, LLC | SM | 40 | JA | SM | 40 | B | 2 | LIFT | Out of Service | G28819 | G13607 | |
| 4647 | Fieldwood Energy, LLC | SM | 149 | 6"SSTI | SM | 132 | B | 6 | BLKO | Out of Service | G03432 | G02592 | [1] |
| 13736 | Fieldwood Energy, LLC | SS | 79 | #2 | SS | 80 | A | 4 | BLKO | Out of Service | G23712 | G15277 | |
| 13737 | Fieldwood Energy, LLC | SS | 79 | #2 | SS | 80 | A | 4 | BLKO | Out of Service | G23713 | G15277 | |
| 8204 | Fieldwood Energy Offshore LLC | SS | 80 | A | EI | 125 | 30 SSTI | 6 | G/C | Out of Service | G09330 | G15277 | |
| 11050 | Fieldwood Energy Offshore LLC | SS | 301 | A | SS | 300 | B | 8 | BLKO | Out of Service | G16055 | G10794 | |
| 5890 | Fieldwood Energy, LLC | ST | 53 | A | ST | 52 | A | 6 | OIL | Out of Service | G09319 | G04000 | [1] |
| 17265 | Fieldwood Energy, LLC | ST | 68 | Caisson No. 1 | ST | 53 | A | 6 | BLKO | Out of Service | G28385 | G04000 | [1] |
| 20278 | Fieldwood Energy, LLC | ST | 308 | A | GC | 39 | K2 SUTA | 5 | UBEH | Proposed | G29427 | G34966 | |
| 10675 | Bandon Oil and Gas, LP | VR | 371 | A | VR | 350 | 08 SSTI | 6 | OIL | Out of Service | G15047 | G09524 | |

13

## **Credit Bid Purchaser RUE**

| Area | Block No. | Structure | Complex ID No. | Authority No. | FW Lease | Operator | Approval Date | Associated Assets | Note |
|------|-----------|-----------|----------------|---------------|----------|----------|---------------|-------------------|------|
| MC | 736 | A (Thunder Hawk) | 2045 | G30354 | G28022 | Fieldwood Energy LLC | 07/03/18 | MC 698 001, MC 734 SS002, SS004, SS005, SS006, MC 782 001 & 002 | |
| SM | 40 | B | 1266 | G30342 | G13607 | Fieldwood Energy Offshore LLC | 06/21/18 | SM 41 B2, B3, B4, B6 & SM 40 B5 | |
| SM | 40 | JA | 27017 | G30352 | G13607 | Fieldwood Energy Offshore | | SM 41 B PF and wells | |
| SS | 80 | A | 23548 | G30201 | G15277 | Fieldwood Energy Offshore LLC | 02/07/13 | SS 79 A002 | |
| ST | 68 | CAISS. #1 | 24108 | G30267 | 00020 | Fieldwood Energy LLC | 03/09/18 | ST 67 #6 | [1] |

14

**Exhibit O2**

**Leases, Rights of Way and Rights of Use and Easement Related to
FWE I Oil & Gas Lease Interests**

## Leases Related to FWE I Oil & Gas Lease Interests[*]

| Block | Lease | Type | Rights | Date Le Eff | Le Cur Acres | Operator | WI | Lease Status | Notes[†] |
|-------|-------|------|--------|-------------|--------------|----------|-----|--------------|----------|
| BA 491 | G06069 | Federal | RT | 10/1/1983 | 5,760 | Fieldwood En | 100.0% | TERMIN | |
| BA A105 | G01757 | Federal | RT | 7/1/1968 | 5,760 | Fieldwood En | 12.5% | PROD | [6] |
| BA A-105 | G01757 | Federal | RT A | 7/1/1968 | 5,760 | Fieldwood En | 12.5% | PROD | [6] |
| BA A-105 | G01757 | Federal | OP 1 | 7/1/1968 | 5,760 | Fieldwood En | 6.3% | PROD | [6] |
| BA A133 | G02665 | Federal | OP | 7/1/1974 | 5,760 | GOM Shelf | 12.5% | PROD | [1], [6] |
| BA A-133 | G02665 | Federal | RT | 7/1/1974 | 5,760 | GOM Shelf | 25.0% | PROD | [1], [6] |
| BA A19 | G33399 | Federal | RT | 1/1/2010 | 5,760 | Apache Shelf Exp | 100.0% | EXPIR | |
| BA A47 | G03940 | Federal | RT | 3/1/1979 | 5,760 | Fieldwood En | 33.3% | TERMIN | |
| BA A47 | G03940 | Federal | OP | 3/1/1979 | 5,760 | Fieldwood En | 100.0% | TERMIN | |
| BA A69 | G32733 | Federal | RT | 11/1/2008 | 5,760 | Apache Shelf Exp | 100.0% | EXPIR | |
| BS 39 | G33683 | Federal | RT | 7/1/2010 | 1,237 | Petsec En | 18.8% | RELINQ | |
| BS 41 | G21142 | Federal | OP 2 | 5/1/1999 | 4,995 | Fieldwood En Off | 13.1% | TERMIN | [3] |
| BS 41 | G21142 | Federal | Contractual | 5/1/1999 | 4,995 | Fieldwood En Off | TBD | TERMIN | [3] |
| BS 42 | G33684 | Federal | RT | 7/1/2010 | 4,552 | Apache Shelf Exp | 37.5% | RELINQ | |
| CA 42 | G32267 | Federal | OP 1 | 7/1/2008 | 5,000 | Fieldwood En | 50.0% | RELINQ | |
| CA 43 | G32268 | Federal | OP 1 | 7/1/2008 | 5,000 | Fieldwood En | 50.0% | PROD | |

---

[*]   The Debtors reserve the right to amend, modify, or supplement this schedule in accordance with the terms of the Plan and subject to any consent rights under the Restructuring Support Agreement.

[1]   Represents leases owned by GOM Shelf LLC.

[2]   Represents leases in which FWE I is to acquire solely the right, title and interest acquired by FWE from Apache; the Credit Bid Purchaser will acquire the Debtors' remaining right, title and interest in such leases. As to all remaining leases on this schedule (except the leases referenced in footnotes [3]-[7] below), FWE I is to obtain all of FWE's right, title and interest in such leases.

[3]   Represents leases in which FWE I is to acquire solely the right, title and interest acquired by FWE from Apache. FWE III will acquire the Debtors' remaining right, title and interest in such leases.

[4]   Represents leases in which FWE I is to acquire solely the right, title and interest acquired by FWE from Apache. The Debtors' remaining right, title and interest in such leases are to be abandoned.

[5]   FWE I is to acquire solely the operating rights as to the NE/4 of this block; the Credit Bid Purchaser is to obtain the Debtors' overriding royalty interest in this lease; and the Debtors' remaining interests in the lease are to be abandoned.

[6]   Represents leases in which FWE I is to acquire solely the right, title and interest acquired by FWE from Apache. The Debtors' remaining right, title and interest in such leases are to be acquired by Chevron.

[7]   Represents leases in which (i) FWE I is to acquire solely the right, title and interest acquired by FWE from Apache and (ii) FWE IV is to acquire solely the right, title and interest acquired by FWE from Chevron. The Debtors' remaining right, title and interest in such leases are to be abandoned.

**Legend**:  CONT - Contractual; OP - Operating Rights; OP 1- Operating Rights 1; OP 2 - Operating Rights 2; OP 3 - Operating Rights 3; OP 4 - Operating Rights 4; OP 5 - Operating Rights 5; OP 6 - Operating Rights 6; OP 7 - Operating Rights 7; OP 10 - Operating Rights 10; OP 11 - Operating Rights 11; OP 12 - Operating Rights 12; OPRTS - Operating Rights; OPRTS Cont - Operating Rights / Contractual; ORRI - Overriding Royalty Interest; RT - Record Title; RT A - Record Title A; RT B - Record Title B; WI - Working Interest

| Block | Lease | Type | Rights | Date Le Eff | Le Cur Acres | Operator | WI | Lease Status | Notes† |
|-------|-------|------|--------|-------------|--------------|----------|-----|--------------|--------|
| CS 71 | SL06618 | SL-LA | ORRI | - | - | - | 5.2% | - | |
| CS 71 | SL12503 | SL-LA | ORRI | - | - | - | 0.6% | TERMIN | |
| DD 253 | G10426 | Federal | RT | 6/1/1990 | 5,760 | Apache Shelf Exp | 100.0% | EXPIR | |
| DD 297 | G10427 | Federal | RT | 6/1/1990 | 5,760 | Apache Shelf Exp | 100.0% | EXPIR | |
| EB 128 | G34034 | Federal | RT | 4/1/2012 | 165 | Apache Shelf Exp | 100.0% | RELINQ | |
| EB 172 | G34035 | Federal | RT | 4/1/2012 | 5,760 | Apache Shelf Exp | 100.0% | RELINQ | |
| EC 12 | G34220 | Federal | RT | 8/1/2012 | 5,000 | Apache Shelf Exp | 100.0% | RELINQ | |
| EC 14 | G13572 | Federal | RT | 7/1/1992 | 2,544 | Fieldwood En | 100.0% | TERMIN | |
| EC 171 | G34228 | Federal | RT | 9/1/2012 | 5,000 | Apache Shelf Exp | 100.0% | RELINQ | |
| EC 172 | G17858 | Federal | RT | 7/1/1997 | 5,000 | Fieldwood En | 100.0% | TERMIN | |
| EC 178 | G34229 | Federal | RT | 10/1/2012 | 5,000 | Apache Shelf Exp | 100.0% | RELINQ | |
| EC 179 | G34230 | Federal | RT | 10/1/2012 | 5,000 | Apache Shelf Exp | 100.0% | RELINQ | |
| EC 185 | G34796 | Federal | RT | 6/1/2013 | 5,000 | Fieldwood En | 100.0% | RELINQ | |
| EC 2 | SL16473 | SL-LA | WI | 7/13/1999 | 148 | Apache | 89.1% | RELINQ | |
| EC 2 | SL16475 | SL-LA | WI | 7/19/1999 | 135 | Apache | 89.1% | ACTIVE | |
| EC 2 | SL18121 | SL-LA | WI | 5/12/2004 | 220 | Fieldwood | 50.0% | ACTIVE | |
| EC 222 | G02037 | Federal | OP 1 | 2/1/1971 | 5,000 | Talos | 17.9% | TERMIN | |
| EC 222 | G02037 | Federal | OP 2 | 2/1/1971 | 5,000 | Talos | 17.9% | TERMIN | |
| EC 229 | G34232 | Federal | RT | 10/1/2012 | 5,000 | Apache Shelf Exp | 100.0% | RELINQ | |
| EC 230 | G34233 | Federal | RT | 10/1/2012 | 5,000 | Apache Shelf Exp | 100.0% | RELINQ | |
| EC 24 | G04098 | Federal | RT | 10/1/1979 | 5,000 | Apex O&G | 18.0% | TERMIN | |
| EC 24 | G04098 | Federal | OP 2 | 10/1/1979 | 5,000 | Apex O&G | 31.3% | TERMIN | |
| EC 24 | G04098 | Federal | OP 3 | 10/1/1979 | 5,000 | Apex O&G | 30.3% | TERMIN | |
| EC 242 | G34234 | Federal | RT | 10/1/2012 | 5,000 | Apache Shelf Exp | 100.0% | RELINQ | |
| EC 243 | G34235 | Federal | RT | 10/1/2012 | 5,000 | Apache Shelf Exp | 100.0% | RELINQ | |
| EC 261 | G00971 | Federal | RT | 6/1/1962 | 5,000 | Fieldwood En | 100.0% | TERMIN | |
| EC 263 | G33072 | Federal | RT | 6/1/2009 | 5,000 | Apache Shelf Exp | 100.0% | EXPIR | |
| EC 264 | G01880 | Federal | RT | 3/1/1969 | 5,000 | Fieldwood En | 100.0% | TERMIN | |
| EC 265 | G00972 | Federal | RT | 6/1/1962 | 5,000 | Fieldwood En | 50.0% | RELINQ | |
| EC 270 | G02045 | Federal | RT | 1/1/1971 | 2,500 | Apache | 70.0% | TERMIN | |
| EC 278 | G00974 | Federal | RT | 6/1/1962 | 5,000 | Fieldwood En | 50.0% | TERMIN | |
| EC 292 | G34237 | Federal | RT | 9/1/2012 | 5,000 | Apache Shelf Exp | 100.0% | RELINQ | |
| EC 293 | G34238 | Federal | RT | 9/1/2012 | 5,000 | Apache Shelf Exp | 100.0% | RELINQ | |
| EC 294 | G34239 | Federal | RT | 9/1/2012 | 5,000 | Apache Shelf Exp | 100.0% | RELINQ | |

| Block | Lease | Type | Rights | Date Le Eff | Le Cur Acres | Operator | WI | Lease Status | Notes[†] |
|---|---|---|---|---|---|---|---|---|---|
| EC 310 | G34240 | Federal | RT | 11/1/2012 | 5,000 | Apache Shelf Exp | 100.0% | RELINQ | |
| EC 328 | G10638 | Federal | RT | 5/1/1989 | 5,000 | Arena Off | 100.0% | PROD | |
| EC 33 | G01972 | Federal | OP | 9/1/1970 | 1,250 | Merit En | 15.6% | TERMIN | |
| EC 335 | G02439 | Federal | OP | 8/1/1973 | 5,000 | Energy XXI GOM | 14.0% | TERMIN | |
| EC 338 | G02063 | Federal | RT | 2/1/1971 | 5,000 | Anadarko US Off | 15.7% | PROD | |
| EC 37 | G25933 | Federal | RT | 5/1/2004 | 2,608 | Probe Res US | 100.0% | TERMIN | |
| EC 370 | G33073 | Federal | RT | 6/1/2009 | 5,000 | Apache Shelf Exp | 100.0% | EXPIR | |
| EC 71 | G13576 | Federal | RT | 9/1/1992 | 5,000 | EC Off Prop | 100.0% | SOP | |
| EC 9/14 | G01440 | Federal | RT | 4/1/1966 | 3,152 | Fieldwood En | 100.0% | PROD | |
| EC 9/14 | G01440 | Federal | OP 1 | 4/1/1966 | 3,152 | Fieldwood En | 100.0% | PROD | |
| EI 10 | G23851 | Federal | RT | 7/1/2002 | 2,303 | Contango Op | 50.0% | PROD | |
| EI 10 | G23851 | Federal | OP 2 | 7/1/2002 | 2,303 | Contango Op | 50.0% | PROD | |
| EI 105 | 00797 | Federal | RT | 5/1/1960 | 5,000 | Fieldwood En | 100.0% | TERMIN | |
| EI 106 | G17966 | Federal | RT A | 7/1/1997 | 5,000 | Apache | 50.0% | TERMIN | |
| EI 106 | G17966 | Federal | RT B | 7/1/1997 | 5,000 | Apache | 100.0% | TERMIN | |
| EI 107 | G15241 | Federal | RT | 9/1/1995 | 5,000 | Apache | 75.0% | TERMIN | |
| EI 108 | G03811 | Federal | OP 1 | 6/1/1978 | 5,000 | Fieldwood En | 60.0% | TERMIN | |
| EI 108 | G03811 | Federal | RT A | 6/1/1978 | 5,000 | Fieldwood En | 60.0% | TERMIN | |
| EI 108 | G03811 | Federal | RT B | 6/1/1978 | 5,000 | Fieldwood En | 71.3% | TERMIN | |
| EI 116 | G34292 | Federal | RT | 9/1/2012 | 5,000 | Apache Shelf Exp | 100.0% | EXPIR | |
| EI 117 | G34293 | Federal | RT | 10/1/2012 | 5,000 | Apache Shelf Exp | 100.0% | RELINQ | |
| EI 118 | G15242 | Federal | RT A | 7/1/1995 | 5,000 | Black Elk En Off Op | 25.0% | TERMIN | |
| EI 118 | G15242 | Federal | RT B | 7/1/1995 | 5,000 | Fieldwood En | 75.0% | TERMIN | |
| EI 119 | 00049 | Federal | RT A | 8/28/1945 | 5,000 | Fieldwood En | 50.0% | PROD | |
| EI 119 | 00049 | Federal | RT B | 8/28/1945 | 5,000 | Fieldwood En | 100.0% | PROD | |
| EI 120 | 00050 | Federal | RT | 8/28/1945 | 5,000 | Fieldwood En | 100.0% | PROD | |
| EI 125 | 00051 | Federal | RT | 8/28/1945 | 5,000 | Fieldwood En | 100.0% | OPERNS | |
| EI 126 | 00052 | Federal | RT | 8/28/1945 | 5,000 | Fieldwood En | 100.0% | PROD | |
| EI 126 | 00052 | Federal | OP | 8/28/1945 | 5,000 | Fieldwood En | 75.0% | PROD | |
| EI 128 | G34294 | Federal | RT | 10/1/2012 | 3,427 | Apache Shelf Exp | 100.0% | RELINQ | |
| EI 131 | G33625 | Federal | RT | 6/1/2010 | 5,000 | Apache Shelf Exp | 100.0% | RELINQ | |
| EI 132 | G33626 | Federal | RT | 6/1/2010 | 5,000 | Apache Shelf Exp | 100.0% | RELINQ | |
| EI 135 | G34296 | Federal | RT | 10/1/2012 | 5,000 | Apache Shelf Exp | 100.0% | RELINQ | |
| EI 136 | G03152 | Federal | RT | 7/1/1975 | 5,000 | Fieldwood En | 100.0% | PROD | |

| Block | Lease | Type | Rights | Date Le Eff | Le Cur Acres | Operator | WI | Lease Status | Notes[†] |
|---|---|---|---|---|---|---|---|---|---|
| EI 156 | G16353 | Federal | OP | 6/1/1996 | 5,000 | Black Elk En Off Op | 50.0% | TERMIN | |
| EI 158 | G01220 | Federal | RT | 6/1/1962 | 5,000 | Fieldwood En | 100.0% | PROD | |
| EI 173 | G13622 | Federal | RT | 7/1/1992 | 5,000 | Fieldwood En | 100.0% | PROD | |
| EI 174 | G03782 | Federal | RT | 6/1/1978 | 5,000 | Arena Off | 100.0% | PROD | |
| EI 174 | G03782 | Federal | OP | 6/1/1978 | 5,000 | Arena Off | 30.0% | PROD | |
| EI 175 | 00438 | Federal | OP 1 | 12/1/1954 | 5,000 | Fieldwood En | 75.0% | PROD | [4] |
| EI 187 | G10736 | Federal | RT | 7/1/1989 | 5,000 | Fieldwood En | 100.0% | PROD | |
| EI 188 | 00443 | Federal | RT | 1/1/1955 | 5,000 | Apache | 100.0% | TERMIN | |
| EI 189 | 00423 | Federal | RT | 12/1/1954 | 3,750 | Fieldwood En | 100.0% | PROD | |
| EI 196 | 00802 | Federal | RT | 5/1/1960 | 3,516 | Fieldwood En | 50.0% | RELINQ | |
| EI 196 | 00802 | Federal | OP | 5/1/1960 | 3,516 | Fieldwood En | 100.0% | RELINQ | |
| EI 196 | G13821 | Federal | OP 2 | 5/1/1960 | 1,484 | Arena Off | 100.0% | RELINQ | |
| EI 196 | G13821 | Federal | OP 4 | 5/1/1960 | 1,484 | Arena Off | 100.0% | RELINQ | |
| EI 20 | G34286 | Federal | RT | 10/1/2012 | 3,582 | Castex Off | 50.0% | RELINQ | |
| EI 207 | G34301 | Federal | RT | 8/1/2012 | 5,000 | Apache Shelf Exp | 100.0% | RELINQ | |
| EI 208 | 00577 | Federal | OP | 9/1/1955 | 2,500 | ANKOR En | 100.0% | PROD | |
| EI 211 | G05502 | Federal | RT B | 7/1/1983 | 5,000 | Fieldwood En | 66.7% | UNIT | |
| EI 211 | G05502 | Federal | OP | 7/1/1983 | 5,000 | Chevron USA | 66.7% | UNIT | |
| EI 212 | G05503 | Federal | RT B | 7/1/1983 | 5,000 | Fieldwood En | 66.7% | UNIT | |
| EI 212 | G05503 | Federal | OP | 7/1/1983 | 5,000 | Chevron USA | 66.7% | UNIT | |
| EI 216 | G34303 | Federal | RT | 8/1/2012 | 5,000 | Apache Shelf Exp | 100.0% | RELINQ | |
| EI 217 | G00978 | Federal | RT | 5/1/1962 | 5,000 | Arena Off | 25.0% | RELINQ | |
| EI 224 | G05504 | Federal | ORRI | 7/1/1983 | 5,000 | Castex Off | 10.0% | PROD | |
| EI 224 | G05504 | Federal | RT | 7/1/1983 | 5,000 | Castex Off | 100.0% | PROD | |
| EI 227 | 00809 | Federal | RT | 5/1/1960 | 5,000 | Arena Off | 50.0% | RELINQ | |
| EI 227 | G36745 | Federal | ORRI | 11/1/2019 | 5,000 | Arena Off | 6.25% | PRIMRY | |
| EI 227 | G36745 | Federal | ORRI | 11/1/2019 | 5,000 | Arena Off | 4.17% | PRIMRY | |
| EI 246 | 00810 | Federal | OP 1 | 5/1/1960 | 5,000 | Fieldwood En | 25.0% | UNIT | |
| EI 246 | 00810 | Federal | OP 2 | 5/1/1960 | 5,000 | Fieldwood En | 75.0% | UNIT | |
| EI 246 | 00810 | Federal | RT | 5/1/1960 | 5,000 | Fieldwood En | 75.0% | UNIT | |
| EI 246 | 00810 | Federal | ORRI | 5/1/1960 | 5,000 | Sanare En Part | 6.3% | UNIT | |
| EI 255 | G01958 | Federal | RT | 1/1/1970 | 2,500 | Cox Op | 2.0% | PROD | |
| EI 255 | G01958 | Federal | OP 3 | 1/1/1970 | 2,500 | Cox Op | 77.2% | PROD | |
| EI 255 | G01958 | Federal | OP 4 | 1/1/1970 | 2,500 | Cox Op | 38.6% | PROD | |

4

| Block | Lease | Type | Rights | Date Le Eff | Le Cur Acres | Operator | WI | Lease Status | Notes[†] |
|-------|-------|------|--------|-------------|--------------|----------|-----|--------------|--------|
| EI 266 | 00811 | Federal | OP 1 | 5/1/1960 | 5,000 | Fieldwood En | 25.0% | UNIT | |
| EI 266 | 00811 | Federal | OP 2 | 5/1/1960 | 5,000 | Fieldwood En | 75.0% | UNIT | |
| EI 266 | 00811 | Federal | RT | 5/1/1960 | 5,000 | Fieldwood En | 75.0% | UNIT | |
| EI 267 | 00812 | Federal | OP | 5/1/1960 | 5,000 | Fieldwood En | 25.0% | UNIT | |
| EI 267 | 00812 | Federal | OP 2 | 5/1/1960 | 5,000 | Fieldwood En | 75.0% | UNIT | |
| EI 267 | 00812 | Federal | RT | 5/1/1960 | 5,000 | Fieldwood En | 75.0% | UNIT | |
| EI 269 | 00813 | Federal | OP 1 | 5/1/1960 | 5,000 | Fieldwood En | 25.0% | UNIT | |
| EI 269 | 00813 | Federal | OP 2 | 5/1/1960 | 5,000 | Fieldwood En | 75.0% | UNIT | |
| EI 269 | 00813 | Federal | RT | 5/1/1960 | 5,000 | Fieldwood En | 75.0% | UNIT | |
| EI 280 | G23876 | Federal | RT | 5/1/2002 | 5,000 | Energy XXI GOM | 18.8% | TERMIN | |
| EI 281 | G09591 | Federal | RT | 5/1/1988 | 5,000 | Bennu O&G | 90.5% | TERMIN | |
| EI 281 | G09591 | Federal | OP 1 | 5/1/1988 | 5,000 | Bennu O&G | 45.3% | TERMIN | |
| EI 281 | G09591 | Federal | OP 2 | 5/1/1988 | 5,000 | Bennu O&G | 45.3% | TERMIN | |
| EI 281 | G09591 | Federal | OP 3 | 5/1/1988 | 5,000 | Bennu O&G | 45.3% | TERMIN | |
| EI 282 | G09592 | Federal | RT | 6/1/1988 | 5,000 | Apache | 75.0% | TERMIN | |
| EI 282 | G09592 | Federal | OP 1 | 6/1/1988 | 5,000 | Apache | 75.0% | TERMIN | |
| EI 282 | G09592 | Federal | OP 2 | 6/1/1988 | 5,000 | Apache | 75.0% | TERMIN | |
| EI 29 | G34287 | Federal | RT | 12/1/2012 | 5,000 | Apache Shelf Exp | 50.0% | RELINQ | |
| EI 307 | G02110 | Federal | OP | 2/1/1971 | 2,500 | Fieldwood En Off | 25.0% | TERMIN | [4] |
| EI 312 | G22679 | Federal | RT | 6/1/2001 | 5,000 | Fieldwood En | 100.0% | TERMIN | [4] |
| EI 312 | G22679 | Federal | ORRI | 6/1/2001 | 5,000 | Fieldwood En | 8.3% | TERMIN | [4] |
| EI 313 | G02608 | Federal | RT | 5/1/1974 | 5,000 | Arena Off | 50.0% | TERMIN | |
| EI 313 | G02608 | Federal | OP 1 | 5/1/1974 | 5,000 | Arena Off | 50.0% | TERMIN | |
| EI 313 | G02608 | Federal | OP 2 | 5/1/1974 | 5,000 | Arena Off | 50.0% | TERMIN | |
| EI 315 | G02112 | Federal | RT | 8/1/1974 | 2,500 | Fieldwood En | 50.0% | TERMIN | |
| EI 315 | G02112 | Federal | OP | 8/1/1974 | 2,500 | Fieldwood En | 50.0% | TERMIN | |
| EI 315 | G24912 | Federal | RT | 5/1/2003 | 2,500 | Fieldwood En | 100.0% | PROD | |
| EI 316 | G05040 | Federal | RT | 4/1/1982 | 5,000 | Fieldwood En | 100.0% | PROD | |
| EI 329 | G02912 | Federal | RT | 12/1/1974 | 5,000 | Fieldwood En | 100.0% | TERMIN | |
| EI 330 | G02115 | Federal | Contractual | 1/1/1971 | 5,000 | Fieldwood En | 63.0% | UNIT | [4] |
| EI 330 | G02115 | Federal | OP 7 | 1/1/1971 | 5,000 | Fieldwood En | 47.0% | UNIT | [4] |
| EI 330 | G02115 | Federal | OP 6 | 1/1/1971 | 5,000 | Fieldwood En | 47.0% | UNIT | [4] |
| EI 330 | G02115 | Federal | OP 5 | 1/1/1971 | 5,000 | Fieldwood En | 47.0% | UNIT | [4] |
| EI 330 | G02115 | Federal | OP 4 | 1/1/1971 | 5,000 | Fieldwood En | 47.0% | UNIT | [4] |

