JOINT OPERATING AGREEMENT

I N D E X

| ARTICLE | | Page |
|---|---|---|
| I. | INTEREST OF PARTIES | 2 |
| | 1.1 | 2 |
| II. | OPERATOR | 3 |
| | 2.1 | 3 |
| III. | EXPLORATION, DEVELOPMENT AND PRODUCTION OF THE JOINT AREA | 4 |
| | 3.1 | 4 |
| | 3.2 | 5 |
| | 3.3 | 5 |
| | 3.4 | 6 |
| | 3.5 | 7 |
| | 3.6 | 8 |
| | 3.7 | 10 |
| | 3.8 | 11 |
| | 3.9 | 12 |
| | 3.10 | 13 |
| IV. | PLATFORM CONSTRUCTION | 13 |
| | 4.1 | 13 |
| | 4.2 | 14 |
| V. | LEASES OF PLATFORM SPACE | |
| | 5.1 | 15 |
| VI. | AGREEMENTS WITH THIRD PARTIES | 16 |
| | 6.1 | 16 |
| VII. | COSTS AND EXPENSES | 18 |
| | 7.1 | 18 |
| | 7.2 | 18 |
| | 7.3 | 19 |
| VIII. | RENTALS AND ROYALTIES | 19 |
| | 8.1 | 19 |
| | 8.2 | 20 |
| IX. | TAXES | 20 |

**FMOG EXHIBIT 3**

|  |  |  |
|---|---|---|
|  | 10.1 | 21 |
|  | 10.2 | 23 |
|  | 10.3 | 23 |
|  | 10.4 | 24 |
| XI. | RIGHT TO TAKE PRODUCTION IN KIND | 24 |
|  | 11.1 | 24 |
|  | 11.2 | 25 |
|  | 11.3 | 25 |
| XII. | LIEN | 25 |
|  | 12.1 | 25 |
| XIII. | RIGHTS OF NON-OPERATORS - LOGS AND OTHER INFORMATION | 26 |
|  | 13.1 | 26 |
|  | 13.2 | 28 |
| XIV. | PREFERENTIAL RIGHT OF PURCHASE | 29 |
|  | 14.1 | 29 |
|  | 14.2 | 30 |
| XV. | NEGATION OF PARTNERSHIP | 31 |
|  | 15.1 | 31 |
| XVI. | SURRENDER, EXPIRATION, ABANDONMENT OR RELEASE OF LEASE | 32 |
|  | 16.1 | 32 |
| XVII. | PARTIES TO WHOM CONTRACT APPLIES | 33 |
|  | 17.1 | 33 |
| XVIII. | ELECTION AS TO TAXES | 33 |
|  | 18.1 | 33 |
| XIX. | ADJUSTMENT FOR LOSS | 34 |
|  | 19.1 | 34 |
| XX. | FORCE MAJEURE | 34 |
|  | 20.1 | 34 |

XXI.        LAWS AND REGULATIONS                    36

            21.1                                    36
            21.2                                    37


XXII.       NON-DISCRIMINATION CLAUSE               37

            22.1                                    37


XXIII.      NON-COMPLIANCE WITH NON-
            DISCRIMINATION CLAUSE                   42

            23.1                                    42


XXIV.       NOTICES                                 42

            24.1                                    42
            24.2                                    44
            24.3                                    44


XXV.        TERM                                    44

            25.1                                    44


XXVI.       EFFECT OF AGREEMENT                     45

            26.1                                    45

## JOINT OPERATING AGREEMENT

This agreement made and entered into as of the 29th day of September, 1972, by and between SHELL OIL COMPANY (hereinafter called "Shell" or "Operator"), and FLORIDA GAS EXPLORATION COMPANY (hereinafter individually called "Florida Gas"), DRILLAMEX, INC., SABINE EXPLORATION COR-PORATION, KIRBY PETROLEUM CO., THE ROYAL GORGE COMPANY, a Texas corporation, and AMERICAN INDEPENDENT OIL COMPANY, (all parties except Shell hereinafter collectively called "Non-Operators");

### W I T N E S S E T H:

That,

WHEREAS, the parties hereto are the owners of certain undivided interests in those certain oil and gas leases described in Exhibit "A" attached hereto and made a part hereof for all purposes, hereinafter called the "joint leases", covering the lands described in Exhibit "A", hereinafter called the "Joint Area".

WHEREAS, the parties hereto are desirous of entering into this Agreement providing for the exploration, development and operation of said lease or leases for the production of oil and gas therefrom;

NOW, THEREFORE, in consideration of the premises and of the covenants and agreements herein contained to be kept and peformed by the parties hereto, it is agreed by and between the parties as follows:

I.

INTEREST OF PARTIES:

1.1  The joint leases subject to this Agreement shall be explored, developed and operated, subject to the terms and provisions of this Agreement, for the benefit of the parties hereto.  Except as otherwise hereinafter provided, each of the parties hereto shall be only liable for, and pay for its proportionate part of all costs, expenses and liabilities incurred by Operator hereunder for the joint account of the parties hereto in accordance with this Agreement including, but not by way of limitation, all costs, expenses and liabilities incurred in exploration, drilling and platform construction on the jointly owned property and producing and saving the oil and gas therefrom. The proportionate part of the costs, expenses and liabilities for which each of said parties shall pay and be liable is that proportion thereof set opposite the name of the parties as follows;

| | |
|---|---|
| Shell Oil Company | 16/24 |
| Florida Gas Exploration Company | 3/24 |
| Drillamex, Inc. | 1/24 |
| Sabine Exploration Corporation | 1/24 |
| Kirby Petroleum Co. | 1/24 |
| The Royal Gorge Company | 1/24 |
| American Independent Oil Company | 1/24 |
| | 24/24 |

The parties hereto shall own in the respective proportions above set forth all of the oil, gas and casinghead gas that may be produced and saved from the joint leases, subject further, however, to the terms and provisions of said leases and less the oil and gas required for the development and operation of said leases.

Except as herein otherwise provided, each and all wells which may be drilled pursuant to this Agreement on the Joint Area, all platforms and facilities constructed thereon, and the material and equipment therein and thereon and included therewith, shall be owned by the parties hereto in the proportions set forth above.

II.

OPERATOR:

2.1   Shell Oil Company is hereby designated as the exclusive Operator of all said joint leases and Joint Area. Operator shall manage, develop and operate the joint leases from and after the effective date of this Agreement at the joint expense and for the joint account of the parties hereto in accordance with the terms and conditions of this Agreement and, subject to the provisions hereof, shall have full and exclusive control of the conduct of operations on the Joint Area for the discovery and production and saving of oil and gas therefrom. Operator shall undertake and perform, subject to the terms and provisions of this Agreement, all of the obligations of the oil and gas leases affecting the lands subject to this Agreement. Shell shall remain Operator hereunder of each of the joint leases so long as it owns an interest therein. Should Shell divest itself of all interest in any of the joint

leases or any portion thereof to one of the parties or
under one of the circumstances excluded from the Preferential
Right to Purchase provided in Article XIV hereof, Shell shall
remain the Operator hereof unless all of the then parties
hereto agree on a new Operator.  Should Shell otherwise
divest itself of all interest in any of the joint leases,
or any portion thereof, such lease or portion thereof shall
no longer be subject to this Agreement, except for appro-
priate disposition of property held in connection with such
lease and final settlement between Shell and Non-Operators.
In the event the then owners of such lease, or any of them,
wish to continue operations thereon, they shall, effective
as of the date of Shell's divestiture, enter into a mutually
agreeable Operating Agreement in which the Operator shall
be designated by the then participants holding a majority
interest in such lease, and Shell shall deliver to such
Operator all pertinent records, information and data held
by it as Operator relative to such lease.


## III.

## EXPLORATION, DEVELOPMENT AND PRODUCTION OF THE JOINT AREA:

3.1  The leases listed in Exhibit "A" were acquired
jointly by the parties at the Outer Continental Shelf Oil
and Gas Lease Sale held by the U. S. Department of Interior
on September 12, 1972.  Operator will make application for
necessary permits, and make all other arrangements required
for the exploration of the Joint Area.

3.2   Prior to commencement of the exploratory program on each lease or combination of leases, Operator will present to Non-Operators a plan of exploration for such lease or leases.   This plan shall be a written report on each prospect on each lease, identifying the area covered by the plan, together with geological maps, and shall include a sufficiently detailed discussion of the various objectives. Also estimates of costs of the program and the estimates of time required to implement the plan will be submitted.   Approval of this plan of exploration by a party or parties possessing in the aggregate over 50% of the participating interest as described in Article I shall be required prior to Operator commencing operations. Operator shall have full control over the conduct of the exploration program.   Operator agrees to advise Non-Operators from time to time, but at least monthly, regarding progress of the program.   Any such plan or program of exploration may be modified, supplemented or terminated with concurrence of a party or parties possessing in the aggregate over 50% of the participating interest as described in Article I. Operator shall promptly advise Non-Operators of any termination, and of any such substantial modification or supplement, the basis thereof and the estimated costs thereof.

3.3   Any Non-Operator may at its election at any time withdraw from the exploration program of all or any of the leases in the Joint Area.   If it is a Non-Operator's decision to withdraw, notice in writing must be given Operator, specifying which lease or leases such Non-Operator is to withdraw from, and from the date of receipt of such notice by Operator forward, such Non-Operator will not

incur further expense as to such lease or leases, but
will remain liable for its share of all costs and expenses
of such program incurred prior to such time.  If such
notice to withdraw is given, such Non-Operator shall within
thirty (30) days deliver to Operator and the other Non-
Operators, without reimbursement and at no cost to the
other parties, an assignment of its entire interest in
the lease or leases from which it has withdrawn, said
assignment to be to such parties in ratio as their respective
interests bear to each other.  Neither the Operator nor
any Non-Operator may withdraw from a particular exploration
program during a well fire, blowout, or other emergency
pertaining thereto, and it shall be and remain liable
for its share of all costs of control of such emergency
including the drilling of relief wells, and of pollution
and oil spill containment and cleanup.


    3.4  Upon completion of the exploration program for
each lease or combination of leases, Operator shall notify
Non-Operators of Operator's final evaluation of the
lease or leases in question and of Operator's opinion as
to whether and when development of said lease or leases
is to be undertaken.  Such notification shall be in the
form of a written report as to results of exploration of
the lease or leases, and shall identify all accumulations
of hydrocarbons, if any, and shall state the estimated
recoverable reserves, if any, the number of platforms
needed to develop said reserves, if any, and the number
of wells contemplated for development, if any.  In addition,
Operator shall furnish written estimates of cost of develop-
ment of each accumulation if development is to be undertaken,

as to each lease or combination of leases on which
development is to be undertaken, is hereinafter sometimes
referred to as the "development program". It is understood
that any such development program may cover and include
one or more sands, formations, or prospects. Also it is
agreed that any such development program may include pro-
visions for and the drilling of an exploratory well or
wells from any platform included in such program, and the
reservation of well slots therefor. The election of a
Non-Operator provided in Article 3.5 shall include any
such exploratory wells and platform slots therefor. If
final evaluation of any lease has not been accomplished
by the end of the fourth year of the primary term of any
lease, Operator will give to Non-Operators a detailed status
report in writing on said lease and outline its plans for
the lease.

