IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| In re: | § | Chapter 11 |
| | § | |
| FIELDWOOD ENERGY LLC, *et. al,* | § | Case No. 20-33948(MI) |
| | § | |
| Debtors.[1] | § | |
| _____ | § | (Jointly Administered) |
| FIELDWOOD ENERGY, LLC | § | |
| | § | |
| Plaintiff, | § | |
| V. | § | Adversary No: _____ |
| | § | |
| VALERO MARKETING AND | § | |
| SUPPLY COMPANY | § | |
| | § | |
| Defendant. | § | |

## ADVERSARY COMPLAINT

Fieldwood Energy, LLC ("Fieldwood" or "Plaintiff") as debtor and debtor in possession in the above-captioned chapter 11 cases (the "Debtor"), and as Plaintiff in the above-captioned adversary proceeding (the "Adversary Proceeding") hereby file this complaint against Valero Marketing and Supply Company ("Valero" or "Defendant") and allege as follows:

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, as applicable, are: Dynamic Offshore Resources NS, LLC (0158); Fieldwood Energy LLC (6778); Fieldwood Energy Inc. (4991); Fieldwood Energy Offshore LLC (4494); Fieldwood Onshore LLC (3489); Fieldwood SD Offshore LLC (8786); Fieldwood Offshore LLC (2930); FW GOM Pipeline, Inc. (8440); GOM Shelf LLC (8107); Bandon Oil and Gas GP, LLC (9172); Bandon Oil and Gas, LP (9266); Fieldwood Energy SP LLC (1971); Galveston Bay Pipeline LLC (5703); and Galveston Bay Processing LLC (0422). The Debtors' primary mailing address is 2000 W. Sam Houston Parkway S., Suite 1200, Houston, TX 77042.

## I.  **Introduction**

1.  In April 2020, Fieldwood delivered 195,000 barrels of oil to Valero under a month to month Purchase Contract.[2]  Valero took delivery of the oil without objection. The Purchase Contract's payment terms are crystal clear:

> **PAYMENT TERMS:**
> PAYMENT SHALL BE MADE ON THE 20TH OF THE MONTH FOLLOWING DELIVERY BY WIRE TRANSFER OF IMMEDIATELY AVAILABLE FUNDS WITHOUT DISCOUNT, DEDUCTION, WITHHOLDING, OFFSET OR COUNTERCLAIM IN U.S. DOLLARS ON OR BEFORE THE PAYMENT DUE DATE TO THE BANK AND ACCOUNT DESIGNATED BY SELLER, AGAINST PRESENTATION TO BUYER BY SELLER OF ORIGINAL HARD COPY, TELECOPY, OR TELEX INVOICE TOGETHER WITH SUPPORTING DOCUMENTATION EVIDENCING BOOK, STOCK, INVENTORY TRANSFER OR PIPELINE METER TICKETS.

*See* Exhibit 1.  On May 15, 2020, Fieldwood invoiced Valero $3,090,564.29 for the 195,000 barrels of oil.  Willfully ignoring the Purchase Contract's clear language, Valero only paid $988,020.29, leaving an underpayment of $2,102,544.00.

2.  Valero attempted to justify the underpayment by claiming damages associated with Fieldwood's failure to deliver oil to Valero in May 2020.  While Fieldwood did not deliver oil in May 2020 because it shut in its wells, that did not cause Valero damages. First, Valero waived its offset rights through the Purchase Contract; second Valero failed to mitigate its alleged damages and third, Valero contractually waived all rights to recover consequential and incidental damages.  Valero had ample opportunity to purchase replacement oil for delivery in May 2020, but it chose not to do

---

[2] Exhibits 1, 2 & 3 are the "Purchase Contract."  Exhibit 1, the Base Contract, contains a provision which states: "When not in conflict with the foregoing, then Conoco's General Terms and Condition for Domestic Crude Oil Agreements, dated January 1, 1993, with Shell Amendments, shall apply and are hereby incorporated by reference."  As of this filing, Fieldwood believes that Exhibits 2 & 3 are the Conoco General Terms and Shell Amendments, but reserves the right to amend should other evidence arise which suggests otherwise.

so. In fact, had Valero purchased oil on the spot market for delivery in May 2020, the spot market price would have been *less* than the Purchase Contract price.

3. Fieldwood files this adversary proceeding to recover $2,102,544.00, plus interest, attorney fees and costs.

## II. Parties

4. Fieldwood Energy LLC is a Delaware limited liability company with its principal place of business located at 2000 W. Sam Houston Parkway, Suite 1200, Houston, Texas 77042.

5. Defendant Valero Marketing Supply Company is a Delaware corporation with its principal place of business located at One Valero Way, San Antonio, Texas 78249-1616. Valero can be served through its registered agent CT Corporation System at 1999 Bryan Street, Suite 900 Dallas, Texas 75201-3136.

## III. Jurisdiction and Venue

6. The Court has jurisdiction to consider this matter pursuant to 28 U.S.C. §1334 and Federal Rule of Bankruptcy Procedure 7001(1) & (2). This is a core proceeding pursuant to 28 U.S.C. §157(b). Pursuant to Rule 7008 of the Federal Rules of Bankruptcy Procedure and Rule 7008-1 of the Bankruptcy Local rules for the Southern District of Texas, the Debtor consents to the entry of final orders or judgment by this Court in connection with this adversary proceeding if it is determined that, absent consent of the parties, the Court cannot enter final orders or judgments consistent with Article III of the United States Constitution.

7.    Venue is proper before the Court pursuant to 28 U.S.C. §1409.  Pursuant to

the *United States District Court for the Southern District of Texas' General Order of Reference*

dated May 24, 2012, the case is automatically referred from the District Court to the

Bankruptcy Court.

## IV.    Background Facts

### A.    The Purchase Contract requires Valero to pay for oil delivered by Fieldwood.

8.    The Purchase Contract is not a guaranteed supply contract, but merely an

agreement by Fieldwood to deliver oil from a designated offshore field to a designated

pipeline operated by Valero.  While the Purchase Contract provides for delivery of 10,000

barrels per day, in practice Fieldwood would inform Valero in advance of each month

the volume of oil it planned to deliver and then deliver that volume, adjusted during the

delivery month for any material changes in actual lease production. The Purchase

Contract is "evergreen" meaning that the contract remains in effect until either party

terminates with 30 days advance written notice.

9.    Pursuant to the parties' practice, in March 2020, Fieldwood informed

Valero that it would be delivering 195,000 barrels of oil to Valero in the month of April.

And, in fact, Fieldwood delivered 195,000 barrels of oil to Valero in April 2020.

Accordingly, Fieldwood sent Invoice No. FW-70-042020 to Valero on May 15, 2020 in the

amount of $3,090,564.29 (the "May 2020 Invoice").  *See* Exhibit 4.  Payment was due on

or before May 20, 2020.  Valero refused to pay the amounts due in the May 20, 2020

Invoice. Instead, in breach of the Purchase Contract, Valero only paid $988,020.29, leaving $2,102,544.00 unpaid.

**B.    Fieldwood exercises its right to terminate the Purchase Contract.**

10.    In April 2020, the world was amid a global pandemic caused by the COVID-19 virus which resulted in a collapse of demand for petroleum products. This collapse in demand forced Fieldwood to shut-in the wells associated with oil production delivered to Valero under the Purchase Contract.

11.    On April 16, 2020, Fieldwood informed Valero that it may be shutting in these wells, which meant that Fieldwood would not be able to deliver any oil to Valero in May 2020. On April 22, 2020, Fieldwood notified Valero that it would not be delivering any oil to Valero under the Purchase Contract for May 2020 because it had shut in its associated wells. At this point, Valero knew that if it needed oil supply in May 2020 then it would need to acquire it on the spot market. In fact, legally, Valero was obligated to cover any shortage of oil by obtaining it on the spot market to mitigate its losses. Upon information and belief, Valero did nothing to try to acquire oil on the spot market in April 2020.

12.    On April 29, 2020, in accordance with the terms of the Purchase Contract, Fieldwood sent notice to Valero that it was terminating the Purchase Contract effective May 30, 2020.

**C.    Valero begins inventing excuses for its knowing breach of the Purchase Contract.**

13.     Valero knew it owed Fieldwood over three million dollars for April 2020 oil delivery and knew that its payment would be due on May 20, 2020.  Valero also knew that it would have to secure a new contract to purchase oil for June because of Fieldwood's termination of the Purchase Contract.  Rather than meeting its obligations, Valero decided to manufacture a default by Fieldwood to avoid payment.

14.     On May 14, 2020, Valero sent a "Demand for Adequate Assurance of Performance" to Fieldwood (the "Demand Letter").  *See* Exhibit 5.    Valero first acknowledges Fieldwood's termination notice and then asserts damages of $2,102,544 for Fieldwood's failure to deliver oil in May 2020. Yet Valero provides no explanation for that figure.  And, as noted above, Valero took no steps to acquire oil on the spot market in April when it knew that Fieldwood was not going to deliver any oil in May.  In fact, had Valero acquired oil on the spot market back in April, the spot market price was actually less than the price under the Purchase Contract.  Thus, Valero could have saved money by buying oil on the spot market.

15.     The Demand Letter goes on to invoke Section G of the Purchase Contract and asks Fieldwood to deposit funds or a standby letter of credit to ensure Fieldwood's performance under the Purchase Contract –which had already been terminated.  Section G of the Purchase Contract provides:

**G.**      **Financial Responsibility:** Delete in its entirety and replace with the following:

"(1)      Adequate Assurance.  Seller may, within Seller's full discretion, at any time request and Buyer shall, not later than two (2) Banking Days after request by Seller, provide Adequate Assurance of Performance.  After such request, and in the event that title has not already been transferred, Seller may withhold performance until such Adequate Assurance of Performance shall have been received by it.  Any cost, expense, or charges associated with any letter of credit procured pursuant to this Section shall be for the account of Buyer."

