# PANACO EAST BREAKS ESCROW ACCOUNT
## ESCROW AND SECURITY AGREEMENT

This Escrow and Security Agreement is made and entered into as of October 29, 1999 by and among RLI Insurance Company an Illinois corporation with offices at 8 Greenway Plaza, Suite 400 (the "Surety"), Panaco, Inc. a Delaware corporation with principal offices at 1100 Louisiana, Suite 5100, Houston, Texas 77002-5220 (the "Principal"), Chase Bank of Texas, N.A., a corporation, with principal offices at 600 Travis Street, 11th Floor, Houston, Texas 77002 (the "Escrow Agent"), B P Exploration & Oil Inc. ("BP"), a corporation with its principal offices at 501 Westlake Boulevard, Houston, Texas 77253-3092 and Foothill Capital Corporation, a California corporation, with a place of business at 11111 Santa Monica Boulevard, Suite 1500, Los Angeles, California 90025-3333, as agent for the benefit of itself and the other lenders under that certain Amended and Restated Loan and Security Agreement dated as of September 30, 1999, by and among Panaco, Inc. and Panaco Production Company, as borrowers, and Foothill Capital Corporation, as agent for the lenders listed therein ("Foothill"). (as the same may from time to time be amended, the "Agreement").

## RECITALS

A.     The Surety shall issue Bond Nos. RLB0001507, RLB0001508 and RLB0001509 (the "Bonds") for the benefit of the Principal, and has executed the Indemnity Agreement with the Principal (the "Indemnity Agreement") for the following purpose:

> For the plugging and abandonment of the well, the salvage and removal of platform and related equipment and restoration of East Breaks 165 and 208 (OCS-G-06280 and OCS-G-07897, respectively) herein otherwise described as "Subject Property") with the Minerals Management Service and BP, collectively as Obligee.

B.     The Surety and the Principal desire to establish an escrow account with the Escrow Agent as security for the payment of obligations in connection with the Bond and the Indemnity Agreement.

C.     It is a condition precedent to issuance of the Bond by the Surety that the Principal shall have made the assignment contemplated by this Agreement.

## AGREEMENT

In consideration of the mutual covenants and agreements contained in the Indemnity Agreement and herein and of the issuance of the Bond, the Principal, the Surety, and the Escrow Agent hereby agree as follows:

Exhibit B

## ARTICLE I

## DEFINITIONS

Section 1.01   Terms Defined Above.  As used in this Agreement, the terms "Surety", "Principal", "Escrow Agent", "Indemnity Agreement" and "Bond" have the meanings set forth above.

Section 1.02   Certain Definitions.  As used in this Agreement, the following terms have the following meanings:

"Bond Documents" means (a) this Agreement, the Indemnity Agreement and the Bond and (b) each other agreement, lease or instrument which in any manner may give rise to a claim under the Bond by the Obligee, including without limitation each agreement, lease or instrument under which the Principal is obligated to the Obligee.

"Business Day" means a day when the Escrow Agent is open for the conduct of commercial banking business.

"Collateral" means the Escrow Funds and the Escrow Account, and all proceeds, replacements, additions to and substitutions for the Escrow Funds and the Escrow Account.

"Debt" means, for any person, without duplication: (a) all indebtedness of such person for borrowed money or for the deferred purchase price of property or services for which such person is liable; (b) all obligations of such person under leases that are, or should be, in accordance with generally accepted accounting principles, recorded as capital leases; (c) all reimbursement and other payment obligations (direct or contingent) of such person in respect of letters of credit, bankers acceptances, bank guaranties, financial performance bonds and surety bonds, receivables sales recourse arrangements and other financial obligations (except endorsements of instruments for deposit or collection in the ordinary course of business); and (d) all obligations of any other person of the types described in clauses (a), (b) and (c) for which such person is liable, whether such liability is direct or contingent, or (as obligor, guarantor or otherwise) in respect of which obligations such person otherwise assures a creditor against loss.

"Default" means any of the events specified in Section 6.01 that would constitute an Event of Default but for the requirement that notice be given or time elapse or both.

"Dollars" or "$" means United States Dollars.

"Escrow Account" means the escrow account with the Escrow Agent established pursuant to Section 3.01.

"Escrow Funds" means the cash and Permitted Investments from time to time held in the Escrow Account by the Escrow Agent pursuant to this Agreement.

"Event of Default" means the occurrence of any of the events specified in Section 6.01, provided that any requirement for notice or lapse of time or any other condition precedent has been satisfied.

"Minimum Balance Requirement" means as of any date an amount equal to the amount set forth on Exhibit A hereto for the period including such date, as the same may be adjusted from time to time in accordance with Section 3.02(c).

"First Priority Obligations" means all indebtedness and other obligations (direct or contingent and whether for the payment of money or the taking of action or both) of the Principal to the Surety now or hereafter existing under or in connection with the Bond Documents, and includes the Surety's reasonable legal expenses and attorneys' fees incurred as a result of execution or enforcement of the Bond Documents or any rights available under applicable law or in equity.

"Second Priority Obligations" means all indebtedness and other obligations (direct or contingent and whether for the payment of money or the taking of action or both) of the Principal to BP now or hereafter existing and of the Surety to BP pursuant to the terms and conditions of the Bond issued on behalf of the Principal by the Surety to BP on the Subject Property.

"Obligee" means the obligee under the Bond.

"Permitted Investments" means (a) direct obligations of the United States of America; or obligations of any agency or instrumentality thereof (provided that said obligations are supported by the full faith and credit of the United States of America) having maturities of not more than one year from the date of acquisition; (b) Dollar time deposits and certificates of deposit in denominations of no greater (in the aggregate with respect to any depository institution) than the then-applicable maximum federal deposit insurance limit (on in greater amounts with the consent of the Surety) with maturities of not more than one year from the date of acquisition of (i) the Escrow Agent or (ii) any bank organized under the laws of the United States or any state of the United States, of recognized standing, having capital and surplus in excess of $500,000,000 and which has (or which is a subsidiary of a bank holding company which has) publicly traded debt securities rated, at the time of issuance of such time deposits, AA or higher by Standard & Poor's Ratings Group or AA-2 or higher by Moody's Investors Service, Inc.; (c) repurchase obligations with a term of not more than seven days for underlying securities of the type described in clause (a) above entered into with any bank meeting the qualifications specified in clause (b) above, provided that the terms of such agreements comply with the guidelines set forth in the Federal Financial Institution Examination Council Supervisory Policy - Repurchase Agreements of Depository Institutions With Security Dealers and Others, as adopted by the Comptroller of the Currency on October 31, 1985, as the same may be amended and supplemented from time to time; (d) commercial paper or other Dollar obligations issued by an entity incorporated in the United States, which commercial paper is rated at least A-1 or the equivalent thereof by Standard & Poor's Ratings Group or at least P-1 or the equivalent thereof by Moody's Investors Service, Inc., and in each case maturing not more than six months after the date of issue; and (e) investments in money market

funds substantially all the assets of which are comprised of securities of the types described in clauses (a) through (d) above.

"Qualified Assets" means cash and Permitted Investments.

Section 1.03  Interpretation.  All titles or headings to articles, sections, subsections or other divisions of this Agreement are only for the convenience of the parties and shall not modify or restrict the terms hereof.  All references to sections are to sections of this Agreement unless otherwise stated.

