A. **Introduction**

The Bankruptcy Code requires that each holder of an impaired Claim or Interest either (i) accept the Plan or (ii) receive or retain under the Plan property of a value, as of the Effective Date, that is not less than the value such holder would receive if the Debtors were liquidated under chapter 7 of the Bankruptcy Code.[1]  This requirement is customarily referred to as the "best interests" of creditors test.

To demonstrate that the Plan satisfies the best interests test, the Debtors, with the assistance of their restructuring advisors, AlixPartners, LLP, have prepared this hypothetical liquidation analysis (the "<u>Liquidation Analysis</u>"), which is based upon certain assumptions discussed in the Disclosure Statement and the accompanying notes to this Liquidation Analysis.

The first step in determining whether the Plan satisfies the best interests test is to determine the dollar amount that would be generated from a hypothetical liquidation of the Debtors' assets and properties in the context of a chapter 7 liquidation case.  The gross amount of Cash that would be available for satisfaction of Claims and Interests would be the sum consisting of the proceeds resulting from the disposition of the assets and properties of the Debtors, augmented by the unencumbered Cash held by the Debtors at the time of the chapter 7 conversion.

The next step is to reduce that gross amount by (i) the costs and expenses of the chapter 7 cases, (ii) the proceeds received from the disposition of encumbered assets that would be distributed to the holders of the liens on such assets up to the value of such assets, and (iii) the amount of additional administrative expense claims and priority claims arising from the use of the chapter 7 process for the purposes of liquidation.  Any remaining Cash would be allocated to unsecured creditors and interest holders in strict priority in accordance with section 726 of the Bankruptcy Code.

B. **Statement of Limitations**

The preparation of a liquidation analysis is an uncertain process involving the use of estimates and assumptions that, although considered reasonable by the Debtors based upon their business judgment and input from their financial and legal advisors, are inherently subject to significant business, economic, and competitive risks, uncertainties and contingencies, most of which are difficult to predict and many of which are beyond the control of the Debtors, their management, and their advisors.  Inevitably, some assumptions in the Liquidation Analysis would not materialize in an actual chapter 7 liquidation and unanticipated events and circumstances could materially affect the ultimate results in an actual chapter 7 liquidation.  The Liquidation Analysis was prepared for the sole purpose of generating a reasonable, good faith estimate of the proceeds that would be generated if the Debtors' assets were liquidated in accordance with chapter 7 of the Bankruptcy Code; it is not intended, and should not be used, for any other purpose.

---

[1] All capitalized terms used but not otherwise defined herein shall have the meaning ascribed to them in the *Disclosure Statement for the Amended Joint Chapter 11 Plan of Fieldwood Energy LLC and Its Affiliated Debtors*, to which this exhibit is attached as Exhibit M.

The underlying financial information in the Liquidation Analysis, and the values stated herein, have not been subject to review, compilation, or audit by any independent accounting firm.  In addition, various liquidation decisions, upon which certain of the assumptions are based, are subject to change.  As a result, the actual amount of the Claims against the Debtors' Estates could vary significantly from the estimates stated herein, depending on the nature and amount of Claims asserted during the pendency of the chapter 7 cases.  Similarly, the value of the Debtors' assets in a liquidation scenario is uncertain and could vary significantly from the values set forth in the Liquidation Analysis.  The Debtors have not estimated, and the Liquidation Analysis does not take into account:  (i) the tax consequences that may result from the liquidation of the Debtors' assets; (ii) the avoidance of any prepetition liens and recoveries resulting from any potential preference, fraudulent transfer, or other litigation or avoidance actions; or (iii) certain of the Claims that may be entitled to priority under the Bankruptcy Code, including certain administrative priority Claims under sections 503(b) and 507(b) of the Bankruptcy Code.  ACCORDINGLY, NEITHER THE DEBTORS NOR THEIR ADVISORS MAKE ANY REPRESENTATION OR WARRANTY THAT THE ACTUAL RESULTS OF A LIQUIDATION OF THE DEBTORS WOULD OR WOULD NOT, IN WHOLE OR IN PART, APPROXIMATE THE ESTIMATES AND ASSUMPTIONS REPRESENTED HEREIN. THE ACTUAL LIQUIDATION VALUE OF THE DEBTORS IS SPECULATIVE AND RESULTS COULD VARY MATERIALLY FROM ESTIMATES PROVIDED HEREIN.

