**<u>Exhibit J</u>**

**Second Lien Exit Facility Agreement**

Current Draft
6/4/21

$[185,000,000][1]

**SECOND AMENDED AND RESTATED SECOND LIEN TERM LOAN AGREEMENT**

Dated as of [●], 2021,

Among

[NEWCO],
as Holdings,

[●],
as the Borrower,

The Several Lenders
from Time to Time Parties Hereto,

and

CANTOR FITZGERALD SECURITIES,
as the Administrative Agent and the Collateral Agent

---

[1] Timing of determination of amount to be discussed.

**Error! Unknown document property name.**
WEIL:\97986321\6\45327.0007

**TABLE OF CONTENTS**

Page

**ARTICLE I**

Definitions ......................................................................................................................... 2

SECTION 1.01.      Defined Terms.................................................................... 2

SECTION 1.02.      Terms Generally ................................................................ 44

SECTION 1.03.      Accounting Terms .............................................................. 44

SECTION 1.04.      Rounding ............................................................................ 44

SECTION 1.05.      Times of Day ...................................................................... 44

SECTION 1.06.      Timing of Payment or Performance ................................. 44

SECTION 1.07.      Hedging Requirements Generally; Hedge Unwinding.................. 44

SECTION 1.08.      Certain Determinations ...................................................... 45

SECTION 1.09.      Making or Maintaining LIBOR Loans ............................. 45

SECTION 1.10.      Divisions ............................................................................ 47

SECTION 1.11.      Deemed Funding of Loans ................................................. 47

SECTION 1.12.      Certain Calculation and Tests............................................ 47

**ARTICLE II**

The Credits......................................................................................................... 47

SECTION 2.01.      Loans .................................................................................. 47

SECTION 2.02.      Existing Loans..............................**Error! Bookmark not defined.**

SECTION 2.03.      Notice of Borrowing........................................................... 48

SECTION 2.04.      Repayment of Loans; Evidence of Debt............................ 49

SECTION 2.05.      Other Fees .......................................................................... 49

SECTION 2.06.      Interest................................................................................ 49

SECTION 2.07.      Interest Periods .................................................................. 50

SECTION 2.08.      Increased Costs, Illegality, etc.......................................... 50

SECTION 2.09.      Compensation..................................................................... 52

SECTION 2.10.      Change of Lending Office .................................................. 52

SECTION 2.11.      Notice of Certain Costs ...................................................... 52

SECTION 2.12.      Voluntary Prepayments ...................................................... 53

SECTION 2.13.      Mandatory Prepayments ..................................................... 53

SECTION 2.14.      Method and Place of Payment............................................ 55

SECTION 2.15.      Net Payments ..................................................................... 55

SECTION 2.16.      Limit on Rate of Interest .................................................... 59

i

Error! Unknown document property name.
WEIL:\97986321\6\45327.0007

Debtors' Exhibit No. 30
Page 3 of 137

SECTION 2.17.        Pro Rata Sharing........................................................... 59
SECTION 2.18.        Adjustments; Set-off ...................................................... 59
SECTION 2.19.        Interest Elections ........................................................... 60

**ARTICLE III**

Representations and Warranties............................................................................ 63
SECTION 3.01.        Corporate Status ........................................................... 63
SECTION 3.02.        Corporate Power and Authority; Enforceability; Security Interests 63
SECTION 3.03.        No Violation; Compliance with Laws............................ 63
SECTION 3.04.        Litigation ...................................................................... 64
SECTION 3.05.        Margin Regulations ....................................................... 64
SECTION 3.06.        Governmental Approvals ............................................... 64
SECTION 3.07.        Investment Company Act ............................................... 64
SECTION 3.08.        True and Complete Disclosure; Financial Condition ..... 64
SECTION 3.09.        Tax Matters .................................................................... 64
SECTION 3.10.        Compliance with ERISA ............................................... 65
SECTION 3.11.        Capital Stock and Ownership ........................................ 65
SECTION 3.12.        Intellectual Property ..................................................... 65
SECTION 3.13.        Environmental Laws ...................................................... 66
SECTION 3.14.        Properties....................................................................... 66
SECTION 3.15.        Solvency ........................................................................ 66
SECTION 3.16.        Anti-Corruption Laws ................................................... 67
SECTION 3.17.        Anti-Terrorism and Anti-Money Laundering Laws; Sanctions ..... 67
SECTION 3.18.        Gas Imbalances, Prepayments........................................ 68
SECTION 3.19.        Marketing of Production ................................................ 68
SECTION 3.20.        Hedge Agreements ......................................................... 68
SECTION 3.21.        Senior Indebtedness........................**Error! Bookmark not defined.**
SECTION 3.22.        Defaults ......................................................................... 68
SECTION 3.23.        Labor Relations ............................................................. 68
SECTION 3.24.        Insurance ....................................................................... 69
SECTION 3.25.        Material Contracts ......................................................... 69
**ARTICLE IV** ........................................................................................................ 69
Conditions Precedent ......................................................................................... 69
SECTION 4.01.        Conditions Precedent to Effectiveness of this Agreement ............ 69

**ARTICLE V**

Covenants ............................................................................................................ 72

**Error! Unknown document property name.**
WEIL:\97986321\6\45327.0007

| SECTION 5.01. | Information Covenants | 72 |
| SECTION 5.02. | Environmental Covenants | 76 |
| SECTION 5.03. | End of Fiscal Years; Fiscal Quarters | 77 |
| SECTION 5.04. | Use of Proceeds | 78 |
| SECTION 5.05. | Change in Business | 78 |
| SECTION 5.06. | Limitation on Incurrence of Indebtedness and Issuance of Disqualified Stock and Preferred Stock | 78 |
| SECTION 5.07. | Limitation on Restricted Payments | 82 |
| SECTION 5.08. | Dividend and Other Payment Restrictions Affecting Subsidiaries. | 85 |
| SECTION 5.09. | Asset Sales | 87 |
| SECTION 5.10. | Transactions with Affiliates | 88 |
| SECTION 5.11. | Mergers, Etc | 90 |
| SECTION 5.12. | Future Guarantors | 90 |
| SECTION 5.13. | Liens | 90 |
| SECTION 5.14. | Compliance with Material Contracts | 91 |
| SECTION 5.15. | Existence; Business and Properties | 91 |
| SECTION 5.16. | Maintenance of Insurance | 91 |
| SECTION 5.17. | Additional Collateral | 92 |
| SECTION 5.18. | Payment of Taxes, etc | 93 |
| SECTION 5.19. | Compliance with Laws | 93 |
| SECTION 5.20. | Further Instruments and Acts | 93 |
| SECTION 5.21. | Books, Records and Inspections | 93 |
| SECTION 5.22. | ERISA | 94 |
| SECTION 5.23. | Hedge Agreements; Swap Agreements | **Error! Bookmark not defined.** |
| SECTION 5.24. | Lender Meetings | 94 |
| SECTION 5.25. | Limitations on Amendments | 94 |
| SECTION 5.26. | Reserve Reports | 95 |
| SECTION 5.27. | Holdings Covenant | 95 |
| SECTION 5.29. | Foreign Subsidiaries; Closing Date Unrestricted Subsidiary | 96 |
| SECTION 5.30. | Account Control Agreements | 96 |
| SECTION 5.31. | Gas Imbalances, Take-or-Pay or Other Prepayments | 97 |
| SECTION 5.32. | Marketing of Production | 97 |
| SECTION 5.33. | Dutch Distributions | 97 |
| SECTION 5.34. | Post-Closing Obligations | 97 |

Error! Unknown document property name.
WEIL:\97986321\6\45327.0007

**ARTICLE VI**

Events of Default ............................................................................................. 97

SECTION 6.01.    Events of Default.................................................. 97

SECTION 6.02.    Application of Proceeds ....................................... 99

SECTION 6.03.    Control by Majority.............................................. 100

SECTION 6.04.    Limitation on Suits............................................... 100

**ARTICLE VII**

The Agents...................................................................................................... 100

SECTION 7.01.    Appointment......................................................... 100

SECTION 7.02.    Delegation of Duties............................................ 101

SECTION 7.03.    Exculpatory Provisions ....................................... 101

SECTION 7.04.    Reliance by Agents............................................... 102

SECTION 7.05.    Notice of Default.................................................. 102

SECTION 7.06.    Non-Reliance on Administrative Agent, Collateral Agent and Other Lenders ........................................................ 102

SECTION 7.07.    Indemnification .................................................... 103

SECTION 7.08.    Agents in Their Individual Capacity ................... 104

SECTION 7.09.    Successor Agents.................................................. 104

SECTION 7.10.    Payments Set Aside.............................................. 105

SECTION 7.11.    Bankruptcy Plan Voting ...................................... 105

SECTION 7.13.    Administrative Agent May File Proofs of Claim ....................... 105

SECTION 7.14.    Collateral Matters................................................ 106

SECTION 7.15.    Intercreditor Agreement and Other Collateral Matters................ 106

SECTION 7.16.    Withholding Tax ................................................... 107

SECTION 7.17.    Erroneous Payment .............................................. 107

**ARTICLE VIII**

Miscellaneous ................................................................................................. 109

SECTION 8.01.    Amendments and Waivers.................................... 109

SECTION 8.02.    Notices.................................................................. 111

SECTION 8.03.    No Waiver; Cumulative Remedies........................ 113

SECTION 8.04.    Survival of Representations and Warranties ........ 113

SECTION 8.05.    Payment of Expenses; Indemnification................ 113

SECTION 8.06.    Successors and Assigns; Participations and Assignments........... 115

SECTION 8.07.    Replacements of Lenders Under Certain Circumstances ............. 118

SECTION 8.08.    Counterparts ........................................................ 119

iv

**Error! Unknown document property name.**
WEIL:\97986321\6\45327.0007

Debtors' Exhibit No. 30
Page 6 of 137

SECTION 8.09.    Severability ................................................................. 119

SECTION 8.10.    GOVERNING LAW ................................................... 119

SECTION 8.11.    Submission to Jurisdiction; Consent to Service; Waivers ............ 119

SECTION 8.12.    Acknowledgments ....................................................... 120

SECTION 8.13.    WAIVERS OF JURY TRIAL ...................................... 120

SECTION 8.14.    Confidentiality ............................................................. 121

SECTION 8.15.    No Advisory or Fiduciary Responsibility .................... 121

SECTION 8.16.    USA PATRIOT Act ...................................................... 122

SECTION 8.17.    Conversion of Currencies ............................................. 122

SECTION 8.18.    Platform; Borrower Materials ...................................... 122

SECTION 8.19.    Release of Liens .......................................................... 123

SECTION 8.20.    Release of Guarantee ................................................... 124

SECTION 8.21.    Acknowledgment and Consent to Bail-In of Affected Financial Institutions .......................................... 124

SECTION 8.22.    Amendment and Restatement ....................................... 125

SECTION 8.23.    Certain ERISA Matters ............................................... 125

SECTION 8.24.    Acknowledgement Regarding Any Supported QFCs .................. 126

SECTION 8.25.    Collateral Matters; Hedge Agreements ..........**Error! Bookmark not defined.**

**Error! Unknown document property name.**
WEIL:\97986321\6\45327.0007

v

Debtors' Exhibit No. 30
Page 7 of 137

| | |
|---|---|
| Exhibit A | Form of Assignment and Acceptance |
| Exhibit B | Form of Note |
| Exhibit C | Form of Interest Period Election Request |
| Exhibit D1 – D4 | Form of Non-Bank Tax Certificate |
| Exhibit E | Form of Notice of Borrowing |
| Exhibit F | Form of PIK Election Notice |
| Exhibit G | Form of Collateral Agreement |
| Exhibit H | Form of Senior Lien Intercreditor Agreement |
| Exhibit I | Form of Solvency Certificate |
| Exhibit J | Form of Permitted Loan Purchase Assignment and Acceptance |
| | |
| Schedule 1.01(a) | Closing Date Investors |
| Schedule 2.01 | Initial Commitments |
| Schedule 3.01 | Jurisdictions |
| Schedule 3.04 | Litigation |
| Schedule 3.11 | Capital Stock and Ownership |
| Schedule 3.18 | Gas Imbalances |
| Schedule 3.19 | Marketing Agreements |
| Schedule 3.20 | Hedge Agreements |
| Schedule 3.25 | Material Contracts |
| Schedule 5.06 | Existing Indebtedness |
| Schedule 5.07 | Existing Investments |
| Schedule 5.10 | Transactions with Affiliates |
| Schedule 5.13 | Existing Liens |
| Schedule 5.34 | Post-Closing Obligations |

vi

**Error! Unknown document property name.**
WEIL:\97986321\6\45327.0007

Debtors' Exhibit No. 30
Page 8 of 137

Current Draft
6/4/21

**SECOND AMENDED AND RESTATED SECOND LIEN TERM LOAN AGREEMENT**

This Second Amended and Restated Second Lien Term Loan Agreement (as amended, restated, amended and restated, supplemented or otherwise modified from time to time, this "Agreement"), dated as of [●], 2021, by and among [Newco] ("Holdings"), [●] (the "Borrower"), the Lenders from time to time party hereto and Cantor Fitzgerald Securities ("CFS"), as administrative agent and collateral agent for the Lenders.

WHEREAS, on September 30, 2013, Fieldwood Energy LLC, a Delaware limited liability company ("FWE"), entered into that certain Credit Agreement, by and among, *inter alios*, FWE, certain lenders party thereto from time to time, and Citibank, N.A., as administrative agent and collateral agent, and the other agents party thereto from time to time (as amended, restated, amended and restated, supplemented or otherwise modified from time to time prior to the effectiveness of the Prepetition First Lien Term Credit Agreement (as defined below), the "Original First Lien Credit Agreement");

WHEREAS, on April 11, 2018, in connection with a Joint Prepackaged Chapter 11 Plan of Fieldwood Energy LLC and its Affiliated Debtors (as amended, restated, amended and restated, supplemented or otherwise modified from time to time, the "Prior Plan of Reorganization"), which was confirmed by the Bankruptcy Court on April 2, 2018, FWE entered into that certain Amended and Restated First Lien Term Loan Agreement, by and among FWE, Fieldwood Energy Inc., a Delaware corporation ("FWE Inc."), the financial institutions from time to time party thereto, the issuing banks from time to time party thereto and CFS, as administrative agent and as collateral agent (as amended, restated, supplemented or otherwise modified from time to time prior to the effectiveness of this Agreement, the "Prepetition First Lien Credit Agreement"), which amended and restated in its entirety the Original First Lien Credit Agreement;

WHEREAS, on August 3, 2020 (the "Petition Date"), FWE Inc., FWE and certain other Affiliates of FWE (each a "Debtor" and collectively, the "Debtors") filed voluntary petitions with the United States Bankruptcy Court for the Southern District of Texas (the "Bankruptcy Court") initiating their respective cases that are pending under chapter 11 of the Bankruptcy Code (each case of the Borrower and each other Debtor, a "Case" and collectively, the "Cases") and have continued in the possession of their assets and the management of their business pursuant to Section 1107 and 1108 of the Bankruptcy Code;

WHEREAS, among others, certain Loan Parties (each, as a debtor and debtor-in-possession under the Cases), the Lenders and CFS, as administrative agent and collateral agent, entered into a senior secured super-priority debtor-in-possession facility, dated as of August 24, 2020 (as amended, restated, amended and restated, supplemented and/or otherwise modified from time to time, the "DIP Facility");

WHEREAS, the Debtors filed the [Third Amended Joint Chapter 11 Plan of Fieldwood Energy LLC and its Affiliated Debtors] (as amended, restated, amended and restated, supplemented or otherwise modified from time to time, the "Plan of Reorganization") which was confirmed by the Bankruptcy Court on [●], 2021;

WHEREAS, as contemplated by the Plan of Reorganization, [●] ("Credit Bid Purchaser") entered into that certain Purchase and Sale Agreement, dated as of [●] (as amended, restated, amended and restated, supplemented or otherwise modified from time to time, the "Credit Bid Purchase Agreement"), by and among, *inter alios*, FWE and certain of its Affiliates, as Sellers (as defined therein) and Credit Bid Purchaser, as Buyer (as defined therein);

WHEREAS upon the effectiveness of the Plan of Reorganization, (i) the outstanding DIP Facility Loans (as defined below) on the Closing Date identified as "Converted DIP Facility Loans" on Schedule 2.01 (the "Converted DIP Facility Loans") shall be converted into Initial DIP Converted Loans (as defined below) hereunder and the relevant Lenders shall be deemed to have made Initial DIP Converted Loans on the Closing Date in an aggregate principal amount of $[_] to the Borrower on the terms and conditions set forth in

Error! Unknown document property name.
WEIL:\97986321\6\45327.0007

Debtors' Exhibit No. 30
Page 9 of 137

this Agreement, and (ii) the Lenders have agreed to provide the Borrower Initial New Loans (as defined below) in an aggregate principal amount of $[_] on the terms and conditions set forth in this Agreement; and

NOW, THEREFORE, the Lenders are willing to extend such term loan to the Borrower on the terms and subject to the conditions set forth herein.  Accordingly, the parties hereto agree as follows:

## ARTICLE I

Definitions

SECTION 1.01.       <u>Defined Terms</u>.  As used in this Agreement, the following terms shall have the meanings specified below:

"<u>2P Developed Producing Reserves</u>" means, collectively, Proved Developed Producing Reserves and Probable Developed Producing Reserves.

"<u>ABR</u>" means, for any day, a fluctuating interest rate per annum in effect from time to time, which rate per annum shall at all times be equal to the highest of (a) the Prime Rate in effect on such day, (b) ½ of 1.00% per annum above the Federal Funds Rate, (c) 1.00% per annum above the one-month Adjusted LIBOR and (d) 2.00%.

"<u>ABR Borrowing</u>" means a Borrowing comprised of ABR Loans.

"<u>ABR Loan</u>" means a Loan bearing interest at a rate equal to ABR <u>plus </u>the Applicable Margin.

"<u>Account Control Agreement</u>" means an account control agreement in form and substance satisfactory to the Collateral Agent (it being agreed that (x) any agreement purporting to require the Collateral Agent to indemnify a depositary bank or securities intermediary in the Collateral Agent's individual capacity shall not be satisfactory to the Collateral Agent and (y) the form of that certain Deposit Account Control Agreement, dated as of May 26, 2020 by and among, *inter alios*, FWE, CFS, Cortland Capital Markets Services, LLC and Capital One, National Association is satisfactory to the Collateral Agent) and the Required Lenders and duly executed by the applicable Credit Party, the Collateral Agent, the Collateral Agent (as defined in the FLTL Credit Agreement) (if applicable) and the applicable depositary bank or securities intermediary, as the case may be.

"<u>Acquired Interests</u>" shall have the meaning set forth in the Credit Bid Purchase Agreement.

"<u>Additional Refinancing Amount</u>" means, in connection with the Incurrence of any Refinancing Indebtedness, the aggregate principal amount of additional Indebtedness, Disqualified Stock or Preferred Stock Incurred to pay premiums (including tender premiums), expenses, defeasance costs and fees in respect thereof.

"<u>Adjusted LIBOR</u>" means, with respect to any Interest Period, an interest rate per annum equal to the product of (a) LIBOR in effect for such Interest Period and (b) Statutory Reserves; <u>provided</u>, that if Adjusted LIBOR is less than 1.00%, Adjusted LIBOR shall be deemed to be 1.00%.

"<u>Administrative Agent</u>" means CFS, as the administrative agent for the Lenders under this Agreement and the other Loan Documents, or any successor administrative agent appointed in accordance with the provisions of <u>Section 7.09</u>.

"<u>Administrative Questionnaire</u>" shall have the meaning set forth in <u>Section 8.06(b)(ii)(D)</u>.

"<u>Adverse Proceedings</u>" shall have the meaning set forth in <u>Section 3.04</u>.

2

Error! Unknown document property name.
WEIL:\97986321\6\45327.0007

Debtors' Exhibit No. 30
Page 10 of 137

"Affiliate" means, with respect to any Person, any other Person directly or indirectly controlling, controlled by, or under direct or indirect common control with such Person. A Person shall be deemed to control another Person if such Person possesses, directly or indirectly, the power to direct or cause the direction of the management and policies of such other Person, whether through the ownership of voting securities, by contract or otherwise. "Controlling" ("controlling") and "controlled" shall have meanings correlative thereto.

"Affiliate Transaction" shall have the meaning set forth in Section 5.10(a).

"Agents" means the Administrative Agent and the Collateral Agent.

"Agreement" shall have the meaning set forth in the preamble hereto, as amended, restated, amended and restated, supplemented or otherwise modified from time to time.

"Agreement Currency" shall have the meaning set forth in Section 8.17(b).

"Anti-Corruption Laws" means the U.S. Foreign Corrupt Practices Act of 1977, the Bribery Act 2010 of the United Kingdom or similar law of a jurisdiction in which Holdings, the Borrower or any of its Subsidiaries conduct their business and to which they are lawfully subject.

"Anti-Terrorism and Anti-Money Laundering Laws" means any and all applicable requirements of law relating to engaging in, financing or facilitating terrorism or money laundering, including the USA Patriot Act, The Currency and Foreign Transactions Reporting Act (also known as the "Bank Secrecy Act", 31 U.S.C. §§5311-5330 and 12 U.S.C. §§1818(s), 1820(b) and 1951-1959), Trading With the Enemy Act (50 U.S.C. §1 et seq.), Executive Order 13224 (effective September 24, 2001) and each of the laws, regulations, and executive orders administered by OFAC (31 C.F.R., Subtitle B, Chapter V).

"Applicable Creditor" shall have the meaning set forth in Section 8.17(b).

"Applicable Margin" means (i) in the case of LIBOR Loans, 8.00% per annum and (ii) in the case of ABR Loans, 7.00% per annum; provided, that, with respect to Interest Payment Date in which the Borrower has made a PIK Election, "Applicable Margin" shall mean (i) in the case of LIBOR Loans, 4.75% per annum and (ii) in the case of ABR Loans, 3.75% per annum.

"Approved Fund" shall have the meaning set forth in Section 8.06(b).

"Approved Petroleum Engineers" means (a) Netherland, Sewell & Associates, Inc., (b) Ryder Scott Company, L.P., (c) W. D. Van Gonten & Co. Petroleum Engineering, (d) DeGolyer and MacNaughton, (e) Cawley, Gillespie & Associates, Inc., (f) Miller and Lents, Ltd. and (g) at the Borrower's option, any other independent petroleum engineers selected by the Borrower that is reasonably acceptable to the Required Lenders.

"Asset Sale" means:

(1)      the sale, conveyance, transfer or other disposition (whether in a single transaction or a series of related transactions) of property or assets (including by way of Production Payments and Reserve Sales and Sale/Leaseback Transactions) (other than an operating lease entered into in the ordinary course of the Oil and Gas Business) (each referred to in this definition as a "*disposition*"); or

(2)      the issuance or sale of Equity Interests (other than directors' qualifying shares and shares issued to foreign nationals or other third parties to the extent required by applicable law) of any Subsidiary (other than to the Borrower or another Restricted Subsidiary) (whether in a single transaction or a series of related transactions),

Error! Unknown document property name.
WEIL:\97986321\6\45327.0007

in each case other than:

(a)   a disposition of Cash Equivalents or Investment Grade Securities or obsolete, damaged or worn out property or equipment in the ordinary course of business;

(b)   any disposition that occurs in connection with a transaction permitted pursuant to Section 5.11;

(c)   any Restricted Payment or Permitted Investment that is permitted to be made, and is made, under Section 5.07;

(d)   any disposition of property or assets, or the issuance of securities, by a Restricted Subsidiary to the Borrower or by the Borrower or a Restricted Subsidiary to a Restricted Subsidiary that is a Guarantor;

(e)   foreclosure, condemnation or any similar action with respect to any property or other asset of the Borrower or any of the Restricted Subsidiaries;

(f)   the lease, assignment or sublease of, or any transfer related to a "reverse build to suit" or similar transaction in respect of, any real or personal property in the ordinary course of business;

(g)   any sale of inventory (including Hydrocarbons and mineral products) in the ordinary course of business;

(h)   any grant in the ordinary course of business of any license of patents, trademarks, know-how or any other intellectual property;

(i)   in the ordinary course of business and other than with respect to any Oil and Gas Properties, any swap of assets, or lease, assignment or sublease of any real or personal property, in exchange for services (including in connection with any outsourcing arrangements) of comparable or greater value or usefulness to the business of the Borrower and the Restricted Subsidiaries as a whole, as determined in good faith by the Borrower;

(j)   any transfer of accounts receivable and related assets of the type specified in the definition of "Receivables Financing" (or a fractional undivided interest therein) by a Receivables Subsidiary in a Qualified Receivables Financing;

(k)   any Sale/Leaseback Transaction provided that the Fair Market Value of all property of the Borrower and its Restricted Subsidiaries subject to such arrangements since the Closing Date does not exceed $11,500,000;

(l)   dispositions in connection with Permitted Liens;

(m)   any disposition of Capital Stock of a Restricted Subsidiary pursuant to an agreement or other obligation with or to a Person (other than the Borrower or a Restricted Subsidiary) from whom such Restricted Subsidiary was acquired or from whom such Restricted Subsidiary acquired its business and assets (having been newly formed in connection with such acquisition), made as part of such acquisition and in each case comprising all or a portion of the consideration in respect of such sale or acquisition;

4

Error! Unknown document property name.
WEIL:\97986321\6\45327.0007

Debtors' Exhibit No. 30
Page 12 of 137

(n)     dispositions of receivables in connection with the compromise, settlement or collection thereof in the ordinary course of business or in bankruptcy or similar proceedings and exclusive of factoring or similar arrangements;

(o)     any surrender, expiration or waiver of contract rights (other than oil and gas leases) or the settlement, release, recovery on or surrender of contract, tort or other claims of any kind;

(p)     any Production Payments and Reserve Sales; *provided* that any such Production Payments and Reserve Sales, other than incentive compensation programs on terms that are reasonably customary in the Oil and Gas Business for geologists, geophysicists and other providers of technical services to the Borrower or a Restricted Subsidiary, shall have been created, incurred, issued, assumed or guaranteed in connection with the financing of, and within 60 days after the acquisition of, the property that is subject thereto;

(q)     the abandonment, farm-out pursuant to a Farm-Out Agreement, lease or sublease of undeveloped Oil and Gas Properties owned or held by the Borrower or any Restricted Subsidiary in the ordinary course of business or which are usual and customary in the Oil and Gas Business generally or in the geographic region in which such activities occur;

(r)     the unwinding of any Hedge Agreement;

(s)     sales, transfer and other dispositions of Investments in joint ventures to the extent required by, or made pursuant to, customary buy/sell arrangements between the joint venture parties set forth in venture arrangements and similar binding arrangements; and

(t)     the lapse or abandonment of intellectual property in the ordinary course of business, which in the reasonable good faith determination of the Borrower are not material to the conduct of the business of the Borrower and its Subsidiaries, taken as a whole.

"Assignee" shall have the meaning set forth in Section 8.06(b)(i).

"Assignment and Acceptance" means an assignment and acceptance entered into by a Lender and an Assignee, and accepted by the Administrative Agent (substantially in the form of Exhibit A or such other form as shall be approved by the Administrative Agent).

"Authorized Officer" means as to any Person, the President, the Chief Executive Officer, the Chief Financial Officer, the Chief Operating Officer, the Treasurer, the Assistant or Vice Treasurer, the Vice President-Finance, the General Counsel and any manager, managing member or general partner, in each case, of such Person, and any other senior officer designated as such in writing to the Administrative Agent by such Person.  Any document delivered hereunder that is signed by an Authorized Officer shall be conclusively presumed to have been authorized by all necessary corporate, limited liability company, partnership and/or other action on the part of the Borrower or any other Credit Party and such Authorized Officer shall be conclusively presumed to have acted on behalf of such Person.

"Available Tenor" means, as of any date of determination and with respect to the then-current Benchmark, as applicable, (x) if the then-current Benchmark is a term rate, any tenor for such Benchmark that is or may be used for determining the length of an Interest Period or (y) otherwise, any payment period for interest calculated with reference to such Benchmark, as applicable, pursuant to this Agreement as of such date.

Error! Unknown document property name.
WEIL:\97986321\6\45327.0007

"Bail-In Action" means the exercise of any Write-Down and Conversion Powers by the applicable Resolution Authority in respect of any liability of an Affected Financial Institution.

"Bail-In Legislation" means, (a) with respect to any EEA Member Country implementing Article 55 of Directive 2014/59/EU of the European Parliament and of the Council of the European Union, the implementing law, regulation, rule or requirement for such EEA Member Country from time to time which is described in the EU Bail-In Legislation Schedule and (b) with respect to the United Kingdom, Part I of the United Kingdom Banking Act 2009 (as amended from time to time) and any other law, regulation or rule applicable in the United Kingdom relating to the resolution of unsound or failing banks, investment firms or other financial institutions or their affiliate (other than through liquidation, administration or other insolvency proceedings).

"Bankruptcy Code" shall have the meaning set forth in Section 6.01(e).

"Bankruptcy Court" shall have the meaning set forth in the recitals hereto.

"Benchmark" means, initially, LIBOR; provided that if a replacement of the Benchmark has occurred pursuant to Section 1.09(b), then "Benchmark" means the applicable Benchmark Replacement to the extent that such Benchmark Replacement has replaced such prior benchmark rate.  Any reference to "Benchmark" shall include, as applicable, the published component used in the calculation thereof.

"Benchmark Replacement" means, for any Available Tenor:

(1)       for purposes of Section 1.09(b)(i), the first alternative set forth below that can be determined by the Administrative Agent:

(a)       the sum of: (i) Term SOFR and (ii) 0.11448% (11.448 basis points) for an Available Tenor of one-month's duration, 0.26161% (26.161 basis points) for an Available Tenor of three-months' duration, and 0.42826% (42.826 basis points) for an Available Tenor of six-months' duration; or

(b)       the sum of: (i) Daily Simple SOFR and (ii) the spread adjustment selected or recommended by the Relevant Governmental Body for the replacement of the tenor of LIBOR with a SOFR-based rate having approximately the same length as the interest payment period specified in Section 1.09(b)(i); and

(2)       for purposes of Section 1.09(b)(ii), the sum of (a) the alternate benchmark rate and (b) an adjustment (which may be a positive or negative value or zero), in each case, that has been selected by the Administrative Agent (at the direction of the Required Lenders) and the Borrower as the replacement for such Available Tenor of such Benchmark giving due consideration to any evolving or then-prevailing market convention, including any applicable recommendations made by the Relevant Governmental Body, for U.S. dollar- denominated syndicated credit facilities at such time;

provided that, if the Benchmark Replacement as determined pursuant to clause (1) or (2) above would be less than the Floor, the Benchmark Replacement will be deemed to be the Floor for the purposes of this Agreement and the other Loan Documents.

"Benchmark Replacement Conforming Changes" means, with respect to any Benchmark Replacement, any technical, administrative or operational changes (including changes to the definition of "ABR," the definition of "Business Day," the definition of "Interest Period," timing and frequency of determining rates and making payments of interest, timing of borrowing requests or prepayment, conversion or continuation notices, the applicability and length of lookback periods, the applicability of breakage provisions, and other technical, administrative or operational matters) that the Administrative Agent (at the direction of the

6

Error! Unknown document property name.
WEIL:\97986321\6\45327.0007

Debtors' Exhibit No. 30
Page 14 of 137

Required Lenders) decides may be appropriate to reflect the adoption and implementation of such Benchmark Replacement and to permit the administration thereof by the Administrative Agent in a manner substantially consistent with market practice (or, if the Administrative Agent (at the direction of the Required Lenders) decides that adoption of any portion of such market practice is not administratively feasible or if the Administrative Agent (at the direction of the Required Lenders) determines that no market practice for the administration of such Benchmark Replacement exists, in such other manner of administration as the Administrative Agent decides is reasonably necessary in connection with the administration of this Agreement and the other Loan Documents).

"Benchmark Transition Event" means, with respect to any then-current Benchmark other than LIBOR, the occurrence of a public statement or publication of information by or on behalf of the administrator of the then-current Benchmark, the regulatory supervisor for the administrator of such Benchmark, the Board of Governors, the NYFRB, an insolvency official with jurisdiction over the administrator for such Benchmark, a resolution authority with jurisdiction over the administrator for such Benchmark or a court or an entity with similar insolvency or resolution authority over the administrator for such Benchmark, announcing or stating that:

(1)     such administrator has ceased or will cease on a specified date to provide all Available Tenors of such Benchmark, permanently or indefinitely, provided that, at the time of such statement or publication, there is no successor administrator that will continue to provide any Available Tenor of such Benchmark; or

(2)     all Available Tenors of such Benchmark are or will no longer be representative of the underlying market and economic reality that such Benchmark is intended to measure and that representativeness will not be restored.

"Beneficial Ownership Regulation" means 31 C.F.R. § 1010.230.

"Benefit Plan" means any of (a) an "employee benefit plan" (as defined in ERISA) that is subject to Title I of ERISA, (b) a "plan" as defined in Section 4975 of the Code or (c) any Person whose assets include (for purposes of ERISA Section 3(42) or otherwise for purposes of Title I of ERISA or Section 4975 of the Code) the assets of any such "employee benefit plan" or "plan".

"Board" means the Board of Governors of the Federal Reserve System of the United States of America (or any successor).

"Board of Directors" means, as to any Person, the board of directors or other governing body of such Person, or if such Person is owned or managed by a single entity, the board of directors or other governing body of such entity.

"Borrower" shall have the meaning set forth in the preamble to this Agreement.

"Borrower Materials" shall have the meaning set forth in Section 8.18.

"Borrowing" means a group of Loans of a single Type and made on a single date and, in the case of LIBOR Loans, as to which a single Interest Period is in effect.

"Budget" shall have the meaning provided in Section 5.01(g).

"Business Day" means any day excluding Saturday, Sunday and any other day on which banking institutions in New York City or Houston, Texas are authorized by law or other governmental actions to close, and, if such day relates to (a) any interest rate settings as to a LIBOR Loan, (b) any fundings, disbursements, settlements and payments in respect of any such LIBOR Loan, or (c) any other dealings pursuant

Error! Unknown document property name.
WEIL:\97986321\6\45327.0007

to this Agreement in respect of any such LIBOR Loan, such day shall be a day on which dealings in deposits in U.S. Dollars are conducted by and between banks in the London interbank eurodollar market.

"Capital Stock" means:

(1)     in the case of a corporation, corporate stock or shares;

(2)     in the case of an association or business entity, any and all shares, interests, participations, rights or other equivalents (however designated) of corporate stock;

(3)     in the case of a partnership or limited liability company, partnership or membership interests (whether general or limited); and

(4)     any other interest or participation that confers on a Person the right to receive a share of the profits and losses of, or distributions of assets of, the issuing Person.

"Capitalized Lease Obligation" means, at the time any determination thereof is to be made, the amount of the liability in respect of a capital lease that would at such time be required to be capitalized and reflected as a liability on a balance sheet (excluding the footnotes thereto) in accordance with GAAP; *provided* that any obligations of the Borrower or its Restricted Subsidiaries, or of a special purpose or other entity not consolidated with the Borrower and its Restricted Subsidiaries, that (i) were not (or would not have been) included on the consolidated balance sheet of the Borrower as capital lease obligations prior to the recharacterization described below and (ii) are subsequently (re)characterized as capital lease obligations or, in the case of such a special purpose or other entity becoming consolidated with the Borrower and its Restricted Subsidiaries, due to a change in accounting treatment or otherwise, shall for all purposes not be treated as Capitalized Lease Obligations or Indebtedness.

"Case" and "Cases" shall have the meaning set forth in the recitals hereto.

"Cash Equivalents" means:

(1)     U.S. Dollars, pounds sterling, euros, the national currency of any member state in the European Union or such local currencies held by an entity from time to time in the ordinary course of business;

(2)     securities issued or directly and fully guaranteed or insured by the U.S. government or any country that is a member of the European Union or any agency or instrumentality thereof in each case maturing not more than two years from the date of acquisition;

(3)     certificates of deposit, time deposits and eurodollar time deposits with maturities of one year or less from the date of acquisition, bankers' acceptances, in each case with maturities not exceeding one year and overnight bank deposits, in each case with any commercial bank having capital and surplus in excess of $250,000,000 in the case of domestic banks and $100,000,000 in the case of (or the U.S. Dollar equivalent thereof) in the case of foreign banks;

(4)     repurchase obligations for underlying securities of the types described in clauses (2) and (3) above entered into with any financial institution meeting the qualifications specified in clause (3) above;

(5)     commercial paper issued by a corporation (other than an Affiliate of the Borrower) rated at least "A-1" or the equivalent thereof by Moody's or S&P (or reasonably equivalent ratings of another internationally recognized ratings agency) and in each case maturing within one year after the date of acquisition;

(6)     readily marketable direct obligations issued by any state of the United States of America or any political subdivision thereof having one of the two highest rating categories obtainable from

8

Error! Unknown document property name.
WEIL:\97986321\6\45327.0007

Debtors' Exhibit No. 30
Page 16 of 137

either Moody's or S&P (or reasonably equivalent ratings of another internationally recognized ratings agency) in each case with maturities not exceeding two years from the date of acquisition;

(7)      Indebtedness issued by Persons (other than the Investors or any of their Affiliates) with a rating of "A" or higher from S&P or "A-2" or higher from Moody's (or reasonably equivalent ratings of another internationally recognized ratings agency) in each case with maturities not exceeding two years from the date of acquisition;

(8)      investment funds investing at least 95% of their assets in securities of the types described in clauses (1) through (7) above; and

(9)      in the case of Investments by any Foreign Subsidiary or Investments made in a country outside the United States, other customarily utilized high-quality Investments in the country where such Foreign Subsidiary is located or in which such Investment is made.

"Cash Management Services" shall mean (a) commercial credit cards, merchant card services, purchase or debit cards, including non-card e-payables services, (b) treasury management services (including, but not limited to, controlled disbursement, overdraft, automated clearing house fund transfer services, return items and interstate depository network services) and (c) any other demand deposit or operating account relationships or other cash management services.

"Casualty Event" means, with respect to any Collateral, (a) any damage to, destruction of, or other casualty or loss involving, any property or asset or (b) any seizure, condemnation, confiscation or taking under the power of eminent domain of, or any requisition of title or use of, or relating to, or any similar event in respect of, any property or asset.

"CFC" means a "controlled foreign corporation" within the meaning of Section 957 of the Code.

"CFS" shall have the meaning set forth in the preamble to this Agreement.

"Change in Law" means (a) the adoption or taking effect of any law, treaty, order, policy, rule or regulation after the Closing Date, (b) any change in any law, treaty, order, policy, rule or regulation or in the administration, interpretation, implementation or application thereof by any Governmental Authority after the Closing Date or (c) the making or issuance of any guideline, request, directive or order enacted or promulgated after the Closing Date by any central bank or other governmental or quasigovernmental authority (whether or not having the force of law); *provided* that notwithstanding anything herein to the contrary, the Dodd-Frank Wall Street Reform and Consumer Protection Act, the Basel Committee on Banking Regulations and Supervisory Practices (or any successor or similar authority) and all guidelines, requests, directives, orders, rules and regulations adopted, enacted or promulgated in connection therewith, in each case pursuant to Basel III, shall in each case be deemed to have gone into effect after the Closing Date regardless of the date adopted, enacted or promulgated and shall be included as a Change in Law; *provided* that no Lender shall be required to disclose any confidential or proprietary information in connection therewith.

"Change of Control" means, at any time: (a) any Person or "group" (within the meaning of Section 13(d) or 14(d) of the Exchange Act, but excluding any employee benefit plan of such Person, entity or "group" and its Subsidiaries and any Person or entity acting in its capacity as trustee, agent or other fiduciary or administrator of any such plan), other than the Permitted Holders (or any holding company parent of Holdings owned directly or indirectly by the Permitted Holders), shall at any time have acquired direct or indirect beneficial ownership (as defined in Rules 13(d)-3 and 13(d)-5 under the Exchange Act) of either (i) voting power of the outstanding Voting Stock of the Borrower having more than 35% of the ordinary voting power for the election of directors of the Borrower or (ii) economic interests in the outstanding Capital Stock of the Borrower having more than 35% of the aggregate economic interests in the outstanding Capital Stock of the Borrower, (b)

9

**Error! Unknown document property name.**
WEIL:\97986321\6\45327.0007

Debtors' Exhibit No. 30
Page 17 of 137

Holdings shall cease to own 100% of the Capital Stock of the Borrower, or (c) any "change of control" or similar term under the FLTL Facility shall occur.

"Class" when used in reference to (a) any Loan, refers to whether such Loan are Loans made or deemed made by any of the Lenders to the Borrower pursuant to Section 2.01 on the Closing Date or a Loan or Loans of another class established pursuant to Section 2.20 or otherwise hereunder, (b) any Commitment, refers to whether such Commitment is an Initial Commitment or a commitment of another class established pursuant to Section 2.20 or otherwise hereunder and (c) any Lender, refers to whether such Lender has a Loan or Commitment of a particular Class. The Initial New Loans and the Initial DIP Converted Loans shall constitute a single Class of Loans for all purposes under this Agreement

"Closing Date" means the date on which all the conditions set forth in Section 4.01 shall have been satisfied (or waived in accordance with Section 8.01).

"Closing Date Unrestricted Subsidiary" means Fieldwood Cooperatief U.A.

"Code" means the Internal Revenue Code of 1986, as amended from time to time.

"Collateral" shall have the meaning provided for such term in each of the Security Documents and shall include any and all assets securing or intended to secure any or all of the Loan Obligations; *provided* that with respect to any Mortgages, "Collateral," as defined herein, shall include "Mortgaged Property" as defined therein; *provided* further, that in no case shall the "Collateral" include any Excluded Asset (including, for the avoidance of doubt, any Excluded Equity Interests).

"Collateral Agent" means CFS, as collateral agent for the benefit of the Secured Parties, or any successor collateral agent appointed in accordance with the provisions of Section 7.09.

"Collateral Agreement" means the Collateral Agreement, to be entered into as of the Closing Date, among the Borrower, the Guarantors and the Collateral Agent, substantially in the form attached hereto as Exhibit G, as may be amended, restated, amended and restated, supplemented or otherwise modified from time to time in accordance with its terms and in accordance with this Agreement.

"Commitment" means, with respect to any Lender, such Lender's Initial Commitment or Incremental Commitment.

"Commitment Letter" shall have the meaning set forth in Section 4.01(v).

"Consolidated Excess Cash" shall mean, as of the end of any fiscal quarter, the amount that (x) the average daily balance of Unrestricted Cash of the Borrower and Subsidiary Guarantors over the last fiscal month of such fiscal quarter exceeds (y) $130,000,000.

"Contingent Obligations" means, with respect to any Person, any obligation of such Person guaranteeing any leases, dividends or other obligations that do not constitute Indebtedness ("primary obligations") of any other Person (the "primary obligor") in any manner, whether directly or indirectly, including, without limitation, any obligation of such Person, whether or not contingent:

    (1)    to purchase any such primary obligation or any property constituting direct or indirect security therefor;

    (2)    to advance or supply funds;

    (a)    for the purchase or payment of any such primary obligation; or

10

Error! Unknown document property name.
WEIL:\97986321\6\45327.0007

Debtors' Exhibit No. 30
Page 18 of 137

(b)     to maintain working capital or equity capital of the primary obligor or otherwise to maintain the net worth or solvency of the primary obligor; or

(3)     to purchase property, securities or services primarily for the purpose of assuring the owner of any such primary obligation of the ability of the primary obligor to make payment of such primary obligation against loss in respect thereof.

"Contractual Requirement" shall have the meaning set forth in Section 3.03.

"Converted DIP Facility Loans" shall have the meaning set forth in the recitals hereto.

"Covered Party" shall have the meaning set forth in Section 8.24(a).

"Credit Bid Purchase Agreement" shall have the meaning set forth in the recitals hereto.

"Credit Bid Purchaser" shall have the meaning set forth in the recitals hereto.

"Credit Party" means each of the Borrower and the Guarantors.

"Customary Intercreditor Agreement" means (a) to the extent executed in connection with incurrence of Indebtedness secured by Liens on the Collateral which are intended to rank equal in priority to the Liens on the Collateral securing the Loan Obligations (but without regard to the control of remedies), a customary intercreditor agreement in form and substance reasonably acceptable to the Required Lenders and the Borrower, which agreement shall provide that the Liens on the Collateral securing such Indebtedness shall rank equal in priority to the Liens on the Collateral securing the Loan Obligations (but without regard to the control of remedies) and (b) to the extent executed in connection with the incurrence of Indebtedness secured by Liens on the Collateral which are intended to rank senior or junior to the Liens on the Collateral securing the Loan Obligations, at the option of the Borrower, either (i) the Senior Lien Intercreditor Agreement, (ii) an intercreditor agreement substantially in the form of the Senior Lien Intercreditor Agreement  (with such modifications as may be necessary or appropriate in light of prevailing market conditions and reasonably acceptable to the Required Lenders) or (iii) a customary intercreditor agreement in form and substance reasonably acceptable to the Required Lenders and the Borrower, which agreement shall provide that the Liens on the Collateral securing such Indebtedness shall rank senior or junior to the Liens on the Collateral securing the Loan Obligations, as applicable.  With regard to the intercreditor agreements or changes described above (other than with respect to clause (b)(i) above), such changes or agreement, as applicable, shall be posted to the Lenders not less than three (3) Business Days before execution thereof and, if the Required Lenders shall not have objected in writing to such changes within three (3) Business Days after posting, then the Required Lenders shall be deemed to have agreed that the Administrative Agent's and/or Collateral Agent's entry into such intercreditor agreement (including with such changes) is reasonable and to have consented to such intercreditor agreement (including with such changes) and to the Administrative Agent's and/or Collateral Agent's execution thereof.

"Daily Simple SOFR" means, for any day, SOFR, with the conventions for this rate (which will include a lookback) being established by the Administrative Agent (at the direction of the Required Lenders) in accordance with the conventions for this rate recommended by the Relevant Governmental Body for determining "Daily Simple SOFR" for syndicated business loans; provided, that if the Administrative Agent decides that any such convention is not administratively feasible for the Administrative Agent, then the Administrative Agent (at the direction of the Required Lenders)  may establish another convention in its reasonable discretion.

"Debt/Equity Incurrence Prepayment Event" means (a) any Incurrence by the Borrower or any of the Restricted Subsidiaries of any Indebtedness, but excluding any Indebtedness permitted to be issued or incurred under Section 5.06 and/or (b) the issuance by Holdings of any Equity Interests other than, so long as no Event of Default has occurred and is continuing, any issuance of Equity Interests (i) issued in connection with "Permitted Investments" or (ii) for purposes of making capital expenditures.

11

Error! Unknown document property name.
WEIL:\97986321\6\45327.0007

Debtors' Exhibit No. 30
Page 19 of 137

"<u>Debtors</u>" shall have the meaning set forth in the recitals hereto.

"<u>Default</u>" means any event which is, or after notice or passage of time or both would be, an Event of Default.

"<u>Defaulting Agent</u>" means any Agent (a) has become or is insolvent or has a parent company that has become or is insolvent or (b) has become or has a parent company that has become the subject of a bankruptcy or insolvency proceeding or any action or proceeding of the type described in <u>Section 6.01(e)</u>, or has had a receiver, conservator, trustee, administrator, assignee for the benefit of creditors or similar Person charged with reorganization or liquidation of its business or custodian, appointed for it, or has taken any action in furtherance of, or indicating its consent to, approval of or acquiescence in any such proceeding or appointment, or has a parent company that has become the subject of a bankruptcy or insolvency proceeding, or has had a receiver, conservator, trustee, administrator, assignee for the benefit of creditors or similar Person charged with reorganization or liquidation of its business or custodian, appointed for it, or has taken any action in furtherance of, or indicating its consent to, approval of or acquiescence in any such proceeding or appointment.

"<u>DIP Facility</u>" has the meaning set forth in the recitals hereto.

"<u>DIP Facility Loans</u>" means the "Loans" as defined in the DIP Facility.

"<u>Discharge of First-Priority Lien Obligations</u>" means, except to the extent otherwise provided in the Senior Lien Intercreditor Agreement with respect to the reinstatement or continuation of any First-Priority Lien Obligation under certain circumstances, the payment in full in cash or immediately available funds (except for contingent indemnities and cost and reimbursement obligations to the extent no claim has been made) of all such First-Priority Lien Obligations then outstanding, if any; provided that the Discharge of First-Priority Lien Obligations shall not be deemed to have occurred if such payments are made with the proceeds of other First-Priority Lien Obligations that constitute an exchange or replacement for or a refinancing of such First-Priority Lien Obligations. In the event the First-Priority Lien Obligations are modified and the First-Priority Lien Obligations are paid over time or otherwise modified pursuant to Section 1129 of the Bankruptcy Code pursuant to a confirmed and consummated plan of reorganization, the First-Priority Lien Obligations shall be deemed to be discharged when the final payment is made in cash or immediately available funds or in the form of consideration otherwise provided for in such plan of reorganization in respect of such Indebtedness and any obligations pursuant to such new or modified indebtedness shall have been satisfied.

"<u>Dispose</u>" means to convey, sell, lease, sell and leaseback, assign, transfer (including via a Farm-Out Agreement) or otherwise dispose.

"<u>Disposition</u>" or "<u>Disposed of</u>" shall have a correlative meaning to the defined term of "Dispose".

"<u>Disqualified Stock</u>" means, with respect to any Person, any Capital Stock of such Person which, by its terms (or by the terms of any security into which it is convertible or for which it is redeemable or exchangeable), or upon the happening of any event:

(1)     matures or is mandatorily redeemable, pursuant to a sinking fund obligation or otherwise (other than as a result of a change of control or asset sale),

(2)     is convertible or exchangeable for Indebtedness or Disqualified Stock of such Person, or

(3)     is redeemable at the option of the holder thereof, in whole or in part (other than solely as a result of a change of control or asset sale),

12

Error! Unknown document property name.
WEIL:\97986321\6\45327.0007

Debtors' Exhibit No. 30
Page 20 of 137

in each case prior to 180 days after the earlier of the Maturity Date or the date the Loans are no longer outstanding; *provided*, *however*, that only the portion of Capital Stock which so matures or is mandatorily redeemable, is so convertible or exchangeable or is so redeemable at the option of the holder thereof prior to such date shall be deemed to be Disqualified Stock; *provided*, *further*, *however*, that if such Capital Stock is issued to any employee or to any plan for the benefit of employees of the Borrower or its Subsidiaries or by any such plan to such employees, such Capital Stock shall not constitute Disqualified Stock solely because it may be required to be repurchased by such Person in order to satisfy applicable statutory or regulatory obligations or as a result of such employee's termination, death or disability; *provided*, *further*, that any class of Capital Stock of such Person that by its terms authorizes such Person to satisfy its obligations thereunder by delivery of Capital Stock that is not Disqualified Stock shall not be deemed to be Disqualified Stock.

"Dollar Denominated Production Payments" means production payment obligations recorded as liabilities in accordance with GAAP, together with all undertakings and obligations in connection therewith.

"Domestic Subsidiary" means each Subsidiary of the Borrower that is organized under the laws of the United States or any state thereof, or the District of Columbia.

"Early Opt-in Effective Date" means, with respect to any Early Opt-in Election, the sixth (6th) Business Day after the date notice of such Early Opt-in Election is provided to the Lenders, so long as the Administrative Agent has not received, by 5:00 p.m. (New York City time) on the fifth (5th) Business Day after the date notice of such Early Opt-in Election is provided to the Lenders, written notice of objection to such Early Opt-in Election from Lenders comprising the Required Lenders.

"Early Opt-in Election" means the occurrence of (a) a notification by the Administrative Agent (on its own or at the direction of the Required Lenders) to (or the request by the Borrower to the Administrative Agent to notify) each of the other parties hereto that at least 5 currently outstanding U.S. dollar-denominated syndicated credit facilities at such time contain (as a result of amendment or as originally executed) a SOFR-based rate (including SOFR, a term SOFR or any other rate based upon SOFR) as a benchmark rate (and such syndicated credit facilities are identified in such notice and are publicly available for review), and (b) the joint election by the Administrative Agent (at the direction of the Required Lenders) and the Borrower to trigger a fallback from LIBOR and the provision by the Administrative Agent of written notice of such election to the Lenders.

"EEA Financial Institution" means (a) any credit institution or investment firm established in any EEA Member Country which is subject to the supervision of an EEA Resolution Authority, (b) any entity established in an EEA Member Country which is a parent of an institution described in clause (a) of this definition, or (c) any financial institution established in an EEA Member Country which is a subsidiary of an institution described in clauses (a) or (b) of this definition and is subject to consolidated supervision with its parent;

"EEA Member Country" means any of the member states of the European Union, Iceland, Liechtenstein, and Norway.

"EEA Resolution Authority" means any public administrative authority or any person entrusted with public administrative authority of any EEA Member Country (including any delegee) having responsibility for the resolution of any EEA Financial Institution.

"Effective Yield" means, as to any Indebtedness, the effective yield on such Indebtedness as reasonably determined by the Borrower, taking into account the applicable interest rate margins, any interest rate floors (the effect of which floors shall be determined in a manner set forth in the proviso below) or similar devices and all fees, including upfront or similar fees or original issue discount (amortized over the shorter of (x) the remaining Weighted Average Life to Maturity of such Indebtedness and (y) the four years following the date of incurrence thereof) payable generally to Lenders or other institutions providing such Indebtedness, but

13

Error! Unknown document property name.
WEIL:\97986321\6\45327.0007

Debtors' Exhibit No. 30
Page 21 of 137

excluding any arrangement, structuring or other similar fees payable in connection therewith that are not generally shared with the relevant Lenders and, if applicable, customary consent or ticking fees for an amendment paid generally to consenting Lenders; *provided* that, with respect to any Indebtedness that includes a "LIBOR floor", (1) to the extent that LIBOR on the date that the Effective Yield is being calculated is less than such floor, the amount of such difference shall be deemed added to the interest rate margin for such Indebtedness for the purpose of calculating the Effective Yield and (2) to the extent that LIBOR on the date that the Effective Yield is being calculated is greater than such floor, then the floor shall be disregarded in calculating the Effective Yield.

"Employee Benefit Plan" means any "employee benefit plan" as defined in Section 3(3) of ERISA that is or was sponsored, maintained or contributed to by, or required to be contributed to by, Holdings, the Borrower, any of their Subsidiaries or any ERISA Affiliates.

"Environmental Claims" means any and all actions, suits, orders, decrees, demands, demand letters, claims, liens, notices of noncompliance, restrictions on use, operations or transferability, violation, or potential responsibility or investigations or proceedings arising under or based upon any Environmental Law, Environmental Permit, or in connection with the presence, Release or threatened Release of, or exposure to, Hazardous Materials (hereinafter, "Claims"), including, without limitation, (i) any and all Claims by governmental or regulatory authorities for enforcement (including, without limitation, as a result of a violation under Environmental Law), cleanup, investigation, removal, response, remediation, corrective action or other actions or damages pursuant to any applicable Environmental Law, (ii) any and all Claims relating to real properties that are currently listed or proposed for listing on the National Priorities List or on the Superfund Enterprise Management System or any analogous state or local list; and (iii) any and all Claims by any third party seeking damages, contribution, indemnification, cost recovery, compensation or injunctive relief regarding the presence, release or threatened release of Hazardous Materials or arising from alleged injury or threat of injury to health or safety (to the extent relating to human exposure to Hazardous Materials), or the environment including, without limitation, ambient air, surface water, groundwater, land surface and subsurface strata and natural resources such as wetlands.

"Environmental Law" means any applicable Federal, state, foreign or local statute, law, rule, regulation, ordinance, code and rule of common law now or hereafter in effect and in each case as amended, and any binding judicial or administrative interpretation thereof, including any binding judicial or administrative order, consent decree or judgment, relating to the protection of the environment, including, without limitation, ambient air, surface water, groundwater, land surface and subsurface strata and natural resources such as wetlands, any generation, treatment, storage, Release or threatened Release, transport or disposal, or arrangement for disposal or transport for disposal of Hazardous Materials, or human health or safety (to the extent relating to human exposure to Hazardous Materials).

"Environmental Permit" means any permit, license, registration, consent, approval, exemption or other authorization required under any Environmental Law or issued by any Governmental Authority.

"Equity Interests" means Capital Stock and all warrants, options or other rights to acquire Capital Stock (but excluding any debt security that is convertible into, or exchangeable for, Capital Stock).

"ERISA" means the Employee Retirement Income Security Act of 1974, as amended from time to time, and the rules and regulations promulgated thereunder.

"ERISA Affiliate" means each person (as defined in Section 3(9) of ERISA) that together with Holdings, the Borrower or any of their Subsidiaries would be deemed to be a "single employer" within the meaning of Section 414(b) or (c) of the Code or, solely for purposes of Section 302 of ERISA and Section 412 of the Code, is treated as a single employer under Section 414 of the Code.  Any former ERISA Affiliate of Holdings, the Borrower or any of their Subsidiaries shall continue to be considered an ERISA Affiliate of Holdings, the Borrower or any such Subsidiary within the meaning of this definition with respect to the period

14

**Error! Unknown document property name.**
WEIL:\97986321\6\45327.0007

Debtors' Exhibit No. 30
Page 22 of 137

such entity was an ERISA Affiliate of Holdings, the Borrower or such Subsidiary and with respect to liabilities arising after such period for which Holdings, the Borrower or such Subsidiary could be liable under the Code or ERISA.

"ERISA Event" means (a) a Reportable Event with respect to a Plan; (b) a withdrawal by Holdings, the Borrower, any of their Subsidiaries or any ERISA Affiliate from a Plan subject to Section 4063 of ERISA during a plan year in which it was a substantial employer (as defined in Section 4001(a)(2) of ERISA) or a cessation of operations that is treated as such a withdrawal under Section 4062(e) of ERISA; (c) the failure of Holdings, the Borrower, any of their Subsidiaries or any ERISA Affiliate to make by its due date a required installment under Section 430(j) of the Code with respect to any Plan; (d) a failure to satisfy the minimum funding standard under Section 412 of the Code or Section 302 of ERISA, or the filing pursuant to Section 412(c) of the Code or Section 302(c) of ERISA of an application for a waiver of the minimum funding standard, in each case with respect to a Plan, whether or not waived, or a failure to make any required contribution to a Multiemployer Plan; (e) a complete or partial withdrawal by Holdings, the Borrower, any of their Subsidiaries or any ERISA Affiliate from a Multiemployer Plan or notification that a Multiemployer Plan is insolvent within the meaning of Title IV of ERISA, is in endangered or critical status, within the meaning of Section 305 of ERISA, or that it intends to terminate or has terminated under Section 4041A or 4042 of ERISA; (f) the filing of a notice of intent to terminate, the treatment of a Plan amendment as a termination under Section 4041 or 4041A of ERISA, respectively, or the commencement of proceedings by the PBGC to terminate a Plan; (g) the appointment of a trustee to administer any Plan or the occurrence of any event or condition that might constitute grounds under ERISA for the termination of, or appointment of a trustee to administer, any Plan; (h) the imposition of any liability under Title IV of ERISA or the imposition of a lien under Section 412 or 430(k) of the Code or Section 303 or 4068 of ERISA on any property (or rights to property, whether real or personal) of Holdings, the Borrower, any of their Subsidiaries or any ERISA Affiliate, but excluding PBGC premiums due but not delinquent under Section 4007 of ERISA, upon Holdings, the Borrower, any of their Subsidiaries or any ERISA Affiliate; (i) a determination that any Plan is, or is expected to be, in "at-risk" status (within the meaning of Section 303(i)(4)(A) of ERISA or Section 430(i)(4)(A) of the Code); (j) the occurrence of an act or omission that could give rise to the imposition on Holdings, the Borrower, any of their Subsidiaries or any ERISA Affiliate of fines, penalties, taxes or related charges under Chapter 43 of the Code or under Section 409, Section 502(c), (i) or (l), or Section 4071 of ERISA in respect of any Employee Benefit Plan; (k) the assertion of a material claim (other than routine claims for benefits) against any Employee Benefit Plan other than a Multiemployer Plan or the assets thereof, or against Holdings, the Borrower, any of their Subsidiaries or any ERISA Affiliate in connection with any Employee Benefit Plan; or (l) receipt from the Internal Revenue Service of notice of the failure of any Plan (or any other Employee Benefit Plan intended to be qualified under Section 401(a) of the Code) to qualify under Section 401(a) of the Code, or the failure of any trust forming part of any Plan (or any such Employee Benefit Plan) to qualify for exemption from taxation under Section 501(a) of the Code.

"Erroneous Payment" has the meaning assigned to it in Section 7.16(a).

"Erroneous Payment Deficiency Assignment" has the meaning assigned to it in Section 7.16(d).

"Erroneous Payment Impacted Loans" has the meaning assigned to it in Section 7.16(d).

"Erroneous Payment Return Deficiency" has the meaning assigned to it in Section 7.16(d).

"Erroneous Payment Subrogation Rights" has the meaning assigned to it in Section 7.16(d).

"EU Bail-In Legislation Schedule" means the EU Bail-In Legislation Schedule published by the Loan Market Association (or any successor person), as in effect from time to time.

"Event of Default" shall have the meaning set forth in Section 6.01.

"Excess Asset Sale Proceeds" shall have the meaning given to such term in Section 2.13(a).

Error! Unknown document property name.
WEIL:\97986321\6\45327.0007

"Excess Casualty Event Proceeds" shall have the meaning given to such term in Section 2.13(a).

"Exchange Act" means the Securities Exchange Act of 1934, as amended, and the rules and regulations of the SEC promulgated thereunder.

"Excluded Accounts" means (a) any deposit account, commodity account or securities account so long as the balance in each such account, individually, does not exceed $500,000 at any time and the aggregate balance of all such deposit accounts, commodity accounts and securities accounts does not at any time exceed $2,500,000, (b) any deposit account that is a zero balance account or a deposit account for which the balance of such deposit account is transferred at the end of each date to a deposit account that is not an Excluded Account, (c) any deposit accounts exclusively used for trust, payroll, payroll taxes and other employee wage and benefit payments to or for the benefit of any employees of the Credit Parties or any of their Subsidiaries, (d) any deposit account which is used in the ordinary course of business as a fiduciary account, trust or suspense account used for payments of royalty obligations, obligations to non-operating working interest owners of Oil and Gas Properties attributable to their share of production from such Oil and Gas Properties attributable to their share of production from such Oil and Gas Properties and similar obligations, in each case, which solely contains deposits made for the benefit of another Person (other than the Borrower or any of its Subsidiaries), and in which such deposits are held on behalf of, and for the benefit of, such other Person, and (e) any other deposit account, commodity account or securities account that is pledged to a third party to the extent such Lien is permitted pursuant to paragraph (1), (4), (6)(C), (13) or (14) of the definition of "Permitted Liens".

"Excluded Assets" shall have the meaning assigned to such term in the Collateral Agreement.

"Excluded Equity Interests" means (a) any Equity Interests with respect to which in the Permitted Business Judgment of the Administrative Agent and the Borrower mutually agree the cost or other consequences of pledging such Equity Interests in favor of the Secured Parties under the Security Documents shall be excessive in view of the benefits to be obtained by the Secured Parties therefrom, (b) any Equity Interests of a Receivables Subsidiary, and (c) any Equity Interests to the extent the pledge thereof would be prohibited by any applicable Requirement of Law.

"Excluded Subsidiary" means (a) each Domestic Subsidiary that is prohibited by any applicable Requirement of Law from guaranteeing or granting Liens to secure the Obligations at the time such Subsidiary becomes a Restricted Subsidiary (and for so long as such prohibition is in effect), (b) any Receivables Subsidiary, (c) the Closing Date Unrestricted Subsidiary (unless and until the Closing Date Unrestricted Subsidiary becomes a Restricted Subsidiary in accordance with (and solely to the extent required) Section 5.29) and (d) any other Domestic Subsidiary with respect to which, the Administrative Agent (acting in its Permitted Business Judgment) and the Borrower mutually agree the cost or other consequences of providing a guarantee of or granting Liens to secure the Obligations shall be excessive in view of the benefits to be obtained by the Lenders therefrom.

"Excluded Taxes" means, with respect to the Administrative Agent, any Lender or any other recipient of any payment to be made by or on account of any obligation of any Credit Party hereunder or under any other Loan Document, (i) Taxes imposed on or measured by net income or branch profits (however denominated, and including (for the avoidance of doubt) any backup withholding in respect thereof under Section 3406 of the Code), and franchise Taxes imposed on it (in lieu of net income Taxes), in each case by a jurisdiction (including any political subdivision thereof) as a result of such recipient being organized in, having its principal office in, or in the case of any Lender, having its applicable lending office in, such jurisdiction or, as a result of any other present or former connection with such jurisdiction (other than any such connection arising solely from such recipient having executed, delivered, become a party to, performed its obligations under, received payments under, received or perfected a security interest under, engaged in any other transaction pursuant to or enforced any Loan Document, or sold or assigned an interest in any Loan or Loan Document), (ii) in the case of a Lender, U.S. federal withholding Tax imposed on any payment by or on account of any obligation

16

Debtors' Exhibit No. 30
Page 24 of 137

of any Credit Party hereunder or under any other Loan Document that is required to be imposed on amounts payable to or for the account of a Lender (other than to the extent such Lender is an assignee pursuant to a request by the Borrower under <u>Section 8.07</u>) pursuant to laws in force at the time such Lender becomes a party hereto (or designates a new lending office), except to the extent that such Lender (or its assignor, if any) was entitled, immediately prior to the designation of a new lending office (or assignment), to receive additional amounts or indemnification payments from any Credit Party with respect to such withholding Tax pursuant to <u>Section 2.15</u>, (iii) any Tax attributable to the Administrative Agent's or any Lender's failure to comply with <u>Section 2.15(d)</u>, <u>(e)</u>, <u>(g)</u> or <u>(h)</u> or (iv) any withholding Tax imposed under FATCA.

"<u>Extraordinary Receipt Event</u>" shall mean the occurrence of any event or circumstance as a result of which any the Borrower or any Restricted Subsidiary receives Extraordinary Receipts.

"<u>Extraordinary Receipts</u>" shall mean 100% of the Net Proceeds actually received by the Borrower or any Restricted Subsidiary not in the ordinary course of business consisting of federal, state or local Tax refunds, pension plan reversions, judgments and proceeds of litigation settlements or other settlements with any Governmental Authority (excluding Casualty Events).

"<u>Fair Market Value</u>" means, with respect to any asset or property, the price which could be negotiated in an arm's-length transaction, for cash, between a willing seller and a willing and able buyer, neither of whom is under undue pressure or compulsion to complete the transaction, as determined by the Borrower in good faith (provided that, upon reasonable request of the Administrative Agent, the Borrower shall provide reasonably detailed supporting evidence of making such determination).

"<u>Farm-In Agreement</u>" means an agreement whereby a Person agrees to pay all or a share of the drilling, completion or other expenses of one or more exploratory or development wells (which agreement may be subject to a maximum payment obligation, after which expenses are shared in accordance with the working or participation interests therein or in accordance with the agreement of the parties) or perform the drilling, completion or other operation on such well or wells as all or a part of the consideration provided in exchange for an ownership interest in an Oil and Gas Property.

"<u>Farm-Out Agreement</u>" means a Farm-In Agreement, viewed from the standpoint of the party that transfers an ownership interest to another.

"<u>FATCA</u>" means Sections 1471 through 1474 of the Code, as of the date of this Agreement (or any amended or successor version that is substantively comparable and not materially more onerous to comply with), any current or future regulations or official interpretations thereof, any agreements entered into pursuant to Section 1471(b)(1) of the Code and any fiscal or regulatory legislation, rules or practices adopted pursuant to any intergovernmental agreement, treaty or convention among Governmental Authorities and implementing such Sections of the Code.

"<u>FCA</u>" shall have the meaning set forth in <u>Section 1.09(b)(i)</u>.

"<u>Federal Funds Rate</u>" means, for any period, a fluctuating interest rate per annum equal for each day during such period to the weighted average of the rates on overnight Federal funds transactions with members of the Federal Reserve System, as published for such day (or, if such day is not a Business Day, for the next preceding Business Day) by the Federal Reserve Bank of New York, or, if such rate is not so published for any day that is a Business Day, the Federal Funds Rate for the last day on which such rate was available.

"<u>Fee Letter</u>" means that certain letter agreement, dated as of the Closing Date, between the Borrower and the Agents.

"<u>Financial Officer</u>" of any Person means the Chief Financial Officer, principal accounting officer, Treasurer or Assistant Treasurer of such Person.

17

Error! Unknown document property name.
WEIL:\97986321\6\45327.0007

Debtors' Exhibit No. 30
Page 25 of 137

"First-Priority Lien Obligations" means all FLTL Obligations.

"Flood Insurance Laws" means, collectively, (i) the National Flood Insurance Act of 1968, as now or hereafter in effect or any successor statute thereto, (ii) the Flood Disaster Protection Act of 1973, as now or hereafter in effect or any successor statute thereto, (iii) the National Flood Insurance Reform Act of 1994, as now or hereafter in effect or any successor statute thereto and (iv) the Flood Insurance Reform Act of 2004, as now or hereafter in effect or any successor statute thereto.

"Floor" means the benchmark rate floor, if any, provided in this Agreement initially (as of the execution of this Agreement, the modification, amendment or renewal of this Agreement or otherwise) with respect to Adjusted LIBOR.

"FLTL Credit Agreement" means [●].

"FLTL Credit Agreement Documents" means the collective reference to any FLTL Credit Agreement, any notes issued pursuant thereto and the guarantees thereof, and the collateral documents relating thereto, as amended, supplemented, restated, amended and restated, renewed, refunded, replaced, restructured, repaid, refinanced or otherwise modified, in whole or in part, from time to time.

"FLTL Facility" means the first lien term loan facility provided pursuant to the FLTL Credit Agreement, as amended, restated, amended and restated, supplemented, waived, replaced (whether or not upon termination, and whether with the original lenders or other lenders), restructured, repaid, refunded, refinanced or otherwise modified from time to time, including pursuant to any amendment thereto or pursuant to a new loan agreement with other lenders, providing for term loans, altering the maturity thereof, refinancing, replacing or otherwise restructuring all or any portion of the Indebtedness under such agreement or under any successor or replacement agreement, increasing the amount loaned thereunder or otherwise modifying the terms thereof.

"FLTL Obligations" means the "Obligations" as defined in the FLTL Credit Agreement.

"Foreign Disposition" shall have the meaning set forth in Section 2.13(a)(ii).

"Foreign Plan" means any employee benefit plan, program, policy, arrangement or agreement maintained or contributed to by Holdings, the Borrower or any of their Subsidiaries with respect to employees employed outside the United States.

"Foreign Subsidiary" means each Subsidiary of the Borrower that is not a Domestic Subsidiary.

"FWE" shall have the meaning set forth in the recitals hereto.

"FWE Inc." shall have the meaning set forth in the recitals hereto.

"GAAP" means generally accepted accounting principles in the United States set forth in the opinions and pronouncements of the Accounting Principles Board of the American Institute of Certified Public Accountants and statements and pronouncements of the Financial Accounting Standards Board or in such other statements by such other entity as have been approved by a significant segment of the accounting profession, which are in effect from time to time.  For the purposes of this Agreement, the term "consolidated" with respect to any Person means such Person consolidated with its Restricted Subsidiaries, and shall not include the Closing Date Unrestricted Subsidiary, but the interest of such Person in the Closing Date Unrestricted Subsidiary will be accounted for as an Investment.

"Governmental Authority" means any nation, sovereign or government, any state, province, territory or other political subdivision thereof, and any entity or authority exercising executive, legislative,

18

Error! Unknown document property name.
WEIL:\97986321\6\45327.0007

Debtors' Exhibit No. 30
Page 26 of 137

judicial, taxing, regulatory or administrative functions of or pertaining to government, including a central bank or stock exchange.

"guarantee" means a guarantee (other than by endorsement of negotiable instruments for collection in the ordinary course of business), direct or indirect, in any manner (including, without limitation, letters of credit and reimbursement agreements in respect thereof), of all or any part of any Indebtedness or other obligations.

"Guarantee" means any guarantee of the Loan Obligations and the Loans by any Guarantor in accordance with the provisions of this Agreement.

"Guarantee Obligations" means, as to any Person, any obligation of such Person guaranteeing or intended to guarantee any Indebtedness of any other Person (the "primary obligor") in any manner, whether directly or indirectly, including any obligation of such Person, whether or not contingent, (a) to purchase any such Indebtedness or any property constituting direct or indirect security therefor, (b) to advance or supply funds (i) for the purchase or payment of any such Indebtedness or (ii) to maintain working capital or equity capital of the primary obligor or otherwise to maintain financial condition or liquidity of the primary obligor so as to enable the primary obligor to pay such Indebtedness, (c) to purchase property, securities or services primarily for the purpose of assuring the owner of any such Indebtedness of the ability of the primary obligor to make payment of such Indebtedness or (d) otherwise to assure or hold harmless the owner of such Indebtedness against loss in respect thereof; *provided*, *however*, that the term "Guarantee Obligations" shall not include endorsements of instruments for deposit or collection in the ordinary course of business or customary and reasonable indemnity obligations in effect on the Closing Date or entered into in connection with any acquisition or disposition of assets permitted under this Agreement (other than such obligations with respect to Indebtedness).  The amount of any Guarantee Obligation shall be deemed to be an amount equal to the stated or determinable amount of the Indebtedness in respect of which such Guarantee Obligation is made or, if not stated or determinable, the maximum reasonably anticipated liability in respect thereof as determined by such Person in good faith.

"Guarantor" means each of Holdings and the Subsidiary Guarantors; *provided* that upon the release or discharge of such Person from its Guarantee in accordance with this Agreement, such Person shall cease to be a Guarantor.

"Hazardous Materials" means (a) any petroleum or petroleum products, natural gas or natural gas liquids, radioactive materials, friable asbestos, urea formaldehyde foam insulation, polychlorinated biphenyls, and radon gas, (b) any chemicals, materials or substances defined as or included in the definition of "hazardous substances", "hazardous waste", "hazardous materials", "extremely hazardous waste", "restricted hazardous waste", "toxic substances", "toxic pollutants", "contaminants", or "pollutants", or words of similar import, under any applicable Environmental Law and (c) any other chemical, material or substance, which is prohibited, limited or regulated by any Environmental Law.

"Hazardous Materials Activity" means any past, current, proposed or threatened activity, event or occurrence involving any Hazardous Materials, including the use, manufacture, possession, storage, holding, presence, existence, location, Release, threatened Release, discharge, placement, generation, transportation, processing, construction, treatment, abatement, removal, remediation, disposal, disposition or handling of any Hazardous Materials, and any corrective action or response action with respect to any of the foregoing.

"Hedge Agreements" means (a) any and all rate swap transactions, basis swaps, credit derivative transactions, forward rate transactions, commodity swaps, commodity options, forward commodity contracts, future contracts, equity or equity index swaps or options, bond or bond price or bond index swaps or options or forward bond or forward bond price or forward bond index transactions, interest rate options, forward foreign exchange transactions, cap transactions, floor transactions, collar transactions, currency swap transactions, cross-currency rate swap transactions, currency options, total return swap, credit spread transaction, repurchase transaction, reserve repurchase transaction, securities lending transaction, weather index transaction,

19

Error! Unknown document property name.
WEIL:\97986321\6\45327.0007

Debtors' Exhibit No. 30
Page 27 of 137

spot contracts, fixed-price physical delivery contracts, whether or not exchange traded, or any other similar transactions or any combination of any of the foregoing (including any options to enter into any of the foregoing), whether or not any such transaction is governed by or subject to any master agreement, and (b) any and all transactions of any kind, and the related confirmations, which are subject to the terms and conditions of, or governed by, any form of master agreement published by the International Swaps and Derivatives Association, Inc., any International Foreign Exchange Master Agreement or any other master agreement (any such master agreement, together with any related schedules, a "Master Agreement"), including any such obligations or liabilities under any Master Agreement.  Notwithstanding the foregoing, agreements or obligations to physically sell any commodity at any index-based price shall not be considered Hedge Agreements.

"Hedging Obligations" means, with respect to any Person, the obligations of such Person under Hedge Agreements.

"Hedge Unwind Event" means the monetization of a hedge position, whether by mutual agreement to terminate or "tear up", in connection with the designation of an early termination date (or any similar concept) with respect to, or the settlement of such hedge position.

"Hedge Unwind Proceeds" means any Net Proceeds received by the Borrower and/or its Restricted Subsidiaries in connection with any Hedge Unwind Event.

"Holdings" shall have the meaning set forth in the preamble to this Agreement.

"Hydrocarbon Interests" means all rights, titles, interests and estates now or hereafter acquired in and to oil and gas leases, oil, gas and mineral leases, or other liquid or gaseous hydrocarbon leases, mineral fee interests, overriding royalty and royalty interests, net profit interests and production payment interests, including any reserved or residual interests of whatever nature.

"Hydrocarbons" means oil, gas, casinghead gas, drip gasoline, natural gasoline, condensate, distillate, liquid hydrocarbons, gaseous hydrocarbons and all products refined or separated therefrom.

"IBA" shall have the meaning set forth in Section 1.09(b)(i).

"Incremental Cap" means, at any time, $50,000,000.

"Incremental Commitment" means, with respect to any Lender, the commitment, if any, of such Lender, established pursuant to an Incremental Facility Agreement and Section 2.20, to make Loans of any Class hereunder, expressed as an amount representing the maximum principal amount of the Loans of such Class to be made by such Lender.  The initial amount of each Lender's Incremental Commitment of any Class, if any, is set forth in the Incremental Facility Agreement pursuant to which such Lender shall have established its Incremental Commitment of such Class.

"Incremental Effective Date" shall have the meaning set forth in Section 2.20(a).

"Incremental Facility" shall have the meaning set forth in Section 2.20(a).

"Incremental Facility Agreement" means an agreement in a form to be determined by the Borrower and the Incremental Lenders providing the applicable Incremental Commitment, among the Borrower, the Administrative Agent and such Incremental Lenders, establishing Incremental Commitments of any Class and effecting such other amendments hereto and the other Loan Documents as are contemplated by Section 2.20.

"Incremental Lender" means a Lender with an Incremental Commitment or a Loan of any Class established under an Incremental Commitment.

20

Error! Unknown document property name.
WEIL:\97986321\6\45327.0007

Debtors' Exhibit No. 30
Page 28 of 137

"Incur" means issue, assume, guarantee, incur or otherwise become liable for; *provided*, *however*, that any Indebtedness or Capital Stock of a Person existing at the time such person becomes a Subsidiary (whether by merger, amalgamation, consolidation, acquisition or otherwise) shall be deemed to be Incurred by such Person at the time it becomes a Subsidiary.

"Indebtedness" means, with respect to any Person:

(1)     the principal and premium (if any) of any indebtedness of such Person, whether or not contingent, (a) in respect of borrowed money, (b) evidenced by bonds, notes, debentures or similar instruments or letters of credit or bankers' acceptances (or, without duplication, reimbursement agreements in respect thereof), (c) representing the deferred and unpaid purchase price of any property (except any such balance that constitutes (i) a trade payable or similar obligation to a trade creditor Incurred in the ordinary course of business, (ii) any earn-out obligations until such obligation becomes a liability on the balance sheet of such Person in accordance with GAAP and (iii) liabilities accrued in the ordinary course of business), which purchase price is due more than six months after the date of placing the property in service or taking delivery and title thereto, (d) in respect of Capitalized Lease Obligations, or (e) representing any Hedging Obligations, if and to the extent that any of the foregoing indebtedness would appear as a liability on a balance sheet (excluding the footnotes thereto) of such Person prepared in accordance with GAAP;

(2)     to the extent not otherwise included, any obligation of such Person to be liable for, or to pay, as obligor, guarantor or otherwise, the obligations referred to in clause (1) of another Person (other than by endorsement of negotiable instruments for collection in the ordinary course of business); and

(3)     to the extent not otherwise included, Indebtedness of another Person secured by a Lien on any asset owned by such Person (whether or not such Indebtedness is assumed by such Person); *provided*, *however*, that the amount of such Indebtedness will be the lesser of: (a) the Fair Market Value of such asset at such date of determination, and (b) the amount of such Indebtedness of such other Person;

*provided, however,* that notwithstanding the foregoing, Indebtedness shall be deemed not to include (1) Contingent Obligations incurred in the ordinary course of business and not in respect of borrowed money (except as expressly included pursuant to clause (1) above); (2) purchase price holdbacks in respect of a portion of the purchase price of an asset to satisfy warranty or other unperformed obligations of the respective seller; (3) Production Payments and Reserve Sales; (4) any obligation of a Person in respect of a Farm-In Agreement or similar arrangement whereby such Person agrees to pay all or a share of the drilling, completion or other expenses of an exploratory or development well (which agreement may be subject to a maximum payment obligation, after which expenses are shared in accordance with the working or participation interest therein or in accordance with the agreement of the parties) or perform the drilling, completion or other operation on such well in exchange for an ownership interest in an oil or gas property; (5) in-kind obligations relating to net oil, natural gas liquids or natural gas balancing positions arising in the ordinary course of business; and (6) any Guarantee Obligations incurred in the ordinary course of business to the extent not guaranteeing Indebtedness.

Notwithstanding anything in this Agreement to the contrary, Indebtedness shall not include, and shall be calculated without giving effect to, the effects of Statement of Financial Accounting Standards No. 133 and related interpretations to the extent such effects would otherwise increase or decrease an amount of Indebtedness for any purpose under this Agreement as a result of accounting for any embedded derivatives created by the terms of such Indebtedness; and any such amounts that would have constituted Indebtedness under this Agreement but for the application of this sentence shall not be deemed an Incurrence of Indebtedness under this Agreement.

"Indemnified Liabilities" means, collectively, any and all liabilities, obligations, losses, damages (including natural resource damages), penalties, claims (including Environmental Claims), actions, judgments, suits, costs (including the costs of any investigation, study, sampling, testing, abatement, cleanup, removal, remediation or other response action necessary to remove, remediate, clean up or abate any Hazardous

21

Error! Unknown document property name.
WEIL:\97986321\6\45327.0007

Debtors' Exhibit No. 30
Page 29 of 137

Materials Activity), Taxes, expenses and disbursements of any kind or nature whatsoever (including attorneys' fees and any fees or expenses incurred by Indemnitees in enforcing this indemnity), whether direct, indirect, special, or consequential and whether based on any federal, state or foreign laws, statutes, rules or regulations (including securities and commercial laws, statutes, rules or regulations and Environmental Laws), on common law or equitable cause or on contract or otherwise, that may be imposed on, incurred by, or asserted against any such Indemnitee (whether asserted by a third party or by any Credit Party or any of its affiliates), in any manner relating to or arising out of (i) this Agreement or the other Loan Documents or the transactions contemplated hereby or thereby (including the Lenders' agreement to make Loans or the use or intended use of the proceeds thereof, or any enforcement of any of the Loan Documents (including any sale of, collection from, or other realization upon any of the Collateral or the enforcement of the Guarantee)); (ii) the statements contained in the commitment letter delivered by any Lender to the Borrower with respect to the transactions contemplated by this Agreement; or (iii) any Environmental Claim or Hazardous Materials Activity relating to or arising from, directly or indirectly, any past or present activity, operation, land ownership, or practice of Holdings or any of its Subsidiaries.

"Indemnified Taxes" means all (a) Taxes (other than Excluded Taxes) imposed on or with respect to any payment by or on account of any obligation of any Credit Party hereunder or under any other Loan Document and (b) to the extent not otherwise described in (a), Other Taxes.

"Indemnitee" shall have the meaning set forth in Section 8.05(b).

"Information" shall have the meaning set forth in Section 3.08.

"Initial Commitment" means, with respect to each Lender, its commitment to (i) in respect of any Initial Loan that is an Initial New Loan, make or otherwise fund such Initial New Loans on the Closing Date, and/or (ii) in respect of any Initial Loan that is an Initial DIP Converted Loan, make or otherwise fund (or be deemed to fund) such Initial DIP Converted Loans on the Closing Date, in each case to the Borrower hereunder. The amount of each Lender's Initial Commitment is set forth on Schedule 2.01. The aggregate principal amount of the Initial Commitments in respect of Initial Loans on the Closing Date is $[185,000,000].

"Initial DIP Converted Loans" means the term loans made or deemed made to the Borrower pursuant to Section 2.01(c).

"Initial Loans" means any of the Initial New Loans made to the Borrower pursuant to Section 2.01(a) and any of the Initial DIP Converted Loans deemed to have been made to the Borrower pursuant to Section 2.01(c).

"Initial New Loans" means the term loans made to the Borrower pursuant to Section 2.01(a).

"Intercreditor Agreement" means (a) in the case of any Indebtedness secured by a Lien on the Collateral senior to the Liens securing the Initial Loans, a Customary Intercreditor Agreement of the type referred to in clause (b) of the definition thereof, (b) in the case of any Indebtedness secured by a Lien on the Collateral pari passu with the Liens securing the Initial Loans, a Customary Intercreditor Agreement of the type referred to in clause (a) of the definition thereof and (c) in the case of any Indebtedness secured by a Lien on the Collateral junior to the Liens securing the Initial Loans, a Customary Intercreditor Agreement of the type referred to in clause (b) of the definition thereof.

"Interest Payment Date" means, (a) with respect to any ABR Loan, the last Business Day of each calendar quarter (being the last day of March, June, September and December of each year), and (b) otherwise, the last day of the Interest Period applicable to the Loan and, in the case of a Loan with an Interest Period of more than three months' duration each day that would have been an Interest Payment Date had successive Interest Periods of three months' duration been applicable to such Loan and, in addition, the date of any conversion of such Loan to an ABR Loan.

Error! Unknown document property name.
WEIL:\97986321\6\45327.0007

"Interest Period" means as to any Loan (other than an ABR Loan), the period commencing on the date of such borrowing or on the last day of the immediately preceding Interest Period applicable to such Loan, as applicable, and ending on the numerically corresponding day (or, if there is no numerically corresponding day, on the last day) in the calendar month that is 1, 3 or 6 months thereafter, as the Borrower may elect, or the date any Loan (other than an ABR Loan) is effectively converted to an ABR Loan in accordance with Section 2.08 or repaid or prepaid in accordance with Section 2.04, Section 2.12 or Section 2.13 or on the Maturity Date; *provided* that if any Interest Period would end on a day other than a Business Day, such Interest Period shall be extended to the next succeeding Business Day unless such next succeeding Business Day would fall in the next calendar month, in which case such Interest Period shall end on the next preceding Business Day. Interest shall accrue from and including the first day of an Interest Period to but excluding the last day of such Interest Period.  For purposes hereof, the date of a borrowing of a Loan initially shall be the date on which such borrowing is made and thereafter shall be the effective date of the most recent conversion or continuation of such borrowing.

"Interest Period Election Request" means a request by the Borrower to elect an Interest Period in accordance with Section 2.19.

"Investment Grade Securities" means:

(1) securities issued or directly and fully guaranteed or insured by the U.S. government or any agency or instrumentality thereof (other than Cash Equivalents),

(2) securities that have a rating equal to or higher than Baa3 (or equivalent) by Moody's and BBB- (or equivalent) by S&P, but excluding any debt securities or loans or advances between and among the Borrower and its Subsidiaries,

(3) investments in any fund that invests exclusively in investments of the type described in clauses (1) and (2) which fund may also hold immaterial amounts of cash pending investment and/or distribution, and

(4) corresponding instruments in countries other than the United States customarily utilized for high quality investments and in each case with maturities not exceeding two years from the date of acquisition.

"Investments" means, with respect to any Person, all investments by such Person in other Persons (including Affiliates) in the form of loans (including guarantees), advances or capital contributions (excluding accounts receivable, trade credit and advances to customers and commission, travel and similar advances to officers, employees and consultants made in the ordinary course of business), purchases or other acquisitions for consideration of Indebtedness, Equity Interests or other securities issued by any other Person and investments that are required by GAAP to be classified on the balance sheet of such Person in the same manner as the other investments included in this definition to the extent such transactions involve the transfer of cash or other property.

"Investors" means the Persons set forth on Schedule 1.01(a).[2]

"IRS" shall have the meaning set forth in Section 2.15(e)(i).

---

[2] NTD: To identify Investors (other than management) holding > 5% on the Closing Date.

**Error! Unknown document property name.**
WEIL:\97986321\6\45327.0007

"<u>Isabela Transaction</u>" means the transactions that occurred in the fourth quarter of 2018 which provide for monthly cash payments to Holdings from BP Exploration and Production Inc. based on a percentage the revenue generated from the Isabela field through 2021 (subject to an annual true-up).

"<u>Judgment Currency</u>" shall have the meaning set forth in <u>Section 8.17(b)</u>.

"<u>Junior Debt</u>" means any Indebtedness for borrowed money that is expressly subordinated in right of payment and/or security to the Indebtedness incurred under this Agreement (or, in each case, any Refinancing Indebtedness in respect thereof to the extent constituting Junior Debt).

"<u>Junior Lien Obligations</u>" means the Obligations with respect to Junior Debt, which by its terms is intended to be secured by the Collateral on a basis junior to the Loans; *provided* such Lien is permitted to be incurred under this Agreement.

"<u>Latest Maturity Date</u>" means, at any date of determination, the latest Maturity Date applicable to any Class of Commitments or Loans that is outstanding hereunder on such date of determination.

"<u>Lender</u>" means each financial institution listed on <u>Schedule 2.01</u>, and any Person that becomes a "Lender" hereunder pursuant to <u>Section 8.06</u>, other than any such Person that has ceased to be a party hereto pursuant to an Assignment and Acceptance in accordance with <u>Section 8.06</u>.

"<u>Lending Office</u>" means, as to any Lender, the applicable branch, office, Affiliate or account (if appropriate) of such Lender designated by such Lender to make Loans to the Borrower.

"<u>LIBOR</u>" means for any Interest Period and as determined on the date that is two Business Days prior to the first day of such Interest Period (i)(a) the rate per annum equal to the rate determined by Administrative Agent to be the London interbank offered rate administered by the ICE Benchmark Administration (or any other Person that takes over the administration of that rate) for deposits (for delivery on the first day of such period) with a term equivalent to such period in dollars displayed on the ICE LIBOR USD page of the Reuters Screen (or other service selected by the Administrative Agent that displays such rate including HIS Markit WSO) or on the appropriate page of any other information service that publishes that rate from time to time in place of Reuters, determined as of approximately 11:00 a.m. (London, England time) on such determination date (the rate referenced in this clause (a), the "<u>Eurodollar Screen Rate</u>"), or (b) in the event the Eurodollar Screen Rate is not available, the rate per annum equal to the offered rate, truncated at five decimal digits, that is set forth on or in such other available quotation page or service as is acceptable to Administrative Agent in its sole discretion and that provides an average ICE Benchmark Administration Limited Interest Settlement Rate or another London interbank offered rate administered by any other Person that takes over the administration of such rate for deposits (for delivery on the first day of the relevant period) with a term equivalent to such period in dollars, determined as of approximately 11:00 a.m. (London, England time) on such determination date, or (c) in the event the rates referenced in the preceding clauses (a) and (b) are not available or if such information, in the reasonable judgment of Administrative Agent (at the direction of the Required Lenders), shall cease to accurately reflect the rate offered by leading banks in the London interbank market as reported by any publicly available source of similar market data selected by Administrative Agent, the rate per annum equal to the rate determined by Administrative Agent to be the offered rate, truncated at five decimal digits, to first class banks in the London interbank market for deposits (for delivery on the first day of the relevant period) with a term equivalent to such Interest Period in Dollars, determined as of approximately 11:00 a.m. (London, England time) on such determination date.

"<u>LIBOR Borrowing</u>" means a Borrowing comprised of LIBOR Loans.

"<u>LIBOR Loan</u>" means a Loan bearing interest at a rate equal to Adjusted LIBOR <u>plus</u> the Applicable Margin.

Error! Unknown document property name.
WEIL:\97986321\6\45327.0007

"Lien" means, with respect to any asset, any mortgage, lien, pledge, charge, security interest or similar encumbrance of any kind in respect of such asset, whether or not filed, recorded or otherwise perfected under applicable law (including any conditional sale or other title retention agreement, any lease in the nature thereof, any option or other agreement to sell or give a security interest in and any filing of or agreement to give any financing statement under the Uniform Commercial Code (or equivalent statutes) of any jurisdiction); *provided* that in no event shall an operating lease be deemed to constitute a Lien.

"Loan Documents" means this Agreement, the Guarantee, the Security Documents, any promissory note issued by the Borrower under this Agreement, the Fee Letter, any Incremental Facility Agreement, and any intercreditor agreement with respect to this Agreement and the Loans entered into on or after the Closing Date to which the Administrative Agent or Collateral Agent is a party on behalf of the Lenders (including the Intercreditor Agreement).

"Loan Obligations" means all obligations in respect of the Loans and other obligations arising under this Agreement, the Security Documents and the other Loan Documents, including, for the avoidance of doubt, the Guarantees and all penalties, fees, indemnifications, reimbursements, damages and other liabilities payable thereunder (including, in each case, interest and any other of the foregoing amounts that, but for the filing of a petition in bankruptcy with respect to any Credit Party, would have accrued on any of the foregoing, whether or not a claim is allowed against such Credit Party for such interest in the related bankruptcy proceeding).

"Loans" means (a) the Initial Loans and (b) any other loans made by Lenders to the Borrower hereunder after the Closing Date.

"Material Adverse Effect" means a circumstance or condition that would, individually or in the aggregate, have a material adverse effect on (a) the business, assets, operations, properties or financial condition of Holdings, the Borrower and its Subsidiaries, taken as a whole, (b) the ability of the Borrower and the Credit Parties, taken as a whole, to perform their obligations under this Agreement or any of the other Loan Documents, taken as a whole, (c) the rights and remedies of the Agents and the Lenders under this Agreement or under any of the other Loan Documents or (d) the validity, perfection or priority of a Lien in favor of the Collateral Agent for the benefit of the Secured Parties on the Collateral, taken as a whole.

"Material Contract" means (i) any joint operating agreement covering Oil and Gas Properties of the Borrower and its Restricted Subsidiaries constituting greater than 20% of the PV-10 Value of 2P Developed Producing Reserves, (ii) Contractual Obligations entered into to engage drillships and other equipment and drilling and completion service providers resulting in net costs or other net liabilities to the Borrower and its Restricted Subsidiaries in excess of $28,750,000, (iii) the organizational documents of the Closing Date Unrestricted Subsidiary and any Contractual Obligations relating to the ownership by the Borrower and its Subsidiaries of the Mexico Assets, including any Contractual Obligations providing for required capital contributions to be made in respect thereof, (iv) any contract binding on the Borrower or any of its Restricted Subsidiaries with [Fieldwood Energy I LLC], [Fieldwood Energy II LLC], or any of their respective Affiliates (including, without limitation, any transition services agreements, joint development agreements and net profits interests agreements) and (v) each contract (other than the Loan Documents) to which such Person is a party which is material to the operations, business, properties or financial condition of such Person and which breach, nonperformance, termination or failure to renew would, either individually or in the aggregate, have a Material Adverse Effect.

"Material Indebtedness" shall mean Indebtedness (other than Loans or other Indebtedness under any Loan Document) of any one or more of the Borrower or any Restricted Subsidiary in an aggregate principal amount exceeding $11,500,000.

"Material Liability" means liabilities in excess of $17,250,000.

25

Error! Unknown document property name.
WEIL:\97986321\6\45327.0007

Debtors' Exhibit No. 30
Page 33 of 137

"Maturity Date" means the fifth anniversary of the Closing Date; *provided* that with respect to any Class of Loans established pursuant to Section 2.20, "Maturity Date" means the final maturity date specified therefor in the Incremental Facility Agreement with respect thereto.

"Mexico Assets" means assets (or equity interests in subsidiaries owning assets) associated with the Borrower and its Subsidiaries' operations and/or investments in Mexico on the Closing Date.

"Mexico Liquidity Event" means any sale or other monetization of Mexico Assets.

"MFN Adjustment" shall have the meaning set forth in Section 2.20(b).

"Moody's" means Moody's Investors Service, Inc. or any successor to the rating agency business thereof.

"Mortgaged Properties" means the owned real property, and any Oil and Gas Properties constituting real property interests, of the Borrower or any Subsidiary Guarantor encumbered by a Mortgage. Notwithstanding any provision in this Agreement or any other Loan Document to the contrary, in no event is any Building (as defined in the applicable Flood Insurance Laws) or Manufactured (Mobile) Home (as defined in the applicable Flood Insurance Laws) included in the definition of "Mortgaged Property" and no Building or Manufactured (Mobile) Home shall be encumbered by this Agreement or any other Loan Document; *provided*, that (a) such Building and Manufactured (Mobile) Home exclusion shall not exclude any interests in any lands, Hydrocarbons or other property situated under, in, or adjacent to any such Building or Manufactured (Mobile) Home and (b) for the avoidance of doubt, neither the Borrower nor any Restricted Subsidiary shall permit to exist any Lien on any Building or Manufactured (Mobile) Home except Permitted Liens.

"Mortgages" means, collectively, the mortgages, trust deeds, deeds of trust and other security documents (if any) delivered with respect to Mortgaged Properties, as amended, supplemented, or otherwise modified from time to time.

"Multiemployer Plan" means any Employee Benefit Plan that is a multiemployer plan as defined in Section 4001(a)(3) of ERISA.

"Net Income" means, with respect to any Person, the net income (loss) of such Person and its Restricted Subsidiaries, determined in accordance with GAAP and before any reduction in respect of Preferred Stock dividends.

"Net Proceeds" means the aggregate cash proceeds received by Holdings, the Borrower or any Restricted Subsidiary in respect of any Asset Sale, Casualty Event (including, without limitation, any payments pursuant to purchase price adjustments and any cash payments received by way of earnout, deferred payment of principal pursuant to a note or installment receivable or otherwise, but only as and when received, but excluding the assumption by the acquiring person of Indebtedness relating to the disposed assets or other consideration received in any other non-cash form), Extraordinary Receipt Event or Debt/Equity Incurrence Prepayment Event, net of the direct costs relating to such Asset Sale, Casualty Event, Extraordinary Receipt Event or Debt/Equity Incurrence Prepayment Event (including, without limitation, legal, accounting and investment banking fees, and brokerage and sales commissions), and any relocation expenses Incurred as a result thereof, taxes paid or payable as a result thereof (including Tax Distributions and after taking into account any available tax credits or deductions and any tax sharing arrangements related solely to such disposition), amounts required to be applied to the repayment of principal, premium (if any) and interest on Indebtedness required to be paid as a result of such transaction, amounts paid in connection with the termination of Hedging Obligations related to Indebtedness repaid with such proceeds or hedging oil, natural gas and natural gas liquid production in notional volumes corresponding to the Oil and Gas Properties subject to such Asset Sale, Casualty Event, Extraordinary Receipt Event or Debt/Equity Incurrence Prepayment Event, and any deduction of appropriate amounts to be provided by the Borrower as a reserve in accordance with GAAP against any liabilities associated with the asset

Error! Unknown document property name.
WEIL:\97986321\6\45327.0007

disposed of in such transaction and retained by the Borrower after such sale or other disposition thereof, including, without limitation, pension and other post-employment benefit liabilities and liabilities related to environmental matters or against any indemnification obligations associated with such transaction.

"<u>Non-Bank Tax Certificate</u>" shall have the meaning set forth in <u>Section 2.15(e)(i).</u>

"<u>Non-Consenting Lender</u>" shall have the meaning set forth in <u>Section 8.07(b)</u>.

"<u>Non-U.S. Lender</u>" means any Lender (a) that is not disregarded as separate from its owner for U.S. federal income tax purposes and that is not a "United States person" as defined by Section 7701(a)(30) of the Code or (b) that is disregarded as separate from its owner for U.S. federal income tax purposes and whose regarded owner is not a "United States person" as defined by Section 7701(a)(30) of the Code.

"<u>Note</u>" means any promissory note issued to a Lender or its registered assigns that evidences the Loans extended by such Lender to the Borrower.

"<u>Notice of Borrowing</u>" shall have the meaning set forth in <u>Section 2.03(a)</u>.

"<u>Obligations</u>" means shall mean all Loan Obligations, all Erroneous Payment Subrogation Rights and all penalties, fees, indemnifications, reimbursements, damages and other liabilities payable thereunder (including, in each case, interest and any other of the foregoing amounts that, but for the filing of a petition in bankruptcy with respect to such Credit Party, would have accrued on any of the foregoing, whether or not a claim is allowed against such Credit Party for such interest in the related bankruptcy proceeding).

"<u>OFAC</u>" means the Office of Foreign Assets Control of the U.S. Department of the Treasury and any successor Governmental Authority.

"<u>Officers' Certificate</u>" means a certificate signed on behalf of the Borrower by two Authorized Officers of the Borrower, one of whom must be the principal executive officer, the principal financial officer, the treasurer or the principal accounting officer of the Borrower, which meets the requirements set forth in this Agreement.

"<u>Oil and Gas Business</u>" means:

(1)      the business of acquiring, exploring, exploiting, developing, producing, operating and disposing of interests in oil, natural gas, natural gas liquids, liquefied natural gas and other Hydrocarbons and mineral properties or products produced in association with any of the foregoing;

(2)      the business of gathering, marketing, distributing, treating, processing, storing, refining, selling and transporting of any production from such interests or properties and products produced in association therewith and the marketing of oil, natural gas, other Hydrocarbons and minerals obtained from unrelated Persons;

(3)      any other related energy business, including power generation and electrical transmission business, directly or indirectly, from oil, natural gas and other Hydrocarbons and minerals produced substantially from properties in which the Borrower or its Restricted Subsidiaries, directly or indirectly, participate;

(4)      any business relating to oil field sales and service; and

(5)      any business or activity relating to, arising from, or necessary, appropriate, incidental or ancillary to the activities described in the foregoing <u>clauses (1)</u> through <u>(4)</u> of this definition.

27

Error! Unknown document property name.
WEIL:\97986321\6\45327.0007

Debtors' Exhibit No. 30
Page 35 of 137

"Oil and Gas Properties" means (a) Hydrocarbon Interests, (b) the properties now or hereafter pooled or unitized with Hydrocarbon Interests, (c) all presently existing or future unitization, pooling agreements and declarations of pooled units and the units created thereby (including all units created under orders, regulations and rules of any Governmental Authority) which may affect all or any portion of the Hydrocarbon Interests, (d) all operating agreements, contracts and other agreements, including production sharing contracts and agreements, which relate to any of the Hydrocarbon Interests or the production, sale, purchase, exchange or processing of Hydrocarbons from or attributable to such Hydrocarbon Interests, (e) all Hydrocarbons in and under and which may be produced and saved or attributable to the Hydrocarbon Interests, including all oil in tanks, and all rents, issues, profits, proceeds, products, revenues and other incomes from or attributable to the Hydrocarbon Interests, (f) all tenements, hereditaments, appurtenances and properties in any manner appertaining, belonging, affixed or incidental to the Hydrocarbon Interests and (g) all properties, rights, titles, interests and estates described or referred to above, including any and all property, real or personal, now owned or hereafter acquired and situated upon, used, held for use or useful in connection with the operating, working or development of any of such Hydrocarbon Interests or property (excluding drilling rigs, automotive equipment, rental equipment or other personal property which may be on such premises for the purpose of drilling a well or for other similar temporary uses) and including any and all oil wells, gas wells, injection wells or other wells, structures, fuel separators, liquid extraction plants, plant compressors, pumps, pumping units, field gathering systems, gas processing plants and pipeline systems and any related infrastructure to any thereof, tanks and tank batteries, fixtures, valves, fittings, machinery and parts, engines, boilers, meters, apparatus, equipment, appliances, tools, implements, cables, wires, towers, casing, tubing and rods, surface leases, rights-of-way, easements and servitudes together with all additions, substitutions, replacements, accessions and attachments to any and all of the foregoing.

"Original FLLO Credit Agreement" shall have the meaning set forth in the recitals hereto.

"Other Taxes" means any and all present or future stamp, registration, documentary, intangible, recording, filing or any other excise, property or similar Taxes arising from any payment made hereunder or made under any other Loan Document or from the execution or delivery of, performance, registration or enforcement of, from the receipt or perfection of a security interest under, consummation or administration of, or otherwise with respect to, this Agreement or any other Loan Document; *provided* that such term shall not include Taxes that result from an assignment ("Assignment Taxes") to the extent such Assignment Taxes are imposed as a result of a connection between the assignor and the taxing jurisdiction (other than a connection arising solely from any Loan Documents or any transactions contemplated thereunder), except to the extent that any such action described in this proviso is requested or required by the Borrower.

"Parent Entity" means any Person that is a direct or indirect parent company (which may be organized as a partnership) of the Borrower, including, without limitation, Holdings.

"Participant" shall have the meaning set forth in Section 8.06(c)(i).

"Participant Register" shall have the meaning set forth in Section 8.06(c)(ii).

"Payment Recipient" has the meaning assigned to it in Section 7.16(a).

"PBGC" means the Pension Benefit Guaranty Corporation established pursuant to Section 4002 of ERISA, or any successor thereto.

"Permitted Business Investment" means any Investment and/or expenditure made in the ordinary course of business or which are of a nature that is or shall have become customary in the Oil and Gas Business generally or in the geographic region in which such activities occur, including investments and expenditures for actively exploiting, exploring for, acquiring, developing, producing, processing, gathering, marketing, distributing, storing, or transporting oil, natural gas or other Hydrocarbons and minerals (including with respect to plugging and abandonment) through agreements, transactions, interests or arrangements which

28

Error! Unknown document property name.
WEIL:\97986321\6\45327.0007

Debtors' Exhibit No. 30
Page 36 of 137

permit one to share risks or costs, comply with regulatory requirements regarding local ownership or satisfy other objectives customarily achieved through the conduct of the Oil and Gas Business jointly with third parties, including:

(1)     Investments in ownership interests (including equity, joint venture or other ownership interests) in oil, natural gas, other Hydrocarbons and minerals properties, liquefied natural gas facilities, processing facilities, gathering systems, pipelines, storage facilities or related systems or ancillary real property interests;

(2)     Investments in the form of or pursuant to operating agreements, working interests, royalty interests, mineral leases, processing agreements, Farm-In Agreements, Farm-Out Agreements, contracts for the sale, transportation or exchange of oil, natural gas, other Hydrocarbons and minerals, production sharing agreements, participation agreements, development agreements, area of mutual interest agreements, unitization agreements, pooling agreements, joint bidding agreements, service contracts, joint venture agreements, partnership agreements (whether general or limited), subscription agreements, stock purchase agreements, stockholder agreements and other similar agreements (including for limited liability companies) with third parties; and

(3)     Investments in direct or indirect ownership interests in drilling rigs and related equipment, including, without limitation, transportation equipment.

"Permitted Business Judgment" means with respect to any term or provision of this Agreement or the other Loan Documents that requires the approval, satisfaction, discretion, determination, decision, action or inaction or any similar concept of or by the Required Lenders or the Administrative Agent, in each case, whether at the request of the Borrower or otherwise, as applicable (collectively, an "Agent Action"), a determination made in good faith with respect to such Agent Action by the Required Lenders or the Administrative Agent, as applicable, in the exercise of their respective reasonable business judgment; provided that, at the Administrative Agent's option, the Administrative Agent may confirm its authority to take such Agent Action, including after giving such consent, by (a) notifying all Lenders (or, with respect to an Agent Action relating solely to one Class of Loans or Commitments, the Lenders under such Class) via the Platform of the proposed Agent Action and (b) Lenders constituting Required Lenders consenting to such Agent Action in the manner prescribed in the relevant communication; provided, that if a Lender does not expressly provide its consent or does not expressly provide its lack of consent with respect to such Agent Action within three (3) Business Days of receiving such communication (or such shorter period set forth in the Agreement), then such Lender shall be deemed to have consented to such Agent Action.

"Permitted Holders" means, at any time, each of the Investors and their respective Affiliates (other than any Affiliate that is a portfolio operating company of such Investors) and any investment funds advised, co-advised, managed or co-managed by any of the foregoing.

"Permitted Investments" means:

(1)     any Investment in the Borrower or any Restricted Subsidiary that is a Guarantor;

(2)     any Investment in Cash Equivalents or Investment Grade Securities;

(3)     any Investment by the Borrower or any Restricted Subsidiary in a Person if as a result of such Investment (a) such Person becomes a Restricted Subsidiary that is a Guarantor, or (b) such Person, in one transaction or a series of related transactions, is merged, consolidated or amalgamated with or into, or transfers or conveys all or substantially all of its assets to, or is liquidated into, the Borrower or a Restricted Subsidiary that is a Guarantor;

Error! Unknown document property name.
WEIL:\97986321\6\45327.0007

(4)     any Investment existing on, or made pursuant to binding commitments existing on, the Closing Date or an Investment consisting of any extension, modification or renewal of any Investment existing on the Closing Date, in each case, listed on Schedule 5.07;

(5)     advances to employees, taken together with all other advances made pursuant to this clause (5), not to exceed $2,300,000 at any one time outstanding; *provided* that no advances pursuant to this clause (5) shall be made if a Default or Event of Default has occurred and is continuing or would result therefrom;

(6)     any Investment acquired by the Borrower or any Restricted Subsidiary (a) in exchange for any other Investment or accounts receivable held by the Borrower or such Restricted Subsidiary in connection with or as a result of a bankruptcy, workout, reorganization or recapitalization of the issuer of such other Investment or accounts receivable, or (b) as a result of a foreclosure by the Borrower or any Restricted Subsidiary with respect to any secured Investment or other transfer of title with respect to any secured Investment in default;

(7)     Hedging Obligations permitted under Section 5.06;

(8)     additional Investments by the Borrower or any Restricted Subsidiary having an aggregate Fair Market Value, taken together with all other Investments made pursuant to this clause (8) that are at that time outstanding, not to exceed $23,000,000 at the time of such Investment (with the Fair Market Value of each Investment being measured at the time made and without giving effect to subsequent changes in value); *provided, however*, that if any Investment pursuant to this clause (8) is made in any Person that is not the Borrower or a Restricted Subsidiary at the date of the making of such Investment and such Person becomes the Borrower or a Restricted Subsidiary after such date, such Investment shall thereafter be deemed to have been made pursuant to clause (1) above and shall cease to have been made pursuant to this clause (8) for so long as such Person continues to be the Borrower or a Restricted Subsidiary;

(9)     loans and advances to officers, directors or employees for business-related travel expenses, moving expenses and other similar expenses, in each case Incurred in the ordinary course of business to fund such person's purchase of Equity Interests of the Borrower or any direct or indirect parent of the Borrower, taken together with all other loans and advances made pursuant to this clause (9), not to exceed $2,300,000 at any one time outstanding; *provided* that no loans or advances pursuant to this clause (9) shall be made if a Default or Event of Default has occurred and is continuing or would result therefrom;

(10)     Investments the payment for which consists of Equity Interests of the Borrower (other than Disqualified Stock) or any direct or indirect parent of the Borrower, as applicable;

(11)     Investments consisting of the licensing or contribution of intellectual property pursuant to joint marketing arrangements with other Persons;

(12)     (x) guarantees issued in accordance with Sections 5.06 and 5.13, including, without limitation, any guarantee or other obligation issued or incurred under this Agreement and FLTL Credit Agreement in connection with any letter of credit issued for the account of the Borrower or any of its Subsidiaries (including with respect to the issuance of, or payments in respect of drawings under, such letters of credit) and (y) guarantees of performance or other obligations (other than Indebtedness) arising in the ordinary course in the Oil and Gas Business, including obligations under Hydrocarbon exploration, development, joint operating and related agreements and licenses, concessions or operating leases related to the Oil and Gas Business;

(13)     Investments consisting of or to finance purchases and acquisitions of inventory, supplies, materials, services or equipment or purchases of contract rights or licenses or leases of intellectual property in the ordinary course of business;

(14)     any Investment in a Receivables Subsidiary or any Investment by a Receivables Subsidiary in any other Person, in each case, in connection with a Qualified Receivables Financing, including

30

Error! Unknown document property name.
WEIL:\97986321\6\45327.0007

Debtors' Exhibit No. 30
Page 38 of 137

Investments of funds held in accounts permitted or required by the arrangements governing such Qualified Receivables Financing or any related Indebtedness;

(15)     any Investment in an entity which is not a Restricted Subsidiary to which a Restricted Subsidiary sells accounts receivable pursuant to a Qualified Receivables Financing;

(16)     so long as no Event of Default has occurred and is continuing or results therefrom, additional Investments in joint ventures not to exceed, at any one time in the aggregate outstanding under this clause (16), $5,750,000 (with the Fair Market Value of each Investment being measured at the time such Investment is made and without giving effect to subsequent changes in value); *provided, however*, that if any Investment pursuant to this clause (16) is made in any Person that is not the Borrower or a Restricted Subsidiary at the date of the making of such Investment and such Person becomes the Borrower or a Restricted Subsidiary after such date, such Investment shall thereafter be deemed to have been made pursuant to clause (1) above and shall cease to have been made pursuant to this clause (16) for so long as such Person continues to be the Borrower or a Restricted Subsidiary;

(17)     Investments of a Restricted Subsidiary acquired after the Closing Date or of an entity merged into, amalgamated with, or consolidated with the Borrower or a Restricted Subsidiary in a transaction that is not prohibited by Section 5.11 after the Closing Date to the extent that such Investments were not made in contemplation of such acquisition, merger, amalgamation or consolidation and were in existence on the date of such acquisition, merger, amalgamation or consolidation;

(18)     Permitted Business Investments;

(19)     Investments constituting non-cash proceeds of dispositions of assets to the extent permitted Section 5.08;

(20)     Investments in the ordinary course of business consisting of endorsements for collection or deposit and customary trade arrangements with customers consistent with industry norm;

(21)     advances of payroll payments to employees, consultants or independent contractors or other advances of salaries or compensation to employees, consultants or independent contractors, in each case in the ordinary course of business, taken together with all other advances made pursuant to this clause (21), not to exceed $2,300,000 at any one time outstanding; *provided* that no advances pursuant to this clause (21) shall be made if a Default or Event of Default has occurred and is continuing or would result therefrom;

(22)     to the extent constituting Investments, the Transactions;

(23)     advances in the form of a prepayment of expenses, so long as such expenses are incurred in the ordinary course of business and are being paid in accordance with customary trade terms of the Borrower or the relevant Restricted Subsidiary;

(24)     so long as no Event of Default has occurred and is continuing or result therefrom, Investments in the Closing Date Unrestricted Subsidiary and its Subsidiaries to fund capital calls required pursuant to the organizational documents of Fieldwood Mexico B.V., which Investments shall not exceed, in any fiscal year, the sum of (x) an amount equal to the reimbursements with respect to general and administrative expenses received in cash by the Credit Parties during such fiscal year and (y) $5,750,000 (*provided, that*, with respect to the fiscal year ending December 31, 2021, the amount of this clause (y) shall be $11,500,000) (it being understood and agreed that, unless and until the Closing Date Unrestricted Subsidiary becomes a Restricted Subsidiary and Subsidiary Guarantor hereunder, the only Investments permitted to be made by the Borrower and its Restricted Subsidiaries in the Closing Date Unrestricted Subsidiary shall be those permitted under this clause (24)); and

31

Error! Unknown document property name.
WEIL:\97986321\6\45327.0007

Debtors' Exhibit No. 30
Page 39 of 137

(25)     Investments resulting from pledges and deposits permitted under <u>clauses (1)</u>, <u>(4)</u> <u>(6)(C)</u>, <u>(14)</u>, <u>(31)</u> and <u>(36)</u> of the definition of "Permitted Liens";

"<u>Permitted Liens</u>" means, with respect to any Person:

(1)     pledges or deposits by such Person under workmen's compensation laws, unemployment insurance laws or similar legislation, or good faith deposits in connection with bids, tenders, contracts (other than for the payment of Indebtedness) or leases to which such Person is a party, or deposits to secure plugging and abandonment obligations or public or statutory obligations of such Person or deposits of cash or U.S. government bonds to secure surety or appeal bonds to which such Person is a party, or deposits as security for contested taxes or import duties or for the payment of rent, in each case Incurred in the ordinary course of business;

(2)     Liens imposed by law, such as landlords', carriers', warehousemen's, mechanics', materialmen's, repairmen's, construction or other like Liens securing obligations that are not overdue by more than 30 days or that are being contested in good faith by appropriate proceedings or other Liens arising out of judgments or awards against such Person with respect to which such Person shall then be proceeding with an appeal or other proceedings for review;

(3)     Liens for taxes, assessments or other governmental charges not yet due or payable or that are being contested in good faith by appropriate proceedings and for which adequate reserves have been maintained in accordance with GAAP;

(4)     Liens (including, for the avoidance of doubt, in the form of cash deposits) in favor of issuers of performance and surety bonds or bid bonds or with respect to other regulatory requirements or letters of credit or bankers acceptances issued pursuant to the request of and for, or completion guarantees provided for, the account of such Person in the ordinary course of its business; provided that the amount of cash deposits provided to secure such obligations shall not exceed, at any time outstanding, 20% of the then-outstanding notional amounts of such obligations;

(5)     minor survey exceptions, minor encumbrances, restrictive covenants, easements or reservations of, or rights of others for, licenses, rights-of- way, sewers, electric lines, telegraph and telephone lines and other similar purposes, or zoning or other restrictions as to the use of real properties or Liens incidental to the conduct of the business of such Person or to the ownership of its properties which were not Incurred in connection with Indebtedness and which do not in the aggregate materially adversely affect the value of said properties or materially impair their use in the operation of the business of such Person;

(6)     (A)     Liens on the Collateral (including Liens on Collateral granted pursuant to the Prepetition Loan Documents to secure the obligations arising under the Prepetition Loan Documents) securing Indebtedness that was permitted to be Incurred pursuant to <u>clauses (i)</u>, <u>(ii)</u> and, solely with respect to Secured Hedge Obligations (as defined in the FLTL Credit Agreement, <u>(viii)</u> of <u>Section 5.06(b)</u> and any Refinancing Indebtedness in respect thereof Incurred pursuant to <u>clause (xi)</u> of <u>Section 5.06(b)</u>, in each case subject to the Intercreditor Agreement;

(B)     Liens securing Indebtedness permitted to be Incurred pursuant to <u>clause (iv)</u> (solely with respect to Liens on the assets subject to such Indebtedness and to the extent such Lien is incurred within 180 days of the acquisition, lease, construction, repair, replacement or improvement of property (real or personal)), and <u>(xviii)</u> (solely with respect to Liens on the equipment financed by such Indebtedness) of <u>Section 5.06(b)</u> and any Refinancing Indebtedness in respect thereof Incurred pursuant to <u>clause (xi)</u> of <u>Section 5.06(b)</u>; and

(C)     Liens on cash collateral securing Indebtedness permitted to be Incurred pursuant to clause <u>(xiv)</u> of <u>Section 5.06(b)</u>;

Error! Unknown document property name.
WEIL:\97986321\6\45327.0007

(7)     Liens existing on the Closing Date listed on Schedule 5.13;

(8)     Liens securing Indebtedness or other obligations of the Borrower or a Restricted Subsidiary owing to the Borrower or another Restricted Subsidiary that is a Subsidiary Guarantor permitted to be Incurred in accordance with Section 5.06;

(9)     Liens on specific items of inventory or other goods and proceeds of any Person securing such Person's obligations in respect of bankers' acceptances issued or created for the account of such Person to facilitate the purchase, shipment or storage of such inventory or other goods;

(10)     leases and subleases of real property (other than Oil and Gas Properties) which do not materially interfere with the ordinary conduct of the business of the Borrower or any of the Restricted Subsidiaries;

(11)     Liens arising from Uniform Commercial Code financing statement filings regarding operating leases entered into by the Borrower and the Restricted Subsidiaries in the ordinary course of business;

(12)     Liens in favor of the Borrower or any Guarantor;

(13)     Liens on accounts receivable and related assets of the type specified in the definition of "Receivables Financing" Incurred in connection with a Qualified Receivables Financing;

(14)     deposits made in the ordinary course of business to secure liability to insurance carriers or self-insurance arrangement;

(15)     grants of software and other technology licenses in the ordinary course of business;

(16)     Liens to secure any refinancing, refunding, extension, renewal or replacement (or successive refinancings, refundings, extensions, renewals or replacements) as a whole, or in part, of any Indebtedness secured by any Lien referred to in the foregoing clauses (3), (6)(C), (7), (8), (12) and this clause (16); *provided*, *however*, that (x) such new Lien shall be limited to all or part of the same property that secured the original Lien (plus improvements on such property), and (y) the Indebtedness secured by such Lien at such time is not increased to any amount greater than the sum of (A) the outstanding principal amount or, if greater, committed amount of the Indebtedness described under such clause at the time the original Lien became a Permitted Lien under this Agreement, and (B) an amount necessary to pay any fees and expenses, including premiums, related to such refinancing, refunding, extension, renewal or replacement; *provided further*, *however*, that in the case of any Liens to secure any refinancing, refunding, extension or renewal of Indebtedness secured by a Lien referred to in clause (6)(C), the principal amount of any Indebtedness Incurred for such refinancing, refunding, extension or renewal shall be deemed secured by a Lien under clause (6)(C), as applicable, and not this clause (16) for purposes of determining the principal amount of Indebtedness outstanding under clause (6)(C), as applicable;

(17)     Liens on equipment of the Borrower or any Restricted Subsidiary granted in the ordinary course of business to the Borrower's or such Restricted Subsidiary's client at which such equipment is located;

(18)     judgment and attachment Liens not giving rise to an Event of Default and notices of lis pendens and associated rights related to litigation being contested in good faith by appropriate proceedings and for which adequate reserves have been made;

(19)     Liens arising out of conditional sale, title retention, consignment or similar arrangements for the sale of goods entered into in the ordinary course of business;

33

Error! Unknown document property name.
WEIL:\97986321\6\45327.0007

(20)     Liens incurred to secure Cash Management Services or to implement cash pooling arrangements, in each case, in the ordinary course of business;

(21)     other Liens securing Indebtedness (other than Indebtedness for borrowed money) the outstanding principal amount of which does not, taken together with the principal amount of all other obligations secured by Liens incurred under this clause (21) that are at that time outstanding, exceed $11,500,000 at the time of Incurrence;

(22)     any encumbrance or restriction (including put and call arrangements) with respect to Capital Stock of any joint venture or similar arrangement pursuant to any joint venture or similar agreement;

(23)     Liens arising by virtue of any statutory or common law provisions relating to banker's Liens, rights of set-off or similar rights and remedies as to deposit accounts or other funds maintained with a depository or financial institution;

(24)     Liens arising out of judgments or awards against such Person with respect to which such Person shall then be proceeding with any appeal or other proceedings for review;

(25)     Liens (i) in favor of credit card companies pursuant to agreements therewith and (ii) in favor of customers;

(26)     Liens in respect of Production Payments and Reserve Sales;

(27)     Liens arising under Farm-Out Agreements, Farm-In Agreements, division orders, contracts for the sale, purchase, exchange, transportation, gathering or processing of Hydrocarbons, unitizations and pooling designations, declarations, orders and agreements, development agreements, joint venture agreements, partnership agreements, operating agreements, royalties, royalty trusts, master limited partnerships, working interests, net profits interests, joint interest billing arrangements, participation agreements, production sales contracts, area of mutual interest agreements, gas balancing or deferred production agreements, injection, repressuring and recycling agreements, salt water or other disposal agreements, seismic or geophysical permits or agreements, and other agreements which are customary in the Oil and Gas Business; *provided*, *however*, in all instances that such Liens are limited to the assets that are the subject of the relevant agreement, program, order, trust, partnership or contract;

(28)     Liens on pipelines or pipeline facilities that arise by operation of law;

(29)     any (a) interest or title of a lessor or sublessor under any lease, liens reserved in oil, gas or other Hydrocarbons, minerals, leases for bonus, royalty or rental payments and for compliance with the terms of such leases; (b) restriction or encumbrance that the interest or title of such lessor or sublessor may be subject to (including, without limitation, ground leases or other prior leases of the demised premises, mortgages, mechanics' liens, tax liens and easements); or (c) subordination of the interest of the lessee or sublessee under such lease to any restrictions or encumbrance referred to in the preceding clause (b);

(30)     Liens that are contractual rights of set-off (i) relating to the establishment of depository relations with banks not given in connection with the issuance of Indebtedness, (ii) relating to pooled deposit or sweep accounts of the Borrower or any of its Restricted Subsidiaries to permit satisfaction of overdraft or similar obligations incurred in the ordinary course of business of the Borrower and its Restricted Subsidiaries or (iii) relating to purchase orders and other agreements entered into with customers of the Borrower or any of its Restricted Subsidiaries in the ordinary course of business;

(31)     security given to a public utility or any municipality or governmental authority when required by such utility or authority in connection with the operations of that Person in the ordinary course of business;

Error! Unknown document property name.
WEIL:\97986321\6\45327.0007

(32)     Liens arising pursuant to Section 107(l) of the Comprehensive Environmental Response, Compensation and Liability Act, 42 U.S.C. § 9607(l), or other Environmental Law, unless such Lien (i) by action of the lienholder, or by operation of law, takes priority over any Liens arising under the Loan Documents on the property upon which it is a Lien, and (ii) such Lien materially impairs the use of the property covered by such Lien for the purposes for which such property is held;

(33)     Liens on goods purchased in the ordinary course of business the purchase price of which is financed by a documentary letter of credit issued for the account of the Borrower or any of its subsidiaries;

(34)     Liens in favor of customs and revenue authorities arising as a matter of law to secure payment of customs duties in connection with the importation of goods in the ordinary course of business;

(35)     Liens (i) of a collection bank arising under Section 4-210 of the Uniform Commercial Code or any comparable or successor provision on items in the course of collection, (ii) attaching to commodity trading accounts or other commodity brokerage accounts incurred in the ordinary course of business and (iii) in favor of banking institutions arising as a matter of law encumbering deposits (including the right of set-off) and which are within the general parameters customary in the banking industry; and

(36)     Liens solely on any cash earnest money deposits made by the Borrower or any of its Restricted Subsidiaries in connection with any letter of intent or purchase agreement permitted in this Agreement.

"Permitted Loan Purchase Assignment and Acceptance" means an assignment and acceptance entered into by a Lender as an assignor and the Borrower as an assignee, and accepted by the Administrative Agent, substantially in the form of Exhibit J or such other form as shall be approved by the Administrative Agent and the Borrower (such approval not to be unreasonably withheld or delayed);

"Permitted Loan Purchases" shall have the meaning set forth in Section 9.06(f)(i).

"Person" means any individual, corporation, partnership, limited liability company, joint venture, association, joint-stock company, trust, unincorporated organization, government or any agency or political subdivision thereof or any other entity.

"Petition Date" shall have the meaning set forth in the recitals hereto.

"Petroleum Industry Standards" means the Definitions for Oil and Gas Reserves promulgated by the Society of Petroleum Engineers (or any generally recognized successor) as in effect at the time in question.

"PIK Election" means an election notice substantially in the form of Exhibit F.

"PIK Election Trigger Period" means any period in which the Borrower and its Restricted Subsidiaries had less than $75,000,000 as of the end of the most recently ended fiscal quarter.

"Plan" means any Employee Benefit Plan subject to Title IV of ERISA, Section 412 of the Code or Section 302 of ERISA (other than a Multiemployer Plan).

"Plan of Reorganization" shall have the meaning set forth in the recitals hereto.

"Platform" shall have the meaning set forth in Section 8.18.

"Preferred Stock" means any Equity Interest with preferential right of payment of dividends or upon liquidation, dissolution, or winding up.

35

Error! Unknown document property name.
WEIL:\97986321\6\45327.0007

Debtors' Exhibit No. 30
Page 43 of 137

"Prepetition First Lien Credit Agreement" shall have the meaning set forth in the recitals hereto.

"Prepetition Loan Documents" means the "Loan Documents" as defined in the Prepetition First Lien Credit Agreement.

"Prime Rate" means the rate of interest quoted in the print edition of *The Wall Street Journal*, Money Rates Section as the Prime Rate (currently defined as the base rate on corporate loans posted by at least 75.00% of the nation's thirty largest banks), as in effect from time to time, or, if such source or rate is unavailable, any replacement or successor source or rate as determined by Administrative Agent.  The Prime Rate is a reference rate and does not necessarily represent the lowest or best rate actually charged to any customer. Administrative Agent or any other Lender may make commercial loans or other loans at rates of interest at, above or below the Prime Rate.

"Prior Plan of Reorganization" shall have the meaning set forth in the recitals hereto.

"Probable Developed Producing Reserves" means oil and gas mineral interests that, in accordance with Petroleum Industry Standards, are classified as both "Probable Reserves" and "Developed Producing Reserves."

"Probable Reserves" means oil and gas mineral interests that, in accordance with Petroleum Industry Standards, are classified as both "Probable Reserves" and one of the following: (a) "Developed Producing Reserves", (b) "Developed Non-Producing Reserves", (c) "Undeveloped Reserves" and (d) "Developed Behind Pipe Reserves".

"Production Payments and Reserve Sales" means the grant or transfer by the Borrower or a Restricted Subsidiary to any Person of a royalty, overriding royalty, net profits interest, production payment (whether volumetric or dollar-denominated), partnership or other interest in Oil and Gas Properties, reserves or the right to receive all or a portion of the production or the proceeds from the sale of production attributable to such properties where the holder of such interest has recourse solely to such production or proceeds of production, subject to the obligation of the grantor or transferor to operate and maintain, or cause the subject interests to be operated and maintained, in a reasonably prudent manner or other customary standard or subject to the obligation of the grantor or transferor to indemnify for environmental, title or other matters customary in the Oil and Gas Business, including any such grants or transfers.

"Proved Developed Behind Pipe Reserves" means oil and gas mineral interests that, in accordance with Petroleum Industry Standards, are classified as "Proved Reserves" and "Developed Behind Pipe Reserves."

"Proved Developed Non-Producing Reserves" means oil and gas mineral interests that, in accordance with Petroleum Industry Standards, are classified as "Proved Reserves" and "Developed Non-Producing Reserves."

"Proved Developed Producing Reserves" means oil and gas mineral interests that, in accordance with Petroleum Industry Standards, are classified as both "Proved Reserves" and "Developed Producing Reserves."

"Proved Developed Reserves" means oil and gas mineral interests that, in accordance with Petroleum Industry Standards, are classified as both "Proved Reserves" and one of the following: (a) "Developed Producing Reserves", (b) "Developed Non-Producing Reserves" or (c) "Developed Behind Pipe Reserves."

"Proved Reserves" means oil and gas mineral interests that, in accordance with Petroleum Industry Standards, are classified as both "Proved Reserves" and one of the following: (a) "Developed Producing

Error! Unknown document property name.
WEIL:\97986321\6\45327.0007

Reserves", (b) "Developed Non-Producing Reserves", (c) "Undeveloped Reserves" and (d) "Developed Behind Pipe Reserves".

"PTE" means a prohibited transaction class exemption issued by the U.S. Department of Labor, as any such exemption may be amended from time to time.

"Public Information" means any information that (a) has been disseminated in a manner making it available to investors generally, within the meaning of Regulation FD under the Securities Act and the Exchange Act and, where applicable, any comparable doctrines under state and foreign securities laws, (b) does not constitute material non-public information concerning the Borrower, any Parent Entity or any Subsidiary or other Affiliate of any of the foregoing, or any security of any of the foregoing, for purposes of the United States federal and state securities laws and, where applicable, foreign securities laws or (c) solely in the case of information concerning the Borrower, any Parent Entity or any Subsidiary of the foregoing (but only if such information does not constitute material non-public information for the foregoing purposes of any other Affiliate thereof), so long as none of the Borrower, any Parent Entity or any Subsidiary of any of the foregoing shall have any securities registered under the Exchange Act or issued pursuant to Rule 144A under the Securities Act, or shall otherwise be subject to the reporting obligations under the Exchange Act, is information of the type that would be publicly disclosed in connection with an issuance of securities by the Borrower, such Parent Entity or such Subsidiary pursuant to an offering of securities registered under the Securities Act or made in reliance on Rule 144A under the Securities Act.

"Public Lender" shall have the meaning set forth in Section 8.18.

"PV-10" means, with respect to any Proved Reserves and/or Probable Reserves expected to be produced from any Oil and Gas Properties of the Credit Parties, the net present value, discounted at 10% per annum, of the future net revenues expected to accrue to the Borrower's and the Credit Parties' collective interests in such reserves during the remaining expected economic lives of such reserves.

"QFC Credit Support" shall have the meaning set forth in Section 8.24.

"Qualified Receivables Financing" means any Receivables Financing of a Receivables Subsidiary that meets the following conditions:

(1)     the Board of Directors of the Borrower shall have determined in good faith that such Qualified Receivables Financing (including financing terms, covenants, termination events and other provisions) is in the aggregate economically fair and reasonable to the Borrower and the Receivables Subsidiary;

(2)     all sales of accounts receivable and related assets to the Receivables Subsidiary are made at Fair Market Value;

(3)     the financing terms, covenants, termination events and other provisions thereof shall be market terms (as determined in good faith by the Borrower) and may include Standard Securitization Undertakings; and

(4)     the maximum committed amount of such Receivables Financing (when aggregated with all other outstanding Receivables Financings) shall not exceed $46,000,000.

The grant of a security interest in any accounts receivable of the Borrower or any Restricted Subsidiary (other than a Receivables Subsidiary) to secure Indebtedness under the FLTL Credit Agreement (or Refinancing Indebtedness with respect thereto), Indebtedness in respect of the Loans or any Refinancing Indebtedness with respect to the Loans shall not be deemed a Qualified Receivables Financing.

Error! Unknown document property name.
WEIL:\97986321\6\45327.0007

"Receivables Fees" means distributions or payments made directly or by means of discounts with respect to any participation interests issued or sold in connection with, and all other fees paid to a Person that is not a Restricted Subsidiary in connection with, any Receivables Financing.

"Receivables Financing" means any transaction or series of transactions that may be entered into by the Borrower or any of its Subsidiaries pursuant to which the Borrower or any of its Subsidiaries may sell, convey or otherwise transfer to (a) a Receivables Subsidiary (in the case of a transfer by the Borrower or any of its Subsidiaries); and (b) any other Person (in the case of a transfer by a Receivables Subsidiary), or may grant a security interest in, any accounts receivable (whether now existing or arising in the future) of the Borrower or any of its Subsidiaries, and any assets related thereto including, without limitation, all collateral securing such accounts receivable, all contracts and all guarantees or other obligations in respect of such accounts receivable, proceeds of such accounts receivable and other assets which are customarily transferred or in respect of which security interests are customarily granted in connection with asset securitization transactions involving accounts receivable and any Hedging Obligations entered into by the Borrower or any such Subsidiary in connection with such accounts receivable.

"Receivables Repurchase Obligation" means any obligation of a seller of receivables in a Qualified Receivables Financing to repurchase receivables arising as a result of a breach of a representation, warranty or covenant or otherwise, including as a result of a receivable or portion thereof becoming subject to any asserted defense, dispute, off-set or counterclaim of any kind as a result of any action taken by, any failure to take action by or any other event relating to the seller.

"Receivables Subsidiary" means a Wholly Owned Restricted Subsidiary which engages in no activities other than in connection with the financing of accounts receivable of the Borrower and its Restricted Subsidiaries, all proceeds thereof and all rights (contractual or other), collateral and other assets relating thereto, and any business or activities incidental or related to such business, and which is designated by the Board of Directors of the Borrower (as provided below) as a Receivables Subsidiary and:

(a)     no portion of the Indebtedness or any other obligations (contingent or otherwise) of which (i) is guaranteed by the Borrower or any other Subsidiary of the Borrower (excluding guarantees of obligations (other than the principal of and interest on, Indebtedness) pursuant to Standard Securitization Undertakings), (ii) is recourse to or obligates the Borrower or any other Subsidiary in any way other than pursuant to Standard Securitization Undertakings, or (iii) subjects any property or asset of the Borrower or any other Subsidiary, directly or indirectly, contingently or otherwise, to the satisfaction thereof, other than pursuant to Standard Securitization Undertakings;

(b)     with which neither the Borrower nor any Subsidiary has any material contract, agreement, arrangement or understanding other than on terms which the Borrower reasonably believes to be no less favorable to the Borrower or such Subsidiary than those that might be obtained at the time from Persons that are not Affiliates of the Borrower; and

(c)     to which neither the Borrower nor any Subsidiary has any obligation to maintain or preserve such entity's financial condition or cause such entity to achieve certain levels of operating results.

Any such designation by the Board of Directors of the Borrower shall be evidenced to the Administrative Agent by filing with the Administrative Agent a certified copy of the resolution of the Board of Directors of the Borrower giving effect to such designation and an Officers' Certificate certifying that such designation complied with the foregoing conditions and that any Qualified Receivables Financing to be entered into by such Receivables Subsidiary meets the requirements of the definition of "Qualified Receivables Financing".

Error! Unknown document property name.
WEIL:\97986321\6\45327.0007

"Refinancing Indebtedness" shall have the meaning set forth in Section 5.06(b)(xi).

"Refunding Capital Stock" shall have the meaning set forth in Section 5.07(b)(i)(A).

"Register" shall have the meaning set forth in Section 8.06(b)(iv).

"Regulation T" means Regulation U of the Board as from time to time in effect, any successor to all or any portion thereof establishing margin requirements and all official rulings and interpretations thereunder or thereof.

"Regulation U" means Regulation U of the Board as from time to time in effect, any successor to all or any portion thereof establishing margin requirements and all official rulings and interpretations thereunder or thereof.

"Regulation X" means Regulation X of the Board as from time to time in effect, any successor to all or any portion thereof establishing margin requirements and all official rulings and interpretations thereunder or thereof.

"Reinvestment Date" shall have the meaning given to such term in Section 2.13(a)(i).

"Related Parties" means, with respect to any specified Person, such Person's Affiliates and the directors, officers, employees, agents and members of such Person or such Person's Affiliates and any Person that possesses, directly or indirectly, the power to direct or cause the direction of the management or policies of such Person, whether through the ability to exercise voting power, by contract or otherwise.

"Release" means any release, spill, emission, leaking, pumping, pouring, injection, escaping, deposit, disposal, discharge, dispersal, dumping, leaching or migration.

"Relevant Governmental Body" means the Board of Governors or the NYFRB, or a committee officially endorsed or convened by the Board of Governors or the NYFRB, or any successor thereto.

"Reorganization Plan" shall have the meaning set forth in Section 7.11.

"Reportable Event" means an event described in Section 4043(c) of ERISA and the regulations thereunder, other than any event as to which the 30-day notice period has been waived.

"Required Lenders" means, at any time, Lenders having outstanding Loans that, taken together, represent more than 50% of the sum of all outstanding Loans at such time.

"Requirement of Law" means, as to any Person, any law, treaty, rule, regulation, statute, order, ordinance, decree, judgment, consent decree, writ, injunction, settlement agreement or governmental requirement enacted, promulgated or imposed or entered into or agreed by any Governmental Authority, in each case applicable to or binding upon such Person or any of its property or assets or to which such Person or any of its property or assets is subject.

"Reserve Report" means a reserve report evaluating, as of the applicable date of determination, the Proved Reserves and the Proved Developed Reserves of the Borrower and its Subsidiaries.

"Resolution Authority" means an EEA Resolution Authority or, with respect to any UK Financial Institution, a UK Resolution Authority.

"Restricted Investment" means an Investment other than a Permitted Investment.

Error! Unknown document property name.
WEIL:\97986321\6\45327.0007

"Restricted Payments" shall have the meaning set forth in Section 5.07(a).

"Restricted Subsidiary" means, with respect to any Person, any Subsidiary of such Person other than the Closing Date Unrestricted Subsidiary (unless and until such time as the Closing Date Unrestricted Subsidiary becomes a Restricted Subsidiary hereunder in accordance with (and solely to the extent required by) Section 5.29).  Unless otherwise indicated in this Agreement, all references to Restricted Subsidiaries means Restricted Subsidiaries of the Borrower.

"Retired Capital Stock" shall have the meaning set forth in Section 5.07(b)(i)(A).

"S&P" means Standard & Poor's Ratings Group or any successor to the rating agency business thereof.

"Sale/Leaseback Transaction" means an arrangement relating to property now owned or hereafter acquired by the Borrower or a Restricted Subsidiary whereby the Borrower or such Restricted Subsidiary transfers such property to a Person and the Borrower or such Restricted Subsidiary leases it from such Person, other than leases between the Borrower and a Restricted Subsidiary or between Restricted Subsidiaries.

"Sanctioned Country" means, at any time, a country, territory or region that is, or whose government is, the subject or target of any Sanctions, which jurisdictions include, as of the Closing Date, the Crimea region of Ukraine, Cuba, Iran, North Korea, Sudan and Syria.

"Sanctioned Person" means any Person with whom dealings, at the time of the relevant dealing, are restricted or prohibited under Sanctions, including (i) any Person listed in any Sanctions-related list of designated Persons maintained by the U.S. (including by OFAC, the U.S. Department of the Treasury, or the U.S. Department of State), or by the United Nations Security Council, the European Union or any EU member state, Her Majesty's Treasury of the United Kingdom or any other relevant sanctions authority, (ii) any Person located, operating, organized or resident in a Sanctioned Country or (iii) any Person owned or controlled, directly or indirectly, by any such Person described in clause (i) or (ii) of this definition.

"Sanctions" means applicable sanctions or trade embargoes enacted, imposed, administered or enforced from time to time by (i) the U.S. government, including those administered by OFAC, U.S. Department of State, or U.S. Department of Commerce, (ii) the United Nations Security Council, the European Union or any of its member states, Her Majesty's Treasury of the United Kingdom or (iii) any other relevant authority.

"SEC" means the Securities and Exchange Commission or any successor thereto.

"Secured Parties" shall mean, collectively, the Administrative Agent, the Collateral Agent, each Lender, and each Subagent appointed by the Administrative Agent with respect to matters relating to the Loan Documents or by the Collateral Agent with respect to matters relating to any Security Document.

"Securities Act" means the Securities Act of 1933, as amended, and the rules and regulations of the SEC promulgated thereunder.

"Security Documents" means the security agreements, pledge agreements, collateral assignments, mortgages (including the Mortgages) and related agreements, as amended, supplemented, restated, renewed, refunded, replaced, restructured, repaid, refinanced or otherwise modified from time to time, creating the security interests in the Collateral for the benefit of the Collateral Agent and the Lenders as contemplated by this Agreement.

"Senior Lien Intercreditor Agreement" means (i) the intercreditor agreement among the collateral agent under the FLTL Facility, the Collateral Agent, and the other parties from time to time party

40

Error! Unknown document property name.
WEIL:\97986321\6\45327.0007

Debtors' Exhibit No. 30
Page 48 of 137

thereto, to be entered into on the Closing Date, substantially in the form attached hereto as <u>Exhibit H</u>, with such changes as the Administrative Agent shall reasonably agree in its Permitted Business Judgment, as it may be amended, restated, supplemented or otherwise modified from time to time in accordance with this Agreement or (ii) any replacement thereof that contains terms not materially less favorable to Lenders than the intercreditor agreement referred to in clause (i).

"<u>Similar Business</u>" means a business, the majority of whose revenues are derived from the activities of the Borrower and its Subsidiaries as of the Closing Date or any business or activity that is reasonably similar or complementary thereto or a reasonable extension, development or expansion thereof or ancillary thereto.

"<u>SOFR</u>" means a rate per annum equal to the secured overnight financing rate for such Business Day published by the NYFRB (or a successor administrator of the secured overnight financing rate) on the website of the NYFRB, currently at http://www.newyorkfed.org (or any successor source for the secured overnight financing rate identified as such by the administrator of the secured overnight financing rate from time to time).

"<u>Specified Asset Sale</u>" has the meaning assigned to it in <u>Section 2.13(a)(i)</u>.

"<u>Standard Securitization Undertakings</u>" means representations, warranties, covenants, indemnities and guarantees of performance entered into by the Borrower or any Subsidiary thereof which the Borrower has determined in good faith to be customary in a Receivables Financing including, without limitation, those relating to the servicing of the assets of a Receivables Subsidiary, it being understood that any Receivables Repurchase Obligation shall be deemed to be a Standard Securitization Undertaking.

"<u>Stated Maturity</u>" means, with respect to any security, the date specified in such security as the fixed date on which the final payment of principal of such security is due and payable, including pursuant to any mandatory redemption provision (but excluding any provision providing for the repurchase of such security at the option of the holder thereof upon the happening of any contingency beyond the control of the issuer unless such contingency has occurred).

"<u>Statutory Reserves</u>" means a fraction (expressed as a decimal), the numerator of which is the number one and the denominator of which is the number one <u>minus</u> the aggregate of the maximum reserve percentages (including any marginal, special, emergency or supplemental reserves) expressed as a decimal established by the Board and any other banking authority, domestic or foreign, to which the Administrative Agent or any Lender (including any branch, Affiliate, or other fronting office making or holding a Loan) is subject for Eurocurrency Liabilities (as defined in Regulation D of the Board). Such reserve percentages shall include those imposed pursuant to such Regulation D. Without limiting the effect of the foregoing, the Statutory Reserves shall reflect any other reserves required to be maintained by such member banks with respect to (i) any category of liabilities that includes deposits by reference to which the applicable Adjusted LIBOR or any other interest rate of a Loan is to be determined, or (ii) any category of extensions of credit or other assets that include Loans bearing interest at Adjusted LIBOR. A Loan that is not an ABR Loan shall be deemed to constitute Eurocurrency Liabilities and to be subject to such reserve requirements without benefit of or credit for proration, exemptions or offsets that may be available from time to time to any Lender under such Regulation D. Statutory Reserves shall be adjusted automatically on and as of the effective date of any change in any reserve percentage.

"<u>Subagent</u>" shall have the meaning set forth in <u>Section 7.02</u>.

"<u>Subsidiary</u>" means, with respect to any Person, (a) any corporation more than 50% of whose Equity Interests of any class or classes having by the terms thereof ordinary voting power to elect a majority of the directors of such corporation (irrespective of whether or not at the time Equity Interests of any class or classes of such corporation shall have or might have voting power by reason of the happening of any contingency) is at the time owned by such Person directly or indirectly through Subsidiaries and (b) any limited liability company,

41

Error! Unknown document property name.
WEIL:\97986321\6\45327.0007

Debtors' Exhibit No. 30
Page 49 of 137

partnership, association, joint venture or other entity of which such Person directly or indirectly through Subsidiaries has more than a 50% equity interest at the time. Unless otherwise expressly provided, all references herein to a "Subsidiary" means a Subsidiary of the Borrower.

"Subsidiary Guarantor" means any Subsidiary that Incurs a Guarantee; *provided* that upon the release or discharge of such Person from its Guarantee in accordance with this Agreement, such Subsidiary shall cease to be a Subsidiary Guarantor; *provided further* that no Excluded Subsidiary shall be a Subsidiary Guarantor.

"Supported QFC" has the meaning set forth in Section 8.24.

"Tax Distributions" means any distributions pursuant to Section 5.07(b)(v).

"Taxes" means any and all present or future taxes, duties, levies, imposts, assessments, deductions, withholdings (including backup withholding), fees or other charges imposed by any Governmental Authority and any interest, fines, penalties or additions to tax with respect to the foregoing.

"Term SOFR" means, for the applicable corresponding tenor, the forward-looking term rate based on SOFR that has been selected or recommended by the Relevant Governmental Body.

"Test Period" means, as of any date of determination, the four consecutive fiscal quarters of the Borrower then last ended and for which financial statements have been delivered to the Administrative Agent in accordance with Section 5.01(a) or (b).

"Transaction Expenses" means any fees or expenses incurred or paid by the Borrower or any of its Subsidiaries or any of their Affiliates in connection with the Transactions, this Agreement and the other Loan Documents.

"Transactions" means, collectively, (a) the funding of (or, as applicable, conversion into) the Initial Loans on the Closing Date and the execution, delivery and performance of the Loan Documents to be entered into on the Closing Date, (b) the funding (or deemed funding) of the Loans (as defined in the FLTL Credit Agreement) on the Closing Date and the execution, delivery and performance of the Loan Documents (as defined in the FLTL Credit Agreement) to be entered into on the Closing Date, (c) the other transactions contemplated by the Plan of Reorganization and (d) the payment of Transaction Expenses.

"Type" means, when used in respect of any Loan, the Rate by reference to which interest on such Loan is determined. For purposes hereof, "*Rate*" shall include the LIBOR and the ABR.

"U.S." means the United States of America.

"U.S. Dollars" or "$" means lawful money of the United States of America.

"U.S. Government Obligations" means securities that are:

(1)      direct obligations of the United States of America for the timely payment of which its full faith and credit is pledged, or

(2)      obligations of a Person controlled or supervised by and acting as an agency or instrumentality of the United States of America, the timely payment of which is unconditionally guaranteed as a full faith and credit obligation by the United States of America, which, in each case, are not callable or redeemable at the option of the issuer thereof, and shall also include a depository receipt issued by a bank (as defined in Section 3(a)(2) of the Securities Act) as custodian with respect to any such U.S. Government Obligations or a specific payment of principal of or interest on any such U.S. Government Obligations held by

42

Error! Unknown document property name.
WEIL:\97986321\6\45327.0007

Debtors' Exhibit No. 30
Page 50 of 137

such custodian for the account of the holder of such depository receipt; *provided* that (except as required by law) such custodian is not authorized to make any deduction from the amount payable to the holder of such depository receipt from any amount received by the custodian in respect of the U.S. Government Obligations or the specific payment of principal of or interest on the U.S. Government Obligations evidenced by such depository receipt.

"U.S. Lender" means any Lender other than a Non-U.S. Lender.

"UK Financial Institution" means any BRRD Undertaking (as such term is defined under the PRA Rulebook (as amended from time to time) promulgated by the United Kingdom Prudential Regulation Authority) or any person falling within IFPRU 11.6 of the FCA Handbook (as amended from time to time) promulgated by the United Kingdom Financial Conduct Authority, which includes certain credit institutions and investment firms, and certain affiliates of such credit institutions or investment firms.

"UK Resolution Authority" means the Bank of England or any other public administrative authority having responsibility for the resolution of any UK Financial Institution.

"Unfunded Current Liability" means, with respect to any Plan, the amount, if any, by which the Accumulated Benefit Obligation (as defined under Statement of Financial Accounting Standards No. 87 or any successor thereto ("SFAS 87")) under the Plan as of the close of its most recent plan year, determined in accordance with SFAS 87 as in effect on the Closing Date, exceeds the value of the Plan assets (as defined under Section 430(g)(3)(A) of the Code without regard to the averaging which may be allowed under Section 430(g)(3)(B) of the Code) allocable thereto and determined as of the close of such plan year.

"Unrestricted Cash" means cash or Cash Equivalents of the Borrower or any Subsidiary Guarantor that would not appear as "restricted" on a consolidated balance sheet of the Borrower or any Subsidiary Guarantor, and (in the case of Section 4.01(q), subject to Section 5.34) held in deposit accounts subject to an Account Control Agreement and is free and clear of all Liens (other than Permitted Liens).

"US Special Resolution Regimes" has the meaning assigned to such term in Section 8.24.

"USA Patriot Act" means the U.S.A. Patriot Act, Title III of Pub. L. 107-56 (signed into law October 26, 2001).

"USD LIBOR" means the London interbank offered rate for U.S. dollars.

"Voting Procedures Order" shall have the meaning assigned to such term in Section 7.11.

"Voting Stock" of any Person as of any date means the Capital Stock of such Person that is at the time entitled to vote in the election of the Board of Directors of such Person.

"Weighted Average Life to Maturity" means, when applied to any Indebtedness or Disqualified Stock or Preferred Stock, as the case may be, at any date, the quotient obtained by dividing (a) the sum of the products of the number of years from the date of determination to the date of each successive scheduled principal payment of such Indebtedness or redemption or similar payment with respect to such Disqualified Stock or Preferred Stock multiplied by the amount of such payment, by (b) the sum of all such payments.

"Wholly Owned Restricted Subsidiary" means any Wholly Owned Subsidiary that is a Restricted Subsidiary.

"Wholly Owned Subsidiary" of any Person means a Subsidiary of such Person 100% of the outstanding Capital Stock or other ownership interests of which (other than directors' qualifying shares or shares required pursuant to applicable law) shall at the time be owned by such Person or by one or more Wholly Owned Subsidiaries of such Person.

43

Error! Unknown document property name.
WEIL:\97986321\6\45327.0007

Debtors' Exhibit No. 30
Page 51 of 137

"Write-Down and Conversion Powers" means, (a) with respect to any EEA Resolution Authority, the write-down and conversion powers of such EEA Resolution Authority from time to time under the Bail-In Legislation for the applicable EEA Member Country, which write-down and conversion powers are described in the EU Bail-In Legislation Schedule, and (b) with respect to the United Kingdom, any powers of the applicable Resolution Authority under the Bail-In Legislation to cancel, reduce, modify or change the form of a liability of any UK Financial Institution or any contract or instrument under which that liability arises, to convert all or part of that liability into shares, securities or obligations of that person or any other person, to provide that any such contract or instrument is to have effect as if a right had been exercised under it or to suspend any obligation in respect of that liability or any of the powers under that Bail-In Legislation that are related to or ancillary to any of those powers.

SECTION 1.02.     Terms Generally.  The definitions set forth or referred to in Section 1.01 shall apply equally to both the singular and plural forms of the terms defined.  Whenever the context may require, any pronoun shall include the corresponding masculine, feminine and neuter forms.  The words "*include*," "*includes*" and "*including*" shall be deemed to be followed by the phrase "*without limitation*."  All references herein to *Articles*, *Sections*, *Exhibits* and *Schedules* shall be deemed references to Articles and Sections of, and Exhibits and Schedules to, this Agreement unless the context shall otherwise require.  Except as otherwise expressly provided herein, any reference in this Agreement to any Loan Document means such document as amended, restated, supplemented or otherwise modified from time to time.  Except as otherwise expressly provided herein, all terms of an accounting or financial nature shall be construed in accordance with GAAP.

SECTION 1.03.     Accounting Terms.  All accounting terms not specifically or completely defined herein shall be construed in conformity with, and all financial data (including financial ratios and other financial calculations) required to be submitted pursuant to this Agreement shall be prepared in conformity with, GAAP, except as otherwise specifically prescribed herein; *provided, however,* that if the Borrower notifies the Administrative Agent that the Borrower requests an amendment to any provision hereof to eliminate the effect of any change occurring after the Closing Date in GAAP or in the application thereof on the operation of such provision (or if the Administrative Agent notifies the Borrower that the Required Lenders request an amendment to any provision hereof for such purpose), regardless of whether any such notice is given before or after such change in GAAP or in the application thereof, then such provision shall be interpreted on the basis of GAAP as in effect and applied immediately before such change shall have become effective until such notice shall have been withdrawn or such provision amended in accordance herewith.

SECTION 1.04.     Rounding.  Any financial ratios required to be maintained or complied with by the Borrower pursuant to this Agreement (or required to be satisfied in order for a specific action to be permitted under this Agreement) shall be calculated by dividing the appropriate component by the other component, carrying the result to one place more than the number of places by which such ratio is expressed herein and rounding the result up or down to the nearest number (with a rounding-up if there is no nearest number).

SECTION 1.05.     Times of Day.  Unless otherwise specified, all references herein to times of day shall be references to New York City (daylight saving or standard, as applicable).

SECTION 1.06.     Timing of Payment or Performance.  When the payment of any obligation or the performance of any covenant, duty or obligation is stated to be due or performance required on a day which is not a Business Day, the date of such payment (other than as described in Section 2.07) or performance shall extend to the immediately succeeding Business Day.

SECTION 1.07.     Hedging Requirements Generally; Hedge Unwinding.  For purposes of any determination with respect to Hedging Obligations or any other calculation under or requirement of this Agreement in respect of hedging shall be calculated on a "barrel of oil equivalent" basis. All references to the "unwinding" (or any cognate thereof) of a hedge shall mean the monetization of a hedge position, whether by mutual agreement to terminate or "tear up", in connection with the designation of an early termination date (or any similar concept) with respect to, or the settlement of such hedge position.

44

Error! Unknown document property name.
WEIL:\97986321\6\45327.0007

Debtors' Exhibit No. 30
Page 52 of 137

SECTION 1.08.    Certain Determinations.  For purposes of determining compliance with any of the covenants set forth in Article V, but subject to any limitation expressly set forth therein, as applicable, at any time (whether at the time of incurrence or thereafter), any Lien, Investment, Indebtedness, disposition, Restricted Payment, Affiliate transaction, prepayment, redemption or the consummation of any other transaction meets the criteria of one, or more than one, of the categories permitted pursuant to Article V, as applicable, the Borrower shall, in its good faith discretion, determine under which category such Lien, Investment, Indebtedness, Asset Sale, Restricted Payment, Affiliate transaction, prepayment, redemption or the consummation of any other transaction (or, in each case, any portion thereof) is permitted.

SECTION 1.09.    Making or Maintaining LIBOR Loans.

(a)    Changed Circumstances/Temporary LIBOR Unavailability.  In the event that the Administrative Agent or the Required Lenders determine (which determination shall be final and conclusive and binding upon all parties hereto), on any interest rate determination date with respect to any LIBOR Loans, that (i) subject to subsection (b) below and Sections 2.08 and 2.09, dollar deposits are not being offered to banks in the London interbank eurodollar market for the applicable amount and Interest Period of such LIBOR Loans, (ii) by reason of circumstances affecting the London interbank market adequate and fair means do not exist for ascertaining the interest rate applicable to such LIBOR Loans on the basis provided for in the definition of LIBOR, or (iii) LIBOR does not adequately and fairly reflect the cost to Lenders of making or maintaining such LIBOR Loans during such Interest Period, the Administrative Agent will reasonably promptly give notice to the Borrower and each Lender of such determination, whereupon (A) no Loans may be made as, or converted to, LIBOR Loans until such time as Administrative Agent (at the direction of the Required Lenders) notifies the Borrower and Lenders that the circumstances giving rise to such notice no longer exist, and (B) any Notice of Borrowing or Interest Period Election Request given by the Borrower with respect to the Loans in respect of which such determination was made shall be deemed to be rescinded by the Borrower.

(b)    Benchmark Replacement Setting.  Notwithstanding anything to the contrary herein or in any other Loan Document:

(i)    Replacing Adjusted LIBOR.  On March 5, 2021 the Financial Conduct Authority ("FCA"), the regulatory supervisor of USD LIBOR's administrator ("IBA"), announced in a public statement the future cessation or loss of representativeness of overnight/Spot Next, 1-month, 3-month, 6-month and 12-month USD LIBOR tenor settings. On the earlier of (i) the date that all Available Tenors of USD LIBOR have either permanently or indefinitely ceased to be provided by IBA or have been announced by the FCA pursuant to public statement or publication of information to be no longer representative and (ii) the Early Opt-in Effective Date, if the then-current Benchmark is USD LIBOR, the Benchmark Replacement will replace such Benchmark for all purposes hereunder and under any Loan Document in respect of any setting of such Benchmark on such day and all subsequent settings without any amendment to, or further action or consent of any other party to this Agreement or any other Loan Document. If the Benchmark Replacement is Daily Simple SOFR, all interest payments will be payable on a quarterly basis.

(ii)    Replacing Future Benchmarks.  Upon the occurrence of a Benchmark Transition Event, the Benchmark Replacement will replace the then-current Benchmark for all purposes hereunder and under any Loan Document in respect of any Benchmark setting at or after 5:00 p.m. (New York City time) on the fifth (5th) Business Day after the date notice of such Benchmark Replacement is provided to the Lenders without any amendment to, or further action or consent of any other party to, this Agreement or any other Loan Document, so long as the Administrative Agent has not received, by such time, written notice of objection to such Benchmark Replacement from Lenders comprising the Required Lenders. At any time that the administrator of the then-current Benchmark has permanently or indefinitely ceased to provide such Benchmark or such Benchmark has been announced by the regulatory supervisor for the administrator of such Benchmark pursuant to public statement or publication of information to be no longer representative of the underlying market and economic reality

45

Error! Unknown document property name.
WEIL:\97986321\6\45327.0007

Debtors' Exhibit No. 30
Page 53 of 137

that such Benchmark is intended to measure and that representativeness will not be restored, the Borrower may revoke any request for a borrowing of, conversion to or continuation of Loans to be made, converted or continued that would bear interest by reference to such Benchmark until the Borrower's receipt of notice from the Administrative Agent (at the direction of the Required Lenders) that a Benchmark Replacement has replaced such Benchmark, and, failing that, the Borrower will be deemed to have converted any such request into a request for a borrowing of or conversion to ABR Loans.  During the period referenced in the foregoing sentence, the component of ABR based upon the Benchmark will not be used in any determination of ABR.

(iii)     Benchmark Replacement Conforming Changes.  In connection with the implementation and administration of a Benchmark Replacement, the Administrative Agent (at the direction of the Required Lenders) will have the right to make Benchmark Replacement Conforming Changes from time to time and, notwithstanding anything to the contrary herein or in any other Loan Document, any amendments implementing such Benchmark Replacement Conforming Changes will become effective without any further action or consent of any other party to this Agreement or any other Loan Document.

(iv)     Notices; Standards for Decisions and Determinations.  The Administrative Agent will promptly notify the Borrower and the Lenders of (i) the implementation of any Benchmark Replacement and (ii) the effectiveness of any Benchmark Replacement Conforming Changes.  Any determination, decision or election that may be made by the Administrative Agent or, if applicable, any Lender (or group of Lenders) pursuant to this Section 1.09, including any determination with respect to a tenor, rate or adjustment or the occurrence or non-occurrence of an event, circumstance or date and any decision to take or refrain from taking any action, will be conclusive and binding absent manifest error and may be made in its or their sole discretion and without consent from any other party to this Agreement or any other Loan Document, except, in each case, as expressly required pursuant to this Section 1.09.

(v)     Unavailability of Tenor of Benchmark.  Notwithstanding anything to the contrary herein or in any other Loan Document, at any time (including in connection with the implementation of a Benchmark Replacement), (i) if the then-current Benchmark is a term rate (including Term SOFR or LIBOR) and either (A) any tenor for such Benchmark is not displayed on a screen or other information service that publishes such rate from time to time as selected by the Administrative Agent in its reasonable discretion or (B) the regulatory supervisor for the administrator of such Benchmark has provided a public statement or publication of information announcing that any tenor for such Benchmark is or will be no longer representative, then the Administrative Agent (at the direction of the Required Lenders) and the Borrower may modify the definition of "Interest Period" for any Benchmark setting at or after such time to remove such unavailable or non-representative tenor and (ii) if a tenor that was removed pursuant to clause (i) above either (A) is subsequently displayed on a screen or information service for a Benchmark (including a Benchmark Replacement) or (B) is not, or is no longer, subject to an announcement that it is or will no longer be representative for a Benchmark (including a Benchmark Replacement), then the Administrative Agent (at the direction of the Required Lenders) may modify the definition of "Interest Period" for all Benchmark settings at or after such time to reinstate such previously removed tenor.

(vi)     Concerning the Administrative Agent.  The Administrative Agent shall have no obligation to make any determination under this Section 1.09 or otherwise related to the Benchmark or the Benchmark Replacement; provided that any determination made in good faith by the Administrative Agent shall be binding on all Lenders and the Administrative Agent shall have no liability to the Lenders or any other Person for any such determination made in good faith; provided, further, that in the event that the Administrative Agent elects to make such a determination and seeks the consent of the Required Lenders in connection therewith, if the Required Lenders do not affirmatively select an alternative rate of interest, then such rate may be selected by the Borrower in

46

Error! Unknown document property name.
WEIL:\97986321\6\45327.0007

Debtors' Exhibit No. 30
Page 54 of 137

good faith and any such selection shall be binding on the Administrative Agent and all Lenders unless and until the Required Lenders select and alternative rate of interest.

SECTION 1.10.    <u>Divisions</u>. For all purposes under the Loan Documents, in connection with any division or plan of division under Delaware law (or any comparable event under a different jurisdiction's laws): (a) if any asset, right, obligation or liability of any Person becomes the asset, right, obligation or liability of a different Person, then it shall be deemed to have been transferred from the original Person to the subsequent Person, and (b) if any new Person comes into existence, such new Person shall be deemed to have been organized on the first date of its existence by the holders of its Equity Interests at such time.

SECTION 1.11.    <u>Deemed Funding of Loans</u>.  All references to any Lender "making" or "funding" a Loan or a Loan being "made" or "funded" (or any similar concept) by a Lender shall for all purposes hereunder, be a reference to the deemed making or funding of such Loan by such Lender or such Loan being deemed made or funded (or any similar concept) by such Lender.

SECTION 1.12.    <u>Certain Calculations and Tests.</u>   In the event that the Borrower or any of its Restricted Subsidiaries Incurs, repays, repurchases or redeems any Indebtedness (other than in the case of any Qualified Receivables Financing, in which case interest expense shall be computed based upon the average daily balance of such Indebtedness during the applicable period) or issues, repurchases or redeems Disqualified Stock or Preferred Stock subsequent to the commencement of the period for which any financial ratio or test is being calculated but prior to the event for which the calculation is made (the "<u>Calculation Date</u>"), then such calculation shall give pro forma effect to such Incurrence, repayment, repurchase or redemption of Indebtedness, or such issuance, repurchase or redemption of Disqualified Stock or Preferred Stock, as if the same had occurred at the beginning of the applicable four-quarter period. For purposes of this definition, whenever pro forma effect is to be given to any event, the pro forma calculations shall be made in good faith by a responsible financial or accounting officer of the Borrower.

If any Indebtedness bears a floating rate of interest and is being given pro forma effect, the interest on such Indebtedness shall be calculated as if the rate in effect on the Calculation Date had been the applicable rate for the entire period (taking into account any Hedging Obligations applicable to such Indebtedness if such Hedging Obligation has a remaining term in excess of 12 months).  Interest on a Capitalized Lease Obligation shall be deemed to accrue at an interest rate reasonably determined by a responsible financial or accounting officer of the Borrower to be the rate of interest implicit in such Capitalized Lease Obligation in accordance with GAAP.

For purposes of this definition, any amount in a currency other than U.S. Dollars will be converted to U.S. Dollars based on the average exchange rate for such currency for the most recent twelve month period immediately prior to the date of determination in a manner consistent with that used in calculating EBITDAX (as defined in the FLTL Credit Agreement) for the applicable period.

## ARTICLE II

The Credits

SECTION 2.01.    <u>Loans</u>.

(a)    Subject to and upon the terms and conditions herein set forth, each Lender having an Initial Commitment with respect to Initial New Loans, severally agrees that it shall make a Loan or Loans on the Closing Date to the Borrower in U.S. Dollars (each such loan, an "<u>Initial New Loan</u>") in an aggregate principal amount set forth for such Lender on <u>Schedule 2.01</u>.  The Commitments in respect of the Initial New Loans shall terminate automatically immediately after the making of the Initial New Loans on the Closing Date.  The initial aggregate principal amount of the Initial New Loans shall be $[_].  The Initial New Loans may be repaid or

47

Error! Unknown document property name.
WEIL:\97986321\6\45327.0007

Debtors' Exhibit No. 30
Page 55 of 137

prepaid in accordance with the provisions hereof, but once repaid or prepaid, may not be reborrowed. The Initial New Loans, together with the Initial DIP Converted Loans, shall constitute a single Class of Loans hereunder.

(b)        [Reserved]

(c)        Subject to the terms and conditions set forth herein and to give effect to the conversion of the Converted DIP Facility Loans owing to each Lender, each Lender having an Initial Commitment with respect to Initial DIP Converted Loans, severally agrees that it shall be deemed to have made a Loan or Loans on the Closing Date to the Borrower in U.S. Dollars (each such loan, an "Initial DIP Converted Loans") in an aggregate principal amount set forth for such Lender on Schedule 2.01. The Initial DIP Converted Loans deemed made pursuant to this Section 2.01(c) shall be converted in accordance with Section 2.02 without any actual funding. After giving effect to this Section 2.01(c), the aggregate principal amount of the Initial DIP Converted Loans on the Closing Date shall be $[_]. The Initial DIP Converted Loans may be repaid or prepaid in accordance with the provisions hereof, but once repaid or prepaid, may not be reborrowed. The Initial DIP Converted Loans, together with the Initial New Loans, shall constitute a single Class of Loans hereunder.

(d)        Each Lender may at its option make any Loan by causing any domestic or foreign branch or Affiliate of such Lender to make such Loan; *provided* that (i) any exercise of such option shall not affect the obligation of the Borrower to repay such Loan and (ii) in exercising such option, such Lender shall use its reasonable efforts to minimize any increased costs to the Borrower resulting therefrom (which obligation of the Lender shall not require it to take, or refrain from taking, actions that it determines would result in increased costs for which it will not be compensated hereunder or that it determines would be otherwise disadvantageous to it and in the event of such request for costs for which compensation is provided under this Agreement, the provisions of Section 2.08 shall apply).

(e)        Incremental Commitments may be established as set forth in Section 2.20. Each Incremental Lender agrees, subject to the terms and conditions set forth in the applicable Incremental Facility Agreement, to make Loans under its Incremental Commitment of any Class in an aggregate principal amount not to exceed such Incremental Commitment.

SECTION 2.02.        Converted DIP Facility Loans.  Subject to the terms and conditions set forth herein, each Lender, severally and not jointly, agrees that the Converted DIP Facility Loans made by such Lender under the DIP Facility and outstanding on the Closing Date immediately prior to giving effect to this Agreement shall be converted (and prepaid by) into Initial DIP Converted Loans in a principal amount equal to the Cnverted DIP Facility Loans owing to such Lender on the Closing Date and such Loans shall be deemed made pursuant to this Agreement on the Closing Date as set forth in Section 2.01(c).  The conversion by a Lender of all or a portion of its Converted DIP Facility Loans shall be deemed to satisfy, dollar for dollar, such Lender's obligation to make Initial DIP Converted Loans on the Closing Date.  Such Converted DIP Facility Loans of each Lender shall hereafter be referred to as "Initial DIP Converted Loans" and on and after the Closing Date shall have all of the rights and benefits of Loans as set forth in this Agreement and the other Loan Documents.  For the avoidance of doubt, such conversion of Converted DIP Facility Loans into Initial DIP Converted Loans hereunder shall be deemed a "Borrowing" for all purposes under this Agreement.

SECTION 2.03.        Notice of Borrowing.

(a)        For the Borrowing made on the Closing Date, the Borrower shall give the Administrative Agent written notice (or telephonic notice promptly confirmed in writing) no later than 12:00 p.m., New York time, one (1) Business Day prior to the Closing Date (or such shorter period as the Administrative Agent may agree).  The notice (a "Notice of Borrowing") shall be revocable if any of the conditions in Section 4.01 that are not reasonably within the control of the Borrower are not satisfied or waived.  Such Notice of Borrowing shall specify (i) the aggregate principal amount of the Loans to be made, (ii) the proposed date of the Loans (which shall be a Business Day), (iii) whether such Loans are to be ABR Loans or LIBOR Loans and, if LIBOR Loans, the initial Interest Period applicable thereto, and (iv) remittance

48

Error! Unknown document property name.
WEIL:\97986321\6\45327.0007

Debtors' Exhibit No. 30
Page 56 of 137

instructions for disbursement of the proceeds of the Loans.  The Notice of Borrowing shall be in substantially the form of Exhibit E.  The Administrative Agent shall promptly give each Lender written notice of the proposed borrowing of Loans, of such Lender's proportionate share thereof and of the other matters covered by the related Notice of Borrowing.

SECTION 2.04.       Repayment of Loans; Evidence of Debt.

(a)       The Borrower hereby unconditionally promises to repay, in U.S. Dollars, the outstanding principal amount of the Loans to the Administrative Agent for the account of each Lender on the Maturity Date, in an amount equal to the then unpaid principal amount of each Loan of such Lender to the Borrower.

(b)       Each Lender shall maintain in accordance with its usual practice an account or accounts evidencing the indebtedness of the Borrower to the appropriate Lending Office of such Lender resulting from the Loan made by such Lending Office of such Lender from time to time, including the amounts of principal and interest payable and paid to such Lending Office of such Lender from time to time under this Agreement.

(c)       The Administrative Agent, acting for this purpose as a non-fiduciary agent of the Borrower, shall maintain the Register pursuant to Section 8.06(b)(iv), and a subaccount for each Lender, in which the Register and subaccounts (taken together) shall be recorded (i) the amount of the Loans made hereunder and the Interest Period(s) applicable thereto, (ii) the amount of any principal or interest due and payable or to become due and payable from the Borrower to each Lender hereunder and (iii) the amount of any sum received by the Administrative Agent hereunder from the Borrower and each Lender's share thereof.

(d)       The entries made in the Register and accounts and subaccounts maintained pursuant to clauses (b) and (c) of this Section 2.04 shall, to the extent permitted by applicable law, be prima facie evidence of the existence and amounts of the obligations of the Borrower therein recorded; provided, however, that the failure of any Lender or the Administrative Agent to maintain such account, such Register or such subaccount, as applicable, or any error therein, shall not in any manner affect the obligation of the Borrower to repay (with applicable interest) the Loan made to the Borrower by such Lender in accordance with the terms of this Agreement; provided further that in the event of any conflict between the accounts maintained by any Lender and those maintained by the Administrative Agent, the Register and the corresponding accounts maintained by the Administrative Agent shall control, absent manifest error.

(e)       Any Lender may request that Loans made by it be evidenced by a Note.  In such event, the Borrower shall prepare, execute and deliver to such Lender a Note payable to such Lender or its registered assigns and in substantially the form attached hereto as Exhibit B.

SECTION 2.05.       Other Fees.   The Borrower shall pay to the Administrative Agent such fees as shall have been separately agreed upon in the Fee Letter in the amounts and at the times specified in the Fee Letter.  Such fees shall be fully earned when paid and shall not be refundable for any reason whatsoever (except as expressly agreed between the Borrower and the Administrative Agent).

SECTION 2.06.       Interest.

(a)       (i) Interest on (A) each Loan that is a LIBOR Loan will accrue and be payable at a rate per annum equal to Adjusted LIBOR plus the Applicable Margin and shall be payable in cash, and (B) each Loan that is an ABR Loan will accrue and be payable at a rate per annum equal to ABR plus the Applicable Margin and shall be payable in cash, each rate as determined by the Administrative Agent;

(ii) [The Borrower may (in its sole discretion) deliver a PIK Election Notice at least [three (3) Business Days' prior to any Interest Payment Date] during a PIK Election Trigger Period to elect to (A)

49

Error! Unknown document property name.
WEIL:\97986321\6\45327.0007

Debtors' Exhibit No. 30
Page 57 of 137

pay the interest provided for in clause (i) above at the Applicable Margin taking into account the delivery of the PIK Election Notice and (B) make an additional interest payment on such Interest Payment Date in kind in an aggregate amount equal to 5.00% per annum of each Initial Loan (the "PIK Interest"), it being understood and agreed that on each Interest Payment Date on which the Borrower has delivered a PIK Election Notice, the PIK Interest shall be capitalized and added to the outstanding principal balance of the Initial Loans, and bear interest from and after such Interest Payment Date.  If the Borrower has not delivered a PIK Election Notice prior to the time prescribed by this Section 2.06(a)(ii), the Borrower shall have irrevocably deemed to have elected to pay the interest for such Interest Period in cash.]³

(b)    (i) At any time when an Event of Default (other than an Event of Default pursuant to Section 6.01(a) or Section 6.01(e)) exists (whether at the stated maturity, by acceleration or otherwise), upon the election of the Required Lenders, or (ii) at any time when an Event of Default pursuant to Section 6.01(a) or Section 6.01(e) (whether at the stated maturity, by acceleration or otherwise) exists, as applicable, all outstanding amounts shall bear interest at a rate per annum that is (x) in the case of principal, the rate that would otherwise be applicable thereto plus 2.00%, (y) in the case of any interest (and premium, if any), to the extent permitted by applicable law, the then-effective rate plus 2.00% and (z) in the case of any amount not specified in subclause (x) or (y) above, a rate per annum equal to the rate per annum otherwise payable at such time on ABR Loans, plus 2.00%. Interest accruing at the rates set forth in this paragraph (b) shall be payable on demand.

(c)    Interest on each Loan shall accrue from and including the date on which such Loan is made to but excluding the date of any repayment thereof and shall be payable (i) on each Interest Payment Date, and (ii) on any prepayment (on the amount prepaid), at maturity (whether by acceleration or otherwise) and, after such maturity, on demand.

(d)    All computations of interest hereunder shall be calculated on the basis of a 360-day year for the actual days elapsed, except that interest computed by reference to the ABR at times when the ABR is based on the prime rate shall be computed on the basis of a year of 365 days (or 366 days in a leap year), and in each case shall be payable for the actual number of days elapsed (including the first day but excluding the last day).

(e)    The Administrative Agent, upon determining Adjusted LIBOR or ABR for any Interest Period, shall promptly notify the Borrower and the relevant Lenders thereof. Each such determination shall, absent clearly demonstrable error, be final and conclusive and binding on all parties hereto.  The Administrative Agent shall, upon the request of any Lender, provide the interest rate then in effect with respect to the applicable Loans.

(f)    Interest on Loans made by Lenders as of the Closing Date shall accrue from and after the Closing Date in accordance with the terms of this Agreement.

SECTION 2.07.    Interest Periods.  Notwithstanding anything to the contrary contained above, if any Interest Period would otherwise expire on a day that is not a Business Day, such Interest Period shall expire on the next succeeding Business Day; *provided* that if any Interest Period would otherwise expire (i) on a day that is not a Business Day but is a day of the month after which no further Business Day occurs in such month, such Interest Period shall expire on the next preceding Business Day and (ii) on a day that is after the Maturity Date, such Interest Period shall expire on the Maturity Date.

SECTION 2.08.    Increased Costs, Illegality, etc.

---

³ NTD: Mechanics under discussion.

Error! Unknown document property name.
WEIL:\97986321\6\45327.0007

(a)     In the event that:

(i)     the Administrative Agent or the Required Lenders shall have reasonably determined (which determination shall, absent clearly demonstrable error, be final and conclusive and binding upon all parties hereto) on any date for determining the LIBOR for any Interest Period that (A) deposits in the principal amounts of the Loans comprising such LIBOR Loan are not generally available in the relevant market or (B) by reason of any changes arising on or after the Closing Date affecting the interbank LIBOR market, adequate and fair means do not exist for ascertaining the applicable interest rate on the basis provided for in the definition of LIBOR; or

(ii)     a Change in Law occurring at any time after the Closing Date shall (A) impose, modify or deem applicable any reserve, special deposit, compulsory loan, insurance charge or similar requirement against assets of, deposits with or for the account of, or credit extended by, any Lender, (B) subject any Lender or the Administrative Agent to any Tax (other than (i) Indemnified Taxes or (ii) Excluded Taxes) on its loans, loan principal, commitments or other obligations, or its deposits, reserves, other liabilities or capital attributable thereto, or (C) impose on any Lender or the London interbank market any other condition, cost or expense (other than Taxes) affecting this Agreement or LIBOR Loans made by such Lender, which, in the case of <u>clause (A)</u>, <u>(B)</u> or <u>(C)</u> results in the cost to such Lender or the Administrative Agent of making, converting into, continuing or maintaining LIBOR Loans increasing by an amount or the amounts received or receivable by such Lender or the Administrative Agent hereunder with respect to the foregoing shall be reduced; or

(iii)     any Lender, shall have reasonably determined (which determination shall, absent clearly demonstrable error, be final and conclusive and binding upon all parties hereto), at any time, that the making or continuance of any LIBOR Loan has become unlawful as a result of compliance by such Lender in good faith with any Requirement of Law (or would conflict with any such Requirement of Law not having the force of law even though the failure to comply therewith would not be unlawful);

then, and in any such event, such Lenders (or the Administrative Agent, in the case of <u>clause (i)</u> or <u>(ii)(B)</u> above) shall within a reasonable time thereafter give written notice to the Borrower and to the Administrative Agent of such determination (which notice the Administrative Agent shall promptly transmit to each of the other Lenders). Thereafter (x) in the case of <u>clause (i)</u> above, LIBOR Loans shall no longer be available until such time as the Administrative Agent notifies the Borrower and the Lenders that the circumstances giving rise to such notice by the Administrative Agent no longer exist (which notice the Administrative Agent agrees to give at such time when such circumstances no longer exist), and any Notice of Borrowing given by the Borrower with respect to LIBOR Loans that have not yet been incurred shall be deemed rescinded by the Borrower, (y) in the case of <u>clause (ii)</u> above, the Borrower shall pay to such Lender or the Administrative Agent, promptly (but no later than ten days) after receipt of written demand therefor such additional amounts as shall be required to compensate such Lender or the Administrative Agent for such increased costs or reductions in amounts receivable hereunder (it being agreed that a written notice as to the additional amounts owed to such Lender or the Administrative Agent submitted to the Borrower by such Lender or the Administrative Agent shall, absent clearly demonstrable error, be final and conclusive and binding upon all parties hereto) and (z) in the case of <u>clause (iii)</u> above, the Borrower shall take one of the actions specified in <u>Section 2.08(b)</u> as promptly as possible and, in any event, within the time period required by applicable Requirements of Law.

(b)     At any time that any LIBOR Loan is affected by the circumstances described in <u>Section 2.08(a)(ii)</u> or <u>(iii)</u>, the Borrower may (and in the case of a LIBOR Loan affected pursuant to <u>Section 2.08(a)(iii)</u> shall) either (1) if the affected LIBOR Loan is then being made pursuant to a borrowing, cancel such borrowing by giving the Administrative Agent telephonic notice (confirmed promptly in writing) thereof on the same date that the Borrower was notified by a Lender pursuant to <u>Section 2.08(a)(ii)</u> or <u>(iii)</u> or (2) if the affected LIBOR Loan is then outstanding, upon at least three Business Days' notice to the

Error! Unknown document property name.
WEIL:\97986321\6\45327.0007

Administrative Agent, require the affected Lender to convert each such LIBOR Loan into an ABR Loan; *provided* that if more than one Lender is affected at any time, then all affected Lenders must be treated in the same manner pursuant to this Section 2.08(b).

(c)     If, after the Closing Date, any Change in Law relating to capital adequacy of any Lender or compliance by any Lender or its parent with any Change in Law relating to capital adequacy occurring after the Closing Date, has or would have the effect of reducing the rate of return on such Lender's or its parent's capital or assets as a consequence of such Lender's commitments or obligations hereunder to a level below that which such Lender or its parent could have achieved but for such Change in Law (taking into consideration such Lender's or its parent's policies with respect to capital adequacy), then from time to time, promptly (but in any event no later than ten days) after written demand by such Lender (with a copy to the Administrative Agent), the Borrower shall pay to such Lender such additional amount or amounts as will compensate such Lender or its parent for such reduction, it being understood and agreed, however, that a Lender shall not be entitled to such compensation as a result of such Lender's compliance with, or pursuant to any request or directive to comply with, any applicable Requirement of Law as in effect on the Closing Date.  Each Lender, upon determining in good faith that any additional amounts will be payable pursuant to this Section 2.08(c), will give prompt written notice thereof to the Borrower, although the failure to give any such notice shall not, subject to Section 2.11, release or diminish the Borrower's obligations to pay additional amounts pursuant to this Section 2.08(c) upon receipt of such notice.

SECTION 2.09.     Compensation.  If (a) any payment of principal of any Loan is made by the Borrower to or for the account of a Lender other than on the last day of the Interest Period for such Loan as a result of a payment pursuant to Section 2.12, as a result of acceleration of the maturity of the Loans pursuant to Article VI or for any other reason, (b) there occurs any failure to borrow, convert, continue or prepay any LIBOR Loan on the date specified in any notice delivered pursuant hereto or (c) there occurs any assignment of any LIBOR Loan other than on the last day of the Interest Period applicable thereto as a result of a request by the Borrower pursuant to Section 8.07, the Borrower shall, after receipt of a written request by such Lender, pay to the Administrative Agent for the account of such Lender any amounts required to compensate such Lender for any additional losses, costs or expenses that such Lender may reasonably incur as a result of such payment, or failure to prepay, including any loss, cost or expense (excluding loss of anticipated profits) actually incurred by reason of the liquidation or reemployment of deposits or other funds acquired by any Lender to fund or maintain such Loan.  A certificate of any Lender setting forth any amount that such Lender is entitled to receive pursuant to this Section 2.09 shall be delivered to the Borrower and shall be conclusive absent manifest error.  The Borrower shall pay such Lender the amount shown as due on such certificate within ten days after receipt thereof, unless such amount is due on an earlier date in accordance with Section 2.12(c).

SECTION 2.10.     Change of Lending Office.  Each Lender agrees that, upon the occurrence of any event giving rise to the operation of Section 2.08(a)(ii), 2.08(a)(iii), 2.08(c) or 2.15 with respect to such Lender, it will, if requested by the Borrower use reasonable efforts  (subject to overall policy considerations of such Lender) to designate another lending office for any Loans affected by such event; *provided* that such designation does not cause such Lender or its lending office to suffer any economic, legal or regulatory disadvantage, with the object of avoiding the consequence of the event giving rise to the operation of any such Section.  Nothing in this Section 2.10 shall affect or postpone any of the obligations of the Borrower or the right of any Lender provided in Section 2.08 or 2.15.

SECTION 2.11.     Notice of Certain Costs.  Notwithstanding anything in this Agreement to the contrary, to the extent any notice required by Section 2.08 or 2.09 is given by any Lender more than 270 days after such Lender has knowledge (or should have had knowledge) of the occurrence of the event giving rise to the additional cost, reduction in amounts, loss, tax or other additional amounts described in such Sections, such Lender shall not be entitled to compensation under Section 2.08 or 2.09, as the case may be, for any such amounts incurred or accruing prior to the 271st day prior to the giving of such notice to the Borrower; *provided* that if a Change in Law that gives rise to such additional amounts is retroactive, then the 270-day period referred to above shall be extended to include the period of retroactive effect thereof.

Error! Unknown document property name.
WEIL:\97986321\6\45327.0007

SECTION 2.12.    Voluntary Prepayments.

(a)    The Borrower shall have the right at any time and from time to time to prepay any Loan in whole or in part, without premium or penalty, in an aggregate principal amount that is an integral multiple of $500,000 and not less than $1,000,000 or, if less, the amount outstanding, upon prior notice to the Administrative Agent by telephone (confirmed by telecopy), not less than three Business Days prior to the date of prepayment, which notice shall be irrevocable except to the extent provided below in Section 2.12(b). Each such notice shall be signed by an Authorized Officer of the Borrower and shall specify the date and amount of such prepayment and the Type(s) of Loans to be prepaid and, if LIBOR Loans are to be prepaid, the Interest Period(s) of such Loans.  The Administrative Agent will promptly notify each applicable Lender of its receipt of each such notice, and of the amount of such Lender's pro rata share of such prepayment. Each prepayment of Loans under this Section 2.12(a) shall be allocated to any Class of Loans outstanding as directed by the Borrower and shall be applied pro rata to the Lenders within each Class, based upon the outstanding principal amounts owing to each such Lender under each such Class of Loans.

(b)    Notwithstanding anything to the contrary contained in this Agreement, the Borrower may rescind any notice of prepayment made under Section 2.12(a) by notice to the Administrative Agent a reasonable time prior to the specified effective time of such prepayment if such prepayment would have resulted from a refinancing of all or any portion of the Loans, which refinancing shall not be consummated or shall otherwise be delayed.

(c)    All prepayments under this Section 2.12 shall be accompanied by all accrued interest thereon, together with, in the case of any such prepayment of a LIBOR Loan on a date other than the last day of an Interest Period therefor, any amounts owing in respect of such LIBOR Loan pursuant to Section 2.09.

SECTION 2.13.    Mandatory Prepayments.

(a)    Asset Sales.

(i)    Subject in all respects to Section 2.13(d), if the Borrower and its Restricted Subsidiaries have received Net Proceeds from one or more Asset Sales (including, for the avoidance of doubt, Net Proceeds of a Mexico Liquidity Event (including those Net Proceeds of a Mexico Liquidity Event received from the Closing Date Unrestricted Subsidiary pursuant to Section 5.33)), Hedge Unwind Events, Extraordinary Receipt Events or Casualty Events, not later than the third Business Day following the date of receipt of any such Net Proceeds, an amount equal to 100% of such Net Proceeds shall be applied as a mandatory prepayment of the Loans in accordance with Section 2.13(e); provided, that (A)(1) with respect to Hedge Unwind Events, until the aggregate amount of Hedge Unwind Proceeds received from one or more Hedge Unwind Events exceeds $5,000,000 in any fiscal year, no such prepayment shall be required during such fiscal year, (2) with respect to Asset Sales of assets constituting Proved Developed Producing Reserves, Proved Developed Non-Producing Reserves and/or related infrastructure assets (other than Mexico Liquidity Events) (any such Asset Sale, a "Specified Asset Sale"), until the aggregate amount of Net Proceeds received from one or more such Specified Asset Sales exceeds $15,000,000 in any fiscal year, no such prepayment shall be required during such fiscal year and any such prepayment shall only be required with Net Proceeds in excess of such threshold, (3) with respect to any Asset Sale (other than a Specified Asset Sale or a Mexico Liquidity Event), until the aggregate amount of Net Proceeds received from one or more of such Asset Sales exceeds $50,000,000 on a cumulative basis calculated from the Closing Date, no such prepayment shall be required and any such prepayment shall only be required with Net Proceeds in excess of such threshold and (4) with respect to any Extraordinary Receipt Event or Casualty Event, until the aggregate amount of Extraordinary Receipts and/or Net Proceeds of a Casualty Event received from one or more Extraordinary Receipt Events and/or Casualty Events exceeds $10,000,000 in any fiscal year, no such prepayment shall be required during such fiscal year and any such prepayment shall only be required

53

Error! Unknown document property name.
WEIL:\97986321\6\45327.0007

Debtors' Exhibit No. 30
Page 61 of 137

with Net Proceeds in excess of such threshold and (B) at the Borrower's election and so long as no Event of Default has occurred and is continuing (1) following the receipt of any Net Proceeds described in the foregoing clauses (A)(2) and (A)(3) in excess of the respective threshold described therein (such excess Net Proceeds, "Excess Asset Sale Proceeds"), the Borrower may reinvest up to 50% of such Excess Asset Sale Proceeds in additional Oil and Gas Properties and/or capital expenditures related to existing Oil and Gas Properties, in each case, within 365 days following the receipt thereof (the "Reinvestment Date") and the remaining 50% of such Excess Asset Sale Proceeds shall be required to be applied in accordance with Section 2.13(e); *provided*, that, to the extent any such Excess Asset Sale Proceeds were received from Specified Asset Sales, such Excess Asset Sale Proceeds shall be reinvested in additional Oil and Gas Properties constituting Proved Developed Producing Reserves and/or capital expenditures on existing Oil and Gas Properties solely to the extent constituting Proved Developed Producing Reserves, Proved Developed Non-Producing Reserves or Proved Developed Behind Pipe Reserves (unless otherwise agree by the Administrative Agent in its sole discretion) and (2) following the receipt of Net Proceeds from any Casualty Event in excess of the threshold described in clause (A)(4) above (such excess Net Proceeds, "Excess Casualty Event Proceeds"), the Borrower may reinvest up to 100% of such Excess Casualty Event Proceeds on or prior to the applicable Reinvestment Date in replacement and/or repair of the property subject to such Casualty Event; *provided*, that the aggregate amount of Excess Casualty Event Proceeds so reinvested shall not exceed the amount necessary to replace and/or repair the property subject to such Casualty Event and any remaining amount of such Excess Casualty Event Proceed shall be applied in accordance with Section 2.13(e). If on the applicable Reinvestment Date, any portion of such Net Proceeds has not been so reinvested, the Borrower will make a prepayment of the Loans, to the extent required above.

(ii)    Notwithstanding any other provisions of this Section 2.13(a) and other than with respect to a Mexico Liquidity Event, to the extent that any of or all the Net Proceeds of any Disposition by a Foreign Subsidiary ("Foreign Disposition") is prohibited or delayed by applicable local law from being repatriated to the United States, the portion of such Net Proceeds so affected will not be required to be applied to repay Loans at the times provided in this Section 2.13(a) but may be retained by the applicable Foreign Subsidiary, in each case, so long, but only so long, as the applicable local law will not permit repatriation to the United States (the Borrower hereby agreeing to cause the applicable Foreign Subsidiary to promptly take all actions reasonably required by the applicable local law to permit such repatriation), and once such repatriation of any of such affected Net Proceeds that, in each case, would otherwise be required to be used to make an offer of prepayment pursuant to Section 2.13(a), is permitted under the applicable local law, such repatriation will be immediately effected and such repatriated Net Proceeds will be promptly (and in any event not later than two Business Days after such repatriation) applied (net of additional taxes payable or reserved against as a result thereof) to the repayment of the Loans pursuant to this Section 2.13(a).

(iii)    All prepayments under this Section 2.13(a) shall be accompanied by all accrued interest thereon, together with, in the case of any such prepayment of a LIBOR Loan on a date other than the last day of an Interest Period therefor, any amounts owing in respect of such LIBOR Loan pursuant to Section 2.09.

(b)    Debt/Equity Incurrence. (i) Subject to Section 2.13(b)(ii) and Section 2.13(d), on each occasion that a Debt/Equity Incurrence Prepayment Event occurs, the Borrower shall, within one Business Day after the receipt of Net Proceeds therefrom, prepay, in accordance with Section 2.13(d), a principal amount of Loans in an amount equal to 100% of the Net Proceeds from such Debt/Equity Incurrence Prepayment Event.

(ii)    Notwithstanding any other provisions of this Section 2.13(b), no prepayment shall be required pursuant to this Section 2.13(b) to the extent that such prepayment would violate applicable Law.

Error! Unknown document property name.
WEIL:\97986321\6\45327.0007

(iii)     All prepayments under this Section 2.13(b) shall be accompanied by all accrued interest thereon, together with, in the case of any such prepayment of a LIBOR Loan on a date other than the last day of an Interest Period therefor, any amounts owing in respect of such LIBOR Loan pursuant to Section 2.09.

(c)     Application of Mandatory Prepayments.  Each prepayment of Loans required by this Section 2.13 shall be allocated to any Class of Loans outstanding as directed by the Borrower (*provided* that any prepayment of any Class of Loans shall be accompanied by at least a ratable payment of Loans made on the Closing Date and shall be applied pro rata to Lenders within each Class, based upon the outstanding principal amounts owing to each such Lender under each such Class of Loans; *provided*, that any Lender may elect, by written notice to the Administrative Agent at least one Business Day prior to the prepayment due date, to decline all or a portion of any prepayment of its Loans (other than a mandatory prepayment under Section 2.13(b) solely to the extent such prepayment represents a refinancing of all of the Obligations, which may not be declined), in which case the aggregate amount of the prepayment that would have been applied to prepay Loans of any Class but was so declined shall be retained by the Borrower.

(d)     Discharge of First-Priority Lien Obligations.  Notwithstanding anything to the contrary set forth in any other clause in this Section 2.13, until the Discharge of First-Priority Lien Obligations shall have occurred, no mandatory prepayments of Loans that would have otherwise been required under this Section 2.13 shall be required to be made except to the extent from any proceeds of Refinancing Indebtedness that constitutes a Debt/Equity Incurrence Prepayment Event.

(e)     Notice of Mandatory Prepayments.  The Borrower shall notify the Administrative Agent in writing of any mandatory prepayment of Loans required to be made pursuant to Sections 2.13(a) or (b) above at least two Business Days prior to the date of such prepayment.  Each such notice shall specify the date of such prepayment and provide a reasonably detailed calculation of the amount of such prepayment, the Type(s) of Loans to be prepaid and, if LIBOR Loans are to be prepaid, the Interest Period(s) of such Loans.

SECTION 2.14.     Method and Place of Payment.

(a)     Except as otherwise specifically provided herein, all payments under this Agreement shall be made by the Borrower, without set-off, counterclaim or deduction of any kind, to the Administrative Agent for the ratable account of the Lenders entitled thereto not later than 12:00 Noon (New York City time) on the date when due and shall be made in immediately available funds at such office as the Administrative Agent shall specify for such purpose by notice to the Borrower, it being understood that written or facsimile notice by the Borrower to the Administrative Agent to make a payment from the funds attributed to the Borrower in an account of the Administrative Agent shall constitute the making of such payment to the extent of such funds held in such account.  All payments under each Loan Document (whether of principal, interest or otherwise) shall be made in U.S. Dollars.  The Administrative Agent will thereafter cause to be promptly distributed like funds relating to the payment of principal or interest or fees ratably to the Lenders entitled thereto.

(b)     Any payments under this Agreement that are made later than 2:00 p.m. (New York City time) shall be deemed to have been made on the next succeeding Business Day.  Except as otherwise provided herein, whenever any payment to be made hereunder shall be stated to be due on a day that is not a Business Day, the due date thereof shall be extended to the next succeeding Business Day and, with respect to payments of principal, interest shall be payable during such extension at the applicable rate in effect immediately prior to such extension.

SECTION 2.15.     Net Payments.

(a)     Any and all payments made by or on behalf of the Borrower or any Guarantor under this Agreement or any other Loan Document shall be made free and clear of, and without deduction or

55

Error! Unknown document property name.
WEIL:\97986321\6\45327.0007

Debtors' Exhibit No. 30
Page 63 of 137

withholding for or on account of, any Taxes; *provided* that if the Borrower, any Guarantor or the Administrative Agent or any other applicable withholding agent shall be required by applicable Requirements of Law to deduct or withhold any Taxes from such payments, then (i) the applicable withholding agent shall make such deductions or withholdings as are reasonably determined by the applicable withholding agent to be required by any applicable Requirement of Law, (ii) the applicable withholding agent shall timely pay the full amount deducted or withheld to the relevant Governmental Authority in accordance with applicable Requirements of Law, and (iii) to the extent withholding or deduction is required to be made on account of Indemnified Taxes, the sum payable by the Borrower or such Guarantor shall be increased as necessary so that after all required deductions and withholdings have been made (including deductions or withholdings applicable to additional sums payable under this Section 2.15) the Administrative Agent, the Collateral Agent or the applicable Lender, as the case may be, receives an amount equal to the sum it would have received had no such deductions or withholdings been made.  As soon as practicable after any payment of Taxes by any Credit Party to a Governmental Authority as provided in this Section 2.15, the Borrower shall deliver to the Administrative Agent the original or a certified copy of a receipt issued by such Governmental Authority evidencing such payment, a copy of any return reporting such payment or other evidence reasonably satisfactory to the Administrative Agent or the applicable Lenders, as the case may be.

(b)     The Borrower shall timely pay to the relevant Governmental Authority in accordance with applicable Requirements of Law, or at the option of the Administrative Agent timely reimburse it for, any Other Taxes (whether or not such Other Taxes were correctly or legally imposed or asserted by the relevant Governmental Authority).

(c)     The Borrower shall indemnify and hold harmless the Administrative Agent, the Collateral Agent and each Lender within 10 Business Days after written demand therefor, for the full amount of any Indemnified Taxes paid or payable by, or required to be withheld or deducted from a payment to, imposed on the Administrative Agent, the Collateral Agent or such Lender, as the case may be (including Indemnified Taxes imposed or asserted on or attributable to amounts payable under this Section 2.15), and any reasonable expenses arising therefrom or with respect thereto, whether or not such Indemnified Taxes were correctly or legally imposed or asserted by the relevant Governmental Authority.  A certificate as to the amount of such payment or liability delivered to the Borrower (and the Administrative Agent, if sent by a Lender) by a Lender, the Administrative Agent or the Collateral Agent (as applicable) on its own behalf or on behalf of a Lender shall be conclusive absent manifest error.

(d)     Each Lender shall deliver to the Borrower and the Administrative Agent, at such time or times reasonably requested by the Borrower or the Administrative Agent, such properly completed and executed documentation prescribed by applicable law and such other reasonably requested information as will permit the Borrower or the Administrative Agent, as the case may be, to determine (A) whether or not any payments made hereunder or under any other Loan Document are subject to Taxes, (B) if applicable, the required rate of withholding or deduction, and (C) such Lender's entitlement to any available exemption from, or reduction of, applicable Taxes in respect of any payments to be made to such Lender by any Credit Party pursuant to any Loan Document or otherwise to establish such Lender's status for withholding tax purposes in the applicable jurisdiction.  In addition, any Lender, if reasonably requested by the Borrower or the Administrative Agent, shall deliver such other documentation prescribed by applicable law or reasonably requested by the Borrower or the Administrative Agent as will enable the Borrower or the Administrative Agent to determine whether or not such Lender is subject to backup withholding or information reporting requirements.

(e)     Without limiting the generality of Section 2.15(d), each Non-U.S. Lender with respect to any Loan made to the Borrower shall, to the extent it is legally entitled to do so:

(i)     deliver to the Borrower and the Administrative Agent (in such number of copies as shall be requested by the recipient), on or prior to the date on which such Lender becomes a Lender under this Agreement, properly completed and duly executed copies of (A) in the case of a Non-

Error! Unknown document property name.
WEIL:\97986321\6\45327.0007

U.S. Lender claiming exemption from U.S. federal withholding tax under Section 871(h) or 881(c) of the Code with respect to payments of "<u>portfolio interest</u>", United States Internal Revenue Service ("<u>IRS</u>") Form W-8BEN or IRS Form W-8BEN-E, as applicable, (or any applicable successor form) (together with a certificate substantially in the form of <u>Exhibit D-1</u>, <u>Exhibit D-2</u>, <u>Exhibit D-3</u> or <u>Exhibit D-4</u> hereto, as applicable, (a "<u>Non-Bank Tax Certificate</u>"), representing that such Non-U.S. Lender is not a bank for purposes of Section 881(c)(3)(A) of the Code, is not a "<u>10 percent shareholder</u>" (within the meaning of Section 871(h)(3)(B) of the Code) of the Borrower, is not a CFC described in Section 881(c)(3)(C) of the Code, (B) IRS Form W-8BEN or IRS Form W-8BEN-E, as applicable, or IRS Form W-8ECI (or any applicable successor form), in each case properly completed and duly executed by such Non-U.S. Lender claiming complete exemption from, or reduced rate of, U.S. federal withholding tax on payments by the Borrower under this Agreement, (C) IRS Form W-8IMY (or any applicable successor form) and all necessary attachments (including the forms described in <u>clauses (A)</u> and <u>(B)</u> above; *provided* that if the Non-U.S. Lender is a partnership and not a participating Lender, and one or more of the partners is claiming portfolio interest treatment, the Non-Bank Tax Certificate may be provided by such Non-U.S. Lender on behalf of such partners) or (D) any other form prescribed by applicable law as a basis for claiming exemption from or a reduction in U.S. federal withholding tax duly completed together with such supplementary documentation as may be prescribed by applicable law to permit the Borrower or the Administrative Agent to determine the withholding or deduction required to be made; and

(ii)     deliver to the Borrower and the Administrative Agent properly completed and duly executed copies of any such form or certification (or any applicable successor form) promptly after such form or certification expires or becomes obsolete or invalid, after the occurrence of any event requiring a material change in the most recent form previously delivered by it to the Borrower and the Administrative Agent, and from time to time thereafter if reasonably requested by the Borrower or the Administrative Agent or promptly notify the Borrower and the Administrative Agent in writing of such Non-U.S. Lender's legal inability to do so.

Each Person that shall become a Participant pursuant to <u>Section 8.06</u> or a Lender pursuant to <u>Section 8.06</u> shall, upon the effectiveness of the related transfer, be required to provide all the forms and statements required pursuant to this <u>Section 2.15(e)</u>; *provided* that in the case of a Participant such Participant shall furnish all such required forms and statements to the Person from which the related participation shall have been purchased.

Notwithstanding anything to the contrary in <u>Section 2.15(d)</u> and this <u>Section 2.15(e)</u>, any form and supplementary documentation (other than such documentation set forth in paragraphs (A), (B) and (C) of this <u>Section 2.15(e)</u>) shall not be required if in the Lender's reasonable judgment such completion, execution or submission would subject such Lender to any material unreimbursed cost or expense or would materially prejudice the legal or commercial position of such Lender.

In addition, to the extent it is legally eligible to do so, each Agent shall deliver to the Borrower (x)(I) prior to the date on which the first payment by the Borrower is due hereunder or (II) prior to the first date on or after the date on which such Agent becomes a successor Agent pursuant to Section 7.09 on which payment by the Borrower is due hereunder, as applicable, (A) properly completed and duly executed copies of IRS Form W-9 certifying its exemption from U.S. Federal backup withholding or (B) properly completed and duly executed applicable copies of IRS Form W-8 certifying its non-U.S. status and its entitlement to any applicable treaty benefits, and (y) on or before the date on which any such previously delivered documentation expires or becomes obsolete or invalid, after the occurrence of any event requiring a change in the most recent documentation previously delivered by it to the Borrower, and from time to time if reasonably requested by the Borrower, properly completed and duly executed copies of such documentation.

(f)     If any Lender, the Administrative Agent or the Collateral Agent, as applicable, determines, in its sole discretion exercised in good faith, that it has received a refund of an Indemnified Tax for which it has been indemnified pursuant to this <u>Section 2.15</u> (including by the payment of additional

Error! Unknown document property name.
WEIL:\97986321\6\45327.0007

amounts pursuant to this <u>Section 2.15</u>), then the Lender, the Administrative Agent or the Collateral Agent, as the case may be, shall reimburse the Borrower or such Guarantor for such amount (but only to the extent of indemnity payments made under this Section with respect to the Taxes giving rise to such refund) (net of all reasonable out-of-pocket expenses (including Taxes) of such Lender, the Administrative Agent or the Collateral Agent, as the case may be, and without interest other than any interest received thereon from the relevant Governmental Authority with respect to such refund); *provided* that the Borrower or such Guarantor, upon the request of the Lender, the Administrative Agent or the Collateral Agent, agrees to repay the amount paid over to the Borrower or such Guarantor (<u>plus</u> any penalties, interest or other charges imposed by the relevant Governmental Authority) to the Lender, the Administrative Agent or the Collateral Agent in the event the Lender, the Administrative Agent or the Collateral Agent is required to repay such refund to such Governmental Authority.  Notwithstanding anything to the contrary in this paragraph (f), in no event will any Lender or Agent be required to pay any amount to the Borrower or any Guarantor pursuant to this paragraph (f), the payment of which would place such Lender or Agent in a less favorable net after-Tax position than such Lender or Agent would have been in if the Tax subject to indemnification and giving rise to such refund had not been deducted, withheld or otherwise imposed and the indemnification payments or additional amounts with respect to such Tax had never been paid.  None of the Lender, the Administrative Agent or the Collateral Agent shall be obliged to make available its tax returns (or any other information relating to its taxes that it deems confidential) to any Credit Party in connection with this <u>clause (f)</u> or any other provision of this <u>Section 2.15</u>.

(g)     Each U.S. Lender shall deliver to the Borrower and the Administrative Agent properly completed and duly executed copies of IRS Forms W-9 (or substitute or successor form), certifying that such U.S. Lender is exempt from United States federal backup withholding (i) on or prior to the Closing Date (or on or prior to the date it becomes a party to this Agreement), (ii) on or before the date that such form expires or becomes obsolete or invalid, (iii) after the occurrence of a change in the U.S. Lender's circumstances requiring a change in the most recent form previously delivered by it to the Borrower and the Administrative Agent, and (iv) from time to time thereafter if reasonably requested by the Borrower or the Administrative Agent.

(h)     If a payment made to any Lender or any Agent under this Agreement or any other Loan Document would be subject to U.S. federal withholding tax imposed by FATCA if such Lender or such Agent were to fail to comply with the applicable reporting requirements of FATCA (including those contained in Section 1471(b) or 1472(b) of the Code, as applicable), such Lender or such Agent shall deliver to the Borrower and the Administrative Agent at the time or times prescribed by law and at such time or times reasonably requested by the Borrower or the Administrative Agent such documentation prescribed by applicable law (including as prescribed by Section 1471(b)(3)(C)(i) of the Code) and such additional documentation reasonably requested by the Borrower or the Administrative Agent as may be necessary for the Borrower and the Administrative Agent to comply with their obligations under FATCA, to determine whether such Lender has or has not complied with such Lender's obligations under FATCA or to determine the amount, if any, to deduct and withhold from such payment.     Solely for purposes of this <u>Section 2.15(h)</u>, "<u>FATCA</u>" shall include any amendments made to FATCA after the date of this Agreement.

(i)     Each Lender shall severally indemnify the Administrative Agent, within 10 days after demand therefor, for (i) any Indemnified Taxes attributable to such Lender (but only to the extent that the Borrower has not already indemnified the Administrative Agent for such Indemnified Taxes and without limiting the obligation of the Borrower to do so), (ii) any Taxes attributable to such lender's failure to comply with the provisions of <u>Section 8.06(c)</u> relating to the maintenance of a Participant Register and (iii) any Excluded Taxes attributable to such lender, in each case, that are payable or paid by the Administrative Agent in connection with any Loan Document, and any reasonable expenses arising therefrom or with respect thereto, whether or not such Taxes were correctly or legally imposed or asserted by the relevant Governmental Authority. A certificate as to the amount of such payment or liability delivered to any Lender by the Administrative Agent shall be conclusive absent manifest error. Each Lender hereby authorizes the Administrative Agent to set off and apply any and all amounts at any time owing to such lender under any

Error! Unknown document property name.
WEIL:\97986321\6\45327.0007

Loan Document or otherwise payable by the Administrative Agent to the Lender from any other source against any amount due to the Administrative Agent under this paragraph (i).

(j)     For the avoidance of doubt, for purposes of this Section 2.15, the term "applicable law" or "Requirements of Law" includes FATCA.

(k)     The agreements in this Section 2.15 shall survive the termination of this Agreement and the payment of the Loans and all other amounts payable hereunder.

SECTION 2.16.     Limit on Rate of Interest.

(a)     No Payment Shall Exceed Lawful Rate.   Notwithstanding any other term of this Agreement, the Borrower shall not be obliged to pay any interest or other amounts under or in connection with this Agreement in excess of the amount or rate permitted under or consistent with any applicable law, rule or regulation.

(b)     Payment at Highest Lawful Rate.  If the Borrower is not obliged to make a payment which it would otherwise be required to make, as a result of Section 2.16(a), the Borrower shall make such payment to the maximum extent permitted by or consistent with applicable laws, rules and regulations.

(c)     Adjustment if Any Payment Exceeds Lawful Rate. If any provision of this Agreement or any of the other Loan Documents would obligate the Borrower to make any payment of interest or other amount payable to any Lender in an amount or calculated at a rate which would be prohibited by any applicable law, rule or regulation, then notwithstanding such provision, such amount or rate shall be deemed to have been adjusted with retroactive effect to the maximum amount or rate of interest, as the case may be, as would not be so prohibited by law, such adjustment to be effected, to the extent necessary, by reducing the amount or rate of interest required to be paid by the Borrower to the affected Lender under Section 2.06.

Notwithstanding the foregoing, and after giving effect to all adjustments contemplated thereby, if any Lender shall have received from the Borrower an amount in excess of the maximum permitted by any applicable law, rule or regulation, then the Borrower shall be entitled, by notice in writing to the Administrative Agent to obtain reimbursement from that Lender in an amount equal to such excess, and pending such reimbursement, such amount shall be deemed to be an amount payable by that Lender to the Borrower.

SECTION 2.17.     Pro Rata Sharing.   Subject in all respect to the provisions of the Intercreditor Agreement, except as expressly set forth herein, whenever any payment received by the Administrative Agent under this Agreement is insufficient to pay in full all amounts then due and payable to the Administrative Agent and the Lenders under this Agreement, such payment shall be distributed by the Administrative Agent and applied by the Administrative Agent and the Lenders in the following order: first, to the payment of fees and expenses due and payable to the Administrative Agent and the Collateral Agent and its Affiliates under and in connection with this Agreement, except any amounts payable to any such Person in its role as Lender, as provided in clause "second" of this Section 2.17; second, to the payment of all expenses due and payable under Section 8.05, ratably among the Lenders in accordance with the aggregate amount of such payments owed to each Lender; third, to the payment of interest and amounts under Sections 2.08 and 2.15, if any, then due and payable on the Loans ratably among the Lenders in accordance with the aggregate amount of interest owed to each Lender; and fourth, to the payment of the principal amount of the Loans that is then due and payable, ratably among the Lenders in accordance with the aggregate principal amount owed to each such Lender.

SECTION 2.18.     Adjustments; Set-off.

(a)     If any Lender shall, by exercising any right of set-off or counterclaim or otherwise, obtain payment in respect of any principal of or interest on any of its Loans resulting in such Lender receiving payment of a greater proportion of the aggregate amount of its Loans and accrued interest thereon than the

Error! Unknown document property name.
WEIL:\97986321\6\45327.0007

proportion received by any other Lender entitled to such payment, then the Lender receiving such greater proportion shall purchase for cash at face value participations in the Loans of other Lenders to the extent necessary so that the benefit of all such payments shall be shared by the Lenders entitled thereto ratably in accordance with the aggregate amount of principal of and accrued interest on their respective Loans; *provided* that (i) if any such participations are purchased and all or any portion of the payment giving rise thereto is recovered, such participations shall be rescinded and the purchase price restored to the extent of such recovery, without interest, and (ii) the provisions of this <u>clause (a)</u> shall not be construed to apply to any payment made by the Borrower pursuant to and in accordance with the terms of this Agreement, or any payment obtained by a Lender as consideration for the assignment of or sale of a participation in any of its Loans to any assignee or participant.   The Borrower consents to the foregoing and agrees, to the extent it may effectively do so under applicable law, that any Lender acquiring a participation pursuant to the foregoing arrangements may exercise against the Borrower rights of set-off and counterclaim with respect to such participation as fully as if such Lender were a direct creditor of the Borrower in the amount of such participation.

(b)     After the occurrence and during the continuance of an Event of Default, in addition to any rights and remedies of the Lenders provided by law, each Lender shall have the right, without prior notice to the Borrower, any such notice being expressly waived by the Borrower to the extent permitted by applicable law, upon any amount becoming due and payable by the Borrower hereunder (whether at the stated maturity, by acceleration or otherwise) to set-off and appropriate and apply against such amount any and all deposits (general or special, time or demand, provisional or final), in any currency, and any other credits, indebtedness or claims, in any currency, in each case whether direct or indirect, absolute or contingent, matured or unmatured, at any time held or owing by such Lender or any branch or agency thereof to or for the credit or the account of the Borrower or any Subsidiary.   Each Lender agrees promptly to notify the Borrower and the Administrative Agent after any such set-off and application made by such Lender; *provided* that the failure to give such notice shall not affect the validity of such set-off and application.

SECTION 2.19.     Interest Elections.  The Loans shall have an initial Interest Period as specified in the applicable Notice of Borrowing.  Thereafter, the Borrower may elect Interest Periods therefor, all as provided in this Section 2.19.  The Borrower may elect different options with respect to different portions of the affected Borrowing, in which case each such portion shall be allocated ratably among the Lenders holding the Loans comprising such Borrowing, and the Loans comprising each such portion shall be considered a separate Borrowing.

(a)     To make an election pursuant to this Section 2.19, the Borrower shall notify the Administrative Agent of such election (as provided in Section 8.02) in a written Interest Period Election Request in the form set forth in Exhibit C and signed by the Borrower.  Such Interest Period Election Request shall be delivered to the Administrative Agent by telephone not later than 11:00 a.m., New York City time, three Business Days prior to the end of the then applicable Interest Period.  Each such Interest Period Election Request shall be irrevocable.

(b)     Each Interest Period Election Request shall specify the following information:

(i)     the Borrowing to which such Interest Period Election Request applies and, if different options are being elected with respect to different portions thereof, the portions thereof to be allocated to each resulting Borrowing (in which case the information to be specified pursuant to clauses (iii) and (iv) below shall be specified for each resulting Borrowing);

(ii)     the effective date of the election made pursuant to such Interest Period Election Request, which shall be a Business Day;

(iii)     whether the resulting Borrowing is to be an ABR Borrowing or a LIBOR Borrowing;

60

Error! Unknown document property name.
WEIL:\97986321\6\45327.0007

Debtors' Exhibit No. 30
Page 68 of 137

(iv)    if the resulting Borrowing is a LIBOR Borrowing, the Interest Period to be applicable thereto after giving effect to such election, which shall be a period contemplated by the definition of the term "Interest Period"; and

(v)    no Default or Event of Default shall have occurred and be continuing as of the date such Interest Period Election Request is delivered or as of the effective date of such election.

If any such Interest Period Election Request requests a LIBOR Borrowing but does not specify an Interest Period, then the Borrower shall be deemed to have selected an Interest Period of one month's duration.

(c)    Promptly following receipt of an Interest Period Election Request, the Administrative Agent shall advise each Lender to which such Interest Period Election Request relates of the details thereof and of such Lender's portion of each resulting Loan.

(d)    If the Borrower fails to deliver a timely Interest Period Election Request with respect to a LIBOR Borrowing prior to the end of the Interest Period applicable thereto, then, unless such Borrowing is repaid as provided herein, at the end of such Interest Period such Borrowing shall be converted to an ABR Borrowing.  Notwithstanding any contrary provision hereof, if an Event of Default has occurred and is continuing and the Administrative Agent, at the written request (including a request through electronic means) of the Required Lenders, so notifies the Borrower, then, so long as an Event of Default is continuing, (i) no outstanding Borrowing may be converted to or continued as a LIBOR Borrowing and (ii) unless repaid, each LIBOR Borrowing shall be converted to an ABR Borrowing at the end of the Interest Period applicable thereto.

(e)    After giving effect to all Borrowings, all conversions of Loans from one Type to the other and all continuations of Loans as the same type, there shall be not more than three Interest Periods in effect with respect to the Loans.

SECTION 2.20.    Incremental Commitments.

(a)    The Borrower may, by written notice to the Administrative Agent from time to time after the Closing Date, add one or more Incremental Commitments in respect of one or more Classes of term loans or increase the Initial Loans in an aggregate outstanding principal amount not to exceed the Incremental Cap (the Incremental Commitments together with the term loans, the "Incremental Facility"); provided that (i) after giving effect to the relevant Incremental Facility and the use of proceeds thereof on a pro forma basis, (x) the aggregate amount of cash and Cash Equivalents of the Borrower and its Restricted Subsidiaries shall be less than $80,000,000 (or, in good faith determination of the Board of Directors of the Borrower, are anticipated to be less than $80,000,000 as of the proposed date of incurrence of such Incremental Facility) or (y) the Board of Directors of the Borrower, in its good faith judgment, determines that the incurrence of such Incremental Facility is in the best interest of the Borrower and its Restricted Subsidiaries, (ii) no Event of Default is continuing or would exist immediately after giving effect to such Incremental Commitment and the use of proceeds therefrom, (iii) the representations and warranties contained in this Agreement and in the other Loan Documents shall be true and correct in all material respects (or, in the case of any representations or warranties that contain a materiality qualification, in all respects) immediately prior to, and after giving effect to, the incurrence of the Incremental Commitment and (iv) all fees and expenses owing to the Administrative Agent and the Incremental Lenders in respect of such Incremental Facility shall have been paid.  The Incremental Commitments will be provided by Incremental Lenders (which may include any existing Lender and any additional lenders, subject to the Administrative Agent's consent to the extent such consent would be required in connection with an Assignment and Acceptance under Section 8.06(b), and such additional lenders will become Lenders under this Agreement through providing the Incremental Commitments) willing to provide such Incremental Commitments in their own discretion.  Any such notice shall set forth (x) the amount of the Incremental Commitments being requested, (y) the date on which such Incremental Commitments or term loans are requested to become effective (any such date, an "Incremental Effective Date") and (z) the interest rate, maturity and other terms being requested with respect thereto (which shall comply with clause (b) below).

61

Error! Unknown document property name.
WEIL:\97986321\6\45327.0007

Debtors' Exhibit No. 30
Page 69 of 137

(b)    Subject to Section 2.20(c) below, the terms and conditions of any Incremental Commitments and Loans to be made thereunder shall be determined by the applicable Incremental Lenders and the Borrower and shall be as set forth in the applicable Incremental Facility Agreement; *provided* that:

(i)    the Weighted Average Life to Maturity of such Loans shall be no shorter than the Weighted Average Life to Maturity of the Loans, and the maturity date applicable to such Loans shall be no earlier than the Latest Maturity Date in effect at the time of incurrence of such Loans

(ii)    except as otherwise provided in this Section 2.20(b), the terms of any Incremental Facility (other than any terms which are applicable only after the Maturity Date of any then-existing tranche of Loans) must be substantially consistent with those applicable to any then-existing Loans (excluding as to interest rates, fees, floors, funding discounts, redemption or prepayment premiums and other pricing terms) or otherwise reasonably acceptable to the Required Lenders in their Permitted Business Judgment (it being understood that no consent of the Required Lenders shall be required for terms and conditions that are more restrictive than those applicable to the then-existing Loans to the extent that the Facility receives the benefit of such provisions);

(iii)    the Incremental Facility may provide for mandatory prepayments of the loans thereunder on a pro rata basis or less than pro rata basis with the then-existing Loans and the Borrower shall be permitted to voluntarily prepay any Class of Loans on a better than pro rata basis as compared to any other Class;

(iv)    the Incremental Facility shall have the same Guarantors as, and if secured, shall be secured on a pari passu or junior basis by the same Collateral securing the then-existing Loans;

(v)    [reserved]; and

(vi)    with respect to any Incremental Commitments in respect of any Incremental Facility that is secured by a pari passu Lien on the Collateral, the Effective Yield applicable to any such Incremental Commitments shall not be more than 0.50% higher than the Effective Yield on the then-existing Loans, unless the Effective Yield with respect to the then-existing Loans is increased by an amount equal to or greater than (A) the difference between the Effective Yield with respect to the Incremental Commitments and the corresponding Effective Yield on the then-existing Loans minus (B) 0.50% (the "MFN Adjustment").

(c)    any Incremental Commitment shall be effected by an Incremental Facility Agreement; *provided* that the Borrower shall have delivered to the Administrative Agent such legal opinions, board resolutions, secretary's certificates, officer's certificates and other customary documents as shall reasonably be requested by the Incremental Lenders in connection therewith.  The Administrative Agent shall promptly notify each Lender as to the effectiveness of each Incremental Facility Agreement.  Each Incremental Facility Agreement may, without the consent of any Lender, effect such amendments to this Agreement and the other Loan Documents as may be necessary or appropriate, in the opinion of the Administrative Agent, to give effect to the provisions of this Section 2.20.

(d)    Incremental Commitments shall become commitments under this Agreement pursuant to an Incremental Facility Agreement which may amend this Agreement and, as appropriate, the other Loan Documents, executed by the Borrower, each Lender agreeing to provide such commitment, if any, each Incremental Lender, if any, and the Administrative Agent.  The Borrower will use the proceeds of the Loans made pursuant to the Incremental Commitments for any purpose not prohibited by this Agreement.

(e)    Upon the effectiveness of an Incremental Commitment of any Incremental Lender, such Incremental Lender shall be deemed to be a "Lender" (and a Lender in respect of commitments and Loans of the applicable class) hereunder, and henceforth shall be entitled to all the rights of, and benefits accruing to,

62

Lenders (or Lenders in respect of Commitments and Loans of the applicable Class) hereunder and shall be bound by all agreements, acknowledgements and other obligations of Lenders (or Lenders in respect of Commitments and Loans of the applicable Class) hereunder and under the other Loan Documents.

(f)    This Section 2.20 shall supersede any provisions in Section 2.17 or 9.01 to the contrary.  For the avoidance of doubt, any provisions of this Section 2.20 may be amended with the consent of the Required Lenders, *provided* no such amendment shall require any Lender to provide any Incremental Commitment without such Lender's consent.

## ARTICLE III

### Representations and Warranties

In order to induce the Agents and the Lenders to enter into this Agreement and to make the Loans, the Borrower makes, on the Closing Date, the following representations and warranties to the Agents and the Lenders, all of which shall survive the execution and delivery of this Agreement and the making of the Loans.

SECTION 3.01.    Corporate Status.  Each of Holdings, the Borrower and each Subsidiary of the Borrower (a) is a duly organized and validly existing corporation or other entity in good standing (or, if applicable in a foreign jurisdiction, enjoys the equivalent status under the laws of such jurisdiction of organization outside the United States) under the laws of the jurisdiction of its organization and has the corporate or other organizational power and authority to own its property and assets and to transact its business as now conducted and (b) has duly qualified and is authorized to do business and is in good standing (if applicable) in all jurisdictions where it is required to be so qualified, except where the failure to be so qualified or in good standing would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect, and all such jurisdictions are set forth on Schedule 3.01.

SECTION 3.02.    Corporate Power and Authority; Enforceability; Security Interests.  Each Credit Party has the corporate or other organizational power and authority to execute, deliver and carry out the terms and provisions of the Loan Documents to which it is a party and has taken all necessary corporate or other organizational action to authorize the execution, delivery and performance of the Loan Documents to which it is a party.  Each Credit Party has duly executed and delivered each Loan Document to which it is a party and each such Loan Document constitutes the legal, valid and binding obligation of such Credit Party enforceable in accordance with its terms, subject to the effects of bankruptcy, insolvency, fraudulent conveyance, reorganization and other similar laws relating to or affecting creditors' rights generally and general principles of equity (whether considered in a proceeding in equity or law).

SECTION 3.03.    No Violation; Compliance with Laws.

(a)    None of the execution, delivery or performance by any Credit Party of the Loan Documents to which it is a party or the compliance with the terms and provisions thereof will (a) contravene any Requirement of Law in any material respect, (b) result in any material breach or material violation of any of the terms, covenants, conditions or provisions of, or constitute a default under, or result in the creation or imposition of (or the obligation to create or impose) any Lien upon any of the property or assets of such Credit Party or any of the Subsidiaries (other than Liens created under the Loan Documents and Liens permitted hereunder) pursuant to the terms of any Material Contract, indenture, loan agreement, lease agreement, mortgage, deed of trust, agreement or other material instrument to which such Credit Party or any of the Subsidiaries is a party or by which it or any of its property or assets is bound (any such term, covenant, condition or provision, a "Contractual Requirement") or (c) violate any provision of the certificate of incorporation, by-laws or other organizational documents of such Credit Party or any of the Subsidiaries.

(b)    Each of Holdings, the Borrower and its Subsidiaries is in compliance in all material respects with all Requirements of Law (it being understood, in the case of any statutes, regulations and orders

63

Error! Unknown document property name.
WEIL:\97986321\6\45327.0007

Debtors' Exhibit No. 30
Page 71 of 137

of, and all applicable restrictions imposed by, all Governmental Authorities that are specifically referred to in any other provision of this Agreement, the Credit Parties shall also be required to represent and/or comply with, as applicable, the express terms of such provision).

SECTION 3.04.    Litigation.  Except as set forth on Schedule 3.04, there are no actions, suits or proceedings, governmental investigations or arbitrations (including Environmental Claims collectively, "Adverse Proceedings") pending or, to the knowledge of the Borrower, threatened in writing against or affecting Holdings, the Borrower, any of its Subsidiaries or any of their respective properties that would reasonably be expected, individually or in the aggregate, to result in a Material Liability to Holdings, the Borrower or any of its Restricted Subsidiaries.

SECTION 3.05.    Margin Regulations. None of Holdings nor any of its Subsidiaries is engaged principally, or as one of its important activities, in the business of extending credit for the purpose of purchasing or carrying any "margin stock" (as defined in the Regulation U of the Board). No portion of the proceeds of the Loans has or will be used in any manner, whether directly or indirectly, that causes or would reasonably be expected to cause, such Loan or the application of such proceeds to violate Regulation T, Regulation U or Regulation X of the Board or any regulation thereof or to violate the Exchange Act.

SECTION 3.06.    Governmental Approvals.  The execution, delivery and performance of each Loan Document and the consummation of the other Transactions do not (or, in the case of each Subsidiary Guarantor, will not) require any consent or approval of, registration or filing with, or other action by, any Governmental Authority, except for (a) such as have been or will be prior to the Closing Date obtained or made and are or will be prior to the Closing Date in full force and effect, (b) filings and recordings in respect of the Liens created pursuant to the Security Documents and (c) such consents, approvals, registrations, filings or actions the failure of which to obtain or make would not reasonably be expected to have a Material Adverse Effect.

SECTION 3.07.    Investment Company Act.  No Credit Party is required to be registered as an "investment company" within the meaning of the Investment Company Act of 1940, as amended.

SECTION 3.08.    True and Complete Disclosure; Financial Condition.  (a) All written factual information (other than estimates and information of a general economic nature or general industry nature) (the "Information") concerning Holdings, the Borrower, its Subsidiaries, the Transactions and any other transactions contemplated hereby prepared by or on behalf of the foregoing or their representatives and made available to any Lenders or the Administrative Agent in connection with the Transactions or the other transactions contemplated hereby, when taken as a whole, was true and correct in all material respects as of the date such Information was furnished to the Lenders and as of the Closing Date and did not, taken as a whole, contain any untrue statement of a material fact as of any such date or omit to state a material fact necessary in order to make the statements contained therein, taken as a whole, not materially misleading in light of the circumstances under which such statements were  made.

(b)      The estimates and information of a general economic nature or general industry nature prepared by or on behalf of the Borrower or any of its representatives and that have been made available to any Lenders or the Administrative Agent in connection with the Transactions or the other transactions contemplated hereby (i) have been prepared in good faith based upon assumptions believed by the Borrower to be reasonable as of the date thereof, as of the date such estimates were furnished to the Lenders and as of the Closing Date, and (ii) as of the Closing Date, have not been modified in any material respect by the Borrower.

(c)      Since the Closing Date, there have been no events, developments or circumstances that have had, or would reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect

SECTION 3.09.    Tax Matters.  Each of Holdings, the Borrower and the Subsidiaries has filed all federal income Tax returns and all other material Tax returns, domestic and foreign, required to be filed by it (including in its capacity as a withholding agent) and has paid all material Taxes payable by it that have become

64

Error! Unknown document property name.
WEIL:\97986321\6\45327.0007

Debtors' Exhibit No. 30
Page 72 of 137

due, other than those (i) not yet delinquent or (ii) being contested in good faith by appropriate proceedings and as to which adequate reserves have been provided to the extent required by and in accordance with GAAP (or in the case of a Foreign Subsidiary, the comparable accounting principles in the relevant jurisdiction).

SECTION 3.10.    Compliance with ERISA.

(a)    Except to the extent that a breach of any of the following representations or warranties in this Section 3.10(a) would not result, individually or in the aggregate, in a Material Liability to Holdings, the Borrower, any of their Restricted Subsidiaries or any ERISA Affiliate: (i) Holdings, the Borrower, each of their Restricted Subsidiaries and each ERISA Affiliate is in compliance with all applicable provisions and requirements of ERISA and the Code and the regulations and published interpretations thereunder with respect to each Employee Benefit Plan, and have performed all their obligations under each Employee Benefit Plan; (ii) each Employee Benefit Plan that is intended to qualify under Section 401(a) of the Code has received a favorable determination letter from the Internal Revenue Service indicating that such Employee Benefit Plan is so qualified and nothing has occurred subsequent to the issuance of such determination letter that would cause such Employee Benefit Plan to lose its qualified status; (iii) no liability to the PBGC (other than required premium payments), the Internal Revenue Service, any Employee Benefit Plan or any trust established under Title IV of ERISA has been or is expected to be incurred by Holdings, the Borrower, any of their Restricted Subsidiaries or any ERISA Affiliate; (iv) no ERISA Event has occurred or is reasonably expected to occur; (v) no Plan has an Unfunded Current Liability; (vi) except to the extent required under Section 4980B of the Code or similar state laws, no Employee Benefit Plan provides health or welfare benefits (through the purchase of insurance or otherwise) for any retired or former employee of Holdings, the Borrower, any of their Restricted Subsidiaries or any ERISA Affiliate; and (vii) Holdings, the Borrower, each of their Restricted Subsidiaries and each ERISA Affiliate have complied with the requirements of Section 515 of ERISA with respect to each Multiemployer Plan and are not in "default" (as defined in Section 4219(c)(5) of ERISA) with respect to payments to a Multiemployer Plan.

(b)    All Foreign Plans are in compliance with, and have been established, administered and operated in accordance with, the terms of such Foreign Plans and applicable law, except for any failure to so comply, establish, administer or operate the Foreign Plans as would not reasonably be expected to result, individually or in the aggregate, in a Material Liability to Holdings, the Borrower or any of their Restricted Subsidiaries.  All material contributions or other payments which are due with respect to each Foreign Plan have been made in full, and none of Holdings, the Borrower or any of their Restricted Subsidiaries has incurred any material obligation in connection with the termination or withdrawal from any Foreign Plan.  The present value of the accrued liabilities (whether or not vested) under each Foreign Plan that is funded, determined as of the end of the most recently ended fiscal year of Holdings, the Borrower or a Restricted Subsidiary of Holdings or the Borrower, as applicable, on the basis of actuarial assumptions, each of which is reasonable, did not exceed the current value of the assets of such Foreign Plan by a material amount, and for each Foreign Plan that is not funded, the obligations of such Foreign Plan are properly accrued.

SECTION 3.11.    Capital Stock and Ownership.  The Capital Stock of the Borrower and its Subsidiaries has been duly authorized and validly issued and is fully paid and non-assessable in connection with the Plan of Reorganization. Except as set forth on Schedule 3.11, there is no existing option, warrant, call right, commitment or other agreement to which Holdings, the Borrower or any of its Subsidiaries is a party requiring, and there is no membership interest or other Capital Stock of the Borrower or any of its Subsidiaries outstanding, that upon conversion or exchange would require, the issuance by the Borrower or any of its Subsidiaries of any additional Capital Stock thereof or other securities convertible into, exchangeable for, or evidencing the right to subscribe for or purchase, additional Capital Stock of the Borrower or any of its Subsidiaries. Schedule 3.11 sets forth the ownership interest of the Borrower and each of its Subsidiaries as of the Closing Date.

SECTION 3.12.    Intellectual Property.  The Borrower and each of the Restricted Subsidiaries own or have obtained valid rights to use all intellectual property, free from any burdensome restrictions, that is necessary for the operation of their respective businesses as currently conducted and as proposed to be

65

Error! Unknown document property name.
WEIL:\97986321\6\45327.0007

Debtors' Exhibit No. 30
Page 73 of 137

conducted, except where the failure to obtain any such rights would not reasonably be expected to have a Material Adverse Effect. Except as would not reasonably be expected to result in a Material Adverse Effect, none of the Borrower or any of its Subsidiaries has infringed, misappropriated, or violated any intellectual property rights of any third party.

SECTION 3.13.    Environmental Laws.  Except as would not, individually or in the aggregate, reasonably be expected to result in a Material Liability, (i) Holdings, the Borrower, each of its Subsidiaries and, to the knowledge of the Borrower, each predecessor of Holdings, the Borrower or any of its Subsidiaries ("Predecessor") to the extent such Predecessor's liabilities under Environmental Law have not been discharged under the Cases ("Predecessor Liabilities"), and each of their respective assets and operations are and have been in compliance with all Environmental Laws and the terms and conditions of all applicable Environmental Permits; (ii) all Environmental Permits required of Holdings, the Borrower or any of its Subsidiaries for performance of their respective businesses as currently conducted have been obtained and are currently in full force and effect under Environmental Law and none of Holdings, the Borrower or any of its Subsidiaries has received any notice that any such existing Environmental Permit will be revoked or any pending application for any new Environmental Permit or renewal of any existing Environmental Permit will be protested or denied; (iii) none of Holdings, the Borrower, any of its Subsidiaries or, to the knowledge of the Borrower, any Predecessor with Predecessor Liabilities has received written notice of any Environmental Claim and to Borrower's knowledge, there are no events or occurrences that would reasonably be expected to result in any of Holdings', the Borrower's or any of its Subsidiary's receipt of such written notice; (iv) none of Holdings, the Borrower, any of its Subsidiaries or, to the knowledge of the Borrower, any Predecessor with Predecessor Liabilities is subject to violations of or liabilities (including, without limitation, as a result of any Releases or threatened Releases of Hazardous Materials) under Environmental Law, none of Holdings, the Borrower or any of its Subsidiaries has an actual or alleged obligation to conduct any cleanup, investigation, removal, remediation or other corrective action pursuant to any Environmental Law at any location and to Borrower's knowledge, there are no events or occurrences that would reasonably be expected to result in any of Holdings, the Borrower or any of its Subsidiaries being subject to such obligation; (v) no Hazardous Materials are being or have been treated, stored, transported, released or disposed of or arranged for disposal or transport for disposal at, on, under or from any property in a manner that would reasonably be expected to give rise to liability of Holdings, the Borrower or any of its Subsidiaries under Environmental Law; and (vi) none of Holdings, the Borrower or any of its Subsidiaries has assumed or retained by contract any liabilities under any Environmental Law or regarding any Hazardous Materials.

SECTION 3.14.    Properties.

(a)    Except for the assignment or transfer of any Oil and Gas Property to the Borrower or any of its Subsidiaries filed in connection with the Transactions in accordance with all applicable Requirements of Law, but is currently pending approval by the applicable Governmental Authority, each of the Borrower and its Subsidiaries has valid fee simple title to, or valid leasehold interests in, or easements or other limited property interests in, all its real properties, good and defensible title to all Hydrocarbon Interests in the Oil and Gas Properties evaluated in the most recently delivered or prepared Reserve Report (except for those that have been disposed of since the date of such Reserve Report as permitted in accordance with this Agreement or leases which have expired in accordance with its terms) and good and defensible title to all other material properties and assets, in each case, except for Liens permitted hereunder and except for minor defects in title that do not materially interfere with its ability to conduct its business as currently conducted or to utilize such properties and assets for their intended purposes.  All such properties and assets are free and clear of Liens, other than Liens permitted hereunder.

(b)    All material leases and agreements necessary for the conduct of the business of the Borrower and the Restricted Subsidiaries are valid and subsisting, in full force and effect.

(c)    The rights and properties presently owned, leased or licensed by the Credit Parties including all easements and rights of way, include all rights and properties necessary to permit the Credit Parties

66

Error! Unknown document property name.
WEIL:\97986321\6\45327.0007

Debtors' Exhibit No. 30
Page 74 of 137

to conduct their respective businesses as currently conducted, except to the extent any failure to have any such rights or properties would not reasonably be expected to result in a Material Adverse Effect.

(d)     All of the properties of the Borrower and the Subsidiaries that are reasonably necessary for the operation of their businesses are in good working condition and are maintained in all material respects in accordance with prudent business standards.

SECTION 3.15.     Solvency.

(a)     On the Closing Date, immediately after giving effect to the Transactions that occur on the Closing Date (and as of any other date required under the Loan Documents and after giving effect to the transactions to occur on such date), (i) the fair value of the assets of the Credit Parties on a consolidated basis, at a fair valuation, will exceed the debts and liabilities, direct, subordinated, contingent or otherwise, of the Credit Parties on a consolidated basis; (ii) the present fair saleable value of the property of the Credit Parties on a consolidated basis will be greater than the amount that will be required to pay the probable liability of the Credit Parties on a consolidated basis on their debts and other liabilities, direct, subordinated, contingent or otherwise, as such debts and other liabilities become absolute and matured; (iii) the Credit Parties on a consolidated basis will be able to pay their debts and liabilities, direct, subordinated, contingent or otherwise, as such debts and liabilities become absolute and matured; and (iv) the Credit Parties on a consolidated basis will not have unreasonably small capital with which to conduct the businesses in which they are engaged as such businesses are now conducted and are proposed to be conducted following the Closing Date.

(b)     The Borrower does not intend to, and the Borrower does not believe that it or any of its Subsidiaries will, incur debts beyond their ability to pay such debts as they mature, taking into account the timing and amounts of cash to be received by them or any such subsidiary and the timing and amounts of cash to be payable on or in respect of their Indebtedness or the Indebtedness of any such Subsidiary.

SECTION 3.16.     Anti-Corruption Laws.     None of Holdings, the Borrower or any of its Subsidiaries, nor, to the knowledge of Holdings, the Borrower or any of its Subsidiaries, any of their directors, officers, agents, employees or Affiliates has (i) used any corporate funds for any unlawful contribution, gift, entertainment or other unlawful expense relating to political activity, (ii) made any direct or indirect unlawful payment to any government official or employee from corporate funds, (iii) violated or is in violation of any Anti-Corruption Laws, (iv) made any unlawful bribe, rebate, payoff, influence payment, kickback or other unlawful payment in violation of Anti-Corruption Laws or (v) has otherwise violated any Anti-Corruption Laws.  No part of the proceeds of the Loans will be used, directly or indirectly, in furtherance of an offer, payment, promise to pay or authorization of the payment or giving of money, or anything else of value, to any person or otherwise in any manner resulting in violation of the Anti-Corruption Laws. Holdings, the Borrower and its Subsidiaries have established and currently maintain policies, procedures and controls that are designed (and otherwise comply with applicable law) to ensure that each of Holdings, the Borrower and its Subsidiaries, and each of their respective directors, officers, employees and agents, is in compliance with all applicable current and future Anti-Corruption Laws.

SECTION 3.17.     Anti-Terrorism and Anti-Money Laundering Laws; Sanctions.

(a)     None of Holdings, the Borrower or any of its Subsidiaries nor, to the knowledge of Borrower, any director, officer, agent, employee or Affiliate of Holdings, the Borrower or any of its Subsidiaries is or is owned or controlled by a person who is currently a Sanctioned Person.

(b)     Each of Holdings, the Borrower and its Subsidiaries and, to the knowledge of Holdings, the Borrower and its Subsidiaries, their directors, officers, agents, employees or Affiliates is in compliance with all and has not violated any Sanctions or Anti-Terrorism and Anti-Money Laundering Laws. None of the proceeds of the Loans has or will be used, directly or indirectly, for the purpose of financing any

67

activities or business of or with any Sanctioned Person or in any Sanctioned Country or otherwise in any manner that would result in a violation of Sanctions or Anti-Terrorism and Anti-Money Laundering Laws.

(c)    Holdings, the Borrower and its Subsidiaries have established and currently maintain policies, procedures and controls that are designed (and otherwise comply with applicable law) to ensure that each of Holdings, the Borrower and its Subsidiaries, and each of their respective directors, officers, employees and agents, is in compliance with all applicable current and future Sanctions and Anti-Terrorism and Anti-Money Laundering Laws.

SECTION 3.18.    <u>Gas Imbalances, Prepayments</u>.    On the Closing Date, except as set forth on <u>Schedule 3.18</u>, on a net basis, there are no gas imbalances, take or pay or other prepayments exceeding 2.5 Bcfe of Hydrocarbon volumes (stated on a gas equivalent basis) for any individual field, with respect to the Credit Parties' Oil and Gas Properties associated with such field that would require any Credit Party to deliver Hydrocarbons either generally or produced from their Oil and Gas Properties at some future time without then or thereafter receiving full payment therefor.

SECTION 3.19.    <u>Marketing of Production</u>.    On the Closing Date, except as set forth on <u>Schedule 3.19</u>, no material agreements exist (which are not cancelable on 60 days' notice or less without penalty or detriment) for the sale of production of the Credit Parties' Hydrocarbons at a fixed non-index price (including calls on, or other rights to purchase, production, whether or not the same are currently being exercised) that (i) represent in respect of such agreements 2.5% or more of the Borrower's average monthly production of Hydrocarbon volumes and (ii) have a maturity or expiry date of longer than six months from the Closing Date.

SECTION 3.20.    <u>Hedge Agreements</u>.    Schedule 3.20 sets forth, as of the Closing Date, a true and complete list of all commodity Hedge Agreements of each Credit Party, the terms thereof relating to the type, term, effective date, termination date and notional amounts or volumes, the net mark to market value thereof (as of the last Business Day of the most recent fiscal quarter preceding the Closing Date and for which a mark to market value is reasonably available), all credit support arrangements relating thereto (including any margin required or supplied) and the counterparty to each such agreement.

SECTION 3.21.    <u>[Reserved]</u>.

SECTION 3.22.    <u>Defaults.</u> No Default or Event of Default has occurred and is continuing.

SECTION 3.23.    <u>Labor Relations.</u> Neither Holdings, the Borrower nor any of its Subsidiaries is engaged in any unfair labor practice that would reasonably be expected to result in a Material Liability to Holdings, the Borrower or any of its Restricted Subsidiaries.  There is (a) no unfair labor practice complaint pending against Holdings, the Borrower or any of its Restricted Subsidiaries, or to the best knowledge of Holdings and the Borrower, threatened against any of them before the National Labor Relations Board and no grievance or arbitration proceeding arising out of or under any collective bargaining agreement that is so pending against Holdings, the Borrower or any of its Restricted Subsidiaries or to the best knowledge of Holdings and the Borrower, threatened against any of them, (b) no strike or work stoppage in existence or threatened involving Holdings, the Borrower or any of its Restricted Subsidiaries, and (c) to the best knowledge of Holdings and the Borrower, no union representation question existing with respect to the employees of Holdings, the Borrower or any of its Restricted Subsidiaries and, to the best knowledge of Holdings and the Borrower, no union organization activity that is taking place, except (with respect to any matter specified in clause (a), (b) or (c) above, either individually or in the aggregate) such as is not reasonably likely to result in a Material Liability to Holdings, the Borrower or any of its Restricted Subsidiaries.  No Credit Party has incurred any liability or obligation under the Worker Adjustment and Retraining Notification Act or any similar federal or state law that remains unpaid or unsatisfied and could reasonably be expected to, individually or in the aggregate with all such liabilities or obligations, result in a Material Liability to Holdings, the Borrower or any of its Restricted Subsidiaries.

SECTION 3.24.     Insurance. The Borrower and its Restricted Subsidiaries maintain insurance in compliance with Section 5.16.

SECTION 3.25.     Material Contracts. Schedule 3.25 contains a true, correct and complete list of all the Material Contracts in effect on the Closing Date.  All Material Contracts are in full force and effect, no material defaults currently exist thereunder, and each such Material Contract has not been amended, waived, or otherwise modified except as permitted under this Agreement.

## ARTICLE IV

Conditions Precedent

SECTION 4.01.     Conditions Precedent to Effectiveness of this Agreement.  The effectiveness of this Agreement is subject to the satisfaction of the following conditions, except as otherwise agreed or waived pursuant to Section 8.01:

(a)     The Administrative Agent (or its counsel) shall have received from each party hereto a counterpart of this Agreement (which may include telecopy or electronic transmission of a signed signature page of this Agreement) signed on behalf of such party.

(b)     The Administrative Agent shall have received, on behalf of itself, the Collateral Agent and the Lenders, a customary written opinion of Weil, Gotshal & Manges LLP, counsel to the Borrower, (i) dated the Closing Date and (ii) addressed to the Administrative Agent and the Lenders on the Closing Date.  The Borrower hereby instructs such counsel to deliver such legal opinion.

(c)     The Administrative Agent shall have received:

(i)     a copy of the certificate of formation or incorporation, as applicable, including all amendments thereto, of the Borrower and each other Credit Party, certified as of a recent date by the Secretary of State of Delaware, and a certificate as to the good standing of the Borrower and each other Credit Party as of a recent date from such Secretary of State, and certificates of good standing and/or qualifications to do business as a foreign corporation in such jurisdictions as the Administrative Agent reasonably requests;

(ii)     a certificate of the Secretary or Assistant Secretary or similar officer of the Borrower and each other Credit Party dated the Closing Date and certifying:

(1)     that attached thereto is a true and complete copy of the limited liability company agreement or by-laws, as applicable, of such Person as in effect on the Closing Date and at all times since a date prior to the date of the resolutions described in clause (2) below,

(2)     that attached thereto is a true and complete copy of resolutions duly adopted by the board of directors (or managing general partner, managing member or equivalent) of such Person authorizing the execution, delivery and performance of this Agreement and the borrowings hereunder and each other Loan Document entered into on the Closing Date, and that such resolutions have not been modified, rescinded or amended and are in full force and effect on the Closing Date,

(3)     that the certificate of formation or incorporation, as applicable, of such Person has not been amended since the date of the last amendment thereto disclosed pursuant to clause (i) above,

Error! Unknown document property name.
WEIL:\97986321\6\45327.0007

(4)      as to the incumbency and specimen signature of each officer executing any Loan Document or any other document delivered in connection herewith on behalf of the Borrower and each other Credit Party, and

(5)      a certificate of a director or an officer as to the incumbency and specimen signature of the Secretary or Assistant Secretary or similar officer executing the certificate pursuant to clause (ii) above.

(d)      The Administrative Agent shall have received executed copies of (i) the Guarantee, executed by Holdings and each Subsidiary which will be a Subsidiary Guarantor on the Closing Date and (ii) the Intercreditor Agreement.

(e)      The Administrative Agent shall have received the Collateral Agreement, executed and delivered by the Borrower and each Guarantor.

(f)      (i) the Administrative Agent shall have received the results of lien searches with respect to the Credit Parties and (ii) subject to Section 5.34, the Administrative Agent shall have received evidence of insurance coverage of the Credit Parties evidencing that such Credit Party is carrying insurance in accordance with Section 5.16.

(g)      The conditions precedent to the effectiveness of the FLTL Credit Agreement shall have been satisfied or duly waived in writing substantially simultaneously with the Closing Date.

(h)      [Reserved].

(i)      The Restructuring Transactions (as defined in the Plan of Reorganization) shall have been, or shall substantially simultaneously be, consummated and effective in accordance with the Plan of Reorganization, the Plan Supplement (as defined in the Plan of Reorganization) and the Plan of Merger (as defined in the Plan of Reorganization), as applicable and the Effective Date (as defined in the Plan of Reorganization) shall have occurred.

(j)      Subject to Section 5.34, all documents and instruments, including Uniform Commercial Code or other applicable personal property and financing statements, reasonably requested by the Collateral Agent or the Required Lenders to be filed, registered or recorded to create the Liens intended to be created by any Security Document and perfect such Liens tothe extent required by, and with the priority required by, such Security Document shall have been delivered to the Collateral Agent for filing, registration or recording by or on behalf of the Collateral Agent.

(k)      The Administrative Agent shall have received executed Mortgages, together with customary local counsel legal opinions, with respect to 100% of the Oil and Gas Properties (and related assets) owned by the Credit Parties as of the Closing Date (after giving effect to the transactions contemplated by the Credit Bid Purchase Agreement).

(l)      All Equity Interests of the Borrower and each Subsidiary directly owned by the Borrower or any Guarantor, in each case as of the Closing Date, shall have been pledged pursuant to the Collateral Agreement (except that such Credit Parties shall not be required to pledge any Excluded Equity Interests).

(m)      On the Closing Date, the Administrative Agent shall have received a solvency certificate substantially in the form of Exhibit I hereto and signed by a Financial Officer of the Borrower.

(n)      [Reserved]

70

Error! Unknown document property name.
WEIL:\97986321\6\45327.0007

Debtors' Exhibit No. 30
Page 78 of 137

(o)      (i) The Agents shall have received all fees payable thereto (including pursuant to the Fee Letter) on or prior to the Closing Date and, to the extent invoiced, all other amounts due and payable pursuant to the Loan Documents on or prior to the Closing Date, including, to the extent invoiced at least one (1) Business Day prior to the Closing Date, reimbursement or payment of all reasonable out-of-pocket expenses (including reasonable fees, charges and disbursements of Davis Polk & Wardwell LLP and Shipman & Goodwin LLP) required to be reimbursed or paid by the Credit Parties hereunder or under any Loan Document and (ii) all other fees, premiums and expenses required to be paid to the Agents, Backstop Parties (as defined in the Commitment Letter) and the Participating DIP Lenders (as defined in the Commitment Letter) at or prior to the Closing Date pursuant to the terms of the Commitment Letter, the Loan Documents and the Plan of Reorganization shall have been paid or shall be paid and the New Money Warrants (as defined in the Commitment Letter) shall be issued substantially simultaneously with the occurrence of the Closing Date.

(p)      The Credit Parties shall have aggregate Unrestricted Cash as of the Closing Date on a pro forma basis (including after payment of Restructuring Expenses (as defined in the Plan of Reorganization) and separate from additional cash reserves to be established on the Closing Date for anticipated litigation settlements (to the extent known to be payable by the Credit Parties or otherwise required under GAAP to be included on the face of the Credit Parties' financial statements) of at least $[___]) of not less than $100,000,000.

(q)      The Administrative Agent shall have received at least three (3) Business Days prior to the Closing Date all documentation and other information required by regulatory authorities under applicable "know your customer" and anti-money laundering rules and regulations, including without limitation, the USA PATRIOT Act and the Beneficial Ownership Regulation, that has been requested not less than ten (10) Business Days prior to the Closing Date.

(r)      On the Closing Date, all representations and warranties made by any Credit Party contained herein or in the other Loan Documents shall be true and correct in all material respects (or with respect to representations and warranties that contain a materiality qualifier, in all respects) with the same effect as though such representations and warranties had been made on and as of such date (expect where such representations and warranties expressly relate to an earlier date, in which case such representations and warranties shall have been trued and correct in all material respects as of such earlier date).

(s)      No Default or Event of Default shall have occurred and be continuing or would result from the consummation of the Transactions.

(t)      Credit Bid Purchaser shall have received, or shall receive substantially simultaneously with the Closing Date, gross proceeds in an amount of no less than $20,000,000 through an equity rights offering on terms and conditions acceptable to the Borrower and the Required Lenders.

(u)      (A) Since the Execution Date (as defined in the Credit Bid Purchase Agreement), no Material Adverse Effect (as defined in the Credit Bid Purchase Agreement) (or any result, event, occurrence, change, circumstance, consequence or development that, individually or in the aggregate would reasonably be expected to result in a Material Adverse Effect (as defined in the Credit Bid Purchase Agreement)) shall have occurred and (B) since the Execution Date (as defined in the Commitment Letter), there has been no occurrence, development or change that has had or would reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect (provided that, for the avoidance of doubt, any change, development or occurrence, arising individually or in the aggregate, from events that would reasonably be expected to result from the pendency of the Cases shall not constitute a Material Adverse Effect).

(v)      The Disclosure Statement (as defined in the Plan of Reorganization) shall be in form and substance reasonably acceptable to the Required Lenders and the Plan of Reorganization and Confirmation Order shall be in form and substance acceptable to the Required Lenders (it being understood that the Plan of Reorganization in the form attached as Annex C to the Commitment Letter, dated as of March 23, 2021 (the

71

Error! Unknown document property name.
WEIL:\97986321\6\45327.0007

Debtors' Exhibit No. 30
Page 79 of 137

"Commitment Letter"), is acceptable to the Required Lenders, as such Plan of Reorganization may be modified with the consent of the Required Lenders).

(w)     The Confirmation Order (as defined in the Plan of Reorganization) shall have been entered and shall be a final order and all conditions precedent described or set forth in the Credit Bid Purchase Agreement shall be satisfied or such conditions shall have been waived in accordance with the terms thereof with the consent of the Majority Backstop Parties (except those conditions precedent that by their nature are to be satisfied concurrently with the closing of the Credit Bid Purchase Agreement or the Closing Date, as applicable; provided that such conditions shall be satisfied concurrently at such times).

(x)     The funding of the Claims Reserve (as defined in the Plan of Reorganization) in the Claims Reserve Amount (as defined in the Plan of Reorganization), which Claims Reserve Amount shall be acceptable to the Borrower and the Majority Backstop Parties (as defined in the Commitment Letter), shall have occurred.

(y)     the estimated amount of Allowed Specified Administrative Expense Claims (as defined in the Plan of Reorganization) to be satisfied under the Plan of Reorganization on or after the Closing Date shall not have been projected at any time prior to the Confirmation Date (as defined in the Plan of Reorganization) to exceed the Toggle Amount (as defined in the Plan of Reorganization)

For purposes of determining compliance with the conditions specified in this Article IV, each Lender shall be deemed to have consented to, approved or accepted or deemed to be satisfied with each document or other matter required thereunder to be consented to or approved by, or acceptable or satisfactory to, the Lenders unless an office of the Administrative Agent shall have received notice from such Lender prior to the Closing Date specifying its objection thereto.

**ARTICLE V**

Covenants

SECTION 5.01.     Information Covenants.  The Borrower will furnish to the Administrative Agent (which shall promptly make such information available to the Lenders in accordance with its customary practice):

(a)     Annual Financial Statements.  Within 105 days after the end of each such fiscal year, the audited consolidated balance sheets of the Borrower and the Subsidiaries and, if different, the Borrower and the Restricted Subsidiaries, in each case as at the end of such fiscal year, and the related consolidated statements of operations, shareholders' equity and cash flows for such fiscal year, and, beginning with the fiscal year ending December 31, 2023, setting forth comparative consolidated figures for the preceding fiscal years (or, in lieu of such audited financial statements of the Borrower and the Restricted Subsidiaries, a reconciliation, reflecting such financial information for the Borrower and the Restricted Subsidiaries, on the one hand, and the Borrower and the Subsidiaries, on the other hand, reflecting adjustments necessary to eliminate the accounts of the Closing Date Unrestricted Subsidiary from such consolidated financial statements) prepared in accordance with GAAP, and, except with respect to such reconciliation, certified by independent certified public accountants of recognized national standing whose opinion shall not be qualified with a scope of audit or "going concern" or like qualification or exception (other than with respect to, or resulting from, the occurrence of an upcoming maturity date of Indebtedness within one year of the date of such opinion).  Notwithstanding the foregoing, the obligations in this Section 5.01(a) may be satisfied with respect to financial information of the Borrower and its consolidated Subsidiaries by furnishing the applicable financial statements of any direct or indirect parent of the Borrower; provided that (i) to the extent such information relates to a Parent Entity of the Borrower, such information is accompanied by consolidating information that explains in reasonable detail the

72

Error! Unknown document property name.
WEIL:\97986321\6\45327.0007

Debtors' Exhibit No. 30
Page 80 of 137

differences between the information relating to such Parent Entity and its consolidated Subsidiaries, on the one hand, and the information relating to the Borrower and its consolidated Subsidiaries and the Borrower and its consolidated Restricted Subsidiaries on a standalone basis, on the other hand and (ii) to the extent such information is in lieu of information required to be provided under the first sentence of this Section 5.01(a), such materials are accompanied by an opinion of an independent registered public accounting firm of recognized national standing, which opinion shall not be qualified with a scope of audit or "going concern" or like qualification or exception (other than with respect to, or resulting from, the occurrence of an upcoming maturity date of Indebtedness within one year of the date of such opinion).

(b)      Quarterly Financial Statements.      On or before the date that is 45 days after each quarterly accounting period in each fiscal year of the Borrower, the consolidated balance sheets of the Borrower and the Subsidiaries and, if different, the Borrower and the Restricted Subsidiaries, in each case as at the end of such quarterly period and the related consolidated statements of operations, shareholders' equity and cash flows for such quarterly accounting period and for the elapsed portion of the fiscal year ended with the last day of such quarterly period, and setting forth comparative consolidated figures for the related periods in the prior fiscal year or, in the case of such consolidated balance sheet, for the last day of the prior fiscal year (or, in lieu of such unaudited financial statements of the Borrower and the Restricted Subsidiaries, a reconciliation reflecting such financial information for the Borrower and the Restricted Subsidiaries, on the one hand, and the Borrower and the Subsidiaries, on the other hand, reflecting adjustments necessary to eliminate the accounts of the Closing Date Unrestricted Subsidiary from such consolidated financial statements), all of which shall be certified by a Financial Officer of the Borrower as fairly presenting in all material respects the financial condition, results of operations, shareholders' equity and cash flows, of the Borrower and its consolidated Subsidiaries in accordance with GAAP, subject to changes resulting from audit and normal year-end audit adjustments and the absence of footnotes.  Notwithstanding the foregoing, the obligations in this Section 5.01(b) may be satisfied with respect to financial information of the Borrower and its consolidated Subsidiaries by furnishing the applicable financial statements of any direct or indirect parent of the Borrower; provided that to the extent such information  relates to a parent of the Borrower, such information is accompanied by consolidating information that explains in reasonable detail the differences between the information relating to such parent and its consolidated Subsidiaries, on the one hand, and the information relating to the Borrower and its consolidated Subsidiaries and the Borrower and its consolidated Restricted Subsidiaries on a standalone basis, on the other.

(c)      Notice of Default; Litigation; ERISA Events and Other Events.

(i)      Promptly after an Authorized Officer of the Borrower or any of the Restricted Subsidiaries obtains actual knowledge thereof, notice of (A) the occurrence of any Default or Event of Default, which notice shall specify the nature thereof, the period of existence thereof and what action the Borrower proposes to take with respect thereto, (B) any Adverse Proceeding, and (C) the occurrence of any ERISA Event or similar event with respect to a Plan, Multiemployer Plan or Foreign Plan, in the case of clauses (B) and (C), that would reasonably be expected to result in a Material Liability to Holdings, the Borrower or any of its Restricted Subsidiaries.

(ii)      In the event that Holdings, Borrower or any of its Restricted Subsidiaries shall intend to enter into any settlement agreement with any Governmental Authority in connection with any Adverse Proceeding for which the Borrower or any of the Restricted Subsidiaries are required to have given notice pursuant to paragraph (i)(B) above, the Borrower shall give the Administrative Agent (for distribution to the Lenders) reasonable prior written notice (and in any event, not less than five (5) Business Days' prior notice) of such intention, the material terms thereof, the anticipated date of entry and any other details thereof reasonably requested by the Required Lenders or their counsel.

(iii)      [Reserved].

Error! Unknown document property name.
WEIL:\97986321\6\45327.0007

(iv)    In the event that the Borrower or any Restricted Subsidiary intends to incur any Indebtedness for borrowed money that will have an aggregate principal (or committed) balance of $11,500,000 or more, the Borrower shall give the Administrative Agent (for further distribution to the Lenders) reasonable prior written notice (and in any event not less than three (3) Business Days' prior notice) of such incurrence of Indebtedness, the material terms thereof and the anticipated date of closing and any other details thereof reasonably requested by the Administrative Agent or any Lender.

(v)    Promptly, and in any event within two (2) days after (A)(x) any Material Contract of the Borrower or any of its Restricted Subsidiaries is terminated or amended in a manner that is materially adverse to the Borrower or any of its Restricted Subsidiaries or to the Lenders or (y) any new Material Contract is entered into, or (B) any officer of the Borrower or any of its Subsidiaries obtaining actual knowledge (x) of any condition or event that constitutes a material default or an event of default under any Material Contract, (y) that any event, circumstance, or condition exists or has occurred that gives any counterparty to such Material Contract a termination or assignment right thereunder, or (z) that notice has been given to the Borrower or any of its Subsidiaries asserting that any such condition or event has occurred, the Borrower shall deliver to the Administrative Agent a certificate of an Authorized Officer specifying the nature and period of existence of such condition or event and, in the case of <u>clause (A)</u>, including copies of such material amendments or new contracts and, in the case of <u>clause (B)</u>, as applicable, explaining the nature of such claimed default or event of default, and including an explanation of any actions being taken or proposed to be taken by the Borrower and its Restricted Subsidiaries with respect thereto.

(d)    <u>Environmental Matters</u>.  Promptly after the receipt or discovery by an officer of Holdings, the Borrower or any of its Restricted Subsidiaries of information (including, but not limited to, as a result of performance of environmental site assessments, audits, invasive sampling and testing of environmental conditions, or receipt of correspondence from or discussions with Governmental Authorities or other Persons) regarding any one or more of the following environmental matters, unless such environmental matters would not, individually, or when aggregated with all other such matters, be reasonably expected to result in a Material Liability to Holdings, the Borrower or any of its Restricted Subsidiaries, notice of:

(i)    any pending or threatened Environmental Claim against any Credit Party; and

(ii)    the occurrence of any event or discovery of any circumstance that is or would reasonably be expected to result in a violation or liability under Environmental Law including, without limitation, any actual presence, Release or threatened Release of, or exposure to, any Hazardous Material on, at, under or from (A) any facility owned, leased or operated by a Credit Party or (B) any real property offsite such facility that is (x) located adjacent or in close proximity to such facility under circumstances where the presence, Release or threatened Release of, or exposure to, Hazardous Materials may reasonably be expected to threaten the facility or (y) where Holdings, Borrower or any of the Subsidiaries transported or disposed, or arranged for the disposal or transport for disposal of Hazardous Materials or the conduct of any cleanup, investigation, removal, remediation or other corrective action in response to the actual or alleged presence, Release or threatened Release of, or exposure to, any Hazardous Material on, at, under or from (1) any facility owned, leased or operated by a Credit Party or (2) any real property offsite such facility that is (x) located adjacent or in close proximity to such facility under circumstances where the presence, Release or threatened Release of, or exposure to, Hazardous Materials may reasonably be expected to threaten the facility or (y) where Holdings, Borrower or any of the Subsidiaries transported or disposed, or arranged for the disposal or transport for disposal of Hazardous Materials.

All such notices shall describe in reasonable detail the nature of the claim, including, without limitation, providing facts and circumstances of which any Credit Party or any of the Subsidiaries is aware giving rise to the claim, together with planned or any implemented cleanups, investigations, removals, remediations or other corrective actions, any proposed actions to modify operations in a manner that could be expected to subject the

74

Error! Unknown document property name.
WEIL:\97986321\6\45327.0007

Debtors' Exhibit No. 30
Page 82 of 137

Credit Parties to new or added obligations or requirements under Environmental Law, any estimates of damages and costs to cure the claim, any governmental Environmental Claims or threatened Environmental Claims, any governmental requests for information regarding the claim, and any reserves, contractual indemnifications or insuring agreements that may be relied upon by any of Holdings, the Borrower or any of the Subsidiaries in connection with the claim.  Such notice is not intended to create, nor shall it create, any obligation upon the Administrative Agent or any Lender with respect thereto. Upon reasonable request of the Administrative Agent or any Lender, the Credit Parties will be obligated to supply such Person with supporting non-privileged documentation with respect to such claim and any responses thereto, and the Credit Parties shall have a continuing obligation to provide prompt status updates on such until such time as the claim is fully resolved (provided that, to the extent any information is withheld due to privilege, the Borrower agrees to provide written notice of the reason for such information being withheld).

(e)        Officers' Certificates.  At the time of the delivery of the financial statements provided for in Section 5.01(a) and Section 5.01(b) (other than with respect to delivery of the financial statements required by Section 5.01(b) with respect to the fourth fiscal quarter of any fiscal year of the Borrower), commencing with respect to certificates delivered for the fiscal quarter ending June 30, 2021, a certificate of a Financial Officer of the Borrower to the effect that no Default or Event of Default has occurred and is continuing or, if any Default or Event of Default does exist, specifying the nature and extent thereof, which certificate shall (i) set forth a reasonably detailed calculation of Consolidated Excess Cash for such fiscal period and (ii) a list of all commodity Hedge Agreements of the Borrower and each Credit Party, the material terms thereof (in respect of the type, term, effective date, termination date and notional amounts or volumes), the net mark-to-market value thereof (as of the last Business Day of such fiscal year or quarter, as applicable and for which a mark-to-market value is reasonably available).

(f)        Other Information.    With reasonable promptness, such other information regarding the operations, business affairs and the financial condition of the Borrower or the Restricted Subsidiaries as the Administrative Agent on behalf of any Lender (acting through the Administrative Agent) may reasonably request in writing from time to time.  Notwithstanding anything to the contrary in this Section 5.01(f), neither the Borrower nor any Restricted Subsidiary will be required to disclose, permit the inspection, examination or making copies or abstracts of, or discussion of, any document, information or other matter (i) that constitutes non-financial trade secrets or non-financial proprietary information, (ii) in respect of which disclosure to the Administrative Agent or any Lender (or their respective representatives or contractors) is prohibited by any Requirement of Law or any binding confidentiality provision (so long as not entered into with the intention of circumventing this provision) or (iii) that is subject to attorney-client or similar privilege or constitutes attorney work product; provided that, to the extent any information is withheld pursuant to the foregoing, the Borrower agrees to provide written notice of the reason for such information being withheld.

(g)        Budget.  Within 60 days after the end of each fiscal year of the Borrower (beginning with the fiscal year ending December 31, 2021), a reasonably detailed consolidated budget for the following fiscal year as customarily prepared by management of the Borrower (including select balance sheet items of the Borrower and its Subsidiaries as of the end of the following fiscal year and a summary of the material underlying assumptions applicable thereto) (collectively, the "Budget"), which Budget shall in each case be accompanied by a certificate of an Authorized Officer stating that such Budget has been prepared in good faith on the basis of the assumptions stated therein, which assumptions were believed to be reasonable at the time of preparation of such Budget, it being understood that actual results may vary from such Budget.

(h)        Production Report; List of Purchasers.  Promptly after request by the Administrative Agent (at the direction of the Required Lenders), (i) a report setting forth, for each calendar month during the then current fiscal year to date, the volume of production of Hydrocarbons for each such calendar month and/or (ii) a list of Persons purchasing Hydrocarbons from any Credit Party who collectively account for at least 80% of the revenues resulting from the sale of all Hydrocarbons from the Credit Parties during the period for which such request was made;  provided that, so long as no Event of Default has occurred and is

Error! Unknown document property name.
WEIL:\97986321\6\45327.0007

continuing, the Administrative Agent shall only be permitted to make up to two (2) requests in any fiscal year.

(i)     Ratings. Within 30 days after the Closing Date (or such later date as the Required Lenders may agree), the Borrower shall use commercially reasonable efforts to obtain a public rating for the Loans from S&P and Moody's and shall continuously maintain such public ratings.

It is understood that documents required to be delivered pursuant to Sections 5.01(a) through (h) may be delivered electronically and if so delivered, shall be deemed to have been delivered on the date (a) on which such documents are transmitted by electronic mail to the Administrative Agent or (b) on which such documents are posted by the Borrower or on the Borrower's behalf on any relevant website to which each Lender and the Administrative Agent have access (whether a commercial, third-party website or whether sponsored by the Administrative Agent or the administrative agent under the FLTL Credit Agreement); *provided* that: (i) upon written request by the Administrative Agent, the Borrower shall deliver paper copies of such documents delivered pursuant to Sections 5.01(a), 5.01(b) and 5.01(c), to the Administrative Agent for further distribution to each Lender until a written request to cease delivering paper copies is given by the Administrative Agent and (ii) the Borrower shall notify (which may be by facsimile or electronic mail) the Administrative Agent of the posting of any such documents and provide to the Administrative Agent by electronic mail electronic versions (i.e., soft copies) of such documents.  Each Lender shall be solely responsible for timely accessing posted documents or requesting delivery of paper copies of such documents from the Administrative Agent and maintaining its copies of such documents.

Delivery of any reports, information and documents under this Section 5.01, as well as any such reports, information and documents pursuant to this Agreement, to the Administrative Agent is for informational purposes only and the Administrative Agent's receipt of such shall not constitute constructive notice of any information contained therein or determinable from information contained therein, including the Borrower's compliance with any of its covenants hereunder (as to which the Administrative Agent is entitled to rely exclusively on the Officers' Certificates). The Administrative Agent shall have no responsibility or liability for the filing, timeliness or content of any report required under this Section 5.01 or any other reports, information and documents required under this Agreement.

SECTION 5.02.     Environmental Covenants.

(a)     Except as could not reasonably be expected to result in a Material Liability to Holdings, the Borrower or any of its Restricted Subsidiaries, each of Holdings and the Borrower will comply, and shall cause each of its Subsidiaries (and shall use commercially reasonable efforts to cause all other Persons, if any, on or occupying any assets of Holdings, the Borrower or any of its Subsidiaries) to comply with all Environmental Laws and Environmental Permits; obtain and renew, and cause each of its Subsidiaries to obtain and renew, all Environmental Permits necessary for each of their respective operations and assets; and conduct, and cause each of its Subsidiaries to conduct, any cleanup, investigation, removal, remediation or other corrective action with respect to any actual or alleged violation of Environmental Law or in response to any Release or threatened Release of, or exposure to, any Hazardous Materials from, at or about any of their respective assets or otherwise relating to or arising out of each of their respective operations, to the extent required by, and in compliance with, all Environmental Laws.

(b)     In the event and to the extent that Holdings, the Borrower or any of its Subsidiaries shall fail to promptly conduct any cleanup, investigation, removal, remediation, or other corrective action with respect to any violation of Environmental Law or any Hazardous Materials as set forth in Section 5.02(a), above, or as otherwise required by Environmental Law, Environmental Permit or a Governmental Authority, which such failure would reasonably be expected to have a Material Adverse Effect, the Administrative Agent on behalf of the Lenders may, but without the obligation to do so, for the sole purpose of protecting the Lenders' interest in the Collateral, upon five (5) Business Days' written notification to the Borrower, enter onto any Holdings, Borrower's or any Subsidiaries' property (or authorize third parties to enter onto any such Person's property)

76

Error! Unknown document property name.
WEIL:\97986321\6\45327.0007

Debtors' Exhibit No. 30
Page 84 of 137

and conduct such cleanups, investigations, removals, remediations, or other corrective actions required by Environmental Law, Environmental Permit or the Governmental Authority with respect to any such violation or Hazardous Material. All reasonable and documented costs and expenses incurred by the Administrative Agent and Lenders (or such third parties) in the exercise of any such rights under this Section 5.02(b), including any sums paid in connection with any judicial or administrative investigation or proceedings, fines and penalties, shall be paid by the Borrower within thirty (30) days of written demand by the Administrative Agent, and until paid shall be added to and become a part of the Loan Obligations.

(c)     In the event there is a Release or threatened Release of, or exposure to, any Hazardous Materials or a failure to comply with any Environmental Law or Environmental Permit at Holdings', the Borrower's or any of its Subsidiaries' assets caused in whole or in part by any of such Persons, which in any event is reasonably expected to have a Material Adverse Effect, Holdings, the Borrower and each of its Subsidiaries shall comply with all reasonable written requests for information made by the Administrative Agent with respect to such matters. Such information reasonably requested may include, at the Borrowers' expense, an environmental site assessment (including invasive sampling and testing) or environmental compliance audit of any such Person's assets caused by any of Holdings, the Borrower or any of its Subsidiaries, to be prepared by a nationally recognized environmental consulting or engineering firm, to assess such Release, threatened Release, exposure or noncompliance with any Environmental Law or Environmental Permit; *provided*, however, that any environmental site assessment, environmental compliance audit or similar report acceptable to the Governmental Authority that is charged to oversee any cleanup, investigation, removal, remediation or other corrective action related to such matters shall be deemed acceptable to the Administrative Agent and the Lenders.

(d)     The Borrower shall defend and indemnify the Agents and the Lenders and hold the Agents, the Lenders and their respective employees, agents, directors and officers harmless from and against all loss, liability, reasonable expense, claims, costs, monetary sanctions, fines and penalties, including, without limitation, reasonable and documented out-of-pocket attorney's fees, suffered or incurred by the Agents or the Lenders under or on account of any Environmental Claim, Hazardous Material, Environmental Law or Environmental Permit, including without limitation, with respect to the presence, Release or threatened Release of, or exposure to, any Hazardous Materials affecting Holdings', the Borrower's or any of its Subsidiaries' assets or operations whether or not the same originates or emerges from any such Person's assets or operations or as a result of any third party's conduct or operations at any nearby site or location, except to the extent such loss, liability, damage and expense is attributable to any presence, Release or threatened Release of, or exposure to, Hazardous Materials that is found by a final and non-appealable judgment of a court of competent jurisdiction to have directly and solely been caused by the gross negligence or willful misconduct of such indemnified party under this Section 5.02(d). The Borrower's obligations under this Section 5.02(d) exist regardless of whether or not any federal, state or local environmental agency has taken or threatened any action in connection with the presence, Release or threatened Release of, or exposure to, any such Hazardous Material. The Borrower's obligations and the indemnifications hereunder shall survive repayment of the Loans and all other amounts payable hereunder, and the earlier resignation or removal of any Agent.

(e)     Upon reasonable request of the Administrative Agent, each of Holdings and the Borrower will make available, and shall cause each of its Subsidiaries to make available complete and correct copies of all environmental site assessments, audits and similar reports and studies, and all documentation and correspondence addressing potentially material environmental liabilities relating to Holdings, the Borrower or any of its Subsidiaries or any of their ownership or operation of the assets.

SECTION 5.03.    End of Fiscal Years; Fiscal Quarters.  The Borrower will, for financial reporting purposes, cause each of its, and each of its Restricted Subsidiaries', fiscal years and fiscal quarters to end on, in the case of the fiscal year, the last day of each calendar year, and in the case of any fiscal quarter, the day of each calendar quarter; *provided*, *however*, that the Borrower may, upon written notice to the Administrative Agent change the financial reporting convention specified above to any other financial reporting convention reasonably acceptable to the Required Lenders in their Permitted Business Judgment, in which case the Borrower and the

Error! Unknown document property name.
WEIL:\97986321\6\45327.0007

Administrative Agent will, and are hereby authorized by the Lenders to, make any adjustments to this Agreement that are necessary in order to reflect such change in financial reporting.

SECTION 5.04.    Use of Proceeds.    The Borrower will use the proceeds of the Initial Loans, together with the loans under the FLTL Facility, on the Closing Date, to consummate the Transactions and thereafter for ongoing working capital or other general corporate purposes.

SECTION 5.05.    Change in Business.    The Borrower and its Restricted Subsidiaries, taken as a whole, will not fundamentally and substantively alter the character of their business, taken as a whole, from the business conducted by them on the Closing Date, the business of Permitted Business Investments by the Borrower and its Restricted Subsidiaries and other business activities incidental, reasonably related or ancillary to any of the foregoing and reasonable extensions thereof.

SECTION 5.06.    Limitation on Incurrence of Indebtedness and Issuance of Disqualified Stock and Preferred Stock.

(a)    The Borrower shall not, and shall not permit any of its Restricted Subsidiaries to Incur any Indebtedness or issue any shares of Disqualified Stock; and the Borrower shall not permit any of its Restricted Subsidiaries (other than a Subsidiary Guarantor) to issue any shares of Preferred Stock.

(b)    The limitations set forth in Section 5.06(a) shall not apply to:

(i)    the Incurrence by the Borrower or any Restricted Subsidiary of Indebtedness under the Loan Documents (including the Loans, any guarantees thereof (including the Guarantee), any PIK Interest and including any Indebtedness incurred pursuant to Section 2.20);

(ii)    the Incurrence by the Borrower or any Restricted Subsidiary of Indebtedness under the FLTL Credit Agreement up to an aggregate principal amount that does not exceed, at the time of Incurrence, $[●][4];

(iii)    Indebtedness existing on the Closing Date and listed on Schedule 5.06 (without giving effect to any increases in principal amount thereof following the Closing Date);

(iv)    Indebtedness (including Capitalized Lease Obligations) Incurred by the Borrower or any of its Restricted Subsidiaries within 180 days of the acquisition, lease, construction, repair, replacement or improvement of property (real or personal) or equipment (whether through the direct purchase of assets or the Capital Stock of any Person owning such assets) in an aggregate principal amount that, when aggregated with the principal amount of all other Indebtedness then outstanding and Incurred pursuant to this clause (iv), together with any Refinancing Indebtedness in respect thereof Incurred pursuant to clause (xi) below, does not exceed $11,500,000 at any time outstanding;

(v)    Indebtedness of the Borrower to a Restricted Subsidiary or of a Restricted Subsidiary to another Restricted Subsidiary; provided that any such Indebtedness owed to a Restricted Subsidiary that is not a Subsidiary Guarantor is subordinated in right of payment to the obligations of the Borrower under the Loans pursuant to an intercompany note that is reasonably satisfactory in form and substance to the Administrative Agent; provided, further, that any subsequent issuance or transfer of any Capital Stock or any other event which results in any such Restricted Subsidiary ceasing to be a Restricted Subsidiary or any other subsequent transfer of any such Indebtedness (except to the Borrower or another Restricted Subsidiary or any pledge of such Indebtedness constituting a Permitted Lien but

---

[4] NTD: to match to principal amount incurred on the Closing Date.

**Error! Unknown document property name.**
WEIL:\97986321\6\45327.0007

not the transfer thereof upon foreclosure) shall be deemed, in each case, to be an Incurrence of such Indebtedness not permitted by this <u>clause (v)</u>;

(vi)     shares of Preferred Stock of a Restricted Subsidiary issued to the Borrower or a Subsidiary Guarantor; *provided* that any subsequent issuance or transfer of any Capital Stock or any other event which results in any Restricted Subsidiary that holds such shares of Preferred Stock of another Restricted Subsidiary ceasing to be a Restricted Subsidiary or any other subsequent transfer of any such shares of Preferred Stock (except to the Borrower or another Restricted Subsidiary) shall be deemed, in each case, to be an issuance of shares of Preferred Stock not permitted by this <u>clause (vi)</u>;

(vii)     Indebtedness of a Restricted Subsidiary to the Borrower or another Restricted Subsidiary; *provided* that such Indebtedness is subordinated in right of payment to the Loan Obligations pursuant to an intercompany note that is reasonably satisfactory in form and substance to the Required Lenders and duly pledged as Collateral under the Collateral Agreement; *provided*, *further*, that any subsequent issuance or transfer of any Capital Stock or any other event which results in any Restricted Subsidiary holding such Indebtedness ceasing to be a Restricted Subsidiary or any other subsequent transfer of any such Indebtedness (except to the Borrower or another Restricted Subsidiary or any pledge of such Indebtedness constituting a Permitted Lien but not the transfer thereof upon foreclosure) shall be deemed, in each case, to be an Incurrence of such Indebtedness not permitted by this <u>clause (vii)</u>;

(viii)     Hedging Obligations that are not incurred for speculative purposes, including, for the avoidance of doubt (1) any Hedging Obligations for the purpose of fixing or hedging interest rate risk with respect to any Indebtedness that is permitted by the terms of this Agreement to be outstanding; (2) any Hedging Obligations for the purpose of fixing or hedging currency exchange rate risk with respect to any currency exchanges; or (3) any Hedging Obligations for the purpose of fixing or hedging commodity price risk with respect to any commodity purchases or sales (including, without limitation, any commodity Hedging Obligation that is intended in good faith, at inception of execution, to hedge or manage any of the risks related to existing and/or forecasted Hydrocarbon production (whether or not contracted)) and, in each case, extensions or replacements thereof;

(ix)     Indebtedness or Disqualified Stock of the Borrower or Indebtedness, Disqualified Stock or Preferred Stock of any Restricted Subsidiary not otherwise permitted hereunder in an aggregate principal amount or liquidation preference, which when aggregated with the principal amount or liquidation preference of all other Indebtedness, Disqualified Stock and Preferred Stock then outstanding and Incurred pursuant to this <u>clause (ix)</u> does not exceed $11,500,000 at the time of Incurrence;

(x)     any guarantee by the Borrower or any Restricted Subsidiary of Indebtedness or other obligations of the Borrower or any Subsidiary Guarantor so long as the Incurrence of such Indebtedness Incurred by the Borrower or such Subsidiary Guarantor is permitted under the terms of this Agreement; *provided* that if such Indebtedness is by its express terms subordinated in right of payment to the Loans or the Guarantee of such Restricted Subsidiary, as applicable, any such guarantee with respect to such Indebtedness shall be subordinated in right of payment to the Loans or such Guarantee, as applicable, substantially to the same extent as such Indebtedness is subordinated to the Loans or the Guarantee, as applicable;

(xi)     the Incurrence by the Borrower or any of the Restricted Subsidiaries of Indebtedness or Disqualified Stock or Preferred Stock of a Restricted Subsidiary that serves to refund, refinance or defease any Indebtedness Incurred or Disqualified Stock or Preferred Stock issued as permitted under <u>clauses (i)</u>, <u>(ii)</u>, <u>(iii)</u>, <u>(iv)</u>, <u>(ix)</u>, <u>(x)</u>, <u>(xiv)</u> and <u>(xviii)</u> of <u>Section 5.06(b)</u> up to the outstanding principal amount (or, if applicable, the liquidation preference face amount, or the like) or, if greater, committed amount (only to the extent the committed amount could have been Incurred on the date of initial Incurrence) of such Indebtedness or Disqualified Stock or Preferred Stock, in each case

Error! Unknown document property name.
WEIL:\97986321\6\45327.0007

at the time such Indebtedness was Incurred or Disqualified Stock or Preferred Stock was issued pursuant to clauses (i), (ii), (iii), (iv), (ix), (x), (xiv) and (xviii) of Section 5.06(b), or any Indebtedness, Disqualified Stock or Preferred Stock Incurred to so substantially concurrently refund or refinance such Indebtedness, Disqualified Stock or Preferred Stock, including any additional Indebtedness, Disqualified Stock or Preferred Stock Incurred to pay accrued and unpaid interest, penalties, premiums (including tender premiums), expenses, defeasance costs, commissions, underwriting discounts and fees in connection therewith (subject to the following proviso, "Refinancing Indebtedness") prior to its respective maturity; *provided*, *however*, that such Refinancing Indebtedness:

> (1)      shall have a Weighted Average Life to Maturity at the time such Refinancing Indebtedness is Incurred which is not less than the shorter of (x) the remaining Weighted Average Life to Maturity of the Indebtedness, Disqualified Stock or Preferred Stock being refunded, refinanced or defeased and (y) the Weighted Average Life to Maturity that would result if all payments of principal on the Indebtedness, Disqualified Stock and Preferred Stock being refunded or refinanced that were due on or after the date that is one year following the last maturity date of any Loans then outstanding were instead due on such date;

> (2)      to the extent such Refinancing Indebtedness refinances (a) Indebtedness junior to the Loans or a Guarantee, as applicable, such Refinancing Indebtedness is junior to the Loans or the Guarantee, as applicable, or unsecured, (b) Disqualified Stock or Preferred Stock, such Refinancing Indebtedness is Disqualified Stock or Preferred Stock or (c) Indebtedness that is payment subordinated to the Loans or a Guarantee, as applicable, such Refinancing Indebtedness is subordinated to the Loans or a Guarantee, as applicable, to at least the same extent pursuant to a customary subordination agreement;

> (3)      shall not include (X) Indebtedness of a Restricted Subsidiary that is not a Subsidiary Guarantor that refinances Indebtedness of the Borrower or a Subsidiary Guarantor, or (Y) Indebtedness of the Borrower or a Restricted Subsidiary that refinances Indebtedness of the Closing Date Unrestricted Subsidiary; and

> (4)      any Refinancing Indebtedness of Indebtedness Incurred in respect of Junior Debt above shall not have a final maturity prior to the date that is 180 days after the earlier of the Maturity Date or the date the Loans are no longer outstanding.

(xii)      to the extent constituting Indebtedness, Indebtedness Incurred by a Receivables Subsidiary in a Qualified Receivables Financing that is not recourse to the Borrower or any Restricted Subsidiary other than a Receivables Subsidiary (except for Standard Securitization Undertakings);

(xiii)      Indebtedness arising from the honoring by a bank or other financial institution of a check, draft or similar instrument drawn against insufficient funds in the ordinary course of business; *provided*, *however*, that such Indebtedness is extinguished within five (5) Business Days of its Incurrence;

(xiv)      Indebtedness in respect of letters of credit with a face amount in an aggregate principal amount or, which when aggregated with the face amount of all other Indebtedness then outstanding and Incurred pursuant to this clause (xiv), does not exceed $57,500,000 at the time of Incurrence;

Error! Unknown document property name.
WEIL:\97986321\6\45327.0007

(xv)      Indebtedness of the Borrower or any Restricted Subsidiary consisting of (1) the financing of insurance premiums or (2) take-or-pay obligations contained in supply arrangements, in each case, in the ordinary course of business and not otherwise restricted by this Agreement;

(xvi)      Indebtedness consisting of Indebtedness issued by the Borrower or a Restricted Subsidiary to current or former officers, directors and employees thereof or any direct or indirect parent thereof, their respective estates, spouses or former spouses, in each case to finance the purchase or redemption of Equity Interests of the Borrower or any Parent Entity to the extent described in clause (i) of Section 5.07(b);

(xvii)      Indebtedness incurred by the Borrower or any Restricted Subsidiary constituting reimbursement obligations with respect to letters of credit issued in the ordinary course of business, including letters of credit in respect of plugging and abandonment obligations, workers' compensation claims, performance or surety bonds, health, disability, or other employee benefits or property, casualty or liability insurance or self-insurance or other Indebtedness with respect to compensation claims, performance or surety bonds, health, disability or other employee benefits or property, casualty or liability insurance or self-insurance; *provided* that upon the drawing of such letters of credit or the Incurrence of such Indebtedness, such obligations are reimbursed within 30 days following such drawing or incurrence;

(xviii)      Indebtedness Incurred in connection with the financing of new equipment in order to reduce near-term capital expenditures associated with deepwater projects that is (x) not recourse to any Credit Party (other than to the equipment so financed by such Credit Party) and (y) otherwise on terms acceptable to the Required Lenders in their sole discretion, in an aggregate principal amount, which when aggregated with the principal amount or liquidation preference of all other Indebtedness, Disqualified Stock and Preferred Stock then outstanding and Incurred pursuant to this clause (xviii), together with any Refinancing Indebtedness in respect thereof incurred pursuant to clause (xi), does not exceed $92,000,000 at the time of Incurrence (plus, in the case of any Refinancing Indebtedness, the Additional Refinancing Amount); and

(xix)      Indebtedness of the Borrower or any of its Restricted Subsidiaries undertaken in connection with cash management and related activities with respect to any Subsidiary in the ordinary course of business.

For purposes of determining compliance with this Section 5.06:

(1)      in the event that an item of Indebtedness, Disqualified Stock or Preferred Stock (or any portion thereof) meets the criteria of more than one of the categories of permitted Indebtedness described in clauses (i) through (xix) of Section 5.06(b), then the Borrower shall, in its sole discretion, classify or divide, such item of Indebtedness, Disqualified Stock or Preferred Stock (or any portion thereof) in any manner that complies with Section 5.06;

(2)      if any Indebtedness denominated in U.S. Dollars is exchanged, converted or refinanced into Indebtedness denominated in a foreign currency, then (in connection with such exchange, conversion or refinancing, and thereafter), the U.S. Dollar amount limitations set forth in any of clauses (i) through (xix) of Section 5.06(b) with respect to such exchange, conversion or refinancing shall be deemed to be the amount of such foreign currency, as applicable, into which such Indebtedness has been exchanged, converted or refinanced at the time of such exchange, conversion or refinancing; and

(3)      if any Indebtedness denominated in a foreign currency is exchanged, converted or refinanced into Indebtedness denominated in U.S. Dollars, then (in

81

**Error! Unknown document property name.**
WEIL:\97986321\6\45327.0007

Debtors' Exhibit No. 30
Page 89 of 137

connection with such exchange, conversion or refinancing, and thereafter), the U.S. Dollar amount limitations set forth in any of <u>clauses (i)</u> through <u>(xix)</u> of <u>Section 5.06(b)</u> with respect to such exchange, conversion or refinancing shall be deemed to be the amount of U.S. Dollars into which such Indebtedness has been exchanged, converted or refinanced at the time of such exchange, conversion or refinancing.

Accrual of interest, the accretion of accreted value, the payment of interest or dividends in the form of additional Indebtedness, Disqualified Stock or Preferred Stock, as applicable, amortization of original issue discount, the accretion of liquidation preference and increases in the amount of Indebtedness outstanding solely as a result of fluctuations in the exchange rate of currencies will not be deemed to be an Incurrence of Indebtedness, Disqualified Stock or Preferred Stock for purposes of this <u>Section 5.06</u>.  Guarantees of, or obligations in respect of letters of credit relating to, Indebtedness which is otherwise included in the determination of a particular amount of Indebtedness shall not be included in the determination of such amount of Indebtedness; *provided* that the Incurrence of the Indebtedness represented by such guarantee or letter of credit, as the case may be, was in compliance with this <u>Section 5.06</u>.

For purposes of determining compliance with any U.S. Dollar-denominated restriction on the Incurrence of Indebtedness other than as provided in <u>clauses (1)</u> and <u>(2)</u> above, the U.S. Dollar-equivalent principal amount of Indebtedness denominated in a foreign currency shall be calculated based on the relevant currency exchange rate in effect on the date such Indebtedness was Incurred, in the case of term debt, or first committed or first Incurred (whichever yields the lower U.S. Dollar equivalent), in the case of revolving credit debt.

Notwithstanding any other provision of this <u>Section 5.06</u>, the maximum amount of Indebtedness that the Borrower and its Restricted Subsidiaries may Incur pursuant to this <u>Section 5.06</u> shall not be deemed to be exceeded, with respect to any outstanding Indebtedness, solely as a result of fluctuations in the exchange rate of currencies.

SECTION 5.07.     <u>Limitation on Restricted Payments</u>.

(a)     The Borrower shall not, and shall not permit any of its Restricted Subsidiaries to:

(i)     declare or pay any dividend or make any distribution on account of the Borrower's or any of its Restricted Subsidiaries' Equity Interests, including any payment made in connection with any merger, amalgamation or consolidation involving the Borrower (other than (A) dividends or distributions payable solely in Equity Interests (other than Disqualified Stock) of the Borrower or in options, warrants or other rights to purchase Equity Interests (other than Disqualified Stock); or (B) dividends or distributions by a Restricted Subsidiary so long as, in the case of any dividend or distribution payable on or in respect of any class or series of securities issued by a Restricted Subsidiary that is not a Wholly Owned Restricted Subsidiary, the Borrower or a Restricted Subsidiary receives at least its pro rata share of such dividend or distribution in accordance with its Equity Interests in such class or series of securities);

(ii)     purchase or otherwise acquire or retire for value any Equity Interests of the Borrower or any direct or indirect parent of the Borrower;

(iii)     make any principal payment on, or redeem, repurchase, defease or otherwise acquire or retire for value, in each case prior to any scheduled repayment or scheduled maturity, any Junior Debt of the Borrower or any Restricted Subsidiary (other than the payment, redemption, repurchase, defeasance, acquisition or retirement of Indebtedness permitted under <u>clauses (v)</u> and <u>(vii)</u> of <u>Section 5.06(b)</u>); or

82

Error! Unknown document property name.
WEIL:\97986321\6\45327.0007

Debtors' Exhibit No. 30
Page 90 of 137

(iv)      make any Restricted Investment

(all such payments and other actions set forth in clauses (i) through (iv) above being collectively referred to as "Restricted Payments").

(b)      The provisions of Section 5.07(a) shall not prohibit:

(i)      (A) the redemption, repurchase, retirement or other acquisition of any Equity Interests ("Retired Capital Stock") or Junior Debt of the Borrower, any direct or indirect parent of the Borrower or any Subsidiary Guarantor in exchange for, or out of the proceeds of, the substantially concurrent sale of, Equity Interests of a Parent Entity (other than Disqualified Stock or any Equity Interests sold to the Borrower or a Subsidiary of the Borrower) (collectively, including any such contributions, "Refunding Capital Stock"); and

(B) the declaration and payment of dividends on the Retired Capital Stock out of the proceeds of the substantially concurrent sale (other than to the Borrower or a Subsidiary of the Borrower) of Refunding Capital Stock; *provided* that no Restricted Payment shall be permitted to be made pursuant to this clause (i) if a Default or Event of Default has occurred and is continuing or would result therefrom;

(ii)      the repayment, prepayment, redemption, repurchase, defeasance or other acquisition or retirement of Junior Debt of the Borrower or any Subsidiary Guarantor made by exchange for, or out of the proceeds of the substantially concurrent sale of, new Indebtedness of the Borrower or a Subsidiary Guarantor which is Incurred in accordance with Section 5.06(b)(xi);

(iii)      the declaration and payment of dividends or distributions to holders of any class or series of Disqualified Stock of the Borrower or any of its Restricted Subsidiaries issued or incurred in accordance with Section 5.06;

(iv)      other Restricted Payments, in an aggregate amount, when taken together with all other Restricted Payments made pursuant to this clause (iv) not to exceed $1,150,000;

(v)      (A) with respect to any taxable period for which the Borrower and/or any of its Subsidiaries are members of a consolidated, combined, affiliated, unitary or similar income tax group for U.S. federal and/or applicable state or local income tax purposes, or for which the Borrower is a partnership or disregarded entity for U.S. federal income tax purposes that is wholly-owned (directly or indirectly) by a C corporation for U.S. federal and/or applicable state or local income tax purposes, distributions to the Borrower and any direct or indirect parent of the Borrower in an amount not to exceed the excess of (I) the amount of any U.S. federal, state and/or local income taxes that the Borrower and/or its Subsidiaries, as applicable, would have paid for such taxable period had the Borrower and/or its Subsidiaries, as applicable, been a stand-alone corporate group over (II) the portion of such income Taxes that is paid by the Borrower and/or its Subsidiaries; *provided*, that any portion of such Restricted Payments that are made on account of Taxes attributable to the Closing Date Unrestricted Subsidiary shall be limited to the amount actually paid with respect to such period by the Closing Date Unrestricted Subsidiary to the Borrower or its Restricted Subsidiaries for the purposes of paying such Taxes; and

(B) with respect to any taxable period ending after the Closing Date for which the Borrower is a partnership or disregarded entity for U.S. federal income tax purposes that is not wholly-owned (directly or indirectly) by a C corporation for U.S. federal and/or applicable state or local income tax purposes, distributions to any direct or indirect parent of the Borrower to pay any Taxes attributable to its direct or indirect ownership of the Borrower and its Subsidiaries with respect to such taxable period (assuming that each owner is subject to Tax at the highest combined marginal federal, state and/or local tax rate applicable to any owner for

83

Error! Unknown document property name.
WEIL:\97986321\6\45327.0007

Debtors' Exhibit No. 30
Page 91 of 137

such taxable period and taking into account the deductibility of state and local income taxes for U.S. federal income tax purposes (and any limitations thereon), the alternative minimum tax, any cumulative net taxable loss of the Borrower for prior taxable periods ending after the Closing Date to the extent such loss is of a character that would allow such loss to be available to reduce Taxes in the current taxable period (taking into account any limitations on the utilization of such loss to reduce such Taxes and assuming such loss has not already been utilized) and the character (e.g. long-term or short-term capital gain or ordinary or exempt) of the applicable income); *provided*, that, any portion of such Restricted Payments that are made on account of Taxes to the Closing Date Unrestricted Subsidiary shall be limited to the amount actually paid with respect to such period by the Closing Date Unrestricted Subsidiary to the Borrower or its Restricted Subsidiaries for the purposes of paying such Taxes.

(vi)   any Restricted Payment (100% of which shall be deemed attributable to the Borrower at all times Holdings owns no material assets other than the Equity Interests of the Borrower), if applicable:

(A)   in amounts required for any direct or indirect parent of the Borrower to pay fees and expenses (including franchise or similar taxes) required to maintain its corporate existence, customary salary, bonus and other benefits payable to, and indemnities provided on behalf of, officers and employees of any direct or indirect parent of the Borrower and general corporate operating and overhead expenses of any direct or indirect parent of the Borrower in each case to the extent such fees and expenses are attributable to the ownership or operation of the Borrower, if applicable, and its Subsidiaries; and

(B)   in amounts required for any direct or indirect parent of the Borrower, if applicable, to pay interest and/or principal on Indebtedness the proceeds of which have been contributed to the Borrower or any Restricted Subsidiary and that has been guaranteed by, or is otherwise considered Indebtedness of, the Borrower Incurred in accordance with Section 5.06.

(vii)   repurchases of Equity Interests deemed to occur upon exercise of stock options or warrants if such Equity Interests represent a portion of the exercise price of such options or warrants;

(viii)   purchases of receivables pursuant to a Receivables Repurchase Obligation in connection with a Qualified Receivables Financing and the payment or distribution of Receivables Fees;

(ix)   Restricted Payments by the Borrower or any Restricted Subsidiary of the Borrower to allow the payment of cash in lieu of the issuance of fractional shares upon the exercise of options or warrants or upon the conversion or exchange of Capital Stock of any such Person;

(x)   any Restricted Payment used to fund the Transactions and the payment of fees and expenses Incurred in connection with the Transactions or owed by the Borrower or any direct or indirect parent of the Borrower or Restricted Subsidiaries of the Borrower to Affiliates, and any other payments made, including any such payments made to any direct or indirect parent of the Borrower to enable it to make payments in connection with the consummation of the Transactions, whether payable on the Closing Date or thereafter;

(xi)   payment made or expected to be made by the Borrower or any Restricted Subsidiary in respect of withholding or similar taxes payable upon exercise of Equity Interests by any future, present or former employee, director, manager or consultant and repurchases of Equity Interests deemed to occur upon exercise of stock options or warrants if such Equity Interests represent a portion of the exercise price of such options or warrants;

84

Error! Unknown document property name.
WEIL:\97986321\6\45327.0007

Debtors' Exhibit No. 30
Page 92 of 137

(xii)    the repayment, prepayment, redemption, repurchase, defeasance or other acquisition or retirement of Junior Debt of the Borrower or any Subsidiary Guarantor once in respect of each fiscal quarter so long as the aggregate principal amount paid in connection with such repayment, prepayment, redemption, repurchase, defeasance or other acquisition or retirement does not to exceed 25% of the amount of Consolidated Excess Cash as of the last day of the most recently ended fiscal quarter, so long as (x) such repayment, prepayment, redemption, repurchase, defeasance or other acquisition or retirement of Junior Debt is made within 5 Business Days of the end of such fiscal quarter, and (y) no Event of Default shall have occurred and be continuing prior to or after giving effect to such repayment, prepayment, redemption, repurchase, defeasance or other acquisition or retirement of Junior Debt or would result as a consequence thereof; and

(xiii)    Restricted Payments consisting of regular cash dividends made by the Borrower from free cash flow (as determined by Board of Directors of the Borrower).

*provided, however*, that any Restricted Payments made with property other than cash shall be calculated using the Fair Market Value of such property.

SECTION 5.08.    <u>Dividend and Other Payment Restrictions Affecting Subsidiaries</u>.  The Borrower shall not, and shall not permit any of its Restricted Subsidiaries to, directly or indirectly, create or otherwise cause or suffer to exist or become effective any consensual encumbrance or consensual restriction on the ability of any Restricted Subsidiary to:

(a)    (i) pay dividends or make any other distributions to the Borrower or any of its Restricted Subsidiaries (1) on its Capital Stock; or (2) with respect to any other interest or participation in, or measured by, its profits; or (ii) pay any Indebtedness owed to the Borrower or any of its Restricted Subsidiaries;

(b)    make loans or advances to the Borrower or any of its Restricted Subsidiaries;

(c)    sell, lease or transfer any of its properties or assets to the Borrower or any of its Restricted Subsidiaries; or

(d)    grant Liens pursuant to the Security Documents on any of their assets to be pledged as Collateral hereunder;

except in each case (in the case of clause (d) above, solely in the case of clauses (iii), (iv), (vii), (viii), (ix), (x), (xi), (xii) and, with respect to the foregoing clauses, (xvii) below) for such encumbrances or restrictions existing under or by reason of:

(i)    (x) contractual encumbrances or restrictions in effect on the Closing Date, including pursuant to the FLTL Facility (including any guarantee thereof) and any Hedging Obligations (including any guarantee thereof) incurred in connection with such facilities and (y) contractual encumbrances or restrictions pursuant to the FLTL Credit Agreement and FLTL Credit Agreement Documents and, in each case, any similar contractual encumbrances effected by any amendments, modifications, restatements, renewals, supplements, refundings, replacements or refinancings of such agreements or instruments;

(ii)    this Agreement or the Guarantee;

(iii)    applicable law or any applicable rule, regulation or order;

(iv)    any agreement or other instrument of a Person acquired by the Borrower or any Restricted Subsidiary which was in existence at the time of such acquisition (but not created in contemplation thereof or to provide all or any portion of the funds or credit support utilized to

85

Error! Unknown document property name.
WEIL:\97986321\6\45327.0007

Debtors' Exhibit No. 30
Page 93 of 137

consummate such acquisition), which encumbrance or restriction is not applicable to any Person, or the properties or assets of any Person, other than the Person and its Subsidiaries, or the property or assets of the Person and its Subsidiaries, so acquired;

(v)     contracts or agreements for the sale of assets, including any restriction with respect to the Borrower or any Restricted Subsidiary imposed pursuant to an agreement entered into for the sale or disposition of the Capital Stock or assets of the Borrower or any such Restricted Subsidiary to the extent such sale or disposition would be permitted hereunder;

(vi)     secured Indebtedness otherwise permitted to be Incurred pursuant to Section 5.06 that limit the right of the debtor to dispose of the assets securing such Indebtedness;

(vii)     restrictions on cash or other deposits or net worth imposed by customers under contracts entered into in the ordinary course of business;

(viii)     customary provisions in joint venture agreements and other similar agreements entered into in the ordinary course of business;

(ix)     purchase money obligations for property acquired, Capitalized Lease Obligations and obligations in respect of indebtedness permitted to be incurred under Section 5.06(b)(xviii) that impose restrictions of the nature discussed in clause (c) above on the property so acquired;

(x)     customary provisions contained in leases, licenses and other similar agreements entered into in the ordinary course of business;

(xi)     in the case of clause (c) above, any encumbrance or restriction that restricts in a customary manner the subletting, assignment or transfer of any property or asset that is subject to a lease (including leases governing leasehold interests or Farm-In Agreements or Farm-Out Agreements relating to leasehold interests in Oil and Gas Properties), license or similar contract, or the assignment or transfer of any such lease (including leases governing leasehold interests or Farm-In Agreements or Farm-Out Agreements relating to leasehold interests in Oil and Gas Properties), license (including without limitations, licenses of intellectual property) or other contracts;

(xii)     any encumbrance or restriction of a Receivables Subsidiary effected in connection with a Qualified Receivables Financing; *provided, however*, that such restrictions apply only to such Receivables Subsidiary;

(xiii)     other Indebtedness, Disqualified Stock or Preferred Stock (A) of the Borrower or any Restricted Subsidiary that is a Subsidiary Guarantor or a Foreign Subsidiary or (B) of any Restricted Subsidiary that is not a Subsidiary Guarantor or a Foreign Subsidiary so long as such encumbrances and restrictions contained in any agreement or instrument will not materially affect the Borrower's ability to make anticipated principal or interest payments on the Loans (as determined in good faith by the Borrower), *provided* that in the case of each of clauses (A) and (B), such Indebtedness, Disqualified Stock or Preferred Stock is permitted to be Incurred subsequent to the Closing Date not in violation of Section 5.06;

(xiv)     any Restricted Investment not prohibited by Section 5.07 and any Permitted Investment;

(xv)     any customary encumbrances or restrictions imposed pursuant to any agreement of the type described in the definition of "Permitted Business Investment";

86

Error! Unknown document property name.
WEIL:\97986321\6\45327.0007

Debtors' Exhibit No. 30
Page 94 of 137

(xvi)     any agreements entered into with respect to any sale, transfer, lease or other disposition permitted by <u>Section 5.09</u> and applicable solely to assets under such sale, transfer, lease or other disposition; or

(xvii)     any encumbrances or restrictions of the type referred to in <u>clauses (a)</u>, <u>(b)</u> or <u>(c)</u> above imposed by any amendments, modifications, restatements, renewals, increases, supplements, refundings, replacements or refinancings of the contracts, instruments or obligations referred to in <u>clauses (i)</u> through <u>(xvi)</u> above; *provided* that such amendments, modifications, restatements, renewals, increases, supplements, refundings, replacements or refinancings are, in the good faith judgment of the Borrower, no more restrictive with respect to such dividend and other payment restrictions than those contained in the dividend or other payment restrictions prior to such amendment, modification, restatement, renewal, increase, supplement, refunding, replacement or refinancing.

For purposes of determining compliance with this <u>Section 5.08</u>, (i) the priority of any Preferred Stock in receiving dividends or liquidating distributions prior to dividends or liquidating distributions being paid on common stock shall not be deemed a restriction on the ability to make distributions on Capital Stock and (ii) the subordination of loans or advances made to the Borrower or a Restricted Subsidiary to other Indebtedness Incurred by the Borrower or any such Restricted Subsidiary shall not be deemed a restriction on the ability to make loans or advances.

SECTION 5.09.     <u>Asset Sales</u>.

(a)     The Borrower shall not, and shall not permit any Restricted Subsidiary to, cause or make any Asset Sale.

(b)     The limitations set forth in <u>Section 5.09(a)</u> shall not apply to:

(i)     Asset Sales constituting Mexico Liquidity Events;

(ii)     Asset Sales of Proved Developed Producing Reserves, Proved Developed Non-Producing Reserves (but excluding any Mexico Assets) and, in each case, infrastructure assets related thereto in an aggregate amount not to exceed $34,500,000;

(iii)     Asset Sales of any Oil and Gas Property or interest therein to which no proved reserves are attributable at the time of such disposition; provided that no Default or Event of Default has occurred and is continuing or would result therefrom;

(iv)     any exchange of assets (including a combination of assets and Cash Equivalents) other than assets constituting Proved Developed Producing Reserves, Proved Developed Non-Producing Reserves, related infrastructure assets and Mexico Assets, for assets related to a Similar Business of comparable or greater market value or usefulness to the business of the Borrower and the Restricted Subsidiaries as a whole, as determined in good faith by the Borrower; provided that any exchange pursuant to this clause (iv) shall only be permitted so long as no Default or Event of Default has occurred and is continuing or would result therefrom;

(v)     other Asset Sales so long as (x) the aggregate amount of Asset Sales pursuant to this <u>clause (v)</u> after the Closing Date does not exceed $115,000,000, (y) at the time of such Asset Sale, no Event of Default has occurred and is continuing and (z) at least 85% of the consideration therefor received by the Borrower or such Restricted Subsidiary, as the case may be, is in the form of cash and/or Cash Equivalents;

*provided* that, in each case of the foregoing, such Asset Sale shall only be permitted (A) solely to the extent occurring pursuant to <u>clause (i)</u>, <u>(ii)</u>, <u>(iii)</u> or <u>(v)</u> above, if for a consideration no less than Fair

Error! Unknown document property name.
WEIL:\97986321\6\45327.0007

Market Value, (B) so long as the Borrower has complied with the notice requirements of <u>Section 5.01(c)(iii)</u> and (C) so long as the Borrower, or other relevant Credit Party, shall apply the proceeds therefrom to the prepayment of the Loans to the extent required pursuant to <u>Section 2.13.</u>

(c)     Solely for the purposes of <u>clause (b)(v)</u> above, the following additional forms of consideration shall qualify as Cash Equivalents;

(i)     any liabilities (as shown on the Borrower's or a Restricted Subsidiary's most recent balance sheet or in the notes thereto) of the Borrower or any Restricted Subsidiary (other than liabilities that are by their terms subordinated to the Loans or any Guarantee) that are assumed by the transferee of any such assets or that are otherwise cancelled or terminated in connection with the transaction with such transferee; and

(ii)     with respect to any Asset Sale of Oil and Gas Properties by the Borrower or any Restricted Subsidiary, the costs and expenses related to the exploration, development, completion or production of such Oil and Gas Properties and activities related thereto which are assumed by the transferee (or an Affiliate thereof) substantially contemporaneously with such Asset Sale.

SECTION 5.10.     <u>Transactions with Affiliates.</u>

(a)     The Borrower shall not, and shall not permit any of its Restricted Subsidiaries to make any payment to, or sell, lease, transfer or otherwise dispose of any of its properties or assets to, or purchase any property or assets from, or enter into or make or amend any transaction or series of transactions, contract, agreement, understanding, loan, advance or guarantee with, or for the benefit of, any Affiliate of the Borrower (each of the foregoing, an "<u>Affiliate Transaction</u>") unless (i) such Affiliate Transaction is on terms that are not materially less favorable to the Borrower or the relevant Restricted Subsidiary than those that could have been obtained in a comparable transaction by the Borrower or such Restricted Subsidiary with an unrelated Person and (ii) the Borrower has provided the Administrative Agent (for further distribution to the Lenders) with written notice of such Affiliate Transaction.

(b)     The provisions of <u>Section 5.10(a)</u> shall not apply to the following:

(i)     transactions between or among the Borrower and/or any Subsidiary Guarantor (or an entity that becomes a Restricted Subsidiary as a result of such transaction);

(ii)     Restricted Payments permitted by <u>Section 5.07</u> and Permitted Investments;

(iii)     the payment of reasonable and customary fees and reimbursement of expenses paid to, and indemnity provided on behalf of, current or former officers, directors, employees or consultants of the Borrower, any Restricted Subsidiary, or any direct or indirect parent of the Borrower;

(iv)     payments or loans (or cancellation of loans) to officers, directors, employees or consultants which are approved by a majority of the Board of Directors of the Borrower in good faith;

(v)     any agreement as in effect as of the Closing Date and specified on <u>Schedule 5.10</u>;

(vi)     the execution of the Transactions, the performance of the obligations under the Loan Documents, the FLTL Credit Agreement and the related transactions, the transactions contemplated by the Plan of Reorganization, and the payment of all fees and expenses related to the Transactions, including fees to the Investors;

(vii)     any transaction effected as part of a Qualified Receivables Financing;

88

Error! Unknown document property name.
WEIL:\97986321\6\45327.0007

Debtors' Exhibit No. 30
Page 96 of 137

(viii)    the issuance of Equity Interests (other than Disqualified Stock) of the Borrower to any Person;

(ix)    the issuances of securities or other payments, awards or grants in cash, securities or otherwise pursuant to, or the funding of, employment arrangements, stock option and stock ownership plans or similar employee benefit plans approved by the Board of Directors of the Borrower or any direct or indirect parent of the Borrower or of a Restricted Subsidiary, as appropriate, in good faith;

(x)    the entering into of any tax sharing agreement or arrangement that complies with clause (iv) of Section 5.07(b);

(xi)    any contribution to the capital of the Borrower;

(xii)    transactions permitted by, and complying with, the provisions of Section 5.11;

(xiii)    transactions between the Borrower or any of its Restricted Subsidiaries and any Person that is an Affiliate solely because a director of such Person is also a director of the Borrower or any direct or indirect parent of the Borrower; *provided*, *however*, that such director abstains from voting as a director of the Borrower or such direct or indirect parent, as the case may be, on any matter involving such other Person;

(xiv)    pledges of Equity Interests of the Closing Date Unrestricted Subsidiary;

(xv)    any employment agreements entered into by the Borrower or any of its Restricted Subsidiaries in the ordinary course of business;

(xvi)    payments by the Borrower or any of its Restricted Subsidiaries to any of the Investors made for any financial advisory, financing, underwriting or placement services or in respect of other investment banking activities, including in connection with acquisitions or divestitures, which payments are approved by a majority of the Board of Directors of the Borrower in good faith;

(xvii)    transactions undertaken in good faith (as certified by a responsible financial or accounting officer of the Borrower in an Officers' Certificate) for the purpose of improving the consolidated tax efficiency of the Borrower and its Subsidiaries and not for the purpose of circumventing any covenant set forth in this Agreement;

(xviii)    customary agreements and arrangements with oil and gas royalty trusts and master limited partnership agreements that comply with the affiliate transaction provisions of such royalty trust or master limited partnership agreement;

(xix)    sales or conveyances of net profits interests for cash at Fair Market Value allowed under Section 5.09;

(xx)    any transaction in respect of which the Borrower delivers to the Administrative Agent a letter addressed to the board of directors or managers of the Borrower from an accounting, appraisal or investment banking firm, in each case of nationally-recognized standing that is in the good faith determination of the Borrower qualified to render such letter, which letter states that such transaction is (A) fair, from a financial point of view, to the Borrower or such Restricted Subsidiary or (B) on terms, taken as a whole, that are no less favorable to the Borrower or such Restricted Subsidiary, as applicable, than would be obtained in a comparable arm's length transaction with a person that is not an Affiliate; and

(xxi)    intellectual property licenses in the ordinary course of business.

SECTION 5.11.    Mergers, Etc.  The Borrower will not, and will not permit any Restricted Subsidiary to, merge into or with or consolidate with any other Person, or permit any other Person to merge into or consolidate with it, or sell, transfer, lease or otherwise dispose of (whether in one transaction or in a series of transactions) all or substantially all of its property to any other Person (whether now owned or hereafter acquired) (any such transaction, a "consolidation"), or liquidate or dissolve; provided that, so long as no Event of Default has occurred and is then continuing:

(a)    any Restricted Subsidiary may be liquidated or may participate in a merger or consolidation with, or dispose of all or substantially all of its assets to, the Borrower or a Subsidiary Guarantor (provided that the Borrower or a Subsidiary Guarantor shall be the continuing or surviving entity in any such transaction involving the Borrower or a Subsidiary Guarantor);

(b)    any Restricted Subsidiary that is not a Subsidiary Guarantor may be liquidated or may participate in a merger or consolidation with, or dispose of all or substantially all of its assets to, any other Restricted Subsidiary that is not a Subsidiary Guarantor or another Person who becomes a Restricted Subsidiary that is not a Subsidiary Guarantor concurrent with such transaction;

(c)    any Subsidiary Guarantor may participate in a merger or consolidation with, or dispose of all or substantially all of its assets to, another Subsidiary Guarantor;

(d)    any Restricted Subsidiary may liquidate or dissolve so long as its assets (if any) are distributed to the Borrower or a Subsidiary Guarantor prior to such liquidation or dissolution; or

(e)    any Restricted Subsidiary may merge or consolidate with any other Person in order to effect a Restricted Investment not prohibited by Section 5.07; provided that the continuing or surviving Person shall be a Restricted Subsidiary or the Borrower, which together with each of its Restricted Subsidiaries, shall have complied with the requirements of Section 5.12 and Section 5.17 to the extent required thereby.

SECTION 5.12.    Future Guarantors.  The Borrower shall cause (a) each Restricted Subsidiary (other than an Excluded Subsidiary), formed or acquired after the Closing Date, (b) each other Subsidiary that guarantees any FLTL Facility or any other Material Indebtedness and (c) as required by Section 5.29, the Closing Date Unrestricted Subsidiary, to execute and deliver to the Administrative Agent (which shall be within thirty (30) days (or such later date as the Required Lenders may reasonably agree) of formation or acquisition in the case of clause (a), concurrently with the provision of any such guarantee in the case of clause (b) and within the time period set forth in Section 5.29 in the case of clause (c)) a joinder agreement to the Guarantee pursuant to which such Restricted Subsidiary will guarantee payment of the Loans on the terms and conditions set forth in this Agreement, and a joinder agreement to each applicable Security Document, and, if required by the Intercreditor Agreement, a joinder to such Intercreditor Agreement; provided, that, at its option, the Borrower shall be permitted to cause any other Affiliate to provide a guarantee pursuant to the terms of this Section 5.12. Each Guarantor shall be released in accordance with Section 8.20.

SECTION 5.13.    Liens.  The Borrower shall not, and shall not permit any Restricted Subsidiary to, create, Incur or suffer to exist any Lien on any asset or property of the Borrower or such Restricted Subsidiary, other than Permitted Liens. For purposes of determining compliance with this Section 5.13, (A) a Lien securing an item of Indebtedness need not be permitted solely by reference to one category of permitted Liens described in the definition of "Permitted Liens" but may be permitted in part under any combination thereof and (B) in the event that a Lien securing an item of Indebtedness, Disqualified Stock or Preferred Stock (or any portion thereof) meets the criteria of one or more of the categories of permitted Liens described in the definition of "Permitted Liens", the Borrower shall, in its sole discretion, classify or divide, such Lien securing such item of Indebtedness (or any portion thereof) in any manner that complies with this Section 5.13 and will only be required to include the amount and type of such Lien or such item of Indebtedness secured by such Lien in one of the clauses of the

90

Error! Unknown document property name.
WEIL:\97986321\6\45327.0007

Debtors' Exhibit No. 30
Page 98 of 137

definition of "Permitted Liens" and such Lien securing such item of Indebtedness will be treated as being Incurred or existing pursuant to only one of such clauses.

SECTION 5.14.    <u>Compliance with Material Contracts.</u> The Borrower shall, and shall cause each Restricted Subsidiary to, comply with and maintain in full force and effect each Material Contract, except where the failure to comply would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect; <u>provided</u>, that the Credit Parties and their Subsidiaries may contest the terms and conditions of any such Material Contract in good faith through applicable proceedings so long as adequate reserves are maintained in accordance with GAAP**.**

SECTION 5.15.    <u>Existence; Business and Properties</u>.  The Borrower shall, and shall cause each Restricted Subsidiary to:

(a)     Do or cause to be done all things necessary to preserve, renew and keep in full force and effect its legal existence except as otherwise permitted by <u>Section 5.11</u>.

(b)     (i) Do or cause to be done all things necessary to obtain, preserve, renew, extend and keep in full force and effect the permits, franchises, authorizations, intellectual property, licenses and rights with respect thereto necessary in all material respects to the normal conduct of its business and (ii) at all times maintain and preserve all material property necessary to the normal conduct of its business and keep such property in good repair, working order and condition and from time to time make, or cause to be made, all needful and proper repairs, renewals, additions, improvements and replacements thereto necessary in order that the business carried on in connection therewith, if any, may be properly conducted in all material respects at all times (in each case except as permitted by this Agreement).

SECTION 5.16.    <u>Maintenance of Insurance</u>.

(a)     The Borrower and its Restricted Subsidiaries shall maintain or cause to be maintained, with financially sound and reputable insurers, (i) directors and officers insurance, and (ii) such casualty insurance, public liability insurance, third party property damage insurance with respect to liabilities, losses or damage in respect of the assets, properties and businesses of the Borrower and its Restricted Subsidiaries as may customarily be carried or maintained under similar circumstances by Persons of established reputation engaged in similar businesses, in each case in such amounts (giving effect to self insurance), with such deductibles, covering such risks and otherwise on such terms and conditions as shall be customary for such Persons.  Each such policy of insurance shall (i) in the case of each liability insurance policy, name Collateral Agent, for the benefit of Secured Parties, as an additional insured thereunder as its interests may appear, (ii) in the case of each casualty insurance policy, contain a lender loss payable clause or endorsement, satisfactory in form and substance to Required Lenders, that names Collateral Agent, for the benefit of Secured Parties, as the lender loss payee thereunder, and (iii) in each case, provide for at least thirty days' prior written notice to Collateral Agent of any modification or cancellation of such policy.

(b)     If any improvements located on any Mortgaged Property are at any time located in an area identified by the Federal Emergency Management Agency (or any successor agency) as a Special Flood Hazard Area with respect to which flood insurance has been made available under the National Flood Insurance Act of 1968 (as now or hereafter in effect or successor act thereto), then the Borrower shall, or shall cause the applicable Credit Party to (i) maintain, or cause to be maintained, with a financially sound and reputable insurer, flood insurance in an amount and otherwise sufficient to comply with all applicable rules and regulations promulgated pursuant to the Flood Insurance Laws and (ii) deliver to the Administrative Agent evidence of such compliance.

(c)     In connection with the covenants set forth in this <u>Section 5.16</u>, it is understood and agreed that:

91

Error! Unknown document property name.
WEIL:\97986321\6\45327.0007

Debtors' Exhibit No. 30
Page 99 of 137

(i)         none of the Administrative Agent, the Lenders and their respective agents or employees shall be liable for any loss or damage insured by the insurance policies required to be maintained under this <u>Section 5.16</u>, it being understood that (A) the Credit Parties shall look solely to their insurance companies or any other parties other than the aforesaid parties for the recovery of such loss or damage and (B) such insurance companies shall have no rights of subrogation against the Administrative Agent, the Lenders or their agents or employees.  If, however, the insurance policies, as a matter of the internal policy of such insurer, do not provide waiver of subrogation rights against such parties, as required above, then the Borrower, on behalf of itself and on behalf of each of its Subsidiaries, hereby agrees, to the extent permitted by law, to waive, and further agrees to cause each of its Subsidiaries to waive, its right of recovery, if any, against the Administrative Agent, the Lenders and their agents and employees; and

(ii)        the designation of any form, type or amount of insurance coverage by the Administrative Agent under this <u>Section 5.16 </u>shall in no event be deemed a representation, warranty or advice by the Administrative Agent or the Lenders that such insurance is adequate for the purposes of the business of the Borrower and the Restricted Subsidiaries or the protection of their properties.

SECTION 5.17.        <u>Additional Collateral</u>.

(a)        In connection with the delivery of the Reserve Reports required by <u>Sections 5.26(a)</u> and <u>5.26(c)</u>, the Borrower shall review such Reserve Report and the list of current Mortgaged Properties to ascertain whether or not the PV-10 of the Mortgaged Properties evaluated in such Reserve Report represent at least 95% of the PV-10 of the Oil and Gas Properties of the Credit Parties after giving effect to exploration and production activities, acquisitions, dispositions and production. In the event the PV-10 of the Mortgaged Properties do not represent 95% of such PV-10 of the Oil and Gas Properties of the Credit Parties, the Borrower or the appropriate Subsidiary Guarantor shall, within 45 days of the date of delivery of such Reserve Report (or such later date as the Required Lenders shall reasonably agree), execute and deliver mortgages, deeds of trust, security instruments, financing statements and other Security Documents as shall be reasonably necessary to vest in the Collateral Agent a perfected security interest, subject only to Permitted Liens, such that after giving effect thereto, the PV-10 of the Mortgaged Properties will represent at least 95% of the PV-10 of the Oil and Gas Properties of the Credit Parties (but subject to the limitations described in <u>Article VIII</u>, the Security Documents, the Intercreditor Agreement and limitations under applicable local law).

(b)        Upon any Restricted Subsidiary becoming a Subsidiary Guarantor as contemplated by <u>Section 5.12</u> or the acquisition by the Borrower or any Subsidiary Guarantor of any after-acquired property (other than Excluded Assets), or upon any additional Restricted Subsidiary becoming a Subsidiary Guarantor that has after-acquired property (other than Excluded Assets), the Borrower or such Subsidiary Guarantor shall within 45 days (or such later date as the Required Lenders shall reasonably agree) of the acquisition of such property (or, in the case of a person that becomes a Subsidiary Guarantor as contemplated by <u>Section 5.12</u>, within the time period for such person becoming a Subsidiary Guarantor set forth therein) execute and deliver such mortgages, deeds of trust, security instruments, financing statements and other Security Documents as shall be reasonably necessary to vest in the Collateral Agent a perfected second-priority security interest, subject only to Permitted Liens, in such after-acquired property (other than Excluded Assets) and to have such after-acquired property (other than Excluded Assets) (but subject to the limitations described in <u>Article VIII</u>, the Security Documents, the Intercreditor Agreement and limitations under applicable local law) added to the Collateral, and thereupon all provisions of this Agreement relating to the Collateral shall be deemed to relate to such after-acquired property (other than Excluded Assets) to the same extent and with the same force and effect; *provided* that no such mortgages, deeds of trust, security instruments, financing statements and other Security Documents shall be required to be executed and delivered by the Borrower or such Subsidiary Guarantor if at least 95% of the PV-10 of the Credit Parties' total Proved Reserves shall constitute Collateral and be subject to any applicable mortgages, deeds of trust, security instruments, financing statements and other Security Documents in connection therewith.

Error! Unknown document property name.
WEIL:\97986321\6\45327.0007

SECTION 5.18.    <u>Payment of Taxes, etc.</u>    The Borrower shall, and shall cause each Restricted Subsidiary to, pay, discharge or otherwise satisfy its obligations in respect of all material Taxes, before the same shall become delinquent or in default, except where the amount or validity thereof is being contested in good faith by appropriate proceedings and the Borrower or a Subsidiary thereof has set aside on its books adequate reserves therefor in accordance with GAAP (or in the case of a Foreign Subsidiary, the comparable accounting principles in the relevant jurisdiction).

SECTION 5.19.    <u>Compliance with Laws</u>.    Each of Holdings, the Borrower and its Subsidiaries shall comply in all material respects with all Requirements of Law (it being understood, in the case of statutes, regulations and orders of, and all applicable restrictions imposed by, all Governmental Authorities that are specifically referred to in any other provision of this Agreement, the Credit Parties shall also be required to represent and/or comply with, as applicable, the express terms of such provision). Holdings, the Borrower and its Subsidiaries shall comply in all material respects with all Sanctions, Anti-Corruption Laws and Anti-Terrorism and Anti-Money Laundering Laws and maintain policies and procedures, such that, at all times, the representations and warranties made in <u>Section 3.17</u> are true and correct.

SECTION 5.20.    <u>Further Instruments and Acts</u>.    At any time or from time to time upon the reasonable request of the Administrative Agent, each Credit Party will, at its expense, promptly execute, acknowledge and deliver such further documents and do such other acts and things as the Administrative Agent or the Collateral Agent may reasonably request in order to effect fully the purposes of the Loan Documents or to perfect or renew the rights of the Collateral Agent for the benefit of the Secured Parties with respect to the Collateral (or with respect to any additions thereto or replacements or proceeds thereof or with respect to any other property or assets hereafter acquired by Holdings or any Subsidiary that may be deemed to be part of the Collateral). In furtherance and not in limitation of the foregoing, each Credit Party shall take such actions as the Administrative Agent or the Collateral Agent may reasonably request from time to time to ensure that the Obligations are guaranteed by the Guarantors and are secured by a second-priority Lien (subject to Permitted Liens) on all of the Collateral.

Notwithstanding the foregoing provisions of this <u>Section 5.20</u> or anything in this Agreement or any other Loan Document to the contrary: (A) Liens required to be granted from time to time shall be subject to exceptions and limitations set forth in the Collateral Agreement and the other Loan Documents and, to the extent appropriate in any applicable jurisdictions, as agreed between the Required Lenders in their Permitted Business Judgment and the Borrower and (B) the Collateral shall not include any Excluded Assets.

SECTION 5.21.    <u>Books, Records and Inspections</u>.

(a)    The Borrower will, and will cause each Restricted Subsidiary to, permit officers and designated representatives of the Administrative Agent or officers and designated representatives of the Required Lenders (as accompanied by the Administrative Agent), upon prior written notice to visit and inspect any of the properties or assets of the Borrower or such Restricted Subsidiary in whomsoever's possession to the extent that it is within such party's control to permit such inspection (and shall use commercially reasonable efforts to cause such inspection to be permitted to the extent that it is not within such party's control to permit such inspection), and to examine the financial records of the Borrower and any such Restricted Subsidiary and discuss the affairs, finances, accounts and condition of the Borrower or any such Restricted Subsidiary with its and their officers and independent accountants therefor, in each case of the foregoing upon reasonable advance notice to the Borrower, all at such reasonable times and intervals during normal business hours and to such reasonable extent as the Administrative Agent or the Required Lenders may desire (and subject, in the case of any such meetings or advice from such independent accountants, to such accountants' customary policies and procedures); *provided* that, excluding any such visits and inspections during the continuation of an Event of Default, (i) only the Administrative Agent on behalf of the Required Lenders accompanied by officers and designated representatives of the Required Lenders may exercise rights of the Administrative Agent and the Lenders under this <u>Section 5.21</u>, and (ii) only one such visit per fiscal year shall be at the Borrower's expense (limited, in the case of such visit, to the expenses incurred by the Administrative Agent); *provided*, *further*, that when an Event of Default has

Error! Unknown document property name.
WEIL:\97986321\6\45327.0007

occurred and is continuing, the Administrative Agent (or any of its representatives or independent contractors) or any representative of the Required Lenders may do any of the foregoing at the expense of the Borrower at any time during normal business hours and upon reasonable advance notice.  The Administrative Agent and the Required Lenders shall give the Borrower the opportunity to participate in any discussions with the Borrower's independent public accountants.  Notwithstanding anything to the contrary in this Section 5.21, neither the Borrower nor any Restricted Subsidiary will be required to disclose, permit the inspection, examination or making copies or abstracts of, or discussion of, any document, information or other matter (x) that constitutes non-financial trade secrets or non-financial proprietary information, (y) in respect of which disclosure to the Administrative Agent or any Lender (or their respective representatives or contractors) is prohibited by any Requirement of Law or any binding agreement or (z) that is subject to attorney-client or similar privilege or constitutes attorney work product; provided that, to the extent any information is withheld pursuant to the foregoing, the Borrower agrees to provide written notice of the reason for such information being withheld.

(b)     The Borrower will, and will cause each of the Restricted Subsidiaries to, keep proper books of record and accounts in conformity in all material respects with GAAP.

SECTION 5.22.     ERISA.

(a)     Promptly after the Borrower knows or has reason to know of the occurrence of any ERISA Event that, individually or in the aggregate (including in the aggregate such ERISA Events previously disclosed or exempt from disclosure hereunder, to the extent the liability therefor remains outstanding), would be reasonably likely to result in a Material Liability to any Credit Party, the Borrower will deliver to the Administrative Agent a certificate of an Authorized Officer or any other senior officer of the Borrower setting forth details as to such occurrence and the action, if any, that Holdings, the Borrower, any of their Restricted Subsidiaries or an ERISA Affiliate, as applicable, is required or proposes to take, together with any notices (required, proposed or otherwise) given to or filed with by Holdings, the Borrower, any such Restricted Subsidiary or any such ERISA Affiliate, the PBGC, a Plan participant (other than notices relating to an individual participant's benefits) or the Plan administrator with respect thereto.  Promptly after the same is available to Holdings, the Borrower, any of their Restricted Subsidiaries or any ERISA Affiliate, the Borrower will deliver copies of (i) each Schedule SB (Actuarial Information) to the annual report (Form 5500 Series) filed by Holdings, the Borrower, any of their Restricted Subsidiaries or any ERISA Affiliate with the Internal Revenue Service, the Department of Labor or any other Governmental Authority with respect to each Plan, (ii) all notices received by Holdings, the Borrower, any of their Restricted Subsidiaries or any ERISA Affiliate from a Multiemployer Plan sponsor concerning an ERISA Event; and (iii) copies of such other documents or governmental reports or filings relating to any Employee Benefit Plan as Administrative Agent shall reasonably request.

(b)     Promptly following any request therefor, the Borrower will deliver to the Administrative Agent copies of (i) any documents described in Section 101(k) of ERISA that Holdings, the Borrower, any of their Restricted Subsidiaries or any ERISA Affiliate may request with respect to any Multiemployer Plan and (ii) any notices described in Section 101(l) of ERISA that Holdings, the Borrower, any of their Restricted Subsidiaries or any ERISA Affiliate may request with respect to any Multiemployer Plan; provided that if Holdings, the Borrower, any of their Restricted Subsidiaries or any ERISA Affiliate has not requested such documents or notices from the administrator or sponsor of the applicable Multiemployer Plan, Holdings, the Borrower, the applicable Restricted Subsidiaries or the applicable ERISA Affiliates shall promptly make a request for such documents or notices from such administrator or sponsor and shall provide copies of such documents and notices promptly after receipt thereof.

SECTION 5.23.     [Reserved].

SECTION 5.24.     Lender Meetings.  The Borrower shall upon the reasonable request of the Administrative Agent (acting upon the reasonable request of the Required Lenders), on a date to be mutually agreed upon by the Borrower and the Administrative Agent following the end of each fiscal year and the end of each of the first three fiscal quarters of each fiscal year, in each case of Borrower (but, in any event, no earlier

Error! Unknown document property name.
WEIL:\97986321\6\45327.0007

than the Business Day following the delivery of annual or quarterly financial statements, as applicable, pursuant to Section 5.01(a) or (b), for such fiscal year or fiscal quarter, as the case may be), to participate in a conference call with the Administrative Agent and the Lenders to discuss the financial condition and results of operations of the Borrower and its consolidated Subsidiaries for such fiscal quarter (and for the period from the beginning of the current fiscal year to the end of such fiscal quarter) or for such fiscal year, as the case may be; provided, that, to the extent the [FLTL Administrative Agent] requests a lender meeting pursuant to Section 5.24 of the FLTL Credit Agreement, the Borrower may (in its sole discretion) combine such lender meeting with any requested lender meeting under this Section 5.24.

SECTION 5.25.    Limitations on Amendments.

(a)    The Borrower shall not and will cause its Restricted Subsidiaries not to amend, supplement, enter into any consent or waiver in respect of or otherwise modify Junior Debt or any other Material Indebtedness, in any manner that would be materially adverse to the interests of the Lenders or not permitted under the terms of the applicable Intercreditor Agreement.

(b)    No Credit Party shall (a) amend or permit any amendments, supplements, waivers or consents under or other modifications to any Credit Party's organizational documents; or (b) amend, terminate, enter into any consent or waiver or other modification of, or permit any amendment, termination, waiver, consent or other modification of any provision of, any Material Contract, if, in either case, such amendment, termination, waiver, consent or other modification would be materially adverse to (x) the Lenders or (y) any Credit Party.

SECTION 5.26.    Reserve Reports.

(a)    On or before the date that is 90 days after the end of each fiscal year (or such later date as the Required Lenders may agree), the Borrower shall deliver a Reserve Report with an "as of" date of December 31st of the preceding year.

(b)    On or before the date of delivery of financial statements required with respect to the first fiscal quarter of any fiscal year pursuant to Section 5.01(b), the Borrower shall deliver a "roll-forward" of the Reserve Report most recently delivered pursuant to Section 5.26(a) reflecting any changes between the "as-of" date of such Reserve Report and the last day of such fiscal quarter.

(c)    On or before the date of delivery of financial statements required with respect to the second fiscal quarter of any fiscal year pursuant to Section 5.01(b), the Borrower shall deliver a Reserve Report with an "as of" date of June 30th of such fiscal year.

(d)    On or before the date of delivery of financial statements required with respect to the third fiscal quarter of any fiscal year pursuant to Section 5.01(b), the Borrower shall deliver a "roll-forward" of the Reserve Report most recently delivered pursuant to Section 5.26(c) reflecting any changes between the "as-of" date of such Reserve Report and the last day of such fiscal quarter.

(e)    All Reserve Reports may be prepared internally by petroleum engineers that are employees of the Borrower, any Restricted Subsidiary, or any of each of their respective Affiliates; provided, that, notwithstanding anything in the foregoing to the contrary, at least one Reserve Report prepared pursuant to Section 5.26(a) or (c) above per fiscal year shall be prepared or audited by an Approved Petroleum Engineer that has audited at least (i) 80% of the Proved Reserves by value and (ii) 80% of Proved Developed Producing Reserves by value.

(f)    With the delivery such information specified in the foregoing clauses (a)-(f), the Borrower shall provide to the Administrative Agent a certificate from an Authorized Officer certifying that in all material respects: (A) the information delivered in connection therewith is true and correct (other than forecasted or forward-looking information), (B) the Credit Parties own good and defensible title to the Oil and

95

Error! Unknown document property name.
WEIL:\97986321\6\45327.0007

Debtors' Exhibit No. 30
Page 103 of 137

Gas Properties evaluated in such engineering information and such Properties are free of all Liens except for Permitted Liens, (C) except as set forth on an exhibit to the certificate, on a net basis there are no gas imbalances, take or pay or other prepayments in excess of the volume specified in <u>Section 5.31</u> with respect to the Oil and Gas Properties evaluated in such Reserve Report which would require any Credit Party to deliver Hydrocarbons either generally or produced from such Oil and Gas Properties constituting Proved Reserves at some future time without then or thereafter receiving full payment therefor, (D) none of the Oil and Gas Properties to be evaluated in such Reserve Report have been disposed of since the date of the last certificate delivered pursuant to this <u>Section 5.26(f)</u>, except as set forth on an exhibit to the certificate, which certificate shall list all of its Oil and Gas Properties disposed of and in such detail as required by the Administrative Agent in its reasonable discretion, and (E) in the case of delivery pursuant to <u>clause (a)</u> or <u>(c)</u> above, certifying that 95% of the PV-10 of Credit Parties' Oil and Gas Properties evaluated in the related Reserve Report (or roll-forward thereof) are Mortgaged Properties, other than Oil and Gas Properties disclosed on a schedule attached thereto, together with a certification that such Oil and Gas Properties will become Mortgaged Properties in accordance with <u>Section 5.17</u>.

SECTION 5.27.    <u>Holdings Covenant</u>.  Holdings covenants and agrees that, unless the Required Lenders shall otherwise consent in writing, Holdings will not engage at any time in any business or business activity other than (i) ownership of the Equity Interests in the Borrower, together with activities related thereto, (ii) performance of its obligations under and in connection with the Loan Documents and the FLTL Credit Agreement Documents, (iii) issuing, selling and redeeming its Equity Interests, (iv) paying taxes, (v) holding directors' and shareholders' meetings, preparing corporate and similar records and other activities (including the ability to incur fees, costs and expenses relating to such maintenance) required to maintain its corporate or other legal structure or to participate in tax, accounting or other administrative matters as a member of the consolidated group of the Credit Parties, (vi) preparing reports to, and preparing and making notices to and filings with, Governmental Authorities and to its holders of Equity Interests, (vii) receiving, and holding proceeds of, Restricted Payments from the Borrower and the Subsidiaries to the extent not prohibited by <u>Section 5.07</u> or <u>5.10</u>, (viii) providing indemnification to officers and directors, (ix) activities permitted hereunder or as otherwise required by Requirements of Law, and (x) activities incidental to the business or activities described in each foregoing clause of this <u>Section 5.27</u>.

SECTION 5.28.    <u>[Reserved]</u>.

SECTION 5.29.    <u>Foreign Subsidiaries; Closing Date Unrestricted Subsidiary</u>.

(a)    Other than the Closing Date Unrestricted Subsidiary and any subsidiaries thereof on the Closing Date, the Borrower shall not, and shall not permit any Credit Party, to have any Foreign Subsidiaries.

(b)    If, at any time, the Closing Date Unrestricted Subsidiary shall become a "restricted subsidiary" and/or a "guarantor" under the FLTL Credit Agreement Documents or any other Material Indebtedness of the Credit Parties, such Closing Date Unrestricted Subsidiary shall, concurrent with such event, become a Restricted Subsidiary and, if applicable, a Subsidiary Guarantor under the Loan Documents.

SECTION 5.30.    <u>Account Control Agreements</u>.  The Borrower shall, and shall cause each Credit Party to, (a) provide notice to the Administrative Agent of the opening of any deposit accounts, commodity accounts or securities accounts (other than an Excluded Account) at least five (5) Business Days prior to the opening thereof (or such other date as the Required Lenders may agree in their sole discretion) and (b) cause their respective deposit accounts, commodity accounts or securities accounts (in each case, other than Excluded Accounts) to at all times be subject to Account Control Agreements; provided that solely in the case of any deposit accounts, commodity accounts or securities accounts in existence on the Closing Date, compliance with this <u>clause (b)</u> shall not be required until the date that is 45 days after the Closing Date (or such later date as the Required Lenders may agree in their sole discretion).

Error! Unknown document property name.
WEIL:\97986321\6\45327.0007

SECTION 5.31.    <u>Gas Imbalances, Take-or-Pay or Other Prepayments</u>. The Borrower shall not, and shall not permit any Credit Party to, allow gas imbalances, take-or-pay or other prepayments with respect to the Oil and Gas Properties of the Borrower or any other Credit Party that would require the Borrower or Credit Party to deliver Hydrocarbons at some future time without then or thereafter receiving full payment therefor to exceed 2.5 Bcfe of Hydrocarbon volumes (stated on a gas equivalent basis) in the aggregate for any individual field.

SECTION 5.32.    <u>Marketing of Production</u>. The Borrower shall not, and shall not permit any Credit Party to enter into any material agreement (which is not cancelable on 90 days' notice or less without penalty or detriment) for the sale of production of the Credit Parties' Hydrocarbons at a fixed non-index price (including calls on, or other rights to purchase, production, whether or not the same are currently being exercised) that (i) represents in respect of such agreements 2.5% or more of the Borrower's average monthly production of Hydrocarbon volumes and (ii) has a maturity or expiry date of longer than six months.

SECTION 5.33.    <u>Dutch Distributions</u>. The Borrower shall cause the Closing Date Unrestricted Subsidiary to promptly transfer all amounts received by the Closing Date Unrestricted Subsidiary as a dividend or distribution from Fieldwood Mexico B.V. on account of the Equity Interests of Fieldwood Mexico B.V. held by the Closing Date Unrestricted Subsidiary to a deposit account subject to an Account Control Agreement.

SECTION 5.34.    <u>Post-Closing Obligations</u>.   The Credit Parties will execute and deliver the documents and complete the tasks set forth on <u>Schedule 5.34</u>, in each case within the time limits specified on such schedule (or such longer period as the Required Lenders may agree in their Permitted Business Judgment).

## ARTICLE VI

Events of Default

SECTION 6.01.    <u>Events of Default</u>.

Upon the occurrence and during the continuation of any of the following specified events (each an "<u>Event of Default</u>"),

(a)    the Borrower shall (i) default in the payment when due of any principal of the Loans or (ii) default, and such default shall continue for three or more Business Days, in the payment when due of any interest on the Loans, fees or of any other amounts owing hereunder or under any other Loan Document (other than any amount referred to in <u>clause (i)</u> above),

(b)    any representation, warranty or statement made or deemed made by any Credit Party herein or in any other Loan Document or any certificate delivered or required to be delivered pursuant hereto or thereto shall prove to be untrue in any material respect on the date as of which made or deemed made (or if any representation or warranty is expressly stated to have been made as of a specific date, untrue in any material respect as of such specific date);

(c)    any Credit Party shall (i) default in the due performance or observance by it of any term, covenant or agreement contained in <u>Section 5.01(a)</u>, <u>5.01(b)</u>, <u>5.01(c)(i)(A)</u>, <u>5.01(e)</u>, <u>5.02</u>, <u>5.04</u>, <u>5.06</u>, <u>5.07</u>, <u>5.08</u>, <u>5.09</u>, <u>5.10</u>, <u>5.11</u>, <u>5.12</u>, <u>5.13</u>, <u>5.15</u> (with respect to the Borrower), <u>5.17</u>, <u>5.20</u>, <u>5.26</u>, <u>5.27</u>, <u>5.29</u>, <u>5.30</u> or <u>5.34</u>, (ii) default in the due performance or observance by it of any term, covenant or agreement contained in <u>Section 5.01(c)</u> (other than to the extent referred to in <u>clause (i)</u> of this <u>Section 6.01(c)</u>) and such default shall continue unremedied for a period of at least 5 Business Days, (iii) default in the due performance or observance by it of any term, covenant or agreement contained in <u>Section 5.01</u> (other than those referred to in <u>clause (i)</u> or <u>(ii)</u> of this <u>Section 6.01(c)</u>) and such default shall continue unremedied for a period of at least 15 days or (iv) default in the due performance or observance by it of any term, covenant or agreement (other than those referred to in <u>Section 6.01(a)</u> or <u>(b)</u> or <u>clauses (i)</u>, (ii) and <u>(iii)</u> of this <u>Section 6.01(c)</u>) contained in this Agreement or any

97

Error! Unknown document property name.
WEIL:\97986321\6\45327.0007

Debtors' Exhibit No. 30
Page 105 of 137

Security Document and such default shall continue unremedied for a period of at least 30 days after receipt of written notice thereof by the Borrower from the Administrative Agent;

(d)        (i) the Borrower or any of the Restricted Subsidiaries shall (1) default in any payment with respect to the FLTL Facility or any other Material Indebtedness (other than the Indebtedness described in Section 6.01(a)) beyond the period of grace, if any, provided in the instrument of agreement under which such Indebtedness was created or (2) default in the observance or performance of any agreement or condition relating to the FLTL Facility or such other Material Indebtedness or contained in any instrument or agreement evidencing, securing or relating thereto, or any other event shall occur or condition exist (other than, (x) with respect to Indebtedness in respect of any Hedge Agreements, termination events or equivalent events pursuant to the terms of such Hedge Agreements, (y) secured Indebtedness that becomes due as a result of a disposition (including as a result of Casualty Event) of the property or assets securing such Indebtedness permitted under this Agreement and (z) any Indebtedness outstanding hereunder), the effect of which default or other event or condition is to cause, or (other than with respect to the FLTL Facility) permit the holders of any such Indebtedness to cause, any such Indebtedness to become due or to be repurchased, prepaid, defeased or redeemed (automatically or otherwise), or an offer to repurchase, prepay, defease or redeem such Indebtedness to be made, prior to its stated maturity, unless, in the case of each of the foregoing, such holder or holders shall have (or through its or their trustee or agent on its or their behalf) waived such default in a writing to the Borrower, or (ii) without limiting the provisions of clause (i) above, any such default under any such Material Indebtedness shall cause such Material Indebtedness to be declared to be due and payable, or required to be prepaid other than by a regularly scheduled required prepayment or as a mandatory prepayment (and, (1) with respect to Indebtedness consisting of any Hedge Agreements, other than due to a termination event or equivalent event pursuant to the terms of such Hedge Agreements and (2) any Indebtedness outstanding hereunder), prior to the stated maturity thereof;

(e)        the Borrower or any Subsidiary Guarantor shall commence a voluntary case, proceeding or action concerning itself under (1) Title 11 of the United States Code entitled "Bankruptcy" or any other applicable insolvency, debtor relief, or debt adjustment law (collectively, the "Bankruptcy Code"); or an involuntary case, proceeding or action is commenced against the Borrower or any Subsidiary Guarantor and the petition is not dismissed or stayed within 60 days after commencement of the case, proceeding or action, the Borrower or the applicable Subsidiary Guarantor consents to the institution of such case, proceeding or action prior to such 60-day period, or any order of relief or other order approving any such case, proceeding or action is entered; or a custodian (as defined in the Bankruptcy Code), receiver, receiver manager, trustee, conservator, liquidator, examiner, rehabilitator, administrator, or similar person is appointed for, or takes charge of, the Borrower  or any Subsidiary Guarantor or all or any substantial portion of the property or business thereof; or the Borrower or any Subsidiary Guarantor suffers any appointment of any custodian, receiver, receiver manager, trustee, conservator, liquidator, examiner, rehabilitator, administrator, or the like for it or any substantial part of its property or business to continue undischarged or unstayed for a period of 60 days; or the Borrower or any Subsidiary Guarantor makes a general assignment for the benefit of creditors;

(f)        (i) an ERISA Event shall have occurred that, individually or in the aggregate, results in or would reasonably be expected to result in a Material Liability of Holdings, the Borrower, any of their Subsidiaries or any ERISA Affiliate, or (ii) there exists any fact or circumstance that reasonably could be expected to result in the imposition of a Lien or security interest under Section 430(k) of the Code or ERISA or a violation of Section 436 of the Code;

(g)        the Guarantee or any material provision thereof shall cease to be in full force or effect (other than pursuant to the terms hereof and thereof) or any Guarantor or any other Credit Party shall assert in writing that any such Guarantor's obligations under the Guarantee are not to be in effect or are not to be legal, valid and binding obligations (other than pursuant to the terms hereof or thereof);

(h)        the Collateral Agreement, Mortgage or any other Security Document pursuant to which assets of the Borrower and the Credit Parties with an aggregate Fair Market Value in excess of

Error! Unknown document property name.
WEIL:\97986321\6\45327.0007

$11,500,000 are pledged as Collateral or any material provision thereof shall cease to be in full force or effect (other than pursuant to the terms hereof or thereof) or any grantor thereunder or any other Credit Party shall assert in writing that any grantor's obligations under the Collateral Agreement, the Mortgage or any other Security Document are not in effect or not legal, valid and binding obligations (other than pursuant to the terms hereof or thereof);

        (i)     one or more monetary judgments or decrees shall be entered against the Borrower or any of the Restricted Subsidiaries involving a liability of $11,500,000 or more in the aggregate for all such judgments and decrees for the Borrower and the Restricted Subsidiaries (to the extent not paid or covered by insurance provided by a carrier not disputing coverage), which judgments are not discharged or effectively waived or stayed for a period of 60 consecutive days; or

        (j)     a Change of Control shall have occurred,

then, and in any such event, and at any time thereafter, if any Event of Default shall then be continuing, the Administrative Agent shall upon the written request of the Required Lenders (subject to Article VII), by written notice to the Borrower, take any or all of the following actions, without prejudice to the rights of the Administrative Agent or any Lender to enforce its claims against the Borrower or any other Credit Party, except as otherwise specifically provided for in this Agreement (*provided* that, if an Event of Default specified in Section 6.01(e) shall occur with respect to the Borrower, the result that would occur upon the giving of written notice by the Administrative Agent as specified below shall occur automatically without the giving of any such notice): (i) declare the principal of and any accrued interest and fees in respect of any or all Loans and any or all Obligations owing hereunder and thereunder to be, whereupon the same shall become, forthwith due and payable without presentment, demand, protest or other notice of any kind, all of which are hereby waived by the Borrower or (ii) exercise rights and remedies in respect of the Collateral in accordance with the Collateral Agreement and/or comparable provisions of any other Security Document. In addition, after the occurrence and during the continuance of an Event of Default, the Administrative Agent and the Lenders will have all other rights and remedies available at law and equity.

        The foregoing shall constitute Events of Default whatever the reason for any such Event of Default and whether it is voluntary or involuntary or is effected by operation of law or pursuant to any judgment, decree or order of any court or any order, rule or regulation of any administrative or governmental body.

        SECTION 6.02.    Application of Proceeds. Any amount received by the Administrative Agent or the Collateral Agent from any Credit Party (or from proceeds of any Collateral) following any acceleration of the Obligations under this Agreement or any Event of Default with respect to the Borrower under Section 6.01(e) shall, subject to the terms of the Intercreditor Agreement, be applied:

     First, to payment of that portion of the Loan Obligations constituting fees, indemnities, expenses and other amounts (including fees, disbursements and other charges of counsel payable under Section 7.07 and amounts payable under Article II) payable to the Administrative Agent and/or Collateral Agent in such Person's capacity as such;

     Second, to payment of that portion of the Loan Obligations constituting fees, indemnities and other amounts (other than principal and interest) payable to the Lenders (including fees, disbursements and other charges of counsel payable under Section 7.07) arising under the Loan Documents and amounts payable under Article II, ratably among them in proportion to the respective amounts described in this clause Second payable to them;

     Third, to payment of that portion of the Loan Obligations constituting accrued and unpaid interest on the Loans, ratably among the Lenders in proportion to the respective amounts described in this clause held by them;

Error! Unknown document property name.
WEIL:\97986321\6\45327.0007

Fourth, to payment of that portion of the Loan Obligations constituting unpaid principal of the Loans, ratably among the Lenders in proportion to the respective amounts described in this clause held by them;

Fifth, to the payment of all other Loan Obligations of the Credit Parties owing under or in respect of the Loan Documents that are due and payable to the Administrative Agent and the other Secured Parties on such date, ratably based upon the respective aggregate amounts of all such Loan Obligations owing to the Administrative Agent and the other Secured Parties on such date; and

Last, the balance, if any, after all of the Loan Obligations have been paid in full, to the Borrower or as otherwise required by Requirements of Law.

SECTION 6.03.    Control by Majority.  The Required Lenders may direct the time, method and place of conducting any proceeding for any remedy available to the Administrative Agent or of exercising any trust or power conferred on the Administrative Agent.  However, the Administrative Agent may refuse to follow any direction that conflicts with law or this Agreement or, subject to Article VII, that the Administrative Agent determines is unduly prejudicial to the rights of any other Lender or that would involve the Administrative Agent in personal liability or expenses for which it is not adequately indemnified in the Administrative Agent's sole discretion; *provided, however*, that the Administrative Agent may take any other action deemed proper by the Administrative Agent that is not inconsistent with such direction.

SECTION 6.04.    Limitation on Suits.  In no event shall the Required Lenders, without the prior written consent of each Lender, direct the Administrative Agent to accelerate and demand payment of the Loans held by one Lender without accelerating and demanding payment of all other Loans.  Each Lender agrees that, except as otherwise provided in any of the Loan Documents and without the prior written consent of the Required Lenders, it will not take any legal action or institute any action or proceeding against any Credit Party with respect to any of the Loan Obligations or Collateral, or accelerate or otherwise enforce its portion of the Loan Obligations.  Without limiting the generality of the foregoing, none of Lenders may exercise any right that it might otherwise have under applicable law to credit bid at foreclosure sales, uniform commercial code sales or other similar sales or dispositions of any of the Collateral except as authorized by the Required Lenders.  Notwithstanding anything to the contrary set forth in this Section 6.04 or elsewhere herein, each Lender shall be authorized to take such action to preserve or enforce its rights against any Credit Party where a deadline or limitation period is otherwise applicable and would, absent the taking of specified action, bar the enforcement of Loan Obligations held by such Lender against such Credit Party, including the filing of proofs of claim in any insolvency proceeding.

**ARTICLE VII**

The Agents

SECTION 7.01.    Appointment.

(a)    Each Lender hereby irrevocably designates and appoints the Administrative Agent as the agent of such Lender under this Agreement and the other Loan Documents and irrevocably authorizes the Administrative Agent, in such capacity, to take such action on its behalf under the provisions of this Agreement and the other Loan Documents and to exercise such powers and perform such duties as are expressly delegated to the Administrative Agent by the terms of this Agreement and the other Loan Documents, together with such other powers as are reasonably incidental thereto.  Notwithstanding any provision to the contrary elsewhere in this Agreement, the Administrative Agent shall not have any duties or responsibilities, except those expressly set forth herein and in the other Loan Documents, or any fiduciary relationship with any Lender or any Credit Party, and no implied covenants, functions, responsibilities, duties, obligations or liabilities shall be read into this Agreement or any other Loan Document or otherwise exist against the Administrative Agent.

Error! Unknown document property name.
WEIL:\97986321\6\45327.0007

(b)      The Administrative Agent and each Lender hereby irrevocably designate and appoint the Collateral Agent as the agent with respect to the Collateral, and each of the Administrative Agent and each Lender irrevocably authorizes the Collateral Agent, in such capacity, to take such action on its behalf under the provisions of this Agreement and the other Loan Documents and to execute and deliver the Security Documents (including the amendments thereto in connection with this Agreement) and to exercise such powers and perform such duties as are expressly delegated to the Collateral Agent by the terms of this Agreement and the other Loan Documents, together with such other powers as are reasonably incidental thereto.  Notwithstanding any provision to the contrary elsewhere in this Agreement, the Collateral Agent shall not have any duties or responsibilities except those expressly set forth herein and in the other Loan Documents, or any fiduciary relationship with any of the Administrative Agent, the Lenders or the Credit Parties, and no implied covenants, functions, responsibilities, duties, obligations or liabilities shall be read into this Agreement or any other Loan Document or otherwise exist against the Collateral Agent.

(c)      The provisions of this <u>Article VII</u> are solely for the benefit of the Agents and the Lenders, and no Credit Party shall have rights as a third-party beneficiary of any such provisions (other than as set forth in <u>Section 7.09</u>, <u>7.11</u> and <u>7.14</u>).  Without limiting the generality of the foregoing, the Agents are expressly authorized to execute each of the Loan Documents and any and all documents (including releases) with respect to the Collateral and any rights of the Secured Parties with respect thereto as contemplated by and in accordance with the provisions of this Agreement and the other Loan Documents, in each case, binding the Lenders to the terms thereof.

SECTION 7.02.    <u>Delegation of Duties</u>.  The Administrative Agent and the Collateral Agent may each execute any of its duties under this Agreement and the other Loan Documents by or through agents, sub-agents, employees or attorneys-in-fact (each, a "<u>Subagent</u>") and shall be entitled to advice of counsel concerning all matters pertaining to such duties; *provided*, *however*, that no such Subagent shall be authorized to take any action with respect to any Collateral unless and except to the extent expressly authorized in writing by the Administrative Agent.  If any Subagent, or successor thereto, shall die, become incapable of acting, resign or be removed, all rights, powers, privileges and duties of such Subagent, to the extent permitted by law, shall automatically vest in and be exercised by the Administrative Agent until the appointment of a new Subagent.  Neither the Administrative Agent nor the Collateral Agent shall be responsible for the negligence or misconduct of any Subagents selected by it in the absence of gross negligence or willful misconduct.  The exculpatory, indemnification and other provisions of this <u>Article VII</u> shall apply to any such Subagent and to the Affiliates of the Agents and any such Subagent.

SECTION 7.03.    <u>Exculpatory Provisions</u>.  No Agent nor any of its officers, directors, employees, agents, attorneys-in-fact or Affiliates shall be (a) liable for any action lawfully taken or omitted to be taken by any of them under or in connection with this Agreement or any other Loan Document, including in such Agent's Permitted Business Judgment (except for its or such Person's own gross negligence or willful misconduct, as determined in the final judgment of a court of competent jurisdiction, in connection with its duties expressly set forth herein), (b) responsible in any manner to any of the Lenders or any participant for any recitals, statements, representations or warranties made by any of the Borrower, any other Credit Party or any officer thereof contained in this Agreement or any other Loan Document or in any certificate, report, statement or other document referred to or provided for in, or received by such Agent under or in connection with, this Agreement or any other Loan Document or for the value, validity, effectiveness, genuineness, enforceability or sufficiency of this Agreement or any other Loan Document, or for any failure of the Borrower or any other Credit Party to perform its obligations hereunder or thereunder or (c) subject to any fiduciary or other implied duties, regardless of whether a Default or an Event of Default has occurred and is continuing.  No Agent shall be under any obligation to any Lender to ascertain or to inquire as to the observance or performance of any of the agreements contained in, or conditions of, this Agreement or any other Loan Document, or to inspect the properties, books or records of any Credit Party or any Affiliate thereof.  The Collateral Agent shall not be under any obligation to the Administrative Agent or any Lender to ascertain or to inquire as to the observance or performance of any of the agreements contained in, or conditions of, this Agreement or any other Loan Document, or to inspect the properties, books or records of any Credit Party.

Error! Unknown document property name.
WEIL:\97986321\6\45327.0007

SECTION 7.04.    Reliance by Agents.  The Administrative Agent and the Collateral Agent shall be entitled to rely, and shall be fully protected in relying, upon any writing, resolution, notice, consent, certificate, affidavit, letter, telecopy, telex or teletype message, statement, order or other document or instruction believed by it to be genuine and correct and to have been signed, sent or made by the proper Person or Persons and upon advice and statements of legal counsel (including counsel to the Borrower), independent accountants and other experts selected by the Administrative Agent or the Collateral Agent.  The Administrative Agent and the Collateral Agent may deem and treat the Lender specified in the Register with respect to any amount owing hereunder as the owner thereof for all purposes unless a written notice of assignment, negotiation or transfer thereof shall have been filed with the Administrative Agent.  The Administrative Agent and the Collateral Agent shall be fully justified in failing or refusing to take any action under this Agreement or any other Loan Document unless it shall first receive such advice or concurrence of the Required Lenders as it deems appropriate or it shall first be indemnified to its satisfaction by the Lenders against any and all losses, liability and expense that may be incurred by it by reason of taking or continuing to take any such action.  The Administrative Agent and the Collateral Agent shall in all cases be fully protected in acting, or in refraining from acting, under this Agreement and the other Loan Documents in accordance with a request of the Required Lenders, including in the Administrative Agent's sole discretion, instructions from legal counsel to the Required Lenders (which, as of the date hereof, is Davis Polk & Wardwell LLP), and such request and any action taken or failure to act pursuant thereto shall be binding upon all the Lenders and all future holders of the Loans; *provided* that the Administrative Agent and Collateral Agent shall not be required to take any action that, in its opinion or in the opinion of its counsel, may expose it to liability or that is contrary to any Loan Document or applicable Requirements of Law.  The Agents shall be entitled to rely upon, and shall not incur any liability for relying upon, any notice, request, certificate, consent, statement, instrument, document or other writing (including any electronic message, Internet or intranet website posting or other distribution) believed by it to be genuine and to have been signed, sent, or otherwise authenticated by a proper person.  The Agents may also rely upon any statement made to it orally and believed by it to have been made by a proper person, and shall not incur any liability for relying thereon.  In determining compliance with any condition hereunder to the making of a Loan that by its terms must be fulfilled to the satisfaction of a Lender, the Administrative Agent may presume that such condition is satisfactory to such Lender unless the Administrative Agent shall have received written notice to the contrary from such Lender prior to the making of such Loan.  The Agents may consult with legal counsel (who may be counsel for the Required Lenders), independent accountants and other advisors selected by it, and shall not be liable for any action taken or not taken by it in accordance with the advice of any such counsel, accountants or advisors.

SECTION 7.05.    Notice of Default.  Neither the Administrative Agent nor the Collateral Agent shall be deemed to have knowledge or notice of the occurrence of any Default or Event of Default hereunder unless the Administrative Agent or Collateral Agent, as applicable, has received written notice from a Lender or the Borrower referring to this Agreement, describing such Default or Event of Default and stating that such notice is a "notice of default".  In the event that the Administrative Agent receives such a notice, it shall give notice thereof to the Lenders and the Collateral Agent.  The Administrative Agent shall take such action with respect to such Default or Event of Default as shall be reasonably directed by the Required Lenders; *provided* that unless and until the Administrative Agent shall have received such directions, the Administrative Agent may (but shall not be obligated to) take such action, or refrain from taking such action, with respect to such Default or Event of Default as it shall deem advisable in the best interests of the Lenders except to the extent that this Agreement requires that such action be taken only with the approval of the Required Lenders or each individual Lender, as applicable.

SECTION 7.06.    Non-Reliance on Administrative Agent, Collateral Agent and Other Lenders.  Each Lender expressly acknowledges that neither the Administrative Agent nor the Collateral Agent nor any of their respective officers, directors, employees, agents, attorneys-in-fact or Affiliates has made any representations or warranties to it and that no act by the Administrative Agent or Collateral Agent hereafter taken, including any review of the affairs of the Borrower or any other Credit Party, shall be deemed to constitute any representation or warranty by the Administrative Agent or Collateral Agent to any Lender.  Each Lender represents to the Administrative Agent and the Collateral Agent that it has, independently and without reliance upon the Administrative Agent, Collateral Agent or any other Lender, and based on such documents and

Error! Unknown document property name.
WEIL:\97986321\6\45327.0007

information as it has deemed appropriate, made its own appraisal of and investigation into the business, operations, property, financial and other condition and creditworthiness of the Borrower and each other Credit Party and made its own decision to make its Loans hereunder and enter into this Agreement.  Each Lender also represents that it will, independently and without reliance upon the Administrative Agent, Collateral Agent or any other Lender, and based on such documents and information as it shall deem appropriate at the time, continue to make its own credit analysis, appraisals and decisions in taking or not taking action under this Agreement and the other Loan Documents, and to make such investigation as it deems necessary to inform itself as to the business, operations, property, financial and other condition and creditworthiness of the Borrower and any other Credit Party.  Except for notices, reports and other documents expressly required to be furnished to the Lenders by the Administrative Agent hereunder, neither the Administrative Agent nor the Collateral Agent shall have any duty or responsibility to provide any Lender with any credit or other information concerning the business, assets, operations, properties, financial condition, prospects or creditworthiness of the Borrower or any other Credit Party that may come into the possession of the Administrative Agent or Collateral Agent or any of their respective officers, directors, employees, agents, attorneys-in-fact or Affiliates. The Agents shall not be responsible for or have any duty to ascertain or inquire into (i) any statement, warranty or representation made in or in connection with any Loan Document, (ii) the contents of any certificate, report or other document delivered hereunder or thereunder or in connection herewith or therewith, (iii) the performance or observance of any of the covenants, agreements or other terms or conditions set forth in any Loan Document or the occurrence of any Default or Event of Default, (iv) the validity, enforceability, effectiveness or genuineness of any Loan Document or any other agreement, instrument or document or (v) the satisfaction of any condition set forth in Article IV or elsewhere in any Loan Document.  Whenever in the administration of this Agreement, or pursuant to any of the Loan Documents, the Agents shall deem it necessary or desirable (in each case, in its sole discretion) that a matter be proved or established with respect to Borrower or the Guarantors in connection with the taking, suffering or omitting of any action hereunder by the, such matter (unless other evidence in respect thereof be herein specifically prescribed) may be deemed to be conclusively provided or established by an Officers' Certificate and such certificate shall be full warranty to such Agent for any action taken, suffered or omitted in reliance thereon.  In no event shall the Agents be responsible or liable for any failure or delay in the performance of its obligations hereunder arising out of or caused by, directly or indirectly, forces beyond its control, including, without limitation, strikes, work stoppages, accidents, acts of war or terrorism, civil or military disturbances, nuclear or natural catastrophes or acts of God, future changes in applicable law or regulation, and interruptions, loss or malfunctions of utilities, communications or computer (software and hardware) services; it being understood that the Agents shall use reasonable efforts consistent with accepted practices in the banking industry to resume performance as soon as practicable under the circumstances.

SECTION 7.07.    Indemnification.  The Lenders agree to indemnify the Administrative Agent and the Collateral Agent, each in its capacity as such (to the extent not reimbursed by the Credit Parties and without limiting the obligation of the Credit Parties to do so), ratably according to their respective portions of the Loans, as applicable, outstanding in effect on the date on which indemnification is sought (or, if indemnification is sought after the date upon which the Loans shall have been paid in full, ratably in accordance with their respective portions of the Loans in effect immediately prior to such date), from and against any and all liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs, expenses or disbursements of any kind whatsoever that may at any time (including at any time following the payment of the Loans) occur, be imposed on, incurred by or asserted against the Administrative Agent or the Collateral Agent in any way relating to or arising out of this Agreement, any of the other Loan Documents or any documents contemplated hereby or referred to herein or therein or the transactions contemplated hereby or thereby or any action taken or omitted by the Administrative Agent or the Collateral Agent under or in connection with any of the foregoing, IN ALL CASES, WHETHER OR NOT CAUSED BY OR ARISING, IN WHOLE OR IN PART, OUT OF THE COMPARATIVE, CONTRIBUTORY, OR SOLE NEGLIGENCE OF SUCH AGENT; *provided* that no Lender shall be liable to the Administrative Agent or the Collateral Agent for the payment of any portion of such liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs, expenses or disbursements resulting from such Agent's, as applicable, gross negligence or willful misconduct as determined by a final judgment of a court of competent jurisdiction; *provided*, *further*, that no action taken in accordance with the directions of the Required Lenders (or such other number or percentage of the Lenders as shall be required by

Error! Unknown document property name.
WEIL:\97986321\6\45327.0007

the Loan Documents) shall be deemed to constitute gross negligence or willful misconduct for purposes of this <u>Section 7.07</u>.  In the case of any investigation, litigation or proceeding giving rise to any liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs, expenses or disbursements of any kind whatsoever that may at any time occur (including at any time following the payment of the Loans), this <u>Section 7.07</u> applies whether any such investigation, litigation or proceeding is brought by any Lender or any other Person.  Without limitation of the foregoing, each Lender shall reimburse the Administrative Agent and the Collateral Agent upon demand for its ratable share of any fees, costs or out-of-pocket expenses (including attorneys' fees) incurred by such Agent in connection with the preparation, execution, delivery, administration, modification, amendment or enforcement (whether through negotiations, legal proceedings or otherwise) of, or legal advice rendered in respect of rights or responsibilities under, this Agreement, any other Loan Document, or any document contemplated by or referred to herein, to the extent that such Agent is not reimbursed for such expenses by or on behalf of the Borrower; *provided* that such reimbursement by the Lenders shall not affect the Borrower's continuing reimbursement obligations with respect thereto.  If any indemnity furnished to any Agent for any purpose shall, in the opinion of such Agent, be insufficient or become impaired, such Agent may call for additional indemnity and cease, or not commence, to do the acts indemnified against until such additional indemnity is furnished; *provided*, in no event shall this sentence require any Lender to indemnify any Agent against any liability, obligation, loss, damage, penalty, action, judgment, suit, cost, expense or disbursement in excess of such Lender's pro rata portion thereof; and *provided further*, this sentence shall not be deemed to require any Lender to indemnify any Agent against any liability, obligation, loss, damage, penalty, action, judgment, suit, cost, expense or disbursement resulting from such Agent's gross negligence or willful misconduct, as determined in the final judgment of a court of competent jurisdiction.  The agreements in this <u>Section 7.07</u> shall survive the payment of the Loans and all other amounts payable hereunder, or the earlier resignation or removal of the Agents.

SECTION 7.08.    <u>Agents in Their Individual Capacity</u>.  Each Agent and its Affiliates may make loans to, accept deposits from and generally engage in any kind of business with the Borrower and any other Credit Party as though such Agent were not an Agent hereunder and under the other Loan Documents.  With respect to the Loans made by it, each Agent shall have the same rights and powers under this Agreement and the other Loan Documents as any Lender and may exercise the same as though it were not an Agent, and the terms "Lender" and "Lenders" shall include each Agent in its individual capacity.

SECTION 7.09.    <u>Successor Agents</u>.  Each of the Administrative Agent and Collateral Agent may at any time give notice of its resignation to the Lenders and the Borrower, and the Borrower or the Required Lenders may at any time that the Administrative Agent or the Collateral Agent becomes a Defaulting Agent deliver notice of removal to the Administrative Agent or Collateral Agent, as applicable.  Upon receipt of any such notice of resignation or removal, the Required Lenders shall have the right, subject to the consent of the Borrower (not to be unreasonably withheld or delayed) so long as no Event of Default is continuing, to appoint a successor, which shall be a bank with an office in the United States, or an Affiliate of any such bank with an office in the United States or another institution providing third party loan agency services.  If, in the case of a resignation of a retiring Agent, no such successor shall have been so appointed by the Required Lenders and shall have accepted such appointment within 30 days after the retiring Agent gives notice of its resignation, then the retiring Agent may on behalf of the Lenders, appoint a successor Agent meeting the qualifications set forth above; *provided* that if the retiring Agent shall notify the Borrower and the Lenders that no qualifying Person has accepted such appointment, then such resignation shall nonetheless become effective in accordance with such notice and (1) the retiring Agent shall be discharged from its duties and obligations hereunder and under the other Loan Documents (except in the case of the Collateral Agent holding collateral security on behalf of any Secured Parties, the retiring Collateral Agent shall continue to hold such collateral security as nominee until such time as a successor Collateral Agent is appointed) and (2) all payments, communications and determinations provided to be made by, to or through such Agent shall instead be made by or to each Lender directly, until such time as the Required Lenders appoint a successor Agent as provided for above in this <u>Section 7.09</u>.  Upon the acceptance of a successor's appointment as the Administrative Agent or Collateral Agent, as the case may be, hereunder, and upon the execution and filing or recording of such financing statements, or amendments thereto, and such other instruments or notices, as may be necessary or desirable, or

Error! Unknown document property name.
WEIL:\97986321\6\45327.0007

as the Required Lenders may request, in order to continue the perfection of the Liens granted or purported to be granted by the Security Documents, such successor shall succeed to and become vested with all of the rights, powers, privileges and duties of the retiring (or retired) Agent, and the retiring Agent shall be discharged from all of its duties and obligations hereunder or under the other Loan Documents (if not already discharged therefrom as provided above in this Section). The fees payable by the Borrower (following the effectiveness of such appointment) to such Agent shall be the same as those payable to its predecessor unless otherwise agreed between the Borrower and such successor. After the retiring Agent's resignation hereunder and under the other Loan Documents, the provisions of this Article VII (including Section 7.07) and Section 8.05 shall continue in effect for the benefit of such retiring Agent, its Subagents and their respective Related Parties in respect of any actions taken or omitted to be taken by any of them while the retiring Agent was acting as an Agent.

SECTION 7.10.    Payments Set Aside.   To the extent that any payment by or on behalf of the Borrower is made to the Administrative Agent, the Collateral Agent or any Lender, or the Administrative Agent, the Collateral Agent or any Lender exercises its right of setoff, and such payment or the proceeds of such setoff or any part thereof is subsequently invalidated, declared to be fraudulent or preferential, set aside or required (including pursuant to any settlement entered into by the Administrative Agent, the Collateral Agent or such Lender in its discretion) to be repaid to a trustee, receiver or any other party, in connection with any proceeding under the Bankruptcy Code or otherwise, then (a) to the extent of such recovery, the obligation or part thereof originally intended to be satisfied shall be revived and continued in full force and effect as if such payment had not been made or such setoff had not occurred and (b) each Lender severally agrees to pay to the Administrative Agent or the Collateral Agent, as applicable, upon demand its applicable share (without duplication) of any amount so recovered from or repaid by the Administrative Agent or the Collateral Agent, as applicable, plus interest thereon from the date of such demand to the date such payment is made at a rate per annum equal to the applicable Federal Funds Rate from time to time in effect, in the applicable currency of such recovery or payment. The obligations of the Lenders under clause (b) of the preceding sentence shall survive the payment in full of the Loan Obligations and the termination of this Agreement, or the earlier resignation or removal of the Agent.

SECTION 7.11.    [Bankruptcy Plan Voting.   In case of the pendency of any proceeding under the Bankruptcy Code or other judicial proceeding relative to any Credit Party, each Lender shall submit any vote on a plan of reorganization or similar disposition plan of restructuring or liquidation (a "Reorganization Plan") to the Administrative Agent so that it is received by the Administrative Agent no later than three (3) Business Days prior to voting deadline established pursuant to the terms of such Reorganization Plan or any court order establishing voting procedures with respect to the Reorganization Plan (the "Voting Procedures Order"). If Lenders constituting more than half of the total number of Lenders and having or holding more than two-thirds of the aggregate outstanding Loans of all Lenders at such time timely vote to accept the Reorganization Plan, the Administrative Agent shall submit a ballot on behalf of all Lenders voting to accept the Reorganization Plan in accordance with the terms of the Reorganization Plan or the Voting Procedures Order. If Lenders constituting more than half of the total number of Lenders and having or holding more than two-thirds of the aggregate outstanding Loans at such time of all Lenders do not timely vote to accept the Reorganization Plan, the Administrative Agent shall submit a ballot on behalf of all Lenders voting to reject the Reorganization Plan in accordance with the terms of the Reorganization Plan or the Voting Procedures Order. For purposes of calculating the total number of Lenders and the number of Lenders voting to accept the Reorganization Plan, Lenders that are Affiliates shall be deemed to be a single Lender holding a single claim with respect to each class of creditors in which such Lenders and Affiliates are included. No Lender may submit a ballot with respect to a Reorganization Plan in contravention of the procedures set forth in this Section 7.11, and the Administrative Agent is irrevocably authorized by each Lender to withdraw any vote submitted by such Lender in contravention of the procedures set forth in this Section 7.11.]

SECTION 7.12.    Administrative Agent May File Proofs of Claim.   In case of the pendency of any proceeding under the Bankruptcy Code or any other judicial proceeding relative to any Credit Party, the Administrative Agent (irrespective of whether the principal of any Loan shall then be due and payable as herein expressed or by declaration or otherwise and irrespective of whether the Administrative Agent shall

Error! Unknown document property name.
WEIL:\97986321\6\45327.0007

have made any demand on the Borrower) shall be entitled and empowered, by intervention in such proceeding or otherwise, (i) to file and prove a claim for the whole amount of the principal and interest owing and unpaid in respect of the Loans and all other Loan Obligations that are owing and unpaid and to file such other documents as may be necessary or advisable in order to have the claims of the Lenders and the Administrative Agent (including any claim for the reasonable compensation, expenses, disbursements and advances of the Lenders and the Administrative Agent and their respective agents and counsel and all other amounts due the Lenders and the Administrative Agent under Section 8.05) allowed in such judicial proceeding and (ii) to collect and receive any monies or other property payable or deliverable on any such claims and to distribute the same; and any custodian, receiver, assignee, trustee, liquidator, sequestrator or other similar official in any such judicial proceeding is hereby authorized by each Lender to make such payments to the Administrative Agent and, if the Administrative Agent shall consent to the making of such payments directly to the Lenders, to pay to the Administrative Agent any amount due for the reasonable compensation, expenses, disbursements and advances of the Administrative Agent and its agents and counsel, and any other amounts due the Administrative Agent under Section 8.05. Nothing contained herein shall be deemed to authorize the Administrative Agent to authorize or consent to or accept or adopt on behalf of any Lender any plan of reorganization, arrangement, adjustment or composition affecting the Loan Obligations or the rights of any Lender to authorize the Administrative Agent to vote in respect of the claim of any Lender or in any such proceeding.

SECTION 7.13.    Collateral Matters. (a) The Lenders irrevocably authorize the Collateral Agent, at its option and in its discretion or in accordance with the instructions and Officers' Certificates delivered to the Collateral Agent in connection therewith, to release any Lien on any property granted to or held by the Collateral Agent under any Loan Document (i) upon payment in full of all Loan Obligations (other than contingent indemnification obligations and expense reimbursement claims to the extent no claim therefor has been made), (ii) if approved, authorized or ratified in writing in accordance with Section 8.01, (iii) pursuant to the Intercreditor Agreement or the Security Documents or (iv) pursuant to Section 8.19.  Upon request by the Collateral Agent at any time, the Required Lenders will confirm in writing the Collateral Agent's authority to release its interest in particular types or items of property in accordance with this Section; *provided* that the Collateral Agent shall rely conclusively on Officers' Certificates and instruction delivered by the Borrower or the other Credit Parties in connection herewith.

(b)    Each Secured Party hereby further authorizes the Administrative Agent or Collateral Agent, as applicable, on behalf of and for the benefit of Secured Parties, to be the agent for and representative of the Secured Parties with respect to the Security Documents.  Subject to Section 8.01, without further written consent or authorization from any Secured Party, the Administrative Agent or Collateral Agent, as applicable, may (a) execute any documents or instruments necessary in connection with a disposition of assets permitted by this Agreement, (b) release any Lien encumbering any item of Collateral that is the subject of such disposition of assets permitted hereunder or with respect to which Required Lenders (or such other Lenders as may be required to give such consent under Section 8.01) have otherwise consented or (c) release any Guarantor from the Guarantee with respect to which Required Lenders (or such other Lenders as may be required to give such consent under Section 8.01) have otherwise consented.

(c)    The Agents shall not be responsible for or have a duty to ascertain or inquire into any representation or warranty regarding the existence, value or collectability of the Collateral, the existence, priority or perfection of the Collateral Agent's Lien thereon, or any certificate prepared by any Credit Party in connection therewith, nor shall an Agent be responsible or liable to the Lenders for any failure to monitor or maintain any portion of the Collateral, including the filing of any UCC financing or continuation statements.

SECTION 7.14.    Intercreditor Agreement and Other Collateral Matters.  The Lenders hereby agree to the terms of the Intercreditor Agreement and acknowledge that CFS (and any Collateral Agent under the Security Documents and the Intercreditor Agreement) will be serving as Collateral Agent for the Secured Parties under the Security Documents and the Intercreditor Agreement and in other capacities contemplated thereby.  Each Lender hereby consents to CFS and any successor serving in such capacities and agrees not to assert any

106

Error! Unknown document property name.
WEIL:\97986321\6\45327.0007

Debtors' Exhibit No. 30
Page 114 of 137

claim (including as a result of any conflict of interest) against CFS, or any such successor, arising from the role of the Collateral Agent under the Security Documents or the Intercreditor Agreement so long as the Collateral Agent is either acting in accordance with the express terms of such documents or otherwise has not engaged in gross negligence or willful misconduct as found by a final non-appealable judgment of a court of competent jurisdiction. Each Lender hereby consents to CFS and any successor serving in such capacities and agrees not to assert any claim (including as a result of any conflict of interest) against CFS, or any such successor, arising from the role of the Collateral Agent under the Security Documents so long as the Collateral Agent is either acting in accordance with the express terms of such documents or otherwise has not engaged in gross negligence or willful misconduct as found by a final non-appealable judgment of a court of competent jurisdiction. In addition, the Administrative Agent and the Collateral Agent shall be authorized, without the consent of any Secured Party, to enter into or execute the Security Documents and the Intercreditor Agreement on or prior to the Closing Date, and, from time to time, to execute or to enter into amendments of, and amendments and restatements of, the Security Documents and the Intercreditor Agreement and any additional and replacement intercreditor agreements, including the Customary Intercreditor Agreements, in each case in order to effect the subordination of and to provide for certain additional rights, obligations and limitations in respect of, any Liens required by the terms of this Agreement to be Liens junior to, pari passu with or senior to the Loan Obligations, that are, in each case, incurred in accordance with <u>Article V</u> of this Agreement, and to establish certain relative rights as between the holders of the Loan Obligations and the holders of the Indebtedness secured by such Liens.

SECTION 7.15.     <u>Withholding Tax</u>.  To the extent required by any applicable Requirement of Law, the Administrative Agent may withhold from any payment to any Lender an amount equivalent to any applicable withholding tax.  If the IRS or any authority of the United States or other jurisdiction asserts a claim that the Administrative Agent did not properly withhold tax from amounts paid to or for the account of any Lender for any reason (including because the appropriate form was not delivered, was not properly executed, or because such Lender failed to notify the Administrative Agent of a change in circumstances that rendered the exemption from, or reduction of, withholding tax ineffective), such Lender shall indemnify the Administrative Agent (to the extent that the Administrative Agent has not already been reimbursed by any applicable Credit Party and without limiting the obligation of any applicable Credit Party to do so) fully for all amounts paid, directly or indirectly, by the Administrative Agent as Tax or otherwise, including penalties, additions to Tax and interest, together with all expenses incurred, including legal expenses, allocated staff costs and any out of pocket expenses.  Each Lender hereby authorizes the Administrative Agent to set off and apply any and all amounts at any time owing to such Lender under this Agreement or any other Loan Document against any amount due to the Administrative Agent under this <u>Section 7.15</u>.

SECTION 7.16.     <u>Erroneous Payment</u>.

(a)     If the Administrative Agent notifies a Lender or Secured Party, or any Person who has received funds on behalf of a Lender or Secured Party (any such Lender, Issuing Bank, Secured Party or other recipient, a "<u>Payment Recipient</u>") that the Administrative Agent has determined in its sole discretion (whether or not after receipt of any notice under immediately succeeding <u>clause (b)</u>) that any funds received by such Payment Recipient from the Administrative Agent or any of its Affiliates were erroneously transmitted to, or otherwise erroneously or mistakenly received by, such Payment Recipient (whether or not known to such Lender, Secured Party or other Payment Recipient on its behalf) (any such funds, whether received as a payment, prepayment or repayment of principal, interest, fees, distribution or otherwise, individually and collectively, an "<u>Erroneous Payment</u>") and demands the return of such Erroneous Payment (or a portion thereof) (<u>provided</u>, that without limiting any other rights or remedies (whether at law or in equity), the Administrative Agent may not make any such demand under this sentence with respect to an Erroneous Payment unless such demand is made within ten (10) Business Days of the date of receipt of such Erroneous Payment by the applicable Payment Recipient), such Erroneous Payment shall at all times remain the property of the Administrative Agent and shall be segregated by the Payment Recipient and held in trust for the benefit of the Administrative Agent, and such Lender or Secured Party shall (or, with respect to any Payment Recipient who received such funds on its behalf, shall cause such Payment Recipient to) promptly, but in no event later than two Business Days thereafter, return to the Administrative Agent the amount of any such Erroneous Payment (or portion thereof) as to which such a

107

Error! Unknown document property name.
WEIL:\97986321\6\45327.0007

Debtors' Exhibit No. 30
Page 115 of 137

demand was made, in same day funds (in the currency so received). A notice of the Administrative Agent to any Payment Recipient under this <u>clause (a)</u> shall be conclusive, absent manifest error.

(b)     Without limiting immediately preceding <u>clause (a)</u>, each Lender and Secured Party hereby further agrees that if it (or any Payment Recipient who on its behalf) receives a payment, prepayment or repayment (whether received as a payment, prepayment or repayment of principal, interest, fees, distribution or otherwise) from the Administrative Agent (or any of its Affiliates) (x) that is in a different amount than, or on a different date from, that specified in a notice of payment, prepayment or repayment sent by the Administrative Agent (or any of its Affiliates) with respect to such payment, prepayment or repayment, (y) that was not preceded or accompanied by a notice of payment, prepayment or repayment sent by the Administrative Agent (or any of its Affiliates), or (z) that such Lender or Secured Party, or other such recipient, otherwise becomes aware was transmitted, or received, in error or by mistake (in whole or in part) in each case:

(i)     (A) in the case of immediately preceding <u>clauses (x)</u> or <u>(y)</u>, an error shall be presumed to have been made (absent written confirmation from the Administrative Agent to the contrary) or (B) an error has been made (in the case of immediately preceding <u>clause (z)</u>), in each case, with respect to such payment, prepayment or repayment; and

(ii)     such Lender or Secured Party shall (and shall cause any other recipient that receives funds on its respective behalf to) promptly (and, in all events, within one Business Day of its knowledge of such error) notify the Administrative Agent of its receipt of such payment, prepayment or repayment, the details thereof (in reasonable detail) and that it is so notifying the Administrative Agent pursuant to this <u>Section 7.16(b)</u>.

(c)     Each Lender or Secured Party hereby authorizes the Administrative Agent to set off, net and apply any and all amounts at any time owing to such Lender or Secured Party under any Loan Document, or otherwise payable or distributable by the Administrative Agent to such Lender or Secured Party from any source, against any amount due to the Administrative Agent under immediately preceding <u>clause (a)</u> or under the indemnification provisions of this Agreement.

(d)     In the event that an Erroneous Payment (or portion thereof) is not recovered by the Administrative Agent for any reason, after demand therefor by the Administrative Agent in accordance with immediately preceding clause (a), from any Lender that has received such Erroneous Payment (or portion thereof) (and/or from any Payment Recipient who received such Erroneous Payment (or portion thereof) on its respective behalf) (such unrecovered amount, an "<u>Erroneous Payment Return Deficiency</u>"), upon the Administrative Agent's notice to such Lender at any time, (i) such Lender shall be deemed to have assigned its Loans with respect to which such Erroneous Payment was made (the "<u>Erroneous Payment Impacted Loans</u>") in an amount equal to the Erroneous Payment Return Deficiency (or such lesser amount as the Administrative Agent may specify) (such assignment of the Loans of the Erroneous Payment Impacted Loans, the "<u>Erroneous Payment Deficiency Assignment</u>") at par plus any accrued and unpaid interest (with the assignment fee to be waived by the Administrative Agent in such instance), and is hereby (together with the Borrower) deemed to execute and deliver an Assignment and Acceptance (or, to the extent applicable, an agreement incorporating an Assignment and Acceptance by reference pursuant to the Platform as to which the Administrative Agent and such parties are participants) with respect to such Erroneous Payment Deficiency Assignment, and such Lender shall deliver any Notes evidencing such Loans to the Borrower or the Administrative Agent, (ii) the Administrative Agent as the assignee Lender shall be deemed to acquire the Erroneous Payment Deficiency Assignment, (iii) upon such deemed acquisition, the Administrative Agent as the assignee Lender shall become a Lender, as applicable, hereunder with respect to such Erroneous Payment Deficiency Assignment and the assigning Lender shall cease to be a Lender hereunder with respect to such Erroneous Payment Deficiency Assignment, excluding, for the avoidance of doubt, its obligations under the indemnification provisions of this Agreement which shall survive as to such assigning Lender and (iv) the Administrative Agent may reflect in the Register its ownership interest in the Loans subject to the Erroneous Payment Deficiency Assignment. The Administrative Agent may, in its discretion, sell any Loans acquired pursuant to an Erroneous Payment

108

<u>Error! Unknown document property name.</u>
WEIL:\97986321\6\45327.0007

Debtors' Exhibit No. 30
Page 116 of 137

Deficiency Assignment and upon receipt of the proceeds of such sale, the Erroneous Payment Return Deficiency owing by the applicable Lender shall be reduced by the net proceeds of the sale of such Loan (or portion thereof), and the Administrative Agent shall retain all other rights, remedies and claims against such Lender (and/or against any recipient that receives funds on its respective behalf). In addition, each party hereto agrees that, except to the extent that the Administrative Agent has sold a Loan (or portion thereof) acquired pursuant to an Erroneous Payment Deficiency Assignment, and irrespective of whether the Administrative Agent may be equitably subrogated, the Administrative Agent shall be contractually subrogated to all the rights and interests of the applicable Lender or Secured Party under the Loan Documents with respect to each Erroneous Payment Return Deficiency (the "Erroneous Payment Subrogation Rights").

(e)        The parties hereto agree that (i) an Erroneous Payment shall not pay, prepay, repay, discharge or otherwise satisfy any Loan Obligations owed by the Borrower or any other Credit Party and (ii) to the extent an Erroneous Payment was in any way or at any time credited as a payment or satisfaction of any of the Loan Obligations, the Loan Obligations or part thereof that were so credited, and all rights of the applicable Lender, other Secured Party or Administrative Agent, as the case may be, shall be reinstated and continue in full force and effect as if such payment or satisfaction had never been received, except, in each case, to the extent such Erroneous Payment is, and solely with respect to the amount of such Erroneous Payment that is, comprised of funds received by the Administrative Agent from the Borrower or any other Credit Party for the purpose of making such Erroneous Payment. Further, each party hereto agrees that, in the event a Secured Party is the recipient of an Erroneous Payment and such Secured Party fails to return such Erroneous Payment in accordance with Section 7.16(a), then the Administrative Agent shall be entitled to (x) collect from the Borrower or any other Credit Party any Obligations owed by the Borrower or any other Credit Party to such Secured Party up to and including the amount of the Erroneous Payment, plus any other amounts owed by such Secured Party under the indemnification provisions of this Agreement, except, to the extent such Erroneous Payment is, and solely with respect to the amount of such Erroneous Payment that is, comprised of funds received by the Administrative Agent from the Borrower or any other Credit Party for the purpose of making such Erroneous Payment and (y) exercise its rights and remedies under Section 7.16(c) until the Administrative Agent has received all amounts owed by the Secured Party to the Administrative Agent pursuant to Section 7.16(a).

(f)        To the extent permitted by applicable law, no Payment Recipient shall assert any right or claim to an Erroneous Payment, and hereby waives, and is deemed to waive, any claim, counterclaim, defense or right of set-off or recoupment with respect to any demand, claim or counterclaim by the Administrative Agent for the return of any Erroneous Payment received, including without limitation waiver of any defense based on "discharge for value" or any similar doctrine.

(g)        Each party's obligations, agreements and waivers under this Section 7.16 shall survive the resignation or replacement of the Administrative Agent, any transfer of rights or obligations by, or the replacement of, a Lender, and/or the repayment, satisfaction or discharge of all Obligations (or any portion thereof) under any Loan Document.

## ARTICLE VIII

### Miscellaneous

SECTION 8.01.        Amendments and Waivers.

(a)        Without Consent of the Lenders.

The Borrower and the Administrative Agent may amend this Agreement and the other Loan Documents without notice to or consent of any Lender:

(i)        to cure any ambiguity, omission, mistake, defect or inconsistency;

Error! Unknown document property name.
WEIL:\97986321\6\45327.0007

(ii)      to provide for the assumption by a successor corporation, partnership or limited liability company of the obligations of the Borrower or any Subsidiary Guarantor under this Agreement or any other Loan Document (in each case so long as such successor corporation, partnership or limited liability company is designated in accordance with Section 5.11);

(iii)     to comply with Section 5.11;

(iv)     to add a Subsidiary Guarantor with respect to the Obligations or Collateral to secure the Obligations;

(v)      to release Collateral or a Guarantor as permitted by this Agreement, the Security Documents or the Intercreditor Agreement (other than to the extent constituting all or substantially all of the Collateral or value of the Guarantees); and

(vi)     to add additional secured creditors holding other Junior Lien Obligations so long as such obligations are not prohibited by this Agreement or the Security Documents; and

(vii)    to the extent necessary to integrate any Incremental Commitment as contemplated by Section 2.20.

The Intercreditor Agreement may be amended without the consent of any Lender or Agent in connection with the permitted entry into the Intercreditor Agreement of any class (or Class) of additional secured creditors holding Junior Lien Obligations to effectuate such entry into the Intercreditor Agreement and to make the lien of such class equal and ratable with, as applicable, the lien of the Junior Lien Obligations.

Each Lender hereunder (x) consents to the amendment of any Loan Document in the manner and for the purposes set forth in this Section 8.01(a), (y) agrees that it will be bound by and will take no actions contrary to the provisions of any amendment to any Loan Document pursuant to Section 8.01(a) and (z) authorizes and instructs the Administrative Agent to enter into any amendment to any Loan Document pursuant to this Section 8.01(a) on behalf of such Lender.

The Administrative Agent shall receive an Officers' Certificate as conclusive evidence that any amendment executed pursuant to this Section 8.01(a) complies with the requirements of this Section 8.01(a), is permitted or authorized by this Agreement and is the legal, valid and binding obligation of the Borrower, enforceable against it in accordance with its terms.

(b)      With Consent of the Lenders.  The Borrower and the Administrative Agent may amend this Agreement and the other Loan Documents with the written consent of the Required Lenders, and any past default or noncompliance with any provisions may be waived with the consent of the Required Lenders. Notwithstanding the foregoing, without the consent of each Lender of an affected Loan (but not the Required Lenders), no amendment may:

(i)      increase or reduce the principal amount of such Loans or waive or extend the time for payment of any portion of the principal amount thereof (it being understood that a waiver, deferral, reduction or other adjustment to a mandatory prepayment under Section 2.13 shall only require the consent of the Required Lenders),

(ii)     reduce the rate of, or extend the time for payment of interest on, any Loan, (it being understood that only the consent of the Required Lenders shall be necessary to waive any obligation of the Borrower to pay interest at the default rate under Section 2.06(b) or amend Section 2.06(b)),

110

Error! Unknown document property name.
WEIL:\97986321\6\45327.0007

Debtors' Exhibit No. 30
Page 118 of 137

(iii)      reduce the principal of or change the Stated Maturity of any Loan (it being understood that a waiver, deferral, reduction or other adjustment to a mandatory prepayment under Section 2.13 shall only require the consent of the Required Lenders),

(iv)      reduce the premium payable (if any) upon prepayment of any Loan or change the time at which any such premium must be paid,

(v)      make any Loan payable in money other than that stated in this Agreement,

(vi)      consent to the transfer of the Borrower's obligations under this Agreement and/or the other Loan Documents,

(vii)      waive, amend or modify the provisions of Section 2.17 or Section 6.02 in a manner that would alter the pro rata sharing of payments required thereby (except in connection with a transaction permitted under Section 8.06(e) and Section 8.07),

(viii)      make any change in the second sentence of this Section 8.01(b) or the definition of the term "Required Lenders," or any other provision hereof expressly specifying the number or percentage of Lenders required to waive, amend or modify any rights hereunder or under any other Loan Document,

(ix)      (A) release all or substantially all of the value of the Guarantee or release all or substantially all of the Collateral, in each case, whether in one or more transactions, (except as otherwise permitted herein or in the other Loan Documents) or (B) subordinate the Loan Obligations or a Lien on a material portion of the Collateral, taken as a whole, (as determined by the Borrower in good faith), securing the Obligations, in either case, to any other Indebtedness other than in connection with a debtor-in-possession financing,

(x)      make any change in the provisions dealing with the application of proceeds of Collateral in the Intercreditor Agreement or this Agreement that would adversely affect the Lenders,

(xi)      amend Section 7.07 or any other provision hereof providing for indemnification obligations of the Agents or Lenders;

*provided further* that no amendment, waiver or other modification of any provision of any Loan Document in a manner that directly and adversely affects the Administrative Agent or the Collateral Agent shall be effective without the written consent of the then-current Administrative Agent and Collateral Agent, as applicable, or any other former or current Agent to whom Article VII then applies.

SECTION 8.02.      Notices.  Except as otherwise set forth herein, all notices, requests and demands to or upon the respective parties hereto to be effective shall be in writing (including by facsimile or electronic mail), and, unless otherwise expressly provided herein, shall be deemed to have been duly given or made when delivered, or three days after being deposited in the mail, postage prepaid, or, in the case of telecopy or electronic mail notice, when received, addressed as follows in the case of the Borrower and the Administrative Agent, and as set forth on Schedule 2.01 in the case of the other parties hereto, or to such other address as may be hereafter notified by the respective parties hereto:

|  |  |
|---|---|
| The Borrower: | Fieldwood Energy LLC |
|  | 2000 W. Sam Houston Pkwy. S., Suite 1200 |
|  | Houston, TX 77042 |
|  | Attention:  Mike Dane, Chief Financial Officer |

111

Error! Unknown document property name.
WEIL:\97986321\6\45327.0007

Debtors' Exhibit No. 30
Page 119 of 137

|  | Fax:  (713) 969-1099 |
|---|---|
|  | Email:  mdane@fwellc.com |

With a copy to:

Weil, Gotshal & Manges LLP
200 Crescent Court, Suite 300
Dallas, Texas  75201
Attention:  Courtney S. Marcus
Fax:  (214) 746-7700
Email:  courtney.marcus@weil.com

The Administrative Agent and the Collateral Agent:

Cantor Fitzgerald Securities
1801 N. Military Trail, Suite 202
Boca Raton, Florida  33431
Attention:  N. Horning (Fieldwood Administrative Agency)
Telephone: (212) 829-4489
Telecopier: (646) 219-1180
Facsimile: (646) 219-1180
Email:  NHorning@cantor.com

Cantor Fitzgerald Securities
900 West Trade Street, Suite 725
Charlotte, North Carolina 28202
Attention:  B. Young (Fieldwood Administrative Agency)
Telephone: (704) 374-0574
Telecopier: (646) 390-1765
Email:  BYoung@cantor.com

With a copy to:

Shipman & Goodwin LLP
One Constitution Plaza
Hartford, Connecticut  06103
Attention:  Nathan Plotkin
Email:  Nplotkin@goodwin.com

Davis Polk & Wardwell LLP
450 Lexington Avenue
New York, New York 10017
Attention: Jinsoo Kim
Email:  jinsoo.kim@davispolk.com

Any other Lender:

At the address, telecopier number, electronic mail address or telephone number specified in its Administrative Questionnaire;

*provided* that any notice, request or demand to or upon the Administrative Agent or the Lenders pursuant to Section 2.03 shall not be effective until received.

Notices and other communications to the Lenders hereunder may be delivered or furnished by electronic communication (including email and Internet or intranet websites) pursuant to procedures approved in writing by the Administrative Agent; *provided* that the foregoing shall not apply to notices to any Lender

Error! Unknown document property name.
WEIL:\97986321\6\45327.0007

pursuant to Article II if such Lender has notified the Administrative Agent in writing that it is incapable of receiving notices under such Article by electronic communication.  The Administrative Agent or the Borrower may, in their discretion, agree to accept notices and other communications to it hereunder by electronic communications pursuant to procedures approved by them, *provided* that approval of such procedures may be limited to particular notices or communications.

Documents required to be delivered pursuant to Section 5.01 (to the extent any such documents are included in materials otherwise filed with the SEC) may be delivered electronically (including as set forth in Section 8.18) and if so delivered, shall be deemed to have been delivered on the date (i) on which the Borrower posts such documents, or provides a link thereto on the Borrower's website on the Internet, or (ii) on which such documents are posted on the Borrower's behalf on an Internet or intranet website, if any, to which each Lender and the Administrative Agent have access (whether a commercial, third-party website or whether sponsored by the Administrative Agent); *provided* that (A) the Borrower shall deliver paper copies of such documents to the Administrative Agent or any Lender that requests the Borrower to deliver such paper copies until a written request to cease delivering paper copies is given by the Administrative Agent or such Lender, and (B) the Borrower shall notify the Administrative Agent and each Lender (by telecopier or electronic mail) of the posting of any such documents and provide to the Administrative Agent by electronic mail electronic versions (i.e., soft copies) of such documents.

SECTION 8.03.      No Waiver; Cumulative Remedies.  No failure to exercise and no delay in exercising, on the part of the Administrative Agent, the Collateral Agent or any Lender, any right, remedy, power or privilege hereunder or under the other Loan Documents shall operate as a waiver thereof, nor shall any single or partial exercise of any right, remedy, power or privilege hereunder preclude any other or further exercise thereof or the exercise of any other right, remedy, power or privilege.  The rights, remedies, powers and privileges herein provided are cumulative and not exclusive of any rights, remedies, powers and privileges provided by law.

SECTION 8.04.      Survival of Representations and Warranties.  All representations and warranties made hereunder, in the other Loan Documents and in any document, certificate or statement delivered pursuant hereto or in connection herewith shall survive the execution and delivery of this Agreement and the making of the Loans hereunder.

SECTION 8.05.      Payment of Expenses; Indemnification.

(a)      Within 30 days after receipt of a written request, together with customary backup documentation in reasonable detail, the Borrower shall pay (i) all fees of the Agents set forth in the Fee Letter and the reasonable and documented (in summary form) out-of-pocket expenses incurred by the Administrative Agent in connection with the preparation and administration of this Agreement or any amendments, modifications or waivers of the provisions hereof and (ii) all reasonable and documented (in reasonable detail) out-of-pocket expenses incurred by the Administrative Agent or any Lender, including the fees, charges and disbursements of legal counsel for the Administrative Agent or any Lender, in connection with the enforcement or protection of its rights in connection with this Agreement, including its rights under this Section 8.05(a), including all such out-of-pocket expenses incurred during any workout, restructuring or negotiations in respect of such Loans; *provided*, that the Borrower's obligations under this Section 8.05(a) for fees and expenses of legal counsel shall be limited to fees and expenses of (x) one primary outside legal counsel for the Administrative Agent (which on the date hereof is Shipman & Goodwin LLP) and, if necessary, one local, regulatory or foreign legal counsel for the Administrative Agent in each appropriate jurisdiction (which may include a single special counsel acting in multiple jurisdictions) and (y) solely in the case of clause (ii) above, one primary outside legal counsel for the Lenders and, if necessary, one local or foreign legal counsel to the Lenders in each appropriate jurisdiction (which may include a single special counsel acting in multiple jurisdictions).

(b)      Each Credit Party agrees to indemnify and hold harmless each Lender and each Agent and each of their respective affiliates, officers, partners, members, Directors, trustees, employees, managers,

113

Error! Unknown document property name.
WEIL:\97986321\6\45327.0007

Debtors' Exhibit No. 30
Page 121 of 137

advisors, consultants, administrators, agents, sub-agents and other Related Parties (each such Person, an "Indemnitee") promptly after receipt of a written request, together with customary backup documentation in reasonable detail, from and against any Indemnified Liabilities, whether or not such proceedings are brought by the Borrower, any of its Related Parties or any other third Person, IN ALL CASES, WHETHER OR NOT CAUSED BY OR ARISING, IN WHOLE OR IN PART, OUT OF THE COMPARATIVE, CONTRIBUTORY OR SOLE NEGLIGENCE OF SUCH INDEMNITEE; *provided* that each Credit Party's obligations under this Section 8.05(b) for fees and expenses of legal counsel (including the cost of any investigation and preparation) shall be limited to the reasonable and documented (in summary form) out-of-pocket fees, disbursements and other charges of (x) one primary outside counsel for the Indemnitees, taken as a whole, (y) if reasonably necessary, one local or foreign legal counsel for the Indemnitees, taken as a whole, in each appropriate jurisdiction (which may include a single special counsel acting in multiple jurisdictions) and (z) if reasonably necessary, one additional regulatory or other specialist counsel for the Indemnitees, taken as a whole, for each relevant area of expertise (which may include a single special counsel acting in multiple areas) (unless there is an actual or perceived conflict of interest in which case the affected Indemnitees, taken as a whole, may engage one additional counsel and solely in the case of any such conflict of interest, one additional local counsel (which may be a single firm for multiple jurisdictions) to all affected Indemnitees taken as a whole, in each such relevant jurisdiction (limited, in the case of legal counsel, to one primary counsel to the Agents' Indemnitees, one primary counsel to the Lenders' Indemnitees, taken as a whole, and, if reasonably necessary, of one local counsel in each relevant jurisdiction and one additional regulatory or other specialist counsel for each relevant area of expertise (in each case, which may be a single firm for multiple jurisdictions)); *provided, further,* that the Borrower shall have no obligation hereunder to any Agent or any Lender or any of their respective Related Parties with respect to Indemnified Liabilities to the extent (1) found by a court of competent jurisdiction in a final non- appealable judgment to have resulted from (i) the gross negligence or willful misconduct of the party to be indemnified or (ii) any material breach of any Loan Document by the party to be indemnified (other than a material breach by any Agent in its capacity as such unless such material breach resulted from the gross negligence or willful misconduct of any Agent or its Related Parties) or (2) arising from disputes, claims, demands, actions, judgments or suits not arising from any act or omission by the Borrower or its Affiliates, brought by an indemnified Person against any other indemnified Person (other than disputes, claims, demands, actions, judgments or suits involving claims against any Agent in its capacity as such).    No Person entitled to indemnification under clause (b) of this Section 8.05 shall be liable for any damages arising from the use by others of any information or other materials obtained through internet, electronic, telecommunications or other information transmission systems (including IntraLinks or SyndTrak Online) in connection with this Agreement or any other Loan Document, except to the extent that such damages have resulted from the gross negligence, bad faith or willful misconduct of the party to be indemnified or any of its Related Parties (as determined by a court of competent jurisdiction in a final and non-appealable decision).    To the extent that the undertakings to defend, indemnify, pay and hold harmless set forth in this Section 8.05 may be unenforceable in whole or in part because they are violative of any law or public policy, the applicable Credit Party shall contribute the maximum portion that it is permitted to pay and satisfy under applicable law to the payment and satisfaction of all Indemnified Liabilities incurred by Indemnitees or any of them.

(c)    To the extent permitted by applicable law, none of Holdings, the Borrower or any Indemnitee shall have any liability for any special, punitive, indirect or consequential damages (including, without limitation, any loss of profits, business or anticipated savings) relating to this Agreement or any other Loan Document or arising out of its activities in connection herewith or therewith (whether before or after the Closing Date); *provided* that nothing contained in this clause (c) shall limit the obligations of the Borrower under Section 8.05(b) in respect of any such damages claimed against the Indemnitees by Persons other than the Indemnitees.

(d)    The agreements in this Section 8.05 shall survive repayment of the Loans and all other amounts payable hereunder, and the earlier resignation or removal of any Agent.  This Section 8.05 shall not apply with respect to any Taxes other than Taxes that represent liabilities, obligations, losses, damages, penalties, claims, demands, actions, judgments, suits, costs, expenses or disbursements of any kind or nature whatsoever resulting from a non-Tax claim.

114

Error! Unknown document property name.
WEIL:\97986321\6\45327.0007

Debtors' Exhibit No. 30
Page 122 of 137

SECTION 8.06.    Successors and Assigns; Participations and Assignments.

(a)    The provisions of this Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns permitted hereby, except that (i) the Borrower may not assign or otherwise transfer any of its rights or obligations hereunder without the prior written consent of each Lender other than pursuant to Section 5.11 (and any attempted assignment or transfer by the Borrower without such consent shall be null and void) and (ii) no Lender may assign or otherwise transfer its rights or obligations hereunder except in accordance with this Section 8.06. Nothing in this Agreement, expressed or implied, shall be construed to confer upon any Person (other than the parties hereto, their respective successors and assigns permitted hereby, Participants (to the extent provided in clause (c) of this Section 8.06), and, to the extent expressly contemplated hereby, the Related Parties of each of the Agents and the Lenders) any legal or equitable right, remedy or claim under or by reason of this Agreement or the other Loan Documents.

(b)    (i) Subject to the conditions set forth in clause (b)(ii) below and the limitations on assignment set forth in clauses (e) below, any Lender may assign to one or more (each, an "Assignee") all or a portion of its rights and obligations under this Agreement (including all or a portion of the Loans at the time owing to it) by:

(A)  providing written notice to the Borrower and, so long as no Event of Default is continuing, obtaining the consent of the Borrower, which consent shall not be unreasonably withheld or delayed (it being understood that the Borrower will be deemed to have consented to an assignment if it has not responded to a request for consent to such assignment within ten (10) Business Days after receipt of written request therefor); *provided* that no consent of the Borrower shall be required for an assignment of any Loan to a Lender, an Affiliate of a Lender or an Approved Fund (as defined below); and

(B)  obtaining the consent of the Administrative Agent (which consent shall not be unreasonably withheld or delayed); *provided* that no consent of the Administrative Agent shall be required for an assignment of any Loan to a Lender, an Affiliate of a Lender or an Approved Fund (as defined below).

(ii)    Assignments shall be subject to the following additional conditions:

(A)  except in the case of an assignment to a Lender, an Affiliate of a Lender or an Approved Fund or an assignment of the entire remaining amount of the assigning Lender's Loans under the Facility, the amount of the Loans of the assigning Lender subject to each such assignment (determined as of the date the Assignment and Acceptance with respect to such assignment is delivered to the Administrative Agent) shall not be less than $1,000,000; *provided* that contemporaneous assignments to a single assignee made by Affiliates of Lenders and related Approved Funds shall be aggregated for purposes of meeting the minimum assignment amount requirements stated above;

(B)  each partial assignment shall be made as an assignment of a proportionate part of all the assigning Lender's rights and obligations under this Agreement;

(C)  the parties to each assignment shall execute and deliver to the Administrative Agent an Assignment and Acceptance via an electronic settlement system acceptable to the Administrative Agent (or, if previously agreed with the Administrative Agent, manually), and shall pay to the Administrative Agent a processing and recordation fee of $3,500 (which fee may be waived or reduced in the sole discretion of the Administrative Agent); *provided* that, in the case of contemporaneous assignments by any Lender to one or more Approved Funds, only a single processing and recordation fee shall be payable for all such assignments; and

115

Error! Unknown document property name.
WEIL:\97986321\6\45327.0007

(D) the Assignee, if it shall not be a Lender, shall deliver to the Administrative Agent an administrative questionnaire in a form approved by the Administrative Agent (the "Administrative Questionnaire") and applicable tax forms (including those described in Sections 2.15(d), (e), (g) and (h), as applicable).

For the purposes of this Section 8.06(b), the term "Approved Fund" means any Person (other than a natural person) that is engaged in making, purchasing, holding or investing in bank loans and similar extensions of credit in the ordinary course and that is administered, advised or managed by (a) a Lender, (b) an Affiliate of a Lender or (c) an entity or an Affiliate of an entity that administers, advises or manages a Lender.

Upon request of the Borrower, the Administrative Agent shall deliver to the Borrower a list of each assignment made during the immediately preceding month, which list shall include the applicable assignor, Assignee, the interest assigned and the date of each assignment.  The delivery of such list shall satisfy the notice requirement set forth in Section 8.06(b)(i)(A).

(iii)    Subject to acceptance and recording thereof pursuant to clause (b)(v) of this Section 8.06, from and after the effective date specified in each Assignment and Acceptance, the Assignee thereunder shall be a party hereto and, to the extent of the interest assigned by such Assignment and Acceptance, have the rights and obligations of a Lender under this Agreement, and the assigning Lender thereunder shall, to the extent of the interest assigned by such Assignment and Acceptance, be released from its obligations under this Agreement (and, in the case of an Assignment and Acceptance covering all of the assigning Lender's rights and obligations under this Agreement, such Lender shall cease to be a party hereto but shall continue to be entitled to the benefits of Sections 2.08, 2.09, 2.15 and 8.05).  Any assignment or transfer by a Lender of rights or obligations under this Agreement that does not comply with this Section 8.06 shall be treated for purposes of this Agreement as a sale by such Lender of a participation in such rights and obligations in accordance with clause (c) of this Section 8.06.

(iv)    The Administrative Agent, acting for this purpose as a non- fiduciary agent of the Borrower, shall maintain a copy of each Assignment and Acceptance delivered to it and a register for the recordation of the names and addresses of the Lenders, and principal and stated interest amounts of the Loans (the "Register").  The entries in the Register shall be conclusive absent manifest error, and the Borrower, the Administrative Agent and the Lenders shall treat each Person whose name is recorded in the Register pursuant to the terms hereof as a Lender hereunder for all purposes of this Agreement, notwithstanding notice to the contrary.  The Register shall be available for inspection by the Borrower, at any reasonable time and from time to time upon reasonable prior notice.

(v)    Upon its receipt of a duly completed Assignment and Acceptance executed by an assigning Lender and an Assignee, the Assignee's completed Administrative Questionnaire (unless the Assignee shall already be a Lender hereunder), all applicable tax forms, the processing and recordation fee referred to in clause (b) of this Section 8.06 and any written consent to such assignment required by clause (b) of this Section 8.06, the Administrative Agent shall promptly accept such Assignment and Acceptance and record the information contained therein in the Register.  No assignment, whether or not evidenced by a promissory note, shall be effective for purposes of this Agreement unless it has been recorded in the Register as provided in this clause.

(c)    (i) Any Lender may, without the consent of, or notice to, the Administrative Agent or the Borrower, sell participations to one or more banks or other entities (other than to Holdings, any of its Subsidiaries or any of its Affiliates or any natural persons) (each, a "Participant") in all or a portion of such Lender's rights and obligations under this Agreement (including all or a portion of the Loans owing to it), *provided* that (A) such Lender's obligations under this Agreement shall remain unchanged, (B) such Lender shall remain solely responsible to the other parties hereto for the performance of such obligations and (C) the Borrower, the Administrative Agent and the other Lenders shall continue to deal solely and directly with such

116

Error! Unknown document property name.
WEIL:\97986321\6\45327.0007

Debtors' Exhibit No. 30
Page 124 of 137

Lender in connection with such Lender's rights and obligations under this Agreement and the other Loan Documents. Any agreement or instrument pursuant to which a Lender sells such a participation shall provide that such Lender shall retain the sole right to enforce this Agreement and the other Loan Documents and to approve any amendment, modification or waiver of any provision of this Agreement and the other Loan Documents, *provided* that (x) such agreement or instrument may provide that such Lender will not, without the consent of the Participant, agree to any amendment, modification or waiver described in clause (ii) or (iii) of the second sentence of Section 8.01(b) that directly affects such Participant and (y) no other agreement with respect to amendment, modification or waiver may exist between such Lender and such Participant. Subject to clause (c)(ii) of this Section 8.06, the Borrower agrees that each Participant shall be entitled to the benefits of Sections 2.08, 2.09 and 2.15 (subject to the limitations and requirements of those Sections and Sections 2.10 and 8.07) to the same extent as if it were a Lender and had acquired its interest by assignment pursuant to clause (b) of this Section 8.06.

(ii)     Each Lender that sells a participation shall, acting solely for this purpose as a non-fiduciary agent of the Borrower, maintain a register on which it enters the name and address of each Participant and the principal and stated interest amounts of each Participant's interest in the Loans held by it (the "Participant Register"). The entries in the Participant Register shall be conclusive absent manifest error, and each party hereto shall treat each Person whose name is recorded in the Participant Register as the owner of such participation for all purposes of this Agreement and the other Loan Documents, notwithstanding notice to the contrary. *No* Lender shall have any obligation to disclose all or any portion of the Participant Register to any Person (including the identity of any Participant or any information relating to a Participant's interest in any Loans or other Obligations under any Loan Document) except to the extent that such disclosure is necessary to establish that such Loan or other Obligation is in registered form Treasury Regulation Section 5f.103-1(c), proposed Treasury Regulation Section 1.163-5 or any applicable temporary, final or other successor regulations. Unless required by the IRS, any disclosure required by the foregoing sentence shall be made by the relevant Lender directly and solely to the IRS. For the avoidance of doubt, Administrative Agent (in its capacity as Administrative Agent) shall have no responsibility for maintaining a Participant Register.

(iii)     A Participant shall not be entitled to receive any greater payment under Section 2.08 or 2.15 than the applicable Lender would have been entitled to receive with respect to the participation sold to such Participant, except to the extent such entitlement to receive a greater payment results from a Change in Law that occurs after such participant acquired the participation or unless the sale of the participation to such Participant thereafter is made with the Borrower's prior written consent.

(d)     Any Lender may at any time pledge or assign a security interest in all or any portion of its rights under this Agreement to secure obligations of such Lender, including any pledge or assignment to secure obligations to a Federal Reserve Bank or other central bank, and this Section 8.06 shall not apply to any such pledge or assignment of a security interest; *provided* that no such pledge or assignment of a security interest shall release a Lender from any of its obligations hereunder or substitute any such pledgee or Assignee for such Lender as a party hereto. In order to facilitate such pledge or assignment, the Borrower hereby agrees that, upon request of any Lender at any time and from time to time, the Borrower shall provide to such Lender, at the Borrower's own expense, a Note, substantially in the form of Exhibit B.

(e)     [Reserved.]

(f)     (i) Notwithstanding anything to the contrary in this Agreement, the Borrower may purchase by way of assignment from any Lender and become an assignee with respect to, and each Lender shall have the right to assign and transfer to the Borrower, at any time and from time to time, all or a portion of such Lender's Loans either pursuant to Dutch auctions available to all Lenders on the same terms or pursuant to open market purchases ("Permitted Loan Purchases"); *provided* that (A) at the time of the effectiveness thereof, no Default or Event of Default has occurred and is continuing or would result from such Permitted Loan Purchase and (B) the Borrower and such assignor Lender shall execute and deliver to the Administrative Agent a Permitted

117

Error! Unknown document property name.
WEIL:\97986321\6\45327.0007

Debtors' Exhibit No. 30
Page 125 of 137

Loan Purchase Assignment and Acceptance (and, for the avoidance of doubt, shall not be required to execute and deliver an Assignment and Acceptance pursuant to Section 9.06(b)(ii)(C)).

(ii)     Upon the effectiveness of any Permitted Loan Purchase, the Loans subject thereto shall, without further action by any Person, be deemed cancelled and no longer outstanding for all purposes of this Agreement and the other Loan Documents, including with respect to (1) the making of, or the application of, any payments to the Lenders under this Agreement or any other Loan Document, (2) the making of any request, demand, authorization, direction, notice, consent or waiver under this Agreement or any other Loan Document or (3) the determination of the Required Lenders, or for any similar or related purpose, under this Agreement or any other Loan Document.  The Administrative Agent is authorized to make appropriate entries in the Register to reflect any cancellation of the Loans.  Permitted Loan Purchases pursuant to this Section 9.06(f) shall not constitute voluntary prepayments for purposes of Section 2.14.  In connection with any Permitted Loan Purchase, the assignor Lender shall, to the extent that its Loans shall have been repurchased and assigned to the Borrower pursuant to such Permitted Loan Purchase, be released from its obligations under this Agreement (and, in the case of a Permitted Loan Purchase covering all of the assigning Lender's rights and obligations under this Agreement, such Lender shall cease to be a party hereto but shall continue to be entitled to the benefits of Section 9.05 (subject to the limitations and requirements of such Section)), but the Borrower shall not obtain any of the rights or obligations of a Lender under this Agreement and the provisions set forth in Section 9.06(b)(ii) shall not apply thereto.

SECTION 8.07.     Replacements of Lenders Under Certain Circumstances.  (a) If any Lender (i) requests reimbursement for amounts owing pursuant to Section 2.08, 2.09 or 2.15 (other than Section 2.15(b)) or (ii) is affected in the manner described in Section 2.08(a)(iii) and as a result thereof of the action described in Section 2.08(b) is required to be taken, then, *provided* that no Event of Default then exists, the Borrower shall, upon five (5) days' notice to the Administrative Agent and the relevant Lender, have the right to replace such Lender by deeming such Lender to have assigned its Loans hereunder to one or more assignees reasonably acceptable to the Administrative Agent; *provided* that (1) such replacement does not conflict with any Requirement of Law, (2) all Loan Obligations (other than any disputed amounts pursuant to Section 2.08, 2.09, or 2.15, as the case may be) owing to such Lender being replaced shall be paid in full to such Lender concurrently with such assignment and the Borrower shall pay any premium that would have been due if the Loans were prepaid, and (3) the replacement Lender shall purchase the foregoing by paying to such Lender a price equal to the principal amount thereof plus accrued and unpaid interest thereon.  No action by or consent of the replaced Lender shall be necessary in connection with such assignment, which shall be immediately and automatically effective upon payment of such purchase price.  In connection with any such assignment, the Borrower, the Administrative Agent, such replaced Lender and the replacement Lender shall otherwise comply with Section 8.06 (*provided* that the Borrower shall be obligated to pay the registration and processing fee referred to therein).  Any such replacement shall not be deemed to be a waiver of any rights that the Borrower, the Administrative Agent or any other Lender shall have against the replaced Lender.

(b)     If any Lender (such Lender, a "Non-Consenting Lender") has failed to consent to a proposed amendment, waiver, discharge or termination which pursuant to the terms of Section 8.01(b) requires the consent of all of the Lenders affected and with respect to which the Required Lenders shall have granted their consent, then, *provided* that no Event of Default (other than an Event of Default relating to the proposed amendment, waiver, discharge or termination) then exists, the Borrower shall, upon five (5) days' notice to the Administrative Agent and the relevant Lender, have the right (unless such Non-Consenting Lender grants such consent) to replace such Non-Consenting Lender by deeming such Non-Consenting Lender to have assigned its Loans hereunder to one or more assignees, reasonably acceptable to the Administrative Agent; *provided* that:  (1) such replacement does not conflict with any Requirement of Law, (2) all Loan Obligations of the Borrower owing to such Non-Consenting Lender being replaced shall be paid in full to such Non-Consenting Lender concurrently with such assignment and the Borrower shall pay any premium that would have been due if the Loans were prepaid, and (3) the replacement Lender shall purchase the foregoing by paying to such Non-Consenting Lender a price equal to the principal amount thereof plus accrued and unpaid interest thereon.  No action by or consent

118

Debtors' Exhibit No. 30
Page 126 of 137

of the Non-Consenting Lender shall be necessary in connection with such assignment, which shall be immediately and automatically effective upon payment of such purchase price. In connection with any such assignment, the Borrower, the Administrative Agent, such Non-Consenting Lender and the replacement Lender shall otherwise comply with <u>Section 8.06</u> (*provided* that the Borrower shall be obligated to pay the registration and processing fee referred to therein).

SECTION 8.08.       <u>Counterparts</u>.  This Agreement may be executed by one or more of the parties to this Agreement on any number of separate counterparts (including by facsimile or other electronic transmission), and all of said counterparts taken together shall be deemed to constitute one and the same instrument.  A set of the copies of this Agreement signed by all the parties shall be lodged with the Borrower and the Administrative Agent. The words "execution," "signed," "signature," and words of like import in any Assignment and Assumption or any Loan Document shall in each case be deemed to include electronic signatures, signatures exchanged by electronic transmission, or the keeping of records in electronic form, each of which shall be of the same legal effect, validity or enforceability as a manually executed signature or the use of a paper-based recordkeeping system, as the case may be, to the extent and as provided for in any applicable law, including the Federal Electronic Signatures in Global and National Commerce Act, the New York State Electronic Signatures and Records Act, or any other similar state laws based on the Uniform Electronic Transactions Act; *provided*, that the Administrative Agent or the Collateral Agent may request, and upon any such request the Credit Parties shall be obligated to provide, manually executed "wet ink" signatures to any Loan Document.

SECTION 8.09.       <u>Severability</u>.  Any provision of this Agreement that is prohibited or unenforceable in any jurisdiction shall, as to such jurisdiction, be ineffective to the extent of such prohibition or unenforceability without invalidating the remaining provisions hereof, and any such prohibition or unenforceability in any jurisdiction shall not invalidate or render unenforceable such provision in any other jurisdiction.

SECTION 8.10.       <u>GOVERNING LAW</u>.  THIS AGREEMENT AND THE RIGHTS AND OBLIGATIONS OF THE PARTIES HEREUNDER SHALL BE GOVERNED BY, AND CONSTRUED AND INTERPRETED IN ACCORDANCE WITH, THE LAW OF THE STATE OF NEW YORK.

SECTION 8.11.       <u>Submission to Jurisdiction; Consent to Service; Waivers</u>.

(a)       Subject to <u>clause (v)</u> below, the parties hereto hereby irrevocably and unconditionally:

(i)       submits for itself and its property in any legal action or proceeding arising out of or relating to this Agreement and the other Loan Documents to which it is a party, or for recognition and enforcement of any judgment in respect thereof, to the exclusive (subject to <u>clause (v)</u> below) general jurisdiction and venue of the courts of the United States of America sitting in the Borough of Manhattan or, if that court does not have subject matter jurisdiction, in any state court located in the City and County of New York;

(ii)       consents that any such action or proceeding may be brought in such courts and waives any objection that it may now or hereafter have to the venue of any such action or proceeding in any such court or that such action or proceeding was brought in an inconvenient court and agrees not to plead or claim the same;

(iii)       in the case of a Credit Party, each agrees that service of process in any such action or proceeding in any such court may be effected by mailing a copy thereof by registered or certified mail (or any substantially similar form of mail), return receipt requested, to the applicable Credit Party at its respective address set forth in <u>Section 8.02</u> or at such other address of which the Administrative Agent shall have been notified pursuant thereto;

119

(iv)      agrees that service as provided in <u>clause (iii)</u> above is sufficient to confer personal jurisdiction over the applicable Credit Party in any such proceeding in any such court, and otherwise constitutes effective and binding service in every respect;

(v)      agrees that Agents and Lenders retain the right to effect service of process in any other manner permitted by law or to bring proceedings against any Credit Party in the courts of any other jurisdiction in connection with the exercise of any rights under any Loan Document or against any Collateral or the enforcement of any judgment and hereby submits to the jurisdiction of, and consents to venue in, any such court; and

(vi)      without limitation of <u>Sections 7.07</u> and <u>8.05</u>, waives, to the maximum extent not prohibited by law, any right it may have to claim or recover in any legal action or proceeding referred to in this <u>Section 8.11</u> any special, exemplary, punitive or consequential damages.

(b)      The parties hereto, to the extent that it has or hereafter may acquire any immunity (sovereign or otherwise) from any legal action, suit or proceeding, from jurisdiction of any court or from setoff or any legal process (whether service of notice, attachment prior to judgment, attachment in aid of execution of judgment, execution of judgment or otherwise) with respect to itself or any of its property or assets, hereby waives and agrees not to plead or claim such immunity in respect of its obligations under this Agreement and the other Loan Documents (it being understood that the waivers contained in this <u>clause (b)</u> shall have the fullest extent permitted under the Foreign Sovereign Immunities Act of 1976, as amended, and are intended to be irrevocable and not subject to withdrawal for the purposes of such Act).

SECTION 8.12.      <u>Acknowledgments</u>.  The parties hereto hereby acknowledge that:

(a)      it has been advised by counsel in the negotiation, execution and delivery of this Agreement and the other Loan Documents;

(b)      none of the Administrative Agent, the Collateral Agent nor any Lender has any fiduciary relationship with or duty to the Borrower arising out of or in connection with this Agreement and any of the other Loan Documents, and the relationship between Administrative Agent, the Collateral Agent and Lenders, on one hand, and the Borrower, on the other hand, in connection herewith or therewith is solely that of debtor and creditor; and

(c)      no joint venture is created hereby or by the other Loan Documents or otherwise exists by virtue of the transactions contemplated hereby among the Lenders or among the Borrower and the Lenders.

SECTION 8.13.      <u>WAIVERS OF JURY TRIAL</u>.  THE PARTIES HERETO HEREBY IRREVOCABLY AND UNCONDITIONALLY WAIVE TRIAL BY JURY IN ANY CLAIM, LEGAL ACTION OR PROCEEDING RELATING TO THIS AGREEMENT OR ANY OTHER LOAN DOCUMENT OR AN DEALINGS BETWEEN SUCH PARTIES RELATING TO THE SUBJECT MATTER OF THIS LOAN TRANSACTION OR THE LENDER/BORROWER RELATIONSHIP THAT IS BEING ESTABLISHED AND FOR ANY COUNTERCLAIM THEREIN.  THE SCOPE OF THIS WAIVER IS INTENDED TO BE ALL ENCOMPASSING OF ANY AND ALL DISPUTES THAT MAY BE FILED IN ANY COURT AND THAT RELATE TO THE SUBJECT MATTER OF THIS TRANSACTION, INCLUDING CONTRACT CLAIMS, TORT CLAIMS, BREACH OF DUTY CLAIMS AND ALL OTHER COMMON LAW AND STATUTORY CLAIMS.  EACH PARTY HERETO ACKNOWLEDGES THAT THIS WAIVER IS A MATERIAL INDUCEMENT TO ENTER INTO A BUSINESS RELATIONSHIP THAT EACH HAS ALREADY RELIED ON THIS WAIVER IN ENTERING INTO THIS AGREEMENT, AND THAT EACH WILL CONTINUE TO RELY ON THIS WAIVER IN ITS RELATED FUTURE DEALINGS.  EACH PARTY HERETO FURTHER WARRANTS AND REPRESENTS THAT IT HAS REVIEWED THIS WAIVER WITH ITS LEGAL COUNSEL AND THAT IT KNOWINGLY AND VOLUNTARILY WAIVES ITS JURY TRIAL RIGHTS FOLLOWING CONSULTATION WITH LEGAL COUNSEL.  THIS WAIVER IS IRREVOCABLE,

120

Error! Unknown document property name.
WEIL:\97986321\6\45327.0007

Debtors' Exhibit No. 30
Page 128 of 137

MEANING THAT IT MAY NOT BE MODIFIED EITHER ORALLY OR IN WRITING (OTHER THAN BY A MUTUAL WRITTEN WAIVER SPECIFICALLY REFERRING TO THIS SECTION 8.13 AND EXECUTED BY EACH OF THE PARTIES HERETO), AND THIS WAIVER SHALL APPLY TO ANY SUBSEQUENT AMENDMENTS, RENEWALS, SUPPLEMENTS OR MODIFICATIONS HERETO OR ANY OF THE OTHER LOAN DOCUMENTS OR TO ANY OTHER DOCUMENTS OR AGREEMENTS RELATING TO THE LOANS MADE HEREUNDER.   IN THE EVENT OF LITIGATION, THIS AGREEMENT MAY BE FILED AS A WRITTEN CONSENT TO A TRIAL BY THE COURT.

SECTION 8.14.   Confidentiality.   The Administrative Agent and each Lender shall hold all information relating to Holdings, the Borrower or any Subsidiary and their respective businesses furnished by or on behalf of Holdings, the Borrower or any such Subsidiary in connection with this Agreement (other than information that (a) has become available to the public other than as a result of a disclosure by such party in breach of this Section 8.14, (b) has been independently developed by such Lender or such Agent without violating this Section 8.14 or (c) was or becomes available to such Lender or such Agent from a third party which, to such person's knowledge, had not breached an obligation of confidentiality to the Borrower or any other Credit Party), confidential in accordance with its customary procedure for handling confidential information of such nature and in any event may make disclosure (a) as required or requested by any governmental agency or representative thereof or any securities exchange on which securities of the disclosing party or any Affiliate of the disclosing party are listed or traded or pursuant to legal process or to such Lender's or the Administrative Agent's attorneys, professional advisors or independent auditors or Affiliates, (b) as part of normal reporting or review procedures to, or examinations by, Governmental Authorities or self-regulatory authorities, including the National Association of Insurance Commissioners or the National Association of Securities Dealers, Inc., (c) in connection with the exercise of any remedies hereunder or under any other Loan Document or any action or proceeding relating to this Agreement or any other Loan Document or in order to enforce its rights hereunder or thereunder any Loan Document, (d) to any pledgee under Section 8.06 or any other prospective assignee of, or prospective Participant in, any of its rights under this Agreement (so long as such person shall agree to keep the same confidential in accordance with this Section 8.14 or terms substantially similar to this Section 8.14), (e) to any direct or indirect contractual counterparty in swap agreements or such contractual counterparty's professional advisor (so long as such contractual counterparty or professional advisor to such contractual counterparty agrees to be bound by the provisions of this Section 8.14 or terms substantially similar to this Section 8.14), (f) on a confidential basis to any rating agency, (g) on a confidential basis to the CUSIP Service Bureau or any similar agency in connection with the issuance and monitoring of CUSIP numbers with respect to the Loans, (g) to any Lenders' financing sources; provided that prior to any disclosure such financing source is informed of the confidential nature of the information and are or have been advised to keep information of this type confidential, (h) to Affiliates and Related Funds of such Lender or such Agent and to their respective officers, Directors, partners, members, employees, legal counsel, independent auditors and other advisors, experts, or agents on a confidential basis (and to other Persons authorized by a Lender or Agent to organize, present or disseminate such information in connection with disclosures otherwise made in accordance with this Section 8.14) and (i) with the consent of the relevant Credit Party; provided that in no event shall any Lender or the Administrative Agent be obligated or required to return any materials furnished by the Borrower or any Subsidiary of the Borrower.  Notwithstanding the foregoing, on or after the Closing Date, Administrative Agent may, at its own expense issue news releases and publish "tombstone" advertisements and other announcements relating to this transaction in newspapers, trade journals and other appropriate media (which may include use of logos of one or more of the Credit Parties)(collectively, "Trade Announcements").  No Lender or Credit Party shall (a) issue any Trade Announcement, (b) use or reference in advertising, publicity, or otherwise the name of any Lender or any of their respective Affiliates, partners, or employees, or (c) represent that any product or any service provided has been approved or endorsed by any Lender, or any of their respective Affiliates, except (i) disclosures required by applicable law, regulation, legal process or the rules of the SEC or in connection with the Transactions or (ii) with the prior approval of Administrative Agent.

SECTION 8.15.   No Advisory or Fiduciary Responsibility.   In connection with all aspects of each transaction contemplated hereby, the Borrower acknowledges and agrees, and acknowledge its Affiliates' understanding, that:  (i) the credit facility provided for hereunder and any related arranging or other services in

Error! Unknown document property name.
WEIL:\97986321\6\45327.0007

connection therewith (including in connection with any amendment, waiver or other modification hereof or of any other Loan Document) are an arm's-length commercial transaction between the Borrower, and its Affiliates, on the one hand, and the Administrative Agent,  each other Agent and each Lender (collectively, solely for purposes of this paragraph, the "Lenders"), on the other hand, and the Borrower and each of its Affiliates is capable of evaluating and understanding and understands and accepts the terms, risks and conditions of the transactions contemplated hereby and by the other Loan Documents (including any amendment, waiver or other modification hereof or thereof); (ii) in connection with the process leading to such transaction, each Lender is and has been acting solely as a principal and is not the financial advisor, agent or fiduciary, for the Borrower, or any of its Affiliates, stockholders, creditors or employees or any other Person; (iii) no Agent or Lender has assumed or will assume an advisory, agency or fiduciary responsibility in favor of the Borrower or any of its Affiliates with respect to any of the transactions contemplated hereby or the process leading thereto, including with respect to any amendment, waiver or other modification hereof or of any other Loan Document (irrespective of whether any Lender has advised or is currently advising the Borrower or any of its respective Affiliates on other matters) and no Agent or Lender has any obligation to the Borrower or any of its Affiliates with respect to the transactions contemplated hereby except those obligations expressly set forth herein and in the other Loan Documents; (iv) each Agent and Lender and its respective Affiliates may be engaged in a broad range of transactions that involve interests that differ from those of the Borrower and its Affiliates, and no Lender has any obligation to disclose any of such interests by virtue of any advisory, agency or fiduciary relationship; and (v) no Agent or Lender has provided and no Agent or Lender will provide any legal, accounting, regulatory or tax advice with respect to any of the transactions contemplated hereby (including any amendment, waiver or other modification hereof or of any other Loan Document) and the Borrower and each its Affiliates has consulted its own legal, accounting, regulatory and tax advisors to the extent it has deemed appropriate.  The Borrower and each its Affiliates hereby waives and releases, to the fullest extent permitted by law, any claims that it may have against any Agent or Lender with respect to any breach or alleged breach of agency or fiduciary duty.

SECTION 8.16.    USA PATRIOT Act.  Each Lender hereby notifies the Borrower that pursuant to the requirements of the USA Patriot Act, it is required to obtain, verify and record information that identifies the Credit Parties, which information includes the name and address of the Credit Parties and other information that will allow such Lender to identify the Credit Parties in accordance with the USA Patriot Act.

SECTION 8.17.    Conversion of Currencies.

(a)    If, for the purpose of obtaining judgment in any court, it is necessary to convert a sum owing hereunder in one currency into another currency, each party hereto agrees, to the fullest extent that it may effectively do so, that the rate of exchange used shall be that at which in accordance with normal banking procedures in the relevant jurisdiction the first currency could be purchased with such other currency on the Business Day immediately preceding the day on which final judgment is given.

(b)    The obligations of the Borrower in respect of any sum due to any party hereto or any holder of the obligations owing hereunder (the "Applicable Creditor") shall, notwithstanding any judgment in a currency (the "Judgment Currency") other than the currency in which such sum is stated to be due hereunder (the "Agreement Currency"), be discharged only to the extent that, on the Business Day following receipt by the Applicable Creditor of any sum adjudged to be so due in the Judgment Currency, the Applicable Creditor may in accordance with normal banking procedures in the relevant jurisdiction purchase the Agreement Currency with the Judgment Currency; if the amount of the Agreement Currency so purchased is less than the sum originally due to the Applicable Creditor in the Agreement Currency, the Borrower agrees, as a separate obligation and notwithstanding any such judgment, to indemnify the Applicable Creditor against such loss.  The obligations of the Borrower contained in this Section 8.17 shall survive the termination of this Agreement and the payment of all other amounts owing hereunder.

SECTION 8.18.    Platform; Borrower Materials.  The Borrower hereby acknowledges that (a) the Administrative Agent will make available to the Lenders materials and/or information provided by or on behalf of the Borrower hereunder (collectively, "Borrower Materials") by posting the Borrower Materials on IntraLinks

122

Error! Unknown document property name.
WEIL:\97986321\6\45327.0007

Debtors' Exhibit No. 30
Page 130 of 137

or another similar electronic system (the "Platform"), and (b) certain of the Lenders may be "public-side" Lenders (i.e., Lenders that do not wish to receive material non-public information with respect to the Borrower or its securities) (each, a "Public Lender"). The Borrower hereby agrees that it will use commercially reasonable efforts to identify that portion of the Borrower Material that may be distributed to the Public Lenders and that (i) all such Borrower Materials shall be clearly and conspicuously marked "PUBLIC" which, at a minimum, means that the word "PUBLIC" shall appear prominently on the first page thereof, (ii) by marking Borrower Materials "PUBLIC," the Borrower shall be deemed to have authorized the Administrative Agent, and the Lenders to treat such Borrower Materials as either publicly available information or not material information (although it may be sensitive and proprietary) with respect to the Borrower or its securities for purposes of United States Federal and state securities laws, (iii) all Borrower Materials marked "PUBLIC" are permitted to be made available through a portion of the Platform designated "Public Investor" and (iv) the Administrative Agent shall be entitled to treat any Borrower Materials that are not marked "PUBLIC" as being suitable only for posting on a portion of the Platform not designated "Public Investor."

SECTION 8.19.    Release of Liens.

(a)    Notwithstanding anything to the contrary in the Security Documents, Collateral may be released from the Lien and security interest created by the Security Documents to secure the Loans and obligations under this Agreement at any time or from time to time in accordance with the provisions of the Intercreditor Agreement or as provided hereby. The applicable property and assets included in the Collateral shall be automatically released from the Liens securing the Loans, and the applicable Guarantor shall be automatically released from its obligations under this Agreement and the Security Documents, under any one or more of the following circumstances or any applicable circumstance as provided in the Intercreditor Agreement or the Security Documents:

(i)    to enable the Borrower and its Subsidiaries to consummate the disposition of such property or assets to a Person that is not the Borrower or a Guarantor to the extent permitted under Section 5.07;

(ii)    in respect of any assets or property constituting Collateral, upon any assets becoming designated as Excluded Equity Interests, Excluded Assets or assets of an Excluded Subsidiary;

(iii)    as provided in Section 8.01 or upon the release of such Guarantor pursuant to Section 8.20; and

(iv)    upon any assets (x) becoming designated as Excluded Equity Interests, Excluded Assets or assets of any Excluded Subsidiary or any Subsidiary Guarantor becoming an Excluded Subsidiary or (y) becoming subject to Liens pursuant to clauses (1), (4), (14), (16) (with respect to a refinancing of Permitted Liens otherwise described in this clause (iv)(y)), (31) and (36) of the definition of Permitted Liens.

(b)    In connection with any termination or release pursuant to this Section 8.19 or a release of a Guarantor pursuant to Section 8.20, the Collateral Agent shall execute and deliver to any Credit Party, at such Credit Party's expense, all documents that such Credit Party shall reasonably request to evidence such termination or release (including, without limitation, UCC termination statements), and will duly assign and transfer to such Credit Party, such of the Pledged Collateral (as defined in the Collateral Agreement) that may be in the possession of the Collateral Agent and has not theretofore been sold or otherwise applied or released pursuant to this Agreement or the Security Documents. Any execution and delivery of documents pursuant to this Section 8.19 shall be without recourse to or warranty by the Collateral Agent. In connection with any release pursuant to this Section 8.19 or 8.20, the Credit Party shall be permitted to take any action in connection therewith consistent with such release including, without limitation, the filing of UCC termination statements. Upon the receipt of any necessary or proper instruments of termination, satisfaction or release prepared by the

123

Error! Unknown document property name.
WEIL:\97986321\6\45327.0007

Debtors' Exhibit No. 30
Page 131 of 137

Borrower, the Collateral Agent shall execute, deliver or acknowledge such instruments or releases to evidence the release of any Collateral permitted to be released pursuant to this Agreement or the Security Documents or the Intercreditor Agreement without the consent of, or notice to, any Lender.

The security interests in all Collateral also will be released upon payment in full of the principal of, together with accrued and unpaid interest on, the Loans and all other Obligations under this Agreement and the Security Documents that are due and payable at or prior to the time such principal, together with accrued and unpaid interest, is paid.

Prior to executing and delivering or authorization of the filing of any release pursuant to this <u>Section 8.19</u>, the Collateral Agent shall receive, and shall be entitled to conclusively rely on, an Officers' Certificate stating that such release complies with the terms of this Agreement and the other Loan Documents, and all conditions precedent to the execution and delivery of such release have been satisfied.

SECTION 8.20.    <u>Release of Guarantee</u>.  Each Guarantor shall be automatically released upon:

(a)    solely in the case of a Subsidiary Guarantor, the sale, disposition, exchange or other transfer (including through merger, consolidation, amalgamation or otherwise) of the Capital Stock (including any sale, disposition or other transfer following which the applicable Subsidiary Guarantor is no longer a Restricted Subsidiary), of the applicable Subsidiary Guarantor if such sale, disposition, exchange or other transfer is made in a manner permitted under this Agreement and the other Loan Documents;

(b)    discharge of the Loan Obligations in accordance with the terms hereof;

(c)    as provided in <u>Section 8.01</u>; and

(d)    solely in the case of a Subsidiary Guarantor, such Subsidiary Guarantor becoming an Excluded Subsidiary.

SECTION 8.21.    <u>Acknowledgement and Consent to Bail-In of Affected Financial Institutions</u>. Notwithstanding anything to the contrary in any Loan Document or in any other agreement, arrangement or understanding of the parties hereto, each such party acknowledges that any liability of any Affected Financial Institution arising under any Loan Document, to the extent such liability is unsecured, may be subject to the write-down and conversion powers of the applicable Resolution Authority and agrees and consents to, and acknowledges and agrees to be bound by:

(a)    the application of any Write-Down and Conversion Powers by the applicable Resolution Authority to any such liabilities arising hereunder which may be payable to it by any party hereto that is an Affected Financial Institution; and

(b)    the effects of any Bail-in Action on any such liability, including, if applicable:

(i)    a reduction in full or in part or cancellation of any such liability;

(ii)    a conversion of all, or a portion of, such liability into shares or other instruments of ownership in such Affected Financial Institution, its parent undertaking, or a bridge institution that may be issued to it or otherwise conferred on it, and that such shares or other instruments of ownership will be accepted by it in lieu of any rights with respect to any such liability under this Agreement or any other Loan Document; or

(iii)    the variation of the terms of such liability in connection with the exercise of the write-down and conversion powers of the applicable Resolution Authority.

124

Error! Unknown document property name.
WEIL:\97986321\6\45327.0007

Debtors' Exhibit No. 30
Page 132 of 137

SECTION 8.22.    Amendment and Restatement.  This Agreement shall be deemed to amend and restate the Prepetition First Lien Credit Agreement in its entirety, and all of the terms and provisions hereof shall supersede the terms and conditions thereof.

SECTION 8.23.    Certain ERISA Matters.  Each Lender (x) represents and warrants, as of the date such Person became a Lender party hereto, to, and (y) covenants, from the date such Person became a Lender party hereto to the date such Person ceases being a Lender party hereto, for the benefit of the Agents and their respective Affiliates and not, for the avoidance of doubt, to or for the benefit of the Borrower or any other Credit Party, that at least one of the following is and will be true:

(a)    such Lender is not using "plan assets" (within the meaning of Section 3(42) of ERISA or otherwise) of one or more Benefit Plans with respect to such Lender's entrance into, participation in, administration of and performance of the Loans or this Agreement,

(b)    the transaction exemption set forth in one or more PTEs, such as PTE 84-14 (a class exemption for certain transactions determined by independent qualified professional asset managers), PTE 95-60 (a class exemption for certain transactions involving insurance company general accounts), PTE 90-1 (a class exemption for certain transactions involving insurance company pooled separate accounts), PTE 91-38 (a class exemption for certain transactions involving bank collective investment funds) or PTE 96-23 (a class exemption for certain transactions determined by in-house asset managers), is applicable with respect to such Lender's entrance into, participation in, administration of and performance of the Loans and this Agreement,

(c)    (i) such Lender is an investment fund managed by a "Qualified Professional Asset Manager" (within the meaning of Part VI of PTE 84-14), (ii) such Qualified Professional Asset Manager made the investment decision on behalf of such Lender to enter into, participate in, administer and perform the Loans and this Agreement, (iii) the entrance into, participation in, administration of and performance of the Loans and this Agreement satisfies the requirements of sub-sections (b) through (g) of Part I of PTE 84-14 and (iv) to the best knowledge of such Lender, the requirements of subsection (a) of Part I of PTE 84-14 are satisfied with respect to such Lender's entrance into, participation in, administration of and performance of the Loans and this Agreement, or

(d)    such other representation, warranty and covenant as may be agreed in writing between the Administrative Agent, in its sole discretion, and such Lender.

In addition, unless either (1) sub-clause (a) in the immediately preceding paragraph is true with respect to a Lender or (2) a Lender has provided another representation, warranty and covenant in accordance with sub-clause (d) in the immediately preceding paragraph, such Lender further (x) represents and warrants, as of the date such Person became a Lender party hereto, to, and (y) covenants, from the date such Person became a Lender party hereto to the date such Person ceases being a Lender party hereto, for the benefit of, the Agents and their respective Affiliates and not, for the avoidance of doubt, to or for the benefit of the Borrower or any other Credit Party, that none of the Agents or their respective Affiliates are a fiduciary with respect to the assets of such Lender involved in such Lender's entrance into, participation in, administration of and performance of the Loans and this Agreement (including in connection with the reservation or exercise of any rights by the Agents under this Agreement, any Loan Document or any documents related hereto or thereto).  The Agents hereby inform the Lenders that each Agent is not undertaking to provide impartial investment advice, or to give advice in a fiduciary capacity, in connection with the transactions contemplated hereby, and that such Agent has a financial interest in the transactions contemplated hereby in that such Agent or an Affiliate thereof (i) may receive interest or other payments with respect to the Loans and this Agreement, (ii) may recognize a gain if it extended the Loans for an amount less than the amount being paid for an interest in the Loans by such Lender or (iii) may receive fees or other payments in connection with the transactions contemplated hereby, the Loan Documents or otherwise, including structuring fees, commitment fees, arrangement fees, facility fees, upfront fees, underwriting fees, ticking fees, agency fees, administrative agent or collateral agent fees, utilization fees, minimum usage fees, letter of credit fees, fronting fees, deal-away or alternate transaction fees, amendment fees,

Error! Unknown document property name.
WEIL:\97986321\6\45327.0007

processing fees, term out premiums, banker's acceptance fees, breakage or other early termination fees or fees similar to the foregoing.

SECTION 8.24.    <u>Acknowledgement Regarding Any Supported QFCs</u>.  To the extent that the Loan Documents provide support, through a guarantee or otherwise, for Derivative Transactions or any other agreement or instrument that is a QFC (such support, "<u>QFC Credit Support</u>" and each such QFC a "<u>Supported QFC</u>"), the parties acknowledge and agree as follows with respect to the resolution power of the Federal Deposit Insurance Corporation under the Federal Deposit Insurance Act and Title II of the Dodd-Frank Wall Street Reform and Consumer Protection Act (together with the regulations promulgated thereunder, the "<u>US Special Resolution Regimes</u>") in respect of such Supported QFC and QFC Credit Support (with the provisions below applicable notwithstanding that the Loan Documents and any Supported QFC may in fact be stated to be governed by the laws of the State of New York and/or of the U.S. or any other state of the U.S.):

(a)    In the event a Covered Entity that is party to a Supported QFC (each, a "<u>Covered Party</u>") becomes subject to a proceeding under a US Special Resolution Regime, the transfer of such Supported QFC and the benefit of such QFC Credit Support (and any interest and obligation in or under such Supported QFC and such QFC Credit Support, and any rights in property securing such Supported QFC or such QFC Credit Support) from such Covered Party will be effective to the same extent as the transfer would be effective under the US Special Resolution Regime if the Supported QFC and such QFC Credit Support (and any such interest, obligation and rights in property) were governed by the laws of the U.S. or a state of the U.S.  In the event a Covered Party or a BHC Act Affiliate of a Covered Party becomes subject to a proceeding under a US Special Resolution Regime, Default Rights under the Loan Documents that might otherwise apply to such Supported QFC or any QFC Credit Support that may be exercised against such Covered Party are permitted to be exercised to no greater extent than such Default Rights could be exercised under the US Special Resolution Regime if the Supported QFC and the Loan Documents were governed by the laws of the U.S. or a state of the U.S. Without limitation of the foregoing, it is understood and agreed that rights and remedies of the parties with respect to a Defaulting Lender shall in no event affect the rights of any Covered Party with respect to a Supported QFC or any QFC Credit Support.

(b)    As used in this <u>Section 8.24</u>, the following terms have the following meanings:

"<u>BHC ACT Affiliate</u>" means an "affiliate" (as defined under, and interpreted in accordance with, 12 U.S.C. 1841(k)).

"<u>Covered Entity</u>" means any of the following:

(i)    a "covered entity" as that term is defined in, and interpreted in accordance with, 12 C.F.R. § 252.82(b);

(ii)    a "covered bank" as that term is defined in, and interpreted in accordance with, 12 C.F.R. § 47.3(b); or

(iii)    a "covered FSI" as that term is defined in, and interpreted in accordance with, 12 C.F.R. § 382.2(b).

"<u>Default Right</u>" has the meaning assigned to that term in, and shall be interpreted in accordance with, 12 C.F.R. §§ 252.81, 47.2 or 382.1, as applicable.

"<u>QFC</u>" has the meaning assigned to the term "qualified financial contract" in, and shall be interpreted in accordance with, 12 U.S.C. 5390(c)(8)(D).

126

Error! Unknown document property name.
WEIL:\97986321\6\45327.0007

Debtors' Exhibit No. 30
Page 134 of 137

[SIGNATURE PAGES FOLLOW]

**Error! Unknown document property name.**
WEIL:\97986321\6\45327.0007

IN WITNESS WHEREOF, each of the parties hereto has caused a counterpart of this Agreement to be duly executed and delivered as of the date first above written.

[●], as the Borrower

By: _____
    Name:
    Title

[●], as Holdings

By: _____
    Name:
    Title

[Signature Page to Credit Agreement]

WEIL:\97986321\4\45327.0007
**Error! Unknown document property name.**
WEIL:\97986321\6\45327.0007

Debtors' Exhibit No. 30
Page 136 of 137

CANTOR FITZGERALD SECURITIES, as the
Administrative Agent and the Collateral Agent


By: _____
      Name:
      Title:

[Signature Page to Credit Agreement]

WEIL:\97986321\4\45327.0007
**Error! Unknown document property name.**
WEIL:\97986321\6\45327.0007

Debtors' Exhibit No. 30
Page 137 of 137