**<u>Exhibit N</u>**

**Additional Predecessor Agreements**

<u>**Exhibit N1**</u>

**Chevron Definitive Documents**

*Execution Version*

## Chevron Term Sheet Implementation Agreement

This IMPLEMENTATION AGREEMENT (the "**Agreement**") is made and entered into as of June 11, 2021, by and among (a) Fieldwood Energy LLC, a Delaware limited liability company ("**FWE**") and (b) Chevron U.S.A. Inc., a Pennsylvania corporation ("**CUSA**") (each, a "**Party**" and collectively, the "**Parties**") to implement the transactions contemplated by or related to the term sheet attached hereto as **Exhibit A** (the "**CUSA Term Sheet**").

## RECITALS

WHEREAS, on March 22, 2021, the Parties executed a letter agreement whereby each Party agreed (i) to work to implement the terms of the CUSA Term Sheet and (ii) negotiate in good faith the definitive documents implementing the transactions contemplated by or relating to the CUSA Term Sheet (the "**CUSA Definitive Documents**");

WHEREAS, CUSA and certain of its affiliates and predecessors sold interests in certain leases, including the associated wells, platforms, and pipelines, to FWE (or companies that would ultimately merge with or be acquired by FWE or its affiliates) in multiple transactions (collectively, the "**Legacy CUSA Properties**");

WHEREAS, CUSA asserts that the decommissioning costs associated with the Legacy CUSA Properties are estimated to total in excess of $500 million and that CUSA and its parent and affiliates, including Noble Energy, Inc., Union Oil Company of California, Unocal Pipeline Company and Texaco Inc., (such parent and affiliates, together with CUSA, individually each a "**CUSA Entity**" and collectively the "**CUSA Entities**") hold certain claims against FWE and its affiliates on account of, among other things, such decommissioning costs (together with any other prepetition claim any CUSA Entity may hold or assert (the "**Chevron Claims**"), including, without limitation, the claims asserted in proofs of claim numbered 424, 425, 430, 226, 429, 440, 452, 445,

444, 448, 446, 447, 449, 451, 427, 428, 431 and 442  filed by certain CUSA Entities against certain of the Debtors (as may be amended from time to time, the "**Chevron POCs**");

WHEREAS, commencing on August 3, 2020 (the "**Petition Date**"), FWE and certain of its affiliates (collectively, the "**Debtors**") each filed with the United States Bankruptcy Court for the Southern District of Texas (the "**Bankruptcy Court**") a voluntary case under chapter 11 of title 11 of the United States Code (the "**Bankruptcy Code**");

WHEREAS, the Bankruptcy Court established a general bar date of 5:00 p.m. (Central Time) on November 25, 2020 (the "**General Bar Date**") for filing proofs of claim against the Debtors and, on November 11, 2020, CUSA timely filed the Chevron POCs;

WHEREAS, on April 15, 2021, the Debtors filed their *Fourth Amended Joint Chapter 11 Plan of Fieldwood Energy LLC and its Affiliated Debtors* [D.I. 1284] (including any exhibits and schedules thereto and as may be further amended, supplemented or modified, the "**Plan**");[1]

WHEREAS, on April 15, 2021, the Bankruptcy Court entered an order approving the Debtors' disclosure statement with respect to the Plan [D.I. 1285] (including any exhibits and schedules thereto and as may be further amended, supplemented, or modified, the "**Disclosure Statement**") and solicitation procedures with respect to the Plan [D.I. 1286], and set June 2, 2021 at 11:59 p.m. (prevailing Central Time) as the deadline by which parties must file with the Bankruptcy Court an objection or response to confirmation of the Plan; and

WHEREAS, attached to the Disclosure Statement as Exhibit P is the CUSA Term Sheet.

NOW, THEREFORE, in consideration of the mutual covenants and agreements set forth in this Agreement, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties, intending to be legally bound, agree as follows:

---

[1] Capitalized terms used but not defined herein shall have the meanings ascribed to them in the Plan.

WEIL:\98002350\6\45327.0007
WORKAMER\51502\366014\38535105.v18-6/10/21

1.     **CUSA Definitive Documents**.  The documents below comprise the CUSA Definitive Documents as contemplated in the CUSA Term Sheet:

a.     *Merger Documents.*

(i)     *Agreement and Plan of Merger (TX) (FWE III/IV)* (the "**FWE III Plan of Merger**").  Annexed hereto as **Exhibit 1-A**.

(ii)     *Certificate of Merger.*  Annexed hereto as **Exhibit 1-B**.

b.     *FWE IV Governance Documents.*

(i)     *Certificate of Formation (TX) (Fieldwood Energy IV LLC).*  Annexed hereto as **Exhibit 2**.

(ii)     *Fieldwood Energy IV LLC Agreement.*  Annexed hereto as **Exhibit 3**.

(iii)     *Sole Manager Agreement.*  Annexed hereto as **Exhibit 4**.

c.     *Omnibus Agreement* (the "**Omnibus Agreement**").  Annexed hereto as **Exhibit 5**.

d.     *Turnkey Removal Agreement.*  Annexed hereto as **Exhibit 6**.

e.     *Contract Operating Agreement.*  Annexed hereto as **Exhibit 7**.

f.     *Escrow Agreement* (the "**Escrow Agreement**").  Annexed hereto as **Exhibit 8**.

g.     *Neptune Spar Transition Services Agreement.*  Annexed hereto as **Exhibit 9**.

h.     *Deepwater Assets Decommissioning Funding Agreement.*   Annexed hereto as **Exhibit 10**.

i.     *SEMS Bridging Agreement.*  Annexed hereto as **Exhibit 11**.

j.     *NewCo Joint Development Agreement.*  Annexed hereto as **Exhibit 12**.

k.     *Assignment of Record Title in Federal OCS Oil and Gas Lease – Ship Shoal 175 OCS-G0550.*  Annexed hereto as **Exhibit 13**.

l.     *Net Profits Interest Conveyance.*  Annex hereto as **Exhibit 14**.

3

WEIL:\98002350\6\45327.0007
WORKAMER\51502\366014\38535105.v18-6/10/21

2.      **Execution of CUSA Definitive Documents; Good Faith Cooperation.**

a.  Each Party agrees, and CUSA expressly acknowledges, that FWE and CUSA have satisfied the requirements under the CUSA Term Sheet to negotiate mutually agreeable CUSA Definitive Documents by the relevant deadlines set forth therein.  Subject to and in accordance with the terms of the CUSA Term Sheet and the applicable consent rights provided for in the Restructuring Support Agreement, each of the Parties shall negotiate any exhibits, amendments, modifications or supplements to the CUSA Definitive Documents in good faith and agree to exercise commercially reasonable efforts with respect to the negotiation, pursuit, approval, execution, delivery, implementation, and consummation of the CUSA Definitive Documents.  Without further Bankruptcy Court approval and subject to the applicable consent rights provided for in the Restructuring Support Agreement, the Parties may at any time prior to the Effective Date of the Plan, by mutual agreement, amend, modify, or supplement this Agreement and/or the forms of the CUSA Definitive Documents attached hereto or negotiate to add additional documents to the list of CUSA Definitive Documents, consistent with the terms and conditions herein, in the CUSA Term Sheet, and subject to the consent rights of the Parties in the CUSA Term Sheet, as necessary or desirable to effectuate the CUSA Term Sheet and the Plan; provided that, either Party hereto may require that, prior to the Effective Date of the Plan, the Parties seek Bankruptcy Court approval with respect to any material amendments, modifications or supplements to the CUSA Definitive Documents.  Subject to the immediately preceding sentence, the Parties shall execute and deliver the CUSA Definitive Documents on or before the Effective Date of the Plan.  Each Party agrees to use commercially reasonable efforts to obtain and/or execute and deliver all instruments, forms, applications,

4

certifications, reports and filings required by federal or state authorities (including, for example, any BOEM or BSEE designation of operator forms and designated applicant Oil Spill Financial Responsibility ("**OSFR**") form designations and any other instruments, forms, applications, certifications, plans, reports and filings required by BOEM, BSEE, EPA, the U.S. Coast Guard or other applicable federal or state authorities) that are necessary to designate and appoint under all applicable laws and contracts Fieldwood Energy IV LLC ("**FWE IV**") as designated operator of producing leases (and, as applicable, the designated applicant under OSFR), and as decommissioning operator for terminated leases (including all steps required for FWE IV to be qualified later to file and obtain approval of a decommissioning plan), for the FWE IV Assets (as defined and set forth in the Plan of Merger) as promptly as practicable.  FWE shall, and shall cause its debtor affiliates in the above-captioned chapter 11 cases to, on the Effective Date, provide for the payment of any and all documentary, filing, recording, stamp, and registration fees, costs, and taxes incurred or imposed in connection with the above obligations.  The FWE IV Divisive Merger (as defined below) shall occur promptly after, and in no case later than one (1) business day following, the Initial Divisive Merger (as defined below).

b.  From the date hereof until the Effective Date, FWE will not, except with CUSA's prior written consent, incur expenses of the type described in clause (viii) of the definition of "FWE IV Obligations" as set forth in the FWE III Plan of Merger, except expenses (i) incurred pursuant to that certain letter agreement, dated as of June 3, 2021, from CUSA to FWE regarding South Timbalier 195 or (ii) that, in the aggregate, do not exceed $100,000.

3.  **Plan and Confirmation Order**.  The Confirmation Order (as defined below) and any amendment to the Plan must be reasonably acceptable to CUSA with respect to

5

any provisions thereof that directly affect the structure of FWE IV or are otherwise materially inconsistent with the terms and provisions of the CUSA Term Sheet, CUSA Definitive Documents, or this Agreement; *provided* that, for the avoidance of doubt, the Plan and Confirmation Order shall be subject to the consent rights in the Restructuring Support Agreement.  To facilitate the implementation of the CUSA Term Sheet and the CUSA Definitive Documents pursuant to the Plan as contemplated in the CUSA Term Sheet, the Parties agree that subject to the negotiation of mutually agreeable definitive language, the Plan, and/or any order of the Bankruptcy Court confirming the Plan (the "**Confirmation Order**"), as applicable, shall provide for the following:

(i)     The Plan shall be amended to provide for the following additional definitions and provisions, in appropriate order thereof:

*CUSA* means Chevron U.S.A. Inc., a Pennsylvania corporation.

*CUSA Definitive Documents* has the meaning set forth in the CUSA Implementation Agreement.

*CUSA Implementation Agreement* means that certain Implementation Agreement, dated June [\_\_], 2021, by and among Debtor Fieldwood Energy LLC, on the one hand, and CUSA on the other hand, as may be amended, restated, or otherwise modified pursuant to the terms thereof.

*CUSA Parties* means, collectively, CUSA and its parent and affiliates, including but not limited to Noble Energy, Inc., Union Oil Company of California, Unocal Pipeline Company and Texaco Inc., and with respect to each of the foregoing Persons, each of their current and former affiliates, and each such Entity's and its current and former affiliates' current and former directors, managers, officers, equity holders (regardless of whether such interests are held directly or indirectly), predecessors, successors, and assigns, subsidiaries, and each of their current and former officers, members, managers, directors, equity holders (regardless of whether such interests are held directly or indirectly), principals, members, employees, agents, managed accounts or funds, management companies, fund advisors, investment advisors, advisory board members, financial advisors, partners (including both general and limited partners), attorneys, accountants, investment bankers, consultants, representatives and other professionals, such Persons' respective heirs, executors, estates, and nominees, in each case solely in their capacity as such.

*CUSA Release Parties* means collectively, and in each case solely in their capacity as such, (a) the DIP Agent and DIP Lenders under the DIP Facility, (b) the Prepetition FLFO

WEIL:\98002350\6\45327.0007
WORKAMER\51502\366014\38535105.v18-6/10/21

Secured Parties, (c) the Consenting Creditors, (d) Prepetition FLFO Collateral Agent, (e) the Prepetition FLTL Agents, (f) the Prepetition SLTL Agent, (g) NewCo and all of its subsidiaries (including the Credit Bid Purchaser), (h) the Exit Facility Agents, (i) the Exit Facility Lenders, (j) the Second Lien Backstop Parties, (k) the ERO Backstop Parties, with respect to each of the foregoing Persons in clauses (a) through (k), in each case solely in their capacity as such, (l) with respect to each of the foregoing Persons in clauses (a) through (k), each of their current and former affiliates, and each such Entity's and its current and former affiliates' current and former directors, managers, officers, equity holders (regardless of whether such interests are held directly or indirectly), predecessors, successors, and assigns, subsidiaries, and each of their current and former officers, members, managers, directors, equity holders (regardless of whether such interests are held directly or indirectly), principals, members, employees, agents, managed accounts or funds, management companies, fund advisors, investment advisors, advisory board members, financial advisors, partners (including both general and limited partners), attorneys, accountants, investment bankers, consultants, representatives and other professionals, such Persons' respective heirs, executors, estates, and nominees, in each case solely in their capacity as such, and (m) each of the Debtor's current and former officers, members, managers, directors, equity holders (regardless of whether such interests are held directly or indirectly (other than any Debtor)), principals, members, employees, agents, managed accounts or funds, management companies, fund advisors, investment advisors, advisory board members, financial advisors, partners (including both general and limited partners), attorneys, accountants, investment bankers, consultants, representatives and other professionals, such Persons' respective heirs, executors, estates, and nominees, in each case solely in their capacity as such; provided, for the avoidance of doubt, no Debtor or Post-Effective Date Debtor will be a CUSA Release Party.

**RELEASES BY THE CUSA PARTIES OF THE CUSA RELEASE PARTIES**. AS OF THE EFFECTIVE DATE, EXCEPT FOR THE RIGHTS AND REMEDIES THAT REMAIN IN EFFECT FROM AND AFTER THE EFFECTIVE DATE TO ENFORCE THE PLAN, THE CONFIRMATION ORDER, THE OBLIGATIONS CONTEMPLATED BY THE DOCUMENTS IN THE PLAN SUPPLEMENT, THE CUSA DEFINITIVE DOCUMENTS, THE FIRST LIEN EXIT FACILITY COMMITMENT LETTER, THE CREDIT BID PURCHASE AGREEMENT, THE SECOND LIEN BACKSTOP COMMITMENT LETTER, THE EQUITY RIGHTS OFFERINGS, THE ERO BACKSTOP AGREEMENTS, THE EXIT FACILITY DOCUMENTS, AND THE RESTRUCTURING TRANSACTIONS, ON AND AFTER THE EFFECTIVE DATE, THE CUSA RELEASE PARTIES WILL BE DEEMED CONCLUSIVELY, ABSOLUTELY, UNCONDITIONALLY, IRREVOCABLY, AND FOREVER RELEASED AND DISCHARGED BY THE CUSA PARTIES, TO THE MAXIMUM EXTENT PERMITTED BY LAW, FROM ANY AND ALL CLAIMS AND CAUSES OF ACTION WHATSOEVER (INCLUDING ANY DERIVATIVE CLAIMS, ASSERTED OR ASSERTABLE ON BEHALF OF THE DEBTORS, THE POST-EFFECTIVE DATE DEBTORS, OR THEIR ESTATES, INCLUDING ANY CAUSES OF ACTION ARISING UNDER CHAPTER 5 OF THE BANKRUPTCY CODE), WHETHER LIQUIDATED OR UNLIQUIDATED, FIXED OR CONTINGENT, MATURED OR UNMATURED, KNOWN OR UNKNOWN, FORESEEN OR

WEIL:\98002350\6\45327.0007
WORKAMER\51502\366014\38535105.v18-6/10/21

UNFORESEEN, ASSERTED OR UNASSERTED, ACCRUED OR UNACRUED, EXISTING OR HEREINAFTER ARISING, IN LAW, EQUITY, CONTRACT, TORT, OR OTHERWISE BY STATUTE, WHETHER ARISING UNDER FEDERAL OR STATE, STATUTORY OR COMMON LAW, VIOLATIONS OF FEDERAL OR STATE SECURITIES LAWS, OR ANY OTHER APPLICABLE INTERNATIONAL, FOREIGN, OR DOMESTIC LAW, RULE STATUTE, REGULATION, TREATY, RIGHT, DUTY, REQUIREMENT OR OTHERWISE, THAT THE CUSA PARTIES, AFFILIATES, HEIRS, EXECUTORS, ADMINISTRATORS, SUCCESSORS, ASSIGNS, MANAGERS, ACCOUNTANTS, ATTORNEYS, REPRESENTATIVES, CONSULTANTS, AGENTS, AND ANY OTHER PERSONS CLAIMING UNDER OR THROUGH THEM WOULD HAVE BEEN LEGALLY ENTITLED TO ASSERT IN THEIR OWN RIGHT (WHETHER INDIVIDUALLY OR COLLECTIVELY) OR ON BEHALF OF THE HOLDER OF ANY CLAIM OR INTEREST OR OTHER PERSON, BASED ON OR RELATING TO, OR IN ANY MANNER ARISING FROM, IN WHOLE OR IN PART, THE DEBTORS, THE POST-EFFECTIVE DATE DEBTORS, OR THEIR ESTATES, THE CHAPTER 11 CASES, THE RESTRUCTURING, THE PURCHASE, SALE, OR RESCISSION OF THE PURCHASE OR SALE OF ANY SECURITY OF THE DEBTORS OR THE POST-EFFECTIVE DATE DEBTORS, THE SUBJECT MATTER OF, OR THE TRANSACTIONS OR EVENTS GIVING RISE TO, ANY CLAIM OR INTEREST THAT IS TREATED IN THE PLAN, THE BUSINESS OR CONTRACTUAL ARRANGEMENTS OR INTERACTIONS BETWEEN ANY DEBTOR AND ANY CUSA PARTY, THE RESTRUCTURING, THE RESTRUCTURING OF ANY CLAIMS OR INTERESTS BEFORE OR DURING THE CHAPTER 11 CASES, THE NEGOTIATION, FORMULATION, PREPARATION, OR CONSUMMATION OF THE PLAN, THE DOCUMENTS IN THE PLAN SUPPLEMENT, THE CREDIT BID PURCHASE AGREEMENT, THE EXIT FACILITY DOCUMENTS, THE FIRST LIEN EXIT FACILITY COMMITMENT LETTER, THE SECOND LIEN BACKSTOP COMMITMENT LETTER, THE EQUITY RIGHTS OFFERINGS, THE ERO BACKSTOP AGREEMENTS, OR RELATED AGREEMENTS, INSTRUMENTS, OR OTHER DOCUMENTS, RELATING THERETO, OR THE SOLICITATION OF VOTES WITH RESPECT TO THE PLAN, IN ALL CASES BASED UPON ANY ACT OR OMISSION, TRANSACTION, AGREEMENT, EVENT, OR OTHER OCCURRENCES TAKING PLACE ON OR BEFORE THE EFFECTIVE DATE.

ENTRY OF THE CONFIRMATION ORDER BY THE BANKRUPTCY COURT SHALL CONSTITUTE THE BANKRUPTCY COURT'S APPROVAL, PURSUANT TO BANKRUPTCY RULE 9019, OF THE RELEASES IN SECTION [10.7(C)] OF THE PLAN (THE "**CUSA-PARTY RELEASE**"), WHICH INCLUDES, BY REFERENCE, EACH OF THE RELATED PROVISIONS AND DEFINITIONS UNDER THE PLAN, AND, FURTHERMORE, SHALL CONSTITUTE THE BANKRUPTCY COURT'S FINDING THAT THE CUSA-PARTY RELEASE IS (I) CONSENSUAL, (II) ESSENTIAL TO THE CONFIRMATION OF THE PLAN, (III) GIVEN IN EXCHANGE FOR THE GOOD, VALUABLE AND ADEQUATE CONSIDERATION PROVIDED BY THE RELEASED PARTIES, (IV) A GOOD FAITH SETTLEMENT AND COMPROMISE OF THE CLAIMS RELEASED BY THE CUSA-PARTY RELEASE,

WEIL:\98002350\6\45327.0007
WORKAMER\51502\366014\38535105.v18-6/10/21

(V) IN THE BEST INTERESTS OF THE DEBTORS AND THEIR ESTATES, (VI) FAIR, EQUITABLE AND REASONABLE, (VII) GIVEN AND MADE AFTER DUE NOTICE AND OPPORTUNITY FOR HEARING, AND (VIII) A BAR TO ANY OF THE CUSA PARTIES ASSERTING ANY CLAIM OR CAUSE OF ACTION RELEASED PURSUANT TO THE CUSA-PARTY RELEASE.

**RELEASES BY THE CUSA RELEASE PARTIES OF THE CUSA PARTIES**. AS OF THE EFFECTIVE DATE, EXCEPT FOR THE RIGHTS AND REMEDIES THAT REMAIN IN EFFECT FROM AND AFTER THE EFFECTIVE DATE TO ENFORCE THE PLAN, THE CONFIRMATION ORDER, THE OBLIGATIONS CONTEMPLATED BY THE DOCUMENTS IN THE PLAN SUPPLEMENT, THE CUSA DEFINITIVE DOCUMENTS, THE FIRST LIEN EXIT FACILITY COMMITMENT LETTER, THE CREDIT BID PURCHASE AGREEMENT, THE SECOND LIEN BACKSTOP COMMITMENT LETTER, THE EQUITY RIGHTS OFFERINGS, THE ERO BACKSTOP AGREEMENTS, THE EXIT FACILITY DOCUMENTS, AND THE RESTRUCTURING TRANSACTIONS, ON AND AFTER THE EFFECTIVE DATE, THE CUSA PARTIES WILL BE DEEMED CONCLUSIVELY, ABSOLUTELY, UNCONDITIONALLY, IRREVOCABLY, AND FOREVER RELEASED AND DISCHARGED BY THE CUSA RELEASE PARTIES, TO THE MAXIMUM EXTENT PERMITTED BY LAW, FROM ANY AND ALL CLAIMS AND CAUSES OF ACTION WHATSOEVER (INCLUDING ANY DERIVATIVE CLAIMS, ASSERTED OR ASSERTABLE ON BEHALF OF THE DEBTORS, THE POST-EFFECTIVE DATE DEBTORS, OR THEIR ESTATES, INCLUDING ANY CAUSES OF ACTION ARISING UNDER CHAPTER 5 OF THE BANKRUPTCY CODE), WHETHER LIQUIDATED OR UNLIQUIDATED, FIXED OR CONTINGENT, MATURED OR UNMATURED, KNOWN OR UNKNOWN, FORESEEN OR UNFORESEEN, ASSERTED OR UNASSERTED, ACCRUED OR UNACRUED, EXISTING OR HEREINAFTER ARISING, IN LAW, EQUITY, CONTRACT, TORT, OR OTHERWISE BY STATUTE, WHETHER ARISING UNDER FEDERAL OR STATE, STATUTORY OR COMMON LAW, VIOLATIONS OF FEDERAL OR STATE SECURITIES LAWS, OR ANY OTHER APPLICABLE INTERNATIONAL, FOREIGN, OR DOMESTIC LAW, RULE STATUTE, REGULATION, TREATY, RIGHT, DUTY, REQUIREMENT OR OTHERWISE, THAT THE CUSA RELEASE PARTIES, AFFILIATES, HEIRS, EXECUTORS, ADMINISTRATORS, SUCCESSORS, ASSIGNS, MANAGERS, ACCOUNTANTS, ATTORNEYS, REPRESENTATIVES, CONSULTANTS, AGENTS, AND ANY OTHER PERSONS CLAIMING UNDER OR THROUGH THEM WOULD HAVE BEEN LEGALLY ENTITLED TO ASSERT IN THEIR OWN RIGHT (WHETHER INDIVIDUALLY OR COLLECTIVELY) OR ON BEHALF OF THE HOLDER OF ANY CLAIM OR INTEREST OR OTHER PERSON, BASED ON OR RELATING TO, OR IN ANY MANNER ARISING FROM, IN WHOLE OR IN PART, THE DEBTORS, THE POST-EFFECTIVE DATE DEBTORS, OR THEIR ESTATES, THE CHAPTER 11 CASES, THE RESTRUCTURING, THE PURCHASE, SALE, OR RESCISSION OF THE PURCHASE OR SALE OF ANY SECURITY OF THE DEBTORS OR THE POST-EFFECTIVE DATE DEBTORS, THE SUBJECT MATTER OF, OR THE TRANSACTIONS OR EVENTS GIVING RISE TO, ANY CLAIM OR INTEREST THAT IS TREATED IN THE PLAN, THE BUSINESS OR

WEIL:\98002350\6\45327.0007
WORKAMER\51502\366014\38535105.v18-6/10/21

CONTRACTUAL ARRANGEMENTS OR INTERACTIONS BETWEEN ANY DEBTOR AND ANY CUSA RELEASE PARTY, THE RESTRUCTURING, THE RESTRUCTURING OF ANY CLAIMS OR INTERESTS BEFORE OR DURING THE CHAPTER 11 CASES, THE NEGOTIATION, FORMULATION, PREPARATION, OR CONSUMMATION OF THE PLAN, THE DOCUMENTS IN THE PLAN SUPPLEMENT, THE EXIT FACILITY DOCUMENTS, THE CREDIT BID PURCHASE AGREEMENT, THE FIRST LIEN EXIT FACILITY COMMITMENT LETTER, THE SECOND LIEN BACKSTOP COMMITMENT LETTER, THE EQUITY RIGHTS OFFERINGS, THE ERO BACKSTOP AGREEMENTS, OR RELATED AGREEMENTS, INSTRUMENTS, OR OTHER DOCUMENTS, RELATING THERETO, OR THE SOLICITATION OF VOTES WITH RESPECT TO THE PLAN, IN ALL CASES BASED UPON ANY ACT OR OMISSION, TRANSACTION, AGREEMENT, EVENT, OR OTHER OCCURRENCES TAKING PLACE ON OR BEFORE THE EFFECTIVE DATE.

ENTRY OF THE CONFIRMATION ORDER BY THE BANKRUPTCY COURT SHALL CONSTITUTE THE BANKRUPTCY COURT'S APPROVAL, PURSUANT TO BANKRUPTCY RULE 9019, OF THE RELEASES IN SECTION [10.7(D)] OF THE PLAN (THE "**CUSA RELEASE-PARTY RELEASE**"), WHICH INCLUDES, BY REFERENCE, EACH OF THE RELATED PROVISIONS AND DEFINITIONS UNDER THE PLAN, AND, FURTHERMORE, SHALL CONSTITUTE THE BANKRUPTCY COURT'S FINDING THAT THE CUSA RELEASE-PARTY RELEASE IS (I) CONSENSUAL, (II) ESSENTIAL TO THE CONFIRMATION OF THE PLAN, (III) GIVEN IN EXCHANGE FOR THE GOOD, VALUABLE AND ADEQUATE CONSIDERATION PROVIDED BY THE RELEASED PARTIES, (IV) A GOOD FAITH SETTLEMENT AND COMPROMISE OF THE CLAIMS RELEASED BY THE CUSA RELEASE-PARTY RELEASE, (V) IN THE BEST INTERESTS OF THE DEBTORS AND THEIR ESTATES, (VI) FAIR, EQUITABLE AND REASONABLE, (VII) GIVEN AND MADE AFTER DUE NOTICE AND OPPORTUNITY FOR HEARING, AND (VIII) A BAR TO ANY OF THE CUSA PARTIES ASSERTING ANY CLAIM OR CAUSE OF ACTION RELEASED PURSUANT TO THE CUSA RELEASE-PARTY RELEASE.

(ii)   No CUSA Entity shall be or shall be deemed to be a "Released Party" or a "Releasing Party" under the Plan or Confirmation Order.  For the avoidance of doubt, other than set forth expressly in the Plan, no CUSA Entity has waived or released, or shall be deemed to have waived or released, any claim, including but not limited to any and all claims under the Bankruptcy Code, the Chevron Claims, and any and all claims related to or arising under this Agreement or the CUSA Definitive Documents; provided, any such claims shall receive the applicable treatment set forth in the Plan.

10

(iii)     In exchange for the consideration provided hereunder, FWE (on behalf of itself and each of the other Debtors) hereby agrees, effective upon effectiveness of the CUSA Definitive Documents pursuant to Section 8, to waive any and all prepetition claims or causes of action against any of the CUSA Entities.  Each CUSA Entity shall be an "Exculpated Party" under the Plan and Confirmation Order (to the maximum extent permitted by the Bankruptcy Court).

(iv)     FWE's assets to be allocated to, possessed by, assumed by, and vested in Fieldwood Energy I LLC ("**FWE I**") and Fieldwood Energy III LLC ("**FWE III**"), respectively, pursuant to the transactions contemplated by and in accordance with the Initial Plan of Merger (the "**Initial Divisive Merger**"), including contracts, permits, leases, oil and gas leases and assets constituting real property interests (including all fee surface interests in land, surface leases, easements, rights of way, servitudes, licenses, franchises, road, railroad, and other surface use permits or agreements), shall be (a) free and clear of (i) any right of consent, notice, and other similar rights, if any, that are applicable to the vesting of the assets in connection with the Initial Divisive Merger and (ii) all preferential purchase rights, rights of first refusal, drag-along rights, tag-along rights, and other similar rights, if any, that are applicable to the vesting of the assets in connection with the Initial Divisive Merger, but (b) subject to and burdened by (x) the liabilities and obligations allocated to and vested in, respectively, FWE I or FWE III, as specified in the Initial Plan of Merger, pursuant to the Initial Divisive Merger and (y) Permitted Post-Closing Liens (as defined in Apache Implementation Agreement).  Notwithstanding anything in this Agreement to the contrary, to the extent Section 4(iii) of the Apache Implementation Agreement is amended, this Clause 3(iv) will be deemed automatically amended to include a corresponding amendment, unless such amendment would be adverse to FWE IV or otherwise adversely affect the implementation of the FWE IV Divisive Merger.

11

(v)     FWE III's assets to be allocated to, possessed by, assumed by, and vested in FWE IV pursuant to the transactions contemplated by and in accordance with the FWE III Plan of Merger (the "**FWE IV Divisive Merger**"), including contracts, permits, leases, oil and gas leases and assets constituting real property interests (including all fee surface interests in land, surface leases, easements, rights of way, servitudes, licenses, franchises, road, railroad, and other surface use permits or agreements), shall be (a) free and clear of (i) any right of consent, notice, and other similar rights, if any, that are applicable to the vesting of the assets in connection with the FWE IV Divisive Merger (such rights, the "**FWE IV Consent Rights**") and (ii) all preferential purchase rights, rights of first refusal, drag-along rights, tag-along rights, and other similar rights, if any, that are applicable to the vesting of the assets in connection with the FWE IV Divisive Merger (such rights, the "**FWE IV Preferential Purchase Rights**"), but (b) subject to and burdened by the liabilities and obligations allocated to and vested in, respectively, FWE III or FWE IV, as specified in the FWE III Plan of Merger (such liability and obligations allocated to and vested in FWE IV, the "**FWE IV Allocated Obligations**").

(vi)    Entities (as defined under section 101(15) of the Bankruptcy Code) or Parties that fail to timely file an objection asserting a FWE IV Consent Right or FWE IV Preferential Purchase Right are (a) forever barred from objecting to the allocation and vesting of the assets in connection with the FWE III Plan of Merger free and clear of all FWE IV Consent Rights and FWE IV Preferential Purchase Rights, and from asserting any alleged FWE IV Consent Rights or FWE IV Preferential Purchase Rights with respect to the FWE III Plan of Merger, and (b) deemed to consent to and approve the allocation and vesting of the assets free and clear of all FWE IV Consent Rights and FWE IV Preferential Purchase Rights, regardless of whether such consent must be in writing pursuant to the terms of any agreement.  For the avoidance of doubt,

12

nothing herein, including the releases provided in Section 3(i), shall affect or be deemed to restrict or limit CUSA's, CUSA's affiliates, or FWE IV's claims for or rights to seek payments or contribution from current or prior working interest owners, predecessors, co-owners and/or operators, or from any other parties that are contractually, legally, regulatorily or equitably liable for decommissioning or related obligations, including obligations under surety bonds, letters of credit or other instruments relating thereto, with respect to the Legacy CUSA Properties or the FWE IV Assets.

(vii)    FWE shall, and shall cause its Debtor affiliates to, on the Effective Date, provide for the payment of any and all documentary, filing, recording, stamp, and registration fees, costs, taxes, and expenses (including all reasonable and documented attorneys' fees and regulatory consultant fees) incurred or imposed in connection with the filing of record by or on behalf of FWE III of any instrument or instruments with the appropriate records office of any county, parish, state, federal, or other governmental unit (including BOEM) that may be required in connection with the implementation of the FWE III Plan of Merger or that the applicable governmental unit or FWE III determines to be necessary or appropriate to reflect in the appropriate records of any governmental unit that as a result of the FWE IV Divisive Merger (a) ownership of the FWE IV Assets have been allocated to and are vested in FWE IV, and (b) the FWE IV Allocated Obligations have been allocated to and vested in, and constitute liabilities and obligations of, FWE III and FWE IV, respectively (collectively, the "**Implementation Costs**"); provided, to the extent any Implementation Costs remain unpaid as of the Effective Date, FWE shall have provided FWE IV with sufficient funds to pay any such outstanding Implementation Costs.

(viii)   All rights of any applicable CUSA Entity with respect to bonds and letters of credit constituting security for the decommissioning of the assets allocated to and vested in

13

FWE IV shall be reserved as against such bonding companies and letter of credit issuers in all respects. The Debtors shall not terminate any bonds issued on behalf of the Debtors relating to such FWE IV assets under which any federal, state or local governmental entity is an obligee.

(ix)     The Bankruptcy Court (i) approves the CUSA Definitive Documents and all transactions contemplated by this Agreement, including the FWE III Plan of Merger, and all actions to be taken, undertakings to be made, and obligations to be incurred by FWE III or FWE IV, as applicable, contemplated thereby; and (ii) following the consummation of the FWE III Plan of Merger, authorizes FWE III or FWE IV, as applicable, without further notice to or action, order, or approval of this Bankruptcy Court and without the need for any further corporate or shareholder action, to enter into, deliver, and fully perform their obligations under the CUSA Definitive Documents.  Upon entry of the Confirmation Order, FWE III or FWE IV, as applicable, shall be authorized and empowered, without further approval of the Bankruptcy Court or any other party, to take such actions and perform such acts as may be necessary, convenient, desirable, or appropriate to execute and deliver the CUSA Definitive Documents in accordance with the Plan and to execute and deliver all documents relating thereto and to perform all of their obligations thereunder.  On the Effective Date, the CUSA Definitive Documents shall constitute legal, valid, binding, and authorized obligations of FWE III or FWE IV, as applicable, enforceable in accordance with their terms, and such obligations of FWE III or FWE IV, as applicable, shall not be enjoined or subject to discharge, impairment, release, avoidance, recharacterization, or subordination by FWE III, FWE IV, the Post-Effective Date Debtors, or the Plan Administrator, under applicable law, the Plan, or the Confirmation Order.

(x)     **Cures**.  In accordance with the Plan, the Debtors or Post-Effective Date Debtors, as applicable, shall be responsible for paying any Cure Amounts associated with the

14

Debtors' Exhibit No. 34
Page 16 of 910

contracts assumed by the Debtors and allocated to FWE IV pursuant to the FWE III Plan of Merger. Notwithstanding anything in the Plan Supplement [Docket No. 1394] with respect to the Schedule of Assumed Contracts and Cure Amounts (or any subsequent schedules and notices with respect to assumed or assumed and assigned contracts and corresponding cure costs, including, without limitation, Docket Nos. 1395 and 1496) to the contrary, only the contracts to be assumed and allocated to FWE IV under the Plan of Merger shall be so assumed and allocated thereto.  The Plan will be revised to remove FWE IV from the definition of "Post Effective Date Debtor."

(xi)    **Murrayfield and Emory Peak**.  Notwithstanding anything in the Plan or Confirmation Order to the contrary, any overriding royalty interests, mortgages, memorandums of understanding and/or UCC-1s related to security documents associated with (x) that certain Joint Operating Agreement by and between Chevron U.S.A. Inc. and Fieldwood Energy LLC, dated July 1, 2019 (as amended) or (y) that certain Joint Operating Agreement by and among Chevron U.S.A. Inc., Fieldwood Energy LLC and Ridgewood Castle Rock, LLC, dated as of August 1, 2019 (as amended), that are being assumed and assigned to Newco in connection with Murrayfield and Emory Peak, shall be permitted encumbrances and shall continue in full force and effect following the Effective Date and such assumption and assignment to Newco.

4.    **Treatment of ASPA Escrow Account and Production Payment**. FWE and CUSA agree that their intent is that the Production Payment (as used in this Section 4, as defined in that Certain Assignment of Production Payment, dated as of June 15, 2016, by Fieldwood Energy Offshore LLC, a Delaware limited liability company, as assignor, to U.S. Bank National Association, as escrow agent and assignee (the "**Production Payment Assignment**")) will be reconveyed to Fieldwood Energy Offshore LLC and terminated as of the Effective Date. Each of FWE and CUSA will take such actions as are necessary (including causing their affiliates

15

to take actions and sending instructions to the Escrow Agent (as used in this Section 4, as defined in the Production Payment Assignment) to (a) terminate the Production Payment effective as of the Effective Date (which interest will revert to Fieldwood Energy Offshore LLC), including any obligations with respect to the Production Payment imposed by Section 18 of that certain Asset Sale and Purchase Agreement between CUSA and Fieldwood Energy Offshore LLC, dated August 1, 2015 (the "**2015 PSA**"), (b) cause the Escrow Agent to disburse all amounts held in the Escrow Account (as used in this Section 4, as defined in the Production Payment Assignment) to FWE IV (to the Escrow Account (in this instance, as defined in the Fieldwood Energy IV LLC Agreement) (such funds, the "**Prior Escrow Funds**").

    5.    **Representations and Warranties**.

a.  FWE represents and warrants to CUSA that (in the case of each of clauses (i) through (iii), subject to entry by the Bankruptcy Court of the Confirmation Order):

(i)  FWE has all requisite power and authority to execute and deliver this Agreement and each of the CUSA Definitive Documents to which it will be a party and to perform its obligations hereunder and thereunder.  The execution, delivery and performance of this Agreement and the CUSA Definitive Documents to which FWE is or will be a party, and the consummation of the transactions contemplated hereby and thereby, have been duly and validly authorized by all requisite limited liability company action on the part of FWE.

(ii) This Agreement has been (and when executed, each CUSA Definitive Document to be executed and delivered by FWE will be) duly executed and delivered by FWE and constitutes (or, in the case of each CUSA Definitive Document to be executed by FWE, upon its execution by FWE will constitute) the valid and binding agreement of FWE

16

enforceable against FWE in accordance with its terms, except as may be limited by bankruptcy, insolvency, reorganization, moratorium, or other similar Laws now in effect relating to or affecting creditors' rights generally, general equitable principles (whether considered in a proceeding in equity or at Law), and the power of a court to deny enforcement of remedies generally based upon public policy.

(iii) The execution and delivery of this Agreement and the CUSA Definitive Documents by FWE and the consummation of the transactions contemplated hereby and thereby by FWE do not and shall not: violate, conflict with or result in any breach of any provision of any organizational document of FWE; result in the creation of any lien on any assets of FWE IV; violate (or be rendered void or ineffective by) any law or order applicable to FWE or by which FWE is bound.

(iv) to FWE's knowledge, as of the date hereof, there are no expenses that have been incurred by FWE that FWE has not paid of the type described in clause (viii) of the definition of "FWE IV Obligations" as set forth in the FWE III Plan of Merger.

b.  CUSA represents and warrants to FWE that:

(i)  CUSA has all requisite power and authority to execute and deliver this Agreement and each of the CUSA Definitive Documents to which it will be a party and to perform its obligations hereunder and thereunder.  The execution, delivery and performance of this Agreement and the CUSA Definitive Documents to which CUSA is or will be a party, and the consummation of the transactions contemplated hereby and thereby, have been duly and validly authorized by all requisite corporate action on the part of CUSA.  To the extent that in this Agreement or any CUSA Definitive Document, CUSA purports to covenant or agree on behalf of, grant a release by, or otherwise bind any affiliate of

WEIL:\98002350\6\45327.0007
WORKAMER\51502\366014\38535105.v18-6/10/21

CUSA, CUSA has all due authority to take such action and such action will be binding on such affiliate of CUSA as though such affiliate were a signatory to this Agreement or such CUSA Definitive Document, as applicable.

(ii) This Agreement has been (and when executed, each CUSA Definitive Document to be executed and delivered by CUSA will be) duly executed and delivered by CUSA and constitutes (or, in the case of each CUSA Definitive Document to be executed by CUSA, upon its execution by CUSA will constitute) the valid and binding agreement of CUSA enforceable against CUSA in accordance with its terms, except as may be limited by bankruptcy, insolvency, reorganization, moratorium, or other similar Laws now in effect relating to or affecting creditors' rights generally, general equitable principles (whether considered in a proceeding in equity or at Law), and the power of a court to deny enforcement of remedies generally based upon public policy.

(iii) The execution and delivery of this Agreement and the CUSA Definitive Documents by CUSA and the consummation of the transactions contemplated hereby and thereby by CUSA do not and shall not: violate, conflict with or result in any breach of any provision of any organizational document of CUSA; result in the creation of any lien on any assets of FWE IV; violate (or be rendered void or ineffective by) any law or order applicable to CUSA or by which CUSA is bound.

6.    **Termination of Agreement.**  This Agreement shall terminate upon the earlier to occur of (a) the effectiveness of the CUSA Definitive Documents pursuant to Section 8 and (b) August 10, 2021 at 11:59 p.m. (Central Time) (the "**Outside Termination Date**"); provided that (i) the Outside Termination Date may be extended by mutual written agreement (which may include email) of the Parties, and (ii) Section 4 shall not terminate until the Prior

WEIL:\98002350\6\45327.0007
WORKAMER\51502\366014\38535105.v18-6/10/21

Escrow Funds have been deposited into the Escrow Account (as defined in the Fieldwood Energy IV LLC Agreement).   Upon termination of this Agreement, each Party shall be immediately released from its obligations, commitments, undertakings and agreements under or related to this Agreement; provided that in no event shall any such termination relieve a Party from liability for its breach or non-performance of its obligations hereunder prior to the date of such termination.

7.      **363 Credit Bid Transaction.** In the event that the 363 Credit Bid Transaction is pursued, CUSA agrees to take reasonable actions to facilitate the 363 Credit Bid Transaction, and cooperate in good faith with Debtors, the Required DIP Lenders and the Requisite FLTL Lenders to facilitate the 363 Credit Bid Transaction, including, if necessary, by making amendments to the CUSA Definitive Documents (to the extent that such amendments constitute reasonable actions to facilitate the 363 Credit Bid Transaction and, as it relates to the CUSA Entities, do not materially alter or negatively impact the economics of, or materially change the structure of, the transactions contemplated herein, unless otherwise agreed).

8.      **Effectiveness.**  This Agreement shall become effective and binding upon each Party upon the execution and delivery by such Party of an executed signature page hereto and shall become effective and binding on all Parties on the date when all Parties have executed and delivered a signature page hereto.  The CUSA Definitive Documents shall become effective and binding upon each Party upon the occurrence (or waiver by CUSA in its sole discretion) of the following conditions precedent (and any conditions precedent included in the CUSA Definitive Documents themselves):

a.      the execution and delivery by each of the parties of countersignatures to the CUSA Definitive Documents, as applicable;

b.      the Parties shall have made the initial contributions to the Escrow Account in accordance with the CUSA Term Sheet, CUSA Definitive Documents, Section 4 of this Agreement and the Escrow Agreement, including the Prior Escrow

19

Funds and the amount for the Initial Safe Out Funds (as such terms are defined in the Omnibus Agreement);

　　　c.　　the Initial Divisive Merger and the FWE IV Divisive Merger shall each have occurred in accordance with the terms of this Agreement;

　　　d.　　the funding of any unpaid Implementation Costs from FWE to FWE IV;

　　　e.　　each of Newco and FWE IV shall have received all approvals and permits by applicable regulatory authorities that are necessary (i) in the case of FWE IV, to hold the FWE IV Leases (as defined in the FWE III Plan of Merger) and (ii) to be a designated operator with respect to offshore leases in the Gulf of Mexico but, in the case of this clause (ii), only if and to the extent required to perform its obligations under the CUSA Definitive Documents (the "**Regulatory Approvals**");

　　　f.　　the Credit Bid Transaction Closing (as defined in the Plan) shall have occurred;

　　　g.　　the entry of the Confirmation Order in a form consistent with Section 3 hereof; and

　　　h.　　the occurrence of the Effective Date.

　　　9.　　**No Waiver**.  For the avoidance of doubt, nothing in this Agreement or in any transactions, acts, and omissions contemplated hereunder, are intended by the Parties to have any effect on any of CUSA's, or any of its affiliates', subsidiaries' or parent's, defenses, claims or rights related to the Legacy CUSA Properties or the FWE IV Assets with respect to parties other than the Debtors, Post-Effective Date Debtors, FWE I or FWE IV, including but not limited to claims for or rights to contractual or regulatory payments or equitable contribution from other parties for decommissioning and related obligations, including obligations under surety bonds, letters of credit or other instruments relating thereto.

　　　10.　　**Counterparts**.  This Agreement may be executed in several counterparts, each of which shall be deemed to be an original, and all of which together shall be deemed to be one and the same agreement.  Execution copies of this Agreement may be delivered by electronic mail, or otherwise, which shall be deemed to be an original for the purposes of this paragraph.

WEIL:\98002350\6\45327.0007
WORKAMER\51502\366014\38535105.v18-6/10/21

Debtors' Exhibit No. 34
Page 22 of 910

11.     **Governing Law; Jurisdiction; Waiver of Jury Trial; Arbitration.**  To the maximum extent permitted by applicable law, this Agreement is governed by and is to be construed in accordance with the internal laws of the State of Texas, without giving effect to any principles of conflicts of law thereunder that would result in the application of the laws of any other jurisdiction.  Each Party irrevocably agrees that any legal action, suit, or proceeding arising out of or relating to this Agreement brought by any party or its successors or assigns shall be brought and determined in the Bankruptcy Court and each Party hereby irrevocably submits to the exclusive jurisdiction of the Bankruptcy Court, and if the Bankruptcy Court does not have (or abstains from) jurisdiction, Courts of the State of Texas and of the United States District Court of the Southern District of Texas, and any appellate court from any thereof, for itself and with respect to its property, generally and unconditionally, with regard to any such proceeding arising out of or relating to this Agreement.  Each Party further agrees that notice as provided herein shall constitute sufficient service of process and the Parties further waive any argument that such service is insufficient.  Each Party hereby irrevocably and unconditionally waives, and agrees not to assert, by way of motion or as a defense, counterclaim or otherwise, in any proceeding arising out of or relating to this Agreement, (a)  any claim that it is not personally subject to the jurisdiction of the Bankruptcy Court as described herein for any reason, (b) that it or its property is exempt or immune from jurisdiction of such court or from any legal process commenced in such court (whether through service of notice, attachment prior to judgment, attachment in aid of execution of judgment, execution of judgment, or otherwise) and (c) that (1) the proceeding in such court is brought in an inconvenient forum, (2) the venue of such proceeding is improper, or (3) this Agreement, or the subject matter hereof, may not be enforced in or by such court.  EACH OF THE PARTIES HERETO HEREBY IRREVOCABLY WAIVES, TO THE FULLEST EXTENT

PERMITTED BY APPLICABLE LAW, ANY AND ALL RIGHT TO TRIAL BY JURY IN ANY ACTION OR PROCEEDING ARISING OUT OF RELATING TO THIS AGREEMENT. EACH PARTY CERTIFIES THAT NO REPRESENTATIVE, AGENT OR ATTORNEY OF ANY OTHER PARTY HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PARTY WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER.

     12.    **Notices.**  All notices hereunder shall be deemed given if delivered and received in writing, if contemporaneously sent by electronic mail, courier or by registered or certified mail (return receipt requested) to the following addresses:

    (1)    If to FWE, to:

Fieldwood Energy LLC
2000 W. Sam Houston Parkway S., Suite 1200
Houston, Texas 77042
Attention:  Thomas R. Lamme

With a copy to:

Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, NY 10153
Attention:   Matt Barr, Esq. (matt.barr@weil.com)
                 Alfredo Peréz, Esq. (alfredo.perez@weil.com)
                 Jessica Liou, Esq. (jessica.liou@weil.com)

    (2)    If to CUSA, to:

Chevron U.S.A. Inc.
100 Northpark Blvd
Covington, LA 70443
Attn: Land Manager
Phone: (985) 773-6538
Email: tdwebre@chevron.com

WEIL:\98002350\6\45327.0007
WORKAMER\51502\366014\38535105.v18-6/10/21

Debtors' Exhibit No. 34
Page 24 of 910

13.    **Amendments.**  Neither this Agreement nor any provision hereof may be waived, amended, or modified except pursuant to an agreement or agreements in writing entered into by FWE and CUSA and subject to the consent rights provided for in the Restructuring Support Agreement.  To the extent of any conflicts between the CUSA Term Sheet and the provisions of this Agreement, the provisions of this Agreement prevail.

*[Signature Pages to Follow]*

WEIL:\98002350\6\45327.0007
WORKAMER\51502\366014\38535105.v18-6/10/21

**IN WITNESS WHEREOF**, the undersigned Parties have executed this Implementation Agreement as of the date first written above.

FIELDWOOD ENERGY LLC,
a Delaware limited liability company

By: _____

Name: Thomas R. Lamme
Title:   Senior Vice President and General Counsel

[FWE Signature Page to CUSA Term Sheet Implementation Agreement]

CHEVRON U.S.A. INC.

By: _____

Name:  Ryan G. Schneider
Title:   Land Management Officer

## Exhibit A

**The "CUSA Term Sheet"**



Thomas R. Lamme
*Senior Vice President and General Counsel*
*Direct  713-969-1107*
*Email  TLamme@fwellc.com*

March 22, 2021

**VIA EMAIL**

Jennifer M. Welshons
Counsel
Chevron North America Exploration and Production Company
(a division of Chevron U.S.A. Inc.)
1400 Smith Street
Houston, TX  77002

    *Re:  Fieldwood/Chevron Term Sheet*

Dear Ms. Welshons:

Attached as <u>Exhibit A</u> is the agreed upon term sheet dated March 22, 2021, by and between Fieldwood Energy LLC ("**Fieldwood**") and Chevron U.S.A. Inc. ("**Chevron**" and, together with Fieldwood, the "**Parties**") supporting the restructuring of the portion of Fieldwood's business relating to certain assets described therein as the "FWE IV Assets" (the "**Fieldwood/Chevron Term Sheet**").

By executing this letter agreement, each of the undersigned Parties agrees (i) to work to implement the terms of the Fieldwood/Chevron Term Sheet and (ii) to negotiate the definitive documents described therein in good faith and in accordance with the terms of the Fieldwood/Chevron Term Sheet.

The Parties may execute and deliver this letter agreement by electronic reproduction and in multiple counterparts, each of which shall constitute an original and all of which shall be one and the same document.  This letter agreement shall be governed by the laws of the State of Texas without regard to any choice of law principles.

Regards,

*Thomas R. Lamme*

Thomas R. Lamme
Senior Vice President and General Counsel

Enclosure

cc:  Michael T. Dane, *via email* MDane@Fwellc.com

IN WITNESS WHEREOF, the undersigned Parties have executed this letter agreement as of the date first written above.

**FIELDWOOD ENERGY LLC**

By: _Thomas R. Lamme_____
Name: Thomas R. Lamme
Title: Senior Vice President and General Counsel

**CHEVRON U.S.A. INC.**

By:

Name: Ryan G. Schneider
Title: Land Management Officer

[Chevron Signature Page to Letter Agreement]

**EXHIBIT A**

FIELDWOOD/CHEVRON TERM SHEET

*This Term Sheet is an expression of interest only and creates no legally binding commitment by either party to negotiate any specific transaction or enter into any agreement. It is expressly understood that no liability or obligation of Fieldwood or Chevron of any nature whatsoever is intended to or will be created hereunder with respect to this Term Sheet or related discussions or writings or the transactions contemplated hereby and that this Term Sheet is neither a contract nor a binding offer. It is understood and agreed that any transaction is expressly conditioned, among others, upon approval by Fieldwood and Chevron, the execution and delivery by Fieldwood and Chevron or their affiliates of definitive written agreements, in form and substance satisfactory to Fieldwood and Chevron in their sole discretion, and the satisfaction of the conditions set forth therein. Fieldwood and Chevron expressly agree that this Term Sheet does not contain all terms that would be required to be agreed to in order to enter into any definitive agreement. Each party is responsible for its own costs and expenses, including those of its legal advisors in conjunction with this Term Sheet.*

| **CHEVRON / FIELDWOOD COMMERCIAL TERM SHEET** |
|---|

Fieldwood Energy LLC ("**FWE**") to create a new entity, Fieldwood Energy IV LLC ("**FWE IV**"), via a Texas divisive merger.

**I. Term Sheet Expiration Date**

FWE and Chevron U.S.A. Inc ("**CUSA**") shall work together in good faith to negotiate the definitive documents contemplated below and any other agreements required to implement the transaction contemplated in this Term Sheet, in each case in accordance with the terms and conditions set forth herein ("**Definitive Documents**"), provided that this Term Sheet shall terminate if the parties have not fully agreed and finalized all such required Definitive Documents on or before midnight one business day before the deadline for filing objections to the o the Plan Confirmation Hearing as scheduled by the bankruptcy court for In Re: Fieldwood Energy LLC, et al, Chapter 11, Case No. 20-33948 (MI) (the "**Bankruptcy**") ("**Termination Date**").

**II. Condition Precedent to Effectiveness**

In addition to any other conditions precedent that may be agreed by the parties, it shall be a condition precedent to the effectiveness of the Definitive Documents that FWE IV will have been granted to the satisfaction of the parties to the Definitive Documents all necessary approvals by applicable regulatory authorities to act as a qualified operator in the Gulf of Mexico for the FWE IV Assets (as defined below) for which it will be required to assume operatorship under the Definitive Documents.  In the event that FWE IV has not been granted such approval(s) by the Termination Date, but the Definitive Documents have been finalized as of the Termination Date, the effective date of the Definitive Documents shall be automatically extended on a day-by-day basis until all such approval(s) are received (or until such condition is waived by CUSA, at its sole discretion); provided that, in the event FWE IV has not been granted all such approvals by July 1, 2021, this Term Sheet and any and all executed Definitive Documents shall automatically terminate on such date. For the avoidance of doubt, in no event shall the failure to finalize and execute any Definitive Document result in any such extension after the Termination Date.

**III. Withdrawal of Objection**

In conjunction with the execution of this Term Sheet or promptly thereafter, FWE and CUSA will enter into a mutually agreed stipulation and order that will provide, among other things, that: (i) with respect to the Disclosure Statement For Joint Chapter 11" filed by FWE on January 1, 2021, as amended, in the Bankruptcy (the "**Disclosure Statement**"), CUSA will withdraw its objection to the approval of the Disclosure Statement filed February 12, 2021, upon filing the stipulation, and (ii) CUSA will not refile the objection or any other objection to FWE's Disclosure Statement or Plan of Reorganization at any time prior to the Termination Date.

1

**IV. FWE IV Assets**

Assets to be allocated to FWE IV are restricted to the rights, title and interests in specific FWE IV assets and the liabilities and obligations associated with those designated assets as described herein.  FWE IV shall be the designated operator for the assets allocated to it herein, unless otherwise expressly agreed by the parties.  "**Closing**" shall take place in conjunction with the effectiveness of the divisive merger and simultaneous execution and delivery of the Definitive Documents, subject to and following due diligence review of the assets by CUSA, as described below.

*Designated FWE IV Assets*

At Closing, FWE shall allocate to FWE IV certain interests in the leases assigned previously to FWE by CUSA (and its predecessors and affiliates) as described in Exhibit "A" attached hereto, which are a portion of the interests acquired from CUSA that are described in the Abandoned Properties category under the FWE Disclosure Statement, or as otherwise agreed.

FWE IV assets will include the oil and gas leases contributed to FWE IV in accordance with the foregoing (or the section below on Agreed FWE III (Winddown Leases)), together with the platforms, wells, pipelines and equipment (including production equipment) located on and attributable to the CUSA interest in such leases, and any hydrocarbons produced from such leases, if applicable (collectively "**FWE IV Assets**").

*Agreed FWE III (Winddown Leases)*

FWE IV will not be allocated any FWE leases that are currently allocated to Fieldwood Energy III LLC ("**FWE III**") in the Disclosure Statement (the "**FWE III (Winddown Leases)**"); provided that a particular FWE III (Winddown Lease) scheduled on Exhibit B attached hereto may be allocated to FWE IV under the following circumstances: (i) if such lease is required by the government to be replaced by other leases during the Chapter 11 process, or (ii) if CUSA and FWE agree to have such lease allocated to FWE IV.  For the avoidance of doubt, CUSA or an affiliate must be a predecessor in the chain of title as noted on BOEM's Serial Register Page of any FWE III (Winddown Lease) lease/asset allocated to FWE IV.

If any such FWE III (Winddown Leases) leases/assets are to be allocated to FWE IV in accordance with (i) in the preceding, then an amount not less than 50% of FWE's predecessor-in-interest share of the funding designated and allocated to FWE III for decommissioning such lease/asset; or, if such lease/asset is allocated to FWE in accordance with (ii) in the preceding, then the agreed upon amount of funding designated and allocated to FWE III for decommissioning such lease/asset ( in either case, the "**FWE III Lease Payment Amount**") shall be paid by FWE into the  Escrow Account for general use at Closing.

**V. FWE IV Governance and Operations**

*Divisive Merger*

FWE IV will be a new Texas limited liability company formed via the divisive merger of FWE (an existing Texas limited liability company) after conversion from a Delaware limited liability company.  FWE IV will be allocated all FWE IV Assets, identified in accordance with the terms hereof, and all associated operating and decommissioning liabilities allocated to FWE IV via a Plan of Merger.  All other assets or liabilities of FWE will remain with a FWE entity and/or be allocated to or assumed and assigned by the various entities described in the Bankruptcy.  To the extent any of the oil and gas leases contained within the FWE IV Assets are terminated leases and as such not transferable, or are not transferrable for any other reason, CUSA and FWE shall negotiate in good faith in order to determine a mutually agreeable structure whereby FWE IV shall be allocated or otherwise obtain certain agreed rights

and obligations associated with such oil and gas leases and the FWE IV assets relating thereto, including, if applicable, the right to act as decommissioning contractor for such FWE IV assets and contractual rights to recover against predecessors-in-interest, surety bond providers and other applicable persons.

*LLC Company Agreement (LLC Agreement)*

Operating agreement of FWE IV addressing governance, management and funding of FWE IV executed at closing. Terms and conditions will include, among others:

1.  Fieldwood Energy Inc. will be sole member and owner of FWE IV.

2.  Sole Manager hired, with approval of CUSA, will be sole officer and employee of FWE IV and will run FWE IV in accordance with the terms of the LLC agreement.

3.  CUSA will have certain consent rights under LLC Agreement, enforceable in its capacity as a third party beneficiary to the agreement.

4.  Sole purpose of the company will be to wind-down and decommission FWE IV Assets.

5.  FWE IV must obtain prior written consent of CUSA before conducting any of the following activities:

    •   Engage in any business or activity other than plugging and abandoning the FWE IV Assets and/or, if applicable, maintaining current production on the FWE IV Assets,

    •   Use revenue or free cash flow for any purpose other than for funding Permitted Third Party Costs, Permitted LOE Charges and, if applicable, payment into the Escrow Account relating to the decommissioning of the FWE IV Assets,

    •   Approve any decommissioning plan for the FWE IV Assets and/or retain any other decommissioning subcontractor other than the NewCo,

    •   Incur any indebtedness,

    •   Replace, remove or change the powers of the Sole Manager,

    •   Replace or remove the NewCo under the Contract Operator Agreement or amend, waive or fail to enforce any provision of the Contract Operator Agreement,

    •   Divest any of the FWE IV Assets or acquire any other assets, or

    •   Declare bankruptcy, liquidate or otherwise terminate the existence of the company or any of its subsidiaries.

6.  FWE IV will provide CUSA with regular informational updates from FWE IV, including monthly and quarterly financial reports and an annual financial audit by an independent accountant approved by CUSA; provided that Ernst and Young is deemed to be pre-approved as an independent accountant.

7.  As a condition precedent to the effectiveness of the Turnkey Removal Agreement (and the other Definitive Documents), FWE IV will become a qualified operator in the Gulf of Mexico.

8.  FWE and CUSA will coordinate as appropriate to assist FWE IV on bonding requirements, with costs allocated in "*Funding and Cost Allocation*", below.

9.   FWE IV will use reasonable efforts to obtain reimbursement/contribution for decommissioning activity that is available under contract or applicable law, including as to predecessors-in-interest to the extent practicable and available surety bonding.[1]

10.  FWE IV shall obtain the written consent of CUSA prior to entering settlement negotiation(s) or agreeing to a settlement and/or initiating dispute resolution, including with respect to obtaining contributions from predecessor-in-interest for decommissioning or funds from surety bonds for decommissioning.

11.  The costs and expenses associated with the formation and administration of FWE IV and the operations conducted by the company shall be allocated as to forth under "*Funding and Cost Allocation*", below.

*Funding and Cost Allocation*

1.   FWE will be responsible for all costs associated with formation of FWE IV in connection with the divisive merger.  Funds required for the ongoing operations of FWE IV shall be provided as set forth in "Contract Operator Agreement and Operating Costs", below.

2.   FWE will provide all funds for any premiums for organizational/areawide bonding requirements.

## VI. Turnkey Removal Agreement

1.   CUSA, FWE IV and NewCo to enter into the Turnkey Removal Agreement whereby, upon agreement of the price for a decommissioning project, NewCo will decommission the FWE IV Assets on a lump sum, turnkey payment basis, and NewCo will earn a single pre-agreed payment (turnkey amount) in exchange for completing such decommissioning project. NewCo will have profit opportunity if it is able to perform a decommissioning project for lower cost than the pre-agreed turnkey amount, and NewCo will bear the risk that the costs of a decommissioning project exceeds the pre-agreed turnkey amount. All such turnkey amounts shall be determined on a 100% (gross) basis and shall cover all costs, expenses and overhead associated with a particular decommissioning project, including all third party costs, any fixed and/or capital costs, tax, etc.

2.   At Closing, the parties shall determine the turnkey amounts for all decommissioning projects under the Turnkey Removal Agreement (leases operated by FWE IV) and shall agree on the decommissioning projects scheduled to be conducted during the first year after Closing under the Turnkey Removal Agreement, all of which shall be attached to the Turnkey Removal Agreement.  Additionally, the parties shall agree on certain qualified conditions for the decommissioning projects ("**Qualified Conditions**"), which such Qualified Conditions, if present, can, at the election of either NewCo or CUSA, as applicable, and subject to the notice requirements set forth in the Definitive Documents, cause the parties to adjust the applicable turnkey amount for a particular project or agree on alternative cost arrangement; provided that such Qualified Conditions shall be set forth in the Definitive Documents and shall be limited to (i) material changes in government regulations that can reasonably be expected to materially increase or decrease the applicable cost of decommissioning a particular project and (ii) as otherwise mutually agreed in the Definitive Documents to by the parties.  In the event the parties are unable to agree to the adjusted turnkey amount or an alternative cost arrangement due to an occurrence of a Qualified Condition, the parties shall follow the method set forth in the Definitive Documents.

3.  For all decommissioning projects to be conducted after the first anniversary of Closing, at least 90 prior to each anniversary of Closing, NewCo will provide CUSA final turnkey amounts for decommissioning projects to be completed in the next successive 12-month period, which final amounts may be the same or updated from the original schedule. Such amounts shall become the agreed upon turnkey amounts for the applicable 12 month period if such amount has not been updated from the original scheduled amount or if CUSA does not object in writing to an updated turnkey amount within 30 days of delivery of the final turnkey amounts. The parties will work in good faith to agree on a final turnkey amount; provided that, if the parties fail to reach agreement on a final turnkey amount for a particular project within 30 days of such objection, the parties shall follow the method set forth in the Definitive Documents. FWE IV will work in good faith with CUSA to determine applicable sources of committed third party funding payments on an asset-by-asset basis prior to commencement of the work for a particular decommissioning project, including (i) available bonds, and (ii) contributions from predecessors-in-interest.

4.  Services provided by NewCo pursuant to the Turnkey Removal Agreement will include performing decommissioning operations to an agreed operational and regulatory performance standard on behalf of FWE IV on agreed terms and conditions. For purposes of clarity, FWE and CUSA agree that NewCo will meet such required standard if it performs such decommissioning operations consistent with required laws, rules and regulations promulgated by governing regulatory agencies, including but not limited to BOEM and BSEE, and consistent with any applicable third party contracts (the "**Performance Standards**").

5.  For each decommissioning project, CUSA shall pay its share of the agreed turnkey payment (as described in "*Funding Obligations and Cost Allocation*", below) into the Escrow Account when FWE IV has received funds or secured a contractual commitment (such as AFE approval) for full funding of the applicable decommissioning project.

6.  Newco shall not undertake the applicable decommissioning project until full funding of the applicable turnkey amount has been agreed to by CUSA and NewCo, including receiving funds or securing a contractual commitment (such as an AFE approval) from applicable third parties, including any Other FWE Party (defined below). Subject to 7 below, CUSA shall authorize, and NewCo shall receive, payment of the full agreed turnkey amount from the Escrow Account (as payment on behalf of FWE IV) upon delivery to FWE IV and CUSA of the filings and other evidence required by BOEM and BSEE or any other applicable governmental authority, including requisite approvals or regulatory concurrence, to support NewCo's representation that all decommissioning obligations with respect to the applicable assets have been satisfied.

7.  If any individual asset subject to the Turnkey Removal Agreement results in an agreed turnkey amount in excess of $5 million or if the aggregate amount of agreed turnkey amounts in effect at any one time for multiple assets subject to the Turnkey Removal Agreement is in excess of $10 million, NewCo and CUSA will agree on milestone payments to be paid in the above manner upon completion of interim decommissioning activities. In no event shall milestone payments equal 100% of the total turnkey amount. Payment of a final percentage of the agreed turnkey amount of 25% shall remain in the applicable Escrow Account until completion of the work in accordance with the terms of the Turnkey Removal Agreement.

8.     CUSA retains the right to terminate the Turnkey Removal Agreement as to a particular asset and/or require FWE IV to competitively bid the decommissioning services with respect to a particular asset in the event NewCo is unable to (or otherwise fails to) perform the services in compliance with Government issued timelines or in the event NewCo is in breach of the Turnkey Removal Agreement, including, but not limited to, the Performance Standards with respect to a particular asset. In the event of termination, CUSA shall be refunded any funds deposited in the Escrow Account for the particular asset decommissioning.

9.     With respect to certain FWE IV Assets for which such activities will be required or otherwise advisable / agreed at Closing, NewCo will perform , and FWE IV will engage NewCo to perform and will reimburse or otherwise pay up to $5 million for, operations necessary to safe-out and otherwise perform preparatory activities to put such FWE IV Assets into a mechanical and operational state such so that they are ready to be decommissioned (up to the $5 million cap on these costs, "**Initial Safe Out**"); provided that NewCo shall not be required to perform any such work without funding therefor from either FWE IV or CUSA.

*Funding Obligations and Cost Allocation*

1.     CUSA will pay 100% of the turnkey amount agreed by the parties to be owed by CUSA for a particular FWE IV Asset decommissioning project when due; provided that in the event there are any other current working interest owner(s) with an interest in the applicable decommissioning project (or the underlying lease or assets), including FWE I or any other entity surviving the FWE divisive merger at Closing, whether as a co-working interest owner in an asset or otherwise ("**Other FWE Party**"), CUSA shall only be required to pay its predecessor-in-interest share of the FWE IV working interest percentage share of the applicable turnkey amount. In the event there are other predecessors-in-interest to the FWE IV Asset (excluding CUSA and the predecessors to CUSA), CUSA shall have the right to elect whether or not to pay 100% of the turnkey amount prior to commencement of work.

2.     CUSA's obligation to pay the turnkey amount for a particular decommissioning project (or its applicable share of the turnkey amount if there are other current working interest owners) shall be subject to reduction (and/or reimbursement) in conjunction with the following (each, a "**CUSA Payment Reduction**"):

    a.     CUSA's obligation to pay the turnkey amount shall be reduced by any funds or contributions that FWE IV secures or otherwise collects from other predecessors-in-interest or otherwise with respect to CUSA's share of the turnkey amount or, if any such funds are collected after the turnkey amount is paid in full, such amounts shall be paid to CUSA as reimbursement such that CUSA's funded amount is equal to its predecessor-in-interest percentage for the particular decommissioning project.

    b.     In the event that there are any funds received from NPI Revenue Amounts available in the Escrow Account, CUSA shall have the option to utilize such funds to reduce its obligation to pay a particular turnkey amount.

    c.     In the event that there are any funds associated with any FWE III Lease Payment Amounts available in the Escrow Account, CUSA shall have the option to utilize such funds to reduce its obligation to pay the FWE III (Winddown Lease) decommissioning turnkey amount or be provided to FWE IV for general use.

    d.     In the event that CUSA is in breach of any of its obligations under a Definitive Document, CUSA Payment Reduction shall exclude subparts (b) and (c) above.

3.    FWE will contribute at Closing $5,000,000 into the FWE IV Escrow Account to cover the Initial Safe Out. FWE IV will pay NewCo for performing the Initial Safe Out upon completion of individual works scopes with such funds from the Escrow Account; Newco shall not be required to undertake any work scopes if funds therefor are not already in the FWE IV Escrow Account.

4.    In no event shall CUSA be required to pay for or otherwise contribute funds in relation to (and no funds in the applicable Escrow Account or any other contribution by CUSA shall be used in any manner for) any of the following ("**Excluded CVX Costs**"):

    a.    Any costs , damages, fines, penalties or liabilities owed to third parties, governmental fines and penalties, environmental liabilities, employment claims and/or any costs, expenses, claims or other liability relating to action taken by FWE IV-

    b.    Any costs , damages, fines, penalties or liabilities owed to third parties, governmental fines and penalties, environmental liabilities, employment claims and/or any costs, expenses, claims or other liability relating to action taken by NewCo in breach of, and subject to, the Turnkey Removal Agreement or Contract Operating Agreement or arising due to the negligence, gross negligence or willful misconduct of NewCo and

    c.    Any costs, damages, fines, penalties or liabilities related to any orphan assets on the FWE IV Assets (as determined with reference to CUSA's predecessor interest in the applicable assets - FWE and CUSA will reasonably agree to the applicable definition of orphan assets).

5.    NewCo shall be responsible for, and otherwise pay, or pay or reimburse FWE IV for, any Excluded CVX Costs arising under 4(b) or 4(c) above.

**VII. Contract Operator Agreement and Operating Costs**

1.    FWE IV and NewCo will enter into a Contract Operator Agreement whereby NewCo manages the administrative and corporate expenses of FWE IV along with the FWE IV Assets for a period of 5 years, subject to agreed-upon conditions for assignment.

2.    Management of the properties shall include, but not be limited to, as services provided: Operations, Production Marketing (for assets that are producing), Accounting and Land Administration.

*Funding Obligations and Cost Allocation*

1.    NewCo will manage the FWE IV Assets at no charge to FWE IV, and NewCo shall bear all amounts associated with such activity, including any corporate activity and administrative overhead of FWE IV, in conjunction with such management obligation, other than any third party costs. If circumstances change (including changes to the assets or regulations covering operations), NewCo may charge a reasonable, mutually agreed fee for such services. The parties agree that third party costs associated with the operations of the FWE IV Assets or management of FWE IV, but not including overhead costs, such as rent or equipment lease payments ("**Permitted Third Party Costs**") shall be paid by funds from the Escrow Account and shall be billed directly to FWE IV. To the extent that any Permitted Third Party Costs are not covered by available funds from the Escrow Account, CUSA shall reimburse and contribute such Permitted Third Party Costs to the Escrow Account on a monthly basis in arrears.

2.    Notwithstanding Item 1 above, to the extent FWE IV or NewCo, through a shared services agreement, incurs lease operating expenditures associated with a permitted operation on or

in relation to a particular FWE IV Asset that would properly be chargeable as OPEX under a joint operating agreement (e.g., lease operating expenses), including, but not limited to, costs related to visitation fees, insurance costs, repair and maintenance, or safe-out costs ("**Permitted LOE Costs**"), such Permitted LOE Costs shall be paid for first by funds from revenue generated from the FWE IV Assets and then by CUSA by payment into the Escrow Account on a monthly basis in arrears; provided that, in the event that a particular lease or asset has co-working interest owners, any obligation to contribute Permitted LOE Costs (whether from the Escrow Account or otherwise) shall be limited to the proportionate share of such costs corresponding to FWE IV's working interest. For the avoidance of doubt, Newco shall not be obligated to either provide any such services without funding therefor or to advance any funds for FWE IV. Additionally, NewCo's assumption of expenses in (1) above and Excluded CVX Costs shall not be included as or deemed Permitted LOE Costs.

3.   Notwithstanding the foregoing, Permitted Third Party Costs and Permitted LOE Costs shall not include any amounts relating to or otherwise associated with (including any operating expenses or overhead allocated to) any Excluded CVX Costs.

## VIII. Escrow Accounts

The parties shall agree to the establishment of the appropriate bank account(s) and escrow account(s) to support the transactions described in this Term Sheet, including but not limited to one operating account and at least one escrow account for the amounts to be paid pursuant to the Turnkey Removal Agreement (as applicable, the "**Escrow Agreement**").

1.   Contributions to the Escrow Account, shall be as fully described in the Definitive Agreements, but include not less than:

   a.   FWE will contribute at Closing $5,000,000 as payment for the Initial Safe Out.

   b.   Subject to item 2.a below, FWE IV will grant at Closing a net profits interests on all FWE IV Assets or otherwise agree with CUSA on the treatment of net profits ("**FWE IV NPI**"). The FWE IV NPI will pay all net profits from production generated by the FWE IV Assets, after deducting royalties and taxes and less amounts required to cover operating expenditures of FWE IV, into the Escrow Account ("**NPI Revenue Amount**").

   c.   Funds obtained from third parties, including any Other FWE Party, in support of decommissioning activity for FWE IV Assets, including contributions from other predecessors-in-interest and proceeds from surety bonds paid directly to FWE IV, will be paid into the FWE IV Escrow Account and, to the extent practicable, designated for use for the particular asset.

   d.   For any FWE III (Winddown Lease) asset allocated to FWE IV in accordance with the provisions above, the corresponding FWE III Lease Payment Amount shall be contributed to the FWE IV Escrow Account by FWE at Closing.

   e.   Any agreed turnkey payments made by CUSA in accordance with the Turnkey Removal Agreement or any decommissioning amounts, whether turnkey or otherwise, received from other co-working interest owners, if applicable.

2.   Contributions to the operating account:

   a.   All revenue from FWE IV Assets will be received into the operating account. If any net revenue exists, after paying Permitted Third Party Costs and Permitted LOE Costs, FWE IV will fund the NPI Revenue Amount out of the operating account.

Debtors' Exhibit No. 34
Page 40 of 910

3.   Distributions to NewCo:

   a.   Funds required to perform the Initial Safe Out, up to $5,000,000 funded at Closing, as such P&A prep activities are performed.

   b.   Turnkey payments upon completion of decommissioning services in accordance with the Turnkey Removal Agreement, including any agreed upon milestone payments.

   c.   Reimbursement for Permitted Third Party Costs and Permitted LOE Costs in accordance with the Contract Operating Agreement.

4.   Distributions to CUSA:

   a.   With respect to any funds associated with a CUSA Payment Reduction amount that are received into the Escrow Account, after CUSA has made an applicable turnkey payment.

5.   Distributions to FWE IV:

   a.   Costs of FWE IV, including operating costs.

   b.   Decommissioning costs to the extent not covered under the Turnkey Removal Agreement.

## IX. Other Agreements to be Negotiated

*Joint Development Agreement*

Parties: FWE IV and NewCo, terms to be mutually agreed.

*Shared Services Agreement*

Parties: FWE IV and NewCo, terms to be mutually agreed.

*Neptune Spar Transition Services Agreement*

Parties: NewCo and CUSA

Terms: Transition services provided by NewCo at CUSA's cost for the period prior to commencement of CUSA's campaign covering decommissioning of the Neptune Spar and related equipment and infrastructure.

*Deepwater Assets Decommissioning Fund*

Parties: NewCo and CUSA

Terms:

1.  Subject to paragraph 2 below, NewCo will deliver to CUSA on the second anniversary of closing of the transaction described herein a $25 million irrevocable surety bond issued by a Qualifying Surety, for which CUSA shall be the sole private beneficiary and which CUSA shall be entitled to call to cover and/or to reimburse certain decommissioning costs on the CVX Deepwater Assets (defined below) as described in item 4 below ("**Deepwater Surety Bond**").  For purposes of this agreement a "Qualifying Surety" means an insurance company or financial institution that is rated equivalent to at least "A+" (by S&P or Fitch), "A1" (by Moody's), or "B++" (by AM Best), by any two of such four credit rating agencies.  Subject to 6 below, in order to be released from its obligations hereunder, NewCo shall ensure any buyer of the deepwater assets provides a replacement Deepwater Surety Bond.

2.  If NewCo is not able to provide the Deepwater Surety Bond after utilizing commercially reasonable efforts or does not deliver a letter of credit of equal amount to the Deepwater Surety Bond from a mutually agreed upon qualified issuing bank, NewCo will grant a net profits interest equivalent to 5% of the net profits of production from the CVX Deepwater Assets ("**Deepwater NPI**"), which shall pay funds into a decommissioning escrow account until the funds in such account equal $25 million ("**Deepwater Escrow Account**"); provided that when the Deepwater Escrow Account reaches $25 million, the Deepwater NPI shall be returned to NewCo and terminated.

3.  If NewCo has funded any portion of the Deepwater Escrow Account, to the extent NewCo provides a qualifying Deepwater Surety Bond in any face amount or an irrevocable standby letter of credit in any amount from a mutually agreed upon qualified issuing bank, NewCo shall be entitled to draw down (and not be required to replenish) from the Deepwater Escrow Account an amount equal to the face amount of the Deepwater Surety Bond or the amount of the letter of credit.

Debtors' Exhibit No. 34
Page 42 of 910

4. The funds in the Deepwater Escrow Account will be made available to CUSA and/or the Deepwater Surety Bond (or letter of credit) will be callable by CUSA, in each case for the purposes of covering decommissioning costs incurred by CUSA for certain NewCo deepwater or shelf assets acquired originally by FWE from CUSA or any current affiliate of CUSA, in each case as such assets are designated on Exhibit C attached hereto ("**CVX Deepwater Assets**") in the event that CUSA or any of its affiliates is ever held liable therefor or otherwise incurs such costs.

5. NewCo will have the right to use any funds in such account to perform decommissioning activities on the CVX Deepwater Assets.

6. The security requirements described hereunder shall terminate, and any security shall be released to NewCo, upon the occurrence of any of the following:

   a. The Turnkey Removal Agreement terminates as a result of an uncured material breach by CUSA (provided that NewCo is not also in material breach);

   b. NewCo performs decommissioning activities equal to or in excess of $25 million on the CVX Deepwater Assets;

   c. NewCo establishes an S&P credit rating equal to BBB or better or an equivalent credit rating with any other established rating agency; or

   d. NewCo sells all or substantially all of its deepwater assets (including all or substantially all of the CVX Deepwater Assets) in an asset transaction or a corporate or equivalent transaction to a buyer with an S&P credit rating equal to BBB or better or an equivalent credit rating with any other established rating agency.

In the event of 6(c), if NewCo's S&P credit rating drops below a BBB (or equivalent), NewCo shall re-establish the Deepwater Surety Bond or letter of credit at the level of security immediately prior to being released under 6(c), within 60 days or, if it fails to do so, the Deepwater NPI shall come into effect, subject to the provisions described above on any reduction or release.

Debtors' Exhibit No. 34
Page 43 of 910

**X. Other**

In the event NewCo has an unpaid balance due to CUSA for any reason under the Definitive Agreements, and that unpaid balance remains due and unpaid for 90 days, CUSA expressly reserves the right to set-off any amounts due to NewCo under the Turnkey Removal Contract or any reimbursement under the Contract Operating Agreement.

At Closing and/or upon qualification as an operator, CUSA and FWE IV shall execute BOEM-0150 "Assignment of Record Title in Federal OCS Oil and Gas Lease" documentation to effectuate the transfer of record title currently held by CUSA to FWE IV in the following leases

- Ship Shoal 175 OCS-G05550

**XI. Due Diligence**

In conjunction with negotiations with FWE, CUSA to commence and perform due diligence of assets and related contracts within the scope of FWE IV. Successful completion of such due diligence (and FWE providing the required materials to CUSA) shall be a condition precedent to the effectiveness of the Definitive Documents.

In accordance with the foregoing, FWE shall provide CUSA with electronic access to the information and materials set forth below promptly after agreeing to this Term Sheet:

1.    All contracts applicable to the assets or used in conjunction with the FWE IV Assets, including operating agreements, production handling arrangements, hydrocarbon transportation, processing and marketing agreements, third party service provider contracts, PSAs, farmouts and any agreements relating to decommissioning,

2.    All bonds, letters of credit, standby funds or other financial arrangements relating to the FWE IV Assets, including any such arrangements in support of decommissioning, and

3.    All government permits, orders and notices relating to the FWE IV Assets or the operation thereof, including any INCs and copies of all BSEE communication relating thereto.

Notwithstanding the information specifically requested above, the scope of CUSA's due diligence will include access to all relevant information relating to the FWE IV Assets that may be requested by CUSA from time to time, which FWE IV shall provide to CUSA in a timely manner following receipt of a request by CUSA.

*[Remainder of page intentionally left blank.]*

Debtors' Exhibit No. 34
Page 44 of 910

**Exhibit "A"**
**FWE IV Assets**

| Area / Block | Lease Number |
|---|---|
| BA A-105 | G01757 |
| BA A-133 | G02665 |
| EB 158 | G02645 |
| EB 159 | G02646 |
| EB 160 | G02647 |
| EB 161 | G02648 |
| EC 331 | G08658 |
| EC 332 | G09478 |
| EI 342 | G02319 |
| HI A-550 | G04081 |
| MP 77 | G04481 |
| SM 132 | G02282 |
| SM 136 | G02588 |
| SM 137 | G02589 |
| SM 150 | G16325 |
| SM 66 | G01198 |
| SS 169 | 00820 |
| SS 206 | G01522 |
| SS 207 | G01523 |
| ST 169 | G01253 |
| ST 195 | G03593 |
| VR 196 | G19760 |
| VR 207 | G19761 |
| VR 261 | G03328 |

**End of Exhibit "A"**

**Exhibit "B"**
**FWE III (Winddown Leases)**

| Area / Block | Lease Number |
|---|---|
| GI 83 | G03793 |
| HI A-446 | G02359 |
| MP 154 | G30337 |
| VR 332 | G09514 |
| VK 113 | G16535 |
| VK 251 | G10930 |
| VK 340 | G10933 |
| VR 314 | G05438 |
| WC 290 | G04818 |

End of Exhibit "B"

**Exhibit "C"**
**CVX Deepwater Assets**

| Area / Block | Lease Number (OCS–) |
|---|---|
| GI 39 | 00127 |
| GI 40 | 00128 |
| GI 41 | 00130 |
| GI 42 | 00131 |
| GI 46 | 00132 |
| GI 47 | 00133 |
| GI 48 | 00134 |
| GI 43 | 00175 |
| WD 70 | 00182 |
| WD 71 | 00838 |
| WD 94 | 00839 |
| WD 95 | G01497 |
| WD 96 | G01498 |
| SM 149 | G02592 |
| VR 363 | G09522 |
| VR 371 | G09524 |
| VR 362 | G10687 |
| GC 282 | G16727 |
| MC 562 | G19966 |
| MC 563 | G21176 |
| GC 679 | G21811 |
| GC 768 | G21817 |
| MC 992 | G24133 |
| MC 993 | G24134 |
| GC 238 | G26302 |
| MC 519 | G27278 |
| EW 834 | G27982 |
| MC 697 | G28021 |
| MC 698 | G28022 |
| MC 948 | G28030 |
| MC 742 | G32343 |
| MC 949 | G32363 |
| EW 790 | G33140 |
| MC 793 | G33177 |
| EW 835 | G33707 |
| MC 782 | G33757 |
| MC 171 | G34428 |
| MC 172 | G34429 |
| MC 297 | G34434 |
| GC 40 | G34536 |
| GC 41 | G34537 |
| EW 1009 | G34878 |
| EW 1010 | G34879 |
| EW 1011 | G34880 |
| MC 80 | G35311 |
| MC 474 | G35825 |
| MC 518 | G35828 |
| GI 32 | 00174 |
| GI 39 | 00126 |

| Area / Block | Lease Number (OCS-) |
|---|---|
| GI 41 | 00129 |
| GI 44 | 00176 |
| GI 52 | 00177 |
| WD 67 | 00179 |
| WD 68 | 00180 |
| WD 69 | 00181 |

End of Exhibit "C"

## Exhibit 1-A

### FWE III Plan of Merger

See attached.

*Exhibit 1-A to the Implementation Agreement*

## AGREEMENT AND PLAN OF MERGER
## OF
## FIELDWOOD ENERGY III LLC
## INTO
## FIELDWOOD ENERGY IV LLC
## AND
## FIELDWOOD ENERGY III LLC

This AGREEMENT AND PLAN OF MERGER, dated as of [●], 2021 (this "Plan of Merger"), is executed and adopted by Fieldwood Energy III LLC, a Texas limited liability company ("FWE III").

WHEREAS, commencing August 3, 2020, Fieldwood Energy LLC, a Delaware limited liability company ("FWE"), and certain other affiliates of FWE (each, a "Debtor" and collectively, the "Debtors") filed voluntary petitions with the United States Bankruptcy Court for the Southern District of Texas (the "Bankruptcy Court") initiating their respective cases pending under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") styled *In re Fieldwood Energy LLC, et al.*, jointly administered under Case No. 20-33948 (MI) (each case of a Debtor, a "Case" and collectively, the "Chapter 11 Cases");

WHEREAS, in connection with the Chapter 11 Cases, the Debtors filed the [____ *Amended Joint Chapter 11 Plan of Fieldwood Energy LLC and Its Affiliated Debtors* at Docket No. ___] (as may be amended, restated, amended and restated, supplemented, or otherwise modified from time to time, the "Plan of Reorganization"), which was confirmed by order of the Bankruptcy Court entered on [●], 2021 at Docket No. [●] (as may be amended, modified, and supplemented, the "Confirmation Order");

WHEREAS, in accordance with the Plan of Reorganization and Confirmation Order, pursuant to the Credit Bid Purchase Agreement (as defined below) certain assets and properties of the Debtors were sold and conveyed to, and certain liabilities and obligations of Debtors were assumed by, Mako Buyer LLC, a Delaware limited liability company ("Credit Bid Purchaser"), prior to the effective time of the First Merger (as defined below) (the "Credit Bid Transaction");

WHEREAS, pursuant to the Plan of Reorganization, and as authorized by the Confirmation Order, FWE converted from a Delaware limited liability company to a Texas limited liability company on [●], 2021;

WHEREAS, pursuant to the Plan of Reorganization, and as authorized by the Confirmation Order, following the Credit Bid Transaction and prior to the Effective Time on [●], 2021, FWE effected a divisional merger (the "First Merger") pursuant to that certain Agreement and Plan of Merger of Fieldwood Energy LLC ("FWE I Plan of Merger"), pursuant to which (i) FWE maintained its separate existence and continued as a surviving entity under the name "Fieldwood Energy III LLC;" (ii) a new Texas limited liability company was formed under the name "Fieldwood Energy I LLC" ("FWE I"); and (iii) all of the assets and liabilities of FWE were allocated to FWE I and FWE III, in each case as set forth in the FWE I Plan of Merger;

WHEREAS, pursuant to the Plan of Reorganization, and as authorized by the Confirmation Order, FWE III is to effect a divisional merger as set forth in this Plan of Merger (the "Merger") promptly following the First Merger, pursuant to which, among other things:

a)   FWE III shall maintain its separate existence and continue as a surviving entity under its name as of immediately prior to the Merger;

b)   a new Texas limited liability company shall be formed under the name "Fieldwood Energy IV LLC" ("FWE IV");

c)   all of the FWE IV Assets (as defined below) shall be allocated to and vested in FWE IV;

d)   all of the FWE IV Obligations (as defined below) shall be allocated to and shall constitute liabilities and obligations of, FWE IV;

e)   all of the FWE III Assets (as defined below) shall be allocated to and vested in FWE III; and

f)   all of the FWE III Obligations (as defined below) shall be allocated to, and shall constitute liabilities and obligations of, FWE III; and

WHEREAS, this Plan of Merger has been authorized by the Confirmation Order, which provides such approval of the transactions contemplated hereby as required for purposes of Sections 10.001 et seq. of the Texas Business Organizations Code (the "TBOC"), and Section 1.002(55)(A) of the TBOC and, in accordance with Section 10.008 of TBOC, the Merger shall be consummated without any reversion or impairment, any further act or deed, or any transfer or assignment having occurred.

NOW, THEREFORE, in consideration of the premises and the mutual covenants and agreements herein contained, and for good and valuable consideration, the sufficiency of which is acknowledged, and for the purpose of prescribing the terms and conditions of the Merger, the mode of carrying it into effect, the manner and basis of allocating assets and liabilities of each of the resulting entities and such other details and provisions of the Merger as are deemed necessary or desirable, FWE III has agreed and covenanted, and does hereby agree and covenant, as follows:

1.      Subject to the provisions of this Plan of Merger, FWE III shall cause the Merger to be consummated by filing a certificate of merger with the Secretary of State of the State of Texas in such form as is required by, and executed in accordance with, the relevant provisions of the TBOC, in substantially the form attached as Exhibit A (the "Certificate of Merger"), together with a certificate of formation of FWE IV in substantially the form attached as Exhibit B-A (the "Certificate of Formation").  The Certificate of Merger shall provide that the Merger shall be effective on the date and time the Certificate of Merger is accepted and filed with the Secretary of State of the State of Texas (the "Effective Time"). The Certificate of Formation of FWE IV shall provide that the Certificate of Formation shall be effective as of the Effective Time.

2

2. At the Effective Time:

(a) FWE III shall be divisionally merged in accordance with Section 10.008 of the TBOC with (i) FWE IV being formed as a Texas limited liability company and new domestic entity, separate from FWE III as a result of the Merger and having been allocated the FWE IV Assets and the FWE IV Obligations in accordance with the TBOC under the name "Fieldwood Energy IV LLC" and (ii) FWE III continuing as a Texas limited liability company and surviving domestic entity of the Merger and having been allocated all assets and liabilities of FWE III (other than the FWE IV Assets and the FWE IV Obligations) in accordance with the TBOC under the same name it had immediately prior to the Merger - "Fieldwood Energy III LLC". The Merger will have the effect set forth below and in Section 10.008 of the TBOC.

(b) There shall be no change (through conversion, exchange, or otherwise) to the membership interests of FWE III, which membership interests in FWE III will continue to be owned by Fieldwood Energy Inc. as of the Effective Time.

(c) All of the membership interests of FWE IV shall be acquired by and owned by Fieldwood Energy Inc. as of the Effective Time.

(d) The certificate of formation and limited liability company agreement of FWE III as in effect immediately prior to the Effective Time shall be the certificate of formation and limited liability company agreement of FWE III immediately following the Effective Time.

(e) The Certificate of Formation shall be the certificate of formation of FWE IV, and the limited liability company agreement of FWE IV immediately following the Effective Time shall be substantially in the form of the company agreement attached hereto as Exhibit B-B (the "FWE IV LLC Agreement").

(f) The officers and managers of FWE III, if any, immediately prior to the Effective Time shall continue to be the officers of FWE III in accordance with and subject to the terms and conditions of the limited liability company agreement of FWE III.

(g) The officers and managers of FWE IV, if any, shall be as set forth in, and subject to the terms and conditions of, the FWE IV LLC Agreement.

(h) All of the rights, title and interests to all real estate and other properties of FWE III described in Part A of Schedule I attached hereto (the "FWE IV Assets"), subject to any existing liens or other encumbrances on such property, shall be allocated to and vested in FWE IV without reversion or impairment, without further act or deed, and without transfer or assignment having occurred, and no others (and expressly excluding any FWE III Asset).

(i) All of the liabilities and obligations of FWE III described in Part B of Schedule I attached hereto (the "FWE IV Obligations") shall be allocated to, and shall constitute liabilities and obligations of, FWE IV, and no others (and expressly excluding any FWE III Obligation).

(j) All of the rights, title and interests to all real estate and other properties of FWE III other than the FWE IV Assets (collectively, the "FWE III Assets"), subject to any existing

3

liens or other encumbrances on such property, shall be allocated to and vested in FWE III without reversion or impairment, without further act or deed, and without transfer or assignment having occurred.

      (k)     All of the liabilities and obligations of FWE III other than the FWE IV Obligations (collectively, the "FWE III Obligations") shall be allocated to, and shall constitute liabilities and obligations of, FWE III.

      (l)     FWE IV shall be substituted in any proceeding pending by or against FWE III (the pre-Merger entity) to the extent that such proceeding is associated with the Obligations or Assets allocated to FWE IV pursuant to Section 2(h) or Section 2(i).

      (m)     FWE III (the surviving entity) shall be substituted in any proceeding pending by or against FWE III (the pre-Merger entity) to the extent that such proceeding is associated with the Obligations or Assets allocated to FWE III pursuant to Section 2(j) or Section 2(k).

      (n)     All acts, plans, policies, Contracts, approvals, and authorizations of FWE III (the pre-Merger entity) and its officers and agents, that were valid and effective immediately prior to the Effective Time shall be taken for all purposes as the acts, plans, policies, Contracts, approvals, and authorizations of FWE III (the surviving entity) and FWE IV, as applicable and consistent with the foregoing and shall be effective and binding thereon as the same were with respect to FWE III (the pre-Merger entity).

      (o)     The Assets, Obligations, reserves, and accounts of FWE III (the pre-Merger entity) shall be recorded on the books of FWE III (the surviving entity) or FWE IV, as applicable and consistent with the foregoing, depending on which entity is allocated such Assets, Obligations, reserves, or accounts, at the amounts at which they, respectively, were carried on the books of FWE III (the pre-Merger entity) immediately prior to the Effective Time, subject to such adjustments as may be appropriate in giving effect to the Merger.

      3.     Post-Merger Covenants.

      (a)     Each of FWE III and FWE IV shall, at any time and from time to time from and after the Effective Time as and when requested by FWE III or FWE IV, as applicable, or by their respective successors or assigns, execute and deliver, or cause to be executed and delivered in its name by its authorized officers, all such conveyances, transfers, deeds, or other instruments as FWE III or FWE IV, as applicable, or such successors or assigns, may reasonably deem necessary in order to carry out the purposes of this Plan of Merger, pursuant to the terms and conditions herein, including to evidence (i) the allocation to and vesting in FWE III of the FWE III Assets, and the allocation to FWE III of, and the liability and obligation of FWE III for, the FWE III Obligations as a result of the Merger and (ii) the allocation to and vesting in FWE IV of the FWE IV Assets, and the allocation to FWE IV of, and the liability and obligation of FWE IV for, the FWE IV Obligations as a result of the Merger. Any cost incurred associated with curing a misallocation of any asset or liability (or failing to properly allocate any asset or liability), or otherwise arising from such misallocation (or failure to allocate), will be properly rectified and borne by FWE III. Without limiting the foregoing, FWE III shall take such actions as necessary to

effect a transfer from an account of FWE III to an account designated in writing by FWE IV of (i) the FWE IV Cash Amount, (ii) the FWE IV Suspense Funds, and (iii) the Prepaid JIB Cash Amount.

(b)      From and after the Effective Time (i) FWE IV shall perform the obligations of FWE under Section 10.12 of the Credit Bid Purchase Agreement with respect to Closing Accounts Receivable to the extent attributable to FWE IV Assets as of the Effective Time (provided FWE IV shall have no obligation to incur any cost or expense in performing such obligations), and (ii) FWE III shall, and shall cause its subsidiaries to, perform the obligations of FWE under Section 10.12 of the Credit Bid Purchase Agreement with respect to Closing Accounts Receivable to the extent attributable to FWE III Assets or any assets held by subsidiaries of FWE III as of the Effective Time.

4.      As a result of the consummation of the Merger in accordance with this Plan of Merger, FWE IV shall only be allocated and shall only be vested in and receive the FWE IV Assets, and shall only be allocated, and shall only be subject to the FWE IV Obligations, and FWE IV shall have no rights or obligations relating to any of the FWE III Assets or the FWE III Obligations, except as may be expressly set forth in a separate agreement, which is entered into at or after the Effective Time, between FWE III and FWE IV with respect to such other Assets or Obligations; and FWE IV shall not be deemed to be a predecessor in interest to any of the FWE III Assets or the FWE III Obligations.

5.      As a result of the consummation of the Merger in accordance with this Plan of Merger, FWE III shall only be allocated  and shall only be vested in and receive the FWE III Assets and shall only be allocated   and shall only be subject to the FWE III Obligations, and FWE III shall have no rights or obligations relating to any of the FWE IV Assets or the FWE IV Obligations, except as may be expressly set forth in a separate agreement, which is entered into at or after the Effective Time, between FWE III and FWE IV with respect to such other Assets or Obligations.

6.      FWE III shall provide to FWE IV all rights afforded to FWE III pursuant to Section 6 of the FWE I Plan of Merger to the extent related to any FWE IV Assets; provided, however, that any obligation or liability incurred by FWE III to the extent arising from, related to, or connected with providing such rights to FWE IV, (1) shall not constitute an FWE III Obligation, (2) shall be FWE IV Obligations and the obligations and liabilities of FWE IV, and (3) FWE IV shall indemnify and hold harmless FWE III from and against all such obligations and liabilities allocated to FWE IV pursuant to this Section 6.

7.      Certain Definitions.  As used herein and in the Schedules and Exhibits attached hereto, (i) the terms set forth below have the meanings ascribed to such terms below and (ii) the terms defined in the Schedules and Exhibits attached hereto have the meanings ascribed to such terms in such Schedules and Exhibits.

(a)      "Asset" means any individual asset, property, right, title or interest in any of the FWE III Assets or the FWE IV Assets; "Assets" means, collectively, the FWE III Assets and the FWE IV Assets.

Debtors' Exhibit No. 34
Page 54 of 910

(b)     "<u>Bankruptcy Code</u>" has the meaning ascribed to such term in the recitals hereto.

(c)     "<u>Bankruptcy Court</u>" has the meaning ascribed to such term in the recitals hereto.

(d)     "<u>BOEM</u>" has the meaning ascribed to such term in the definition of Environmental Liabilities.

(e)     "<u>BSEE</u>" has the meaning ascribed to such term in the definition of Environmental Liabilities.

(f)     "<u>Case</u>" has the meaning ascribed to such term in the recitals hereto.

(g)     "<u>CERCLA</u>" has the meaning ascribed to such term in the definition of Environmental Laws.

(h)     "<u>Certificate of Formation</u>" has the meaning ascribed to such term in <u>Section 1</u> hereto.

(i)     "<u>Certificate of Merger</u>" has the meaning ascribed to such term in <u>Section 1</u> hereto.

(j)     "<u>Chapter 11 Cases</u>" has the meaning ascribed to such term in the recitals hereto.

(k)     "<u>Chevron PSAs</u>" means, collectively, (i) that certain Asset Sale and Purchase Agreement, dated as of June 15, 2016, by and between CUSA and Fieldwood Energy Offshore LLC, a Delaware limited liability company, (ii) that certain Purchase and Sale Agreement, dated as of September 1, 2003, by and between Northstar Gulfsands, LLC and Noble Energy, Inc., (iii) that certain Purchase and Sale Agreement, dated as of March 1, 2006, by and between Coldren Resources LP and Noble Energy, Inc., (iv) that certain Purchase and Sale Agreement, dated as of January 1, 2018, by and between Fieldwood Energy LLC and Noble Energy, Inc., (v) that certain Asset Sale and Purchase Agreement, dated as of January 1, 2015, by and among Fieldwood Energy Offshore LLC, CUSA and Union Oil Company of California, (vi) that certain Asset Sale and Purchase Agreement, dated as of January 1, 2015, by and among Fieldwood Energy SD Offshore LLC, CUSA, Union Oil Company of California and Unocal Pipeline Company, (vii) that certain Asset Sale and Purchase Agreement, dated as of August 1,2015, by and between Fieldwood Energy Offshore LLC and CUSA, (viii) that certain Purchase and Sale Agreement, dated as of October 1, 2003, by and among SPN Resources, LLC, UnionOil Company of California and Pure Resources, L.P., and (ix) any other agreements pursuant to which FWE or its affiliates acquired any interest in any FWE IV Oil and Gas Properties from CUSA or its affiliates.

(l)     "<u>Closing Accounts Receivable</u>" has the meaning ascribed to such term in the Credit Bid Purchase Agreement.

6

(m)     "Confirmation Order" has the meaning ascribed to such term in the recitals hereto.

(n)     "Contract" means any contract, subcontract, lease, sublease, mortgage, franchise, license, purchase order, sales order, indenture, settlement, note, bond, guarantee, loan, instrument, obligation, promise, grant, or other agreement, arrangement, understanding or commitment, whether or not in written form, that is binding upon a Person or its property.

(o)     "Conveyed" means conveyed, transferred, assigned, or sold pursuant to the Chevron PSAs, regardless of whether such conveyance, transfer, assignment, or bill of sale was recorded in the appropriate records of, or approved or recognized by, the applicable Governmental Authority.

(p)     "Credit Bid Purchase Agreement" means the Purchase and Sale Agreement, dated [●], 2021, by and among FWE, certain affiliates of FWE and Credit Bid Purchaser.

(q)     "Credit Bid Purchaser" has the meaning ascribed to such term in the recitals hereto.

(r)     "Credit Bid Transaction" has the meaning ascribed to such term in the recitals hereto.

(s)     "CUSA" means Chevron U.S.A. Inc., a Pennsylvania corporation.

(t)     "Debtor" and "Debtors" has the meaning ascribed to such term in the recitals hereto.

(u)     "Effective Time" has the meaning ascribed to such term in Section 1 hereto.

(v)     "Environmental Laws" means, the Comprehensive Environmental Response, Compensation and Liability Act, 42 U.S.C. § 9601 et seq. ("CERCLA"); the Resource Conservation and Recovery Act, 42 U.S.C. § 6901 et seq.; the Federal Water Pollution Control Act, 33 U.S.C. § 1251 et seq.; the Clean Air Act, 42 U.S.C. § 7401 et seq.; the Hazardous Materials Transportation Act, 49 U.S.C. § 5101 et seq.; the Toxic Substances Control Act, 15 U.S.C. §§ 2601 through 2629; the Oil Pollution Act, 33 U.S.C. § 2701 et seq.; the Emergency Planning and Community Right to Know Act, 42 U.S.C. § 11001 et seq.; the Endangered Species Act, 16 U.S.C. § 1531 et seq.; the Safe Drinking Water Act, 42 U.S.C. §§ 300f through 300j; the Marine Mammal Protection Act, 16 U.S.C. § 1361 et seq.; the Marine Protection, Research and Sanctuaries Act, 16 U.S.C. § 1431 et seq. and 33 U.S.C. § 1401 et seq.; the Outer Continental Shelf Lands Act, 43 U.S.C. § 1331 et seq., and the National Environmental Policy Act, 42 U.S.C. § 4321 et seq., in each case as amended in effect as of the Effective Time, and all similar Laws in effect as of the Effective Time of any Governmental Authority having jurisdiction over the property in question addressing pollution, protection of the environment, biological resources, Hazardous Substances, occupational safety, or P&A Obligations.

(w)     "Environmental Liabilities" means any and all damages, remediation, obligations, liabilities, environmental response costs, costs to cure, cost to investigate or monitor, restoration costs, costs of remediation or removal, settlements, penalties, fines, and attorneys' and

Debtors' Exhibit No. 34
Page 56 of 910

consultants fees and expenses arising out of or related to any violations or non-compliance with any Environmental Laws, including any contribution obligation under CERCLA or any other Environmental Law or matters incurred or imposed pursuant to any claim or cause of action by a Governmental Authority or other Person, attributable to any environmental liabilities, any Release of Hazardous Substances, or any other environmental condition with respect to the ownership or operation of the Assets, including conditions of FWE IV Facilities not in compliance with Laws promulgated by the Bureau of Ocean Energy Management ("BOEM"), the Bureau of Safety and Environmental Enforcement ("BSEE"), or the United States Coast Guard.

(x)      "First Merger" has the meaning ascribed to such term in the recitals hereto.

(y)      "FWE" has the meaning ascribed to such term in the recitals hereto.

(z)      "FWE I" has the meaning ascribed to such term in the recitals hereto.

(aa)     "FWE I Plan of Merger" has the meaning ascribed to such term in the recitals hereto.

(bb)     "FWE III" has the meaning ascribed to such term in the recitals hereto.

(cc)     "FWE III Assets" has the meaning ascribed to such term in Section 2(j) hereto.

(dd)     "FWE III Obligations" has the meaning ascribed to such term in Section 2(k) hereto.

(ee)     "FWE IV" has the meaning ascribed to such term in the recitals hereto.

(ff)     "FWE IV Assets" has the meaning ascribed to such term in Section 2(h) hereto.

(gg)     "FWE IV Bonds" has the meaning ascribed to such term in clause (xvi) in Part A of Schedule I attached hereto.

(hh)     "FWE IV Cash Amount" has the meaning ascribed to such term in clause (xvii) of Part A of Schedule I hereto.

(ii)     "FWE IV Contracts" has the meaning ascribed to such term in clause (viii) in Part A of Schedule I attached hereto.

(jj)     "FWE IV Facilities" has the meaning ascribed to such term in clause (ii) in Part A of Schedule I attached hereto.

(kk)     "FWE IV Lands" has the meaning ascribed to such term in clause (i) in Part A of Schedule I attached hereto.

(ll)     "FWE IV Leases" has the meaning ascribed to such term in clause (i) in Part A of Schedule I attached hereto.

8

(mm)   "FWE IV Obligations" has the meaning ascribed to such term in Section 2(i) hereto.

(nn)   "FWE IV Oil and Gas Properties" has the meaning ascribed to such term in clause (ii) in Part A of Schedule I attached hereto.

(oo)   "FWE IV Permits" has the meaning ascribed to such term in clause (v) in Part A of Schedule I attached hereto.

(pp)   "FWE IV Rights of Way" has the meaning ascribed to such term in clause (iv) in Part A of Schedule I attached hereto.

(qq)   "FWE IV Suspense Funds" has the meaning ascribed to such term in clause (xiv) in Part A of Schedule I attached hereto.

(rr)   "FWE IV Units" has the meaning ascribed to such term in clause (i) in Part A of Schedule I attached hereto.

(ss)   "FWE IV Wells" has the meaning ascribed to such term in clause (ii) in Part A of Schedule I attached hereto.

(tt)   "Governmental Authority" means any court, tribunal, arbitrator, body, agency, division, board, bureau, commission or any other similar entity exercising executive, legislative, judicial, regulatory, or administrative functions of government, or any subdivision of any of the foregoing, whether federal, state, county, municipal, tribal, local or foreign, in each case with competent jurisdiction.

(uu)   "Hazardous Substances" means any pollutant, contaminant, dangerous or toxic substance, hazardous or extremely hazardous substance or chemical, or otherwise hazardous material or waste defined as "hazardous waste", "hazardous substance" or "hazardous material" under applicable Environmental Laws, including chemicals, pollutants, contaminants, wastes, or toxic substances that are classified as hazardous, toxic, radioactive, or otherwise are regulated by, or form the basis for Environmental Liability under, any applicable Environmental Law, including hazardous substances under CERCLA.

(vv)   "Hydrocarbons" means oil and gas and other hydrocarbons produced or processed in association therewith (regardless of whether such item is in liquid or gaseous form), or any combination thereof, and any minerals (whether in liquid or gaseous form) produced in association therewith, including all crude oil, gas, casinghead gas, condensate, natural gas liquids, and other gaseous or liquid hydrocarbons (including ethane, propane, iso-butane, nor-butane, gasoline, and scrubber liquids) of any type and chemical composition.

(ww)   "Imbalance" means any over-production, under-production, over-delivery, under-delivery, or similar imbalance of Hydrocarbons produced from or allocated to the FWE III Assets or the FWE IV Assets, as applicable, regardless of whether such over-production, under-production, over-delivery, under-delivery, or similar imbalance arises at the wellhead, pipeline, gathering system, transportation system, processing plant, or other location, including any

9

imbalances under gas balancing or similar agreements, imbalances under processing agreements, and imbalances under gathering or transportation agreements.

(xx)   "JIB Advance AR" has the meaning ascribed to such term in clause (xiii) in Part A of Schedule I attached hereto.

(yy)   "Laws" means all laws (including common law), statutes, rules, regulations, ordinances, orders, decrees, requirements, judgments, and codes of Governmental Authorities.

(zz)   "Merger" has the meaning ascribed to such term in the recitals hereto.

(aaa)   "Obligation" means any individual debt, liability or obligation, damages, losses, and claims (whether direct or indirect, absolute or contingent, accrued or unaccrued, liquidated or unliquidated, or due or to become due) and including all costs and expenses relating thereto in any of the FWE III Obligations or the FWE IV Obligations; "Obligations" means, collectively, the FWE III Obligations and the FWE IV Obligations.

(bbb)   "P&A Obligations" means any and all obligations, liabilities, damages, losses, and claims arising out of or attributable to the payment or performance of all Plugging and Abandonment.

(ccc)   "Person" means any individual, corporation, partnership, limited liability company, association, joint stock company, trust, estate, joint venture, firm, association, unincorporated organization, Governmental Authority, or any other entity.

(ddd)   "Plan Effective Date" means the date on which the Plan of Reorganization becomes effective.

(eee)   "Plan of Merger" has the meaning ascribed to such term in the recitals hereto.

(fff)   "Plan of Reorganization" has the meaning ascribed to such term in the recitals hereto.

(ggg)   "Plugging and Abandonment" and "Plugged and Abandoned" and its derivatives mean all plugging, replugging, abandonment, re-plugging and re-abandonment, equipment removal, disposal, or restoration associated with the properties and assets included in or burdened by the FWE III Assets or the FWE IV Assets, as applicable, including all plugging and abandonment, removal, dismantling, decommissioning, surface and subsurface restoration, site clearance, and disposal of the FWE IV Wells or the FWE IV Facilities, well cellars, fixtures, platforms, caissons, flowlines, pipelines, structures, and personal property of whatever kind located on or under, related to, or associated with operations and activities conducted by whomever with respect to each of the FWE III Assets and the FWE IV Assets, as applicable, the flushing, pickling, burial, removal, and capping of all associated flowlines, field transmission and gathering lines, pit closures, the restoration of the surface, site clearance, any disposal of related waste materials and Hazardous Substances and obligations to obtain plugging exceptions for any of the FWE IV Wells with a current plugging exception, all in accordance with 30 CFR 250 Subpart Q

10

and all other applicable Laws, the terms and conditions of each of the FWE IV Leases or similar leasehold interests, beneficial interests, easements and the FWE IV Leases.

(hhh)   "Prepaid JIB Cash Amount" has the meaning ascribed to such term in clause (xiii) in Part A of Schedule I attached hereto.

(iii)   "Records" means all books, records, files, data, information, drawings, maps, corporate, financial, tax, and legal data and records to the extent (and only to the extent) related to the FWE III Assets, the FWE III Obligations, the FWE IV Assets, and/or the FWE IV Obligations, as applicable, including electronic copies of all computer records where available, Contract files (including lease files), well logs, division order files, title opinions and other title information (including abstracts, evidences of rental payments, maps, surveys, and data sheets), hazard data and surveys, production records, SEMS Documentation and Procedures, engineering files, and environmental records.

(jjj)   "Release" means any discharge, emission, spilling, leaking, emptying, escaping, pumping, pouring, injecting, dumping, burying, leaching, migrating, abandoning, or disposing into or through the environment of any Hazardous Substance, including the abandonment or discarding of barrels, containers, and other closed receptacles containing any Hazardous Substance.

(kkk)   "Royalties" means all rentals, minimum royalties, shut in payments, royalties, overriding royalties, reversionary interests, net profits interests, production payments, carried interests, non-participating royalty interests, reversionary interests, and other royalty burdens and other interests payable out of production of Hydrocarbons from or allocated to the FWE IV Assets, or the proceeds thereof to third parties.

(lll)   "SEMS Documentation and Procedures" means all documents and procedures in place as of the Effective Date by FWE III to comply with BSEE's Safety and Environmental Management System (SEMS) 30 CFR 250 Subpart S with respect to the FWE III Assets and/or the FWE IV Assets.

(mmm) "Suspense Funds" means any and all funds held in suspense by FWE III at the Effective Time, and any interest accrued in escrow accounts for such suspended funds.

(nnn)   "TBOC" has the meaning ascribed to such term in the recitals hereto.

8.   Choice of Law.  This Plan of Merger shall be governed by, construed and interpreted in accordance with the Laws of the State of Texas, without giving effect to any choice or conflict of law provision or rule (whether of the State of Texas or any other jurisdiction) that would cause the application of the Laws of any jurisdiction other than the State of Texas and without regard to any borrowing statute that would result in the application of the statutes of limitations or repose of any other jurisdiction.  In furtherance of the foregoing, the Laws of the State of Texas will control even if under such jurisdiction's choice of law or conflict of law analysis, the substantive or procedural law of some other jurisdiction would ordinarily or necessarily apply.

11

9.      FWE III Obligation to Pay Recording Expenses. FWE III shall, and shall cause its debtor affiliates in the Chapter 11 Cases to, on the Plan Effective Date, provide for the payment of any and all documentary, filing, recording, stamp, and registration fees, costs, taxes, and expenses (including all reasonable and documented attorneys' fees and regulatory consultant fees) incurred or imposed after the Effective Time in connection with the filing of record by or on behalf of FWE IV of any instrument or instruments with the appropriate records office of any county, parish, state, federal, or other governmental unit (including BOEM) that may be required in connection with the implementation of the Merger or that either FWE IV determines in its respective sole discretion to be necessary or appropriate to reflect in the appropriate records of any governmental unit that as a result of the Merger (a) ownership of the FWE IV Assets have been allocated to and are vested in FWE IV, and (b) the liabilities and obligations to be allocated to and vested in, respectively, FWE III or FWE IV pursuant to the Merger have been allocated to and vested in, and constitute liabilities and obligations of, FWE III and FWE IV, respectively.

10.     Interpretation.  The captions herein are included for convenience of reference only and shall be ignored in the construction or interpretation hereof.  As used herein, the words "include," "includes," and "including" shall be deemed to be followed by the words "without limitation" and will not be construed to limit any general statement that it follows to the specific or similar items or matters immediately following it.  Words such as "herein," "hereinafter," "hereof," and "hereunder" refer to this Plan of Merger as a whole and not merely to a subdivision in which such words appear unless the context otherwise requires.  All Exhibits and Schedules annexed hereto or referred to in this Plan of Merger are hereby incorporated in and made a part of this Plan of Merger as if set forth in full in this Plan of Merger, and definitions therein shall apply herein.  Any capitalized terms used in any Schedule or Exhibit but not otherwise defined therein will be defined as set forth in this Plan of Merger, and vice-versa.  A reference to any legislation or to any provision of any legislation shall include any modification or re-enactment thereof, any legislative provision substituted therefor, and all regulations and statutory instruments issued thereunder or pursuant thereto.

11.     Rejected Contracts.  Any Contract rejected pursuant to Section 365 of the Bankruptcy Code in the Chapter 11 Cases shall be deemed to be excluded and removed from any Exhibit or Schedule attached hereto, and any such Contract shall not be allocated to any of FWE III or FWE IV, and any liabilities or obligations of such Contract shall be treated in accordance with the Plan of Reorganization and Confirmation Order or otherwise satisfied, compromised, settled, released, or discharged pursuant to the Plan of Reorganization and Confirmation Order.

12.     Certain Amendments.  This Agreement may not be amended in a manner that is materially adverse to FWE IV except with the prior written of CUSA.  CUSA is an express third party beneficiary of this Plan of Merger.

13.     Electronic Signatures.  A manual signature on this Plan of Merger or other documents to be delivered pursuant to this Plan of Merger, an image of which shall have been transmitted electronically, will constitute an original signature for all purposes. The delivery of copies of this Plan of Merger or other documents to be delivered pursuant to this Plan of Merger, including executed signature pages where required, by electronic transmission will constitute effective delivery of this Plan of Merger or such other document for all purposes and shall have the same effect as if FWE III had executed and delivered an original of this Plan of Merger or such

12

other document.  Minor variations in the form of the signature page, including footers from earlier versions of this Plan of Merger or any such other document, shall be disregarded in determining FWE III's intent or the effectiveness of such signature.

\* \* \* \* \* \*

13

IN WITNESS WHEREOF, the undersigned has duly executed this Plan of Merger as of the date first written above.

**FIELDWOOD ENERGY III LLC**,
a Texas limited liability company


By: _____
Name:
Title:

Signature Page to Agreement and Plan of Merger

**Schedule I**

**FWE IV Assets and FWE IV Obligations[1]**

Part A:

"FWE IV Assets" means all of FWE III's right, title, and interest in, to, or under the following:

(i)        all ownership or other interests of FWE III of any kind or nature in the oil, gas, other Hydrocarbon and mineral leases, subleases, operating rights, record title interests, carried interests, royalties, overriding royalty interests, net profits interests, production payments, reversionary interests and other rights or interests of any kind or character in or to Hydrocarbons in place described on Exhibit I-A(i) and Exhibit I-A(ii) attached hereto (including following their termination or expiration), but, in the case of Exhibit I-A(i), only to the extent such ownership interests were Conveyed to FWE or its affiliates pursuant to the Chevron PSAs, and mineral interests or servitudes of every nature, in, on, under, and that may be produced from or attributable to any of the lands covered by such leases, subleases, interests and rights, whether legal or equitable, vested or contingent, and regardless of whether the same are expired or terminated (provided that, with respect to any US OCS oil and gas leases or other assets that are expired or terminated as of the Effective Time, it is acknowledged that (i) such oil and gas leases may not be assignable to the extent they no longer exist, but are being allocated hereby) and (ii) the intent of this definition is to include all interests, rights and obligations held by FWE (including for purposes of the definition of FWE Obligations) with respect to such oil and gas leases as of the Effective Time, if any, but, in the case relating to the interests listed on Exhibit I-A(i), only to the extent such ownership or other interests were Conveyed to FWE or its affiliates pursuant to the Chevron PSAs) (collectively, the "FWE IV Leases"), together with all pooled, communitized, or unitized acreage that includes all or part of any of the FWE IV Leases (the "FWE IV Units"), and all tenements, hereditaments, and appurtenances belonging to the FWE IV Leases and the FWE IV Units (collectively with the FWE IV Leases and FWE IV Units, the "FWE IV Lands"); for the avoidance of doubt, with respect to the FWE IV Leases described on Exhibit I-A(i), the FWE IV Lands comprising a part of the FWE IV Assets shall only include the ownership interests therein Conveyed to FWE or its affiliates pursuant to the Chevron PSAs, and the descriptions in Exhibit I-A(i) shall only reference such ownership interests;

(ii)       all ownership interests of FWE III in the Hydrocarbon, water, CO2, injection, disposal wells or other wells described on Exhibit I-B(i) and Exhibit I-B(ii) attached hereto, but, in the case of Exhibit I-B(i), only to the extent such ownership interests were Conveyed to FWE or its affiliates pursuant to the Chevron PSAs (the "FWE IV Wells" and, together with the FWE IV Leases and the FWE IV Units, the "FWE IV Oil and Gas Properties"); for the avoidance of doubt, (x) in the case of Exhibit I-B(i), the FWE IV Wells comprising a part of the FWE IV Assets shall only include the ownership interests therein Conveyed to FWE or its affiliates pursuant to the Chevron PSAs, and the descriptions in Exhibit I-B(i) shall only reference such ownership interests and (y) rights conveyed to FWE IV pursuant to clause (i) and this clause (ii) include all

---

[1] Note to Draft: Certain interests to be allocated to FWE IV are held by subsidiaries of Fieldwood Energy LLC. TBD how such interests will be moved to Fieldwood Energy LLC prior to this merger (or otherwise will ultimately be transferred to FWE IV).

rights of FWE III to operate or as to operatorship of the FWE IV Oil and Gas Properties to the extent such rights were Conveyed to FWE or its affiliates pursuant to the Chevron PSAs or otherwise derived from rights and interests Conveyed to FWE or its affiliates pursuant thereto;

(iii)    all platforms identified on Exhibit I-C(i) attached hereto and all facilities identified on Exhibit I-C(ii) attached hereto, including all associated processing systems, buildings, compressors, meters, tanks, machinery, tools, personal property, equipment (including spars, trees, PLETs, jumpers, flowlines, risers, umbilicals, control assemblies, and production handling equipment), pipelines, gathering lines, water lines, tank batteries, pipeline capacity, other water gathering, transportation, or disposal infrastructure and equipment, frac tanks, ponds, metering facilities, interconnections, and other inventory, boats, vehicles, fixtures, improvements, and other property (whether real, immovable, personal, movable, mixed or otherwise), which were acquired by FWE or its affiliates pursuant to the Chevron PSAs, but in such event only as to the interests (A) so acquired by FWE or its affiliates under and pursuant to such Chevron PSAs or (B) relating to the interests described on Exhibit I-A(ii) and Exhibit I-B(ii) (the "FWE IV Facilities");

(iv)    all surface fee interests, easements, right-of-use easements, licenses, servitudes, rights-of-way, surface leases, authorizations, permits,  and other rights to use the surface or seabed described on Exhibit I-D(i) attached hereto and Exhibit I-D(ii) attached hereto, but only to the extent such were acquired by FWE or its affiliates pursuant to the Chevron PSAs, and only as to the interests (A) so acquired by FWE or its affiliates under and pursuant to such Chevron PSAs or (B) relating to the interests described on Exhibit I-A(ii) and Exhibit I-B(ii) (the "FWE IV Rights of Way");

(v)    all environmental and other governmental (whether federal, state, or local) permits (including all plans filed with or approved by applicable Governmental Authorities), licenses, orders, authorizations, franchises, and related instruments or rights described on Exhibit I-E attached hereto (the "FWE IV Permits");

(vi)    all Hydrocarbons in, on, under, or that may be produced from or attributable to the FWE IV Leases, the FWE IV Units, or the FWE IV Wells, including all oil, condensate, and scrubber liquids inventories and ethane, propane, iso-butane, nor-butane, and gasoline inventories of FWE III from the FWE IV Oil and Gas Properties in storage or constituting linefill and Imbalances;

(vii)    the FCC licenses associated with the call signs listed on Exhibit I-F attached hereto;

(viii)    all (A) joint operating agreements or unit operating agreements and (B) all other Contracts listed on Exhibit I-G, in each case, to the extent relating to the ownership or operation of any or all of the FWE IV Oil and Gas Properties (the "FWE IV Contracts");

(ix)    originals of the Records that relate exclusively to any one or more of the FWE IV Assets or the FWE IV Obligations, or both, and copies of the Records that constitute FWE I Assets (as defined in the FWE I Plan of Merger) or FWE III Assets and also relate to either or both of the FWE IV Assets or the FWE IV Obligations;

Debtors' Exhibit No. 34
Page 65 of 910

(x)     inventory, equipment, machinery, tools, and other personal property, to the extent located on the FWE IV Facilities or, if located elsewhere, used or held for use exclusively in connection with the FWE IV Oil and Gas Properties, or the FWE IV Facilities, or charged to the joint account pursuant to the applicable FWE IV Contracts;

(xi)     FWE III-owned SCADA equipment and all automation systems, including meters and related telemetry, licensed radio frequencies, and associated communications infrastructure including towers, antennas, data links, and network circuits used or held for use exclusively in connection with the FWE IV Oil and Gas Properties or the FWE IV Facilities, or for the production of Hydrocarbons therefrom;

(xii)     all deposits with third parties, escrow accounts, guarantees, letters of credit, treasury securities, insurance policies, Oil Spill Financial Responsibility coverage (whether consisting of one or more insurance policies) and other forms of credit assurances or credit support provided by a third party for financial assurance for the obligations and liabilities arising out of or related to the FWE IV Assets, including the P&A Obligations arising out of or related to the FWE IV Assets, in each case only to the extent described on **Exhibit I-H**;

(xiii)     all (i) accounts receivable attributable to the FWE IV Oil and Gas Properties as of the Effective Time, if any, other than the Closing Accounts Receivable (ii) rights to insurance proceeds or other claims of recovery, indemnity, contribution, or reimbursement for any casualty occurring on or at any FWE IV Asset, whether occurring prior to, on or after the Effective Time, (iii) instruments and general intangibles (as such terms are defined in the Uniform Commercial Code of the applicable jurisdictions in which the FWE IV Oil and Gas Properties to which such assets relate are located) and other economic benefits in each case attributable to the FWE IV Oil and Gas Properties (excluding only the Closing Accounts Receivable); *provided*, that, for the avoidance of doubt, nothing in the preceding clauses (i) or (ii) shall be interpreted to limit the scope of "Closing Accounts Receivable" as that term is defined in the Credit Bid Purchase Agreement, (iv) claims of indemnity, contribution, or reimbursement relating to the FWE IV Obligations, (v) Imbalances receivables of FWE III attributable to the FWE IV Oil and Gas Properties, (vi) cash in the amount of advance payments on account of third party working interest owners in the FWE IV Oil and Gas Properties ("Prepaid JIB Cash Amount"), to the extent such Prepaid JIB Cash Amount is associated with FWE IV Obligations, and (vii) rights to receive and collect cash and advance payments pursuant to cash calls associated with the FWE IV Oil and Gas Properties ("JIB Advance AR"), to the extent such JIB Advance AR is associated with FWE IV Obligations;

(xiv)     all Suspense Funds to the extent attributable to any of the FWE IV Oil and Gas Properties (collectively, "FWE IV Suspense Funds");

(xv)     unless rejected by the Debtors in the Chapter 11 Cases, the Chevron PSAs and the other transaction documents entered into in connection with the consummation of the transactions contemplated thereby, in each case to the extent related to the FWE IV Assets;

(xvi)     all rights to all area-wide operator bonds described on Exhibit I-I attached hereto (the "FWE IV Bonds");

(xvii) cash in an amount (the "<u>FWE IV Cash Amount</u>") equal to $19,469,669.00; and

(xviii) all rights of FWE III under Section 6 of the FWE I Plan of Merger to the extent related to the FWE IV Assets.

<u>Part B:</u>

"<u>FWE IV Obligations</u>" means (A) all of the obligations and liabilities (contractual or otherwise) of FWE III as of the Effective Time (which shall include such obligations and liabilities of FWE as of immediately prior to the effective time of the First Merger which were vested in and became Obligations of FWE III as of the effective time of the First Merger), without duplication, of any kind, character, or description (whether known or unknown, accrued, absolute, contingent, or otherwise, including claims thereunder) relating to, arising out of, or with respect to any of the FWE IV Assets, including obligations and liabilities of FWE immediately before the First Merger, and of FWE III as of the Effective Time:  (i) relating to the furnishing of makeup gas according to the terms of applicable gas sales, gathering, or transportation FWE IV Contracts and all liabilities and obligations with respect to Imbalances arising out of, related to, or attributable to FWE IV's ownership interests in any of the FWE IV Oil and Gas Properties; (ii) with respect to Royalties arising out of, related to, or attributable to any of the FWE IV Oil and Gas Properties, FWE IV Suspense Funds, and Prepaid JIB Cash Amounts, including any reporting and/or mis-reporting, and payment and/or mis-payment of such Royalties, FWE IV Suspense Funds, or Prepaid JIB Cash Amounts; (iii) constituting or related to Environmental Liabilities arising out of, related to, or attributable to any of the FWE IV Assets; (iv) applicable to or imposed on the lessee, owner, operator, holder, responsible party, payor or designated applicant under or with respect to any of the FWE IV Assets; (v) constituting or relating to any and all P&A Obligations related to FWE IV's ownership interests in, or operation of, any of the FWE IV Assets; (vi) relating to the FWE IV Suspense Funds; (vii) relating to the Chevron PSAs (unless rejected by the Debtors in the Chapter 11 Cases) or any of the other agreements entered into in connection with the consummation of the transactions contemplated thereby, in each case to the extent related to the FWE IV Assets; and (viii) expenses incurred by FWE or FWE III for Plugging and Abandonment costs and expenses on the FWE IV Assets between the filing on August 3, 2020, of the Chapter 11 Cases and the Effective Time to the extent not paid as of the Effective Time; and (B) the Obligations of FWE IV under Section 3(b)(i) of the Plan of Merger and the Obligations of FWE III under Section 6 of the FWE I Plan of Merger to the extent related to the FWE IV Assets; provided, however, that, subject to the foregoing <u>clause (B)</u>, the FWE IV Obligations do not include any claims, liabilities, or obligations satisfied, compromised, settled, released, or discharged pursuant to the Plan of Reorganization and Confirmation Order, and, for the avoidance of doubt, no other claims, obligations or liabilities of any kind.

Debtors' Exhibit No. 34
Page 67 of 910

## Schedule of Exhibits

| | |
|---|---|
| Exhibit A: | Certificate of Merger |
| Exhibit B-A: | Certificate of Formation – FWE IV |
| Exhibit B-B | FWE IV LLC Agreement |
| Exhibit I-A(i): | FWE IV Leases |
| Exhibit I-A(ii): | Certain Other FWE IV Leases |
| Exhibit I-B(i): | FWE IV Wells |
| Exhibit I-B(ii): | Certain Other FWE IV Wells |
| Exhibit I-C(i): | FWE IV Platforms |
| Exhibit I-C(ii): | FWE IV Facilities |
| Exhibit I-D(i): | FWE IV Rights of Way |
| Exhibit I-D(ii): | FWE IV RUEs |
| Exhibit I-E: | FWE IV Permits |
| Exhibit I-F: | FWE IV FCC Licenses |
| Exhibit I-G | FWE IV Contracts |
| Exhibit I-H | FWE IV Financial Assurances |
| Exhibit I-I: | FWE IV Bonds |

[End of Schedule of Exhibits]

## **Exhibit A**

**Certificate of Merger**

[see attached]

**CERTIFICATE OF MERGER**
**(DOMESTIC ENTITY DIVISIONAL MERGER)**
**OF**
**FIELDWOOD ENERGY III LLC**

**[●], 2021**

Pursuant to Title 1, Chapter 10 and Title 3 of the Texas Business Organizations Code (the "TBOC"), the undersigned, Fieldwood Energy III LLC, a Texas limited liability company ("FWE III"), submits this certificate of merger for the purpose of dividing itself into a surviving domestic entity and one new domestic entity, and hereby certifies the following:

FIRST:  The name of the domestic filing entity that is dividing itself is Fieldwood Energy III LLC.

SECOND:  The principal place of business of FWE III is 2000 W Sam Houston Pkwy S #1200, Houston, TX 77042.

THIRD:  The filing number issued to FWE III by the Secretary of State of the State of Texas is [●][1].

FOURTH:  FWE III is organized as a limited liability company.

FIFTH: FWE III shall survive the merger and shall maintain its separate existence and continue as a filing entity under its name as of immediately prior to the merger.

SIXTH:  In lieu of providing the plan of merger, the filing entity certifies that:

(i)  An executed copy of the Agreement and Plan of Merger, dated as of [●], 2021 (the "Plan of Merger"), of FWE III is on file at the principal place of business of each surviving and new domestic entity provided in this form.

(ii)  On written request, a copy of the Plan of Merger will be furnished without cost by each surviving or new domestic entity to any member of any domestic entity that is a party to or created by the Plan of Merger, and any creditor or obligee of the parties to the merger at the time of the merger if a liability or obligation is then outstanding.

SEVENTH:  No amendments to the certificate of formation of FWE III are being effected by the merger.

EIGHTH:  The name, jurisdiction of organization, principal place of business address, and entity description of the entity to be created pursuant to the plan of merger are set forth below. The

---

[1] **Note to Draft**:  To be assigned upon conversion of FWE to a Texas LLC.

certificate of formation of the new domestic filing entity to be created is being filed with this certificate of merger.

    <u>Name</u>:  Fieldwood Energy IV LLC

    <u>Entity Description</u>:  limited liability company

    <u>Jurisdiction of Organization</u>:  Texas

    <u>Principal place of business</u>: 200 W. Sam Houston Pkwy S. Suite 1200.

    NINTH:  The Plan of Merger has been approved as required by the laws of the jurisdiction of formation and by the governing documents of the filing entity.

    TENTH:  This document becomes effective when the document is accepted and filed by the Secretary of State of the State of Texas.

    ELEVENTH:  In lieu of providing the tax certificate, FWE III shall continue to be liable for the payment of all required franchise taxes of FWE III.

<div align="center">*  *  *  *  *  *</div>

Debtors' Exhibit No. 34
Page 71 of 910

IN WITNESS WHEREOF, the undersigned has caused this certificate of merger to be duly executed as of the date first set forth above.

**FIELDWOOD ENERGY III LLC**
a Texas limited liability company

By: _____

Name: _____

Title: _____

## Exhibit B-A

### Certificate of Formation – FWE IV

[see attached]

**Form 205**
**(Revised 05/11)**

Submit in duplicate to:
Secretary of State
P.O. Box 13697
Austin, TX 78711-3697
512 463-5555
FAX: 512 463-5709
**Filing Fee:  $300**

This space reserved for office use.

**Certificate of Formation**
**Limited Liability Company**

## Article 1 – Entity Name and Type

The filing entity being formed is a limited liability company.  The name of the entity is:

FIELDWOOD ENERGY IV LLC

The name must contain the words "limited liability company," "limited company," or an abbreviation of one of these phrases.

## Article 2 – Registered Agent and Registered Office
(See instructions. Select and complete either A or B and complete C.)

☒  A.  The initial registered agent is an organization (cannot be entity named above) by the name of:

CAPITOL CORPORATE SERVICES, INC.

**OR**
☐  B.  The initial registered agent is an individual resident of the state whose name is set forth below:

| First Name | M.I. | Last Name | Suffix |
|---|---|---|---|

C.  The business address of the registered agent and the registered office address is:

| 206 E. 9TH STREET, SUITE 1300 | AUSTIN | TX | 78701 |
|---|---|---|---|
| Street Address | City | State | Zip Code |

## Article 3—Governing Authority
(Select and complete either A or B and provide the name and address of each governing person.)

☒  A.  The limited liability company will have managers. The name and address of each initial manager are set forth below.

☐  B.  The limited liability company will not have managers.  The company will be governed by its members, and the name and address of each initial member are set forth below.

| **GOVERNING PERSON 1** |
|---|
| **NAME** (Enter the name of either an individual or an organization, but not both.) |
| **IF INDIVIDUAL** |

| First Name | M.I. | Last Name | Suffix |
|---|---|---|---|

**OR**
**IF ORGANIZATION**

Sunset Energy Gulf Coast Asset Management LLC
*Organization Name*

**ADDRESS**

| 1727 Sunset Boulevard | Houston | TX | USA | 77005 |
|---|---|---|---|---|
| Street or Mailing Address | City | State | Country | Zip Code |

Form 205                                        4

**GOVERNING PERSON 2**

**NAME** (Enter the name of either an individual or an organization, but not both.)
  **IF INDIVIDUAL**

| *First Name* | *M.I.* | *Last Name* | *Suffix* |

  **OR**
  **IF ORGANIZATION**

  *Organization Name*

**ADDRESS**

| *Street or Mailing Address* | *City* | *State* | *Country* | *Zip Code* |

---

**GOVERNING PERSON 3**

**NAME** (Enter the name of either an individual or an organization, but not both.)
  **IF INDIVIDUAL**

| *First Name* | *M.I.* | *Last Name* | *Suffix* |

  **OR**
  **IF ORGANIZATION**

  *Organization Name*

**ADDRESS**

| *Street or Mailing Address* | *City* | *State* | *Country* | *Zip Code* |

### Article 4 – Purpose

The purpose for which the company is formed is for the transaction of any and all lawful purposes for which a limited liability company may be organized under the Texas Business Organizations Code.

### Supplemental Provisions/Information

Text Area: [The attached addendum, if any, is incorporated herein by reference.]

The entity is formed pursuant to a plan of merger. The name of the merging filing entity is Fieldwood Energy III LLC; the surviving domestic entity is Fieldwood Energy III LLC and the new domestic entity created by the divisive merger is this Fieldwood Energy IV LLC.

The address of the merging filing entity is 2000 W. Sam Houston Pkwy. S., Suite 1200, Houston, Texas 77042.

The merging filing entity was previously a Delaware limited liability company, originally formed on 11/5/2012 under the laws of the State of Delaware, USA. The merging filing entity converted to a Texas limited liability company on [__]/[__]/2021.

Form 205

5

TX060BOC - 11/27/2013 Wolters Kluwer Online

## Organizer

The name and address of the organizer:

_____
*Name*

_____
*Street or Mailing Address*                              *City*                          *State*    *Zip Code*

## Effectiveness of Filing (Select either A, B, or C.)

A. ☒ This document becomes effective when the document is filed by the secretary of state.

B. ☐ This document becomes effective at a later date, which is not more than ninety (90) days from the date of signing.  The delayed effective date is: _____

C. ☐ This document takes effect upon the occurrence of the future event or fact, other than the passage of time.  The 90th day after the date of signing is: _____

The following event or fact will cause the document to take effect in the manner described below:

```
┌──────────────────────────────────────────────────────────────────────┐
│                                                                      │
│                                                                      │
│                                                                      │
└──────────────────────────────────────────────────────────────────────┘
```

## Execution

The undersigned affirms that the person designated as registered agent has consented to the appointment.  The undersigned signs this document subject to the penalties imposed by law for the submission of a materially false or fraudulent instrument and certifies under penalty of perjury that the undersigned is authorized to execute the filing instrument.

Date: _____

_____
Signature of organizer

_____
Printed or typed name of organizer

| Print | Reset |

Form 205

6

## Exhibit B-B

**FWE IV LLC Agreement**

[see attached]

**LIMITED LIABILITY COMPANY AGREEMENT**

**OF**

**FIELDWOOD ENERGY IV LLC**

*(a Texas Limited Liability Company)*

**[●], 2021**

**THE MEMBERSHIP INTERESTS REFERENCED IN THIS LIMITED LIABILITY COMPANY AGREEMENT HAVE BEEN ACQUIRED FOR INVESTMENT AND HAVE NOT BEEN REGISTERED UNDER THE U.S. SECURITIES ACT OF 1933, AS AMENDED, OR UNDER ANY APPLICABLE STATE SECURITIES LAWS.  SUCH MEMBERSHIP INTERESTS MAY NOT BE SOLD, ASSIGNED, PLEDGED, HYPOTHECATED OR OTHERWISE DISPOSED OF AT ANY TIME WITHOUT EFFECTIVE REGISTRATION UNDER SUCH ACT AND LAWS OR EXEMPTION THEREFROM, AS WELL AS COMPLIANCE WITH THE OTHER SUBSTANTIAL RESTRICTIONS ON TRANSFERABILITY THAT ARE SET FORTH HEREIN.**

## TABLE OF CONTENTS

**ARTICLE I DEFINITIONS** ..................................................................................................**1**

    **Section 1.01**    **Definitions** ...............................................................1

    **Section 1.02.**    **Interpretation**. ..........................................................12

**ARTICLE II ORGANIZATION** .........................................................................................**13**

    **Section 2.01**    **Formation**. ...............................................................13

    **Section 2.02**    **Name** ......................................................................13

    **Section 2.03**    **Principal Office** .......................................................13

    **Section 2.04**    **Registered Office; Registered Agent.** ......................13

    **Section 2.05**    **Purposes; Powers**. ...................................................14

    **Section 2.06**    **Term** ......................................................................14

**ARTICLE III CAPITAL CONTRIBUTIONS; CAPITAL ACCOUNTS** ..............................**14**

    **Section 3.01**    **Tax Partnership Provisions** ....................................14

    **Section 3.02**    **Initial Capital Contributions** ..................................14

    **Section 3.03**    **Additional Capital Contributions** ...........................14

    **Section 3.04**    **Maintenance of Capital Accounts** ...........................14

    **Section 3.05**    **Succession Upon Transfer** ......................................15

    **Section 3.06**    **Negative Capital Accounts** .....................................15

    **Section 3.07**    **No Withdrawals from Capital Accounts** ...................15

    **Section 3.08**    **Treatment of Loans from Members** .........................15

    **Section 3.09**    **Modifications** .........................................................16

**ARTICLE IV MEMBERS** ..................................................................................................**16**

    **Section 4.01**    **No Personal Liability** .............................................16

    **Section 4.02**    **No Withdrawal** .......................................................16

    **Section 4.03**    **No Interest in Company Property** ............................16

    **Section 4.04**    **Certification of Membership Interests** .....................16

    **Section 4.05**    **Meetings of Members**. ............................................17

    **Section 4.06**    **Action Without Meeting**. ........................................18

    **Section 4.07**    **Power of Members** .................................................18

    **Section 4.08**    **Similar or Competitive Activities; Business Opportunities** ...............18

**ARTICLE V ALLOCATIONS** ............................................................................................**19**

    **Section 5.01**    **Tax Partnership Provisions** ....................................19

    **Section 5.02**    **Allocation of Net Income and Net Loss** ...................19

    **Section 5.03**    **Regulatory and Special Allocations** .........................19

i

Section 5.04    **Tax Allocations**..........................................................................20
Section 5.05    **Allocations in Respect of Transferred Membership Interests**............22

**ARTICLE VI DISTRIBUTIONS** ...............................................................**22**

Section 6.01    **General**......................................................................................22
Section 6.02    **Tax Advances**............................................................................23
Section 6.03    **Tax Withholding; Withholding Advances**...................................23
Section 6.04    **Distributions in Kind**.................................................................24

**ARTICLE VII MANAGEMENT** .................................................................**25**

Section 7.01    **Management of the Company** .....................................................25
Section 7.02    **Sole Manager**............................................................................25
Section 7.03    **Material Project Contracts; Net Profit Interest** .........................25
Section 7.04    **Actions Requiring CUSA Consent** ............................................26
Section 7.05    **No Compensation of the Sole Manager** ......................................27
Section 7.06    **No Personal Liability** ................................................................27

**ARTICLE VIII TRANSFER** ......................................................................**28**

Section 8.01    **General Restrictions on Transfer**..............................................28

**ARTICLE IX EXCULPATION AND INDEMNIFICATION** ..............................**29**

Section 9.01    **Exculpation of Covered Persons**................................................29
Section 9.02    **Liabilities and Duties of Covered Persons**..................................30
Section 9.03    **Indemnification**.........................................................................30
Section 9.04    **Survival**....................................................................................32

**ARTICLE X ACCOUNTING; TAX MATTERS** ............................................**33**

Section 10.01   **Financial Statements and Other Information** .............................33
Section 10.02   **Inspection Rights**......................................................................33
Section 10.03   **Income Tax Status** ....................................................................34
Section 10.04   **Tax Matters Representative**......................................................34
Section 10.05   **Tax Returns**.............................................................................35
Section 10.06   **Company Funds** ........................................................................36

**ARTICLE XI WINDING UP AND TERMINATION** ......................................**36**

Section 11.01   **Events Requiring Winding Up** ...................................................36
Section 11.02   **Effectiveness of Termination** ....................................................36
Section 11.03   **Liquidation**...............................................................................37

ii

**Section 11.04**   **Certificate of Termination** .................................................38
**Section 11.05**   **Survival of Rights, Duties, and Obligations** .........................38
**Section 11.06**   **Recourse for Claims** ...........................................................38

**ARTICLE XII MISCELLANEOUS** ...............................................................**38**
**Section 12.01**   **Expenses** ..............................................................................38
**Section 12.02**   **Further Assurances** ..............................................................38
**Section 12.03**   **Confidentiality** .....................................................................39
**Section 12.04**   **Notices** ..................................................................................40
**Section 12.05**   **Headings** ...............................................................................41
**Section 12.06**   **Severability** ..........................................................................41
**Section 12.07**   **Entire Agreement** .................................................................41
**Section 12.08**   **Successors and Assigns** ........................................................41
**Section 12.09**   **No Third-Party Beneficiaries** ...............................................41
**Section 12.10**   **Amendment** ...........................................................................42
**Section 12.11**   **Waiver** ...................................................................................42
**Section 12.12**   **Governing Law** .....................................................................42
**Section 12.13**   **Submission to Jurisdiction** ...................................................42
**Section 12.14**   **Waiver of Jury Trial** ............................................................42
**Section 12.15**   **Equitable Remedies** ..............................................................43
**Section 12.16**   **Attorney's Fees** ....................................................................43
**Section 12.17**   **Remedies Cumulative** ...........................................................43
**Section 12.18**   **Counterparts** .........................................................................43

**SCHEDULE A MEMBERS SCHEDULE**                                          A-1

iii

## LIMITED LIABILITY COMPANY AGREEMENT OF
## FIELDWOOD ENERGY IV LLC

This Limited Liability Company Agreement of Fieldwood Energy IV LLC, a Texas limited liability company (the "**Company**"), dated as of [●], 2021 (this "**Agreement**"), is entered into by and among the Company, the Initial Member executing this Agreement as of the date hereof, and each other Person who after the date hereof becomes a Member of the Company and becomes a party to this Agreement by executing a joinder agreement in form and substance acceptable to the Company.

### RECITALS

**WHEREAS,** the Company was formed under the laws of the State of Texas by the filing of a Certificate of Formation with the Secretary of State of the State of Texas on [●], 2021 (the "**Certificate of Formation**") for the purposes set forth in Section 2.05 of this Agreement;

**WHEREAS,** pursuant to and in accordance with the Confirmation Order and the Term Sheet, respectively, and as a result of a divisive merger pursuant to § 10.008 of the BOC, the Company owns the FWE IV Assets, subject to the operational liabilities in connection therewith allocated to the Company in the merger, including the FWE IV Obligations; and

**WHEREAS,** the Initial Member wishes to enter into this Agreement to set forth the terms and conditions governing the ownership, operation and management of the Company.

**NOW, THEREFORE,** in consideration of the mutual covenants and agreements hereinafter set forth and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto agree as follows:

### ARTICLE I
### DEFINITIONS

**Section 1.01   Definitions.**  Capitalized terms used herein and not otherwise defined shall have the meanings set forth in this Section 1.01:

"**Adjusted Capital Account Deficit**" means, with respect to any Member, the deficit balance, if any, in such Member's Capital Account as of the end of the relevant Fiscal Year, after giving effect to the following adjustments:

(a)      crediting to such Capital Account any amount that such Member is obligated to restore or is deemed to be obligated to restore pursuant to Treasury Regulations Sections 1.704-1(b)(2)(ii)(c), 1.704-2(g)(1) and 1.704-2(i); and

(b)      debiting to such Capital Account the items described in Treasury Regulations Section 1.704-1(b)(2)(ii)(d)(4), (5) and (6).

"**Adjusted Taxable Income**" of a Member, or if the Member is disregarded for U.S. federal income tax purposes, the members or beneficiaries of such Member, for a Fiscal Year (or

portion thereof) with respect to the Membership Interest held by such Member means the federal taxable income allocated by the Company to the Member with respect to its Membership Interest (as adjusted by any final determination in connection with any tax audit or other proceeding) for such Fiscal Year (or portion thereof); provided, that such taxable income shall be computed (i) minus any excess taxable loss of the Company for any prior period allocable to such Member with respect to its Membership Interest that were not previously taken into account for purposes of determining such Member's Adjusted Taxable Income in a prior Fiscal Year to the extent such loss would be available under the Code to offset income of the Member (or, as appropriate, the direct or indirect owners of the Member) determined as if the income and loss from the Company were the only income and loss of the Member (or, as appropriate, the direct or indirect owners of the Member) in such Fiscal Year and all prior Fiscal Years, and (ii) taking into account any special basis adjustment with respect to such Member resulting from an election by the Company under Code Section 754.

"**Affiliate**" means, with respect to any Person, any other Person who, directly or indirectly (including through one or more intermediaries), controls, is controlled by, or is under common control with, such Person.  For purposes of this definition, "control," when used with respect to any specified Person, shall mean the power, direct or indirect, to direct or cause the direction of the management and policies of such Person, whether through ownership of voting securities or partnership or other ownership interests, by contract or otherwise; and the terms "controlling" and "controlled" shall have correlative meanings.  For the avoidance of doubt, neither CUSA nor any of its Subsidiaries nor Credit Bid Purchaser nor any of its Subsidiaries control the Company and none of them shall constitute an Affiliate of the Company.

"**Agreement**" has the meaning set forth in the Preamble.

"**Applicable Law**" means all applicable provisions of (a) constitutions, treaties, statutes, laws (including the common law), rules, regulations, decrees, ordinances, codes, proclamations, declarations, or orders of any Governmental Authority; (b) any consents or approvals of any Governmental Authority; and (c) any orders, decisions, advisory or interpretative opinions, injunctions, judgments, awards, decrees of, or agreements with, any Governmental Authority.

"**Bankruptcy**" means (i) the filing by the Company of a petition under the Bankruptcy Code seeking to adjudicate the Company a bankrupt or an insolvent or otherwise commencing, authorizing, or acquiescing in the commencement of a proceeding or cause of action seeking liquidation, winding up, reorganization, arrangement, adjustment, protection, composition, or other relief with respect to itself or its debts under any bankruptcy, insolvency, or other similar law now or hereafter in effect or seeking the appointment of a trustee, receiver, liquidator, custodian, or other similar official over it or any substantial part of its property, or consenting to any such relief or to the appointment of or taking possession by any such official in an involuntary case or other proceeding commenced against it, or taking any corporate or similar official action to authorize any of the foregoing; (ii) the making of an assignment or any general arrangement for the benefit of creditors; or (iii) the Company's filing an answer or other pleading admitting or failing to contest the allegations of a petition filed against it in any proceeding of the foregoing nature, or taking any other action to authorize any of the actions set forth above.

2

"**Bankruptcy Code**" means title 11 of the United States Code, 11 U.S.C. §§ 101, et seq., as amended.

"**BOC**" means the Texas Business Organizations Code, as amended and in effect from time to time.

"**Book Depreciation**" means, with respect to any Company asset for each Fiscal Year, the Company's depreciation, amortization, or other cost recovery deductions determined for federal income tax purposes, except that if the Book Value of an asset differs from its adjusted tax basis at the beginning of such Fiscal Year, Book Depreciation shall be (a) if such difference is being eliminated by use of the remedial method under Treasury Regulations Section 1.704-3(d), the amount of book basis recovered for such period under the rules prescribed by Treasury Regulations Section 1.704-3(d)(2), or (b) if the remedial method is not used, an amount which bears the same ratio to such beginning Book Value as the federal income tax depreciation, amortization, or other cost recovery deduction for such Fiscal Year bears to such beginning adjusted tax basis; provided, that if the adjusted basis for federal income tax purposes of an asset at the beginning of such Fiscal Year is zero and the Book Value of the asset is positive, Book Depreciation shall be determined with reference to such beginning Book Value using any permitted method selected by the Sole Manager in accordance with Treasury Regulations Section 1.704-1(b)(2)(iv)(g)(3).

"**Book Value**" means, with respect to any Company asset, the adjusted basis of such asset for federal income tax purposes, except as follows:

(a)     the initial Book Value of any Company asset contributed by a Member to the Company shall be the gross Fair Market Value of such Company asset as of the date of such contribution;

(b)     immediately before the distribution by the Company of any Company asset to a Member, the Book Value of such asset shall be adjusted to its gross Fair Market Value as of the date of such distribution;

(c)     the Book Value of all Company assets may, in the sole discretion of the Sole Manager, be adjusted to equal their respective gross Fair Market Values, as reasonably determined by the Sole Manager, as of the following times:

(i)     the acquisition of an additional Membership Interest in the Company by a new or existing Member in consideration for more than a *de minimis* Capital Contribution;

(ii)     the distribution by the Company to a Member of more than a *de minimis* amount of property (other than cash) as consideration for all or a part of such Member's Membership Interest in the Company; and

(iii)     the liquidation of the Company within the meaning of Treasury Regulations Section 1.704-1(b)(2)(ii)(g);

3

(d)     the Book Value of each Company asset shall be increased or decreased, as the case may be, to reflect any adjustments to the adjusted tax basis of such Company asset pursuant to Code Section 734(b) or Code Section 743(b), but only to the extent that such adjustments are taken into account in determining Capital Account balances pursuant to Treasury Regulations Section 1.704-1(b)(2)(iv)(m); provided, that Book Values shall not be adjusted pursuant to this paragraph (d) to the extent that an adjustment pursuant to paragraph (c) above is made in conjunction with a transaction that would otherwise result in an adjustment pursuant to this paragraph (d); and

(e)     if the Book Value of a Company asset has been determined pursuant to paragraph (a) or adjusted pursuant to paragraphs (c) or (d) above, such Book Value shall thereafter be adjusted to reflect the Book Depreciation taken into account with respect to such Company asset for purposes of computing Net Income and Net Losses.

"**Business Day**" means a day other than a Saturday, Sunday or other day on which commercial banks in the State of Texas are authorized or required to close.

"**Capital Account**" has the meaning set forth in Section 3.04.

"**Capital Contribution**" means, for any Member, the total amount of cash and cash equivalents and the Book Value of any property contributed to the Company by such Member.

"**Certificate of Formation**" has the meaning set forth in the Recitals.

"**Certificate of Merger**" means that certain Certificate of Merger filed by Fieldwood III with the Secretary of State of the State of Texas on [●], 2021.

"**Certificate of Termination**" means a certificate to be filed upon completion of the winding up and liquidation of the Company as set forth in Section 11.04, which certificate shall be in the form required by § 11.101 of the BOC.

"**Code**" means the Internal Revenue Code of 1986, as amended.

"**Company**" has the meaning set forth in the Preamble.

"**Company Minimum Gain**" means "partnership minimum gain" as defined in Treasury Regulations Section 1.704-2(b)(2), substituting the term "Company" for the term "partnership" as the context requires.

"**Confidential Information**" has the meaning set forth in Section 12.03(a).

"**Confirmation Order**" means the confirmation order entered in Chapter 11 Case 20-33948, In re: Fieldwood Energy LLC, *et al*, in the United States Bankruptcy Court for the Southern District of Texas, Houston Division.

"**Continuance**" has the meaning set forth in Section 11.01.

"**Contract Operating Agreement**" means that certain Contract Operating Agreement of even date herewith by and among Credit Bid Purchaser and the Company, of which CUSA is an express third party beneficiary.

"**Covered Person**" has the meaning set forth in Section 9.01(a).

"**Credit Bid Purchaser**" means Mako Buyer LLC, a Delaware limited liability company.

"**CUSA**" means Chevron U.S.A. Inc., a Pennsylvania corporation, and its successors or assigns.

"**Deepwater Assets Decommissioning Funding Agreement**" means that certain Decommissioning Funding Agreement, of event date herewith, by and between CUSA and Credit Bid Purchaser.

"**Depletable Property**" means each separate oil and gas property as defined in Section 614 of the Code.

"**Divisive Merger Documents**" means the Certificate of Merger, Plan of Merger, Certificate of Formation and other documents filed by or on behalf of Fieldwood III with respect to the Company with the Texas Secretary of State related to the divisive merger of Fieldwood III into Fieldwood III (the surviving entity) and the newly-created Company.

"**Electronic Transmission**" means any form of communication, including communication by use of or participation in one or more electronic networks or databases, not directly involving the physical transmission of paper that creates a record that may be retained, retrieved, and reviewed by a recipient thereof and that may be directly reproduced in paper form by such a recipient through an automated process.

"**Escrow Account**" means **[bank information for the Escrow Account to come]**.

"**Escrow Agreement**" means that certain Escrow Agreement of even date herewith between U.S. Bank National Association, as escrow agent, Fieldwood III, the Company and Credit Bid Purchaser.

"**Estimated Tax Amount**" of a Member, or if the Member is disregarded for U.S. federal income tax purposes, the members or beneficiaries of such Member, for a Fiscal Year means the Member's Tax Amount for such Fiscal Year as estimated in good faith from time to time by the Sole Manager.  In making such estimate, the Sole Manager shall take into account amounts shown on Internal Revenue Service Form 1065 filed by the Company and similar state or local forms filed by the Company for the preceding taxable year and such other adjustments as the Sole Manager reasonably determines are necessary or appropriate to reflect the estimated operations of the Company for the Fiscal Year.

"**Excess Amount**" has the meaning set forth in Section 6.02(c).

5

Debtors' Exhibit No. 34
Page 86 of 910

"**Fair Market Value**" of any asset as of any date means the purchase price that a willing buyer having all relevant knowledge would pay a willing seller for such asset in an arm's length transaction, as determined in good faith by the Sole Manager on such factors as the Sole Manager, in the exercise of his or her reasonable business judgment, considers relevant.

"**Fieldwood**" means Fieldwood Energy LLC, a Texas limited liability company, and its successors and assigns (excluding, for the avoidance of doubt, the Company).

"**Fieldwood III**" means Fieldwood Energy III LLC, a Texas limited liability company, and its successors and assigns (excluding, for the avoidance of doubt, the Company).

"**Final Completion**" has the meaning ascribed to such term in the Turnkey Removal Agreement.

"**Fiscal Year**" means the calendar year, unless the Company is required to have a taxable year other than the calendar year, in which case Fiscal Year shall be the period that conforms to its taxable year.

"**FWE IV Assets**" has the meaning set forth in the Plan of Merger.

"**FWE IV Obligations**" has the meaning set forth in the Plan of Merger.

"**GAAP**" means generally accepted accounting principles in the United States of America in effect from time to time; provided, that, notwithstanding any term or provision contained in this Agreement, GAAP will be deemed for all purposes hereof to treat leases that would have not been considered to be indebtedness in accordance with GAAP as in effect on December 31, 2017 (whether such leases were in effect on such date or are entered into thereafter) in a manner consistent with the treatment of such leases under GAAP as in effect on December 31, 2017, notwithstanding any modification or interpretative changes thereto or implementations of any such modifications or interpretative changes that may have occurred thereafter.

"**Governmental Authority**" means any court, tribunal, arbitrator, body, agency, division, board, bureau, commission or any other similar entity exercising executive, legislative, judicial, regulatory, or administrative functions of government, or any subdivision of any of the foregoing, whether federal, state, county, municipal, tribal, local or foreign, in each case with competent jurisdiction.

"**Guarantee Obligation**" means, as to any Person (the "guaranteeing Person"), any obligation of (i) the guaranteeing Person or (ii) another Person (including any bank under any letter of credit), if to induce the creation of such obligation of such other Person the guaranteeing Person has issued a reimbursement, counterindemnity or similar obligation, in either case guaranteeing or in effect guaranteeing any Indebtedness, leases, dividends or other obligations (the "primary obligations") of any other third Person (the "primary obligor") in any manner, whether directly or indirectly, including any obligation of the guaranteeing Person, whether or not contingent, (A) to purchase any such primary obligation or any property constituting direct or indirect security therefor, (B) to advance or supply funds (1) for the purchase or payment of any such primary obligation or (2) to maintain working capital or equity capital of the primary obligor or otherwise

6

to maintain the net worth or solvency of the primary obligor, (C) to purchase property, securities or services, in each case, primarily for the purpose of assuring the owner of any such primary obligation of the ability of the primary obligor to make payment of such primary obligation or (D) otherwise to assure or hold harmless the owner of any such primary obligation against loss in respect thereof; provided, however, that the term Guarantee Obligation shall not include endorsements of instruments for deposit or collection in the ordinary course of business.

"**Indebtedness**" means, with respect to any Person at any date, without duplication, all (i) indebtedness of such Person for borrowed money; (ii) obligations of such Person for the deferred purchase price of property or services (other than trade payables incurred in the ordinary course of such Person's business); (iii) obligations of such Person evidenced by notes, bonds, debentures or other similar instruments; (iv) indebtedness created or arising under any conditional sale or other title retention agreement with respect to property acquired by such Person (even though the rights and remedies of the seller or lender under such agreement in the event of default are limited to repossession or sale of such property); (v) capital lease obligations of such Person; (vi) obligations of such Person, contingent or otherwise, as an account party or applicant under acceptance, letter of credit or similar facilities; (vii) obligations of such Person, contingent or otherwise, to purchase, redeem, retire or otherwise acquire for value any capital stock of such Person; (viii) Guarantee Obligations of such Person in respect of obligations of the kind referred to in clauses (i) through (vii) above; and (ix) obligations of the kind referred to in clauses (i) through (viii) above secured by (or for which the holder of such obligation has an existing right, contingent or otherwise, to be secured by) any Lien on property (including accounts and contract rights) owned by such Person, whether or not such Person has assumed or become liable for the payment of such obligation.

"**Initial Member**" has the meaning set forth in the term "Member".

"**Joint Development Agreement**" means that certain Joint Development Agreement of even date herewith by and between the Company and Credit Bid Purchaser.

"**Lien**" means any mortgage, pledge, security interest, option, right of first offer, encumbrance, or other restriction or limitation of any nature whatsoever.

"**Liquidator**" has the meaning set forth in Section 11.03(a).

"**Losses**" has the meaning set forth in Section 9.03(a).

"**Material Project Contracts**" means, collectively, the Omnibus Agreement, the NPI Conveyance, the Contract Operating Agreement, the Turnkey Removal Agreement, the Transition Services Agreement, the Joint Development Agreement, the Deepwater Assets Decommissioning Funding Agreement and the SEMS Bridging Agreement, and each a "**Material Project Contract**".

"**Member**" means (a) the Person identified on the Members Schedule as of the date hereof as a Member and who has executed this Agreement or a counterpart thereof (each, an "**Initial Member**"); and (b) each Person who is hereafter admitted as a Member in accordance with the terms of this Agreement and the BOC, in each case so long as such Person is shown on the

WEIL:\97901822\22\45327.0007

Company's books and records as an owner of Membership Interests.  The Members shall constitute "members" (as that term is defined in the BOC) of the Company.

"**Member Nonrecourse Debt**" means "partner nonrecourse debt" as defined in Treasury Regulations Section 1.704-2(b)(4), substituting the term "Company" for the term "partnership" and the term "Member" for the term "partner" as the context requires.

"**Member Nonrecourse Debt Minimum Gain**" means an amount, with respect to each Member Nonrecourse Debt, equal to the Company Minimum Gain that would result if the Member Nonrecourse Debt were treated as a Nonrecourse Liability, determined in accordance with Treasury Regulations Section 1.704-2(i)(3).

"**Member Nonrecourse Deduction**" means "partner nonrecourse deduction" as defined in Treasury Regulations Section 1.704-2(i), substituting the term "Member" for the term "partner" as the context requires.

"**Members Schedule**" has the meaning set forth in Section 3.02.

"**Membership Interest**" means an interest in the Company owned by a Member, including such Member's right (a) to its distributive share of Net Income, Net Losses, and other items of income, gain, loss, and deduction of the Company; (b) to its distributive share of the assets of the Company; (c) to vote on, consent to, or otherwise participate in any decision of the Members as provided in this Agreement; and (d) to any and all other benefits to which such Member may be entitled as provided in this Agreement or the BOC.  The Membership Interest of each Member shall be expressed as a percentage interest and shall be as set forth on the Members Schedule.

"**Net Income**" and "**Net Loss**" mean, for each Fiscal Year or other period specified in this Agreement, an amount equal to the Company's taxable income or taxable loss, or particular items thereof, determined in accordance with Code Section 703(a) (where, for this purpose, all items of income, gain, loss, or deduction required to be stated separately pursuant to Code Section 703(a)(1) shall be included in taxable income or taxable loss), but with the following adjustments:

    (a)    any income realized by the Company that is exempt from federal income taxation, as described in Code Section 705(a)(1)(B), shall be added to such taxable income or taxable loss, notwithstanding that such income is not includable in gross income;

    (b)    any expenditures of the Company described in Code Section 705(a)(2)(B), including any items treated under Treasury Regulations Section 1.704-1(b)(2)(iv)(I) as items described in Code Section 705(a)(2)(B), shall be subtracted from such taxable income or taxable loss, notwithstanding that such expenditures are not deductible for federal income tax purposes;

    (c)    any gain or loss (including Simulated Gain or Loss) resulting from any disposition of Company property with respect to which gain or loss is recognized for federal income tax purposes shall be computed by reference to the Book Value of the property so disposed, notwithstanding that the adjusted tax basis of such property differs from its Book Value;

8

(d)     any items of depreciation, amortization, and other cost recovery deductions with respect to Company property having a Book Value that differs from its adjusted tax basis shall be computed by reference to the property's Book Value (as adjusted for Book Depreciation) in accordance with Treasury Regulations Section 1.704-1(b)(2)(iv)(g);

(e)     if the Book Value of any Company property is adjusted as provided in the definition of Book Value, then the amount of such adjustment shall be treated as an item of gain or loss and included in the computation of such taxable income or taxable loss;

(f)     to the extent an adjustment to the adjusted tax basis of any Company property pursuant to Code Sections 732(d), 734(b) or 743(b) is required, pursuant to Treasury Regulations Section 1.704 1(b)(2)(iv)(m), to be taken into account in determining Capital Accounts, the amount of such adjustment to the Capital Accounts shall be treated as an item of gain (if the adjustment increases the basis of the asset) or loss (if the adjustment decreases such basis); and

(g)     any items which are specially allocated pursuant to Section 5.03 hereof shall not be taken into account in computing Net Income or Net Loss.  The amounts of the items of Company income, gain, loss or deduction available to be specially allocated pursuant to Section 5.03 hereof shall be determined by applying rules analogous to those set forth in subparagraphs (a) through (f) above.

"**Nonrecourse Deductions**" has the meaning set forth in Treasury Regulations Section 1.704-2(b).

"**Nonrecourse Liability**" has the meaning set forth in Treasury Regulations Section 1.704-2(b)(3).

"**NPI Conveyance**" means that certain Conveyance of Net Profits Overriding Royalty Interest from Company to the Escrow Account.

"**NPI Payment**" has the meaning attributed to the term "NPI Payment" under the NPI Conveyance.

"**Omnibus Agreement**" means that certain Omnibus Agreement of even date herewith by and between the Company, CUSA and Credit Bid Purchaser.

"**Person**" means any individual, corporation, partnership, limited liability company, association, joint stock company, trust, estate, joint venture, firm, association, unincorporated organization, Governmental Authority, or any other entity.

"**Plan of Merger**" means the Agreement and Plan of Merger of Fieldwood Energy III LLC into Fieldwood Energy IV LLC and Fieldwood Energy III LLC, dated as of [●], 2021, and adopted by Fieldwood Energy III LLC.

"**Plan of Reorganization**" means the plan of reorganization of Fieldwood that was included in, and was confirmed by, the Confirmation Order.

9

"**Production Period**" has the meaning attributed to the term "Production Period" under the NPI Conveyance.

"**Quarterly Estimated Tax Amount**" of a Member, or if the Member is disregarded for U.S. federal income tax purposes, the members or beneficiaries of such Member, for any calendar quarter of a Fiscal Year means the excess, if any of: (a) the product of (i) a quarter (1/4) in the case of the first calendar quarter of the Fiscal Year, half (1/2) in the case of the second calendar quarter of the Fiscal Year, three-quarters (3/4) in the case of the third calendar quarter of the Fiscal Year, and one (1) in the case of the fourth calendar quarter of the Fiscal Year and (ii) the Member's Estimated Tax Amount for such Fiscal Year; over (b) all distributions previously made during such Fiscal Year to such Member.

"**Regulatory Allocations**" has the meaning set forth in Section 5.03(f).

"**Reimbursable Costs**" has the meaning attributed to such term in the Contract Operating Agreement.

"**Representative**" means, with respect to any Person, any and all directors, officers, employees, consultants, financial advisors or lenders, counsel, accountants, and other agents of such Person.

"**Securities Act**" means the Securities Act of 1933, as amended, and the rules and regulations thereunder, which shall be in effect at the time.

"**SEMS Bridging Agreement**" means that certain SEMS Bridging Agreement & Interface Document, dated of even date herewith by and between Credit Bid Purchaser and the Company.

"**Shortfall Amount**" has the meaning set forth in Section 6.02(b).

"**Simulated Basis**" means, with respect to each Depletable Property, the Book Value of such property.

"**Simulated Depletion**" means, with respect to each Depletable Property, a depletion allowance computed in accordance with U.S. federal income tax principles (as if the Simulated Basis of the property were its adjusted tax basis and using simulated cost depletion) and in the manner specified in Treasury Regulations Section 1.704-1(b)(2)(iv)(k)(2); provided that the Simulated Depletion with respect to a Depletable Property shall in no event exceed the Simulated Basis of such Depletable Property.

"**Simulated Gain or Loss**" means the simulated gain or loss computed with respect to a sale or other disposition of any Depletable Property pursuant to Treasury Regulations Section 1.704-1(b)(2)(iv)(k)(2).

"**Sole Manager**" has the meaning set forth in Section 7.01.

10

"**Subsidiary**" means, with respect to any Person, any other Person of which a majority of the outstanding shares or other equity interests having the power to vote for directors or managers or comparable positions are owned, directly or indirectly, by the first Person.

"**Tax Advance**" has the meaning set forth in Section 6.02(a).

"**Tax Amount**" of a Member, or if the Member is disregarded for U.S. federal income tax purposes, the members or beneficiaries of such Member, for a Fiscal Year means, subject to (i) any restrictions in the Company's then-applicable debt financing arrangements, if any, and (ii) the Sole Manager's good faith determination to retain any other amounts necessary to satisfy obligations of the Company that are reasonably expect to be due and payable during the 90 days following the date of determination (i) the product of (a) the Tax Rate for such Fiscal Year (but not to exceed the Tax Rate applicable to C-corporations for such Fiscal Year) and (b) the Adjusted Taxable Income of the Member for such Fiscal Year with respect to its Membership Interest or (ii) the actual amount of U.S. federal, state and local income tax (including any state or local tax imposed in lieu of an income tax) paid by such Member with respect to such Fiscal Year in respect of the taxable income allocated to the Member by the Company, after taking into account all deductions available to such Member from all sources in excess of such Member's income from other sources; *provided*, *however*, that if at any time Fieldwood Energy Inc. has cash tax liability (including an estimated tax liability) on account of items of income or gain of the Company without sufficient cash on hand from a corresponding cash distribution in respect of such income or gain (all as reasonably determined by Fieldwood Energy Inc.), then the Tax Amount shall be increased such that the Company timely distributes cash sufficient to pay such tax liability.

"**Tax Matters Representative**" has the meaning set forth in Section 10.04(a).

"**Tax Rate**" of a Member, or if the Member is disregarded for U.S. federal income tax purposes, the members or beneficiaries of such Member, for any period, means the highest effective marginal combined federal, state, and local tax rate applicable to an individual residing in Houston, Texas (or, if higher, a corporation doing business in Houston, Texas), taking into account (a) the character (for example, long-term or short-term capital gain, ordinary, or exempt) of the applicable income and (b) if applicable, the deduction under IRC Section 199A.

"**Taxing Authority**" has the meaning set forth in Section 6.03(b).

"**Term Sheet**" means that certain term sheet, dated March 22, 2021, by and between Fieldwood, on the one hand, and CUSA, on the other hand.

"**Third Party Payment**" has the meaning attributed to such term in the Contract Operating Agreement.

"**Transfer**" means to, directly or indirectly, sell, transfer, assign, convey, gift, pledge, encumber, hypothecate, or similarly dispose of, either voluntarily or involuntarily, by operation of law or otherwise (including by merger or division), or to enter into any contract, option, or other arrangement or understanding with respect to the sale, transfer, assignment, conveyance, gift, pledge, encumbrance, hypothecation, or similar disposition of, any Membership Interests owned by a Person or any interest (including a beneficial interest) in any Membership Interests owned by

11

Debtors' Exhibit No. 34
Page 92 of 910

a Person.  "**Transfer**" when used as a noun shall have a correlative meaning.  "**Transferor**" and "**Transferee**" mean a Person who makes or receives a Transfer, respectively.

"**Transition Services Agreement**" means the Neptune Spar Transition Services Agreement of even date herewith by and between Credit Bid Purchaser and Noble Energy, Inc.

"**Treasury Regulations**" means the final or temporary regulations issued by the United States Department of Treasury pursuant to its authority under the Code, and any successor regulations.

"**Turnkey Removal Agreement**" means that certain Turnkey Removal Agreement of even date herewith by and among Credit Bid Purchaser, CUSA and the Company.

"**Withholding Advances**" has the meaning set forth in Section 6.03(b).

**Section 1.02.    Interpretation**.  For purposes of this Agreement: (a) the words "include," "includes," and "including" shall be deemed to be followed by the words "without limitation"; (b) the word "or" is not exclusive; and (c) the words "herein," "hereof," "hereby," "hereto," and "hereunder" refer to this Agreement as a whole.

The definitions given for any defined terms in this Agreement shall apply equally to both the singular and plural forms of the terms defined.  Whenever the context may require, any pronoun shall include the corresponding masculine, feminine, and neuter forms.

Unless the context otherwise requires, references herein: (x) to Articles, Sections, Exhibits, and Schedules mean the Articles and Sections of, and Exhibits and Schedules attached to, this Agreement; (y) to an agreement, instrument, or other document means such agreement, instrument, or other document as amended, supplemented, and modified from time to time to the extent permitted by the provisions thereof; and (z) to a statute means such statute as amended from time to time and includes any successor legislation thereto and any regulations promulgated thereunder.

This Agreement shall be construed without regard to any presumption or rule requiring construction or interpretation against the party drafting an instrument or causing any instrument to be drafted.

The Exhibits and Schedules referred to herein shall be construed with, and as an integral part of, this Agreement to the same extent as if they were set forth verbatim herein.

The headings in this Agreement are for reference only and shall not affect the interpretation of this Agreement.

WEIL:\97901822\22\45327.0007

## ARTICLE II
## ORGANIZATION

**Section 2.01   Formation**.

(a)      The Company was formed on [●], 2021, pursuant to the provisions of the BOC, upon the filing and acceptance of the Certificate of Formation with the Secretary of State of the State of Texas.

(b)      This Agreement shall constitute the "company agreement" (as that term is used in the BOC) of the Company.  The rights, powers, duties, obligations, and liabilities of the Members and the Sole Manager shall be determined pursuant to the BOC and this Agreement.  To the extent that the rights, powers, duties, obligations, and liabilities of any Members or the Sole Manager are different by reason of any provision of this Agreement than they would be under the BOC in the absence of such provision, this Agreement shall, to the extent permitted by the BOC, control.

**Section 2.02   Name.** The name of the Company is "Fieldwood Energy IV LLC" or such other name or names as may be designated by the Sole Manager; provided, that the name shall always contain the words "Limited Liability Company" or "Limited Company" or an abbreviation of one of those phrases.  Amendments to the Certificate of Formation or this Agreement to reflect any such name change may be made by the Sole Manager without the consent of the Members. The Sole Manager shall give prompt notice to the Members and CUSA of any change to the name of the Company and any related amendment to the Certificate of Formation or this Agreement. The Company may conduct business under any assumed or fictitious name required by Applicable Law or otherwise deemed desirable by the Sole Manager.

**Section 2.03   Principal Office.** The principal office of the Company is located at 2000 W. Sam Houston Parkway S., Suite 1200, Houston, Texas 77042, or such other place as may from time to time be determined by the Sole Manager.  The Sole Manager shall give prompt notice of any such change to each of the Members and CUSA.

**Section 2.04   Registered Office; Registered Agent.**

(a)      The registered office of the Company shall be the office of the initial registered agent named in the Certificate of Formation or such other office (which need not be a place of business of the Company) as the Sole Manager may designate from time to time in the manner provided by the BOC and Applicable Law.

(b)      The registered agent for service of process on the Company in the State of Texas shall be the initial registered agent named in the Certificate of Formation or such other Person or Persons as the Sole Manager may designate from time to time in the manner provided by the BOC and Applicable Law.

13

**Section 2.05   Purposes; Powers**.

(a)     The purposes of the Company are to (i) engage in the Plugging and Abandonment and decommissioning of the FWE IV Assets, as such terms are defined in the Plan of Merger, (ii) the operation of the FWE IV Assets prior to their Plugging and Abandonment and decommissioning, (iii) such other activities as are approved pursuant to the terms of this Agreement, including subject to Section 7.04, and (iv) to engage in any and all activities necessary or incidental to the foregoing purposes.

(b)     The Company shall have all the powers necessary or convenient to carry out the purposes for which it is formed, including the powers granted by the BOC.

**Section 2.06   Term.**  The term of the Company commenced on the date the Certificate of Formation was filed with the Secretary of State of the State of Texas and shall continue in existence perpetually until the Company is terminated in accordance with the provisions of this Agreement.

<div align="center">

**ARTICLE III**
**CAPITAL CONTRIBUTIONS; CAPITAL ACCOUNTS**

</div>

**Section 3.01   Tax Partnership Provisions.**  This ARTICLE III is intended to apply only if the Company becomes a partnership for U.S. federal income tax purposes.

**Section 3.02   Initial Capital Contributions.**  Contemporaneously with the execution of this Agreement, and pursuant to the Plan of Reorganization and as a result of a divisive merger pursuant to § 10.008 of the BOC, the Company holds the properties and assets identified as the FWE IV Assets, which shall, together with the amount of any expenses paid pursuant to Section 12.01, constitute the aggregate Capital Contributions made by the Initial Member.  The Initial Member shall own Membership Interests in the amount set forth opposite such Member's name on Schedule A attached hereto (the "**Members Schedule**").  From and after the date of this Agreement, the Sole Manager shall maintain and update the Members Schedule upon the issuance or Transfer of any Membership Interests to any new or existing Member in accordance with this Agreement.

**Section 3.03   Additional Capital Contributions.**  No Member shall be required to make any additional Capital Contributions to the Company.  Any future Capital Contributions made by any Member shall only be made with the consent of the Sole Manager.  To the extent that a Member makes an additional Capital Contribution to the Company, the Sole Manager shall revise the Members Schedule to reflect an increase in the Membership Interest of the contributing Member that fairly and equitably reflects the value of its additional Capital Contribution in relation to the aggregate amount of all Capital Contributions made by the Members.

**Section 3.04   Maintenance of Capital Accounts.**  The Company shall establish and maintain for each Member a separate capital account (a "**Capital Account**") on its books and records in accordance with this Section 3.04.  Each Capital Account shall be established and maintained in accordance with the following provisions:

(a)     Each Member's Capital Account shall be increased by the amount of:

14

(i)        such Member's Capital Contributions, including such Member's initial Capital Contribution and any additional Capital Contributions;

(ii)       any Net Income or other item of income or gain allocated to such Member pursuant to ARTICLE V; and

(iii)      any liabilities of the Company that are assumed by such Member or secured by any property distributed to such Member.

(b)        Each Member's Capital Account shall be decreased by:

(i)        the cash amount or Book Value of any property distributed to such Member pursuant to ARTICLE VI and Section 11.03(d);

(ii)       the amount of any Net Loss or other item of loss or deduction allocated to such Member pursuant to ARTICLE V; and

(iii)      the amount of any liabilities of such Member assumed by the Company or that are secured by any property contributed by such Member to the Company.

**Section 3.05   Succession Upon Transfer.**  In the event that any Membership Interests are Transferred in accordance with the terms of this Agreement, the Transferee shall succeed to the Capital Account of the Transferor to the extent it relates to the Transferred Membership Interests and, subject to Section 5.05, shall receive allocations and distributions pursuant to ARTICLE V, ARTICLE VI, and ARTICLE XI in respect of such Membership Interests.

**Section 3.06   Negative Capital Accounts.**  In the event that any Member shall have a deficit balance in its Capital Account, such Member shall have no obligation, during the term of the Company or upon termination or liquidation thereof, to restore such negative balance or make any Capital Contributions to the Company by reason thereof, except as may be required by Applicable Law or in respect of any negative balance resulting from a withdrawal of capital or termination in contravention of this Agreement.

**Section 3.07   No Withdrawals from Capital Accounts.**  No Member shall be entitled to withdraw any part of its Capital Account or to receive any distribution from the Company, except as otherwise provided in this Agreement.  No Member shall receive any interest, salary, or drawing with respect to its Capital Contributions or its Capital Account, except as otherwise provided in this Agreement.  The Capital Accounts are maintained for the sole purpose of allocating items of income, gain, loss, and deduction among the Members and shall have no effect on the amount of any distributions to any Members, in liquidation or otherwise.

**Section 3.08   Treatment of Loans from Members.**  Loans by any Member to the Company shall not be considered Capital Contributions and shall not affect the maintenance of such Member's Capital Account, other than to the extent provided in Section 3.04(a)(iii), if applicable.

WEIL:\97901822\22\45327.0007

**Section 3.09   Modifications.**  The foregoing provisions and the other provisions of this Agreement relating to the maintenance of Capital Accounts are intended to comply with Treasury Regulations Section 1.704-1(b) and shall be interpreted and applied in a manner consistent with such Treasury Regulations.  If the Sole Manager determines that it is prudent to modify the manner in which the Capital Accounts, or any increases or decreases to the Capital Accounts, are computed in order to comply with such Treasury Regulations, the Sole Manager may authorize such modifications without the consent of any Member.

<div align="center">

**ARTICLE IV**
**MEMBERS**

</div>

**Section 4.01   No Personal Liability.**  Except as otherwise expressly provided in the BOC, by Applicable Law, or expressly in this Agreement, no Member will be obligated personally for any debt, obligation, or liability of the Company or other Members, whether arising in contract, tort, or otherwise, including a debt, obligation, or liability under a judgment, decree, or order of a court, solely by reason of being a Member.

**Section 4.02   No Withdrawal.**  So long as a Member continues to hold a Membership Interest, such Member shall not have the ability to withdraw or resign as a Member prior to the winding up and termination of the Company and any such withdrawal or resignation or attempted withdrawal or resignation by a Member prior to the winding up and termination of the Company shall be null and void.  As soon as any Person who is a Member ceases to hold a Membership Interest, such Person shall no longer be a Member.

**Section 4.03   No Interest in Company Property.**  No real or personal property of the Company shall be deemed to be owned by any Member individually, but shall be owned by, and title shall be vested solely in, the Company.  Without limiting the foregoing, each Member hereby irrevocably waives during the term of the Company any right that such Member may have to maintain any action for partition with respect to the property of the Company.

**Section 4.04   Certification of Membership Interests**.

(a)      The Sole Manager may, but shall not be required to, issue certificates to the Members representing the Membership Interests held by such Member.

(b)      In the event that the Sole Manager shall issue certificates representing Membership Interests in accordance with Section 4.04(a), then in addition to any other legend required by Applicable Law, all certificates representing issued and outstanding Membership Interests shall bear a legend substantially in the following form:

THE MEMBERSHIP INTEREST REPRESENTED BY THIS CERTIFICATE IS SUBJECT TO A LIMITED LIABILITY COMPANY AGREEMENT AMONG THE COMPANY AND ITS MEMBERS, A COPY OF WHICH IS ON FILE AT THE PRINCIPAL EXECUTIVE OFFICE OF THE COMPANY.   NO TRANSFER, SALE, CONVEYANCE, ASSIGNMENT, GIFT, PLEDGE, HYPOTHECATION, ENCUMBRANCE, OR OTHER DISPOSITION OF THE MEMBERSHIP

<div align="center">16</div>

INTEREST REPRESENTED BY THIS CERTIFICATE MAY BE MADE EXCEPT IN ACCORDANCE WITH THE PROVISIONS OF SUCH COMPANY AGREEMENT.

THE MEMBERSHIP INTEREST REPRESENTED BY THIS CERTIFICATE HAS NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED, OR UNDER ANY OTHER APPLICABLE SECURITIES LAWS AND MAY NOT BE TRANSFERRED, SOLD, ASSIGNED, GIFTED, PLEDGED, HYPOTHECATED, OR OTHERWISE DISPOSED EXCEPT PURSUANT TO (A) A REGISTRATION STATEMENT EFFECTIVE UNDER SUCH ACT AND LAWS OR (B) AN EXEMPTION FROM REGISTRATION THEREUNDER.

**Section 4.05   Meetings of Members**.

(a)      Meetings of the Members may be called by (i) the Sole Manager or (ii) Members holding a majority of the Membership Interests.

(b)      Written notice stating the place, date, and time of the meeting and, in the case of a meeting of the Members not regularly scheduled, describing the purposes for which the meeting is called, shall be delivered not fewer than ten days and not more than 60 days before the date of the meeting to each Member, by or at the direction of the Sole Manager or the Member(s) calling the meeting, as the case may be.  The Members may hold meetings at the Company's principal office or at such other place, within or outside the State of Texas, as the Sole Manager or the Member(s) calling the meeting may designate in the notice for such meeting.

(c)      Any Member may participate in a meeting of the Members by means of conference telephone or other communications equipment by means of which all Persons participating in the meeting can talk to and hear each other, and participation in a meeting by such means shall constitute presence in person at such meeting.

(d)      On any matter that is to be voted on by Members, a Member may vote in person or by proxy, and such proxy may be granted in writing, by means of Electronic Transmission or as otherwise permitted by Applicable Law.  Every proxy shall be revocable in the discretion of the Member executing it unless otherwise provided in such proxy; provided, that such right to revocation shall not invalidate or otherwise affect actions taken under such proxy prior to such revocation.  In lieu of a proxy, a Member may grant an irrevocable power of attorney to conduct the affairs of such Member with respect to matters of the Company, including matters relating to the organization, internal affairs, or termination of the Company.

(e)      The business to be conducted at such meeting need not be limited to the purpose described in the notice and can include business to be conducted by Members; provided, that the appropriate Members shall have been notified of the meeting in accordance with Section 4.05(b).  Attendance of a Member at any meeting shall constitute

17

a waiver of notice of such meeting, except where a Member attends a meeting for the express purpose of objecting to the transaction of any business on the ground that the meeting is not lawfully called or convened.

(f)     A quorum of any meeting of the Members shall require the presence, whether in person or by proxy, of the Members holding a majority of the Membership Interests.  Subject to Section 4.06, no action may be taken by the Members unless the appropriate quorum is present at a meeting.

(g)     Subject to Section 4.06, Section 7.04, Section 12.10 or any provision of this Agreement or the BOC requiring the vote, consent, or approval of a different percentage of the Membership Interests, no action may be taken by the Members at any meeting at which a quorum is present without the affirmative vote of the Members holding a majority of the outstanding Membership Interests.

**Section 4.06   Action Without Meeting**.

(a)     Notwithstanding the provisions of Section 4.05, any matter that is to be voted on, consented to, or approved by the Members may be taken without a meeting, without prior notice, and without a vote if consented to, in writing or by Electronic Transmission, by a Member or Members holding not less than the minimum number of votes that would be necessary to authorize or take such action at a meeting at which each Member entitled to vote on the action is present and votes.  A record shall be maintained by the Sole Manager of each such action taken by written consent of a Member or Members.

(b)     A Member's consent may not be established by a Member's failure to object to an action in a timely manner or by any other means not explicitly provided for in this Agreement.

(c)     If any action or decision permitted by this Agreement to be taken or made by less than all of the Members is taken or made by a written consent signed by less than all of the Members, the Sole Manager shall, within ten calendar days after such action is taken or such decision is made, give written notice of the action taken or the decision made to the Members who did not sign the written consent.

**Section 4.07   Power of Members.**  The Members shall have the power to exercise any and all rights or powers granted to Members pursuant to the express terms of this Agreement and the BOC.  Except as otherwise specifically provided by this Agreement or required by the BOC, no Member, in its capacity as a Member, shall have the power to act for or on behalf of, or to bind, the Company, other than to the extent that the Company has granted a power of attorney to such Member to bind the Company on such actions.

**Section 4.08   Similar or Competitive Activities; Business Opportunities.**  Nothing contained in this Agreement shall prevent any Member or any of its Affiliates from engaging in any other activities or businesses, regardless of whether those activities or businesses are similar to or competitive with the Company.  None of the Members nor any of their Affiliates shall be

18

obligated to account to the Company or to the other Members for any profits or income earned or derived from such other activities or businesses.  None of the Members nor any of their Affiliates shall be obligated to inform the Company or the other Members of a business opportunity of any type or description.

## ARTICLE V
## ALLOCATIONS

**Section 5.01   Tax Partnership Provisions.**  This ARTICLE V is intended to apply only if the Company becomes a partnership for U.S. federal income tax purposes.

**Section 5.02   Allocation of Net Income and Net Loss.**  For each Fiscal Year (or portion thereof), after giving effect to the special allocations set forth in Section 5.03, Net Income and Net Loss of the Company shall be allocated among the Members pro rata in accordance with their Membership Interests.

**Section 5.03   Regulatory and Special Allocations.**  Notwithstanding the provisions of Section 5.02:

(a)      If there is a net decrease in Company Minimum Gain (determined according to Treasury Regulations Section 1.704-2(d)(1)) during any Fiscal Year, each Member shall be specially allocated Net Income for such Fiscal Year (and, if necessary, subsequent Fiscal Years) in an amount equal to such Member's share of the net decrease in Company Minimum Gain, determined in accordance with Treasury Regulations Section 1.704-2(g). The items to be so allocated shall be determined in accordance with Treasury Regulations Sections 1.704-2(f)(6) and 1.704-2(j)(2).  This Section 5.03(a) is intended to comply with the "minimum gain chargeback" requirement in Treasury Regulations Section 1.704-2(f) and shall be interpreted consistently therewith.

(b)      Member Nonrecourse Deductions shall be allocated in the manner required by Treasury Regulations Section 1.704-2(i).  Except as otherwise provided in Treasury Regulations Section 1.704-2(i)(4), if there is a net decrease in Member Nonrecourse Debt Minimum Gain during any Fiscal Year, each Member that has a share of such Member Nonrecourse Debt Minimum Gain shall be specially allocated Net Income for such Fiscal Year (and, if necessary, subsequent Fiscal Years) in an amount equal to that Member's share of the net decrease in Member Nonrecourse Debt Minimum Gain.  Items to be allocated pursuant to this paragraph shall be determined in accordance with Treasury Regulations Sections 1.704-2(i)(4) and 1.704-2(j)(2).  This Section 5.03(b) is intended to comply with the "minimum gain chargeback" requirement in Treasury Regulations Section 1.704-2(i)(4) and shall be interpreted consistently therewith.

(c)      Nonrecourse Deductions shall be allocated to the Members in accordance with their Membership Interests.

(d)      In the event any Member unexpectedly receives any adjustments, allocations, or distributions described in Treasury Regulations Section 1.704-1(b)(2)(ii)(d)(4), (5) or (6), Net Income shall be specially allocated to such Member in an

19

Debtors' Exhibit No. 34
Page 100 of 910

amount and manner sufficient to eliminate the Adjusted Capital Account Deficit created by such adjustments, allocations, or distributions as quickly as possible. This Section 5.03(d) is intended to comply with the "qualified income offset" requirement in Treasury Regulations Section 1.704-1(b)(2)(ii)(d) and shall be interpreted consistently therewith.

(e)  Simulated Depletion and Simulated Gain or Loss with respect to any Depletable Property shall be allocated among the Members in proportion to their shares of the Simulated Basis in such property. Each Member's share of the Simulated Basis in each of the Company's Depletable Properties shall be allocated to each Member in accordance with such Member's Membership Interest as of the time such Depletable Property is acquired by the Company, and shall be reallocated among the Members in accordance with the Members' Membership Interest as determined immediately following the occurrence of an event giving rise to any adjustment to the Book Values of the Company's oil and gas properties pursuant to the terms of this Agreement (or at the time of any material additions to the federal income tax basis of such Depletable Property).

(f)  The allocations set forth in subsections Section 5.03(a), Section 5.03(b), Section 5.03(c), Section 5.03(d) and Section 5.03(e) above (the "**Regulatory Allocations**") are intended to comply with certain requirements of the Treasury Regulations under Code Section 704. Notwithstanding any other provisions of this ARTICLE V (other than the Regulatory Allocations), the Regulatory Allocations shall be taken into account in allocating Net Income and Net Losses among Members so that, to the extent possible, the net amount of such allocations of Net Income and Net Losses and other items and the Regulatory Allocations to each Member shall be equal to the net amount that would have been allocated to such Member if the Regulatory Allocations had not occurred.

**Section 5.04   Tax Allocations**.

(a)  Subject to Section 5.04(b), Section 5.04(c), and Section 5.04(d), all income, gains, losses and deductions of the Company shall be allocated, for federal, state, and local income tax purposes, among the Members in accordance with the allocation of such income, gains, losses, and deductions pursuant to Section 5.02 and Section 5.03, except that if any such allocation for tax purposes is not permitted by the Code or other Applicable Law, the Company's subsequent income, gains, losses, and deductions shall be allocated among the Members for tax purposes, to the extent permitted by the Code and other Applicable Law, so as to reflect as nearly as possible the allocation set forth in Section 5.02 and Section 5.03.

(b)  Items of Company taxable income, gain, loss, and deduction with respect to any property contributed to the capital of the Company shall be allocated among the Members in accordance with Code Section 704(c) using such reasonable method under Treasury Regulations Section 1.704-3 as shall be determined by the Sole Manager, so as to take account of any variation between the adjusted basis of such property to the Company for federal income tax purposes and its Book Value.

WEIL:\97901822\22\45327.0007

(c)      If the Book Value of any Company asset is adjusted pursuant to Treasury Regulations Section 1.704-1(b)(2)(iv)(f) as provided in clause (c) of the definition of Book Value, subsequent allocations of items of taxable income, gain, loss, and deduction with respect to such asset shall take account of any variation between the adjusted basis of such asset for federal income tax purposes and its Book Value using such reasonable method under Treasury Regulations Section 1.704-3 as shall be determined by the Sole Manager.

(d)      Allocations of tax credit, tax credit recapture, and any items related thereto shall be allocated to the Members according to their interests in such items as determined by the Sole Manager taking into account the principles of Treasury Regulations Section 1.704-1(b)(4)(ii).

(e)      The deduction for depletion with respect to each separate oil and gas property (as defined in Section 614 of the Code) shall, in accordance with Section 613A(c)(7)(D) of the Code, be computed for federal income tax purposes separately by the Members rather than the Company.  The proportionate share of the adjusted tax basis of each oil and gas property shall be allocated to each Member in accordance with such Member's Membership Interest as of the time such oil and gas property is acquired by the Company (and any additions to such U.S. federal income tax basis resulting from expenditures required to be capitalized in such basis shall be allocated among the Members in a manner designed to cause the Members' proportionate shares of such adjusted U.S. federal income tax basis to be in accordance with their Membership Interests as determined at the time of any such additions), and shall be reallocated among the Members in accordance with the Members' Membership Interests as determined immediately following the occurrence of an event giving rise to an adjustment to the Book Values of the Company's oil and gas properties.  For purposes of the separate computation of gain or loss by each Member on the taxable disposition of each oil and gas property, the amount realized from such disposition shall be allocated (i) first, to the Members in an amount equal to the Simulated Basis in such oil and gas property in proportion to their allocable shares thereof and (ii) second, any remaining amount realized shall be allocated consistent with the allocation of Simulated Gain or Loss.  The allocations described in this Section 5.04(e) are intended to be applied in accordance with the Members' "interests in partnership capital" under Section 613A(c)(7)(D) or the Code; provided, however, that the Members understand and agree that the Sole Manager may authorize special allocations of federal income tax basis, income, gain, deduction or loss, as computed for U.S. federal income tax purposes, in order to eliminate differences between Simulated Basis and adjusted U.S. federal income tax basis with respect to each oil and gas property, in such manner as determined consistent with the principles outlined in Sections 5.04b) and 5.04c).  The provisions of this Section 5.04(e) and the other provisions of this Agreement relating to allocations under Section 613A(c)(7)(D) of the Code are intended to comply with Treasury Regulations Section 1.704-1(b)(4)(v) and shall be interpreted and applied in a manner consistent with such Treasury Regulations.  Each Member, with the assistance of the Company, shall separately keep records of its share of the adjusted tax basis in each oil and gas property, adjust such share of the adjusted tax basis for any cost or percentage depletion allowable with respect to such property and use such adjusted tax basis in the computation of its cost depletion or in the computation of its gain or loss on the disposition

21

of such property by the Company.  Upon the reasonable request of the Company, each Member shall advise the Company of its adjusted tax basis in each oil and gas property and any depletion computed with respect thereto, both as computed in accordance with the provisions of this subsection for purposes of allowing the Company to make adjustments to the tax basis of its assets as a result of certain transfers of interests in the Company or distributions by the Company.  The Company may rely on such information and, if it is not provided by the Member, may make such reasonable assumptions as it shall determine with respect thereto.  When reasonably requested by the Members, the Company shall provide all available information needed by such Members to comply with the record keeping requirements of this Section 5.04(e) and other applicable tax reporting obligations.

(f)      Allocations pursuant to this Section 5.04 are solely for purposes of federal, state, and local taxes and shall not affect, or in any way be taken into account in computing, any Member's Capital Account or share of Net Income, Net Losses, distributions, or other items pursuant to any provisions of this Agreement.

**Section 5.05   Allocations in Respect of Transferred Membership Interests.**  In the event of a Transfer of Membership Interests during any Fiscal Year made in compliance with the provisions of ARTICLE VIII, Net Income, Net Losses, and other items of income, gain, loss, and deduction of the Company attributable to such Membership Interests for such Fiscal Year shall be determined using the interim closing of the books method.

## ARTICLE VI
## DISTRIBUTIONS

**Section 6.01   General**.

(a)      Subject to Section 6.02 and Section 7.03(b), distributions of available cash shall be made to the Members when and in such amounts as determined by the Sole Manager and only following (i) payment of all operating expenses of the Company, including required payments under the Material Project Contracts, and the termination of the Material Project Contracts, (ii) the payment in full of any and all amounts owing to Credit Bid Purchaser or CUSA under any Material Project Contract, and (iii) the cessation of all production from, and Final Completion of all plugging and abandonment and decommissioning of the FWE IV Assets.  After making all distributions required for a given Fiscal Year under Section 6.02, and paying all operating expenses, and making appropriate reserves for future operating expenses, and paying all amounts then due and outstanding under the Material Project Contracts as described in the preceding sentence, the termination of the Material Project Contracts, and the satisfaction of the condition under item (iii), in each case as described in the preceding sentence, distributions determined to be made by the Sole Manager pursuant to this Section 6.01(a) shall be paid to the Members in accordance with their respective Membership Interests.

(b)      Notwithstanding any provision to the contrary contained in this Agreement, the Company shall not make any distribution to the Members (i) prior to the cessation of all production from, and Final Completion of all plugging and abandonment and

decommissioning activities on, the FWE IV Assets, except as provided in Section 6.02, or (ii) if such distribution would violate § 101.206 of the BOC or other Applicable Law.

**Section 6.02   Tax Advances**.

(a)      Subject to (i) any restrictions in the Company's then-applicable debt financing arrangements, if any, and (ii) the Sole Manager's good faith determination to retain any other amounts necessary to satisfy obligations of the Company that are reasonably expected to be due and payable in the 90 days following the date of determination, at least three days before each date prescribed by the Code for a calendar-year corporation to pay quarterly installments of estimated tax, the Company shall use commercially reasonable efforts to distribute cash to each Member in proportion to and to the extent of such Member's Quarterly Estimated Tax Amount for the applicable calendar quarter (each such distribution, a "**Tax Advance**").

(b)      If, at any time after the final Quarterly Estimated Tax Amount has been distributed pursuant to Section 6.02(a) with respect to any Fiscal Year, the aggregate Tax Advances to any Member with respect to such Fiscal Year are less than such Member's Tax Amount for such Fiscal Year (a "**Shortfall Amount**"), the Company shall use commercially reasonable efforts to distribute cash in proportion to and to the extent of each Member's Shortfall Amount.  The Company shall use commercially reasonable efforts to distribute Shortfall Amounts with respect to a Fiscal Year before the 90th day of the next succeeding Fiscal Year; provided, that if the Company has made distributions other than pursuant to this Section 6.02, the Sole Manager may apply such distributions to reduce any Shortfall Amount.

(c)      If the aggregate Tax Advances made to any Member pursuant to this Section 6.02 for any Fiscal Year exceed such Member's Tax Amount (an "**Excess Amount**"), such Excess Amount shall reduce subsequent Tax Advances that would be made to such Member pursuant to this Section 6.02, except to the extent taken into account as an advance pursuant to Section 6.02(d).

(d)      Any distributions made pursuant to this Section 6.02 shall be treated for purposes of this Agreement as advances on distributions pursuant to Section 6.01 and shall reduce, dollar-for-dollar, the amount otherwise distributable to such Member pursuant to Section 6.01.

**Section 6.03   Tax Withholding; Withholding Advances**.

(a)      **Tax Withholding.**  Each Member agrees to furnish the Company with any representations and forms as shall be reasonably requested by the Company to assist it in determining the extent of, and in fulfilling, any withholding obligations it may have.

(b)      **Withholding Advances.**  The Company is hereby authorized at all times to make payments ("**Withholding Advances**") with respect to each Member in amounts required to discharge any obligation of the Company, including any obligation under Section 6225 of the Code (as determined by the Tax Matters Representative based on the

WEIL:\97901822\22\45327.0007

advice of legal or tax counsel to the Company) to withhold or make payments to any federal, state, local or foreign taxing authority (a "**Taxing Authority**") with respect to any distribution or allocation by the Company of income or gain to such Member and to withhold the same from distributions to such Member.  Any funds withheld from a distribution by reason of this Section 6.03(b) shall nonetheless be deemed distributed to the Member in question for all purposes under this Agreement.  If the Company makes any Withholding Advance in respect of a Member hereunder that is not immediately withheld from actual distributions to the Member, then the Member shall promptly reimburse the Company for the amount of such payment, plus interest at a rate equal to the prime rate published in the Wall Street Journal on the date of payment plus two percent per annum, compounded annually, on such amount from the date of such payment until such amount is repaid (or deducted from a distribution) by the Member (any such payment shall not constitute a Capital Contribution).  Each Member's reimbursement obligation under this Section 6.03(b) shall continue after such Member transfers its Membership Interests.

(c)     **Indemnification.**  Each Member hereby agrees to defend, indemnify and hold harmless the Company and the other Members from and against any liability with respect to taxes, interest, or penalties that may be asserted by reason of the Company's failure to deduct and withhold tax on amounts distributable or allocable to such Member.  The provisions of this Section 6.03(c) and the obligations of a Member pursuant to Section 6.03(b) shall survive the termination, dissolution, liquidation, and winding up of the Company and the withdrawal of such Member from the Company or Transfer of its Membership Interests.  The Company may pursue and enforce all rights and remedies it may have against each Member under this Section 6.03, including bringing a lawsuit to collect repayment with interest of any Withholding Advances.

(d)     **Overwithholding.**  None of the Company or the Sole Manager shall be liable for any excess taxes withheld in respect of any distribution or allocation of income or gain to a Member.  In the event of an overwithholding, a Member's sole recourse shall be to apply for a refund from the appropriate Taxing Authority.

**Section 6.04   Distributions in Kind**.

(a)     Subject to Sections 6.01 and 6.02, the Sole Manager is hereby authorized, as it may reasonably determine, to make distributions to the Members in the form of securities or other property (but not including any oil and gas properties) held by the Company; provided, that Tax Advances shall only be made in cash.  In any non-cash distribution, the securities or property so distributed will be distributed among the Members in the same proportion and priority as cash equal to the Fair Market Value of such securities or property would be distributed among the Members pursuant to Section 6.01.

(b)     Any distribution of securities shall be subject to such conditions and restrictions as the Sole Manager determines are required or advisable to ensure compliance with Applicable Law.  In furtherance of the foregoing, the Sole Manager may require that the Members execute and deliver such documents as the Sole Manager may deem necessary or appropriate to ensure compliance with all federal and state securities laws that

WEIL:\97901822\22\45327.0007

apply to such distribution and any further Transfer of the distributed securities, and may appropriately legend the certificates that represent such securities to reflect any restriction on Transfer with respect to such laws.

## ARTICLE VII
## MANAGEMENT

**Section 7.01   Management of the Company.**  The business and affairs of the Company shall be managed, operated, and controlled by or under the direction of one manager designated pursuant to Section 7.02 (the "**Sole Manager**").  Subject to the provisions of Section 7.04, the Sole Manager shall have, and is hereby granted, full and complete power, authority, and discretion for, on behalf of, and in the name of the Company, to take such actions as it may deem necessary or advisable to carry out any and all of the objectives and purposes of the Company, to the exclusion of the Members unless expressly provided for otherwise in this Agreement or expressly required under the BOC.  Subject to the provisions of Section 7.06, the Sole Manager shall have, and is hereby granted, full and complete power, authority, and discretion for, on behalf of, and in the name of the Company, to take such actions as it may deem necessary or advisable to carry out any and all of the objectives and purposes of the Company.

**Section 7.02   Sole Manager.**  The Company shall not have any officers or employees other than the Sole Manager.  Sunset Energy Gulf Coast Asset Management LLC has been selected and designated by the Member with the consent of CUSA to serve as the initial Sole Manager. The Sole Manager may not be removed without CUSA's prior written consent, which may be given, delayed or withheld in its sole discretion.  In the event that the Sole Manager is removed with CUSA's written consent or the Sole Manager resigns or otherwise ceases to serve in such capacity, then the Sole Manager shall be selected pursuant to the following procedure:  CUSA and the Company (acting through the Member for all purposes under this Section 7.02, who shall solicit input from Credit Bid Purchaser for all purposes under this Section 7.02) shall agree on a replacement, and, if they cannot agree, the Company shall designate a replacement, which shall be subject to CUSA's approval (which approval shall not to be unreasonably withheld, conditioned or delayed).

**Section 7.03   Material Project Contracts; Net Profit Interest**.

(a)      The Company's execution and performance of its obligations under each of the Omnibus Agreement, the NPI Conveyance, the Contract Operating Agreement, the Turnkey Removal Agreement, the Joint Development Agreement, the Deepwater Assets Decommissioning Funding Agreement, the SEMS Bridging Agreement, the Transition Services Agreement and the Escrow Agreement has been approved by the Member and shall not require any other approval on the part of the Company (by the Sole Manager or otherwise).  The Sole Manager shall not amend or modify such agreements, except in accordance with this Agreement.

(b)      At the end of each Production Period, the Company shall pay into the Escrow Account the NPI Payment, if any is due, as calculated pursuant to the terms of the NPI Conveyance.

**Section 7.04   Actions Requiring CUSA Consent.**  Without the prior written consent of CUSA (which written consent may be given, delayed or withheld in CUSA's sole discretion, unless expressly indicated otherwise), the Company shall not do, or enter into any commitment to do, any of the following:

(a)   engage in any business or activity other than (i) plugging and abandoning and decommissioning the FWE IV Assets and (ii) operating the FWE IV Assets prior to their plugging and abandonment and decommissioning;

(b)   use revenue or free cash flow for any purpose other than (i) for funding Reimbursable Costs or Third Party Payments under the Contract Operating Agreement (or similar charges under a replacement thereto) and, if applicable, payment into the Escrow Account and (ii) Tax Advances pursuant to Section 6.02(a);

(c)   issue additional Membership Interests or any other equity securities or admit additional Members to the Company;

(d)   approve any decommissioning plan with respect to the FWE IV Assets; or engage or retain any decommissioning subcontractor other than Credit Bid Purchaser pursuant to the Turnkey Removal Agreement;

(e)   incur any Indebtedness;

(f)   make any loan, advance, or capital contribution or make any investment in any Person;

(g)   replace, remove or change the powers of the Sole Manager;

(h)   replace or remove Credit Bid Purchaser under the Contract Operating Agreement; engage or retain any contract operator other than Credit Bid Purchaser pursuant to the Contract Operating Agreement; amend, or waive the application of, any provision of the Contract Operating Agreement;

(i)   divest any of the FWE IV Assets (other than sales of hydrocarbons in the ordinary course of business) or acquire any other assets (other than for a purpose permitted under Section 7.04(a) and in accordance with the terms of the Contract Operating Agreement, and further subject to any approval rights contained therein);

(j)   approving any prospective joint development project or other capital project for which an election to participate has been delivered to the Company pursuant to the Joint Development Agreement or approve any well takeover under the Joint Development Agreement;

(k)   agree to any (i) settlement or order with any Governmental Authority relating to the FWE IV Assets or the operations conducted thereon, (ii) settlement relating to contribution or payment amounts relating to decommissioning obligations with any Person, including any predecessor-in-interest to all or any portion of the leases and lands

26

Debtors' Exhibit No. 34
Page 107 of 910

covered by the FWE IV Assets or any surety bond provider or other provider or holder of security relating to decommissioning operations, or (iii) any other settlement involving FWE IV Assets or the operation of FWE IV;

(l)     amend any provision of a Material Project Contract, or waive any material right of the Company under a Material Project Contract;

(m)     [Reserved];

(n)     take any act of Bankruptcy, liquidate or otherwise terminate the existence of the Company or any of its Subsidiaries;

(o)     enter into a fundamental business transaction within the meaning of such term in the BOC;

(p)     establish a Subsidiary or enter into any joint venture or similar business arrangement or enter into a transaction covered by Section 7.03;

(q)     enter into, amend, waive, or terminate any contract with an Affiliate of the Company; or

(r)     amend, modify, supplement, restate, or waive any provision of the Certificate of Formation, this Agreement or any other organizational documents of the Company or its Subsidiaries (and any such amendment, modification, supplement, or waiver that is attempted without CUSA's prior written consent shall be void *ab initio* and without effect).

If CUSA in good faith believes that (x) Credit Bid Purchaser is in breach the Contract Operating Agreement in a manner that is materially adverse to the Company or is liable to the Company for indemnification pursuant to the terms of the Contract Operating Agreement, and (y) the Company has failed to enforce its rights (including, if applicable, termination right) with respect to such breach or indemnification and such failure is materially adverse to the Company, then CUSA may (i) deliver a written notice to the Company requesting that the Company enforce such rights (any rights to which such request relates must be specifically identified) and (ii) if the Company fails to enforce such rights within thirty days of its receipt of such notice, CUSA may itself enforce the rights of the Company against Credit Bid Purchaser on the Company's behalf.

**Section 7.05   No Compensation of the Sole Manager**.  The Sole Manager shall receive an offer letter and be compensated for the services provided by such individual as the Sole Manager of the Company in the amount set forth in such offer letter.  The Company shall reimburse the Sole Manager for all reasonable, ordinary, necessary, and direct third-party expenses incurred by the Sole Manager on behalf of the Company in carrying out the Company's business activities.

**Section 7.06   No Personal Liability**.  Except as otherwise provided in the BOC or by Applicable Law, or expressly provided in this Agreement or any written agreement between the Company and the Sole Manager, (i) the Sole Manager will not be obligated personally for any debt, obligation, or liability of the Company, whether arising in contract, tort, or otherwise,

including a debt, obligation, or liability under a judgment, decree, or order of a court, solely by reason of being or acting as the Sole Manager and (ii) subject to Section 7.04, the Sole Manager shall carry out his or her duties under this Agreement in good faith and a manner in which the Sole Manager believes to be consistent with and in furtherance of the purpose of the Company specified in Section 2.05(a).

## ARTICLE VIII
## TRANSFER

**Section 8.01   General Restrictions on Transfer**.

(a)     No Member shall Transfer all or any portion of its Membership Interest in the Company without the prior written approval of the Sole Manager.

(b)     Subject to Section 8.01(a), each Member agrees that it will not Transfer all or any portion of its Membership Interest in the Company, and the Company agrees that it shall not issue any Membership Interests:

(i)     except as permitted under the Securities Act and other Applicable Laws, and then, with respect to a Transfer of Membership Interests, only upon delivery to the Company of an opinion of counsel in form and substance satisfactory to the Company to the effect that such Transfer may be effected without registration under the Securities Act;

(ii)     if the Company becomes a partnership for U.S. federal income tax purposes, if such Transfer or issuance would cause the Company to be considered a "publicly traded partnership" under Section 7704(b) of the Code within the meaning of Treasury Regulations Section 1.7704-1(h)(1)(ii), including the look-through rule in Treasury Regulations Section 1.7704-1(h)(3);

(iii)     if such Transfer or issuance would affect the Company's existence or qualification as a limited liability company under the BOC;

(iv)     if the Company becomes a partnership for U.S. federal income tax purposes, if such Transfer or issuance would cause the Company to lose its status as a partnership for federal income tax purposes;

(v)     if such Transfer or issuance would cause the Company to be required to register as an investment company under the Investment Company Act of 1940, as amended;

(vi)     if such Transfer or issuance would cause the assets of the Company to be deemed "Plan Assets" as defined under the Employee Retirement Income Security Act of 1974 or its accompanying regulations or result in any "prohibited transaction" thereunder involving the Company; and

WEIL:\97901822\22\45327.0007

(vii)    such Transfer would limit, hinder or prohibit the Company from carrying out its purpose under Section 2.05(a).

(c)    Any Transfer or attempted Transfer of any Membership Interest in violation of this Agreement shall be null and void *ab initio*, no such Transfer shall be recorded on the Company's books, and the purported Transferee in any such Transfer shall not be treated (and the purported Transferor shall continue to be treated) as the owner of such Membership Interest for all purposes of this Agreement.

(d)    No Transfer of any Membership Interest to a Person not already a Member of the Company shall be deemed completed until the prospective Transferee has executed a joinder agreement in form and substance acceptable to the Company.

(e)    For the avoidance of doubt, any completed Transfer of a Membership Interest permitted by this Agreement shall be deemed a sale, transfer, conveyance, assignment, or other disposal of such Membership Interest in its entirety as intended by the parties to such Transfer, and shall not be deemed a sale, transfer, conveyance, assignment, or other disposal of any less than all of the rights and benefits described in the definition of the term "Membership Interest."

## ARTICLE IX
## EXCULPATION AND INDEMNIFICATION

### Section 9.01    Exculpation of Covered Persons.

(a)    **Covered Persons.**  As used herein, the term "**Covered Person**" shall mean (i) each current or former Member; (ii) each current or former manager, officer, director, shareholder, partner, member, Affiliate, employee, agent, or Representative of each Member, and each of their Affiliates; and (iii) each manager (including the Sole Manager), officer (if any), employee (if any), agent, or Representative of the Company.

(b)    **Standard of Care.**  No Covered Person shall be liable to the Company or any other Covered Person for any loss, damage, or claim incurred by reason of any action taken or omitted to be taken by such Covered Person in good faith reliance on the provisions of this Agreement, so long as such action or omission does not constitute fraud or willful misconduct by such Covered Person.

(c)    **Good Faith Reliance.**  A Covered Person shall be fully protected in relying in good faith upon the records of the Company and upon such information, opinions, reports, or statements (including financial statements and information, opinions, reports, or statements as to the value or amount of the assets, liabilities, Net Income, or Net Losses of the Company or any facts pertinent to the existence and amount of assets from which distributions might properly be paid) of the following Persons or groups: (i) another Member; (ii) one or more managers, officers or employees of the Company; (iii) any attorney, independent accountant, appraiser, or other expert or professional employed or engaged by or on behalf of the Company; or (iv) any other Person selected in good faith by or on behalf of the Company, in each case as to matters that such relying Person

29

reasonably believes to be within such other Person's professional or expert competence. The preceding sentence shall in no way limit any Person's right to rely on information to the extent provided in § 3.102 or § 3.105 of the BOC.

**Section 9.02   Liabilities and Duties of Covered Persons**.

(a)   **Limitation of Liability.**  This Agreement, unless otherwise specifically stated herein, is not intended to, and does not, create or impose any fiduciary duty on any Covered Person.  Furthermore, each of the Members and the Company hereby waives any and all fiduciary duties that, absent such waiver, may be implied by Applicable Law, and in doing so, acknowledges and agrees that the duties and obligations of each Covered Person to each other and to the Company are only as expressly set forth in this Agreement.   The provisions of this Agreement, to the extent that they restrict the duties and liabilities of a Covered Person otherwise existing at law or in equity, are agreed by the Members to replace such other duties and liabilities of such Covered Person.

(b)   **Duties.**  Subject to Section 7.06, whenever in this Agreement a Covered Person is permitted or required to make a decision (including a decision that is in such Covered Person's "discretion" or under a grant of similar authority or latitude), the Covered Person shall be entitled to consider only such interests and factors as such Covered Person desires and shall have no duty or obligation to give any consideration to any interest of or factors affecting the Company or any other Person.  Whenever in this Agreement a Covered Person is permitted or required to make a decision in such Covered Person's "good faith," the Covered Person shall act under such express standard and shall not be subject to any other or different standard imposed by this Agreement or any other Applicable Law.

**Section 9.03   Indemnification**.

(a)   **Indemnification.**  To the fullest extent permitted by the BOC, as the same now exists or may hereafter be amended, substituted or replaced (but, in the case of any such amendment, substitution, or replacement, only to the extent that such amendment, substitution, or replacement permits the Company to provide broader indemnification rights than the BOC permitted the Company to provide prior to such amendment, substitution, or replacement), the Company shall indemnify, hold harmless, defend, pay, and reimburse any Covered Person against any and all losses, claims, damages, judgments, fines, or liabilities, including reasonable legal fees or other expenses incurred in investigating or defending against such losses, claims, damages, judgments, fines, or liabilities, and any amounts expended in settlement of any claims (collectively, "**Losses**") to which such Covered Person may become subject by reason of:

(i)   any act or omission or alleged act or omission performed or omitted to be performed on behalf of the Company, any Member, or any direct or indirect Subsidiary of the foregoing in connection with the business of the Company; or

(ii)   such Covered Person being or acting in connection with the business of the Company as a member, shareholder, Affiliate, manager, director, officer, employee, or agent of the Company, any Member, or any of their respective

Affiliates, or that such Covered Person is or was serving at the request of the Company as a member, manager, director, officer, employee, or agent of any Person including the Company;

provided, that (x) such Covered Person acted in good faith and in a manner believed by such Covered Person to be in, or not opposed to, the best interests of the Company and, with respect to any criminal proceeding, had no reasonable cause to believe his conduct was unlawful, and (y) such Covered Person's conduct did not constitute fraud or willful and intentional misconduct, in either case as determined by a final, nonappealable order of a court of competent jurisdiction. In connection with the foregoing, the termination of any action, suit, or proceeding by judgment, order, settlement, conviction, or upon a plea of nolo contendere or its equivalent, shall not, of itself, create a presumption that the Covered Person did not act in good faith or, with respect to any criminal proceeding, had reasonable cause to believe that such Covered Person's conduct was unlawful, or that the Covered Person's conduct constituted fraud or willful misconduct.

(b)     **Control of Defense.**  Upon a Covered Person's discovery of any claim, lawsuit, or other proceeding relating to any Losses for which such Covered Person may be indemnified pursuant to this Section 9.03, the Covered Person shall give prompt written notice to the Company of such claim, lawsuit, or proceeding; provided, that the failure of the Covered Person to provide such notice shall not relieve the Company of any indemnification obligation under this Section 9.03, unless the Company shall have been materially prejudiced thereby. The Company shall be entitled to participate in or assume the defense of any such claim, lawsuit, or proceeding at its own expense. After notice from the Company to the Covered Person of its election to assume the defense of any such claim, lawsuit, or proceeding, the Company shall not be liable to the Covered Person under this Agreement or otherwise for any legal or other expenses subsequently incurred by the Covered Person in connection with investigating, preparing to defend, or defending any such claim, lawsuit, or other proceeding. If the Company does not elect (or fails to elect) to assume the defense of any such claim, lawsuit, or proceeding, the Covered Person shall have the right to assume the defense of such claim, lawsuit, or proceeding as it deems appropriate, but it shall not settle any such claim, lawsuit, or proceeding without the consent of the Company (which consent shall not be unreasonably withheld, conditioned, or delayed).

(c)     **Reimbursement.**  The Company shall promptly reimburse (and/or advance to the extent reasonably required) each Covered Person for reasonable legal or other expenses (as incurred) of such Covered Person in connection with investigating, preparing to defend, or defending any claim, lawsuit, or other proceeding relating to any Losses for which such Covered Person may be indemnified pursuant to this Section 9.03; provided, that if it is finally judicially determined that such Covered Person is not entitled to the indemnification provided by this Section 9.03, then such Covered Person shall promptly reimburse the Company for any reimbursed or advanced expenses.

(d)     **Entitlement to Indemnity.**  The indemnification provided by this Section 9.03 shall not be deemed exclusive of any other rights to indemnification to which those

seeking indemnification may be entitled under the BOC, any agreement or otherwise.  The provisions of this Section 9.03 shall continue to afford protection to each Covered Person regardless of whether such Covered Person remains in the position or capacity pursuant to which such Covered Person became entitled to indemnification under this Section 9.03 and shall inure to the benefit of the executors, administrators, legatees, and distributees of such Covered Person.

(e)     **Insurance.**  To the extent available on commercially reasonable terms, the Company may purchase, at its expense, insurance to cover Losses covered by the foregoing indemnification provisions and to otherwise cover Losses for any breach or alleged breach by any Covered Person of such Covered Person's duties in such amount and with such deductibles as the Sole Manager may reasonably determine; provided, that the failure to obtain such insurance shall not affect the right to indemnification of any Covered Person under the indemnification provisions contained herein, including the right to be reimbursed or advanced expenses or otherwise indemnified for Losses hereunder.  If any Covered Person recovers any amounts in respect of any Losses from any insurance coverage, then such Covered Person shall, to the extent that such recovery is duplicative, reimburse the Company for any amounts previously paid to such Covered Person by the Company in respect of such Losses.

(f)     **Funding of Indemnification Obligation.**  Notwithstanding anything contained herein to the contrary, any indemnity by the Company relating to the matters covered in this Section 9.03 shall be provided out of and to the extent of Company assets only, and no Member (unless such Member otherwise agrees in writing) shall have personal liability on account thereof or shall be required to make additional Capital Contributions to help satisfy such indemnity by the Company.

(g)     **Savings Clause.**  If this Section 9.03 or any portion hereof shall be invalidated on any ground by any court of competent jurisdiction, then the Company shall nevertheless indemnify and hold harmless each Covered Person pursuant to this Section 9.03 to the fullest extent permitted by any applicable portion of this Section 9.03 that shall not have been invalidated and to the fullest extent permitted by Applicable Law.

(h)     **Amendment.**  The provisions of this Section 9.03 shall be a contract between the Company, on the one hand, and each Covered Person who served in such capacity at any time while this Section 9.03 is in effect, on the other hand, pursuant to which the Company and each such Covered Person intend to be legally bound.  No amendment, modification, or repeal of this Section 9.03 that adversely affects the rights of a Covered Person to indemnification for Losses incurred or relating to a state of facts existing prior to such amendment, modification or repeal shall apply in such a way as to eliminate or reduce such Covered Person's entitlement to indemnification for such Losses without the Covered Person's prior written consent.

**Section 9.04   Survival.**  The provisions of this ARTICLE IX shall survive the dissolution, liquidation, winding up, termination of the Company and the withdrawal of any Member or the Transfer of any Member's interest in the Company.

## ARTICLE X
## ACCOUNTING; TAX MATTERS

**Section 10.01 Financial Statements and Other Information.**  The Company shall prepare and furnish to each Member and CUSA the following reports:

(a) **Annual Financial Statements.**  As soon as available, and in any event within 105 days after the end of each Fiscal Year, its unaudited consolidated balance sheet and related consolidated statements of operations, Members' equity and cash flows as of the end of and for such year prepared in accordance with GAAP consistently applied.

(b) **Quarterly Financial Statements.**  As soon as available, and in any event within 60 days after the end of each quarterly accounting period in each Fiscal Year (including the last fiscal quarter of the Fiscal Year), its unaudited consolidated balance sheet and related unaudited consolidated statements of operations, Members' equity and cash flows as of the end of and for such fiscal quarter and the then elapsed portion of the current Fiscal Year, setting forth in each case in comparative form the figures for the corresponding period or periods of the previous Fiscal Year or as at the end of such period or periods, all in reasonable detail and certified by the Company as presenting fairly in all material respects the consolidated financial condition and results of operations of the Company in accordance with GAAP consistently applied, subject to normal year-end audit adjustments and the absence of footnotes.

(c) **Monthly Operating Data.**  As soon as available, but in no event later than 45 days after the end of each calendar month, a statement in a form reasonably satisfactory to each Member and CUSA showing all operating data for the Company, including operating expenses and revenue for each of the Company, for such calendar month.

(d) **Budget Updates.**  Promptly once available and no less than bi-annually, an operating budget for the Fiscal Year, forecasting revenue, operating costs, and capital expenses for each fiscal quarter.

(e) **Material Government Communication.**  Promptly following receipt thereof by FWE IV, copies of all material written notices or other material communications issued or provided by or to any Governmental Authority.

(f) **Additional Information.**  Promptly following any reasonable request therefor, such other information regarding the operations, business affairs and financial condition of the Company, as any Member or CUSA may reasonably request, including, without limitation, decommissioning cost estimates and calculations.

**Section 10.02 Inspection Rights.**  Upon reasonable notice from a Member or CUSA, the Company shall afford each Member or CUSA and their respective Representatives access during normal business hours to (a) the Company's properties, offices, plants, and other facilities; (b) the corporate, financial, and similar records, reports, and documents of the Company, including, without limitation, all books and records, minutes of proceedings, internal management documents, reports of operations, reports of adverse developments, copies of any management

WEIL:\97901822\22\45327.0007

letters and communications with Members or the Sole Manager, and to permit each Member or CUSA and their respective Representatives to examine such documents and make copies thereof; and (c) the Sole Manager, any officers, senior employees, and public accountants of the Company, and to afford each Member or CUSA and their respective Representatives the opportunity to discuss the affairs, finances, and accounts of the Company with such Sole Manager, officers, senior employees, and public accountants (and the Company hereby authorizes said accountants to discuss with such Member or CUSA and their respective Representatives such affairs, finances, and accounts).

**Section 10.03 Income Tax Status.**  The Company and the Initial Member intend that the Company shall be treated as a disregarded entity for U.S., federal, state, and local income tax purposes.  Neither the Company nor any Member shall make an election for the Company to be classified as other than a partnership or a disregarded entity pursuant to Treasury Regulations Section 301.7701-3.

**Section 10.04 Tax Matters Representative**.  The following Sections 10.04(a)-(f) are intended to apply if the Company becomes a partnership for U.S. federal income tax purposes:

(a)      **Appointment.**      The Members hereby appoint the Sole Manager as "partnership representative" as provided in Code Section 6223(a) (the "**Tax Matters Representative**").      If any state or local tax law provides for a tax matters partner/partnership representative or Person having similar rights, powers, authority or obligations, the Person designated as the Tax Matters Representative shall also serve in such capacity.  To the extent required by Applicable Law, if the Tax Matters Representative is an entity, it shall appoint a "designated individual" to act on its behalf.  The Tax Matters Representative can be removed at any time by a vote of Members holding a majority of the Membership Interests, and shall resign if it is no longer a Member.  In the event of the resignation or removal of the Tax Matters Representative, Members holding a majority of the Membership Interests shall select a replacement Tax Matters Representative.

(b)      **Tax Examinations and Audits.**      The Tax Matters Representative is authorized and required to represent the Company (at the Company's expense) in connection with all examinations of the Company's affairs by Taxing Authorities, including resulting administrative and judicial proceedings, and to expend Company funds for professional services and costs associated therewith.  The Tax Matters Representative shall promptly notify the Members in writing of the commencement of any tax audit of the Company, upon receipt of a tax assessment and upon receipt of a notice of final partnership adjustment, and shall keep the Members reasonably informed of the status of any tax audit and resulting administrative and judicial proceedings.  Without the consent of Members holding a majority of the Membership Interests, the Tax Matters Representative shall not extend the statute of limitations, file a request for administrative adjustment, file suit relating to any Company tax refund or deficiency or enter into any settlement agreement relating to items of income, gain, loss or deduction of the Company with any Taxing Authority.

WEIL:\97901822\22\45327.0007

(c)      **US Federal Tax Proceedings.**   The Members acknowledge that the Company may elect the application of Section 6226 of the Code.  This acknowledgement applies to each Member whether or not the Member owns an interest in the Company in both the reviewed year and the year of the tax adjustment.  In the event that the Company elects the application of Section 6226 of the Code, the Members agree and covenant to take into account and report to the Internal Revenue Service (or any other applicable taxing authority) any adjustment to their tax items for the reviewed year of which they are notified by the Company in a written statement, in the manner provided in Section 6226(b) of the Code, whether or not the Member owns any interest in the Company at such time.  Any Member that fails to report its share of such adjustments on its tax return, agrees to indemnify and hold harmless the Company and the Tax Matters Representative from and against any and all losses, costs, liabilities and expenses related to taxes (including penalties and interest) imposed on the Company as a result of the Member's inaction.  If the Company is required to pay the assessment of the imputed underpayment under Section 6225(a)(1) of the Code or similar provisions of state law, any taxes, penalties, and interest payable by the Company shall be treated as attributable to the Members, and, to the extent possible, the Tax Matters Representative shall allocate the burden of any such amounts to those Members to whom such amounts are reasonably attributable taking into account the Member's or former Member's allocable share of taxable income or loss with respect to the Fiscal Year to which such assessment pertains and adjustments that may have been made in computing the imputed underpayment.  To the extent that any such amount is payable by the Company, at the option of the Tax Matters Representative, such amount shall be recoverable from such Member as provided in Section 6.03(c).  The provisions contained in this Section 10.04 shall survive the dissolution, termination or liquidation of the Company, the withdrawal of any Member or the Transfer of any Member's interest in the Company and apply to unadmitted assignees of a Member's interest who may be considered current or former partners of the Company for federal tax purposes.

(d)      **Tax Returns.**   Each Member agrees that such Member shall not treat any Company item inconsistently on such Member's federal, state, foreign or other income tax return with the treatment of the item on the Company's return.

(e)      **Section 754 Election.**   The Tax Matters Representative will make an election under Code Section 754, if the Company becomes a partnership for U.S. federal income tax purposes.

(f)      **Indemnification**.   The Company shall defend, indemnify, and hold harmless the Tax Matters Representative against any and all liabilities sustained as a result of any act or decision concerning Company tax matters and within the scope of responsibilities as Tax Matters Representative, so long as such act or decision was done or made in good faith and does not constitute gross negligence or willful misconduct.

**Section 10.05 Tax Returns.**  At the expense of the Company, the Sole Manager (or any officer of the Company that it may designate pursuant to this Agreement) shall endeavor to cause the preparation and timely filing (including extensions) of all tax returns, if any, required to be filed by the Company pursuant to the Code as well as all other required tax returns in each

WEIL:\97901822\22\45327.0007

jurisdiction in which the Company owns property or does business.  If the Company becomes a partnership for U.S. federal income tax purposes, as soon as reasonably possible after the end of each Fiscal Year, the Sole Manager or any designated officer of the Company, as applicable, will cause to be delivered to each Person who was a Member at any time during such Fiscal Year, IRS Schedule K-1 to Form 1065, if applicable, and such other information with respect to the Company as may be necessary for the preparation of such Person's federal, state, and local income tax returns for such Fiscal Year.

Section 10.06 Company Funds.  All funds of the Company shall be deposited in its name, or in such name as may be designated by the Sole Manager, in such checking, savings, or other accounts, or held in its name in the form of such other investments as shall be designated by the Sole Manager.  The funds of the Company shall not be commingled with the funds of any other Person.  All withdrawals of such deposits or liquidations of such investments by the Company shall be made exclusively upon the signature or signatures of the Sole Manager, or any officer or officers of the Company that may be designated by the Sole Manager, as applicable, pursuant to this Agreement.

<div align="center">

**ARTICLE XI**
**WINDING UP AND TERMINATION**

</div>

Section 11.01 Events Requiring Winding Up.  The Company shall begin to wind up its business and affairs only upon the occurrence of any of the following events (in each case, subject to the applicable provisions of Section 7.04):

> (a)      upon the permanent cessation of all production from, and Final Completion of all plugging and abandonment and decommissioning of, the FWE IV Assets;

> (b)      the occurrence of a nonwaivable event under the terms of the BOC which requires the winding up of the Company after its termination unless a Continuance occurs in respect of such event; or

> (c)      the entry of a judicial decree ordering winding up and termination under § 11.314 of the BOC in proceedings of which CUSA has been given notice and an opportunity to participate.

> (d)      Notwithstanding the occurrence of an event referenced in Section 11.01(b), if the Company is permitted prior to the termination of its existence in accordance with the BOC to revoke a winding up upon the occurrence of such event and the Sole Manager provides its prior written consent to such revocation, then, to the extent so permitted under the BOC and in the manner provided therein, the Company's existence shall be continued (the revocation of such a winding up and continuance of the Company, a "**Continuance**").

Section 11.02 Effectiveness of Termination.  The Company shall begin to wind up its business and affairs as soon as reasonably practicable upon the occurrence of an event described in Section 11.01 (if such event has not been revoked or cancelled), but the Company shall not terminate until the winding up of the Company has been completed, the assets of the Company

WEIL:\97901822\22\45327.0007

have been distributed as provided in Section 11.03, and the Certificate of Termination shall have been filed as provided in Section 11.04.

**Section 11.03 Liquidation.**  If the Company is to be terminated pursuant to Section 11.01, the Company shall be liquidated and its business and affairs wound up in accordance with the BOC and the following provisions:

(a)  **Liquidator.**  The Sole Manager shall act as liquidator to wind up the Company (the "**Liquidator**"); provided, however, that if there is then a vacancy in the position of the Sole Manager or the Sole Manager is not willing to act as the Liquidator, the Members shall appoint a Person to act as the Liquidator with the consent of CUSA. The Liquidator shall have full power and authority to sell, assign, and encumber any or all of the Company's assets and to wind up and liquidate the affairs of the Company in an orderly and business-like manner.

(b)  **Accounting.**  As promptly as possible after the event requiring winding up and again after final liquidation, the Liquidator shall cause a proper accounting to be made by a recognized firm of certified public accountants of the Company's assets, liabilities, and operations through the last day of the calendar month in which such event occurs or the final liquidation is completed, as applicable.

(c)  **Notice.**  The Liquidator shall deliver to each known claimant of the Company the notice required by § 11.052 of the BOC.

(d)  **Distribution of Proceeds.**  The Liquidator shall liquidate the assets of the Company and distribute the proceeds of such liquidation in the following order of priority, unless otherwise required by mandatory provisions of Applicable Law:

(i)  First, to the payment of all of the Company's debts and liabilities to its creditors (including Members, if applicable), including amounts owed, if any, pursuant to the Material Project Contracts to CUSA and/or Credit Bid Purchaser, and the expenses of liquidation (including sales commissions incident to any sales of assets of the Company);

(ii)  Second, to the establishment of and additions to other reserves that are determined by the Liquidator to be reasonably necessary for any contingent unforeseen liabilities or obligations of the Company; and

(iii)  Third, to the Members in accordance with the positive balances in their respective Capital Accounts, as determined after taking into account all Capital Account adjustments for the taxable year of the Company during which the liquidation of the Company occurs.

(e)  **Discretion of Liquidator.**  Notwithstanding the provisions of Section 11.03(d) that require the liquidation of the assets of the Company, but subject to the order of priorities set forth in Section 11.03(d), if upon winding up of the Company the Liquidator reasonably determines that an immediate sale of part or all of the Company's

WEIL:\97901822\22\45327.0007

assets would be impractical or could cause undue loss to the Members, the Liquidator may defer the liquidation of any assets except those necessary to satisfy Company liabilities and reserves, and may, upon approval of holders of a majority of the outstanding Membership Interests, distribute to the Members, in lieu of cash, as tenants in common and in accordance with the provisions of Section 11.03(d), undivided interests in such Company assets as the Liquidator deems not suitable for liquidation. Any such distribution in kind shall be subject to such conditions relating to the disposition and management of such properties as the Liquidator deems reasonable and equitable and to any agreements governing the operating of such properties at such time. For purposes of any such distribution, any property to be distributed will be valued at its Fair Market Value.

**Section 11.04 Certificate of Termination.** Upon completion of the distribution of the assets of the Company as provided in Section 11.03(d) hereof, the Liquidator or other such officer or Sole Manager shall execute and cause to be filed a Certificate of Termination in the State of Texas and shall cause the cancellation of all qualifications and registrations of the Company as a foreign limited liability company in jurisdictions other than the State of Texas and shall take such other actions as may be necessary to terminate the Company. Upon acceptance of the Certificate of Termination by the Texas Secretary of State, the Company shall be terminated.

**Section 11.05 Survival of Rights, Duties, and Obligations.** Dissolution, liquidation, winding up, or termination of the Company for any reason shall not release any party from any Loss that at the time of such dissolution, liquidation, winding up, or termination already had accrued to any other party or thereafter may accrue in respect of any act or omission prior to such dissolution, liquidation, winding up, or termination. For the avoidance of doubt, none of the foregoing shall replace, diminish, or otherwise adversely affect any Member's right to indemnification pursuant to Section 9.03.

**Section 11.06 Recourse for Claims.** Each Member shall look solely to the assets of the Company for all distributions with respect to the Company, such Member's Capital Account, and such Member's share of Net Income, Net Loss, and other items of income, gain, loss, and deduction, and shall have no recourse therefor (upon termination or otherwise) against the Liquidator or any other Member.

## ARTICLE XII
## MISCELLANEOUS

**Section 12.01 Expenses.** The Initial Member will pay, or cause to be paid, or contribute to the Company amounts necessary for the Company to pay, all amounts necessary to fully cover (a) costs associated with the formation of the Company in connection with the Divisive Merger Documents and (b) any premiums to satisfy organizational or area wide bonding requirements.

**Section 12.02 Further Assurances.** In connection with this Agreement and the transactions contemplated hereby, the Company and the Member hereby agree, at the request of the Company or any other Member, to execute and deliver such additional documents, instruments, conveyances, and assurances and to take such further actions as may be required to carry out the provisions hereof and give effect to the transactions contemplated hereby.

WEIL:\97901822\22\45327.0007

Debtors' Exhibit No. 34
Page 119 of 910

**Section 12.03 Confidentiality**.

(a)     Each Member acknowledges that it will have access to and become acquainted with trade secrets, proprietary information, and confidential information belonging to the Company and its Affiliates that are not generally known to the public, including, but not limited to, information concerning business plans, financial statements, and other information, operating practices and methods, expansion plans, strategic plans, marketing plans, contracts, customer lists, or other business documents that the Company treats as confidential, in any format whatsoever (including oral, written, electronic, or any other form or medium) (collectively, "**Confidential Information**").  In addition, each Member acknowledges that:  (i) the Company has invested, and continues to invest, substantial time, expense, and specialized knowledge in developing its Confidential Information; (ii) the Confidential Information provides the Company with a competitive advantage over others in the marketplace; and (iii) the Company would be irreparably harmed if the Confidential Information were disclosed to competitors or made available to the public.  Without limiting the applicability of any other agreement to which any Member is subject, no Member shall, directly or indirectly, disclose or use (other than solely for the purposes of such Member monitoring and analyzing its investment in the Company) at any time, including, without limitation, use for personal, commercial, or proprietary advantage or profit, either during its association with the Company or thereafter, any Confidential Information of which such Member is or becomes aware.  Each Member in possession of Confidential Information shall take all appropriate steps to safeguard such information and to protect it against disclosure, misuse, espionage, loss, and theft.

(b)     Nothing contained in Section 12.03(a) shall prevent any Member from disclosing Confidential Information: (i) upon the order of any court or administrative agency; (ii) upon the request or demand of any regulatory agency or authority having jurisdiction over such Member; (iii) to the extent compelled by legal process or required or requested pursuant to subpoena, interrogatories, or other discovery requests; (iv) to the extent necessary in connection with the exercise of any remedy hereunder; (v) to the other Members; or (vi) to such Member's Representatives who, in the reasonable judgment of such Member, need to know such Confidential Information and agree to be bound by the provisions of this Section 12.03 as if a Member; or (vii) to any potential Transferee in connection with a proposed Transfer of Membership Interests from such Member, as long as such potential Transferee agrees in writing to be bound by the provisions of this Section 12.03 as if a Member before receiving such Confidential Information; provided, that in the case of clause (i), (ii), or (iii), such Member shall notify the Company and other Members of the proposed disclosure as far in advance of such disclosure as practicable (but in no event make any such disclosure before notifying the Company and other Members) and use reasonable efforts to ensure that any Confidential Information so disclosed is accorded confidential treatment satisfactory to the Company, when and if available.

(c)     The restrictions of Section 12.03(a) shall not apply to Confidential Information that: (i) is or becomes generally available to the public other than as a result of a disclosure by a Member in violation of this Agreement; (ii) is or has been independently developed or conceived by such Member without use of Confidential

39

Information; or (iii) becomes available to such Member or any of its Representatives on a non-confidential basis from a source other than the Company, the other Members, or any of their respective Representatives, provided, that such source is not known by the receiving Member to be bound by a confidentiality agreement regarding the Company.

(d)     The obligations of each Member under this Section 12.03 shall survive for so long as such Member remains a Member, and for three years following the earlier of (i) termination, dissolution, liquidation, and winding up of the Company; (ii) the withdrawal of such Member from the Company; or (iii) such Member's Transfer of its Membership Interests; provided that with respect to Confidential Information that constitutes a trade secret under Applicable Law, the obligations of each Member under this Section 12.03 shall survive until, if ever, such Confidential Information loses its trade secret protection other than due, directly or indirectly, to an act or omission of the Member.

**Section 12.04 Notices.**   All notices, requests, consents, claims, demands, waivers, and other communications hereunder shall be in writing and shall be deemed to have been given:

(a)     when delivered by hand (with written confirmation of receipt);

(b)     when received by the addressee if sent by a nationally recognized overnight courier (receipt requested);

(c)     on the third day after the date mailed, by certified or registered mail, return receipt requested, postage prepaid; or

(d)     on the day delivered if sent by electronic mail to the address below during normal business hours of the recipient and on the next Business Day if sent by electronic mail after normal business hours of the recipient.

Such communications must be sent to the respective parties at the following addresses (or at such other address for a party as shall be specified in a notice given in accordance with this Section 12.04):

**If to the Company:**          Fieldwood Energy IV LLC
                              2000 W. Sam Houston Parkway S., Suite 1200
                              Houston, Texas 77042
                              Attention: Sole Manager
                              Phone: [●]
                              Email: [●]

40

with a copy to:

(which shall not
constitute notice)

Chevron U.S.A. Inc.
100 Northpark Blvd
Covington, LA 70443
Attention: Land Manager
Phone: (985) 773-6538
Email: tdwebre@chevron.com

**If to Member**:       To the Member's respective mailing address as set forth on the Members Schedule.

**Section 12.05 Headings.**  The headings in this Agreement are inserted for convenience or reference only and are in no way intended to describe, interpret, define, or limit the scope, extent, or intent of this Agreement or any provision of this Agreement.

**Section 12.06 Severability.**  If any term or provision of this Agreement is held to be invalid, illegal, or unenforceable under Applicable Law in any jurisdiction, such invalidity, illegality, or unenforceability shall not affect any other term or provision of this Agreement or invalidate or render unenforceable such term or provision in any other jurisdiction.  Except as provided in Section 9.03(g), upon such determination that any term or other provision is invalid, illegal, or unenforceable, this Agreement shall be modified automatically so as to effect the original intent of the parties as closely as possible in order that the transactions contemplated hereby be consummated as originally contemplated to the greatest extent possible, legal, and enforceable.

**Section 12.07 Entire Agreement.**  This Agreement, together with the Certificate of Merger, Plan of Merger, Certificate of Formation, the Material Project Contracts and all related Exhibits and Schedules, constitute the sole and entire agreement of the parties to this Agreement with respect to the subject matter contained herein and therein, and supersede all prior and contemporaneous understandings, agreements, representations, and warranties, both written and oral, with respect to such subject matter.

**Section 12.08 Successors and Assigns.**  Subject to the restrictions on Transfers set forth herein, this Agreement shall be binding upon and shall inure to the benefit of the parties hereto and their respective heirs, executors, administrators, successors, and assigns.

**Section 12.09 No Third-Party Beneficiaries.**  Except (a) with respect to certain rights reserved to CUSA as set forth in this Agreement, which shall be for the benefit of and enforceable by CUSA, and (b) as provided in ARTICLE IX, which shall be for the benefit of and enforceable by Covered Persons as described therein, this Agreement is for the sole benefit of the parties hereto (and their respective heirs, executors, administrators, successors, and assigns) and nothing herein, express or implied, is intended to or shall confer upon any other Person, including any creditor of the Company, any legal or equitable right, benefit, or remedy of any nature whatsoever under or by reason of this Agreement; provided, however that CUSA and each Covered Persons shall be an express third party beneficiary of this Agreement.

41

**Section 12.10 Amendment.**  Subject to Sections 2.02, no provision of this Agreement may be amended or modified except by an instrument in writing executed by the Company and the Members holding a majority of the Membership Interests; provided, however that any amendment or modification which impacts the rights of CUSA hereunder, including changes to Section 2.05 (Purpose) shall be subject to the prior written consent of CUSA, which may be given, delayed or withheld in its sole discretion.  Any such written amendment or modification will be binding upon the Company, CUSA and each Member.   Notwithstanding the foregoing, amendments to the Members Schedule following any new issuance, redemption, repurchase, or Transfer of Membership Interests in accordance with this Agreement may be made by the Sole Manager without the consent of or execution by the Members.

**Section 12.11 Waiver.**  No waiver by any party or CUSA of any of the provisions hereof shall be effective unless explicitly set forth in writing and signed by the party so waiving or CUSA, respectively.  No waiver by any party or CUSA shall operate or be construed as a waiver in respect of any failure, breach, or default not expressly identified by such written waiver, whether of a similar or different character, and whether occurring before or after that waiver.  No failure to exercise, or delay in exercising, any right, remedy, power, or privilege arising from this Agreement shall operate or be construed as a waiver thereof, nor shall any single or partial exercise of any right, remedy, power, or privilege hereunder preclude any other or further exercise thereof or the exercise of any other right, remedy, power, or privilege.  For the avoidance of doubt, nothing contained in this Section 12.11 shall diminish any of the explicit and implicit waivers described in this Agreement.

**Section 12.12 Governing Law.**  All issues and questions concerning the application, construction, validity, interpretation, and enforcement of this Agreement shall be governed by and construed in accordance with the internal laws of the State of Texas, without giving effect to any choice or conflict of law provision or rule (whether of the State of Texas or any other jurisdiction) that would cause the application of laws of any jurisdiction other than those of the State of Texas.

**Section 12.13 Submission to Jurisdiction.**  The parties hereby agree that any suit, action, or proceeding seeking to enforce any provision of, or based on any matter arising out of or in connection with, this Agreement or the transactions contemplated hereby, whether in contract, tort, or otherwise, shall be brought in the federal courts of the United States of America or the courts of the State of Texas, in each case located in Harris County and in Houston, Texas.  Each of the parties hereby irrevocably consents to the jurisdiction of such courts (and of the appropriate appellate courts therefrom) in any such suit, action, or proceeding and irrevocably waives, to the fullest extent permitted by law, any objection that it may now or hereafter have to the laying of the venue of any such suit, action, or proceeding in any such court or that any such suit, action, or proceeding that is brought in any such court has been brought in an inconvenient forum.  Service of process, summons, notice, or other document by registered mail to the address set forth in Section 12.04 shall be effective service of process for any suit, action, or other proceeding brought in any such court.

**Section 12.14 Waiver of Jury Trial**.  EACH PARTY HERETO ACKNOWLEDGES AND AGREES THAT ANY DISPUTE OR CONTROVERSY THAT MAY ARISE UNDER THIS AGREEMENT IS LIKELY TO INVOLVE COMPLICATED AND DIFFICULT ISSUES

WEIL:\97901822\22\45327.0007

AND, THEREFORE, EACH SUCH PARTY IRREVOCABLY AND UNCONDITIONALLY WAIVES ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN RESPECT OF ANY LEGAL ACTION ARISING OUT OF RELATING TO THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY.

**Section 12.15 Equitable Remedies.**  Each party hereto acknowledges that a breach or threatened breach by such party of any of its obligations under this Agreement would give rise to irreparable harm to the other parties or CUSA, for which monetary damages would not be an adequate remedy, and hereby agrees that in the event of a breach or a threatened breach by such party of any such obligations, each of the other parties hereto and CUSA shall, in addition to any and all other rights and remedies that may be available to them in respect of such breach, be entitled to equitable relief, including a temporary restraining order, an injunction, specific performance, and any other relief that may be available from a court of competent jurisdiction (without any requirement to post bond).

**Section 12.16 Attorney's Fees.**  In the event that any party or third-party beneficiary hereto institutes any legal suit, action, or proceeding, including arbitration, against another party in respect of a matter arising out of or relating to this Agreement, the prevailing party or third-party beneficiary in the suit, action, or proceeding shall be entitled to receive, in addition to all other damages to which it may be entitled, the costs incurred by it in conducting the suit, action, or proceeding, including reasonable attorneys' fees and expenses and court costs.

**Section 12.17 Remedies Cumulative.**  The rights and remedies under this Agreement are cumulative and are in addition to and not in substitution for any other rights and remedies available at law or in equity or otherwise, except to the extent expressly provided in Section 9.02 to the contrary.

**Section 12.18 Counterparts.**  This Agreement may be executed in counterparts, each of which shall be deemed an original, but all of which together shall be deemed to be one and the same agreement.  A signed copy of this Agreement delivered by email or other means of Electronic Transmission shall be deemed to have the same legal effect as delivery of an original signed copy of this Agreement.

(SIGNATURE PAGE FOLLOWS)

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be entered into as of the date first written above by their respective officers thereunto duly authorized.

**The Company:**

FIELDWOOD ENERGY IV LLC,
a Texas limited liability company


By:_____
Name:
Title:


**The Initial Member:**

FIELDWOOD ENERGY INC.,
a Delaware corporation


By:_____
Name:
Title:

# SCHEDULE A

## <u>MEMBERS SCHEDULE</u>

| Member Name, and Address | Membership Interest |
|---|---|
| Fieldwood Energy Inc.<br>2000 W. Sam Houston Parkway S., Suite 1200<br>Houston, Texas 77042 | 100% |
| Total: | 100% |

WEIL:\97901822\22\45327.0007

**Exhibit I-A(i)**

**FWE IV Leases**

| Field | Block | Lease | Type | Rights | Date Le Eff | Date Le Exp | Le Cur Acres (Ac) | Operator | WI | Lease Status |
|---|---|---|---|---|---|---|---|---|---|---|
| BRAZOS A-102/A-105 | BA A-102 | G01754 | Federal | RT | 6/1/1968 | 6/14/2020 | 5,760 | Fieldwood En | 100.0% | TERMIN |
| BRAZOS A-102/A-105 | BA A-105 | G01757 | Federal | RT A | 7/1/1968 | N/A | 4,320 | Fieldwood En | 56.3% | PROD |
| BRAZOS A-102/A-105 | BA A-105 | G01757 | Federal | RT B | 7/1/1968 | N/A | 1,440 | Fieldwood En | 100.0% | PROD |
| BRAZOS A-102/A-105 | BA A-105 | G01757 | Federal | OP 1 | 7/1/1968 | N/A | 4,320 | Fieldwood En | 56.3% | PROD |
| BRAZOS A-133 | BA A-133 | G02665 | Federal | RT | 7/1/1974 | N/A | 5,760 | GOM Shelf | 25.0% | PROD |
| EAST BREAKS 158/159/160/161 | EB 158 | G02645 | Federal | RT | 7/1/1974 | N/A | 5,760 | Fieldwood SD Off | 66.7% | PROD |
| EAST BREAKS 158/159/160/161 | EB 158 | G02645 | Federal | OP 1 | 7/1/1974 | N/A | 5,760 | Fieldwood SD Off | 66.7% | PROD |
| EAST BREAKS 158/159/160/161 | EB 159 | G02646 | Federal | RT | 7/1/1974 | N/A | 5,760 | Fieldwood SD Off | 66.7% | PROD |
| EAST BREAKS 158/159/160/161 | EB 159 | G02646 | Federal | OP 1 | 7/1/1974 | N/A | 5,760 | Fieldwood SD Off | 66.7% | PROD |
| EAST CAMERON 331/332 | EC 331 | G08658 | Federal | OP 1 | 8/1/1987 | 11/20/2020 | 5,000 | Fieldwood En Off | 52.8% | TERMIN |
| EAST CAMERON 331/332 | EC 331 | G08658 | Federal | OP 2 | 8/1/1987 | 11/20/2020 | 5,000 | Fieldwood En Off | 52.8% | TERMIN |
| EAST CAMERON 331/332 | EC 332 | G09478 | Federal | RT | 5/1/1988 | 11/20/2020 | 5,000 | Fieldwood En Off | 88.0% | TERMIN |
| EAST CAMERON 331/332 | EC 332 | G09478 | Federal | OP 1 | 5/1/1988 | 11/20/2020 | 5,000 | Fieldwood En Off | 88.0% | TERMIN |
| EUGENE IS. 342/343 | EI 342 | G02319 | Federal | RT A | 2/1/1973 | 10/28/2020 | 2,500 | Fieldwood En | 50.0% | TERMIN |
| HIGH IS. A-550 | HI A-550 | G04081 | Federal | RT | 10/1/1979 | N/A | 5,760 | Fieldwood En Off | 100.0% | PROD |
| HIGH IS. A-550 | HI A-550 | G04081 | Federal | OP 1 | 10/1/1979 | N/A | 720 | Fieldwood En Off | 100.0% | PROD |
| HIGH IS. A-550 | HI A-550 | G04081 | Federal | OP 2 | 10/1/1979 | N/A | 5,040 | Fieldwood En Off | 100.0% | PROD |
| MAIN PASS 77 | MP 77 | G04481 | Federal | RT | 11/1/1980 | 10/26/2020 | 4,655 | Fieldwood En Off | 55.6% | RELINQ |

| Field | Block | Lease | Type | Rights | Date Le Eff | Date Le Exp | Le Cur Acres (Ac) | Operator | WI | Lease Status |
|---|---|---|---|---|---|---|---|---|---|---|
| SOUTH MARSH IS. 132 | SM 132 | G02282 | Federal | RT | 2/1/1973 | 4/1/2016 | 5,000 | Fieldwood En | 50.0% | TERMIN |
| SOUTH MARSH IS. 136/137/149/150 | SM 136 | G02588 | Federal | RT | 5/1/1974 | 8/4/2019 | 2,500 | Fieldwood En | 50.0% | TERMIN |
| SOUTH MARSH IS. 136/137/149/150 | SM 137 | G02589 | Federal | RT | 5/1/1974 | 6/30/2015 | 5,000 | Fieldwood En | 50.0% | TERMIN |
| SOUTH MARSH IS. 136/137/149/150 | SM 150 | G16325 | Federal | RT | 6/1/1996 | 5/22/2018 | 3,329 | Fieldwood En | 50.0% | RELINQ |
| SOUTH MARSH IS. 66 | SM 66 | G01198 | Federal | RT | 6/1/1962 | 9/25/2019 | 5,000 | Fieldwood En | 50.0% | TERMIN |
| SHIP SHOAL 169/182/193/194 | SS 169 | 00820 | Federal | RT | 4/1/1960 | N/A | 5,000 | Fieldwood En | 33.3% | PROD |
| SHIP SHOAL 190/206/216 | SS 206 | G01522 | Federal | RT | 7/1/1967 | 3/22/2021 | 5,000 | Fieldwood En | 40.0% | TERMIN |
| SHIP SHOAL 190/206/216 | SS 207 | G01523 | Federal | RT | 7/1/1967 | 3/22/2021 | 5,000 | Fieldwood En | 26.3% | TERMIN |
| SHIP SHOAL 252/253 | SS 252 | G01529 | Federal | RT | 7/1/1967 | 4/23/2021 | 5,000 | Fieldwood En Off | 50.0% | TERMIN |
| SHIP SHOAL 252/253 | SS 253 | G01031 | Federal | RT | 7/1/1967 | 4/23/2021 | 5,000 | Fieldwood En Off | 50.0% | TERMIN |
| SOUTH TIMBALIER 169 | ST 169 | G01253 | Federal | RT | 6/1/1962 | 1/8/2010 | 4,708 | Beryl O&G | 100.0% | TERMIN |
| SOUTH TIMBALIER 195 | ST 195 | G03593 | Federal | RT | 8/1/1977 | 2/5/2019 | 5,000 | Fieldwood En Off | 100.0% | TERMIN |
| VIOSCA KNOLL 113 | VK 113 | G16535 | Federal | RT | 6/1/1996 | 2/23/2020 | 5,760 | Fieldwood En Off | 100.0% | TERMIN |
| VIOSCA KNOLL 251/340/384 | VK 251 | G10930 | Federal | RT | 7/1/1989 | N/A | 5,760 | Fieldwood En Off | 100.0% | UNIT |
| VIOSCA KNOLL 251/340/384 | VK 251 | G10930 | Federal | OP 1 | 7/1/1989 | N/A | 5,760 | Fieldwood En Off | 100.0% | UNIT |
| VIOSCA KNOLL 251/340/384 | VK 251 | G10930 | Federal | OP 2 | 7/1/1989 | N/A | 5,760 | Fieldwood En Off | 55.0% | UNIT |
| VIOSCA KNOLL 251/340/384 | VK 340 | G10933 | Federal | RT | 7/1/1989 | N/A | 5,760 | Fieldwood En Off | 100.0% | UNIT |

| Field | Block | Lease | Type | Rights | Date Le Eff | Date Le Exp | Le Cur Acres (Ac) | Operator | WI | Lease Status |
|---|---|---|---|---|---|---|---|---|---|---|
| VIOSCA KNOLL 251/340/384 | VK 340 | G10933 | Federal | OP 1 | 7/1/1989 | N/A | 5,760 | Fieldwood En Off | 100.0% | UNIT |
| VIOSCA KNOLL 251/340/384 | VK 340 | G10933 | Federal | OP 2 | 7/1/1989 | N/A | 5,760 | Fieldwood En Off | 55.0% | UNIT |
| VERMILION 196 | VR 196 | G19760 | Federal | OP 1 | 8/1/1998 | 11/30/2020 | 5,000 | Fieldwood En Off | 25.0% | TERMIN |
| VERMILION 196 | VR 207 | G19761 | Federal | OP 1 | 8/1/1998 | 7/27/2009 | 5,000 | Beryl O&G | 46.4% | RELINQ |
| VERMILION 261/262 | VR 261 | G03328 | Federal | RT | 4/1/1976 | 8/10/2020 | 5,429 | Fieldwood En | 25.0% | TERMIN |
| VERMILION 261/262 | VR 261 | G03328 | Federal | OP 1 | 4/1/1976 | 8/10/2020 | 509 | Fieldwood En | 25.0% | TERMIN |
| VERMILION 315/332 | VR 314 | G05438 | Federal | OP 2 | 7/1/1983 | 4/30/2021 | 5,000 | Fieldwood En Off | 50.0% | TERMIN |

**Exhibit I-A(ii)**

**Certain Other FWE IV Leases**

| Field | Block | Lease | Type | Rights | Date Le Eff | Date Le Exp | Le Cur Acres (Ac) | Operator | WI | Lease Status |
|---|---|---|---|---|---|---|---|---|---|---|
| EAST BREAKS 158/159/160/161 | EB 160 | G02647 | Federal | RT | 7/1/1974 | N/A | 5,760 | Fieldwood SD Off | 100.0% | PROD |
| EAST BREAKS 158/159/160/161 | EB 160 | G02647 | Federal | OP 1 | 7/1/1974 | N/A | 5,760 | Fieldwood SD Off | 100.0% | PROD |
| EAST BREAKS 158/159/160/161 | EB 161 | G02648 | Federal | RT | 7/1/1974 | N/A | 5,760 | Fieldwood SD Off | 100.0% | PROD |
| EAST BREAKS 158/159/160/161 | EB 161 | G02648 | Federal | OP 1 | 7/1/1974 | N/A | 5,760 | Fieldwood SD Off | 100.0% | PROD |
| HIGH IS. A-446 | HI A-446 | G02359 | Federal | RT | 8/1/1973 | 4/12/2016 | 5,760 | Bandon O&G | 100.0% | TERMIN |
| VERMILION 315/332 | VR 332 | G09514 | Federal | RT | 7/1/1988 | N/A | 5,000 | Fieldwood En | 100.0% | PROD |
| VERMILION 315/332 | VR 332 | G09514 | Federal | OP 1 | 7/1/1988 | N/A | 5,000 | Fieldwood En | 66.5% | PROD |

**Exhibit I-B(i)**

**FWE IV Wells**

| Asset Name | FWE Acct. Code | Lease Number | API | WI | NRI |
|---|---|---|---|---|---|
| BRAZOS A-105 #002 | BAA105002 | G01757 | 427054000400 | 100.0% | 83.3% |
| BRAZOS A-105 #A001 | BAA105A01 | G01757 | 427054003100 | 100.0% | 83.3% |
| BRAZOS A-105 #A002 | BAA102A02 | G01754 | 427054002500 | 100.0% | NP |
| BRAZOS A-105 #A003 | BAA105A03 | G01757 | 427054002900 | 100.0% | 83.3% |
| BRAZOS A-105 #A004 | BAA105A04 | G01757 | 427054003000 | 100.0% | 83.3% |
| BRAZOS A-105 #A005 | BAA105A05 | G01757 | 427054003200 | 100.0% | 83.3% |
| BRAZOS A-105 #B001 | BAA105B010 | G01757 | 427054012200 | 56.3% | 46.9% |
| BRAZOS A-105 #B002 | BAA105B020 | G01757 | 427054012600 | 56.3% | 46.9% |
| BRAZOS A-105 #B003 | BAA105B030 | G01757 | 427054012800 | 56.3% | 46.9% |
| BRAZOS A-105 #B004 | BAA105B040 | G01757 | 427054013000 | 56.3% | 46.9% |
| BRAZOS A-105 #B005 | BAA105B050 | G01757 | 427054013300 | 56.3% | 46.9% |
| BRAZOS A-133 #A001 | BAA133A010 | G02665 | 427054002400 | 25.0% | 20.8% |
| BRAZOS A-133 #A002 | BAA133A020 | G02665 | 427054003300 | 25.0% | 20.8% |
| BRAZOS A-133 #A003 | BAA133A030 | G02665 | 427054003500 | 25.0% | TA |
| BRAZOS A-133 #A004 ST1 | BAA133A041 | G02665 | 427054004301 | 25.0% | 20.8% |
| BRAZOS A-133 #A005 ST1 | BAA133A051 | G02665 | 427054004001 | 25.0% | 20.8% |
| BRAZOS A-133 #A006 | BAA133A060 | G02665 | 427054004500 | 25.0% | 20.8% |
| BRAZOS A-133 #A007 | BAA133A070 | G02665 | 427054004800 | 25.0% | 20.8% |
| BRAZOS A-133 #A008 | BAA133A080 | G02665 | 427054005200 | 25.0% | 20.8% |
| BRAZOS A-133 #A009 | BAA133A090 | G02665 | 427054005400 | 25.0% | 20.8% |
| BRAZOS A-133 #A010 | BAA133A100 | G02665 | 427054013100 | 25.0% | 20.8% |
| BRAZOS A-133 #C001 | BAA133C010 | G02665 | 427054007800 | 25.0% | 20.8% |
| BRAZOS A-133 #C002 | BAA133C020 | G02665 | 427054008200 | 25.0% | 20.8% |
| BRAZOS A-133 #C003 | BAA133C030 | G02665 | 427054010700 | 25.0% | 20.8% |
| BRAZOS A-133 #C004 | BAA133C040 | G02665 | 427054013500 | 25.0% | 20.8% |
| BRAZOS A-133 #D001 ST1 | BAA133D011 | G02665 | 427054009201 | 25.0% | 20.8% |
| BRAZOS A-133 #D003 | BAA133D030 | G02665 | 427054012700 | 25.0% | 20.8% |
| EAST BREAKS 158 #A003 ST4 | EB158A03 | G02645 | 608044004104 | 66.7% | 55.6% |
| EAST BREAKS 158 #A007 | EB158A07 | G02645 | 608044005100 | 66.7% | 55.6% |
| EAST BREAKS 158 #A012 | EB158A12 | G02645 | 608044005601 | 66.7% | 55.6% |
| EAST BREAKS 158 #A014 ST1 | EB158A14 | G02645 | 608044005901 | 66.7% | 55.6% |
| EAST BREAKS 159 #A002 | EB159A02 | G02646 | 608044003800 | 66.7% | 55.6% |
| EAST BREAKS 159 #A003 | EB158A03 | G02647 | 608044004101 | 66.7% | 55.6% |

| Asset Name | FWE Acct. Code | Lease Number | API | WI | NRI |
|---|---|---|---|---|---|
| EAST BREAKS 159 #A005 ST2 | EB159A05 | G02646 | 608044004503 | 66.7% | 55.6% |
| EAST BREAKS 159 #A006 ST1 | EB159A06 | G02646 | 608044004401 | 66.7% | 55.6% |
| EAST BREAKS 159 #A009 | EB159A09 | G02646 | 608044005200 | 66.7% | 55.6% |
| EAST BREAKS 159 #A011 | EB159A11 | G02646 | 608044005400 | 66.7% | 55.6% |
| EAST BREAKS 159 #A012 | EB158A12 | G02646 | 608044005600 | 66.7% | 55.6% |
| EAST BREAKS 159 #A017 | EB159A17 | G02646 | 608044018300 | 66.7% | 55.6% |
| EAST CAMERON 331 #A001 | EC331A01 | G08658 | 177044076300 | 70.4% | NP |
| EAST CAMERON 331 #A003 | EC331A03 | G08658 | 177044076400 | 70.4% | NP |
| EAST CAMERON 331 #A004 | EC331A04 | G08658 | 177044076700 | 70.4% | NP |
| EAST CAMERON 331 #A009 | EC331A09 | G08658 | 177044079400 | 52.8% | NP |
| EAST CAMERON 331 #A010 | EC331A10 | G08658 | 177044079500 | 52.8% | NP |
| EAST CAMERON 331 #A012 | EC331A12 | G08658 | 177044083300 | 52.8% | NP |
| EAST CAMERON 331 #A013 | EC331A13 | G08658 | 177044083400 | 70.4% | NP |
| EAST CAMERON 332 #A002 | EC332A02 | G09478 | 177044076200 | 70.4% | NP |
| EAST CAMERON 332 #A005 | EC332A05 | G09478 | 177044076800 | 70.4% | TA |
| EAST CAMERON 332 #A006 ST1 | EC332A06 | G09478 | 177044077301 | 70.4% | TA |
| EAST CAMERON 332 #A007 | EC332A07 | G09478 | 177044077400 | 70.4% | NP |
| EAST CAMERON 332 #A008 | EC332A08 | G09478 | 177044077700 | 70.4% | NP |
| EAST CAMERON 332 #A011 | EC332A11 | G09478 | 177044083101 | 70.4% | NP |
| EAST CAMERON 332 #A014 | EC332A14 | G09478 | 177044094600 | 70.4% | NP |
| EAST CAMERON 332 #A016 | EC332A16 | G09478 | 177044097901 | 70.4% | NP |
| EAST CAMERON 332 #A017 | EC332A17 | G09478 | 177044078103 | 70.4% | NP |
| EUGENE IS 342 #004 | EI34200400 | G02319 | 177104113000 | 0.0% | NP |
| EUGENE IS 342 #C002 ST1 | EI342C0201 | G02319 | 177104110601 | 0.0% | NP |
| EUGENE IS 342 #C003 | EI342C0300 | G02319 | 177104114000 | 0.0% | NP |

| Asset Name | FWE Acct. Code | Lease Number | API | WI | NRI |
|---|---|---|---|---|---|
| EUGENE IS 342 #C004 | EI342C0401 | G02319 | 177104120101 | 0.0% | NP |
| EUGENE IS 342 #C005 | EI342C0502 | G02319 | 177104120202 | 50.0% | NP |
| EUGENE IS 342 #C006 | EI342C0600 | G02319 | 177104120300 | 0.0% | NP |
| EUGENE IS 342 #C007 | EI342C0700 | G02319 | 177104120800 | 0.0% | NP |
| EUGENE IS 342 #C008 | EI342C0800 | G02319 | 177104121000 | 0.0% | NP |
| EUGENE IS 342 #C009 | EI342C0900 | G02319 | 177104121300 | 0.0% | NP |
| EUGENE IS 342 #C011 | EI342C1100 | G02319 | 177104122000 | 0.0% | NP |
| EUGENE IS 342 #C012 | EI342C1200 | G02319 | 177104122200 | 0.0% | NP |
| EUGENE IS 342 #C013 | EI342C1300 | G02319 | 177104122700 | 0.0% | NP |
| EUGENE IS 342 #C014 | EI342C1400 | G02319 | 177104135800 | 0.0% | NP |
| EUGENE IS 342 #C015 | EI342C1501 | G02319 | 177104162101 | 0.0% | NP |
| EUGENE IS 342 #C016 | EI342C1601 | G02319 | 177104162201 | 0.0% | NP |
| EUGENE IS 342 #C017 BP1 | EI342C1701 | G02319 | 177104162501 | 50.0% | NP |
| HIGH ISLAND A-550 #002 | HIA55002 | G04081 | 427094062700 | 100.0% | TA |
| HIGH ISLAND A-550 #003 | HIA55003 | G04081 | 427094063700 | 100.0% | TA |
| HIGH ISLAND A-550 #A001 ST3 | HIA550A01 | G04081 | 427094057004 | 100.0% | NP |
| HIGH ISLAND A-550 #A002 ST1 | HIA550A02 | G04081 | 427094074101 | 100.0% | NP |
| HIGH ISLAND A-550 #A003 | HIA550A03 | G04081 | 427094076000 | 100.0% | TA |
| HIGH ISLAND A-550 #A004 ST1 | HIA550A04 | G04081 | 427094099501 | 100.0% | NP |
| HIGH ISLAND A-550 #A005 | HIA550A05 | G04081 | 427094099801 | 100.0% | NP |
| HIGH ISLAND A-550 #A006 | HIA550A06 | G04081 | 427094104801 | 100.0% | NP |
| MAIN PASS 077 #A001 | MP077A0100 | G04481 | 177254033800 | 55.6% | NP |
| MAIN PASS 077 #A002 ST1 | MP077A0201 | G04481 | 177254043101 | 55.6% | NP |
| MAIN PASS 077 #A003 | MP077A0300 | G04481 | 177254036100 | 55.6% | NP |
| MAIN PASS 077 #A004 | MP077A0400 | G04481 | 177254036900 | 55.6% | NP |
| MAIN PASS 077 #A005 | MP077A0500 | G04481 | 177254038000 | 55.6% | NP |
| MAIN PASS 077 #A006 ST2 | MP077A0602 | G04481 | 177254036402 | 55.6% | NP |
| MAIN PASS 077 #A010 | MP077A1000 | G04481 | 177254039600 | 55.6% | NP |
| MAIN PASS 077 #A011 | MP077A1100 | G04481 | 177254042400 | 55.6% | NP |
| MAIN PASS 077 #A012 | MP077A1200 | G04481 | 177254039700 | 55.6% | NP |
| MAIN PASS 077 #A013 | MP077A1300 | G04481 | 177254044900 | 55.6% | NP |
| MAIN PASS 077 #A014 | MP077A1400 | G04481 | 177254044500 | 55.6% | NP |
| MAIN PASS 077 #A015 | MP077A1501 | G04481 | 177254045101 | 55.6% | NP |

| Asset Name | FWE Acct. Code | Lease Number | API | WI | NRI |
|---|---|---|---|---|---|
| MAIN PASS 077 #A016 | MP077A1600 | G04481 | 177254045900 | 55.6% | NP |
| MAIN PASS 077 #A017 | MP077A1700 | G04481 | 177254046200 | 55.6% | NP |
| MAIN PASS 077 #A018 | MP077A1800 | G04481 | 177254046800 | 55.6% | NP |
| MAIN PASS 077 #A019 | MP077A1900 | G04481 | 177254048200 | 55.6% | NP |
| MAIN PASS 077 #A020 ST1 | MP077A2001 | G04481 | 177254048501 | 55.6% | NP |
| MAIN PASS 077 #A021 ST2 | MP077A2100 | G04481 | 177254067002 | 55.6% | NP |
| MAIN PASS 077 #A022 | MP077A2201 | G04481 | 177254067401 | 55.6% | NP |
| MAIN PASS 077 #A023 | MP077A23 | G04481 | 177254067601 | 55.6% | NP |
| MAIN PASS 077 #A07 | MP077A0700 | G04481 | 177254041000 | 55.6% | NP |
| MAIN PASS 077 #A08 | MP077A0800 | G04481 | 177254038200 | 55.6% | NP |
| MAIN PASS 077 #A09 | MP077A0900 | G04481 | 177254039000 | 55.6% | NP |
| MAIN PASS 154 #A001 | MP154A01 | G10902 | 177244060400 | 100.0% | NP |
| MAIN PASS 154 #A002 | MP154A02 | G10902 | 177244069000 | 100.0% | NP |
| SHIP SHOAL 169 #BB001 | SS169BB010 | 00820 | 177114048100 | 33.3% | 27.4% |
| SHIP SHOAL 169 #BB002 | SS169BB020 | 00820 | 177114055501 | 33.3% | 27.4% |
| SHIP SHOAL 169 #BB003 | SS169BB030 | 00820 | 177114057800 | 33.3% | 27.4% |
| SHIP SHOAL 169 #BB004 | SS169BB040 | 00820 | 177114056500 | 33.3% | 27.4% |
| SHIP SHOAL 169 #BB005 | SS169BB050 | 00820 | 177114059600 | 33.3% | 27.4% |
| SHIP SHOAL 169 #BB006 | SS169BB060 | 00820 | 177114060101 | 33.3% | 27.4% |
| SHIP SHOAL 169 #C001 | SS169C0100 | 00820 | 177114075600 | 33.3% | 27.4% |
| SHIP SHOAL 169 #C003 | SS169C0300 | 00820 | 177114078500 | 33.3% | 27.4% |
| SHIP SHOAL 169 #C004 | SS169C0400 | 00820 | 177114077400 | 33.3% | 27.4% |
| SHIP SHOAL 169 #C006 | SS169C0600 | 00820 | 177114080201 | 33.3% | 27.4% |
| SHIP SHOAL 169 #C007 | SS169C0700 | 00820 | 177114080601 | 33.3% | 27.4% |
| SHIP SHOAL 169 #C008 | SS169C0800 | 00820 | 177114081300 | 33.3% | 27.4% |
| SHIP SHOAL 169 #C009 | SS169C0900 | 00820 | 177114144400 | 33.3% | 27.4% |
| SHIP SHOAL 169 #C010 | SS169C1000 | 00820 | 177114144800 | 33.3% | 27.4% |
| SHIP SHOAL 169 #G001 | SS169G0100 | 00820 | 177114127400 | 33.3% | 27.4% |
| SHIP SHOAL 169 #G002 | SS169G0200 | 00820 | 177114128500 | 33.3% | 27.4% |
| SHIP SHOAL 169 #G003 | SS169G0300 | 00820 | 177114156600 | 33.3% | TA |
| SHIP SHOAL 206 #E002 | SS206E0201 | G01522 | 177114118101 | 37.94% | NP |
| SHIP SHOAL 206 #E003 | SS206E0301 | G01522 | 177114118201 | 40.0% | NP |
| SHIP SHOAL 206 #E004 | SS206E0400 | G01522 | 177114141800 | 37.94% | NP |
| SHIP SHOAL 206 #E005 | SS206E0500 | G01522 | 177114142000 | 37.94% | NP |
| SHIP SHOAL 207 #A003 ST1 | SS207A0301 | G01523 | 177110072801 | 26.3% | NP |
| SHIP SHOAL 207 #A004B | SS207A04B0 | G01523 | 177110075500 | 26.3% | NP |
| SHIP SHOAL 207 #A006D | SS207A06D0 | G01523 | 177110078200 | 26.3% | NP |

| Asset Name | FWE Acct. Code | Lease Number | API | WI | NRI |
|---|---|---|---|---|---|
| SHIP SHOAL 207 #A008B | SS207A08B0 | G01523 | 177110080700 | 26.3% | NP |
| SHIP SHOAL 207 #A009 | SS207A0900 | G01523 | 177110082400 | 26.3% | NP |
| SHIP SHOAL 207 #A010D | SS207A10D0 | G01523 | 177110083900 | 26.3% | NP |
| SHIP SHOAL 207 #A013 | SS207A1300 | G01523 | 177112002500 | 26.3% | NP |
| SHIP SHOAL 207 #A015 ST1 | SS207A1501 | G01523 | 177112010601 | 26.3% | NP |
| SHIP SHOAL 207 #A016 ST1 | SS207A1601 | G01523 | 177112011401 | 26.3% | NP |
| SHIP SHOAL 207 #A018 | SS207A1800 | G01523 | 177112005000 | 26.3% | NP |
| SHIP SHOAL 207 #A019ST | SS207A1901 | G01523 | 177114009401 | 26.3% | NP |
| SHIP SHOAL 207 #A020 | SS207A2000 | G01523 | 177114010300 | 26.3% | NP |
| SHIP SHOAL 207 #A022 ST1 | SS207A2201 | G01523 | 177114011301 | 26.3% | NP |
| SHIP SHOAL 207 #A023B | SS207A23B0 | G01523 | 177114013500 | 26.3% | NP |
| SHIP SHOAL 207 #A024 | SS207A2400 | G01523 | 177114014300 | 26.3% | NP |
| SHIP SHOAL 207 #A025 | SS207A2500 | G01523 | 177114015500 | 26.3% | NP |
| SHIP SHOAL 207 #A026 | SS207A2601 | G01523 | 177112001101 | 26.3% | NP |
| SHIP SHOAL 207 #A027 | SS207A2701 | G01523 | 177110079401 | 26.3% | NP |
| SHIP SHOAL 207 #A028 | SS207A2801 | G01523 | 177110077301 | 26.3% | NP |
| SHIP SHOAL 207 #A029 ST | SS207A2901 | G01523 | 177112001901 | 26.3% | NP |
| SHIP SHOAL 207 #A030 | SS207A3001 | G01523 | 177110071501 | 26.3% | NP |
| SHIP SHOAL 207 #A031 ST2 | SS207A3102 | G01523 | 177114117702 | 26.3% | NP |
| SHIP SHOAL 207 #A032 | SS207A3201 | G01523 | 177114119701 | 26.3% | NP |
| SHIP SHOAL 207 #A033 ST1 | SS207A3301 | G01523 | 177114121901 | 26.3% | NP |
| SHIP SHOAL 207 #A034 | SS207A3400 | G01523 | 177114122200 | 26.3% | NP |
| SHIP SHOAL 207 #A035 ST1 | SS207A3501 | G01523 | 177114133301 | 26.3% | NP |
| SHIP SHOAL 207 #A036 | SS207A3600 | G01523 | 177114137700 | 26.3% | NP |
| SHIP SHOAL 207 #D002 | SS207D0200 | G01523 | 177114025400 | 26.3% | NP |
| SHIP SHOAL 207 #D007 | SS207D0700 | G01523 | 177114030300 | 26.3% | NP |
| SHIP SHOAL 207 #D008 | SS207D0800 | G01523 | 177114032300 | 26.3% | NP |
| SHIP SHOAL 207 #D009 | SS207D0900 | G01523 | 177114116400 | 26.3% | NP |
| SHIP SHOAL 207 #D010 ST1 | SS207D1001 | G01523 | 177114116501 | 26.3% | NP |
| SHIP SHOAL 252 #C004 | SS252C04 | G01529 | 177122001500 | 50.0% | NP |
| SHIP SHOAL 252 #C005 | SS252C05 | G01529 | 177122002000 | 50.0% | NP |
| SHIP SHOAL 252 #C009 | SS252C09 | G01529 | 177124029400 | 50.0% | NP |
| SHIP SHOAL 252 #C012 | SS252C12 | G01529 | 177124047300 | 50.0% | NP |

| Asset Name | FWE Acct. Code | Lease Number | API | WI | NRI |
|---|---|---|---|---|---|
| SHIP SHOAL 252 #F001 | SS252F01 | G01529 | 177124052000 | 50.0% | NP |
| SHIP SHOAL 252 #F003 | SS252F03 | G01529 | 177124052200 | 50.0% | NP |
| SHIP SHOAL 252 #F004 | N/A | G01529 | 177124067400 | 50.0% | NP |
| SHIP SHOAL 253 #C001 | SS253C01 | G01031 | 177122000100 | 50.0% | NP |
| SHIP SHOAL 253 #C002 | SS253C02 | G01031 | 177122006700 | 50.0% | NP |
| SHIP SHOAL 253 #C003 | SS253C03 | G01031 | 177122001300 | 50.0% | NP |
| SHIP SHOAL 253 #C006 | SS253C06 | G01031 | 177122002100 | 50.0% | NP |
| SHIP SHOAL 253 #C007 | SS253C07 | G01031 | 177122002300 | 50.0% | NP |
| SHIP SHOAL 253 #C008 | SS253C08 | G01031 | 177124030000 | 50.0% | NP |
| SHIP SHOAL 253 #C010 | SS253C10 | G01031 | 177124029300 | 50.0% | NP |
| SHIP SHOAL 253 #C011 | SS253C11 | G01031 | 177124030900 | 50.0% | NP |
| SHIP SHOAL 253 #C012 | SS252C12 | G01031 | 177124047300 | 50.0% | NP |
| SHIP SHOAL 253 #D001 | SS253D01 | G01031 | 177122004200 | 50.0% | NP |
| SHIP SHOAL 253 #D003 | SS253D03 | G01031 | 177124000400 | 50.0% | NP |
| SHIP SHOAL 253 #D004 | SS253D04 | G01031 | 177124001100 | 50.0% | NP |
| SHIP SHOAL 253 #D005 | SS253D05 | G01031 | 177124001200 | 50.0% | NP |
| SHIP SHOAL 253 #D006 | SS253D06 | G01031 | 177124001300 | 50.0% | NP |
| SHIP SHOAL 253 #D007 | SS253D07 | G01031 | 177124001400 | 50.0% | NP |
| SHIP SHOAL 253 #D008 | SS253D08 | G01031 | 177124001600 | 50.0% | NP |
| SHIP SHOAL 253 #D009 | SS253D09 | G01031 | 177124001800 | 50.0% | NP |
| SHIP SHOAL 253 #D010 | SS253D10 | G01031 | 177124002000 | 50.0% | NP |
| SHIP SHOAL 253 #D012 | N/A | G01031 | 177124002400 | 50.0% | NP |
| SHIP SHOAL 253 #D013 | SS253D13 | G01031 | 177124002600 | 50.0% | NP |
| SHIP SHOAL 253 #D014 | SS253D14 | G01031 | 177124002700 | 50.0% | NP |
| SHIP SHOAL 253 #E001 | SS253E01 | G01031 | 177124024200 | 50.0% | NP |
| SHIP SHOAL 253 #E002 | SS253E02 | G01031 | 177124024600 | 50.0% | NP |
| SHIP SHOAL 253 #E003 ST1 | SS253E03 | G01031 | 177124025301 | 50.0% | NP |
| SHIP SHOAL 253 #E004 | SS253E04 | G01031 | 177124025400 | 50.0% | NP |
| SHIP SHOAL 253 #E005 ST1 | SS253E05 | G01031 | 177124025501 | 50.0% | NP |
| SHIP SHOAL 253 #E006 | SS253E06 | G01031 | 177124026600 | 50.0% | NP |
| SHIP SHOAL 253 #E007 | SS253E07 | G01031 | 177124026800 | 50.0% | NP |
| SHIP SHOAL 253 #E008 | SS253E08 | G01031 | 177124027600 | 50.0% | NP |
| SHIP SHOAL 253 #E009 ST1 | SS253E09 | G01031 | 177124027700 | 50.0% | NP |
| SHIP SHOAL 253 #E010 | SS253E10 | G01031 | 177124027800 | 50.0% | NP |
| SHIP SHOAL 253 #E011 | SS253E11 | G01031 | 177124028200 | 50.0% | NP |
| SHIP SHOAL 253 #E012 | SS253E12 | G01031 | 177124028400 | 50.0% | NP |
| SHIP SHOAL 253 #E013 | SS253E13 | G01031 | 177124037500 | 50.0% | NP |

| Asset Name | FWE Acct. Code | Lease Number | API | WI | NRI |
|---|---|---|---|---|---|
| SHIP SHOAL 253 #E014 | SS253E14 | G01031 | 177124042100 | 50.0% | NP |
| SHIP SHOAL 253 #E015 ST1 | SS253E15 | G01031 | 177124044401 | 50.0% | NP |
| SHIP SHOAL 253 #F002 | SS253F02 | G01031 | 177124044400 | 50.0% | NP |
| SHIP SHOAL206#E001(SS207E1 | SS207E0100 | G01523 | 177114115500 | 37.94% | NP |
| SOUTH MARSH IS 066 #C001 | SM066C0100 | G01198 | 177070041200 | 50.0% | NP |
| SOUTH MARSH IS 066 #C002 | SM066C0200 | G01198 | 177070049000 | 50.0% | NP |
| SOUTH MARSH IS 066 #C003 | SM066C0300 | G01198 | 177074005800 | 50.0% | NP |
| SOUTH MARSH IS 066 #C004 | SM066C0400 | G01198 | 177070050000 | 50.0% | NP |
| SOUTH MARSH IS 066 #C005 | SM066C0500 | G01198 | 177070050700 | 50.0% | NP |
| SOUTH MARSH IS 066 #C006 | SM066C0600 | G01198 | 177072018700 | 50.0% | NP |
| SOUTH MARSH IS 066 #C007 | SM066C0700 | G01198 | 177070052800 | 50.0% | NP |
| SOUTH MARSH IS 066 #C009B | SM066C09B0 | G01198 | 177072001200 | 50.0% | NP |
| SOUTH MARSH IS 066 #C011 | SM066C1100 | G01198 | 177074072900 | 50.0% | NP |
| SOUTH MARSH IS 066 #C012 | SM066C1200 | G01198 | 177074073500 | 50.0% | NP |
| SOUTH MARSH IS 066 #D001 | SM066D0100 | G01198 | 177074025400 | 50.0% | NP |
| SOUTH MARSH IS 066 #D003 | SM066D0300 | G01198 | 177074029000 | 50.0% | NP |
| SOUTH MARSH IS 066 #D004 | SM066D0400 | G01198 | 177074032000 | 50.0% | NP |
| SOUTH MARSH IS 066 #D005 | SM066D0500 | G01198 | 177074032600 | 50.0% | NP |
| SOUTH MARSH IS 066 #D006 ST | SM066D0601 | G01198 | 177074031201 | 50.0% | NP |
| SOUTH MARSH IS 066 #D007 ST1BP | SM066D0701 | G01198 | 177074027401 | 50.0% | NP |
| SOUTH MARSH IS 132 #B002 | SM132B0200 | G02282 | 177084031800 | 50.0% | TA |
| SOUTH MARSH IS 132 #B003 ST1 | SM132B0301 | G02282 | 177084031601 | 50.0% | TA |
| SOUTH MARSH IS 132 #B004 | SM132B0400 | G02282 | 177084033000 | 50.0% | TA |

| Asset Name | FWE Acct. Code | Lease Number | API | WI | NRI |
|---|---|---|---|---|---|
| SOUTH MARSH IS 132 #B005 | SM132B0500 | G02282 | 177084033500 | 50.0% | TA |
| SOUTH MARSH IS 132 #B006 | SM132B0600 | G02282 | 177084033900 | 50.0% | TA |
| SOUTH MARSH IS 132 #B007 | SM132B0700 | G02282 | 177084034100 | 50.0% | TA |
| SOUTH MARSH IS 132 #B008 | SM132B0800 | G02282 | 177084035500 | 50.0% | TA |
| SOUTH MARSH IS 132 #B009 | SM132B0900 | G02282 | 177084036200 | 50.0% | TA |
| SOUTH MARSH IS 132 #B010 | SM132B1000 | G02282 | 177084036500 | 50.0% | TA |
| SOUTH MARSH IS 132 #B011 | SM132B1100 | G02282 | 177084037800 | 50.0% | NP |
| SOUTH MARSH IS 136 #A004 | SM136A0400 | G02588 | 177084021900 | 50.0% | NP |
| SOUTH MARSH IS 136 #A008 | SM136A08 | G02588 | 177084032401 | 50.0% | NP |
| SOUTH MARSH IS 136 #A010 | SM136A1000 | G02588 | 177084035700 | 50.0% | NP |
| SOUTH MARSH IS 136 #A015 | SM136A1500 | G02588 | 177084071200 | 50.0% | NP |
| SOUTH MARSH IS 136 #C007 | SM136C0700 | G02588 | 177084091900 | 50.0% | NP |
| SOUTH MARSH IS 137 #A001 | SM137A0100 | G02589 | 177084007700 | 50.0% | NP |
| SOUTH MARSH IS 137 #A003 | SM137A0300 | G02589 | 177084020400 | 50.0% | NP |
| SOUTH MARSH IS 137 #A005 | SM137A0500 | G02589 | 177084024100 | 50.0% | NP |
| SOUTH MARSH IS 137 #A009 | SM137A0900 | G02589 | 177084034600 | 50.0% | NP |
| SOUTH MARSH IS 137 #A011 ST1 | SM137A1101 | G02589 | 177084030201 | 50.0% | NP |
| SOUTH MARSH IS 137 #A012 | SM137A1200 | G02589 | 177084040400 | 50.0% | NP |
| SOUTH MARSH IS 137 #A013 | SM137A1300 | G02589 | 177084042900 | 50.0% | NP |
| SOUTH MARSH IS 137 #A014 | SM137A1400 | G02589 | 177084045000 | 50.0% | NP |
| SOUTH MARSH IS 137 #A018 | SM137A1800 | G02589 | 177084072800 | 50.0% | NP |
| SOUTH MARSH IS 150 #C006 BP2 | SM150C0600 | G16325 | 177084091802 | 50.0% | NP |

| Asset Name | FWE Acct. Code | Lease Number | API | WI | NRI |
|---|---|---|---|---|---|
| SOUTH TIMBALIER 195 #B001 | ST195B01 | G03593 | 177154091400 | 100.0% | TA |
| SOUTH TIMBALIER 195 #B002 | ST195B02 | G03593 | 177154092500 | 100.0% | TA |
| SOUTH TIMBALIER 195 #B003 | ST195B03 | G03593 | 177154117901 | 100.0% | NP |
| VERMILION 196 #A001 | VR196A01 | G19760 | 177054112300 | 25.0% | NP |
| VERMILION 196 #A002 | VR196A02 | G19760 | 177054116700 | 25.0% | NP |
| VERMILION 196 #A004 | VR196A04 | G19760 | 177054127900 | 25.0% | NP |
| VERMILION 207 #A003 | VR207A03 | G19761 | 177054117600 | 46.4% | TA |
| VERMILION 261 #A001 | VR261A0100 | G03328 | 177064029000 | 25.0% | NP |
| VERMILION 261 #A002 | VR261A0200 | G03328 | 177064033000 | 25.0% | NP |
| VERMILION 261 #A004 | VR261A0402 | G03328 | 177064032902 | 25.0% | NP |
| VERMILION 261 #A005 | VR261A0500 | G03328 | 177064034600 | 25.0% | NP |
| VERMILION 261 #A007 | VR261A0700 | G03328 | 177064035400 | 25.0% | NP |
| VERMILION 261 #A008 | VR261A0800 | G03328 | 177064084900 | 25.0% | NP |
| VERMILION 314 #A009 | VR314A09 | G05438 | 177064076900 | 50.0% | NP |
| VIOSCA KNOLL 113 #A001 | VK113A01 | G16535 | 608164039101 | 100.0% | 83.3% |
| VIOSCA KNOLL 251 #A001 | VK251A001 | G10930 | 608164029800 | 100.0% | 81.3% |
| VIOSCA KNOLL 251 #A002 | VK251A002 | G10930 | 608164034501 | 100.0% | 81.3% |
| VIOSCA KNOLL 251 #A003 | VK251A003 | G10930 | 608164041500 | 100.0% | 81.3% |
| VIOSCA KNOLL 251 #A004 | VK251A004 | G10930 | 608164042101 | 100.0% | 81.3% |
| VIOSCA KNOLL 340 #A001 | VK340A01 | G10933 | 608164038800 | 100.0% | 81.4% |
| VIOSCA KNOLL 340 #A002 | VK340A02 | G10933 | 608164044400 | 100.0% | 81.4% |

**Exhibit I-B(ii)**

**Certain Other FWE IV Wells**

| Asset Name | FWE Acct. Code | Lease Number | API | WI | NRI |
|---|---|---|---|---|---|
| EAST BREAKS 160 #A005 HB-2 | EB160A05 | G02647 | 608044003700 | 100.0% | 83.3% |
| EAST BREAKS 160 #A009 HB2 | EB160A09 | G02647 | 608044005800 | 100.0% | 83.3% |
| EAST BREAKS 160 #A010 GA1 | EB160A10 | G02647 | 608044008702 | 100.0% | 83.3% |
| EAST BREAKS 160 #A016 | EB160A16 | G02647 | 608044006000 | 100.0% | 83.3% |
| EAST BREAKS 160 #A018 ST4 | EB160A18 | G02647 | 608044006904 | 100.0% | 83.3% |
| EAST BREAKS 160 #A023 | EB160A23 | G02647 | 608044003900 | 100.0% | 83.3% |
| EAST BREAKS 160 #A025 | EB160A25 | G02647 | 608044004600 | 100.0% | 83.3% |
| EAST BREAKS 160 #A027 HB2 | EB160A27 | G02647 | 608044004900 | 100.0% | 83.3% |
| EAST BREAKS 160 #A031 HB2 | EB160A31 | G02647 | 608044008400 | 100.0% | 83.3% |
| EAST BREAKS 160 #A033 ST TA | EB160A33 | G02647 | 608044007002 | 100.0% | 83.3% |
| EAST BREAKS 161 #002 (CORONA) | EB16102 | G02648 | 608044022600 | 100.0% | 83.3% |
| EAST BREAKS 161 #A001 ST | EB161A01 | G02648 | 608044002801 | 100.0% | 83.3% |
| EAST BREAKS 161 #A002 | EB161A02 | G02648 | 608044003100 | 100.0% | 83.3% |
| EAST BREAKS 161 #A003 HB4 | EB161A03 | G02648 | 608044002900 | 100.0% | 83.3% |
| EAST BREAKS 161 #A004 | N/A | G02648 | 608044003400 | 100.0% | 83.3% |
| EAST BREAKS 161 #A007 GM1 | EB161A07 | G02648 | 608044004300 | 100.0% | 83.3% |
| EAST BREAKS 161 #A008 HB2 | EB161A08 | G02648 | 608044004800 | 100.0% | 83.3% |
| EAST BREAKS 161 #A013 ST | EB161A13 | G02648 | 608044024501 | 100.0% | 83.3% |
| EAST BREAKS 161 #A024 | EB161A24 | G02648 | 608044009701 | 100.0% | 83.3% |
| EAST BREAKS 161 #A029 GA3 | EB161A29 | G02648 | 608044005300 | 100.0% | 83.3% |
| HIGH ISLAND A-446 #A001 | HIA446A01 | G02359 | 427094055400 | 100.0% | 68.4% |
| HIGH ISLAND A-446 #A002B | HIA446A02 | G02360 | 427094055700 | 100.0% | 68.4% |
| HIGH ISLAND A-446 #A004 | HIA446A04 | G02359 | 427094056300 | 100.0% | TA |
| HIGH ISLAND A-446 #A005 | HIA446A05 | G02359 | 427094057700 | 100.0% | TA |
| HIGH ISLAND A-446 #A006 | HIA446A06 | G02359 | 427094056700 | 100.0% | 68.4% |
| HIGH ISLAND A-446 #A007 | HIA446A07 | G02359 | 427094056800 | 100.0% | TA |
| HIGH ISLAND A-446 #A008 | HIA446A08 | G02359 | 427094057400 | 100.0% | TA |
| HIGH ISLAND A-446 #A009 | HIA446A09 | G02359 | 427094060200 | 100.0% | 68.4% |
| HIGH ISLAND A-446 #A010 | HIA446A10 | G02359 | 427094058300 | 100.0% | 68.4% |
| HIGH ISLAND A-446 #A011 | HIA446A11 | G02359 | 427094058700 | 100.0% | TA |
| HIGH ISLAND A-446 #A012 | HIA446A12 | G02359 | 427094059400 | 100.0% | TA |
| HIGH ISLAND A-446 #A014 | HIA446A14 | G02359 | 427094060900 | 100.0% | 68.4% |
| HIGH ISLAND A-446 #A015 | HIA446A15 | G02359 | 427094061300 | 100.0% | TA |
| HIGH ISLAND A-446 #A016 | HIA446A16 | G02359 | 427094062300 | 100.0% | TA |
| VERMILION 332 #A001 | VR332A01 | G09514 | 177064069400 | 66.5% | 55.4% |

| | | | | | |
|---|---|---|---|---|---|
| VERMILION 332 #A002 | VR332A02 | G09514 | 177064069900 | 66.5% | 55.4% |
| VERMILION 332 #A003 | VR332A03 | G09514 | 177064072300 | 66.5% | TA |
| VERMILION 333 #A004 | N/A | G14417 | 177064072600 | 50.0% | TA |
| VERMILION 332 #A005 | VR332A05 | G09514 | 177064077802 | 66.5% | 55.4% |
| VERMILION 332 #A006 | VR332A06 | G09514 | 177064077901 | 66.5% | 55.4% |

**Exhibit I-C(i)**

**FWE IV Platforms**

| Asset Name | FWE Acct. Code | Lease Number | Area/Block | WI |
|---|---|---|---|---|
| BRAZOS A-105 P/F-A | BAA105PFA | G01757 | BAA105 | 56.3% |
| BRAZOS A-105 P/F-B | BAA105PFB | G01757 | BAA105 | 56.3% |
| BRAZOS A-133 P/F-A | BAA133APLT | G02665 | BAA133 | 25.0% |
| BRAZOS A-133 P/F-B | BAA133BPLT | G02665 | BAA133 | 25.0% |
| BRAZOS A-133 P/F-C-AUX | BAA133CAUX | G02665 | BAA133 | 25.0% |
| BRAZOS A-133 P/F-D | BAA133DPLT | G02665 | BAA133 | 25.0% |
| BRAZOS A-133 P/F-E | BAA133EPLT | G02665 | BAA133 | 25.0% |
| EAST BREAKS 159 P/F-A | EB159PFA | G02646 | EB159 | 66.7% |
| EAST CAMERON 332 P/F-A | EC332PFA | G09478 | EC332 | 88.0% |
| HIGH ISLAND A-550 P/F-A | HIA550PFA | G04081 | HIA550 | 100.0% |
| MAIN PASS 077 P/F-A | MP077PFA | G04481 | MP077 | 55.6% |
| MAIN PASS 154 P/F-A | MP154PFA | G30337 | MP154 | 100.0% |
| SHIP SHOAL 169 P/F-BB | SS169PFBB | 00820 | SS169 | 33.3% |
| SHIP SHOAL 169 P/F-C | SS169PFC | 00820 | SS169 | 33.3% |
| SHIP SHOAL 169 P/F-G | SS169PFG | 00820 | SS169 | 33.3% |
| SHIP SHOAL 206 P/F-E | SS206EPLT | G01522 | SS206 | 40.0% |
| SHIP SHOAL 207 P/F-A-CMP | SS207ACOMP | G01523 | SS207 | 26.3% |
| SHIP SHOAL 207 P/F-A-DRILL | SS207ADRL | G01523 | SS207 | 26.3% |
| SHIP SHOAL 207 P/F-A-MANTIS | SS207PFAMA | G01523 | SS207 | 26.3% |
| SHIP SHOAL 207 P/F-A-PROD | SS207APRD | G01523 | SS207 | 26.3% |
| SHIP SHOAL 207 P/F-D | SS207DPLT | G01523 | SS207 | 26.3% |
| SHIP SHOAL 207 P/F-DWPF | SS207DPLT | G01523 | SS207 | 26.3% |
| SHIP SHOAL 253 C | SS253PFC | G01031 | SS 253 | 50.0% |
| SHIP SHOAL 253 D | SS253PFD | G01031 | SS 253 | 50.0% |
| SHIP SHOAL 253 E | SS253PFE | G01031 | SS 253 | 50.0% |
| SHIP SHOAL 253 F | SS253PFF | G01031 | SS 253 | 50.0% |
| SOUTH MARSH IS 066 P/F-C | SM66CPLT | G01198 | SM066 | 50.0% |
| SOUTH MARSH IS 066 P/F-D | SM66DPLT | G01198 | SM066 | 50.0% |
| SOUTH MARSH IS 137 P/F-A | SM137APLT | G02589 | SM137 | 50.0% |
| SOUTH TIMBALIER 195 P/F-B | ST195PFB | G03593 | ST195 | 100.0% |
| VERMILION 196 P/F-A | VR196PFA | G19760 | VR196 | 25.0% |
| VERMILION 261 P/F-A | VR261APLT | G03328 | VR261 | 25.0% |
| VERMILION 261 P/F-A-AUX | VR261AAUX | G03328 | VR261 | 25.0% |
| VERMILION 315 P/F-A | VR315PFA | G30213 | VR315 | 100.0% |
| VERMILION 315 P/F-A-AUX | VR315PFAAU | G30213 | VR315 | 100.0% |

| Asset Name | FWE Acct. Code | Lease Number | Area/Block | WI |
|---|---|---|---|---|
| VIOSCA KNOLL 113 P/F-A | VK113PFA | G16535 | VK113 | 100.0% |
| VIOSCA KNOLL 251 P/F-A | VK251PFA | G10930 | VK251 | 100.0% |
| VIOSCA KNOLL 251 P/F-A-AUX | VK251PFAAU | G10930 | VK251 | 100.0% |
| VIOSCA KNOLL 340 P/F-A | VK340PFA | G10933 | VK340 | 100.0% |

**Exhibit I-C(ii)**

**FWE IV Facilities**

| Asset Name | FWE Acct. Code | Lease Number | Area/Block | WI | |
|---|---|---|---|---|---|
| EAST BREAKS 160 P/F-A | EB160PFA | G02647 | EB160 | 100.0% | *1 |
| HIGH ISLAND A-446 P/F-A | HIA446PFA | G02359 | HIA446 | 100.0% | *1 |
| VERMILION 332 P/F-A | VR332PFA | G09514 | VR332 | 66.5% | *1 |

*1  - FWE IV Assets to include all rights of FWE III held in applicable FWE IV Facility immediately prior to the Effective Time, as contemplated by part (B) of clause (iv) in Part A of Schedule I of the Plan of Merger.

**Exhibit I-D(i)**
**FWE IV Rights of Way**

| SEGMENT NUMBER | COMPANY NAME | ORG AREA | ORG BLOCK | ORG NAME | REC AREA | REC BLOCK | REC NAME | SIZE | PRODUCT | STATUS | ROW NUMBER | FW Lease | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 7912 | Fieldwood SD Offshore LLC | EB | 160 | A | HI | A582 | SSTI | 12 | GAS | Out of Service | G08528 | G02647 | *2 |
| 10301 | Bandon Oil and Gas, LP | EC | 332 | A | EC | 330 | 08 SSTI | 6 | OIL | Out of Service | G14699 | G09478 | |
| 7943 | Fieldwood Energy, LLC | EI | 342 | C | EI | 327 | 08 SSTI | 4 | OIL | Out of Service | G08541 | G02319 | *1 |
| 18493 | Fieldwood Energy, LLC | EI | 342 | C | EI | 343 | SSTI | 6 | GAS | Out of Service | G29108 | G02319 | *1 |
| 19960 | Fieldwood Energy LLC | EI | 342 | C | EI | 342 | Blind Flange | 6 | OIL | Out of Service | G29471 | G02319 | *1 |
| 15818 | Fieldwood Energy Offshore LLC | MP | 77 | A | MP | 151 | 18"SSTI | 8 | GAS | Out of Service | G28221 | G04481 | |
| 6748 | Fieldwood Energy, LLC | SS | 169 | C Platform | SS | 169 | 18-inch SSTI | 6 | OIL | Out of Service | G09322 | 00820 | |
| 11107 | Bandon Oil and Gas, LP | ST | 196 | 06-inch SSTI | SS | 208 | F | 6 | OIL | Permitted for Abandonment Approved | G05120 | G03593 | |
| 13193 | Bandon Oil and Gas, LP | VR | 196 | A | VR | 206 | 12 SSTI | 8 | G/C | Out of Service | G22418 | G19760 | |
| 18591 | Fieldwood Energy, LLC | VR | 196 | A | VR | 215 | A | 4 | BLKO | Out of Service | G29137 | G19760 | |
| 18588 | Fieldwood Energy, LLC | VR | 215 | A | VR | 196 | A | 4 | GAS | Active | G29136 | G19760 | |
| 17090 | Fieldwood Energy, LLC | VR | 261 | A | VR | 265 | A | 8 | BLKO | Out of Service | G28347 | G03328 | *1 |
| 19427 | Fieldwood Energy, LLC | VK | 113 | A | CA | 43 | A | 4 | BLKG | Out of Service | G29321 | G16535 | |

| SEGMENT NUMBER | COMPANY NAME | ORG AREA | ORG BLOCK | ORG NAME | REC AREA | REC BLOCK | REC NAME | SIZE | PRODUCT | STATUS | ROW NUMBER | FW Lease | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 13721 | Fieldwood Energy, LLC | VK | 251 | A | VK | 340 | A | 3 | AIR | Active | G28704 | G10930 | |
| 14876 | Fieldwood Energy, LLC | VK | 251 | A | MP | 154 | A | 4 | H2O | Active | G22465 | G10930 | |
| 13720 | Fieldwood Energy Offshore LLC | VK | 340 | 8-inch SSTI | VK | 251 | Platform A | 8 | BLGH | Active | G28703 | G10933 | |
| 7298 | Dynamic Industries, Inc | VR | 315 | A | VR | 331 | 06 SSTI | 6 | OIL | Out of Service | G07545 | G04215 | |
| 10736 | Dynamic Industries, Inc | VR | 332 | A | VR | 315 | A | 8 | BLKG | Out of Service | G15672 | G09514 | *2 |
| 10737 | Dynamic Industries, Inc | VR | 332 | A | VR | 315 | A | 6 | LIFT | Out of Service | G15673 | G09514 | *2 |

*1 -The Parties recognize that segments and ROWs will be operated by Fieldwood Energy I, LLC.  In addition, the Parties acknowledges that segment numbers and ROW names may have changed after the FWE IV Rights of Way were conveyed pursuant to the Chevron PSAs.

*2 - FWE IV Assets to include all rights of FWE III held in applicable FWE IV Right of Way immediately prior to the Effective Time, as contemplated by part (B) of clause (iv) in Part A of Schedule I of the Plan of Merger.

**Exhibit I-D(ii)**

**FWE IV RUEs**

| Area | Block No. | Structure | Complex ID No. | Authority No. | FW Lease | Operator | Approval Date | Associated Assets |
|------|-----------|-----------|----------------|---------------|----------|----------|---------------|-------------------|
| MP | 154 | A | 24171 | G30337 | G10902 | Fieldwood Energy Offshore LLC | 02/03/17 | MP 154 A001 & A002 |
| VR | 315 | A | 22981 | G30213 | G04215 | Fieldwood Energy Offshore LLC | 11/26/13 | VR 332 A001, A002, A005 & A006 |
| VR | 315 | A-AUX | 22981 | G30213 | G04215 | Fieldwood Energy Offshore LLC | 11/26/13 | Production from VR 315 A RUE |

**<u>Exhibit I-E</u>**

**FWE IV Permits**

To be agreed.

**<u>Exhibit I-F</u>**

**FWE IV FCC Licenses**

None.

## **Exhibit I-G**

**FWE IV Contracts**

To be agreed.

## Exhibit I-H

### FWE IV Financial Assurances

| Account | Acct No. | Amount | Associated Asset |
|---|---|---|---|
| U.S. Bank Escrow Account | 246166000 | $792,381.49 | MAIN PASS 77 (MP 77) |

## **Exhibit I-I**

### **FWE IV Bonds**

None.

## **Exhibit 1-B**

### **Certificate of Merger**

See attached.

*Exhibit 1-B to the Implementation Agreement*

# CERTIFICATE OF MERGER
# (DOMESTIC ENTITY DIVISIONAL MERGER)
# OF
# FIELDWOOD ENERGY III LLC

## [●], 2021

Pursuant to Title 1, Chapter 10 and Title 3 of the Texas Business Organizations Code (the "TBOC"), the undersigned, Fieldwood Energy III LLC, a Texas limited liability company ("FWE III"), submits this certificate of merger for the purpose of dividing itself into a surviving domestic entity and one new domestic entity, and hereby certifies the following:

FIRST:  The name of the domestic filing entity that is dividing itself is Fieldwood Energy III LLC.

SECOND:  The principal place of business of FWE III is 2000 W Sam Houston Pkwy S #1200, Houston, TX 77042.

THIRD:  The filing number issued to FWE III by the Secretary of State of the State of Texas is [●][1].

FOURTH:  FWE III is organized as a limited liability company.

FIFTH: FWE III shall survive the merger and shall maintain its separate existence and continue as a filing entity under its name as of immediately prior to the merger.

SIXTH:  In lieu of providing the plan of merger, the filing entity certifies that:

(i)  An executed copy of the Agreement and Plan of Merger, dated as of [●], 2021 (the "Plan of Merger"), of FWE III is on file at the principal place of business of each surviving and new domestic entity provided in this form.

(ii)  On written request, a copy of the Plan of Merger will be furnished without cost by each surviving or new domestic entity to any member of any domestic entity that is a party to or created by the Plan of Merger, and any creditor or obligee of the parties to the merger at the time of the merger if a liability or obligation is then outstanding.

SEVENTH:  No amendments to the certificate of formation of FWE III are being effected by the merger.

EIGHTH:  The name, jurisdiction of organization, principal place of business address, and entity description of the entity to be created pursuant to the plan of merger are set forth below. The

---

[1] **Note to Draft**:  To be assigned upon conversion of FWE to a Texas LLC.

certificate of formation of the new domestic filing entity to be created is being filed with this certificate of merger.

<u>Name</u>:  Fieldwood Energy IV LLC

<u>Entity Description</u>:  limited liability company

<u>Jurisdiction of Organization</u>:  Texas

<u>Principal place of business</u>: 200 W. Sam Houston Pkwy S. Suite 1200.

NINTH:  The Plan of Merger has been approved as required by the laws of the jurisdiction of formation and by the governing documents of the filing entity.

TENTH:  This document becomes effective when the document is accepted and filed by the Secretary of State of the State of Texas.

ELEVENTH:  In lieu of providing the tax certificate, FWE III shall continue to be liable for the payment of all required franchise taxes of FWE III.

\* \* \* \* \* \*

2

IN WITNESS WHEREOF, the undersigned has caused this certificate of merger to be duly executed as of the date first set forth above.

**FIELDWOOD ENERGY III LLC**
a Texas limited liability company

By: _____

Name: _____

Title: _____

## Exhibit 2

### Certificate of Formation (TX) (Fieldwood Energy IV LLC)

See attached.

| | | |
|---|---|---|
| **Form 205**<br>**(Revised 05/11)**<br><br>Submit in duplicate to:<br>Secretary of State<br>P.O. Box 13697<br>Austin, TX 78711-3697<br>512 463-5555<br>FAX: 512 463-5709<br>**Filing Fee:  $300** | **Certificate of Formation**<br>**Limited Liability Company** | This space reserved for office use. |

## Article 1 – Entity Name and Type

The filing entity being formed is a limited liability company.  The name of the entity is:

FIELDWOOD ENERGY IV LLC
_____
The name must contain the words "limited liability company," "limited company," or an abbreviation of one of these phrases.

## Article 2 – Registered Agent and Registered Office
(See instructions. Select and complete either A or B and complete C.)

☒  A.  The initial registered agent is an organization (cannot be entity named above) by the name of:

CAPITOL CORPORATE SERVICES, INC.
_____
**OR**
☐  B.  The initial registered agent is an individual resident of the state whose name is set forth below:

_____
*First Name*                              *M.I.*           *Last Name*                                      *Suffix*

C.  The business address of the registered agent and the registered office address is:

206 E. 9TH STREET, SUITE 1300        AUSTIN                    TX    78701
*Street Address*                              *City*                              *State*      *Zip Code*

## Article 3—Governing Authority
(Select and complete either A or B and provide the name and address of each governing person.)

☒  A.  The limited liability company will have managers. The name and address of each initial manager are set forth below.

☐  B.  The limited liability company will not have managers.  The company will be governed by its members, and the name and address of each initial member are set forth below.

| **GOVERNING PERSON 1** |
|---|
| **NAME** (Enter the name of either an individual or an organization, but not both.) |
| **IF INDIVIDUAL** |
| |
| *First Name*                    *M.I.*          *Last Name*                                  *Suffix* |
| **OR** |
| **IF ORGANIZATION** |
| Sunset Energy Gulf Coast Asset Management LLC |
| *Organization Name* |
| **ADDRESS** |
| 1727 Sunset Boulevard              Houston            TX    USA    77005 |
| *Street or Mailing Address*          *City*              *State*  *Country*  *Zip Code* |

Form 205                                           4

**GOVERNING PERSON 2**

**NAME** (Enter the name of either an individual or an organization, but not both.)

**IF INDIVIDUAL**

| *First Name* | *M.I.* | *Last Name* | *Suffix* |
|---|---|---|---|

**OR**

**IF ORGANIZATION**

*Organization Name*

**ADDRESS**

| *Street or Mailing Address* | *City* | *State* | *Country* | *Zip Code* |
|---|---|---|---|---|

**GOVERNING PERSON 3**

**NAME** (Enter the name of either an individual or an organization, but not both.)

**IF INDIVIDUAL**

| *First Name* | *M.I.* | *Last Name* | *Suffix* |
|---|---|---|---|

**OR**

**IF ORGANIZATION**

*Organization Name*

**ADDRESS**

| *Street or Mailing Address* | *City* | *State* | *Country* | *Zip Code* |
|---|---|---|---|---|

### Article 4 – Purpose

The purpose for which the company is formed is for the transaction of any and all lawful purposes for which a limited liability company may be organized under the Texas Business Organizations Code.

### Supplemental Provisions/Information

Text Area: [The attached addendum, if any, is incorporated herein by reference.]

The entity is formed pursuant to a plan of merger. The name of the merging filing entity is Fieldwood Energy III LLC; the surviving domestic entity is Fieldwood Energy III LLC and the new domestic entity created by the divisive merger is this Fieldwood Energy IV LLC.

The address of the merging filing entity is 2000 W. Sam Houston Pkwy. S., Suite 1200, Houston, Texas 77042.

The merging filing entity was previously a Delaware limited liability company, originally formed on 11/5/2012 under the laws of the State of Delaware, USA. The merging filing entity converted to a Texas limited liability company on [__]/[__]/2021.

Form 205

5

TX060BOC - 11/27/2013 Wolters Kluwer Online

## Organizer

The name and address of the organizer:

_____
*Name*

_____
*Street or Mailing Address*                              *City*                    *State*    *Zip Code*

## Effectiveness of Filing (Select either A, B, or C.)

A. ☒ This document becomes effective when the document is filed by the secretary of state.

B. ☐ This document becomes effective at a later date, which is not more than ninety (90) days from the date of signing.  The delayed effective date is: _____

C. ☐ This document takes effect upon the occurrence of the future event or fact, other than the passage of time.  The 90th day after the date of signing is: _____

The following event or fact will cause the document to take effect in the manner described below:

_____
|                                                                               |
|                                                                               |
_____

## Execution

The undersigned affirms that the person designated as registered agent has consented to the appointment.  The undersigned signs this document subject to the penalties imposed by law for the submission of a materially false or fraudulent instrument and certifies under penalty of perjury that the undersigned is authorized to execute the filing instrument.

Date: _____

_____
Signature of organizer

_____
Printed or typed name of organizer

| Print | Reset |

Form 205

6

## Exhibit 3

**Fieldwood Energy IV LLC Agreement**

See attached.

*Exhibit 3 to the Implementation Agreement*

## LIMITED LIABILITY COMPANY AGREEMENT

### OF

### FIELDWOOD ENERGY IV LLC

*(a Texas Limited Liability Company)*

**[●], 2021**

**THE MEMBERSHIP INTERESTS REFERENCED IN THIS LIMITED LIABILITY COMPANY AGREEMENT HAVE BEEN ACQUIRED FOR INVESTMENT AND HAVE NOT BEEN REGISTERED UNDER THE U.S. SECURITIES ACT OF 1933, AS AMENDED, OR UNDER ANY APPLICABLE STATE SECURITIES LAWS. SUCH MEMBERSHIP INTERESTS MAY NOT BE SOLD, ASSIGNED, PLEDGED, HYPOTHECATED OR OTHERWISE DISPOSED OF AT ANY TIME WITHOUT EFFECTIVE REGISTRATION UNDER SUCH ACT AND LAWS OR EXEMPTION THEREFROM, AS WELL AS COMPLIANCE WITH THE OTHER SUBSTANTIAL RESTRICTIONS ON TRANSFERABILITY THAT ARE SET FORTH HEREIN.**

# TABLE OF CONTENTS

**ARTICLE I DEFINITIONS** ...................................................................................................**1**

    **Section 1.01**    **Definitions**.........................................................................1

    **Section 1.02.**    **Interpretation**.................................................................12

**ARTICLE II ORGANIZATION** ......................................................................................**13**

    **Section 2.01**    **Formation**......................................................................13

    **Section 2.02**    **Name** ...............................................................................13

    **Section 2.03**    **Principal Office** ...........................................................13

    **Section 2.04**    **Registered Office; Registered Agent.**......................13

    **Section 2.05**    **Purposes; Powers**.........................................................14

    **Section 2.06**    **Term**................................................................................14

**ARTICLE III CAPITAL CONTRIBUTIONS; CAPITAL ACCOUNTS**...............**14**

    **Section 3.01**    **Tax Partnership Provisions** ......................................14

    **Section 3.02**    **Initial Capital Contributions** ...................................14

    **Section 3.03**    **Additional Capital Contributions** ...........................14

    **Section 3.04**    **Maintenance of Capital Accounts** ...........................14

    **Section 3.05**    **Succession Upon Transfer** ........................................15

    **Section 3.06**    **Negative Capital Accounts** .......................................15

    **Section 3.07**    **No Withdrawals from Capital Accounts** .................15

    **Section 3.08**    **Treatment of Loans from Members**.........................15

    **Section 3.09**    **Modifications**................................................................16

**ARTICLE IV MEMBERS** ..................................................................................................**16**

    **Section 4.01**    **No Personal Liability**...................................................16

    **Section 4.02**    **No Withdrawal** .............................................................16

    **Section 4.03**    **No Interest in Company Property**.............................16

    **Section 4.04**    **Certification of Membership Interests**.....................16

    **Section 4.05**    **Meetings of Members.**.................................................17

    **Section 4.06**    **Action Without Meeting**.............................................18

    **Section 4.07**    **Power of Members** ......................................................18

    **Section 4.08**    **Similar or Competitive Activities; Business Opportunities**...............18

**ARTICLE V ALLOCATIONS**...........................................................................................**19**

    **Section 5.01**    **Tax Partnership Provisions** ......................................19

    **Section 5.02**    **Allocation of Net Income and Net Loss** ..................19

    **Section 5.03**    **Regulatory and Special Allocations** ........................19

i

| | | |
|---|---|---|
| Section 5.04 | **Tax Allocations**. | 20 |
| Section 5.05 | **Allocations in Respect of Transferred Membership Interests** | 22 |

**ARTICLE VI DISTRIBUTIONS** ................................................................. **22**

| | | |
|---|---|---|
| Section 6.01 | **General**. | 22 |
| Section 6.02 | **Tax Advances**. | 23 |
| Section 6.03 | **Tax Withholding; Withholding Advances** | 23 |
| Section 6.04 | **Distributions in Kind**. | 24 |

**ARTICLE VII MANAGEMENT** .................................................................. **25**

| | | |
|---|---|---|
| Section 7.01 | **Management of the Company** | 25 |
| Section 7.02 | **Sole Manager** | 25 |
| Section 7.03 | **Material Project Contracts; Net Profit Interest** | 25 |
| Section 7.04 | **Actions Requiring CUSA Consent** | 26 |
| Section 7.05 | **No Compensation of the Sole Manager** | 27 |
| Section 7.06 | **No Personal Liability** | 27 |

**ARTICLE VIII TRANSFER** ...................................................................... **28**

| | | |
|---|---|---|
| Section 8.01 | **General Restrictions on Transfer** | 28 |

**ARTICLE IX EXCULPATION AND INDEMNIFICATION** ............................... **29**

| | | |
|---|---|---|
| Section 9.01 | **Exculpation of Covered Persons**. | 29 |
| Section 9.02 | **Liabilities and Duties of Covered Persons**. | 30 |
| Section 9.03 | **Indemnification**. | 30 |
| Section 9.04 | **Survival** | 32 |

**ARTICLE X ACCOUNTING; TAX MATTERS** ............................................. **33**

| | | |
|---|---|---|
| Section 10.01 | **Financial Statements and Other Information** | 33 |
| Section 10.02 | **Inspection Rights** | 33 |
| Section 10.03 | **Income Tax Status** | 34 |
| Section 10.04 | **Tax Matters Representative** | 34 |
| Section 10.05 | **Tax Returns** | 35 |
| Section 10.06 | **Company Funds** | 36 |

**ARTICLE XI WINDING UP AND TERMINATION** ....................................... **36**

| | | |
|---|---|---|
| Section 11.01 | **Events Requiring Winding Up** | 36 |
| Section 11.02 | **Effectiveness of Termination** | 36 |
| Section 11.03 | **Liquidation** | 37 |

WEIL:\97901822\22\45327.0007

Section 11.04      **Certificate of Termination** ............................................................38
Section 11.05      **Survival of Rights, Duties, and Obligations** .............................38
Section 11.06      **Recourse for Claims** ..................................................................38

**ARTICLE XII MISCELLANEOUS** ..............................................................**38**
Section 12.01      **Expenses** ....................................................................................38
Section 12.02      **Further Assurances** ...................................................................38
Section 12.03      **Confidentiality** .........................................................................39
Section 12.04      **Notices** .......................................................................................40
Section 12.05      **Headings** ....................................................................................41
Section 12.06      **Severability** ................................................................................41
Section 12.07      **Entire Agreement** .....................................................................41
Section 12.08      **Successors and Assigns** .............................................................41
Section 12.09      **No Third-Party Beneficiaries** ..................................................41
Section 12.10      **Amendment** ...............................................................................42
Section 12.11      **Waiver** ........................................................................................42
Section 12.12      **Governing Law** ..........................................................................42
Section 12.13      **Submission to Jurisdiction** .......................................................42
Section 12.14      **Waiver of Jury Trial** .................................................................42
Section 12.15      **Equitable Remedies** ..................................................................43
Section 12.16      **Attorney's Fees** .........................................................................43
Section 12.17      **Remedies Cumulative** ...............................................................43
Section 12.18      **Counterparts** .............................................................................43

**SCHEDULE A MEMBERS SCHEDULE**                                              A-1

WEIL:\97901822\22\45327.0007

Debtors' Exhibit No. 34
Page 165 of 910

## LIMITED LIABILITY COMPANY AGREEMENT OF
## FIELDWOOD ENERGY IV LLC

This Limited Liability Company Agreement of Fieldwood Energy IV LLC, a Texas limited liability company (the "**Company**"), dated as of [●], 2021 (this "**Agreement**"), is entered into by and among the Company, the Initial Member executing this Agreement as of the date hereof, and each other Person who after the date hereof becomes a Member of the Company and becomes a party to this Agreement by executing a joinder agreement in form and substance acceptable to the Company.

### RECITALS

**WHEREAS,** the Company was formed under the laws of the State of Texas by the filing of a Certificate of Formation with the Secretary of State of the State of Texas on [●], 2021 (the "**Certificate of Formation**") for the purposes set forth in Section 2.05 of this Agreement;

**WHEREAS,** pursuant to and in accordance with the Confirmation Order and the Term Sheet, respectively, and as a result of a divisive merger pursuant to § 10.008 of the BOC, the Company owns the FWE IV Assets, subject to the operational liabilities in connection therewith allocated to the Company in the merger, including the FWE IV Obligations; and

**WHEREAS,** the Initial Member wishes to enter into this Agreement to set forth the terms and conditions governing the ownership, operation and management of the Company.

**NOW, THEREFORE,** in consideration of the mutual covenants and agreements hereinafter set forth and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto agree as follows:

### ARTICLE I
### DEFINITIONS

**Section 1.01   Definitions.**  Capitalized terms used herein and not otherwise defined shall have the meanings set forth in this Section 1.01:

"**Adjusted Capital Account Deficit**" means, with respect to any Member, the deficit balance, if any, in such Member's Capital Account as of the end of the relevant Fiscal Year, after giving effect to the following adjustments:

(a)      crediting to such Capital Account any amount that such Member is obligated to restore or is deemed to be obligated to restore pursuant to Treasury Regulations Sections 1.704-1(b)(2)(ii)(c), 1.704-2(g)(1) and 1.704-2(i); and

(b)      debiting to such Capital Account the items described in Treasury Regulations Section 1.704-1(b)(2)(ii)(d)(4), (5) and (6).

"**Adjusted Taxable Income**" of a Member, or if the Member is disregarded for U.S. federal income tax purposes, the members or beneficiaries of such Member, for a Fiscal Year (or

Debtors' Exhibit No. 34
Page 166 of 910

portion thereof) with respect to the Membership Interest held by such Member means the federal taxable income allocated by the Company to the Member with respect to its Membership Interest (as adjusted by any final determination in connection with any tax audit or other proceeding) for such Fiscal Year (or portion thereof); provided, that such taxable income shall be computed (i) minus any excess taxable loss of the Company for any prior period allocable to such Member with respect to its Membership Interest that were not previously taken into account for purposes of determining such Member's Adjusted Taxable Income in a prior Fiscal Year to the extent such loss would be available under the Code to offset income of the Member (or, as appropriate, the direct or indirect owners of the Member) determined as if the income and loss from the Company were the only income and loss of the Member (or, as appropriate, the direct or indirect owners of the Member) in such Fiscal Year and all prior Fiscal Years, and (ii) taking into account any special basis adjustment with respect to such Member resulting from an election by the Company under Code Section 754.

"**Affiliate**" means, with respect to any Person, any other Person who, directly or indirectly (including through one or more intermediaries), controls, is controlled by, or is under common control with, such Person.  For purposes of this definition, "control," when used with respect to any specified Person, shall mean the power, direct or indirect, to direct or cause the direction of the management and policies of such Person, whether through ownership of voting securities or partnership or other ownership interests, by contract or otherwise; and the terms "controlling" and "controlled" shall have correlative meanings.  For the avoidance of doubt, neither CUSA nor any of its Subsidiaries nor Credit Bid Purchaser nor any of its Subsidiaries control the Company and none of them shall constitute an Affiliate of the Company.

"**Agreement**" has the meaning set forth in the Preamble.

"**Applicable Law**" means all applicable provisions of (a) constitutions, treaties, statutes, laws (including the common law), rules, regulations, decrees, ordinances, codes, proclamations, declarations, or orders of any Governmental Authority; (b) any consents or approvals of any Governmental Authority; and (c) any orders, decisions, advisory or interpretative opinions, injunctions, judgments, awards, decrees of, or agreements with, any Governmental Authority.

"**Bankruptcy**" means (i) the filing by the Company of a petition under the Bankruptcy Code seeking to adjudicate the Company a bankrupt or an insolvent or otherwise commencing, authorizing, or acquiescing in the commencement of a proceeding or cause of action seeking liquidation, winding up, reorganization, arrangement, adjustment, protection, composition, or other relief with respect to itself or its debts under any bankruptcy, insolvency, or other similar law now or hereafter in effect or seeking the appointment of a trustee, receiver, liquidator, custodian, or other similar official over it or any substantial part of its property, or consenting to any such relief or to the appointment of or taking possession by any such official in an involuntary case or other proceeding commenced against it, or taking any corporate or similar official action to authorize any of the foregoing; (ii) the making of an assignment or any general arrangement for the benefit of creditors; or (iii) the Company's filing an answer or other pleading admitting or failing to contest the allegations of a petition filed against it in any proceeding of the foregoing nature, or taking any other action to authorize any of the actions set forth above.

WEIL:\97901822\22\45327.0007

"**Bankruptcy Code**" means title 11 of the United States Code, 11 U.S.C. §§ 101, et seq., as amended.

"**BOC**" means the Texas Business Organizations Code, as amended and in effect from time to time.

"**Book Depreciation**" means, with respect to any Company asset for each Fiscal Year, the Company's depreciation, amortization, or other cost recovery deductions determined for federal income tax purposes, except that if the Book Value of an asset differs from its adjusted tax basis at the beginning of such Fiscal Year, Book Depreciation shall be (a) if such difference is being eliminated by use of the remedial method under Treasury Regulations Section 1.704-3(d), the amount of book basis recovered for such period under the rules prescribed by Treasury Regulations Section 1.704-3(d)(2), or (b) if the remedial method is not used, an amount which bears the same ratio to such beginning Book Value as the federal income tax depreciation, amortization, or other cost recovery deduction for such Fiscal Year bears to such beginning adjusted tax basis; provided, that if the adjusted basis for federal income tax purposes of an asset at the beginning of such Fiscal Year is zero and the Book Value of the asset is positive, Book Depreciation shall be determined with reference to such beginning Book Value using any permitted method selected by the Sole Manager in accordance with Treasury Regulations Section 1.704-1(b)(2)(iv)(g)(3).

"**Book Value**" means, with respect to any Company asset, the adjusted basis of such asset for federal income tax purposes, except as follows:

     (a)     the initial Book Value of any Company asset contributed by a Member to the Company shall be the gross Fair Market Value of such Company asset as of the date of such contribution;

     (b)     immediately before the distribution by the Company of any Company asset to a Member, the Book Value of such asset shall be adjusted to its gross Fair Market Value as of the date of such distribution;

     (c)     the Book Value of all Company assets may, in the sole discretion of the Sole Manager, be adjusted to equal their respective gross Fair Market Values, as reasonably determined by the Sole Manager, as of the following times:

          (i)     the acquisition of an additional Membership Interest in the Company by a new or existing Member in consideration for more than a *de minimis* Capital Contribution;

          (ii)     the distribution by the Company to a Member of more than a *de minimis* amount of property (other than cash) as consideration for all or a part of such Member's Membership Interest in the Company; and

          (iii)     the liquidation of the Company within the meaning of Treasury Regulations Section 1.704-1(b)(2)(ii)(g);

3

Debtors' Exhibit No. 34
Page 168 of 910

(d)      the Book Value of each Company asset shall be increased or decreased, as the case may be, to reflect any adjustments to the adjusted tax basis of such Company asset pursuant to Code Section 734(b) or Code Section 743(b), but only to the extent that such adjustments are taken into account in determining Capital Account balances pursuant to Treasury Regulations Section 1.704-1(b)(2)(iv)(m); provided, that Book Values shall not be adjusted pursuant to this paragraph (d) to the extent that an adjustment pursuant to paragraph (c) above is made in conjunction with a transaction that would otherwise result in an adjustment pursuant to this paragraph (d); and

(e)      if the Book Value of a Company asset has been determined pursuant to paragraph (a) or adjusted pursuant to paragraphs (c) or (d) above, such Book Value shall thereafter be adjusted to reflect the Book Depreciation taken into account with respect to such Company asset for purposes of computing Net Income and Net Losses.

"**Business Day**" means a day other than a Saturday, Sunday or other day on which commercial banks in the State of Texas are authorized or required to close.

"**Capital Account**" has the meaning set forth in Section 3.04.

"**Capital Contribution**" means, for any Member, the total amount of cash and cash equivalents and the Book Value of any property contributed to the Company by such Member.

"**Certificate of Formation**" has the meaning set forth in the Recitals.

"**Certificate of Merger**" means that certain Certificate of Merger filed by Fieldwood III with the Secretary of State of the State of Texas on [●], 2021.

"**Certificate of Termination**" means a certificate to be filed upon completion of the winding up and liquidation of the Company as set forth in Section 11.04, which certificate shall be in the form required by § 11.101 of the BOC.

"**Code**" means the Internal Revenue Code of 1986, as amended.

"**Company**" has the meaning set forth in the Preamble.

"**Company Minimum Gain**" means "partnership minimum gain" as defined in Treasury Regulations Section 1.704-2(b)(2), substituting the term "Company" for the term "partnership" as the context requires.

"**Confidential Information**" has the meaning set forth in Section 12.03(a).

"**Confirmation Order**" means the confirmation order entered in Chapter 11 Case 20-33948, In re: Fieldwood Energy LLC, *et al*, in the United States Bankruptcy Court for the Southern District of Texas, Houston Division.

"**Continuance**" has the meaning set forth in Section 11.01.

4

"**Contract Operating Agreement**" means that certain Contract Operating Agreement of even date herewith by and among Credit Bid Purchaser and the Company, of which CUSA is an express third party beneficiary.

"**Covered Person**" has the meaning set forth in Section 9.01(a).

"**Credit Bid Purchaser**" means Mako Buyer LLC, a Delaware limited liability company.

"**CUSA**" means Chevron U.S.A. Inc., a Pennsylvania corporation, and its successors or assigns.

"**Deepwater Assets Decommissioning Funding Agreement**" means that certain Decommissioning Funding Agreement, of event date herewith, by and between CUSA and Credit Bid Purchaser.

"**Depletable Property**" means each separate oil and gas property as defined in Section 614 of the Code.

"**Divisive Merger Documents**" means the Certificate of Merger, Plan of Merger, Certificate of Formation and other documents filed by or on behalf of Fieldwood III with respect to the Company with the Texas Secretary of State related to the divisive merger of Fieldwood III into Fieldwood III (the surviving entity) and the newly-created Company.

"**Electronic Transmission**" means any form of communication, including communication by use of or participation in one or more electronic networks or databases, not directly involving the physical transmission of paper that creates a record that may be retained, retrieved, and reviewed by a recipient thereof and that may be directly reproduced in paper form by such a recipient through an automated process.

"**Escrow Account**" means **[bank information for the Escrow Account to come]**.

"**Escrow Agreement**" means that certain Escrow Agreement of even date herewith between U.S. Bank National Association, as escrow agent, Fieldwood III, the Company and Credit Bid Purchaser.

"**Estimated Tax Amount**" of a Member, or if the Member is disregarded for U.S. federal income tax purposes, the members or beneficiaries of such Member, for a Fiscal Year means the Member's Tax Amount for such Fiscal Year as estimated in good faith from time to time by the Sole Manager.  In making such estimate, the Sole Manager shall take into account amounts shown on Internal Revenue Service Form 1065 filed by the Company and similar state or local forms filed by the Company for the preceding taxable year and such other adjustments as the Sole Manager reasonably determines are necessary or appropriate to reflect the estimated operations of the Company for the Fiscal Year.

"**Excess Amount**" has the meaning set forth in Section 6.02(c).

WEIL:\97901822\22\45327.0007

"**Fair Market Value**" of any asset as of any date means the purchase price that a willing buyer having all relevant knowledge would pay a willing seller for such asset in an arm's length transaction, as determined in good faith by the Sole Manager on such factors as the Sole Manager, in the exercise of his or her reasonable business judgment, considers relevant.

"**Fieldwood**" means Fieldwood Energy LLC, a Texas limited liability company, and its successors and assigns (excluding, for the avoidance of doubt, the Company).

"**Fieldwood III**" means Fieldwood Energy III LLC, a Texas limited liability company, and its successors and assigns (excluding, for the avoidance of doubt, the Company).

"**Final Completion**" has the meaning ascribed to such term in the Turnkey Removal Agreement.

"**Fiscal Year**" means the calendar year, unless the Company is required to have a taxable year other than the calendar year, in which case Fiscal Year shall be the period that conforms to its taxable year.

"**FWE IV Assets**" has the meaning set forth in the Plan of Merger.

"**FWE IV Obligations**" has the meaning set forth in the Plan of Merger.

"**GAAP**" means generally accepted accounting principles in the United States of America in effect from time to time; provided, that, notwithstanding any term or provision contained in this Agreement, GAAP will be deemed for all purposes hereof to treat leases that would have not been considered to be indebtedness in accordance with GAAP as in effect on December 31, 2017 (whether such leases were in effect on such date or are entered into thereafter) in a manner consistent with the treatment of such leases under GAAP as in effect on December 31, 2017, notwithstanding any modification or interpretative changes thereto or implementations of any such modifications or interpretative changes that may have occurred thereafter.

"**Governmental Authority**" means any court, tribunal, arbitrator, body, agency, division, board, bureau, commission or any other similar entity exercising executive, legislative, judicial, regulatory, or administrative functions of government, or any subdivision of any of the foregoing, whether federal, state, county, municipal, tribal, local or foreign, in each case with competent jurisdiction.

"**Guarantee Obligation**" means, as to any Person (the "guaranteeing Person"), any obligation of (i) the guaranteeing Person or (ii) another Person (including any bank under any letter of credit), if to induce the creation of such obligation of such other Person the guaranteeing Person has issued a reimbursement, counterindemnity or similar obligation, in either case guaranteeing or in effect guaranteeing any Indebtedness, leases, dividends or other obligations (the "primary obligations") of any other third Person (the "primary obligor") in any manner, whether directly or indirectly, including any obligation of the guaranteeing Person, whether or not contingent, (A) to purchase any such primary obligation or any property constituting direct or indirect security therefor, (B) to advance or supply funds (1) for the purchase or payment of any such primary obligation or (2) to maintain working capital or equity capital of the primary obligor or otherwise

Debtors' Exhibit No. 34
Page 171 of 910

to maintain the net worth or solvency of the primary obligor, (C) to purchase property, securities or services, in each case, primarily for the purpose of assuring the owner of any such primary obligation of the ability of the primary obligor to make payment of such primary obligation or (D) otherwise to assure or hold harmless the owner of any such primary obligation against loss in respect thereof; provided, however, that the term Guarantee Obligation shall not include endorsements of instruments for deposit or collection in the ordinary course of business.

"**Indebtedness**" means, with respect to any Person at any date, without duplication, all (i) indebtedness of such Person for borrowed money; (ii) obligations of such Person for the deferred purchase price of property or services (other than trade payables incurred in the ordinary course of such Person's business); (iii) obligations of such Person evidenced by notes, bonds, debentures or other similar instruments; (iv) indebtedness created or arising under any conditional sale or other title retention agreement with respect to property acquired by such Person (even though the rights and remedies of the seller or lender under such agreement in the event of default are limited to repossession or sale of such property); (v) capital lease obligations of such Person; (vi) obligations of such Person, contingent or otherwise, as an account party or applicant under acceptance, letter of credit or similar facilities; (vii) obligations of such Person, contingent or otherwise, to purchase, redeem, retire or otherwise acquire for value any capital stock of such Person; (viii) Guarantee Obligations of such Person in respect of obligations of the kind referred to in clauses (i) through (vii) above; and (ix) obligations of the kind referred to in clauses (i) through (viii) above secured by (or for which the holder of such obligation has an existing right, contingent or otherwise, to be secured by) any Lien on property (including accounts and contract rights) owned by such Person, whether or not such Person has assumed or become liable for the payment of such obligation.

"**Initial Member**" has the meaning set forth in the term "Member".

"**Joint Development Agreement**" means that certain Joint Development Agreement of even date herewith by and between the Company and Credit Bid Purchaser.

"**Lien**" means any mortgage, pledge, security interest, option, right of first offer, encumbrance, or other restriction or limitation of any nature whatsoever.

"**Liquidator**" has the meaning set forth in Section 11.03(a).

"**Losses**" has the meaning set forth in Section 9.03(a).

"**Material Project Contracts**" means, collectively, the Omnibus Agreement, the NPI Conveyance, the Contract Operating Agreement, the Turnkey Removal Agreement, the Transition Services Agreement, the Joint Development Agreement, the Deepwater Assets Decommissioning Funding Agreement and the SEMS Bridging Agreement, and each a "**Material Project Contract**".

"**Member**" means (a) the Person identified on the Members Schedule as of the date hereof as a Member and who has executed this Agreement or a counterpart thereof (each, an "**Initial Member**"); and (b) each Person who is hereafter admitted as a Member in accordance with the terms of this Agreement and the BOC, in each case so long as such Person is shown on the

Company's books and records as an owner of Membership Interests.  The Members shall constitute "members" (as that term is defined in the BOC) of the Company.

"**Member Nonrecourse Debt**" means "partner nonrecourse debt" as defined in Treasury Regulations Section 1.704-2(b)(4), substituting the term "Company" for the term "partnership" and the term "Member" for the term "partner" as the context requires.

"**Member Nonrecourse Debt Minimum Gain**" means an amount, with respect to each Member Nonrecourse Debt, equal to the Company Minimum Gain that would result if the Member Nonrecourse Debt were treated as a Nonrecourse Liability, determined in accordance with Treasury Regulations Section 1.704-2(i)(3).

"**Member Nonrecourse Deduction**" means "partner nonrecourse deduction" as defined in Treasury Regulations Section 1.704-2(i), substituting the term "Member" for the term "partner" as the context requires.

"**Members Schedule**" has the meaning set forth in Section 3.02.

"**Membership Interest**" means an interest in the Company owned by a Member, including such Member's right (a) to its distributive share of Net Income, Net Losses, and other items of income, gain, loss, and deduction of the Company; (b) to its distributive share of the assets of the Company; (c) to vote on, consent to, or otherwise participate in any decision of the Members as provided in this Agreement; and (d) to any and all other benefits to which such Member may be entitled as provided in this Agreement or the BOC.  The Membership Interest of each Member shall be expressed as a percentage interest and shall be as set forth on the Members Schedule.

"**Net Income**" and "**Net Loss**" mean, for each Fiscal Year or other period specified in this Agreement, an amount equal to the Company's taxable income or taxable loss, or particular items thereof, determined in accordance with Code Section 703(a) (where, for this purpose, all items of income, gain, loss, or deduction required to be stated separately pursuant to Code Section 703(a)(1) shall be included in taxable income or taxable loss), but with the following adjustments:

> (a)  any income realized by the Company that is exempt from federal income taxation, as described in Code Section 705(a)(1)(B), shall be added to such taxable income or taxable loss, notwithstanding that such income is not includable in gross income;

> (b)  any expenditures of the Company described in Code Section 705(a)(2)(B), including any items treated under Treasury Regulations Section 1.704-1(b)(2)(iv)(I) as items described in Code Section 705(a)(2)(B), shall be subtracted from such taxable income or taxable loss, notwithstanding that such expenditures are not deductible for federal income tax purposes;

> (c)  any gain or loss (including Simulated Gain or Loss) resulting from any disposition of Company property with respect to which gain or loss is recognized for federal income tax purposes shall be computed by reference to the Book Value of the property so disposed, notwithstanding that the adjusted tax basis of such property differs from its Book Value;

WEIL:\97901822\22\45327.0007

(d)     any items of depreciation, amortization, and other cost recovery deductions with respect to Company property having a Book Value that differs from its adjusted tax basis shall be computed by reference to the property's Book Value (as adjusted for Book Depreciation) in accordance with Treasury Regulations Section 1.704-1(b)(2)(iv)(g);

(e)     if the Book Value of any Company property is adjusted as provided in the definition of Book Value, then the amount of such adjustment shall be treated as an item of gain or loss and included in the computation of such taxable income or taxable loss;

(f)     to the extent an adjustment to the adjusted tax basis of any Company property pursuant to Code Sections 732(d), 734(b) or 743(b) is required, pursuant to Treasury Regulations Section 1.704 1(b)(2)(iv)(m), to be taken into account in determining Capital Accounts, the amount of such adjustment to the Capital Accounts shall be treated as an item of gain (if the adjustment increases the basis of the asset) or loss (if the adjustment decreases such basis); and

(g)     any items which are specially allocated pursuant to Section 5.03 hereof shall not be taken into account in computing Net Income or Net Loss.  The amounts of the items of Company income, gain, loss or deduction available to be specially allocated pursuant to Section 5.03 hereof shall be determined by applying rules analogous to those set forth in subparagraphs (a) through (f) above.

"**Nonrecourse Deductions**" has the meaning set forth in Treasury Regulations Section 1.704-2(b).

"**Nonrecourse Liability**" has the meaning set forth in Treasury Regulations Section 1.704-2(b)(3).

"**NPI Conveyance**" means that certain Conveyance of Net Profits Overriding Royalty Interest from Company to the Escrow Account.

"**NPI Payment**" has the meaning attributed to the term "NPI Payment" under the NPI Conveyance.

"**Omnibus Agreement**" means that certain Omnibus Agreement of even date herewith by and between the Company, CUSA and Credit Bid Purchaser.

"**Person**" means any individual, corporation, partnership, limited liability company, association, joint stock company, trust, estate, joint venture, firm, association, unincorporated organization, Governmental Authority, or any other entity.

"**Plan of Merger**" means the Agreement and Plan of Merger of Fieldwood Energy III LLC into Fieldwood Energy IV LLC and Fieldwood Energy III LLC, dated as of [●], 2021, and adopted by Fieldwood Energy III LLC.

"**Plan of Reorganization**" means the plan of reorganization of Fieldwood that was included in, and was confirmed by, the Confirmation Order.

9

Debtors' Exhibit No. 34
Page 174 of 910

"**Production Period**" has the meaning attributed to the term "Production Period" under the NPI Conveyance.

"**Quarterly Estimated Tax Amount**" of a Member, or if the Member is disregarded for U.S. federal income tax purposes, the members or beneficiaries of such Member, for any calendar quarter of a Fiscal Year means the excess, if any of: (a) the product of (i) a quarter (1/4) in the case of the first calendar quarter of the Fiscal Year, half (1/2) in the case of the second calendar quarter of the Fiscal Year, three-quarters (3/4) in the case of the third calendar quarter of the Fiscal Year, and one (1) in the case of the fourth calendar quarter of the Fiscal Year and (ii) the Member's Estimated Tax Amount for such Fiscal Year; over (b) all distributions previously made during such Fiscal Year to such Member.

"**Regulatory Allocations**" has the meaning set forth in Section 5.03(f).

"**Reimbursable Costs**" has the meaning attributed to such term in the Contract Operating Agreement.

"**Representative**" means, with respect to any Person, any and all directors, officers, employees, consultants, financial advisors or lenders, counsel, accountants, and other agents of such Person.

"**Securities Act**" means the Securities Act of 1933, as amended, and the rules and regulations thereunder, which shall be in effect at the time.

"**SEMS Bridging Agreement**" means that certain SEMS Bridging Agreement & Interface Document, dated of even date herewith by and between Credit Bid Purchaser and the Company.

"**Shortfall Amount**" has the meaning set forth in Section 6.02(b).

"**Simulated Basis**" means, with respect to each Depletable Property, the Book Value of such property.

"**Simulated Depletion**" means, with respect to each Depletable Property, a depletion allowance computed in accordance with U.S. federal income tax principles (as if the Simulated Basis of the property were its adjusted tax basis and using simulated cost depletion) and in the manner specified in Treasury Regulations Section 1.704-1(b)(2)(iv)(k)(2); provided that the Simulated Depletion with respect to a Depletable Property shall in no event exceed the Simulated Basis of such Depletable Property.

"**Simulated Gain or Loss**" means the simulated gain or loss computed with respect to a sale or other disposition of any Depletable Property pursuant to Treasury Regulations Section 1.704-1(b)(2)(iv)(k)(2).

"**Sole Manager**" has the meaning set forth in Section 7.01.

"**Subsidiary**" means, with respect to any Person, any other Person of which a majority of the outstanding shares or other equity interests having the power to vote for directors or managers or comparable positions are owned, directly or indirectly, by the first Person.

"**Tax Advance**" has the meaning set forth in Section 6.02(a).

"**Tax Amount**" of a Member, or if the Member is disregarded for U.S. federal income tax purposes, the members or beneficiaries of such Member, for a Fiscal Year means, subject to (i) any restrictions in the Company's then-applicable debt financing arrangements, if any, and (ii) the Sole Manager's good faith determination to retain any other amounts necessary to satisfy obligations of the Company that are reasonably expect to be due and payable during the 90 days following the date of determination (i) the product of (a) the Tax Rate for such Fiscal Year (but not to exceed the Tax Rate applicable to C-corporations for such Fiscal Year) and (b) the Adjusted Taxable Income of the Member for such Fiscal Year with respect to its Membership Interest or (ii) the actual amount of U.S. federal, state and local income tax (including any state or local tax imposed in lieu of an income tax) paid by such Member with respect to such Fiscal Year in respect of the taxable income allocated to the Member by the Company, after taking into account all deductions available to such Member from all sources in excess of such Member's income from other sources; *provided*, *however*, that if at any time Fieldwood Energy Inc. has cash tax liability (including an estimated tax liability) on account of items of income or gain of the Company without sufficient cash on hand from a corresponding cash distribution in respect of such income or gain (all as reasonably determined by Fieldwood Energy Inc.), then the Tax Amount shall be increased such that the Company timely distributes cash sufficient to pay such tax liability.

"**Tax Matters Representative**" has the meaning set forth in Section 10.04(a).

"**Tax Rate**" of a Member, or if the Member is disregarded for U.S. federal income tax purposes, the members or beneficiaries of such Member, for any period, means the highest effective marginal combined federal, state, and local tax rate applicable to an individual residing in Houston, Texas (or, if higher, a corporation doing business in Houston, Texas), taking into account (a) the character (for example, long-term or short-term capital gain, ordinary, or exempt) of the applicable income and (b) if applicable, the deduction under IRC Section 199A.

"**Taxing Authority**" has the meaning set forth in Section 6.03(b).

"**Term Sheet**" means that certain term sheet, dated March 22, 2021, by and between Fieldwood, on the one hand, and CUSA, on the other hand.

"**Third Party Payment**" has the meaning attributed to such term in the Contract Operating Agreement.

"**Transfer**" means to, directly or indirectly, sell, transfer, assign, convey, gift, pledge, encumber, hypothecate, or similarly dispose of, either voluntarily or involuntarily, by operation of law or otherwise (including by merger or division), or to enter into any contract, option, or other arrangement or understanding with respect to the sale, transfer, assignment, conveyance, gift, pledge, encumbrance, hypothecation, or similar disposition of, any Membership Interests owned by a Person or any interest (including a beneficial interest) in any Membership Interests owned by

11

a Person.  "**Transfer**" when used as a noun shall have a correlative meaning.  "**Transferor**" and "**Transferee**" mean a Person who makes or receives a Transfer, respectively.

"**Transition Services Agreement**" means the Neptune Spar Transition Services Agreement of even date herewith by and between Credit Bid Purchaser and Noble Energy, Inc.

"**Treasury Regulations**" means the final or temporary regulations issued by the United States Department of Treasury pursuant to its authority under the Code, and any successor regulations.

"**Turnkey Removal Agreement**" means that certain Turnkey Removal Agreement of even date herewith by and among Credit Bid Purchaser, CUSA and the Company.

"**Withholding Advances**" has the meaning set forth in Section 6.03(b).

**Section 1.02.    Interpretation**.  For purposes of this Agreement: (a) the words "include," "includes," and "including" shall be deemed to be followed by the words "without limitation"; (b) the word "or" is not exclusive; and (c) the words "herein," "hereof," "hereby," "hereto," and "hereunder" refer to this Agreement as a whole.

The definitions given for any defined terms in this Agreement shall apply equally to both the singular and plural forms of the terms defined.  Whenever the context may require, any pronoun shall include the corresponding masculine, feminine, and neuter forms.

Unless the context otherwise requires, references herein: (x) to Articles, Sections, Exhibits, and Schedules mean the Articles and Sections of, and Exhibits and Schedules attached to, this Agreement; (y) to an agreement, instrument, or other document means such agreement, instrument, or other document as amended, supplemented, and modified from time to time to the extent permitted by the provisions thereof; and (z) to a statute means such statute as amended from time to time and includes any successor legislation thereto and any regulations promulgated thereunder.

This Agreement shall be construed without regard to any presumption or rule requiring construction or interpretation against the party drafting an instrument or causing any instrument to be drafted.

The Exhibits and Schedules referred to herein shall be construed with, and as an integral part of, this Agreement to the same extent as if they were set forth verbatim herein.

The headings in this Agreement are for reference only and shall not affect the interpretation of this Agreement.

WEIL:\97901822\22\45327.0007

Debtors' Exhibit No. 34
Page 177 of 910

## ARTICLE II
## ORGANIZATION

**Section 2.01   Formation**.

(a)     The Company was formed on [●], 2021, pursuant to the provisions of the BOC, upon the filing and acceptance of the Certificate of Formation with the Secretary of State of the State of Texas.

(b)     This Agreement shall constitute the "company agreement" (as that term is used in the BOC) of the Company.  The rights, powers, duties, obligations, and liabilities of the Members and the Sole Manager shall be determined pursuant to the BOC and this Agreement.  To the extent that the rights, powers, duties, obligations, and liabilities of any Members or the Sole Manager are different by reason of any provision of this Agreement than they would be under the BOC in the absence of such provision, this Agreement shall, to the extent permitted by the BOC, control.

**Section 2.02   Name.** The name of the Company is "Fieldwood Energy IV LLC" or such other name or names as may be designated by the Sole Manager; provided, that the name shall always contain the words "Limited Liability Company" or "Limited Company" or an abbreviation of one of those phrases.  Amendments to the Certificate of Formation or this Agreement to reflect any such name change may be made by the Sole Manager without the consent of the Members. The Sole Manager shall give prompt notice to the Members and CUSA of any change to the name of the Company and any related amendment to the Certificate of Formation or this Agreement. The Company may conduct business under any assumed or fictitious name required by Applicable Law or otherwise deemed desirable by the Sole Manager.

**Section 2.03   Principal Office.** The principal office of the Company is located at 2000 W. Sam Houston Parkway S., Suite 1200, Houston, Texas 77042, or such other place as may from time to time be determined by the Sole Manager.  The Sole Manager shall give prompt notice of any such change to each of the Members and CUSA.

**Section 2.04   Registered Office; Registered Agent.**

(a)     The registered office of the Company shall be the office of the initial registered agent named in the Certificate of Formation or such other office (which need not be a place of business of the Company) as the Sole Manager may designate from time to time in the manner provided by the BOC and Applicable Law.

(b)     The registered agent for service of process on the Company in the State of Texas shall be the initial registered agent named in the Certificate of Formation or such other Person or Persons as the Sole Manager may designate from time to time in the manner provided by the BOC and Applicable Law.

13

**Section 2.05   Purposes; Powers**.

(a)     The purposes of the Company are to (i) engage in the Plugging and Abandonment and decommissioning of the FWE IV Assets, as such terms are defined in the Plan of Merger, (ii) the operation of the FWE IV Assets prior to their Plugging and Abandonment and decommissioning, (iii) such other activities as are approved pursuant to the terms of this Agreement, including subject to Section 7.04, and (iv) to engage in any and all activities necessary or incidental to the foregoing purposes.

(b)     The Company shall have all the powers necessary or convenient to carry out the purposes for which it is formed, including the powers granted by the BOC.

**Section 2.06   Term.**  The term of the Company commenced on the date the Certificate of Formation was filed with the Secretary of State of the State of Texas and shall continue in existence perpetually until the Company is terminated in accordance with the provisions of this Agreement.

## ARTICLE III
## CAPITAL CONTRIBUTIONS; CAPITAL ACCOUNTS

**Section 3.01   Tax Partnership Provisions.**  This ARTICLE III is intended to apply only if the Company becomes a partnership for U.S. federal income tax purposes.

**Section 3.02   Initial Capital Contributions.**  Contemporaneously with the execution of this Agreement, and pursuant to the Plan of Reorganization and as a result of a divisive merger pursuant to § 10.008 of the BOC, the Company holds the properties and assets identified as the FWE IV Assets, which shall, together with the amount of any expenses paid pursuant to Section 12.01, constitute the aggregate Capital Contributions made by the Initial Member.  The Initial Member shall own Membership Interests in the amount set forth opposite such Member's name on Schedule A attached hereto (the "**Members Schedule**").  From and after the date of this Agreement, the Sole Manager shall maintain and update the Members Schedule upon the issuance or Transfer of any Membership Interests to any new or existing Member in accordance with this Agreement.

**Section 3.03   Additional Capital Contributions.**  No Member shall be required to make any additional Capital Contributions to the Company.  Any future Capital Contributions made by any Member shall only be made with the consent of the Sole Manager.  To the extent that a Member makes an additional Capital Contribution to the Company, the Sole Manager shall revise the Members Schedule to reflect an increase in the Membership Interest of the contributing Member that fairly and equitably reflects the value of its additional Capital Contribution in relation to the aggregate amount of all Capital Contributions made by the Members.

**Section 3.04   Maintenance of Capital Accounts.**  The Company shall establish and maintain for each Member a separate capital account (a "**Capital Account**") on its books and records in accordance with this Section 3.04.  Each Capital Account shall be established and maintained in accordance with the following provisions:

(a)     Each Member's Capital Account shall be increased by the amount of:

14

(i)     such Member's Capital Contributions, including such Member's initial Capital Contribution and any additional Capital Contributions;

(ii)     any Net Income or other item of income or gain allocated to such Member pursuant to ARTICLE V; and

(iii)     any liabilities of the Company that are assumed by such Member or secured by any property distributed to such Member.

(b)     Each Member's Capital Account shall be decreased by:

(i)     the cash amount or Book Value of any property distributed to such Member pursuant to ARTICLE VI and Section 11.03(d);

(ii)     the amount of any Net Loss or other item of loss or deduction allocated to such Member pursuant to ARTICLE V; and

(iii)     the amount of any liabilities of such Member assumed by the Company or that are secured by any property contributed by such Member to the Company.

**Section 3.05   Succession Upon Transfer.**  In the event that any Membership Interests are Transferred in accordance with the terms of this Agreement, the Transferee shall succeed to the Capital Account of the Transferor to the extent it relates to the Transferred Membership Interests and, subject to Section 5.05, shall receive allocations and distributions pursuant to ARTICLE V, ARTICLE VI, and ARTICLE XI in respect of such Membership Interests.

**Section 3.06   Negative Capital Accounts.**  In the event that any Member shall have a deficit balance in its Capital Account, such Member shall have no obligation, during the term of the Company or upon termination or liquidation thereof, to restore such negative balance or make any Capital Contributions to the Company by reason thereof, except as may be required by Applicable Law or in respect of any negative balance resulting from a withdrawal of capital or termination in contravention of this Agreement.

**Section 3.07   No Withdrawals from Capital Accounts.**  No Member shall be entitled to withdraw any part of its Capital Account or to receive any distribution from the Company, except as otherwise provided in this Agreement.  No Member shall receive any interest, salary, or drawing with respect to its Capital Contributions or its Capital Account, except as otherwise provided in this Agreement.  The Capital Accounts are maintained for the sole purpose of allocating items of income, gain, loss, and deduction among the Members and shall have no effect on the amount of any distributions to any Members, in liquidation or otherwise.

**Section 3.08   Treatment of Loans from Members.**  Loans by any Member to the Company shall not be considered Capital Contributions and shall not affect the maintenance of such Member's Capital Account, other than to the extent provided in Section 3.04(a)(iii), if applicable.

Debtors' Exhibit No. 34
Page 180 of 910

**Section 3.09   Modifications.**   The foregoing provisions and the other provisions of this Agreement relating to the maintenance of Capital Accounts are intended to comply with Treasury Regulations Section 1.704-1(b) and shall be interpreted and applied in a manner consistent with such Treasury Regulations.  If the Sole Manager determines that it is prudent to modify the manner in which the Capital Accounts, or any increases or decreases to the Capital Accounts, are computed in order to comply with such Treasury Regulations, the Sole Manager may authorize such modifications without the consent of any Member.

<div align="center">

**ARTICLE IV**
**MEMBERS**

</div>

**Section 4.01   No Personal Liability.**   Except as otherwise expressly provided in the BOC, by Applicable Law, or expressly in this Agreement, no Member will be obligated personally for any debt, obligation, or liability of the Company or other Members, whether arising in contract, tort, or otherwise, including a debt, obligation, or liability under a judgment, decree, or order of a court, solely by reason of being a Member.

**Section 4.02   No Withdrawal.**   So long as a Member continues to hold a Membership Interest, such Member shall not have the ability to withdraw or resign as a Member prior to the winding up and termination of the Company and any such withdrawal or resignation or attempted withdrawal or resignation by a Member prior to the winding up and termination of the Company shall be null and void.  As soon as any Person who is a Member ceases to hold a Membership Interest, such Person shall no longer be a Member.

**Section 4.03   No Interest in Company Property.**   No real or personal property of the Company shall be deemed to be owned by any Member individually, but shall be owned by, and title shall be vested solely in, the Company.  Without limiting the foregoing, each Member hereby irrevocably waives during the term of the Company any right that such Member may have to maintain any action for partition with respect to the property of the Company.

**Section 4.04   Certification of Membership Interests**.

(a)   The Sole Manager may, but shall not be required to, issue certificates to the Members representing the Membership Interests held by such Member.

(b)   In the event that the Sole Manager shall issue certificates representing Membership Interests in accordance with Section 4.04(a), then in addition to any other legend required by Applicable Law, all certificates representing issued and outstanding Membership Interests shall bear a legend substantially in the following form:

> THE MEMBERSHIP INTEREST REPRESENTED BY THIS CERTIFICATE IS SUBJECT TO A LIMITED LIABILITY COMPANY AGREEMENT AMONG THE COMPANY AND ITS MEMBERS, A COPY OF WHICH IS ON FILE AT THE PRINCIPAL EXECUTIVE OFFICE OF THE COMPANY.   NO TRANSFER, SALE, CONVEYANCE, ASSIGNMENT, GIFT, PLEDGE, HYPOTHECATION, ENCUMBRANCE, OR OTHER DISPOSITION OF THE MEMBERSHIP

16

INTEREST REPRESENTED BY THIS CERTIFICATE MAY BE MADE EXCEPT IN ACCORDANCE WITH THE PROVISIONS OF SUCH COMPANY AGREEMENT.

THE MEMBERSHIP INTEREST REPRESENTED BY THIS CERTIFICATE HAS NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED, OR UNDER ANY OTHER APPLICABLE SECURITIES LAWS AND MAY NOT BE TRANSFERRED, SOLD, ASSIGNED, GIFTED, PLEDGED, HYPOTHECATED, OR OTHERWISE DISPOSED EXCEPT PURSUANT TO (A) A REGISTRATION STATEMENT EFFECTIVE UNDER SUCH ACT AND LAWS OR (B) AN EXEMPTION FROM REGISTRATION THEREUNDER.

**Section 4.05   Meetings of Members**.

(a)      Meetings of the Members may be called by (i) the Sole Manager or (ii) Members holding a majority of the Membership Interests.

(b)      Written notice stating the place, date, and time of the meeting and, in the case of a meeting of the Members not regularly scheduled, describing the purposes for which the meeting is called, shall be delivered not fewer than ten days and not more than 60 days before the date of the meeting to each Member, by or at the direction of the Sole Manager or the Member(s) calling the meeting, as the case may be.  The Members may hold meetings at the Company's principal office or at such other place, within or outside the State of Texas, as the Sole Manager or the Member(s) calling the meeting may designate in the notice for such meeting.

(c)      Any Member may participate in a meeting of the Members by means of conference telephone or other communications equipment by means of which all Persons participating in the meeting can talk to and hear each other, and participation in a meeting by such means shall constitute presence in person at such meeting.

(d)      On any matter that is to be voted on by Members, a Member may vote in person or by proxy, and such proxy may be granted in writing, by means of Electronic Transmission or as otherwise permitted by Applicable Law.  Every proxy shall be revocable in the discretion of the Member executing it unless otherwise provided in such proxy; provided, that such right to revocation shall not invalidate or otherwise affect actions taken under such proxy prior to such revocation.  In lieu of a proxy, a Member may grant an irrevocable power of attorney to conduct the affairs of such Member with respect to matters of the Company, including matters relating to the organization, internal affairs, or termination of the Company.

(e)      The business to be conducted at such meeting need not be limited to the purpose described in the notice and can include business to be conducted by Members; provided, that the appropriate Members shall have been notified of the meeting in accordance with Section 4.05(b).  Attendance of a Member at any meeting shall constitute

17

a waiver of notice of such meeting, except where a Member attends a meeting for the express purpose of objecting to the transaction of any business on the ground that the meeting is not lawfully called or convened.

(f)     A quorum of any meeting of the Members shall require the presence, whether in person or by proxy, of the Members holding a majority of the Membership Interests.  Subject to Section 4.06, no action may be taken by the Members unless the appropriate quorum is present at a meeting.

(g)     Subject to Section 4.06, Section 7.04, Section 12.10 or any provision of this Agreement or the BOC requiring the vote, consent, or approval of a different percentage of the Membership Interests, no action may be taken by the Members at any meeting at which a quorum is present without the affirmative vote of the Members holding a majority of the outstanding Membership Interests.

**Section 4.06   Action Without Meeting**.

(a)     Notwithstanding the provisions of Section 4.05, any matter that is to be voted on, consented to, or approved by the Members may be taken without a meeting, without prior notice, and without a vote if consented to, in writing or by Electronic Transmission, by a Member or Members holding not less than the minimum number of votes that would be necessary to authorize or take such action at a meeting at which each Member entitled to vote on the action is present and votes.  A record shall be maintained by the Sole Manager of each such action taken by written consent of a Member or Members.

(b)     A Member's consent may not be established by a Member's failure to object to an action in a timely manner or by any other means not explicitly provided for in this Agreement.

(c)     If any action or decision permitted by this Agreement to be taken or made by less than all of the Members is taken or made by a written consent signed by less than all of the Members, the Sole Manager shall, within ten calendar days after such action is taken or such decision is made, give written notice of the action taken or the decision made to the Members who did not sign the written consent.

**Section 4.07   Power of Members.**  The Members shall have the power to exercise any and all rights or powers granted to Members pursuant to the express terms of this Agreement and the BOC.  Except as otherwise specifically provided by this Agreement or required by the BOC, no Member, in its capacity as a Member, shall have the power to act for or on behalf of, or to bind, the Company, other than to the extent that the Company has granted a power of attorney to such Member to bind the Company on such actions.

**Section 4.08   Similar or Competitive Activities; Business Opportunities.**  Nothing contained in this Agreement shall prevent any Member or any of its Affiliates from engaging in any other activities or businesses, regardless of whether those activities or businesses are similar to or competitive with the Company.  None of the Members nor any of their Affiliates shall be

18

obligated to account to the Company or to the other Members for any profits or income earned or derived from such other activities or businesses.  None of the Members nor any of their Affiliates shall be obligated to inform the Company or the other Members of a business opportunity of any type or description.

<div align="center">

**ARTICLE V**
**ALLOCATIONS**

</div>

**Section 5.01   Tax Partnership Provisions.**  This ARTICLE V is intended to apply only if the Company becomes a partnership for U.S. federal income tax purposes.

**Section 5.02   Allocation of Net Income and Net Loss.**  For each Fiscal Year (or portion thereof), after giving effect to the special allocations set forth in Section 5.03, Net Income and Net Loss of the Company shall be allocated among the Members pro rata in accordance with their Membership Interests.

**Section 5.03   Regulatory and Special Allocations.**  Notwithstanding the provisions of Section 5.02:

(a)     If there is a net decrease in Company Minimum Gain (determined according to Treasury Regulations Section 1.704-2(d)(1)) during any Fiscal Year, each Member shall be specially allocated Net Income for such Fiscal Year (and, if necessary, subsequent Fiscal Years) in an amount equal to such Member's share of the net decrease in Company Minimum Gain, determined in accordance with Treasury Regulations Section 1.704-2(g). The items to be so allocated shall be determined in accordance with Treasury Regulations Sections 1.704-2(f)(6) and 1.704-2(j)(2).  This Section 5.03(a) is intended to comply with the "minimum gain chargeback" requirement in Treasury Regulations Section 1.704-2(f) and shall be interpreted consistently therewith.

(b)     Member Nonrecourse Deductions shall be allocated in the manner required by Treasury Regulations Section 1.704-2(i).  Except as otherwise provided in Treasury Regulations Section 1.704-2(i)(4), if there is a net decrease in Member Nonrecourse Debt Minimum Gain during any Fiscal Year, each Member that has a share of such Member Nonrecourse Debt Minimum Gain shall be specially allocated Net Income for such Fiscal Year (and, if necessary, subsequent Fiscal Years) in an amount equal to that Member's share of the net decrease in Member Nonrecourse Debt Minimum Gain.  Items to be allocated pursuant to this paragraph shall be determined in accordance with Treasury Regulations Sections 1.704-2(i)(4) and 1.704-2(j)(2).  This Section 5.03(b) is intended to comply with the "minimum gain chargeback" requirement in Treasury Regulations Section 1.704-2(i)(4) and shall be interpreted consistently therewith.

(c)     Nonrecourse Deductions shall be allocated to the Members in accordance with their Membership Interests.

(d)     In the event any Member unexpectedly receives any adjustments, allocations, or distributions described in Treasury Regulations Section 1.704-1(b)(2)(ii)(d)(4), (5) or (6), Net Income shall be specially allocated to such Member in an

<div align="center">19</div>

amount and manner sufficient to eliminate the Adjusted Capital Account Deficit created by such adjustments, allocations, or distributions as quickly as possible.  This Section 5.03(d) is intended to comply with the "qualified income offset" requirement in Treasury Regulations Section 1.704-1(b)(2)(ii)(d) and shall be interpreted consistently therewith.

(e)     Simulated Depletion and Simulated Gain or Loss with respect to any Depletable Property shall be allocated among the Members in proportion to their shares of the Simulated Basis in such property.  Each Member's share of the Simulated Basis in each of the Company's Depletable Properties shall be allocated to each Member in accordance with such Member's Membership Interest as of the time such Depletable Property is acquired by the Company, and shall be reallocated among the Members in accordance with the Members' Membership Interest as determined immediately following the occurrence of an event giving rise to any adjustment to the Book Values of the Company's oil and gas properties pursuant to the terms of this Agreement (or at the time of any material additions to the federal income tax basis of such Depletable Property).

(f)     The allocations set forth in subsections Section 5.03(a), Section 5.03(b), Section 5.03(c), Section 5.03(d) and Section 5.03(e) above (the "**Regulatory Allocations**") are intended to comply with certain requirements of the Treasury Regulations under Code Section 704.  Notwithstanding any other provisions of this ARTICLE V (other than the Regulatory Allocations), the Regulatory Allocations shall be taken into account in allocating Net Income and Net Losses among Members so that, to the extent possible, the net amount of such allocations of Net Income and Net Losses and other items and the Regulatory Allocations to each Member shall be equal to the net amount that would have been allocated to such Member if the Regulatory Allocations had not occurred.

**Section 5.04   Tax Allocations**.

(a)     Subject to Section 5.04(b), Section 5.04(c), and Section 5.04(d), all income, gains, losses and deductions of the Company shall be allocated, for federal, state, and local income tax purposes, among the Members in accordance with the allocation of such income, gains, losses, and deductions pursuant to Section 5.02 and Section 5.03, except that if any such allocation for tax purposes is not permitted by the Code or other Applicable Law, the Company's subsequent income, gains, losses, and deductions shall be allocated among the Members for tax purposes, to the extent permitted by the Code and other Applicable Law, so as to reflect as nearly as possible the allocation set forth in Section 5.02 and Section 5.03.

(b)     Items of Company taxable income, gain, loss, and deduction with respect to any property contributed to the capital of the Company shall be allocated among the Members in accordance with Code Section 704(c) using such reasonable method under Treasury Regulations Section 1.704-3 as shall be determined by the Sole Manager, so as to take account of any variation between the adjusted basis of such property to the Company for federal income tax purposes and its Book Value.

WEIL:\97901822\22\45327.0007

Debtors' Exhibit No. 34
Page 185 of 910

(c)     If the Book Value of any Company asset is adjusted pursuant to Treasury Regulations Section 1.704-1(b)(2)(iv)(f) as provided in clause (c) of the definition of Book Value, subsequent allocations of items of taxable income, gain, loss, and deduction with respect to such asset shall take account of any variation between the adjusted basis of such asset for federal income tax purposes and its Book Value using such reasonable method under Treasury Regulations Section 1.704-3 as shall be determined by the Sole Manager.

(d)     Allocations of tax credit, tax credit recapture, and any items related thereto shall be allocated to the Members according to their interests in such items as determined by the Sole Manager taking into account the principles of Treasury Regulations Section 1.704-1(b)(4)(ii).

(e)     The deduction for depletion with respect to each separate oil and gas property (as defined in Section 614 of the Code) shall, in accordance with Section 613A(c)(7)(D) of the Code, be computed for federal income tax purposes separately by the Members rather than the Company.  The proportionate share of the adjusted tax basis of each oil and gas property shall be allocated to each Member in accordance with such Member's Membership Interest as of the time such oil and gas property is acquired by the Company (and any additions to such U.S. federal income tax basis resulting from expenditures required to be capitalized in such basis shall be allocated among the Members in a manner designed to cause the Members' proportionate shares of such adjusted U.S. federal income tax basis to be in accordance with their Membership Interests as determined at the time of any such additions), and shall be reallocated among the Members in accordance with the Members' Membership Interests as determined immediately following the occurrence of an event giving rise to an adjustment to the Book Values of the Company's oil and gas properties.  For purposes of the separate computation of gain or loss by each Member on the taxable disposition of each oil and gas property, the amount realized from such disposition shall be allocated (i) first, to the Members in an amount equal to the Simulated Basis in such oil and gas property in proportion to their allocable shares thereof and (ii) second, any remaining amount realized shall be allocated consistent with the allocation of Simulated Gain or Loss.  The allocations described in this Section 5.04(e) are intended to be applied in accordance with the Members' "interests in partnership capital" under Section 613A(c)(7)(D) or the Code; provided, however, that the Members understand and agree that the Sole Manager may authorize special allocations of federal income tax basis, income, gain, deduction or loss, as computed for U.S. federal income tax purposes, in order to eliminate differences between Simulated Basis and adjusted U.S. federal income tax basis with respect to each oil and gas property, in such manner as determined consistent with the principles outlined in Sections 5.04b) and 5.04c). The provisions of this Section 5.04(e) and the other provisions of this Agreement relating to allocations under Section 613A(c)(7)(D) of the Code are intended to comply with Treasury Regulations Section 1.704-1(b)(4)(v) and shall be interpreted and applied in a manner consistent with such Treasury Regulations.  Each Member, with the assistance of the Company, shall separately keep records of its share of the adjusted tax basis in each oil and gas property, adjust such share of the adjusted tax basis for any cost or percentage depletion allowable with respect to such property and use such adjusted tax basis in the computation of its cost depletion or in the computation of its gain or loss on the disposition

21

of such property by the Company.  Upon the reasonable request of the Company, each Member shall advise the Company of its adjusted tax basis in each oil and gas property and any depletion computed with respect thereto, both as computed in accordance with the provisions of this subsection for purposes of allowing the Company to make adjustments to the tax basis of its assets as a result of certain transfers of interests in the Company or distributions by the Company.  The Company may rely on such information and, if it is not provided by the Member, may make such reasonable assumptions as it shall determine with respect thereto.  When reasonably requested by the Members, the Company shall provide all available information needed by such Members to comply with the record keeping requirements of this Section 5.04(e) and other applicable tax reporting obligations.

(f)     Allocations pursuant to this Section 5.04 are solely for purposes of federal, state, and local taxes and shall not affect, or in any way be taken into account in computing, any Member's Capital Account or share of Net Income, Net Losses, distributions, or other items pursuant to any provisions of this Agreement.

**Section 5.05   Allocations in Respect of Transferred Membership Interests.**  In the event of a Transfer of Membership Interests during any Fiscal Year made in compliance with the provisions of ARTICLE VIII, Net Income, Net Losses, and other items of income, gain, loss, and deduction of the Company attributable to such Membership Interests for such Fiscal Year shall be determined using the interim closing of the books method.

## ARTICLE VI
## DISTRIBUTIONS

**Section 6.01   General**.

(a)     Subject to Section 6.02 and Section 7.03(b), distributions of available cash shall be made to the Members when and in such amounts as determined by the Sole Manager and only following (i) payment of all operating expenses of the Company, including required payments under the Material Project Contracts, and the termination of the Material Project Contracts, (ii) the payment in full of any and all amounts owing to Credit Bid Purchaser or CUSA under any Material Project Contract, and (iii) the cessation of all production from, and Final Completion of all plugging and abandonment and decommissioning of the FWE IV Assets.  After making all distributions required for a given Fiscal Year under Section 6.02, and paying all operating expenses, and making appropriate reserves for future operating expenses, and paying all amounts then due and outstanding under the Material Project Contracts as described in the preceding sentence, the termination of the Material Project Contracts, and the satisfaction of the condition under item (iii), in each case as described in the preceding sentence, distributions determined to be made by the Sole Manager pursuant to this Section 6.01(a) shall be paid to the Members in accordance with their respective Membership Interests.

(b)     Notwithstanding any provision to the contrary contained in this Agreement, the Company shall not make any distribution to the Members (i) prior to the cessation of all production from, and Final Completion of all plugging and abandonment and

WEIL:\97901822\22\45327.0007

decommissioning activities on, the FWE IV Assets, except as provided in Section 6.02, or (ii) if such distribution would violate § 101.206 of the BOC or other Applicable Law.

**Section 6.02   Tax Advances**.

(a)      Subject to (i) any restrictions in the Company's then-applicable debt financing arrangements, if any, and (ii) the Sole Manager's good faith determination to retain any other amounts necessary to satisfy obligations of the Company that are reasonably expected to be due and payable in the 90 days following the date of determination, at least three days before each date prescribed by the Code for a calendar-year corporation to pay quarterly installments of estimated tax, the Company shall use commercially reasonable efforts to distribute cash to each Member in proportion to and to the extent of such Member's Quarterly Estimated Tax Amount for the applicable calendar quarter (each such distribution, a "**Tax Advance**").

(b)      If, at any time after the final Quarterly Estimated Tax Amount has been distributed pursuant to Section 6.02(a) with respect to any Fiscal Year, the aggregate Tax Advances to any Member with respect to such Fiscal Year are less than such Member's Tax Amount for such Fiscal Year (a "**Shortfall Amount**"), the Company shall use commercially reasonable efforts to distribute cash in proportion to and to the extent of each Member's Shortfall Amount.  The Company shall use commercially reasonable efforts to distribute Shortfall Amounts with respect to a Fiscal Year before the 90th day of the next succeeding Fiscal Year; provided, that if the Company has made distributions other than pursuant to this Section 6.02, the Sole Manager may apply such distributions to reduce any Shortfall Amount.

(c)      If the aggregate Tax Advances made to any Member pursuant to this Section 6.02 for any Fiscal Year exceed such Member's Tax Amount (an "**Excess Amount**"), such Excess Amount shall reduce subsequent Tax Advances that would be made to such Member pursuant to this Section 6.02, except to the extent taken into account as an advance pursuant to Section 6.02(d).

(d)      Any distributions made pursuant to this Section 6.02 shall be treated for purposes of this Agreement as advances on distributions pursuant to Section 6.01 and shall reduce, dollar-for-dollar, the amount otherwise distributable to such Member pursuant to Section 6.01.

**Section 6.03   Tax Withholding; Withholding Advances**.

(a)      **Tax Withholding.**  Each Member agrees to furnish the Company with any representations and forms as shall be reasonably requested by the Company to assist it in determining the extent of, and in fulfilling, any withholding obligations it may have.

(b)      **Withholding Advances.**  The Company is hereby authorized at all times to make payments ("**Withholding Advances**") with respect to each Member in amounts required to discharge any obligation of the Company, including any obligation under Section 6225 of the Code (as determined by the Tax Matters Representative based on the

WEIL:\97901822\22\45327.0007

advice of legal or tax counsel to the Company) to withhold or make payments to any federal, state, local or foreign taxing authority (a "**Taxing Authority**") with respect to any distribution or allocation by the Company of income or gain to such Member and to withhold the same from distributions to such Member.  Any funds withheld from a distribution by reason of this Section 6.03(b) shall nonetheless be deemed distributed to the Member in question for all purposes under this Agreement.  If the Company makes any Withholding Advance in respect of a Member hereunder that is not immediately withheld from actual distributions to the Member, then the Member shall promptly reimburse the Company for the amount of such payment, plus interest at a rate equal to the prime rate published in the Wall Street Journal on the date of payment plus two percent per annum, compounded annually, on such amount from the date of such payment until such amount is repaid (or deducted from a distribution) by the Member (any such payment shall not constitute a Capital Contribution).  Each Member's reimbursement obligation under this Section 6.03(b) shall continue after such Member transfers its Membership Interests.

(c)    **Indemnification.**  Each Member hereby agrees to defend, indemnify and hold harmless the Company and the other Members from and against any liability with respect to taxes, interest, or penalties that may be asserted by reason of the Company's failure to deduct and withhold tax on amounts distributable or allocable to such Member.  The provisions of this Section 6.03(c) and the obligations of a Member pursuant to Section 6.03(b) shall survive the termination, dissolution, liquidation, and winding up of the Company and the withdrawal of such Member from the Company or Transfer of its Membership Interests.  The Company may pursue and enforce all rights and remedies it may have against each Member under this Section 6.03, including bringing a lawsuit to collect repayment with interest of any Withholding Advances.

(d)    **Overwithholding.**  None of the Company or the Sole Manager shall be liable for any excess taxes withheld in respect of any distribution or allocation of income or gain to a Member.  In the event of an overwithholding, a Member's sole recourse shall be to apply for a refund from the appropriate Taxing Authority.

### Section 6.04   Distributions in Kind.

(a)    Subject to Sections 6.01 and 6.02, the Sole Manager is hereby authorized, as it may reasonably determine, to make distributions to the Members in the form of securities or other property (but not including any oil and gas properties) held by the Company; provided, that Tax Advances shall only be made in cash.  In any non-cash distribution, the securities or property so distributed will be distributed among the Members in the same proportion and priority as cash equal to the Fair Market Value of such securities or property would be distributed among the Members pursuant to Section 6.01.

(b)    Any distribution of securities shall be subject to such conditions and restrictions as the Sole Manager determines are required or advisable to ensure compliance with Applicable Law.  In furtherance of the foregoing, the Sole Manager may require that the Members execute and deliver such documents as the Sole Manager may deem necessary or appropriate to ensure compliance with all federal and state securities laws that

WEIL:\97901822\22\45327.0007

apply to such distribution and any further Transfer of the distributed securities, and may appropriately legend the certificates that represent such securities to reflect any restriction on Transfer with respect to such laws.

## ARTICLE VII
## MANAGEMENT

**Section 7.01   Management of the Company.**  The business and affairs of the Company shall be managed, operated, and controlled by or under the direction of one manager designated pursuant to Section 7.02 (the "**Sole Manager**").  Subject to the provisions of Section 7.04, the Sole Manager shall have, and is hereby granted, full and complete power, authority, and discretion for, on behalf of, and in the name of the Company, to take such actions as it may deem necessary or advisable to carry out any and all of the objectives and purposes of the Company, to the exclusion of the Members unless expressly provided for otherwise in this Agreement or expressly required under the BOC.  Subject to the provisions of Section 7.06, the Sole Manager shall have, and is hereby granted, full and complete power, authority, and discretion for, on behalf of, and in the name of the Company, to take such actions as it may deem necessary or advisable to carry out any and all of the objectives and purposes of the Company.

**Section 7.02   Sole Manager.**  The Company shall not have any officers or employees other than the Sole Manager.  Sunset Energy Gulf Coast Asset Management LLC has been selected and designated by the Member with the consent of CUSA to serve as the initial Sole Manager. The Sole Manager may not be removed without CUSA's prior written consent, which may be given, delayed or withheld in its sole discretion.  In the event that the Sole Manager is removed with CUSA's written consent or the Sole Manager resigns or otherwise ceases to serve in such capacity, then the Sole Manager shall be selected pursuant to the following procedure:  CUSA and the Company (acting through the Member for all purposes under this Section 7.02, who shall solicit input from Credit Bid Purchaser for all purposes under this Section 7.02) shall agree on a replacement, and, if they cannot agree, the Company shall designate a replacement, which shall be subject to CUSA's approval (which approval shall not to be unreasonably withheld, conditioned or delayed).

**Section 7.03   Material Project Contracts; Net Profit Interest**.

(a)      The Company's execution and performance of its obligations under each of the Omnibus Agreement, the NPI Conveyance, the Contract Operating Agreement, the Turnkey Removal Agreement, the Joint Development Agreement, the Deepwater Assets Decommissioning Funding Agreement, the SEMS Bridging Agreement, the Transition Services Agreement and the Escrow Agreement has been approved by the Member and shall not require any other approval on the part of the Company (by the Sole Manager or otherwise).  The Sole Manager shall not amend or modify such agreements, except in accordance with this Agreement.

(b)      At the end of each Production Period, the Company shall pay into the Escrow Account the NPI Payment, if any is due, as calculated pursuant to the terms of the NPI Conveyance.

WEIL:\97901822\22\45327.0007

**Section 7.04   Actions Requiring CUSA Consent.**  Without the prior written consent of CUSA (which written consent may be given, delayed or withheld in CUSA's sole discretion, unless expressly indicated otherwise), the Company shall not do, or enter into any commitment to do, any of the following:

(a)     engage in any business or activity other than (i) plugging and abandoning and decommissioning the FWE IV Assets and (ii) operating the FWE IV Assets prior to their plugging and abandonment and decommissioning;

(b)     use revenue or free cash flow for any purpose other than (i) for funding Reimbursable Costs or Third Party Payments under the Contract Operating Agreement (or similar charges under a replacement thereto) and, if applicable, payment into the Escrow Account and (ii) Tax Advances pursuant to Section 6.02(a);

(c)     issue additional Membership Interests or any other equity securities or admit additional Members to the Company;

(d)     approve any decommissioning plan with respect to the FWE IV Assets; or engage or retain any decommissioning subcontractor other than Credit Bid Purchaser pursuant to the Turnkey Removal Agreement;

(e)     incur any Indebtedness;

(f)     make any loan, advance, or capital contribution or make any investment in any Person;

(g)     replace, remove or change the powers of the Sole Manager;

(h)     replace or remove Credit Bid Purchaser under the Contract Operating Agreement; engage or retain any contract operator other than Credit Bid Purchaser pursuant to the Contract Operating Agreement; amend, or waive the application of, any provision of the Contract Operating Agreement;

(i)     divest any of the FWE IV Assets (other than sales of hydrocarbons in the ordinary course of business) or acquire any other assets (other than for a purpose permitted under Section 7.04(a) and in accordance with the terms of the Contract Operating Agreement, and further subject to any approval rights contained therein);

(j)     approving any prospective joint development project or other capital project for which an election to participate has been delivered to the Company pursuant to the Joint Development Agreement or approve any well takeover under the Joint Development Agreement;

(k)     agree to any (i) settlement or order with any Governmental Authority relating to the FWE IV Assets or the operations conducted thereon, (ii) settlement relating to contribution or payment amounts relating to decommissioning obligations with any Person, including any predecessor-in-interest to all or any portion of the leases and lands

WEIL:\97901822\22\45327.0007

covered by the FWE IV Assets or any surety bond provider or other provider or holder of security relating to decommissioning operations, or (iii) any other settlement involving FWE IV Assets or the operation of FWE IV;

(l)   amend any provision of a Material Project Contract, or waive any material right of the Company under a Material Project Contract;

(m)   [Reserved];

(n)   take any act of Bankruptcy, liquidate or otherwise terminate the existence of the Company or any of its Subsidiaries;

(o)   enter into a fundamental business transaction within the meaning of such term in the BOC;

(p)   establish a Subsidiary or enter into any joint venture or similar business arrangement or enter into a transaction covered by Section 7.03;

(q)   enter into, amend, waive, or terminate any contract with an Affiliate of the Company; or

(r)   amend, modify, supplement, restate, or waive any provision of the Certificate of Formation, this Agreement or any other organizational documents of the Company or its Subsidiaries (and any such amendment, modification, supplement, or waiver that is attempted without CUSA's prior written consent shall be void *ab initio* and without effect).

If CUSA in good faith believes that (x) Credit Bid Purchaser is in breach the Contract Operating Agreement in a manner that is materially adverse to the Company or is liable to the Company for indemnification pursuant to the terms of the Contract Operating Agreement, and (y) the Company has failed to enforce its rights (including, if applicable, termination right) with respect to such breach or indemnification and such failure is materially adverse to the Company, then CUSA may (i) deliver a written notice to the Company requesting that the Company enforce such rights (any rights to which such request relates must be specifically identified) and (ii) if the Company fails to enforce such rights within thirty days of its receipt of such notice, CUSA may itself enforce the rights of the Company against Credit Bid Purchaser on the Company's behalf.

**Section 7.05   No Compensation of the Sole Manager**.  The Sole Manager shall receive an offer letter and be compensated for the services provided by such individual as the Sole Manager of the Company in the amount set forth in such offer letter.  The Company shall reimburse the Sole Manager for all reasonable, ordinary, necessary, and direct third-party expenses incurred by the Sole Manager on behalf of the Company in carrying out the Company's business activities.

**Section 7.06   No Personal Liability**.  Except as otherwise provided in the BOC or by Applicable Law, or expressly provided in this Agreement or any written agreement between the Company and the Sole Manager, (i) the Sole Manager will not be obligated personally for any debt, obligation, or liability of the Company, whether arising in contract, tort, or otherwise,

including a debt, obligation, or liability under a judgment, decree, or order of a court, solely by reason of being or acting as the Sole Manager and (ii) subject to Section 7.04, the Sole Manager shall carry out his or her duties under this Agreement in good faith and a manner in which the Sole Manager believes to be consistent with and in furtherance of the purpose of the Company specified in Section 2.05(a).

# ARTICLE VIII
# TRANSFER

**Section 8.01   General Restrictions on Transfer**.

(a)      No Member shall Transfer all or any portion of its Membership Interest in the Company without the prior written approval of the Sole Manager.

(b)      Subject to Section 8.01(a), each Member agrees that it will not Transfer all or any portion of its Membership Interest in the Company, and the Company agrees that it shall not issue any Membership Interests:

(i)      except as permitted under the Securities Act and other Applicable Laws, and then, with respect to a Transfer of Membership Interests, only upon delivery to the Company of an opinion of counsel in form and substance satisfactory to the Company to the effect that such Transfer may be effected without registration under the Securities Act;

(ii)      if the Company becomes a partnership for U.S. federal income tax purposes, if such Transfer or issuance would cause the Company to be considered a "publicly traded partnership" under Section 7704(b) of the Code within the meaning of Treasury Regulations Section 1.7704-1(h)(1)(ii), including the look-through rule in Treasury Regulations Section 1.7704-1(h)(3);

(iii)      if such Transfer or issuance would affect the Company's existence or qualification as a limited liability company under the BOC;

(iv)      if the Company becomes a partnership for U.S. federal income tax purposes, if such Transfer or issuance would cause the Company to lose its status as a partnership for federal income tax purposes;

(v)      if such Transfer or issuance would cause the Company to be required to register as an investment company under the Investment Company Act of 1940, as amended;

(vi)      if such Transfer or issuance would cause the assets of the Company to be deemed "Plan Assets" as defined under the Employee Retirement Income Security Act of 1974 or its accompanying regulations or result in any "prohibited transaction" thereunder involving the Company; and

28

(vii)    such Transfer would limit, hinder or prohibit the Company from carrying out its purpose under Section 2.05(a).

(c)    Any Transfer or attempted Transfer of any Membership Interest in violation of this Agreement shall be null and void *ab initio*, no such Transfer shall be recorded on the Company's books, and the purported Transferee in any such Transfer shall not be treated (and the purported Transferor shall continue to be treated) as the owner of such Membership Interest for all purposes of this Agreement.

(d)    No Transfer of any Membership Interest to a Person not already a Member of the Company shall be deemed completed until the prospective Transferee has executed a joinder agreement in form and substance acceptable to the Company.

(e)    For the avoidance of doubt, any completed Transfer of a Membership Interest permitted by this Agreement shall be deemed a sale, transfer, conveyance, assignment, or other disposal of such Membership Interest in its entirety as intended by the parties to such Transfer, and shall not be deemed a sale, transfer, conveyance, assignment, or other disposal of any less than all of the rights and benefits described in the definition of the term "Membership Interest."

## ARTICLE IX
## EXCULPATION AND INDEMNIFICATION

**Section 9.01    Exculpation of Covered Persons**.

(a)    **Covered Persons.**  As used herein, the term "**Covered Person**" shall mean (i) each current or former Member; (ii) each current or former manager, officer, director, shareholder, partner, member, Affiliate, employee, agent, or Representative of each Member, and each of their Affiliates; and (iii) each manager (including the Sole Manager), officer (if any), employee (if any), agent, or Representative of the Company.

(b)    **Standard of Care.**  No Covered Person shall be liable to the Company or any other Covered Person for any loss, damage, or claim incurred by reason of any action taken or omitted to be taken by such Covered Person in good faith reliance on the provisions of this Agreement, so long as such action or omission does not constitute fraud or willful misconduct by such Covered Person.

(c)    **Good Faith Reliance.**  A Covered Person shall be fully protected in relying in good faith upon the records of the Company and upon such information, opinions, reports, or statements (including financial statements and information, opinions, reports, or statements as to the value or amount of the assets, liabilities, Net Income, or Net Losses of the Company or any facts pertinent to the existence and amount of assets from which distributions might properly be paid) of the following Persons or groups: (i) another Member; (ii) one or more managers, officers or employees of the Company; (iii) any attorney, independent accountant, appraiser, or other expert or professional employed or engaged by or on behalf of the Company; or (iv) any other Person selected in good faith by or on behalf of the Company, in each case as to matters that such relying Person

Debtors' Exhibit No. 34
Page 194 of 910

reasonably believes to be within such other Person's professional or expert competence. The preceding sentence shall in no way limit any Person's right to rely on information to the extent provided in § 3.102 or § 3.105 of the BOC.

**Section 9.02   Liabilities and Duties of Covered Persons**.

(a)   **Limitation of Liability.**  This Agreement, unless otherwise specifically stated herein, is not intended to, and does not, create or impose any fiduciary duty on any Covered Person.  Furthermore, each of the Members and the Company hereby waives any and all fiduciary duties that, absent such waiver, may be implied by Applicable Law, and in doing so, acknowledges and agrees that the duties and obligations of each Covered Person to each other and to the Company are only as expressly set forth in this Agreement.  The provisions of this Agreement, to the extent that they restrict the duties and liabilities of a Covered Person otherwise existing at law or in equity, are agreed by the Members to replace such other duties and liabilities of such Covered Person.

(b)   **Duties.**  Subject to Section 7.06, whenever in this Agreement a Covered Person is permitted or required to make a decision (including a decision that is in such Covered Person's "discretion" or under a grant of similar authority or latitude), the Covered Person shall be entitled to consider only such interests and factors as such Covered Person desires and shall have no duty or obligation to give any consideration to any interest of or factors affecting the Company or any other Person.  Whenever in this Agreement a Covered Person is permitted or required to make a decision in such Covered Person's "good faith," the Covered Person shall act under such express standard and shall not be subject to any other or different standard imposed by this Agreement or any other Applicable Law.

**Section 9.03   Indemnification**.

(a)   **Indemnification.**  To the fullest extent permitted by the BOC, as the same now exists or may hereafter be amended, substituted or replaced (but, in the case of any such amendment, substitution, or replacement, only to the extent that such amendment, substitution, or replacement permits the Company to provide broader indemnification rights than the BOC permitted the Company to provide prior to such amendment, substitution, or replacement), the Company shall indemnify, hold harmless, defend, pay, and reimburse any Covered Person against any and all losses, claims, damages, judgments, fines, or liabilities, including reasonable legal fees or other expenses incurred in investigating or defending against such losses, claims, damages, judgments, fines, or liabilities, and any amounts expended in settlement of any claims (collectively, "**Losses**") to which such Covered Person may become subject by reason of:

(i)   any act or omission or alleged act or omission performed or omitted to be performed on behalf of the Company, any Member, or any direct or indirect Subsidiary of the foregoing in connection with the business of the Company; or

(ii)   such Covered Person being or acting in connection with the business of the Company as a member, shareholder, Affiliate, manager, director, officer, employee, or agent of the Company, any Member, or any of their respective

WEIL:\97901822\22\45327.0007

Affiliates, or that such Covered Person is or was serving at the request of the Company as a member, manager, director, officer, employee, or agent of any Person including the Company;

provided, that (x) such Covered Person acted in good faith and in a manner believed by such Covered Person to be in, or not opposed to, the best interests of the Company and, with respect to any criminal proceeding, had no reasonable cause to believe his conduct was unlawful, and (y) such Covered Person's conduct did not constitute fraud or willful and intentional misconduct, in either case as determined by a final, nonappealable order of a court of competent jurisdiction.  In connection with the foregoing, the termination of any action, suit, or proceeding by judgment, order, settlement, conviction, or upon a plea of nolo contendere or its equivalent, shall not, of itself, create a presumption that the Covered Person did not act in good faith or, with respect to any criminal proceeding, had reasonable cause to believe that such Covered Person's conduct was unlawful, or that the Covered Person's conduct constituted fraud or willful misconduct.

(b)     **Control of Defense.**  Upon a Covered Person's discovery of any claim, lawsuit, or other proceeding relating to any Losses for which such Covered Person may be indemnified pursuant to this Section 9.03, the Covered Person shall give prompt written notice to the Company of such claim, lawsuit, or proceeding; provided, that the failure of the Covered Person to provide such notice shall not relieve the Company of any indemnification obligation under this Section 9.03, unless the Company shall have been materially prejudiced thereby.  The Company shall be entitled to participate in or assume the defense of any such claim, lawsuit, or proceeding at its own expense.  After notice from the Company to the Covered Person of its election to assume the defense of any such claim, lawsuit, or proceeding, the Company shall not be liable to the Covered Person under this Agreement or otherwise for any legal or other expenses subsequently incurred by the Covered Person in connection with investigating, preparing to defend, or defending any such claim, lawsuit, or other proceeding.  If the Company does not elect (or fails to elect) to assume the defense of any such claim, lawsuit, or proceeding, the Covered Person shall have the right to assume the defense of such claim, lawsuit, or proceeding as it deems appropriate, but it shall not settle any such claim, lawsuit, or proceeding without the consent of the Company (which consent shall not be unreasonably withheld, conditioned, or delayed).

(c)     **Reimbursement.**  The Company shall promptly reimburse (and/or advance to the extent reasonably required) each Covered Person for reasonable legal or other expenses (as incurred) of such Covered Person in connection with investigating, preparing to defend, or defending any claim, lawsuit, or other proceeding relating to any Losses for which such Covered Person may be indemnified pursuant to this Section 9.03; provided, that if it is finally judicially determined that such Covered Person is not entitled to the indemnification provided by this Section 9.03, then such Covered Person shall promptly reimburse the Company for any reimbursed or advanced expenses.

(d)     **Entitlement to Indemnity.**  The indemnification provided by this Section 9.03 shall not be deemed exclusive of any other rights to indemnification to which those

31

seeking indemnification may be entitled under the BOC, any agreement or otherwise.  The provisions of this Section 9.03 shall continue to afford protection to each Covered Person regardless of whether such Covered Person remains in the position or capacity pursuant to which such Covered Person became entitled to indemnification under this Section 9.03 and shall inure to the benefit of the executors, administrators, legatees, and distributees of such Covered Person.

(e)     **Insurance.**  To the extent available on commercially reasonable terms, the Company may purchase, at its expense, insurance to cover Losses covered by the foregoing indemnification provisions and to otherwise cover Losses for any breach or alleged breach by any Covered Person of such Covered Person's duties in such amount and with such deductibles as the Sole Manager may reasonably determine; provided, that the failure to obtain such insurance shall not affect the right to indemnification of any Covered Person under the indemnification provisions contained herein, including the right to be reimbursed or advanced expenses or otherwise indemnified for Losses hereunder.  If any Covered Person recovers any amounts in respect of any Losses from any insurance coverage, then such Covered Person shall, to the extent that such recovery is duplicative, reimburse the Company for any amounts previously paid to such Covered Person by the Company in respect of such Losses.

(f)     **Funding of Indemnification Obligation.**  Notwithstanding anything contained herein to the contrary, any indemnity by the Company relating to the matters covered in this Section 9.03 shall be provided out of and to the extent of Company assets only, and no Member (unless such Member otherwise agrees in writing) shall have personal liability on account thereof or shall be required to make additional Capital Contributions to help satisfy such indemnity by the Company.

(g)     **Savings Clause.**  If this Section 9.03 or any portion hereof shall be invalidated on any ground by any court of competent jurisdiction, then the Company shall nevertheless indemnify and hold harmless each Covered Person pursuant to this Section 9.03 to the fullest extent permitted by any applicable portion of this Section 9.03 that shall not have been invalidated and to the fullest extent permitted by Applicable Law.

(h)     **Amendment.**  The provisions of this Section 9.03 shall be a contract between the Company, on the one hand, and each Covered Person who served in such capacity at any time while this Section 9.03 is in effect, on the other hand, pursuant to which the Company and each such Covered Person intend to be legally bound.  No amendment, modification, or repeal of this Section 9.03 that adversely affects the rights of a Covered Person to indemnification for Losses incurred or relating to a state of facts existing prior to such amendment, modification or repeal shall apply in such a way as to eliminate or reduce such Covered Person's entitlement to indemnification for such Losses without the Covered Person's prior written consent.

**Section 9.04   Survival.**  The provisions of this ARTICLE IX shall survive the dissolution, liquidation, winding up, termination of the Company and the withdrawal of any Member or the Transfer of any Member's interest in the Company.

WEIL:\97901822\22\45327.0007

**ARTICLE X**
**ACCOUNTING; TAX MATTERS**

**Section 10.01 Financial Statements and Other Information.**   The Company shall prepare and furnish to each Member and CUSA the following reports:

(a)    **Annual Financial Statements.**   As soon as available, and in any event within 105 days after the end of each Fiscal Year, its unaudited consolidated balance sheet and related consolidated statements of operations, Members' equity and cash flows as of the end of and for such year prepared in accordance with GAAP consistently applied.

(b)    **Quarterly Financial Statements.**   As soon as available, and in any event within 60 days after the end of each quarterly accounting period in each Fiscal Year (including the last fiscal quarter of the Fiscal Year), its unaudited consolidated balance sheet and related unaudited consolidated statements of operations, Members' equity and cash flows as of the end of and for such fiscal quarter and the then elapsed portion of the current Fiscal Year, setting forth in each case in comparative form the figures for the corresponding period or periods of the previous Fiscal Year or as at the end of such period or periods, all in reasonable detail and certified by the Company as presenting fairly in all material respects the consolidated financial condition and results of operations of the Company in accordance with GAAP consistently applied, subject to normal year-end audit adjustments and the absence of footnotes.

(c)    **Monthly Operating Data.**   As soon as available, but in no event later than 45 days after the end of each calendar month, a statement in a form reasonably satisfactory to each Member and CUSA showing all operating data for the Company, including operating expenses and revenue for each of the Company, for such calendar month.

(d)    **Budget Updates.**   Promptly once available and no less than bi-annually, an operating budget for the Fiscal Year, forecasting revenue, operating costs, and capital expenses for each fiscal quarter.

(e)    **Material Government Communication.**   Promptly following receipt thereof by FWE IV, copies of all material written notices or other material communications issued or provided by or to any Governmental Authority.

(f)    **Additional Information.**   Promptly following any reasonable request therefor, such other information regarding the operations, business affairs and financial condition of the Company, as any Member or CUSA may reasonably request, including, without limitation, decommissioning cost estimates and calculations.

**Section 10.02 Inspection Rights.**   Upon reasonable notice from a Member or CUSA, the Company shall afford each Member or CUSA and their respective Representatives access during normal business hours to (a) the Company's properties, offices, plants, and other facilities; (b) the corporate, financial, and similar records, reports, and documents of the Company, including, without limitation, all books and records, minutes of proceedings, internal management documents, reports of operations, reports of adverse developments, copies of any management

letters and communications with Members or the Sole Manager, and to permit each Member or CUSA and their respective Representatives to examine such documents and make copies thereof; and (c) the Sole Manager, any officers, senior employees, and public accountants of the Company, and to afford each Member or CUSA and their respective Representatives the opportunity to discuss the affairs, finances, and accounts of the Company with such Sole Manager, officers, senior employees, and public accountants (and the Company hereby authorizes said accountants to discuss with such Member or CUSA and their respective Representatives such affairs, finances, and accounts).

**Section 10.03 Income Tax Status.**  The Company and the Initial Member intend that the Company shall be treated as a disregarded entity for U.S., federal, state, and local income tax purposes.  Neither the Company nor any Member shall make an election for the Company to be classified as other than a partnership or a disregarded entity pursuant to Treasury Regulations Section 301.7701-3.

**Section 10.04 Tax Matters Representative**.  The following Sections 10.04(a)-(f) are intended to apply if the Company becomes a partnership for U.S. federal income tax purposes:

(a)     **Appointment.**     The Members hereby appoint the Sole Manager as "partnership representative" as provided in Code Section 6223(a) (the "**Tax Matters Representative**").   If any state or local tax law provides for a tax matters partner/partnership representative or Person having similar rights, powers, authority or obligations, the Person designated as the Tax Matters Representative shall also serve in such capacity.  To the extent required by Applicable Law, if the Tax Matters Representative is an entity, it shall appoint a "designated individual" to act on its behalf.  The Tax Matters Representative can be removed at any time by a vote of Members holding a majority of the Membership Interests, and shall resign if it is no longer a Member.  In the event of the resignation or removal of the Tax Matters Representative, Members holding a majority of the Membership Interests shall select a replacement Tax Matters Representative.

(b)     **Tax Examinations and Audits.**     The Tax Matters Representative is authorized and required to represent the Company (at the Company's expense) in connection with all examinations of the Company's affairs by Taxing Authorities, including resulting administrative and judicial proceedings, and to expend Company funds for professional services and costs associated therewith.  The Tax Matters Representative shall promptly notify the Members in writing of the commencement of any tax audit of the Company, upon receipt of a tax assessment and upon receipt of a notice of final partnership adjustment, and shall keep the Members reasonably informed of the status of any tax audit and resulting administrative and judicial proceedings.  Without the consent of Members holding a majority of the Membership Interests, the Tax Matters Representative shall not extend the statute of limitations, file a request for administrative adjustment, file suit relating to any Company tax refund or deficiency or enter into any settlement agreement relating to items of income, gain, loss or deduction of the Company with any Taxing Authority.

WEIL:\97901822\22\45327.0007

(c)     **US Federal Tax Proceedings.**   The Members acknowledge that the Company may elect the application of Section 6226 of the Code.  This acknowledgment applies to each Member whether or not the Member owns an interest in the Company in both the reviewed year and the year of the tax adjustment.  In the event that the Company elects the application of Section 6226 of the Code, the Members agree and covenant to take into account and report to the Internal Revenue Service (or any other applicable taxing authority) any adjustment to their tax items for the reviewed year of which they are notified by the Company in a written statement, in the manner provided in Section 6226(b) of the Code, whether or not the Member owns any interest in the Company at such time.  Any Member that fails to report its share of such adjustments on its tax return, agrees to indemnify and hold harmless the Company and the Tax Matters Representative from and against any and all losses, costs, liabilities and expenses related to taxes (including penalties and interest) imposed on the Company as a result of the Member's inaction.  If the Company is required to pay the assessment of the imputed underpayment under Section 6225(a)(1) of the Code or similar provisions of state law, any taxes, penalties, and interest payable by the Company shall be treated as attributable to the Members, and, to the extent possible, the Tax Matters Representative shall allocate the burden of any such amounts to those Members to whom such amounts are reasonably attributable taking into account the Member's or former Member's allocable share of taxable income or loss with respect to the Fiscal Year to which such assessment pertains and adjustments that may have been made in computing the imputed underpayment.  To the extent that any such amount is payable by the Company, at the option of the Tax Matters Representative, such amount shall be recoverable from such Member as provided in Section 6.03(c).  The provisions contained in this Section 10.04 shall survive the dissolution, termination or liquidation of the Company, the withdrawal of any Member or the Transfer of any Member's interest in the Company and apply to unadmitted assignees of a Member's interest who may be considered current or former partners of the Company for federal tax purposes.

(d)     **Tax Returns.**  Each Member agrees that such Member shall not treat any Company item inconsistently on such Member's federal, state, foreign or other income tax return with the treatment of the item on the Company's return.

(e)     **Section 754 Election.**  The Tax Matters Representative will make an election under Code Section 754, if the Company becomes a partnership for U.S. federal income tax purposes.

(f)     **Indemnification**.   The Company shall defend, indemnify, and hold harmless the Tax Matters Representative against any and all liabilities sustained as a result of any act or decision concerning Company tax matters and within the scope of responsibilities as Tax Matters Representative, so long as such act or decision was done or made in good faith and does not constitute gross negligence or willful misconduct.

**Section 10.05 Tax Returns.**  At the expense of the Company, the Sole Manager (or any officer of the Company that it may designate pursuant to this Agreement) shall endeavor to cause the preparation and timely filing (including extensions) of all tax returns, if any, required to be filed by the Company pursuant to the Code as well as all other required tax returns in each

WEIL:\97901822\22\45327.0007

jurisdiction in which the Company owns property or does business.  If the Company becomes a partnership for U.S. federal income tax purposes, as soon as reasonably possible after the end of each Fiscal Year, the Sole Manager or any designated officer of the Company, as applicable, will cause to be delivered to each Person who was a Member at any time during such Fiscal Year, IRS Schedule K-1 to Form 1065, if applicable, and such other information with respect to the Company as may be necessary for the preparation of such Person's federal, state, and local income tax returns for such Fiscal Year.

Section 10.06 Company Funds.  All funds of the Company shall be deposited in its name, or in such name as may be designated by the Sole Manager, in such checking, savings, or other accounts, or held in its name in the form of such other investments as shall be designated by the Sole Manager.  The funds of the Company shall not be commingled with the funds of any other Person.  All withdrawals of such deposits or liquidations of such investments by the Company shall be made exclusively upon the signature or signatures of the Sole Manager, or any officer or officers of the Company that may be designated by the Sole Manager, as applicable, pursuant to this Agreement.

## ARTICLE XI
## WINDING UP AND TERMINATION

Section 11.01 Events Requiring Winding Up.  The Company shall begin to wind up its business and affairs only upon the occurrence of any of the following events (in each case, subject to the applicable provisions of Section 7.04):

      (a)      upon the permanent cessation of all production from, and Final Completion of all plugging and abandonment and decommissioning of, the FWE IV Assets;

      (b)      the occurrence of a nonwaivable event under the terms of the BOC which requires the winding up of the Company after its termination unless a Continuance occurs in respect of such event; or

      (c)      the entry of a judicial decree ordering winding up and termination under § 11.314 of the BOC in proceedings of which CUSA has been given notice and an opportunity to participate.

      (d)      Notwithstanding the occurrence of an event referenced in Section 11.01(b), if the Company is permitted prior to the termination of its existence in accordance with the BOC to revoke a winding up upon the occurrence of such event and the Sole Manager provides its prior written consent to such revocation, then, to the extent so permitted under the BOC and in the manner provided therein, the Company's existence shall be continued (the revocation of such a winding up and continuance of the Company, a "**Continuance**").

Section 11.02 Effectiveness of Termination.  The Company shall begin to wind up its business and affairs as soon as reasonably practicable upon the occurrence of an event described in Section 11.01 (if such event has not been revoked or cancelled), but the Company shall not terminate until the winding up of the Company has been completed, the assets of the Company

have been distributed as provided in Section 11.03, and the Certificate of Termination shall have been filed as provided in Section 11.04.

**Section 11.03 Liquidation.**   If the Company is to be terminated pursuant to Section 11.01, the Company shall be liquidated and its business and affairs wound up in accordance with the BOC and the following provisions:

(a)   **Liquidator.**   The Sole Manager shall act as liquidator to wind up the Company (the "**Liquidator**"); provided, however, that if there is then a vacancy in the position of the Sole Manager or the Sole Manager is not willing to act as the Liquidator, the Members shall appoint a Person to act as the Liquidator with the consent of CUSA. The Liquidator shall have full power and authority to sell, assign, and encumber any or all of the Company's assets and to wind up and liquidate the affairs of the Company in an orderly and business-like manner.

(b)   **Accounting.**   As promptly as possible after the event requiring winding up and again after final liquidation, the Liquidator shall cause a proper accounting to be made by a recognized firm of certified public accountants of the Company's assets, liabilities, and operations through the last day of the calendar month in which such event occurs or the final liquidation is completed, as applicable.

(c)   **Notice.**   The Liquidator shall deliver to each known claimant of the Company the notice required by § 11.052 of the BOC.

(d)   **Distribution of Proceeds.**   The Liquidator shall liquidate the assets of the Company and distribute the proceeds of such liquidation in the following order of priority, unless otherwise required by mandatory provisions of Applicable Law:

(i)   First, to the payment of all of the Company's debts and liabilities to its creditors (including Members, if applicable), including amounts owed, if any, pursuant to the Material Project Contracts to CUSA and/or Credit Bid Purchaser, and the expenses of liquidation (including sales commissions incident to any sales of assets of the Company);

(ii)   Second, to the establishment of and additions to other reserves that are determined by the Liquidator to be reasonably necessary for any contingent unforeseen liabilities or obligations of the Company; and

(iii)   Third, to the Members in accordance with the positive balances in their respective Capital Accounts, as determined after taking into account all Capital Account adjustments for the taxable year of the Company during which the liquidation of the Company occurs.

(e)   **Discretion of Liquidator.**   Notwithstanding the provisions of Section 11.03(d) that require the liquidation of the assets of the Company, but subject to the order of priorities set forth in Section 11.03(d), if upon winding up of the Company the Liquidator reasonably determines that an immediate sale of part or all of the Company's

37

Debtors' Exhibit No. 34
Page 202 of 910

assets would be impractical or could cause undue loss to the Members, the Liquidator may defer the liquidation of any assets except those necessary to satisfy Company liabilities and reserves, and may, upon approval of holders of a majority of the outstanding Membership Interests, distribute to the Members, in lieu of cash, as tenants in common and in accordance with the provisions of Section 11.03(d), undivided interests in such Company assets as the Liquidator deems not suitable for liquidation.  Any such distribution in kind shall be subject to such conditions relating to the disposition and management of such properties as the Liquidator deems reasonable and equitable and to any agreements governing the operating of such properties at such time.  For purposes of any such distribution, any property to be distributed will be valued at its Fair Market Value.

**Section 11.04 Certificate of Termination.**  Upon completion of the distribution of the assets of the Company as provided in Section 11.03(d) hereof, the Liquidator or other such officer or Sole Manager shall execute and cause to be filed a Certificate of Termination in the State of Texas and shall cause the cancellation of all qualifications and registrations of the Company as a foreign limited liability company in jurisdictions other than the State of Texas and shall take such other actions as may be necessary to terminate the Company.  Upon acceptance of the Certificate of Termination by the Texas Secretary of State, the Company shall be terminated.

**Section 11.05 Survival of Rights, Duties, and Obligations.**  Dissolution, liquidation, winding up, or termination of the Company for any reason shall not release any party from any Loss that at the time of such dissolution, liquidation, winding up, or termination already had accrued to any other party or thereafter may accrue in respect of any act or omission prior to such dissolution, liquidation, winding up, or termination.  For the avoidance of doubt, none of the foregoing shall replace, diminish, or otherwise adversely affect any Member's right to indemnification pursuant to Section 9.03.

**Section 11.06 Recourse for Claims.**  Each Member shall look solely to the assets of the Company for all distributions with respect to the Company, such Member's Capital Account, and such Member's share of Net Income, Net Loss, and other items of income, gain, loss, and deduction, and shall have no recourse therefor (upon termination or otherwise) against the Liquidator or any other Member.

<div align="center">

**ARTICLE XII**
**MISCELLANEOUS**

</div>

**Section 12.01 Expenses.**  The Initial Member will pay, or cause to be paid, or contribute to the Company amounts necessary for the Company to pay, all amounts necessary to fully cover (a) costs associated with the formation of the Company in connection with the Divisive Merger Documents and (b) any premiums to satisfy organizational or area wide bonding requirements.

**Section 12.02 Further Assurances.**  In connection with this Agreement and the transactions contemplated hereby, the Company and the Member hereby agree, at the request of the Company or any other Member, to execute and deliver such additional documents, instruments, conveyances, and assurances and to take such further actions as may be required to carry out the provisions hereof and give effect to the transactions contemplated hereby.

**Section 12.03 Confidentiality**.

(a)     Each Member acknowledges that it will have access to and become acquainted with trade secrets, proprietary information, and confidential information belonging to the Company and its Affiliates that are not generally known to the public, including, but not limited to, information concerning business plans, financial statements, and other information, operating practices and methods, expansion plans, strategic plans, marketing plans, contracts, customer lists, or other business documents that the Company treats as confidential, in any format whatsoever (including oral, written, electronic, or any other form or medium) (collectively, "**Confidential Information**").  In addition, each Member acknowledges that:  (i) the Company has invested, and continues to invest, substantial time, expense, and specialized knowledge in developing its Confidential Information; (ii) the Confidential Information provides the Company with a competitive advantage over others in the marketplace; and (iii) the Company would be irreparably harmed if the Confidential Information were disclosed to competitors or made available to the public.  Without limiting the applicability of any other agreement to which any Member is subject, no Member shall, directly or indirectly, disclose or use (other than solely for the purposes of such Member monitoring and analyzing its investment in the Company) at any time, including, without limitation, use for personal, commercial, or proprietary advantage or profit, either during its association with the Company or thereafter, any Confidential Information of which such Member is or becomes aware.  Each Member in possession of Confidential Information shall take all appropriate steps to safeguard such information and to protect it against disclosure, misuse, espionage, loss, and theft.

(b)     Nothing contained in Section 12.03(a) shall prevent any Member from disclosing Confidential Information: (i) upon the order of any court or administrative agency; (ii) upon the request or demand of any regulatory agency or authority having jurisdiction over such Member; (iii) to the extent compelled by legal process or required or requested pursuant to subpoena, interrogatories, or other discovery requests; (iv) to the extent necessary in connection with the exercise of any remedy hereunder; (v) to the other Members; or (vi) to such Member's Representatives who, in the reasonable judgment of such Member, need to know such Confidential Information and agree to be bound by the provisions of this Section 12.03 as if a Member; or (vii) to any potential Transferee in connection with a proposed Transfer of Membership Interests from such Member, as long as such potential Transferee agrees in writing to be bound by the provisions of this Section 12.03 as if a Member before receiving such Confidential Information; provided, that in the case of clause (i), (ii), or (iii), such Member shall notify the Company and other Members of the proposed disclosure as far in advance of such disclosure as practicable (but in no event make any such disclosure before notifying the Company and other Members) and use reasonable efforts to ensure that any Confidential Information so disclosed is accorded confidential treatment satisfactory to the Company, when and if available.

(c)     The restrictions of Section 12.03(a) shall not apply to Confidential Information that: (i) is or becomes generally available to the public other than as a result of a disclosure by a Member in violation of this Agreement; (ii) is or has been independently developed or conceived by such Member without use of Confidential

WEIL:\97901822\22\45327.0007

Information; or (iii) becomes available to such Member or any of its Representatives on a non-confidential basis from a source other than the Company, the other Members, or any of their respective Representatives, provided, that such source is not known by the receiving Member to be bound by a confidentiality agreement regarding the Company.

(d)     The obligations of each Member under this Section 12.03 shall survive for so long as such Member remains a Member, and for three years following the earlier of (i) termination, dissolution, liquidation, and winding up of the Company; (ii) the withdrawal of such Member from the Company; or (iii) such Member's Transfer of its Membership Interests; provided that with respect to Confidential Information that constitutes a trade secret under Applicable Law, the obligations of each Member under this Section 12.03 shall survive until, if ever, such Confidential Information loses its trade secret protection other than due, directly or indirectly, to an act or omission of the Member.

**Section 12.04 Notices.**   All notices, requests, consents, claims, demands, waivers, and other communications hereunder shall be in writing and shall be deemed to have been given:

(a)     when delivered by hand (with written confirmation of receipt);

(b)     when received by the addressee if sent by a nationally recognized overnight courier (receipt requested);

(c)     on the third day after the date mailed, by certified or registered mail, return receipt requested, postage prepaid; or

(d)     on the day delivered if sent by electronic mail to the address below during normal business hours of the recipient and on the next Business Day if sent by electronic mail after normal business hours of the recipient.

Such communications must be sent to the respective parties at the following addresses (or at such other address for a party as shall be specified in a notice given in accordance with this Section 12.04):

| | |
|---|---|
| **If to the Company:** | Fieldwood Energy IV LLC |
| | 2000 W. Sam Houston Parkway S., Suite 1200 |
| | Houston, Texas 77042 |
| | Attention: Sole Manager |
| | Phone: [●] |
| | Email: [●] |

Debtors' Exhibit No. 34
Page 205 of 910

with a copy to:

(which shall not
constitute notice)

Chevron U.S.A. Inc.
100 Northpark Blvd
Covington, LA 70443
Attention: Land Manager
Phone: (985) 773-6538
Email: tdwebre@chevron.com

**If to Member**:     To the Member's respective mailing address as set forth on the
Members Schedule.

**Section 12.05 Headings.**  The headings in this Agreement are inserted for convenience or reference only and are in no way intended to describe, interpret, define, or limit the scope, extent, or intent of this Agreement or any provision of this Agreement.

**Section 12.06 Severability.**  If any term or provision of this Agreement is held to be invalid, illegal, or unenforceable under Applicable Law in any jurisdiction, such invalidity, illegality, or unenforceability shall not affect any other term or provision of this Agreement or invalidate or render unenforceable such term or provision in any other jurisdiction.  Except as provided in Section 9.03(g), upon such determination that any term or other provision is invalid, illegal, or unenforceable, this Agreement shall be modified automatically so as to effect the original intent of the parties as closely as possible in order that the transactions contemplated hereby be consummated as originally contemplated to the greatest extent possible, legal, and enforceable.

**Section 12.07 Entire Agreement.**  This Agreement, together with the Certificate of Merger, Plan of Merger, Certificate of Formation, the Material Project Contracts and all related Exhibits and Schedules, constitute the sole and entire agreement of the parties to this Agreement with respect to the subject matter contained herein and therein, and supersede all prior and contemporaneous understandings, agreements, representations, and warranties, both written and oral, with respect to such subject matter.

**Section 12.08 Successors and Assigns.**  Subject to the restrictions on Transfers set forth herein, this Agreement shall be binding upon and shall inure to the benefit of the parties hereto and their respective heirs, executors, administrators, successors, and assigns.

**Section 12.09 No Third-Party Beneficiaries.**  Except (a) with respect to certain rights reserved to CUSA as set forth in this Agreement, which shall be for the benefit of and enforceable by CUSA, and (b) as provided in ARTICLE IX, which shall be for the benefit of and enforceable by Covered Persons as described therein, this Agreement is for the sole benefit of the parties hereto (and their respective heirs, executors, administrators, successors, and assigns) and nothing herein, express or implied, is intended to or shall confer upon any other Person, including any creditor of the Company, any legal or equitable right, benefit, or remedy of any nature whatsoever under or by reason of this Agreement; provided, however that CUSA and each Covered Persons shall be an express third party beneficiary of this Agreement.

41

**Section 12.10 Amendment.**  Subject to Sections 2.02, no provision of this Agreement may be amended or modified except by an instrument in writing executed by the Company and the Members holding a majority of the Membership Interests; provided, however that any amendment or modification which impacts the rights of CUSA hereunder, including changes to Section 2.05 (Purpose) shall be subject to the prior written consent of CUSA, which may be given, delayed or withheld in its sole discretion.  Any such written amendment or modification will be binding upon the Company, CUSA and each Member.   Notwithstanding the foregoing, amendments to the Members Schedule following any new issuance, redemption, repurchase, or Transfer of Membership Interests in accordance with this Agreement may be made by the Sole Manager without the consent of or execution by the Members.

**Section 12.11 Waiver.**  No waiver by any party or CUSA of any of the provisions hereof shall be effective unless explicitly set forth in writing and signed by the party so waiving or CUSA, respectively.  No waiver by any party or CUSA shall operate or be construed as a waiver in respect of any failure, breach, or default not expressly identified by such written waiver, whether of a similar or different character, and whether occurring before or after that waiver.  No failure to exercise, or delay in exercising, any right, remedy, power, or privilege arising from this Agreement shall operate or be construed as a waiver thereof, nor shall any single or partial exercise of any right, remedy, power, or privilege hereunder preclude any other or further exercise thereof or the exercise of any other right, remedy, power, or privilege.  For the avoidance of doubt, nothing contained in this Section 12.11 shall diminish any of the explicit and implicit waivers described in this Agreement.

**Section 12.12 Governing Law.**  All issues and questions concerning the application, construction, validity, interpretation, and enforcement of this Agreement shall be governed by and construed in accordance with the internal laws of the State of Texas, without giving effect to any choice or conflict of law provision or rule (whether of the State of Texas or any other jurisdiction) that would cause the application of laws of any jurisdiction other than those of the State of Texas.

**Section 12.13 Submission to Jurisdiction.**  The parties hereby agree that any suit, action, or proceeding seeking to enforce any provision of, or based on any matter arising out of or in connection with, this Agreement or the transactions contemplated hereby, whether in contract, tort, or otherwise, shall be brought in the federal courts of the United States of America or the courts of the State of Texas, in each case located in Harris County and in Houston, Texas.  Each of the parties hereby irrevocably consents to the jurisdiction of such courts (and of the appropriate appellate courts therefrom) in any such suit, action, or proceeding and irrevocably waives, to the fullest extent permitted by law, any objection that it may now or hereafter have to the laying of the venue of any such suit, action, or proceeding in any such court or that any such suit, action, or proceeding that is brought in any such court has been brought in an inconvenient forum.  Service of process, summons, notice, or other document by registered mail to the address set forth in Section 12.04 shall be effective service of process for any suit, action, or other proceeding brought in any such court.

**Section 12.14 Waiver of Jury Trial**.  EACH PARTY HERETO ACKNOWLEDGES AND AGREES THAT ANY DISPUTE OR CONTROVERSY THAT MAY ARISE UNDER THIS AGREEMENT IS LIKELY TO INVOLVE COMPLICATED AND DIFFICULT ISSUES

WEIL:\97901822\22\45327.0007

AND, THEREFORE, EACH SUCH PARTY IRREVOCABLY AND UNCONDITIONALLY WAIVES ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN RESPECT OF ANY LEGAL ACTION ARISING OUT OF RELATING TO THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY.

**Section 12.15 Equitable Remedies.**  Each party hereto acknowledges that a breach or threatened breach by such party of any of its obligations under this Agreement would give rise to irreparable harm to the other parties or CUSA, for which monetary damages would not be an adequate remedy, and hereby agrees that in the event of a breach or a threatened breach by such party of any such obligations, each of the other parties hereto and CUSA shall, in addition to any and all other rights and remedies that may be available to them in respect of such breach, be entitled to equitable relief, including a temporary restraining order, an injunction, specific performance, and any other relief that may be available from a court of competent jurisdiction (without any requirement to post bond).

**Section 12.16 Attorney's Fees.**  In the event that any party or third-party beneficiary hereto institutes any legal suit, action, or proceeding, including arbitration, against another party in respect of a matter arising out of or relating to this Agreement, the prevailing party or third-party beneficiary in the suit, action, or proceeding shall be entitled to receive, in addition to all other damages to which it may be entitled, the costs incurred by it in conducting the suit, action, or proceeding, including reasonable attorneys' fees and expenses and court costs.

**Section 12.17 Remedies Cumulative.**  The rights and remedies under this Agreement are cumulative and are in addition to and not in substitution for any other rights and remedies available at law or in equity or otherwise, except to the extent expressly provided in Section 9.02 to the contrary.

**Section 12.18 Counterparts.**  This Agreement may be executed in counterparts, each of which shall be deemed an original, but all of which together shall be deemed to be one and the same agreement.  A signed copy of this Agreement delivered by email or other means of Electronic Transmission shall be deemed to have the same legal effect as delivery of an original signed copy of this Agreement.

(SIGNATURE PAGE FOLLOWS)

43

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be entered into as of the date first written above by their respective officers thereunto duly authorized.

<div style="margin-left: 45%;">

**The Company:**

FIELDWOOD ENERGY IV LLC,
a Texas limited liability company


By:_____
Name:
Title:


**The Initial Member:**

FIELDWOOD ENERGY INC.,
a Delaware corporation


By:_____
Name:
Title:

</div>

## SCHEDULE A

## <u>MEMBERS SCHEDULE</u>

| Member Name, and Address | Membership Interest |
|---|---|
| Fieldwood Energy Inc.<br>2000 W. Sam Houston Parkway S., Suite 1200<br>Houston, Texas 77042 | 100% |
| Total: | 100% |

## **Exhibit 4**

**Sole Manager Agreement**

See attached.

*Exhibit 4 to the Implementation Agreement*

Sunset Energy Gulf Coast Asset Management LLC
Attn: David Abell
1727 Sunset Boulevard
Houston, TX 77005

June ___, 2021

Dear Mr. Abell,

      This letter agreement (this "**Agreement**") sets forth the terms and conditions whereby Sunset Energy Gulf Coast Asset Management LLC ("Sunset", "you", "your") agrees to provide the services to be performed by the "Sole Manager" on behalf of or in the service of Fieldwood Energy IV LLC, a Texas limited liability company (the "**Company**"), as more fully set forth and described in the Limited Liability Company Agreement of the Company, dated as of [●], 2021 (such agreement, as it may be amended, supplemented, or modified from time to time, the "**Company Agreement**"), a copy of which is attached as Exhibit A hereto.  In connection with this Agreement, Sunset will appoint David Abell to direct or otherwise oversee and be responsible for the activities of the Sole Manager.  As used in this Agreement, the term "**Parties**" shall refer to both Sunset and the Company and "**Party**" shall refer to Sunset or the Company.  For purposes of this Agreement and the Company Agreement, Sunset will be a "manager" within the meaning of that term under the Texas Business Organizations Code, which is referred to as the Sole Manager in the Company Agreement.  Capitalized terms used but not defined herein shall have the meaning set forth in the Company Agreement.

**Section 1.**      <u>**Services**</u>.

      (a)      The Company hereby agrees that Sunset will serve as Sole Manager of the Company and the Company will engage Sunset, and Sunset hereby accepts such appointment as Sole Manager and the engagement to perform for or provide to the Company the services that are specified in the Company Agreement to be performed or provided by the Sole Manager in accordance with the Company Agreement and as otherwise set forth herein (collectively, the "**Services**"), such Services to be performed or provided on the terms and subject to the conditions set forth in the Company Agreement and this Agreement.

      (b)      The scope of the Services to be performed or provided by the Sole Manager and Sunset's authority to take actions on behalf of the Company as the Sole Manager shall be subject to the limitations thereon as set forth in the Company Agreement and this Agreement.

      (c)      Sunset shall devote the appropriate business time and attention and its full skill and best efforts to performing or providing the Services and to the furtherance of the Company's interests. Sunset shall perform or provide the Services and carry out the responsibilities reasonably related thereto, to the best of its ability, in a diligent, trustworthy, and businesslike manner for the purpose of advancing the business of the Company.

      (d)      Sunset agrees that it shall work with Mako Buyer LLC in accordance with the terms of the Contract Operating Agreement between Mako Buyer LLC and Company.

**Section 2.**      <u>**Service as Sole Manager; Term of Engagement**</u>.  The term of your service as Sole Manager and engagement under this Agreement shall commence as of the date set forth above and shall continue until the earlier of (a) the date on which you are removed as the Sole Manager by the Company for any reason, with the consent of CUSA, and (b) the [tenth] anniversary of this Agreement, unless extended annually thereafter (such period of time, the "**Engagement Period**").  **You acknowledge and understand that your engagement with the Company may be terminated pursuant to Section 9 below,**

meaning that you or the Company (with CUSA's consent) may terminate the engagement and your role as Sole Manager at any time, with or without Cause (as defined herein), and with or without notice and for any reason or no particular reason. Although your compensation and benefits may change from time to time, the at-will nature of your engagement and service as Sole Manager may only be changed with the prior written consent of CUSA.

**Section 3.** **Compensation**.

(a)     In consideration for your performing or providing the Services and any duties related thereto and the rights granted to the Company in this Agreement, the Company shall pay you an initial annual fee of ██████████████, subject to review from time to time, payable at the beginning of each month in equal monthly instalments without deductions; provided, however, that you acknowledge that you shall be solely responsible and liable for any all taxes payable with respect thereto and shall remit and pay such taxes on a timely basis and indemnify the Company for any failure to do so.

(b)     The Company shall pay or reimburse you for all expenses (including travel expenses) reasonably incurred by you during the Engagement Period in connection with performing or providing the Services or carrying out the responsibilities reasonably related thereto, provided that you shall provide to the Company reasonable documentation or evidence of expenses for which you seek reimbursement.

**Section 4.** **Property Rights**.

(a)     You shall protect the assets of the Company from misuse or misappropriation, including, without limitation, any Confidential Information (as defined below) or other intellectual property rights of the Company.

(b)     As between you and the Company, the Company is, and will remain, the sole and exclusive owner of all right, title, and interest in and to any documents, specifications, data, know-how, methodologies, software, and other materials provided to you by the Company, including any intellectual property rights therein or other Confidential Information ("**Company Materials**"). You have no right or license to reproduce or use any Company Materials except solely during the Engagement Period to the extent necessary to perform your obligations under this Agreement in furtherance of the Company's business. All other rights in and to the Company Materials are expressly reserved by the Company. Without prior written permission, you have no right or license to use the Company's trademarks, service marks, trade names, logos, symbols, or brand names.

**Section 5.** **Confidentiality**.

(a)     You acknowledge that you will have access to information that is non-public or otherwise treated as confidential and proprietary by the Company, including, without limitation, the existence and terms of the Company Agreement, trade secrets, technology, and information pertaining to business operations and strategies, customers, pricing, marketing, finances, sourcing, seismic information, projected production, projected cost and expenses (including projected plugging and abandonment and decommissioning costs) or operations of the Company, its Affiliates, or their suppliers or customers, in each case whether  spoken, written, printed, electronic, or in any other form or medium, including with respect to the Company's or its Affiliates' arrangements with CUSA or agreements related thereto (collectively, the "**Confidential Information**"). Any Confidential Information that you access in connection with the Services or any work related thereto shall be subject to the terms and conditions of this Section 5 during the term of your engagement and for two years after Termination. You agree not to use any Confidential Information for any purpose except as required in the performance of the Services. You

shall notify the Member of the Company (who shall also notify CUSA) immediately in the event you become aware of any loss or disclosure of any Confidential Information.

(b)      Confidential Information shall not include information that:

(i)      is or becomes generally available to the public other than through your breach of this Agreement; or

(ii)      is communicated to you by a third party that had no confidentiality obligations with respect to such information; or

(iii)      was available to you on a non-confidential basis prior to its disclosure by the Company without violation of any confidentiality obligations appliable to Sunset or its affiliates.

(c)      Nothing herein shall be construed to prevent disclosure of Confidential Information as may be required by applicable law or regulation, or pursuant to a valid order of a court of competent jurisdiction or an authorized government agency.

(d)      Notice of Immunity Under the Defend Trade Secrets Act of 2016 ("**DTSA**").

Notwithstanding any other provision of this Agreement:

(i)      You will not be held criminally or civilly liable under any federal or state trade secret law for any disclosure of a trade secret that:

(A)      is made: (1) in confidence to a federal, state, or local government official, either directly or indirectly, or to an attorney and (2) solely for the purpose of reporting or investigating a suspected violation of law; or

(B)      is made in a complaint or other document that is filed under seal in a lawsuit or other proceeding.

(ii)      If you file a lawsuit for retaliation by the Company for reporting a suspected violation of law, you may disclose the Company's trade secrets to your attorney and use the trade secret information in the court proceeding if you:

(A)      file any document containing the trade secret under seal; and

(B)      do not disclose the trade secret, except pursuant to court order.

**Section 6.**      **Representations and Warranties**.

(a)      You represent and warrant to the Company that:

(i)      you have the right to enter into this Agreement, to grant the rights granted herein and to perform fully all of your obligations in this Agreement and the Company Agreement;

(ii)      your entering into this Agreement with the Company and your performance of the Services or any work related thereto do not and will not conflict with or result in any breach or default under any other agreement to which you are subject, including, without limitation, any non-competition, non-solicitation, or other work-related restrictions imposed by a current or former employer, and you have informed any entity with which you have such restrictions that are you assuming the role of Sole Manager;

(iii)    you will inform the Member (who shall promptly inform CUSA) about any non-competition, non-solicitation, or other work-related restrictions to which you are subject and provide as much information about them as legally possible, including any agreements describing such restrictions on your activities;

(iv)    you will not use or disclose non-public, confidential or propriety information of others or subject to other confidentiality agreements with the Company;

(v)    you will discuss any questions you may have about ownership of particular documents or other information with appropriate personnel from your clients or former employers before removing or copying the documents or information for use in connection with your employment with the Company;

(vi)    you have the required skill, experience, and qualifications to perform the Services and any work related thereto, you shall perform the Services and such work in a professional and workmanlike manner in accordance with generally recognized industry standards for similar services and you shall devote sufficient resources to ensure that the Services are performed in a timely and reliable manner; and

(vii)    you shall perform the Services in compliance with all applicable federal, state, and local laws and regulations, including by maintaining all licenses, permits, and registrations required to perform the Services or any work related thereto.

(b)    The Company hereby represents and warrants to you that:

(i)    it has the full right, power, and authority to enter into this Agreement and to perform its obligations hereunder; and

(ii)    the execution of this Agreement by its representative whose signature is set forth at the end hereof has been duly authorized by all necessary limited liability company action.

**Section 7.**    **Indemnification**.  You shall be entitled to indemnification by the Company on the terms and subject to the conditions set forth in the Company Agreement, all of which you acknowledge by your signature below.

**Section 8.**    **Insurance**.  The Company may, at its own expense, but is not required to, provide directors' and officers' liability insurance coverage to you in your capacity as the Sole Manager, in an amount and on terms reasonably customary for directors and officers of oil and gas exploration and production companies that are similarly situated to the Company.  The Company shall notify you of the existence of and any termination, cancellation, or material adverse changes to such insurance coverage provided to you.

**Section 9.**    **Termination**.

(a)    You or the Company (in the case of the Company, as directed by the Member and subject to the prior consent or approval of CUSA as provided in the Company Agreement) may terminate this Agreement without Cause upon sixty (60) calendar days' written notice to the other Party.  In the event of termination by you pursuant to this clause (a), the Company shall pay you on a pro-rata basis for any portion of your compensation then due and payable for any Services completed up to and including the date of such termination, plus unreimbursed expenses pursuant to Section 3 (b) above.  In the event of termination by

the Company pursuant to this clause (a), the Company shall pay you six (6) months of your annual fee from and after the date of such termination.

(b)      The Company (as directed by the Member and subject to the prior consent and approval of CUSA) may terminate this Agreement, effective immediately upon written notice to you, for "**Cause**" (as defined below) or should David Abell cease (or otherwise be unavailable) to  direct the activities of the Sole Manager. You may terminate this Agreement upon thirty (30) days advance written notice to the Member (who shall promptly notify CUSA).  As used herein, "**Cause**" means a good faith finding by the Member (in consultation with CUSA) of: (a) the commission by you of an act of fraud, dishonesty, or embezzlement against the Company or any of its Affiliates or Subsidiaries, or any customer or client thereof; (b) the unauthorized use or disclosure by you of material Confidential Information or intellectual property rights of the Company or any of its Affiliates or Subsidiaries; (c) your indictment or conviction (or a plea by you or on your behalf of nolo contendere) for: (i) a felony or (ii) a crime involving fraud, dishonesty or moral turpitude; or (d)  your failure to perform your material duties as the Sole Manager of the Company in accordance with this Agreement or if you intentionally, or with gross negligence, take action (or elect not to take action) or engage in conduct adverse to the interests of the Company, its Affiliates, it Subsidiaries, or its or their assets, business or business opportunities that the Member has reasonably determined is or could be materially injurious to the Company; provided, however, that prior to a termination for Cause under clause (d) of this definition, the Member shall provide written notice to you of any such failure(s), violation(s), breach(es), action(s), or inaction(s) upon which the Company intends to rely as the basis for a termination for Cause and the Member will offer the Sole Manager (subject to the consent of CUSA) no less than five (5) calendar days to cure such failure(s), violation(s), breach(es), action(s), or inaction(s) (as applicable) if the Member, in the exercise of its good faith judgment, deems such failure(s), violation(s), breach(es), action(s), or inaction(s) (as applicable) to be capable of cure; provided, further, that the Member shall only be required to give the Sole Manager such notice and opportunity to cure one time.  In the event of termination by the Member pursuant to this clause (b) for Cause or by you pursuant to this clause (b), the Company shall pay you on a pro-rata basis for any portion of your compensation then due and payable for any Services completed up to and including the effective date of such termination.

(c)      Upon expiration or termination of this Agreement for any reason, or at any other time upon the Company's written request, you shall promptly after such expiration or termination:

(i)      deliver to the Company  all materials, equipment, and other property provided for your use by the Company;

(ii)      deliver to the Company all tangible documents and other media (including any copies), containing, reflecting, incorporating, or based on the Confidential Information;

(iii)      permanently erase all the Confidential Information from your personal computer systems; and

(iv)      certify in writing to the Company that you have complied with the requirements of this clause.

(d)      The terms and conditions of clause (c) and this clause (d) of Section 9 and Sections 4, 5, 6, 7, 10, 11, 12, 13, 14, and 15 shall survive the expiration or termination of this Agreement.

**Section 10.**      **Reserved**

Debtors' Exhibit No. 34
Page 216 of 910

**Section 11.**     **Additional Acknowledgments**.

    (a)     You acknowledge and agree that (i) the Services to be performed or provided by you to the Company as Sole Manager under the Company Agreement are of a special and unique character; (ii) you will obtain knowledge and skill relevant to the Company's industry, methods of doing business, and marketing and operational strategies by virtue of your engagement; and (iii) the restrictive covenants and other terms and conditions of this Agreement (including, but not limited to, those in Section 5 of this Agreement) are reasonable and reasonably necessary to protect the legitimate business interest of the Company and its Affiliates.

    (b)     You further acknowledge that (i) the benefits provided to you under this Agreement, including the amount of your compensation, reflect, in part, your obligations and the Company's rights under this Agreement, including, but not limited to, those in Section 5 of this Agreement; (ii) you have no expectation of any additional compensation, royalties, or other payment of any kind not otherwise referenced herein in connection herewith; and (iii) you will not suffer undue hardship by reason of full compliance with the terms and conditions of Section 5 of this Agreement or the Company's enforcement thereof.

**Section 12.**     **Assignment**.   You may not assign any rights or obligations under this Agreement without the prior written consent of the Member (which such consent is subject to the prior consent of CUSA). Any purported assignment in violation of the foregoing sentence shall be deemed null and void *ab initio*. Subject to the limits on assignment stated in this Section 12, this Agreement will inure to the benefit of, be binding on, and be enforceable against each of the Parties and their respective successors and assigns.

**Section 13.**     **Remedies**.   In the event you breach or threaten to breach Section 5 of this Agreement, you hereby acknowledge and agree that monetary damages would not afford an adequate remedy and that the Company shall be entitled to seek, in addition to other available remedies, a temporary or permanent injunction or other equitable relief restraining such breach or threatened breach from any court of competent jurisdiction, without the necessity of showing any actual damages, and without the necessity of posting any bond or other security. This equitable relief shall be in addition to, not in lieu of, legal remedies, monetary damages, or other available forms of relief.

**Section 14.**     **Disputes**.   Subject to Section 13, any dispute, controversy, or claim arising out of or related to this Agreement or any breach or termination of this Agreement, including but not limited to the Services or work related thereto that you provide to the Company, and any alleged violation of any federal, state, or local statute, regulation, common law, or public policy, whether sounding in contract, tort, or statute, shall be submitted to and decided by federal or state courts sitting in Harris County, Texas.

**Section 15.**     **Governing Law, Jurisdiction, and Venue**.   This Agreement and all related documents including all exhibits and schedules attached hereto and all matters arising out of or relating to this Agreement and the Services or work related thereto provided hereunder, whether sounding in contract, tort, or statute, for all purposes shall be governed by and construed in accordance with, the laws of the State of Texas (including its statutes of limitations), without giving effect to the conflict of laws principles that would cause laws of any jurisdiction other than those of the State of Texas to apply.

**Section 16.**     **Miscellaneous**.

    (a)     You shall not export, directly or indirectly, any technical data acquired from the Company, or any products utilizing any such data, to any country in violation of any applicable export laws or regulations.

Debtors' Exhibit No. 34
Page 217 of 910

(b)       All notices, requests, consents, claims, demands, waivers, and other communications hereunder (each, a "**Notice**") shall be in writing, and shall be delivered by email and additionally by (i) personal delivery, (ii) nationally recognized overnight courier (with all fees prepaid), or (iii) certified or registered mail (in each case of clause (iii), return receipt requested, postage prepaid).  Except as otherwise provided in this Agreement, a Notice is effective only if (x) the receiving Party has received the Notice and (y) the Party giving the Notice has complied with the requirements of this Section 16(b).  Any Notice must be sent to the respective Parties at the following addresses (or at such other address for a Party as shall be specified in a Notice given in accordance with this Section 16(b)):

If to Sole Manager:                           Sunset Energy Gulf Coast Asset Management LLC
                                              1727 Sunset Boulevard
                                              Houston, TX 77005
                                              Attention: David Abell
                                              Email: [EMAIL ADDRESS]

with a copy to
(which shall not constitute notice):          Chevron U.S.A. Inc.
                                              100 Northpark Blvd
                                              Covington, LA 70443
                                              Attention: Land Manager
                                              Email: tdwebre@chevron.com

If to the Company:                            Fieldwood Energy IV LLC
                                              2000 W. Sam Houston Parkway S., Suite 1200
                                              Houston, TX 77042
                                              Attention: Member
                                              Email: TLamme@fwellc.com

with a copy to
(which shall not constitute notice):          Chevron U.S.A. Inc.
                                              100 Northpark Blvd
                                              Covington, LA 70443
                                              Attention: Land Manager
                                              Email: tdwebre@chevron.com

(c)       This Agreement, together with the applicable provisions of the Company Agreement and any other documents expressly incorporated herein by reference, and related exhibits and schedules, constitutes the sole and entire agreement of the Parties with respect to the subject matter contained herein, and supersedes all prior and contemporaneous understandings, agreements, representations, and warranties, both written and oral, with respect to such subject matter.

(d)       This Agreement may only be amended, modified, or supplemented by an agreement in writing signed by each Party, and any of the terms thereof may be waived only by a written document signed by each Party or, in the case of waiver, by the Party waiving compliance.  Notwithstanding the foregoing, the Parties agree to amend or modify this Agreement as is necessary to comply with the requirements of Section 409A of the Code.

(e)       If any term or provision of this Agreement is invalid, illegal, or unenforceable in any jurisdiction, such invalidity, illegality, or unenforceability shall not affect any other term or provision of this Agreement or invalidate or render unenforceable such term or provision in any other jurisdiction.

Debtors' Exhibit No. 34
Page 218 of 910

(f)      This Agreement may be executed in counterparts and by facsimile signature, each of which shall be deemed an original and all of which together shall constitute one instrument.

*(Signature page follows)*

WORKAMER\38706476.v7

If this Agreement accurately sets forth our understanding, kindly execute the enclosed copy and return it to the undersigned.

Very truly yours,

**FIELDWOOD ENERGY IV LLC**

By: _____

Name:

Title:

ACCEPTED AND AGREED:

**SUNSET ENERGY GULF COAST ASSET MANAGEMENT LLC**

_____

Name: David Abell

Date:

**<u>EXHIBIT A</u>**

**Limited Liability Company Agreement of
Fieldwood Energy IV LLC**

(See attached)

*Exhibit A to Sole Manager Agreement*

# LIMITED LIABILITY COMPANY AGREEMENT

## OF

## FIELDWOOD ENERGY IV LLC

### *(a Texas Limited Liability Company)*

**[●], 2021**

**THE MEMBERSHIP INTERESTS REFERENCED IN THIS LIMITED LIABILITY COMPANY AGREEMENT HAVE BEEN ACQUIRED FOR INVESTMENT AND HAVE NOT BEEN REGISTERED UNDER THE U.S. SECURITIES ACT OF 1933, AS AMENDED, OR UNDER ANY APPLICABLE STATE SECURITIES LAWS.  SUCH MEMBERSHIP INTERESTS MAY NOT BE SOLD, ASSIGNED, PLEDGED, HYPOTHECATED OR OTHERWISE DISPOSED OF AT ANY TIME WITHOUT EFFECTIVE REGISTRATION UNDER SUCH ACT AND LAWS OR EXEMPTION THEREFROM, AS WELL AS COMPLIANCE WITH THE OTHER SUBSTANTIAL RESTRICTIONS ON TRANSFERABILITY THAT ARE SET FORTH HEREIN.**

# TABLE OF CONTENTS

**ARTICLE I DEFINITIONS** ............................................................................1
    **Section 1.01**    **Definitions**.................................................................1
    **Section 1.02.**    **Interpretation**.............................................................12

**ARTICLE II ORGANIZATION** .....................................................................13
    **Section 2.01**    **Formation**..................................................................13
    **Section 2.02**    **Name** ........................................................................13
    **Section 2.03**    **Principal Office** ........................................................13
    **Section 2.04**    **Registered Office; Registered Agent.** .....................13
    **Section 2.05**    **Purposes; Powers**......................................................14
    **Section 2.06**    **Term** .........................................................................14

**ARTICLE III CAPITAL CONTRIBUTIONS; CAPITAL ACCOUNTS** ...............14
    **Section 3.01**    **Tax Partnership Provisions** .....................................14
    **Section 3.02**    **Initial Capital Contributions** ..................................14
    **Section 3.03**    **Additional Capital Contributions** ...........................14
    **Section 3.04**    **Maintenance of Capital Accounts** ...........................14
    **Section 3.05**    **Succession Upon Transfer** .......................................15
    **Section 3.06**    **Negative Capital Accounts** ......................................15
    **Section 3.07**    **No Withdrawals from Capital Accounts** ..................15
    **Section 3.08**    **Treatment of Loans from Members** .........................15
    **Section 3.09**    **Modifications** ...........................................................16

**ARTICLE IV MEMBERS** .............................................................................16
    **Section 4.01**    **No Personal Liability** ...............................................16
    **Section 4.02**    **No Withdrawal** .........................................................16
    **Section 4.03**    **No Interest in Company Property**.............................16
    **Section 4.04**    **Certification of Membership Interests**.....................16
    **Section 4.05**    **Meetings of Members.** ...............................................17
    **Section 4.06**    **Action Without Meeting** ..........................................18
    **Section 4.07**    **Power of Members** ...................................................18
    **Section 4.08**    **Similar or Competitive Activities; Business Opportunities** ...............18

**ARTICLE V ALLOCATIONS** .......................................................................19
    **Section 5.01**    **Tax Partnership Provisions** .....................................19
    **Section 5.02**    **Allocation of Net Income and Net Loss** ...................19
    **Section 5.03**    **Regulatory and Special Allocations** ........................19

i

| Section 5.04 | **Tax Allocations** | 20 |
| Section 5.05 | **Allocations in Respect of Transferred Membership Interests** | 22 |

**ARTICLE VI DISTRIBUTIONS** .......... **22**

| Section 6.01 | **General** | 22 |
| Section 6.02 | **Tax Advances** | 23 |
| Section 6.03 | **Tax Withholding; Withholding Advances** | 23 |
| Section 6.04 | **Distributions in Kind** | 24 |

**ARTICLE VII MANAGEMENT** .......... **25**

| Section 7.01 | **Management of the Company** | 25 |
| Section 7.02 | **Sole Manager** | 25 |
| Section 7.03 | **Material Project Contracts; Net Profit Interest** | 25 |
| Section 7.04 | **Actions Requiring CUSA Consent** | 26 |
| Section 7.05 | **No Compensation of the Sole Manager** | 27 |
| Section 7.06 | **No Personal Liability** | 27 |

**ARTICLE VIII TRANSFER** .......... **28**

| Section 8.01 | **General Restrictions on Transfer** | 28 |

**ARTICLE IX EXCULPATION AND INDEMNIFICATION** .......... **29**

| Section 9.01 | **Exculpation of Covered Persons** | 29 |
| Section 9.02 | **Liabilities and Duties of Covered Persons** | 30 |
| Section 9.03 | **Indemnification** | 30 |
| Section 9.04 | **Survival** | 32 |

**ARTICLE X ACCOUNTING; TAX MATTERS** .......... **33**

| Section 10.01 | **Financial Statements and Other Information** | 33 |
| Section 10.02 | **Inspection Rights** | 33 |
| Section 10.03 | **Income Tax Status** | 34 |
| Section 10.04 | **Tax Matters Representative** | 34 |
| Section 10.05 | **Tax Returns** | 35 |
| Section 10.06 | **Company Funds** | 36 |

**ARTICLE XI WINDING UP AND TERMINATION** .......... **36**

| Section 11.01 | **Events Requiring Winding Up** | 36 |
| Section 11.02 | **Effectiveness of Termination** | 36 |
| Section 11.03 | **Liquidation** | 37 |

ii

Section 11.04    **Certificate of Termination** ................................................................38
Section 11.05    **Survival of Rights, Duties, and Obligations** ............................38
Section 11.06    **Recourse for Claims** ......................................................................38

**ARTICLE XII MISCELLANEOUS** ..........................................................................**38**

Section 12.01    **Expenses** ...........................................................................................38
Section 12.02    **Further Assurances** ........................................................................38
Section 12.03    **Confidentiality** ...............................................................................39
Section 12.04    **Notices** ..............................................................................................40
Section 12.05    **Headings** ...........................................................................................41
Section 12.06    **Severability** ......................................................................................41
Section 12.07    **Entire Agreement** ...........................................................................41
Section 12.08    **Successors and Assigns** ..................................................................41
Section 12.09    **No Third-Party Beneficiaries** .......................................................41
Section 12.10    **Amendment** ......................................................................................42
Section 12.11    **Waiver** ...............................................................................................42
Section 12.12    **Governing Law** ................................................................................42
Section 12.13    **Submission to Jurisdiction** ...........................................................42
Section 12.14    **Waiver of Jury Trial** .....................................................................42
Section 12.15    **Equitable Remedies** .......................................................................43
Section 12.16    **Attorney's Fees** ..............................................................................43
Section 12.17    **Remedies Cumulative** .....................................................................43
Section 12.18    **Counterparts** ...................................................................................43

**SCHEDULE A MEMBERS SCHEDULE**                                          A-1

iii

## LIMITED LIABILITY COMPANY AGREEMENT OF
## FIELDWOOD ENERGY IV LLC

This Limited Liability Company Agreement of Fieldwood Energy IV LLC, a Texas limited liability company (the "**Company**"), dated as of [●], 2021 (this "**Agreement**"), is entered into by and among the Company, the Initial Member executing this Agreement as of the date hereof, and each other Person who after the date hereof becomes a Member of the Company and becomes a party to this Agreement by executing a joinder agreement in form and substance acceptable to the Company.

### RECITALS

**WHEREAS,** the Company was formed under the laws of the State of Texas by the filing of a Certificate of Formation with the Secretary of State of the State of Texas on [●], 2021 (the "**Certificate of Formation**") for the purposes set forth in Section 2.05 of this Agreement;

**WHEREAS,** pursuant to and in accordance with the Confirmation Order and the Term Sheet, respectively, and as a result of a divisive merger pursuant to § 10.008 of the BOC, the Company owns the FWE IV Assets, subject to the operational liabilities in connection therewith allocated to the Company in the merger, including the FWE IV Obligations; and

**WHEREAS,** the Initial Member wishes to enter into this Agreement to set forth the terms and conditions governing the ownership, operation and management of the Company.

**NOW, THEREFORE,** in consideration of the mutual covenants and agreements hereinafter set forth and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto agree as follows:

### ARTICLE I
### DEFINITIONS

**Section 1.01   Definitions.**  Capitalized terms used herein and not otherwise defined shall have the meanings set forth in this Section 1.01:

"**Adjusted Capital Account Deficit**" means, with respect to any Member, the deficit balance, if any, in such Member's Capital Account as of the end of the relevant Fiscal Year, after giving effect to the following adjustments:

(a)   crediting to such Capital Account any amount that such Member is obligated to restore or is deemed to be obligated to restore pursuant to Treasury Regulations Sections 1.704-1(b)(2)(ii)(c), 1.704-2(g)(1) and 1.704-2(i); and

(b)   debiting to such Capital Account the items described in Treasury Regulations Section 1.704-1(b)(2)(ii)(d)(4), (5) and (6).

"**Adjusted Taxable Income**" of a Member, or if the Member is disregarded for U.S. federal income tax purposes, the members or beneficiaries of such Member, for a Fiscal Year (or

portion thereof) with respect to the Membership Interest held by such Member means the federal taxable income allocated by the Company to the Member with respect to its Membership Interest (as adjusted by any final determination in connection with any tax audit or other proceeding) for such Fiscal Year (or portion thereof); provided, that such taxable income shall be computed (i) minus any excess taxable loss of the Company for any prior period allocable to such Member with respect to its Membership Interest that were not previously taken into account for purposes of determining such Member's Adjusted Taxable Income in a prior Fiscal Year to the extent such loss would be available under the Code to offset income of the Member (or, as appropriate, the direct or indirect owners of the Member) determined as if the income and loss from the Company were the only income and loss of the Member (or, as appropriate, the direct or indirect owners of the Member) in such Fiscal Year and all prior Fiscal Years, and (ii) taking into account any special basis adjustment with respect to such Member resulting from an election by the Company under Code Section 754.

"**Affiliate**" means, with respect to any Person, any other Person who, directly or indirectly (including through one or more intermediaries), controls, is controlled by, or is under common control with, such Person.  For purposes of this definition, "control," when used with respect to any specified Person, shall mean the power, direct or indirect, to direct or cause the direction of the management and policies of such Person, whether through ownership of voting securities or partnership or other ownership interests, by contract or otherwise; and the terms "controlling" and "controlled" shall have correlative meanings.  For the avoidance of doubt, neither CUSA nor any of its Subsidiaries nor Credit Bid Purchaser nor any of its Subsidiaries control the Company and none of them shall constitute an Affiliate of the Company.

"**Agreement**" has the meaning set forth in the Preamble.

"**Applicable Law**" means all applicable provisions of (a) constitutions, treaties, statutes, laws (including the common law), rules, regulations, decrees, ordinances, codes, proclamations, declarations, or orders of any Governmental Authority; (b) any consents or approvals of any Governmental Authority; and (c) any orders, decisions, advisory or interpretative opinions, injunctions, judgments, awards, decrees of, or agreements with, any Governmental Authority.

"**Bankruptcy**" means (i) the filing by the Company of a petition under the Bankruptcy Code seeking to adjudicate the Company a bankrupt or an insolvent or otherwise commencing, authorizing, or acquiescing in the commencement of a proceeding or cause of action seeking liquidation, winding up, reorganization, arrangement, adjustment, protection, composition, or other relief with respect to itself or its debts under any bankruptcy, insolvency, or other similar law now or hereafter in effect or seeking the appointment of a trustee, receiver, liquidator, custodian, or other similar official over it or any substantial part of its property, or consenting to any such relief or to the appointment of or taking possession by any such official in an involuntary case or other proceeding commenced against it, or taking any corporate or similar official action to authorize any of the foregoing; (ii) the making of an assignment or any general arrangement for the benefit of creditors; or (iii) the Company's filing an answer or other pleading admitting or failing to contest the allegations of a petition filed against it in any proceeding of the foregoing nature, or taking any other action to authorize any of the actions set forth above.

Debtors' Exhibit No. 34
Page 227 of 910

"**Bankruptcy Code**" means title 11 of the United States Code, 11 U.S.C. §§ 101, et seq., as amended.

"**BOC**" means the Texas Business Organizations Code, as amended and in effect from time to time.

"**Book Depreciation**" means, with respect to any Company asset for each Fiscal Year, the Company's depreciation, amortization, or other cost recovery deductions determined for federal income tax purposes, except that if the Book Value of an asset differs from its adjusted tax basis at the beginning of such Fiscal Year, Book Depreciation shall be (a) if such difference is being eliminated by use of the remedial method under Treasury Regulations Section 1.704-3(d), the amount of book basis recovered for such period under the rules prescribed by Treasury Regulations Section 1.704-3(d)(2), or (b) if the remedial method is not used, an amount which bears the same ratio to such beginning Book Value as the federal income tax depreciation, amortization, or other cost recovery deduction for such Fiscal Year bears to such beginning adjusted tax basis; provided, that if the adjusted basis for federal income tax purposes of an asset at the beginning of such Fiscal Year is zero and the Book Value of the asset is positive, Book Depreciation shall be determined with reference to such beginning Book Value using any permitted method selected by the Sole Manager in accordance with Treasury Regulations Section 1.704-1(b)(2)(iv)(g)(3).

"**Book Value**" means, with respect to any Company asset, the adjusted basis of such asset for federal income tax purposes, except as follows:

(a)     the initial Book Value of any Company asset contributed by a Member to the Company shall be the gross Fair Market Value of such Company asset as of the date of such contribution;

(b)     immediately before the distribution by the Company of any Company asset to a Member, the Book Value of such asset shall be adjusted to its gross Fair Market Value as of the date of such distribution;

(c)     the Book Value of all Company assets may, in the sole discretion of the Sole Manager, be adjusted to equal their respective gross Fair Market Values, as reasonably determined by the Sole Manager, as of the following times:

(i)     the acquisition of an additional Membership Interest in the Company by a new or existing Member in consideration for more than a *de minimis* Capital Contribution;

(ii)     the distribution by the Company to a Member of more than a *de minimis* amount of property (other than cash) as consideration for all or a part of such Member's Membership Interest in the Company; and

(iii)     the liquidation of the Company within the meaning of Treasury Regulations Section 1.704-1(b)(2)(ii)(g);

WEIL:\97901822\22\45327.0007

(d)      the Book Value of each Company asset shall be increased or decreased, as the case may be, to reflect any adjustments to the adjusted tax basis of such Company asset pursuant to Code Section 734(b) or Code Section 743(b), but only to the extent that such adjustments are taken into account in determining Capital Account balances pursuant to Treasury Regulations Section 1.704-1b(2)(iv)(m); provided, that Book Values shall not be adjusted pursuant to this paragraph (d) to the extent that an adjustment pursuant to paragraph (c) above is made in conjunction with a transaction that would otherwise result in an adjustment pursuant to this paragraph (d); and

(e)      if the Book Value of a Company asset has been determined pursuant to paragraph (a) or adjusted pursuant to paragraphs (c) or (d) above, such Book Value shall thereafter be adjusted to reflect the Book Depreciation taken into account with respect to such Company asset for purposes of computing Net Income and Net Losses.

"**Business Day**" means a day other than a Saturday, Sunday or other day on which commercial banks in the State of Texas are authorized or required to close.

"**Capital Account**" has the meaning set forth in Section 3.04.

"**Capital Contribution**" means, for any Member, the total amount of cash and cash equivalents and the Book Value of any property contributed to the Company by such Member.

"**Certificate of Formation**" has the meaning set forth in the Recitals.

"**Certificate of Merger**" means that certain Certificate of Merger filed by Fieldwood III with the Secretary of State of the State of Texas on [●], 2021.

"**Certificate of Termination**" means a certificate to be filed upon completion of the winding up and liquidation of the Company as set forth in Section 11.04, which certificate shall be in the form required by § 11.101 of the BOC.

"**Code**" means the Internal Revenue Code of 1986, as amended.

"**Company**" has the meaning set forth in the Preamble.

"**Company Minimum Gain**" means "partnership minimum gain" as defined in Treasury Regulations Section 1.704-2(b)(2), substituting the term "Company" for the term "partnership" as the context requires.

"**Confidential Information**" has the meaning set forth in Section 12.03(a).

"**Confirmation Order**" means the confirmation order entered in Chapter 11 Case 20-33948, In re: Fieldwood Energy LLC, *et al*, in the United States Bankruptcy Court for the Southern District of Texas, Houston Division.

"**Continuance**" has the meaning set forth in Section 11.01.

Debtors' Exhibit No. 34
Page 229 of 910

"**Contract Operating Agreement**" means that certain Contract Operating Agreement of even date herewith by and among Credit Bid Purchaser and the Company, of which CUSA is an express third party beneficiary.

"**Covered Person**" has the meaning set forth in Section 9.01(a).

"**Credit Bid Purchaser**" means Mako Buyer LLC, a Delaware limited liability company.

"**CUSA**" means Chevron U.S.A. Inc., a Pennsylvania corporation, and its successors or assigns.

"**Deepwater Assets Decommissioning Funding Agreement**" means that certain Decommissioning Funding Agreement, of event date herewith, by and between CUSA and Credit Bid Purchaser.

"**Depletable Property**" means each separate oil and gas property as defined in Section 614 of the Code.

"**Divisive Merger Documents**" means the Certificate of Merger, Plan of Merger, Certificate of Formation and other documents filed by or on behalf of Fieldwood III with respect to the Company with the Texas Secretary of State related to the divisive merger of Fieldwood III into Fieldwood III (the surviving entity) and the newly-created Company.

"**Electronic Transmission**" means any form of communication, including communication by use of or participation in one or more electronic networks or databases, not directly involving the physical transmission of paper that creates a record that may be retained, retrieved, and reviewed by a recipient thereof and that may be directly reproduced in paper form by such a recipient through an automated process.

"**Escrow Account**" means **[bank information for the Escrow Account to come]**.

"**Escrow Agreement**" means that certain Escrow Agreement of even date herewith between U.S. Bank National Association, as escrow agent, Fieldwood III, the Company and Credit Bid Purchaser.

"**Estimated Tax Amount**" of a Member, or if the Member is disregarded for U.S. federal income tax purposes, the members or beneficiaries of such Member, for a Fiscal Year means the Member's Tax Amount for such Fiscal Year as estimated in good faith from time to time by the Sole Manager.  In making such estimate, the Sole Manager shall take into account amounts shown on Internal Revenue Service Form 1065 filed by the Company and similar state or local forms filed by the Company for the preceding taxable year and such other adjustments as the Sole Manager reasonably determines are necessary or appropriate to reflect the estimated operations of the Company for the Fiscal Year.

"**Excess Amount**" has the meaning set forth in Section 6.02(c).

WEIL:\97901822\22\45327.0007

"**Fair Market Value**" of any asset as of any date means the purchase price that a willing buyer having all relevant knowledge would pay a willing seller for such asset in an arm's length transaction, as determined in good faith by the Sole Manager on such factors as the Sole Manager, in the exercise of his or her reasonable business judgment, considers relevant.

"**Fieldwood**" means Fieldwood Energy LLC, a Texas limited liability company, and its successors and assigns (excluding, for the avoidance of doubt, the Company).

"**Fieldwood III**" means Fieldwood Energy III LLC, a Texas limited liability company, and its successors and assigns (excluding, for the avoidance of doubt, the Company).

"**Final Completion**" has the meaning ascribed to such term in the Turnkey Removal Agreement.

"**Fiscal Year**" means the calendar year, unless the Company is required to have a taxable year other than the calendar year, in which case Fiscal Year shall be the period that conforms to its taxable year.

"**FWE IV Assets**" has the meaning set forth in the Plan of Merger.

"**FWE IV Obligations**" has the meaning set forth in the Plan of Merger.

"**GAAP**" means generally accepted accounting principles in the United States of America in effect from time to time; provided, that, notwithstanding any term or provision contained in this Agreement, GAAP will be deemed for all purposes hereof to treat leases that would have not been considered to be indebtedness in accordance with GAAP as in effect on December 31, 2017 (whether such leases were in effect on such date or are entered into thereafter) in a manner consistent with the treatment of such leases under GAAP as in effect on December 31, 2017, notwithstanding any modification or interpretative changes thereto or implementations of any such modifications or interpretative changes that may have occurred thereafter.

"**Governmental Authority**" means any court, tribunal, arbitrator, body, agency, division, board, bureau, commission or any other similar entity exercising executive, legislative, judicial, regulatory, or administrative functions of government, or any subdivision of any of the foregoing, whether federal, state, county, municipal, tribal, local or foreign, in each case with competent jurisdiction.

"**Guarantee Obligation**" means, as to any Person (the "guaranteeing Person"), any obligation of (i) the guaranteeing Person or (ii) another Person (including any bank under any letter of credit), if to induce the creation of such obligation of such other Person the guaranteeing Person has issued a reimbursement, counterindemnity or similar obligation, in either case guaranteeing or in effect guaranteeing any Indebtedness, leases, dividends or other obligations (the "primary obligations") of any other third Person (the "primary obligor") in any manner, whether directly or indirectly, including any obligation of the guaranteeing Person, whether or not contingent, (A) to purchase any such primary obligation or any property constituting direct or indirect security therefor, (B) to advance or supply funds (1) for the purchase or payment of any such primary obligation or (2) to maintain working capital or equity capital of the primary obligor or otherwise

WEIL:\97901822\22\45327.0007

to maintain the net worth or solvency of the primary obligor, (C) to purchase property, securities or services, in each case, primarily for the purpose of assuring the owner of any such primary obligation of the ability of the primary obligor to make payment of such primary obligation or (D) otherwise to assure or hold harmless the owner of any such primary obligation against loss in respect thereof; provided, however, that the term Guarantee Obligation shall not include endorsements of instruments for deposit or collection in the ordinary course of business.

"**Indebtedness**" means, with respect to any Person at any date, without duplication, all (i) indebtedness of such Person for borrowed money; (ii) obligations of such Person for the deferred purchase price of property or services (other than trade payables incurred in the ordinary course of such Person's business); (iii) obligations of such Person evidenced by notes, bonds, debentures or other similar instruments; (iv) indebtedness created or arising under any conditional sale or other title retention agreement with respect to property acquired by such Person (even though the rights and remedies of the seller or lender under such agreement in the event of default are limited to repossession or sale of such property); (v) capital lease obligations of such Person; (vi) obligations of such Person, contingent or otherwise, as an account party or applicant under acceptance, letter of credit or similar facilities; (vii) obligations of such Person, contingent or otherwise, to purchase, redeem, retire or otherwise acquire for value any capital stock of such Person; (viii) Guarantee Obligations of such Person in respect of obligations of the kind referred to in clauses (i) through (vii) above; and (ix) obligations of the kind referred to in clauses (i) through (viii) above secured by (or for which the holder of such obligation has an existing right, contingent or otherwise, to be secured by) any Lien on property (including accounts and contract rights) owned by such Person, whether or not such Person has assumed or become liable for the payment of such obligation.

"**Initial Member**" has the meaning set forth in the term "Member".

"**Joint Development Agreement**" means that certain Joint Development Agreement of even date herewith by and between the Company and Credit Bid Purchaser.

"**Lien**" means any mortgage, pledge, security interest, option, right of first offer, encumbrance, or other restriction or limitation of any nature whatsoever.

"**Liquidator**" has the meaning set forth in Section 11.03(a).

"**Losses**" has the meaning set forth in Section 9.03(a).

"**Material Project Contracts**" means, collectively, the Omnibus Agreement, the NPI Conveyance, the Contract Operating Agreement, the Turnkey Removal Agreement, the Transition Services Agreement, the Joint Development Agreement, the Deepwater Assets Decommissioning Funding Agreement and the SEMS Bridging Agreement, and each a "**Material Project Contract**".

"**Member**" means (a) the Person identified on the Members Schedule as of the date hereof as a Member and who has executed this Agreement or a counterpart thereof (each, an "**Initial Member**"); and (b) each Person who is hereafter admitted as a Member in accordance with the terms of this Agreement and the BOC, in each case so long as such Person is shown on the

WEIL:\97901822\22\45327.0007

Company's books and records as an owner of Membership Interests.  The Members shall constitute "members" (as that term is defined in the BOC) of the Company.

"**Member Nonrecourse Debt**" means "partner nonrecourse debt" as defined in Treasury Regulations Section 1.704-2(b)(4), substituting the term "Company" for the term "partnership" and the term "Member" for the term "partner" as the context requires.

"**Member Nonrecourse Debt Minimum Gain**" means an amount, with respect to each Member Nonrecourse Debt, equal to the Company Minimum Gain that would result if the Member Nonrecourse Debt were treated as a Nonrecourse Liability, determined in accordance with Treasury Regulations Section 1.704-2(i)(3).

"**Member Nonrecourse Deduction**" means "partner nonrecourse deduction" as defined in Treasury Regulations Section 1.704-2(i), substituting the term "Member" for the term "partner" as the context requires.

"**Members Schedule**" has the meaning set forth in Section 3.02.

"**Membership Interest**" means an interest in the Company owned by a Member, including such Member's right (a) to its distributive share of Net Income, Net Losses, and other items of income, gain, loss, and deduction of the Company; (b) to its distributive share of the assets of the Company; (c) to vote on, consent to, or otherwise participate in any decision of the Members as provided in this Agreement; and (d) to any and all other benefits to which such Member may be entitled as provided in this Agreement or the BOC.  The Membership Interest of each Member shall be expressed as a percentage interest and shall be as set forth on the Members Schedule.

"**Net Income**" and "**Net Loss**" mean, for each Fiscal Year or other period specified in this Agreement, an amount equal to the Company's taxable income or taxable loss, or particular items thereof, determined in accordance with Code Section 703(a) (where, for this purpose, all items of income, gain, loss, or deduction required to be stated separately pursuant to Code Section 703(a)(1) shall be included in taxable income or taxable loss), but with the following adjustments:

      (a)    any income realized by the Company that is exempt from federal income taxation, as described in Code Section 705(a)(1)(B), shall be added to such taxable income or taxable loss, notwithstanding that such income is not includable in gross income;

      (b)    any expenditures of the Company described in Code Section 705(a)(2)(B), including any items treated under Treasury Regulations Section 1.704-1(b)(2)(iv)(I) as items described in Code Section 705(a)(2)(B), shall be subtracted from such taxable income or taxable loss, notwithstanding that such expenditures are not deductible for federal income tax purposes;

      (c)    any gain or loss (including Simulated Gain or Loss) resulting from any disposition of Company property with respect to which gain or loss is recognized for federal income tax purposes shall be computed by reference to the Book Value of the property so disposed, notwithstanding that the adjusted tax basis of such property differs from its Book Value;

WEIL:\97901822\22\45327.0007

(d)     any items of depreciation, amortization, and other cost recovery deductions with respect to Company property having a Book Value that differs from its adjusted tax basis shall be computed by reference to the property's Book Value (as adjusted for Book Depreciation) in accordance with Treasury Regulations Section 1.704-1(b)(2)(iv)(g);

(e)     if the Book Value of any Company property is adjusted as provided in the definition of Book Value, then the amount of such adjustment shall be treated as an item of gain or loss and included in the computation of such taxable income or taxable loss;

(f)     to the extent an adjustment to the adjusted tax basis of any Company property pursuant to Code Sections 732(d), 734(b) or 743(b) is required, pursuant to Treasury Regulations Section 1.704 1(b)(2)(iv)(m), to be taken into account in determining Capital Accounts, the amount of such adjustment to the Capital Accounts shall be treated as an item of gain (if the adjustment increases the basis of the asset) or loss (if the adjustment decreases such basis); and

(g)     any items which are specially allocated pursuant to Section 5.03 hereof shall not be taken into account in computing Net Income or Net Loss.  The amounts of the items of Company income, gain, loss or deduction available to be specially allocated pursuant to Section 5.03 hereof shall be determined by applying rules analogous to those set forth in subparagraphs (a) through (f) above.

"**Nonrecourse Deductions**" has the meaning set forth in Treasury Regulations Section 1.704-2(b).

"**Nonrecourse Liability**" has the meaning set forth in Treasury Regulations Section 1.704-2(b)(3).

"**NPI Conveyance**" means that certain Conveyance of Net Profits Overriding Royalty Interest from Company to the Escrow Account.

"**NPI Payment**" has the meaning attributed to the term "NPI Payment" under the NPI Conveyance.

"**Omnibus Agreement**" means that certain Omnibus Agreement of even date herewith by and between the Company, CUSA and Credit Bid Purchaser.

"**Person**" means any individual, corporation, partnership, limited liability company, association, joint stock company, trust, estate, joint venture, firm, association, unincorporated organization, Governmental Authority, or any other entity.

"**Plan of Merger**" means the Agreement and Plan of Merger of Fieldwood Energy III LLC into Fieldwood Energy IV LLC and Fieldwood Energy III LLC, dated as of [●], 2021, and adopted by Fieldwood Energy III LLC.

"**Plan of Reorganization**" means the plan of reorganization of Fieldwood that was included in, and was confirmed by, the Confirmation Order.

9

Debtors' Exhibit No. 34
Page 234 of 910

"**Production Period**" has the meaning attributed to the term "Production Period" under the NPI Conveyance.

"**Quarterly Estimated Tax Amount**" of a Member, or if the Member is disregarded for U.S. federal income tax purposes, the members or beneficiaries of such Member, for any calendar quarter of a Fiscal Year means the excess, if any of: (a) the product of (i) a quarter (1/4) in the case of the first calendar quarter of the Fiscal Year, half (1/2) in the case of the second calendar quarter of the Fiscal Year, three-quarters (3/4) in the case of the third calendar quarter of the Fiscal Year, and one (1) in the case of the fourth calendar quarter of the Fiscal Year and (ii) the Member's Estimated Tax Amount for such Fiscal Year; over (b) all distributions previously made during such Fiscal Year to such Member.

"**Regulatory Allocations**" has the meaning set forth in Section 5.03(f).

"**Reimbursable Costs**" has the meaning attributed to such term in the Contract Operating Agreement.

"**Representative**" means, with respect to any Person, any and all directors, officers, employees, consultants, financial advisors or lenders, counsel, accountants, and other agents of such Person.

"**Securities Act**" means the Securities Act of 1933, as amended, and the rules and regulations thereunder, which shall be in effect at the time.

"**SEMS Bridging Agreement**" means that certain SEMS Bridging Agreement & Interface Document, dated of even date herewith by and between Credit Bid Purchaser and the Company.

"**Shortfall Amount**" has the meaning set forth in Section 6.02(b).

"**Simulated Basis**" means, with respect to each Depletable Property, the Book Value of such property.

"**Simulated Depletion**" means, with respect to each Depletable Property, a depletion allowance computed in accordance with U.S. federal income tax principles (as if the Simulated Basis of the property were its adjusted tax basis and using simulated cost depletion) and in the manner specified in Treasury Regulations Section 1.704-1(b)(2)(iv)(k)(2); provided that the Simulated Depletion with respect to a Depletable Property shall in no event exceed the Simulated Basis of such Depletable Property.

"**Simulated Gain or Loss**" means the simulated gain or loss computed with respect to a sale or other disposition of any Depletable Property pursuant to Treasury Regulations Section 1.704-1(b)(2)(iv)(k)(2).

"**Sole Manager**" has the meaning set forth in Section 7.01.

WEIL:\97901822\22\45327.0007

"**Subsidiary**" means, with respect to any Person, any other Person of which a majority of the outstanding shares or other equity interests having the power to vote for directors or managers or comparable positions are owned, directly or indirectly, by the first Person.

"**Tax Advance**" has the meaning set forth in Section 6.02(a).

"**Tax Amount**" of a Member, or if the Member is disregarded for U.S. federal income tax purposes, the members or beneficiaries of such Member, for a Fiscal Year means, subject to (i) any restrictions in the Company's then-applicable debt financing arrangements, if any, and (ii) the Sole Manager's good faith determination to retain any other amounts necessary to satisfy obligations of the Company that are reasonably expect to be due and payable during the 90 days following the date of determination (i) the product of (a) the Tax Rate for such Fiscal Year (but not to exceed the Tax Rate applicable to C-corporations for such Fiscal Year) and (b) the Adjusted Taxable Income of the Member for such Fiscal Year with respect to its Membership Interest or (ii) the actual amount of U.S. federal, state and local income tax (including any state or local tax imposed in lieu of an income tax) paid by such Member with respect to such Fiscal Year in respect of the taxable income allocated to the Member by the Company, after taking into account all deductions available to such Member from all sources in excess of such Member's income from other sources; *provided*, *however*, that if at any time Fieldwood Energy Inc. has cash tax liability (including an estimated tax liability) on account of items of income or gain of the Company without sufficient cash on hand from a corresponding cash distribution in respect of such income or gain (all as reasonably determined by Fieldwood Energy Inc.), then the Tax Amount shall be increased such that the Company timely distributes cash sufficient to pay such tax liability.

"**Tax Matters Representative**" has the meaning set forth in Section 10.04(a).

"**Tax Rate**" of a Member, or if the Member is disregarded for U.S. federal income tax purposes, the members or beneficiaries of such Member, for any period, means the highest effective marginal combined federal, state, and local tax rate applicable to an individual residing in Houston, Texas (or, if higher, a corporation doing business in Houston, Texas), taking into account (a) the character (for example, long-term or short-term capital gain, ordinary, or exempt) of the applicable income and (b) if applicable, the deduction under IRC Section 199A.

"**Taxing Authority**" has the meaning set forth in Section 6.03(b).

"**Term Sheet**" means that certain term sheet, dated March 22, 2021, by and between Fieldwood, on the one hand, and CUSA, on the other hand.

"**Third Party Payment**" has the meaning attributed to such term in the Contract Operating Agreement.

"**Transfer**" means to, directly or indirectly, sell, transfer, assign, convey, gift, pledge, encumber, hypothecate, or similarly dispose of, either voluntarily or involuntarily, by operation of law or otherwise (including by merger or division), or to enter into any contract, option, or other arrangement or understanding with respect to the sale, transfer, assignment, conveyance, gift, pledge, encumbrance, hypothecation, or similar disposition of, any Membership Interests owned by a Person or any interest (including a beneficial interest) in any Membership Interests owned by

WEIL:\97901822\22\45327.0007

a Person.  "**Transfer**" when used as a noun shall have a correlative meaning.  "**Transferor**" and "**Transferee**" mean a Person who makes or receives a Transfer, respectively.

"**Transition Services Agreement**" means the Neptune Spar Transition Services Agreement of even date herewith by and between Credit Bid Purchaser and Noble Energy, Inc.

"**Treasury Regulations**" means the final or temporary regulations issued by the United States Department of Treasury pursuant to its authority under the Code, and any successor regulations.

"**Turnkey Removal Agreement**" means that certain Turnkey Removal Agreement of even date herewith by and among Credit Bid Purchaser, CUSA and the Company.

"**Withholding Advances**" has the meaning set forth in Section 6.03(b).

**Section 1.02.    Interpretation**.  For purposes of this Agreement: (a) the words "include," "includes," and "including" shall be deemed to be followed by the words "without limitation"; (b) the word "or" is not exclusive; and (c) the words "herein," "hereof," "hereby," "hereto," and "hereunder" refer to this Agreement as a whole.

The definitions given for any defined terms in this Agreement shall apply equally to both the singular and plural forms of the terms defined.  Whenever the context may require, any pronoun shall include the corresponding masculine, feminine, and neuter forms.

Unless the context otherwise requires, references herein: (x) to Articles, Sections, Exhibits, and Schedules mean the Articles and Sections of, and Exhibits and Schedules attached to, this Agreement; (y) to an agreement, instrument, or other document means such agreement, instrument, or other document as amended, supplemented, and modified from time to time to the extent permitted by the provisions thereof; and (z) to a statute means such statute as amended from time to time and includes any successor legislation thereto and any regulations promulgated thereunder.

This Agreement shall be construed without regard to any presumption or rule requiring construction or interpretation against the party drafting an instrument or causing any instrument to be drafted.

The Exhibits and Schedules referred to herein shall be construed with, and as an integral part of, this Agreement to the same extent as if they were set forth verbatim herein.

The headings in this Agreement are for reference only and shall not affect the interpretation of this Agreement.

WEIL:\97901822\22\45327.0007

## ARTICLE II
## ORGANIZATION

**Section 2.01   Formation**.

(a)      The Company was formed on [●], 2021, pursuant to the provisions of the BOC, upon the filing and acceptance of the Certificate of Formation with the Secretary of State of the State of Texas.

(b)      This Agreement shall constitute the "company agreement" (as that term is used in the BOC) of the Company.  The rights, powers, duties, obligations, and liabilities of the Members and the Sole Manager shall be determined pursuant to the BOC and this Agreement.  To the extent that the rights, powers, duties, obligations, and liabilities of any Members or the Sole Manager are different by reason of any provision of this Agreement than they would be under the BOC in the absence of such provision, this Agreement shall, to the extent permitted by the BOC, control.

**Section 2.02   Name.** The name of the Company is "Fieldwood Energy IV LLC" or such other name or names as may be designated by the Sole Manager; provided, that the name shall always contain the words "Limited Liability Company" or "Limited Company" or an abbreviation of one of those phrases.  Amendments to the Certificate of Formation or this Agreement to reflect any such name change may be made by the Sole Manager without the consent of the Members. The Sole Manager shall give prompt notice to the Members and CUSA of any change to the name of the Company and any related amendment to the Certificate of Formation or this Agreement. The Company may conduct business under any assumed or fictitious name required by Applicable Law or otherwise deemed desirable by the Sole Manager.

**Section 2.03   Principal Office.** The principal office of the Company is located at 2000 W. Sam Houston Parkway S., Suite 1200, Houston, Texas 77042, or such other place as may from time to time be determined by the Sole Manager.  The Sole Manager shall give prompt notice of any such change to each of the Members and CUSA.

**Section 2.04   Registered Office; Registered Agent.**

(a)      The registered office of the Company shall be the office of the initial registered agent named in the Certificate of Formation or such other office (which need not be a place of business of the Company) as the Sole Manager may designate from time to time in the manner provided by the BOC and Applicable Law.

(b)      The registered agent for service of process on the Company in the State of Texas shall be the initial registered agent named in the Certificate of Formation or such other Person or Persons as the Sole Manager may designate from time to time in the manner provided by the BOC and Applicable Law.

13

**Section 2.05   Purposes; Powers**.

(a)     The purposes of the Company are to (i) engage in the Plugging and Abandonment and decommissioning of the FWE IV Assets, as such terms are defined in the Plan of Merger, (ii) the operation of the FWE IV Assets prior to their Plugging and Abandonment and decommissioning, (iii) such other activities as are approved pursuant to the terms of this Agreement, including subject to Section 7.04, and (iv) to engage in any and all activities necessary or incidental to the foregoing purposes.

(b)     The Company shall have all the powers necessary or convenient to carry out the purposes for which it is formed, including the powers granted by the BOC.

**Section 2.06   Term.**  The term of the Company commenced on the date the Certificate of Formation was filed with the Secretary of State of the State of Texas and shall continue in existence perpetually until the Company is terminated in accordance with the provisions of this Agreement.

## ARTICLE III
## CAPITAL CONTRIBUTIONS; CAPITAL ACCOUNTS

**Section 3.01   Tax Partnership Provisions.**  This ARTICLE III is intended to apply only if the Company becomes a partnership for U.S. federal income tax purposes.

**Section 3.02   Initial Capital Contributions.**  Contemporaneously with the execution of this Agreement, and pursuant to the Plan of Reorganization and as a result of a divisive merger pursuant to § 10.008 of the BOC, the Company holds the properties and assets identified as the FWE IV Assets, which shall, together with the amount of any expenses paid pursuant to Section 12.01, constitute the aggregate Capital Contributions made by the Initial Member.  The Initial Member shall own Membership Interests in the amount set forth opposite such Member's name on Schedule A attached hereto (the "**Members Schedule**").  From and after the date of this Agreement, the Sole Manager shall maintain and update the Members Schedule upon the issuance or Transfer of any Membership Interests to any new or existing Member in accordance with this Agreement.

**Section 3.03   Additional Capital Contributions.**  No Member shall be required to make any additional Capital Contributions to the Company.  Any future Capital Contributions made by any Member shall only be made with the consent of the Sole Manager.  To the extent that a Member makes an additional Capital Contribution to the Company, the Sole Manager shall revise the Members Schedule to reflect an increase in the Membership Interest of the contributing Member that fairly and equitably reflects the value of its additional Capital Contribution in relation to the aggregate amount of all Capital Contributions made by the Members.

**Section 3.04   Maintenance of Capital Accounts.**  The Company shall establish and maintain for each Member a separate capital account (a "**Capital Account**") on its books and records in accordance with this Section 3.04.  Each Capital Account shall be established and maintained in accordance with the following provisions:

(a)     Each Member's Capital Account shall be increased by the amount of:

WEIL:\97901822\22\45327.0007

(i)      such Member's Capital Contributions, including such Member's initial Capital Contribution and any additional Capital Contributions;

(ii)      any Net Income or other item of income or gain allocated to such Member pursuant to ARTICLE V; and

(iii)      any liabilities of the Company that are assumed by such Member or secured by any property distributed to such Member.

(b)      Each Member's Capital Account shall be decreased by:

(i)      the cash amount or Book Value of any property distributed to such Member pursuant to ARTICLE VI and Section 11.03(d);

(ii)      the amount of any Net Loss or other item of loss or deduction allocated to such Member pursuant to ARTICLE V; and

(iii)      the amount of any liabilities of such Member assumed by the Company or that are secured by any property contributed by such Member to the Company.

**Section 3.05   Succession Upon Transfer.**  In the event that any Membership Interests are Transferred in accordance with the terms of this Agreement, the Transferee shall succeed to the Capital Account of the Transferor to the extent it relates to the Transferred Membership Interests and, subject to Section 5.05, shall receive allocations and distributions pursuant to ARTICLE V, ARTICLE VI, and ARTICLE XI in respect of such Membership Interests.

**Section 3.06   Negative Capital Accounts.**  In the event that any Member shall have a deficit balance in its Capital Account, such Member shall have no obligation, during the term of the Company or upon termination or liquidation thereof, to restore such negative balance or make any Capital Contributions to the Company by reason thereof, except as may be required by Applicable Law or in respect of any negative balance resulting from a withdrawal of capital or termination in contravention of this Agreement.

**Section 3.07   No Withdrawals from Capital Accounts.**  No Member shall be entitled to withdraw any part of its Capital Account or to receive any distribution from the Company, except as otherwise provided in this Agreement.  No Member shall receive any interest, salary, or drawing with respect to its Capital Contributions or its Capital Account, except as otherwise provided in this Agreement.  The Capital Accounts are maintained for the sole purpose of allocating items of income, gain, loss, and deduction among the Members and shall have no effect on the amount of any distributions to any Members, in liquidation or otherwise.

**Section 3.08   Treatment of Loans from Members.**  Loans by any Member to the Company shall not be considered Capital Contributions and shall not affect the maintenance of such Member's Capital Account, other than to the extent provided in Section 3.04(a)(iii), if applicable.

WEIL:\97901822\22\45327.0007

**Section 3.09   Modifications.**   The foregoing provisions and the other provisions of this Agreement relating to the maintenance of Capital Accounts are intended to comply with Treasury Regulations Section 1.704-1(b) and shall be interpreted and applied in a manner consistent with such Treasury Regulations.  If the Sole Manager determines that it is prudent to modify the manner in which the Capital Accounts, or any increases or decreases to the Capital Accounts, are computed in order to comply with such Treasury Regulations, the Sole Manager may authorize such modifications without the consent of any Member.

<div align="center">

**ARTICLE IV**
**MEMBERS**

</div>

**Section 4.01   No Personal Liability.**   Except as otherwise expressly provided in the BOC, by Applicable Law, or expressly in this Agreement, no Member will be obligated personally for any debt, obligation, or liability of the Company or other Members, whether arising in contract, tort, or otherwise, including a debt, obligation, or liability under a judgment, decree, or order of a court, solely by reason of being a Member.

**Section 4.02   No Withdrawal.**   So long as a Member continues to hold a Membership Interest, such Member shall not have the ability to withdraw or resign as a Member prior to the winding up and termination of the Company and any such withdrawal or resignation or attempted withdrawal or resignation by a Member prior to the winding up and termination of the Company shall be null and void.  As soon as any Person who is a Member ceases to hold a Membership Interest, such Person shall no longer be a Member.

**Section 4.03   No Interest in Company Property.**   No real or personal property of the Company shall be deemed to be owned by any Member individually, but shall be owned by, and title shall be vested solely in, the Company.  Without limiting the foregoing, each Member hereby irrevocably waives during the term of the Company any right that such Member may have to maintain any action for partition with respect to the property of the Company.

**Section 4.04   Certification of Membership Interests**.

(a)       The Sole Manager may, but shall not be required to, issue certificates to the Members representing the Membership Interests held by such Member.

(b)       In the event that the Sole Manager shall issue certificates representing Membership Interests in accordance with Section 4.04(a), then in addition to any other legend required by Applicable Law, all certificates representing issued and outstanding Membership Interests shall bear a legend substantially in the following form:

THE MEMBERSHIP INTEREST REPRESENTED BY THIS CERTIFICATE IS SUBJECT TO A LIMITED LIABILITY COMPANY AGREEMENT AMONG THE COMPANY AND ITS MEMBERS, A COPY OF WHICH IS ON FILE AT THE PRINCIPAL EXECUTIVE OFFICE OF THE COMPANY.   NO TRANSFER, SALE, CONVEYANCE, ASSIGNMENT, GIFT, PLEDGE, HYPOTHECATION, ENCUMBRANCE, OR OTHER DISPOSITION OF THE MEMBERSHIP

Debtors' Exhibit No. 34
Page 241 of 910

INTEREST REPRESENTED BY THIS CERTIFICATE MAY BE MADE EXCEPT IN ACCORDANCE WITH THE PROVISIONS OF SUCH COMPANY AGREEMENT.

THE MEMBERSHIP INTEREST REPRESENTED BY THIS CERTIFICATE HAS NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED, OR UNDER ANY OTHER APPLICABLE SECURITIES LAWS AND MAY NOT BE TRANSFERRED, SOLD, ASSIGNED, GIFTED, PLEDGED, HYPOTHECATED, OR OTHERWISE DISPOSED EXCEPT PURSUANT TO (A) A REGISTRATION STATEMENT EFFECTIVE UNDER SUCH ACT AND LAWS OR (B) AN EXEMPTION FROM REGISTRATION THEREUNDER.

**Section 4.05   Meetings of Members**.

(a)    Meetings of the Members may be called by (i) the Sole Manager or (ii) Members holding a majority of the Membership Interests.

(b)    Written notice stating the place, date, and time of the meeting and, in the case of a meeting of the Members not regularly scheduled, describing the purposes for which the meeting is called, shall be delivered not fewer than ten days and not more than 60 days before the date of the meeting to each Member, by or at the direction of the Sole Manager or the Member(s) calling the meeting, as the case may be.  The Members may hold meetings at the Company's principal office or at such other place, within or outside the State of Texas, as the Sole Manager or the Member(s) calling the meeting may designate in the notice for such meeting.

(c)    Any Member may participate in a meeting of the Members by means of conference telephone or other communications equipment by means of which all Persons participating in the meeting can talk to and hear each other, and participation in a meeting by such means shall constitute presence in person at such meeting.

(d)    On any matter that is to be voted on by Members, a Member may vote in person or by proxy, and such proxy may be granted in writing, by means of Electronic Transmission or as otherwise permitted by Applicable Law.  Every proxy shall be revocable in the discretion of the Member executing it unless otherwise provided in such proxy; provided, that such right to revocation shall not invalidate or otherwise affect actions taken under such proxy prior to such revocation.  In lieu of a proxy, a Member may grant an irrevocable power of attorney to conduct the affairs of such Member with respect to matters of the Company, including matters relating to the organization, internal affairs, or termination of the Company.

(e)    The business to be conducted at such meeting need not be limited to the purpose described in the notice and can include business to be conducted by Members; provided, that the appropriate Members shall have been notified of the meeting in accordance with Section 4.05(b).  Attendance of a Member at any meeting shall constitute

WEIL:\97901822\22\45327.0007

a waiver of notice of such meeting, except where a Member attends a meeting for the express purpose of objecting to the transaction of any business on the ground that the meeting is not lawfully called or convened.

(f)     A quorum of any meeting of the Members shall require the presence, whether in person or by proxy, of the Members holding a majority of the Membership Interests.  Subject to Section 4.06, no action may be taken by the Members unless the appropriate quorum is present at a meeting.

(g)     Subject to Section 4.06, Section 7.04, Section 12.10 or any provision of this Agreement or the BOC requiring the vote, consent, or approval of a different percentage of the Membership Interests, no action may be taken by the Members at any meeting at which a quorum is present without the affirmative vote of the Members holding a majority of the outstanding Membership Interests.

**Section 4.06   Action Without Meeting**.

(a)     Notwithstanding the provisions of Section 4.05, any matter that is to be voted on, consented to, or approved by the Members may be taken without a meeting, without prior notice, and without a vote if consented to, in writing or by Electronic Transmission, by a Member or Members holding not less than the minimum number of votes that would be necessary to authorize or take such action at a meeting at which each Member entitled to vote on the action is present and votes.  A record shall be maintained by the Sole Manager of each such action taken by written consent of a Member or Members.

(b)     A Member's consent may not be established by a Member's failure to object to an action in a timely manner or by any other means not explicitly provided for in this Agreement.

(c)     If any action or decision permitted by this Agreement to be taken or made by less than all of the Members is taken or made by a written consent signed by less than all of the Members, the Sole Manager shall, within ten calendar days after such action is taken or such decision is made, give written notice of the action taken or the decision made to the Members who did not sign the written consent.

**Section 4.07   Power of Members.**  The Members shall have the power to exercise any and all rights or powers granted to Members pursuant to the express terms of this Agreement and the BOC.  Except as otherwise specifically provided by this Agreement or required by the BOC, no Member, in its capacity as a Member, shall have the power to act for or on behalf of, or to bind, the Company, other than to the extent that the Company has granted a power of attorney to such Member to bind the Company on such actions.

**Section 4.08   Similar or Competitive Activities; Business Opportunities.**  Nothing contained in this Agreement shall prevent any Member or any of its Affiliates from engaging in any other activities or businesses, regardless of whether those activities or businesses are similar to or competitive with the Company.  None of the Members nor any of their Affiliates shall be

18

obligated to account to the Company or to the other Members for any profits or income earned or derived from such other activities or businesses.  None of the Members nor any of their Affiliates shall be obligated to inform the Company or the other Members of a business opportunity of any type or description.

<div align="center">

**ARTICLE V**
**ALLOCATIONS**

</div>

**Section 5.01   Tax Partnership Provisions.**  This ARTICLE V is intended to apply only if the Company becomes a partnership for U.S. federal income tax purposes.

**Section 5.02   Allocation of Net Income and Net Loss.**  For each Fiscal Year (or portion thereof), after giving effect to the special allocations set forth in Section 5.03, Net Income and Net Loss of the Company shall be allocated among the Members pro rata in accordance with their Membership Interests.

**Section 5.03   Regulatory and Special Allocations.**  Notwithstanding the provisions of Section 5.02:

(a)      If there is a net decrease in Company Minimum Gain (determined according to Treasury Regulations Section 1.704-2(d)(1)) during any Fiscal Year, each Member shall be specially allocated Net Income for such Fiscal Year (and, if necessary, subsequent Fiscal Years) in an amount equal to such Member's share of the net decrease in Company Minimum Gain, determined in accordance with Treasury Regulations Section 1.704-2(g). The items to be so allocated shall be determined in accordance with Treasury Regulations Sections 1.704-2(f)(6) and 1.704-2(j)(2).  This Section 5.03(a) is intended to comply with the "minimum gain chargeback" requirement in Treasury Regulations Section 1.704-2(f) and shall be interpreted consistently therewith.

(b)      Member Nonrecourse Deductions shall be allocated in the manner required by Treasury Regulations Section 1.704-2(i).  Except as otherwise provided in Treasury Regulations Section 1.704-2(i)(4), if there is a net decrease in Member Nonrecourse Debt Minimum Gain during any Fiscal Year, each Member that has a share of such Member Nonrecourse Debt Minimum Gain shall be specially allocated Net Income for such Fiscal Year (and, if necessary, subsequent Fiscal Years) in an amount equal to that Member's share of the net decrease in Member Nonrecourse Debt Minimum Gain.  Items to be allocated pursuant to this paragraph shall be determined in accordance with Treasury Regulations Sections 1.704-2(i)(4) and 1.704-2(j)(2).  This Section 5.03(b) is intended to comply with the "minimum gain chargeback" requirement in Treasury Regulations Section 1.704-2(i)(4) and shall be interpreted consistently therewith.

(c)      Nonrecourse Deductions shall be allocated to the Members in accordance with their Membership Interests.

(d)      In the event any Member unexpectedly receives any adjustments, allocations, or distributions described in Treasury Regulations Section 1.704-1(b)(2)(ii)(d)(4), (5) or (6), Net Income shall be specially allocated to such Member in an

<div align="center">19</div>

amount and manner sufficient to eliminate the Adjusted Capital Account Deficit created by such adjustments, allocations, or distributions as quickly as possible.  This Section 5.03(d) is intended to comply with the "qualified income offset" requirement in Treasury Regulations Section 1.704-1(b)(2)(ii)(d) and shall be interpreted consistently therewith.

(e)     Simulated Depletion and Simulated Gain or Loss with respect to any Depletable Property shall be allocated among the Members in proportion to their shares of the Simulated Basis in such property.  Each Member's share of the Simulated Basis in each of the Company's Depletable Properties shall be allocated to each Member in accordance with such Member's Membership Interest as of the time such Depletable Property is acquired by the Company, and shall be reallocated among the Members in accordance with the Members' Membership Interest as determined immediately following the occurrence of an event giving rise to any adjustment to the Book Values of the Company's oil and gas properties pursuant to the terms of this Agreement (or at the time of any material additions to the federal income tax basis of such Depletable Property).

(f)     The allocations set forth in subsections Section 5.03(a), Section 5.03(b), Section 5.03(c), Section 5.03(d) and Section 5.03(e) above (the "**Regulatory Allocations**") are intended to comply with certain requirements of the Treasury Regulations under Code Section 704.  Notwithstanding any other provisions of this ARTICLE V (other than the Regulatory Allocations), the Regulatory Allocations shall be taken into account in allocating Net Income and Net Losses among Members so that, to the extent possible, the net amount of such allocations of Net Income and Net Losses and other items and the Regulatory Allocations to each Member shall be equal to the net amount that would have been allocated to such Member if the Regulatory Allocations had not occurred.

**Section 5.04   Tax Allocations**.

(a)     Subject to Section 5.04(b), Section 5.04(c), and Section 5.04(d), all income, gains, losses and deductions of the Company shall be allocated, for federal, state, and local income tax purposes, among the Members in accordance with the allocation of such income, gains, losses, and deductions pursuant to Section 5.02 and Section 5.03, except that if any such allocation for tax purposes is not permitted by the Code or other Applicable Law, the Company's subsequent income, gains, losses, and deductions shall be allocated among the Members for tax purposes, to the extent permitted by the Code and other Applicable Law, so as to reflect as nearly as possible the allocation set forth in Section 5.02 and Section 5.03.

(b)     Items of Company taxable income, gain, loss, and deduction with respect to any property contributed to the capital of the Company shall be allocated among the Members in accordance with Code Section 704(c) using such reasonable method under Treasury Regulations Section 1.704-3 as shall be determined by the Sole Manager, so as to take account of any variation between the adjusted basis of such property to the Company for federal income tax purposes and its Book Value.

Debtors' Exhibit No. 34
Page 245 of 910

(c)     If the Book Value of any Company asset is adjusted pursuant to Treasury Regulations Section 1.704-1(b)(2)(iv)(f) as provided in clause (c) of the definition of Book Value, subsequent allocations of items of taxable income, gain, loss, and deduction with respect to such asset shall take account of any variation between the adjusted basis of such asset for federal income tax purposes and its Book Value using such reasonable method under Treasury Regulations Section 1.704-3 as shall be determined by the Sole Manager.

(d)     Allocations of tax credit, tax credit recapture, and any items related thereto shall be allocated to the Members according to their interests in such items as determined by the Sole Manager taking into account the principles of Treasury Regulations Section 1.704-1(b)(4)(ii).

(e)     The deduction for depletion with respect to each separate oil and gas property (as defined in Section 614 of the Code) shall, in accordance with Section 613A(c)(7)(D) of the Code, be computed for federal income tax purposes separately by the Members rather than the Company.  The proportionate share of the adjusted tax basis of each oil and gas property shall be allocated to each Member in accordance with such Member's Membership Interest as of the time such oil and gas property is acquired by the Company (and any additions to such U.S. federal income tax basis resulting from expenditures required to be capitalized in such basis shall be allocated among the Members in a manner designed to cause the Members' proportionate shares of such adjusted U.S. federal income tax basis to be in accordance with their Membership Interests as determined at the time of any such additions), and shall be reallocated among the Members in accordance with the Members' Membership Interests as determined immediately following the occurrence of an event giving rise to an adjustment to the Book Values of the Company's oil and gas properties.  For purposes of the separate computation of gain or loss by each Member on the taxable disposition of each oil and gas property, the amount realized from such disposition shall be allocated (i) first, to the Members in an amount equal to the Simulated Basis in such oil and gas property in proportion to their allocable shares thereof and (ii) second, any remaining amount realized shall be allocated consistent with the allocation of Simulated Gain or Loss.  The allocations described in this Section 5.04(e) are intended to be applied in accordance with the Members' "interests in partnership capital" under Section 613A(c)(7)(D) or the Code; provided, however, that the Members understand and agree that the Sole Manager may authorize special allocations of federal income tax basis, income, gain, deduction or loss, as computed for U.S. federal income tax purposes, in order to eliminate differences between Simulated Basis and adjusted U.S. federal income tax basis with respect to each oil and gas property, in such manner as determined consistent with the principles outlined in Sections 5.04b) and 5.04c).  The provisions of this Section 5.04(e) and the other provisions of this Agreement relating to allocations under Section 613A(c)(7)(D) of the Code are intended to comply with Treasury Regulations Section 1.704-1(b)(4)(v) and shall be interpreted and applied in a manner consistent with such Treasury Regulations.  Each Member, with the assistance of the Company, shall separately keep records of its share of the adjusted tax basis in each oil and gas property, adjust such share of the adjusted tax basis for any cost or percentage depletion allowable with respect to such property and use such adjusted tax basis in the computation of its cost depletion or in the computation of its gain or loss on the disposition

21

Debtors' Exhibit No. 34
Page 246 of 910

of such property by the Company.  Upon the reasonable request of the Company, each Member shall advise the Company of its adjusted tax basis in each oil and gas property and any depletion computed with respect thereto, both as computed in accordance with the provisions of this subsection for purposes of allowing the Company to make adjustments to the tax basis of its assets as a result of certain transfers of interests in the Company or distributions by the Company.  The Company may rely on such information and, if it is not provided by the Member, may make such reasonable assumptions as it shall determine with respect thereto.  When reasonably requested by the Members, the Company shall provide all available information needed by such Members to comply with the record keeping requirements of this Section 5.04(e) and other applicable tax reporting obligations.

(f)     Allocations pursuant to this Section 5.04 are solely for purposes of federal, state, and local taxes and shall not affect, or in any way be taken into account in computing, any Member's Capital Account or share of Net Income, Net Losses, distributions, or other items pursuant to any provisions of this Agreement.

**Section 5.05   Allocations in Respect of Transferred Membership Interests.**  In the event of a Transfer of Membership Interests during any Fiscal Year made in compliance with the provisions of ARTICLE VIII, Net Income, Net Losses, and other items of income, gain, loss, and deduction of the Company attributable to such Membership Interests for such Fiscal Year shall be determined using the interim closing of the books method.

## ARTICLE VI
## DISTRIBUTIONS

**Section 6.01   General**.

(a)     Subject to Section 6.02 and Section 7.03(b), distributions of available cash shall be made to the Members when and in such amounts as determined by the Sole Manager and only following (i) payment of all operating expenses of the Company, including required payments under the Material Project Contracts, and the termination of the Material Project Contracts, (ii) the payment in full of any and all amounts owing to Credit Bid Purchaser or CUSA under any Material Project Contract, and (iii) the cessation of all production from, and Final Completion of all plugging and abandonment and decommissioning of the FWE IV Assets.  After making all distributions required for a given Fiscal Year under Section 6.02, and paying all operating expenses, and making appropriate reserves for future operating expenses, and paying all amounts then due and outstanding under the Material Project Contracts as described in the preceding sentence, the termination of the Material Project Contracts, and the satisfaction of the condition under item (iii), in each case as described in the preceding sentence, distributions determined to be made by the Sole Manager pursuant to this Section 6.01(a) shall be paid to the Members in accordance with their respective Membership Interests.

(b)     Notwithstanding any provision to the contrary contained in this Agreement, the Company shall not make any distribution to the Members (i) prior to the cessation of all production from, and Final Completion of all plugging and abandonment and

decommissioning activities on, the FWE IV Assets, except as provided in Section 6.02, or (ii) if such distribution would violate § 101.206 of the BOC or other Applicable Law.

**Section 6.02   Tax Advances**.

(a)     Subject to (i) any restrictions in the Company's then-applicable debt financing arrangements, if any, and (ii) the Sole Manager's good faith determination to retain any other amounts necessary to satisfy obligations of the Company that are reasonably expected to be due and payable in the 90 days following the date of determination, at least three days before each date prescribed by the Code for a calendar-year corporation to pay quarterly installments of estimated tax, the Company shall use commercially reasonable efforts to distribute cash to each Member in proportion to and to the extent of such Member's Quarterly Estimated Tax Amount for the applicable calendar quarter (each such distribution, a "**Tax Advance**").

(b)     If, at any time after the final Quarterly Estimated Tax Amount has been distributed pursuant to Section 6.02(a) with respect to any Fiscal Year, the aggregate Tax Advances to any Member with respect to such Fiscal Year are less than such Member's Tax Amount for such Fiscal Year (a "**Shortfall Amount**"), the Company shall use commercially reasonable efforts to distribute cash in proportion to and to the extent of each Member's Shortfall Amount.  The Company shall use commercially reasonable efforts to distribute Shortfall Amounts with respect to a Fiscal Year before the 90th day of the next succeeding Fiscal Year; provided, that if the Company has made distributions other than pursuant to this Section 6.02, the Sole Manager may apply such distributions to reduce any Shortfall Amount.

(c)     If the aggregate Tax Advances made to any Member pursuant to this Section 6.02 for any Fiscal Year exceed such Member's Tax Amount (an "**Excess Amount**"), such Excess Amount shall reduce subsequent Tax Advances that would be made to such Member pursuant to this Section 6.02, except to the extent taken into account as an advance pursuant to Section 6.02(d).

(d)     Any distributions made pursuant to this Section 6.02 shall be treated for purposes of this Agreement as advances on distributions pursuant to Section 6.01 and shall reduce, dollar-for-dollar, the amount otherwise distributable to such Member pursuant to Section 6.01.

**Section 6.03   Tax Withholding; Withholding Advances**.

(a)     **Tax Withholding.**  Each Member agrees to furnish the Company with any representations and forms as shall be reasonably requested by the Company to assist it in determining the extent of, and in fulfilling, any withholding obligations it may have.

(b)     **Withholding Advances.**  The Company is hereby authorized at all times to make payments ("**Withholding Advances**") with respect to each Member in amounts required to discharge any obligation of the Company, including any obligation under Section 6225 of the Code (as determined by the Tax Matters Representative based on the

WEIL:\97901822\22\45327.0007

advice of legal or tax counsel to the Company) to withhold or make payments to any federal, state, local or foreign taxing authority (a "**Taxing Authority**") with respect to any distribution or allocation by the Company of income or gain to such Member and to withhold the same from distributions to such Member.  Any funds withheld from a distribution by reason of this Section 6.03(b) shall nonetheless be deemed distributed to the Member in question for all purposes under this Agreement.  If the Company makes any Withholding Advance in respect of a Member hereunder that is not immediately withheld from actual distributions to the Member, then the Member shall promptly reimburse the Company for the amount of such payment, plus interest at a rate equal to the prime rate published in the Wall Street Journal on the date of payment plus two percent per annum, compounded annually, on such amount from the date of such payment until such amount is repaid (or deducted from a distribution) by the Member (any such payment shall not constitute a Capital Contribution).  Each Member's reimbursement obligation under this Section 6.03(b) shall continue after such Member transfers its Membership Interests.

(c)     **Indemnification.**  Each Member hereby agrees to defend, indemnify and hold harmless the Company and the other Members from and against any liability with respect to taxes, interest, or penalties that may be asserted by reason of the Company's failure to deduct and withhold tax on amounts distributable or allocable to such Member.  The provisions of this Section 6.03(c) and the obligations of a Member pursuant to Section 6.03(b) shall survive the termination, dissolution, liquidation, and winding up of the Company and the withdrawal of such Member from the Company or Transfer of its Membership Interests.  The Company may pursue and enforce all rights and remedies it may have against each Member under this Section 6.03, including bringing a lawsuit to collect repayment with interest of any Withholding Advances.

(d)     **Overwithholding.**  None of the Company or the Sole Manager shall be liable for any excess taxes withheld in respect of any distribution or allocation of income or gain to a Member.  In the event of an overwithholding, a Member's sole recourse shall be to apply for a refund from the appropriate Taxing Authority.

**Section 6.04   Distributions in Kind**.

(a)     Subject to Sections 6.01 and 6.02, the Sole Manager is hereby authorized, as it may reasonably determine, to make distributions to the Members in the form of securities or other property (but not including any oil and gas properties) held by the Company; provided, that Tax Advances shall only be made in cash.  In any non-cash distribution, the securities or property so distributed will be distributed among the Members in the same proportion and priority as cash equal to the Fair Market Value of such securities or property would be distributed among the Members pursuant to Section 6.01.

(b)     Any distribution of securities shall be subject to such conditions and restrictions as the Sole Manager determines are required or advisable to ensure compliance with Applicable Law.  In furtherance of the foregoing, the Sole Manager may require that the Members execute and deliver such documents as the Sole Manager may deem necessary or appropriate to ensure compliance with all federal and state securities laws that

WEIL:\97901822\22\45327.0007

apply to such distribution and any further Transfer of the distributed securities, and may appropriately legend the certificates that represent such securities to reflect any restriction on Transfer with respect to such laws.

## ARTICLE VII
## MANAGEMENT

**Section 7.01   Management of the Company.**  The business and affairs of the Company shall be managed, operated, and controlled by or under the direction of one manager designated pursuant to Section 7.02 (the "**Sole Manager**").  Subject to the provisions of Section 7.04, the Sole Manager shall have, and is hereby granted, full and complete power, authority, and discretion for, on behalf of, and in the name of the Company, to take such actions as it may deem necessary or advisable to carry out any and all of the objectives and purposes of the Company, to the exclusion of the Members unless expressly provided for otherwise in this Agreement or expressly required under the BOC.  Subject to the provisions of Section 7.06, the Sole Manager shall have, and is hereby granted, full and complete power, authority, and discretion for, on behalf of, and in the name of the Company, to take such actions as it may deem necessary or advisable to carry out any and all of the objectives and purposes of the Company.

**Section 7.02   Sole Manager.**  The Company shall not have any officers or employees other than the Sole Manager.  Sunset Energy Gulf Coast Asset Management LLC has been selected and designated by the Member with the consent of CUSA to serve as the initial Sole Manager. The Sole Manager may not be removed without CUSA's prior written consent, which may be given, delayed or withheld in its sole discretion.  In the event that the Sole Manager is removed with CUSA's written consent or the Sole Manager resigns or otherwise ceases to serve in such capacity, then the Sole Manager shall be selected pursuant to the following procedure:  CUSA and the Company (acting through the Member for all purposes under this Section 7.02, who shall solicit input from Credit Bid Purchaser for all purposes under this Section 7.02) shall agree on a replacement, and, if they cannot agree, the Company shall designate a replacement, which shall be subject to CUSA's approval (which approval shall not to be unreasonably withheld, conditioned or delayed).

**Section 7.03   Material Project Contracts; Net Profit Interest**.

(a)    The Company's execution and performance of its obligations under each of the Omnibus Agreement, the NPI Conveyance, the Contract Operating Agreement, the Turnkey Removal Agreement, the Joint Development Agreement, the Deepwater Assets Decommissioning Funding Agreement, the SEMS Bridging Agreement, the Transition Services Agreement and the Escrow Agreement has been approved by the Member and shall not require any other approval on the part of the Company (by the Sole Manager or otherwise).  The Sole Manager shall not amend or modify such agreements, except in accordance with this Agreement.

(b)    At the end of each Production Period, the Company shall pay into the Escrow Account the NPI Payment, if any is due, as calculated pursuant to the terms of the NPI Conveyance.

WEIL:\97901822\22\45327.0007

**Section 7.04   Actions Requiring CUSA Consent.**  Without the prior written consent of CUSA (which written consent may be given, delayed or withheld in CUSA's sole discretion, unless expressly indicated otherwise), the Company shall not do, or enter into any commitment to do, any of the following:

(a)      engage in any business or activity other than (i) plugging and abandoning and decommissioning the FWE IV Assets and (ii) operating the FWE IV Assets prior to their plugging and abandonment and decommissioning;

(b)      use revenue or free cash flow for any purpose other than (i) for funding Reimbursable Costs or Third Party Payments under the Contract Operating Agreement (or similar charges under a replacement thereto) and, if applicable, payment into the Escrow Account and (ii) Tax Advances pursuant to Section 6.02(a);

(c)      issue additional Membership Interests or any other equity securities or admit additional Members to the Company;

(d)      approve any decommissioning plan with respect to the FWE IV Assets; or engage or retain any decommissioning subcontractor other than Credit Bid Purchaser pursuant to the Turnkey Removal Agreement;

(e)      incur any Indebtedness;

(f)      make any loan, advance, or capital contribution or make any investment in any Person;

(g)      replace, remove or change the powers of the Sole Manager;

(h)      replace or remove Credit Bid Purchaser under the Contract Operating Agreement; engage or retain any contract operator other than Credit Bid Purchaser pursuant to the Contract Operating Agreement; amend, or waive the application of, any provision of the Contract Operating Agreement;

(i)      divest any of the FWE IV Assets (other than sales of hydrocarbons in the ordinary course of business) or acquire any other assets (other than for a purpose permitted under Section 7.04(a) and in accordance with the terms of the Contract Operating Agreement, and further subject to any approval rights contained therein);

(j)      approving any prospective joint development project or other capital project for which an election to participate has been delivered to the Company pursuant to the Joint Development Agreement or approve any well takeover under the Joint Development Agreement;

(k)      agree to any (i) settlement or order with any Governmental Authority relating to the FWE IV Assets or the operations conducted thereon, (ii) settlement relating to contribution or payment amounts relating to decommissioning obligations with any Person, including any predecessor-in-interest to all or any portion of the leases and lands

WEIL:\97901822\22\45327.0007

covered by the FWE IV Assets or any surety bond provider or other provider or holder of security relating to decommissioning operations, or (iii) any other settlement involving FWE IV Assets or the operation of FWE IV;

(l)   amend any provision of a Material Project Contract, or waive any material right of the Company under a Material Project Contract;

(m)   [Reserved];

(n)   take any act of Bankruptcy, liquidate or otherwise terminate the existence of the Company or any of its Subsidiaries;

(o)   enter into a fundamental business transaction within the meaning of such term in the BOC;

(p)   establish a Subsidiary or enter into any joint venture or similar business arrangement or enter into a transaction covered by Section 7.03;

(q)   enter into, amend, waive, or terminate any contract with an Affiliate of the Company; or

(r)   amend, modify, supplement, restate, or waive any provision of the Certificate of Formation, this Agreement or any other organizational documents of the Company or its Subsidiaries (and any such amendment, modification, supplement, or waiver that is attempted without CUSA's prior written consent shall be void *ab initio* and without effect).

If CUSA in good faith believes that (x) Credit Bid Purchaser is in breach the Contract Operating Agreement in a manner that is materially adverse to the Company or is liable to the Company for indemnification pursuant to the terms of the Contract Operating Agreement, and (y) the Company has failed to enforce its rights (including, if applicable, termination right) with respect to such breach or indemnification and such failure is materially adverse to the Company, then CUSA may (i) deliver a written notice to the Company requesting that the Company enforce such rights (any rights to which such request relates must be specifically identified) and (ii) if the Company fails to enforce such rights within thirty days of its receipt of such notice, CUSA may itself enforce the rights of the Company against Credit Bid Purchaser on the Company's behalf.

Section 7.05   No Compensation of the Sole Manager.  The Sole Manager shall receive an offer letter and be compensated for the services provided by such individual as the Sole Manager of the Company in the amount set forth in such offer letter.  The Company shall reimburse the Sole Manager for all reasonable, ordinary, necessary, and direct third-party expenses incurred by the Sole Manager on behalf of the Company in carrying out the Company's business activities.

Section 7.06   No Personal Liability.  Except as otherwise provided in the BOC or by Applicable Law, or expressly provided in this Agreement or any written agreement between the Company and the Sole Manager, (i) the Sole Manager will not be obligated personally for any debt, obligation, or liability of the Company, whether arising in contract, tort, or otherwise,

including a debt, obligation, or liability under a judgment, decree, or order of a court, solely by reason of being or acting as the Sole Manager and (ii) subject to Section 7.04, the Sole Manager shall carry out his or her duties under this Agreement in good faith and a manner in which the Sole Manager believes to be consistent with and in furtherance of the purpose of the Company specified in Section 2.05(a).

## ARTICLE VIII
## TRANSFER

**Section 8.01   General Restrictions on Transfer**.

(a)      No Member shall Transfer all or any portion of its Membership Interest in the Company without the prior written approval of the Sole Manager.

(b)      Subject to Section 8.01(a), each Member agrees that it will not Transfer all or any portion of its Membership Interest in the Company, and the Company agrees that it shall not issue any Membership Interests:

(i)      except as permitted under the Securities Act and other Applicable Laws, and then, with respect to a Transfer of Membership Interests, only upon delivery to the Company of an opinion of counsel in form and substance satisfactory to the Company to the effect that such Transfer may be effected without registration under the Securities Act;

(ii)      if the Company becomes a partnership for U.S. federal income tax purposes, if such Transfer or issuance would cause the Company to be considered a "publicly traded partnership" under Section 7704(b) of the Code within the meaning of Treasury Regulations Section 1.7704-1(h)(1)(ii), including the look-through rule in Treasury Regulations Section 1.7704-1(h)(3);

(iii)      if such Transfer or issuance would affect the Company's existence or qualification as a limited liability company under the BOC;

(iv)      if the Company becomes a partnership for U.S. federal income tax purposes, if such Transfer or issuance would cause the Company to lose its status as a partnership for federal income tax purposes;

(v)      if such Transfer or issuance would cause the Company to be required to register as an investment company under the Investment Company Act of 1940, as amended;

(vi)      if such Transfer or issuance would cause the assets of the Company to be deemed "Plan Assets" as defined under the Employee Retirement Income Security Act of 1974 or its accompanying regulations or result in any "prohibited transaction" thereunder involving the Company; and

WEIL:\97901822\22\45327.0007

(vii)   such Transfer would limit, hinder or prohibit the Company from carrying out its purpose under Section 2.05(a).

(c)   Any Transfer or attempted Transfer of any Membership Interest in violation of this Agreement shall be null and void *ab initio*, no such Transfer shall be recorded on the Company's books, and the purported Transferee in any such Transfer shall not be treated (and the purported Transferor shall continue to be treated) as the owner of such Membership Interest for all purposes of this Agreement.

(d)   No Transfer of any Membership Interest to a Person not already a Member of the Company shall be deemed completed until the prospective Transferee has executed a joinder agreement in form and substance acceptable to the Company.

(e)   For the avoidance of doubt, any completed Transfer of a Membership Interest permitted by this Agreement shall be deemed a sale, transfer, conveyance, assignment, or other disposal of such Membership Interest in its entirety as intended by the parties to such Transfer, and shall not be deemed a sale, transfer, conveyance, assignment, or other disposal of any less than all of the rights and benefits described in the definition of the term "Membership Interest."

## ARTICLE IX
## EXCULPATION AND INDEMNIFICATION

**Section 9.01   Exculpation of Covered Persons**.

(a)   **Covered Persons.**  As used herein, the term "**Covered Person**" shall mean (i) each current or former Member; (ii) each current or former manager, officer, director, shareholder, partner, member, Affiliate, employee, agent, or Representative of each Member, and each of their Affiliates; and (iii) each manager (including the Sole Manager), officer (if any), employee (if any), agent, or Representative of the Company.

(b)   **Standard of Care.**  No Covered Person shall be liable to the Company or any other Covered Person for any loss, damage, or claim incurred by reason of any action taken or omitted to be taken by such Covered Person in good faith reliance on the provisions of this Agreement, so long as such action or omission does not constitute fraud or willful misconduct by such Covered Person.

(c)   **Good Faith Reliance.**  A Covered Person shall be fully protected in relying in good faith upon the records of the Company and upon such information, opinions, reports, or statements (including financial statements and information, opinions, reports, or statements as to the value or amount of the assets, liabilities, Net Income, or Net Losses of the Company or any facts pertinent to the existence and amount of assets from which distributions might properly be paid) of the following Persons or groups: (i) another Member; (ii) one or more managers, officers or employees of the Company; (iii) any attorney, independent accountant, appraiser, or other expert or professional employed or engaged by or on behalf of the Company; or (iv) any other Person selected in good faith by or on behalf of the Company, in each case as to matters that such relying Person

WEIL:\97901822\22\45327.0007

reasonably believes to be within such other Person's professional or expert competence. The preceding sentence shall in no way limit any Person's right to rely on information to the extent provided in § 3.102 or § 3.105 of the BOC.

**Section 9.02   Liabilities and Duties of Covered Persons**.

(a)   **Limitation of Liability.**   This Agreement, unless otherwise specifically stated herein, is not intended to, and does not, create or impose any fiduciary duty on any Covered Person.  Furthermore, each of the Members and the Company hereby waives any and all fiduciary duties that, absent such waiver, may be implied by Applicable Law, and in doing so, acknowledges and agrees that the duties and obligations of each Covered Person to each other and to the Company are only as expressly set forth in this Agreement.  The provisions of this Agreement, to the extent that they restrict the duties and liabilities of a Covered Person otherwise existing at law or in equity, are agreed by the Members to replace such other duties and liabilities of such Covered Person.

(b)   **Duties.**   Subject to Section 7.06, whenever in this Agreement a Covered Person is permitted or required to make a decision (including a decision that is in such Covered Person's "discretion" or under a grant of similar authority or latitude), the Covered Person shall be entitled to consider only such interests and factors as such Covered Person desires and shall have no duty or obligation to give any consideration to any interest of or factors affecting the Company or any other Person.  Whenever in this Agreement a Covered Person is permitted or required to make a decision in such Covered Person's "good faith," the Covered Person shall act under such express standard and shall not be subject to any other or different standard imposed by this Agreement or any other Applicable Law.

**Section 9.03   Indemnification**.

(a)   **Indemnification.**   To the fullest extent permitted by the BOC, as the same now exists or may hereafter be amended, substituted or replaced (but, in the case of any such amendment, substitution, or replacement, only to the extent that such amendment, substitution, or replacement permits the Company to provide broader indemnification rights than the BOC permitted the Company to provide prior to such amendment, substitution, or replacement), the Company shall indemnify, hold harmless, defend, pay, and reimburse any Covered Person against any and all losses, claims, damages, judgments, fines, or liabilities, including reasonable legal fees or other expenses incurred in investigating or defending against such losses, claims, damages, judgments, fines, or liabilities, and any amounts expended in settlement of any claims (collectively, "**Losses**") to which such Covered Person may become subject by reason of:

(i)   any act or omission or alleged act or omission performed or omitted to be performed on behalf of the Company, any Member, or any direct or indirect Subsidiary of the foregoing in connection with the business of the Company; or

(ii)   such Covered Person being or acting in connection with the business of the Company as a member, shareholder, Affiliate, manager, director, officer, employee, or agent of the Company, any Member, or any of their respective

Affiliates, or that such Covered Person is or was serving at the request of the Company as a member, manager, director, officer, employee, or agent of any Person including the Company;

provided, that (x) such Covered Person acted in good faith and in a manner believed by such Covered Person to be in, or not opposed to, the best interests of the Company and, with respect to any criminal proceeding, had no reasonable cause to believe his conduct was unlawful, and (y) such Covered Person's conduct did not constitute fraud or willful and intentional misconduct, in either case as determined by a final, nonappealable order of a court of competent jurisdiction.  In connection with the foregoing, the termination of any action, suit, or proceeding by judgment, order, settlement, conviction, or upon a plea of nolo contendere or its equivalent, shall not, of itself, create a presumption that the Covered Person did not act in good faith or, with respect to any criminal proceeding, had reasonable cause to believe that such Covered Person's conduct was unlawful, or that the Covered Person's conduct constituted fraud or willful misconduct.

(b)    **Control of Defense.**  Upon a Covered Person's discovery of any claim, lawsuit, or other proceeding relating to any Losses for which such Covered Person may be indemnified pursuant to this Section 9.03, the Covered Person shall give prompt written notice to the Company of such claim, lawsuit, or proceeding; provided, that the failure of the Covered Person to provide such notice shall not relieve the Company of any indemnification obligation under this Section 9.03, unless the Company shall have been materially prejudiced thereby.  The Company shall be entitled to participate in or assume the defense of any such claim, lawsuit, or proceeding at its own expense.  After notice from the Company to the Covered Person of its election to assume the defense of any such claim, lawsuit, or proceeding, the Company shall not be liable to the Covered Person under this Agreement or otherwise for any legal or other expenses subsequently incurred by the Covered Person in connection with investigating, preparing to defend, or defending any such claim, lawsuit, or other proceeding.  If the Company does not elect (or fails to elect) to assume the defense of any such claim, lawsuit, or proceeding, the Covered Person shall have the right to assume the defense of such claim, lawsuit, or proceeding as it deems appropriate, but it shall not settle any such claim, lawsuit, or proceeding without the consent of the Company (which consent shall not be unreasonably withheld, conditioned, or delayed).

(c)    **Reimbursement.**  The Company shall promptly reimburse (and/or advance to the extent reasonably required) each Covered Person for reasonable legal or other expenses (as incurred) of such Covered Person in connection with investigating, preparing to defend, or defending any claim, lawsuit, or other proceeding relating to any Losses for which such Covered Person may be indemnified pursuant to this Section 9.03; provided, that if it is finally judicially determined that such Covered Person is not entitled to the indemnification provided by this Section 9.03, then such Covered Person shall promptly reimburse the Company for any reimbursed or advanced expenses.

(d)    **Entitlement to Indemnity.**  The indemnification provided by this Section 9.03 shall not be deemed exclusive of any other rights to indemnification to which those

31

seeking indemnification may be entitled under the BOC, any agreement or otherwise.  The provisions of this Section 9.03 shall continue to afford protection to each Covered Person regardless of whether such Covered Person remains in the position or capacity pursuant to which such Covered Person became entitled to indemnification under this Section 9.03 and shall inure to the benefit of the executors, administrators, legatees, and distributees of such Covered Person.

(e)     **Insurance.**  To the extent available on commercially reasonable terms, the Company may purchase, at its expense, insurance to cover Losses covered by the foregoing indemnification provisions and to otherwise cover Losses for any breach or alleged breach by any Covered Person of such Covered Person's duties in such amount and with such deductibles as the Sole Manager may reasonably determine; provided, that the failure to obtain such insurance shall not affect the right to indemnification of any Covered Person under the indemnification provisions contained herein, including the right to be reimbursed or advanced expenses or otherwise indemnified for Losses hereunder.  If any Covered Person recovers any amounts in respect of any Losses from any insurance coverage, then such Covered Person shall, to the extent that such recovery is duplicative, reimburse the Company for any amounts previously paid to such Covered Person by the Company in respect of such Losses.

(f)     **Funding of Indemnification Obligation.**  Notwithstanding anything contained herein to the contrary, any indemnity by the Company relating to the matters covered in this Section 9.03 shall be provided out of and to the extent of Company assets only, and no Member (unless such Member otherwise agrees in writing) shall have personal liability on account thereof or shall be required to make additional Capital Contributions to help satisfy such indemnity by the Company.

(g)     **Savings Clause.**  If this Section 9.03 or any portion hereof shall be invalidated on any ground by any court of competent jurisdiction, then the Company shall nevertheless indemnify and hold harmless each Covered Person pursuant to this Section 9.03 to the fullest extent permitted by any applicable portion of this Section 9.03 that shall not have been invalidated and to the fullest extent permitted by Applicable Law.

(h)     **Amendment.**  The provisions of this Section 9.03 shall be a contract between the Company, on the one hand, and each Covered Person who served in such capacity at any time while this Section 9.03 is in effect, on the other hand, pursuant to which the Company and each such Covered Person intend to be legally bound.  No amendment, modification, or repeal of this Section 9.03 that adversely affects the rights of a Covered Person to indemnification for Losses incurred or relating to a state of facts existing prior to such amendment, modification or repeal shall apply in such a way as to eliminate or reduce such Covered Person's entitlement to indemnification for such Losses without the Covered Person's prior written consent.

**Section 9.04   Survival.**  The provisions of this ARTICLE IX shall survive the dissolution, liquidation, winding up, termination of the Company and the withdrawal of any Member or the Transfer of any Member's interest in the Company.

## ARTICLE X
## ACCOUNTING; TAX MATTERS

**Section 10.01 Financial Statements and Other Information.**   The Company shall prepare and furnish to each Member and CUSA the following reports:

(a)    **Annual Financial Statements.**   As soon as available, and in any event within 105 days after the end of each Fiscal Year, its unaudited consolidated balance sheet and related consolidated statements of operations, Members' equity and cash flows as of the end of and for such year prepared in accordance with GAAP consistently applied.

(b)    **Quarterly Financial Statements.**   As soon as available, and in any event within 60 days after the end of each quarterly accounting period in each Fiscal Year (including the last fiscal quarter of the Fiscal Year), its unaudited consolidated balance sheet and related unaudited consolidated statements of operations, Members' equity and cash flows as of the end of and for such fiscal quarter and the then elapsed portion of the current Fiscal Year, setting forth in each case in comparative form the figures for the corresponding period or periods of the previous Fiscal Year or as at the end of such period or periods, all in reasonable detail and certified by the Company as presenting fairly in all material respects the consolidated financial condition and results of operations of the Company in accordance with GAAP consistently applied, subject to normal year-end audit adjustments and the absence of footnotes.

(c)    **Monthly Operating Data.**   As soon as available, but in no event later than 45 days after the end of each calendar month, a statement in a form reasonably satisfactory to each Member and CUSA showing all operating data for the Company, including operating expenses and revenue for each of the Company, for such calendar month.

(d)    **Budget Updates.**   Promptly once available and no less than bi-annually, an operating budget for the Fiscal Year, forecasting revenue, operating costs, and capital expenses for each fiscal quarter.

(e)    **Material Government Communication.**   Promptly following receipt thereof by FWE IV, copies of all material written notices or other material communications issued or provided by or to any Governmental Authority.

(f)    **Additional Information.**   Promptly following any reasonable request therefor, such other information regarding the operations, business affairs and financial condition of the Company, as any Member or CUSA may reasonably request, including, without limitation, decommissioning cost estimates and calculations.

**Section 10.02 Inspection Rights.**   Upon reasonable notice from a Member or CUSA, the Company shall afford each Member or CUSA and their respective Representatives access during normal business hours to (a) the Company's properties, offices, plants, and other facilities; (b) the corporate, financial, and similar records, reports, and documents of the Company, including, without limitation, all books and records, minutes of proceedings, internal management documents, reports of operations, reports of adverse developments, copies of any management

letters and communications with Members or the Sole Manager, and to permit each Member or CUSA and their respective Representatives to examine such documents and make copies thereof; and (c) the Sole Manager, any officers, senior employees, and public accountants of the Company, and to afford each Member or CUSA and their respective Representatives the opportunity to discuss the affairs, finances, and accounts of the Company with such Sole Manager, officers, senior employees, and public accountants (and the Company hereby authorizes said accountants to discuss with such Member or CUSA and their respective Representatives such affairs, finances, and accounts).

**Section 10.03 Income Tax Status.**  The Company and the Initial Member intend that the Company shall be treated as a disregarded entity for U.S., federal, state, and local income tax purposes.  Neither the Company nor any Member shall make an election for the Company to be classified as other than a partnership or a disregarded entity pursuant to Treasury Regulations Section 301.7701-3.

**Section 10.04 Tax Matters Representative**.  The following Sections 10.04(a)-(f) are intended to apply if the Company becomes a partnership for U.S. federal income tax purposes:

(a)   **Appointment.**   The Members hereby appoint the Sole Manager as "partnership representative" as provided in Code Section 6223(a) (the "**Tax Matters Representative**").   If any state or local tax law provides for a tax matters partner/partnership representative or Person having similar rights, powers, authority or obligations, the Person designated as the Tax Matters Representative shall also serve in such capacity.  To the extent required by Applicable Law, if the Tax Matters Representative is an entity, it shall appoint a "designated individual" to act on its behalf.  The Tax Matters Representative can be removed at any time by a vote of Members holding a majority of the Membership Interests, and shall resign if it is no longer a Member.  In the event of the resignation or removal of the Tax Matters Representative, Members holding a majority of the Membership Interests shall select a replacement Tax Matters Representative.

(b)   **Tax Examinations and Audits.**   The Tax Matters Representative is authorized and required to represent the Company (at the Company's expense) in connection with all examinations of the Company's affairs by Taxing Authorities, including resulting administrative and judicial proceedings, and to expend Company funds for professional services and costs associated therewith.  The Tax Matters Representative shall promptly notify the Members in writing of the commencement of any tax audit of the Company, upon receipt of a tax assessment and upon receipt of a notice of final partnership adjustment, and shall keep the Members reasonably informed of the status of any tax audit and resulting administrative and judicial proceedings.  Without the consent of Members holding a majority of the Membership Interests, the Tax Matters Representative shall not extend the statute of limitations, file a request for administrative adjustment, file suit relating to any Company tax refund or deficiency or enter into any settlement agreement relating to items of income, gain, loss or deduction of the Company with any Taxing Authority.

WEIL:\97901822\22\45327.0007

(c)     **US Federal Tax Proceedings.**   The Members acknowledge that the Company may elect the application of Section 6226 of the Code.  This acknowledgement applies to each Member whether or not the Member owns an interest in the Company in both the reviewed year and the year of the tax adjustment.  In the event that the Company elects the application of Section 6226 of the Code, the Members agree and covenant to take into account and report to the Internal Revenue Service (or any other applicable taxing authority) any adjustment to their tax items for the reviewed year of which they are notified by the Company in a written statement, in the manner provided in Section 6226(b) of the Code, whether or not the Member owns any interest in the Company at such time.  Any Member that fails to report its share of such adjustments on its tax return, agrees to indemnify and hold harmless the Company and the Tax Matters Representative from and against any and all losses, costs, liabilities and expenses related to taxes (including penalties and interest) imposed on the Company as a result of the Member's inaction.  If the Company is required to pay the assessment of the imputed underpayment under Section 6225(a)(1) of the Code or similar provisions of state law, any taxes, penalties, and interest payable by the Company shall be treated as attributable to the Members, and, to the extent possible, the Tax Matters Representative shall allocate the burden of any such amounts to those Members to whom such amounts are reasonably attributable taking into account the Member's or former Member's allocable share of taxable income or loss with respect to the Fiscal Year to which such assessment pertains and adjustments that may have been made in computing the imputed underpayment.  To the extent that any such amount is payable by the Company, at the option of the Tax Matters Representative, such amount shall be recoverable from such Member as provided in Section 6.03(c).  The provisions contained in this Section 10.04 shall survive the dissolution, termination or liquidation of the Company, the withdrawal of any Member or the Transfer of any Member's interest in the Company and apply to unadmitted assignees of a Member's interest who may be considered current or former partners of the Company for federal tax purposes.

(d)     **Tax Returns.**   Each Member agrees that such Member shall not treat any Company item inconsistently on such Member's federal, state, foreign or other income tax return with the treatment of the item on the Company's return.

(e)     **Section 754 Election.**   The Tax Matters Representative will make an election under Code Section 754, if the Company becomes a partnership for U.S. federal income tax purposes.

(f)     **Indemnification**.   The Company shall defend, indemnify, and hold harmless the Tax Matters Representative against any and all liabilities sustained as a result of any act or decision concerning Company tax matters and within the scope of responsibilities as Tax Matters Representative, so long as such act or decision was done or made in good faith and does not constitute gross negligence or willful misconduct.

**Section 10.05 Tax Returns.**  At the expense of the Company, the Sole Manager (or any officer of the Company that it may designate pursuant to this Agreement) shall endeavor to cause the preparation and timely filing (including extensions) of all tax returns, if any, required to be filed by the Company pursuant to the Code as well as all other required tax returns in each

jurisdiction in which the Company owns property or does business. If the Company becomes a partnership for U.S. federal income tax purposes, as soon as reasonably possible after the end of each Fiscal Year, the Sole Manager or any designated officer of the Company, as applicable, will cause to be delivered to each Person who was a Member at any time during such Fiscal Year, IRS Schedule K-1 to Form 1065, if applicable, and such other information with respect to the Company as may be necessary for the preparation of such Person's federal, state, and local income tax returns for such Fiscal Year.

Section 10.06 Company Funds. All funds of the Company shall be deposited in its name, or in such name as may be designated by the Sole Manager, in such checking, savings, or other accounts, or held in its name in the form of such other investments as shall be designated by the Sole Manager. The funds of the Company shall not be commingled with the funds of any other Person. All withdrawals of such deposits or liquidations of such investments by the Company shall be made exclusively upon the signature or signatures of the Sole Manager, or any officer or officers of the Company that may be designated by the Sole Manager, as applicable, pursuant to this Agreement.

## ARTICLE XI
## WINDING UP AND TERMINATION

Section 11.01 Events Requiring Winding Up. The Company shall begin to wind up its business and affairs only upon the occurrence of any of the following events (in each case, subject to the applicable provisions of Section 7.04):

(a)     upon the permanent cessation of all production from, and Final Completion of all plugging and abandonment and decommissioning of, the FWE IV Assets;

(b)     the occurrence of a nonwaivable event under the terms of the BOC which requires the winding up of the Company after its termination unless a Continuance occurs in respect of such event; or

(c)     the entry of a judicial decree ordering winding up and termination under § 11.314 of the BOC in proceedings of which CUSA has been given notice and an opportunity to participate.

(d)     Notwithstanding the occurrence of an event referenced in Section 11.01(b), if the Company is permitted prior to the termination of its existence in accordance with the BOC to revoke a winding up upon the occurrence of such event and the Sole Manager provides its prior written consent to such revocation, then, to the extent so permitted under the BOC and in the manner provided therein, the Company's existence shall be continued (the revocation of such a winding up and continuance of the Company, a "**Continuance**").

Section 11.02 Effectiveness of Termination. The Company shall begin to wind up its business and affairs as soon as reasonably practicable upon the occurrence of an event described in Section 11.01 (if such event has not been revoked or cancelled), but the Company shall not terminate until the winding up of the Company has been completed, the assets of the Company

have been distributed as provided in Section 11.03, and the Certificate of Termination shall have been filed as provided in Section 11.04.

**Section 11.03 Liquidation.**  If the Company is to be terminated pursuant to Section 11.01, the Company shall be liquidated and its business and affairs wound up in accordance with the BOC and the following provisions:

(a)     **Liquidator.**  The Sole Manager shall act as liquidator to wind up the Company (the "**Liquidator**"); provided, however, that if there is then a vacancy in the position of the Sole Manager or the Sole Manager is not willing to act as the Liquidator, the Members shall appoint a Person to act as the Liquidator with the consent of CUSA. The Liquidator shall have full power and authority to sell, assign, and encumber any or all of the Company's assets and to wind up and liquidate the affairs of the Company in an orderly and business-like manner.

(b)     **Accounting.**  As promptly as possible after the event requiring winding up and again after final liquidation, the Liquidator shall cause a proper accounting to be made by a recognized firm of certified public accountants of the Company's assets, liabilities, and operations through the last day of the calendar month in which such event occurs or the final liquidation is completed, as applicable.

(c)     **Notice.**  The Liquidator shall deliver to each known claimant of the Company the notice required by § 11.052 of the BOC.

(d)     **Distribution of Proceeds.**  The Liquidator shall liquidate the assets of the Company and distribute the proceeds of such liquidation in the following order of priority, unless otherwise required by mandatory provisions of Applicable Law:

(i)     First, to the payment of all of the Company's debts and liabilities to its creditors (including Members, if applicable), including amounts owed, if any, pursuant to the Material Project Contracts to CUSA and/or Credit Bid Purchaser, and the expenses of liquidation (including sales commissions incident to any sales of assets of the Company);

(ii)     Second, to the establishment of and additions to other reserves that are determined by the Liquidator to be reasonably necessary for any contingent unforeseen liabilities or obligations of the Company; and

(iii)     Third, to the Members in accordance with the positive balances in their respective Capital Accounts, as determined after taking into account all Capital Account adjustments for the taxable year of the Company during which the liquidation of the Company occurs.

(e)     **Discretion of Liquidator.**  Notwithstanding the provisions of Section 11.03(d) that require the liquidation of the assets of the Company, but subject to the order of priorities set forth in Section 11.03(d), if upon winding up of the Company the Liquidator reasonably determines that an immediate sale of part or all of the Company's

WEIL:\97901822\22\45327.0007

Debtors' Exhibit No. 34
Page 262 of 910

assets would be impractical or could cause undue loss to the Members, the Liquidator may defer the liquidation of any assets except those necessary to satisfy Company liabilities and reserves, and may, upon approval of holders of a majority of the outstanding Membership Interests, distribute to the Members, in lieu of cash, as tenants in common and in accordance with the provisions of Section 11.03(d), undivided interests in such Company assets as the Liquidator deems not suitable for liquidation.  Any such distribution in kind shall be subject to such conditions relating to the disposition and management of such properties as the Liquidator deems reasonable and equitable and to any agreements governing the operating of such properties at such time.  For purposes of any such distribution, any property to be distributed will be valued at its Fair Market Value.

**Section 11.04 Certificate of Termination.**  Upon completion of the distribution of the assets of the Company as provided in Section 11.03(d) hereof, the Liquidator or other such officer or Sole Manager shall execute and cause to be filed a Certificate of Termination in the State of Texas and shall cause the cancellation of all qualifications and registrations of the Company as a foreign limited liability company in jurisdictions other than the State of Texas and shall take such other actions as may be necessary to terminate the Company.  Upon acceptance of the Certificate of Termination by the Texas Secretary of State, the Company shall be terminated.

**Section 11.05 Survival of Rights, Duties, and Obligations.**  Dissolution, liquidation, winding up, or termination of the Company for any reason shall not release any party from any Loss that at the time of such dissolution, liquidation, winding up, or termination already had accrued to any other party or thereafter may accrue in respect of any act or omission prior to such dissolution, liquidation, winding up, or termination.  For the avoidance of doubt, none of the foregoing shall replace, diminish, or otherwise adversely affect any Member's right to indemnification pursuant to Section 9.03.

**Section 11.06 Recourse for Claims.**  Each Member shall look solely to the assets of the Company for all distributions with respect to the Company, such Member's Capital Account, and such Member's share of Net Income, Net Loss, and other items of income, gain, loss, and deduction, and shall have no recourse therefor (upon termination or otherwise) against the Liquidator or any other Member.

<div align="center">

**ARTICLE XII**
**MISCELLANEOUS**

</div>

**Section 12.01 Expenses.**  The Initial Member will pay, or cause to be paid, or contribute to the Company amounts necessary for the Company to pay, all amounts necessary to fully cover (a) costs associated with the formation of the Company in connection with the Divisive Merger Documents and (b) any premiums to satisfy organizational or area wide bonding requirements.

**Section 12.02 Further Assurances.**  In connection with this Agreement and the transactions contemplated hereby, the Company and the Member hereby agree, at the request of the Company or any other Member, to execute and deliver such additional documents, instruments, conveyances, and assurances and to take such further actions as may be required to carry out the provisions hereof and give effect to the transactions contemplated hereby.

WEIL:\97901822\22\45327.0007

**Section 12.03 Confidentiality**.

(a)     Each Member acknowledges that it will have access to and become acquainted with trade secrets, proprietary information, and confidential information belonging to the Company and its Affiliates that are not generally known to the public, including, but not limited to, information concerning business plans, financial statements, and other information, operating practices and methods, expansion plans, strategic plans, marketing plans, contracts, customer lists, or other business documents that the Company treats as confidential, in any format whatsoever (including oral, written, electronic, or any other form or medium) (collectively, "**Confidential Information**").  In addition, each Member acknowledges that:  (i) the Company has invested, and continues to invest, substantial time, expense, and specialized knowledge in developing its Confidential Information; (ii) the Confidential Information provides the Company with a competitive advantage over others in the marketplace; and (iii) the Company would be irreparably harmed if the Confidential Information were disclosed to competitors or made available to the public.  Without limiting the applicability of any other agreement to which any Member is subject, no Member shall, directly or indirectly, disclose or use (other than solely for the purposes of such Member monitoring and analyzing its investment in the Company) at any time, including, without limitation, use for personal, commercial, or proprietary advantage or profit, either during its association with the Company or thereafter, any Confidential Information of which such Member is or becomes aware.  Each Member in possession of Confidential Information shall take all appropriate steps to safeguard such information and to protect it against disclosure, misuse, espionage, loss, and theft.

(b)     Nothing contained in Section 12.03(a) shall prevent any Member from disclosing Confidential Information: (i) upon the order of any court or administrative agency; (ii) upon the request or demand of any regulatory agency or authority having jurisdiction over such Member; (iii) to the extent compelled by legal process or required or requested pursuant to subpoena, interrogatories, or other discovery requests; (iv) to the extent necessary in connection with the exercise of any remedy hereunder; (v) to the other Members; or (vi) to such Member's Representatives who, in the reasonable judgment of such Member, need to know such Confidential Information and agree to be bound by the provisions of this Section 12.03 as if a Member; or (vii) to any potential Transferee in connection with a proposed Transfer of Membership Interests from such Member, as long as such potential Transferee agrees in writing to be bound by the provisions of this Section 12.03 as if a Member before receiving such Confidential Information; provided, that in the case of clause (i), (ii), or (iii), such Member shall notify the Company and other Members of the proposed disclosure as far in advance of such disclosure as practicable (but in no event make any such disclosure before notifying the Company and other Members) and use reasonable efforts to ensure that any Confidential Information so disclosed is accorded confidential treatment satisfactory to the Company, when and if available.

(c)     The restrictions of Section 12.03(a) shall not apply to Confidential Information that: (i) is or becomes generally available to the public other than as a result of a disclosure by a Member in violation of this Agreement; (ii) is or has been independently developed or conceived by such Member without use of Confidential

39

Information; or (iii) becomes available to such Member or any of its Representatives on a non-confidential basis from a source other than the Company, the other Members, or any of their respective Representatives, provided, that such source is not known by the receiving Member to be bound by a confidentiality agreement regarding the Company.

(d)  The obligations of each Member under this Section 12.03 shall survive for so long as such Member remains a Member, and for three years following the earlier of (i) termination, dissolution, liquidation, and winding up of the Company; (ii) the withdrawal of such Member from the Company; or (iii) such Member's Transfer of its Membership Interests; provided that with respect to Confidential Information that constitutes a trade secret under Applicable Law, the obligations of each Member under this Section 12.03 shall survive until, if ever, such Confidential Information loses its trade secret protection other than due, directly or indirectly, to an act or omission of the Member.

**Section 12.04 Notices.**  All notices, requests, consents, claims, demands, waivers, and other communications hereunder shall be in writing and shall be deemed to have been given:

(a)  when delivered by hand (with written confirmation of receipt);

(b)  when received by the addressee if sent by a nationally recognized overnight courier (receipt requested);

(c)  on the third day after the date mailed, by certified or registered mail, return receipt requested, postage prepaid; or

(d)  on the day delivered if sent by electronic mail to the address below during normal business hours of the recipient and on the next Business Day if sent by electronic mail after normal business hours of the recipient.

Such communications must be sent to the respective parties at the following addresses (or at such other address for a party as shall be specified in a notice given in accordance with this Section 12.04):

**If to the Company:**          Fieldwood Energy IV LLC
                                2000 W. Sam Houston Parkway S., Suite 1200
                                Houston, Texas 77042
                                Attention: Sole Manager
                                Phone: [●]
                                Email: [●]

WEIL:\97901822\22\45327.0007

with a copy to:

(which shall not
constitute notice)

Chevron U.S.A. Inc.
100 Northpark Blvd
Covington, LA 70443
Attention: Land Manager
Phone: (985) 773-6538
Email: tdwebre@chevron.com

**If to Member**:                   To the Member's respective mailing address as set forth on the
Members Schedule.

**Section 12.05 Headings.**  The headings in this Agreement are inserted for convenience or reference only and are in no way intended to describe, interpret, define, or limit the scope, extent, or intent of this Agreement or any provision of this Agreement.

**Section 12.06 Severability.**  If any term or provision of this Agreement is held to be invalid, illegal, or unenforceable under Applicable Law in any jurisdiction, such invalidity, illegality, or unenforceability shall not affect any other term or provision of this Agreement or invalidate or render unenforceable such term or provision in any other jurisdiction.  Except as provided in Section 9.03(g), upon such determination that any term or other provision is invalid, illegal, or unenforceable, this Agreement shall be modified automatically so as to effect the original intent of the parties as closely as possible in order that the transactions contemplated hereby be consummated as originally contemplated to the greatest extent possible, legal, and enforceable.

**Section 12.07 Entire Agreement.**  This Agreement, together with the Certificate of Merger, Plan of Merger, Certificate of Formation, the Material Project Contracts and all related Exhibits and Schedules, constitute the sole and entire agreement of the parties to this Agreement with respect to the subject matter contained herein and therein, and supersede all prior and contemporaneous understandings, agreements, representations, and warranties, both written and oral, with respect to such subject matter.

**Section 12.08 Successors and Assigns.**  Subject to the restrictions on Transfers set forth herein, this Agreement shall be binding upon and shall inure to the benefit of the parties hereto and their respective heirs, executors, administrators, successors, and assigns.

**Section 12.09 No Third-Party Beneficiaries.**  Except (a) with respect to certain rights reserved to CUSA as set forth in this Agreement, which shall be for the benefit of and enforceable by CUSA, and (b) as provided in ARTICLE IX, which shall be for the benefit of and enforceable by Covered Persons as described therein, this Agreement is for the sole benefit of the parties hereto (and their respective heirs, executors, administrators, successors, and assigns) and nothing herein, express or implied, is intended to or shall confer upon any other Person, including any creditor of the Company, any legal or equitable right, benefit, or remedy of any nature whatsoever under or by reason of this Agreement; provided, however that CUSA and each Covered Persons shall be an express third party beneficiary of this Agreement.

41

**Section 12.10 Amendment.**  Subject to Sections 2.02, no provision of this Agreement may be amended or modified except by an instrument in writing executed by the Company and the Members holding a majority of the Membership Interests; provided, however that any amendment or modification which impacts the rights of CUSA hereunder, including changes to Section 2.05 (Purpose) shall be subject to the prior written consent of CUSA, which may be given, delayed or withheld in its sole discretion.  Any such written amendment or modification will be binding upon the Company, CUSA and each Member.   Notwithstanding the foregoing, amendments to the Members Schedule following any new issuance, redemption, repurchase, or Transfer of Membership Interests in accordance with this Agreement may be made by the Sole Manager without the consent of or execution by the Members.

**Section 12.11 Waiver.**  No waiver by any party or CUSA of any of the provisions hereof shall be effective unless explicitly set forth in writing and signed by the party so waiving or CUSA, respectively.  No waiver by any party or CUSA shall operate or be construed as a waiver in respect of any failure, breach, or default not expressly identified by such written waiver, whether of a similar or different character, and whether occurring before or after that waiver.  No failure to exercise, or delay in exercising, any right, remedy, power, or privilege arising from this Agreement shall operate or be construed as a waiver thereof, nor shall any single or partial exercise of any right, remedy, power, or privilege hereunder preclude any other or further exercise thereof or the exercise of any other right, remedy, power, or privilege.  For the avoidance of doubt, nothing contained in this Section 12.11 shall diminish any of the explicit and implicit waivers described in this Agreement.

**Section 12.12 Governing Law.**  All issues and questions concerning the application, construction, validity, interpretation, and enforcement of this Agreement shall be governed by and construed in accordance with the internal laws of the State of Texas, without giving effect to any choice or conflict of law provision or rule (whether of the State of Texas or any other jurisdiction) that would cause the application of laws of any jurisdiction other than those of the State of Texas.

**Section 12.13 Submission to Jurisdiction.**  The parties hereby agree that any suit, action, or proceeding seeking to enforce any provision of, or based on any matter arising out of or in connection with, this Agreement or the transactions contemplated hereby, whether in contract, tort, or otherwise, shall be brought in the federal courts of the United States of America or the courts of the State of Texas, in each case located in Harris County and in Houston, Texas.  Each of the parties hereby irrevocably consents to the jurisdiction of such courts (and of the appropriate appellate courts therefrom) in any such suit, action, or proceeding and irrevocably waives, to the fullest extent permitted by law, any objection that it may now or hereafter have to the laying of the venue of any such suit, action, or proceeding in any such court or that any such suit, action, or proceeding that is brought in any such court has been brought in an inconvenient forum.  Service of process, summons, notice, or other document by registered mail to the address set forth in Section 12.04 shall be effective service of process for any suit, action, or other proceeding brought in any such court.

**Section 12.14 Waiver of Jury Trial**.  EACH PARTY HERETO ACKNOWLEDGES AND AGREES THAT ANY DISPUTE OR CONTROVERSY THAT MAY ARISE UNDER THIS AGREEMENT IS LIKELY TO INVOLVE COMPLICATED AND DIFFICULT ISSUES

WEIL:\97901822\22\45327.0007

AND, THEREFORE, EACH SUCH PARTY IRREVOCABLY AND UNCONDITIONALLY WAIVES ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN RESPECT OF ANY LEGAL ACTION ARISING OUT OF RELATING TO THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY.

**Section 12.15 Equitable Remedies.**  Each party hereto acknowledges that a breach or threatened breach by such party of any of its obligations under this Agreement would give rise to irreparable harm to the other parties or CUSA, for which monetary damages would not be an adequate remedy, and hereby agrees that in the event of a breach or a threatened breach by such party of any such obligations, each of the other parties hereto and CUSA shall, in addition to any and all other rights and remedies that may be available to them in respect of such breach, be entitled to equitable relief, including a temporary restraining order, an injunction, specific performance, and any other relief that may be available from a court of competent jurisdiction (without any requirement to post bond).

**Section 12.16 Attorney's Fees.**  In the event that any party or third-party beneficiary hereto institutes any legal suit, action, or proceeding, including arbitration, against another party in respect of a matter arising out of or relating to this Agreement, the prevailing party or third-party beneficiary in the suit, action, or proceeding shall be entitled to receive, in addition to all other damages to which it may be entitled, the costs incurred by it in conducting the suit, action, or proceeding, including reasonable attorneys' fees and expenses and court costs.

**Section 12.17 Remedies Cumulative.**  The rights and remedies under this Agreement are cumulative and are in addition to and not in substitution for any other rights and remedies available at law or in equity or otherwise, except to the extent expressly provided in Section 9.02 to the contrary.

**Section 12.18 Counterparts.**  This Agreement may be executed in counterparts, each of which shall be deemed an original, but all of which together shall be deemed to be one and the same agreement.  A signed copy of this Agreement delivered by email or other means of Electronic Transmission shall be deemed to have the same legal effect as delivery of an original signed copy of this Agreement.

(SIGNATURE PAGE FOLLOWS)

WEIL:\97901822\22\45327.0007

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be entered into as of the date first written above by their respective officers thereunto duly authorized.

**The Company:**

FIELDWOOD ENERGY IV LLC,
a Texas limited liability company

By:_____
Name:
Title:

**The Initial Member:**

FIELDWOOD ENERGY INC.,
a Delaware corporation

By:_____
Name:
Title:

## SCHEDULE A

## <u>MEMBERS SCHEDULE</u>

| Member Name, and Address | Membership Interest |
|---|---|
| Fieldwood Energy Inc.<br>2000 W. Sam Houston Parkway S., Suite 1200<br>Houston, Texas 77042 | 100% |
| Total: | 100% |

## Exhibit 5

**Omnibus Agreement**

See attached.

*Exhibit 5 to the Implementation Agreement*

## OMNIBUS AGREEMENT

This Omnibus Agreement (this "Agreement"), dated and effective as of _____, 2021 (the "Effective Date"), is by and among Mako Buyer LLC, a Delaware limited liability company ("Operator"), Fieldwood Energy IV LLC, a Texas limited liability company (the "Company"), and Chevron U.S.A. Inc., a Pennsylvania corporation ("CUSA"). Operator, Company and CUSA are sometimes referred to collectively as the "Parties" and individually as a "Party".

**WHEREAS**, Company is a resulting entity of a divisive merger effected pursuant to the laws of the State of Texas in connection with the confirmed plan of reorganization (the "Plan") of Fieldwood Energy LLC (and its affiliated debtor entities) pursuant to Chapter 11 of the United States Bankruptcy Code in Case 20-33948, *In re: Fieldwood Energy LLC et al.*, in the United States Bankruptcy Court for the Southern District of Texas, Houston Division (the "Bankruptcy Cases");

**WHEREAS**, the divisive merger was conducted in accordance with (i) the Implementation Agreement, which was agreed prior to the confirmation of the Plan, and (ii) the Plan of Merger;

**WHEREAS**, under the Implementation Agreement and pursuant to the divisive merger as set out in the Plan of Merger, Company was allocated the Operating Properties and operational responsibility of the Terminated Properties for the purposes of Decommissioning such Assets;

**WHEREAS,** CUSA is desirous of entering into the Material Project Contracts to support Company and Operator's economical and orderly Decommissioning of Assets; and

**WHEREAS**, Company, CUSA and Operator wish to memorialize certain funding obligations and related limitations and certain other rights and obligations of the Parties relating to the Decommissioning operations of Company and the Assets.

**NOW, THEREFORE**, in consideration of the premises and of the mutual promises, covenants, conditions, and agreements contained herein, and for other valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties hereby agree as follows:

## ARTICLE I.  DEFINITIONS

**Section 1.1**   **Defined Terms**. Capitalized terms used herein shall have the meanings given such terms in Appendix 1.

## ARTICLE II.  ESCROW ACCOUNT

**Section 2.1**   **Escrow Account**. CUSA and Company shall establish and maintain until this Agreement has terminated the Decommissioning Escrow Account and apply the funds contained therein in accordance with this Agreement and the other Material Project Contracts until Final Completion has occurred with respect to all of the Assets.

**Section 2.2**   **Deposits into Decommissioning Escrow Account**.

(a)     **Decommissioning Costs**.  The Parties shall cause the amounts required by Section 3.1 to be deposited in the Decommissioning Escrow Account at the times required therein.  Such amounts will be used solely to pay Turnkey Amounts and Decommissioning Costs in accordance with Section 3.2 or Section 5.3(c) or distributed in accordance with Section 2.3(d) or Section 3.3. CUSA may deposit additional funds in the Decommissioning Escrow Account in accordance with Section 5.3(c) which will be used solely to pay Decommissioning Costs in accordance with Section 5.3(c).

(b)     **NPI Payments**.  Company shall cause all NPI Payments made under, and as defined in, the NPI Conveyance to be deposited in the Decommissioning Escrow Account when made.  Such amounts will be used to pay Turnkey Amounts and Decommissioning Costs in accordance with Sections 3.2 or Section 5.3(c) or distributed in accordance with Section 2.3(d) or Section 3.3.

(c)     **Initial Deposits**.

(1)  Fieldwood Energy, LLC shall deposit, or cause to be deposited, five million dollars ($5,000,000) into the Decommissioning Escrow Account on the Effective Date (the "Initial Safe Out Funds") pursuant to the Plan of Merger.  The Initial Safe Out Funds will for be used solely to pay Operator for completion of the Initial Safe Out Work in accordance with Section 3.4.

(2)  Fieldwood Energy, LLC shall deposit, or cause to be deposited, fourteen million, four hundred and sixty-nine thousand and six hundred and sixty nine dollars ($14,469,669) into the Decommissioning Escrow Account on the Effective Date (the "Additional FWE IV Property Funds") pursuant to the Plan of Merger.  The Additional FWE IV Property Funds will be deemed to be Available Funds hereunder.

(3)  Fieldwood Energy, LLC and CUSA shall cause the Prior Escrow Funds to be deposited into the Decommissioning Escrow Account on the Effective Date pursuant to the Implementation Agreement.  The Prior Escrow Funds will deemed to be Available Funds hereunder.

**Section 2.3     Transfers from Decommissioning Escrow Account**.  A transfer from the Decommissioning Escrow Account may be made from time to time as set forth in clauses (a)-(d) below only if: (i) written instruction signed by CUSA (and, in the case of Section 2.3(c), Operator) is given to the Escrow Agent in accordance with the Decommissioning Escrow Agreement, (ii) the circumstance permitting the applicable draw set forth below has occurred, and (iii) the proceeds of such draw are paid to the Person(s) and in the amount(s) for the applicable draw as set forth below.

(a)     **Turnkey Amounts and Decommissioning Costs**.  From the Decommissioning Escrow Account: (i) to Operator upon Operator's delivery of the written Notices of Payment Milestone or Final Completion in accordance with Section 3.2(b), Section 3.2(c) or Section 3.2(d)(3), respectively; (ii) to CUSA upon the events specified in Section 3.1(a), Section 3.3(a), Section 3.3(b) or Section 3.3(c)(i) respectively; (iii) to a non-Affiliate entitled to such

#94614673v11
WEIL:\97967346\16\45327.0007

amounts upon the event specified in Section 3.3(c)(ii) in the amount such non-Affiliate is entitled to thereunder and (iv) to Company or applicable decommissioning contractor entitled to such amounts under Section 5.3(c) upon Company's delivery of a written Notice specifying the amounts then due and payable for the applicable Decommissioning Project.

(b)     **Initial Safe Out Costs**.  From the Decommissioning Escrow Account to Operator upon Operator's delivery of an Invoice containing Safe Out Costs in accordance with Section 3.4.

(c)     **Escrow Agreement**.   From the Decommissioning Escrow Account to the applicable Person(s) in accordance with instructions given jointly by CUSA and Operator pursuant to Sections 5 or 6.1(A) of the Escrow Agreement, for the amount specified in such instructions.

(d)     **Termination**.  On the termination of this Agreement, in the following order, (i) first, from the Decommissioning Escrow Account to Operator in an amount equal to all amounts then due and payable to Operator pursuant to this Agreement, (ii) second, from the Decommissioning Escrow Account to the applicable non-Affiliates, such amounts as are subject to any contractual obligations of CUSA or Company with respect to any non-Affiliate that would require returning such funds to such non-Affiliate, (iii) third, from the Decommissioning Escrow Account to CUSA (after taking into account the releases specified by the preceding clauses (i) and (ii)) (A) any amounts constituting CUSA Turnkey Payments and, as applicable to the extent permitted by applicable agreements with third parties, Other WI Turnkey Payments, Contributed Predecessor Funds or Recovered Bond Proceeds then held in the Decommissioning Escrow Account, and (B) any additional amounts sufficient to reimburse CUSA for all other Decommissioning Costs paid by CUSA and/or payments made by CUSA pursuant to Section 4.2 (for the avoidance of doubt, clause (iii) is limited to recovery to the extent available in the Escrow Account and no Party will have any obligation to reimburse CUSA for such amounts), and (iv) fourth, from the Decommissioning Escrow Account to Company any remaining funds on deposit in the Decommissioning Escrow Account (after taking into account the releases specified by the preceding clauses (i), (ii) and (iii)).

Section 2.4     **Timing of Escrow Notices**.  Subject to Section 2.3, the following shall apply with respect to the timing of written instructions made to the Escrow Agent (as contemplated under paragraph (i) of the first paragraph of Section 2.3):

(a)     With respect to transfers made under Section 2.3(a)(i), CUSA shall send the written instruction to the Escrow Agent promptly, and in any event within five (5) Business Days following Operator's delivery of the written Notices of Payment Milestone or Final Completion in accordance with Section 3.2(b), Section 3.2(c) or Section 3.2(d)(3), respectively;

(b)     With respect to transfers made under Section 2.3(b), CUSA shall send the written instruction to the Escrow Agent promptly, and in any event within five (5) Business Days following Operator's delivery of written Notice of completion of the Initial Safe Out Work in accordance with Section 3.4; and

(c)     If CUSA intends to cause a release of Escrowed Project Funds that relate to a Decommissioning Project for which CUSA has delivered the Notice specified by Section 3.2(a)(i)

3

Debtors' Exhibit No. 34
Page 274 of 910

to Operator under <u>Section 3.3(c)(i)</u> following a termination of the Turnkey Removal Agreement in its entirety by CUSA due to an alleged breach of the Turnkey Removal Agreement, then CUSA shall deliver written Notice of its intent to cause such release to Operator at least five (5) Business Days prior to delivering a written instruction to the Escrow Agent with respect to such release.

## ARTICLE III.      TURNKEY REMOVAL AGREEMENT

### Section 3.1      <u>Decommissioning Cost Funding Obligation</u>.

(a)      With respect to each Decommissioning Project conducted under the Turnkey Removal Agreement, subject to the other provisions of this <u>Section 3.1</u> and subject to <u>Section 5.7</u>, CUSA shall fund the CUSA Turnkey Payment attributable to such Decommissioning Project by wire transfer of immediately available funds made into the Decommissioning Escrow Account by no later than the Target Funding Date for such Decommissioning Project; provided that, in the event that there are one or more Other WI Parties other than CUSA (or its Affiliates) with respect to a particular Asset subject to a Decommissioning Project and such Other WI Parties have not provided Committed WI Payments in support of such Decommissioning Project in an amount that is, in total, equivalent to the Other WI Turnkey Payment with respect to the applicable Decommissioning Project (and CUSA has not agree to contribute such amount as a CUSA Covered Payment), then CUSA shall not be required to fund or otherwise pay any amount in excess of the CUSA Turnkey Payment.  If a Decommissioning Project does not become Fully Committed within 90 days of the Target Funding Date, then CUSA shall be entitled to transfer any CUSA Turnkey Payment associated with such Decommissioning Project that CUSA has made into the Decommissioning Escrow Account for such Decommissioning Project to CUSA from the Decommissioning Escrow Account.

(b)      No Orphan Asset shall be part of any Decommissioning Project.  Each Orphan Asset shall be Decommissioned to Final Completion on or before the applicable scheduled completion date for such Orphan Asset set out on Exhibit A attached hereto.  If an Orphan Asset is not listed on Exhibit A but is designated by the Parties as an Orphan Asset under <u>Section 3.5</u>, then Operator will Decommission the applicable Orphan Asset to Final Completion; provided further that Operator shall use commercially reasonable efforts to achieve Final Completion with respect to any such Orphan Asset within one hundred eighty (180) days following such designation.  Notwithstanding any other provision contained herein or in any other Material Project Contract, it shall be Operator's sole responsibility to Decommission each Orphan Asset, at Operator's sole cost, and Company and CUSA shall not bear any costs associated therewith.

(c)      If there is an Other WI Turnkey Payment amount associated with an applicable Decommissioning Project, then, the Company shall use commercially reasonable efforts to obtain Committed WI Payments from each applicable Other WI Party with respect to such Person's allocable share of such Other WI Turnkey Payment, by no later than the Target Funding Date for such Decommissioning Project and all Committed WI Payments shall be transferred directly into the Decommissioning Escrow Account when and as received (except as contemplated by the final proviso to <u>Section 3.2(c)</u>).  Operator, in its capacity as "Operator" under the Contract Operating Agreement shall use commercially reasonable efforts to support such efforts to obtain Committed WI Payments from each Other WI Party for each Decommissioning Project.  In the event that

4

Company or Operator (as stated above) has not deposited or otherwise obtained, as applicable, Committed WI Payments for a particular Decommissioning Project equivalent to the total Other WI Payment amount associated with such Decommissioning Project then, at any time prior to the applicable Target Start Date for such Decommissioning Project, CUSA, at its sole discretion, may elect to cover all or any portion of the applicable shortfall amount by providing written Notice to each other Party hereunder (any such amount, a "CUSA Covered Payment").  Such CUSA Covered Payment will be transferred to the Decommissioning Escrow Account pursuant to clause (a) above.

(d)     To the extent Company (or any other Party) receives any Contributed Predecessor Funds or Recovered Bond Proceeds relating to a particular Decommissioning Project, such funds shall be transferred to the Decommissioning Escrow Account as funds designated in support of such Decommissioning Project.

(e)     In the event that there are any Available Funds in the Decommissioning Escrow Account on the Target Funding Date for a particular Decommissioning Project, CUSA may designate such funds to be allocated to the such Decommissioning Project by providing written Notice to the Parties (any such funds so designated, "Allocated Available Funds"); *provided*, that CUSA will not be permitted to designate Available Funds as Allocated Available Funds pursuant to this Section 3.1(e) at any time that CUSA (or any of its Affiliates) is in breach of any of its (or their) obligations under a Material Project Contract.

(f)     In the event that the Turnkey Amount for an applicable Decommissioning Project increases in accordance with the Turnkey Removal Agreement following the Target Funding Date for such Decommissioning Project, (i) Operator shall provide written Notice to CUSA of such increase, and (ii) CUSA shall deposit funds into the Decommissioning Escrow Account to cover any shortfall between the CUSA Turnkey Payment for such Decommissioning Project as calculated prior to such increase and the CUSA Turnkey Payment as calculated following such increase within thirty (30) days following receipt of such Notice, provided that if there are any Available Funds in the Decommissioning Escrow Account at such time, CUSA shall have the option to allocate such Available Funds for such particular Decommissioning Project to cover such shortfall (which such funds shall thereafter be deemed Allocated Available Funds).

(g)     With respect to each Decommissioning Project, (i) any CUSA Turnkey Payment, Contributed Predecessor Funds, Recovered Bond Proceeds, or Committed WI Payment that are paid into the Decommissioning Escrow Account for such Decommissioning Project, (ii) any Allocated Available Funds contained in the Decommissioning Escrow Account that are designated by CUSA in accordance with Section 3.1(e) for such Decommissioning Project, and (iii) for the avoidance of doubt, any amounts associated with a CUSA At-Cost Payment (including At-Cost Allocated Funds or CUSA At-Cost Shortfall Payments) or an Other At-Cost Payment made under Section 3.2(d) shall remain in the Decommissioning Escrow Account and not be used for any other purposes or otherwise distributed to any Person, except in accordance with Section 3.1(a), Section 3.2 or Section 3.3.

**Section 3.2     Payment under Turnkey Removal Agreement**.

#94614673v11
WEIL:\97967346\16\45327.0007

Debtors' Exhibit No. 34
Page 276 of 910

(a)     In the event that the total amount of Escrowed Project Funds for a particular Decommissioning Project equals or exceeds the Turnkey Amount (such project is "Fully Committed"), (i) CUSA shall provide written Notice to Operator, and (ii) Operator, in its capacity as "Contractor" under the Turnkey Removal Agreement, shall initiate work on the applicable Decommissioning Project.

(b)     In the event that a particular Decommissioning Project qualifies for Payment Milestones under the Turnkey Removal Agreement, Operator shall provide written Notice to CUSA certifying that such Payment Milestone has been met and that payment associated with a Payment Milestone is due and, pursuant to Section 2.3(a), CUSA shall transfer to Operator Escrowed Project Funds for such Decommissioning Project, in an amount equal to the amount due and payable to Operator, in its capacity as "Contractor" under the Turnkey Removal Agreement for the applicable Payment Milestone, for the benefit of Company, in its capacity as "FWE IV" under the Turnkey Removal Agreement.

(c)     Upon Final Completion of an applicable Decommissioning Project, Operator shall provide written Notice to CUSA certifying that Final Completion has occurred and, pursuant to Section 2.3(a), CUSA shall transfer to Operator the Escrowed Project Funds for such Decommissioning Project, in an amount equal to the Turnkey Amount (as adjusted from time to time in accordance with the Turnkey Removal Agreement) for such Decommissioning Project (less any Payment Milestone payments actually made in connection with such Decommissioning Project or any Committed WI Payment not yet received by Company), payable to Operator, in its capacity as "Contractor" under the Turnkey Removal Agreement, for the benefit of Company in its capacity as "FWE IV" under the Turnkey Removal Agreement.  Such payment shall be deemed to satisfy all payment obligations of Company and CUSA, respectively, under the Turnkey Removal Agreement for the applicable Decommissioning Project; provided that in the event that any Committed WI Payment has not been paid in full by an applicable Other WI Party at the time of such payment and any amounts attributable to such Committed WI Payment are received by Company following such date, Company shall transfer such amounts to Operator (and, if such amounts are received into the Decommissioning Escrow Account, CUSA shall, pursuant to Section 2.3(a), cause such amounts to be released to Operator), promptly, and not later than thirty (30) days of receipt by Company or Escrow Agent, as applicable.

(d)     Notwithstanding any provisions to the contrary in this Article 3, the following provisions shall apply to Decommissioning Projects on the Additional FWE IV Properties:

(1)   The applicable Decommissioning Project shall be conducted as an At-Cost Project under the Turnkey Removal Agreement.  CUSA's obligation to make or otherwise secure payment under the Turnkey Removal Agreement for an At-Cost Project shall be limited to an amount equivalent to the Company Working Interest share of the applicable amounts due under Section 2.3(a)(iii) of the Turnkey Removal Agreement for such At-Cost Project.

(2)   Each applicable Decommissioning Project shall be deemed "Fully Committed" hereunder if the Company Working Interest in the applicable Decommissioning Project is 100%.  If the Company Working Interest in an applicable Decommissioning Project is not 100%,

6

then Operator, CUSA and Company shall negotiate in good faith to agree on cost sharing arrangements with the applicable Other WI Parties to cover the Other Party Working Interest share of applicable amounts due under Section 2.3(a)(iii) of the Turnkey Removal Agreement for such Decommissioning Project; and such Decommissioning Project shall be deemed "Fully Committed" once such Other WI Parties have entered into contractual commitments covering such payments that are satisfactory to each Party at its reasonable discretion. Each payment made by an Other WI Party in accordance with such contractual commitments shall be referred to herein as an "Other At-Cost Payment".

(3)  Upon delivery by Operator of an invoice for monthly costs associated with an At-Cost Project under Section 3.2(a)(iii) of the Turnkey Removal Agreement (an "At-Cost Invoice"), CUSA shall transfer to Operator the following amounts by the date that is 30 days after receipt of the At-Cost Invoice (the "At-Cost Invoice Due Date"):

   (i)  The total amount due under such At-Cost Invoice, multiplied by the Company Working Interest in the applicable Decommissioning Project (the "CUSA At-Cost Payment"); and

   (ii)  If the Company Working Interest in the applicable Decommissioning Project is not 100%, the aggregate amount of Other At-Cost Payments that have been made into the Decommissioning Escrow Account prior to the At-Cost Invoice Due Date; provided that, in the event that any Other At-Cost Payment has not been paid in full by an applicable Other WI Party at the time of such payment and any amounts attributable to such Other At-Cost Payment are received by Company following such date, Company shall transfer such amounts to Operator (and, if such amounts are received into the Decommissioning Escrow Account, CUSA shall cause such amounts to be released to Operator), promptly, and not later than thirty (30) days of receipt by Company.

(4)  CUSA shall be entitled to cover all or any portion of a CUSA At-Cost Payment by one or more of the following sources of funds, by providing written notice to the Parties setting out the applicable allocation of the At-Cost Allocated Funds on or prior to the applicable At-Cost Invoice Due Date (in aggregate, the "At-Cost Allocated Funds"):

   (i)  Any Available Funds in the Decommissioning Escrow Account that are allocated by CUSA to cover all or any part of the amount due, in accordance with the procedures under Section 3.1(e);

   (ii)  The equitable portion (as determined in good faith by CUSA and the Company) of any Contributed Predecessor Funds that have been contributed into the Decommissioning Escrow Account for such Decommissioning Project; and

   (iii)  Any Recovered Bond Proceeds that have been contributed into the Decommissioning Escrow Account for such Decommissioning Project to the extent CUSA is the beneficiary of such Recovered Bond Proceeds (and any other Recovered Bond Proceeds that the Company and CUSA agree to apply).

7

(5)   In the event that CUSA is unable to (or, at its discretion, chooses not to) cover all or any portion of a CUSA At-Cost Payment with At-Cost Allocated Funds, CUSA shall transfer the applicable shortfall amount into the Decommissioning Escrow Account on or prior to the At-Cost Invoice Due Date (as applicable, a "<u>CUSA At-Cost Shortfall Payment</u>").

(6)   The funds transferred under <u>Section 3.2(d)(3)</u> above shall be amounts payable to Operator, in its capacity as "Contractor" under the Turnkey Removal Agreement, for the benefit of Company in its capacity as "FWE IV" under the Turnkey Removal Agreement. Such payment shall be deemed to satisfy the payment obligations of Company and CUSA, respectively, under the Turnkey Removal Agreement for the applicable Decommissioning Project that are attributable to the applicable At-Cost Invoice.

**Section 3.3**   <u>**Refund or Reuse of Escrow Amounts for Decommissioning**</u>.

(a)   To the extent that CUSA has elected to make, and has paid into the Decommissioning Escrow Account, any CUSA Covered Payment, and the applicable Other WI Payment covered by such CUSA Covered Payment is recovered by any Party, it shall be paid into the Decommissioning Escrow Account.   Following payment of such funds into the Decommissioning Escrow Account, the Company shall give CUSA written Notice of such deposit and, pursuant to <u>Section 2.3(a)</u>, CUSA may transfer funds from the Escrow Account equal to the amount of such Other WI Payment so contributed, payable to CUSA as reimbursement of the corresponding portion of the applicable CUSA Covered Payment.

(b)   In the event that any Contributed Predecessor Funds or Recovered Bond Proceeds for a particular Decommissioning Project are transferred into the Decommissioning Escrow Account and CUSA has already paid the CUSA Turnkey Payment for such Decommissioning Project into the Decommissioning Escrow Account as of the date of such transfer, the Company shall give CUSA written Notice of such deposit and, pursuant to <u>Section 2.3(a)</u>, CUSA may transfer funds payable to CUSA (as reimbursement) from the Decommissioning Escrow Account in an amount reasonably determined by CUSA and the Company to represent CUSA's equitable share of such Contributed Predecessor Funds or Recovered Bond Proceeds (determined consistent with the definition of CUSA Turnkey Payment).

(c)   In the event that the Turnkey Removal Agreement is terminated with respect to a particular Decommissioning Project prior to Final Completion thereof pursuant to the Turnkey Removal Agreement (including any termination of the Turnkey Removal Agreement in its entirety prior to Final Completion of one or more Decommissioning Projects), then: (i) in the event CUSA has funded any CUSA Turnkey Payment into the Decommissioning Escrow Account for such Decommissioning Project, pursuant to <u>Section 2.3(a)</u>, CUSA may transfer funds from the Decommissioning Escrow Account in an amount equal to the amount of such CUSA Turnkey Payment to CUSA (less any Decommissioning Costs or Payment Milestones paid prior to such time with respect to such Decommissioning Project); (ii) in the event any Other WI Turnkey Payment, Contributed Predecessor Funds or Recovered Bond Proceeds have been funded into the Decommissioning Escrow Account, such funds shall remain in the Decommissioning Escrow Account to cover future Decommissioning Costs for the applicable Assets in accordance with

8

Section 5.3, subject to any contractual obligations of CUSA or Company with respect to any non-Affiliate that would require returning such funds, in which case, pursuant to Section 2.3(a), CUSA may transfer funds from the Decommissioning Escrow Account in an amount equal to the amount of such Other WI Turnkey Payment, Contributed Predecessor Funds or Recovered Bond Proceeds that such non-Affiliate is entitled to, to such non-Affiliate; and (iii) in the event that CUSA has designated any Allocated Available Funds to the applicable Decommissioning Project, CUSA shall be entitled to release such funds from their designation as Allocated Available Funds within the Decommissioning Escrow Account, to be applied to other permitted uses as addressed herein.

**Section 3.4    Initial Safe-Out Costs**.    With respect to the five million dollars ($5,000,000) contributed into the Decommissioning Escrow Account on the Effective Date for the purpose of performing the Initial Safe Out Work (the "Safe Out Funds"), Operator shall conduct the Initial Safe Out Work until the total actual costs incurred by Operator for such Initial Safe Out Work (the "Safe Out Costs") is equivalent to the total actual amount of Safe Out Funds contributed into the Decommissioning Escrow Account on the Effective Date.    For the first full or partial calendar month following the Effective Date, and then for each calendar month thereafter, following the end of the applicable prior month, Operator shall deliver to CUSA and Company an invoice setting out (i) the Initial Safe Out Work conducted by Operator during such (full or partial) month, and (ii) the Safe Out Costs incurred by Operator for such Initial Safe Out Work.    Upon receipt by CUSA of such an invoice from Operator, CUSA shall initiate a release of funds from the Decommissioning Escrow Account in an amount equivalent to the Safe Out Costs set forth therein, payable to Operator; provided that the total amount of Safe Out Costs invoiced and paid under this Section 3.4 shall not exceed the total amount of the Safe Out Funds contributed into the Decommissioning Escrow Account on the Effective Date.    The Safe Out Funds do not constitute Available Funds and will not be released for any purpose other than pursuant to this Section 3.4, except with the written consent of Operator. Operator shall use commercially reasonable efforts to complete the Initial Safe Out Work in a commercially prudent manner, provided that Operator will not be obligated to perform a particular Initial Safe Out Work if the Decommissioning Escrow Account does not hold Safe Out Funds sufficient to cover the applicable Safe Out Costs associated with such Initial Safe Out Work.    Subject to the foregoing payment provisions, the Initial Safe Out Work shall be conducted under the Contract Operating Agreement and shall be deemed to be "Services" (as such term is defined in the Contract Operating Agreement) conducted by Operator thereunder for all purposes; provided that all fees and costs earned or incurred by Operator and/or funded, reimbursed or paid by Company or CUSA for such Services shall be limited solely to the transfer of the Safe Out Funds as forth in this Section 3.4.    For the avoidance of doubt, all Safe Out Work (other than Initial Safe Out Work), if any is conducted, shall be performed by Operator subject to and in accordance with the Contract Operating Agreement and shall be subject to the terms set out thereunder, including Operator's right to recover Reimbursable Costs.

**Section 3.5    Orphan Assets**. The Parties agree that the Assets listed on Exhibit A attached hereto shall be deemed to be Orphan Assets for the purpose of this Agreement and the other Material Project Contracts, as applicable.    In the event that following the Effective Date CUSA determines in good faith that any Asset (or part thereof) that is not listed on Exhibit A is an Orphan Asset, it shall provide written Notice to Operator with a description of the particular Asset (or part thereof) and information in support of CUSA's determination that such Asset (or part thereof) is an Orphan Asset.    If Operator fails to respond to such Notice within thirty (30) days or

9

otherwise affirms CUSA's determination, then the applicable Asset shall be deemed to be an Orphan Asset for all purposes hereunder. If Operator provides a written Notice in response to CUSA's Notice disputing CUSA's determination that the Asset is an Orphan Asset, then the applicable dispute shall be resolved in accordance with the dispute resolution provisions of <u>Article IX</u>.  Notwithstanding the foregoing, the Parties agree for the purposes of this Agreement that those certain pipeline segments listed on <u>Exhibit A-2</u> are not Orphan Assets.

   **Section 3.6**   **<u>Surety Decommissioning</u>**. In the event that a surety bond or other private bond in support of Decommissioning any of the Assets provides the surety or other bond counterparty (a "<u>Surety Counterparty</u>") with the option to perform the applicable Decommissioning of the Asset in lieu of payment of Decommissioning Costs or otherwise, and the applicable Surety Counterparty elects to exercise such performance right, the Parties shall permit the Surety Counterparty to perform the applicable Decommissioning.  To the extent the Surety Counterparty then actually does Decommission the applicable Asset, the Turnkey Removal Agreement shall no longer apply to such Asset (and any Decommissioning Project associated therewith) and no Party hereunder shall have any related obligations (including performance or payment obligations) under the Turnkey Removal Agreement with respect to such Asset.

## ARTICLE IV.        CONTRACT OPERATING AGREEMENT

   **Section 4.1**   **<u>Company Payment Request</u>**.  In the event that, in accordance with the terms of the Contract Operating Agreement, Operator delivers to Company during a particular month: (i) an Invoice requiring Company to make an Invoice Payment relating to Reimbursable Costs or Third Party Payments to Operator or (ii) a cash call pursuant to Section 3.1(b) of the Contract Operating Agreement and, in each case, the amounts required to be paid by the Company thereunder are properly due and payable under the Contract Operating Agreement, then Company shall (or Operator may on Company's behalf) deliver such Invoice or cash call(s) to CUSA (x) in the case of an Invoice, within three (3) Business Days following receipt by  the Company and (y) in the case of a cash call, on, on but not prior to the succeeding 15th day of a calendar month following its delivery to the Company, provided that, if a particular amount owed by the Company to Operator for a cash call exceeds two hundred fifty thousand dollars ($250,000), then Company shall deliver such cash call to CUSA within one (1) Business Day following receipt of such cash call (a "<u>COA Payment Request</u>").

   **Section 4.2**   **<u>CUSA Payment</u>**.  CUSA shall, no later than thirty (30) days after CUSA receives a COA Payment Request, transfer into the Revenue Account an amount equivalent to (a) the Invoice Payment amount payable with respect to any Invoice included in such COA Payment Request and (b) the amount requested and payable pursuant to any cash call included in such COA Payment Request.

## ARTICLE V. OTHER PAYMENT COVENANTS

   **Section 5.1**   **<u>Excluded CUSA Costs</u>**.  Notwithstanding any other provision herein or in any other Material Project Contract, the Parties agree that CUSA shall not be obligated to bear any costs or expenses of Company or otherwise associated with the Assets to the extent consisting of or relating to the following (collectively, the "<u>Excluded CUSA Costs</u>"):

#94614673v11
WEIL:\97967346\16\45327.0007

Debtors' Exhibit No. 34
Page 281 of 910

(a)     Any costs, damages, fines, penalties or liabilities owed to third parties, governmental fines and penalties, Environmental Liabilities, employment claims and/or any costs, expenses, claims or other liability relating to action taken by Company;

(b)     Any costs, damages, fines, penalties or liabilities owed to third parties, governmental fines and penalties, Environmental Liabilities, employment claims and/or any costs, expenses, claims or other liability relating to action taken by Operator (i) in breach of, and subject to, the Turnkey Removal Agreement or Contract Operating Agreement or (ii) arising due to the negligence, gross negligence or willful misconduct of Operator, in each case in Operator's capacity as "Contractor" under the Turnkey Removal Agreement or as "Operator" under the Contract Operating Agreement, as applicable; and

(c)     Any costs, damages, fines, penalties or liabilities (including Environmental Liabilities and Decommissioning Costs) related to any Orphan Assets.

### Section 5.2     Covered Operator Costs.

(a)     Notwithstanding any other provision herein or in any other Material Project Contract (but without duplication of any payment made under a Material Project Contract), the Parties agree that Operator shall be responsible for all costs or expenses of Company to the extent consisting of or relating to the following (collectively, the "Covered Operator Costs"):

(1)  Any costs, damages, fines, penalties or liabilities owed to third parties, governmental fines and penalties, Environmental Liabilities, employment claims and/or any costs, expenses, claims or other liability relating to action taken by Operator (i) in breach of, and subject to, the Turnkey Removal Agreement or Contract Operating Agreement or (ii) arising due to the negligence, gross negligence or willful misconduct of Operator, in each case in Operator's capacity as "Contractor" under the Turnkey Removal Agreement or as "Operator" under the Contract Operating Agreement, as applicable; and

(2)  Any costs, damages, fines, penalties or liabilities (including Environmental Liabilities and Decommissioning Costs) related to any Orphan Assets; and

(3)  The premiums for any organizational or areawide bonds for the Company.

(b)     To the extent Company incurs any Covered Operator Costs, it shall provide written Notice to Operator and CUSA detailing such costs.  Operator shall pay to Company the applicable Covered Operator Costs contained in such Notice by the later of (i) thirty (30) days prior to the date that such costs are due, or (ii) thirty (30) days following the date of such Notice.

### Section 5.3     Other Decommissioning Costs.  In the event that the Turnkey Removal Agreement does not apply to a particular Asset for whatever reason, including the fact that the Turnkey Removal Agreement has terminated with respect to a particular Asset in accordance with its terms (a "Non-Covered Asset"):

11

(a)      Operator shall remain liable for Decommissioning all Orphan Assets to Final Completion in accordance with the terms of Section 3.1(b).

(b)      Operator, in its capacity as "Operator" under the Contract Operating Agreement, will remain the contract operator with respect to such Non-Covered Asset until (x) with respect to a Non-Covered Asset that is a Terminated Property, a decommissioning contractor is engaged pursuant to Section 5.3(c) and such decommissioning contractor assumes operational control of such Asset or (y) with respect a Non-Covered Asset that is an Operating Property, the date that is three (3) months following the termination of the Turnkey Removal Agreement with respect to such Non-Covered Asset, upon the expiration of which period such Non-Covered Asset will be removed from the scope of the Contract Operating Agreement and Operator and Company will enter into a new agreement in the form attached hereto as Exhibit C, pursuant to which Operator will act as contract operator with respect to such Non-Covered Asset (subject to Section 5.3(c)).

(c)      With respect to a particular Non-Covered Asset, CUSA shall have the right to use any of the following type of funds contained in the Escrow Account to fund Decommissioning Costs associated with a Decommissioning Project for such Asset: (i) Available Funds, (ii) Contributed Predecessor Funds attributable to such Asset, and (iii) Recovered Bond Proceeds attributable to such Asset.  With respect to a particular Non-Covered Asset, CUSA shall have the option, but not the obligation, to fund any Decommissioning Costs associated with a Decommissioning Project on such Non-Covered Asset that are not covered by amounts available in the Escrow Account under this Section 5.3(c) with respect to such Non-Covered Asset, either through deposit to the Decommissioning Escrow Account or otherwise.  CUSA shall provide Notice to Company of the applicable amount available in the Decommissioning Escrow Account for a particular Decommissioning Project by no later than ten (10) days prior to the targeted start date for work for such Decommissioning Project.  Upon written Notice from Company of Decommissioning Costs that are due and payable with a respect to a Non-Covered Asset, subject to the foregoing provisions of this Section 5.3(c), CUSA shall transfer funds from the Decommissioning Escrow Account (pursuant to Section 2.3(a)) equivalent to the amount contained in such Notice, payable to Company or to the applicable decommissioning contractor, as applicable; provided that CUSA and Company shall work together in good faith to coordinate the amount and timing of distribution of the applicable funds.

**Section 5.4     Certain Covenants**. Each Party shall use commercially reasonable efforts:

(a)      to cause Company to be made "decommissioning operator" (or provided functionally equivalent status) of the Terminated Properties, including engaging with BSEE to reach an agreement memorializing that Company shall be "decommissioning operator" (or provided functionally equivalent status) with respect to the Terminated Properties, in each case, to the extent permitted by BSEE and applicable Law.

(b)      to seek to recover Recovered Bond Proceeds and Contributed Predecessor Funds with respect to the Assets to the extent available under Law, prior to or following Final Completion with respect to any applicable Asset (or part thereof); provided that Company and Operator shall obtain the written consent of CUSA prior to entering settlement negotiation(s) or agreeing to a

12

settlement and/or initiating dispute resolution with respect to Recovered Bond Proceeds and Contributed Predecessor Funds.

(c)     To execute, in conjunction execution of this Agreement, the BOEM-0150 "Assignment of Record Title in Federal OCS Oil and Gas Lease" document attached as Exhibit D to effectuate the transfer of record title from CUSA to Company of Ship Shoal 175, OCS-G05550.

**Section 5.5     Additional Bonding**. CUSA shall use its commercially reasonable efforts to assist Company with obtaining bonding; provided that CUSA shall have no obligation to contribute any funds towards obtaining such bonding.

**Section 5.6     Set-Off**. In the event Operator has an unpaid balance due to CUSA or Company for any reason under any Material Project Contract, and that unpaid balance remains due and unpaid for ninety (90) days, CUSA and/or Company expressly reserves the right to set-off any amounts due to Operator under the Turnkey Removal Agreement or the Contract Operating Agreement (including any amount payable under this Agreement) against such amounts.

**Section 5.7     Limitations**. Notwithstanding any other provision contained herein, unless otherwise agreed (i) CUSA shall not be required to fund or pay Operator any portion of Decommissioning Costs of any Decommissioning Project in an amount that is in excess of CUSA's equitable share of Decommissioning Costs that is directly attributable to CUSA's (and its Affiliate's) prior ownership of the applicable underlying oil and gas leases as an Existing Predecessor thereof, and (ii) CUSA shall not be required to fund or pay Operator any portion of Decommissioning Costs of any Decommissioning Project that is not conducted under the Turnkey Removal Agreement.  With respect to the foregoing, and notwithstanding any other provision in contained herein, unless otherwise agreed by CUSA in writing, the Company Working Interest for a particular Asset shall never exceed the working interest percentage that is directly attributable to CUSA's (and its Affiliate's) prior ownership of the applicable underlying oil and gas leases as an Existing Predecessor thereof, which such working interest percentage is set out on Exhibit E attached hereto.

## ARTICLE VI.     TERM OF AGREEMENT

**Section 6.1     Term**. Subject to Section 6.2, the term of this Agreement shall be from the Effective Date until Final Completion has been achieved for all Assets, provided that the following provisions shall survive termination: Articles V through IX.

**Section 6.2     Termination of Contract Operating Agreement and Turnkey Removal Agreement**. In the event that the Turnkey Removal Agreement terminates in its entirety, then Article III of this Agreement shall terminate upon the effective date of such termination; provided that Article III shall continue to apply to any rights or obligations that accrued prior to the effective date of such termination.  In the event that the Contract Operating Agreement terminates in its entirety, then Article IV of this Agreement shall terminate upon the effective date of such termination; provided that Article IV shall continue to apply to any rights or obligations that accrued prior to the effective date of such termination.

13

## ARTICLE VII.        MISCELLANEOUS

**Section 7.1    Notices**. Any notice, request, instruction, correspondence or other document to be given hereunder by any Party to another (herein collectively called "Notice") shall be in writing and delivered (i) in person, (ii) by courier service or by overnight delivery service in each case that requires acknowledgement of receipt, (iii) mailed by certified mail, postage prepaid and return receipt requested, or (iv) delivered by electronic mail and expressly acknowledged as received by return electronic mail, as follows:

If to Company:

> Fieldwood Energy IV LLC
> 2000 W. Sam Houston Parkway S., Suite 1200
> Houston, Texas 77042
> Attn: Sole Manager
> Phone: [__]
> Email: [__]

If to Operator:

> Mako Buyer LLC
> 2000 W. Sam Houston Pkwy S. Suite 1200
> Houston, Texas 77042
> Attn:   Thomas R. Lamme
> Phone: (713) 969-1107
> Email: TLamme@fwellc.com

If to CUSA:

> Chevron U.S.A. Inc.
> 100 Northpark Blvd
> Covington, LA 70443
> Attn:   Land Manager
> Phone: (985) 773-6538
> Email:  tdwebre@chevron.com

Notice given by personal delivery or courier shall be effective upon actual receipt. Notice given by mail shall be effective upon actual receipt or, if not actually received, the fifth Business Day following deposit with the U.S. Post Office. Notice given by electronic mail shall be effective upon acknowledgement of receipt.  If a date specified herein for giving any Notice or taking any action is not a Business Day (or if the period during which any Notice is required to be given or any action taken expires on a date which is not a Business Day), then the date for giving such Notice or taking such action (and the expiration date of such period during which notice is required to be given or action taken) shall be the next day which is a Business Day. Any Party may change any

14

address, electronic or otherwise, to which Notice is to be given to it by giving Notice as provided above of such change of address; provided that copies to CUSA may not be amended, discontinued or delayed without CUSA's express written consent.

**Section 7.2**     <u>**No Joint Venture or Partnership**</u>. Nothing in this Agreement is intended to create, or shall be construed as creating, a partnership, joint venture, association for profit or other business entity between or among the Parties, and for federal and state income tax purposes, the Parties elect to be excluded from the application of the provisions of Subchapter K, Chapter 1, Subtitle A of the Internal Revenue Code of 1986, as amended, as permitted and authorized by Section 761 of said Code and the regulations promulgated thereunder.

**Section 7.3**     <u>**No Fiduciary Duty**</u>. It is expressly understood and agreed that this Agreement is a purely commercial transaction between the Parties and that nothing stated herein shall operate to create any fiduciary duty which a Party shall owe to the other Party.

**Section 7.4**     <u>**Confidentiality**</u>.

(a)     Each Party acknowledges that during term of this Agreement, it will have access to and become acquainted with trade secrets, proprietary information and confidential information belonging to each other Party that are not generally known to the public, including, but not limited to, information concerning business plans, operating practices and methods, financial statements, personnel information, contracts, and other information provided pursuant to this Agreement that each other Party treats as confidential, in any format whatsoever (including oral, written, electronic or any other form or medium) (collectively, "<u>Confidential Information</u>").  In addition, each Party acknowledges that: (i) each other Party has invested, and continues to invest, substantial time, expense and specialized knowledge in developing its Confidential Information; (ii) the Confidential Information provides each such other Party with a competitive advantage over others in the marketplace; and (iii) each such other Party would be irreparably harmed if the Confidential Information were disclosed to competitors or made available to the public. Without limiting the applicability of any other agreement to which each Party is subject, each such Party may not, without the each other Party's consent, directly or indirectly, disclose or use (other than solely for the purposes of complying with a Party's obligations under this Agreement or the other Material Project Contracts) at any time, including, without limitation, use for personal, commercial or proprietary advantage or profit, any Confidential Information of which such Party is or becomes aware. Each Party must take all appropriate steps to safeguard the Confidential Information in its possession and to protect it against disclosure, misuse, espionage, loss and theft.

(b)     Nothing contained in this <u>Section 7.4</u> will prevent a Party from disclosing Confidential Information:  (i) upon the order of any court or administrative agency; (ii) upon the request or demand of any regulatory agency or authority having jurisdiction over such Party; (iii) to the extent compelled by legal process or required or requested pursuant to subpoena, interrogatories or other discovery requests; (iv) to the extent necessary in connection with the exercise of any remedy hereunder; (v) to the extent necessary to perform such Party's obligations under a Material Project Contract; or (vi) to the Party's employees, agents, representatives and advisors who, in the reasonable judgment of the Party, need to know such Confidential Information and agree to be bound by the provisions of this <u>Section 7.4</u> (provided that such Party will remain

15

liable for any breach of this <u>Section 7.4</u> by any such Person); provided, that in the case of clause (i), (ii) or (iii), the applicable Party must notify the other Parties of the proposed disclosure as far in advance of such disclosure as practicable (but in no event make any such disclosure before notifying the other Parties) and use reasonable efforts to ensure that any Confidential Information so disclosed is accorded confidential treatment satisfactory to the other Parties, when and if available.

(c)     With respect to a particular Party, the restrictions of <u>Section 7.4</u> will not apply to Confidential Information that: (i) is or becomes generally available to the public other than as a result of a disclosure by such Party in violation of this Agreement; (ii) is or has been independently developed or conceived such Party without use of Confidential Information and outside of its duties hereunder; or (iii) becomes available to such Party or any of its employees, agents, representatives and advisors on a non-confidential basis from a source other than the other Parties or any of their employees, agents, representatives and advisors, provided, that such source is not known by the Party to be bound by a confidentiality agreement with one of the other Parties.

(d)     The obligations of each Party under this <u>Section 7.4</u> shall survive the termination of this Agreement.

(e)     Each Party hereby acknowledges that the provisions of <u>Section 7.4</u> are reasonable and necessary to protect the legitimate interests of the other Parties and that any violation of such provisions would result in irreparable injury to the other Parties. In the event of a violation of the provisions of this <u>Section 7.4</u>, each Party further agrees that the other Parties will, in addition to all other remedies available to it, be entitled to equitable relief by way of injunction and any other legal or equitable remedies without any requirement to post bond.

**Section 7.5**     <u>**Costs and Expenses**</u>.  Each Party shall bear its own costs and expenses in relation to the negotiation and preparation of this Agreement.

**Section 7.6**     <u>**Further Assurances**</u>.  The Parties shall at their own cost and expense execute and deliver such further documents and instruments and shall take such other actions as may be reasonably required or appropriate to evidence or carry out the intent and purposes of this Agreement.

**Section 7.7**     <u>**Authority of Parties/Signatories**</u>. Each Party represents and warrants to the other that the execution and delivery of this Agreement and the performance of such Party's duties have been duly authorized and that this Agreement is a valid and legal agreement binding on such Party and enforceable in accordance with its terms.

**Section 7.8**     <u>**Public Announcements**</u>.  No Party shall issue any public announcement or statement concerning this Agreement or make any use of the names, image, logos, or trademarks of any other Party or any of its Affiliates without obtaining the prior written consent of the other Parties, except as may be determined to be required or reasonably necessary by the Company or Operator in connection with the Bankruptcy Cases.

16

**Section 7.9** <u>Entire Agreement</u>. This Agreement (together with the Appendix and Exhibits hereto) constitutes the entire agreement among the Parties with respect to the subject hereof and supersedes any other representations, understandings or agreements (whether written, oral or otherwise) that may have been made or entered into by the Parties or any of their respective Affiliates relating to the transactions contemplated hereby or the subject hereof.

**Section 7.10** <u>Successors and Assignments</u>. No Party may assign, directly or indirectly, all or any part of its rights or obligations under this Agreement to any Person, including in the event of a reorganization, merger, consolidation or asset sale, without the prior written consent of the other Parties, which may be withheld at such Party's sole discretion; *provided*, *however*, that the foregoing shall not apply if Operator assigns this Agreement in total (i) along with all of its personnel who are performing any part of the Work (as defined in <u>Appendix 1</u> to the Turnkey Removal Agreement) to an Affiliate, provided that no such assignment by Operator to an Affiliate shall relieve Operator of its obligations under this Agreement, or (ii) to an acquirer of all or substantially all of Operator's business or all or substantially all of Operator's employees providing Work (as defined in <u>Appendix 1</u> to the Turnkey Removal Agreement) and the Services (as defined in the Contract Operating Agreement); provided that, with respect to an assignment under item (ii), any such assignment must be made in conjunction with an assignment of Operator's interest in the Turnkey Removal Agreement and the Contract Operating Agreement and, following any such assignment, CUSA shall have the right to trigger any and all termination rights of Company and/or CUSA under the Turnkey Removal Agreement and/or the Contract Operating Agreement without any liability accruing to Company or CUSA thereunder except as required thereunder. Notwithstanding any provision to the contrary, Operator may not assign its interest in the Turnkey Removal Agreement or the Contract Operating Agreement to a particular transferee unless such assignment also includes an assignment of 100% of Operator's interest in this Agreement, the Turnkey Removal Agreement and the Contract Operating Agreement to such transferee and is performed in conjunction with the requirements of this <u>Section 7.10</u>. Any attempted assignment in breach of this <u>Section 7.10</u> is void.

**Section 7.11** <u>Amendment</u>. This Agreement may be amended or modified in whole or in part, and terms and conditions may be waived, only by a duly authorized agreement in writing which makes reference to this Agreement executed by each Party.

**Section 7.12** <u>Construction</u>.

All article, section, schedule, and exhibit references used in this Agreement are to articles and sections of, and Appendix and Exhibits to, this Agreement, unless otherwise specified. The appendix and exhibits attached to this Agreement constitute a part of this Agreement and are incorporated herein for all purposes.

Unless otherwise indicated, with respect to a Party, the terms "ordinary course of business" or "ordinary course" shall be deemed to refer to the ordinary conduct of business in a manner consistent with the past practices and customs of such Party.

If a term is defined as one part of speech (such as a noun), it shall have a corresponding meaning when used as another part of speech (such as a verb). Terms defined in the singular have the

17

#94614673v11
WEIL:\97967346\16\45327.0007

corresponding meanings in the plural, and vice versa. Unless the context of this Agreement clearly requires otherwise, words importing the masculine gender shall include the feminine and neutral genders and vice versa. The words "include", "includes" or "including" do not limit the preceding terms and shall be deemed to be followed by the words "without limitation." The words "hereof," "hereto," "hereby," "herein," "hereunder" and words of similar import, when used in this Agreement, shall refer to this Agreement as a whole and not to any particular section or article in which such words appear. The term "or" is not exclusive.

The terms "day" and "days" mean and refer to calendar day(s). The terms "year" and "years" mean and refer to calendar year(s).

Each Party has participated in the negotiation and drafting of this Agreement, and, if an ambiguity should arise, this Agreement shall be construed as if drafted jointly by the Parties and no presumption or burden of proof shall arise favoring or burdening any Party by virtue of the authorship of any of the provisions in this Agreement.

The captions in this Agreement are for convenience only and shall not be considered a part of or affect the construction or interpretation of any provision of this Agreement.

All references to currency herein shall be to, and all payments required hereunder shall be paid in, United States Dollars.

The serial comma is sometimes included and sometimes omitted. Its inclusion or omission shall not affect the interpretation of any phrase.

**Section 7.13   Severability**. If any provision of this Agreement is held invalid or unenforceable by any court of competent jurisdiction, the other provisions of this Agreement shall remain in full force and effect. The Parties further agree that if any provision contained herein is, to any extent, held invalid or unenforceable in any respect under the Laws governing this Agreement, they shall take any actions necessary to render the remaining provisions of this Agreement valid and enforceable to the fullest extent permitted by Law and, to the extent necessary, shall amend or otherwise modify this Agreement to replace any provision contained herein that is held invalid or unenforceable with a valid and enforceable provision giving effect to the intent of the Parties to the greatest extent legally permissible.

**Section 7.14   Counterparts**. This Agreement may be executed in two or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument. Any .pdf or other electronic transmission hereof or signature hereon shall, for all purposes, be deemed originals.

**Section 7.15   Third Party Beneficiaries**.  No Person who is not a Party to this Agreement has any rights under this Agreement or may enforce any provision in this Agreement.

**Section 7.16   Waivers**.  No waiver by any Party of this Agreement's terms, provisions or conditions is effective unless specifically evidenced in writing and signed by or on behalf of the Party granting such waiver. Any Party's failure to pursue remedies for breach of this Agreement,

#94614673v11
WEIL:\97967346\16\45327.0007

or payment by any Party of invoices, does not constitute a waiver by any such Party of any breach of this Agreement or raise any defense against claims against a Party for breach of this Agreement. The waiver, failure to pursue remedies or to require the performance of any agreement or obligation under this Agreement, does not constitute (1) a waiver of any breach of this Agreement, or (2) a waiver of a later breach of any such agreement or obligation.

**Section 7.17   <u>Conflict</u>**.   In the event of a conflict between the provisions of this Agreement and the provisions of any other Material Project Contract, the provisions of this Agreement shall control.

<div align="center">

### ARTICLE VIII.   <u>COMPLIANCE</u>

</div>

**Section 8.1   <u>Compliance with Laws</u>**. In performing their obligations hereunder and under each Material Project Contract, each Party shall observe and comply with, and shall ensure that all members of its Party Group observe and comply with, all federal, state and local laws, orders, rules and regulations which are now or may in the future become applicable to such Party (or such employee, agent, representative or subcontractor, as the case may be) or to the performance of such obligations.

**Section 8.2   <u>Conflict of Interest and Improper Influence</u>**. In performing their obligations hereunder and under each Material Project Contract, no member of any Party Group will (A) give to or receive from any director, employee, or agent of any other Party or their individual Affiliate in connection with such obligations, any gift, entertainment, or other benefit of more than nominal cost or value, or any commission, fee, or rebate, (B) enter into any business arrangement with any individual known by such member of a Party Group to be a director, employee or agent (excluding attorneys and accountants) of any other Party or their individual Affiliate without such other Party's prior written consent, (C) offer or make any payment, or offer or give anything of value to any Government Official, or any immediate family member of a Government Official, any political party to influence any act or decision by any Government Official, government, government instrumentality, party, or Public International Organization, or to gain any other advantage for any Party Group arising out of this Agreement, or (D) offer or make any payment, or offer or give anything of value to any Person if the Party Group member knows or has reason to believe that any portion of the payment or thing of value will be given directly, indirectly, or through a third party to any Government Official, any immediate family member of any Government Official, or any political party.

(a)   **Representation and Warranty**. Each Party represents and warrants for itself and on behalf of each member of its Party Group (acting in their capacities as such) that no event has occurred prior to the Effective Date which, had it occurred after the Effective Date, would constitute a violation of <u>Section 8.2</u>.

(b)   **Reporting Violations and Termination**. Each Party shall immediately notify each other Party, as applicable, of any violation of <u>Section 8.2</u> or breach of the warranty under <u>Section 8.2(a)</u>. Notwithstanding any other provision of this Agreement, CUSA or Company, as applicable, may terminate this Agreement at any time for any violation of <u>Section 8.2</u>, or breach of the warranty under <u>Section 8.2(a)</u> by Operator, and neither CUSA nor Company is obligated to make

<div align="center">19</div>

any payment to Operator after the date of such violation or event, except in satisfaction of payment obligations that accrued on or prior to the date of such violation or event, and that CUSA or Company has determined are not directly or indirectly related to such violation or event.

Section 8.3    **Controls and Records**.

(a)    In performing their obligations hereunder and under each Material Project Contract, each Party shall ensure that all members of its Party Group establish and maintain all internal controls and Records that are necessary and appropriate in accordance with good management practice to achieve the following.

(1)  Ensure the accuracy and completeness of Party's invoices and of the Records required to be kept under this Agreement.

(2)  Ensure and to record accurately and completely compliance with Section 8.2(a), and detection of any other improper conduct by members of its Party Group.

(3)  Ensure and to record accurately and completely compliance with all other obligations of Party under this Agreement and the other Material Project Contracts.

(4)  Record accurately and completely the performance by such Party of its obligations under this Agreement and the other Material Project Contracts, and the liability for and calculation of all amounts payable by CUSA or Company to Operator under this Agreement or the other Material Project Contracts.

(5)  Record accurately and completely all amounts payable by members of its Party Group to other members of its Party Group, or other Person in connection with the performance of such Party's obligations under the Material Project Contracts.

(b)    Each Party shall maintain complete, accurate and current detailed Records of all costs and documentation of equipment, materials, supplies, labor and any other items or aspects of performing their obligations hereunder and under each Material Project Contract for not less than two (2) years after final termination of this Agreement or the other Material Project Contracts; provided, however, if any Claim related to such obligations is made by any Person or entity within such two (2) year period, then such Party shall retain such Records until final resolution of such Claim.  Each Party shall grant to each other Party, its authorized representatives, its authorized invitees and/or public accounting firm selected by such Party, the right, at a reasonable time, to inspect, audit, examine and copy any applicable Records or documents of such Party as may be necessary to confirm that the requirements of this Agreement or another Material Project Contract are met, including to verify the validity and correctness of the charges reflected on any invoice and to protest or dispute any such charge; *provided*, that no Party shall request more than one inspection, audit or examination in any twelve month period.

Section 8.4    **Trade Sanctions Compliance**. Each Party shall provide each other Party with ninety (90) days' advance Notice of the names and addresses of any member of its Party Group which may be the target of, or owned or subject to control by, any country, institution,

<center>20</center>

organization, entity, or Person that is subject to economic sanctions or any trade restrictions imposed by the U.S. government; debarred or excluded or declared ineligible to participate in U.S. government contracts, or contracts, grants, or other programs financed in whole or part by the U.S. government; or listed by the U.S. Departments of Commerce or State as an entity which U.S. persons may not engage in export or re-export related transactions.

**Section 8.5** **Import and Export Charges**. Each Party is responsible for importing and exporting all equipment that such Party requires to perform its obligations hereunder and under each Material Project Contract. Each Party is solely responsible for all import and export charges and any other lawfully payable charged related to the import and export of such Party's equipment.

## ARTICLE IX.     DISPUTE RESOLUTION

**Section 9.1** **Governing Law**. This Agreement is governed by and interpreted in accordance with the laws of the State of Texas, without regard to its choice of law rules, except that the substantive and procedural rules of the Federal Arbitration Act, 9 U.S.C. §§ 1-16 (the "Act") govern Section 9.5.

**Section 9.2** **Resolution of Disputes**. The Parties shall exclusively and finally resolve any dispute between them using direct negotiations, mediation, and then arbitration as set out in this Article IX.

**Section 9.3** **Direct Negotiations.** If a dispute arises, a Party seeking to initiate the dispute resolution process shall give Notice to the other Party (or Parties) to the dispute setting out, in writing and in detail, the issues in dispute and the value of the disputed amount. The Parties to the dispute shall attempt to resolve the dispute through direct negotiations in a meeting between the Parties to the dispute, attended by individuals with decision-making authority, which must take place within thirty (30) days, or as otherwise agreed to by such Parties, from the date the Notice was sent.

**Section 9.4** **Mediation.** If the dispute cannot be resolved by direct negotiations within thirty (30) days of initiation of the resolution process, a Party to the dispute may initiate mediation by giving notice to the other Party (or Parties) to the dispute. Mediation must be attended by a representative from each such Party with decision-making authority, and the proceeding must take place in Houston, Texas.

**Section 9.5** **Arbitration Proceedings.** If the Parties to a dispute fail to resolve the dispute within sixty (60) days from Notice of mediation, any Party (or Parties) the dispute may initiate binding arbitration by giving Notice to the other Party (or Parties) to the dispute. The arbitration must be conducted in accordance with the International Institute for Conflict Prevention and Resolution ("CPR") Rules. To the extent of any conflicts between the Act or the CPR Rules and the provisions of this Agreement, the provisions of this Agreement prevail. The CPR is the appointing authority. The place of arbitration must be Houston, Texas.

The following provisions will apply to arbitration proceedings, in each case with respect to the Parties to a particular dispute:

21

(A) One arbitrator (or three (3) arbitrators if the monetary value of the dispute is more than US five million dollars ($5,000,000_ or its currency equivalent) will conduct the arbitral proceedings in English. If there is a dispute whether the monetary value exceeds the US five million dollars ($5,000,000), then the number of arbitrators must be three (3).

(B) The maximum number of witnesses each Party may call to give evidence on its behalf, including by oral testimony, declaration or witness statement, is five (5) witnesses of fact and three (3) expert witnesses.

(C) The existence of a dispute and any negotiations, mediation, and arbitration proceedings between the Parties in relation to any dispute are confidential and the Parties shall not make any disclosure to any third party. Any information, documents, or materials, created or produced for the purposes of, or used in, negotiations, mediation, or arbitration of a dispute are confidential and the Parties shall not disclose them to any third party unless there is a legal or regulatory obligation to make a disclosure (but the disclosure must be limited to the extent necessary to comply with that legal or regulatory obligation), or to the extent required to enforce or challenge an award in bona fide legal proceedings before a state court or other judicial authority.

(D) The arbitrator(s) has no authority to appoint or retain expert witnesses for any purpose unless agreed to by the Parties. The arbitrator(s) may not act as *amiable compositeur or ex aequo et bono*.

(E) In resolving any dispute among the Parties, the arbitrator(s) shall have the authority to construe the Parties' rights and obligations under any Material Project Contract.

(F) The Parties intend that regardless of which Party prevails, all arbitration fees and costs must be split equally, between the Parties, and each Party shall bear its own costs of legal representation, witness expenses, and ancillary costs.

(G) The award is final and binding, and except for proceedings under Section 9.5(H), the Parties agree to waive their rights to: (1) apply to the court for determination of a point of Law; and (2) any form of appeal, review or recourse in respect of any such award to any court or other judicial authority, to the extent that such waiver may be validly made.

(H) The Parties may apply to a court with appropriate jurisdiction for any of the following without waiving its arbitration rights:

  (1) Interim measures as necessary until appointment of the arbitrator(s) or pending determination by the arbitrator(s).
  (2) Preserving property pending determination by the arbitrator(s).
  (3) Enforcing judgment entered on an award over the Person or assets of the non-prevailing Party.

22

(4)   Enforcing <u>Section 9.5(C)</u> and preventing any information, documents or materials used in those proceedings from being used or disclosed by that Party for any purpose other than enforcement of <u>Section 9.5(C)</u>.

(I)   Proceedings to (1) preserve property pending determination by the arbitrator(s), (2) enforce <u>Section 9.5(C)</u>, or (3) enforce judgment entered on an award may be brought in any court having jurisdiction over the Person or assets of the non-prevailing Party. The prevailing Party may seek, in any court having jurisdiction, judicial recognition of the award, or order of enforcement or any other order or decree that is necessary to give full effect to the award.

**Section 9.6    Consolidation of Disputes.** The Parties agree that the arbitration agreements contained the Material Project Contracts are compatible and that two or more arbitrations pending under the CPR Rules may be consolidated into the arbitration commenced first.  The arbitrator(s) of the arbitration commenced first shall determine whether to consolidate and may shall take into account any circumstances it considers to be relevant, including whether one or more arbitrators have been appointed in more than one of the arbitrations and, if so, whether the same or different persons have been appointed; the existence of common issues of Law or fact creates the possibility of conflicting decisions in the separate arbitration proceedings; prejudice resulting from a failure to consolidate is not outweighed by the risk of undue delay or prejudice to the rights of or hardship to parties opposing consolidation; and consolidation would serve the interests of justice and efficiency. Any request for consolidation shall be made within sixty (60) days of the commencement of the later arbitration.  The monetary value of the consolidated dispute shall be considered in determining the number of arbitrators pursuant to <u>Section 9.5(A)</u>.

[*Remainder of Page Intentionally Left Blank. Signature Page(s) to Follow.*]

23

IN WITNESS WHEREOF, this Agreement has been signed by each of the Parties as of the date first above written.

**OPERATOR**:

Mako Buyer LLC


By: _____
Name: _____
Title: _____


**COMPANY:**

Fieldwood Energy IV LLC


By: _____
Name: _____
Title: _____


**CUSA**:

Chevron U.S.A. Inc.


By: _____
Name: _____
Title: _____


Omnibus Agreement Signature Page

## Appendix 1

## Definitions

Capitalized terms used in this Agreement shall have the meanings set forth in this Appendix.

1) "Act" has the meaning attributed to such term in Section 9.1.

2) "Additional FWE IV Properties" means those Assets described on Exhibit F attached hereto.

3) "Additional FWE IV Property Funds" has the meaning attributed to such term in Section 2.2(c)(2).

4) "Affiliate" means, with respect to a Party means any Person or entity that controls, is controlled by or is under common control with such Party where control means the direct or indirect power to direct the management of the entity at issue.  For the avoidance of doubt, (i) neither the Company nor any of its direct or indirect subsidiaries shall constitute an Affiliate of Operator for purposes of this Agreement, and (ii) neither the Operator nor any of its direct or indirect subsidiaries shall constitute an Affiliate of Company for purposes of this Agreement.

5) "Agreement" has the meaning attributed to such term in the Preamble.

6) "Allocated Available Funds" has the meaning attributed to such term in Section 3.1(e).

7) "Assets" means, collectively, the Terminated Properties and the Operating Properties.

8) "At-Cost Allocated Funds" has the meaning attributed to such term in Section 3.2(d)(4).

9) "At-Cost Invoice Due Date" has the meaning attributed to such term in Section 3.2(d)(3).

10) "At-Cost Project" has the meaning attributed to such term in the Turnkey Removal Agreement.

11) "Available Funds" means an amount in dollars equivalent to, at the time of such designation: (i) the total funds contained in the Decommissioning Escrow Account; *minus* (ii) the aggregate amount of Escrowed Project Funds contained in the Decommissioning Escrow Account.

12) "Available Project Funds" means, with respect to a particular Decommissioning Project, an amount in dollars equivalent to: (i) the equitable portion (as determined in good faith by CUSA and the Company) of any Contributed Predecessor Funds that have been contributed into the Decommissioning Escrow Account for such Decommissioning Project that are attributable to the Turnkey Amount for such Decommissioning Project, *plus* (ii) any Recovered Bond Proceeds that have been contributed into the Decommissioning Escrow Account for such Decommissioning Project to the extent CUSA is the beneficiary of such

Omnibus Agreement
Appendix 1 – Definitions

Recovered Bond Proceeds (and any other Recovered Bond Proceeds that the Company and CUSA agree to apply as Available Project Funds), *plus* (iii) any Allocated Available Funds for such Decommissioning Project that have been designated to such Decommissioning Project by CUSA in accordance with <u>Section 3.1(e)</u>.

13) "<u>Bankruptcy Cases</u>" has the meaning attributed to such term in the Recitals.

14) "<u>BOEM</u>" means the Bureau of Ocean Energy Management of the United States Department of the Interior, or any successor agency.

15) "<u>BSEE</u>" means the Bureau of Safety and Environmental Enforcement of the United States Department of the Interior, or any successor agency.

16) "<u>Business Day</u>" mean any day other than a Saturday or a Sunday or a day on which federally chartered banking institutions in Houston, Texas, are authorized by Law to close, but for purposes of Notices or other communications given hereunder, means before 4:00 p.m. Central Time on such day in the city of Houston, Texas.

17) "<u>COA Payment Request</u>" has the meaning attributed to such term in <u>Section 4.1</u>.

18) "<u>Committed WI Payment</u>" means, with respect to a particular Other WI Party's share of the total Other WI Turnkey Payment associated with a particular Decommissioning Project, any amount(s): (i) that are paid by or on behalf of such Other WI Party into the Decommissioning Escrow Account, or (ii) that are subject to a contractual commitment by such Other WI Party and enforceable by one or more of the Parties to make such payment to Company or to contribute such payment into the Decommissioning Escrow Account for the purpose of funding the Decommissioning Project; provided that in each case the applicable Other WI Party shall also be subject to a contractual commitment by such Other WI Party that is enforceable by one or more of the Parties to contribute, as an additional payment into the Decommissioning Escrow Account, such Other WI Party's share of any applicable shortfall in the total Other WI Turnkey Payment for such Decommissioning Project caused by an increase in the Turnkey Amount for such Decommissioning Project that occurs after the Target Funding Date in accordance with the terms of the Turnkey Removal Agreement.

19) "<u>Company</u>" has the meaning attributed to such term in the Preamble.

20) "<u>Company Working Interest</u>" means, subject to <u>Section 5.7</u>, with respect to a particular Asset, a percentage expressed as a decimal equivalent to: (i) for Operating Properties, the current working interest ownership percentage held by Company in the applicable Asset, and (ii) for Terminated Properties, the undivided percentage ownership interest in the applicable Asset that was (a) held by FWE (or its Affiliates) immediately prior to the expiration of termination of such applicable oil and gas lease, and then (b) actually allocated to Company under the Plan of Merger. For the purposes of this definition, "working interest" means the cost bearing interest in the applicable underlying Asset, which shall either be the interest associated with the "operating rights" or the "record title" of the applicable underlying oil and gas lease, as such terms are defined in 43 CFR § §3100.0-5 (Definitions).

Omnibus Agreement
Appendix 1 – Definitions

21) "<u>Confidential Information</u>" has the meaning attributed to such term in <u>Section 7.4(a)</u>.

22) "<u>Contract Operating Agreement</u>" means that certain Contract Operating Agreement, of even date herewith, between Operator and Company.

23) "<u>Contributed Predecessor Funds</u>" means funds contributed by an Existing Predecessor for Decommissioning a particular Asset which are not made as part of an Other WI Turnkey Payment.

24) "<u>Covered Operator Costs</u>" has the meaning attributed to such term in <u>Section 5.2(a)</u>.

25) "<u>CPR</u>" has the meaning attributed to such term in <u>Section 9.5</u>.

26) "<u>CUSA At-Cost Payment</u>" has the meaning attributed to such term in <u>Section 3.2(d)(3)(i)</u>.

27) "<u>CUSA At-Cost Shortfall Payment</u>" has the meaning attributed to such term in <u>Section 3.2(d)(5)</u>.

28) "<u>CUSA Covered Payment</u>" has the meaning attributed to such term in <u>Section 3.1(c)</u>.

29) "<u>CUSA Turnkey Payment</u>" means, with respect to a particular Decommissioning Project, an amount in dollars equivalent to (i) the Turnkey Amount for such Decommissioning Project *multiplied by* the Company Working Interest for the applicable Asset; *plus* (ii) any CUSA Covered Payment applicable to such Decommissioning Project, *minus*; (iii) any Available Project Funds applicable to such Decommissioning Project.

30) "<u>Decommissioning</u>" and its derivatives mean all plugging, replugging, abandonment, re-plugging and re-abandonment, equipment removal, disposal, remediation, reclamation, or restoration associated with the properties and assets included in or burdened by the Assets, as applicable, including all plugging and abandonment, removal, dismantling, decommissioning, surface and subsurface restoration, reclamation, site clearance, and disposal (including any associated pre-planning, planning and engineering) of the FWE IV Wells or the FWE IV Facilities, fixtures, platforms, caissons, flowlines, pipelines, structures, and personal property of whatever kind located on or under, related to, or associated with operations and activities conducted by whomever with respect to each of the Assets, as applicable, and the flushing, pickling, burial, removal, and capping of all associated flowlines, field transmission and gathering lines, the restoration of the surface, site clearance, any proper disposal of related waste materials and Hazardous Substances, and obligations to obtain plugging exceptions for any of the FWE IV Wells with a current plugging exception  in accordance therewith, all in accordance with 30 CFR 250 Subpart Q and all other applicable Laws, the terms and conditions of each of the FWE IV Leases or similar leasehold interests, beneficial interests, easements and the FWE IV Leases.

31) "<u>Decommissioning Costs</u>" means any and all cost associated with Decommissioning Obligations for a particular Asset (or part thereof).

32) "<u>Decommissioning Escrow Account</u>" means that certain escrow account established pursuant to the Decommissioning Escrow Agreement.

33) "<u>Decommissioning Escrow Agreement</u>" means that certain escrow agreement governing the account established on the Effective Date to collect and safeguard funds to pay for certain future Decommissioning Costs of Company, dated the Effective Date, by and between Company, CUSA and Escrow Agent.

34) "<u>Decommissioning Obligations</u>" means any and all costs, obligations, liabilities, damages, losses, and claims arising out of or attributable to the payment or performance of achieving Final Completion.

35) "<u>Decommissioning Project</u>" means a project to Decommission an Asset (or part thereof) as allocated under the Turnkey Removal Agreement or pursuant to 30 CFR 250 Subpart Q or otherwise, as the context requires.

36) "<u>Effective Date</u>" has the meaning attributed to such term in the Preamble.

37) "<u>Environmental Laws</u>" means, the Comprehensive Environmental Response, Compensation, and Liability Act, 42 U.S.C. § 9601 et seq. ("CERCLA"); the Resource Conservation and Recovery Act, 42 U.S.C. § 6901 et seq.; the Federal Water Pollution Control Act, 33 U.S.C. § 1251 et seq.; the Clean Air Act, 42 U.S.C. § 7401 et seq.; the Hazardous Materials Transportation Act, 49 U.S.C. § 5101 et seq.; the Toxic Substances Control Act, 15 U.S.C. §§ 2601 through 2629; the Oil Pollution Act, 33 U.S.C. § 2701 et seq.; the Emergency Planning and Community Right to Know Act, 42 U.S.C. § 11001 et seq.; the Endangered Species Act, 16 U.S.C. § 1531 et seq.; the Safe Drinking Water Act, 42 U.S.C. §§ 300f through 300j; the Marine Mammal Protection Act, 16 U.S.C. § 1361 et seq.; the Marine Protection, Research and Sanctuaries Act, 16 U.S.C. § 1431 et seq. and 33 U.S.C. § 1401 et seq.; the Outer Continental Shelf Lands Act, 43 U.S.C. § 1331 et seq., and the National Environmental Policy Act, 42 U.S.C. § 4321 et seq., the Occupational Safety and Health Act, 29 U.S.C. ch. 15 § 651 et seq. (and all Occupational Safety and Health Administration (OSHA) promulgated standards), and the Hazardous Materials Transportation Act, 49 U.S.C. §§ 5101 et seq., in each case as amended in effect as of the Effective Date (or amended after the Effective Date), and all similar Laws in effect as of the Effective Date (or amended or passed after the Effective Date) of any Governmental Authority having jurisdiction over the property, operation, activity, or condition in question addressing pollution, protection of the environment, biological resources, Hazardous Substances, occupational safety, product registrations, hazard communication, Decommissioning Obligations, or the generation, storage, transportation, disposal, or Release of Hazardous Substances.

38) "<u>Environmental Liabilities</u>" means any and all claims, actions, damages, remediation, obligations, liabilities, environmental response costs, natural resource damages, costs to cure, cost to investigate or monitor, restoration costs, costs of remediation or removal, corrective action, injunctive relief, settlements, penalties, fines, and attorneys' and consultants fees and expenses arising out of or related to any violations or non-compliance with or liability under any Environmental Laws, including any contribution obligation under CERCLA or any other Environmental Law, or any cost, responsibility, or liability incurred related to or airing from a claim or cause of action by a Governmental Authority or Person, attributable to any environmental liabilities, any Release of Hazardous

Substances, or any other environmental condition or circumstance with respect to the ownership or operation of the Assets, including conditions of FWE IV Facilities not in compliance with Laws promulgated by the Environmental Protection Agency, BOEM, BSEE or the United States Coast Guard.

39) "Escrow Agent" means U.S. Bank National Association.

40) "Escrowed Project Funds" means, with respect to a particular Decommissioning Project, an amount in dollars equivalent to the total amount of (i) any CUSA Turnkey Payment paid into the Decommissioning Escrow Account for such Decommissioning Project, (ii) any Contributed Predecessor Funds or Recovered Bond Proceeds paid into the Decommissioning Escrow Account for such Decommissioning Project, (iii) any Committed WI Payment associated with such Decommissioning Project, and (iv) any Allocated Available Funds contained in the Decommissioning Escrow Account that are designated by CUSA in accordance with Section 3.1(e) for such Decommissioning Project.

41) "Excluded CUSA Costs" has the meaning attributed to such term in Section 5.1.

42) "Existing Predecessor" means, with respect to a particular Asset, a Person that is a predecessor-in-interest in the chain of title with respect to such Asset, or the legal successor-in-interest to any such Person.

43) "Final Completion" has the meaning ascribed to such term in the Turnkey Removal Agreement

44) "Fully Committed" has the meaning attributed to such term in Section 3.2(a).

45) "FWE" means Fieldwood Energy LLC.

46) "FWE IV Facilities" means all platforms and facilities, including all associated processing systems, buildings, compressors, meters, tanks, machinery, tools, personal property, equipment (including spars, trees, PLETs, jumpers, flowlines, risers, umbilicals, control assemblies, and production handling equipment), pipelines, gathering lines, water lines, tank batteries, pipeline capacity, other water gathering, transportation, or disposal infrastructure and equipment, frac tanks, ponds, metering facilities, interconnections, and other inventory, boats, vehicles, fixtures, improvements, and other property (whether real, immovable, personal, movable, mixed or otherwise), contained within the Assets, to the extent of Company's interest therein.

47) "FWE IV Leases" has the meaning ascribed to such term in the Plan of Merger.

48) "FWE IV Wells" means all hydrocarbon wells, CO2 wells, injection wells, disposal wells or other wells contained within the Assets, to the extent of Company's interest therein.

49) "Governmental Authority" means any court, tribunal, arbitrator, body, agency, division, board, bureau, commission or any other similar entity exercising executive, legislative, judicial, regulatory, or administrative functions of government, or any subdivision of any

of the foregoing, whether federal, state, county, municipal, tribal, local or foreign, in each case with competent jurisdiction.

50) "Government Official" means any officer or employee of any government (including federal, state, local, and national governments), Public International Organization, any department, agency, company, or other instrumentality of any government or Public International Organization, or any candidate for political office.

51) "Hazardous Substances" means any material,  product, pollutant, contaminant, dangerous or toxic substance, hazardous or extremely hazardous substance or chemical, or otherwise hazardous material or waste defined as "hazardous waste", "hazardous substance," "pollutant," or "hazardous material" under applicable Environmental Laws, including chemicals, pollutants, contaminants, wastes, or toxic substances that are classified as hazardous, toxic, radioactive, or otherwise are regulated by, or form the basis for Environmental Liability under, any applicable Environmental Law, including hazardous substances under CERCLA, and oil of any kind or in any form, oil waste, petroleum and any fraction thereof, petroleum by-products and components, hydrocarbons, hydrocarbon waste, naturally occurring radioactive material, produced water, polychlorinated biphenyls, and asbestos.

52) "Implementation Agreement" means that certain Implementation Agreement, dated [___], by and between CUSA and FWE.

53) "Initial Safe Out Funds" has the meaning attributed to such term in Section 2.2(c)(1).

54) "Safe Out Work" means the performance of necessary preparatory activities to prepare an Asset into a mechanical and operational state such that  said Asset is ready to be Decommissioned.

55) "Initial Safe Out Work" means Safe Out Work conducted under Section 3.4 until the Safe Out Funds are fully expended.

56) "Invoice" has the meaning attributed to such term in the Contract Operating Agreement.

57) "Invoice Payment" has the meaning attributed to such term in the Contract Operating Agreement.

58) "Laws" means any and all applicable laws, statutes, codes, constitutions, ordinances, decrees, writs, injunctions, orders, judgments, principles of common law, rules, licenses, authorizations, or regulations (including Environmental Laws and Notices to Lessees,) that are promulgated, issued, or enacted by any Governmental Authority having jurisdiction.

59) "LLC Agreement" means the limited liability company operating agreement of Company.

60) "Material Project Contracts" means the following agreements: (i) this Agreement, (ii) the Contract Operating Agreement, (iii) the Turnkey Removal Agreement, (iv) the LLC Agreement, (v) the NPI Conveyance, and (vi) the Escrow Agreement, and "Material Project Contract" means any such agreement.

61) "<u>Notice</u>" has the meaning attributed to such term in <u>Section 7.1</u>.

62) "<u>Non-Covered Asset</u>" has the meaning set forth in <u>Section 5.3</u>.

63) "<u>NPI Conveyance</u>" means the Net Profits Conveyance, of even date herewith made by Company to the Escrow Agent.

64) "<u>NPI Payments</u>" means the net profits payments made under the NPI Conveyance.

65) "<u>Operating Properties</u>" means those certain FWE IV Leases that have not expired or terminated as of the Effective Date (as such term is defined in the Plan of Merger) and the FWE IV Assets (as such term is defined in the Plan of Merger) associated therewith.

66) "<u>Operator</u>" has the meaning set forth in the Preamble.

67) "<u>Orphan Asset</u>" means a FWE IV Well or FWE IV Facility that was drilled or constructed on a date after CUSA or its Affiliates divested its interests in the underlying lease and specifically (i) includes those Assets set forth on Exhibit A but (ii) excludes those Assets set forth in <u>Exhibit A-2</u>.

68) "<u>Other At-Cost Payment</u>" has the meaning attributed to such term in <u>Section 3.2(d)(2)</u>.

69) "<u>Other Party Working Interest</u>" means, with respect to a particular Asset, a percentage expressed as a decimal equivalent 1.00 minus the Company Working Interest for such Asset, expressed as decimal.

70) "<u>Other WI Party</u>" means, with respect to a particular Asset, (i) for Operating Properties, each Person with a current working interest ownership in the applicable Asset (or any Existing Predecessor to such Person with respect to such working interest ownership), and (ii) for Terminated Properties, each Person that held an ownership interest in the applicable Asset immediately prior to the expiration of termination of the applicable underlying oil and gas lease associated with such Asset (or any Existing Predecessor to such Person with respect to such ownership interest).

71) "<u>Other WI Turnkey Payment</u>" means, with respect to a particular Decommissioning Project, an amount in dollars equivalent to the Turnkey Amount for such Decommissioning Project, *multiplied by* the Other Party Working Interest for the applicable Asset.

72) "<u>Party</u>" and "<u>Parties</u>" has the meaning attributed to such term in the Preamble.

73) "<u>Party Group</u>" means, with respect to each Party, mean, individually and collectively, such Party, its parent, its Affiliates, its and their, joint venturers, contractors and subcontractors (of any tier), and all of their respective employees, officers, directors, agents, representatives, subcontractors, insurers and the subrogees of all such parties.

74) "<u>Payment Milestone</u>" has the meaning attributed to such term in the Turnkey Removal Agreement.

75) "<u>Person</u>" means any individual, corporation, partnership, limited liability company, association, joint stock company, trust, estate, joint venture, firm, association, unincorporated organization, Governmental Authority, or any other entity.

76) "<u>Plan</u>" has the meaning attributed to such term in the Recitals.

77) "<u>Plan of Merger</u>" means that certain Agreement and Plan of Merger dated [   ], pursuant to which Fieldwood Energy III LLC was divisively merged into the Company and Fieldwood Energy III LLC which was attached as an exhibit to the Implementation Agreement .

78) "<u>Prior Escrow Funds</u>" has the meaning attributed to such term in the Implementation Agreement.

79) "<u>Public International Organization</u>" means an international organization formed by governments or other public international organizations, whatever the form of organization and scope of competence.

80) "<u>Recovered Bond Proceeds</u>" means the proceeds of any surety bonds or private bonds payable for Decommissioning Costs associated with an Asset that are recovered by the Parties.

81) "<u>Records</u>" means information in any recorded form, including electronic, that relates to this Agreement or another Material Project Contract, as applicable.

82) "<u>Reimbursable Costs</u>" has the meaning attributed to such term in the Contract Operating Agreement

83) "<u>Release</u>" means any discharge, emission, spilling, leaking, pumping, pouring, injecting, dumping, burying, leaching, migrating, abandoning, or disposing into or through the environment of any Hazardous Substance, including the abandonment or discarding of barrels, containers, and other closed receptacles containing any Hazardous Substance.

84) "<u>Revenue Account</u>" has the meaning attributed to such term in the Contract Operating Agreement

85) "<u>Safe Out Funds</u>" has the meaning attributed to such term in <u>Section 3.4</u>.

86) "<u>Surety Counterparty</u>" has the meaning attributed to such term in <u>Section 3.6</u>.

87) "<u>Target Funding Date</u>" means thirty (30) days prior to the Target Start Date for such Decommissioning Project.

88) "<u>Target Start Date</u>" means the date that a particular Decommissioning Project is targeted to start as determined pursuant to the Turnkey Removal Agreement.

89) "<u>Terminated Properties</u>" means those certain FWE IV Leases that have expired or terminated as of the Effective Date (as such term is defined in the Plan of Merger) and the FWE IV Assets (as such term is defined in the Plan of Merger) associated therewith.

90) "<u>Third Party Payment</u>" has the meaning attributed to such term in the Contract Operating Agreement

91) "<u>Turnkey Amount</u>" has the meaning attributed to such term in the Turnkey Removal Agreement.

92) "<u>Turnkey Removal Agreement</u>" means that certain Turnkey Removal Agreement, of even date herewith, between Operator, Company and CUSA.

Omnibus Agreement
Appendix 1 – Definitions

**EXHIBIT A**

<u>Orphan Assets</u>

1. OCS-G01529, Ship Shoal Block 252, Well F004, API No. 177124067400
2. OCS-G16535, Viosca Knoll 113, Pipeline Segment No. 19427

**EXHIBIT A-2**

# REDACTED

# EXHIBIT B

[RESERVED]

## EXHIBIT C

Form of Contract Operating Agreement

See attached.

## TRANSITION SERVICES AGREEMENT

This Transition Services Agreement dated and effective as of _____, 2021 (the "Effective Date") (this "Agreement") is by and between Mako Buyer LLC, a Delaware company (the "Service Provider") and [_____] a [state] [entity] (the "Predecessor"). Service Provider and Predecessor are sometimes referred to collectively as the "Parties" and individually as a "Party".

**WHEREAS**, pursuant to the final confirmation order in respect of the Chapter 11 cases of Fieldwood Energy LLC and its debtor Affiliates (as defined below) (collectively the "Debtors") in Case No. 20-33948 the Debtors have abandoned certain oil and gas properties and assets for which Predecessor is a predecessor-in-interest;

**WHEREAS**, Predecessor has requested that Service Provider provide certain operational maintenance, monitoring, technical, and administrative services with respect to the Asset (as defined below), upon the terms and conditions set forth herein, for three hundred sixty-five (365) days from the exit of the Chapter 11 cases, and Service Provider has agreed to do so; and

**WHEREAS**, other than as otherwise agreed by the Parties, during the Service Term (as defined below) and during any transition activities, Predecessor will be responsible for and shall pay all costs associated with the Asset and/or the Services (as defined below), including but not limited to third party costs and costs associated with Services provided by Service Provider's employees.

**NOW, THEREFORE**, in consideration of the premises and of the mutual promises, covenants, conditions, and agreements contained herein, and for other valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties hereby agree as follows:

## ARTICLE I.  TRANSITION SERVICES

Section 1.1    **Services**. Subject to the terms of this Agreement, Service Provider shall provide or cause to be provided the transition services described on Exhibit A (collectively, the "Services") for all of the oil and gas assets described in Schedule 1 attached hereto (the "Asset") in accordance with the standard of performance set forth in Section 1.2 below for the period set forth in Article IV, subject to the provisions of Article V.  The Services will be provided to Predecessor in connection with the continued maintenance and monitoring of the Asset and, as necessary, to assist in the transition of the maintenance and monitoring of the Asset to Predecessor or another service provider and terminate the Services hereunder on or before the end of the Service Term.

Section 1.2    **Standard of Performance**. Subject to the terms of this Agreement, Service Provider shall perform or cause to be performed the Services (a) as a reasonably prudent operator as the contract service provider hereunder would perform such Services, (b) in a good and workmanlike manner consistent with past practices related to the Asset, (c) with due diligence and dispatch, and (d) in compliance with all Laws (as defined below), licenses, authorizations and permits; **PROVIDED, HOWEVER, EXCEPT AS EXPRESSLY PROVIDED HEREIN, IN NO EVENT SHALL SERVICE PROVIDER HAVE ANY OBLIGATIONS OR LIABILITY TO ANY PREDECESSOR GROUP MEMBER EXCEPT WITH RESPECT TO SERVICE**

**PROVIDER'S INDEMNITY OBLIGATIONS AS PROVIDED IN SECTION 6.2.**  For purposes of this Agreement, "Laws" means any and all applicable laws, statutes, codes, constitutions, ordinances, decrees, writs, injunctions, orders, judgments, principles of common law, rules, licenses, authorizations, or regulations (including environmental laws) that are promulgated, issued, or enacted by any Governmental Authority (as defined below) having jurisdiction. In providing the Services to the Predecessor, Service Provider may use, at its discretion, its own personnel or the personnel of any of its Affiliates or employ the services of contractors, subcontractors, vendors, or other third parties.  For purposes of this Agreement, "Affiliates" with respect to a Party means any person or entity that controls, is controlled by or is under common control with such Party where control means the direct or indirect power to direct the management of the entity at issue.

      **Section 1.3**    **Independent Contractor**. At all times during the performance of Services by Service Provider, all persons performing such Services who shall be in the employ and/or under the control of Service Provider or its Affiliates (including agents, contractors, temporary employees, and consultants) shall be independent from Predecessor and not employees of Predecessor and shall not be entitled to any payment, benefit, or perquisite directly from Predecessor on account of such Services, including, but not limited to, group insurance and participation in any employee benefit and pension plans maintained by Predecessor or any Affiliate of Predecessor. Service Provider shall be responsible for all employee benefits and payroll taxes of its employees performing the Services. Service Provider will not be required to provide any Services the provision of which would violate applicable Laws. Notwithstanding any other provision contained elsewhere in this Agreement, in all cases where the Service Provider is performing Services under this Agreement offshore the State of Louisiana or are otherwise covered by the Louisiana Worker's Compensation Act, La. Rev. Stat. § 23.1021 et seq., the Parties acknowledge and agree that all such operations pursuant to this Agreement are an integral part of and are essential to the ability of Predecessor to generate Predecessor's goods, products, or services, and that whenever Services and work are performed hereunder in or offshore Louisiana, or the Louisiana Workers' Compensation Act may be applicable, the employees of Service Provider and their contractors providing such Services or performing such work, if any, whether direct, statutory, borrowed, or otherwise, are statutory employees of Predecessor in accordance with the Louisiana Worker's Compensation Act, La. Rev. Stat. § 23.1021 et seq. and the protections afforded a statutory employer under Louisiana Law shall apply. In such event, Service Provider agrees that Predecessor is and shall be deemed a statutory employer of Service Provider's employees for the sole purposes of La. Rev. Stat. § 23.1061(A)(3), as the same may be amended from time to time.

      **Section 1.4**    **Records**.  Service Provider shall use commercially reasonable efforts to maintain or cause to be maintained true and correct records of all receipts, invoices, reports, and such other documents as are customarily maintained by Service Provider for its own operations relating to each Service rendered hereunder for a period of the later of (i) two (2) years following the end of the Service Term or (ii) such other time required by applicable Law. All such receipts, invoices, reports, and other documents are the property of Predecessor.

      **Section 1.5**    **Limitation of Services**.  Notwithstanding anything herein to the contrary, Predecessor acknowledges certain personnel of Service Provider and/or its Affiliates involved in

the provision of the Services may leave the employment of such Service Provider and/or its Affiliates or terminate their employment or contract with such Service Provider or its Affiliates during the term of this Agreement. The Services shall not include providing any technical evaluations regarding any proposals for drilling, reworking, or other capital expenditure projects, or the new development of any assets. Service Provider makes no representation or warranty regarding the ability of Service Provider and/or its Affiliates to retain any employees, contractors, or subcontractors and neither Service Provider nor any of its Affiliates shall have any liability to Predecessor as to the result of the loss of any such employees, contractors, or subcontractors. Service Provider and its Affiliates shall use commercially reasonable efforts to report all information accurately but shall not be responsible for the accuracy or completeness of any information furnished by any other party for inclusion in any reports or for results obtained by use of any inaccurate information so furnished.

(A) Notwithstanding any other provision in this Agreement to the contrary:

(i) Service Provider shall have no obligation to be designated with any applicable state, local, or federal governmental entity (each individually, a "Governmental Authority"; and collectively, "Governmental Authorities") as a designated operator, designated applicant, designated payor, or responsible party for the Asset;

(ii) Service Provider shall have no obligation to post any bond or other security on behalf of Predecessor or to make any payment directly out of Service Provider's own funds for any Services;

(iii) Service Provider shall have no obligation to provide any Service for which a third party is obligated or permitted (under a joint operating agreement, contract services agreement or otherwise) to provide the same service for Predecessor; provided, however, that Service Provider's use of a subcontractor to perform any part of the Services shall not excuse Service Provider from the obligation to perform such Services;

(iv) Predecessor acknowledges and agrees that it will be responsible for and shall provide any required bond or security for the Services;

(v) if Service Provider reasonably believes that it cannot perform any Service without creating a breach of an existing agreement to which Predecessor is a party or the Asset is bound as of the Effective Date, and/or violating the Law, then Service Provider shall have no obligation to perform such Service and such Service shall no longer be included  within the Services, and Service Provider shall give prompt, written Notice (as defined below) of such issue to Predecessor, prior to the discontinuation of such Service, with detailed descriptions of the agreement in question and the breach and/or violation Service Provider believes will be created.  In the event such possible breach and/or violation is cured or remedied within thirty (30) days following Predecessor's receipt of such Notice, Service Provider may perform such Service only insofar as performance would not create the breach or violation; and

(vi) In the performance of the Services, Service Provider must obtain consent of Predecessor to perform any of the following actions on behalf of Predecessor: execute, amend, waive, release, extend, terminate, or otherwise modify any of the

governmental approvals, leases, or other agreements related to the Asset (other than an agreement in the ordinary course of business with a service provider using agreements substantially in the form previously used or other forms reasonably approved by Predecessor).

**Section 1.6    Service Provider's Access to the Asset**.  To the extent necessary for Service Provider to perform the Services, Predecessor shall provide Service Provider unrestricted access to the Asset and shall execute any instrument, license, certificate, or other agreement reasonably necessary to provide such access.

**Section 1.7    Designated Operator.**  To the extent allowed or required under applicable Law, as soon as reasonably possible after the Effective Date, Predecessor shall become the designated operator of the Asset for decommissioning purposes.

## ARTICLE II. COMPENSATION

**Section 2.1    Compensation for Services**. During the Service Term, Predecessor shall pay to and reimburse Service Provider the amounts determined pursuant to Section 3.1 below for the provision of the Services to Predecessor.

## ARTICLE III.        PAYMENT AND DEFAULT

**Section 3.1    Submission of Invoice**. Service Provider shall submit a written invoice (the "Invoice") to Predecessor, along with copies of any third party invoices and other supporting details evidencing the expenses satisfactory to Predecessor, on or before the fifteenth (15th) Business Day of each month setting forth an itemized accounting of the actual costs incurred in the preceding month, or as applicable, the preceding months for which an Invoice was not issued, for the Services provided by Service Provider.  For the purposes of this Agreement, "Business Day" shall mean any day other than a Saturday or a Sunday or a day on which federally chartered banking institutions in Houston, Texas, are authorized by Law to close, but for purposes of Notices or other communications given hereunder, means before 4:00 p.m. on such day in the city of Houston, Texas.

For shared costs, such as salaried and hourly personnel, IT systems, and other office related infrastructure and overhead, Service Provider shall allocate those costs as follows:

For "people" costs, Service Provider shall bill Predecessor for actual time incurred by its full-time employees in performing Services hereunder rounded up to the nearest hour.  The hourly rate of each Service Provider employee shall be equal to the annual payroll cost (including salary, vacation pay, target bonus, 401(k) match, and payroll taxes) of the employee divided by 2,080 hours.

For illustrative purposes, two actual employees are shown below:

4



For all other shared costs identified below, Service Provider shall bill Predecessor for the proportionate use in the performance of the Services hereunder.  The proportionate use shall be determined by the Total Hours Billed divided by the Total Employee Hours. "Total Hours Billed" is equal to the total number of hours recorded by Service Provider's full-time employees in performing Services hereunder and "Total Employee Hours" is equal to Service Provider's average daily headcount of full-time employees performing Services hereunder during the applicable month multiplied by eight hours multiplied by the number of Business Days in the month.

All other shared costs include and are limited to the following:
(i)  IT-related costs (IT systems and software)
(ii)  Healthcare and other benefits (benefits cost and administration)
(iii)  Communications

For example, assuming an average daily headcount of 275 full-time employees performing Services hereunder and 20 Business Days in the applicable month, Total Employee Hours for the month would equal 44,000 hours (275 employees x 20 Business Days x 8 hours).  If the Total Hours Billed for the month is 100, Predecessor's proportionate use would be 0.23%; and Service Provider would bill Predecessor for 0.23% of these other shared costs.

Any third party costs associated with the Services will be billed to the Service Provider and charged to the Predecessor on monthly invoices.

**Section 3.2**    **Payment of Invoices**. Absent manifest error in inclusion or omission of items or calculations contained in an Invoice (if there is a manifest error, Predecessor will correct such error and show such recalculation on or before the date when payment would otherwise be due), the Predecessor shall pay within thirty (30) Business Days of Predecessor's receipt of an Invoice the undisputed amounts invoiced to Predecessor by wire transfer of immediately available funds to the bank account designated on the Invoice by Service Provider. Service Provider shall be liable for any state or local sales or use taxes required to be paid in connection with its receipt of such payment of Invoice amounts. Adjustment credit or debits shall be shown on the Invoice next succeeding the Invoice in which the adjustment is made. Service Provider shall provide reasonable back-up and supporting documents related to any Invoice within five (5) Business Days of Predecessor's written request. Any preexisting obligation to make payment for the Services provided hereunder or out-of-pocket costs of Service Provider shall survive the termination of this Agreement until paid. Predecessor shall have access to and the right to audit all records supporting such Invoice amounts for the period set forth in Section 1.4 and Section 7.4.

**Section 3.3**    **Predecessor Default**. It shall constitute a default on behalf of Predecessor (an "Predecessor Default") if Predecessor fails to timely pay any Invoice amount for Services

provided pursuant to this Agreement in accordance with the provisions of this <u>Article III</u> or fails to perform any covenants of Predecessor under this Agreement, which failure continues for at least fifteen (15) days following receipt of written Notice to Predecessor that such Invoice amount is past due; provided, however, that if Predecessor cannot reasonably cure such failure (other than for the payment of money or providing indemnity defense) within such fifteen (15) day period, no Predecessor Default shall be deemed to occur provided Predecessor demonstrates that it has diligently taken reasonable steps to cure such failure within such fifteen (15) day period and diligently prosecutes such cure to completion. Upon the occurrence of a Predecessor Default, Service Provider may, in addition to all other remedies available at Law or at equity, (i) suspend all or any portion of the provision of Services hereunder to Predecessor until such time as the Predecessor Default is cured and all unpaid, undisputed Invoice amounts for Services to Service Provider under this Agreement for such suspended Services are paid in full or (ii) terminate this Agreement effective immediately and be entitled to any amounts owed to Service Provider by Predecessor hereunder together with interest on such amount at a rate equal to 5% per annum, calculated daily on the basis of a year of 365 days and the actual number of days elapsed (the "<u>Rate</u>") from the date due, until such undisputed amounts, together with  all accrued and unpaid interest thereon, are paid in full.

   **Section 3.4** <u>**Service Provider Default**</u>. Subject to <u>Section 3.3</u> above, it shall constitute a default on behalf of Service Provider (an "<u>Service Provider Default</u>") if Service Provider fails to provide a Service to Predecessor in accordance with the terms and conditions of this Agreement, which failure is not by reason of an Predecessor Default or Force Majeure and continues for at least fifteen (15) days following receipt of written Notice to Service Provider; provided, however, that if Service Provider cannot reasonably cure such failure within such fifteen (15) day period, no Service Provider Default shall be deemed to occur provided Service Provider demonstrates that it has diligently taken reasonable steps to cure such failure within such fifteen (15) day period and diligently prosecutes such cure to completion.  Upon the occurrence of a Service Provider Default, Predecessor may, in addition to any other rights or remedies available at Law, in equity, or by contract, terminate this Agreement within the time frame specified by Predecessor in a written Notice to Service Provider so terminating this Agreement.

   **Section 3.5** <u>**Third Person Services**</u>. Predecessor recognizes that Service Provider may hire third parties to provide certain portions of the Services, and Predecessor shall be responsible for the payment to Service Provider of amounts due by Service Provider to such third parties, which are incurred from and after the Effective Date with respect to the Asset.  In the event Service Provider incurs costs of a third party, such costs will be included in an Invoice, and Predecessor shall reimburse Service Provider at the same time and in the same manner as the payment described in <u>Section 3.2</u>.

   **Section 3.6** <u>**Sales Taxes**</u>.  Except as otherwise provided in Section 3.2, any sales, use, value-added or similar taxes paid or incurred hereunder for Services that Service Provider is required to pay or incur as a result of such Services shall be passed on to, and be the obligation of, Predecessor as an explicit surcharge and shall be paid by Predecessor in addition to any payments for Services as set forth in <u>Section 3.1</u> above, whether included in the applicable Invoice, or added retroactively, such that the amount received by the Service Provider shall be as if no such taxes had been imposed. If Predecessor submits to Service Provider a timely and valid resale or other

exemption certificate sufficient to support the exemption from sales taxes, then such taxes will not be added to the Invoices for Services payable pursuant to this Article III; provided, however, that if Service Provider is ever required to pay such taxes, Predecessor will promptly reimburse Service Provider for such tax, including any interest, penalties, and attorney's fees assessed thereon by the applicable Governmental Authority. The Parties will reasonably cooperate to contest any invalid sales or use taxes imposed on the Services and to minimize the imposition of any such sales taxes.

## ARTICLE IV.        TERM OF AGREEMENT

**Section 4.1      Term**. The term of this Agreement (the "Service Term") shall be a period beginning on the Effective Date until the earlier to occur of (i) the date Predecessor, in its sole discretion, is ready and able to take over operations on the Asset and (ii) a date which is 365 days from the Effective Date, subject to Article V.  No Services shall be provided after the expiration of the Service Term, except by the mutual written agreement of the Parties.

## ARTICLE V.  CESSATION OF SERVICES

**Section 5.1      Discontinuation of Services**. Predecessor may, with or without cause and for any or no reason, terminate the Service Term and discontinue any Service by giving Service Provider not less than ten (10) days prior written Notice of such discontinuation. Predecessor shall be liable to Service Provider for all costs, expenses, losses, and obligations Service Provider remains obligated to pay for (i) Services provided through the date of such termination or discontinuation under the terms hereunder or (ii) the actual and documented costs incurred under any other existing contract directly as a result of the termination or discontinuation of such Services, provided that Service Provider has an obligation to mitigate such costs and any such costs billed to Predecessor pursuant to clause (ii) shall be limited to the average monthly charge billed to Predecessor under Section 3.1 using the previous three (3) calendar months to determine such average monthly charge.

**Section 5.2      Effect of Termination of Services**. Upon the discontinuation or termination of all Services hereunder, this Agreement shall terminate and be of no further force and effect, except as to obligations accrued prior to the date of discontinuation or termination; provided, however, that Section 1.4, Articles VI and VII, and Predecessor's audit rights under Section 3.2 and Section 7.4 of this Agreement shall survive such discontinuation or termination.

**Section 5.3      Transition of Operations**.  The Parties agree to preserve as a priority during any transition of operations the safety of individuals and the environment in compliance with all Laws and Governmental Authorities.  Prior to and through the termination of this Agreement, Service Provider shall make commercially reasonable efforts to transition the performance of the Services to a third party or to Predecessor, including providing commercially reasonable assistance to Predecessor to facilitate such transition; provided that the applicable compensation for Services so transitioned shall continue until the actual termination thereof, and Predecessor shall pay any actual, documented out-of-pocket costs incurred for the transition of such Services.  Upon request, Predecessor shall provide Service Provider with an update as to the status of activities to transition the Services.  At Predecessor's request and expense, Service Provider shall deliver all documents, records, and other data to the extent related to the Assets that

are in the Service Provider's possession.  Alternatively, at Predecessor's request and expense, Service Provider shall make such documents available for Predecessor to retrieve.  Service Provider may keep copies of any documents, records or other data it is required to maintain by any Governmental Authority.

**Section 5.4    Predecessor's Access to Employees and Asset**.  In order that Predecessor may become familiar with the Services as described in Exhibit A provided by the employees and agents of Service Provider and make orderly arrangements for the assumption of the obligations for the provision of such Services after the termination of this Agreement, Predecessor Group, upon the prior written consent of Service Provider, which consent will not be unreasonably withheld, shall be entitled to access the Asset and to consult with the employees or agents of Service Provider providing the Services during normal business hours throughout the Service Term, provided such consultations do not unreasonably interfere with the performance by those employees of their duties.

## ARTICLE VI.        INDEMNITIES; DISCLAIMERS

**Section 6.1    Predecessor's Indemnification Obligations**. EXCEPT AS PROVIDED IN SECTION 6.2, NOTWITHSTANDING ANY KNOWLEDGE OR INVESTIGATION OF ANY PERSON, PREDECESSOR AGREES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAWS, TO ASSUME, RELEASE, INDEMNIFY, DEFEND, AND HOLD HARMLESS SERVICE PROVIDER, AND ITS EQUITY-HOLDERS, PARENT, AFFILIATES, AND SUBSIDIARY COMPANIES TOGETHER WITH ITS AND ALL OF THEIR RESPECTIVE OFFICERS, DIRECTORS, MANAGERS, EMPLOYEES, COUNSEL, CONTRACTORS, SUBCONTRACTORS, AGENTS, AND REPRESENTATIVES, AND THE RESPECTIVE SUCCESSORS, SPOUSES, RELATIVES, DEPENDENTS, HEIRS, AND ESTATE OF ANY OF THE FOREGOING (EXCLUDING ANY MEMBERS OF THE PREDECESSOR GROUP) (THE "SERVICE PROVIDER GROUP") AGAINST AND FROM ALL CLAIMS, DEMANDS, COMPLAINTS, LOSSES, FINES, PENALTIES, CITATIONS, DAMAGES, CAUSES OF ACTION, SUITS, JUDGMENTS, ORDERS, EXPENSES, OR COSTS, INCLUDING COURT COSTS, REASONABLE ATTORNEYS' FEES, AND EXPERT WITNESSES' FEES (COLLECTIVELY "DAMAGES") CAUSED BY OR ARISING OUT OF OR RESULTING FROM THIS AGREEMENT OR THE PROVISION OF SERVICES PURSUANT TO THIS AGREEMENT, BUT ONLY TO THE EXTENT SUCH DAMAGES ARE NOT CAUSED BY ANY MEMBER OF SERVICE PROVIDER GROUP'S GROSS NEGLIGENCE OR WILLFUL MISCONDUCT. **THE FOREGOING INDEMNITY OBLIGATIONS SHALL APPLY WHETHER OR NOT SUCH DAMAGES ARISE OUT OF (i) NEGLIGENCE (INCLUDING SOLE, SIMPLE, CONCURRENT, ACTIVE, OR PASSIVE NEGLIGENCE OR OTHERWISE), BUT EXPRESSLY NOT INCLUDING GROSS NEGLIGENCE OR WILLFUL MISCONDUCT OF SERVICE PROVIDER OR ANY OTHER MEMBER OF THE SERVICE PROVIDER GROUP, (ii) STRICT LIABILITY, OR (iii) THE UNSEAWORTHINESS OF ANY VESSEL OR THE UNAIRWORTHINESS OF ANY AIRCRAFT EXCEPT IN THE EVENT THAT SUCH DAMAGES OR VIOLATION IS CAUSED BY OR RESULTS FROM THE GROSS NEGLIGENCE OR WILLFUL MISCONDUCT OF ANY MEMBER OF THE SERVICE PROVIDER GROUP.**

Debtors' Exhibit No. 34
Page 316 of 910

**Section 6.2**   <u>**Service Provider's Indemnity Obligations.**</u>   SERVICE PROVIDER SHALL, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAWS, ASSUME, RELEASE, INDEMNIFY, DEFEND, AND HOLD HARMLESS PREDECESSOR, AND ITS EQUITY-HOLDERS, PARENT, AFFILIATES, AND SUBSIDIARY COMPANIES, CO-LESSEES, CO-OWNERS, PARTNERS, JOINT VENTURERS, TOGETHER WITH ITS AND ALL OF THEIR RESPECTIVE OFFICERS, DIRECTORS, MANAGERS, EMPLOYEES, IN-HOUSE LEGAL COUNSEL, AGENTS, AND REPRESENTATIVES, AND THE RESPECTIVE SUCCESSORS, SPOUSES, RELATIVES, DEPENDENTS, HEIRS, AND ESTATE OF ANY OF THE FOREGOING (EXCLUDING ANY MEMBERS OF THE SERVICE PROVIDER GROUP) (THE "<u>PREDECESSOR GROUP</u>") AGAINST AND FROM (A) ALL DAMAGES CAUSED BY OR ARISING OUT OF OR RESULTING FROM THE GROSS NEGLIGENCE OR WILLFUL MISCONDUCT OF ANY MEMBER OF THE SERVICE PROVIDER GROUP IN CONNECTION WITH THE PROVISION OF SERVICES UNDER THIS AGREEMENT, (B) ALL DAMAGES IN RELATION TO PERSONAL INJURY, DEATH, OR DISEASE OF ANY MEMBER OF THE SERVICE PROVIDER GROUP ARISING OUT OF OR RESULTING FROM THE PROVISION OF SERVICES UNDER THIS AGREEMENT, (C) ALL DAMAGES IN RELATION TO PROPERTY DAMAGE OF ANY MEMBER OF THE SERVICE PROVIDER GROUP ARISING OUT OF OR RESULTING FROM THE PROVISION OF SERVICES UNDER THIS AGREEMENT, (D) ALL DAMAGES (INCLUDING COSTS AND EXPENSES) IN RELATION TO GOVERNMENTAL FINES AND PENALTIES ASSESSED IN CONNECTION WITH ANY PERFORMANCE OF THE SERVICES RESULTING FROM THE NEGLIGENCE OR FAULT OF ANY MEMBER OF SERVICE PROVIDER, AND (E) ALL DAMAGES INCURRED BY THIRD PARTIES ARISING OUT OF OR RESULTING FROM THE PROVISION OF SERVICES UNDER THIS AGREEMENT. **THE INDEMNITY OBLIGATIONS IN SET FORTH IN THE FOREGOING CLAUSES (B) AND (C) SHALL APPLY WHETHER OR NOT SUCH DAMAGES ARISE OUT OF (i) NEGLIGENCE (INCLUDING SOLE, SIMPLE, CONCURRENT, ACTIVE, OR PASSIVE NEGLIGENCE OR OTHERWISE), BUT EXPRESSLY NOT INCLUDING GROSS NEGLIGENCE OR WILLFUL MISCONDUCT OF PREDECESSOR OR ANY OTHER MEMBER OF THE PREDECESSOR GROUP, (ii) STRICT LIABILITY, OR (iii) THE UNSEAWORTHINESS OF ANY VESSEL OR THE UNAIRWORTHINESS OF ANY AIRCRAFT EXCEPT IN THE EVENT THAT SUCH DAMAGES OR VIOLATION IS CAUSED BY OR RESULTS FROM THE GROSS NEGLIGENCE OR WILLFUL MISCONDUCT OF ANY MEMBER OF THE PREDECESSOR GROUP**

**Section 6.3**   <u>**Disclaimers**</u>.   NOTWITHSTANDING ANY OTHER TERM OF THIS AGREEMENT TO THE CONTRARY, SERVICE PROVIDER MAKES NO, AND DISCLAIMS ANY, REPRESENTATIONS AND WARRANTIES, EXPRESS, IMPLIED, OR STATUTORY, WITH RESPECT TO THIS AGREEMENT OR THE PERFORMANCE OR RESULTS OF THE SERVICES.   EXCEPT AS PROVIDED IN <u>Section 6.2</u> WITH RESPECT TO THE GROSS NEGLIGENCE OR WILLFUL MISCONDUCT OF SERVICE PROVIDER OR ANY OTHER MEMBER OF THE SERVICE PROVIDER GROUP IN THE PERFORMANCE OF SERVICES UNDER THIS AGREEMENT, SERVICE PROVIDER EXPRESSLY DISCLAIMS, AND PREDECESSOR AGREES THAT THE SERVICE PROVIDER GROUP SHALL BE FREE FROM, ALL LIABILITY AND RESPONSIBILITY FOR ANY REPRESENTATION,

Debtors' Exhibit No. 34
Page 317 of 910

WARRANTY, STATEMENT, OR INFORMATION WITH RESPECT TO THE SERVICES THAT IS MADE OR COMMUNICATED (ORALLY OR IN WRITING) TO ANY PREDECESSOR GROUP MEMBER (INCLUDING ANY OPINION, INFORMATION, PROJECTION, EVALUATIONS, OR ADVICE THAT MAY HAVE BEEN PROVIDED TO ANY PREDECESSOR GROUP MEMBER BY ANY SERVICE PROVIDER GROUP MEMBER).

**Section 6.4** **Laws; Application**.  The indemnification obligations in this Article VI are intended to comply with applicable Laws. To the extent such indemnification provisions are found to violate any applicable Law, or in the event any applicable Law is enacted or amended so as to cause these provisions to be in violation therewith, this Agreement shall automatically be amended to provide that the indemnification provided hereunder shall extend only to the maximum extent permitted by the applicable Law.

**Section 6.5** **Limitations**.  NOTWITHSTANDING ANY OTHER TERM OF THIS AGREEMENT TO THE CONTRARY, NO PARTY SHALL BE LIABLE TO ANY OTHER PARTY OR TO A MEMBER OF THE PREDCESSOR GROUP OR SERVICE PROVIDER GROUP UNDER THIS AGREEMENT FOR ANY PUNITIVE, EXEMPLARY, SPECIAL, INDIRECT OR CONSEQUENTIAL DAMAGE RESULTING FROM OR ARISING OUT OF THIS AGREEMENT.

### ARTICLE VII.        ADDITIONAL OBLIGATIONS

**Section 7.1** **Conflict of Interest**. In performing their obligations hereunder, no member of Service Provider Group will (A) enter into any business arrangement with any individual known by such member of Service Provider Group to be a director, employee or agent (excluding attorneys and accountants) of Predecessor or any of its Affiliates without Predecessor's prior written consent  or (B) give to or receive from any director, employee or agent of Predecessor or any of its Affiliates in connection with such obligations anything that is more than a nominal cost or value. Service Provider shall ensure that all members of Service Provider Group comply with this Agreement.

**Section 7.2** **Improper Influence**. No member of Service Provider Group may, directly or indirectly, offer or make any payment, or offer or give anything of value to any official or immediate family member of an official of any government, public international organization, or political party (including any officer or employee of any department, agency, or instrumentality of any government or public organization), or to any candidate for public office to influence their or its act or decision, or to gain any other advantage for Predecessor, its Affiliates, Service Provider Group, or any of them arising out of this Agreement.

**Section 7.3** **Pre-Contract Violations and Reporting**. Service Provider warrants that no event has occurred prior to the Effective Date, which if it had occurred after the Effective Date, would be a violation of Section 7.1 or Section 7.2. Service Provider shall immediately notify Predecessor of any violation of Section 7.1, Section 7.2 or Section 7.3. Nothing in this Agreement requires either Party to comply with Laws if such requirement would be inconsistent with United States ("U.S.") laws, including U.S. anti-boycott laws.

Debtors' Exhibit No. 34
Page 318 of 910

**Section 7.4**    **Records and Inspection**. Up until 24 months from the end of the calendar year in which this Agreement is completed or terminated, (A) Service Provider shall ensure that all members of Service Provider Group retain all records related to this Agreement (or until expiry of the statute of limitations for taxes or import or export charges) and (B) Predecessor may inspect at any time all records to confirm that the requirements of the Agreement are met.

**Section 7.5**    **Trade Sanctions Compliance**. Service Provider shall provide Predecessor with advance Notice of the names and addresses of any member of Service Provider Group who is or may be in the near future subject to economic sanctions or any trade restrictions imposed by the U.S. government; or debarred or excluded or declared ineligible to participate in U.S. government contracts, or contracts, grants, or other programs financed in whole or part by the U.S. government (collectively "Restricted Parties"). Service Provider shall provide such Notice promptly upon, and in no event later that 90 days after, learning of the Service Provider Group member's designation as a Restricted Party. Service Provider Group personnel providing Services must not be citizens of countries subject to comprehensive U.S. trade sanctions without Predecessor's prior written consent.

**Section 7.6**    **Data Protection**. Service Provider shall process any information in connection with this Agreement that can be used to identify an individual in accordance with Law and Predecessor's reasonable instructions. Service Provider shall (A) apply appropriate security measures for the protection of, and restrict third party access to, this personal information, (B) immediately notify Predecessor of any improper use, disclosure, or exposure of the personal information, and (C) cooperate with Predecessor's reasonable requests to investigate and remediate such incidents.

**Section 7.7**    **Flow Down Requirements**. Service Provider shall ensure that the Services are performed in accordance with the applicable U.S. regulations referenced at http://www-eproc.chevron.com/Public/GDS%20Documents/Certain%20U.S.%20Regulations.pdf.

**Section 7.8**    **Confidentiality**.  From and after the date hereof, Service Provider shall not, and shall ensure that members of Service Provider Group do not, directly or indirectly, use or disclose or divulge any trade secrets or other Confidential Information of Predecessor, including information of others that Service Provider has agreed to keep confidential; provided that the foregoing restriction shall not apply to information (a) which is lawfully and independently obtained by Service Provider from a third party without restriction as to disclosure, (b) which is already known to Service Provider or to others not bound by a duty of confidentiality or which is in the public domain or enters into the public domain through no fault of any member of Service Provider Group, and (c) Service Provider is required by Law or legal process to disclose; and provided further that Service Provider may use such information in connection with the performance of the transactions contemplated by this Agreement, including enforcement of its rights thereunder or under any document delivered pursuant thereto.  As used herein, "Confidential Information" shall mean confidential and/or proprietary information including, without limitation, all geological, geophysical, economic, financial or other information, whether in the form of maps, charts, logs, seismographs, interpretations, calculations, summaries or opinion, as well as other written notes, analyses, compilations, studies, interpretations, trade secrets, ideas, processes, procedures, data, know-how, improvements, discoveries, developments, designs, blueprints,

11

drawings, techniques and other documents, materials or information regarding plans for exploration, development, marketing and selling, business records and plans, budgets, prices and costs, suppliers, customers and potential customers.

## ARTICLE VIII.    GOVERNING LAW AND RESOLUTION OF DISPUTES

### Section 8.1    Governing Law

(a)    If the Services (as defined in Exhibit A) is performed offshore or on inland waters, notwithstanding the place of execution hereof or the place for performance of any covenant, promise or agreement herein made, this Agreement and the validity hereof, the agreements evidenced hereby, and all matters and issues arising hereunder, shall, to the fullest extent possible, be construed pursuant to and governed by the General Maritime Laws of the United States.  If the General Maritime Laws of the United States are held to be inapplicable to this Agreement or the Services (or any part thereof) to be performed hereunder by a court of competent jurisdiction, then Subsections 8.1(b) and 8.1(c) below shall apply, as appropriate, but only to the extent that United States General Maritime Law is held to be inapplicable.

(b)    If any court of competent jurisdiction determines that United States General Maritime Law is not applicable to any relevant part of this Agreement or the work to be performed hereunder, then such part of this Agreement and/or the work to be performed hereunder, shall, to the fullest extent enforceable under applicable Law, be interpreted and enforced exclusively in accordance with the Laws of the State of Texas.

(c)    If any court of competent jurisdiction determines that neither United States General Maritime Law nor the Laws of the state of Texas are applicable to any relevant part of this Agreement or the work to be performed hereunder, then such part of this Agreement and/or the work to be performed hereunder, shall, to the fullest extent enforceable under applicable Law, be interpreted and enforced exclusively in accordance with the Laws of the State of Louisiana, excluding any conflicts of law rules that might refer same to another jurisdiction.

### Section 8.2    Resolution of Disputes. The Parties shall exclusively and finally resolve any Dispute between them using direct negotiations, mediation, and then arbitration as set out in Article VIII, except as permitted in Sections 8.5(G) and 8.5(H). Service Provider shall not stop, suspend, or otherwise fail to progress the Services pending resolution of a Dispute.  "Dispute" means any claim, disagreement or controversy arising out of this Agreement, including a claim under this Agreement and any dispute or controversy regarding the existence, construction, validity, interpretation, enforceability, termination or breach of this Agreement, whether based in contract, tort or in any other manner.

### Section 8.3    Direct Negotiations. If a Dispute arises, a Party seeking to initiate the dispute resolution process shall give Notice to the other Party setting out, in writing and in detail, the issues in Dispute and the value of the claim. The Parties shall attempt to resolve the Dispute through direct negotiations in a meeting between the Parties, attended by individuals with decision-making authority, which must take place within thirty (30) days, or as otherwise agreed to by the Parties, from the date the Notice was sent.

Debtors' Exhibit No. 34
Page 320 of 910

**Section 8.4    Mediation.** If the Dispute cannot be resolved by direct negotiations within 30 days of initiation of the resolution process, either Party may initiate mediation by giving Notice to the other Party. Mediation must be attended by a representative from each Party with decision-making authority, and the proceeding must take place in Houston, Texas.

**Section 8.5    Arbitration Proceedings.** If the Parties fail to resolve the Dispute within 60 days from Notice of mediation, either Party may initiate binding arbitration by giving Notice to the other Party. The arbitration must be conducted in accordance with the International Institute for Conflict Prevention and Resolution ("CPR") Rules. To the extent of any conflicts between the Act or the CPR Rules and the provisions of this Agreement, the provisions of this Agreement prevail. The CPR is the appointing authority. The place of arbitration must be Houston, Texas.

The following provisions will apply to arbitration proceedings:

(A)    One (1) arbitrator (or three (3) arbitrators if the monetary value of the Dispute is more than US$5,000,000 or its currency equivalent) will conduct the arbitral proceedings in English. If there is a Dispute whether the monetary value exceeds the US$5,000,000, then the number of arbitrators must be three (3).

(B)    The maximum number of witnesses each Party may call to give evidence on its behalf, including by oral testimony, declaration or witness statement, is five (5) witnesses of fact and three (3) expert witnesses.

(C)    The existence of a Dispute and any negotiations, mediation, and arbitration proceedings between the Parties in relation to any Dispute are confidential and the Parties shall not make any disclosure to any third party. Any information, documents, or materials, created or produced for the purposes of, or used in, negotiations, mediation, or arbitration of a Dispute are confidential and the Parties shall not disclose them to any third party unless there is a legal or regulatory obligation to make a disclosure (but the disclosure must be limited to the extent necessary to comply with that legal or regulatory obligation), or to the extent required to enforce or challenge an award in bona fide legal proceedings before a state court or other judicial authority.

(D)    The arbitrator(s) does not have the power to award, nor will the arbitrator(s) award, the Damages waived and released under Section 6.5. The arbitrator(s) has no authority to appoint or retain expert witnesses for any purpose unless agreed to by the Parties. The arbitrator(s) may not act as *amiable compositeur or ex aequo et bono*.

(E)    Unless a Party is otherwise entitled to be indemnified for such costs pursuant to this Agreement, the Parties intend that regardless of which Party prevails, all arbitration fees and costs must be split equally, between the Parties, and each Party shall bear its own costs of legal representation, witness expenses, and ancillary costs.

(F)    The award is final and binding, and except for proceedings under Sections 8.5(G) and 8.5(H), the Parties agree to waive their rights to: (1) apply to the court for

determination of a point of law; and (2) any form of appeal, review or recourse in respect of any such award to any court or other judicial authority, to the extent that such waiver may be validly made.

(G)     The Parties may apply to a court with appropriate jurisdiction for any of the following without waiving its arbitration rights:

   (1)     Interim measures as necessary until appointment of the arbitrator(s) or pending determination by the arbitrator(s).

   (2)     Preserving property pending determination by the arbitrator(s).

   (3)     Enforcing judgment entered on an award.

   (4)     Enforcing Section 8.5(C) and preventing any information, documents or materials used in those proceedings from being used or disclosed by that Party for any purpose other than enforcement of Section 8.5(C).

(H)     Proceedings to (1) preserve property pending determination by the arbitrator(s), (2) enforce Section 8.5(C), (3) enforce judgment entered on an award may be brought in any court having jurisdiction over the person or assets of the non-prevailing Party. The prevailing Party may seek, in any court having jurisdiction, judicial recognition of the award, or order of enforcement or any other order or decree that is necessary to give full effect to the award.

## ARTICLE IX.         INSURANCE

**Section 9.1     Insurance Coverage**. Service Provider shall  maintain, at its own expense, the following insurance and all other insurance required by applicable Law:

   (i) Workers' Compensation and Employer's Liability Insurance as prescribed by applicable Laws where the Services are performed and, if applicable, the states of residence of any subcontractor personnel performing the Services;

   (ii) Commercial General Liability (Bodily Injury and Property Damage) Insurance. The policy territory coverage must include all areas where the Services are to be performed.   The policy limits must not be less than US$10,000,000 combined single limit per occurrence; and

   (iii) Automobile Bodily Injury and Property Damage Liability Insurance extending to all vehicles provided by Service Provider in the performance of the Services. The policy limits for this insurance must be the higher of the amount required by applicable Law or US$5,000,000 combined single limit per occurrence.

**Section 9.2     Policy Endorsements**.

14

(i) Service Provider shall, or shall endeavor to cause its insurer to provide Predecessor with thirty days' Notice before canceling or making a material change to an insurance policy obtained pursuant to this Section during the Service Term of this Agreement;

(ii) Service Provider shall require its insurer to provide waivers of subrogation in favor of Predecessor in any Workers' Compensation insurance policies obtained pursuant to this Section; and

(iii) Service Provider shall require its insurer to provide that any insurance obtained pursuant to Sections 9.1(ii) and 9.1(iii) shall include all of the following, but only to the extent that the Service Provider Group has liability under Section 6.2 of this Agreement:

(a) Predecessor shall be named as an additional insured;

(b) A provision that the insurance is primary with respect to all insureds, including additional insureds, and that no other insurance carried by Predecessor will be considered as contributory insurance for any loss; and

(c) A cross liability or severability of interest clause which has the effect of insuring that each insured (including additional insureds) is covered as a separate insured.

**Section 9.3    Evidence of Insurance**.  If requested by Predecessor in writing before performance any of the Services, Service Provider shall provide Predecessor or its designee with certificates or other documentary evidence satisfactory to Predecessor of the insurance and endorsements obtained pursuant to this Section. Service Provider acknowledges that failure to provide a certificate other evidence of insurance obtained pursuant to this Section may lead to non-payment of Service Provider's Invoices or termination of this Agreement.

**Section 9.4    Satisfaction of Insurance Limits**.  Service Provider may satisfy the insurance limits provided for in this Section through any combination of primary and excess layers of insurance.

## ARTICLE X. MISCELLANEOUS

**Section 10.1    <u>Force Majeure</u>**.  In the event that Service Provider is rendered unable, wholly or in part, by Force Majeure or other causes herein specified, to carry out all or any of its obligation under this Agreement, it is agreed that on Service Provider's delivery of written Notice, so far as Service Provider is prevented by such Force Majeure or other causes herein specified, Service Provider's obligation shall be suspended during the continuance of any inability so caused, and Service Provider will not be liable to Predecessor for any interruptions of service, any delays, or any failure to perform under this Agreement caused by such Force Majeure. For the avoidance of doubt, any delays, interruptions or failures to perform caused by such occurrences shall not be deemed to be a breach or failure to perform under this Agreement. The term "Force Majeure" means occurrences beyond the reasonable control of Service Provider and is limited to: acts of

15

God, strikes, lockouts, or other industrial disturbances, acts of the public enemy, wars, blockades, insurrections, riots, epidemics, pandemics, landslides, lightning, earthquakes, fires, storms, hurricanes, tropical storms, loop currents, floods, washouts, arrests, and restraints of the Government, either federal or state, civil or military, civil disturbances, explosions, sabotage, malicious mischief, breakage or accident to machinery or lines of pipe, freezing of wells or lines of pipe, refusal or inability of resale owner(s) or transporter(s) to take deliveries due to events of Force Majeure, inability of Service Provider to obtain right-of-way, necessary materials, supplies, or permits not caused by the failure of Service Provider to pay for or negligence to obtain such rights-of-way, necessary materials, supplies, or permits, an order, directive, or restraint issued or imposed by any Governmental Authority, regulatory body or court having jurisdiction. It is understood and agreed that the settlement of strikes or other labor difficulties shall be entirely within the discretion of Service Provider. During the continuation of a Force Majeure event, Service Provider shall act diligently to overcome the impediments caused by such event and use its commercially reasonable efforts to promptly resume performance of its obligations under this Agreement.

    **Section 10.2   <u>Notices</u>**. Any  notice, request, instruction, correspondence or other document to be given hereunder by any Party to another (herein collectively called "<u>Notice</u>") shall be in writing and delivered by email and additionally in person or by courier service requiring acknowledgement of receipt or mailed by certified mail, postage prepaid and return receipt requested, or by overnight delivery service, or by electronic mail (provided that Notices by electronic mail shall also be sent by one of the other permitted means to be effective), as follows:

If to Predecessor:

    [_____]
    100 Northpark Blvd
    Covington, LA 70433
    Attn:   Scott Ritter
    Phone: (985) 773-7424
    Email: scottritter@chevron.com


If to Service Provider:

    Mako Buyer LLC
    2000 W. Sam Houston Pkwy S. Suite 1200
    Houston, Texas 77042
    Attn:   Thomas R. Lamme
    Phone: (713) 969-1107
    Email: TLamme@fwellc.com

Notice given by personal delivery or courier shall be effective upon actual receipt. Notice given by mail shall be effective upon actual receipt or, if not actually received, the fifth Business Day following deposit with the U.S. Post Office. Notice given by electronic mail shall be effective upon delivery if delivered to a working email address during the recipient's normal business hours, or

at the beginning of the recipient's next Business Day if not delivered during the recipient's normal business hours.  If a date specified herein for giving any Notice or taking any action is not a Business Day (or if the period during which any Notice is required to be given or any action taken expires on a date which is not a Business Day), then the date for giving such Notice or taking such action (and the expiration date of such period during which Notice is required to be given or action taken) shall be the next day which is a Business Day. Any Party may change any address, electronic or otherwise, to which Notice is to be given to it by giving Notice as provided above of such change of address.

Section 10.3   **No Joint Venture or Partnership**. Nothing in this Agreement is intended to create, or shall be construed as creating, a partnership, joint venture, association for profit or other business entity between or among the Parties, and for federal and state income  tax purposes, the Parties elect to be excluded from the application of the provisions of Subchapter K, Chapter 1, Subtitle A of the Internal Revenue Code of 1986, as amended, as permitted and authorized by Section 761 of said Code and the regulations promulgated thereunder.

Section 10.4   **No Fiduciary Duty**. It is expressly understood and agreed that this Agreement is a purely commercial transaction between the Parties and that nothing stated herein shall operate to create any fiduciary duty which a Party shall owe to the other Party.

Section 10.5   **Entire Agreement**. This Agreement constitutes the entire agreement among the Parties with respect to the subject hereof and supersedes any other representations, understandings or agreements (whether written, oral or otherwise) that may have been made or entered into by the Parties or any of their respective Affiliates relating to the transactions contemplated hereby or the subject hereof.

Section 10.6   **Successors and Assignments**. This Agreement is personal as to Service Provider and Predecessor and shall not be assigned by either Party without the other Party's prior written consent.

Section 10.7   **Amendment**. This Agreement may be amended or modified in whole or in part, and terms and conditions may be waived, only by a duly authorized agreement in writing which makes reference to this Agreement executed by each Party.

Section 10.8   **Construction**. All article, section, schedule, and exhibit references used in this Agreement are to articles and sections of, and Schedules and Exhibits to, this Agreement, unless otherwise specified. The schedules and exhibits attached to this Agreement constitute a part of this Agreement and are incorporated herein for all purposes.

Unless otherwise indicated, with respect to either Party, the terms "ordinary course of business" or "ordinary course" shall be deemed to refer to the ordinary conduct of business in a manner consistent with the past practices and customs of such Party.

If a term is defined as one part of speech (such as a noun), it shall have a corresponding meaning when used as another part of speech (such as a verb). Terms defined in the singular have the corresponding meanings in the plural, and vice versa. Unless the context of this

Agreement clearly requires otherwise, words importing the masculine gender shall include the feminine and neutral genders and vice versa. The words "include", "includes" or "including" do not limit the preceding terms and shall be deemed to be followed by the words "without limitation." The words "hereof," "hereto," "hereby," "herein," "hereunder" and words of similar import, when used in this Agreement, shall refer to this Agreement as a whole and not to any particular section or article in which such words appear. The term "or" is not exclusive.

The terms "day" and "days" mean and refer to calendar day(s). The terms "year" and "years" mean and refer to calendar year(s).

Service Provider and Predecessor have each participated in the negotiation and drafting of this Agreement, and, if an ambiguity should arise, this Agreement shall be construed as if drafted jointly by the Parties and no presumption or burden of proof shall arise favoring or burdening any Party by virtue of the authorship of any of the provisions in this Agreement.

The captions in this Agreement are for convenience only and shall not be considered a part of or affect the construction or interpretation of any provision of this Agreement.

All references to currency herein shall be to, and all payments required hereunder shall be paid in, United States Dollars.

The serial comma is sometimes included and sometimes omitted. Its inclusion or omission shall not affect the interpretation of any phrase.

**Section 10.9   <u>Severability</u>**. If any provision of this Agreement is held invalid or unenforceable by any court of competent jurisdiction, the other provisions of this Agreement shall remain in full force and effect. The Parties further agree that if any provision contained herein is, to any extent, held invalid or unenforceable in any respect under the Laws governing this Agreement, they shall take any actions necessary to render the remaining provisions of this Agreement valid and enforceable to the fullest extent permitted by Law and, to the extent necessary, shall amend or otherwise modify this Agreement to replace any provision contained herein that is held invalid or unenforceable with a valid and enforceable provision giving effect to the intent of the Parties to the greatest extent legally permissible.

**Section 10.10 <u>Counterparts</u>**. This Agreement may be executed in two or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument. Any .pdf or other electronic transmission hereof or signature hereon shall, for all purposes, be deemed originals.

*[Remainder of Page Intentionally Left Blank. Signature Page to Follow.]*

Debtors' Exhibit No. 34
Page 326 of 910

IN WITNESS WHEREOF, this Agreement has been signed by each of the Parties as of the date first above written.


**SERVICE PROVIDER**:

Mako Buyer LLC


By: _____
Name: _____
Title: _____


**PREDECESSOR:**

[_____]


By: _____
Name:
Title:


[*Signature page to the Transition Services Agreement*]

## EXHIBIT A

## TO TRANSITION SERVICES AGREEMENT

**SERVICES**

1.      **Asset Services**. Subject to the terms of this Agreement, including but not limited to Section 1.5 of this Agreement, Service Provider shall provide the following Services with respect to the Asset.

**1.1     Maintenance and Monitoring Services**.

Services:  Providing the following maintenance and monitoring services with respect to the Assets:

(i)   Complying with, and causing the Asset to be operated in compliance in all material respects with, all state and federal Laws and regulations, including, but not limited to, following all required health, safety and environmental Laws, regulations and programs (such as SEMS), complying with all regulatory filing and reporting requirements, and obtaining all necessary permits; provided that nothing in this provision shall require Service Provider to make on behalf of Predecessor any filing, payment, or submission (or otherwise take any action) that, under applicable Law, may be made only by a party designated with the applicable Governmental Authority as a designated operator, designated applicant, designated payor, or responsible party for Predecessor or that could make Service Provider directly liable or responsible to the applicable Governmental Authority, or any other third party with respect to any of the Assets in which event Service Provider shall prepare the necessary filing or submission and provide it to the Predecessor to file or submit or, in the case of a payment, notify the Predecessor of such payment so that Predecessor can make such payment.

(ii)   Performing the following as and when needed:

(A)      purchasing (either directly or as agent for Predecessor) supplies, materials, tools, and equipment associated with the Asset, provided that the costs of such that are paid directly by Service Provider will be reimbursed by the Predecessor to Service Provider, further, provided that without Predecessor's prior written consent Service Provider will not purchase any single item with respect to the Assets if such purchase would result in a charge or cost to Predecessor greater than $10,000.00 dollars for any single item  during the Service Term.

(B)      contracting (either directly or as agent for Predecessor) for services associated with the physical maintenance and monitoring of the Asset, provided that the costs associated with such services will be

Exhibit A – Page 1
Transition Services Agreement

reimbursed to Service Provider by Predecessor, further, provided that without Predecessor's prior written consent Service Provider will not contract for any of such services with respect to any of the Assets if such contract (1) is with an Affiliate of Service Provider or (2) would obligate Predecessor for a period more than the Service Term for the operating services or (3) involves a fair market value of greater than $100,000.00.

(C)    providing to the Predecessor communications with Governmental Authorities related to the Asset.

*[Remainder of Page Intentionally Left Blank]*

Exhibit A – Page 2
Transition Services Agreement

SCHEDULE 1

TO THE TRANSITION SERVICES AGREEMENT

[Description]

Schedule 1 – Page 1
Transition Services Agreement

**EXHIBIT D**

Form of Assignment of Record Title

See attached.

Form 3000-3
(Aug 2018)

FORM APPROVED
OMB NO. 1004-0034
Expires: June 30, 2021

UNITED STATES
DEPARTMENT OF THE INTERIOR
BUREAU OF LAND MANAGEMENT
**ASSIGNMENT OF RECORD TITLE INTEREST IN A
LEASE FOR OIL AND GAS OR GEOTHERMAL RESOURCES**

Mineral Leasing Act of 1920 (30 U.S.C. 181 et seq.)
Act for Acquired Lands of 1947 (30 U.S.C. 351-359)
Geothermal Steam Act of 1970 (30 U.S.C. 1001-1025)
Department of the Interior Appropriations Act, Fiscal Year 1981 (42 U.S.C. 6508)

Lease Serial No.
OCS-G05550

Lease Effective Date
(Anniversary Date)
07/01/1983

New Serial No.

**Type or print plainly in ink and sign in ink.**

**PART A: ASSIGNMENT**

1. Assignee*  Fieldwood Energy IV LLC
   Street  2000 W. Sam Houston Pkwy S, Suite 1200
   City, State, Zip Code Houston, Texas 77042

1a. Assignor  Chevron U.S.A. Inc.

*If more than one assignee, check here ☐ and list the name(s) and address(es) of all additional assignees on page 2 of this form or on a separate attached sheet of paper.

This record title assignment is for: *(Check one)* ☑ Oil and Gas Lease, or ☐ Geothermal Lease

Interest conveyed: *(Check one or both, as appropriate)* ☑ Record Title, ☐ Overriding Royalty, payment out of production or other similar interests or payments

2. This assignment conveys the following interest:

| Land Description | Percent of Interest | | | Percent of Overriding Royalty Similar Interests | |
|---|---|---|---|---|---|
| Additional space on page 2, if needed.  Do not submit documents or agreements other than this form, such documents or agreements shall only be referenced herein. | Owned | Conveyed | Retained | Reserved | Previously reserved or conveyed |
| a | b | c | d | e | f |
| E1/2;N1/2NW1/4;SE1/4NW1/4;N1/2SW1/4NW1/4;S1/2SW1/4; NE1/4SW1/4 of Block 175, Ship Shoal Area (4531.25) | 100% | 100% | 0 | 0% | 0% |

**FOR BLM USE ONLY – DO NOT WRITE BELOW THIS LINE**
UNITED STATES OF AMERICA

**This assignment is approved solely for administrative purposes. Approval does not warrant that either party to this assignment holds legal or equitable title to this lease.**

☐ Assignment approved for above described lands;

Assignment approved effective _____

☐ Assignment approved for attached land description

☐ Assignment approved for land description indicated on reverse of this form

By _____
   Bureau of Land Management (BLM)            (Title)            (Date)

(Continued on Page 2)

(Form 3000-3)

Part A (Continued) ADDITIONAL SPACE for Names and addresses of additional assignees in Item No. 1, if needed, or for Land Description in Item 2, if needed.

## PART B – CERTIFICATION AND REQUEST FOR APPROVAL

1.  The Assignor certifies as owner of an interest in the above designated lease that he/she hereby assigns to the above assignee(s) the rights specified above.

2.  Assignee certifies as follows: (a) Assignee is a citizen of the United States; as association of such citizens; a municipality; or a corporation organized under the laws of the United States or of any State or territory thereof.  For the assignment of NPR-A leases, assignee is a citizen, national, or resident alien of the United States or associations of such citizens, nationals, resident aliens or private, public or municipal corporations; (b) Assignee is not considered a minor under the laws of the State in which the lands covered by this assignment are located; (c) Assignee's chargeable interests, direct and indirect, in each public domain and acquired lands separately in the same State, do not exceed 246,080 acres in oil and gas leases (of which up to 200,000 acres may be in oil and gas options), or 300,000 acres in leases in each leasing District in Alaska of which up to 200,000 acres may be in options, if this is an oil and gas lease issued in accordance with the Minerals Leasing Act of 1920, or 51,200 acres in any one State if this is a geothermal lease; (d) All parties holding an interest in the assignment are otherwise in compliance with the regulations (43 CFR Group 3100 or 3200) and the authorizing Acts; (e) Assignee is in compliance with reclamation requirements for all Federal oil and gas lease holdings as required by sec. 17(g) of the Mineral Leasing Act; and (f) Assignee is not in violation of sec. 41 of the Mineral Leasing Act.

3.  Assignee's signature to this assignment constitutes acceptance of all applicable terms, conditions, stipulations and restrictions pertaining to the lease described herein.

For geothermal assignments, an overriding royalty may not be less than one-fourth (1/4) of one percent of the value of output, nor greater than 50 percent of the rate of royalty due to the United States when this assignment is added to all previously created overriding royalties (43 CFR 3241).

I certify that the statements made herein by me are true, complete, and correct to the best of my knowledge and belief and are made in good faith.

Executed this _____ day of _____ 20<sup>21</sup>          Executed this _____ day of _____ 20<sup>21</sup>

Name of Assignor  Chevron U.S.A. Inc.
_____
(Please type or print)

Assignor  _____          Assignee  _____
(Signature)                                                          (Signature)

R. G. Schneider   Assistant Secretary
_____                        _____
(Title)                                                              (Title)
or                                                                   or
Attorney-in-fact _____          Attorney-in-fact _____
(Signature)                                                          (Signature)

_____
(Assignor's Address)

_____   _____   _____
(City)              (State)     (Zip Code)

Title 18 U.S.C. Sec. 1001 makes it a crime for any person knowingly and willfully to make to any Department or agency of the United States any false, fictitious, or fraudulent statements or representations as to any matter within its jurisdiction.

(Continued on Page 3)                                                    (Form 3000-3, Page 2)

**PART C – GENERAL INSTRUCTIONS**

1. Assignor/Assignee must complete Parts A1 and A2 and Part B. All parties to assignment must sign as follows. The assignor(s) must manually sign 3 original copies and the assignee(s) must manually sign at least 1 of the 3 original copies. File three (3) completed copies of this form in the proper BLM office for each assignment of record title. For a transfer of overriding royalty interest, payment out of production or other similar interest or payment, file one (1) manually signed copy of this form. The required filing fee (nonrefundable) must accompany the assignment. File assignment within ninety (90) days after date of execution of assignor.

2. Separate form must be used for each lease being affected by this assignment and for each type of interest conveyed.

3. In Item No. 2 of Part A, describe lands affected (See 43 CFR 3106, 3135 or 3241). For columns b, c, d, and e, enter the interest expressed as a percentage of total interest in the lease, *e.g.*, if assign or assigns one quarter of a 20% interest, enter 20% in column b, 5% in column c, and 15% in column d.

4. If assignment is to more than one assignee, enter each assignee's name across columns d, e, and f next to the respective interest being conveyed. Also, list names and addresses of any additional assignee(s) on reverse of this form or on a separate attached sheet of paper.

5. If any payment out of production or similar interest, arrangements or payments have previously been created out of the interest being assigned, or if any such payments or interests are reserved under this assignment, include a statement giving full details as to amount, method of payment, and other pertinent terms as provided under 43 CFR 3106, 3135, or 3241.

6. The lease account must be in good standing before this assignment can be approved as provided under 43 CFR 3106 and 3241.

7. Assignment, if approved, takes effect on the first day of the month following the date of filing in the proper BLM office. If a bond is necessary it must be furnished prior to approval of the assignment.

8. Approval of assignment of record title to 100% of a portion of the leased lands creates separate leases of the retained and the assigned portions, but does not change the terms and conditions of the lease anniversary date for purposes of payment of annual rental.

9. Overriding royalty, payment out of production or other similar types of transfers must be filed with BLM, but will be accepted for record purpose only. No official approval will be given.

Debtors' Exhibit No. 34
Page 334 of 910

**NOTICES**

AUTHORITY: This information is solicited under the authority of 30 U.S.C. 181 et seq.; 30 U.S.C. 1001-1025; 42 U.S.C. 6508

PURPOSE: The primary purpose for collecting this information is to facilitate the timely processing of record title assignments for oil and gas/geothermal resources leases.

ROUTINE USES: This information may be disclosed to agencies, organizations or persons for authorized purposes as follows: (1) The adjudication of the assignee's rights to the land or resources. (2) Documentation for public information in support of notations made on land status, records for the management, disposal, and use of public lands and resource. (3) Transfer to appropriate Federal agencies when concurrence is required prior to granting a right in public lands or resources. (4) Information from the record and/or the record will be transferred to appropriate Federal, State, local or foreign agencies, when relevant to civil, criminal or regulatory investigations or prosecutions. Additional information on authorized routine uses may be found in the published system of records notice, BLM-3, Mineral Lease Management—Interior, which may be viewed at https://www.doi.gov/privacy/blm_notices

DISCLOSURE: Furnishing the information on this form is voluntary, however, failure to provide all or part of the requested information may result in the rejection of the assignment. See regulations at 43 CFR Groups 3100 and 3200.

The Paperwork Reduction Act of 1995 requires us to inform you that:
The BLM collects this information to create and maintain a record of oil and gas/geothermal lease activity.

Response to this request is required to obtain a benefit.

The BLM would like you to know that you do not have to respond to this or any other Federal agency-sponsored information collection unless it displays a currently valid OMB control number.

**BURDEN HOURS STATEMENT:** Public reporting burden for this form is estimated to average 30 minutes per response including the time for reviewing instructions, gathering and maintaining data, and completing and reviewing the form. Direct comments regarding the burden estimate or any other aspect of this form to U.S. Department of the Interior, Bureau of Land Management (1004-0034), Bureau Information Collection Clearance Officer (WO-630), 1849 C Street, N.W., Room 2134LM, Washington, D. C. 20240.

(Form 3000-3, Page 4)

**EXHIBIT E**

Company Working Interests

To be completed.

**EXHIBIT F**

<u>Additional FWE IV Properties</u>

| Field | Block | Lease | Type | Rights | Date Le Eff | Date Le Exp | Le Cur Acres (Ac) | Operator | WI | | Lease Status |
|---|---|---|---|---|---|---|---|---|---|---|---|
| VIOSCA KNOLL 113 | VK 113 | G16535 | Federal | RT | 6/1/1996 | 2/23/2020 | 5,760 | Fieldwood En Off | 100.0% | | TERMIN |
| VIOSCA KNOLL 251/340/384 | VK 251 | G10930 | Federal | OP 1 | 7/1/1989 | N/A | 5,760 | Fieldwood En Off | 100.0% | | UNIT |
| VIOSCA KNOLL 251/340/384 | VK 251 | G10930 | Federal | RT | 7/1/1989 | N/A | 5,760 | Fieldwood En Off | 100.0% | | UNIT |
| VIOSCA KNOLL 251/340/384 | VK 251 | G10930 | Federal | OP 2 | 7/1/1989 | N/A | 5,760 | Fieldwood En Off | 55.0% | | UNIT |
| VIOSCA KNOLL 251/340/384 | VK 340 | G10933 | Federal | OP 1 | 7/1/1989 | N/A | 5,760 | Fieldwood En Off | 100.0% | | UNIT |
| VIOSCA KNOLL 251/340/384 | VK 340 | G10933 | Federal | RT | 7/1/1989 | N/A | 5,760 | Fieldwood En Off | 100.0% | | UNIT |
| VIOSCA KNOLL 251/340/384 | VK 340 | G10933 | Federal | OP 2 | 7/1/1989 | N/A | 5,760 | Fieldwood En Off | 55.0% | | UNIT |
| VERMILION 315/332 | VR 314 | G05438 | Federal | OP 2 | 7/1/1983 | 4/30/2021 | 5,000 | Fieldwood En Off | 50.0% | | TERMIN |
| HIGH IS. A-446 | HI A-446 | G02359 | Federal | RT | 8/1/1973 | 4/12/2016 | 5,760 | Bandon O&G | 100.0% | | TERMIN |
| VERMILION 315/332 | VR 332 | G09514 | Federal | OP 1 | 7/1/1988 | N/A | 5,000 | Fieldwood En | 66.5% | | PROD |
| VERMILION 315/332 | VR 332 | G09514 | Federal | RT | 7/1/1988 | N/A | 5,000 | Fieldwood En | 100.0% | | PROD |

WEIL:\97967346\16\45327.0007

| Area | Block No. | Structure | Complex ID No. | Authority No. | FW Lease | Operator | Approval Date | Associated Assets |
|------|-----------|-----------|----------------|---------------|----------|----------|---------------|-------------------|
| MP | 154 | A | 24171 | G30337 | G10902 | Fieldwood Energy Offshore LLC | 02/03/17 | MP 154 A001 & A002 |
| VR | 315 | A | 22981 | G30213 | G04215 | Fieldwood Energy Offshore LLC | 11/26/13 | VR 332 A001, A002, A005 & A006 |
| VR | 315 | A-AUX | 22981 | G30213 | G04215 | Fieldwood Energy Offshore LLC | 11/26/13 | Production from VR 315 A RUE |

WEIL:\97967346\16\45327.0007

## Exhibit 6

**Turnkey Removal Agreement**

See attached.

*Exhibit 6 to the Implementation Agreement*

# TURNKEY REMOVAL AGREEMENT
## by and among
## CHEVRON U.S.A. INC,
## AND
## FIELDWOOD ENERGY IV LLC
## AND

## MAKO BUYER LLC

THIS TURNKEY REMOVAL AGREEMENT (the "**Agreement**") is made effective as of [_____] (the "**Effective Date**"), by and among Chevron U.S.A. Inc. ("**CUSA**") a Pennsylvania corporation with offices at 1500 Louisiana Street, Houston, Texas 77002, Fieldwood Energy IV LLC ("**FWE IV**") a Delaware limited liability company with offices at 2000 W. Sam Houston Pkwy S, Suite 1200, and Mako Buyer LLC, a Delaware limited liability company, with offices at 2000 W Sam Houston Pkwy S, Suite 1200, Houston, Texas 77042 (hereinafter referred to as "**Contractor**").  CUSA, FWE IV and Contractor may hereinafter be referred to collectively as "**Parties**" or individually as a "**Party**."

## RECITALS

WHEREAS, FWE IV is a resulting entity of a divisive merger effected in connection with the confirmed plan of reorganization of Chapter 11 Case 20-33948, In re: Fieldwood Energy LLC et al., in the United States Bankruptcy Court for the Southern District of Texas, Houston Division;

WHEREAS, CUSA is identified as a predecessor-in-interest of the FWE IV Assets (as defined herein);

WHEREAS, CUSA and FWE IV desire that Contractor provide certain decommissioning and removal services with respect to the FWE IV Assets, upon the terms and conditions set forth herein, and Contractor has agreed to do so for the consideration set forth herein.

NOW, THEREFORE, in consideration of the premises and of the mutual promises, covenants, conditions, and agreements contained herein, and for other valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties hereby agree as follows:

## ARTICLE I.
## SERVICES

**Section 1.1**   **Services**. Subject to the terms of this Agreement, Contractor will plug, abandon, decommission, and remove certain assets associated with the leases, together with the platforms, wells, pipelines and equipment (including production equipment) located on such leases, and any hydrocarbons produced from such leases, if applicable (collectively the "**FWE IV Assets**") on a lump sum, project-by-project, turnkey payment basis.  Each such decommissioning project is described in detail on <u>Exhibit A</u> hereto (each a "**Decommissioning Project**").  In exchange for completing each such Decommissioning Project identified on <u>Exhibit A</u> hereto, Contractor will earn a single lump sum amount (the "**Turnkey Amount**") for such Decommissioning Project.  Each Turnkey Amount is subject to adjustment only by Change Order

pursuant to Section 1.3, Section 1.4 or Section 1.6, and each Turnkey Amount shall compensate Contractor in full for the full and complete performance of each applicable Decommissioning Project, including all taxes, costs, expenses, charges and overhead associated with a particular Decommissioning Project, including all third party costs and expenses. Additionally, the Parties agree that Contractor shall have no obligation to commence any one Decommissioning Project until the full funding of such project (i.e. the one hundred percent (100%) of the applicable Turnkey Amount) has been Fully Committed as defined in Section 2.2 below.

**Section 1.2**     **First Year**. The Parties agree that the Decommissioning Projects that Contractor will endeavor to commence during the twelve (12) month period commencing on the Effective Date ("**Year 1**") are those identified on Exhibit A for Year 1 (the "**Year 1 Projects**"). All Decommissioning Projects to be commenced by Contractor under this Agreement in years subsequent to Year 1 (each year a "**Contract Year**") are additionally identified on Exhibit A and are identified by the Contract Year.  Additionally, the Turnkey Amounts for all Decommissioning Projects to be performed and completed by Contractor under this Agreement are identified on Exhibit A, which such Turnkey Amounts may only be adjusted by Change Order as provided herein.  The Parties agree it shall not be a breach of this Agreement if Contractor does not complete a Decommissioning Project in the scheduled Contract Year, provided that this sentence shall not limit CUSA's rights to terminate any Decommissioning Project or this Agreement as provided in Section 3.2 or Section 3.3.

**Section 1.3**     **Subsequent Years**.

(a)     For Decommissioning Projects to be commenced in Contract Years other than Year 1, Contractor shall have the opportunity to submit for CUSA's consideration updated proposed Turnkey Amounts for any such Decommissioning Project.   Contractor shall submit such updated proposed Turnkey Amounts no later than the date that is (90) days prior to the beginning of the Contract Year in which such Decommissioning Project is to be commenced by Contractor as identified on Exhibit A.  Any such updated proposed Turnkey Amounts shall become the agreed upon Turnkey Amount for the applicable Decommissioning Project if the Parties agree on such updated proposed pricing, or if CUSA does not object in writing to an updated Turnkey Amount within thirty (30) days of delivery of such updated Turnkey Amount to CUSA, and the Turnkey Amount shall be updated by Change Order signed by all Parties.  If Contractor submits any updated proposed Turnkey Amount pursuant to this Section 1.3, the Parties will work in good faith to agree on a final Turnkey Amount; *provided that*, if the Parties fail to reach agreement on a final Turnkey Amount for a particular Decommissioning Project by the beginning of the applicable Contract Year, the Parties shall submit the dispute for Expert Determination as provided in Section 1.6; *provided further, however*, the Parties may at any time agree on a  final Turnkey Amount and may issue a Change Order to reflect the same (even if proceedings for an Expert Determination have already commenced).

(b)     The Parties agree that upon the date that funding with respect to a Decommissioning Project has been Fully Committed pursuant to Section 2.2, the Turnkey Amount applicable to such Decommissioning Project shall not be subject to further adjustment, except as provided in Section 1.4 below.

2

**Section 1.4**     <u>Claims for Qualified Conditions</u>.

(a)     The Parties have agreed upon certain qualified conditions for all of the Decommissioning Projects which are provided in <u>Exhibit B</u> (the "**Qualified Conditions**").

(b)     If Contractor believes that any such Qualified Conditions exist with respect to any Decommissioning Project, Contractor shall promptly provide written notice to CUSA. Contractor's notice shall state in detail all known and presumed facts upon which its claim is based, including the character, duration and extent of such circumstance, the date Contractor first knew of such circumstance, any activities impacted by such circumstance, the cost and time consequences of such circumstance (including showing the impact of such circumstance, if any, on the critical path of the Work for such Decommissioning Project) and any other details or information that are expressly required under this Agreement (including under <u>Appendix 1</u> hereto). Thereafter, Contractor shall submit to CUSA a request for a proposed Change Order as soon as reasonable practicable after giving CUSA written notice but in no event later than thirty (30) days after the completion of each such circumstance, together with a written statement (i) detailing why Contractor believes that a Change Order should be issued, plus all documentation reasonably requested by or necessary for CUSA to determine the factors necessitating the possibility of a Change Order and all other information and details expressly required under this Agreement; and (ii) setting forth the effect, if any, which such proposed Change Order would have for the Work.

(c)     After receiving the required notice and proposed Change Order pursuant to <u>Section 1.4(b)</u>, if CUSA agrees that a Change Order is necessary to adjust the Turnkey Amount and agrees with Contractor's proposed adjustment to the applicable Turnkey Amount, then CUSA shall issue a Change Order reflecting such agreed-upon adjustment to the applicable Turnkey Amount, and such Change Order shall become binding on the Parties as part of this Agreement upon execution thereof by CUSA and Contractor.

(d)     In the event CUSA and Contractor are unable to agree either (i) that a Qualified Condition occurred or (ii) upon the appropriate adjustment to the Turnkey Amount due to the occurrence of a Qualified Condition, CUSA and Contractor shall submit the dispute for Expert Determination as provided in <u>Section 1.6</u>; *provided, however*, CUSA and Contractor may agree to resolve the dispute by and between themselves at any time, and may issue a Change Order to reflect the same (even if proceedings for an Expert Determination have already commenced).

(e)     The Parties acknowledge that CUSA may be prejudiced if Contractor fails to provide the notices and proposed Change Orders as required under this <u>Section 1.4</u>. Contractor therefore agrees that, to the extent Contractor's failure to comply with such requirements prejudices CUSA, that such requirements are an express condition precedent necessary to any right for an adjustment to any Turnkey Amount arising out of any Qualified Conditions and that, to the extent Contractor's failure to comply with such requirements in fact prejudice CUSA, any right to adjust the Turnkey Amount related to the required notice or Change Order proposal that was not provided by Contractor in accordance with such requirements shall be waived and the related claim shall be barred. Oral notice, shortness of time, or CUSA's actual knowledge of a particular

3

circumstance shall not waive, satisfy, discharge or otherwise excuse Contractor's strict compliance with this <u>Section 1.4</u>.

**Section 1.5    Terms and Conditions**. The Parties agree that the performance of each Decommissioning Project shall also be governed by the definitions, terms and conditions attached hereto as <u>Appendix 1</u>, which are incorporated herein by this reference.

**Section 1.6    Expert Determination**.

(a)    If CUSA and Contractor cannot agree on an adjusted Turnkey Amount either (i) after Contractor's submission of proposed updated pricing in accordance with <u>Section 1.3</u> or (ii) in relation to Contractor's claim for an adjustment to a Turnkey Amount due to the occurrence of Qualified Conditions in accordance with <u>Section 1.4</u> after good faith negotiations, such Parties shall submit the dispute for Expert Determination pursuant to this <u>Section 1.6</u>.

(b)    Prior to submitting a dispute for Expert Determination, the Party intending to make the submission shall provide written notice to the other Parties of such intent (a "**Dispute Notice**"). The Parties to the dispute shall attempt to resolve the dispute through direct negotiations in a meeting between the Parties to the dispute, attended by individuals with decision-making authority, which must take place no later than thirty (30) days from the date the notice was sent, or any longer time as mutually agreed by the Parties in writing.  If CUSA and Contractor are unable to agree upon the Turnkey Amount within such time period, the Party intending to submit the matter for Expert Determination may so submit such matter to the Expert for final and binding determination.

(c)    The Party that submits a dispute for Expert Determination pursuant to this <u>Section 1.6</u> (the "**Disputing Party**") shall provide the Expert (copying the other Parties) with (i) its proposed Turnkey Amount and (ii) all such supporting data and information that the Disputing Party believes justifies its proposed Turnkey Amount, which such data and information shall include applicable well data and information related to any structures, pipelines, facilities and other assets associated with the Decommissioning Project, provided that if Contractor is the Disputing Party and the dispute is concerning a Qualified Condition under <u>Section 1.4</u>, the supporting data and information submitted by Contractor shall be materially consistent with the supporting data and information provided by Contractor under <u>Section 1.4(e)</u>.  No later than fourteen (14) days after the Disputing Party's submission of its proposed Turnkey Amount and all permitted supporting evidence, the other Party (the "**Responding Party**") shall provide the Expert with (i) its proposed Turnkey Amount (which, for clarity, may be the original Turnkey Amount set forth in Exhibit A) and (ii) all such supporting data and information justifying its proposed Turnkey Amount (as applicable).

(d)    After receiving all information required under <u>Section 1.6(c)</u> from both the Disputing Party and the Responding Party, the Expert shall within fifteen (15) days, select the final Turnkey Amount by selecting either (i) the Turnkey Amount proposed by the Disputing Party pursuant to <u>Section 1.6(c)</u> or (ii) the Turnkey Amount proposed by the Responding Party pursuant to <u>Section 1.6(c)</u>.  For clarity, the Expert shall not have the authority to calculate or select any other Turnkey Amount but must select between the options presented by such Parties.

4

(e)     If, prior to the Expert finalizing its determination of the Turnkey Amount, CUSA and Contractor reach agreement, such Parties may withdraw the matter from the Expert.  If different from the Turnkey Amount in Exhibit A, the final Turnkey Amount shall be implemented by a Change Order.

(f)     The determination of the Expert pursuant to Section 1.6(d) shall be final and binding on the Parties for all purposes hereunder.  The fees and expenses of the Expert under this Section 1.6 shall be borne one half by CUSA and one half by Contractor, and such cost sharing shall occur regardless of who prevails in a dispute before the Expert or if the dispute is resolved by the Parties prior to or after issuance of the Expert's determination pursuant to Section 1.6(d). Additionally, for all purposes of this Section 1.6, FWE IV and CUSA shall be treated as being one (1) Party, and Contractor shall be treated as the other Party (and thus if Contractor is the Disputing Party, CUSA and FWE IV shall be treated as the Responding Party).

(g)     The Parties agree to utilize one of the following as the Expert for the purposes herein (the "**Expert**"): *EDG, Inc. (https://www.edg.net/)* ("**EDG**"); *or TSB Offshore (https://tsboffshore.com/)* ("**TSB**"), with TSB being the Expert unless TSB is unable or unwilling to serve as the Expert, in which case, EDG shall be the Expert, unless the Parties otherwise agree in writing.  If both Experts are unable or unwilling to serve as the Expert hereunder, CUSA and Contractor shall agree on a newly identified Expert.

(h)     Notwithstanding any dispute between the Parties regarding a Qualified Condition on a particular Decommissioning Project, it shall be the responsibility of Contractor to continue to prosecute all of the Work on all Decommissioning Projects diligently in conformity with this Agreement, including the particular Decommissioning Project which is the subject of such dispute pursuant to this Section 1.6.  Contractor shall have no right to cease performance hereunder or to permit the prosecution of the Work to be delayed on such Decommissioning Project unless the amount of the disputed adjustment to the subject Turnkey Amount due to a Qualified Condition is more than fifty percent (50%) of said original Turnkey Amount for the particular Decommissioning Project.

**Section 1.7     Acknowledgement Regarding Certain Decommissioning Projects**.

(a)     The Parties acknowledge that the following two (2) pipeline segments were installed after CUSA sold its ownership interest to an Affiliate of FWE IV; however the Parties have agreed to include such as Decommissioning Projects.  Such assets are identified as follows:

o Vermillion Block 196 (OCS-G 19760) SN 18591 Pipeline

o Vermillion Block 196 (OCS-G 19760) SN 18588 Pipeline

Debtors' Exhibit No. 34
Page 344 of 910

## ARTICLE II.
## FUNDING AND COST REPORTS

**Section 2.1** **Escrow Account**. The following escrow account has been established by the Parties to fund portions of the decommissioning liabilities for the FWE IV Assets (the "**Escrow Account**"): [                                      ]. The Escrow Account shall be funded and distributions from the Escrow Account shall be made, in each case, in accordance with the Omnibus Agreement (as defined in Appendix 1 hereto) and is called the "Decommissioning Escrow Account" under the Omnibus Agreement.

**Section 2.2** **Funding Commitment and Commencing a Decommissioning Project**.

(a)    When Contractor is ready to commence a particular Decommissioning Project, Contractor shall issue written notice of the same to CUSA (each a "**Ready-to-Commence Notice**"), *provided that*, Contractor shall not issue a Ready-to-Commence Notice to CUSA for a given Decommissioning Project earlier than the date that is ninety (90) days before the Targeted Funding Date (as set forth in Exhibit A) for such Decommissioning Project (unless CUSA and Contractor otherwise agree in a writing signed by both such Parties referring to this Section 2.2(a)).

(b)    Within the ninety (90) days after issuance of a Ready-to-Commence Notice for a Decommissioning Project, CUSA shall deposit its proportionate share of the Turnkey Amount into the Escrow Agreement.  The Parties agree that Contractor shall not be obligated to commence a Decommissioning Project until one hundred percent (100%) of the Turnkey Amount applicable to such Decommissioning Project has been Fully Committed.

(c)    Funds are "**Fully Committed**" when Contractor has received notice of the same in accordance with the Omnibus Agreement.

(d)    If one hundred percent (100%) of the Turnkey Amount applicable to a Decommissioning Project has been Fully Committed, and Contractor nonetheless has not commenced the applicable Decommissioning Project within the ninety (90) days after issuance of notice under the Omnibus Agreement that such funds have been Fully Committed, CUSA shall be entitled to withdraw its proportionate share of the Fully Committed funds from the Escrow Account; *provided that* such ninety (90) day period shall be extended if the Work has not commenced due to an event of *force majeure* (as defined in Appendix 1) with such extension equal to the time that such event of *force majeure* prevented the commencement of such Work.  In such event, Contractor shall be required to issue a new Ready-to-Commence Notice for such Decommissioning Project when it is ready to commence the applicable Decommissioning Project, and this Section 2.2 shall apply as if the original notice had not been issued.  Furthermore, if Contractor has not received notice under Section 2.2(c) above that the funds are Fully Committed within ninety (90) days of the date CUSA deposits its proportionate share of the Turnkey Amount for any particular Decommissioning Project into the applicable Escrow Account, CUSA shall have the right to withdraw its proportionate share of such Turnkey Amounts pursuant to this Section 2.2(d).  In such event, Contractor shall be required to issue a new Ready-to-Commence Notice for

6

such Decommissioning Project when it is ready to commence the applicable Decommissioning Project, and this <u>Section 2.2</u> shall apply as if the original notice had not been issued.

**Section 2.3** **Payments**. Contractor shall be compensated for the performance of each Decommissioning Project pursuant to this <u>0</u>.

(a)    Upon achieving Final Completion (as defined in Appendix 1) of a Decommissioning Project, Contractor shall be entitled to the Turnkey Amount applicable to such Decommissioning Project as set forth in <u>Exhibit A</u>, as adjusted pursuant to this Agreement; *provided, however*, CUSA and Contractor may agree on a case-by-case basis to an alternative payment structure for any Decommissioning Project provided that such alternative payment structure is incorporated into a writing referencing this <u>Section 2.3(a)</u> and signed by both such Parties.  For clarity, Contractor's compensation earned under this Agreement shall be paid pursuant to and subject to the Omnibus Agreement.

(i)    ***Interim Payment Milestones***.  Notwithstanding <u>Section 2.3(a)</u>, the Parties agree that if the Turnkey Amount of a particular Decommissioning Project is in excess of Five Million U.S. Dollars (U.S. $5,000,000), or if the commencement of a particular Decommissioning Project would result in Contractor simultaneously performing Work on two or more Decommissioning Projects that, in the aggregate, result in CUSA's proportionate share of the Turnkey Amounts being in excess of Ten Million U.S. Dollars (U.S. $10,000,000), then, for such Decommissioning Project, CUSA and Contractor will negotiate interim payment milestones authorizing the release of agreed-upon sums of compensation to Contractor upon achievement of objectively-defined milestones in the Work to complete any such Decommissioning Project; *provided, however*, the Parties agree that the last payment milestone for any such Decommissioning Project shall not be less than twenty five (25%) of the applicable Turnkey Amount and shall not become owed before achievement of Final Completion of such Decommissioning Project.  The agreed-upon payment milestones for such Decommissioning Project shall be set forth in writing and signed by both such Parties.

(ii)    ***Alternative Cost-Plus Pricing***.  The Parties agree that Contractor shall be compensated on a lump sum, turnkey basis for all Decommissioning Projects unless, prior to the commencement of a particular Decommissioning Project, CUSA and Contractor mutually elect in writing (signed by both such Parties) to utilize a cost-plus reimbursable pricing and compensation methodology (instead of a lump sum, turnkey payment and compensation methodology) for that particular Decommissioning Project. The Parties agree that any such cost-plus reimbursable compensation model shall be set forth in detail and agreed to by CUSA and Contractor in writing, including procedures, rules and limitations on what shall be and what shall not be reimbursable thereunder, and which shall be based, to the extent applicable, on the procedures, rules and limitations set forth in the "COPAS

7

2012 Deepwater Accounting Procedure" published by the Council of Petroleum Accountants Societies (COPAS). The markup for profit owed under any such cost-plus compensation model shall be fifteen percent (15%) on allowable costs. The details of the cost-plus reimbursable payment methodology shall be finalized by CUSA and Contractor prior to the commencement of Work on any such Decommissioning Project.

(iii) ***At-Cost Projects***. Certain Decommission Projects have been designated by the Parties in <u>Exhibit A</u> as "at-cost" Decommissioning Projects (the "**At-Cost Projects**"). The Parties agree that Contractor shall be compensated for such At-Cost Project on a reimbursable, at-cost basis without markup. The Parties agree that they will negotiate in good faith and agree upon a reimbursable compensation model applicable to the At-Cost Projects, including procedures, rules and limitations on what shall be and what shall not be an "allowable cost" thereunder, and which shall be based, to the extent applicable, on the procedures, rules and limitations set forth in the "COPAS 2012 Deepwater Accounting Procedure" published by the Council of Petroleum Accountants Societies (COPAS). The details of the reimbursable payment methodology shall be finalized by CUSA and Contractor prior to the commencement of Work on any At-Cost Project. After the commencement of an At-Cost Project, Contractor shall submit invoices in the first ten (10) days of each month during the performance of such At-Cost Project incorporating the allowable costs incurred in the prior month. Contractor's entitlement to receive compensation under this Agreement for the At-Cost Projects shall be pursuant to the Omnibus Agreement. The Parties agree that Section 2.2 shall not apply to the At-Cost Projects.

(b) Notwithstanding <u>Section 2.3(a)</u>, if Contractor has achieved all requirements of Final Completion of a particular Decommissioning Project but BOEM has failed to issue the applicable approval required under the definition of Final Completion with respect to such Decommissioning Project within the forty-five (45) day period immediately following Contractor's proper request and submission for such approval from BOEM, and *provided that* BOEM's failure to issue an approval in such forty-five (45) day period is not due to the fault or other act or omission of Contractor or any person for whom Contractor is responsible under this Agreement, including but not limited to Contractor failing to meet BOEM's requirements to receive such approval, "Final Completion" for the purposes of this <u>0</u> shall be deemed to have been achieved and Contractor shall be entitled to the applicable payment provided that Contractor submits to CUSA all documents provided to BOEM to obtain such Final Completion. Notwithstanding the foregoing, if BOEM requires that additional work be performed as a condition of BOEM issuing its approval in relation to the applicable Decommissioning Project, Contractor shall promptly and diligently complete such additional work at Contractor's own cost.

**Section 2.4** **Cost Reporting**. Contractor shall submit a monthly cost report to FWE IV LLC, with a copy to CUSA, summarizing the accrued costs for each Decommissioning Project in each month after the Effective Date (each a "**Monthly Cost Report**"). If CUSA or

Debtors' Exhibit No. 34
Page 347 of 910

FWE IV request additional information with respect to any cost in any Monthly Cost Report, Contractor shall provide reasonable and appropriate documentation to substantiate the charges on the cost report and/or respond to such request for additional information.

<div align="center">

**ARTICLE III.**
**TERM**

</div>

**Section 3.1**      **Term**.  The term of this Agreement shall be from and after the Effective Date until the FWE IV Assets identified on <u>Exhibit A</u> are completely plugged and abandoned and Site Clearance (as defined in Appendix 1) has been achieved with respect to all such FWE IV Assets, unless terminated earlier as provided herein.

**Section 3.2**      **Termination by CUSA of Entire Agreement**.  CUSA retains the right to terminate this Agreement in its entirety in the event that (i) Contractor repudiates or abandons this Agreement; or (ii) the Decommissioning Projects on <u>Exhibit A</u> are performed in a manner or in a timing that is materially inconsistent with the Standard of Performance (as defined in Appendix 1).  In the event the Agreement is terminated in its entirety, any funds deposited in the Escrow Account for any uncompleted portions of any Decommissioning Projects shall be transferred to CUSA in accordance with the Omnibus Agreement.

**Section 3.3**      **Termination by CUSA for Particular Asset.**  CUSA retains the right to terminate this Agreement as to a particular Decommissioning Project or portion thereof in the event Contractor (i) is unable to (or otherwise fails to) perform or complete such Work in compliance with government issued timelines, or (ii) in the event Contractor is in breach of this Agreement, including, but not limited to, the Standard of Performance (as defined in Appendix 1) with respect to such Work, and such breach remains outstanding after CUSA or FWE IV having provided thirty (30) days' written notice to Contractor.  In the event of termination as to a particular Decommissioning Project, any funds deposited in the Escrow Account for the particular Decommissioning Project shall be transferred to CUSA in accordance with the Omnibus Agreement.

**Section 3.4**      **Additional Rights After Such A Termination**.  If this entire Agreement is terminated pursuant to <u>Section 3.2</u> or if this Agreement is terminated as to a particular Decommissioning Project or portion thereof pursuant to <u>Section 3.3</u>, CUSA may: (i) if requested by CUSA and if agreed by Contractor, take assignment of any or all of Contractor's subcontracts with respect to such terminated Work; and (ii) complete such Work either itself or through others (including through FWE IV).  In the event of such a termination, the Parties shall have all rights at law with respect to such a termination.

**Section 3.5**      **Termination for Convenience by CUSA**.  If Contractor assigns its obligations under this Agreement to any other person or entity pursuant to <u>Section 5.10</u>, notwithstanding anything to the contrary, CUSA shall have the right to terminate this Agreement in whole by issuing written notice of the same to Contractor.  The termination for convenience shall become effective six (6) months after Contractor's receipt of the termination notice; provided that Contractor shall be entitled (but not obligated) to complete any Decommissioning Projects commenced prior to the date of CUSA's termination notice, in which case this Agreement shall

<div align="center">

9

</div>

remain in effect as it relates to such Decommissioning Projects until such Decommissioning Projects reach Final Completion.  Upon termination pursuant to this <u>Section 3.5</u>, Contractor shall (i) not commence any further Decommissioning Projects, (ii) place no further orders for subcontracts, equipment, or any other items or services except as may be necessary for completion of such portion of the Work as is not discontinued, (iii) promptly make every reasonable effort to procure cancellation upon terms satisfactory to CUSA of all subcontracts and rental agreements to the extent they relate to the performance of the Work that is discontinued unless CUSA elects to take assignment of any such subcontracts subject to the agreement of Contractor, and (iv) use commercially reasonable efforts to cooperate with CUSA for the efficient transition of the Work. Upon termination for convenience, Contractor shall be entitled to (a) the portion of the applicable Turnkey Amount(s) for the Work completed prior to termination, less that portion of the Turnkey Amount(s) previously paid to Contractor, plus (b) actual and direct close-out costs reasonably incurred by Contractor on account of such termination (which costs shall be adequately documented and supported by Contractor) but in no event shall Contractor be entitled to receive any amount for unabsorbed overhead, contingency, risk, or anticipatory profit.  Contractor shall submit all reasonable direct close-out costs to CUSA for verification and audit within sixty (60) Days after the effective date of termination.  If no Work has been performed by Contractor under the Agreement at the time of termination, Contractor shall be entitled to the sum of One Hundred U.S. Dollars (U.S. $100) for its undertaking to perform.  Upon termination for convenience, any funds deposited in the Escrow Agreement for any Decommissioning Projects shall be transferred in accordance with the Omnibus Agreement.

Section 3.6          <u>Termination by Contractor</u>.

(a)     <u>Suspension of Work</u>:  Subject to CUSA's right to withhold or offset payment to Contractor, if Contractor does not receive undisputed amounts owed to Contractor when due and owing, Contractor shall provide written notice of the same to CUSA, and, if such failure has not been cured by CUSA within thirty (30) days after Contractor's written notice to CUSA to cure such failure, Contractor may suspend performance of the Work and the obligation to commence or progress any Decommissioning Project during a Contract Year shall be tolled until such failure is cured by CUSA.

(b)     <u>Termination of Work</u>:  Contractor may terminate this Agreement if Contractor has suspended performance of the Work in accordance with <u>Section 3.6(a)</u> and Contractor has provided CUSA with notice at the time of such Work suspension that it intends to terminate the Agreement if such nonpayment is not cured in ninety (90) days after such notice, and such nonpayment is not cured within ninety (90) days after receipt of such notice from Contractor.  In the event of such a termination, the Parties shall have all rights at law with respect to such a termination.  Contractor's sole right to terminate any portion of this Agreement is set forth in this <u>Section 3.6(b)</u>.

<div align="center">

**ARTICLE IV.**
**GOVERNING LAW; DISPUTES**

</div>

Section 4.1     <u>Governing Law</u>.

<div align="center">10</div>

(a)     Notwithstanding the place of execution hereof or the place for performance of any covenant, promise or agreement herein made, this Agreement and the validity hereof, the agreements evidenced hereby, and all matters and issues arising hereunder, shall, to the fullest extent possible, be construed pursuant to and governed by the General Maritime Laws of the United States.  If the General Maritime Laws of the United States are held to be inapplicable to this Agreement or to the Work (or any part thereof) to be performed hereunder, then such part of this Agreement or of the Work shall, to the fullest extent possible, be construed pursuant to and governed by the laws of the State of Texas, without regard to its choice of law rules, except that the substantive and procedural rules of the Federal Arbitration Act, 9 U.S.C. §§ 1-16 (the "**Act**") govern this Article IV, provided that if it is not possible for the laws of the State of Texas to apply as to a particular issue due to the application of the federal law of the United States (specifically, the Outer Continental Shelf Lands Act (OCSLA)), then the laws of the State of the United States adjacent to the part of the Agreement or the Work giving rise to such dispute shall govern such dispute.

**Section 4.2     Resolution of Disputes**. The Parties shall exclusively and finally resolve any dispute between them using direct negotiations, mediation, and then arbitration as set out in this Article IV, except as permitted in Section 1.6.

**Section 4.3     Direct Negotiations.** If a dispute arises, a Party seeking to initiate the dispute resolution process shall give notice to the other Party (or Parties) to the dispute setting out, in writing and in detail, the issues in dispute and the value of the disputed amount (the "**Claim**"). The Parties to the dispute shall attempt to resolve the dispute through direct negotiations in a meeting between the Parties to the dispute, attended by individuals with decision-making authority, which must take place within 30 days, or as otherwise agreed to by such Parties, from the date the notice was sent.

**Section 4.4     Mediation.** If the dispute cannot be resolved by direct negotiations within 30 days of initiation of the resolution process, a Party to the dispute may initiate mediation by giving notice to the other Party (or Parties) to the dispute. Mediation must be attended by a representative from each such Party with decision-making authority, and the proceeding must take place in Houston, Texas.

**Section 4.5     Arbitration Proceedings.** If the Parties to a dispute fail to resolve the dispute within 60 days from notice of mediation, any Party (or Parties) the dispute may initiate binding arbitration by giving notice to the other Party (or Parties) to the dispute. The arbitration must be conducted in accordance with the International Institute for Conflict Prevention and Resolution ("**CPR**") Rules. To the extent of any conflicts between the Act or the CPR Rules and the provisions of this Agreement, the provisions of this Agreement prevail. The CPR is the appointing authority. The place of arbitration must be Houston, Texas.

The following provisions will apply to arbitration proceedings, in each case with respect to the Parties to a particular dispute:

(a)     One arbitrator (or 3 arbitrators if the monetary value of the dispute is more than US $5,000,000 or its currency equivalent) will conduct the arbitral proceedings in English. If there is

Debtors' Exhibit No. 34
Page 350 of 910

a dispute whether the monetary value exceeds the US $5,000,000, then the number of arbitrators must be 3.

(b)     The maximum number of witnesses each Party may call to give evidence on its behalf, including by oral testimony, declaration or witness statement, is 5 witnesses of fact and 3 expert witnesses.

(c)     The existence of a dispute and any negotiations, mediation, and arbitration proceedings between the Parties in relation to any dispute are confidential and the Parties shall not make any disclosure to any third party. Any information, documents, or materials, created or produced for the purposes of, or used in, negotiations, mediation, or arbitration of a dispute are confidential and the Parties shall not disclose them to any third party unless there is a legal or regulatory obligation to make a disclosure (but the disclosure must be limited to the extent necessary to comply with that legal or regulatory obligation), or to the extent required to enforce or challenge an award in bona fide legal proceedings before a state court or other judicial authority.

(d)     The arbitrator(s) has no authority to appoint or retain expert witnesses for any purpose unless agreed to by the Parties. The arbitrator(s) may not act as *amiable compositeur or ex aequo et bono*.

(e)     Subject to Section 4.3(b), the Parties intend that regardless of which Party prevails, all arbitration fees and costs must be split equally, between the Parties, and each Party shall bear its own costs of legal representation, witness expenses, and ancillary costs.

(f)     The award is final and binding, and except for proceedings under Section 4.3(g), the Parties agree to waive their rights to: (1) apply to the court for determination of a point of law; and (2) any form of appeal, review or recourse in respect of any such award to any court or other judicial authority, to the extent that such waiver may be validly made.

(g)     The Parties may apply to a court with appropriate jurisdiction for any of the following without waiving its arbitration rights:

> (i)   Interim measures as necessary until appointment of the arbitrator(s) or pending determination by the arbitrator(s).
> (ii)  Preserving property pending determination by the arbitrator(s).
> (iii) Enforcing judgment entered on an award over the Person or assets of the non-prevailing Party.
> (iv)  Enforcing Section 4.3(c) and preventing any information, documents or materials used in those proceedings from being used or disclosed by that Party for any purpose other than enforcement of Section 4.3(c).

(h)     Proceedings to (1) preserve property pending determination by the arbitrator(s), (2) enforce Section 4.3(c), (3) enforce judgment entered on an award may be brought in any court having jurisdiction over the Person or assets of the non-prevailing Party. The prevailing Party may

Debtors' Exhibit No. 34
Page 351 of 910

seek, in any court having jurisdiction, judicial recognition of the award, or order of enforcement or any other order or decree that is necessary to give full effect to the award.

**Section 4.6     Consolidation of Disputes.** The Parties agree that a dispute under this Agreement may raise issues that are common with other disputes under one or more of the Material Project Documents or which are substantially the same or interdependent and interrelated or connected with issues raised in any such related dispute, controversy, or claim between or among the Parties and their Affiliates under one or more of the Material Project Documents. "**Material Project Documents**" shall have the meaning set forth in the Omnibus Agreement (as defined in Appendix 1). Accordingly, any Party to a dispute under this Agreement or another Material Project Documents that is related to another dispute under this Agreement or another Material Project Document may elect in writing within fifteen (15) days after the initiation of a such dispute to refer such new dispute and any such related dispute for resolution in accordance with the provision of Section 4.5 on a consolidated basis. If the applicable arbitral panel determines that the applicable disputes are related, then the disputes shall be resolved on a consolidated basis; provided that, if the arbitral panel determines that the disputes are not related or for any other equitable reason should not be consolidated, then the disputes shall proceed separately.

## ARTICLE V.
## MISCELLANEOUS

**Section 5.1     Notices.** Any   notice, request, instruction, correspondence or other document to be given hereunder by any Party to another (herein collectively called "**Notice**") shall be in writing and delivered (i) in person, (ii) by courier service or by overnight delivery service in each case that requires acknowledgement of receipt, (iii) mailed by certified mail, postage prepaid and return receipt requested, or (iv) delivered by electronic mail and expressly acknowledged as received by return electronic mail, as follows:

If to FWE IV:

Fieldwood Energy IV LLC
2000 W. Sam Houston Parkway S., Suite 1200
Houston, Texas 77042
Attention: Sole Manager
Phone: [●]
Email: [●]

If to Contractor:

13

Mako Buyer LLC
2000 W. Sam Houston Pkwy S. Suite 1200
Houston, Texas 77042
Attn:   Thomas R. Lamme
Phone: (713) 969-1107
Email: TLamme@fwellc.com


If to CUSA:

Chevron U.S.A. Inc.
100 Northpark Blvd
Covington, LA 70433
Attn:   Land Manager
Phone: (985) 773-6538
Email:  tdwebre@chevron.com

Notice given by personal delivery or courier shall be effective upon actual receipt. Notice given by mail shall be effective upon actual receipt or, if not actually received, the fifth Business Day following deposit with the U.S. Post Office. "***Business Day***" means every day other than a Saturday, a Sunday or a day that is an official holiday for employees of the federal government of the United States of America. Notice given by electronic mail shall be effective upon acknowledgement of receipt.  If a date specified herein for giving any Notice or taking any action is not Business Day (or if the period during which any Notice is required to be given or any action taken expires on a date which is not a Business Day), then the date for giving such Notice or taking such action (and the expiration date of such period during which notice is required to be given or action taken) shall be the next Business Day. Any Party may change any address, electronic or otherwise, to which Notice is to be given to it by giving Notice as provided above of such change of address; provided that copies to Chevron may not be amended, discontinued or delayed without CUSA's express written consent.


**Section 5.2    No Joint Venture or Partnership**. Nothing in this Agreement is intended to create, or shall be construed as creating, a partnership, joint venture, association for profit or other business entity between or among the Parties, and for federal and state income  tax purposes, the Parties elect to be excluded from the application of the provisions of Subchapter K, Chapter 1, Subtitle A of the Internal Revenue Code of 1986, as amended, as permitted and authorized by Section 761 of said Code and the regulations promulgated thereunder.


**Section 5.3    No Fiduciary Duty**. It is expressly understood and agreed that this Agreement is a purely commercial transaction among the Parties and that nothing stated herein shall operate to create any fiduciary duty which a Party shall owe to another Party.


**Section 5.4    Confidentiality**.

14

(a)    Each Party acknowledges that during term of this Agreement, it will have access to and become acquainted with trade secrets, proprietary information and confidential information belonging to each other Party that are not generally known to the public, including, but not limited to, information concerning business plans, operating practices and methods, financial statements, personnel information, contracts, and other information provided pursuant to this Agreement that each other Party treats as confidential, in any format whatsoever (including oral, written, electronic or any other form or medium) (collectively, "**Confidential Information**").  In addition, each Party acknowledges that: (i) each other Party has invested, and continues to invest, substantial time, expense and specialized knowledge in developing its Confidential Information; (ii) the Confidential Information provides each such other Party with a competitive advantage over others in the marketplace; and (iii) each such other Party would be irreparably harmed if the Confidential Information were disclosed to competitors or made available to the public. Without limiting the applicability of any other agreement to which each Party is subject, each such Party may not, without the each other Party's consent, directly or indirectly, disclose or use (other than solely for the purposes of complying with a Party's obligations under this Agreement or the other Material Project Contracts) at any time, including, without limitation, use for personal, commercial or proprietary advantage or profit, any Confidential Information of which such Party is or becomes aware.  Each Party must take all appropriate steps to safeguard the Confidential Information in its possession and to protect it against disclosure, misuse, espionage, loss and theft.

(b)    Nothing contained in this Section 5.4 will prevent a Party from disclosing Confidential Information:  (i) upon the order of any court or administrative agency; (ii) upon the request or demand of any regulatory agency or authority having jurisdiction over such Party; (iii) to the extent compelled by legal process or required or requested pursuant to subpoena, interrogatories or other discovery requests; (iv) to the extent necessary in connection with the exercise of any remedy hereunder; or (v) to the Party's employees, agents, representatives and advisors who, in the reasonable judgment of the Party, need to know such Confidential Information and agree to be bound by the provisions of this Section 5.4 (provided that such Party will remain liable for any breach of this Section 5.4 by any such Person); provided, that in the case of clause (i), (ii) or (iii), the applicable Party must notify the other Parties of the proposed disclosure as far in advance of such disclosure as practicable (but in no event make any such disclosure before notifying the other Parties) and use reasonable efforts to ensure that any Confidential Information so disclosed is accorded confidential treatment satisfactory to the other Parties, when and if available.

(c)    With respect to a particular Party, the restrictions of Section 5.4 will not apply to Confidential Information that: (i) is or becomes generally available to the public other than as a result of a disclosure by such Party in violation of this Agreement; (ii) is or has been independently developed or conceived such Party without use of Confidential Information and outside of its duties hereunder; or (iii) becomes available to such Party or any of its employees, agents, representatives and advisors on a non-confidential basis from a source other than the other Parties or any of their employees, agents, representatives and advisors, provided, that such source is not known by the Party to be bound by a confidentiality agreement with one of the other Parties.

(d)    The obligations of each Party under this Section 5.4 shall survive the termination of this Agreement.

Debtors' Exhibit No. 34
Page 354 of 910

(e)      Each Party hereby acknowledges that the provisions of <u>Section 5.4</u> are reasonable and necessary to protect the legitimate interests of the other Parties and that any violation of such provisions would result in irreparable injury to the other Parties. In the event of a violation of the provisions of this <u>Section 5.4</u>, each Party further agrees that the other Parties may, in addition to all other remedies available to it, be entitled to equitable relief by way of injunction and any other legal or equitable remedies without any requirement to post bond.

**Section 5.5      <u>Costs and Expenses</u>**.  Each Party shall bear its own costs and expenses in relation to the negotiation and preparation of this Agreement.

**Section 5.6      <u>Further Assurances</u>**.  The Parties shall at their own cost and expense execute and deliver such further documents and instruments and shall take such other actions as may be reasonably required or appropriate to evidence or carry out the intent and purposes of this Agreement.

**Section 5.7      <u>Authority of Parties/Signatories</u>**. Each person signing this Agreement represents and warrants that he or she is duly authorized and has legal capacity to execute and deliver this Agreement. Each Party represents and warrants to the other that the execution and delivery of this Agreement and the performance of such Party's duties have been duly authorized and that this Agreement is a valid and legal agreement binding on such Party and enforceable in accordance with its terms.

**Section 5.8      <u>Public Announcements</u>**.  No Party shall issue any public announcement or statement concerning this Agreement or make any use of the names, image, logos, or trademarks of any other Party or any of its Affiliates without obtaining the prior written consent of the other Parties.

**Section 5.9      <u>Entire Agreement</u>**. This Agreement (together with the Schedules, Exhibits and Appendices hereto), together with the other Material Project Contracts, constitutes the entire agreement among the Parties with respect to the subject hereof and supersedes any other representations, understandings or agreements (whether written, oral or otherwise) by any Party or any of its Affiliates relating to the transactions contemplated hereby or the subject hereof.

**Section 5.10      <u>Successors and Assignments</u>**.  No Party may assign, directly or indirectly, all or any part of its rights or obligations under this Agreement to any person, including in the event of a reorganization, merger, consolidation or asset sale, without the prior written consent of each other Party, which may be withheld at such Party's sole discretion; *provided that* the foregoing shall not apply if Contractor assigns this Agreement in total (i) along with all of its personnel who are performing any part of the Work (as defined in Appendix 1) hereunder to an Affiliate, provided that no such assignment by Contractor to an Affiliate shall relieve Contractor of its obligations under this Agreement, or (ii) to an acquirer of all or substantially all of Contractor's business or all or substantially all of Contractor's employees providing Work (as defined in Appendix 1).  Any attempted assignment in breach of this obligation is void.

<div align="center">16</div>

**Section 5.11   Amendment**.  This Agreement may be amended or modified in whole or in part, and terms and conditions may be waived, only by a duly authorized agreement in writing or by Change Order which makes reference to this Agreement executed by each Party.

**Section 5.12   Construction**.

All article, section, schedule, and exhibit references used in this Agreement are to articles and sections of, and Schedules, Appendices and Exhibits to, this Agreement, unless otherwise specified. The schedules and exhibits attached to this Agreement constitute a part of this Agreement and are incorporated herein for all purposes.

Unless otherwise indicated, with respect to a Party, the terms "ordinary course of business" or "ordinary course" shall be deemed to refer to the ordinary conduct of business in a manner consistent with the past practices and customs of such Party.

If a term is defined as one part of speech (such as a noun), it shall have a corresponding meaning when used as another part of speech (such as a verb). Terms defined in the singular have the corresponding meanings in the plural, and vice versa. Unless the context of this Agreement clearly requires otherwise, words importing the masculine gender shall include the feminine and neutral genders and vice versa. The words "include", "includes" or "including" do not limit the preceding terms and shall be deemed to be followed by the words "without limitation." The words "hereof," "hereto," "hereby," "herein," "hereunder" and words of similar import, when used in this Agreement, shall refer to this Agreement as a whole and not to any particular section or article in which such words appear. The term "or" is not exclusive.

The terms "day" and "days" mean and refer to calendar day(s). The terms "year" and "years" mean and refer to calendar year(s), provided that the terms "Year 1" and "Contract Year" shall have the meanings specified in Section 1.2.

Each Party has participated in the negotiation and drafting of this Agreement, and, if an ambiguity should arise, this Agreement shall be construed as if drafted jointly by the Parties and no presumption or burden of proof shall arise favoring or burdening any Party by virtue of the authorship of any of the provisions in this Agreement.

The captions in this Agreement are for convenience only and shall not be considered a part of or affect the construction or interpretation of any provision of this Agreement.

All references to currency herein shall be to, and all payments required hereunder shall be paid in, United States Dollars.

The serial comma is sometimes included and sometimes omitted. Its inclusion or omission shall not affect the interpretation of any phrase.

**Section 5.13   Severability**. If any provision of this Agreement is held invalid or unenforceable by any court of competent jurisdiction, the other provisions of this Agreement shall remain in full force and effect. The Parties further agree that if any provision contained herein is, to any extent, held invalid or unenforceable in any respect under the laws governing this Agreement, they shall take any actions necessary to render the remaining provisions of this Agreement valid and enforceable to the fullest extent permitted by applicable law and, to the extent

17

necessary, shall amend or otherwise modify this Agreement to replace any provision contained herein that is held invalid or unenforceable with a valid and enforceable provision giving effect to the intent of the Parties to the greatest extent legally permissible.

      **Section 5.14   <u>Counterparts</u>**. This Agreement may be executed in one or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument. Any .pdf or other electronic transmission hereof or signature hereon shall, for all purposes, be deemed originals.

      **Section 5.15   <u>Third Party Beneficiaries</u>**.  No Person who is not a Party to this Agreement has any rights under this Agreement or may enforce any provision in this Agreement.

      **Section 5.16   <u>Waivers</u>**.  No waiver by any Party of this Agreement's terms, provisions or conditions is effective unless specifically evidenced in writing and signed by or on behalf of the Party granting such waiver. Any Party's failure to pursue remedies for breach of this Agreement, or payment by any Party of invoices, does not constitute a waiver by any such Party of any breach of this Agreement or raise any defense against claims against a Party for breach of this Agreement. The waiver, failure to pursue remedies or to require the performance of any agreement or obligation under this Agreement, does not constitute (1) a waiver of any breach of this Agreement, or (2) a waiver of a later breach of any such agreement or obligation.

<p align="center">[<em>Signature page to follow</em>]</p>

<p align="center">18</p>

WITNESS THE SIGNATURES of the Parties hereto as set forth below.

<div align="center">

**<u>CUSA</u>:**

**CHEVRON U.S.A. INC.**

</div>

By: _____
Name:
Title:

<div align="center">

**FIELDWOOD ENERGY IV LLC**

</div>

By: _____
Name:
Title:

<div align="center">

**<u>CONTRACTOR:</u>**

**MAKO BUYER LLC**

</div>

By: _____
Name:
Title:

<div align="center">

[*Signature page to Turnkey Removal Contract*]

</div>

Exhibit A
<u>Turnkey Projects and Turnkey Amounts</u>

# REDACTED

Exhibit B
<u>Qualified Conditions</u>

# **REDACTED**

Appendix 1
<u>Terms and Conditions</u>

[*See attached.*]

*Final Version*

## TURNKEY REMOVAL TERMS AND CONDITIONS

### ARTICLE I.         DEFINITIONS

As used in this Appendix, each of the following terms has the meaning provided below.

1.1   "Affiliate" means, with respect to a Party means any person or entity that controls, is controlled by or is under common control with such Party where control means the direct or indirect power to direct the management of the entity at issue.  For the avoidance of doubt, (i) neither CUSA nor any of its direct or indirect subsidiaries shall constitute an Affiliate of Contractor for purposes of this Agreement, and (ii) neither Contractor nor FWE IV nor any of their direct or indirect subsidiaries shall constitute an Affiliate of CUSA for purposes of this Appendix 1.

1.2   "Appendix" shall mean this Appendix 1 (including all Exhibits attached hereto) which is itself attached to and incorporated in the Turnkey Removal Agreement.

1.3   "BOEM" shall mean the Bureau of Ocean Energy Management and/or any successor agencies thereto, as applicable.

1.4   "BSEE" shall mean the Bureau of Safety and Environmental Enforcement, and/or any successor agencies thereto, as applicable.

1.5   "Business Day" means every day other than a Saturday, a Sunday or a day that is an official holiday for employees of the federal government of the United States of America.

1.6    "Claims" shall mean any and all losses, liabilities, damages, obligations, expenses, fines, penalties, costs, claims, causes of action, judgments, awards and any and all other losses of any kind or character, including, without limitation, court costs and attorneys' fees.

1.7   "Contractor" shall have the meaning set forth in the Turnkey Removal Agreement.

1.8   "Contractor Group" shall mean, individually and collectively, Contractor, its parent, its Affiliates, its and their, joint venturers, contractors and subcontractors (of any tier), and all of their respective employees, officers, managers, directors, agents, representatives, subcontractors, and insurers and the subrogees of all such parties.

1.9   "CUSA" shall have the meaning set forth in the Turnkey Removal Agreement.

1.10   "Decommissioning Project" shall have the meaning set forth in the Turnkey Removal Agreement.

1.11   "Escrow Account" means that certain escrow account established pursuant to the Decommissioning Escrow Agreement (as defined in the Omnibus Agreement).

1.12   "Facilities" shall mean the platforms, pipelines, facilities, structures and other items or

Debtors' Exhibit No. 34
Page 362 of 910

objects connected to or associated with the FWE IV Assets (as identified on <u>Exhibit A</u> to the Turnkey Removal Agreement) and all parts and components thereof.

1.13    "<u>Final Completion</u>" means:

      i.   with respect to any Decommissioning Project that is a Well, acceptance by the applicable regulators of the End of Operations Report (EOR) with respect to such Well;

     ii.   with respect to any Decommissioning Project that is a Pipeline, acceptance by the applicable regulators of a "completion report" with respect to such Pipeline; and

    iii.   with respect to any Decommissioning Project that is a Platform/Facility, acceptance by the applicable regulators of Site Clearance with respect to such Platform/Facility,

with the type of each Decommissioning Project being as set forth in <u>Exhibit A</u> to the Turnkey Removal Agreement; *provided, however,* the Parties may agree on an alternative definition of "Final Completion" on a case-by-case basis in a writing signed by CUSA and Contractor prior to commencement of such Decommissioning Project.

1.14    "<u>FWE IV Group</u>" shall mean, individually and collectively, FWE IV, CUSA, and their respective parents, their Affiliates, and their respective co-venturers, co-lessees, co-owners, joint venturers, and all of their respective employees, officers, managers, directors, agents, representatives, attorneys-in-fact, and insurers and the subrogees of all such parties (provided that no member of the Contractor Group shall be a member of the FWE IV Group).

1.15    "<u>Government Official</u>" means any officer or employee of any government (including federal, state, local, and national governments), Public International Organization, any department, agency, company, or other instrumentality of any government or Public International Organization, or any candidate for political office.

1.16    "<u>Group</u>" means, with respect to FWE IV or CUSA, the FWE IV Group and, with respect to Contractor, the Contractor Group.

1.17    "<u>Notice</u>" and "<u>notice</u>" shall mean any notice, request, direction or other communication permitted or required to be given by one Party to the other with regard to this Appendix.

1.18    "<u>Omnibus Agreement</u>" means the omnibus agreement dated [_____] between Contractor, FWE IV and CUSA governing, among other matters, contributions into and distributions from the Escrow Account.

1.19    "<u>On The Hook</u>" shall mean the moment that such portion of the Facility (or part, piece or component thereof, as the case may be) is first lifted from its original resting position and is hanging free on Contractor's (or its subcontractor's) crane or other equipment during

the performance of the Work to be performed under this Appendix.

1.20 "Public International Organization" means an international organization formed by governments or other public international organizations, whatever the form of organization and scope of competence

1.21 "Records" mean information in any recorded form, including electronic, that relates to this Agreement.

1.22 "Reefed Items" shall mean the Facilities (and any part, piece and component thereof) to be reefed as set out in Section 2.4 herein and in accordance with the applicable reef permit.

1.23 "Site Clearance" shall mean delivery by Contractor to FWE IV (with a copy to CUSA) of evidence that BOEM and BSEE and all other applicable governmental authorities have accepted "site clearance" of the applicable Platform/Facility comprised in the applicable Decommissioning Project, including all requisite approvals or regulatory concurrence from such governmental authorities with respect to such Platform/Facility.

1.24 "Special Claim(s)" shall mean any and all Claims for or relating to special, indirect, consequential, exemplary, incidental or punitive damages of any kind or character, including, but not limited to, loss of use, loss of profit, loss of revenue, loss of product or production, reservoir damage, or hole damage (due to blowout or cratering).

1.25 "Targeted Completion Date" shall have the meaning set forth in Exhibit A to the Turnkey Removal Agreement.

1.26 "Third Party" shall mean any individual, person, company or entity or any other natural or juridical being, other than any member of the FWE IV Group or the Contractor Group.

1.27 "Transferred Items" shall mean the Facilities (and any part, piece and component thereof), including any equipment, materials, scrap metal, caissons, risers (and any and all other pieces, part or components thereof), but no part of any lease, that are to be removed or abandoned by Contractor as part of the Work and in accordance with this Appendix.

1.28 "Turnkey Removal Agreement" means the agreement between Contractor, FWE IV and CUSA with an effective date of [_____] and to which this Appendix 1 is attached and into which these Turnkey Removal Terms and Conditions have been incorporated.

1.29 "Turnkey Removal Terms and Conditions" means Article I through Article VIII of this Appendix 1 and Exhibits "A" through "F" attached hereto.

1.30 "Work" shall mean the work and activities, including the plugging, abandonment, decommissioning and removal of the relevant components of the FWE IV Assets, and the salvage and removal of the Facilities, to be conducted by or on behalf of Contractor pursuant to the terms and provisions of this Appendix, as more fully described in

Debtors' Exhibit No. 34
Page 364 of 910

Schedule "A" to this Appendix.

1.31    Any capitalized terms used herein but not defined in this Appendix shall have the meaning ascribed in the Turnkey Removal Agreement.


## ARTICLE II.    WORK

2.1    Scope of Work.

Contractor shall perform the Work upon the terms and provision set forth in this Appendix 1.  The scope of the Work for each Decommissioning Project is more fully set forth in Schedule "A" to this Appendix.

Additionally, the Parties acknowledge that Contractor will prepare a particularized scope of work for certain Decommissioning Projects that Contractor will submit to BSEE through Contractor's Application for Permit to Modify (APM) for each Decommissioning Project. Upon submittal of such APM to BSEE, Contractor shall also provide to CUSA, for informational purposes only, an unredacted copy of the APM and all supporting documents reasonably requested by CUSA.  For any Decommissioning Project that does not require an APM, Contractor shall provide CUSA, for informational purposes only, with copies of any permit applications filed with BSEE.  Upon approval by BSEE of the APM or applicable permit application and BSEE's issuance of the applicable permit approving such Decommissioning Project, Contractor's particularized scope of work that was so approved by BSEE shall become the "Definitive Scope of Work" for such Decommissioning Project. Upon request by CUSA, Contractor shall provide CUSA with the project execution plan for any Decommissioning Project.

2.2    Inspection.

The Work and all parts thereof shall be subject to inspection at all reasonable times by inspectors designated by FWE IV, its representatives, or its invitees (which such invitees may include CUSA and/or representatives of CUSA).  No such inspection shall relieve Contractor of any of its obligations hereunder.  No failure to inspect or failure to discover any aspect of the Work that is not performed in accordance with any provision of this Appendix shall be construed to imply any acceptance of such Work or to relieve Contractor of any of its obligations hereunder.  Contractor shall correct any portion of the Work that is incomplete or otherwise as required to achieve Final Completion of the Decommissioning Project, subject to the terms of the Agreement.

2.3    Title.

FWE IV grants, bargains, sells, conveys and assigns to Contractor, and Contractor accepts and assumes title to and ownership of the Transferred Items, which such transfer shall occur for each of the Transferred Items at such time as such Transferred Items are On The Hook.

**THE TRANSFERRED ITEMS SHALL BE TRANSFERRED TO AND ACCEPTED BY CONTRACTOR "AS IS, WHERE IS" WITH ALL FAULTS. FWE IV DOES NOT MAKE ANY, AND FWE IV EXPRESSLY DISCLAIMS ANY AND ALL, WARRANTIES CONCERNING THE TRANSFERRED ITEMS, WHETHER EXPRESS, IMPLIED, STATUTORY OR OTHERWISE, INCLUDING, WITHOUT LIMITATION, ANY WARRANTIES OF MERCHANTABILITY, FITNESS FOR A PARTICULAR USE, AND FREEDOM FROM DEFECTS, WHETHER SUCH DEFECTS ARE PATENT, LATENT, PRE-EXISTING, REDHIBITORY OR OTHERWISE. UPON SUCH TRANSFER OF OWNERSHIP FROM FWE IV TO CONTRACTOR OF THE TRANSFERRED ITEMS, CONTRACTOR SHALL BE SOLELY RESPONSIBLE FOR, AND SHALL ASSUME ALL RISK AND LIABILITY FOR SUCH TRANSFERRED ITEMS, INCLUDING, WITHOUT LIMITATION, ALL LIABILITY FOR TIE DOWN AND SEA FASTENING, SALVAGE IF LOST DURING TRANSPORT, REMOVAL AND DISPOSAL OF SUCH TRANSFERRED ITEMS AND ALL POLLUTION OR ENVIRONMENTAL CONTAMINATION ATTRIBUTABLE THERETO.** The foregoing notwithstanding, the Parties expressly acknowledge that nothing herein shall cause the transfer of, and Contractor does not accept, the assignment or conveyance of any record title ownership of any lease or any operating rights thereunder. FWE IV agrees to provide a bill of sale related to such Transferred Items upon request by Contractor.

2.4   <u>Reefed Items.</u> In accordance with the Work to be performed under this Appendix, Contractor shall remove and transport the Reefed Items to the designated reef sites as described in the applicable reef permits. **CONTRACTOR SHALL BE SOLELY RESPONSIBLE FOR, AND SHALL ASSUME ALL RISK AND LIABILITY FOR SUCH REEFED ITEMS, INCLUDING, WITHOUT LIMITATION, ALL LIABILITY FOR THE TOW AND SALVAGE, IF LOST DURING TOWING, OF SUCH REEFED ITEMS AND ALL POLLUTION AND ENVIRONMENTAL CONTAMINATION ATTRIBUTABLE THERETO (EXCEPT TO THE EXTENT DUE TO THE CONDITION OR STRUCTURAL INTEGRITY OF THE RETAINED ITEMS FOR WHICH FWE IV SHALL REMAIN RESPONSIBLE) BEGINNING WHEN SUCH REEFED ITEMS ARE ON THE HOOK AND UNTIL SUCH TIME AS THE REEFED ITEMS ARE DELIVERED BY MATERIAL BARGE TO THE DESIGNATED REEF SITES FOR POSITIONING ON THE SEA FLOOR PURSUANT TO THE APPLICABLE REEF PERMIT.**

## ARTICLE III.      SURVEY AND PERMITS

3.1   <u>On-Site Survey.</u>

At the completion of the removal, reefing or abandonment of any particular Facility in accordance with the Work to be performed hereunder, Contractor shall conduct a survey over the relevant Facility site, if necessary to obtain Final Completion of the Decommissioning Project. Any costs of such on-site survey shall be to Contractor's account.

Debtors' Exhibit No. 34
Page 366 of 910

3.2     Permits.

FWE IV agrees to timely obtain and shall thereafter maintain all permits and approvals that are necessary for Contractor to perform the Work and required to be in the name of any member of Contractor Group (the "Contractor Permits").  Contractor shall provide all necessary information, assistance and documentation to FWE IV as reasonably requested in connection with the permits to be obtained by FWE IV.

## ARTICLE IV.        OBLIGATIONS OF CONTRACTOR

4.1     Independent Contractor.

Contractor is an independent contractor with the sole authority and right to direct, supervise and control the performance of all details of the Work, subject only to the general right of inspection by FWE IV or its representatives or invitees (including CUSA) to achieve the desired results and satisfactory completion of the Work. Any provision of this Appendix that may appear to give FWE IV or its representatives or invitees (including CUSA) the right to direct Contractor as to the details of doing the Work or to exercise a measure of control over the Work shall be deemed to mean that Contractor shall follow the desires of FWE IV or its representatives or its invitees (including CUSA) in the results of the Work only and not in the means whereby the Work is to be accomplished.  Except as otherwise expressly provided in Section 4.2 hereof, no member of the Contractor Group shall be deemed to be an agent, representative, or employee of FWE IV or any other member of FWE IV Group.  Contractor shall remain responsible for all of the actions of its subcontractors and the agents, representatives and employees of such subcontractors.

4.2     Statutory Employee.

In all cases where Contractor's employees (defined for the purposes of this Section 4.2 to include any Contractor Group member's direct, borrowed, special or statutory employees) are performing Work in or offshore the State of Louisiana or are otherwise covered by the Louisiana Worker's Compensation Act, La. Rev. Stat. §§ 23.1021 et seq., FWE IV, CUSA and Contractor acknowledge and agree that all Work and operations performed by Contractor and its subcontractors and their employees pursuant to this Appendix are an integral part of and are essential to the ability of FWE IV to generate FWE IV's goods, products or services.  In such event, and without limiting the provisions of Section 4.1 above, FWE IV and Contractor agree that FWE IV is and shall be deemed a statutory employer of Contractor's employees and its subcontractor's employees for the sole purposes of La. Rev. Stat. § 23.1061(A)(3), as the same may be amended from time to time. Contractor shall ensure that all of its subcontracts contain the same provisions as this Section 4.2.

4.3     Standard of Performance.

A.  Contractor covenants and agrees that it shall safely and efficiently prosecute the Work with due diligence and care in a good and workmanlike manner with qualified, careful and efficient workers in strict compliance and accordance with (i) generally accepted standards of engineering, construction and decommissioning practice for work that is substantially

similar to the Work covered under this Appendix; (ii) the provisions of the Appendix; and (iii) all applicable laws, rules, regulations and standards of the BOEM and any other applicable governmental or regulatory agency or body (together, the "Standard of Performance"). The Parties agree that Contractor will have met the Standard of Performance under the Agreement, including this Appendix, if it performs the Work consistent with all required laws, rules and regulations promulgated by governing regulatory agencies, including but not limited to BOEM and BSEE, and consistent with any applicable third party contracts. As used in this Section 4.3, "third party contracts" means contracts that govern or otherwise impose obligations on FWE IV with respect to the performance of engineering, construction and decommissioning activities in relation to the FWE IV Assets.

B. With respect to the Decommissioning Projects known to the Parties as (i) East Breaks 158 (OCS-G02645), (ii) East Breaks 159 (OSC-G02646), (iii) East Breaks 160 (OCS-G02647) and (iv) East Breaks 161 (OSC-G02648) (hereinafter the "East Breaks Assets"), Contractor agrees to comply with the following and that the following shall be part of the "Standard of Performance" with respect to the Decommissioning Projects that include any of the East Breaks Assets:

    i. For the East Breaks Assets that are Wells, Contractor shall monitor such wells for pressure or bubbles in accordance with BSEE regulations for sixty (60) consecutive days following achievement of "Temporary Abandoned Status" (as commonly defined and accepted by BSEE) through surface plug completion date. When Contractor experiences zero (0) flow and zero (0) bubbles for thirty (30) consecutive minutes, such monitoring may cease. In the event of denial by BSEE of sustained casing pressure departure requests submitted on the wells known to the Parties as the EB 159 A007, EB 160 A029, EB 160 A007 and EB 160 A024 Wells, the above requirement shall be conducted only when Work scheduling allows (as determined by Contractor).

    ii. All conductors shall be reefed at a maximum depth of 200' below the waterline, unless such reefing is not approved by BSEE or Texas Parks & Wildlife. The Parties reserve the right to mutually agree in writing to different severance depths.

4.4    Contractor's Personnel.

Notwithstanding the fact that Contractor shall perform the Work as an independent contractor, Contractor covenants and agrees to keep competent personnel on the job.

4.5    Compliance with Laws.

Contractor shall observe and comply with, and shall ensure that all members of the Contractor Group observe and comply with, all federal, state and local laws, orders, rules and regulations which are now or may in the future become applicable to Contractor (or such employee, agent, representative or subcontractor, as the case may be) or to the performance of the Work under this Appendix and shall comply with the provisions in Schedule "B" attached hereto and made a part hereof for all purposes.

Debtors' Exhibit No. 34
Page 368 of 910

4.6     Equipment & Materials.

All equipment, tools, materials and facilities to be furnished by Contractor in the performance of the Work shall be serviceable and kept in good operating condition.  Contractor shall schedule its other operations so as to ensure that the necessary equipment, tools, materials and facilities and personnel to operate the same shall be available at the times necessary for the orderly completion of the Work in accordance with the terms of this Appendix.

4.7     Schedule Obligations.

Contractor shall provide FWE IV and CUSA a schedule for the commencement of each Decommissioning Project for Year 1 on a date no more than sixty (60) days after the Effective Date of the Turnkey Removal Agreement.  For each subsequent Contract Year, Contractor will provide a schedule related to the Decommissioning Projects to be conducted in such Contract Year no later than the date that is ninety (90) days prior to the beginning of the Contract Year in which such Decommissioning Project is to be commenced as identified on Exhibit A for the Turnkey Removal Agreement.  Contractor shall provide FWE IV and CUSA a monthly update to the schedule reflecting any changes to the schedule.

4.8     Delay Notice.

If, at any time, Contractor becomes aware that it will achieve Final Completion of a Decommissioning Project later than the applicable Targeted Completion Date, Contractor shall notify CUSA of such delay and the measures Contractor is taking and will take to timely complete such Decommissioning Project.

4.9     Liens.

**CONTRACTOR SHALL INDEMNIFY AND HOLD HARMLESS THE FWE IV GROUP FROM ANY AND ALL LIENS AND OTHER ENCUMBRANCES AGAINST ANY PROPERTY OR INTERESTS OF ANY MEMBER OF THE FWE IV GROUP AND FROM AND AGAINST ANY AND ALL CLAIMS ON ACCOUNT OF DEBTS ALLEGED TO BE DUE FROM ANY MEMBER OF CONTRACTOR GROUP, TO ANY PERSON INCLUDING ANY OTHER MEMBER OF CONTRACTOR GROUP, AND SHALL DEFEND AT ITS OWN EXPENSE ANY CLAIM OR LITIGATION IN CONNECTION THEREWITH; PROVIDED, HOWEVER, THE FOREGOING SHALL NOT APPLY TO THE EXTENT THE LIEN OR OTHER ENCUMBRANCE OR OTHER CLAIM ARISES OUT OF CUSA'S OR OTHER WI PARTY'S (AS SUCH TERM IS DEFINED IN THE OMNIBUS AGREEMENT) FAILURE TO PAY UNDISPUTED AMOUNTS OWED.**

4.10    Conflict of Interest and Improper Influence

In performing their obligations hereunder, no member of Contractor Group will (a) give to or receive from any director, employee, or agent of FWE IV or CUSA or their individual Affiliate in connection with the Work, any gift, entertainment, or other benefit of more than nominal cost or value, or any commission, fee, or rebate, (b) enter into any business arrangement with any individual known by such member of the Contractor Group to be a director, employee or agent (excluding

attorneys and accountants) of FWE IV or CUSA or their individual Affiliate without FWE IV or CUSA's, as applicable, prior written consent, (c) offer or make any payment, or offer or give anything of value to any Government Official, or any immediate family member of a Government Official, any political party to influence any act or decision by any Government Official, government, government instrumentality, party, or Public International Organization, or to gain any other advantage for FWE IV Group or Contractor Group or any of them arising out of this Agreement, or (d) offer or make any payment, or offer or give anything of value to any person if the Contractor member knows or has reason to believe that any portion of the payment or thing of value will be given directly, indirectly, or through a third party to any Government Official, any immediate family member of any Government Official, or any political party.

A. **Representation and Warranty.** Contractor represents and warrants for itself and on behalf of each member of the Contractor Group (acting in its capacity as such) that no event has occurred prior to the Effective Date which, had it occurred after the Effective Date, would constitute a violation of Section 4.10.

B. **Reporting Violations and Termination.** Contractor shall immediately notify FWE IV or CUSA, as applicable, of any violation of Section 4.10 or breach of the warranty under Section 4.10(A). Notwithstanding any other provision of this Agreement, FWE IV or CUSA, as applicable, may terminate this Agreement at any time for any violation of Section 4.10, or breach of the warranty under Section 4.10(A), and neither FWE IV nor CUSA is obligated to make any payment to Contractor after the date of such violation or event, except in satisfaction of payment obligations that accrued on or prior to the date of such violation or event, and that FWE IV or CUSA has determined are not directly or indirectly related to such violation or event.

4.11    Controls and Records.

Contractor shall ensure that all members of Contractor Group establish and maintain all internal controls and Records that are necessary and appropriate in accordance with good management practice to achieve the following:

(i)     Ensure the accuracy and completeness of Contractor's invoices and of the Records required to be kept under this Agreement.

(ii)    Ensure and to record accurately and completely compliance with Section 4.10(A), and detection of any other improper conduct by members of Contractor Group.

(iii)   Ensure and to record accurately and completely compliance with all other obligations of Contractor under this Agreement, including HES Guidelines and DAS Policy.

(iv)    Record accurately and completely the performance by Contractor of its obligations under this Agreement, and the liability for and calculation of all amounts payable by FWE IV to Contractor under this Agreement.

(v)     Record accurately and completely all amounts payable by members of Contractor Group to other members of Contractor Group, or other person in connection with the performance of Contractor of its obligations under this Agreement.

4.12    Records.

- 9 -

Contractor shall maintain complete, accurate and current detailed Records of all costs and documentation of equipment, materials, supplies, labor and any other items or aspects of the Work performed hereunder for not less than two (2) years after final termination of the Agreement; provided, however, if any Claim related to the Work performed pursuant to this Appendix is made by any person or entity within such two (2) year period, then Contractor shall retain such Records until final resolution of such Claim.  Contractor shall grant to FWE IV, its authorized representatives, its authorized invitees (including CUSA) and/or public accounting firm selected by FWE IV, the right, at a reasonable time, to inspect, audit, examine and copy any applicable Records or documents of Contractor as may be necessary confirm that the requirements of this Agreement are met, including to verify the validity and correctness of the charges reflected on any invoice and to protest or dispute any such charge.  Nonetheless, nothing in this Appendix shall create a right to inspect, audit, examine or copy any records relating to Contractor's profits or overhead or to its costs or expenses relating to any Decommissioning Project performed on a lump sum basis; provided that this sentence shall not limit CUSA's rights to inspect, audit, examine or copy records relating to (i) Decommissioning Projects performed on a cost-plus, at-cost or other reimbursable basis or (ii) Contractor claims in relation to Qualified Conditions.

4.13   Trade Sanctions Compliance.

Contractor shall provide FWE IV and CUSA with 90 days' advance notice of the names and addresses of any member of Contractor Group which may be the target of, or owned or subject to control by, any country, institution, organization, entity, or person that is subject to economic sanctions or any trade restrictions imposed by the U.S. government; debarred or excluded or declared ineligible to participate in U.S. government contracts, or contracts, grants, or other programs financed in whole or part by the U.S. government; or listed by the U.S. Departments of Commerce or State as an entity which U.S. persons may not engage in export or re-export related transactions.

4.14   Import and Export Charges.

Contractor is responsible for importing and exporting all Contractor equipment that Contractor requires to perform the Work.  Contractor is solely responsible for all import and export charges and any other lawfully payable charged related to the import and export of Contractor equipment.

4.15   Taxes.

Contractor agrees to pay all taxes, licenses and fees levied or assessed in connection with, or incident to, Contractor's performance of the Work by any governmental agency, including for (i) income taxes; (ii) unemployment compensation insurance, benefits, social security; or (iii) any other taxes upon the amounts paid to Contractor, its agents, employees and representatives.  Contractor shall also be responsible for and shall pay all sales, ad valorem or use taxes and all import/customs duties, fees, charges or costs that may be assessed or incurred as a result of the performance of the Work, including the transfer of the Transferred Items from FWE IV to Contractor pursuant to the terms hereof and the Turnkey Removal Agreement.

- 10 -

## ARTICLE V.    INDEMNIFICATION AND LIABILITY

### 5.1    CONTRACTOR'S INDEMNITY.

CONTRACTOR SHALL BE LIABLE AND RESPONSIBLE FOR, AND SHALL RELEASE, DEFEND, PROTECT, INDEMNIFY AND HOLD HARMLESS THE **FWE IV** GROUP FROM AND AGAINST ANY AND ALL CLAIMS ARISING FROM OR RELATING TO:

A.    THE LOSS OF OR DAMAGE OR INJURY TO THE PROPERTY OF ANY MEMBER OF THE CONTRACTOR GROUP AND/OR WRECK REMOVAL OF SUCH PROPERTY, INCLUDING, WITHOUT LIMITATION, ANY SUCH MEMBER'S EQUIPMENT, VESSELS, BARGES AND TUGS, AND (FROM AND AFTER THE TIME AT WHICH THE OWNERSHIP OF SUCH TRANSFERRED ITEMS VESTS IN CONTRACTOR PURSUANT TO **SECTION 2.3**) THE TRANSFERRED ITEMS, WHETHER SUCH PROPERTY IS OWNED, RENTED OR OPERATED BY ANY SUCH MEMBER OF THE CONTRACTOR GROUP;

B.    ANY ILLNESS, INJURY OR DEATH SUFFERED BY ANY MEMBER OF THE CONTRACTOR GROUP;

C.    (1) THE LOSS OF OR DAMAGE OR INJURY TO THE PROPERTY OF ANY THIRD PARTY, OR (2) THE ILLNESS, INJURY OR DEATH SUFFERED BY ANY THIRD PARTY, TO THE EXTENT THAT ANY SUCH CLAIM IS CAUSED BY THE BREACH OF THE TURNKEY REMOVAL AGREEMENT (INCLUDING THIS APPENDIX) BY CONTRACTOR OR THE NEGLIGENCE, GROSS NEGLIGENCE OR WILLFUL MISCONDUCT OF ANY MEMBER OF CONTRACTOR GROUP;

D.    THE LOSS OF OR DAMAGE OR INJURY TO THE PROPERTY OF **FWE IV** THAT IS NOT THE SUBJECT OF THE APPLICABLE DECOMMISSIONING PROJECT BEING UNDERTAKEN AT THE TIME OF SUCH LOSS OR DAMAGE, TO THE EXTENT THAT ANY SUCH CLAIM IS CAUSED BY THE NEGLIGENCE, GROSS NEGLIGENCE OR WILLFUL MISCONDUCT OF ANY MEMBER OF CONTRACTOR GROUP;

E.    GOVERNMENTAL FINES AND PENALTIES ASSESSED IN CONNECTION WITH ANY DECOMMISSIONING PROJECT OR ANY OF THE WORK RESULTING FROM THE BREACH OF THE TURNKEY REMOVAL AGREEMENT (INCLUDING THIS APPENDIX) BY CONTRACTOR OR THE NEGLIGENCE, GROSS NEGLIGENCE OR WILLFUL MISCONDUCT OF ANY MEMBER OF CONTRACTOR GROUP;

F.    THE FAILURE OF CONTRACTOR OR ANY OTHER PERSON FOR WHOM CONTRACTOR IS RESPONSIBLE TO PAY TAXES THAT ARE CONTRACTOR'S RESPONSIBILITY PURSUANT TO **SECTION 4.15**;

G.    POLLUTION OR CONTAMINATION (INCLUDING, WITHOUT LIMITATION, PROPERTY DAMAGE, CONTROL, REMOVAL, RESTORATION OF LANDS OR SEA BEDS, AND CLEANUP OF ALL POLLUTION OR CONTAMINATION), INCLUDING, WITHOUT

- 11 -

LIMITATION, SPILLS OR LEAKS OR FUEL, LUBRICANTS, MOTOR OILS, PIPE DOPE, PAINTS, SOLVENTS, BALLASTS, BILGE, GARBAGE OR SEWAGE, WHICH EITHER (I) ORIGINATES FROM THE PROPERTY OF ANY MEMBER OF CONTRACTOR GROUP OR (II) IS CAUSED BY A BREACH OF THE TURNKEY REMOVAL AGREEMENT (INCLUDING THIS APPENDIX) BY CONTRACTOR OR THE NEGLIGENCE, GROSS NEGLIGENCE OR WILLFUL MISCONDUCT OF ANY MEMBER OF CONTRACTOR GROUP;

H.   ASSESSMENTS OR LEVIES AGAINST FWE IV GROUP IN CONNECTION WITH CONTRACTOR'S IMPORT/EXPORT OBLIGATIONS ARISING OUT OF THIS AGREEMENT;

I.   ANY INACCURACY OF THE REPRESENTATIONS SET FORTH IN SECTIONS 4.5 AND 4.10;

J.   ANY BREACH OF APPLICABLE LAW BY ANY MEMBER OF CONTRACTOR GROUP;

K.   LIENS;

WHICH ARISE OUT OF OR RELATE TO THE TURNKEY REMOVAL AGREEMENT (INCLUDING THIS APPENDIX) OR THE PERFORMANCE OF ANY WORK HEREUNDER. **CONTRACTOR'S OBLIGATIONS UNDER THIS SECTION 5.1, INCLUDING, WITHOUT LIMITATION, ITS OBLIGATIONS TO DEFEND, PROTECT, INDEMNIFY AND HOLD HARMLESS THE FWE IV GROUP, SHALL BE OWED WITHOUT LIMIT AND WITHOUT REGARD TO THE CAUSE OR CAUSES OF ANY CLAIMS FOR WHICH SUCH OBLIGATIONS ARE OWED, INCLUDING, WITHOUT LIMITATION, THE SOLE, JOINT OR CONTRIBUTORY NEGLIGENCE, STRICT LIABILITY, LIABILITY WITHOUT FAULT, STATUTORY LIABILITY, CONTRACTUAL LIABILITY OR OTHER FAULT OF ANY MEMBER OF THE FWE IV GROUP, THE UNSEAWORTHINESS OF ANY VESSEL, THE UNAIRWORTHINESS OF ANY AIRCRAFT OR THE EXISTENCE OF ANY DEFECT, WHETHER PATENT, LATENT, PRE-EXISTING OR OTHERWISE; PROVIDED, HOWEVER, THAT SUCH OBLIGATIONS SHALL NOT BE OWED TO THE EXTENT SUCH CLAIMS ARE CAUSED BY THE GROSS NEGLIGENCE OR WILLFUL MISCONDUCT OF ANY MEMBER OF THE FWE IV GROUP.**

5.2   FWE IV's INDEMNITY.

FWE IV SHALL BE LIABLE AND RESPONSIBLE FOR, AND SHALL RELEASE, DEFEND, PROTECT, INDEMNIFY AND HOLD HARMLESS THE CONTRACTOR GROUP FROM AND AGAINST ANY AND ALL CLAIMS ARISING FROM OR RELATING TO:

A.   SUBJECT TO SECTION 5.1D, THE LOSS OF OR DAMAGE OR INJURY TO THE PROPERTY OF ANY MEMBER OF THE FWE IV GROUP AND/OR WRECK REMOVAL OF SUCH PROPERTY, INCLUDING, WITHOUT LIMITATION, ANY SUCH MEMBER'S EQUIPMENT, VESSELS, BARGES AND TUGS, WHETHER SUCH PROPERTY IS OWNED, RENTED OR OPERATED BY ANY SUCH MEMBER OF FWE IV GROUP;

B.   ANY ILLNESS, INJURY OR DEATH SUFFERED BY ANY MEMBER OF THE FWE IV GROUP; AND

- 12 -

C.     (1) THE LOSS OF OR DAMAGE OR INJURY TO THE PROPERTY OF ANY THIRD PARTY, OR (2) THE ILLNESS, INJURY OR DEATH SUFFERED BY ANY THIRD PARTY, TO THE EXTENT THAT ANY SUCH CLAIM IS CAUSED BY THE NEGLIGENCE, GROSS NEGLIGENCE OR WILLFUL MISCONDUCT OF ANY MEMBER OF FWE IV GROUP;

WHICH ARISE OUT OF OR RELATE TO THE TURNKEY REMOVAL AGREEMENT (INCLUDING THIS APPENDIX) OR THE PERFORMANCE OF ANY WORK HEREUNDER.  **FWE IV'S OBLIGATIONS UNDER THIS SECTION 5.2, INCLUDING, WITHOUT LIMITATION, ITS OBLIGATIONS TO DEFEND, PROTECT, INDEMNIFY AND HOLD HARMLESS THE CONTRACTOR GROUP, SHALL BE OWED WITHOUT REGARD TO THE CAUSE OR CAUSES OF ANY CLAIMS FOR WHICH SUCH OBLIGATIONS ARE OWED, INCLUDING, WITHOUT LIMITATION, THE SOLE, JOINT OR CONTRIBUTORY NEGLIGENCE, STRICT LIABILITY, LIABILITY WITHOUT FAULT, STATUTORY LIABILITY, CONTRACTUAL LIABILITY OR OTHER FAULT OF ANY MEMBER OF THE CONTRACTOR GROUP, THE UNSEAWORTHINESS OF ANY VESSEL, THE UNAIRWORTHINESS OF ANY AIRCRAFT OR THE EXISTENCE OF ANY DEFECT, WHETHER PATENT, LATENT, PRE-EXISTING OR OTHERWISE; PROVIDED, HOWEVER, THAT SUCH OBLIGATIONS SHALL NOT BE OWED TO THE EXTENT SUCH CLAIMS ARE CAUSED BY THE GROSS NEGLIGENCE OR WILLFUL MISCONDUCT OF ANY MEMBER OF THE CONTRACTOR GROUP.**

## 5.3     SPECIAL CLAIMS.

NOTWITHSTANDING ANYTHING TO THE CONTRARY CONTAINED ELSEWHERE HEREIN, NEITHER PARTY (NOR THE MEMBERS OF SUCH PARTY'S GROUP) SHALL BE LIABLE TO THE OTHER PARTY FOR ANY SPECIAL CLAIM(S), WHENEVER ARISING UNDER THE TURNKEY REMOVAL AGREEMENT (INCLUDING THIS APPENDIX) OR AS A RESULT OF, RELATING TO OR IN CONNECTION WITH ANY WORK; AND NO SUCH SPECIAL CLAIM(S) SHALL BE MADE BY ANY PARTY AGAINST ANY OTHER PARTY OR SUCH OTHER PARTY'S GROUP (OR ANY MEMBER OF SUCH OTHER PARTY'S GROUP AS SUCH IS CONTEMPLATED HEREUNDER), **REGARDLESS OF THE CAUSE OR CAUSES OF SUCH SPECIAL CLAIM(S), INCLUDING WHETHER OR NOT ANY SUCH SPECIAL CLAIM IS BASED OR ALLEGED TO BE BASED, IN WHOLE OR IN PART, ON THE NEGLIGENCE (INCLUDING SOLE, JOINT, ACTIVE, PASSIVE, CONCURRENT OR GROSS NEGLIGENCE), BREACH OF WARRANTY, STRICT LIABILITY, STATUTORY LIABILITY, CONTRACTUAL LIABILITY OR OTHER FAULT OF ANY PARTY OR ANY MEMBER OF SUCH PARTY'S GROUP, THE UNSEAWORTHINESS OF ANY VESSEL, THE UNAIRWORTHINESS OF ANY AIRCRAFT, OR THE EXISTENCE OF ANY DEFECT, WHETHER PATENT, LATENT, PRE-EXISTING OR OTHERWISE; PROVIDED, HOWEVER, THIS SECTION 5.3 SHALL NOT APPLY TO CLAIMS MADE BY THIRD PARTIES (OR TO OBLIGATIONS TO INDEMNIFY AND DEFEND AGAINST CLAIMS MADE BY THIRD PARTIES)**.

## ARTICLE VI.     INSURANCE

6.1     Contractor's Insurance.

Contractor shall carry, at its own expense, with insurers who are reliable and with an A.M Best rating of not less than A- and authorized to do business in the states or other jurisdictions in which the Work is to be performed by Contractor hereunder, insurance coverages of the types and

with limits no less than those set forth in Schedule "C" attached hereto and made a part hereof. Further, Contractor agrees to carry adequate contractual liability insurance to support the indemnities given herein.  Prior to commencing any of the Work to be conducted pursuant to the terms of this Appendix, if requested by CUSA, Contractor agrees to provide CUSA with certificates of insurance evidencing such insurance coverages in commercially-available forms acceptable to CUSA, and Contractor agrees to maintain current certificates of insurance on file with CUSA for the duration of this Appendix.  The Parties expressly acknowledge and agree that the insurance and indemnity provisions of this Appendix are separate and distinct; and that any insurance requirements contained herein shall not be deemed to restrict or limit any of the indemnity obligations set forth in this Appendix.

If Contractor hires any subcontractor to perform any of the Work hereunder, then Contractor shall require that any such subcontractor will obtain insurance protection with coverages of the types and with limits deemed appropriate by Contractor.  Any deficiencies in the coverages, policy limits or endorsements of Contractor's subcontractors shall be the sole responsibility of Contractor and shall be covered by Contractor's insurance.

6.2     Louisiana Anti-Indemnity Provisions.

Notwithstanding anything contained herein to the contrary, Contractor and FWE IV agree that with respect to all Work performed in Louisiana or offshore Louisiana and with respect to which the laws of the state of Louisiana are otherwise applicable, FWE IV (on its own behalf, on behalf of CUSA, and on behalf of their respective agents and representatives and their respective employees) and Contractor (on its behalf, and on behalf of its subcontractors, agents and representatives and their respective employees) may pay to each other's insurers the premium required by their respective insurers or their insurer's agents or authorized representatives to extend all of their insurance policies to include coverage for FWE IV's and Contractor's respective indemnities as required under this Appendix, and such insurance protection shall be governed by Louisiana law.  Each of FWE IV and Contractor will arrange to have the other billed for the premium by its respective insurer, and will advise the other prior to the commencement of any Work under this Appendix if the premium will be in excess of $2,000.00.  The insurance policy shall apply to incidents arising out of the performance of this Appendix.  At each subsequent renewal of insurance, during the term of the Appendix, each party will advise the other of the amounts of the premium required for the extensions described above and arrange billing for the appropriate premium by its insurers or their agents or authorized representatives.  It is expressly acknowledged and agreed to by the Parties that the provisions of this Section 6.2 are intended to comply with the provisions of *Marcel v. Placid Oil Co.*, 11 F.3d 563 (5th Cir. 1994), and the provisions hereof shall be interpreted in such a manner as to comply therewith.

6.3     Texas Anti-Indemnity Act.

To the extent that the Work or any part thereof is subject to the laws of the state of Texas, the Parties agree that in order to be in compliance with the Texas Anti-Indemnity Act regarding indemnification mutually assumed for the other Party's sole or concurrent negligence, each Party agrees to carry supporting insurance in equal amounts of the types and in the minimum amounts

specified in the insurance agreements hereunder; provided, however, that FWE IV shall have the right to self-insure any or all coverages required of it hereunder.

<div align="center">

**ARTICLE VII.    CUSA POLICIES**

</div>

7.1    <u>Compliance with Policies</u>.

Contractor covenants and agrees to, and shall cause its subcontractors to agree to, abide by and act in accordance with the following Contractor policies, as such are set forth in <u>Exhibits "B,"</u> "<u>D</u>," "<u>E</u>" and "<u>F</u>," respectively, attached hereto and made a part hereof:

1.    Equal Opportunity Policy
2.    Drug and Alcohol Policy;
3.    Safety Program; and
4.    Search and Seizure Policy.

<div align="center">

**ARTICLE VIII.    GENERAL PROVISIONS**

</div>

8.1    <u>Force Majeure</u>.

A.    All obligations imposed by the Turnkey Removal Agreement (including this Appendix) on each Party, except for obligations to pay money or to provide defense or indemnity, shall be suspended while compliance is prevented, in whole or in part, by an event of *force majeure*. As used herein an event of *force majeure* shall mean any of: an industry-wide labor dispute, fire, flood, war, civil disturbance, act of God (including numbered or named tropical disturbances); a change in laws or governmental rules, regulations or orders (other than a Change in Law as defined in <u>Exhibit B</u> to the Turnkey Removal Agreement, which, for clarity, shall be addressed as a Qualified Condition and not as an event of *force majeure* pursuant to this <u>Section 8.1</u>), or any other cause, whether similar or dissimilar, provided that such event or circumstance (i) delays or renders impossible the affected Party's performance of its obligations under this Appendix; (ii) is beyond the reasonable control of the affected Party, not due to its fault or negligence and was not reasonable foreseeable, and (iii) could not have been prevented or avoided by the affected Party through the exercise of due diligence, including the expenditure of any reasonable sum, and provided further that *force majeure* shall not include any of the following: (i) economic hardship, (ii) changes in market conditions, (iii) late delivery or failure of construction equipment or materials (unless such late delivery or failure was itself caused by an event of *force majeure*); (iv) labor availability, strikes or other similar labor actions limited to personnel of Contractor Group, or (v) climatic conditions (including rain, snow, wind, temperature and other weather conditions), tides, and seasons, regardless of the magnitude, severity, duration or frequency of such climatic conditions, tides or seasons, other than an act of God (including numbered or named tropical disturbances).

B.    Notwithstanding the foregoing, such Party shall resume performance within a reasonable time after such event of *force majeure* has ended or been removed, or such Party is able to overcome the prevention caused by such event.  Contractor shall consistently monitor and use its commercially reasonable endeavors, including the reasonable expenditure of money, to

<div align="center">

- 15 -

</div>

overcome, mitigate and minimize the event of *force majeure* and its consequences.  No Party shall be entitled to additional compensation or other payment as a result of an event of force majeure.

8.2     <u>Work Site Access.</u>

To the extent reasonably necessary for Contractor to perform the Work, FWE IV shall provide Contractor unrestricted access to all the Facilities and shall execute any agency agreement, power of attorney, instrument, license, certificate, or other agreement reasonably necessary to provide such access.  Only the authorized personnel of Contractor Group, CUSA or proper governmental agencies shall be permitted access to any premises where Work is being performed under this Appendix.

8.3     <u>Survival.</u>

All provisions of this Appendix that cannot be performed before the expiration or termination of this Appendix, including, without limitation, the indemnity and confidentiality provisions contained herein, and all representations, promises, releases, and indemnities under this Appendix, shall survive the expiration or termination of this Appendix.

[End of Appendix 1; Schedules "A"-"F" to Appendix 1 follow]

Debtors' Exhibit No. 34
Page 377 of 910

## SCHEDULE "A" to APPENDIX 1

The Scope of Work includes all plugging and abandonment of the FWE IV Assets, including abandonment and removal of all wells/conductors, removal of all platforms/structures, achieving Site Clearance with respect to all Platforms/Facilities, and flushing and abandonment in place or removal of pipelines as permitted.

The Definitive Scope of Work for each Decommissioning Project shall be established by the documentation submitted by Contractor to BSEE for the Application for Permit to Modify (APM) or other permit filed with BSEE on Decommissioning Projects that do not consist of wells, with respect to each Decommissioning Project.

## SCOPE OF WORK

### 1.0    CONTRACTOR RESPONSIBILITIES

1.1    Contractor shall perform the following Work, as applicable, as required to complete and to achieve Final Completion for each Decommissioning Project identified on Exhibit A to the Turnkey Removal Agreement:

- Abandon all wells as per the BSEE-approved permits (APM's & RPM's)
- Abandon all pipelines as per the BSEE-approved permits (abandonment in place being the standard and removal only where mandated by BSEE or another governmental agency).
- Remove or reef all platforms as per the BSEE and/or COE-approved permits.

1.2    Contractor shall furnish all equipment, services, and personnel to conduct the offshore operations outlined in 1.1 including but not limited to the following (as applicable and necessary):

- Derrick / Lift Vessel
- Lift Boats
- Dive Support Vessels
- Support Tugs and Crew Boats
- Shorebase support
- NORM & Asbestos remediation & disposal
- Material Barges and Tugs
- All slings, shackles, spreader bars, spreader frames, and rigging
- Pile jetting equipment and personnel
- Conductor and pile cutting personnel and equipment
- Divers and equipment
- Flushing & Filtration equipment
- Engineering & Project Management
- Permit Generation & Submittal

1.3   Contractor shall supply all labor, equipment, and material required to perform and complete the Scope of Work that is not specifically stated as being supplied by FWE IV.

1.4   Contractor's derrick barge shall maintain an anchor handling tugboat with it at all times capable of handling the vessel's anchors.

1.5   Contractor's derrick barge and anchor handling tug(s) shall be equipped with an appropriate positioning system to assure safe placement of anchors.

1.6   Contractor is responsible for notification of Operators of facilities and pipelines affected by placement of anchors near or over those facilities and/or pipelines.

1.7   Contractor's derrick barge shall have a current certificate of classification and a load line certificate from a recognized marine classification society.

1.8   Contractor shall provide current crane certification on the derrick barges primary crane and all auxiliary cranes.  All rigging must be certified and tagged.

1.9   Cargo Barges

   1.9.1 Contractor shall provide cargo barges of sufficient size to safely operate in the most severe environmental conditions in which tow may occur.

   1.9.2 Contractor shall ensure that the cargo barge(s) have adequate strength for the load out, tie down, transport, and offloading of the salvaged material.

   1.9.3 Each cargo barge shall have a valid U.S. Coast Guard certificate of inspection and a U.S. Coast Guard stability letter.

1.10 Tugs

   1.10.1 Contractor shall provide with each barge a minimum of one (1) tug of sufficient size, bollard pull, and horsepower to operate in any sea environment that may develop.

   1.10.2 Contractor shall provide assist (tail) tugs as required to guide the barge from the open sea to the offloading site.

   1.10.3 Vessels and crews shall comply with U.S. Coast Guard licensing and manning requirements.

1.11 Diving

   1.11.1 Contractor shall ensure that diving subcontractor performs all diving operations in strict accordance with the latest rules and regulations governing diving operations.

1.12 Any equipment, material, jacket, deck, or piles that fall into the sea during the salvage operation shall be retrieved by Contractor at Contractor's expense.

1.13 If at any time during the platform removal operations Contractor has to pull away from the structure, Contractor shall supply and install on the structure temporary navigational aids meeting U.S. Coast Guard Class "A" specifications for lights and horn.

1.14 Contractor shall assume all weather liability, other than Severe Weather Events that constitute Unforeseen Events.

1.15 CUSA is not obligated to pay Contractor for weather downtime, named tropical storms or otherwise, at any time before or during mobilization, or during or after demobilization.

1.16 EH&S

    1.16.1  Contractor shall submit safety records upon request for review by CUSA.

    1.16.2  Contractor shall provide gas detection devices, fire extinguishers, and other safety equipment to check all structural members, equipment, and piping for the presence of hydrocarbons.

    1.16.3  Contractor shall check for the presence of hydrocarbons prior to flame cutting or using spark producing devices on any structural members, equipment, and piping.

    1.16.4  Contractor shall provide a dedicated fire watch when hot work operations are in progress.

    1.16.5  Contractor shall comply with government regulations, Contractor's policies, and CUSA's policies regarding confined space entry.

## 2.0   TECHNICAL

### 2.1   Engineering

    2.1.1  Contractor Required Design and Analysis Work

    Contractor shall perform all design, analysis, and design checks required to complete the Work in accordance with all applicable drawings, specifications, standards and codes, and other documents that are part of or are incorporated into this Scope of Work.  Contractor's proposed methods of performing the design and analysis work listed below shall be submitted to FWE IV prior to beginning the work.

    2.1.2  Engineering to be provided by Contractor to include the following (as applicable and necessary):

Debtors' Exhibit No. 34
Page 380 of 910

- Material Barge Ballast Plan
- Removal Rigging
- Tie-Down Design
- Transportation Analysis
- Component Lift Weight Analysis
- Component Center of Gravity Analysis
- Component Pad Eye or Lifting Trunnions Design
- Welding procedures and welder qualifications.

2.1.4   Contractor shall confirm all lift weights, center of gravities, and Pad Eye or Lifting Trunion designs in writing.  Contractor will be responsible for any Pad Eye or Lifting Trunion design or modification.

Without limitation to the turnkey nature of each Decommissioning Project and the Work to be completed under the Turnkey Removal Agreement and this Appendix, Contractor shall be fully responsible for all of the following costs and expenses:

- The costs of salaries and travel expenses of executive officers or personnel who are not directly assigned to the Change Order Work
- The costs of salaries and travel expenses of non-exempt administrative support personnel
- Interest on capital employed or on borrowed money
- Gross receipts taxes and/or income taxes
- Costs for employee bonus or profit sharing plans
- Engineering, administrative, and drafting tools and equipment and stock office supplies
- Consumable supplies and materials utilized during construction of the components
- All disposal and environmental fees and costs
- Rotation expenses
- Severance expenses
- Recruiting expenses
- General and administrative expenses
- Small tools, equipment and rental items
- Costs for general business license or professional license
- Insurance premiums and deductibles applicable to Contractor's insurance
- Overtime and rainout costs

[End of Schedule "A" to Appendix 1]

4

Debtors' Exhibit No. 34
Page 381 of 910

## SCHEDULE "B" to APPENDIX 1

## <u>FEDERAL CONTRACT PROVISIONS</u>

Contractor shall fully comply with the following statutes and executive orders as well as the regulations, orders and rules promulgated thereunder, where required by law, and such statutes and executive orders are hereby incorporated in this Contract by reference as set out:

(1)     Equal Opportunity Clause (41 CFR 60-1.4).  Applicable to all contracts or purchase orders in excess of $10,000;

(2)     Affirmative Action Compliance Programs (41 CFR 60-1.40).  Applicable to contracts or purchase orders of $50,000 or more and if Contractor has 50 or more employees;

(3)     Equal Employment Opportunity Reporting Requirements (CFR 60-1-7).  Applicable to contracts or purchase orders of $50,000 or more and if Contractor has 50 or more employees;

(4)     Employment of the handicapped (41 CFR 60-250).  Applicable to contracts or purchase orders $2,500; or employment of disabled veterans and veterans of the Vietnam Era (Applicable to contracts or purchase orders of $10,000 or more;

(6)     Utilization of Minority Business Enterprises (41 CFR 1-1.13).  Applicable to contracts or purchase orders of $10,000 or more;

(7)     Utilization of Small Business Concerns (41 CFR 1-1.710-3).  Applicable to contracts or purchase orders of $10,000 or more;

(8)     Utilization of Labor Surplus Area Concerns (41 CFR 1-1.,305-3(a)).  Applicable to contracts or purchase orders of $10,000 or more;

(9)     Minority Business, Small businesses and Labor Surplus Area Subcontracting (41 CFR 1-1.1310-2(b), 1-1710-3(b), 1-1.805-3).  Applicable to contracts or purchase orders of $500,000 or more; and

(10)    Clean Air and Water.  Applicable to contracts or purchase orders of CFR 15.4 and 15.5, 41 CFR 1-1.2302.

Contractor certifies that it does not maintain or provide for its employees any segregated facilities at any of its establishments, and that it does not permit its employees to perform their services at any location, under its control, where segregated facilities are maintained.  It certifies further that it will not maintain or provide for its employees any segregated facilities at any of its establishments and that it will not permit its employees to perform their services at any location, under its control, where segregated facilities are maintained.  The Contractor agrees that a breach of this certification is a violation of the Equal Opportunity Clause in this Contract.  As used in this certification, the term "segregated facilities" means but is not limited to any waiting rooms, work areas, rest rooms and wash rooms, restaurants and other eating areas, time clocks, locker rooms

and other storage or dressing areas, parking lots, drinking fountains, recreation or entertainment areas, transportation and housing facilities provided for employees which are segregated by explicit directive or are in fact segregated on the basis of race, color, religion, sex or national origin, because of habit, local custom or otherwise.  It further agrees that (except where it has obtained identical certifications from proposed subcontractors for specific time periods) it will obtain identical certifications from proposed subcontractors prior to the award of subcontracts exceeding $10,000, which are not exempt from the provisions of the Equal Opportunity Clause; that it will retain such certification in its files; and that it will forward the following notice to such proposed subcontractors (except where the proposed subcontractors have submitted identical certificates for specific time periods):

NOTICE TO PROSPECTIVE SUBCONTRACTORS OF REQUIREMENT FOR CERTIFICATIONS OF NONSEGREGATED FACILITIES:

Certification of Nonsegregated Facilities must be submitted prior to the award of a subcontract exceeding $10,000 which is not exempt from the provisions of the Equal Opportunity Clause.  The certification may be submitted either for each subcontract or for all subcontracts during a period (i.e. quarterly, semi-annually or annually).  Note:  The penalty for making false statements is prescribed in 18 U.S.C. 1001.

[End of Schedule "B" to Appendix 1]

## SCHEDULE "C" to APPENDIX 1

## <u>INSURANCE PROVISIONS</u>

**Insurance Requirements.** During the term of the Agreement, Contractor will carry insurance coverages as set forth below at its own expense and with deductibles for its own account, with providers reasonably satisfactory to CUSA and authorized to do business in the states or territories in which Contractor performs any Work. The insurance coverages required herein represent Contractor's minimum requirements and do not limit or invalidate any indemnity or other obligations of Contractor under this agreement. Contractor's failure to secure the required insurance coverages or the required endorsements on the policies or any denial of coverage by underwriters does not relieve Contractor from or limit its liabilities or obligations under this agreement.

**Required Coverage.** The following insurance coverage is required. An owner's limitation clause, including any clause purporting to limit coverage to liability of an insured "as owner of the vessel," shall not be included in any of the policies required below. All policies and group policies must contain applicable territorial extensions and navigation limits adequate for the performance of the Work.

**Workers' Compensation**, as required by applicable law.

**Employer's Liability**, with a limit of not less than **$1,000,000** per occurrence, including (i) coverage for the Longshore and Harbor Workers' Compensation Act, including its extension by the Outer Continental Shelf Lands Act, the Jones Act, and the Death on the High Seas Act, (ii) coverage for masters and members of the crews of vessels (on a voluntary compensation basis), including transportation, wages, maintenance, and cure; alternatively, protection and indemnity insurance may be used for this coverage as specified below, (iii) "in rem" endorsement, stating that an action "in rem" will be treated as a claim against the insured "in personam," and (iv) "borrowed servant" endorsement, stating that a claim brought against FWE IV Group for compensation as a "borrowed servant" by any member of Contractor Group will be treated as a claim against Contractor.

**Automobile Liability**, with a limit of not less than **$1,000,000** per occurrence, combined single limit for bodily injury and property damage, covering all owned, hired, leased, or non-owned vehicles (as required by applicable law).

**Commercial General Liability**, with a limit of not less than **$1,000,000** per occurrence, combined single limit for bodily injury and property damage, including (i) blanket contractual liability, (ii) products/completed operations liability, (iii) sudden and accidental pollution liability (including cleanup costs), (iv) surface damage for blowout and cratering, (v) removal of any exclusions, restrictions, or limitations relating to explosion, collapse, or underground property damage, (vi) removal of any professional liability exclusions or limitations, (vii) action over buyback and deletion of any provisions that limit or exclude coverage of claims made by Contractor Group's employees against any member of FWE IV Group, (viii) extended reporting

period of not less than 36 months, if written on a claims-made policy and is non-renewed or canceled, or deletion of any "sunset clause" purporting to cancel coverage on claims following cancellation or non-renewal, if written on an occurrence policy, (ix) "in rem" endorsement stating that an action "in rem" will be treated as a claim against the insured "in personam," and (x) removal of the "watercraft" exclusion; alternatively, protection and indemnity insurance may be used for this coverage as specified below.

**Hull and Machinery**, which Contractor will carry, or cause to be carried, for each vessel owned or chartered by Contractor Group in connection with the Work at the declared value of each vessel and its equipment, including (i) deletion of limitation of liability clause, (ii) if any vessel engages in towing operations, this insurance will include full towers liability with the sistership clause un-amended, and (iii) removal of wreck or debris, if removal is required by applicable law.

**Protection and Indemnity**, which Contractor will carry, or cause to be carried, for each vessel owned or chartered by Contractor Group in connection with the Work with a limit of not less than **$5,000,000** per occurrence, including (i) coverage for pollution emanating from or caused by a vessel or vessels owned or chartered by Contractor Group, (ii) deletion of any language limiting coverage for FWE IV Group in the event of the applicability of any statute limiting liability; (iii) "in rem" endorsement stating that an action "in rem" will be treated as a claim against the insured "in personam," (iv) towers liability, where applicable; alternatively, liability coverage may be afforded in accordance with the Commercial General Liability coverages above (deleting the "watercraft" exclusions), (v) coverage for the crews; alternatively, the crew coverage may be afforded in accordance with the workers' compensation and employer's liability coverages above, and (vi) removal of wreck or debris, if removal is required by applicable law.

**Charterers Legal Liability**, which Contractor will carry, or cause to be carried, for each vessel chartered by Contractor Group in connection with the Work with a limit of not less than **$1,000,000** per occurrence, including (i) liabilities arising out of operation and use of such vessel and (ii) contractual liability for liabilities assumed by Contractor.

**Excess or Umbrella Liability**, with a limit of not less than **$20,000,000** per occurrence, combined single limit for bodily injury and property damage in excess of the limits specified above for employer's liability, automobile liability, commercial general liability, hull and machinery, protection and indemnity, and charterers legal liability, which such liability limits may be met with any combination of primary, umbrella, and excess policies.

**Aircraft Liability**, which Contractor will carry, or cause to be carried, for each aircraft owned or chartered by Contractor Group in connection with the Work with a limit of not less than **$75,000,000** per occurrence, combined single limit for bodily injury or death (including passengers) and loss of or damage to property, including (i) passenger liability, (ii) cargo legal liability, and (iii) no provision limiting coverage "per seat" or "per passenger."

**Aircraft Hull**, which Contractor will carry, or cause to be carried, for each aircraft owned or chartered by Contractor Group in connection with the Work for the declared value of each aircraft and its equipment.

**Professional Liability**, if applicable, with a limit of not less than **$1,000,000** per claim, including errors or omissions or rendering or failing to render any professional services as required under this agreement.

**Endorsements and Other Requirements.** To the extent of the liabilities assumed by Contractor hereunder, all insurance policies of Contractor will comply with the following:

**Waiver of Subrogation.** Such policies will expressly waive subrogation as to FWE IV Group.

**Additional Insured.** Such policies, other than workers' compensation, employer's liability, and professional liability policies, will include FWE IV Group as an additional insured, on a broad-form basis. Such additional-insured endorsements must include coverage for the sole, joint, or concurrent negligence of the additional insureds and not be restricted to: (i) ongoing operations and products/completed operations; (ii) coverage for vicarious liability; or (iii) circumstances in which the named insured is partially negligent. The parties deem a portion of the payment made by CUSA for Work performed to include compensation to Contractor for any costs Contractor may incur due to including FWE IV Group as additional insured. If any additional-insured endorsement limits coverage to amounts required by written contract, the amounts required in the agreement will instead be the maximum amounts of Contractor's insurance policies, but not less than the minimums set forth herein.

**Primary.** Such policies will be primary to and receive no contribution from any insurance policies maintained by FWE IV Group.

[End of Schedule "C" to Appendix 1]

Debtors' Exhibit No. 34
Page 386 of 910

<center>SCHEDULE "D" to APPENDIX 1</center>

<center>**DRUG AND ALCOHOL POLICY**</center>

**PURPOSE**

This policy implements Contractor's effort to enhance the safety of its operations and to provide its employees an opportunity to work in an environment free of drugs and alcohol.  Contractor will deter alcohol and drug abuse by prevention through education, detection through testing, and disciplinary action when warranted.

**POLICY**

Contractor prohibits:

- employees possessing or consuming alcohol or drugs while working;
- employees working while under the influence of alcohol or drugs; and
- employees possessing or consuming drugs while not working.

**EXCEPTIONS**

Contractor permits employee possession of prescription drugs in containers that bear the doctor's and employee's name and a prescription date less than one year old, and permits the safe use of those drugs for the prescribed purposes, but Contractor does not permit employees to work while under the influence of prescription medications that may have an adverse effect on the employee's fitness for duty.

Contractor permits possession and moderate, lawful consumption of alcohol at business-related social functions that have been appropriately authorized by management, but prohibits employees and other attendees from working or operating motor vehicles after such a function if their abilities may have been impaired by alcohol.

**DEFINITIONS**

"Employees" means (for purposes of this policy only) all regular full-time, regular part-time or temporary employees, all Contractor independent contractors and agents, and all other persons using Contractor equipment, vehicles or boats (including those owned, used, rented or leased by or for Contractor) or performing duties on Contractor premises or property.

"Drugs" means (1) marijuana, cocaine, opiates, phencyclidine (PCP) and amphetamines; and (2) any other substances specified in Schedule I through V of the federal Controlled Substances Act whether or not prescribed for employee use by a physician.

"Test" means a drug test and/or alcohol test using urine and/or blood samples, conducted in accordance with this policy and Contractor testing procedures.

"Working" means reporting for work, performing job duties, engaging in business-related travel or entertainment, operating any Contractor equipment, vehicle or boat (including those owned, used, rented or leased by or for Contractor), being on Contractor property or premises, or attending any Contractor -related business or social function.

## TESTING AND DISCIPLINE

Contractor may require employees to submit to tests to determine the presence of drugs or alcohol.  If an employee's test yields a verified positive result, their employment will be terminated immediately.  In the case of a verified positive pre-employment test result, any offer of employment will be automatically withdrawn.

A refusal to take a test, failure to cooperate with a test, an attempt to tamper with a specimen, violation of Contractor testing policies or procedures or any attempt to subvert Contractor testing policies or procedures will have the same consequences as failing a drug test – immediate termination of employment or withdrawal of offer of employment.

The Contractor human resources department maintains written procedures for testing, which may be changed by Contractor at any time, for any reason.  The procedures are available for employee review.

## EMPLOYEE DRUG CONVICTIONS

As required by the Drug Free Work Place Act of 1989, any employee convicted of any violation of any criminal drug statute must notify management of the conviction no later than five (5) days after a conviction.  Failure to give notice shall result in the employee's termination.  The management personnel given the notice will immediately notify the human resources department of any reported conviction.  Contractor may terminate any employee convicted of drug-related crime regardless of the results of any administered drug test.

## PRE-EMPLOYMENT TESTING

All applicants for employment at Contractor shall undergo a pre-employment drug test within 24 hours of Contractor's request.

## POST ACCIDENT TESTING

Contractor will test each employee whose performance either contributed to an accident or cannot be completely discounted as a contributing factor to the accident, if the accident:

- results in a death or a personal injury necessitating medical attention;
- results in an explosion or fire;

- causes a significant damage to or loss of property;
- requires the emergency shut-down of an operation or facility;
- is a reportable incident regarding a gas pipeline facility under 49 CFR Part 191; or
- is a reportable accident involving pipeline facilities used in the transportation of hazardous liquids under 49 CFR Part 195.

In addition to the mandatory post-accident testing described above, Contractor may, in its sole discretion, also require post-accident testing following any accident that it determines is significant and warrants post-accident testing.

## RANDOM TESTING

Contractor will conduct random testing on employees at certain Contractor facilities designated by the Vice President of Exploration and Production, the Vice President of Human Resources, and the Sr. Vice President and General Counsel.  Procedures for selecting of employees for random testing are stated in Contractor's written procedures for testing.

## REASONABLE CAUSE TESTING

Contractor will test an employee when there is reasonable cause to believe that the employee is using a drug or is under the influence of alcohol.  "Reasonable cause" depends on the circumstances of each case.  It includes observation of an employee's:

- unauthorized use or possession of alcohol while working;
- use or possession of drugs;
- slurred speech;
- unsafe actions;
- inability or difficulty in performing routine tasks effectively;
- unsteady standing or walking;
- disorientation or confusion; or
- erratic or unusual behavior.

It may also include:

- concerns about the employee's fitness for duty;
- an employee's voluntary admission of the prohibited use of alcohol or drugs;
- an employee's arrest or conviction for a drug-related offense, or the identification of an employee as the focus of a criminal investigation into illegal drug possession, use or trafficking;
- information related to employee drug use or prohibited alcohol use provided by reliable and credible sources or independently corroborated by Contractor;
- evidence that an employee has tampered with a drug test;
- the odor of alcohol, marijuana, or any other drug; or
- an employee's operation of a Contractor vehicle after leaving an establishment where alcohol is served.

<div align="center">3</div>

Reasonable cause for testing may arise in circumstances in addition to those specified above. A test for reasonable cause will be conducted only upon concurrence of at least two of the employee's supervisors, one of whom is trained in the detection of the possible symptoms of drug and alcohol use. A drug test for reasonable cause will also require the concurrence of either the Vice President of Human Resources or the Sr. Vice President and General Counsel (either of whom may also constitute the concurring supervisors).

## OTHER TESTING

If an employee transfers to a facility designated for random testing, a drug test will be required before transfer. If an employee is on a leave of absence from a facility designated for random-testing, a drug test may be required before the employee may return to work. Employees may be drug tested upon commencing or ending multiple-day work shifts on offshore facilities.

## MEDICAL REVIEW OFFICER

Contractor has designated a licensed physician with knowledge of drug abuse disorders as its medical review officer ("MRO"). The MRO reviews and interprets positive test results obtained through Contractor's testing program. The MRO is responsible for verifying positive test results. The MRO examines alternative medical explanations for any positive test results, and review all medical records made available by the tested employee when a confirmed positive drug test could have resulted from legally prescribed drugs. Contractor's test procedures describe the process under which the MRO reviews information, gives the tested employee an opportunity to discuss the test result, and otherwise determines whether the test result should be reported as negative or should be reported as a verified positive test:

## RE-TESTING AT THE EMPLOYEE'S REQUEST

An employee may submit a written request to the MRO within 72 hours of receipt of a verified positive drug test, asking that the employee's original specimen be re-tested. Employees are entitled to only one re-test of each specimen. Re-testing procedures are stated in the written procedures for testing maintained by the human resources department.

## EMPLOYEE EDUCATION AND TRAINING

Employees at the facilities designated for random testing will participate in a training program that addresses the consequences of alcohol and drug use on personal health, safety, and the work environment. The program will also address indicators of alcohol and drug use and abuse. Informational materials (including a community service drug hot-line telephone number for employee assistance), and Contractor's policy regarding drug and alcohol use in the work place will be distributed as part of the training program.

In addition to training for all employees, supervisors of the designated facilities will receive annual training of specific contemporaneous physical, behavioral and performance indicators of probable drug use.

4

**VOLUNTARY REHABILITATION**

Employees are encouraged to seek treatment for any alcohol or drug problem before being in a situation that may warrant a test.  Upon request, the Contractor human resources department will refer employees to an independent treatment program.

Medical and disability benefits will be provided for treatment to the extent available under Contractor's medical and disability plans.  Employees referred by Contractor to a treatment program and employees seeking Contractor medical or disability benefits for treatment must consent to the disclosure of all treatment-related information to Contractor.  An employee's employment shall be terminated if they do not cooperate with treatment, if they leave a treatment program before being discharged, or if they violate this policy after returning to work following treatment.

**IMPLIED CONSENT**

Employees are conclusively deemed to consent to cooperate in maintaining a work place free from the effects of alcohol and drugs through the use and enforcement of this and related corporate policies and procedures.


[End of Schedule "D" to Appendix 1]

Debtors' Exhibit No. 34
Page 391 of 910

# SCHEDULE "E" to APPENDIX 1

## CONTRACTOR SAFETY AND ENVIRONMENTAL REQUIREMENTS

### A.     Purpose and Scope

A.1    The purpose and scope of these requirements is to establish safety and environmental requirements for contractors to be able to work on CUSA owned or managed properties.

The objectives of these requirements are to ensure that all contractors and subcontractors working on CUSA's facilities/work sites have programs in place to comply with the Bureau of Safety and Environmental Enforcement (BSEE) Safety and Environmental Management Systems (SEMS) requirements or other applicable safety and environmental regulations, laws, rules and standards of agencies having jurisdiction at locations, their employees are adequately skilled and knowledgeable to safely perform their assigned job task functions, to ensure that safety and environmental policies have been established and to ensure that contractor's management is committed to safety.

### B.     Written Safety and Environmental Programs

B.1    Contractors shall develop and implement written safety and environmental management programs which must include but not be limited to the following:

- Management Commitment
- Written Safe Work Practices specific for work to be performed in compliance with applicable OSHA, BSEE, U.S. Coast Guard, EPA and other applicable government agencies.
- Training Program to include an employee Skills and Knowledge Verification process
- Drug and Alcohol Prevention Program (DISA)
- Hazard Recognition Program to include JSA (Job Safety Analysis)
- Stop Work Authority Program
- Incident Reporting and Investigation Program
- Operating Procedures for Equipment
- Mechanical Integrity Program
- Management of Change (MOC)

### C.     Training Requirements

C.1    Contractor's personnel (and those of all subcontractors) shall be skilled and knowledgeable for the tasks or activities to be accomplished. This includes being in compliance with appropriate safety and environmental training codes, standards, laws and regulations as required by governmental agencies having jurisdiction at the work site (e.g., BSEE, USCG, EPA, DOT, OSHA) as well as Contractor's Contractor Training Requirements.

C.2    A Training Matrix has been established to identify minimal training requirements for contractor personnel performing work on CUSA properties. Contractors should refer to Contractor's SEMS portal for the latest version of the Training Matrix and must verify the training requirements are met for the appropriate job titles (functions).

**D.      Safety and Environmental Management Systems (SEMS) - Contractor Requirements**

D.1      Contractor has established very specific contractor safety and environmental management requirements in order to provide for the safety of all personnel and to comply with current safety and environmental regulations. Below are specific requirements as part of the SEMS contractor agreement/bridging process. A detailed description and compliance guide can be obtained from through Contractor's EH&S department.

D.2      Requirements

D.2.1    Contractors performing activities on-site offshore must participate in the ISNetworld Review and Verification, as well as the Training Qualification (TQ) processes;

D.2.2    Contractor must review Contractor's  Safety and Environmental Management System (SEMS), related SEMS requirements, Safe Work Practices and must perform all contractual obligations in accordance with such Contractor programs;

D.2.3    The Contractor must communicate identified hazards to all affected personnel (including CUSA and 3rd Party personnel) prior to performing oil, gas and sulphur operations for CUSA;

D.2.4    The Contractor must comply with all applicable safety and environmental regulations, laws, rules and standards of agencies having jurisdiction at locations where work is conducted for the Operator;

D.2.5    Contractor must verify and provide documentation upon request that its personnel and any subcontractors performing work for Contractor have the skills and knowledge to perform their assigned duties in a safe and environmentally sound manner, has documented such, and that the information contained therein is accurate, timely and reflective of all appropriate safety and environmental training codes, standards, laws and regulations as required by governmental or regulatory agencies having jurisdiction at the work site.(e.g., BOEM, BSEE, USCG, EPA, DOT, OSHA) ;

D.2.6    The Contractor must have written safe work practices that help minimize the risk to personnel and the environment for all work conducted for CUSA, and all activities performed by the Contractor will be conducted in accordance with those safe work practices;

D.2.7    The Contractor must require all personnel performing work for Contractor to undergo periodic retraining and skill assessments, in accordance with Contractor's Training Requirements  for On-Site Contractors (Training Matrix), to ensure adequate retention of the skills and knowledge required to perform their assigned duties;

D.2.8    The Contractor must obtain and/or develop written operating procedures to ensure the safe operation of critical equipment that is operated and maintained by the Contractor whether or not that equipment is owned by the Contractor or any Third Party.  Critical equipment, per Appendix D of API RP 75, is defined as:  "Equipment and other systems determined to be essential in preventing the

occurrence of or mitigating the consequences of an uncontrolled release." Such equipment may include vessels, machinery (compressors, mud pumps, fire pumps, etc.), piping, blowout preventers, wellheads and related valving, flares, wireline equipment, coil tubing equipment, fluid management equipment, safety systems, alarms, interlocks, fire protection equipment and other monitoring, control and response systems.

D.2.9    The Contractor must periodically review their written operating procedures used to operate critical equipment to ensure they reflect actual operating conditions;

D.2.10   The Contractor must develop and implement a written mechanical integrity program for any critical equipment that will be maintained and operated by the Contractor. Such a program must include, as applicable:

- The design, fabrication, procurement, installation, testing, calibration and inspection criteria and limits;
- The basis for maintenance (manufacturer's recommendation, industry standards, etc.
- A quality assurance program to ensure the mechanical integrity and safe operation of the Equipment;

D.2.11   All documents required per 30 CFR 250, Subpart S and API RP 75 will be maintained in an orderly manner, will be readily identifiable, retrievable, and legible, and will be available for review on request by CUSA or appropriate regulatory authorities. Examples of such documentation include, but are not limited to:

- Safe work practices and policies;

- Training records, including certifications for specialty work, as applicable;

- Verifications that personnel are skilled and knowledgeable in their assigned duties;

- Approved Job Safety Analyses (JSAs) as required;

D.2.12   For oil, gas and sulphur activities performed on CUSA's **facilities** and on a Contractor's **facility** on  the OCS the Contractor agrees to the following, where "facilities" is defined to include all types of offshore structures permanently or temporarily attached to the seabed ( *i.e.* , mobile offshore drilling units; floating production systems; floating production, storage and offloading facilities; tension-leg platforms; spars used for exploration, development, production, and transportation activities for oil, gas, or sulphur from areas leased in the OCS, as well as wells, structures, living quarters, drilling and workover packages, process equipment, utilities and DOI regulated pipelines (except as noted in API RP 75 section 1.3.1.1):

D.2.13   The Contractor must conduct, keep current and provide upon request to Contractor Hazards Analyses (including Mitigation plans) of the Contractor's facilities and ongoing operations;

D.2.14   The Contractor must manage and document all changes to the Contractor's facility that are directly involved in performing oil, gas and sulphur activities for CUSA;

D.2.15   The Contractor must develop and communicate an Emergency Action Plan to all personnel on the Contractor's facilities;

D.2.16   The Contractor must conduct Job Safety Analysis (JSA) to identify potential task specific hazards associated with the work to be performed and must include the steps required to mitigate the hazards

identified.  Copies of all JSAs must be kept at the work site and be readily accessible for at least 30 days to all personnel involved with the work. The Contractor must also maintain copies of all completed JSAs for at least 2 years.

D.2.17  The Contactor must conduct routine safety meetings to communicate safety expectations, incidents, near miss reports, prevention, safety alerts, etc.

D.2.18  The Contractor must immediately notify a CUSA representative by whatever means  of communication is most expedient, and shall maintain written records in addition thereto, of any incidents resulting in the following:
- Fatalities
- All injuries that require the evacuation of the injured person(s) from the facility to shore or to another offshore facility
- All losses of well control
- All fires and explosions
- All reportable releases of H2S gas
- All collisions
- All incidents involving severe structural damage
- All incidents involving crane or personnel/material handling operations
- All incidents that damage or disable safety systems or equipment

D.2.19  Contractor is required to complete incident reports and provide additional information as necessary in order to determine root cause and corrective actions.

## E.   Personal Protective Equipment (PPE)

Contractor shall provide its employees and personnel with proper PPE for them to perform their jobs safely. Contractor shall also ensure that its employees and personnel are trained in the proper use and maintenance of all PPE issued. The following is only the minimum PPE required to work on facilities owned, operated or managed by CUSA or any of its Affiliates. Any additional job specific PPE (face shields, goggles, respiratory protection, fall protection, hand protection, gas monitors, etc.) required by CUSA, governmental regulations or hazard assessments shall also be provided by Contractor.

*Minimal PPE Requirements for contractors*:

- Safety Glasses – Safety Glasses shall comply with ANSI Z87.1 – 1989, as such may be updated or modified from time to time, and shall be worn in areas where personnel are exposed to flying particles and/or when working  around pressurized process equipment, piping, pumps, etc.

- Hard Hat – Hard hats shall comply with ANSI Z89.1 – 1997, Type 1 requirements, as such may be updated or modified from time to time, and shall be worn at all times when working on CUSA facilities or work sites.

- Safety/Steel Toe Shoes / Boots – Safety/Steel toe shoes / boots shall comply with ANSI Z41 – 1991, as such may be updated or modified from time to time, and shall be worn at all times when working at any facility or work site owned, operated or managed by CUSA or any of its Affiliates.

- Hearing Protection – Hearing protection is required in high noise areas or areas that are posted as requiring hearing protection.

- Personal Flotation Devices (PFD's) – USCG Type 1 or 5 are necessary for any Work or portion thereof that is to be performed outside the handrails, on +10 level of offshore platforms, during personnel transfers to and from offshore platforms and while boarding and exiting boats from boat landings.

**F.    Inspections/Audits**

In addition to any right provided elsewhere in the Contract or otherwise available by law, CUSA reserves the right to inspect/audit the Environmental, Health and Safety activities of all contractors and subcontractors who work on any properties, facilities or premises owned, operated or managed by CUSA or any of its Affiliates. CUSA or third party auditing teams or individuals may conduct these inspections/audits.

The objective of conducting an inspection/audit is to assess Contractor's compliance with applicable CUSA, governmental and regulatory requirements and to prevent adverse environmental and safety incidents.

F.1    Field Inspections/audits

CUSA may have field inspections conducted so that the inspector(s)/auditor(s) can:

- Physically observe the Work or any part thereof that Contractor, or any of its subcontractors or personnel, is performing.
- Assess Contractor's performance of Work, or any part thereof, according to applicable CUSA, governmental or regulatory requirements.
- Advise Contractor regarding any deficiencies that are observed and require that such be corrected.

CUSA may conduct field inspections at any time and from time to time as CUSA, in its sole discretion, may deem necessary or appropriate to maintain compliance with the applicable requirements of CUSA or any governmental or regulatory agency or body.

F.2    Office Audits

CUSA may have office audits conducted:

- To verify information that Contractor certifies as having when completing this Contractor Safety Program Requirements agreement.
- To check Contractor's documentation of training, safety meeting attendance, accidents,

- equipment inspections, safety program elements, etc.
- To share environmental, safety and health philosophies.

[End of Schedule "E" to Appendix 1]

### SCHEDULE "F" to APPENDIX 1

### SEARCH AND SEIZURE POLICY

### NOTICE TO ALL PERSONNEL WORKING ON CUSA OWNED OR OPERATED PROPERTIES

It is the Contractor's belief that the misuse of drugs, alcohol, or any substance having a physiological, psychological, or biochemical effect impairs a person's health and performance and creates unsafe working conditions. Contractor is committed to maintaining a productive, safe and healthy work environment, free of unauthorized drug and alcohol usage. In order to achieve this objective, Contractor has adopted a Drug and Alcohol Policy. All Contractor Personnel are required to comply with the policy.

The use, possession, distribution or sale of unauthorized drugs by anyone while on Contractor premises or while engaged in Contractor business is prohibited. A person reporting for work on Contractor premises with unauthorized drugs and/or alcohol in his/her body is in violation of this policy.

Reporting to work while under the influence of alcohol by any person is prohibited. The consumption or possession of alcohol in unsealed or opened containers on Contractor premises is prohibited. No alcohol is allowed at any offshore location.

For the purpose of this policy, the term "unauthorized drugs" shall mean any substance, other than an authorized substance, which has the effect on the human body of being a narcotic, depressant, stimulant, hallucinogen or cannabinoid, their precursors, derivatives or analogues, and includes, but is not limited to, those substances scheduled as controlled substances pursuant to the Federal Controlled Substances Act.

"Authorized substances" are substances having a physiological, psychological, or biochemical effect that are lawfully prescribed or that are available without a prescription, that are lawfully obtained by an individual and that the individual possesses and uses in the appropriate manner, in the dosages and for the purposes for which the substances were prescribed or manufactured.

It is each person's responsibility to notify his or her supervisor in writing when that person is taking any prescription or non-prescription medicine or substance which may impair judgment or performance or otherwise adversely affect the normal functions or his or her mental faculties or physical abilities.

In enforcing the policy, searches of persons and their property on Contractor premises, work area searches, and laboratory testing are authorized. Any person who refuses, when requested, to cooperate with a search or to submit to laboratory testing shall be deemed to be in violation of the policy. Contractor reserves the right to conduct unannounced personal searches. Entry upon Contractor's premises by Personnel will be deemed to constitute consent by such persons to personal searches pursuant to this policy.

A personal search includes inspection of any personal property of Personnel located on Contractor premises including, but not limited to, their personal effects, lockers, baggage, desks, lunch boxes, containers, purses, billfolds, parcels, or vehicles if on Contractor premises.

Any person charged with or under investigation in connection with a drug-related or alcohol-related criminal offense may be required to submit to laboratory testing.

Any person possessing food, supplies, or tools not belonging to them, at a time when such items should not be in their possession, is subject to disciplinary action.

Firearms are prohibited on all Contractor premises.  Without limiting the generality of the foregoing, Personnel may not possess firearms on their person, or in their personal effects, lockers, baggage, desks, lunch boxes, containers, purses, parcels, or vehicles if on Contractor premises.

[End of Schedule "F" to Appendix 1]

**Exhibit 7**

**Contract Operating Agreement**

See attached.

*Exhibit 7 to the Implementation Agreement*

## CONTRACT OPERATING AGREEMENT

This Contract Operating Agreement (this "Agreement"), dated and effective as of _____, 2021 (the "Effective Date"), is by and among Mako Buyer LLC, a Delaware limited liability company (the "Operator") and Fieldwood Energy IV LLC (the "Owner"). Operator and Owner are sometimes referred to collectively as the "Parties" and individually as a "Party". Capitalized terms used in this Agreement but not defined herein are defined in Appendix I.

**WHEREAS**, Owner is a resulting entity of a divisive merger effected in connection with the confirmed plan of reorganization of Chapter 11 Case 20-33948, *In re: Fieldwood Energy LLC et al.*, in the United States Bankruptcy Court for the Southern District of Texas, Houston Division (the "Plan");

**WHEREAS**, the divisive merger was conducted in accordance with (i) the Implementation Agreement, which was agreed prior to the confirmation of the Plan, and (ii) the Plan of Merger;

**WHEREAS**, under the Implementation Agreement and pursuant to the divisive merger as set out in the Plan of Merger, (i) Owner was allocated the Operating Assets, and (ii) Owner agreed to assume operational responsibility for the purposes of decommissioning the Terminated Properties;

**WHEREAS**, Owner is or will become the operator (as designated by BOEM or BSEE or pursuant to a joint operating (or similar) agreement), of certain Assets;

**WHEREAS**, in accordance with the Owner's LLC Agreement, the business and activity of Owner is managed by a Sole Manager (as such term is defined in the LLC Agreement); and

**WHEREAS**, Owner has requested that Operator provide certain contract operational, technical, and administrative services with respect to the Assets, upon the terms and conditions set forth herein, until the end of each respective Service Term, and Operator has agreed to do so.

**NOW, THEREFORE**, in consideration of the premises and of the mutual promises, covenants, conditions, and agreements contained herein, and for other valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties hereby agree as follows:

## ARTICLE I.  SERVICES

**Section 1.1    Services**. Subject to the terms of this Agreement, Operator shall provide or cause to be provided the Services in support of Permitted Operations for Owner and on the Assets, in each case in accordance with the standard of performance set forth in Section 1.2 below for the Service Term. Rights to all products of the Services performed hereunder by Operator for Owner or otherwise in respect of the Assets shall belong exclusively to Owner, and Operator shall retain no ownership, interest, or rights therein. For the avoidance of doubt, the Services provided by Operator hereunder shall not include, and Operator shall not perform the Restricted Activities. Notwithstanding anything in Exhibit A to the contrary, the Services shall include, and Operator shall conduct, the day-to-day business of Owner in relation to the management of the Assets and the corporate functions of Owner, subject to Owner's general oversight and instruction and any approval or consent rights expressly attributed to Owner herein;

provided that Operator agrees and acknowledges that it is the intent of the Owner that the business and operations of the Owner and the operation of the Assets shall be limited to, and in support of, the Permitted Operations.

Section 1.2   **Standard of Performance**. Subject to the terms of this Agreement, Operator shall perform or cause to be performed the Services as follows (collectively, the "Performance Standard"):  (a) as a reasonably prudent operator as the contract service provider hereunder would perform such Services, (b) in a good and workmanlike manner, (c) with due diligence and dispatch, (d) in accordance with good oilfield practices, and (e) in compliance with all Laws (as defined below), licenses, authorizations and permits.  In providing the Services to the Owner, Operator may use, at its discretion, its own personnel or the personnel of any of its Affiliates or employ the services of contractors, Subcontractors, vendors, or other Third Parties.

Section 1.3   **Independent Contractor**. At all times during the performance of  Services by Operator, all Persons performing such Services who shall be in the employ and/or under the control of Operator or its Affiliates (including agents, contractors, temporary employees, and consultants) shall be independent from Owner and not employees of Owner and shall not be entitled to any payment, benefit, or perquisite directly from Owner on account of such Services, including, but not limited to, group insurance and participation in any employee benefit and pension plans maintained by Owner or any Affiliate of Owner.  Operator will not be required to provide any Services solely to the extent the provision of such Services would violate applicable Laws. Notwithstanding any other provision contained elsewhere in this Agreement, in all cases where the Operator is performing Services under this Agreement offshore the State of Louisiana or are otherwise covered by the Louisiana Worker's Compensation Act, La. Rev. Stat. § 23.1021 et seq., the Parties acknowledge and agree that all such operations pursuant to this Agreement are an integral part of and are essential to the ability of the Owner to generate Owner's goods, products, or services, and that whenever Services and work are performed hereunder in or offshore Louisiana, or the Louisiana Workers' Compensation Act may be applicable, the employees of Operator and their contractors providing such Services or performing such work, if any, whether direct, statutory, borrowed, or otherwise, are statutory employees of Owner in accordance with the Louisiana Worker's Compensation Act, La. Rev. Stat. § 23.1021 et seq. and the protections afforded a statutory employer under Louisiana Law shall apply. In such event, Operator agrees that Owner is and shall be deemed a statutory employer of Operator's employees for the sole purposes of La. Rev. Stat. § 23.1061(A)(3), as the same may be amended from time to time.

Section 1.4   **Records**.  Operator shall use commercially reasonable efforts to maintain or cause to be maintained true and correct records of all receipts, invoices, reports, and such other documents as are customarily maintained by Operator for its own operations relating to each Service rendered hereunder for a period of the later of (i) two (2) years following the end of the calendar year during which the end of the Service Term for such Service occurs or (ii) such other time required by applicable Law. All such receipts, invoices, reports, and other documents are the property of Owner.

Section 1.5   **Representatives**. Each Party shall, at all times during the Service Term, keep one or more representatives available either by telephone, electronic mail, or in person during normal business hours, to receive communications from the other Party regarding the day-to-day Services and to respond to inquiries concerning the performance of the day-to-day Services.  For the avoidance of doubt, all Notices required or permitted hereunder shall be delivered pursuant to Section 7.2 of this Agreement. Operator's representatives are designated along with their contact information on Exhibit C ("Operator's

2

<u>Representative</u>"). Each Party may replace any of its representatives or designate such other representatives from time to time by written Notice to the other Parties delivered pursuant to <u>Section 7.2</u>. At all times while this Agreement remains in effect, Owner shall cause at least one of its representatives to be included on Owner's BOEM "qualification card" as an authorized signatory for Owner.

**Section 1.6    <u>Limitation of Services</u>.**

(a)    Notwithstanding anything herein to the contrary, Owner acknowledges certain personnel of Operator and/or its Affiliates involved in the provision of the Services may leave the employment of Operator and/or its Affiliates or terminate their employment or contract with Operator or its Affiliates during the term of this Agreement. The Services shall not include providing any technical evaluations regarding any proposals for the new development of any assets, including the drilling of new wells or other capital expenditure projects associated with new development.  Operator makes no representation or warranty regarding the ability of Operator and/or its Affiliates to retain any employees, contractors, or Subcontractors and neither Operator nor any of its Affiliates shall have any liability to Owner as to the result of the loss of any such employees, contractors, or Subcontractors; provided that in no event will any such losses excuse Operator from the obligation to perform the Services. Operator and its Affiliates shall use commercially reasonable efforts to report all information accurately, but shall not be responsible for the accuracy or completeness of any information furnished by any other party for inclusion in any reports or for results obtained by use of any inaccurate information so furnished.

(b)    Notwithstanding any other provision in this Agreement to the contrary, in each case with respect to Operator's obligation to provide the Services under this Agreement:

(i)    Operator shall have no obligation to be designated with any Governmental Authority, as a designated operator, designated applicant, designated payor, or responsible party for any of the Assets;

(ii)    Operator shall have no obligation to post any bond or other security on behalf of the Owner arising solely from its capacity as Operator hereunder;

(iii)    Operator shall have no obligation to provide any Service for which a Third Party is obligated or permitted (under a joint operating agreement, contract services agreement or otherwise) to provide the same service for the Owner; provided, however, that Operator's use of a Subcontractor to perform any part of the Services shall not excuse Operator from the obligation to perform such Services;

(iv)    Owner acknowledges and agrees that it will remain responsible for providing any bond or security, subject to Section 5.2(a)(3) of the Omnibus Agreement; and

(v)    if Operator reasonably believes that it cannot perform any Service without creating a breach of an agreement to which Owner is a party or an Asset is bound, and/or violating the Law, Operator shall have no obligation to perform such Service and such Service shall no longer be included within the Services, and Operator shall give prompt, written Notice of such issue to Owner, prior to the discontinuation of such Service, with detailed descriptions of the agreement in question and the breach

3

and/or violation Operator believes will be created.  In the event such possible breach and/or violation is cured or remedied within thirty (30) days following Owner's receipt of such Notice, Operator may perform such Service only insofar as performance would not create the breach or violation.

(c)     Operator and Owner shall use commercially reasonable efforts to obtain, and to keep and maintain in effect (or to cause their respective Affiliates to obtain, and to keep and maintain in effect), all governmental or Third Party licenses and consents required for the provision of any Service by Operator in accordance with the terms of this Agreement, in each case to the extent directly attributable to the Assets (and not arising from any requirement that applies on a general or areawide basis).  Any direct, out-of-pocket costs relating to obtaining any such licenses or consents shall be borne by Owner; and none of Operator or any of its Affiliates shall be required to pay any money or other consideration or grant any other accommodation to any person (including any amendment to any contract) or initiate any action, suit, or proceeding against any person to obtain any such license or consent.  Operator shall have no obligation to provide any Services which require any such licenses or consents which are not obtained.

(d)     The Parties are entering into the Joint Development Agreement of even date herewith, and, therefore, any technical evaluation regarding any drilling, reworking, or other capital expenditure projects that may be proposed by Operator to Owner in Operator's capacity as a party to the Joint Development Agreement shall not constitute part of the Services to be provided hereunder.  Costs and expenses included in the calculation of the Recovery Threshold (as defined in the Joint Development Agreement) may not also be included in Third Party costs charged to the Owner hereunder.

**Section 1.7     Operator's Access to Assets**.  To the extent reasonably necessary for Operator to perform the Services, Owner shall provide Operator unrestricted access to all the Operated Assets.  In the event requested by Owner in writing, Owner and Operator shall execute any agency agreement mutually agreed to by Operator and Owner covering certain areas of service, as requested by Owner in writing.

**Section 1.8     Accounts**.

(a)     Operator shall receive and keep all production revenue from the Assets or other revenue received by Operator or its Affiliates that is generated by the Assets or otherwise attributable to the Owner or any of its Affiliates in the Revenue Account, provided that Operator shall have access and permission to utilize the Revenue Account in the performance of the Services.  Operator shall have the right to transfer funds from the Revenue Account to timely pay on behalf of Owner: (i) taxes and royalties attributable to production from the Assets; (ii) Reimbursable Costs; (iii) Third Party Payments that are properly incurred hereunder; and (iv) any NPI Payment made (and as defined) under the NPI Conveyance shall be paid into the Escrow Account and in the event received by Operator or Owner for any reasons, shall immediately be transferred into the Escrow Account.

(b)     Notwithstanding any other provision contained herein, Operator shall not have any rights under the Escrow Agreement and the Services provided hereunder shall expressly exclude management of the Escrow Account.

4

**Section 1.9**     <u>**Owner Meeting and Approvals**</u>.

(a)     Owner's Representative and Operator's Representative(s) (and/or their designated representatives and consultants) shall meet on a quarterly basis by no later than ten (10) days following the end of the prior calendar quarter at the offices of Operator or another mutually agreed location to review the performance of the Services for the prior calendar quarter and the Services that Operator anticipates providing for the current calendar quarter and the three immediately subsequent calendar quarters.

(b)     Operator must obtain the prior written consent of Owner's Representative for the following: (i) to perform any of the operations or other actions set forth on <u>Exhibit B-1</u> on the Assets or otherwise on behalf of Owner (such operations or actions, the "<u>Restricted Activities</u>"); or (ii) prior to entering into any contract set forth on <u>Exhibit B-2</u> on behalf of Owner or for which Operator has a reimbursement right hereunder (such contracts, the "<u>Material Contracts</u>").

**Section 1.10**     <u>**Decommissioning Services**</u>.

(a)     Operator shall not amend, waive or otherwise modify any rights or obligations of Owner under the Turnkey Removal Agreement or the Omnibus Agreement or provide any consent or approval of Owner, or any release by Owner, with respect to any provision of the Turnkey Removal Agreement or the Omnibus Agreement.  Any such action taken by or on behalf of Owner with respect to the Turnkey Removal Agreement or the Omnibus Agreement shall be under the sole authority of Owner's Representative, and may be performed at the sole discretion of Owner's Representative. Operator shall provide copies of all written notices, written communication and other information that is delivered or that is required to be provided by either party under the Turnkey Removal Agreement or the Omnibus Agreement to the Owner's Representative.

(b)     In the event that the Turnkey Removal Agreement is terminated as to all or part of the Assets, with the cooperation of Owner's Representative, Operator shall obtain bids from at least three (3) potential counterparties to act as decommissioning operator of the applicable Assets no longer covered by the Turnkey Removal Agreement; provided that the applicable performance and pricing methodology applicable to the bid shall be approved in advance by Owner's Representative.  Owner's Representative shall choose the winning bidder, with input from Operator.

## ARTICLE II. COMPENSATION

**Section 2.1**     <u>**Compensation for Services**</u>. During the Service Term for each Service and subject to Owner's obligation to pay for Reimbursable Costs and Third Party Payments, Operator shall perform the Services at no cost to Owner, including any administrative overhead of Owner; provided that the Parties agree that: (i) if the cost for Operator to provide the Services (other than any services for which Owner bears Reimbursable Costs or Third Party Payments) increases due to a material change in Law or due to a material increase in the costs to provide services similar to the Services that impacts the overall U.S. offshore oil and gas industry or that is reflected in a broadly used price index relevant to the oil and gas industry, the Parties will work in good faith to determine appropriate fees for the Services; and (ii) any qualifying Reimbursable Costs or Third Party Payments shall be paid by Owner as provided in <u>Section 3.1</u>.

Debtors' Exhibit No. 34
Page 405 of 910

Section 2.2    **Initial Safe Out**.  Notwithstanding anything herein to the contrary, payment for any Initial Safe Out Work (as defined in the Omnibus Agreement) shall be made in accordance with Section 3.4 of the Omnibus Agreement.

## ARTICLE III.          PAYMENT AND DEFAULT

Section 3.1    **Third Person Services**.

(a)     *Reimbursable Costs*.  Owner recognizes that Operator may hire Third Parties to provide certain portions of the Services from and after the Effective Date with respect to the Assets, whether or not the cost for such Third Party services qualify as Reimbursable Costs hereunder. Operator shall bear all costs and expenses associated with the Services, including the hire of and payment to such Third Parties; provided that in the event that Operator incurs any permitted Reimbursable Costs during a particular month, Operator shall be entitled to reimbursement of such costs and expenses by Owner under the Invoice attributable to such month pursuant to Section 3.2 and Section 3.3.

(b)     *Third Party Payments*.  In the event that Operator incurs and pays any Third Party Payments during a particular month, Operator shall pay such costs when due and Operator shall be entitled to reimbursement of such costs and expenses by Owner under the Invoice attributable to such month pursuant to Section 3.2 and Section 3.3; provided that, in the event that the total amount of Third Party Payments for a particular month are reasonably expected to exceed the funds in the Revenue Account that are available to cover such costs and expenses, Operator shall be entitled to require Owner to pay or cause to be paid such amount into the Revenue Account by issuance of a prepayment cash call equivalent to such excess amount to the Owner in advance of the month in which such costs will be incurred on behalf of Owner, and Owner shall cause the amount of the applicable cash call to be transferred into the Revenue Account by the date specified in Section 4.2 of the Omnibus Agreement, pursuant to Article IV of the Omnibus Agreement.  If the amount of the Owner prepayment is not actually expended by Operator during a particular month, Operator will credit the overpayment to the Owner in the Invoice for such month or the next cash call issued by Operator, whichever occurs first.  Any such Invoice or cash call for which any overpayment has been applied shall reflect the credit for such overpayment at the time it is submitted to Owner.

(c)     With respect to any services, equipment or materials for which Owner will bear Reimbursable Costs hereunder, to the extent that Operator also utilizes such services, equipment or materials for the purpose of providing Services in support of Non-FWE IV Operations, Operator shall allocate the Reimbursable Costs charged to Owner hereunder in a commercially reasonable manner between the applicable operations and otherwise accordance with applicable COPAS guidance as between the applicable operations.

Section 3.2    **Submission of Invoice**. Operator shall submit an Invoice to Owner on or before the fifteenth (15th) Business Day of each month setting forth an itemized accounting of the following, in each case with respect to the prior month: (i) all revenue generated by the Assets attributable to such month, including any production revenue, (ii) the total amount of Reimbursable Costs and Third Party Payments incurred by Operator during such month, or as applicable, any earlier months for which an

6

Invoice was not issued, for the Services provided by Operator; (iii) the amount of any prepayments made by Owner in response to cash calls that are attributable to such month, if any; (iv) the Revenue Account balance as of the beginning and the end of the applicable month; (v) the amount, if any, that Operator has transferred from the Revenue Account to cover Reimbursable Costs and Third Party Payments; and (vi) any shortfall between the amount of funds contained in the Revenue Account and the total amount owed under clause (ii), which shall be the Invoice Payment.

Section 3.3    **Payment of Invoices**. Absent manifest error in inclusion or omission of items or calculations contained in an Invoice (if there is a manifest error, Owner will correct such error and show such recalculation), if there are not sufficient funds in the Revenue Account to cover an applicable Invoice amount, Owner shall cause the amount of the applicable undisputed Invoice Payment to be transferred into the Revenue Account by the date specified in Section 4.2 of the Omnibus Agreement, pursuant to Article IV of the Omnibus Agreement.  The Operator and Owner agree to use reasonable efforts to resolve any dispute over Invoice amounts within thirty (30) days of Owner's written Notice to Operator of such dispute.  Adjustment credit or debits shall be shown on the Invoice next succeeding the Invoice in which the adjustment is made. Operator shall provide reasonable back-up and supporting documents related to any Invoice within five (5) Business Days of an Owner's written request. Any preexisting obligation to make payment for the Services provided hereunder or out-of-pocket costs of Operator shall survive the termination of a Service and this Agreement until paid.  Owner shall have access to and the right to audit all records supporting such Invoice amounts for the period set forth in Section 1.4 and Section 7.7 during normal business hours and on dates reasonably agreed between Operator and Owner.

Section 3.4    **Owner Default**. It shall constitute a default on behalf of an Owner (an "Owner Default") if Owner fails to timely transfer into the Revenue Account or otherwise cover any undisputed Invoice Payment amount for Services provided pursuant to this Agreement in accordance with the provisions of this ARTICLE III or perform any covenants of Owner under this Agreement, which failure is not by reason of an Operator Default or, subject to the requirements and limitations of Section 7.1 (Force Majeure), excused by an event of *force majeure*, and continues for at least thirty (30) days following receipt of written Notice to Owner that such performance is required; provided, however, that if Owner cannot reasonably cure such failure within such thirty (30) day period (other than in the case of a payment default), no Owner Default shall be deemed to occur provided Owner demonstrates that it has diligently taken reasonable steps to cure such failure within such thirty (30) day period and diligently prosecutes such cure to completion. Upon the occurrence of an Owner Default, Operator may, in addition to all other remedies available at Law or in equity, (i) suspend all or any portion of the provision of Services hereunder to Owner that is the subject of the Owner Default, including Services for which payment is outstanding, until such time as the Owner Default is cured and all unpaid, undisputed Invoice amounts for Services to Operator under this Agreement for such suspended Services are paid in full or (ii) terminate this Agreement effective immediately and be entitled to any amounts owed to Operator by Owner hereunder together with interest on such amount at a rate equal to 5% per annum, calculated daily on the basis of a year of 365 days and the actual number of days elapsed (the "Rate") from the date due, until such undisputed amounts, together with  all accrued and unpaid interest thereon, are paid in full; provided, however, that Operator may not suspend or terminate Services reasonably determined by Operator to be critical to the safety of the operation of the subject Assets until such time as Operator can make the Assets safe for handover to Owner or its designee.  All costs related to making the Assets safe for handover to Owner or its designee shall be borne by Owner in addition to any other amount due and owing to Operator.

Debtors' Exhibit No. 34
Page 407 of 910

Section 3.5   **Operator Default**. It shall constitute an Operator Default if Operator fails (i) to maintain the Revenue Account in accordance with the requirements set forth herein or to pay applicable Third Party costs and expenses that are required to provide the Services if it has an obligation to do so hereunder, (ii) to provide a Service to Owner in accordance with the terms and conditions of this Agreement or to perform any other covenants of Owner under this Agreement, which failure is not by reason of an Owner Default or, subject to the requirements and limitations of <u>Section 7.1</u> (Force Majeure), excused by an event of *force majeure* event or (iii) to comply with a BSEE deadline, and in the case of a default under (iii), continues for at least fifteen (15) days following receipt of written Notice to Operator that such default has occurred or, in all other instances, for at least thirty (30) days following receipt of written Notice to Owner that such performance is required; provided, however, that if Operator cannot reasonably cure such failure within such fifteen (15) or thirty (30) day period, as applicable, no Operator Default shall be deemed to occur provided Operator demonstrates that it has diligently taken reasonable steps to cure such failure within such fifteen (15) or thirty (30) day period, as applicable, and diligently prosecutes such cure to completion.  Upon the occurrence of an Operator Default, Owner may, in addition to any other rights or remedies available at Law or in equity, terminate this Agreement or specific Services provided hereunder within the time frame specified by Owner in a written Notice to Operator so terminating this Agreement.

Section 3.6   **Sales Taxes**.  Any sales, use, value-added or similar excise taxes (but excluding any income, withholding, excess profit or other taxes levied on account of Operator's earnings or receipts, franchise taxes, or taxes assessed on any Operator property) paid hereunder for Services that Operator is required to pay or incur as a result of such Services shall be passed on to, and be the obligation of, the Owner to which such Services are provided as an explicit surcharge and shall be paid by Owner in addition to any payments for Services as set forth in <u>Section 3.1</u> above, whether included in the applicable Invoice, or added retroactively, such that the amount received by the Operator shall be as if no such taxes had been imposed. If Owner submits to Operator a timely and valid resale or other exemption certificate sufficient to support the exemption from sales taxes, then such taxes will not be added to the Invoices for Services payable pursuant to this <u>ARTICLE III</u>; provided, however, that if Operator is ever required to pay such taxes, Owner will promptly reimburse Operator for such tax, including any interest, penalties, and attorney's fees assessed thereon by the applicable Governmental Authority. The Parties will cooperate to contest any invalid sales or use taxes imposed on the Services and to minimize the imposition of any such sales taxes.

## ARTICLE IV.     TERM OF AGREEMENT

Section 4.1   **Term**. Unless earlier terminated as herein provided, Operator shall perform the Services for the Service Term.  No Services shall be provided after the expiration of the Service Term, except by the mutual written agreement of the Parties; provided however the Parties will comply with the provisions of <u>Section 5.3</u> at the conclusion of the Service Term.

## ARTICLE V.  CESSATION OF SERVICES

Section 5.1   **Discontinuation of Services**.  Owner may, with or without cause and for any or no reason, terminate this Agreement or discontinue any Service by giving Operator not less than ten (10) days prior written Notice of such discontinuation, to be effective on the last day of the month specified by Owner in its Notice. Owner shall be liable to Operator for all costs and expenses that Operator remains obligated to pay for Services provided until the actual completion of the transition of the Services.

8

Operator shall act under the Performance Standard in transitioning the performance of the Services to a Third Party or to Owner or another operator; provided that the applicable compensation for Services so transitioned shall continue until the termination thereof in accordance herewith and, with respect to any transition following a termination of Services under this Section 5.1, Owner shall pay any actual, documented out-of-pocket costs incurred for the transition of such Services.

Section 5.2     **Procedures Upon Discontinuation or Termination of Services**. Upon the discontinuation of all of the Services hereunder, this Agreement shall terminate and be of no further force and effect, except as to obligations accrued prior to the date of discontinuation or termination; provided, however, that Section 1.4, Section 3.3, Section 5.3 and ARTICLES VI, VII and VIII and Owner's audit rights under Section 3.3 and Section 7.7, shall survive such discontinuation or termination.

Section 5.3     **Transition of Operations**.  The Parties agree to preserve as a priority during any transition of operations the safety of individuals and the environment in compliance with all Laws and Governmental Authorities.  Prior to and through the expiration of the Service Term, including any termination of this Agreement, Operator shall make commercially reasonable efforts to transition the performance of the Services to a Third Party or to Owner in accordance with the Performance Standard, including providing commercially reasonable assistance to Owner to facilitate such transition; provided that the applicable compensation for Services so transitioned shall continue until the actual termination thereof, and Owner shall pay Operator any actual, documented out-of-pocket costs incurred by Operator for the transition of such Services.  Owner shall provide Notice to Operator containing the applicable recipient and the manner and format of delivery for transfer of any records to Owner (or its designee). Operator shall promptly deliver the records in accordance with such Notice, provided that Operator shall deliver the records by no later than 30 (thirty) days after the expiration of the Service Term and any supplemental records received by Operator after such date shall be transferred to the applicable recipient in a timely manner according to protocols established by the parties, if necessary.  Owner shall be responsible for the documented out of pocket costs incurred by Operator to transfer and deliver such records.  Operator may retain copies of any records or other data it is required to maintain by any Governmental Authority.

Section 5.4     **Marketing Contracts**. Upon expiration or termination of this Agreement pursuant to the terms hereof, to the extent Operator is the owner of such contracts or agreements, Operator shall immediately assign to Owner its rights to all contracts or agreements related to the Marketing Services described on Exhibit A hereto and take such actions as may be reasonably necessary to obtain any required consents for such assignments; provided, however, that Operator shall not be required to provide any monetary or non-monetary consideration for such consent unless paid by Owner.  During the term of this Agreement, Operator shall not enter into any agreement(s) for the benefit or use of the Owner or in connection with the operation of the Assets that prohibits assignment to Owner.

## ARTICLE VI.          INDEMNITIES; DISCLAIMERS

Section 6.1     **Operator Indemnification**.

Operator shall be liable and responsible for, and shall release, defend, protect, indemnify and hold harmless the Owner Group from and against any and all Claims arising from or relating to any of the following, in each case (i) relating to action or inaction taken by any member of Operator Group in breach of the Agreement, or (ii) arising due to the negligence, gross negligence or willful misconduct

of any member of Operator Group in performance of the Services or arising out of or related to the Agreement:

    A.    the loss of or damage or injury to the property of Operator Group;

    B.    any illness, injury or death suffered by any member of the Operator Group;

    C.    (1) the loss of or damage or injury to the property of any Third Party, or (2) the illness, injury or death suffered by any Third Party;

    D.    the loss of or damage or injury to the property of Owner, where Operator indemnifies the Owner Group under this <u>Section 6.1</u>, Operator shall where possible repair or replace the damaged or lost Property at Owner's sole option;

    E.    governmental fines and penalties assessed in connection with provision of the Services;

    F.    the failure of Operator or any other person for whom Operator is responsible to pay taxes that are Operator's responsibility pursuant to <u>Section 3.6</u>

    G.    pollution or contamination (including, without limitation, property damage, control, removal, restoration of lands or sea beds, and cleanup of all pollution or contamination), including, without limitation, spills or leaks or fuel, lubricants, motor oils, pipe dope, paints, solvents, ballasts, bilge, garbage or sewage;

    H.    any breach of applicable Laws;

    I.    Liens; or

    J.    Claims brought against the Owner Group by any member of the Operator Group, including employment-related Claims, other than Claims by Operator consistent with this Agreement.

**Section 6.2**    <u>**Limitations on Classes of Damages**</u>.

    (a)    Operator and Owner mutually waive and release to the fullest extent permitted by applicable Law all of the following Claims for damages suffered by the other Party arising out of this Agreement, whether such Claims are made in connection with an indemnity, a breach of any obligation under this Agreement, or any other Claim:

    (i)    Indirect, special, or consequential damages or losses;

    (ii)    Loss of profits, loss of production (including production of petroleum or petroleum products), loss of economic advantage or benefit, or loss of business opportunity, in each case whether direct, indirect, prospective, or actual; and

    (iii)    Punitive or exemplary damages.

<div align="center">10</div>

(b)      The limitations provided in Section 6.2 do not apply to Claims for damages or losses suffered by any Person other than Owner or Operator.

**Section 6.3      Exclusions for Gross Negligence or Willful Misconduct.**

(a)      **THE WAIVER, AND RELEASE OBLIGATIONS IN SECTION 6.2 APPLY REGARDLESS OF THE ACTIVE, SOLE, PASSIVE, CONTRIBUTORY, CONCURRENT OR GROSS NEGLIGENCE OR LIABILITY WITHOUT FAULT OF ANY PERSON RELEASED, EXCEPT AS PROVIDED FOR IN SECTION 6.3(b) .**

(b)      **OPERATOR'S AND OWNER'S WAIVER AND RELEASE OBLIGATIONS DO NOT APPLY WHERE THE LOSS IN RELATION TO A CLAIM IS THE RESULT OF THE WILLFUL OR INTENTIONAL MISCONDUCT OF A MEMBER OF THE OWNER GROUP OR OPERATOR GROUP, RESPECTIVELY, TO THE EXTENT THAT SUCH MEMBER'S WILLFUL OR INTENTIONAL MISCONDUCT CONTRIBUTED TO THE DEATH, INJURY, DISEASE, DAMAGE, OR LOSS.**

**Section 6.4      Defense of Claims**.

(a)      When a Party indemnifies any member of the Operator Group or the Owner Group against Claims, the indemnifying Party shall defend and hold the indemnified party harmless against those Claims and against all reasonable costs, expenses, and fees of any kind (including attorneys' fees) incurred by the indemnified party in defending those Claims, and any tax imposed on the indemnified party as a consequence of receiving payment under this Article VI. Any such defense costs are in addition to any amounts that are subject to a maximum liability amount under this Agreement.

(b)      A Person seeking to rely on an indemnity has the right to reasonably object to counsel selected by the indemnifying Party and select alternative counsel at the cost of the indemnifying Party.

**Section 6.5      Insurance**.   Operator shall maintain, in all areas where Services are to be performed, all insurance required by applicable Law during the time that Services are being performed. Nothing contained under this Section 6.6, nor the actual amounts of insurance maintained by Operator or its Subcontractors, limits or reduces Operator's liability and indemnity obligations under this Agreement.

**Section 6.6      Disclaimers**.   EXCEPT AS EXPRESSLY SET FORTH IN THIS AGREEMENT, OPERATOR MAKES NO, AND DISCLAIMS ANY, REPRESENTATIONS AND WARRANTIES, EXPRESS, IMPLIED, OR STATUTORY, WITH RESPECT TO THIS AGREEMENT OR THE PERFORMANCE OR RESULTS OF THE SERVICES.

**Section 6.7      Laws; Application**.   The indemnification obligations in this ARTICLE VI are intended to comply with applicable Laws. To the extent such indemnification provisions are found to violate any applicable Laws, or in the event any applicable Laws are enacted or amended so as to cause these provisions to be in violation therewith, this Agreement shall automatically be amended to provide

that the indemnification provided hereunder shall extend only to the maximum extent permitted by the applicable Laws.

## ARTICLE VII.          MISCELLANEOUS

**Section 7.1     Force Majeure**.

(a)     All obligations imposed by this Agreement on each Party, except for obligations to pay money or to provide indemnity, shall be suspended while compliance is prevented, in whole or in part, by an event of *force majeure*.  As used herein an event of *force majeure* shall mean any of: an industry-wide labor dispute, fire, flood, war, civil disturbance, act of God (including numbered or named tropical disturbances); a change in laws or governmental rules, regulations or orders, or any other cause, whether similar or dissimilar, provided that such event or circumstance (i) delays or renders impossible the affected Party's performance of its obligations under this Agreement; (ii) is beyond the reasonable control of the affected Party, not due to its fault or negligence and was not reasonable foreseeable, and (iii) could not have been prevented or avoided by the affected Party through the exercise of due diligence, including the expenditure of any reasonable sum, and provided further that *force majeure* shall not include any of the following: (i) economic hardship, (ii) changes in market conditions, (iii) late delivery or failure of construction equipment or materials (unless such late delivery or failure was itself caused by an event of *force majeure*); (iv) labor availability, strikes or other similar labor actions limited to personnel of Operator Group, or (v) climatic conditions (including rain, snow, wind, temperature and other weather conditions), tides, and seasons, regardless of the magnitude, severity, duration or frequency of such climatic conditions, tides or seasons, other than an act of God (including numbered or named tropical disturbances).

(b)     A Party seeking relief under this <u>Section 7.1</u> shall give Notice to the other Party of the fact of the occurrence of the event of force majeure as soon as reasonably practicable after the commencement of such occurrence, and, such Party shall serve on the other Party further written details which shall include (i) a description of the event of force majeure and its likely effect on the affected Party's obligations under this Agreement; (ii) a good faith estimate of the duration of the event of force majeure; and (iii) the actions being taken (or that will be taken) to mitigate against the impacts of such event of force majeure.  For continuing events of force majeure, the affected Party shall update such information no less frequently than once per week.

(c)     Notwithstanding the foregoing, such Party shall resume performance within a reasonable time after such event of *force majeure* has ended or been removed, or such Party is able to overcome the prevention caused by such event.  Operator shall consistently monitor and use its reasonable best endeavors, including the reasonable expenditure of money, to overcome, mitigate and minimize the event of *force majeure* and its consequences.  Neither Party shall be entitled to additional compensation or other payment as a result of an event of *force majeure*.

**Section 7.2     Notices**. Any Notice shall be in writing and delivered (i) in person, (ii) by courier service or by overnight delivery service in each case that requires acknowledgement of receipt, (iii) mailed by certified mail, postage prepaid and return receipt requested, or (iv) delivered by electronic mail and expressly acknowledged as received by return electronic mail, as follows:

Debtors' Exhibit No. 34
Page 412 of 910

If to Owner:

      Fieldwood Energy IV LLC
      2000 W. Sam Houston Pkwy S. Suite 1200
      Houston, Texas 77042
      Attn:   Sole Manager
      Phone: _____
      Email: _____


If to Operator:

      Mako Buyer LLC
      2000 W. Sam Houston Pkwy S. Suite 1200
      Houston, Texas 77042
      Attn:   Thomas R. Lamme
      Phone: (713) 969-1107
      Email: TLamme@fwellc.com

Notice given by personal delivery or courier shall be effective upon actual receipt. Notice given by mail shall be effective upon actual receipt or, if not actually received, the fifth Business Day following deposit with the U.S. Post Office. Notice given by electronic mail shall be effective upon delivery if delivered to a working email address during the recipient's normal business hours, or at the beginning of the recipient's next Business Day if not delivered during the recipient's normal business hours.  If a date specified herein for giving any Notice or taking any action is not a Business Day (or if the period during which any Notice is required to be given or any action taken expires on a date which is not a Business Day), then the date for giving such Notice or taking such action (and the expiration date of such period during which notice is required to be given or action taken) shall be the next day which is a Business Day. Any Party may change any address, electronic or otherwise, to which Notice is to be given to it by giving Notice as provided above of such change of address.

      **Section 7.3**   **No Joint Venture or Partnership**. Nothing in this Agreement is intended  to create, or shall be construed as creating, a partnership, joint venture, association for profit or  other business entity between or among the Parties, and for federal and state income  tax purposes, the Parties elect to be excluded from the application of the provisions of Subchapter K, Chapter 1, Subtitle A of the Internal Revenue Code of 1986, as amended, as permitted and authorized by Section 761 of said Code and the regulations promulgated thereunder.

      **Section 7.4**   **No Fiduciary Duty**. It is expressly understood and agreed that this Agreement is a purely commercial transaction between the Parties and that nothing stated herein shall operate to create any fiduciary duty which a Party shall owe to the other Party, except with respect to the handling of cash by Operator on behalf of Owner.

      **Section 7.5**   **Confidentiality**. From and after the Effective Date, neither Party shall, and shall ensure that members of its Group do not, directly or indirectly, use or disclose or divulge any trade secrets or other Confidential Information of the other Party, including information of others that such Party has

<div align="center">13</div>

agreed to keep confidential; provided that the foregoing restriction shall not apply to information (a) which is lawfully and independently obtained from a Third Party without restriction as to disclosure, (b) which is already known to the Party or to others not bound by a duty of confidentiality or which is in the public domain or enters into the public domain through no fault of any member of such Party's Group, and (c) the Party is required by law or legal process to disclose; and provided further that (i) the Parties may use such information in connection with the performance of the transactions contemplated by this Agreement, including enforcement of its rights thereunder or under any document delivered pursuant thereto, and (ii) Owner may disclose such information to the extent Owner is required to disclose or expressly permitted to disclose such information under any Material Project Contract.

Section 7.6   **Costs and Expenses**.  Each Party shall bear its own costs and expenses in relation to the negotiation and preparation of this Agreement.

Section 7.7   **Records and Inspection**.  Up until 24 months from the end of the calendar year in which this Agreement is completed or terminated, (A) Operator shall ensure that all members of Operator Group retain all records related to this Agreement (or until expiry of the statute of limitations for taxes or import or export charges) and (B) Owner may inspect at any time all records to confirm that the requirements of the Agreement are met.

Section 7.8   **Further Assurances.**  The Parties shall at their own cost and expense execute and deliver such further documents and instruments and shall take such other actions as may be reasonably required or appropriate to evidence or carry out the intent and purposes of this Agreement.

Section 7.9   **Authority of Parties/Signatories**.  Each person signing this Agreement represents and warrants that he or she is duly authorized and has legal capacity to execute and deliver this Agreement. Each Party represents and warrants to the other that the execution and delivery of this Agreement and the performance of such Party's duties have been duly authorized and that this Agreement is a valid and legal agreement binding on such Party and enforceable in accordance with its terms.

Section 7.10   **Public Announcements**.  Operator shall not issue any public announcement or statement concerning this Agreement or make any use of the names, image, logos, or trademarks of Owner or any of its Affiliates or CUSA or any of its Affiliates without obtaining the prior written consent of Owner and CUSA's prior written consent.  If the proposed public announcement or statement makes any use of the names, image, logos, or trademarks of CUSA or any of its Affiliates, Operator shall not proceed without obtaining the prior written consent of CUSA.

Section 7.11   **Entire Agreement**.  This Agreement (together with the Appendix and Exhibits hereto,) constitutes the entire agreement among the Parties with respect to the subject hereof and supersedes any other representations, understandings or agreements (whether written, oral or otherwise) that may have been made or entered into by the Parties or any of their respective Affiliates relating to the transactions contemplated hereby or the subject hereof.

Section 7.12   **Successors and Assignments**.  This Agreement is personal as to Operator and Owner and shall not be assigned by Operator without Owner's consent or any Owner without Operator's consent; provided that the foregoing shall not apply if Operator assigns this Agreement in total (i) along with all of its personnel who are performing any part of the Services hereunder to an Affiliate, provided

Debtors' Exhibit No. 34
Page 414 of 910

that no such assignment by Operator shall relieve Operator of its obligations under this Agreement, or (ii) to an acquirer of all or substantially all of Operator's employees providing Services hereunder.

**Section 7.13    Amendment**.  This Agreement may be amended or modified in whole or in part, and terms and conditions may be waived, only by a duly authorized agreement in writing which makes reference to this Agreement executed by each Party.

**Section 7.14    Construction**.

(a)    All article, section, schedule, and exhibit references used in this Agreement are to articles and sections of, and Appendix and Exhibits to, this Agreement, unless otherwise specified. The appendix and exhibits attached to this Agreement constitute a part of this Agreement and are incorporated herein for all purposes.

(b)    Unless otherwise indicated, with respect to either Party, the terms "ordinary course of business" or "ordinary course" shall be deemed to refer to the ordinary conduct of business in a manner consistent with the past practices and customs of such Party.

(c)    If a term is defined as one part of speech (such as a noun), it shall have a corresponding meaning when used as another part of speech (such as a verb). Terms defined in the singular have the corresponding meanings in the plural, and vice versa. Unless the context of this Agreement clearly requires otherwise, words importing the masculine gender shall include the feminine and neutral genders and vice versa. The words "include", "includes" or "including" do not limit the preceding terms and shall be deemed to be followed by the words "without limitation." The words "hereof," "hereto," "hereby," "herein," "hereunder" and words of similar import, when used in this Agreement, shall refer to this Agreement as a whole and not to any particular section or article in which such words appear. The term "or" is not exclusive.

(d)    The terms "day" and "days" mean and refer to calendar day(s). The terms "year" and "years" mean and refer to calendar year(s).

(e)    Operator and Owner have each participated in the negotiation and drafting of this Agreement, and, if an ambiguity should arise, this Agreement shall be construed as if drafted jointly by the Parties and no presumption or burden of proof shall arise favoring or burdening any Party by virtue of the authorship of any of the provisions in this Agreement.

(f)    The captions in this Agreement are for convenience only and shall not be considered a part of or affect the construction or interpretation of any provision of this Agreement.

(g)    All references to currency herein shall be to, and all payments required hereunder shall be paid in, United States Dollars.

(h)    The serial comma is sometimes included and sometimes omitted. Its inclusion or omission shall not affect the interpretation of any phrase.

**Section 7.15    Severability**. If any provision of this Agreement is held invalid or unenforceable by any court of competent jurisdiction, the other provisions of this Agreement shall remain in full force

Debtors' Exhibit No. 34
Page 415 of 910

and effect. The Parties further agree that if any provision contained herein is, to any extent, held invalid or unenforceable in any respect under the Laws governing this Agreement, they shall take any actions necessary to render the remaining provisions of this Agreement valid and enforceable to the fullest extent permitted by Law and, to the extent necessary, shall amend or otherwise modify this Agreement to replace any provision contained herein that is held invalid or unenforceable with a valid and enforceable provision giving effect to the intent of the Parties to the greatest extent legally permissible.

Section 7.16   **Counterparts**. This Agreement may be executed in two or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument. Any .pdf or other electronic transmission hereof or signature hereon shall, for all purposes, be deemed originals.

Section 7.17   **Third Party Beneficiaries**.  No Person who is not a Party to this Agreement has any rights under this Agreement or may enforce any provision in this Agreement, except where a Person, or CUSA is entitled to insurance, defense, release, limitation of liability or indemnity protection under this Agreement. Notwithstanding the foregoing, the Parties agree that CUSA is an express third-party beneficiary of this Agreement.  The Parties agree that CUSA shall have the right to enforce (i) Owner's rights hereunder in the event of an Operator breach or default under this Agreement, including those rights set out in Section 3.5, on behalf of Owner, in accordance with the last paragraph of Section 7.04 of the LLC Agreement, and (ii) Owner's termination rights hereunder, including those rights set out in Section 5.1, on behalf of Owner, in accordance with Section 7.10 of the Omnibus Agreement.

Section 7.18   **Waivers**.   No waiver by any Party of this Agreement's terms, provisions or conditions is effective unless specifically evidenced in writing and signed by or on behalf of the Party granting such waiver. Any Party's failure to pursue remedies for breach of this Agreement, or payment by any Party of Invoices, does not constitute a waiver by any such Party of any breach of this Agreement or raise any defense against claims against a Party for breach of this Agreement. The waiver, failure to pursue remedies or to require the performance of any agreement or obligation under this Agreement, does not constitute (1) a waiver of any breach of this Agreement, or (2) a waiver of a later breach of any such agreement or obligation.

## ARTICLE VIII.        DISPUTE RESOLUTION

Section 8.1   **Governing Law**.

(a)      If the Services are performed offshore or on inland waters, notwithstanding the place of execution hereof or the place for performance of any covenant, promise or agreement herein made, this Agreement and the validity hereof, the agreements evidenced hereby, and all matters and issues arising hereunder, shall, to the fullest extent possible, be construed pursuant to and governed by the General Maritime Laws of the United States.  If the General Maritime Laws of the United States are held to be inapplicable to this Agreement or the work to be performed hereunder (or any part thereof) to be performed hereunder by a court of competent jurisdiction, then Sections 8.1(b) and 8.1(c) below shall apply, as appropriate, but only to the extent that United States General Maritime Law is held to be inapplicable.

(b)      If any court of competent jurisdiction determines that United States Maritime Law is not applicable to any relevant part of this Agreement or the work to be performed hereunder, then

Debtors' Exhibit No. 34
Page 416 of 910

such part of this Agreement and/or the work to be performed hereunder, shall, to the fullest extent enforceable under applicable law, be interpreted and enforced exclusively in accordance with the laws of the State of Texas.

(c)     If any court of competent jurisdiction determines that neither United States General Maritime Law nor the laws of the state of Texas are applicable to any relevant part of this Agreement or the work to be performed hereunder, then such part of this Agreement and/or the work to be performed hereunder, shall, to the fullest extent enforceable under applicable law, be interpreted and enforced exclusively in accordance with the laws of the State of Louisiana, excluding any conflicts of law rules that might refer same to another jurisdiction .

**Section 8.2     Resolution of Disputes**. The Parties shall exclusively and finally resolve any dispute between them using direct negotiations, mediation, and then arbitration as set out in this Article VIII, except as permitted in Section 8.5(g).

**Section 8.3     Direct Negotiations.** If a dispute arises, a Party seeking to initiate the dispute resolution process shall give Notice to the other Party of the Claim. The Parties shall attempt to resolve the dispute through direct negotiations in a meeting between the Parties, attended by individuals with decision-making authority, which must take place within 30 days, or as otherwise agreed to by the Parties, from the date the Notice was sent.

**Section 8.4     Mediation.** If the dispute cannot be resolved by direct negotiations within 30 days of initiation of the resolution process, either Party may initiate mediation by giving Notice to the other Party. Mediation must be attended by a representative from each Party with decision-making authority, and the proceeding must take place in Houston, Texas.

**Section 8.5     Arbitration Proceedings.** If the Parties fail to resolve the dispute within 60 days from Notice of mediation, either Party may initiate binding arbitration by giving Notice to the other Party. The arbitration must be conducted in accordance with the CPR Rules. To the extent of any conflicts between the Act or the CPR Rules and the provisions of this Agreement, the provisions of this Agreement prevail. The CPR is the appointing authority. The place of arbitration must be Houston, Texas. The following provisions will apply to arbitration proceedings:

(a)     One arbitrator (or three (3) arbitrators if the monetary value of the dispute is more than US $5,000,000 or its currency equivalent) will conduct the arbitral proceedings in English. If there is a dispute whether the monetary value exceeds the US $5,000,000, then the number of arbitrators must be three (3).

(b)     The maximum number of witnesses each Party may call to give evidence on its behalf, including by oral testimony, declaration or witness statement, is five (5) witnesses of fact and three (3) expert witnesses.

(c)     The existence of a dispute and any negotiations, mediation, and arbitration proceedings between the Parties in relation to any dispute are confidential and the Parties shall not make any disclosure to any Third Party. Any information, documents, or materials, created or produced for the purposes of, or used in, negotiations, mediation, or arbitration of a dispute are confidential and the Parties shall not disclose them to any Third Party unless there is a legal or

regulatory obligation to make a disclosure (but the disclosure must be limited to the extent necessary to comply with that legal or regulatory obligation), or to the extent required to enforce or challenge an award in bona fide legal proceedings before a state court or other judicial authority.

(d)      The arbitrator(s) has no authority to appoint or retain expert witnesses for any purpose unless agreed to by the Parties. The arbitrator(s) may not act as *amiable compositeur or ex aequo et bono*.

(e)      Unless a Party is otherwise entitled to be indemnified for such costs pursuant to this Agreement, the Parties intend that regardless of which Party prevails, all arbitration fees and costs must be split equally, between the Parties, and each Party shall bear its own costs of legal representation, witness expenses, and ancillary costs.

(f)      The award is final and binding, and except for proceedings under Section 8.5(g), the Parties agree to waive their rights to: (i) apply to the court for determination of a point of law; and (ii) any form of appeal, review or recourse in respect of any such award to any court or other judicial authority, to the extent that such waiver may be validly made.

(g)      The Parties may apply to a court with appropriate jurisdiction for any of the following without waiving its arbitration rights:

(i)      Interim measures as necessary until appointment of the arbitrator(s) or pending determination by the arbitrator(s).

(ii)      Preserving property pending determination by the arbitrator(s).

(iii)      Enforcing judgment entered on an award over the Person or assets of the non-prevailing Party.

(iv)      Enforcing Section 8.5(c) and preventing any information, documents or materials used in those proceedings from being used or disclosed by that Party for any purpose other than enforcement of Section 8.5(c).

(v)      Proceedings to (A) preserve property pending determination by the arbitrator(s), (B) enforce Section 8.5(c), or (C) enforce judgment entered on an award may be brought in any court having jurisdiction over the Person or assets of the non-prevailing Party. The prevailing Party may seek, in any court having jurisdiction, judicial recognition of the award, or order of enforcement or any other order or decree that is necessary to give full effect to the award.

[*Remainder of Page Intentionally Left Blank. Signature Page(s) to Follow.*]

Debtors' Exhibit No. 34
Page 418 of 910

IN WITNESS WHEREOF, this Agreement has been signed by each of the Parties as of the date first above written.

**OPERATOR**:

Mako Buyer LLC


By: _____
Name: _____
Title: _____


**OWNER:**

Fieldwood Energy IV LLC


By: _____
Name: _____
Title: _____

[*Signature page to Contract Operating Agreement*]

# **APPENDIX I**

# **DEFINITIONS**

"<u>Act</u>" means the Federal Arbitration Act, 9 U.S.C. §§ 1-16.

"<u>Affiliate</u>" means, with respect to a Party means any Person or entity that controls, is controlled by or is under common control with such Party where control means the direct or indirect power to direct the management of the entity at issue.  For the avoidance of doubt, (i) neither the Owner nor any of its direct or indirect subsidiaries shall constitute an Affiliate of Operator for purposes of this Agreement, and (ii) neither the Operator nor any of its direct or indirect subsidiaries shall constitute an Affiliate of Owner for purposes of this Agreement.

"<u>Assets</u>" means, collectively, the Terminated Properties and the Operating Assets.

"<u>BOEM</u>" means the Bureau of Ocean Energy Management of the United States Department of the Interior, or any successor agency.

"<u>BSEE</u>" means the Bureau of Safety and Environmental Enforcement of the United States Department of the Interior, or any successor agency.

"<u>Business Day</u>" mean any day other than a Saturday or a Sunday or a day on which federally chartered banking institutions in Houston, Texas, are authorized by Law to close, but for purposes of Notices or other communications given hereunder, means before 4:00 p.m. on such day in the city of Houston, Texas.

"<u>Claim</u>" means any claim, liability, loss, demand, damage, cost, lien, cause of action of any kind, obligation, requirement, clean-up costs, penalty, fine, interest and award, and whether arising by law, contract, tort (including negligence), voluntary settlement, or in any other manner. For indemnification Claims involving damage to Property, "Claim" also includes the cost of removal of lost or damaged Property.

"<u>Confidential Information</u>" means, collectively, trade secrets, proprietary information and confidential information including, but not limited to, all geological, geophysical, economic, financial, personnel information, contracts, and other information provided pursuant to this Agreement, whether in the form of maps, charts, logs, seismographs, interpretations, calculations, summaries or opinion, as well as other written notes, analyses, compilations, studies, interpretations, trade secrets, ideas, processes, procedures, data, know-how, improvements, discoveries, developments, designs, blueprints, drawings, techniques and other documents, materials or information regarding plans for exploration, development, marketing and selling, business records and plans, budgets, prices and costs, suppliers, customers and potential customers.

"<u>CPR</u>" means Conflict Prevention and Resolution.

"<u>CPR Rules</u>" means the International Institute for CPR Rules.

"<u>CUSA</u>" means Chevron U.S.A. Inc.

"<u>Escrow Account</u>" means that certain escrow account established pursuant to the Escrow Agreement.

"<u>Escrow Agreement</u>" means that certain escrow agreement governing the escrow account established on the Effective Date to collect and safeguard funds to pay for certain future decommissioning costs of Owner, dated the Effective Date, by and between Owner, CUSA, and the U.S. Bank National Association, as escrow agent.

"<u>FWE Parent</u>" means Fieldwood Energy LLC.

"<u>Governmental Authority</u>", individually, and "<u>Governmental Authorities</u>", collectively, means BOEM, BSEE, or any other applicable state, local, or federal governmental entity.

"<u>Implementation Agreement</u>" means that certain Implementation Agreement, dated [___], by and between CUSA and FWE Parent.

"<u>Invoice</u>" means a written invoice submitted by Operator.

"<u>Invoice Payment</u>" means the amount due to be paid by Owner to Operator pursuant to <u>Section 3.2</u>.

"<u>Joint Development Agreement</u>" means that certain Joint Development Agreement of even date herewith by and between the Owner and Operator.

"<u>Joint Interest Owner</u>" means any Person with whom Owner (or its Affiliates) has a legal or contractual relationship regarding the ownership of the project, joint venture, or license for which the Services are performed, and their successors in interest (but for the purposes of this Agreement, only in such ownership capacity).

"<u>Laws</u>" means any and all applicable laws, statutes, codes, constitutions, ordinances, decrees, writs, injunctions, orders, judgments, principles of common law, rules, licenses, authorizations, or regulations (including environmental laws) that are promulgated, issued, or enacted by any Governmental Authority having jurisdiction.

"<u>LLC Agreement</u>" means the limited liability company operating agreement of Owner, of even date herewith.

"<u>Material Contracts</u>" has the meaning attributed to such term in <u>Section 1.9(b)</u>.

"<u>Material Project Contracts</u>" means the following agreements: (i) this Agreement, (ii) the Omnibus Agreement, (iii) the Turnkey Removal Agreement, (iv) the LLC Agreement, (v) the NPI Conveyance and (vi) the Escrow Agreement, and "<u>Material Project Contract</u>" means any such agreement.

"<u>Non-Affiliate</u>" means any Person that is not Operator or an Affiliate of any such Person.

"<u>Non-FWE IV Operations</u>" means operations, business or other activity that is not related to the Services provided hereunder or that is not conducted on the Assets, including any operations

conducted by Operator or any of its Affiliates on its or its Affiliates oil and gas leases or the oil and gas leases of a Non-Affiliate.

"Non-Operated Assets" means Assets other than Operated Assets.

"Notice" means any notice, request, instruction, correspondence or other document to be given hereunder by any Party to another.

"NPI Conveyance" means the net profits conveyance, of even date herewith, made by Owner to U.S. Bank National Association, as escrow agent of the Escrow Account.

"Omnibus Agreement" means that certain Omnibus Agreement, of even date herewith, by and between Owner, Operator and CUSA.

"Operated Assets" means Assets while operated by Owner (or by Operator on behalf of Owner).

"Operating Assets" means those certain FWE IV Leases (as such term is defined in the Plan of Merger) that have not expired or terminated as of the Effective Date (as such term is defined in the Plan of Merger) and the FWE IV Assets (as such term is defined in the Plan of Merger) associated therewith.

"Operator" means Mako Buyer LLC, a Delaware limited liability company.

"Operator Default" means a default on behalf of Operator, as set forth in Section 3.5.

"Operator Group" means Operator, Operator's Affiliates, Subcontractors, and their respective directors, officers, employees, and any Person acting on behalf of any of them in connection with any subject matter of this Agreement.

"Owner" means Fieldwood Energy IV LLC.

"Owner Default" means a default on behalf of Owner, as set forth in Section 3.4.

"Owner Group" means Owner, Owner's Affiliates, Owner invitees, Joint Interest Owners and their Affiliates, and their respective directors, officers, and employees (and excludes Owner's contractors and their subcontractors, and their respective directors, officers, and employees).

"Operator's Representative" has the meaning set forth in Section 1.5.

"Owner's Representative" means, as of the Effective Date, the "Sole Manager" appointed under the LLC Agreement.

"Performance Standard" has the meaning attributed to such term in Section 1.2.

"Permitted Operations" means the following activities: (i) managing the safe-out operations and maintenance and monitoring activities with respect to the Terminated Properties; (ii) maintaining current production on the Operating Assets in a safe and cost-effective manner until the wells and facilities associated therewith are ready to be decommissioned; (iii) upon cessation of production on the Operating Assets, performing safe-out operations and maintenance and monitoring

activities; and (iv) for all Assets that are plugged, abandoned or decommissioned or that are to be plugged, abandoned and decommissioned, using commercially reasonable efforts to maximize third-party contribution amounts and other appropriate revenue sources to support such decommissioning operations, including from current working interest owners, predecessors-in-interest and surety bond providers.

"Person" means an individual, corporation, company, association, partnership, state, statutory corporation, government entity, or any other legal entity.

"Plan" means the plan of reorganization of Chapter 11 Case 20-33948, In re: Fieldwood Energy LLC et al., in the United States Bankruptcy Court for the Southern District of Texas, Houston Division, which was confirmed as of [_], 2021.

"Plan of Merger" means that certain Plan of Merger Agreement, of even date herewith, by Fieldwood Energy III LLC.

"Property" means property owned, leased, or furnished by a Person or in which a Person has a legal, beneficial, or economic interest.

"Rate" means a rate equal to 5% per annum, calculated daily on the basis of a year of 365 days and the actual number of days elapsed.

"Reimbursable Costs" means costs or expenditures consisting of: (i) any expenses actually incurred and paid by Operator for any service, insurance coverage, equipment or material that is required to provide the Services hereunder and that is procured by Operator from a Non-Affiliate, in each case to the extent such service, equipment or materials (A) is utilized by Operator to provide the Services (B) would be obtained from Third Parties by a reasonable and prudent operator, and (C) does not consist of overhead costs; or (ii) lease operating expenses associated with Permitted Operations on Operated Assets, that would properly be chargeable as OPEX under a joint operating agreement, but excluding any overhead costs.

 "Restricted Activities" has the meaning attributed to such term in Section 1.9(b).

"Revenue Account" means a segregated bank account in the name of Operator where Operator shall receive and keep all production revenue from the Assets or other revenue received by Operator or its Affiliates that is generated by the Assets or otherwise attributable to the Owner or any of its Affiliates.

"Services" means the services described on Exhibit A.

"Service Term" means five (5) years commencing on the Effective Date, and with respect to each Service, the period set forth on Exhibit A.

"Subcontractor" means any Person who is engaged by Operator or any subcontractor or subsupplier of any tier to provide Services (other than an employee of Operator).

"Terminated Properties" means those certain FWE IV Leases (as such term is defined in the Plan of Merger) that have expired or terminated as of the Effective Date (as such term is defined in the

Plan of Merger) and the FWE IV Assets (as such term is defined in the Plan of Merger) associated therewith.

"Third Party" means any Person who is not a member of Operator Group or Owner Group.

"Third Party Operator" means Assets other than Operated Assets.

"Third Party Payment" means costs or expenditures consisting of: (i) any amounts payable in accordance with Permitted Operations on Non-Operated Assets to the operator thereof, that are properly charged under the applicable joint operating agreement; or (ii) lease operating expenses associated with Permitted Operations on Non-Operated Assets that are properly charged as OPEX under the applicable joint operating agreement.

"Turnkey Removal Agreement" means that certain Turnkey Removal Agreement for decommissioning the Assets, of even date herewith, by and between Operator, Owner and CUSA.

## EXHIBIT A

## TO CONTRACT OPERATING AGREEMENT

**SERVICES**

**0.1** **Generally Applicable Provisions**. The following provisions shall apply to each type of Services set forth in this Exhibit A:

> (i) Operator shall provide the Services at no cost to Owner, provided that Operator shall have the right to obtain reimbursement or advance payment for Reimbursable Costs or Third Party Payments, in each case subject to and in accordance with Section 3.1 and Section 4.1 of the Contract Operating Agreement.

> (ii) All Services described in this Exhibit A shall exclude and be expressly limited by any provisions contained in the Contract Operating Agreement applicable thereto, including Section 1.1, Section 1.6 and Sections 1.8 through 1.11. In the event of a conflict between the Contract Operating Agreement and this Exhibit A, the Contract Operating Agreement shall apply.

**1.** **Asset Management Services**. Subject to the terms of this Agreement, Operator shall provide the following Services with respect to the Assets.

**1.1** **Operating Services**.

Services: Providing the following operating services ("Operating Services") with respect to the Operated Assets:

> (i) Complying with, and causing the Operated Assets to be operated (and maintained) in compliance with all state and federal Laws and regulations, including, but not limited to, following all required health, safety and environmental Laws, regulations and programs (such as SEMS), complying with all regulatory filing and reporting requirements, and obtaining all necessary permits; provided that nothing in this provision shall require Operator to make on behalf of Owner any filing, payment, or submission (or otherwise take any action) that, under applicable Law, may be made only by a party designated with BOEM, BSEE, or other Governmental Authority as a designated operator, designated applicant, designated payor, or responsible party for Owner or that could make Operator directly liable or responsible to BOEM, BSEE, or other Governmental Authority, or any other third party with respect to any of the Assets in which event Operator shall prepare the necessary filing or submission and provide it to the Owner to file or submit or, in the case of a payment, notify the Owner of such payment so that Owner can make such payment.

> (ii) Until the end of the Service Term, serve as Owner's authorized agent with respect to the Operated Assets of Owner, in accordance with the terms hereof and any applicable

operating agreements and similar contracts (if any), by performing the following as and when needed:

(1) purchasing (either directly or as agent for Owner) supplies, materials, tools, and equipment associated with the Operated Assets, provided that the costs of such that are paid directly by Operator will be reimbursed by the Owner to Operator, further, provided that without Owner's prior written consent Operator will not purchase any single item with respect to the Operated Assets if such purchase would result in a charge or cost to Owner greater than one million dollars ($1,000,000.00) for any single item or five million dollars ($5,000,000.00) in the aggregate as to all such items during any calendar year.  Owner's consent shall be deemed granted unless Owner notifies Operator to the contrary within ten (10) Business Days from Owner's receipt of Operator's request;

(2) contracting (either directly or as agent for Owner) for services associated with the physical operation of the Operated Assets, provided that without Owner's prior written consent Operator will not contract for any of such services with respect to any of the Operated Assets if such contract (1) is with an affiliate of Operator or (2) would obligate Owner for a period more than ninety (90) days after the end of the Service Term for the Operating Services. Owner's consent shall be deemed granted unless Owner notifies Operator to the contrary within ten (10) Business Days from receipt of Operator's request;

(3) executing, amending, or extending contracts (either directly or as agent for Owner) associated with the physical operation of the Operated Assets in the normal course of business, provided that without Owner's prior written consent Operator will not contract for any of such services with respect to any of the Operated Assets if such contract (1) is with an Affiliate of Operator; or (2) would obligate Owner for a period more than ninety (90) days after the end of the Service Term for the Operating Services. Owner's consent shall be deemed granted unless Owner notifies Operator to the contrary within ten (10) Business Days from receipt of Operator's request;

(4) assisting Owner in Owner's capacity as operator under the applicable joint operating agreements, production handling agreements, and other similar operating agreements related to the Operated Assets with all rights and authority to communicate with co-lessees and non-operating parties and take all actions under the applicable agreement as if it were Owner;

(5) assisting Owner with the implementation of applicable master service agreements, work orders, purchase orders and similar service contracts related to the Operated Assets; and

(6) assisting Owner in all dealings and communications with Governmental Authorities, provided that Operator must obtain the prior approval of Owner before Operator agrees to any fine or penalty.  Operator will provide Owner copies of all correspondence with Governmental Authorities, other than routine correspondence, on a periodic basis or as requested by Owner.

**1.2     Production Marketing, Marketing Services, and Marketing Accounting Services:**

Services: Providing the following production marketing, marketing services and marketing accounting services (collectively, the "Marketing Services") with respect to the Assets:

(1) Performing all marketing, gas control, crude oil and gas scheduling, contract administration, and other similar services necessary to sell production associated with the Assets in a manner substantially consistent with Operator's or its personnel's current general practices, provided that all marketing shall be at prices Operator reasonably believes to be representative of market value. Upon request, Operator will provide Owner summaries of the scheduled oil and gas or plant statements;

(2) Performing all revenue and marketing accounting functions relating to the Assets, including the calculation and payment of royalty and overriding royalties, transportation, cash out, netback pricing, weighted average sales price, and other marketing accounting functions performed in the normal course of business; and

(3) Management of all lease of platform space agreements, production handling agreements, pipeline interconnect agreements, boarding agreements, midstream facility ownership and/or contract operating agreements, and other similar agreements of an Owner with respect to its Assets.

**1.3    Treasury and Accounting Services:**

Services: Providing the following treasury and accounting services with respect to the Assets:

(1) Managing the Revenue Account and any other bank accounts of Owner associated with the operation of the Assets;

(2) Performing all expenditure accounting functions for Owner relating to Owner's Assets, including for Owner's payment of all invoices and subsequent billing of same to all working interest owners, AFE maintenance, and maintenance of property/cost center numbers;

  (i)    Managing the collection of any joint interest billings and revenue relating to the Assets;

  (ii)   Performing as needed all the calculations of severance, ad valorem/property, and sales and use taxes, but excluding state or federal income, margin, or excise taxes;

  (iii)  Performing all of the property, revenue, and royalty accounting services related to the Assets, including properly disbursing payments to and collecting payments from Third Parties and working interest, royalty, and overriding royalty owners as required by such accounting services as well as rental, severance or production taxes, right of way payments, leasehold, minimum or

Exhibit A – Page 3
Contract Operating Agreement

advance payments due in the normal course of business, and annual 1099 reporting as required by the Internal Revenue Service;

(iv)   Performing all the calculations and preparation of monthly gas and oil balancing and payout statements in the ordinary course of business;

(v)   Identifying to the Owner, and making payments for lease rentals, shut-in royalties, minimum royalties, payments in lieu of production, royalties, overriding royalties, production payments, net profit payments, and other similar burdens that are associated with the ownership and operation of the Assets;

(vi)   Prepare and obtain monthly and quarterly financial reports, and procure and assist with annual financial audit by independent accountant approved by Owner (Ernst & Young is deemed pre-approved);

(vii)   Prepare and obtain monthly and quarterly financial reports, and procure and assist with annual financial audit by independent accountant approved by Owner (Ernst & Young is deemed pre-approved); and

(viii)   Use reasonable efforts to obtain reimbursement/contribution for Owner decommissioning operations that is available under contract or applicable law, including as to predecessors-in-interest to the extent practicable and available surety bonding.

## 1.4   Land Administration Services.

Services: Providing the following land administration services with respect to the Assets:

(1) Administering and maintaining all leases and agreements relating to the Assets;

(2) Maintaining and updating all lease, ownership, contract, and property records and databases relating to the Assets;

(3) Maintaining and updating all royalty payment reports and databases;

(4) Maintaining and updating all royalty suspense accounts, reports, and databases and administering escheat duties in accordance with established State rules and regulations;

(5) Maintaining and updating all accounts, reports, and databases associated with compulsory pooled interests related to the Assets;

(6) Generating, verifying, processing, approving, and signing all internal and external division orders and transfer orders required in the normal course of business;

Exhibit A – Page 4
Contract Operating Agreement

(7) Identifying for payment by Owner and appropriately invoicing all rentals, surface, right of way, shut-in payments, and other payments required by the leases or other agreements relating to the Assets;

(8) Maintaining all land, contract, division of interest, lease files, and other files relating to the subject land administration functions; and

(9) Such other administrative services as Operator administered or caused to be administered to maintain the leases or agreements relating to the Assets.

**1.5    Supply Chain**.

Services. Providing the following supply chain services with respect to the Operated Assets:

(1) Operator shall provide procurement services with respect to the Operated Assets; and

(2) Except as it relates to marketing contracts, which shall be covered by <u>Section 1.2</u> of this <u>Exhibit A</u>, Operator shall provide contract administration services with respect to the Operated Assets.

**1.6    Records Management and Reporting Services:**

Services: Providing the following records creation and management and information reporting services:

(1) Format and data storage for records;

(2) Preparing all reports and updates that Owner is required to provide under LLC Agreement and responding to questions and requests relating to same; and

(3) Respond to data requests from CUSA made in accordance with LLC Agreement, Omnibus Agreement or other Material Project Contract.

*[Remainder of Page Intentionally Left Blank]*

Exhibit A – Page 5
Contract Operating Agreement

Debtors' Exhibit No. 34
Page 429 of 910

**EXHIBIT B-1**

**TO CONTRACT OPERATING AGREEMENT**

RESTRICTED ACTIVITIES

1.      Make any payment to renew or extend a lease;

2.      Plug and abandon any well;

3.      Execute, amend, waive, release, extend, terminate, or otherwise modify any of the governmental approvals, leases, or other agreements related to the Assets (other than an agreement in the ordinary course of business with a service provider using agreements substantially in the form previously used or other forms reasonably approved by Owner); and,

4.      Conduct or cause Owner to conduct any of the activities set  out in Section 7.04 of the LLC Agreement.

Exhibit B-1 – Page 1
Contract Operating Agreement

**EXHIBIT B-2**

**TO CONTRACT OPERATING AGREEMENT**

MATERIAL CONTRACTS*

1.      Any contract with Operator, Fieldwood Energy I LLC, a Texas limited liability company, Fieldwood Energy III LLC, a Texas limited liability company or an Affiliate of any of them with Owner or involving any Asset;

2.      Any contract for an amount receivable or payable in excess of One Hundred Thousand Dollars ($100,000) net to Owner;

3.      Any hydrocarbon purchase and sale, transportation, gathering, treating, compression, processing or similar contract that is not terminable by Owner without penalty on ninety (90) days' or less notice;

4.      Any contract that constitutes a lease under which Owner is the lessor or the lessee of real or personal property that (A) cannot be terminated by Owner without penalty upon ninety (90) days' or less notice and (B) involves an annual base rental of more than One Hundred Thousand Dollars ($100,000.00);

5.      Any contract that is an indenture, mortgage, loan, credit agreement, sale-leaseback, guaranty of any obligation, bond, letter of credit or similar financial contract;

6.      Any contract that is a farmout or farmin agreement, joint venture agreement, term assignment, participation agreement, exploration agreement, development agreement, joint operating agreement, unit operating agreement, operating agreement, unit agreement, pooling agreement or similar contract;

7.      Any contract for the sale, lease or exchange, of Owner's interest in the Assets;

8.      Any contract that contains any calls on, or options to purchase, material quantities of hydrocarbon production;

9.      Any contract that can reasonably be expected to result in aggregate payments by or on behalf of Owner or aggregate revenues paid to Owner, in each case, (A) of more than One Hundred Thousand Dollars ($100,000) during the current or any subsequent fiscal year or (B) One Hundred Thousand Dollars ($100,000) in the aggregate over the term of such contract (in each case, based solely on the terms thereof);

10.      Any contract that is a seismic or other geophysical acquisition or sharing agreement or license;

11.      Any contract, the primary purpose of which is to provide indemnity rights;

Exhibit B-2 – Page 1
Contract Operating Agreement

12.     Any contract that (A) contains or constitutes an existing area of mutual interest agreement or (B) includes non-competition restrictions, non-solicitation or no-hire obligations;

13.     Any contract that is a drilling contract, rig contract (including workover rig) or fracturing services contract;

14.     Any joint operating agreement;

15.     Any contract that constitutes a partnership agreement, joint venture agreement or similar contract; and

16.     Any contract to perform or agree to a Restricted Activity.

*   For the purposes of this Exhibit B-2, the word "contract" includes any work orders, service orders, purchase orders or any other operative instruments associated with an agreement or contract.

Exhibit B-2 – Page 2
Contract Operating Agreement

## EXHIBIT C

## TO CONTRACT OPERATING AGREEMENT

OPERATOR REPRESENTATIVES LIST[1]

To be completed.

---

[1] NTD: List will include name, title and contact information for the individuals in charge of performing each Service.

Exhibit C – Page 1
Contract Operating Agreement

## **Exhibit 8**

**Escrow Agreement**

See attached.

*Exhibit 8 to the Implementation Agreement*

## ESCROW AGREEMENT

THIS ESCROW AGREEMENT (this "**Agreement**") is made and entered into this [--] day of [--], 2021 (the "**Effective Date**"), by and among Chevron U.S.A. Inc., a Pennsylvania corporation ("**CUSA**"), Mako Buyer LLC, a Delaware limited liability company ("**Operator**"), Fieldwood Energy IV LLC, a Texas limited liability company ("**FWE IV**"), and **U.S. BANK NATIONAL ASSOCIATION**, as escrow agent (in such capacity, "**Escrow Agent**"). Operator, FWE IV and CUSA are sometimes referred to in this Agreement individually as "**Party**" or collectively as the "**Parties**".

## RECITALS

A.  CUSA and Fieldwood Energy LLC, a Texas limited liability company (now known as Fieldwood Energy III LLC ("**FWE**")), entered into that certain Implementation Agreement, dated as of June 9, 2021 (as amended, restated, supplemented or otherwise modified, the "**Implementation Agreement**").

B.  FWE IV was formed in connection with a divisive merger under Texas law of FWE.

C.  CUSA, FWE IV and Operator have entered into that certain Omnibus Agreement, dated as of [___], 2021 (as amended, restated, supplemented or otherwise modified, the "**Omnibus Agreement**"). Capitalized terms used but not defined in this Agreement have the meanings assigned thereto in the Omnibus Agreement.

D.  As part of the consideration under the Omnibus Agreement and the Implementation Agreement, and subject to the terms of the Omnibus Agreement and the Implementation Agreement, the Parties have agreed that each of the Parties, as and when required by the Omnibus Agreement or the Implementation Agreement, will make, or cause to be made, certain deposits of cash into the Escrow Account (the "**Escrow Amounts**").

E.  CUSA, FWE IV and Operator have requested, and Escrow Agent has agreed, that Escrow Agent will hold the Escrowed Funds, invested as provided for in this Agreement, for the purposes set forth in the Omnibus Agreement and make disbursements to the Parties as provided in this Agreement.

F.  In consideration of the premises and the mutual covenants set out in this Agreement, and other good and valuable consideration, the receipt and sufficiency of which is acknowledged, the Parties and the Escrow Agent agree to be bound by the provisions of this Agreement (and, solely as between the Parties, the provisions of the Omnibus Agreement).

## 1.  DEPOSIT TO THE ESCROW ACCOUNT.

1.1  The Parties shall from time to time deposit, or cause to be deposited, any and all Escrow Amounts as required pursuant to the Implementation Agreement and the Omnibus Agreement, and Escrow Agent hereby confirms that all or any portion of the Escrow Amount deposited from time to time in the Escrow Account will be available for payment in accordance with this Agreement. For purposes of this Agreement:

(A)  "**Escrow Account**" means the deposit account of Escrow Agent bearing number [--] maintained by and with Escrow Agent for the benefit of CUSA, FWE IV and Operator pursuant to this Agreement.

(B)     "**Banking Day**" means any day other than a Saturday, Sunday or day when Escrow Agent is authorized or required to be closed for business to the public.

(C)     "**Dollars**" and "**US$**" means United States Dollars.

1.2     Escrow Agent will hold the Escrow Amount (including any interest accrued thereon as a result of the Permitted Investments) in the Escrow Account (collectively, the "**Escrowed Funds**"), for the benefit of CUSA, FWE IV and Operator, and will disburse the Escrowed Funds solely in accordance with this Agreement.

2.      **DISBURSEMENT OF ESCROWED FUNDS.**

2.1     Escrow Agent shall not disburse or otherwise transfer any Escrowed Funds except as follows:

(A)     After receipt from a duly authorized representative of CUSA from time to time of executed disbursement instructions in the form attached hereto as <u>Exhibit A</u> (each, a "**Disbursement Notice**"), that are executed by only CUSA and specifically reference this <u>Section 2.1(A)</u>, Escrow Agent will disburse, within one (1) Banking Day (but no later than the third Banking Day) after receipt of such Disbursement Notice to the person or persons indicated in such Disbursement Notice the portion of Escrowed Funds equal to the amount set forth in such Disbursement Notice. CUSA will only give Escrow Agent Disbursement Notices pursuant to this <u>Section 2.1(A)</u> in the circumstances and in the amounts permitted by Section 2.3 of the Omnibus Agreement (except Section 2.3(c) of the Omnibus Agreement).

(B)     After receipt from a duly authorized representative of each of Operator and CUSA from time to time of a Disbursement Notice executed by each of Operator and CUSA, that specifically references this <u>Section 2.1(B)</u>, Escrow Agent will disburse, within one (1) Banking Day (but no later than the third Banking Day) after receipt of such Disbursement Notice to the person or persons indicated in such Disbursement Notice the portion of Escrowed Funds equal to the amount set forth in such Disbursement Notice. Operator and CUSA will only give Escrow Agent Disbursement Notices pursuant to this <u>Section 2.1(B)</u> in the circumstances and in the amounts permitted by Section 2.3(c) of the Omnibus Agreement.

(C)     After receipt from a duly authorized representative of each of the Parties from time to time of a Disbursement Notice executed by each of CUSA, FWE IV and Operator, that specifically references this <u>Section 2.1(C)</u>, Escrow Agent will disburse, within one (1) Banking Day (but no later than the third Banking Day) after receipt of such Disbursement Notice to the person or persons indicated in such Disbursement Notice the portion of Escrowed Funds equal to the amount set forth in such Disbursement Notice.

(D)     Escrow Agent shall transfer and deposit the Escrowed Funds as provided in <u>Sections 5</u> and <u>6.1(A)</u>.

2.2     Escrow Agent may conclusively rely on without question, investigation, consent of or additional notice to either Party, and act upon, in each case, (A) the written instructions from a duly authorized representative of CUSA given pursuant to a Disbursement Notice with respect to the Escrow Account and Escrowed Funds if given in accordance with

Section 2.1(A), (B) the joint written instructions from a duly authorized representative of each of Operator and CUSA given pursuant to a Disbursement Notice with respect to the Escrow Account and Escrowed Funds if given in accordance with Section 2.1(B), and (C) the joint written instructions from a duly authorized representative of each Party given pursuant to a Disbursement Notice with respect to the Escrow Account and Escrowed Funds if given in accordance with Section 2.1(C), Section 5 or Section 6.1(A). For the avoidance of doubt, Escrow Agent may not take any action with respect to the Escrow Account, the Escrowed Funds or this Agreement based upon the unilateral instruction from Operator (or any person or entity acting on its behalf, including any trustee or the equivalent on its behalf in any insolvency, bankruptcy, receivership or similar proceeding) unless CUSA agrees in writing thereto.

**3.    DUTIES OF ESCROW AGENT.**

3.1    The duties of Escrow Agent shall be as follows:

(A)    During the term of this Agreement, Escrow Agent shall hold and disburse the Escrowed Funds in accordance with only the terms and provisions of this Agreement (*provided* that, for the avoidance of doubt, the Parties are bound by the terms of the Omnibus Agreement and will only instruct the Escrow Agent to make disbursements of the Escrowed Funds in accordance with the terms of the Omnibus Agreement).

(B)    Escrow Agent shall be obligated only for the performance of the duties as are specifically set forth in this Agreement.  Escrow Agent has no fiduciary or discretionary duties of any kind.  Escrow Agent assumes no liability in connection with this Agreement except for its negligence, gross negligence, fraud or willful misconduct.  Escrow Agent shall in no case or event be liable for punitive, incidental or consequential damages (including, but not limited to, lost profits).

(C)    Except as provided in Sections 3.1(B) and 9.1, Escrow Agent shall not be responsible for the validity, correctness or genuineness of any document, statement, invoice or notice submitted to it by the Parties under this Agreement, provided that such documents, statements, invoices or notices are delivered by at least one of the Parties.  Escrow Agent may seek advice from its own counsel and, except as provided in Sections 3.1(B) and 9.1, shall be fully protected in any action reasonably taken by it in good faith reliance upon the advice of its counsel.

**4.    STATEMENTS.**

4.1    The Escrow Agent shall send statements on the status of the Escrow Account to the Parties on a monthly basis, showing any disbursements and to whom disbursed, any service charges levied, all earnings on or attributable to the Escrowed Funds, opening and closing balances and the type of investments and rates of earnings on the Escrowed Funds.  Each of the Parties may request and obtain reasonable additional information concerning such matters from the Escrow Agent.

5.    **REMOVAL OF OR RESIGNATION OF ESCROW AGENT.**

5.1    CUSA and Operator may at any time remove Escrow Agent upon thirty (30) days' prior written notice with or without cause by any instrument or instruments in writing signed by authorized representatives of both CUSA and Operator and delivered to Escrow Agent.

5.2    Escrow Agent may resign at any time on ninety (90) days' prior written notice to the Parties hereto by delivering written notice of its intended resignation to the Parties; *provided* that such resignation shall not be effective until a successor escrow agent has been appointed and accepted its appointment.  If Operator and CUSA jointly designate in writing a successor escrow agent, then Escrow Agent shall transfer the Escrowed Funds to such successor and, once the Escrowed Funds have been securely transferred to such successor, Escrow Agent shall be discharged of any liability or responsibility with respect to the Escrowed Funds arising from and after the date that Escrow Agent delivers the Escrowed Funds to the designated successor Escrow Agent.

6.    **TERMINATION.**

6.1    This Agreement shall terminate upon the earliest of the following:

(A)    Receipt by Escrow Agent of a joint written notice of termination signed by authorized representatives of each of the Parties, whereupon Escrow Agent shall disburse all remaining Escrowed Funds to the applicable Party stated in such notice.

(B)    Following release by Escrow Agent of all the Escrowed Funds in accordance with this Agreement upon written confirmation by the Parties to Escrow Agent that the Omnibus Agreement has been terminated.

(C)    Upon termination in accordance with any other provision of this Agreement.

Upon termination of this Agreement, none of the Parties, on the one hand, or Escrow Agent, on the other, shall have any further rights, duties or obligations under this Agreement to the other; *provided* that this statement in no way affects the obligations of the Parties to each other under the Omnibus Agreement.

7.    **NOTICES.**

7.1    All notices and other communications to Operator, FWE IV, CUSA or Escrow Agent may be hand delivered or sent by email or courier, to any Party or the Escrow Agent at the addresses provided in this Section 7:

**If to Operator**:

Mako Buyer LLC
2000 W. Sam Houston Pkwy S. Suite 1200
Houston, Texas 77042
Attn:        Thomas R. Lamme
Telephone:  (713) 969-1107
Email:       TLamme@fwellc.com

Debtors' Exhibit No. 34
Page 438 of 910

**If to FWE IV**:

    Fieldwood Energy IV LLC
    2000 W. Sam Houston Pkwy S. Suite 1200
    Houston, Texas 77042
    Attn:   Sole Manager
    Telephone: [--]
    Email: [--]

**If to CUSA**:

    Chevron U.S.A. Inc.
    100 Northpark Boulevard
    Covington, LA 70433
    Attn:   Land Manager
    Telephone: (985) 773-6538
    Email:   tdwebre@chevron.com

**If to Escrow Agent**:

    U.S. Bank National Association
    One California Street, Suite 1000
    San Francisco, CA 94111
    Attn:   Global Corporate Trust
        David A. Jason, Vice President
    Telephone: (415) 677-3622
    Facsimile: (415) 677-3769
    Email: david.jason@usbank.com

7.2    For all purposes of this Agreement, a notice or communication will be deemed effective: on the day it is delivered unless (a) that day is not a day upon which commercial banks are open for the transaction of business in the city specified (a "**Local Banking Day**") in the address for notice provided by the recipient or (b) if delivered after the close of business on a Local Banking Day, then on the next succeeding Local Banking Day.

**8.**    **FEE.**

8.1    FWE IV shall pay Escrow Agent the compensation in accordance with the fee schedule attached as <u>Exhibit B</u> hereto.  If not paid by FWE IV within ten Banking Days of demand, Escrow Agent shall have the right to set off against the Escrowed Funds (A) the amounts due in such fee schedule, and (B) as provided for in Section 10.  Otherwise, Escrow Agent shall have no right of set off against the Escrowed Funds and shall have no lien or security interest in the Escrow Account or the Escrowed Funds.  CUSA shall have no obligation to pay fees to Escrow Agent.

**9.**    **INDEMNIFICATION.**

9.1    In consideration of Escrow Agent's acceptance of this appointment, each Party hereby agrees to indemnify and hold Escrow Agent harmless as to any liability, and reasonable and duly documented costs and expenses (including, without limitation, counsel fees and expenses) which Escrow Agent may suffer or incur by reason of (a) any action, claim or

proceeding brought against Escrow Agent by such Party and arising out of or relating in any way to this Escrow Agreement or the transaction to which Agreement relates, except in the case of Escrow Agent's negligence, gross negligence, fraud or willful misconduct and (b) Escrow Agent's enforcement of its rights under this Section 9.  The foregoing indemnification and agreement to hold harmless shall survive any resignation or removal of Escrow Agent and shall survive the termination of this Agreement.

**10.   INVESTMENTS.**

10.1   Escrow Agent shall invest Escrowed Funds only in investments described on <u>Exhibit C</u> into which the Parties direct Escrow Agent in writing to invest ("**Permitted Investments**"); and Escrow Agent shall have no power or authority to invest or reinvest the Escrowed Funds except in such investments.  All investments held in the name of Escrow Agent shall be held as the agent of the Parties.  In the absence of written investment instructions described above, Escrow Agent shall invest the Escrowed Funds to the extent reasonably practicable in the investment identified in clause (a) in <u>Exhibit C</u>.  Escrow Agent may make Permitted Investments through its own investment department or through affiliates.  Interest earned will become part of the Escrowed Funds.  Escrow Agent represents and warrants that neither it nor any affiliate of it will receive any compensation, commissions, fees (including, without limitation, any sale load charges, redemption fees, exchange fees, account fees, purchase fees, management fees, distribution fees, service fees or charges or similar payment) in connection with any investment of the Escrowed Funds except as disclosed on <u>Exhibit B</u>.  The representation and warranty in the preceding sentence shall be deemed to have been made and repeated by Escrow Agent on each occasion on which any investment is made with any portion of the Escrowed Funds.  Escrow Agent may elect, but shall not be obligated, to credit the Escrow Account with funds representing income or principal payments due on, or sales proceeds due in respect of, assets in any of the Escrow Account, or to credit to any of the Escrow Account assets intended to be purchased with such funds, in each case before actually receiving the requisite funds from the payment source, or to otherwise advance funds for Escrow Account transactions.  Notwithstanding anything else in this Agreement, any such crediting of funds or assets shall be provisional in nature, and the Escrow Agent shall be authorized to reverse any such transactions or advances of funds in the event that it does not receive good funds with respect thereto.

**11.   CONFLICTS OF INTEREST.**

11.1   No director, employee or agent of Escrow Agent shall give to or receive from any director, employee or agent of the Parties or any affiliate thereof any commission, fee, rebate, or any gift or entertainment of significant cost or value, or enter into any business arrangement with any director, employee or agent of the Parties or any affiliate thereof other than as a representative of the Parties or their affiliates, in connection with the services provided hereunder without the Parties' prior written consent.  Escrow Agent shall promptly notify the Parties of any violation of this provision and any consideration received as a result of such violation shall be paid over or credited to the Parties.  Additionally, if any violation of this provision occurring prior to the date of this Agreement resulted directly or indirectly in the Parties' consent to enter into this Agreement with Escrow Agent, the Parties may, at their sole option, terminate this Agreement at any time and, notwithstanding any other provision of this Agreement, pay no compensation or reimbursement to Escrow Agent whatsoever for any services provided after the date of termination.

Debtors' Exhibit No. 34
Page 440 of 910

12.    **NO PAYMENT TO GOVERNMENT OFFICIALS.**

12.1   Neither Escrow Agent nor its employees, agents or subcontractors shall make any payment or give anything of value to any official of any government or public international organization, including any officer or employee of any government department, agency, or instrumentality to influence his or its decision, or to gain any other advantage for any Party or Escrow Agent in connection with the services performed hereunder.  Any party to this Agreement shall immediately notify the other parties to this Agreement of any violation of this Section.  Each party to this Agreement shall hold the others harmless from and against all losses and expenses arising out of any such violation.  In the event of any violation of this Section, any party to this Agreement may, at its sole option, terminate this Agreement at any time.

13.    **RIGHT TO AUDIT.**

13.1   Escrow Agent shall maintain true and correct records in connection with all matters relating to this Agreement and retain such records for the greater of 24 months or such period of time as is required by the Escrow Agent's document retention policies.   Any representative(s) authorized by the Parties may in a reasonable time and to a reasonable extent audit records of Escrow Agent for the sole purpose of determining whether there has been compliance with the applicable provisions of this Agreement.

14.    **TAX REPORTING.**

14.1   Each Party shall provide Escrow Agent a properly completed and duly executed applicable U.S. Internal Revenue Service ("**IRS**") Form W-9 for each payee to which it directs payment. If such tax documentation is not so provided, Escrow Agent is authorized to withhold taxes as required by the U.S. Internal Revenue Code and regulations promulgated thereunder. The Parties have determined that any interest or income on Escrowed Funds shall be reported on an accrual basis and deemed to be for the account of CUSA, and the Parties shall prepare and file all required tax filings with any applicable taxing authority consistent therewith.

14.2   The Parties shall provide Escrow Agent with all information requested by Escrow Agent necessary for (a) the preparation and filing by Escrow Agent with the IRS or other taxing authority of any applicable IRS Form 1099, IRS Form 1042-S, or similar document, or (b) the performance by Escrow Agent of any reporting obligations under the Foreign Account Tax Compliance Act, Foreign Investment in Real Property Tax Act, or other applicable law or regulation, in each case to the extent related to the performance or fulfilment of Escrow Agent's duties and obligations pursuant to this Agreement.

15.    **MISCELLANEOUS.**

15.1   This Agreement (and, solely as between the Parties, the Omnibus Agreement and the Implementation Agreement) sets forth the entire agreement of the Parties and Escrow Agent with respect to the subject matter hereof.  The provisions of this Agreement may be waived, altered, amended or supplemented, in whole or in part, only by writing signed by each of the Parties and Escrow Agent.  Neither this Agreement nor any right or interest hereunder may be assigned in whole or in part by any party to this Agreement, except to affiliates of such party, without the prior written consent of the other parties hereto.

Debtors' Exhibit No. 34
Page 441 of 910

15.2     This Agreement shall be governed by and construed under the laws of the State of Texas, without giving effect to its conflict of law principles; provided, however, that nothing herein shall be construed to modify or negate the agreement of the Parties, solely as between themselves, that all disputes between them shall be resolved exclusively and finally pursuant to the dispute resolution provisions in the Omnibus Agreement.

15.3     No party to this Agreement is liable to any other party hereto for losses due to, or if it is unable to perform its obligations under the terms of this Agreement because of, acts of God, fire, war, earthquake, terrorism, floods, strikes, electrical outages, equipment or transmission failure, or other causes reasonably beyond its control.

15.4     This Agreement may be executed in one or more counterparts, each of which shall be deemed an original, but all of which together shall constitute the same instrument. All signatures of the Parties and Escrow Agent may be transmitted by facsimile, by email with the signature page as an image attachment (such as a .PDF, .TIF, .BIT, or .JPEG file) or by way of a digital signature provided by DocuSign (or such other digital signature provider as specified in writing to Escrow Agent by the authorized representative of the applicable Party), and such facsimile, email image attachment or digital signature will, for all purposes, be deemed the original signature of such Party or Escrow Agent whose signature it reproduces, and will be binding upon such Party or Escrow Agent.  Each party hereto agrees to assume all risks arising out of the use of digital signatures and electronic methods to submit communications to the other parties hereto, including without limitation the risk of Escrow Agent acting on unauthorized instructions, and the risk of interception and misuse by third parties.

15.5     If any provision of this Agreement is determined to be prohibited or unenforceable by reason of any applicable law of a jurisdiction, then such provision shall, as to such jurisdiction, be ineffective to the extent of such prohibition or unenforceability without invalidating the remaining provisions thereof, and any such prohibition or unenforceability in such jurisdiction shall not invalidate or render unenforceable such provisions in any other jurisdiction.

15.6     A person who is not a Party or Escrow Agent shall have no right to enforce any term of this Agreement.

15.7     The Parties represent, warrant and covenant that each document, notice, instruction or request provided by such Party to Escrow Agent shall comply with applicable laws and regulations.  Where, however, the conflicting provisions of any such applicable law may be waived, they are hereby irrevocably waived by the Parties and Escrow Agent to the fullest extent permitted by law, to the end that this Agreement shall be enforced as written.

15.8     Each of the Parties and Escrow Agent submits to the exclusive jurisdiction of the Federal and state law courts of Harris County, Texas for the limited and sole purpose to resolve any disputes regarding the formation, existence, construction, performance, validity and all aspects of this Agreement, provided that such submission will not prevent the enforcement of a Texas Federal or state court judgment in another jurisdiction.  Nothing in this Section 15.8 shall be deemed to be an agreement by the Parties and Escrow Agent that Texas federal or state courts can exercise general jurisdiction over any Party or Escrow Agent. Any process may be validly served upon the Parties and Escrow Agent at the applicable address of the Party and Escrow Agent provided in Section 7.1.

Debtors' Exhibit No. 34
Page 442 of 910

16.    **CONFIDENTIALITY.**

16.1    This Agreement and all transactions hereunder shall be kept confidential by Escrow Agent, and Escrow Agent hereby agrees not to provide copies of this Agreement or to disclose its specific terms or any of the transactions to any person without the prior written consent of CUSA and Operator except: (a) Escrow Agent may disclose to the applicable court in connection with any proceedings initiated to collect payment under this Agreement; (b) to any extent that it is required to disclose the same pursuant to any law or order of any court of competent jurisdiction, or any procedure for disclosure of documents in any proceedings before any such court (including any proceeding to enforce this Agreement) or in regulatory proceedings, or pursuant to any law or regulation having the force of law; provided, however, Escrow Agent shall give CUSA and Operator advance written notice of Escrow Agent's intention to disclose the same based on that requirement and a reasonable amount of time consistent with the requirement pursuant to which disclosure is to occur in which to seek adequate protective orders; and (c) to Escrow Agent's direct or indirect shareholders, directors, officers, employees, independent auditors, legal counsel, and other professional advisors to the extent such persons have a need to know, in each case if such persons are informed by Escrow Agent of its confidential nature and of their duty to maintain the confidentiality hereof, and who prior to any such disclosures shall have agreed to be bound by such duty of confidentiality. Notwithstanding anything to the contrary herein, Escrow Agent may provide copies of this Agreement and disclose its specific terms to a bank regulatory agency or in connection with an examination of its records by bank examiners without prior notice to CUSA or Operator, provided that Escrow Agent shall provide notice to CUSA and Operator as soon as practicable thereafter.

17.    **PATRIOT ACT DISCLOSURE.**

17.1    Section 326 of the Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism Act of 2001 ("**USA PATRIOT Act**") requires Escrow Agent to implement reasonable procedures to verify the identity of any person that opens a new account with it. Accordingly, the Parties acknowledge that Section 326 of the USA PATRIOT Act and agree that Escrow Agent's identity verification procedures require Escrow Agent to obtain information which may be used to confirm a Party's identity, including, without limitation, name, address and organizational documents ("identifying information"). The Parties each agree to provide Escrow Agent with any such identifying information required as a condition of opening an account with or using any service provided by Escrow Agent.

18.    **SECURITY PROCEDURE FOR FUNDS TRANSFERS**

18.1    Escrow Agent shall confirm each Disbursement Notice and any other funds transfer instruction received in the name of a Party by means of the security procedure selected by such Party and communicated to Escrow Agent through a signed certificate in the form of Exhibit D-1 (in the case of CUSA) or Exhibit D-2 (in the case of Operator) attached hereto, which upon receipt by Escrow Agent shall become a part of this Agreement. Once delivered to Escrow Agent, Exhibit D-1 and Exhibit D-2 may be revised or rescinded only by a writing signed by an authorized representative of CUSA (in the case of Exhibit D-1) or the Operator (in the case of Exhibit D-2). Such revisions or rescissions shall be effective only after actual receipt by Escrow Agent and following such period of time as may be necessary to afford Escrow Agent a reasonable opportunity to act on it. If a revised Exhibit

9

D-1 or Exhibit D-2 or a rescission of an existing Exhibit D-1 or Exhibit D-2 is delivered to Escrow Agent by an entity that is a successor-in-interest to the applicable Party, such document shall be accompanied by additional documentation satisfactory to the Escrow Agent showing that such entity has succeeded to the rights and responsibilities of such Party under this Escrow Agreement.

18.2    The Parties understand that Escrow Agent's inability to receive or confirm each Disbursement Notice or any other funds transfer instructions received in the name of a Party pursuant to the security procedure selected by such Party may result in a delay in accomplishing the funds transfer requested pursuant to such Disbursement Notice or other funds transfer instructions, and agree that Escrow Agent shall not be liable for any loss caused by any such delay.

[SIGNATURE PAGES IMMEDIATELY FOLLOW THIS PAGE]

WITNESS the following execution and delivery of this Agreement by duly authorized representatives of each of the following Parties and Escrow Agent as of the Effective Date:

**MAKO BUYER LLC**

By: _____
Name:
Title:

**CHEVRON U.S.A. INC.**

By: _____
Name:
Title:

Debtors' Exhibit No. 34
Page 446 of 910

**FIELDWOOD ENERGY IV LLC**

By: _____
Name:
Title:

13

**ESCROW AGENT:**

**U.S. BANK NATIONAL ASSOCIATION**

By: _____
Name:
Title:

# EXHIBITS TO ESCROW AGREEMENT

# TO BE AGREED WITH ESCROW AGENT

## Exhibit 9

**Neptune Spar Transition Services Agreement**

See attached.

*Exhibit 9 to the Implementation Agreement*

## NEPTUNE SPAR TRANSITION SERVICES AGREEMENT

This Neptune Spar Transition Services Agreement dated and effective as of _____, 2021 (the "Effective Date") (this "Agreement") is by and between Mako Buyer LLC, a Delaware limited liability company (the "Service Provider") and Noble Energy, Inc. a Delaware corporation (the "Predecessor"). Service Provider and Predecessor are sometimes referred to collectively as the "Parties" and individually as a "Party".

**WHEREAS**, pursuant to the final confirmation order in respect of the Chapter 11 cases of Fieldwood Energy LLC and its debtor Affiliates (as defined below) (collectively the "Debtors") in Case No. 20-33948 the Debtors have abandoned certain oil and gas properties and assets for which Predecessor is a predecessor-in-interest;

**WHEREAS**, Predecessor has requested that Service Provider provide certain operational maintenance, monitoring, technical, and administrative services with respect to the Asset (as defined below), upon the terms and conditions set forth herein, for three hundred sixty-five (365) days from the exit of the Chapter 11 cases, and Service Provider has agreed to do so; and

**WHEREAS**, other than as otherwise agreed by the Parties, during the Service Term (as defined below) and during any transition activities, Predecessor will be responsible for and shall pay all costs associated with the Asset and/or the Services (as defined below), including but not limited to third party costs and costs associated with Services provided by Service Provider's employees.

**NOW, THEREFORE**, in consideration of the premises and of the mutual promises, covenants, conditions, and agreements contained herein, and for other valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties hereby agree as follows:

## ARTICLE I.  TRANSITION SERVICES

**Section 1.1**  **Services**. Subject to the terms of this Agreement, Service Provider shall provide or cause to be provided the transition services described on Exhibit A (collectively, the "Services") for all of the oil and gas assets described in Schedule 1 attached hereto (the "Asset") in accordance with the standard of performance set forth in Section 1.2 below for the period set forth in Article IV, subject to the provisions of Article V.  The Services will be provided to Predecessor in connection with the continued maintenance and monitoring of the Asset and, as necessary, to assist in the transition of the maintenance and monitoring of the Asset to Predecessor or another service provider and terminate the Services hereunder on or before the end of the Service Term.

**Section 1.2**  **Standard of Performance**. Subject to the terms of this Agreement, Service Provider shall perform or cause to be performed the Services (a) as a reasonably prudent operator as the contract service provider hereunder would perform such Services, (b) in a good and workmanlike manner consistent with past practices related to the Asset, (c) with due diligence and dispatch, and (d) in compliance with all Laws (as defined below), licenses, authorizations and permits; **PROVIDED, HOWEVER, EXCEPT AS EXPRESSLY PROVIDED HEREIN, IN NO EVENT SHALL SERVICE PROVIDER HAVE ANY OBLIGATIONS OR LIABILITY**

**TO ANY PREDECESSOR GROUP MEMBER EXCEPT WITH RESPECT TO SERVICE PROVIDER'S INDEMNITY OBLIGATIONS AS PROVIDED IN SECTION 6.2.** For purposes of this Agreement, "Laws" means any and all applicable laws, statutes, codes, constitutions, ordinances, decrees, writs, injunctions, orders, judgments, principles of common law, rules, licenses, authorizations, or regulations (including environmental laws) that are promulgated, issued, or enacted by any Governmental Authority (as defined below) having jurisdiction. In providing the Services to the Predecessor, Service Provider may use, at its discretion, its own personnel or the personnel of any of its Affiliates or employ the services of contractors, subcontractors, vendors, or other third parties. For purposes of this Agreement, "Affiliates" with respect to a Party means any person or entity that controls, is controlled by or is under common control with such Party where control means the direct or indirect power to direct the management of the entity at issue.

Section 1.3     **Independent Contractor**. At all times during the performance of Services by Service Provider, all persons performing such Services who shall be in the employ and/or under the control of Service Provider or its Affiliates (including agents, contractors, temporary employees, and consultants) shall be independent from Predecessor and not employees of Predecessor and shall not be entitled to any payment, benefit, or perquisite directly from Predecessor on account of such Services, including, but not limited to, group insurance and participation in any employee benefit and pension plans maintained by Predecessor or any Affiliate of Predecessor. Service Provider shall be responsible for all employee benefits and payroll taxes of its employees performing the Services. Service Provider will not be required to provide any Services the provision of which would violate applicable Laws. Notwithstanding any other provision contained elsewhere in this Agreement, in all cases where the Service Provider is performing Services under this Agreement offshore the State of Louisiana or are otherwise covered by the Louisiana Worker's Compensation Act, La. Rev. Stat. § 23.1021 et seq., the Parties acknowledge and agree that all such operations pursuant to this Agreement are an integral part of and are essential to the ability of Predecessor to generate Predecessor's goods, products, or services, and that whenever Services and work are performed hereunder in or offshore Louisiana, or the Louisiana Workers' Compensation Act may be applicable, the employees of Service Provider and their contractors providing such Services or performing such work, if any, whether direct, statutory, borrowed, or otherwise, are statutory employees of Predecessor in accordance with the Louisiana Worker's Compensation Act, La. Rev. Stat. § 23.1021 et seq. and the protections afforded a statutory employer under Louisiana Law shall apply. In such event, Service Provider agrees that Predecessor is and shall be deemed a statutory employer of Service Provider's employees for the sole purposes of La. Rev. Stat. § 23.1061(A)(3), as the same may be amended from time to time.

Section 1.4     **Records**. Service Provider shall use commercially reasonable efforts to maintain or cause to be maintained true and correct records of all receipts, invoices, reports, and such other documents as are customarily maintained by Service Provider for its own operations relating to each Service rendered hereunder for a period of the later of (i) two (2) years following the end of the Service Term or (ii) such other time required by applicable Law. All such receipts, invoices, reports, and other documents are the property of Predecessor.

2

**Section 1.5      Limitation of Services**.  Notwithstanding anything herein to the contrary, Predecessor acknowledges certain personnel of Service Provider and/or its Affiliates involved in the provision of the Services may leave the employment of such Service Provider and/or its Affiliates or terminate their employment or contract with such Service Provider or its Affiliates during the term of this Agreement. The Services shall not include providing any technical evaluations regarding any proposals for drilling, reworking, or other capital expenditure projects, or the new development of any assets. Service Provider makes no representation or warranty regarding the ability of Service Provider and/or its Affiliates to retain any employees, contractors, or subcontractors and neither Service Provider nor any of its Affiliates shall have any liability to Predecessor as to the result of the loss of any such employees, contractors, or subcontractors. Service Provider and its Affiliates shall use commercially reasonable efforts to report all information accurately but shall not be responsible for the accuracy or completeness of any information furnished by any other party for inclusion in any reports or for results obtained by use of any inaccurate information so furnished.

(A)   Notwithstanding any other provision in this Agreement to the contrary:

   (i)     Service Provider shall have no obligation to be designated with any applicable state, local, or federal governmental entity (each individually, a "Governmental Authority"; and collectively, "Governmental Authorities") as a designated operator, designated applicant, designated payor, or responsible party for the Asset;

  (ii)     Service Provider shall have no obligation to post any bond or other security on behalf of Predecessor or to make any payment directly out of Service Provider's own funds for any Services;

 (iii)     Service Provider shall have no obligation to provide any Service for which a third party is obligated or permitted (under a joint operating agreement, contract services agreement or otherwise) to provide the same service for Predecessor; provided, however, that Service Provider's use of a subcontractor to perform any part of the Services shall not excuse Service Provider from the obligation to perform such Services;

  (iv)     Predecessor acknowledges and agrees that it will be responsible for and shall provide any required bond or security for the Services;

  (v)     if Service Provider reasonably believes that it cannot perform any Service without creating a breach of an existing agreement to which Predecessor is a party or the Asset is bound as of the Effective Date, and/or violating the Law, then Service Provider shall have no obligation to perform such Service and such Service shall no longer be included  within the Services, and Service Provider shall give prompt, written Notice (as defined below) of such issue to Predecessor, prior to the discontinuation of such Service, with detailed descriptions of the agreement in question and the breach and/or violation Service Provider believes will be created.  In the event such possible breach and/or violation is cured or remedied within thirty (30) days following Predecessor's receipt of such Notice, Service Provider may perform such Service only insofar as performance would not create the breach or violation; and

WEIL:\98011006\2\45327.0007

Debtors' Exhibit No. 34
Page 453 of 910

(vi)   In the performance of the Services, Service Provider must obtain consent of Predecessor to perform any of the following actions on behalf of Predecessor: execute, amend, waive, release, extend, terminate, or otherwise modify any of the governmental approvals, leases, or other agreements related to the Asset (other than an agreement in the ordinary course of business with a service provider using agreements substantially in the form previously used or other forms reasonably approved by Predecessor).

**Section 1.6**   **Service Provider's Access to the Asset**.   To the extent necessary for Service Provider to perform the Services, Predecessor shall provide Service Provider unrestricted access to the Asset and shall execute any instrument, license, certificate, or other agreement reasonably necessary to provide such access.

**Section 1.7**   **Designated Operator.**  To the extent allowed or required under applicable Law, as soon as reasonably possible after the Effective Date, Predecessor shall become the designated operator of the Asset for decommissioning purposes and shall provide any required bonding and/or Certificate of Financial Responsibility coverage.

## ARTICLE II. COMPENSATION

**Section 2.1**   **Compensation for Services**. During the Service Term, Predecessor shall pay to and reimburse Service Provider the amounts determined pursuant to Section 3.1 below for the provision of the Services to Predecessor.

## ARTICLE III.        PAYMENT AND DEFAULT

**Section 3.1**   **Submission of Invoice**. Service Provider shall submit a written invoice (the "Invoice") to Predecessor, along with copies of any third party invoices and other supporting details evidencing the expenses satisfactory to Predecessor, on or before the fifteenth (15th) Business Day of each month setting forth an itemized accounting of the actual costs incurred in the preceding month, or as applicable, the preceding months for which an Invoice was not issued, for the Services provided by Service Provider.  For the purposes of this Agreement, "Business Day" shall mean any day other than a Saturday or a Sunday or a day on which federally chartered banking institutions in Houston, Texas, are authorized by Law to close, but for purposes of Notices or other communications given hereunder, means before 4:00 p.m. on such day in the city of Houston, Texas.

For shared costs, such as salaried and hourly personnel, IT systems, and other office related infrastructure and overhead, Service Provider shall allocate those costs as follows:

For "people" costs, Service Provider shall bill Predecessor for actual time incurred by its full-time employees in performing Services hereunder rounded up to the nearest hour.  The hourly rate of each Service Provider employee shall be equal to the annual payroll cost (including salary, vacation pay, target bonus, 401(k) match, and payroll taxes) of the employee divided by 2,080 hours.

4

Debtors' Exhibit No. 34
Page 454 of 910