For illustrative purposes, two actual employees are shown below:



For all other shared costs identified below, Service Provider shall bill Predecessor for the proportionate use in the performance of the Services hereunder. The proportionate use shall be determined by the Total Hours Billed divided by the Total Employee Hours. "Total Hours Billed" is equal to the total number of hours recorded by Service Provider's full-time employees in performing Services hereunder and "Total Employee Hours" is equal to Service Provider's average daily headcount of full-time employees performing Services hereunder during the applicable month multiplied by eight hours multiplied by the number of Business Days in the month.

All other shared costs include and are limited to the following:
  (i)  IT-related costs (IT systems and software)
 (ii)  Healthcare and other benefits (benefits cost and administration)
(iii)  Communications

For example, assuming an average daily headcount of 275 full-time employees performing Services hereunder and 20 Business Days in the applicable month, Total Employee Hours for the month would equal 44,000 hours (275 employees x 20 Business Days x 8 hours). If the Total Hours Billed for the month is 100, Predecessor's proportionate use would be 0.23%; and Service Provider would bill Predecessor for 0.23% of these other shared costs.

Any third party costs associated with the Services will be billed to the Service Provider and charged to the Predecessor on monthly invoices.

**Section 3.2    Payment of Invoices**. Absent manifest error in inclusion or omission of items or calculations contained in an Invoice (if there is a manifest error, Predecessor will correct such error and show such recalculation on or before the date when payment would otherwise be due), the Predecessor shall pay within thirty (30) Business Days of Predecessor's receipt of an Invoice the undisputed amounts invoiced to Predecessor by wire transfer of immediately available funds to the bank account designated on the Invoice by Service Provider. Adjustment credit or debits shall be shown on the Invoice next succeeding the Invoice in which the adjustment is made. Service Provider shall provide reasonable back-up and supporting documents related to any Invoice within five (5) Business Days of Predecessor's written request. Any preexisting obligation to make payment for the Services provided hereunder or out-of-pocket costs of Service Provider shall survive the termination of this Agreement until paid. Predecessor shall have access to and the right to audit all records supporting such Invoice amounts for the period set forth in <u>Section 1.4</u> and <u>Section 7.4</u>.

**Section 3.3     Predecessor Default**. It shall constitute a default on behalf of Predecessor (an "Predecessor Default") if Predecessor fails to timely pay any Invoice amount for Services provided pursuant to this Agreement in accordance with the provisions of this Article III or fails to perform any covenants of Predecessor under this Agreement, which failure continues for at least fifteen (15) days following receipt of written Notice to Predecessor of such failure; provided, however, that if Predecessor cannot reasonably cure such failure (other than for the payment of money or providing indemnity defense) within such fifteen (15) day period, no Predecessor Default shall be deemed to occur provided Predecessor demonstrates that it has diligently taken reasonable steps to cure such failure within such fifteen (15) day period and diligently prosecutes such cure to completion. Upon the occurrence of a Predecessor Default, Service Provider may, in addition to all other remedies available at Law or at equity, (i) suspend all or any portion of the provision of Services hereunder to Predecessor until such time as the Predecessor Default is cured and all unpaid, undisputed Invoice amounts for Services to Service Provider under this Agreement for such suspended Services are paid in full or (ii) terminate this Agreement effective immediately and be entitled to any amounts owed to Service Provider by Predecessor hereunder together with interest on such amount at a rate equal to 5% per annum, calculated daily on the basis of a year of 365 days and the actual number of days elapsed (the "Rate") from the date due, until such undisputed amounts, together with all accrued and unpaid interest thereon, are paid in full.

**Section 3.4     Service Provider Default**. Subject to Section 3.3 above, it shall constitute a default on behalf of Service Provider (an "Service Provider Default") if Service Provider fails to provide a Service to Predecessor in accordance with the terms and conditions of this Agreement, which failure is not by reason of an Predecessor Default or Force Majeure and continues for at least fifteen (15) days following receipt of written Notice to Service Provider; provided, however, that if Service Provider cannot reasonably cure such failure within such fifteen (15) day period, no Service Provider Default shall be deemed to occur provided Service Provider demonstrates that it has diligently taken reasonable steps to cure such failure within such fifteen (15) day period and diligently prosecutes such cure to completion. Upon the occurrence of a Service Provider Default, Predecessor may, in addition to any other rights or remedies available at Law, in equity, or by contract, terminate this Agreement within the time frame specified by Predecessor in a written Notice to Service Provider so terminating this Agreement.

**Section 3.5     Third Person Services**. Predecessor recognizes that Service Provider may hire third parties to provide certain portions of the Services, and Predecessor shall be responsible for the payment to Service Provider of amounts due by Service Provider to such third parties, which are incurred from and after the Effective Date with respect to the Asset. In the event Service Provider incurs costs of a third party, such costs will be included in an Invoice, and Predecessor shall reimburse Service Provider at the same time and in the same manner as the payment described in Section 3.2.

**Section 3.6     Sales Taxes**. Any sales, use, value-added or similar taxes paid or incurred hereunder for Services that Service Provider is required to pay or incur as a result of such Services shall be passed on to, and be the obligation of, Predecessor as an explicit surcharge and shall be paid by Predecessor in addition to any payments for Services as set forth in Section 3.1 above, whether included in the applicable Invoice, or added retroactively, such that the amount received by the Service Provider shall be as if no such taxes had been imposed. If Predecessor submits to

WEIL:\98011006\2\45327.0007

Debtors' Exhibit No. 34
Page 456 of 910

Service Provider a timely and valid resale or other exemption certificate sufficient to support the exemption from sales taxes, then such taxes will not be added to the Invoices for Services payable pursuant to this Article III; provided, however, that if Service Provider is ever required to pay such taxes, Predecessor will promptly reimburse Service Provider for such tax, including any interest, penalties, and attorney's fees assessed thereon by the applicable Governmental Authority. The Parties will reasonably cooperate to contest any invalid sales or use taxes imposed on the Services and to minimize the imposition of any such sales taxes.

## ARTICLE IV.      TERM OF AGREEMENT

**Section 4.1     Term**. The term of this Agreement (the "Service Term") shall be a period beginning on the Effective Date until the earlier to occur of (i) the date Predecessor, in its sole discretion, is ready and able to take over operations on the Asset and (ii) a date which is 365 days from the Effective Date, subject to Article V.  No Services shall be provided after the expiration of the Service Term, except by the mutual written agreement of the Parties.

## ARTICLE V.  CESSATION OF SERVICES

**Section 5.1     Discontinuation of Services**. Predecessor may, with or without cause and for any or no reason, terminate the Service Term and discontinue any Service by giving Service Provider not less than ten (10) days prior written Notice of such discontinuation. Predecessor shall be liable to Service Provider for all costs, expenses, losses, and obligations Service Provider remains obligated to pay (x_ under the terms hereunder or (y) under any other existing contract related to such Services, including as a result of such termination or discontinuation, including any and all actual, documented out-of-pocket amounts reasonably incurred by Service Provider, provided that (a) Service Provider has an obligation to mitigate such costs and (b) any such costs billed to Predecessor pursuant to clause (y)  shall be limited to the average monthly charge billed to Predecessor under Section 3.1 using the previous three (3) calendar months to determine such average monthly charge.

**Section 5.2     Effect of Termination of Services**. Upon the discontinuation or termination of all Services hereunder, this Agreement shall terminate and be of no further force and effect, except as to obligations accrued prior to the date of discontinuation or termination; provided, however, that Section 1.4, Articles VI and VII, and Predecessor's audit rights under Section 3.2 and Section 7.4 of this Agreement shall survive such discontinuation or termination.

**Section 5.3     Transition of Operations**.  The Parties agree to preserve as a priority during any transition of operations the safety of individuals and the environment in compliance with all Laws and Governmental Authorities.  Prior to and through the termination of this Agreement, Service Provider shall make commercially reasonable efforts to transition the performance of the Services to a third party or to Predecessor, including providing commercially reasonable assistance to Predecessor to facilitate such transition; provided that the applicable compensation for Services so transitioned shall continue until the actual termination thereof, and Predecessor shall pay any actual, documented out-of-pocket costs incurred for the transition of such Services.  Upon request, Predecessor shall provide Service Provider with an update as to the status of activities to transition the Services.  At Predecessor's request and expense, Service

7

Debtors' Exhibit No. 34
Page 457 of 910

Provider shall deliver all documents, records, and other data to the extent related to the Assets that are in the Service Provider's possession.  Alternatively, at Predecessor's request and expense, Service Provider shall make such documents available for Predecessor to retrieve.  Service Provider may keep copies of any documents, records or other data it is required to maintain by any Governmental Authority.

      **Section 5.4**　<u>**Predecessor's Access to Employees and Asset**</u>.  In order that Predecessor may become familiar with the Services as described in <u>Exhibit A</u> provided by the employees and agents of Service Provider and make orderly arrangements for the assumption of the obligations for the provision of such Services after the termination of this Agreement, Predecessor Group, upon the prior written consent of Service Provider, which consent will not be unreasonably withheld, shall be entitled to access the Asset and to consult with the employees or agents of Service Provider providing the Services during normal business hours throughout the Service Term, provided such consultations do not unreasonably interfere with the performance by those employees of their duties.

## ARTICLE VI.　　INDEMNITIES; DISCLAIMERS

      **Section 6.1**　<u>**Predecessor's Indemnification Obligations**</u>. EXCEPT AS PROVIDED IN SECTION 6.2, NOTWITHSTANDING ANY KNOWLEDGE OR INVESTIGATION OF ANY PERSON, PREDECESSOR AGREES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAWS, TO ASSUME, RELEASE, INDEMNIFY, DEFEND, AND HOLD HARMLESS SERVICE PROVIDER, AND ITS EQUITY-HOLDERS, PARENT, AFFILIATES, AND SUBSIDIARY COMPANIES TOGETHER WITH ITS AND ALL OF THEIR RESPECTIVE OFFICERS, DIRECTORS, MANAGERS, EMPLOYEES, COUNSEL, CONTRACTORS, SUBCONTRACTORS, AGENTS, AND REPRESENTATIVES, AND THE RESPECTIVE SUCCESSORS, SPOUSES, RELATIVES, DEPENDENTS, HEIRS, AND ESTATE OF ANY OF THE FOREGOING (EXCLUDING ANY MEMBERS OF THE PREDECESSOR GROUP) (THE "<u>SERVICE PROVIDER GROUP</u>") AGAINST AND FROM ALL CLAIMS, DEMANDS, COMPLAINTS, LOSSES, FINES, PENALTIES, CITATIONS, DAMAGES, CAUSES OF ACTION, SUITS, JUDGMENTS, ORDERS, EXPENSES, OR COSTS, INCLUDING COURT COSTS, REASONABLE ATTORNEYS' FEES, AND EXPERT WITNESSES' FEES (COLLECTIVELY "<u>DAMAGES</u>") CAUSED BY OR ARISING OUT OF OR RESULTING FROM THIS AGREEMENT OR THE PROVISION OF SERVICES PURSUANT TO THIS AGREEMENT, BUT ONLY TO THE EXTENT SUCH DAMAGES ARE NOT CAUSED BY ANY MEMBER OF SERVICE PROVIDER GROUP'S GROSS NEGLIGENCE OR WILLFUL MISCONDUCT. **THE FOREGOING INDEMNITY OBLIGATIONS SHALL APPLY WHETHER OR NOT SUCH DAMAGES ARISE OUT OF (i) NEGLIGENCE (INCLUDING SOLE, SIMPLE, CONCURRENT, ACTIVE, OR PASSIVE NEGLIGENCE OR OTHERWISE), BUT EXPRESSLY NOT INCLUDING GROSS NEGLIGENCE OR WILLFUL MISCONDUCT OF SERVICE PROVIDER OR ANY OTHER MEMBER OF THE SERVICE PROVIDER GROUP, (ii) STRICT LIABILITY, OR (iii) THE UNSEAWORTHINESS OF ANY VESSEL OR THE UNAIRWORTHINESS OF ANY AIRCRAFT EXCEPT IN THE EVENT THAT SUCH DAMAGES OR VIOLATION IS CAUSED BY OR RESULTS FROM THE GROSS**

WEIL:\98011006\2\45327.0007

NEGLIGENCE OR WILLFUL MISCONDUCT OF ANY MEMBER OF THE SERVICE PROVIDER GROUP.

Section 6.2    Service Provider's Indemnity Obligations.   SERVICE PROVIDER SHALL, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAWS, ASSUME, RELEASE, INDEMNIFY, DEFEND, AND HOLD HARMLESS PREDECESSOR, AND ITS EQUITY-HOLDERS, PARENT, AFFILIATES, AND SUBSIDIARY COMPANIES, CO-LESSEES, CO-OWNERS, PARTNERS, JOINT VENTURERS, TOGETHER WITH ITS AND ALL OF THEIR RESPECTIVE OFFICERS, DIRECTORS, MANAGERS, EMPLOYEES, IN-HOUSE LEGAL COUNSEL, AGENTS, AND REPRESENTATIVES, AND THE RESPECTIVE SUCCESSORS, SPOUSES, RELATIVES, DEPENDENTS, HEIRS, AND ESTATE OF ANY OF THE FOREGOING (EXCLUDING ANY MEMBERS OF THE SERVICE PROVIDER GROUP) (THE "PREDECESSOR GROUP") AGAINST AND FROM (A) ALL DAMAGES CAUSED BY OR ARISING OUT OF OR RESULTING FROM THE GROSS NEGLIGENCE OR WILLFUL MISCONDUCT OF ANY MEMBER OF THE SERVICE PROVIDER GROUP IN CONNECTION WITH THE PROVISION OF SERVICES UNDER THIS AGREEMENT, (B) ALL DAMAGES IN RELATION TO PERSONAL INJURY, DEATH, OR DISEASE OF ANY MEMBER OF THE SERVICE PROVIDER GROUP ARISING OUT OF OR RESULTING FROM THE PROVISION OF SERVICES UNDER THIS AGREEMENT, (C) ALL DAMAGES IN RELATION TO PROPERTY DAMAGE OF ANY MEMBER OF THE SERVICE PROVIDER GROUP ARISING OUT OF OR RESULTING FROM THE PROVISION OF SERVICES UNDER THIS AGREEMENT,  (D) ALL DAMAGES (INCLUDING COSTS AND EXPENSES) IN RELATION TO GOVERNMENTAL FINES AND PENALTIES ASSESSED IN CONNECTION WITH ANY PERFORMANCE OF THE SERVICES RESULTING FROM THE NEGLIGENCE OR FAULT OF ANY MEMBER OF SERVICE PROVIDER, AND (E) ALL DAMAGES INCURRED BY THIRD PARTIES ARISING OUT OF OR RESULTING FROM THE PROVISION OF SERVICES UNDER THIS AGREEMENT. **THE INDEMNITY OBLIGATIONS IN SET FORTH IN THE FOREGOING CLAUSES (B) AND (C) SHALL APPLY WHETHER OR NOT SUCH DAMAGES ARISE OUT OF (i) NEGLIGENCE (INCLUDING SOLE, SIMPLE, CONCURRENT, ACTIVE, OR PASSIVE NEGLIGENCE OR OTHERWISE), BUT EXPRESSLY NOT INCLUDING GROSS NEGLIGENCE OR WILLFUL MISCONDUCT OF PREDECESSOR OR ANY OTHER MEMBER OF THE PREDECESSOR GROUP, (ii) STRICT LIABILITY, OR (iii) THE UNSEAWORTHINESS OF ANY VESSEL OR THE UNAIRWORTHINESS OF ANY AIRCRAFT EXCEPT IN THE EVENT THAT SUCH DAMAGES OR VIOLATION IS CAUSED BY OR RESULTS FROM THE GROSS NEGLIGENCE OR WILLFUL MISCONDUCT OF ANY MEMBER OF THE PREDECESSOR GROUP**

Section 6.3    Disclaimers.   NOTWITHSTANDING ANY OTHER TERM OF THIS AGREEMENT TO THE CONTRARY, SERVICE PROVIDER MAKES NO, AND DISCLAIMS ANY, REPRESENTATIONS AND WARRANTIES, EXPRESS, IMPLIED, OR STATUTORY, WITH RESPECT TO THIS AGREEMENT OR THE PERFORMANCE OR RESULTS OF THE SERVICES.  EXCEPT AS PROVIDED IN Section 6.2 WITH RESPECT TO THE GROSS NEGLIGENCE OR WILLFUL MISCONDUCT OF SERVICE PROVIDER OR ANY OTHER MEMBER OF THE SERVICE PROVIDER GROUP IN THE PERFORMANCE OF SERVICES UNDER THIS AGREEMENT, SERVICE PROVIDER EXPRESSLY DISCLAIMS, AND

9

Debtors' Exhibit No. 34
Page 459 of 910

PREDECESSOR AGREES THAT THE SERVICE PROVIDER GROUP SHALL BE FREE FROM, ALL LIABILITY AND RESPONSIBILITY FOR ANY REPRESENTATION, WARRANTY, STATEMENT, OR INFORMATION WITH RESPECT TO THE SERVICES THAT IS MADE OR COMMUNICATED (ORALLY OR IN WRITING) TO ANY PREDECESSOR GROUP MEMBER (INCLUDING ANY OPINION, INFORMATION, PROJECTION, EVALUATIONS, OR ADVICE THAT MAY HAVE BEEN PROVIDED TO ANY PREDECESSOR GROUP MEMBER BY ANY SERVICE PROVIDER GROUP MEMBER).

**Section 6.4**     **Laws; Application**.  The indemnification obligations in this Article VI are intended to comply with applicable Laws. To the extent such indemnification provisions are found to violate any applicable Law, or in the event any applicable Law is enacted or amended so as to cause these provisions to be in violation therewith, this Agreement shall automatically be amended to provide that the indemnification provided hereunder shall extend only to the maximum extent permitted by the applicable Law.

**Section 6.5**     **Limitations**.  NOTWITHSTANDING ANY OTHER TERM OF THIS AGREEMENT TO THE CONTRARY, NO PARTY SHALL BE LIABLE TO ANY OTHER PARTY OR TO A MEMBER OF THE PREDECESSOR GROUP OR SERVICE PROVIDER GROUP UNDER THIS AGREEMENT FOR ANY PUNITIVE, EXEMPLARY, SPECIAL, INDIRECT OR CONSEQUENTIAL DAMAGE RESULTING FROM OR ARISING OUT OF THIS AGREEMENT.

## ARTICLE VII.     ADDITIONAL OBLIGATIONS

**Section 7.1**     **Conflict of Interest**.  In performing their obligations hereunder, no member of Service Provider Group will (A) enter into any business arrangement with any individual known by such member of Service Provider Group to be a director, employee or agent (excluding attorneys and accountants) of Predecessor or any of its Affiliates without Predecessor's prior written consent  or (B) give to or receive from any director, employee or agent of Predecessor or any of its Affiliates in connection with such obligations anything that is more than a nominal cost or value. Service Provider shall ensure that all members of Service Provider Group comply with this Agreement.

**Section 7.2**     **Improper Influence**. No member of Service Provider Group may, directly or indirectly, offer or make any payment, or offer or give anything of value to any official or immediate family member of an official of any government, public international organization, or political party (including any officer or employee of any department, agency, or instrumentality of any government or public organization), or to any candidate for public office to influence their or its act or decision, or to gain any other advantage for Predecessor, its Affiliates, Service Provider Group, or any of them arising out of this Agreement.

**Section 7.3**     **Pre-Contract Violations and Reporting**. Service Provider warrants that no event has occurred prior to the Effective Date, which if it had occurred after the Effective Date, would be a violation of Section 7.1 or Section 7.2. Service Provider shall immediately notify Predecessor of any violation of Section 7.1, Section 7.2 or Section 7.3. Nothing in this Agreement requires either Party to comply with Laws if such requirement would be inconsistent with United States ("U.S.") laws, including U.S. anti-boycott laws.

WEIL:\98011006\2\45327.0007

**Section 7.4** **Records and Inspection**. Up until 24 months from the end of the calendar year in which this Agreement is completed or terminated, (A) Service Provider shall ensure that all members of Service Provider Group retain all records related to this Agreement (or until expiry of the statute of limitations for taxes or import or export charges) and (B) Predecessor may inspect at any time all records to confirm that the requirements of the Agreement are met.

**Section 7.5** **Trade Sanctions Compliance**. Service Provider shall provide Predecessor with advance Notice of the names and addresses of any member of Service Provider Group who is or may be in the near future subject to economic sanctions or any trade restrictions imposed by the U.S. government; or debarred or excluded or declared ineligible to participate in U.S. government contracts, or contracts, grants, or other programs financed in whole or part by the U.S. government (collectively "Restricted Parties"). Service Provider shall provide such Notice promptly upon, and in no event later that 90 days after, learning of the Service Provider Group member's designation as a Restricted Party. Service Provider Group personnel providing Services must not be citizens of countries subject to comprehensive U.S. trade sanctions without Predecessor's prior written consent.

**Section 7.6** **Data Protection**. Service Provider shall process any information in connection with this Agreement that can be used to identify an individual in accordance with Law and Predecessor's reasonable instructions. Service Provider shall (A) apply appropriate security measures for the protection of, and restrict third party access to, this personal information, (B) immediately notify Predecessor of any improper use, disclosure, or exposure of the personal information, and (C) cooperate with Predecessor's reasonable requests to investigate and remediate such incidents.

**Section 7.7** **Flow Down Requirements**. Service Provider shall ensure that the Services are performed in accordance with the applicable U.S. regulations referenced at http://www-eproc.chevron.com/Public/GDS%20Documents/Certain%20U.S.%20Regulations.pdf.

**Section 7.8** **Confidentiality**. From and after the date hereof, Service Provider shall not, and shall ensure that members of Service Provider Group do not, directly or indirectly, use or disclose or divulge any trade secrets or other Confidential Information of Predecessor, including information of others that Service Provider has agreed to keep confidential; provided that the foregoing restriction shall not apply to information (a) which is lawfully and independently obtained by Service Provider from a third party without restriction as to disclosure, (b) which is already known to Service Provider or to others not bound by a duty of confidentiality or which is in the public domain or enters into the public domain through no fault of any member of Service Provider Group, and (c) Service Provider is required by Law or legal process to disclose; and provided further that Service Provider may use such information in connection with the performance of the transactions contemplated by this Agreement, including enforcement of its rights thereunder or under any document delivered pursuant thereto.  As used herein, "Confidential Information" shall mean confidential and/or proprietary information including, without limitation, all geological, geophysical, economic, financial or other information, whether in the form of maps, charts, logs, seismographs, interpretations, calculations, summaries or opinion, as well as other written notes, analyses, compilations, studies, interpretations, trade secrets, ideas, processes,

11

Debtors' Exhibit No. 34
Page 461 of 910

procedures, data, know-how, improvements, discoveries, developments, designs, blueprints, drawings, techniques and other documents, materials or information regarding plans for exploration, development, marketing and selling, business records and plans, budgets, prices and costs, suppliers, customers and potential customers.

### ARTICLE VIII.        GOVERNING LAW AND RESOLUTION OF DISPUTES

**Section 8.1**    <u>**Governing Law**</u>

(a)        If the Services (as defined in <u>Exhibit A</u>) is performed offshore or on inland waters, notwithstanding the place of execution hereof or the place for performance of any covenant, promise or agreement herein made, this Agreement and the validity hereof, the agreements evidenced hereby, and all matters and issues arising hereunder, shall, to the fullest extent possible, be construed pursuant to and governed by the General Maritime Laws of the United States.  If the General Maritime Laws of the United States are held to be inapplicable to this Agreement or the Services (or any part thereof) to be performed hereunder by a court of competent jurisdiction, then Subsections 8.1(b) and 8.1(c) below shall apply, as appropriate, but only to the extent that United States General Maritime Law is held to be inapplicable.

(b)        If any court of competent jurisdiction determines that United States General Maritime Law is not applicable to any relevant part of this Agreement or the work to be performed hereunder, then such part of this Agreement and/or the work to be performed hereunder, shall, to the fullest extent enforceable under applicable Law, be interpreted and enforced exclusively in accordance with the Laws of the State of Texas.

(c)        If any court of competent jurisdiction determines that neither United States General Maritime Law nor the Laws of the state of Texas are applicable to any relevant part of this Agreement or the work to be performed hereunder, then such part of this Agreement and/or the work to be performed hereunder, shall, to the fullest extent enforceable under applicable Law, be interpreted and enforced exclusively in accordance with the Laws of the State of Louisiana, excluding any conflicts of law rules that might refer same to another jurisdiction.

**Section 8.2**    <u>**Resolution of Disputes**</u>.  The Parties shall exclusively and finally resolve any Dispute between them using direct negotiations, mediation, and then arbitration as set out in Article VIII, except as permitted in Sections 8.5(G) and 8.5(H). Service Provider shall not stop, suspend, or otherwise fail to progress the Services pending resolution of a Dispute.  "<u>Dispute</u>" means any claim, disagreement or controversy arising out of this Agreement, including a claim under this Agreement and any dispute or controversy regarding the existence, construction, validity, interpretation, enforceability, termination or breach of this Agreement, whether based in contract, tort or in any other manner.

**Section 8.3**    <u>**Direct Negotiations**</u>.  If a Dispute arises, a Party seeking to initiate the dispute resolution process shall give Notice to the other Party setting out, in writing and in detail, the issues in Dispute and the value of the claim. The Parties shall attempt to resolve the Dispute through direct negotiations in a meeting between the Parties, attended by individuals with decision-making authority, which must take place within thirty (30) days, or as otherwise agreed to by the Parties, from the date the Notice was sent.

12

**Section 8.4**     **Mediation.** If the Dispute cannot be resolved by direct negotiations within 30 days of initiation of the resolution process, either Party may initiate mediation by giving Notice to the other Party. Mediation must be attended by a representative from each Party with decision-making authority, and the proceeding must take place in Houston, Texas.

**Section 8.5**     **Arbitration Proceedings.** If the Parties fail to resolve the Dispute within 60 days from Notice of mediation, either Party may initiate binding arbitration by giving Notice to the other Party. The arbitration must be conducted in accordance with the International Institute for Conflict Prevention and Resolution ("CPR") Rules. To the extent of any conflicts between the Act or the CPR Rules and the provisions of this Agreement, the provisions of this Agreement prevail. The CPR is the appointing authority. The place of arbitration must be Houston, Texas.

The following provisions will apply to arbitration proceedings:

(A)     One (1) arbitrator (or three (3) arbitrators if the monetary value of the Dispute is more than US$5,000,000 or its currency equivalent) will conduct the arbitral proceedings in English. If there is a Dispute whether the monetary value exceeds the US$5,000,000, then the number of arbitrators must be three (3).

(B)     The maximum number of witnesses each Party may call to give evidence on its behalf, including by oral testimony, declaration or witness statement, is five (5) witnesses of fact and three (3) expert witnesses.

(C)     The existence of a Dispute and any negotiations, mediation, and arbitration proceedings between the Parties in relation to any Dispute are confidential and the Parties shall not make any disclosure to any third party. Any information, documents, or materials, created or produced for the purposes of, or used in, negotiations, mediation, or arbitration of a Dispute are confidential and the Parties shall not disclose them to any third party unless there is a legal or regulatory obligation to make a disclosure (but the disclosure must be limited to the extent necessary to comply with that legal or regulatory obligation), or to the extent required to enforce or challenge an award in bona fide legal proceedings before a state court or other judicial authority.

(D)     The arbitrator(s) does not have the power to award, nor will the arbitrator(s) award, the Damages waived and released under Section 6.5. The arbitrator(s) has no authority to appoint or retain expert witnesses for any purpose unless agreed to by the Parties. The arbitrator(s) may not act as *amiable compositeur or ex aequo et bono*.

(E)     Unless a Party is otherwise entitled to be indemnified for such costs pursuant to this Agreement, the Parties intend that regardless of which Party prevails, all arbitration fees and costs must be split equally, between the Parties, and each Party shall bear its own costs of legal representation, witness expenses, and ancillary costs.

WEIL:\98011006\2\45327.0007

(F)     The award is final and binding, and except for proceedings under Sections 8.5(G) and 8.5(H), the Parties agree to waive their rights to: (1) apply to the court for determination of a point of law; and (2) any form of appeal, review or recourse in respect of any such award to any court or other judicial authority, to the extent that such waiver may be validly made.

(G)     The Parties may apply to a court with appropriate jurisdiction for any of the following without waiving its arbitration rights:

(1)     Interim measures as necessary until appointment of the arbitrator(s) or pending determination by the arbitrator(s).

(2)     Preserving property pending determination by the arbitrator(s).

(3)     Enforcing judgment entered on an award.

(4)     Enforcing Section 8.5(C) and preventing any information, documents or materials used in those proceedings from being used or disclosed by that Party for any purpose other than enforcement of Section 8.5(C).

(H)     Proceedings to (1) preserve property pending determination by the arbitrator(s), (2) enforce Section 8.5(C), (3) enforce judgment entered on an award may be brought in any court having jurisdiction over the person or assets of the non-prevailing Party. The prevailing Party may seek, in any court having jurisdiction, judicial recognition of the award, or order of enforcement or any other order or decree that is necessary to give full effect to the award.

## ARTICLE IX.         INSURANCE

**Section 9.1     Insurance Coverage**. Service Provider shall  maintain, at its own expense, the following insurance and all other insurance required by applicable Law:

(i) Workers' Compensation and Employer's Liability Insurance as prescribed by applicable Laws where the Services are performed and, if applicable, the states of residence of any subcontractor personnel performing the Services;

(ii) Commercial General Liability (Bodily Injury and Property Damage) Insurance. The policy territory coverage must include all areas where the Services are to be performed.   The policy limits must not be less than US$10,000,000 combined single limit per occurrence; and

(iii) Automobile Bodily Injury and Property Damage Liability Insurance extending to all vehicles provided by Service Provider in the performance of the Services. The policy limits for this insurance must be the higher of the amount required by applicable Law or US$5,000,000 combined single limit per occurrence.

14

**Section 9.2**     **Policy Endorsements**.

(i) Service Provider shall, or shall endeavor to cause its insurer to provide Predecessor with thirty days' Notice before canceling or making a material change to an insurance policy obtained pursuant to this Section during the Service Term of this Agreement;

(ii) Service Provider shall require its insurer to provide waivers of subrogation in favor of Predecessor in any Workers' Compensation insurance policies obtained pursuant to this Section; and

(iii) Service Provider shall require its insurer to provide that any insurance obtained pursuant to Sections 9.1(ii) and 9.1(iii) shall include all of the following, but only to the extent that the Service Provider Group has liability under Section 6.2 of this Agreement:

(a) Predecessor shall be named as an additional insured;

(b) A provision that the insurance is primary with respect to all insureds, including additional insureds, and that no other insurance carried by Predecessor will be considered as contributory insurance for any loss; and

(c) A cross liability or severability of interest clause which has the effect of insuring that each insured (including additional insureds) is covered as a separate insured.

**Section 9.3     Evidence of Insurance**.  If requested by Predecessor in writing before performance any of the Services, Service Provider shall provide Predecessor or its designee with certificates or other documentary evidence satisfactory to Predecessor of the insurance and endorsements obtained pursuant to this Section. Service Provider acknowledges that failure to provide a certificate other evidence of insurance obtained pursuant to this Section may lead to non-payment of Service Provider's Invoices or termination of this Agreement.

**Section 9.4     Satisfaction of Insurance Limits**.   Service Provider may satisfy the insurance limits provided for in this Section through any combination of primary and excess layers of insurance.

## ARTICLE X. MISCELLANEOUS

**Section 10.1     Force Majeure**.   In the event that Service Provider is rendered unable, wholly or in part, by Force Majeure or other causes herein specified, to carry out all or any of its obligation under this Agreement, it is agreed that on Service Provider's delivery of written Notice, so far as Service Provider is prevented by such Force Majeure or other causes herein specified, Service Provider's obligation shall be suspended during the continuance of any inability so caused, and Service Provider will not be liable to Predecessor for any interruptions of service, any delays, or any failure to perform under this Agreement caused by such Force Majeure. For the avoidance of doubt, any delays, interruptions or failures to perform caused by such occurrences shall not be

15

Debtors' Exhibit No. 34
Page 465 of 910

deemed to be a breach or failure to perform under this Agreement. The term "Force Majeure" means occurrences beyond the reasonable control of Service Provider and is limited to: acts of God, strikes, lockouts, or other industrial disturbances, acts of the public enemy, wars, blockades, insurrections, riots, epidemics, pandemics, landslides, lightning, earthquakes, fires, storms, hurricanes, tropical storms, loop currents, floods, washouts, arrests, and restraints of the Government, either federal or state, civil or military, civil disturbances, explosions, sabotage, malicious mischief, breakage or accident to machinery or lines of pipe, freezing of wells or lines of pipe, refusal or inability of resale owner(s) or transporter(s) to take deliveries due to events of Force Majeure, inability of Service Provider to obtain right-of-way, necessary materials, supplies, or permits not caused by the failure of Service Provider to pay for or negligence to obtain such rights-of-way, necessary materials, supplies, or permits, an order, directive, or restraint issued or imposed by any Governmental Authority, regulatory body or court having jurisdiction. It is understood and agreed that the settlement of strikes or other labor difficulties shall be entirely within the discretion of Service Provider. During the continuation of a Force Majeure event, Service Provider shall act diligently to overcome the impediments caused by such event and use its commercially reasonable efforts to promptly resume performance of its obligations under this Agreement.

Section 10.2   **Notices**. Any   notice, request, instruction, correspondence or other document to be given hereunder by any Party to another (herein collectively called "Notice") shall be in writing and delivered by email and additionally in person or by courier service requiring acknowledgement of receipt or mailed by certified mail, postage prepaid and return receipt requested, or by overnight delivery service, or by electronic mail (provided that Notices by electronic mail shall also be sent by one of the other permitted means to be effective), as follows:

If to Predecessor:

> Noble Energy, Inc.
> 100 Northpark Blvd
> Covington, LA 70433
> Attn:   Scott Ritter
> Phone: (985) 773-7424
> Email: scottritter@chevron.com

If to Service Provider:

> Mako Buyer LLC
> 2000 W. Sam Houston Pkwy S. Suite 1200
> Houston, Texas 77042
> Attn:   Thomas R. Lamme
> Phone: (713) 969-1107
> Email:  TLamme@fwellc.com

Notice given by personal delivery or courier shall be effective upon actual receipt. Notice given by mail shall be effective upon actual receipt or, if not actually received, the fifth Business Day

16

Debtors' Exhibit No. 34
Page 466 of 910

following deposit with the U.S. Post Office. Notice given by electronic mail shall be effective upon delivery if delivered to a working email address during the recipient's normal business hours, or at the beginning of the recipient's next Business Day if not delivered during the recipient's normal business hours.  If a date specified herein for giving any Notice or taking any action is not a Business Day (or if the period during which any Notice is required to be given or any action taken expires on a date which is not a Business Day), then the date for giving such Notice or taking such action (and the expiration date of such period during which Notice is required to be given or action taken) shall be the next day which is a Business Day. Any Party may change any address, electronic or otherwise, to which Notice is to be given to it by giving Notice as provided above of such change of address.

Section 10.3   **No Joint Venture or Partnership**. Nothing in this Agreement is intended to create, or shall be construed as creating, a partnership, joint venture, association for profit or other business entity between or among the Parties, and for federal and state income  tax purposes, the Parties elect to be excluded from the application of the provisions of Subchapter K, Chapter 1, Subtitle A of the Internal Revenue Code of 1986, as amended, as permitted and authorized by Section 761 of said Code and the regulations promulgated thereunder.

Section 10.4   **No Fiduciary Duty**. It is expressly understood and agreed that this Agreement is a purely commercial transaction between the Parties and that nothing stated herein shall operate to create any fiduciary duty which a Party shall owe to the other Party.

Section 10.5   **Entire Agreement**. This Agreement constitutes the entire agreement among the Parties with respect to the subject hereof and supersedes any other representations, understandings or agreements (whether written, oral or otherwise) that may have been made or entered into by the Parties or any of their respective Affiliates relating to the transactions contemplated hereby or the subject hereof.

Section 10.6   **Successors and Assignments**. This Agreement is personal as to Service Provider and Predecessor and shall not be assigned by either Party without the other Party's prior written consent; provided that the foregoing shall not apply if Service Provider assigns this Agreement in total (i) along with all of its personnel who are performing any part of the Services hereunder to an Affiliate, provided that no such assignment by Service Provider to an Affiliate shall relieve Service Provider of its obligations under this Agreement, or (ii) to an acquirer of all or substantially all of Service Provider's business or all or substantially all of Service Provider's employees providing Services hereunder.

Section 10.7   **Amendment**.  This Agreement may be amended or modified in whole or in part, and terms and conditions may be waived, only by a duly authorized agreement in writing which makes reference to this Agreement executed by each Party.

Section 10.8   **Construction**.  All article, section, schedule, and exhibit references used in this Agreement are to articles and sections of, and Schedules and Exhibits to, this Agreement, unless otherwise specified. The schedules and exhibits attached to this Agreement constitute a part of this Agreement and are incorporated herein for all purposes.

WEIL:\98011006\2\45327.0007

Unless otherwise indicated, with respect to either Party, the terms "ordinary course of business" or "ordinary course" shall be deemed to refer to the ordinary conduct of business in a manner consistent with the past practices and customs of such Party.

If a term is defined as one part of speech (such as a noun), it shall have a corresponding meaning when used as another part of speech (such as a verb). Terms defined in the singular have the corresponding meanings in the plural, and vice versa. Unless the context of this Agreement clearly requires otherwise, words importing the masculine gender shall include the feminine and neutral genders and vice versa. The words "include", "includes" or "including" do not limit the preceding terms and shall be deemed to be followed by the words "without limitation." The words "hereof," "hereto," "hereby," "herein," "hereunder" and words of similar import, when used in this Agreement, shall refer to this Agreement as a whole and not to any particular section or article in which such words appear. The term "or" is not exclusive.

The terms "day" and "days" mean and refer to calendar day(s). The terms "year" and "years" mean and refer to calendar year(s).

Service Provider and Predecessor have each participated in the negotiation and drafting of this Agreement, and, if an ambiguity should arise, this Agreement shall be construed as if drafted jointly by the Parties and no presumption or burden of proof shall arise favoring or burdening any Party by virtue of the authorship of any of the provisions in this Agreement.

The captions in this Agreement are for convenience only and shall not be considered a part of or affect the construction or interpretation of any provision of this Agreement.

All references to currency herein shall be to, and all payments required hereunder shall be paid in, United States Dollars.

The serial comma is sometimes included and sometimes omitted. Its inclusion or omission shall not affect the interpretation of any phrase.

**Section 10.9   Severability**. If any provision of this Agreement is held invalid or unenforceable by any court of competent jurisdiction, the other provisions of this Agreement shall remain in full force and effect. The Parties further agree that if any provision contained herein is, to any extent, held invalid or unenforceable in any respect under the Laws governing this Agreement, they shall take any actions necessary to render the remaining provisions of this Agreement valid and enforceable to the fullest extent permitted by Law and, to the extent necessary, shall amend or otherwise modify this Agreement to replace any provision contained herein that is held invalid or unenforceable with a valid and enforceable provision giving effect to the intent of the Parties to the greatest extent legally permissible.

**Section 10.10 Counterparts**. This Agreement may be executed in two or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument. Any .pdf or other electronic transmission hereof or signature hereon shall, for all purposes, be deemed originals.

WEIL:\98011006\2\45327.0007

*[Remainder of Page Intentionally Left Blank. Signature Page to Follow.]*

19

IN WITNESS WHEREOF, this Agreement has been signed by each of the Parties as of the date first above written.


**SERVICE PROVIDER**:

Mako Buyer LLC


By: _____
Name: _____
Title: _____


**PREDECESSOR:**

Noble Energy, Inc.


By: _____
Name:
Title:


*[Signature page to the Neptune Spar Transition Services Agreement]*

<u>**EXHIBIT A**</u>

**TO NEPTUNE SPAR TRANSITION SERVICES AGREEMENT**

**SERVICES**

1.      **Asset Services**. Subject to the terms of this Agreement, including but not limited to <u>Section 1.5</u> of this Agreement, Service Provider shall provide the following Services with respect to the Asset.

**1.1      Maintenance and Monitoring Services**.

Services:  Providing the following maintenance and monitoring services with respect to the Assets:

(i)   Complying with, and causing the Asset to be operated in compliance in all material respects with, all state and federal Laws and regulations, including, but not limited to, following all required health, safety and environmental Laws, regulations and programs (such as SEMS), complying with all regulatory filing and reporting requirements, and obtaining all necessary permits; provided that nothing in this provision shall require Service Provider to make on behalf of Predecessor any filing, payment, or submission (or otherwise take any action) that, under applicable Law, may be made only by a party designated with the applicable Governmental Authority as a designated operator, designated applicant, designated payor, or responsible party for Predecessor or that could make Service Provider directly liable or responsible to the applicable Governmental Authority, or any other third party with respect to any of the Assets in which event Service Provider shall prepare the necessary filing or submission and provide it to the Predecessor to file or submit or, in the case of a payment, notify the Predecessor of such payment so that Predecessor can make such payment.

(ii)   Performing the following as and when needed:

(A)      purchasing (either directly or as agent for Predecessor) supplies, materials, tools, and equipment associated with the Asset, provided that the costs of such that are paid directly by Service Provider will be reimbursed by the Predecessor to Service Provider, further, provided that without Predecessor's prior written consent Service Provider will not purchase any single item with respect to the Assets if such purchase would result in a charge or cost to Predecessor greater than $10,000.00 dollars for any single item  during the Service Term.

(B)      contracting (either directly or as agent for Predecessor) for services associated with the physical maintenance and monitoring of the Asset, provided that the costs associated with such services will be reimbursed to Service Provider by Predecessor, further, provided that

Exhibit A – Page 1
Neptune Spar Transition Services Agreement

without Predecessor's prior written consent Service Provider will not contract for any of such services with respect to any of the Assets if such contract (1) is with an Affiliate of Service Provider or (2) would obligate Predecessor for a period more than the Service Term for the operating services or (3) involves a fair market value of greater than $100,000.00.

     (C)   providing to the Predecessor communications with Governmental Authorities related to the Asset.

*[Remainder of Page Intentionally Left Blank]*

Exhibit A – Page 2
Neptune Spar Transition Services Agreement

<u>SCHEDULE 1</u>

<u>TO THE NEPTUNE SPAR TRANSITION SERVICES AGREEMENT</u>

Neptune Spar, Complex ID No. 24235, located on Viosca Knoll (VK) Block 826 (VK 826)
    Including, but not limited to, the following spar components:
- Topsides;
- Hull;
- On-platform mooring components;
- Mooring lines; and,
- All transferrable equipment on the spar, including subsea cathodic protection systems.
- Risers, end terminations and equipment associated with pipelines

Well (VK 826 SS012) (API#60-81640358-00)
    Including, but not limited to, the following spar components:
- All subsea connections;
- Subsea wellhead and Jumper, and
- Risers, subsea manifolds, end terminations and equipment associated with pipelines

Well VK 917 01 ST2 (API#60-816-40400-02)
    Including, but not limited to, the following spar components:
- All subsea connections;
- Subsea wellhead and Jumper, and
- Risers, subsea manifolds, end terminations and equipment associated with pipelines

Well VK 962 ST 1 (API#60-816-40399-01)
    Including, but not limited to, the following spar components:
- All subsea connections;
- Subsea wellhead and Jumper, and
- Risers, subsea manifolds, end terminations and equipment associated with pipelines

ROW G29151 and Pipeline Segment No. 18648, 18649 and 18904

Subsea Equipment on VK 826, including but not limited to all dry tree wells, well heads and installed downhole equipment associated with all wells currently in PA state on VK 826.

Debtors' Exhibit No. 34
Page 473 of 910

**Exhibit 10**

**Deepwater Assets Decommissioning Funding Agreement**

See attached.

**SUBJECT TO FRE 408**
**Confidential**
*Exhibit 10 to the Implementation Agreement*

## DECOMMISSIONING FUNDING AGREEMENT

This Decommissioning Funding Agreement dated and effective as of _____, 2021 (the "Effective Date") (this "Agreement") is by and among Mako Buyer LLC, a Delaware limited liability company ("Operator"), and Chevron U.S.A. Inc., a Pennsylvania corporation ("CUSA"). Operator and CUSA are sometimes referred to collectively as the "Parties" and individually as a "Party".

RECITALS

**WHEREAS**, Operator acquired certain oil and gas assets from Fieldwood Energy LLC and certain of its subsidiaries pursuant to that certain Purchase and Sale Agreement ("PSA") effected in connection with the *Fourth Amended Joint Chapter 11 Plan of Fieldwood Energy LLC and Its Affiliated Debtors* filed at Docket No. 1284 in the Chapter 11 cases styled as *In re: Fieldwood Energy LLC et al.*, Case No. 20-33948, which was confirmed by order of the United States Bankruptcy Court for the Southern District of Texas, Houston Division, on [_____], 2021 at Docket No. [___] (as amended, modified, and supplemented, the "Plan");

**WHEREAS**, pursuant to the terms and subject to the conditions set forth in this Agreement, CUSA and Operator desire to establish the obligation of Operator to provide security to support the decommissioning of the CUSA Deepwater Assets, which were acquired by Operator under the PSA; and

**WHEREAS**, this Agreement sets out the mechanisms by which Operator will provide financial security for the Coverage Amount for CUSA's benefit in the event CUSA or any of its Affiliates incur any costs or liabilities in relation to the decommissioning of any CUSA Deepwater Assets, and the circumstances in which CUSA shall be entitled to call upon any such security to cover any such costs or liabilities.

**NOW, THEREFORE**, in consideration of the premises and of the mutual promises, covenants, conditions, and agreements contained herein, and for other valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties hereby agree as follows:

### ARTICLE I.  DEFINITIONS

**Section 1.1**     As used herein, the following terms have the following meanings:

(a)     "Acceptable Credit Rating" means, in respect of the relevant entity, a credit rating (in respect of the senior, unsecured, long-term debt, not supported by third party credit enhancement) that is equal to or better than one of the following: (i) BBB by Standard & Poor's Rating Services; (ii) BBB by Fitch, Inc.; (iii) Baa2 by Moody's Investors Service; or (iv) any comparable credit rating by any other nationally recognized statistical rating organizations registered with the U.S. Securities and Exchange Commission.

(b)     "Affiliate" means, with respect to a Party means any Person or entity that controls, is controlled by or is under common control with such Party where control means the direct or indirect power to direct the management of the entity at issue.

(c)     "Agreement" has the meaning set forth in the preamble.

(d)     "Applicable Required Security" means, collectively, any then-outstanding Deepwater Surety Bond, LC and funds in the Deepwater Escrow Account.

(e)     "BOEM" means the Bureau of Ocean Energy Management of the United States Department of the Interior and any successor agency.

(f)     "BSEE" means the Bureau of Safety and Environmental Enforcement of the United States Department of the Interior and any successor agency.

(g)     "Coverage Amount" means (a) twenty five million U.S. dollars ($25,000,000), *less* (b) the aggregate Paid Reduction Amounts expended by Operator or its Affiliates, *less* (c) the aggregate amounts drawn by CUSA pursuant to Section 2.4(b), *less* (d) the aggregate amount called by CUSA against a Deepwater Surety Bond or LC pursuant to Section 2.5; provided that the Coverage Amount shall never be reduced below zero.

(h)     "CPR" has the meaning set forth in Section 4.14.

(i)     "CUSA" has the meaning set forth in the preamble.

(j)     "CUSA Deepwater Assets" means the ownership interest in the oil and gas leases described on Exhibit A attached hereto and the oil and gas assets located thereon or attached thereto, including any wells, facilities, pipelines and equipment, in each case to the extent such oil and gas leases and/or assets were acquired by Fieldwood Energy LLC (or any of its Affiliates) from CUSA (or any of its Affiliates as of the Effective Date); provided that CUSA Deepwater Assets shall only include the interests in the assets acquired by Operator under the PSA.

(k)     "Decommissioning" and its derivatives mean all plugging, replugging, abandonment, re-plugging and re-abandonment, equipment removal, disposal, remediation, reclamation, or restoration associated with the properties and assets included in or burdened by the CUSA Deepwater Assets, as applicable, including all plugging and abandonment, removal, dismantling, decommissioning, surface and subsurface restoration, reclamation, site clearance, and disposal (including any associated pre-planning, planning and engineering) of the CUSA Deepwater Assets, fixtures, platforms, caissons, flowlines, pipelines, structures, and personal property of whatever kind located on or under, related to, or associated with operations and activities conducted by whomever with respect to each of the CUSA Deepwater Assets, as applicable, and the flushing, pickling, burial, removal, and capping of all associated flowlines, field transmission and gathering lines, the restoration of the surface, site clearance, any proper disposal of related waste materials and hazardous substances, and obligations to obtain plugging exceptions for any of the CUSA Deepwater Assets with a current plugging exception   in accordance therewith, all in accordance with 30 CFR 250 Subpart Q and all other applicable laws, the terms and conditions of each of the applicable leases, leasehold interests, beneficial interests, easements and the like.

(l)     "Decommissioning Costs" means any and all cost associated with Decommissioning for a particular CUSA Deepwater Asset (or part thereof).

2

Debtors' Exhibit No. 34
Page 476 of 910

(m)     "Deepwater Escrow Account" has the meaning set forth in Section 2.3.

(n)     "Deepwater Surety Bond" has the meaning set forth in Section 2.2(a).

(o)     "Effective Date" has the meaning set forth in the preamble.

(p)     "Escrow Agreement" has the meaning set forth in Section 2.3.

(q)     "Final Completion" means:

   (i)     with respect to the Decommissioning of a well, acceptance by the applicable regulators of the End of Operations Report (EOR) with respect to such well;

   (ii)    with respect to the Decommissioning of a pipeline, acceptance by the applicable regulators of a completion report with respect to such pipeline; and

   (iii)   with respect to the Decommissioning of a platform or facility, acceptance by the applicable regulators of Site Clearance with respect to such platform or facility, indicated by delivery by Operator to CUSA of evidence that the applicable regulators have accepted "site clearance" of the applicable platform or facility, including all requisite approvals or regulatory concurrence from such governmental authorities with respect to such platform or facility.

(r)     "Funding Date" has the meaning set forth in Section 4.1.

(s)     "FWE IV" means Fieldwood Energy IV LLC.

(t)     "LC" has the meaning set forth in Section 2.2(b).

(u)     "Notice" has the meaning set forth in Section 4.2.

(v)     "NPI Grant" has the meaning set forth in Section 2.2.

(w)     "Operator" has the meaning set forth in the preamble.

(x)     "Paid Reduction Amounts" means amounts that are actually expended by Operator or its Affiliates for field operations to Decommission CUSA Deepwater Assets (net to Operator's interest), without counting any contribution or reimbursement received from third parties, including working interest owner parties, bonding entities or predecessors-in-interest other than CUSA or its Affiliates, and for which Operator has delivered a PRA Certificate pursuant to Section 2.1.

(y)     "Party" or "Parties" has the meaning set forth in the preamble.

(z)     "Person" means an individual, corporation, company, association, partnership, state, statutory corporation, government entity, or any other legal entity.

(aa)    "Plan" has the meaning set forth in the recitals.

3

(bb)    "PRA Certificate" has the meaning set forth in Section 2.1.

(cc)    "Qualified Surety" means an insurance company or financial institution with two credit ratings (in respect of the senior, unsecured, long-term debt, not supported by third party credit enhancement) from the following named rating agencies (or their successor agencies) that are each equal to or better than the following: (i) A+ by Standard & Poor's Rating Services; (ii) A+ by Fitch, Inc.; (iii) A1 by Moody's Investors Service; and (iv) in the case of an insurance company,  B++ by AM Best Company.

(dd)    "Release Date" has the meaning set forth in Section 3.2.

(ee)    "Turnkey Removal Agreement" means that certain Turnkey Removal Agreement pursuant to which Operator will undertake decommissioning operations in relation to assets held by FWE IV.

## ARTICLE II. FUNDING SECURITY; RELEASE DATE

**Section 2.1    PRA Certificates**.  From time to time after Operator has commenced the operations contemplated by this Agreement, but not more frequently than once per calendar quarter, Operator may deliver a certificate to CUSA (a "PRA Certificate"), executed by an officer of Operator, and certifying to the amount of Paid Reduction Amounts expended by Operator and its Affiliates prior to the date of delivery of such PRA Certificate (without duplication of Paid Reduction Amounts certified to in prior PRA Certificates delivered by Operator) on Decommissioning projects for which Final Completion has been achieved; and with all requisite filings and other evidence provided or otherwise required by BOEM, BSEE and any other applicable governmental authority, supporting the representations therein attached to the PRA Certificate.

**Section 2.2    Funding of Security**.  Subject to Section 3.1, on the second anniversary of the Effective Date Operator shall deliver to CUSA security with face value totaling no less than the Coverage Amount and, from and after the second anniversary of the Effective Date through the Release Date, Operator shall maintain such security in full force and effect at all times, utilizing one or more of the following forms:

(a)    one or more irrevocable decommissioning surety bonds, each in a form reasonably acceptable to CUSA, issued by a Qualified Surety and naming CUSA as the sole private beneficiary and otherwise consistent with this Agreement, including Section 2.5 (each, a "Deepwater Surety Bond"); or

(b)    one or more irrevocable standby letters of credit, each issued by a Qualified Surety or other financial institution mutually agreeable to Operator and CUSA on terms substantially consistent with those set forth in the form of letter of credit attached as Exhibit C and otherwise consistent with this Agreement, including Section 2.5 (each, an "LC").

(c)    If Operator is unable, after using commercially reasonable efforts, to secure a Deepwater Surety Bond and/or LC as set forth in Sections 2.2(a) and 2.2(b) sufficient to cause the aggregate of funding from all Applicable Required Securities to equal the Coverage Amount by the second anniversary of the Effective Date, then on or before such date Operator will execute a grant (in the

4

Debtors' Exhibit No. 34
Page 478 of 910

form attached hereto as Exhibit B) of a five percent (5%) interest from the net profits of production from the CUSA Deepwater Assets in favor of the "NPI Owner" (as defined in the form of NPI Grant attached as Exhibit B) (or such other grantee as agreed to by the Parties) for payment into the Escrow Account as contemplated by the last sentence of this Section 2.2 and in Section 2.3 (an "NPI Grant").  Any and all amounts payable under the NPI Grant shall be deposited into the Deepwater Escrow Account until the earlier of the aggregate of funding from all Applicable Required Securities is equal to the Coverage Amount (as the amount may be reduced) or the occurrence of the Release Date upon which event the NPI Grant shall be reconveyed to Operator and terminated.

(d)     If at any time any issuer of an LC notifies CUSA that it will not allow the automatic renewal of such LC for an additional one-year period, or a Deepwater Surety Bond or LC will terminate prior to the Release Date, as applicable, Contractor shall, within one hundred eighty days of receipt of such notice (or, if expiration upon such non-renewal or such termination will occur prior to the expiration of such one hundred eighty day period, then at least 5 days prior to termination of the applicable Deepwater Surety Bond or LC), replace the applicable LC or Deepwater Surety Bond with a replacement letter of credit or decommissioning surety bond which satisfies all of the applicable requirements for such type of security set forth in this Section 2.2 and is otherwise consistent with this Agreement, including Section 2.5.  If, at any time, any issuer of a Deepwater Surety Bond or LC ceases to meet the requirements (including the ratings requirements) to be a Qualified Surety, Operator shall, within one-hundred-eighty days of receipt of Notice from CUSA, replace such LC or Deepwater Surety Bond with a replacement letter of credit or decommissioning surety bond which satisfies all the requirements in this Section 2.2 and is otherwise consistent with this Agreement, including Section 2.5.

Section 2.3    **Deepwater Escrow Account**.  If the NPI Grant is granted in accordance with Section 2.2, the Parties shall establish a decommissioning escrow account with U.S. Bank National Association, or another financial institution acceptable to CUSA (such account, the "Deepwater Escrow Account"), pursuant to an escrow account agreement in substantially the form attached hereto as Exhibit D (the "Escrow Agreement").

Section 2.4    **Draw on Escrow Account**.  A draw against the Deepwater Escrow Account may be made from time to time as follows:

(a)     upon instruction by CUSA and Operator, to Operator upon Operator's delivery of a Deepwater Surety Bond or LC in any face amount, for an amount not to exceed the face amount of such Deepwater Surety Bond or LC, respectively;

(b)     upon instruction by CUSA and Operator, to Operator in the circumstances contemplated by Section 3.1(b) for the full amount then on deposit in the Deepwater Escrow Account;

(c)     upon instruction by CUSA, to CUSA in the event BOEM or BSEE issues a decommissioning order to CUSA or any of its Affiliates in respect of any CUSA Deepwater Assets in an amount equal to the Decommissioning Costs actually incurred by CUSA or any of its Affiliates in connection with such order or CUSA or any of its Affiliates otherwise incurs any such

5

Debtors' Exhibit No. 34
Page 479 of 910

Decommissioning Costs with respect to the CUSA Deepwater Assets, for up to the amount of such Decommissioning Costs;

(d)      upon instruction by CUSA and Operator, to Operator, upon delivery of a PRA Certificate, for the amount of the applicable Paid Reduction Amounts certified to CUSA in such PRA Certificate;

(e)      upon instruction by CUSA and Operator, to the applicable Person(s) in accordance with instructions given by CUSA and Operator pursuant to Sections 5 or 6.1(A) of the Escrow Agreement, for the amount specified in such instructions; or

(f)      upon instruction by CUSA and Operator, on the Release Date (i) if the Release Date occurred pursuant to Section 3.2(c), to CUSA for the amount of any Decommissioning Costs incurred by CUSA or any of its Affiliates and not previously paid under clause (b) above, in the amount of such Decommissioning Costs and (ii) to Operator, in an amount equal to the remaining funds on deposit in the Deepwater Escrow Account (after, if applicable, the payments made to CUSA pursuant to clause (i) above).

Upon a draw in accordance with Section 2.4(b), the Coverage Amount will be reduced by the amount of draw (as contemplated by the definition of Coverage Amount).  No draw shall reduce the Deepwater Escrow Account below a zero balance.

Section 2.5    **Calls on Other Securities**.  A call against any Deepwater Surety Bond or LC may be made from time to time by CUSA (a) in the event BOEM or BSEE issues a decommissioning order to CUSA or any of its Affiliates in relation to any CUSA Deepwater Assets in an amount equal to the Decommissioning Costs actually incurred by CUSA or any of its Affiliates in connection with such order, (b) in the event CUSA or any of its Affiliates otherwise incurs any such Decommissioning Costs with respect to the CUSA Deepwater Assets, for up to the amount of such Decommissioning Costs or (c) if Operator has failed to deliver a replacement letter of credit, decommissioning surety bond or other Applicable Required Security when required under Section 2.2(d), in the maximum amount available under such LC or Deepwater Surety Bond.

## ARTICLE III.      SUSPENSION; RELEASE.

**Section 3.1**    Suspension of Security Obligation.

(a)      Operator's obligation under Section 2.2 to provide and maintain the financial security shall be suspended when Operator achieves and maintains an Acceptable Credit Rating.

(b)      Upon achievement by Operator of an Acceptable Credit Rating, any security then posted by Operator pursuant to Section 2.2 shall be promptly released to Operator.

(c)      If Operator is subsequently downgraded and no longer has an Acceptable Credit Rating, then Operator's obligations in Section 2.2 shall resume immediately and Operator shall provide financial security to the Coverage Amount within 60 days thereafter or, failing to do so, the Parties shall effect and instate (or reinstate) the NPI Grant pursuant to Section 2.2.

6

Debtors' Exhibit No. 34
Page 480 of 910

**Section 3.2     Release Date**.  Operator's security requirements described hereunder shall terminate, and all outstanding security shall be promptly released to Operator, upon the first to occur of any of the following (such date, the "Release Date"), so long as no demand has been made by CUSA pursuant to such security that remains unsatisfied as of such time:

(a)     the Turnkey Removal Agreement is terminated in its entirety by Operator due to a breach and uncured default by CUSA thereunder resulting in termination of the agreement by Operator (and provided that Operator is not also in material breach thereunder);

(b)     the Coverage Amount is reduced to zero; or

(c)     Operator sells all or substantially all of its deepwater assets in the U.S. Gulf of Mexico (including all or substantially all of the CUSA Deepwater Assets), whether via an asset or equity sale or equivalent transaction, to a buyer with an Acceptable Credit Rating.

## ARTICLE IV.        MISCELLANEOUS

**Section 4.1     Representations and Warranties**. Each Party hereby represents and warrants to the other Party as of the date hereof and as of each date that Operator delivers security pursuant to Article II (each, a "Funding Date"):

(a)     such Party is duly formed, validly existing and in good standing under the laws of the state of its formation and has all company power and authority to execute and deliver this Agreement and to perform its obligations hereunder;

(b)     the execution and delivery of this Agreement by such Party and the performance by such Party of its obligations hereunder have been duly authorized by all requisite action on the part of such Party and do not and will not require any governmental approvals or third party consents, except such as have been previously obtained and will be in full force and effect as of such Funding Date; and

(c)     this Agreement has been duly executed and delivered by such Party, and this Agreement constitutes a valid and binding obligation of such Party, enforceable against it in accordance with its terms, except as enforcement may be limited by general principles of equity whether applied in a court of law or a court of equity, and by applicable bankruptcy, insolvency and similar laws affecting creditors' rights and remedies generally.

**Section 4.2     Notices**.  Any notice, request, instruction, correspondence or other document to be given hereunder by any Party to another (herein collectively called "Notice") shall be in writing and delivered in person or by courier service, requiring acknowledgement of receipt, mailed by certified mail, postage prepaid and return receipt requested, or by overnight delivery service, or by electronic mail, as follows:

If to CUSA:

> Chevron U.S.A. Inc.
> 100 Northpark Boulevard
> Covington, LA  70433

WEIL:\98010843\2\45327.0007

Debtors' Exhibit No. 34
Page 481 of 910

Attn: GOM Land Manager
Phone: (985) 773-6538
Email: tdwebre@chevron.com

If to Operator:

Mako Buyer LLC
2000 W. Sam Houston Pkwy S. Suite 1200
Houston, Texas 77042
Attn:   Thomas R. Lamme
Phone: (713) 969-1107
Email: TLamme@fwellc.com _____

Notice given by personal delivery or courier shall be effective upon actual receipt. Notice given by mail shall be effective upon actual receipt or, if not actually received, the fifth business day following deposit with the U.S. Post Office.  Notice given by electronic mail shall be effective upon confirmation of receipt (via electronic mail or phone call) by the recipient.  If a date specified herein for giving any Notice or taking any action is not a business day (or if the period during which any Notice is required to be given or any action taken expires on a date which is not a business day), then the date for giving such Notice or taking such action (and the expiration date of such period during which notice is required to be given or action taken) shall be the next day which is a business day. Any Party may change any address, electronic or otherwise, to which Notice is to be given to it by giving Notice as provided above of such change of address.

**Section 4.3**   **No Joint Venture or Partnership**. Nothing in this Agreement is intended to create, or shall be construed as creating, a partnership, joint venture, association for profit or other business entity between or among the Parties, and for federal and state income tax purposes, the Parties elect to be excluded from the application of the provisions of Subchapter K, Chapter 1, Subtitle A of the Internal Revenue Code of 1986, as amended, as permitted and authorized by Section 761 of said Code and the regulations promulgated thereunder.

**Section 4.4**   **No Fiduciary Duty**. It is expressly understood and agreed that this Agreement is a purely commercial transaction between the Parties and that nothing stated herein shall operate to create any fiduciary duty which a Party shall owe to the other Party.

**Section 4.5**   **Entire Agreement**. This Agreement (together with the Exhibits hereto) constitute the entire agreement among the Parties with respect to the subject hereof and supersedes any other representations, understandings or agreements (whether written, oral or otherwise) that may have been made or entered into by the Parties or any of their respective Affiliates relating to the transactions contemplated hereby or the subject hereof.

**Section 4.6**   **Successors and Assignments**. This Agreement may not be assigned by a Party, whether by contract, by operation of law or otherwise, without the express written consent of the other Party (which consent may be granted or withheld in the sole discretion of such Party) and any such assignment or attempted assignment without such consent shall be void; provided, however, (i) CUSA may assign this Agreement to an Affiliate without the consent of Operator, and (ii) Operator may assign this Agreement without the consent of CUSA to an acquirer of all or

8

substantially all of its deepwater assets in the U.S. Gulf of Mexico (including all or substantially all of the CUSA Deepwater Assets), whether via an asset or equity sale or equivalent transaction if such buyer has assumed this Agreement and provided Applicable Required Security in the amount of the then current Coverage Amount.  Following an assignment pursuant to the preceding clause (ii), Operator will be released from its obligations hereunder and any Applicable Required Security posted by Operator will be released and returned to Operator.

Section 4.7   **Expenses**.  Except as otherwise expressly specified in this Agreement, all costs and expenses, including fees and disbursements of counsel, financial advisors and accountants, incurred by Operator or any of its Affiliates in connection with the establishment, maintenance and operations of any financial security in Article II shall be paid by Operator. Notwithstanding the prior sentence, each Party shall bear its own costs and expenses in relation to the negotiation and preparation of this Agreement.

Section 4.8   **Waivers; Cumulative Remedies**.  Any waiver shall be valid only if set forth in an instrument in writing signed by the Party to be bound thereby. Any waiver of any term or condition shall not be construed as a waiver of any subsequent breach or a subsequent waiver of the same term or condition, or a waiver of any other term or condition of this Agreement. The failure of any Party hereto to assert any of its rights hereunder shall not constitute a waiver of any of such rights. All rights and remedies existing under this Agreement are cumulative to, and not exclusive of, any rights or remedies otherwise available under contract, under law or in equity, and may include specific performance.

Section 4.9   **Amendment**.  This Agreement may be amended or modified in whole or in part, and terms and conditions may be waived, only by a duly authorized agreement in writing which makes reference to this Agreement executed by each Party.

Section 4.10  **Construction**.

(a)     All article, section, and exhibit references used in this Agreement are to articles and sections of, and Exhibits to, this Agreement, unless otherwise specified. The exhibits attached to this Agreement constitute a part of this Agreement and are incorporated herein for all purposes.

(b)     If a term is defined as one part of speech (such as a noun), it shall have a corresponding meaning when used as another part of speech (such as a verb). Terms defined in the singular have the corresponding meanings in the plural, and vice versa. Unless the context of this Agreement clearly requires otherwise, words importing the masculine gender shall include the feminine and neutral genders and vice versa. The words "include", "includes" or "including" do not limit the preceding terms and shall be deemed to be followed by the words "without limitation." The words "hereof," "hereto," "hereby," "herein," "hereunder" and words of similar import, when used in this Agreement, shall refer to this Agreement as a whole and not to any particular section or article in which such words appear. The term "or" is not exclusive and unless preceded by "either" means "and/or".  The terms "day" and "days" mean and refer to calendar day(s). The terms "year" and "years" mean and refer to calendar year(s).

(c)     Operator and CUSA have each participated in the negotiation and drafting of this Agreement, and, if an ambiguity should arise, this Agreement shall be construed as if drafted

9

jointly by the Parties and no presumption or burden of proof shall arise favoring or burdening any Party by virtue of the authorship of any of the provisions in this Agreement.

(d)     The captions in this Agreement are for convenience only and shall not be considered a part of or affect the construction or interpretation of any provision of this Agreement.

(e)     All references to currency herein shall be to, and all payments required hereunder shall be paid in, United States Dollars.

(f)     The serial comma is sometimes included and sometimes omitted. Its inclusion or omission shall not affect the interpretation of any phrase.

Section 4.11    **Severability**. If any provision of this Agreement is held invalid or unenforceable by any court of competent jurisdiction, the other provisions of this Agreement shall remain in full force and effect. The Parties further agree that if any provision contained herein is, to any extent, held invalid or unenforceable in any respect under the laws governing this Agreement, they shall take any actions necessary to render the remaining provisions of this Agreement valid and enforceable to the fullest extent permitted by law and, to the extent necessary, shall amend or otherwise modify this Agreement to replace any provision contained herein that is held invalid or unenforceable with a valid and enforceable provision giving effect to the intent of the Parties to the greatest extent legally permissible.

Section 4.12    **Counterparts**. This Agreement may be executed in two or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument. Any .pdf or other electronic transmission hereof or signature hereon shall, for all purposes, be deemed originals.

Section 4.13    **Governing Law**. This Agreement shall be governed by, construed under, and enforced in accordance with the laws of the State of Texas without regard to the principles of conflicts of laws that would direct the application of the laws of another jurisdiction.

Section 4.14    **Dispute Resolution**.  The Parties shall exclusively and finally resolve any dispute between them using direct negotiations, mediation, and then arbitration as set out in this Section 4.14.  If a dispute arising out of or in connection with this Agreement (including dispute in respect of arbitrability) is not resolved by direct negotiations, either Party may initiate mediation by giving Notice to the other setting out the disputed issues and the value of the claim.  If the Parties fail to resolve the dispute within sixty (60) days from notice of mediation, either Party may initiate binding arbitration by giving notice to the other Party. The place of arbitration must be Houston, Texas. One arbitrator (or three (3) arbitrators if the monetary value of the dispute is more than five million U.S. dollars (US$5,000,000) or its currency equivalent, or if there is a dispute whether the monetary value exceeds the US$5,000,000 threshold) will conduct the arbitral proceedings in accordance with the International Institute for Conflict Prevention and Resolution ("CPR") Rules. To the extent of any conflicts between the Act or the CPR Rules and the provisions of this Agreement, the provisions of this Agreement prevail. The CPR is the appointing authority. The maximum number of witnesses each Party may call to give evidence is three (3) witnesses of fact and one (1) expert witness. The arbitration award is final and binding.

WEIL:\98010843\2\45327.0007

[*Remainder of Page Intentionally Left Blank. Signature Page(s) to Follow.*]

WEIL:\98010843\2\45327.0007

Debtors' Exhibit No. 34
Page 485 of 910

IN WITNESS WHEREOF, this Agreement has been signed by each of the Parties as of the Effective Date.

**OPERATOR**:

Mako Buyer LLC


By: _____
Name: _____
Title: _____


**CUSA:**

Chevron U.S.A. Inc.


By: _____
Name: _____
Title: _____

[*Signature page to Decommissioning Funding Agreement*]

**EXHIBIT A**

**CUSA DEEPWATER ASSETS**

| Area / Block | Lease Number (OCS-) | CBP Interest |
|:---:|:---:|:---:|
| GI 39 | 127 | 25% record title<br>25% operating rights in W/2 of Block 39, Grand Isle Area, from 12,256' TVDSS to 18,000' subsea (TVDS)<br>25% operating rights in W/2 of Block 39, Grand Isle Area, as to depths below 18,000 feet subsea (TVDS) to 99,999 feet subsea (TVDS) |
| GI 40 | 128 | 25% record title<br>25% operating rights in all of Block 40, Grand Isle Area, from 12,469' TVDSS to 18,000' subsea (TVDS)<br>25% operating rights in all of Block 40, Grand Isle Area, as to depths below 18,000 feet subsea (TVDS) to 99,999 feet subsea (TVDS) |
| GI 41 | 130 | 25% record title<br>25% operating rights in W/2 of Block 41, Grand Isle Area, from 14,123' TVDSS to 18,000' subsea (TVDS)<br>25% operating rights in W/2 of Block 41, Grand Isle Area, as to depths below 18,000 feet subsea (TVDS) to 99,999 feet subsea (TVDS) |
| GI 42 | 131 | 25% record title<br>25% operating rights in all of Block 42, Grand Isle Area, from 12,504' TVDSS to 18,000' subsea (TVDS)<br>25% operating rights in all of Block 42, Grand Isle Area, as to depths below 18,000 feet subsea (TVDS) to 99,999 feet subsea (TVDS) |
| GI 46 | 132 | 25% operating rights in all of Block 46, Grand Isle Area, from 12,792' TVDSS to 18,000' subsea (TVDS)<br>25% operating rights in all of Block 46, Grand Isle Area, as to depths below 18,000 feet subsea (TVDS) to 99,999 feet subsea (TVDS) |
| GI 47 | 133 | 25% operating rights in all of Block 47, Grand Isle Area, from 15,742' TVDSS to 18,000' subsea (TVDS)<br>25% operating rights in all of Block 47, Grand Isle Area, as to depths below 18,000 feet subsea (TVDS) to 99,999 feet subsea (TVDS) |

Exhibit A – Page 1
Decommissioning Funding Agreement

| Area / Block | Lease Number (OCS-) | CBP Interest |
|---|---|---|
| GI 48 | 134 | 25% record title<br>25% operating rights in all of Block 48, Grand Isle Area, from 16,812' TVDSS to 18,000' subsea (TVDS)<br>25% operating rights in all of Block 48, Grand Isle Area, as to depths below 18,000 feet subsea (TVDS) to 99,999 feet subsea (TVDS) |
| GI 43 | 175 | 25% record title<br>25% operating rights in all of Block 43, Grand Isle Area, from 12,830' TVDSS to 18,000' subsea (TVDS)<br>25% operating rights in all of Block 43, Grand Isle Area, as to depths below 18,000 feet subsea (TVDS) to 99,999 feet subsea (TVDS) |
| WD 70 | 182 | 25% record title<br>25% operating rights in all of Block 70, West Delta Area, from 13,182' TVDSS to 18,000' subsea (TVDS)<br>25% operating rights in all of Block 70, West Delta Area, as to depths below 18,000 feet subsea (TVDS) to 99,999 feet subsea (TVDS) |
| WD 71 | 838 | 25% record title<br>25% operating rights in all of Block 71, West Delta Area, from 13,357' TVDSS to 18,000' SSTVD<br>25% operating rights in all of Block 71, West Delta Area, as to depths below 18,000 feet subsea (TVDS) to 99,999 feet subsea (TVDS) |
| WD 94 | 839 | 25% record title<br>25% operating rights in all of Block 94, West Delta Area, from 13,159' SSTVD to 99,999' SSTVD |
| WD 95 | G01497 | 25% record title<br>25% operating rights in the S1/2SE1/4; S1/2N1/2SE1/4; SE1/4SW1/4; S1/2SW1/4SW1/4 of Block 95, West Delta Area, from the surface of the earth down to and including 7,369 feet subsea<br>25% operating rights in N1/2; N1/2N1/2SE1/4; N1/2SW1/4; N1/2SW1/4SW1/4 of Block 95, West Delta Area, from 13,601' SSTVD to 99,999' SSTVD |
| WD 96 | G01498 | 25% record title<br>25% operating rights in all of Block 96, West Delta Area, from 13,399' TVDSS to 18,000' SSTVD<br>25% operating rights in all of Block 96, West Delta Area, from 18,000' TVDSS to 99,999' TVDSS |

Exhibit A – Page 2
Decommissioning Funding Agreement

| Area / Block | Lease Number (OCS-) | CBP Interest |
|---|---|---|
| SM 149 | G02592 | 50% record title<br>4.2% ORRI as to production from the South Marsh Island 149 #D001 well (API 177084094401)<br>50% operating rights in all of Block 149, South Marsh Island Area, South Addition, from 7,386' SSTVD to 99,999' SSTVD |
| VR 363 | G09522 | 100% record title<br>33.33333% operating rights in the SE/4 of Block 363, Vermilion Area, South Addition<br>66.66667% operating rights in the SE/4 of Block 363, Vermilion Area, South Addition<br>100% operating rights in the N1/2; SW1/4 of Block 363, Vermilion Area, South Addition, from the surface to 10,180' SSTVD<br>50% operating rights in the N1/2; SW1/4 of Block 363, Vermilion Area, South Addition, from 10,180' SSTVD to 99,999' SSTVD |
| VR 371 | G09524 | 33.33333% record title<br>66.66667% record title<br>16.66667% operating rights in all of Block 371, Vermilion Area, South Addition, from 11,820' SSTVS to 99,999' SSTVD<br>66.66667% operating rights in all of Block 371, Vermilion Area, South Addition, from 11,820' SSTVS to 99,999' SSTVD |
| VR 362 | G10687 | 33.33333% record title<br>66.66667% record title |
| GC 282 | G16727 | 25% operating rights in all of Block 282, Green Canyon, from 16,700' TVD to 99,999' TVD<br>1.75% ORRI insofar as the lease pertains to depths from 0 to 16,999' TVD |
| MC 562 | G19966 | 12.5% record title<br>0% operating rights in N/2 of Block 562, Mississippi Canyon, from the surface to 19,500' TVDSS<br>0% operating rights in N/2 of Block 562, Mississippi Canyon, from depths below 19,500' TVDSS down to and including 99,999' TVDSS<br>0% operating rights in S/2 of Block 562, Mississippi Canyon, from depths below 20,000' TVDSS down to and including 99,999' TVDSS |

Exhibit A – Page 3
Decommissioning Funding Agreement

| Area / Block | Lease Number (OCS-) | CBP Interest |
|---|---|---|
| MC 563 | G21176 | 23.25% operating rights in all of Block 563, Mississippi Canyon, as to depths from below 19,000' down to 99,999' TVDSS<br>0.465% ORRI insofar as the lease covers all of Block 563, Mississippi Canyon, limited to depths from the surface to 19,000' TVDSS |
| GC 679 | G21811 | 37.5% record title<br>0% operating rights in E1/2 of Block 679, Green Canyon Area, limited in depth from the surface down to the stratigraphic equivalent of 16,048' TVD (17,315' MD) as seen in the Kerr-McGee OCS-G 21811 No. 1 (ST#1) well<br>0% operating rights in W1/2 of Block 679, Green Canyon Area, limited in depth from the surface down to 16,048' TVD<br>43.125% operating rights in all of Block 679, Green Canyon, below 16,048' TVD to 99,999' TVD |
| GC 768 | G21817 | 100% record title<br>50% operating rights in all of Block 768, Green Canyon, from the surface to the stratigraphic equivalent of 13,370' subsea TVD in the OCS-G 21817 #1 Well<br>43.125% operating rights in all of Block 768, Green Canyon, below the stratigraphic equivalent of 13,370' subsea TVD in the OCS-G 21817 #1 Well down to a depth of 40,000' subsea TVD |
| MC 992 | G24133 | 58.9363% record title in N1/2 of Block 992, Mississippi Canyon<br>52.94% record title in S1/2 of Block 992, Mississippi Canyon |
| MC 993 | G24134 | 58.9363% record title in N1/2 of Block 993, Mississippi Canyon<br>45% record title in S1/2 of Block 993, Mississippi Canyon |
| GC 238 | G26302 | 40% operating rights in all of Block 238, Green Canyon, from 16,700' TVD to 99,999' TVD<br>2.8% ORRI insofar as the lease pertains to depths from 0 to 16,999' TVD |

Exhibit A – Page 4
Decommissioning Funding Agreement

| Area / Block | Lease Number (OCS-) | CBP Interest |
|---|---|---|
| MC 519 | G27278 | 65.0% record title<br>49% operating rights in SW1/4 of Block 519, Mississippi Canyon, from the surface down to and including 99,999' TVDSS<br>49% operating rights in S1/2NW1/4 of Block 519, Mississippi Canyon, from the surface down to and including 14,000'<br>25.75% operating rights in S1/2; S1/2SE1/4NE1/4 of Block 519, Mississippi Canyon, from depths below 19,300' TVDSS down to and including 99,999' TVDSS<br>25.75% operating rights in S1/2NW1/4 of Block 519, Mississippi Canyon, from depths below 14,000' TVDSS down to and including 99,999' TVDSS<br>25.75% operating rights in N1/2NW1/4; N1/2NE1/4; SW1/4NE1/4 and N1/2SE1/4NE1/4 of Block 519, Mississippi Canyon, from the surface down to and including 99,999' TVDSS |
| EW 834 | G27982 | 1.3% ORRI insofar as the lease covers NE1/4, NW1/4NW1/4, N/2SE1/4NE1/4 and NE/4NE1/4 of Block 834, Ewing Bank, from the surface down to 26,000' TVDSS |
| MC 697 | G28021 | 54% record title |
| MC 698 | G28022 | 54% record title |
| MC 948 | G28030 | 58.9363% record title |
| MC 742 | G32343 | 100% record title in NE1/4; S1/2 of Block 742, Mississippi Canyon<br>54% record title in NW1/4 of Block 742, Mississippi Canyon |
| MC 949 | G32363 | 58.9363% record title |
| EW 790 | G33140 | 100.0% operating rights in SW1/4SW1/4; S1/2SE1/4SW1/4; S1/2SW1/4SE1/4 and NW1/4SE1/4SW1/4 of Block 790, Ewing Bank, limited to depths from below 26,000' TVDSS to 99,999' TVDSS<br>100.0% operating rights in N1/2; N1/2S1/2; SE1/4SE1/4; N1/2SW1/4SE1/4 and N1/4SE1/5SW1/4 of Block 790, Ewing Bank, from the surface to 99,999' TVDSS<br>1.3% ORRI insofar as the lease covers SW1/4SW1/4; S1/2SE1/4SW1/4; S1/2SW1/4SE1/4; NW1/4SE1/4SW1/4 of Block 790, Ewing Bank, from surface down to and including 26,000' TVDSS |
| MC 793 | G33177 | 1.3% ORRI insofar as the lease covers the W1/2W1/2NW1/4 of Block 793, Mississippi Canyon, from the surface down to 26,000' TVDSS |
| EW 835 | G33707 | 1.3% ORRI insofar as the lease covers the North 7800' of Block 835, Ewing Bank, from the surface down to 26,000' TVDSS |

Exhibit A – Page 5
Decommissioning Funding Agreement

| Area / Block | Lease Number (OCS–) | CBP Interest |
|---|---|---|
| MC 782 | G33757 | 45% record title |
| MC 171 | G34428 | 100% record title |
| MC 172 | G34429 | 100% record title |
| MC 297 | G34434 | 70% record title |
| GC 40 | G34536 | 50% record title |
| GC 41 | G34537 | 50% record title |
| EW 1009 | G34878 | 50% record title |
| EW 1010 | G34879 | 50% record title |
| EW 1011 | G34880 | 50% record title |
| MC 474 | G35825 | 24.33333% record title<br>12.5% operating rights in all of Block 474, Mississippi Canyon, from depths below 20,000' TVDSS down to and including 99,9999' TVDSS |
| MC 518 | G35828 | 24.33333% record title<br>0% operating rights in all of Block 518, Mississippi Canyon, from depths below 19,500' TVDSS down to and including 99,9999' TVDSS |
| GI 32 | 174 | 25% record title<br>25% operating rights in S/2 of Block 32, Grand Isle Area, from 12,756' TVDSS to 18,000' subsea (TVDS)<br>25% operating rights in S/2 of Block 32, Grand Isle Area, as to depths below 18,000 feet subsea (TVDS) to 99,999 feet subsea (TVDS) |
| GI 39 | 126 | 25% record title<br>25% operating rights in W/2 of Block 39, Grand Isle Area, from 12,256' TVDSS to 18,000' TVDSS<br>25% operating rights in W/2 of Block 39, Grand Isle Area, from 18,000' feet TVDS to 99,999' TVDS |
| GI 41 | 129 | 25% record title<br>25% operating rights in E/2 of Block 41, Grand Isle Area, from 14,123' TVDSS to 18,000' subsea (TVDS)<br>25% operating rights in E/2 of Block 41, Grand Isle Area, as to depths below 18,000 feet subsea (TVDS) to 99,999 feet subsea (TVDS) |

Exhibit A – Page 6
Decommissioning Funding Agreement

| Area / Block | Lease Number (OCS-) | CBP Interest |
|---|---|---|
| GI 44 | 176 | 25% record title<br>25% operating rights in N/2 of Block 44, Grand Isle Area, from 13,102' TVDSS to 18,000' subsea (TVDS)<br>25% operating rights in N/2 of Block 44, Grand Isle Area, as to depths below 18,000 feet subsea (TVDS) to 99,999 feet subsea (TVDS) |
| GI 52 | 177 | 25% record title<br>25% operating rights in N/2 of Block 52, Grand Isle Area, as to all depths below 17,651 feet TVDSS down to 99,999 feet TVDSS |
| WD 67 | 179 | 25% record title<br>25% operating rights in S/2 of Block 67, West Delta Area, from 11,650' TVDSS to 18,000' subsea (TVDS)<br>25% operating rights in S/2 of Block 67, West Delta Area, as to depths below 18,000' subsea (TVDS) to 99,999' subsea (TVDS) |
| WD 68 | 180 | 25% record title<br>25% operating rights in S/2 of Block 68, West Delta Area, from 13,225' TVDSS to 18,000' subsea (TVDS)<br>25% operating rights in S/2 of Block 68, West Delta Area, as to depths below 18,000' subsea (TVDS) to 99,999' subsea (TVDS) |
| WD 69 | 181 | 25% record title<br>25% operating rights in all of Block 69, West Delta Area, from 13,102' TVDSS to 18,000' subsea (TVDS)<br>25% operating rights in all of Block 69, West Delta Area, as to depths below 18,000 feet subsea (TVDS) to 99,999 feet subsea (TVDS) |

Exhibit A – Page 7
Decommissioning Funding Agreement

**EXHIBIT B**

**FORM OF NPI GRANT**

See attached.

**Execution Version**

**CONVEYANCE OF**

**NET PROFITS OVERRIDING ROYALTY INTEREST**

**From**

**MAKO BUYER LLC**

**as Grantor**

**to**

**DEEPWATER ASSET DECOMMISSIONING ESCROW ACCOUNT**

**as NPI Owner**

**_____ __, 2021**

This document prepared by and when recorded return to:
[  ]

#4325225.15

## CONVEYANCE OF NET PROFITS OVERRIDING ROYALTY INTEREST

THIS CONVEYANCE OF NET PROFITS OVERRIDING ROYALTY INTEREST (as from time to time supplemented or amended, this "Conveyance"), dated as of [_____] (the "Conveyance Date"), is made from and by Mako Buyer LLC, a Delaware limited liability company (the "Grantor"), to and in favor of [The Deepwater Asset Decommissioning Escrow Account], through U.S. Bank National Association as escrow agent (herein called "NPI Owner").

### RECITALS

WHEREAS, Grantor acquired certain oil and gas assets from Fieldwood Energy LLC and certain of its subsidiaries pursuant to that certain Purchase and Sale Agreement ("PSA") effected in connection with the Fourth Amended Joint Chapter 11 Plan of Fieldwood Energy LLC and Its Affiliated Debtors filed at Docket No. 1284 in the chapter 11 cases styled as In re: Fieldwood Energy LLC et al., Case No. 20-33948, which was confirmed by order of the United States Bankruptcy Court for the Southern District of Texas, Houston Division, on [_____], 2021 at Docket No. [____] (as amended, modified, and supplemented, the "Plan");

WHEREAS, pursuant to the terms and subject to that certain Deepwater Funding Agreement, dated [__] by and between Grantor and Chevron U.S.A. Inc., a Pennsylvania corporation ("CUSA") (the "Deepwater Security Agreement"), Grantor agreed to provide CUSA with certain security in support of decommissioning operations on certain of the assets acquired by Grantor in connection with the PSA; and

WHEREAS, this Conveyance is granted in conjunction with the security obligations of Grantor set out in the Deepwater Security Agreement;

NOW, THEREFORE, in consideration of the premises, the agreements and mutual covenants contained herein, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties agree as follows:

### ARTICLE I

### DEFINED TERMS

Section 1.1.   Defined Terms.   When used in this Conveyance or in any exhibit or schedule hereto (unless otherwise defined in any such exhibit or schedule), the following terms have the respective meanings assigned to them in this section or in the sections, subsections, exhibits and schedules referred to below:

"Act" has the meaning ascribed to such term in Section 7.6(a).

"Affiliate" means, with respect to any Person, any other Person that, directly or indirectly, controls, is controlled by or is under common control with, such specified Person through one or more intermediaries or otherwise.  For the purposes of this definition, "control" means, where used with respect to any Person, the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of such Person, whether through the ownership of

voting securities, by contract or otherwise, and the terms "controlling" and "controlled" have correlative meanings.

"Applicable JOA" means any joint operating agreement applicable to any part of the Subject Interests.

"Application Date" means, with respect to Net Profits attributable to Subject Hydrocarbons produced, saved and sold during any Production Period, the last Business Day of the Month following such Production Period; provided that the Application Date with regard to the Production Periods during the period of time beginning on the Effective Time until the end of the Month following the Month in which the Conveyance Date occurs shall be deemed to occur ninety (90) days after the Conveyance Date.

"BOEM" means the Bureau of Ocean Energy Management of the U.S. Department of Interior.

"BSEE" means the Bureau of Safety and Environmental Enforcement of the U.S. Department of Interior.

"Business Day" means any day that is not a Saturday, Sunday or legal holiday in the State of Texas and that is not otherwise a federal holiday in the United States.

"Claim" has the meaning ascribed to such term in Section 7.6(c).

"Conveyance Date" has the meaning ascribed to such term in the preamble.

"Conveyance" has the meaning ascribed to such term in the preamble.

"CPR" has the meaning ascribed to such term in Section 7.6(e).

"CUSA" means has the meaning ascribed to such term in the recitals.

"Debited Taxes" means all Taxes incurred, accrued or paid by Grantor with respect to the ownership of the Subject Interests or the extraction of the Subject Hydrocarbons after the Effective Time, including (a) production, severance, excise and other similar Taxes assessed against, and/or measured by, the production of Subject Hydrocarbons, (b) occupation Taxes, (c) sales and use taxes, (d) ad valorem Taxes assessed against or attributable to the Subject Interests or the Non-Processing Equipment and (e) any extraordinary or windfall profits Taxes that may be assessed in the future based upon profits realized or prices received from the sale of Subject Hydrocarbons.

"Decommissioning" has the meaning attributed thereto in the Deepwater Security Agreement.

"Effective Time" means 7:00 a.m. local time at the locations of the Subject Interests on the Conveyance Date.

"Environmental Laws" means, the Comprehensive Environmental Response, Compensation, and Liability Act, 42 U.S.C. § 9601 et seq. ("CERCLA"); the Resource

Debtors' Exhibit No. 34
Page 497 of 910

Conservation and Recovery Act, 42 U.S.C. § 6901 et seq.; the Federal Water Pollution Control Act, 33 U.S.C. § 1251 et seq.; the Clean Air Act, 42 U.S.C. § 7401 et seq.; the Hazardous Materials Transportation Act, 49 U.S.C. § 5101 et seq.; the Toxic Substances Control Act, 15 U.S.C. §§ 2601 through 2629; the Oil Pollution Act, 33 U.S.C. § 2701 et seq.; the Emergency Planning and Community Right to Know Act, 42 U.S.C. § 11001 et seq.; the Endangered Species Act, 16 U.S.C. § 1531 et seq.; the Safe Drinking Water Act, 42 U.S.C. §§ 300f through 300j; the Marine Mammal Protection Act, 16 U.S.C. § 1361 et seq.; the Marine Protection, Research and Sanctuaries Act, 16 U.S.C. § 1431 et seq. and 33 U.S.C. § 1401 et seq.; the Outer Continental Shelf Lands Act, 43 U.S.C. § 1331 et seq., and the National Environmental Policy Act, 42 U.S.C. § 4321 et seq., the Occupational Safety and Health Act, 29 U.S.C. ch. 15 § 651 et seq. (and all Occupational Safety and Health Administration (OSHA) promulgated standards), and the Hazardous Materials Transportation Act, 49 U.S.C. §§ 5101 et seq., in each case as amended in effect as of the Conveyance Date (or amended after the Conveyance Date), and all similar Laws  in effect as of the Conveyance Date (or amended or passed after the Conveyance Date) of any Governmental Authority having jurisdiction over the property, operation, activity, or condition in question addressing pollution, protection of the environment, biological resources, Hazardous Substances, occupational safety, product registrations, hazard communication, decommissioning obligations, or the generation, storage, transportation, disposal, or release of Hazardous Substances.

"Equipment" means all equipment and machinery (including well equipment and machinery), platforms, facilities, buildings, fixtures, and other tangible personal property and improvements owned by Grantor and used or held for use by Grantor in connection with the operation of the Subject Interests or the production of Subject Hydrocarbons.

"Escrow Account" means that certain escrow account established pursuant to the Escrow Agreement and called the "Deepwater Escrow Account" under the Deepwater Security Agreement.

"Escrow Agreement" means that certain escrow agreement governing the Escrow Account, dated [_____] by and between Grantor, CUSA, and U.S. Bank National Association, as escrow agent, and called the "Escrow Agreement" under Deepwater Security Agreement.

"Fixed Rate" means, for any day, the lesser of (i) the rate of six percent (6%) per annum and (ii) the maximum rate of interest permitted to be charged pursuant to this Conveyance under applicable Law.

"Governmental Authority" means any federal, state, municipal, local or similar governmental authority, regulatory or administrative agency, court or arbitral body or any subdivision of the foregoing.

"Gross Proceeds" has the meaning ascribed to such term in Section 3.2.

"Hazardous Substances" means any material,  product, pollutant, contaminant, dangerous or toxic substance, hazardous or extremely hazardous substance or chemical, or otherwise hazardous material or waste defined as "hazardous waste", "hazardous substance," "pollutant," or "hazardous material" under applicable Environmental Laws, including chemicals, pollutants, contaminants, wastes, or toxic substances that are classified as hazardous, toxic, radioactive, or

otherwise are regulated by, or form the basis for Environmental Liability under, any applicable Environmental Law, including hazardous substances under CERCLA, and oil of any kind or in any form, oil waste, petroleum and any fraction thereof, petroleum by-products and components, hydrocarbons, hydrocarbon waste, naturally occurring radioactive material, produced water, polychlorinated biphenyls, and asbestos.

"Hydrocarbons" means all of the oil, liquid hydrocarbons, gas, and any and all other liquid or gaseous hydrocarbons, as well as their respective constituent products (including condensate, casinghead gas, distillate and natural gas liquids), and, to the extent useful for the exploration for and production of the foregoing, any other minerals produced in association therewith (including, elemental sulfur, helium, carbon dioxide and other non-hydrocarbon substances produced in association with any of the above-described items).

"Law" means any and all applicable laws, statutes, codes, constitutions, ordinances, decrees, writs, injunctions, orders, judgments, principles of common law, rules, licenses, authorizations, or regulations (including Environmental Laws) that are promulgated, issued, or enacted by any Governmental Authority having jurisdiction.

"Lease" means (i) as of the Conveyance Date, an oil, gas and/or mineral lease described in Exhibit A hereto, together with (ii) any renewal, amendment, ratification, or extension of any such Subject Interest that is to be subject to this Agreement pursuant to Section 2.4.

"Losses" has the meaning ascribed to such term in Section 7.9(b).

"Manufacturing Costs" shall mean the costs of Processing any Subject Hydrocarbons, which shall be equivalent to (i) for Processing of any Subject Hydrocarbons performed by a Non-Affiliate, the actual costs charged by such Non-Affiliate and paid by Grantor for such Processing (or debited with respect to revenue from such Subject Hydrocarbons actually received by Grantor for such Processing), or (ii) for any other Processing of Subject Hydrocarbons, the actual costs incurred by Grantor or its Affiliate and paid to a Non-Affiliate (or debited from revenue attributable to) for Processing.

"Month" means the period between 7:00 a.m. (local time, at the location of each Subject Interest) on the first day of each calendar month and 7:00 a.m. on the first day of the next succeeding calendar month.

"Monthly Statement" has the meaning ascribed to such term in Section 3.6.

"Net Deficit" has the meaning ascribed to such term in Section 3.5(c).

"Net Profit" has the meaning ascribed to such term in Section 3.5(b).

"Net Profits Account" has the meaning ascribed to such term in Section 3.1.

"Non-Affiliate" means any Person that is not a Related Person.

Debtors' Exhibit No. 34
Page 499 of 910

"Non-Processing Equipment" means all fixtures, equipment and supplies (other than any of the same used in Processing) located on or used in connection with production from any of the Subject Interests.

"Non-Qualified Expenditures" means any amount attributable to (i) costs and expenses that are paid or incurred in connection with Decommissioning of the Subject Interests, or (ii) capital expenditures for the drilling and development of the Subject Interests.

"Notice" has the meaning ascribed to such term in Section 7.8.

"NPI" has the meaning ascribed to such term in Section 2.1.

"NPI Owner Indemnitees" has the meaning ascribed to such term in Section 7.9(a).

"NPI Payment" has the meaning ascribed to such term in Section 3.5(b).

"NPI Percentage" means an undivided five percent (5%).

"Parties" means Grantor and NPI Owner and each, a "Party".

"Person" means an individual, partnership, corporation, limited liability company, association, trust, unincorporated organization, or a government or agency or political subdivision thereof.

"Processing" or "Processed" means to process, manufacture, fractionate or refine Subject Hydrocarbons, but does not mean or include the use of lease or well equipment (such as dehydrators, gas treating facilities, separators, heater-treaters, lease compression facilities, injection or recycling equipment, tank batteries, field gathering systems, pipelines and equipment and so forth) for treating or conditioning Hydrocarbons or other normal operations on any of the Subject Interests.

"Production Period" means each Month in which Subject Hydrocarbons are produced and saved from the Subject Interests.  Except as otherwise provided herein, for purposes of this Conveyance, the first Production Period shall begin at the Effective Time.

"Reasonably Prudent Operator" means an operational standard requiring an operator to maintain and exercise a degree of skill and judgment, and the utilization of practices, methods, techniques and standards, that are generally expected of a skilled and experienced operator engaged in work similar in nature which shall at a minimum require operations be conducted (a) in a good and workmanlike manner, (b) with due diligence and dispatch, (c) in accordance with good oilfield practices, and (d) in compliance with all applicable Laws, licenses, authorizations and permits.

"Reimbursable Expenses" means all costs and expenses paid or incurred by or on behalf of NPI Owner or its Affiliates which are related to:  (a) the enforcement or termination of the NPI, this Conveyance, or any waivers or amendments hereto or thereto, or (b) any litigation, contest, release or discharge of any adverse claim or demand made or proceeding instituted by any Person affecting in any manner whatsoever the NPI, this Conveyance, the enforcement or defense hereof

Debtors' Exhibit No. 34
Page 500 of 910

or thereof, or the defense of NPI Owner's and its Affiliates' exercise of their rights hereunder or thereunder.  Included among the Reimbursable Expenses are, in each case to the extent paid or incurred by NPI Owner or its Affiliates: (i) all recording and filing fees and (ii) all costs of NPI Owner in exercising any of its remedies hereunder.

"Related Person" means Grantor, Fieldwood Energy I LLC, Fieldwood Energy III LLC, Fieldwood Energy IV LLC or Fieldwood Energy LLC or any Affiliate of any such Person.

"Subject Hydrocarbons" means the Hydrocarbons in and under Subject Lands that may be produced after the Effective Time from (or, to the extent pooled or unitized, allocated to) the Subject Lands that are attributable to the Subject Interests.

"Subject Interests" means:

(a)    all of Grantor's right, title and interest in and to the leasehold interests and other property interests described in Exhibit A attached hereto;

(b)    without limitation of the foregoing, all other right, title and interest (of whatever kind or character, whether legal or equitable and whether vested or contingent) of Grantor (whether in the form of a record title interest or interest in operating rights or contractual working interests) in and to the Hydrocarbons in and under or that may be produced from any Subject Lands (including interests in oil, gas or mineral leases to the extent the same cover such lands, overriding royalties, production payments and net profits interests in such lands or such leases, and fee mineral interests, fee royalty interests and other interests in such oil, gas and other minerals) even though Grantor's interest in such oil, gas and other minerals may be incorrectly described in, or omitted from, Exhibit A; and

(c)    all rights, titles and interests of Grantor in and to, or otherwise derived from, all presently existing and valid oil, gas or mineral unitization, pooling, or communitization agreements, declarations or orders and in and to the properties covered and the units created thereby (including all units formed under orders, rules, regulations, or other official acts of any federal, state, or other authority having jurisdiction, voluntary unitization agreements, designations or declarations, and so-called "working interest units" created under operating agreements or otherwise) relating to the interests described in clauses (a) and (b) of this definition,

in each case, as any of the foregoing may be enlarged from time to time by the discharge of any burdens or by the removal of any charges or encumbrances to which any of the foregoing may be subject as of the date hereof, and any and all renewals and extensions of any of the same pursuant to Section 2.4.  For purposes of clarity, it is expressly understood and agreed that the term "Subject Interests", as used in this Conveyance, shall mean gross interests before any deductions, charges or encumbrances.  The Subject Interests shall not include additional interests acquired by Grantor from a third party from and after the Conveyance Date, including additional interests acquired by Grantor in the Leases that comprise the Subject Interests, unless such interests are expressly added to this Conveyance by qualifying amendment.

"Subject Lands" means all of the tracts of land described in Exhibit A and all lands subject to each Lease, unit or other property interest that is described in Exhibit A, in each case, as to all depths.

Debtors' Exhibit No. 34
Page 501 of 910

"<u>Subject Wells</u>" means all wells now located on the Subject Lands (whether fully drilled and completed or not) or hereafter drilled on the Subject Lands, and any other wells now or hereafter located on lands or leases pooled, communitized or unitized with the Subject Interests, including any wells identified on <u>Exhibit A</u>.

"<u>Taxes</u>" means all ad valorem, property, gathering, transportation, pipeline regulating, severance, production, excise, heating content, carbon, environmental, occupation, sales, use, value added, fuel, and other taxes and governmental charges and assessments imposed on or as a result of all or any part of the Subject Interests, the Subject Hydrocarbons or the proceeds thereof, or the NPI, regardless of the point at which or the manner in which or the Person against whom such taxes, charges, or assessments are charged, collected, levied, or otherwise imposed. Any estimated taxes, deficiency assessments, additions to tax, interest, penalties, and withholding obligations owing to Governmental Authorities with respect to any Taxes shall also constitute Taxes. The only taxes which are not Taxes for purposes hereof are federal and state income taxes, state franchise taxes, state margin taxes, and any penalty or interest surcharges thereon.

Section 1.2.   <u>Rules of Construction</u>.   All references in this Conveyance to articles, sections, subsections and other subdivisions refer to corresponding articles, sections, subsections and other subdivisions of this Conveyance unless expressly provided otherwise. Titles appearing at the beginning of any of such subdivisions are for convenience only and shall not constitute part of such subdivisions and shall be disregarded in construing the language contained in such subdivisions. The words "this Conveyance", "this instrument", "herein", "hereof", "hereunder" and words of similar import refer to this Conveyance as a whole and not to any particular subdivision unless expressly so limited. Unless the context otherwise requires:  "including" and its grammatical variations mean "including without limitation"; "of" is not exclusive; words in the singular form shall be construed to include the plural and vice versa; words in any gender include all other genders; references herein to any instrument or agreement refer to such instrument or agreement as it may be from time to time amended or supplemented; and references herein to any Person include such Person's successors and assigns. All references in this Conveyance to exhibits and schedules refer to exhibits and schedules to this Conveyance unless expressly provided otherwise, and all such exhibits and schedules are hereby incorporated herein by reference and made a part hereof for all purposes. Any reference to a Law includes any amendment or modification to such Law, and all regulations, rulings, and other Laws promulgated under such Law.

**ARTICLE II**
**GRANTING PROVISIONS**

Section 2.1.   <u>Granting Clause</u>.   For and in consideration of good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Grantor does hereby GRANT, BARGAIN, SELL, TRANSFER, ASSIGN, CONVEY, WARRANT and DELIVER to NPI Owner a net profits overriding royalty interest in and to the Subject Interests and in and to the Subject Hydrocarbons in and under the Subject Interests and that may be produced and saved from (or otherwise allocable to) each Subject Interest that is equal to (and measured by) the NPI Percentage of the Net Profits, as determined by and calculated in accordance with the terms of <u>Article III</u>, of the Subject Hydrocarbons that may be produced and saved from (or otherwise allocable to) the Subject Interests, together with all and singular the rights and appurtenances

Debtors' Exhibit No. 34
Page 502 of 910

thereto in anywise belonging (the "NPI"), all as more fully discussed and subject to the terms provided below.

TO HAVE AND TO HOLD the NPI unto NPI Owner, its successors and assigns, forever. Grantor will pay and account to NPI Owner the NPI as provided herein.

Section 2.2.    Non-Operating, Limited Cost-Bearing Interest.  The NPI is a non-operating, limited expense-bearing net profits overriding royalty interest in and to the Subject Interests, free of all cost, risk, and expense of exploration, development, plugging and abandonment of the Subject Interests or the Subject Hydrocarbons.  Except as described in Section 3.3(c), the NPI shall be free and clear of (and without deduction therefrom of), and Grantor shall bear and pay, all Taxes (other than Debited Taxes) with respect to the NPI and the Subject Hydrocarbons imposed on NPI Owner.  Without limitation of the foregoing, Grantor will promptly (and in any event within thirty (30) days after receiving any notice or statement for the same) pay all Reimbursable Expenses which have been incurred and are unpaid and will reimburse NPI Owner for any Reimbursable Expenses, and for any other amounts that Grantor is obligated to pay hereunder, which have nonetheless been paid by or on behalf of NPI Owner.  Each amount that is to be paid by Grantor pursuant to this Conveyance which is instead paid by or on behalf of NPI Owner shall bear interest at the Fixed Rate on each day from and including the date of such payment until but not including the date repaid by Grantor  This Conveyance is an absolute conveyance of a presently vested interest in real and/or immovable property and, in the State of Louisiana, an immovable right, causing title to the NPI to be vested in NPI Owner as of the Effective Time.

Section 2.3.    No Proportionate Reduction.  It is understood and agreed that, although the NPI is conveyed by Grantor to NPI Owner out of the Subject Interests, the NPI shall be determined based on all of Grantor's right, title and interest in and to the Subject Interests as of the Conveyance Date.

Section 2.4.    Renewals and Extensions.    Grantor shall have the unrestricted right to renew, extend, modify or amend the Leases with respect to any of the Subject Lands covered thereby without the consent of NPI Owner.  This Conveyance and the NPI shall apply to Grantor's and its Affiliates' interests in all renewals, extensions, modifications and amendments of each lease (or other determinable interest) which is included in the Subject Interests, whether such renewals, extensions, modifications and amendments have heretofore been obtained by Grantor or are hereafter obtained by or for Grantor or any Affiliate thereof and whether or not the same are described in Exhibit A; provided that any fees, costs and expenses actually paid by Grantor with respect to such renewal, extension, modification and amendment may be debited to the Net Profits Account.  For the purposes of the preceding sentence, a new lease or other determinable property interest that covers the same interest (or any part thereof) covered by a prior lease or property interest, and which is acquired within twelve (12) months after the expiration, termination, or release of such prior lease or property interest, shall be treated as a renewal or extension of such prior lease or property interest.

Section 2.5.    Termination of a Subject Interest.  In the event any particular Subject Interest (or portion thereof, as applicable) should by its terms terminate and not be extended, renewed, or replaced, the NPI shall no longer apply to that particular Subject Interest (or such portion thereof, as applicable), but the NPI shall remain in full force and effect and undiminished

as to all remaining Subject Interests, if any, (and the remaining portion of such Subject Interest, as applicable); provided, however, that, notwithstanding such termination, any costs and expenses attributable to such Subject Interest (or portion thereof, as applicable) that are otherwise eligible to be debited from the Net Profits Account shall continue to be debited pursuant to the provisions of Article III.

Section 2.6.    Pooling, Communitization and Unitization.

(a)    Certain of the Subject Interests may have been pooled, communitized or unitized for the production of oil, gas and/or minerals prior to the Effective Time or, after the Effective Time, may be so pooled or unitized pursuant to Section 2.6(b).  Such Subject Interests are and shall be subject to the terms and provisions of such pooling and unitization agreements, and the NPI in each such Subject Interest shall apply to (and the term "Subject Hydrocarbons" shall include) the production from such units which is attributable to such Subject Interest (and the Net Profits Account shall be computed giving consideration to such production and costs, expenses, charges and credits attributable to such Subject Interest) under and by virtue of the applicable pooling and unitization agreements.

(b)    Grantor shall have the right and power to unitize, communitize or pool, on a voluntary basis, any portion or portions of the Subject Interests without the express written consent of NPI Owner.  Notwithstanding the foregoing, if pursuant to any such voluntary pooling or unitization or any Law or order of any Governmental Authority, any portion of the Subject Interests is pooled, communitized or unitized in any manner, the NPI shall apply to the production which is attributable to such portion of the Subject Interests under and by virtue of such pooling, communitization and unitization arrangements (as if such unit or property interest and the interest of Grantor therein were specifically described in Exhibit A). NPI Owner shall, at Grantor's sole cost and expense, cooperate in good faith to prepare and execute any documents reasonably necessary to accomplish the purposes of this Section 2.6.

# ARTICLE III
# ESTABLISHMENT OF NET PROFITS ACCOUNT

Section 3.1.    Establishment.  Grantor shall establish on its books and maintain a net profits account (herein called the "Net Profits Account") in accordance with sound, accurate and comprehensive accounting practices and consistent with the various provisions of this Conveyance and shall at all times keep true and correct books and records with respect thereto.

Section 3.2.    Credits.  Except as otherwise provided herein, the Net Profits Account shall be credited (without duplication herein) with the following gross revenue actually received by (or credited to Grantor if credited by a Related Person) from the sale or other disposition of Subject Hydrocarbons produced from and after the Effective Time, in each case as of the date the corresponding proceeds for Subject Hydrocarbons are actually received by Grantor (the "Gross Proceeds").  The amount of Gross Proceeds to be credited to the Net Profits Account with respect to any sale or disposition of Subject Hydrocarbons shall be subject to the following:

(a)    Gross Proceeds shall include all consideration and other amounts actually received by (or credited to Grantor if credited by a Related Person) attributable to the sale or other

Debtors' Exhibit No. 34
Page 504 of 910

disposition of Subject Hydrocarbons, including any amounts actually received by (or credited to Grantor if credited by a Related Person) attributable to overriding royalty or other royalty interest that is part of the Subject Interests and owned by Grantor;

(b)     If any Non-Affiliate withholds or delays payment of proceeds of Subject Hydrocarbons for any reason (other than at the request of Grantor), such proceeds shall not be considered to be Gross Proceeds until such proceeds are actually paid and received by Grantor (provided that if any interest or penalty is also paid in connection therewith, such interest or penalty shall be deemed proceeds of Subject Hydrocarbons), and provided further that if a Related Person withholds or delays payment of proceeds of Subject Hydrocarbons for any reason, such proceeds shall be considered to be Gross Proceeds relating to the applicable Production Period;

(c)     If any Subject Hydrocarbons are Processed before sale, the amount of Gross Proceeds credited to the Net Profits Account for such Subject Hydrocarbons shall be the amount actually received from the sale of such Subject Hydrocarbons less the Manufacturing Costs; and

(d)     Gross Proceeds shall not include any amounts that are to be applied as reductions to debits pursuant to Section 3.4.

Section 3.3.    Debits.  Except as otherwise provided herein, the Net Profits Account shall be debited (without duplication herein or any duplication resulting from any charges under the COPAS accounting procedures attached to any Applicable JOA) with the following costs and expenses to the extent (i) such costs and expenses are properly allocable to the Subject Interests and incurred during the period from and after the Effective Time, and (ii) such costs and expenses are actually paid by Grantor from and after the Effective Time:

(a)     All costs and expenses for (i) direct lease-level and field-level services and labor (including fringe benefits) necessary for exploring, developing, operating, producing, reworking, and maintaining the Subject Interests, (ii) dehydration, compression, processing, treating, metering, separation, transportation, gathering, storage and marketing of the Subject Hydrocarbons to the or at the first point of sale giving rise to Gross Proceeds, (iii) material, supplies, equipment, fixtures, vehicles, vessels, and other personal property purchased or rented in connection with operating, producing, reworking and maintaining the Subject Interests, including all costs relating to fuel supply, power supply, salt water disposal, repairs, dock services and other charges incidental thereto, (iv) fluid injection, pressure maintenance, secondary recovery, recycling and other enhanced recovery operations attributable to the Subject Interests, and (v) all other charges permitted under the COPAS accounting procedures attached to any Applicable JOA;

(b)     All Debited Taxes;

(c)     The portion of any insurance costs paid by Grantor attributable to the ownership or operation of the Subject Interests;

(d)     All amounts attributable to any Subject Interest consisting of royalties, overriding royalties, production payments, rentals, shut-in well royalties, minimum royalties and similar payments and burdens that are payable with respect to periods after the Effective Time and are payable to any Non-Affiliate;

Debtors' Exhibit No. 34
Page 505 of 910

(e)     All direct costs and charges attributable to the Subject Interests that are paid by Grantor to a Non-Affiliate operator with respect to periods after the Effective Time under an Applicable JOA (and all exhibits attached thereto including the COPAS accounting procedures) governing the relevant Subject Interests;

(f)     All (i) costs and expenses of litigation, proceedings, collections, liens, judgments, liabilities and claims incurred and paid by Grantor allocable to the Subject Interests or Subject Hydrocarbons and (ii) payment of judgments, penalties and other liabilities (including interest thereon), incurred by Grantor (and not paid or reimbursed under insurance maintained by Grantor or others) and involving any of the Subject Interests, or incident to the development, operation or maintenance of the Subject Interests from and after the Effective Time, or requiring the payment or restitution of any proceeds of Subject Hydrocarbons;

(g)     If as a result of the occurrence of the bankruptcy or insolvency or similar occurrence of the purchaser of Subject Hydrocarbons any amounts previously included in Gross Proceeds are reclaimed from Grantor or its representative, then the amounts reclaimed as promptly as practicable following Grantor's payment thereof; and

(h)     All costs, expenses and liabilities incurred by Grantor in maintaining, renewing or extending any of the Leases or maintaining or increasing production on such Lease.

Notwithstanding the foregoing provisions of this <u>Section 3.3</u> or anything else to the contrary contained in this Conveyance, the amounts debited to the Net Profits Account shall not include any of the following:

(i)     Non-Qualified Expenditures.

(ii)     Any amount otherwise able to be debited which has also reduced the amount of the Subject Hydrocarbons or Gross Proceeds (including, by way of example, royalties and overriding royalties not included in Subject Hydrocarbons and production, severance, and other Taxes (other than penalties or interest) withheld and not included in Gross Proceeds).

(iii)     Any overriding royalty, production payment or other charge burdening the Subject Interests which is created by Grantor after the Effective Time.

(iv)     Any expenses and any penalties, interests or other similar charges which result from the failure of Grantor to properly discharge all costs and expenses (including Taxes) of operating, producing and maintaining the Subject Interests as a Reasonably Prudent Operator.

(v)     Any interest, premiums, fees or similar charges arising out of borrowings, bonds, letters of credit or other credit support or purchases of any goods, equipment or other items on credit, whether or not used on or otherwise related to the Subject Interests.

(vi)     Any general, administrative or overhead costs paid or incurred by Grantor or its Affiliates, except for any of such costs permitted under <u>Sections 3.3(a)</u>.

-11-

(vii)   Any amounts paid by Grantor (A) for the acquisition of any new Lease, including any bonus or similar payment or (B) to any of Grantor's predecessors in interest with respect to the acquisition of the Subject Interests (including any purchase price or other consideration paid by Grantor to any such predecessor in interest to acquire all or part of the Subject Interests).

(viii)   Any expenses, expenditures or other amounts accrued prior to the Effective Time, even if paid after the Effective Time, unless agreed to by Grantor and CUSA in writing.

Section 3.4.   <u>Reduction of Debits</u>.  The debits to the Net Profits Account provided for in <u>Section 3.3</u> and elsewhere in this Conveyance shall be reduced after the Effective Time by the following to the extent actually received by or credit to Grantor and to the extent applicable to the Subject Interests:

(a)   The gross proceeds attributable to Subject Interests which are received by Grantor from the sale of (or, if disposed of by Grantor other than by sale, the then current market value of) any materials, supplies, equipment and other personal property or fixtures located on or used in connection with the Subject Interests (including all amounts attributable thereto which are received by Grantor by way of conformance of investment in personal property and equipment if the Subject Interests or any part or parts thereof are hereafter unitized).

(b)   The gross proceeds of all insurance payments collected by Grantor (i) if the cost of the related policy is chargeable to the Net Profits Account, directly or indirectly, or (ii) for loss of or damage to any of the Subject Interests, any Subject Hydrocarbons, or any materials, supplies, equipment or other personal property or fixtures located on or used in connection with any of the Subject Interests.

(c)   The proceeds of all judgments and settlements (net of legal fees and expenses) collected by Grantor for loss of or damage to any of the Subject Interests or any part thereof or interest therein, any Subject Hydrocarbons, or any materials, supplies, equipment or other personal property or fixtures, or any part thereof or interest therein, located on or used in connection with any of the Subject Interests.

(d)   Any Prior Period Debit Reduction.

Section 3.5.   <u>Accounting</u>.

(a)   By the end of the second Month after each Production Period, a calculation of Net Profits or Net Deficit shall then be made by Grantor with respect to the NPI for such Production Period by deducting (i) the result of (A) the total debits properly made to the Net Profits Account during such Production Period pursuant to <u>Section 3.3</u>, *plus* (B) the Net Deficit carried forward from the prior Production Period (as determined under <u>Section 3.5)(c)</u>), if any, *minus* (C) the total debit reductions properly made to the Net Profits Account during such Production Period pursuant to <u>Section 3.4</u>; *from* (ii) the results of (A) total credits properly made to the Net Profits Account for Subject Hydrocarbons produced during such Production Period pursuant to <u>Section 3.2</u>, *plus* (B) total credits properly made to the Net Profits Account for Subject Hydrocarbons produced during any prior Production Period, to the extent the applicable credit was not actually received by

or credited to Grantor until after the Application Date for such prior Production Period or was not otherwise allocated to the Net Profits Account for a prior Production Period; provided that if the result of the calculation under (i) is a negative number, then the absolute value of such amount shall be deemed a "<u>Prior Period Debit Reduction</u>" and carried forward into the next Production Period under <u>Section 3.4</u>.

(b)     If the computation made in accordance with <u>Section 3.5(a)</u> results in a positive amount with respect to a Production Period (the "<u>Net Profits</u>"), then (i) that positive amount shall be subtracted from the balance of the Net Profits Account to cause the Net Profits Account to have a zero balance immediately following the end of such Production Period, (ii) that positive amount shall be multiplied by the NPI Percentage to determine the NPI payable with respect to such Production Period, and (iii) the product resulting from the calculations in (ii) above shall be payable to NPI Owner, as specified in <u>Section 4.1</u> (the "<u>NPI Payment</u>").

(c)     If the computation made in accordance with <u>Section 3.5(a)</u> results in a negative amount with respect to a Production Period, the negative sum shall be deemed the "<u>Net Deficit</u>." Any Net Deficit shall be carried forward as a debit to the Net Profits Account for the following Production Period. If there is a Net Deficit with respect to the Net Profits Account at the end of any Production Period, no payments shall be made to NPI Owner in respect of the NPI. For the avoidance of doubt, NPI Owner shall never be liable to make any payment to Grantor in respect of the Net Deficit.

Section 3.6.     <u>Monthly Statements</u>.   On or before the last day of the second Month following each Production Period, beginning with the first Production Period after the Conveyance Date, Grantor shall furnish to NPI Owner a detailed statement (a "<u>Monthly Statement</u>") (a) identifying the balance (if any) of the Net Profits Account as of the close of business on the last day of the preceding Production Period, (b) identifying (with sufficient description so that NPI Owner can identify such items and the particular Subject Interest involved) those items which gave rise to debits and credits to the Net Profits Account during such Production Period and (c) identifying, with respect to each Subject Interest, the volumes of Subject Hydrocarbons both produced and sold therefrom during the Production Period covered by such Monthly Statement, the prices at which such volumes were sold, and the Taxes paid with respect to such sales. Any Net Deficit reflected by any Monthly Statement shall be carried forward and used in the calculation of Net Profits Account for the next and succeeding Production Periods until such Net Deficit has been eliminated and liquidated. As more particularly described in <u>Section 3.5(b)</u>, NPI Payments shall be made to NPI Owner in accordance with Section 4.1 when a Net Profit is reflected by any Monthly Statement.

Section 3.7.     <u>Overpayments</u>.   If at any time Grantor pays NPI Owner more than the amount then due with respect to the NPI to NPI Owner, NPI Owner shall not be obligated to return any such overpayment to Grantor, but the amount or amounts otherwise payable for any subsequent period or periods shall be reduced by such overpayment, unless such overpayment is disputed by NPI Owner, in which case Grantor shall not reduce any future payment by the amount of the disputed overpayment until such dispute is resolved.

Debtors' Exhibit No. 34
Page 508 of 910

Section 3.8.   <u>Past Due Payments</u>.  Any amount not paid by Grantor to NPI Owner with respect to the NPI when due shall bear, and Grantor hereby agrees to pay, interest at a rate equal to the Fixed Rate, from the due date until such amount has been paid.

**ARTICLE IV**
**PAYMENTS; MARKETING; AUDIT AND INSPECTION RIGHTS**

Section 4.1.   <u>NPI Payments</u>.   Grantor shall pay to NPI Owner the NPI Payment attributable to each Production Period in immediately available U.S. funds on or before the Application Date for such Production Period.  NPI Owner and Grantor agree that all NPI Payments or other payments required to be made to NPI Owner hereunder shall be paid via wire transfer, or other agreed means, of immediately available funds to the Escrow Account and NPI Owner agrees that all funds in the Escrow Account will be used in accordance with the terms of the Deepwater Security Agreement and the Escrow Agreement without any further notice, consent or action to or from NPI Owner.

Section 4.2.   <u>Nature of Marketing Arrangements</u>.  Grantor shall have the obligation to prudently market, or cause to be prudently marketed, the Subject Hydrocarbons in arm's-length transactions with reputable purchasers who are not Affiliates.  Grantor shall duly and prudently perform all obligations performable by it under any arrangements by which Subject Hydrocarbons are sold or otherwise marketed, and shall take all appropriate measures to enforce the performance under each such arrangement of the obligations of the other parties thereto.

Section 4.3.   <u>Audit and Inspection Rights</u>.  NPI Owner shall have the right from time to time to audit the books and records of Grantor with respect to the Subject Interests and the Subject Hydrocarbons, including all information with respect to the matters to be reported on by Grantor as provided herein, and Grantor shall, within thirty (30) days after being invoiced therefor, pay (or reimburse NPI Owner for) the costs and expenses of one (but no more than one) such audit during each calendar year.  Such audits shall be conducted by NPI Owner so as to result in a minimum disruption in the ongoing business and affairs of Grantor and shall be conducted during normal business hours at Grantor's offices or at the offices where Grantor maintains the records relating to the items set forth above.  If, as a result of any such audit, it is determined that any amount is due NPI Owner as a result of the failure of Grantor to properly pay the full amount of any NPI Payment that is required to be made hereunder, Grantor shall pay NPI Owner the value (as reasonably determined by NPI Owner) of the proceeds which Grantor failed to remit, together with interest at the Fixed Rate from the date that such amount should have been delivered or paid in accordance with the terms of this Conveyance to the date of payment.  If, as a result of any such audit, it is determined that any amount is due Grantor as a result of overpayment by Grantor, such overpayment shall be resolved in accordance with <u>Section 3.7</u>.

**ARTICLE V**
**OPERATIONAL MATTERS**

Section 5.1.   <u>Operations</u>.  Grantor shall conduct and carry on, or cause to be conducted and carried on, the development, maintenance and operation of the Subject Interests as a Reasonably Prudent Operator operating in the Outer Continental Shelf of the Gulf of Mexico without regard to the burden of the NPI.   Without limitation of the foregoing, Grantor, without

-14-

regard to the burden of the NPI, (a) shall maintain and operate the Subject Interests in accordance with all applicable Laws in all material respects, including Environmental Laws and (b) pay promptly as and when due and payable by Grantor (i) all royalties and other lease burdens with respect to the Subject Interests or Subject Hydrocarbons (or necessary to maintain the Subject Interests in full force and effect), (ii) all Taxes which may be imposed on the Subject Interests or the Subject Hydrocarbons, and (iii) all costs and expenses of development, maintenance and operation of the Subject Interests. Decisions with regard to the conduct of operations, including, with respect to the election to shut-in, abandon or make a non-consent election on any well located or proposed to be located on the Subject Interests, will be made by Grantor without regard to the burden of the NPI. As to any portions of the Subject Interests, if any, as to which Grantor is not the operator, Grantor shall take all such action and exercise all such rights and remedies as are legally and reasonably available to it to cause the operator to so develop, maintain and operate such portions of the Subject Interests (*provided* that Grantor shall never be obligated to pay any costs or expenses attributable to any interest other than the Subject Interests and all royalties related thereto) but shall not be deemed to be in violation of any of its covenants or agreements hereunder in the event that such operator fails to do so. It is expressly understood that the powers given to Grantor in this Section 5.1 shall include the power of Grantor to elect to participate, or not participate, in drilling, reworking, plugging back, deepening, sidetracking or completing of a well, or in other operations (including, but not limited to, operations in connection with secondary and/or tertiary recovery) proposed to be conducted on the Subject Interests.

Section 5.2.    Title. Grantor hereby binds itself to WARRANT and FOREVER DEFEND all and singular title to the NPI unto NPI Owner, its successors and permitted assigns, against every Person lawfully claiming or to claim the same or any part thereof by, through or under Grantor, but not otherwise.

Section 5.3.    Leases, Deeds and Contracts:  Performance of Obligations. Grantor agrees to use commercially reasonable efforts to maintain the oil, gas or mineral leases, contracts, servitudes, fees, deeds, and other agreements forming a part of the Subject Interests producing as of the Conveyance Date, to the extent the same cover or otherwise relate to the Subject Interests, in full force and effect to the extent a Reasonably Prudent Operator, without giving effect to the burden of the NPI or this Conveyance, would do so.

Section 5.4.    Abandonment. Subject to Section 5.3, Grantor shall have the right without the joinder of NPI Owner to release, surrender and/or abandon its interest in the Subject Interests, or any part thereof, or interest therein even though the effect of such release, surrender or abandonment will be to release, surrender or abandon the NPI the same as though NPI Owner had joined therein insofar as the NPI covers the Subject Interests, or any part thereof or interest therein, so released, surrendered or abandoned by Grantor. Grantor shall have an unequivocal right to abandon the Subject Interests, or any part thereof, if such abandonment is necessary for health, safety or environmental reasons or if the Subject Hydrocarbons cannot be produced in a manner sufficient to cover operating expenses.

Section 5.5.    Compliance with Laws. Grantor will not cause or permit the Subject Lands or Grantor to be in violation of any Environmental Laws or other Laws with respect to the Subject Lands.

Debtors' Exhibit No. 34
Page 510 of 910

Section 5.6.    Non-consent Operations.  If Grantor elects to be a non-participating party with respect to any drilling, deepening, plugging back, reworking, sidetracking or completion (or other) operation on any Subject Interest or elects to be an abandoning party with respect to a Subject Well, the consequence of which election is that Grantor's interest in such Subject Interest or part thereof is temporarily (i.e., during a recoupment period) or permanently forfeited to the parties participating in such operations, or electing not to abandon such well, then the costs and proceeds attributable to such forfeited interest shall not, for the period of such forfeiture (which may be a continuous and permanent period), be debited or credited to the Net Profits Account and such forfeited interest shall not, for the period of such forfeiture, be subject to the NPI.

**ARTICLE VI**
**ASSIGNMENTS AND TRANSFERS**

Section 6.1.    Assignment and Transfer by NPI Owner.  NPI Owner may not sell, convey, assign, mortgage or otherwise dispose of the NPI (including its rights, titles, interests, estates, remedies, powers and privileges appurtenant or incident to the NPI under this Conveyance), in whole or in part without the prior written consent of Grantor, which may be withheld at Grantor's discretion.  No change of ownership of the NPI shall be binding upon Grantor, however, until Grantor is furnished with copies of the documents evidencing such change.  Each Person comprising NPI Owner may exercise the rights of NPI Owner attributable to its percentage share.  Upon receipt by Grantor of copies of the documents evidencing a sale, conveyance, assignment, mortgage or other disposition of the NPI, Grantor shall thereafter deal with the transferee NPI Owner with respect to the NPI transferred to such transferee NPI Owner in place of the transferring NPI Owner and references herein to the NPI Owner with respect to the NPI transferred to such transferee NPI Owner shall thereafter be deemed to be references to such transferee NPI Owner, provided that the transferring NPI Owner shall continue to have, and benefit from, all rights to indemnification and reimbursement that are provided herein with regard to the period of its ownership of the NPI transferred to such transferee NPI Owner.

Section 6.2.    Assignment and Transfer by Grantor.  Except as contemplated in the Deepwater Security Agreement, any sale, conveyance or assignment of the Subject Interests, or any part thereof or interest therein, by Grantor shall be void.  Any sale, conveyance or assignment of the Subject Interests, or any part thereof or interest therein, permitted hereunder shall be subject to this Conveyance, and in the instrument effecting such sale, conveyance or assignment, the transferee or recipient must expressly recognize and assume all obligations, covenants and agreements of Grantor hereunder.

Section 6.3.    Covenants Running With the Subject Interests.  All covenants and agreements of Grantor herein contained shall be deemed to be covenants running with the Subject Interests.  All of the provisions hereof shall inure to the benefit of NPI Owner and its successors and assigns.

**ARTICLE VII**
**MISCELLANEOUS PROVISIONS**

Section 7.1.    Further Assurances.  Grantor agrees to execute and deliver to NPI Owner, and, to the extent it is within Grantor's power to do so, to cause any third parties to execute and

-16-

deliver to NPI Owner, all such other and additional instruments and to do all such further acts and things as may be necessary or appropriate to more fully vest in and assure to NPI Owner all of the rights, titles, interests, remedies, powers and privileges herein granted or intended so to be including executing, delivering and recording further conveyances to effect the provisions of Section 2.4. NPI Owner agrees to execute and deliver to Grantor all such other and additional instruments and to all such further acts and things as may be necessary or appropriate to more fully implement the transactions contemplated by this Conveyance.

Section 7.2.   No Waiver.  The failure of any Party to insist upon strict performance of a covenant hereunder or of any obligation hereunder, irrespective of the length of time for which such failure continues, shall not be a waiver of such Party's right to demand strict compliance in the future.  No consent or waiver, express or implied, to or of any breach or default in the performance of any obligation hereunder shall constitute a consent or waiver to or of any other breach or default in the performance of the same or any other obligation hereunder.  No provision of this Conveyance shall be deemed a waiver by NPI Owner of any rights granted to NPI Owner under applicable Law governing overriding royalty interests and the rights of the owners thereof.

Section 7.3.   Authority of Parties/Signatories.  Each Person signing this Conveyance represents and warrants that he or she is duly authorized and has legal capacity to execute and deliver this Conveyance. Each Party represents and warrants to the other that the execution and delivery of this Conveyance and the performance of such Party's duties have been duly authorized and that this Conveyance is a valid and legal agreement binding on such Party and enforceable in accordance with its terms.

Section 7.4.   Public Announcements.  No Party shall issue any public announcement or statement concerning this Agreement or make any use of the names, image, logos, or trademarks of any other Party or any of its Affiliates without obtaining the prior written consent of the other Parties.

Section 7.5.   Time is of the Essence. Each Party shall perform the obligations under this Agreement in a timely manner as set out in this Agreement.  Each Party shall meet these timing requirements at its own cost. Each Party may recover against each other Party an amount equal to such Party damages arising from such other Party's failure to perform in time.

Section 7.6.   Applicable Law; Dispute Resolution.

(a)   Governing Law. This Agreement is governed by and interpreted in accordance with the laws of the State of Texas, without regard to its choice of law rules, except that the substantive and procedural rules of the Federal Arbitration Act, 9 U.S.C. §§ 1-16 (the "Act") govern Section 7.6(e).

(b)   Resolution of Disputes. The Parties shall exclusively and finally resolve any dispute between them using direct negotiations, mediation, and then arbitration as set out in this Section 7.6.

(c)   Direct Negotiations. If a dispute arises, a Party seeking to initiate the dispute resolution process shall give Notice to the other Party (or Parties) to the dispute setting out, in writing and in detail, the issues in dispute and the value of the disputed amount (the "Claim"). The

Debtors' Exhibit No. 34
Page 512 of 910

Parties to the dispute shall attempt to resolve the dispute through direct negotiations in a meeting between the Parties to the dispute, attended by individuals with decision-making authority, which must take place within thirty (30) days, or as otherwise agreed to by such Parties, from the date the Notice was sent.

(d)     <u>Mediation</u>. If the dispute cannot be resolved by direct negotiations within thirty (30) days of initiation of the resolution process, a Party to the dispute may initiate mediation by giving Notice to the other Party (or Parties) to the dispute. Mediation must be attended by a representative from each such Party with decision-making authority, and the proceeding must take place in Houston, Texas.

(e)     <u>Arbitration Proceedings</u>. If the Parties to a dispute fail to resolve the dispute within sixty (60) days from Notice of mediation, any Party (or Parties) the dispute may initiate binding arbitration by giving Notice to the other Party (or Parties) to the dispute. The arbitration must be conducted in accordance with the International Institute for Conflict Prevention and Resolution ("CPR") Rules. To the extent of any conflicts between the Act or the CPR Rules and the provisions of this Agreement, the provisions of this Agreement prevail. The CPR is the appointing authority. The place of arbitration must be Houston, Texas.

The following provisions will apply to arbitration proceedings, in each case with respect to the Parties to a particular dispute:

1.  One arbitrator (or three (3) arbitrators if the monetary value of the dispute is more than US $5,000,000 or its currency equivalent) will conduct the arbitral proceedings in English. If there is a dispute whether the monetary value exceeds the US $5,000,000, then the number of arbitrators must be three (3).

2.  The maximum number of witnesses each Party may call to give evidence on its behalf, including by oral testimony, declaration or witness statement, is five (5) witnesses of fact and three (3) expert witnesses.

3.  The existence of a dispute and any negotiations, mediation, and arbitration proceedings between the Parties in relation to any dispute are confidential and the Parties shall not make any disclosure to any third party. Any information, documents, or materials, created or produced for the purposes of, or used in, negotiations, mediation, or arbitration of a dispute are confidential and the Parties shall not disclose them to any third party unless there is a legal or regulatory obligation to make a disclosure (but the disclosure must be limited to the extent necessary to comply with that legal or regulatory obligation), or to the extent required to enforce or challenge an award in bona fide legal proceedings before a state court or other judicial authority.

4.  The arbitrator(s) has no authority to appoint or retain expert witnesses for any purpose unless agreed to by the Parties. The arbitrator(s) may not act as *amiable compositeur or ex aequo et bono*.

5.  The Parties intend that regardless of which Party prevails, all arbitration fees and costs must be split equally, between the Parties, and each Party shall bear its own costs of legal representation, witness expenses, and ancillary costs.

Debtors' Exhibit No. 34
Page 513 of 910

6.  The award is final and binding, and except for proceedings under Section 7.6(e)(7), the Parties agree to waive their rights to: (1) apply to the court for determination of a point of law; and (2) any form of appeal, review or recourse in respect of any such award to any court or other judicial authority, to the extent that such waiver may be validly made.

7.  The Parties may apply to a court with appropriate jurisdiction for any of the following without waiving its arbitration rights:

  (1)  Interim measures as necessary until appointment of the arbitrator(s) or pending determination by the arbitrator(s).

  (2)  Preserving property pending determination by the arbitrator(s).

  (3)  Enforcing judgment entered on an award over the Person or assets of the non-prevailing Party.

  (4)  Enforcing Section 7.6(e)(3) and preventing any information, documents or materials used in those proceedings from being used or disclosed by that Party for any purpose other than enforcement of Section 7.6(e)(3).

8.  Proceedings to (1) preserve property pending determination by the arbitrator(s), (2) enforce Section 7.6(e)(3), (3) enforce judgment entered on an award may be brought in any court having jurisdiction over the Person or assets of the non-prevailing Party. The prevailing Party may seek, in any court having jurisdiction, judicial recognition of the award, or order of enforcement or any other order or decree that is necessary to give full effect to the award.

Section 7.7.   Severability.   Every provision in this Conveyance is intended to be severable.  If any term or provision hereof is determined to be invalid, illegal or unenforceable for any reason whatsoever, such invalidity, illegality or unenforceability shall not affect the validity, legality and enforceability of the remainder of this Conveyance.  The Parties further agree that if any provision contained herein is, to any extent, held invalid or unenforceable in any respect under the Laws governing this Conveyance, they shall take any actions necessary to render the remaining provisions of this Conveyance valid and enforceable to the fullest extent permitted by Law and, to the extent necessary, this Conveyance shall be deemed to be automatically amended to replace any provision contained herein that is held invalid or unenforceable with a valid and enforceable provision giving effect to the intent of the Parties to the greatest extent legally permissible.

Section 7.8.   Notices.   Any notice, request, instruction, correspondence or other document to be given hereunder by any Party to another (herein collectively called "Notice") shall be in writing and delivered (i) in person, (ii) by courier service or by overnight delivery service in each case that requires acknowledgement of receipt, (iii) mailed by certified mail, postage prepaid and return receipt requested, or (iv) delivered by electronic mail and expressly acknowledged as received by return electronic mail, as follows:

**Grantor**

Mako Buyer LLC
2000 W. Sam Houston Parkway S., Suite 1200
Houston, Texas 77042
Attention: Thomas R. Lamme
Phone: (713) 969-1107

-19-

Email: TLamme@fwellc.com

**NPI Owner**

[To Come]

Notice given by personal delivery or courier shall be effective upon actual receipt. Notice given by mail shall be effective upon actual receipt or, if not actually received, the fifth Business Day following deposit with the U.S. Post Office. Notice given by electronic mail shall be effective upon acknowledgement of receipt.  If a date specified herein for giving any Notice or taking any action is not a Business Day (or if the period during which any Notice is required to be given or any action taken expires on a date which is not a Business Day), then the date for giving such Notice or taking such action (and the expiration date of such period during which Notice is required to be given or action taken) shall be the next day which is a Business Day. Any Party may change any address, electronic or otherwise, to which Notice is to be given to it by giving Notice as provided above of such change of address.

Section 7.9.    Indemnity.

(a)    As used herein, "NPI Owner Indemnitees" means NPI Owner and NPI Owner's successor and permitted assigns, all of their respective Affiliates, and all of the officers, directors, agents, beneficiaries, trustees, attorneys and employees of themselves and their Affiliates.

(b)    Grantor will, promptly upon demand, indemnify and hold each NPI Owner Indemnitee harmless from and against all claims, demands, damages, liabilities, liens, losses, fines, penalties, charges, administrative and judicial proceedings, orders, judgments, remedial action requirements, investigations, and enforcement actions of any kind, together with all interest thereon and all costs and expenses related thereto (including reasonable fees and disbursements of counsel and other advisors) and all other obligations whatsoever (collectively, "Losses") arising, in whole or in part, directly or indirectly, from or in connection with any of the following:

(i)    the acquiring, exploring, drilling, completing, developing, operating, producing, maintaining, reworking, redrilling, recompleting, plugging, abandoning or otherwise disposing of any Subject Interests or any Subject Wells, or other operations on any of the Subject Lands, or the production of Subject Hydrocarbons, or the dehydration, compression, treatment, gathering, transporting, processing or other handling of any Subject Hydrocarbons,

(ii)    any Losses suffered by any NPI Owner Indemnitee as a result of any claim that NPI Owner must deliver or pay over to any Person any part of the payments attributable to the Subject Hydrocarbons at any time received by NPI Owner for any reason other than the sale or assignment of interests in such payments (or the NPI under which such payments are received) by NPI Owner, or

(iii)    any breach by Grantor of any of its representations, warranties, covenants or agreements herein or any matters relating to the enforcement or defense of this Conveyance by NPI Owner.

(c)    **THE FOREGOING INDEMNITY WILL APPLY WHETHER OR NOT ARISING OUT OF THE SOLE, JOINT OR CONCURRENT NEGLIGENCE, FAULT OR STRICT LIABILITY OF ANY NPI OWNER INDEMNITEE, ANY PERSON THAT IS PART OF GRANTOR, OR ANY OTHER PERSON, AND WILL APPLY, WITHOUT LIMITATION, TO ANY LIABILITY IMPOSED UPON ANY NPI OWNER INDEMNITEE, ANY PERSON THAT IS PART OF GRANTOR, OR ANY OTHER PERSON AS A RESULT OF ANY THEORY OF STRICT LIABILITY OR ANY OTHER DOCTRINE OF LAW**, *provided* that the foregoing indemnity will not apply to any Losses incurred by any NPI Owner Indemnitee to the extent proximately caused by the gross negligence or willful misconduct of such NPI Owner Indemnitee.  The rights of the NPI Owner Indemnitees under this Section 7.9 will survive any termination of this Conveyance and will be in addition to, and not in replacement or limitation of, all other indemnities, reimbursement rights, and other similar rights and assurances at any time made by Grantor for the benefit of any NPI Owner Indemnitee.

Section 7.10.   No Partition.   Grantor and NPI Owner acknowledge that neither has any right or interest that would permit it to partition any portion of the Subject Interests as against the other, and each waives any such right.

Section 7.11.   Disclaimer.   EXCEPT AS SET FORTH IN SECTION 5.2, GRANTOR MAKES THIS CONVEYANCE AND ASSIGNS THE NPI WITHOUT RECOURSE, COVENANT OR WARRANTY OF TITLE OF ANY KIND, EXPRESS, IMPLIED OR STATUTORY.   ANY COVENANTS OR WARRANTIES IMPLIED BY STATUTE OR LAW BY THE USE HEREIN OF THE WORDS "GRANT", "CONVEY" OR OTHER SIMILAR WORDS ARE HEREBY EXPRESSLY DISCLAIMED, WAIVED AND NEGATED. WITHOUT LIMITING THE GENERALITY OF THE TWO PRECEDING SENTENCES, NPI OWNER ACKNOWLEDGES THAT GRANTOR HAS NOT MADE, AND GRANTOR HEREBY EXPRESSLY DISCLAIMS AND NEGATES, AND NPI OWNER HEREBY EXPRESSLY WAIVES, ANY REPRESENTATION OR WARRANTY, EXPRESS, IMPLIED, AT COMMON LAW, BY STATUTE OR OTHERWISE RELATING TO (i) PRODUCTION RATES, RECOMPLETION OPPORTUNITIES, DECLINE RATES OR THE QUALITY, QUANTITY OR VOLUME OF THE RESERVES OF HYDROCARBONS, IF ANY, ATTRIBUTABLE TO THE SUBJECT INTERESTS, (ii) ANY IMPLIED OR EXPRESS WARRANTY OF MERCHANTABILITY, (iii) ANY IMPLIED OR EXPRESS WARRANTY OF FITNESS FOR A PARTICULAR PURPOSE, (iv) ANY IMPLIED OR EXPRESS WARRANTY OF CONFORMITY TO MODELS OR SAMPLES OF MATERIALS, (v) REDHIBITORY DEFECTS, AND (vi) ANY AND ALL IMPLIED WARRANTIES EXISTING UNDER ANY APPLICABLE LEGAL REQUIREMENT; IT BEING THE EXPRESS INTENTION OF BOTH THE GRANTOR AND THE NPI OWNER THAT THE NPI IS HEREBY ASSIGNED TO NPI OWNER ON AN "AS IS" AND "WHERE IS" BASIS WITH ALL FAULTS, AND THAT NPI OWNER HAS MADE OR CAUSED TO BE MADE SUCH INSPECTIONS AS NPI OWNER DEEMS APPROPRIATE.   GRANTOR AND NPI OWNER AGREE THAT, TO THE EXTENT REQUIRED BY APPLICABLE LAW TO BE EFFECTIVE,

THE DISCLAIMERS OF CERTAIN WARRANTIES CONTAINED IN THIS SECTION 7.11 ARE "CONSPICUOUS" DISCLAIMERS FOR THE PURPOSES OF ANY APPLICABLE LAW.

Section 7.12.   Amendments.  This Conveyance may not be modified or amended except by an instrument or instruments in writing signed by Grantor and NPI Owner.  Provisions of this Conveyance that require consent, approval or agreement of the Parties or of one Party shall require such consent, approval or agreement to be in writing.

Section 7.13.   Counterparts.  This Conveyance is being executed in several counterparts, all of which are identical, except that, to facilitate recordation, in certain counterparts hereof only that portion of Exhibit A which contains specific descriptions of the Subject Interests located in the recording jurisdiction in which the counterpart is to be recorded shall be included, and all other portions of Exhibit A shall be included by reference only.  All of such counterparts together shall constitute one and the same instrument.  Complete copies, of this Conveyance, containing the entire Exhibit A, have been retained by Grantor and NPI Owner.

Section 7.14.   Third Party Beneficiary.  The Parties acknowledge that Chevron U.S.A. Inc. is a third party beneficiary to this Conveyance and can enforce the rights of NPI Owner hereunder.

*[Remainder of page intentionally left blank]*

Debtors' Exhibit No. 34
Page 517 of 910

IN WITNESS WHEREOF, Grantor and NPI Owner have each executed this Conveyance on the dates set forth in their respective acknowledgments below and Grantor has delivered this Conveyance to NPI Owner as the transfer and conveyance to NPI Owner of a presently vested interest in real and/or immovable property, to be effective as of the Effective Time.

[**Other Relevant State Acknowledgments To Come.**]

**GRANTOR:**                    **MAKO BUYER LLC**

By:_____
    Name:
    Title:

## TEXAS ACKNOWLEDGEMENT

**STATE OF** _____        §
                                     §
**COUNTY OF** _____         §


The foregoing instrument was acknowledged before me this _____ day of _____, 2021 by _____, as _____ of [_____], a [_____], as the act and deed of such [_____].


_____

Name:_____

Notary Public in and for the State of _____

*[Signature Page and Texas Acknowledgment to Conveyance]*

**NPI OWNER:**                                    [_____]


By:_____
Name:
Title:


**TEXAS ACKNOWLEDGEMENT**

**STATE OF** _____                §

§

**COUNTY OF** _____                §


The foregoing instrument was acknowledged before me this _____ day of _____, 2021   by   _____,   as   _____   of   [_____],   a [_____], as the act and deed of such [_____].


_____

Name:_____

Notary Public in and for the State of _____


*[Signature Page and Texas Acknowledgment to Conveyance]*

**Exhibit A**

**Leases**

## **EXHIBIT C**

## **FORM OF LC**

See attached.

Exhibit C – Page 1
Decommissioning Funding Agreement

## IRREVOCABLE STANDBY LETTER OF CREDIT

**DATE:**              [Insert Date]

**APPLICANT:**    Mako Buyer LLC
2000 W. Sam Houston Pkwy S. Suite 1200
Houston, Texas 77042
Attn:   Thomas R. Lamme
Phone:  (713) 969-1107

**BENEFICIARY:**    Chevron U.S.A. Inc.
100 Northpark Boulevard
Covington, LA 70433
Attn:   Land Manager
Phone: (985) 773-6538
Email:  tdwebre@chevron.com

By order and for the account of Mako Buyer LLC, a Delaware limited liablity company ("**Applicant**"), [Insert Name of Bank] (the "**Bank**" or "**we**" or "**us**" or "**our**") opens our irrevocable standby letter of credit no. [Insert Number] (this "**Letter of Credit**") in favor of  Chevron U.S.A. Inc. ("**Beneficiary**") for an amount up to [_____] U.S. dollars ($[_____]), expiring at our counters with the close of business on [Insert Date].

Payments under this Letter of Credit are available to Beneficiary upon presentation of a statement in the form of Annex 1 attached to this Letter of Credit purportedly signed by an authorized representative of Beneficiary. The amount of such draft will not exceed [_____] U.S. dollars ($[_____]). Such presentation may be made to us in person, or by courier or facsimile transmission. Presentations by facsimile transmission are permitted to us at facsimile no. [Insert Fax Number], Attention: [Insert Name].

Multiple and partial drawings may be made under this Letter of Credit. Each drawing paid by us will permanently reduce the available amount of this Letter of Credit by the amount paid. Notwithstanding any contrary provision in this Letter of Credit, in no event will the total of the amounts payable under this Letter of Credit exceed [_____] U.S. dollars ($[_____]) in the aggregate.

The expiration date of this Letter of Credit will be automatically extended without amendment for additional periods of one year from the present or any future expiration date of this Letter of Credit, unless we notify Beneficiary by certified mail at least sixty calendar days prior to the expiration date then applicable, that we elect not to renew this Letter of Credit for an additional one year period.

Each presentation under this Letter of Credit will be honored by [Insert Time] p.m. on the day on which such demand is received if such demand is received before [Insert Time] on that day. Any demand received after that time will be honored by [Insert Time] p.m. on the next day on which we are open for business. Payments must be made in full without any deduction or withholding (whether in respect of set off, counterclaim, duties, present or future taxes, charges or otherwise whatsoever). Upon presentation of a demand in the form of Annex 1, our obligation to make such payment shall be irrevocable and unconditional, without regard to any circumstance, including following the bankruptcy of, or insolvency with respect to, the Applicant.

1

All fees associated with this Letter of Credit are for the Applicant's account.

Spelling and typographical errors are not to be considered discrepancies, except for numbers and amounts.

All amendments and notices to Beneficiary must be delivered via courier at 100 Northpark Boulevard Covington, LA  70433, Attention: [Insert Job Title, e.g., Finance Manager].

If the original Letter of Credit is lost, stolen, mutilated or destroyed, then, subject to Beneficiary providing us with an indemnity stating that Beneficiary shall indemnify us for all losses it may incur as a result of issuing a replacement letter of credit, we shall issue a replacement letter of credit.

This Letter of Credit is freely transferrable and the proceeds of draws under this Letter of Credit are freely assignable.

This Letter of Credit is subject to the International Standby Practices 98, International Chamber of Commerce Publication Number 590 ("**ISP 98**") (excluding Rule 3.12). As to matters not governed by ISP 98, this Letter of Credit will be governed by the laws of the State of [_____] (without regard to conflicts of law provisions). We irrevocably agree that any legal action or proceeding with respect to this Letter of Credit must be brought in the courts of the State of [_____].

Please direct any correspondence including drawing or inquiry to us at [Insert Bank Name, Address, or Other Contact Information].

**BANK:**
**[INSERT ISSUING BANK NAME]**

**By:**

**Name:**   [Insert Authorized Name - Bank]

**Title:**   [Insert Authorized Title - Bank]

WEIL:\97994501\2\45327.0007

**ANNEX 1 TO STANDBY LETTER OF CREDIT**
**NO. [INSERT CREDIT NUMBER]**
**DATED [INSERT DATE]**

[Insert Date]

[Insert Issuing Bank Name]
[Insert Issuing Bank Address]

Re: Letter of Credit No. [Insert Letter of Credit Number] dated [Insert Letter of Credit Date]

Dear Ladies and Gentlemen:

This is a demand for payment of [Insert Specific Amount In Words] U.S. dollars ($[Insert Specific Amount In Numbers]) under the above-referenced standby letter of credit. We certify that we are entitled to demand payment under such letter of credit pursuant to that certain Decommissioning Funding Agreement (as amended, restated, supplemented or otherwise modified), dated as of [_____], 2021, by and between Mako Buyer LLC, a Delaware limited liablity company, and Chevron U.S.A. Inc., a Pennsylvania corporation.

Please pay the amount demanded to the following account:

[Insert Specific Details]

**BENEFICIARY:**

**CHEVRON U.S.A. INC.**

**By:**

**Name:**      [Insert Beneficiary Name]

**Title:**      [Insert Beneficiary Title]

WEIL:\97994501\2\45327.0007

# **EXHIBIT D**

## **FORM OF ESCROW AGREEMENT**

See attached.

Exhibit D – Page 1
Decommissioning Funding Agreement

*Exhibit D to the Decommissioning Funding Agreement*

## ESCROW AGREEMENT

THIS ESCROW AGREEMENT (this "**Agreement**") is made and entered into this [--] day of [--] (the "**Effective Date**"), by and among Chevron U.S.A. Inc., a Pennsylvania corporation ("**CUSA**"), Mako Buyer LLC, a Delaware limited liability company ("**Operator**"), and **U.S. BANK NATIONAL ASSOCIATION**, as escrow agent (in such capacity, "**Escrow Agent**").  Operator and CUSA are sometimes referred to in this Agreement individually as "**Party**" or collectively as the "**Parties**".

## RECITALS

A.      CUSA and Operator have entered into that certain Decommissioning Funding Agreement, dated as of [____], 2021 (as amended, restated, supplemented or otherwise modified, the "**Decommissioning Agreement**").  Capitalized terms used but not defined in this Agreement have the meanings assigned thereto in the Decommissioning Agreement.

B.      As part of the consideration under the Decommissioning Agreement, and subject to the terms of the Decommissioning Agreement, the Parties have agreed that if applicable pursuant to Section 2.2 of the Decommissioning Agreement, any and all amounts payable under the NPI Grant (as defined in the Decommissioning Agreement) shall be deposited into the Escrow Account until the aggregate funding from all Applicable Required Securities (as defined in the Decommissioning Agreement) is equal to the Coverage Amount (as defined in the Decommissioning Agreement).

C.      CUSA and Operator have requested, and Escrow Agent has agreed, that Escrow Agent will hold the Escrowed Funds, invested as provided for in this Agreement, for the purposes set forth in the Decommissioning Agreement and make disbursements to the Parties as provided in this Agreement.

D.      In consideration of the premises and the mutual covenants set out in this Agreement, and other good and valuable consideration, the receipt and sufficiency of which is acknowledged, the Parties and the Escrow Agent agree to be bound by the provisions of this Agreement (and, solely as between the Parties, the provisions of the Decommissioning Agreement).

## 1.      DEPOSIT TO THE ESCROW ACCOUNT.

1.1      Operator shall from time to time deposit any and all amounts payable under the NPI Grant into the Escrow Account until the aggregate funding from all Applicable Required Securities is equal to the Coverage Amount (such aggregate amount of funds, the "**Escrow Amount**"), and Escrow Agent hereby confirms that all or any portion of the Escrow Amount deposited from time to time in the Escrow Account will be available for payment in accordance with this Agreement.  For purposes of this Agreement:

(A)      "**Escrow Account**" means the deposit account of Escrow Agent bearing number [--] maintained by and with Escrow Agent for the benefit of CUSA and Operator pursuant to this Agreement.

(B)      "**Banking Day**" means any day other than a Saturday, Sunday or day when Escrow Agent is authorized or required to be closed for business to the public.

(C)      "**Dollars**" and "**US$**" means United States Dollars.

1.2     Escrow Agent will hold the Escrow Amount (including any interest accrued thereon as a result of the Permitted Investments) in the Escrow Account (collectively, the "**Escrowed Funds**"), for the benefit of CUSA and Operator, and will disburse the Escrowed Funds solely in accordance with this Agreement.

**2.     DISBURSEMENT OF ESCROWED FUNDS.**

2.1     Escrow Agent shall not disburse or otherwise transfer any Escrowed Funds except as follows:

(A)     After receipt from a duly authorized representative of CUSA from time to time of executed disbursement instructions in the form attached hereto as Exhibit A (each, a "**Disbursement Notice**"), that are executed by only CUSA and specifically reference this Section 2.1(A), Escrow Agent will disburse, within one (1) Banking Day (but no later than the third Banking Day) after receipt of such Disbursement Notice to CUSA the portion of Escrowed Funds equal to the amount set forth in such Disbursement Notice.  CUSA will only give Escrow Agent Disbursement Notices pursuant to this Section 2.1(A) in the circumstances and in the amounts permitted by Section 2.4(c) of the Decommissioning Agreement.

(B)     After receipt from a duly authorized representative of each of the Parties from time to time of a Disbursement Notice executed by each of CUSA and Operator, that specifically references this Section 2.1(B), Escrow Agent will disburse, within one (1) Banking Day (but no later than the third Banking Day) after receipt of such Disbursement Notice to Operator the portion of Escrowed Funds equal to the amount set forth in such Disbursement Notice.  The Parties will only give Escrow Agent Disbursement Notices pursuant to this Section 2.1(B) in the circumstances and in the amounts permitted by Section 2.4(a), Section 2.4(b) and Section 2.4(d) of the Decommissioning Agreement.

(C)     After receipt from a duly authorized representative of each of the Parties from time to time of a Disbursement Notice executed by each of CUSA and Operator, that specifically references this Section 2.1(C), Escrow Agent will disburse, within one (1) Banking Day (but no later than the third Banking Day) after receipt of such Disbursement Notice to the Party or Parties indicated in such Disbursement Notice the portion of Escrowed Funds equal to the amount set forth in such Disbursement Notice. The Parties will only give Escrow Agent Disbursement Notices pursuant to this Section 2.1(C) in the circumstances and in the amounts permitted by Section 2.4(e) and Section 2.4(f) of the Decommissioning Agreement.

(D)     Escrow Agent shall transfer and deposit the Escrowed Funds as provided in Sections 5 and 6.1(A).

2.2     Escrow Agent may conclusively rely on without question, investigation, consent of or additional notice to either Party, and act upon, in each case, (A) the written instructions from a duly authorized representative of CUSA given pursuant to a Disbursement Notice with respect to the Escrow Account and Escrowed Funds if given in accordance with Section 2.1(A) and (B) the joint written instructions from a duly authorized representative of each of the Parties given pursuant to a Disbursement Notice with respect to the Escrow Account and Escrowed Funds if given in accordance with Section 2.1(B), Section 2.1(C), Section 5 or Section 6.1(A). For the avoidance of doubt, Escrow Agent may not take any

2

action with respect to the Escrow Account, the Escrowed Funds or this Agreement based upon the unilateral instruction from Operator (or any person or entity acting on its behalf, including any trustee or the equivalent on its behalf in any insolvency, bankruptcy, receivership or similar proceeding) unless CUSA agrees in writing thereto.

**3.     DUTIES OF ESCROW AGENT.**

3.1     The duties of Escrow Agent shall be as follows:

(A)     During the term of this Agreement, Escrow Agent shall hold and disburse the Escrowed Funds in accordance with only the terms and provisions of this Agreement (*provided* that, for the avoidance of doubt, the Parties are bound by the terms of the Decommissioning Agreement and will only instruct the Escrow Agent to make disbursements of the Escrowed Funds in accordance with the terms of the Decommissioning Agreement).

(B)     Escrow Agent shall be obligated only for the performance of the duties as are specifically set forth in this Agreement.  Escrow Agent has no fiduciary or discretionary duties of any kind.  Escrow Agent assumes no liability in connection with this Agreement except for its negligence, gross negligence, fraud or willful misconduct.  Escrow Agent shall in no case or event be liable for punitive, incidental or consequential damages (including, but not limited to, lost profits).

(C)     Except as provided in Sections 3.1(B) and 9.1, Escrow Agent shall not be responsible for the validity, correctness or genuineness of any document, statement, invoice or notice submitted to it by the Parties under this Agreement, provided that such documents, statements, invoices or notices are delivered by at least one of the Parties. Escrow Agent may seek advice from its own counsel and, except as provided in Sections 3.1(B) and 9.1, shall be fully protected in any action reasonably taken by it in good faith reliance upon the advice of its counsel.

**4.     STATEMENTS.**

4.1     The Escrow Agent shall send statements on the status of the Escrow Account to CUSA and Operator on a monthly basis, showing any disbursements and to whom disbursed, any service charges levied, all earnings on or attributable to the Escrowed Funds, opening and closing balances and the type of investments and rates of earnings on the Escrowed Funds. Each of CUSA and Operator may request and obtain reasonable additional information concerning such matters from the Escrow Agent.

**5.     REMOVAL OF OR RESIGNATION OF ESCROW AGENT.**

5.1     CUSA and Operator may at any time remove Escrow Agent upon thirty (30) days' prior written notice with or without cause by any instrument or instruments in writing signed by authorized representatives of both CUSA and Operator and delivered to Escrow Agent.

5.2     Escrow Agent may resign at any time on ninety (90) days' prior written notice to the Parties hereto by delivering written notice of its intended resignation to the Parties; *provided* that such resignation shall not be effective until a successor escrow agent has been appointed and accepted its appointment.  If Operator and CUSA jointly designate in writing a successor escrow agent, then Escrow Agent shall transfer the Escrowed Funds to such

Debtors' Exhibit No. 34
Page 528 of 910

successor and, once the Escrowed Funds have been securely transferred to such successor, Escrow Agent shall be discharged of any liability or responsibility with respect to the Escrowed Funds arising from and after the date that Escrow Agent delivers the Escrowed Funds to the designated successor Escrow Agent.

**6.     TERMINATION.**

6.1     This Agreement shall terminate upon the earliest of the following:

(A)     Receipt by Escrow Agent of a joint written notice of termination signed by authorized representatives of both CUSA and Operator, whereupon Escrow Agent shall disburse all remaining Escrowed Funds to the applicable Party stated in such notice.

(B)     Following release by Escrow Agent of all the Escrowed Funds in accordance with this Agreement upon written confirmation by the Parties to Escrow Agent that the NPI Grant has been terminated.

(C)     Upon termination in accordance with any other provision of this Agreement.

Upon termination of this Agreement, none of the Parties, on the one hand, or Escrow Agent, on the other, shall have any further rights, duties or obligations under this Agreement to the other; *provided* that this statement in no way affects the obligations of the Parties to each other under the Decommissioning Agreement.

**7.     NOTICES.**

7.1     All notices and other communications to Operator, CUSA or Escrow Agent may be hand delivered or sent by email or courier, to any Party or the Escrow Agent at the addresses provided in this Section 7:

**If to Operator**:

Mako Buyer LLC
2000 W. Sam Houston Pkwy S. Suite 1200
Houston, Texas 77042
Attn:       Thomas R. Lamme
Telephone: (713) 969-1107
Email:      TLamme@fwellc.com

**If to CUSA**:

Chevron U.S.A. Inc.
100 Northpark Boulevard
Covington, LA 70433
Attn:       Land Manager
Telephone: (985) 773-6538
Email:      tdwebre@chevron.com

**If to Escrow Agent**:

4

U.S. Bank National Association
One California Street, Suite 1000
San Francisco, CA 94111
Attn:    Global Corporate Trust
        David A. Jason, Vice President
Telephone: (415) 677-3622
Facsimile: (415) 677-3769
Email: david.jason@usbank.com

7.2     For all purposes of this Agreement, a notice or communication will be deemed effective: on the day it is delivered unless (a) that day is not a day upon which commercial banks are open for the transaction of business in the city specified (a "**Local Banking Day**") in the address for notice provided by the recipient or (b) if delivered after the close of business on a Local Banking Day, then on the next succeeding Local Banking Day.

## 8.     FEE.

8.1     Operator shall pay Escrow Agent the compensation in accordance with the fee schedule attached as Exhibit B hereto.  If not paid by Operator within ten Banking Days of demand, Escrow Agent shall have the right to set off against the Escrowed Funds (A) the amounts due in such fee schedule, and (B) as provided for in Section 10.  Otherwise, Escrow Agent shall have no right of set off against the Escrowed Funds and shall have no lien or security interest in the Escrow Account or the Escrowed Funds.  CUSA shall have no obligation to pay fees to Escrow Agent.

## 9.     INDEMNIFICATION.

9.1     In consideration of Escrow Agent's acceptance of this appointment, each Party hereby agrees to indemnify and hold Escrow Agent harmless as to any liability, and reasonable and duly documented costs and expenses (including, without limitation, counsel fees and expenses) which Escrow Agent may suffer or incur by reason of (a) any action, claim or proceeding brought against Escrow Agent by such Party and arising out of or relating in any way to this Escrow Agreement or the transaction to which Agreement relates, except in the case of Escrow Agent's negligence, gross negligence, fraud or willful misconduct and (b) Escrow Agent's enforcement of its rights under this Section 9.  The foregoing indemnification and agreement to hold harmless shall survive any resignation or removal of Escrow Agent and shall survive the termination of this Agreement.

## 10.    INVESTMENTS.

10.1     Escrow Agent shall invest Escrowed Funds only in investments described on Exhibit C into which the Parties direct Escrow Agent in writing to invest ("**Permitted Investments**"); and Escrow Agent shall have no power or authority to invest or reinvest the Escrowed Funds except in such investments.  All investments held in the name of Escrow Agent shall be held as the agent of the Parties.  In the absence of written investment instructions described above, Escrow Agent shall invest the Escrowed Funds to the extent reasonably practicable in the investment identified in clause (a) in Exhibit C.  Escrow Agent may make Permitted Investments through its own investment department or through affiliates.  Interest earned will become part of the Escrowed Funds.  Escrow Agent represents and warrants that neither it nor any affiliate of it will receive any compensation, commissions, fees (including, without limitation, any sale load charges, redemption fees,

5

exchange fees, account fees, purchase fees, management fees, distribution fees, service fees or charges or similar payment) in connection with any investment of the Escrowed Funds except as disclosed on <u>Exhibit B</u>.  The representation and warranty in the preceding sentence shall be deemed to have been made and repeated by Escrow Agent on each occasion on which any investment is made with any portion of the Escrowed Funds. Escrow Agent may elect, but shall not be obligated, to credit the Escrow Account with funds representing income or principal payments due on, or sales proceeds due in respect of, assets in any of the Escrow Account, or to credit to any of the Escrow Account assets intended to be purchased with such funds, in each case before actually receiving the requisite funds from the payment source, or to otherwise advance funds for Escrow Account transactions.  Notwithstanding anything else in this Agreement, any such crediting of funds or assets shall be provisional in nature, and the Escrow Agent shall be authorized to reverse any such transactions or advances of funds in the event that it does not receive good funds with respect thereto.

## 11.    CONFLICTS OF INTEREST.

11.1    No director, employee or agent of Escrow Agent shall give to or receive from any director, employee or agent of the Parties or any affiliate thereof any commission, fee, rebate, or any gift or entertainment of significant cost or value, or enter into any business arrangement with any director, employee or agent of the Parties or any affiliate thereof other than as a representative of the Parties or their affiliates, in connection with the services provided hereunder without the Parties' prior written consent.  Escrow Agent shall promptly notify the Parties of any violation of this provision and any consideration received as a result of such violation shall be paid over or credited to the Parties.  Additionally, if any violation of this provision occurring prior to the date of this Agreement resulted directly or indirectly in the Parties' consent to enter into this Agreement with Escrow Agent, the Parties may, at their sole option, terminate this Agreement at any time and, notwithstanding any other provision of this Agreement, pay no compensation or reimbursement to Escrow Agent whatsoever for any services provided after the date of termination.

## 12.    NO PAYMENT TO GOVERNMENT OFFICIALS.

12.1    Neither Escrow Agent nor its employees, agents or subcontractors shall make any payment or give anything of value to any official of any government or public international organization, including any officer or employee of any government department, agency, or instrumentality to influence his or its decision, or to gain any other advantage for any Party or Escrow Agent in connection with the services performed hereunder.  Any party to this Agreement shall immediately notify the other parties to this Agreement of any violation of this Section.  Each party to this Agreement shall hold the others harmless from and against all losses and expenses arising out of any such violation.  In the event of any violation of this Section, any party to this Agreement may, at its sole option, terminate this Agreement at any time.

## 13.    RIGHT TO AUDIT.

13.1    Escrow Agent shall maintain true and correct records in connection with all matters relating to this Agreement and retain such records for the greater of 24 months or such period of time as is required by the Escrow Agent's document retention policies.  Any representative(s) authorized by the Parties may in a reasonable time and to a reasonable

6

Debtors' Exhibit No. 34
Page 531 of 910

extent audit records of Escrow Agent for the sole purpose of determining whether there has been compliance with the applicable provisions of this Agreement.

## 14.   TAX REPORTING.

14.1   Each Party shall provide Escrow Agent a properly completed and duly executed applicable U.S. Internal Revenue Service ("**IRS**") Form W-9 for each payee to which it directs payment. If such tax documentation is not so provided, Escrow Agent is authorized to withhold taxes as required by the U.S. Internal Revenue Code and regulations promulgated thereunder. Operator and CUSA have determined that any interest or income on Escrowed Funds shall be reported on an accrual basis and deemed to be for the account of CUSA, and Operator and CUSA shall prepare and file all required tax filings with any applicable taxing authority consistent therewith.

14.2   Operator and CUSA shall provide Escrow Agent with all information requested by Escrow Agent necessary for (a) the preparation and filing by Escrow Agent with the IRS or other taxing authority of any applicable IRS Form 1099, IRS Form 1042-S, or similar document, or (b) the performance by Escrow Agent of any reporting obligations under the Foreign Account Tax Compliance Act, Foreign Investment in Real Property Tax Act, or other applicable law or regulation, in each case to the extent related to the performance or fulfilment of Escrow Agent's duties and obligations pursuant to this Agreement.

## 15.   MISCELLANEOUS.

15.1   This Agreement (and, solely as between the Parties, the Decommissioning Agreement and the NPI Grant) sets forth the entire agreement of the Parties and Escrow Agent with respect to the subject matter hereof.  The provisions of this Agreement may be waived, altered, amended or supplemented, in whole or in part, only by writing signed by each of the Parties and Escrow Agent.  Neither this Agreement nor any right or interest hereunder may be assigned in whole or in part by any party to this Agreement, except to affiliates of such party, without the prior written consent of the other parties hereto.

15.2   This Agreement shall be governed by and construed under the laws of the State of Texas, without giving effect to its conflict of law principles; provided, however, that nothing herein shall be construed to modify or negate the agreement of CUSA and Operator, solely as between themselves, that all disputes between them shall be resolved exclusively and finally pursuant to the dispute resolution provisions in the Decommissioning Agreement.

15.3   No party to this Agreement is liable to any other party hereto for losses due to, or if it is unable to perform its obligations under the terms of this Agreement because of, acts of God, fire, war, earthquake, terrorism, floods, strikes, electrical outages, equipment or transmission failure, or other causes reasonably beyond its control.

15.4   This Agreement may be executed in one or more counterparts, each of which shall be deemed an original, but all of which together shall constitute the same instrument. All signatures of the Parties and Escrow Agent may be transmitted by facsimile, by email with the signature page as an image attachment (such as a .PDF, .TIF, .BIT, or .JPEG file) or by way of a digital signature provided by DocuSign (or such other digital signature provider as specified in writing to Escrow Agent by the authorized representative of the applicable Party), and such facsimile, email image attachment or digital signature will, for all purposes, be deemed the original signature of such Party or Escrow Agent whose signature

7

it reproduces, and will be binding upon such Party or Escrow Agent. Each party hereto agrees to assume all risks arising out of the use of digital signatures and electronic methods to submit communications to the other parties hereto, including without limitation the risk of Escrow Agent acting on unauthorized instructions, and the risk of interception and misuse by third parties.

15.5    If any provision of this Agreement is determined to be prohibited or unenforceable by reason of any applicable law of a jurisdiction, then such provision shall, as to such jurisdiction, be ineffective to the extent of such prohibition or unenforceability without invalidating the remaining provisions thereof, and any such prohibition or unenforceability in such jurisdiction shall not invalidate or render unenforceable such provisions in any other jurisdiction.

15.6    A person who is not a Party or Escrow Agent shall have no right to enforce any term of this Agreement.

15.7    The Parties represent, warrant and covenant that each document, notice, instruction or request provided by such Party to Escrow Agent shall comply with applicable laws and regulations. Where, however, the conflicting provisions of any such applicable law may be waived, they are hereby irrevocably waived by the Parties and Escrow Agent to the fullest extent permitted by law, to the end that this Agreement shall be enforced as written.

15.8    Each of the Parties and Escrow Agent submits to the exclusive jurisdiction of the Federal and state law courts of Harris County, Texas for the limited and sole purpose to resolve any disputes regarding the formation, existence, construction, performance, validity and all aspects of this Agreement, _provided_ that such submission will not prevent the enforcement of a Texas Federal or state court judgment in another jurisdiction. Nothing in this Section 15.8 shall be deemed to be an agreement by the Parties and Escrow Agent that Texas federal or state courts can exercise general jurisdiction over any Party or Escrow Agent. Any process may be validly served upon the Parties and Escrow Agent at the applicable address of the Party and Escrow Agent provided in Section 7.1.

**16.    CONFIDENTIALITY.**

16.1    This Agreement and all transactions hereunder shall be kept confidential by Escrow Agent, and Escrow Agent hereby agrees not to provide copies of this Agreement or to disclose its specific terms or any of the transactions to any person without the prior written consent of CUSA and Operator except: (a) Escrow Agent may disclose to the applicable court in connection with any proceedings initiated to collect payment under this Agreement; (b) to any extent that it is required to disclose the same pursuant to any law or order of any court of competent jurisdiction, or any procedure for disclosure of documents in any proceedings before any such court (including any proceeding to enforce this Agreement) or in regulatory proceedings, or pursuant to any law or regulation having the force of law; _provided_, _however_, Escrow Agent shall give CUSA and Operator advance written notice of Escrow Agent's intention to disclose the same based on that requirement and a reasonable amount of time consistent with the requirement pursuant to which disclosure is to occur in which to seek adequate protective orders; and (c) to Escrow Agent's direct or indirect shareholders, directors, officers, employees, independent auditors, legal counsel, and other professional advisors to the extent such persons have a need to know, in each case if such persons are informed by Escrow Agent of its confidential nature and of their

Debtors' Exhibit No. 34
Page 533 of 910

duty to maintain the confidentiality hereof, and who prior to any such disclosures shall have agreed to be bound by such duty of confidentiality. Notwithstanding anything to the contrary herein, Escrow Agent may provide copies of this Agreement and disclose its specific terms to a bank regulatory agency or in connection with an examination of its records by bank examiners without prior notice to CUSA or Operator, <u>provided</u> that Escrow Agent shall provide notice to CUSA and Operator as soon as practicable thereafter.

## 17.    PATRIOT ACT DISCLOSURE.

17.1    Section 326 of the Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism Act of 2001 ("**USA PATRIOT Act**") requires Escrow Agent to implement reasonable procedures to verify the identity of any person that opens a new account with it.  Accordingly, CUSA and Operator acknowledge Section 326 of the USA PATRIOT Act and agree that Escrow Agent's identity verification procedures require Escrow Agent to obtain information which may be used to confirm Operator's or CUSA's respective identities, including, without limitation, name, address and organizational documents ("identifying information"). Operator and CUSA each agree to provide Escrow Agent with any such identifying information required as a condition of opening an account with or using any service provided by Escrow Agent.

## 18.    SECURITY PROCEDURE FOR FUNDS TRANSFERS

18.1    Escrow Agent shall confirm each Disbursement Notice and any other funds transfer instruction received in the name of a Party by means of the security procedure selected by such Party and communicated to Escrow Agent through a signed certificate in the form of <u>Exhibit D-1</u> (in the case of CUSA) or <u>Exhibit D-2</u> (in the case of Operator) attached hereto, which upon receipt by Escrow Agent shall become a part of this Agreement.  Once delivered to Escrow Agent, <u>Exhibit D-1</u> and <u>Exhibit D-2</u> may be revised or rescinded only by a writing signed by an authorized representative of CUSA (in the case of <u>Exhibit D-1</u>) or the Operator (in the case of <u>Exhibit D-2</u>).  Such revisions or rescissions shall be effective only after actual receipt by Escrow Agent and following such period of time as may be necessary to afford Escrow Agent a reasonable opportunity to act on it.  If a revised <u>Exhibit D-1</u> or <u>Exhibit D-2</u> or a rescission of an existing <u>Exhibit D-1</u> or <u>Exhibit D-2</u> is delivered to Escrow Agent by an entity that is a successor-in-interest to the applicable Party, such document shall be accompanied by additional documentation satisfactory to the Escrow Agent showing that such entity has succeeded to the rights and responsibilities of such Party under this Escrow Agreement.

18.2    The Parties understand that Escrow Agent's inability to receive or confirm each Disbursement Notice or any other funds transfer instructions received in the name of a Party pursuant to the security procedure selected by such Party may result in a delay in accomplishing the funds transfer requested pursuant to such Disbursement Notice or other funds transfer instructions, and agree that Escrow Agent shall not be liable for any loss caused by any such delay.

[SIGNATURE PAGES IMMEDIATELY FOLLOW THIS PAGE]

9

WITNESS the following execution and delivery of this Agreement by duly authorized representatives of each of the following Parties and Escrow Agent as of the Effective Date:

**MAKO BUYER LLC**

By: _____
Name:
Title:

Debtors' Exhibit No. 34
Page 535 of 910

**CHEVRON U.S.A. INC.**

By: _____
Name:
Title:

Debtors' Exhibit No. 34
Page 536 of 910

**ESCROW AGENT:**

**U.S. BANK NATIONAL ASSOCIATION**

By: _____
Name:
Title:

12

# EXHIBITS TO ESCROW AGREEMENT

# TO BE AGREED WITH ESCROW AGENT

**Exhibit 11**

**SEMS Bridging Agreement**

See attached.

*Exhibit H to Implementation Agreement*

# SEMS BRIDGING AGREEMENT & INTERFACE DOCUMENT

This Bridging Agreement dated and effective as of _____, 2021 (the "Effective Date") (this "Agreement") is by and among Mako Buyer LLC, a Delaware limited liability company (the "Contractor"), FIELDWOOD ENERGY IV LLC, a Delaware limited liability company (the "Owner"). Contractor and Owner are sometimes referred to collectively as the "Parties" and individually as a "Party".

**WHEREAS**, each Owner is the operator, as designated by the Bureau of Ocean Energy Management of the United States Department of the Interior ("BOEM"), of certain of the assets owned by such Owner as of the Effective Date (the "Assets");

**WHEREAS**, Fieldwood Energy IV is a resulting entity of a divisive merger effected in connection with the confirmed plan of reorganization of Chapter 11 Case 20-33948, *In re: Fieldwood Energy LLC et al*, in the United States Bankruptcy Court for the Southern District of Texas, Houston Division (the "Plan");

**WHEREAS**, in accordance with the Plan, the Owner does not have employees and require a third party to provide operational, technical, and administrative services for the Assets;

**WHEREAS**, pursuant to the Contract Operating Agreement dated and effective as of the Effective Date by and among the Parties (the "Contract Operating Agreement"), Contractor has agreed to provide certain operational, technical, and administrative services with respect to the ownership and operation of the Assets, upon the terms and conditions set forth therein, until the end of the Term (as defined therein).

In furtherance of and solely in connection with the Services (as such term is defined in the Contract Operating Agreement) provided by Contractor pursuant to the Contract Operating Agreement (the "Services") the Parties agree as follows:

1. **MANAGEMENT SYSTEM IMPLEMENTATION**
   For the purposes of providing the Services, Contractor agrees that it has used commercially reasonable efforts to;
   **A.** review the requirements of 30 CFR 250.1900 and the American Petroleum Institute's Recommended Practices for Development of a Safety and Environmental Management Program for Offshore Operations and Facilities (API RP 75) as incorporated by reference;
   **B.** identify and review other safety, health, environmental, integrity and quality requirements relevant to the organizational department of Contractor that is providing services for Fieldwood Energy I on the Gulf of Mexico Outer Continental Shelf ("OCS"), such as those found in Contractor's own standards and in regulations promulgated by U.S. government agencies, such as:
      I.    The Bureau of Safety and Environmental Enforcement (BSEE)
      II.   The United States Coast Guard (USCG)
      III.  The Environmental Protection Agency (EPA);
   **C.** determine all requirements, to include from sources listed above, that are applicable to Contractor's provision of Services to Fieldwood Energy I on the Gulf of Mexico OCS;
   **D.** develop and properly implement safety, health and environmental programs and/or management systems to enable compliance with those applicable requirements set forth above;

## SEMS BRIDGING AGREEMENT & INTERFACE DOCUMENT

**E.** systematically monitor and assess the effectiveness of those systems set forth above on a departmental or unit level; and

**F.** Continuously improve those systems where appropriate.

**2. SEMS INTERFACE DOCUMENT**

This SEMS Bridging Agreement and Interface Document identifies whose environmental, health and safety manuals, policies, procedures and responsibilities shall prevail at the work site and for the activities involved pursuant to the Contract Operating Agreement. Contractor shall use commercially reasonable efforts to deliver all documents indicated in this document upon request of Owner at any time or for any reason at the sole discretion of Owner. Notwithstanding anything in this Agreement to the contrary, Contractor and its subcontractors shall not have any obligation under this Agreement to provide any service or item in this Agreement to the extent Contractor is not required to provide any such service under the Contract Operating Agreement.

**3. SUBCONTRACTORS**

Contractor shall direct its subcontractor who are providing Services under the Contract Operating Agreement to comply with the requirements of this Agreement and shall disseminate to such subcontractors the information appropriate and necessary for such subcontractors to comply with this Agreement.

**4. AGREEMENT**

**A.** By signing below, each Party affirms, agrees to and endorses the contents of this Agreement.

**B.** This Agreement shall terminate automatically upon the termination of the Contract Operating Agreement.

**C.** This Agreement is personal to the parties hereto. Neither Contractor nor Owner shall assign, convey, transfer, or otherwise dispose of all or any portion of its interest in, or its rights and obligations under, this Agreement without the prior written consent of the other party unless such assignment is permitted under the Contract Operating Agreement. Any attempted assignment without appropriate consent shall be voidable at the sole discretion of the non-assigning party.

## INSTRUCTIONS

1) The checked box (**"F1"** for Owners, **"F2"** for Contractor or both) indicates responsibility for the particular item.

2) Review and understand each Party's responsibility for each item or question.

3) For items with shared or dual responsibility of both Owner and Contractor, see additional comments or details.

4) Upon complete review of this Agreement, a member of Owner and Contractor's executive management team is to then properly sign and date this document.

5) Once properly signed, dated and fully executed by both Owner and Contractor, this entire document is then considered a Controlled Document, whereby only changes can be made upon written agreement of all Parties.

**Page 2 of 6**

## SEMS BRIDGING AGREEMENT & INTERFACE DOCUMENT

6)  Any specific issue not listed below shall be submitted and approved by all Parties prior to the execution of work.

7)  All matters below are with respect to Services provided by Contractor.



**Page 3 of 6**

## SEMS BRIDGING AGREEMENT & INTERFACE DOCUMENT

| ITEM | F2 | F1 | ADDITIONAL DETAILS |
|---|---|---|---|
| **ELEMENT 1: GENERAL** | | | |
| Establishing goals and performance measures, appoint management representatives responsible for carrying out SEMS activities | X | | Beginning upon signature of this document, operations performed on Fieldwood Energy IV's leases, rights of way, rights of use and easements will adhere to Contactor's SEMS plan |
| Performing annual review of SEMS program in accordance with 250.1909(d) | X | | |
| **ELEMENT 2: SAFETY & ENVIRONMENTAL INFORMATION** | | | |
| Policies and procedures to create or modify the safety & environmental information (i.e. P&IDs, SAFE charts, control systems, NPDES) | X | | |
| To maintain red-line drawings or as built drawings for all modifications to the facility | X | | |
| Well permit or drilling permit approvals and procedures (APM) | X | | |
| **ELEMENT 3: HAZARDS ANALYSIS** | | | |
| Conduct, manage, and communicate the hazards analysis (facility level) | X | | |
| Job safety analysis (JSA) for activities involving equipment, materials or processes led by Contractor. (Note: All personnel performing work must be included in the creation of the JSA.) | X | | |
| JSA for activities involving equipment, materials or processes owned by sub-contractors | X | | |
| **ELEMENT 4: MANAGEMENT OF CHANGE (MOC)** | | | |
| Identify and control hazards caused by changes made to Contractor's equipment, materials, operating conditions, operating procedures and personnel, including a means to communicate the change to all affected personnel | X | | |
| Identify and control hazards caused by changes made to the sub-contractor's equipment, materials, operating conditions, operating procedures and personnel, including a means to communicate the change to all affected personnel | X | | |
| Identify and control hazards by managing changes to existing drilling programs, well design, SAFE charts, control systems, etc. | X | | |
| **ELEMENT 5: OPERATING PROCEDURES** | | | |
| Operating procedures that provide instructions for conducting safe and environmentally sound activities and address equipment or processes | X | | |
| Operating procedures that provide instructions for conducting safe and environmentally sound activities and address equipment or processes owned by sub-contractors or used by Contractor | X | | |
| **ELEMENT 6: SAFE WORK PRACTICES and CONTRACTOR SELECTION** | | | |
| Bypassing critical protections | X | | |
| Confined space entry | X | | |
| Electrical work & isolation of hazardous energy (Lock out / tag out) | X | | |
| Hot work | X | | |

**Page 4 of 6**

Debtors' Exhibit No. 34
Page 543 of 910

## SEMS BRIDGING AGREEMENT & INTERFACE DOCUMENT

| | | | |
|---|---|---|---|
| Crane operations, lifting & rigging | X | | |
| Simultaneous operations planning | X | | |
| Working at heights | X | | |
| Spill reporting procedures | X | | |
| Well control procedures | X | | |
| Safe work practices other than those listed above | X | | |
| Safe work practices (other than those listed above) on a third-party owned facility, such as a drilling rig, lift boat, derrick barge, motor vessel, etc. that is contracted by Contractor | X | | |
| Selection of sub-contractors to work under the supervision of Contractor | X | | |
| **ELEMENT 7: TRAINING** | | | |
| Verify all personnel are trained to conduct their assigned duties in a safe and environmentally sound manner. | X | | |
| **ELEMENT 8: MECHANICAL INTEGRITY** | | | |
| Verify that all critical equipment owned, operated or maintained by Contractor is designed, procured, fabricated, installed, calibrated and maintained in accordance with service requirements, OEM recommendations or industry standards | X | | |
| Verify that inspections and tests for critical equipment owned, operated or maintained by Contractor are documented in accordance with regulatory requirements and industry standards.  At a minimum, the documentation must include the date of the inspection/test, the name, position, and signature of the inspector/tester, the equipment's serial number or other unique identifier, a description of the test performed, and the results of the inspection or test | X | | |
| Assure that well control equipment, such as BOP's are tested and maintained according to OEM and regulatory requirements and conditions of approval of the drilling permit application | X | | |
| **ELEMENT 9: PRE-STARTUP SAFETY REVIEW (PSSR)** | | | |
| Conduct the pre-startup safety and environmental review (including appropriate safety, environmental, operating, maintenance, training and emergency information) for commissioning of new or significantly modified facilities | X | | |
| **ELEMENT 10: EMERGENCY RESPONSE AND CONTROL** | | | |
| Maintain and revise accordingly emergency response and control plans | X | | |
| Emergency response and control plan for use during an emergency when working on a sub-contractor owned facility, such as a drilling rig, lift boat, derrick barge, motor vessel, etc. contracted by Contractor | X | | |
| **ELEMENT 11: INCIDENT INVESTIGATION** | | | |
| Investigation of incidents | X | X | Owner reserves the right to participate as necessary |
| Investigation of incidents that occur on a sub-contractor owned facility (rig, derrick barge, lift boat, motor vessel, etc.) by a third party | X | X | Owner reserves the right to participate as necessary |
| **ELEMENT 12: AUDITING** | | | |

**Page 5 of 6**

Debtors' Exhibit No. 34
Page 544 of 910

## SEMS BRIDGING AGREEMENT & INTERFACE DOCUMENT

| | | | |
|---|---|---|---|
| Manage/facilitate/execute SEMS auditing in accordance with 30 CFR 250.1920 | X | X | Owner reserves the right to conduct audits as necessary of the Contractor SEMS |
| **ELEMENT 13: RECORDKEEPING & DOCUMENTATION** | | | |
| Record retention, management and control of all records pertaining to scope of operations | X | X | Contractor will maintain all records and share records and documentation as required or requested by Owner |
| **ELEMENT 14: STOP WORK AUTHORITY** | | | |
| Ensure all personnel have the authority to stop work | X | X | |
| **ELEMENT 15: ULTIMATE WORK AUTHORITY (UWA)** | | | |
| Establish person with ultimate work authority (UWA) and communicate UWA to all crewmembers | X | | |
| For situations that may develop during drilling, workover and P&A operations, such as well control or other emergency conditions that may require the UWA responsibility to shift to another individual | X | | As designated in job planning, the UWA will be communicated to all. On sub-contractor owned facilities, sub-contractor is responsible for providing Contractor with UWA designated Parties |
| In the event that stop work authority is initiated for imminent risk or danger, work can only resume after the person with UWA has granted approval | X | | |
| **ELEMENT 16: EMPLOYEE PARTICIPATION** | | | |
| Employee participation and involvement program | X | | |
| **ELEMENT 17: REPORTING UNSAFE WORKING CONDITIONS** | | | |
| Any person may report to BSEE any hazardous or unsafe working condition or possible violation on any facility engaged in OCS activities. In addition, Contractor will provide, at request of Owner, any reports necessary to ascertain working knowledge of unsafe working conditions | X | X | |

**OWNER APPROVAL**
**Fieldwood Energy IV LLC**

By:_____
(SIGNATURE)


_____
Owner Authorized Representative
(PRINT NAME)

Title: _____

Date: _____

**CONTRACTOR APPROVAL**
**Mako Buyer LLC**

By:_____
(SIGNATURE)


_____
Contractor Authorized Representative:
(PRINT NAME)

Title: _____

Date: _____

Debtors' Exhibit No. 34
Page 545 of 910

## **Exhibit 12**

### **NewCo Joint Development Agreement**

See attached.

*Exhibit 12 to the Implementation Agreement*

## JOINT DEVELOPMENT AGREEMENT

This Joint Development Agreement ("**Agreement**") dated as of [_____], 2021 ("**Execution Date**"), but effective as of the Effective Date, is by and among Fieldwood Energy IV LLC, a Texas limited liability company ("**Owner**") and Mako Buyer LLC, a Delaware limited liability company ("**NewCo**"). Owner and NewCo may each be referred to herein as a "**Party**" and collectively as the "**Parties**".

### W I T N E S S E T H

WHEREAS, NewCo desires to farm into the development of, operation of, and production of hydrocarbons from the Development Area, subject to the terms and conditions set forth herein; and

WHEREAS, Owner and NewCo desire to set forth their agreements regarding their joint participation in the development of, operation of, and production of hydrocarbons from the Development Area.

NOW, THEREFORE, in consideration of the mutual benefits to each Party, the mutual promises set forth herein, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties agree as follows:

### ARTICLE I.
### DEFINITIONS

**Section 1.1.**    **Defined Terms**.  As used in this Agreement, each of the following terms is defined below:

"**Abandonment Notice**" is defined in Section 4.10(a).

"**Affiliate**" means, with respect to any Person, any other Person that, directly or indirectly, controls, is controlled by or is under common control with, such specified Person through one (1) or more intermediaries or otherwise; provided, however, that, for the purposes of this Agreement, Owner shall not be deemed an Affiliate of NewCo, and *vice versa*.  For the purposes of this definition, "control" means, where used with respect to any Person, the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of such Person, whether through the ownership of voting securities, by contract or otherwise, and the terms "controlling" and "controlled" have correlative meanings.

"**Agreement**" is defined in the preamble above.

"**Base Assignment Form**" is defined in Section 4.5(b).

"**BOEM**" means the Bureau of Ocean Energy Management of the United States Department of the Interior, and any successor Governmental Authorities thereto.

"**Business Day**" means a day, other than a Saturday or Sunday, on which commercial banks are open for business with the public in Houston, Texas.

"**Capital Development Project**" means either a (i) Rework or Recompletion Project or (ii) a Sidetrack, Bypass, Or Deepening Project.

"**Capital Development Project Costs**" means any and all out-of-pocket costs and expenses incurred in developing, preparing for, and completing a Capital Development Project and conducting all other operations set forth in the applicable Proposal attributable to Owner Interests in the Project, including, without limitation, all reasonable Third Party engineering costs, legal costs, and permitting costs, but excluding overhead and general and administrative costs.

"**Commence(s)**" means (i) with respect to any Rework or Recompletion Project, the entry into the well using the equipment necessary to begin the operation to either rework or plug back the existing completion, as applicable, and (ii) with respect to a Sidetrack, Bypass, or Deepening Project or an Election Well, the commencement of actual drilling of new hole through the turning of a drill bit into the earth, in each case, with a rig, coiled tubing unit, or other equipment capable of completing the applicable Project.

"**Company Agreement**" means that certain Limited Liability Company Agreement of Fieldwood Energy IV LLC, a Texas limited liability company, dated [•], 2021.

"**Contractor Operator Agreement**" means that certain Contract Operator Agreement by and among the Parties dated [•], 2021.

"**Development Area**" means the state submerged lands and Outer Continental Shelf blocks and acreage held by the leases set forth on Exhibit A.

"**Effective Date**" means [EMERGENCE DATE].

"**Election Period**" is defined in Section 4.1.

"**Election to Participate**" means the form presented by NewCo to Owner with a Proposal pursuant to which Owner can elect to participate in a Proposal.

"**Election Well**" means a new well in the Development Area.

"**Election Well Costs**" means, subject to the terms of the applicable Operating Agreement, any and all out-of-pocket costs and expenses attributable to Owner Interests incurred in drilling, evaluating, completing, and equipping an Election Well to its Objective Depth and conducting all other operations set forth in the applicable Proposal, including, without limitation, all reasonable Third Party engineering costs, legal costs, and permitting costs, but excluding overhead and general and administrative costs.

"**Evaluation Data**" means Seismic Data and other data and information relating to a Prospect Area or, if applicable, the Objective Formation(s) as to a Capital Development Project or an Election Well in the possession of NewCo that was materially relied upon by NewCo in the

2

determination of the Prospect, including, without limitation, to the extent applicable, relevant geological and geophysical interpretations and information, including the most recent reports, interpretations, and maps, and all specialty processing and analysis of Seismic Data (*e.g.*, migration, AVO, *etc.*).

"**Execution Date**" is defined in the preamble above.

"**Excess Net Profit**" means the Net Profit from a Capital Development Project over any applicable period, minus the Pre-Existing Net Profit. For the purposes of this Agreement, the Pre-Existing Net Profit that would have been realized over such period if the Capital Development Project had not been undertaken will be deemed to be zero ($0) for a recompletion where the well's production data from the most recent three (3) months of production prior to the date NewCo, or another operator pursuant to Section 4.4, applies for a permit to modify the applicable well shows the existing completion producing at average rates of less than fifty (50) barrels of oil per day or, if the well is a gas well, three hundred (300) MCFD of gas; provided, however, periods during which the well was intermittently shut-in during such three (3) month period shall be excluded from the calculation of average production so that such average is not artificially lowered as a result of any such intermittent shut-ins.

"**Existing Burdens**" means the following, to the extent that Owner Interests are burdened by or subject to them as of the time a Proposal is made with respect to such Owner Interests:

(a)     Lessors' royalties (including, without limitation, sliding scale royalties and royalties measured by net profits), overriding royalties, reversionary interests, net profit interests, production payments, carried interests, non-participating royalty interests, and similar burdens on or measured by production from or allocated to the proceeds thereof;

(b)     The terms of leases, unit agreements, pooling agreements, operating agreements, production sales contracts, areas of mutual interest or similar obligations entered into in the ordinary course of the oil and gas industry, and any other contracts, agreements, rights, and instruments applicable to the Owner Interests that are binding on Owner;

(c)     Preferential rights to purchase all or any portion of the Owner Interests;

(d)     Third Party consent requirements and similar restrictions that are applicable to any transfer of all or any portion of the Owner Interests; and

(e)     Rights of reassignment arising upon final intention to abandon or release the Owner Interests.

"**Expert**" means Netherland, Sewell & Associates or such other reservoir engineering consultant as may be mutually agreed by the Parties or determined pursuant to Section 4.12.

"**Force Majeure**" means any event or circumstance or combination thereof beyond the reasonable control of the Party claiming to be impacted by such event or circumstance that prevents such Party from performing its obligations under this Agreement, but only to the extent such Party is actually prevented or hindered from so performing, which events or circumstances include acts

3

of God, fires, floods, hurricanes, storms, tornados, earthquakes, landslides, lightning, loop currents, washouts, epidemics, pandemics, or other natural disaster; arrests, restraints, actions, delays, or inaction of any Governmental Authority; strikes, lockouts, or other industrial disturbances; acts of the public enemy, wars, invasions, blockades, embargos, sanctions, sabotage, insurgency, terrorism, civil wars, civil disturbances, riots, malicious mischief, or insurrections of any kind; explosions; breakage or accident to machinery or lines of pipe, freezing of wells or lines of pipe; refusal or inability of resale owner(s) or transporter(s) to take deliveries due to events of Force Majeure, inability or delays of a Party to obtain rights of way, necessary materials, supplies or permits not caused by the failure of the Party claiming to have been affected by Force Majeure to pay for or take diligent and prompt actions to obtain such rights of way, necessary materials, supplies, or permits; or labor strikes or work stoppages.

 "**Governmental Authority**" means any federal, state, municipal, tribal, local, or similar governmental authority, regulatory or administrative agency, court or arbitral body, or any subdivision of any of the foregoing.

"**Law**" means any applicable statute, writ, law, rule, regulation, ordinance, order, judgment, injunction, award, determination, or decree of a Governmental Authority.

"**MCFD**" means thousand cubic feet of gas per day, as measured at a base temperature of sixty degrees Fahrenheit (60ºF) and a base pressure of fourteen and sixty-five hundredths (14.65) pounds per square inch absolute (psia).

"**Net Profit**" means, with respect to production attributable to Owner Interests obtained as a result of a Capital Development Project, the difference obtained by subtracting Operating Costs from Revenue; where (i) "Operating Costs" equals the sum of (1) direct operating costs related to the well that is the subject of the Capital Development Project during the applicable production month, including platform, facility, processing, and pipeline operating costs and fees allocated equally amongst all producing wells on or tied back to such platform, if applicable, (2) all Existing Burdens on such well, (3) all severance or other taxes measured or calculated based upon production from such well (but for the avoidance of doubt, excluding income taxes and ad valorem taxes), and (4) the ORRI, and (ii) "Revenue" equals the net revenue attributable to Owner's net revenue interest in the proceeds of production from the completion resulting from such Capital Development Project received for that applicable production month.

"**NewCo**" is defined in the preamble above.

"**NewCo Earned Interest**" means with respect to an Election Well (a) one hundred percent (100%) of Owner Interests (determined at the time the Election Well Proposal is made, reduced by any burdens, reversions, pay-outs, back-ins, or other contractual interests springing or arising after such time, but existing at the time such Election Well Proposal was made) in the Prospect Area associated with the Prospect to be developed by such Election Well until NewCo has reached the Recovery Threshold relative to such Election Well, and reducing to (b) fifty percent (50%) of Owner Interests (determined at the time the Election Well Proposal was made, reduced by any burdens, reversions, pay-outs, back-ins, or other contractual interests springing or arising after such time, but existing at the time such Election Well Proposal was made) in such Prospect Area

from and after that time at which NewCo has reached the Recovery Threshold relative to such Election Well. For the avoidance of doubt, Owner's working interest, for purposes of the foregoing calculations and otherwise, excludes (i) Owner Interests insofar as they relate to any other wells that are located within the applicable Prospect Area and in existence as of the time the Election Well Proposal is made, regardless of whether such other wells are then or may thereafter be completed within any Objective Formation in the Prospect Area and (ii) Owner's ORRI.

"**NewCo NPI**" means, with respect to the production resulting from any Capital Development Project, a net profits interest equal to (i) 100% of the Excess Net Profit until NewCo has reached the Recovery Threshold and (ii) from and after such time that NewCo has reached the Recovery Threshold, fifty percent (50%) of the Excess Net Profit.

"**Objective Depth**" means, with respect to an Election Well, the depth that is sufficient to test the applicable Objective Formation(s), or the specific footage depth set forth in the Proposal, whichever is the greater depth, for such Election Well.

"**Objective Formation(s)**" means, with respect to an Election Well, the formations, intervals, or sands that are proposed to be tested, as set forth in the Proposal for such Election Well.

"**Operating Agreement**" means any Subject Operating Agreement or Third Party Operating Agreement.

"**Operating Costs**" has the meaning set forth in the definition of "Net Profits."

"**ORRI**" means, with respect to any NewCo Earned Interest or any NewCo NPI, an overriding royalty interest equal to twenty-five percent (25%) less Existing Burdens proportionately reduced to the NewCo Earned Interest or NewCo NPI, as applicable and further proportionately reduced as the NewCo Earned Interests or the NewCo NPI may be reduced pursuant to the terms of this Agreement as a result of NewCo achieving the Recovery Threshold with respect to any Project, which ORRI shall be a non-operating, non-expense-bearing, overriding royalty interest, free of cost and expense of production, operations, marketing, and delivery of the hydrocarbons to the applicable delivery points.

"**Owner**" is defined in the preamble above.

"**Owner Interests**" means, with respect to any Proposal and the Project to be carried out pursuant to such Proposal, the rights, title, and interests of Owner in the lands and leases in the applicable portion of the Development Area that is to be developed by such Project, determined as of the date such Proposal is made (reduced by any burdens, reversions, pay-outs, back-ins, or other contractual interests springing or arising after such time, but existing at the time such Proposal was made), and including the Owner's proportionate share of any non-consenting party's interest in the applicable Project that may be allocable to Owner under an applicable Third Party Operating Agreement for only so long as such interest is allocated to Owner in accordance with the terms of such Third Party Operating Agreement.

Debtors' Exhibit No. 34
Page 551 of 910

"**Owner Percentage**" means the difference between (i) the Owner Interests in a Prospect Area that is developed by an Election Well and (ii) the NewCo Earned Interest.

"**P&A**" means the plugging, abandonment, and removal of any wells, facilities, platforms, pipelines, or other equipment and the restoration and remediation of the land and seabed in accordance with all applicable Laws and the terms and conditions of any applicable leases, contracts, and agreements, including the removal, surface and subsurface restoration, site clearance, and disposal of the wells, well cellars, fixtures, platforms, flowlines, pipelines, structures, and personal property located on or associated with assets and properties and the lands burdened thereby, the flushing, pickling, burial, removal, or capping of all associated flowlines, field transmission and gathering lines, pipelines, pit closures, the restoration of the surface and seabed, site clearance, and any disposal of related waste materials and hazardous substances.

"**P&A Costs**" means the costs and expenses to conduct P&A.

"**P&A Well**" is defined in Section 4.10(a).

"**Party**" or "**Parties**" is defined in the preamble above.

"**Permitted Encumbrances**" means the following:

(a)     The Existing Burdens;

(b)     Liens for current taxes or assessments not yet delinquent or, if delinquent, being contested in good faith by appropriate actions diligently pursued;

(c)     Materialmen's, mechanic's, repairman's, employee's, contractor's, operator's, and other similar liens or charges arising in the ordinary course of business for amounts not yet delinquent (including any amounts being withheld as provided by Law) or if delinquent, being contested in good faith by appropriate actions diligently pursued;

(d)     All rights to consent by, required notices to, filings with, or other actions by Governmental Authorities in connection with the transfer of the Owner Interests;

(e)     All rights reserved to or vested in any Governmental Authorities to control or regulate any of the Development Area in any manner and all obligations and duties under all applicable Laws, rules, and orders of any such Governmental Authorities or under any franchise, grant, license or permit issued by any such Governmental Authorities; and

(f)     Easements, rights-of-way, servitudes, and permits or other burdens or encumbrances that individually or in the aggregate would not be reasonably likely to materially detract from the value of or materially interfere with the use, development, operation or ownership of the Development Area subject thereto or affected thereby.

"**Person**" means an individual, corporation, partnership, limited liability company, association, joint stock company, trust or trustee thereof, estate or executor thereof, unincorporated organization, joint venture, or any other legally recognizable entity.

6

"**Pre-Existing Net Profit**" means the forecast of Net Profit that would have been realized over the applicable period in which Excess Net Profit is being calculated if the Capital Development Project had not been undertaken, as such forecast is agreed upon by and between the Parties using the forward strip pricing for crude oil and natural gas as provided by NYMEX as of the date the Proposal for such Capital Development Project was delivered to Owner.  If, after ten (10) Business Days following the expiration of the Election Period applicable to a Capital Development Project, the Parties have not yet agreed on the Pre-Existing Net Profit for the well that is the subject of such Capital Development Project, then either Party may submit the determination of such Pre-Existing Net Profit to the Expert pursuant to Section 4.12 below.

"**Project**" means either an Election Well or a Capital Development Project, as applicable.

"**Project Notice**" is defined in <u>Section 3.2</u>.

"**Project Security**" means security, in form and amount reasonably acceptable to Owner, to cover NewCo's obligations and liabilities hereunder associated with (i) with respect to an Election Well, Owner's share of the P&A obligations and liabilities, including P&A Costs, environmental liability, obligations, or liabilities owed to any vendors, co-owners, Governmental Authorities, or Third Party, for such Election Well and (ii) with respect to a Sidetrack, Bypass, or Deepening Project, the well that is sidetracked, bypassed, or deepened, including, without limitation, Owner's share of incremental P&A obligations and liabilities (including P&A Costs, environmental liability, obligations, or liabilities owed to any vendors, co-owners, Governmental Authorities, or Third Party) for such sidetrack, bypass, or deepening well.

"**Proposal**" means a proposal to drill, evaluate, and complete an Election Well or undertake a Capital Development Project, as the case may be, proposed by NewCo to the Owner on lands or facilities in the Development Area.  For the avoidance of doubt, a Proposal may not include more than one Election Well or one proposed completion or recompletion of an existing well, as applicable.

"**Prospect**" means a geologic structural or stratigraphic trap located within any Development Area that is believed to have the potential for accumulations of hydrocarbons, to the extent such Development Area also covers or includes such geologic structure or stratigraphic trap.

"**Prospect Area**" is defined in <u>Section 4.5(a)</u>.

"**Recovery Threshold**" means, with respect to a Capital Development Project, NewCo's recovery from the Net Profit it receives attributable to such project of an amount equal to one hundred percent (100%) of the Capital Development Project Costs incurred by NewCo in performing the relevant Project and, with respect to an Election Well, NewCo's recovery from the NewCo Earned Interest it receives attributable to such well of an amount equal to one hundred percent (100%) of the Election Well Costs incurred by NewCo in performing the relevant Project.

"**Representatives**" means a Person's directors, officers, partners, members, managers, employees, agents, investors, or advisors (including attorneys, accountants, consultants, bankers, and financial advisors) and any representatives of those advisors (provided that Newco and its Representatives shall not be considered Representatives of Owner).

7

"**Revenue**" has the meaning set forth in the definition of "Net Profits."

"**Rework or Recompletion Project**" means a development operation on an existing well in the Development Area to either (i) work-over the then-current completion in such existing well in an effort to increase or resume production, cause such well to produce in paying quantities, increase production or reserves, or extend the productive life of such completion or (ii) plug and abandon the then-current completion in such existing well and recomplete the well at a shallower interval.

"**Seismic Data**" means any and all seismic data, two-dimensional multifold seismic data, three-dimensional seismic data, stacked and migrated processed sections, digital field tapes, stacked tapes, support data relating thereto, stick and quality control segments, receiver and bin center locations, stacking velocities, shot hole drilling information, digital shot point locations, magnetic, surface, and other surveys, seismic sections, surface and subsurface maps, plats, charts, and any interpretations of any of the foregoing or other like information customarily used in connection with oil and/or gas exploration.

"**Sidetrack, Bypass, or Deepening Project**" means a development operation on an existing well in the Development Area to plug and abandon the then-current completion and conduct sidetracking, bypassing, or deepening operations on such existing well in an effort to increase or resume production, cause such well to produce in paying quantities, increase production or reserves, or to extend the productive life of such well.

"**Subject Operating Agreement**" is defined in Section 4.5(a).

"**Technical Review Meeting**" is defined in Section 3.2(b).

"**Term**" is defined in Section 2.1.

"**Third Party**" means any Person that is not a Party or any Affiliate of any Party.

"**Third Party Operating Agreement**" is defined in Section 4.5(c).

"**Transaction Documents**" means this Agreement, the Contract Operator Agreement, and each other agreement, document, certificate, or instrument delivered pursuant hereto or thereto.

"**Well Data**" means any logs, core samples, other geological and geophysical data or similar data created during drilling operations, any engineering records or reports (including wellbore schematics), any drilling records or reports (including detailed daily drilling reports), and any related reports filed with the BOEM.

**Section 1.2.    Exhibits.**  The following exhibits are incorporated herein and made a part hereof:

| | |
|---|---|
| Exhibit A | Development Area (Including Oil and Gas Leases) |
| Exhibit B | Form of Net Profits Interest Assignment |

8

Debtors' Exhibit No. 34
Page 554 of 910

Exhibit C        Form of Election Well Assignment

Exhibit D        Form of Operating Agreement

## ARTICLE II.
### TERM

**Section 2.1.   Term**.  This Agreement shall be effective for a period commencing on the Effective Date and expiring upon the earlier to occur of (i) the date two (2) years after the Effective Date, and (ii), as to each lease, the expiration of such lease comprising a part of the Development Area (including any and all renewals, replacements, and extensions of such lease) (the "**Term**").

**Section 2.2.   Effect of Termination**.  After the expiration of the Term, this Agreement shall terminate and be of no further force and effect; provided, however, that (i) the provisions of this Section 2.2 and Sections 3.2(d), 3.3, 4.8, 4.11, 5.3, 5.4, 5.5, and 5.14, the provisions in the third sentence of Section 3.2(a) (the sentence beginning "If Owner receives") and the last sentence of Section 4.5(g), and (ii) any and all rights, obligations and remedies hereunder that have accrued on or prior to the expiration of the Term of this Agreement, shall survive the termination of this Agreement indefinitely; and, provided, further, that any rights, obligations, and remedies in any Transaction Document that by their nature are intended to survive termination or expiration of this Agreement shall so survive.  Notwithstanding anything herein to the contrary, termination of this Agreement will not affect the rights of NewCo hereunder to any Proposals presented to Owner before the end of the Term.

## ARTICLE III.
### PROSPECT GENERATION

**Section 3.1.   Evaluation of Possible Prospect.**  To assist NewCo in its evaluation of the Development Area, Owner will exercise reasonable efforts to provide NewCo with access to all materials either in its possession or those materials which it is entitled to review regarding the Development Area, including any Evaluation Data, but only to the extent NewCo is permitted to view such materials pursuant to any contract or agreement to which such materials may be subject.  In the event that NewCo desires to present a Proposal, it shall provide a notice to Owner as set forth below.

**Section 3.2.   Notice of Prospects or Capital Development Project**.

(a)   Notice.  With respect to any Proposal being made by NewCo, NewCo shall provide a written notice to the Owner (a "**Project Notice**"), which shall include the following information:

(i)   a description of the Proposal in reasonable detail (including, if such Proposal relates to an Election Well, all potentially productive zones, the proposed Objective Depths, the proposed Objective Formations, together with descriptions of the Prospect(s) and the associated Prospect Area(s));

(ii)   a good faith, preliminary estimate of Capital Development Project Costs or the Election Well Costs, as the case may be;

9

(iii)    a good faith, preliminary estimate of any and all P&A Costs for a Sidetrack, Bypass or Deepening Project or Election Well, as the case may be, and

(iv)    an Election to Participate.

For the avoidance of doubt, the following shall be void and deemed automatically withdrawn by NewCo: (i) Proposals for which Owner does not have the requisite authority, under the applicable Operating Agreement, to make such Proposal and (ii) Proposals that conflict with any ongoing, approved, or previously proposed operations under any applicable Operating Agreement. If Owner receives a Proposal for a Capital Development Project to be performed on a well which Owner either (A) desires to continue producing from its then-current completion or (B) desires to conduct an operation that is in conflict with the Capital Development Project proposed by NewCo, Owner may, on or before the expiration of the Election Period for such Proposal, send written notice to NewCo that it rejects the Proposal pursuant to the foregoing grounds, in which case the applicable Proposal shall be deemed to have been withdrawn and void; *provided* that if Owner rejects such a Proposal and undertakes or agrees to participate in the Project that was the subject of such rejected Proposal within two (2) years after expiration of the Election Period for such Proposal, then Owner shall offer NewCo the right (exercisable for a period of 30 days) to participate in such opportunity on the same terms as set forth in the original Proposal and this Agreement. If, after diligent efforts, NewCo or the Parties are unable to proceed with the operations contemplated under a Proposal because of conflicts with existing Operating Agreements (or other restrictions affecting the applicable Owner Interests) that existed as of the time the Proposal was made, either Party may send notice to the other Party terminating the affected Proposal. For the avoidance of doubt, the Parties recognize and agree that nothing in this Agreement shall prevent an Owner from conducting any projects, operations, or activities or from participating in projects, operations, or activities that may be proposed or offered by a Third Party or from entering into any agreements or contracts, including, without limitation, farmouts, sales, or assignments, affecting the Owner Interests, in all cases, without any obligation to offer NewCo the opportunity to participate in any such project, operations, or activities or to obtain the consent of NewCo, unless (x) any such project, operations, or activities were proposed by NewCo under a Proposal received by Owner prior to such Owner's receipt of the proposal from a Third Party and (y) such NewCo Proposal has not terminated, been withdrawn, or deemed to have been withdrawn.

(b)    Technical Review Meeting.  NewCo will present the Proposal and all related Evaluation Data to the Owner at an in-person meeting at the offices of NewCo (a "**Technical Review Meeting**") to be held on a mutually agreed Business Day during NewCo's normal business hours no later than ten (10) Business Days after delivery of the applicable Project Notice. At either Party's request, the meeting may be held online via technology that allows a Party to share screens with the other Party, such as Zoom, Skype, WebEx, or Microsoft Teams. Each Party shall use reasonable efforts to ensure that the Technical Review Meeting is attended by a reasonably sufficient number of technical representatives of such Party who are familiar with and capable of presenting and/or discussing the Proposal with the other Party.

(c)    Access to Evaluation Data. Until the end of the Election Period, NewCo shall make Evaluation Data with respect to a Proposal available for review and evaluation by the Owner, at

10

the Owner's expense, in NewCo's offices during NewCo's normal business hours or available through a virtual data room or similar electronic platform. Likewise, Owner will provide NewCo with reasonable access to any Evaluation Data in its possession with respect to a Proposal, including but not limited to well files, logs, and data. Notwithstanding the foregoing, neither Party shall be obligated to disclose such Evaluation Data when such disclosure would violate any Third Party contract or agreement binding on a Party or applicable to such Evaluation Data.

     (d)   Confidentiality. Each Party shall, and shall cause its Affiliates and its and their respective Representatives to, keep the Proposals, all Evaluation Data, Well Data, and Seismic Data of the other Party, information relating to the Proposal and information from the Technical Review Meeting, to the extent prepared by or received from the other Parties, strictly confidential, and no Party or any of its Affiliates or any of its or their respective Representatives shall disclose such Proposals, Evaluation Data, Well Data, or Seismic Data, information relating to the Proposal, or information from the Technical Review Meeting to any Third Party except as required under a Third Party Operating Agreement. With respect to Evaluation Data, Well Data, and Seismic Data, these disclosure restrictions shall terminate upon the later to occur of (i) two (2) years after the date on which the Technical Review Meeting took place with respect to the applicable Proposal and (ii) the date on which such Evaluation Data, Well Data, or Seismic Data, as applicable, is no longer subject to disclosure restrictions under an agreement or contract with a Third Party. With respect to the Proposal itself, these disclosure restrictions shall terminate upon the later to occur of (x) the date on which the Project that is the subject of such Proposal is Commenced and (y) that date on which such Proposal terminates, is withdrawn, or is deemed to have been withdrawn.

**Section 3.3.** **Waiver of Liability with Respect to Evaluation Data**. The information included in a Project Notice and any other Evaluation Data or Well Data furnished by NewCo or Owner, as applicable, pursuant to this Agreement shall be provided for informational purposes only. Each Party is responsible for and shall make its own decisions with respect to Evaluation Data, Well Data, or the opinions or analysis of the other Party that may be provided. (A) NEWCO DOES NOT MAKE, AND THE OWNER WAIVES AND REPRESENTS AND WARRANTS THAT OWNER HAS NOT AND WILL NOT RELY UPON, AND (B) OWNER DOES NOT MAKE, AND NEWCO WAIVES AND REPRESENTS AND WARRANTS THAT NEWCO HAS NOT AND WILL NOT RELY UPON: ANY REPRESENTATION OR WARRANTY, EXPRESS OR IMPLIED, IN THIS AGREEMENT OR ANY OTHER INSTRUMENT, AGREEMENT, OR CONTRACT DELIVERED HEREUNDER OR IN CONNECTION WITH THE EVALUATION DATA, WELL DATA, OR ANY OTHER OPINION OR ANALYSIS THAT MAY BE PROVIDED HEREUNDER, INCLUDING, BUT NOT LIMITED TO, ANY REPRESENTATION OR WARRANTY, EXPRESS OR IMPLIED AS TO (I) THE CONTENTS, CHARACTER, OR NATURE OF ANY DESCRIPTIVE SUMMARY, OR ANY REPORT OF ANY PETROLEUM ENGINEERING CONSULTANT, OR ANY GEOLOGICAL DATA, SEISMIC DATA, WELL DATA, EVALUATION DATA, RESERVE DATA, RESERVE REPORTS, RESERVE INFORMATION (AND ANY ANALYSIS OR INTERPRETATION OF ANY OF THE FOREGOING) RELATING TO ANY SEISMIC DATA OR EVALUATION DATA OR ANY OF THE PROPOSALS, (II) THE QUANTITY, QUALITY, OR RECOVERABILITY OF HYDROCARBONS IN OR FROM ANY PROPOSAL, (III) THE PRODUCTION OF PETROLEUM SUBSTANCES FROM ANY PROPOSAL, OR ANY PRODUCTION OR DECLINE RATES, OR (IV) ANY OTHER RECORD, FILES,

11

MATERIALS, OR INFORMATION (INCLUDING AS TO THE ACCURACY, COMPLETENESS, OR CONTENTS OF THE RECORDS) THAT MAY HAVE BEEN MADE AVAILABLE, DELIVERED, OR COMMUNICATED TO THE OTHER PARTY IN CONNECTION WITH THE REVIEW AND EVALUATION OF THE SEISMIC DATA, WELL DATA, OR EVALUATION DATA PURSUANT TO THIS AGREEMENT. NOTHING IN THIS AGREEMENT SHALL LIMIT ANY PARTY'S RIGHTS OR REMEDIES PURSUANT TO ANY OTHER AGREEMENT BETWEEN THE PARTIES OTHER THAN THIS AGREEMENT OR PURSUANT TO ANY INSTRUMENT OR AGREEMENT DELIVERED PURSUANT TO THIS AGREEMENT.

## ARTICLE IV.
## JOINT DEVELOPMENT OPERATIONS

**Section 4.1.** <u>Election to Participate</u>. The Owner may elect to participate in a valid Proposal by delivering its written Election to Participate to NewCo no later than 5:00 p.m. in Houston, Texas on the first Business Day that is on or after the date thirty (30) days after the Business Day the Owner received the applicable Project Notice (the "**Election Period**"). The failure of Owner to make a timely written election to participate in a valid Proposal by the expiration of the Election Period shall be deemed to be Owner's election not to participate in such Proposal. If the Owner delivers to NewCo prior to the expiration of the applicable Election Period a valid written Election to Participate, then, subject to the terms of any applicable Third Party Operating Agreement and the terms and conditions of this Agreement, such election shall constitute a valid and binding obligation of the Parties to participate in the operations set forth in such Proposal upon the terms of this Agreement.

**Section 4.2.** <u>Rework or Recompletion Projects.</u> If the Proposal is for a Rework or Recompletion Project and Owner does not reject such Proposal as contemplated under Section 3.2(a) then NewCo may proceed with the Rework or Recompletion Project at its sole risk and expense only after the Pre-Existing Net Profit relating to such Rework or Recompletion Project has been determined either by agreement of the Parties or by the Expert. In such event (i) NewCo shall pay 100% of the Capital Development Project Costs associated with the Rework or Recompletion Project and attributable to Owner Interests and (ii) upon completing the Rework or Recompletion Project as a successful completion, NewCo will receive an assignment of the NewCo NPI from Owner in a form substantially the same as Exhibit B attached hereto, reserving unto Owner the ORRI. For the avoidance of doubt, at such time as NewCo has reached the Recovery Threshold for such applicable Rework or Recompletion Project, the NewCo NPI will be reduced from one hundred percent (100%) to fifty percent (50%). The assignment of the NewCo NPI to NewCo pursuant to this Section 4.2 shall: (1) be subject to this Agreement, (2) be "as-is," without warranties of any kind, and expressly subject to all agreements and matters of record, and Permitted Encumbrances, (3) be subject to the ORRI reserved by Owner hereunder, and (4) be limited as further described in Section 4.9(a). For the avoidance of doubt, (i) upon completion of the Rework or Recompletion Project, NewCo shall not be responsible for any expenses, costs, losses, or operations associated with the well that is the subject of such Project and attributable to Owner Interests and (ii) if the Rework or Recompletion Project results in a dry hole or if NewCo does not reach the Recovery Threshold relative to a Rework or Recompletion Project, NewCo shall be solely responsible for any loss it incurred as a result of conducting such Project and shall have

12

Debtors' Exhibit No. 34
Page 558 of 910

no right of recovery or recourse against Owner relative to such loss; provided that NewCo shall not be responsible for paying for or conducting P&A activities on such well, except that, in the event of a dry hole or unsuccessful completion attempt, prior to removing any equipment used to conduct the applicable Rework or Recompletion Project, NewCo shall, at its sole cost and expense, take such additional actions as are necessary to leave the well in a condition that will not require Owner to take additional actions or perform any additional operations on such well in order to leave the well in a satisfactory condition under then-current regulations. For the avoidance of doubt, for the purpose of this Section 4.2, so long as Owner does not reject such Proposal as contemplated under Section 3.2(a) and subject to the other terms of this Agreement, NewCo may proceed with the activities contemplated in the Proposal regardless of whether Owner elects to participate.

**Section 4.3.    Sidetrack, Bypass, or Deepening Project.**    If the Proposal is for a Sidetrack, Bypass, or Deepening Project and Owner does not reject such Proposal as contemplated under Section 3.2(a) then NewCo may proceed with the Sidetrack, Bypass, or Deepening Project at its sole risk and expense; provided, however, that before it may proceed with such Proposal, within thirty (30) days of the expiration of the Election Period, (a) NewCo must provide Owner with Project Security for the operations contemplated under such Proposal and (b) the Pre-Existing Net Profit relating to such Sidetrack, Bypass, or Deepening Project shall have been determined either by agreement of the Parties or by the Expert. If NewCo fails to timely provide Owner with Project Security with respect to any Proposal, then such Proposal shall automatically terminate and have no further or ongoing force or effect and shall be deemed to have been withdrawn by NewCo; and, in such event, NewCo may not proceed with the Project contemplated under the applicable Proposal.    In the event NewCo proceeds with a Sidetrack, Bypass, or Deepening Project as permitted herein, (i) NewCo shall pay 100% of the Capital Development Project Costs associated with the Sidetrack, Bypass, or Deepening Project and attributable to Owner Interests, (ii) following the completion of the Sidetrack, Bypass, or Deepening Project as a successful completion, NewCo will receive an assignment of the NewCo NPI in a form substantially the same as Exhibit B attached hereto, reserving unto Owner the ORRI, (iii) except for P&A Costs as set forth below in clause (iv), upon either completion or termination of the Sidetrack, Bypass, or Deepening Project, NewCo shall not be responsible for any expenses, costs, losses, or operations associated with the well that is the subject of such Project, and (iv) at such time as NewCo has reached the Recovery Threshold and the P&A work and activities are performed on the well that is the subject of such Sidetrack, Bypass, or Deepening Project, NewCo shall pay to Owner fifty percent (50%) of Owner's share of the incremental P&A Costs, if any, incurred by the Sidetrack, Bypass, or Deepening Project.    Owner shall have the right to cash call NewCo for its share of P&A Costs due hereunder; and, in such event, NewCo shall pay Owner such cash called amounts within thirty (30) days of its receipt of such cash call request.    Owner shall promptly following completion of the P&A notify NewCo of the incremental costs incurred and reimburse NewCo for any overpayment, if applicable. For the avoidance of doubt, at such time as NewCo has reached the Recovery Threshold for such applicable Sidetrack, Bypass, or Deepening Project, the NewCo NPI will be reduced from one hundred percent (100%) to fifty percent (50%).    The assignment of the NPI to NewCo pursuant to this Section 4.3 shall: (1) be subject to this Agreement, (2) be "as-is," without warranties of any kind, and expressly subject to all agreements and matters of record, and Permitted Encumbrances, (3) be subject to the ORRI reserved by Owner hereunder, and (4) be limited as further described in Section 4.9(a).    For the avoidance of doubt, with respect to any

13

Sidetrack, Bypass, or Deepening Project undertaken by NewCo, (A) Owner shall have no liability or responsibility to NewCo in the event NewCo is unable to reach the Recovery Threshold relative to such Project, and (B) if NewCo does not reach the Recovery Threshold relative to such Project, then NewCo shall be responsible for one hundred percent (100%) of Owner's share of the incremental P&A Costs caused by the subject of the Sidetrack, Bypass, or Deepening Project. For the avoidance of doubt, for the purpose of this Section 4.3, so long as Owner does not reject such Proposal as contemplated under Section 3.2(a) and subject to the other terms of this Agreement, NewCo may proceed with the activities contemplated in the Proposal regardless of whether Owner elects to participate.

**Section 4.4.    NewCo Project Manager.**  In the event NewCo is not the contract operator of an Owner Interest at the time of a Proposal or at the time a Capital Development Project is performed, NewCo shall be the project manager on behalf of Owner for the operation, and Owner shall take reasonable actions necessary to cause the then current operator or contract operator to promptly proceed with the operations described in the Proposal at NewCo's direction.  In furtherance of such right of NewCo to be the project manager for such operation, Owner, to the extent it has the ability to do so, hereby grants to NewCo the following rights as the project manager: (i) the right to directly consult with, advise, and direct the then current operator or contract operator, as applicable, regarding such operation, provided that Owner's Representatives shall be included in any such consultations, (ii) access to all books, records, data, and information relating to such operation (including any daily or other periodic operations reports), provided that such access shall be subject to the same restrictions on access and disclosure as apply to Evaluation Data under Section 3.2, and (iii) access to all facilities relating to such operation subject to NewCo's execution of a mutually agreeable boarding agreement. All reasonable out-of-pocket costs incurred by NewCo in performing the foregoing activities as such project manager shall be included in the Capital Development Project Costs for the applicable Project.

**Section 4.5.    Election Well.**

(a)    Operating Agreement.  If the Proposal is for the drilling of an Election Well, then contemporaneously with Owner electing to participate in an Election Well, to the extent not in conflict with any existing Third Party Operating Agreements, the Parties shall execute and deliver to each other an operating agreement in substantially the form attached hereto as Exhibit D (each, a "**Subject Operating Agreement**") setting forth the Owner Percentage and NewCo Earned Interest, and the "Contract Area" under such Subject Operating Agreement shall be limited to the Prospect Area to be assigned to NewCo under this Section 4.5(a) if NewCo were to become entitled to such assignment hereunder; provided, however, if NewCo does not earn the assignment to be made pursuant to Section 4.5(b) with respect to any Proposal for which the Parties have executed a Subject Operating Agreement, then such Subject Operating Agreement shall be deemed to have terminated, and the Parties shall take such further actions and execute such additional documents as may be necessary or appropriate to evidence the termination of such Operating Agreement.  With respect to each Prospect that may be the subject of a Proposal for an Election Well, the "**Prospect Area**" associated with any such Prospect shall be limited to (i) such area as may be reasonably developed and drained by such individual well without need for further development within the applicable Prospect Area and (ii) depths from the top of shallowest Objective Formation tested by such Election Well down to the stratigraphic equivalent of one

14

hundred (100) feet below the base of the deepest Objective Formation tested by such Election Well from which production is commenced within two (2) years after spudding such Election Well.

(b)     Owner Participation. If Owner elects to participate in an Election Well, then NewCo shall provide Owner with Project Security for the Election Well, and then, only after providing Owner with such Project Security, may proceed with the Election Well at its sole risk and expense.  In such event, (i) NewCo (A) shall pay 100% of the Election Well Costs associated with the Election Well and attributable to Owner Interests and (B) upon completing the Election Well as a successful completion, will receive an assignment of the NewCo Earned Interest applicable to such Election Well in a form substantially the same as Exhibit C attached hereto (the "**Base Assignment Form**"), subject to Section 4.9(c), and shall receive the NewCo Earned Interest share of Revenue and bear the NewCo Earned Interests share of Operating Costs relative to the Project until NewCo has reached the Recovery Threshold relative to such Project, and (ii) thereafter, the ongoing Revenue and Operating Costs, and including P&A Costs, associated with the Project shall be received and borne by the Parties in accordance with the Owner Percentage and NewCo Earned Interest, provided that Owner shall not bear any portion of the ORRI or the Operating Costs incurred prior to NewCo reaching the Recovery Threshold.  For the avoidance of doubt, at such time as NewCo has reached the Recovery Threshold for such applicable Election Well, the NewCo Earned Interest will be reduced from one hundred percent (100%) of the applicable Owner Interests to fifty percent (50%) of such Owner Interests, in each case still subject to the ORRI.  The assignment of the NewCo Earned Interest to NewCo pursuant to this Section 4.5(b) shall: (1) be subject to this Agreement, (2) be "as-is," without warranties of any kind, and expressly subject to all agreements and matters of record, and Permitted Encumbrances, (3) reserve unto Owner the ORRI, and (4) convey the applicable NewCo Earned Interest as further described in Section 4.9(b).  For the avoidance of doubt, if the Election Well is a dry hole or results in a completion for which Owner does not reach the Recovery Threshold, then NewCo shall be solely responsible for bearing such loss and for performing the P&A associated with Owner Interests in such well, including paying all such associated P&A Costs.

(c)     Third Party Operating Agreements. During the Term, in the event that any Prospect Area is subject to any existing operating agreement other than a Subject Operating Agreement (each a "**Third Party Operating Agreement**"), then the terms of such Third Party Operating Agreement shall govern and control.  In the event the Prospect Area for a Proposal is subject to a Third Party Operating Agreement, Owner agrees to take such reasonable actions as may be required by the terms of such agreement to propose the Proposal to the other parties to such agreement; provided, that NewCo shall assist Owner in taking such actions as may reasonably be requested by Owner.

(d)     Operating Agreement Conflicts. To the extent that the provisions of this Agreement conflict with the provisions of any Third Party Operating Agreement, then solely between the Parties, the provisions of this Agreement shall govern and control, *mutatis mutandis*; provided, however, upon commencement of any Election Well, the provisions of any applicable Operating Agreement shall govern all further elections and operations with respect to such Election Well and any subsequent operations within a Prospect Area.

15

(e)     <u>Operator Designation</u>. To the extent permitted by applicable Law and subject to the terms of any Third Party Operating Agreement, upon written request of Owner for each Prospect Area associated with an Election Well pursuant to which NewCo earns a NewCo Earned Interest, NewCo shall be designated and assume the responsibilities of operator of each such Prospect Area. In such event, Owner agrees to take reasonable actions in assisting NewCo in having all co-owners of such Prospect Area agree to such designation and to execute the required documentation for such designation.

(f)     <u>Existing Facilities</u>. Subject to (i) the terms of any applicable Third Party Operating Agreement and applicable Law and (ii) the condition of the applicable facilities and any operations then being conducted thereon, to the extent Owner has the ability to grant NewCo such rights, NewCo shall be entitled to access and use existing facilities owned by Owner to the extent necessary to drill, evaluate, complete, equip, and produce any Election Well, free of costs except Third Party costs and the fees described in Section 4.11 (which costs shall be Election Well Costs), and Owner shall take commercially reasonable actions to help facilitate NewCo's right to access such facilities. In so accessing any of Owner's facilities, NewCo shall execute and deliver to Owner a boarding agreement or such other instrument as may be reasonably required by Owner in its reasonable discretion to permit NewCo's access to such facilities and to allocate risks associated with NewCo's operations on such facilities.

(g)     <u>Elections Not to Participate</u>. Notwithstanding anything herein to the contrary, if the Proposal is to drill an Election Well and Owner does not elect to participate within the Election Period, then the Proposal shall expire, and neither Party shall have any obligation to the other with respect to the Proposal and NewCo shall have no right to proceed with drilling the Election Well. If Owner or its successors or assigns undertake to drill the Election Well described in the Proposal within two (2) years after expiration of the Election Period for such Proposal, then Owner shall offer NewCo the right (exercisable for a period of 30 days) to participate in such Election Well on the same terms as set forth in the original Proposal and this Agreement.

**Section 4.6.     <u>Withdrawal or Termination of Proposals</u>.**

(a)     Subject to any applicable Third Party Operating Agreement, NewCo may withdraw a Proposal at any time prior to the mobilization of materials and equipment toward the commencement of operations under the Proposal. If a Proposal is withdrawn by NewCo or deemed to have been withdrawn as provided in this Agreement, then all terms of this Agreement shall be interpreted as if such Proposal was never made.

(b)     Notwithstanding Section 4.6(a), with respect to any Project for which NewCo has the right to proceed hereunder, the Proposal for such Project shall be deemed to have automatically terminated and been withdrawn if NewCo does not (i) Commence the applicable Project within one hundred twenty (120) days (excluding any extension expressly agreed to in writing by the Parties) following NewCo's making of such Proposal and (ii) thereafter diligently and continuously perform such Project until completed, subject to extensions of the foregoing time period to the extent NewCo is prevented from either Commencing or performing such Project by events of Force Majeure; provided that NewCo shall make reasonably diligent efforts to overcome such events of Force Majeure. In the event any Project is deemed terminated or

16

withdrawn, Owner shall promptly return to NewCo any Project Security it provided to Owner under this Agreement in connection with such Proposal.

(c)     If a Proposal is terminated pursuant to Section 4.6(b) as a result of NewCo's failure to timely Commence performance of a Project, then (i) the applicable Owner may elect to conduct the Project that was the subject of such Proposal without any obligation to offer NewCo the opportunity to participate in such Project notwithstanding any term in this Agreement to the contrary and (ii) if Owner has not so elected and NewCo desires to conduct the Project that was the subject of such terminated Proposal, it must resubmit a new Proposal for such Project which shall be subject to the terms of this Agreement in all respects.

**Section 4.7.     Project Security.**  With respect to any Project for which NewCo has provided Owner with Project Security hereunder, upon the occurrence of the Recovery Threshold for such Project, the Owner agrees that the principal amount of such Project Security shall be proportionately reduced in an amount corresponding to the reduction of NewCo's responsibility for costs and expenses attributable to such Project including the reduction of its P&A obligations; and the Parties agree to execute such instruments or take such other actions as may be reasonably necessary to evidence such reduction.

**Section 4.8.     Liability for Operations.**

**(a)     With respect to any operations conducted by NewCo or its contractors on any Capital Development Project or Election Well, as between Owner and NewCo, NewCo shall be solely responsible and liable for, and shall fully indemnify, defend, and hold harmless Owner, their affiliated and subsidiary companies, contractors (other than NewCo), representatives, and consultants, and all of their respective officers, directors, and employees, from and against any and all claims, demands, suits, causes of action, judgments, fines, penalties, or orders relating to or arising out of the operations so conducted by NewCo or its contractors, including, without limitation, incidents of non-compliance, civil penalties, personal injuries, property damage, or pollution, without regard to the negligence (whether sole, joint, or concurrent, or active or passive), strict liability, or other fault of the foregoing indemnified Persons, <u>except to the extent resulting from the negligence, gross negligence or willful misconduct of any of the foregoing indemnified Persons.</u>**

**(b)     Notwithstanding anything herein to the contrary, in no event shall NewCo be liable for any damages or claims arising in whole or in part from its failure or inability to reach the Objective Depths or Objective Formations.**

**Section 4.9.     Assignments.**

(a)     <u>NPI Assignments.</u>  If NewCo is entitled to receive an assignment of a NewCo NPI in connection with any Capital Development Project, such assignment shall be limited to the interval completed or worked over as a result of such operation.

(b)     <u>Election Well Assignments.</u>  If NewCo is entitled to receive an assignment from Owner in connection with any Proposal for an Election Well, such assignment shall, subject to Section 4.9(c) below, be limited to the applicable oil and gas lease(s) insofar as it pertains to each

17

Prospect Area that is developed by the Election Well and the depths as specified in Section 4.5(a) above.

(c)   BOEM Assignments.  To the extent any Prospect Area in which NewCo earns an assignment of the NewCo Earned Interest hereunder covers all or a part of one or more aliquots in which BOEM would recognize NewCo's ownership, then in conjunction with the assignment of the NewCo Earned Interest and notwithstanding the Base Assignment Form, the Parties agree to execute and file appropriate BOEM-0150 forms from the pertinent Owner to NewCo and covering fifty percent (50%) of Owner's BOEM recognized operating rights in and to such aliquot(s) from the surface to one hundred feet (100') below the deepest depth drilled of the applicable Election Well (utilizing the Base Assignment Form attached as Exhibit A thereto) ("***BOEM OR Assignments***"). In such event, the Parties recognize and agree that such BOEM OR Assignments must be filed with BOEM or such other required Governmental Authorities.  In the event any such Governmental Authorities fail to accept or approve any such BOEM OR Assignments, the Parties will fully cooperate in the development of an assignment and any other filings or instruments that will comply with the requirements of such Governmental Authority's filing and approval procedures (or such other filing procedures as may be hereafter promulgated) or as will accomplish the intent of this Agreement, together with assignments to be filed in the adjacent county or parish records reasonably necessary to give effect to the intent of this Agreement and provide Third Parties with notice of any such assignments.  Notwithstanding the foregoing, if, as a result of circumstances beyond the reasonable control of Owner and NewCo, the assignment will not be approved by BOEM, the Parties will file the BOEM OR Assignment in the non-required records maintained by BOEM for the applicable lease or leases.

(d)   ORRI.  It is understood and agreed that the ORRI reserved by the applicable Owner under any certain assignment made pursuant to the terms of this Agreement shall apply to all renewals, extensions, and other similar arrangements (and/or interests therein) of the applicable subject lease(s). Only a new lease taken by NewCo, its successors or assigns, within one (1) year after expiration or release of a such applicable subject lease and which covers the same lands, shall be considered a renewal or extension for the purposes hereof.

**Section 4.10.**   **Rights upon Abandonment of Certain Wells**.

(a)   Abandonment Notice.  Subject to the terms of all applicable Third Party Operating Agreements, in the event that Owner and/or the other joint owners in any of the Owner Interests, if any, desire to permanently plug and abandon a well in the Development Area that was producing on the Execution Date (each a "**P&A Well**"), Owner (or, if the Contract Operator Agreement is then in effect, NewCo) shall provide NewCo, no later than the earlier of (A) fifteen (15) days prior to the election deadline set forth in the applicable Third Party Operating Agreement, if any, for which the Owner must elect whether to permanently plug and abandon such well and (B) one hundred and twenty (120) days prior to the commencement of such plugging, abandonment, dismantling, or decommissioning, a written notice to NewCo ("**Abandonment Notice**") that identifies such P&A Well and, if there are no other then-completed wells within such applicable aliquot, the leasehold interests in the aliquot within which such P&A Well is then completed and for which BOEM would recognize an assignment of such interest to NewCo (the "**P&A Leasehold**"); provided that if the Contact Operator Agreement is

18

then in effect or if NewCo or its Affiliate is then the contract service provider to Owner, Owner shall not be obligated to provide any such Abandonment Notice to NewCo.  Notwithstanding anything herein to the contrary, Owners shall have no liability or obligations to NewCo as a result of the failure to provide NewCo with any Abandonment Notice.

(b)    Right to Acquire P&A Well.  Subject to the terms of any Third Party Operating Agreement, NewCo may elect to acquire all or any P&A Well and the corresponding P&A Leasehold, if any, by delivering a written election to acquire same no later than ten (10) days after NewCo's receipt of an Abandonment Notice.  If NewCo fails to deliver a written election to acquire any P&A Well prior to or on the date ten (10) days after receipt of an Abandonment Notice, such failure shall be deemed an election not to acquire any such P&A Well. Notwithstanding anything in this Agreement to the contrary, NewCo's election to acquire any P&A Well may be accepted or rejected by Owner in Owner's sole discretion.

(c)    Effect of Exercise.  If NewCo validly elects to acquire any P&A Well and the corresponding P&A Leasehold, if any, such election shall constitute a binding obligation of NewCo to acquire Owner Interests in same no later than the later of (i) sixty (60) days after NewCo's election or (ii) the date NewCo obtains all applicable pre-assignment approvals, qualifications, right of use easements, and permits required under applicable Laws and contracts to acquire and operate (if applicable) such P&A Well and P&A Leasehold, if any.  Owner and NewCo shall execute and deliver to NewCo such forms and instruments reasonably requested by NewCo or Owner, including an assignment in form mutually agreeable to the Parties; provided, however, that the P&A Well and P&A Leasehold, if any, shall be assigned subject to this Agreement, "as-is" and without warranties of any kind, and expressly subject to all agreements and matters of record and all existing encumbrances.  In consideration for such assignment, NewCo shall assume, and perform and indemnify, defend, and hold harmless Owner, from the P&A Costs with respect to such P&A Well and P&A Leasehold, if any; however, Owner shall retain liability for and indemnify, defend, and hold harmless NewCo for all other obligations related to the time period prior to the assignment.  Furthermore, NewCo must provide Owner with a mutually agreed upon security instrument covering the full estimated cost for such P&A Well at the time of the assignment, which shall remain in place until NewCo has completed the P&A for such P&A Well. In connection with delivery of the assignment hereunder, at the sole cost and expense of NewCo, the Owner shall deliver to, or cause to be delivered to, NewCo all Well Data and all other records and information in its possession with respect to the P&A Well in a manner reasonably agreed to by the Parties.  Owner shall cooperate with NewCo to execute any assignment, designation of operator, or any other instrument reasonably required by NewCo to consummate the intent of this Section 4.10, including NewCo becoming the owner and designated operator of the P&A Well and P&A Leasehold, if any.

**Section 4.11.  Processing Fees.**

(a)    Subject to any applicable Third Party Operating Agreement, NewCo agrees to pay of its proportionate share of all fees associated with any production handling agreement or any other agreement governing the processing of production at any facility owned in part or in whole or operated by Owner.

19

(b)     Subject to any applicable Third Party Operating Agreement, in absence of a production handling agreement or any other agreement covering the processor of production any facility owned by Owner, NewCo hereby agrees to pay Owner the following fees for the NewCo Earned Interest share of production processed at any facility owned in party or in whole by Owner:

    (i)     $2.00 per barrel for oil/condensate;

    (ii)     $1.50 per barrel for water; and

    (iii)     $0.20 per MCF for gas.

As used herein, "MCF" means one thousand cubic feet measured at standard pressure and temperature, defined to as cubic feet of volume at 60 degrees Fahrenheit and 14.7 pounds per square inch and a "barrel" is 42 U.S. gallons.

Effective March 1 of each year during which any production from a Project conducted under this Agreement is processed under this Section 4.11, the fees to be charged hereunder shall be adjusted by multiplying the rates then in effect by the percentage increase, if any, in the consumer price index, as published by the Bureau of Labor Statistics of the United States Department of Labor for all Urban Consumers, specifically, the "All Items" Unadjusted Expenditure Category (the "CPI-U"), from (i) December 31 of the year immediately preceding the year then just ended to (ii) December 31 of the year just ended.  For the avoidance of doubt, no adjustment will be made in the event of a decrease in the CPI-U for an applicable year.

For the avoidance of doubts, the "Operating Costs" used for the purpose of calculating the NewCo NPI and for determining when NewCo has reached the Recovery Threshold shall include the processing fees provided herein with respect to NewCo NPI share of production resulting from the Capital Development Project.  For the purpose of this Section 4.11, the NewCo NPI share means fifty percent (50%) of Owner's Interest in the production.

**Section 4.12.   <u>Expert Determination of Pre-Existing Net Profit</u>.**  If, as contemplated in the definition of Pre-Existing Net Profit, a Party submits the determination of Pre-Existing Net Profit with respect to any Capital Development Project to the Expert, the procedures set forth in this Section 4.12 shall apply.  Prior to submitting such matter to the Expert, the Party intending to make the submission shall provide written notice to the other Party of such intent.  If the Parties are still unable to agree upon the Pre-Existing Net Profit within five (5) Business Days following the other Party's receipt of the notice provided herein, then the Party intending to submit the matter to the Expert may so submit such matter to the Expert for final and binding determination.  To submit the determination of Pre-Existing Net Profit to the Expert, the submitting Party shall provide the Expert and the other Party with written notice of its request to have the Expert determine Pre-Existing Net Profit.  Within five (5) Business Days of providing that notice, the Parties shall each provide the Expert with (a) such data and information as is necessary for the Expert to be able to determine the Pre-Existing Net Profit, which data and information shall include applicable Well Data, Evaluation Data, and production data relating to the well that is the subject of such proposed Capital Development Project and (b) such Party's estimate of the Pre-Existing Net Profit.  The Expert shall, within five (5) Business Days of receiving such data and information, make its calculation of the Pre-Existing Net Profit using the data and information it has received from the

20

Parties and the most recently available forward curve strip pricing for crude oil and natural gas as provided by NYMEX as of the date preceding the Expert's determination. In making its determination hereunder, the Expert (i) shall be bound by the provisions of this Section 4.12 and the related definitions and (ii) may not assign a value to the Pre-Existing Net Profit greater than the value provided by Owner or less than the value provided by NewCo. If, prior to the Expert finalizing its determination of the Pre-Existing Net Profit, the Parties reach agreement, then they may withdraw the matter from the Expert. The determination of the Expert shall be (x) final and binding on the Parties and (y) final and non-appealable for all purposes hereunder. The fees and expenses of the Expert under this Section 4.12 shall be borne one half by the Owner and one half by NewCo. If the party selected as the Expert is unable or unwilling to serve as the Expert hereunder, then the Expert shall be selected by lot from among the nationally recognized independent reserves or reservoir engineering firms that have not represented any Party or its Affiliates at any time during the three-year period of time immediately preceding its designation hereunder.

## ARTICLE V.
## MISCELLANEOUS

**Section 5.1.** **Notices**. All notices, copies, and other communications that are required or that may be given pursuant to this Agreement (including notices to change the below information) shall be (a) sufficient in all respects if given in writing, in English, and delivered by both email and, additionally, by mail, or recognized courier service to the Party to be noticed or copied pursuant to the contact information below that corresponds with the applicable form of notice and (b) deemed received when actually delivered (as reflected by the courier's receipt or similar electronic receipt (as to email transmissions) or without receipt of invalid delivery):

If to NewCo:

Mako Buyer LLC
2000 W. Sam Houston Parkway, Suite 1200
Houston, Texas 77042
Attn: Thomas R. Lamme
Telephone: (713) 969-1107
Email: TLamme@fwellc.com

If to Owner:

Fieldwood Energy IV LLC
2000 W. Sam Houston Parkway S., Suite 1200
Houston, Texas 77042
Attn: Sole Manager
Telephone: _____
Email: _____

or to such other address or addresses as the Parties may from time to time designate in writing.

21

**Section 5.2.** **Conflicts**.  To the extent that any provision of this Agreement conflicts with the provisions of the Contractor Operator Agreement, then as solely between the Parties, the provisions of this Agreement shall govern and control.  Additionally, Owner's elections in this Agreement are subject to the Company Agreement.

**Section 5.3.** **Governing Law**.  This Agreement shall be governed and construed in accordance with the Laws of the State of Texas, without regard to the Laws that might be applicable under conflicts of laws principles.

**Section 5.4.** **Venue**.  Each Party consents to personal jurisdiction in any action brought in the United States federal and state courts located in the State of Texas with respect to any dispute, claim, or controversy arising out of or in relation to or in connection with this Agreement, and each of the Parties hereto agrees that any action instituted by it against the other with respect to any such dispute, controversy, or claim will be instituted exclusively in the state and federal district courts located in Harris County, Texas.  EACH PARTY HEREBY IRREVOCABLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY LAW, ANY OBJECTION WHICH THEY MAY NOW OR HEREAFTER HAVE TO THE VENUE OF ANY SUCH DISPUTE ARISING OUT OF THIS AGREEMENT BROUGHT IN SUCH COURT OR ANY DEFENSE OF INCONVENIENT FORUM FOR THE MAINTENANCE OF SUCH DISPUTE.

**Section 5.5.** **Waiver of Jury Trial**.  EACH OF THE PARTIES AND THEIR RESPECTIVE SUCCESSORS AND ASSIGNS HEREBY IRREVOCABLY WAIVES ALL RIGHT TO TRIAL BY JURY IN ANY ACTION, PROCEEDING, OR COUNTERCLAIM (WHETHER BASED ON CONTRACT, TORT, OR OTHERWISE) ARISING OUT OF OR RELATING TO THIS AGREEMENT, THE TRANSACTIONS CONTEMPLATED HEREBY, OR THE ACTIONS OF ANY OTHER PARTY IN THE NEGOTIATION, ADMINISTRATION, PERFORMANCE, AND ENFORCEMENT THEREOF.

**Section 5.6.** **Expenses**.  Except as provided in another agreement, all fees, costs, and expenses incurred by NewCo and Owner in negotiating this Agreement shall be paid by the Party incurring the same, including, without limitation, legal fees, costs, and expenses.

**Section 5.7.** **Compliance with Law**.  Each Party agrees that it will comply with applicable Laws, rules, regulations, and orders of Governmental Authority in the performance of this Agreement.

**Section 5.8.** **Amendment**.  This Agreement may be amended or modified only by a duly authorized agreement in writing that makes reference to this Agreement executed by each Party.

**Section 5.9.** **Waiver**.  Any failure by any Party to comply with any of its obligations, agreements, or conditions herein contained may be waived by the Party to whom such compliance is owed by an instrument signed by the Party to whom compliance is owed and expressly identified as a waiver, but not in any other manner.  No waiver of, or consent to a change in or modification of, any of the provisions of this Agreement shall be deemed or shall constitute a waiver of, or consent to a change in or modification of, any other provisions hereof (whether or not similar), nor shall such waiver constitute a continuing waiver unless otherwise expressly provided.

22

**Section 5.10.  Entire Agreement**.  This Agreement (together with the Exhibits hereto) and the other Transaction Documents constitute the entire agreement among the Parties and supersede any term sheets or oral agreements that may have been made or entered into by the Parties or any of their respective Affiliates relating to the transactions contemplated hereby.

**Section 5.11.  Assignment**.  No Party may assign any interest in this Agreement without the prior written consent of the other Party(ies).  This Agreement is personal to the Parties, and any attempted assignment shall be void *ab initio*; provided that the foregoing shall not apply if NewCo assigns this Agreement along with its personnel to an Affiliate.  Neither assignment nor consent to assignment shall relieve or release the assignor from its obligations under this Agreement, without an express written release signed by the other Party or Parties.  Notwithstanding anything herein to the contrary, this Agreement is personal between Owner and NewCo and shall not constitute a covenant running with the lands included in the Development Area or a burden on any Owner Interests except as to a particular Owner Interest for which (x) Owner has received a Proposal from NewCo relating to such Owner Interest and (y) such NewCo Proposal has not terminated, been withdrawn, or deemed to have been withdrawn.

**Section 5.12.  Binding Effect**.  The covenants, provisions, and conditions contained in each Assignment given pursuant to this Agreement are agreed and acknowledged to be covenants running with the land and the respective interests of the Parties and will be binding upon and inure to the benefit of the Parties and their respective successors and assigns.

**Section 5.13.  Further Assurances**.  Subject to the terms and conditions of this Agreement, each Party shall use its reasonable efforts to take, or cause to be taken, all actions and to do, or cause to be done, all things necessary or desirable, under applicable Law or otherwise, to consummate the transactions contemplated by this Agreement.  The Parties agree to and shall execute and deliver such other documents, certificates, agreements, and other writings and to take such other actions as may be necessary or desirable in order to consummate or implement expeditiously the transactions contemplated by this Agreement in accordance with the terms hereof.

**Section 5.14.  Construction**.

(a)  All article, section, schedule, and exhibit references used in this Agreement are to articles and sections of, and Schedules and Exhibits to, this Agreement, unless otherwise specified. The Schedules and Exhibits attached to this Agreement shall not amend or modify this Agreement, but the facts (as distinguished from agreements) stated therein are incorporated herein for all purposes.

(b)  Unless otherwise indicated, with respect to either Party, the terms "ordinary course of business" or "ordinary course" shall be deemed to refer to the ordinary conduct of business in a manner consistent with the past practices and customs of such Party.

(c)  If a term is defined as one part of speech (such as a noun), it shall have a corresponding meaning when used as another part of speech (such as a verb).  Terms defined in the singular have the corresponding meanings in the plural, and vice versa. Unless the context of this Agreement clearly requires otherwise, words importing the masculine gender shall include the feminine and neutral genders and vice versa.  The words "include", "includes" or "including"

23

Debtors' Exhibit No. 34
Page 569 of 910

do not limit the preceding terms and shall be deemed to be followed by the words "without limitation." The words "hereof," "hereto," "hereby," "herein," "hereunder" and words of similar import, when used in this Agreement, shall refer to this Agreement as a whole and not to any particular section or article in which such words appear. The term "or" is not exclusive.

(d)     The terms "day" and "days" mean and refer to calendar day(s). The terms "year" and "years" mean and refer to calendar year(s). If any action is to be taken or given on or by a particular calendar day, and such calendar day is not a Business Day, then such action shall be deferred until the next Business Day.

(e)     Owner and NewCo have each participated in the negotiation and drafting of this Agreement and if an ambiguity should arise, this Agreement shall be construed as if drafted jointly by the Parties, and no presumption or burden of proof shall arise favoring or burdening any Party by virtue of the authorship of any of the provisions in this Agreement.

(f)     The captions in this Agreement are for convenience only and shall not be considered a part of or affect the construction or interpretation of any provision of this Agreement.

(g)     The phrase "made available" means that such Party or one of its Affiliates or Representatives has had the opportunity prior to the date hereof to review such documents or materials at the offices of another Party or its Affiliates.

(h)     All references to currency herein shall be to, and all payments required hereunder shall be paid in, United States Dollars.

(i)     The serial comma is sometimes included and sometimes omitted. Its inclusion or omission shall not affect the interpretation of any phrase.

**Section 5.15.   No Partnership**.  Except as otherwise expressly provided in this Agreement, (a) nothing in this Agreement is intended to create, or shall be construed as creating, a partnership, joint venture, association for profit, or other business entity between or among the Parties and (b) for federal and state income tax purposes, the Parties do not intend that the provisions of Subchapter K, Chapter 1, Subtitle A of the Internal Revenue Code of 1986, as amended, as permitted and authorized by Section 761 of said Code and the regulations promulgated thereunder apply to the transactions described in this Agreement.

**Section 5.16.   Severability**.  If any provision of this Agreement is held invalid or unenforceable by any court of competent jurisdiction, the other provisions of this Agreement remain in full force and effect. The Parties further agree that if any provision contained herein is, to any extent, held invalid or unenforceable in any respect under the Laws governing this Agreement, they shall take any actions necessary to render the remaining provisions of this Agreement valid and enforceable to the fullest extent permitted by Law and, to the extent necessary, shall amend or otherwise modify this Agreement to replace any provision contained herein that is held invalid or unenforceable with a valid and enforceable provision giving effect to the intent of the Parties to the greatest extent legally permissible.

24

**Section 5.17.  Third Party Beneficiaries**.  Owner and NewCo acknowledge and agree that this Agreement is entered solely for the benefit of the Parties hereto and shall not create any rights, including without limitation third-party beneficiary rights, in favor of any other party.

**Section 5.18.  Counterparts**.  This Agreement may be executed in two or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.  Any .pdf or other electronic transmission hereof or signature hereon shall, for all purposes, be deemed originals.

[Remainder of Page Intentionally Blank]

25

Executed as of the Execution Date but effective as of the Effective Date.

**OWNER:**

**FIELDWOOD ENERGY IV LLC**

By: _____
Name:
Title:

**NEWCO:**

**MAKO BUYER LLC**

By: _____
Name:
Title:

Signature Page to Joint Development Agreement

## EXHIBIT A

## DEVELOPMENT AREA (INCLUDING OIL AND GAS LEASES)

| Area / Block | Lease Number |
|---|---|
| BA A-105 | OCS-G01757 |
| BA A-133 | OCS-G02665 |
| EB 158 | OCS-G02645 |
| EB 159 | OCS-G02646 |
| EB 160 | OCS-G02647 |
| EB 161 | OCS-G02648 |
| SS 169 | OCS-00820 |

**EXHIBIT B**

**<u>Form of Net Profits Interest Assignment</u>**

(See attached.)

## ASSIGNMENT OF NET PROFITS INTEREST

This ASSIGNMENT OF NET PROFITS INTEREST ("**Assignment**") dated [_____, 202_], but effective as of 12:01 a.m. Central Standard Time, on [●], 202_ (the "**Effective Time**"), is from Fieldwood Energy IV LLC, a Texas limited liability, with an office at 2000 West Sam Houston Parkway South, Suite 1200, Houston, Texas 77042 ("**Assignor**") to Mako Buyer LLC, a Delaware limited liability company, with an office at 2000 West Sam Houston Parkway South, Suite 1200, Houston, Texas 77042 ("**Assignee**").  Assignor and Assignee sometimes individually referred to herein as, a "**Party**" and collectively referred to herein as, the "**Parties**".

FOR Ten Dollars ($10.00) and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Assignor hereby GRANTS, BARGAINS, SELLS, CONVEYS and ASSIGNS to Assignee the Assigned NPI (as defined below), reserving unto Assignor the ORRI.

TO HAVE AND TO HOLD the Assigned NPI under Assignee subject to the ORRI and the following terms and conditions:

1.      As used in this Assignment, the following terms shall have the meanings ascribed to them below:

"Affiliate" means, with respect to any Person, any other Person that, directly or indirectly, controls, is controlled by or is under common control with, such specified Person through one (1) or more intermediaries or otherwise; provided, however, that, for the purposes of this Agreement, Assignor shall not be deemed an Affiliate of Assignee, and *vice versa*.  For the purposes of this definition, "control" means, where used with respect to any Person, the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of such Person, whether through the ownership of voting securities, by contract or otherwise, and the terms "controlling" and "controlled" have correlative meanings.

"Assigned NPI" means with respect to production from the Interval, a net profits interest equal to (i) one hundred percent (100%) of the Excess Net Profit until Assignee has reached the Recovery Threshold with respect to such Interval and (ii) from and after such time that Assignee has reached the Recovery Threshold with respect to such Interval, automatically reducing to fifty percent (50%) of the Excess Net Profit.

"Capital Development Project" has the meaning given such term in the Joint Development Agreement.

"Capital Development Project Costs" means, to the extent attributable to Assignor's right, title, and interest in and to the Interval, any and all out-of-pocket costs and expenses incurred in (i) preparing for and completing the Capital Development Project pursuant to which Assignee is receiving this Assignment and (ii) conducting all other operations set forth in the applicable Proposal for such Capital Development Project, including, without

limitation, all reasonable Third Party engineering costs, legal costs, and permitting costs, but excluding overhead and general and administrative costs.

"Excess Net Profit" means the Net Profit from a Capital Development Project over any applicable period, minus the Pre-Existing Net Profit.  For the purposes of this Assignment, the  Pre-Existing Net Profit that would have been realized over such period if the Capital Development Project had not been undertaken will be deemed to be zero ($0) for a recompletion where the well's production data from the most recent three (3) months of production prior to the date Assignee, or another operator pursuant to Section 4.4 of the Joint Development Agreement, applies for a permit to modify the applicable well shows the existing completion producing at average rates of less than fifty (50) barrels of oil per day or, if the well is a gas well, three hundred (300) MCFD of gas; provided, however, periods during which the well was intermittently shut-in during such three (3) month period shall be excluded from the calculation of average production so that such average is not artificially lowered as a result of any such intermittent shut-ins.

"Existing Burdens" has the meaning given such term in the Joint Development Agreement, as such is applied to Assignor's interest in the Well at the time the Proposal for this Capital Development Project was made.

"Interval" means the completed or reworked interval from [●] feet TVDSS to [●] feet TVDSS in the Lease as such production is obtained from the Well.

"Joint Development Agreement" means that certain Joint Development Agreement dated [●] by and between Fieldwood Energy IV LLC, as Owner, and Mako Buyer LLC, as NewCo.

"Lease" means that oil and gas lease [OCS or State of Louisiana No.  ] dated        granted by      in favor of      .

"MCFD" means thousand cubic feet of gas per day, as measured at a base temperature of sixty degrees Fahrenheit (60ºF) and a base pressure of fourteen and sixty-five hundredths (14.65) pounds per square inch absolute (psia).

"Net Profit" means, with respect to Assignor's rights, title, and interest in and to the production from the Interval, the difference obtained by subtracting Operating Costs from Revenue; where (i) "Operating Costs" equals the sum of (1) direct operating costs related to the Well during the applicable production month, including platform, facility, processing, and pipeline operating costs and fees allocated equally amongst all producing wells on or tied back to such platform, if applicable, (2) all Existing Burdens on such Interval, (3) all severance or other taxes measured or calculated based upon production from such Well (but for the avoidance of doubt, excluding income taxes and ad valorem taxes), and (4) the ORRI, and (ii) "Revenue" equals the net revenue attributable to Assignor's net revenue interest in the proceeds of production from the Interval for that applicable production month.

Debtors' Exhibit No. 34
Page 576 of 910

"ORRI" means, with respect to the Assigned NPI, an overriding royalty interest equal to twenty-five percent (25%) less Existing Burdens proportionately reduced to the Assigned NPI, as applicable and further proportionately reduced as the Assigned NPI may be reduced pursuant to the terms of the Joint Development Agreement as a result of Assignee achieving the Recovery Threshold with respect to the Interval.

"Person" means an individual, corporation, partnership, limited liability company, association, joint stock company, trust or trustee thereof, estate or executor thereof, unincorporated organization, joint venture, or any other legally recognizable entity.

"Pre-Existing Net Profit" means [●].

"Proposal" has the meaning given such term in the Joint Development Agreement.

"Recovery Threshold" means, with respect to the Capital Development Project resulting in this Assignment, Assignee's recovery from the Assigned NPI equal to one hundred percent (100%) of the Capital Development Project Costs incurred by Assignee in performing such Capital Development Project.

"Third Party" means any Person who is not a Party or any Affiliate of any Party.

"Well" means the [●] well located on [●].

2.    Agreements.  This Assignment is made subject to and is burdened by the Existing Burdens and the terms of the Joint Development Agreement.

3.    ORRI.  The ORRI is expressly reserved unto Assignor hereunder and shall be a non-operating, non-expense-bearing, overriding royalty interest, free of cost and expense of production, operations, marketing, and delivery of the hydrocarbons to the applicable delivery points.

4.    Warranties.  EXCEPT AS SET FORTH BELOW, THIS ASSIGNMENT IS MADE, AND THE ASSIGNED NPI IS CONVEYED AND ASSIGNED HEREUNDER, WITHOUT REPRESENTATION OR WARRANTY OF ANY KIND OR CHARACTER, INCLUDING, WITHOUT LIMITATION, WARRANTIES OF TITLE, FITNESS FOR ANY PARTICULAR PURPOSE, MARKETABILITY, MERCHANTABILITY, FREEDOM FROM DEFECTS, QUALITY OR PRESENCE OF HYDROCARBONS OR RESERVES, AND ANY OTHER REPRESENTATIONS AND WARRANTIES, EXPRESS OR IMPLIED, AT LAW OR IN EQUITY; AND ASSIGNOR DOES HEREBY DISCLAIM AND ASSIGNEE WAIVES ANY AND ALL SUCH REPRESENTATIONS OR WARRANTIES. THE ASSIGNED NPI SHALL BE ASSIGNED TO ASSIGNEE FREE AND CLEAR OF ANY AND ALL MORTGAGES, LIENS AND ENCUMBRANCES CREATED BY, THROUGH, OR UNDER ASSIGNOR.

5.    Compliance with Laws.  This Assignment is made subject to all applicable laws, statutes, ordinances, permits, decrees, orders, judgments, rules, and regulations that are promulgated, issued or enacted by a governmental entity having jurisdiction, and Assignee agrees to comply with the same on and after the Effective Time.

6.     Successors and Assigns.    The terms, covenants, and conditions contained in this Assignment are binding upon and inure to the benefit of the Parties and their respective successors and assigns, and such terms, covenants, and conditions are covenants running with the land and with each subsequent transfer or assignment of the Assets or any part thereof.

7.     Redhibition Waiver.    ASSIGNEE: (I) WAIVES ALL RIGHTS IN REDHIBITION PURSUANT TO LOUISIANA CIVIL CODE ARTICLES 2520, ET SEQ.; (II) ACKNOWLEDGES THAT THIS EXPRESS WAIVER SHALL BE CONSIDERED A MATERIAL AND INTEGRAL PART OF THIS SALE AND THE CONSIDERATION THEREOF; AND (III) ACKNOWLEDGES THAT THIS WAIVER HAS BEEN BROUGHT TO THE ATTENTION OF ASSIGNEE, HAS BEEN EXPLAINED IN DETAIL AND THAT ASSIGNEE HAS VOLUNTARILY AND KNOWINGLY CONSENTED TO THIS WAIVER OF WARRANTY OF FITNESS AND WARRANTY AGAINST REDHIBITORY VICES AND DEFECTS FOR INTERESTS ASSIGNED AND CONVEYED HEREUNDER.

8.     UTPCPL Waiver.    TO THE EXTENT APPLICABLE TO THE ASSIGNED NPI OR ANY PORTION THEREOF, ASSIGNEE HEREBY WAIVES THE PROVISIONS OF THE LOUISIANA UNFAIR TRADE PRACTICES AND CONSUMER PROTECTION LAW (LA. R.S. 51:1402, ET SEQ.).  ASSIGNEE WARRANTS AND REPRESENTS THAT IT: (I) IS EXPERIENCED AND KNOWLEDGEABLE WITH RESPECT TO THE OIL AND GAS INDUSTRY GENERALLY AND WITH TRANSACTIONS OF THIS TYPE SPECIFICALLY; (II) POSSESSES THE REQUISITE KNOWLEDGE, EXPERIENCE, AND EXPERTISE TO EVALUATE INDEPENDENTLY THE MERITS AND RISKS OF THE TRANSACTIONS HEREIN CONTEMPLATED; AND (III) IS NOT IN A SIGNIFICANTLY DISPARATE BARGAINING POSITION.

9.     Further Assurances.  Each Party covenants and agrees to execute and deliver to the other Party all such additional reasonable instruments and other documents and will do all such other reasonable acts and things as may be reasonably necessary to accomplish the intent of this Assignment.

10.    Governing Law.  This Assignment shall be governed and construed in accordance with the Laws of the State of Texas, without regard to the Laws that might be applicable under conflicts of laws principles.

11.    Jurisdiction and Venue.  Each Party consents to personal jurisdiction in any action brought in the United States federal and state courts located in the State of Texas with respect to any dispute, claim, or controversy arising out of or in relation to or in connection with this Assignment, and each of the Parties hereto agrees that any action with respect to any such dispute, controversy, or claim will be determined exclusively in a state or federal district court located in Harris County, Texas, and they do hereby irrevocably submit to the exclusive jurisdiction of such courts for such purposes.  Each Party hereby irrevocably waives, to the fullest extent permitted by law, any objection which they may now or hereafter have to the venue of any such dispute arising out of this assignment brought in such court or any defense of inconvenient forum for the maintenance of such dispute.

12.    Counterparts.  This Assignment may be executed in any number of counterparts and each of such counterparts shall for all purposes be deemed to be an original, and all such counterparts shall together constitute but one and the same Assignment.

Debtors' Exhibit No. 34
Page 578 of 910

[*Signature Page to Follow*]

EXECUTED on the day and year first referenced above, but effective as of the Effective Time.

**WITNESSES:**

**ASSIGNOR:**

**FIELDWOOD ENERGY IV LLC**

_____
Name: _____

By: _____
Name: _____
Title: _____

_____
Name: _____


STATE OF [●]                    §
                                §
COUNTY OF [●]                   §

On this _____ day of _____, 202_, before me appeared [●] to me personally known, who, being by me duly sworn (or affirmed) did say that [he/she] is the [●] of Fieldwood Energy IV LLC, a Texas limited liability company, and that the instrument was signed on behalf of the limited liability company and by the authority of the Members and that [he/she] acknowledged the instrument to be the free act and deed of the limited liability company.


_____
NOTARY PUBLIC
STATE OF [●]
COUNTY OF [●]
Printed Name: _____

.

**ASSIGNEE:**

**WITNESSES:**                     **MAKO BUYER LLC**


_____        By: _____
Name: _____        Name: _____
                               Title: _____


_____
Name: _____


STATE OF [●]                §
                            §
COUNTY OF [●]               §

On this ____ day of _____, 202_, before me appeared [●] to me personally known, who, being by me duly sworn (or affirmed) did say that [he/she] is the [●] of Mako Buyer LLC, a Delaware limited liability company, and that the instrument was signed on behalf of the limited liability company and by the authority of the Members and that [he/she] acknowledged the instrument to be the free act and deed of the limited liability company.


                            _____
                            NOTARY PUBLIC
                            STATE OF [●]
                            COUNTY OF [●]
                            Printed Name: _____


.

**EXHIBIT C**

**<u>Form of Election Well Assignment</u>**

(See attached.)

## ASSIGNMENT AND BILL OF SALE

This ASSIGNMENT AND BILL OF SALE ("**Assignment**") dated [_____, 2021], but effective as of 12:01 a.m. Central Standard Time, on [●], 2021 (the "**Effective Time**"), is from Fieldwood Energy IV LLC, a Texas limited liability with an office at 2000 West Sam Houston Parkway South, Suite 1200, Houston, Texas 77042 ("**Assignor**") to Mako Buyer LLC, a Delaware limited liability company, with an office at 2000 West Sam Houston Parkway South, Suite 1200, Houston, Texas 77042 ("**Assignee**").  Assignor and Assignee are sometimes individually referred to herein as, a "**Party**" and collectively referred to herein as, the "**Parties**".

FOR Ten Dollars ($10.00) and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Assignor hereby GRANTS, BARGAINS, SELLS, CONVEYS and ASSIGNS to Assignee the Assigned Interest (as defined below), reserving unto Assignor the ORRI.

TO HAVE AND TO HOLD the Assigned Interest under Assignee subject to the ORRI and the following terms and conditions:

1.      As used in this Assignment, the following terms shall have the meanings ascribed to them below:

"Affiliate" means, with respect to any Person, any other Person that, directly or indirectly, controls, is controlled by or is under common control with, such specified Person through one (1) or more intermediaries or otherwise; provided, however, that, for the purposes of this Agreement, Assignor shall not be deemed an Affiliate of Assignee, and *vice versa*.  For the purposes of this definition, "control" means, where used with respect to any Person, the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of such Person, whether through the ownership of voting securities, by contract or otherwise, and the terms "controlling" and "controlled" have correlative meanings.

"Assigned Interest" means (subject to and excluding (i) the ORRI and (ii) all of Assignor's rights, title, and interests in and to all Other Wells) (a) one hundred percent (100%) of Assignor's right, title, and interest as of the Effective Time in and to the Prospect Area until Assignee has reached the Recovery Threshold with respect to the Well and (b) from and after such time that Assignee has reached the Recovery Threshold with respect to such Well, automatically reducing to fifty percent (50%) of Assignor's rights, title, and interest as of the Effective Time in and to the Prospect Area.

"Existing Burdens" has the meaning given such term in the Joint Development Agreement, as such is applied to Assignor's interest in the Well immediately prior to the Effective Time.

"Joint Development Agreement" means that certain Joint Development Agreement dated [●] by and between Fieldwood Energy IV LLC and Mako Buyer LLC.

"Leases" means the oil and gas lease(s) described on Exhibit "A" attached hereto and made a part hereof.

"ORRI" means, with respect to the Assigned Interest, an overriding royalty interest equal to twenty-five percent (25%) less Existing Burdens proportionately reduced to the Assigned Interest, as applicable and further proportionately reduced as the Assigned Interest may be reduced pursuant to the terms of the Joint Development Agreement as a result of Assignee achieving the Recovery Threshold.

"Other Wells" means any and all wells located within the Prospect Area as of the Effective Time other than the Well.

"Person" means an individual, corporation, partnership, limited liability company, association, joint stock company, trust or trustee thereof, estate or executor thereof, unincorporated organization, joint venture, or any other legally recognizable entity.

"Project" means the Project (as defined in the Joint Development Agreement) with respect to the Well.

"Proposal" has the meaning given such term in the Joint Development Agreement.

"Prospect Area" means the Leases, limited as to the lands described on Exhibit "B" attached hereto and made a part hereof, limited in depth from the stratigraphic equivalent of the top of the formation found at [●] feet TVDSS as identified on the [●] log down to and including the stratigraphic equivalent of 100 feet below the base of the formation, as such base is found at [●] feet TVDSS as identified on the [●] log.

"Recovery Threshold" means, with respect to the Well, Assignee's recovery from the Assigned Interest an amount equal to one hundred percent (100%) of the Well Costs incurred by Assignee with respect to such Project.

"Third Party" means any Person who is not a Party or any Affiliate of any Party.

"Well" means the [●] well, API No. _____ , located on OCS _____[●].

"Well Costs" means, to the extent attributable to Assignor's right, title, and interest in and to the Well, any and all out-of-pocket costs and expenses incurred in (i) drilling, evaluating, completing, and equipping the Well and (ii) conducting all other operations set forth in the applicable Proposal for such Well, including, without limitation, all reasonable Third Party engineering costs, legal costs, and permitting costs, but excluding overhead and general and administrative costs.

2.    Agreements.  This Assignment is made subject to and is burdened by the Existing Burdens and the terms of the Joint Development Agreement.

3.    ORRI.  The ORRI is expressly reserved unto Assignor hereunder and shall be a non-operating, non-expense-bearing, overriding royalty interest, free of cost and expense of production, operations, marketing, and delivery of the hydrocarbons to the applicable delivery points.

4.    Warranties.  EXCEPT AS PROVIDED IN THE FOLLOWING SENTENCES, THIS ASSIGNMENT IS MADE, AND THE ASSIGNED INTEREST IS CONVEYED AND ASSIGNED HEREUNDER, WITHOUT

Debtors' Exhibit No. 34
Page 584 of 910

REPRESENTATION OR WARRANTY OF ANY KIND OR CHARACTER, INCLUDING, WITHOUT LIMITATION, WARRANTIES OF TITLE, FITNESS FOR ANY PARTICULAR PURPOSE, MARKETABILITY, MERCHANTABILITY, FREEDOM FROM DEFECTS, QUALITY OR PRESENCE OF HYDROCARBONS OR RESERVES, AND ANY OTHER REPRESENTATIONS AND WARRANTIES, EXPRESS OR IMPLIED, AT LAW OR IN EQUITY; AND ASSIGNOR DOES HEREBY DISCLAIM AND ASSIGNEE WAIVES ANY AND ALL SUCH REPRESENTATIONS OR WARRANTIES. THE ASSIGNED INTEREST IS CONVEYED AND ASSIGNED TO AND ACCEPTED BY ASSIGNEE IN ITS "AS IS, WHERE IS" CONDITION AND STATE OF REPAIR, AND WITH ALL FAULTS AND DEFECTS, WITHOUT ANY REPRESENTATION, WARRANTY, OR COVENANT OF ANY KIND OR NATURE, EXPRESS, IMPLIED OR STATUTORY. NOTWITHSTANDING ANY OF THE FOREGOING, ASSIGNOR WARRANTS THAT THE ASSIGNED INTEREST ARE BEING ASSIGNED TO ASSIGNEE FREE AND CLEAR OF ANY AND ALL MORTGAGES, LIENS, AND ENCUMBRANCES CREATED BY, THROUGH, OR UNDER FIELDWOOD ENERGY LLC, ASSIGNOR OR ANY AFFILIATE OF EITHER ENTITY. ASSIGNOR AND ASSIGNEE EXPRESSLY AGREE AND UNDERSTAND THAT THIS ASSIGNMENT IS MADE PURSUANT TO THE JOINT DEVELOPMENT AGREEMENT.

5.  Compliance with Laws.  This Assignment is made subject to all applicable laws, statutes, ordinances, permits, decrees, orders, judgments, rules, and regulations that are promulgated, issued or enacted by a governmental entity having jurisdiction, and Assignee agrees to comply with the same on and after the Effective Time.

6.  Successors and Assigns.  The terms, covenants, and conditions contained in this Assignment are binding upon and inure to the benefit of the Parties and their respective successors and assigns, and such terms, covenants, and conditions are covenants running with the land and with each subsequent transfer or assignment of the Assets or any part thereof.

7.  Redhibition Waiver.  ASSIGNEE: (I) WAIVES ALL RIGHTS IN REDHIBITION PURSUANT TO LOUISIANA CIVIL CODE ARTICLES 2520, ET SEQ.; (II) ACKNOWLEDGES THAT THIS EXPRESS WAIVER SHALL BE CONSIDERED A MATERIAL AND INTEGRAL PART OF THIS SALE AND THE CONSIDERATION THEREOF; AND (III) ACKNOWLEDGES THAT THIS WAIVER HAS BEEN BROUGHT TO THE ATTENTION OF ASSIGNEE, HAS BEEN EXPLAINED IN DETAIL AND THAT ASSIGNEE HAS VOLUNTARILY AND KNOWINGLY CONSENTED TO THIS WAIVER OF WARRANTY OF FITNESS AND WARRANTY AGAINST REDHIBITORY VICES AND DEFECTS FOR INTERESTS ASSIGNED AND CONVEYED HEREUNDER.

8.  UTPCPL Waiver.  TO THE EXTENT APPLICABLE TO THE ASSIGNED INTEREST OR ANY PORTION THEREOF, ASSIGNEE HEREBY WAIVES THE PROVISIONS OF THE LOUISIANA UNFAIR TRADE PRACTICES AND CONSUMER PROTECTION LAW (LA. R.S. 51:1402, ET SEQ.). ASSIGNEE WARRANTS AND REPRESENTS THAT IT: (I) IS EXPERIENCED AND KNOWLEDGEABLE WITH RESPECT TO THE OIL AND GAS INDUSTRY GENERALLY AND WITH TRANSACTIONS OF THIS TYPE SPECIFICALLY; (II) POSSESSES THE REQUISITE KNOWLEDGE, EXPERIENCE, AND EXPERTISE TO EVALUATE INDEPENDENTLY THE MERITS AND RISKS OF THE TRANSACTIONS HEREIN CONTEMPLATED; AND (III) IS NOT IN A SIGNIFICANTLY DISPARATE BARGAINING POSITION.

9.  Further Assurances.  Each Party covenants and agrees to execute and deliver to the other Party all such additional reasonable instruments and other documents and will do all such other reasonable acts and things as may be reasonably necessary to accomplish the intent of this Assignment.

Debtors' Exhibit No. 34
Page 585 of 910

10.     <u>Governing Law</u>.  This Assignment shall be governed and construed in accordance with the Laws of the State of Texas, without regard to the Laws that might be applicable under conflicts of laws principles.

11.     <u>Jurisdiction and Venue</u>.  Each Party consents to personal jurisdiction in any action brought in the United States federal and state courts located in the State of Texas with respect to any dispute, claim, or controversy arising out of or in relation to or in connection with this Assignment, and each of the Parties hereto agrees that any action with respect to any such dispute, controversy, or claim will be determined exclusively in a state or federal district court located in Harris County, Texas, and they do hereby irrevocably submit to the exclusive jurisdiction of such courts for such purposes.  Each Party hereby irrevocably waives, to the fullest extent permitted by law, any objection which they may now or hereafter have to the venue of any such dispute arising out of this assignment brought in such court or any defense of inconvenient forum for the maintenance of such dispute.

12.     <u>BOEM Assignment Form</u>.  The Parties acknowledge and agree that this Assignment may be attached to a Form BOEM-0151 or other assignment form required by a governmental authority (a "<u>Government Required Form</u>").  The Parties agree that, to the extent of any conflict between this Assignment and any such Government Required Form the Parties may execute in connection herewith, such Government Required Form shall control to extent required by applicable law for the Bureau of Ocean Energy Management (or other applicable governmental authority) to approve the Parties' assignment hereunder.

13.     <u>Counterparts</u>.  This Assignment may be executed in any number of counterparts and each of such counterparts shall for all purposes be deemed to be an original, and all such counterparts shall together constitute but one and the same Assignment.

[*Signature Pages to Follow*]

Debtors' Exhibit No. 34
Page 586 of 910

EXECUTED by Assignor in the presence of the undersigned competent witnesses on the date and year referenced in the notarial acknowledgment below, but effective as of the Effective Time.

**WITNESSES:**

**ASSIGNOR:**

**FIELDWOOD ENERGY IV LLC**

_____

Name: _____

By: _____
Name: _____
Title: _____

_____

Name: _____

STATE OF [●]                              §
                                         §
COUNTY OF [●]                            §

On this _____ day of _____, 202_, before me, the undersigned notary public in and for the foregoing jurisdiction, appeared [●] to me personally known, who, being by me duly sworn (or affirmed) did say that [he/she] is the [●] of Fieldwood Energy IV LLC, a Texas limited liability company, and that the instrument was signed on behalf of the limited liability company and by the authority of its governing authority and that [he/she] acknowledged the instrument to be the free act and deed of the limited liability company.

_____
NOTARY PUBLIC
STATE OF [●]
COUNTY OF [●]
Printed Name: _____
Notarial Commission No._____
My commission expires: _____

Debtors' Exhibit No. 34
Page 587 of 910

EXECUTED by Assignee in the presence of the undersigned competent witnesses on the date and year referenced in the notarial acknowledgment below, but effective as of the Effective Time.

**ASSIGNEE:**

**WITNESSES:**                               **MAKO BUYER LLC**

_____

Name: _____

                                             By: _____

                                             Name: _____

                                             Title: _____

_____

Name: _____

STATE OF [●]                         §
                                             §

COUNTY OF [●]                    §

On this _____ day of _____, 202_, before me, the undersigned notary public in and for the foregoing jurisdiction, appeared [●] to me personally known, who, being by me duly sworn (or affirmed) did say that [he/she] is the [●] of Mako Buyer LLC, a Delaware limited liability company, and that the instrument was signed on behalf of the limited liability company and by the authority of its governing authority and that [he/she] acknowledged the instrument to be the free act and deed of the limited liability company.

_____
NOTARY PUBLIC
STATE OF [●]
COUNTY OF [●]
Printed Name: _____
Notarial Commission No._____
My commission expires: _____

**EXHIBIT "A"**

**ATTACHED TO AND MADE A PART OF THAT CERTAIN ASSIGNMENT AND BILL OF SALE DATED [●] BY AND BETWEEN FIELDWOOD ENERGY IV LLC, AS ASSIGNOR, AND MAKO BUYER LLC, AS ASSIGNEE**

**THE LEASES**

**EXHIBIT "B"**

**ATTACHED TO AND MADE A PART OF THAT CERTAIN ASSIGNMENT AND BILL OF SALE DATED [●] BY AND BETWEEN FIELDWOOD ENERGY IV LLC, AS ASSIGNOR, AND MAKO BUYER LLC, AS ASSIGNEE**

**THE PROSPECT AREA**

**EXHIBIT D**

**<u>Form of Operating Agreement</u>**

(See attached.)

Professionals Eyes Only
Highly Confidential
Subject to FRE 408

EXHIBIT "D"

Attached to and made a part of that certain Joint Development Agreement dated effective _____ __, 202_, by and between _____, as Operator, and _____, as Non-Operators

# OFFSHORE OPERATING AGREEMENT

## _____

## (OPERATOR)

## AND

## _____,

## _____, and _____

## (NON-OPERATORS)

## COVERING

## [_____]

## EFFECTIVE _____, 20__

#93828440v3
#93828440v5



Case 20-33948   Document 1562-2   Filed in TXSB on 06/15/21   Page 1242 of 1636

Professionals Eyes Only
Highly Confidential
Subject to FRE 408

# Table of Contents

**ARTICLE 1 – APPLICATION** ...................................................................................................1

1.1     A<small>PPLICATION TO</small> E<small>ACH</small> L<small>EASE</small> ...........................................................................................1

**ARTICLE 2 – DEFINITIONS** ...................................................................................................1

2.1     A<small>DDITIONAL</small> T<small>ESTING</small> ...................................................................................................1
2.2     A<small>FFILIATE</small> ..................................................................................................................1
2.3     A<small>UTHORIZATION FOR</small> E<small>XPENDITURE</small> (AFE) ..................................................................1
2.4     BOEMRE ................................................................................................................1
2.5     C<small>OMPLETE</small>, C<small>OMPLETING</small>, C<small>OMPLETION</small> ...................................................................1
2.6     C<small>OMPLETION</small> E<small>QUIPMENT</small> ........................................................................................1
2.7     C<small>ONFIDENTIAL</small> D<small>ATA</small> ...............................................................................................2
2.8     D<small>EEPEN</small>, D<small>EEPENING</small> ...............................................................................................2
2.9     D<small>EVELOPMENT</small> F<small>ACILITIES</small> .......................................................................................2
2.10   D<small>EVELOPMENT</small> O<small>PERATION</small> .....................................................................................2
2.11   D<small>EVELOPMENT</small> W<small>ELL</small> ..............................................................................................2
2.12   E<small>XPLORATORY</small> O<small>PERATION</small> ......................................................................................2
2.13   E<small>XPLORATORY</small> W<small>ELL</small> ...............................................................................................2
2.14   E<small>XPORT</small> P<small>IPELINES</small> ...................................................................................................2
2.15   F<small>ORCE</small> M<small>AJEURE</small> ......................................................................................................2
2.16   H<small>YDROCARBONS</small> ......................................................................................................2
2.17   J<small>OINT</small> A<small>CCOUNT</small> .......................................................................................................2
2.18   L<small>EASE</small> .......................................................................................................................3
2.19   N<small>ON-CONSENT</small> O<small>PERATION</small> .....................................................................................3
2.20   N<small>ON-CONSENT</small> P<small>LATFORM</small> .......................................................................................3
2.21   N<small>ON-CONSENT</small> W<small>ELL</small> ..............................................................................................3
2.22   N<small>ON-OPERATOR</small>(S) ..................................................................................................3
2.23   N<small>ON-PARTICIPATING</small> P<small>ARTY</small> ...................................................................................3
2.24   N<small>ON-PARTICIPATING</small> P<small>ARTY'S</small> S<small>HARE</small> .....................................................................3
2.25   O<small>BJECTIVE</small> D<small>EPTH</small> ...................................................................................................3
2.26   O<small>BJECTIVE</small> H<small>ORIZON</small> ...............................................................................................3
2.27   O<small>FFSITE</small> H<small>OST</small> F<small>ACILITIES</small> .........................................................................................3
2.28   O<small>PERATOR</small> ................................................................................................................3
2.29   P<small>ARTICIPATING</small> I<small>NTEREST</small> .......................................................................................3
2.30   P<small>ARTICIPATING</small> P<small>ARTY</small> ............................................................................................3
2.31   P<small>LATFORM</small> .................................................................................................................3
2.32   P<small>RODUCIBLE</small> R<small>ESERVOIR</small> .........................................................................................3
2.33   P<small>RODUCIBLE</small> W<small>ELL</small> ..................................................................................................3
2.34   P<small>RODUCTION</small> I<small>NTERVAL</small> ...........................................................................................4
2.35   R<small>ECOMPLETE</small>, R<small>ECOMPLETING</small>, R<small>ECOMPLETION</small> ....................................................4
2.36   R<small>EWORK</small>, R<small>EWORKING</small> .............................................................................................4
2.37   S<small>IDETRACK</small>, S<small>IDETRACKING</small> .....................................................................................4
2.38   T<small>AKE-IN-KIND</small> F<small>ACILITIES</small> .......................................................................................4
2.39   T<small>RANSFER OF</small> I<small>NTEREST</small> ............................................................................................4
2.40   W<small>ORKING</small> I<small>NTEREST</small> ................................................................................................4

**ARTICLE 3 – EXHIBITS** ........................................................................................................4

1

3.1     EXHIBITS ............................................................................................................4
        3.1.1 Exhibit "A".............................................................................................4
        3.12  Exhibit "B".............................................................................................5
        3.13  Exhibit "C".............................................................................................5
        3.14  Exhibit "D".............................................................................................5
        3.15  Exhibit "E".............................................................................................5
        3.16  Exhibit "F".............................................................................................5
3.2     CONFLICTS .........................................................................................................5

**ARTICLE 4 – OPERATOR**.....................................................................................................**5**

4.1     OPERATOR ..........................................................................................................5
4.2     CIRCUMSTANCES UNDER WHICH OPERATOR MUST CONDUCT A NON-CONSENT OPERATION ....................5
4.3     OPERATOR'S CONDUCT OF A NON-CONSENT OPERATION IN WHICH IT IS A NON-PARTICIPATING PARTY........5
4.4     RESIGNATION OF OPERATOR .................................................................................5
4.5     REMOVAL OF OPERATOR ......................................................................................6
4.6     SELECTION OF SUCCESSOR ...................................................................................6
4.7     EFFECTIVE DATE OF RESIGNATION OR REMOVAL ...................................................6
4.8     DELIVERY OF PROPERTY ......................................................................................6

**ARTICLE 5 –  AUTHORITY AND DUTIES OF OPERATOR**.......................................................**7**

5.1     EXCLUSIVE RIGHT TO OPERATE .............................................................................7
5.2     WORKMANLIKE CONDUCT ....................................................................................7
5.3     LIENS AND ENCUMBRANCES .................................................................................7
5.4     EMPLOYEES AND CONTRACTORS ...........................................................................7
5.5     RECORDS .............................................................................................................7
5.6     COMPLIANCE .......................................................................................................7
5.7     CONTRACTORS .....................................................................................................7
5.8     GOVERNMENTAL REPORTS ...................................................................................8
5.9     INFORMATION TO PARTICIPATING PARTIES .............................................................8
5.10    INFORMATION TO NON-PARTICIPATING  PARTIES…………………………………… …….…..8

**ARTICLE 6 – VOTING AND VOTING PROCEDURES**.............................................................**9**

6.1     VOTING PROCEDURES ..........................................................................................9
        6.1.1 Voting Interest........................................................................................9
        6.1.2 Vote Required.........................................................................................9
        6.1.3 Votes........................................................... ...........................................9
        6.1.4 Meetings.................................................................................................9

**ARTICLE 7 – ACCESS** .........................................................................................................**9**

7.1     ACCESS TO LEASE ...............................................................................................9
7.2     REPORTS ..............................................................................................................9
7.3     CONFIDENTIALITY ..............................................................................................10
7.4     LIMITED DISCLOSURE .........................................................................................10
7.5     LIMITED RELEASES TO OFFSHORE SCOUT ASSOCIATION ..........................................10
7.6     MEDIA RELEASES ...............................................................................................10

**ARTICLE 8 – EXPENDITURES** ...........................................................................................**11**

8.1     BASIS OF CHARGE TO THE PARTIES .....................................................................11
8.2     AFEs .................................................................................................................11
8.3     EMERGENCY AND REQUIRED EXPENDITURES ........................................................11
8.4     ADVANCE BILLINGS ...........................................................................................11
8.5     COMMINGLING OF FUNDS ...................................................................................11
8.6     SECURITY RIGHTS ..............................................................................................11
        8.6.1 Mortgage in Favor of Operator ...........................................................11

2

Debtors' Exhibit No. 34
Page 595 of 910

|  |  |  |
|---|---|---|
| | *8.6.2  Security Interest in Favor of Operator* | 12 |
| | *8.6.3  Mortgage in Favor of the Non-operator Parties* | 13 |
| | *8.6.4  Security Interest in Favor of the Non-operator(s)* | 14 |
| | *8.6.5  Recording* | 15 |
| | *8.6.6  The Memorandum of Operating Agreement and Financing Statement* | 16 |
| 8.7 | UNPAID CHARGES AND DEFAULT | 16 |
| 8.8 | CONFESSION OF JUDGMENT; EXECUTORY PROCESS | 16 |

**ARTICLE 9 – NOTICES** .......................................................................................................**17**

| 9.1 | GIVING AND RECEIVING NOTICES | 17 |
|---|---|---|
| 9.2 | CONTENT OF NOTICE | 18 |
| 9.3 | RESPONSE TO NOTICES | 18 |
| | *9.3.1 Platform and/or Development Facilities Proposals* | 18 |
| | *9.3.2 Well Proposals* | 18 |
| | *9.3.3 Proposal for Multiple Operations* | 18 |
| | *9.3.4 Other Matters* | 18 |
| 9.4 | FAILURE TO RESPOND | *18* |
| 9.5 | RESPONSE TO COUNTERPROPOSALS | 18 |
| 9.6 | TIMELY WELL OPERATIONS | 18 |
| 9.7 | TIMELY PLATFORM / DEVELOPMENT FACILITIES OPERATIONS | 19 |

**ARTICLE 10 – EXPLORATORY OPERATIONS** ..................................................................**19**

| 10.1 | PROPOSING OPERATIONS | 19 |
|---|---|---|
| 10.2 | COUNTERPROPOSALS | 19 |
| 10.3 | OPERATIONS BY ALL PARTIES | 19 |
| 10.4 | SECOND OPPORTUNITY TO PARTICIPATE | 19 |
| 10.5 | OPERATIONS BY FEWER THAN ALL PARTIES | 20 |
| | *10.5.1 First Exploratory Well* | 20 |
| 10.6 | EXPENDITURES APPROVED | 20 |
| 10.7 | CONDUCT OF OPERATIONS | 20 |
| 10.8 | COURSE OF ACTION AFTER REACHING OBJECTIVE DEPTH | 20 |
| | *10.8.1  Election by Participating Parties* | 20 |
| | *10.8.2  Priority of Operations* | 21 |
| | *10.8.3  Second Opportunity to Participate* | 21 |
| | *10.8.4 Operations by Fewer Than All Parties* | 21 |
| | *10.8.5 Subsequent Operations* | 22 |
| 10.9 | WELLS PROPOSED BELOW DEEPEST PRODUCIBLE RESERVOIR | 22 |

**ARTICLE 11 – DEVELOPMENT OPERATIONS** ..................................................................**23**

| 11.1 | PROPOSING OPERATIONS | 23 |
|---|---|---|
| 11.2 | COUNTERPROPOSALS | 23 |
| 11.3 | OPERATIONS BY ALL PARTIES | 23 |
| 11.4 | SECOND OPPORTUNITY TO PARTICIPATE | 23 |
| 11.5 | OPERATIONS BY FEWER THAN ALL PARTIES | 23 |
| 11.6 | EXPENDITURES APPROVED | 24 |
| 11.7 | CONDUCT OF OPERATIONS | 24 |
| 11.8 | COURSE OF ACTION AFTER REACHING OBJECTIVE DEPTH | 24 |
| | *11.8.1 Election by Fewer Than All Parties* | 24 |
| | *11.8.2 Priority of Operations* | 24 |
| | *11.8.3 Second Opportunity to Participate* | 25 |
| | *11.8.4 Operations by Fewer Than All Parties* | 25 |
| | *11.8.5 Subsequent Operations* | 25 |

3

**ARTICLE 12 – PLATFORM AND DEVELOPMENT FACILITIES** ................................................**26**

12.1   PROPOSALS.............................................................................................................26
12.2   COUNTERPROPOSALS .............................................................................................26
    12.2.1 Operations by All Parties ..............................................................................26
    12.2.2 Second Opportunity to Participate ................................................................26
    12.2.3 Operations by Fewer Than All Parties..........................................................26
12.3   OWNERSHIP AND USE OF THE PLATFORM AND DEVELOPMENT FACILITIES .........27
12.4   RIGHTS TO TAKE IN KIND........................................................................................27
12.5   EXPANSION OR MODIFICATION OF A PLATFORM AND/OR DEVELOPMENT FACILITIES ..28
12.6   OFFSITE HOST FACILITIES .......................................................................................28

**ARTICLE 13 – NON-CONSENT OPERATIONS** .................................................................**29**

13.1   NON-CONSENT OPERATIONS ...................................................................................29
    13.1.1 Non-interference ...........................................................................................29
    13.1.2 Multiple Completion Limitation ...................................................................29
    13.1.3 Metering ........................................................................................................29
    13.1.4 Non-consent Well..........................................................................................29
    13.1.5 Cost Information ...........................................................................................29
    13.1.6 Completions ..................................................................................................30
13.2   RELINQUISHMENT OF INTEREST ..............................................................................30
    13.2.1 Production Reversion Recoupment ...............................................................30
    13.2.2 Non-production Reversion.............................................................................31
13.3   DEEPENING OR SIDETRACKING OF NON-CONSENT WELL ........................................31
13.4   DEEPENING OR SIDETRACKING COST ADJUSTMENTS ..............................................31
13.5   SUBSEQUENT OPERATIONS IN NON-CONSENT WELL ...............................................31
13.6   OPERATIONS IN A PRODUCTION INTERVAL ..............................................................32
13.7   OPERATIONS UTILIZING A NON-CONSENT PLATFORM AND/OR DEVELOPMENT FACILITIES........32
13.8   DISCOVERY OR EXTENSION FROM NON-CONSENT DRILLING ...................................32
13.9   ALLOCATION OF PLATFORM / DEVELOPMENT FACILITIES COSTS TO NON-CONSENT OPERATIONS ...............33
    13.9.1 Charges.........................................................................................................33
    13.9.2 Operating and Maintenance Charges ..........................................................34
13.10  ALLOCATION OF COSTS BETWEEN ZONES ...............................................................34
13.11  LEASE MAINTENANCE OPERATIONS ........................................................................34
    13.11.1 Participation in Lease Maintenance Operations .........................................34
    13.11.2 Accounting for Non-participation ...............................................................35
13.12  RETENTION OF LEASE BY NON-CONSENT WELL ......................................................35
13.13  NON-CONSENT PREMIUMS ......................................................................................36

**ARTICLE 14 – ABANDONMENT, SALVAGE, AND SURPLUS** ..........................................**36**

14.1   PLATFORM SALVAGE AND REMOVAL COSTS ...........................................................36
14.2   ABANDONMENT OF PLATFORMS, DEVELOPMENT FACILITIES, OR WELLS.................36
14.3   ASSIGNMENT OF INTEREST ......................................................................................36
14.4   ABANDONMENT OPERATIONS REQUIRED BY GOVERNMENTAL AUTHORITY ...........36
14.5   DISPOSAL OF SURPLUS MATERIAL ..........................................................................37

**ARTICLE 15 – WITHDRAWAL** ........................................................................................**37**

15.1   RIGHT TO WITHDRAW .............................................................................................37
15.2   RESPONSE TO WITHDRAWAL NOTICE ......................................................................37
    15.2.1 Unanimous Withdrawal.................................................................................37
    15.2.2 No Additional Withdrawing Parties .............................................................38
    15.2.3 Acceptance of the Withdrawing Parties' Interests ........................................38
    15.2.4 Effects of Withdrawal ...................................................................................38
15.3   LIMITATION ON AND CONDITIONS OF WITHDRAWAL ..............................................38
    15.3.1 Prior Expenses ..............................................................................................38
    15.3.2 Confidentiality ..............................................................................................39

4

*15.3.3 Emergencies and Force Majeure* ................................................................39

**ARTICLE 16 – RENTALS, ROYALTIES, AND OTHER PAYMENTS** ................................**39**

16.1   OVERRIDING ROYALTY AND OTHER BURDENS .......................................39
16.2   SUBSEQUENTLY CREATED INTEREST ....................................................39
16.3   PAYMENT OF RENTALS AND MINIMUM ROYALTIES ...............................40
16.4   NON-PARTICIPATION IN PAYMENTS ......................................................40
16.5   ROYALTY PAYMENTS ..........................................................................40

**ARTICLE 17 -  TAXES** ...............................................................................**40**

17.1   PROPERTY TAXES ..............................................................................40
17.2   CONTEST OF PROPERTY TAX VALUATION .............................................41
17.3   PRODUCTION AND SEVERANCE TAXES ................................................41
17.4   OTHER TAXES AND ASSESSMENTS ......................................................41

**ARTICLE 18 – INSURANCE** .......................................................................**41**

18.1   INSURANCE .......................................................................................41
18.2   BONDS .............................................................................................41

**ARTICLE 19 – LIABILITY, CLAIMS, AND LAWSUITS** .....................................**41**

19.1   INDIVIDUAL OBLIGATIONS ...................................................................41
19.2   NOTICE OF CLAIM OR LAWSUIT ...........................................................41
19.3   SETTLEMENTS ...................................................................................42
19.4   DEFENSE OF CLAIMS AND LAWSUITS ..................................................42
19.5   LIABILITY FOR DAMAGES ....................................................................42
19.6   INDEMNIFICATION FOR NON-CONSENT OPERATIONS .............................42
19.7   DAMAGE TO RESERVOIR, LOSS OF RESERVES AND PROFIT ....................42
19.8   NON-ESSENTIAL PERSONNEL ..............................................................43

**ARTICLE 20 – INTERNAL REVENUE PROVISION** ..........................................**43**

20.1   INTERNAL REVENUE PROVISION ...........................................................43

**ARTICLE 21 – CONTRIBUTIONS** ...............................................................**43**

21.1   NOTICE OF CONTRIBUTIONS OTHER THAN ADVANCES FOR SALE OF PRODUCTION ....................43
21.2   CASH CONTRIBUTIONS ........................................................................43
21.3   ACREAGE CONTRIBUTIONS ..................................................................43

**ARTICLE 22 – DISPOSITION OF PRODUCTION** ...........................................**44**

22.1   TAKE-IN-KIND FACILITIES ...................................................................44
22.2   DUTY TO TAKE IN KIND .......................................................................44
22.3   FAILURE TO TAKE OIL AND CONDENSATE IN KIND .................................44
22.4   FAILURE TO TAKE GAS IN KIND ............................................................44
22.5   EXPENSES OF DELIVERY IN KIND ..........................................................45

**ARTICLE 23 – APPLICABLE LAW, JURISDICTION, AND VENUE** ......................**45**

23.1   APPLICABLE LAW ...............................................................................45
23.2   JURISDICTION AND VENUE ...................................................................45

**ARTICLE 24 – LAWS, REGULATIONS, AND NONDISCRIMINATION** ..................**45**

24.1   LAWS AND REGULATIONS ....................................................................45
24.2   NONDISCRIMINATION ..........................................................................45

**ARTICLE 25 – FORCE MAJEURE** ..............................................................**45**

25.1   FORCE MAJEURE ...............................................................................45

5

**ARTICLE 26 – SUCCESSORS AND ASSIGNS** ...........................................................46

26.1 TRANSFER OF INTEREST ...........................................................46
    *26.1.1 Exceptions to Transfer Notice* ...........................................................46
    *26.1.2 Effective Date of Transfer of Interest* ...........................................................46
    *26.1.3 Form of Transfer of Interest* ...........................................................46
    *26.1.4 Warranty* ...........................................................47

**ARTICLE 27 – ADMINISTRATIVE PROVISIONS** ...........................................................47

27.1 TERM ...........................................................47
27.2 WAIVER ...........................................................47
27.3 WAIVER OF RIGHT TO PARTITION ...........................................................47
27.4 COMPLIANCE WITH LAWS AND REGULATIONS ...........................................................47
    *27.4.1 Severance of Invalid Provisions* ...........................................................47
    *27.4.2 Fair and Equal Employment* ...........................................................48
27.5 CONSTRUCTION AND INTERPRETATION OF THIS AGREEMENT ...........................................................48
    *27.5.1 Headings for Convenience* ...........................................................48
    *27.5.2 Article References* ...........................................................48
    *27.5.3 Gender and Number* ...........................................................48
    *27.5.4 Future References* ...........................................................48
    *27.5.5 Currency* ...........................................................48
    *27.5.6 Optional Provisions* ...........................................................48
    *27.5.7 Joint Preparation* ...........................................................48
    *27.5.8 Integrated Agreement* ...........................................................48
    *27.5.9 Binding Effect* ...........................................................49
    *27.5.10 Further Assurances* ...........................................................49
    *27.5.11 Counterpart Execution* ...........................................................49
27.6 RESTRICTED BIDDING ...........................................................49
27.7 GOVERNING AGREEMENT ...........................................................49

**EXHIBIT "A"** ...........................................................1

**EXHIBIT "B"** *(Insurance Provisions)* ...........................................................1

**EXHIBIT "C"** (COPAS) ...........................................................1

**EXHIBIT "D"** *(Non-Discrimination Provisions)* ...........................................................1

**EXHIBIT "E"** *(Gas Balancing Provisions)* ...........................................................1

6

Professionals Eyes Only
Highly Confidential
Subject to FRE 408

# OFFSHORE OPERATING AGREEMENT

This Offshore Operating Agreement (the "Agreement'), made effective the___ day of_____,  20__, by the signers hereof, their respective heirs, successors, legal representatives, and assigns, herein referred to collectively as the "Parties" and individually as a "Party".

WHEREAS, the Parties own or control a leasehold interest in the Lease identified in Exhibit "A" and desire to explore, develop, produce, and operate the Lease pursuant to this Agreement.

NOW, THEREFORE, in consideration of the foregoing premises and the mutual covenants in this Agreement, along with other good and valuable consideration, the receipt of which is hereby acknowledged, the Parties agree as follows:

# ARTICLE 1
# APPLICATION

### 1.1    Application to Each Lease

This Agreement applies separately to each oil and gas Lease or portion thereof described in Exhibit "A".

# ARTICLE 2
# DEFINITIONS

### 2.1    Additional Testing

An operation not previously approved in the AFE and proposed for the specific purpose of obtaining additional subsurface data.

### 2.2    Affiliate

For a person, another person that controls, is controlled by, or is under common control with that person. In this definition, (a) "control" means the ownership by one (1) person, directly or indirectly, of more than fifty percent (50%) of the voting securities of a corporation or, for other persons, the equivalent ownership interest (such as partnership interests), and (b) "person" means an individual, corporation, partnership, trust, estate, unincorporated organization, association, or other legal entity.

### 2.3    Authorization for Expenditure (AFE)

An authority to expend funds prepared by a Party to estimate the costs to be incurred in conducting an operation under this Agreement.

1

2.4     **BOEMRE**

The Bureau of Ocean Energy Management and/or Bureau of Safety and Environmental Enforcement, United States Department of Interior, or their successor agency.  Where appropriate, the reference to BOEMRE shall include the appropriate state agency.

2.5     **Complete, Completing, Completion**

An operation to complete a well for initial Hydrocarbon production in one (1) or more Producible Reservoirs, including but not limited to setting production casing, perforating the casing, stimulating the well, installing Completion Equipment, and/or conducting production tests.

2.6     **Completion Equipment**

That certain equipment on an Exploratory Well or a Development Well required to be installed before the movement of a well-completion rig off that well:

(a)     under 30 CFR 250.502, or any succeeding order or regulation issued by the BOEMRE, up to and including the tree, and

(b)     by any other regulatory agency having jurisdiction, including but not limited to a caisson and navigational aids.

2.7     **Confidential Data**

The information and data obtained under this Agreement, including but not limited to geological, geophysical, and reservoir information; originals and copies of logs; core and core analysis; and other well information including but not limited to the progress, tests, or results of a well drilled or an operation conducted under this Agreement, except data or information that becomes public other than by breach of this Agreement or as agreed to in writing by the Participating Parties.

2.8     **Contract Area**

The "Contract Area" described in Exhibit "A".

2.9     **Deepen, Deepening**

A drilling operation conducted in an existing wellbore below the Objective Depth to which the well was previously drilled.

2.9     **Development Facilities**

Production equipment other than Completion Equipment that is installed on or outside the Lease in order to handle or process Hydrocarbon production. Development Facilities include, but are not limited to:

(a)     compression, separation, dehydration, generators, treaters, skimmers, bunkhouses, and metering equipment;

(b)     the flowlines, gathering lines, or lateral lines that deliver Hydrocarbons and water

1        from the Completion Equipment to the Platform or to Offsite Host Facilities, or

2        from the Platform to Export Pipelines; and

(c)     injection and disposal wells.

2.10    **Development Operation**

2

An operation on the Lease other than an Exploratory Operation.

**2.11   Development Well**

A well or portion of a well proposed as a Development Operation.

**2.12   Exploratory Operation**

An operation that is conducted on the Lease and that is any of the following:

(a)      proposed to Complete an Exploratory Well;

(b)      proposed for an Objective Horizon that is not a Producible Reservoir; or

(c)      proposed for an Objective Horizon that has a Producible Well, but that will be penetrated at a location where the distance between the midpoint of the Objective Horizon to be penetrated by the proposed operation and the midpoint of the same Objective Horizon where it is actually penetrated by a Producible Well will be at least two thousand (2,000) feet for a gas Completion and at least one thousand (1,000) feet for an oil Completion.

**2.13   Exploratory Well**

A well or portion of a well proposed as an Exploratory Operation.

**2.14   Export Pipelines**

Pipelines to which a gathering line or lateral line downstream of the Platform and/or Development Facilities or, if there is no Platform, the Completion Equipment, is connected and that are used to transport Hydrocarbons or produced water to shore.

**2.15   Force Majeure**

An event or cause that is reasonably beyond the control of the Party claiming the existence of such event or cause and that reasonably prevents such Party from fulfilling its obligations under this Agreement,  including, but not limited to, a flood, a storm, a hurricane, a loop current/eddy, or other act of God, a fire, loss of well control, an oil spill, or other environmental catastrophe, a war, a terrorist act, a civil disturbance, a labor dispute, a strike, a lockout, compliance with a law, order, rule, or regulation, governmental action or delay in granting necessary permits or permit approvals, and the inability to secure materials or a rig.

**2.16   Hydrocarbons**

Oil and/or gas and associated liquid and gaseous by-products (except helium) that may be produced from a wellbore located on the Lease.

**2.17   Joint Account**

This term has the same definition as the defined term "Joint Account" in Exhibit "C" (Accounting Procedure).

**2.18   Lease**

Each oil and gas lease identified in Exhibit "A" and the lands covered by that lease.

**2.19   Non-consent Operation**

An operation conducted on the Lease by fewer than all Parties, which subjects the Non-participating Party to Article 13 (Non-Consent Operations).

3

Debtors' Exhibit No. 34
Page 602 of 910

**2.20    Non-consent Platform**

A Platform owned by fewer than all Parties.

**2.21    Non-consent Well**

An Exploratory Well or a Development Well owned by fewer than all Parties.

**2.22    Non-operator(s)**

A Party other than Operator.

**2.23    Non-participating Party**

A Party other than a Participating Party.

**2.24    Non-participating Party's Share**

The Participating Interest that a Non-participating Party would have had if all Parties had participated in the operation.

**2.25    Objective Depth**

A depth sufficient to test the lesser of the Objective Horizon or the specific footage depth stated in the AFE and approved by the Participating Parties.

**2.26    Objective Horizon**

The interval consisting of the deepest zone, formation, or horizon to be tested in an Exploratory Well, Development Well, Deepening operation, or Sidetracking operation, as stated in the AFE and approved by the Participating Parties.

**2.27    Offsite Host Facilities**

Development and handling facilities that (a) are located off the Lease and (b) are either owned by one (1) or more third parties or by one (1) or more Participating Parties in a well, whose interests in the development and handling facilities differ from their respective Working Interest shares in the well.

**2.28    Operator**

The Party designated as Operator pursuant to Article 4 of this Agreement.

**2.29    Participating Interest**

The percentage of the costs and risks of conducting an operation under this Agreement that a Participating Party agrees, or is otherwise obligated, to pay and bear.

**2.30    Participating Party**

A Party that executes an AFE for a proposed operation or otherwise agrees, or becomes liable, to pay and bear a share of the costs and risks of conducting an operation under this Agreement.

**2.31    Platform**

An offshore structure on the Lease that supports Wells, Completion Equipment, or Development Facilities, whether fixed, compliant, or floating, and the components of that structure, including but not limited to caissons or well protectors to the extent that same are not Completion Equipment, rising above the water line and used for the exploration, development, or production of Hydrocarbons.   The term "Platform" shall also mean any offshore equipment or template

4

(excluding templates used for drilling operations) and any component thereof, other than Completion Equipment (including but not limited to flow lines and control systems), that is resting on or attached to the sea floor and used to obtain production of Hydrocarbons.

**2.32    Producible Reservoir**

An underground accumulation of Hydrocarbons (a) in a single and separate natural pool characterized by a distinct pressure system, (b) not in Hydrocarbon communication with another accumulation of Hydrocarbons, and (c) into which a Producible Well has been drilled.

**2.33    Producible Well**

A well that is drilled under this Agreement and that (a) is producing Hydrocarbons; (b) is determined to be, or meets the criteria for being determined to be, capable of producing Hydrocarbons in paying quantities under an applicable order or regulation issued by the governmental authority having jurisdiction; or (c) is determined to be a Producible Well by one (1) or more Participating Parties having a combined Working Interest of fifty percent (50%) or more, even if the well has been plugged and permanently or temporarily abandoned.

**2.34    Production Interval**

A zone or interval producing or capable of producing Hydrocarbons from a well without Reworking operations.

**2.35    Recomplete, Recompleting, Recompletion**

An operation whereby a Completion in one (1) Producible Reservoir is abandoned in order to attempt a Completion in a different Producible Reservoir within the existing wellbore.

**2.36    Rework, Reworking**

An operation conducted in a well, after it has been Completed in one (1) or more Producible Reservoirs, to restore, maintain, or improve Hydrocarbon production from one (1) or more of those Producible Reservoirs, but specifically excluding drilling, Sidetracking, Deepening, Completing, or Recompleting the well.

**2.37    Sidetrack, Sidetracking**

The directional control and intentional deviation of a well to change the bottom-hole location, whether it be to the original Objective Depth or formation or another bottom-hole location not deeper than the stratigraphic equivalent of the initial Objective Depth, unless the intentional deviation is done to straighten the hole or to drill around junk in the hole or to overcome other mechanical difficulties.

**2.38    Take-in-Kind Facilities**

Facilities that (i) are not paid for by the Joint Account and (ii) are installed for the benefit and use of a particular Party or Parties to take its or their share of Hydrocarbon production in kind.

**2.39    Transfer of Interest**

A conveyance, assignment, transfer, farmout, exchange, or other disposition of all or part of a Party's Working Interest.

#93828440v3
#93828440v5

**2.40    Working Interest**

The record title interest, or where applicable, the operating rights of each Party in and to each Lease (expressed as the percentage provided in Exhibit "A").  If a Party's record title interest is different from its operating rights, the Working Interest of each Party is the interest provided in Exhibit "A".

Any capitalized terms used herein, but not defined herein, shall have the meaning attributable to them in that certain Joint Development Agreement dated effective _____ __, 20__, by and between _____, _____, _____, _____ and _____ (the "Joint Development Agreement").

# ARTICLE 3
# EXHIBITS

**3.1    Exhibits**

The following exhibits are attached to this Agreement and incorporated into this Agreement by reference:

**3.1.1    Exhibit "A"**

Operator, Description of Lease, Division of Interests, and Notification Addresses

**3.1.2    Exhibit "B"**

Insurance provisions.

**3.1.3    Exhibit "C"**

Accounting procedure.

**3.1.4    Exhibit "D"**

Non-discrimination Provisions.

**3.1.5    Exhibit "E"**

Gas Balancing Agreement.

**3.1.6    Exhibit "F"**

Memorandum of Operating Agreement and Financing Statement.

**3.2    Conflicts**

If a provision of an exhibit, except Exhibits "D" or "E" is inconsistent with a provision in the body of this Agreement, the provision in the body of this Agreement shall prevail. If a provision of Exhibit "D" or "E" is inconsistent with a provision in the body of this Agreement, the provision of the exhibit shall prevail.

# ARTICLE 4
# OPERATOR

6

Debtors' Exhibit No. 34
Page 605 of 910

**4.1**     **Operator**

_____ is designated as Operator of the Lease.  The Parties shall promptly execute and provide Operator with all documents required by the BOEMRE in connection with the designation of _____ as Operator or with the designation of any other Party as a substitute or successor Operator.  Unless agreed to the contrary by all Parties hereto, Operator shall also be classified as the designated applicant for oil spill financial responsibility purposes and each Non-operator Party shall promptly execute the appropriate documentation reflecting this designation and promptly provide same to Operator for filing with BOEMRE.

**4.2**     **Circumstances Under Which Operator Must Conduct a Non-Consent Operation**

If:

(a)     a drilling rig is on location and Operator becomes a Non-participating Party in a supplemental AFE for an Exploratory Operation, or Development Operation, or

(b)     Operator becomes a Non-participating Party in an operation to be conducted from a Platform operated by Operator,

Operator, as a Non-participating Party, shall conduct the Non-consent Operation on behalf of the Participating Parties and at the Participating Parties' sole cost and risk under Article 13 (Non-Consent Operations).

**4.3**     **Operator's Conduct of a Non-Consent Operation in Which it is a Non-participating Party**

When, under Article 4.2 (Circumstances Under Which Operator Must Conduct a Non-Consent Operation), Operator conducts a Non-consent Operation in which it is a Non-participating Party, it shall follow the practices and standards in Article 5 (Exclusive Right to Operate). Notwithstanding anything to the contrary in Exhibit "C", Operator shall not be required to proceed with the Non-consent Operation until the Participating Parties have advanced the total estimated costs of the Non-consent Operation to Operator.  Operator shall never be obligated to expend any of its own funds for the Non-consent Operation in which it is a Non-participating Party.

**4.4**     **Resignation of Operator**

Subject to Article 4.6 (Selection of Successor), Operator may resign at any time by giving written notice to the Parties, except that Operator may not without the other Parties' consent resign during a Force Majeure or an emergency that poses a threat to life, safety, property, or the environment.  If Operator or its Affiliates cease to own a Working Interest, Operator automatically shall be deemed to have resigned as Operator without any action by the Non-operator(s).

**4.5**     **Removal of Operator**

Operator may be removed by an affirmative vote of the Parties owning a combined Working Interest of fifty percent (50%) or more of the remaining Working Interest after excluding Operator's Working Interest if:

(a)     Operator becomes insolvent or unable to pay its debts as they mature, makes an

7

assignment for the benefit of creditors, commits an act of bankruptcy, or seeks relief under laws providing for the relief of debtors;

(b)     a receiver is appointed for Operator or for substantially all its property or affairs;

(c)     a Transfer of Interest by Operator (excluding an interest assigned to an Affiliate) reduces Operator's Working Interest to less than the Working Interest of any Non-operator, whether accomplished by one (1) or more Transfer of Interest.

(d)     Operator commits a substantial breach of a material provision of this Agreement and fails to cure the breach within thirty (30) days after notice of the breach.

## 4.6     Selection of Successor

On resignation or removal of Operator, a successor Operator shall be selected from among the Parties by an affirmative vote of one (1) or more Parties having a combined Working Interest of fifty percent (50%) or more.  If the resigned or removed Operator is not entitled to vote, fails to vote, or votes only to succeed itself, the successor Operator shall be selected by the affirmative vote of the Parties owning a combined Working Interest of fifty percent (50%) or more of the remaining Working Interest after excluding the Working Interest of the resigned or removed Operator.  If Operator assigns all or a part of its Working Interest, under Article 4.4 (Resignation of Operator) or Article 4.5(c), the Party that acquired all or a part of the former Operator's Working Interest shall not be excluded from voting for a successor Operator.  If there are only two (2) Parties to this Agreement when Operator resigns or is removed, the Non-operator automatically has the right, but not the obligation, to become Operator.  If no Party is willing to become Operator, this Agreement shall terminate under Article 27.1 (Term).

## 4.7     Effective Date of Resignation or Removal

The resignation or removal of Operator shall become effective as soon as practical but no later than 7:00 a.m. on the first day of the month following a period of ninety (90) days after the date of resignation or removal, unless a longer period is required for the Parties to obtain approval of the designation of the successor Operator, and designated applicant for oil spill financial responsibility purposes, by the BOEMRE; however, in no event shall the resignation or removal of Operator become effective until a successor Operator has assumed the duties of Operator.  The resignation or removal of the outgoing Operator shall not prejudice any rights, obligations, or liabilities resulting from its operatorship.  The successor Operator may charge the Joint Account for reasonable costs incurred in connection with copying or obtaining the former Operator's records, information, or data except when the change of Operator results from a merger, consolidation, reorganization, or sale or transfer to an Affiliate of Operator.

## 4.8     Delivery of Property

On the effective date of resignation or removal of Operator, the outgoing Operator shall deliver or transfer to the successor Operator custodianship of the Joint Account and possession of all items purchased for the Joint Account under this Agreement, all Hydrocarbons that are not the separate

8

property of a Party, and all equipment, materials, and appurtenances purchased for the Joint Account under this Agreement, which are not already in the possession of the successor Operator.   The outgoing Operator shall further use its reasonable efforts to transfer to the successor Operator, as of the effective date of the resignation or removal, its rights as Operator under all contracts exclusively relating to the activities or operations conducted under this Agreement, and the successor Operator shall assume all obligations of Operator that are assignable under the contracts.   The Parties may audit the Joint Account and conduct an inventory of all property and all Hydrocarbons that are not the separate property of a Party, and the inventory shall be used in the accounting to all Parties by the outgoing Operator of the property and the Hydrocarbons that are not the separate property of a Party.  The inventory and audit shall be conducted under Exhibit "C".

# ARTICLE 5
# AUTHORITY AND DUTIES OF OPERATOR

**5.1**   **Exclusive Right to Operate**

Unless otherwise provided in this Agreement, Operator shall have the exclusive right and duty to conduct operations (or cause them to be conducted) under this Agreement.   In performing services under this Agreement for the Non-operators, Operator shall be an independent contractor, not subject to the control or direction of Non-operators, except for the type of operation to be undertaken in accordance with the voting and election procedures in this Agreement.   No Party shall be deemed to be, or hold itself out as, the agent or fiduciary of another Party.

**5.2**   **Workmanlike Conduct**

Operator shall timely commence and conduct all operations in a good and workmanlike manner, as would a prudent operator under the same or similar circumstances.  OPERATOR SHALL NOT BE LIABLE TO NON-OPERATORS FOR LOSSES SUSTAINED OR LIABILITIES INCURRED, EXCEPT AS MAY RESULT FROM OPERATOR'S GROSS NEGLIGENCE OR WILLFUL MISCONDUCT.  Operator shall never be required under this Agreement to conduct an operation that it believes would be unsafe or would endanger persons, property, or the environment. Unless otherwise provided in this Agreement, Operator shall consult with Non-operators and keep them informed of all important matters.

**5.3**   **Liens and Encumbrances**

Operator shall endeavor to keep the Lease, wells, Platforms, Development Facilities, and other equipment free from all liens and other encumbrances occasioned by operations hereunder, except those provided in Article 8.6 (Security Rights).

**5.4**   **Employees and Contractors**

9

Operator shall select employees and contractors and determine their number, hours of labor, and compensation.

**5.5     Records**

Operator shall keep or cause to be kept accurate books, accounts, and records of activities or operations under this Agreement in compliance with the Accounting Procedure in Exhibit "C". Unless otherwise provided in this Agreement, all records of the Joint Account shall be available to a Non-operator as provided in Exhibit "C".  Operator shall use good-faith efforts to ensure that the settlements, billings, and reports rendered to each Party under this Agreement are complete and accurate.

**5.6     Compliance**

Operator shall comply, and shall require all agents and contractors to comply, with all applicable laws, rules, regulations, and orders of governmental authorities having jurisdiction.  Each Non-operator Party shall take all action, including the execution of all documents and forms, as necessary for Operator to comply with all applicable laws, rules, regulations, and orders of governmental authorities having jurisdiction.

**5.7     Contractors**

Operator may enter into contracts with qualified and responsible independent contractors for the design, construction, installation, drilling, production, or operation of wells, Platforms, and Development Facilities. Operator shall, in its discretion, use competitive bidding to procure goods and services for the benefit of the Parties.  All drilling operations conducted under this Agreement shall be conducted by properly qualified and responsible drilling contractors under current competitive contracts.  A drilling contract will be presumed to be a current competitive contract if it (a) was made within twelve (12) months before the commencement of the well and (b) contains terms, rates, and provisions that, when the contract was made, did not exceed those generally prevailing in the area for operations involving substantially equivalent rigs that are capable of conducting the drilling operation.  At its election, Operator may use its own or an Affiliate's drilling equipment, derrick barge, tools, or machinery to conduct drilling operations, but the work shall be (i) performed by Operator or its Affiliate acting as an independent contractor, (ii) approved by written agreement with the Participating Parties before commencement of operations, and (iii) conducted under the same terms and conditions and at the same rates as are customary and prevailing in competitive contracts of third parties doing work of similar nature.

**5.8     Governmental Reports**

Operator shall make reports to governmental authorities it has a duty to make as Operator and shall furnish copies of the reports to the Participating Parties.  Each Non-operator Party shall take all action, including the execution of all documents and forms, as necessary for Operator to make such reports to governmental authorities.

**5.9     Information to Participating Parties**

10

Except as provided in Article 8.7.1, Operator shall furnish each Participating Party at its request the following information, if applicable, for each activity or operation conducted by Operator:

**5.9.1**   A copy of the application for permit to drill and all amendments thereto.

**5.9.2**   A daily drilling report (or Reworking report or Recompletion report, if applicable), giving the depth, corresponding lithological information, data on drilling fluid characteristics, information about drilling or operational difficulties or delays, if any, and other pertinent information, by facsimile transmission or electronic mail within forty-eight (48) hours (excluding Saturdays, Sundays, and federal holidays) for well operations conducted in the preceding twenty-four (24)-hour period.

**5.9.3**   A complete report of each core analysis.

**5.9.4**   A copy of each electrical survey, currently as it is run; all data for each radioactivity log, temperature survey, deviation or directional survey, caliper log, and other log or survey obtained during the drilling of the well; and, on completion of the well, a composite of all electrical-type logs, insofar as is reasonable and customary.

**5.9.5**   A copy of all well test results, bottom-hole pressure surveys, and fluid analyses.

**5.9.6**   On written request received by Operator before commencement of drilling, samples of cuttings and cores taken from the well (if sufficient cores are retrieved), packaged in containers furnished by Operator at the expense of the requesting Party, marked as to the depths from which they were taken, and shipped at the expense of the requesting Party by express courier to the address designated by the requesting Party.

**5.9.7**   To the extent possible, twenty-four (24) hours' advance notice of, and access to, logging, coring, and testing operations.

**5.9.8**   A monthly report on the volume of Hydrocarbons and water produced from each well.

**5.9.9**   A copy of each report made to a governmental authority having jurisdiction.

**5.9.10**   On written request, other pertinent information available to Operator, including but not limited to those portions of the contracts to be used for the benefit of the Joint Account and that pertain to the Lease, but excluding Operator's proprietary or secret information and its subsurface interpretations.

**5.10**   **Information to Non-participating Parties**

Operator shall furnish each Non-participating Party a copy of each Operator's governmental report that is available to the public and associated with the applicable Non-consent Operation. Until the applicable recoupment under Article 13 (Non-consent Operations) is complete, a Non-participating Party shall not receive or review any other information specified by Article 5.9 (Information to Participating Parties), except as may be necessary for a payout audit of the Non-consent Operation.

## ARTICLE 6

#93828440v3
#93828440v5

Debtors' Exhibit No. 34
Page 610 of 910

## VOTING AND VOTING PROCEDURES

**6.1   Voting Procedures**

Unless otherwise provided in this Agreement, each matter requiring approval of the Parties shall be determined as follows:

**6.1.1   Voting Interest**

Subject to Article 8.6 (Security Rights), each Party shall have a voting interest equal to its Working Interest or its Participating Interest, as applicable.

**6.1.2   Vote Required**

Unless expressly stated to the contrary herein, a matter requiring approval of the Parties shall be decided by the affirmative vote of one (1) or more Parties having a combined voting interest of more than fifty percent (50%).  If there are only two (2) Parties to this Agreement, the matter shall be determined by the Party having a majority voting interest or, if the interests are equal, the matter shall require unanimous consent.

**6.1.3   Votes**

The Parties may vote at a meeting; by telephone, promptly confirmed in writing to Operator; by electronic mail; or by facsimile transmission.  Operator shall give each Party prompt notice of the results of the voting.

**6.1.4   Meetings**

Meetings of the Parties may be called by Operator on its own motion or at the request of one or more Parties having a collective voting interest of not less than twenty-five percent (25%).  Except in an emergency, no meeting shall be called on less than ten (10) days' advance written notice, and the notice of meeting shall include the meeting agenda prepared by Operator or the requesting Party.  The representative of Operator shall be chairman of each meeting.  Only matters included in the agenda may be discussed at a meeting, but the agenda and items included in the agenda may be amended before or during the meeting by unanimous agreement of all Parties.

# ARTICLE 7
# ACCESS

**7.1   Access to Lease**

Except as provided in Article 8.7.1, each Party shall have access, at its sole risk and expense and at all reasonable times, to the Lease, Platform, Development Facilities, and Joint Account assets to inspect activities, operations, and wells in which it participates, and to pertinent records and data.  A Non-operator shall give Operator at least twenty-four (24) hours' notice of the Non-operator's intention to visit the Lease.  To protect Operator and the Non-operators from lawsuits,

12

claims, and legal liability, if it is necessary for a person who is not performing services for Operator directly related to the joint operations, but is performing services solely for a Non-operator or pertaining to the business or operations of a Non-operator, to visit, use, or board a rig, well, Platform, or Development Facilities subject to this Agreement, the Non-operator shall give Operator advance notice of the visit, use, or boarding, and shall secure from that person an agreement, in a form satisfactory to Operator, indemnifying and holding Operator and Non-operators harmless, or shall itself provide the same hold harmless and indemnification in favor of Operator and other Non-operators before the visit, use, or boarding.

**7.2    Reports**

On written request, Operator shall furnish a requesting Party any information not otherwise furnished under Article 5 (Authority and Duties of Operator) to which that Party is entitled under this Agreement.  The costs of gathering and furnishing information not furnished under Article 5 shall be charged to the requesting Party. Operator is not obligated to furnish interpretative data that was generated by Operator at its sole cost.

**7.3    Confidentiality**

Except as otherwise provided in Article 7.4 (Limited Disclosure), Article 7.5 (Limited Releases to Offshore Scout Association), Article 7.6 (Media Releases), and Article 21.1 (Notice of Contributions Other Than Advances for Sale of Production), and except for necessary disclosures to governmental authorities having jurisdiction, or except as agreed in writing by all Participating Parties, no Party or Affiliate shall disclose Confidential Data to a third party.  This Article 7.3 shall remain in force and effect during the term of this Agreement and for one (1) year after termination of this Agreement.

**7.4    Limited Disclosure**

A Party may make Confidential Data to which it is entitled under this Agreement available to:

(a)    outside professional consultants and reputable engineering firms for the purpose of evaluations and/or submitting bids;

(b)    gas transmission companies for Hydrocarbon reserve or other technical evaluations;

(c)    reputable financial institutions for study before commitment of funds;

(d)    governmental authorities having jurisdiction or the public, to the extent required by applicable laws or by those governmental authorities;

(e)    the public, to the extent required by the regulations of a recognized stock exchange;

(f)    third parties with which a Party is engaged in a bona fide effort to effect a merger or consolidation, sell all or a controlling part of that Party's stock, or sell all or substantially all assets of that Party or an Affiliate of that Party;

(g)    an Affiliate of a Party;

(h)    such limited well information that is typically disclosed by Operator's representative during meetings of the Offshore Oil Scouts Association; and

13

(i)      third parties with which a Party is engaged in a bona fide effort to sell, farm out, or trade all or a portion of its interest in the Lease.

Confidential Data made available under Articles 7.4(f) and 7.4(h) shall not be removed from the custody or premises of the Party making the Confidential Data available to third parties described in those Articles.  A third party permitted access under Articles 7.4, (a), (b), (c), (f), and (h) shall first agree in writing neither to disclose the Confidential Data to others nor to use the Confidential Data, except for the purpose for which it was disclosed.  The disclosing Party shall give prior notice to the other Parties that it intends to make the Confidential Data available.

7.5     **Limited Releases to Offshore Scout Association**

Operator may disclose Confidential Data to the Offshore Oil Scouts Association at their regularly scheduled meetings.  The Confidential Data that may be disclosed is limited to information concerning well locations, well operations, and well completions to the extent reasonable and customary in industry practice or required under the by-laws of the Offshore Oil Scouts Association.

7.6     **Media Releases**

Except as unanimously agreed by the Participating Parties or otherwise permitted by this Article, no Party shall issue a news or media release about operations on the Lease.  In an emergency involving extensive property or environmental damage, operations failure, loss of human life, or other clear emergency, and for which there is insufficient time to obtain the prior approval of the Parties, Operator may furnish the minimum, strictly factual, information necessary to satisfy the legitimate public interest of the media and governmental authorities having jurisdiction.  Operator shall then promptly advise the other Parties of the information furnished in response to the emergency.

# ARTICLE 8
# EXPENDITURES

8.1     **Basis of Charge to the Parties**

Subject to the other provisions of this Agreement, Operator shall pay all costs incurred under this Agreement, and each Party shall reimburse Operator in proportion to its Participating Interest.  All charges, credits, and accounting for expenditures shall be made and done pursuant to Exhibit "C".

8.2     **AFEs**

Before undertaking an operation or making a single expenditure to be in excess of Two Hundred Thousand Dollars ($200,000.00), and before conducting an activity or operation to drill, Sidetrack, Deepen, Complete, Rework, or Recomplete a well (regardless of the estimated cost), Operator shall submit an AFE for the operation or expenditure to the Parties for approval.  Operator shall

14

also furnish an informational AFE to all Parties for an operation or single expenditure estimated to cost Two Hundred Thousand Dollars ($200,000.00) or less, but in excess of Fifty Thousand Dollars ($50,000.00).   Operator shall notify the Participating Parties as soon as reasonably possible when it appears that the cost of an ongoing activity or operation, before its completion, will exceed the original AFE by more than one hundred twenty-five percent (125%).   This overexpenditure notice shall be furnished to the Participating Parties as a supplemental AFE for informational purposes only and is not subject to an election by any of the Parties.

**8.3**      **Emergency and Required Expenditures**

Notwithstanding anything in this Agreement to the contrary, Operator is hereby authorized to conduct operations and incur expenses that in its opinion are reasonably necessary to safeguard life, property, and the environment in case of an actual or imminently threatened blowout, explosion, accident, fire, flood, storm, hurricane, catastrophe, or other emergency, and the expenses shall be borne by the Participating Parties in the affected operation.   Operator shall report to the Participating Parties, as promptly as practical, the nature of the emergency and the action taken.   Operator is also authorized to conduct operations and incur expenses reasonably required by statute, regulation, order, or permit condition or by a governmental authority having jurisdiction, which expenses shall be borne by the Participating Parties in the affected operation, subject to Exhibit "C".

**8.4**      **Advance Billings**

Operator may require each Party to advance its respective share of estimated expenditures pursuant to Exhibit "C".

**8.5**      **Commingling of Funds**

Funds received by Operator under this Agreement may be commingled with its own funds.

**8.6**      **Security Rights**

In addition to any other security rights and remedies provided by law with respect to services rendered or materials and equipment furnished under this Agreement, for and in consideration of the covenants and mutual undertakings of Operator and the Non-operator(s) herein, the Parties shall have the following security rights:

**8.6.1**      **Mortgage in Favor of Operator**

Each Non-operator(s) hereby grants to Operator a mortgage, hypothecate, and pledge of and over all its rights, titles, and interests in and to (a) the Lease, (b) the oil and gas in, on, under, and that may be produced from the lands within the Lease, and (c) all other immovable property or other property susceptible of mortgage situated within the Lease.

(i)      This mortgage is given to secure the complete and timely performance of and payment by each Non-operator(s) of all obligations and indebtedness of every kind and nature, whether now owed by such Non-operator(s) or hereafter arising, pursuant to this Agreement.  To the extent susceptible under applicable law, this

15

mortgage and the security interests granted in favor of Operator herein shall secure the payment of all costs and other expenses properly charged to such Party, together with (a) interest on such indebtedness, costs, and other expenses at the rate set forth in Exhibit "C" attached hereto (the "Accounting Procedure") or the maximum rate allowed by law, whichever is the lesser, (b) reasonable attorneys' fees, (c) court costs, and (d) other directly related collection costs. If any Non-operator(s) Party does not pay any such uncontested costs and other expenses or perform its obligations under this Agreement when due, Operator shall have the additional right to notify the purchaser or purchasers of the defaulting Non-operator's(s') production and collect such costs and other expenses out of the proceeds from the sale of the defaulting Non-operator's(s') share of production until the amount owed has been paid. Operator shall have the right to offset the amount owed against the proceeds from the sale of such defaulting Non-operator's(s) share of production if the amount owing is uncontested. Any purchaser of such production shall be entitled to rely on Operator's statement concerning the amount of costs and other expenses owed by the defaulting Non-operator(s) and payment made to Operator by any purchaser shall be binding and conclusive as between such purchaser and such defaulting Non-operator(s).

(ii)    The maximum amount for which the mortgage herein granted by each Non-operator(s) shall be deemed to secure the obligations and indebtedness of such Non-operator(s) to Operator as stipulated herein is hereby fixed in an amount equal to Twenty-Five Million Dollars ($25,000,000.00) (the "Limit of the Mortgage of each Non-operator(s)"). Except as provided in the previous sentence (and then only to the extent that such limitations are required by law), the entire amount of obligations and indebtedness of each Non-operator(s) to Operator is secured hereby without limitation. Notwithstanding the foregoing Limit of the Mortgage of each Non-operator(s), the liability of each Non-operator(s) under this Agreement and the mortgage and security interest granted hereby shall be limited to (and Operator shall not be entitled to enforce the same against such Non-operator(s) for an amount exceeding) the actual obligations and indebtedness (including all interest charges, costs, attorneys' fees, and other charges provided for in this Agreement or in the attached Exhibit "F") outstanding and unpaid and that are attributable to or charged against the interest of such Non-operator(s) pursuant to this Agreement.

**8.6.2   Security Interest in Favor of Operator**

To secure the complete and timely performance of and payment by each Non-operator(s)

16

of all obligations and indebtedness of every kind and nature, whether now owed by such Non-operator(s) or hereafter arising, pursuant to this Agreement, each Non-operator Party hereby grants to Operator a continuing security interest in and to all its rights, titles, interests, claims, general intangibles, proceeds, and products thereof, whether now existing or hereafter acquired, in and to (a) all oil and gas produced from the lands or offshore blocks covered by the Lease or attributable to the Lease when produced, (b) all accounts receivable accruing or arising as a result of the sale of such oil and gas (including, without limitation, accounts arising from gas imbalances or from the sale of oil and gas at the wellhead), (c) all cash or other proceeds from the sale of such oil and gas once produced, and (d) all Platforms, wells, facilities, fixtures, other corporeal property, whether movable or immovable, whether now or hereafter placed on the lands or offshore blocks covered by the Lease or maintained or used in connection with the ownership, use, or exploitation of the Lease, and other surface and sub-surface equipment of any kind or character located on or attributable to the Lease and the cash or other proceeds realized from the sale, transfer, disposition, or conversion thereof.  The interest of the Non-operator(s) in and to the oil and gas produced from or attributable to the Lease when extracted and the accounts receivable accruing or arising as the result of the sale thereof shall be financed at the wellhead of the well or wells located on the Lease.  To the extent susceptible under applicable law, the security interest granted by each Non-operator(s) hereunder covers: (a) all substitutions, replacements, and accessions to the property of such Non-operator(s) described herein and is intended to cover all the rights, titles, and interests of such Non-operator(s) in all movable property now or hereafter located on or used in connection with the Lease, whether corporeal or incorporeal; (b) all rights under any gas balancing agreement, farmout rights, option farmout rights, acreage and cash contributions, and conversion rights of such Non-operator(s) in connection with the Lease, or the oil and gas produced from or attributable to the Lease, whether now owned and existing or hereafter acquired or arising, including, without limitation, all interests of each Non-operator(s) in any partnership, tax partnership, limited partnership, association, joint venture, or other entity or enterprise that holds, owns, or controls any interest in the Lease; and (c) all rights, claims, general intangibles, and proceeds, whether now existing or hereafter acquired, of each Non-operator(s) in and to the contracts, agreements, permits, licenses, rights-of-way, and similar rights and privileges that relate to or are appurtenant to the Lease, including the following:

(i)     all its rights, titles, and interests, whether now owned and existing or hereafter acquired or arising, in, to, and under or derived from any present or future operating, farmout, bidding, pooling, unitization, and communitization agreements, assignments, and subleases, whether or not described in Exhibit

17

"A", to the extent, and only to the extent, that such agreements, assignments, and subleases cover or include any of its rights, titles, and interests, whether now owned and existing or hereafter acquired or arising, in and to all or any portion of the Lease, and all units created by any such pooling, unitization, and communitization agreements and all units formed under orders, regulations, rules, or other official acts of any governmental authority having jurisdiction, to the extent and only to the extent that such units cover or include all or any portion of the Lease;

(ii)     all its rights, titles, and interests, whether now owned and existing or hereafter acquired or arising, in, to, and under or derived from all presently existing and future advance payment agreements, and oil, casinghead gas, and gas sales, exchange, and processing contracts and agreements, including, without limitation, those contracts and agreements that are described on Exhibit "A", to the extent, and only to the extent, that those contracts and agreements cover or include all or any portion of the Lease; and

(iii)    all its rights, titles, and interests, whether now owned and existing or hereafter acquired or arising, in, to, and under or derived from all existing and future permits, licenses, rights of way, and similar rights and privileges that relate to or are appurtenant to any of the Lease(s).

### 8.6.3   Mortgage in Favor of the Non-operator Parties

Operator hereby grants to each Non-operator(s) a mortgage, hypothecate, and pledge of and over all its rights, titles, and interests in and to (a) the Lease; (b) the oil and gas in, on, under, and that may be produced from the lands within the Lease; and (c) all other immovable property or other property susceptible of mortgage situated within the Lease.

(i)      This mortgage is given to secure the complete and timely performance of and payment by Operator of all obligations and indebtedness of every kind and nature, whether now owed by Operator or hereafter arising, pursuant to this Agreement.  To the extent susceptible under applicable law, this mortgage and the security interests granted in favor of each Non-operator(s) herein shall secure the payment of all costs and other expenses properly charged to Operator, together with (a) interest on such indebtedness, costs, and other expenses at the rate set forth in the Accounting Procedure or the maximum rate allowed by law, whichever is the lesser, (b) reasonable attorneys' fees, (c) court costs, and (d) other directly related collection costs.  If Operator does not pay any such uncontested costs and other expenses or perform its obligations under this Agreement when due, the Non-operator(s) shall have the additional right to notify the purchaser or purchasers of Operator's production and collect such costs and

18

other expenses out of the proceeds from the sale of Operator's share of production until the amount owed has been paid.  The Non-operator(s) shall have the right to offset the amount owed against the proceeds from the sale of Operator's share of production if the amount owing is uncontested.  Any purchaser of such production shall be entitled to rely on the Non-operator(s)' statement concerning the amount of costs and other expenses owed by Operator and payment made to the Non-operator(s) by any purchaser shall be binding and conclusive as between such purchaser and Operator.

(ii)     The maximum amount for which the mortgage herein granted by Operator shall be deemed to secure the obligations and indebtedness of Operator to all Non-operator(s) as stipulated herein is hereby fixed in an amount equal to Twenty-Five Million Dollars ($25,000,000) in the aggregate (the "Limit of the Mortgage of Operator").  Except as provided in the previous sentence (and then only to the extent such limitations are required by law), the entire amount of obligations and indebtedness of Operator to the Non-operator(s) is secured hereby without limitation.  Notwithstanding the foregoing Limit of the Mortgage of Operator, the liability of Operator under this Agreement and the mortgage and security interest granted hereby shall be limited to (and the Non-operator(s) shall not be entitled to enforce the same against Operator for an amount exceeding) the actual obligations and indebtedness (including all interest charges, costs, attorneys' fees, and other charges provided for in this Agreement or in Exhibit "F") outstanding and unpaid and that are attributable to or charged against the interest of Operator pursuant to this Agreement.

### 8.6.4    Security Interest in Favor of the Non-operator(s)

To secure the complete and timely performance of and payment by Operator of all obligations and indebtedness of every kind and nature, whether now owed by Operator or hereafter arising, pursuant to this Agreement, Operator hereby grants to each Non-operator(s) a continuing security interest in and to all its rights, titles, interests, claims, general intangibles, proceeds, and products thereof, whether now existing or hereafter acquired, in and to (a) all oil and gas produced from the lands or offshore blocks covered by the Lease or attributable to the Lease when produced, (b) all accounts receivable accruing or arising as a result of the sale of such oil and gas (including, without limitation, accounts arising from gas imbalances or from the sale of oil and gas at the wellhead), (c) all cash or other proceeds from the sale of such oil and gas once produced, and (d) all Platforms, wells, facilities, fixtures, other corporeal property whether movable or immovable, whether now or hereafter placed on the offshore blocks covered by the Lease or maintained or used in connection with the ownership, use, or exploitation of the

19

#93828440v3
#93828440v5

Lease, and other surface and sub-surface equipment of any kind or character located on or attributable to the Lease and the cash or other proceeds realized from the sale, transfer, disposition, or conversion thereof.  The interest of Operator in and to the oil and gas produced from or attributable to the Lease when extracted and the accounts receivable accruing or arising as the result of the sale thereof shall be financed at the wellhead of the well or wells located on the Lease.  To the extent susceptible under applicable law, the security interest granted by Operator hereunder covers: (a) all substitutions, replacements, and accessions to the property of Operator described herein and is intended to cover all the rights, titles and interests of Operator in all movable property now or hereafter located on or used in connection with the Lease, whether corporeal or incorporeal; (b) all rights under any gas balancing agreement, farmout rights, option farmout rights, acreage and cash contributions, and conversion rights of Operator in connection with the Lease, the oil and gas produced from or attributable to the Lease, whether now owned and existing or hereafter acquired or arising, including, without limitation, all interests of Operator in any partnership, tax partnership, limited partnership, association, joint venture, or other entity or enterprise that holds, owns, or controls any interest in the Lease; and (c) all rights, claims, general intangibles, and proceeds, whether now existing or hereafter acquired, of Operator in and to the contracts, agreements, permits, licenses, rights-of-way, and similar rights and privileges that relate to or are appurtenant to the Lease, including the following:

(i)     all its rights, titles, and interests, whether now owned and existing or hereafter acquired or arising, in, to, and under or derived from any present or future operating, farmout, bidding, pooling, unitization, and communitization agreements, assignments, and subleases, whether or not described in Exhibit "A", to the extent, and only to the extent, that such agreements, assignments, and subleases cover or include any of its rights, titles, and interests, whether now owned and existing or hereafter acquired or arising, in and to all or any portion of the Lease, and all units created by any such pooling, unitization, and communitization agreements and all units formed under orders, regulations, rules, or other official acts of any governmental authority having jurisdiction, to the extent and only to the extent that such units cover or include all or any portion of the Lease;

(ii)    all its rights, titles, and interests, whether now owned and existing or hereafter acquired or arising, in, to, and under or derived from all presently existing and future advance payment agreements, and oil, casinghead gas, and gas sales, exchange, and processing contracts and agreements, including, without limitation, those contracts and agreements that are described on Exhibit "A", to

20

#93828440v3
#93828440v5

the extent, and only to the extent that those contracts and agreements cover or include all or any portion of the Lease; and

(iii)     all its rights, titles, and interests, whether now owned and existing or hereafter acquired or arising, in, to, and under or derived from all existing and future permits, licenses, rights-of-way, and similar rights and privileges that relate to or are appurtenant to any of the Lease.

**8.6.5    Recording**

To provide evidence of, and to further perfect the Parties' security rights created hereunder, on request, each Party shall execute and acknowledge the attached Exhibit "F" (the "Memorandum of Operating Agreement and Financing Statement") in multiple counterparts as appropriate. The Parties authorize Operator to file the Memorandum of Operating Agreement and Financing Statement in the public records set forth below to serve as notice of the existence of this Agreement as a burden on the title of Operator and the Non-operator(s) to their interests in the Lease and for purposes of satisfying otherwise relevant recording and filing requirements of applicable law and to attach an original of the Memorandum of Operating Agreement and Financing Statement to a standard UCC-1 for filing in the UCC records set forth below to perfect the security interests created by the Parties in this Agreement. Such Memorandum of Operating Agreement and Financing Statement shall be amended from time to time on acquisition of additional leasehold interests in the Lease, and the Parties shall, within five (5) business days following request by one (1) of the Parties hereto, execute and furnish to the requesting Party for recordation any such amendment.

**8.6.6    The Memorandum of Operating Agreement and Financing Statement**

The Memorandum of Operating Agreement and Financing Statement is to be filed or recorded, as the case may be, in (a) the conveyance records of the parish or parishes adjacent to the lands or offshore blocks covered by the Lease pursuant to La. R.S. 9:2731 et seq., (b) the mortgage records of such parish(es) or county(ies), (c) the appropriate Uniform Commercial Code records, and (d) the records of the BOEMRE as a non–required filing. A copy of such filed or recorded instrument(s) shall be furnished to Non-operator(s) once received by Operator.

**8.7    Unpaid Charges and Default**

**8.7.1**    If a Party fails to pay the charges due under this Agreement within sixty (60) days after receipt of Operator's statement, and if Operator then issues a notice of default and the default is not cured in the time and manner provided below, the other Participating Parties shall, on Operator's request, pay the unpaid amount in proportion to their Participating Interests. Each Party paying its share of the unpaid amount shall be subrogated to Operator's security rights, to the extent of the payment. In addition to other

21

remedies provided by this Agreement or by law, if a Party does not pay, when due, its share of the charges under this Agreement, Operator may give that Party notice that unless payment is made within thirty (30) days after receipt of Operator's notice, the Party shall be in default if the amount owing is uncontested.  A Party in default shall have no further access to the Lease, maps, records, data, or other information obtained in connection with operations.  If a Party believes that Operator's charges, or a portion thereof, are incorrect, that Party shall nevertheless pay the charges claimed by Operator and may notify Operator that the charges are in dispute.  Thereafter, Operator and the Non-operator(s) shall attempt to resolve the issue within sixty (60) days after receipt of payment.  A defaulting Party shall not be entitled to vote or exercise an election on any matter until that Party's payments are current.  The voting interest of each non-defaulting Party shall be in the proportion its Participating Interest bears to the total Participating Interests of all non-defaulting Parties. For each operation approved while a Party is in default, the defaulting Party shall be deemed to have voted not to participate in that operation.

8.7.2    The first sentence of Article 8.6.1(ii) of this Agreement shall be applicable only when both of the following conditions have been met: (i) Operator has fully complied with the provisions of this Agreement that are intended for the prevention of such a default, including, without limitation, timely advance billings, reasonable efforts to timely collect payment for advance billings as well as all monthly billings, providing due notice of default to a party that fails to make timely payment as required and recording of a fully executed Memorandum of Operating Agreement and Financing Statement as set forth in Exhibit "F", and (ii) the defaulting party is any Party other than Operator or its assigns.

8.8    **Confession of Judgment; Executory Process**

To the extent the Contract Area is located adjacent to Louisiana and to the extent allowed under La. C.C.P. art. 2631 et seq., each Party may use executory process to enforce the mortgage and security rights granted hereunder as to any property subject hereto.  Therefore, each Non-operator Party hereby confesses judgment in favor of the Operator up to the full amount secured hereunder as set forth in Article 8.6.1 (Mortgage in Favor of the Operator), and does by these present, consent, agree, and stipulate that, in the event the mortgage or security interests or any charges thereon not being promptly and fully paid when the same becomes due and payable, or in the event of failure to comply with any of the obligations herein set forth, or the breach of this Agreement in any of its parts by such Non-operator Party, the mortgage or security interests shall, at the option of the Operator, become due and payable, anything therein contained to the contrary notwithstanding, and it shall be lawful for the Operator, as holder or the mortgage or security interests, without making a demand and without notice or putting in default, the same being hereby expressly waived, to cause all and singular the property herein mortgaged or

22

secured to be seized and sold without appraisal, which is hereby expressly waived, by executory process issued by a competent court or to proceed with enforcement of its mortgage or security interest in any other manner provided by law.   Furthermore, the Operator hereby confesses judgment in favor of each Non-operator Party up to the full amount secured hereunder as set forth in Article 8.6.3 (Mortgage in Favor of the Non-operator Parties), and does by these present, consent, agree, and stipulate that, in the event the mortgage or security interests or any charges thereon not being promptly and fully paid when the same becomes due and payable, or in the event of failure to comply with any of the obligations herein set forth, or the breach of this Agreement in any of its parts by such Operator, the mortgage or security interests shall, at the option of such Non-operator Party, become due and payable, anything therein contained to the contrary notwithstanding, and it shall be lawful for such Non-operator Party, as holder or the mortgage or security interests, without making a demand and without notice or putting in default, the same being hereby expressly waived, to cause all and singular the property herein mortgaged or secured to be seized and sold by executory process issued by a competent court or to proceed with enforcement of its mortgage or security interest in any other manner provided by law.

# ARTICLE 9
# NOTICES

**9.1**   **Giving and Receiving Notices**

Except as otherwise provided in this Agreement, all AFEs and notices required or permitted by this Agreement shall be in writing and shall be delivered in person or by mail, courier service, or electronic mail, or facsimile transmission, with postage and charges prepaid, addressed to the Parties at the addresses in Exhibit "A".   When a drilling rig is on location and standby charges are accumulating, however, notices pertaining to the rig shall be given orally or by telephone.   All telephone or oral notices permitted by this Agreement shall be confirmed as soon as reasonably practical thereafter by written notice.   A notice shall be deemed to have been delivered only when received by the Party to which it was directed, and the period for a Party to deliver a response thereto begins on the date the notice is received.   "Receipt", for oral or telephone notice, means actual and immediate communication to the Party to be notified, and for written notice, means actual delivery of the notice to the address of the Party to be notified, as specified in this Agreement, or to the facsimile machine of that Party.   A responsive notice shall be deemed to have been delivered when the Party to be notified is in receipt of same.   When a response is required in forty-eight (48) hours or less, however, the response shall be given orally or by telephone, electronic mail, or facsimile transmission within that period. If a Party is unavailable to accept delivery of a notice required to be given orally or by telephone, the notice may be delivered by any other method specified in this Article 9.1.   A message left on an answering

23

machine or with an answering service or other third person shall not be deemed to be adequate telephonic or oral notice.

**9.2     Content of Notice**

An AFE or a notice requiring a response shall indicate the maximum response time specified in Article 9.3 (Response to Notices).  A proposal for a Platform and/or Development Facilities shall include an AFE containing a description of the Platform and/or Development Facilities, including but not limited to location and the estimated costs of design, fabrication, transportation, and installation.   A proposal for a well operation shall include an AFE describing the estimated commencement date, the proposed depth, the objective formation or formations to be penetrated or tested, the Objective Horizon, the surface and bottom-hole locations, proposed directional or horizontal drilling operations, the type of equipment to be used, and the estimated costs of the operation, including but not limited to the estimated costs of drilling, testing, and Completing or abandoning the well. If a proposed operation is subject to Article 13.11 (Lease Maintenance Operations), the notice shall specify that the proposal is a Lease Maintenance Operation. A proposal for multiple operations on more than one (1) well location by the same rig shall contain separate AFEs or notices for each operation and shall specify in writing in what order the operations will be conducted. Each Party shall respond to each proposed multiple operation in the manner provided in Article 9.3.3 (Proposal for Multiple Operations).

**9.3     Response to Notices**

Except as provided in Article 9.1, each Party's response to a proposal shall be in writing to the proposing Party. Unless otherwise provided in this Agreement, the response time shall be as follows:

**9.3.1     Platform and/or Development Facilities Proposals**

Each Party shall respond within sixty (60) days after its receipt of the AFE or notice for a Platform and/or Development Facilities.

**9.3.2     Well Proposals**

Except as provided in Article 9.3.3 (Proposal for Multiple Operations), each Party shall respond within thirty (30) days after receipt of the well, Rework, or Recompletion proposal, but if (a) a drilling rig is on location, (b) the proposal relates to the same well or its substitute, and (c) standby charges are accumulating, a response shall be made within forty-eight (48) hours after receipt of the proposal, including Saturdays, Sundays, and federal holidays.

**9.3.3     Proposal for Multiple Operations**

When a proposal is made to conduct multiple Development Operations at separate well locations using the same rig, each Party shall respond (a) to the well operation taking precedence, within thirty (30) days after receipt of the proposal; and (b) to each

24

subsequent well location, within forty-eight (48) hours after completion of approved operations at the prior location and notification thereof by Operator.

**9.3.4    Other Matters**

For all other matters requiring notice, each Party shall respond within thirty (30) days after receipt of notice.

**9.4    Failure to Respond**

Failure of a Party to respond to a proposal or notice, to vote, or to elect to participate within the period required by this Agreement shall be deemed to be a negative response, vote, or election.

**9.5    Response to Counterproposals**

Should a counterproposal be allowed under this Agreement, responses to that counterproposal must be made within the response period for the original proposal.

**9.6    Timely Well Operations**

Unless otherwise provided, an approved well shall be commenced within one hundred eighty (180) days after the date when the last applicable election on that well may be made.  Wells shall be deemed to have commenced on the day charges commence under the drilling contract for that well. Subject to Exhibit "C", if a proposal for a well is deemed to have been withdrawn, all costs incurred in the preparation for or in furtherance of that well will be chargeable to the Parties that voted to participate in the well proposal for that well.

**9.7    Timely Platform / Development Facilities Operations**

Unless otherwise provided, Operator shall commence, or cause to commence, the construction, acquisition, or refurbishment of an approved proposal for a Platform and/or Development Facilities within one hundred eighty (180) days after the date when the last applicable election on that Platform and/or Development Facilities may be made.   The construction, acquisition, or refurbishment of an approved Platform and/or Development Facilities proposal shall be deemed to have commenced on the date the contract is awarded for the design, acquisition, fabrication, or refurbishment of the Platform and/or Development Facilities.  Subject to Exhibit "C", regardless of whether or not the construction, acquisition, or refurbishment of a Platform and/or Development Facilities is commenced, all costs incurred by Operator, attributable to that activity, shall be paid by the Participating Parties.

# ARTICLE 10
# EXPLORATORY OPERATIONS

**10.1    Proposing Operations**

A Party may propose an Exploratory Operation in accordance with Article 9 (Notices) to the other Parties that are entitled to vote or make an election in regard to that operation

**10.2    Counterproposals**

#93828440v3
#93828440v5

When an Exploratory Operation is proposed, a Party may, within seven (7) days (exclusive of Saturdays, Sundays, and federal holidays) after receipt of the AFE or notice for the original proposal, make a counterproposal to conduct an alternative Exploratory Operation by sending an AFE or notice to such Parties in accordance with Article 9 (Notices).  The AFE or notice shall indicate that the proposal is a counterproposal to the original proposal.  If one (1) or more counterproposals are made, such Parties shall elect to participate in either the original proposal, one (1) counterproposal, or neither the original proposal nor a counterproposal.  If two (2) or more proposals receive the approval of the number of Parties and combined Working Interests required by Article 10.5 (Operations by Fewer Than All Parties), the proposal receiving the largest percentage of Working Interest approval shall take precedence, and in the event of a tie between two (2) or more approved proposals, the proposal first received by the Parties shall take precedence.  Except for the response period provided in this Article 10.2, a counterproposal shall be subject to the same terms and conditions as the original proposal.

**10.3     Operations by All Parties**

If all Parties elect to participate in the proposed operation, Operator shall conduct the operation at their cost and risk.

**10.4     Second Opportunity to Participate**

If there are more than two (2) Parties to this Agreement and if fewer than all but one (1) or more Parties elect to participate, the proposing Party shall notify the Parties of the elections made, whereupon a Party originally electing not to participate may then elect to participate by notifying the proposing Party within forty-eight (48) hours, including Saturdays, Sundays, and federal holidays, after receipt of such notice.  If all Parties elect to participate in the proposed operation, Operator shall conduct the operation at their cost and risk.  If there are only two (2) Parties to this Agreement, there shall not be a second opportunity to elect to participate, and if the Participating Party agrees to pay and bear one hundred percent (100%) of the costs and risks of the operation, Operator shall conduct the operation as a Non-consent Operation for the benefit of the Participating Party, and the provisions of Article 13 (Non-consent Operations) shall apply.

**10.5     Operations by Fewer Than All Parties**

If there are more than two (2) Parties to this Agreement and if, after the election made under Article 10.4 (Second Opportunity to Participate), fewer than all but one (1) or more Parties having the requisite Working Interest to approve the operation have elected to participate in the proposed operation, the proposing Party shall notify the Participating Parties, and each Participating Party shall have forty-eight (48) hours, including Saturdays, Sundays, and federal holidays, after receipt of the notice to notify the proposing Party of the portion of costs and risks attributable to the total Non-participating Parties' interests it elects to pay and bear.  Unless otherwise agreed by the Participating Parties, each Participating Party may, but shall not be

26

obligated to, pay and bear that portion of the costs and risks attributable to the total Non-participating Parties' interests in the ratio that the Participating Party's interest bears to the total interests of all Participating Parties that elect to pay and bear a portion of costs and risks attributable to the total Non-participating Parties' interests.  Failure to respond shall be deemed to be an election not to pay or bear any additional costs or risks.  If the Participating Parties agree to pay and bear one hundred percent (100%) of the costs and risks of the operation, Operator shall conduct the operation as a Non-consent Operation for the benefit of the Participating Parties, and the provisions of Article 13 (Non-consent Operations) shall apply.  If such agreement is not obtained, however, the operation shall not be conducted and the effect shall be as if the proposal had not been made.

### 10.5.1  First Exploratory Well

If a Party elects to be a Non-participating Party in the drilling of the first Exploratory Well on the Lease, then, as of the last applicable election date, each Non-participating Party shall be deemed to have relinquished its entire Working Interest in the Lease to the Participating Party.  If such first Exploratory Well is commenced timely after the last applicable election date and is drilled to the proposed Objective Depth or deepest Objective Horizon, whichever is lesser, in accordance with this Agreement, each Non-participating Party shall execute an assignment of its entire Working Interest in the Lease to the Participating Party(ies) in proportion to their interests in such first Exploratory Well.

### 10.6  Expenditures Approved

Approval of an Exploratory Operation shall cover all necessary expenditures associated with the operation proposed in the AFE or notice that are incurred by Operator in connection with (a) preparations for drilling; (b) the actual drilling; (c) evaluations, such as testing, coring, and logging; and (d) plugging and abandonment.

### 10.7  Conduct of Operations

After commencement of drilling an Exploratory Well, Operator shall diligently conduct the operation without unreasonable delay until the well reaches the Objective Depth, unless the well encounters, at a lesser depth, impenetrable conditions or mechanical difficulties that cannot be overcome by reasonable and prudent operations and that render further operations impracticable. If a well does not reach its Objective Depth as a result of the conditions mentioned in this Article 10.7, the operation shall be deemed to have been completed and Article 13 (Non-consent Operations) shall apply to each Non-participating Party for the portion of the well drilled.

### 10.8  Course of Action After Reaching Objective Depth

When an Exploratory Well has been drilled to its Objective Depth and reasonable testing, coring, and logging have been completed as set forth in the approved AFE and the results have been furnished to the Participating Parties, Operator shall notify the Participating Parties of Operator's recommendation for further operations in the well, and the following provisions shall apply:

27

**10.8.1   Election by Participating Parties**

A Participating Party shall have the right to propose another operation by notifying Operator and the other Participating Parties of its proposed operation within twenty-four (24) hours, including Saturdays, Sundays, and federal holidays, of receipt of Operator's notice.   The Participating Parties shall notify Operator within forty-eight (48) hours, including Saturdays, Sundays, and federal holidays, of receipt of Operator's proposal whether the Participating Parties elect to (a) participate in a recommended operation, or (b) not participate in a recommended operation.   Failure to respond shall be deemed to be an election not to participate in any of the recommended operations.

**10.8.2   Priority of Operations**

If all Participating Parties elect to participate in the same proposed operation, Operator shall conduct the operation at their cost and risk.   If more than one (1) operation is approved by one (1) or more Participating Parties having a combined Working Interest of fifty percent (50%) or more, the approved operation with the lowest number as indicated below shall take precedence:

1    Additional Testing, coring, or logging.   (If conflicting proposals are approved, the proposal receiving the largest percentage of Working Interest approval shall take precedence, and in the event of a tie between two (2) or more approved proposals, the approved proposal first received by the Parties shall take precedence.)

2    Deepen.   (If conflicting proposals are approved, the operation proposed to the deepest depth shall take precedence.)

3    Sidetrack.   (If conflicting proposals are approved, the proposal receiving the largest percentage Working Interest approval shall take precedence, and in the event of a tie between two (2) or more approved proposals, the approved proposal first received by the Parties shall take precedence.)

4    Complete at the Objective Horizon.

5    Complete above the Objective Horizon.   (If conflicting proposals are approved, the operation proposed at the deepest depth shall take precedence.)

6    Other operations.   (If conflicting proposals are approved, the proposal receiving the largest percentage Working Interest approval shall take precedence, and in the event of a tie between two (2) or more approved proposals, the approved proposal first received by the Parties shall take precedence.)

7    Temporarily abandon.

8    Plug and abandon.

**10.8.3   Second Opportunity to Participate**

If there are more than two (2) Participating Parties and fewer than all but one (1) or more Participating Parties elect to participate in an operation, the proposing Party shall notify

28

Debtors' Exhibit No. 34
Page 627 of 910

the Participating Parties of the elections made, whereupon a Party originally electing not to participate in the proposed operation may then elect to participate by notifying the proposing Party within forty-eight (48) hours, including Saturdays, Sundays, and federal holidays, after receipt of such notice.  If all Parties elect to participate in the proposed operation, Operator shall conduct the operation at their cost and risk. If there are only two (2) Participating Parties, there shall not be a second opportunity to elect to participate.

**10.8.4    Operations by Fewer Than All Parties**

If, after the election (if applicable) made under Article 10.8.3 (Second Opportunity to Participate), fewer than all but one (1) or more Parties having the requisite Working Interest to approve the operation elect to participate in the proposed operation that takes precedence, the proposing Party shall notify the Participating Parties and each Participating Party shall have forty-eight (48) hours, including Saturdays, Sundays, and federal holidays, after receipt of the notice to notify the proposing Party of the portion of the costs and risks attributable to the total Non-participating Parties' interests it elects to pay and bear.  Unless otherwise agreed by the Participating Parties, each Participating Party may, but shall not be obligated to, pay and bear that portion of the costs and risks attributable to the total Non-participating Parties' interests in the ratio that the Participating Party's interest bears to the total interests of all Participating Parties that elect to pay and bear a portion of costs and risks attributable to the Non-participating Parties' interests.  Failure to respond shall be deemed to be an election not to pay or bear any additional costs or risks.  If the Participating Parties agree to bear one hundred percent (100%) of the costs and risks of the operation, Operator shall conduct the operation as a Non-consent Operation for the benefit of the Participating Parties, and the provisions of Article 13 (Non-consent Operations) shall apply.  If such agreement is not obtained, however, the operation shall not be conducted and the effect shall be as if the proposal had not been made.  If a Participating Party in a well elects not to participate in the Deepening or Sidetracking operation in the well, such non-consenting Party shall become a Non-participating Party in all operations conducted in the Deepened or Sidetracked portion of the well after that election.

**10.8.5    Subsequent Operations**

On completion of an operation conducted under Article 10.8 (Course of Action After Reaching Objective Depth), if the well is not either (a) Completed as a Producible Well, or (b) temporarily abandoned or permanently plugged and abandoned, Operator shall notify the Participating Parties of Operator's recommendation for further operations in the well under Articles 10.8.1 through 10.8.4, which again shall apply.  If sufficient approval is not obtained to conduct a subsequent operation in a well or if all Participating Parties elect to plug and abandon the well, subject to Article 14 (Abandonment and Salvage), Operator

29

#93828440v3
#93828440v5

shall permanently plug and abandon the well at the cost and risk of all Participating Parties.  Each Participating Party shall be responsible for its proportionate share of the plugging and abandonment costs associated with the operation in which it participated.

**10.9    Wells Proposed Below Deepest Producible Reservoir**

If a proposal is made to conduct an Exploratory Operation involving the drilling of a well to an Objective Horizon below the base of the deepest Producible Reservoir, a Party may elect within the applicable period to limit its participation in the operation down to the base of the deepest Producible Reservoir.  For purposes of this Article 10.9, a Party that elects to limit its participation in the operation down to the base of the deepest Producible Reservoir shall be referred to as "Shallow Participant" and a Party that elects to participate in the entire operation shall be referred to as "Deep Participant".  If a Party elects to limit its participation to the base of the deepest Producible Reservoir, Operator shall prepare and submit to the Shallow Participant, for informational purposes, a separate AFE covering operations down to the deepest Producible Reservoir.  The Shallow Participant shall be a Participating Party in, and shall pay and bear the costs and risks of, each operation to the base of the deepest Producible Reservoir, according to its Participating Interest.  The Shallow Participant shall be a Non-participating Party in each operation below the deepest Producible Reservoir, and the operation shall be considered a Non-consent Operation, and the provisions of Article 13 (Non-consent Operations) shall apply.  If the well is Completed and produces Hydrocarbons from a horizon below the deepest Producible Reservoir, the Deep Participant shall reimburse the Shallow Participant for its share of the actual well costs to the base of the deepest Producible Reservoir.  Payment shall be due within thirty (30) days after receipt of notice of the well being completed below the deepest Producible Reservoir.  If the well is Completed and produces Hydrocarbons from a horizon below the deepest Producible Reservoir, the Shallow Participant shall reimburse the Deep Participant for its Working Interest share of the actual well costs to the base of the deepest Producible Reservoir in accordance with Article 13.4 (Deepening or Sidetracking Cost Adjustments), on the earlier of the time that (a) the well is plugged back to a horizon above the base of the deepest Producible Reservoir, as determined when the original well was proposed, (b) the well is plugged and abandoned, or (c) the amount to be recouped by the Deep Participant under Article 13 (Non-consent Operations) is recovered.

# ARTICLE 11
# DEVELOPMENT OPERATIONS

**11.1    Proposing Operations**

A Party may propose a Development Operation in accordance with Article 9 (Notices) to the other Parties that are entitled to vote or make an election in regard to that operation.

**11.2    Counterproposals**

#93828440v3
#93828440v5

When a Development Operation is proposed, a Party may, within seven (7) days (exclusive of Saturdays, Sundays, and federal holidays) after receipt of the AFE or notice for the original proposal, make a counterproposal to conduct an alternative Development Operation by sending an AFE or notice to such Parties in accordance with Article 9 (Notices).  The AFE or notice shall indicate that the proposal is a counterproposal to the original proposal.  If one (1) or more counterproposals are made, such Parties shall elect to participate in either the original proposal, one (1) counterproposal, or neither the original proposal nor a counterproposal.  If two (2) or more proposals receive the approval of the number of Parties and combined Working Interests required by Article 11.5 (Operations By Fewer Than All Parties), the proposal receiving the largest percentage Working Interest approval shall take precedence, and in the event of a tie between two (2) or more approved proposals, the approved proposal first received by the Parties shall prevail.  Except for the response period provided in this Article 11.2, a counterproposal shall be subject to the same terms and conditions as the original proposal.

**11.3    Operations by All Parties**

If all Parties elect to participate in the proposed operation, Operator shall conduct the operation at their cost and risk.

**11.4    Second Opportunity to Participate**

If there are more than two (2) Parties to this Agreement and if fewer than all but one (1) or more Parties elect to participate, the proposing Party shall notify the Parties of the elections made, whereupon a Party originally electing not to participate may then elect to participate by notifying the proposing Party within forty-eight (48) hours, including Saturdays, Sundays, and federal holidays, after receipt of such notice.  If all Parties elect to participate in the proposed operation, Operator shall conduct the operation at their cost and risk.  If there are only two (2) Parties to this Agreement, there shall not be a second opportunity to elect to participate, and if the Participating Party agrees to pay and bear one hundred percent (100%) of the costs and risks of the operation, Operator shall conduct the operation as a Non-consent Operation for the benefit of the Participating Party, and the provisions of Article 13 (Non-consent Operations) shall apply.

**11.5    Operations by Fewer Than All Parties**

If there are more than two (2) Parties to this Agreement and if, after the election made under Article 11.4 (Second Opportunity to Participate), fewer than all but one (1) or more Parties having the requisite Working Interest to approve the operation have elected to participate in the proposed operation, the proposing Party shall notify the Participating Parties, and each Participating Party shall have forty-eight (48) hours, including Saturdays, Sundays, and federal holidays, after receipt of the notice to notify the proposing Party of the portion of the costs and risks attributable to the total Non-participating Parties' interests it elects to pay and bear.  Unless otherwise agreed by the Participating Parties, each Participating Party may, but shall not be obligated to, pay and bear that portion of costs and risks attributable to the total Non-participating

31

Parties' interests in the ratio that the Participating Party's interest bears to the total interests of all Participating Parties that elect to pay and bear a portion of the costs and risks attributable to the total Non-participating Parties' interests.  Failure to respond shall be deemed to be an election not to pay or bear any additional costs or risks.  If the Participating Parties agree to pay and bear one hundred percent (100%) of the costs and risks of the operation, Operator shall conduct the operation as a Non-consent Operation for the benefit of the Participating Parties, and the provisions of Article 13 (Non-consent Operations) shall apply.  If such agreement is not obtained, however, the operation shall not be conducted and the effect shall be as if the proposal had not been made.

**11.6    Expenditures Approved**

Approval of a Development Operation shall cover all necessary expenditures associated with the operation proposed in the AFE or notice that are incurred by Operator in connection with (a) preparations for drilling; (b) the actual drilling; (c) evaluations, such as testing, coring, and logging; and (d) plugging and abandonment.

**11.7    Conduct of Operations**

After commencement of a Development Well, Operator shall diligently conduct the operation without unreasonable delay until the well reaches the Objective Depth, unless the well encounters, at a lesser depth, impenetrable conditions or mechanical difficulties that cannot be overcome by reasonable and prudent operations and render further operations impracticable.  If a well does not reach its Objective Depth as a result of the conditions mentioned in this Article 11.7, the operation shall be deemed to have been completed and Article 13 (Non-consent Operations) shall apply to each Non-participating Party for the portion of the well drilled.

**11.8    Course of Action After Reaching Objective Depth**

When a Development Well has been drilled to its Objective Depth and reasonable testing, coring, and logging have been completed and the results have been furnished to the Participating Parties, Operator shall notify the Participating Parties of Operator's recommendation for further operations in the well and the following provisions shall apply:

**11.8.1    Election by Fewer Than All Parties**

A Participating Party shall have the right to propose another operation by notifying Operator and the other Participating Parties of its proposed operation within twenty-four (24) hours, including Saturdays, Sundays, and federal holidays, of receipt of Operator's notice.  The Participating Parties shall notify Operator within forty-eight (48) hours, including Saturdays, Sundays, and federal holidays, of receipt of Operator's proposal whether the Participating Parties elect to (a) participate in a recommended operation, or (b) not participate in a recommended operation.  Failure to respond shall be deemed to be an election not to participate in any of the recommended operations.

**11.8.2    Priority of Operations**

32

If all Participating Parties elect to participate in the same proposed operation, Operator shall conduct the operation at their cost and risk.  If more than one (1) operation is approved by one (1) or more Participating Parties having a combined Working Interest of fifty percent (50%) or more, the approved operation with the lowest number as indicated below shall take precedence:

1    Additional Testing, coring, or logging.  (If conflicting proposals are approved, the proposal receiving the largest percentage of Working Interest approval shall take precedence, and in the event of a tie between two (2) or more approved proposals, the approved proposal first received by the Parties shall take precedence.)

2    Complete at the Objective Horizon.

3    Complete above the Objective Horizon.  (If conflicting proposals are approved, the operation proposed to the deepest depth shall take precedence.)

4    Deepen.  (If conflicting proposals are approved, the operation proposed to the deepest depth shall take precedence.)

5    Sidetrack.  (If conflicting proposals are approved, the proposal receiving the largest percentage of Working Interest approval shall take precedence, and in the event of a tie between two (2) or more approved proposals, the approved proposal first received by the Parties shall take precedence.)

6    Other operations.  (If conflicting proposals are approved, the proposal receiving the largest percentage of Working Interest approval shall take precedence, and in the event of a tie between two (2) or more approved proposals, the approved proposal first received by the Parties shall take precedence.)

7    Temporarily abandon.

8    Plug and abandon.

### 11.8.3   Second Opportunity to Participate

If there are more than two (2) Participating Parties and if fewer than all but one (1) or more Participating Parties elect to participate in an operation, the proposing Party shall notify the Participating Parties of the elections made, whereupon a Party originally electing not to participate in the proposed operation may then elect to participate by notifying the proposing Party within forty-eight (48) hours, including Saturdays, Sundays, and federal holidays, after receipt of such notice.  If all Parties elect to participate in the proposed operation, Operator shall conduct the operation at their cost and risk. If there are only two (2) Participating Parties, there shall not be a second opportunity to elect to participate.

### 11.8.4   Operations by Fewer Than All Parties

If, after the election (if applicable) made under Article 11.8.3 (Second Opportunity to

33

Participate), fewer than all but one (1) or more Parties having the requisite Working Interest to approve the operation elect to participate in the proposed operation that takes precedence, the proposing Party shall notify the Participating Parties and each Participating Party shall have forty-eight (48) hours, including Saturdays, Sundays, and federal holidays, after receipt of the notice to notify the proposing Party of the portion of the costs and risks attributable to the total Non-participating Parties' interests that it elects to pay and bear.  Unless otherwise agreed by the Participating Parties, each Participating Party may, but shall not be obligated to, pay and bear that portion of the costs and risks attributable to the total Non-participating Parties' interests in the ratio that the Participating Party's interest bears to the total interests of all Participating Parties that elect to pay and bear a portion of costs and risks attributable to the Non-participating Parties' interests.  Failure to respond shall be deemed to be an election not to pay or bear any additional costs or risks.  If the Participating Parties agree to pay and bear one hundred percent (100%) of the costs and risks of the operation, Operator shall conduct the operation as a Non-consent Operation for the benefit of the Participating Parties, and the provisions of Article 13 (Non-consent Operations) shall apply.  If such agreement is not obtained, however, the operation shall not be conducted and the effect shall be as if the proposal had not been made.  If a Participating Party in a well elects not to participate in the Deepening or Sidetracking operation in the well, such non-consenting Party shall become a Non-participating Party in all operations conducted in the Deepened or Sidetracked portion of the well after that election.

**11.8.5   Subsequent Operations**

On the completion of an operation conducted under Article 11.8 (Course of Action After Reaching Objective Depth), if the well is not either (a) Completed as a well capable of producing Hydrocarbons in paying quantities, or (b) temporarily abandoned or permanently plugged and abandoned, Operator shall notify the Participating Parties of Operator's recommendation for operations in the well under Articles 11.8.1 through 11.8.4, which again shall apply.  If sufficient approval is not obtained to conduct a subsequent operation in a well, or if all Participating Parties elect to plug and abandon the well, subject to Article 14 (Abandonment, Salvage, and Surplus), Operator shall permanently plug and abandon the well at the expense of all Participating Parties.  Each Participating Party shall be responsible for its proportionate share of the plugging and abandonment costs associated with the operation in which it participated.

# ARTICLE 12
# PLATFORM AND DEVELOPMENT FACILITIES

34

**12.1**   **Proposals**

A Party may propose the fabrication or acquisition and installation of a Platform and/or Development Facilities by sending an AFE or notice to the other Parties in accordance with Article 9 (Notices).

**12.2**   **Counterproposals**

When a Platform and/or Development Facilities is proposed under Article 12.1, a Party may, within seven (7) days after receipt of the AFE or notice for the original proposal, make a counterproposal to fabricate or otherwise acquire and install said Platform and/or Development Facilities by sending an AFE or notice to the other Parties in accordance with Article 9 (Notices). The AFE or notice shall indicate that the proposal is a counterproposal to the original proposal. If one (1) or more counterproposals are made, each Party shall elect to participate in either the original proposal, one (1) counterproposal, or neither the original proposal nor a counterproposal. If two (2) or more proposals receive the approval of the number of Parties and combined Working Interests required by Article 12.5 (Operations By Fewer Than All Parties), the proposal receiving the largest percentage Working Interest approval shall be deemed approved, and if two (2) or more approved proposals receive the same Working Interest approval, the approved proposal first received by the Parties shall be deemed approved.

**12.2.1**   **Operations by All Parties**

If all Parties elect to participate in the proposed operation, Operator shall conduct the operation at their cost and risk.

**12.2.2**   **Second Opportunity to Participate**

If there are more than two (2) Parties and if fewer than all but one (1) or more Parties elect to participate in the Platform and/or Development Facilities, the proposing Party shall notify the Parties of the elections made, whereupon a Party originally electing not to participate may then elect to participate by notifying the proposing Party within forty-eight (48) hours, including Saturdays, Sundays, and federal holidays, after receipt of such notice. If all Parties elect to participate in the Platform and/or Development Facilities, Operator shall timely commence the fabrication and installation of the Platform and/or Development Facilities at their cost and risk. If there are only two (2) Parties to this Agreement, there shall not be a second opportunity to elect to participate, and if the Participating Party agrees to pay and bear one hundred percent (100%) of the costs and risks of the operation, Operator shall conduct the operation as a Non-consent Operation for the benefit of the Participating Party, and the provisions of Article 13 (Non-consent Operations) shall apply.

**12.2.3**   **Operations by Fewer Than All Parties**

If there are more than two (2) Parties to this Agreement and if, after the election made under Article 12.2.2 (Second Opportunity to Participate), fewer than all but one (1) or

#93828440v3
#93828440v5

more Parties having the requisite Working Interest to approve the operation elect to participate in the Platform and/or Development Facilities, the proposing Party shall notify the Participating Parties, and each Participating Party shall have forty-eight (48) hours, including Saturdays, Sundays, and federal holidays, after receipt of the notice to notify the proposing Party of the portion of the costs and risks attributable to the total Non-participating Parties' interests it elects to pay and bear.  Unless otherwise agreed by the Participating Parties, each Participating Party may, but shall not be obligated to, pay and bear that portion of costs and risks attributable to the total Non-participating Parties' interests in the ratio that the Participating Party's interest bears to the total interests of all Participating Parties that elect to pay and bear a portion of the costs and risks attributable to the total Non-participating Parties' interests.  Failure to respond shall be deemed to be an election not to pay or bear any additional costs or risks.  If the Participating Parties agree to pay and bear one hundred percent (100%) of the costs and risks of the operation, Operator shall conduct the operation as a Non-consent Operation for the benefit of the Participating Parties, and except as provided in Article 12.4 (Rights to Take in Kind), the provisions of Article 13.2.1.(b) shall apply.  If such agreement is not obtained, however, the fabrication and installation of the Platform and/or Development Facilities shall not be commenced, and the effect shall be as if the proposal had not been made.

**12.3    Ownership and Use of the Platform and Development Facilities**

The Participating Parties in the Development Facilities own all the excess capacity of the Development Facilities and the excess weight, space, and buoyancy of the Platform.  Each Participating Party in the Development Facilities does not have the right to use its Participating Interest share of the excess capacity, weight, space, and buoyancy for hydrocarbon production from outside the Lease.  Each Participating Party in the Development Facilities or Platform must obtain the unanimous approval of the other Participating Parties in the Development Facilities or Platform in order to utilize any portion of the excess capacity, weight, space, and buoyancy.  It must negotiate the payment of a fee with the Participating Parties in the Development Facilities or Platform in order to utilize any portion of the excess capacity, weight, space, and buoyancy.  Each of the Participating Parties in the Development Facilities or Platform shall receive its Participating Interest share of all fees derived from the utilization of the excess capacity, weight, space, and buoyancy.  All hydrocarbon production from outside the Lease shall be processed under a "Facilities Use and Production Handling Agreement" unanimously agreed to by the Participating Parties in the Development Facilities.

**12.4    Rights to Take in Kind**

Nothing in this Article 12 shall act to limit a Party's rights under Article 22 (Disposition of Production), or to otherwise separately dispose of its share of Hydrocarbon production.  If a Party

36

Debtors' Exhibit No. 34
Page 635 of 910

elects (a) not to participate in an approved Development Facilities proposal and (b) to separately dispose of its share of Hydrocarbon production (the "Separately Disposing Party"), the Separately Disposing Party (c) shall not be subject to the provisions of Article 13.2.1.(b), but must provide proof to the Participating Parties in the approved Development Facilities proposal, within seven (7) days from the last applicable response date to the Development Facilities proposal, that it has entered into fabrication and transportation contracts to separately dispose of its own share of Hydrocarbon production.  If a Separately Disposing Party fails to provide such proof by that deadline and if there is sufficient capacity for the Development Facilities to accommodate the Separately Disposing Party's share of the Hydrocarbons, it shall immediately (i) become a Participating Party in the Development Facilities and utilize the Development Facilities for its share of Hydrocarbon production, (ii) pay to the Participating Parties in the approved Development Facilities proposal an amount equal to two hundred percent (200%) of what would have been the Separately Disposing Party's share of the costs and expense of the Development Facilities had it elected to participate in the Development Facilities under Article 12.1 or 12.2, and (iii) assume its share of the risks and liabilities associated with the construction and ownership of the Development Facilities as of the date of commencement of the operations to construct same. The Participating Parties in the original Development Facilities and the Separately Disposing Party, which becomes a Participating Party in the original Development Facilities under this Article 12.4, shall own the original Development Facilities based on their Participating Interest share in the original Development Facilities.  If a Separately Disposing Party fails to provide such proof by that deadline and if there is insufficient capacity for the Development Facilities to accommodate the Separately Disposing Party's share of the Hydrocarbons, the Separately Disposing Party shall (i) become a Participating Party in the original Development Facilities and utilize the available capacity in the original Development Facilities, if any, for its share of Hydrocarbon production, (ii) pay one hundred percent (100%) of the costs of an expansion or modification of the Development Facilities, which is required to accommodate all or a portion of its share of the Hydrocarbons, and assume one hundred percent (100%) of the risks and liabilities associated with (a) the construction, installation and commissioning of the expanded or modified Development Facilities and (b) the utilization of the expanded or modified Development Facilities for thirty (30) days after the commencement of Hydrocarbon production through same, (iii) pay to the Participating Parties in the approved Development Facilities proposal an amount equal to two hundred percent (200%) of what would have been the Separately Disposing Party's share of the costs and expense of the original Development Facilities had it elected to participate in the original Development Facilities under Article 12.1 or 12.2, and (iv) assume its share of the risks and liabilities associated with the construction and ownership of the original Development Facilities as of the date of commencement of the operations to construct the original Development Facilities.  The Participating Parties in the original Development Facilities and the

37

Separately Disposing Party, which becomes a Participating Party in the original Development Facilities under Article 12.4(i), shall own the expanded or modified Development Facilities based on their Participating Interest share in the original Development Facilities, and the Participating Parties in the original Development Facilities shall assume their Participating Interest share of the risks and liabilities associated with the ownership of the expanded or modified Development Facilities thirty (30) days after that the expanded or modified Development Facilities have been utilized.

**12.5    Expansion or Modification of a Platform and/or Development Facilities**

After installation of a Platform and/or Development Facilities, any Participating Party in that Platform and/or Development Facilities may propose the expansion or modification of that Platform and/or Development Facilities by written notice (along with its associated AFE) to the other Participating Parties in that Platform and/or Development Facilities.  That proposal requires approval by one (1) or more of the Participating Parties in the Platform and/or Development Facilities with more than fifty percent (50%) of the Participating Interest in the Platform and/or Development Facilities.  If approved, that proposal will be binding on all Participating Parties in that Platform and/or Development Facilities, and Operator shall commence that expansion or modification at the sole cost and risk of all the Participating Parties in that Platform and/or Development Facilities unless otherwise agreed.

**12.6    Offsite Host Facilities**

If one (1) or more Parties with more than fifty percent (50%) of the Participating Interest in Hydrocarbon production agree that Hydrocarbon production can most effectively be processed and handled by an Offsite Host Facilities, Operator, on behalf of the Participating Parties, shall use reasonable efforts to secure a formal "Facilities Use and Production Handling Agreement" from the owners of the Offsite Host Facilities.  If Operator does secure access to Offsite Host Facilities in a Facilities Use and Production Handling Agreement, each Participating Party shall have the right, but not the obligation, to utilize its Participating Interest share of the capacity so secured.  This Article 12.6 shall not constitute a limit on a Party's right to install its own Take-in-Kind Facilities under Article 22 (Disposition of Production).

# ARTICLE 13
# NON-CONSENT OPERATIONS

**13.1    Non-consent Operations**

38

Operator shall conduct Non-consent Operations at the sole cost and risk of the Participating Parties in accordance with the following provisions:

### 13.1.1   Non-interference

Non-consent Operations shall not interfere unreasonably with operations approved by all the Parties.

### 13.1.2   Multiple Completion Limitation

Subject to Article 10.9, a Non-consent Operation shall not be conducted in a well having multiple Completions unless (a) each Completion is owned by the same Parties in the same proportions; (b) the well is incapable of producing from any Completion; or (c) all Participating Parties in the well consent to the operation.

### 13.1.3   Metering

In Non-consent Operations, Hydrocarbon production shall be determined on the basis of appropriate well tests, unless separate metering devices are required by a governmental authority having jurisdiction.

### 13.1.4   Non-consent Well

Operations on a Non-consent Well shall not be conducted in a Producible Reservoir without approval of all Parties unless (a) the Producible Reservoir is designated in the notice as a Completion objective; (b) Completion of the well in the Producible Reservoir will not increase the rates of Hydrocarbon production that are prescribed and approved for the Producible Reservoir by the governmental authority having jurisdiction; and (c) the horizontal distance between the vertical projections of the midpoint of the Producible Reservoir in the well and an existing well currently completed in and producing from the same Producible Reservoir will be at least one thousand (1,000) feet for an oil-well Completion or two thousand (2,000) feet for a gas-well Completion.

### 13.1.5   Cost Information

Operator shall, within one hundred twenty (120) days after completion of a Non-consent Operation, furnish the Parties either (a) an inventory and an itemized statement of the cost of the Non-consent Operation and equipment pertaining thereto, or (b) a detailed statement of the monthly billings.  Each quarter thereafter, while the Participating Parties are being reimbursed under Article 13.2.1 (Production Reversion Recoupment), Operator shall furnish the Non-participating Parties a quarterly statement detailing all costs and liabilities incurred in the Non-consent Operation, together with a statement of the quantities of Hydrocarbons produced from it and the amount of the proceeds from the sale of the Non-participating Parties' relinquished Hydrocarbon production from the Non-consent Operation for the preceding quarter.   Operator shall prepare the monthly statement of the quantities of Hydrocarbons produced and the amounts of the proceeds from the sale of Non-participating Parties' relinquished Hydrocarbon production based on

#93828440v3
#93828440v5

the proceeds received for Operator's share of Hydrocarbon production.  When Operator's payout calculation indicates that payout has occurred, Operator shall promptly notify all Parties.  The Participating Parties that assumed a portion of the Non-participating Parties' relinquished interest shall then provide Operator all information pertaining to the cumulative proceeds received from the sale of the Non-participating Parties' relinquished Hydrocarbon production.  Operator shall revise the payout date using the actual proceeds from the sale of the Non-participating Parties' relinquished Hydrocarbon production and administer any subsequent adjustments between the Parties.

### 13.1.6   Completions

For determinations under Article 13.1 (Non-consent Operations), each Non-consent Operation in a single wellbore shall be accounted for separately.

## 13.2   Relinquishment of Interest

On commencement of Non-consent Operations, other than Non-consent Operations governed by Article 10.5 (Operations by Fewer Than All Parties) or Article 13.7 (Operations Utilizing a Non-consent Platform and/or Development Facilities), each Non-participating Party's interest and leasehold operating rights in the Non-consent Operation and title to Hydrocarbon production resulting therefrom; and if Article 13.8 (Discovery or Extension from Non-consent Drilling) is effective, one-half (1/2) of each Non-participating Party's interest and leasehold operating rights and title to Hydrocarbon production from wells mentioned in Article 13.8 (Discovery or Extension from Non-consent Drilling), shall be owned by and vested in each Participating Party in proportion to its Participating Interest, or in the proportions otherwise agreed by the Participating Parties, for as long as the Non-Consent Operation is being conducted or Hydrocarbon production is obtained therefrom, subject to the following:

### 13.2.1   Production Reversion Recoupment

When the Participating Parties have recouped out of Hydrocarbon production from the Non-consent Operations attributable to the Non-participating Party's interest an amount, which when added to amounts received under Article 13.3 (Deepening or Sidetracking of Non-consent Well), equals the sum of the following:

(a)     Eight hundred percent (800%) of the Non-participating Party's share of the costs of the following Non-consent Exploratory Operations, or six hundred percent (600%) of the Non-participating Party's share of the costs of the following Non-consent Development Operations: drilling, testing, Completing, Recompleting, Deepening, Sidetracking, Reworking, plugging back, and temporarily abandoning a well, reduced by the Non-participating Party's Share of a cash contribution received under Article 21.2 (Cash Contributions);

(b)     If applicable, three hundred percent (300%) of Non-participating Party's Share of

40

the cost of Platforms and/or Development Facilities approved under Article 12.1 (Proposal) or Article 12.2 (Counterproposals); such recoupment is limited to the Non-participating Party's Share of the Hydrocarbon production that utilize such Platform and/or Development Facilities;

(c)     Two hundred percent (200%) of the Non-participating Party's Share of the cost charged in accordance with Article 13.9 (Allocation of Platform / Development Facilities Costs to Non-consent Operations) of using an existing Platform / Development Facilities; and

(d)     the Non-participating Party's Share of the costs of operation, maintenance, treating, processing, gathering, and transportation, including but not limited to an Offsite Host Facilities' handling fees, as well as lessor's royalties and severance, Hydrocarbon production, and excise taxes,

the relinquished interests of the Non-participating Party shall automatically revert to the Non-participating Party as of 7:00 a.m. of the day after the recoupment occurs. Thereafter, the Non-participating Party shall own the same interest in the Non-consent Well, equipment pertaining thereto, including but not limited to any Platform or Development Facilities, and the Hydrocarbon production therefrom as the Non-participating Party would have owned or been entitled to if it had participated in the Non-consent Operation. On reversion, the Non-participating Party shall become a Participating Party and, as such, shall become liable for its proportionate share of the further costs of the operation as set forth in this Agreement and Exhibit "C".

### 13.2.2   Non-production Reversion

If the Non-consent Operation fails to obtain Hydrocarbon production or if the operation results in Hydrocarbon production that ceases before complete recoupment by the Participating Parties under Article 13.2.1 (Production Reversion Recoupment), such leasehold operating rights shall revert to each Non-participating Party, except that all Non-consent Wells, Platforms, and Development Facilities shall remain vested in the Participating Parties (but the salvage value in excess of the sum remaining under Article 13.2.1 shall be credited to all Parties).

### 13.3   Deepening or Sidetracking of Non-consent Well

If a Participating Party proposes to Deepen or Sidetrack a Non-consent Well, a Non-participating Party may then elect to participate in the Deepening or Sidetracking operation by notifying Operator within thirty (30) days, or within forty-eight (48) hours, including Saturdays, Sundays, and federal holidays, if a rig is on location and standby charges are being incurred, after receiving notice of the proposal.   A Non-participating Party that elects to participate in Deepening or Sidetracking the well, as proposed, shall immediately pay the Participating Parties, in accordance

41

with Article 13.4 (Deepening or Sidetracking Cost Adjustments), its Working Interest share of actual well costs (excluding logging, coring, testing, and Completion costs other than the cost of setting any casing or Completion Equipment that is used in the Deepening or Sidetracking), less all amounts recovered by the Participating Parties from the proceeds of Hydrocarbon production from the well, as if the Non-participating Party had originally participated to the initial objective depth or formation, in the case of a Deepening operation, or the depth at which the Sidetracking operation is initiated.   Thereafter, the Non-participating Party shall be deemed to be a Participating Party for the Deepening or Sidetracking operations, and Article 13.2.1(a) shall not apply to that Party for the Deepened or Sidetracked portion of the well.  The initial Participating Parties, however, shall continue to recoup out of the proceeds of Hydrocarbon production from the non-consent portion of the well any balance for the Non-consent Well remaining to be recovered under Article 13.2.1 (Production Reversion Recoupment), less the amounts paid by the Non-participating Party under this Article 13.3.

**13.4    Deepening or Sidetracking Cost Adjustments**

If a proposal is made to Deepen or Sidetrack a Non-consent Well, a well cost adjustment will be performed as follows:

(a)    Intangible drilling will be valued at the actual cost incurred by the Participating Parties.

(b)    Tangible materials will be valued in accordance with the provisions of Exhibit "C".

(c)    For Sidetracking operations, the values determined in Articles 13.4(a) and 13.4(b) shall be reduced by the amount allocated to that portion of the well from the surface to one hundred feet (100') below the point at which the Sidetracking was initiated.  Such allocations shall be consistent with the guidelines recommended by the applicable Council of Petroleum Accountants Societies ("COPAS") Guideline, as amended from time to time.

(d)    Amortization/depreciation shall be applied to both intangible and tangible values at the rate of ten percent (10%) per annum from the date the well commenced Hydrocarbon production to the date operations commence to Deepen or Sidetrack the well, provided, however, that the value of tangible materials after applying depreciation shall never be less than fifty percent (50%) of the value determined in Article 13.4(b).

**13.5    Subsequent Operations in Non-consent Well**

Except as provided in Article 13.3 (Deepening or Sidetracking of Non-consent Well), an election not to participate in the drilling, Sidetracking, or Deepening of a well shall be deemed to be an election not to participate in any subsequent operations in the well before full recovery by the Participating Parties of the Non-participating Party's recoupment amount.

**13.6    Operations in a Production Interval**

A Participating Party in a Production Interval may propose Rework or Sidetrack operations within

42

that Production Interval, or to permanently plug and abandon that Production Interval in a well; however, no Production Interval in a well shall be abandoned without the unanimous approval of the Participating Parties in the Production Interval.  If a proposal, estimated to exceed the amount specified in Article 8.2 (Authorization), is made to Rework or Sidetrack a Production Interval and the Participating Parties elect to participate in the proposed operation, Operator shall conduct the operation at their sole cost and risk.  If fewer than all but one (1) or more Parties having a combined Participating Interest of fifty percent (50%) or more elect to participate in the proposed operation, Operator shall conduct the Reworking or Sidetracking operation at the cost and risk of the Participating Parties owning an interest in the Production Interval.  A proposal to Rework an interval, other than a Production Interval, shall be made and approved in accordance with Article 11.5 (Operations by Fewer Than All Parties).

**13.7    Operations Utilizing a Non-consent Platform and/or Development Facilities**

Except as otherwise provided in Article 12.4 (Rights to Take in Kind) and this Article 13.7, if applicable, a Party that did not originally participate in a Platform and/or Development Facilities shall be a Non-participating Party for all operations utilizing the Platform and/or Development Facilities and shall be subject to Article 13.2 (Relinquishment of Interest). Notice, in accordance with Article 9 (Notices), shall be given to the Non-participating Party for all wells proposed to be drilled from or tied back to the Non-consent Platform and/or handled by non-consent Development Facilities.   If a Non-participating Party in a Non-consent Platform and/or Development Facilities desires to participate in the drilling of any such well proposed by the Participating Parties in the Platform and/or Development Facilities, the Non-participating Party desiring to join in the proposed well shall first pay the Participating Parties in the Platform and/or Development Facilities its proportionate share of the cost of the Platform and/or Development Facilities, including but not limited to costs of material, fabrication, transportation, and installation plus any remaining amounts to be recouped under Article 13.2.1(b).  The Non-participating Party shall remit payment to Operator and Operator shall (a) reimburse the Participating Parties in the Platform and/or Development Facilities in the same proportions they are sharing in the Platforms and/or Development Facilities recoupment account, and (b) credit the applicable payout account. On payment of that amount, the original Non-participating Party shall become an owner and a Participating Party in the Platform and/or Development Facilities in the same manner as if recoupment had occurred under Article 13.2.1 (Production Reversion Recoupment), and may participate in all future wells drilled from or tied back to the Platform. As to well operations conducted from the Platform and/or Development Facilities before payment under this Article 13.7, the original Non-participating Party shall remain a Non-participating Party in such Non-consent Operations until such time as the entire recoupment balance applicable to all such Non-consent Operations in the aggregate has occurred, as provided for in Articles 13.2.1(a) and 13.2.1(d).

#93828440v3
#93828440v5

**13.8     Discovery or Extension from Non-consent Drilling**

If a Non-consent Well (a) discovers a new Producible Reservoir or (b) extends an existing Producible Reservoir beyond its recognized boundaries, as unanimously agreed by the Participating Parties in all existing wells currently producing from the existing Producible Reservoir before commencement of drilling operations, the recoupment of costs for the well shall be governed by Article 13.2 (Relinquishment of Interest) and shall be recovered by the Participating Parties in one (1) of the following ways:

(a)     if the Non-consent Well is not completed and produced, recoupment shall be out of one-half (1/2) of each Non-participating Party's interest in Hydrocarbon production from all subsequently drilled and completed wells on the Lease that are completed in the Producible Reservoir discovered, or in that portion extended, by the Non-consent Well and in which the Non-participating Party has a Participating Interest; or

(b)     if the Non-consent Well is completed and produced, recoupment shall be out of the Non-participating Party's Share of all Hydrocarbon production from the Non-consent Well and one-half (1/2) of the Non-participating Party's interest in Hydrocarbon production from all subsequently drilled and completed wells on the Lease that are completed in the Producible Reservoir discovered, or in that portion extended, by the Non-consent Well and in which the Non-participating Party has a Participating Interest.

**13.9     Allocation of Platform / Development Facilities Costs to Non-consent Operations**

Non-consent Operations shall be subject to further conditions as follows:

**13.9.1   Charges**

If a well is drilled or produced from a Platform and/or is produced through Development Facilities whose Participating Parties are different from the Participating Parties in that well or if the Participating Parties' Participating Interest shares in that Platform and/or Development Facilities are different from their Participating Interest shares in that well, the rights of the Participating Parties in that well and the costs to use the Platform and/or Development Facilities for that well shall be determined as follows:

(a)     The Participating Parties in that well shall pay to Operator a one-time slot usage fee for the use of a slot on the Platform equal to two percent (2%) of the cost of the Platform.  Within fifteen (15) days of its receipt of that fee, Operator shall distribute to the Participating Parties in the Platform their Participating Interest share of that payment.  For purposes of calculating the slot usage fee, the total cost of the Platform shall be reduced by one-half percent (0.5%) per month, commencing on the date the Platform was installed and continuing every month thereafter until the month actual drilling operations on that well is commenced; however, the total cost of the Platform shall not be reduced by more than fifty percent (50%) of the total Platform's costs.  The cost of additions to the Platform

44

#93828440v3
#93828440v5

shall be reduced in the same manner commencing the first month after the addition is installed.   If that well is abandoned having never produced Hydrocarbons, the right of the Participating Parties in that well to use the Platform slot through which the well was drilled shall terminate unless those Parties commence drilling a substitute well for the abandoned well through the same slot within ninety (90) days of the abandonment. If that substitute well is abandoned having never produced Hydrocarbons, the right of the Participating Parties in that well to use the Platform slot through which the well was drilled shall terminate.   The slot usage fee shall not apply to a slot deemed to be "surplus".   A slot may be deemed surplus only by the unanimous agreement of the Participating Parties in the Platform.

(b)     The Participating Parties in that well shall pay to the owners of the Development Facilities a lump sum equal to that portion of the total cost of those Development Facilities that the throughput volume of the Non-consent Operation bears to the current total design throughput volume of the Development Facilities. Throughput volume shall be estimated by Operator in barrels produced per day (with 1 barrel of oil equaling 5.8 mcf of gas), using an average daily volume of the first three (3) months of Hydrocarbon production from the Non-consent Operation.   For purposes of calculating the Development Facilities lump sum payment, the total cost of the Development Facilities shall be reduced by one-half percent (0.5%) per month, commencing from the date when the Development Facilities were installed and continuing every month thereafter until the first month during which Hydrocarbon production from the Non-consent Operation commences, but the total cost of the Development Facilities shall not be reduced more than fifty percent (50%) of the total Development Facilities' cost.  If a modification, expansion, or addition to the Development Facilities is made after commencing first Hydrocarbon production and before connection of the Non-consent Operation to the Development Facilities, the Development Facilities lump sum payment shall be reduced in the same manner described above, from the month in which the Development Facilities modification, expansion, or addition is completed until the first month during which Hydrocarbon production from the Non-consent Operation is commenced.

Payment of sums under this Article 13.9.1 is not a purchase of an additional interest in the Platform or the Development Facilities.  Such payment shall be included in the total amount that the Participating Parties are entitled to recoup out of Hydrocarbon production from the Non-consent Well.

**13.9.2   Operating and Maintenance Charges**

45

#93828440v3
#93828440v5

The Participating Parties shall pay all costs necessary to connect a Non-consent Well to the Platform and/or Development Facilities and that proportionate part of the costs of operating and maintaining the Platform and/or Development Facilities applicable to the Non-consent Well.  Platform operating and maintenance costs that are costs not directly attributable to a wellbore shall be allocated equally to all actively producing Completions. Operating and maintenance costs for the Development Facilities shall be allocated on a volume throughput basis, that is, in the proportion that the volume throughput of the well bears to the total volume throughput of all wells connected to the Development Facilities. Volume throughput, as used in this Article 13.9.2, shall be determined by considering all Hydrocarbons and water volumes.

## 13.10   Allocation of Costs Between Zones

Except as provided in Article 10.9 (Wells Proposed Below Deepest Producible Reservoir), if for any reason the Participating Interests of the Parties in a well are not the same for the entire depth or the Completion thereof, the costs of drilling, Completing, and equipping the well shall be allocated in an equitable manner, as agreed by the Parties, based on the value and allocation recommended in the applicable COPAS Guideline, as amended from time to time.

## 13.11   Lease Maintenance Operations

An operation proposed within the last one (1) year of the primary term or, subsequent thereto, an operation proposed to perpetuate the Lease or portion thereof at its expiration date or otherwise, including but not limited to well operations, regulatory relief (for example, course of action necessary to satisfy the statutory or regulatory requirements of the governmental authority having jurisdiction), and other Lease operations, shall be deemed to be a "Lease Maintenance Operation."  To invoke this Article 13.11, a notice or an AFE that proposes an operation must state that the proposed operation is a Lease Maintenance Operation.

### 13.11.1 Participation in Lease Maintenance Operations

A Party may propose a Lease Maintenance Operation by giving notice to the other Parties.  If fewer than all Parties elect to participate in the proposed Lease Maintenance Operation, the proposing Party shall notify the Parties of the elections made. Each Party electing not to participate shall then have a second opportunity to participate in the proposed operation by notifying the other Parties of its election within forty-eight (48) hours after receipt of the notice.   A Lease Maintenance Operation shall not require minimum approval, either of the number of Parties or the percentage of the voting interests of the Parties otherwise required in Article 6.1.2 (Vote Required). For a Lease Maintenance Operation to be conducted, the Participating Parties must agree to pay and bear one hundred percent (100%) of the costs and risks of the operation. If more than one (1) Lease Maintenance Operation is proposed, the operation with the greatest percentage approval shall be conducted. Notwithstanding the recoupment provisions of

46

this Agreement, a Party electing not to participate in a well operation proposed as a Lease Maintenance Operation shall promptly assign, effective as of the date the operation commences, to the Participating Parties all its right, title, and interest in and to that portion of the Lease that would otherwise expire and the property and equipment attributable thereto, in accordance with Article 26 (Successors, Assigns).  In the event of such assignment, the assigning Party shall retain all obligations and liabilities incurred before the effective date of such assignment, and the Participating Parties that are assigned such interest may require the assigning Party to provide reasonable financial assurances including but not limited to posting a performance bond (in an amount, form and with a surety acceptable to the Participating Parties) for the retained liabilities for such assigned interest.  If more than one (1) Lease Maintenance Operation is proposed and there is a tie between two (2) proposed operations, both operations shall be conducted and the costs and risks of conducting both operations shall be paid and borne by the Participating Parties.  If the drilling of a well is undertaken as a Lease Maintenance Operation, further operations conducted by the Participating Parties in the well shall be governed by Article 10.9 (Course of Action After Reaching Objective Depth) or Article 11.9 (Course of Action After Reaching Objective Depth), whichever applies.  If more than one (1) well operation is conducted, any of which would perpetuate the Lease or such portion thereof, an assignment shall not be required from a Party participating in any such well operation.

**13.11.2 Accounting for Non-participation**

If, after one (1) year from completion of a well operation conducted as a Lease Maintenance Operation, the Lease or portion thereof is being perpetuated by a Lease Maintenance Operation, as provided in Article 13.11.1 (Participation in Lease Maintenance Operations), Operator shall render a final statement, if applicable, to the assigning Party for its share of all expenses attributed to the assigned interest before the effective date of the assignment, plus any credit or deficiency in salvage value calculated under Article 15.3.1 (Prior Expenses).  The assigning Party shall settle any deficiency owed the non-assigning Parties within thirty (30) days after receipt of Operator's statement.

**13.12   Retention of Lease by Non-consent Well**

If, at the expiration of the primary term of the Lease, one (1) or more Non-consent Wells, except wells drilled under Article 10.5.1 (First Exploratory Well) provision of Article 10.5 (Operations by Fewer Than All Parties), if selected, are the only wells perpetuating the Lease, Operator shall give written notice to each Non-participating Party that the Non-consent Wells are serving to perpetuate the Lease. Each Non-participating Party shall, within thirty (30) days after receipt of Operator's written notice, elect one (1) of the following:

47

(a)     to assign its entire interest in the Lease to the Participating Parties in the proportions in which the Non-consent Wells are owned subject to the assignor's retained obligations under Article 15.3.1 (Prior Expenses); or

(b)     to pay the Participating Parties, within sixty (60) days after its election, the lesser of its proportionate share of the actual well costs of the wells, as if the Non-participating Party had originally participated, or the balance of the recoupment account.  The payment shall be made to Operator and credited to the account of each Participating Party.  The Non-participating Party shall remain as a Non-participating Party until full recoupment is obtained, but the payment shall be credited against the total amount to be recouped by the Participating Parties.

A Non-participating Party that fails to make the required election shall be deemed to have elected under Article 13.12(a) to relinquish its entire interest in the Lease.  If a Non-participating Party elects to make payment under Article 13.12(b) but fails to make the required payment within sixty (60) days after its election, the Non-participating Party shall either remain liable for the obligation to pay or, by unanimous vote of the Participating Parties, be deemed to have elected under Article 13.12(a) to relinquish its entire interest in the Lease.  Each relinquishing Non-participating Party shall promptly execute and deliver an assignment of its interest to the Participating Parties, in accordance with Article 26 (Successors and Assigns) subject to the assignor's retained obligations under Article 15.3.1 (Prior Expenses).

**13.13    Non-Consent Premiums**

A non-consent premium paid by a Non-Participating Party to the Participating Parties shall be allocated to the Participating Parties based on their original Participating Interest share in the Non-consent Operation that generated the non-consent premium.


# ARTICLE 14
# ABANDONMENT, SALVAGE, AND SURPLUS

**14.1    Platform Salvage and Removal Costs**

When the Parties owning wells, Platforms, and/or Development Facilities unanimously agree to dispose of the wells, Platforms, and/or Development Facilities, it shall be disposed of by Operator in the time and manner approved by the Parties. The costs, risks, and net proceeds, if any, for the disposal shall be shared by the Parties in proportion to their Participating Interests therein.

**14.2    Abandonment of Platforms, Development Facilities, or Wells**

Except as provided in Article 10 (Exploratory Operations) and Article 11 (Development Operations), a Participating Party may propose the abandonment of a Platform and Development Facilities or wells by notifying the other Participating Parties.  No Platform and Development Facilities or wellbore shall be abandoned without the unanimous approval of the Participating

#93828440v3
#93828440v5

Parties.  If the Participating Parties do not approve abandoning the Platform and Development Facilities or wells, Operator shall prepare a statement of the abandoning Party's share of estimated abandonment costs, less its share of estimated salvage value, as determined by Operator pursuant to Exhibit "C".  The Party desiring to abandon it shall pay Operator, on behalf of the Participating Parties for that Party's share of the estimated abandonment costs, less its share of estimated salvage value, within thirty (30) days after receipt of Operator's statement.  If the Party that shall serve as Operator after a Party abandons its interest does not qualify by BOEMRE as exempt from supplemental bonding requirements, then the Party desiring to abandon its interest may place its share of the estimated abandonment costs, less its estimated salvage value, in escrow, with such escrowed funds made available to Operator upon abandoning Party's receipt of all necessary end of operations reports and site clearance and restoration report.  If an abandoning Party's respective share of the estimated salvage value is greater than its share of the estimated costs, Operator, on behalf of the Participating Parties, shall pay a sum equal to the deficiency to the abandoning Party within thirty (30) days after the abandoning Party's receipt of Operator's statement.

**14.3    Assignment of Interest**

Each Participating Party desiring to abandon a Platform and Development Facilities or wells under Article 14.2 (Abandonment of Platforms, Development Facilities, or Wells) shall assign, effective as of the last applicable election date, to the non-abandoning Parties, in proportion to their Participating Interests, its interest in the Platform and Development Facilities or wells and the equipment therein and its ownership in the Hydrocarbon production from the wells.  A Party so assigning shall be relieved from further liability for the Platform and Development Facilities or wells, except liability for payments under Article 14.2 (Abandonment of Platforms, Development Facilities, or Wells).

**14.4    Abandonment Operations Required by Governmental Authority**

A well abandonment or Platform and Development Facilities removal required by a governmental authority having jurisdiction shall be accomplished by Operator with the costs, risks, and net proceeds, if any, to be shared by the Parties owning the well or Platform and Development Facilities in proportion to their Participating Interests therein.  No approval by the Parties will be necessary for Operator to proceed with the government-required well abandonment, or Platform and Development Facilities removal. Operator shall provide the Parties with an informational AFE before commencing such an abandonment or removal.

**14.5    Disposal of Surplus Material**

Material and equipment acquired hereunder may be classified as surplus by Operator when deemed no longer needed in present or foreseeable operations.  Operator shall determine the value and cost of disposing of the materials in accordance with Exhibit "C".  If the material is classified as junk or if the value, less cost of disposal, is less than or equal to Fifty Thousand

#93828440v3
#93828440v5

Dollars ($50,000), Operator shall dispose of the surplus materials in any manner it deems appropriate.  If the value, less the cost of disposal of the surplus material, is greater than Fifty Thousand Dollars ($50,000), Operator shall give written notice thereof to the Parties owning the material. Unless purchased by Operator, the surplus material shall be disposed of in accordance with the method of disposal approved by the Parties owning the material.  Proceeds from the sale or transfer of surplus material shall be promptly credited to each Party in proportion to its ownership of the material at the time of retirement or disposition.

## ARTICLE 15
## WITHDRAWAL

**15.1    Right to Withdraw**

Subject to this Article 15.1, any Party may withdraw from this Agreement as to the Lease (the "Withdrawing Party") by giving prior written notice to all other Parties stating its decision to withdraw ("the withdrawal notice").  The withdrawal notice shall specify an effective date of withdrawal that is at least sixty (60) days, but not more than ninety (90) days, after the date of the withdrawal notice.  Within thirty (30) days of receipt of the withdrawal notice, the other Parties may join in the withdrawal by giving written notice of that fact to Operator ("written notice to join in the withdrawal") and on giving written notice to join in the withdrawal are "Other Withdrawing Parties".  The withdrawal notice and the written notice to join in the withdrawal are unconditional and irrevocable offers by the Withdrawing Party and the Other Withdrawing Parties to convey to the Parties that do not join in the withdrawal ("the Remaining Parties") the Withdrawing Party's and the Other Withdrawing Parties' entire Working Interest in the Lease, Hydrocarbon production, and other property and equipment owned under this Agreement.

**15.2    Response to Withdrawal Notice**

Failure to respond to a withdrawal notice is deemed a decision not to join in the withdrawal.

**15.2.1    Unanimous Withdrawal**

If all the other Parties join in the withdrawal,

(a)    no assignment of Working Interests shall take place;

(b)    subject to Article 14.4, no further operations may be conducted under this Agreement unless agreed to by all Parties;

(c)    the Parties shall abandon all activities and operations within the Lease and relinquish all of their Working Interests to the BOEMRE within one hundred twenty (120) days of the conclusion of the thirty (30) day joining period; and

(d)    notwithstanding anything to the contrary in Article 14 (Abandonment, Salvage and Surplus), Operator shall:

1)    furnish all Parties a detailed abandonment plan, if applicable, and a

#93828440v3
#93828440v5

Debtors' Exhibit No. 34
Page 649 of 910

detailed cost estimate for the abandonment within one hundred eighty (180) days after the conclusion of the thirty (30) day joining period; and

2)      cease operations and begin to permanently plug and abandon all wells and remove all Facilities in accordance with the abandonment plan.

### 15.2.2   No Additional Withdrawing Parties

If none of the other Parties join in the withdrawal, the Remaining Parties must accept an assignment of their Participating Interest share of the Withdrawing Party's Working Interest.

### 15.2.3   Acceptance of the Withdrawing Parties' Interests

If one (1) or more but not all of the other Parties join in the withdrawal and become Other Withdrawing Parties, within forty-eight (48) hours (excluding Saturdays, Sundays, and federal holidays) of the conclusion of the thirty (30) day joining period, each of the Remaining Parties shall submit to Operator a written rejection or acceptance of its Participating Interest share of the Withdrawing Party's and Other Withdrawing Parties' Working Interest.  Failure to make that written rejection or acceptance shall be deemed a written acceptance.  If the Remaining Parties are unable to select a successor Operator, if applicable, or if a Remaining Party submits a written rejection and the other Remaining Parties do not agree to accept one hundred percent (100%) of the Withdrawing Party's and Other Withdrawing Parties' Working Interest within fifteen (15) days of the conclusion of the forty-eight- (48-) hour period to submit a written rejection or acceptance, the Remaining Parties will be deemed to have joined in the withdrawal, and Article 15.2.1 (Unanimous Withdrawal) will apply.

### 15.2.4   Effects of Withdrawal

Except as otherwise provided in this Agreement, after giving a withdrawal notice or a written notice to join in the withdrawal, the Withdrawing Party and Other Withdrawing Parties are not entitled to approve or participate in any activity or operation in the Lease, other than those activities or operations for which they retain a financial responsibility. The Withdrawing Party and Other Withdrawing Parties shall take all necessary steps to accomplish their withdrawal by the effective date referred to in Article 15.1 (Right to Withdraw) and shall execute and deliver to the Remaining Parties all necessary instruments to assign their Working Interest to the Remaining Parties.  A Withdrawing Party and Other Withdrawing Parties shall bear all expenses associated with their withdrawal and the transfer of their Working Interest.

## 15.3   Limitation on and Conditions of Withdrawal

### 15.3.1   Prior Expenses

The Withdrawing Party and Other Withdrawing Parties remain liable for their Participating Interest share of the costs of all activities, operations, rentals, royalties, taxes, damages,

51

Hydrocarbon imbalances, or other liability or expense accruing or relating to (i) obligations existing as of the effective date of the withdrawal, (ii) operations conducted before the effective date of the withdrawal, (iii) operations approved by the Withdrawing Party and Other Withdrawing Parties before the effective date of the withdrawal, or (iv) operations commenced by Operator under one (1) of its discretionary powers under this Agreement before the effective date of the withdrawal. Before the effective date of the withdrawal, Operator shall provide a statement to the Withdrawing Party and Other Withdrawing Parties for (1) their respective shares of all identifiable costs under this Article 15.3.1 and (2) their respective Participating Interest shares of the estimated current costs of plugging and abandoning all wells and removing all Platforms, Development Facilities, and other material and equipment owned by the Joint Account, less their respective Participating Interest Shares of the estimated salvage value of the assets at the time of abandonment, as approved by vote. This statement of expenses, costs, and salvage value shall be prepared by Operator under Exhibit "C". Before withdrawing, the Withdrawing Party and Other Withdrawing Parties shall pay Operator, for the benefit of the Remaining Parties, the amounts allocated to them as shown in the statement for all obligations and liabilities they have incurred and all obligations and liabilities attributable to them before the effective date of the withdrawal. All liens, charges, and other encumbrances, including but not limited to overriding royalties, net profits interest, and production payments, that the Withdrawing Party and Other Withdrawing Parties placed (or caused to be placed) on their Working Interest shall be fully satisfied or released before the effective date of its withdrawal (unless the Remaining Parties are willing to accept the Working Interest subject to those liens, charges, and other encumbrances).

**15.3.2   Confidentiality**

The Withdrawing Party and Other Withdrawing Parties will continue to be bound by the confidentiality provisions of Article 7.3 (Confidentiality) after the effective date of the withdrawal but will have no further access to technical information relating to activities or operations under this Agreement. The Withdrawing Party and Other Withdrawing Parties are not required to return to the Remaining Parties Confidential Data acquired before the effective date of the withdrawal.

**15.3.3   Emergencies and Force Majeure**

No Party may withdraw during a Force Majeure or emergency that poses a threat to life, safety, property, or the environment but may withdraw from this Agreement after termination of the Force Majeure or emergency. The Withdrawing Party and Other Withdrawing Parties remain liable for their share of all costs and liabilities arising from the Force Majeure or emergency, including but not limited to the drilling of relief wells,

52

containment and clean-up of oil spills and pollution, and all costs of debris removal made necessary by the Force Majeure or emergency.

# ARTICLE 16
# RENTALS, ROYALTIES, AND OTHER PAYMENTS

**16.1    Overriding Royalty and Other Burdens**

If the Working Interest or Participating Interest of a Party is subject to an overriding royalty, Hydrocarbon production payment, net profits interest, mortgage, lien, security interest, or other burden or encumbrance, other than lessor's royalty and other burdens listed in Exhibit "A", the Party so burdened shall pay and bear all liabilities and obligations created or secured by the burden or encumbrance and shall indemnify and hold the other Parties harmless from all claims and demands for payment asserted by the owners of the burdens or encumbrances. If a Party becomes entitled to an assignment under this Agreement, or as a result of Non-consent Operations hereunder becomes entitled to receive a relinquished interest, as provided in Article 13.2 (Relinquishment of Interest), otherwise belonging to a Non-participating Party whose Working Interest in the operations is so burdened or encumbered, the Party entitled to receive the assignment from the Non-participating Party or the relinquished interest of the Non-participating Party's Hydrocarbon production shall receive same free and clear of all such burdens and encumbrances, and the Non-participating Party whose interest is subject to the burdens and encumbrances shall hold the Participating Parties harmless for the burdens and encumbrances, and will bear same at its own expense.

**16.2    Subsequently Created Interest**

Notwithstanding anything in this Agreement to the contrary, if a Party, after execution of this Agreement, creates an overriding royalty, Hydrocarbon production payment, net profits interest, carried interest, or any other interest out of its Working Interest that the Parties do not unanimously agree to list on Exhibit "A" (hereinafter called "Subsequently Created Interest"), the Subsequently Created Interest shall be made specifically subject to this Agreement. If the Party owning the interest from which the Subsequently Created Interest was established fails to pay, when due, its share of costs, and if the proceeds from the sale of Hydrocarbon production under Articles 8.6 (Security Rights) are insufficient for that purpose, or elects to abandon a well, or elects to relinquish its interest in the Lease, the Subsequently Created Interest shall be chargeable with a pro rata portion of all costs in the same manner as if the Subsequently Created Interest were a Working Interest, and Operator may enforce against the Subsequently Created Interest the lien and other rights granted or recognized under this Agreement to secure and enforce collection of costs chargeable to the Subsequently Created Interest.  The rights of the owner of the Subsequently Created Interest shall be, and hereby are, subordinated to the rights

53

granted or recognized by Article 8.6 (Security Rights).

**16.3    Payment of Rentals and Minimum Royalties**

Operator shall pay in a timely manner, for the joint account of the Parties, all rental, minimum royalties, and other similar payments accruing under the Lease and shall, on request, submit evidence of each such payment to the Parties. Operator shall not be held liable to the other Parties in damages for loss of the Lease or interest therein if, through mistake or oversight, a rental, minimum royalty, or other payment is not paid or is erroneously paid.  The loss of a Lease or interest therein resulting from Operator's failure to pay, or erroneous payment of rental or minimum royalty shall be a joint loss, and there shall be no readjustment of interests.   For Hydrocarbon production delivered in kind by Operator to a Non-operator or to another for the account of a Non-operator, the Non-operator shall provide Operator with information about the Non-operator's proceeds received or the value of the Hydrocarbon production taken in kind in order that Operator may make payments of minimum royalties due.

**16.4    Non-participation in Payments**

A Party that desires not to pay its share of a rental, minimum royalty, or similar payment shall notify the other Parties in writing at least sixty (60) days before the payment is due. Operator shall then make the payment for the benefit of the Parties that do desire to maintain the Lease.   In such event, the Non-participating Party shall assign to the Participating Parties, on their request, the portions of its interest in the Lease maintained by the payment.   The assigned interest shall be owned by each Participating Party in proportion to its Participating Interest. The assignment shall be made in accordance with Article 27 (Successors and Assigns) and shall be subject to the assignor's retained obligations under Article 15.3.1 (Prior Expenses).

**16.5    Royalty Payments**

Each Party shall be responsible for and shall separately bear and properly pay or cause to be paid all royalty and other amounts due on its share of Hydrocarbon production taken in accordance with state or federal regulations, as may be amended from time to time.  Adjustments shall be made among the Parties in accordance with Exhibit "E" (Gas Balancing Agreement). During a period when Participating Parties in a Non-consent Operation are receiving a Non-participating Party's share of Hydrocarbon production, the Participating Parties shall bear and properly pay, or cause to be paid, the Lease royalty on the Hydrocarbon production taken, and shall hold the Non-participating Parties harmless from liability for the payment.

# ARTICLE 17
# TAXES

**17.1    Property Taxes**

Operator shall render property covered by this Agreement for ad valorem taxation, if applicable,

#93828440v3
#93828440v5

Debtors' Exhibit No. 34
Page 653 of 910

and shall pay the property taxes for the benefit of each Party.  Operator shall charge each Party its share of the tax payments.  If the ad valorem taxes are based in whole or in part on separate valuations of each Party's Working Interest, notwithstanding anything in this Agreement to the contrary, each Party's share of property taxes shall be in proportion to the tax value generated by that Party's Working Interest.

**17.2    Contest of Property Tax Valuation**

Operator shall timely and diligently protest to a final determination each tax valuation it deems unreasonable.  Pending such determination, Operator may elect to pay under protest.  On final determination, Operator shall pay the taxes and the interest, penalties, and costs accrued as a result of the protest. In either event, Operator shall charge each Party its share of any amounts due, and each Party shall be responsible for reimbursing Operator for any such amounts paid.

**17.3    Production and Severance Taxes**

Each Party shall pay, or cause to be paid, all production and severance taxes due on Hydrocarbon production that it receives under this Agreement.

**17.4    Other Taxes and Assessments**

Operator shall pay other applicable taxes (other than income taxes, excise taxes, or other similar types of taxes) or assessments and charge each Party its share.

# ARTICLE 18
# INSURANCE

**18.1    Insurance**

Operator shall provide and maintain the insurance prescribed in Exhibit "B" and charge those costs to the Joint Account.  No other insurance shall be carried for the benefit of the Parties under this Agreement, except as provided in Exhibit "B".

**18.2    Bonds**

Operator shall obtain and maintain all bonds or financial guarantees required by an applicable law, regulation, or rule.  The costs of those bonds or financial guarantees acquired exclusively for the conduct of activities and operations under this Agreement shall be charged to the Joint Account, including an amount equivalent to the reasonable cost of that bond or financial guarantee if Operator provides that bond or guarantee itself and does not engage a third party to do so. Operator shall require all contractors to obtain and maintain all bonds required by an applicable law, regulation, or rule.

# ARTICLE 19
# LIABILITY, CLAIMS, AND LAWSUITS

#93828440v3
#93828440v5

Debtors' Exhibit No. 34
Page 654 of 910

19.1    **Individual Obligations**

The obligations, duties, and liabilities of the Parties under this Agreement are several, not joint or collective.  Nothing in this Agreement shall ever be construed as creating a partnership of any kind, joint venture, agency relationship, association, or other character of business entity recognizable in law for any purpose.  In their relations with each other under this Agreement, the Parties shall not be considered to be fiduciaries or to have established a confidential relationship, except as specifically provided in Article 7.3 (Confidentiality) and Article 7.4 (Limited Disclosure), but rather shall be free to act at arm's length in accordance with their own respective self-interests.  Each Party shall hold all other Parties harmless from liens and encumbrances on the Lease arising as a result of its acts.

19.2    **Notice of Claim or Lawsuit**

If, on account of a matter involving activities or operations under this Agreement, or affecting the Lease, a claim is made against a Party, or if a party outside this Agreement files a lawsuit against a Party, or if a Party files a lawsuit, or if a Party receives notice of a material administrative or judicial hearing or other proceeding, that Party shall give written notice of the claim, lawsuit, hearing, or proceeding ("Claim") to the other Parties as soon as reasonably practical.

19.3    **Settlements**

Operator may settle a Claim, or multiple Claims arising out of the same incident, involving activities or operations under this Agreement or affecting the Lease, if the aggregate expenditure does not exceed five hundred thousand dollars ($500,000.00) and if the payment is in complete, or substantially complete, settlement of these Claims.  If the amount required for settlement exceeds this amount, the Parties shall determine the further handling of the Claims under Article 19.4 (Defense of Claims and Lawsuits).

19.4    **Defense of Claims and Lawsuits**

Operator shall supervise the handling, conduct, and prosecution of all Claims involving activities or operations under this Agreement or affecting the Lease.  Claims may be settled in excess of the amount specified in Article 19.3 (Settlements) if the settlement is approved by vote in accordance with Article 6.1.2 of the Participating Parties in the activity or operation out of which the Claim arose, but a Party may independently settle a Claim or the portion of a Claim that is attributable to its Participating Interest share alone as long as that settlement does not directly adversely affect the interest or rights of the other Participating Parties. Legal expenses shall be handled in accordance with Exhibit "C".

19.5    **Liability for Damages**

**UNLESS SPECIFICALLY PROVIDED OTHERWISE IN THIS AGREEMENT, LIABILITY FOR LOSSES, DAMAGES, COSTS, EXPENSES OR CLAIMS INVOLVING ACTIVITIES OR OPERATIONS UNDER THIS AGREEMENT OR AFFECTING THE LEASE THAT ARE NOT**

56

COVERED BY OR IN EXCESS OF THE INSURANCE CARRIED FOR THE JOINT ACCOUNT SHALL BE BORNE BY EACH PARTY IN PROPORTION TO ITS PARTICIPATING INTEREST SHARE IN THE ACTIVITY OR OPERATION OUT OF WHICH THAT LIABILITY ARISES, EXCEPT TO THE EXTENT THAT LIABILITY RESULTS FROM THE GROSS NEGLIGENCE OR WILLFUL MISCONDUCT OF A PARTY, IN WHICH CASE THAT PARTY SHALL BE SOLELY RESPONSIBLE FOR LIABILITY RESULTING FROM ITS GROSS NEGLIGENCE OR WILLFUL MISCONDUCT.

**19.6    Indemnification for Non-consent Operations**

TO THE EXTENT ALLOWED BY LAW, THE PARTICIPATING PARTIES WILL HOLD THE NON-PARTICIPATING PARTIES (AND THEIR AFFILIATES, AGENTS, INSURERS, DIRECTORS, OFFICERS, AND EMPLOYEES) HARMLESS AND RELEASE, DEFEND, AND INDEMNIFY THEM AGAINST ALL CLAIMS, DEMANDS, LIABILITIES, REGULATORY DECREES, AND LIENS FOR ENVIRONMENTAL POLLUTION AND PROPERTY DAMAGE OR PERSONAL INJURY, INCLUDING SICKNESS AND DEATH, CAUSED BY OR OTHERWISE ARISING OUT OF NON-CONSENT OPERATIONS, AND ANY LOSS AND COST SUFFERED BY A NON-PARTICIPATING PARTY AS AN INCIDENT THEREOF, EXCEPT WHERE THAT LOSS OR COST RESULTS FROM THE SOLE, CONCURRENT, OR JOINT NEGLIGENCE, FAULT, OR STRICT LIABILITY OR WILLFUL MISCONDUCT OF THAT NON-PARTICIPATING PARTY, IN WHICH CASE EACH PARTY SHALL PAY OR CONTRIBUTE TO THE SETTLEMENT OR SATISFACTION OF JUDGMENT IN THE PROPORTION THAT ITS NEGLIGENCE, FAULT, OR STRICT LIABILITY OR WILLFUL MISCONDUCT CAUSED OR CONTRIBUTED TO THE INCIDENT. IF AN INDEMNITY IN THIS AGREEMENT IS DETERMINED TO VIOLATE LAW OR PUBLIC POLICY, THAT INDEMNITY SHALL THEN BE ENFORCEABLE ONLY TO THE MAXIMUM EXTENT ALLOWED BY LAW.

**19.7    Damage to Reservoir, Loss of Reserves and Profit**

NOTWITHSTANDING ANY CONTRARY PROVISION OF THIS AGREEMENT, NO PARTY IS LIABLE TO ANY OTHER PARTY FOR SPECIAL, INDIRECT, CONSEQUENTIAL, EXEMPLARY OR PUNITIVE DAMAGES RESULTING FROM OR ARISING OUT OF THIS AGREEMENT, INCLUDING WITHOUT LIMITATION DAMAGE TO A RESERVOIR, LOSS OF HYDROCARBONS, LOSS OF PROFITS, OR BUSINESS INTERRUPTIONS, HOWSOEVER THE SAME MAY BE CAUSED.

**19.8    Non-essential Personnel**

A NON-OPERATOR THAT REQUESTS TRANSPORTATION OR ACCESS TO A DRILLING RIG, PLATFORM, VESSEL, OR OTHER FACILITY USED FOR ACTIVITIES OR OPERATIONS UNDER THIS AGREEMENT SHALL HOLD THE OTHER PARTIES HARMLESS AND SHALL RELEASE, DEFEND, AND INDEMNIFY THEM AGAINST (I) ALL CLAIMS, DEMANDS, AND LIABILITIES FOR PROPERTY DAMAGE AND (II) ALL CLAIMS, DEMANDS, AND

57

**LIABILITIES FOR ANY LOSS OR COST SUFFERED BY A PARTY AS AN INCIDENT THEREOF, INCLUDING BUT NOT LIMITED TO INJURY, SICKNESS, AND DEATH, CAUSED BY OR OTHERWISE ARISING OUT OF THAT TRANSPORTATION OR ACCESS, OR BOTH, EXCEPT TO THE EXTENT THAT LOSS OR COST RESULTS FROM THE GROSS NEGLIGENCE OR WILLFUL MISCONDUCT OF THE PARTY SO INDEMNIFIED AND PROTECTED.**

## ARTICLE 20
## INTERNAL REVENUE PROVISION

**20.1    Internal Revenue Provision**

Notwithstanding any provision in this Agreement to the effect that the rights and liabilities of the Parties are several, not joint or collective, and that the Agreement and the activities and operations under this Agreement do not constitute a partnership under state law, each Party elects to be excluded from the application of all or any part of the provisions of Subchapter K, Chapter 1, Subtitle A, of the Internal Revenue Code of 1986, as amended, or similar provisions of applicable state laws regardless of whether for federal income tax purposes this Agreement and the activities and operations under this Agreement are regarded as a partnership.

## ARTICLE 21
## CONTRIBUTIONS

**21.1    Notice of Contributions Other Than Advances for Sale of Production**

Each Party shall promptly notify the other Parties of all offers of contributions that it may obtain, or contributions it is attempting to obtain, for the drilling of a well or the conducting of an operation on the Lease.  Payments received as consideration for entering into a contract for the sale of Hydrocarbon production from the Lease, loans, and other financial arrangements shall not be considered contributions for the purpose of this Article 21.  No Party shall release or obligate itself to release Confidential Data in return for a contribution from a third party without prior written consent of the Participating Parties or Parties having the right to participate in the well.

**21.2    Cash Contributions**

If a Party receives a cash contribution for drilling a well on the Lease or conducting an activity or operation on the Lease, the cash contribution shall be paid to Operator, and Operator shall credit the amount thereof to the Parties in proportion to their Participating Interests in the well or the Platform and/or Development Facilities.  If the well is a Non-consent Well, the amount of the contribution shall be deducted from the cost specified in Article 13.2.1(a) before computation of the amount to be recouped out of Hydrocarbon production.

**21.3    Acreage Contributions**

58

If a Party receives an acreage contribution for the drilling of a well on the Lease, the acreage contribution shall be shared by each Participating Party that accepts it in proportion to its Participating Interest in the well.  As between the Participating Parties, this Agreement shall apply separately to the acreage.


# ARTICLE 22
# DISPOSITION OF PRODUCTION

**22.1    Take-in-Kind Facilities**

Subject to Article 22.2, a Party may, at its sole cost and risk, construct Take-in-Kind Facilities to take its share of Hydrocarbon production in kind.

**22.2    Duty to Take in Kind**

Each Party shall own and, at its own cost and risk, shall take in kind or separately dispose of its share of the oil, gas, and condensate produced and saved from the Lease, excluding Hydrocarbon production used by Operator in activities or operations conducted under this Agreement, subject to this Article 22.  In order to avoid interference with operations on or regarding the Platform, the Development Facilities, and the Lease, a Party exercising its right to construct Take-in Kind Facilities ("the Take in Kind Party") shall provide Operator with a list of equipment it deems necessary for its Take in Kind Facilities ("the components") along with its notice informing Operator of its election to take in kind.  If Operator, in its sole discretion, agrees to install and operate the Take-in Kind Facilities, Operator shall purchase the components and install it on behalf of the Take in Kind Party at the Take in Kind Party's sole risk and cost, including but not limited to any fees, penalties or other costs incurred as a result of any cancellation of placed orders as may be requested by the Take in Kind Party.  Operator shall provide the Take in Kind Party with monthly updates on the progress of the ordering and installation of the Take in Kind Facilities.  Operator, based on the instructions of the Take in Kind Party, shall install and operate all the components.  Operator shall not be responsible for any losses or damages to the components or the Take in Kind Party's Hydrocarbon production metered, treated, processed, or transported by the components unless such losses or damages are the result of Operator's gross negligence or willful misconduct.  If Operator refuses or fails to install the Take-in Kind Facilities by one hundred twenty (120) days before the deadline provided in Section 12.4, the Take-in Kind Party shall have the right to install and operate the Take-in Kind Facilities providing that such operations do not interfere with existing operations or proposed operations that have been approved under terms of this Agreement.

**22.3    Failure to Take Oil and Condensate in Kind**

#93828440v3
#93828440v5

Notwithstanding Article 22.2 (Duty to Take in Kind), if a Party fails to take in kind or dispose of its share of the oil or condensate, Operator shall have the right, but not the obligation, subject to revocation at will by the Party owning the Hydrocarbon production, to purchase for its own account, sell to others, or otherwise dispose of all or part of the Hydrocarbon production at the same price at which Operator calculates and pays lessor's royalty on its own portion of the oil or condensate.  Operator shall notify the non-taking Party when the option is exercised. A purchase or sale by Operator of any other Party's share of the oil or condensate shall be for such reasonable periods of time as are consistent with the minimum needs of the industry under the circumstances, but in no event shall a contract be for a period in excess of one (1) year. Proceeds of the oil or condensate purchased, sold, or otherwise disposed of by Operator under this Article 22.3 shall be paid to the Party that had, but did not exercise, the right to take in kind and separately dispose of the oil or condensate.  Operator, in disposing of another Party's oil or condensate, shall not be responsible for making any filing with regulatory agencies not required by law to be made by it in respect to another Party's share of oil or condensate.  Unless required by governmental authority having jurisdiction or by judicial process, no Party shall be forced to share an available market with a non-taking Party.

**22.4    Failure to Take Gas in Kind**

Article 22.3 (Failure to Take Oil and Condensate in Kind) shall not apply to gas produced from the Lease.  In no event shall Operator be responsible for, or obligated to dispose of, another Party's share of gas production.  If for any reason a Party fails to take or market its full share of gas as produced, that Party may later take, market, or receive a cash accounting for its full share in accordance with Exhibit "E".

**22.5    Expenses of Delivery in Kind**

A cost that is incurred by Operator in making delivery of a Party's share of Hydrocarbons or disposing of same shall be paid by the Party.


# ARTICLE 23
# APPLICABLE LAW, JURISDICTION, AND VENUE


**23.1    Applicable Law**

**THIS AGREEMENT AND THE RELATIONSHIP OF THE PARTIES UNDER THIS AGREEMENT SHALL BE GOVERNED BY AND INTERPRETED IN ACCORDANCE WITH THE GENERAL MARITIME LAW, OR IF THE GENERAL MARITIME LAW IS NOT APPLICABLE, THE LAWS OF THE STATE OF TEXAS, WITHOUT REGARD TO PRINCIPLES OF CONFLICTS OF LAWS THAT WOULD OTHERWISE REFER THE MATTER TO THE LAWS OF ANOTHER JURISDICTION; PROVIDED HOWEVER, THAT NO LAW THEORY OR PUBLIC POLICY SHALL BE GIVEN EFFECT THAT WOULD UNDERMINE, DIMINISH, OR REDUCE THE**

60

**EFFECTIVENESS OF THE WAIVER DAMAGES PROVIDED IN THE PRECEDING ARTICLE 19.7, IT BEING THE EXPRESS INTENT, UNDERSTANDING, AND AGREEMENT OF THE PARTIES THAT SUCH WAIVER IS TO BE GIVEN THE FULLEST EFFECT, NOTWITHSTANDING THE NEGLIGENCE (WHETHER SOLE, JOINT, OR CONCURRENT), GROSS NEGLIGENCE, WILLFUL MISCONDUCT, STRICT LIABILITY, OR OTHER LEGAL FAULT OF A PARTY HERETO.**

**23.2    Jurisdiction and Venue**

For every dispute that arises under this Agreement, including any claim of breach of this Agreement, the Parties hereby consent to the exclusive jurisdiction and venue of a Federal court or Texas state court sitting in Houston, Texas.

# ARTICLE 24
# LAWS, REGULATIONS, AND NONDISCRIMINATION

**24.1    Laws and Regulations**

This Agreement and operations under this Agreement are subject to all applicable laws, rules, regulations, and orders by all governmental authorities claiming jurisdiction now and in the future. A provision of this Agreement found to be contrary to or inconsistent with any such law, rule, regulation, or order shall be deemed to have been modified accordingly.

**24.2    Nondiscrimination**

In performing work under this Agreement, the Parties shall comply and Operator shall require each independent contractor to comply with the governmental requirements in Exhibit "D" and with Articles 202(1) to (7), including Executive Order 11246, as amended.

# ARTICLE 25
# FORCE MAJEURE

**25.1    Force Majeure**

If a Party is unable, wholly or in part because of a Force Majeure, to carry out its obligations under this Agreement, other than the obligation to make money payments, that Party shall give the other Parties prompt written notice of the Force Majeure with sufficient particulars about it. Effective on the date notice is given, the obligations of the Party, so far as they are affected by the Force Majeure, shall be suspended during, but no longer than, the continuance of the Force Majeure.  Time is of the essence in the performance of this Agreement, and every reasonable effort will be made by the Party to avoid delay or suspension of any work or acts to be performed under this Agreement.  The requirement that the Force Majeure be remedied with all reasonable dispatch shall not require a Party to settle strikes or other labor difficulties.

61

# ARTICLE 26
## SUCCESSORS AND ASSIGNS

**26.1    Transfer of Interest**

Except as provided in 26.1.1 (Exceptions to Transfer Notice), a Transfer of Interest shall be provided by written notice to Operator and the other Parties ("the Transfer Notice").  Any Transfer of Interest shall be made to a party qualified by the BOEMRE to own leases in the Gulf of Mexico, and is financially capable of assuming the corresponding obligations under this Agreement.  The non-transferring Parties' consent can be conditioned on requiring the proposed transferee to provide (i) replacement financial assurances for any financial assurances previously provided by the transferring Party and (ii) additional reasonable financial assurances of the party to which the working interest is to be transferred and its ability to perform its obligations under this Agreement, after giving due consideration to the replacement financial assurances to be provided pursuant to clause (i).  All Transfers of Interest to any Person must be approved by and consented to in writing by the non-transferring Parties for any assignment made hereunder to be valid and binding upon the non-transferring Parties.  Any Transfer of Interest shall contain a provision in the assignment requiring that the non-transferring Parties' written consent must also be obtained before any future Transfer of Interest under this Agreement in whole or in part to any Person, and shall also include a provision that the party to which the working interest is transferred to be bound by all the terms and conditions of this Agreement.  No Transfer of Interest shall release a Party from its obligations and liabilities under this Agreement, and the security rights under Article 8.6 (Security Rights) shall continue to burden the Working Interest transferred and to secure the payment of those obligations and liabilities.

**26.1.1    Exceptions to Transfer Notice**

Notwithstanding any contrary provision of this Agreement, the Transfer Notice is not required when a Party proposes to mortgage, pledge, hypothecate, or grant a security interest in all or a portion of its Working Interest (including Assignments of Hydrocarbon production executed as further security for the debt secured by that security device), in any wells, Platforms, Development Facilities, or other equipment.  However, an encumbrance arising from the financing transaction shall be expressly made subject and subordinated to this Agreement.

**26.1.2    Effective Date of Transfer of Interest**

A Transfer of Interest becomes effective twenty (20) days after the day all Parties are in receipt of the Transfer Notice.  No Transfer of Interest, other than those provided in Article 15.1 (Right to Withdraw) and Article 26.1.1 (Exceptions to Prior Written Notice), is binding on the Parties unless and until (i) the assignor or assignee provides all remaining Parties with a photocopy of a fully executed Transfer of Interest, an executed BOEMRE

#93828440v3
#93828440v5

"Designation of Operator" form and a designation of oil spill responsibility form, and (ii) evidence of receipt of all necessary approvals by the BOEMRE.  The Parties shall promptly undertake all reasonable actions necessary to secure those approvals and shall execute and deliver all documents necessary to effectuate that Transfer of Interest.  All costs attributable to a Transfer of Interest are the sole obligation of the assigning Party.

### 26.1.3   Form of Transfer of Interest

Any Transfer of Interest shall incorporate provisions that the Transfer of Interest is subordinate to and made expressly subject to this Agreement and provide for the assumption by the assignee of the performance of all the assigning Party's obligations under this Agreement.  Any Transfer of Interest not in compliance with this provision is voidable by the non-assigning Parties.

### 26.1.4   Warranty

Any Transfer of Interest, vesting, or relinquishment of Working Interest between the Parties under this Agreement shall be made without warranty of title, except as provided in the next sentence.  All liens, charges, and other encumbrances, including but not limited to overriding royalties, net profits interest, and production payments, which a Party placed (or caused to be placed) on its Working Interest shall be fully satisfied or released before the effective date of a Transfer of Interest, vesting, or relinquishment of Working Interest between that Party and another Party under this Agreement (unless the other Party is willing to accept the Working Interest subject to those liens, charges, and other encumbrances).

## ARTICLE 27
## ADMINISTRATIVE PROVISIONS

**27.1   Term**

This Agreement shall remain in effect so long as a Lease remains in effect and thereafter until (a) all wells have been abandoned and plugged or turned over to the Parties owning an interest in the Lease on which the wells are located; (b) all Platforms, Development Facilities, and equipment have been disposed of by Operator in accordance with Article 14 (Abandonment, Salvage, and Surplus); (c) all Claims as defined in Article 19 (Liability, Claims, and Lawsuits) have been settled or otherwise disposed of; and (d) there has been a final accounting and settlement by all Parties.  In accordance with Article 4.5 (Selection of Successor Operator), this Agreement will terminate if no Party is willing to become Operator, effective after all conditions in clauses (a) through (d) above have been completed.   In accordance with Article 15.2.1 (Unanimous Withdrawal), this Agreement will terminate if all Parties elect to withdraw, effective

63

#93828440v3
#93828440v5

after all conditions in clauses (a) through (d) above have been completed.  Termination of this Agreement shall not relieve a Party of a liability or obligation accrued or incurred before termination and is without prejudice to all continuing confidentiality obligations or other obligations in this Agreement.

**27.2   Waiver**

A term, provision, covenant, representation, warranty, or condition of this Agreement may be waived only by written instrument executed by the Party waiving compliance.  The failure or delay of a Party in the enforcement or exercise of the rights granted under this Agreement shall not constitute a waiver of said rights nor shall it be considered as a basis for estoppel.  Time is of the essence in the performance of this Agreement and all time limits shall be strictly construed and enforced.

**27.3   Waiver of Right to Partition**

Each Party waives the right to bring an action for partition of its interest in the Lease, wells, Platform, Development Facilities, and other equipment held under this Agreement, and covenants that during the existence of this Agreement it shall not resort at any time to an action at law or in equity to partition any or all of the Lease and lands or personal property subject to this Agreement.

**27.4   Compliance with Laws and Regulations**

This Agreement, and all activities or operations conducted by the Parties under this Agreement, are expressly subject to, and shall comply with, all laws, orders, rules, and regulations of all federal, state, and local governmental authorities having jurisdiction over the Lease.

**27.4.1   Severance of Invalid Provisions**

If, for any reason and for so long as, a clause or provision of this Agreement is held by a court of competent jurisdiction to be illegal, invalid, unenforceable, or unconscionable under a present or future law or interpretation thereof, the remainder of this Agreement will not be affected by that illegality or invalidity.  An illegal or invalid provision will be deemed severed from this Agreement, as if this Agreement had been executed without the illegal or invalid provision.  The surviving provisions of this Agreement will remain in full force and effect unless the removal of the illegal or invalid provision destroys the legitimate purposes of this Agreement, in which event this Agreement shall be null and void.

**27.4.2   Fair and Equal Employment**

Each of the Parties is an Equal Opportunity Employer, and the equal opportunity provisions of 30 CFR 270 and 41 CFR 60-1, as amended or modified, are incorporated in this Agreement by reference.  The affirmative-action clauses concerning disabled veterans and veterans of the Vietnam era (41 CFR 60-250) and the affirmative-action clauses concerning employment of the handicapped (41 CFR 60-741) are also

64

incorporated in this Agreement by reference. In performing work under this Agreement, the Parties shall comply with (and Operator shall require each independent contractor to comply with) the governmental requirements in Exhibit "D" that pertain to non-segregated facilities.

### 27.5 Construction and Interpretation of This Agreement

#### 27.5.1 Headings for Convenience

Except for the definition headings in Article 2 (Definitions), all the table of contents, captions, numbering sequences, and paragraph headings in this Agreement are inserted for convenience only and do not define, expand, or limit the scope, meaning, or intent of this Agreement.

#### 27.5.2 Article References

Except as otherwise provided in this Agreement, each reference to an article of this Agreement includes all the referenced article and its sub-articles.

#### 27.5.3 Gender and Number

The use of pronouns in whatever gender or number is a proper reference to the Parties to this Agreement though the Parties may be individuals, business entities, or groups thereof. Reference in this Agreement to the singular of a noun or pronoun includes the plural and vice versa.

#### 27.5.4 Future References

A reference to a Party includes such Party's successors and assigns and, in the case of governmental bodies, persons succeeding to their respective functions and capacities.

#### 27.5.5 Currency

Any amounts due or payable under this Agreement shall be paid in United States currency.

#### 27.5.6 Optional Provisions

If any "Optional" provision of this Agreement is not adopted by the Parties to this Agreement by a typed, printed, or handwritten indication, such provision shall not form a part of this Agreement, and no inference shall be made concerning the intent of the Parties in regard to the subject matter of the "Optional" provision.

#### 27.5.7 Joint Preparation

This Agreement shall be deemed for all purposes to have been prepared through the joint efforts of the Parties and shall not be construed for or against one (1) Party or the other as a result of the preparation, submittal, drafting, execution, or other event of negotiation hereof.

#### 27.5.8 Integrated Agreement

This Agreement contains the final and entire agreement of the Parties for the matters covered by this Agreement and, as such, supersedes all prior written or oral

#93828440v3
#93828440v5

communications and agreements.  This Agreement may not be modified or changed except by written amendment signed by the Parties.

### 27.5.9   Binding Effect

To the extent that it is assignable, this Agreement shall bind and inure to the benefit of the Parties and their respective successors and assigns, and shall constitute a covenant running with the land comprising the Lease.  This Agreement does not benefit or create any rights in a person or entity that is not a Party to this Agreement.

### 27.5.10  Further Assurances

Each Party will take all actions necessary and will sign all documents necessary to implement this Agreement.  Except as otherwise provided in this Agreement, within thirty (30) days after their receipt of a valid written request for those documents from a Party, all other Parties shall prepare and execute the documents.

### 27.5.11  Counterpart Execution

This Agreement may be executed by signing the original or a counterpart.  If this Agreement is executed in counterparts, all counterparts taken together shall have the same effect as if all Parties had signed the same agreement.  No Party shall be bound to this Agreement until all Parties have executed a counterpart or the original of this Agreement.  This Agreement may also be ratified by a separate instrument that refers to this Agreement and adopts by reference all provisions of this Agreement.  A ratification shall have the same effect as an execution of this Agreement.

### 27.6   Restricted Bidding

If more than one (1) Party is ever on the list of restricted joint bidders for Outer Continental Shelf ("OCS") lease sales, as issued by the BOEMRE under 30 CFR 256.44, as amended, the Parties shall comply with all statutes and regulations regarding restricted joint bidders on the OCS.

### 27.7   Governing Agreement

The Parties to this Agreement are also Parties to that certain Joint Development Agreement dated effective _____ __, 20__, by and between _____, _____, _____, _____, and _____.  The Parties agree that should any conflict arise between the terms and conditions of this Agreement and the terms and conditions of the Joint Development Agreement, the terms and conditions of the Joint Development Agreement shall govern.


**IN WITNESS WHEREOF**, this Agreement has been executed by the Parties as of the day and year first above written.

66

#93828440v3
#93828440v5

Debtors' Exhibit No. 34
Page 665 of 910

**WITNESSES:**                                 [_____]

_____        By: _____

_____        Title:

**WITNESSES:**                                 [_____]

_____        By: _____

_____        Title:

**WITNESSES:**                                 [_____]

_____        By: _____

_____        Title:

**WITNESSES:**                                 [_____]

_____        By: _____

_____        Title:

**WITNESSES:**                                 [_____]

_____        By: _____

_____        Title:

#93828440v3
#93828440v5

Debtors' Exhibit No. 34
Page 666 of 910

Case 20-33948   Document 1562-2   Filed in TXSB on 06/15/21   Page 1316 of 1636

Professionals Eyes Only
Highly Confidential
Subject to FRE 408

## EXHIBIT "A"

Attached to and made a part of that certain Offshore Operating Agreement dated effective _____ _____ __, 20__, by and between _____, as Operator, and _____, as Non-Operators.

**I.      OPERATOR**

[_____]

**II.     NON-OPERATOR(S)**

[_____]
[_____]
[_____]
[_____]

**III.    DESCRIPTION OF CONTRACT AREA**

**IV.    WORKING INTEREST OF THE PARTIES**

| PARTY | WI % |
|---|---|
| [_____] | X |
| [_____] | X |
| [_____] | X |
| [_____] | X |
| [_____] | 50% |

**V.      ADDRESSES AND CONTACT NUMBERS**

[_____]                      [_____]
[_____]                      [_____]
[_____]                      [_____]
Attention:                              Attention:
Phone:                                  Phone:
Fax:                                    Fax:

[_____]                      [_____]
[_____]                      [_____]
[_____]                      [_____]
Attention:                              Attention:
Phone:                                  Phone:
Fax:                                    Fax:

[_____]

1

#93828440v3
#93828440v5

[_____]
[_____]
Attention:
Phone:
Fax:

**VI.** **BURDENS AND CONTRACTS IN CONTRACT AREA**

2

#93828440v3
#93828440v5

Professionals Eyes Only
Highly Confidential
Subject to FRE 408

## EXHIBIT "B"

Attached to and made a part of that certain Offshore Operating Agreement dated effective _____ _____ __, 20__, by and between _____, as Operator, and _____, as Non-Operators.

## INSURANCE PROVISIONS

I.    Operator shall carry the insurance specified in Section I with the limits stipulated below for the joint account. Operator shall have the right to charge the joint account premiums for the insurance coverage required by this Exhibit "B." Such premiums shall be allocated to the joint account using a fair and reasonable method based on the nature of the operations covered by this Agreement.

    A.    <u>Workers' Compensation and Employer's Liability</u>.

        1.    Workers' Compensation and Employer's Liability Insurance covering the employees of Operator engaged in operations hereunder in compliance with all applicable State and Federal Laws.

        2.    Coverage under U. S. Longshore and Harbor Worker's Compensation Act, extended to include the Outer Continental Shelf.

        3.    Extension of Coverage B of policy to provide for not less than $1,000,000 ("for assured's interest") for death or bodily injury to one person in any one accident; coverage also to include Employer's Liability under Admiralty Jurisdiction, including the Jones Act, with Marine and Voluntary Compensation Endorsement providing for a limit of liability of not less than $1,000,000 per accident and an endorsement for transportation, maintenance, wages and cure, all with same limits, as well as an endorsement to the effect that a claim "in rem" shall be treated as a claim against the insured.

II.    Operator shall not be obligated or authorized to obtain or carry on behalf of the joint account any additional insurance covering the Parties or the operations to be conducted hereunder. Each Party, at its own expense, must carry its own coverage for the types of insurance and with the minimum limits as set forth in each of Paragraphs A-G below. Each Party must provide Operator prior to commencement of operations a certificate of insurance or other evidence of coverage demonstrating coverage with the required limits of liability. All losses and all damages to jointly owned property, except losses covered by insurance carried for the joint account, shall be borne by the Parties in proportion to their respective interests, unless the loss is caused by the gross negligence or willful misconduct of a Party hereto. The insurance coverages required herein represent minimum requirements and do not limit or invalidate any indemnity or other obligation of the Parties under this Agreement. A Party's failure to secure the required insurance coverages or the required endorsements on the policies or any denial of coverage by underwriters does not relieve such Party or limit its liabilities or obligations under this Agreement.

    Any Party, at its own expense, may acquire such additional insurance as it may deem necessary to protect its own interest against claims, losses, damages or destruction to property arising out of operations hereunder.

1

Each Party hereby waives its rights of recovery against all other Parties to this agreement and agrees that all insurance covering its interest in the jointly owned property will be suitably endorsed to affect a waiver of subrogation as per the indemnity and obligations assumed within the agreement.

A.   Commercial General Liability and Business Automobile Liability.  Coverage for all operations conducted hereunder with a combined single limit each occurrence, and in the aggregate, of $1,000,000 ("for assured's interest").  Said Commercial General Liability Insurance shall also include contractual liability coverage, sudden and accidental pollution coverage.  Automobile liability insurance shall include coverage for owned, hired and non-owned vehicles and mobile equipment licensed for highway use.

B.   Vessels. All vessels chartered by any Party shall be covered Protection and Indemnity coverage, with limits of $1,000,000 ("for assured's interest") per occurrence and in the aggregate.

C.   Aircraft. All aircraft owned or chartered by any Party shall be covered by Aircraft Liability Insurance with limits of $5,000,000 ("for assured's interest") per occurrence and in the aggregate.

D.   Excess Liability. Each Party shall carry Excess Liability insurance in the amount of $50,000,000 per occurrence and in the aggregate ("for assured's interest"), excess of all primary liability limits in the insurance specified in Sections A-C.

E.   Extra Expense Liability.  Extra expense liability coverage including control of well, seepage, pollution and contamination coverage, cleanup and/or containment coverage, re-drilling and/or restoring, and care, custody and control shall be carried by each Party with limits of liability of $75,000,000 per occurrence and in the aggregate and $5,000,000 per occurrence and in the aggregate for Care, Custody and Control coverage.

F.   Financial Responsibility Insurance:  Operator shall demonstrate coverage, as required by the Bureau of Ocean Energy Management pursuant to the Oil Pollution Act of 1990 as per CFR Part 253 "Final Rule for Oil Spill Financial Responsibility", according to the applicable governmental guidelines.

G.   Contractors:  Operator shall use reasonable efforts to require all contractors working or performing services hereunder to comply with the workers' compensation and employer's liability laws, both State and Federal, and said contractors or others performing services shall be required to procure and maintain appropriate insurance coverage as deemed by Operator for the types of operations undertaken.  All insurance shall be endorsed to include the Operator and the Parties as additional insureds, except for Worker's Compensation.  All such policies shall be endorsed with a Waiver of Subrogation in favor of Operator and the Parties.

END OF EXHIBIT "B"

#93828440v3
#93828440v5

Professionals Eyes Only
Highly Confidential
Subject to FRE 408

## EXHIBIT "C"

Attached to and made a part of that certain Offshore Operating Agreement dated effective _____ _____ __, 20__, by and between _____, as Operator, and _____, as Non-Operators.

**[*insert COPAS provisions*]**[1]

---

[1] **NOTE TO DRAFT:** This Exhibit "C" needs to be filled out and inserted.

1



Case 20-33948   Document 1562-2   Filed in TXSB on 06/15/21   Page 1322 of 1636

## EXHIBIT "D"

Attached to and made a part of that certain Offshore Operating Agreement dated effective _____ _____ __, 20__, by and between _____, as Operator, and _____, as Non-Operators.

## Non-Discrimination Provisions

During the performance of this Agreement, the "contractor" (meaning and referring separately to each party hereto) agrees, unless exempt therefrom to comply with all provisions of Executive Order 11246 which are incorporated herein by reference, and (a) if contractor has more than 50 employees or contracts with another party hereto in excess of $10,000, contractor must file Standard Form 100 (EEO 1), (b) if contractor has 50 or more employees and a contract of $50,000 or more, contractor is required to develop a written "Affirmative Action Compliance Program" for each of its establishments according to the Rules and Regulations published by the United States Department of Labor in 41 CFR, Chapter 60.  Further, contractor hereby certifies that it does not now and will not maintain any facilities provided for its employees in a segregated manner or permit its employees to perform their services at any location under its control where segregated facilities are maintained, as such segregated facilities are defined in Title 41, Chapter 60 1.8, Code of Federal Regulations, revised as of January 1, 1969, unless exempt therefrom.  Contractor further warrants that no other law, regulation or ordinance of the United States, or any state, or any governmental authority or agency has been violated in the manufacture, procurement or sale of any good furnished, work performed or service rendered pursuant to this contract.

Unless exempt by rules, regulations or orders of the United States Secretary of Labor, issued pursuant to Section 204 of Executive Order 11246, dated September 24, 1965, during the performance of this contract, the contractor agrees as follows:

(1)     The contractor will not discriminate against any employee or applicant for employment because of race, color, religion, sex or national origin.  The contractor will take affirmative action to ensure that applicants are employed and that employees are treated during employment, without regard to their race, color, religion, sex or national original.  Such action shall include, but not be limited to, the following:  employment, upgrading, demotion, transfer, recruitment or recruitment advertising; layoff or termination; rates of pay or other forms of compensation; and selection for training, including apprenticeship.  The contractor agrees to post in conspicuous places, available to employees and applicants for employment, notices to be provided by the contracting officer setting forth the provisions of this nondiscrimination clause.

(2)     The contractor will, in all solicitations or advertisements for employees placed by or on behalf of the contractor, state that all qualified applicants will receive consideration for employment without regard to race, color, religion, sex or national origin.

(3)     The contractor will send to each labor union or representative of workers with which he has a collective bargaining agreement or other contract or understanding, a notice to be provided by the agency contracting officer, advising the labor union or workers' representative of the contractor's commitments under Section 202 of Executive Order 11246 of September 24, 1965, and shall post copies of the notice in conspicuous places available to employees and applicants for employment.

1

(4)     The contractor will comply with all provisions of Executive Order 11246 of September 24, 1965, and of the rules, regulations and relevant orders of the Secretary of Labor.

(5)     The contractor will furnish all information and reports required by Executive Order 11246 of September 24, 1965, and by the rules, regulations and orders of the Secretary of Labor, or pursuant thereto, and will permit access to his books, records and accounts by the contracting agency and the Secretary of Labor for purposes of investigating to ascertain compliance with such rules, regulations and orders.

(6)     In the event of the contractor's noncompliance with the nondiscrimination clauses of this contract or with any of such rules, regulations or orders, this contract may be canceled, terminated or suspended in whole or in part and the contractor may be declared ineligible for further Government contracts in accordance with procedures authorized in Executive Order 11246 of September 24, 1965, or by rule, regulation or order of the Secretary of Labor, or as otherwise provided by law.

(7)     The contractor will include the provisions of paragraph (1) through (8) in every subcontract or purchase order unless exempted by rules, regulations or orders of the Secretary of Labor issued pursuant to Section 204 of Executive Order 11246 of September 24, 1965, so that such provisions will be binding upon each subcontractor or vendor.  The contractor will take such action with respect to any subcontract or purchase order as the contracting agency may direct as a means of enforcing such provisions including sanctions for noncompliance; provided, however, that in the event the contractor becomes involved in, or is result of such direction by the contracting agency, the contractor may request the United States to enter into such litigation to protect the interests of the United States.

(8)     Contractor agrees and covenants that none of its employees or employees of its subcontractors who provided services pursuant to this contract are unauthorized aliens, as defined in the Immigration, Reform and Control Act of 1986.


[End of Exhibit "D"]

2

## <u>EXHIBIT "E"</u>

Attached to and made a part of that certain Offshore Operating Agreement dated effective _____ _____ __, 20__, by and between _____, as Operator, and _____, as Non-Operators.

## GAS BALANCING PROVISIONS

1. **DEFINITIONS**

   The following definitions shall apply to this Agreement:

   1.01 "Arm's Length Agreement" shall mean any gas sales agreement with an unaffiliated purchaser or any gas sales agreement with an affiliated purchaser where the sales price and delivery conditions under such agreement are representative of prices and delivery conditions existing under other similar agreements in the area between unaffiliated parties at the same time for natural gas of comparable quality and quantity.

   1.02 "Balancing Area" shall mean **(select one):**

   ■ each well drilled pursuant to **the Lease** that produces Gas or is allocated a share of Gas production. If a single well is completed in two or more producing intervals, each producing interval from which the Gas production is not commingled in the wellbore shall be considered a separate well.

   ☐ all the acreage and depths subject to the Operating Agreement.

   ☐ _____

   _____

   _____

   _____

   1.03 "Full Share of Current Production" shall mean the Percentage Interest of each Party in the Gas actually produced from the Balancing Area during each month.

   1.04 "Gas" shall mean all hydrocarbons produced or producible from the Balancing Area, whether from a well classified as an oil well or gas well by the regulatory agency having jurisdiction in such matters, which are or may be made available for sale or separate disposition by the Parties, excluding oil, condensate and other liquids recovered by field equipment operated for the joint account. "Gas" does not include gas used in joint operations, such as for fuel, recycling or reinjection, or which is vented or lost before its sale or delivery from the Balancing Area.

   1.05 "Makeup Gas" shall mean any Gas taken by an Underproduced Party from the Balancing Area in excess of its Full Share of Current Production, whether pursuant to Section 3.3 or Section 4.1 hereof.

   1.06 "Mcf" shall mean one thousand cubic feet. A cubic foot of Gas shall mean the volume of gas contained in one cubic foot of space at a standard pressure base and at a standard temperature base.

   1.07 "MMBtu" shall mean one million British Thermal Units. A British Thermal Unit shall mean the quantity of heat required to raise one pound avoirdupois of pure water from 58.5 degrees Fahrenheit to 59.5 degrees Fahrenheit at a constant pressure of 14.73 pounds per square inch absolute.

   1.08 "Operator"              shall          mean          the          individual          or          entity designated as the operator of the well(s) located in the Balancing Area.

   1.09 "Overproduced Party" shall mean any Party having taken a greater quantity of Gas from the Balancing Area than the Percentage interest of such Party in the cumulative quantity of all Gas produced from the Balancing Area.

   1.10 "Overproduction" shall mean the cumulative quantity of Gas taken by a Party in excess of its Percentage Interest in the cumulative quantity of all Gas produced from the Balancing Area.

   1.11 "Party" shall mean those individuals or entities subject to this Agreement, and their respective heirs, successors, transferees and assigns.

   1.12 "Percentage Interest" shall mean the percentage or decimal interest of each Party in the Gas produced from the Balancing Area pursuant to the Lease covering the Balancing Area.

   **1.13 ("Intentionally Deleted")**

   1.14 "Underproduced Party" shall mean any Party having taken a lesser quantity of Gas from the Balancing Area than the Percentage Interest of such Party in the cumulative quantity of all Gas produced from the Balancing Area.

   1.15 "Underproduction" shall mean the deficiency between the cumulative quantity of Gas taken by a Party and its

1

Percentage Interest in the cumulative quantity of all Gas produced from the Balancing Area.

1.16   ☐ **(Optional)** "Winter Period" shall mean the month(s) of _____November and December_____ in one calendar year and the month(s) of _____January and February_____ in the succeeding calendar year.

## 2.   BALANCING AREA

2.1   If this Agreement covers more than one Balancing Area, it shall be applied as if each Balancing Area were covered by separate but identical agreements. All balancing hereunder shall be on the basis of Gas taken from the Balancing Area measured in **(Alternative 1)** ☐ Mcfs or **(Alternative 2)** ■ MMBtus.

## 3.   RIGHT OF PARTIES TO TAKE GAS

3.1   Each Party desiring to take Gas will notify the Operator, or cause the Operator to be notified, of the volumes nominated, the name of the transporting pipeline and the pipeline contract number (if available) and meter station relating to such delivery, sufficiently in advance for the Operator, acting with reasonable diligence, to meet all nomination and other requirements. Operator is authorized to deliver the volumes so nominated and confirmed (if confirmation is required) to the transporting pipeline in accordance with the terms of this Agreement. Operator shall provide each Party with an estimate of its Full Share of Current Production and the estimated sustainable Gas volumes for Makeup Gas by the 15th calendar day of the month before the month of production. The Parties recognize that Operator's estimates are no more than estimates, and that these estimated volumes may vary from the actual Gas sales volumes during the month. Operator will, insofar as reasonably possible and practical, notify (by telephone or facsimile) the Parties of significant variances in production volumes relative to nominations where these variances could be reasonably expected to result in penalties being imposed by pipeline/purchases. Operator will notify all the parties of scheduled operations that will impact sustained production.

3.2   Each Party shall make a reasonable, good faith effort to take its Full Share of Current Production each month, to the extent that such production is required to maintain leases in effect, to protect the producing capacity of a well or reservoir, to preserve correlative rights, or to maintain oil production.

3.3   When a Party fails for any reason to take its Full Share of Current Production (as such Share may be reduced by the right of the other Parties to make up for Underproduction as provided herein), the other Parties shall be entitled to take any Gas which such Party fails to take. To the extent practicable, such Gas shall be made available initially to each Underproduced Party in the proportion that its Percentage Interest in the Balancing Area bears to the total Percentage Interests of all Underproduced Parties desiring to take such Gas. If all such Gas is not taken by the Underproduced Parties, the portion not taken shall then be made available to the other Parties in the proportion that their respective Percentage Interests in the Balancing Area bear to the total Percentage Interests of such Parties.

3.4   All Gas taken by a Party in accordance with the provisions of this Agreement, regardless of whether such Party is underproduced or overproduced, shall be regarded as Gas taken for its own account with title thereto being in such taking Party.

3.5   Notwithstanding the provisions of Section 3.3 hereof, no Overproduced Party shall be entitled in any month to take any Gas in excess of three hundred percent (300%) of its Percentage Interest of the Balancing Area's then-current Maximum Monthly Availability; provided, however, that this limitation shall not apply to the extent that it would preclude production that is required to maintain leases in effect, to protect the producing capacity of a well or reservoir, to preserve correlative rights, or to maintain oil production. "Maximum Monthly Availability" shall mean the maximum average monthly rate of production at which Gas can be delivered from the Balancing Area, as determined by the Operator, considering the maximum efficient well rate for each well within the Balancing Area, the maximum allowable(s) set by the appropriate regulatory agency, mode of operation, production facility capabilities and pipeline pressures.

3.6   In the event that a Party fails to make arrangements to take its Full Share of Current Production required to be produced to maintain leases in effect, to protect the producing capacity of a well or reservoir, to preserve correlative rights, or to maintain oil production, the Operator may sell any part of such Party's Full Share of Current Production that such Party fails to take for the account of such Party and render to such Party, on a current basis, the full proceeds of the sale, less any reasonable marketing, compression, treating, gathering or transportation costs incurred directly in connection with the sale of such Full Share of Current Production. In making the sale contemplated herein, the Operator shall be obliged only to obtain such price and conditions for the sale as are reasonable under the circumstances and shall not be obliged to share any of its markets. Any such sale by Operator under the terms hereof shall be only for such reasonable periods of time as are consistent with the minimum needs of the industry under the particular circumstances, but in no event for a period in excess of one year. Notwithstanding the provisions of Article 3.4 hereof, Gas sold by Operator for a Party under the provisions hereof shall be deemed to be Gas taken for the account of such Party. Notwithstanding anything contained herein to the contrary, no agency relationship or other relationship of trust and confidence shall be created by such sale, and Operator's sale of production under the terms hereof shall be subject to the terms of Section 12.3 hereof.

## 4. IN-KIND BALANCING

4.1   Effective the first day of any calendar month following at least _____thirty(_____30)_____ days' prior written notice to the Operator, any Underproduced Party may begin taking, in addition to its Full Share of Current

Debtors' Exhibit No. 34
Page 677 of 910

Production and any Makeup Gas taken pursuant to Section 3.3 of this Agreement, a share of current production determined by multiplying <u>fifty</u> percent (<u>50</u>%) of the Full Shares of Current Production of all Overproduced Parties by a fraction, the numerator of which is the Percentage Interest of such Underproduced Party and the denominator of which is the total of the Percentage Interests of all Underproduced Parties desiring to take Makeup Gas. In no event will an Overproduced Party be required to provide more than ~~fifty~~ percent (<u>50</u>%) of its Full Share of Current Production for Makeup Gas. The Operator will promptly notify all Overproduced Parties of the election of an Underproduced Party to begin taking Makeup Gas.

~~4.2 ☐ **(Optional – Seasonal Limitation on Makeup – Option 1)** Notwithstanding the provisions of Section 4.1, the average monthly amount of Makeup Gas taken by an Underproduced Party during the Winter Period pursuant to Section 4.1 shall not exceed the average monthly amount of Makeup Gas taken by such Underproduced Party during the _____ (_____) months immediately preceding the Winter Period.~~

4.2 ☐ **(Optional – Seasonal Limitation on Makeup – Option 2)** Notwithstanding the provisions of Section 4.1, no Overproduced Party will be required to provide more than <u>twenty-five percent</u> percent (<u>25</u>%) of its Full Share of Current Production for Makeup Gas during the Winter Period.

~~4.3 ☐ **(Optional)** Notwithstanding any other provision of this Agreement, at such time and for so long as Operator, or (insofar as concerns production by the Operator) any Underproduced Party, determines in good faith that an Overproduced Party has produced all its share of the ultimately recoverable reserves in the Balancing Area, such Overproduced Party may be required to make available for Makeup Gas, on the demand of the Operator or any Underproduced Party, up to ____percent (_____%) of such Overproduced Party's Full Share of Current Production.~~

## 5. STATEMENT OF GAS BALANCES

5.1   The Operator will maintain appropriate accounting on a monthly and cumulative basis of the volumes of Gas that each Party is entitled to receive and the volumes of Gas actually taken or sold for each Party's account. Within forty-five (45) days after the month of production, the Operator will furnish a statement for such month showing (1) each Party's Full Share of Current Production, (2) the total volume of Gas actually taken or sold for each Party's account, (3) the difference between the volume taken by each Party and that Party's Full Share of Current Production, (4) the Overproduction or Underproduction of each Party, and (5) other data as recommended by the provisions of the Council of Petroleum Accountants Societies Bulletin No.24, as amended or supplemented hereafter. Each Party taking Gas will promptly provide to the Operator any data required by the Operator for preparation of the statements required hereunder.

5.2   If any Party fails to provide the data required herein for four (4) consecutive production months, the Operator, or where the Operator has failed to provide data, another Party, may audit the production and Gas sales and transportation volumes of the non-reporting Party to provide the required data. Such audit shall be conducted only after reasonable notice and during normal business hours in the office of the Party whose records are being audited. All costs associated with such audit will be charged to the account of the Party failing to provide the required data.

## 6. PAYMENTS ON PRODUCTION

6.1   Each Party taking Gas shall pay or cause to be paid all production and severance taxes due on all volumes of Gas actually taken by such Party.

**6.2   (Intentionally Deleted)**

~~6.2.1 ☐ **(Optional – For use only with Section 6.2 – Alternative I – Entitlement)** On written request of a Party taking less than its Full Share of Current Production in a given month ("Current Underproducer"), any Party taking more than its Full Share of Current Production in such month ("Current Overproducer") will pay to such Current Underproducer an amount each month equal to the Royalty percentage of the proceeds received by the Current Overproducer for that portion of the Current Underproducer's Full Share of Current Production taken by the Current Overproducer; provided, however, that such payment will not exceed the Royalty percentage that is common to all Royalty burdens in the Balancing Area. Payments made pursuant to this Section 6.2.1 will be deemed payments to the Underproduced Party's Royalty owners for purposes of Section 7.5.~~

~~6.2 ☐ **(Alternative 2 – Sales)** Each Party shall pay or cause to be paid Royalty due with respect to Royalty owners to whom it is accountable based on the volume of Gas actually taken for its account.~~

**6.3   (Intentionally Deleted)**

## 7.   CASH SETTLEMENTS

7.1   On the earlier of the plugging and abandonment of the last producing interval in the Balancing Area, or at any time no Gas is taken from the Balancing Area for a period of twelve (12) consecutive months, any Party may give written notice calling for cash Settlement of the Gas production imbalances among the Parties. Such notice shall be given to all Parties in the Balancing Area.

7.2   Within ninety (90) days after the notice calling for cash settlement under Section 7.1, the Operator will distribute to each Party a Final Gas Settlement Statement detailing the quantity of Overproduction owed by each Overproduced Party to each Underproduced Party and identifying the month to which such Overproduction is attributed, pursuant to the methodology set out in Section 7.4.

3

#93828440v3
#93828440v5

7.3 ■ **(Alternative I - Direct Party-to-Party Settlement)** Within ninety (90) days after receipt of the Final Gas Settlement Statement, each Overproduced Party will pay to each Underproduced Party entitled to settlement the appropriate cash Settlement, accompanied by appropriate accounting detail. At the time of payment, the Overproduced Party will notify the Operator of the Gas imbalance settled by the Overproduced Party's payment.

~~7.3 ☐ **(Alternative 2 – Settlement Through Operator)** Within sixty (60) days after receipt of the Final Gas Settlement Statement, each Overproduced Party will send its cash settlement, accompanied by appropriate accounting detail, to the Operator. The Operator will distribute the monies so received, along with any settlement owed by the Operator as an Overproduced Party, to each Underproduced Party to whom settlement is due within ninety (90) days after issuance of the Final Gas Settlement Statement. In the event that any Overproduced Party fails to pay any settlement due hereunder, the Operator may turn over responsibility for the collection of such settlement to the Party to whom it is owed, and the Operator will have no further responsibility with regard to such settlement.~~

~~7.3.1 ☐ **(Optional – For use only with Section 7.3, Alternative 2 – Settlement Through Operator)** Any Party shall have the right at any time on thirty (30) days' prior written notice to all other Parties to demand that any settlements due such Party for Overproduction be paid directly to such Party by the Overproduced Party, rather than being paid through the Operator. In the event that an Overproduced Party pays the Operator any sums due to an Underproduced Party at any time after thirty (30) days following the receipt of the notice provided for herein, the Overproduced Party will continue to be liable to such Underproduced Party for any sums so paid, until payment is actually received by the Underproduced Party.~~

7.4 ■ **(Alternative 1 - Historical Sales Basis)** The amount of the cash settlement will be based on the proceeds received by the Overproduced Party under an Arm's Length Agreement for the Gas taken from time to time by the Overproduced Party in excess of the Overproduced Party's Full Share of Current Production. Any Makeup Gas taken by the Underproduced Party before monetary settlement hereunder will be applied to offset Overproduction chronologically in the order of accrual. The method of valuation for cash settlement will be First In First Out (FIFO)

~~7.4 ☐ **(Alternative 2 – Most Recent Sales Basis)** The amount of the cash settlement will be based on the proceeds received by the Overproduced Party under an Arm's Length Agreement for the volume of Gas that constituted Overproduction by the Overproduced Party from the Balancing Area. For the purpose of implementing the cash settlement provision of the Section 7, an Overproduced Party will not be considered to have produced any of an Underproduced Party's share of Gas until the Overproduced Party has produced cumulatively all its Percentage Interest share of the Gas ultimately produced from the Balancing Area.~~

7.5 The values used for calculating the cash settlement under Section 7.4 will include all proceeds received for the sale of the Gas by the Overproduced Party calculated at the Balancing Area, after deducting any production or severance taxes paid as well as any reasonable marketing, compression, treating, gathering or transportation costs incurred directly in connection with the sale of the Overproduction.

7.5.1 ■ **(Optional - For Valuation Under Percentage of Proceeds Contracts)** For Overproduction sold under a gas purchase contract providing for payment based on a percentage of the proceeds obtained by the purchaser on resale of residue gas and liquid hydrocarbons extracted at a gas processing plant, the values used for calculating cash settlement will include proceeds received by the Overproduced Party for both the liquid hydrocarbons and the residue gas attributable to the Overproduction.

~~7.5.2 ☐ **(Optional – Valuation for Processed Gas – Option 1)** For Overproduction processed for the account of the Overproduced Party at a gas processing plant for the extraction of liquid hydrocarbons, the full quantity of the Overproduction will be valued for purposes of cash settlement at the prices received by the Overproduced Party for the sale of the residue gas attributable to the Overproduction without regard to proceeds attributable to liquid hydrocarbons which may have been extracted from the Overproduction.~~

7.5.2 ■ **(Optional - Valuation for Processed Gas - Option 2)** For Overproduction processed for the account of the Overproduced Party at a gas processing plant for the extraction of liquid hydrocarbons, the values used for calculating cash settlement will include the proceeds received by the Overproduced Party for the sale of the liquid hydrocarbons extracted from the Overproduction, less the actual reasonable costs incurred by the Overproduced Party to process the Overproduction and to transport, fractionate and handle the liquid hydrocarbons extracted therefrom before sale.

7.6 To the extent the Overproduced Party did not sell all Overproduction under an Arm's Length Agreement, the cash settlement will be based on the weighted average price received by the Overproduced Party for any gas sold from the Balancing Area under Arm's Length Agreements during the months to which such Overproduction is attributed. In the event that no sales under Arm's Length Agreements were made during any such month, the cash settlement for such month will be based on the simple average of the spot sales prices published for the applicable geographic area in the first issue of Inside F.E.R.C.'s Gas Market Report, *~~Natural Gas Week and~~ Natural Gas Intelligence for such month. Should these publications cease to exist, a mutually acceptable pricing bulletin shall be used. * published by McGraw Hill for deliveries at Henry Hub, subject to reasonable base adjustments between the point of delivery to the applicable pipeline transportation system and the point at which the index price applies

7.7 Interest compounded at the ~~rate of~~ Prime rate in effect at Citibank N.A. of New York, plus one percent (1%) percent (_____%) per annum or the maximum lawful

4

rate of interest applicable to the Balancing Area, whichever is less, will accrue for all amounts due under Section 7.1 beginning the first day following the date payment is due pursuant to Section 7.3. Such interest shall be borne by the Operator or any Overproduced Party in the proportion that their respective delays beyond the deadlines set out in Sections 7.2 and 7.3 contributed to the accrual of the interest.

7.8   In lieu of the cash settlement required by Section 7.3, an Overproduced Party may deliver to the Underproduced Party an offer to settle its Overproduction in-kind and at such rates, quantities, times and sources as may be agreed on by the Underproduced Party. If the Parties are unable to agree on the manner in which such in-kind settlement gas will be furnished within ninety (90) days after the Overproduced Party's offer to settle in kind, which period may be extended by agreement of said Parties, the Overproduced Party shall make a cash settlement as provided in Section 7.3. The making of an in-kind settlement offer under this Section 7.8 will not delay the accrual of interest on the cash settlement should the Parties fail to reach agreement on an in-kind settlement.

~~7.9   ██ (Optional – Interim Cash Balancing) At any time during the term of this Agreement, any Overproduced Party may, in its sole discretion, make cash settlement(s) with the Underproduced Parties covering all or part of its outstanding Gas imbalance, provided that such settlements must be made with all Underproduced Parties proportionately based on the relative imbalances of the Underproduced Parties, and provided further that such settlements may not be made more often than once every twenty-four (24) months. Such settlements will be calculated in the same manner provided above for final cash settlements. The Overproduced Party will provide Operator a detailed accounting of any such cash settlement within thirty (30) days after the settlement is made..~~

**8.   TESTING**

Notwithstanding any provision of this Agreement to the contrary, any Party shall have the right, from time to time, to produce and take up to one hundred percent (100%) of a well's entire Gas stream to meet the reasonable deliverability test(s) required by such Party's Gas purchaser, and the right to take any Makeup Gas shall be subordinate to the right of any Party to conduct such tests; provided, however, that such tests shall be conducted in accordance with prudent operating practices only after ___thirty_____(30) days' prior written notice to the Operator and shall last no longer than ___seventy-two_____(72) hours. Consent of parties then taking all or any part of their share of gas shall be required to conduct testing during Winter Period.

**9.   OPERATING COSTS (Intentionally Deleted)**

**10.   LIQUIDS**

The Parties shall share proportionately in and own all liquid hydrocarbons recovered with Gas by field equipment operated for the joint account in accordance with their Percentage Interests in the Balancing Area.

**11.   AUDIT RIGHTS**

Notwithstanding any provision in this Agreement or any other agreement between the Parties hereto, and further notwithstanding any termination or cancellation of this Agreement, for a period of two (2) years from the end of the calendar year in which any information to be furnished under Section 5 or 7 hereof is supplied, any Party shall have the right to audit the records of any other Party regarding quantity, including but not limited to information regarding Btu-content. Any Underproduced Party shall have the right for a period of two (2) years from the end of the calendar year in which any cash settlement is received pursuant to Section 7 to audit the records of any Overproduced Party as to all matters concerning values, including but not limited to information regarding prices and disposition of Gas from the Balancing Area. Any such audit shall be conducted at the expense of the Party or Parties desiring such audit, and shall be conducted, after reasonable notice, during normal business hours in the office of the Party whose records are being audited. Each Party hereto agrees to maintain records as to the volumes and prices of Gas sold each month and the volumes of Gas used in its own operations, along with the Royalty paid on any such Gas used by a Party in its own operations. The audit rights provided for in this Section 11 shall be in addition to those provided for in Section 5.2 of this Agreement, but any statements rendered by Operator shall conclusively be presumed to be true and correct after twenty-four (24) months following the end of any such calendar year, unless with the said twenty-four (24) month period an Underproduced Party takes written exception thereto and makes claim on Overproduced Party for adjustment.

**12.   MISCELLANEOUS**

12.1 As between the Parties, in the event of any conflict between the provisions of this Agreement and the provisions of any gas sales contract, or in the event of any conflict between the provisions of this Agreement and the provisions of the **Lease**, the provisions of this Agreement shall govern.

12.2 Each Party agrees to defend, indemnify and hold harmless all other Parties from and against any and all liability for any claims, which may be asserted by any third party which now or hereafter stands in a contractual relationship with such indemnifying Party and which arise out of the operation of this Agreement or any activities of such indemnifying Party under the provisions of this Agreement, and does further agree to save the other Parties harmless from all judgments or damages sustained and costs incurred in connection therewith.

12.3 Except as otherwise provided in this Agreement, Operator is authorized to administer the provisions of this

5

#93828440v3
#93828440v5

Agreement, but shall have no liability to the other Parties for losses sustained or liability incurred which arise out of or in connection with the performance of Operator's duties hereunder, except such as may result from Operator's gross negligence or willful misconduct. Operator shall not be liable to any Underproduced Party for the failure of any Overproduced Party, (other than Operator) to pay any amounts owed pursuant to the terms hereof.

12.4 This Agreement shall remain in full force and effect for as long as the **Lease** shall remain in force and effect as to the Balancing Area, and thereafter until the Gas accounts between the Parties are settled in full, and shall inure to the benefit of and be binding on the Parties hereto, and their respective heirs, successors, legal representatives and assigns, if any. The Parties hereto agree to give notice of the existence of this Agreement to any successor in interest of any such Party and to provide that any such successor shall be bound by this Agreement, and shall further make any transfer of any interest subject to the **Lease,** or any part thereof, also subject to the terms of this Agreement.

12.5 Unless the context clearly indicates otherwise, words used in the singular include the plural, the plural includes the singular, and the neuter gender includes the masculine and the feminine.

12.6 In the event that any "Optional" provision of this Agreement is not adopted by the Parties to this Agreement by a typed, printed or handwritten indication, such provision shall not form a part of this Agreement, and no inference shall be made concerning the intent of the Parties in such event. In the event that any "Alternative" provision of this Agreement is not so adopted by the Parties, Alternative 1 in each such instance shall be deemed to have been adopted by the Parties as a result of any such omission. In those cases where it is indicated that an Optional provision may be used only if a specific Alternative is selected: (i) an election to include said Optional provision shall not be effective unless the Alternative in question is selected; and (ii) the election to include said Optional provision must be expressly indicated hereon, it being understood that the selection of an Alternative either expressly or by default as provided herein shall not, in and of itself, constitute an election to include an associated Optional provision.

12.7 This Agreement shall bind the Parties in accordance with the provisions hereof, and nothing herein shall be construed or interpreted as creating any rights in any person or entity not a signatory hereto, or as being a stipulation in favor of any such person or entity.

12.8 If contemporaneously with this Agreement becoming effective, or thereafter, any Party requests that any other Party execute an appropriate memorandum or notice of this Agreement in order to give third parties notice of record of same and submits same for execution in recordable form, such memorandum or notice shall be duly executed by the Party to which such request is made and delivered promptly thereafter to the Party making the request. On receipt, the Party making the request shall cause the memorandum or notice to be duly recorded in the appropriate real property or other records affecting the Balancing Area.

12.9 In the event federal tax regulations require a uniform method of computing taxable income by all Parties, the Parties agree to negotiate in good faith to develop such a uniform method that is in accordance with the requirement of said tax regulations.

**13.   ASSIGNMENT AND RIGHTS ON ASSIGNMENT**

13.1 Subject to the provisions of Sections 13.2 (if elected) and 13.3 hereof, and notwithstanding anything in this Agreement or in the Operating Agreement to the contrary, if any Party assigns (including any sale, exchange or other transfer) any of its working interest in the Balancing Area when such Party is an Underproduced or Overproduced Party, the assignment or other act of transfer shall, insofar as the Parties hereto are concerned, include all interest of the assigning or transferring Party in the Gas, all rights to receive or obligations to provide or take Makeup Gas and all rights to receive or obligations to make any monetary payment which may ultimately be due hereunder, as applicable. Operator and each of the other Parties hereto shall thereafter treat the assignment accordingly, and the assigning or transferring Party shall look solely to its assignee or other transferee for any interest in the Gas or monetary payment that such Party may have or to which it may be entitled, and shall cause its assignee or other transferee to assume its obligations hereunder.

13.2 ■ **(Optional - Cash Settlement on Assignment)** Notwithstanding anything in this Agreement (including but not limited to the provisions of Section 13.1 hereof) or in the Operating Agreement to the contrary, and subject to the provisions of Section 13.3 hereof, in the event an Overproduced Party intends to sell, assign, exchange or otherwise transfer any of its interest in a Balancing Area, such Overproduced Party shall notify in writing the other working interest owners who are Parties hereto in such Balancing Area of such fact at least sixty(_____ 60) days after closing the

transaction. Such notice shall contain a preliminary gas settlement statement detailing the quantity of Overproduction owed by the Overproduced Party to each Underproduced Party and the value of such Overproduction, calculated in accordance with Section 7.4 and 7.6 hereof. Thereafter, any Underproduced Party may demand from such Overproduced Party in writing, within _____ sixty ( _____ 60 _____ ) days after receipt of the Overproduced Party's notice, a cash settlement of its Underproduction from the Balancing Area. The Operator shall be notified of any such demand and of any cash settlement pursuant to this Section 13, and the Overproduction and Underproduction of each Party shall be adjusted accordingly. Any cash settlement pursuant to this Section 13 shall be paid by the Overproduced Party ~~on or before the earlier to occur (i) of sixty (60) days after receipt of the Underproduced Party's demand or~~ (ii) within 120 days after the closing of the transaction in which the Overproduced Party sells, assigns, exchanges or otherwise transfers its interest in a Balancing Area on the same basis as otherwise set forth in

Sections 7.3 through 7.6 hereof, and shall bear interest at the rate set forth in Section 7.7 hereof, beginning ~~sixty (60) days~~ following the 121st day after closing of

6

#93828440v3
#93828440v5

after the Overproduced Party's sale, assignment, exchange or transfer of its interest in the Balancing Area for any amounts not paid. Provided, however, if any Underproduced Party does not so demand such cash settlement of its Underproduction from the Balancing Area, such Underproduced Party shall look exclusively to the assignee or other successor in interest of the Overproduced Party giving notice hereunder for the satisfaction of such Underproduced Party's Underproduction in accordance with the provisions of Section 13.1 hereof.

13.3 The provisions of this Section 13 shall not be applicable in the event any Party mortgages its interest or disposes of its interest by merger, reorganization, consolidation or sale of substantially all its assets to a subsidiary or parent company, or to any company in which any parent or subsidiary of such Party owns a majority of the stock of such company.

7

#93828440v3
#93828440v5



Case 20-33948   Document 1562-2   Filed in TXSB on 06/15/21   Page 1332 of 1636

## EXHIBIT "F"

Attached to and made a part of that certain Offshore Operating Agreement dated effective _____ _____ __, 20__, by and between _____, as Operator, and _____, as Non-Operators.

## MEMORANDUM OF OPERATING AGREEMENT AND FINANCING STATEMENT

**To be filed in the conveyance records and in the mortgage records and as a non-standard financing statement in accordance with Paragraph 6.0 herein.**

1.0    This Memorandum of Operating Agreement and Financing Statement (this "Memorandum") is effective as of the effective date of the Operating Agreement referred to in Paragraph 2.0 below and is executed by the undersigned, duly authorized representative of [_____] (the "Operator"), and is executed by the undersigned, duly authorized representatives of [_____],[_____],[_____], and [_____] (the "Non-Operators").  Operator and Non-Operators may be referred to herein individually as a "Party" and together as the "Parties".

2.0    The Operator and Non-Operators are Parties to that certain Operating Agreement effective _____ ___, 20__ (the "Operating Agreement"), which Operating Agreement provides for the exploration, development and operation of the oil and gas leases described in Exhibit "A" of the Operating Agreement (hereinafter called the "Contract Area") and which designates [_____], as the Operator, to conduct such operations for itself and the Non-Operators.

3.0    Among other provisions, the Operating Agreement (a) provides for certain liens, mortgages, pledges and security interests to secure payment by the Parties of their respective share of costs and other obligations under the Operating Agreement, (b) contains an Accounting Procedure, which establishes, among other things, interest to be charged on indebtedness, certain costs, and other expenses under the Operating Agreement at the rate set forth therein, and (c) includes non-consent clauses which establish that Parties who elect not to participate in certain operations shall (i) be deemed to have relinquished their interest in production until the carrying consenting Parties recover their costs of such operations plus a specified amount or (ii) forfeit their interest in certain Contract Area or portions thereof involved in such operations.

4.0    The Operator hereby certifies that a true and correct copy of the Operating Agreement is on file and is available for inspection by third parties at the offices of the Operator at the address set forth in this Memorandum.

5.0    In addition to any other security rights and remedies provided for by law with respect to services rendered or materials and equipment furnished under the Operating Agreement, for and in consideration of the covenants and mutual undertakings of the Operator and the Non-Operators set forth in the Operating Agreement, the Operator and the Non-Operators hereby agree as follows:

5.1    To secure the performance of and payment by the Non-Operators of all obligations and indebtedness of the Non-Operators pursuant to the Operating Agreement, whether now

1

#93828440v3
#93828440v5

owed or hereafter arising, and to the extent susceptible under applicable law, the Non-Operators hereby grants to the Operator a mortgage, hypothec, and pledge of and over all of its rights, titles, and interests in and to (a) the Contract Area, (b) the oil and gas in, on, under, and that may be produced from the lands covered by the Contract Area, and (c) all other immovable property susceptible of mortgage situated within the Contract Area.

5.2     To secure the performance of and payment by the Non-Operators of all obligations and indebtedness of the Non-Operators pursuant to the Operating Agreement, whether now owed or hereafter arising, and to the extent susceptible under applicable law, the Non-Operators hereby grant to the Operator a continuing security interest in and to all of its rights, titles, interests, claims, general intangibles, proceeds, and products thereof, whether now existing or hereafter acquired, in and to (a) all oil and gas produced from the lands covered by the Contract Area or attributable to the Contract Area when produced, (b) all accounts receivable accruing or arising as a result of the sale of such oil and gas (including, without limitation, accounts arising from gas imbalances or from the sale of oil and gas at the wellhead), (c) all cash or other proceeds from the sale of such oil and gas once produced, and (d) all platforms, wells, facilities, fixtures, other corporeal property, whether movable or immovable, whether now or hereafter placed on the property covered by the Contract Area or maintained or used in connection with the ownership, use, or exploitation of the Contract Area, and other surface and sub-surface equipment of any kind or character located on or attributable to the Contract Area, and the cash or other proceeds realized from any sale, transfer, disposition or conversion thereof.   The interest of the Non-Operators in and to the oil and gas produced from or attributable to the Contract Area when extracted and the accounts receivable accruing or arising as the result of the sale thereof shall be financed at the wellhead of the well or wells located on the Contract Area.   To the extent permissible under applicable law, the security interest granted by the Non-Operators hereunder covers (i) all substitutions, replacements, and accessions to the property of the Non-Operators described herein and is intended to cover all of the rights, titles, and interests of the Non-Operators in all movable property now or hereafter located upon or used in connection with the Contract Area, whether corporeal or incorporeal, (ii) all rights under any gas balancing agreement, farmout rights, option farmout rights, acreage and cash contributions, and conversion rights of the Non-Operators in connection with the Contract Area, or the oil and gas produced from or attributable to the Contract Area, whether now owned or existing or hereafter acquired or arising, including, without limitation, all interests of the Non-Operators in any partnership, tax partnership, limited partnership, association, joint venture, or other entity or enterprise that holds, owns, or controls any interest in the Contract Area, and (iii) all rights, claims, general intangibles, and proceeds, whether now existing or hereafter acquired, of the Non-Operators in and to the contracts, agreements, permits, licenses, rights-of-way, and similar rights and privileges that relate to or are appurtenant to any of the Contract Area, including the following:

2

(1)     all rights, titles, and interests of the Non-Operators, whether now owned and existing or hereafter acquired or arising, in, to, and under or derived from any present or future operating, farmout, bidding, pooling, unitization, and communitization agreements, assignments, and subleases, whether or not described in Attachment "1," to the extent, and only to the extent, that such agreements, assignments, and subleases cover or include any of its rights, titles, and interests, whether now owned and existing or hereafter acquired or arising, in and to all or any portion of the Contract Area, and all units created by any such pooling, unitization, and communitization agreements, and all units formed under orders, regulations, rules, or other official acts of any governmental authority having jurisdiction, to the extent and only to the extent that such units cover or include all or any portion of the  Contract Area;

(2)     all rights, titles, and interests of the Non-Operators, whether now owned and existing or hereafter acquired or arising, in, to, and under or derived from all presently existing and future advance payment agreements, and oil, casinghead gas, and gas sales, exchange, and processing contracts and agreements, including, without limitation, those contracts and agreements that are described on Attachement "1" to the extent, and only to the extent, that those contracts and agreements cover or include all or any portion of the Contract Area; and

(3)     all rights, titles, and interests of the Non-Operators, whether now owned and existing or hereafter acquired or arising, in, to, and under or derived from all existing and future permits, licenses, rights-of-way, and similar rights and privileges that relate to or are appurtenant to any of the Contract Area.

5.3     As applicable to the jurisdiction of operations under the Operating Agreement, this Memorandum (including a carbon, photographic, or other reproduction thereof and hereof) shall constitute a non-standard form of financing statement under the terms of Chapter 9 of the Louisiana Commercial Laws, La. R.S. 10:9-101 et seq. (the "Uniform Commercial Code," as adopted in the State of Louisiana) and, as such, for the purposes of the security interest in favor of the Operator, may be filed for record in the office of the Clerk of Court of any parish in the State of Louisiana and/or any county in the State of Texas, as applicable, with the Operator being the secured party and the Non-Operators being the debtors with respect to such filing.

5.4     The maximum amount for which the mortgage herein granted by the Non-Operators shall be deemed to secure the obligations and indebtedness of such Non-Operators to the Operator as stipulated herein is hereby fixed in an amount equal to Twenty-Five Million Dollars ($25,000,000.00) (the "Limit of the Mortgage of the Non-Operators"). Except as provided in the previous sentence (and then only to the extent such limitations are required by law), the entire amount of obligations and indebtedness of the Non-Operators to the Operator is secured hereby without limitation. Notwithstanding the foregoing Limit of the Mortgage of the Non-Operators, the liability of the Non-Operators under this Memorandum and the mortgage and security interest granted hereby shall be limited to (and the Operator shall not be entitled to enforce the same against the Non-Operators for, an amount exceeding) the actual obligations and

3

indebtedness (including all interest charges, Costs, attorneys' fees, and other charges provided for in this Memorandum or in the Operating Agreement) outstanding and unpaid and that are attributable to or charged against the interest of the Non-Operators pursuant to the Operating Agreement.

5.5     To secure the performance of and payment by the Operator of all obligations and indebtedness of the Operator pursuant to the Operating Agreement, whether now owed or hereafter arising, and to the extent susceptible under applicable law, the Operator hereby grants to the Non-Operators a mortgage, hypothec, and pledge of and over all of its rights, titles, and interests in and to (a) the Contract Area, (b) the oil and gas in, on, under, and that may be produced from the lands included within the Contract Area, and (c) all other immovable property susceptible of mortgage situated within the Contract Area.

5.6     To secure the performance of and payment by the Operator of all obligations and indebtedness of the Operator pursuant to the Operating Agreement, whether now owed or hereafter arising, and to the extent susceptible under applicable law, the Operator hereby grants to the Non-Operators a continuing security interest in and to all of its rights, titles, interests, claims, general intangibles, proceeds, and products thereof, whether now existing or hereafter acquired, in and to (a) all oil and gas produced from the lands covered by the Contract Area or attributable to the Contract Area when produced, (b) all accounts receivable accruing or arising as a result of the sale of such oil and gas (including, without limitation, accounts arising from gas imbalances or from the sale of oil and gas at the wellhead), (c) all cash or other proceeds from the sale of such oil and gas once produced, and (d) all platforms, wells, facilities, fixtures, other corporeal property, whether movable or immovable, whether now or hereafter placed on the property covered by the Contract Area or maintained or used in connection with the ownership, use or exploitation of the Contract Area, and other surface and sub-surface equipment of any kind or character located on or attributable to the Contract Area and the cash or other proceeds realized from any sale, transfer, disposition or conversion thereof.  The interest of the Operator in and to the oil and gas produced from or attributable to the Contract Area when extracted and the accounts receivable accruing or arising as the result of the sale thereof shall be financed at the wellhead of the well or wells located on the Contract Area.  To the extent permissible under applicable law, the security interest granted by the Operator hereunder covers (a) all substitutions, replacements, and accessions to the property of the Operator described herein and is intended to cover all of the rights, titles and interests of the Operator in all movable property now or hereafter located upon or used in connection with the Contract Area, whether corporeal or incorporeal, (b) all rights under any gas balancing agreement, farmout rights, option farmout rights, acreage and cash contributions, and conversion rights of the Operator in connection with the Contract Area, or the oil and gas produced from or attributable to the Contract Area, whether now owned or existing or hereafter acquired or arising, including, without limitation, all interests of the Operator in any partnership, tax partnership, limited partnership, association, joint venture, or other entity or enterprise that holds, owns, or controls any interest in the

4

Contract Area, and (c) all rights, claims, general intangibles, and proceeds of the Operator, whether now existing or hereafter acquired, in and to the contracts, agreements, permits, licenses, rights-of-way, and similar rights and privileges that relate to or are appurtenant to any of the Contract Area, including the following:

(i)     all rights, titles, and interests of the Operator, whether now owned and existing or hereafter acquired or arising, in, to, and under or derived from any present or future operating, farmout, bidding, pooling, unitization, and communitization agreements, assignments, and subleases, whether or not described in Attachment "1," to the extent, and only to the extent, that such agreements, assignments, and subleases cover or include any of its rights, titles, and interests, whether now owned and existing or hereafter acquired or arising, in and to all or any portion of the Contract Area, and all units created by any such pooling, unitization, and communitization agreements and all units formed under orders, regulations, rules, or other official acts of any governmental authority having jurisdiction, to the extent and only to the extent that such units cover or include all or any portion of the Contract Area;

(ii)    all rights, titles, and interests of the Operator, whether now owned and existing or hereafter acquired or arising, in, to, and under or derived from all presently existing and future advance payment agreements, and oil, casinghead gas, and gas sales, exchange, and processing contracts and agreements, including, without limitation, those contracts and agreements that are described on Attachment "1" to the extent, and only to the extent, that those contracts and agreements cover or include all or any portion of the Contract Area; and

(iii)   all rights, titles, and interests of the Operator, whether now owned and existing or hereafter acquired or arising, in, to, and under or derived from all existing and future permits, licenses, rights-of-way, and similar rights and privileges that relate to or are appurtenant to any of the Contract Area.

5.7     For the purposes of the security interest in favor of the Non-Operators, this Memorandum (including a carbon, photographic, or other reproduction thereof and hereof) may be filed as a non-standard form of financing statement pursuant to the Uniform Commercial Code in the office of the Clerk of Court of any parish in the State of Louisiana and/or any county in the State of Texas, as applicable, with the Non-Operators being the secured Party and the Operator being the debtor with respect to such filing.

5.8     The maximum amount for which the mortgage herein granted shall be deemed to secure the obligations and indebtedness of the Operator to the Non-Operators as stipulated herein is hereby fixed in an amount equal to Twenty-Five Million Dollars ($25,000,000.00) in the aggregate (the "Limit of the Mortgage of the Operator"), irrespective of the total number of Non-Operators party to the Operating Agreement at any time.  Except as provided in the previous sentence (and then only to the extent such limitations are required by law), the entire amount of obligations and indebtedness of the Operator to the Non-Operators is secured hereby without limitation.

#93828440v3
#93828440v5

Notwithstanding the foregoing Limit of the Mortgage of the Operator, the liability of the Operator under this Memorandum and the mortgage and security interest granted hereby shall be limited to (and the Non-Operators shall not be entitled to enforce the same against Operator for, an amount exceeding) the actual obligations and indebtedness (including all interest charges, Costs, attorneys' fees, and other charges provided for in this Memorandum or in the Operating Agreement) outstanding and unpaid and that are attributable to or charged against the interest of the Operator pursuant to the Operating Agreement.

6.0   As applicable to the jurisdiction of operations under the Operating Agreement, to serve as notice of the existence of the Operating Agreement as a burden on the title of the Operator and the Non-Operators to their interests in and to the Contract Area, and for purposes of satisfying otherwise relevant recording and filing requirements of applicable law, this Memorandum is to be filed or recorded, as the case may be, in (a) the conveyance records of the parish or parishes in which the lands included within the Contract Area are located or adjacent pursuant to La. R.S. 9:2731 et seq., and/or the conveyance records of the county or counties in which the lands included in the Contract Area or located or adjacent (b) the mortgage records of such parish or parishes and/or county or counties, and (c) the appropriate Uniform Commercial Code records. All parties to the Operating Agreement are identified on Attachment "1" hereto.

7.0   If performance of any obligation under the Operating Agreement or payment of any indebtedness created thereunder does not occur or is not made when due under the Operating Agreement or upon default of any covenant or condition of the Operating Agreement, in addition to any other remedy afforded by law, each Party to the Operating Agreement and any successor to such Party by assignment, operation of law, or otherwise, shall have, and is hereby given and vested with, the power and authority to foreclose the mortgage, pledge, and security interest established in its favor herein and in the Operating Agreement in the manner provided by law and to exercise all rights of a secured Party under the Uniform Commercial Code. If the Non-Operators do not pay its indebtedness or perform its obligations under the Operating Agreement when due, the Operator shall have the additional right to notify the purchaser or purchasers of the Non-Operator's production and collect such indebtedness out of the proceeds from the sale of the Non-Operator's share of production until the amount owed has been paid. The Operator shall have the right to offset the amount owed against the proceeds from the sale of the Non-Operator's share of production.  Any purchaser of such production shall be entitled to rely on the Operator's statement concerning the amount of indebtedness owed by the Non-Operators and payment made to the Operator by any purchaser shall be binding and conclusive as between such purchaser and the Non-Operators.

8.0   Upon expiration of the Operating Agreement and the satisfaction of all obligations and indebtedness arising thereunder, the Operator, on behalf of all parties to the Operating Agreement, shall file of record an appropriate release and termination of all security and other rights created under the Operating Agreement and this Memorandum executed by all Parties to the Operating Agreement.  Upon the filing of such release and termination instrument, all benefits and obligations under this Memorandum shall terminate as to all Parties who have executed or ratified this Memorandum.  In addition, at any time prior to the filing of such

6

release and termination instrument, each of the Operator and the Non-Operators shall have the right to (i) file a continuation statement pursuant to the Uniform Commercial Code with respect to any financing statement filed in their favor under the terms of this Memorandum and (ii) reinscribe this act in the appropriate mortgage records.

9.0     It is understood and agreed by the Parties hereto that if any part, term, or provision of this Memorandum is held by the courts to be illegal or in conflict with any law of the state where made, the validity of the remaining portions or provisions shall not be affected, and the rights and obligations of the Parties shall be construed and enforced as if the Memorandum did not contain the particular part, term, or provision held to be invalid.

10.0    This Memorandum shall be binding upon and shall inure to the benefit of the Parties hereto and their respective legal representatives, successors and permitted assigns. The failure of one or more persons owning an interest in the Contract Area to execute this Memorandum shall not in any manner affect the validity of the Memorandum as to those persons who execute this Memorandum.

11.0    A party having an interest in the Contract Area may ratify this Memorandum by execution and delivery of an instrument of ratification, adopting and entering into this Memorandum, and such ratification shall have the same effect as if the ratifying party had executed this Memorandum or a counterpart thereof.  By execution or ratification of this Memorandum, such party hereby consents to its ratification and adoption by any party who acquires or may acquire any interest in the Contract Area.

12.0    This Memorandum may be executed or ratified in one or more counterparts and all of the executed or ratified counterparts shall together constitute one instrument.  For purposes of recording in each of the records described in Paragraph 6 above, duplicate copies of this Memorandum with individual signature pages attached thereto may be filed of record, one copy of each to be indexed in the name of the Operator, as grantor, and one copy of each to be indexed in the name of the Non-Operators, as grantor, and duplicate copies of this Memorandum with individual signature pages attached thereto may be filed in the appropriate Uniform Commercial Code records, one filing for the Operator, as secured Party, and another filing for the Non-Operators, as secured Party.  The respective addresses of the Operator, as both secured Party and debtor, and the Non-Operators, as both debtor and secured Party, at which information with respect to the security interests created in the Operating Agreement may be obtained, are set forth in Paragraph 1.0 of this Memorandum.

13.0    The Operator and the Non-Operators hereby agree to execute, acknowledge and deliver or cause to be executed, acknowledged and delivered, any instrument or take any action necessary or appropriate to effectuate the terms of the Operating Agreement or any Exhibit, instrument, certificate or other document pursuant thereto.

14.0    Whenever the context requires, reference herein made to the single number shall be understood to include the plural, and the plural shall likewise be understood to include the singular, and specific enumeration shall not exclude the general, but shall be construed as cumulative.

7

EXECUTED on the dates set forth below each signature but made effective as of _____ _, 20__.

**<u>OPERATOR</u>**:

WITNESSES:                                      [_____]

_____      By:_____

Printed Name: _____

_____

Printed Name: _____      Date:_____

**<u>NON-OPERATORS</u>**:

WITNESSES:                                      [_____]

_____      By:_____

Printed Name: _____

_____

Printed Name: _____      Date:_____

#93828440v3
#93828440v5

WITNESSES:                                         [_____]


_____            By:_____

Printed Name: _____

_____

Printed Name: _____            Date:_____


WITNESSES:                                         [_____]


_____            By:_____

Printed Name: _____

_____

Printed Name: _____            Date:_____


WITNESSES:                                         [_____]


_____            By:_____

Printed Name: _____

_____

Printed Name: _____            Date:_____

9

**ACKNOWLEDGMENT**

THE STATE OF _____          §
                                 §
COUNTY OF _____            §

     On this _____ day of _____, 20__, before me appeared _____, to me personally known, who, being by me duly sworn, did say that she is the _____ of [_____], a [_____], and that said instrument was signed in behalf of said [_____] by authority of its [_____] and said appearer acknowledged said instrument to be the free act and deed of said [_____].

     In witness whereof, I have hereunto set my official hand and seal on the date hereinabove written.

                                                _____
                                              Notary Public in and for the State of Texas

THE STATE OF _____          §
                                 §
COUNTY OF _____            §

     On this _____ day of _____, 20__, before me appeared _____, to me personally known, who, being by me duly sworn, did say that she is the _____ of [_____], a [_____], and that said instrument was signed in behalf of said [_____] by authority of its [_____] and said appearer acknowledged said instrument to be the free act and deed of said [_____].

     In witness whereof, I have hereunto set my official hand and seal on the date hereinabove written.

                                                _____
                                            Notary Public in and for the State of Texas

THE STATE OF _____          §
                                 §
COUNTY OF _____            §

     On this _____ day of _____, 20__, before me appeared _____, to me personally known, who, being by me duly sworn, did say that she is the _____ of [_____], a [_____], and that said instrument was signed in behalf of said [_____] by authority of its [_____] and said appearer acknowledged said instrument to be the free act and deed of said [_____].

     In witness whereof, I have hereunto set my official hand and seal on the date hereinabove written.

                                                _____
                                            Notary Public in and for the State of Texas

10

THE STATE OF _____        §
                              §
COUNTY OF _____         §

On this ____ day of _____, 20__, before me appeared _____, to me personally known, who, being by me duly sworn, did say that she is the _____ of [_____], a [_____], and that said instrument was signed in behalf of said [_____] by authority of its [_____] and said appearer acknowledged said instrument to be the free act and deed of said [_____].

In witness whereof, I have hereunto set my official hand and seal on the date hereinabove written.

_____
Notary Public in and for the State of Texas


THE STATE OF TEXAS     §
                       §
COUNTY OF HARRIS       §

On this ____ day of _____, 20__, before me appeared_____, to me personally known, who, being by me duly sworn, did say that he is the _____ of [_____], a [_____], and that said instrument was signed in behalf of said [_____] by authority of its [_____] and said appearer acknowledged said instrument to be the free act and deed of said [_____].

In witness whereof, I have hereunto set my official hand and seal on the date hereinabove written.

_____
Notary Public in and for the State of Texas

11

**ATTACHMENT "1"**

Attached to and made a part of the Memorandum of Operating Agreement and Financing Statement by and between _____, as Operator, and _____, as Non-Operators

I.  DESCRIPTION OF LANDS AND LEASES WITHIN THE "LEASE"

II.  OPERATOR

[_____]

III.  INTEREST OF THE PARTIES

IV.  NAMES AND ADDRESSES OF PARTIES FOR NOTIFICATION PURPOSES

[_____]
[_____]
[_____]
Attention:
Phone:
Fax:

[_____]
[_____]
[_____]
Attention:
Phone:
Fax:

[_____]
[_____]
[_____]
Attention:
Phone:
Fax:

[_____]
[_____]
[_____]
Attention:
Phone:
Fax:

[_____]
[_____]
[_____]
Attention:
Phone:
Fax:

12

## Exhibit 13

**Assignment of Record Title in Federal OCS Oil and Gas Lease – Ship Shoal 175 OCS-G0550**

See attached.

Form 3000-3
(Aug 2018)

UNITED STATES
DEPARTMENT OF THE INTERIOR
BUREAU OF LAND MANAGEMENT
**ASSIGNMENT OF RECORD TITLE INTEREST IN A
LEASE FOR OIL AND GAS OR GEOTHERMAL RESOURCES**

Mineral Leasing Act of 1920 (30 U.S.C. 181 et seq.)
Act for Acquired Lands of 1947 (30 U.S.C. 351-359)
Geothermal Steam Act of 1970 (30 U.S.C. 1001-1025)
Department of the Interior Appropriations Act, Fiscal Year 1981 (42 U.S.C. 6508)

FORM APPROVED
OMB NO. 1004-0034
Expires: June 30, 2021

Lease Serial No.
OCS-G05550

Lease Effective Date
(Anniversary Date)
07/01/1983

New Serial No.

**Type or print plainly in ink and sign in ink.**

**PART A: ASSIGNMENT**

1. Assignee*  Fieldwood Energy IV LLC
   Street  2000 W. Sam Houston Pkwy S, Suite 1200
   City, State, Zip Code Houston, Texas 77042

1a.  Assignor  Chevron U.S.A. Inc.

*If more than one assignee, check here ☐ and list the name(s) and address(es) of all additional assignees on page 2 of this form or on a separate attached sheet of paper.

This record title assignment is for: *(Check one)* ☑ Oil and Gas Lease, or ☐ Geothermal Lease

Interest conveyed: *(Check one or both, as appropriate)* ☑ Record Title, ☐ Overriding Royalty, payment out of production or other similar interests or payments

2. This assignment conveys the following interest:

| Land Description | Percent of Interest | | | Percent of Overriding Royalty Similar Interests | |
| --- | --- | --- | --- | --- | --- |
| Additional space on page 2, if needed.  Do not submit documents or agreements other than this form, such documents or agreements shall only be referenced herein. | Owned | Conveyed | Retained | Reserved | Previously reserved or conveyed |
| a | b | c | d | e | f |
| E1/2;N1/2NW1/4;SE1/4NW1/4;N1/2SW1/4NW1/4;S1/2SW1/4; NE1/4SW1/4 of Block 175, Ship Shoal Area (4531.25) | 100% | 100% | 0 | 0% | 0% |

**FOR BLM USE ONLY – DO NOT WRITE BELOW THIS LINE**
UNITED STATES OF AMERICA

**This assignment is approved solely for administrative purposes. Approval does not warrant that either party to this assignment holds legal or equitable title to this lease.**

☐ Assignment approved for above described lands;

Assignment approved effective _____

☐ Assignment approved for attached land description

☐ Assignment approved for land description indicated on reverse of this form

By _____
        Bureau of Land Management (BLM)                    (Title)                    (Date)

Part A (Continued) ADDITIONAL SPACE for Names and addresses of additional assignees in Item No. 1, if needed, or for Land Description in Item 2, if needed.

## PART B – CERTIFICATION AND REQUEST FOR APPROVAL

1.  The Assignor certifies as owner of an interest in the above designated lease that he/she hereby assigns to the above assignee(s) the rights specified above.

2.  Assignee certifies as follows: (a) Assignee is a citizen of the United States; as association of such citizens; a municipality; or a corporation organized under the laws of the United States or of any State or territory thereof. For the assignment of NPR-A leases, assignee is a citizen, national, or resident alien of the United States or associations of such citizens, nationals, resident aliens or private, public or municipal corporations; (b) Assignee is not considered a minor under the laws of the State in which the lands covered by this assignment are located; (c) Assignee's chargeable interests, direct and indirect, in each public domain and acquired lands separately in the same State, do not exceed 246,080 acres in oil and gas leases (of which up to 200,000 acres may be in oil and gas options), or 300,000 acres in leases in each leasing District in Alaska of which up to 200,000 acres may be in options, if this is an oil and gas lease issued in accordance with the Minerals Leasing Act of 1920, or 51,200 acres in any one State if this is a geothermal lease; (d) All parties holding an interest in the assignment are otherwise in compliance with the regulations (43 CFR Group 3100 or 3200) and the authorizing Acts; (e) Assignee is in compliance with reclamation requirements for all Federal oil and gas lease holdings as required by sec. 17(g) of the Mineral Leasing Act; and (f) Assignee is not in violation of sec. 41 of the Mineral Leasing Act.

3.  Assignee's signature to this assignment constitutes acceptance of all applicable terms, conditions, stipulations and restrictions pertaining to the lease described herein.

For geothermal assignments, an overriding royalty may not be less than one-fourth (1/4) of one percent of the value of output, nor greater than 50 percent of the rate of royalty due to the United States when this assignment is added to all previously created overriding royalties (43 CFR 3241).

I certify that the statements made herein by me are true, complete, and correct to the best of my knowledge and belief and are made in good faith.

Executed this _____ day of _____ 20 21        Executed this _____ day of _____ 20 21

Name of Assignor   Chevron U.S.A. Inc. _____
                                             (Please type or print)

Assignor _____        Assignee _____
                    (Signature)                                    (Signature)

R. G. Schneider    Assistant Secretary        _____
                    (Title)                                         (Title)

or                                             or
Attorney-in-fact _____   Attorney-in-fact _____
                    (Signature)                                    (Signature)

_____
        (Assignor's Address)

_____
   (City)        (State)      (Zip Code)

Title 18 U.S.C. Sec. 1001 makes it a crime for any person knowingly and willfully to make to any Department or agency of the United States any false, fictitious, or fraudulent statements or representations as to any matter within its jurisdiction.

(Continued on Page 3)                                                          (Form 3000-3, Page 2)

**PART C – GENERAL INSTRUCTIONS**

1. Assignor/Assignee must complete Parts A1 and A2 and Part B.  All parties to assignment must sign as  follows.  The assignor(s) must manually sign 3 original copies and the assignee(s) must manually sign  at least 1 of the 3 original copies.  File three (3) completed copies of this form in the proper BLM  office for each assignment of record title.  For a transfer of overriding royalty interest, payment out of  production or other similar interest or payment, file one (1) manually signed copy of this form.  The  required filing fee (nonrefundable) must accompany the assignment.  File assignment within ninety  (90) days after date of execution of assignor.

2. Separate form must be used for each lease being affected by this assignment and for each type of  interest conveyed.

3. In Item No. 2 of Part A, describe lands affected (See 43 CFR 3106, 3135 or 3241).  For columns b, c,  d, and e, enter the interest expressed as a percentage of total interest in the lease, *e.g.,* if assign or  assigns one quarter of a 20% interest, enter 20% in column b, 5% in column c, and 15% in column d.

4. If assignment is to more than one assignee, enter each assignee's name across columns d, e, and f next  to the respective interest being conveyed.  Also, list names and addresses of any additional assignee(s)  on reverse of this form or on a separate attached sheet of paper.

5. If any payment out of production or similar interest, arrangements or payments have previously been  created out of the interest being assigned, or if any such payments or interests are reserved under this  assignment, include a statement giving full details as to amount, method of payment, and other  pertinent terms as provided under 43 CFR 3106, 3135, or 3241.

6. The lease account must be in good standing before this assignment can be approved as provided under 43 CFR 3106 and 3241.

7. Assignment, if approved, takes effect on the first day of the month following the date of filing in the  proper BLM office.  If a bond is necessary it must be furnished prior to approval of the assignment.

8. Approval of assignment of record title to 100% of a portion of the leased lands creates separate leases  of the retained and the assigned portions, but does not change the terms and conditions of the lease  anniversary date for purposes of payment of annual rental.

9. Overriding royalty, payment out of production or other similar types of transfers must be filed with BLM, but will be accepted for record purpose only.  No official approval will be given.

Debtors' Exhibit No. 34
Page 699 of 910

**NOTICES**

AUTHORITY: This information is solicited under the authority of 30 U.S.C. 181 et seq.; 30 U.S.C. 1001-1025; 42 U.S.C. 6508

PURPOSE: The primary purpose for collecting this information is to facilitate the timely processing of record title  assignments for oil and gas/geothermal resources leases.

ROUTINE USES: This information may be disclosed to agencies, organizations or persons for authorized purposes  as follows: (1) The adjudication of the assignee's rights to the land or resources.  (2) Documentation for public  information in support of notations made on land status, records for the management, disposal, and use of public  lands and resource.  (3) Transfer to appropriate Federal agencies when concurrence is required prior to granting a  right in public lands or resources.  (4) Information from the record and/or the record will be transferred to  appropriate Federal, State, local or foreign agencies, when relevant to civil, criminal or regulatory investigations or  prosecutions.  Additional information on authorized routine uses may be found in the published system of records  notice, BLM-3, Mineral Lease Management—Interior, which may be viewed at  https://www.doi.gov/privacy/blm_notices

DISCLOSURE:  Furnishing the information on this form is voluntary, however, failure to provide all or part of the  requested information may result in the rejection of the assignment.  See regulations at 43 CFR Groups 3100 and  3200.

The Paperwork Reduction Act of 1995 requires us to inform you that:
The BLM collects this information to create and maintain a record of oil and gas/geothermal lease activity.

Response to this request is required to obtain a benefit.

The BLM would like you to know that you do not have to respond to this or any other Federal agency-sponsored  information collection unless it displays a currently valid OMB control number.

**BURDEN HOURS STATEMENT:** Public reporting burden for this form is estimated to average 30 minutes per  response including the time for reviewing instructions, gathering and maintaining data, and completing and  reviewing the form.  Direct comments regarding the burden estimate or any other aspect of this form to U.S.  Department of the Interior, Bureau of Land Management (1004-0034), Bureau Information Collection Clearance  Officer (WO-630), 1849 C Street, N.W., Room 2134LM, Washington, D. C. 20240.

## **Exhibit 14**

### **Net Profits Interest Conveyance**

See attached.

*Exhibit 14 to the Implementation Agreement*

## CONVEYANCE OF

## NET PROFITS OVERRIDING ROYALTY INTEREST

**From**

## FIELDWOOD ENERGY IV LLC

**as Grantor**

**to**

## FIELDWOOD IV DECOMMISSIONING ESCROW ACCOUNT

**as NPI Owner**

**_____ __, 2021**

This document prepared by and when recorded return to:
[  ]

## CONVEYANCE OF NET PROFITS OVERRIDING ROYALTY INTEREST

THIS CONVEYANCE OF NET PROFITS OVERRIDING ROYALTY INTEREST (as from time to time supplemented or amended, this "Conveyance"), dated as of [_____] (the "Closing Date"), is made from and by Fieldwood Energy IV LLC, a Texas limited liability company (the "Grantor"), to and in favor of The Fieldwood IV Decommissioning Escrow Account, through U.S. Bank National Association as escrow agent (herein called "NPI Owner").

### RECITALS

WHEREAS, Fieldwood Energy IV LLC is a resulting entity of a divisive merger effected in connection with the confirmed plan of reorganization of Chapter 11 Case 20-33948, In re: Fieldwood Energy LLC et al., in the United States Bankruptcy Court for the Southern District of Texas, Houston Division (the "Plan");

WHEREAS, this Conveyance is granted in conjunction with the formation of Grantor by divisive merger upon confirmation of the Plan and in support of certain arrangements entered into in support of Grantor's decommissioning obligations from and after its formation, as set out under that certain Omnibus Agreement (as defined below).

NOW, THEREFORE, in consideration of the premises, the agreements and mutual covenants contained herein, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties agree as follows:

### ARTICLE I

### DEFINED TERMS

Section 1.1.    Defined Terms.    When used in this Conveyance or in any exhibit or schedule hereto (unless otherwise defined in any such exhibit or schedule), the following terms have the respective meanings assigned to them in this section or in the sections, subsections, exhibits and schedules referred to below:

"Act" has the meaning ascribed to such term in Section 7.6(a).

"Affiliate" means, with respect to any Person, any other Person that, directly or indirectly, controls, is controlled by or is under common control with, such specified Person through one or more intermediaries or otherwise.  For the purposes of this definition, "control" means, where used with respect to any Person, the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of such Person, whether through the ownership of voting securities, by contract or otherwise, and the terms "controlling" and "controlled" have correlative meanings.

"Applicable JOA" means any joint operating agreement applicable to any part of the Subject Interests.

"Application Date" means, with respect to Net Profits attributable to Subject Hydrocarbons produced, saved and sold during any Production Period, the last Business Day of the Month following such Production Period; provided that the Application Date with regard to the Production Periods during the period of time beginning on the Effective Time until the end of the Month following the Month in which the Closing Date occurs shall be deemed to occur ninety (90) days after the Closing Date.

"Business Day" means any day that is not a Saturday, Sunday or legal holiday in the State of Texas and that is not otherwise a federal holiday in the United States.

"Claim" has the meaning ascribed to such term in Section 7.6(c).

"Closing" means the time on the Closing Date at which Grantor is allocated or otherwise receives the Subject Interests in accordance with the transactions contemplated by the Omnibus Agreement.

"Closing Date" has the meaning ascribed to such term in the preamble.

"Conveyance" has the meaning ascribed to such term in the preamble.

"Contract Operating Agreement" means that certain Contract Operating Agreement, dated [____], between Grantor and Mako Buyer LLC.

"CPR" has the meaning ascribed to such term in Section 7.6(e).

"CUSA" means Chevron U.S.A Inc.

"Debited Taxes" means all Taxes incurred, accrued or paid by Grantor with respect to the ownership of the Subject Interests or the extraction of the Subject Hydrocarbons after the Effective Time, including (a) production, severance, excise and other similar Taxes assessed against, and/or measured by, the production of Subject Hydrocarbons, (b) occupation Taxes, (c) sales and use taxes, (d) ad valorem Taxes assessed against or attributable to the Subject Interests or the Non-Processing Equipment and (e) any extraordinary or windfall profits Taxes that may be assessed in the future based upon profits realized or prices received from the sale of Subject Hydrocarbons.

"Decommissioning Obligations" has the meaning attributed thereto in the Omnibus Agreement.

"Effective Time" means 7:00 a.m. local time at the locations of the Subject Interests on [____].

"Environmental Laws" has the meaning attributed thereto in the Omnibus Agreement.

"Equipment" means all equipment and machinery (including well equipment and machinery), platforms, facilities, buildings, fixtures, and other tangible personal property and improvements owned by Grantor and used or held for use by Grantor in connection with the operation of the Subject Interests or the production of Subject Hydrocarbons.

Debtors' Exhibit No. 34
Page 704 of 910

"Escrow Account" means that certain escrow account established pursuant to the Escrow Agreement and called the "Decommissioning Escrow Account" under the Omnibus Agreement.

"Escrow Agreement" means that certain escrow agreement governing the FWE IV Escrow Account, dated [_____] by and between Grantor, CUSA, and U.S. Bank National Association, as escrow agent, and called the "Decommissioning Escrow Agreement" under the Omnibus Agreement.

"Fixed Rate" means, for any day, the lesser of (i) the rate of six percent (6%) per annum and (ii) the maximum rate of interest permitted to be charged pursuant to this Conveyance under applicable Law.

"Governmental Authority" has the meaning attributed thereto in the Omnibus Agreement.

"Gross Proceeds" has the meaning ascribed to such term in Section 3.2.

"Hydrocarbons" means all of the oil, liquid hydrocarbons, gas, and any and all other liquid or gaseous hydrocarbons, as well as their respective constituent products (including condensate, casinghead gas, distillate and natural gas liquids), and, to the extent useful for the exploration for and production of the foregoing, any other minerals produced in association therewith (including, elemental sulfur, helium, carbon dioxide and other non-hydrocarbon substances produced in association with any of the above-described items).

"Law" has the meaning attributed thereto in the Omnibus Agreement.

"Lease" means (i) as of the Closing Date, an oil, gas and/or mineral lease described in Exhibit A hereto, together with (ii) any renewal, amendment, ratification, or extension of any such Subject Interest that is to be subject to this Agreement pursuant to Section 2.4.

"Losses" has the meaning ascribed to such term in Section 7.9(b).

"Manufacturing Costs" shall mean the costs of Processing any Subject Hydrocarbons, which shall be equivalent to (i) for Processing of any Subject Hydrocarbons performed by a Non-Affiliate, the actual costs charged by such Non-Affiliate and paid by Grantor for such Processing (or debited with respect to revenue from such Subject Hydrocarbons actually received by Grantor for such Processing), or (ii) for any other Processing of Subject Hydrocarbons, the actual costs incurred by Grantor or its Affiliate and paid to a Non-Affiliate (or debited from revenue attributable to) for Processing.

"Month" means the period between 7:00 a.m. (local time, at the location of each Subject Interest) on the first day of each calendar month and 7:00 a.m. on the first day of the next succeeding calendar month.

"Monthly Statement" has the meaning ascribed to such term in Section 3.6.

"Net Deficit" has the meaning ascribed to such term in Section 3.5(c).

"Net Profit" has the meaning ascribed to such term in Section 3.5(b).

Debtors' Exhibit No. 34
Page 705 of 910

"<u>Net Profits Account</u>" has the meaning ascribed to such term in <u>Section 3.1</u>.

"<u>Non-Affiliate</u>" means any Person that is not a Related Person.

"<u>Non-Processing Equipment</u>" means all fixtures, equipment and supplies (other than any of the same used in Processing) located on or used in connection with production from any of the Subject Interests.

"<u>Non-Qualified Expenditures</u>" means any amount attributable to any costs and expenses that are paid or incurred (i) in connection with paying, performing, discharging or otherwise satisfying any Decommissioning Obligations, or (ii) in connection with operations other than Permitted Operations.

"<u>Notice</u>" has the meaning ascribed to such term in <u>Section 7.8</u>.

"<u>NPI</u>" has the meaning ascribed to such term in <u>Section 2.1</u>.

"<u>NPI Owner Indemnitees</u>" has the meaning ascribed to such term in <u>Section 7.9(a)</u>.

"<u>NPI Payment</u>" has the meaning ascribed to such term in <u>Section 3.5(b)</u>.

"<u>NPI Percentage</u>" means an undivided one hundred percent (100%).

"<u>Omnibus Agreement</u>" means that certain Omnibus Agreement, dated [____], between Grantor. CUSA and Mako Buyer LLC.

"<u>Parties</u>" means Grantor and NPI Owner and each, a "<u>Party</u>".

"<u>Permitted Operations</u>" has the meaning attributed thereto in the Contract Operating Agreement.

"<u>Person</u>" means an individual, partnership, corporation, limited liability company, association, trust, unincorporated organization, or a government or agency or political subdivision thereof.

"<u>Processing</u>" or "<u>Processed</u>" means to process, manufacture, fractionate or refine Subject Hydrocarbons, but does not mean or include the use of lease or well equipment (such as dehydrators, gas treating facilities, separators, heater-treaters, lease compression facilities, injection or recycling equipment, tank batteries, field gathering systems, pipelines and equipment and so forth) for treating or conditioning Hydrocarbons or other normal operations on any of the Subject Interests.

"<u>Production Period</u>" means each Month in which Subject Hydrocarbons are produced and saved from the Subject Interests.  Except as otherwise provided herein, for purposes of this Conveyance, the first Production Period shall begin at the Effective Time.

"<u>Reasonably Prudent Operator</u>" means an operational standard requiring an operator to maintain and exercise a degree of skill and judgment, and the utilization of practices, methods,

techniques and standards, that are generally expected of a skilled and experienced operator engaged in work similar in nature which shall at a minimum require operations be conducted (a) in a good and workmanlike manner, (b) with due diligence and dispatch, (c) in accordance with good oilfield practices, and (d) in compliance with all applicable Laws, licenses, authorizations and permits.

"Reimbursable Expenses" means all costs and expenses paid or incurred by or on behalf of NPI Owner or its Affiliates which are related to:  (a) the enforcement or termination of the NPI, this Conveyance, or any waivers or amendments hereto or thereto, or (b) any litigation, contest, release or discharge of any adverse claim or demand made or proceeding instituted by any Person affecting in any manner whatsoever the NPI, this Conveyance, the enforcement or defense hereof or thereof, or the defense of NPI Owner's and its Affiliates' exercise of their rights hereunder or thereunder.  Included among the Reimbursable Expenses are, in each case to the extent paid or incurred by NPI Owner or its Affiliates: (i) all recording and filing fees and (ii) all costs of NPI Owner in exercising any of its remedies hereunder.

"Related Person" means Fieldwood Energy I LLC, Fieldwood Energy III LLC, Fieldwood Energy IV LLC, Fieldwood Energy LLC or Mako Buyer LLC or any Affiliate of any such Person.

"Subject Hydrocarbons" means the Hydrocarbons in and under Subject Lands that may be produced after the Effective Time from (or, to the extent pooled or unitized, allocated to) the Subject Lands that are attributable to the Subject Interests.

"Subject Interests" means:

(a)     upon consummation of the Closing, all of Grantor's right, title and interest in and to the leasehold interests and other property interests described in Exhibit A attached hereto;

(b)     without limitation of the foregoing, all other right, title and interest (of whatever kind or character, whether legal or equitable and whether vested or contingent) of Grantor (whether in the form of a record title interest or interest in operating rights or contractual working interests) as of the Closing in and to the Hydrocarbons in and under or that may be produced from any Subject Lands (including interests in oil, gas or mineral leases to the extent the same cover such lands, overriding royalties, production payments and net profits interests in such lands or such leases, and fee mineral interests, fee royalty interests and other interests in such oil, gas and other minerals) even though Grantor's interest in such oil, gas and other minerals may be incorrectly described in, or omitted from, Exhibit A; and

(c)     all rights, titles and interests of Grantor in and to, or otherwise derived from, all presently existing and valid oil, gas or mineral unitization, pooling, or communitization agreements, declarations or orders and in and to the properties covered and the units created thereby (including all units formed under orders, rules, regulations, or other official acts of any federal, state, or other authority having jurisdiction, voluntary unitization agreements, designations or declarations, and so-called "working interest units" created under operating agreements or otherwise) relating to the interests described in clauses (a) and (b) of this definition,

in each case, as any of the foregoing may be enlarged from time to time by the discharge of any burdens or by the removal of any charges or encumbrances to which any of the foregoing may be

subject as of the date hereof, and any and all renewals and extensions of any of the same pursuant to <u>Section 2.4</u>.  For purposes of clarity, it is expressly understood and agreed that the term "Subject Interests", as used in this Conveyance, shall mean gross interests before any deductions, charges or encumbrances.  The Subject Interests shall not include additional interests acquired by Grantor from a third party from and after the Closing Date, including additional interests acquired by Grantor in the Leases that comprise the Subject Interests, unless such interests are expressly added to this Conveyance by qualifying amendment.

"<u>Subject Lands</u>" means all of the tracts of land described in <u>Exhibit A</u> and all lands subject to each Lease, unit or other property interest that is described in <u>Exhibit A</u>, in each case, as to all depths.

"<u>Subject Wells</u>" means all wells now located on the Subject Lands (whether fully drilled and completed or not) or hereafter drilled on the Subject Lands, and any other wells now or hereafter located on lands or leases pooled, communitized or unitized with the Subject Interests, including any wells identified on <u>Exhibit A</u>.

"<u>Taxes</u>" means all ad valorem, property, gathering, transportation, pipeline regulating, severance, production, excise, heating content, carbon, environmental, occupation, sales, use, value added, fuel, and other taxes and governmental charges and assessments imposed on or as a result of all or any part of the Subject Interests, the Subject Hydrocarbons or the proceeds thereof, or the NPI, regardless of the point at which or the manner in which or the Person against whom such taxes, charges, or assessments are charged, collected, levied, or otherwise imposed.  Any estimated taxes, deficiency assessments, additions to tax, interest, penalties, and withholding obligations owing to Governmental Authorities with respect to any Taxes shall also constitute Taxes.  The only taxes which are not Taxes for purposes hereof are federal and state income taxes, state franchise taxes, state margin taxes, and any penalty or interest surcharges thereon.

"<u>Turnkey Removal Agreement</u>" means that certain Turnkey Removal Agreement, dated [____], between Grantor, CUSA and Mako Buyer LLC.

Section 1.2.    <u>Rules of Construction</u>.    All references in this Conveyance to articles, sections, subsections and other subdivisions refer to corresponding articles, sections, subsections and other subdivisions of this Conveyance unless expressly provided otherwise.  Titles appearing at the beginning of any of such subdivisions are for convenience only and shall not constitute part of such subdivisions and shall be disregarded in construing the language contained in such subdivisions.  The words "this Conveyance", "this instrument", "herein", "hereof", "hereunder" and words of similar import refer to this Conveyance as a whole and not to any particular subdivision unless expressly so limited.  Unless the context otherwise requires:  "including" and its grammatical variations mean "including without limitation"; "of" is not exclusive; words in the singular form shall be construed to include the plural and vice versa; words in any gender include all other genders; references herein to any instrument or agreement refer to such instrument or agreement as it may be from time to time amended or supplemented; and references herein to any Person include such Person's successors and assigns.  All references in this Conveyance to exhibits and schedules refer to exhibits and schedules to this Conveyance unless expressly provided otherwise, and all such exhibits and schedules are hereby incorporated herein by reference and made a part hereof for all purposes.  Any reference to a Law includes any amendment or

modification to such Law, and all regulations, rulings, and other Laws promulgated under such Law.

## ARTICLE II
## GRANTING PROVISIONS

Section 2.1.   <u>Granting Clause</u>.   For and in consideration of good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Grantor does hereby GRANT, BARGAIN, SELL, TRANSFER, ASSIGN, CONVEY, WARRANT and DELIVER to NPI Owner a net profits overriding royalty interest in and to the Subject Interests and in and to the Subject Hydrocarbons in and under the Subject Interests and that may be produced and saved from (or otherwise allocable to) each Subject Interest that is equal to (and measured by) the NPI Percentage of the Net Profits, as determined by and calculated in accordance with the terms of <u>Article III</u>, of the Subject Hydrocarbons that may be produced and saved from (or otherwise allocable to) the Subject Interests, together with all and singular the rights and appurtenances thereto in anywise belonging (the "<u>NPI</u>"), all as more fully discussed and subject to the terms provided below.

TO HAVE AND TO HOLD the NPI unto NPI Owner, its successors and assigns, forever. Grantor will pay and account to NPI Owner the NPI as provided herein.

Section 2.2.   <u>Non-Operating, Limited Cost-Bearing Interest</u>.   The NPI is a non-operating, limited expense-bearing net profits overriding royalty interest in and to the Subject Interests, free of all cost, risk, and expense of exploration, development, plugging and abandonment of the Subject Interests or the Subject Hydrocarbons.  Except as described in <u>Section 3.3(c)</u>, the NPI shall be free and clear of (and without deduction therefrom of), and Grantor shall bear and pay, all Taxes (other than Debited Taxes) with respect to the NPI and the Subject Hydrocarbons imposed on NPI Owner.  Without limitation of the foregoing, Grantor will promptly (and in any event within thirty (30) days after receiving any notice or statement for the same) pay all Reimbursable Expenses which have been incurred and are unpaid and will reimburse NPI Owner for any Reimbursable Expenses, and for any other amounts that Grantor is obligated to pay hereunder, which have nonetheless been paid by or on behalf of NPI Owner.  Each amount that is to be paid by Grantor pursuant to this Conveyance which is instead paid by or on behalf of NPI Owner shall bear interest at the Fixed Rate on each day from and including the date of such payment until but not including the date repaid by Grantor  This Conveyance is an absolute conveyance of a presently vested interest in real and/or immovable property and, in the State of Louisiana, an immovable right, causing title to the NPI to be vested in NPI Owner as of the Effective Time.

Section 2.3.   <u>No Proportionate Reduction</u>.   It is understood and agreed that, although the NPI is conveyed by Grantor to NPI Owner out of the Subject Interests, the NPI shall be determined based on all of Grantor's right, title and interest in and to the Subject Interests as of the Closing.

Section 2.4.   <u>Renewals and Extensions</u>.   Grantor shall have the unrestricted right to renew, extend, modify or amend the Leases with respect to any of the Subject Lands covered thereby without the consent of NPI Owner.  This Conveyance and the NPI shall apply to Grantor's and its Affiliates' interests in all renewals, extensions, modifications and amendments of each lease (or other determinable interest) which is included in the Subject Interests, whether such

Debtors' Exhibit No. 34
Page 709 of 910

renewals, extensions, modifications and amendments have heretofore been obtained by Grantor or are hereafter obtained by or for Grantor or any Affiliate thereof and whether or not the same are described in Exhibit A; provided that any fees, costs and expenses actually paid by Grantor with respect to such renewal, extension, modification and amendment may be debited to the Net Profits Account. For the purposes of the preceding sentence, only a new lease or other determinable property interest that covers the same interest (or any part thereof) covered by a prior lease or property interest, and which is acquired within twelve (12) months after the expiration, termination, or release of such prior lease or property interest, shall be treated as a renewal or extension of such prior lease or property interest.

Section 2.5.   Termination of a Subject Interest.   In the event any particular Subject Interest (or portion thereof, as applicable) should by its terms terminate and not be extended, renewed, or replaced, the NPI shall no longer apply to that particular Subject Interest (or such portion thereof, as applicable), but the NPI shall remain in full force and effect and undiminished as to all remaining Subject Interests, if any, (and the remaining portion of such Subject Interest, as applicable); provided, however, that, notwithstanding such termination, any costs and expenses attributable to such Subject Interest (or portion thereof, as applicable) that are otherwise eligible to be debited from the Net Profits Account shall continue to be debited pursuant to the provisions of Article III.

Section 2.6.   Pooling, Communitization and Unitization.   Grantor shall have the right and power to unitize, communitize or pool, on a voluntary basis, any portion or portions of the Subject Interests without the express written consent of NPI Owner.   Notwithstanding the foregoing, if pursuant to any such voluntary pooling or unitization or any Law or order of any Governmental Authority, any portion of the Subject Interests is pooled, communitized or unitized in any manner, the NPI shall apply to the production which is attributable to such portion of the Subject Interests under and by virtue of such pooling, communitization and unitization arrangements (as if such unit or property interest and the interest of Grantor therein were specifically described in Exhibit A). NPI Owner shall, at Grantor's sole cost and expense, cooperate in good faith to prepare and execute any documents reasonably necessary to accomplish the purposes of this Section 2.6.

## ARTICLE III
## ESTABLISHMENT OF NET PROFITS ACCOUNT

Section 3.1.   Establishment.   Grantor shall establish on its books and maintain a net profits account (herein called the "Net Profits Account") in accordance with sound, accurate and comprehensive accounting practices and consistent with the various provisions of this Conveyance and shall at all times keep true and correct books and records with respect thereto.

Section 3.2.   Credits.   Except as otherwise provided herein, the Net Profits Account shall be credited (without duplication herein) with the following gross revenue actually received by (or credited to Grantor if credited by a Related Person) from the sale or other disposition of Subject Hydrocarbons produced from and after the Effective Time, in each case as of the date the corresponding proceeds for Subject Hydrocarbons are actually received by Grantor (the "Gross Proceeds").   The amount of Gross Proceeds to be credited to the Net Profits Account with respect to any sale or disposition of Subject Hydrocarbons shall be subject to the following:

Debtors' Exhibit No. 34
Page 710 of 910

(a)      Gross Proceeds shall include all consideration and other amounts actually received by (or credited to Grantor if credited by a Related Person) attributable to the sale or other disposition of Subject Hydrocarbons, including any amounts actually received by (or credited to Grantor if credited by a Related Person) attributable to overriding royalty or other royalty interest that is part of the Subject Interests and owned by Grantor;

(b)      If any Non-Affiliate withholds or delays payment of proceeds of Subject Hydrocarbons for any reason (other than at the request of Grantor), such proceeds shall not be considered to be Gross Proceeds until such proceeds are actually paid and received by Grantor (provided that if any interest or penalty is also paid in connection therewith, such interest or penalty shall be deemed proceeds of Subject Hydrocarbons), and provided further that if a Related Person withholds or delays payment of proceeds of Subject Hydrocarbons for any reason, such proceeds shall be considered to be Gross Proceeds relating to the applicable Production Period;

(c)      If any Subject Hydrocarbons are Processed before sale, the amount of Gross Proceeds credited to the Net Profits Account for such Subject Hydrocarbons shall be the amount actually received from the sale of such Subject Hydrocarbons less the Manufacturing Costs; and

(d)      Gross Proceeds shall not include any amounts that are to be applied as reductions to debits pursuant to Section 3.4.

Section 3.3.    Debits.  Except as otherwise provided herein, the Net Profits Account shall be debited (without duplication herein or any duplication resulting from any charges under the COPAS accounting procedures attached to any Applicable JOA) with the following costs and expenses to the extent (i) such costs and expenses are properly allocable to the Subject Interests and incurred during the period from and after the Effective Time, (ii) such costs and expenses are actually paid by Grantor from and after the Effective Time, and (iii) to the extent and only to the extent such costs and expenses were incurred in conjunction with or otherwise relate to Permitted Operations:

(a)      All costs and expenses for Permitted Operations and for reasonable general, administrative or overhead charges, to the extent such charges are permitted under the COPAS accounting procedures attached to any Applicable JOA;

(b)      All Debited Taxes;

(c)      The portion of any insurance costs paid by Grantor attributable to the ownership or operation of the Subject Interests;

(d)      All amounts attributable to any Subject Interest consisting of royalties, overriding royalties, production payments, rentals, shut-in well royalties, minimum royalties and similar payments and burdens that are payable with respect to periods after the Effective Time and are payable to Non-Affiliate;

(e)      All direct costs and charges attributable to the Subject Interests that are paid by Grantor to a Non-Affiliate operator with respect to periods after the Effective Time under an Applicable JOA (and all exhibits attached thereto including the COPAS accounting procedures) governing the relevant Subject Interests;

-9-

(f)      All (i) costs and expenses of litigation, proceedings, collections, liens, judgments, liabilities and claims incurred and paid by Grantor allocable to the Subject Interests or Subject Hydrocarbons and (ii) payment of judgments, penalties and other liabilities (including interest thereon), incurred by Grantor (and not paid or reimbursed under insurance maintained by Grantor or others) and involving any of the Subject Interests, or incident to the development, operation or maintenance of the Subject Interests from and after the Effective Time, or requiring the payment or restitution of any proceeds of Subject Hydrocarbons;

(g)      If as a result of the occurrence of the bankruptcy or insolvency or similar occurrence of the purchaser of Subject Hydrocarbons any amounts previously included in Gross Proceeds are reclaimed from Grantor or its representative, then the amounts reclaimed as promptly as practicable following Grantor's payment thereof; and

(h)      All costs, expenses and liabilities incurred by Grantor in maintaining, renewing or extending any of the Leases or maintaining or increasing production on such Lease.

Notwithstanding the foregoing provisions of this <u>Section 3.3</u> or anything else to the contrary contained in this Conveyance, the amounts debited to the Net Profits Account shall not include any of the following:

(i)      Non-Qualified Expenditures.

(ii)      Any amount otherwise able to be debited which has also reduced the amount of the Subject Hydrocarbons or Gross Proceeds (including, by way of example, royalties and overriding royalties not included in Subject Hydrocarbons and production, severance, and other Taxes (other than penalties or interest) withheld and not included in Gross Proceeds).

(iii)      Any overriding royalty, production payment or other charge burdening the Subject Interests which is created by Grantor after the Effective Time.

(iv)      Any expenses and any penalties, interests or other similar charges which result from the failure of Grantor to properly discharge all costs and expenses (including Taxes) of operating, producing and maintaining the Subject Interests as a Reasonably Prudent Operator.

(v)      Any interest, premiums, fees or similar charges arising out of borrowings, bonds, letters of credit or other credit support or purchases of any goods, equipment or other items on credit, whether or not used on or otherwise related to the Subject Interests.

(vi)      Any general, administrative or overhead costs paid or incurred by Grantor or its Affiliates, except for any of such costs permitted under <u>Sections 3.3(a)</u>.

(vii)      Any amounts paid by Grantor (A) for the acquisition of any new Lease, including any bonus or similar payment or (B) to any of Grantor's predecessors in interest with respect to the acquisition of the Subject Interests (including any purchase price or other consideration paid by Grantor to any such predecessor in interest to acquire all or part of the Subject Interests).

Debtors' Exhibit No. 34
Page 712 of 910

(viii)   Any expenses, expenditures or other amounts accrued prior to the Effective Time, even if paid after the Effective Time, unless agreed to by Grantor and CUSA in writing.

(ix)   Any costs or expenses paid or incurred to pay, perform, discharge or otherwise satisfy Decommissioning Obligations.

Section 3.4.   <u>Reduction of Debits</u>.  The debits to the Net Profits Account provided for in <u>Section 3.3</u> and elsewhere in this Conveyance shall be reduced after the Effective Time by the following to the extent actually received by or credited to Grantor and to the extent applicable to the Subject Interests:

(a)   The gross proceeds attributable to Subject Interests which are received by Grantor from the sale of (or, if disposed of by Grantor other than by sale, the then current market value of) any materials, supplies, equipment and other personal property or fixtures located on or used in connection with the Subject Interests (including all amounts attributable thereto which are received by Grantor by way of conformance of investment in personal property and equipment if the Subject Interests or any part or parts thereof are hereafter unitized).

(b)   The gross proceeds of all insurance payments collected by Grantor (i) if the cost of the related policy is chargeable to the Net Profits Account, directly or indirectly, or (ii) for loss of or damage to any of the Subject Interests, any Subject Hydrocarbons, or any materials, supplies, equipment or other personal property or fixtures located on or used in connection with any of the Subject Interests.

(c)   The proceeds of all judgments and settlements (net of legal fees and expenses) collected by Grantor for loss of or damage to any of the Subject Interests or any part thereof or interest therein, any Subject Hydrocarbons, or any materials, supplies, equipment or other personal property or fixtures, or any part thereof or interest therein, located on or used in connection with any of the Subject Interests.

(d)   Any Prior Period Debit Reduction.

Section 3.5.   <u>Accounting</u>.

(a)   By the end of the second Month after each Production Period, a calculation of Net Profits or Net Deficit shall then be made by Grantor with respect to the NPI for such Production Period by deducting (i) the result of (A) the total debits properly made to the Net Profits Account during such Production Period pursuant to <u>Section 3.3</u>, *plus* (B) the Net Deficit carried forward from the prior Production Period (as determined under <u>Section 3.5)(c)</u>), if any, *minus* (C) the total debit reductions properly made to the Net Profits Account during such Production Period pursuant to <u>Section 3.4</u>; *from* (ii) the results of (A) total credits properly made to the Net Profits Account for Subject Hydrocarbons produced during such Production Period pursuant to <u>Section 3.2</u>, *plus* (B) total credits properly made to the Net Profits Account total credits for Subject Hydrocarbons produced during any prior Production Period, to the extent the applicable credit was not actually received by or credited to Grantor until after the Application Date for such prior Production Period or was not otherwise allocated to the Net Profits Account for a prior Production Period; provided that if the result of the calculation under (i) is a negative number, then the absolute value of such

amount shall be deemed a "Prior Period Debit Reduction" and carried forward into the next Production Period under Section 3.4.

(b)  If the computation made in accordance with Section 3.5(a) results in a positive amount with respect to a Production Period (the "Net Profits"), then (i) that positive amount shall be subtracted from the balance of the Net Profits Account to cause the Net Profits Account to have a zero balance immediately following the end of such Production Period, (ii) that positive amount shall be multiplied by the NPI Percentage to determine the NPI payable with respect to such Production Period, and (iii) the product resulting from the calculations in (ii) above shall be payable to NPI Owner, as specified in Section 4.1 (the "NPI Payment").

(c)  If the computation made in accordance with Section 3.5(a) results in a negative amount with respect to a Production Period, the negative sum shall be deemed the "Net Deficit." Any Net Deficit shall be carried forward as a debit to the Net Profits Account for the following Production Period.  If there is a Net Deficit with respect to the Net Profits Account at the end of any Production Period, no payments shall be made to NPI Owner in respect of the NPI.  For the avoidance of doubt, NPI Owner shall never be liable to make any payment to Grantor in respect of the Net Deficit.

Section 3.6.  Monthly Statements.  On or before the last day of the second Month following each Production Period, beginning with the first Production Period after the Closing Date, Grantor shall furnish to NPI Owner a detailed statement (a "Monthly Statement") (a) identifying the balance (if any) of the Net Profits Account as of the close of business on the last day of the preceding Production Period, (b) identifying (with sufficient description so that NPI Owner can identify such items and the particular Subject Interest involved) those items which gave rise to debits and credits to the Net Profits Account during such Production Period and (c) identifying, with respect to each Subject Interest, the volumes of Subject Hydrocarbons both produced and sold therefrom during the Production Period covered by such Monthly Statement, the prices at which such volumes were sold, and the Taxes paid with respect to such sales.  Any Net Deficit reflected by any Monthly Statement shall be carried forward and used in the calculation of Net Profits Account for the next and succeeding Production Periods until such Net Deficit has been eliminated and liquidated.  As more particularly described in Section 3.5(b), NPI Payments shall be made to NPI Owner in accordance with Section 4.1 when a Net Profit is reflected by any Monthly Statement.

Section 3.7.  Overpayments.  If at any time Grantor pays NPI Owner more than the amount then due with respect to the NPI to NPI Owner, NPI Owner shall not be obligated to return any such overpayment to Grantor, but the amount or amounts otherwise payable for any subsequent period or periods shall be reduced by such overpayment, unless such overpayment is disputed by NPI Owner, in which case Grantor shall not reduce any future payment by the amount of the disputed overpayment until such dispute is resolved.

Section 3.8.  Past Due Payments.  Any amount not paid by Grantor to NPI Owner with respect to the NPI when due shall bear, and Grantor hereby agrees to pay, interest at a rate equal to the Fixed Rate, from the due date until such amount has been paid.

Debtors' Exhibit No. 34
Page 714 of 910

**ARTICLE IV**
**PAYMENTS; MARKETING; AUDIT AND INSPECTION RIGHTS**

Section 4.1.    <u>NPI Payments</u>.    Grantor shall pay to NPI Owner the NPI Payment attributable to each Production Period in immediately available U.S. funds on or before the Application Date for such Production Period. NPI Owner and Grantor agree that all NPI Payments or other payments required to be made to NPI Owner hereunder shall be paid via wire transfer, or other agreed means, of immediately available funds to the Escrow Account and NPI Owner agrees that all funds in the Escrow Account will be used in accordance with the terms of the Omnibus Agreement and the Escrow Agreement without any further notice, consent or action to or from NPI Owner.

Section 4.2.    <u>Nature of Marketing Arrangements</u>.    Grantor shall have the obligation to prudently market, or cause to be prudently marketed, the Subject Hydrocarbons in arm's-length transactions with reputable purchasers who are not Affiliates. Grantor shall duly and prudently perform all obligations performable by it under any arrangements by which Subject Hydrocarbons are sold or otherwise marketed, and shall take all appropriate measures to enforce the performance under each such arrangement of the obligations of the other parties thereto.

Section 4.3.    <u>Audit and Inspection Rights</u>.  NPI Owner shall have the right from time to time to audit the books and records of Grantor with respect to the Subject Interests and the Subject Hydrocarbons, including all information with respect to the matters to be reported on by Grantor as provided herein, and Grantor shall, within thirty (30) days after being invoiced therefor, pay (or reimburse NPI Owner for) the costs and expenses of one (but no more than one) such audit during each calendar year. Such audits shall be conducted by NPI Owner so as to result in a minimum disruption in the ongoing business and affairs of Grantor and shall be conducted during normal business hours at Grantor's offices or at the offices where Grantor maintains the records relating to the items set forth above. If, as a result of any such audit, it is determined that any amount is due NPI Owner as a result of the failure of Grantor to properly pay the full amount of any NPI Payment that is required to be made hereunder, Grantor shall pay NPI Owner the value (as reasonably determined by NPI Owner) of the proceeds which Grantor failed to remit, together with interest at the Fixed Rate from the date that such amount should have been delivered or paid in accordance with the terms of this Conveyance to the date of payment. If, as a result of any such audit, it is determined that any amount is due Grantor as a result of overpayment by Grantor, such overpayment shall be resolved in accordance with <u>Section 3.7</u>.

**ARTICLE V**
**OPERATIONAL MATTERS**

Section 5.1.    <u>Operations</u>.    Grantor shall conduct and carry on, or cause to be conducted and carried on, the maintenance and operation of the Subject Interests as a Reasonably Prudent Operator operating in the Outer Continental Shelf of the Gulf of Mexico without regard to the burden of the NPI. Without limitation of the foregoing, Grantor, without regard to the burden of the NPI, (a) shall maintain and operate the Subject Interests in accordance with all applicable Laws in all material respects, including Environmental Laws and (b) pay promptly as and when due and payable by Grantor (i) all royalties and other lease burdens with respect to the Subject Interests or Subject Hydrocarbons (or necessary to maintain the Subject Interests in full force and effect), (ii)

Debtors' Exhibit No. 34
Page 715 of 910

all Taxes which may be imposed on the Subject Interests or the Subject Hydrocarbons, and (iii) all costs and expenses of maintenance and operation of the Subject Interests.  Decisions with regard to the conduct of operations, including, with respect to the election to shut-in, abandon or make a non-consent election on any well located or proposed to be located on the Subject Interests, will be made by Grantor without regard to the burden of the NPI.  As to any portions of the Subject Interests, if any, as to which Grantor is not the operator, Grantor shall take all such action and exercise all such rights and remedies as are legally and reasonably available to it to cause the operator to so develop, maintain and operate such portions of the Subject Interests (*provided* that Grantor shall never be obligated to pay any costs or expenses attributable to any interest other than the Subject Interests and all royalties related thereto) but shall not be deemed to be in violation of any of its covenants and agreements hereunder in the event that such operator fails to do so. It is expressly understood that the powers given to Grantor in this Section 5.1 shall include the power of Grantor to elect to participate, or not participate, in drilling, reworking, plugging back, deepening, sidetracking or completing of a well, or in other operations (including, but not limited to, operations in connection with secondary and/or tertiary recovery) proposed to be conducted on the Subject Interests.

Section 5.2.    Title.  Grantor hereby binds itself to WARRANT and FOREVER DEFEND all and singular title to the NPI unto NPI Owner, its successors and permitted assigns, against every Person lawfully claiming or to claim the same or any part thereof by, through or under Grantor, but not otherwise.

Section 5.3.    Leases, Deeds and Contracts:  Performance of Obligations.  Grantor agrees to use commercially reasonable efforts to maintain the oil, gas or mineral leases, contracts, servitudes, fees, deeds, and other agreements forming a part of the Subject Interests producing as of the Closing Date, to the extent the same cover or otherwise relate to the Subject Interests, in full force and effect to the extent a Reasonably Prudent Operator, without giving effect to the burden of the NPI or this Conveyance, would do so.

Section 5.4.    Abandonment.  Subject to Section 5.3, Grantor shall have the right without the joinder of NPI Owner to release, surrender and/or abandon its interest in the Subject Interests, or any part thereof, or interest therein even though the effect of such release, surrender or abandonment will be to release, surrender or abandon the NPI the same as though NPI Owner had joined therein insofar as the NPI covers the Subject Interests, or any part thereof or interest therein, so released, surrendered or abandoned by Grantor.  Grantor shall have an unequivocal right to abandon the Subject Interests, or any part thereof, if such abandonment is necessary for health, safety or environmental reasons or if the Subject Hydrocarbons cannot be produced in a manner sufficient to cover operating expenses.

Section 5.5.    Compliance with Laws.  Grantor will not cause or permit the Subject Lands or Grantor to be in violation of any Environmental Laws or other Laws with respect to the Subject Lands.

Section 5.6.    Non-consent Operations.  If Grantor elects to be a non-participating party with respect to any drilling, deepening, plugging back, reworking, sidetracking or completion (or other) operation on any Subject Interest or elects to be an abandoning party with respect to a Subject Well, the consequence of which election is that Grantor's interest in such Subject Interest

-14-

or part thereof is temporarily (i.e., during a recoupment period) or permanently forfeited to the parties participating in such operations, or electing not to abandon such well, then the costs and proceeds attributable to such forfeited interest shall not, for the period of such forfeiture (which may be a continuous and permanent period), be debited or credited to the Net Profits Account and such forfeited interest shall not, for the period of such forfeiture, be subject to the NPI.

## ARTICLE VI
## ASSIGNMENTS AND TRANSFERS

Section 6.1.   Assignment and Transfer by NPI Owner.  NPI Owner may not sell, convey, assign, mortgage or otherwise dispose of the NPI (including its rights, titles, interests, estates, remedies, powers and privileges appurtenant or incident to the NPI under this Conveyance), in whole or in part without the prior written consent of Grantor, which may be withheld at Grantor's discretion.  No permitted change of ownership of the NPI shall be binding upon Grantor, however, until Grantor is furnished with copies of the documents evidencing such change.  Each Person comprising NPI Owner may exercise the rights of NPI Owner attributable to its percentage share. Upon receipt by Grantor of copies of the documents evidencing a permitted sale, conveyance, assignment, mortgage or other disposition of the NPI, Grantor shall thereafter deal with the transferee NPI Owner with respect to the NPI transferred to such transferee NPI Owner in place of the transferring NPI Owner and references herein to the NPI Owner with respect to the NPI transferred to such transferee NPI Owner shall thereafter be deemed to be references to such transferee NPI Owner, provided that the transferring NPI Owner shall continue to have, and benefit from, all rights to indemnification and reimbursement that are provided herein with regard to the period of its ownership of the NPI transferred to such transferee NPI Owner.

Section 6.2.   Assignment and Transfer by Grantor.   Except as contemplated in the Omnibus Agreement or the Turnkey Removal Agreement, any sale, conveyance or assignment of the Subject Interests, or any part thereof or interest therein, by Grantor shall be void.  Any sale, conveyance or assignment of the Subject Interests, or any part thereof or interest therein, permitted hereunder shall be subject to this Conveyance, and in the instrument effecting such sale, conveyance or assignment, the transferee or recipient must expressly recognize and assume all obligations, covenants and agreements of Grantor hereunder.

Section 6.3.   Covenants Running with the Subject Interests.   All covenants and agreements of Grantor herein contained shall be deemed to be covenants running with the Subject Interests.  All of the provisions hereof shall inure to the benefit of NPI Owner and its successors and assigns.

## ARTICLE VII
## MISCELLANEOUS PROVISIONS

Section 7.1.   Further Assurances.  Grantor agrees to execute and deliver to NPI Owner, and, to the extent it is within Grantor's power to do so, to cause any third parties to execute and deliver to NPI Owner, all such other and additional instruments and to do all such further acts and things as may be necessary or appropriate to more fully vest in and assure to NPI Owner all of the rights, titles, interests, remedies, powers and privileges herein granted or intended so to be including executing, delivering and recording further conveyances to effect the provisions of

-15-

Section 2.4.  NPI Owner agrees to execute and deliver to Grantor all such other and additional instruments and to all such further acts and things as may be necessary or appropriate to more fully implement the transactions contemplated by this Conveyance.

Section 7.2.  <u>No Waiver</u>.  The failure of any Party to insist upon strict performance of a covenant hereunder or of any obligation hereunder, irrespective of the length of time for which such failure continues, shall not be a waiver of such Party's right to demand strict compliance in the future.  No consent or waiver, express or implied, to or of any breach or default in the performance of any obligation hereunder shall constitute a consent or waiver to or of any other breach or default in the performance of the same or any other obligation hereunder.  No provision of this Conveyance shall be deemed a waiver by NPI Owner of any rights granted to NPI Owner under applicable Law governing overriding royalty interests and the rights of the owners thereof.

Section 7.3.  <u>Authority of Parties/Signatories</u>.  Each Person signing this Conveyance represents and warrants that he or she is duly authorized and has legal capacity to execute and deliver this Conveyance. Each Party represents and warrants to the other that the execution and delivery of this Conveyance and the performance of such Party's duties have been duly authorized and that this Conveyance is a valid and legal agreement binding on such Party and enforceable in accordance with its terms.

Section 7.4.  <u>Public Announcements</u>.  No Party shall issue any public announcement or statement concerning this Agreement or make any use of the names, image, logos, or trademarks of any other Party or any of its Affiliates without obtaining the prior written consent of the other Parties.

Section 7.5.  <u>Time is of the Essence</u>. Each Party shall perform the obligations under this Agreement in a timely manner as set out in this Agreement.  Each Party shall meet these timing requirements at its own cost. Each Party may recover against each other Party an amount equal to such Party damages arising from such other Party's failure to perform in time.

Section 7.6.  <u>Applicable Law; Dispute Resolution</u>.

(a)  <u>Governing Law</u>. This Agreement is governed by and interpreted in accordance with the laws of the State of Texas, without regard to its choice of law rules, except that the substantive and procedural rules of the Federal Arbitration Act, 9 U.S.C. §§ 1-16 (the "<u>Act</u>") govern <u>Section 7.6(e)</u>.

(b)  <u>Resolution of Disputes</u>. The Parties shall exclusively and finally resolve any dispute between them using direct negotiations, mediation, and then arbitration as set out in this <u>Section 7.6</u>.

(c)  <u>Direct Negotiations</u>. If a dispute arises, a Party seeking to initiate the dispute resolution process shall give Notice to the other Party (or Parties) to the dispute setting out, in writing and in detail, the issues in dispute and the value of the disputed amount (the "<u>Claim</u>"). The Parties to the dispute shall attempt to resolve the dispute through direct negotiations in a meeting between the Parties to the dispute, attended by individuals with decision-making authority, which must take place within thirty (30) days, or as otherwise agreed to by such Parties, from the date the Notice was sent.

Debtors' Exhibit No. 34
Page 718 of 910

(d)     <u>Mediation</u>. If the dispute cannot be resolved by direct negotiations within thirty (30) days of initiation of the resolution process, a Party to the dispute may initiate mediation by giving Notice to the other Party (or Parties) to the dispute. Mediation must be attended by a representative from each such Party with decision-making authority, and the proceeding must take place in Houston, Texas.

(e)     <u>Arbitration Proceedings</u>. If the Parties to a dispute fail to resolve the dispute within sixty (60) days from Notice of mediation, any Party (or Parties) the dispute may initiate binding arbitration by giving Notice to the other Party (or Parties) to the dispute. The arbitration must be conducted in accordance with the International Institute for Conflict Prevention and Resolution ("CPR") Rules. To the extent of any conflicts between the Act or the CPR Rules and the provisions of this Agreement, the provisions of this Agreement prevail. The CPR is the appointing authority. The place of arbitration must be Houston, Texas.

The following provisions will apply to arbitration proceedings, in each case with respect to the Parties to a particular dispute:

1.  One arbitrator (or three (3) arbitrators if the monetary value of the dispute is more than US $5,000,000 or its currency equivalent) will conduct the arbitral proceedings in English. If there is a dispute whether the monetary value exceeds the US $5,000,000, then the number of arbitrators must be three (3).

2.  The maximum number of witnesses each Party may call to give evidence on its behalf, including by oral testimony, declaration or witness statement, is five (5) witnesses of fact and three (3) expert witnesses.

3.  The existence of a dispute and any negotiations, mediation, and arbitration proceedings between the Parties in relation to any dispute are confidential and the Parties shall not make any disclosure to any third party. Any information, documents, or materials, created or produced for the purposes of, or used in, negotiations, mediation, or arbitration of a dispute are confidential and the Parties shall not disclose them to any third party unless there is a legal or regulatory obligation to make a disclosure (but the disclosure must be limited to the extent necessary to comply with that legal or regulatory obligation), or to the extent required to enforce or challenge an award in bona fide legal proceedings before a state court or other judicial authority.

4.  The arbitrator(s) has no authority to appoint or retain expert witnesses for any purpose unless agreed to by the Parties. The arbitrator(s) may not act as *amiable compositeur or ex aequo et bono*.

5.  The Parties intend that regardless of which Party prevails, all arbitration fees and costs must be split equally, between the Parties, and each Party shall bear its own costs of legal representation, witness expenses, and ancillary costs.

6.  The award is final and binding, and except for proceedings under <u>Section 7.6(e)(7)</u>, the Parties agree to waive their rights to: (1) apply to the court for determination of a point of law; and (2) any form of appeal, review or recourse in respect of any such award to any court or other judicial authority, to the extent that such waiver may be validly made.

Debtors' Exhibit No. 34
Page 719 of 910

7. The Parties may apply to a court with appropriate jurisdiction for any of the following without waiving its arbitration rights:

   (1) Interim measures as necessary until appointment of the arbitrator(s) or pending determination by the arbitrator(s).

   (2) Preserving property pending determination by the arbitrator(s).

   (3) Enforcing judgment entered on an award over the Person or assets of the non-prevailing Party.

   (4) Enforcing Section 7.6(e)(3) and preventing any information, documents or materials used in those proceedings from being used or disclosed by that Party for any purpose other than enforcement of Section 7.6(e)(3).

8. Proceedings to (1) preserve property pending determination by the arbitrator(s), (2) enforce Section 7.6(e)(3), (3) enforce judgment entered on an award may be brought in any court having jurisdiction over the Person or assets of the non-prevailing Party. The prevailing Party may seek, in any court having jurisdiction, judicial recognition of the award, or order of enforcement or any other order or decree that is necessary to give full effect to the award.

   Section 7.7.   Severability.   Every provision in this Conveyance is intended to be severable.  If any term or provision hereof is determined to be invalid, illegal or unenforceable for any reason whatsoever, such invalidity, illegality or unenforceability shall not affect the validity, legality and enforceability of the remainder of this Conveyance.  The Parties further agree that if any provision contained herein is, to any extent, held invalid or unenforceable in any respect under the Laws governing this Conveyance, they shall take any actions necessary to render the remaining provisions of this Conveyance valid and enforceable to the fullest extent permitted by Law and, to the extent necessary, this Conveyance shall be deemed to be automatically amended to replace any provision contained herein that is held invalid or unenforceable with a valid and enforceable provision giving effect to the intent of the Parties to the greatest extent legally permissible.

   Section 7.8.   Notices.   Any   notice, request, instruction, correspondence or other document to be given hereunder by any Party to another (herein collectively called "Notice") shall be in writing and delivered (i) in person, (ii) by courier service or by overnight delivery service in each case that requires acknowledgement of receipt, (iii) mailed by certified mail, postage prepaid and return receipt requested, or (iv) delivered by electronic mail and expressly acknowledged as received by return electronic mail, as follows:

   **Grantor**

   Fieldwood Energy IV LLC
   2000 W. Sam Houston Parkway S., Suite 1200
   Houston, Texas 77042
   Attention: Sole Manager
   Phone: [●]
   Email: [●]

   **NPI Owner**

-18-

[To Come]

Notice given by personal delivery or courier shall be effective upon actual receipt. Notice given by mail shall be effective upon actual receipt or, if not actually received, the fifth Business Day following deposit with the U.S. Post Office. Notice given by electronic mail shall be effective upon acknowledgement of receipt.  If a date specified herein for giving any Notice or taking any action is not a Business Day (or if the period during which any Notice is required to be given or any action taken expires on a date which is not a Business Day), then the date for giving such Notice or taking such action (and the expiration date of such period during which Notice is required to be given or action taken) shall be the next day which is a Business Day. Any Party may change any address, electronic or otherwise, to which Notice is to be given to it by giving Notice as provided above of such change of address.

Section 7.9.    Indemnity.

(a)    As used herein, "NPI Owner Indemnitees" means NPI Owner and NPI Owner's successor and permitted assigns, all of their respective Affiliates, and all of the officers, directors, agents, beneficiaries, trustees, attorneys and employees of themselves and their Affiliates.

(b)    Grantor will, promptly upon demand, indemnify and hold NPI Owner harmless from and against all claims, demands, damages, liabilities, liens, losses, fines, penalties, charges, administrative and judicial proceedings, orders, judgments, remedial action requirements, investigations, and enforcement actions of any kind, together with all interest thereon and all costs and expenses related thereto (including reasonable fees and disbursements of counsel and other advisors) and all other obligations whatsoever (collectively, "Losses") arising, in whole or in part, directly or indirectly, from or in connection with any Losses suffered by NPI Owner as a result of any claim that NPI Owner must deliver or pay over to any Person any part of the payments attributable to the Subject Hydrocarbons at any time received by NPI Owner for any reason other than the sale or assignment of interests in such payments (or the NPI under which such payments are received) by NPI Owner.

(c)    **THE FOREGOING INDEMNITY WILL APPLY WHETHER OR NOT ARISING OUT OF THE SOLE, JOINT OR CONCURRENT NEGLIGENCE, FAULT OR STRICT LIABILITY OF ANY NPI OWNER INDEMNITEE, ANY PERSON THAT IS PART OF GRANTOR, OR ANY OTHER PERSON, AND WILL APPLY, WITHOUT LIMITATION, TO ANY LIABILITY IMPOSED UPON ANY NPI OWNER INDEMNITEE, ANY PERSON THAT IS PART OF GRANTOR, OR ANY OTHER PERSON AS A RESULT OF ANY THEORY OF STRICT LIABILITY OR ANY OTHER DOCTRINE OF LAW**, *provided* that the foregoing indemnity will not apply to any Losses incurred by any NPI Owner Indemnitee to the extent arising from or proximately caused by the gross negligence or willful misconduct of such NPI Owner Indemnitee.  The rights of the NPI Owner Indemnitees under this Section 7.9 will survive any termination of this Conveyance and will be in addition to, and not in replacement or limitation of, all other indemnities, reimbursement rights, and other similar rights and assurances at any time made by Grantor for the benefit of any NPI Owner Indemnitee.

Debtors' Exhibit No. 34
Page 721 of 910

Section 7.10.  <u>No Partition</u>.  Grantor and NPI Owner acknowledge that neither has any right or interest that would permit it to partition any portion of the Subject Interests as against the other, and each waives any such right.

Section 7.11.  <u>Disclaimer</u>.  EXCEPT AS SET FORTH IN <u>SECTION 5.2</u>, GRANTOR MAKES THIS CONVEYANCE AND ASSIGNS THE NPI WITHOUT RECOURSE, COVENANT OR WARRANTY OF TITLE OF ANY KIND, EXPRESS, IMPLIED OR STATUTORY.  ANY COVENANTS OR WARRANTIES IMPLIED BY STATUTE OR LAW BY THE USE HEREIN OF THE WORDS "GRANT", "CONVEY" OR OTHER SIMILAR WORDS ARE HEREBY EXPRESSLY DISCLAIMED, WAIVED AND NEGATED. WITHOUT LIMITING THE GENERALITY OF THE TWO PRECEDING SENTENCES, NPI OWNER ACKNOWLEDGES THAT GRANTOR HAS NOT MADE, AND GRANTOR HEREBY EXPRESSLY DISCLAIMS AND NEGATES, AND NPI OWNER HEREBY EXPRESSLY WAIVES, ANY REPRESENTATION OR WARRANTY, EXPRESS, IMPLIED, AT COMMON LAW, BY STATUTE OR OTHERWISE RELATING TO (i) PRODUCTION RATES, RECOMPLETION OPPORTUNITIES, DECLINE RATES OR THE QUALITY, QUANTITY OR VOLUME OF THE RESERVES OF HYDROCARBONS, IF ANY, ATTRIBUTABLE TO THE SUBJECT INTERESTS, (ii) ANY IMPLIED OR EXPRESS WARRANTY OF MERCHANTABILITY, (iii) ANY IMPLIED OR EXPRESS WARRANTY OF FITNESS FOR A PARTICULAR PURPOSE, (iv) ANY IMPLIED OR EXPRESS WARRANTY OF CONFORMITY TO MODELS OR SAMPLES OF MATERIALS, (v) REDHIBITORY DEFECTS, AND (vi) ANY AND ALL IMPLIED WARRANTIES EXISTING UNDER ANY APPLICABLE LEGAL REQUIREMENT; IT BEING THE EXPRESS INTENTION OF BOTH THE GRANTOR AND THE NPI OWNER THAT THE NPI IS HEREBY ASSIGNED TO NPI OWNER ON AN "AS IS" AND "WHERE IS" BASIS WITH ALL FAULTS, AND THAT NPI OWNER HAS MADE OR CAUSED TO BE MADE SUCH INSPECTIONS AS NPI OWNER DEEMS APPROPRIATE.  GRANTOR AND NPI OWNER AGREE THAT, TO THE EXTENT REQUIRED BY APPLICABLE LAW TO BE EFFECTIVE, THE DISCLAIMERS OF CERTAIN WARRANTIES CONTAINED IN THIS <u>SECTION 7.11</u> ARE "CONSPICUOUS" DISCLAIMERS FOR THE PURPOSES OF ANY APPLICABLE LAW.

Section 7.12.  <u>Amendments</u>.  This Conveyance may not be modified or amended except by an instrument or instruments in writing signed by Grantor and NPI Owner.  Provisions of this Conveyance that require consent, approval or agreement of the Parties or of one Party shall require such consent, approval or agreement to be in writing.

Section 7.13.  <u>Counterparts</u>.  This Conveyance is being executed in several counterparts, all of which are identical, except that, to facilitate recordation, in certain counterparts hereof only that portion of <u>Exhibit A</u> which contains specific descriptions of the Subject Interests located in the recording jurisdiction in which the counterpart is to be recorded shall be included, and all other portions of <u>Exhibit A</u> shall be included by reference only.  All of such counterparts together shall constitute one and the same instrument.  Complete copies, of this Conveyance, containing the entire <u>Exhibit A</u>, have been retained by Grantor and NPI Owner.

Section 7.14.  <u>Third Party Beneficiary</u>.  The Parties acknowledge that CUSA is a third party beneficiary to this Conveyance and can enforce the rights of NPI Owner hereunder.

Debtors' Exhibit No. 34
Page 722 of 910

*[Remainder of page intentionally left blank]*

Debtors' Exhibit No. 34
Page 723 of 910

IN WITNESS WHEREOF, Grantor and NPI Owner have each executed this Conveyance on the dates set forth in their respective acknowledgments below and Grantor has delivered this Conveyance to NPI Owner as the transfer and conveyance to NPI Owner of a presently vested interest in real and/or immovable property, to be effective as of the Effective Time.

**[Other Relevant State Acknowledgments To Come.**]

**GRANTOR:**                                          **FIELDWOOD ENERGY IV, LLC**


By:_____
  Name:
  Title:


## TEXAS ACKNOWLEDGEMENT

**STATE OF _____**                    §
                                                 §
**COUNTY OF _____**                     §


The foregoing instrument was acknowledged before me this _____ day of _____, 2021 by _____, as _____ of [_____], a [_____], as the act and deed of such [_____].


_____

Name:_____

Notary Public in and for the State of
_____

*[Signature Page and Texas Acknowledgment to Conveyance]*

**NPI OWNER:**                                    [_____]

                                      By:_____
                                      Name:
                                      Title:

**TEXAS ACKNOWLEDGEMENT**

**STATE OF** _____                §

                                                §

**COUNTY OF** _____                §


     The foregoing instrument was acknowledged before me this _____ day of _____, 2021   by   _____,   as   _____   of   [_____],   a [_____], as the act and deed of such [_____].


                        _____

                        Name:_____

                        Notary Public in and for the State of _____

*[Signature Page and Texas Acknowledgment to Conveyance]*

**Exhibit A**

**Leases**

| Field | Block | Lease | Type | Rights | Date Le Eff | Date Le Exp | Le Cur Acres (Ac) | Operator | WI | Lease Status |
|-------|-------|-------|------|--------|-------------|-------------|-------------------|----------|-----|--------------|
| BRAZOS A-102/A-105 | BA A-105 | G01757 | Federal | RT A | 7/1/1968 | N/A | 1,440 | Fieldwood En | 56.3% | PROD |
| BRAZOS A-102/A-105 | BA A-105 | G01757 | Federal | RT B | 7/1/1968 | N/A | 4,320 | Fieldwood En | 100.0% | PROD |
| BRAZOS A-133 | BA A-133 | G02665 | Federal | RT | 7/1/1974 | N/A | 5,760 | GOM Shelf | 25.0% | PROD |
| EAST BREAKS 158/159/160/161 | EB 158 | G02645 | Federal | RT | 7/1/1974 | N/A | 5,760 | Fieldwood SD Off | 66.7% | PROD |
| EAST BREAKS 158/159/160/161 | EB 159 | G02646 | Federal | RT | 7/1/1974 | N/A | 5,760 | Fieldwood SD Off | 66.7% | PROD |
| HIGH IS. A-550 | HI A-550 | G04081 | Federal | RT | 10/1/1979 | N/A | 5,760 | Fieldwood En Off | 100.0% | PROD |
| HIGH IS. A-550 | HI A-550 | G04081 | Federal | OP 1 | 10/1/1979 | N/A | 720 | Fieldwood En Off | 100.0% | PROD |
| HIGH IS. A-550 | HI A-550 | G04081 | Federal | OP 2 | 10/1/1979 | N/A | 5,040 | Fieldwood En Off | 100.0% | PROD |
| SHIP SHOAL 169/182/193/194 | SS 169 | 00820 | Federal | RT | 4/1/1960 | N/A | 5,000 | Fieldwood En | 33.3% | PROD |
| VIOSCA KNOLL 251/340/384 | VK 251 | G10930 | Federal | OP 1 | 7/1/1989 | N/A | 5,760 | Fieldwood En Off | 100.0% | UNIT |
| VIOSCA KNOLL 251/340/384 | VK 251 | G10930 | Federal | RT | 7/1/1989 | N/A | 5,760 | Fieldwood En Off | 100.0% | UNIT |
| VIOSCA KNOLL 251/340/384 | VK 251 | G10930 | Federal | OP 2 | 7/1/1989 | N/A | 5,760 | Fieldwood En Off | 55.0% | UNIT |
| VIOSCA KNOLL 251/340/384 | VK 340 | G10933 | Federal | OP 1 | 7/1/1989 | N/A | 5,760 | Fieldwood En Off | 100.0% | UNIT |
| VIOSCA KNOLL 251/340/384 | VK 340 | G10933 | Federal | RT | 7/1/1989 | N/A | 5,760 | Fieldwood En Off | 100.0% | UNIT |

[Exhibit A]

| Field | Block | Lease | Type | Rights | Date Le Eff | Date Le Exp | Le Cur Acres (Ac) | Operator | WI | Lease Status |
|-------|-------|-------|------|--------|-------------|-------------|-------------------|----------|-----|--------------|
| VIOSCA KNOLL 251/340/384 | VK 340 | G10933 | Federal | OP 2 | 7/1/1989 | N/A | 5,760 | Fieldwood En Off | 55.0% | UNIT |
| EAST BREAKS 158/159/160/161 | EB 160 | G02647 | Federal | RT | 7/1/1974 | N/A | 5,760 | Fieldwood SD Off | 100.0% | PROD |
| EAST BREAKS 158/159/160/161 | EB 161 | G02648 | Federal | RT | 7/1/1974 | N/A | 5,760 | Fieldwood SD Off | 100.0% | PROD |
| VERMILION 315/332 | VR 332 | G09514 | Federal | OP 1 | 7/1/1988 | N/A | 5,000 | Fieldwood En | 66.5% | PROD |
| VERMILION 315/332 | VR 332 | G09514 | Federal | RT | 7/1/1988 | N/A | 5,000 | Fieldwood En | 100.0% | PROD |

[Exhibit A]

**Exhibit N2**

**Eni Definitive Documents**

*EXECUTION VERSION*

### Eni Term Sheet Implementation Agreement

This ENI TERM SHEET IMPLEMENTATION AGREEMENT (the "**Agreement**") is made and entered into as of June [___], 2021, by and among (a) Fieldwood Energy LLC, a Delaware limited liability company ("**FWE**") and its affiliated debtors and debtors in possession in the chapter 11 cases pending before the Honorable Marvin Isgur jointly administered under Case No. 20-33948 (collectively, the "**Debtors**"), (b) Eni Petroleum US LLC, a Delaware limited liability company, and Eni US Operating Co. Inc., a Delaware corporation, (collectively, "**Eni**"), and, following execution of the Joinders (as defined below), (c) [____], a Delaware limited liability company ("**Credit Bid Purchaser**"), and (d) Fieldwood Energy III LLC ("**FWE III**") to implement the transactions contemplated by or related to the Eni Term Sheet (as defined in the recitals below).  Each of the Debtors, Eni and, following execution of a Joinder, Credit Bid Purchaser and FWE III, may be referred to as a "**Party**" and, collectively, the "**Parties**". Capitalized terms used but not defined herein shall have the meanings ascribed to them in the Plan (as defined below).

### RECITALS

WHEREAS, on May 12, 2021, the Debtors and Eni executed a letter agreement whereby each of Eni and FWE agreed (i) to work to implement the terms of the Eni Term Sheet and (ii) negotiate the definitive documents described therein in good faith and in accordance with the terms of the Eni Term Sheet (the "**Eni Definitive Documents**");

WHEREAS, commencing on August 3, 2020 (the "**Petition Date**"), the Debtors each filed with the United States Bankruptcy Court for the Southern District of Texas (the "**Bankruptcy Court**") a voluntary case under chapter 11 of title 11 of the United States Code (the "**Bankruptcy Code**");

WHEREAS, the Bankruptcy Court established November 25, 2020 at 5:00 p.m. (Central Time) as the deadline for creditors, other than governmental entities, to file proofs of claim against any of the Debtors (the "**Bar Date**");

WHEREAS, Eni and its affiliates have asserted claims against certain of the Debtors that are described in proofs of claim numbered 461, 462, 468, 497, 498, 500, 601, and 693 (collectively, the "**Eni Claims**");

WHEREAS, on April 15, 2021, the Debtors filed the solicitation versions of their *Disclosure Statement for Fourth Amended Joint Chapter 11 Plan of Fieldwood Energy LLC and its Affiliated Debtors* [D.I. 1285] (including any exhibits and schedules thereto and as may be further amended, supplemented, or modified, the "**Disclosure Statement**") and *Fourth Amended Joint Chapter 11 Plan of Fieldwood Energy LLC and its Affiliated Debtors* [D.I. 1284] (including any exhibits and schedules thereto and as may be further amended, supplemented or modified, the "**Plan**");[1]

WHEREAS, on April 15, 2021, the Bankruptcy Court entered an order [D.I. 1286] approving, among other things, the Debtors' Disclosure Statement and solicitation procedures with respect to the Plan;

WHEREAS, on May 12, 2021, the Debtors filed the *Notice of Filing of Executed Term Sheet By and Between the Debtors and Eni Petroleum US LLC* [D.I. 1368], which attached, as **Exhibit A** thereto, a term sheet by and between Eni and the Debtors reflecting an agreement-in-principle with respect to the treatment under the Plan of certain oil and gas leases and facilities (including but not limited to, for all purposes thereunder, any wells, pipelines, or other structures

---

[1] Capitalized terms used but not defined herein shall have the meanings ascribed to them in the Plan.

Debtors' Exhibit No. 34
Page 730 of 910

set forth therein) that were previously conveyed to the Debtors by Eni and certain of its affiliates (the "**Eni Term Sheet**");

WHEREAS, FWE will survive the Initial Plan of Merger contemplated by the Plan as FWE III; and

WHEREAS, the interests of the Debtors in the oil and gas leases set forth on **Exhibit C** (the "**Specified Interests**") and certain related rights-of-way and rights-of-use, as well as related facilities (including wells, pipelines and other structures) to the extent they were previously conveyed to the Debtors by Eni and certain of its affiliates (collectively, the "**Specified Assets**") shall be abandoned pursuant to the Plan.

NOW, THEREFORE, in consideration of the mutual covenants and agreements set forth in this Agreement, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties, intending to be legally bound, agree as follows:

1.     **Eni Definitive Documents**.   The documents below comprise the Eni Definitive Documents as contemplated in the Eni Term Sheet:

a.     *Turnkey Removal Agreement*.   Annexed hereto as **Exhibit B** (the "**Turnkey Removal Agreement**").

2.     **Execution of Eni Definitive Documents**; **Good Faith Cooperation.**

a.     Each Party agrees, and Eni expressly acknowledges, that the Debtors and Eni have satisfied the requirements under the Eni Term Sheet to negotiate mutually agreeable Eni Definitive Documents by the relevant deadlines set forth therein.  Each Party agrees to negotiate any exhibits, amendments, modifications or supplements to the Eni Definitive Documents in good faith and to exercise commercially reasonable efforts with respect to the negotiation, pursuit, approval, execution, delivery, implementation, and consummation of the Eni Definitive Documents.  The

Parties may, by mutual agreement, amend, modify, or supplement this Agreement and/or the forms of the Eni Definitive Documents attached hereto or negotiate to add additional documents to the list of Eni Definitive Documents, consistent with the terms and conditions herein, in the Turnkey Removal Agreement, and subject to the applicable consent rights under the Restructuring Support Agreement.  Subject to the immediately preceding sentence, FWE III and Eni shall execute and deliver the Eni Definitive Documents, and Credit Bid Purchaser and FWE III shall each execute and deliver a Joinder to this Agreement in the form attached as **Exhibit D** and **E** (the "**Joinders**"), in each case, on the Effective Date of the Plan (and, for the avoidance of doubt, after the consummation of the transactions contemplated by the Credit Bid Purchase Agreement and the Divisive Merger pursuant to the Initial Plan of Merger) (the "**Credit Bid Transaction Closing**").

b.      Each Party agrees to use commercially reasonable efforts to obtain and/or execute and deliver all instruments, forms, applications, certifications, reports, permits, and filings required by federal or state authorities (including, for example, any BOEM or BSEE designation of operator forms and designated applicant Oil Spill Financial Responsibility ("**OSFR**") form designations and any other instruments, forms, applications, certifications, plans, reports and filings required by BOEM, BSEE, EPA, the U.S. Coast Guard or other applicable federal or state authorities) that are necessary for FWE III to perform its obligations pursuant to the Eni Definitive Documents. On the Effective Date, the Debtors shall fund such premiums as are required to maintain the organizational or area-wide bonds applicable to FWE III.

**3.      Support of the Plan.**  Eni agrees not to file any objections to the Plan or to support any other party, directly or indirectly, in objecting to or opposing the Plan and agrees it will support confirmation of the Plan.

Debtors' Exhibit No. 34
Page 732 of 910

4.   **Plan and Confirmation Order**.   The Confirmation Order and any amendment to the Plan must be reasonably acceptable to Eni solely with respect to any provisions thereof that directly affect the rights and obligations of Eni in the Eni Definitive Documents as contemplated by the Eni Term Sheet; *provided* that, for the avoidance of doubt, the Plan and Confirmation Order shall be subject to the applicable consent rights set forth in the Restructuring Support Agreement.   To facilitate the implementation of the Eni Term Sheet and the Eni Definitive Documents pursuant to the Plan as contemplated in the Eni Term Sheet, the Parties agree that any order of the Bankruptcy Court confirming the Plan (the "**Confirmation Order**") shall provide for the following:

a.   On the Effective Date, FWE shall have withdrawn as operator of the Specified Assets immediately prior to their abandonment pursuant to the Plan.

b.   On the Effective Date, FWE III shall reimburse Eni for reasonable and documented legal fees and expenses incurred in connection with the Chapter 11 Cases in the amount of $1.5 million.   Additionally, on the Effective Date, FWE III shall pay $3 million in cash to Eni to be used in connection with Actual Decommissioning Costs (as defined in the Turnkey Removal Agreement) not covered by the proceeds of Performance Bond No. 2196705 by and between Fieldwood Energy Offshore LLC ("**FEO**") as Principal, North American Specialty Insurance Company ("**NAS**") as Surety, and Eni as Obligee (the "**NAS Bond**").

c.   On the Effective Date, FWE III shall provide for the payment of any and all documentary, filing, recording, stamp, and registration fees, costs, and expenses  incurred in connection with any required filing of record by or on behalf of FWE III of any instrument or instruments with the appropriate records office of any county, parish, state, federal, or other governmental unit (including BOEM) that may be required in connection with the FWE III Plan

of Merger as it relates to the Specified Assets or incurred in connection with the satisfaction of the Regulatory Condition (collectively, the "**Implementation Costs**").

d.      Immediately upon the occurrence of the Effective Date, FEO's interests in the Specified Assets shall be abandoned by FEO pursuant to section 554(a) of the Bankruptcy Code, the Plan, and the Confirmation Order.  For the avoidance of doubt, upon abandonment of the Specified Assets, no funds shall have been allocated to FEO to perform or satisfy any plugging, abandonment, or decommissioning obligations associated with the Specified Assets and FEO acknowledges it will be in default of such decommissioning obligations.  Any Debtor which previously owned or operated a Specified Asset shall appoint FWE III as its agent to perform the Agreed Activities (as defined in the Turnkey Removal Agreement) and the Initial Safe Out (as defined in the Turnkey Removal Agreement) work, and, subject to the commencement triggers set forth in the Turnkey Removal Agreement, FWE III shall be authorized and empowered by Eni to be its decommissioning agent in relation to the Specified Assets.

e.      On the Effective Date, except for the rights and remedies of Eni to enforce (i) the Plan, (ii) the Confirmation Order, and (iii) the obligations contemplated by the Eni Definitive Documents, Eni shall be deemed a Releasing Party (without submitting a ballot(s) to accept the Plan) against all Released Parties other than FEO and its Estate under the Plan for all purposes thereunder, and shall waive and release any and all pre-Effective Date claims of any kind against the Debtors, their Estates and any other Released Party, other than FEO and its Estate, including, without limitation, the Eni Claims and any claims for administrative expense under sections 503(b) or 507(a)(2) of the Bankruptcy Code; *provided, however,* that, upon the occurrence of (i) the Effective Date and (ii) effectiveness of the Eni Definitive Documents, notwithstanding this Section 4(e), Eni shall be deemed to have an Allowed Class 6B General Unsecured Claim in an amount

equal to the aggregate sum of the Eni Net Turnkey Amounts for the Decommissioning Projects (each as defined in the Turnkey Removal Agreement).  Except as otherwise provided for hereunder with respect to the Released Parties (under and as defined in the Plan other than Apache and FEO and its Estate), nothing herein shall affect or be deemed to restrict or limit Eni's claims for or rights to seek payments or contribution from current or prior working interest owners, predecessors, co-owners and/or operators, or from any other parties that are contractually, legally, regulatorily or equitably liable for decommissioning or related obligations, including obligations under surety bonds, letters of credit or other instruments relating thereto, with respect to the Specified Assets. For the avoidance of doubt, the Eni Definitive Documents shall be included within the definition of Additional Predecessor Agreement Documents provided in the Plan.

f.      On the Effective Date, except for the rights and remedies to enforce (i) the Plan, (ii) the Confirmation Order, and (iii) the obligations contemplated by this Agreement or the Eni Definitive Documents, the Debtors shall waive and release any and all pre-Effective Date claims of any kind against Eni (including, for the avoidance of doubt, each of Eni's affiliates and each of their and their affiliates' current and former directors, managers, officers, equity holders, predecessors, successors, and assigns, subsidiaries, and each of their current and former officers, members, managers, directors, equity holders, principals, members, employees, or other agents, in each case, in their capacities as such), in all circumstances only to the extent such claims accrued on or prior to the Effective Date.

g.      All rights of Eni with respect to bonds and letters of credit constituting security for the decommissioning of the assets associated with the Specified Assets shall be reserved as against such bonding companies and letter of credit issuers in all respects. The Debtors shall not terminate

Debtors' Exhibit No. 34
Page 735 of 910

any bonds issued on behalf of the Debtors relating to such Specified Assets under which any federal, state or local governmental entity is an obligee.

h.      The Bankruptcy Court (i) approves the Eni Definitive Documents and all transactions contemplated by this Agreement and all actions to be taken, undertakings to be made, and obligations to be incurred by the parties thereto; (ii) following the consummation of the Initial Plan of Merger, authorizes FWE III, without further notice to or action, order, or approval of this Bankruptcy Court and without the need for any further corporate or shareholder action, to enter into, deliver, and fully perform their obligations under the Eni Definitive Documents; and (iii) finds that the parties' entry into the Eni Definitive Documents and the implementation of the transactions contemplated therein shall not impair Eni's right and ability to draw on Performance Bond No. 2196705 by and between FEO as Principal, NAS as Surety, and Eni as Obligee, and shall not impair NAS's defenses to such draw.  Upon entry of the Confirmation Order, FWE III shall be authorized and empowered, without further approval of the Bankruptcy Court or any other party, to take such actions and perform such acts as may be necessary, convenient, desirable, or appropriate to execute and deliver the Eni Definitive Documents in accordance with the Plan and Confirmation Order and to execute and deliver all documents relating thereto and to perform all of their obligations thereunder.  On the Effective Date, the Eni Definitive Documents shall constitute legal, valid, binding, and authorized obligations of FWE III enforceable in accordance with their terms, and such obligations of FWE III shall not be enjoined or subject to discharge, impairment, release, avoidance, recharacterization, or subordination by FWE III, the Post-Effective Date Debtors, or the Plan Administrator, under applicable law, the Plan, or the Confirmation Order.

Debtors' Exhibit No. 34
Page 736 of 910

5.     **Right of First Offer; ORRI; Notice of Sale**.

a.      To the extent that, in connection with the resolution of any other predecessor-in-interest's decommissioning claims against the Debtors, any such predecessor-in-interest is granted (or Credit Bid Purchaser agrees to grant to such predecessor-in-interest) a right of first offer, right of first refusal, or similar preferential purchase right in connection with any assets to be transferred to Credit Bid Purchaser pursuant to the Plan (such assets, collectively, the "**Credit Bid Purchaser Assets**"), Credit Bid Purchaser shall grant Eni rights that are substantially similar with respect to the Credit Bid Purchaser Assets.

b.      To the extent that, in connection with the resolution of any other predecessor-in-interest's decommissioning claims against the Debtors, any other predecessor-in-interest is granted (or Credit Bid Purchaser agrees to grant to such predecessor-in-interest) an overriding royalty interest or similar future interest in Credit Bid Purchaser's production from any of the Credit Bid Purchaser Assets in connection with the decommissioning of any predecessor-in-interest's prior assets, Credit Bid Purchaser shall grant Eni a similar and proportionate overriding royalty interest burdening such Credit Bid Purchaser Assets in connection with Eni's turnkey removal payments.

c.      After the Effective Date of the Plan, in the event that Credit Bid Purchaser desires to sell, transfer or otherwise dispose of any portion of Credit Bid Purchaser Assets pursuant to the Plan through a sale process that has been publicly announced utilizing a third party agent, investment bank, or similar service approaching multiple potential purchasers, Credit Bid

Debtors' Exhibit No. 34
Page 737 of 910

Purchaser shall use commercially reasonable efforts to cause such agent or investment bank to provide Eni with written notice and an opportunity to participate in any related sales process.

6.    **FWE III Governance and Operations**.

a.    FWE III shall, from and after the Effective Date, prepare and furnish to Eni the following reports which, in each case, will be limited to relate solely to the Specified Assets and the Eni Definitive Documents:

(i) Annual Financial Statements.  As soon as available, and in any event within 105 days after the end of each fiscal year of FWE III, its unaudited consolidated balance sheet and related consolidated statements of operations, members' equity and cash flows as of the end of and for such year.

(ii) Quarterly Financial Statements.  As soon as available, and in any event within 60 days after the end of each quarterly accounting period in each fiscal year of FWE III (including the last fiscal quarter of such fiscal year), its unaudited consolidated balance sheet and related unaudited consolidated statements of operations, members' equity and cash flows as of the end of and for such fiscal quarter and the then elapsed portion of the current fiscal year.

(iii) Monthly Operating Data.  As soon as available, but in no event later than 45 days after the end of each calendar month, a statement showing monthly operating data for  FWE III, including operating expenses and revenue for each of FWE III, for such calendar month.

b.    FWE III will use reasonable efforts to seek to obtain reimbursement and/or contribution for decommissioning activity relating to the Specified Assets that is available under contract or applicable law, including any other record title and/or operating rights interest holders

Debtors' Exhibit No. 34
Page 738 of 910

and predecessors-in-interest other than Eni to the extent practicable and available surety bonding, including available surety bonding for which Eni is the beneficiary; *provided* that, for the avoidance of doubt, FWE III shall not be required to incur any out-of-pocket costs or obligations in connection with such efforts, unless such costs or obligations are reimbursed by Eni.

c.      FWE III shall obtain the written consent of Eni (not to be unreasonably withheld) prior to agreeing to a settlement agreement and/or initiating dispute resolution or other formal settlement negotiation proceedings(s) with respect to obtaining contributions from other record title and/or operating rights interest holders and predecessors-in-interest for decommissioning or funds from surety bonds for decommissioning, in each case, with respect to the Specified Assets.

7.      **Temporary Abandoned Wells and Excluded Wells**.

a.      Reference is made to that certain Purchase and Sale Agreement by and among Eni and Eni US Operating Co. Inc., as Seller, and FEO, a Purchaser, dated as of December 1, 2015 (the "**Comal PSA**"). Defined terms used in this <u>Section 7</u> that are not otherwise defined in this Agreement will have the meanings ascribed to such terms in the Comal PSA (and, for the avoidance of doubt, such definition will not be affected by the termination, or rejection in connection with the Chapter 11 Cases, of the Comal PSA). As used herein, the term "**Temporary Abandoned Well**" or "**Temporary Abandoned Wells**" means individually any of, or collectively those Wells listed on <u>**Exhibit G**</u> and the term "**Excluded Wells**" means all wells which are located on the Lands that are permanently Plugged, Abandoned, and Decommissioned as of the Closing Date, including without limitation, those listed on <u>**Exhibit F.**</u> As used herein, and as was defined in the Comal PSA, the term "**Well Intervention Work**" shall mean any work within the portion of the wellbore of any Temporary Abandoned Well or Excluded Well that FWE III deems necessary as a reasonably prudent operator to correct, remediate or redo any Plugging,

Debtors' Exhibit No. 34
Page 739 of 910

Abandonment and Decommissioning work that was performed by any member of Seller Group (when used in this Section 7, as such term is defined in the Comal PSA) or Seller's (when used in this Section 7, as such term is defined in the Comal PSA) predecessors or their respective contractors prior to the Effective Date, including which, if there is an existing plug in the wellbore of such well, requires FWE III to drill through such existing plug (or otherwise penetrate that point where such existing plug is located) in the wellbore of such Temporary Abandoned Well or Excluded Well (as determined to be required in the reasonable discretion of FWE III), and, in each case, is necessary to put any Temporary Abandoned Well or Excluded Well into compliance with applicable Laws, requirements of Governmental Authority, the Leases or the Contracts. Notwithstanding the foregoing, the following work with respect to any Temporary Abandoned Well shall not constitute Well Intervention Work: setting a surface plug if there is not currently a surface plug present in the wellbore of such well as of the Effective Date (as such term is defined in the Comal PSA), any measuring operations or circulation of fluids in the wellbore above and unrelated to any plugs or cement which were previously set by any member of Seller Group or Seller's predecessors or their respective contractors prior to the Effective Date (when used in this Section 7, as such term is defined in the Comal PSA), cutting and/or pulling the production casing in such well (except to the extent such casing is located below a plug set by Seller, Seller's predecessors or their respective contractors prior to the Effective Date), and/or cutting and/or pulling the conductor in the wellbore of any such well.

  b.  Without waiving any right of contribution, Eni agrees that it shall be solely responsible for the costs of Plugging, Abandoning and Decommissioning of all Excluded Wells. If FWE III becomes aware of information that indicates that the Plugging, Abandonment and Decommissioning with respect to any Excluded Well is no longer in compliance with applicable

Laws, requirements of Governmental Authority, the Leases or the Contracts, FWE III shall provide written notice to the other Parties and such Parties shall cooperate in determining how to address causing such Excluded Well to be in compliance, subject to the other provisions of this Section 7; provided, however, in the event that the Parties do not agree on how to address causing such Excluded Well to be in compliance then FWE III shall proceed with the Well Intervention Work as FWE III deems necessary at Eni's cost and expense to the extent provided in this Section 7. Upon such notice, FWE III hereby covenants and agrees to diligently perform or cause to be performed all Plugging, Abandonment and Decommissioning work with respect to any such Excluded Well as necessary to bring such Excluded Well into compliance with applicable Laws, requirements of Governmental Authority, the Leases or the Contracts. Eni shall be liable and responsible to pay for all Eligible Well Intervention Costs (as defined in Section 7(e) below) with respect to any such Excluded Well.

c.      Eni shall be liable and responsible to pay for all Eligible Well Intervention Costs with respect to any Temporary Abandoned Well which is required to properly Plug, Abandon and Decommission any such Temporary Abandoned Well. For the sake of clarity, subject to Section 7(f), Eni shall remain responsible for all obligations, liabilities and Damages relating to, arising out of or attributable to work performed with respect to the Temporary Abandoned Wells prior to the Effective Date (as defined in the Comal PSA) to the extent set forth in subpart (i)(f) in the definition of "Retained Obligations" in the Comal PSA.

d.      Notwithstanding anything in this Section 7 to the contrary, but and subject to Section 7(f), with respect to any Temporary Abandoned Well, FWE III shall determine whether any Well Intervention Work is necessary to properly Plug, Abandon and Decommission such Temporary Abandoned Well or Excluded Well as provided in this Section 7(d). Within thirty (30)

Debtors' Exhibit No. 34
Page 741 of 910

days of FWE III determining that Well Intervention Work is necessary to properly Plug, Abandon and Decommission any Temporary Abandoned Well or Excluded Well, FWE III shall deliver to Eni a notice that such Well Intervention Work is necessary, subject to any event of Force Majeure or imminent danger to life, property and/or the environment which requires the immediate commencement of such Well Intervention Work. The Parties shall cooperate in determining what Well Intervention Work is necessary to be conducted with respect to any Temporary Abandoned Well or Excluded Well, provided, however, in the event that the Parties do not agree on what Well Intervention Work is necessary to be conducted with respect to such Temporary Abandoned Well or Excluded Well then FWE III shall proceed with the Well Intervention Work as FWE III deems necessary at Eni's cost and expense to the extent provided in this Section 7.  At least thirty (30) days prior to commencement of any Well Intervention Work concerning any Temporary Abandoned Well or Excluded Well (subject to any event of Force Majeure or imminent danger to life, property and/or the environment and/or additional or revised Well Intervention Work, in each case as set forth in this Section 7(d)), FWE III shall be required to provide any applicable Well Intervention Work Orders with respect to either the applicable Temporary Abandoned Well or the applicable Excluded Well. Subject to Section 7(f), any Well Intervention Work with respect to a Temporary Abandoned Well or Excluded Well that is set forth on a Well Intervention Work Order that is delivered to Eni on or prior to the applicable thirtieth (30th) day prior to commencement of such Well Intervention Work shall be deemed to be "Eligible Well Intervention Work" for purposes of this Section 7; provided, however, subject to Section 7(f), Eligible Well Intervention Work may include (i) additional or revised Well Intervention Work that is determined by FWE III to be necessary or is required by applicable Laws, requirements of Governmental Authority, the Leases or the Contracts if circumstances reasonably change requiring such additional or revised

Debtors' Exhibit No. 34
Page 742 of 910

Well Intervention Work after the delivery of the Well Intervention Work Order (including if such situation arises while the Well Intervention Work is being conducted) and/or (ii) Well Intervention Work that FWE III reasonably deems necessary to be performed prior to such thirty (30) day notice due to any event of Force Majeure or imminent danger to life, property and/or the environment. Upon completion of the Well Intervention Work set forth in any Well Intervention Work Order, FWE III will provide to Eni a written statement setting forth (x) evidence that such work has been completed, (y) invoices and/or billing statements outlining in reasonable detail the Well Intervention Work actually done and the costs and expenses of such Well Intervention Work (including, in the event that such costs and expenses exceed the amount set forth on the applicable Well Intervention Work Order for such work, reasonably detailed information itemizing the amount and cause of any such excess costs and expenses) and (z) the bank account to which Eni is to make payment of the amount of Eligible Well Intervention Costs (as defined below) with respect to such work (each a "**Well Intervention Completion Notice**"). Within thirty (30) days of receipt of a Well Intervention Completion Notice, Eni shall pay (or cause to be paid) to FWE III the amount of the Eligible Well Intervention Costs set forth on such Well Intervention Completion Notice by a wire transfer of immediately available funds to the account set forth in the Well Intervention Completion Notice.

e.      For purposes of this Section 7, the term "**Eligible Well Intervention Costs**" shall mean, with respect to Temporary Abandoned Wells, any costs and expenses for Eligible Well Intervention Work and, with respect to Excluded Wells, any costs and expenses for Well Intervention Work incurred by FWE III pursuant to Section 7(b), such costs and expenses shall include costs to obtain, mobilize, transport, house and store, equipment, supplies and personnel to perform such Well Intervention Work. Notwithstanding anything in this Section 7 to the contrary,

15

Eni shall not be obligated to pay for the costs and expenses of Well Intervention Work on any Temporary Abandoned Well which is not Eligible Well Intervention Work, provided, however, Eni's obligation to pay Eligible Well Intervention Costs under this <u>Section 7</u> shall not be limited to the amounts set forth on any Well Intervention Work Order but shall also include any excess costs and expenses for any Eligible Well Intervention Work that are identified on the applicable Well Intervention Completion Notice and which are reasonably and prudently incurred for any Eligible Well Intervention Work.  In the event of a conflict between this <u>Section 7</u> and the Turnkey Removal Agreement with respect to the costs associated with a Temporary Abandoned Well, this <u>Section 7</u> shall control. All amounts charged by FWE III under this <u>Section 7</u> shall include reasonable overhead charges by Credit Bid Purchaser in accordance with the COPAS attached to the Contract Operating Agreement (as defined in the Turnkey Removal Agreement), including if FWE III engages Credit Bid Purchaser to perform any Eligible Well Intervention Work.

  f.  Notwithstanding anything in this <u>Section 7</u> to the contrary, Eni's liability for, and obligation and responsibility to pay for, Eligible Well Intervention Costs with respect to any Temporary Abandoned Well pursuant to <u>Section 7(c)</u> shall terminate with respect to each Temporary Abandoned Well as follows:

  (i) With respect to any Temporary Abandoned Well which (i) any Debtor has re-entered since the Effective Date of the Comal PSA or (ii) FWE III re-enters after the Effective Date of the Turnkey Removal Agreement, in each case, in order to conduct development operations (including, without limitation, to conduct any sidetracking, completing or re-completing operation in such Temporary Abandoned Well) other than operations arising out of or related to permanently Plugging, Abandonment and Decommissioning such Temporary Abandoned Well (the "**Development**

16

**Operations**"). Eni's liability for and/or responsibility and obligation to pay Eligible Well Intervention Costs with respect to such Temporary Abandoned Well pursuant to Section 7(c) shall terminate upon the re-entry of such Temporary Abandoned Well for such Development Operations.

(ii) With respect to any Temporary Abandoned Well which FWE III re-enters in order to conduct operations to permanently Plug, Abandon and Decommission such Temporary Abandoned Well and in which FWE III also conducts Well Intervention Work, Eni's liability for and/or responsibility and obligation to pay Eligible Well Intervention Costs with respect to such Temporary Abandoned Well pursuant to Section 7(c) shall terminate upon the acceptance by BSEE of an End of Operations Report (Form BSEE-0125) for such Temporary Abandoned Well. For the sake of clarity, Eni shall retain the liability for and/or responsibility and obligation to pay Eligible Well Intervention Costs for any Temporary Abandoned Well pursuant to this Agreement in the event that FWE III permanently Plugs, Abandons and Decommissions such Temporary Abandoned Well but does not conduct any Well Intervention Work for such Temporary Abandoned Well.

8. **Termination of Agreement.**

a. This Agreement shall terminate in its entirety at 11:59 p.m. on September 30, 2021 (prevailing Central Time) (the "**Outside Termination Date**") if either (i) the ENI Definitive Documents have not been executed and delivered in accordance with Section 2(a) or (ii) the Regulatory Condition (as defined below) has not been satisfied on or prior to such date; *provided*, *however,* that the Outside Termination Date may be extended by mutual written agreement of the Parties (which writing may include e-mail).  Each of Sections 1 through 4 hereof will terminate

Debtors' Exhibit No. 34
Page 745 of 910

automatically upon the occurrence of the Effective Date.  Upon termination of this Agreement in its entirety, each Party shall be immediately released from its obligations, commitments, undertakings and agreements under or related to this Agreement and the Eni Term Sheet; *provided* that in no event shall any such termination relieve a Party from liability for its breach or non-performance of its obligations hereunder prior to the date of such termination.

b.    The "**Regulatory Condition**" means that FWE III has been granted, or otherwise holds, to the satisfaction of the Parties, all necessary recognitions or approvals by applicable regulatory authorities to act as a qualified operator in the Gulf of Mexico to the extent required to perform its obligations pursuant to the Definitive Documents.

9.    **363 Credit Bid Transaction**. In the event that the 363 Credit Bid Transaction is pursued, Eni agrees to support and take reasonable actions to facilitate the 363 Credit Bid Transaction, and cooperate in good faith with Debtors, the Required DIP Lenders, and the Requisite FLTL Lenders to facilitate the 363 Credit Bid Transaction, including, without limitation, by making amendments to the Eni Definitive Documents (in form and substance reasonably acceptable to Eni, the Debtors, the Required DIP Lenders, and the Requisite FLTL Lenders and to the extent that such amendments constitute reasonable actions to facilitate the 363 Credit Bid Transaction).

10.    **Effectiveness.**  This Agreement shall become effective and binding upon each of the parties hereto upon execution and delivery by such party of an executed signature page hereto on the Effective Date.

11.    **Counterparts**.  This Agreement may be executed in several counterparts, each of which shall be deemed to be an original, and all of which together shall be deemed to be

Debtors' Exhibit No. 34
Page 746 of 910

one and the same agreement.  Execution copies of this Agreement may be delivered by electronic mail, or otherwise, which shall be deemed to be an original for the purposes of this paragraph.

12.     **Governing Law; Jurisdiction; Waiver of Jury Trial.**  To the maximum extent permitted by applicable law, this Agreement is governed by and is to be construed in accordance with the internal laws of the State of Texas, without giving effect to any principles of conflicts of law thereunder that would result in the application of the laws of any other jurisdiction. Each Party irrevocably agrees that any legal action, suit, or proceeding arising out of or relating to this Agreement brought by any Party or its successors or assigns shall be brought and determined in the Bankruptcy Court and each Party hereby irrevocably submits to the exclusive jurisdiction of the Bankruptcy Court, and if the Bankruptcy Court does not have (or abstains from) jurisdiction, Courts of the State of Texas and of the United States District Court of the Southern District of Texas, and any appellate court from any thereof, for itself and with respect to its property, generally and unconditionally, with regard to any such proceeding arising out of or relating to this Agreement.  Each Party further agrees that notice as provided herein shall constitute sufficient service of process and the Parties further waive any argument that such service is insufficient. Each Party hereby irrevocably and unconditionally waives, and agrees not to assert, by way of motion or as a defense, counterclaim or otherwise, in any proceeding arising out of or relating to this Agreement, (a)  any claim that it is not personally subject to the jurisdiction of the Bankruptcy Court as described herein for any reason, (b) that it or its property is exempt or immune from jurisdiction of such court or from any legal process commenced in such court (whether through service of notice, attachment prior to judgment, attachment in aid of execution of judgment, execution of judgment, or otherwise) and (c) that (1) the proceeding in such court is brought in an inconvenient forum, (2) the venue of such proceeding is improper, or (3) this Agreement, or the

19

subject matter hereof, may not be enforced in or by such court.  EACH OF THE PARTIES HERETO HEREBY IRREVOCABLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY AND ALL RIGHT TO TRIAL BY JURY IN ANY ACTION OR PROCEEDING ARISING OUT OF OR RELATING TO THIS AGREEMENT.  EACH PARTY CERTIFIES THAT NO REPRESENTATIVE, AGENT OR ATTORNEY OF ANY OTHER PARTY HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PARTY WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER.

13.     **Notices.**  All notices hereunder shall be deemed given if delivered and received in writing, if contemporaneously sent by electronic mail, courier or by registered or certified mail (return receipt requested) to the following addresses:

(1)     If to FWE III, to:

Fieldwood Energy III LLC
2000 W. Sam Houston Parkway S., Suite 1200
Houston, Texas 77042
Attention:  Thomas R. Lamme

With a copy to:

Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, NY 10153
Attention:   Matt Barr, Esq. (matt.barr@weil.com)
               Alfredo Peréz, Esq. (alfredo.perez@weil.com)
               Jessica Liou, Esq. (jessica.liou@weil.com)

Debtors' Exhibit No. 34
Page 748 of 910

(2)    If to Eni, to:

Eni Petroleum US LLC
1200 Smith Street, Suite 1700
Houston, Texas 77002
Attention:  Christian Johnson
Telephone: (713) 393-6184
Email: chris.johnson@eni.com

With a copy to:

Bracewell LLP
711 Louisiana Street, Suite 2300
Houston, Texas 77002
Attention:    J.J. McAnelly (james.mcanelly@bracewell.com)
              Jason Hutt (jason.hutt@bracewell.com)
              Mark Dendinger (mark.dendinger@bracewell.com)

(3)    If to Credit Bid Purchaser, to:

[_____]

With a copy to:

[_____]

14.    **Amendments.**  Neither this Agreement nor any provision hereof may be waived, amended, or modified except pursuant to an agreement or agreements in writing entered into by the Parties.

*[Signature Pages to Follow]*

21

**IN WITNESS WHEREOF**, the undersigned Parties have executed this Eni Term Sheet Implementation Agreement as of the date first written above.

FIELDWOOD ENERGY LLC,
a Delaware limited liability company

By: _____
_____
Name: _____
_____
Title: _____
_____

[Signature Page to Eni Term Sheet Implementation Agreement]

ENI PETROLEUM US LLC


By:_____

Name: Luca Pellicciotta
Title: President and CEO


ENI US OPERATING CO. INC.


By:_____

Name: Luca Pellicciotta
Title: President and CEO

[Signature Page to Eni Term Sheet Implementation Agreement]

## Exhibit A

### Notice of Filing Term Sheet

See attached.

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

|                                          |     |                              |
|------------------------------------------|-----|------------------------------|
| **In re:**                               | §   | **Chapter 11**               |
|                                          | §   |                              |
| **FIELDWOOD ENERGY LLC,** *et al.,*      | §   | **Case No. 20-33948 (MI)**   |
|                                          | §   |                              |
| **Debtors.**[1]                          | §   | **(Jointly Administered)**   |
|                                          | §   | **Re Docket No. 1284**       |

### NOTICE OF FILING OF EXECUTED TERM SHEET BY AND BETWEEN
### THE DEBTORS AND ENI PETROLEUM US LLC

**PLEASE TAKE NOTICE** that on May 12, 2021, Fieldwood Energy LLC

("**Fieldwood**") and its debtor affiliates, as debtors and debtors in possession in the above-

captioned chapter 11 cases (collectively, the "**Debtors**"), after extensive good faith, arm's length

negotiations, executed a term sheet with Eni Petroleum US LLC ("**Eni**" and, together with the

Debtors, the "**Parties**") reflecting an agreement-in-principle between the Parties with respect to

the treatment under the *Fourth Amended Joint Chapter 11 Plan of Fieldwood Energy LLC and

Its Affiliated Debtors* dated April 15, 2021 filed at ECF No. 1284 (including any exhibits and

schedules thereto and as may be further amended, supplemented, or modified, the "**Plan**") of

certain oil and gas leases and related interests and obligations, a copy of which is attached hereto

as **Exhibit A** (the "**Fieldwood/Eni Term Sheet**").

**PLEASE TAKE FURTHER NOTICE** that the Fieldwood/Eni Term Sheet

provides for, among other terms and conditions:

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, as applicable, are: Dynamic Offshore Resources NS, LLC (0158); Fieldwood Energy LLC (6778); Fieldwood Energy Inc. (4991); Fieldwood Energy Offshore LLC (4494); Fieldwood Onshore LLC (3489); Fieldwood SD Offshore LLC (8786); Fieldwood Offshore LLC (2930); FW GOM Pipeline, Inc. (8440); GOM Shelf LLC (8107); Bandon Oil and Gas GP, LLC (9172); Bandon Oil and Gas, LP (9266); Fieldwood Energy SP LLC (1971); Galveston Bay Pipeline LLC (5703); and Galveston Bay Processing LLC (0422). The Debtors' primary mailing address is 2000 W. Sam Houston Parkway S., Suite 1200, Houston, TX 77042.

- an agreement-in-principle between the Parties regarding the treatment of the oil and gas leases and facilities (including but not limited to, for all purposes thereunder, any wells, pipelines, or other structures) set forth on Exhibit A attached to the Fieldwood/Eni Term Sheet previously conveyed to the Debtors by Eni and certain of its affiliates;

- Eni's agreement to withdraw any pending objections it has filed to the Plan and to not file any further objections to the Plan or support any other party in objecting to or opposing the Plan and agrees it will support confirmation of the Plan;  and

- that the Debtors, Fieldwood, Credit Bid Purchaser,[2] and Eni shall work together in good faith to negotiate the definitive documents contemplated in the Fieldwood/Eni Term Sheet and any other agreements required to implement the transactions contemplated therein, in each case in accordance with the terms and conditions set forth herein and acceptable to the Required DIP Lenders and the Requisite FLTL Lenders.

---

[2] Capitalized terms used but not defined herein have the meanings ascribed to them in the Plan.

Debtors' Exhibit No. 34
Page 754 of 910

Dated: May 12, 2021
  Houston, Texas

       Respectfully submitted,


        */s/ Jessica Liou*
        WEIL, GOTSHAL & MANGES LLP
        Alfredo R. Pérez (15776275)
        700 Louisiana Street, Suite 1700
        Houston, Texas 77002
        Telephone:  (713) 546-5000
        Facsimile:  (713) 224-9511
        Email:   Alfredo.Perez@weil.com


        -and-

        WEIL, GOTSHAL & MANGES LLP
        Matthew S. Barr (admitted *pro hac vice*)
        Jessica Liou (admitted *pro hac vice*)
        767 Fifth Avenue
        New York, New York 10153
        Telephone:  (212) 310-8000
        Facsimile:  (212) 310-8007
        Email:   Matt.Barr@weil.com
           Jessica.Liou@weil.com


        *Attorneys for Debtors*
        *and Debtors in Possession*

Debtors' Exhibit No. 34
Page 755 of 910

### Certificate of Service

I hereby certify that, on May 12, 2021, a true and correct copy of the foregoing document was served by the Electronic Case Filing System for the United States Bankruptcy Court for the Southern District of Texas.

 _/s/  Jessica Liou_
Jessica Liou

# EXHIBIT A

**Fieldwood/Eni Term Sheet**



*Thomas R. Lamme*
*Senior Vice President and General Counsel*
*Direct: 713-969-1107*
*Email: TLamme@fwellc.com*

May 12, 2021

**VIA EMAIL**

Luca Pelicciotta
President and CEO
Eni Petroleum US LLC
1200 Smith Street, Suite 1700
Houston, Texas 77002
E-mail: luca.pelicciotta@eni.com

    *Re: Fieldwood/Eni Term Sheet*

Dear Mr. Pelicciotta:

Attached as <u>Exhibit A</u> is the agreed upon term sheet dated May 12, 2021, by and between Fieldwood Energy LLC and its affiliated debtors and Eni Petroleum US LLC ("**Eni**" and, together with the Debtors, the "**Parties**") supporting the restructuring of the portion of the Debtors' business relating to certain assets described therein as the "Abandoned Properties" (the "**Fieldwood/Eni Term Sheet**").

By executing this letter agreement, each of the undersigned Parties agrees (i) to work to implement the terms of the Fieldwood/Eni Term Sheet and (ii) to negotiate the definitive documents described therein in good faith and in accordance with the terms of the Fieldwood/Eni Term Sheet.

The Parties may execute and deliver this letter agreement by electronic reproduction and in multiple counterparts, each of which shall constitute an original and all of which shall be one and the same document.  This letter agreement shall be governed by the laws of the State of Texas without regard to any choice of law principles.

[Signature Pages Follow]

Enclosure

cc: Michael T. Dane, *via email* MDane@Fwellc.com

IN WITNESS WHEREOF, the undersigned Parties have executed this letter agreement as of the date first written above.

**FIELDWOOD ENERGY LLC**

By: _Thomas R. Lamme_

Name:   Thomas R. Lamme

Title:   Senior Vice President and General Counsel

[Fieldwood Signature Page to Eni Letter Agreement]

**ENI**:

ENI PETROLEUM US LLC

By: _____

Name:     Luca Pellicciotta
Title:     President and CEO

[Eni Signature Page to Eni Letter Agreement]

# EXHIBIT A

FIELDWOOD/ENI TERM SHEET

*This Term Sheet is an expression of interest only and creates no legally binding commitment by either party to negotiate any specific transaction or enter into any agreement. It is expressly understood that no liability or obligation of Fieldwood Energy LLC and its affiliated debtors (collectively, the "**Debtors**") or Eni Petroleum US LLC ("**Eni**") of any nature whatsoever is intended to or will be created hereunder with respect to this Term Sheet or related discussions or writings or the transactions contemplated hereby and that this Term Sheet is neither a contract nor a binding offer. It is understood and agreed that any transaction is expressly conditioned, among others, upon approval by the Debtors and Eni, the execution and delivery by the Debtors and Eni or their affiliates of definitive written agreements, in form and substance satisfactory to the Debtors and Eni in their sole discretion, the satisfaction of the conditions set forth therein, and Bankruptcy Court approval. The Debtors and Eni expressly agree that this Term Sheet does not contain all terms that would be required to be agreed to in order to enter into any definitive agreement. Without prejudice to the foregoing, this Term Sheet constitutes a "Definitive Document" under the Restructuring Support Agreement (as defined in the Plan (as defined below)) and is subject to the consent rights set forth therein. Except as provided for herein, each party is responsible for its own costs and expenses, including those of its legal advisors in conjunction with this Term Sheet.* [1]

| |
|---|
| **ENI / FIELDWOOD COMMERCIAL TERM SHEET** |
| Through the Initial Plan of Merger contemplated under the *Fourth Amended Joint Chapter 11 Plan of Fieldwood Energy LLC and Its Affiliated Debtors* dated April 15, 2021 filed at ECF No. 1284 (including any exhibits and schedules thereto and as may be further amended, supplemented, or modified, the "**Plan**"), Fieldwood Energy III LLC ("**FWE III**") will, subject to the terms and conditions set forth herein, decommission the oil and gas leases and facilities (including but not limited to, for all purposes hereunder, any wells, pipelines, or other structures) set forth on **Exhibit A** attached hereto (collectively, the "**Abandoned Properties**" and each individually, an "**Abandoned Property**") previously conveyed to Debtors by Eni and certain of its affiliates. |
| **Term Sheet Expiration Date** |
| The Debtors, FWE, Credit Bid Purchaser, and Eni shall work together in good faith to negotiate the definitive documents contemplated below and any other agreements required to implement the transactions contemplated in this Term Sheet, in each case in accordance with the terms and conditions set forth herein and acceptable to the Required DIP Lenders and the Requisite FLTL Lenders ("**Definitive Documents**"), provided that this Term Sheet shall terminate if the parties have not fully agreed and finalized all such required Definitive Documents on or before the Effective Date of the Plan (such date, the "**Termination Date**"). |
| **Conditions Precedent to Effectiveness** |
| In addition to any other conditions precedent that may be agreed by the parties, it shall be a condition precedent to the effectiveness of the Definitive Documents that FWE III will have been granted to the satisfaction of the parties to the Definitive Documents all necessary approvals by applicable regulatory authorities to act as a qualified operator in the Gulf of Mexico.  In the event that FWE III has not been granted such approval(s) by September 30, 2021, this Term Sheet and any and all executed Definitive Documents shall automatically terminate on such date. For the avoidance of doubt, in no event shall the failure to consummate any Definitive Document result in any such extension after the Termination Date. |
| **Closing** |

---

[1] Capitalized terms used but not defined herein have the meanings ascribed to them in the Plan.

"**Closing**" shall take place in conjunction with the effectiveness of the divisive merger and simultaneous execution and delivery of the Definitive Documents.

**FWE III Governance and Operations**

1. FWE III will provide Eni with regular informational updates, including monthly, quarterly, and annual financial reports. Eni shall have the right but not the obligation to share such information with the sureties.

2. As a condition precedent to the effectiveness of the Turnkey Removal Agreement (and the other Definitive Documents), FWE III will become a qualified operator in the Gulf of Mexico.

3. FWE III will use reasonable efforts to obtain reimbursement/contribution for decommissioning activity that is available under contract or applicable law, including any other record title and/or operating rights interest holders and predecessors-in-interest other than Eni to the extent practicable and available surety bonding other than Eni's bonds; provided that, for the avoidance of doubt, FWE III shall not be required to incur any out-of-pocket costs or obligations in connection with such efforts.

4. FWE III shall obtain the written consent of Eni (not to be unreasonably withheld) prior to entering settlement negotiation(s) or agreeing to a settlement and/or initiating dispute resolution regarding the Abandoned Properties, including with respect to obtaining contributions from other record title and/or operating rights interest holders and predecessors-in-interest for decommissioning or funds from surety bonds for decommissioning.

5. The Debtors and FWE III will be responsible for all costs associated with formation of FWE III in connection with the Initial Plan of Merger as contemplated in the Plan. Funds required for the ongoing operations of FWE III shall be provided as set forth in the "Implementation and Funding Agreement" below.

6. FWE III will provide all funds for any premiums for organizational/area-wide bonding requirements.

**Withdrawal of Objections and Support of the Plan**

In conjunction with the execution of this Term Sheet or promptly thereafter, Eni will withdraw any pending objections it has filed to the Plan, and agree not to file any further objections to the Plan or to support any other party in objecting to or opposing the Plan and agrees it will support confirmation of the Plan.

**Turnkey Removal Agreement**

1. ***Total Turnkey Amount***.

   a. Eni, FWE III and Credit Bid Purchaser agree to enter into a Turnkey Removal Agreement acceptable to Eni, FWE III, Credit Bid Purchaser, the Required DIP Lenders, and the Requisite FLTL Lenders, whereby Credit Bid Purchaser will decommission the Abandoned Properties on a turnkey payment basis, and Credit Bid Purchaser will earn a turnkey amount in exchange for completing each such decommissioning project. The total turnkey amount for each lease or facility comprising an Abandoned Property shall be set forth (i) on a gross 8/8ths basis (the "**Gross Decom Amount**") and (ii) on a net basis to Eni (such amount, the "**Eni (Net) Costs**"). The sum of each Gross Decom Amount for each lease and/or facility located at the Abandoned Properties shall not exceed $95,755,436.46 (the "**Total Decom Cost**"). The sum of all Eni (Net) Costs for each lease and/or facility located at the Abandoned Properties shall not exceed $57,325,130.98 ("**Total Eni (Net) Costs**"). The Total Decom Cost and Total Eni Cost

2

may be adjusted for the Qualified Conditions and/or Regulatory Changes, as set forth below.  For the avoidance of doubt, each Gross Decom Amount for each Abandoned Property shall be inclusive of all operating expenses and all costs and expenses of decommissioning as required to meet the Performance Standard defined below. Subject to Section 1.b and Section 4 below, Eni shall have no obligation to pay the parties to this Term Sheet any costs or liability to perform any obligations associated with the decommissioning of any lease or facility comprising an Abandoned Property once Eni has paid Credit Bid Purchaser the applicable turnkey costs, as adjusted hereunder, for such lease or facility, as applicable.

b.  In order to facilitate the diligent and continuous performance of the decommissioning obligations set forth in this Term Sheet, Credit Bid Purchaser, FWE III, and Eni agree that Eni shall have the right, but not the obligation (in Eni's sole discretion) to make an irrevocable election to agree to pay to Credit Bid Purchaser the Gross Decom Amount for any such lease or facility comprising an Abandoned Property (such election, the "**Turnkey Election**"). In the event that Eni desires to make such a Turnkey Election, Eni shall provide Credit Bid Purchaser and FWE III written notice of its intent (a "**Turnkey Notice**") and Credit Bid Purchaser shall promptly commence the decommissioning contemplated for any such lease or facility. The decommissioning project schedule contained in the Turnkey Removal Agreement shall be modified to address any such Turnkey Election. Notwithstanding anything to the contrary contained in this Term Sheet or any other Definitive Document, in the event Eni makes a Turnkey Election, (i) Eni agrees to pay Credit Bid Purchaser the applicable Gross Decom Amount, as it may be increased, (ii) in the event  the actual cost to decommission the lease or facility, as applicable, associated with such Turnkey Election and excluding the costs addressed in Section 4 in accordance with the Performance Standard exceeds the Gross Decom Amount, as adjusted for the Qualified Conditions and/or Regulatory Changes, Credit Bid Purchaser shall assume the risk of any costs in excess of the Gross Decom Amount, as such amounts may be adjusted as a result of a Qualified Condition and/or Regulatory Changes, and (iii) Eni shall have the right to seek contribution from third parties for any share of the Gross Decom Amount for any lease or facility comprising an Abandoned Property.  In the event Eni makes a Turnkey Election, it may assign its interest in the Turnkey Removal Agreement insofar as it covers such asset (to the extent that it relates to Eni's prior undivided interests in the Abandoned Property) to any third party or parties with joint and several liability for such decommissioning, provided that Eni shall remain responsible for all of its obligations.

c.  Subject to the Qualified Conditions and Regulatory Changes provisions, Credit Bid Purchaser shall assume the risk that the costs of decommissioning each lease or facility comprising an Abandoned Property exceeds (i) the Eni (Net) Costs attributable to Eni's prior interest in such lease or facility, as applicable, in the event no Turnkey Election is made, or (ii) the Gross Decom Amount attributed to such lease or facility, as applicable, in the event a Turnkey Election is made. In the event of a Qualified Condition (as defined in Section 3 below), Eni and Credit Bid Purchaser shall share in any costs related to the Qualified Condition(s) in excess of the relevant Eni (Net) Costs (or the Gross Decom Amount if the Turnkey Election is made) up to, on an aggregated basis of all Abandoned Properties, $15,000,000 (the "**Qualified Condition Cap**") as follows: (i) Eni shall be responsible for the first $5,000,000 of costs related to Qualified Conditions, and (ii) Eni and Credit Bid Purchaser shall be responsible 75% / 25% respectively for the remaining cost up to the Qualified Condition Cap.  Eni's responsibility for any costs related to a Qualified Condition shall not commence until the full amount of the relevant Eni (Net) Costs, or if the Turnkey Election is made the relevant Gross Decom Amount, have been

3

incurred. The calculation and application of these amounts (including such Qualified Condition Cap) shall be limited to the portion allocated to the Eni (Net Costs) in the event Eni did not elect to pay the Gross Decom Amount with regard to such asset. In the event that one or more Qualified Conditions results in costs that exceed the Qualified Condition Cap, Eni's liability for any additional costs shall terminate once the Qualified Condition Cap has been reached and Eni shall have no further liability for any costs or the performance of any obligations associated with any Qualified Condition.

d.  Credit Bid Purchaser will have profit opportunity following the completion of decommissioning for any lease or facility comprising an Abandoned Property if it is able to decommission any lease or facility comprising an Abandoned Property for a lower cost than the (i) the Eni (Net) Costs, provided that Eni did not make a Turnkey Election for such asset or (ii) the Gross Decom Amount if a Turnkey Election was made by Eni (including any increases to the applicable Eni (Net) Costs or Gross Decom Amount, respectively, for any Qualified Conditions or Regularly Conditions) attributed to such lease or facility comprising an Abandoned Property.

e.  FWE III's obligations under the Turnkey Removal Agreement for any specific Abandoned Property shall commence upon the earlier of (i) receipt by Eni and other joint and several liable parties of a BOEM/BSEE order requiring decommissioning of such Abandoned Property and after full funding for the project has been finalized, or (ii) a Turnkey Election by Eni for such Abandoned Property; provided that the decommissioning project schedule contained in the Turnkey Removal Agreement shall be modified to address either such event.

2.  *Services*. Services provided by Credit Bid Purchaser pursuant to the Turnkey Removal Agreement will include performing decommissioning operations at the Abandoned Properties to an agreed operational and regulatory performance standard on behalf of FWE III on agreed terms and conditions. FWE III and Eni agree that Credit Bid Purchaser will meet such required standard if it performs such decommissioning operations consistent with required laws, rules and regulations promulgated by governing regulatory agencies, including but not limited to BOEM and BSEE, and consistent with any applicable third party contracts (the "**Performance Standards**").

3.  *Qualified Conditions*. At or before Closing, Credit Bid Purchaser and Eni shall determine the turnkey amounts on a project-by-project basis for all decommissioning projects under the Turnkey Removal Agreement (leases and facilities to be operated by FWE III) and shall agree on a decommissioning project schedule consistent with the terms set forth in Section 7 below, all of which shall be attached to the Turnkey Removal Agreement. The parties shall also agree upon certain qualified conditions for the decommissioning projects ("**Qualified Conditions**"), which such Qualified Conditions, if present, can, at the election of either Credit Bid Purchaser or Eni, as applicable, and subject to the notice requirements set forth in the Definitive Documents, cause the parties to adjust the applicable turnkey amount for a particular project or agree on alternative cost arrangement; provided that such Qualified Conditions shall be set forth in the Definitive Documents and shall be limited to the items listed on **Schedule 1** attached hereto. In the event the parties are unable to agree to the adjusted turnkey amount or an alternative cost arrangement due to an occurrence of a Qualified Condition, the parties shall follow the method set forth in the Definitive Documents.

4.  *Temporary Abandoned Wells and Excluded Wells*. Credit Bid Purchaser and Eni acknowledge and agree that there may be decommissioning obligations attributable to the wells identified on **Exhibit B** attached hereto which were purported to have been temporarily

Debtors' Exhibit No. 34
Page 765 of 910

plugged and abandoned as of the effective date of that certain *Purchase and Sale Agreement by and among Eni Petroleum US LLC and Eni US Operating Co. Inc., as Seller, and Fieldwood Energy Offshore LLC, a Purchaser, dated as of December 1, 2015* (the "**Comal PSA**"). Eni will be solely responsible for the costs associated with the decommissioning of the "Excluded Wells" (as such term is defined in the Comal PSA) and shall be solely responsible for the "Eligible Well Intervention Costs" (as such term is defined in the Comal PSA) for any "Temporary Abandoned Well" (as such term is defined in the Comal PSA) as provided in the following sentence.  Notwithstanding the foregoing, Eni shall have no obligation for (i) any costs or obligations attributable to any Temporary Abandoned Well in excess of the "Eligible Well Intervention Costs" associated with any such Temporary Abandoned Well, or (ii) any costs or obligations attributable to a Temporary Abandoned Well for which Eni's liability terminated pursuant to Section 7.19(e) of the Comal PSA. Notwithstanding anything herein to the contrary, in the event the Credit Bid Purchaser is required to handle Eni's obligations as addressed in this section, Eni shall promptly reimburse Credit Bid Purchaser for all costs and expenses incurred in connection therewith, together with a reasonable overhead charge in accordance with the COPAS attached to the Contract Operating Agreement defined in Section 2 of the Implementation and Funding Agreement and, for the avoidance of doubt, none of such costs, expenses or overhead shall be considered in the calculation of the Qualified Condition Cap. Such payment shall occur promptly upon completion of the work set forth in this section.

5.    *Regulatory Changes*.  In addition to the Qualified Conditions described on **Schedule 1** attached hereto, if any regulatory body either (i) issues new regulations that increase or materially change the cost to conduct decommissioning or (ii) designates additional sand sediment areas requiring pipeline removal as opposed to abandonment in place (if the turnkey amount for the particular pipeline assumes abandonment in place), Eni and Credit Bid Purchaser shall negotiate in good faith to adjust the applicable Gross Decom Amount to take into account the incremental costs to complete the project under the Turnkey Removal Agreement.  For the avoidance of doubt, new regulations include but are not limited to, NTLs, BSEE or BOEM national, regional or district policies, executive orders and new regulations in the CFRs that govern decommissioning. If the parties cannot agree on a revised Gross Decom Amount, the project shall be completed on a cost-plus 15% basis.

6.    *Surety Bonds*.  Eni may apply any available proceeds from bonds that cover the decommissioning costs associated with the Abandoned Properties to any amounts owed hereunder.  Eni will bear all costs and risks associated with such bonds and notwithstanding its failure to recover all or any bond proceeds, Eni will be required to pay the Total Eni (Net) Costs or Gross Decom Amount, as applicable pursuant to terms and conditions of this Term Sheet.

7.    *Payments*. Subject to Section 1.b and without limitation of Credit Bid Purchaser's obligation to perform the Initial Safe Out as provided in Section 9 below, Credit Bid Purchaser shall not undertake the applicable decommissioning project until full funding of the applicable Gross Decom Amount has been agreed to by Eni and Credit Bid Purchaser, including receiving or securing a contractual commitment (such as a decommissioning agreement) from applicable third parties. Eni will be required to pay Credit Bid Purchaser the Eni (Net) Costs or Gross Decom Amount (in the event a Turnkey Election was made pursuant to this Term Sheet), as applicable, attributable to the decommissioning activities performed for each lease or facility comprising an Abandoned Property upon delivery to FWE III and to Eni of the filings and other evidence (i) required by BOEM and/or BSEE or any other applicable governmental authority, including requisite approvals or regulatory concurrence, with regard to the satisfaction of decommissioning obligations with respect to the applicable asset to

5

support Credit Bid Purchaser's representation that the applicable project has been completed; and (ii) an invoice and/or billing statement outlining in detail the decommissioning work actually performed for such lease or facility along with supporting documentation. Notwithstanding anything to the contrary herein, the payments made by Eni in satisfaction of the obligations set forth herein, shall not exceed $20,000,000 on an annual basis for any given year; provided that (i) if Eni has delivered the Turnkey Notice as provided in this Term Sheet or (ii) if Eni is required, pursuant to an order from any governmental or regulatory authority, to perform any decommissioning project on a schedule that is more accelerated than contemplated in the schedule set forth in the Turnkey Removal Agreement, then such annual limitation will be increased above $20,000,000 to the extent such increase is necessitated to perform the decommissioning activities contemplated in subparts (i) and (ii) of this sentence.

8.  *Termination*. Eni retains the right to terminate the Turnkey Removal Agreement as to any particular lease or facility located at the Abandoned Properties and/or require FWE III to competitively bid the decommissioning services with respect to any particular lease or facility attributable to an Abandoned Property in the event Credit Bid Purchaser is in material breach of the Turnkey Removal Agreement in relation to the particular lease or facility. Credit Bid Purchaser or Eni may terminate the Turnkey Removal Agreement as to any particular lease or facility located at the Abandoned Properties if, within three (3) years from the effective date of the Turnkey Removal Agreement, a Turnkey Election is not made for such lease or facility or contractual commitments for full funding of the applicable Gross Decom Amount for such lease or facility have not been received.

9.  *Initial Safe Out*. With respect to the Abandoned Properties, FWE III will engage Credit Bid Purchaser to promptly perform, operations necessary to safe-out and otherwise perform preparatory activities to put such Abandoned Properties, subject to Section 4, into a mechanical and operational state such that they are hydrocarbon free and ready to be decommissioned (the "**Initial Safe Out**"); provided, however that such Initial Safe Out shall be completed no later than December 31, 2021, unless agreed to in writing by Eni (such consent not to be unreasonably withheld, delayed or conditioned).

10. *Right of First Offer and Notice of Sale*. To the extent that any other predecessor-in-interest, in connection with the decommissioning of such predecessor-in-interest's prior assets, is granted a right of first offer, right of first refusal, or similar preferential purchase right in connection with any assets transferred to Credit Bid Purchaser pursuant to the Plan, Credit Bid Purchaser shall grant Eni rights that are substantially similar in connection with the Abandoned Properties.  After the Effective Date of the Plan, in the event that Credit Bid Purchaser desires to sell, transfer or otherwise dispose of any portion of its interests in any assets transferred to Credit Bid Purchaser pursuant to the Plan through a public marketing process utilizing a third party agent, investment bank, or similar service, Credit Bid Purchaser shall use reasonable efforts to cause such agent or investment bank to provide Eni with written notice and an opportunity to participate in any related sales process.

11. *Mutual Indemnity*. Credit Bid Purchaser and Eni shall indemnify one another for a material breach of their respective obligations under the Turnkey Removal Agreement; provided, however, the indemnity obligations set forth herein shall not include lost profit opportunity, indirect damages, consequential damages, third party claims, fines or penalties (except to the extent directly resulting from a material breach by the other party), attorney's fees, or any other third party costs.

12. *Audit Rights*. For each year the Turnkey Removal Agreement remains in effect and for up to twelve (12) months following the completion of the decommissioning obligations

6

contemplated in this Term Sheet, Eni shall have the right to conduct, during normal business hours upon at least thirty (30) days' prior notice, an audit of Credit Bid Purchaser's records to the extent related to any amount charged to Eni hereunder.

**Implementation and Funding Agreement**

1. ***Funding Contribution***. Without limitation of FWE's obligation to perform the Agreed Activities pursuant to the Plan, FWE will contribute on the Effective Date $3 million to FWE III (the "**Contribution Amount**"), which amount will be used solely in connection with the Abandoned Properties and partially in satisfaction of Eni's obligation to pay the Total Eni (Net) Costs.

2. ***Operating Costs***.  From and after the Effective Date and subject to Section 4 above, Credit Bid Purchaser will manage on behalf of FWE III the Abandoned Properties until the commencement of the decommissioning pursuant to a mutually acceptable contract operating agreement between FWE III and Credit Bid Purchaser (the "**Contract Operating Agreement**").  Except as set forth in Section 4 above, Eni shall not be responsible for any operating costs associated with Eni's interests in the Abandoned Properties. Management of the properties shall include, but not be limited to, as services provided: operations, production marketing (for producing assets), accounting and land administration.

3. ***Legal Fees***.  FWE/FWE III, as applicable, will pay for Eni's reasonable and documented legal fees incurred in connection with the Debtors' chapter 11 cases, up to a cap of $1.5 million.

4. ***ORRI***. To the extent that any other predecessor-in-interest is granted an overriding royalty interest or similar future interest in Credit Bid Purchaser's production prior to the Effective Date in connection with the decommissioning of such predecessor-in-interest's prior assets, FWE shall grant Eni a similar and proportionate interest in connection with Eni's turnkey removal payments.

7

**Exhibit "A"**
**Abandoned Properties**

| Block | Lease |
|-------|-------|
| SS 246 | OCS-G 01027 |
| VR 313 | OCS-G 01172 |
| SS 247 | OCS-G 01028 |
| SS 248 | OCS-G 01029 |
| SS 249 | OCS-G 01030 |
| SS 270 | OCS-G 01037 |
| WC 72 | OCS-G 23735 |

End of Exhibit "A"

**Exhibit "B"**
**Temporary Abandoned Wells**

Case 20-33948   Document 1562-28   Filed in TXSB on 06/15/21   Page 420 of 636

# EXHIBIT B
## TEMPORARY ABANDONED WELLS

| API | LEASE | AREA | BLOCK | WELL NAME | SUFFIX | Status |
|---|---|---|---|---|---|---|
| 42-706-40442-00 | OCS-G15740 | Galveston | 151 | 5 | ST00BP00 | Temporarily Abandoned. Operated by Fieldwood. |
| 17-712-40057-00 | OCS-G 01027 | Ship Shoal | 246 | A-001 | ST00BP00 | TA 2010. 13 3/8" CICR @ 164' BML with 120' surface cement plug f/ 164' to 44' BML. 13 3/8" and 20" removed to 25' BML. Top of 30" is +/- 5" AML. Need to remove 30" to 15' BML when platform is removed. |
| 17-712-40074-00 | OCS-G 01027 | Ship Shoal | 246 | A-002 | ST00BP00 | TA 2001.  LS@ 1357', SS@ 1424'. Spotted cmt plugs in LS 10100'-9800' and 3100' - 2800'. CICR @ 1300' with 200' cmt on top f/ 1300' - 1100'.  Need to PT & BT annuli, set surface cmt plug and remove 7", 9 5/8", 13 3/8", 20" and 26" casings to 15' BML. |
| 17-712-40102-00 | OCS-G 01027 | Ship Shoal | 246 | A-009 | ST00BP00 | TA 2001.  Casing damage at 9764'. 7", 29# CIBP at 9000' with 200' cement plug f/ 8800' - 9000'. Displace well w/ 13.5ppg WBM. Test cmt plug w/ 1000 psi.  Need to PT & BT annuli and set additional cement plugs as required by BSEE. Remove 7", 9 5/8", 13 3/8", 20", and 26" at 15' BML. |
| 17-712-40224-00 | OCS-G01028 | Ship Shoal | 247 | F-010 | ST00BP00 | TA 2013.  Surface cement plug @ 70' BML.  Need to cut 7 5/8", 10 ¾", 16" & 26" at 15' BML. |
| 17-712-40221-00 | OCS-G01029 | Ship Shoal | 248 | F-008 | ST00BP00 | TA 2000.  197' surface cement plug at 81' - 278' BML.  7 5/8" casing cut at 276' and 186' BML, could not pull. Cemented to surface.  Need to PT & BT all annuli and remove 7 5/8", 10 3/4", 16" and 26" to 15' BML. |
| 17-712-40131-00 | OCS-G01028 | Ship Shoal | 247 | D-003 | ST00BP00 | TA 1982. 205' surface cement plug f/ 50' - 255' BML in 7".  Need to PT & BT all annuli and remove 7", 9 5/8", 13 3/8", 20" and 26" casings to 15' BML. |
| 17-712-40156-00 | OCS-G01028 | Ship Shoal | 247 | D-007 | ST00BP00 | TA 2013. Surface cement plug @ 100' BML.  Need to cut 10 ¾", 16", & 26" at 15' BML. |
| 17-712-40166-00 | OCS-G01028 | Ship Shoal | 247 | D-009 | ST00BP00 | TA 1999.  Casing restriction @ 11195'. CICR @ 11150' with 370' cement plug on top f/ 11150' - 10780'. 7" wellbore has 13.0 ppg WBM. Need to PT & BT all annuli, set additional cmt plugs as required by BSEE and remove 7", 9 5/8", 13 3/8" 20" and 26" to 15' BML. |
| 17-712-40179-03 | OCS-G01028 | Ship Shoal | 247 | D-012 | ST03BP00 | TA 2013.  Highest cement plug @ 789' BML.  Need to set surface cement plug.  PT & BT.  Cut 9 5/8", 13 3/8", 18 5/8" & 26" at 15' BML. |
| 17-712-40150-0 | OCS-G01029 | Ship Shoal | 248 | D-006 | ST00BP00 | TA 1977.  Drilled and TA'd 1977.  Highest cement plug (150') f/ 420' - 540' RKB (150' - 300' BML).  17.5 ppg WBM in wellbore.  Need to tag cement plug at 150' BML, circulate clean with seawater, set 9 5/8" CIBP at TOC and spot +/- 50' cement on top.  PT & BT annuli.  Remove 9 5/8", 13 3/8", 20" and 26" casings to 15' BML. |

1 of 3

**EXHIBIT B**
**TEMPORARY ABANDONED WELLS**

| API | LEASE | AREA | BLOCK | WELL NAME | SUFFIX | Status |
|---|---|---|---|---|---|---|
| 17-712-40206-00 | OCS-G01029 | Ship Shoal | 248 | D-015 | ST00BP00 | TA 2013. Highest cement plug @ 900' RKB (620' BML). Need to set surface cement plug. PT & BT. Cut 7 5/8", 10 ¾", 16" & 26" at 15' BML. |
| 17-712-40210-00 | OCS-G01029 | Ship Shoal | 248 | D-016 | ST00BP00 | TA 2014. Highest cement plug @ 670' RKB (390' BML). Need to set surface cement plug. PT & BT. Cut 7 5/8", 10 ¾", 16" & 26" at 15' BML. |
| 17-712-40211-00 | OCS-G01029 | Ship Shoal | 248 | D-018 | ST00BP00 | TA 2013. Highest cement plug @ 900' RKB (620' BML). Need to set surface cement plug. PT & BT. Cut 7 5/8", 10 ¾", 16" & 26" at 15' BML. |
| 17-712-40530-00 | OCS-G01029 | Ship Shoal | 248 | G-002 | ST00BP00 | TA 2013. Surface cement plug @ 124' BML. Need to cut 9 5/8", 13 3/8" & 26" at 15' BML. |
| 17-712-40533-00 | OCS-G01029 | Ship Shoal | 248 | G-003 | ST00BP00 | TA 2013. Surface cement plug @ 45' BML. Need to cut 9 5/8", 13 3/8", 20" & 26" at 15' BML. |
| 17-712-40120-00 | OCS-G01030 | Ship Shoal | 249 | D-002 | ST00BP00 | TA 2013. Highest cement plug @ 620' BML. Need to set surface cement plug. PT & BT. Cut 7", 9 5/8", 13 3/8", 20" & 26" at 15' BML. |
| 17-712-40159-00 | OCS-G01030 | Ship Shoal | 249 | D-008 | ST00BP00 | TA 2013. Surface cement plug @ 90' BML. Need to cut 7", 9 5/8", 13 3/8", 20" & 26" at 15' BML. |
| 17-712-40171-00 | OCS-G01030 | Ship Shoal | 249 | D-004 | ST00BP00 | TA 1978. Drilled and TA'd in 1978. Highest cement plug (150') at 465' - 315' RKB (185' - 35' BML). Plug tested 1000 psi. 15.9 ppg WBM in wellbore. Need to PT & BT annuli and remove 9 5/8", 13 3/8", 20" and 26" casings to 15' BML. |
| 17-712-40192-00 | OCS-G01030 | Ship Shoal | 249 | D-014 | ST00BP01 | TA 1978. Drilled and TA'd in 1978.  Highest cement plug f/ 10120' to 10389' (269'). Set 9 5/8" CICR @ 10170'. Squeeze 61 sxs below (219') and spot 50' on top of CR.  9 5/8" shoe @ 10239'.  16.8 ppg WBM in wellbore.  Need to PT & BT annuli, spot additional cement plugs as required by BSEE and remove 9 5/8", 13 3/8", 20" and 26" casings to 15' BML. |
| 17-712-40208-00 | OCS-G01030 | Ship Shoal | 249 | D-017 | ST00BP00 | TA 2013. Highest cement plug @ 620' BML. Need to set surface cement plug. PT & BT. Cut 7 5/8", 10 ¾", 16" & 26" at 15' BML. |
| 17-712-40215-00 | OCS-G01030 | Ship Shoal | 249 | D-019 | ST00BP00 | TA 2013. Highest cement plug @ 820' BML. Need to set surface cement plug. PT & BT.  Cut 7", 9 5/8", 13 3/8", 20" & 26" at 15' BML. |
| 17-712-40622-00 | OCS-G01030 | Ship Shoal | 249 | 6 | ST00BP00 | TA 2001. 7 5/8" CIBP set at 200' BML, no cement.  Need to spot surface cement plug on CIBP.  Cut 16" and 24" at 15' BML. |
| 17-705-40778-00 | OCS-G04421 | Vermilion | 78 | A001 | ST00BP00 | Temporarily Abandoned. Operated by Fieldwood. |
| 17-706-40281-00 | OCS-G01172 | Vermilion | 313 | B001 | ST00BP01 | TA 2014. Surface cement plug @ 110' BML. Need to cut 10 ¾", 16" & 26" at 15' BML. |
| 17-706-40297-00 | OCS-G01172 | Vermilion | 313 | B002 | ST00BP00 | TA 2014. Surface cement plug @ 110' BML. Need to cut 7 5/8", 10 ¾", 16" & 26" at 15' BML. |

2 of 3

## EXHIBIT B
## TEMPORARY ABANDONED WELLS

| API | LEASE | AREA | BLOCK | WELL NAME | SUFFIX | Status |
|---|---|---|---|---|---|---|
| 17-706-40314-00 | OCS-G01172 | Vermilion | 313 | B004 | ST00BP00 | Listed in BSEE database (and OWL) as P&A in 1978. HOWEVER THE CASINGS AND WELLHEADS ARE STILL IN PLACE ON PLATFORM. SO IT IS ACTUALLY TA'd. Drilled and TA'd in 1978. Set 10 3/4" CICR at 3425'. Squeezed 75 sxs cmt below CR and left 25 sxs on top. Highest cement plug (155') f/ 605' - 450' RKB (322'- 167' BML). Surface plug tested to 2000 psi. 13.8 ppg WBM left in wellbore. Need to PT & BT annuli, tag plug at 450', circulate clean with seawater, complete surface plug with additional +/- 60' of cement and remove 10 3/4", 16" and 26" casings to 15' BML. |
| 17-706-40319-00 | OCS-G01172 | Vermilion | 313 | B006 | ST00BP00 | TA 2014. Surface cement plug @ 110' BML. Need to cut 7 5/8", 10 ¾", 16" & 26" at 15' BML. |
| 17-706-40327-00 | OCS-G01172 | Vermilion | 313 | B007 | ST00BP00 | TA 1978. Drilled and TA'd in 1978. Highest cement plug (150') at 450'-600' RKB (167' - 317' BML). 13.7ppg WBM in wellbore. Need to spot additional +/- 50' cement to complete surface plug, PT & BT annuli and remove 10 3/4", 16" and 26" casings to 15' BML. |
| 17-706-40338-01 | OCS-G01172 | Vermilion | 313 | B009 | ST01BP00 | TA 2014. Surface cement plug @ 110' BML. Need to cut 7 5/8", 10 ¾", 16" & 26" at 15' BML. |
| 17-706-40371-00 | OCS-G01172 | Vermilion | 313 | B011 | ST00BP00 | TA 2014. Surface cement plug @ 110' BML. Need to cut 7 5/8", 10 ¾", 16" & 26" at 15' BML. |
| 17-706-40719-00 | OCS-G01172 | Vermilion | 313 | C002 | ST00BP00 | TA 2014. Surface cement plug @ 98' BML. Need to cut 7", 10 ¾", 16" & 30" at 15' BML. |
| 17-706-40722-00 | OCS-G01172 | Vermilion | 313 | C003 | ST00BP00 | TA 2014. Surface cement plug @ 96' BML. Need to cut 7", 10 ¾", 16" & 30" at 15' BML. |
| 17-706-40720-00 | OCS-G01172 | Vermilion | 313 | C004 | ST00BP00 | TA 2014. Surface cement plug @ 100' BML. Need to cut 7", 10 ¾", 16" & 30" at 15' BML. |

3 of 3

## Schedule 1

### Qualified Conditions

1) To the extent that any well comprising an Abandoned Property that is not assigned a Gross Decom Amount requires the performance of any decommissioning activities, Eni and Credit Bid Purchaser shall agree to a Gross Decom Amount before commencing any decommissioning activities; provided, however, Temporary Abandoned with no estimated cost will not be subject to the Qualified Condition Cap.

2) For a period of up to eighteen (18) months after the effective date of the Turnkey Removal Agreement, any damage to an Abandoned Property due to a wind-storm, weather damage, or other casualty events associated with severe tropical weather arising after the effective date of the Turnkey Removal Agreement; provided, however, any damage to any platform related to ingress and egress shall not be a Qualified Condition.

3) To the extent that any pipeline comprising an Abandoned Property is required  to be buried where the Turnkey Removal Agreement does not already assume burial, the incremental cost (above the agreed Gross Decom Amount) shall be performed at cost and the Gross Decom Amounts and Eni (Net) Costs shall be proportionately adjusted subject to Section 1.c of the Term Sheet, provided that Eni and Credit Bid Purchaser shall agree to a Gross Decom Amount before commencing any such activities.

End of Schedule "1"

## **Exhibit B**

### **Turnkey Removal Agreement**

See attached.

*EXECUTION VERSION*

# TURNKEY REMOVAL AGREEMENT
### by and among
## ENI PETROLEUM US LLC
### AND
## FIELDWOOD ENERGY III LLC
### AND

## MAKO BUYER LLC

THIS TURNKEY REMOVAL AGREEMENT (the "**Agreement**") is made effective as of the [_____], 2021 (the "**Effective Date**"), by and among Eni Petroleum US LLC ("**Eni**"), a Delaware limited liability company having a mailing address of 1200 Smith Street, Suite 1700, Houston, Texas 77002, Fieldwood Energy III LLC ("**FWE III**"), a Delaware limited liability company having a mailing address of 2000 W. Sam Houston Pkwy S, Suite 1200, Houston, Texas 77042, and Mako Buyer LLC, a Delaware limited liability company (hereinafter referred to as "**Contractor**"), a Delaware limited liability company, having its mailing address at 2000 W Sam Houston Pkwy S, Suite 1200, Houston, Texas 77042.  Eni, FWE III and Contractor may hereinafter be referred to collectively as "**Parties**" or individually as a "**Party**."

## RECITALS

WHEREAS, FWE III is a resulting entity of a divisive merger effected in connection with the confirmed plan of reorganization of Chapter 11 Case 20-33948, In re: Fieldwood Energy LLC et al., in the United States Bankruptcy Court for the Southern District of Texas, Houston Division;

WHEREAS, Eni is identified as a predecessor-in-interest of the Specified Assets (as defined below);

WHEREAS, Eni and FWE III have requested that Contractor provide certain decommissioning and removal services with respect to the Specified Assets, upon the terms and conditions set forth herein, and Contractor has agreed to do so.

NOW, THEREFORE, in consideration of the premises and of the mutual promises, covenants, conditions, and agreements contained herein, and for other valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties hereby agree as follows:

## ARTICLE I.
## SERVICES

**Section 1.1**    **Services**. Subject to the terms of this Agreement, including the Performance Standards (as defined below), with respect to the interests identified on <u>Schedule 1</u> of this Agreement (the "**Specified Interests**"), Contractor will perform (i) the Agreed Activities, (ii) the Initial Safe Out,  and (iii) plug, abandon, decommission, remove when reefing or burial are not allowed, and salvage as appropriate ("**Decommission**" or "**Decommissioning**") certain platforms, wells, pipelines, facilities and equipment (including production equipment) located at, and any

hydrocarbons produced from, if applicable, the Specified Interests (collectively the "**Specified Assets**") on a lump sum, project-by-project, turnkey payment basis as contemplated in this Agreement.

**Section 1.2**    Turnkey Amounts.

(a)    Contractor will earn a single turnkey payment in exchange for completing the Decommissioning for each decommissioning project identified on Exhibit A hereto (each a "**Decommissioning Project**"). The total turnkey amount for each Decommissioning Project set forth on Exhibit A shall be set forth (i) on a gross 8/8ths basis (the "**Gross Turnkey Amount**") and (ii) Eni's individual net share of such Gross Turnkey Amount (such amount, the "**Eni Net Turnkey Amount**"). Without limitation of Eni's share of any Agreed Excess Qualified Conditions Costs pursuant to Section 1.8 up to the Qualified Condition Cap or any Excess Regulatory Costs pursuant to Section 1.7, (i) the aggregate sum of Gross Turnkey Amounts for the Decommissioning Projects shall not exceed $95,755,436.46, and (ii) the aggregate sum of Eni Net Turnkey Amounts for the Decommissioning Projects shall not exceed $57,325,130.98.  The Parties acknowledge and agree that except as provided in this Agreement or the Implementation Agreement (as defined below), neither Contractor nor Eni shall have any obligation to Decommission any Specified Assets which are not identified on Exhibit A.

(b)    Subject to the terms of this Agreement, each Gross Turnkey Amount for each applicable Decommissioning Project shall be inclusive of all costs, expenses, taxes and reasonable overhead (in accordance with COPAS provisions attached to the Contract Operating Agreement as defined in Section 1.12) associated with a particular Decommissioning Project, including all third-party costs, any fixed and/or capital costs, and  taxes as necessary to meet the Performance Standard (collectively, the "**Actual Decommissioning Costs**"). Contractor shall be paid the applicable Eni Net Turnkey Amount for each completed Decommissioning Project, unless Eni makes a Turnkey Election pursuant to Section 1.4 below, in which case, Contractor shall be paid the applicable Gross Turnkey Amount; provided, however, in either case, the payment shall be made pursuant to Section 2.3 of this Agreement.

(c)    Contractor shall have a profit opportunity following the completion of Decommissioning for any Decommissioning Project if it is able to Decommission such Decommissioning Project for a lower Actual Decommissioning Cost (i) net to the interests of Eni, as set forth in Decommissioning Project Schedule on Exhibit A in the column labeled "Eni Ownership (%)*," than the Eni Net Turnkey Amount, provided, that Eni did not make a Turnkey Election for such Decommissioning Project, or (ii) than the Gross Turnkey Amount if a Turnkey Election was made by Eni.  The Parties acknowledge and agree that once Eni has paid Contractor the Eni Net Turnkey Amount or Gross Turnkey Amount, as applicable, Eni shall have (subject to Sections 1.4, 1.6, 1.7, and 1.8) no further obligations (monetary or otherwise) with respect to the applicable Decommissioning Project, and Contractor shall bear the risk that the Actual Decommissioning Costs of a Decommissioning Project exceed the applicable Eni Net Turnkey Amount in the event no Turnkey Election is made, or the Gross Turnkey Amount attributed to such Decommissioning Project, in the event a Turnkey Election is made.

Debtors' Exhibit No. 34
Page 777 of 910

  **Section 1.3**  **Commencement of Decommissioning Projects**. Without limitation of Contractor's obligations under <u>Section 1.5</u>, Contractor shall not be obligated to commence a Decommissioning Project until the earlier of (i) receipt by Eni and other joint and several parties of a BOEM/BSEE order(s) requiring such Decommissioning and full funding for such Decommissioning Project has been agreed upon in accordance with <u>Section 2.3</u>, or (ii) Eni makes a Turnkey Election for such Decommissioning Project; provided that the Decommissioning Project Schedule on <u>Exhibit A</u> shall be modified to address either such event.

  **Section 1.4**  **Turnkey Election**. Eni shall have the right, but not the obligation (in Eni's sole discretion), to make an irrevocable election to agree to pay to Contractor the Gross Turnkey Amount for any particular Decommissioning Project (a "**Turnkey Election**"). In order to make a Turnkey Election, Eni shall provide Notice of its election to Contractor and FWE III, specifically identifying the Decommissioning Project to which the Turnkey Election applies (a "**Turnkey Notice**"). Upon receipt of a Turnkey Notice, Contractor shall promptly commence the applicable Decommissioning Project. Notwithstanding anything to the contrary contained in this Agreement, the Eni Term Sheet Implementation Agreement by and among (a) Fieldwood Energy LLC and its affiliated debtors and debtors in possession in the jointly administered Chapter 11 cases pending before the Honorable Marvin Isgur under Case No. 20-33948, (b) Eni Petroleum US LLC, and (c) the Credit Bid Purchaser dated of even date herewith (the "**Implementation Agreement**"), or any other Eni Definitive Documents (as defined in the Implementation Agreement), in the event Eni makes a Turnkey Election: (i) Eni agrees to pay Contractor the applicable Gross Turnkey Amount, subject to the terms of <u>Section 2.3</u>, plus, as applicable, any Agreed Excess Qualified Conditions Costs pursuant to <u>Section 1.8</u> up to the Qualified Condition Cap or any Excess Regulatory Costs pursuant to <u>Section 1.7</u>, (ii) Contractor assumes the risk that the actual costs for the Decommissioning Project, performed in accordance with the Performance Standards, and excluding any costs for "Excluded Wells" and/or "Eligible Well Intervention Costs" (as such terms are defined in the Implementation Agreement) with respect to any particular "Temporary Abandoned Well" (as such term is defined in the Implementation Agreement) pursuant to <u>Section 7</u> of the Implementation Agreement, exceed the Gross Turnkey Amount, plus, as applicable, any Agreed Excess Qualified Conditions Costs pursuant to <u>Section 1.8</u> (up to the Qualified Condition Cap) and any Excess Regulatory Costs pursuant to <u>Section 1.7</u>, and (iii) Eni shall have the right to seek contribution from third parties for any share of the Gross Turnkey Amount.  In the event Eni makes a Turnkey Election for any Decommissioning Project, Eni may assign its rights in this Agreement insofar as it covers such Decommissioning Project (to the extent that it relates to Eni's prior undivided interests in the Specified Assets) to any third party or parties with joint and several liability for such Decommissioning Project, provided that Eni shall remain responsible for all of its obligations hereunder in relation to such Decommissioning Project.

  **Section 1.5**  **Initial Safe Out**. With respect to the Decommissioning Projects, Contractor shall promptly perform the operations necessary to safe-out and otherwise perform preparatory activities in accordance with the Performance Standards to put such assets into a mechanical and operational state such that they are hydrocarbon free and ready to be Decommissioned (the "**Initial Safe Out**"). The Initial Safe Out for all Decommissioning Projects shall be completed no later than

December 31, 2021, unless agreed to in writing by Eni, such consent not to be unreasonably withheld, delayed or conditioned.

**Section 1.6** **Qualified Conditions**. If it is discovered that any qualified condition(s) identified on Exhibit B ("**Qualified Conditions**") is present and is reasonably likely to result in additional costs or expenses to Contractor in excess of the existing Gross Turnkey Amount, either Contractor or Eni may provide Notice to the other, and for thirty (30) days following receipt of such Notice, the Parties shall work together in good faith to agree, as applicable, upon (i) any excess costs and expenses for such Qualified Conditions above the existing Gross Turnkey Amount or an alternative cost arrangement for an existing Decommissioning Project, and/or (ii) a Gross Turnkey Amount for a Specified Asset that is not already included in a Decommissioning Project as provided in Section 1 of Exhibit B ((i) and (ii) collectively, the "**Excess Qualified Conditions Costs**"). In the event the Parties are unable to reach an agreement with respect to (i) the existence of a Qualified Condition or (ii) the Excess Qualified Conditions Costs attributable to a Qualified Condition, the Parties may submit the matter for Expert Determination, as provided in Section 1.10 below. As either agreed by the Parties or determined by Expert Determination, any such Excess Qualified Conditions Costs are the "**Agreed Excess Qualified Conditions Costs**."

**Section 1.7** **Regulatory Changes**. If any regulatory body either (i) issues a new regulation(s) that increases the cost to conduct a Decommissioning Project in accordance with Performance Standards, or (ii) designates additional sand sediment areas requiring pipeline removal as opposed to abandonment in place for any Decommissioning Project that did not already assume pipeline removal, following thirty (30) days prior written notice by Contractor to Eni, Eni and Contractor shall negotiate in good faith as to the existence of any regulatory change, and any necessary excess costs above the existing Gross Turnkey Amount for any affected Decommissioning Projects ("**Excess Regulatory Costs**") to take into account the incremental costs required to complete any such Decommissioning Project.  For the avoidance of doubt, new regulations include but are not limited to, NTLs, BSEE or BOEM national, regional or district policies and requirements, executive and Secretary of Interior orders and new and revised CFR regulations that govern or affect decommissioning. In the event that of new regulations, then (i) the Excess Regulatory Costs therefor shall be as agreed upon by the Parties, or (ii) if Eni and Contractor are unable to agree on the amount of Excess Regulatory Costs for a particular Decommissioning Project, then such Excess Regulatory costs shall be determined on a cost-plus 15% basis where costs are actual, reasonable third-party costs necessary for Decommissioning in accordance with Performance Standards.

**Section 1.8** **Qualified Conditions Cap**. Without limitation of and subject to Section 1.7, above, but subject to the existence of a Qualified Condition, Contractor shall assume the risk that the costs to Decommission a Decommissioning Project exceeds the Eni Net Turnkey Amount attributed to such Decommissioning Project, in the event no Turnkey Election is made, or the Gross Turnkey Amount attributed to such Decommissioning Project, in the event a Turnkey Election is made. In the event of a Qualified Condition, Eni and Contractor shall share in any Agreed Excess Qualified Conditions Costs related to the Qualified Condition(s) in excess of the relevant Eni Net Turnkey Amount (or the Gross Turnkey Amount if the Turnkey Election is made) up to, on an aggregated basis of all Decommissioning Projects, fifteen million and 00/100 dollars ($15,000,000) (the "**Qualified Condition Cap**") as follows: (i) Eni shall be responsible for the first five million and 00/100 dollars ($5,000,000) of Agreed Excess Qualified Conditions Costs

4

related to Qualified Conditions, and (ii) Eni shall be responsible for 75% and Contractor shall be responsible for 25% of the remaining Agreed Excess Qualified Conditions Costs up to the Qualified Condition Cap. Eni's responsibility for any Agreed Excess Qualified Conditions Costs related to a Qualified Condition shall not commence until the full amount of the relevant Eni Net Turnkey Amount, or if the Turnkey Election is made, the relevant Gross Turnkey Amount, have been incurred. The calculation and application of these amounts (including such Agreed Excess Qualified Conditions Costs) shall be limited to the percentage portion (based on the "Eni Ownership (%)" as indicated on Exhibit A) for a particular Decommissioning Project in the event Eni did not elect to make the Turnkey Election with regard to such Decommissioning Project. In the event that one or more Qualified Conditions results in costs that exceed the Qualified Condition Cap, Eni's liability for any additional costs shall terminate once the Qualified Condition Cap has been reached and Eni shall have no further liability for any costs or the performance of any obligations associated with any Qualified Condition or the applicable Decommissioning Project.

Section 1.9    **Terms and Conditions**. The Parties agree that the performance of the Agreed Activities, the Initial Safe Out, and each Decommissioning Project shall be performed in accordance with the terms and conditions of this Agreement. Eni agrees that Contractor will have met the required standard of performance under this Agreement if it performs the Agreed Activities, the Initial Safe Out, and such Decommissioning Project consistent with required laws, rules and regulations promulgated by governing regulatory agencies, including but not limited to BOEM and BSEE; consistent with any applicable third-party contracts; and consistent with the Decommissioning Schedule set forth on Exhibit A (the "**Performance Standards**").

Section 1.10    **Expert Determination**. If the Parties cannot agree on (i) the existence of a Qualified Condition or (ii) the Excess Qualified Condition Costs as contemplated above (the "**Qualified Condition Dispute**") after good faith negotiations, either Eni or Contractor may submit the matter for expert determination according to the procedure outlined in this Section 1.10. Prior to submitting such matter to the Expert (as defined below), the Party intending to make the submission shall provide written notice to the other Party of such intent. If the Parties are unable to agree upon resolve the Qualified Condition Dispute within fifteen (15) days following the other Party's receipt of the notice provided herein, the Party intending to submit the matter to the Expert may so submit such matter to the Expert for final and binding determination. To submit the determination of the Qualified Condition Dispute to the Expert, the Parties shall each provide the Expert with (a) such data and information as is necessary for the Expert to be able to determine the resolution of the Qualified Condition Dispute, such data and information shall include applicable well data and information related to any structures, pipelines, facilities and other assets associated with the Decommissioning Project. The Expert shall, within fifteen (15) days of receiving such data and information, make its determination of the Qualified Condition Dispute using the data and information it has received from the Parties. In making its determination hereunder, the Expert (i) shall be bound by the provisions of this Section 1.10 and (ii) if the Qualified Condition Dispute relates to the amount of the Excess Qualified Condition Costs, the Expert may not assign a value to the Excess Qualified Condition Costs greater than the value provided by Contractor or less than the value provided by Eni. If, prior to the Expert finalizing its determination that the Qualified Condition Dispute relates to the amount of the Excess Qualified Condition Costs, the Expert, the Parties reach agreement, the Parties may withdraw the matter from the Expert. The determination of the Expert shall be final and binding on the Parties for all

Debtors' Exhibit No. 34
Page 780 of 910

purposes hereunder.  The fees and expenses of the Expert under this <u>Section 1.10</u> shall be borne one half by the Eni and one half by Contractor.  The Parties agree to utilize TSB Offshore, Inc. as the Expert for the purposes herein (the "**Expert**").  If the party selected as the Expert is unable or unwilling to serve as the Expert hereunder the Parties shall agree on a newly identified Expert.  If the Parties cannot agree after thirty (30) days of good faith negotiations, the Expert shall be selected by lot from among the nationally recognized independent engineering firms that have not represented any Party or its affiliates at any time during the three-year period of time immediately preceding its designation hereunder.  For selection by lot, Eni shall provide two (2) options, and Contractor shall provide two (2) options.  The Parties designate Opportune, LLP to make the selection by lot.

Section 1.11   **Contributions from Other Predecessors**.  FWE III will use commercially reasonable efforts to obtain reimbursement and/or contribution for Decommissioning activity that is available under contract or applicable law, including from any other record title and/or operating rights interest holders and predecessors-in-interest other than Eni to the extent practicable and from available surety bonding other than Eni's bonds; provided that, for the avoidance of doubt, FWE III shall not be required to incur any out-of-pocket costs or obligations in connection with such efforts. In addition, FWE III shall obtain the written consent of Eni, not to be unreasonably withheld, delayed or conditioned, prior to entering into settlement negotiation(s), agreeing to a settlement, and/or initiating dispute resolution regarding the Specified Assets, including with respect to obtaining contributions for decommissioning from other record title and/or operating rights interest holders and predecessors-in-interest or obtaining funds from surety bonds for decommissioning.

Section 1.12   **Operations**.  Contractor will manage, on behalf of FWE III, the Specified Assets until the commencement of the Decommissioning pursuant to a contract operating agreement which is mutually acceptable to the Parties and by and between FWE III and Contractor (the "**Contract Operating Agreement**"). Except as set forth in the Implementation Agreement, Eni shall not be responsible for any operating costs associated with Eni's interests for any Decommissioning Project. Management of the Specified Assets shall include, but not be limited to, as services provided: operations, production marketing (for producing assets), accounting and land/regulatory administration, including all actions necessary for compliance with the Turnkey Removal Additional Terms and Conditions set forth in <u>Appendix 1</u>. Notwithstanding anything to the contrary, the Parties acknowledge and agree that the members of the Predecessor Group shall receive the benefit of any indemnification provisions contained in the Contract Operating Agreement which are provided by Contractor in favor of FWE III as intended third party beneficiaries of such provisions.

## ARTICLE II.
## FUNDING AND INVOICES

Section 2.1   **Funding Commitment**. Except with respect to the "Agreed Activities" (as such term is defined in the Plan) and the Initial Safe Out, which is governed by <u>Section 1.5</u>, Contractor shall not undertake any Decommissioning Project until (a) full funding of the applicable Gross Turnkey Amount has been agreed to by Eni and Contractor, including receiving funds or securing a contractual commitment (such as a decommissioning agreement) from applicable third

parties for any such Decommissioning Project, or (b) Eni makes a Turnkey Election for any such Decommissioning Project.

**Section 2.2    Invoicing**. Contractor shall submit a monthly invoice to FWE III LLC, with a copy to Eni, summarizing the accrued Actual Decommissioning Costs for each Decommissioning Project.  If Eni or FWE III reasonably disputes any portion of any invoice, Eni or FWE III shall notify Contractor within fifteen (15) days of receipt of the invoice in writing of the amount in dispute and the reasons thereof.  Contractor will provide reasonable and appropriate documentation to substantiate the charges on the invoice.

**Section 2.3    Payment**. For each Decommissioning Project, Eni shall pay to Contractor and Contractor shall receive, payment of the full agreed Eni Net Turnkey Amount or Gross Turnkey Amount (in the event a Turnkey Election was made), as adjusted pursuant to Section 1.7 and subject to Section 1.8.  For the avoidance of doubt, such payment shall include Eni's share of any Agreed Excess Qualified Conditions Costs pursuant to Section 1.8 up to the Qualified Conditions Cap or Excess Regulatory Costs, provided Eni shall have no obligation to tender any such payment contemplated in this Section 2.3 until Contractor delivers to FWE III and to Eni (i) a Site Clearance (as defined in Appendix 1) with respect to such Specified Interest; and (ii) an invoice and/or billing statement outlining in detail the Decommissioning work actually performed for such Decommissioning Project itemized by the applicable Decommissioning Project on Exhibit A, along with supporting documentation. Notwithstanding the foregoing but subject to Section 3.1, if Contractor has achieved all requirements of Site Clearance of a particular Decommissioning Project but BOEM has failed to issue the applicable approval required under the definition of Site Clearance with respect to such Decommissioning Project within the forty-five (45) day period immediately following Contractor's proper request and submission for such approval from BOEM, and *provided that* BOEM's failure to issue an approval in such forty-five (45) day period is not due to the fault or other act or omission of Contractor or any person for whom Contractor is responsible under this Agreement, including but not limited to Contractor failing to meet BOEM's requirements to receive such approval, "Site Clearance" for the purposes of this Section 2.3 shall be deemed to have been achieved and Contractor shall be entitled to the applicable payment provided that Contractor submits to Eni all documents provided to BOEM to obtain such Site Clearance.  Notwithstanding anything to the contrary herein, the payments made by Eni in satisfaction of the obligations set forth herein, shall not exceed twenty million dollars ($20,000,000.00) on an annual basis for any given calendar year; provided that (i) if Eni has delivered a Turnkey Notice, or (ii) if Eni is required, pursuant to an order from any governmental or regulatory authority, to perform any Decommissioning Project on a schedule that is more accelerated than contemplated on Exhibit A, then such annual limitation will be increased above twenty million dollars ($20,000,000.00) to the extent such increase is necessitated to perform the Decommissioning Project contemplated in subparts (i) and (ii) of this sentence. Such payment will be made by wire transfer in immediately available funds to a bank account designated by Contractor. Notwithstanding anything herein to the contrary in this Agreement, any amounts paid by Eni for a Decommissioning Project pursuant to this Section 2.3, shall be net of any proceeds realized by Contractor from the sale of hydrocarbons produced from the underlying Specified Asset of a Decommissioning Project identified on Exhibit A after the Effective Date. For the

avoidance of doubt, such proceeds shall be netted on the percentage basis attributed to Eni in the "Eni Ownership (%)" as indicated on Exhibit A for such particular Specified Asset.

Section 2.4    **Surety Bonds.** Eni may apply to any amounts owed hereunder any available proceeds from surety bonds that cover the Decommissioning of any applicable Decommissioning Projects.  Eni shall bear all costs and risks associated with such surety bonds.

Section 2.5    **Audit Rights**. Eni shall have the right to conduct, during normal business hours upon at least thirty (30) days' prior written notice, an audit of Contractor's records to the extent related to any amount charged to Eni hereunder. These audit rights shall survive the termination of this Agreement for a period of twelve (12) months.

Section 2.6    **Waiver and Release**.  Within ninety (90) days following the completion of a Decommissioning Project and only if (i) all amounts payable under this Agreement by Eni with respect to that Decommissioning Project have been paid by Eni in accordance with this Agreement and (ii) Eni has completely performed in accordance with this Agreement all of its obligations under this Agreement with respect to that Decommissioning Project, Contractor shall execute and deliver legal instruments in form and substance that are acceptable to Eni acting reasonably whereby Contractor: (a) acknowledges and agree that all amounts payable under this Agreement by Eni with respect to that Decommissioning Project have been paid by Eni in accordance with this Agreement; (b) waives, releases and forever discharges the members of the Predecessor Group from any and all Claims arising out of or relating to that Decommissioning Project; (c) acknowledges and agrees that Eni has completely performed in accordance with this Agreement all of its obligations under this Agreement with respect to that Decommissioning Project; and (d) acknowledges that Contractor has fully paid any non-disputed amounts owed to third parties in connection with such Decommissioning Project.

## ARTICLE III.
## TERM

Section 3.1    **Term and Survival**.  Subject to the condition precedent in Section 3.5 below, the term of this Agreement shall be from and after the Effective Date until (i) the Decommissioning Projects are completely Decommissioned in accordance with Performance Standards and (ii) Contractor has delivered a Site Clearance (as defined in Appendix 1) to FWE III and to Eni with respect to such Specified Interest, unless terminated earlier as provided in this Article III. In the event of termination pursuant to this Article III, Article II, and the terms and conditions set forth in Appendix 1, each of the foregoing shall survive such termination for four (4) years following the date of termination; provided, however, the definitions set forth in Appendix 1, the terms of Article V and Article VI, and the defined terms set forth in this Agreement shall survive indefinitely; provided further, Eni shall pay Contractor for any Decommissioning Projects completed prior to the date of termination in accordance with the terms of this Agreement. Following the termination or expiration of this Agreement, as applicable, in the event BOEM/BSEE issues an order with respect to any Specified Asset which indicates that the Decommissioning for such Decommissioning Project was not performed in accordance with the Performance Standards, then Contractor shall promptly cause, at its sole cost and expense, any

such Specified Asset that was the subject of a specific Decommissioning Project to be further Decommissioned in accordance with the Performance Standards.

Section 3.2   **Termination by Eni for Particular Asset.**   Eni may terminate this Agreement as to any Decommissioning Project and/or require FWE III to competitively bid the decommissioning services with respect to a Decommissioning Project in the event Contractor is in breach of this Agreement with respect to such Decommissioning Project, and such breach remains outstanding thirty (30) days after Eni or FWE III have provided written notice of such breach to Contractor; provided, however, any such termination shall be limited to the applicable Decommissioning Project and the remainder of this Agreement shall survive in full force and effect in accordance with the terms set forth herein.

Section 3.3   **Termination by Eni or Contractor**. Contractor or Eni may terminate this Agreement as to a particular Decommissioning Project if, within three (3) years of the Effective Date, (i) a Turnkey Election is not made by Eni for such Decommissioning Project, or (ii) contractual commitments for full funding of the Gross Turnkey Amount for such Decommissioning Project has not been received; provided, however, in the event that a Party is entitled to a right of termination pursuant to subpart (i) or subpart (ii) of this Section 3.3, such termination shall be limited to the applicable Decommissioning Project and the remainder of this Agreement shall survive in full force and effect in accordance with the terms set forth herein.

Section 3.4   **Suspension by Contractor**. Contractor may suspend performance under this Agreement if Eni is in breach of this Agreement, and such breach remains outstanding for thirty (30) days after Contractor has provided written notice of such breach to Eni.  All schedules and timelines in this Agreement shall be tolled until such breach is remedied.

Section 3.5   **Condition Precedent**. This Agreement shall become effective only in the event that on or before September 30, 2021 (except as otherwise mutually agreed by the Parties), Contractor has received all necessary approvals by applicable regulatory authorities to act as a qualified operator in the Gulf of Mexico.

**ARTICLE IV.**
**NOTICE**

Section 4.1   **Notice Addresses.**   All notices and correspondence required or permitted to be given by one Party to another hereunder shall be made in writing and shall be delivered to the appropriate Party at the address specified below either by hand, by nationally recognized overnight delivery service or by electronic delivery, unless a different address for notice or copy thereof is changed by notice, with copies to such other parties or addresses as a Party may designate by notice (each, a "**Notice**").  Notices sent by hand delivery or nationally recognized overnight delivery service shall be deemed to have been received upon the recipient's actual receipt of such Notice.  Notices sent by electronic delivery shall be deemed to have been received (i) on the date such transmission was sent if it was sent prior to 5:00 p.m. (at the recipient's local time) on a business day; or (ii) on the next business day following the date such transmission was sent if it

9

was sent after 5:00 p.m. (at the recipient's local time) on any business day or at any time on a non-business day.

If to Eni Petroleum US LLC:

Eni Petroleum US LLC
1200 Smith Street, Suite 1700
Houston, Texas 77002
Attn: Christian Johnson
Telephone: (713) 393-6184
Email: chris.johnson@eni.com

With a copy to:

Bracewell LLP
711 Louisiana Street, Suite 2300
Houston, Texas 77002
Attention:     J.J. McAnelly (james.mcanelly@bracewell.com)
               Jason Hutt (jason.hutt@bracewell.com)
               Mark Dendinger (mark.dendinger@bracewell.com)


If to Fieldwood Energy III LLC:

Fieldwood Energy III LLC
2000 W. Sam Houston Pkwy South, Suite 1200
Houston, Texas  77042
Attn:  Thomas R. Lamme
Telephone:  (713) 969-1000
Email: TLamme@fwellc.com


If to Mako Buyer LLC:

Mako Buyer LLC
2000 W. Sam Houston Pkwy South, Suite 1200
Houston, Texas  77042
Attn:  Thomas R. Lamme
Telephone: (713) 969-1000
Email: TLamme@fwellc.com

Debtors' Exhibit No. 34
Page 785 of 910

## ARTICLE V.
## GOVERNING LAW; DISPUTES

**Section 5.1**    Governing Law.

(a)    Notwithstanding the place of execution hereof or the place for performance of any covenant, promise or agreement herein made, this Agreement and the validity hereof, the agreements evidenced hereby, and all matters and issues arising hereunder, shall, to the fullest extent possible, be construed pursuant to and governed by the General Maritime Laws of the United States.  If the General Maritime Laws of the United States are held to be inapplicable to this Agreement or the Work (or any part thereof) to be performed hereunder by a court of competent jurisdiction, then Subsections 5.1(b) and 5.1(c) below shall apply, as appropriate, but only to the extent that United States General Maritime Law is held to be inapplicable.

(b)    If any court of competent jurisdiction determines that United States Maritime Law is not applicable to any relevant part of this Agreement or the Work to be performed hereunder, then such part of this Agreement and/or the work to be performed hereunder, shall, to the fullest extent enforceable under applicable law, be interpreted and enforced exclusively in accordance with the laws of the State of Texas.

(c)    If any court of competent jurisdiction determines that neither United States General Maritime Law nor the laws of the state of Texas are applicable to any relevant part of this Agreement or the Work to be performed hereunder, then such part of this Agreement and/or the work to be performed hereunder, shall, to the fullest extent enforceable under applicable law, be interpreted and enforced exclusively in accordance with the laws of the State of Louisiana, excluding any conflicts of law rules that might refer same to another jurisdiction.

(d)    Notwithstanding the choice of law provisions contained in this Article V, no conflicts of laws principles that would require the application of any law other than that expressly set forth in Sections 5.1(a), 5.1(b) or 5.1(c), as appropriate, shall be applicable to this Agreement or the enforcement of any provision hereof.  **FURTHER, NO LAW, THEORY OR PUBLIC POLICY, SHALL BE GIVEN EFFECT WHICH WOULD UNDERMINE, DIMINISH OR REDUCE THE EFFECTIVENESS OF THE WAIVER OF SPECIAL CLAIMS PROVIDED IN SECTION 5.3 OF APPENDIX 1 ATTACHED HERETO, IT BEING THE EXPRESS INTENT, UNDERSTANDING AND AGREEMENT OF THE PARTIES THAT SUCH WAIVER IS TO BE GIVEN THE FULLEST EFFECT, NOTWITHSTANDING ANY PRE-EXISTING DEFECT OR THE NEGLIGENCE (WHETHER SOLE, JOINT OR CONCURRENT), GROSS NEGLIGENCE, WILLFUL MISCONDUCT, STRICT LIABILITY OR OTHER LEGAL FAULT OF ANY PARTY OR OTHERWISE.**

**Section 5.2    WAIVER OF JURY TRIAL**.  EACH OF THE PARTIES HERETO HEREBY IRREVOCABLY WAIVES ANY AND ALL RIGHT TO TRIAL BY JURY IN ANY LEGAL PROCEEDING ARISING OUT OF OR RELATED TO THIS AGREEMENT,

Debtors' Exhibit No. 34
Page 786 of 910

INCLUDING THE ENFORCEABILITY OF THE AGREEMENT, OR THE TRANSACTIONS CONTEMPLATED HEREBY.

**Section 5.3**     **Disputes**. The Parties agree that all disputes in any way arising out of or resulting from this Agreement that will be litigated, if any at all, shall be litigated exclusively in the state and/or federal courts in Harris County, Texas.  The Parties accordingly hereby submit to the jurisdiction and venue of such courts for all purposes.

**Section 5.4**     Compliance with Anti-Corruption Laws.

(a)     Each Party warrants that, in connection with this Agreement, it and its affiliates will comply with all applicable anti-bribery and corruption, anti-money laundering, trade control, and sanctions laws and regulations, such as the Bribery Act 2010 of the United Kingdom, Foreign Corrupt Practices Act 1977 of the United States of America, and the Australian Criminal Code of 1995, as amended, Division 70 – Bribery of foreign public officials, and the OECD Convention on Combating Bribery of Foreign Public Officials in International Business Transactions, and all applicable successor legislation, and in any event, will not and will procure that its employees and third party providers (including its subcontractors, agents and other intermediaries) will not offer, give or agree to give any person whosoever, or solicit, accept or agree to accept from any person, either directly or indirectly, anything of value in order to obtain, influence, induce or reward any improper advantage (the "**Anti-Corruption Obligation**").

(b)     Contractor and FWE III each represent and warrant that it has reviewed and understood: (a) the general standards of transparency of the sensitive activities related to the Model 231 pursuant to Legislative Decree 231/2001 and Eni's Supplier Code of Conduct, adopted by Eni; (b) the Anti-Corruption Management System Guidelines of Eni; and (c) Eni's Statement on respect for human rights.  Contractor and FWE III take note that each of the documents under (a) to (c) above are available on the website: *www.eni.com* and undertake to comply with the principles contained therein.

(c)     Each Party agrees it shall on an on-going basis, and subject to any applicable data privacy law, legal privilege, or other legal restriction:

(i)     as soon as reasonably possible disclose in writing to the other Parties details of any breach of the Anti-Corruption Obligation; and

(ii)     on reasonable request, use best endeavors to cooperate to ensure and monitor compliance with the Anti-Corruption Obligation, which shall include promptly responding in reasonable detail to any notice from another Party reasonably connected to the Anti-Corruption Obligation and making any relevant books, records, or personnel relating to this Agreement and a Party's compliance with the Anti-Corruption Obligation available for review by the other Parties.

Debtors' Exhibit No. 34
Page 787 of 910

(d)     Each Party shall throughout the term of this Agreement:

(i)   institute and maintain policies and procedures which are designed to ensure compliance with all applicable laws and the Anti-Corruption Obligation, including the maintenance of complete and accurate books and records and an effective system of internal accounting controls;

(ii)   maintain at its normal place of business, throughout the term and for at least two (2) years following its expiration or termination, detailed books, records and accounts which accurately and fairly reflect all transactions and payments made by it in connection with this Agreement;

(iii)   make clear, in its dealings connected to this Agreement, that it is required to act, and is acting, in accordance with the Anti-Corruption Obligation; and

(iv)   on reasonable notice, and subject to any applicable data privacy law,  legal privilege, confidentiality obligation, license agreement or other express legal restriction, permit any other Party or its duly appointed third party representatives, at the other Party's sole expense, during normal working hours, at the Party's normal place of business, to access, review, inspect and make copies of its books, records and accounts, but only to the extent reasonably necessary in order to audit its compliance with the Anti-Corruption Obligation.  The rights set out in this Section 5.4 will be exercised in accordance with all applicable competition laws.

## ARTICLE VI.
## MISCELLANEOUS

**Section 6.1     Entire Agreement**. This Agreement (together with the schedule, exhibits, and appendices hereto, which are incorporated herein by reference), the Implementation Agreement of even date herewith, and the other Definitive Documents constitute the entire agreement among the Parties with respect to the subject matter hereof and supersede any other representations, understandings or agreements (whether written, oral or otherwise) that may have been made, understood or entered into by the Parties or any of their respective affiliates relating to the transactions contemplated hereby or the subject matter hereof.

**Section 6.2     Successors and Assigns**. This Agreement is personal as to each Party and shall not be assigned without the other Parties' consent; *provided* that the foregoing shall not apply if Contractor assigns this Agreement in total:

(a)     along with all of its personnel who are performing any part of the services hereunder to another entity *provided*, that no such assignment by Contractor, or any subsequent assignment or Transfer of ownership (other than, in each case, a Transfer that conforms with the

requirements of subpart (b) below), shall relieve Contractor of its obligations under this Agreement; or

(b)     to an acquirer of all or substantially all of Contractor's employees providing services hereunder provided that: (i) such acquirer has a Tangible Net Worth of at least five (5) times the then-current P90 estimate of the remaining Decommissioning Projects to be Decommissioned in accordance with the Performance Standards and, (ii) at the time of the assignment, at least seventy percent (70%) of the Work (as defined in Appendix 1) described in the Decommissioning Schedule set forth on Exhibit A, based on the Eni Net Turnkey Amount, has been Decommissioned in accordance with the Performance Standards (a "Permitted 3rd-Party Assignment"). If any platform described on Exhibit A has not been Decommissioned in accordance with the Performance Standards ("Remaining Platforms") at the time of any Permitted 3rd Party Assignment made pursuant to this Section 6.2, the Credit Bid Purchaser shall cause the assignee to deliver, as conditions of the assignment, with evidence of their respective satisfaction prior to the effectiveness of such assignment, (i) a windstorm and casualty policy, at the expense of assignee, with a limit of not less than the total amount of the then-current P90 estimate of the Remaining Platforms, with applicable endorsements and other requirements as set forth on Exhibit C of Appendix 1, covering the Remaining Platforms that have not been Decommissioned in accordance with the Performance Standards, which such policy shall have a deductible reasonably acceptable to Eni and shall be required to be maintained throughout the Decommissioning of the Remaining Platforms in accordance with the Performance Standards; and (ii) an express assumption and agreement by assignee to the terms and obligations, accrued or unaccrued, contemplated in this Agreement.

(c)     For purposes of this Agreement, "**Tangible Net Worth**" of any assignee means, as of any date of determination, the positive difference, if any, of the total assets of such assignee minus total liabilities of such assignee, with total assets and total liabilities each to be determined in accordance with generally accepted accounting principles applicable to such assignee, *excluding*, *however*, from the determination of total assets (i) patents, patent applications, trademarks, copyrights and trade names, (ii) goodwill, organizational, experimental, research and development expense and other like intangibles, , and (iii) unamortized debt discount and expense. For purposes of this Agreement, "**Transfer**" means the assignment, transfer, equity sale, merger, divisive merger, or hypothecation, as well as any change of control transaction.

Section 6.3     **Amendment**. This Agreement may be amended or modified in whole or in part, and terms and conditions may be waived, only by a duly authorized agreement in writing which makes express reference to this Agreement and is executed by each Party.

Section 6.4     **Severability**. If any provision of this Agreement is held invalid or unenforceable by any court of competent jurisdiction, the other provisions of this Agreement shall remain in full force and effect. The Parties further agree that if any provision contained herein is, to any extent, held invalid or unenforceable in any respect under the laws governing this Agreement, they shall take any actions necessary to render the remaining provisions of this Agreement valid and enforceable to the fullest extent permitted by law and, to the extent necessary, shall amend or otherwise modify this Agreement to replace any provision contained herein that is

Debtors' Exhibit No. 34
Page 789 of 910

held invalid or unenforceable with a valid and enforceable provision giving effect to the intent of the Parties to the greatest extent legally permissible.

     **Section 6.5**    __Counterparts__. This Agreement may be executed in two or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument. Any .pdf or other electronic transmission of an executed signature page to this Agreement shall, for all purposes, be deemed an original.

     **Section 6.6**    __Further Assurances__. Subject to the terms and conditions of this Agreement, each Party shall use its reasonable efforts to take, or cause to be taken, all actions and to do, or cause to be done, all things necessary or desirable, under applicable law or otherwise, to consummate or implement the transactions contemplated by this Agreement.  The Parties agree to and shall execute and deliver all such other documents, certificates, agreements, and other writings and shall take all such other actions as may be necessary or desirable in order to consummate or implement expeditiously the transactions contemplated in this Agreement in accordance with the terms hereof, including but not limited to any actions or agreements reasonably necessary as a result of the presence of a Qualified Condition or Regulatory Change.

[*Signature page to follow*]

15

IN WITNESS WHEREOF, the Parties hereto as set forth below have executed this Agreement as of the date first written above.

**ENI PETROLEUM US LLC**

By: _____
Name:  Luca Pellicciotta
Title:  President and CEO

[*Signature page to Turnkey Removal Agreement*]

**FIELDWOOD ENERGY III LLC**

By: _____
Name:
Title:

*[Signature page to Turnkey Removal Agreement]*

**<u>CONTRACTOR:</u>**

**MAKO BUYER LLC**

By: _____
Name:
Title:

*[Signature page to Turnkey Removal Agreement]*

Schedule 1

Specified Interests

| Block | Lease |
|-------|-------|
| GA 151 | OCS-G 15740 |
| SS 246 | OCS-G 01027 |
| VR 78 | OCS-G 04421 |
| VR 313 | OCS-G 01172 |
| SS 247 | OCS-G 01028 |
| SS 248 | OCS-G 01029 |
| SS 249 | OCS-G 01030 |
| SS 270 | OCS-G 01037 |
| SS 271 | OCS-G 01038 |
| WC 72 | OCS-G 23735 |

Exhibit A

Decommissioning Projects, Turnkey Amounts and Decommissioning Schedule

See attached.

**Turnkey Estimates**

### 2021

| Block | Year | Host Platform | Designation | Asset | Status | Water Depth | ENI Ownership (%)* | Gross | Net (ENI) |
|---|---|---|---|---|---|---|---|---|---|
| SS 246 | 2021 | SS 246 A | A002 | Well | Partial TA | 166 | 76.76% | 470,971 | 361,538 |
| SS 246 | 2021 | SS 246 A | A004 | Well | COM | 166 | 76.76% | 1,036,136 | 795,383 |
| SS 246 | 2021 | SS 246 A | A005 | Well | COM | 166 | 80.69% | 1,036,136 | 836,079 |
| SS 246 | 2021 | SS 246 A | A006 | Well | COM | 166 | 80.69% | 1,036,136 | 836,079 |
| SS 246 | 2021 | SS 246 A | A007 | Well | COM | 166 | 80.69% | 1,036,136 | 836,079 |
| SS 246 | 2021 | SS 246 A | A009 | Well | Partial TA | 166 | 76.76% | 470,971 | 361,538 |
| SS 246 | 2021 | SS 246 A | A011 | Well | COM | 166 | 76.76% | 2,825,825 | 2,169,227 |
| SS 246 | 2021 | SS 246 A | A014 | Well | COM | 166 | 76.76% | 1,036,136 | 795,383 |
| SS 246 | 2021 | SS 246 A | A019 | Well | COM | 166 | 76.76% | 847,748 | 650,768 |
| SS 246 | 2021 | SS 246 A | A020 | Well | COM | 166 | 80.69% | 1,224,524 | 988,093 |
| SS 246 | 2021 | SS 246 A | 10258 | Pipeline | OUT | 166 | 77.22% | 236,329 | 182,488 |
| SS 246 | 2021 | SS 246 J | J001 | Well | COM | 162 | 80.69% | 1,036,136 | 836,079 |
| SS 246 | 2021 | SS 246 J | 13056 | Pipeline | OUT | 162 | 97.30% | 240,915 | 234,416 |
| VR 313 | 2021 | VR 313 B | SN 5440 | Pipeline | OUT | 202 | 100.00% | 375,323 | 375,323 |
| VR 313 | 2021 | VR 313 B | SN 15136 | Pipeline | OUT | 202 | 100.00% | 375,323 | 375,323 |
| VR 313 | 2021 | VR 313 C | SN 10558 | Pipeline | OUT | 213 | 100.00% | 187,626 | 187,626 |
| VR 313 | 2021 | VR 313 C | C001 | Well | COM | 213 | 100.00% | 1,152,493 | 1,152,493 |
| VR 313 | 2021 | VR 313 C | C004 | Well | Partial TA | 213 | 100.00% | 443,267 | 443,267 |
| VR 313 | 2021 | VR 313 D | D001 | Well | COM | 214 | 50.00% | 797,880 | 398,940 |
| VR 313 | 2021 | VR 313 D | D002 | Well | COM | 214 | 50.00% | 797,880 | 398,940 |
| VR 313 | 2021 | VR 313 D | D003 | Well | COM | 214 | 50.00% | 797,880 | 398,940 |
| VR 313 | 2021 | VR 313 D | D004 | Well | COM | 214 | 50.00% | 797,880 | 398,940 |
| VR 313 | 2021 | VR 313 D | D005 | Well | COM | 214 | 50.00% | 797,880 | 398,940 |
| SS 247 | 2021 | SS 247 F | SN 5902 | Pipeline | OUT | 225 | 25.59% | 240,783 | 61,612 |
| SS 248 | 2021 | SS 248 D | 10611 | Pipeline | OUT | 180 | 30.78% | 410,379 | 126,303 |
| SS 248 | 2021 | SS 248 G | 10349 | Pipeline | PABN | 188 | 30.78% | 241,979 | 74,474 |
| WC 72 | 2021 | WC 72 #2 | #2 | Platform | | 39 | 75.00% | 620,573 | 465,430 |
| WC 72 | 2021 | WC 72 #2 | O02 | Well | COM | 39 | 75.00% | 1,008,432 | 756,324 |
| | | | | | | | Total | $21,579,675.88 | $15,896,024.01 |

### 2022

| Block | Year | Host Platform | Designation | Asset | Status | Water Depth | ENI Ownership (%) | Gross | Net (ENI) |
|---|---|---|---|---|---|---|---|---|---|
| VR 313 | 2022 | VR 313 B | B003 | Well | COM | 202 | 100.00% | 797,880 | 797,880 |
| VR 313 | 2022 | VR 313 B | B005 | Well | COM | 202 | 100.00% | 797,880 | 797,880 |
| VR 313 | 2022 | VR 313 B | B010 | Well | COM | 202 | 100.00% | 797,880 | 797,880 |
| VR 313 | 2022 | VR 313 C | C001 | Well | COM | 202 | 100.00% | 1,152,493 | 1,152,493 |
| SS 246 | 2022 | SS 246 A | SS 246 A | Platform | | 166 | 77.22% | 9,915,095 | 7,656,196 |
| SS 246 | 2022 | SS 246 E | SS 246 E | Platform | | 166 | 77.22% | 5,329,033 | 4,114,950 |
| SS 246 | 2022 | SS 246 J | SS 246 J | Platform | | 162 | 97.30% | 2,340,885 | 2,277,743 |
| SS 248 | 2022 | SS 248 D | D009 | Well | Partial TA | 180 | 25.56% | 659,359 | 184,840 |
| SS 248 | 2022 | SS 248 D | D012 | Well | | 180 | 30.85% | 470,971 | 145,285 |
| SS 248 | 2022 | SS 248 D | D015 | Well | Partial TA | 180 | 30.78% | 659,359 | 202,932 |
| SS 248 | 2022 | SS 248 D | D016 | Well | Partial TA | 180 | 30.78% | 470,971 | 144,951 |
| SS 248 | 2022 | SS 248 D | D018 | Well | Partial TA | 180 | 30.78% | 470,971 | 144,951 |
| SS 248 | 2022 | SS 248 D | D020 | Well | COM | 180 | 30.78% | 847,748 | 260,913 |
| SS 249 | 2022 | SS 248 D | D002 | Well | Partial TA | 180 | 39.57% | 470,971 | 186,370 |
| SS 249 | 2022 | SS 248 D | D005 | Well | COM | 180 | 55.76% | 847,748 | 472,683 |
| SS 249 | 2022 | SS 248 D | D011 | Well | COM | 180 | 39.57% | 1,036,136 | 410,014 |
| SS 249 | 2022 | SS 248 D | D014 | Well | Partial TA | 180 | 39.57% | 659,359 | 260,918 |
| SS 249 | 2022 | SS 248 D | D017 | Well | Partial TA | 180 | 30.78% | 470,971 | 144,951 |
| SS 249 | 2022 | SS 248 D | D019 | Well | Partial TA | 180 | 52.29% | 470,971 | 246,293 |
| SS 248 | 2022 | SS 248 G | G001 | Well | COM | 188 | 30.78% | 847,748 | 260,913 |
| SS 248 | 2022 | Subsea | SS 249 | Well | Partial TA | 195 | 53.49% | 941,942 | 503,882 |
| | | | | | | | Total | $30,456,369.02 | $21,144,920.17 |

### 2023

| Block | Year | Host Platform | Designation | Asset | Status | Water Depth | ENI Ownership (%) | Gross | Net (ENI) |
|---|---|---|---|---|---|---|---|---|---|
| VR 313 | 2023 | VR 313 B | VR 313 B | Platform | | 202 | 100.00% | 4,875,933 | 4,875,933 |
| VR 313 | 2023 | VR 313 C | VR 313 C | Platform | | 213 | 100.00% | 2,659,600 | 2,659,600 |
| VR 313 | 2023 | VR 313 D | VR 313 D | Platform | | 214 | 50.00% | 3,102,867 | 1,551,433 |
| SS 247 | 2023 | SS 247 F | F002 | Well | COM | 225 | 25.00% | 847,748 | 211,937 |
| SS 247 | 2023 | SS 247 F | F014 | Well | COM | 225 | 25.00% | 1,036,136 | 259,034 |
| SS 247 | 2023 | SS 247 F | F017 | Well | COM | 225 | 25.00% | 847,748 | 211,937 |
| SS 247 | 2023 | SS 247 F | F018 | Well | COM | 225 | 45.80% | 847,748 | 388,281 |
| SS 247 | 2023 | SS 247 F | F019 | Well | COM | 225 | 25.00% | 847,748 | 211,937 |
| SS 247 | 2023 | SS 247 F | SS 247 F | Platform | | 225 | 25.00% | 10,361,358 | 2,651,289 |
| SS 248 | 2023 | SS 248 D | SS 248 D | Platform | | 180 | 30.78% | 10,361,358 | 3,188,933 |
| SS 248 | 2023 | SS 248 G | SS 248 G | Platform | | 188 | 30.78% | 4,238,738 | 1,304,563 |
| WC 72 | 2023 | WC 72 #1 | #1 | Platform | | 37 | 75.00% | 543,002 | 407,251 |
| WC 72 | 2023 | WC 72 #1 | O01 | Well | COM | 37 | 75.00% | 1,008,432 | 756,324 |
| WC 72 | 2023 | WC 72 #1 | SN 14251 | Pipeline | ACTIVE | 37 | 75.00% | 232,715 | 174,536 |
| WC 72 | 2023 | WC 72 #3 | #3 | Platform | | 37 | 75.00% | 543,002 | 407,251 |
| WC 72 | 2023 | WC 72 #3 | O03 | Well | COM | 37 | 75.00% | 1,318,718 | 989,039 |
| WC 72 | 2023 | WC 72 #3 | SN 15893 | Pipeline | OUT | 37 | 75.00% | 46,543 | 34,907 |
| | | | | | | | Total | $43,719,391.75 | $20,284,186.80 |
| | | | | | | | Grand Total | $95,755,436.46 | $57,325,130.98 |

COM: Completed Well

Full TA: Temporarily Abandoned well that has the required plugs and testing

Partial TA: Partially Temporarily Abandoned where a well does not have the required plugs to
fully temporarily abandon a well  Active: An Active pipeline according to BOEM/BSEE records

Active: An Active pipeline according to BOEM/BSEE records

PABN: Pipeline that is proposed to be abandoned

OUT: A pipeline that is out of service

Note: The following wells have been temporarily abandoned and all that remains necessary to
decommission these wells is the removal of the applicable conductor and the cost to remove such
conductor has been included in the Gross Decom Amount(s) and Eni (Net) Costs for each
applicable host-facility for each applicable well that is referenced above:

Ship Shoal 246: SS 246 A001

Ship Shoal 247: SS 247 F001, SS 247 F003, SS 247 F004, SS 247 F005, SS 247 F006, SS 247 F007, SS 247
F008, SS 247 F009, SS 247 F010, SS 247 F011, SS 247 F012, SS 247 F013, SS 247 F016

Ship Shoal 248: SS 248 D001, SS 248 D003, SS 248 D004, SS 248 D006, SS 248 D007, SS 248 G002, SS 248
G003

Vermilion 313: VR 313 B001, VR 313 B002, VR 313 B004, VR 313 B008, VR 313 B009, VR
313 C002, VR 313 C003

* The Parties acknowledge and agree that in the event that either Party presents evidence that the
ownership interest allocated pursuant to this Decommissioning Schedule is less than or greater
than set forth in this Decommissioning Schedule, that they will use commercially reasonable
efforts to amend and revise the ownership interest and other obligations within this
Decommissioning Schedule allocated to Eni based on the applicable title records for the applicable
Decommissioning Project.

<u>Exhibit B</u>

<u>Qualified Conditions</u>

1) To the extent that any well comprising a Specified Asset is not assigned a Gross Turnkey Amount and requires the performance of any decommissioning activities, Eni and Contractor shall agree to a Gross Turnkey Amount for such well before commencing any decommissioning activities.

2) For a period of up to eighteen (18) months after the Effective Date, any damage to a Specified Asset due to a wind-storm, weather damage, or other casualty events associated with severe tropical weather arising after the Effective Date; provided, however, any damage to any platform related to ingress and egress shall not be a Qualified Condition.

3) To the extent that any pipeline included in a Decommissioning Project is required to be buried where this Agreement does not already assume burial, the work associated with such burial shall be a Qualified Condition and such work shall be performed at cost.

End of <u>Exhibit B</u>

<u>Appendix 1</u>
<u>Additional Terms and Conditions</u>

See attached.

*EXECUTION VERSION*

**APPENDIX 1**

**TURNKEY REMOVAL ADDITIONAL TERMS AND CONDITIONS**

**ARTICLE I.**
**DEFINITIONS**

As used in this <u>Appendix 1</u>, each of the following terms has the meaning provided below.

1.1   "<u>Agreed Activities</u>" shall mean those certain safety and related repairs and improvements on Specified Assets at such Abandoned Properties as provided in Section I.G.2 of the Disclosure Statement, to the extent the repairs and improvements are necessary to protect the public health and safety and/or the environment from hazardous conditions or to re-establish ingress and egress to Facilities so that the decommissioning of the Facilities can be conducted in a safe manner. For the avoidance of doubt, any capitalized terms used in this definition but not assigned a meaning in this Agreement shall have the meaning set forth in the Disclosure Statement.

1.2   "<u>Agreement</u>" shall mean the Turnkey Removal Agreement to which this <u>Appendix 1</u> is attached and made a part thereof.

1.3   "<u>Appendix 1</u>" shall mean these Turnkey Removal Additional Terms and Conditions.

1.4   "<u>BOEM</u>" shall mean the Bureau of Ocean Energy Management and/or any successor agencies thereto, as applicable.

1.5   "<u>BSEE</u>" shall mean the Bureau of Safety and Environmental Enforcement and/or any successor agency thereto, as applicable.

1.6   "<u>Claims</u>" shall mean any and all losses, liabilities, damages (including natural resource damages), obligations, expenses, fines, penalties, costs, claims, causes of action, judgments, awards and any and all other losses of any kind or character, including, without limitation, court costs.

1.7   "<u>Contractor</u>" shall mean Mako Buyer LLC.

1.8   "<u>Contractor Group</u>" shall mean, individually and collectively, Contractor, its parent, subsidiary and affiliated companies, its and their joint venturers, contractors and subcontractors (of any tier), and all of their respective employees, officers, directors, agents, representatives, attorneys-in-fact, subcontractors and insurers, and the subrogees of all such parties.

1.9   "<u>Contractor Obligation</u>" shall mean any obligation attributable to Contractor under the terms of the Agreement.

1.10 "<u>Disclosure Statement</u>" shall mean the *Disclosure Statement for Fourth Amended Joint Chapter 11 Plan of Fieldwood Energy LLC and its Affiliated Debtors*, filed on April 15, 2021 [Dkt. 1285], including any exhibits and schedules thereto and as may be further amended, supplemented or modified from time to time.

1.11 "<u>Facilities</u>" shall mean the platforms, wells, pipelines, caissons, risers, facilities, structures and equipment (including production equipment) located on the Specified Interests and all parts and components thereof.

1.12 "<u>On The Hook</u>" shall mean the condition of any Facility (or any part, piece or component thereof) that occurs at the instant such Facility (or part, piece or component thereof, as the case may be) is first lifted from its original resting position and is hanging free on Contractor's (or its subcontractor's) crane or other equipment in accordance with the Work to be performed under this <u>Appendix 1</u>.

1.13 "<u>Owner</u>" shall mean Fieldwood Energy III LLC

1.14 "<u>Owner Group</u>" shall mean, individually and collectively, Owner, its parent, subsidiary and affiliated companies, its and their joint venturers, contractors and subcontractors (of any tier), and all of their respective employees, officers, directors, agents, representatives, attorneys-in-fact, subcontractors and insurers, and the subrogees of all such parties.

1.15 "<u>Predecessor</u>" shall mean ENI Petroleum US LLC.

1.16 "<u>Predecessor Group</u>" shall mean, individually and collectively, Predecessor, its parent, subsidiary and affiliated companies, its and their joint venturers, contractors and subcontractors (of any tier), and all of their respective employees, officers, directors, agents, representatives, attorneys-in-fact, subcontractors and insurers, and the subrogees of all such parties.

1.17 "<u>Predecessor Obligation</u>" shall mean any obligation attributable to Predecessor under the terms of the Agreement.

1.18 "<u>Reefed Items</u>" shall mean the Facilities to be reefed as set out in <u>Section 2.4</u> herein and in accordance with Owner's reef permit.

1.19 "<u>Site Clearance</u>" shall mean (subject to Section 2.3 of the Agreement) delivery to Owner and Predecessor of (i) any On-Site Survey required by BOEM or BSEE and (ii) the filings and other evidence required by BOEM and BSEE or any other applicable governmental authority, including any required approvals or regulatory concurrence from relevant governmental authorities, to support Contractor's representation that all Decommissioning obligations with respect to the applicable assets have been satisfied, and (iii) documentation reasonably satisfactory to Predecessor from BSEE and/or BOEM reflecting that their databases have been updated to show that all Decommissioning obligations with respect to the applicable assets have been fully satisfied.

DM-#8062177
#94614816v4
#94614816v6

1.20   "Special Claim(s)" shall mean any and all Claims for or relating to special, indirect, consequential, exemplary, incidental or punitive damages of any kind or character, including, but not limited to, loss of use, loss of profit, loss of revenue, loss of product or production, reservoir damage, loss of hole damage, and any attorneys' fees; provided however, any and all claims for fines or penalties shall not be Special Claims to the extent arising from, or as a result of, a material breach by a party.

1.21   "Third Party" shall mean any individual, person, company or entity or any other natural or juridical being, other than any member of the Owner Group or Contractor Group.

1.22   "Transferred Items" shall mean the Facilities that are to be removed or abandoned in accordance with this Appendix 1.

1.23   "Work" shall mean the work and activities to Decommission the Specified Assets, to be conducted by or on behalf of Contractor pursuant to the terms and provisions of this Agreement, including, without limitation, the Agreed Activities and the Initial Safe Out.

1.24   Any capitalized terms used herein but not defined in this Appendix 1 shall have the meaning ascribed in the Agreement.

## ARTICLE II.
## WORK

2.1   Scope of Work.

Contractor shall perform the Work upon the terms and provisions set forth in this Agreement, including the Performance Standards.  The scope of the Work is more fully set forth in Exhibit A to this Appendix 1 and shall be performed with respect to the Decommissioning of the Specified Assets described on Exhibit A to the Agreement.

2.2   Inspection.

The Work and all parts thereof shall be subject to inspection at all reasonable times by inspectors designated by Owner or Predecessor or their representatives at such Party's costs and risk.  No such inspection shall relieve Contractor of any of its obligations hereunder.  No failure to inspect or failure to discover any aspect of the Work that is not performed in accordance with any provision of this Appendix 1 shall be construed to imply any acceptance of such Work or to relieve Contractor of any of its obligations hereunder.  Contractor shall correct any portion of the Work that is incomplete or otherwise as required to receive Site Clearance, subject to the terms of the Agreement.

2.3   Title.

At Contractor's option to be exercised by written notice to Owner with respect to any Transferred Items, Owner grants, bargains, sells, conveys and assigns to Contractor, and

DM-#8062177
#94614816v4
#94614816v6

Contractor accepts and assumes title to and ownership of such Transferred Items at such time as such Transferred Items are On The Hook.  **The Transferred Items shall be transferred to and accepted by Contractor, "AS IS, WHERE IS" with all faults.  Owner makes no, and expressly disclaims any and all, warranties concerning the Transferred Items, whether express, implied, statutory or otherwise, including, without limitation, any warranties of merchantability, fitness for a particular use, and freedom from defects, whether such defects are patent, latent, pre-existing, redhibitory or otherwise.  Upon such transfer of ownership of the Transferred Items, Contractor shall be solely responsible for, and shall assume all risk and liability for such Transferred Items, including, without limitation, all liability for tie down and sea fastening, salvage if lost during transport, removal and disposal of such Transferred Items and all pollution or environmental contamination attributable thereto after such Transferred Items are On The Hook.**  The foregoing notwithstanding, the Parties expressly acknowledge that nothing herein shall cause the transfer of, and Contractor does not accept, the assignment or conveyance of any record title ownership of any lease or any operating rights thereunder.  Owner agrees to provide a bill of sale related to such Transferred Items upon request by Contractor.

2.4    <u>Reefed Items.</u> In accordance with the Work to be performed under this <u>Appendix 1</u>, Contractor shall remove and transport the Reefed Items to the designated reef sites.  **Contractor shall be solely responsible for, and shall assume all risk and liability for any Reefed Item (including, without limitation, all liability for the tow and salvage, if lost during towing, of such Reefed Items and all pollution and environmental contamination attributable thereto (except to the extent due to the condition or structural integrity of such Reefed Item for which Owner shall remain responsible)) from the time such Reefed Item is On The Hook until such time as such Reefed Item is delivered by material barge to the designated reef sites for positioning on the sea floor pursuant to the Owner's reef permit.**

## ARTICLE III.
## SURVEY AND PERMITS

3.1    <u>On-Site Survey.</u>

At the completion of the removal, reefing or abandonment of any particular Facility in accordance with the Work to be performed hereunder, Contractor shall conduct a survey over the relevant Facility site if required by BOEM or BSEE to obtain Site Clearance.

DM-#8062177
#94614816v4
#94614816v6

3.2     Permits.

Owner agrees to timely and diligently obtain all necessary permits and approvals that must be obtained by Owner in order for Contractor to perform the Work, and Contractor agrees to timely and diligently obtain all necessary permits and approvals that must be obtained by Contractor to perform the Work.

## ARTICLE IV.
## OBLIGATIONS OF CONTRACTOR

4.1     Independent Contractor.

Contractor is an independent contractor with the sole authority and right to direct, supervise and control the performance of all details of the Work, subject only to the Performance Standards, and the general right of inspection by Owner and Predecessor to achieve the desired results and satisfactory completion of the Work. Any provision of this Appendix 1 that may appear to give Owner and Predecessor or their representatives the right to direct Contractor as to the details of doing the Work or to exercise a measure of control over the Work shall be deemed to mean that Contractor shall follow the desires of Owner and/or Predecessor or its or their representatives in the results of the Work only and not in the means whereby the Work is to be accomplished.  Except as otherwise expressly provided in Section 4.2 hereof, no member of the Contractor Group shall be deemed to be an agent, representative, or employee of Owner or Predecessor.  Contractor shall remain responsible for all of the actions of its subcontractors and the agents, representatives and employees of such subcontractors.

4.2     Statutory Employee.

In all cases where Contractor's employees (defined for the purposes of this Section 4.2 to include any Contractor Group member's direct, borrowed, special or statutory employees) are performing Work in or offshore the State of Louisiana or are otherwise covered by the Louisiana Worker's Compensation Act, La. Rev. Stat. §§ 23.1021 et seq., Owner, Predecessor and Contractor acknowledge and agree that all Work and operations performed by Contractor and its subcontractors and their employees pursuant to this Appendix 1 are an integral part of and are essential to the ability of Owner and Predecessor to generate Owner's and Predecessor's goods, products or services.  In such event, and without limiting the provisions of Section 4.1 above, Owner, Predecessor and Contractor agree that Owner and Predecessor shall each be deemed a statutory employer of Contractor's employees and its subcontractor's employees for the sole purposes of La. Rev. Stat. § 23.1061(A)(3), as the same may be amended from time to time.  Contractor shall ensure that all of its subcontracts contain the same provisions as this Section 4.2.

DM-#8062177
#94614816v4
#94614816v6

4.3     Standard of Performance.

Contractor covenants and agrees that it shall safely and efficiently prosecute the Work with due diligence and care in a good and workmanlike manner using good oilfield practices with qualified, careful and efficient workers in accordance with (i) generally accepted standards of engineering, construction and decommissioning practice for the Work covered under this Appendix 1; (ii) the provisions of this Appendix 1; and (iii) all applicable laws, rules, regulations and standards of the BOEM, the BSEE and any other applicable governmental or regulatory agency or body.  The Parties agree that Contractor will have met the required standard of performance under the Agreement, including this Appendix 1, if it performs the Work consistent with the Performance Standards.

4.4     Contractor's Personnel.

Notwithstanding the fact that Contractor shall perform the Work as an independent contractor, Contractor covenants and agrees to keep on the job a competent superintendent, project manager, engineer and all necessary assistants, who will be in charge of the Work.

4.5     Compliance with Laws.

Contractor shall observe and comply with, and shall ensure that all members of the Contractor Group observe and comply with, all federal, state and local laws, orders, rules and regulations which are now or may in the future become applicable to Contractor (or such employee, agent, representative or subcontractor, as the case may be) or to the performance of the Work under this Appendix 1, including, but not limited to, those statutes and regulations set out in Exhibit B attached hereto and made a part hereof for all purposes.

4.6     Equipment & Materials.

All equipment, tools, materials and facilities to be furnished by Contractor in the performance of the Work shall be serviceable and kept in good operating condition.  Contractor shall schedule its other operations so as to ensure that the necessary equipment, tools, materials and facilities and personnel to operate the same shall be available at the times necessary for the orderly completion of the Work in accordance with the terms of this Appendix 1.

4.7     Liens.

**CONTRACTOR SHALL INDEMNIFY AND HOLD HARMLESS THE OWNER GROUP AND THE PREDECESSOR GROUP FROM ANY AND ALL LIENS AND OTHER ENCUMBRANCES AGAINST ANY PROPERTY OR INTERESTS OF ANY MEMBER OF THE OWNER GROUP OR THE PREDECESSOR GROUP AND FROM AND AGAINST ANY AND ALL CLAIMS ON ACCOUNT OF DEBTS ALLEGED TO BE DUE FROM ANY MEMBER OF CONTRACTOR GROUP, TO ANY PERSON INCLUDING ANY OTHER MEMBER OF CONTRACTOR GROUP, AND WILL DEFEND AT ITS OWN EXPENSE ANY CLAIM OR LITIGATION IN CONNECTION THEREWITH; PROVIDED, HOWEVER, THE FOREGOING SHALL NOT APPLY IN THE**

Appendix 1
Page 6 of 11

**EVENT THAT CONTRACTOR IS NOT TIMELY PAID (BY OWNER, PREDECESSOR OR OTHERWISE) FOR ANY PORTION OF THE WORK.**

4.8     Records.

    Contractor shall maintain complete, accurate and current detailed records of all costs and documentation of equipment, materials, supplies, labor and any other items or aspects of the Work performed hereunder for a Decommissioning Project for not less than two (2) years after Site Clearance for such Decommissioning Project; provided, however, if Owner, any member of Contractor Group, any member of Owner Group or any Third Party, makes a timely written Claim which relates to the Work performed pursuant to this Appendix 1 within such two (2) year period, then Contractor shall retain such records until final resolution of such Claim.  Contractor shall grant to FWE III, its authorized representatives, and/or public accounting firm selected by Owner, the right, at a reasonable time, to inspect, audit, examine and copy any applicable records or documents of Contractor as may be necessary to verify the validity and correctness of the charges reflected on any invoice and to protest or dispute any such charge.

4.9     Taxes.

    Contractor agrees to pay all taxes, licenses and fees levied or assessed against Contractor in connection with, or incident to, Contractor's performance of the Work by any governmental agency for (i) income taxes; (ii) unemployment compensation insurance, benefits, social security; or (iii) any other taxes upon the amounts paid to Contractor, its agents, employees and representatives. Notwithstanding the foregoing, Owner shall be responsible for and shall pay all sales, ad valorem or use taxes and all import/customs duties, fees, charges or costs that may be assessed or incurred as a result of the performance of the Work or the transfer of the Transferred Items to Contractor pursuant to the terms hereof.

**ARTICLE V.**
**INDEMNIFICATION AND LIABILITY**

**5.1     CONTRACTOR'S INDEMNITY.**

    **EXCEPT AS PROVIDED IN THE FOLLOWING SENTENCE, CONTRACTOR SHALL PROTECT, DEFEND, INDEMNIFY AND HOLD HARMLESS THE PREDECESSOR GROUP FOR CLAIMS ARISING OUT OF OR RESULTING FROM, IN WHOLE OR IN PART, A MATERIAL BREACH BY CONTRACTOR OF ANY CONTRACTOR OBLIGATION ("CONTRACTOR'S INDEMNITY"). NOTWITHSTANDING THE FOREGOING, CONTRACTOR'S INDEMNITY DOES NOT COVER ANY SPECIAL CLAIMS ARISING OUT OF OR RESULTING FROM CONTRACTOR'S MATERIAL BREACH OF A CONTRACTOR OBLIGATION.**

**5.2     PREDECESSOR'S INDEMNITY.**

    **EXCEPT AS PROVIDED IN THE FOLLOWING SENTENCE, PREDECESSOR SHALL PROTECT, DEFEND, INDEMNIFY AND HOLD HARMLESS THE CONTRACTOR GROUP FOR CLAIMS ARISING**

Appendix 1
Page 7 of 11

OUT OF OR RESULTING FROM, IN WHOLE OR IN PART, A MATERIAL BREACH BY **PREDECESSOR** OF ANY **PREDECESSOR OBLIGATION** ("**PREDECESSOR'S INDEMNITY**"). **NOTWITHSTANDING THE** FOREGOING, **PREDECESSOR'S INDEMNITY** DOES NOT COVER ANY **SPECIAL CLAIMS** ARISING OUT OF OR RESULTING FROM **PREDECESSOR'S** MATERIAL BREACH OF A **PREDECESSOR OBLIGATION.**

## 5.3      SPECIAL CLAIMS.

NOTWITHSTANDING ANYTHING TO THE CONTRARY CONTAINED ELSEWHERE IN THE **AGREEMENT**, NEITHER **PREDECESSOR** NOR **CONTRACTOR** (NOR THE MEMBERS OF SUCH **PARTY'S** "**GROUP**") SHALL BE LIABLE TO ANOTHER **PARTY** (NOR THE MEMBERS OF SUCH OTHER **PARTY'S** "**GROUP**") FOR ANY **SPECIAL CLAIM(S)**, INCLUDING ATTORNEY'S FEES, WHENEVER ARISING, AS A RESULT OF, RELATING TO OR IN CONNECTION WITH THE **AGREEMENT** OR ANY **WORK**; AND NO **SPECIAL CLAIM(S)**, INCLUDING ATTORNEY'S FEES, SHALL BE MADE BY A **PARTY** AGAINST ANOTHER **PARTY** (OR AGAINST ANY MEMBER OF ANOTHER **PARTY'S** "**GROUP**"), <u>REGARDLESS OF THE CAUSE OR</u> <u>CAUSES OF SUCH SPECIAL CLAIM(S), INCLUDING WHETHER OR NOT ANY SUCH SPECIAL CLAIM IS</u> <u>BASED OR ALLEGED TO BE BASED, IN WHOLE OR IN PART, ON THE NEGLIGENCE (INCLUDING SOLE,</u> <u>JOINT, ACTIVE, PASSIVE, CONCURRENT OR GROSS NEGLIGENCE), BREACH OF WARRANTY, STRICT</u> <u>LIABILITY, STATUTORY LIABILITY, CONTRACTUAL LIABILITY OR OTHER FAULT OF ANY MEMBER</u> <u>OF PREDECESSOR GROUP OR CONTRACTOR GROUP, THE UNSEAWORTHINESS OF ANY VESSEL, THE</u> <u>UNAIRWORTHINESS OF ANY AIRCRAFT, OR THE EXISTENCE OF ANY DEFECT, WHETHER PATENT,</u> <u>LATENT, PRE-EXISTING OR OTHERWISE</u>.

## 5.4      EXPRESS NEGLIGENCE

<u>WITH RESPECT TO THIS AGREEMENT, THE PARTIES AGREE THAT THIS</u> <u>STATEMENT COMPLIES WITH THE REQUIREMENT, KNOWN AS THE EXPRESS</u> <u>NEGLIGENCE RULE, TO EXPRESSLY STATE IN A CONSPICUOUS MANNER TO</u> <u>AFFORD FAIR AND ADEQUATE NOTICE THAT THIS AGREEMENT HAS</u> <u>PROVISIONS THAT COULD REQUIRE A PARTY TO BE RESPONSIBLE FOR THE</u> <u>NEGLIGENCE, STRICT LIABILITY, OR OTHER FAULT OF ANOTHER PARTY (OR</u> <u>THE MEMBERS OF ANOTHER PARTY'S "GROUP").</u>

**ARTICLE VI.**
**INSURANCE**

6.1      <u>Contractor's Insurance.</u>

Contractor shall carry, at its own expense, with insurers who are reliable and with an A.M Best rating of not less than A- and authorized to do business in the states or other jurisdictions in which the Work is to be performed by Contractor hereunder, or in the states or other jurisdictions adjacent to the offshore location in which the Work is to be performed hereunder, insurance coverages of the types and with limits required by Owner but in no event less than those set forth in <u>Exhibit C</u> attached hereto and made a part hereof.  Further, Contractor agrees to carry adequate contractual liability insurance to support the indemnities given herein.  Prior to commencing any of

Appendix 1
Page 8 of 11

the Work to be conducted pursuant to the terms of this Appendix 1, if requested by Owner, Contractor agrees to provide Owner with certificates of insurance evidencing such insurance coverages in commercially available forms acceptable to Owner, and Contractor agrees to maintain current certificates of insurance on file with Owner for the duration of the Agreement.  The Parties expressly acknowledge and agree that the insurance and indemnity provisions of this Appendix 1 are separate and distinct; and that any insurance requirements contained herein shall not be deemed to restrict or limit any of the indemnity obligations set forth in this Appendix 1.

If Contractor hires any subcontractor to perform any of the Work hereunder, then Contractor shall require that any such subcontractor will obtain insurance protection with coverages of the types and with limits deemed appropriate by Contractor.  Any deficiencies in the coverages, policy limits or endorsements of Contractor's subcontractors shall be the sole responsibility of Contractor and shall be covered by Contractor's insurance.

6.2    Louisiana Anti-Indemnity Provisions.

Notwithstanding anything contained herein to the contrary, Contractor and Owner agree that with respect to all Work performed in Louisiana or offshore Louisiana and with respect to which the laws of the state of Louisiana are otherwise applicable, Owner (on its own behalf, and on behalf of its other contractors, subcontractors, agents and representatives and their respective employees) and Contractor (on its behalf, and on behalf of its subcontractors, agents and representatives and their respective employees) shall pay to each other's insurers the premium required by their respective insurers or their insurer's agents or authorized representatives to extend all of their insurance policies to include coverage for Owner's and Contractor's respective indemnities as required under this Appendix 1, and such insurance protection shall be governed by Louisiana law.  Each Party will arrange to have the other Party billed for the premium by its respective insurer, and will advise the other Party prior to the inception of this Appendix 1 if the premium will be in excess of $2,000.00.  The insurance policy shall apply to incidents arising out of the performance of this Appendix 1.  At each subsequent renewal of insurance, during the term of this Appendix 1, each Party will advise the other of the amounts of the premium required for the extensions described above and arrange billing for the appropriate premium by its insurers or their agents or authorized representatives.  It is expressly acknowledged and agreed to by the Parties that the provisions of this Section 6.2 are intended to comply with the provisions of *Marcel v. Placid Oil Co.*, 11 F.3d 563 (5th Cir. 1994), and the provisions hereof shall be interpreted in such a manner as to comply therewith.

6.3    Texas Anti-Indemnity Act.

To the extent that the Work or any part thereof is subject to the laws of the state of Texas, the Parties agree that in order to be in compliance with the Texas Anti-Indemnity Act regarding indemnification mutually assumed for the other Party's sole or concurrent negligence, each Party agrees to carry supporting insurance in equal amounts of the types and in the minimum amounts specified in the insurance agreements hereunder; provided, however, that Owner shall have the right to self-insure any or all coverages required of it hereunder.

DM-#8062177
#94614816v4
#94614816v6

# ARTICLE VII.
## CONTRACTOR'S POLICIES

7.1     <u>Compliance with Policies</u>.

Contractor covenants and agrees to, and shall cause its subcontractors to agree to, abide by and act in accordance with the following Contractor policies, as such are set forth in <u>Exhibits B</u>, <u>D</u>, <u>E</u> and <u>F</u>, respectively, attached hereto and made a part hereof:

1.     Federal Contract Requirements
2.     Drug and Alcohol Policy;
3.     Safety Program; and
4.     Search and Seizure Policy.

# ARTICLE VIII.
## GENERAL PROVISIONS

8.1     <u>Force Majeure.</u>

All obligations imposed by this <u>Appendix 1</u> or the Agreement on each Party, except for obligations to pay money or to provide indemnity, shall be suspended while compliance with such obligations are prevented, in whole or in part, by an event of *force majeure*.  As used herein an event of *force majeure* shall mean any of: a labor dispute, pandemic or epidemic impacting the region where the Work is to be performed, fire, flood, war, civil disturbance, act of God (including numbered or named tropical disturbances and other adverse weather or wave conditions); a change in laws or governmental rules, regulations or orders, an inability to timely secure materials or an inability to timely secure government permits from the BOEM, BSEE or any other governmental agency as required for the Work, or any other cause, whether similar or dissimilar, beyond the reasonable control of the Party claiming that its compliance has been prevented or delayed by such event of *force majeure*.  Notwithstanding the foregoing, such Party shall resume performance within a reasonable time after such event of *force majeure* has ended or been removed, or such Party is able to overcome the prevention caused by such event; provided, however, that no Party shall be required, against its will, to settle any labor dispute so at to overcome such event of *force majeure*.  If a Party's obligations are suspended under this <u>Section 8.1</u>, such Party shall promptly notify the other Party and give full particulars of the reasons for such suspension. For the avoidance of doubt, this <u>Section 8.1</u> does not modify the Qualified Conditions and allocation of risk under the Agreement.

8.2     <u>Work Site Access.</u>

To the extent reasonably necessary for Contractor to perform the Work, Owner shall provide Contractor unrestricted access to all the Specified Assets and shall execute any agency agreement, power of attorney, instrument, license, certificate, or other agreement reasonably necessary to provide such access.  Only the authorized personnel of Contractor, Owner or proper governmental

DM-#8062177
#94614816v4
#94614816v6

agencies shall be permitted access to any premises where Work is being performed under this <u>Appendix 1</u>.

8.3     <u>Survival.</u>

All provisions of this <u>Appendix 1</u> that cannot be performed before the expiration or termination of this <u>Appendix 1</u>, including, without limitation, the indemnity provisions contained herein, and all representations, promises, releases, and indemnities under this <u>Appendix 1</u>, shall survive the expiration or termination of this <u>Appendix 1</u>.

Appendix 1
Page 11 of 11

**EXHIBIT A to APPENDIX 1**

**SCOPE OF WORK**

**1.0    CONTRACTOR RESPONSIBILITIES**

1.1    Contractor shall perform the following Work, as applicable, as required to complete and to achieve Final Completion for each Decommissioning Project identified on Exhibit A to the Agreement:

- Perform and complete the Agreed Activities.
- Perform and complete the Initial Safe Out.
- Abandon all wells as per the BSEE-approved permits (APM's & RPM's).
- Abandon all pipelines as per the BSEE-approved permits (abandonment in place being the standard and removal only where mandated by BSEE or another governmental agency).
- Remove or reef all platforms as per the BSEE and/or COE-approved permits.

1.2    Contractor shall furnish all equipment, services, and personnel to conduct the offshore operations outlined in Section 1.1 including but not limited to the following as may be applicable and required:

- Derrick / Lift Vessel
- Lift Boats
- Dive Support Vessels
- Support Tugs and Crew Boats
- Shorebase support
- NORM & Asbestos remediation & disposal
- Material Barges and Tugs
- All slings, shackles, spreader bars, spreader frames, and rigging
- Pile jetting equipment and personnel
- Conductor and pile cutting personnel and equipment
- Divers and equipment
- Flushing & Filtration equipment
- Engineering & Project Management
- Permit Generation & Submittal

1.3    Contractor shall supply all labor, equipment, and material required to perform and complete the Scope of Work that is not specifically stated as being supplied by FWE III.

1.4    Contractor's derrick barge shall maintain an anchor handling tugboat with it at all times capable of handling the vessel's anchors.

1.5    Contractor's derrick barge and anchor handling tug(s) shall be equipped with an

DM-#8062177
#94614816v4
#94614816v6

appropriate positioning system to assure safe placement of anchors.

1.6   Contractor is responsible for notification of Operators of facilities and pipelines affected by placement of anchors near or over those facilities and/or pipelines.

1.7   Contractor's derrick barge shall have a current certificate of classification and a load line certificate from a recognized marine classification society.

1.8   Contractor shall provide current crane certification on the derrick barges primary crane and all auxiliary cranes.  All rigging must be certified and tagged.

1.9   Cargo Barges

1.9.1 Contractor shall provide cargo barges of sufficient size to safely operate in the most severe environmental conditions in which tow may occur.

1.9.2 Contractor shall ensure that the cargo barge(s) have adequate strength for the load out, tie down, transport, and offloading of the salvaged material.

1.9.3 Each cargo barge shall have a valid U.S. Coast Guard certificate of inspection and a U.S. Coast Guard stability letter.

1.10 Tugs

1.10.1  Contractor shall provide with each barge a minimum of one (1) tug of sufficient size, bollard pull, and horsepower to operate in any sea environment that may develop.

1.10.2  Contractor shall provide assist (tail) tugs as required to guide the barge from the open sea to the offloading site.

1.10.3  Vessels and crews shall comply with U.S. Coast Guard licensing and manning requirements.

1.11 Diving

1.11.1  Contractor shall ensure that diving subcontractor performs all diving operations in strict accordance with the latest rules and regulations governing diving operations.

1.12 Any equipment, material, jacket, deck, or piles that fall into the sea during the salvage operation shall be retrieved by Contractor at Contractor's expense.

1.13 If at any time during the platform removal operations Contractor has to pull away from the structure, Contractor shall supply and install on the structure temporary navigational aids meeting U.S. Coast Guard Class "A" specifications for lights and horn.

DM-#8062177
#94614816v4
#94614816v6

1.14 Contractor shall assume all weather liability.

1.15 Company is not obligated to pay Contractor for weather downtime, named tropical storms or otherwise, at any time before or during mobilization, or during or after demobilization.

1.16 EH&S

   1.16.1  Contractor shall submit safety records upon request for review by Company.

   1.16.2  Contractor shall provide gas detection devices, fire extinguishers, and other safety equipment to check all structural members, equipment, and piping for the presence of hydrocarbons.

   1.16.3  Contractor shall check for the presence of hydrocarbons prior to flame cutting or using spark producing devices on any structural members, equipment, and piping.

   1.16.4  Contractor shall provide a dedicated fire watch when hot work operations are in progress.

   1.16.5  Contractor shall comply with government regulations, Contractor's policies, and Company's policies regarding confined space entry.

**2.0**   <u>**TECHNICAL**</u>

   **2.1**   **Engineering**

      2.1.1  Contractor Required Design and Analysis Work

      Contractor shall perform all design, analysis, and design checks required to complete the Work in accordance with all applicable drawings, specifications, standards and codes, and other documents that are part of or are incorporated into this Scope of Work.  Contractor's proposed methods of performing the design and analysis work listed below shall be submitted to FWE III and Predecessor prior to beginning the work.

      2.1.2  Engineering to be provided by Contractor to include the following as may be applicable and required:

- Material Barge Ballast Plan
- Removal Rigging
- Tie-Down Design
- Transportation Analysis
- Component Lift Weight Analysis

Exhibit A to Appendix 1

Page 3 of 4

Debtors' Exhibit No. 34
Page 812 of 910

- Component Center of Gravity Analysis
- Component Pad Eye or Lifting Trunnions Design
- Welding procedures and welder qualifications.

2.1.4   Contractor shall confirm all lift weights, center of gravities, and Pad Eye or Lifting Trunion designs in writing.  Contractor will be responsible for any Pad Eye or Lifting Trunion design or modification.

END OF EXHIBIT A  TO APPENDIX 1

Exhibit A to Appendix 1
Page 4 of 4

**EXHIBIT B to APPENDIX 1**

**FEDERAL CONTRACT REQUIREMENTS**

Contractor shall fully comply with all applicable statutes and executive orders as well as the regulations, orders and rules promulgated thereunder ("Federal Contract Requirements"), and such Federal Contract Requirements, including the regulations set out below to the extent applicable hereto, are hereby incorporated into Appendix 1 by reference:

(1)     Equal Opportunity Clause (41 CFR 60-1.4).  Applicable to all contracts or purchase orders in excess of $10,000;

(2)     Affirmative Action Compliance Programs (41 CFR 60-1.40).  Applicable to contracts or purchase orders of $50,000 or more and if Contractor has 50 or more employees;

(3)     Equal Employment Opportunity Reporting Requirements (CFR 60-1-7).  Applicable to contracts or purchase orders of $50,000 or more and if Contractor has 50 or more employees;

(4)     Employment of the handicapped (41 CFR 60-250).  Applicable to contracts or purchase orders $2,500; or employment of disabled veterans and veterans of the Vietnam Era (Applicable to contracts or purchase orders of $10,000 or more;

(6)     Utilization of Minority Business Enterprises (41 CFR 1-1.13).  Applicable to contracts or purchase orders of $10,000 or more;

(7)     Utilization of Small Business Concerns (41 CFR 1-1.710-3).  Applicable to contracts or purchase orders of $10,000 or more;

(8)     Utilization of Labor Surplus Area Concerns (41 CFR 1-1.305-3(a)).  Applicable to contracts or purchase orders of $10,000 or more;

(9)     Minority Business, Small Businesses and Labor Surplus Area Subcontracting (41 CFR 1-1.1310-2(b), 1-1710-3(b), 1-1.805-3).  Applicable to contracts or purchase orders of $500,000 or more;

(10)    Clean Air and Water.  Applicable to contracts or purchase orders of CFR 15.4 and 15.5, 41 CFR 1-1.2302;

(11)    Outer Continental Shelf Lands Act endorsement (WC 00 01 09 A) (43 U.S.C. §§ 1331 *et seq.*); and

(12)    Oil Pollution Act of 1990, as amended (33 U.S.C. § 2701 *et seq.*).

Contractor certifies that it does not maintain or provide for its employees any segregated facilities at any of its establishments, and that it does not permit its employees to perform their services at any location, under its control, where segregated facilities are maintained.  It certifies

DM-#8062177
#94614816v4
#94614816v6

Debtors' Exhibit No. 34
Page 814 of 910

further that it will not maintain or provide for its employees any segregated facilities at any of its establishments and that it will not permit its employees to perform their services at any location, under its control, where segregated facilities are maintained.  The Contractor agrees that a breach of this certification is a violation of the Equal Opportunity Clause under this Appendix 1.  As used in this certification, the term "segregated facilities" means but is not limited to any waiting rooms, work areas, rest rooms and wash rooms, restaurants and other eating areas, time clocks, locker rooms and other storage or dressing areas, parking lots, drinking fountains, recreation or entertainment areas, transportation and housing facilities provided for employees which are segregated by explicit directive or are in fact segregated on the basis of race, color, religion, sex or national origin, because of habit, local custom or otherwise.  It further agrees that (except where it has obtained identical certifications from proposed subcontractors for specific time periods) it will obtain identical certifications from proposed subcontractors prior to the award of subcontracts exceeding $10,000.00, which are not exempt from the provisions of the Equal Opportunity Clause; that it will retain such certification in its files; and that it will forward the following notice to such proposed subcontractors (except where the proposed subcontractors have submitted identical certificates for specific time periods):

NOTICE TO PROSPECTIVE SUBCONTRACTORS OF REQUIREMENT FOR CERTIFICATIONS OF NONSEGREGATED FACILITIES:

Certification of Nonsegregated Facilities must be submitted prior to the award of a subcontract exceeding $10,000.00, which is not exempt from the provisions of the Equal Opportunity Clause.  The certification may be submitted either for each subcontract or for all subcontracts during a period (i.e. quarterly, semi-annually or annually).  Note:  The penalty for making false statements is prescribed in 18 U.S.C. 1001.

END OF EXHIBIT B TO APPENDIX 1

DM-#8062177
#94614816v4
#94614816v6

**EXHIBIT C to APPENDIX 1**

**INSURANCE PROVISIONS**

**Insurance Requirements.** During the term of the Agreement, Contractor will carry insurance coverages as set forth below at its own expense and with deductibles for its own account, with providers reasonably satisfactory to Owner and authorized to do business in the states or territories in which, and in the offshore blocks on which, Contractor performs any Work. The insurance coverages required herein represent Contractor's minimum requirements and do not limit or invalidate any indemnity or other obligations of Contractor under the Agreement. Contractor's failure to secure the required insurance coverages or the required endorsements on the policies or any denial of coverage by underwriters does not relieve Contractor from or limit its liabilities or obligations under the Agreement.

**Required Coverage.** The following insurance coverage is required. An owner's limitation clause, including any clause purporting to limit coverage to liability of an insured "as owner of the vessel," shall not be included in any of the policies required below. All policies and group policies must contain applicable territorial extensions and navigation limits adequate for the performance of the Work.

**Workers' Compensation**, as required by applicable law.

**Employer's Liability**, with a limit of not less than **$1,000,000** per occurrence, including (i) coverage for the Longshore and Harbor Workers' Compensation Act, including its extension by the Outer Continental Shelf Lands Act, the Jones Act, and the Death on the High Seas Act, (ii) coverage for masters and members of the crews of vessels (on a voluntary compensation basis), including transportation, wages, maintenance, and cure; alternatively, protection and indemnity insurance may be used for this coverage as specified below, (iii) "in rem" endorsement, stating that an action "in rem" will be treated as a claim against the insured "in personam," and (iv) "borrowed servant" endorsement, stating that a claim brought against Owner Group for compensation as a "borrowed servant" by any member of Contractor Group will be treated as a claim against Contractor.

**Automobile Liability**, with a limit of not less than **$1,000,000** per occurrence, combined single limit for bodily injury and property damage, covering all owned, hired, leased, or non-owned vehicles (as required by applicable law).

**Commercial General Liability**, with a limit of not less than **$1,000,000** per occurrence, combined single limit for bodily injury and property damage, including (i) blanket contractual liability, (ii) products/completed operations liability, (iii) sudden and accidental pollution liability (including cleanup costs), (iv) surface damage for blowout and cratering, (v) removal of any exclusions, restrictions, or limitations relating to explosion, collapse, or underground property damage, (vi) removal of any professional liability exclusions or limitations, (vii) action over buyback and deletion of any provisions that limit or exclude coverage of claims made by

Exhibit C to Appendix 1
Page 1 of 3

DM-#8062177
#94614816v4
#94614816v6

Contractor Group's employees against any member of Owner Group, (viii) extended reporting period of not less than 36 months, if written on a claims-made policy and is non-renewed or canceled, or deletion of any "sunset clause" purporting to cancel coverage on claims following cancellation or non-renewal, if written on an occurrence policy, (ix) "in rem" endorsement stating that an action "in rem" will be treated as a claim against the insured "in personam," and (ix) removal of the "watercraft" exclusion; alternatively, protection and indemnity insurance may be used for this coverage as specified below.

**Hull and Machinery**, which Contractor will carry, or cause to be carried, for each vessel owned or chartered by Contractor Group in connection with the Work at the declared value of each vessel and its equipment, including (i) deletion of limitation of liability clause, (ii) if any vessel engages in towing operations, this insurance will include full towers liability with the sistership clause un-amended, and (iii)  removal of wreck or debris, if removal is required by applicable law.

**Protection and Indemnity**, which Contractor will carry, or cause to be carried, for each vessel owned or chartered by Contractor Group in connection with the Work with a limit of not less than **$5,000,000** per occurrence, including (i) coverage for pollution emanating from or caused by a vessel or vessels owned or chartered by Contractor Group, (ii) deletion of any language limiting coverage for Owner Group in the event of the applicability of any statute limiting liability; (iii) "in rem" endorsement stating that an action "in rem" will be treated as a claim against the insured "in personam," (iv) towers liability, where applicable; alternatively, liability coverage may be afforded in accordance with the Commercial General Liability coverages above (deleting the "watercraft" exclusions), (v) coverage for the crews; alternatively, the crew coverage may be afforded in accordance with the workers' compensation and employer's liability coverages above, and (vi) removal of wreck or debris, if removal is required by applicable law.

**Charterers Legal Liability**, which Contractor will carry, or cause to be carried, for each vessel chartered by Contractor Group in connection with the Work with a limit of not less than **$1,000,000** per occurrence, including (i) liabilities arising out of operation and use of such vessel and (ii) contractual liability for liabilities assumed by Contractor.

**Excess or Umbrella Liability**, with a limit of not less than **$100,000,000** per occurrence, combined single limit for bodily injury and property damage in excess of the limits specified above and is follow-form with additional exclusions for employer's liability, automobile liability, commercial general liability, hull and machinery, protection and indemnity, and charterers legal liability, which such liability limits may be met with any combination of primary, umbrella, and excess policies.

**Aircraft Liability**, which Contractor will carry, or cause to be carried, for each aircraft owned or chartered by Contractor Group in connection with the Work with a limit of not less than **$75,000,000** per occurrence, combined single limit for bodily injury or death (including passengers) and loss of or damage to property, including (i) passenger liability, (ii) cargo legal liability, and (iii) no provision limiting coverage "per seat" or "per passenger."

Exhibit C to Appendix 1
Page 2 of 3

DM-#8062177
#94614816v4
#94614816v6

**Aircraft Hull**, which Contractor will carry, or cause to be carried, for each aircraft owned or chartered by Contractor Group in connection with the Work for the declared value of each aircraft and its equipment.

**Professional Liability**, if applicable, with a limit of not less than $1,000,000 per claim, including errors or omissions or rendering or failing to render any professional services as required under the Agreement.

**Endorsements and Other Requirements.** To the extent of the liabilities assumed by Contractor hereunder, all insurance policies of Contractor will comply with the following:

(a)   **Waiver of Subrogation.** Such policies will expressly waive subrogation as to Owner Group.

(b)   **Additional Insured.** Such policies, other than workers' compensation, employer's liability, and professional liability policies, will include Owner Group as an additional insured, on a broad-form basis. Such additional-insured endorsements must include coverage for the sole, joint, or concurrent negligence of the additional insureds and not be restricted to: (i) ongoing operations and products/completed operations; (ii) coverage for vicarious liability; or (iii) circumstances in which the named insured is partially negligent. The Parties deem a portion of the payment made by Owner for Work performed to include compensation to Contractor for any costs Contractor may incur due to including Owner Group as additional insured. If any additional-insured endorsement limits coverage to amounts required by written contract, the amounts required in the agreement will instead be the maximum amounts of Contractor's insurance policies, but not less than the minimums set forth herein.

(c)   **Primary.** Such policies will be primary to and receive no contribution from any insurance policies maintained by Owner Group.

END OF EXHIBIT C OF APPENDIX 1

Exhibit C to Appendix 1
Page 3 of 3

DM-#8062177
#94614816v4
#94614816v6

EXHIBIT D to APPENDIX 1

## DRUG AND ALCOHOL POLICY

**PURPOSE**

This policy implements Contractor's effort to enhance the safety of its operations and to provide its employees an opportunity to work in an environment free of drugs and alcohol. Contractor will deter alcohol and drug abuse by prevention through education, detection through testing, and disciplinary action when warranted.

**POLICY**

Contractor prohibits:

- employees possessing or consuming alcohol or drugs while working;
- employees working while under the influence of alcohol or drugs; and
- employees possessing or consuming drugs while not working.

**EXCEPTIONS**

Contractor permits employee possession of prescription drugs in containers that bear the doctor's and employee's name and a prescription date less than one year old, and permits the safe use of those drugs for the prescribed purposes, but Contractor does not permit employees to work while under the influence of prescription medications that may have an adverse effect on the employee's fitness for duty.

Contractor permits possession and moderate, lawful consumption of alcohol at business-related social functions that have been appropriately authorized by management, but prohibits employees and other attendees from working or operating motor vehicles after such a function if their abilities may have been impaired by alcohol.

**DEFINITIONS**

"Employees" means (for purposes of this policy only) all regular full-time, regular part-time or temporary employees, all Contractor independent contractors and agents, and all other persons using Contractor equipment, vehicles or boats (including those owned, used, rented or leased by or for Contractor) or performing duties on Contractor premises or property.

"Drugs" means (1) marijuana, cocaine, opiates, phencyclidine (PCP) and amphetamines; and (2) any other substances specified in Schedule I through V of the federal Controlled Substances Act whether or not prescribed for employee use by a physician.

DM-#8062177
#94614816v4
#94614816v6

"Test" means a drug test and/or alcohol test using urine and/or blood samples, conducted in accordance with this policy and Contractor testing procedures.

"Working" means reporting for work, performing job duties, engaging in business-related travel or entertainment, operating any Contractor equipment, vehicle or boat (including those owned, used, rented or leased by or for Contractor), being on Contractor property or premises, or attending any Contractor-related business or social function.

**TESTING AND DISCIPLINE**

Contractor may require employees to submit to tests to determine the presence of drugs or alcohol.  If an employee's test yields a verified positive result, their employment will be terminated immediately.   In the case of a verified positive pre-employment test result, any offer of employment will be automatically withdrawn.

A refusal to take a test, failure to cooperate with a test, an attempt to tamper with a specimen, violation of Contractor testing policies or procedures or any attempt to subvert Contractor testing policies or procedures will have the same consequences as failing a drug test – immediate termination of employment or withdrawal of offer of employment.

The Contractor human resources department maintains written procedures for testing, which may be changed by Contractor at any time, for any reason.  The procedures are available for employee review.

**EMPLOYEE DRUG CONVICTIONS**

As required by the Drug Free Work Place Act of 1989, any employee convicted of any violation of any criminal drug statute must notify management of the conviction no later than five (5) days after a conviction.  Failure to give notice shall result in the employee's termination.  The management personnel given the notice will immediately notify the human resources department of any reported conviction.  Contractor may terminate any employee convicted of a drug-related crime regardless of the results of any administered drug test.

**PRE-EMPLOYMENT TESTING**

All applicants for employment at Contractor shall undergo a pre-employment drug test within 24 hours of Contractor's request.

**POST ACCIDENT TESTING**

Contractor will test each employee whose performance either contributed to an accident or cannot be completely discounted as a contributing factor to the accident, if the accident:

- results in a death or a personal injury necessitating medical attention;

Exhibit D to Appendix 1
Page 2 of 5

- results in an explosion or fire;
- causes a significant damage to or loss of property;
- requires the emergency shut-down of an operation or facility;
- is a reportable incident regarding a gas pipeline facility under 49 CFR Part 191; or
- is a reportable accident involving pipeline facilities used in the transportation of hazardous liquids under 49 CFR Part 195.

In addition to the mandatory post-accident testing described above, Contractor may, in its sole discretion, also require post-accident testing following any accident that it determines is significant and warrants post-accident testing.

## RANDOM TESTING

Contractor will conduct random testing on employees at certain Contractor facilities designated by the Vice President of Exploration and Production, the Vice President of Human Resources, and the Sr. Vice President and General Counsel.  Procedures for selecting employees for random testing are stated in Contractor's written procedures for testing.

## REASONABLE CAUSE TESTING

Contractor will test an employee when there is reasonable cause to believe that the employee is using a drug or is under the influence of alcohol.  "Reasonable cause" depends on the circumstances of each case.  It includes observation of an employee's:

- unauthorized use or possession of alcohol while working;
- use or possession of drugs;
- slurred speech;
- unsafe actions;
- inability or difficulty in performing routine tasks effectively;
- unsteady standing or walking;
- disorientation or confusion; or
- erratic or unusual behavior.

It may also include:

- concerns about the employee's fitness for duty;
- an employee's voluntary admission of the prohibited use of alcohol or drugs;
- an employee's arrest or conviction for a drug-related offense, or the identification of an employee as the focus of a criminal investigation into illegal drug possession, use or trafficking;
- information related to employee drug use or prohibited alcohol use provided by reliable and credible sources or independently corroborated by Contractor;
- evidence that an employee has tampered with a drug test;
- the odor of alcohol, marijuana, or any other drug; or

Exhibit D to Appendix 1
Page 3 of 5

DM-#8062177
#94614816v4
#94614816v6

Debtors' Exhibit No. 34
Page 821 of 910

- an employee's operation of a Contractor vehicle after leaving an establishment where alcohol is served.

Reasonable cause for testing may arise in circumstances in addition to those specified above. A test for reasonable cause will be conducted only upon concurrence of at least two of the employee's supervisors, one of whom is trained in the detection of the possible symptoms of drug and alcohol use. A drug test for reasonable cause will also require the concurrence of either the Vice President of Human Resources or the Sr. Vice President and General Counsel (either of whom may also constitute the concurring supervisors).

## OTHER TESTING

If an employee transfers to a facility designated for random testing, a drug test will be required before transfer. If an employee is on a leave of absence from a facility designated for random testing, a drug test may be required before the employee may return to work. Employees may be drug tested upon commencing or ending multiple-day work shifts on offshore facilities.

## MEDICAL REVIEW OFFICER

Contractor has designated a licensed physician with knowledge of drug abuse disorders as its medical review officer ("MRO"). The MRO reviews and interprets positive test results obtained through Contractor's testing program. The MRO is responsible for verifying positive test results. The MRO examines alternative medical explanations for any positive test results, and reviews all medical records made available by the tested employee when a confirmed positive drug test could have resulted from legally prescribed drugs. Contractor's test procedures describe the process under which the MRO reviews information, gives the tested employee an opportunity to discuss the test result, and otherwise determines whether the test result should be reported as negative or should be reported as a verified positive test.

## RE-TESTING AT THE EMPLOYEE'S REQUEST

An employee may submit a written request to the MRO within 72 hours of receipt of a verified positive drug test, asking that the employee's original specimen be re-tested. Employees are entitled to only one re-test of each specimen. Re-testing procedures are stated in the written procedures for testing maintained by the Contractor's human resources department.

## EMPLOYEE EDUCATION AND TRAINING

Employees at the facilities designated for random testing will participate in a training program that addresses the consequences of alcohol and drug use on personal health, safety, and the work environment. The program will also address indicators of alcohol and drug use and abuse. Informational materials (including a community service drug hot-line telephone number for employee assistance), and Contractor's policy regarding drug and alcohol use in the work place will be distributed as part of the training program.

Exhibit D to Appendix 1<br>Page 4 of 5

DM-#8062177
#94614816v4
#94614816v6

In addition to training for all employees, supervisors of the designated facilities will receive annual training of specific contemporaneous physical, behavioral and performance indicators of probable drug use.

**VOLUNTARY REHABILITATION**

Employees are encouraged to seek treatment for any alcohol or drug problem before being in a situation that may warrant a test.  Upon request, the Contractor's human resources department will refer employees to an independent treatment program.

Medical and disability benefits will be provided for treatment to the extent available under Contractor's medical and disability plans.  Employees referred by Contractor to a treatment program and employees seeking Contractor medical or disability benefits for treatment must consent to the disclosure of all treatment-related information to Contractor.  An employee's employment shall be terminated if they do not cooperate with treatment, if they leave a treatment program before being discharged, or if they violate this policy after returning to work following treatment.

**IMPLIED CONSENT**

Employees are conclusively deemed to consent to cooperate in maintaining a work place free from the effects of alcohol and drugs through the use and enforcement of this and related corporate policies and procedures.


END OF EXHIBIT D OF APPENDIX 1


Exhibit D to Appendix 1
Page 5 of 5

DM-#8062177
#94614816v4
#94614816v6

Debtors' Exhibit No. 34
Page 823 of 910

## EXHIBIT E to APPENDIX 1

### CONTRACTOR SAFETY AND ENVIRONMENTAL REQUIREMENTS

**A      Purpose and Scope**

A.1      The purpose and scope of these requirements is to establish safety and environmental requirements for contractors to be able to work on Owner owned or managed properties.

The objectives of these requirements are to ensure that all contractors and subcontractors working on Owner's facilities/work sites have programs in place to comply with the Bureau of Safety and Environmental Enforcement (BSEE) Safety and Environmental Management Systems (SEMS) requirements or other applicable safety and environmental regulations, laws, rules and standards of agencies having jurisdiction at locations, their employees are adequately skilled and knowledgeable to safely perform their assigned job task functions, to ensure that safety and environmental policies have been established and to ensure that Contractor's management is committed to safety.

**B      Written Safety and Environmental Programs**

B.1      Contractors shall develop and implement written safety and environmental management programs which must include but not be limited to the following:

- Management Commitment
- Written Safe Work Practices specific for work to be performed in compliance with applicable OSHA, BSEE, U.S. Coast Guard, EPA and other applicable government agencies.
- Training Program to include an employee Skills and Knowledge Verification process
- Drug and Alcohol Prevention Program (e.g., DISA)
- Hazard Recognition Program to include JSA (Job Safety Analysis)
- Stop Work Authority Program
- Incident Reporting and Investigation Program
- Operating Procedures for Equipment
- Mechanical Integrity Program
- Management of Change (MOC)

**C      Training Requirements**

C.1      Contractor's personnel (and those of all subcontractors) shall be skilled and knowledgeable for the tasks or activities to be accomplished. This includes being in compliance with appropriate safety and environmental training codes, standards, laws and regulations as required by governmental agencies having jurisdiction at the work site (e.g., BSEE, USCG, EPA, DOT, OSHA) as well as Contractor's Contractor Training Requirements.

C.2      A Training Matrix has been established to identify minimal training requirements for Contractor personnel performing work on Owner properties. Contractors should refer to Contractor's SEMS portal for the latest version of the Training Matrix and must verify the training requirements are met for the appropriate job titles (functions).

Exhibit E to Appendix 1
Page 1 of 6

DM-#8062177
#94614816v4
#94614816v6

**D**       **Safety and Environmental Management Systems (SEMS) - Contractor Requirements**

D.1       Contractor has established very specific contractor safety and environmental management requirements in order to provide for the safety of all personnel and to comply with current safety and environmental regulations. Below are specific requirements as part of the SEMS contractor agreement/bridging process. A detailed description and compliance guide can be obtained from the Contractor SEMS portal or by calling Contractor's EH&S department.

D.2       Requirements

D.2.1       Contractors performing activities on-site offshore must participate in the ISNetworld Review and Verification, as well as the Training Qualification (TQ) processes;

D.2.2       Contractor must review Contractor's  Safety and Environmental Management System (SEMS), related  SEMS requirements, Safe Work Practices and must perform all contractual obligations in accordance with such Contractor programs;

D.2.3       The Contractor must communicate identified hazards to all affected personnel (including Owner and 3rd Party personnel) prior to performing oil, gas and sulphur operations for Owner;

D.2.4       The Contractor must comply with all applicable safety and environmental regulations, laws, rules and standards of agencies having jurisdiction at locations where work is conducted for the Operator;

D.2.5       Contractor must verify and provide documentation upon request that its personnel and any subcontractors performing work for Contractor have the skills and knowledge to perform their assigned duties in a safe and environmentally sound manner, has documented such, and that the information contained therein is accurate, timely and reflective of all appropriate safety and environmental training codes, standards, laws and regulations as required by governmental or regulatory agencies having jurisdiction at the work site.(e.g., BOEM, BSEE, USCG, EPA, DOT, OSHA) ;

D.2.6       The Contractor must have written safe work practices that help minimize the risk to personnel and the environment for all work conducted for Owner, and all activities performed by the Contractor will be conducted in accordance with those safe work practices;

D.2.7       The Contractor must require all personnel performing work for Contractor to undergo periodic retraining and skill assessments, in accordance with Contractor's Training Requirements  for On-Site Contractors (Training Matrix), to ensure adequate retention of the skills and knowledge required to perform their assigned duties;

D.2.8       The Contractor must obtain and/or develop written operating procedures to ensure the safe operation of critical equipment that is operated and maintained by the

Exhibit E to Appendix 1
Page 2 of 6

Contractor whether or not that equipment is owned by the Contractor or any Third Party.  Critical equipment, per Appendix D of API RP 75, is defined as: "Equipment and other systems determined to be essential in preventing the occurrence of or mitigating the consequences of an uncontrolled release."  Such equipment may include vessels, machinery (compressors, mud pumps, fire pumps, etc.), piping, blowout preventers, wellheads and related valving, flares, wireline equipment, coil tubing equipment, fluid management equipment, safety systems, alarms, interlocks, fire protection equipment and other monitoring, control and response systems.

D.2.9   The Contractor must periodically review their written operating procedures used to operate critical equipment to ensure they reflect actual operating conditions;

D.2.10  The Contractor must develop and implement a written mechanical integrity program for any critical equipment that will be maintained and operated by the Contractor. Such a program must include, as applicable:

- The design, fabrication, procurement, installation, testing, calibration and inspection criteria and limits;
- The basis for maintenance (manufacturer's recommendation, industry standards, etc.
- A quality assurance program to ensure the mechanical integrity and safe operation of the equipment;

D.2.11  All documents required per 30 CFR 250, Subpart S and API RP 75 will be maintained in an orderly manner, will be readily identifiable, retrievable, and legible, and will be available for review on request by Owner or appropriate regulatory authorities. Examples of such documentation include, but are not limited to:

- Safe work practices and policies;
- Training records, including certifications for specialty work, as applicable;
- Verifications that personnel are skilled and knowledgeable in their assigned duties;
- Approved Job Safety Analyses (JSAs) as required;

D.2.12  For oil, gas and sulphur activities performed on Owner's *facilities* and on a Contractor's *facility* on  the OCS the Contractor agrees to the following, where "facilities" is defined to include all types of offshore structures permanently or temporarily attached to the seabed ( *i.e.* , mobile offshore drilling units; floating production units; floating production, storage and offloading facilities; tension-leg platforms; spars used for exploration, development, production, and transportation activities for oil, gas, or sulphur from areas leased in the OCS, as well as wells, structures, living quarters, drilling and workover packages, process equipment, utilities and DOI regulated pipelines (except as noted in API RP 75 section 1.3.1.1);

Exhibit E to Appendix 1
Page 3 of 6

DM-#8062177
#94614816v4
#94614816v6

D.2.13   The Contractor must conduct, keep current and provide upon request to Contractor Hazards Analyses (including Mitigation plans) of the Contractor's facilities and ongoing operations;

D.2.14   The Contractor must manage and document all changes to the Contractor's facility that are directly involved in performing oil, gas and sulphur activities for Owner;

D.2.15   The Contractor must develop and communicate an Emergency Action Plan to all personnel on the Contractor's facilities;

D.2.16   The Contractor must conduct Job Safety Analysis (JSA) to identify potential task specific hazards associated with the work to be performed and must include the steps required to mitigate the hazards identified.  Copies of all JSAs must be kept at the work site and be readily accessible for at least 30 days to all personnel involved with the work. The Contractor must also maintain copies of all completed JSAs for at least 2 years.

D.2.17   The Contactor must conduct routine safety meetings to communicate safety expectations, incidents, near miss reports, prevention, safety alerts, etc.

D.2.18   The Contractor must immediately notify an Owner representative by whatever means  of communication is most expedient, and shall maintain written records in addition thereto, of any incidents resulting in the following:

- Fatalities
- All injuries that require the evacuation of the injured person(s) from the facility to shore or to another offshore facility
- All losses of well control
- All fires and explosions
- All reportable releases of H2S gas
- All collisions
- All incidents involving severe structural damage
- All incidents involving crane or personnel/material handling operations
- All incidents that damage or disable safety systems or equipment

D.2.19   Contractor is required to complete incident reports and provide additional information as necessary in order to determine root cause and corrective actions.

## E        Personal Protective Equipment (PPE)

Contractor shall provide its employees and personnel with proper PPE for them to perform their jobs safely. Contractor shall also ensure that its employees and personnel are trained in the proper use and maintenance of all PPE issued. The following is only the minimum PPE required to work on facilities owned, operated or managed by Owner or any of its affiliated or subsidiary companies. Any additional job specific PPE (face shields, goggles, respiratory protection, fall protection, hand protection, gas monitors, etc.) required by Owner, governmental regulations or hazard assessments shall also be provided by Contractor.

DM-#8062177
#94614816v4
#94614816v6

*Minimal PPE Requirements for contractors*:

- Safety Glasses – Safety Glasses shall comply with ANSI Z87.1 – 1989, as such may be updated or modified from time to time, and shall be worn in areas where personnel are exposed to flying particles and/or when working around pressurized process equipment, piping, pumps, etc.

- Hard Hat – Hard hats shall comply with ANSI Z89.1 – 1997, Type 1 requirements, as such may be updated or modified from time to time, and shall be worn at all times when working on Owner facilities or work sites.

- Safety/Steel Toe Shoes / Boots – Safety/Steel toe shoes / boots shall comply with ANSI Z41 – 1991, as such may be updated or modified from time to time, and shall be worn at all times when working at any facility or work site owned, operated or managed by Owner or any of its affiliated or subsidiary companies.

- Hearing Protection – Hearing protection is required in high noise areas or areas that are posted as requiring hearing protection.

- Personal Flotation Devices (PFD's) – USCG Type 1 or 5 are necessary for any Work or portion thereof that is to be performed outside the handrails, on +10 level of offshore platforms, during personnel transfers to and from offshore platforms and while boarding and exiting boats from boat landings.

**F        Inspections/Audits**

In addition to any right provided elsewhere in this <u>Appendix 1</u> or otherwise available by law, Owner reserves the right to inspect/audit the Environmental, Health and Safety activities of all contractors and subcontractors who work on any properties, facilities or premises owned, operated or managed by Owner or any of its affiliated or subsidiary companies. Owner or Third Party auditing teams or individuals may conduct these inspections/audits.

The objective of conducting an inspection/audit is to assess Contractor's compliance with applicable Owner, governmental and regulatory requirements and to prevent adverse environmental and safety incidents.

F.1      Field Inspections/audits

Owner may have field inspections conducted so that the inspector(s)/auditor(s) can:

- Physically observe the Work or any part thereof that Contractor, or any of its subcontractors or personnel, is performing.
- Assess Contractor's performance of Work, or any part thereof, according to applicable Owner, governmental or regulatory requirements.
- Advise Contractor regarding any deficiencies that are observed and require that such be corrected.

DM-#8062177
#94614816v4
#94614816v6

Owner may conduct field inspections at any time and from time to time as Owner, in its sole discretion, may deem necessary or appropriate to maintain compliance with the applicable requirements of Owner or any governmental or regulatory agency or body.

F.2      Office Audits

Owner may have office audits conducted:

- To verify information that Contractor certifies as having when completing this Contractor Safety Program Requirements agreement.
- To check Contractor's documentation of training, safety meeting attendance, accidents, equipment inspections, safety program elements, etc.
- To share environmental, safety and health philosophies.

END OF EXHIBIT E TO APPENDIX 1

Exhibit E to Appendix 1<br>Page 6 of 6

**EXHIBIT F to APPENDIX 1**

**SEARCH AND SEIZURE POLICY**

**NOTICE TO ALL PERSONNEL**

It is the Contractor's belief that the misuse of drugs, alcohol, or any substance having a physiological, psychological, or biochemical effect impairs a person's health and performance and creates unsafe working conditions. Contractor is committed to maintaining a productive, safe and healthy work environment, free of unauthorized drug and alcohol usage. In order to achieve this objective, Contractor has adopted a Drug and Alcohol Policy. All Contractor personnel are required to comply with the policy.

The use, possession, distribution or sale of unauthorized drugs by anyone while on Contractor premises or while engaged in Contractor business is prohibited. A person reporting for work on Contractor premises with unauthorized drugs and/or alcohol in his/her body is in violation of this policy.

Reporting to work while under the influence of alcohol by any person is prohibited. The consumption or possession of alcohol in unsealed or opened containers on Contractor premises is prohibited. No alcohol is allowed at any offshore location.

For the purpose of this policy, the term "unauthorized drugs" shall mean any substance, other than an authorized substance, which has the effect on the human body of being a narcotic, depressant, stimulant, hallucinogen or cannabinoid, their precursors, derivatives or analogues, and includes, but is not limited to, those substances scheduled as controlled substances pursuant to the Federal Controlled Substances Act.

"Authorized substances" are substances having a physiological, psychological, or biochemical effect that are lawfully prescribed or that are available without a prescription, that are lawfully obtained by an individual and that the individual possesses and uses in the appropriate manner, in the dosages and for the purposes for which the substances were prescribed or manufactured.

It is each person's responsibility to notify his or her supervisor in writing when that person is taking any prescription or non-prescription medicine or substance which may impair judgment or performance or otherwise adversely affect the normal functions or his or her mental faculties or physical abilities.

In enforcing the policy, searches of persons and their property on Contractor premises, work area searches, and laboratory testing are authorized. Any person who refuses, when requested, to cooperate with a search or to submit to laboratory testing shall be deemed to be in violation of the policy. Contractor reserves the right to conduct unannounced personal searches. Entry upon Contractor's premises by personnel will be deemed to constitute consent by such persons to personal searches pursuant to this policy.

DM-#8062177
#94614816v4
#94614816v6

A personal search includes inspection of any personal property of personnel located on Contractor premises including, but not limited to, their personal effects, lockers, baggage, desks, lunch boxes, containers, purses, billfolds, parcels, or vehicles if on Contractor premises.

Any person charged with or under investigation in connection with a drug-related or alcohol-related criminal offense may be required to submit to laboratory testing.

Any person possessing food, supplies, or tools not belonging to them, at a time when such items should not be in their possession, is subject to disciplinary action.

Firearms are prohibited on all Contractor premises.  Without limiting the generality of the foregoing, personnel may not possess firearms on their person, or in their personal effects, lockers, baggage, desks, lunch boxes, containers, purses, parcels, or vehicles if on Contractor premises.

END OF EXHIBIT F TO APPENDIX 1; END OF AGREEMENT

DM-#8062177
#94614816v4
#94614816v6

## Exhibit C

### Specified Interests

| Block | Lease |
|-------|-------|
| GA 151 | OCS-G 15740 |
| SS 246 | OCS-G 01027 |
| VR 78 | OCS-G 04421 |
| VR 313 | OCS-G 01172 |
| SS 247 | OCS-G 01028 |
| SS 248 | OCS-G 01029 |
| SS 249 | OCS-G 01030 |
| SS 270 | OCS-G 01037 |
| SS 271 | OCS-G 01038 |
| WC 72 | OCS-G 23735 |

## **Exhibit D**

### **Form of Joinder**

## **CREDIT BID PURCHASER JOINDER**

       This Joinder ("**Joinder**") to the Eni Term Sheet Implementation Agreement, dated as of [\_\_\_\_], 2021 (as amended, supplemented or otherwise modified from time to time, the "**Implementation Agreement**"), by and among Fieldwood Energy III LLC, a Delaware limited liability company ("**FWE III**"), and its affiliated debtors and debtors in possession in the jointly administered chapter 11 cases pending before the Honorable Marvin Isgur under Case No. 20-33948 (collectively, the "**Debtors**"), (b) Eni Petroleum US LLC and Eni US Operating Co. Inc. (collectively, "**Eni**") and (c) following execution of this Joinder, [\_\_\_\_], a Delaware limited liability company ("**Credit Bid Purchaser**"), is executed and delivered by Credit Bid Purchaser as of [●], 2021.  Each capitalized term used herein but not otherwise defined shall have the meaning set forth in the Implementation Agreement.

       Section 1.    <u>Agreement to be Bound</u>.  Credit Bid Purchaser hereby agrees to and shall become and be bound by all of the terms and conditions, commitments, and obligations of Credit Bid Purchaser under the Implementation Agreement.

       Section 2.    <u>Governing Law</u>. For the avoidance of doubt, <u>Section 12</u> of the Implementation Agreement shall apply to this Joinder *mutatis mutandis*.

       Section 3.    <u>Notice</u>. All notices and other communications given or made pursuant to the Implementation Agreement shall be sent to Credit Bid Purchaser at the address set forth in signature pages hereto.

       Section 4.    <u>No Recourse</u>. Notwithstanding anything that may be expressed or implied in this Joinder or any other document, with respect to Credit Bid Purchaser, no Person other than Credit Bid Purchaser (and its successors or assignees) has any obligation hereunder.

**[*Signature Pages Follow*]**

IN WITNESS WHEREOF, Credit Bid Purchaser has caused this Joinder to be executed as of the date first written above.

**[Credit Bid Purchaser]**


By:_____
Name:
Title:


**<u>Notice Address</u>:**
[●]

Fax: [●]

Attention: [●]

Email: [●]

**Exhibit E**

**Form of Joinder**

**FWE III JOINDER**

This Joinder ("**Joinder**") to the Eni Term Sheet Implementation Agreement, dated as of [\_\_\_], 2021 (as amended, supplemented or otherwise modified from time to time, the "**Implementation Agreement**"), by and among Fieldwood Energy LLC, a Delaware limited liability company ("**FWE**"), and its affiliated debtors and debtors in possession in the jointly administered chapter 11 cases pending before the Honorable Marvin Isgur under Case No. 20-33948 (collectively, the "**Debtors**"), (b) Eni Petroleum US LLC and Eni US Operating Co. Inc. (collectively, "**Eni**") and (c) following execution of this Joinder, Fieldwood Energy III LLC, a Delaware limited liability company ("**FWE III**"), is executed and delivered by FWE III as of [●], 2021.  Each capitalized term used herein but not otherwise defined shall have the meaning set forth in the Implementation Agreement.

Section 1.    Agreement to be Bound.  FWE III hereby agrees to and shall become and be bound by all of the terms and conditions, commitments, and obligations of FWE III under the Implementation Agreement.

Section 2.    Governing Law. For the avoidance of doubt, Section 12 of the Implementation Agreement shall apply to this Joinder *mutatis mutandis*.

Section 3.    Notice. All notices and other communications given or made pursuant to the Implementation Agreement shall be sent to FWE III at the address set forth in signature pages hereto.

Section 4.    No Recourse. Notwithstanding anything that may be expressed or implied in this Joinder or any other document, with respect to FWE III, no Person other than FWE III (and its successors or assignees) has any obligation hereunder.

**[*Signature Pages Follow*]**

IN WITNESS WHEREOF, FWE III has caused this Joinder to be executed as of the date first written above.

FWE III


By:_____
Name:
Title:


**<u>Notice Address</u>:**
[●]

Fax: [●]

Attention: [●]

Email: [●]

## Exhibit F

### Excluded Wells

See attached.

## EXHIBIT F
## EXCLUDED WELLS

| API | LEASE | AREA | BLOCK | WELL NAME | SUFFIX |
|---|---|---|---|---|---|
| 4270640465-02 | G15740 | GA | 151 | B1 | ST00BP02 |
| 1771200065-00 | G01027 | SS | 246 | 1 | ST00BP00 |
| 1771240061-00 | G01027 | SS | 246 | 3 | ST00BP00 |
| 1771240071-00 | G01027 | SS | 246 | B001 | ST00BP00 |
| 1771240073-00 | G01027 | SS | 246 | 5 | ST00BP00 |
| 1771240079-00 | G01027 | SS | 246 | A003 | ST00BP00 |
| 1771240080-00 | G01027 | SS | 246 | B002 | ST00BP00 |
| 1771240081-01 | G01027 | SS | 246 | B006 | ST01BP00 |
| 1771240088-00 | G01027 | SS | 246 | B007 | ST00BP00 |
| 1771240096-00 | G01027 | SS | 246 | A008 | ST00BP00 |
| 1771240105-00 | G01027 | SS | 246 | A010 | ST00BP00 |
| 1771240121-00 | G01027 | SS | 246 | A012 | ST00BP00 |
| 1771240135-00 | G01027 | SS | 246 | A015 | ST00BP00 |
| 1771240126-00 | G01027 | SS | 246 | A016 | ST00BP00 |
| 1771240134-00 | G01027 | SS | 246 | A017 | ST00BP01 |
| 1771240440-00 | G01027 | SS | 246 | H001 | ST00BP00 |
| 1771200064-00 | G01028 | SS | 247 | 1 | ST00BP00 |
| 1771200114-00 | G01028 | SS | 247 | 2 | ST00BP00 |
| 1771240094-00 | G01028 | SS | 247 | C001 | ST00BP00 |
| 1771240100-00 | G01028 | SS | 247 | C005 | ST00BP00 |
| 1771240108-00 | G01028 | SS | 247 | C003 | ST00BP00 |
| 1771240112-00 | G01028 | SS | 247 | C007 | ST00BP00 |
| 1771240155-03 | G01028 | SS | 247 | F001 | ST00BP00 |
| 1771240174-00 | G01028 | SS | 247 | 4 | ST00BP00 |
| 1771240196-00 | G01028 | SS | 247 | F004 | ST00BP00 |
| 1771240198-00 | G01028 | SS | 247 | F003 | ST00BP00 |
| 1771240209-00 | G01028 | SS | 247 | F006 | ST00BP00 |
| 1771240212-00 | G01028 | SS | 247 | F005 | ST00BP00 |
| 1771240216-00 | G01028 | SS | 247 | F009 | ST00BP00 |
| 1771240218-01 | G01028 | SS | 247 | F007 | ST01BP00 |

1 of 3

Debtors' Exhibit No. 34
Page 838 of 910

**EXHIBIT F**
**EXCLUDED WELLS**

| API | LEASE | AREA | BLOCK | WELL NAME | SUFFIX |
|---|---|---|---|---|---|
| 1771240219-00 | G01028 | SS | 247 | F011 | ST00BP00 |
| 1771240227-00 | G01028 | SS | 247 | F012 | ST00BP00 |
| 1771240230-00 | G01028 | SS | 247 | F013 | ST00BP00 |
| 1771240231-00 | G01028 | SS | 247 | F016 | ST00BP00 |
| 1771200011-00 | G01029 | SS | 248 | A003 | ST02BP00 |
| 1771240010-00 | G01029 | SS | 248 | 1 | ST00BP00 |
| 1771240077-00 | G01029 | SS | 248 | D001 | ST00BP00 |
| 1771240147-00 | G01029 | SS | 248 | 4 | ST00BP00 |
| 1771240238-00 | G01029 | SS | 248 | 5 | ST00BP00 |
| 1771240482-00 | G01029 | SS | 248 | 6 | ST00BP00 |
| 1771240486-00 | G01029 | SS | 248 | 7 | ST00BP00 |
| 1771200066-00 | G01030 | SS | 249 | 1 | ST00BP00 |
| 1771240060-00 | G01030 | SS | 249 | 2 | ST00BP00 |
| 1771240263-00 | G01030 | SS | 249 | 5 | ST00BP00 |
| 1771240563-00 | G01030 | SS | 249 | H002 | ST00BP00 |
| 1771240045-00 | G01037 | SS | 270 | 1 | ST00BP00 |
| 1771200032-01 | G01038 | SS | 271 | A005 | ST01BP00 |
| 1771200033-02 | G01038 | SS | 271 | A007 | ST02BP00 |
| 1771200081-00 | G01038 | SS | 271 | 1 | ST00BP00 |
| 1771240089-01 | G01038 | SS | 271 | A006 | ST01BP00 |
| 1771240099-00 | G01038 | SS | 271 | A008 | ST00BP00 |
| 1771240133-01 | G01038 | SS | 271 | 5 | ST01BP00 |
| 1771240136-00 | G01038 | SS | 271 | 3 | ST00BP00 |
| 1771240182-00 | G01038 | SS | 271 | B001 | ST00BP00 |
| 1771240187-00 | G01038 | SS | 271 | B002 | ST00BP00 |
| 1771240205-00 | G01038 | SS | 271 | B004 | ST00BP00 |
| 1771240250-00 | G01038 | SS | 271 | 4 | ST00BP00 |
| 1771240261-00 | G01038 | SS | 271 | B005 | ST00BP00 |
| 1771240264-00 | G01038 | SS | 271 | B006 | ST00BP00 |
| 1771240267-00 | G01038 | SS | 271 | B009 | ST00BP00 |
| 1771240455-00 | G01038 | SS | 271 | 6 | ST00BP00 |
| 1770541031-00 | G04421 | VR | 78 | A004 | ST00BP00 |
| 1770600047-00 | G01172 | VR | 313 | 1 | ST00BP00 |

2 of 3

**EXHIBIT F**
**EXCLUDED WELLS**

| API | LEASE | AREA | BLOCK | WELL NAME | SUFFIX |
|---|---|---|---|---|---|
| 1770600066-00 | G01172 | VR | 313 | 2 | ST00BP00 |
| 1770620027-00 | G01172 | VR | 313 | 3 | ST00BP00 |
| 1770640024-00 | G01172 | VR | 313 | 4 | ST00BP00 |
| 1770640061-00 | G01172 | VR | 313 | 5 | ST00BP00 |
| 1770640163-00 | G01172 | VR | 313 | 6 | ST00BP00 |
| 1770640202-00 | G01172 | VR | 313 | A001 | ST00BP00 |
| 1770640208-01 | G01172 | VR | 313 | A009 | ST01BP00 |
| 1770640210-00 | G01172 | VR | 313 | A003 | ST00BP00 |
| 1770640215-00 | G01172 | VR | 313 | A004 | ST00BP00 |
| 1770640218-02 | G01172 | VR | 313 | A011 | ST02BP00 |
| 1770640221-01 | G01172 | VR | 313 | A012 | ST01BP00 |
| 1770640222-00 | G01172 | VR | 313 | A007 | ST00BP00 |
| 1770640244-00 | G01172 | VR | 313 | A010 | ST00BP00 |
| 1770041148-00 | G22510 | WC | 100 | 3 | ST00BP00 |
| 1770041161-01 | G12761 | WC | 130 | 2 | ST01BP00 |
| 1770041259-01 | G12761 | WC | 130 | 4 | ST00BP01 |

3 of 3

## Exhibit G

**Temporary Abandoned Wells**

See attached.

# EXHIBIT G
## TEMPORARY ABANDONED WELLS

| API | LEASE | AREA | BLOCK | WELL NAME | SUFFIX | Status |
|---|---|---|---|---|---|---|
| 42-706-40442-00 | OCS-G15740 | Galveston | 151 | 5 | ST00BP00 | Temporarily Abandoned. Operated by Fieldwood. |
| 17-712-40057-00 | OCS-G 01027 | Ship Shoal | 246 | A-001 | ST00BP00 | TA 2010. 13 3/8" CICR @ 164' BML with 120' surface cement plug f/ 164' to 44' BML. 13 3/8" and 20" removed to 25' BML. Top of 30" is +/- 5" AML. Need to remove 30" to 15' BML when platform is removed. |
| 17-712-40074-00 | OCS-G 01027 | Ship Shoal | 246 | A-002 | ST00BP02 | TA 2001.  LS@ 1357', SS@ 1424'. Spotted cmt plugs in LS 10100'- 9800' and 3100' - 2800'. CICR @ 1300' with 200' cmt on top f/ 1300' - 1100'.  Need to PT & BT annuli, set surface cmt plug and remove 7", 9 5/8", 13 3/8", 20" and 26" casings to 15' BML. |
| 17-712-40102-00 | OCS-G 01027 | Ship Shoal | 246 | A-009 | ST00BP00 | TA 2001.  Casing damage at 9764'. 7", 29# CIBP at 9000' with 200' cement plug f/ 8800' - 9000'. Displace well w/ 13.5ppg WBM. Test cmt plug w/ 1000 psi.  Need to PT & BT annuli and set additional cement plugs as required by BSEE. Remove 7", 9 5/8", 13 3/8", 20", and 26" at 15' BML. |
| 17-712-40224-00 | OCS-G01028 | Ship Shoal | 247 | F-010 | ST00BP00 | TA 2013.  Surface cement plug @ 70' BML.  Need to cut 7 5/8", 10 ¾", 16" & 26" at 15' BML. |
| 17-712-40221-00 | OCS-G01029 | Ship Shoal | 248 | F-008 | ST00BP00 | TA 2000.  197' surface cement plug at 81' - 278' BML.  7 5/8" casing cut at 276' and 186' BML, could not pull.  Cemented to surface.  Need to PT & BT all annuli and remove 7 5/8", 10 3/4", 16" and 26" to 15' BML. |
| 17-712-40131-00 | OCS-G01028 | Ship Shoal | 247 | D-003 | ST00BP02 | TA 1982.  205' surface cement plug f/ 50' - 255' BML in 7".  Need to PT & BT all annuli and remove 7", 9 5/8", 13 3/8", 20" and 26" casings to 15' BML. |
| 17-712-40156-00 | OCS-G01028 | Ship Shoal | 247 | D-007 | ST00BP00 | TA 2013. Surface cement plug @ 100' BML.  Need to cut 10 ¾", 16", & 26" at 15' BML. |
| 17-712-40166-00 | OCS-G01028 | Ship Shoal | 247 | D-009 | ST00BP00 | TA 1999.  Casing restriction @ 11195'. CICR @ 11150' with 370' cement plug on top f/ 11150' - 10780'. 7" wellbore has 13.0 ppg WBM. Need to PT & BT all annuli, set additional cmt plugs as required by BSEE and remove 7", 9 5/8", 13 3/8" 20" and 26" to 15' BML. |
| 17-712-40179-03 | OCS-G01028 | Ship Shoal | 247 | D-012 | ST03BP00 | TA 2013.  Highest cement plug @ 789' BML.  Need to set surface cement plug.  PT & BT.  Cut 9 5/8", 13 3/8", 18 5/8" & 26" at 15' BML. |
| 17-712-40150-0 | OCS-G01029 | Ship Shoal | 248 | D-006 | ST00BP00 | TA 1977.  Drilled and TA'd 1977.  Highest cement plug (150') f/ 420' - 540' RKB (150' - 300' BML).  17.5 ppg WBM in wellbore.  Need to tag cement plug at 150' BML, circulate clean with seawater, set 9 5/8" CIBP at TOC and spot +/- 50' cement on top.  PT & BT annuli.  Remove 9 5/8", 13 3/8", 20" and 26" casings to 15' BML. |

1 of 3

**EXHIBIT G**
**TEMPORARY ABANDONED WELLS**

| API | LEASE | AREA | BLOCK | WELL NAME | SUFFIX | Status |
|---|---|---|---|---|---|---|
| 17-712-40206-00 | OCS-G01029 | Ship Shoal | 248 | D-015 | ST00BP00 | TA 2013. Highest cement plug @ 900' RKB (620' BML). Need to set surface cement plug. PT & BT. Cut 7 5/8", 10 ¾", 16" & 26" at 15' BML. |
| 17-712-40210-00 | OCS-G01029 | Ship Shoal | 248 | D-016 | ST00BP00 | TA 2014. Highest cement plug @ 670' RKB (390' BML). Need to set surface cement plug. PT & BT. Cut 7 5/8", 10 ¾", 16" & 26" at 15' BML. |
| 17-712-40211-00 | OCS-G01029 | Ship Shoal | 248 | D-018 | ST00BP00 | TA 2013. Highest cement plug @ 900' RKB (620' BML). Need to set surface cement plug. PT & BT. Cut 7 5/8", 10 ¾", 16" & 26" at 15' BML. |
| 17-712-40530-00 | OCS-G01029 | Ship Shoal | 248 | G-002 | ST00BP00 | TA 2013. Surface cement plug @ 124' BML. Need to cut 9 5/8", 13 3/8" & 26" at 15' BML. |
| 17-712-40533-00 | OCS-G01029 | Ship Shoal | 248 | G-003 | ST00BP00 | TA 2013. Surface cement plug @ 45' BML. Need to cut 9 5/8", 13 3/8", 20" & 26" at 15' BML. |
| 17-712-40120-00 | OCS-G01030 | Ship Shoal | 249 | D-002 | ST00BP00 | TA 2013. Highest cement plug @ 620' BML. Need to set surface cement plug. PT & BT. Cut 7", 9 5/8", 13 3/8", 20" & 26" at 15' BML. |
| 17-712-40159-00 | OCS-G01030 | Ship Shoal | 249 | D-008 | ST00BP00 | TA 2013. Surface cement plug @ 90' BML. Need to cut 7", 9 5/8", 13 3/8", 20" & 26" at 15' BML. |
| 17-712-40171-00 | OCS-G01030 | Ship Shoal | 249 | D-004 | ST00BP00 | TA 1978. Drilled and TA'd in 1978. Highest cement plug (150') at 465' - 315' RKB (185' - 35' BML). Plug tested 1000 psi. 15.9 ppg WBM in wellbore. Need to PT & BT annul and remove 9 5/8", 13 3/8", 20" and 26" casings to 15' BML. |
| 17-712-40192-00 | OCS-G01030 | Ship Shoal | 249 | D-014 | ST00BP01 | TA 1978. Drilled and TA'd in 1978.  Highest cement plug f/ 10120' to 10389' (269'). Set 9 5/8" CICR @ 10170'. Squeeze 61 sxs below (219') and spot 50' on top of CR.  9 5/8" shoe @ 10239'. 16.8 ppg WBM in wellbore.  Need to PT & BT annul, spot additional cement plugs as required by BSEE and remove 9 5/8", 13 3/8", 20" and 26" casings to 15' BML. |
| 17-712-40208-00 | OCS-G01030 | Ship Shoal | 249 | D-017 | ST00BP00 | TA 2013. Highest cement plug @ 620' BML. Need to set surface cement plug. PT & BT. Cut 7 5/8", 10 ¾", 16" & 26" at 15' BML. |
| 17-712-40215-00 | OCS-G01030 | Ship Shoal | 249 | D-019 | ST00BP00 | TA 2013. Highest cement plug @ 820' BML. Need to set surface cement plug. PT & BT. Cut 7", 9 5/8", 13 3/8", 20" & 26" at 15' BML. |
| 17-712-40622-00 | OCS-G01030 | Ship Shoal | 249 | 6 | ST00BP00 | TA 2001. 7 5/8" CIBP set at 200' BML, no cement. Need to spot surface cement plug on CIBP. Cut 16" and 24" at 15' BML. |
| 17-705-40778-00 | OCS-G04421 | Vermilion | 78 | A001 | ST00BP00 | Temporarily Abandoned. Operated by Fieldwood. |
| 17-706-40281-00 | OCS-G01172 | Vermilion | 313 | B001 | ST00BP01 | TA 2014. Surface cement plug @ 110' BML. Need to cut 10 ¾", 16" & 26" at 15' BML. |
| 17-706-40297-00 | OCS-G01172 | Vermilion | 313 | B002 | ST00BP00 | TA 2014. Surface cement plug @ 110' BML. Need to cut 7 5/8", 10 ¾", 16" & 26" at 15' BML. |

2 of 3

**EXHIBIT G**
**TEMPORARY ABANDONED WELLS**

| API | LEASE | AREA | BLOCK | WELL NAME | SUFFIX | Status |
|---|---|---|---|---|---|---|
| 17-706-40314-00 | OCS-G01172 | Vermilion | 313 | B004 | ST00BP00 | Listed in BSEE database (and OWL) as P&A in 1978. HOWEVER THE CASINGS AND WELLHEADS ARE STILL IN PLACE ON PLATFORM. SO IT IS ACTUALLY TA'd. Drilled and TA'd in 1978. Set 10 3/4" CICR at 3425'. Squeezed 75 sxs cmt below CR and left 25 sxs on top. Highest cement plug (155') f/ 605' - 450' RKB (322'- 167' BML). Surface plug tested to 2000 psi. 13.8 ppg WBM left in wellbore. Need to PT & BT annuli, tag plug at 450', circulate clean with seawater, complete surface plug with additional +/- 60' of cement and remove 10 3/4", 16" and 26" casings to 15' BML. |
| 17-706-40319-00 | OCS-G01172 | Vermilion | 313 | B006 | ST00BP00 | TA 2014. Surface cement plug @ 110' BML. Need to cut 7 5/8", 10 ¾", 16" & 26" at 15' BML. |
| 17-706-40327-00 | OCS-G01172 | Vermilion | 313 | B007 | ST00BP00 | TA 1978. Drilled and TA'd in 1978. Highest cement plug (150') at 450'-600' RKB (167' - 317' BML). 13.7ppg WBM in wellbore. Need to spot additional +/- 50' cement to complete surface plug, PT & BT annuli and remove 10 3/4", 16" and 26" casings to 15' BML. |
| 17-706-40338-01 | OCS-G01172 | Vermilion | 313 | B009 | ST01BP00 | TA 2014. Surface cement plug @ 110' BML. Need to cut 7 5/8", 10 ¾", 16" & 26" at 15' BML. |
| 17-706-40371-00 | OCS-G01172 | Vermilion | 313 | B011 | ST00BP00 | TA 2014. Surface cement plug @ 110' BML. Need to cut 7 5/8", 10 ¾", 16" & 26" at 15' BML. |
| 17-706-40719-00 | OCS-G01172 | Vermilion | 313 | C002 | ST00BP00 | TA 2014. Surface cement plug @ 98' BML. Need to cut 7", 10 ¾", 16" & 30" at 15' BML. |
| 17-706-40722-00 | OCS-G01172 | Vermilion | 313 | C003 | ST00BP00 | TA 2014. Surface cement plug @ 96' BML. Need to cut 7", 10 ¾", 16" & 30" at 15' BML. |
| 17-706-40720-00 | OCS-G01172 | Vermilion | 313 | C004 | ST00BP00 | TA 2014. Surface cement plug @ 100' BML. Need to cut 7", 10 ¾", 16" & 30" at 15' BML. |

3 of 3

*EXECUTION VERSION*

# TURNKEY REMOVAL AGREEMENT
## by and among
## ENI PETROLEUM US LLC
## AND
## FIELDWOOD ENERGY III LLC
## AND

## MAKO BUYER LLC

THIS TURNKEY REMOVAL AGREEMENT (the "**Agreement**") is made effective as of the [_____], 2021 (the "**Effective Date**"), by and among Eni Petroleum US LLC ("**Eni**"), a Delaware limited liability company having a mailing address of 1200 Smith Street, Suite 1700, Houston, Texas 77002, Fieldwood Energy III LLC ("**FWE III**"), a Delaware limited liability company having a mailing address of 2000 W. Sam Houston Pkwy S, Suite 1200, Houston, Texas 77042, and Mako Buyer LLC, a Delaware limited liability company (hereinafter referred to as "**Contractor**"), a Delaware limited liability company, having its mailing address at 2000 W Sam Houston Pkwy S, Suite 1200, Houston, Texas 77042.  Eni, FWE III and Contractor may hereinafter be referred to collectively as "**Parties**" or individually as a "**Party**."

## RECITALS

WHEREAS, FWE III is a resulting entity of a divisive merger effected in connection with the confirmed plan of reorganization of Chapter 11 Case 20-33948, In re: Fieldwood Energy LLC et al., in the United States Bankruptcy Court for the Southern District of Texas, Houston Division;

WHEREAS, Eni is identified as a predecessor-in-interest of the Specified Assets (as defined below);

WHEREAS, Eni and FWE III have requested that Contractor provide certain decommissioning and removal services with respect to the Specified Assets, upon the terms and conditions set forth herein, and Contractor has agreed to do so.

NOW, THEREFORE, in consideration of the premises and of the mutual promises, covenants, conditions, and agreements contained herein, and for other valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties hereby agree as follows:

## ARTICLE I.
## SERVICES

**Section 1.1      Services**. Subject to the terms of this Agreement, including the Performance Standards (as defined below), with respect to the interests identified on Schedule 1 of this Agreement (the "**Specified Interests**"), Contractor will perform (i) the Agreed Activities, (ii) the Initial Safe Out,  and (iii) plug, abandon, decommission, remove when reefing or burial are not allowed, and salvage as appropriate ("**Decommission**" or "**Decommissioning**") certain platforms, wells, pipelines, facilities and equipment (including production equipment) located at, and any

DM-#8062176

hydrocarbons produced from, if applicable, the Specified Interests (collectively the "**Specified Assets**") on a lump sum, project-by-project, turnkey payment basis as contemplated in this Agreement.

    **Section 1.2**    Turnkey Amounts.

    (a)    Contractor will earn a single turnkey payment in exchange for completing the Decommissioning for each decommissioning project identified on <u>Exhibit A</u> hereto (each a "**Decommissioning Project**"). The total turnkey amount for each Decommissioning Project set forth on <u>Exhibit A</u> shall be set forth (i) on a gross 8/8ths basis (the "**Gross Turnkey Amount**") and (ii) Eni's individual net share of such Gross Turnkey Amount (such amount, the "**Eni Net Turnkey Amount**"). Without limitation of Eni's share of any Agreed Excess Qualified Conditions Costs pursuant to <u>Section 1.8</u> up to the Qualified Condition Cap or any Excess Regulatory Costs pursuant to <u>Section 1.7</u>, (i) the aggregate sum of Gross Turnkey Amounts for the Decommissioning Projects shall not exceed $95,755,436.46, and (ii) the aggregate sum of Eni Net Turnkey Amounts for the Decommissioning Projects shall not exceed $57,325,130.98. The Parties acknowledge and agree that except as provided in this Agreement or the Implementation Agreement (as defined below), neither Contractor nor Eni shall have any obligation to Decommission any Specified Assets which are not identified on <u>Exhibit A</u>.

    (b)    Subject to the terms of this Agreement, each Gross Turnkey Amount for each applicable Decommissioning Project shall be inclusive of all costs, expenses, taxes and reasonable overhead (in accordance with COPAS provisions attached to the Contract Operating Agreement as defined in <u>Section 1.12</u>) associated with a particular Decommissioning Project, including all third-party costs, any fixed and/or capital costs, and taxes as necessary to meet the Performance Standard (collectively, the "**Actual Decommissioning Costs**"). Contractor shall be paid the applicable Eni Net Turnkey Amount for each completed Decommissioning Project, unless Eni makes a Turnkey Election pursuant to <u>Section 1.4</u> below, in which case, Contractor shall be paid the applicable Gross Turnkey Amount; provided, however, in either case, the payment shall be made pursuant to <u>Section 2.3</u> of this Agreement.

    (c)    Contractor shall have a profit opportunity following the completion of Decommissioning for any Decommissioning Project if it is able to Decommission such Decommissioning Project for a lower Actual Decommissioning Cost (i) net to the interests of Eni, as set forth in Decommissioning Project Schedule on <u>Exhibit A</u> in the column labeled "Eni Ownership (%)*," than the Eni Net Turnkey Amount, provided, that Eni did not make a Turnkey Election for such Decommissioning Project, or (ii) than the Gross Turnkey Amount if a Turnkey Election was made by Eni. The Parties acknowledge and agree that once Eni has paid Contractor the Eni Net Turnkey Amount or Gross Turnkey Amount, as applicable, Eni shall have (subject to <u>Sections</u> <u>1.4</u>, <u>1.6</u>, <u>1.7</u>, and <u>1.8</u>) no further obligations (monetary or otherwise) with respect to the applicable Decommissioning Project, and Contractor shall bear the risk that the Actual Decommissioning Costs of a Decommissioning Project exceed the applicable Eni Net Turnkey Amount in the event no Turnkey Election is made, or the Gross Turnkey Amount attributed to such Decommissioning Project, in the event a Turnkey Election is made.

Debtors' Exhibit No. 34
Page 846 of 910

**Section 1.3**     **Commencement of Decommissioning Projects**. Without limitation of Contractor's obligations under Section 1.5, Contractor shall not be obligated to commence a Decommissioning Project until the earlier of (i) receipt by Eni and other joint and several parties of a BOEM/BSEE order(s) requiring such Decommissioning and full funding for such Decommissioning Project has been agreed upon in accordance with Section 2.3, or (ii) Eni makes a Turnkey Election for such Decommissioning Project; provided that the Decommissioning Project Schedule on Exhibit A shall be modified to address either such event.

**Section 1.4**     **Turnkey Election**. Eni shall have the right, but not the obligation (in Eni's sole discretion), to make an irrevocable election to agree to pay to Contractor the Gross Turnkey Amount for any particular Decommissioning Project (a "**Turnkey Election**"). In order to make a Turnkey Election, Eni shall provide Notice of its election to Contractor and FWE III, specifically identifying the Decommissioning Project to which the Turnkey Election applies (a "**Turnkey Notice**"). Upon receipt of a Turnkey Notice, Contractor shall promptly commence the applicable Decommissioning Project. Notwithstanding anything to the contrary contained in this Agreement, the Eni Term Sheet Implementation Agreement by and among (a) Fieldwood Energy LLC and its affiliated debtors and debtors in possession in the jointly administered Chapter 11 cases pending before the Honorable Marvin Isgur under Case No. 20-33948, (b) Eni Petroleum US LLC, and (c) the Credit Bid Purchaser dated of even date herewith (the "**Implementation Agreement**"), or any other Eni Definitive Documents (as defined in the Implementation Agreement), in the event Eni makes a Turnkey Election: (i) Eni agrees to pay Contractor the applicable Gross Turnkey Amount, subject to the terms of Section 2.3, plus, as applicable, any Agreed Excess Qualified Conditions Costs pursuant to Section 1.8 up to the Qualified Condition Cap or any Excess Regulatory Costs pursuant to Section 1.7, (ii) Contractor assumes the risk that the actual costs for the Decommissioning Project, performed in accordance with the Performance Standards, and excluding any costs for "Excluded Wells" and/or "Eligible Well Intervention Costs" (as such terms are defined in the Implementation Agreement) with respect to any particular "Temporary Abandoned Well" (as such term is defined in the Implementation Agreement) pursuant to Section 7 of the Implementation Agreement, exceed the Gross Turnkey Amount, plus, as applicable, any Agreed Excess Qualified Conditions Costs pursuant to Section 1.8 (up to the Qualified Condition Cap) and any Excess Regulatory Costs pursuant to Section 1.7, and (iii) Eni shall have the right to seek contribution from third parties for any share of the Gross Turnkey Amount.  In the event Eni makes a Turnkey Election for any Decommissioning Project, Eni may assign its rights in this Agreement insofar as it covers such Decommissioning Project (to the extent that it relates to Eni's prior undivided interests in the Specified Assets) to any third party or parties with joint and several liability for such Decommissioning Project, provided that Eni shall remain responsible for all of its obligations hereunder in relation to such Decommissioning Project.

**Section 1.5**     **Initial Safe Out**. With respect to the Decommissioning Projects, Contractor shall promptly perform the operations necessary to safe-out and otherwise perform preparatory activities in accordance with the Performance Standards to put such assets into a mechanical and operational state such that they are hydrocarbon free and ready to be Decommissioned (the "**Initial Safe Out**"). The Initial Safe Out for all Decommissioning Projects shall be completed no later than

Debtors' Exhibit No. 34
Page 847 of 910

December 31, 2021, unless agreed to in writing by Eni, such consent not to be unreasonably withheld, delayed or conditioned.

**Section 1.6** <u>**Qualified Conditions**</u>. If it is discovered that any qualified condition(s) identified on <u>Exhibit B</u> ("**Qualified Conditions**") is present and is reasonably likely to result in additional costs or expenses to Contractor in excess of the existing Gross Turnkey Amount, either Contractor or Eni may provide Notice to the other, and for thirty (30) days following receipt of such Notice, the Parties shall work together in good faith to agree, as applicable, upon (i) any excess costs and expenses for such Qualified Conditions above the existing Gross Turnkey Amount or an alternative cost arrangement for an existing Decommissioning Project, and/or (ii) a Gross Turnkey Amount for a Specified Asset that is not already included in a Decommissioning Project as provided in <u>Section 1</u> of <u>Exhibit B</u> ((i) and (ii) collectively, the "**Excess Qualified Conditions Costs**"). In the event the Parties are unable to reach an agreement with respect to (i) the existence of a Qualified Condition or (ii) the Excess Qualified Conditions Costs attributable to a Qualified Condition, the Parties may submit the matter for Expert Determination, as provided in <u>Section 1.10</u> below. As either agreed by the Parties or determined by Expert Determination, any such Excess Qualified Conditions Costs are the "**Agreed Excess Qualified Conditions Costs**."

**Section 1.7** <u>**Regulatory Changes**</u>. If any regulatory body either (i) issues a new regulation(s) that increases the cost to conduct a Decommissioning Project in accordance with Performance Standards, or (ii) designates additional sand sediment areas requiring pipeline removal as opposed to abandonment in place for any Decommissioning Project that did not already assume pipeline removal, following thirty (30) days prior written notice by Contractor to Eni, Eni and Contractor shall negotiate in good faith as to the existence of any regulatory change, and any necessary excess costs above the existing Gross Turnkey Amount for any affected Decommissioning Projects ("**Excess Regulatory Costs**") to take into account the incremental costs required to complete any such Decommissioning Project. For the avoidance of doubt, new regulations include but are not limited to, NTLs, BSEE or BOEM national, regional or district policies and requirements, executive and Secretary of Interior orders and new and revised CFR regulations that govern or affect decommissioning. In the event that of new regulations, then (i) the Excess Regulatory Costs therefor shall be as agreed upon by the Parties, or (ii) if Eni and Contractor are unable to agree on the amount of Excess Regulatory Costs for a particular Decommissioning Project, then such Excess Regulatory costs shall be determined on a cost-plus 15% basis where costs are actual, reasonable third-party costs necessary for Decommissioning in accordance with Performance Standards.

**Section 1.8** <u>**Qualified Conditions Cap**</u>. Without limitation of and subject to <u>Section 1.7</u>, above, but subject to the existence of a Qualified Condition, Contractor shall assume the risk that the costs to Decommission a Decommissioning Project exceeds the Eni Net Turnkey Amount attributed to such Decommissioning Project, in the event no Turnkey Election is made, or the Gross Turnkey Amount attributed to such Decommissioning Project, in the event a Turnkey Election is made. In the event of a Qualified Condition, Eni and Contractor shall share in any Agreed Excess Qualified Conditions Costs related to the Qualified Condition(s) in excess of the relevant Eni Net Turnkey Amount (or the Gross Turnkey Amount if the Turnkey Election is made) up to, on an aggregated basis of all Decommissioning Projects, fifteen million and 00/100 dollars ($15,000,000) (the "**Qualified Condition Cap**") as follows: (i) Eni shall be responsible for the first five million and 00/100 dollars ($5,000,000) of Agreed Excess Qualified Conditions Costs

4

related to Qualified Conditions, and (ii) Eni shall be responsible for 75% and Contractor shall be responsible for 25% of the remaining Agreed Excess Qualified Conditions Costs up to the Qualified Condition Cap.  Eni's responsibility for any Agreed Excess Qualified Conditions Costs related to a Qualified Condition shall not commence until the full amount of the relevant Eni Net Turnkey Amount, or if the Turnkey Election is made, the relevant Gross Turnkey Amount, have been incurred. The calculation and application of these amounts (including such Agreed Excess Qualified Conditions Costs) shall be limited to the percentage portion (based on the "Eni Ownership (%)" as indicated on Exhibit A) for a particular Decommissioning Project in the event Eni did not elect to make the Turnkey Election with regard to such Decommissioning Project. In the event that one or more Qualified Conditions results in costs that exceed the Qualified Condition Cap, Eni's liability for any additional costs shall terminate once the Qualified Condition Cap has been reached and Eni shall have no further liability for any costs or the performance of any obligations associated with any Qualified Condition or the applicable Decommissioning Project.

Section 1.9    **Terms and Conditions**. The Parties agree that the performance of the Agreed Activities, the Initial Safe Out, and each Decommissioning Project shall be performed in accordance with the terms and conditions of this Agreement.  Eni agrees that Contractor will have met the required standard of performance under this Agreement if it performs the Agreed Activities, the Initial Safe Out, and such Decommissioning Project consistent with required laws, rules and regulations promulgated by governing regulatory agencies, including but not limited to BOEM and BSEE; consistent with any applicable third-party contracts; and consistent with the Decommissioning Schedule set forth on Exhibit A (the "**Performance Standards**").

Section 1.10    **Expert Determination**. If the Parties cannot agree on (i) the existence of a Qualified Condition or (ii) the Excess Qualified Condition Costs as contemplated above (the "**Qualified Condition Dispute**") after good faith negotiations, either Eni or Contractor may submit the matter for expert determination according to the procedure outlined in this Section 1.10. Prior to submitting such matter to the Expert (as defined below), the Party intending to make the submission shall provide written notice to the other Party of such intent.  If the Parties are unable to agree upon resolve the Qualified Condition Dispute within fifteen (15) days following the other Party's receipt of the notice provided herein, the Party intending to submit the matter to the Expert may so submit such matter to the Expert for final and binding determination.  To submit the determination of the Qualified Condition Dispute to the Expert, the Parties shall each provide the Expert with (a) such data and information as is necessary for the Expert to be able to determine the resolution of the Qualified Condition Dispute, such data and information shall include applicable well data and information related to any structures, pipelines, facilities and other assets associated with the Decommissioning Project.  The Expert shall, within fifteen (15) days of receiving such data and information, make its determination of the Qualified Condition Dispute using the data and information it has received from the Parties.  In making its determination hereunder, the Expert (i) shall be bound by the provisions of this Section 1.10 and (ii) if the Qualified Condition Dispute relates to the amount of the Excess Qualified Condition Costs, the Expert may not assign a value to the Excess Qualified Condition Costs greater than the value provided by Contractor or less than the value provided by Eni.  If, prior to the Expert finalizing its determination that the Qualified Condition Dispute relates to the amount of the Excess Qualified Condition Costs, the Expert, the Parties reach agreement, the Parties may withdraw the matter from the Expert.  The determination of the Expert shall be final and binding on the Parties for all

Debtors' Exhibit No. 34
Page 849 of 910

purposes hereunder.  The fees and expenses of the Expert under this <u>Section 1.10</u> shall be borne one half by the Eni and one half by Contractor.  The Parties agree to utilize TSB Offshore, Inc. as the Expert for the purposes herein (the "**Expert**").  If the party selected as the Expert is unable or unwilling to serve as the Expert hereunder the Parties shall agree on a newly identified Expert.  If the Parties cannot agree after thirty (30) days of good faith negotiations, the Expert shall be selected by lot from among the nationally recognized independent engineering firms that have not represented any Party or its affiliates at any time during the three-year period of time immediately preceding its designation hereunder.  For selection by lot, Eni shall provide two (2) options, and Contractor shall provide two (2) options.  The Parties designate Opportune, LLP to make the selection by lot.

Section 1.11    <u>Contributions from Other Predecessors</u>.  FWE III will use commercially reasonable efforts to obtain reimbursement and/or contribution for Decommissioning activity that is available under contract or applicable law, including from any other record title and/or operating rights interest holders and predecessors-in-interest other than Eni to the extent practicable and from available surety bonding other than Eni's bonds; provided that, for the avoidance of doubt, FWE III shall not be required to incur any out-of-pocket costs or obligations in connection with such efforts. In addition, FWE III shall obtain the written consent of Eni, not to be unreasonably withheld, delayed or conditioned, prior to entering into settlement negotiation(s), agreeing to a settlement, and/or initiating dispute resolution regarding the Specified Assets, including with respect to obtaining contributions for decommissioning from other record title and/or operating rights interest holders and predecessors-in-interest or obtaining funds from surety bonds for decommissioning.

Section 1.12    <u>Operations</u>.  Contractor will manage, on behalf of FWE III, the Specified Assets until the commencement of the Decommissioning pursuant to a contract operating agreement which is mutually acceptable to the Parties and by and between FWE III and Contractor (the "**Contract Operating Agreement**"). Except as set forth in the Implementation Agreement, Eni shall not be responsible for any operating costs associated with Eni's interests for any Decommissioning Project. Management of the Specified Assets shall include, but not be limited to, as services provided: operations, production marketing (for producing assets), accounting and land/regulatory administration, including all actions necessary for compliance with the Turnkey Removal Additional Terms and Conditions set forth in <u>Appendix 1</u>. Notwithstanding anything to the contrary, the Parties acknowledge and agree that the members of the Predecessor Group shall receive the benefit of any indemnification provisions contained in the Contract Operating Agreement which are provided by Contractor in favor of FWE III as intended third party beneficiaries of such provisions.

**ARTICLE II.**
**FUNDING AND INVOICES**

Section 2.1    <u>Funding Commitment</u>. Except with respect to the "Agreed Activities" (as such term is defined in the Plan) and the Initial Safe Out, which is governed by <u>Section 1.5</u>, Contractor shall not undertake any Decommissioning Project until (a) full funding of the applicable Gross Turnkey Amount has been agreed to by Eni and Contractor, including receiving funds or securing a contractual commitment (such as a decommissioning agreement) from applicable third

6

parties for any such Decommissioning Project, or (b) Eni makes a Turnkey Election for any such Decommissioning Project.

Section 2.2    **Invoicing**. Contractor shall submit a monthly invoice to FWE III LLC, with a copy to Eni, summarizing the accrued Actual Decommissioning Costs for each Decommissioning Project.  If Eni or FWE III reasonably disputes any portion of any invoice, Eni or FWE III shall notify Contractor within fifteen (15) days of receipt of the invoice in writing of the amount in dispute and the reasons thereof.  Contractor will provide reasonable and appropriate documentation to substantiate the charges on the invoice.

Section 2.3    **Payment**. For each Decommissioning Project, Eni shall pay to Contractor and Contractor shall receive, payment of the full agreed Eni Net Turnkey Amount or Gross Turnkey Amount (in the event a Turnkey Election was made), as adjusted pursuant to Section 1.7 and subject to Section 1.8.  For the avoidance of doubt, such payment shall include Eni's share of any Agreed Excess Qualified Conditions Costs pursuant to Section 1.8 up to the Qualified Conditions Cap or Excess Regulatory Costs, provided Eni shall have no obligation to tender any such payment contemplated in this Section 2.3 until Contractor delivers to FWE III and to Eni (i) a Site Clearance (as defined in Appendix 1) with respect to such Specified Interest; and (ii) an invoice and/or billing statement outlining in detail the Decommissioning work actually performed for such Decommissioning Project itemized by the applicable Decommissioning Project on Exhibit A, along with supporting documentation. Notwithstanding the foregoing but subject to Section 3.1, if Contractor has achieved all requirements of Site Clearance of a particular Decommissioning Project but BOEM has failed to issue the applicable approval required under the definition of Site Clearance with respect to such Decommissioning Project within the forty-five (45) day period immediately following Contractor's proper request and submission for such approval from BOEM, and *provided that* BOEM's failure to issue an approval in such forty-five (45) day period is not due to the fault or other act or omission of Contractor or any person for whom Contractor is responsible under this Agreement, including but not limited to Contractor failing to meet BOEM's requirements to receive such approval, "Site Clearance" for the purposes of this Section 2.3 shall be deemed to have been achieved and Contractor shall be entitled to the applicable payment provided that Contractor submits to Eni all documents provided to BOEM to obtain such Site Clearance.  Notwithstanding anything to the contrary herein, the payments made by Eni in satisfaction of the obligations set forth herein, shall not exceed twenty million dollars ($20,000,000.00) on an annual basis for any given calendar year; provided that (i) if Eni has delivered a Turnkey Notice, or (ii) if Eni is required, pursuant to an order from any governmental or regulatory authority, to perform any Decommissioning Project on a schedule that is more accelerated than contemplated on Exhibit A, then such annual limitation will be increased above twenty million dollars ($20,000,000.00) to the extent such increase is necessitated to perform the Decommissioning Project contemplated in subparts (i) and (ii) of this sentence. Such payment will be made by wire transfer in immediately available funds to a bank account designated by Contractor. Notwithstanding anything herein to the contrary in this Agreement, any amounts paid by Eni for a Decommissioning Project pursuant to this Section 2.3, shall be net of any proceeds realized by Contractor from the sale of hydrocarbons produced from the underlying Specified Asset of a Decommissioning Project identified on Exhibit A after the Effective Date. For the

Debtors' Exhibit No. 34
Page 851 of 910

avoidance of doubt, such proceeds shall be netted on the percentage basis attributed to Eni in the "Eni Ownership (%)" as indicated on Exhibit A for such particular Specified Asset.

Section 2.4    **Surety Bonds.** Eni may apply to any amounts owed hereunder any available proceeds from surety bonds that cover the Decommissioning of any applicable Decommissioning Projects.  Eni shall bear all costs and risks associated with such surety bonds.

Section 2.5    **Audit Rights**. Eni shall have the right to conduct, during normal business hours upon at least thirty (30) days' prior written notice, an audit of Contractor's records to the extent related to any amount charged to Eni hereunder. These audit rights shall survive the termination of this Agreement for a period of twelve (12) months.

Section 2.6    **Waiver and Release**.  Within ninety (90) days following the completion of a Decommissioning Project and only if (i) all amounts payable under this Agreement by Eni with respect to that Decommissioning Project have been paid by Eni in accordance with this Agreement and (ii) Eni has completely performed in accordance with this Agreement all of its obligations under this Agreement with respect to that Decommissioning Project, Contractor shall execute and deliver legal instruments in form and substance that are acceptable to Eni acting reasonably whereby Contractor: (a) acknowledges and agree that all amounts payable under this Agreement by Eni with respect to that Decommissioning Project have been paid by Eni in accordance with this Agreement; (b) waives, releases and forever discharges the members of the Predecessor Group from any and all Claims arising out of or relating to that Decommissioning Project; (c) acknowledges and agrees that Eni has completely performed in accordance with this Agreement all of its obligations under this Agreement with respect to that Decommissioning Project; and (d) acknowledges that Contractor has fully paid any non-disputed amounts owed to third parties in connection with such Decommissioning Project.

## ARTICLE III.
## TERM

Section 3.1    **Term and Survival**.  Subject to the condition precedent in Section 3.5 below, the term of this Agreement shall be from and after the Effective Date until (i) the Decommissioning Projects are completely Decommissioned in accordance with Performance Standards and (ii) Contractor has delivered a Site Clearance (as defined in Appendix 1) to FWE III and to Eni with respect to such Specified Interest, unless terminated earlier as provided in this Article III. In the event of termination pursuant to this Article III, Article II, and the terms and conditions set forth in Appendix 1, each of the foregoing shall survive such termination for four (4) years following the date of termination; provided, however, the definitions set forth in Appendix 1, the terms of Article V and Article VI, and the defined terms set forth in this Agreement shall survive indefinitely; provided further, Eni shall pay Contractor for any Decommissioning Projects completed prior to the date of termination in accordance with the terms of this Agreement. Following the termination or expiration of this Agreement, as applicable, in the event BOEM/BSEE issues an order with respect to any Specified Asset which indicates that the Decommissioning for such Decommissioning Project was not performed in accordance with the Performance Standards, then Contractor shall promptly cause, at its sole cost and expense, any

such Specified Asset that was the subject of a specific Decommissioning Project to be further Decommissioned in accordance with the Performance Standards.

Section 3.2    **Termination by Eni for Particular Asset.**   Eni may terminate this Agreement as to any Decommissioning Project and/or require FWE III to competitively bid the decommissioning services with respect to a Decommissioning Project in the event Contractor is in breach of this Agreement with respect to such Decommissioning Project, and such breach remains outstanding thirty (30) days after Eni or FWE III have provided written notice of such breach to Contractor; provided, however, any such termination shall be limited to the applicable Decommissioning Project and the remainder of this Agreement shall survive in full force and effect in accordance with the terms set forth herein.

Section 3.3    **Termination by Eni or Contractor**. Contractor or Eni may terminate this Agreement as to a particular Decommissioning Project if, within three (3) years of the Effective Date, (i) a Turnkey Election is not made by Eni for such Decommissioning Project, or (ii) contractual commitments for full funding of the Gross Turnkey Amount for such Decommissioning Project has not been received; provided, however, in the event that a Party is entitled to a right of termination pursuant to subpart (i) or subpart (ii) of this Section 3.3, such termination shall be limited to the applicable Decommissioning Project and the remainder of this Agreement shall survive in full force and effect in accordance with the terms set forth herein.

Section 3.4    **Suspension by Contractor**. Contractor may suspend performance under this Agreement if Eni is in breach of this Agreement, and such breach remains outstanding for thirty (30) days after Contractor has provided written notice of such breach to Eni.  All schedules and timelines in this Agreement shall be tolled until such breach is remedied.

Section 3.5    **Condition Precedent**. This Agreement shall become effective only in the event that on or before September 30, 2021 (except as otherwise mutually agreed by the Parties), Contractor has received all necessary approvals by applicable regulatory authorities to act as a qualified operator in the Gulf of Mexico.

### ARTICLE IV.
### NOTICE

Section 4.1    **Notice Addresses.**  All notices and correspondence required or permitted to be given by one Party to another hereunder shall be made in writing and shall be delivered to the appropriate Party at the address specified below either by hand, by nationally recognized overnight delivery service or by electronic delivery, unless a different address for notice or copy thereof is changed by notice, with copies to such other parties or addresses as a Party may designate by notice (each, a "**Notice**").  Notices sent by hand delivery or nationally recognized overnight delivery service shall be deemed to have been received upon the recipient's actual receipt of such Notice.  Notices sent by electronic delivery shall be deemed to have been received (i) on the date such transmission was sent if it was sent prior to 5:00 p.m. (at the recipient's local time) on a business day; or (ii) on the next business day following the date such transmission was sent if it

Debtors' Exhibit No. 34
Page 853 of 910

was sent after 5:00 p.m. (at the recipient's local time) on any business day or at any time on a non-business day.

<u>If to Eni Petroleum US LLC</u>:

Eni Petroleum US LLC
1200 Smith Street, Suite 1700
Houston, Texas 77002
Attn:  Christian Johnson
Telephone: (713) 393-6184
Email: chris.johnson@eni.com

With a copy to:

Bracewell LLP
711 Louisiana Street, Suite 2300
Houston, Texas 77002
Attention:     J.J. McAnelly (james.mcanelly@bracewell.com)
               Jason Hutt (jason.hutt@bracewell.com)
               Mark Dendinger (mark.dendinger@bracewell.com)


<u>If to Fieldwood Energy III LLC</u>:

Fieldwood Energy III LLC
2000 W. Sam Houston Pkwy South, Suite 1200
Houston, Texas  77042
Attn:  Thomas R. Lamme
Telephone:  (713) 969-1000
Email: TLamme@fwellc.com


<u>If to Mako Buyer LLC</u>:

Mako Buyer LLC
2000 W. Sam Houston Pkwy South, Suite 1200
Houston, Texas  77042
Attn:  Thomas R. Lamme
Telephone: (713) 969-1000
Email: TLamme@fwellc.com

Debtors' Exhibit No. 34
Page 854 of 910

## ARTICLE V.
## GOVERNING LAW; DISPUTES

**Section 5.1**     Governing Law.

(a)     Notwithstanding the place of execution hereof or the place for performance of any covenant, promise or agreement herein made, this Agreement and the validity hereof, the agreements evidenced hereby, and all matters and issues arising hereunder, shall, to the fullest extent possible, be construed pursuant to and governed by the General Maritime Laws of the United States.  If the General Maritime Laws of the United States are held to be inapplicable to this Agreement or the Work (or any part thereof) to be performed hereunder by a court of competent jurisdiction, then Subsections 5.1(b) and 5.1(c) below shall apply, as appropriate, but only to the extent that United States General Maritime Law is held to be inapplicable.

(b)     If any court of competent jurisdiction determines that United States Maritime Law is not applicable to any relevant part of this Agreement or the Work to be performed hereunder, then such part of this Agreement and/or the work to be performed hereunder, shall, to the fullest extent enforceable under applicable law, be interpreted and enforced exclusively in accordance with the laws of the State of Texas.

(c)     If any court of competent jurisdiction determines that neither United States General Maritime Law nor the laws of the state of Texas are applicable to any relevant part of this Agreement or the Work to be performed hereunder, then such part of this Agreement and/or the work to be performed hereunder, shall, to the fullest extent enforceable under applicable law, be interpreted and enforced exclusively in accordance with the laws of the State of Louisiana, excluding any conflicts of law rules that might refer same to another jurisdiction.

(d)     Notwithstanding the choice of law provisions contained in this Article V, no conflicts of laws principles that would require the application of any law other than that expressly set forth in Sections 5.1(a), 5.1(b) or 5.1(c), as appropriate, shall be applicable to this Agreement or the enforcement of any provision hereof.  **FURTHER, NO LAW, THEORY OR PUBLIC POLICY, SHALL BE GIVEN EFFECT WHICH WOULD UNDERMINE, DIMINISH OR REDUCE THE EFFECTIVENESS OF THE WAIVER OF SPECIAL CLAIMS PROVIDED IN SECTION 5.3 OF APPENDIX 1 ATTACHED HERETO, IT BEING THE EXPRESS INTENT, UNDERSTANDING AND AGREEMENT OF THE PARTIES THAT SUCH WAIVER IS TO BE GIVEN THE FULLEST EFFECT, NOTWITHSTANDING ANY PRE-EXISTING DEFECT OR THE NEGLIGENCE (WHETHER SOLE, JOINT OR CONCURRENT), GROSS NEGLIGENCE, WILLFUL MISCONDUCT, STRICT LIABILITY OR OTHER LEGAL FAULT OF ANY PARTY OR OTHERWISE.**

**Section 5.2     WAIVER OF JURY TRIAL**.  EACH OF THE PARTIES HERETO HEREBY IRREVOCABLY WAIVES ANY AND ALL RIGHT TO TRIAL BY JURY IN ANY LEGAL PROCEEDING ARISING OUT OF OR RELATED TO THIS AGREEMENT,

Debtors' Exhibit No. 34
Page 855 of 910

INCLUDING THE ENFORCEABILITY OF THE AGREEMENT, OR THE TRANSACTIONS CONTEMPLATED HEREBY.

**Section 5.3**    **Disputes**. The Parties agree that all disputes in any way arising out of or resulting from this Agreement that will be litigated, if any at all, shall be litigated exclusively in the state and/or federal courts in Harris County, Texas.  The Parties accordingly hereby submit to the jurisdiction and venue of such courts for all purposes.

**Section 5.4**    Compliance with Anti-Corruption Laws.

(a)    Each Party warrants that, in connection with this Agreement, it and its affiliates will comply with all applicable anti-bribery and corruption, anti-money laundering, trade control, and sanctions laws and regulations, such as the Bribery Act 2010 of the United Kingdom, Foreign Corrupt Practices Act 1977 of the United States of America, and the Australian Criminal Code of 1995, as amended, Division 70 – Bribery of foreign public officials, and the OECD Convention on Combating Bribery of Foreign Public Officials in International Business Transactions, and all applicable successor legislation, and in any event, will not and will procure that its employees and third party providers (including its subcontractors, agents and other intermediaries) will not offer, give or agree to give any person whosoever, or solicit, accept or agree to accept from any person, either directly or indirectly, anything of value in order to obtain, influence, induce or reward any improper advantage (the "**Anti-Corruption Obligation**").

(b)    Contractor and FWE III each represent and warrant that it has reviewed and understood: (a) the general standards of transparency of the sensitive activities related to the Model 231 pursuant to Legislative Decree 231/2001 and Eni's Supplier Code of Conduct, adopted by Eni; (b) the Anti-Corruption Management System Guidelines of Eni; and (c) Eni's Statement on respect for human rights.  Contractor and FWE III take note that each of the documents under (a) to (c) above are available on the website: *www.eni.com* and undertake to comply with the principles contained therein.

(c)    Each Party agrees it shall on an on-going basis, and subject to any applicable data privacy law, legal privilege, or other legal restriction:

>    (i)    as soon as reasonably possible disclose in writing to the other Parties details of any breach of the Anti-Corruption Obligation; and

>    (ii)    on reasonable request, use best endeavors to cooperate to ensure and monitor compliance with the Anti-Corruption Obligation, which shall include promptly responding in reasonable detail to any notice from another Party reasonably connected to the Anti-Corruption Obligation and making any relevant books, records, or personnel relating to this Agreement and a Party's compliance with the Anti-Corruption Obligation available for review by the other Parties.

Debtors' Exhibit No. 34
Page 856 of 910

(d)     Each Party shall throughout the term of this Agreement:

(i)   institute and maintain policies and procedures which are designed to ensure compliance with all applicable laws and the Anti-Corruption Obligation, including the maintenance of complete and accurate books and records and an effective system of internal accounting controls;

(ii)   maintain at its normal place of business, throughout the term and for at least two (2) years following its expiration or termination, detailed books, records and accounts which accurately and fairly reflect all transactions and payments made by it in connection with this Agreement;

(iii)   make clear, in its dealings connected to this Agreement, that it is required to act, and is acting, in accordance with the Anti-Corruption Obligation; and

(iv)   on reasonable notice, and subject to any applicable data privacy law,  legal privilege, confidentiality obligation, license agreement or other express legal restriction, permit any other Party or its duly appointed third party representatives, at the other Party's sole expense, during normal working hours, at the Party's normal place of business, to access, review, inspect and make copies of its books, records and accounts, but only to the extent reasonably necessary in order to audit its compliance with the Anti-Corruption Obligation.  The rights set out in this Section 5.4 will be exercised in accordance with all applicable competition laws.

## ARTICLE VI.
## MISCELLANEOUS

**Section 6.1     Entire Agreement**. This Agreement (together with the schedule, exhibits, and appendices hereto, which are incorporated herein by reference), the Implementation Agreement of even date herewith, and the other Definitive Documents constitute the entire agreement among the Parties with respect to the subject matter hereof and supersede any other representations, understandings or agreements (whether written, oral or otherwise) that may have been made, understood or entered into by the Parties or any of their respective affiliates relating to the transactions contemplated hereby or the subject matter hereof.

**Section 6.2     Successors and Assigns**. This Agreement is personal as to each Party and shall not be assigned without the other Parties' consent; *provided* that the foregoing shall not apply if Contractor assigns this Agreement in total:

(a)     along with all of its personnel who are performing any part of the services hereunder to another entity *provided*, that no such assignment by Contractor, or any subsequent assignment or Transfer of ownership (other than, in each case, a Transfer that conforms with the

Debtors' Exhibit No. 34
Page 857 of 910

requirements of subpart (b) below), shall relieve Contractor of its obligations under this Agreement; or

(b)     to an acquirer of all or substantially all of Contractor's employees providing services hereunder provided that: (i) such acquirer has a Tangible Net Worth of at least five (5) times the then-current P90 estimate of the remaining Decommissioning Projects to be Decommissioned in accordance with the Performance Standards and, (ii) at the time of the assignment, at least seventy percent (70%) of the Work (as defined in Appendix 1) described in the Decommissioning Schedule set forth on Exhibit A, based on the Eni Net Turnkey Amount, has been Decommissioned in accordance with the Performance Standards (a "Permitted 3rd-Party Assignment"). If any platform described on Exhibit A has not been Decommissioned in accordance with the Performance Standards ("Remaining Platforms") at the time of any Permitted 3rd Party Assignment made pursuant to this Section 6.2, the Credit Bid Purchaser shall cause the assignee to deliver, as conditions of the assignment, with evidence of their respective satisfaction prior to the effectiveness of such assignment, (i) a windstorm and casualty policy, at the expense of assignee, with a limit of not less than the total amount of the then-current P90 estimate of the Remaining Platforms, with applicable endorsements and other requirements as set forth on Exhibit C of Appendix 1, covering the Remaining Platforms that have not been Decommissioned in accordance with the Performance Standards, which such policy shall have a deductible reasonably acceptable to Eni and shall be required to be maintained throughout the Decommissioning of the Remaining Platforms in accordance with the Performance Standards; and (ii) an express assumption and agreement by assignee to the terms and obligations, accrued or unaccrued, contemplated in this Agreement.

(c)     For purposes of this Agreement, "**Tangible Net Worth**" of any assignee means, as of any date of determination, the positive difference, if any, of the total assets of such assignee minus total liabilities of such assignee, with total assets and total liabilities each to be determined in accordance with generally accepted accounting principles applicable to such assignee, *excluding*, *however*, from the determination of total assets (i) patents, patent applications, trademarks, copyrights and trade names, (ii) goodwill, organizational, experimental, research and development expense and other like intangibles, , and (iii) unamortized debt discount and expense. For purposes of this Agreement, "**Transfer**" means the assignment, transfer, equity sale, merger, divisive merger, or hypothecation, as well as any change of control transaction.

Section 6.3     **Amendment**. This Agreement may be amended or modified in whole or in part, and terms and conditions may be waived, only by a duly authorized agreement in writing which makes express reference to this Agreement and is executed by each Party.

Section 6.4     **Severability**. If any provision of this Agreement is held invalid or unenforceable by any court of competent jurisdiction, the other provisions of this Agreement shall remain in full force and effect. The Parties further agree that if any provision contained herein is, to any extent, held invalid or unenforceable in any respect under the laws governing this Agreement, they shall take any actions necessary to render the remaining provisions of this Agreement valid and enforceable to the fullest extent permitted by law and, to the extent necessary, shall amend or otherwise modify this Agreement to replace any provision contained herein that is

Debtors' Exhibit No. 34
Page 858 of 910

held invalid or unenforceable with a valid and enforceable provision giving effect to the intent of the Parties to the greatest extent legally permissible.

Section 6.5   **Counterparts**. This Agreement may be executed in two or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument. Any .pdf or other electronic transmission of an executed signature page to this Agreement shall, for all purposes, be deemed an original.

Section 6.6   **Further Assurances**. Subject to the terms and conditions of this Agreement, each Party shall use its reasonable efforts to take, or cause to be taken, all actions and to do, or cause to be done, all things necessary or desirable, under applicable law or otherwise, to consummate or implement the transactions contemplated by this Agreement.  The Parties agree to and shall execute and deliver all such other documents, certificates, agreements, and other writings and shall take all such other actions as may be necessary or desirable in order to consummate or implement expeditiously the transactions contemplated in this Agreement in accordance with the terms hereof, including but not limited to any actions or agreements reasonably necessary as a result of the presence of a Qualified Condition or Regulatory Change.

[*Signature page to follow*]

IN WITNESS WHEREOF, the Parties hereto as set forth below have executed this Agreement as of the date first written above.

**ENI PETROLEUM US LLC**

By: _____
Name:  Luca Pellicciotta
Title:  President and CEO

[*Signature page to Turnkey Removal Agreement*]

**FIELDWOOD ENERGY III LLC**

By: _____

Name:

Title:

*[Signature page to Turnkey Removal Agreement]*

**<u>CONTRACTOR:</u>**

**MAKO BUYER LLC**


By: _____

Name:

Title:

[*Signature page to Turnkey Removal Agreement*]

<u>Schedule 1</u>

<u>Specified Interests</u>

| Block | Lease |
|-------|-------|
| GA 151 | OCS-G 15740 |
| SS 246 | OCS-G 01027 |
| VR 78 | OCS-G 04421 |
| VR 313 | OCS-G 01172 |
| SS 247 | OCS-G 01028 |
| SS 248 | OCS-G 01029 |
| SS 249 | OCS-G 01030 |
| SS 270 | OCS-G 01037 |
| SS 271 | OCS-G 01038 |
| WC 72 | OCS-G 23735 |

<u>Exhibit A</u>

<u>Decommissioning Projects, Turnkey Amounts and Decommissioning Schedule</u>

See attached.

**Turnkey Estimates**

### 2021

| Block | Year | Host Platform | Designation | Asset | Status | Water Depth | ENI Ownership (%)* | Gross | Net (ENI) |
|---|---|---|---|---|---|---|---|---|---|
| SS 246 | 2021 | SS 246 A | A002 | Well | Partial TA | 166 | 76.76% | 470,971 | 361,538 |
| SS 246 | 2021 | SS 246 A | A004 | Well | COM | 166 | 76.76% | 1,036,136 | 795,383 |
| SS 246 | 2021 | SS 246 A | A005 | Well | COM | 166 | 80.69% | 1,036,136 | 836,079 |
| SS 246 | 2021 | SS 246 A | A006 | Well | COM | 166 | 80.69% | 1,036,136 | 836,079 |
| SS 246 | 2021 | SS 246 A | A007 | Well | COM | 166 | 80.69% | 1,036,136 | 836,079 |
| SS 246 | 2021 | SS 246 A | A009 | Well | Partial TA | 166 | 76.76% | 470,971 | 361,538 |
| SS 246 | 2021 | SS 246 A | A011 | Well | COM | 166 | 76.76% | 2,825,825 | 2,169,227 |
| SS 246 | 2021 | SS 246 A | A014 | Well | COM | 166 | 76.76% | 1,036,136 | 795,383 |
| SS 246 | 2021 | SS 246 A | A019 | Well | COM | 166 | 76.76% | 847,748 | 650,768 |
| SS 246 | 2021 | SS 246 A | A020 | Well | COM | 166 | 80.69% | 1,224,524 | 988,093 |
| SS 246 | 2021 | SS 246 J | 1025B | Pipeline | OUT | 166 | 76.76% | 236,329 | 182,488 |
| SS 246 | 2021 | SS 246 J | J001 | Pipeline | OUT | 162 | 80.69% | 1,036,136 | 836,079 |
| SS 246 | 2021 | SS 246 J | 13056 | Pipeline | OUT | 162 | 97.30% | 240,915 | 234,416 |
| VR 313 | 2021 | VR 313 B | SN 5440 | Pipeline | OUT | 202 | 100.00% | 375,323 | 375,323 |
| VR 313 | 2021 | VR 313 B | SN 15136 | Pipeline | OUT | 202 | 100.00% | 375,323 | 375,323 |
| VR 313 | 2021 | VR 313 C | SN 10558 | Pipeline | OUT | 200 | 100.00% | 187,626 | 187,626 |
| VR 313 | 2021 | VR 313 C | C001 | Well | COM | 213 | 100.00% | 1,152,493 | 1,152,493 |
| VR 313 | 2021 | VR 313 C | C004 | Well | Partial TA | 213 | 100.00% | 443,267 | 443,267 |
| VR 313 | 2021 | VR 313 D | D001 | Well | COM | 214 | 50.00% | 797,880 | 398,940 |
| VR 313 | 2021 | VR 313 D | D002 | Well | COM | 214 | 50.00% | 797,880 | 398,940 |
| VR 313 | 2021 | VR 313 D | D003 | Well | COM | 214 | 50.00% | 797,880 | 398,940 |
| VR 313 | 2021 | VR 313 D | D004 | Well | COM | 214 | 50.00% | 797,880 | 398,940 |
| VR 313 | 2021 | VR 313 D | D005 | Well | COM | 214 | 50.00% | 797,880 | 398,940 |
| SS 247 | 2021 | SS 248 D | SN 5902 | Pipeline | OUT | 225 | 25.59% | 240,783 | 61,612 |
| SS 247 | 2021 | SS 248 D | 10611 | Pipeline | OUT | 180 | 30.78% | 126,303 | 126,303 |
| SS 248 | 2021 | SS 248 G | 10349 | Pipeline | PABN | 188 | 30.78% | 241,979 | 74,474 |
| WC 72 | 2021 | WC 72 #2 | #2 | Platform | | 39 | 75.00% | 620,573 | 465,430 |
| WC 72 | 2021 | WC 72 #2 | O02 | Well | COM | 39 | 75.00% | 1,008,432 | 756,324 |
| | | | | | | | Total | $21,579,675.68 | $15,896,024.01 |

### 2022

| Block | Year | Host Platform | Designation | Asset | Status | Water Depth | ENI Ownership (%) | Gross | Net (ENI) |
|---|---|---|---|---|---|---|---|---|---|
| VR 313 | 2022 | VR 313 B | B003 | Well | COM | 202 | 100.00% | 797,880 | 797,880 |
| VR 313 | 2022 | VR 313 B | B005 | Well | COM | 202 | 100.00% | 797,880 | 797,880 |
| VR 313 | 2022 | VR 313 B | B010 | Well | COM | 202 | 100.00% | 797,880 | 797,880 |
| VR 313 | 2022 | VR 313 B | B012 | Well | COM | 202 | 100.00% | 1,152,493 | 1,152,493 |
| SS 246 | 2022 | SS 246 A | SS 246 A | Platform | | 166 | 77.22% | 9,915,095 | 7,656,196 |
| SS 246 | 2022 | SS 246 E | SS 246 E | Platform | | 166 | 77.22% | 5,329,033 | 4,114,950 |
| SS 246 | 2022 | SS 246 J | SS 246 J | Platform | | 162 | 97.30% | 2,340,885 | 2,277,743 |
| SS 248 | 2022 | SS 248 D | D009 | Well | Partial TA | 180 | 25.00% | 659,359 | 164,840 |
| SS 248 | 2022 | SS 248 D | D012 | Well | COM | 180 | 30.85% | 470,971 | 145,285 |
| SS 248 | 2022 | SS 248 D | D015 | Well | Partial TA | 180 | 30.78% | 659,359 | 202,932 |
| SS 248 | 2022 | SS 248 D | D016 | Well | COM | 180 | 30.78% | 470,971 | 144,951 |
| SS 248 | 2022 | SS 248 D | D018 | Well | Partial TA | 180 | 30.78% | 470,971 | 144,951 |
| SS 248 | 2022 | SS 248 D | D020 | Well | COM | 180 | 30.78% | 847,748 | 260,913 |
| SS 249 | 2022 | SS 248 D | D002 | Well | Partial TA | 180 | 39.57% | 470,971 | 186,370 |
| SS 249 | 2022 | SS 248 D | D005 | Well | COM | 180 | 55.76% | 847,748 | 472,683 |
| SS 249 | 2022 | SS 248 D | D011 | Well | COM | 180 | 39.57% | 1,036,136 | 410,014 |
| SS 249 | 2022 | SS 248 D | D014 | Well | Partial TA | 180 | 39.57% | 659,359 | 260,918 |
| SS 249 | 2022 | SS 248 D | D017 | Well | COM | 180 | 30.78% | 470,971 | 144,951 |
| SS 249 | 2022 | SS 248 D | D019 | Well | Partial TA | 180 | 52.29% | 470,971 | 246,293 |
| SS 248 | 2022 | SS 248 G | G001 | Well | COM | 188 | 30.78% | 847,748 | 260,913 |
| SS 249 | 2022 | Subsea | SS 249 | Well | Partial TA | 195 | 53.49% | 941,942 | 503,882 |
| | | | | | | | Total | $30,456,369.02 | $21,144,920.17 |

### 2023

| Block | Year | Host Platform | Designation | Asset | Status | Water Depth | ENI Ownership (%) | Gross | Net (ENI) |
|---|---|---|---|---|---|---|---|---|---|
| VR 313 | 2023 | VR 313 B | VR 313 B | Platform | | 202 | 100.00% | 4,875,933 | 4,875,933 |
| VR 313 | 2023 | VR 313 C | VR 313 C | Platform | | 214 | 100.00% | 2,659,600 | 2,659,600 |
| VR 313 | 2023 | VR 313 D | VR 313 D | Platform | | 214 | 50.00% | 3,102,867 | 1,551,433 |
| SS 247 | 2023 | SS 247 F | F002 | Well | COM | 225 | 25.00% | 847,748 | 211,937 |
| SS 247 | 2023 | SS 247 F | F014 | Well | COM | 225 | 25.00% | 1,036,136 | 259,034 |
| SS 247 | 2023 | SS 247 F | F017 | Well | COM | 225 | 25.00% | 847,748 | 211,937 |
| SS 247 | 2023 | SS 247 F | F018 | Well | COM | 225 | 45.80% | 847,748 | 388,281 |
| SS 247 | 2023 | SS 247 F | F019 | Well | COM | 225 | 25.00% | 847,748 | 211,937 |
| SS 247 | 2023 | SS 247 F | SS 247 F | Platform | | 225 | 25.59% | 10,361,358 | 2,651,289 |
| SS 248 | 2023 | SS 248 D | SS 248 D | Platform | | 180 | 30.78% | 10,361,358 | 3,188,933 |
| SS 248 | 2023 | SS 248 G | SS 248 G | Platform | | 188 | 30.78% | 4,238,738 | 1,304,563 |
| WC 72 | 2023 | WC 72 #1 | #1 | Platform | | 37 | 75.00% | 543,002 | 407,251 |
| WC 72 | 2023 | WC 72 #1 | O01 | Well | COM | 37 | 75.00% | 1,008,432 | 756,324 |
| WC 72 | 2023 | WC 72 #1 | SN 14251 | Pipeline | ACTIVE | 37 | 75.00% | 232,715 | 174,536 |
| WC 72 | 2023 | WC 72 #3 | #3 | Platform | | 37 | 75.00% | 543,002 | 407,251 |
| WC 72 | 2023 | WC 72 #3 | O03 | Well | COM | 37 | 75.00% | 1,318,718 | 989,039 |
| WC 72 | 2023 | WC 72 #3 | SN 15893 | Pipeline | OUT | 37 | 75.00% | 46,543 | 34,907 |
| | | | | | | | Total | $43,719,391.75 | $20,284,186.80 |
| | | | | | | | Grand Total | $95,755,438.46 | $57,325,130.98 |

COM: Completed Well

Full TA: Temporarily Abandoned well that has the required plugs and testing

Partial TA: Partially Temporarily Abandoned where a well does not have the required plugs to fully temporarily abandon a well  Active: An Active pipeline according to BOEM/BSEE records

Active: An Active pipeline according to BOEM/BSEE records

PABN: Pipeline that is proposed to be abandoned

OUT: A pipeline that is out of service

Note: The following wells have been temporarily abandoned and all that remains necessary to decommission these wells is the removal of the applicable conductor and the cost to remove such conductor has been included in the Gross Decom Amount(s) and ENI (Net) Costs for each applicable host-facility for each applicable well that is referenced above:

Ship Shoal 246: SS 246 A001

Ship Shoal 247: SS 247 F001, SS 247 F003, SS 247 F004, SS 247 F005, SS 247 F006, SS 247 F007, SS 247 F008, SS 247 F009, SS 247 F010, SS 247 F011, SS 247 F012, SS 247 F013, SS 247 F016

Ship Shoal 248: SS 248 D001, SS 248 D003, SS 248 D004, SS 248 D006, SS 248 D007, SS 248 G002, SS 248 G003

Vermilion 313: VR 313 B001, VR 313 B002, VR 313 B004, VR 313 B005, VR 313 B008, VR 313 B 009, VR 313 C002, VR 313 C003

* The Parties acknowledge and agree that in the event that either Party presents evidence that the ownership interest allocated pursuant to this Decommissioning Schedule is less than or greater than set forth in this Decommissioning Schedule, that they will use commercially reasonable efforts to amend and revise the ownership interest and other obligations within this Decommissioning Schedule allocated to Eni based on the applicable title records for the applicable Decommissioning Project.

<u>Exhibit B</u>

<u>Qualified Conditions</u>

1)   To the extent that any well comprising a Specified Asset is not assigned a Gross Turnkey Amount and requires the performance of any decommissioning activities, Eni and Contractor shall agree to a Gross Turnkey Amount for such well before commencing any decommissioning activities.

2)   For a period of up to eighteen (18) months after the Effective Date, any damage to a Specified Asset due to a wind-storm, weather damage, or other casualty events associated with severe tropical weather arising after the Effective Date; provided, however, any damage to any platform related to ingress and egress shall not be a Qualified Condition.

3)   To the extent that any pipeline included in a Decommissioning Project is required to be buried where this Agreement does not already assume burial, the work associated with such burial shall be a Qualified Condition and such work shall be performed at cost.

End of <u>Exhibit B</u>

<u>Appendix 1</u>
<u>Additional Terms and Conditions</u>

See attached.

*EXECUTION VERSION*

**APPENDIX 1**

**TURNKEY REMOVAL ADDITIONAL TERMS AND CONDITIONS**

**ARTICLE I.**
**DEFINITIONS**

As used in this <u>Appendix 1</u>, each of the following terms has the meaning provided below.

1.1     "<u>Agreed Activities</u>" shall mean those certain safety and related repairs and improvements on Specified Assets at such Abandoned Properties as provided in Section I.G.2 of the Disclosure Statement, to the extent the repairs and improvements are necessary to protect the public health and safety and/or the environment from hazardous conditions or to re-establish ingress and egress to Facilities so that the decommissioning of the Facilities can be conducted in a safe manner. For the avoidance of doubt, any capitalized terms used in this definition but not assigned a meaning in this Agreement shall have the meaning set forth in the Disclosure Statement.

1.2     "<u>Agreement</u>" shall mean the Turnkey Removal Agreement to which this <u>Appendix 1</u> is attached and made a part thereof.

1.3     "<u>Appendix 1</u>" shall mean these Turnkey Removal Additional Terms and Conditions.

1.4     "<u>BOEM</u>" shall mean the Bureau of Ocean Energy Management and/or any successor agencies thereto, as applicable.

1.5     "<u>BSEE</u>" shall mean the Bureau of Safety and Environmental Enforcement and/or any successor agency thereto, as applicable.

1.6     "<u>Claims</u>" shall mean any and all losses, liabilities, damages (including natural resource damages), obligations, expenses, fines, penalties, costs, claims, causes of action, judgments, awards and any and all other losses of any kind or character, including, without limitation, court costs.

1.7     "<u>Contractor</u>" shall mean Mako Buyer LLC.

1.8     "<u>Contractor Group</u>" shall mean, individually and collectively, Contractor, its parent, subsidiary and affiliated companies, its and their joint venturers, contractors and subcontractors (of any tier), and all of their respective employees, officers, directors, agents, representatives, attorneys-in-fact, subcontractors and insurers, and the subrogees of all such parties.

1.9     "<u>Contractor Obligation</u>" shall mean any obligation attributable to Contractor under the terms of the Agreement.

1.10   "<u>Disclosure Statement</u>" shall mean the *Disclosure Statement for Fourth Amended Joint Chapter 11 Plan of Fieldwood Energy LLC and its Affiliated Debtors*, filed on April 15, 2021 [Dkt. 1285], including any exhibits and schedules thereto and as may be further amended, supplemented or modified from time to time.

1.11   "<u>Facilities</u>" shall mean the platforms, wells, pipelines, caissons, risers, facilities, structures and equipment (including production equipment) located on the Specified Interests and all parts and components thereof.

1.12   "<u>On The Hook</u>" shall mean the condition of any Facility (or any part, piece or component thereof) that occurs at the instant such Facility (or part, piece or component thereof, as the case may be) is first lifted from its original resting position and is hanging free on Contractor's (or its subcontractor's) crane or other equipment in accordance with the Work to be performed under this <u>Appendix 1</u>.

1.13   "<u>Owner</u>" shall mean Fieldwood Energy III LLC

1.14   "<u>Owner Group</u>" shall mean, individually and collectively, Owner, its parent, subsidiary and affiliated companies, its and their joint venturers, contractors and subcontractors (of any tier), and all of their respective employees, officers, directors, agents, representatives, attorneys-in-fact, subcontractors and insurers, and the subrogees of all such parties.

1.15   "<u>Predecessor</u>" shall mean ENI Petroleum US LLC.

1.16   "<u>Predecessor Group</u>" shall mean, individually and collectively, Predecessor, its parent, subsidiary and affiliated companies, its and their joint venturers, contractors and subcontractors (of any tier), and all of their respective employees, officers, directors, agents, representatives, attorneys-in-fact, subcontractors and insurers, and the subrogees of all such parties.

1.17   "<u>Predecessor Obligation</u>" shall mean any obligation attributable to Predecessor under the terms of the Agreement.

1.18   "<u>Reefed Items</u>" shall mean the Facilities to be reefed as set out in <u>Section 2.4</u> herein and in accordance with Owner's reef permit.

1.19   "<u>Site Clearance</u>" shall mean (subject to Section 2.3 of the Agreement) delivery to Owner and Predecessor of (i) any On-Site Survey required by BOEM or BSEE and (ii) the filings and other evidence required by BOEM and BSEE or any other applicable governmental authority, including any required approvals or regulatory concurrence from relevant governmental authorities, to support Contractor's representation that all Decommissioning obligations with respect to the applicable assets have been satisfied, and (iii) documentation reasonably satisfactory to Predecessor from BSEE and/or BOEM reflecting that their databases have been updated to show that all Decommissioning obligations with respect to the applicable assets have been fully satisfied.

Appendix 1
Page 2 of 11

1.20    "Special Claim(s)" shall mean any and all Claims for or relating to special, indirect, consequential, exemplary, incidental or punitive damages of any kind or character, including, but not limited to, loss of use, loss of profit, loss of revenue, loss of product or production, reservoir damage, loss of hole damage, and any attorneys' fees; provided however, any and all claims for fines or penalties shall not be Special Claims to the extent arising from, or as a result of, a material breach by a party.

1.21    "Third Party" shall mean any individual, person, company or entity or any other natural or juridical being, other than any member of the Owner Group or Contractor Group.

1.22    "Transferred Items" shall mean the Facilities that are to be removed or abandoned in accordance with this Appendix 1.

1.23    "Work" shall mean the work and activities to Decommission the Specified Assets, to be conducted by or on behalf of Contractor pursuant to the terms and provisions of this Agreement, including, without limitation, the Agreed Activities and the Initial Safe Out.

1.24    Any capitalized terms used herein but not defined in this Appendix 1 shall have the meaning ascribed in the Agreement.

## ARTICLE II.
## WORK

2.1    Scope of Work.

Contractor shall perform the Work upon the terms and provisions set forth in this Agreement, including the Performance Standards. The scope of the Work is more fully set forth in Exhibit A to this Appendix 1 and shall be performed with respect to the Decommissioning of the Specified Assets described on Exhibit A to the Agreement.

2.2    Inspection.

The Work and all parts thereof shall be subject to inspection at all reasonable times by inspectors designated by Owner or Predecessor or their representatives at such Party's costs and risk. No such inspection shall relieve Contractor of any of its obligations hereunder. No failure to inspect or failure to discover any aspect of the Work that is not performed in accordance with any provision of this Appendix 1 shall be construed to imply any acceptance of such Work or to relieve Contractor of any of its obligations hereunder. Contractor shall correct any portion of the Work that is incomplete or otherwise as required to receive Site Clearance, subject to the terms of the Agreement.

2.3    Title.

At Contractor's option to be exercised by written notice to Owner with respect to any Transferred Items, Owner grants, bargains, sells, conveys and assigns to Contractor, and

DM-#8062177
#94614816v4
#94614816v6

Contractor accepts and assumes title to and ownership of such Transferred Items at such time as such Transferred Items are On The Hook.  **THE TRANSFERRED ITEMS SHALL BE TRANSFERRED TO AND ACCEPTED BY CONTRACTOR, "AS IS, WHERE IS" WITH ALL FAULTS.  OWNER MAKES NO, AND EXPRESSLY DISCLAIMS ANY AND ALL, WARRANTIES CONCERNING THE TRANSFERRED ITEMS, WHETHER EXPRESS, IMPLIED, STATUTORY OR OTHERWISE, INCLUDING, WITHOUT LIMITATION, ANY WARRANTIES OF MERCHANTABILITY, FITNESS FOR A PARTICULAR USE, AND FREEDOM FROM DEFECTS, WHETHER SUCH DEFECTS ARE PATENT, LATENT, PRE-EXISTING, REDHIBITORY OR OTHERWISE.  UPON SUCH TRANSFER OF OWNERSHIP OF THE TRANSFERRED ITEMS, CONTRACTOR SHALL BE SOLELY RESPONSIBLE FOR, AND SHALL ASSUME ALL RISK AND LIABILITY FOR SUCH TRANSFERRED ITEMS, INCLUDING, WITHOUT LIMITATION, ALL LIABILITY FOR TIE DOWN AND SEA FASTENING, SALVAGE IF LOST DURING TRANSPORT, REMOVAL AND DISPOSAL OF SUCH TRANSFERRED ITEMS AND ALL POLLUTION OR ENVIRONMENTAL CONTAMINATION ATTRIBUTABLE THERETO AFTER SUCH TRANSFERRED ITEMS ARE ON THE HOOK.**  The foregoing notwithstanding, the Parties expressly acknowledge that nothing herein shall cause the transfer of, and Contractor does not accept, the assignment or conveyance of any record title ownership of any lease or any operating rights thereunder.  Owner agrees to provide a bill of sale related to such Transferred Items upon request by Contractor.

2.4    <u>Reefed Items.</u>  In accordance with the Work to be performed under this <u>Appendix 1</u>, Contractor shall remove and transport the Reefed Items to the designated reef sites.  **CONTRACTOR SHALL BE SOLELY RESPONSIBLE FOR, AND SHALL ASSUME ALL RISK AND LIABILITY FOR ANY REEFED ITEM (INCLUDING, WITHOUT LIMITATION, ALL LIABILITY FOR THE TOW AND SALVAGE, IF LOST DURING TOWING, OF SUCH REEFED ITEMS AND ALL POLLUTION AND ENVIRONMENTAL CONTAMINATION ATTRIBUTABLE THERETO (EXCEPT TO THE EXTENT DUE TO THE CONDITION OR STRUCTURAL INTEGRITY OF SUCH REEFED ITEM FOR WHICH OWNER SHALL REMAIN RESPONSIBLE)) FROM THE TIME SUCH REEFED ITEM IS ON THE HOOK UNTIL SUCH TIME AS SUCH REEFED ITEM IS DELIVERED BY MATERIAL BARGE TO THE DESIGNATED REEF SITES FOR POSITIONING ON THE SEA FLOOR PURSUANT TO THE OWNER'S REEF PERMIT.**

### ARTICLE III.
### SURVEY AND PERMITS

3.1    <u>On-Site Survey.</u>

At the completion of the removal, reefing or abandonment of any particular Facility in accordance with the Work to be performed hereunder, Contractor shall conduct a survey over the relevant Facility site if required by BOEM or BSEE to obtain Site Clearance.

Appendix 1
Page 4 of 11

3.2     Permits.

Owner agrees to timely and diligently obtain all necessary permits and approvals that must be obtained by Owner in order for Contractor to perform the Work, and Contractor agrees to timely and diligently obtain all necessary permits and approvals that must be obtained by Contractor to perform the Work.

## ARTICLE IV.
## OBLIGATIONS OF CONTRACTOR

4.1     Independent Contractor.

Contractor is an independent contractor with the sole authority and right to direct, supervise and control the performance of all details of the Work, subject only to the Performance Standards, and the general right of inspection by Owner and Predecessor to achieve the desired results and satisfactory completion of the Work. Any provision of this Appendix 1 that may appear to give Owner and Predecessor or their representatives the right to direct Contractor as to the details of doing the Work or to exercise a measure of control over the Work shall be deemed to mean that Contractor shall follow the desires of Owner and/or Predecessor or its or their representatives in the results of the Work only and not in the means whereby the Work is to be accomplished.  Except as otherwise expressly provided in Section 4.2 hereof, no member of the Contractor Group shall be deemed to be an agent, representative, or employee of Owner or Predecessor.  Contractor shall remain responsible for all of the actions of its subcontractors and the agents, representatives and employees of such subcontractors.

4.2     Statutory Employee.

In all cases where Contractor's employees (defined for the purposes of this Section 4.2 to include any Contractor Group member's direct, borrowed, special or statutory employees) are performing Work in or offshore the State of Louisiana or are otherwise covered by the Louisiana Worker's Compensation Act, La. Rev. Stat. §§ 23.1021 et seq., Owner, Predecessor and Contractor acknowledge and agree that all Work and operations performed by Contractor and its subcontractors and their employees pursuant to this Appendix 1 are an integral part of and are essential to the ability of Owner and Predecessor to generate Owner's and Predecessor's goods, products or services.  In such event, and without limiting the provisions of Section 4.1 above, Owner, Predecessor and Contractor agree that Owner and Predecessor shall each be deemed a statutory employer of Contractor's employees and its subcontractor's employees for the sole purposes of La. Rev. Stat. § 23.1061(A)(3), as the same may be amended from time to time.  Contractor shall ensure that all of its subcontracts contain the same provisions as this Section 4.2.

4.3     Standard of Performance.

Contractor covenants and agrees that it shall safely and efficiently prosecute the Work with due diligence and care in a good and workmanlike manner using good oilfield practices with qualified, careful and efficient workers in accordance with (i) generally accepted standards of engineering, construction and decommissioning practice for the Work covered under this Appendix 1; (ii) the provisions of this Appendix 1; and (iii) all applicable laws, rules, regulations and standards of the BOEM, the BSEE and any other applicable governmental or regulatory agency or body.  The Parties agree that Contractor will have met the required standard of performance under the Agreement, including this Appendix 1, if it performs the Work consistent with the Performance Standards.

4.4     Contractor's Personnel.

Notwithstanding the fact that Contractor shall perform the Work as an independent contractor, Contractor covenants and agrees to keep on the job a competent superintendent, project manager, engineer and all necessary assistants, who will be in charge of the Work.

4.5     Compliance with Laws.

Contractor shall observe and comply with, and shall ensure that all members of the Contractor Group observe and comply with, all federal, state and local laws, orders, rules and regulations which are now or may in the future become applicable to Contractor (or such employee, agent, representative or subcontractor, as the case may be) or to the performance of the Work under this Appendix 1, including, but not limited to, those statutes and regulations set out in Exhibit B attached hereto and made a part hereof for all purposes.

4.6     Equipment & Materials.

All equipment, tools, materials and facilities to be furnished by Contractor in the performance of the Work shall be serviceable and kept in good operating condition.  Contractor shall schedule its other operations so as to ensure that the necessary equipment, tools, materials and facilities and personnel to operate the same shall be available at the times necessary for the orderly completion of the Work in accordance with the terms of this Appendix 1.

4.7     Liens.

**CONTRACTOR SHALL INDEMNIFY AND HOLD HARMLESS THE OWNER GROUP AND THE PREDECESSOR GROUP FROM ANY AND ALL LIENS AND OTHER ENCUMBRANCES AGAINST ANY PROPERTY OR INTERESTS OF ANY MEMBER OF THE OWNER GROUP OR THE PREDECESSOR GROUP AND FROM AND AGAINST ANY AND ALL CLAIMS ON ACCOUNT OF DEBTS ALLEGED TO BE DUE FROM ANY MEMBER OF CONTRACTOR GROUP, TO ANY PERSON INCLUDING ANY OTHER MEMBER OF CONTRACTOR GROUP, AND WILL DEFEND AT ITS OWN EXPENSE ANY CLAIM OR LITIGATION IN CONNECTION THEREWITH; PROVIDED, HOWEVER, THE FOREGOING SHALL NOT APPLY IN THE**

Appendix 1
Page 6 of 11

**EVENT THAT CONTRACTOR IS NOT TIMELY PAID (BY OWNER, PREDECESSOR OR OTHERWISE) FOR ANY PORTION OF THE WORK.**

4.8    Records.

Contractor shall maintain complete, accurate and current detailed records of all costs and documentation of equipment, materials, supplies, labor and any other items or aspects of the Work performed hereunder for a Decommissioning Project for not less than two (2) years after Site Clearance for such Decommissioning Project; provided, however, if Owner, any member of Contractor Group, any member of Owner Group or any Third Party, makes a timely written Claim which relates to the Work performed pursuant to this Appendix 1 within such two (2) year period, then Contractor shall retain such records until final resolution of such Claim.  Contractor shall grant to FWE III, its authorized representatives, and/or public accounting firm selected by Owner, the right, at a reasonable time, to inspect, audit, examine and copy any applicable records or documents of Contractor as may be necessary to verify the validity and correctness of the charges reflected on any invoice and to protest or dispute any such charge.

4.9    Taxes.

Contractor agrees to pay all taxes, licenses and fees levied or assessed against Contractor in connection with, or incident to, Contractor's performance of the Work by any governmental agency for (i) income taxes; (ii) unemployment compensation insurance, benefits, social security; or (iii) any other taxes upon the amounts paid to Contractor, its agents, employees and representatives. Notwithstanding the foregoing, Owner shall be responsible for and shall pay all sales, ad valorem or use taxes and all import/customs duties, fees, charges or costs that may be assessed or incurred as a result of the performance of the Work or the transfer of the Transferred Items to Contractor pursuant to the terms hereof.

## ARTICLE V.
## INDEMNIFICATION AND LIABILITY

**5.1    CONTRACTOR'S INDEMNITY.**

**EXCEPT AS PROVIDED IN THE FOLLOWING SENTENCE, CONTRACTOR SHALL PROTECT, DEFEND, INDEMNIFY AND HOLD HARMLESS THE PREDECESSOR GROUP FOR CLAIMS ARISING OUT OF OR RESULTING FROM, IN WHOLE OR IN PART, A MATERIAL BREACH BY CONTRACTOR OF ANY CONTRACTOR OBLIGATION ("CONTRACTOR'S INDEMNITY").  NOTWITHSTANDING THE FOREGOING, CONTRACTOR'S INDEMNITY DOES NOT COVER ANY SPECIAL CLAIMS ARISING OUT OF OR RESULTING FROM CONTRACTOR'S MATERIAL BREACH OF A CONTRACTOR OBLIGATION.**

**5.2    PREDECESSOR'S INDEMNITY.**

**EXCEPT AS PROVIDED IN THE FOLLOWING SENTENCE, PREDECESSOR SHALL PROTECT, DEFEND, INDEMNIFY AND HOLD HARMLESS THE CONTRACTOR GROUP FOR CLAIMS ARISING**

DM-#8062177
#94614816v4
#94614816v6

**OUT OF OR RESULTING FROM, IN WHOLE OR IN PART, A MATERIAL BREACH BY PREDECESSOR OF ANY PREDECESSOR OBLIGATION ("PREDECESSOR'S INDEMNITY"). NOTWITHSTANDING THE FOREGOING, PREDECESSOR'S INDEMNITY DOES NOT COVER ANY SPECIAL CLAIMS ARISING OUT OF OR RESULTING FROM PREDECESSOR'S MATERIAL BREACH OF A PREDECESSOR OBLIGATION.**

## 5.3   SPECIAL CLAIMS.

**NOTWITHSTANDING ANYTHING TO THE CONTRARY CONTAINED ELSEWHERE IN THE AGREEMENT, NEITHER PREDECESSOR NOR CONTRACTOR (NOR THE MEMBERS OF SUCH PARTY'S "GROUP") SHALL BE LIABLE TO ANOTHER PARTY (NOR THE MEMBERS OF SUCH OTHER PARTY'S "GROUP") FOR ANY SPECIAL CLAIM(S), INCLUDING ATTORNEY'S FEES, WHENEVER ARISING, AS A RESULT OF, RELATING TO OR IN CONNECTION WITH THE AGREEMENT OR ANY WORK; AND NO SPECIAL CLAIM(S), INCLUDING ATTORNEY'S FEES, SHALL BE MADE BY A PARTY AGAINST ANOTHER PARTY (OR AGAINST ANY MEMBER OF ANOTHER PARTY'S "GROUP"), REGARDLESS OF THE CAUSE OR CAUSES OF SUCH SPECIAL CLAIM(S), INCLUDING WHETHER OR NOT ANY SUCH SPECIAL CLAIM IS BASED OR ALLEGED TO BE BASED, IN WHOLE OR IN PART, ON THE NEGLIGENCE (INCLUDING SOLE, JOINT, ACTIVE, PASSIVE, CONCURRENT OR GROSS NEGLIGENCE), BREACH OF WARRANTY, STRICT LIABILITY, STATUTORY LIABILITY, CONTRACTUAL LIABILITY OR OTHER FAULT OF ANY MEMBER OF PREDECESSOR GROUP OR CONTRACTOR GROUP, THE UNSEAWORTHINESS OF ANY VESSEL, THE UNAIRWORTHINESS OF ANY AIRCRAFT, OR THE EXISTENCE OF ANY DEFECT, WHETHER PATENT, LATENT, PRE-EXISTING OR OTHERWISE.**

## 5.4   EXPRESS NEGLIGENCE

**WITH RESPECT TO THIS AGREEMENT, THE PARTIES AGREE THAT THIS STATEMENT COMPLIES WITH THE REQUIREMENT, KNOWN AS THE EXPRESS NEGLIGENCE RULE, TO EXPRESSLY STATE IN A CONSPICUOUS MANNER TO AFFORD FAIR AND ADEQUATE NOTICE THAT THIS AGREEMENT HAS PROVISIONS THAT COULD REQUIRE A PARTY TO BE RESPONSIBLE FOR THE NEGLIGENCE, STRICT LIABILITY, OR OTHER FAULT OF ANOTHER PARTY (OR THE MEMBERS OF ANOTHER PARTY'S "GROUP").**

**ARTICLE VI.**
**INSURANCE**

6.1   Contractor's Insurance.

Contractor shall carry, at its own expense, with insurers who are reliable and with an A.M Best rating of not less than A- and authorized to do business in the states or other jurisdictions in which the Work is to be performed by Contractor hereunder, or in the states or other jurisdictions adjacent to the offshore location in which the Work is to be performed hereunder, insurance coverages of the types and with limits required by Owner but in no event less than those set forth in Exhibit C attached hereto and made a part hereof.  Further, Contractor agrees to carry adequate contractual liability insurance to support the indemnities given herein.  Prior to commencing any of

Appendix 1
Page 8 of 11

the Work to be conducted pursuant to the terms of this Appendix 1, if requested by Owner, Contractor agrees to provide Owner with certificates of insurance evidencing such insurance coverages in commercially available forms acceptable to Owner, and Contractor agrees to maintain current certificates of insurance on file with Owner for the duration of the Agreement. The Parties expressly acknowledge and agree that the insurance and indemnity provisions of this Appendix 1 are separate and distinct; and that any insurance requirements contained herein shall not be deemed to restrict or limit any of the indemnity obligations set forth in this Appendix 1.

If Contractor hires any subcontractor to perform any of the Work hereunder, then Contractor shall require that any such subcontractor will obtain insurance protection with coverages of the types and with limits deemed appropriate by Contractor. Any deficiencies in the coverages, policy limits or endorsements of Contractor's subcontractors shall be the sole responsibility of Contractor and shall be covered by Contractor's insurance.

6.2     Louisiana Anti-Indemnity Provisions.

Notwithstanding anything contained herein to the contrary, Contractor and Owner agree that with respect to all Work performed in Louisiana or offshore Louisiana and with respect to which the laws of the state of Louisiana are otherwise applicable, Owner (on its own behalf, and on behalf of its other contractors, subcontractors, agents and representatives and their respective employees) and Contractor (on its behalf, and on behalf of its subcontractors, agents and representatives and their respective employees) shall pay to each other's insurers the premium required by their respective insurers or their insurer's agents or authorized representatives to extend all of their insurance policies to include coverage for Owner's and Contractor's respective indemnities as required under this Appendix 1, and such insurance protection shall be governed by Louisiana law. Each Party will arrange to have the other Party billed for the premium by its respective insurer, and will advise the other Party prior to the inception of this Appendix 1 if the premium will be in excess of $2,000.00. The insurance policy shall apply to incidents arising out of the performance of this Appendix 1. At each subsequent renewal of insurance, during the term of this Appendix 1, each Party will advise the other of the amounts of the premium required for the extensions described above and arrange billing for the appropriate premium by its insurers or their agents or authorized representatives. It is expressly acknowledged and agreed to by the Parties that the provisions of this Section 6.2 are intended to comply with the provisions of *Marcel v. Placid Oil Co.*, 11 F.3d 563 (5th Cir. 1994), and the provisions hereof shall be interpreted in such a manner as to comply therewith.

6.3     Texas Anti-Indemnity Act.

To the extent that the Work or any part thereof is subject to the laws of the state of Texas, the Parties agree that in order to be in compliance with the Texas Anti-Indemnity Act regarding indemnification mutually assumed for the other Party's sole or concurrent negligence, each Party agrees to carry supporting insurance in equal amounts of the types and in the minimum amounts specified in the insurance agreements hereunder; provided, however, that Owner shall have the right to self-insure any or all coverages required of it hereunder.

DM-#8062177
#94614816v4
#94614816v6

### ARTICLE VII.
### CONTRACTOR'S POLICIES

7.1     <u>Compliance with Policies</u>.

     Contractor covenants and agrees to, and shall cause its subcontractors to agree to, abide by and act in accordance with the following Contractor policies, as such are set forth in <u>Exhibits B</u>, <u>D</u>, <u>E</u> and <u>F</u>, respectively, attached hereto and made a part hereof:

    1.     Federal Contract Requirements
    2.     Drug and Alcohol Policy;
    3.     Safety Program; and
    4.     Search and Seizure Policy.

### ARTICLE VIII.
### GENERAL PROVISIONS

8.1     <u>Force Majeure.</u>

     All obligations imposed by this <u>Appendix 1</u> or the Agreement on each Party, except for obligations to pay money or to provide indemnity, shall be suspended while compliance with such obligations are prevented, in whole or in part, by an event of *force majeure*.  As used herein an event of *force majeure* shall mean any of: a labor dispute, pandemic or epidemic impacting the region where the Work is to be performed, fire, flood, war, civil disturbance, act of God (including numbered or named tropical disturbances and other adverse weather or wave conditions); a change in laws or governmental rules, regulations or orders, an inability to timely secure materials or an inability to timely secure government permits from the BOEM, BSEE or any other governmental agency as required for the Work, or any other cause, whether similar or dissimilar, beyond the reasonable control of the Party claiming that its compliance has been prevented or delayed by such event of *force majeure*.  Notwithstanding the foregoing, such Party shall resume performance within a reasonable time after such event of *force majeure* has ended or been removed, or such Party is able to overcome the prevention caused by such event; provided, however, that no Party shall be required, against its will, to settle any labor dispute so at to overcome such event of *force majeure*.  If a Party's obligations are suspended under this <u>Section 8.1</u>, such Party shall promptly notify the other Party and give full particulars of the reasons for such suspension. For the avoidance of doubt, this <u>Section 8.1</u> does not modify the Qualified Conditions and allocation of risk under the Agreement.

8.2     <u>Work Site Access.</u>

     To the extent reasonably necessary for Contractor to perform the Work, Owner shall provide Contractor unrestricted access to all the Specified Assets and shall execute any agency agreement, power of attorney, instrument, license, certificate, or other agreement reasonably necessary to provide such access.  Only the authorized personnel of Contractor, Owner or proper governmental

agencies shall be permitted access to any premises where Work is being performed under this Appendix 1.

8.3     Survival.

All provisions of this Appendix 1 that cannot be performed before the expiration or termination of this Appendix 1, including, without limitation, the indemnity provisions contained herein, and all representations, promises, releases, and indemnities under this Appendix 1, shall survive the expiration or termination of this Appendix 1.

DM-#8062177
#94614816v4
#94614816v6

**EXHIBIT A to APPENDIX 1**

**SCOPE OF WORK**

**1.0     CONTRACTOR RESPONSIBILITIES**

1.1   Contractor shall perform the following Work, as applicable, as required to complete and to achieve Final Completion for each Decommissioning Project identified on Exhibit A to the Agreement:

- Perform and complete the Agreed Activities.
- Perform and complete the Initial Safe Out.
- Abandon all wells as per the BSEE-approved permits (APM's & RPM's).
- Abandon all pipelines as per the BSEE-approved permits (abandonment in place being the standard and removal only where mandated by BSEE or another governmental agency).
- Remove or reef all platforms as per the BSEE and/or COE-approved permits.

1.2   Contractor shall furnish all equipment, services, and personnel to conduct the offshore operations outlined in Section 1.1 including but not limited to the following as may be applicable and required:

- Derrick / Lift Vessel
- Lift Boats
- Dive Support Vessels
- Support Tugs and Crew Boats
- Shorebase support
- NORM & Asbestos remediation & disposal
- Material Barges and Tugs
- All slings, shackles, spreader bars, spreader frames, and rigging
- Pile jetting equipment and personnel
- Conductor and pile cutting personnel and equipment
- Divers and equipment
- Flushing & Filtration equipment
- Engineering & Project Management
- Permit Generation & Submittal

1.3   Contractor shall supply all labor, equipment, and material required to perform and complete the Scope of Work that is not specifically stated as being supplied by FWE III.

1.4   Contractor's derrick barge shall maintain an anchor handling tugboat with it at all times capable of handling the vessel's anchors.

1.5   Contractor's derrick barge and anchor handling tug(s) shall be equipped with an

Exhibit A to Appendix 1
Page 1 of 4

DM-#8062177
#94614816v4
#94614816v6

appropriate positioning system to assure safe placement of anchors.

1.6 Contractor is responsible for notification of Operators of facilities and pipelines affected by placement of anchors near or over those facilities and/or pipelines.

1.7 Contractor's derrick barge shall have a current certificate of classification and a load line certificate from a recognized marine classification society.

1.8 Contractor shall provide current crane certification on the derrick barges primary crane and all auxiliary cranes. All rigging must be certified and tagged.

1.9 Cargo Barges

    1.9.1 Contractor shall provide cargo barges of sufficient size to safely operate in the most severe environmental conditions in which tow may occur.

    1.9.2 Contractor shall ensure that the cargo barge(s) have adequate strength for the load out, tie down, transport, and offloading of the salvaged material.

    1.9.3 Each cargo barge shall have a valid U.S. Coast Guard certificate of inspection and a U.S. Coast Guard stability letter.

1.10 Tugs

    1.10.1 Contractor shall provide with each barge a minimum of one (1) tug of sufficient size, bollard pull, and horsepower to operate in any sea environment that may develop.

    1.10.2 Contractor shall provide assist (tail) tugs as required to guide the barge from the open sea to the offloading site.

    1.10.3 Vessels and crews shall comply with U.S. Coast Guard licensing and manning requirements.

1.11 Diving

    1.11.1 Contractor shall ensure that diving subcontractor performs all diving operations in strict accordance with the latest rules and regulations governing diving operations.

1.12 Any equipment, material, jacket, deck, or piles that fall into the sea during the salvage operation shall be retrieved by Contractor at Contractor's expense.

1.13 If at any time during the platform removal operations Contractor has to pull away from the structure, Contractor shall supply and install on the structure temporary navigational aids meeting U.S. Coast Guard Class "A" specifications for lights and horn.

Exhibit A to Appendix 1<br>Page 2 of 4

DM-#8062177
#94614816v4
#94614816v6

1.14 Contractor shall assume all weather liability.

1.15 Company is not obligated to pay Contractor for weather downtime, named tropical storms or otherwise, at any time before or during mobilization, or during or after demobilization.

1.16 EH&S

    1.16.1  Contractor shall submit safety records upon request for review by Company.

    1.16.2  Contractor shall provide gas detection devices, fire extinguishers, and other safety equipment to check all structural members, equipment, and piping for the presence of hydrocarbons.

    1.16.3  Contractor shall check for the presence of hydrocarbons prior to flame cutting or using spark producing devices on any structural members, equipment, and piping.

    1.16.4  Contractor shall provide a dedicated fire watch when hot work operations are in progress.

    1.16.5  Contractor shall comply with government regulations, Contractor's policies, and Company's policies regarding confined space entry.

## 2.0  **TECHNICAL**

### 2.1  Engineering

    2.1.1  Contractor Required Design and Analysis Work

    Contractor shall perform all design, analysis, and design checks required to complete the Work in accordance with all applicable drawings, specifications, standards and codes, and other documents that are part of or are incorporated into this Scope of Work.  Contractor's proposed methods of performing the design and analysis work listed below shall be submitted to FWE III and Predecessor prior to beginning the work.

    2.1.2  Engineering to be provided by Contractor to include the following as may be applicable and required:

- Material Barge Ballast Plan
- Removal Rigging
- Tie-Down Design
- Transportation Analysis
- Component Lift Weight Analysis

Exhibit A to Appendix 1
Page 3 of 4

- Component Center of Gravity Analysis
- Component Pad Eye or Lifting Trunnions Design
- Welding procedures and welder qualifications.

2.1.4   Contractor shall confirm all lift weights, center of gravities, and Pad Eye or Lifting Trunion designs in writing.  Contractor will be responsible for any Pad Eye or Lifting Trunion design or modification.

END OF EXHIBIT A  TO APPENDIX 1

Exhibit A to Appendix 1
Page 4 of 4

**EXHIBIT B to APPENDIX 1**

**FEDERAL CONTRACT REQUIREMENTS**

Contractor shall fully comply with all applicable statutes and executive orders as well as the regulations, orders and rules promulgated thereunder ("Federal Contract Requirements"), and such Federal Contract Requirements, including the regulations set out below to the extent applicable hereto, are hereby incorporated into Appendix 1 by reference:

(1)   Equal Opportunity Clause (41 CFR 60-1.4).  Applicable to all contracts or purchase orders in excess of $10,000;

(2)   Affirmative Action Compliance Programs (41 CFR 60-1.40).  Applicable to contracts or purchase orders of $50,000 or more and if Contractor has 50 or more employees;

(3)   Equal Employment Opportunity Reporting Requirements (CFR 60-1-7).  Applicable to contracts or purchase orders of $50,000 or more and if Contractor has 50 or more employees;

(4)   Employment of the handicapped (41 CFR 60-250).  Applicable to contracts or purchase orders $2,500; or employment of disabled veterans and veterans of the Vietnam Era (Applicable to contracts or purchase orders of $10,000 or more;

(6)   Utilization of Minority Business Enterprises (41 CFR 1-1.13).  Applicable to contracts or purchase orders of $10,000 or more;

(7)   Utilization of Small Business Concerns (41 CFR 1-1.710-3).  Applicable to contracts or purchase orders of $10,000 or more;

(8)   Utilization of Labor Surplus Area Concerns (41 CFR 1-1.305-3(a)).  Applicable to contracts or purchase orders of $10,000 or more;

(9)   Minority Business, Small Businesses and Labor Surplus Area Subcontracting (41 CFR 1-1.1310-2(b), 1-1710-3(b), 1-1.805-3).  Applicable to contracts or purchase orders of $500,000 or more;

(10)  Clean Air and Water.  Applicable to contracts or purchase orders of CFR 15.4 and 15.5, 41 CFR 1-1.2302;

(11)  Outer Continental Shelf Lands Act endorsement (WC 00 01 09 A) (43 U.S.C. §§ 1331 *et seq.*); and

(12)  Oil Pollution Act of 1990, as amended (33 U.S.C. § 2701 *et seq.*).

Contractor certifies that it does not maintain or provide for its employees any segregated facilities at any of its establishments, and that it does not permit its employees to perform their services at any location, under its control, where segregated facilities are maintained.  It certifies

DM-#8062177
#94614816v4
#94614816v6

further that it will not maintain or provide for its employees any segregated facilities at any of its establishments and that it will not permit its employees to perform their services at any location, under its control, where segregated facilities are maintained.  The Contractor agrees that a breach of this certification is a violation of the Equal Opportunity Clause under this Appendix 1.  As used in this certification, the term "segregated facilities" means but is not limited to any waiting rooms, work areas, rest rooms and wash rooms, restaurants and other eating areas, time clocks, locker rooms and other storage or dressing areas, parking lots, drinking fountains, recreation or entertainment areas, transportation and housing facilities provided for employees which are segregated by explicit directive or are in fact segregated on the basis of race, color, religion, sex or national origin, because of habit, local custom or otherwise.  It further agrees that (except where it has obtained identical certifications from proposed subcontractors for specific time periods) it will obtain identical certifications from proposed subcontractors prior to the award of subcontracts exceeding $10,000.00, which are not exempt from the provisions of the Equal Opportunity Clause; that it will retain such certification in its files; and that it will forward the following notice to such proposed subcontractors (except where the proposed subcontractors have submitted identical certificates for specific time periods):

NOTICE TO PROSPECTIVE SUBCONTRACTORS OF REQUIREMENT FOR CERTIFICATIONS OF NONSEGREGATED FACILITIES:

Certification of Nonsegregated Facilities must be submitted prior to the award of a subcontract exceeding $10,000.00, which is not exempt from the provisions of the Equal Opportunity Clause.  The certification may be submitted either for each subcontract or for all subcontracts during a period (i.e. quarterly, semi-annually or annually).  Note:  The penalty for making false statements is prescribed in 18 U.S.C. 1001.

END OF EXHIBIT B TO APPENDIX 1

Exhibit B to Appendix 1
Page 2 of 2

DM-#8062177
#94614816v4
#94614816v6

Debtors' Exhibit No. 34
Page 884 of 910

**EXHIBIT C to APPENDIX 1**

**INSURANCE PROVISIONS**

**Insurance Requirements.** During the term of the Agreement, Contractor will carry insurance coverages as set forth below at its own expense and with deductibles for its own account, with providers reasonably satisfactory to Owner and authorized to do business in the states or territories in which, and in the offshore blocks on which, Contractor performs any Work. The insurance coverages required herein represent Contractor's minimum requirements and do not limit or invalidate any indemnity or other obligations of Contractor under the Agreement. Contractor's failure to secure the required insurance coverages or the required endorsements on the policies or any denial of coverage by underwriters does not relieve Contractor from or limit its liabilities or obligations under the Agreement.

**Required Coverage.** The following insurance coverage is required. An owner's limitation clause, including any clause purporting to limit coverage to liability of an insured "as owner of the vessel," shall not be included in any of the policies required below. All policies and group policies must contain applicable territorial extensions and navigation limits adequate for the performance of the Work.

**Workers' Compensation**, as required by applicable law.

**Employer's Liability**, with a limit of not less than **$1,000,000** per occurrence, including (i) coverage for the Longshore and Harbor Workers' Compensation Act, including its extension by the Outer Continental Shelf Lands Act, the Jones Act, and the Death on the High Seas Act, (ii) coverage for masters and members of the crews of vessels (on a voluntary compensation basis), including transportation, wages, maintenance, and cure; alternatively, protection and indemnity insurance may be used for this coverage as specified below, (iii) "in rem" endorsement, stating that an action "in rem" will be treated as a claim against the insured "in personam," and (iv) "borrowed servant" endorsement, stating that a claim brought against Owner Group for compensation as a "borrowed servant" by any member of Contractor Group will be treated as a claim against Contractor.

**Automobile Liability**, with a limit of not less than **$1,000,000** per occurrence, combined single limit for bodily injury and property damage, covering all owned, hired, leased, or non-owned vehicles (as required by applicable law).

**Commercial General Liability**, with a limit of not less than **$1,000,000** per occurrence, combined single limit for bodily injury and property damage, including (i) blanket contractual liability, (ii) products/completed operations liability, (iii) sudden and accidental pollution liability (including cleanup costs), (iv) surface damage for blowout and cratering, (v) removal of any exclusions, restrictions, or limitations relating to explosion, collapse, or underground property damage, (vi) removal of any professional liability exclusions or limitations, (vii) action over buyback and deletion of any provisions that limit or exclude coverage of claims made by

Exhibit C to Appendix 1
Page 1 of 3

Contractor Group's employees against any member of Owner Group, (viii) extended reporting period of not less than 36 months, if written on a claims-made policy and is non-renewed or canceled, or deletion of any "sunset clause" purporting to cancel coverage on claims following cancellation or non-renewal, if written on an occurrence policy, (ix) "in rem" endorsement stating that an action "in rem" will be treated as a claim against the insured "in personam," and (ix) removal of the "watercraft" exclusion; alternatively, protection and indemnity insurance may be used for this coverage as specified below.

**Hull and Machinery**, which Contractor will carry, or cause to be carried, for each vessel owned or chartered by Contractor Group in connection with the Work at the declared value of each vessel and its equipment, including (i) deletion of limitation of liability clause, (ii) if any vessel engages in towing operations, this insurance will include full towers liability with the sistership clause un-amended, and (iii)  removal of wreck or debris, if removal is required by applicable law.

**Protection and Indemnity**, which Contractor will carry, or cause to be carried, for each vessel owned or chartered by Contractor Group in connection with the Work with a limit of not less than **$5,000,000** per occurrence, including (i) coverage for pollution emanating from or caused by a vessel or vessels owned or chartered by Contractor Group, (ii) deletion of any language limiting coverage for Owner Group in the event of the applicability of any statute limiting liability; (iii) "in rem" endorsement stating that an action "in rem" will be treated as a claim against the insured "in personam," (iv) towers liability, where applicable; alternatively, liability coverage may be afforded in accordance with the Commercial General Liability coverages above (deleting the "watercraft" exclusions), (v) coverage for the crews; alternatively, the crew coverage may be afforded in accordance with the workers' compensation and employer's liability coverages above, and (vi) removal of wreck or debris, if removal is required by applicable law.

**Charterers Legal Liability**, which Contractor will carry, or cause to be carried, for each vessel chartered by Contractor Group in connection with the Work with a limit of not less than **$1,000,000** per occurrence, including (i) liabilities arising out of operation and use of such vessel and (ii) contractual liability for liabilities assumed by Contractor.

**Excess or Umbrella Liability**, with a limit of not less than **$100,000,000** per occurrence, combined single limit for bodily injury and property damage in excess of the limits specified above and is follow-form with additional exclusions for employer's liability, automobile liability, commercial general liability, hull and machinery, protection and indemnity, and charterers legal liability, which such liability limits may be met with any combination of primary, umbrella, and excess policies.

**Aircraft Liability**, which Contractor will carry, or cause to be carried, for each aircraft owned or chartered by Contractor Group in connection with the Work with a limit of not less than **$75,000,000** per occurrence, combined single limit for bodily injury or death (including passengers) and loss of or damage to property, including (i) passenger liability, (ii) cargo legal liability, and (iii) no provision limiting coverage "per seat" or "per passenger."

Exhibit C to Appendix 1
Page 2 of 3

**Aircraft Hull**, which Contractor will carry, or cause to be carried, for each aircraft owned or chartered by Contractor Group in connection with the Work for the declared value of each aircraft and its equipment.

**Professional Liability**, if applicable, with a limit of not less than $1,000,000 per claim, including errors or omissions or rendering or failing to render any professional services as required under the Agreement.

**Endorsements and Other Requirements.** To the extent of the liabilities assumed by Contractor hereunder, all insurance policies of Contractor will comply with the following:

(a)　**Waiver of Subrogation.** Such policies will expressly waive subrogation as to Owner Group.

(b)　**Additional Insured.** Such policies, other than workers' compensation, employer's liability, and professional liability policies, will include Owner Group as an additional insured, on a broad-form basis. Such additional-insured endorsements must include coverage for the sole, joint, or concurrent negligence of the additional insureds and not be restricted to: (i) ongoing operations and products/completed operations; (ii) coverage for vicarious liability; or (iii) circumstances in which the named insured is partially negligent. The Parties deem a portion of the payment made by Owner for Work performed to include compensation to Contractor for any costs Contractor may incur due to including Owner Group as additional insured. If any additional-insured endorsement limits coverage to amounts required by written contract, the amounts required in the agreement will instead be the maximum amounts of Contractor's insurance policies, but not less than the minimums set forth herein.

(c)　**Primary.** Such policies will be primary to and receive no contribution from any insurance policies maintained by Owner Group.

END OF EXHIBIT C OF APPENDIX 1

Exhibit C to Appendix 1
Page 3 of 3

DM-#8062177
#94614816v4
#94614816v6

## EXHIBIT D to APPENDIX 1

## <u>DRUG AND ALCOHOL POLICY</u>

**PURPOSE**

This policy implements Contractor's effort to enhance the safety of its operations and to provide its employees an opportunity to work in an environment free of drugs and alcohol.  Contractor will deter alcohol and drug abuse by prevention through education, detection through testing, and disciplinary action when warranted.

**POLICY**

Contractor prohibits:

- employees possessing or consuming alcohol or drugs while working;
- employees working while under the influence of alcohol or drugs; and
- employees possessing or consuming drugs while not working.

**EXCEPTIONS**

Contractor permits employee possession of prescription drugs in containers that bear the doctor's and employee's name and a prescription date less than one year old, and permits the safe use of those drugs for the prescribed purposes, but Contractor does not permit employees to work while under the influence of prescription medications that may have an adverse effect on the employee's fitness for duty.

Contractor permits possession and moderate, lawful consumption of alcohol at business-related social functions that have been appropriately authorized by management, but prohibits employees and other attendees from working or operating motor vehicles after such a function if their abilities may have been impaired by alcohol.

**DEFINITIONS**

"Employees" means (for purposes of this policy only) all regular full-time, regular part-time or temporary employees, all Contractor independent contractors and agents, and all other persons using Contractor equipment, vehicles or boats (including those owned, used, rented or leased by or for Contractor) or performing duties on Contractor premises or property.

"Drugs" means (1) marijuana, cocaine, opiates, phencyclidine (PCP) and amphetamines; and (2) any other substances specified in Schedule I through V of the federal Controlled Substances Act whether or not prescribed for employee use by a physician.

DM-#8062177
#94614816v4
#94614816v6

"Test" means a drug test and/or alcohol test using urine and/or blood samples, conducted in accordance with this policy and Contractor testing procedures.

"Working" means reporting for work, performing job duties, engaging in business-related travel or entertainment, operating any Contractor equipment, vehicle or boat (including those owned, used, rented or leased by or for Contractor), being on Contractor property or premises, or attending any Contractor-related business or social function.

**TESTING AND DISCIPLINE**

Contractor may require employees to submit to tests to determine the presence of drugs or alcohol.  If an employee's test yields a verified positive result, their employment will be terminated immediately.  In the case of a verified positive pre-employment test result, any offer of employment will be automatically withdrawn.

A refusal to take a test, failure to cooperate with a test, an attempt to tamper with a specimen, violation of Contractor testing policies or procedures or any attempt to subvert Contractor testing policies or procedures will have the same consequences as failing a drug test – immediate termination of employment or withdrawal of offer of employment.

The Contractor human resources department maintains written procedures for testing, which may be changed by Contractor at any time, for any reason.  The procedures are available for employee review.

**EMPLOYEE DRUG CONVICTIONS**

As required by the Drug Free Work Place Act of 1989, any employee convicted of any violation of any criminal drug statute must notify management of the conviction no later than five (5) days after a conviction.  Failure to give notice shall result in the employee's termination.  The management personnel given the notice will immediately notify the human resources department of any reported conviction.  Contractor may terminate any employee convicted of a drug-related crime regardless of the results of any administered drug test.

**PRE-EMPLOYMENT TESTING**

All applicants for employment at Contractor shall undergo a pre-employment drug test within 24 hours of Contractor's request.

**POST ACCIDENT TESTING**

Contractor will test each employee whose performance either contributed to an accident or cannot be completely discounted as a contributing factor to the accident, if the accident:

- results in a death or a personal injury necessitating medical attention;

Exhibit D to Appendix 1
Page 2 of 5

- results in an explosion or fire;
- causes a significant damage to or loss of property;
- requires the emergency shut-down of an operation or facility;
- is a reportable incident regarding a gas pipeline facility under 49 CFR Part 191; or
- is a reportable accident involving pipeline facilities used in the transportation of hazardous liquids under 49 CFR Part 195.

In addition to the mandatory post-accident testing described above, Contractor may, in its sole discretion, also require post-accident testing following any accident that it determines is significant and warrants post-accident testing.

## RANDOM TESTING

Contractor will conduct random testing on employees at certain Contractor facilities designated by the Vice President of Exploration and Production, the Vice President of Human Resources, and the Sr. Vice President and General Counsel. Procedures for selecting employees for random testing are stated in Contractor's written procedures for testing.

## REASONABLE CAUSE TESTING

Contractor will test an employee when there is reasonable cause to believe that the employee is using a drug or is under the influence of alcohol. "Reasonable cause" depends on the circumstances of each case. It includes observation of an employee's:

- unauthorized use or possession of alcohol while working;
- use or possession of drugs;
- slurred speech;
- unsafe actions;
- inability or difficulty in performing routine tasks effectively;
- unsteady standing or walking;
- disorientation or confusion; or
- erratic or unusual behavior.

It may also include:

- concerns about the employee's fitness for duty;
- an employee's voluntary admission of the prohibited use of alcohol or drugs;
- an employee's arrest or conviction for a drug-related offense, or the identification of an employee as the focus of a criminal investigation into illegal drug possession, use or trafficking;
- information related to employee drug use or prohibited alcohol use provided by reliable and credible sources or independently corroborated by Contractor;
- evidence that an employee has tampered with a drug test;
- the odor of alcohol, marijuana, or any other drug; or

Exhibit D to Appendix 1
Page 3 of 5

DM-#8062177
#94614816v4
#94614816v6

- an employee's operation of a Contractor vehicle after leaving an establishment where alcohol is served.

Reasonable cause for testing may arise in circumstances in addition to those specified above. A test for reasonable cause will be conducted only upon concurrence of at least two of the employee's supervisors, one of whom is trained in the detection of the possible symptoms of drug and alcohol use. A drug test for reasonable cause will also require the concurrence of either the Vice President of Human Resources or the Sr. Vice President and General Counsel (either of whom may also constitute the concurring supervisors).

## OTHER TESTING

If an employee transfers to a facility designated for random testing, a drug test will be required before transfer. If an employee is on a leave of absence from a facility designated for random testing, a drug test may be required before the employee may return to work. Employees may be drug tested upon commencing or ending multiple-day work shifts on offshore facilities.

## MEDICAL REVIEW OFFICER

Contractor has designated a licensed physician with knowledge of drug abuse disorders as its medical review officer ("MRO"). The MRO reviews and interprets positive test results obtained through Contractor's testing program. The MRO is responsible for verifying positive test results. The MRO examines alternative medical explanations for any positive test results, and reviews all medical records made available by the tested employee when a confirmed positive drug test could have resulted from legally prescribed drugs. Contractor's test procedures describe the process under which the MRO reviews information, gives the tested employee an opportunity to discuss the test result, and otherwise determines whether the test result should be reported as negative or should be reported as a verified positive test.

## RE-TESTING AT THE EMPLOYEE'S REQUEST

An employee may submit a written request to the MRO within 72 hours of receipt of a verified positive drug test, asking that the employee's original specimen be re-tested. Employees are entitled to only one re-test of each specimen. Re-testing procedures are stated in the written procedures for testing maintained by the Contractor's human resources department.

## EMPLOYEE EDUCATION AND TRAINING

Employees at the facilities designated for random testing will participate in a training program that addresses the consequences of alcohol and drug use on personal health, safety, and the work environment. The program will also address indicators of alcohol and drug use and abuse. Informational materials (including a community service drug hot-line telephone number for employee assistance), and Contractor's policy regarding drug and alcohol use in the work place will be distributed as part of the training program.

DM-#8062177
#94614816v4
#94614816v6

In addition to training for all employees, supervisors of the designated facilities will receive annual training of specific contemporaneous physical, behavioral and performance indicators of probable drug use.

## VOLUNTARY REHABILITATION

Employees are encouraged to seek treatment for any alcohol or drug problem before being in a situation that may warrant a test.  Upon request, the Contractor's human resources department will refer employees to an independent treatment program.

Medical and disability benefits will be provided for treatment to the extent available under Contractor's medical and disability plans.  Employees referred by Contractor to a treatment program and employees seeking Contractor medical or disability benefits for treatment must consent to the disclosure of all treatment-related information to Contractor.  An employee's employment shall be terminated if they do not cooperate with treatment, if they leave a treatment program before being discharged, or if they violate this policy after returning to work following treatment.

## IMPLIED CONSENT

Employees are conclusively deemed to consent to cooperate in maintaining a work place free from the effects of alcohol and drugs through the use and enforcement of this and related corporate policies and procedures.

END OF EXHIBIT D OF APPENDIX 1

Exhibit D to Appendix 1
Page 5 of 5

DM-#8062177
#94614816v4
#94614816v6

Debtors' Exhibit No. 34
Page 892 of 910

**EXHIBIT E to APPENDIX 1**

**CONTRACTOR SAFETY AND ENVIRONMENTAL REQUIREMENTS**

**A**      **Purpose and Scope**

A.1      The purpose and scope of these requirements is to establish safety and environmental requirements for contractors to be able to work on Owner owned or managed properties.

The objectives of these requirements are to ensure that all contractors and subcontractors working on Owner's facilities/work sites have programs in place to comply with the Bureau of Safety and Environmental Enforcement (BSEE) Safety and Environmental Management Systems (SEMS) requirements or other applicable safety and environmental regulations, laws, rules and standards of agencies having jurisdiction at locations, their employees are adequately skilled and knowledgeable to safely perform their assigned job task functions, to ensure that safety and environmental policies have been established and to ensure that Contractor's management is committed to safety.

**B**      **Written Safety and Environmental Programs**

B.1      Contractors shall develop and implement written safety and environmental management programs which must include but not be limited to the following:

- Management Commitment
- Written Safe Work Practices specific for work to be performed in compliance with applicable OSHA, BSEE, U.S. Coast Guard, EPA and other applicable government agencies.
- Training Program to include an employee Skills and Knowledge Verification process
- Drug and Alcohol Prevention Program (e.g., DISA)
- Hazard Recognition Program to include JSA (Job Safety Analysis)
- Stop Work Authority Program
- Incident Reporting and Investigation Program
- Operating Procedures for Equipment
- Mechanical Integrity Program
- Management of Change (MOC)

**C**      **Training Requirements**

C.1      Contractor's personnel (and those of all subcontractors) shall be skilled and knowledgeable for the tasks or activities to be accomplished. This includes being in compliance with appropriate safety and environmental training codes, standards, laws and regulations as required by governmental agencies having jurisdiction at the work site (e.g., BSEE, USCG, EPA, DOT, OSHA) as well as Contractor's Contractor Training Requirements.

C.2      A Training Matrix has been established to identify minimal training requirements for Contractor personnel performing work on Owner properties. Contractors should refer to Contractor's SEMS portal for the latest version of the Training Matrix and must verify the training requirements are met for the appropriate job titles (functions).

Exhibit E to Appendix 1
Page 1 of 6

**D**    **Safety and Environmental Management Systems (SEMS) - Contractor Requirements**

D.1    Contractor has established very specific contractor safety and environmental management requirements in order to provide for the safety of all personnel and to comply with current safety and environmental regulations. Below are specific requirements as part of the SEMS contractor agreement/bridging process. A detailed description and compliance guide can be obtained from the Contractor SEMS portal or by calling Contractor's EH&S department.

D.2    Requirements

D.2.1    Contractors performing activities on-site offshore must participate in the ISNetworld Review and Verification, as well as the Training Qualification (TQ) processes;

D.2.2    Contractor must review Contractor's  Safety and Environmental Management System (SEMS), related  SEMS requirements, Safe Work Practices and must perform all contractual obligations in accordance with such Contractor programs;

D.2.3    The Contractor must communicate identified hazards to all affected personnel (including Owner and 3rd Party personnel) prior to performing oil, gas and sulphur operations for Owner;

D.2.4    The Contractor must comply with all applicable safety and environmental regulations, laws, rules and standards of agencies having jurisdiction at locations where work is conducted for the Operator;

D.2.5    Contractor must verify and provide documentation upon request that its personnel and any subcontractors performing work for Contractor have the skills and knowledge to perform their assigned duties in a safe and environmentally sound manner, has documented such, and that the information contained therein is accurate, timely and reflective of all appropriate safety and environmental training codes, standards, laws and regulations as required by governmental or regulatory agencies having jurisdiction at the work site.(e.g., BOEM, BSEE, USCG, EPA, DOT, OSHA) ;

D.2.6    The Contractor must have written safe work practices that help minimize the risk to personnel and the environment for all work conducted for Owner, and all activities performed by the Contractor will be conducted in accordance with those safe work practices;

D.2.7    The Contractor must require all personnel performing work for Contractor to undergo periodic retraining and skill assessments, in accordance with Contractor's Training Requirements  for On-Site Contractors (Training Matrix), to ensure adequate retention of the skills and knowledge required to perform their assigned duties;

D.2.8    The Contractor must obtain and/or develop written operating procedures to ensure the safe operation of critical equipment that is operated and maintained by the

Exhibit E to Appendix 1
Page 2 of 6

Contractor whether or not that equipment is owned by the Contractor or any Third Party. Critical equipment, per Appendix D of API RP 75, is defined as: "Equipment and other systems determined to be essential in preventing the occurrence of or mitigating the consequences of an uncontrolled release." Such equipment may include vessels, machinery (compressors, mud pumps, fire pumps, etc.), piping, blowout preventers, wellheads and related valving, flares, wireline equipment, coil tubing equipment, fluid management equipment, safety systems, alarms, interlocks, fire protection equipment and other monitoring, control and response systems.

D.2.9   The Contractor must periodically review their written operating procedures used to operate critical equipment to ensure they reflect actual operating conditions;

D.2.10  The Contractor must develop and implement a written mechanical integrity program for any critical equipment that will be maintained and operated by the Contractor. Such a program must include, as applicable:

- The design, fabrication, procurement, installation, testing, calibration and inspection criteria and limits;
- The basis for maintenance (manufacturer's recommendation, industry standards, etc.
- A quality assurance program to ensure the mechanical integrity and safe operation of the equipment;

D.2.11  All documents required per 30 CFR 250, Subpart S and API RP 75 will be maintained in an orderly manner, will be readily identifiable, retrievable, and legible, and will be available for review on request by Owner or appropriate regulatory authorities. Examples of such documentation include, but are not limited to:

- Safe work practices and policies;
- Training records, including certifications for specialty work, as applicable;
- Verifications that personnel are skilled and knowledgeable in their assigned duties;
- Approved Job Safety Analyses (JSAs) as required;

D.2.12  For oil, gas and sulphur activities performed on Owner's *facilities* and on a Contractor's *facility* on the OCS the Contractor agrees to the following, where "facilities" is defined to include all types of offshore structures permanently or temporarily attached to the seabed ( *i.e.* , mobile offshore drilling units; floating production systems; floating production, storage and offloading facilities; tension-leg platforms; spars used for exploration, development, production, and transportation activities for oil, gas, or sulphur from areas leased in the OCS, as well as wells, structures, living quarters, drilling and workover packages, process equipment, utilities and DOI regulated pipelines (except as noted in API RP 75 section 1.3.1.1);

Exhibit E to Appendix 1
Page 3 of 6

DM-#8062177
#94614816v4
#94614816v6

D.2.13   The Contractor must conduct, keep current and provide upon request to Contractor Hazards Analyses (including Mitigation plans) of the Contractor's facilities and ongoing operations;

D.2.14   The Contractor must manage and document all changes to the Contractor's facility that are directly involved in performing oil, gas and sulphur activities for Owner;

D.2.15   The Contractor must develop and communicate an Emergency Action Plan to all personnel on the Contractor's facilities;

D.2.16   The Contractor must conduct Job Safety Analysis (JSA) to identify potential task specific hazards associated with the work to be performed and must include the steps required to mitigate the hazards identified.  Copies of all JSAs must be kept at the work site and be readily accessible for at least 30 days to all personnel involved with the work. The Contractor must also maintain copies of all completed JSAs for at least 2 years.

D.2.17   The Contactor must conduct routine safety meetings to communicate safety expectations, incidents, near miss reports, prevention, safety alerts, etc.

D.2.18   The Contractor must immediately notify an Owner representative by whatever means  of communication is most expedient, and shall maintain written records in addition thereto, of any incidents resulting in the following:

- Fatalities
- All injuries that require the evacuation of the injured person(s) from the facility to shore or to another offshore facility
- All losses of well control
- All fires and explosions
- All reportable releases of H2S gas
- All collisions
- All incidents involving severe structural damage
- All incidents involving crane or personnel/material handling operations
- All incidents that damage or disable safety systems or equipment

D.2.19   Contractor is required to complete incident reports and provide additional information as necessary in order to determine root cause and corrective actions.

## E        Personal Protective Equipment (PPE)

Contractor shall provide its employees and personnel with proper PPE for them to perform their jobs safely. Contractor shall also ensure that its employees and personnel are trained in the proper use and maintenance of all PPE issued. The following is only the minimum PPE required to work on facilities owned, operated or managed by Owner or any of its affiliated or subsidiary companies. Any additional job specific PPE (face shields, goggles, respiratory protection, fall protection, hand protection, gas monitors, etc.) required by Owner, governmental regulations or hazard assessments shall also be provided by Contractor.

Exhibit E to Appendix 1
Page 4 of 6

*Minimal PPE Requirements for contractors*:

- Safety Glasses – Safety Glasses shall comply with ANSI Z87.1 – 1989, as such may be updated or modified from time to time, and shall be worn in areas where personnel are exposed to flying particles and/or when working around pressurized process equipment, piping, pumps, etc.

- Hard Hat – Hard hats shall comply with ANSI Z89.1 – 1997, Type 1 requirements, as such may be updated or modified from time to time, and shall be worn at all times when working on Owner facilities or work sites.

- Safety/Steel Toe Shoes / Boots – Safety/Steel toe shoes / boots shall comply with ANSI Z41 – 1991, as such may be updated or modified from time to time, and shall be worn at all times when working at any facility or work site owned, operated or managed by Owner or any of its affiliated or subsidiary companies.

- Hearing Protection – Hearing protection is required in high noise areas or areas that are posted as requiring hearing protection.

- Personal Flotation Devices (PFD's) – USCG Type 1 or 5 are necessary for any Work or portion thereof that is to be performed outside the handrails, on +10 level of offshore platforms, during personnel transfers to and from offshore platforms and while boarding and exiting boats from boat landings.

## F    Inspections/Audits

In addition to any right provided elsewhere in this <u>Appendix 1</u> or otherwise available by law, Owner reserves the right to inspect/audit the Environmental, Health and Safety activities of all contractors and subcontractors who work on any properties, facilities or premises owned, operated or managed by Owner or any of its affiliated or subsidiary companies. Owner or Third Party auditing teams or individuals may conduct these inspections/audits.

The objective of conducting an inspection/audit is to assess Contractor's compliance with applicable Owner, governmental and regulatory requirements and to prevent adverse environmental and safety incidents.

F.1    Field Inspections/audits

Owner may have field inspections conducted so that the inspector(s)/auditor(s) can:

- Physically observe the Work or any part thereof that Contractor, or any of its subcontractors or personnel, is performing.
- Assess Contractor's performance of Work, or any part thereof, according to applicable Owner, governmental or regulatory requirements.
- Advise Contractor regarding any deficiencies that are observed and require that such be corrected.

Exhibit E to Appendix 1
Page 5 of 6

Owner may conduct field inspections at any time and from time to time as Owner, in its sole discretion, may deem necessary or appropriate to maintain compliance with the applicable requirements of Owner or any governmental or regulatory agency or body.

F.2     Office Audits

Owner may have office audits conducted:

- To verify information that Contractor certifies as having when completing this Contractor Safety Program Requirements agreement.
- To check Contractor's documentation of training, safety meeting attendance, accidents, equipment inspections, safety program elements, etc.
- To share environmental, safety and health philosophies.

END OF EXHIBIT E TO APPENDIX 1

DM-#8062177
#94614816v4
#94614816v6

**EXHIBIT F to APPENDIX 1**

**SEARCH AND SEIZURE POLICY**

**NOTICE TO ALL PERSONNEL**

It is the Contractor's belief that the misuse of drugs, alcohol, or any substance having a physiological, psychological, or biochemical effect impairs a person's health and performance and creates unsafe working conditions. Contractor is committed to maintaining a productive, safe and healthy work environment, free of unauthorized drug and alcohol usage. In order to achieve this objective, Contractor has adopted a Drug and Alcohol Policy. All Contractor personnel are required to comply with the policy.

The use, possession, distribution or sale of unauthorized drugs by anyone while on Contractor premises or while engaged in Contractor business is prohibited. A person reporting for work on Contractor premises with unauthorized drugs and/or alcohol in his/her body is in violation of this policy.

Reporting to work while under the influence of alcohol by any person is prohibited. The consumption or possession of alcohol in unsealed or opened containers on Contractor premises is prohibited. No alcohol is allowed at any offshore location.

For the purpose of this policy, the term "unauthorized drugs" shall mean any substance, other than an authorized substance, which has the effect on the human body of being a narcotic, depressant, stimulant, hallucinogen or cannabinoid, their precursors, derivatives or analogues, and includes, but is not limited to, those substances scheduled as controlled substances pursuant to the Federal Controlled Substances Act.

"Authorized substances" are substances having a physiological, psychological, or biochemical effect that are lawfully prescribed or that are available without a prescription, that are lawfully obtained by an individual and that the individual possesses and uses in the appropriate manner, in the dosages and for the purposes for which the substances were prescribed or manufactured.

It is each person's responsibility to notify his or her supervisor in writing when that person is taking any prescription or non-prescription medicine or substance which may impair judgment or performance or otherwise adversely affect the normal functions or his or her mental faculties or physical abilities.

In enforcing the policy, searches of persons and their property on Contractor premises, work area searches, and laboratory testing are authorized. Any person who refuses, when requested, to cooperate with a search or to submit to laboratory testing shall be deemed to be in violation of the policy. Contractor reserves the right to conduct unannounced personal searches. Entry upon Contractor's premises by personnel will be deemed to constitute consent by such persons to personal searches pursuant to this policy.

DM-#8062177
#94614816v4
#94614816v6

A personal search includes inspection of any personal property of personnel located on Contractor premises including, but not limited to, their personal effects, lockers, baggage, desks, lunch boxes, containers, purses, billfolds, parcels, or vehicles if on Contractor premises.

Any person charged with or under investigation in connection with a drug-related or alcohol-related criminal offense may be required to submit to laboratory testing.

Any person possessing food, supplies, or tools not belonging to them, at a time when such items should not be in their possession, is subject to disciplinary action.

Firearms are prohibited on all Contractor premises.  Without limiting the generality of the foregoing, personnel may not possess firearms on their person, or in their personal effects, lockers, baggage, desks, lunch boxes, containers, purses, parcels, or vehicles if on Contractor premises.

END OF EXHIBIT F TO APPENDIX 1; END OF AGREEMENT

DM-#8062177
#94614816v4
#94614816v6

**<u>Exhibit N3</u>**

**Hunt Term Sheet**



*Thomas R. Lamme*
*Senior Vice President and General Counsel*
*Direct: 713-969-1107*
*Email: TLamme@fwellc.com*

May 20, 2021

**VIA EMAIL**

Matt Johnson
Assistant General Counsel
Hunt Oil Company
1900 North Akard Street
Dallas, Texas 75201
E-mail: mjohnson@huntoil.com

   *Re: Fieldwood/Hunt Term Sheet*

Dear Matt:

Attached as <u>Exhibit A</u> is the agreed upon term sheet dated May [20], 2021, by and between Fieldwood Energy LLC and its affiliated debtors and Hunt Oil Company and its subsidiaries Chieftain International (U.S.) L.L.C. and Hunt Chieftain Development, L.P. (collectively, "**Hunt**" and, together with the Debtors, the "**Parties**") supporting the restructuring of the portion of the Debtors' business relating to certain assets described therein as the "Hunt Turnkey Property," "Hunt Non-Turnkey Properties," and the "Abandoned Properties" (the "**Fieldwood/Hunt Term Sheet**").

By executing this letter agreement, each of the undersigned Parties agrees (i) to work to implement the terms of the Fieldwood/Hunt Term Sheet and (ii) to negotiate the definitive documents described therein in good faith and in accordance with the terms of the Fieldwood/Hunt Term Sheet.

The Parties may execute and deliver this letter agreement by electronic reproduction and in multiple counterparts, each of which shall constitute an original and all of which shall be one and the same document.  This letter agreement shall be governed by the laws of the State of Texas without regard to any choice of law principles.

[Signature Pages Follow]

Enclosure

cc: Michael T. Dane, *via email* MDane@Fwellc.com

IN WITNESS WHEREOF, the undersigned Parties have executed this letter agreement as of the date first written above.

**FIELDWOOD ENERGY LLC**

By: _Thomas R. Lamme_

Name:   Thomas R. Lamme

Title:   Senior Vice President and General Counsel

[Fieldwood Signature Page to Hunt Term Sheet]

Debtors' Exhibit No. 34
Page 903 of 910

IN WITNESS WHEREOF, the undersigned Parties have executed this letter agreement as of the date first written above.

**HUNT OIL COMPANY**

By: _____
Name:      Mark C. Gunnin
Title:      President

**EXHIBIT A**

FIELDWOOD/HUNT TERM SHEET

*This Term Sheet is an expression of interest only and creates no legally binding commitment by either party to negotiate any specific transaction or enter into any agreement. It is expressly understood that no liability or obligation of Fieldwood Energy LLC and its affiliated debtors (collectively, the "**Debtors**") or Hunt Oil Company and its subsidiaries Chieftain International (U.S.) L.L.C. and Hunt Chieftain Development, L.P. (collectively, "**Hunt**") of any nature whatsoever is intended to or will be created hereunder with respect to this Term Sheet or related discussions or writings or the transactions contemplated hereby and that this Term Sheet is neither a contract nor a binding offer. It is understood and agreed that any transaction is expressly conditioned, among others, upon approval by the Debtors and Hunt, the execution and delivery by the Debtors and Hunt or their affiliates of definitive written agreements, in form and substance satisfactory to the Debtors and Hunt in their sole discretion, the satisfaction of the conditions set forth therein, and Bankruptcy Court approval. The Debtors and Hunt expressly agree that this Term Sheet does not contain all terms that would be required to be agreed to in order to enter into any definitive agreement. Without prejudice to the foregoing, this Term Sheet constitutes a "Definitive Document" under the Restructuring Support Agreement (as defined in the Plan (as defined below)) and is subject to the consent rights set forth therein. Except as provided for herein, each party is responsible for its own costs and expenses, including those of its legal advisors in conjunction with this Term Sheet.*

| |
|---|
| **HUNT / FIELDWOOD COMMERCIAL TERM SHEET** |

Through the divisive merger (the "**Divisive Merger**") contemplated under the *Fourth Amended Joint Chapter 11 Plan of Fieldwood Energy LLC and Its Affiliated Debtors* dated April 15, 2021 filed at ECF No. 1284 (including any exhibits and schedules thereto and as may be further amended, supplemented, or modified, the "**Plan**"),[1] Fieldwood Energy III LLC ("**FWE III**") will be allocated and vested with the Debtors' rights, title, and interests in Eugene Island Block 63 (OCS Lease No. G00425) and OCS RUE No. G30244 (collectively, the "**Hunt Turnkey Property**").

Through the Divisive Merger, FWE III will also be allocated and vested with rights, title, and interests in certain other oil and gas assets (collectively, the "**Hunt Non-Turnkey Properties**"). FWE III will be responsible for the decommissioning the Hunt Non-Turnkey Properties. A schedule of the Hunt Non-Turnkey Properties is attached hereto as **Exhibit A**.

The Debtors' rights, title, and interests in certain other oil and gas assets (collectively, the "**Hunt Abandoned Properties**") will be abandoned as set forth in the Plan. A schedule of the Hunt Abandoned Properties is attached hereto as **Exhibit B**.

**Withdrawal of Objections, Support of the Plan and Hunt's Unsecured Claim**

In conjunction with the execution of this Term Sheet or promptly thereafter, Fieldwood and Hunt will enter into a mutually agreed stipulation and order that will provide that Hunt will (i) withdraw any pending objections it has filed to the Plan; (ii) not file any further objections to the Plan; (iii) support confirmation of the Plan; and (iv) not support any party in objecting to or opposing the Plan.

In conjunction with the execution of this Term Sheet or promptly thereafter, Fieldwood agrees to allow, support and approve the filing by Hunt of an unsecured claim in the bankruptcy equal to $22,770,453.59 for the net BSEE estimated (P90) decommissioning and site clearance costs for the Hunt Abandoned Properties and RUEs and ROWs to be abandoned by Debtors as set forth in the Plan.

**Turnkey Removal Agreement**

---

[1] Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the Plan.

1. ***Turnkey Amount***. Subject to Bankruptcy Court approval (if required), Hunt and Fieldwood Energy LLC ("**Fieldwood**") will enter into a Turnkey Removal Agreement acceptable to Hunt, Fieldwood, the Required DIP Lenders (as defined in the Plan), and the Requisite FLTL Lenders (as defined in the Plan) whereby Fieldwood will decommission the Hunt Turnkey Property on a turnkey payment basis and Fieldwood will earn a single pre-agreed payment (the "**Turnkey Amount**") in exchange for decommissioning the Hunt Turnkey Property. The Turnkey Amount will be $5.4 million. Fieldwood will take commercially reasonable efforts to perform all decommissioning work for the Hunt Turnkey Property on or before June 30, 2021. Subject to certain exceptions,[2] Fieldwood will have an opportunity to realize a profit if it is able to decommission the Hunt Turnkey Property for a lower cost than the Turnkey Amount, and Fieldwood will bear the risk that the cost of decommissioning the Hunt Turnkey Property exceeds the sum of the Turnkey Amount.

2. ***Parties to the Turnkey Removal Agreement***. On the Effective Date of the Plan, (i) FWE III will be allocated and vested with all of Fieldwood's rights, interests, and obligations under the Turnkey Removal Agreement pursuant to the Divisive Merger and (ii) Credit Bid Purchaser will become a party to the Turnkey Removal Agreement and will perform any remaining decommissioning activities on the Hunt Turnkey Property pursuant to the terms of the Turnkey Removal Agreement.

3. ***Mutual Indemnity***. Credit Bid Purchaser and Hunt shall indemnify one another for a material breach of their respective obligations under the Turnkey Removal Agreement; provided, however, the indemnity obligations set forth herein shall not include lost profit opportunity, indirect damages, consequential damages, third party claims, fines or penalties (except to the extent directly resulting from a material breach by the other party), attorney's fees, or any other third party costs.

4. ***Excluded Wells***. Notwithstanding anything herein to the contrary, the Turnkey Amount shall not include any decommissioning obligations that relate to any wells located on the Hunt Turnkey Property that were plugged and abandoned or temporarily plugged and abandoned prior to the entry into the Turnkey Removal Agreement (the "**Excluded Wells**"), and Hunt will be solely responsible for any such obligations related to the Excluded Wells.[3] Fieldwood/FWE III, Credit Bid Purchaser and Hunt, as applicable, will determine the list of Excluded Wells.

5. ***Surety Bonds***. Hunt may apply any available proceeds from bonds that cover the decommissioning costs associated with the Hunt Turnkey Property to the Turnkey Amount. Hunt will bear all costs and risks associated with such bonds, and notwithstanding its failure to recover all or any bond proceeds, Hunt will pay the Turnkey Amount, as it may be adjusted.

6. ***Payments***. Hunt will pay Fieldwood or Credit Bid Purchaser, as applicable, the full agreed

---

[2] This agreement will include exceptions that will cause the parties to increase the Turnkey Amount limited to (i) changes to the conditions of the properties to be decommissioned outside of Fieldwood's, FWE III's and/or Credit Bid Purchaser's reasonable control, including extraordinary events, such as hurricanes; and (ii) material changes in government regulations that can reasonably be expected to materially increase the applicable cost of decommissioning a particular project.

[3] The Debtors are not currently aware of any liabilities, including any downhole well work, associated with the Excluded Wells.

Debtors' Exhibit No. 34
Page 907 of 910

Turnkey Amount, as it may be adjusted, upon delivery to Hunt of the filings and other evidence required by BOEM and/or BSEE or any other applicable governmental authority, including requisite approvals or regulatory concurrence, with regard to the satisfaction of decommissioning obligations with respect to the Hunt Turnkey Property; including the following filings, to the extent applicable:

    a)    Certified platform post-removal report that complies with the requirements of 30 C.F.R. 250.1729, and

    b)    Certified site clearance report that complies with the requirements of 30 C.F.R. 250.1743(b).

**Implementation and Funding Agreement**

1. ***Funding Contribution***.   Subject to Bankruptcy Court approval (if necessary), Hunt and Fieldwood will enter into an Implementation and Funding Agreement (unless otherwise included in the Turnkey Removal Agreement) acceptable to Hunt, Fieldwood, the Required DIP Lenders (as defined in the Plan), and the Requisite FLTL Lenders (as defined in the Plan) whereby the Debtors will contribute on the Effective Date $375,000 to FWE III (the "**Contribution Amount**"), which amount will be used in connection with the Hunt Turnkey Property. The Contribution Amount shall be reduced by any amount spent on safety related repairs and improvements ("**Agreed Activities**") performed on the Hunt Turnkey Property. Any Contribution Amount remaining after reduction for amounts spent on the Agreed Activities (the "**Remaining Balance**") will be paid by FWE III to Hunt; provided that if the Turnkey Amount becomes due prior to the Effective Date, the Turnkey Amount shall be reduced by the Remaining Balance and the Debtors will not contribute any Contribution Amount to FWE III.

2. ***Operating Costs***.   The Implementation and Funding Agreement shall also provide that, from and after the Effective Date, Credit Bid Purchaser will manage on behalf of FWE III the Hunt Turnkey Property and the Hunt Non-Turnkey Properties, except for the Excluded Wells, until the completion of the decommissioning pursuant to a mutually acceptable contract operator agreement between FWE III and Credit Bid Purchaser.  Hunt shall be responsible for any operating costs associated with the Excluded Wells, but shall not be responsible for any operating costs associated with the rest of the Hunt Turnkey Property or the Hunt Non-Turnkey Properties.

**State Leases**

Fieldwood and Hunt will endeavor in good faith to mutually agree on the responsibility for Debtors' rights, title and interests acquired from Hunt in any oil and gas leases granted by the State of Louisiana.

Debtors' Exhibit No. 34
Page 908 of 910

**Exhibit A**
**Hunt Non-Turnkey Properties**

| Area / Block | Lease Number |
|---|---|
| SM 39 | G16320 |
| ST 242 | G23933 |
|  |  |
|  |  |
|  |  |
|  |  |
|  |  |
|  |  |
|  |  |
|  |  |
|  |  |
|  |  |
|  |  |
|  |  |
|  |  |
|  |  |
|  |  |
|  |  |
|  |  |
|  |  |
|  |  |
|  |  |
|  |  |
|  |  |
|  |  |
|  |  |

[End of Exhibit A]

**Exhibit B**
**Hunt Abandoned Properties**

| Area / Block | Lease Number |
|---|---|
| SP 37 | 00697 |
| SM 268 | G02310 |
| SS 216 | G01524 |
| SS 204 | G01520 |
| SM 269 | G02311 |
| SM 281 | G02600 |
| EC 349 | G14385 |
| EC 350 | G15157 |
| EC 356 | G13592 |
| HI A-531 | G02696 |
|  |  |
|  |  |
|  |  |
|  |  |
|  |  |
|  |  |
|  |  |
|  |  |
|  |  |
|  |  |
|  |  |
|  |  |
|  |  |
|  |  |
|  |  |

[End of Exhibit B]