**BP MIDSTREAM PARTNERS LP**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**
**(in thousands of dollars, unless otherwise indicated)**

*Other Contingencies*

We recognize liabilities for contingencies when we have an exposure that indicates it is both probable that a liability has been incurred and the amount of loss can be reasonably estimated. Where the most likely outcome of a contingency can be reasonably estimated, we accrue a liability for that amount. Where the most likely outcome cannot be estimated, a range of potential losses is established and if no one amount in that range is more likely than any other, the lower end of the range is accrued. To the extent that actual outcomes differ from our estimates, or additional facts and circumstances cause us to revise our estimates, our earnings will be affected.

*Fair Value Estimates*

Fair value is the price that would be received to sell an asset or paid to transfer a liability in an orderly transaction between market participants. We categorize assets and liabilities measured at fair value into one of three levels depending on the ability to observe inputs employed in their measurement:

- Level 1 inputs are quoted prices in active markets for identical assets or liabilities.
- Level 2 inputs are inputs that are observable, either directly or indirectly, other than quoted prices included within level 1 for the asset or liability.
- Level 3 inputs are unobservable inputs for the asset or liability reflecting significant modifications to observable related market data or our assumptions about pricing by market participants.

We classify the fair value of an asset or liability based on the lowest level of input significant to its measurement. A fair value initially reported as Level 3 will be subsequently reported as Level 2 if the unobservable inputs become inconsequential to its measurement, or corroborating market data becomes available. Asset and liability fair values initially reported as Level 2 will be subsequently reported as Level 3 if corroborating market data becomes unavailable.

*Net Income per Unit*

Net income per unit applicable to common limited partner units and to subordinated limited partner units is computed by dividing the respective limited partners' interest in net income for the period subsequent to the IPO by the weighted average number of common units and subordinated units, respectively, outstanding for the period. Because we have more than one class of participating securities, we use the two-class method when calculating the net income per unit applicable to limited partners. The classes of participating securities include common units, subordinated units and incentive distribution rights.

*Unit-Based Compensation*

The fair value of phantom unit awards granted to non-employee directors is based on the fair market value of our common units on the date of grant. Our unit-based compensation expenses are recognized ratably over the vesting term of the awards. We have elected to recognize the impact of forfeitures only when they occur.

*Accounting Pronouncements Adopted in 2019*

As of January 1, 2019, we adopted ASU 2016-02, "Leases" utilizing the modified retrospective approach. The adoption required the recognition of a lease liability and a corresponding lease asset for virtually all lease contracts. It also required additional disclosures about leasing arrangements. The adoption of ASC 842 resulted in the recognition of approximately $0.6 million in right-of-use assets and the same amount of lease liability on our balance sheet for the present value of the rights and obligations.

We have elected the optional practical expedients permitted under the transition guidance within the new lease standard, which among other things, allows us to carry forward the historical accounting treatment relating to classification for existing leases upon adoption, allows us to not be required to reassess whether an expired or existing contract is or contains a lease, and allows us not to have to reassess initial direct costs for an existing lease.

In addition, we elected the optional transition guidance related to land easements that allows us to carry forward our historical accounting treatment on existing agreements upon adoption. This allowed us to not be required to assess existing land easements that were not historically accounted for as leases under Topic 840, therefore they are excluded from this disclosure.

87

**BP MIDSTREAM PARTNERS LP**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**
(in thousands of dollars, unless otherwise indicated)

We also elected the practical expedient to not separate lease and non-lease components for all asset classes. However, we did not elect to apply the hindsight practical expedient; therefore, the non-exercised renewals were not included in the lease terms.

### 3. Acquisitions

*Contributed Business and Assets*

On October 30, 2017, the Partnership completed its IPO of 42,500,000 common units representing limited partner interests at a price to the public of $18.00 per unit. Subsequent to the IPO, the underwriters partially exercised their over-allotment option and purchased 5,294,358 additional common units at $18.00 per unit. A total of 47,794,358 common units were issued to the public unitholders in the IPO.

Immediately prior to the IPO, BP Pipelines contributed the following interests to the Partnership:

- 100% ownership interest in the Wholly Owned Assets;
- 28.5% ownership interest in Mars; and
- 20% managing member interest in Mardi Gras, pursuant to which the Partnership has the right to vote Mardi Gras' ownership interest in each of the Mardi Gras Joint Ventures.

In exchange for its contribution of such interests to the Partnership, BP Pipelines, through its wholly owned subsidiary, BP Midstream Partners Holdings LLC ("BP Holdco"), and through BP Holdco's wholly owned subsidiary, BP Midstream Partners GP LLC (the "General Partner"), received:

- 4,581,177 common units and 52,375,535 subordinated units, representing an aggregate 54.4% limited partner interest;
- all of the non-economic general partner interest and our incentive distribution rights; and
- a cash distribution of $814.7 million, of which $814.4 million was paid as of December 31, 2017 and the remainder was paid as of December 31, 2018.

The Partnership received net proceeds of $814.7 million from the sale of 47,794,358 common units in the IPO, after deducting underwriting discounts and commissions, structuring fees and other offering expenses of $45.6 million. See Note 9 - *Debt* and Note 10 - *Related Party Transactions* for further discussion regarding agreements entered into in connection with the IPO.

*Acquisition of Equity Interests*

On October 1, 2018, pursuant to an Interest Purchase Agreement (the "Interest Purchase Agreement") with BP Products North America Inc. ("BP Products"), BP Offshore Pipelines Company LLC ("BP Offshore"), and BP Pipelines, we completed the acquisition of:

- (i) an additional 45.0% interest in Mardi Gras, from BP Pipelines,
- (ii) a 22.7% interest in Ursa, from BP Offshore, and
- (iii) a 25% interest in KM Phoenix, from BP Products.

These assets were acquired in exchange for aggregate consideration of $468 million funded with borrowings under our revolving credit facility. The purchase was accounted for as an acquisition of assets between entities under common control; as a result, we recognized the acquired assets at their historical carrying value. The consideration paid is reported in our consolidated statements of cash flows as $381 million in financing activities for the distributions to our Parent for the acquisition of the non-controlling interest in Mardi Gras and excess of the purchase price over the carrying value for other assets acquired and $87 million in investing activities for the remainder. For more details see the consolidated statements of cash flows.

88

**BP MIDSTREAM PARTNERS LP**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**
**(in thousands of dollars, unless otherwise indicated)**

## 4. Revenue Recognition

Topic 606 requires entities to recognize revenue through the application of a five-step model, which includes: (1) identification of the contract; (2) identification of the performance obligations; (3) determination of the transaction price; (4) allocation of the transaction price to the performance obligations; and (5) recognition of revenue as the entity satisfies the performance obligations.

Under Topic 606, we recognize revenue over time or at a point in time, depending on the nature of the performance obligations contained in the respective contract with our customer. A performance obligation is our unit of account and it represents a promise in a contract to transfer goods or services to the customer. The contract transaction price, which is the amount of consideration to which an entity expects to be entitled in exchange for transferring promised goods or services to a customer, is allocated to each performance obligation and recognized as revenue when or as the performance obligation is satisfied. The following is an overview of our significant revenue stream, including a description of the respective performance obligations and related methods of revenue recognition.

*Pipeline Transportation*

Revenue from pipeline transportation is comprised of tariffs and fees associated with the transportation of liquid petroleum products, generally at published tariffs and in certain instances, revenue from minimum volume commitment contracts at negotiated rates. Tariff revenue is recognized either at the point of delivery or at the point of receipt, pursuant to specifications outlined in the respective tariffs. We record revenue for crude oil, refined products and diluent transportation over the period in which they are earned (i.e., either physical delivery of product has taken place or the services designated in the contract have been performed.) Our services are typically billed on a monthly basis, and we generally do not offer extended payment terms. We accrue revenue based on services rendered but not billed for that accounting month.

Billings to BP Products for deficiency volumes under its minimum volume commitments, if any, are recorded as deferred revenue and credits, a contract liability, on our consolidated balance sheets, as BP Products has the right to make up the deficiency volumes within the measurement period specified by the agreements. Deferred revenue under these arrangements is recognized into revenue once it is deemed remote that the customer will meet its required annual minimum volume commitments. If the customer does satisfy its minimum volume commitment by shipping the deficiency volumes within the same calendar year, it may receive a refund of excess payments.

*Allowance Oil*

Our tariff for crude oil transportation at BP2 includes a fixed loss allowance ("FLA"). An FLA factor per barrel, a fixed percentage, is a separate fee that is considered a part of the transaction price under the applicable crude oil tariff to cover evaporation and other losses in transit. The fixed product loss allowance factor intends to cover evaporation, crude viscosity, temperature differences and other losses in transit. Revenue related to allowance oil sales is recognized as a part of the transportation revenue from the shipper during the month the throughput volume is transported on the pipeline.

The amount of revenue recognized is a product of the quantity transported, the applicable FLA factor and the settlement price during the month the product is transported.

The settlement price for volumes accumulated prior to October 1, 2017 was a summation of the calendar-month average of West Texas Intermediate ("WTI") on the New York Mercantile Exchange and a differential provided by our Parent. The differential represents the difference in market price between WTI and the type of allowance oil to be settled and the difference in market price between the settlement month and the month prior to settlement. The fluctuation in commodity prices between the month of movement and the month of settlement resulted in an embedded derivative, which we measured along with the allowance oil receivable in their entirety at fair value because the economic characteristics and risks of the embedded derivative were clearly and closely related to the economic characteristics and risks of the host arrangement. The allowance oil volumes accumulated prior to October 1, 2017 were entirely settled upon October 30, 2017. While such volumes were outstanding, we recognized the changes in their fair value in Other income on the consolidated statements of operations. The embedded derivative was not designated as a hedging instrument.

89

**BP MIDSTREAM PARTNERS LP**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**
**(in thousands of dollars, unless otherwise indicated)**

The settlement price for volumes accumulated on and after October 1, 2017 is determined using the same equation as the prior periods but with pricing input from the month of movement, instead of the month of settlement, pursuant to a related party agreement that we entered into with our affiliate. The settlement price is fixed and determinable upon the completion of transportation. As a result, the allowance oil balances at December 31, 2017 and onward no longer contain a derivative feature or result in a gain or loss related to the change in its fair value. We now settle the allowance oil at the end of each period; therefore, the balances are entirely recorded in Accounts receivable – related parties after October 1, 2017.

In the years ended December 31, 2019, 2018 and 2017, we recognized income of $10,312, $8,753 and $8,691, respectively, and a gain/(loss) due to changes in fair value of $0, $0 and $25, respectively, related to the FLA arrangements with our Parent.

The following table provides information about disaggregated revenue:

*Disaggregation of Revenue*

| | Year Ended December 31, | | | |
|---|---|---|---|---|
| **Disaggregation of revenue** | **2019** | | **2018** | |
| Transportation services revenue – third parties | $ | 3,032 | $ | 2,828 |
| Transportation services revenue – related parties | | 125,436 | | 113,603 |
| Total ASC 606 revenue | | 128,468 | | 116,431 |
| Other revenue | | — | | 8 |
| Total revenue | $ | 128,468 | $ | 116,439 |

The following table includes estimated revenue associated with contractual minimum volume commitments excluding revenue from fixed loss allowance, based on the practical expedient that we elected to apply as the sales price is based on index-based pricing or variable volume attributes. The fixed portion of our existing customer contracts are summarized in the future performance obligations as of December 31, 2019. The unfulfilled performance obligations included in the table below are expected to be recognized in revenue in the specified periods:

*Future Performance Obligations*

| **Unfulfilled performance obligations** | **As of December 31, 2019** | |
|---|---|---|
| 2020 | $ | 115,292 |
| 2021 | | 1,660 |
| Total | $ | 116,952 |

*Contract Balances*

Contract assets and contract liabilities are the result of timing differences between revenue recognition, billings and cash collections. Contract liabilities or deferred revenue and credits primarily relate to consideration received from customers for temporary deficiency quantities under minimum volume contracts that the customer has the right to make up in a future period, which we subsequently recognize as revenue or amounts we credit back to the customer in a future period.

The following table provides information about receivables from contracts with customers, contract assets and contract liabilities (in thousands):

| | As of December 31, | | | |
|---|---|---|---|---|
| **Contract balances** | **2019** | | **2018** | |
| Receivables from contracts with customers – third parties | $ | 626 | $ | 325 |
| Receivables from contracts with customers – related parties | | 11,251 | | 9,611 |
| Deferred revenue and credits – related parties | | 1,544 | | 1,067 |

Deferred revenue and credits on our consolidated balance sheets as of December 31, 2019 and 2018 were credited to customers' invoices in January 2020 and January 2019, respectively.

Debtors' Exhibit No. 60
Page 90 of 258

**BP MIDSTREAM PARTNERS LP**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**
**(in thousands of dollars, unless otherwise indicated)**

## 5. Leases

Beginning January 1, 2019, operating right-of-use ("ROU") assets and operating lease liabilities are recognized based on the present value of lease payments over the lease term at commencement date. Because our leases do not provide an explicit rate of return, we use our incremental borrowing rate based on lease term information available at the commencement date in determining the present value of lease payments.

The impact of Topic 842 on our condensed consolidated balance sheet beginning January 1, 2019 was through the recognition of ROU assets and lease liabilities for operating leases. Amounts recognized at January 1, 2019 for operating leases were as follows:

|  | January 1, 2019 |
| --- | --- |
| ROU Assets | $        518 |
| Current lease liability | 60 |
| Long-term lease liability | 458 |

We have a total of four operating leases related to office space of which the term of two expires in 2036 and the other two in 2020. We have the option to terminate our leases 30 days after providing written notice of the election to terminate to the landlord. Two of our leases include a right of renewal and an annual 3% escalation on the anniversary date of lease inception. We have the option to renew our leases by giving notice to landlord not less than 60 days prior to the expiration of the lease term. We have not included the option to renew the leases in our determination of lease term because at the time of lease inception it was not certain we would exercise the renewal. We have included the variable lease payments based on the escalation percentage from above in the determination of our lease liabilities and our ROU assets. The other two leases include a non-lease component for maintenance expense. No leases include a residual value guarantee or provide us an option to acquire the real property at the end of the lease. We have no material subleasing arrangements.

Amounts recognized in the accompanying condensed consolidated balance sheet are as follows:

| Lease activity | Balance sheet location | December 31, 2019 |
| --- | --- | --- |
| ROU assets | Other assets | $        469 |
| Current lease liability | Other current liabilities | 60 |
| Long-term lease liability | Other liabilities | 417 |

As of December 31, 2019, the weighted average discount rate of our leases was 4.37% and the weighted average remaining lease term was 15.4 years.

The undiscounted future minimum lease payments as of December 31, 2019 and 2018 are presented in the table below:

|  | Post-adoption ASC 842 | Pre-adoption ASC 842 |
| --- | --- | --- |
|  | December 31, 2019 | December 31, 2018 |
| 2019 | $        — | $        62 |
| 2020 | 63 | 63 |
| 2021 | 32 | 32 |
| 2022 | 33 | 33 |
| 2023 | 34 | 34 |
| 2024 | 35 | 35 |
| Thereafter | 479 | 479 |
| Total | $        676 | $        738 |

Debtors' Exhibit No. 60
Page 91 of 258

**BP MIDSTREAM PARTNERS LP**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**
**(in thousands of dollars, unless otherwise indicated)**

**6. Equity Method Investments**

We account for our ownership interests in Mars, Ursa, KM Phoenix and the Mardi Gras Joint Ventures using the equity method for financial reporting purposes. Our financial results include our proportionate share of the net income of Mars, Ursa, KM Phoenix and the Mardi Gras Joint Ventures, which is reflected in Income from equity method investments on the consolidated statements of operations. We did not record any impairment loss on our equity method investments during the years ended 2019, 2018 or 2017.

The table below summarizes the balances and activities related to each of our equity method investments ("EMI") that we recorded for the years ended December 31, 2019, 2018 and 2017:

| | **2019** | | | |
|---|---|---|---|---|
| | Percentage ownership at year end | Distributions received | Income from EMI | Carrying value at year end |
| Mars | 28.5 % | $ (53,412) | $ 51,153 | $ 56,884 |
| Caesar[1] | 56.0 % | (19,488) | 17,492 | 117,394 |
| Cleopatra[1] | 53.0 % | (10,971) | 9,014 | 117,593 |
| Proteus[1] | 65.0 % | (19,032) | 13,034 | 75,334 |
| Endymion[1] | 65.0 % | (16,770) | 15,270 | 81,011 |
| Others[2] | Various | (11,730) | 10,784 | 86,167 |
| Total Equity Investments | | $ (131,403) | $ 116,747 | $ 534,383 |

| | **2018** | | | | |
|---|---|---|---|---|---|
| | Percentage ownership at year end | Cumulative effect of accounting change[3] | Distributions received | Income from EMI | Carrying value at year end |
| Mars | 28.5 % | $ (2,746) | $ (47,538) | $ 43,866 | $ 59,143 |
| Caesar[1] | 56.0 % | — | (20,957) | 16,761 | 119,390 |
| Cleopatra[1] | 53.0 % | — | (10,494) | 6,532 | 119,550 |
| Proteus[1] | 65.0 % | — | (18,135) | 12,323 | 81,332 |
| Endymion[1] | 65.0 % | — | (18,005) | 12,320 | 82,511 |
| Others[2] | Various | — | (2,675) | 2,559 | 87,113 |
| Total Equity Investments | | $ (2,746) | $ (117,804) | $ 94,361 | $ 549,039 |

| | **2017** | | | |
|---|---|---|---|---|
| | Percentage ownership at year end | Distributions received | Income from EMI | Carrying value at year end |
| Mars | 28.5 % | $ (12,540) | $ 7,793 | $ 65,561 |
| Caesar[1] | 56.0 % | (5,880) | 3,344 | 123,586 |
| Cleopatra[1] | 53.0 % | (2,385) | 1,112 | 123,512 |
| Proteus[1] | 65.0 % | (4,030) | 2,100 | 87,144 |
| Endymion[1] | 65.0 % | (5,070) | 3,567 | 88,196 |
| Total Equity Investments | | $ (29,905) | $ 17,916 | $ 487,999 |

(1) These investments are held by our investment in Mardi Gras which increased to 65% from 20% on October 1, 2018. See Note 3 - *Acquisitions* for further detail.
(2) Includes ownership interest in Ursa (22.7%) and KM Phoenix (25%) acquired on October 1, 2018.
(3) The financial results of Mars reflect the adoption of Topic 606 on January 1, 2018 under the modified retrospective transition method through a cumulative adjustment to equity. Our cumulative effect impact from this accounting change to our Mars investment was $(2,746), offset to equity. The Mardi Gras Joint Ventures and Ursa adopted this ASU on January 1, 2019, and there was no cumulative effect impact from the adoption. KM Phoenix adopted Topic 606 on January 1, 2018, and there was no cumulative effect impact from the adoption.