5

| Block | Lease | Type | Rights | Date Le Eff | Le Cur Acres | Operator | WI | Lease Status | Notes[†] |
|-------|-------|------|--------|-------------|--------------|----------|-----|--------------|----------|
| EI 330 | G02115 | Federal | OP 3 | 1/1/1971 | 5,000 | Fieldwood En | 47.0% | UNIT | [4] |
| EI 330 | G02115 | Federal | OP 2 | 1/1/1971 | 5,000 | Fieldwood En | 47.0% | UNIT | [4] |
| EI 330 | G02115 | Federal | RT | 1/1/1971 | 5,000 | Fieldwood En | 42.0% | UNIT | [4] |
| EI 330 | G02115 | Federal | RT | 1/1/1971 | 5,000 | Fieldwood En | 23.0% | UNIT | [1], [4] |
| EI 330 | G02115 | Federal | OP 7 | 1/1/1971 | 5,000 | Fieldwood En | 23.0% | UNIT | [1], [4] |
| EI 330 | G02115 | Federal | OP 6 | 1/1/1971 | 5,000 | Fieldwood En | 23.0% | UNIT | [1], [4] |
| EI 330 | G02115 | Federal | OP 5 | 1/1/1971 | 5,000 | Fieldwood En | 23.0% | UNIT | [1], [4] |
| EI 330 | G02115 | Federal | OP 4 | 1/1/1971 | 5,000 | Fieldwood En | 23.0% | UNIT | [1], [4] |
| EI 330 | G02115 | Federal | OP 3 | 1/1/1971 | 5,000 | Fieldwood En | 23.0% | UNIT | [1], [4] |
| EI 330 | G02115 | Federal | OP 2 | 1/1/1971 | 5,000 | Fieldwood En | 23.0% | UNIT | [1], [4] |
| EI 333 | G02317 | Federal | RT | 2/1/1973 | 5,000 | Fieldwood En | 100.0% | TERMIN | |
| EI 334 | G15263 | Federal | RT | 7/1/1995 | 5,000 | Fieldwood En | 100.0% | TERMIN | |
| EI 337 | G03332 | Federal | RT | 3/1/1976 | 5,000 | Fieldwood En | 100.0% | UNIT | |
| EI 337 | G03332 | Federal | OP 4 | 3/1/1976 | 5,000 | Fieldwood En | 98.0% | UNIT | |
| EI 337 | G03332 | Federal | OP 1 | 3/1/1976 | 5,000 | Fieldwood En | 100.0% | UNIT | |
| EI 337 | G03332 | Federal | OP 3 | 3/1/1976 | 5,000 | Fieldwood En | 100.0% | UNIT | |
| EI 337 | G03332 | Federal | ORRI | 3/1/1976 | | Fieldwood En | 0.1% | UNIT | |
| EI 342 | G02319 | Federal | RT A | 2/1/1973 | 5,000 | Fieldwood En | 50.0% | TERMIN | [6] |
| EI 342 | G02319 | Federal | RT B | 2/1/1973 | 5,000 | Fieldwood En | 75.0% | TERMIN | [6] |
| EI 342 | G02319 | Federal | OP 1 | 2/1/1973 | 5,000 | Fieldwood En | 75.0% | TERMIN | [6] |
| EI 342 | G02319 | Federal | OP 2 | 2/1/1973 | 5,000 | Fieldwood En | 61.8% | TERMIN | [6] |
| EI 345 | G21647 | Federal | RT | 7/1/2000 | 5,000 | Fieldwood En | 50.0% | TERMIN | |
| EI 346 | G14482 | Federal | RT | 6/1/1994 | 5,000 | Arena Off | 100.0% | PROD | |
| EI 353 | G03783 | Federal | OP | 6/1/1978 | 5,000 | Fieldwood En | 100.0% | TERMIN | |
| EI 354 | G10752 | Federal | RT | 5/1/1989 | 5,000 | Fieldwood En | 100.0% | PROD | |
| EI 354 | G10752 | Federal | OP | 5/1/1989 | 5,000 | Fieldwood En | 67.0% | PROD | |
| EI 361 | G02324 | Federal | RT | 2/1/1973 | 5,000 | Cox Op | 12.4% | PROD | |
| EI 53 | 00479 | Federal | OP 1 | 12/1/1954 | 5,000 | EnVen En Vent | 66.7% | PROD | [4] |
| EI 53 | 00479 | Federal | OP | 12/1/1954 | 5,000 | EnVen En Vent | 100.0% | PROD | [4] |
| EI 57 | G02601 | Federal | OP 2 | 5/1/1974 | 5,000 | Talos | 31.7% | TERMIN | |
| EI 57 | G02601 | Federal | OP 4 | 5/1/1974 | 5,000 | ANKOR En | 15.8% | TERMIN | |
| EI 88 | G10721 | Federal | OP | 7/1/1989 | 5,000 | Fieldwood En | 75.0% | TERMIN | |
| EI 89 | 00044 | Federal | OP | 8/28/1945 | 5,000 | Fieldwood En | 75.0% | TERMIN | |
| EI 89 | 00044 | Federal | OP 2 | 8/28/1945 | 5,000 | Fieldwood En | 75.0% | TERMIN | |

| Block | Lease | Type | Rights | Date Le Eff | Le Cur Acres | Operator | WI | Lease Status | Notes[†] |
|-------|-------|------|--------|-------------|--------------|----------|-----|--------------|----------|
| EI 90 | 00229 | Federal | OP | 11/19/1948 | 1,250 | Fieldwood En | 75.0% | TERMIN | |
| EI 93 | 00228 | Federal | OP | 11/19/1948 | 2,500 | Fieldwood En | 75.0% | TERMIN | |
| EI 94 | G05488 | Federal | OP | 7/1/1983 | 5,000 | Fieldwood En | 75.0% | TERMIN | |
| EI 95 | 00046 | Federal | OP | 8/28/1945 | 5,000 | Fieldwood En | 75.0% | TERMIN | |
| EW 525 | G33704 | Federal | RT | 7/1/2010 | 2,420 | Apache Shelf Exp | 46.9% | RELINQ | |
| EW 526 | G33134 | Federal | RT | 6/1/2009 | 3,517 | Apache Shelf Exp | 100.0% | EXPIR | |
| EW 781 | G33137 | Federal | RT | 6/1/2009 | 309 | Apache Shelf Exp | 100.0% | EXPIR | |
| EW 782 | G31470 | Federal | RT | 12/1/2007 | 1,093 | Fieldwood En | 100.0% | PROD | [4] |
| EW 789 | G33139 | Federal | RT | 7/1/2009 | 5,760 | Apache Shelf Exp | 100.0% | RELINQ | |
| EW 826 | G05800 | Federal | RT | 7/1/1983 | 5,760 | BP E&P | 100.0% | PROD | |
| EW 905 | G34415 | Federal | RT | 8/1/2012 | 1,007 | Apache Shelf Exp | 100.0% | RELINQ | |
| EW 906 | G33708 | Federal | RT | 6/1/2010 | 1,084 | Apache Shelf Exp | 100.0% | RELINQ | |
| EW 949 | G34877 | Federal | RT | 8/1/2013 | 5,760 | Apache Shelf Exp | 100.0% | RELINQ | |
| EW 950 | G33709 | Federal | RT | 6/1/2010 | 5,760 | Apache Shelf Exp | 100.0% | RELINQ | |
| FM 411 | G08361 | Federal | RT | 8/1/1986 | 5,760 | Chevron USA | 24.3% | EXPIR | |
| FM 412 | G08362 | Federal | RT | 8/1/1986 | 5,760 | Chevron USA | 16.0% | EXPIR | |
| FM 455 | G08363 | Federal | RT | 8/1/1986 | 5,760 | Chevron USA | 24.2% | EXPIR | |
| FM 456 | G08364 | Federal | RT | 8/1/1986 | 5,760 | Chevron USA | 24.3% | EXPIR | |
| FM 499 | G08365 | Federal | RT | 8/1/1986 | 5,760 | Chevron USA | 24.3% | EXPIR | |
| FM 500 | G08366 | Federal | RT | 8/1/1986 | 5,760 | Chevron USA | 16.0% | EXPIR | |
| FM 543 | G08367 | Federal | RT | 8/1/1986 | 5,760 | Chevron USA | 24.3% | EXPIR | |
| FM 587 | G08368 | Federal | RT | 8/1/1986 | 5,760 | Chevron USA | 24.3% | EXPIR | |
| GA 151 | G15740 | Federal | RT | 11/1/1995 | 4,804 | Fieldwood En | 33.3% | TERMIN | [4] |
| GA 180 | G03228 | Federal | RT | 9/1/1975 | 5,760 | Fieldwood En | 100.0% | UNIT | |
| GA 192 | G03229 | Federal | CONT | 9/1/1975 | 5,760 | Arena Off | 90.0% | UNIT | |
| GA 210 | G25524 | Federal | OP 1 | 12/1/2003 | 5,760 | Fieldwood En | 83.3% | PROD | [4] |
| GA 210 | G25524 | Federal | OP 3 | 12/1/2003 | 5,760 | Fieldwood En | 66.7% | PROD | [4] |
| GA 210 | G25524 | Federal | RT | 12/1/2003 | 5,760 | Fieldwood En | 66.7% | PROD | [4] |
| GA 210 | G25524 | Federal | OP | 12/1/2003 | 5,760 | Fieldwood En | 83.3% | PROD | [4] |
| GA 343 | G06105 | Federal | RT | 10/1/1983 | 5,760 | Black Elk En Off Op | 12.5% | TERMIN | |
| GA 343 | G06105 | Federal | OP | 10/1/1983 | 5,760 | Black Elk En Off Op | 37.5% | TERMIN | |
| GB 85 | G34515 | Federal | RT | 8/1/2012 | 4,450 | Apache Shelf Exp | 100.0% | RELINQ | |
| GI 104 | G33671 | Federal | RT | 7/1/2010 | 5,000 | Apache Shelf Exp | 46.9% | RELINQ | |
| GI 110 | G13943 | Federal | RT | 8/1/1993 | 5,000 | Fieldwood En | 50.0% | UNIT | [2] |

7

| Block | Lease | Type | Rights | Date Le Eff | Le Cur Acres | Operator | WI | Lease Status | Notes[†] |
|-------|-------|------|--------|-------------|--------------|----------|-----|--------------|----------|
| GI 116 | G13944 | Federal | RT | 7/1/1993 | 5,000 | Fieldwood En | 50.0% | UNIT | [2] |
| GI 116 | G13944 | Federal | OP | 7/1/1993 | 5,000 | Fieldwood En | 25.0% | UNIT | [2] |
| GI 117 | G32232 | Federal | RT | 8/1/2008 | 4,540 | Apache | 100.0% | EXPIR | |
| GI 32 | 00174 | Federal | RT | 7/17/1948 | 2,500 | GOM Shelf | 75.0% | UNIT | [1], [2] |
| GI 32 | 00174 | Federal | OP 1 | 7/17/1948 | 2,500 | BP E&P | 18.8% | UNIT | [1], [2] |
| GI 32 | 00174 | Federal | OP 2 | 7/17/1948 | 2,500 | GOM Shelf | 37.5% | UNIT | [1], [2] |
| GI 32 | G01580 | Federal | RT | 7/1/1967 | 2,500 | BP Am Prod | 75.0% | TERMIN | [1] |
| GI 32 | G01580 | Federal | OP | 7/1/1967 | 2,500 | BP Am Prod | 37.5% | TERMIN | [1] |
| GI 33 | G04002 | Federal | RT | 3/1/1979 | 5,000 | Fieldwood En | 100.0% | RELINQ | |
| GI 39 | 00126 | Federal | RT | 4/21/1947 | 2,500 | GOM Shelf | 75.0% | UNIT | [1], [2] |
| GI 39 | 00126 | Federal | OP 1 | 4/21/1947 | 2,500 | BP E&P | 18.8% | UNIT | [1], [2] |
| GI 39 | 00126 | Federal | OP 2 | 4/21/1947 | 2,500 | GOM Shelf | 37.5% | UNIT | [1], [2] |
| GI 39 | 00127 | Federal | RT | 4/21/1947 | 2,500 | GOM Shelf | 75.0% | UNIT | [1], [2] |
| GI 39 | 00127 | Federal | OP 1 | 4/21/1947 | 2,500 | BP E&P | 18.8% | UNIT | [1], [2] |
| GI 39 | 00127 | Federal | OP 2 | 4/21/1947 | 2,500 | GOM Shelf | 37.5% | UNIT | [1], [2] |
| GI 40 | 00128 | Federal | RT | 4/21/1947 | 5,000 | GOM Shelf | 75.0% | UNIT | [1], [2] |
| GI 40 | 00128 | Federal | OP 1 | 4/21/1947 | 5,000 | BP E&P | 18.8% | UNIT | [1], [2] |
| GI 40 | 00128 | Federal | OP 2 | 4/21/1947 | 5,000 | GOM Shelf | 37.5% | UNIT | [1], [2] |
| GI 41 | 00129 | Federal | RT | 4/21/1947 | 2,500 | GOM Shelf | 75.0% | UNIT | [1], [2] |
| GI 41 | 00129 | Federal | OP 1 | 4/21/1947 | 2,500 | BP E&P | 18.8% | UNIT | [1], [2] |
| GI 41 | 00129 | Federal | OP 2 | 4/21/1947 | 2,500 | GOM Shelf | 37.5% | UNIT | [1], [2] |
| GI 41 | 00130 | Federal | RT | 4/21/1947 | 2,500 | GOM Shelf | 75.0% | UNIT | [1], [2] |
| GI 41 | 00130 | Federal | OP 1 | 4/21/1947 | 2,500 | BP E&P | 18.8% | UNIT | [1], [2] |
| GI 41 | 00130 | Federal | OP 2 | 4/21/1947 | 2,500 | GOM Shelf | 37.5% | UNIT | [1], [2] |
| GI 42 | 00131 | Federal | RT | 4/21/1947 | 5,000 | GOM Shelf | 75.0% | UNIT | [1], [2] |
| GI 42 | 00131 | Federal | OP 1 | 4/21/1947 | 5,000 | BP E&P | 18.8% | UNIT | [1], [2] |
| GI 42 | 00131 | Federal | OP 2 | 4/21/1947 | 5,000 | GOM Shelf | 37.5% | UNIT | [1], [2] |
| GI 43 | 00175 | Federal | RT | 7/17/1948 | 5,000 | GOM Shelf | 75.0% | UNIT | [1], [2] |
| GI 43 | 00175 | Federal | OP 1 | 7/17/1948 | 5,000 | BP E&P | 18.8% | UNIT | [1], [2] |
| GI 43 | 00175 | Federal | OP 2 | 7/17/1948 | 5,000 | GOM Shelf | 37.5% | UNIT | [1], [2] |
| GI 44 | 00176 | Federal | RT | 7/17/1948 | 2,500 | GOM Shelf | 75.0% | UNIT | [1], [2] |
| GI 44 | 00176 | Federal | OP 1 | 7/17/1948 | 2,500 | BP E&P | 18.8% | UNIT | [1], [2] |
| GI 44 | 00176 | Federal | OP 2 | 7/17/1948 | 2,500 | GOM Shelf | 37.5% | UNIT | [1], [2] |
| GI 46 | 00132 | Federal | RT | 4/21/1947 | 5,000 | GOM Shelf | 75.0% | UNIT | [1], [2] |

| Block | Lease | Type | Rights | Date Le Eff | Le Cur Acres | Operator | WI | Lease Status | Notes[†] |
|-------|-------|------|--------|-------------|--------------|----------|-----|--------------|----------|
| GI 46 | 00132 | Federal | OP 1 | 4/21/1947 | 5,000 | BP E&P | 18.8% | UNIT | [1], [2] |
| GI 46 | 00132 | Federal | OP 2 | 4/21/1947 | 5,000 | GOM Shelf | 37.5% | UNIT | [1], [2] |
| GI 47 | 00133 | Federal | RT | 4/21/1947 | 5,000 | GOM Shelf | 75.0% | UNIT | [1], [2] |
| GI 47 | 00133 | Federal | OP 1 | 4/21/1947 | 5,000 | BP E&P | 18.8% | UNIT | [1], [2] |
| GI 47 | 00133 | Federal | OP 2 | 4/21/1947 | 5,000 | GOM Shelf | 37.5% | UNIT | [1], [2] |
| GI 48 | 00134 | Federal | RT | 4/21/1947 | 5,000 | GOM Shelf | 75.0% | UNIT | [1], [2] |
| GI 48 | 00134 | Federal | OP 1 | 4/21/1947 | 5,000 | BP E&P | 18.8% | UNIT | [1], [2] |
| GI 48 | 00134 | Federal | OP 2 | 4/21/1947 | 5,000 | GOM Shelf | 37.5% | UNIT | [1], [2] |
| GI 52 | 00177 | Federal | RT | 7/17/1948 | 2,500 | GOM Shelf | 75.0% | UNIT | [1], [2] |
| GI 52 | 00177 | Federal | OP 1 | 7/17/1948 | 2,500 | GOM Shelf | 100.0% | UNIT | [1], [2] |
| GI 52 | 00177 | Federal | OP 2 | 7/17/1948 | 2,500 | BP E&P | 18.8% | UNIT | [1], [2] |
| GI 54 | G27173 | Federal | RT | 7/1/2005 | 5,000 | Fieldwood En | 50.0% | TERMIN | |
| GI 76 | G02161 | Federal | RT | 10/1/1972 | 5,000 | Fieldwood En | 95.8% | RELINQ | |
| GI 90 | G04003 | Federal | RT | 3/1/1979 | 5,000 | Fieldwood En | 100.0% | TERMIN | |
| GI 90 | G04003 | Federal | OP 1 | 3/1/1979 | 5,000 | Fieldwood En | 100.0% | TERMIN | |
| GI 90 | G04003 | Federal | OP 2 | 3/1/1979 | 5,000 | Fieldwood En | 50.0% | TERMIN | |
| GI 90 | G04003 | Federal | OP 4 | 3/1/1979 | 5,000 | Fieldwood En | 50.0% | TERMIN | |
| GI 90 | G04003 | Federal | OP 5 | 3/1/1979 | 5,000 | Fieldwood En | 100.0% | TERMIN | |
| GI 90 | G04003 | Federal | OP 6 | 3/1/1979 | 5,000 | Fieldwood En | 100.0% | TERMIN | |
| GI 93 | G02628 | Federal | RT | 5/1/1974 | 5,000 | BP E&P | 100.0% | TERMIN | |
| GI 93 | G02628 | Federal | OP | 5/1/1974 | 5,000 | BP E&P | 100.0% | TERMIN | |
| GI 94 | G02163 | Federal | RT | 11/1/1972 | 4,540 | Fieldwood En | 100.0% | RELINQ | |
| GI 94 | G02163 | Federal | OP | 11/1/1972 | 4,540 | Fieldwood En | 100.0% | RELINQ | |
| GI 98 | G34354 | Federal | RT | 8/1/2012 | 5,000 | Apache Shelf Exp | 100.0% | RELINQ | |
| HI 110 | G02353 | Federal | RT | 8/1/1973 | 5,760 | W & T Off | 20.0% | TERMIN | [1] |
| HI 111 | G02354 | Federal | RT | 8/1/1973 | 5,760 | W & T Off | 20.0% | TERMIN | [1] |
| HI 114 | G32747 | Federal | RT | 12/1/2008 | 5,760 | Apache Shelf Exp | 100.0% | EXPIR | |
| HI 116 | G06156 | Federal | RT | 10/1/1983 | 5,760 | Fieldwood En | 100.0% | TERMIN | |
| HI 129 | G01848 | Federal | RT | 6/1/1968 | 5,760 | Fieldwood En | 90.0% | PROD | |
| HI 129 | G01848 | Federal | ORRI | 6/1/1968 | | Fieldwood En | 10.4% | PROD | |
| HI 132 | G32748 | Federal | RT | 12/1/2008 | 5,760 | Apache Shelf Exp | 100.0% | EXPIR | |
| HI 140 | 00518 | Federal | OP | 1/1/1955 | 5,760 | Black Elk En Off Op | 50.0% | TERMIN | |
| HI 163 | G22236 | Federal | RT | 12/1/2000 | 5,760 | Fieldwood En | 70.0% | TERMIN | |

| Block | Lease | Type | Rights | Date Le Eff | Le Cur Acres | Operator | WI | Lease Status | Notes[†] |
|-------|-------|------|--------|-------------|--------------|----------|-----|-------------|----------|
| HI 176 | G06164 | Federal | OPRTS Cont | 10/1/1983 | 5,760 | Apache | 49.5% | TERMIN | |
| HI 179 | G03236 | Federal | RT | 9/1/1975 | 5,760 | Cox Op | 100.0% | UNIT | |
| HI 193 | G03237 | Federal | CONT | 9/1/1975 | 5,760 | Arena Off | 90.0% | UNIT | |
| HI 194 | G06166 | Federal | RT | 10/1/1983 | 5,760 | Apache | 100.0% | TERMIN | |
| HI 194 | G06166 | Federal | OP | 10/1/1983 | 5,760 | Apache | 45.0% | TERMIN | |
| HI 201 | G23199 | Federal | OP | 12/1/2001 | 5,760 | Apache Shelf | 37.6% | TERMIN | |
| HI 206 | G20660 | Federal | RT | 1/1/1999 | 5,760 | Fieldwood En | 100.0% | PROD | |
| HI 45 | G12564 | Federal | RT | 10/1/1990 | 4,367 | Fieldwood En | 16.7% | TERMIN | |
| HI 45 | G12564 | Federal | OP 1 | 10/1/1990 | 4,367 | Fieldwood En | 15.0% | TERMIN | |
| HI 45 | G12564 | Federal | OP 2 | 10/1/1990 | 4,367 | Fieldwood En | 33.3% | TERMIN | |
| HI 52 | 00508 | Federal | RT | 1/1/1955 | 1,440 | SandRidge En Off | 75.0% | TERMIN | |
| HI 52 | 00509 | Federal | RT | 1/1/1955 | 1,440 | Apache | 75.0% | TERMIN | |
| HI 52 | 00511 | Federal | RT | 1/1/1955 | 1,440 | Apache | 75.0% | TERMIN | |
| HI 53 | 00513 | Federal | RT | 1/1/1955 | 180 | Phoenix Exp | 75.0% | TERMIN | |
| HI 53 | 00740 | Federal | RT | 4/1/1960 | 1,440 | Apache | 75.0% | TERMIN | |
| HI A-133 | G32760 | Federal | RT | 11/1/2008 | 5,760 | Apache | 100.0% | EXPIR | |
| HI A-145 | G32761 | Federal | RT | 11/1/2008 | 5,760 | Apache | 100.0% | EXPIR | |
| HI A-146 | G32762 | Federal | RT | 11/1/2008 | 5,760 | Apache Shelf Exp | 100.0% | EXPIR | |
| HI A-148 | G32763 | Federal | RT | 11/1/2008 | 5,760 | Apache | 100.0% | EXPIR | |
| HI A-160 | G32764 | Federal | RT | 11/1/2008 | 5,760 | Apache | 100.0% | EXPIR | |
| HI A-171 | G30679 | Federal | RT | 12/1/2006 | 5,760 | Walter O&G | 33.3% | TERMIN | |
| HI A-326 | G32777 | Federal | RT | 11/1/2008 | 5,760 | Apache | 100.0% | EXPIR | |
| HI A-334 | G02423 | Federal | RT | 8/1/1973 | 5,760 | Fieldwood En | 38.9% | TERMIN | |
| HI A-341 | G25605 | Federal | RT | 12/1/2003 | 5,760 | Fieldwood En | 60.0% | PROD | [4] |
| HI A-350 | G02428 | Federal | RT | 8/1/1973 | 4,345 | Apache | 100.0% | RELINQ | |
| HI A360 | G34677 | Federal | RT | 3/1/2013 | 5,760 | Apache Shelf Exp | 100.0% | RELINQ | |
| HI A361 | G34678 | Federal | RT | 3/1/2013 | 5,760 | Fieldwood En | 100.0% | RELINQ | |
| HI A363 | G33413 | Federal | RT | 10/1/2009 | 5,760 | Apache Shelf Exp | 100.0% | EXPIR | |
| HI A-365 | G02750 | Federal | RT | 7/1/1974 | 5,760 | Fieldwood En | 53.1% | PROD | [4] |
| HI A-376 | G02754 | Federal | OP 1 | 7/1/1974 | 5,760 | Fieldwood En | 100.0% | PROD | [4] |
| HI A-376 | G02754 | Federal | RT | 7/1/1974 | 5,760 | Fieldwood En | 44.4% | PROD | [4] |
| HI A-376 | G02754 | Federal | ORRI | 7/1/1974 | | Fieldwood En | 1.2% | PROD | [4] |
| HI A-376 | G02754 | Federal | ORRI | 7/1/1974 | | Fieldwood En | 6.0% | PROD | [4] |