    3.5  Within thirty (30) days after receipt of Operator's
evaluation report on and opinion as to development of said
lease or combination of leases, each Non-Operator shall,
if Operator's decision is to develop, notify Operator in
writing of its election to either participate in the de-
velopment of said lease or leases, including construction
and installation of platforms, or of its election not to
participate. Failure of a Non-Operator to notify Operator
in writing timely shall be construed as such Non-Operator's
election not to participate. Such Non-Operator shall not
in such event incur any expense as to said development
program. Such Non-Operator shall, within thirty (30) days
after its election not to participate, deliver to Operator
and the other parties hereto, without reimbursement and

at no cost, an assignment of its entire interest in said
lease or leases, or, if said development program covers
and applies to less than the whole of said lease or leases,
its interest in such portion of the lease or leases, as
to all depths, that said development program covers and
applies to.  Such assignment shall be made to the other
parties hereto in the proportion that their respective
interests in each such lease or portion thereof bear to
one another.

    3.6  Operator agrees to advise Non-Operators from
time to time regarding progress of each development program.
Any development program, including any programs after
one or more Non-Operators have elected not to participate
in same, may be modified, supplemented or terminated at
any time with the concurrence of a party or parties in
such development program possessing over 50% of the aggregate
interest participating in such program.  In any such event,
Operator shall advise the participating Non-Operators
in writing of the particulars of such modification or
supplement, with sufficiently detailed information regarding
same, including the estimated costs involved.  Operator
may, at its discretion, use a well slot or slots on any
platform which is no longer needed on behalf of the joint
account to accomplish the objectives of any such development
program, for the drilling of a well or wells to other
sands, formations or prospects not included in such develop-
ment program, as an exploratory well or wells for such
other sands, formations or prospects.  In the event Operator
determines to so divert or change any such well or wells
to such other sands, formations or prospects, it shall

or wells to be diverted, a sufficiently detailed discussion
of the sand(s), formation(s) or prospect(s) to which said
well is to be drilled, and the estimated cost of drilling
involved.  Each Non-Operator shall notify Operators within
ten (10) days from receipt of notice from Operators, and
within 24 hours, exclusive of Saturdays, Sundays and holidays,
from actual receipt of notice if a rig is on the well
or wells, whether or not such Non-Operator desires to
participate in the drilling of such well or wells to such
other sand(s), formation(s) or prospect(s).  Failure to
timely give Shell such notice shall constitute an election
by such Non-Operator not to participate.  As to any Non-
Operator electing to participate, such well or wells shall
be diverted as aforesaid and such drilling undertaken
by Operator for the account of the participating parties,
and all tests, completion attempts, equipping or otherwise
shall be made by Operator in its discretion at the joint
expense of the participating parties.  Should one or more
of the Non-Operators elect not to participate in the diversion
of any such well or wells, then Operator and any such
participating Non-Operators shall pay to the non-participating
Non-Operators only their share of the depreciated cost
of any conductor or conductors (if theretofore installed)
on a platform used for such well or wells, and Operator
and the participating Non-Operators shall not be liable
to the non-participating Non-Operators for any other amounts
prior to production, if any, from such well or wells.
Thereafter, said slot or slots and well or wells taken
over by Operator and/any participating Non-Operators and
all rights to and in the sand(s), formation(s) or prospect(s)

explored, including all production therefrom shall automati-
cally vest in Operator and such participating Non-Operators,
if any, and the non-participating Non-Operators shall
execute and deliver to Operator and any participating
Non-Operators an assignment of all of their rights in
said slot or slots and well or wells and said sand(s),
formation(s) or prospect(s) as to the joint lease or leases
explored by such well or wells, and production therefrom.
Such assignment shall be made to the other parties hereto
in the proportion that their respective interests in each
such lease or portion thereof bears to one another.  In
the event of production from any such well or wells, Operator
and any participating Non-Operators in the proportion
of their respective interests therein, shall bear and
be liable for the depreciated costs of any production
facilities on the platform involved, and of costs of maintain-
ing and operating the platform, in the proportion that
the number of such drainage point or points produced from
such platform for the benefit of Operator and the participat-
ing Non-Operators bears to the total number of drainage
points producing from such platform.  It is understood
that the platform is not a part of the production facilities
as used in the preceding sentence.

    3.7  If any Non-Operator participates in any develop-
ment program initially including the drilling of an explora-
tory well or wells as provided in Section 3.4 of this
Article, or if any Non-Operator participates in the drilling
of an exploratory well or wells from a diverted well slot
or slots as provided in Section 3.6 of this Article, then
after the completion of the drilling of such exploratory
well or wells all of the provisions of Sections 3.4, 3.5

program or programs, if any, resulting from such exploratory
well or wells, and to such Non-Operator's election to
participate or not participate therein.  It is agreed,
however, that should such Non-Operator elect, after the
exploratory well or wells included in an initial development
program have been drilled, not to participate in a development
program resulting therefrom, then such Non-Operator shall
be divested only of its rights in, and shall assign to
the other parties only its rights in, the sands(s), formation(s)
or prospect(s) to be included in the development program
resulting from such exploratory well or wells, as to the
lease or leases, or portion thereof, affected by such
development program.


    3.8  If after commitment to development of any joint
lease or combination of leases, any Non-Operator decides
to withdraw from further development of said lease or
combination of leases, notice must be given in writing to
Operator of such decision;  such notice specifying which
development program is being terminated and properly des-
cribing the lease or leases or portions thereof involved.
Upon giving such notice, such Non-Operator will not be
liable for any cost of any well or wells in such development
program thereafter commenced and will not incur any expense
as to subsequent wells in such program, or expense of
operation and production of subsequent wells, except for
wells already then commenced, and will not be entitled
to receive revenues from such subsequent wells, but shall
remain liable for its share of all obligations accrued
prior thereto and for its share of all costs of wells in
said program then commenced; and such Non-Operator shall

continue to receive its share of the revenues from any
wells theretofore commenced in such program.  An assign-
ment of such Non-Operator's entire interest in the lease
or leases or portions thereof concerned to Operator and
the other Non-Operators will be delivered by such Non-
Operator within thirty (30) days, subject to the retention
by such Non-Operator of its interest in any wells commenced
prior to its notice of withdrawal to Operator.

3.9  It is understood and agreed that when any Non-
Operator commits itself to the development of a lease or
combination of leases, including platform construction
and installation, it shall thereupon become and remain fully
liable for its full share of the cost of the construction and
installation of the platform or platforms, and for the
salvage and removal thereof when and as required by the
lease or applicable regulations, whether or not such Non-
Operator withdraws from further development of such lease
or leases after commitment for development; provided,
should one or more but less than all the parties hereto
("sole benefit parties"), pursuant to any provisions of
this Agreement or otherwise by agreement among all the
parties, take over and use for their account any well slot
or slots owned by the joint account, then the share of the
cost of salvage and removal of such platform of any Non-
Operators who had committed to development but is not one
of the sole benefit parties, shall be reduced by an amount
equal to the product of the total cost of salvage and re-
moval multiplied by a fraction that is the number of well
slots on such platform which have been taken over by the
sole benefit parties for their account over the total
original number of joint account well slots on said platform.

Further, anything foregoing to the contrary in paragraph 3.8, neither the Operator nor any Non-Operator shall have the right to withdraw during a well or platform fire, blowout, or other emergency, but may withdraw from the development of the lease or leases concerned after such emergency, provided it shall be and remain liable for its full share of all costs of control of such emergency, including the drilling of relief wells, and of pollution and oil spill containment and clean-up, and all costs of debris or platform removal made necessary by emergency.

3.10 Operator shall not at the joint expense of the parties hereto, unless consented to by all of said parties, undertake on or with respect to the joint leases any re-search project, money for which is included in Operator's internal Research and Development Budget; it being under-stood that such restriction will not apply to Operator's employment of new drilling tools, equipment and techniques which become available and are included in Operator's operating budget and are employed in operations hereunder for the benefit of the joint account.  Operator may under-take any research project on or with respect to the joint leases at its own cost and expense, without the consent of or notice to or joinder by Non-Operators.

IV.

PLATFORM CONSTRUCTION

4.1  After any of the joint leases has been evaluated by exploratory drilling and Operator's plan of development of said lease has been submitted and the elections of Non-Operators to participate therein or not having been made

Operator shall, at the joint expense of the parties partici-
pating in such development program, erect the platform or
platforms which may be deemed necessary for the drilling of
development wells on said lease, and may erect or construct
facilities which may be required to handle the production
from any such well or wells.  Operator may enter into con-
tracts with independent contractors for the construction and
installation of said platforms and facilities and the cost
of constructing and installing the same shall be paid for
by the Joint Account of the parties participating, and said
platform and facilities shall be owned by the parties
participating in accordance with their proportionate in-
terests.  Within one hundred and twenty (120) days after the
completion of the construction and installation of any
platform or facilities, Operator shall furnish the par-
ticipating Non-Operators a statement of all costs thereof,
showing as separate items the costs of all prefabricated
materials included therein.

4.2  If any time before of after the termination of
any lease or leases described in Exhibit "A" which are then
subject to this Agreement, the parties or Operator are
required by any provision of the lease or leases, or by
any regulation or order of the Secretary of the Interior
or the Department of the Interior or any branch or sub-
division thereof, or of any other governmental body or
agency having jurisdiction, or by any law, to remove any
such jointly owned platform, or debris therefrom, from
the joint leases, then Operator shall remove same at the
expenses of and as a charge to those parties liable
therefor as otherwise provided herein.  Operator shall

salvage or dispose of such platform, and all amounts
realized from such salvage or disposal shall be credited
to the account of the parties who must bear the cost of
salvage and in the same proportions.

V.

LEASES OF PLATFORM SPACE

5.1  At any time that any party hereto intends to
itself take gas produced from the joint leases from a
platform located thereon, such other party shall enter
into and execute with the other parties hereto a
lease covering space on said platform necessary for the
receipt and measurement of such gas, which lease shall
be on the form of Lease of Offshore Platform Space
attached hereto and made a part hereof as Exhibit C
hereto.  Also, at any time that any party hereto sells
its share of the gas produced from the joint leases to
a party not a party to this Agreement, the selling party
shall require its purchaser of such gas to enter into
and execute with all parties hereto such a lease of plat-
form space on the form attached as Exhibit C hereto.
Prior to executing any such lease agreement, the parties
shall complete the blank space in paragraph 5(a) therein
as follows:  If the gas purchaser is not a party hereto,
the price in paragraph 5(a) will be determined by multiply-
ing the anticipated or known cost of the platform by a
fraction, the numerator of which is the number of square
feet of deck space to be used by the gas taker or pur-
chaser's facilities and the denominator of which is the
number of square feet of deck space on the entire platform.
If the gas taker is a party hereto, the price in paragraph

5(a) shall be the amount determined as above, less the
product of such taker's percentage interest in the plat-
form times the amount determined as above.  Also, should
the taker of gas from the platform be a party hereto,
taking its own share of the gas produced from the platform,
the preamble and Paragraph (1) of the lease agreement shall
be appropriately amended to reflect said party's capacity
in taking gas from the platform.

VI.