(2)      Financial Responsibility.  Notwithstanding anything to the contrary in this Agreement, if in the reasonable opinion of a party (the "Secured Party") at any time the reliability or the financial responsibility of the other party ("Posting Party") (or of any guarantor or other person furnishing security in support of Posting Party) is or becomes impaired or unsatisfactory, Adequate Assurance of Performance shall be given by Posting Party to Secured Party on demand by Secured Party in respect of each or any cargo or any portion thereof.  Any amounts specified in such demand shall thereby become due and payable no later than two (2) Banking Days from the date of the demand.  After such demand, and in the event that title has not already been transferred, Secured Party may withhold performance until such Adequate Assurance of Performance shall have been received by it.  Any cost, expense, or charges associated with any letter of credit procured pursuant to this Section shall be for the account of the party providing the letter of credit. If Buyer exceeds the credit line Seller established for Buyer, which Seller may establish and modify in its sole discretion from time to time, Seller may deem the financial responsibility of Buyer to be unsatisfactory and demand Adequate Assurance of Performance pursuant to the Financial Responsibility provision set forth in the contract."

*See* Exhibit 3.

16.     Valero incorrectly interprets Section G. to require Fieldwood to provide adequate assurance to pay for Valero's alleged damages on a contract that had been terminated.  The very nature of an adequate assurance provision is to protect a party for future performance, it is not a mechanism to demand damages after termination.

17.     The day after sending the Demand Letter, Valero received the May 2020 Invoice and, on May 20, 2020, paid $988,020.29 which is the amount of the invoice minus its alleged damages without any further explanation for its damages claim.   In a June 1, 2020 letter, Valero's in-house counsel recognized its duty to mitigate its damages for non-delivery in May 2020:

Finally, you address mitigation and have numerous requests regarding Valero's efforts to mitigate its damages. The very definition of mitigation is that a party who suffers loss as a result of a breach of contract has a duty to mitigate those losses. While a duty to mitigate losses exists, unless you would agree that Fieldwood has breached the contract, this is a topic best addressed in litigation. Valero prefers not to go to litigation, and hopes that a commercial resolution can be reached. However, should you choose to pursue litigation, we feel confident in our position and remain willing and eager to defend it.

*See* Exhibit 6. Despite this admission, Valero has provided no evidence that it sought to mitigate its losses.

## V. Causes of Action

### A. Breach of contract

18.     The Purchase Contract is a valid and enforceable agreement. In April 2020, Fieldwood performed under the Purchase Contract by delivering 195,000 barrels of oil to Valero. As reflected in the May 2020 Invoice, Valero owed Fieldwood $3,090,564.29 on or before May 20, 2020. Valero knowingly and willfully breached the Purchase Contract by only paying $988,020.29 on the May 2020 Invoice. Consequently, Fieldwood has suffered damages in an amount not less than $2,102,544.00. In addition to its actual damages, Valero is liable for interest on the unpaid amount.

### B. Declaratory Judgment No. 1– Adequate Assurance provision of Purchase Contract.

19.     On May 14, 2020, Valero sent a "Demand for Adequate Assurance of Performance" to Fieldwood (the "Demand Letter"). *See* Exhibit 5. Through the Demand Letter, Valero attempted to invoke Section G of the Purchase Contract and require Fieldwood to deposit funds or a standby letter of credit to ensure Fieldwood's performance under the Purchase Contract, which had been terminated. Section G of the Purchase Contract provides:

G.    **Financial Responsibility:** Delete in its entirety and replace with the following:
"(1)    Adequate Assurance. Seller may, within Seller's full discretion, at any time request and Buyer shall, not later than two (2) Banking Days after request by Seller, provide Adequate Assurance of Performance. After such request, and in the event that title has not already been transferred, Seller may withhold performance until such Adequate Assurance of Performance shall have been received by it. Any cost, expense, or charges associated with any letter of credit procured pursuant to this Section shall be for the account of Buyer."

(2)    Financial Responsibility. Notwithstanding anything to the contrary in this Agreement, if in the reasonable opinion of a party (the "Secured Party") at any time the reliability or the financial responsibility of the other party ("Posting Party") (or of any guarantor or other person furnishing security in support of Posting Party) is or becomes impaired or unsatisfactory, Adequate Assurance of Performance shall be given by Posting Party to Secured Party on demand by Secured Party in respect of each or any cargo or any portion thereof. Any amounts specified in such demand shall thereby become due and payable no later than two (2) Banking Days from the date of the demand. After such demand, and in the event that title has not already been transferred, Secured Party may withhold performance until such Adequate Assurance of Performance shall have been received by it. Any cost, expense, or charges associated with any letter of credit procured pursuant to this Section shall be for the account of the party providing the letter of credit. If Buyer exceeds the credit line Seller established for Buyer, which Seller may establish and modify in its sole discretion from time to time, Seller may deem the financial responsibility of Buyer to be unsatisfactory and demand Adequate Assurance of Performance pursuant to the Financial Responsibility provision set forth in the contract."

*See* Exhibit 3.

20.    Fieldwood rejected Valero's claim for adequate assurance because Fieldwood never had any obligation to pay amounts to Valero under the Purchase Contract. Valero subsequently claimed Fieldwood was in breach of Purchase Contract because of its alleged failure to provide adequate assurance.

21.    Pursuant to Texas Civil Practices and Remedies Code §37.001, *et. seq.* and/or 28 U.S.C. §2201 Fieldwood seeks a declaration that the adequate assurance provision of the Purchase Contract did not require Fieldwood to post any security or other funds as was requested by Valero in its Demand Letter.

C.    **Declaratory Judgment No. 2 – Waiver of damages provision of Purchase Agreement.**

22.    In its Demand Letter, Valero claims damages of $2,102,544 for Fieldwood's failure to deliver oil during the month of May 2020. While Valero did not provide any

evidence of these alleged damages, based upon the price of oil on the spot market for May 2020, Valero would not have paid $2,102,544 for delivery of oil in May. In fact, had it actually exercised its cover rights and attempted to mitigate its damages, Valero would have paid less than the contract price to purchase oil for delivery in May 2020. Thus, the only basis for its damage claim would be some form of lost profits, consequential damages or other indirect damages. Such damages are specifically excluded under the Purchase Contract. Section S of the Conoco General Terms and Conditions (as amended) specifically exclude recovery of any such damages:

> "**S. LIABILITIES:** IN NO EVENT SHALL SELLER OR BUYER BE LIABLE FOR CONSEQUENTIAL, INCIDENTAL, PUNITIVE, SPECIAL, EXEMPLARY OR INDIRECT DAMAGES, OR LOST PROFITS."

*See* Exhibit 3.

23. Pursuant to Texas Civil Practices and Remedies Code §37.001, *et. seq.* and/or 28 U.S.C. §2201, Fieldwood seeks a declaration that Valero is not entitled to recover any consequential, incidental, punitive, special, exemplary or indirect damages, or lost profits for its failure to deliver oil in May 2020.

### D. Objection to Valero's Proof of Claim

24. On November 25, 2020, Valero filed proof of claim No. 709. In its proof of claim, Valero seeks to set off the amounts due Fieldwood in the amount of $2,102,544.00 and seeks additional damages of $1,016,056.00 for Fieldwood's failure to deliver oil in May 2020. Pursuant to 11 U.S.C. §3007, and for the reasons set forth herein, Fieldwood objects to Claim No. 709 and seeks an order disallowing the claim.

**E.**     **Valero has no valid or perfected lien**

25.     On November 25, 2020, Valero filed a proof of claim in the Bankruptcy Case. (*See* Claim No. 709). In its proof of claim, Valero claims that it has a secured claim against Fieldwood's property. *Id.* Specifically, Valero alleges that the value of the property secured and the amount of the secured claim is $2,102,544.00—the amount of the April 2020 unpaid invoice. However, Valero did not attach any documents to its proof of claim nor did it explain the basis for its secured claim. Fieldwood contests the validity, extent and priority of any lien claim made by Valero through its proof of claim.

26.     As a result of the foregoing, an actual controversy has arisen and now exists between Fieldwood and Valero as to the validity, priority and extent of Valero's purported prepetition liens on Fieldwood's assets.

27.     Pursuant to 11 U.S.C. §506, Texas Civil Practices and Remedies Code §37.001, *et. seq.* and/or 28 U.S.C. §2201 Fieldwood seeks a determination by the Bankruptcy Court of the validity, priority, and extent of the prepetition security interests in Fieldwood's assets claimed by Valero in its proof of claim. Such a determination is necessary to the proper administration of the estate.

**VI.**     **Request for attorney fees and costs**

28. The Purchase Contract provides that Texas law shall govern any disputes arising thereunder. In accordance with Texas Civil Practices and Remedies Code §§37.009, 38.001, and any other contract provision or applicable law, Fieldwood seeks recovery of its attorney fees and costs associated with this proceeding. Fieldwood has

11

made demand on Valero for amounts due under the Purchase Contract and Valero has failed to tender the amounts due.

### Conclusion and Prayer

For the reasons set forth herein, Fieldwood asks that the Court enter judgment against Valero for all of its actual damages, attorney fees, declaratory judgments as requested herein, interest, disallowance of Valero's proof of claim No. 709, and all other relief, in law or equity, that it shows itself entitled.