## ARTICLE II

### THE ESCROW AGENT

Section 2.01  Appointment of Escrow Agent.  The Principal and the Surety hereby appoint and designate Chase Bank of Texas, N.A. as Escrow Agent.  Chase Bank of Texas, N.A. accepts such appointment and agrees to serve hereunder for the purposes and on the terms herein set forth.

Section 2.02  Compensation of Escrow Agent.  The Escrow Agent shall be entitled to receive compensation for its services rendered as Escrow Agent under this Agreement in accordance with the fee schedule attached hereto as Exhibit B and shall be entitled to reimbursement for its expenses incurred in serving as Escrow Agent.  Such compensation shall be billed to the Principal, with a copy of the invoice sent to the Surety.  The Principal shall pay the invoice on demand.  If the Principal fails to pay the Escrow Agent within 30 days following receipt of the invoice, the Escrow Agent shall notify the Surety of such failure. Within five Business Days (if payment by the Principal has still not been received), the Surety shall either (a) pay the Escrow Agent the amount of such invoice, in which case the Principal shall immediately reimburse the Surety for the amount of such payment, together with interest thereon at the rate of ten percent (10%) per annum from the date the Surety makes such payment until the date the Surety receives such reimbursement, or (b) direct the Escrow Agent in writing to pay itself the amount of such invoice from the Escrow Account, in which case the Principal shall immediately pay to the Escrow Agent, for deposit to the Escrow Account, the amount required, if any, under Section 3.02 to maintain the Minimum Balance Requirement.

Section 2.03  Records and Reports.  The Escrow Agent will keep books of record and account in which complete entries shall be made of all transactions relating to the receipts, disbursements and investment of the Escrow Funds, and such books shall be available for inspection at reasonable hours and under reasonable conditions by the Principal and the Surety. The Escrow Agent shall report to the Principal and the Surety monthly by account statement as to the balance of the Escrow Account and the value, amount and nature of the investments therein.  The Escrow Agent shall establish a monthly valuation date as of which the Permitted Investments shall be valued for the purpose of the monthly account statements.  Each account statement shall be deemed correct as regards the rights and obligations of the Escrow Agent,

absent manifest error, unless the Principal or the Surety notifies the other parties hereto within 30 days of a discrepancy; provided that this sentence shall not affect the respective rights and obligations of the Principal and the Surety, as between themselves, under the other Bond Documents.

Section 2.04   Indemnification of Escrow Agent.

(a)     The Principal hereby agrees to indemnify the Escrow Agent, its officers, directors and employees (collectively, the "Indemnified Parties") for, and to hold them harmless against, any loss, liability or expense (including without limitation, reasonable fees and disbursements of counsel) incurred without gross negligence, willful misconduct, or bad faith on the part of the Indemnified Parties arising out of, or in connection with, entering into this Agreement and carrying out the duties hereunder. THE FOREGOING INDEMNITY SHALL INCLUDE LOSSES, LIABILITIES AND EXPENSES INCURRED BY THE ORDINARY NEGLIGENCE (WHETHER SOLE, JOINT, CONTRIBUTORY, OR CONCURRENT) OF THE INDEMNIFIED PARTIES. IT IS THE EXPRESS INTENT OF THE PRINCIPAL TO INDEMNIFY AND HOLD HARMLESS THE INDEMNIFIED PARTIES FROM THEIR OWN ORDINARY NEGLIGENCE IN THEIR ACTS AND OMISSIONS. The Principal further agrees to indemnify the Surety for any amounts paid by the Surety to the Escrow Agent in regard to Section 2.04(B) (including without limitation, reasonable fees and disbursements of counsel).  The Principal shall pay any amounts subject to this Section 2.04(a) within ten (10) Business Days following written demand. The Principal agrees to pay all reasonable legal expenses of the Escrow Agent in connection with the transactions evidenced by this Agreement, including, but not limited to, the initial review and structuring of this Agreement and any costs and expenses arising from a petition for interpleader or arbitration under Section 2.05.

(b)     The Surety agrees to indemnify the Indemnified Parties for, and to hold them harmless against, any loss, liability or expense (including without limitation, reasonable fees and disbursements of counsel) arising out of, or in connection with, entering into this Agreement and carrying out the duties hereunder and not resulting from the ordinary negligence (whether sole, joint, contributory, or concurrent), gross negligence, willful misconduct, breach of this Agreement, bad faith or the violation of any banking law or regulation on the part of the Indemnified Parties.  The Surety shall be entitled to prompt notice of any proceeding in respect of which a claim for indemnity may be made under this Section; provided, however, that the failure to provide such notice shall not discharge or reduce any indemnity claim except to the extent that the Surety has been prejudiced thereby.  The Surety shall be entitled to participate in the defense of any such proceeding.  If the Surety stipulates in writing that a claim is covered by this indemnity, then the Surety (i) shall be entitled to assume, at the Surety's expense, the defense of any such proceeding (except for criminal proceedings and proceedings in respect of the alleged violation of any banking law or regulation), for so long as the interests of Escrow Agent in respect of any such proceeding are being reasonably protected in or by such defense; provided however, that the Escrow Agent shall, in any event, have the right to approve the counsel selected or used by Surety for such defense (which approval shall not be unreasonably withheld) and provided further that the Surety's decision as to whether to litigate, appeal or settle such claim shall be subject to the consent of the Escrow Agent.  The Surety shall be obligated to pay any amounts under this Section at any time after

the related loss, liability or expense is incurred by an Indemnified Party, thirty (30) days after written demand therefor. Nothing in this Section 2.04(b) shall at any time remove or impair an Indemnified Party's right, at its own expense, to be represented by counsel of its own choosing in any proceeding.

(c)     The Surety and BP shall be subrogated to the rights of the Indemnified Parties against the Principal under Section 2.04(a) with respect any payment to the Indemnified Parties under Section 2.04(b).

Section 2.05   Liability of Escrow Agent. The Escrow Agent shall be obligated only for the performance of such duties as are expressly set forth in this Agreement. No implied duties of the Escrow Agent shall be read into this Agreement. The Escrow Agent is not a principal, participant or beneficiary in any transaction underlying this Agreement, is not a party to any of the other Bond Documents, and shall have no duty, except as expressly stated herein, to determine or inquire into the happening or occurrence of any event or contingency. In the event of any disagreements or conflicting instructions resulting in adverse claims or demands being made upon the Escrow Agent in connection herewith, or in the event that the Escrow Agent, in good faith, is in doubt as to what action should be taken hereunder, or if a substitute Escrow Agent is not designated as provided in Section 2.09, the Escrow Agent may, at its option, subject to Section 3.07(a), (a) refuse to comply with any claim or demand, or refuse to take any other action hereunder (provided that, during such time, the Escrow Agent shall continue to invest the Escrow Funds in accordance with the provisions hereof) so long as such disagreement or conflict continues or such doubt exists, or in the case where a substitute Escrow Agent has not been designated as provided in Section 2.09 until such substitute Escrow Agent is appointed, and in any such event the Escrow Agent shall not be or become liable in any way or to any party for its failure or refusal from acting until all differences shall have been adjusted and all doubt resolved, or until a substitute Escrow Agent is appointed, as the case may be, or (b) institute a petition for interpleader in any court of competent jurisdiction to determine the rights of the parties hereto. In the event the Escrow Agent is a party to any dispute, the Escrow Agent may refer such controversy to binding arbitration upon the consent of the Surety, BP and the Principal. In any case where Section 3.07(a) is applicable, the Escrow Agent shall pay the Escrow Funds to the Surety to the extent provided therein (unless enjoined by a court of competent jurisdiction), and the Escrow Agent shall have no liability to the Principal for making such payment, irrespective of any dispute or claim. The Escrow Agent may consult with its counsel or other counsel satisfactory to it concerning any question relating to its duties or responsibilities hereunder and shall not be liable for any action taken, suffered or omitted by the Escrow Agent in good faith upon the advice of such counsel. The Escrow Agent may act through its officers, employees, agents and attorneys.