In addition, the Liquidation Analysis includes estimates for Claims not currently asserted in these Chapter 11 Cases, but which could be asserted and allowed in a chapter 7 liquidation, including unpaid administrative priority Claims relating to wind-down costs and chapter 7 trustee fees.  To date, the Bankruptcy Court has not estimated or otherwise fixed the total amount of Allowed Claims used for purposes of preparing this Liquidation Analysis.  Therefore, the Debtors' estimate of Allowed Claims set forth in the Liquidation Analysis should not be relied on for any other purpose, including determining the value of any distribution to be made on account of Allowed Claims under the Plan.  NOTHING CONTAINED IN THE LIQUIDATION ANALYSIS IS INTENDED TO BE OR CONSTITUTES A CONCESSION OR ADMISSION OF THE DEBTORS.  THE ACTUAL AMOUNT OF ALLOWED CLAIMS IN THE CHAPTER 11 CASES COULD MATERIALLY DIFFER FROM THE ESTIMATED AMOUNTS SET FORTH IN THE LIQUIDATION ANALYSIS.

### C.  Basis of Presentation

This Liquidation Analysis has been prepared assuming that the Debtors' Chapter 11 Cases are converted to Chapter 7 cases on or about May 1, 2021 (the "Liquidation Date").  It is assumed that on the Liquidation Date, the Bankruptcy Court would appoint a Chapter 7 trustee (the "Trustee") to oversee the liquidation of the Debtors' estates, during which time all of the assets of the Debtors would be sold, on a piecemeal basis or as a whole, and the Cash proceeds, net of liquidation-related costs, would then be distributed to creditors in accordance with applicable law: (i) first, to pay wind-down expenses and other Allowed administrative priority Claims; (ii) second, to pay the secured portions of Allowed Claims relating to the respective collateral; and (iii) third, to pay other priority Claims.  Any remaining net Cash would be

distributed to creditors holding Allowed general unsecured Claims, including any unsecured deficiency Claims.

D. **Assumptions and Analysis**

The timeframe associated with the liquidation analysis is uncertain and there is no assurance that the recoveries assigned to the assets would in fact be realized. Under Section 704 of the Bankruptcy Code, a trustee must, among other duties, collect and convert the property of the estate as expeditiously (generally in a distressed process) as is compatible with the best interests of parties-in-interest.

In the event of a chapter 7 liquidation, it is likely that a chapter 7 liquidation would (i) incur increased costs and expenses arising from fees payable to the Trustee in bankruptcy and professional advisors to the Trustee, (ii) erode value of any remaining assets in the context of a forced sale or takeover, and (iii) result in the potentially substantial increase in Claims that would dilute creditor recoveries.

**1. Increased Fees and Expenses.** This Liquidation Analysis assumes that the Debtors' costs of liquidation under chapter 7 would include the fees payable to the Trustee as well as those fees that might be payable to attorneys and other professionals that the Trustee might engage. Other liquidation costs include the expenses incurred during the Chapter 11 Cases that are allowed as administrative priority Claims in the chapter 7 cases, such as compensation for attorneys, financial advisors, appraisers, accountants, and other professionals for the Debtors and statutory committees appointed in the Chapter 11 Cases, and costs and expenses of members of such committees, as well as other compensation Claims.

**2. Increased Costs and Additional Claims Incurred by a Delayed Liquidation**. This Liquidation Analysis assumes the operations of the Debtors will cease and that the Plan construct associated with FWE I, FWE III, FWE IV, the Abandoned Properties and the Credit Bid Acquired Interests would no longer apply. Each of these groups of properties or assets were evaluated for how they would be treated in a hypothetical chapter 7 liquidation scenario.

For the Credit Bid Acquired Interests, it is assumed that the Prepetition FLTL Lenders, in conjunction with the FLFO Lenders, will credit bid their outstanding debt or otherwise seize their collateral. The Trustee would be responsible for abandoning or otherwise winding-down all of the Debtors' assets that are not sold or otherwise seized by the Prepetition FLTL Lenders and/or the Prepetition FLFO Lenders, including the FWE I Properties, the FWE III Properties, the FWE IV Properties and the Abandoned Properties. As a result, the Debtors expect they would need additional funding to wind-down the estates.

For the FWE I Assets and the FWE IV assets, it is assumed that the Apache Implementation Agreement and the Chevron Definitive Documents, respectively, will no longer be in place upon a chapter 7 conversion and that the Trustee would attempt to negotiate an alternative agreement with Apache (or other third party) with respect to the Legacy Apache Properties and similarly, the Trustee would attempt to negotiate an alternative agreement with Chevron (or other third party) with respect to the FWE IV Properties. It is assumed that the Debtors would continue to remain financially responsible for maintaining the Legacy Apache Properties and the FWE IV Properties while such negotiations were pending. As a result, the

Debtors expect that the failure to consummate the Apache Implementation Agreement and the Chevron Definitive Documents would substantially increase the costs of administering the FWE I Assets and the FWE IV assets to the Debtors and their estates.