Debtors' Exhibit No. 60
Page 92 of 258

**BP MIDSTREAM PARTNERS LP**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**
**(in thousands of dollars, unless otherwise indicated)**

The following tables present aggregated selected balance sheet and income statement data for our equity method investments on a 100% basis for the years ended December 31, 2019, 2018 and 2017 and as of December 31, 2019 and 2018:

| | For the Year Ended December 31, | | | For the Period from |
|---|---|---|---|---|
| | 2019[1] | 2018[1] | 2017 | October 30, 2017 to December 31, 2017 |
| *Statement of operations* | | | | |
| Revenue | $ 560,485 | $ 470,802 | $ 391,301 | $ 65,075 |
| Operating expenses | 246,014 | 200,901 | 129,405 | 21,386 |
| Net income | 317,172 | 270,356 | 262,345 | 44,131 |

(1) Amounts for the years ended December 31, 2019 and 2018 include Ursa and KM Phoenix for the entire year.

| | As of December 31, | |
|---|---|---|
| | 2019 | 2018 |
| *Balance Sheets* | | |
| Current assets | 128,696 | 123,408 |
| Non current assets | 1,630,688 | 1,646,324 |
| Current liabilities | 49,641 | 35,791 |
| Non current liabilities | 492,969 | 486,634 |
| Equity | 1,216,773 | 1,247,307 |

## 7. Property, Plant and Equipment

Property, plant and equipment consisted of the following:

| | December 31, | |
|---|---|---|
| | 2019 | 2018 |
| Land | $ 155 | $ 155 |
| ROW assets | 1,380 | 1,380 |
| Buildings and improvements | 6,940 | 12,032 |
| Pipelines and equipment | 94,435 | 93,617 |
| Other | 514 | 509 |
| Construction in progress | 559 | 277 |
| Property, plant and equipment | 103,983 | 107,970 |
| Less: Accumulated depreciation | (41,290) | (39,390) |
| Property, plant and equipment, net | $ 62,693 | $ 68,580 |

During the year ended December 31, 2019, an impairment charge of $4.4 million, before insurance recoveries, was recorded under "Impairment and other, net" on our consolidated statements of operations. See Note 14 - *Commitments and Contingencies*.

There were no impairments on our property, plant and equipment for the years ended December 31, 2018 or 2017.

Debtors' Exhibit No. 60
Page 93 of 258

**BP MIDSTREAM PARTNERS LP**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**
**(in thousands of dollars, unless otherwise indicated)**

**8. Other Current Liabilities**

Other current liabilities consist of the following:

| | December 31, | | |
|---|---|---|---|
| | **2019** | | **2018** |
| Current portion of environmental remediation obligation | $ 637 | $ | 629 |
| Current portion of lease liabilities | 60 | | — |
| Accrued interest payable - related parties | 4,200 | | 4,155 |
| Accrued liabilities | 1,702 | | 2,116 |
| Other current liabilities | $ 6,599 | $ | 6,900 |

**9. Debt**

On October 30, 2017, the Partnership entered into a $600.0 million unsecured revolving credit facility agreement (the "credit facility") with an affiliate of BP. The credit facility terminates on October 30, 2022 and provides for certain covenants, including the requirement to maintain a consolidated leverage ratio, which is calculated as total indebtedness to consolidated EBITDA (as defined in the credit facility), not to exceed 5.0 to 1.0, subject to a temporary increase in such ratio to 5.5 to 1.0 in connection with certain material acquisitions. In addition, the limited liability company agreement of the Partnership's General Partner requires the approval of BP Holdco prior to the incurrence of any indebtedness that would cause the Partnership's leverage ratio to exceed 4.5 to 1.0. As of December 31, 2019, the Partnership was in compliance with the covenants contained in the credit facility.

The credit facility also contains customary events of default, such as (i) nonpayment of principal when due, (ii) nonpayment of interest, fees or other amounts, (iii) breach of covenants, (iv) misrepresentation, (v) cross-payment default and cross-acceleration (in each case, to indebtedness in excess of $75.0 million) and (vi) insolvency. Additionally, the credit facility limits our ability to, among other things: (i) incur or guarantee additional debt, (ii) redeem or repurchase units or make distributions under certain circumstances; and (iii) incur certain liens or permit them to exist. Indebtedness under this facility bears interest at the 3-month LIBOR plus 0.85%. Once a request to borrow is completed, our interest rate is fixed through the maturity date of the borrowing, typically six months. The weighted average interest rate for the credit facility was 3.25% at December 31, 2019 and 2018. This facility includes customary fees, including a commitment fee of 0.10% and a utilization fee of 0.20%. There is no debt issuance cost associated with the credit facility.

On November 6, 2017, the Partnership borrowed $15.0 million under the credit facility to fund our working capital in the near term. The balance was due for repayment six months after the date of the withdrawal. On May 4, 2018, the Partnership repaid outstanding borrowings under the credit facility. This short-term debt had a principal balance of $15.0 million at the time of repayment and the repayment was made using cash on hand.

On October 1, 2018, the Partnership borrowed $468.0 million under the credit facility to fund our acquisition.

On February 20, 2019, we entered into a Credit Facility Waiver Agreement ("First Waiver Agreement") whereby the lender waived certain terms on our outstanding $468.0 million borrowings. The original loan repayment date of March 29, 2019 was waived and amended and modified to April 1, 2020.

On May 3, 2019, we entered into a Second Credit Facility Waiver Agreement ("Second Waiver Agreement") whereby the lender waived certain terms on our outstanding $468.0 million borrowings. The amended loan repayment date of April 1, 2020 was waived and amended and modified to November 30, 2020. Accrued interest will be paid on the 25th day of April, July, October and January of each year. Any remaining interest will be paid on November 30, 2020. All other terms of the credit facility remain the same.

On February 24, 2020, we entered into a $468.0 million Term Loan Facility Agreement ("term loan") with an affiliate of BP. Proceeds will be used to repay outstanding borrowings under our credit facility. The term loan has a final repayment date of February 24, 2025 and provides for certain covenants, including the requirement to maintain a consolidated leverage ratio, which is calculated as total indebtedness to consolidated EBITDA, not to exceed 5.0 to 1.0, subject to a temporary increase in such ratio to 5.5 to 1.0 in connection with certain material acquisitions. Simultaneous with this transaction, we entered into a First Amendment to Short Term Credit Facility Agreement ("First Amendment") whereby the lender added a provision that

94

**BP MIDSTREAM PARTNERS LP**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**
**(in thousands of dollars, unless otherwise indicated)**

indebtedness under both the term loan and credit facility shall not exceed $600.0 million. All other terms of the credit facility remain the same.

Pursuant to the issuance of the term loan, we have classified the $468.0 million outstanding as Long-term debt on our consolidated balance sheet at December 31, 2019. Pursuant to the First Waiver Agreement, we had classified the $468.0 million outstanding as Long-term debt on our consolidated balance sheet at December 31, 2018.

For the years ended December 31, 2019, 2018 and 2017, interest and fees incurred were $16.5 million, $4.8 million and $0.2 million, respectively. There was $468.0 million outstanding borrowings under the credit facility at December 31, 2019 and 2018.

## 10. Related Party Transactions

Related party transactions include transactions with our Parent and our Parent's affiliates, including those entities in which our Parent has an ownership interest but does not have control. In addition to the fixed loss allowance arrangements discussed in Note 4 - *Revenue Recognition* and the credit facilities in Note 9 - *Debt*, we have entered into the following transactions with our related parties:

### *Omnibus Agreement*

The Partnership has entered into an omnibus agreement with BP Pipelines and certain of its affiliates, including the General Partner. This agreement addresses, among other things, (i) the Partnership's obligation to pay an annual fee for general and administrative services provided by BP Pipelines and its affiliates, (ii) the Partnership's obligation to reimburse BP Pipelines for personnel and other costs related to the direct operation, management and maintenance of the assets and (iii) the Partnership's obligation to reimburse BP Pipelines for services and certain direct or allocated costs and expenses incurred by BP Pipelines or its affiliates on behalf of the Partnership.

Pursuant to the omnibus agreement, BP Pipelines will indemnify the Partnership and fund the costs of required remedial action for its known historical and legacy spills and releases and other environmental and litigation claims identified in the omnibus agreement.

The omnibus agreement also addresses the Partnership's right of first offer to acquire BP Pipelines' retained ownership interest in Mardi Gras and all of BP Pipelines' interests in midstream pipeline systems and assets related thereto in the contiguous United States and offshore Gulf of Mexico that are owned by BP Pipelines at the closing of the IPO.

Further, the omnibus agreement addresses the granting of a license from BPA to the Partnership with respect to use of certain BP trademarks and tradename.

### *Related Party Revenue*

We provide crude oil, refined products and diluent transportation services to related parties and generate revenue through published tariffs.

Effective July 1, 2017, we entered into a throughput and deficiency agreement with BP Products for transporting diluent on the Diamondback pipeline under two throughput and deficiency agreements and a dedication agreement. The dedication agreement and one throughput and deficiency agreement will renew in June 2020 pursuant to their terms for one additional year. The parties have the option to allow the two agreements to renew annually for one additional year by not sending written notice of termination six months prior to the expiration date.

We entered into additional throughput and deficiency agreements with BP Products for each of our three wholly owned pipeline systems: BP2, River Rouge and Diamondback. Under these fee-based agreements, we provide transportation services to BP Products, in exchange for BP Products' commitment to pay us the applicable tariff rates for the minimum monthly volumes, whether or not such volumes are physically shipped by BP Products through our pipelines. BP Products is allowed to make up for the monthly deficiency within the same calendar year during the initial term ending December 31, 2020. Adjustment to the monthly deficiency payments remitted to us by BP Products, if any, is determined at the end of each calendar

95

**BP MIDSTREAM PARTNERS LP**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**
**(in thousands of dollars, unless otherwise indicated)**

year based on the actual volume transported during such period. These agreements do not have renewal terms and will expire on December 31, 2020. The Partnership is reviewing its options with respect to these agreements.

Our revenue from related parties was $125,436, $113,603 and $105,947 for the years ended December 31, 2019, 2018 and 2017, respectively.

We recognized $5,572, $7,973 and $787 of deficiency revenue under the throughput and deficiency agreements with BP Products for the years ended December 31, 2019, 2018 and 2017, respectively. At December 31, 2019 and 2018, there was $1,544 and $1,067, respectively, of deferred revenue and credits recorded in relation to these agreements.

*Related Party Expenses*

All employees performing services on behalf of our operations are employees of our Parent. Our Parent also procures our insurance policies on our behalf and performs certain general corporate functions for us related to finance, accounting, treasury, legal, information technology, human resources, shared services, government affairs, insurance, health, safety, security, employee benefits, incentives, severance and environmental functional support. Personnel and operating costs incurred by our Parent on our behalf are included in either Operating expenses – related parties or General and administrative – related parties in the consolidated statements of operations, depending on the nature of the service provided.

During the Predecessor period from January 1, 2017 through October 29, 2017, we were allocated operating and indirect general corporate expenses incurred by our Parent. These allocated expenses related primarily to insurance and the wages and benefits of our Parent's employees that support our operations. Expenses incurred by our Parent on our behalf have been allocated to us on the basis of direct usage when identifiable. Costs incurred by our Parent that could not be determined to relate to us by specific identification were allocated to us primarily on the basis of headcount, throughput volumes, miles of pipe and other measures. The expense allocations were determined on a basis that both we and our Parent consider to be a reasonable reflection of the utilization of services provided or the benefit received by us during the periods presented. The allocations may not, however, fully reflect the expenses we would have incurred as a separate, publicly traded company for the periods presented.

We paid our Parent an annual fee of $13.6 million and $13.3 million in 2019 and 2018, respectively, under the omnibus agreement. The annual fee was adjusted to $15.2 million per year, payable in equal monthly installments, beginning on January 1, 2020.

Our general partner may adjust the administrative fee to reflect, among others, any change in the level or complexity of our operations, a change in the scope or cost of services provided to us, inflation or a change in law or other regulatory requirements, the contribution, acquisition or disposition of our assets or any material change in our operation activities.

We also reimburse our Parent for personnel and other costs related to the direct operation, management and maintenance of the assets and services and certain direct or allocated costs and expenses incurred by our Parent or its affiliates on our behalf pursuant to the terms in the omnibus agreement.

During the years ended December 31, 2019, 2018 and 2017, we recorded the following amounts for related party expenses, which also included the expenses related to pension and retirement savings plans and share-based compensation discussed below:

| | Years Ended December 31, | | | | | Partnership | | Predecessor | |
| | 2019 | | 2018 | | 2017 | | October 30, 2017 - December 31, 2017 | | January 1, 2017 - October 29, 2017 | |
|---|---|---|---|---|---|---|---|---|---|---|
| Operating expenses—related parties | $ | 5,813 | $ | 5,006 | $ | 7,073 | $ | 731 | $ | 6,342 |
| Maintenance expenses—related parties | | 268 | | 97 | | 461 | | 79 | | 382 |
| General and administrative—related parties | | 14,124 | | 14,072 | | 6,670 | | 2,357 | | 4,313 |
| Total operating, maintenance, and general corporate costs—related parties | $ | 20,205 | $ | 19,175 | $ | 14,204 | $ | 3,167 | $ | 11,037 |

96

**BP MIDSTREAM PARTNERS LP**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**
**(in thousands of dollars, unless otherwise indicated)**

*Pension and Retirement Savings Plans*

Employees who directly or indirectly support our operations participate in the pension, post-retirement health insurance, and defined contribution benefit plans sponsored by our Parent. Pension and defined contribution benefit plan expenses prior to the IPO were allocated to us and included in General and administrative – related parties or Operating expenses – related parties on the consolidated statements of operations, depending on the nature of the employee's role in our operations. Subsequent to the IPO, our portion of the pension and defined contribution benefit plan expense is charged to us by our Parent under the omnibus agreement through the annual general and administrative fees or direct reimbursement.

*Share-based Compensation*

Our Parent operates share option plans and equity-settled employee share plans. These plans typically have a three-year performance or restricted period during which the units accrue net notional dividends, which are treated as having been reinvested. Leaving employment will normally preclude the conversion of units into shares, but special arrangements apply for participants that leave for qualifying reasons.

Certain employees of our Parent supporting our operations were historically granted these types of awards. Prior to the IPO, these share-based compensation costs were allocated to us as part of the cost allocations from our Parent. These costs were $214 for the year ended December 31, 2017, recorded in General and administrative – related parties on the consolidated statements of operations.

After the IPO, the share-based compensation related to the employees of our Parent who provide services to us is charged to the Partnership pursuant to the terms of the omnibus agreement. The Partnership also issued its own unit-based compensation under our long-term incentive plan. See Note 16 - *Unit-Based Compensation.*

*Non-controlling Interests*

Non-controlling interests consist of the 35% ownership interest in Mardi Gras held by our Parent at December 31, 2019 and 2018 compared to the 80% ownership interest held before completion of the acquisition on October 1, 2018.

Net income attributable to non-controlling interests is the product of the non-controlling interests ownership percentage and the net income of Mardi Gras. We report Non-controlling interests as a separate component of equity on our consolidated balance sheets and Net income attributable to non-controlling interests on our consolidated statements of operations.

**11. Distributions and Net Income Per Unit**

The following table details the distributions declared and/or paid for the periods presented:

| Three Months Ended | Date Paid or to be Paid | General Partner | Limited Partners' Common Units | Limited Partners' Subordinated Units | Total | Distributions per Limited Partner Unit |
|---|---|---|---|---|---|---|
| December 31, 2017* | February 15, 2018 | $ — | $ 9,415 | $ 9,415 | $ 18,830 | $ 0.1798 |
| March 31, 2018 | May 15, 2018 | — | 14,010 | 14,011 | 28,021 | 0.2675 |
| June 30, 2018 | August 15, 2018 | — | 14,272 | 14,271 | 28,543 | 0.2725 |
| September 30, 2018 | November 15, 2018 | — | 15,268 | 15,268 | 30,536 | 0.2915 |
| December 31, 2018 | February 14, 2019 | — | 15,794 | 15,791 | 31,585 | 0.3015 |
| March 31, 2019 | May 15, 2019 | 198 | 16,375 | 16,373 | 32,946 | 0.3126 |
| June 30, 2019 | August 14, 2019 | 403 | 16,958 | 16,954 | 34,315 | 0.3237 |
| September 30, 2019 | November 14, 2019 | 743 | 17,576 | 17,572 | 35,891 | 0.3355 |
| December 31, 2019 | February 13, 2020 | 1,162 | 18,205 | 18,200 | 37,567 | 0.3475 |

* For the period subsequent to IPO Oct 30, 2017 – Dec 31, 2017, prorated from minimum quarterly distribution amount of $0.2625 / unit.