10

| Block | Lease | Type | Rights | Date Le Eff | Le Cur Acres | Operator | WI | Lease Status | Notes[†] |
|-------|-------|------|--------|-------------|--------------|----------|----|--------------|--------|
| HI A-382 | G02757 | Federal | RT | 7/1/1974 | 5,760 | Fieldwood En | 72.4% | PROD | [4] |
| HI A406 | G32767 | Federal | RT | 11/1/2008 | 5,760 | Apache | 100.0% | EXPIR | |
| HI A430 | G33412 | Federal | RT | 10/1/2009 | 5,760 | Apache Shelf Exp | 100.0% | EXPIR | |
| HI A442 | G11383 | Federal | OP | 11/1/1989 | 5,760 | Northstar Off Grp | 22.7% | TERMIN | |
| HI A454 | G32769 | Federal | RT | 11/1/2008 | 5,760 | Apache | 100.0% | EXPIR | |
| HI A457 | G32770 | Federal | RT | 11/1/2008 | 5,760 | Apache | 100.0% | EXPIR | |
| HI A-474 | G02366 | Federal | RT | 8/1/1973 | 5,760 | McMoRan O&G | 10.0% | TERMIN | [4] |
| HI A-475 | G02367 | Federal | CONT | 8/1/1973 | 5,760 | McMoRan O&G | 10.0% | TERMIN | [4] |
| HI A-489 | G02372 | Federal | RT | 8/1/1973 | 5,760 | McMoRan O&G | 8.5% | TERMIN | [4] |
| HI A537 | G02698 | Federal | CONT | 5/29/1974 | | McMoRan O&G | | TERMIN | |
| HI A545 | G17199 | Federal | OP | 1/1/1997 | 5,760 | Fieldwood En | 60.0% | TERMIN | |
| HI A-572 | G02392 | Federal | RT | 8/1/1973 | 5,760 | Apache | 72.4% | TERMIN | [4] |
| HI A-573 | G02393 | Federal | RT | 8/1/1973 | 5,760 | Fieldwood En | 72.4% | PROD | [4] |
| HI A-581 | G18959 | Federal | CONT | 8/27/1997 | | Cox Op | 24.7% | TERMIN | [4] |
| HI A582 | G02719 | Federal | RT | 7/1/1974 | 5,760 | Cox Op | 24.7% | PROD | [4] |
| HI A-582 | G02719 | Federal | OP 1 | 7/1/1974 | 5,760 | Cox Op | 15.5% | PROD | [4] |
| HI A-595 | G02721 | Federal | RT | 7/1/1974 | 5,760 | Fieldwood En | 72.4% | PROD | [4] |
| HI A-596 | G02722 | Federal | RT | 7/1/1974 | 5,760 | Fieldwood En | 72.4% | PROD | [4] |
| MC 108 | G09777 | Federal | RT | 7/1/1988 | 5,760 | BP E&P | 75.2% | PROD | |
| MC 108 | G09777 | Federal | OP | 7/1/1988 | 5,760 | BP E&P | 75.2% | PROD | |
| MC 110 | G18192 | Federal | RT | 8/1/1997 | 5,760 | Fieldwood En | 50.0% | PROD | [2] |
| MC 110 | G18192 | Federal | OP | 8/1/1997 | 5,760 | Fieldwood En | 25.0% | PROD | [2] |
| MC 110 | G18192 | Federal | ORRI | 8/1/1997 | | Fieldwood En | 3.9% | PROD | [2] |
| MC 21 | G28351 | Federal | ORRI | 7/1/1995 | 4,445 | ANKOR En | 3.0% | PROD | |
| MC 311 | G02968 | Federal | RT | 12/1/1974 | 5,760 | Fieldwood En | 100.0% | PROD | |
| MC 65 | G21742 | Federal | RT | 6/1/2000 | 5,760 | ANKOR En | 100.0% | PROD | |
| MC 65 | G21742 | Federal | ORRI | 6/1/2000 | | ANKOR En | 13.0% | PROD | |
| MI 486 | MF88560 | SL - TX | WI | 10/5/1982 | 1,440 | Fieldwood | 100.0% | EXPIRED | |
| MI 487 | MF-88562 | SL - TX | WI | 10/5/1982 | 1,305 | Fieldwood | 100.0% | SI | |
| MI 518 | G05169 | Federal | RT | 1/1/1983 | 5,675 | Fieldwood En | 100.0% | TERMIN | |
| MI 518 | MF80522 | SL - TX | WI | 10/2/1979 | 85 | Fieldwood | 100.0% | EXPIRED | |
| MI 519 | MF-79413 | SL - TX | WI | 2/6/1979 | 739 | Fieldwood | 100.0% | SI | |
| MI 622 | G05000 | Federal | RT | 4/1/1982 | 5,760 | Fieldwood En | 81.0% | TERMIN | |
| MI 622 | G05000 | Federal | OP | 4/1/1982 | 5,760 | BP E&P | 37.5% | TERMIN | |

11

| Block | Lease | Type | Rights | Date Le Eff | Le Cur Acres | Operator | WI | Lease Status | Notes[†] |
|-------|-------|------|--------|-------------|--------------|----------|-----|--------------|----------|
| MI 623 | G03088 | Federal | RT | 4/1/1975 | 5,760 | Fieldwood En | 81.0% | TERMIN | |
| MI 623 | G03088 | Federal | OP | 4/1/1975 | 5,760 | BP E&P | 37.5% | TERMIN | |
| MI 635 | G06043 | Federal | RT | 10/1/1983 | 5,760 | Fieldwood En | 81.0% | TERMIN | |
| MI 635 | G06043 | Federal | OP | 10/1/1983 | 5,760 | BP E&P | 37.5% | TERMIN | |
| MI 636 | G34670 | Federal | RT | 4/1/2013 | 5,760 | Apache Shelf Exp | 100.0% | RELINQ | |
| MI 652 | G34022 | Federal | RT | 2/1/2012 | 5,760 | Apache Shelf Exp | 100.0% | EXPIR | |
| MI 681 | G04703 | Federal | RT | 9/1/1981 | 5,760 | Fieldwood En | 100.0% | TERMIN | |
| MI 685 | G04548 | Federal | RT | 1/1/1981 | 5,760 | EOG Res | 50.0% | TERMIN | |
| MI 685 | G04548 | Federal | OP | 1/1/1981 | 5,760 | EOG Res | 2.5% | TERMIN | |
| MI 703 | G03733 | Federal | RT | 6/1/1978 | 5,760 | Fieldwood En | 100.0% | TERMIN | |
| MI 703 | G03733 | Federal | OP 1 | 6/1/1978 | 5,760 | Fieldwood En | 100.0% | TERMIN | |
| MI 703 | G03733 | Federal | OP 2 | 6/1/1978 | 5,760 | Fieldwood En | 100.0% | TERMIN | |
| MI 772 | MF93351 | SL - TX | WI | 2/7/1989 | 704 | Fieldwood | 100.0% | TERMINATED | |
| MO 820 | G34403 | Federal | RT | 8/1/2012 | 3,347 | Apache Shelf Exp | 100.0% | RELINQ | |
| MO 821 | G05058 | Federal | RT | 4/1/1982 | 4,028 | Fieldwood En | 100.0% | TERMIN | |
| MO 821 | STATE OF ALABAMA 627 | SL - AL | WI | 8/14/1984 | 2,511 | Fieldwood | 100.0% | TERMINATED | |
| MO 826 | G26176 | Federal | RT | 7/1/2004 | 1,430 | Fieldwood En | 75.0% | PROD | |
| MO 871 | G32272 | Federal | RT | 8/1/2008 | 5,760 | Apache | 100.0% | EXPIR | |
| MO 913 | G33131 | Federal | RT | 6/1/2009 | 5,760 | Apache Shelf Exp | 75.0% | EXPIR | |
| MO 914 | G33132 | Federal | RT | 6/1/2009 | 5,760 | Apache Shelf Exp | 75.0% | EXPIR | |
| MP 120 | G03197 | Federal | ORRI | 5/28/1975 | | Arena Off | 2.0% | PROD | |
| MP 120 | G03197 | Federal | ORRI | 7/1/1975 | | Arena Off | 2.0% | PROD | |
| MP 134 | G34375 | Federal | RT | 10/1/2012 | 4,995 | Apache Shelf Exp | 100.0% | RELINQ | |
| MP 135 | G34376 | Federal | RT | 10/1/2012 | 4,995 | Apache Shelf Exp | 100.0% | RELINQ | |
| MP 136 | G34377 | Federal | RT | 10/1/2012 | 4,995 | Apache Shelf Exp | 100.0% | RELINQ | |
| MP 137 | G34378 | Federal | RT | 10/1/2012 | 4,995 | Apache Shelf Exp | 100.0% | RELINQ | |
| MP 140 | G02193 | Federal | RT | 10/1/1972 | 4,995 | Fieldwood En | 65.0% | PROD | |
| MP 143 | G34380 | Federal | RT | 10/1/2012 | 4,995 | Apache Shelf Exp | 100.0% | RELINQ | |
| MP 146 | G34860 | Federal | RT | 7/1/2013 | 4,561 | Apache Shelf Exp | 75.0% | RELINQ | |
| MP 147 | G34861 | Federal | RT | 7/1/2013 | 4,561 | Apache Shelf Exp | 75.0% | RELINQ | |
| MP 148 | G34381 | Federal | RT | 11/1/2012 | 5,000 | Apache Shelf Exp | 100.0% | RELINQ | |
| MP 149 | G34382 | Federal | RT | 11/1/2012 | 5,000 | Apache Shelf Exp | 100.0% | RELINQ | |

| Block | Lease | Type | Rights | Date Le Eff | Le Cur Acres | Operator | WI | Lease Status | Notes[†] |
|---|---|---|---|---|---|---|---|---|---|
| MP 150 | G34862 | Federal | RT | 7/1/2013 | 5,000 | Apache Shelf Exp | 75.0% | RELINQ | |
| MP 152 | G01966 | Federal | RT | 1/1/1970 | 4,978 | Fieldwood En | 50.0% | UNIT | |
| MP 152 | G01966 | Federal | OP | 1/1/1970 | 4,978 | Fieldwood En | 75.0% | UNIT | |
| MP 153 | G01967 | Federal | RT | 1/1/1970 | 5,000 | Fieldwood En | 50.0% | UNIT | |
| MP 153 | G01967 | Federal | OP | 1/1/1970 | 5,000 | Fieldwood En | 75.0% | UNIT | |
| MP 166 | G26152 | Federal | RT | 7/1/2004 | 4,995 | Fieldwood En | 100.0% | TERMIN | |
| MP 175 | G08753 | Federal | OP | 8/1/1987 | 4,995 | Tana Exp | 21.2% | TERMIN | |
| MP 255 | G07825 | Federal | RT | 8/1/1985 | 4,995 | Fieldwood En | 52.4% | TERMIN | |
| MP 259 | G07827 | Federal | RT | 9/1/1985 | 4,995 | Fieldwood En | 56.9% | TERMIN | |
| MP 260 | G07828 | Federal | RT | 9/1/1985 | 4,995 | Fieldwood En | 56.9% | TERMIN | |
| MP 270 | G22812 | Federal | ORRI | 7/1/2001 | 4,995 | Castex Off | 1.0% | UNIT | |
| MP 271 | G34388 | Federal | RT | 10/1/2012 | 4,995 | Apache Shelf Exp | 100.0% | EXPIR | |
| MP 272 | G34865 | Federal | RT | 7/1/2013 | 4,995 | Apache Shelf Exp | 75.0% | RELINQ | |
| MP 273 | G33690 | Federal | RT | 7/1/2010 | 4,995 | Castex Off | 37.5% | UNIT | |
| MP 274 | G33691 | Federal | RT | 7/1/2010 | 4,995 | Castex Off | 37.5% | EXPIR | |
| MP 275 | G15395 | Federal | RT | 9/1/1995 | 4,995 | Fieldwood En | 100.0% | PROD | |
| MP 275 | G15395 | Federal | ORRI | 9/1/1995 | | Fieldwood En | 8.3% | PROD | |
| MP 281 | G10910 | Federal | RT | 7/1/1989 | 4,995 | EnVen En Vent | 50.0% | PROD | |
| MP 281 | G10910 | Federal | OP | 7/1/1989 | 4,995 | EnVen En Vent | 30.0% | PROD | |
| MP 281 | G10910 | Federal | ORRI | 7/1/1989 | | EnVen En Vent | 3.1% | PROD | |
| MP 289 | G01666 | Federal | RT | 7/1/1967 | 4,561 | Fieldwood En | 100.0% | PROD | |
| MP 290 | G01667 | Federal | RT | 7/1/1967 | 4,561 | Apache | 100.0% | TERMIN | |
| MP 290 | G34866 | Federal | RT | 7/1/2013 | 4,561 | Apache Shelf Exp | 75.0% | RELINQ | |
| MP 291 | G34391 | Federal | RT | 11/1/2012 | 4,561 | Apache Shelf Exp | 100.0% | EXPIR | |
| MP 292 | G34392 | Federal | RT | 11/1/2012 | 4,561 | Apache Shelf Exp | 100.0% | RELINQ | |
| MP 293 | G34393 | Federal | RT | 11/1/2012 | 4,561 | Apache Shelf Exp | 100.0% | EXPIR | |
| MP 294 | G34394 | Federal | RT | 11/1/2012 | 4,561 | Apache Shelf Exp | 100.0% | RELINQ | |
| MP 295 | G32263 | Federal | CONT | 8/1/2008 | 4,561 | Fieldwood En | 37.5% | TERMIN | |
| MP 296 | G01673 | Federal | RT | 6/1/1967 | 4,561 | GOM Shelf | 50.0% | UNIT | [1] |
| MP 296 | G01673 | Federal | OP | 6/1/1967 | 4,561 | GOM Shelf | 25.0% | UNIT | |
| MP 297 | G34395 | Federal | RT | 11/1/2012 | 4,561 | Apache Shelf Exp | 100.0% | RELINQ | |
| MP 300 | G01317 | Federal | OP | 6/1/1962 | 4,561 | Cantium | 10.4% | UNIT | |
| MP 301 | G04486 | Federal | OP 1 | 11/1/1980 | 5,000 | Walter O&G | 10.4% | TERMIN | |
| MP 301 | G04486 | Federal | OP 2 | 11/1/1980 | 5,000 | Walter O&G | 6.3% | TERMIN | |

13

| Block | Lease | Type | Rights | Date Le Eff | Le Cur Acres | Operator | WI | Lease Status | Notes[†] |
|-------|-------|------|--------|-------------|--------------|----------|-----|--------------|----------|
| MP 301 | G04486 | Federal | OP 3 | 11/1/1980 | 5,000 | Walter O&G | 10.4% | TERMIN | |
| MP 301 | G04486 | Federal | RT | 11/1/1980 | 5,000 | Walter O&G | 10.4% | TERMIN | |
| MP 302 | G32264 | Federal | RT | 7/1/2008 | 5,000 | GOM Shelf | 100.0% | PROD | |
| MP 303 | G04253 | Federal | OP 1 | 12/1/1979 | 5,000 | Fieldwood En | 25.0% | UNIT | |
| MP 303 | G04253 | Federal | RT | 12/1/1979 | 5,000 | Fieldwood En | 100.0% | UNIT | |
| MP 304 | G03339 | Federal | OP | 4/1/1976 | 5,000 | ConocoPhillips | 100.0% | UNIT | |
| MP 305 | G34396 | Federal | RT | 12/1/2012 | 5,000 | Apache Shelf Exp | 100.0% | RELINQ | |
| MP 308 | G32265 | Federal | RT | 8/1/2008 | 5,000 | Fieldwood En | 100.0% | PROD | |
| MP 309 | G08760 | Federal | RT | 6/1/1987 | 5,000 | Fieldwood En | 100.0% | PROD | |
| MP 310 | G04126 | Federal | RT | 10/1/1979 | 5,000 | Fieldwood En | 100.0% | UNIT | |
| MP 311 | G02213 | Federal | RT | 11/1/1972 | 5,000 | GOM Shelf | 50.0% | PROD | [1] |
| MP 311 | G02213 | Federal | OP | 11/1/1972 | 5,000 | GOM Shelf | 25.0% | PROD | |
| MP 312 | G16520 | Federal | RT | 7/1/1996 | 5,000 | Fieldwood En | 100.0% | PROD | |
| MP 314 | G33693 | Federal | OP | 7/1/2010 | 5,000 | Apache Shelf Exp | 80.0% | EXPIR | |
| MP 315 | G08467 | Federal | RT | 7/1/1986 | 5,000 | Fieldwood En | 100.0% | PROD | |
| MP 315 | G08467 | Federal | OP 3 | 7/1/1986 | 5,000 | Fieldwood En | 100.0% | PROD | |
| MP 315 | G08467 | Federal | OP 1 | 7/1/1986 | 5,000 | Fieldwood En | 80.0% | PROD | |
| MP 5 | SL13890 | SL-LA | WI | | 26 | Apache | 50.0% | TERMIN | |
| MP 59 | G03194 | Federal | OP | 7/1/1975 | 1,406 | Cantium | 37.5% | UNIT | |
| MP 59 | G08461 | Federal | OP | 7/1/1986 | 2,340 | Cantium | 37.5% | UNIT | |
| MP 6 | SL03771 | SL-LA | WI | 4/26/1961 | 1,067 | Apache | 50.0% | TERMIN | |
| MP 6 | SL13580 | SL-LA | WI | | 287 | Apache | 50.0% | TERMIN | |
| MP 6 | SL13891 | SL-LA | WI | | 270 | Apache | 50.0% | TERMIN | |
| MP 64 | G04909 | Federal | ORRI | 12/1/1981 | 4,988 | Sanare En Part | 4.2% | UNIT | |
| MP 7 | SL03773 | SL-LA | WI | 4/26/1961 | – | Apache | 50.0% | TERMIN | |
| MP 7 | SL13892 | SL-LA | WI | | 44 | Apache | 50.0% | TERMIN | |
| MP 74 | G34857 | Federal | RT | 8/1/2013 | 1,733 | Apache Shelf Exp | 75.0% | RELINQ | |
| MP 77 | G04481 | Federal | RT | 11/1/1980 | 4,655 | Fieldwood En Off | 26.2% | RELINQ | [7] |
| MP 77/78 | G04481 | Federal | OP | 11/1/1980 | 4,655 | Fieldwood En Off | 23.5% | RELINQ | [7] |
| MP 91 | G14576 | Federal | RT | 5/1/1994 | 1,017 | Apache | 100.0% | TERMIN | |
| MU 883 | MF98761 | SL - TX | WI | | | Apache | 100.0% | TERMIN | |
| MU A-111 | G03068 | Federal | RT | 4/1/1975 | 5,760 | Apache | 100.0% | TERMIN | |
| MU A133 | G33392 | Federal | RT | 10/1/2009 | 5,760 | Apache Shelf Exp | 100.0% | EXPIR | |
| MU A134 | G32724 | Federal | RT | 11/1/2008 | 5,760 | Apache | 100.0% | EXPIR | |