AGREEMENTS WITH THIRD PARTIES

6.1  Operator shall have the right and authority to
commit any joint lease or leases subject hereto, or any
portions thereof, to joint operating agreements or drill-
ing agreements, and exploratory, production and secondary
or supplemental recovery units and unit agreements with
third parties, but may not commit any joint interest to
farmout agreements.  Prior to any commitment to any such
agreement or unit, Operator shall present to Non-Operators
a written report concerning the proposed agreement or unit
as is provided for in Article III hereof with respect to
exploratory and development programs, including informa-
tion and sufficiently detailed discussion of objectives
and an estimate of costs as required in Article III, and
Non-Operators shall have the same election to participate
or not participate in the proposed agreement or unit as
they have under Section 3.5 of Article III hereof,
exercisable within thirty (30) days of receipt of said
report,  with respect to development programs;  and should
any one or more of the Non-Operators elect not to par-
ticipate in any such agreement or unit, they shall assign
to Operator and the other Non-Operators their interests

leases, or portions thereof, or in the sand(s), formation(s), or prospect(s) in such lease or leases, or portions thereof, to be covered or affected by such agreement or unit, the same as provided in Article III with respect to exploratory and development programs, with the same effect as in Article III. Operator may, at its sole discretion, commit the joint account of the parties hereto to contracts for test promotions in the form of receiving or giving monetary contributions to drilling of wells, for seismograph surveys, soil test and studies, and other contracts and agreements necessary and proper for the exploration, development, production and operation of the joint leases; it being understood that should any Non-Operator have, previous to the letting of any such contract, elected because of non-participation in any program or proposal hereunder to assign to other parties hereto under any provision of this Agreement its interests in a lease or leases or portion thereof covered or affected by any such test promotion, seismic, soil test or other contract, it shall not be liable for any costs of such contract for work on or allocable to such lease or leases or portions thereof which it has elected to assign. Operator shall sign, execute or approve all such contracts and agreements. Farmout and farmin agreements for the joint account shall only be made with the agreement of all parties and all parties then owning an intrest in a particular joint lease shall have the opportunity to participate proportionately in the acquisition by any other party hereto of any leasehold interest contiguous to such joint lease.

VII.

## COSTS AND EXPENSES

7.1  Operator shall advance and pay all costs and
expenses incurred in the exploration, development, pro-
duction and operation of the lease or leases for the
joint account.  All charges to the joint account assessed
to Non-Operators shall be made to Non-Operators in
accordance with the provisions of the Schedule of Account-
ing Procedure attached hereto, marked Exhibit "B" and
made a part hereof.  In the event of any conflict between
the provisions of said Exhibit "B" and this contract,
the latter shall be controlling.

7.2  If the monthly statement provided in Exhibit
"B" and furnished to Non-Operators reflects any amount to
be due to Non-Operators, Operator shall accompany such
statement with its check or draft for the amount thereof.
If payment of such amount does not accompany such state-
ment, the unpaid balance shall bear interest at the rate
of 10% per annum from the date such payment is due until
paid.  If such statement reflects an amount to be due
to Operator, Non-Operators shall pay said amount within
thirty (30) days after receipt of said statement, and,
if payment is not made within said period, the unpaid
balance shall bear interest at the rate of 10% per
annum from the date such payment was due until paid.
The receipt by Non-Operators of such statement and pay-
ment thereof shall not prejudice the right of Non-Operators
to protest the correctness of charges, provided, however,
that unless same is protested in writing within two (2)
years after the close of the calendar year covered by

such statement, the same shall for all purposes be
considered correct, conclusive and binding.


7.3  At its option Operator may make a monthly advance
estimate of costs to be incurred in operations hereunder
and bill Non-Operators therefor.  Such advance estimate
shall be submitted to Non-Operators between the 15th and
25th day of the preceding month and shall be itemized in
the manner set forth in Article I, Section 2 of Exhibit
"B."  Non-Operators shall advance their proportionate
share thereof within 15 days of receipt of the advance
estimate.  At the end of each monthly period the necessary
adjustment of actual costs will be made in the monthly
billing provided for in Exhibit "B."  If payment is not
made as provided for herein, the unpaid balance shall
bear interest at the rate of 10% per annum from such date
until paid.


## VIII.

RENTALS AND ROYALTIES

8.1  Operator shall, for and on behalf of the parties
to this Agreement, pay or cause to be paid monthly to the
proper agency of the Federal Government all rentals,
shut-in gas well royalties, minimum royalties, royalties,
or other amounts and charges which may be or become payable
under the provisions of the lease or leases subject to
this Agreement, and shall charge to Non-Operators the
amount thereof applicable to Non-Operators' interests.
When any Non-Operator is receiving in kind its propor-
tionate share of production, then it shall advise Operator
in writing on or before the 10th day of the month follow-
ing that in which the same is sold or used off the premises

the amount so used and the price received therefor.

In the event any party hereto, including Operator, does not desire to maintain any lease in effect as to all or any portion of the acreage covered thereby and for that reason does not desire to pay the rentals, shut-in gas well royalties, minimum royalties, or similar sums which may be due and payable thereon, it shall notify the other parties hereto to this effect at least sixty (60) days before such payment shall become due and upon receipt of such notice, such other parties shall have the right within thirty (30) days to require the party not desiring to make payment to assign said lease to them in the pro-portions their respective interests bear to one another insofar as the same affects the acreage not desired to be maintained, without warranty and without payment of any cash; and thereafter the ownership of said lease and the pertinent provisions of this instrument shall be corrected accordingly. Upon such assignment, the assignor shall be relieved of future obligations, but not of any liability accrued prior to the date of such assignment.

8.2  It is agreed that while Operator shall use reason-able care in endeavoring to make proper payment of the rentals, shut-in gas well royalties, minimum royalties, or similar sums which may become due and payable under the provisions of the lease covered by this Agreement, Operator shall incur no liability to the other parties hereto should it fail to timely make payment.

IX.

TAXES

9.1  Operator agrees to advance and pay, on behalf

of all parties hereto, all taxes, either State or Federal
(except income, franchise, capital stock or other general
or corporate taxes) on said lease or leases for which each
party hereto may be liable and which may be legally
assessed against production (as to the interest of each
of said parties) whether in the form of a severance or
production tax or otherwise, and also agrees to render
for assessment (when necessary to do so) and pay all
taxes which may be legally assessed against the leasehold
interest, oil, and gas, personal property and equipment,
and all taxes so paid shall be included in the charges
to the joint account.

## X.

INSURANCE

    10.1  Operator agrees to carry and keep in force the
following insurance coverage for protection of the joint
interests, and shall charge premiums for same to the Joint
Account:

      (a)  Workmen's Compensation and Employer's Liability
          Insurance which shall comply with the laws of all
          states in which operations are conducted, with
          limits of $1,000,000.00 on Employers' Liability.
          This insurance shall also include protection for
          liability under the Federal Longshoremen's and
          Harbor Workers' Compensation Act as amended,
          including protection with respect to the extension
          of this act under the Outer Continental Shelf
          Lands Act.  Coverage for liability under the Jones
          Act, Death on the High Seas Act, and the General
          Maritime Law shall be included.  Coverage shall
          be amended to provide that a claim "in rem" shall

Coverage shall provide protection against liability
of employer to provide Transportation, Wages,
Maintenance and Cure to any maritime employees.
Provided, however, Operator may be a self-insurer
for liability under said compensation laws, in
which event the only charge that shall be made to
the Joint Account shall be an amount equivalent
to the premiums which would have been paid had
such insurance been obtained.

(b)   Comprehensive General Public Liability Insurance
with limits of $100,000.00 per person and
$300,000.00 per occurrence for death and bodily
injury, and $100,000.00 for property damage, with
coverage to extend to all premises, operations,
independent contractors, completed operations
and contractual liability.  Coverage shall also
include watercraft, the "in rem" endorsement, and
the territorial limits shall be extended to
include the Gulf of Mexico.  Personal injury
liability shall be included and the coverage
shall be extended by endorsement to co-venturers.
Excess Umbrella Liability Insurance with limits
of $5,000,000.00 extended to co-venturers.

(c)   Automobile Public Liability Insurance in the
amount of $100,000.00 for any one person injured
in any one accident and $300,000.00 for more than
one person injured in any one accident;  and
$100,000.00 property damage per accident.

(d)  Liability coverage for accidental and sudden (excluding cleanup) seepage and pollution with limits of $5,000,000.00 extended to co-venturers.

(e)  Operator shall require contractors and subcontractors performing work for the Joint Account to provide such insurance as deemed necessary by Operator in relation to the work to be performed by said contractors or subcontractors.

10.2  Liability, except that covered by insurance, against any of the parties hereto for damages to property of third persons or injury to or death of third persons arising out of the joint operations, including expenses incurred in defending claims or actions asserting liability of this character, shall be borne separately and individually, and not in solido, by the parties hereto in proportion to their respective undivided interests in the joint operation.  Any party hereto individually may acquire such additional insurance as it desires to protect itself against any liability not covered by insurance required at its own cost.  All insurance purchased individually by a party to this Agreement shall contain a waiver by the insurance company of all rights of subrogation in favor of the parties to this Agreement.

10.3  Fire, windstorm, tornado, explosion, vandalism, malicious mischief, or other extended perils insurance will not be carried by Operator to protect the joint interests.  Therefore, the account of the parties shall be charged with all expenditures incurred as a result of fire, windstorm, tornado, explosion, vandalism, malicious

other casualties for which insurance is
not required hereunder. Each party hereto hereby releases
Operator from all claims for loss by or damage to, such
party arising out of, in connection with, or as an incident
to, any act or omission, including negligence, of Operator
or its employees, agents or contractors, in acquiring,
operating or maintaining the Joint Account; provided this
release shall not apply to Operator's pro-rata share of the
cost and expenses as otherwise provided in this Agreement.
The obligations of each party under this Agreement are
separate and individual, and not in solido, with any other
party hereto.

10.4 Operator shall promptly notify Non-Operators
of any loss, damage or claim not covered by insurance
carried by Operator for the Joint Account.

XI.

RIGHT TO TAKE PRODUCTION IN KIND

11.1 Each party shall take in kind or separately
dispose of its proportionate share of all oil and gas pro-
duced from the Joint Leases, exclusive of production which
may be used in development and producing operations and
in preparing and treating oil for marketing purposes and
production unavoidably lost. Each party shall pay or
deliver, or cause to be paid or delivered, all overriding
royalties, or other payments due on its share of such produc-
tion, except lessor's royalties, and shall hold the other parties
free from any liability therefor. Any extra expenditure
incurred in the taking in kind or separate disposition
by any party of its proportionate share of the production
shall be borne by such party.

and contracts of sale pertaining to its interest in pro-
duction from the Joint Leases, and shall be entitled to
receive payment direct from the purchaser or purchasers
thereof for its share of all production.

11.3   In the event any party shall fail to make the
arrangements necessary to take in kind or separately
dispose of its proportionate share of the oil and gas pro-
duced from the Joint Leases, Operator shall have the right,
subject to revocation at will by the party owning it,
but not the obligation, to purchase such oil and gas
or sell it to others for the time being, at not less than
the market price prevailing in the area, which shall in
no event be less than the price which Operator receives
for its portion of the oil and gas produced from the
Joint Leases.  Any such purchase or sale by Operator shall
be subject always to the right of the owner of the pro-
duction to exercise at any time its right to take in kind,
or separately dispose of, its share of all oil and gas
not previously delivered to a purchaser.  Notwithstand-
ing the foregoing, Operator shall not make a sale into
interstate commerce of any other party's share of gas
production without first giving such other party sixty
(60) days notice of such intended sale.

XII.

LIEN

12.1   Each party shall have and is hereby given a first
and prior lien on the interests of the other parties in
the joint leases, and the equipment thereon, and all pro-
ceeds thereof, as security for the payment of any amount

due by such parties to such party hereto.   Each party agrees and obligates itself at any time when it is in arrears in payment to any other party or parties hereto, but only in such event, to execute from time to time as requested by such other party or parties to whom it may be indebted, preference and priority over any third party or parties for the payment of any kind and all amounts then due and owing under the terms of this Agreement.   Without limitation of the foregoing, any party hereto shall have the right to bring and maintain any actions at law or in equity against a defaulting party or parties to enforce collection of such indebtedness due it, either with or without fore- closure of such lien.   In addition, upon default by any party in the payment to Operator of costs or lease burdens chargeable to such defaulting party, Operator shall have the right to collect and receive directly from the purchaser or purchasers thereof the proceeds of such party's share of production up to the amount owing by such party plus interest at the rate of ten percent (10%) per annum from the due date until all sums hereunder are paid in full;   and each and all purchasers of production shall be entitled to rely upon Operator's statements concerning the existence and amounts of any such default or defaults without necessity of indemnifica- tion or bond of Operator or receipt or notice of receipt by Operator of an appropriate Transfer Order covering such interest in production.