Date: December 11, 2020

*/s/Robert L. Paddock*
BUCK KEENAN LLP
Robert L. Paddock (Tx. Bar No. 24002723)
E.F. Mano DeAyala (Tx. Bar No.00785946)
2229 San Felipe, Suite 1000
Houston, Texas 77019
(713) 225-4500 (main)
(713) 225-3719 – Facsimile
rpaddock@buckkeenan.com
deayala@buckkeenan.com

-and-

/s/ Alfredo R. Pérez
WEIL, GOTSHAL & MANGES LLP
Alfredo R. Pérez (15776275)
700 Louisiana Street, Suite 1700
Houston, Texas 77002
Telephone: (713) 546-5000
Facsimile: (713) 224-9511
Email: Alfredo.Perez@weil.com

-and-

WEIL, GOTSHAL & MANGES LLP
Matthew S. Barr (admitted pro hac vice)
Jessica Liou (admitted pro hac vice)
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007
Email: Matt.Barr@weil.com
Jessica.Liou@weil.com

ATTORNEYS FOR PLAINTIFF
FIELDWOOD ENERGY, LLC,



# VALERO
## MARKETING AND SUPPLY COMPANY

One Valero Way, San Antonio, TX 78249-1616
P.O. Box 696000, San Antonio, TX 78269-6000

Purchase From:

(Printed on 06/13/2018)

FIELDWOOD ENERGY LLC
2000 W SAM HOUSTON PKWY S, SUITE 12
HOUSTON TX  77042

Contact: JOHNNY DOBECKA
Fax:    713-969-1099

**Purchase Contract**

Contract number/date
**4200144305 / 06/07/2018**

Contract Type
**Evergreen**

Vendor No
**525116**

Validity Period
**07/01/2018 to 12/31/9999**

Valero Trader
**JORGE PARRA**

Telephone
**210-345-2273**

Contract Administration
**KRISTIN KIOLBASSA**

PLEASE NOTE THAT VALERO MARKETING AND SUPPLY COMPANY'S ("VALERO") CONTRACT
ADMINISTRATION FAX NUMBER IS 001-210-345-2585. ALL CONTRACTUAL CORRESPONDENCE FOR
THIS DEAL MUST BE DIRECTED TO THIS FAX NUMBER. VALERO MARKETING AND SUPPLY COMPANY
WILL NOT BE DEEMED TO HAVE NOTICE OF CORRESPONDENCE SENT TO ANY OTHER NUMBER, AND
WILL NOT BE RESPONSIBLE FOR ANY LOSSES, COSTS, LIABILITIES OR DELAYS RESULTING FROM
CORRESPONDENCE SENT TO ANY OTHER NUMBER.

IN ACCORDANCE WITH THE AGREEMENT ON 06/07/2018 BETWEEN JORGE PARRA OF VALERO
MARKETING AND SUPPLY COMPANY AND JOHNNY DOBECKA OF FIELDWOOD ENERGY LLC, VALERO IS
PLEASED TO CONFIRM THE FOLLOWING SALES CONTRACT.

TERM:  JULY 1, 2018 AND FORWARD, CONTINUING ON A MONTH TO MONTH BASIS UNTIL CANCELLED
BY EITHER PARTY PROVIDING THIRTY (30) DAYS PRIOR WRITTEN NOTICE OF CANCELLATION.

PLEASE REFER TO VALERO'S CONTRACT NUMBER ON ALL CORRESPONDENCE.

Exhibit 1

To: 713-969-1099    From: VALERO    Fax: 210-444-8500    Powered by KOFAX®    at: JUN-13-2018-11:51    Doc: 729 Page: 002

**FIELDWOOD ENERGY LLC**
**HOUSTON TX 77042**

Contract number/date
4200144305 / 06/07/2018

Page
2 of 5

***** ITEM 00010 *****
PRODUCT
THUNDERHORSE

SPECIFICATIONS
MEETING CURRENT QUALITY SPECIFICATIONS FOR THUNDERHORSE CRUDE OIL

QUANTITY
620,000.000 Barrel 60°F
APPROXIMATELY 10,000 BARRELS PER DAY.

TOLERANCE:  PER ACTUAL PRODUCTION ABOUT 49.5 PERCENT OF NOBLE'S SHARE (BIG
BEND/DANTZLER).

DELIVERY
INTO BUYER'S NOMINATED PIPELINE EX-CLOVELLY CAVERN AT CLOVELLY, LOUISIANA, VIA
MUTUALLY AGREEABLE SCHEDULING OR VIA ACCEPTABLE BOOK, STOCK, OR INVENTORY TRANSFER.

PRICE
THE ARITHMETIC AVERAGE OF THE NYMEX DAILY SETTLEMENT PRICES REPORTED PER BARREL FOR
WTI (TRADING DAYS ONLY) FUTURES CONTRACTS FOR THE MONTH DURING WHICH THE PRODUCT IS
DELIVERED, PLUS

THE ARGUS WTI DIFF TO CMA NYMEX (WEIGHTED AVERAGE) PER BARREL FOR THE TRADE MONTH,
PLUS

THE ARGUS THUNDERHORSE QUOTE DIFF TO WTI (WEIGHTED AVERAGE) PER BARREL FOR THE TRADE
MONTH

---

PAYMENT TERMS:
PAYMENT SHALL BE MADE ON THE 20TH OF THE MONTH FOLLOWING DELIVERY BY WIRE TRANSFER OF
IMMEDIATELY AVAILABLE FUNDS WITHOUT DISCOUNT, DEDUCTION, WITHHOLDING, OFFSET OR
COUNTERCLAIM IN U.S. DOLLARS ON OR BEFORE THE PAYMENT DUE DATE TO THE BANK AND
ACCOUNT DESIGNATED BY SELLER, AGAINST PRESENTATION TO BUYER BY SELLER OF ORIGINAL
HARD COPY, TELECOPY, OR TELEX INVOICE TOGETHER WITH SUPPORTING DOCUMENTATION
EVIDENCING BOOK, STOCK, INVENTORY TRANSFER OR PIPELINE METER TICKETS.

IF ANY PAYMENT UNDER THIS AGREEMENT FALLS DUE ON A SATURDAY OR A NON- MONDAY U.S.
BANK HOLIDAY IN NEW YORK, PAYMENT SHALL BE MADE ON THE FIRST BANKING DAY PRIOR
THERETO.  PAYMENTS FALLING DUE ON A SUNDAY OR A MONDAY U.S. BANK HOLIDAY IN NEW YORK
SHOULD BE MADE ON THE NEXT SUCCEEDING BANKING DAY.

IN THE EVENT OF A BOOK TRANSFER, FOR PARTIAL OR FOR FULL CONTRACTUAL VOLUME, OIL
COMBINATIONS INC. OR OIL DISTRIBUTION SERVICES'S DETERMINATION STATEMENT AND INVOICE

To: 713-969-1099    From: VALERO    Fax: 210-444-8500    Powered by KOFAX    at: JUN-13-2018-11:51    Doc: 729 Page: 003

**FIELDWOOD ENERGY LLC**
**HOUSTON TX 77042**

Contract number/date
**4200144305 / 06/07/2018**

Page
**3 of 5**

SHALL SERVE AS EVIDENCE OF THE BOOK TRANSFER.

IF APPLICABLE, NET-OUT INVOICES SHALL BE ACCORDING TO THE ESTABLISHED NET-OUT
AGREEMENT BETWEEN BUYER AND SELLER.

**CREDIT:**
OPEN CREDIT.

**TITLE AND RISK OF LOSS:**
EXCEPT AS OTHERWISE SPECIFIED IN THIS AGREEMENT, TITLE AND RISK OF LOSS SHALL PASS
FROM SELLER TO BUYER AT CLOVELLY, LA., AS FOLLOWS:
A.  WHEN DELIVERING ONTO OR RECEIVING OFF A VESSEL OR BARGE, AS THE
    PRODUCT PASSES THE PERMANENT INLET OR OUTLET FLANGE ON THE OUTBOARD
    END OF THE LAST VESSEL/BARGE-SUPPLIED REDUCER, FITTING, OR HOSE;
B.  WHEN DELIVERING INTO OR OUT OF A PIPELINE, AS THE PRODUCT
    RESPECTIVELY ENTERS OR LEAVES SUCH PIPELINE;
C.  WHEN DELIVERING INTO OR OUT OF A TRUCK, AS THE PRODUCT
    RESPECTIVELY ENTERS OR LEAVES SUCH TRUCK;
D.  WHEN DELIVERING INTO OR OUT OF A STORAGE TANK FACILITY, AS THE
    PRODUCT RESPECTIVELY ENTERS OR LEAVES THE INLET OR OUTLET FLANGE
    OF SUCH STORAGE TANK FACILITY;
E.  IN THE CASE OF A BOOK, IN-LINE, IN-TANK, INVENTORY OR STOCK
    TRANSFER, ON THE EFFECTIVE DATE OF THE RESPECTIVE TRANSFER.