Section 2.06   Reliance on Documents, Etc. The Escrow Agent shall be entitled to rely upon any written notice, demand, certificate or document that it in good faith believes to be genuine. The Escrow Agent shall not be responsible for the sufficiency or accuracy of the form, execution, validity or genuineness of checks or other instruments or documents of any kind deposited hereunder, or of any endorsement thereof, or for any lack of endorsement thereon, nor shall it be responsible or liable in any respect on account of the identity, authority

or right of any person executing or delivering, or purporting to execute or deliver, any such instruments or endorsement.

Section 2.07   Attachment of Escrow Funds. If any of the Escrow Funds are at any time attached, garnished or levied upon or under any court order, or in case the payment or transfer of any such Escrow Funds shall be stayed or enjoined by any court order, or in case any order, judgment or decree shall be made or entered by any court affecting such Escrow Funds or a portion thereof, then in any of such events the Escrow Agent is authorized, in its sole discretion, to rely upon and comply with any such order, writ, judgment or decree that it is advised by legal counsel of its own choosing as binding upon it under the terms of this Agreement or otherwise. The Escrow Agent shall provide the Principal and the Surety prompt notice of any such court order prior to taking any action thereon.   If the Escrow Agent complies with any such order, writ, judgment or decree, it shall not be liable to the other parties to this Agreement or to any other person by reason of such compliance, even though such order, writ, judgment or decree may subsequently be reversed, modified, annulled, set aside or vacated.

Section 2.08   Taxes. The Principal shall provide the Escrow Agent with an appropriate Form W-8 or Form W-9 upon execution of this Escrow Agreement, which form shall contain the Principal's taxpayer identification number stated adjacent to its signature hereto.   The parties recognize that failure to provide such a form may prevent or delay disbursements from the Escrow Account, may result in the assessment of a penalty against the Principal and may require the Escrow Agent to withhold tax on any interest or other income earned on the Escrow Account.   The Principal represents and warrants to the Escrow Agent that the Escrow Agent has no duty to withhold any federal or state income tax, local or state property tax, local or state sales or use taxes, or any other tax by any taxing authority.   The Principal agrees to indemnify the Escrow Agent fully for any tax liability, penalties or interest incurred by the Escrow Agent arising hereunder and agrees to pay in full any such tax liability together with penalty and interest if any tax liability is ultimately assessed against the Escrow Agent for any reason as the result of its actions hereunder (except for the Escrow Agent's individual income or franchise tax liability arising from the income from its fees).   The parties hereto agree that (a) for federal, state and local tax purposes, the Principal shall be treated as the owner of the Escrow Funds, and the Escrow Account shall be treated as a grantor trust pursuant to Section 468(B)(g) of the Internal Revenue Code of 1986, as amended, and (b) none of the parties hereto will take any position inconsistent with such treatment. The Escrow Agent shall report any income in connection with the Escrow Account on Form 1099-INT (or any successor or other applicable form) under the Principal's tax identification number.   The Principal agrees to pay out of the Principal's separate funds any federal, state or local taxes (including any penalties and interest thereon)  owed in connection with the Escrow Account.

Section 2.09   Removal or Resignation of Escrow Agent. The Escrow Agent may resign without obtaining the order of any court, by giving at least 30 days' prior written notice (unless waived) to the Principal, BP, and the Surety.  The Surety may remove the Escrow Agent at any time for any reason or for no reason by giving written notice thereof to the Escrow Agent,

BP, and the Principal at least 10 days prior to the date specified for such removal to take effect. On or before the effective date specified for resignation or removal of the Escrow Agent, the Surety shall appoint a successor Escrow Agent by a written instrument, provided that the Principal shall consent to the appointment of the successor Escrow Agent, which consent shall not be unreasonably withheld. Such resignation or removal shall be effective upon the appointment of a successor Escrow Agent pursuant to the provisions hereof. If, however, a successor agent is not appointed by the effective date specified for resignation or removal of the Escrow Agent, the Escrow Agent shall deliver the Escrow Funds to the Surety who shall act in regard to the Escrow Funds, as nearly as practicable, as if the Surety were the Escrow Agent until a successor Escrow Agent is appointed. Any successor Escrow Agent shall be a bank domiciled in the United States of America and having combined capital and surplus of at least $500,000,000. Any successor Escrow Agent appointed under the provisions of this Agreement shall have all of the same rights, powers, privileges, immunities and authority with respect to the matters contemplated herein as are granted herein to the original Escrow Agent. Upon the effective date of any resignation or removal of an Escrow Agent, the Principal shall pay all fees and expenses owed to the retiring Escrow Agent and the Escrow Funds shall be delivered by the retiring Escrow Agent to the successor Escrow Agent (or to the Surety if there is no successor Escrow Agent on such date), whereupon all of the retiring Escrow Agent's obligations hereunder shall cease and terminate. The indemnities contained herein in favor of the retiring Escrow Agent, its officers, directors and employees (or any of them) shall survive for a period of one year from the date of its resignation or removal and the termination of its obligations hereunder, with respect to events or circumstances occurring prior to such resignation or removal.

## ARTICLE III

## THE ESCROW ACCOUNT AND THE ESCROW FUNDS

Section 3.01  Establishment of Escrow Account. The Escrow Agent acknowledges that it has established the Escrow Account, named "Panaco East Breaks Escrow Account" and agrees that it will, acting as Escrow Agent, hold in the Escrow Account such Qualified Assets as may be delivered to the Escrow Agent for the Escrow Account under the provisions of this Agreement and such Permitted Investments as the Escrow Agent may purchase from time to time pursuant to the provisions of this Agreement. All Permitted Investments shall be held in the name of the Escrow Agent, or the Escrow Agent's bank nominee name(s).

Section 3.02  Payments to Escrow Account; Minimum Balance Requirement.

(a)     The Principal agrees to deposit Qualified Assets into the Escrow Account in such amounts and by such dates as will always equal or exceed the then applicable Minimum Balance Requirement. If any day on which a deposit shall be due hereunder shall not be a Business Day, such deposit shall be due on the next preceding day that is a Business Day.

(b)     In addition to the deposits required by Section 3.02(a), if the Escrow Funds shall at any time fall below the Minimum Balance Requirement (due to an increase of the schedule

of Minimum Balance Requirements pursuant to Section 3.02(c) or for any other reason), the Escrow Agent shall as soon as reasonably possible and in any event within two Business Days of acquiring actual knowledge thereof, notify the Principal, BP, and the Surety in writing that a deficiency exists and, if the Escrow Agent is reasonably able to determine the amount of the deficiency based on information available to it, the amount of the deficiency. The Principal shall promptly, and in any event within three Business Days of the Escrow Agent's notice, deposit such Qualified Assets into the Escrow Account so that the Escrow Funds shall equal or exceed such Minimum Balance Requirement. For such purpose, if the Escrow Agent's notice of deficiency does not specify the amount thereof, the Principal shall make its best estimate of such amount in determining the required deposit of Qualified Assets that will eliminate such deficiency and meet the Minimum Balance Requirement.