For the Abandoned Properties, FWE III Properties, and FWE IV Properties, the plan and timing for abandoning these properties and transitioning to predecessors in the chain-of-title or other responsible parties the plugging and abandonment and decommissioning responsibilities associated with these properties is unclear and not currently knowable without the Plan in place. The Debtors believe, however, that any such transition would be significantly delayed by several months, if not longer, as a result of the Debtors' cessation of operations and the loss and disruption to the Debtors' workforce responsible for facilitating such transition. In addition, the Trustee would likely determine that additional professionals would need to be retained to help aid the Trustee in facilitating such transition. If the Debtors continued to be financially and legally responsible for maintaining the Abandoned Properties, FWE III Properties, and FWE IV Properties, it is expected they would incur in excess of approximately $7.5 million in carrying costs each month beyond the Liquidation Date. Further, any litigation associated with abandoning the Abandoned Properties, FWE III Properties, and FWE IV Properties would result in additional professional fees and expenses to the Debtors and their estates and additional delays in the transition.

The process of liquidating the Debtors' businesses would also be subject to review by numerous regulatory agencies, including BOEM and BSEE, which would likely further delay the liquidation process. In the event litigation was necessary to resolve claims asserted in the chapter 7 case, such delay would likely be further prolonged and involve additional costs to the Debtors and their estates.

**3. Other Additional Claims.** This Liquidation Analysis further assumes that additional Claims would arise by reason of the breach or rejection of obligations incurred and leases and executory contracts assumed or entered into by the Debtors during the pendency of the Chapter 11 Cases. The foregoing types of Claims, costs, expenses, fees, and such other Claims that may arise in a liquidation case would be paid in full from the liquidation proceeds before the balance of those proceeds would be made available to pay prepetition priority and unsecured Claims, or available for distribution to the holders of Interests.

E.   <u>Conclusion</u>

The Debtors estimate that, in a chapter 7 liquidation, the aggregate value of all property of the Debtors that is not subject to prepetition liens would total no more than approximately $11 million to $15 million. To provide a recovery to holders of general unsecured Claims, the value of such property would need to exceed the outstanding amounts due under the Debtors' senior secured superpriority postpetition DIP Facility and the estimated Allowed administrative priority Claims that arose in the Chapter 11 Cases and additional Allowed administrative priority Claims arising in the chapter 7 cases.

As detailed in the *Emergency Motion of Debtors for Interim and Final Orders (I) Authorizing Debtors (A) To Obtain Postpetition Financing Pursuant to 11 U.S.C. §§ 105, 361, 362, 363(b), 364(c)(1), 364(c)(2), 364(c)(3), 364(d)(1) and 364(e) and (B) To Utilize Cash Collateral Pursuant to 11 U.S.C. § 363, (II) Granting Adequate Protection to Prepetition*

*Secured Parties Pursuant to 11 U.S.C. §§ 361, 362, 363, 364 and 507(b) and (III) Scheduling Final Hearing Pursuant to Bankruptcy Rules 4001(b) and (c)* (Docket No. 22) (the "<u>DIP Motion</u>"), and as approved in the final order approving the DIP Motion (Docket No. 346) (the "<u>Final DIP Order</u>"), the outstanding amounts owed by the Debtors under the DIP Facility is secured by a senior lien on effectively all of the Debtors' assets.  It is assumed that as of the Liquidation Date, the Debtors will owe approximately $10 million under the DIP Facility.

In addition to satisfying the $10 million DIP Facility, the estimated amount needed to plug and abandon and decommission the FWE III Properties in a chapter 7 liquidation would likely be substantially greater than the up to $27 million under the Plan currently allocated to plug and abandon and decommission the FWE III Properties, which the Debtors assumed under the Plan would be efficiently and cost-effectively wound-down in the two years after the Effective Date.  Additionally, expenses associated with maintaining the Apache Legacy Properties, the Abandoned Properties, and FWE IV Properties, as further described above, would require further incremental funding.  As such, given the shortfall in the value of the Debtors' assets relative to the additional expenses and Claims that would need to be satisfied in full before a recovery could be provided to holders of Allowed general unsecured Claims, it is expected that no distributions would be available for any general unsecured creditors, including the Prepetition SLTL Lenders.

Based on the foregoing, the Debtors believe that the value of any distributions to each Class of Allowed Claims in a chapter 7 liquidation, including all Allowed secured Claims, would be equal to, or less than, the value of distributions provided to each Class under the Plan, and many of the distributions made in a chapter 7 case liquidation would likely not occur until several months after the Liquidation Date, thus lowering the expected value of such distributions.