Debtors' Exhibit No. 60
Page 97 of 258

**BP MIDSTREAM PARTNERS LP**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**
**(in thousands of dollars, unless otherwise indicated)**

Earnings in excess of distributions are allocated to the limited partners based on their respective percentage interests. Payments made to the Partnership's unitholders are determined in relation to actual distributions declared and are not based on the net income allocations used in the calculation of net income per unit.

In addition to the common and subordinated units, the Partnership also identified the incentive distribution rights ("IDRs") currently held by the General Partner as a participating security and uses the two-class method when calculating the net income per unit that is based on the weighted-average number of common units outstanding during the period.

When calculating basic earnings per unit under the two-class method for a master limited partnership, net income for the current reporting period is reduced by the amount of available cash that will be distributed to the General Partner and limited partners for that reporting period. The following tables show the allocation of net income to arrive at net income per unit for the years ended December 31, 2019, 2018 and 2017:

| | For the years ended December 31, | | |
|---|---|---|---|
| | **2019** | **2018** | **2017\*** |
| Net income attributable to the Partnership | $ 167,884 | $ 133,057 | $ 21,775 |
| Less: | | | |
| Incentive distribution rights currently held by the General Partner | 2,506 | — | — |
| Limited partners' distribution declared on common units | 69,114 | 59,344 | 9,415 |
| Limited partners' distribution declared on subordinated units | 69,099 | 59,341 | 9,415 |
| Net income attributable to the Partnership in excess of distributions | $ 27,165 | $ 14,372 | $ 2,945 |

\* Represents the period from October 30, 2017 through December 31, 2017

| | For the year ended December 31, 2019 | | | |
|---|---|---|---|---|
| | **General Partner** | **Limited Partners' Common Units** | **Limited Partners' Subordinated Units** | **Total** |
| | (in thousands of dollars, unless otherwise indicated) | | | |
| Distributions declared | $ 2,506 | $ 69,114 | $ 69,099 | $ 140,719 |
| Net income attributable to the Partnership in excess of distributions | — | 13,583 | 13,582 | 27,165 |
| Net income attributable to the Partnership | $ 2,506 | $ 82,697 | $ 82,681 | $ 167,884 |
| Weighted average units outstanding (in millions): | | | | |
| Basic and Diluted | | 52.4 | 52.4 | 104.8 |
| Net income per limited partner unit (in dollars): | | | | |
| Basic and Diluted | | $ 1.58 | $ 1.58 | |

| | For the year ended December 31, 2018 | | | |
|---|---|---|---|---|
| | **General Partner** | **Limited Partners' Common Units** | **Limited Partners' Subordinated Units** | **Total** |
| | (in thousands of dollars, unless otherwise indicated) | | | |
| Distributions declared | $ — | $ 59,344 | $ 59,341 | $ 118,685 |
| Net income attributable to the Partnership in excess of distributions | — | 7,186 | 7,186 | 14,372 |
| Net income attributable to the Partnership | $ — | $ 66,530 | $ 66,527 | $ 133,057 |
| Weighted average units outstanding (in millions): | | | | |
| Basic and Diluted | | 52.4 | 52.4 | 104.8 |
| Net income per limited partner unit (in dollars): | | | | |
| Basic and Diluted | | $ 1.27 | $ 1.27 | |

Debtors' Exhibit No. 60
Page 98 of 258

**BP MIDSTREAM PARTNERS LP**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**
**(in thousands of dollars, unless otherwise indicated)**

| | | October 30, 2017 - December 31, 2017 | | |
| | General Partner | Limited Partners' Common Units | Limited Partners' Subordinated Units | Total |
|---|---|---|---|---|
| | | **(in thousands of dollars, unless otherwise indicated)** | | |
| Distributions declared | $ — | $ 9,415 | $ 9,415 | $ 18,830 |
| Net income attributable to the Partnership in excess of distributions | — | 1,473 | 1,472 | 2,945 |
| Net income attributable to the Partnership | $ — | $ 10,888 | $ 10,887 | $ 21,775 |
| Weighted average units outstanding (in millions): | | | | |
| Basic and Diluted | | 52.4 | 52.4 | 104.8 |
| Net income per limited partner unit (in dollars): | | | | |
| Basic and Diluted | | $ 0.21 | $ 0.21 | |

## 12. Fair Value Measurements

The carrying amounts of our accounts receivable, accounts payable, and accrued liabilities approximate their fair values due to their short-term nature.
The carrying value of borrowings under our revolving credit facility as of December 31, 2019 and 2018 approximate fair value as the interest rates are reflective of market rates.

## 13. Income Taxes

Prior to our IPO, the Predecessor was a part of BPA and was included in the income tax returns of BPA. Our tax provision prior to the IPO was prepared on a separate return basis, as if the Predecessor was a separate group of companies under common ownership. Our operations were filed on a consolidated basis for U.S. federal tax purposes. Income taxes paid during the Predecessor periods were not reflected in a supplemental disclosure on the consolidated statements of cash flows as the Predecessor, which was derived from the assets within BPA, did not historically remit federal or state tax payments on a standalone basis.

BP Midstream Partners LP is not a taxable entity for U.S. federal and state income tax purposes. Taxes on our net income are generally borne by our partners through the allocation of taxable income. The financial statements, therefore, do not include a provision for income tax after the IPO.

The following table reflects the components of income tax expense for the period from January 1, 2017 through October 29, 2017:

| | January 1 - October 29 2017 |
|---|---|
| Current tax expense: | |
| U.S. federal | $ 20,890 |
| U.S. state | 3,975 |
| Total current tax expense | 24,865 |
| Deferred tax expense: | |
| U.S. federal | 381 |
| U.S. state | 72 |
| Total deferred tax expense | 453 |
| Total income tax expense | $ 25,318 |

99

**BP MIDSTREAM PARTNERS LP**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**
**(in thousands of dollars, unless otherwise indicated)**

Income tax expense differed from the amounts computed by applying the U.S. federal income tax rate of 35% to the pre-tax income for the period from January 1, 2017 through October 29, 2017 as a result of the following:

| | January 1 - October 29 2017 | |
|---|---|---|
| Statutory U.S. federal income taxes / rate | $ 22,685 | 35.0 % |
| State income taxes, net of federal benefit | 2,633 | 4.1 % |
| Total income taxes / effective tax rates | $ 25,318 | 39.1 % |

For the periods prior to the IPO, we expected to realize our deferred tax assets through the reversal of existing taxable temporary differences and future taxable income. Therefore, a valuation allowance was not established against any deferred tax assets. We considered the reversal of deferred tax liabilities, projected future taxable income, and tax planning strategies in making this assessment. As of October 29, 2017, we had $6,312 net deferred tax liabilities. These deferred tax liabilities, along with working capital and other balances were not contributed to the Partnership. The account retained by our Parent is reflected as an equity distribution.

We did not record a liability for uncertain tax positions as of October 29, 2017. There were no reductions to the balances for settlements with tax authorities or expiration of statutory limitations.

As of December 31, 2019, the IRS was in the process of auditing the U.S. consolidated returns of BPA for 2014 through 2016. BPA is no longer subject to U.S. federal and state income tax examinations by tax authorities for years before 2014.

### 14. Commitments and Contingencies

#### *Legal Proceedings*

We are party to ongoing legal proceedings in the ordinary course of business. For each of our outstanding legal matters, if any, we evaluate the merits of the case, our exposure to the matter, possible legal or settlement strategies and the likelihood of an unfavorable outcome. While the outcome of these proceedings cannot be predicted with certainty, we do not believe the results of these proceedings, individually or in the aggregate, will have a material adverse effect on our business, financial condition, results of operations or liquidity.

#### *Indemnification*

Under our omnibus agreement, our Parent will indemnify us for certain environmental liabilities, litigation and other matters attributable to the ownership or operation of our assets prior to our ownership. For the purposes of determining the indemnified amount of any loss suffered or incurred by the Partnership, the Partnership's ownership of 28.5% in Mars and 65% in Mardi Gras, and Mardi Gras' 56% ownership in Caesar, 53% ownership in Cleopatra, 65% ownership in Endymion and 65% ownership in Proteus will be considered. Indemnification for certain identified environmental liabilities is subject to a cap of $25.0 million without any deductible. Other matters covered by the omnibus agreement are subject to a cap of $15.0 million and an aggregate deductible of $0.5 million before we are entitled to indemnification. Indemnification for any unknown environmental liabilities is limited to liabilities due to occurrences prior to the closing of the IPO and that are identified before the third anniversary of the closing of the IPO.

The Interest Purchase Agreement contains customary representations, warranties and covenants of our Parent and the Partnership. Our Parent, on the one hand, and the Partnership, on the other hand, have agreed to indemnify each other and their respective affiliates, officers, directors and other representatives against certain losses, including those resulting from any breach of their representations, warranties or covenants contained in the Interest Purchase Agreement, subject to certain limitations and survival periods. This agreement covers the Partnership's ownership of 22.7% in Ursa and 25% in KM Phoenix.

#### *Environmental Matters*

We are subject to federal, state, and local environmental laws and regulations. We record provisions for environmental liabilities based on management's best estimates, using all information that is available at the time. In making environmental liability estimations, we consider the material effect of environmental compliance, pending legal actions against us and potential third-party liability claims. Often, as the remediation evaluation and effort progress, additional information is

100

**BP MIDSTREAM PARTNERS LP**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**
**(in thousands of dollars, unless otherwise indicated)**

obtained, requiring revisions to estimated costs. We are indemnified by our Parent under the omnibus agreement against environmental cleanup costs for incidents that occurred prior to our ownership. Revisions to the estimated environmental liability for conditions that are not indemnified under the omnibus agreement with our Parent are reflected in our consolidated statements of operations in the year in which they are probable and reasonably estimable.

We accrued $3,676 and $3,853 for environmental liabilities at December 31, 2019 and 2018, respectively. These balances are broken down on the consolidated balance sheets as follows:

| | Balance sheet location | December 31, | | | |
| --- | --- | --- | --- | --- | --- |
| | | **2019** | | **2018** | |
| Current portion of environmental remediation obligations | Other current liabilities | $ | 637 | $ | 629 |
| Long-term portion of environmental remediation obligations | Other liabilities | | 3,039 | | 3,224 |
| Total | | $ | 3,676 | $ | 3,853 |

The balances are related to incidents that occurred prior to our ownership and are entirely indemnified by our Parent. As a result, we recorded corresponding indemnification assets of $3,676 and $3,853 on the consolidated balance sheet as of December 31, 2019, and 2018, respectively. These balances are broken down on the consolidated balance sheets as follows:

| | Balance sheet location | December 31, | | | |
| --- | --- | --- | --- | --- | --- |
| | | **2019** | | **2018** | |
| Current portion of indemnification assets | Other current assets | $ | 637 | $ | 629 |
| Non-current portion of indemnification assets | Other assets | | 3,039 | | 3,224 |
| Total | | $ | 3,676 | $ | 3,853 |

*Griffith Station Incident*

On June 13, 2019, a building fire occurred at the Griffith Station on BP2. Management has performed an evaluation of the assets and determined that an impairment is required. A charge of $4.4 million for the impairment was recorded under "Impairment and other, net" on our consolidated statements of operations for the year ended December 31, 2019. In addition, we incurred $1.6 million as a response expense for the year ended December 31, 2019. Our assets are insured with a deductible of $1.0 million per incident. We have accrued an offsetting insurance receivable of $5.0 million resulting in a net charge of $1.0 million to "Impairment and other, net" for the year ended December 31, 2019. The insurance receivable is recorded as $4.3 million under "Other current assets" and $0.7 million under "Other assets" on our consolidated balance sheet as of December 31, 2019.

*Commitments*

We hold easements or rights-of-way ("ROWs") arrangements from landowners permitting the use of land for the construction and operation of our pipeline systems.

We incurred ROWs expenses, operating lease expenses and service contract expenses of $154, $162 and $104 for the years ended December 31, 2019, 2018 and 2017, respectively. Such amounts are included in Operating expenses – third parties on the consolidated statements of operations.

These ROWs are not within the scope of ASC 842 based on the optional transition guidance utilized upon adoption of ASC 842. At December 31, 2019, our future minimum commitment for contracts in excess of one year is as follows:

| | Total | | 2020 | | 2021 | | 2022 | | 2023 | | 2024 | | Thereafter | |
| --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- |
| Rights-of-way | $ | 3,036 | $ | 78 | $ | 78 | $ | 78 | $ | 78 | $ | 78 | $ | 2,646 |
| Total | $ | 3,036 | $ | 78 | $ | 78 | $ | 78 | $ | 78 | $ | 78 | $ | 2,646 |

**15. Transactions with Major Customers and Concentration of Credit Risk**

Our Parent accounted for 97.6% of our total revenues for both the years ended December 31, 2019 and 2018, and 98.0% for the year ended December 31, 2017. We are potentially exposed to concentration of credit risk primarily through our accounts

101

**BP MIDSTREAM PARTNERS LP**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**
**(in thousands of dollars, unless otherwise indicated)**

receivable from our Parent for the pipeline transportation services that we provide. These receivables have payment terms of 30 days or less. We have no history of collectability issues with our Parent.

We have a concentration of trade receivables due from customers in the oil and gas industry, which may impact our overall exposure to credit risk as they may be similarly affected by changes in economic, regulatory and other factors. We manage our exposure to credit risk through credit analysis, credit limit approvals and monitoring procedures, and for certain transactions, we may request letters of credit, prepayments or guarantees. As of December 31, 2019 and 2018, there were no such arrangements.

We have concentrated credit risk for cash by maintaining deposits with an affiliate of BP and a major bank. Amounts on deposit in the major bank may at times exceed amounts covered by insurance provided by the United States Federal Deposit Insurance Corporation ("FDIC"). We monitor the financial health of the affiliate and major bank and have not experienced any losses in such accounts and believe we are not exposed to any significant credit risk. At December 31, 2019 and 2018, we had $98,581 and $56,720 in cash and cash equivalents in excess of FDIC limits, respectively.

### 16. Unit-Based Compensation

#### *Long-Term Incentive Plan*

On October 26, 2017, we adopted BP Midstream Partners LP 2017 Long Term Incentive Plan (the "LTIP"). Awards under the LTIP are available for eligible officers, directors, employees and consultants of the General Partner and its affiliates, who perform services for the Partnership. The LTIP allows the Partnership to grant unit options, unit appreciation rights, restricted units, phantom units, unit awards, cash awards, performance awards, distribution equivalent rights, substitute awards and other unit-based awards. The maximum aggregate number of common units that may be issued pursuant to the awards granted under the LTIP shall not exceed 5,502,271, subject to proportionate adjustment in the event of unit splits and similar events.

#### *Unit-Based Awards under the LTIP*

Phantom units vest on the first anniversary of the date of grant. As a part of the phantom unit awards, the grantees will also receive distribution equivalent rights that entitle them, prior to vesting, with distributions for the same amounts that are distributed to the common unit holders. Distribution equivalent rights accrue in the form of either cash or additional phantom units. These phantom units do not convey voting rights.

The following is a summary of phantom unit award activities of the Partnership's common units from 2017 to 2019:

| | Phantom Units | | |
| --- | --- | --- | --- |
| | Number of Units | Weighted Average Grant Date Fair Value per Unit (in dollars) | Aggregate Fair Value (in thousands) |
| Outstanding at October 30, 2017 | — | — | |
| Granted | 8,468 | 17.48 | $          148 |
| Vested | — | — | |
| Outstanding at December 31, 2017 | 8,468 | 17.48 | |
| Granted | 3,737 | 20.07 | $           75 |
| Vested | (8,468) | 17.48 | |
| Outstanding at December 31, 2018 | 3,737 | 20.07 | |
| Granted | 15,227 | 16.64 | $          253 |
| Vested | (3,737) | 20.07 | |
| Outstanding at December 31, 2019 | 15,227 | 16.64 | |

Total compensation expense recognized for phantom unit awards were $239, $177 and $19 for 2019, 2018 and 2017, respectively. These amounts are included in General and administrative – related parties on the consolidated statements of operations. The unrecognized compensation cost related to phantom unit awards was $41 at December 31, 2019, which is

102

**BP MIDSTREAM PARTNERS LP**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**
**(in thousands of dollars, unless otherwise indicated)**

expected to be recognized over a weighted average period of 0.2 years. There were no forfeitures in the years ended December 31, 2019, 2018 and 2017.

## 17. Variable Interest Entity

Mardi Gras is a Delaware corporation and a pass-through entity for federal and state income tax purposes. Mardi Gras holds equity interests in the Mardi Gras Joint Ventures and accounts for them as equity method investments. Mardi Gras does not have any other operations or activities. The remaining interests in each of the Mardi Gras Joint Ventures are owned by unaffiliated third-party investors. Each of the Mardi Gras Joint Ventures is managed by their respective management committee, and decisions made by these management committees require approval of two or more members that are not affiliates with equity interest holdings meeting certain thresholds.