14

| Block | Lease | Type | Rights | Date Le Eff | Le Cur Acres | Operator | WI | Lease Status | Notes[†] |
|-------|-------|------|--------|-------------|--------------|----------|-----|--------------|----------|
| MU A85 | G03061 | Federal | RT | 4/1/1975 | 5,760 | EnVen En Vent | 53.3% | PROD | |
| PE 881 | G06390 | Federal | OP | 2/1/1984 | 5,760 | ConocoPhillips | 18.8% | TERMIN | |
| PL 1 | G04234 | Federal | RT | 1/1/1980 | 1,568 | Fieldwood En | 100.0% | TERMIN | |
| PL 10 | G02925 | Federal | RT | 12/1/1974 | 5,000 | Fieldwood En | 100.0% | TERMIN | |
| PL 11 | 00071 | Federal | RT | 9/12/1946 | 5,000 | Fieldwood En | 100.0% | RELINQ | |
| PL 13 | G03171 | Federal | RT | 7/1/1975 | 5,000 | ANKOR En | 12.5% | TERMIN | |
| PL 13 | G03171 | Federal | OP 1 | 7/1/1975 | 391 | ANKOR En | 12.5% | TERMIN | |
| PL 13 | G03171 | Federal | OP 2 | 7/1/1975 | 3,906 | ANKOR En | 12.5% | TERMIN | |
| PL 13 | G03171 | Federal | OP 3 | 7/1/1975 | 703 | ANKOR En | 4.4% | TERMIN | |
| PL 13 | G03171 | Federal | OP 5 | 7/1/1975 | 391 | ANKOR En | 12.5% | TERMIN | |
| PL 25 | G14535 | Federal | RT | 7/1/1994 | 5,000 | Fieldwood En | 100.0% | TERMIN | |
| PL 5 | G12027 | Federal | RT | 6/1/1990 | 5,000 | Talos En Off | 100.0% | RELINQ | |
| PL 6 | G09651 | Federal | RT | 5/1/1988 | 5,000 | Walter O&G | 100.0% | RELINQ | |
| PL 6 | G09651 | Federal | OP 1 | 5/1/1988 | 5,000 | Walter O&G | 35.0% | RELINQ | |
| PL 6 | G09651 | Federal | OP 2 | 5/1/1988 | 5,000 | Walter O&G | 65.0% | RELINQ | |
| PL 8 | G03587 | Federal | RT | 8/1/1977 | 5,000 | ANKOR En | 12.5% | TERMIN | |
| PL 9 | G02924 | Federal | RT | 12/1/1974 | 5,000 | Fieldwood En | 100.0% | TERMIN | |
| PL 9 | G02924 | Federal | OP | 12/1/1974 | 5,000 | Fieldwood En | 50.0% | TERMIN | |
| PN 883 | MF100410 | SL - TX | WI | 10/6/1998 | 720 | Fieldwood | 35.0% | ACTIVE | |
| PN 883 | MF100411 | SL - TX | WI | 10/6/1998 | 720 | Fieldwood | 35.0% | ACTIVE | |
| PN 883 | MF100412 | SL - TX | WI | 10/6/1998 | 720 | Fieldwood | 35.0% | ACTIVE | |
| PN 883 | MF101898 | SL - TX | WI | 10/6/1998 | | Apache | 35.0% | TERMIN | |
| PN 883 | MF96146 | SL - TX | WI | 10/4/1994 | 720 | Fieldwood | 35.0% | ACTIVE | |
| PN 883 | MF96147 | SL - TX | WI | 10/4/1994 | 720 | Fieldwood | 35.0% | ACTIVE | |
| PN 883 | SL96146 | SL - TX | WI | 10/4/1994 | 720 | Fieldwood | 35.0% | ACTIVE | |
| PN 899L | MF100413 | SL - TX | WI | 10/6/1998 | 375 | Fieldwood | 35.0% | ACTIVE | |
| PN 899L | MF100414 | SL - TX | WI | 10/6/1998 | 360 | Fieldwood | 35.0% | ACTIVE | |
| PN 969 | G05953 | Federal | RT | 10/1/1983 | 5,760 | Peregrine O&G II | 8.3% | TERMIN | |
| PN 976 | G05954 | Federal | RT | 10/1/1983 | 5,760 | Peregrine O&G II | 8.3% | TERMIN | |
| SA 10 | G03958 | Federal | RT | 3/1/1979 | 3,144 | Fieldwood En | 92.3% | TERMIN | |
| SA 10 | G03958 | Federal | OP | 3/1/1979 | 3,144 | Fieldwood En | 20.0% | TERMIN | |
| SA 13 | G03959 | Federal | OP | 3/1/1979 | 5,000 | Renaissance Off | 50.0% | TERMIN | |
| SM 10 | G01181 | Federal | RT | 4/1/1962 | 5,000 | Fieldwood En | 100.0% | TERMIN | |
| SM 105 | G17938 | Federal | RT | 8/1/1997 | 5,000 | Fieldwood En | 100.0% | PROD | |

| Block | Lease | Type | Rights | Date Le Eff | Le Cur Acres | Operator | WI | Lease Status | Notes[†] |
|-------|-------|------|--------|-------------|--------------|----------|-----|--------------|----------|
| SM 106 | G02279 | Federal | RT | 2/1/1973 | 2,500 | Fieldwood En | 100.0% | TERMIN | |
| SM 106 | G03776 | Federal | RT | 6/1/1978 | 2,500 | Fieldwood En | 100.0% | PROD | |
| SM 108 | 00792 | Federal | RT | 5/1/1960 | 5,000 | Talos En Off | 25.0% | PROD | [1] |
| SM 108 | 00792 | Federal | OP | 5/1/1960 | 5,000 | Talos En Off | 12.5% | PROD | |
| SM 11 | G01182 | Federal | RT | 3/1/1962 | 5,000 | Fieldwood En | 100.0% | TERMIN | |
| SM 127 | G02883 | Federal | RT | 12/1/1974 | 2,784 | Fieldwood En | 66.7% | PROD | |
| SM 127 | G02883 | Federal | OP 2 | 12/1/1974 | 2,784 | Fieldwood En | 33.3% | PROD | |
| SM 127 | G02883 | Federal | RT | 12/1/1974 | 2,784 | Fieldwood En | 17.3% | PROD | [1] |
| SM 127 | G02883 | Federal | OP 2 | 12/1/1974 | 2,784 | Fieldwood En | 8.7% | PROD | [1] |
| SM 128 | G02587 | Federal | RT | 5/1/1974 | 5,000 | Fieldwood En | 66.7% | PROD | |
| SM 128 | G02587 | Federal | RT | 5/1/1974 | 5,000 | Fieldwood En | 17.3% | PROD | [1] |
| SM 132 | G02282 | Federal | RT | 2/1/1973 | 5,000 | Fieldwood En | 50.0% | TERMIN | [6] |
| SM 135 | G19776 | Federal | RT | 5/1/1998 | 3,293 | Fieldwood En | 50.0% | TERMIN | [4] |
| SM 136 | G02588 | Federal | RT | 5/1/1974 | 2,500 | Fieldwood En | 50.0% | TERMIN | [6] |
| SM 137 | G02589 | Federal | RT | 5/1/1974 | 5,000 | Fieldwood En | 50.0% | TERMIN | [6] |
| SM 141 | G02885 | Federal | OP 2 | 12/1/1974 | 5,000 | Fieldwood En | 66.7% | TERMIN | |
| SM 141 | G02885 | Federal | RT | 12/1/1974 | 5,000 | Fieldwood En | 77.6% | TERMIN | |
| SM 141 | G02885 | Federal | OP 2 | 12/1/1974 | 5,000 | Fieldwood En | 17.3% | TERMIN | [1] |
| SM 149 | G02592 | Federal | RT | 5/1/1974 | 2,500 | Fieldwood En | 50.0% | PROD | [2] |
| SM 149 | G02592 | Federal | OP | 5/1/1974 | 2,500 | Fieldwood En | 25.0% | PROD | [2] |
| SM 150 | G16325 | Federal | RT | 6/1/1996 | 3,329 | Fieldwood En | 50.0% | RELINQ | [6] |
| SM 161 | G04809 | Federal | RT | 9/1/1981 | 5,000 | Fieldwood En | 100.0% | PROD | |
| SM 171 | G34273 | Federal | RT | 9/1/2012 | 5,000 | Apache Shelf Exp | 100.0% | EXPIR | |
| SM 172 | G34274 | Federal | RT | 9/1/2012 | 5,000 | Apache Shelf Exp | 100.0% | RELINQ | |
| SM 177 | G34275 | Federal | RT | 9/1/2012 | 5,000 | Apache Shelf Exp | 100.0% | RELINQ | |
| SM 178 | G34276 | Federal | RT | 9/1/2012 | 5,000 | Apache Shelf Exp | 100.0% | EXPIR | |
| SM 18 | G08680 | Federal | RT | 6/1/1987 | 5,000 | Fieldwood En | 50.0% | TERMIN | |
| SM 18 | G08680 | Federal | OP | 6/1/1987 | 5,000 | Fieldwood En | 100.0% | TERMIN | |
| SM 188 | G34277 | Federal | RT | 9/1/2012 | 5,000 | Apache Shelf Exp | 100.0% | RELINQ | |
| SM 189 | G34278 | Federal | RT | 9/1/2012 | 5,000 | Apache Shelf Exp | 100.0% | RELINQ | |
| SM 193 | G34279 | Federal | RT | 9/1/2012 | 5,000 | Apache Shelf Exp | 100.0% | RELINQ | |
| SM 195 | G21108 | Federal | ORRI | 6/1/1999 | | Tarpon O&D | 4.0% | TERMIN | |
| SM 236 | G4437 | Federal | ORRI | 11/1/1980 | | Cox Op | 4.4% | UNIT | |
| SM 241 | 00310 | Federal | RT | 2/7/1936 | 114,601 | Cox Op | 60.0% | UNIT | |

16

| Block | Lease | Type | Rights | Date Le Eff | Le Cur Acres | Operator | WI | Lease Status | Notes† |
|---|---|---|---|---|---|---|---|---|---|
| SM 241 | 00310 | Federal | OP | 2/7/1936 | 114,601 | Cox Op | 60.0% | UNIT | |
| SM 241 | 00310 | Federal | Unit | 2/7/1936 | 114,601 | Cox Op | 16.0% | UNIT | |
| SM 268 | G02310 | Federal | CONT | 12/19/1972 | | Apache | 69.9% | TERMIN | [4] |
| SM 268 | G34284 | Federal | RT | 8/1/2012 | 3,237 | Apache Shelf Exp | 100.0% | EXPIR | [4] |
| SM 269 | G02311 | Federal | RT 1 | 1/1/1973 | 5,000 | Fieldwood En | 72.8% | PROD | [4] |
| SM 280 | G14456 | Federal | OP 1 | 6/1/1994 | 5,000 | Fieldwood En | 50.0% | PROD | [4] |
| SM 280 | G14456 | Federal | OP 3 | 6/1/1994 | 5,000 | Fieldwood En | 50.0% | PROD | [4] |
| SM 280 | G14456 | Federal | RT | 6/1/1994 | 5,000 | Fieldwood En | 50.0% | PROD | [4] |
| SM 281 | G02600 | Federal | RT | 4/1/1974 | 3,214 | Fieldwood En | 68.1% | PROD | [4] |
| SM 34 | G13897 | Federal | OP | 5/1/1993 | 5,000 | Black Elk En Off Op | 50.0% | TERMIN | |
| SM 41 | G01192 | Federal | OP 2 | 6/1/1962 | 5,000 | Sanare En Part | 25.0% | PROD | [2] |
| SM 41 | G01192 | Federal | OP 3 | 6/1/1962 | 5,000 | Sanare; Fieldwd En Off | 50.0% | PROD | [2] |
| SM 44 | G23840 | Federal | RT | 5/1/2002 | 5,000 | SandRidge En Off | 100.0% | TERMIN | |
| SM 48 | 00786 | Federal | RT | 5/1/1960 | 5,000 | Fieldwood En | 100.0% | PROD | [2] |
| SM 48 | 00786 | Federal | OP | 5/1/1960 | 5,000 | Fieldwood En | 50.0% | PROD | [2] |
| SM 58 | G01194 | Federal | RT | 5/1/1962 | 5,000 | ANKOR En | 100.0% | PROD | |
| SM 66 | G01198 | Federal | RT | 6/1/1962 | 5,000 | Fieldwood En | 50.0% | TERMIN | [6] |
| SM 7 | G33610 | Federal | RT | 7/1/2010 | 5,000 | Apache Shelf Exp | 100.0% | RELINQ | |
| SM 76 | G01208 | Federal | RT | 6/1/1962 | 5,000 | Fieldwood En | 50.0% | TERMIN | |
| SM 93 | G21618 | Federal | RT | 5/1/2000 | 5,000 | Talos ERT | 12.5% | PROD | |
| SM 97 | G32159 | Federal | RT | 8/1/2008 | 5,000 | Apache | 100.0% | EXPIR | |
| SP 61 | G01609 | Federal | OP | 7/1/1967 | 5,000 | Fieldwood En | 100.0% | UNIT | [5] |
| SP 62 | G01294 | Federal | RT | 6/1/1962 | 5,000 | Fieldwood En | 100.0% | PROD | |
| SP 63 | G34365 | Federal | RT | 8/1/2012 | 5,000 | Apache Shelf Exp | 100.0% | EXPIR | |
| SP 64 | G01901 | Federal | RT | 1/1/1969 | 5,000 | Fieldwood En | 50.0% | UNIT | |
| SP 64 | G01901 | Federal | OP | 1/1/1969 | 5,000 | Fieldwood En | 75.0% | UNIT | |
| SP 65 | G01610 | Federal | RT | 7/1/1967 | 5,000 | Fieldwood En | 50.0% | UNIT | |
| SP 65 | G01610 | Federal | OP | 7/1/1967 | 5,000 | Fieldwood En | 75.0% | UNIT | |
| SP 66 | G1611 | Federal | ORRI | 6/1/1967 | | Fieldwood En | 8.3% | UNIT | [4] |
| SP 68 | G34366 | Federal | RT | 8/1/2012 | 5,000 | Apache Shelf Exp | 100.0% | RELINQ | |
| SP 69 | G34367 | Federal | RT | 8/1/2012 | 5,000 | Apache Shelf Exp | 100.0% | RELINQ | |
| SP 70 | G01614 | Federal | RT | 6/1/1967 | 5,000 | Fieldwood En | 100.0% | PROD | |
| SP 75 | G05051 | Federal | OP 2 | 4/1/1982 | 5,000 | GOM Shelf | 28.8% | TERMIN | |

| Block | Lease | Type | Rights | Date Le Eff | Le Cur Acres | Operator | WI | Lease Status | Notes[†] |
|-------|-------|------|--------|-------------|--------------|----------|-----|--------------|-------|
| SP 75 | G05051 | Federal | RT | 4/1/1982 | 5,000 | GOM Shelf | 71.2% | TERMIN | [1] |
| SP 75 | G05051 | Federal | OP 2 | 4/1/1982 | 5,000 | GOM Shelf | 71.2% | TERMIN | [1] |
| SP 83 | G05052 | Federal | ORRI | 4/1/1982 | 5,000 | Arena Off | 0.7% | RELINQ | |
| SP 87 | G07799 | Federal | RT | 9/1/1985 | 3,540 | Fieldwood En | 33.3% | TERMIN | |
| SP 87 | G07799 | Federal | RT | 9/1/1985 | 3,540 | Fieldwood En | 33.3% | TERMIN | [1] |
| SP 88 | G10894 | Federal | RT | 6/1/1989 | 3,540 | Apache | 100.0% | RELINQ | |
| SP 89 | G01618 | Federal | RT | 7/1/1967 | 5,000 | Fieldwood En | 50.0% | PROD | |
| SP 96 | G31431 | Federal | RT | 3/1/2008 | 5,000 | Stone En | 50.0% | RELINQ | |
| SS 105 | G09614 | Federal | RT | 8/1/1988 | 5,000 | Bennu O&G | 100.0% | PROD | |
| SS 105 | G09614 | Federal | OP 2 | 8/1/1988 | 5,000 | Bennu O&G | 100.0% | PROD | |
| SS 105 | G09614 | Federal | OP 3 | 8/1/1988 | 5,000 | Bennu O&G | 100.0% | PROD | |
| SS 126 | G12940 | Federal | RT | 5/1/1991 | 5,000 | Fieldwood En | 100.0% | TERMIN | |
| SS 126 | G12940 | Federal | OP | 5/1/1991 | 5,000 | Fieldwood En | 100.0% | TERMIN | |
| SS 129 | G12941 | Federal | RT | 5/1/1991 | 5,000 | Fieldwood En | 100.0% | PROD | |
| SS 129 | G12941 | Federal | ORRI | 5/1/1991 | | Fieldwood En | 3.3% | PROD | |
| SS 130 | 00453 | Federal | ORRI | 1/1/1955 | 5,000 | W&T Off | 3.0% | TERMIN | |
| SS 145 | G34831 | Federal | CONT | 9/1/2013 | 5,000 | Hoactzin Part | 25.0% | TERMIN | |
| SS 150 | 00419 | Federal | ORRI | 11/1/1954 | 5,000 | Ridgelake En | 5.0% | PROD | |
| SS 151 | G15282 | Federal | RT | 7/1/1995 | 5,000 | EnVen En Vent | 100.0% | PROD | |
| SS 153 | G18011 | Federal | RT | 7/1/1997 | 5,000 | Fieldwood En | 33.3% | TERMIN | |
| SS 154 | 00420 | Federal | ORRI | 11/1/1954 | | Ridgelake En | 8.0% | PROD | |
| SS 159 | G11984 | Federal | OP | 7/1/1990 | 5,000 | Hoactzin Part | 15.5% | TERMIN | |
| SS 169 | 00820 | Federal | RT | 4/1/1960 | 5,000 | Fieldwood En | 66.7% | PROD | [6] |
| SS 175 | G05550 | Federal | RT | 7/1/1983 | 5,000 | Chevron USA | 66.7% | UNIT | |
| SS 176 | G33646 | Federal | RT | 7/1/2010 | 5,000 | Fieldwood En | 40.0% | PROD | |
| SS 178 | G05551 | Federal | RT | 7/1/1983 | 5,000 | Fieldwood En | 100.0% | PROD | |
| SS 182 | G03998 | Federal | RT | 3/1/1979 | 2,500 | Fieldwood En | 100.0% | PROD | |
| SS 188 | G05203 | Federal | CONT | 1/1/1983 | 5,027 | Fieldwood En | 100.0% | TERMIN | |
| SS 189 | G04232 | Federal | OP 5 | 12/1/1979 | 5,000 | Fieldwood En | 99.0% | PROD | [4] |
| SS 189 | G04232 | Federal | RT | 12/1/1979 | 5,000 | Fieldwood En | 99.0% | PROD | [4] |
| SS 189 | G4232 | Federal | ORRI | 12/1/1979 | | Fieldwood En | 8.0% | PROD | [4] |
| SS 190 | G10775 | Federal | RT | 4/1/1989 | 5,000 | Fieldwood En | 60.0% | TERMIN | |
| SS 190 | G10775 | Federal | OP | 4/1/1989 | 5,000 | Fieldwood En | 100.0% | TERMIN | |
| SS 193 | G13917 | Federal | RT | 5/1/1993 | 5,000 | Fieldwood En | 100.0% | PROD | |

18

| Block | Lease | Type | Rights | Date Le Eff | Le Cur Acres | Operator | WI | Lease Status | Notes[†] |
|-------|-------|------|--------|-------------|--------------|----------|-----|--------------|----------|
| SS 194 | G15288 | Federal | RT | 7/1/1995 | 5,000 | Fieldwood En | 100.0% | PROD | |
| SS 198 | 00593 | Federal | RT | 9/1/1955 | 2,969 | Renaissance Off | 50.0% | PROD | [1] |
| SS 198 | G12355 | Federal | OP | 9/1/1955 | 2,031 | Renaissance Off | 25.0% | PROD | |
| SS 199 | 00594 | Federal | RT | 9/1/1955 | 3,516 | Talos En Off | 50.0% | PROD | |
| SS 199 | G12358 | Federal | OP | 9/1/1955 | 1,484 | Renaissance Off | 50.0% | PROD | |
| SS 204 | G01520 | Federal | RT | 7/1/1967 | 5,000 | Fieldwood En | 55.2% | PROD | [4] |
| SS 206 | G01522 | Federal | RT | 7/1/1967 | 5,000 | Fieldwood En | 60.0% | UNIT | [6] |
| SS 207 | G01523 | Federal | RT | 7/1/1967 | 5,000 | Fieldwood En | 72.2% | UNIT | [7] |
| SS 207 | G01523 | Federal | OP | 7/1/1967 | 5,000 | Fieldwood En | 47.6% | UNIT | [7] |
| SS 210 | G05204 | Federal | CONT | 1/1/1983 | 5,000 | Fieldwood En | 100.0% | RELINQ | |
| SS 216 | G01524 | Federal | RT | 7/1/1967 | 5,000 | Fieldwood En | 80.0% | PROD | [4] |
| SS 243 | G10780 | Federal | RT | 7/1/1989 | 5,000 | Fieldwood En | 50.0% | PROD | |
| SS 243 | G10780 | Federal | ORRI | 7/1/1989 | | Fieldwood En | 4.2% | PROD | |
| SS 249 | G01030 | Federal | OP 1 | 6/1/1962 | 5,000 | Fieldwood En Off | 5.3% | UNIT | [4] |
| SS 249 | G1030 | Federal | ORRI | 6/1/1962 | | Fieldwood En Off | 0.2% | UNIT | [4] |
| SS 258 | G05560 | Federal | RT | 7/1/1983 | 5,000 | Castex Off | 100.0% | TERMIN | |
| SS 258 | G05560 | Federal | OP | 7/1/1983 | 5,000 | Castex Off | 7.4% | TERMIN | |
| SS 259 | G05044 | Federal | RT | 4/1/1982 | 5,141 | Fieldwood En | 100.0% | TERMIN | |
| SS 259 | G05044 | Federal | OP | 4/1/1982 | 5,141 | Fieldwood En | 7.4% | TERMIN | |
| SS 271 | G01038 | Federal | RT | 6/1/1962 | 5,000 | Fieldwood En Off | 20.0% | UNIT | [4] |
| SS 274 | G01039 | Federal | RT | 6/1/1962 | 5,000 | Fieldwood En | 100.0% | PROD | |
| SS 276 | G10785 | Federal | RT | 5/1/1989 | 5,000 | Monforte | 66.7% | TERMIN | |
| SS 277 | G09627 | Federal | RT | 5/1/1988 | 5,000 | Fieldwood En | 1.0% | SOP | |
| SS 277 | G09627 | Federal | OP | 5/1/1988 | 5,000 | Fieldwood En | 100.0% | SOP | |
| SS 278 | G32206 | Federal | RT | 8/1/2008 | 5,000 | Apache | 100.0% | EXPIR | |
| SS 291 | G02923 | Federal | OP | 12/1/1974 | 3,750 | Fieldwood En | 67.9% | OPERNS | [4] |
| SS 30 | 00333 | Federal | RT | 9/12/1946 | 5,000 | W & T Off | 37.5% | UNIT | |
| SS 301 | G10794 | Federal | ORRI | 5/1/1989 | | Fieldwood En | 1.5% | SOP | [2] |
| SS 31 | 00334 | Federal | RT | 9/12/1946 | 5,000 | W & T Off | 37.5% | UNIT | |
| SS 314 | G26074 | Federal | OP 4 | 5/1/2004 | 5,000 | Fieldwood En | 37.5% | PROD | |
| SS 314 | G26074 | Federal | RT | 5/1/2004 | 5,000 | Fieldwood En | 75.0% | PROD | |
| SS 314 | G26074 | Federal | ORRI | 5/1/2004 | | Fieldwood En | 4.5% | PROD | |
| SS 32 | 00335 | Federal | RT | 9/12/1946 | 5,000 | W & T Off | 37.5% | UNIT | |
| SS 33 | 00336 | Federal | CONT | 9/12/1946 | 5,000 | W&T Off | 28.9% | UNIT | |

| Block | Lease | Type | Rights | Date Le Eff | Le Cur Acres | Operator | WI | Lease Status | Notes[†] |
|-------|-------|------|--------|-------------|--------------|----------|-----|--------------|----------|
| SS 33 | 00336 | Federal | ORRI | 9/12/1946 | 5,000 | W&T Off | 0.8% | UNIT | |
| SS 354 | G15312 | Federal | RT | 7/1/1995 | 5,000 | Fieldwood En | 100.0% | PROD | |
| SS 355 | G33650 | Federal | RT | 6/1/2010 | 5,323 | Apache Shelf Exp | 100.0% | RELINQ | |
| SS 58 | G07746 | Federal | ORRI | 7/1/1985 | 5,000 | Talos Third Cst | 10.5% | PROD | |
| SS 68 | G02917 | Federal | RT | 12/1/1974 | 5,000 | Fieldwood En | 100.0% | RELINQ | |
| SS 87 | G12349 | Federal | ORRI | 9/12/1946 | 1,953 | Sanare En Part | 1.0% | UNIT | |
| SS 91 | G02919 | Federal | RT | 12/1/1974 | 5,000 | Fieldwood En | 87.5% | PROD | |
| SS 91 | G02919 | Federal | OP 2 | 12/1/1974 | 5,000 | Fieldwood En | 87.5% | PROD | |
| SS 91 | G02919 | Federal | OP 2 | 12/1/1974 | 5,000 | Fieldwood En | 12.5% | PROD | [1] |
| SS 91 | G02919 | Federal | RT | 12/1/1974 | 5,000 | Fieldwood En | 12.5% | PROD | [1] |
| ST 146 | G33110 | Federal | RT | 7/1/2009 | 3,772 | Apache Shelf Exp | 100.0% | EXPIR | |
| ST 148 | G01960 | Federal | RT | 2/1/1970 | 2,500 | Arena Off | 15.6% | PROD | |
| ST 148 | G01960 | Federal | OP | 2/1/1970 | 2,500 | Arena Off | 15.6% | PROD | |
| ST 161 | G01248 | Federal | OP | 6/1/1962 | 5,000 | Arena Off | 25.0% | PROD | |
| ST 166 | G01252 | Federal | OP | 6/1/1962 | 5,000 | Apache | 100.0% | TERMIN | |
| ST 173 | G04001 | Federal | RT | 3/1/1979 | 5,000 | Apache | 100.0% | TERMIN | |
| ST 179 | G12020 | Federal | RT | 6/1/1990 | 5,000 | Fieldwood En Off | 50.0% | TERMIN | |
| ST 179 | G12020 | Federal | OP | 6/1/1990 | 5,000 | Fieldwood En Off | 68.8% | TERMIN | |
| ST 190 | G01261 | Federal | RT | 6/1/1962 | 5,000 | Black Elk En Off Op | 40.0% | TERMIN | |
| ST 190 | G01261 | Federal | OP | 6/1/1962 | 5,000 | Black Elk En Off Op | 40.0% | TERMIN | |
| ST 194 | G05610 | Federal | RT | 7/1/1983 | 5,000 | Fieldwood En | 100.0% | TERMIN | |
| ST 203 | G01269 | Federal | OP 1 | 6/1/1962 | 5,000 | Black Elk En Off Op | 40.0% | TERMIN | |
| ST 203 | G01269 | Federal | OP 2 | 6/1/1962 | 5,000 | Black Elk En Off Op | 20.0% | TERMIN | |
| ST 203 | G01269 | Federal | RT | 6/1/1962 | 5,000 | Black Elk En Off Op | 40.0% | TERMIN | |
| ST 205 | G05612 | Federal | RT | 7/1/1983 | 5,000 | Fieldwood En | 50.0% | PROD | |
| ST 205 | G05612 | Federal | OP 3 | 7/1/1983 | 5,000 | Fieldwood En | 75.0% | PROD | |
| ST 205 | G05612 | Federal | OP 4 | 7/1/1983 | 5,000 | Fieldwood En | 100.0% | PROD | |
| ST 205 | G05612 | Federal | OP 7 | 7/1/1983 | 5,000 | Fieldwood En | 50.0% | PROD | |
| ST 205 | G05612 | Federal | OP 6 | 7/1/1983 | 5,000 | Fieldwood En | 75.0% | PROD | |
| ST 205 | G05612 | Federal | OP 5 | 7/1/1983 | 5,000 | Fieldwood En | 50.0% | PROD | |
| ST 205 | G05612 | Federal | ORRI | 7/1/1983 | 5,000 | Fieldwood En | 2.0% | PROD | |
| ST 206 | G05613 | Federal | RT | 7/1/1983 | 5,000 | Fieldwood En | 50.0% | TERMIN | |
| ST 228 | G32217 | Federal | RT | 8/1/2008 | 5,000 | Eni US Op | 40.0% | EXPIR | |
| ST 229 | G13938 | Federal | OP | 7/1/1993 | 2,148 | W & T Off | 33.3% | PROD | |