## XIII.

RIGHTS OF NON-OPERATORS - LOGS AND OTHER INFORMATION

13.1  Non-Operators, shall have the following specific rights and privileges:

(A)  Access to the leased premises, at their own cost
and risk, at all reasonable times to inspect the
work or development and operations thereon.

(B)  Upon due notice the right to inspect in a desig-
nated office of Operator logs, samples, cuttings
and other data from any and all wells drilled
hereunder.

(C)  Operator shall make available to Non-Operators
at the office of Florida Gas in New Orleans,
Louisiana, by phone or letter daily drilling
reports on all joint account drilling wells
hereunder.

(D)  The right to inspect and audit, at all reason-
able times, the books of Operator and its records
and invoices pertaining to the matter of account-
ing arising hereunder as provided in Exhibit "B."

(E)  Operator shall promptly notify Non-Operators
in writing of all claims which exceed $30,000
including, but not limited to, accidents or losses
covering property damage or personal injury result-
ing from operations on the Joint Area.  If any
claim is made against any Non-Operator due to
matters arising from operations hereunder and
over which it individually has no control because
of the rights given Operator hereunder, Non-
Operator shall immediately notify Operator and
such claim shall be treated as any other claim
involving operations hereunder.

(F)  Operator shall investigate, defend or settle all
uninsured claims.  Operator may settle any claim
under $300,000 without consulting Non-Operators,
provided the payment is in complete settlement
of the claim, and the amount required to settle
such claim shall be charged to the Joint Account.
Non-Operators, upon written request to Operator,
shall have the right to participate in the inves-
tigation, defense and settlement of such claims
which exceed $300,000.  Operator shall furnish
Non-Operators full information concerning any
good faith settlement offer received from
claimant covering claims which exceed $300,000,
and its recommendation as to settlement.
Within twenty (20) days, or such period as may
be set out in such offer, Operator shall be
notified by each Non-Operator whether or not
it is willing to accept such offer.  If a Non-
Operator fails to reply, it shall be con-
sidered unwilling to accept such offer.
The amount of settlement of any claim in ex-
cess of $300,000 may be charged to the Joint
Account if made by Operator with the consent
of all the Non-Operators.


13.2  Operator shall have the exclusive right, at its
sole discretion, to trade or exchange any or all logs and
other information and data acquired hereunder regarding
the joint lease or leases with third parties in return
for other logs, information and data, whether or not same
relate to the joint lease or leases; provided, copies of
all logs and other information traded or exchanged shall

be furnished to Non-Operators and copies of all logs,
information and data acquired by Operator by trade or
exchange shall be furnished Non-Operators for such use and
disposition as they desire, although not related to this
Agreement.  Operator shall also be free to make such use
and disposition, although not related to this Agreement,
of such logs, information and data.

XIV.

PREFERENTIAL RIGHT OF PURCHASE

    14.1  If any party to this Agreement shall de-
sire to sell any part of its interest in any portion
or all of any or all of the joint leases, all the other
then parties to this Agreement who then own an interest
in the joint lease or leases affected by the interest to
be sold shall have a preferential right to purchase such
interest.  The parties shown by the records of the
BLM to own such joint lease or leases shall be the parties
to whom notice shall be sent.  In any such event, the
party desiring to sell shall give written notice to
that effect to the party or parties having such preferen-
tial right, stating in the notice the price, terms and
conditions upon which the interest is offered for sale.
The party or parties having such preferential right shall
thereupon have an option for a period of thirty (30) days
after the receipt of such notice to elect to purchase
such interest at the price and on the terms and conditions
stated in the notice.  Such election shall be made by the
exercising party giving to the offering party written
notice of its election to purchase.  If such election is
made, such purchase shall be concluded within a reasonable
time, but in no event later than sixty (60) days after

receipt of the offer of sale. If more than one of the
other parties entitled to do so exercise the option to
purchase the interest affected by such offer, then each of
such other parties shall be entitled to participate in the
purchase as to each part of the property to be sold in the
same proportion that its interest in such part bears to
the aggregate of the interests in such part of all parties
participating in such purchase, or in such other propor-
tions as such other parties may agree upon. If none of the
parties hereto exercise the option, the party desiring
to sell shall be at liberty to effect a sale of the
entire interest then being offered (but not less than the
entire interest) at any time not later than ninety (90)
days after the end of the option period to any purchaser
who is not a party hereto, at a price not less than and
on terms no more favorable to the purchaser than the price
and terms stated in the aforementioned notice; and if such
sale is made, the preferential rights to purchase shall
continue as to the interest of any purchaser. If the
interest is not so sold within such ninety (90) day period,
then the provisions hereinabove shall apply, in the event
of a subsequent offer to sell such interest, as though
such interest had never been offered for sale.

14.2   The provisions of this Article shall not, however,
apply to

(A)   Any mortgage or mortgages (including assignments
of production executed as further security for the
debt secured by any such mortgage) by a party hereto
of its interest or any portion thereof in the joint
leases, or any judicial, trustee's or other sales
to foreclose the same;

any transfer or disposition of the interest of the party hereto by corporate merger or consolidation or by any sale or sales of substantially all of its oil and gas properties; or

(C) Any sale, merger, consolidation or other transfer by a party hereto of any part of its interest to or with any "affiliate" (as such term is defined in Regulation C, issued under the Securities Act of 1933).

(D) The first sales, transfers, or other dispositions by Florida Gas of portions of its interest in all the joint leases, so long as the total interests so sold, transferred, or otherwise disposed of do not exceed one-quarter of 33-1/3% interest in all the joint leases.

Any assignment under this provision shall be effective upon approval of the lessor or at such earlier date as agreed to by the lessor.

### XV.

NEGATION OF PARTNERSHIP:

15.1  It is not the intention of this Agreement to create the relationship of partnership between the parties. No act done by any party pursuant to the provisions hereof shall operate to create such relationship, nor shall the provisions of this Agreement be construed as creating such relationship.  Each party shall be responsible only for its obligation as herein set forth and shall be liable only for its proportionate part of the costs, expenses

saving and marketing the oil and gas from the joint leases.

## XVI.

## SURRENDER, EXPIRATION, ABANDONMENT OR RELEASE OF LEASE

16.1  No lease covered hereby shall be surrendered,
let to expire, abandoned, or released, in whole or in part,
unless the parties hereto mutually consent thereto in
writing.  In the event less than all parties hereto should
elect to surrender, let expire, abandon or release all
or any part of any lease or leases covered hereby and the
other party or parties do not consent or agree thereto,
the party or parties so electing shall notify the other
party or parties not less than sixty (60) days in advance
of such surrender, expiration, abandonment or release,
and if requested so to do by the party or parties not so
electing, immediately shall assign without warranty to
the latter party or parties in the proportions their
respective interests bear to one another in the interest
assigned, all its or their right, title and interest in
and to said lease or leases or portions thereof, the
platforms, facilities, well or wells located thereon and
the casing and other physical equipment in or on said well
or wells.  If the party or parties not so electing fail
to request such assignment within said period of sixty
(60) days, the party or parties so electing shall have the
right to surrender, let expire, abandon or release said
lease or leases or any part thereof.  In the event such
assignment is so requested, the party or parties to whom
such assignment is made, upon the delivery thereof, shall
pay to the assigning party or parties the salvage value
of its interest in all of the savable platforms, facilities,

lease acreage, said value to be determined in accordance
with the provisions of the Accounting Procedure attached
hereto as Exhibit "B". After delivery of any such assign-
ment, the party or parties making the assignment shall be
released from and discharged of all the duties and obliga-
tions thereafter accruing or arising hereunder in connection
with the operation and development of the lease acreage
with respect to the assigned lease or leases or portions
thereof.


## XVII.

## PARTIES TO WHOM CONTRACT APPLIES

17.1  This Agreement shall extend to and be binding
upon the parties hereto and their respective successors
and assigns.  Should any party change its name or merge
with another corporation, such merger or change in cor-
porate name shall not affect any of its rights hereunder.
In any assignment or transfer of any lease or leases
subject hereto, or interest therein, the assignment or
transfer shall specifically recognize this Agreement and
the assignee or transferee shall in such instrument agree
to be bound by all the provisions hereof.


## XVIII.

## ELECTION AS TO TAXES

18.1  Each party hereto hereby elects to be excluded
from the application of Subchapter K of Chapter 1 of Sub-
title A of the Internal Revenue Code of 1954, and Subpart
D of Part II of Chapter 1 of Title 47, Louisiana Revised
Statutes of 1950, as amended, insofar as such Subchapter
or Subpart or any portion or portions thereof may be

applicable to the parties with respect to the operations
covered by this Agreement. Operator is hereby authorized
and directed to execute on behalf of each of the parties
hereto such additional or further evidence of said election
as may be required by regulations issued by the Federal
Internal Revenue Service or Collector of Revenue of the
State of Louisiana or, should said regulations require
each party to execute such further evidence, each party
agrees to execute such evidence or to join in the execu-
tion thereof.


XIX.

ADJUSTMENT FOR LOSS

19.1 Any liens, mortgages and other encumbrances,
or any overriding royalties, carried or net profit working
interest, or any similar payments chargeable against any
interest in the leaseholds subject hereto, shall be wholly
withstood and suffered by the party hereto who created
or is responsible for such obligation. Also, all assign-
ments of leases or portions thereof by a party or parties
hereto to another party or parties hereto pursuant to
provisions in Articles III, VI, VIII, and XVI hereof shall
be free and clear of all such encumbrances and payments
aforesaid on and chargeable against the interests reassigned.


XX.

FORCE MAJEURE

20.1 In the event of any party hereto being rendered
unable wholly or in part, by force majeure to carry out
its obligations under this contract, other than the obli-
gation to make payment of amounts due hereunder, it is

party giving the notice and reasonably full particulars of such force majeure in writing or by telegraph to the other parties hereto within a reasonable time after the occurrence of the cause relied upon, then the obligations of the party giving the notice, so far as they are affected by force majeure, shall be suspended during the continuance of any inability so caused, but for no longer period; and the cause of the force majeure shall, so far as possible, be remedied with all reasonable dispatch.

20.2  The term "force majeure" as employed herein shall mean acts of God, strikes, lockouts or other industrial disturbances, acts of the public enemy, wars, blockades, insurrections, riots, epidemic, lightning, earthquakes, fires, storms, floods, washouts, arrests and restraints of government and people, civil disturbances, explosions, breakage or accident to machinery or lines of pipe, freezing of wells or lines of pipe, partial or entire failure of natural gas wells or any other causes, whether of the kind herein enumerated or otherwise, not reasonably within the control of the party claiming suspension.  The term shall likewise include (1) in those instances where any party hereto is required to obtain right of way grants, permits or licenses to enable it to fulfill its obligations here-under, the inability of the party to acquire or the delay on the part of the party in acquiring, at reasonable cost and after the exercise of reasonable diligence, the rights of way grants, permits or licenses; and (2) in those in-stances for the purposes of constructing or maintaining facilities to enable the party to fulfill its obligations hereunder, the inability of the party to acquire, or the

delays on the part of the party in acquiring, at reasonable
cost and after the execise of reasonable diligence, the
materials and supplies required for such construction or
maintenance, and the inability of the party to secure, or
the delays in securing, after the exercise of reasonable
diligence, permission from any governmental agency to use
materials and supplies which the party may have in its
possession.