**TAXES:**
SALES-RELATED TAXES ARE REIMBURSED BY BUYER IN ADDITION TO THE PURCHASE PRICE.  IF
ANY SALE OF PRODUCT PURSUANT TO THIS AGREEMENT SHALL BE SUBJECT TO SALES OR USE TAX,
EXCISE, GROSS RECEIPTS, OR OTHER TRANSACTION TAXES, FEES, LEVYS, LICENSE OR ANY
CHARGE IMPOSED BY A GOVERNMENTAL AUTHORITY WHICH SELLER IS OBLIGATED BY SUCH
GOVERNMENTAL AUTHORITY TO PAY, OR COLLECT AND REMIT, SUCH TAX SHALL BE BORNE BY THE
BUYER.  IT IS EXPRESSLY UNDERSTOOD THAT THE PRICE MUTUALLY AGREED TO BETWEEN SELLER
AND BUYER AS PROVIDED FOR HEREIN SHALL BE EXCLUSIVE OF SALES OR USE, EXCISE, GROSS
RECEIPTS OR OTHER TRANSACTION TAXES, FEES, LEVYS, LICENSE OR ANY CHARGE IMPOSED BY A
GOVERNMENTAL AUTHORITY INCLUDING APPLICABLE PENALTIES AND/OR INTEREST (REGARDLESS OF
WHEN, HOW, OR AGAINST WHICH PARTY SUCH TAX, PENALTY AND INTEREST IS IMPOSED) BY ANY
FEDERAL, STATE, OR LOCAL OR FOREIGN GOVERNMENT OR INSTRUMENTALITY THEREOF, UPON THE
SALE, TRANSFER OR DELIVERY OF ALL PRODUCT SOLD, TRANSFERRED OR DELIVERED BY SELLER
PURSUANT TO THIS AGREEMENT, OR UPON THE BUYER'S PURCHASE, POSSESSION, STORAGE, USE OR
CONSUMPTION THEREOF. IF PROPER EXEMPTION CERTIFICATES ARE NOT PROVIDED BY BUYER,
SELLER WILL BILL THE BUYER FOR APPLICABLE SALES, USE, EXCISE, GROSS RECEIPTS OR OTHER
TRANSACTION TAXES.  THIS PROVISION SHALL SURVIVE TERMINATION OF THIS AGREEMENT.

**NO SETOFF/NETTING:**
NOTWITHSTANDING ANYTHING TO THE CONTRARY IN THE TERMS AND CONDITIONS GOVERNING THIS
TRANSACTION, NEITHER PARTY HERETO SHALL HAVE THE RIGHT TO NET OR SET OFF ANY PAYMENTS
DUE FROM IT HEREUNDER AGAINST ANY PAYMENTS DUE OR ALLEGEDLY DUE TO IT OR ANY OF ITS
AFFILIATES FROM THE OTHER PARTY OR ITS AFFILIATES IN CONNECTION WITH ANY SEPARATE
TRANSACTION, UNLESS AND ONLY TO THE EXTENT THE PARTIES HAVE ENTERED INTO A SEPARATE

**FIELDWOOD ENERGY LLC**
**HOUSTON TX 77042**

Contract number/date
**4200144305 / 06/07/2018**

Page
**4** of **5**

MASTER NETTING AGREEMENT OR SIMILAR AGREEMENT THAT EXPRESSLY PROVIDES FOR SUCH
NETTING OF PAYMENTS.

**PAYMENT NETTING:**
PAYMENT NETTING SHALL APPLY ONLY TO AMOUNTS DUE WITH RESPECT TO U.S. DOMESTIC CRUDE
OIL PRODUCTS AND SHALL NOT APPLY TO OTHER PRODUCT TRANSACTIONS.

**MEASUREMENT:**
QUANTITY DELIVERED HEREUNDER SHALL BE DETERMINED BY PIPELINE METER TICKET(S) ADJUSTED
TO 60 DEGREES FAHRENHEIT OR DOCUMENTATION EVIDENCING BOOK, STOCK, OR INVENTORY
TRANSFER.

**ASSIGNMENT:**
NEITHER PARTY SHALL ASSIGN THIS AGREEMENT OR ANY RIGHTS HEREUNDER WITHOUT THE WRITTEN
CONSENT OF THE OTHER PARTY, WHICH CONSENT SHALL NOT BE UNREASONABLY WITHHELD.

**OTHER TERMS AND CONDITIONS:**
WHEN NOT IN CONFLICT WITH THE FOREGOING, THEN CONOCO INC.'S GENERAL TERMS AND
CONDITIONS FOR DOMESTIC CRUDE OIL AGREEMENTS, DATED JANUARY 1,1993, WITH SHELL
AMENDMENTS, SHALL APPLY AND ARE HEREBY INCORPORATED BY REFERENCE.

**TEXAS LAW AND JURISDICTION SHALL GOVERN THIS AGREEMENT.**

THESE SPECIFIC TERMS WILL GOVERN AND CONSTITUTE THE ENTIRE AGREEMENT BETWEEN THE
PARTIES.  IT SUPERCEDES ANY PRIOR ORAL OR WRITTEN CORRESPONDENCE BETWEEN THE PARTIES
INCLUDING ANY PREPARED AGREEMENT BY A BROKER.

**CONTACTS:**
    CONTRACTS:      KRISTIN KIOLBASSA    TEL: (210) 345-3465
                                          FAX: (210) 345-2585
                    E-MAIL: KRISTIN.KIOLBASSA@VALERO.COM

    CREDIT:    ROSA RAMIREZ    TEL: (210) 345-2743
                                FAX: (210) 345-2716

    INVOICE:      LARRY SMITH      TEL: (210) 345-2275
                                    FAX: (210) 444-8513

WE ARE PLEASED TO HAVE CONCLUDED THIS CONTRACT WITH YOUR COMPANY.

IF YOU ARE NOT IN AGREEMENT WITH ANY OF THE ABOVE PROVISIONS, PLEASE ADVISE BY RETURN
TELEX OR TELECOPY TO THE ATTENTION OF KRISTIN KIOLBASSA, CONTRACT ADMINISTRATION
DEPT. (FAX # 210/345-2585).  IF NO RESPONSE IS RECEIVED WITHIN TWO BUSINESS DAYS OF
RECEIPT, THE TERMS AND CONDITIONS HEREIN SHALL BE CONSIDERED BINDING ON BOTH PARTIES.

REGARDS,
VALERO MARKETING AND SUPPLY COMPANY



### GENERAL PROVISIONS
### DOMESTIC CRUDE OIL AGREEMENTS

**A. Measurement and Tests:** All measurements hereunder shall be made from static tank gauges on 100 percent tank table basis or by positive displacement meters. All measurements and tests shall be made in accordance with the latest ASTM or ASME-API (Petroleum PD Meter Code) published methods then in effect, whichever apply. Volume and gravity shall be adjusted to 60 degrees Fahrenheit by the use of Table 6A and 5A of the Petroleum Measurement Tables ASTM Designation D1250 in their latest revision. The crude oil delivered hereunder shall be marketable and acceptable in the applicable common or segregated stream of the carriers involved but not to exceed 1% S&W. Full deduction for all free water and S&W content shall be made according to the API/ASTM Standard Method then in effect. Either party shall have the right to have a representative witness all gauges, tests and measurements. In the absence of the other party's representative, such gauges, tests and measurements shall be deemed to be correct.

**B. Warranty:** The Seller warrants good title to all crude oil delivered hereunder and warrants that such crude oil shall be free from all royalties, liens, encumbrances and all applicable foreign, federal, state and local taxes.

     Seller further warrants that the crude oil delivered shall not be contaminated by chemicals foreign to virgin crude oil including, but not limited to chlorinated and/or oxygenated hydrocarbons and lead. Buyer shall have the right, without prejudice to any other remedy available to Buyer, to reject and return to Seller any quantities of crude oil which are found to be so contaminated, even after delivery to Buyer.

**C. Rules and Regulations:** The terms, provisions and activities undertaken pursuant to this Agreement shall be subject to all applicable laws, orders and regulations of all governmental authorities. If at any time a provision hereof violates any such applicable laws, orders or regulations, such provision shall be voided and the remainder of the Agreement shall continue in full force and effect unless terminated by either party upon giving written notice to the other party hereto. If applicable, the parties hereto agree to comply with all provisions (as amended) of the Equal Opportunity Clause prescribed in 41 C.F.R. 60-1.4; the Affirmative Action Clause for disabled veterans and veterans of the Vietnam Era prescribed in 41 C.F.R. 60-250.4; the Affirmative Action Clause for Handicapped Workers prescribed in 41 C.F.R. 60-741.4; 48 C.F.R. Chapter 1 Subpart 19.7 regarding Small Business and Small Disadvantaged Business Concerns; 48 C.F.R. Chapter 1 Subpart 20.3 regarding Utilization of Labor Surplus Area Concerns; Executive Order 12138 and regulations thereunder regarding subcontracts to women-owned business concerns; Affirmative Action Complicance Program (41 C.F.R. 60-1.40); annually file SF-100 Employer Information Report (41 C.F.R. 60-1.7); 41 C.F.R. 60-1.8 prohibiting segregated facilities; and the Fair Labor Standards Act of 1938 as amended, all of which are incorporated in this Agreement by reference.

**D. Hazard Communication:** Seller shall provide its Material Safety Data Sheet ("MSDS") to Buyer. Buyer acknowledges the hazards and risks in handling and using crude oil. Buyer shall read the MSDS and advise its employees, its affiliates, and third parties, who may purchase or come into contact with such crude oil, about the hazards of crude oil, as well as the precautionary procedures for handling said crude oil, which are set forth in such MSDS and any supplementary MSDS or written warning(s) which Seller may provide to Buyer from time to time.

**E. Force Majeure:** Except for payment due hereunder, either party hereto shall be relieved from liability for failure to perform hereunder for the duration and to the extent such failure is occasioned by war, riots, insurrections, fire, explosions, sabotage, strikes, and other labor or industrial disturbances, acts of God or the elements, governmental laws, regulations, or requests, acts in furtherance of the International Energy Program, disruption or breakdown of production or transportation facilities, delays of pipeline carrier in receiving and delivering crude oil tendered, or by any other cause, whether similar or not, reasonably beyond the control of such party. Any such failures to perform shall be remedied with all reasonable dispatch, but neither party shall be required to supply substitute quantities from other sources of supply. Failure to perform due to events of Force Majeure shall not extend the terms of this Agreement.

     Notwithstanding the above, and in the event that the Agreement is an associated purchase/sale, or exchange of crude oil, the parties shall have the rights and obligations described below in the circumstances described below:

     (1) If, because of Force Majeure, the party declaring Force Majeure (the "Declaring Party") is unable to deliver part or all of the quantity of crude oil which the Declaring Party is obligated to deliver under the Agreement or associated contract, the other party (the "Exchange Partner") shall have the right but not the obligation to reduce its deliveries of crude oil under the same Agreement or associated contract by an amount not to exceed the number of barrels of crude oil that the Declaring Party fails to deliver.