(c)     Notwithstanding Sections 3.02(a) and (b), the Surety shall retain the right to increase or decrease the schedule of Minimum Balance Requirements at its sole discretion; provided, however, that no Minimum Balance Requirement shall exceed $6,500,000. The Surety shall notify both the Escrow Agent and the Principal of any increase or decrease in the Minimum Balance Requirements and shall provide with such notice a replacement Exhibit A hereto reflecting such increase or decrease. Exhibit A shall be deemed to be amended by any replacement accompanying a notice provided under this Section 3.02(c). The adjusted Minimum Balance Requirement will become effective as of the next succeeding Business Day after the giving of such notice by the Surety. In the event that the value of the Escrow Funds exceeds the adjusted Minimum Balance Requirement, then the Principal may request the Surety to notify the Escrow Agent to withdraw the proceeds of excess Qualified Assets and pay such proceeds to the Principal, in accordance with the provisions and subject to the conditions of Section 3.07(d).

(d)     The Escrow Agent shall notify the Principal, BP, and the Surety within two Business Days if any deposit required to be made hereunder is not made when due in accordance with Exhibit A hereto.

(e)     When this Agreement requires the Permitted Investments to be valued, or if the Surety so requests by notice to the Principal and the Escrow Agent specifying an applicable valuation date (which need not be the monthly valuation date established under Section 2.03), the value of the Permitted Investments as of such date shall be equal to the sum of the following (without duplication) (i) the closing price of each Permitted Investment on the securities exchange on which such Permitted Investment is traded, or the NASDAQ closing bid price, as the case may be, on the last preceding day on which such exchange was open or the NASDAQ figures were published; or (ii) if the Permitted Investment in question is not traded on a securities exchange or no price is quoted therefore by NASDAQ, such value shall be equal to the market value thereof as established by a recognized dealer (selected by the Escrow Agent, in any case where the Escrow Agent is to determine a value, or otherwise selected by the Surety) in such Permitted Investment; or (iii) if the Permitted Investment in question cannot be valued by the methods set forth in the immediately preceding clauses (i) and (ii), then the value of such Permitted Investment shall be equal to the lesser of (A) the cost of such Permitted Investment, or (B) the value of such Permitted Investment determined by the Escrow

Agent, in any case where the Escrow Agent is to determine a value, or otherwise by the Surety, in its reasonable commercial judgment.

(f)     The value of each Permitted Investment shall be determined by the Escrow Agent in accordance with Section 3.02(e) when each such Permitted Investment is initially deposited into the Escrow Account.  Thereafter, the value of Permitted Investments shall be determined by the Escrow Agent, monthly or on the request of the Surety, as necessary to comply with Sections 2.03, 3.02(b) and 3.02(c).  When, pursuant to the provisions of Section 3.02(e)(iii) or Section 3.02(g), the Surety determines the value of a Permitted Investment, the Surety shall promptly supply such valuation to the Escrow Agent, BP, and the Principal, with such other information regarding the valuation as the Principal or the Escrow Agent may reasonably request.

(g)     If the Escrow Agent does not determine a value of Permitted Investments under Section 2.03, Section 3.02(b), Section 3.02(c) or any other applicable provision of this Agreement, the Surety may make such determination in accordance with the valuation provisions of Section 3.02(e).  The Surety may then give the Principal (with a copy to the Escrow Agent) the notice of deficiency amount otherwise to be given by the Escrow Agent pursuant to Section 3.02(b), if applicable (and without prejudice to the Principal's obligations under such Section), whereupon the Principal shall promptly and in any event within three Business Days of the Surety's notice, deposit such Qualified Assets into the Escrow Account so that the Escrow Funds equal or exceed the Minimum Balance Requirement (irrespective of whether the Principal shall have made a deposit of Qualified Assets based on its estimate of the deficiency amount pursuant to Section 3.02(b)).

Section 3.03   Purpose of Escrow Funds.  Escrow Funds are to be used solely for the purpose of satisfying first, a) the First Priority Obligations, and upon full satisfaction of such obligations; then, secondly, b) the Second Priority Obligations.  Without limiting the generality of the foregoing sentence, Escrow Funds may be used to pay the premiums on the Bonds and the fees, expenses and other sums under the Bond Documents unless such sums are otherwise paid as agreed in writing by the Surety and the Principal.  Nothing in this Section 3.03 shall diminish, release or impair the Principal's full liability for the First Priority Obligations and the Second Priority Obligations, irrespective of the use or sufficiency of the Escrow Funds, or any obligation of the Principal to pay any sum pursuant to any other agreement between the Principal and the Surety or BP.

Section 3.04   Account Investments.  The Principal shall direct the Escrow Agent in the selection of Permitted Investments for the Escrow Account.  In the absence of valid written instructions from the Principal, the Escrow Agent shall maintain the Escrow Funds in investments within the meaning of part (a) of the definition of Permitted Investments with the maturity not to exceed 90 days from the dates of the respective investments.  The Escrow Agent shall not maintain, purchase, accept or pay for any assets for the Escrow Account that are not Qualified Assets.  Such instructions referred to above, if any, shall specify the type and identity of the Permitted Investments to be purchased or sold and shall also include the particular settlement procedures required, if any (which settlement procedures shall be consistent

with industry standards and practices) and such other information as Escrow Agent may require. Unless the Escrow Agent is otherwise directed, the Escrow Agent may use a broker-dealer of its own selection, including a broker-dealer owned by or affiliated with the Escrow Agent. It is expressly agreed and understood by the parties hereto that the Escrow Agent shall not be liable for losses on any Permitted Investments, including, but not limited to, losses from market risks due to premature liquidation or resulting from other actions taken pursuant to this Escrow Agreement. The Escrow Agent or any of its affiliates may receive compensation with respect to any investment directed hereunder.

Section 3.05  Escrow Funds Separate.  The Escrow Agent shall at all times hold the Escrow Funds wholly segregated from all other funds and securities deposited with or held by the Escrow Agent; the Escrow Agent shall not commingle the Escrow Funds with any other assets of the Escrow Agent; and the Escrow Agent shall hold and dispose of the Escrow Account only as set forth herein. The Escrow Funds shall always be maintained by the Escrow Agent for the benefit of the Surety; and the Escrow Account shall at all times be maintained on the books of the Escrow Agent as a special account evidencing such facts.  Amounts received by the Escrow Agent under this Agreement shall not be considered as a banking deposit or be subject to checks or drafts drawn by the Surety or the Principal, and the Escrow Agent shall have no right or title with respect thereto except as Escrow Agent under the terms hereof.  The Escrow Agent hereby waives any rights that the Escrow Agent may now or hereafter have to security interests, bank's and other possessory liens, rights of offset or other claims against the Escrow Funds and the Escrow Account except for fees, expenses and costs incurred as Escrow Agent which the Escrow Agent is permitted to recover under Section 2.02. The Escrow Agent shall neither make nor permit any disbursement from the Escrow Account except as expressly provided herein.

Section 3.06  Title to Escrow Funds.  Prior to the termination of this Agreement, the Principal shall not have legal title to any of the Escrow Funds, but shall be treated as the owner solely for tax purposes as provided in Section 2.08.  Title to the Escrow Funds shall be held by the Escrow Agent for the benefit of the Surety as provided herein.

Section 3.07  Payments from Escrow Funds.