On October 30, 2017, our Parent contributed to us 20% of its economic interest and 100% of its managing member interest in Mardi Gras. The remainder of the economic interest in Mardi Gras was held 79% by BP Pipelines and 1% by an affiliate of BP. Through our managing member interest in Mardi Gras, we have the right to vote 100% of Mardi Gras' interest in each of the Mardi Gras Joint Ventures. We determined that Mardi Gras is a variable interest entity because (i) we hold disproportional voting rights as compared to our economic interest in Mardi Gras, and (ii) substantially all of Mardi Gras' activities involve or are conducted on behalf of our Parent, which holds disproportionately few voting rights.

On October 1, 2018, pursuant to the Interest Purchase Agreement we completed the acquisition of an additional 45% interest in Mardi Gras from BP Pipelines. This reduced the non-controlling interest on Mardi Gras from 80% to 35%.

The managing member interest in Mardi Gras provides us with the unilateral power to direct the activities of Mardi Gras that most significantly impact its economic performance including the right to exercise the voting rights of BP for each of the Mardi Gras Joint Ventures. In addition, our obligations to absorb the expected losses of and the right to receive the residual returns from Mardi Gras relative to our economic ownership is significant to Mardi Gras. As a result, we are the primary beneficiary of Mardi Gras and consolidate Mardi Gras.

We have the obligation to provide financial support to Mardi Gras if all members unanimously determine that additional capital contributions are necessary to fund Mardi Gras' operations. The assets of Mardi Gras can only be used to satisfy its own obligations, which were zero at December 31, 2019 and 2018. Under the current limited liability company agreement of Mardi Gras, creditors of Mardi Gras, if any, do not have any recourse to the general credit of the Partnership.

The financial position of Mardi Gras as of December 31, 2019 and 2018 and its financial performance and cash flows for each of the three years ended December 31, 2019, 2018 and 2017, as reflected in our consolidated financial statements, are as follows:

| | | As of December 31, | |
| --- | --- | --- | --- |
| | | **2019** | **2018** |
| **Balance sheet** | | | |
| Equity method investments | $ | 391,332 $ | 402,783 |
| Non-controlling interests | | 136,966 | 140,974 |

| | For the Year Ended December 31, 2019 | For the Year Ended December 31, 2018 | October 30, 2017 - December 31, 2017 |
| --- | --- | --- | --- |
| **Statement of operations** | | | |
| Income from equity method investments | $ 54,810 $ | 47,936 $ | 10,123 |
| Less: Net income attributable to non-controlling interests | 19,183 | 32,619 | 8,099 |
| Net impact on Net income attributable to the Partnership | $ 35,627 $ | 15,317 $ | 2,024 |

Debtors' Exhibit No. 60
Page 103 of 258

**BP MIDSTREAM PARTNERS LP**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**
**(in thousands of dollars, unless otherwise indicated)**

| | For the Year Ended December 31, 2019 | For the Year Ended December 31, 2018 | October 30, 2017 - December 31, 2017 |
|---|---|---|---|
| **Statement of cash flows** | | | |
| *Cash flows from operating activities* | | | |
| Distributions of earnings received from equity method investments | $ 54,810 | $ 47,936 | $ 10,123 |
| *Cash flows from investing activities* | | | |
| Distribution in excess of earnings from equity method investments | 11,451 | 19,655 | 7,242 |
| *Cash flows from financing activities* | | | |
| Distributions of prorated fourth quarter joint venture dividends to prior owners | — | — | (5,474) |
| Distributions to non-controlling interests | (23,191) | (46,412) | (9,513) |
| Cash flows used in financing activities | (23,191) | (46,412) | (14,987) |
| Net change on BPMP's cash and cash equivalents | $ 43,070 | $ 21,179 | $ 2,378 |

## 18. Subsequent Events

We have evaluated subsequent events through the issuance of these consolidated financial statements. Based on this evaluation, it was determined that no subsequent events occurred, other than the items noted below, that require recognition or disclosure in the consolidated financial statements.

### Distribution

On February 13, 2020, we paid a cash distribution of $0.3475 per limited partner unit to unitholders of record on January 30, 2020, for the period from October 1 through December 31, 2019. The total distribution paid was $37.6 million, with $16.6 million distributed to our non-affiliated common unitholders and $21.0 million, including $1.2 million for IDRs, distributed to our Parent in respect of its ownership of our common units, subordinated units and IDRs.

### Credit Agreements

On February 24, 2020, we entered into a $468.0 million term loan with an affiliate of BP. Proceeds will be used to repay outstanding borrowings under our credit facility. The term loan has a final repayment date of February 24, 2025 and provides for certain covenants, including the requirement to maintain a consolidated leverage ratio, which is calculated as total indebtedness to consolidated EBITDA, not to exceed 5.0 to 1.0, subject to a temporary increase in such ratio to 5.5 to 1.0 in connection with certain material acquisitions. Simultaneous with this transaction, we entered into a First Amendment whereby the lender added a provision that indebtedness under both the term loan and credit facility shall not exceed $600.0 million. All other terms of the credit facility remain the same.

**BP MIDSTREAM PARTNERS LP**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**
**(in thousands of dollars, unless otherwise indicated)**

**19. Selected Quarterly Financial Data (Unaudited)**

| (in thousands of dollars, except for per unit data) | Total Revenues | Income before Income Taxes | Net Income | Net Income Attributable to Partnership | Limited Partners' Interest in Net Income Attributable to Partnership | Net Income per Common Unit – Basic and Diluted (in dollars) |
|---|---|---|---|---|---|---|
| **2019** | | | | | | |
| First | $ 30,241 | $ 40,619 | $ 40,619 | $ 37,153 | $ 36,955 | $ 0.35 |
| Second | 28,600 | 42,195 | 42,195 | 37,331 | 36,928 | 0.35 |
| Third | 34,561 | 50,393 | 50,393 | 45,754 | 45,011 | 0.43 |
| Fourth | 35,066 | 53,860 | 53,860 | 47,646 | 46,484 | 0.45 |
| **2018** | | | | | | |
| First | $ 26,619 | $ 40,708 | $ 40,708 | $ 30,539 | $ 30,539 | $ 0.29 |
| Second | 28,935 | 40,192 | 40,192 | 30,470 | 30,470 | 0.29 |
| Third | 32,074 | 43,491 | 43,491 | 35,219 | 35,219 | 0.34 |
| Fourth | 28,811 | 41,285 | 41,285 | 36,829 | 36,829 | 0.35 |

105

**Item 9. CHANGES IN AND DISAGREEMENTS WITH ACCOUNTANTS ON ACCOUNTING AND FINANCIAL DISCLOSURE**

None.

**Item 9A. CONTROLS AND PROCEDURES**

**Management's Evaluation of Disclosure Controls and Procedures**

Our management, with the participation of our principal executive officer and principal financial officer, is responsible for evaluating the effectiveness of our disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)). Our disclosure controls and procedures are designed to provide reasonable assurance that the information required to be disclosed by us in reports that we file or submit under the Exchange Act is accumulated and communicated to our management, including our principal executive officer and principal financial officer, as appropriate to allow timely decisions regarding required disclosure and is recorded, processed, summarized and reported within the time periods specified in the rules and forms of the SEC. Based upon that evaluation, our principal executive officer and principal financial officer concluded that, as of the end of the period covered by this report, our disclosure controls and procedures were effective.

**Management's Report on Internal Control Over Financial Reporting**

The management of our general partner, with the participation of our principal executive officer and principal financial officer, is responsible for establishing and maintaining adequate internal control over our financial reporting, as such term is defined under Exchange Act Rule 13a-15(f). Our internal control system was designed to provide reasonable assurance to the management of our general partner regarding the preparation and fair presentation of published financial statements.

In evaluating the effectiveness of our internal control over financial reporting as of December 31, 2019, the management of our general partner used the criteria established in the UK Financial Reporting Council's Guidance on Risk Management, Internal Control and Related Financial and Business Reporting. As a result of this assessment and based on the criteria in the UK Financial Reporting Council's Guidance, management of our general partner has concluded that, as of December 31, 2019, our internal control over financial reporting was effective.

Deloitte & Touche LLP, our independent registered public accounting firm, issued an attestation report on our internal control over financial reporting, which is contained herein.

**Changes in Internal Control Over Financial Reporting**

There were no changes in internal controls over financial reporting that occurred during the most recent fiscal quarter that have materially affected, or are reasonably likely to materially affect, our internal controls over financial reporting.

**REPORT OF INDEPENDENT REGISTERED PUBLIC ACCOUNTING FIRM**

To the Board of Directors of BP Midstream Partners GP LLC and the
Partners of BP Midstream Partners LP
Houston, Texas

**Opinion on Internal Control over Financial Reporting**

We have audited the internal control over financial reporting of BP Midstream Partners LP and subsidiaries (the "Partnership") as of December 31, 2019, based on criteria established in the UK Financial Reporting Council's Guidance on Risk Management, Internal Control and Related Financial and Business Reporting. In our opinion, the Partnership maintained, in all material respects, effective internal control over financial reporting as of December 31, 2019, based on criteria established in the UK Financial Reporting Council's Guidance.

We have also audited, in accordance with the standards of the Public Company Accounting Oversight Board (United States) (PCAOB), the consolidated financial statements as of and for the year ended December 31, 2019 of the Partnership and our report dated February 27, 2020 expressed an unqualified opinion on those financial statements.

**Basis for Opinion**

The Partnership's management is responsible for maintaining effective internal control over financial reporting and for its assessment of the effectiveness of internal control over financial reporting, included in the accompanying Management's Report on Internal Control Over Financial Reporting. Our responsibility is to express an opinion on the Partnership's internal control over financial reporting based on our audit. We are a public accounting firm registered with the PCAOB and are required to be independent with respect to the Partnership in accordance with the U.S. federal securities laws and the applicable rules and regulations of the Securities and Exchange Commission and the PCAOB.

We conducted our audit in accordance with the standards of the PCAOB. Those standards require that we plan and perform the audit to obtain reasonable assurance about whether effective internal control over financial reporting was maintained in all material respects. Our audit included obtaining an understanding of internal control over financial reporting, assessing the risk that a material weakness exists, testing and evaluating the design and operating effectiveness of internal control based on the assessed risk, and performing such other procedures as we considered necessary in the circumstances. We believe that our audit provides a reasonable basis for our opinion.

**Definition and Limitations of Internal Control over Financial Reporting**

A company's internal control over financial reporting is a process designed to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles. A company's internal control over financial reporting includes those policies and procedures that (1) pertain to the maintenance of records that, in reasonable detail, accurately and fairly reflect the transactions and dispositions of the assets of the company; (2) provide reasonable assurance that transactions are recorded as necessary to permit preparation of financial statements in accordance with generally accepted accounting principles, and that receipts and expenditures of the company are being made only in accordance with authorizations of management and directors of the company; and (3) provide reasonable assurance regarding prevention or timely detection of unauthorized acquisition, use, or disposition of the company's assets that could have a material effect on the financial statements.

Because of its inherent limitations, internal control over financial reporting may not prevent or detect misstatements. Also, projections of any evaluation of effectiveness to future periods are subject to the risk that controls may become inadequate because of changes in conditions, or that the degree of compliance with the policies or procedures may deteriorate.

/s/ DELOITTE & TOUCHE LLP

Houston, Texas
February 27, 2020

107

## Item 9B. OTHER INFORMATION

*Credit Agreement and Term Loan Agreement*

As described elsewhere in this annual report, on February 24, 2020, BP Midstream Partners LP (the "Partnership") entered into an Term Loan Facility Agreement ("term loan") by and among the Partnership and North America Funding Company (the "Lender"), which provides for an unsecured term loan facility commitment in the aggregate principal amount of $468,000,000. On the same date, the Partnership also entered into a First Amendment to Short Term Credit Facility Agreement ("First Amendment") whereby the lender added a provision that indebtedness under both the term loan and Short Term Credit Facility Agreement ("credit facility") shall not exceed $600,000,000. All other terms of the credit facility remain the same.

The proceeds of the term loan will be used by the Partnership to refinance the outstanding borrowings under the credit facility. Funds may be borrowed, repaid and reborrowed under the term loan until February 24, 2025, at which time all amounts borrowed must be repaid. Loans under the term loan will bear interest at a floating rate per annum rate equal to the 3-month London interbank offered rate, plus a margin of 0.73%. Interest payments will be due the twenty-fifth (25th) day of April, July, October and January in each year.

**PART III**

## Item 10. DIRECTORS, EXECUTIVE OFFICERS AND CORPORATE GOVERNANCE

### Management of BP Midstream Partners LP

We are managed and operated by the board of directors and executive officers of our general partner, BP Midstream Partners GP LLC. Our general partner is controlled by BP Holdco, a wholly owned subsidiary of BP Pipelines. All of the officers and certain of the directors of our general partner are also officers and directors of BP Pipelines or its affiliates. Neither our general partner nor its board of directors is elected by our unitholders. BP Holdco is the sole member of our general partner and has the right to appoint our general partner's entire board of directors, including at least three independent directors meeting the independence standards established by the NYSE. Our unitholders are not entitled to directly participate in our management or operations. Our general partner owes certain contractual duties to our unitholders as well as a fiduciary duty to its owners.

Our general partner has eight directors. The NYSE does not require a listed publicly traded partnership, such as ours, to have a majority of independent directors on the board of directors of our general partner or to establish a compensation committee or a nominating committee. However, our general partner is required to have an audit committee of at least three members within one year of the listing of our common units on the NYSE, and all its members are required to meet the independence and experience standards established by the NYSE and the Exchange Act.

All of the executive officers of our general partner listed below allocate their time between managing our business and affairs and the business and affairs of BP Pipelines or its affiliates. The amount of time that our executive officers devote to our business and the business of BP Pipelines or its affiliates will vary in any given year based on a variety of factors though ordinarily we expect that less than 50% will be devoted to our business.

Our operations are conducted through, and our assets are owned by, various subsidiaries. However, neither we nor our subsidiaries have any employees. Our general partner has the sole responsibility for providing the personnel necessary to conduct our operations, whether through directly hiring personnel or by obtaining services of personnel employed by BP, BP Pipelines or third parties, but we sometimes refer to these individuals, for drafting convenience only, in this Annual Report as our employees because they provide services directly to us. These operations personnel primarily provide services with respect to the assets we operate: BP2, River Rouge and Diamondback. Mars, Ursa, and the Mardi Gras Joint Ventures are operated by an affiliate of Shell. KM Phoenix is operated by an affiliate of Kinder Morgan.

Neither our general partner nor BP Pipelines receives any management fee or other compensation in connection with our general partner's management of our business, but we reimburse our general partner and its affiliates, including BP Pipelines, for all expenses they incur and payments they make on our behalf. Our partnership agreement does not set a limit on the amount of expenses for which our general partner and its affiliates may be reimbursed. These expenses include salary, benefits, bonus, long term incentives and other amounts paid to persons who perform services for us or on our behalf and expenses allocated to our general partner by its affiliates. Please read "Certain Relationships and Related Transactions, and Director Independence-Agreements Governing the Formation Transactions."

108

**Executive Sessions**

To facilitate candid discussion among our directors, the non‑management directors will meet in regularly scheduled executive sessions. The director who presides at these meetings will be chosen by the board of directors of our general partner prior to such meetings.

**Interested Party Communications**

Unitholders and other interested parties may communicate by writing to: BP Midstream Partners LP, 501 Westlake Park Boulevard, Houston, Texas 77079. Unitholders may submit their communications to the board of directors of our general partner, any committee of the board of directors of our general partner or individual directors on a confidential or anonymous basis by sending the communication in a sealed envelope marked "Unitholder Communication with Directors" and clearly identify the intended recipient(s) of the communication.

Our Chief Legal Counsel and Secretary will review each communication from unitholders and other interested parties and will forward the communication, as expeditiously as reasonably practicable, to the addressees if: (1) the communication complies with the requirements of any applicable policy adopted by the board of directors relating to the subject matter of the communication; and (2) the communication falls within the scope of matters generally considered by the board of directors. To the extent the subject matter of a communication relates to matters that have been delegated by the board of directors to a committee or to an executive officer of the general partner, then the general partner's Chief Legal Counsel and Secretary may forward the communication to the executive officer or chairman of the committee to which the matter has been delegated. The acceptance and forwarding of communications to the members of the board of directors or an executive officer does not imply or create any fiduciary duty of the board members or executive officer to the person submitting the communications.

Information may be submitted confidentially and anonymously, although we may be obligated by law to disclose the information or identity of the person providing the information in connection with government or private legal actions and in other circumstances. Our policy is not to take any adverse action, and not to tolerate any retaliation, against any person for asking questions or making good faith reports of possible violations of law, our policies or our Corporate Code of Business Conduct and Ethics.

**Available Governance Materials**

The board of directors has adopted the following materials, which are available on our website www.bpmidstreampartners.com:

- Charter of the Audit Committee of the Board of Directors;
- Corporate Code of Business Conduct and Ethics;
- Financial Code of Ethics; and
- Corporate Governance Guidelines.

Unitholders may obtain a copy, free of charge, of each of these documents by sending a written request to BP Midstream Partners LP, 501 Westlake Park Boulevard, Houston, Texas 77079.  We intend to disclose any amendments to, or waivers from, our Code of Business Conduct and Ethics on our website.

**Executive Officers and Directors of Our General Partner**

The following table sets forth information for the executive officers and directors of our general partner. Directors hold office until their successors have been elected or qualified or until the earlier of their death, resignation, removal or disqualification. Executive officers serve at the discretion of the board. There are no family relationships among any of our directors or executive officers. All of our non‑independent directors and all of our executive officers also serve as directors or executives of BP Pipelines or its affiliates.