20

| Block | Lease | Type | Rights | Date Le Eff | Le Cur Acres | Operator | WI | Lease Status | Notes[†] |
|---|---|---|---|---|---|---|---|---|---|
| ST 244 | G34341 | Federal | RT | 10/1/2012 | 4,572 | Apache Shelf Exp | 100.0% | RELINQ | |
| ST 26 | G01361 | Federal | RT | 5/1/1964 | 625 | Cox Op | 50.0% | UNIT | |
| ST 26 | G01870 | Federal | RT | 11/1/1968 | 1,875 | Cox Op | 50.0% | UNIT | |
| ST 26 | G02620 | Federal | RT | 5/1/1974 | 2,500 | Cox Op | 50.0% | UNIT | |
| ST 276 | G07780 | Federal | RT | 8/1/1985 | 5,000 | Eni US Op | 100.0% | UNIT | |
| ST 276 | G07780 | Federal | OP | 8/1/1985 | 5,000 | Eni US Op | 100.0% | UNIT | |
| ST 290 | G16454 | Federal | RT | 4/24/1996 | 5,000 | Apache | 100.0% | TERMIN | |
| ST 291 | G16455 | Federal | RT | 9/1/1996 | 5,000 | Fieldwood En | 100.0% | PROD | |
| ST 291 | G16455 | Federal | OP | 9/1/1996 | 5,000 | Fieldwood En | 100.0% | PROD | |
| ST 295 | G05646 | Federal | RT | 7/1/1983 | 5,000 | Fieldwood En | 100.0% | UNIT | |
| ST 296 | G12981 | Federal | RT | 5/1/1991 | 5,000 | Fieldwood En | 100.0% | UNIT | |
| ST 296 | G12981 | Federal | OP | 5/1/1991 | 5,000 | Fieldwood En | 100.0% | UNIT | |
| ST 311 | G31418 | Federal | RT | 3/1/2008 | 5,000 | Walter O&G | 45.0% | PROD | |
| ST 316 | G22762 | Federal | RT | 6/1/2001 | 4,435 | W & T Off | 20.0% | PROD | [4] |
| ST 320 | G24990 | Federal | RT | 5/1/2003 | 5,000 | W & T Off | 11.3% | PROD | |
| ST 47 | G33652 | Federal | RT | 7/1/2010 | 5,000 | Apache Shelf Exp | 100.0% | RELINQ | |
| ST 49 | G24956 | Federal | RT | 6/1/2003 | 5,000 | Fieldwood En | 100.0% | PROD | |
| ST 49 | G24956 | Federal | OP | 6/1/2003 | 5,000 | Fieldwood En | 100.0% | PROD | |
| ST 50 | G34331 | Federal | RT | 8/1/2012 | 5,000 | Apache Shelf Exp | 100.0% | RELINQ | |
| ST 53 | G04000 | Federal | RT | 3/1/1979 | 5,000 | Fieldwood En | 50.0% | PROD | [2] |
| ST 53 | G04000 | Federal | OP 1 | 3/1/1979 | 5,000 | Fieldwood En | 50.0% | PROD | [2] |
| ST 53 | G04000 | Federal | OP 2 | 3/1/1979 | 5,000 | Fieldwood En | 25.0% | PROD | [2] |
| ST 59 | G31404 | Federal | RT | 2/1/2008 | 5,000 | LLOG Exp Off | 25.0% | RELINQ | |
| ST 64 | G33106 | Federal | RT | 7/1/2009 | 5,000 | Apache Shelf Exp | 100.0% | EXPIR | |
| ST 67 | 00020 | Federal | CONT | 4/25/1947 | | Fieldwood En | 79.7% | UNIT | [2] |
| SX 17 | G04143 | Federal | RT | 10/1/1979 | 2,042 | Apache | 92.3% | RELINQ | |
| SX 17 | G04143 | Federal | OP | 10/1/1979 | 2,042 | Apache | 20.0% | RELINQ | |
| VK 118 | G33697 | Federal | RT | 5/1/2010 | 5,760 | Apache Shelf Exp | 75.0% | EXPIR | |
| VK 203 | G07890 | Federal | RT | 7/1/1985 | 5,760 | Talos ERT | 33.3% | TERMIN | |
| VK 203 | G07890 | Federal | OP | 7/1/1985 | 5,760 | Talos ERT | 33.3% | TERMIN | |
| VK 204 | G04921 | Federal | RT | 12/1/1981 | 5,760 | Talos ERT | 33.3% | TERMIN | |
| VK 204 | G04921 | Federal | OP | 12/1/1981 | 5,760 | Talos ERT | 33.3% | TERMIN | |
| VK 251 | G10930 | Federal | OP | 7/1/1989 | 5,760 | Fieldwood En Off | 7.5% | UNIT | |
| VK 340 | G10933 | Federal | OP | 7/1/1989 | 5,760 | Fieldwood En Off | 7.5% | UNIT | |

| Block | Lease | Type | Rights | Date Le Eff | Le Cur Acres | Operator | WI | Lease Status | Notes[†] |
|-------|-------|------|--------|-------------|--------------|----------|-----|--------------|-------|
| VK 384 | G16541 | Federal | OP | 6/1/1996 | 5,760 | Chevron USA | 20.0% | TERMIN | |
| VK 692/693 | G07898 | Federal | RT | 9/1/1985 | 4,773 | Fieldwood En | 56.9% | TERMIN | |
| VK 694 | G13055 | Federal | RT | 7/1/1991 | 3,214 | Fieldwood En | 53.1% | TERMIN | |
| VK 694 | G13055 | Federal | OP | 7/1/1991 | 3,214 | Fieldwood En | 92.1% | TERMIN | |
| VK 698 | G07901 | Federal | RT | 8/1/1985 | 4,996 | Fieldwood En | 52.4% | TERMIN | |
| VK 736 | G13987 | Federal | RT | 7/1/1993 | 4,742 | Fieldwood En | 100.0% | TERMIN | |
| VK 780 | G06884 | Federal | RT | 6/1/1984 | 5,760 | Fieldwood En | 100.0% | TERMIN | |
| VK 824 | G15436 | Federal | RT | 9/1/1995 | 5,760 | Apache | 100.0% | RELINQ | |
| VK 856 | G34872 | Federal | RT | 7/1/2013 | 877 | Apache Shelf Exp | 75.0% | RELINQ | |
| VK 899 | G34408 | Federal | RT | 8/1/2012 | 1,553 | Apache Shelf Exp | 100.0% | EXPIR | |
| VR 115 | G33593 | Federal | RT | 6/1/2010 | 5,000 | Apache Shelf Exp | 100.0% | RELINQ | |
| VR 128 | G33594 | Federal | RT | 6/1/2010 | 5,000 | Apache Shelf Exp | 100.0% | RELINQ | |
| VR 131 | 00775 | Federal | OP | 5/1/1960 | 4,923 | Talos En Off | 72.5% | TERMIN | |
| VR 146 | G33084 | Federal | RT | 7/1/2009 | 5,000 | Apache Shelf Exp | 100.0% | EXPIR | |
| VR 156 | G34251 | Federal | RT | 10/1/2012 | 5,000 | Apache Shelf Exp | 100.0% | RELINQ | |
| VR 160 | G34252 | Federal | RT | 10/1/2012 | 5,000 | Apache Shelf Exp | 100.0% | RELINQ | |
| VR 161 | G34253 | Federal | RT | 10/1/2012 | 4,868 | Apache Shelf Exp | 100.0% | RELINQ | |
| VR 252 | G05431 | Federal | ORRI | 7/1/1983 | 4,454 | Castex Off | 2.0% | PROD | |
| VR 253 | G17912 | Federal | ORRI | 7/1/1997 | 5,000 | Castex Off | 0.6% | PROD | |
| VR 26 | 00297 | Federal | OP 1 | 11/26/1946 | 4,646 | Apache Shelf | 100.0% | TERMIN | |
| VR 26 | 00297 | Federal | OP 2 | 11/26/1946 | 4,646 | Apache Shelf | 25.0% | TERMIN | |
| VR 26 | 00297 | Federal | RT | 11/26/1946 | 4,646 | Apache Shelf | 50.0% | TERMIN | |
| VR 261 | G03328 | Federal | RT | 4/1/1976 | 5,429 | Fieldwood En | 75.0% | TERMIN | [6] |
| VR 261 | G03328 | Federal | OP 2 | 4/1/1976 | 5,429 | Fieldwood En | 37.5% | TERMIN | [6] |
| VR 261 | G03328 | Federal | ORRI | 4/1/1976 | | Fieldwood En | 6.3% | TERMIN | [6] |
| VR 262 | G34257 | Federal | RT | 10/1/2012 | 5,485 | Fieldwood En | 75.0% | RELINQ | [4] |
| VR 265 | G01955 | Federal | RT | 1/1/1970 | 5,000 | Fieldwood En | 100.0% | SOP | |
| VR 27 | G01329 | Federal | OP 2 | 12/1/1962 | 1,902 | Apache Shelf | 100.0% | TERMIN | |
| VR 27 | G01329 | Federal | OP 1 | 12/1/1962 | 1,902 | Apache Shelf | 25.0% | TERMIN | |
| VR 27 | G01329 | Federal | RT | 12/1/1962 | 1,902 | Apache Shelf | 50.0% | TERMIN | |
| VR 271 | G04800 | Federal | OP | 9/1/1981 | 4,418 | Castex Off | 12.5% | PROD | |
| VR 326 | G21096 | Federal | RT | 6/1/1999 | 5,000 | Fieldwood En | 70.3% | TERMIN | |
| VR 332 | G09514 | Federal | CONT | 3/30/1988 | | Fieldwood En | 50.0% | PROD | |

| Block | Lease | Type | Rights | Date Le Eff | Le Cur Acres | Operator | WI | Lease Status | Notes† |
|-------|-------|------|--------|-------------|--------------|----------|-----|--------------|--------|
| VR 34 | G01356 | Federal | OP 1 | 6/1/1964 | 625 | Apache Shelf | 100.0% | TERMIN | |
| VR 34 | G01356 | Federal | OP 2 | 6/1/1964 | 625 | Apache Shelf | 75.0% | TERMIN | |
| VR 34 | G01356 | Federal | RT | 6/1/1964 | 625 | Apache Shelf | 100.0% | TERMIN | |
| VR 35 | 00548 | Federal | OP 1 | 9/1/1955 | 2,500 | Apache Shelf | 100.0% | TERMIN | |
| VR 35 | 00548 | Federal | OP 2 | 9/1/1955 | 2,500 | Apache Shelf | 75.0% | TERMIN | |
| VR 35 | 00548 | Federal | RT | 9/1/1955 | 2,500 | Apache Shelf | 100.0% | TERMIN | |
| VR 35 | 00549 | Federal | OP 1 | 9/1/1955 | 2,500 | Apache Shelf | 100.0% | TERMIN | |
| VR 35 | 00549 | Federal | OP 2 | 9/1/1955 | 2,500 | Apache Shelf | 75.0% | TERMIN | |
| VR 35 | 00549 | Federal | RT | 9/1/1955 | 2,500 | Apache Shelf | 100.0% | TERMIN | |
| VR 356 | G17921 | Federal | ORRI | 8/1/1997 | 4,093 | EnVen En Vent | 2.6% | PROD | |
| VR 36 | G01357 | Federal | OP 2 | 6/1/1964 | 625 | Apache Shelf | 75.0% | TERMIN | |
| VR 36 | G01357 | Federal | OP 1 | 6/1/1964 | 625 | Apache Shelf | 100.0% | TERMIN | |
| VR 36 | G01357 | Federal | RT | 6/1/1964 | 625 | Apache Shelf | 100.0% | TERMIN | |
| VR 369 | G02274 | Federal | OP 4 | 2/1/1973 | 5,000 | Renaissance Off | 23.2% | UNIT | |
| VR 369 | G02274 | Federal | OP 3 | 2/1/1973 | 5,000 | Renaissance Off | 23.2% | UNIT | |
| VR 369 | G02274 | Federal | RT | 2/1/1973 | 5,000 | Renaissance Off | 23.2% | UNIT | |
| VR 369 | G02274 | Federal | Unit | 2/1/1973 | 5,000 | Renaissance Off | 23.2% | UNIT | |
| VR 374 | G32153 | Federal | RT | 8/1/2008 | 5,000 | Apache | 100.0% | EXPIR | |
| VR 380 | G02580 | Federal | RT | 5/1/1974 | 5,000 | Fieldwood En | 100.0% | PROD | |
| VR 381 | G16314 | Federal | RT | 9/1/1996 | 5,000 | Apache Shelf | 100.0% | TERMIN | |
| VR 381 | G16314 | Federal | OP | 9/1/1996 | 5,000 | Apache Shelf | 80.0% | TERMIN | |
| VR 386 | G02278 | Federal | RT A | 2/1/1973 | 5,000 | Marathon Oil | 30.2% | UNIT | |
| VR 386 | G02278 | Federal | RT B | 2/1/1973 | 5,000 | Marathon Oil | 29.0% | UNIT | |
| VR 408 | G15212 | Federal | RT | 7/1/1995 | 5,000 | Fieldwood En | 12.5% | PROD | |
| VR 408 | G15212 | Federal | OP | 7/1/1995 | 5,000 | Fieldwood En | 100.0% | PROD | |
| WC 102 | 00247 | Federal | RT | 9/9/1946 | 5,000 | Fieldwood En | 100.0% | TERMIN | |
| WC 110 | 00081 | Federal | RT | 6/10/1947 | 5,000 | BP E&P | 100.0% | PROD | |
| WC 110 | 00081 | Federal | OP | 6/10/1947 | 5,000 | BP E&P | 37.5% | PROD | |
| WC 111 | 00082 | Federal | RT | 6/10/1947 | 1,250 | BP E&P | 100.0% | PROD | |
| WC 111 | 00082 | Federal | OP | 6/10/1947 | 1,250 | BP E&P | 37.5% | PROD | |
| WC 111 | G33046 | Federal | RT | 8/1/2009 | 3,750 | Eni US Op | 25.0% | EXPIR | |
| WC 130 | G12761 | Federal | RT | 5/1/1991 | 5,000 | Eni US Op | 25.0% | TERMIN | |
| WC 144 | G01953 | Federal | RT | 2/1/1970 | 5,000 | Fieldwood En | 62.5% | TERMIN | |
| WC 155 | G32114 | Federal | RT | 8/1/2008 | 5,000 | Apache | 100.0% | EXPIR | |

| Block | Lease | Type | Rights | Date Le Eff | Le Cur Acres | Operator | WI | Lease Status | Notes† |
|-------|-------|------|--------|-------------|--------------|----------|-----|--------------|--------|
| WC 163 | G05299 | Federal | RT A | 7/1/1983 | 5,000 | Fieldwood En | 61.0% | TERMIN | |
| WC 163 | G05299 | Federal | RT B | 7/1/1983 | 5,000 | Fieldwood En | 56.2% | TERMIN | |
| WC 165 | 00758 | Federal | RT | 4/1/1960 | 5,000 | Fieldwood En | 100.0% | TERMIN | |
| WC 172 | G01998 | Federal | OP 1 | 2/1/1971 | 5,000 | Apache Shelf | 22.5% | TERMIN | |
| WC 172 | G01998 | Federal | OP 2 | 2/1/1971 | 5,000 | Apache Shelf | 22.5% | TERMIN | |
| WC 172 | G01998 | Federal | OP 3 | 2/1/1971 | 5,000 | Apache Shelf | 22.5% | TERMIN | |
| WC 172 | G01998 | Federal | OP 4 | 2/1/1971 | 5,000 | Apache Shelf | 22.5% | TERMIN | |
| WC 172 | G01998 | Federal | OP 10 | 2/1/1971 | 5,000 | Apache Shelf | 25.0% | TERMIN | |
| WC 172 | G01998 | Federal | OP 11 | 2/1/1971 | 5,000 | Apache Shelf | 25.0% | TERMIN | |
| WC 172 | G01998 | Federal | OP 12 | 2/1/1971 | 5,000 | Apache Shelf | 25.0% | TERMIN | |
| WC 181 | G33558 | Federal | RT | 6/1/2010 | 2,500 | Apache Shelf Exp | 100.0% | RELINQ | |
| WC 196 | G05292 | Federal | RT | 7/1/1983 | 5,000 | Union Oil CA | 8.3% | TERMIN | |
| WC 20 | 00680 | Federal | OP | 8/1/1959 | 1,873 | Sanare En Part | 50.0% | PROD | |
| WC 210 | G34216 | Federal | RT | 10/1/2012 | 5,000 | Apache | 100.0% | RELINQ | |
| WC 225 | G00900 | Federal | OP 1 | 4/1/1962 | 5,000 | Tarpon O&D | 26.7% | TERMIN | |
| WC 269 | G13563 | Federal | OP | 8/1/1992 | 5,000 | Sanare En Part | 33.8% | TERMIN | |
| WC 290 | G04818 | Federal | OP 1 | 9/1/1981 | 5,000 | Fieldwood En Off | 10.4% | TERMIN | [3] |
| WC 290 | G04818 | Federal | RT | 9/1/1981 | 5,000 | Fieldwood En Off | 16.7% | TERMIN | [3] |
| WC 291 | G04397 | Federal | RT | 11/1/1980 | 5,000 | Apache | 100.0% | TERMIN | |
| WC 291 | G04397 | Federal | OP | 11/1/1980 | 5,000 | Apache | 60.0% | TERMIN | |
| WC 295 | G24730 | Federal | OP 1 | 5/1/2003 | 5,000 | Fieldwood En | 20.6% | PROD | [4] |
| WC 300 | G15078 | Federal | RT | 7/1/1995 | 5,000 | SandRidge En Off | 14.0% | TERMIN | |
| WC 300 | G15078 | Federal | OP | 7/1/1995 | 5,000 | SandRidge En Off | 24.4% | TERMIN | |
| WC 310 | G17789 | Federal | RT | 8/1/1997 | 5,000 | Fieldwood En | 100.0% | TERMIN | |
| WC 310 | G17789 | Federal | OP | 8/1/1997 | 5,000 | Fieldwood En | 73.7% | TERMIN | |
| WC 33 | G15050 | Federal | RT | 7/1/1995 | 2,891 | Fieldwood En | 100.0% | PROD | |
| WC 34 | G03251 | Federal | RT | 9/1/1975 | 4,506 | Apache | 100.0% | TERMIN | |
| WC 35 | G02819 | Federal | RT | 12/1/1974 | 4,688 | Apache | 100.0% | TERMIN | |
| WC 35 | G02819 | Federal | OP | 12/1/1974 | 4,688 | Apache | 100.0% | TERMIN | |
| WC 35, WC 66 | G01860 | Federal | OP 2 | 1/1/1969 | 1,563 | BP E&P | 100.0% | PROD | |
| WC 35/66 | G01860 | Federal | RT | 1/1/1969 | 1,563 | BP E&P | 100.0% | PROD | |
| WC 401 | G07619 | Federal | RT | 7/1/1985 | 5,000 | ConocoPhillips | 33.3% | TERMIN | |
| WC 576 | G33061 | Federal | RT | 6/1/2009 | 5,000 | Apache Shelf Exp | 100.0% | EXPIR | |

| Block | Lease | Type | Rights | Date Le Eff | Le Cur Acres | Operator | WI | Lease Status | Notes[†] |
|-------|-------|------|--------|-------------|--------------|----------|----|--------------|--------|
| WC 624 | G33064 | Federal | RT | 6/1/2009 | 5,000 | Apache Shelf Exp | 100.0% | EXPIR | |
| WC 65 | G02825 | Federal | OP 4 | 12/1/1974 | 5,000 | BP E&P | 81.3% | PROD | [4] |
| WC 65 | G02825 | Federal | RT | 12/1/1974 | 5,000 | BP E&P | 100.0% | PROD | [4] |
| WC 65 | G02825 | Federal | OP | 12/1/1974 | 5,000 | BP E&P | 100.0% | PROD | [4] |
| WC 650 | G34217 | Federal | RT | 10/1/2012 | 5,000 | Apache Shelf Exp | 100.0% | RELINQ | |
| WC 656 | G34218 | Federal | RT | 10/1/2012 | 5,000 | Apache Shelf Exp | 100.0% | RELINQ | |
| WC 657 | G34219 | Federal | RT | 10/1/2012 | 5,000 | Apache Shelf Exp | 100.0% | RELINQ | |
| WC 66 | G02826 | Federal | OP 2 | 12/1/1974 | 3,750 | Fieldwood En | 75.0% | PROD | [4] |
| WC 66 | G02826 | Federal | OP | 12/1/1974 | 3,750 | Fieldwood En | 100.0% | PROD | [4] |
| WC 67 | G03256 | Federal | OP 1 | 9/1/1975 | 5,000 | Apache | 100.0% | TERMIN | [4] |
| WC 67 | G03256 | Federal | OP 2 | 9/1/1975 | 5,000 | Apache | 66.6% | TERMIN | [4] |
| WC 68 | 00526 | Federal | RT | 9/1/1955 | 2,500 | BP Am Prod | 100.0% | TERMIN | |
| WC 71 | 00244 | Federal | RT | 9/9/1946 | 5,000 | Fieldwood En | 100.0% | TERMIN | |
| WC 72 | G23735 | Federal | RT | 7/1/2002 | 5,000 | Fieldwood En Off | 25.0% | PROD | |
| WC 73 | G23736 | Federal | OP | 7/1/2002 | 5,000 | Castex Off | 25.0% | PROD | |
| WC 99 | G34213 | Federal | RT | 8/1/2012 | 5,000 | Apache Shelf Exp | 100.0% | RELINQ | |
| WD 103 | 00840 | Federal | RT | 5/1/1960 | 3,984 | Fieldwood En | 100.0% | PROD | |
| WD 103 | G12360 | Federal | OP 1 | 5/1/1960 | 1,016 | Fieldwood En | 81.3% | PROD | [4] |
| WD 104 | 00841 | Federal | RT | 5/1/1960 | 5,000 | Fieldwood En | 100.0% | PROD | |
| WD 104 | 00841 | Federal | OP 1 | 5/1/1960 | 5,000 | Fieldwood En | 100.0% | PROD | |
| WD 104 | 00841 | Federal | OP 2 | 5/1/1960 | 5,000 | Fieldwood En | 100.0% | PROD | |
| WD 104 | 00841 | Federal | OP 3 | 5/1/1960 | 5,000 | Fieldwood En | 100.0% | PROD | |
| WD 104 | 00841 | Federal | OP 5 | 5/1/1960 | 5,000 | Fieldwood En | 100.0% | PROD | |
| WD 105 | 00842 | Federal | RT | 5/1/1960 | 5,000 | Fieldwood En | 100.0% | PROD | |
| WD 105 | 00842 | Federal | OP 3 | 5/1/1960 | 5,000 | Fieldwood En | 100.0% | PROD | |
| WD 105 | 00842 | Federal | OP 4 | 5/1/1960 | 5,000 | Fieldwood En | 100.0% | PROD | |
| WD 105 | 00842 | Federal | OP 5 | 5/1/1960 | 5,000 | Fieldwood En | 100.0% | PROD | |
| WD 105 | 00842 | Federal | OP 6 | 5/1/1960 | 5,000 | Fieldwood En | 100.0% | PROD | |
| WD 121 | G19843 | Federal | OP 1 | 8/1/1998 | 5,000 | Fieldwood En | 84.0% | PROD | [4] |
| WD 122 | G13645 | Federal | OP 1 | 8/1/1992 | 5,000 | Fieldwood En | 84.0% | PROD | [4] |
| WD 122 | G13645 | Federal | OP 2 | 8/1/1992 | 5,000 | Fieldwood En | 84.0% | PROD | [4] |
| WD 122 | G13645 | Federal | RT | 8/1/1992 | 5,000 | Fieldwood En | 100.0% | PROD | [4] |
| WD 128 | G10883 | Federal | RT | 6/1/1989 | 5,000 | Fieldwood En | 100.0% | TERMIN | |
| WD 133 | G01106 | Federal | RT | 5/1/1962 | 5,000 | Arena Off | 100.0% | PROD | |