20.3 It is understood and agreed that the settlement
of strikes and lockouts shall be entirely within the dis-
cretion of the party having the difficulty, and that the
above mentioned requirement that any force majeure shall
be remedied with all reasonable dispatch shall not require
the settlement of strikes or lockouts by acceding to the
demands of opposing party when such course is inadvisable
in the discretion of the party having the difficulty.

XXI.

LAWS AND REGULATIONS

21.1  All the terms and provisions of this Agreement
are hereby expressly made subject to all Federal and State
laws and to all orders, rules and regulations of any duly
constituted authority having jurisdiction in the premises
and no party hereto shall suffer a forteiture and be liable

in damages for failure to comply with any of the provisions

of this Agreement if such compliance is prevented by or
if such failure results from compliance with any such law,
order, rule or regulation.

21.2  This Agreement shall be deemed to have been exe-
cuted and delivered in the State of Louisiana, and the
construction of the terms and provisions hereof shall be
governed by the laws of such state.

XXII.

NON-DISCRIMINATION CLAUSE

22.1  In connection with the performance of work under
this Agreement, the parties hereto (herein referred to
as "Contractors" in this Article XXII) agree as follows:

(A)  Contractors will not discriminate against any
employee or applicant for employment because of
race, religion, color, sex, or national origin.
Contractors will take affirmative action to
ensure that applicants are employed, and that
employees are treated during employment, without
regard to their race, religion, color, sex, or
national origin.  Such action shall include, but
not be limited to, the following:  employment,
upgrading, demotion, or transfer; recruitment
or recruitment advertising; layoff or termination;
rates of pay or other forms of compensation; and
selection for training, including apprenticeship.
Contractors agree to post in conspicuous place,
available to employees and applicants for em-
ployment, notices to be provided by the contract-
ing officer setting forth the provisions of this
nondiscrimination clause.

tisements for employees placed by or on behalf
of the Contractors, state that all qualified
applicants will receive consideration for employ-
ment without regard to race, religion, color,
sex, or national origin.

(C)    Contractors will send to each labor union or
representative of workers with which they have
a collective bargaining agreement or other contract
or understanding, a notice to be provided by the
agency contracting officer, advising the labor
union or workers' representative of the Con-
tractors' commitments under Section 202 of the
Executive Order 11246 of September 24, 1965, and
shall post copies of the notice in conspicuous
places available to employees and applicants for
employment.

(D)    Contractors will comply with all provisions of
Executive Order 11246 of September 24, 1965,
and of the rules, regulations, and relevant
orders of the Secretary of Labor.

(E)    Contractors will furnish all information and
reports required by Executive Order 11246 of
September 24, 1965, and by the rules, regulations,
and orders of the Secretary of Labor, or pursuant
thereto, and will permit access to their books,
records, and accounts by the contracting agency
and the Secretary of Labor for the purposes of
investigation to ascertain compliance with such

In the event of the Contractors' noncompliance with the nondiscrimination clauses of this contract or with any of such rules, regulations, or orders, this contract may be cancelled, terminated, or suspended in whole or in part, and the Contractors may be declared ineligible for further Government contracts in accordance with procedures authorized in Executive Order 11246 of September 24, 1965, and such other sanctions may be imposed and remedies invoked as provided in Executive Order 11246 of September 24, 1965, or by rule, regulation, or order of the Secretary of Labor, or as otherwise provided by law.

(G) Contractors will include the provisions of Paragraphs (A) through (H) in every subcontract or purchase order unless exempted by rules, regulations, or orders of the Secretary of Labor issued pursuant to Section 204 of Executive Order 11246 of September 24, 1965, so that such provisions will be binding upon each subcontractor or vendor. They will take such action with respect to any subcontract or purchase order as the contracting agency may direct as a means of enforcing such provisions including sanctions for noncompliance: provided, however, that in the event the Contractors become involved in, or are threatened with litigation with a subcontractor or vendor as a result of such direction by the contracting agency, the Contractors may request the United States to enter into such litigation to protect the interests of the United States.

(H)  Contractors are aware of and are fully cognizant
of Contractors' responsibilities under Executive
Order 11598 which provides for the listing of
job vacancies by federal contractors and subcon-
tractors.  Contractors agree to the following
provisions:

(1)  As provided by 41 CFR 50-250, Contractors
agree that all employment openings of the
Contractors which exist at the time of the
execution of this agreement and those which
occur during the performance of this agree-
ment including those not generated by the
agreement and including those occurring at
an establishment of the Contractors other
than the one wherein the agreement is being
performed but excluding those of independently
operated corporate affiliates, shall, to the
maximum extent feasible, be offered for list-
ing at an appropriate local office of the
State employment service system wherein the
opening occurs and to provide such periodic
reports to such local office regarding
employment openings and hires as may be
required: Provided, that this provision shall
not apply to openings which the Contractors
fill from within the Contractors' organizations
or are filled pursuant to a customary and
traditional employer-union hiring arrangement
and that the listing of employment openings
shall involve only the normal obligations
which attach to the placing of job orders.

(b) Contractors agree further to place the above provision in any subcontract directly under this agreement covered by 41 CFR 50-250. Contractors acknowledge that they may be required to file Standard Form 100 (EEO-1) promulgated jointly by the Office of Federal Contract Compliance, the Equal Employment Opportunity Commission, and Plans for Progress with Joint Reporting Committee, Federal Depot, Jeffersonville, Indiana, within thirty (30) days of the date of contract award if such report has not been filed for the current year and otherwise comply with or file such other compliance reports as may be required under Executive Order 11246, as amended. Contractors further acknowledge that they may be required to develop a written affirmative action compliance program as required by the Rules and Regulations approved by the Secretary of Labor under authority of Executive Order 11246 and supply the other parties hereto with a copy of such program if such parties so request.

The provisions hereof are subject to the exemptions, qualifications and limitations contained in and which Contractors may claim under 41 CFR Chapter 60, and such provisions are qualified to the extent and so that the Contractors shall have the full benefit thereof. The terms used herein shall have the meanings specified in 41 CFR Section 1 - 12.802.

Each party hereto simultaneously herewith
delivers to the other its Certificate of
Non-Segregated Facilities Agreement.

## XXIII.

### NON-COMPLIANCE WITH NON-DISCRIMINATION CLAUSE

23.1  Should any party hereto fail to comply with any
provisions of Article XXII hereof or of any provisions of
the Equal Opportunity Clause of the joint lease or leases
or the orders, rules and regulations referred to therein,
and cancellation or suspension of any joint lease or leases
are threatened because of alleged non-compliance by such
party, or such party is declared ineligible for Federal
Government contracts or leases by reason of such non-
compliance, or for any other cause, then such party shall
so advise the other parties hereto and shall execute and
deliver to the other parties hereto, without warranty, an
assignment of all of its interest in any and all joint lease
or leases subject hereto, and all wells, installations and
facilities thereon, and the other parties hereto shall pay
to such party for such assignment such party's unamortized
investment in all such leases and the wells, installations
and facilities thereon, being the total investment of such
party in such properties, including all operating costs
paid theretofore by such party, less the total revenues
theretofore derived by such party from said properties.

## XXIV.

### NOTICES

24.1  All notices, reports, statements and any and
all other information required to be given or furnished
to Operator and to Non-Operators, shall, unless otherwise

provided herein, be in writing and mailed to the follow-

ing addresses of said parties:

Shell Oil Company
P. O. Box 60193
New Orleans, Louisiana 70160
Attention: Mr. John C. Marshall

Florida Gas Exploration Company
Room 1750, 1010 Common Street,
New Orleans, Louisiana 70112
Attention: Mr. Donald I. Andrews

The Royal Gorge Company
2300 First National Bank Building
Dallas, Texas 75202
Attention: Mr. L. R. Spence

Kirby Petroleum Co.
P. O. Box 1745
Houston, Texas 77001
Attention: Mr. Warren F. Johnson

American Independent Oil Company
50 Rockefeller Plaza
New York, New York 10020
Attention: Mr. George W. Dawson

Sabine Exploration Corporation
2627 Tenneco Building
Houston, Texas
Attention: Mr. W. P. Goodson

Drillamex, Inc.
c/o American Express Company
65 Broadway
New York, New York 10006
Attention:  Mr. Richard F. Blanchard

Except where actual receipt of notice or copy thereof is

required herein, any notice or copy thereof given under

the provisions of this Agreement shall be deemed fully

served or rendered seventy-two (72) hours after the mail-

ing thereof by prepaid, First Class, United States mail,

or six (6) hours after the delivery thereof to a licensed

telegraph company for immediate transaction by standard

telegram or when actually received by the appropriate

party, whichever is earlier.

24.2  The parties may change their addresses, but no
change of address shall become effective until written
notice of such change shall have been given by the party
desiring its address changed and same has been received
by the other party.

24.3  Notwithstanding the foregoing, at Operator's
election all information, notices, reports and plans of
exploration and development, modifications, supplements
and terminations thereof, and other notices required to
be given by Operator under this Agreement (except bill-
ings to Non-Operators under Exhibit B hereof) may from
time to time be given and furnished by Operator only
to Florida Gas at the above address, who in such event
shall transmit such notices, information, reports and
plans to the remaining Non-Operators for their decisions,
elections, or information, as called for.  Non-Operators
in such event shall transmit their decisions, elections
or other action called for to Florida Gas at its above
address who shall in turn transmit same to Operator.
In such event, in any case where times and periods are
specified in this Agreement for the giving of notice,
the making of elections, or other appropriate action,
such times and periods shall be increased by forty-eight
(48) hours.

XXV.

TERM

25.1  This Agreement shall continue in force and effect
so long as Shell and any other party or parties hereto
continue to hold an undivided interest in any joint lease,

and for the additional time during which salvage or removal
operations of all structures, materials, equipment, supplies,
and property owned by the parties for operations hereunder,
or debris therefrom, are conducted, same are disposed of
and a final settlement by the parties shall have been made
on the basis of their proportionate ownership hereunder.

XXVI.

EFFECT OF AGREEMENT

26.1 The terms, covenants and conditions of this Agree-
ment shall be binding upon, and shall inure to the benefit
of, the parties hereto and their respective successors and
assigns; and said terms, covenants and conditions shall
be covenants running with the leasehold estates covered
hereby and with each transfer or assignment of said lands
or leasehold estates.

WITNESS THE EXECUTION HEREOF in multiple originals
as of the 29th day of September, 1972.

WITNESSES:

SHELL OIL COMPANY

By _____
   Attorney-In-Fact

FLORIDA GAS EXPLORATION COMPANY

By _____
   President

DRILLAMEX, INC.

By _____
   Vice President

SABINE EXPLORATION CORPORATION

KIRBY PETROLEUM CO.

By _____
           *Vice President*

THE ROYAL GORGE COMPANY

By _____
           Vice President

AMERICAN INDEPENDENT OIL COMPANY

By _____
           Vice President

On this __4th__ day of October, 1972, before me appeared

__D. K. Galtney__ to me personally known, who, being by me

duly sworn, did say that he is the __Attorney-In-Fact__ of SHELL

OIL COMPANY, and that the foregoing instrument was signed in behalf

of said corporation by authority of its Board of Directors, and said

Appearer acknowledged said instrument to be the free act and deed of

said corporation.

_____
NOTARY PUBLIC

JAMES A. MUNDIE, JR.
Notary Public, Parish of Jefferson, State of La.
My Commission is issued for life.


STATE OF LOUISIANA

PARISH OF JEFFERSON

On this __4th__ day of October, 1972, before me appeared

__W. J. Bowen__ to me personally known, who, being by me

duly sworn, did say that he is the __President__ of FLORIDA

GAS EXPLORATION COMPANY, and that the foregoing instrument was signed

in behalf of said corporation by authority of its Board of Directors,

and said Appearer acknowledged said instrument to be the free act and

deed of said corporation.