     (2) If, because of Force Majeure, the Declaring Party is unable to take delivery of part or all of the quantity of crude oil to be delivered by the Exchange Partner under the Agreement or associated contract, the Exchange Partner shall have the right but not the

**Exhibit 2**

Crude Oil Purchase Agreement effective as of October 1, 2011

Payment shall be deemed to be made on the date good funds are credited to Seller's account at Seller's designated bank.

In the event that Buyer fails to make any payment when due, Seller shall have the right to charge interest on the amount of the overdue payment at a per annum rate which shall be two percentage points higher than the published prime lending rate of Morgan Guaranty Trust Company of New York on the date payment was due, but not to exceed the maximum rate permitted by law.

**G. Financial Responsibility:** Notwithstanding anything to the contrary in this Agreement, should Seller reasonably believe it necessary to assure payment, Seller may at any time require, by written notice to Buyer, advance cash payment or satisfactory security in the form of a Letter or Letters of Credit at Buyer's expense in a form and from a bank acceptable to Seller to cover any or all deliveries of crude oil. If Buyer does not provide the Letter of Credit on or before the date specified in Seller's notice under this section, Seller or Buyer may terminate this Agreement forthwith. However, if a Letter of Credit is required under the Special Provisions of this Agreement and Buyer does not provide same, then Seller only may terminate this Agreement forthwith. In no event shall Seller be obligated to schedule or complete delivery of the crude oil until said Letter of Credit is found acceptable to Seller. Each party may offset any payments or deliveries due to the other party under this or any other agreement between the parties.

If a party to this Agreement (the "Defaulting Party") should (1) become the subject of bankruptcy or other insolvency proceedings, or proceedings for the appointment of a receiver, trustee, or similar official, (2) become generally unable to pay its debts as they become due, or (3) make a general assignment for the benefit of creditors, the other party to this Agreement may withhold shipments without notice.

**H. Liquidation:**

(1) Right to Liquidate. At any time after the occurrence of one or more of the events described in the third paragraph of Section G, Financial Responsibility, the other party to the Agreement (the "Liquidating Party") shall have the right, at its sole discretion, to liquidate this Agreement by terminating this Agreement. Upon termination, the parties shall have no further rights or obligations with respect to this Agreement, except for the payment of the amount(s) (the "Settlement Amount" or "Settlement Amounts") determined as provided in Paragraph (3) of this section.

(2) Multiple Deliveries. If this Agreement provides for multiple deliveries of one or more types of crude oil in the same or different delivery months, or for the purchase or exchange of crude oil by the parties, all deliveries under this Agreement to the same party at the same delivery location during a particular delivery month shall be considered a single commodity transaction ("Commodity Transaction") for the purpose of determining the Settlement Amount(s). If the Liquidating Party elects to liquidate this Agreement, the Liquidating Party must terminate all Commodity Transactions under this Agreement.

(3) Settlement Amount. With respect to each terminated Commodity Transaction, the Settlement Amount shall be equal to the contract quantity of crude oil, multiplied by the difference between the contract price per barrel specified in this Agreement (the "Contract Price") and the market price per barrel of crude oil on the date the Liquidating Party terminates this Agreement (the "Market Price"). If the Market Price exceeds the Contract Price in a Commodity Transaction, the selling party shall pay the Settlement Amount to the buying party. If the Market Price is less than the Contract Price in a Commodity Transaction, the buying party shall pay the Settlement Amount to the selling party. If the Market Price is equal to the Contract Price in a Commodity Transaction, no Settlement Amount shall be due.

(4) Termination Date. For the purpose of determining the Settlement Amount, the date on which the Liquidating Party terminates this Agreement shall be deemed to be (a) the date on which the Liquidating Party sends written notice of termination to the Defaulting Party, if such notice of termination is sent by telex or facsimile transaction; or (b) the date on which the Defaulting Party receives written notice of termination from the Liquidating Party, if such notice of termination is given by United States mail or a private mail delivery service.

(5) Market Price. Unless otherwise provided in this Agreement, the Market Price of crude oil sold or exchanged under this Agreement shall be the price for crude oil for the delivery month specified in this Agreement and at the delivery location that corresponds to the delivery location specified in this Agreement, as reported in Platt's Oilgram Price Report ("Platt's") for the date on which the Liquidating Party terminates this Agreement. If Platt's reports a range of prices for crude oil on that date, the Market Price shall be the arithmetic average of the high and low prices reported by Platt's. If Platt's does not report prices for the crude oil being sold under this Agreement, the Liquidating Party shall determine the Market Price of such crude oil in a commercially reasonable manner, unless otherwise provided in this Agreement.

(6) Payment of Settlement Amount. Any Settlement Amount due upon termination of this Agreement shall be paid in immediately available funds within two business days after the Liquidating Party terminates this Agreement. However, if this Agreement provides for more than one Commodity Transaction, or if Settlement Amounts are due under other agreements terminated by the Liquidating Party, the Settlement Amounts due to each party for such Commodity Transactions and/or agreements shall be aggregated. The party owing the net amount after such aggregation shall pay such net amount to the other party in immediately available funds within two business days after the date on which the Liquidating Party terminates this Agreement.

(7) Miscellaneous. This section shall not limit the rights and remedies available to the Liquidating Party by law or under other provisions of this Agreement. The parties hereby acknowledge that this Agreement constitutes a forward contract for purposes of Section 556 of the U.S. Bankruptcy Code.

4/23/2020 Crude Oil Purchase Agreement effective as of October 1, 2011

**Effective January 1, 1993**
**Supersedes November 1983 General Provisions**

Case 20-30949 Document 1609-2 Filed in TXSB on 05/16/20 Page 21 of 33

**I. Equal Daily Deliveries:** For pricing purposes only, unless otherwise specified in the Special Provisions, all crude oil delivered hereunder during any calendar month shall be considered to have been delivered in equal daily quantities during such month.

**J. Exchange Balancing:** If volumes are exchanged, each party shall be responsible for maintaining the exchange in balance on a month-to-month basis, as near as pipeline or other transportation conditions will permit. In all events upon termination of this Agreement and after all monetary obligations under this Agreement have been satisfied, any volume imbalance existing at the conclusion of this Agreement of less than 1,000 barrels will be declared in balance. Any volume imbalance of 1,000 barrels or more, limited to the total contract volume, will be settled by the underdelivering party making delivery of the total volume imbalance in accordance with the delivery provisions of this Agreement applicable to the underdelivering party, unless mutually agreed to the contrary. The request to schedule all volume imbalances must be confirmed in writing by one party or both parties. Volume imbalances confirmed by the 20th of the month shall be delivered during the calendar month after the volume imbalance is confirmed. Volume imbalances confirmed after the 20th of the month shall be delivered during the second calendar month after the volume imbalance is confirmed.

**K. Delivery, Title, and Risk of Loss:** Delivery, title, and risk of loss of the crude oil delivered hereunder shall pass from Seller to Buyer as follows:

For lease delivery locations, delivery of the crude oil to the Buyer shall be effected as the crude oil passes the last permanent delivery flange and/or meter connecting the Seller's lease/unit storage tanks or processing facilities to the Buyer's carrier. Title to and risk of loss of the crude oil shall pass from Seller to Buyer at the point of delivery.

For delivery locations other than lease/unit delivery locations, delivery of the crude oil to the Buyer shall be effected as the crude oil passes the last permanent delivery flange and/or meter connecting the delivery facility designated by the Seller to the Buyer's carrier. If delivery is by in-line transfer, delivery of the crude oil to the Buyer shall be effected at the particular pipeline facility designated in this Agreement. Title to and risk of loss of the crude oil shall pass from the Seller to the Buyer upon delivery.

**L. Term:** Unless otherwise specified in the Special Provisions, delivery months begin at 7:00 a.m. on the first day of the calendar month and end at 7:00 a.m. on the first day of the following calendar month.

**M. Governing Law:** This Agreement and any disputes arising hereunder shall be governed by the laws of the State of Texas.

**N. Necessary Documents:** Upon request, each party agrees to furnish all substantiating documents incident to the transaction, including a Delivery Ticket for each volume delivered and an invoice for any month in which the sums are due.

**O. Waiver:** No waiver by either party regarding the performance of the other party under any of the provisions of this Agreement shall be construed as a waiver of any subsequent performance under the same or any other provisions.

**P. Assignment:** Neither party shall assign this Agreement or any rights hereunder without the written consent of the other party unless such assignment is made to a person controlling, controlled by or under common control of assignor, in which event assignor shall remain responsible for nonperformance.

**Q. Entirety of Agreement:** The Special Provisions and these General Provisions contain the entire Agreement of the parties; there are no other promises, representations or warranties. Any modification of this Agreement shall be by written instrument. Any conflict between the Special Provisions and these General Provisions shall be resolved in favor of the Special Provisions. The section headings are for convenience only and shall not limit or change the subject matter of this Agreement.

**R. Definitions:** When used in this Agreement, the terms listed below have the following meanings:

"API" means the American Petroleum Institute.

"ASME" means the American Society of Mechanical Engineers.

"ASTM" means the American Society for Testing Materials.

"Barrel" means 42 U.S. gallons of 231 cubic inches per gallon corrected to 60 degrees Fahrenheit.

"Carrier" means a pipeline, barge, truck, or other suitable transporter of crude oil.

"Crude Oil" means crude oil or condensate, as appropriate.

"Day," "month," and "year" mean, respectively, calendar day, calendar month, and calendar year, unless otherwise specified.