(a)  The entire amount or (if so specified in the Surety's notice referred to in Section 6.02(b)) any portion of the Escrow Funds (including proceeds from the liquidation of Permitted Investments but less any withholding required by law in relation to taxes) shall be paid by the Escrow Agent to the Surety forthwith upon receipt by the Escrow Agent of a notice signed by an officer of the Surety substantially in the form of Exhibit C hereto, pursuant to Section 6.02(b). Such payment shall be made by wire transfer in immediately available funds to such account as the Surety shall direct.

(b)  The Surety shall use Escrow Funds received pursuant to Section 3.07(a) solely for the purposes described in Section 3.03. Any Escrow Funds received by the Surety pursuant to Section 3.07(a) in excess thereof shall promptly be returned by the Surety to the Escrow

Agent for deposit in the Escrow Account or, if this Agreement shall have then terminated, the Surety shall pay such excess amount to the Principal, upon the express written consent of BP.

(c)     Any Qualified Assets shall be liquidated as promptly as possible if and to the extent that the Escrow Agent is permitted or required hereunder to pay the Escrow Funds to (i) itself (for fees, expenses and costs incurred as Escrow Agent which the Escrow Agent is permitted to recover under Section 2.02), (ii) the Surety under Section 3.07(a), (iii) the Principal under Section 3.07(d), (iv) a successor Escrow Agent (or the Surety if there is no successor Escrow Agent) under Section 2.09, or (v) the Principal upon the joint instructions of the Principal, BP, and the Surety under Section 7.01.  The order, manner and timing of any such liquidation shall be at the instructions of the Surety, BP (or of the Principal, BP, and the Surety jointly) if included in the notice given under Section 3.07(a), 3.07(d) or 7.01, or otherwise in accordance with the Escrow Agent's customary operating procedures and decisions, as the case may be.  Any interest or other income received on investment of the Escrow Funds shall be held as part of the Escrow Funds and shall be distributed in accordance herewith.

(d)     At any time when no Default or Event of Default exists and to the extent (but only to the extent) that the value of the Escrow Funds exceeds the Minimum Balance Requirement then in effect, the Principal may, upon five Business Days' notice to the Suretyand BP, request that the Surety notify the Escrow Agent to withdraw from the Escrow Account any Qualified Assets in excess of the Minimum Balance Requirement.  The Principal's notice shall specify all information regarding the excess Qualified Assets as is necessary to permit the Surety to instruct the Escrow Agent to liquidate any Permitted Investments, if applicable, and pay the proceeds of such excess Escrow Funds to the Principal if, within three Business Days of notice being given to BP, BP consents to the payment of the proceeds to the Principal.  If BP does not consent to the payment of the proceeds within such three day period, BP is deemed to have not consented, and the Escrow Agent shall retain the proceeds on the Escrow Account.  The Surety shall promptly notify the Escrow Agent to release excess Escrow Funds to which the Principal is entitled under this Section 3.07(d).

## ARTICLE IV

## SECURITY AGREEMENT

Section 4.01  <u>Grant of Security Interest</u>.  Notwithstanding anything to the contrary contained herein or in any other Bond Document, this Agreement is intended by the Surety, BP, and the Principal to first, a) constitute security for the Surety on the First Priority Obligations; and to second, b) constitute security for BP on the Second Priority Obligations.  In furtherance of the foregoing, the Principal, as debtor, hereby assigns and grants a) to the Surety, as secured party, a First Priority security interest in and right of set-off against the Collateral, whether now existing or hereafter acquired, to secure prompt payment and performance of the First Priority Obligations: and b) to BP, as a secured party, a Second Priority security interest in and right of set-off against the Collateral (after satisfaction of Surety's security interests), whether now existing or hereafter acquired to secure prompt payment and performance of the Second Priority Obligations.  In order to perfect the security

interest granted herein, the Escrow Agent hereby (a) acknowledges that it is acting as bailee, agent, financial intermediary and custodian for the benefit of the Surety and BP, as secured parties, and (b) acknowledges receipt of a signed copy of this Agreement.

Section 4.02   Remedies.   The Surety, as secured party, shall have all of the rights, remedies and powers that are accorded to a secured party in law and in equity, including, without limitation, (a) those rights, remedies and powers provided for under the applicable version of the Uniform Commercial Code, (b) the rights and remedies referred to in Section 6.02, and (c) the right to apply the proceeds of disposition of any and all of the Collateral following an Event of Default to the reasonable attorney's fees and legal expenses incurred by the Surety.   Upon the request of the Surety, the Principal agrees (at the Principal's expense) to execute and deliver all such assignments, certificates, financing statements or other documents and give further assurances and do all other acts and things as the Surety may reasonably request to perfect the Surety's security interest in the Collateral or to protect, enforce or otherwise effect the Surety's rights and remedies hereunder.   The rights and remedies created hereunder are cumulative of any rights and remedies that are available to the Surety under or in respect of any of the other Bond Documents or under applicable law or in equity.

Section 4.03   Continual Security Interest.   This Agreement shall create a continuing security interest in the Collateral, whether now existing or hereafter acquired, and shall remain in full force and effect until the later of (x) payment in full of the Obligations and (y) the release of all the Collateral pursuant to Section 7.01.   When the events described in Section 7.01 have occurred, the security interest granted hereby shall terminate and all rights to the Collateral shall revert to the Principal.

Section 4.04   Subordination by Foothill Capital Corporation.   Foothill, by and through execution of this Agreement, agrees that Surety's and BP's secured interest in the Escrow Funds and Escrow Account shall be superior in priority and that the interest of Foothill in the Escrow Funds and Escrow Account, if any, shall be subordinate to the secured interest of Surety and BP.   Foothill agrees not to, and herein expressly waives any right, to claim (whether affirmatively or defensively) that its interest in the Escrow Funds and Escrow Account is superior to the secured interest of Surety or BP.

ARTICLE V

REPRESENTATIONS AND WARRANTIES

Section 5.01   Principal's Representations.   The Principal represents and warrants as follows:

(a)      The Principal is the legal and beneficial owner of the Qualified Assets deposited into the Escrow Fund, free and clear of any lien, security interest, option or other charge or encumbrance except for the escrow and security interest created by this Agreement.

(b)     The pledge and assignment of the Collateral pursuant to this Agreement create a valid and perfected first priority security interest in the Collateral, securing the payment of the Obligations.  The escrow and security interest created by this Agreement are free of adverse claims.

(c)     No consent of any other person or entity and no authorization, approval, or other action by, and no notice to or filing with, any governmental authority or regulatory body is required (i) for the pledge and assignment by the Principal of the Collateral pursuant to this Agreement or for the execution, delivery or performance of this Agreement by the Principal, (ii) for the creation of the Escrow Account and the delivery of Qualified Assets to the Escrow Agent, (iii) for the perfection or maintenance of the security interest created hereby (including the first priority nature of such security interest), or (iv) for the exercise by the Escrow Agent and the Surety of their respective rights and remedies hereunder.

(d)     The Principal's taxpayer identification number, for purposes of U.S. federal income taxes, is correctly stated adjacent to its signature hereto.

The representations and warranties of this Section 5.01 shall be deemed to be repeated on and as of each date when additional Qualified Assets are deposited into the Escrow Account.

Section 5.02   Escrow Agent's Representations. The Escrow Agent is a [bank] organized under the laws of the [United States of America], is not in violation of any provisions of its charter documents or by-laws and has the corporate power to enter into this Agreement and by proper corporate action has duly authorized the execution, delivery and performance of this Agreement. Neither the execution and delivery by it of this Agreement nor the consummation by it of the transactions contemplated herein conflict with or will result in a breach of or default under its charter documents or by-laws or the terms, conditions or provisions of any statute, order, rule, regulation, judgment, decree, agreement or instrument of which it is party or by which it is bound.