109

| Name | Age[1] | Position with BP Midstream Partners GP LLC |
|---|---|---|
| Robert P. Zinsmeister | 62 | Director, Chief Executive Officer |
| Craig W. Coburn | 55 | Director, Chief Financial Officer |
| Gerald J. Maret | 62 | Chief Operating Officer |
| Derek Rush[2] | 48 | Chief Development Officer |
| Hans F. Boas | 54 | Chief Legal Counsel and Secretary |
| J. Douglas Sparkman | 62 | Director, Chairman of the Board of Directors |
| Brian D. Smith | 52 | Director |
| Clive Christison | 48 | Director |
| Walter Clements | 60 | Independent Director |
| Robert Malone | 67 | Independent Director |
| Michele F. Joy | 64 | Independent Director |

(1)   On February 27, 2020.

(2)   Mr. Rush was appointed to the position of Chief Development Officer, effective August 6, 2019.

**Robert P. Zinsmeister** was appointed as the Chief Executive Officer of our general partner and member of the board of directors of our general partner in September 2017. Since January 2012, Mr. Zinsmeister has served as Chief Operating Officer of BP's Global M&A organization. Mr. Zinsmeister has 21 years of M&A experience, and prior to his current role, his titles and responsibilities included M&A Director Downstream, Corporate, Chemicals and M&A Project Manager in BP's Global M&A organization. Mr. Zinsmeister has served in a variety of management positions within the BP organization, including Commercial Manager and Engineering Manager of an Upstream business unit, and a variety of engineering roles in corporate, division, and field operations. In addition to his roles at BP, Mr. Zinsmeister is a member of the Advisory Board of Buckthorn Partners, a private equity investment firm investing exclusively in oil field service businesses, as well as a member of the advisory board of the M&A Research Centre at Cass Business School, City University of London. Mr. Zinsmeister earned a Bachelor of Science in Petroleum and Natural Gas Engineering, from Pennsylvania State University and an MBA, finance emphasis, from the University of Chicago. In his career Mr. Zinsmeister has personally negotiated three US pipeline transactions, and has overseen all Downstream M&A, including pipelines and midstream, since 2006. We believe that based on Mr. Zinsmeister's extensive experience in M&A in the energy industry and managerial experience within the BP organization, Mr. Zinsmeister brings important skills and expertise to the board of directors of our general partner.

**Craig W. Coburn** was appointed as the Chief Financial Officer of our general partner and member of the board of directors of our general partner in September 2017. Since August of 2016, Mr. Coburn has served as Chief Financial Officer for BP America. Prior to such role, from July 2013 to August 2016, Mr. Coburn was Vice President, Technology Commercialization & Venturing (TC&V) for BP. In this role, Mr. Coburn's primary responsibility was to manage BP's corporate venture capital portfolio and new investments. Additionally, from January 2006 to August 2016, Mr. Coburn was CFO for BP's Alternative Energy business which included the Solar, Wind, Biofuels and Emerging Business & Ventures businesses. Prior to holding such roles, Mr. Coburn served in a variety of finance and commercial positions within the BP organization since 1986. Mr. Coburn has over 31 years of oil and gas experience with Amoco and BP, as well as over 20 years of experience working with high tech businesses and renewable energy. He has extensive experience in finance, corporate venturing, technology commercialization, planning and strategy, mergers and acquisitions and business carve-outs. Mr. Coburn has a BS degree in Accountancy from the University of Illinois at Urbana–Champaign and an MBA from the Kellogg School of Management at Northwestern University. We believe that based on Mr. Coburn's extensive experience in the energy industry and extensive financial knowledge, Mr. Coburn brings important skills and expertise to the board of directors of our general partner.

**Gerald J. Maret** was appointed as the Chief Operating Officer of our general partner in September 2017. Since October 2015, Mr. Maret has served as President of BP Pipelines and Vice President of BP US Pipelines and Logistics. From January 2014 to October 2015, Mr. Maret held the role of Manager of Projects, Engineering, Inspection & Construction of BP US Pipelines and Logistics. From October of 2012 to January of 2014, Mr. Maret served as Engineering and Technical Services Manager of BP US Pipelines and Logistics. Prior to October 2012, Mr. Maret served in several management positions within BP including Global Commercial Manager Polypropylene Licensing and Engineering & Operations Manager Polypropylene Licensing. Prior to the merger of BP and Amoco, Mr. Maret held positions with Amoco Upstream Exploration & Production and Amoco Worldwide Engineering & Construction. Mr. Maret has a BS in Mechanical Engineering from the University of New Orleans and an MBA from Vanderbilt University.

**Derek Rush** was appointed Chief Development Officer of our general partner in August 2019. Since August 2018, Mr. Rush has served as Head of Finance for BP US Pipelines and Logistics and as a Director for BP Pipelines. From July 2015 to July

110

2018, Mr. Rush served as Head of Control for BP Downstream, and from April 2013 to July 2015 served as Vice President of BP-Husky Refining LLC. Prior to that, Mr. Rush held a variety of financial and commercial roles in BP. He joined BP in 2005 from PricewaterhouseCoopers, where he was a Director in the financial advisory practice. Mr. Rush has a BS in Biology from the University of Illinois at Urbana-Champaign and a MS in Accountancy from Illinois State University.

**Hans F. Boas** was appointed as the Chief Legal Counsel and Secretary of our general partner in September 2017. Since February 2017, Mr. Boas has served as Managing Counsel of BP America, Inc., supporting BP's Treasury functions in the US. From July 2009 to January, 2017, Mr. Boas served as Senior Counsel of BP America, supporting Treasury functions in Houston, Texas. Mr. Boas has over 17 years of experience in the oil and gas industry. Mr. Boas has a BBA, Finance from Texas A&M University and a JD from University of Houston Law Center.

**J. Douglas Sparkman** became Chairman and member of the board of directors of our general partner in September 2017. Since October 2014, Mr. Sparkman has served as the Chief Operating Officer, Fuels North America for BP. In this role, he is responsible for BP's North American Downstream—three refineries, USPL, Supply, Sales and Marketing. Prior to this role, Mr. Sparkman was the Strategic Performance Unit leader for the Midwest Fuels Value Chain for BP, which he held since January 2010. Prior to working for BP, Mr. Sparkman served as the Senior Vice President for Transportation and Logistics for Marathon Oil Corporation. Mr. Sparkman has over 38 years of experience in the Downstream business with deep experience in Refining and Midstream operations. We believe that Mr. Sparkman's substantial experience in various aspects of the energy industry makes him qualified to serve as a member of the board of directors of our general partner.

**Brian D. Smith** became a member of the board of directors of our general partner in September 2017. Since January 2019, Mr. Smith has served as Vice President, Commercial Funding (Downstream & Integrated Supply and Trading), BP Treasury. Mr. Smith has served in multiple management roles, including Vice President, Structured Finance – Western Hemisphere, Head of Developments Finance, Gulf of Mexico and Planning and Strategy Manager, North American Gas. Mr. Smith has over 25 years of oil and gas industry experience, primarily with ARCO and BP. Mr. Smith received a BS, Foreign Service from Georgetown University and an MBA from University of California at Los Angeles. We believe that Mr. Smith's significant experience in finance and treasury makes him qualified to serve as a member of the board of directors of our general partner.

**Clive Christison** became a member of the board of directors of our general partner in September 2017. Since September 2015, Mr. Christison has served in the role of Senior Vice President Pipelines, Supply & Optimization for Fuels North America. Prior to his current role, from September 2013 to September 2015 he was the Chief Executive of BP's Integrated Supply & Trading business for the Americas, responsible for BP's oil trading and supply activity in the Americas and for crude oil globally. In addition, from September 2008 to September 2013, Mr. Christison also led BP's oil, gas, chemicals, carbon and finance trading business for the Eastern Hemisphere, covering the Middle East, Southern & East Africa, Australia, India, South East Asia and China. Mr. Christison has 20 years of international experience in Oil, Gas and Power industries, holding a number of senior roles in Supply & Trading, Refining & Marketing and Logistics for Mobil Oil Corporation and BP plc. Mr. Christison is a member of the boards of directors of BP Americas Diversity and Inclusion Council, Commodities Futures Trading Commission (CFTC) Global Markets Advisory Committee, Futures Industry Association, Commodity Markets Council, British American Business Council, Chicago Shakespeare Theatre and the Chicago Urban League. Mr. Christison is a graduate of Edinburgh University with a degree in Chemical Engineering and has an MBA from Warwick Business School. We believe that Mr. Christison's extensive experience in the energy industry, particularly his experience in supply and trading, makes him qualified to serve as a member of the board of directors of our general partner.

**Walter Clements** became an independent member of our board of directors, effective upon our listing on the NYSE. Effective January 2019, Mr. Clements was named Associate Dean of Executive Education at University of Notre Dame's Mendoza College of Business in addition to his role as Teaching Professor of Finance at the college where he has served since August 2012. Previously, from August 2010 to July 2012, Mr. Clements served as a Visiting Lecturer of Finance at Indiana University. Additionally, Mr. Clements currently consults for new ventures and has 28 years of experience in the energy industry. Mr. Clements has an undergraduate degree in Accounting from Indiana University, an MBA from the University of Chicago, and is a Certified Public Accountant. We believe that Mr. Clements' extensive experience in finance makes him qualified to serve as a member of the board of directors of our general partner.

**Robert Malone** became an independent member of our board of directors in November 2017. He has served as the Executive Chairman, President and CEO of First Sonora Bancshares, Inc. (a privately-held bank holding company), the holding company for The First National Bank of Sonora (dba Sonora Bank) since 2014. Mr. Malone has also served as the Chairman, President and Chief Executive Officer of Sonora Bank since 2014. He joined First Sonora Bancshares and Sonora Bank in October 2009 as President and Chief Executive Officer. He joined Community Banking following a 35 year career with BP. Prior to his retirement he was an Executive Vice President of BP p.l.c., Chairman and President of BP America and a member of BP's London based Executive Management team that guided the worldwide operations of BP. Mr. Malone has served in a variety of

111

operating, engineering and executive roles with BP's subsidiary companies and he also served as President, CEO and COO of Alyeska Pipeline Service Company, operator of the Trans Alaska Oil Pipeline and as the Chief Executive of the London based BP Shipping Ltd. Mr. Malone currently serves as an independent director of the Halliburton Company, Peabody Energy Company and Teledyne Technologies Incorporated. Mr. Malone earned a BS in Metallurgical Engineering from the University of Texas at El Paso, and was an Alfred P. Sloan Fellow at the Massachusetts Institute of Technology where he received a Master of Science in Management. We believe that Mr. Malone's extensive experience in finance makes him qualified to serve as a member of the board of directors of our general partner.

*Michele F. Joy* became an independent member of our board of directors in May 2018. She has served as Vice President, Regulatory and Major Projects of the general partner of Shell Midstream Partners ("SHLX") from 2014 to 2017, when she resigned and retired from Shell. From April 2012, Ms. Joy also served as Vice President, SPLC and General Manager of Major Projects and Regulatory for Shell Oil Company. Ms. Joy split her time between her roles at SPLC and time devoted to SHLX's business and affairs. She was responsible for SPLC and SHLX planning and long-term growth, as well as regulatory compliance. Ms. Joy joined SPLC in 2006 as Director of Joint Interests. From 2008 to 2012, she was General Manager, Business Development for SPLC during a period of significant growth. She has also served as a Shell representative on a number of joint ventures, including Colonial, LOOP LLC, Poseidon Pipeline Company LLC and Explorer Pipeline Company. Ms. Joy was a member of the Department of Transportation's Hazardous Liquid Pipeline Safety Advisory Committee and the Association of Oil Pipeline's Economic Regulatory Committee until her retirement. Prior to joining Shell, Ms. Joy served as the General Counsel for the Association of Oil Pipe Lines from 1991 to 2006. In that role, she was involved in the industry's and regulators' joint work to simplify economic regulation at the FERC; improve pipeline safety at DOT (including pipeline integrity and the elimination of outside force damage); and support the EPA's environmental improvements such as ultra-low sulfur diesel implementation. Ms. Joy also served five years as an adjunct professor at Northwestern University's Transportation Institute and spent eight years in private practice focusing on gas and electric regulation and international law. Ms. Joy earned a Bachelor of Arts from Carleton College and a Juris Doctor from American University. We believe that Ms. Joy's extensive experience in finance makes her qualified to serve as a member of the board of directors of our general partner.

## Director Independence

As a publicly traded partnership, we qualify for, and are relying on, certain exemptions from the NYSE corporate governance requirements, including:

- the requirement that a majority of the board of directors of our general partner consist of independent directors;
- the requirement that the board of directors of our general partner have a nominating/corporate governance committee that is composed entirely of independent directors; and,
- the requirement that the board of directors of our general partner have a compensation committee that is composed entirely of independent directors.

As a result of these exemptions, our general partner's board of directors is not comprised of a majority of independent directors. Our board of directors does not currently intend to establish a nominating/corporate governance committee or a compensation committee. Accordingly, unitholders do not have the same protections afforded to equityholders of companies that are subject to all of the corporate governance requirements of the NYSE.

We are, however, required to have an audit committee of at least three members, all of whom satisfy the independence and experience standards established by the NYSE and the Exchange Act. The board of directors has affirmatively found Walter Clements, Robert Malone and Michele Joy to be independent under such standards.

## Committees of the Board of Directors

The board of directors of our general partner has a standing audit committee and an ad-hoc conflicts committee. We do not have a compensation committee, but rather that the board of directors of our general partner will approve equity grants to eligible directors and employees.

### *Audit Committee*

Our general partner has an audit committee composed of at least three members, each of whom meet the independence and experience standards established by the NYSE and the Exchange Act. The audit committee of the board of directors of our general partner assists the board of directors in its oversight of the integrity of our financial statements and our compliance with legal and regulatory requirements and partnership policies and controls. The audit committee has the sole authority to (1) retain and terminate our independent registered public accounting firm, (2) approve all auditing services and related fees and the

terms thereof performed by our independent registered public accounting firm and (3) pre-approve any non-audit services and tax services to be rendered by our independent registered public accounting firm.

The audit committee is also responsible for confirming the independence and objectivity of our independent registered public accounting firm. Our independent registered public accounting firm will be given unrestricted access to the audit committee and our management, as necessary. Mr. Robert Malone, Mr. Walter Clements, and Ms. Michele Joy comprise the members of the audit committee. Each of the members satisfy the definition of audit committee financial expert for purposes of the SEC's rules.

While the audit committee of the board of directors of our general partner oversees the Partnership's financial reporting process on behalf of the board of directors, management has the primary responsibility for the financial statements and the reporting process, including the systems of internal controls. In fulfilling its oversight responsibilities, the audit committee reviews and discusses with management the audited financial statements contained in this Annual Report on Form 10-K.

### Conflicts Committee

One or more independent members of the board of directors of our general partner will serve on a conflicts committee to review specific matters that the board believes may involve conflicts of interest and determines to submit to the conflicts committee for review. The conflicts committee will determine if the resolution of the conflict of interest is opposed to the interest of the partnership. The members of the conflicts committee may not be officers or employees of our general partner or directors, officers or employees of its affiliates, including BP Pipelines, and must meet the independence standards established by the NYSE and the Exchange Act to serve on an audit committee of a board of directors. In addition, the members of our conflicts committee may not own any interest in our general partner or its affiliates (other than common units or awards under our LTIP) that is determined by the board of directors of our general partner to have an adverse impact on the ability of such director to act in an independent manner with respect to the matter submitted to the conflicts committee. Any matters approved by the conflicts committee will be conclusively deemed to be approved by us and all of our partners and not a breach by our general partner of any duties it may owe us or our unitholders.

Our partnership agreement provides that the conflicts committee of the board of directors of our general partner may be comprised of one or more independent directors. For example, if as a result of resignation, disability, death or conflict of interest with respect to a party to a particular transaction, only one independent director is available or qualified to evaluate such transaction, your interests may not be as well served as if the conflicts committee acted with at least two independent directors. A single-member conflicts committee would not have the benefit of discussion with, and input from, other independent directors.

### Board Leadership Structure

The board of directors of our general partner has no policy with respect to the separation of the offices of chairman of the board of directors and chief executive officer. Instead, that relationship is defined and governed by the amended and restated limited liability company agreement of our general partner, which permits the same person to hold both offices. Directors of the board of directors of our general partner are designated or elected by BP Holdco. Accordingly, unlike holders of common stock in a corporation, our unitholders have only limited voting rights on matters affecting our business or governance, subject in all cases to any specific unitholder rights contained in our partnership agreement.

### Board Role in Risk Oversight

Our corporate governance guidelines provide that the board of directors of our general partner is responsible for reviewing the process for assessing the major risks facing us and the options for their mitigation. This responsibility is largely satisfied by our audit committee, which is responsible for reviewing and discussing with management and our independent registered public accounting firm our major risk exposures and the policies management has implemented to monitor such exposures, including our financial risk exposures and risk management policies.

## Item 11. EXECUTIVE COMPENSATION AND OTHER INFORMATION

### Compensation Discussion and Analysis

We do not directly employ any of the persons responsible for managing our business. We are managed and operated by our general partner. All of the executive officers of our general partner are employed and compensated by BP Pipelines or its affiliates. They have responsibilities to both us and BP Pipelines and its affiliates, and we expect that they are allocating their time between managing our business and managing the business of BP Pipelines.

Debtors' Exhibit No. 60
Page 113 of 258

The responsibility and authority for compensation-related decisions for our executive officers reside with BP Pipelines or its affiliates. Any such compensation decisions are not subject to any approvals by the board of directors of our general partner or any committees thereof. However, all determinations with respect to awards that may be made to our executive officers, key employees, and independent directors under the LTIP are made by the board of directors of our general partner.