| Block | Lease | Type | Rights | Date Le Eff | Le Cur Acres | Operator | WI | Lease Status | Notes[†] |
|-------|-------|------|--------|-------------|--------------|----------|-----|--------------|-------|
| WD 133 | G01106 | Federal | ORRI | 5/1/1962 | | Arena Off | 1.0% | PROD | |
| WD 133 | G01106 | Federal | ORRI | 5/1/1962 | | Arena Off | 7.2% | PROD | |
| WD 34 | G03414 | Federal | RT | 1/1/1977 | 2,500 | Fieldwood En | 76.7% | TERMIN | |
| WD 34 | G03414 | Federal | OP | 1/1/1977 | 2,500 | Fieldwood En | 46.7% | TERMIN | |
| WD 38 | G22772 | Federal | RT | 5/1/2001 | 1,796 | Apache | 87.5% | TERMIN | |
| WD 38 | G22772 | Federal | OP | 5/1/2001 | 1,796 | Apache | 43.8% | TERMIN | |
| WD 41 | G01073 | Federal | RT | 3/1/1962 | 5,000 | Apache | 100.0% | TERMIN | |
| WD 41 | G01073 | Federal | OP | 3/1/1962 | 5,000 | Apache | 50.0% | TERMIN | |
| WD 42 | G16470 | Federal | RT | 9/1/1996 | 5,000 | Fieldwood En | 100.0% | TERMIN | |
| WD 42 | G16470 | Federal | OP | 9/1/1996 | 5,000 | Fieldwood En | 50.0% | TERMIN | |
| WD 53 | 17935 | SL-LA | WI | 10/13/2003 | – | Whitney Oil | 33.3% | TERMIN | |
| WD 67 | 00179 | Federal | RT | 7/17/1948 | 2,500 | GOM Shelf | 75.0% | UNIT | [1], [2] |
| WD 67 | 00179 | Federal | OP 1 | 7/17/1948 | 2,500 | BP E&P | 18.8% | UNIT | [1], [2] |
| WD 67 | 00179 | Federal | OP 2 | 7/17/1948 | 2,500 | GOM Shelf | 37.5% | UNIT | [1], [2] |
| WD 68 | 00180 | Federal | RT | 7/17/1948 | 1,833 | GOM Shelf | 75.0% | UNIT | [1], [2] |
| WD 68 | 00180 | Federal | OP 1 | 7/17/1948 | 1,833 | BP E&P | 18.8% | UNIT | [1], [2] |
| WD 68 | 00180 | Federal | OP 2 | 7/17/1948 | 1,833 | GOM Shelf | 37.5% | UNIT | [1], [2] |
| WD 69 | 00181 | Federal | RT | 7/17/1948 | 3,665 | GOM Shelf | 75.0% | UNIT | [1], [2] |
| WD 69 | 00181 | Federal | OP 1 | 7/17/1948 | 3,665 | BP E&P | 18.8% | UNIT | [1], [2] |
| WD 69 | 00181 | Federal | OP 2 | 7/17/1948 | 3,665 | GOM Shelf | 37.5% | UNIT | [1], [2] |
| WD 70 | 00182 | Federal | RT | 7/17/1948 | 5,000 | GOM Shelf | 75.0% | UNIT | [1], [2] |
| WD 70 | 00182 | Federal | OP 1 | 7/17/1948 | 5,000 | BP E&P | 18.8% | UNIT | [1], [2] |
| WD 70 | 00182 | Federal | OP 2 | 7/17/1948 | 5,000 | GOM Shelf | 37.5% | UNIT | [1], [2] |
| WD 71 | 00838 | Federal | RT | 4/1/1960 | 5,000 | BP E&P | 75.0% | UNIT | [1], [2] |
| WD 71 | 00838 | Federal | OP 1 | 4/1/1960 | 5,000 | BP E&P | 18.8% | UNIT | [1], [2] |
| WD 71 | 00838 | Federal | OP 2 | 4/1/1960 | 5,000 | GOM Shelf | 37.5% | UNIT | [1], [2] |
| WD 75 | G01085 | Federal | RT | 6/1/1962 | 5,000 | Fieldwood En | 100.0% | PROD | |
| WD 90 | G01089 | Federal | OP 3 | 6/1/1962 | 5,000 | Fieldwood En | 81.3% | PROD | [4] |
| WD 90 | G01089 | Federal | RT | 6/1/1962 | 5,000 | Fieldwood En | 100.0% | PROD | [4] |
| WD 94 | 00839 | Federal | RT | 5/1/1960 | 5,000 | GOM Shelf | 75.0% | PROD | [1], [2] |
| WD 94 | 00839 | Federal | OP 1 | 5/1/1960 | 5,000 | GOM Shelf | 37.5% | PROD | [1], [2] |
| WD 94 | 00839 | Federal | OP 2 | 5/1/1960 | 5,000 | GOM Shelf | 75.0% | PROD | [1], [2] |
| WD 95 | G01497 | Federal | RT | 12/1/1966 | 5,000 | GOM Shelf | 75.0% | PROD | [1], [2] |
| WD 95 | G01497 | Federal | OP 1 | 12/1/1966 | 5,000 | GOM Shelf | 37.5% | PROD | [1], [2] |

| Block | Lease | Type | Rights | Date Le Eff | Le Cur Acres | Operator | WI | Lease Status | Notes[†] |
|---|---|---|---|---|---|---|---|---|---|
| WD 95 | G01497 | Federal | OP 2 | 12/1/1966 | 5,000 | GOM Shelf | 75.0% | PROD | [1], [2] |
| WD 96 | G01498 | Federal | RT | 12/1/1966 | 3,665 | GOM Shelf | 75.0% | PROD | [1], [2] |
| WD 96 | G01498 | Federal | OP 2 | 12/1/1966 | 3,665 | GOM Shelf | 37.5% | PROD | [1], [2] |

## FWE I ROW

| SEGMENT NUMBER | COMPANY NAME | ORG AREA | ORG BLOCK | ORG NAME | REC AREA | REC BLOCK | REC NAME | SIZE | PRODUCT | STATUS | ROW NUMBER | FW LEASE | NOTE[3] |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 15213 | Fieldwood Energy, LLC | BS | 41 | B | BS | 42 | 24" SSTI | 10 | G/C | Partial Abandon | G25383 | G21142 | |
| 17938 | Fieldwood Energy, LLC | CA | 43 | A | VK | 247 | 24"SSTI | 6 | GAS | Active | G29431 | G32268 | |
| 3519 | Fieldwood Energy, LLC | EC | 14 | CF | EC | 9 | F/S | 4 | COND | Out of Service | G13721 | G01440 | |
| 13104 | Fieldwood Energy, LLC | EC | 2 | F/S | EC | 2 | 6" SSTI | 4 | GAS | Permitted for Abandonment | G22383 | G15050 | |
| 17801 | Fieldwood Energy, LLC | EC | 14 | CF | WC | 69 | 30 SSTI | 12 | GAS | Permitted for Abandonment | G28556 | G01440 | |
| 44 | Fieldwood Energy, LLC | EI | 175 | C | EI | 176 | 12" SSTI | 8 | OIL | Out of Service | G13445 | 00438 | [3] |
| 1128 | Fieldwood Energy, LLC | EI | 330 | flanged end | EI | 306 | 14-inch SSTI | 14 | OIL | Active | G02139A | G02115 | [3] |
| 6818 | Fieldwood Energy, LLC | EI | 337 | A | EI | 330 | B | 6 | GAS | Out of Service | G05932 | G03332 | |
| 6819 | Fieldwood Energy, LLC | EI | 337 | A | EI | 330 | 14 SSTI | 6 | OIL | Out of Service | G05931 | G03332 | |
| 6852 | Fieldwood Energy, LLC | EI | 315 | A | EI | 330 | 14 SSTI | 6 | OIL | Out of Service | G13447 | G02112 | |
| 7290 | Fieldwood Energy, LLC | EI | 316 | A | EI | 330 | 14 SSTI | 8 | OIL | Active | G07537 | G05040 | |
| 7347 | Fieldwood Energy, LLC | EI | 316 | A | EI | 330 | 8" SSTI | 6 | GAS | Active | G07555 | G05040 | |
| 7914 | Fieldwood Energy, LLC | EI | 212 | A | SS | 152 | 24 SSTI | 6 | GAS | Out of Service | G08530 | G05503 | |
| 7915 | Fieldwood Energy, LLC | EI | 212 | A | EI | 213 | 12 SSTI | 6 | OIL | Out of Service | G08531 | G05503 | |
| 7943 | Fieldwood Energy, LLC | EI | 342 | C | EI | 327 | 08 SSTI | 4 | OIL | Out of Service | G08541 | G02319 | [4] |

---

[1]   Lease carries $0 liability.
[2]   FWE I is to obtain 75% of the Debtors' interests in Segment 9084, 50% of the Debtors' interest in Segments 4647 and 5890 and 79.666% of the Debtors' interest in Segment 17265, and the Credit Bid Purchaser is to obtain the Debtors' remaining interests in those four pipeline segments.
[3]   Represents each ROW in which FWE I is to acquire solely as to the same 8/8ths undivided interest that FWE I is to acquire in the related lease referenced above for such ROW; the Debtors' remaining interests in such ROW are to be abandoned.
[4]   Represents each ROW in which (i) FWE I is to acquire solely as to the same 8/8ths undivided interest that FWE I is to acquire in the related lease referenced above for such ROW; and (ii) FWE IV is to acquire solely as to the same 8/8ths undivided interest that FWE IV is to acquire in the related lease referenced above for such ROW. The Debtors' remaining interests in such ROW are to be abandoned.
[5]   Represents each ROW in which FWE is to acquire solely as to the 8/8ths undivided interest that FWE I is to acquire in the related lease reference above for such ROW; and in which FWE IV is to acquire solely as to the same 8/8ths undivided interest that FWE IV is to acquire in the release lease reference above for such ROW.

28

| SEGMENT NUMBER | COMPANY NAME | ORG AREA | ORG BLOCK | ORG NAME | REC AREA | REC BLOCK | REC NAME | SIZE | PRODUCT | STATUS | ROW NUMBER | FW LEASE | NOTE[3] |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 9211 | Fieldwood Energy, LLC | EI | 53 | B | EI | 64 | 22 SSTI | 6 | G/C | Partial Abandon | G12373 | 00479 | [3] |
| 9376 | Fieldwood Energy, LLC | EI | 142 | A | EI | 141 | 10 SSTI | 4 | OIL | Out of Service | G12734 | 00052 | |
| 11923 | Fieldwood Energy, LLC | EI | 53 | C | EI | 64 | 22 SSTI | 10 | G/C | Out of Service | G20539 | 00479 | |
| 14073 | Fieldwood Energy, LLC | EI | 188 | JE | EI | 188 | 06 SSTI | 4 | BLKG | Out of Service | G29056 | 00443 | |
| 14479 | Fieldwood Energy, LLC | EI | 158 | C | EI | 176 | 12"SSTI | 6 | OIL | Out of Service | G13702 | G01220 | |
| 15906 | Fieldwood Energy, LLC | EI | 173 | G | EI | 175 | C | 4 | BLKO | Out of Service | G28239 | G13622 | |
| 16225 | Fieldwood Energy, LLC | EI | 354 | D | EI | 337 | A | 4 | OIL | Out of Service | G28598 | G10752 | |
| 16226 | Fieldwood Energy, LLC | EI | 354 | D | EI | 337 | A | 4 | GAS | Out of Service | G28599 | G10752 | |
| 16243 | Fieldwood Energy, LLC | EI | 189 | B | EI | 188 | A | 4 | GAS | Out of Service | G29057 | 00423 | |
| 18493 | Fieldwood Energy, LLC | EI | 342 | C | EI | 343 | SSTI | 6 | GAS | Out of Service | G29108 | G02319 | [4] |
| 19960 | Fieldwood Energy LLC | EI | 342 | C | EI | 342 | Blind Flange | 6 | OIL | Out of Service | G29471 | G02319 | [4] |
| - | Fieldwood Energy, LLC | EI | 187 | 2 | EI | 187 | 2 | | | Active | G30283 | G10736 | |
| 8487 | Fieldwood Energy, LLC | EW | 826 | A | ST | 300 | 12 SSTI | 12 | OIL | Out of Service | G10110 | G05800 | |
| 15298 | Fieldwood Energy, LLC | GA | 210 | B | GA | 239 | 12 SSTI | 8 | G/C | Active | G26931 | G25524 | [3] |
| 7866 | Fieldwood Energy, LLC | GI | 33 | A | GI | 22 | L | 8 | GAS | Permitted for Abandonment Approved | G08514 | G04002 | |
| 9084 | GOM Shelf, LLC | GI | 43 | AS | GI | 19 | F/S | 10 | OIL | Active | G12304 | 00175 | [2] |
| 17673 | Fieldwood Energy, LLC | GI | 54 | #2 | GI | 47 | L | 4 | BLKO | Permitted for Abandonment Approved | G28528 | G27173 | |
| 5470 | Fieldwood Energy, LLC | HI | A356 | Valve | HI | A343 | HIOS | 12 | GAS | Out of Service | G04050 | G02754 | |
| 6504 | Fieldwood Energy, LLC | HI | A595 | D | HI | 573 | B | 8 | OIL | Out of Service | G28525 | G02721 | |
| 6669 | Fieldwood Energy, LLC | HI | A 376 | A | HI | A 356 | 12 SSTI | 10 | GAS | Out of Service | G05238 | G02754 | [3] |
| 6669 | Fieldwood Energy LLC | HI | A 376 | Platform A | HI | A 356 | 12 SSTI W/PSN 10882 | 10 | GAS | Out of Service | G05238 | G02754 | [3] |

29

| SEGMENT NUMBER | COMPANY NAME | ORG AREA | ORG BLOCK | ORG NAME | REC AREA | REC BLOCK | REC NAME | SIZE | PRODUCT | STATUS | ROW NUMBER | FW LEASE | NOTE[3] |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 10882 | Fieldwood Energy, LLC | HI | A356 | 10SST | HI | A356 | 12SSTI | 12 | GAS | Out of Service | G04051 | G02754 | [3] |
| 11841 | Fieldwood Energy, LLC | HI | A 545 | JA | HI | A 547 | B | 6 | BLKG | Permitted for Abandonment | G20510 | G17199 | |
| 14650 | Fieldwood Energy, LLC | HI | 201 | #1 | HI | 199 | A | 6 | BLKG | Partial Abandon | G25397 | G23199 | |
| 15401 | Fieldwood Energy, LLC | HI | A 341 | B | HI | A 340 | 30" SSTI | 812 | G/C | Active | G26938 | G25605 | [3] |
| 15581 | Fieldwood Energy, LLC | HI | 120 | A | HI | 128 | SSTI | 6 | G/C | Out of Service | G26968 | G24730 | |
| 16077 | Fieldwood Energy, LLC | HI | 130 | #2 | HI | 165 | 8-inch SSTI | 8 | BLGH | Partial Abandon | G28284 | G25579 | [1] |
| 18789 | Fieldwood Energy LLC | HI | 116 | Platform A | HI | 71 | 16-inch SSTI | 16 | G/C | PABN | G28649 | G06156 | |
| 9032 | Fieldwood Energy, LLC | MC | 311 | A | MC | 312 | 8 SSTI | 8 | OIL | Active | G11747 | G02968 | |
| 3472 | Fieldwood Energy, LLC | MP | 140 | B | MP | 56 | F/S | 18 | BLKG | Out of Service | G13511 | G02193 | |
| 5917 | GOM Shelf, LLC | MP | 311 | A | MP | 313 | 12 SSTI | 8 | OIL | Out of Service | G13466 | G02213 | |
| 7143 | Fieldwood Energy, LLC | MP | 310 | A | MP | 297 | 12 SSTI | 6 | OIL | Out of Service | G07100 | G04126 | |
| 13100 | Fieldwood Energy, LLC | MP | 259 | A | VK | 739 | #01 | 5 | UMB | Out of Service | G22377 | G07827 | |
| 15818 | Fieldwood Energy Offshore LLC | MP | 77 | A | MP | 151 | 18"SSTI | 8 | GAS | Out of Service | G28221 | G04481 | [4] |
| 5408 | Fieldwood Energy, LLC | PL | 10 | B | PL | 13 | 20 SSTI | 8 | OIL | Out of Service | G09317 | G02925 | |
| 16044 | Fieldwood Energy, LLC | PL | 9 | #10 | PL | 10 | B | 6 | BLKG | Out of Service | G28276 | G02924 | |
| 4008 | Fieldwood Energy, LLC | SM | 268 | A | SS | 28 | A | 12 | OIL | Out of Service | G02816 | G34284 | |
| 4647 | Fieldwood Energy, LLC | SM | 149 | 6"SSTI | SM | 132 | B | 6 | BLKO | Out of Service | G03432 | G02592 | [2] |
| 5427 | Fieldwood Energy, LLC | SM | 281 | E | SM | 268 | A | 12 | SPLY | Out of Service | G02817 | G02600 | |
| 5429 | Fieldwood Energy, LLC | SM | 281 | C | SM | 281 | 12 SSTI | 10 | SPLY | Out of Service | G02817 | G02600 | |
| 6512 | Fieldwood Energy, LLC | SM | 281 | C | SM | 268 | D | 10 | BLKO | Out of Service | G29131 | G02600 | |
| 6513 | Fieldwood Energy, LLC | SM | 268 | D | SM | 268 | A | 10 | BLKO | Out of Service | G29132 | G02310 | |
| 10977 | Fieldwood Energy, LLC | SM | 268 | A | SM | 280 | #03 | 3 | BLKG | Active | G28756 | G14456 | |

| SEGMENT NUMBER | COMPANY NAME | ORG AREA | ORG BLOCK | ORG NAME | REC AREA | REC BLOCK | REC NAME | SIZE | PRODUCT | STATUS | ROW NUMBER | FW LEASE | NOTE[3] |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 11046 | Fieldwood Energy, LLC | SM | 11 | Well No.34 | SM | 10 | A | 6 | BLKG | Out of Service | G28813 | G01182 | |
| 11047 | Fieldwood Energy, LLC | SM | 10 | A | SM | 11 | 34 | 3 | LIFT | Out of Service | G28812 | G01181 | |
| 11986 | Fieldwood Energy, LLC | SM | 39 | A | SM | 33 | 30 SSTI | 8 | GAS | Out of Service | G20565 | G16320 | |
| 11987 | Fieldwood Energy, LLC | SM | 39 | A | SM | 40 | 10 SSTI | 6 | OIL | Out of Service | G20566 | G16320 | |
| 13642 | Fieldwood Energy, LLC | SM | 280 | H | SM | 268 | A | 10 | BLKG | Permitted for Abandonment | G28758 | G14456 | [3] |
| 17499 | Fieldwood Energy, LLC | SM | 269 | B | SM | 268 | A | 10 | GAS | Active | G28484 | G02311 | |
| 18057 | Fieldwood Energy, LLC | SM | 11 | No.58 Caisson | SM | 10 | A | 4 | BLKG | Out of Service | G28815 | G01182 | |
| 18510 | Fieldwood Energy, LLC | SM | 10 | A | SM | 287 | SSTI | 6 | GAS | Out of Service | G29113 | G01181 | |
| 18563 | Fieldwood Energy, LLC | SM | 48 | E | SM | 39 | A | 6 | G/C | Out of Service | G29128 | 00786 | |
| 18583 | Fieldwood Energy, LLC | SM | 10 | A | SM | 11 | SSTI | 4 | OIL | Out of Service | G28814 | G01181 | |
| 18802 | Fieldwood Energy, LLC | SM | 39 | A | SM | 48 | E | 3 | LIFT | Out of Service | G29182 | G16320 | |
| 4716 | Fieldwood Energy, LLC | SP | 70 | C | SP | 60 | B | 8 | GAS | Active | G03436 | G01614 | |
| 15064 | FW GOM Pipeline, Inc. | SP | 49 | A | SP | 27 | F/S Boundary | 10 | G/O | Active | G07561 | G05051 | |
| 15598 | Fieldwood Energy, LLC | SP | 70 | C | SP | 60 | E | 6 | OIL | Out of Service | G26860 | G01614 | |
| 15626 | Fieldwood Energy, LLC | SP | 65 | A | SP | 62 | 18 SSTI | 8 | OIL | Out of Service | G01686A | G01610 | |
| 1137 | Fieldwood Energy, LLC | SS | 207 | A Platform | SS | 204 | A | 4 | GAS | Out of Service | G13489 | G01523 | [3] |
| 1138 | Fieldwood Energy, LLC | SS | 204 | A | SS | 207 | A | 6 | G/O | Out of Service | G13491 | G01520 | [3] |
| 1147 | Fieldwood Energy, LLC | SS | 207 | A | SS | 208 | F-Pump | 12 | OIL | Out of Service | G13492 | G01523 | [3] |
| 6432 | Fieldwood Energy, LLC | SS | 182 | A | SS | 169 | 18 SSTI | 6 | OIL | Active | G09321 | G03998 | |
| 6538 | Fieldwood Energy, LLC | SS | 91 | A | PL | 11 | 08 SSTI | 6 | OIL | Out of Service | G05146 | G02919 | |
| 6748 | Fieldwood Energy, LLC | SS | 169 | C Platform | SS | 169 | 18-inch SSTI | 6 | OIL | Out of Service | G09322 | 00820 | [4] |
| 7650 | Fieldwood Energy, LLC | SS | 178 | A | SS | 169 | 18 SSTI | 6 | OIL | Out of Service | G08054 | G05551 | |

| SEGMENT NUMBER | COMPANY NAME | ORG AREA | ORG BLOCK | ORG NAME | REC AREA | REC BLOCK | REC NAME | SIZE | PRODUCT | STATUS | ROW NUMBER | FW LEASE | NOTE[3] |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 10406 | Fieldwood Energy, LLC | SS | 274 | A | EI | 259 | A | 8 | OIL | Active | G14731 | G01039 | |
| 10780 | Fieldwood Energy, LLC | SS | 193 | A | SS | 183 | 18 SSTI | 6 | OIL | Active | G15683 | G13917 | |
| 10781 | Fieldwood Energy, LLC | SS | 193 | A | SS | 183 | 10 SSTI | 6 | GAS | Active | G15684 | G13917 | |
| 11137 | Fieldwood Energy, LLC | SS | 129 | A | SS | 122 | 18 SSTI | 6 | OIL | Out of Service | G16084 | G12941 | |
| 11145 | Fieldwood Energy, LLC | SS | 129 | A | SS | 149 | 6 SSTI | 6 | G/C | Out of Service | G16087 | G12941 | |
| 11480 | Fieldwood Energy, LLC | SS | 105 | A | EI | 165 | 30 SSTI | 10 | GAS | Out of Service | G18801 | G09614 | |
| 11544 | Fieldwood Energy, LLC | SS | 126 | B | SS | 105 | A | 6 | BLKG | Out of Service | G18820 | G12940 | |
| 12778 | Fieldwood Energy, LLC | SS | 189 | A | SS | 185 | 26"SSTI | 8 | G/C | Out of Service | G22139 | G04232 | [3] |
| 15530 | Fieldwood Energy, LLC | SS | 183 | Flange | SS | 169 | Flange | 10 | GAS | Out of Service | G01460 | G13917 | |
| 16036 | Fieldwood Energy, LLC | SS | 190 | Capped End | SS | 207 | A | 4 | BLKO | Permitted for Abandonment | G14734 | G10775 | |
| 18837 | Fieldwood Energy, LLC | SS | 176 | C | EI | 212 | A | 6 | BLKG | Out of Service | G29190 | G33646 | |
| 20050 | Fieldwood Energy, LLC | SS | 168 | SSTI | SS | 168 | SSTI | 6 | | Proposed | G28788 | 00820 | [3] |
| 5890 | Fieldwood Energy, LLC | ST | 53 | A | ST | 52 | A | 6 | OIL | Out of Service | G09319 | G04000 | [2] |
| 7802 | Fieldwood Energy, LLC | ST | 295 | A | ST | 296 | SS 8487 | 8 | OIL | Active | G08385 | G05646 | |
| 8676 | Fieldwood Energy, LLC | ST | 206 | A | ST | 175 | T-22 | 16 | G/C | Out of Service | G11146 | G05613 | |
| 9313 | Fieldwood Energy, LLC | ST | 295 | A | ST | 295 | 24 SSTI | 8 | GAS | Active | G12709 | G05646 | |
| 13462 | Fieldwood Energy, LLC | ST | 205 | G | ST | 206 | A | 8 | BLKG | Out of Service | G028821 | G05612 | |
| 13462 | Fieldwood Energy LLC | ST | 205 | G | ST | 206 | A | 8 | BLKG | Out of Service | G29451 | G05612 | |
| 17265 | Fieldwood Energy, LLC | ST | 68 | Caisson No. 1 | ST | 53 | A | 6 | BLKO | Out of Service | G28385 | G04000 | [2] |
| 17898 | Fieldwood Energy, LLC | ST | 49 | Platfrom A | ST | 35 | 6-inch SSTI | 4 | OIL | Out of Service | G28577 | G24956 | |
| 19776 | Fieldwood Energy, LLC | ST | 295 | 24" SSTI | ST | 292 | A | 24 | GAS | Active | G29376 | G05646 | |
| 13098 | Fieldwood Energy, LLC | VK | 694 | #04 | MP | 259 | A | 4 | BLKG | Out of Service | G22376 | G13055 | |