_____
NOTARY PUBLIC

JAMES A. MUNDIE, JR.
Notary Public, Parish of Jefferson, State of La.
My Commission is issued for life.

STATE OF LOUISIANA
PARISH OF JEFFERSON

On this __4th__ day of October, 1972, before me appeared
__M. S. Simpson_____ to me personally known, who, being by me
duly sworn, did say that he is the ___Vice President_____ of DRILLAMEX,
INC., and that the foregoing instrument was signed in behalf of said
corporation by authority of its Board of Directors, and said Appearer
acknowledged said instrument to be the free act and deed of said
corporation.

_____
NOTARY PUBLIC

JAMES A. MUNDIE, JR.
Notary Public, Parish of Jefferson, State of La.
My Commission is issued for life.

STATE OF LOUISIANA
PARISH OF JEFFERSON

On this __4th__ day of October, 1972, before me appeared
__D. W. Johnston_____ to me personally known, who, being by me
duly sworn, did say that he is the ___Vice President_____ of SABINE
EXPLORATION CORPORATION, and that the foregoing instrument was signed in
behalf of said corporation by authority of its Board of Directors, and
said Appearer acknowledged said instrument to be the free act and deed
of said corporation.

_____
NOTARY PUBLIC

JAMES A. MUNDIE, JR.
Notary Public, Parish of Jefferson, State of La.
My Commission is issued for life.

STATE OF LOUISIANA
PARISH OF JEFFERSON

      On this ___4th___ day of October, 1972, before me appeared
_____John M. Parker_____ to me personally known, who, being by me
duly sworn, did say that he is the _____Vice President_____ of KIRBY
PETROLEUM CO., and that the foregoing instrument was signed in behalf
of said corporation by authority of its Board of Directors, and said
Appearer acknowledged said instrument to be the free act and deed of
said corporation.

                _____
                      NOTARY PUBLIC

                  JAMES A. MUNDIE, JR.
           Notary Public, Parish of Jefferson, State of La.
              My Commission is issued for life.

STATE OF LOUISIANA
PARISH OF JEFFERSON

      On this ___4th___ day of October, 1972, before me appeared
_____L. R. Spence_____ to me personally known, who, being by me
duly sworn, did say that he is the _____Vice President_____ of THE ROYAL
GORGE COMPANY, and that the foregoing instrument was signed in behalf
of said corporation by authority of its Board of Directors, and said
Appearer acknowledged said instrument to be the free act and deed of
said corporation.

                _____
                      NOTARY PUBLIC

                  JAMES A. MUNDIE, JR.
            Notary Public, Parish of Jefferson, State of La.
              My Commission is issued for life.

STATE OF LOUISIANA

PARISH OF JEFFERSON

On this ___4th___ day of October, 1972, before me appeared

___George W. Dawson___ to me personally known, who, being by me

duly sworn, did say that he is the ___Vice President___ of AMERICAN

INDEPENDENT OIL COMPANY, and that the foregoing instrument was signed in

behalf of said corporation by authority of its Board of Directors, and

said Appearer acknowledged said instrument to be the free act and deed

of said corporation.

NOTARY PUBLIC

JAMES A. MUNDIE, JR.
Notary Public, Parish of Jefferson, State of La.
My Commission is issued for life.

EXHIBIT "A"

Lease No. OCS G-2161, effective October 1, 1972, executed by
The United States of America, as Lessor, in favor of Shell Oil Company,
Florida Gas Exploration Company, Sabine Exploration Corporation,
Drillamex, Inc., Kirby Petroleum Co., The Royal Gorge Company, and
American Independent Oil Company, as Lessees, and covering all of Block
76, Grand Isle Area as shown on Official Leasing Map, Louisiana Map
No. 7.

Attached to and made a part of ........ Operating Agreement between ........
Shell Oil Company and Florida Gas Exploration Company, ........
et al, dated September , 1972. ........

# ACCOUNTING PROCEDURE
# JOINT OPERATIONS

## I. GENERAL PROVISIONS

### 1. Definitions

"Joint Account" shall mean the account showing the charges and credits accruing because of the Joint Operations and which are to be shared by the Parties.

"Joint Property" shall mean the real and personal property subject to the agreement to which this Accounting Procedure is attached.

"Joint Operations" shall mean all operations necessary or proper for the development, operation, protection and maintenance of the Joint Property.

"Operator" shall mean the party designated to conduct the Joint Operations.

"Non-Operators" shall mean the parties to this agreement other than the Operator.

"Parties" shall mean Operator and Non-Operators.

"Material" shall mean personal property, equipment or supplies acquired or held for use on the Joint Property.

"Controllable Material" shall be defined as set forth under the subparagraph selected below:

A. [ ] Material which at the time is so classified in the Material Classification Manual as most recently recommended by the Council of Petroleum Accountants Societies of North America.

B. [X] Material which is ordinarily so classified and controlled by Operator in the conduct of its operations. List shall be furnished Non-Operators upon request.

### 2. Statements and Billings

Operator shall bill Non-Operators on or before the last day of each month for their proportionate share of costs and expenses for the preceding month. Such bills will be accompanied by statements reflecting the total charges and credits as set forth under the subparagraph selected below:

A. [ ] Statement in detail of all charges and credits to the Joint Account.

B. [ ] Statement of all charges and credits to the Joint Account, summarized by appropriate classifications indicative of the nature thereof.

C. [X] Statement of all charges and credits to the Joint Account, summarized by appropriate classification indicative of the nature thereof, except that items of Controllable Material and unusual charges and credits shall be detailed.

### 3. Advances and Payments by Non-Operators

Unless otherwise provided for in the agreement, the Operator may require the Non-Operators to advance their share of estimated cash outlay for the succeeding month's operation. Operator shall adjust each monthly billing to reflect advances received from the Non-Operators.

Each Non-Operator shall pay its proportion of all bills within fifteen (15) days after receipt. If payment is not made within such time, the unpaid balance shall bear interest monthly at the rate of ten per cent (10%) per annum or the maximum contract rate permitted by the applicable usury laws in the state in which the Joint Property is located, whichever is the lesser.

### 4. Adjustments

Payment of any such bills shall not prejudice the right of any Non-Operator to protest or question the correctness thereof; provided however, all bills and statements rendered to Non-Operators by Operator during any calendar year shall conclusively be presumed to be true and correct after twenty-four (24) months following the end of any such calendar year, unless within the said twenty-four (24) month period a Non-Operator takes written exception thereto and makes claim on Operator for adjustment. No adjustment favorable to Operator shall be made unless it is made within the same prescribed period. The provisions of this paragraph shall not prevent adjustments resulting from a physical inventory of the Joint Property as provided for in Section VII.

### 5. Audits

A Non-Operator, upon notice in writing to Operator and all other Non-Operators, shall have the right to audit Operator's accounts and records relating to the accounting hereunder for any calendar year within the twenty-four (24) month period following the end of such calendar year; provided however, the making of an audit shall not extend the time for the taking of written exception to and the adjustments of accounts as provided for in Paragraph 4 of this Section I. Where there are two or more Non-Operators, the Non-Operators shall make every reasonable effort to conduct joint or simultaneous audits in a manner which will result in a minimum of inconvenience to the Operator. Operator shall bear no portion of the Non-Operators' audit cost incurred under this paragraph unless agreed to by the Operator.

Operator shall charge the Joint Account with the following items:

1. **Rentals and Royalties**

   Lease rentals and royalties paid by Operator for the Joint Operations.

2. **Labor**

   A. (1) Salaries and wages of Operator's employees directly employed on the Joint Property in the conduct of Joint Operations.

   (2) Salaries of first-level supervisors in the field if such charges are excluded from overhead rates in Option A of Section III.

   (3) Salaries and wages of technical employees temporarily assigned to and directly employed on the Joint Property if such charges are excluded from overhead rates in Option B of Section III.

   (4) Salaries and wages of technical employees either temporarily or permanently assigned to and directly employed in the operation of the Joint Property if such charges are excluded from overhead rates in Option C of Section III.

   B. Operator's cost of holiday, vacation, sickness and disability benefits and other customary allowances paid to the employees whose salaries and wages are chargeable to the Joint Account under Paragraph 2A of this Section II and Paragraph 1A of Section III; except that in the case of those employees only a pro rata portion of whose salaries and wages are chargeable to the Joint Account under Paragraph 1A of Section III, not more than the same pro rata portion of the benefits and allowances herein provided for shall be charged to the Joint Account. Cost under this Paragraph 2B may be charged on a "when and as paid basis" or by "percentage assessment" on the amount of salaries and wages chargeable to the Joint Account under Paragraph 2A of this Section II and Paragraph 1A of Section III. If percentage assessment is used, the rate shall be based on the Operator's cost experience.

   C. Expenditures or contributions made pursuant to assessments imposed by governmental authority which are applicable to Operator's labor cost of salaries and wages chargeable to the Joint Account under Paragraphs 2A and 2B of this Section II and Paragraph 1A of Section III.

   D. Reasonable personal expenses of those employees whose salaries and wages are chargeable to the Joint Account under Paragraph 2A of this Section II and for which expenses the employees are reimbursed under Operator's usual practice.

3. **Employee Benefits**

   Operator's current cost of established plans for employees' group life insurance, hospitalization, pension, retirement, stock purchase, thrift, bonus, and other benefit plans of a like nature, applicable to Operator's labor cost chargeable to the Joint Account under Paragraphs 2A and 2B of this Section II and Paragraph 1A of Section III shall be chargeable as indicated in the subparagraph selected below:

   A. [ ] Operator's actual cost.

   B. [X] Operator's actual cost not to exceed fifteen per cent (15%).

4. **Material**

   Material purchased or furnished by Operator for use on the Joint Property as provided under Section IV. So far as it is reasonably practical and consistent with efficient and economical operation, only such Material shall be purchased for or transferred to the Joint Property as may be required for immediate use; and the accumulation of surplus stocks shall be avoided.

5. **Transportation**

   Transportation of employees and Material necessary for the Joint Operations but subject to the following limitations:

   A. If Material is moved to the Joint Property from the Operator's warehouse or other properties, no charge shall be made to the Joint Account for a distance greater than the distance from the nearest reliable supply store, recognized barge terminal, or railway receiving point where like material is normally available, unless agreed to by Operator and Non-Operators.

   B. If surplus Material is moved to Operator's warehouse or other storage point, no charge shall be made to the Joint Account for a distance greater than the distance to the nearest reliable supply store, recognized barge terminal, or railway receiving point unless agreed to by Operators and Non-Operators. No charge shall be made to the Joint Account for moving Material to other properties belonging to Operator, unless agreed to by Operator and Non-Operators.

   C. In the application of Subparagraphs A and B above, there shall be no equalization of actual gross trucking costs of $100 or less.

6. **Services**

   A. The cost of contract services and utilities procured from outside sources other than services covered by Paragraph 8 of this Section II and Paragraph 1B of Section III. The cost of professional consultant services shall not be charged to the Joint Account unless agreed to by Operator and Non-Operators.

   B. Use and service of equipment and facilities furnished by Operator as provided in Paragraph 5 of Section IV.

7. **Damages and Losses to Joint Property**

   All costs or expenses necessary for the repair or replacement of Joint Property made necessary because of damages or losses incurred by fire, flood, storm, theft, accident, or other cause, except to the extent that the damage or loss could have been avoided through the exercise of reasonable diligence on the part of Operator. Operator shall furnish Non-Operators written notice of damages or losses incurred as soon as practicable after a report thereof has been received by Operator.