"Delivery Ticket" means a shipping/loading document or documents stating the type and quality of crude oil delivered, the volume delivered and method of measurement, the corrected specific gravity, temperature, and S&W content.

"Invoice" means a statement setting forth at least the following information: The date(s) of delivery under the transaction; the location(s) of delivery; the volume(s); price(s); the specific gravity and gravity adjustments to the price(s) (where applicable); and the

Crude Oil Purchase Agreement effective as of October 1, 2011

term(s) of payment.

    "S&W" means sediment and water.

**Effective January 1, 1993**
**Supersedes November 1983 General Provisions**

To the extent that they are not in conflict with the above terms, all other terms shall be as per Conoco's General Provisions dated January 1993, with the following amendments:

**C.     Rules and Regulations:**  The third sentence of Section C is deleted in its entirety.

**E.     Force Majeure:**  Delete in its entirety and replace with the following:
"Except for payment due hereunder, either party hereto shall be relieved from liability for failure to perform hereunder for the duration and to the extent such failure is occasioned by war, riots, insurrections, fire, explosions, sabotage, strikes, and other labor or industrial disturbances, acts of God or the elements, governmental laws, regulations, or requests, acts in furtherance of the International Energy Program, disruption or breakdown of production or transportation facilities, delays of pipeline carrier in receiving and delivering crude oil tendered, or by any other cause, whether similar or not, reasonably beyond the control of such party.  Any such failures to perform shall be remedied with all reasonable dispatch, but neither party shall be required to supply substitute quantities from other sources of supply.  Failure to perform due to events of Force Majeure shall not extend the terms of this Agreement; provided, however, the term of the Agreement shall be extended to the extent necessary to comply with the provisions of Section J. Buy/Sell and Exchange Balancing.

In addition to the above, and in the event substantially similar volumes are intended to be bought and sold or exchanged under this Agreement, the parties shall have the rights and obligations set forth in the circumstances described below:
        (1)     If, because of Force Majeure, a party (the "Delivering Party") is unable to deliver part or all of the quantity of crude oil which it is obligated to deliver under this Agreement, the other party (the "Receiving Party") shall have the right, but not the obligation, to reduce its deliveries of crude oil under this Agreement by an amount not to exceed the number of barrels of crude oil that the Delivering Party fails to deliver.
        (2)     If, because of Force Majeure, the Receiving Party is unable to take delivery of part or all of the quantity of crude oil to be delivered by the Delivering Party under this Agreement, the Delivering Party shall have the right, but not the obligation, to reduce its receipts of crude oil under this Agreement by an amount not to exceed the number of barrels of crude oil that the Receiving Party fails to take delivery of."

**F.     Payment:**  The first sentence of Section F is deleted in its entirety and replaced with the following sentence:
"Unless otherwise specified in the Special Provisions of this Agreement, Buyer agrees to make payment against Seller's invoice for the crude oil purchased hereunder to a bank designated by Seller in U.S. dollars by telegraphic transfer in immediately available funds, in full, without discount, withholding, setoff or counterclaim (except as otherwise provided herein)."

Third paragraph, delete "Morgan Guaranty Trust Company of New York" and replace with "JP Morgan Chase Bank, New York, N.Y. (or Citibank N.A. New York, N.Y., if the JP Morgan Chase Bank interest rate is unknown)".

**G.     Financial Responsibility:**  Delete in its entirety and replace with the following:
        "(1)     Adequate Assurance.  Seller may, within Seller's full discretion, at any time request and Buyer shall, not later than two (2) Banking Days after request by Seller, provide Adequate Assurance of Performance.  After such request, and in the event that title has not already been transferred, Seller may withhold performance until such Adequate Assurance of Performance shall have been received by it.  Any cost, expense, or charges associated with any letter of credit procured pursuant to this Section shall be for the account of Buyer."

        (2)     Financial Responsibility.  Notwithstanding anything to the contrary in this Agreement, if in the reasonable opinion of a party (the "Secured Party") at any time the reliability or the financial responsibility of the other party ("Posting Party") (or of any guarantor or other person furnishing security in support of Posting Party) is or becomes impaired or unsatisfactory, Adequate Assurance of Performance shall be given by Posting Party to Secured Party on demand by Secured Party in respect of each or any

Exhibit 3

cargo or any portion thereof. Any amounts specified in such demand shall thereby become due and payable no later than two (2) Banking Days from the date of the demand. After such demand, and in the event that title has not already been transferred, Secured Party may withhold performance until such Adequate Assurance of Performance shall have been received by it. Any cost, expense, or charges associated with any letter of credit procured pursuant to this Section shall be for the account of the party providing the letter of credit. If Buyer exceeds the credit line Seller established for Buyer, which Seller may establish and modify in its sole discretion from time to time, Seller may deem the financial responsibility of Buyer to be unsatisfactory and demand Adequate Assurance of Performance pursuant to the Financial Responsibility provision set forth in the contract."

**H.      Liquidation:** Delete in its entirety and replace with the following new section:

**"H. Default and Liquidation; Termination:**

(1)      For purposes of this Agreement, an event of default ("Event of Default") shall mean with respect to a party or, the guarantor of such party, if any, any of the following: (a) the failure by such party or its guarantor, if any, to make, when due, any payment required under this Agreement, or any guaranty given in support of this Agreement, if such failure is not remedied within five (5) Banking Days after receipt of written notice; (b) the failure by such party to provide Adequate Assurance of Performance when due, if such failure is not cured within five (5) Banking Days after receipt of written notice; or (c) the occurrence of an Insolvency Event.

(2)      If an Event of Default occurs and is continuing, the non-defaulting party may, without limiting any other rights and remedies that may be available to the non-defaulting party under this Agreement or otherwise, (a) offset all or any portion of any amounts owed by the defaulting party to the non-defaulting party against any amounts owed by the non-defaulting party to the defaulting party, (b) apply any prepayments made, or Adequate Assurance of Performance posted, by the defaulting party to the non-defaulting party against any amounts that are owed to the non-defaulting party, (c) if the non-defaulting party is the Seller, suspend deliveries until all amounts due for all previous deliveries to the defaulting party have been paid in full; provided, however, to the extent the non-defaulting party sustains damages related to the suspension of deliveries, the defaulting party shall pay such damages to the non-defaulting party, (d) place the defaulting party on a pre-pay basis, if the defaulting party is the Buyer, and/or (e) terminate this Agreement pursuant to Section H(5) or terminate all Transactions pursuant to Section H(3), as applicable.

(3)      If an Insolvency Event occurs and is continuing, the non-defaulting party ("Liquidating Party") may, by written notice to the defaulting party, designate a day no earlier than the day such notice is effective and no later than twenty (20) days after such notice is effective as an early termination date ("Early Termination Date"). On the Early Termination Date, all transactions between the parties for the purchase and sale of all crude oils, whether governed by these Provisions or otherwise, including the Transactions, shall be terminated except as provided herein ("Terminated Transactions"). If an Early Termination Date has been designated, the Liquidating Party shall in good faith calculate the Settlement Amount of all Terminated Transactions as of the Early Termination Date (or as soon thereafter as reasonably practicable). The Liquidating Party shall aggregate all amounts due between the Parties into a single net amount (the "Termination Payment") by aggregating or setting off, as appropriate, (i) the Settlement Amount for each Terminated Transaction, (ii) all Unpaid Amounts owed to the Liquidating Party, and (iii) all Unpaid Amounts owed to the defaulting party; provided, however, if the net of the Settlement Amounts for all such Terminated Transactions would be an amount owing to the defaulting party, then such net amount shall be zero for purposes of determining the Termination Payment. The Liquidating Party shall notify the defaulting party in writing of the amount of the Termination Payment due from the defaulting party, along with reasonable detail regarding the calculation of such amount. The defaulting party shall pay the Termination Payment to the Liquidating Party within two (2) Banking Days after receipt of such notice, with interest (as provided in Section F) from the Early Termination Date until paid. If an Early Termination Date is designated, the Liquidating Party shall be entitled, in its sole discretion, to set-off any amount payable by the Liquidating Party or any of its Affiliates to the defaulting party under this Agreement or otherwise, against any amounts payable by the defaulting party to the Liquidating Party or any of its Affiliates under this Agreement or otherwise. The Liquidating Party shall also be entitled to apply any Adequate Assurance of Performance posted by the defaulting party to the

Liquidating Party or any of its Affiliates against any amounts owed to the Liquidating Party. This Section H(3) shall be in addition to any right of setoff or other rights and remedies to which any Party is otherwise entitled (whether under this Agreement, by operation of law, contract, normal business practice, or otherwise). If an obligation is unascertained, the Liquidating Party may in good faith estimate that obligation and set-off in respect of the estimate, subject to the Liquidating Party accounting to the defaulting party when the obligation is ascertained.

(4)     The Parties acknowledge and agree that this Agreement is a "Forward Contract" as defined in the Bankruptcy Code and that each Party is a "Forward Contract Merchant" as defined the Bankruptcy Code.

(5)     Notwithstanding anything to the contrary contained in this Agreement, if an Event of Default (other than an Insolvency Event) occurs and has not been remedied pursuant to Section H(1), the non-defaulting party shall be entitled to terminate this Agreement, whereupon the non-defaulting party shall have all remedies that may be available to it under this Agreement or by law."