## ARTICLE VI

## EVENTS OF DEFAULT

Section 6.01   Events.  Any of the following events shall be considered an "Event of Default" as that term is used herein:

(a)     The Principal shall default in the deposit, payment or prepayment when due of any required amount hereunder and such failure continues for more than five calendar days after such amount becomes due or, in the case of Sections 2.04(a), 3.02(b) and 3.02(g), the number of Business Days specified therein; or

(b)     Any representation or warranty by the Principal under any Bond Document or in any certificate, request or other document furnished pursuant to or under any Bond

Document proves to have been incorrect in any material respect as of the date when made or deemed made; or

      (c)    Default is made in the due observance or performance by the Principal of any of the covenants or agreements contained in this Agreement or in any of the other Bond Documents on its part to be performed or observed, if (i) such failure shall remain unremedied for 15 days after notice shall have been given by the Surety or the Escrow Agent or (ii) the effect of such failure is to cause or permit the Obligee to make a claim under the Bond (whether or not such failure shall have been waived by the Obligee); or

      (d)    An involuntary case or other proceedings shall be commenced against the Principal that seeks liquidation, reorganization or other relief with respect to it or its debts or other liabilities under any bankruptcy, insolvency or similar law now or hereafter in effect or seeking the appointment of a trustee, receiver, liquidator, custodian or other similar official of it or any substantial part of its property, and such involuntary case or other proceeding shall remain undismissed or unstayed for a period of 30 days; or an order for relief against the Principal shall be entered in any such case under the Federal Bankruptcy Code (11 U.S.C. 101 et seq.); or

      (e)    The Principal shall commence a voluntary case or other proceeding seeking liquidation, reorganization or other relief with respect to itself or its debts or other liabilities under any bankruptcy, insolvency or other similar law now or hereafter in effect or seeking the appointment of a trustee, receiver, liquidator, custodian or other similar official of it or any substantial part of its property, or shall consent to any such relief or to the appointment of or taking possession by any such official in an involuntary case or other proceeding commenced against it, or shall make a general assignment for the benefit of creditors, or shall fail generally to, or shall admit in writing its inability to pay its debts generally as they become due, or shall take any corporate action to authorize or affect of the foregoing; or

      (f)    The Principal discontinues its usual business; or

      (g)    The Principal shall default in any payment of principal of or interest on any other Debt in the amount of $100,000 in the aggregate beyond any period of grace provided with respect thereto, or in the performance of any other agreement, term or condition contained in any agreement or instrument under or by which any such Debt is created, evidenced or secured if the effect of such default is to cause such obligation to become due before its stated maturity or to permit the holder(s) of such obligations or the trustee(s) under any such agreement or instrument to cause such obligation to become due prior to its stated maturity, whether or not such default or failure to perform shall have been waived by the holder(s) of such obligation or such trustee(s); or

      (h)    The Principal shall fail within 30 days to pay or otherwise discharge any judgment or order for the payment of money in excess of $100,000 that is not otherwise being satisfied in accordance with its terms and is not stayed on appeal; or

(i)     The Principal shall be in default under or in violation of any law, statute, ordinance, decree, requirement, order, judgment, rule or regulation (or interpretation of any of the foregoing) of the United States of America, any state of the United States, or any political subdivision of any of the foregoing, or of any agency, department, commission, board, bureau or court or other tribunal having jurisdiction over the Principal or its assets or property, which failure or violation might have a material adverse effect on the business or operations of the Principal and such failure or violation shall not have been corrected within 30 days from the date thereof; or

(j)     The Principal shall suffer or permit to exist the dissolution, liquidation or termination of the existence of the Principal or the sale, conveyance, lease or other disposition of any substantial part of the assets of the Principal; or

(k)     The Principal shall suffer any material adverse change in its assets, liabilities, financial condition, business, operations or circumstances.

Section 6.02    Remedies.  Upon the occurrence of any Event of Default described in Section 6.01(d) or (e), the Principal shall pay immediately into the Escrow Account an amount in immediately available funds sufficient to cause the total value of the Escrow Funds to equal the sum of the total remaining liability (direct or contingent) of the Surety under the Bond plus the amount of all other First Priority Obligations then owing, all without written notice and without presentment, demand, protest, notice of protest or dishonor, notice of intention to accelerate maturity, or any other notice of any kind, all of which are hereby expressly waived by the Principal.  Upon the occurrence and at any time during the continuance of any Event of Default specified in Section 6.01, other than Sections 6.01(d) or (e), the Surety and/or may (without prejudice to the rights of the Surety or BP set forth in Sections 3.02 and 4.02) by written notice require the Principal to pay into the Escrow Account in immediately available funds an amount sufficient to cause the total value of the Escrow Funds to equal the sum of the total remaining liability (direct or contingent) of the Surety under the Bond plus the amount of all other First Priority Obligations then owing, without presentment, demand, protest, notice of protest or dishonor, notice of intention to accelerate maturity, or any other notice of any kind, all of which are hereby expressly waived by the Principal.  In addition to the remedies set forth above, upon the occurrence and at any time during the continuance of an Event of Default, the Surety may do any or all of the following:

(a)     Effective as of the date of such Event of Default, immediately increase the premium on the Bond to as much as 15% per annum of the total liability (direct or contingent) of the Surety under the Bond; and

(b)     Deliver to the Escrow Agent (with a copy to the Principal) pursuant to Section 3.07(a), one or more notices substantially in the form of Exhibit C, whereupon in each case the Escrow Agent shall pay to the Surety from the Escrow Funds the amount or amounts required thereby.

Section 6.03  Notice of Default.  If the Principal or the Escrow Agent shall at any time know or have reason to believe that a Default or an Event of Default has occurred and is continuing, the Principal or the Escrow Agent, as the case may be, shall give notice of such Default or Event of Default to the Surety, specifying the details of such Default or Event of Default.  Any such notice from the Principal shall include its statement of the action that the Principal has taken and purposes to take with respect to such Default or Event of Default.

ARTICLE VII

MISCELLANEOUS

Section 7.01  Termination.  When the Principal has either (a) fully paid and performed the First Priority Obligations or (b) obtained a termination or release of liability of the Surety under the Bond from the Obligee in form and substance satisfactory to the Surety (including the return and cancellation of the Bond) and fully paid and performed all other First Priority Obligations, this Agreement shall terminate and the Surety shall take such steps as are reasonably requested by the Principal to release its First Priority security interest in the Collateral.  When the Surety has released its First Priority security interest in the Collateral and either (i) the Principal has fully paid and performed the Second Priority Obligations or (ii) BP agrees in writing, this Agreement shall terminate.  Upon such termination of this Agreement and upon delivery of joint instructions to the Escrow Agent from the Principal and BP the Surety, the Escrow Agent shall:

(a)  Apply sufficient Escrow Funds to pay all unpaid and reasonably anticipated Escrow Agent fees, expenses and costs; and

(b)  Disburse the balance of the Escrow Funds as directed in the joint instructions.