Except with respect to awards that have been granted under the LTIP, our executive officers do not currently receive separate amounts of compensation in relation to the services they provide to us. We reimburse BP Pipelines for compensation related expenses attributable to the portion of each executive officer's time dedicated to providing services to us. Although we bear an allocated portion of BP Pipelines' costs of providing compensation and benefits to employees who serve as executive officers of our general partner, we have no control over such costs and do not establish or direct the compensation policies or practices of BP Pipelines.

Our general partner does not have a compensation committee and does not currently expect to put one in place.

**Summary Compensation Table**

The following summarizes the total compensation paid to our executive officers by BPMP for their services in relation to our business in 2019, 2018 and 2017.

| Name and Principal Position[1] | Year | Salary | Stock Awards | Bonus | Stock Options | Non-Equity Incentive Compensation | Change in Pension Value and Nonqualified Deferred Compensation Earnings | All Other Compensation | Total |
|---|---|---|---|---|---|---|---|---|---|
| Robert P. Zinsmeister, Chief Executive Officer and Director | 2019 | — | — | — | — | — | — | — | — |
| | 2018 | — | — | — | — | — | — | — | — |
| | 2017 | — | — | — | — | — | — | — | — |
| Craig W. Coburn, Chief Financial Officer and Director | 2019 | — | — | — | — | — | — | — | — |
| | 2018 | — | — | — | — | — | — | — | — |
| | 2017 | — | — | — | — | — | — | — | — |
| Gerald J. Maret, Chief Operating Officer | 2019 | — | — | — | — | — | — | — | — |
| | 2018 | — | — | — | — | — | — | — | — |
| | 2017 | — | — | — | — | — | — | — | — |
| Derek Rush, Chief Development Officer[2] | 2019 | — | — | — | — | — | — | — | — |
| Hans F. Boas, Chief Legal Counsel and Secretary | 2019 | — | — | — | — | — | — | — | — |
| | 2018 | — | — | — | — | — | — | — | — |
| | 2017 | — | — | — | — | — | — | — | — |

(1) Messrs. Zinsmeister, Coburn, Maret, Rush and Boas devote a portion of their overall working time to our business. Except for the fixed administrative fee we paid to BP Pipelines under the omnibus agreement, we did not pay or reimburse any compensation amounts to or for our named executive officers in 2019, 2018 or 2017.

(2) Mr. Rush was appointed to the position of Chief Development Officer, effective August 6, 2019.

**Narrative Disclosure to Summary Compensation Table and Additional Narrative Disclosure**

**Compensation by BP**

Our named executive officers receive compensation in the form of base salaries, annual cash incentive awards, long-term equity incentive awards and participation in various employee benefit plans and arrangements, including broad based and supplemental defined contribution and defined benefit retirement plans. In addition, although our executive officers have not entered into employment agreements with BP, they have end of employment arrangements with BP under which they would receive separation payments and benefits from BP based on termination at the employer's initiative or on mutually agreed terms. In the future, BP may provide different or additional compensation components, benefits, or perquisites to our named executive officers.

114

The following sets forth a more detailed explanation of the elements of compensation that our named executive officers receive.

**Base Compensation**

Our named executive officers earn a base salary for their services to BP and its affiliates, which amounts are paid by BP or its affiliates other than us. We incur only a fixed expense per month under the omnibus agreement with respect to the compensation paid by BP to each of our named executive officers.

**Annual Cash Bonus Payments**

Our named executive officers are eligible to earn cash payments from BP under BP's annual incentive bonus program and other discretionary bonuses that may be awarded by BP. Any bonus payments earned by the named executive officers will be paid by BP and will be determined solely by BP without input from us or our general partner or its board of directors. The amount of any bonus payment made by BP will not result in changes to the contractually fixed fee for executive management services that we pay to BP under the omnibus agreement.

**Share-Based Compensation**

The incentive compensation programs in which our named executive officers participate primarily consist of share awards, restricted share awards or cash awards (any of which may be a performance award). Conditional awards of BP shares are made under the terms of the Share Value Plan on a selective basis to senior personnel each year. The extent to which the awards vest is determined over a three-year performance period. The award is based on the business performance of BP plus an adjustment using an individual performance factor. All shares that vest are increased by an amount equal to the notional dividends accrued on those shares during the period from the award date to the vesting date. None of the awards result in beneficial ownership until the shares are delivered. Shares are awarded subject to a three-year vesting period.

**Long-Term Equity-Based Incentive Compensation**

BP maintains a long-term incentive program pursuant to which it grants equity-based awards in BP p.l.c. to certain of its executives and employees. Our named executive officers may receive awards under BP's equity incentive plan from time to time as may be determined by BP (if applicable). The amount of any long-term incentive compensation made by BP will not result in changes to the contractually fixed fee for executive management services that we will pay to BP under the omnibus agreement.

**Retirement, Health, Welfare and Additional Benefits**

Our named executive officers are eligible to participate in the employee benefit plans and programs that BP offers to its employees, subject to the terms and eligibility requirements of those plans. Our named executive officers are also eligible to participate in BP's tax-qualified defined contribution and defined benefit retirement plans, and post retiree medical plans, to the same extent as all other BP employees. BP also has certain supplemental retirement plans in which its executives and key employees participate.

**Severance Arrangements**

Our named executive officers are covered by standard BP severance arrangements. The nature and level of these arrangements vary by job grade and service completed. The maximum payment does not exceed twice base salary plus outplacement support and other non-cash benefits.

**Outstanding Equity Awards at Fiscal Year End Table**

The following summarizes the outstanding equity awards granted by us at 2019 fiscal year end.

| Name | Option awards | | | | | Stock awards | | | |
|---|---|---|---|---|---|---|---|---|---|
| | Number of Securities of Underlying Unexercised Options (#) Exercisable | Number of Securities of Underlying Unexercised Options (#) Unexercisable | Equity Incentive Plan Awards: Number of Securities Underlying Unexercised Unearned Options (#) | Option Exercise Price ($) | Option Expiration Date | Number of Shares or Units of Stock that Have Not Vested (#) | Market Value of Shares or Units of Stock that Have Not Vested ($) | Equity Incentive Plan Awards: Number of Unearned Shares, Units or Other Rights that Have Not Vested (#) | Equity Incentive Plan Awards: Number of Unearned Shares, Units or Other Rights that Have Not Vested ($) |
| Robert P. Zinsmeister | — | — | — | — | — | — | — | — | — |
| Craig W. Coburn | — | — | — | — | — | — | — | — | — |
| Gerald J. Maret | — | — | — | — | — | — | — | — | — |
| Derek Rush[1] | — | — | — | — | — | — | — | — | — |
| Hans F. Boas | — | — | — | — | — | — | — | — | — |

(1)   Mr. Rush was appointed to the position of Chief Development Officer, effective August 6, 2019.

**Director Compensation**

The executive officers or employees of our general partner or of BP who also serve as directors of our general partner do not receive any additional compensation from us for their service as a director of our general partner. Directors of our general partner who are not also officers or employees of BP ("non-employee director") will receive compensation for services on our general partner's board of directors and committees thereof. We currently pay such directors a cash retainer of $75,000. We also currently pay the chair of the audit committee and the chair of the conflicts committee, as applicable, an additional cash retainer of $20,000. We also award an annual equity-based grant under the LTIP. Non-employee directors are reimbursed for out-of-pocket expenses in connection with attending meetings of the board of directors and committee meetings.

For 2019, each non-employee director received an award of phantom units under the LTIP valued at approximately $75,000. To align awards with our Parent, such awards were granted in February 2019.

Under the LTIP, on February 26, 2019, Mr. Clements was awarded 5,977 phantom units, Mr. Malone was awarded 5,619 phantom units and Ms. Joy was awarded 3,631 phantom units.

The phantom units vest in full on the first anniversary of the date of grant but are not settled until the second anniversary of grant. Each member of the board of directors of our general partner will be indemnified for his actions associated with being a director to the fullest extent permitted under Delaware law.

**Non-Employee Director Compensation Table**

The following summarizes the compensation for our non-employee directors for 2019.

| Name [1] | Fee Earned or Paid in Cash | Unit Awards[2] | Option Awards | Non-Equity Inventive Plan Compensation | Non-Qualified Compensation | Deferred Earnings | All Other Compensation | Total |
|---|---|---|---|---|---|---|---|---|
| Walter Clements | $ 75,000 | $ 99,457 | $ — | $ — | $ — | $ — | $ — | $ 174,457 |
| Robert Malone | 95,000 | 93,500 | — | — | — | — | — | 188,500 |
| Michele F. Joy | 95,000 | 60,420 | — | — | — | — | — | 155,420 |

116

(1)   Mr. Clements was appointed to the board of directors on October 25, 2017. Mr. Malone was appointed to the board of directors on November 14, 2017. Ms. Joy was appointed to the board of directors on May 8, 2018.

(2)   Amounts reported in this column reflect the aggregate grant date fair value of the phantom units, computed in accordance with FASB ASC Topic 718, determined without regard to forfeitures. For more information, please see Part II, Item 8, Note 16 - *Unit-Based Compensation*. As of December 31, 2019, there were a total of 15,227 phantom units outstanding under the LTIP, of which (a) 5,977 were held by Mr. Clement, (b) 5,619 were held by Mr. Malone and (c) 3,631 were held by Ms. Joy.

## Pay Ratio Disclosure

We do not have any employees. The officers and all other personnel necessary for our business are employed and compensated by BP, subject to the administrative services fee in accordance with the terms of the omnibus agreement and our operating agreements. Therefore we are unable to provide an estimate of the relationship of the median of the annual total compensation of our employees and the annual total compensation of our chief executive officer.

## Compensation Committee Report

We do not have a Compensation Committee. Accordingly, the Compensation Committee Report required by Item 407(e)(5) of Regulation S-K is given by the board of directors of our general partner. The board of directors of our general partner has reviewed and discussed the Compensation Discussion and Analysis presented above with management and, based on such review and discussions, the board has approved the inclusion of the Compensation Discussion and Analysis in this Annual Report on Form 10-K.

***Members of the board of directors of BP Midstream Partners GP LLC***:
J. Douglas Sparkman
Robert P. Zinsmeister
Craig W. Coburn
Brian D. Smith
Clive Christison
Walter Clements
Robert Malone
Michele F. Joy

## Item 12. SECURITY OWNERSHIP OF CERTAIN BENEFICIAL OWNERS AND MANAGEMENT AND RELATED STOCKHOLDER MATTERS

The following table sets forth the beneficial ownership of common and subordinated units of BP Midstream Partners LP held by beneficial owners of 5% or more of such units, by each director and named executive officer of our general partner and by the directors and executive officers of our general partner as a group. The percentage of units beneficially owned is based on 52,387,740 common units and 52,375,535 subordinated units outstanding.

117

| Name of Beneficial Owner (1) | Common Units Beneficially Owned | Percentage of Common Units Beneficially Owned | Subordinated Units Beneficially Owned | Percentage of Subordinated Units Beneficially Owned | Percentage of Total Common and Subordinated Units Beneficially Owned |
|---|---|---|---|---|---|
| BP Midstream Holdings LLC (2) | 4,581,177 | 8.7 % | 52,375,535 | 100 % | 54.4 % |
| Kayne Anderson Capital Advisors, L.P. 1800 Avenue of the Stars Third Floor Los Angeles, CA 90067 (3) | 8,354,812 | 15.9 % | — | — | 8.0 % |
| Tortoise Capital Advisors, L.L.C. 5100 W 115th Place Leawood, KS 66211 (4) | 6,606,852 | 12.6 % | — | — | 6.3 % |
| Clearbridge Investments, LLC 620 8th Avenue New York, NY 10018 (5) | 4,541,291 | 8.7 % | — | — | 4.3 % |
| Salient Capital Advisors, LLC 4265 San Felipe 8th Floor Houston, Texas 77027 (6) | 3,886,629 | 7.4 % | — | — | 3.7 % |
| Chickasaw Capital Management, LLC 6075 Poplar Ave. Suite 720 Memphis, TN 38119 (7) | 3,339,669 | 6.4 % | — | — | 3.2 % |
| Energy Income Partners, LLC 10 Wright Street Westport, Connecticut 06880 (8) | 3,083,135 | 5.9 % | — | — | 2.9 % |
| Robert P. Zinsmeister | 5,555 | * | — | — | * |
| Craig W. Coburn | 5,500 | * | — | — | * |
| Mark Frena (9) | 5,555 | * | — | — | * |
| Gerald J. Maret | 2,500 | * | — | — | * |
| Derek Rush (10) | — | — | — | — | — |
| Hans F. Boas | — | — | — | — | — |
| J. Douglas Sparkman | 5,555 | * | — | — | * |
| Brian D. Smith | — | — | — | — | — |
| Clive Christison | 2,500 | * | — | — | * |
| Walter Clements (11) | 10,143 | * | — | — | * |
| Robert Malone (11) | 9,921 | * | — | — | * |
| Michele F. Joy (11) | 7,368 | * | — | — | * |
| Directors and executive officers as a group (11 persons) | 54,597 | * | — | — | * |

(*) Indicates beneficial ownership of less than 1%.
(1) The address for all beneficial owners in this table, except as noted in the table, is 501 Westlake Park Boulevard, Houston, Texas 77079.
(2) BP Holdco is a wholly owned subsidiary of BP Pipelines (North America) Inc. and owns the common and subordinated units presented above. BP Pipelines (North America) Inc. may be deemed to beneficially own the units held by BP Holdco.
(3) Based solely on a Schedule 13G/A filed by Kayne Anderson Capital Advisors, L.P. and Richard A. Kayne on January 9, 2020.
(4) Based solely on a Schedule 13G/A filed by Tortoise Capital Advisors, L.L.C. on February 14, 2020.
(5) Based solely on a Schedule 13G/A filed by Clearbridge Investments, LLC on February 14, 2020.
(6) Based solely on a Schedule 13G/A filed by Salient Capital Advisors, LLC on May 10, 2019.
(7) Based solely on a Schedule 13G/A filed by Chickasaw Capital Management, LLC on February 7, 2020.
(8) Based solely on a Schedule 13G filed by Energy Income Partners, LLC, James Murchie, Eva Pao, Saul Ballesteros, and John Tysseland on February 14, 2020.
(9) Mr. Frena elected to retire from his position as Chief Development Officer effective July 2, 2019.
(10) Mr. Rush was appointed to the position of Chief Development Officer effective August 6, 2019.
(11) Represents unit-based awards granted under the LTIP and are subject to the terms thereunder.

**Securities Authorized for Issuance under Equity Compensation Plans**

The following table sets forth information about all existing equity compensation plans as of December 31, 2019.

| Plan Category | Number of Securities to be Issued Upon Exercise of Outstanding Options, Warrants and Rights | Weighted-Average Exercise Price of Outstanding Options, Warrants and Rights | Number of Securities Remaining Available for Future Issuance Under Equity Compensation Plans (Excluding Securities Reflected in Column (a)) (1) |
|---|---|---|---|
| | (a) | (b) | (c) |
| Equity compensation plans approved by security holders | 15,227 (2) | — | 5,474,839 |
| Equity compensation plans not approved by security holders | — | — | — |
| Total | 15,227 | — | 5,474,839 |

(1)  The amounts shown represents common units available under the LTIP as of December 31, 2019.
(2)  Represents unit-based awards granted under the LTIP and are subject to the terms thereunder.

**Item 13. CERTAIN RELATIONSHIPS AND RELATED PARTY TRANSACTIONS, AND DIRECTOR INDEPENDENCE**

As of February 26, 2020, BP Holdco owns 4,581,177 common units and 52,375,535 subordinated units representing approximately an aggregate 54.4% limited partner interest in us (excluding the incentive distribution rights, which cannot be expressed as a fixed percentage), and owns and controls our general partner. BP Holdco also appoints all of the directors of our general partner, which owns a non-economic general partner interest in us and owns the incentive distribution rights.

The terms of the transactions and agreements disclosed in this section were determined by and among affiliated entities and, consequently, are not the result of arm's length negotiations. These terms are not necessarily at least as favorable to the parties to these transactions and agreements as the terms that could have been obtained from unaffiliated third parties.

**Distributions and Payments to Our General Partner and Its Affiliates**

The following table summarizes the distributions and payments to be made by us to our general partner and its affiliates in connection with the ongoing operation and any liquidation of the Partnership.

*Operational Stage*

| | |
|---|---|
| Distributions of cash available for distribution to our general partner and its affiliates | We make cash distributions to our unitholders, including affiliates of our general partner. In addition, if distributions exceed the minimum quarterly distribution and other higher target distribution levels, our general partner is entitled to increasing percentages of the distributions, up to 50.0% of the distributions above the highest target distribution level. Assuming we have sufficient cash available for distribution to pay the full minimum quarterly distribution on all of our outstanding common units and subordinated units for four quarters, our general partner and its affiliates would receive an annual distribution of approximately $59.8 million on their units. |

119

| | |
|---|---|
| Payments to our general partner and its affiliates | BP Pipelines provides customary operating, management and general administrative services to us. Our general partner shall reimburse BP Pipelines and its affiliates pursuant to the Omnibus Agreement as described below for its direct expenses incurred on behalf of us and a proportionate amount of its and their indirect expenses incurred on behalf of us, including, but not limited to, compensation expenses. Our general partner does not receive a management fee or other compensation for its management of our partnership, but we do reimburse our general partner and its affiliates for all direct and indirect expenses they incur and payments they make on our behalf, including payments made to BP Pipelines for customary management and general administrative services. Our partnership agreement does not set a limit on the amount of expenses for which our general partner and its affiliates may be reimbursed. These expenses include salary, benefits, bonus, incentive compensation and other amounts paid to persons who perform services for us or on our behalf and expenses allocated to our general partner by its affiliates. Our partnership agreement provides that our general partner will determine the expenses that are allocable to us. |
| Withdrawal or removal of our general partner | If our general partner withdraws or is removed, its non-economic general partner interest and its incentive distribution rights will either be sold to the new general partner for cash or converted into common units, in each case for an amount equal to the fair market value of those interests. |
| *Liquidation Stage* | |
| Liquidation | Upon our liquidation, the partners, including our general partner, will be entitled to receive liquidating distributions according to their respective capital account balances. |

## Agreements Governing the Formation Transactions

We entered into various documents and agreements with BP, as described in detail below. These agreements are not the result of arm's-length negotiations. However, we believe that these fees are substantially equivalent to the fees that we would expect to charge others or to be charged by others for similar services.