| SEGMENT NUMBER | COMPANY NAME | ORG AREA | ORG BLOCK | ORG NAME | REC AREA | REC BLOCK | REC NAME | SIZE | PRODUCT | STATUS | ROW NUMBER | FW LEASE | NOTE[3] |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 13099 | Fieldwood Energy, LLC | VK | 739 | SS #3 | MP | 259 | A | 4 | BLKG | Out of Service | G22377 | G07827 | |
| 13721 | Fieldwood Energy, LLC | VK | 251 | A | VK | 340 | A | 3 | AIR | Active | G28704 | G10930 | [5] |
| 14876 | Fieldwood Energy, LLC | VK | 251 | A | MP | 154 | A | 4 | H2O | Active | G22465 | G10930 | [5] |
| 6113 | Fieldwood Energy, LLC | VR | 380 | A | VR | 397 | 24 SSTI | 12 | GAS | Out of Service | G04645 | G02580 | |
| 12502 | Fieldwood Energy, LLC | VR | 326 | A Platform | VR | 321 | 22-inch SSTI | 6 | G/C | Out of Service | G21523 | G21096 | |
| 17090 | Fieldwood Energy, LLC | VR | 261 | A | VR | 265 | A | 8 | BLKO | Out of Service | G28347 | G03328 | [4] |
| 18502 | Fieldwood Energy, LLC | VR | 380 | A | VR | 398 | 16" SSTI | 6 | OIL | Out of Service | G02919 | G02580 | |
| 18502 | Fieldwood Energy LLC | VR | 380 | Platform A | VR | 398 | 16-inch SSTI | 6 | OIL | Out of Service | G29109 | G02580 | |
| 2698 | Fieldwood Energy, LLC | WC | 102 | flange | WC | 102 | G | 8 | GAS | Out of Service | G02124D | 00247 | |
| 3763 | Fieldwood Energy, LLC | WC | 102 | #02 | WC | 102 | 08 SSTI | 8 | GAS | Out of Service | G02124D | 00247 | |
| 3986 | Fieldwood Energy, LLC | WC | 66 | A | WC | 31 | F/S | 10 | G/O | Active | G03345 | G01860 | |
| 5343 | Fieldwood Energy, LLC | WC | 34 | D | WC | 35 | 10 SSTI | 8 | G/O | Out of Service | G28659 | G01860 | |
| 8621 | Bandon Oil and Gas, LP | WC | 290 | A | WC | 289 | A | 6 | BLKG | Out of Service | G10532 | G04818 | |
| 9504 | Fieldwood Energy, LLC | WC | 71 | 12 SSTI | WC | 71 | 12 SSTI | 12 | GAS | Out of Service | G04346 | 00244 | |
| 14251 | Fieldwood Energy Offshore LLC | WC | 72 | #1 | WC | 65 | JA | 4 | BLKG | Out of Service | G25275 | G23735 | [3] |
| 15210 | Fieldwood Energy, LLC | WC | 295 | 2 | HI | 120 | A-PROCESS | 6 | BLKG | Out of Service | G26886 | G24730 | |
| 15952 | Fieldwood Energy, LLC | WC | 33 | O | WC | 34 | D | 4 | G/O | Out of Service | G28657 | G15050 | |
| 20483 | Fieldwood Energy Offshore LLC | WC | 295 | Flanged End | WC | 293 | 16-inch SSTI | 12 | G/C | PABN | G10085 | G01848 | |
| 23036 | Fieldwood Energy LLC | WC | 289 | A-PROCESS | WC | 289 | A-PROCESS | | | Expired | G14262 | G04818 | |
| 7919 | Fieldwood Energy, LLC | WD | 105 | E | WD | 104 | D | 6 | GAS | Out of Service | G08533 | 00842 | |
| 15960 | Fieldwood Energy, LLC | WD | 90 | A | WD | 73 | SSTI | 4 | OIL | Out of Service | G28260 | G01089 | [3] |
| 16088 | Fieldwood Energy, LLC | WD | 122 | A | WD | 105 | E | 6 | GAS | Out of Service | G28289 | G13645 | [3] |

33

| SEGMENT NUMBER | COMPANY NAME | ORG AREA | ORG BLOCK | ORG NAME | REC AREA | REC BLOCK | REC NAME | SIZE | PRODUCT | STATUS | ROW NUMBER | FW LEASE | NOTE[3] |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 16089 | Fieldwood Energy, LLC | WD | 122 | A | WD | 105 | E | 3 | OIL | Out of Service | G28290 | G13645 | [3] |

## FWE I RUE

| Area | Block No. | Structure | Complex ID No. | Authority No. | FW Lease | Operator | Approval Date | Associated Assets | Note[4] |
|------|-----------|-----------|----------------|---------------|----------|----------|---------------|-------------------|---------|
| EI | 188 | JE | 26052 | G30268 | G10736 | Fieldwood Energy LLC | 04/18/14 | EI 187 JC001, JD001, JD002, 002 & JE002 | |
| HI | 120 | A-PROCESS | 10450 | G30270 | G01848 | Fieldwood Energy LLC | 08/06/14 | WC 295 A001 & A002 | |
| SM | 132 | B | 21982 | G30329 | G02588 | Fieldwood Energy LLC | 05/06/19 | SM 136 C007, SM 149 C001, C002 & C004 | [1] |
| SM | 10 | A | 20706 | G30365 | G01181 | Fieldwood Energy LLC | | | |
| SM | 268 | A | 21739 | G30282 | G14456 | Fieldwood Energy LLC | 06/15/18 | SM 257 001, SM 269 B017, B019, F001, SM 280 G001, G002, H001, B, F, SM 280 G, H, I, SM 281 C010, C014, C015, C020, C023, C024, C025, C026, C028, E005, E011, I001, I003, C & E | [2] |
| SM | 268 | A-PRD | 21739 | G30282 | G14456 | Fieldwood Energy LLC | 06/15/18 | Production from SM 268 A RUE | [2] |
| ST | 206 | A | 23851 | G30291 | G05612 | Fieldwood Energy LLC | 12/11/15 | ST 205 G001 & G003 | |

---

[1]  RUE services a lease to be co-owned by FWE I and the Credit Bid Purchaser (for SM 149) plus a lease going just to FWE I. RUE only assignable to one entity and are assigned to entity with operatorship.  Expenditures will be shared based on serviced lease ownership.

[2]  RUE services leases included on both FWE I and Abandoned Properties schedules. RUE only assignable to one entity and are assigned to entity with operatorship.  Expenditures will be shared based on serviced lease ownership.

**Exhibit O5**

**Leases, Rights of Way and Rights of Use and Easement Related to Abandoned Properties**

# Leases Related to Abandoned Properties*

| Block | Lease | Type | Rights | Date Le Eff | Le Cur Acres (Ac) | Operator | WI | Lease Status | Note[†] |
|-------|-------|------|--------|-------------|-------------------|----------|-----|--------------|------|
| AT 023 | G35015 | Federal | RT | 08/01/2013 | 5,760 | Murphy E&P USA | 8% | PRIMARY | |
| BA A-105 | G01757 | Federal | RT A | 7/1/1968 | 5,760 | Fieldwood En | 31.25% | PROD | [6] |
| EB 165 | G06280 | Federal | RT | 10/1/1983 | 5,760 | Fieldwood SD Off | 100% | UNIT | |
| EB 209 | G07397 | Federal | RT | 9/1/1984 | 5,760 | Fieldwood SD Off | 100% | UNIT | |
| EC 330 | G03540 | Federal | OP 1 | 8/1/1977 | 5,000 | Fieldwood En Off | 50% | TERMIN | |
| EC 331 | G08658 | Federal | OP 1 | 8/1/1987 | 5,000 | Fieldwood En Off | 40% | TERMIN | [5] |
| EC 331 | G08658 | Federal | OP 2 | 8/1/1987 | 5,000 | Fieldwood En Off | 40% | TERMIN | [5] |
| EC 349 | G14385 | Federal | OP 1 | 5/1/1994 | 5,000 | W & T Off | 25% | PROD | |
| EC 350 | G15157 | Federal | OP 1 | 9/1/1995 | 5,000 | W & T Off | 25% | TERMIN | |
| EC 356 | G13592 | Federal | RT | 9/1/1992 | 5,000 | W & T Off | 25% | RELINQ | |
| EC 371 | G02267 | Federal | CONT | 2/1/1973 | 5,000 | Talos ERT | 25% | TERMIN | |
| EI 100 | 796 | Federal | Contractual | 5/1/1960 | 5,000 | Fieldwood En | 100% | PROD | |
| EI 175 | 438 | Federal | OP 1 | 12/1/1954 | 5,000 | Fieldwood En | 25% | PROD | [1] |
| EI 307 | G02110 | Federal | RT | 2/1/1971 | 2,500 | Fieldwood En Off | 25% | TERMIN | [1] |

---

* The Debtors reserve the right to amend, modify, or supplement this schedule in accordance with the terms of the Plan and subject to any consent rights under the Restructuring Support Agreement.

[1] Represents leases in which all of the Debtors' right, title and interest in such leases are to be abandoned (less and except the right, title and interest acquired by FWE from Apache); as to all remaining leases on this schedule (other than those leases referenced in footnotes [2]-[6] below), all of the Debtors' right, title and interest in such leases are to be abandoned. For each lease on this schedule, see the BOEM's Serial Register Page to identify the Debtors' interests; this schedule identifies each separate interest of the Debtors that carries any assets or liabilities, but does not necessarily identify each separate interest of the Debtors in each such lease.

[2] Fieldwood Energy Offshore's record title solely as to the NE/4 of the block and its interest in the operating rights are to be abandoned; its remaining record title and its overriding royalty interests are to be acquired by the Credit Bid Purchaser.

[3] FWE I is to acquire solely the operating rights as to the NE/4 of this block; the Credit Bid Purchaser is to obtain the Debtors' overriding royalty interest in this lease; and the Debtors' remaining interests in the lease are to be abandoned.

[4] Represents leases where the Credit Bid Purchaser is to acquire solely the Debtors' overriding royalty interests; the Debtors' remaining interests in these leases are to be abandoned.

[5] Represents leases in which all of the Debtors' right, title and interest in such leases are to be abandoned (less and except the right, title and interest acquired by FWE from Chevron).

[6] Represents leases in which all of the Debtors' right, title and interest in such leases are to be abandoned (less and except the right, title and interests acquired by FWE from both Apache and Chevron).

[7] COB 381, Page 256, File No. 331928, St. Mary Parish, LA.

[8] COB Instr. No. 324586, St. Mary Parish, LA.

**Legend**: CONT - Contractual; OP 1- Operating Rights 1; OP 2 - Operating Rights 2; OP 3 - Operating Rights 3; OP 4 - Operating Rights 4; OP 5 - Operating Rights 5; OP 11 - Operating Rights 11; OP 13 - Operating Rights 13; ORRI - Overriding Royalty Interest; RT - Record Title; RT A - Record Title A; RT B - Record Title B; RT C - Record Title C; WI - Working Interest

| Block | Lease | Type | Rights | Date Le Eff | Le Cur Acres (Ac) | Operator | WI | Lease Status | Note[†] |
|-------|-------|------|--------|-------------|-------------------|----------|-----|--------------|---------|
| EI 311 | G27918 | Federal | RT | 7/1/2006 | 5,000 | Dynamic Off Res | 60% | TERMIN | |
| EI 312 | G22679 | Federal | OP 1 | 6/1/2001 | 5,000 | Fieldwood En | 60% | TERMIN | [1] |
| EI 32 | 00196 | Federal | OP 1 | 11/26/1946 | 5,000 | Cox Op | 24% | PROD | |
| EI 330 | G02115 | Federal | Contractual | 1/1/1971 | 5,000 | Fieldwood En | 17% | UNIT | [1] |
| EI 53 | 00479 | Federal | OP 1 | 12/1/1954 | 5,000 | Fieldwood En | 11% | PROD | [1] |
| EI 63 | 00425 | Federal | RT | 12/1/1954 | 5,000 | Fieldwood En Off | 100% | TERMIN | |
| EW 782 | G05793 | Federal | CONT | 7/1/1983 | 1,093 | Fieldwood En | 100% | TERMIN | [1] |
| GA 151 | G15740 | Federal | RT | 11/1/1995 | 4,804 | Fieldwood En | 33% | TERMIN | [1] |
| GA 210 | G25524 | Federal | OP 1 | 12/1/2003 | 5,760 | Fieldwood En | 17% | PROD | [1] |
| GA 210 | G25524 | Federal | OP 3 | 12/1/2003 | 5,760 | Fieldwood En | 33% | PROD | [1] |
| GA A-155 | G30654 | Federal | RT | 10/1/2006 | 5,760 | Peregrine O&G | 11% | TERMIN | |
| GC 157 | G24154 | Federal | RT | 6/1/2002 | 5,760 | LLOG Exp Off | 15% | TERMIN | |
| GC 201 | G12210 | Federal | OP | 5/1/1990 | 5,760 | LLOG Exp Off | 15% | UNIT | |
| GC 201 | G12210 | Federal | RT NE4 | 5/1/1990 | 5,760 | Fieldwood En Off; LLOG Exp Off | 100% | UNIT | [2] |
| GC 245 | G05916 | Federal | CONT | 7/1/1983 | 5,760 | Fieldwood En Off | 100% | TERMIN | |
| GC 64 | G07005 | Federal | CONT | 6/1/1984 | 5,760 | Fieldwood En Off | 49% | RELINQ | |
| HI A-341 | G25605 | Federal | RT | 12/1/2003 | 5,760 | Fieldwood En | 40% | PROD | |
| HI A-365 | G02750 | Federal | RT | 7/1/1974 | 5,760 | Fieldwood En | 50% | PROD | [1] |
| HI A-376 | G02754 | Federal | RT | 7/1/1974 | 5,760 | Fieldwood En | 55% | PROD | [1] |
| HI A-382 | G02757 | Federal | RT | 7/1/1974 | 5,760 | Fieldwood En | 28% | PROD | [1] |
| HI A-474 | G02366 | Federal | RT | 8/1/1973 | 5,760 | McMoRan O&G | 12% | TERMIN | [1] |
| HI A-475 | G02367 | Federal | CONT | 8/1/1973 | 5,760 | McMoRan O&G | 12% | TERMIN | [1] |
| HI A-489 | G02372 | Federal | RT | 8/1/1973 | 5,760 | McMoRan O&G | 12% | TERMIN | [1] |
| HI A-531 | G02696 | Federal | OP 1 | 7/1/1974 | 5,760 | Fieldwood En Off | 75% | TERMIN | |
| HI A-563 | G02388 | Federal | OP 1 | 8/1/1973 | 5,760 | Cox Op | 2% | PROD | |
| HI A-564 | G02389 | Federal | OP 1 | 8/1/1973 | 5,760 | Cox Op | 2% | TERMIN | |
| HI A-572 | G02392 | Federal | RT | 8/1/1973 | 5,760 | Fieldwood En | 24% | TERMIN | [1] |
| HI A-573 | G02393 | Federal | RT | 8/1/1973 | 5,760 | Fieldwood En | 28% | PROD | [1] |
| HI A-581 | G18959 | Federal | RT | 12/1/1997 | 5,760 | Cox Op | 2% | TERMIN | [1] |
| HI A-582 | G02719 | Federal | OP 1 | 7/1/1974 | 5,760 | Cox Op | 2% | PROD | [1] |
| HI A-595 | G02721 | Federal | RT | 7/1/1974 | 5,760 | Fieldwood En | 28% | PROD | [1] |

2

| Block | Lease | Type | Rights | Date Le Eff | Le Cur Acres (Ac) | Operator | WI | Lease Status | Note[†] |
|---|---|---|---|---|---|---|---|---|---|
| HI A-596 | G02722 | Federal | RT | 7/1/1974 | 5,760 | Fieldwood En | 28% | PROD | [1] |
| MO 861 | G05062 | Federal | RT | 4/1/1982 | 5,198 | Providence Res GOM 2 | 100% | TERMIN | |
| MO 861 | G05062 | Federal | OP 1 | 4/1/1982 | 5,198 | Providence Res GOM 2 | 50% | TERMIN | |
| MP 101 | G22792 | Federal | RT | 7/1/2001 | 4,995 | Fieldwood En Off | 78% | TERMIN | |
| MP 109 | G22794 | Federal | OP 1 | 5/1/2001 | 4,995 | W & T Off | 33% | TERMIN | |
| MP 109 | G22794 | Federal | OP 2 | 5/1/2001 | 4,995 | W & T Off | 33% | TERMIN | |
| MP 77 | G04481 | Federal | RT | 11/1/1980 | 4,655 | Fieldwood En Off | 18% | RELINQ | [1], [6] |
| PL 13 | G03171 | Federal | OP 3 | 7/1/1975 | 5,000 | ANKOR En | 2% | TERMIN | |
| SM 102 | G24872 | Federal | RT | 5/1/2003 | 3,113 | Fieldwood En Off | 100% | PROD | |
| SM 135 | G19776 | Federal | RT | 5/1/1998 | 3,293 | Fieldwood En | 50% | TERMIN | [1] |
| SM 139 | G21106 | Federal | OP 1 | 7/1/1999 | 5,000 | Fieldwood En Off | 100% | TERMIN | |
| SM 142 | G01216 | Federal | RT | 6/1/1962 | 2,761 | Fieldwood En Off | 86% | TERMIN | |
| SM 142 | G01216 | Federal | OP 1 | 6/1/1962 | 2,761 | Fieldwood En Off | 86% | TERMIN | |
| SM 143 | G01217 | Federal | CONT | 5/1/1962 | 2,738 | Fieldwood En Off | 16% | TERMIN | |
| SM 146 | G09546 | Federal | RT | 7/1/1988 | 5,000 | Dynamic Off Res | 100% | TERMIN | |
| SM 147 | G06693 | Federal | RT | 7/1/1984 | 5,000 | Fieldwood En Off | 100% | TERMIN | |
| SM 268 | G02310 | Federal | RT | 1/1/1973 | 3,237 | Fieldwood En | 30% | TERMIN | [1] |
| SM 269 | G02311 | Federal | RT | 1/1/1973 | 5,000 | Fieldwood En | 18% | PROD | [1] |
| SM 269 | G02311 | Federal | RT | 1/1/1973 | 5,000 | Fieldwood En | 9% | PROD | [1] |
| SM 269 | G02311 | Federal | RT | 1/1/1973 | 5,000 | Fieldwood En | 0% | PROD | [1] |
| SM 280 | G14456 | Federal | OP 1 | 6/1/1994 | 5,000 | Fieldwood En | 50% | PROD | [1] |
| SM 280 | G14456 | Federal | OP 3 | 6/1/1994 | 5,000 | Fieldwood En | 50% | PROD | [1] |
| SM 281 | G02600 | Federal | RT | 4/1/1974 | 3,214 | Fieldwood En | 32% | PROD | [1] |
| SM 87 | G24870 | Federal | RT | 5/1/2003 | 3,077 | Castex Off | 100% | PROD | |
| SP 17 | G02938 | Federal | RT | 11/1/1974 | 962 | Fieldwood En Off | 100% | UNIT | |
| SP 37 | 00697 | Federal | OP 1 | 10/1/1959 | 2,500 | Whitney O&G | 44% | PROD | |
| SP 59 | G02942 | Federal | RT | 11/1/1974 | 1,657 | Fieldwood En Off | 100% | UNIT | |
| SP 59 | G02943 | Federal | RT | 11/1/1974 | 907 | Fieldwood En Off | 100% | UNIT | |
| SP 59, SP 60 | G01608 | Federal | RT | 7/1/1967 | 3,510 | Fieldwood En Off | 100% | UNIT | |
| SP 6 | G03337 | Federal | RT | 4/1/1976 | 318 | Fieldwood En Off | 100% | UNIT | |

| Block | Lease | Type | Rights | Date Le Eff | Le Cur Acres (Ac) | Operator | WI | Lease Status | Note[†] |
|-------|-------|------|--------|-------------|-------------------|----------|-----|--------------|---------|
| SP 6 | G03337 | Federal | OP | 4/1/1976 | 318 | Fieldwood En Off | 100% | UNIT | |
| SP 60 | G02137 | Federal | RT | 11/1/1971 | 1,762 | Fieldwood En Off | 100% | UNIT | |
| SP 61 | G01609 | Federal | RT | 7/1/1967 | 5,000 | Fieldwood En | 100% | UNIT | [3] |
| SP 61 | G01609 | Federal | OP 1 | 7/1/1967 | 5,000 | Fieldwood En | 100% | UNIT | [3] |
| SP 66 | G01611 | Federal | RT | 6/1/1967 | 4,310 | Fieldwood En Off | 100% | UNIT | [1] |
| SP 67 | G01612 | Federal | RT | 7/1/1967 | 5,000 | Fieldwood En Off | 100% | UNIT | |
| SS 149 | 00434 | Federal | OP 1 | 1/1/1955 | 5,000 | W & T Off | 3% | TERMIN | |
| SS 149 | 00434 | Federal | OP 2 | 1/1/1955 | 5,000 | W & T Off | 3% | TERMIN | |
| SS 149 | 00434 | Federal | OP 1 | 1/1/1955 | 5,000 | W&T Off | 3% | TERMIN | |
| SS 149 | 00434 | Federal | OP 2 | 1/1/1955 | 5,000 | W&T Off | 3% | TERMIN | |
| SS 177 | 00590 | Federal | RT | 9/1/1955 | 5,000 | W & T Off | 25% | PROD | |
| SS 189 | G04232 | Federal | OP 5 | 12/1/1979 | 5,000 | Fieldwood En | 1% | PROD | [1] |
| SS 204 | G01520 | Federal | RT | 7/1/1967 | 5,000 | Fieldwood En | 21% | PROD | [1] |
| SS 204 | G01520 | Federal | RT | 7/1/1967 | 5,000 | Fieldwood En | 0% | PROD | [1] |
| SS 207 | G01523 | Federal | RT | 7/1/1967 | 5,000 | Fieldwood En | 0% | UNIT | [1], [6] |
| SS 214 | 00828 | Federal | RT | 5/1/1960 | 5,000 | W & T Off | 35% | PROD | |
| SS 214 | 00828 | Federal | OP 1 | 5/1/1960 | 5,000 | W & T Off | 14% | PROD | |
| SS 216 | G01524 | Federal | RT | 7/1/1967 | 5,000 | Fieldwood En | 20% | PROD | [1] |
| SS 216 | G01524 | Federal | RT | 7/1/1967 | 5,000 | Fieldwood En | 0% | PROD | [1] |
| SS 232 | G15293 | Federal | RT | 9/1/1995 | 5,000 | W & T Off | 34% | TERMIN | |
| SS 233 | G01528 | Federal | RT | 7/1/1967 | 5,000 | W & T Off | 34% | PROD | |
| SS 238 | G03169 | Federal | RT | 7/1/1975 | 5,000 | W & T Off | 35% | PROD | |
| SS 238 | G03169 | Federal | OP 2 | 7/1/1975 | 5,000 | Peregrine O&G II | 35% | PROD | |
| SS 246 | G01027 | Federal | OP 11 | 6/1/1962 | 5,000 | Fieldwood En Off | 81% | TERMIN | |
| SS 246 | G01027 | Federal | OP 13 | 6/1/1962 | 5,000 | Fieldwood En Off | 77% | TERMIN | |
| SS 247 | G01028 | Federal | RT B | 6/1/1962 | 5,000 | Fieldwood En Off | 89% | UNIT | |
| SS 247 | G01028 | Federal | RT C | 6/1/1962 | 5,000 | Fieldwood En Off | 77% | UNIT | |
| SS 248 | G01029 | Federal | RT B | 6/1/1962 | 5,000 | Fieldwood En Off | 77% | UNIT | |
| SS 249 | G01030 | Federal | OP 1 | 6/1/1962 | 5,000 | Fieldwood En Off | 80% | UNIT | [1] |
| SS 249 | G01030 | Federal | OP 2 | 6/1/1962 | 5,000 | Fieldwood En Off | 69% | UNIT | [1] |
| SS 252 | G01529 | Federal | OP 2 | 7/1/1967 | 5,000 | Fieldwood En Off | 32% | PROD | [5] |
| SS 252 | G01529 | Federal | OP 1 | 7/1/1967 | 5,000 | Fieldwood En Off | 100% | PROD | [5] |
| SS 252 | G01529 | Federal | RT | 7/1/1967 | 5,000 | Fieldwood En Off | 32% | PROD | [5] |