8. **Legal Expense**

   All costs and expenses of handling, investigating, and settling litigation or claims arising by reason of the Joint Operations or necessary to protect or recover the Joint Property, including, but not limited to, attorney's fees, court costs, cost of investigation or procuring evidence and amounts paid in settlement or satisfaction of any such litigation or claims; provided, (a) no charge shall be made for the services of Operator's legal staff or other regularly employed personnel (such services being considered to be Administrative Overhead under Section III)

In the event Joint Operations are conducted in a state in which Operator may act as self-insurer for Workmen's Compensation or Employer's Liability under the respective statutory provisions, Operator may, at its election, include the risk under its self-insurance program and in that event, Operator shall include a charge therefor on the following basis:

An amount equivalent to the premiums which would have been paid had such insurance been obtained.

## 11. Other Expenditures

Any other expenditure not covered or dealt with in the foregoing provisions of this Section II, or in Section III, and which is incurred by the Operator for the necessary and proper conduct of the Joint Operations.

## III. INDIRECT CHARGES

Operator may charge the Joint Account for indirect costs either by use of an allocation of district expense items plus the rate for administrative overhead, and plus the warehousing charges, all as provided for in Paragraph 1 of this Section III or by combining all three of said items under the rates provided for in Paragraph 2 or 3 of this Section III, as indicated next below:

### OPERATOR SHALL CHARGE INDIRECT COSTS TO THE JOINT ACCOUNT UNDER THE TERMS OF:

[ ] Paragraph 1. (District Expense, Administrative Overhead and Warehousing)
[ ] Paragraph 2. (Combined Rates – Well Basis)
[X] Paragraph 3. (Combined Rates – Percentage Basis)

The cost and expense of services from outside sources in connection with matters of taxation, traffic, accounting or matters before or involving governmental agencies shall be considered as included in the overhead rates provided for in the above selected Paragraph of this Section III unless such cost and expense are agreed to by Operator and Non-Operators as a direct charge to the Joint Account.

### THE OVERHEAD RATES PROVIDED FOR IN ANY OF THE PARAGRAPHS SELECTED ABOVE

A. [ ] shall [X] shall not include salaries and related expenses of first-level supervisors in the field.
B. [X] shall [ ] shall not include salaries, wages and personal expenses of technical employees temporarily assigned to and directly employed on the Joint Property.
C. [X] shall [ ] shall not include salaries, wages and personal expenses of technical employees either temporarily or permanently assigned to and directly employed in the operation of the Joint Property.

## 1. District Expense, Administrative Overhead and Warehousing

### A. District Expense

Operator shall charge the Joint Account with a pro rata portion of the salaries, wages and expenses of Operator's production superintendent and other employees serving the Joint Property and other properties of the Operator in the same operating area, whose time is not allocated directly to the properties, and a pro rata portion of the cost of maintaining and operating a production office known as Operator's ........................... ............................................................ office located at or near ............................ (or a comparable office if location changed); and necessary sub-offices (if any), maintained for the convenience of the above-described office, and all necessary camps, including housing facilities for employees if required, used in connection with the operations of the Joint Property and other properties in the same operating area. The expense of, less any revenue from, such facilities may, at the option of Operator, include depreciation of investment or a fair monthly rental in lieu of depreciation. Such charges shall be apportioned to all properties served on some equitable basis consistent with Operator's accounting practice.

### B. Administrative Overhead

Operator shall charge administrative overhead to the Joint Account at the following rates, which charge shall be in lieu of the cost and expense of all offices of the Operator not covered by Paragraph 1A of this Section III, including salaries, wages and expenses of personnel assigned to such offices. Such charge shall be in addition to the salaries, wages and expenses of employees of Operator authorized to be charged direct as provided in Paragraphs 2 and 8 of Section II. Such charge shall be made on the basis indicated below, either (1) well basis or (2) percentage basis, at the rates shown thereunder.

(1) [ ] Well Basis

#### RATE PER WELL PER MONTH

| Well Depth | DRILLING WELL RATE (Use Total Depth) Each Well | PRODUCING WELL RATE (Use Current Producing Depth) First Five | Next Five | All Wells Over Ten |
|---|---|---|---|---|
| ---------------- | ---------------- | ---------------- | ---------------- | ---------------- |
| ---------------- | ---------------- | ---------------- | ---------------- | ---------------- |
| ---------------- | ---------------- | ---------------- | ---------------- | ---------------- |
| ---------------- | ---------------- | ---------------- | ---------------- | ---------------- |

(2) [ ] Percentage Basis

#### PERCENTAGE BASIS

Development:

............... Percent ( %) of the cost of development of the Joint Property exclusive of costs pro-

**2. Combined Rates - Well Basis**

Operator shall charge the Joint Account for the services covered by Paragraph 1 of this Section III on the basis indicated below:

### RATE PER WELL PER MONTH

| Well Depth | DRILLING WELL RATE (Use Total Depth) Each Well | PRODUCING WELL RATE (Use Current Producing Depth) | | |
| | | First Five | Next Five | All Wells Over Ten |
|---|---|---|---|---|
| ............... | ............... | ............... | ............... | ............... |
| ............... | ............... | ............... | ............... | ............... |
| ............... | ............... | ............... | ............... | ............... |
| ............... | ............... | ............... | ............... | ............... |

**3. Combined Rates - Percentage Basis**

Operator shall charge the Joint Account for the services covered by Paragraph 1 of this Section III on the basis indicated below:

### PERCENTAGE BASIS

A. Development:

 Ten  Percent ( 10 %) of the cost of development of the Joint Property exclusive of costs provided under Paragraph 8 of Section II and all salvage credits.

B. Operating:

 Ten  Percent (10 %) of the cost of operating the Joint Property exclusive of costs provided under Paragraphs 1 and 8 of Section II, all salvage credits, the value of injected substances purchased for secondary recovery and all taxes and assessments which are levied, assessed and paid upon the mineral interest in and to the Joint Property.

**4. Application of Administrative Overhead or Combined Rates - Well Basis**

The following limitations, instructions and charges shall apply in the application of the rates as provided under either Paragraph 1B (1) or Paragraph 2 of this Section III.

A. Charges for drilling wells shall begin on the date each well is spudded and terminate on the date the drilling or completion rig is released, whichever is later, except that no charge shall be made during the suspension of drilling operations for fifteen (15) or more consecutive days.

B. The status of wells shall be as follows:

   (1) Producing gas wells, injection wells for recovery operations, water supply wells utilized for waterflooding operations and salt water disposal wells shall be considered the same as producing oil wells.

   (2) Wells permanently shut down but on which plugging operations are deferred shall be dropped from the well schedule at the time the shutdown is effected. Any well being plugged or produced during any portion of the month shall be considered as a producing well for the entire month.

   (3) Wells being plugged back, drilled deeper, converted to a source or input well, or which are undergoing any type of workover that requires the use of a drilling rig or workover rig capable of drilling shall be considered the same as drilling wells.

   (4) Temporarily shut-down wells, which are not produced or worked upon for a period of a full calendar month, shall not be included in the well schedule, provided however, wells shut in by governmental regulatory body shall be included in the well schedule only in the event the allowable production is transferred to some other well or wells on the Joint Property. In the event of a unit allowable, shut-in wells shall be counted in determining the charge hereunder for such month if said wells contribute allowable production that is actually produced during such month from one or more unit wells as a result of allowable transfer, inclusion in the unit allowable or other circumstances, but the total shut-in well count shall be limited to the minimum number of shut-in wells necessary to provide the contributed allowable actually produced during the month.

   (5) Gas wells shall be included in the well schedule if directly connected to a permanent sales outlet even though temporarily shut in due to overproduction or failure of purchaser to take the allowed production.

   (6) Wells completed in multiple horizons, shall be considered as a producing well for each separately producing horizon, providing each completion is considered a separate well by governmental or other state-wide regulatory authority.

C. The well rates for producing wells shall be applied to the individual leases; provided that, whenever leases covered by this agreement are operated as a unitized project, the well rates shall be applied to the total number of producing wells, irrespective of individual leases.

D. The well rates shall be adjusted as of the first day of April each year following the effective date of the agreement to which this Accounting Procedure is attached. The adjustment shall be computed by multiplying the rate currently in use by the percentage increase or decrease in the average weekly earnings of Crude Petroleum and Gas Production Workers for the last calendar year compared to the preceding calendar year as shown by "The Index of Average Weekly Earnings of Crude Petroleum and Gas Production Workers" as published by the United States Department of Labor, Bureau of Labor Statistics, or the equivalent Canadian Index as published by the Dominion Bureau of Statistics, as applicable. The adjusted rates shall be the rates currently in use, plus or minus the computed adjustment.

**5. Application of Administrative Overhead or Combined Rates - Percentage Basis**

For the purpose of determining charges on a Percentage Basis under Paragraph 1B (2) or Paragraph 3 of this Section III, Development shall include all costs in connection with drilling, redrilling, deepening or any remedial operations on any or all wells involving the use of drilling crew and equipment; also, preliminary expenditures necessary in preparation for drilling and expenditures incurred in abandoning when well is not completed as a

the Joint Account with an additional overhead charge as follows:

- A. Total cost less than $25,000, _____10__ % of total cost.
- B. Total cost more than $25,000, but less than $100,000, _____10__ % of total cost.
- C. Total cost of $100,000 or more, _____10__ % of the first $100,000 plus _____10__ % of all over $100,000 of total cost.

Total cost shall mean the total gross cost of any one project. For the purpose of this paragraph the component parts of a single project shall not be treated separately and the cost of drilling wells shall be excluded.

**7. Amendment of Rates**

The specific rates provided for in this Section III may be amended from time to time by mutual agreement between the Parties hereto if, in practice, the rates are found to be insufficient or excessive.

# IV. BASIS OF CHARGES TO JOINT ACCOUNT

Subject to the further provisions of this Section IV, Operator will procure all Material and services for the Joint Property. At the Operator's option, Non-Operators may supply Material or services for the Joint Property.

**1. Purchases**

Material purchased and service procured shall be charged at the price paid by Operator after deduction of all discounts actually received.

**2. Material furnished from Operator's Warehouse or Other Properties**

A. New Material (Condition "A")

(1) Tubular goods, except line pipe, shall be priced on a maximum carload and/or barge load weight basis regardless of quantity transferred and equalized to the lowest prevailing price f.o.b. railway receiving point or recognized barge terminal nearest the Joint Property where such Material is normally available effective at date of transfer.

(2) Line pipe shall be priced at the current replacement cost effective at date of transfer from a reliable supply store nearest the Joint Property where such Material is normally available if the movement is less than 30,000 pounds. If the movement is 30,000 pounds or more, it shall be priced on the same basis as casing and tubing under Subparagraph (1) of this paragraph.

(3) When the Operator has equalized actual hauling costs as provided for in Paragraph 5 of Section II, Operator is permitted to include ten cents (10¢) per hundred-weight on all tubular goods furnished from his stocks in lieu of loading and unloading costs sustained.

(4) Other Material shall be priced at the current replacement cost of the same kind of Material, effective at date of movement and f.o.b. the supply store or railway receiving point nearest the Joint Property where Material of the same kind is normally available.

(5) The Joint Account shall not be credited with cash discounts applicable to prices provided for in this Paragraph 2 of Section IV.

B. Used Material (Condition "B" and "C")

(1) Material in sound and serviceable condition and suitable for reuse without reconditioning, shall be classified as Condition "B" and priced at seventy-five per cent (75%) of the current price of new Material.

(2) Material which is not suitable for its original function until after reconditioning shall be furnished to the Joint Account under one of the two methods defined below:

(a) Classified as Condition "B" and priced at seventy-five per cent (75%) of the current price of new Material. The cost of reconditioning shall be absorbed by the Operator of the transferring property.

(b) Classified as Condition "C" and priced at fifty per cent (50%) of current price of new Material. The cost of reconditioning also shall be charged to the receiving property, provided Condition "C" value, plus cost of reconditioning, does not exceed Condition "B" value.