**J.     Buy/Sell and Exchange Balancing**: Delete in its entirety and replace with the following:
"The terms of this Section J shall only apply to this Agreement if substantially similar volumes are intended to be bought and sold or exchanged under this Agreement:
Each party shall be responsible for maintaining the volumes bought and sold or exchanged in balance on a month-to-month basis, as near as reasonably possible. If a party fails to deliver or take its required volume during any month (Shortfall Month), including a failure to deliver or take due to an event of Force Majeure, despite reasonable efforts to remain in balance, such volumes (Imbalance Volumes) shall be delivered and taken as soon thereafter as is reasonably practicable, and the term of this Agreement shall be extended for the sole purpose of balancing deliveries. The parties shall endeavor to cause the Imbalance Volumes confirmed by the 20th of the month to be delivered during the following calendar month, and the Imbalance Volumes confirmed after the 20th of the month to be delivered during the second following calendar month, except to the extent prevented by the continuation of the event of Force Majeure.

An event of Force Majeure shall not relieve either Party from its obligations under this Section J. to balance deliveries once the event of Force Majeure has passed and the imbalance created during said period is known. For avoidance of doubt, a declaration of Force Majeure is not required for the terms of this provision to apply. If Imbalance Volumes created as a result of an event of Force Majeure have not been delivered within three months after the Shortfall Month, and no other resolution of the Imbalance Volumes has been agreed between the Parties, during the fourth month following the Shortfall Month, the Delivering Party shall deliver, and the Receiving Party shall take, an amount of crude oil equal to the Imbalance Volumes of the same type, at the same location and at the same price as was received by the Delivering Party during the Shortfall Month.

For all imbalances, if the price specified in this Agreement is a fixed price, or a formula price which is based on fixed calendar dates (eg. April 12, 2009 or April 12-19, 2009), the price of the Imbalance Volumes shall be equal to such price without regard to the month of actual delivery. However, if the price specified in the Agreement is a formula price not based on fixed calendar dates, that formula, based on prices for the month of actual delivery, will be used to calculate the price for the Imbalance Volumes, unless specified otherwise in the Special Provisions of this Agreement.

The foregoing notwithstanding, for any Imbalance Volumes existing at the end of this Agreement less than 1000 barrels, the obligation of either party to deliver or take such Imbalance Volumes shall be excused."

**P.     Assignment: Delete Section P in its entirety and replace with the following language:**
"This Contract shall extend to and be binding upon the successors and assigns of the parties, but neither this Contract nor any part, including any rights, interests or obligations hereunder (unless expressly set forth herein), shall be assigned or transferred by either party or by operation of law, merger or otherwise without the prior written consent of the other party, which shall not be unreasonably withheld. Any

assignment or transfer made by either party without the other party's written consent need not be recognized by and shall not be binding upon the other party. Upon the making of any such assignment, unless otherwise agreed by the parties, the assignor shall remain bound to perform or procure performance of the said obligations (as so accepted) by the assignee. For the purpose of this Contract, a merger constitutes an assignment subject to this provision. Notwithstanding the foregoing, Seller may without Buyer's consent assign all or a portion of its rights to receive and obtain payment under the Contract in connection with any finance, securitization or bank funding arrangements, always providing such assignment does not contravene any applicable law, regulation or decree binding upon Buyer. Any payment made by Buyer to the payee specified in Seller's invoice in respect of crude oil delivered under the Contract shall be in full discharge of Buyer's payment obligations to Seller under the Contract. Any such assignment will not detract from Seller's obligations under the Contract."

**R.    Definitions:** Amend by adding the following definitions in their appropriate alphabetical order:

"Adequate Assurance of Performance" means either (i) an irrevocable stand-by letter of credit in a form and for a commercially-reasonable amount acceptable to Secured Party opened or confirmed by a "Qualified Institution" acceptable to Secured Party or (ii) cash or prepayment in immediately available funds in a commercially-reasonable amount acceptable to the Secured Party, at the option of the Party providing the Adequate Assurance.

"Affiliate" means, in relation to any person, an entity controlled, directly or indirectly, by the person, any entity that controls, directly or indirectly, the person or any entity directly or indirectly under common control with the person. For this purpose, "control" of any entity or person means ownership of a majority of the voting power of the entity or person.

"Agreement" means these GTC's (including, where applicable, the Attachments attached hereto) together with a Confirmation;

'Banking Day" means a day other than a Saturday or Sunday when federal banks are open for business in New York, NY.

"Bankruptcy Code" means Title 11 of the United States Code, 11 U.S.C. §§ 101 et seq., as amended from time to time.

"Product" means any commodity or commodities bought or sold between the parties as identified in a particular Confirmation;

"Provisions" means these Conoco General Provisions for Domestic Crude Oil Agreements dated January 1, 1993, as amended.

"Insolvency Event" means the Party or its guarantor (i) makes a general assignment for the benefit of its creditors, (ii) commences a proceeding under applicable bankruptcy law or other law for the relief of debtors, (iii) files a petition seeking to take advantage of any other law relating to bankruptcy, insolvency, reorganization, winding-up, or composition or readjustment of debts, (iv) has a trustee, custodian, conservator, receiver or similar official appointed for it, or for a substantial part of its property; (v) becomes insolvent or is unable to pay its debts as they become due; or (vi) becomes subject to any involuntary bankruptcy, reorganization, debt arrangement, or other proceeding under any applicable bankruptcy, insolvency or other similar law for the relief of debtors or any dissolution or liquidation proceeding is instituted against the party or its guarantor;

"Qualified Institution" means (i) the U.S. office of a commercial bank or trust company (which is not an Affiliate of either Party) organized under the laws of the United States (or any state or political subdivision thereof), or (ii) the U.S. branch of a foreign bank (which is not an Affiliate of either Party), in each case having assets of at least ten billion dollars ($10,000,000,000), and having a credit rating of at least A- by Standard's & Poor's and at least A3 by Moody's.

"Settlement Amount" of a Terminated Transaction means the amount, as calculated by the Liquidating Party in a commercially reasonable manner, which the Liquidating Party would pay to or receive from a third party in an arm's-length transaction as consideration for the third party's entering into a new transaction (discounted to net present value as of the Early Termination Date) in which: (a) the Liquidating Party holds the same position as it currently holds in the subject Terminated Transaction; (b) the third party holds the same position as the Defaulting Party holds in the subject Terminated Transaction; and (c) the new transaction has economic terms and conditions substantially the same in all respects to the economic terms and conditions of the subject Terminated Transaction; provided, however, that in making such determination, the Liquidating Party may consider, among other things, quotations from leading dealers in the relevant market, and/or its own internal valuation for such Terminated Transaction kept in the ordinary course of its business; provided, further, that nothing herein shall require the Liquidating Party to enter into any replacement Transactions for the Terminated Transactions;

"Transaction" means any purchase or sale of crude oils between the Parties that is evidenced by a written confirmation that incorporates the Provisions.

"Unpaid Amounts" means any unpaid amounts due and payable under this Agreement and all Terminated Transactions, whether due prior to or after any Early Termination Date (but excluding any Settlement Amounts), including but not limited to attorneys' fees and other expenses payable, as well as any other amounts due and payable by the Defaulting Party to the Liquidating Party."

**Insert a new section (Section S) as follows**:
"**S.      LIABILITIES:**  IN NO EVENT SHALL SELLER OR BUYER BE LIABLE FOR CONSEQUENTIAL, INCIDENTAL, PUNITIVE, SPECIAL, EXEMPLARY OR INDIRECT DAMAGES, OR LOST PROFITS."

**Insert a new section (Section T) as follows:**
"**T.      Export Controls:**  The Parties acknowledge that they will comply in all respects with U.S. laws, regulations and administrative requirements applicable to this Contract concerning any export or reexport of the Product, including, but not limited to, the International Traffic in Arms Regulations, the Export Administration Regulations, the Foreign Trade Regulations and the regulations and orders issued and/or administered by the U.S. Department Of The Treasury, Office Of Foreign Assets Control in relation to export control, antiboycott and trade sanctions matters ("US Export Control Laws and Regulations").

Notwithstanding any other provisions herein, this Contract does not constitute an agreement by either Party or any of its affiliates to which this Agreement is assigned to comply with any provisions in this Contract that are inconsistent with U.S. Export Control Laws and Regulations. This Contract does not constitute, and shall not be construed to constitute, an agreement by either Party to take or refrain from taking any action which would constitute non-compliance with any laws, regulations or other official government rules or requirements applicable to such Party which relate to export control, antiboycott or trade sanctions matters."

**Insert a new section (Section U) as follows:**

"**U.      Netting:**

(1) Purpose.  The parties are selling to and buying from each other various quantities of crude oil or condensate at stated prices, or are exchanging with each other various quantities of crude oil or condensate at stated differentials under existing agreements (collectively, the "Crude Contracts").  For purposes of this Net Settlement Arrangement (defined below), Crude Contracts shall not include agreements in the nature of division orders.  With respect to deliveries of crude oil or condensate under the Crude Contracts, the parties agree to engage in net settlement arrangements (the "Net Settlement Arrangement") for the purpose of making payments (and thereby settling the parties' respective accounts) for (a) all existing Crude Contracts, and (b) for

all future Crude Contracts that do not specifically identify, and reject application of, this netting procedure.

(2) <u>Procedure</u>.  For each calendar month in which sales or exchange transactions occur (a "Transaction Month"), each party shall determine the sales price for the crude oil or condensate sold to the other party and the exchange differentials, if any, due from such other party under the Crude Contracts according to the respective pricing provisions contained therein, to determine the total amount owed by such other party.  The parties shall continue to issue invoices to each other in the normal course of business.  In addition, after the receipt of all invoices and at least three business day before the 20th day of the month following the Transaction Month, each party shall (a) issue a statement showing all invoice amounts for both parties and the difference resulting after offsetting the total amount each party owes to the other party (the "Net Settlement Amount"), and (b) confer by telephone and compare and confirm the Net Settlement Amount.  The Net Settlement Amount shall be paid by the party hereto owing the greater amount by paying such difference to the party hereto owing the lesser amount in accordance with this Agreement.