Upon the taking of all the actions as described herein by the Escrow Agent, the Escrow Agent shall have no further obligations or responsibilities hereunder to the parties hereto or to any other person or persons in connection with this Agreement.  The Escrow Agent may dispose of any records or reports concerning the Escrow Account and any transactions relating to such account in accordance with the Escrow Agent's established procedures.  The provisions of Section 2.04 and Section 2.08 shall survive for a period of four years from the date of termination of this Agreement and shall apply to any claim for indemnity or payment properly given to the Principal or the Surety, as the case may be, prior to the expiration of such four-year period (but not to any claims presented thereafter, irrespective of the date of occurrence of an event or circumstance giving rise to such claim, whether or not discovered).

Section 7.02  Notices.  All notices, directions, instructions and other communications provided for hereunder shall be in writing (including fax) and mailed, faxed, or delivered, to the address or fax number of the party set forth opposite the party's signature below or at such other address or fax number as shall be designated by such party in a written notice to the other parties.  All such notices and communications shall be effective, if mailed, two Business Days after deposit in the mails; if sent by overnight courier, one Business Day after delivery

to the courier company; and if sent by fax, when received by the receiving fax equipment, respectively; provided, however, that (a) notices and communications to the Escrow Agent shall not be effective until received by the Escrow Agent; and (b) faxed notices received by any party after its normal business hours (or on a day other than a Business Day) shall be effective on the next Business Day.

Section 7.03  Amendments.  Any provision of this Agreement may be amended, modified or waived if, but only if, such amendment, modification or waiver is signed by the Surety, the Principal, BP, Foothill and the Escrow Agent.  Any waiver or consent shall be effective only in the specific instance and for the specific purpose for which given.

Section 7.04  Jurisdiction.  All actions or proceedings with respect to the Bond Documents may be instituted in the courts of the State of Texas located in Harris County, Texas, or in the United States District Court for the Southern District of Texas, and by execution and delivery of this Agreement, the Principal irrevocably and unconditionally submits to the nonexclusive jurisdiction (both subject matter and personal) of each such court to the extent permitted by the law.  The Principal irrevocably and unconditionally waives (a) any objection the Principal may now or hereafter have to the laying of venue in any such courts, and (b) any claim that any action or proceeding brought in any of such courts has been brought in an inconvenient form.  The Principal hereby irrevocably designates and appoints Robert Wonish, 1100 Louisiana, Suite 5100, Houston, Texas  77002-5220 as its authorized agent in the State of Texas to accept and acknowledge on its behalf service of any and all process which may be served in any suit, action or proceeding in the State of Texas, and the Principal agrees that any service of process upon such agent shall be deemed in every respect effective service upon the Principal.

Section 7.05  Governing Law.  This Agreement shall be governed by, and construed in accordance with, the laws of the State of Texas.

Section 7.06  Successors and Assigns.

(a)     This Agreement shall inure to the benefit of and be binding upon the parties hereto and their respective successors and assigns; provided that neither the Escrow Agent (except as provided in Section 2.09), the Principal nor the Surety (except as provided in Section 7.06(b)) shall have any right to assign its rights hereunder without the prior written consent of the other parties hereto.

(b)     The Surety, in the ordinary course of its business, may assign all or any part of its rights hereunder to any person that may become obligated on all or any part of the Bond or that may insure or reinsure all or any part of the risk evidenced by the Bond.  However, without the written consent of the Escrow Agreement to any assignment, which will not be unreasonably withheld, (i) an assignment shall not be effective as against the Escrow Agent (but shall be effective solely as between the Surety and its assignee), (ii) the Escrow Agent shall be entitled to deal solely with the Principal or the Surety, or both, as the case may be, in respect of this Agreement, any amendments or waivers, and all other matters regarding the performance of this Agreement and (iii) the Escrow Agent shall have no liability to any assignee for continuing to deal solely with the Principal or the Surety, or both, as the case may be.

Section 7.07  <u>No Third Party Beneficiaries</u>.   This Agreement is for the sole and exclusive benefit of the Escrow Agent, the Surety, BP, and the Principal (and their respective successors and assigns to the extent provided in Section 7.06), and no other person (including, without limitation, the Obligee except as provided for in the Second Priority Obligation) shall have standing to require satisfaction of the provisions hereof or be entitled to assume compliance herewith.

Section 7.08  <u>Entire Agreement</u>.  This Agreement, in the case of the Escrow Agent, and the Bond Documents, in the case of the Principal and the Surety, represent the entire understanding among the parties and supersede any prior agreements, written or oral, with respect thereto.

Section 7.09  <u>Funds Transfer</u>.  In the event funds transfer instructions are given (other than in writing at the time of execution of the Agreement), whether in writing, by telefax, or otherwise, the Escrow Agent is authorized to seek confirmation of such instructions by telephone call-back to the person or person designated on Exhibit D hereto, and the Escrow Agent may rely upon the confirmations of anyone purporting to be the person or persons so designated.  The persons and telephone numbers for call-backs may be changed only in writing actually received and acknowledged by the Escrow Agent.  The parties to this Agreement acknowledge that such security procedure is commercially reasonable.

It is understood that the Escrow Agent and the beneficiary's bank in any funds transfer may rely solely upon any account numbers or similar identifying number provided by either of the other parties hereto to identify (i) the beneficiary, (ii) the beneficiary's bank, or (iii) an intermediary bank.  The Escrow Agent may apply any of the escrowed funds for any payment order it executes using any such identifying number, even where its use may result in a person other than the beneficiary being paid, or the transfer of funds to a bank other than the beneficiary's bank or an intermediary bank, designated.

IN WITNESS WHEREOF, the parties have executed this Agreement in multiple counterparts, each of which is and shall be considered an original (and all of which taken together shall constitute one and the same agreement), effective as of the date first above written.

Address:

8 Greenway Plaza, Suite 400
Houston, Texas  77046-0891
Fax No. 713.961.0285

Address:

1100 Louisiana, Suite 5100
Houston, Texas  77002-5200
Fax No.:_____
Tax I.D. No._____

SURETY:
RLI Insurance Company

By: _____
Roy C. Die, Attorney-in-Fact

PRINCIPAL:
Panaco, Inc.

By: _____
(Signature)

Gregory K Sampson / Vice President Land
(Printed Name/Title)

Address:

600 Travis Street, 11th Floor
Houston, Texas  77002
Fax No.: 713-216-6927

ESCROW AGENT:
Chase Bank of Texas, N.A.

By: _Mona H Rodgrs_____
Mona H. Rodgers
Vice President and Trust Officer


Address:
501 Westlake Boulevard
Houston, Texas  77253-3092
Fax No.: _281-366-7975_____

By: _____
(Signature)
L. Hirsch, Attorney-in-Fact
(Printed Name/Title)

B P Exploration & Oil, Inc.


Address:

11111 Santa Monica Boulevard, Suite 1500
Los Angeles, California  90025-3333
Fax No.:_____

By: _____
(Signature)

_____
(Printed Name/Title)

Foothill Capital Corporation, Individually
and as Agent

Address:

600 Travis Street, 11th Floor
Houston, Texas 77002
Fax No.:

**ESCROW AGENT:**
Chase Bank of Texas, N.A.

By: _____

Mona H. Rodgers
Vice President and Trust Officer

Address:
501 Westlake Boulevard
Houston, Texas 77253-3092
Fax No.: 281-366-7975

B P Exploration & Oil, Inc.