### Omnibus Agreement

We have an omnibus agreement in place with BP Pipelines and our general partner that addresses the following matters:

- our payment of an annual administrative fee of $13.6 million, for the provision of general and administrative services and, in addition, to reimburse personnel and other costs related to the direct operation, management and maintenance of the assets by BP Pipelines and its affiliates;
- our obligation to reimburse BP Pipelines and its affiliates for personnel costs related to the direct operation, management, maintenance and repair of the assets incurred by BP Pipelines or its affiliates on our behalf;
- our obligation to reimburse BP Pipelines and its affiliates for services and certain direct or allocated costs and expenses incurred by BP Pipelines or its affiliates on our behalf;
- BP Pipelines' obligation to indemnify us for certain environmental and other liabilities, and our obligation to indemnify BP Pipelines for certain environmental and other liabilities related to our assets to the extent BP Pipelines is not required to indemnify us;
- the granting of a license from BP America Inc. to us with respect to use of certain BP trademarks and trade names; and
- BP Pipelines granting to us of a ROFO with respect to the Subject Assets.

So long as BP Pipelines indirectly controls our general partner, the omnibus agreement will remain in full force and effect. If BP Pipelines or its successor ceases to directly or indirectly control our general partner, either party may terminate the omnibus agreement, *provided* that the indemnification obligations will remain in full force and effect in accordance with their terms.

***Payment of Administrative Fee and Reimbursement of Expenses.*** We pay BP Pipelines an administrative fee of $13.6 million annually (payable in equal monthly installments), to reimburse BP Pipelines and its affiliates for the provision of certain general and administrative services for our benefit, including services related to the following areas: executive management services; financial management and administrative services (such as treasury and accounting); information technology services; legal services; health, safety and environmental services; land and real property management services;

120

human resources services; procurement services; corporate engineering services; business development services; investor relations, communications and external affairs; insurance administration and tax related services.

Under this agreement, we have agreed to also reimburse BP Pipelines and its affiliates for all other direct or allocated costs and expenses incurred by BP Pipelines in providing these services to us, including personnel costs related to the direct operation, management, maintenance and repair of the assets. This reimbursement is in addition to our reimbursement of our general partner and its affiliates for certain costs and expenses incurred on our behalf for managing and controlling our business and operations as required by our partnership agreement.

The fee was adjusted to $15.2 million per year, payable in equal monthly installments, beginning on January 1, 2020. Our general partner, in good faith, may adjust the administrative fee to reflect, among others, any change in the level or complexity of our operations, a change in the scope or cost of services provided to us, inflation or a change in law or other regulatory requirements, the contribution, acquisition or disposition of our assets or any material change in our operation activities.

***Environmental Indemnification by BP Pipelines.***    Under the omnibus agreement, BP Pipelines will indemnify us for losses incurred by us as a result of violations of environmental laws and environmental remediation or corrective action that is required by environmental laws resulting or arising from releases occurring during the ownership or operation of the assets contributed to us by BP Pipelines in connection with our IPO, in each case to the extent (i) such violation occurred on or prior to the closing our IPO under laws in existence prior to the closing of our IPO and (ii) not identified in a voluntary audit or investigation undertaken outside the ordinary course of business by us. BP Pipelines will also indemnify us for Scheduled Environmental Matters related to our assets. Except for Scheduled Environmental Matters, BP Pipelines will not be obligated to indemnify us for any environmental losses unless BP Pipelines is notified of such losses prior to the third anniversary of the closing of our IPO. Furthermore, except for Scheduled Environmental Matters, BP Pipelines will not be obligated to indemnify us until our aggregate indemnifiable losses exceed a $0.5 million deductible (and then BP Pipelines will only be obligated to indemnify us for amounts in excess of such deductible) and such indemnity is capped at $15.0 million (including indemnity obligations for all other environmental, and certain title and litigation claims).

***Other Indemnifications by BP Pipelines.***    BP Pipelines also indemnifies us for the following, to the extent not covered by the above-described environmental indemnity:

- events and conditions associated with BP Pipelines' retained assets, whether before or after the IPO, except to the extent caused by our act or omission after the closing;
- the failure of BP Pipelines to have obtained title or any consent or approval necessary for the direct or indirect conveyance, contribution or transfer to us or our applicable subsidiaries of pipeline and related assets or interests (other than environmental and title, rights of way, consents, licenses, permits or approvals addressed in the other indemnities described above), in each case to the extent BP Pipelines is notified of such matters prior to the first anniversary of the closing of the IPO and subject to an aggregate deductible of $0.5 million;
- any litigation matters attributable to the ownership or operation of the assets contributed to us in connection with the IPO, including the matters pending at the closing of the offering and identified on a schedule to the omnibus agreement, to the extent BP Pipelines is notified of matters that are not listed on such schedule prior to the first anniversary of the closing of the IPO and subject to an aggregate deductible of $0.5 million for such unlisted matters; and
- for a period of time immediately following the closing of the IPO equal to the applicable statute of limitations *plus* 60 days, all tax liabilities attributable to the ownership or operation of the assets contributed to us in connection with the IPO and arising prior to the closing of the IPO and any such tax liabilities that resulted from the formation of our general partner and us from the consummation of the transactions contemplated by our contribution agreement.

***Limitations on Indemnification by BP Pipelines.***    BP Pipelines' indemnity obligation for tax liabilities and liabilities associated with BP Pipelines' retained assets is not subject to a cap. BP Pipelines' indemnity obligation for conveyance, contribution or transfer of the applicable membership interest or other equity interest to us is capped at BP Pipelines' net proceeds of the IPO without any deductible. Scheduled Environmental Matters are subject to a cap of $25 million without any deductible, all other indemnity obligations of BP Pipelines under the omnibus agreement (including indemnity obligations for all other environmental, title and litigation claims) are capped at $15 million, and many are subject to a deductible as described above.

***Indemnification by Us.***    We have agreed to indemnify BP Pipelines for events and conditions associated with the ownership, management or operation of our assets, whether related to the period before or after the IPO closing date (including any violation of or any non-compliance with or liability under environmental laws (other than any liabilities for which BP Pipelines is specifically required to indemnify us as described above)). We have also agreed to indemnify BP Pipelines for any losses arising from the performance of BP Pipelines in providing general and administrative services and operating personnel services to us, except to the extent caused by the gross negligence or willful misconduct of BP Pipelines or the personnel

Debtors' Exhibit No. 60
Page 121 of 258

providing such services. There is no deductible or limit on the amount for which we will indemnify BP Pipelines under the omnibus agreement.

**License of Trademarks.**   BP America Inc. has granted us a nontransferable, nonexclusive, royalty-free worldwide right and license to use certain trademarks and tradenames owned by BP.

**ROFO.**   BP Pipelines has agreed and has caused its affiliates to agree that if, at any time prior to the earlier of the seventh anniversary of the closing of the IPO and the date on which BP Pipelines or its affiliates cease to control our general partner, BP Pipelines or any of its affiliates decide to attempt to sell (other than to another affiliate of BP Pipelines) the Subject Assets, BP Pipelines or its affiliate will notify us of its desire to sell such Subject Assets and, prior to selling such Subject Assets to a third party, will allow us 45 days from such notice to make a binding written offer regarding the such Subject Assets. Following receipt of any such offer, BP Pipelines or its affiliate will negotiate with us exclusively and in good faith for a period of 60 days in order to give us an opportunity to enter into definitive agreements for the purchase and sale of such Subject Assets on terms that are mutually acceptable to BP Pipelines or its affiliate and us. If (i) we do not deliver a binding written offer regarding such Subject Assets within 45 days of receiving notice of BP Pipelines or its affiliates' desire to sell such Subject Assets, or (ii) if we and BP Pipelines or its affiliate have not entered into a letter of intent or a definitive purchase and sale agreement with respect to such Subject Assets within such 60-day negotiation period, then BP Pipelines or its affiliate may enter into a definitive transfer agreement with any third party with respect to such Subject Assets on terms and conditions that are acceptable to BP Pipelines or its affiliate and such third party.

**Termination.**   The omnibus agreement, except for the indemnification provisions, will terminate by written agreement of all the parties thereto or by BP Pipelines or us immediately at such time as BP Pipelines ceases to indirectly control our general partner.

## Contracts with Affiliates

### *Mardi Gras Limited Liability Company Agreement*

**General.**   The Partnership, BP Pipelines and Standard Oil have entered into an amended and restated limited liability company agreement for Mardi Gras (the "Mardi Gras LLC Agreement") that provides us with a 65% managing member interest in Mardi Gras and BP Pipelines and Standard Oil retained a 34% and a 1% interest in Mardi Gras, respectively. The Mardi Gras LLC Agreement governs the ownership and management of Mardi Gras. The purpose of Mardi Gras under the Mardi Gras LLC Agreement is to engage directly or indirectly in any lawful business activity that is approved by us as the managing member, which includes the voting of Mardi Gras' ownership interests in each of the Mardi Gras Joint Ventures.

**Governance.**   Under the Mardi Gras LLC Agreement, Mardi Gras is managed by us in our capacity as managing member. Except as otherwise expressly provided in the Mardi Gras LLC Agreement, all management powers over the business and affairs of Mardi Gras, including the voting of its ownership interests in the Mardi Gras Joint Ventures, is exclusively vested in us as the managing member, and no other member of Mardi Gras has any management power over the business and affairs of the company.

For purposes of the management and voting of each member's respective interests in Mardi Gras, each member of Mardi Gras is represented by a designated representative appointed by such member. Meetings of the members are held at such times and locations as we determine in our sole discretion as managing member. The presence of each member of Mardi Gras, or its respective designated representative, in person or by proxy shall constitute a quorum at a meeting of members.

Notwithstanding the foregoing, the following actions require the unanimous approval of all members:

- the sale, lease, transfer, pledge or other disposition of any of Mardi Gras' interests in any of the Mardi Gras Joint Ventures;
- other than equity securities issued upon exercise of convertible or exchangeable securities authorized with the unanimous approval of all members of Mardi Gras, the authorization, sale and/or issuance by Mardi Gras or any of the Mardi Gras Joint Ventures of any of their respective equity securities or interests, including the granting of any options to do the same;
- the incurrence of any indebtedness by Mardi Gras or any of the Mardi Gras Joint Ventures, the incurrence of any indebtedness by any other person secured by any lien on any property of Mardi Gras or any of the Mardi Gras Joint Ventures, or the guarantee by Mardi Gras or any of the Mardi Gras Joint Ventures of the debts of any other person;
- the approval of the annual budget of Mardi Gras, including the approval of the amount of cash reserves to be set aside before payment of any distributions to the members;
- any repurchase or redemption by Mardi Gras or any of the Mardi Gras Joint Ventures of any debt or equity securities;

Debtors' Exhibit No. 60
Page 122 of 258

- any merger, consolidation or share exchange of Mardi Gras or any of the Mardi Gras Joint Ventures with or into any person, or any similar business combination transaction;
- any filing for bankruptcy, liquidation, dissolution or winding up of Mardi Gras or any of the Mardi Gras Joint Ventures or any event that would cause a dissolution or winding up of Mardi Gras or any of the Mardi Gras Joint Ventures or any consent to any such action;
- any amendment or repeal of the certificate of formation of Mardi Gras or the Mardi Gras LLC Agreement;
- any capital contributions to Mardi Gras or any of the Mardi Gras Joint Ventures; and
- approving of or granting an option to perform any actions that are intended to accomplish any of the foregoing.

In lieu of a meeting, the members may elect to act by unanimous written consent of representatives that could have taken action at the meeting of the members.

**Quarterly Cash Distributions.**    The Mardi Gras LLC Agreement provides for quarterly cash distributions to the members equal to the company's "distributable cash," which is defined to include the cash and cash equivalents of Mardi Gras less the amount of any cash reserves established by the unanimous approval of all members.

**Capital Calls to the Members.**    Under the Mardi Gras LLC Agreement, from time to time by unanimous approval of all members, we may issue a capital call request to the members of Mardi Gras for capital contributions. We shall specify the purpose for which the funds are to be applied and the date on which payments of capital contributions shall be made and method of payment.

**Transfer Restrictions.**    Under the Mardi Gras LLC Agreement, we, as managing member, may not transfer all or any part of our interests in Mardi Gras to any person without first obtaining the written approval of each of the other members, subject to certain exceptions. Each of the other members may, in its sole discretion, transfer all or any part of its interest without approval from any other member, subject to the ROFO that we have been granted with respect to BP Pipelines' interest in Mardi Gras under the omnibus agreement. Each transferee shall execute and deliver to Mardi Gras such instruments that we, as managing member, deem necessary or appropriate to effectuate the admission of such transferee as a member and to confirm the agreement of such transferee to be bound by all the terms and provisions of the Mardi Gras LLC Agreement.

**Termination.**    The Mardi Gras LLC Agreement provides that Mardi Gras will dissolve only upon the occurrence of any of the following events:

- at any time when there are no members, unless the business of Mardi Gras is continued under the Delaware Limited Liability Company Act;
- the written consent of all members to dissolve the company;
- an "event of withdrawal" (as defined in the Delaware Limited Liability Company Act) of the managing member; or
- the entry of a decree of judicial dissolution of Mardi Gras pursuant to Section 18-802 of the Delaware Limited Liability Company Act.

## Interest Purchase Agreement

On October 1, 2018, the Partnership entered into the Interest Purchase Agreement with BP Products, BP Offshore, and BP Pipelines to acquire (i) an additional 45.0% interest in Mardi Gras from BP Pipelines, (ii) a 25.0% interest in KM Phoenix from BP Products, and (iii) a 22.7% interest in Ursa from BP Offshore in exchange for aggregate consideration of $468.0 million, funded with borrowings under the Partnership's revolving credit facility.

## Revolving Credit Facility

We entered into a unsecured revolving credit facility with an affiliate of BP. The credit facility has a borrowing capacity of $600.0 million, under which $468.0 million was drawn to fund our October 2018 acquisition and is outstanding as of December 31, 2019. The credit facility provides for certain covenants, including the requirement to maintain a consolidated leverage ratio not to exceed 5.0 to 1.0, subject to a temporary increase in such ratio to 5.5 to 1.0 in connection with certain material acquisitions. In addition, the limited liability company agreement of our general partner requires the approval of BP Holdco prior to the incurrence of any indebtedness that would cause our ratio of total indebtedness to consolidated EBITDA (as defined in the credit facility) to exceed 4.5 to 1.0.

The credit facility also contains customary events of default, such as (i) nonpayment of principal when due, (ii) nonpayment of interest, fees or other amounts, (iii) breach of covenants, (iv) misrepresentation, (v) cross-payment default and cross-acceleration (in each case, to indebtedness in excess of $75 million) and (vi) insolvency. Additionally, our revolving credit facility limits our ability to, among other things: (i) incur or guarantee additional debt, (ii) redeem or repurchase units or make

123

distributions under certain circumstances; and (iii) incur certain liens or permit them to exist. Indebtedness under this facility bears interest at the 3 month LIBOR plus 0.85%. This facility includes customary fees, including a commitment fee of 0.1% and a utilisation fee of 0.2%. The credit facility is subject to definitive documentation, closing requirements and certain other conditions.

On February 20, 2019, we entered into a Credit Facility Waiver Agreement ("First Waiver Agreement") whereby the lender waived certain terms on our outstanding $468.0 million borrowings. The original loan repayment date of March 29, 2019 was waived and amended and modified to April 1, 2020.

On May 3, 2019, we entered into a Second Credit Facility Waiver Agreement ("Second Waiver Agreement") whereby the lender waived certain terms on our outstanding $468.0 million borrowings. The amended loan repayment date of April 1, 2020 was waived and amended and modified to November 30, 2020. Accrued interest will be paid on the 25th day of April, July, October and January of each year. Any remaining interest will be paid on November 30, 2020. All other terms of the credit facility remain the same.

On February 24, 2020, we entered into a $468.0 million Term Loan Facility Agreement ("term loan") with an affiliate of BP. Proceeds will be used to repay outstanding borrowings under our credit facility. The term loan has a final repayment date of February 24, 2025 and provides for certain covenants, including the requirement to maintain a consolidated leverage ratio, which is calculated as total indebtedness to consolidated EBITDA, not to exceed 5.0 to 1.0, subject to a temporary increase in such ratio to 5.5 to 1.0 in connection with certain material acquisitions. Simultaneous with this transaction, we entered into a First Amendment to Short Term Credit Facility Agreement ("First Amendment") whereby the lender added a provision that indebtedness under both the term loan and credit facility shall not exceed $600.0 million. All other terms of the credit facility remain the same.

**Transportation Revenues**

During the year ended December 31, 2019, we recognized transportation revenues of $119.9 million related to volumes transported on the Wholly Owned Assets from companies affiliated with BP.