4

| Block | Lease | Type | Rights | Date Le Eff | Le Cur Acres (Ac) | Operator | WI | Lease Status | Note[†] |
|-------|-------|------|--------|-------------|-------------------|----------|-----|--------------|---------|
| SS 253 | G01031 | Federal | OP 1 | 6/1/1962 | 5,000 | Fieldwood En Off | 100% | PROD | [5] |
| SS 253 | G01031 | Federal | OP 2 | 6/1/1962 | 5,000 | Fieldwood En Off | 50% | TERMIN | [5] |
| SS 253 | G01031 | Federal | OP 4 | 6/1/1962 | 5,000 | Fieldwood En Off | 100% | PROD | [5] |
| SS 253 | G01031 | Federal | OP 5 | 6/1/1962 | 5,000 | Fieldwood En Off | 100% | PROD | [5] |
| SS 253 | G01031 | Federal | RT | 6/1/1962 | 5,000 | Fieldwood En Off | 50% | TERMIN | [5] |
| SS 270 | G01037 | Federal | RT | 3/13/1962 | 5,000 | Fieldwood En Off | 89% | UNIT | |
| SS 271 | G01038 | Federal | RT | 3/13/1962 | 5,000 | Fieldwood En Off | 72% | UNIT | [1] |
| SS 271 | G01038 | Federal | OP | 3/13/1962 | 5,000 | Fieldwood En Off | 72% | UNIT | [1] |
| SS 291 | G02923 | Federal | RT B | 12/1/1974 | 3,750 | Fieldwood En | 15% | OPERNS | [1] |
| SS 300 | G07760 | Federal | RT | 8/1/1985 | 5,000 | W & T Off | 24% | PROD | |
| SS 315 | G09631 | Federal | RT | 6/1/1988 | 5,000 | W & T Off | 25% | PROD | |
| ST 315 | G23946 | Federal | RT | 7/1/2002 | 4,458 | W & T Off | 50% | PROD | |
| ST 316 | G22762 | Federal | RT | 6/1/2001 | 4,435 | W & T Off | 40% | PROD | [1] |
| VK 824 | G15436 | Federal | CONT | 9/1/1995 | 5,760 | Fieldwood En | 6% | RELINQ | |
| VK 826 | G06888 | Federal | RT | 6/1/1984 | 5760 | Fieldwood En | 100% | TERMIN | |
| VK 917 | G15441 | Federal | OP | 7/1/1995 | 5760 | Fieldwood En | 85% | PROD | |
| VK 962 | G15445 | Federal | OP 1 | 7/1/1995 | 5760 | Fieldwood En | 85% | TERMIN | |
| VR 196 | G19760 | Federal | OP 1 | 8/1/1998 | 5,000 | Fieldwood En Off | 38% | TERMIN | [5] |
| VR 262 | G34257 | Federal | RT | 10/1/2012 | 5,485 | Fieldwood En | 25% | RELINQ | [1] |
| VR 272 | G23829 | Federal | RT | 6/1/2002 | 4,381 | Fieldwood En Off | 100% | PROD | |
| VR 273 | G14412 | Federal | OP 3 | 5/1/1994 | 5,000 | Fieldwood En Off | 100% | TERMIN | |
| VR 279 | G11881 | Federal | OP 1 | 5/1/1990 | 5,000 | Talos En Off | 50% | TERMIN | |
| VR 313 | G01172 | Federal | OP 1 | 6/1/1962 | 5,000 | Fieldwood En Off | 100% | TERMIN | |
| VR 313 | G01172 | Federal | OP 2 | 6/1/1962 | 5,000 | Fieldwood En Off | 100% | TERMIN | |
| VR 408 | G15212 | Federal | CONT | 7/1/1995 | 5,000 | Fieldwood En | 33% | PROD | |
| WC 171 | G01997 | Federal | RT | 1/1/1971 | 5,000 | XTO | 34% | TERMIN | |
| WC 295 | G24730 | Federal | OP 1 | 5/1/2003 | 5,000 | Fieldwood En | 14% | PROD | [1] |
| WC 485 | G02220 | Federal | RT | 2/1/1973 | 5,000 | Fieldwood En Off | 100% | UNIT | |
| WC 498 | G03520 | Federal | RT | 8/1/1977 | 5,000 | Cox Op | 4% | PROD | |
| WC 507 | G02549 | Federal | RT | 4/1/1974 | 2,500 | Fieldwood En Off | 100% | UNIT | |
| WC 507 | G02549 | Federal | OP 1 | 4/1/1974 | 2,500 | Fieldwood En Off | 50% | UNIT | |
| WC 507 | G10594 | Federal | RT | 6/1/1989 | 2,500 | Fieldwood En Off | 100% | UNIT | |
| WC 65 | G02825 | Federal | OP 4 | 12/1/1974 | 5,000 | Fieldwood En | 19% | PROD | [1] |

| Block | Lease | Type | Rights | Date Le Eff | Le Cur Acres (Ac) | Operator | WI | Lease Status | Note[†] |
|-------|-------|------|--------|-------------|-------------------|----------|-----|--------------|---------|
| WC 66 | G02826 | Federal | OP 2 | 12/1/1974 | 3,750 | Fieldwood En | 25% | PROD | [1] |
| WC 67 | G03256 | Federal | CONT | 9/1/1975 | 5,000 | Fieldwood En | 17% | TERMIN | [1] |
| WC 72 | G23735 | Federal | RT | 7/1/2002 | 5,000 | Fieldwood En Off | 75% | PROD | |
| WC 96 | G23740 | Federal | OP 1 | 5/1/2002 | 5,000 | Talos | 25% | UNIT | |
| WD 103 | G12360 | Federal | OP 1 | 5/1/1960 | 1,016 | Fieldwood En | 19% | PROD | [1] |
| WD 121 | G19843 | Federal | OP 1 | 8/1/1998 | 5,000 | Fieldwood En | 16% | PROD | [1] |
| WD 122 | G13645 | Federal | OP 1 | 8/1/1992 | 5,000 | Fieldwood En | 16% | PROD | [1] |
| WD 122 | G13645 | Federal | OP 2 | 8/1/1992 | 5,000 | Fieldwood En | 16% | PROD | [1] |
| WD 27 | G04473 | Federal | RT B | 11/1/1980 | 5,000 | Cox Op | 14% | PROD | |
| WD 57, WD 79, WD 80 | G01449 | Federal | RT | 5/1/1966 | 3,125 | Fieldwood En Off | 100% | UNIT | [4] |
| WD 63 | G19839 | Federal | OP 1 | 6/1/1998 | 5,000 | Peregrine O&G | 13% | RELINQ | |
| WD 64 | G25008 | Federal | RT | 5/1/2003 | 5,000 | Peregrine O&G | 6% | TERMIN | |
| WD 73 | G01083 | Federal | OP 2 | 6/1/1962 | 5,000 | Cox Op | 6% | UNIT | |
| WD 74 | G01084 | Federal | OP 1 | 6/1/1962 | 5,000 | Cox Op | 6% | UNIT | |
| WD 79, WD 80 | G01874 | Federal | RT | 12/1/1968 | 3,438 | Fieldwood En Off | 100% | UNIT | [4] |
| WD 80 | G01989 | Federal | RT | 8/1/1970 | 1,875 | Fieldwood En Off | 100% | UNIT | [4] |
| WD 80 | G02136 | Federal | RT | 1/1/1972 | 938 | Fieldwood En Off | 100% | UNIT | [4] |
| WD 85 | G04895 | Federal | RT | 12/1/1981 | 2,630 | Fieldwood En Off | 100% | TERMIN | |
| WD 85 | G04895 | Federal | OP 1 | 12/1/1981 | 2,630 | Fieldwood En Off | 100% | TERMIN | |
| WD 86 | G02934 | Federal | RT | 12/1/1974 | 2,500 | SPN Res | 100% | TERMIN | |
| WD 86 | G04243 | Federal | RT | 1/1/1980 | 2,500 | Fieldwood En Off | 100% | TERMIN | |
| WD 86 | G04243 | Federal | OP 1 | 1/1/1980 | 2,500 | Fieldwood En Off | 100% | TERMIN | |
| WD 86 | G04243 | Federal | OP 2 | 1/1/1980 | 2,500 | Fieldwood En Off | 100% | TERMIN | |
| WD 86 | G04243 | Federal | OP 3 | 1/1/1980 | 2,500 | Fieldwood En Off | 100% | TERMIN | |
| WD 90 | G01089 | Federal | OP 3 | 6/1/1962 | 5,000 | Fieldwood En | 19% | PROD | [1] |
| SP 42 | SL03011 | SL- LA | WI | - | - | - | 100% | SOP | |
| - | SL 14519 | SL - LA | WI | - | - | - | 50% | RELEASED | |
| - | SL 14520 | SL - LA | WI | - | - | - | 50% | RELEASED | |
| - | SL 14914 | SL - LA | WI | - | - | - | 66% | RELEASED | |
| SP 42 | SL16869 | SL- LA | WI | - | - | - | 100% | PROD | |

| Block | Lease | Type | Rights | Date Le Eff | Le Cur Acres (Ac) | Operator | WI | Lease Status | Note[†] |
|---|---|---|---|---|---|---|---|---|---|
| BS 45 | SL19051 | SL- LA | ORRI | 8/9/2006 | | Southern Oil of Louisiana | 0% | UNIT | |
| BS 53 | SL3770 | SL- LA | WI | | | | 50% | RELEASED | |
| - | SL17072 | SL- LA | WI | - | - | - | 38% | ACTIVE | |
| - | SL18287 | SL- LA | WI | - | - | - | 44% | - | |
| - | SL19266 | SL- LA | WI | - | - | - | 17% | ACTIVE | |
| - | Hayes Lumber Co. | Onshore | WI | - | - | Fieldwood Onshore | 63% | TERMINATED | |
| - | 111650 | SL - TX | WI | | | TR Offshore, LLC | 7% | ACTIVE | |
| - | 115727 | SL - TX | WI | | | TR Offshore, LLC | 7% | ACTIVE | |
| - | 114988 | SL - TX | WI | | | TR Offshore, LLC | 7% | ACTIVE | |
| - | 136449 | SL - TX | WI | - | - | TR Offshore, LLC | 7% | ACTIVE | |
| - | 168986 | SL - TX | WI | - | - | Fieldwood Onshore | 100% | TERMIN | |
| - | 189098 | SL - TX | WI | - | - | Fieldwood Onshore | 100% | TERMIN | |
| - | 206882 | SL - TX | WI | - | - | Fieldwood Onshore | 100% | TERMIN | |
| - | JMB Partnership | Onshore | WI | 2/6/2019 | | | 100% | | [7] |
| - | Caroline Baker Trust No. 1 | Onshore | WI | 1/22/2016 | | | 100% | | [7] |

7

## Abandoned Properties ROW

| SEGMENT NUMBER | COMPANY NAME | ORG AREA | ORG BLOCK | ORG NAME | REC AREA | REC BLOCK | REC NAME | SIZE | PRODUCT | STATUS | ROW NUMBER | FW LEASE | NOTE[3] |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 7923 | Fieldwood Energy, LLC | EB | 165 | A | HI | A 582 | 30 SSTI | 12 | GAS | Active | G08536 | G06280 | |
| 10301 | Bandon Oil and Gas, LP | EC | 332 | A | EC | 330 | 08 SSTI | 6 | OIL | Out of Service | G14699 | G09478 | [2] |
| 44 | Fieldwood Energy, LLC | EI | 175 | C | EI | 176 | 12" SSTI | 8 | OIL | Out of Service | G13445 | 00438 | |
| 1128 | Fieldwood Energy, LLC | EI | 330 | flanged end | EI | 306 | 14-inch SSTI | 14 | OIL | Out of Service | G02139A | G02115 | |
| 7943 | Fieldwood Energy, LLC | EI | 342 | C | EI | 327 | 08 SSTI | 4 | OIL | Out of Service | G08541 | G02319 | [3] |
| 18493 | Fieldwood Energy, LLC | EI | 342 | C | EI | 343 | SSTI | 6 | GAS | Out of Service | G29108 | G02319 | [3] |
| 19960 | Fieldwood Energy LLC | EI | 342 | C | EI | 342 | Blind Flange | 6 | OIL | Out of Service | G29471 | G02319 | [3] |
| 11923 | Fieldwood Energy, LLC | EI | 53 | C | EI | 64 | 22 SSTI | 10 | G/C | Out of Service | G20539 | 00479 | |
| 9211 | Fieldwood Energy, LLC | EI | 53 | B | EI | 64 | 22 SSTI | 6 | G/C | Partial Abandon | G12373 | 00479 | |
| 15298 | Fieldwood Energy, LLC | GA | 210 | B | GA | 239 | 12 SSTI | 8 | G/C | Active | G26931 | G25524 | |
| 16077 | Fieldwood Energy, LLC | HI | 130 | #2 | HI | 165 | 8-inch SSTI | 8 | BLGH | Partial Abandon | G28284 | G25579 | [1] |
| 15401 | Fieldwood Energy, LLC | HI | A 341 | B | HI | A 340 | 30" SSTI | 812 | G/C | Active | G26938 | G25605 | |
| 6669 | Fieldwood Energy, LLC | HI | A 376 | A | HI | A 356 | 12 SSTI | 10 | GAS | Out of Service | G05238 | G02754 | |
| 6669 | Fieldwood Energy LLC | HI | A 376 | Platform A | HI | A 356 | 12 SSTI W/PSN 10882 | 10 | GAS | Out of Service | G05238 | G02754 | |
| 7684 | Fieldwood Energy, LLC | HI | A 550 | A | HI | A 568 | 20 SSTI | 10 | GAS | Out of Service | G08276 | G04081 | |
| 6340 | Fieldwood Energy, LLC | HI | A 568 | Subsea Valve | HI | A 539 | 20 SSTI | 20 | G/C | Out of Service | G04974 | G04081 | |
| 5470 | Fieldwood Energy, LLC | HI | A356 | Valve | HI | A343 | HIOS | 12 | GAS | Out of Service | G04050 | G02754 | |

[1]  Lease carries $0 liability
[2]  Represents each ROW in which (i) FWE IV is to acquire solely as to the same 8/8ths undivided interest that FWE IV is to acquire in the related lease referenced above for such ROW. The Debtors' remaining interests in such ROW are to be abandoned.
[3]  Represents each ROW in which FWE is to acquire solely as to the 8/8ths undivided interest that FWE I is to acquire in the related lease reference above for such ROW; and in which FWE IV is to acquire solely as to the same 8/8ths undivided interest that FWE IV is to acquire in the release lease reference above for such ROW.  The Debtors' remaining interests in such ROW are to be abandoned.
[4]  Represents each ROW in which FWE is to acquire solely as to the 8/8ths undivided interest that FWE I is to acquire in the related lease reference above for such ROW.  The Debtors' remaining interests in such ROW are to be abandoned.

| SEGMENT NUMBER | COMPANY NAME | ORG AREA | ORG BLOCK | ORG NAME | REC AREA | REC BLOCK | REC NAME | SIZE | PRODUCT | STATUS | ROW NUMBER | FW LEASE | NOTE[3] |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 10882 | Fieldwood Energy, LLC | HI | A356 | 10SST | HI | A356 | 12SSTI | 12 | GAS | Out of Service | G04051 | G02754 | |
| 6504 | Fieldwood Energy, LLC | HI | A595 | D | HI | 573 | B | 8 | OIL | Out of Service | G28525 | G02721 | |
| 14304 | Fieldwood Energy, LLC | MP | 101 | SSTI Manifold | MP | 102 | Plat A | 8 | BLKG | Partial Abandon | G24687 | G22792 | |
| 15810 | Fieldwood Energy Offshore LLC | MP | 29 | Well No. 1 | MP | 118 | Platform A | 6 | BLKG | Out of Service | G28216 | G27196 | [1] |
| 15818 | Fieldwood Energy Offshore LLC | MP | 77 | A | MP | 151 | 18"SSTI | 8 | GAS | Out of Service | G28221 | G04481 | [3] |
| 4733 | Fieldwood Energy Offshore LLC | SM | 142 | A | SM | 127 | 24 SSTI | 10 | G/C | Out of Service | G03441 | G01216 | |
| 15106 | Fieldwood Energy Offshore LLC | SM | 146 | B | SM | 147 | A | 6 | BLKG | Out of Service | G26837 | G09546 | |
| 15107 | Fieldwood Energy Offshore LLC | SM | 146 | B | SM | 147 | A | 4 | BLKG | Out of Service | G26838 | G09546 | |
| 15108 | Fieldwood Energy, LLC | SM | 147 | A | SM | 146 | B | 2 | LIFT | Out of Service | G26839 | G09546 | |
| 19363 | Fieldwood Energy Offshore LLC | SM | 147 | A | SM | 130 | 12 SSTI | 6 | BLKO | Out of Service | G14093 | G06693 | |
| 19363 | Fieldwood Energy Offshore LLC | SM | 147 | A | SM | 130 | 12 SSTI | 6 | BLKO | Out of Service | G29316 | G06693 | |
| 10977 | Fieldwood Energy, LLC | SM | 268 | A | SM | 280 | #03 | 3 | BLKG | Out of Service | G28756 | G14456 | |
| 17499 | Fieldwood Energy, LLC | SM | 269 | B | SM | 268 | A | 10 | GAS | Out of Service | G28484 | G02311 | |
| 13642 | Fieldwood Energy, LLC | SM | 280 | H | SM | 268 | A | 10 | BLKG | Permitted for Abandonment | G28758 | G14456 | |
| 5427 | Fieldwood Energy, LLC | SM | 281 | E | SM | 268 | A | 12 | SPLY | Out of Service | G02817 | G02600 | |
| 5429 | Fieldwood Energy, LLC | SM | 281 | C | SM | 281 | 12 SSTI | 10 | SPLY | Out of Service | G02817 | G02600 | |
| 6512 | Fieldwood Energy, LLC | SM | 281 | C | SM | 268 | D | 10 | BLKO | Out of Service | G29131 | G02600 | |
| 10268 | Fieldwood Energy SP LLC | SP | 60 | A | SP | 6 | F/S | 10 | OIL | Out of Service | G14679 | G02137 | |
| 20050 | Fieldwood Energy, LLC | SS | 168 | SSTI | SS | 168 | SSTI | 6 | | Proposed | G28788 | 00820 | [4] |
| 6748 | Fieldwood Energy, LLC | SS | 169 | C Platform | SS | 169 | 18-inch SSTI | 6 | OIL | Out of Service | G09322 | 00820 | [3] |
| 12778 | Fieldwood Energy, LLC | SS | 189 | A | SS | 185 | 26"SSTI | 8 | G/C | Out of Service | G22139 | G04232 | |
| 1138 | Fieldwood Energy, LLC | SS | 204 | A | SS | 207 | A | 6 | G/O | Out of Service | G13491 | G01520 | |

9

| SEGMENT NUMBER | COMPANY NAME | ORG AREA | ORG BLOCK | ORG NAME | REC AREA | REC BLOCK | REC NAME | SIZE | PRODUCT | STATUS | ROW NUMBER | FW LEASE | NOTE[3] |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1137 | Fieldwood Energy, LLC | SS | 207 | A Platform | SS | 204 | A | 4 | GAS | Out of Service | G13489 | G01523 | |
| 1147 | Fieldwood Energy, LLC | SS | 207 | A | SS | 208 | F-Pump | 12 | OIL | Out of Service | G13492 | G01523 | |
| 17775 | Fieldwood Energy, LLC | SS | 253 | C | SS | 208 | F-Pump | 4 | OIL | Out of Service | G01691C | G01031 | |
| 18094 | Bandon Oil and Gas, LP | ST | 195 | B | ST | 196 | SSTI | 6 | G/C | Permitted for Abandonment Approved | G29005 | G03593 | |
| 11107 | Bandon Oil and Gas, LP | ST | 196 | 06-inch SSTI | SS | 208 | F | 6 | OIL | Permitted for Abandonment Approved | G05120 | G03593 | [2] |
| 13720 | Fieldwood Energy, LLC | VK | 340 | 8"SSTI | VK | 251 | A | 8 | BLGH | Active | G28221 | G04481 | |
| 13193 | Bandon Oil and Gas, LP | VR | 196 | A | VR | 206 | 12 SSTI | 8 | G/C | Out of Service | G22418 | G19760 | [2] |
| 18591 | Fieldwood Energy, LLC | VR | 196 | A | VR | 215 | A | 4 | BLKO | Out of Service | G29137 | G19760 | [2] |
| 18588 | Fieldwood Energy, LLC | VR | 215 | A | VR | 196 | A | 4 | GAS | Active | G29136 | G19760 | [2] |
| 17090 | Fieldwood Energy, LLC | VR | 261 | A | VR | 265 | A | 8 | BLKO | Out of Service | G28347 | G03328 | [2] |
| 14609 | Fieldwood Energy, LLC | VR | 272 | "A" | VR | 250 | 8" SSTI | 4 | OIL | Out of Service | G25384 | G23829 | |
| 14277 | Fieldwood Energy, LLC | VR | 272 | A | SM | 116 | 20" SSTI | 10 | G/C | Out of Service | G25288 | G23829 | |
| 5440 | Fieldwood Energy Offshore LLC | VR | 313 | B | VR | 313 | 20 SSTI | 10 | GAS | Out of Service | G04044 | G01172 | |
| 15136 | Fieldwood Energy, LLC | VR | 313 | B | VR | 313 | 6" SSTI | 6 | OIL | Out of Service | G03879 | G01172 | |
| 4289 | Fieldwood Energy Offshore LLC | WC | 485 | A | WC | 509 | GP | 12 | GAS | Out of Service | G02122E | G02220 | |
| 14251 | Fieldwood Energy Offshore LLC | WC | 72 | #1 | WC | 65 | JA | 4 | BLKG | Out of Service | G25275 | G23735 | |
| 16088 | Fieldwood Energy, LLC | WD | 122 | A | WD | 105 | E | 6 | GAS | Out of Service | G28289 | G13645 | |
| 16089 | Fieldwood Energy, LLC | WD | 122 | A | WD | 105 | E | 3 | OIL | Out of Service | G28290 | G13645 | |
| 15960 | Fieldwood Energy, LLC | WD | 90 | A | WD | 73 | SSTI | 4 | OIL | Out of Service | G28260 | G01089 | |
| 18649 | Fieldwood Energy, LLC | VK | 826 | A | VK | 962 | UTA | 4 | UBEH | Out of Service | G29151 | G15441 | |
| 18904 | Fieldwood Energy, LLC | VK | 826 | A | VK | 917 | SUTA | 1 | UMB | Out of Service | G29151 | G15441 | |

| SEGMENT NUMBER | COMPANY NAME | ORG AREA | ORG BLOCK | ORG NAME | REC AREA | REC BLOCK | REC NAME | SIZE | PRODUCT | STATUS | ROW NUMBER | FW LEASE | NOTE[3] |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 18648 | Fieldwood Energy, LLC | VK | 962 | PLET | VK | 826 | A-Nep Spar | 6 | SERV | Active | G29151 | G15441 | |
| 14906 | Fieldwood Energy, LLC | VK | 962 | SSW #1 | VK | 826 | A Nep Spar | 6 | BLKO | Out of Service | G25481 | G15441 | |
| 14907 | Fieldwood Energy, LLC | VK | 962 | SSW#1 | VK | 826 | A | 10 | CSNG | Out of Service | G25481 | G15441 | |

11

## **Abandoned Properties RUE**

| Area | Block No. | Structure | Complex ID No. | Authority No. | FW Lease | Operator | Approval Date | Associated Assets |
|------|-----------|-----------|----------------|---------------|----------|----------|---------------|-------------------|
| EI | 63 | A | 21515 | G30244 | 00425 | Fieldwood Energy Offshore LLC | 12/02/13 | EI 63 002,003, EI 62 and 005, 006, 008, 009, 010 and 011 |
| EI | 63 | B | 21515 | G30244 | 00425 | Fieldwood Energy Offshore LLC | 12/02/13 | Production from EI 63 A |
| EI | 63 | C-QTR | 21515 | G30244 | 00425 | Fieldwood Energy Offshore LLC | 12/02/13 | Production from EI 63 A |
| SM | 146 | B | 1663 | G30248 | G09546 | Fieldwood Energy Offshore LLC | 08/21/13 | SM 139 B001 & B002 |
| SM | 147 | A | 23389 | G30200 | G06693 | Fieldwood Energy Offshore LLC | 09/12/13 | SM 139 B001, B002 & B002D |
| WD | 86 | A | 22593 | G30173 | G04243 | Fieldwood Energy Offshore LLC | 06/20/13 | WD 86 B001, B002 & B005 |
| VK | 826 | A-Neptune Spar | 24235 | G30353 | G15441 | Fieldwood Energy LLC | 07/03/18 | VK 917 SS001 & VK 962 SS001 |