(3) Obsolete Material or Material which cannot be classified as Condition "B" or Condition "C" shall be priced at a value commensurate with its use. Material no longer suitable for its original purpose but usable for some other purpose, shall be priced on a basis comparable with that of items normally used for such other purpose.

(4) Material involving erection costs shall be charged at applicable percentage of the current knocked-down price of new Material.

**3. Premium Prices**

Whenever Material is not readily obtainable at prices specified in Paragraphs 1 and 2 of this Section IV because of national emergencies, strikes or other unusual causes over which the Operator has no control, the Operator may charge the Joint Account for the required Material at the Operator's actual cost incurred in procuring such Material, in making it suitable for use, and in moving it to the Joint Property, provided, that notice in writing is furnished to Non-Operators of the proposed charge prior to billing Non-Operators for such Material. Each Non-Operator shall have the right, by so electing and notifying Operator within 10 days after receiving notice from Operator, to furnish in kind all or part of his share of such Material suitable for use and acceptable to Operator.

**4. Warranty of Material Furnished by Operator**

Operator does not warrant the Material furnished. In case of defective Material, credit shall not be passed to the Joint Account until adjustment has been received by Operator from the manufacturers or their agents.

**5. Equipment and Facilities Furnished by Operator**

A. Operator shall charge the Joint Account for use of equipment and facilities at rates commensurate with cost of ownership and operation. Such rates shall include cost of maintenance, repairs, other operating

B. Whenever requested, Operator shall inform Non-Operators in advance of the rates it proposes to charge.

C. Rates shall be revised and adjusted from time to time when found to be either excessive or insufficient.

## V. DISPOSAL OF MATERIAL

The Operator may purchase, but shall be under no obligation to purchase, interest of Non-Operators in surplus Condition "A" or "B" Material. The disposition of surplus Controllable Material, not purchased by Operator, shall be agreed to by Operator and Non-Operators, provided Operator shall dispose of normal accumulations of junk and scrap Material either by transfer or sale from Joint Property.

1. **Material Purchased by the Operator or Non-Operators.**
   Material purchased by either the Operator or Non-Operators shall be credited by the Operator to the Joint Account for the month in which the Material is removed by the purchaser.

2. **Division in Kind**
   Division of Material in kind, if made between Operator and Non-Operators, shall be in proportion to the respective interests in such Material. The Parties will thereupon be charged individually with the value of the Material received or receivable. Proper credits shall be made by the Operator to the Joint Account.

3. **Sales to Outsiders**
   Sales to outsiders of Material from the Joint Property shall be credited by Operator to the Joint Account at the net amount collected by Operator from vendee. Any claim by vendee related to such sale shall be charged back to the Joint Account if and when paid by Operator.

## VI. BASIS OF PRICING MATERIAL TRANSFERRED FROM JOINT ACCOUNT

Material purchased by either Operator or Non-Operators or divided in kind, unless agreed to by Operator and Non-Operators shall be priced on the following basis:

1. **New Price Defined**
   New price as used in this Section VI shall be the price specified for new Material in Section IV.

2. **New Material**
   New Material (Condition "A"), being new Material procured for the Joint Property but never used, at one hundred per cent (100%) of current new price (plus sales tax if any).

3. **Good Used Material**
   Good used Material (Condition "B"), being used Material in sound and serviceable condition, suitable for reuse without reconditioning:
   A. At seventy-five per cent (75%) of current new price if Material was charged to Joint Account as new, or
   B. At sixty-five per cent (65%) of current new price if Material was originally charged to the Joint Account as secondhand at seventy-five per cent (75%) of new price.

4. **Other Used Material**
   Used Material (Condition "C"), at fifty per cent (50%) of current new price, being used Material which:
   A. Is not in sound and serviceable condition but suitable for reuse after reconditioning, or
   B. Is serviceable for original function but not suitable for reconditioning.

5. **Bad-Order Material**
   Material (Condition "D"), no longer suitable for its original purpose without excessive repair cost but usable for some other purpose at a price comparable with that of items normally used for such other purpose.

6. **Junk Material**
   Junk Material (Condition "E"), being obsolete and scrap Material, at prevailing prices.

7. **Temporarily Used Material**
   When the use of Material is temporary and its service to the Joint Property does not justify the reduction in price as provided for in Paragraph 3B of this Section VI, such Material shall be priced on a basis that will leave a net charge to the Joint Account consistent with the value of the service rendered.

## VII. INVENTORIES

The Operator shall maintain detailed records of Controllable Material.

1. **Periodic Inventories, Notice and Representation**
   At reasonable intervals, inventories shall be taken by Operator of the Joint Account Controllable Material. Written notice of intention to take inventory shall be given by Operator at least thirty (30) days before any inventory is to begin so that Non-Operators may be represented when any inventory is taken. Failure of Non-Operators to be represented at an inventory shall bind Non-Operators to accept the inventory taken by Operator.

2. **Reconciliation and Adjustment of Inventories**
   Reconciliation of inventory with the Joint Account shall be made, and a list of overages and shortages shall be furnished to the Non-Operators. Inventory adjustments shall be made by Operator with the Joint Account for overages and shortages, but Operator shall be held accountable to Non-Operators only for shortages due to lack of reasonable diligence.

3. **Special Inventories**

## LEASE OF OFFSHORE PLATFORM SPACE

THIS AGREEMENT, entered into by and between _____

_____, _____,

_____, _____,

_____, and _____,

herein called "Lessors", and _____,

herein called "Lessee", to-wit:

Reference is made to that certain Gas Purchase and Sale Contract

dated _____, between Lessors and Lessee, relating

to the sale and purchase of gas to be produced from _____

_____, Offshore, Louisiana.

Lessors are agreeable to the use by Lessee of space on the following

offshore platform on said block necessary to Lessee for the measurement

and receiving of gas subject to said contract.  Said platform is desig-

nated or identified as _____.

NOW, THEREFORE:

(1) Lessors hereby lease to Lessee, as to each Lessor's interest

in said platform, _____ square feet of space on said platform

as the parties mutually agree upon for the installation, operation, main-

tenance, repair and removal of the measuring and receiving facilities,

including meters, piping and pipeline riser, necessary to Lessee for the

receipt and measurement of gas under said Gas Purchase and Sale Contract,

ties and the placement thereof on said platform shall be in accordance with drawings and plans which have heretofore been mutually agreed upon by the parties and which are incorporated herein by reference thereto.

(2) Lessee shall give Lessors notice of the installation of said facilities on the platform and of any subsequent repair or mainten-ance thereof sufficiently in advance so that Lessors' representatives may be present at such operations and the installation, repair and maintenance shall be under the final authority of Lessors' authorized inspector and if Lessors' inspector should at any time be of the opinion that any such work is not being done in accordance herewith; or is being done in an unduly dangerous or unworkmanlike manner, he shall notify the person or persons performing the same and, upon receipt thereof, Lessee or its representatives will cease such operations and will re-sume same only when agreed to as to manner or method by Lessors, it being understood that Lessors shall not arbitrarily or without suffi-cient cause delay Lessee's operations under this provision or cause Lessee to design, construct or operate its facilities under any codes and requirements other than standard state, federal or local codes and requirements prescribed for similar facilities.

(3) Lessee has inspected said platform and assumes the entire risk of placing and operating its facilities and equipment thereon and the entire responsibility for its employees and representatives working thereon. Lessee hereby releases and agrees to hold Lessors harmless from any and all responsibility and liability to Lessee's employees,

-2-

contractors and representatives, and to Lessee's facilities and equip-
ment on said platform which might be incurred or result from Lessee's
use of the platform hereunder, even if such damage, loss or injury is
caused solely by Lessors' negligence.  Lessee further agrees to be
wholly responsible for any damage to or loss of said platform or of
any property belonging to third parties caused by or arising by reason
of the installation, operation, maintenance, repair or removal of its
facilities on said platform, or from any defect therein or failure
thereof, whether or not resulting from the negligence of Lessee, its
employees or representatives; provided that Lessee shall not be respon-
sible for such damage or loss as may result from the negligence of
Lessors, their employees or representatives.

(4) Lessee shall conduct its operations on the leased space
so as not to unreasonably interfere with the operations of Lessors.

(5) In consideration for the lease of space on said platform,
Lessee agrees:

(a) To pay to Lessors $_____

for said space on the platform to be con-

nected hereunder.  The said amount shall

be paid to Lessors prior to the commence-

ment of installation of its facilities by

Lessee on such space.

(b) To pay to Lessors an annual maintenance and

overhead lease expense charge, which charge

shall be determined by multiplying the total

-3-

and overhead lease expense of said plat-

form by a fraction, the numerator of which
is the number of square feet of deck space
to be used by Lessee's facilities and the
denominator of which is the number of
square feet of deck space on the entire
platform, and then applying Lessors' percen-
tage interest in the platform to the product
of said multiplication.  Such amount shall
be paid to Lessors by Lessee on or before
the end of each anniversary date of this
agreement.  All estimates of such expenses
shall be based on Lessors' most recent cost
experience, together with anticipated changes
in Lessors' costs.

(6) The lease of space on said platform shall remain in force
until Lessee no longer uses said space for its performance under said
Gas Purchase and Sale Contract.

IN WITNESS WHEREOF, the parties have executed this Agreement
on the dates set forth under their respective signatures.

WITNESSES:

_____

_____

SHELL OIL COMPANY
_____

BY_____

Date_____

--4--

Date _____

WITNESSES:                          SABINE EXPLORATION CORPORATION

_____     BY _____

_____     Date _____


WITNESSES:                          DRILLAMEX, INC.

_____     BY _____

_____     Date _____


WITNESSES:                          KIRBY PETROLEUM CO.

_____     BY _____

_____     Date _____


WITNESSES:                          THE ROYAL GORGE COMPANY

_____     BY _____

_____     Date _____


WITNESSES:                          AMERICAN INDEPENDENT OIL COMPANY

_____     BY _____

_____     Date _____


-5-

The parties hereto assure each other that they do not and will not maintain or provide for their employees any segregated facilities at any of their establishments, and that they do not and will not permit their employees to perform their services at any location, under their control, where segregated facilities are maintained.  For this purpose, it is understood that the phrase "SEGREGATED FACILITIES" includes facilities which are in fact segregated on a basis of race, color, religion, or national origin, because of habit, local custom, or otherwise.  It is further understood and agreed that maintaining or providing segregated facilities for their employees or permitting their employees to perform their services at any location under their control where segregated facilities are maintained is a violation of the Equal Opportunity Clause required by Executive Order 11246 of September 24, 1965.

The parties hereto further understand and agree that a breach of the assurance herein contained subjects them to the provisions of the order at 41 CFR Chapter 60 of the Secretary of Labor dated May 21, 1968, and the provisions of the Equal Opportunity Clause enumerated in contracts between the United States of America and the assureds.

Whoever knowingly and willfully makes any false, factitious, or fraudulent representation may be liable to criminal prosecution under 18 U.S.C. Par. 1001.

The parties hereto reserve to themselves the benefit of all exemptions, qualifications and limitations contained in and which it may claim under 41 CFR Chapter 60 and this certification is qualified to the extent and so that the parties hereto shall have the full benefit thereof.

Dated this _19_ day of _September_, 1972.

SHELL OIL COMPANY

BY: _____
                    Attorney-In-Fact

FLORIDA GAS EXPLORATION COMPANY

BY: _____
                    President

SABINE EXPLORATION CORPORATION

BY: _____
                    Vice President

DRILLAMEX, INC.

BY: _____
                    Vice President

KIRBY PETROLEUM CO.

BY: _____
                    Vice President

THE ROYAL GORGE COMPANY

BY: _____
                    Vice President