(3) <u>Disputed or Unverified Amounts</u>.  If any invoice or portion of an invoice is disputed in good faith or cannot be timely verified and approved for payment, such invoice shall not be held for payment under the Net Settlement Arrangement, but shall be settled independently as soon as verified or as soon as any dispute is resolved, provided that any invoice that is partially verified or disputed shall be included in the Net Settlement Arrangement to the extent that it is verified or undisputed.  Notwithstanding the foregoing, each party agrees to use every reasonable effort to achieve the objective of timely verification of invoices in order to permit payment of such invoices pursuant to the terms of this Contract in the month following the Transaction Month and no dispute or lack of verification shall excuse participation in the Net Settlement Arrangement.

(4) <u>Effect on Other Agreements</u>.  Except as expressly provided herein, existing agreements between the parties hereto shall continue in effect and shall not otherwise be affected by this Contract.  Notwithstanding the provisions hereof, nothing in this Contract shall have the effect of amending or modifying the pre-payment provisions or the close out netting provisions under this Contract or any existing or future master agreement between the parties.

# Fieldwood Energy

**BILL TO:**          **Valero Marketing & Supply Company**
                               **Attn:**  Jill Trowbridge

| | | |
|---|---|---|
| **Email** | Jill.Trowbridge@valero.com | **INVOICE:** FW-70-042020 |
| **Phone** | **(210) 345-5812** | **INVOICE DATE:** 5/15/2020 |
| | | Purchaser Code:      Valero |

| LEASE | Production<br>Month | Shelf<br>BARRELS | PRICE | | AMOUNT |
|---|---|---|---|---|---|
| **Thunderhawk**<br>**MC 698/MC782** | 04/20 | 195,000 | $15.8490 | $ | 3,090,564.29 |
| | | | Total Due Fieldwood Energy, LLC | $ | 3,090,564.29 |

**TERMS:**
  PAY BY WIRE TRANSFER ON OR BEFORE THE 20TH OF THE MONTH
  PLEASE INDICATE THE INVOICE REFERENCE ON THE PAYMENT

**NEW BANKING INSTRUCTIONS**
  SEND PAYMENT TO:
Account Name: Fieldwood Engy/FWFinco-DBNYSTEFFS
ABA: 021001033
SWIFT: BKTRUS33
Account #: 01482558
Financial Institution Name: Deutsche Bank Trust Company Americas
Reference: Finco Invoice No.
Attention: Commercial Loans Division

REVENUE ACCOUNTING CONTACT:
Linda Cobb
Phone: (713) 969-1273
linda.cobb@fwellc.com

# Exhibit 4



May 14, 2020

*VIA FACSIMILE and ELECTRONIC MAIL*

Fieldwood Energy LLC
2000 W Sam Houston Parkway S, Suite 12
Houston, Texas 77042
Attn: Jim Brysch
VP – Production Marketing
Email: Jim.Brysch@fwellc.com
Fax: (713) 969-1099

**Re: Demand for Adequate Assurance of Performance by Fieldwood Energy LLC ("*Fieldwood*") pursuant to Purchase Contract No. 4200144305 (the "*Contract*")**

Dear Mr. Brysch:

Valero Marketing and Supply Company ("*Valero*") is in receipt of Fieldwood's April 29, 2020 Notice of Termination Letter, terminating the Contract effective as of May 30, 2020, as well as Fieldwood's consistent communications that Fieldwood will not deliver any crude oil to Valero during the month of May. Valero has thus calculated its estimated damages resulting from Fieldwood's failure to deliver any May volumes to be $2,102,544 ("*Valero's Damages*").

Based on the foregoing and other recent events, it is Valero's reasonable opinion that the reliability of Fieldwood to perform its obligations as well as its ability to pay Valero for Valero's Damages is impaired and/or unsatisfactory. On this basis and pursuant to the Contract, Valero hereby demands that Fieldwood provide to Valero "Adequate Assurance of Performance" confirming Fieldwood's ability to pay Valero's Damages, in either an irrevocable stand-by letter of credit for such amount (in the form and by a bank acceptable to Valero) or through payment of such amount in immediately available funds to the account specified in *Appendix 1*.

Pursuant to the Contract, Valero's Damages shall become due and payable by Fieldwood no later than two Banking Days from the date of this communication. In the event Valero does not receive Adequate Assurance of Performance within this time period, Valero reserves the right to pursue further remedies under the Contract and at law.

Please provide your response in writing to physicalbulkcontracts@valero.com with a copy to Randy.Hawkins@valero.com.

Regards,

Randall E. Hawkins
Senior Vice President

cc: Johnny Dobecka via email at Johnny.Dobecka@Fwellc.com

Post Office Box 696000 • San Antonio, Texas 78269-6000 • Telephone (210) 345-2000

**Exhibit 5**

# APPENDIX 1



P.O. Box 696000, San Antonio, Texas 78269-6000
Ph 800-333-3377 Fax 210-345-2234


VALERO ENERGY CORPORATION

JPMORGAN CHASE BANK

NEW YORK, NY

ACCOUNT #323272568

ABA #021000021

SWIFT CODE:  CHASUS33

For the benefit of:

Payment Reference:


Director Cash Management:  Shawna Krepps (210) 345-2276


JPMORGAN CHASE BANK
712 Main Street, Floor 05
Houston, TX 77002-3204

CONTACT: Chavonne Johnson  713-216-2837



Nathan L. Mechler
Senior Counsel

June 1, 2020

*VIA FACSIMILE and ELECTRONIC MAIL*

Fieldwood Energy LLC
2000 W Sam Houston Parkway S, Suite 12
Houston, Texas 77042
Attn: Troy Allen
Assistant General Counsel
Email: Troy.Allen@fwellc.com
Fax: (713) 969-1099

>       Re:     **Fieldwood Energy LLC ("*Fieldwood*") Breach of Purchase Contract
>               No. 4200144305 (the "*Contract*")**

Dear Mr. Allen:

Valero Marketing and Supply Company ("***Valero***") is in receipt of your May 28, 2020 correspondence. My apologies on the last letter, as I should have sent to your attention and will do so in the future. Regarding your most recent letter, Valero disagrees with the legal rights and obligations of the parties. Valero reserves all rights and defenses under the contract and the law, but will attempt to address some of the issues here.

First, Valero disagrees that COVID-19 is a force majeure event under the Contract. The Contract does not expressly state that a pandemic qualifies as a force majeure event, and Fieldwood has failed to demonstrate that COVID-19 is a cause reasonably beyond its control that actually prevented it from performing under the Contract. Moreover, Fieldwood's business, like Valero's business, qualified as an essential business to the country, thereby allowing Fieldwood to continue its business and ability to perform its contractual obligations. Rather, the email from Fieldwood prior to its claim of force majeure clearly demonstrates why it ceased operation – economics. Specifically, on April 16, 2020, Johnny Doebecka stated:

> *Fieldwood's Management continues to monitor the various crude oil pricing components and our ability to economically produce and sell the production. If the current pricing environment does not improve or continues to deteriorate, one of the options being considered is to curtail or shut in certain platforms. Fieldwood will inform you as to any decisions affecting May deliveries.*

Thus, COVID-19 did not prevent Fieldwood from performing under the Contract. Fieldwood chose not to perform purely based on the economics of having to perform.

In addition, you state that Fieldwood did not breach the Contract, as the Contract required only the output from the two fields mentioned. Essentially, Fieldwood's position is that with the fields shut-in and thus no production, there could be no breach under a production contract. Even assuming that this is a production contract, Valero also disagrees with this position. The Quality

Exhibit 6

Fieldwood Energy LLC
2000 W Sam Houston Parkway S, Suite 12
Houston, Texas 77042
Attn: Troy Allen
June 1, 2020
Page 2

Provision of the Contract states: "620,000.00 Barrel…Approximately 10,000 Barrels Per Day. Tolerance: Per Actual Production about 49.5% of Noble's Share (Big Bend/Dantzler)."

As this Contract is governed by the laws of Texas, Chapter 2 of the Texas Business and Commerce Code applies. Section 2-306(1) states:

A term which measures the quantity by the output of the seller or the requirements of the buyer means such actual output or requirements as may occur in good faith, except that no quantity unreasonably disproportionate to any stated estimate or in the absence of a stated estimate to any normal or otherwise comparable prior output or requirements may be tendered or demanded.

There is no doubt that the Contract provided a stated estimate, and thus Fieldwood was under an obligation to provide a quantity that was not unreasonably disproportionate to the stated amount. Going from the stated amount of 10,000 barrels per day to zero barrels per day is unreasonably disproportionate.

Next, you mention Fieldwood being relieved from performing due to Valero not providing the adequate assurance demanded. Again, we disagree with Fieldwood's ability to use this provision as retaliation to Valero's prior demand under this provision. But even assuming that this provision were validly used by Fieldwood, it certainly would not excuse Fieldwood's daily performance failures that resulted prior to this demand. And it certainly would not cure Fieldwood's breach of Contract as provided above.

Regarding the withholding of performance, this has already been addressed by Valero. Section G of the amendments to the Conoco General Provisions specifically allows for this right. In fact, withholding performance is the only option permitted for Valero following Fieldwood's refusal to provide adequate assurance of performance.

Finally, you address mitigation and have numerous requests regarding Valero's efforts to mitigate its damages. The very definition of mitigation is that a party who suffers loss as a result of a breach of contract has a duty to mitigate those losses. While a duty to mitigate losses exists, unless you would agree that Fieldwood has breached the contract, this is a topic best addressed in litigation. Valero prefers not to go to litigation, and hopes that a commercial resolution can be reached. However, should you choose to pursue litigation, we feel confident in our position and remain willing and eager to defend it.

Regards,

Nathan Mechler
Senior Counsel - Litigation