By: _____
(Signature)
L. Hirsch, Attorney-in-Fact
(Printed Name/Title)

Address:

11111 Santa Monica Boulevard, Suite 1500
Los Angeles, California 90025-3333
Fax No.: (310) 478-9788

Foothill Capital Corporation, Individually
and as Agent

By: _____
(Signature)
Stephen Schwartz / Assistant Vice President
(Printed Name/Title)

PANACO EAST BREAKS  ESCROW ACCOUNT

**EXHIBIT "A"**
**MINIMUM BALANCE  REQUIREMENT**

|  |  | AMOUNT |
|---|---|---|
| From: | October  29, 1999 | $  2,500,000 |
| | | |
| (1st day of each month set forth below) | | |
| | January 2000 ($250,000) | 2,750,000 |
| | April 2000 | 3,000,000 |
| | July 2000 | 3,250,000 |
| | October 2000 | 3,500,000 |
| | January 2001 | 3,750,000 |
| | April 2001 | 4,000,000 |
| | July 2001 | 4,250,000 |
| | October 2001 | 4,500,000 |
| | January 2002 | 4,750,000 |
| | April 2002 | 5,000,000 |
| | July 2002 | 5,250,000 |
| | October 2002 | 5,500,000 |
| | January 2003 | 5,750,000 |
| | April 2003 | 6,000,000 |
| | July 2003 | 6,250,000 |
| To: | October 2003 | $  6,500,000 |

*The last entry under this column shall continue to be applicable to establish the
  Minimum Balance Requirement until all the Obligation has been paid and performed in full.

A-1

**CHASE**

## EXHIBIT B

## CHASE BANK OF TEXAS, NATIONAL ASSOCIATION
## GLOBAL TRUST SERVICES
## ESCROW AGENT FEE SCHEDULE

*Fees for the Bank's standard services shall be as follows:*

**New Account Acceptance Fee** . . . . . . . . . . . . . . . . . . . . . **$500.00(WAIVED)**
        Payable upon Account Opening

**Minimum Administrative Fee** . . . . . . . . . . . . . . . . . . . . . . . . . . . . **$3,000.00**
        Payable upon Account Opening and in Advance
        for each year in which we act as Escrow Agent

**A New Account Acceptance Fee will be charged for the Bank's review of the Escrow Agreement along with any related account documentation. A one (1) year Minimum Administration Fee will be assessed for any account which is funded. The account will be invoiced in the month in which the account is opened and annually thereafter. Payment of the invoice is due 30 days following receipt.**

The Administrative Fee will cover a maximum of fifteen (15) annual administrative hours for the Bank's standard Escrow services including account setup, safekeeping of assets, investment of funds, collection of income and other receipts, preparation of statements comprising account activity and asset listing, and distribution of assets in accordance with the specific terms of the Escrow Agreement.

*Extraordinary Services:*

Any additional services beyond our standard services as specified above, such as annual administrative activities in excess of fifteen (15) hours and all expenses including attorney's fees will be considered extraordinary services for which related costs, transaction charges, and additional fees will be billed at the Bank's standard rate.

*Modification of Fees:*

Circumstances may arise necessitating a change in the foregoing fee schedule. The Bank will attempt at all times, however, to maintain the fees at a level which is fair and reasonable in relation to the responsibilities assumed and the duties performed.

EXHIBIT C

RLI Insurance Company
8 Greenway Plaza, Suite 400
Houston, Texas  77046-0891
October 29, 1999

Ms. Mona H. Rodgers, Vice President
Chase Bank of Texas, N.A.
600 Travis Street, 11th Floor
Houston, Texas  77002

Dear Ms. Rodgers:

RLI Insurance Company (the "Surety"), Panaco, Inc. (the "Principal"), Chase Bank of Texas, N.A. (the "Escrow Agent"), B P Exploration & Oil Inc. ("BP") and Foothill Capital Corporation ("Foothill") executed and delivered that certain Escrow and Security Agreement dated as of October 25, 1999 (as amended from time to time, the "Escrow Agreement").  Any term used in this letter and defined in the Escrow Agreement shall have the meaning ascribed to such term in the Escrow Agreement.

Pursuant to the terms of the Escrow Agreement, the Surety hereby notifies the Escrow Agent and the Principal that the Escrow Funds (or such amount thereof as may be indicated on Annex I hereto) are to be paid to the Surety pursuant to the Escrow Agreement and that the Surety hereby requests that the Escrow Agent deliver such Escrow Funds to the Surety in accordance with the Escrow Agreement and the instructions attached to this letter as Annex I.

The Surety hereby certifies that the amount to be paid to it shown in Annex I does not exceed the amount of First Priority Obligations due and owing to the Surety at this time.

Thank you for your attention to this matter.

Very truly yours,

RLI Insurance Company -Houston

By: _____
Roy C. Die, President

cc:  Panaco, Inc.
1100 Louisiana, Suite 5100
Houston, Texas  77002-5220

B P Exploration & Oil Inc.
501 Westlake Boulevard
Houston, Texas  77253-3092

Foothill Capital Corporation
11111 Santa Monica Boulevard, Suite 1500
Los Angeles, California  90025-3333

ANNEX I

Amount of Escrow Funds To Be Paid to Surety at This Time:

$ _____

Wire Transfer Instructions:

[Optional] Instructions Regarding Liquidation of Qualified Assets:

**PANACO EAST BREAKS  ESCROW ACCOUNT**

**EXHIBIT "A"**
**MINIMUM BALANCE  REQUIREMENT**

**As Amended February 25, 2000**

|  |  | AMOUNT |
|---|---|---|
| From: | October  29, 1999 | $  2,250,000 |
| (1st day of each month set forth below) | | |
| | January 2000 ($250,000) | 2,500,000 |
| | April 2000 | 2,750,000 |
| | July 2000 | 3,000,000 |
| | October 2000 | 3,250,000 |
| | January 2001 | 3,500,000 |
| | April 2001 | 3,750,000 |
| | July 2001 | 4,000,000 |
| | October 2001 | 4,250,000 |
| | January 2002 | 4,500,000 |
| | April 2002 | 4,750,000 |
| | July 2002 | 5,000,000 |
| | October 2002 | 5,250,000 |
| | January 2003 | 5,500,000 |
| | April 2003 | 5,750,000 |
| | July 2003 | 6,000,000 |
| | October 2003 | 6,250,000 |
| To: | November 2003 | $  6,500,000 |

*The last entry under this column shall continue to be applicable to establish the
Minimum Balance Requirement until all the Obligation has been paid and performed in full.

A-1

**PANACO EAST BREAKS  ESCROW ACCOUNT**

**EXHIBIT "A"**
**MINIMUM BALANCE  REQUIREMENT**

**As Amended February 25, 2000**

|  |  | AMOUNT |
|---|---|---|
| From: | October  29, 1999 | $ 2,250,000 |
| | | |
| (1st day of each month set forth below) | | |
| | January 2000 ($250,000) | 2,500,000 |
| | April 2000 | 2,750,000 |
| | July 2000 | 3,000,000 |
| | October 2000 | 3,250,000 |
| | January 2001 | 3,500,000 |
| | April 2001 | 3,750,000 |
| | July 2001 | 4,000,000 |
| | October 2001 | 4,250,000 |
| | January 2002 | 4,500,000 |
| | April 2002 | 4,750,000 |
| | July 2002 | 5,000,000 |
| | October 2002 | 5,250,000 |
| | January 2003 | 5,500,000 |
| | April 2003 | 5,750,000 |
| | July 2003 | 6,000,000 |
| | October 2003 | 6,250,000 |
| To: | November 2003 | $ 6,500,000 |

*The last entry under this column shall continue to be applicable to establish the
  Minimum Balance Requirement until all the Obligation has been paid and performed in full.

A-1