These transactions were conducted at posted tariff rates or prices that we believe approximate market rates. These amounts do not include revenues from Mars, Ursa, KM Phoenix or the Mardi Gras Joint Ventures. The transportation revenues recognized during these periods include FLA amounts settled with BP. On October 30, 2017, we entered into an agreement with an affiliate of BP governing the sale of crude oil acquired as FLA under the applicable crude oil tariffs whereby the partnership will continue to settle its FLA collected volumes with such affiliate of BP.

**Throughput and Deficiency Agreements**

During the year ended December 31, 2019, we recognized transportation revenues of $119.9 million and deficiency revenue of $5.5 million for a total of $125.4 million from the throughput and deficiency agreements with companies affiliated with BP.

We have commercial agreements with BP Products that include minimum volume commitments and that initially support substantially all of our aggregate revenue on BP2, River Rouge and Diamondback. Under these fee-based agreements, we provide transportation services to BP Products, and BP Products has committed to pay us for minimum monthly volumes of crude oil, refined products and diluent, regardless of whether such volumes are physically shipped by BP Products through our pipelines during the term of the agreements. Please read "Business-Our Commercial Agreements with BP-Minimum Volume Commitment Agreements."

**Other Agreements**

BP2 OpCo and River Rouge OpCo have entered into sublease agreements with BP Pipelines with respect to locations where the IPO Contributed Assets are located within BP Pipelines' lease premises. The sublease agreements provide the right for the assets to be located on the premises and define certain services provided by BP Pipelines related to the assets on the premises. These agreements have a term of 50 years.

124

**Third-Party Joint Venture Limited Liability Company Agreements**

*Mars Limited Liability Company Agreement*

    *General.*   In connection with the IPO, BP Pipelines contributed to us its 28.5% ownership interest in Mars, and certain affiliates of Shell own the remaining 71.5% interest. We and the affiliates of Shell are parties to the limited liability company agreement of Mars (the "Mars LLC Agreement"), which governs the ownership and management of Mars. The purpose of Mars under the Mars LLC Agreement is generally to own and operate the Mars pipeline system and related facilities owned by the company and to conduct such other business activities as the company's management committee determines is necessary or appropriate in such ownership and operation.

    Under the Mars LLC Agreement, each member and its affiliates may engage in other business opportunities, including those that compete with Mars' business, free from any obligation to disclose the same to the other members or the company.

    *Governance.*   Mars is managed by a management committee composed of one representative designated by each member. All acts of management of Mars are taken by the management committee or by agents duly authorized in writing by the management committee. The management committee has full power and authority to manage the entire business and affairs of the Mars pipeline system.

    The management committee is required to meet semi-annually, subject to more or less frequent meetings upon approval of the management committee. Special meetings of the management committee may be called at such times, and in such manner, as any member deems necessary. The presence in person or by proxy of a representative for each member constitutes a quorum of the management committee.

    Except as noted below, all decisions of the management committee require the vote of at least 51% of the ownership interests in the company. An affiliate of Shell is able to vote a majority of the ownership interests.

    The following actions require the vote of members representing 100% of the ownership interests:

- authorizing the use of the Mars pipeline system for transportation of substances other than crude oil;
- approving capital expenditures in excess of $500,000 per project, or $2 million annually;
- any change in the direction or configuration of the pipeline system;
- establishing a connection policy;
- entering into any contract, lease, sublease, note, deed of trust or other obligation unless a provision contained therein limits the claims thereunder to the company's assets;
- the acquisition, encumbrance, sale, lease or disposition of all or substantially all of the real and personal property assets of the company;
- authorizing the borrowing of money on the credit of the company;
- the issuance of any securities by the company;
- determining that a legal prohibition against a provision of the Mars LLC Agreement invalidates the purpose or intent of the agreement;
- authorizing any individual member or member of the management committee to act on behalf of the company;
- entering into settlements, claims, judgments or matters of potential litigation greater than $100,000;
- dissolution of the company; and
- any other action that, pursuant to an express provision of the Mars LLC Agreement, requires the approval of a unanimous interest.

    If the company is composed of only two members, the following actions require the vote of members representing 100% of the ownership interests; if the company is composed of more than two members, these actions only require the vote of 51% of the ownership interests. For purposes of the voting provisions under the Mars LLC Agreement, the Shell affiliates together constitute one member. As a result, the following actions require our approval:

- approval of any company contracts or amendments thereto with certain Shell affiliates;
- approval of operating and capital budgets and any amendments thereto;
- creation of and appointments to any subcommittees to advise the management committee;
- establishment or administration of a quality bank;
- establishment or amendment of tariff rates applicable to the Mars pipeline system;
- resolution of audit exceptions; and
- any other action that, pursuant to an express provision of the Mars LLC Agreement, requires the approval of a super majority interest.

125

If the company is composed of only two members, the following actions require the vote of members representing 28.5% of the ownership interests; if the company is composed of more than two members, these actions require the vote of 51% of the ownership interests. As described above, the Shell affiliates are deemed one member and the following actions require our approval:

- giving notice of default to a defaulting member;
- expelling a defaulting member;
- directing the chairman or secretary to call special meetings of the member committee;
- causing a dispute under the company's operating agreement to go to arbitration; and
- giving notice of termination of the operating agreement because either (i) a court of competent jurisdiction has found the Mars operator to be guilty of gross negligence or willful misconduct, (ii) the Mars operator has dissolved, liquidated or terminated its existence, (iii) the Mars operator has filed a petition under Chapter 7 or Chapter 11 of the Federal Bankruptcy Act of 1978 or (iv) the Mars operator has ceased to be a member or an affiliate of a member of the company.

In lieu of a meeting, the management committee may elect to act by written consent of the members of the management committee necessary to take such action.

*Quarterly Cash Distributions.*    The Mars LLC Agreement provides for cash distributions to the members from time to time, and at least quarterly, equal to Mars' "available cash," which is defined as unrestricted cash and cash equivalents less reasonable cash reserves, which shall be determined by the management committee.

*Capital Calls to the Members.*    From time to time as determined by the management committee, the management committee may issue a capital call notice to the members of Mars for capital contributions. The management committee shall specify the amount of the capital contribution from all members collectively, the amount of the capital contribution from the member to whom such notice is addressed, the purpose for which the funds will be used, the date that the contributions are to be made and the method of contribution.

*Transfer Restrictions.*    Under the Mars LLC Agreement, each member can transfer all or any portion of its membership interests subject to certain transfer restrictions, including a preferential purchase right in favor of the other members. The preferential purchase right does not apply, among other exceptions, in the case of transfers to an affiliate of the transferring member, subject to certain criteria.

*Termination.*    The Mars LLC Agreement provides that Mars will dissolve only upon the occurrence of any of the following events:

- the vote of a unanimous interest to dissolve the company;
- any event which makes it unlawful for the business of the company to be carried on;
- the occurrence of any other event causing a dissolution of the company under Section 18-801 of the Delaware Limited Liability Company Act; or
- the filing of a certificate of cancellation with the Secretary of State of the State of Delaware.

## Mardi Gras Joint Venture Limited Liability Company Agreements

### Caesar Limited Liability Company Agreement

*General.*    We own a 65% interest in Mardi Gras, which owns a 56% interest in Caesar, and unaffiliated third-party investors own the remaining 44%. Pursuant to the Mardi Gras LLC Agreement, we have voting power sufficient such that any cash reserves by Caesar that reduce the amount of cash distributed by Caesar requires our approval.

The Third Amended and Restated Limited Liability Company Agreement of Caesar (the "Caesar LLC Agreement") governs the ownership and management of Caesar. The purpose of Caesar under the Caesar LLC Agreement is generally to own and operate the Caesar pipeline system, market the services of the Caesar pipeline system and engage in any other related activities.

*Governance.*    Caesar is managed by a management committee composed of one representative designated by each member. All acts of management of Caesar are taken by the management committee or by agents duly authorized in writing by the management committee. The management committee has full power and authority to manage the entire business and affairs of the Caesar pipeline system.

126

The management committee is required to meet semi-annually, subject to more or less frequent meetings upon approval of the management committee. Special meetings of the management committee may be called at such times, and in such manner, as any member deems necessary. The presence in person or by proxy of a representative for each member that is not a challenging member or a withdrawn member constitutes a quorum of the management committee.

The following actions require a unanimous interest or the vote of 100% of the percentage interests of all members:

- dissolution of the company;
- approval of the company's execution of, assignment of, and any amendment to or waiver of certain specified construction agreements, operating agreements and letters of understanding (the "Caesar Definitive Agreements");
- termination pursuant to the terms thereof of any Caesar Definitive Agreement or any other agreement with respect to the construction or operation of the Caesar pipeline system;
- except for collection actions, the institution of litigation, arbitration, or similar proceedings against persons other than any member or any affiliate of any member at a cost to the company which could reasonably be expected to exceed $1,000,000;
- settlement of any litigation, arbitration or similar proceedings against any person or the company for an amount in excess of $1,000,000, excluding those claims covered by any insurance policy the company may have;
- authorization of transactions the nature of which are not in the ordinary course of business;
- approval of the merger, consolidation, or participation in a share exchange or other statutory reorganization with, or voluntary or involuntary sale, exchange, assignment, transfer, conveyance, bequest, devise, merger, consolidation, gift or any other alienation, with or without consideration, of all or substantially all of the assets of the company to, any person;
- authorization of a transaction involving a lease or similar arrangement which either (1) involves an asset with a fair market value of more than $5,000,000 or (2) could reasonably be expected to result in annual payments of more than $5,000,000;
- acceptance of non-cash contributions from any member and determining the fair market value thereof;
- purchase of any insurance by the company;
- incurring any debt obligation of the company through long term or short term borrowing;
- hiring or termination of any employees of the company;
- appointment or removal of the company's independent auditor;
- amendment of the Caesar LLC Agreement;
- approval of the filing of any application with any governmental agency for a change in the jurisdictional or carrier status of the Caesar pipeline system;
- approval of capital expenditures associated with any single project or undertaking estimated to exceed $40,000,000 in the aggregate; and
- any other action that, pursuant to an express provision of the Caesar LLC Agreement, requires the approval of a unanimous interest.

The following actions require a super majority interest of three or more members that are not affiliates holding at least 70% of the percentage interests:

- approval by the company of the assignment of certain of the Caesar Definitive Agreements;
- authorization of any contract or agreement to be executed by company involving capital expenditures of more than $5,000,000 in any year;
- approval of capital expenditures associated with any single project or undertaking estimated to exceed $20,000,000 in the aggregate; and
- approval of any amendment or revision to the budget to reflect an increase in the then current budget total under certain of the Caesar Definitive Agreements.

The following actions require a majority interest of two or more members that are not affiliates holding among them at least 61% of the percentage interests:

- approval of any expenditure or undertaking required to perform any major repair to the Caesar pipeline system;
- approval of any action that requires the approval of the management committee but does not expressly require the approval of a unanimous interest or a super majority interest;
- approval of any action that requires the approval of the company under the Caesar Definitive Agreements;
- approval of the assignment by Mardi Gras to the company of certain portions of a memorandum of understanding pertaining to certain interconnections to be constructed by a third party;

- authorization for the company to conduct an audit under certain of the Caesar Definitive Agreements and designation of the person who will be responsible for conducting such audit;
- approval of any inspection to be made by the company under certain of the Caesar Definitive Agreements and designation of the person who will be responsible for conducting such inspection;
- approval of the submission of any dispute by company under certain of the Caesar Definitive Agreements to the dispute resolution process set forth therein and any other matters necessary to conduct such process;
- approval by company to assert a claim for indemnification against the current operator of Caesar;
- submission of any request by company that the current operator of Caesar provide details regarding the allocation of costs among the Caesar pipeline system and other projects under certain of the Caesar Definitive Agreements, as applicable;
- approval of the company's transportation policy, as well as any amendments or modifications thereto;
- approval by the company of any action that is designated as requiring the approval of a super majority interest under the company's transportation policy; and
- any other action that requires the approval of a majority interest under the Caesar LLC Agreement.

In lieu of a meeting, the management committee may elect to act by written consent of the members of the management committee necessary to take such action.

*Quarterly Cash Distributions.*    The Caesar LLC Agreement provides for cash distributions to the members from time to time, and at least quarterly, equal to Caesar's "available cash," which is defined as unrestricted cash and cash equivalents less reasonable cash reserves, which shall be determined by the management committee.

*Capital Calls to the Members.*    From time to time as determined by the management committee, the management committee may issue a capital call request to the members of Caesar for capital contributions. The management committee shall specify (i) the total amount of the capital contributions requested from all members, (ii) the amount of capital contribution from each member individually, which amount shall be in accordance with the expense interest of such member, (iii) the purpose for which the funds are to be applied and (iv) the date on which payments of capital contributions shall be made and method of payment.

*Transfer Restrictions.*    Under the Caesar LLC Agreement, each member may transfer all or any portion of its membership interest subject to certain transfer restrictions. If a member transfers all or any portion to any person that is not another member or an affiliate of the transferring member, such person or its parent must satisfy certain credit requirements and other criteria.

*Termination.*    The Caesar LLC Agreement provides that Caesar will dissolve only upon the occurrence of any of the following events:

- the vote of a unanimous interest to dissolve the company;
- the occurrence of any other event causing a dissolution of the company under Section 18-801 of the Delaware Limited Liability Company Act; or
- the filing of a certificate of cancellation with the Secretary of State of the State of Delaware.

### Cleopatra Limited Liability Company Agreement

*General.*    We own a 65% interest in Mardi Gras, which owns a 53% interest in Cleopatra, and unaffiliated third-party investors own the remaining 47%. Pursuant to the Mardi Gras LLC Agreement, we have voting power sufficient such that any cash reserves by Cleopatra that reduce the amount of cash distributed by Cleopatra requires our approval.

The Third Amended and Restated Limited Liability Company Agreement of Cleopatra (the "Cleopatra LLC Agreement") governs the ownership and management of Cleopatra. The purpose of Cleopatra under the Cleopatra LLC Agreement is generally to own and operate the Cleopatra pipeline system, market the services of the Cleopatra pipeline system and engage in any other related activities.

*Governance.*    Cleopatra is managed by a management committee composed of one representative designated by each member. All acts of management of Cleopatra are taken by the management committee or by agents duly authorized in writing by the management committee. The management committee has full power and authority to manage the entire business and affairs of the Cleopatra pipeline system.

The management committee is required to meet semi-annually, subject to more or less frequent meetings upon approval of the management committee. Special meetings of the management committee may be called at such times, and in such manner, as any member deems necessary. The presence in person or by proxy of a representative for each member that is not a challenging member or a withdrawn member constitutes a quorum of the management committee.

The following actions require a unanimous interest or the vote of 100% of the percentage interests of all members:

- dissolution of the company;
- approval of the company's execution of, assignment of, and any amendment to or waiver of certain specified construction agreements, operating agreements and letters of understanding (the "Cleopatra Definitive Agreements");
- termination pursuant to the terms thereof of any Cleopatra Definitive Agreement or any other agreement with respect to the construction or operation of the Cleopatra pipeline system;
- except for collection actions, the institution of litigation, arbitration, or similar proceedings against persons other than any member or any affiliate of any member at a cost to the company which could reasonably be expected to exceed $1,000,000;
- settlement of any litigation, arbitration or similar proceedings against any person or the company for an amount in excess of $1,000,000, excluding those claims covered by any insurance policy the company may have;
- authorization of transactions the nature of which are not in the ordinary course of business;
- approval of the merger, consolidation, or participation in a share exchange or other statutory reorganization with, or voluntary or involuntary sale, exchange, assignment, transfer, conveyance, bequest, devise, merger, consolidation, gift or any other alienation, with or without consideration, of all or substantially all of the assets of the company to, any person;
- authorization of a transaction involving a lease or similar arrangement which either (1) involves an asset with a fair market value of more than $5,000,000 or (2) could reasonably be expected to result in annual payments of more than $5,000,000;
- acceptance of non-cash contributions from any member and determining the fair market value thereof;
- purchase of any insurance by the company;
- incurring any debt obligation of the company through long term or short term borrowing;
- hiring or termination of any employees of the company;
- appointment or removal of the company's independent auditor;
- amendment of the Cleopatra LLC Agreement;
- approval of the filing of any application with any governmental agency for a change in the jurisdictional or carrier status of the Cleopatra pipeline system;
- approval of capital expenditures associated with any single project or undertaking estimated to exceed $30,000,000 in the aggregate; and
- any other action that, pursuant to an express provision of the Cleopatra LLC Agreement, requires the approval of a unanimous interest.

The following actions require a super majority interest of three or more members that are not affiliates holding at least 70% of the percentage interests:

- approval by the company of the assignment of certain of the Cleopatra Definitive Agreements;
- authorization of any contract or agreement to be executed by company involving capital expenditures of more than $5,000,000 in any year;
- approval of capital expenditures associated with any single project or undertaking estimated to exceed $20,000,000 in the aggregate; and
- approval of any amendment or revision to the budget to reflect an increase in the then current budget total under certain of the Cleopatra Definitive Agreements.

The following actions require a majority interest of two or more members that are not affiliates holding among them at least 61% of the percentage interests:

- approval of any expenditure or undertaking required to perform any major repair to the Cleopatra pipeline system;
- approval of any action that requires the approval of the management committee but does not expressly require the approval of a unanimous interest or a super majority interest;
- approval of any action that requires the approval of the company under the Cleopatra Definitive Agreements;
- approval of the assignment by Mardi Gras to the company of certain portions of a memorandum of understanding pertaining to certain interconnections to be constructed by a third party;

129