- authorization for the company to conduct an audit under certain of the Cleopatra Definitive Agreements and designation of the person who will be responsible for conducting such audit;
- approval of any inspection to be made by the company under certain of the Cleopatra Definitive Agreements and designation of the person who will be responsible for conducting such inspection;
- approval of the submission of any dispute by company under certain of the Cleopatra Definitive Agreements to the dispute resolution process set forth therein and any other matters necessary to conduct such process;
- approval by company to assert a claim for indemnification against the current operator of Cleopatra;
- submission of any request by company that the current operator of Cleopatra provide details regarding the allocation of costs among the Cleopatra pipeline system and other projects under certain of the Cleopatra Definitive Agreements; and
- any other action that requires the approval of a majority interest under the Cleopatra LLC Agreement.

In lieu of a meeting, the management committee may elect to act by written consent of the members of the management committee necessary to take such action.

*Quarterly Cash Distributions.*    The Cleopatra LLC Agreement provides for cash distributions to the members from time to time, and at least quarterly, equal to Cleopatra's "available cash," which is defined as unrestricted cash and cash equivalents less reasonable cash reserves, which shall be determined by the management committee.

*Capital Calls to the Members.*    From time to time as determined by the management committee, the management committee may issue a capital call request to the members of Cleopatra for capital contributions. The management committee shall specify (i) the total amount of the capital contributions requested from all members, (ii) the amount of capital contribution from each member individually, which amount shall be in accordance with the expense interest of such member, (iii) the purpose for which the funds are to be applied and (iv) the date on which payments of capital contributions shall be made and method of payment.

*Transfer Restrictions.*    Under the Cleopatra LLC Agreement, each member may transfer all or any portion of its membership interest subject to certain transfer restrictions. If a member transfers all or any portion to any person that is not another member or an affiliate of the transferring member, such person or its parent must satisfy certain credit requirements and other criteria.

*Termination.*    The Cleopatra LLC Agreement provides that Cleopatra will dissolve only upon the occurrence of any of the following events:

- the vote of a unanimous interest to dissolve the company;
- the occurrence of any other event causing a dissolution of the company under Section 18‑801 of the Delaware Limited Liability Company Act; or
- the filing of a certificate of cancellation with the Secretary of State of the State of Delaware.

### Proteus Limited Liability Company Agreement

*General.*    We own a 65% interest in Mardi Gras, which owns a 65% interest in Proteus, and unaffiliated third‑party investors own the remaining 35%. Pursuant to the Mardi Gras LLC Agreement, we have voting power sufficient such that any cash reserves by Proteus that reduce the amount of cash distributed by Proteus requires our approval.

The Second Amended and Restated Limited Liability Company Agreement of Proteus (the "Proteus LLC Agreement") governs the ownership and management of Proteus. The purpose of Proteus under the Proteus LLC Agreement is generally to own and operate the Proteus pipeline system, market the services of the Proteus pipeline system and engage in any other related activities.

*Governance.*    Proteus is managed by a management committee composed of one representative designated by each member. All acts of management of Proteus are taken by the management committee or by agents duly authorized in writing by the management committee. The management committee has full power and authority to manage the entire business and affairs of the Proteus pipeline system.

The management committee is required to meet semi‑annually, subject to more or less frequent meetings upon approval of the management committee. Special meetings of the management committee may be called at such times, and in such manner, as any member deems necessary. The presence in person or by proxy of a representative for each member that is not a challenging member or a withdrawn member constitutes a quorum of the management committee.

130

The following actions require a unanimous interest or the vote of 100% of the percentage interests of all members:

- dissolution of the company pursuant to the Proteus LLC Agreement or the filing of any bankruptcy or reorganization petition on behalf of the company and acquiescence in such a petition filed by others;
- approval of the company's execution of, assignment of, and any amendment to or waiver of certain specified construction agreements, operating agreements and letters of understanding (the "Proteus Definitive Agreements");
- termination pursuant to the terms thereof of any Proteus Definitive Agreement or any other agreement with respect to the construction or operation of the Proteus pipeline system and appointment of a replacement operator or construction manager, as applicable;
- except for collection actions, the institution of litigation, arbitration, or similar proceedings against persons other than any member or any affiliate of any member at a cost to the company which could reasonably be expected to exceed $500,000;
- settlement of any litigation, arbitration or similar proceedings against any person or the company for an amount in excess of $500,000, excluding those claims covered by any insurance policy the company may have;
- authorization of transactions the nature of which are not in the ordinary course of business;
- approval of the merger, consolidation, or participation in a share exchange or other statutory reorganization with, or voluntary or involuntary sale, exchange, assignment, transfer, conveyance, bequest, devise, merger, consolidation, gift or any other alienation, with or without consideration, of all or substantially all of the assets of the company to, any person;
- authorization of a transaction involving a lease or similar arrangement which either (1) involves an asset with a fair market value of more than $5,000,000 or (2) could reasonably be expected to result in annual payments of more than $5,000,000;
- acceptance of non-cash contributions from any member and determining the fair market value thereof;
- approval of the purchase of any insurance policy to be held by the company or the cancellation of any insurance policy then held by the company;
- incurring any debt obligation of the company through long term or short term borrowing;
- hiring or termination of any employees of the company;
- appointment or removal of the company's independent auditor;
- appointment or removal of any independent auditor that company has the right to appoint pursuant to certain of the Proteus Definitive Agreements;
- amendment of the Proteus LLC Agreement;
- approval of any single project or undertaking and the budget for such single project or undertaking with capital expenditures estimated to exceed $20,000,000 in the aggregate;
- authorization of expenditures for any single project or undertaking with capital expenditures estimated to exceed $20,000,000 in the aggregate;
- designation of the officers of the company, including the decision to include vice presidents among the officers, but excluding the designation of any specific vice president;
- removal of any officer of the company, excluding the removal of any vice president appointed by a member;
- approval of the company's policies and procedures, as well as any modifications or amendments thereto that may be made from time to time;
- decision to appoint a person other than the current Proteus operator to be the tax reporting member under the Proteus LLC Agreement and designation of a replacement tax reporting member;
- decision to shorten any required notification period set forth in the Proteus LLC Agreement for the holding of quarterly or special management committee meetings;
- approval of banking resolutions, including, designation of persons that may (1) sign checks and other orders for the payment of money by the company; (2) sign contracts and other instruments or documents in the name of the company; and (3) endorse checks and other orders for the payment of money made payable to the company; and
- any other action that, pursuant to an express provision of the Proteus LLC Agreement, requires the approval of a unanimous interest.

The following actions require a super majority interest of three or more members that are not affiliates holding at least 76% of the percentage interests:

- approval by the company of the assignment of certain of the Proteus Definitive Agreements;
- authorization of any contract or agreement to be executed by company involving capital expenditures of more than $5,000,000 in any year;
- approval of any single project or undertaking and the budget for such single project or undertaking with capital expenditures estimated to exceed $15,000,000 but not to exceed $20,000,000 in the aggregate;

131

- authorization of expenditures for any single project or undertaking with capital expenditures estimated to exceed $15,000,000 but not to exceed $20,000,000 in the aggregate;
- approval of any amendment or revision to the budget under certain of the Proteus Definitive Agreements to reflect an increase in the then current budget total;
- execution by company of the completion certificate pursuant to certain construction agreements;
- approval of the amount of cash reserves to be set aside before the payment of any distribution to the members;
- approval of the company's transportation policy, as well as any amendments or modifications thereto;
- approval of the first operating budget under certain of the Proteus Definitive Agreements;
- decision to reduce the 30-day or 60-day period in which payments of capital contributions must be made;
- approval by the company of any action that is designated as requiring the approval of a super majority interest under the company's transportation policy; and
- any other action that, pursuant to an express provision of the Proteus LLC Agreement, requires the approval of a super majority interest.

The following actions require a majority interest of two or more members that are not affiliates holding among them at least 60% of the percentage interests:

- approval of any expenditure or undertaking required to perform any major repair to the Proteus pipeline system;
- approval of the amount of a capital contribution;
- approval of any action that requires the approval of the management committee but does not expressly require the approval of a unanimous interest or a super majority interest;
- approval of any action that requires the approval of the company under the Proteus Definitive Agreements, including without limitation, the approval of any operating budget or approval of any single project or undertaking and the budget for such single project or undertaking capital expenditures estimated to be less than or equal to $15,000,000 in the aggregate and the authorization of such capital expenditures;
- approval of certain interconnect agreements, lease of platform space agreements or operating agreements;
- decision to terminate the Proteus operating agreement;
- approval of the submission of any dispute by company under certain of the Proteus Definitive Agreements to the dispute resolution process set forth therein and any other matters necessary to conduct such process;
- approval by company to assert a claim for indemnification against a Proteus operator or to declare an operator to be in default under certain of the Proteus Definitive Agreements;
- submission of any request by company that an operator provide details regarding the allocation of costs among the Proteus pipeline system and other projects under certain of the Proteus Definitive Agreements;
- decision to make distributions hereunder more frequently than on a quarterly basis;
- approval by the company of any action that is designated as requiring the approval of a majority interest under the company's transportation policy; and
- any other action that requires the approval of a majority interest under the Proteus LLC Agreement.

In lieu of a meeting, the management committee may elect to act by written consent of the members of the management committee necessary to take such action.

**Quarterly Cash Distributions.**    The Proteus LLC Agreement provides for cash distributions to the members from time to time, and at least quarterly, equal to Proteus' "available cash," which is defined as unrestricted cash and cash equivalents less reasonable cash reserves as the management committee shall determine.

**Capital Calls to the Members.**    From time to time as determined by the management committee, the management committee may issue a capital call request to the members of Proteus for capital contributions. The management committee shall specify (i) the total amount of the capital contributions requested from all members, (ii) the amount of capital contribution from each member individually, which amount shall be in accordance with the expense interest of such member, (iii) the budget line item for which the funds are to be applied and (iv) the date on which payments of capital contributions shall be made and method of payment.

**Transfer Restrictions.**    Under the Proteus LLC Agreement, each member can transfer all or any portion of its membership interest subject to certain transfer restrictions, including a preferential purchase right in favor of the other members. The preferential purchase right does not apply, among other exceptions, in the case of transfers to an affiliate of the transferring member, subject to certain credit requirements and other criteria.

*Termination.*    The Proteus LLC Agreement provides that Proteus will dissolve only upon the occurrence of any of the following events:

- the vote of a unanimous interest to dissolve the company;
- the occurrence of any other event causing a dissolution of the company under Section 18-801 of the Delaware Limited Liability Company Act; or
- the filing of a certificate of cancellation with the Secretary of State of the State of Delaware.

### *Endymion Limited Liability Company Agreement*

*General.*    We own a 65% interest in Mardi Gras, which owns a 65% interest in Endymion, and unaffiliated third-party investors own the remaining 35%. Pursuant to the Mardi Gras LLC Agreement, we have voting power sufficient such that any cash reserves by Endymion that reduce the amount of cash distributed by Endymion requires our approval.

The Second Amended and Restated Limited Liability Company Agreement of Endymion (the "Endymion LLC Agreement") governs the ownership and management of Endymion. The purpose of Endymion under the Endymion LLC Agreement is generally to own and operate the Endymion pipeline system, market the services of the Endymion pipeline system and engage in any other related activities.

*Governance.*    Endymion is managed by a management committee composed of one representative designated by each member. All acts of management of Endymion are taken by the management committee or by agents duly authorized in writing by the management committee. The management committee has full power and authority to manage the entire business and affairs of the Endymion pipeline system.

The management committee is required to meet semi-annually, subject to more or less frequent meetings upon approval of the management committee. Special meetings of the management committee may be called at such times, and in such manner, as any member deems necessary. The presence in person or by proxy of a representative for each member that is not a challenging member or a withdrawn member constitutes a quorum of the management committee.

The following actions require a unanimous interest or the vote of 100% of the percentage interests of all members:

- dissolution of the company pursuant to the Endymion LLC Agreement or the filing of any bankruptcy or reorganization petition on behalf of the company and acquiescence in such a petition filed by others;
- approval of the company's execution of, assignment of, and any amendment to or waiver of certain specified construction agreements, operating agreements and letters of understanding (the "Endymion Definitive Agreements");
- termination pursuant to the terms thereof of any Endymion Definitive Agreement or any other agreement with respect to the construction or operation of the Endymion pipeline system and appointment of a replacement operator or construction manager, as applicable;
- except for collection actions, the institution of litigation, arbitration, or similar proceedings against persons other than any member or any affiliate of any member at a cost to the company which could reasonably be expected to exceed $500,000;
- settlement of any litigation, arbitration or similar proceedings against any person or the company for an amount in excess of $500,000, excluding those claims covered by any insurance policy the company may have;
- authorization of transactions the nature of which are not in the ordinary course of business;
- approval of the merger, consolidation, or participation in a share exchange or other statutory reorganization with, or voluntary or involuntary sale, exchange, assignment, transfer, conveyance, bequest, devise, merger, consolidation, gift or any other alienation, with or without consideration, of all or substantially all of the assets of the company to, any person;
- authorization of a transaction involving a lease or similar arrangement which either (1) involves an asset with a fair market value of more than $5,000,000 or (2) could reasonably be expected to result in annual payments of more than $5,000,000;
- acceptance of non-cash contributions from any member and determining the fair market value thereof;
- approval of the purchase of any insurance policy to be held by the company or the cancellation of any insurance policy then held by the company;
- incurring any debt obligation of the company through long term or short term borrowing;
- hiring or termination of any employees of the company;
- appointment or removal of the company's independent auditor;
- appointment or removal of any independent auditor that the company has the right to appoint pursuant to certain of the Endymion Definitive Agreements;
- amendment of the Endymion LLC Agreement;

133

- approval of any single project or undertaking and the budget for such single project or undertaking with capital expenditures estimated to exceed $20,000,000 in the aggregate;
- authorization of expenditures for any single project or undertaking with capital expenditures estimated to exceed $20,000,000 in the aggregate;
- designation of the officers of the company, including the decision to include vice presidents among the officers, but excluding the designation of any specific vice president;
- removal of any officer of the company, excluding the removal of any vice president appointed by a member;
- approval of the company's policies and procedures, as well as any modifications or amendments thereto that may be made from time to time;
- decision to appoint a person other than the current Endymion operator to be the tax reporting member under the Endymion LLC Agreement and designation of a replacement tax reporting member;
- decision to shorten any required notification period set forth in the Endymion LLC Agreement for the holding of quarterly or special management committee meetings;
- approval of banking resolutions, including, designation of persons that may (1) sign checks and other orders for the payment of money by the company; (2) sign contracts and other instruments or documents in the name of the company; and (3) endorse checks and other orders for the payment of money made payable to the company; and
- any other action that, pursuant to an express provision of the Endymion LLC Agreement, requires the approval of a unanimous interest.

The following actions require a super majority interest of three or more members that are not affiliates holding at least 76% of the percentage interests:

- approval by the company of the assignment of certain of the Endymion Definitive Agreements;
- authorization of any contract or agreement to be executed by company involving capital expenditures of more than $5,000,000 in any year;
- approval of any single project or undertaking and the budget for such single project or undertaking with capital expenditures estimated to exceed $15,000,000 but not to exceed $20,000,000 in the aggregate;
- authorization of expenditures for any single project or undertaking with capital expenditures estimated to exceed $15,000,000 but not to exceed $20,000,000 in the aggregate;
- approval of any amendment or revision to the budget under certain of the Endymion Definitive Agreements to reflect an increase in the then current budget total;
- execution by company of the completion certificate pursuant to certain construction agreements;
- approval of the amount of cash reserves to be set aside before the payment of any distribution to the members;
- approval of the company's transportation policy, as well as any amendments or modifications thereto;
- approval of the first operating budget under certain of the Endymion Definitive Agreements;
- decision to reduce the 30-day or 60-day period in which payments of capital contributions must be made;
- approval by the company of any action that is designated as requiring the approval of a super majority interest under the company's transportation policy; and
- any other action that, pursuant to an express provision of the Endymion LLC Agreement, requires the approval of a super majority interest.

The following actions require a majority interest of two or more members that are not affiliates holding among them at least 60% of the percentage interests:

- approval of any expenditure or undertaking required to perform any major repair to the Endymion pipeline system;
- approval of the amount of a capital contribution;
- approval of any action that requires the approval of the management committee but does not expressly require the approval of a unanimous interest or a super majority interest;
- approval of any action that requires the approval of the company under the Endymion Definitive Agreements including without limitation, the approval of any operating budget or approval of any single project or undertaking and the budget for such single project or undertaking capital expenditures estimated to be less than or equal to $15,000,000 in the aggregate and the authorization of such capital expenditures;
- approval of certain interconnect agreements, lease of platform space agreements or operating agreements;
- decision to terminate the Endymion operating agreement;
- approval of the submission of any dispute by company under certain of the Endymion Definitive Agreements to the dispute resolution process set forth therein and any other matters necessary to conduct such process;
- approval by company to assert a claim for indemnification against an Endymion operator or to declare an operator to be in default under certain of the Endymion Definitive Agreements;

134

- submission of any request by company that an operator provide details regarding the allocation of costs among the Endymion pipeline system and other projects under certain of the Endymion Definitive Agreements;
- decision to make distributions hereunder more frequently than on a quarterly basis;
- approval by the company of any action that is designated as requiring the approval of a majority interest under the company's transportation policy; and
- any other action that requires the approval of a majority interest under the Endymion LLC Agreement.

In lieu of a meeting, the management committee may elect to act by written consent of the members of the management committee necessary to take such action.

*Quarterly Cash Distributions.*    The Endymion LLC Agreement provides for cash distributions to the members from time to time, and at least quarterly, equal to Endymion's "available cash," which is defined as unrestricted cash and cash equivalents less reasonable cash reserves as the management committee shall determine.

*Capital Calls to the Members.*    From time to time as determined by the management committee, the management committee may issue a capital call request to the members of Endymion for capital contributions. The management committee shall specify (i) the total amount of the capital contributions requested from all members, (ii) the amount of capital contribution from each member individually, which amount shall be in accordance with the expense interest of such member, (iii) the budget line item for which the funds are to be applied and (iv) the date on which payments of capital contributions shall be made and method of payment.

*Transfer Restrictions.*    Under the Endymion LLC Agreement, each member can transfer all or any portion of its membership interest subject to certain transfer restrictions, including a preferential purchase right in favor of the other members. The preferential purchase right does not apply, among other exceptions, in the case of transfers to an affiliate of the transferring member, subject to certain credit requirements and other criteria.

*Termination.*    The Endymion LLC Agreement provides that Endymion will dissolve only upon the occurrence of any of the following events:

- the vote of a unanimous interest to dissolve the company;
- the occurrence of any other event causing a dissolution of the company under Section 18-801 of the Delaware Limited Liability Company Act; or
- the filing of a certificate of cancellation with the Secretary of State of the State of Delaware.

## Procedures for Review, Approval or Ratification of Transactions with Related Parties

The board of directors of our general partner has adopted policies for the review, approval and ratification of transactions with related persons. The board has also adopted a written code of business conduct and ethics, under which a director will be expected to bring to the attention of the chief executive officer or the board any conflict or potential conflict of interest that may arise between the director in his or her personal capacity or any affiliate of the director in his or her personal capacity, on the one hand, and us or our general partner on the other. The resolution of any such conflict or potential conflict should, at the discretion of the board in light of the circumstances, be determined by a majority of the disinterested directors.

If a conflict or potential conflict of interest arises between our general partner or its affiliates, on the one hand, and us or our unitholders, on the other hand, the resolution of any such conflict or potential conflict should be addressed by the board of directors of our general partner in accordance with the provisions of our partnership agreement. At the discretion of the board in light of the circumstances, the resolution may be determined by the board in its entirety or by a conflicts committee meeting the definitional requirements for such a committee under our partnership agreement.

Our adoption of our code of business conduct requires executive officers to avoid personal conflicts of interest unless approved by the board of directors of our general partner.

There were no related person transactions during 2019 which were required to be reported in "Certain Relationships and Related Transactions, and Director Independence" where the procedures described above did not require review, approval or ratification or where these procedures were not followed.

**Director Independence**

Rather than adopting categorical standards, the board of directors of our general partner assesses director independence on a case-by-case basis, in each case consistent with applicable legal requirements and the listing standards of the NYSE. After reviewing all relationships each director has with us, including the nature and extent of (i) any business, employment or familial relationships between us and each director, as well as (ii) any significant charitable contributions we make to organizations where our directors serve as board members or executive officers, the board of directors of our general partner has affirmatively determined that Walter Clements, Robert Malone, and Michele Joy have no material relationships with us and are independent as defined by the current listing standards of the NYSE.

**Item 14. PRINCIPAL ACCOUNTING FEES AND SERVICES**

The following table presents fees for professional services performed by independent registered public accounting firm, Deloitte & Touche LLP for 2019 and 2018, respectively.

| Fees (millions of dollars) | 2019 | | 2018 | |
|---|---|---|---|---|
| Audit fees [1] | $ | 1.1 | $ | 1.0 |
| Audit-related fees | | — | | — |
| Tax fees | | — | | — |
| All other fees | | — | | — |
| Total | $ | 1.1 | $ | 1.0 |

(1) Audit fees represent amounts billed for professional services rendered in connection with (i) the audit of our annual financial statements and internal controls over financial reporting, (ii) the review of our quarterly financial statements, and (iii) services provided in connection with regulatory filings.

The Audit Committee has adopted a pre-approval policy that provides guidelines for the audit, audit-related, tax and other non-audit services that may be provided to the Partnership. All of the fees in the table above were approved in accordance with this policy. The policy (a) identifies the guiding principles that must be considered by the Audit Committee in approving services to ensure that Deloitte & Touche LLP's independence is not impaired; (b) describes the audit, audit-related, tax and other services that may be provided and the non-audit services that are prohibited; and (c) sets forth pre-approval requirements for all permitted services. Under the policy, all services to be provided by Deloitte & Touche LLP must be pre-approved by the Audit Committee. The Audit Committee has delegated authority to approve permitted services to the Audit Committee's Chair. Such approval must be reported to the entire Audit Committee at the next scheduled Audit Committee meeting.

The audit committee has sole authority to (1) retain and terminate our independent registered public accounting firm, (2) approve all auditing services and related fees and the terms thereof performed by our independent registered public accounting firm and, as outlined above, (3) pre-approve any non-audit services and tax services to be rendered by our independent registered public accounting firm. The audit committee is also responsible for confirming the independence and objectivity of our independent registered public accounting firm. Our independent registered public accounting firm has been given unrestricted access to the audit committee and our management.

## PART IV

**Item 15. EXHIBITS, FINANCIAL STATEMENT SCHEDULES**

1. Financial Statements and Supplementary Data

The financial statements and supplementary information listed in the Index to Consolidated Financial Statements, which appears in Part II, Item 8, are filed as part of this Annual Report.

2. Financial Statement Schedules

The following financial statements are included pursuant to Rule 3-09 of Regulation S-X (17 CFR 210.3-09):

136

| | |
|---|---|
| Mars Oil Pipeline Company, LLC | Financial Statements as of December 31, 2019 and 2018 and for the fiscal years ended December 31, 2019, 2018 and 2017. |
| Caesar Oil Pipeline Company, LLC | Financial Statements as of and for the fiscal years ended December 31, 2019 and 2018. |
| Caesar Oil Pipeline Company, LLC | Financial Statements as of and for the fiscal years ended December 31, 2018 and 2017. |
| Cleopatra Gas Gathering Company, LLC | Financial Statements as of and for the fiscal years ended December 31, 2019 and 2018. |
| Cleopatra Gas Gathering Company, LLC | Financial Statements as of and for the fiscal years ended December 31, 2018 and 2017. |

All other financial statement schedules are omitted because they are not required, not significant, not applicable or the information is shown in another schedule, the consolidated financial statements or the notes to consolidated financial statements.

3. Exhibits

The exhibits listed in the Index to Exhibits are filed as part of this Annual Report.

**BP MIDSTREAM PARTNERS LP**
**INDEX TO EXHIBITS**

| Exhibit No. | Exhibit Description | Incorporated by Reference | | | | Filed Herewith | Furnished Herewith |
|---|---|---|---|---|---|---|---|
| | | Form | Exhibit | Filing Date | SEC File No. | | |
| 3.1 | Certificate of Limited Partnership of BP Midstream Partners LP | S-1 | 3.1 | 9/11/2017 | 333-220407 | | |
| 3.2 | Amended and Restated Agreement of Limited Partnership of BP Midstream Partners LP dated October 30, 2017. | 10-Q | 3.2 | 12/6/2017 | 001-38260 | | |
| 3.3 | Certificate of Formation of BP Midstream Partners GP LLC | S-1 | 3.3 | 9/11/2017 | 333-220407 | | |
| 3.4 | First Amended and Restated Limited Liability Company Agreement of BP Midstream Partners GP LLC | S-1 | 3.4 | 9/11/2017 | 333-220407 | | |
| 4.1 | Description of Securities Registered Pursuant to Section 12 of the Securities Exchange Act of 1934 | | | | | X | |
| 10.1 | Contribution, Assignment and Assumption Agreement dated, October 30, 2017 by and among BP Pipelines (North America) Inc., BP Midstream Partners GP LLC, BP Midstream Partners LP, BP Midstream Partners Holdings LLC, and The Standard Oil Company. | 8-K | 10.1 | 11/1/2017 | 001-38260 | | |
| 10.2 | Omnibus Agreement dated October 30, 2017 by and among BP Pipelines (North America) Inc., BP Midstream Partners LP, BP Midstream Partners GP LLC, and solely for the purposes of Articles 4 and 6, BP America Inc. | 8-K | 10.2 | 11/1/2017 | 001-38260 | | |
| 10.3 | BP Midstream Partners LP Short Term Credit Facility Agreement, dated as of October 30, 2017, between BP Midstream Partners LP and North America Funding Company | 8-K | 10.3 | 11/1/2017 | 001-38260 | | |
| 10.4* | Form of Indemnification Agreement | S-1/A | 10.6 | 9/25/2017 | 333-220407 | | |
| 10.5 | BP Two Pipeline Company LLC Throughput and Deficiency Agreement, dated October 30, 2017, between BP Midstream Partners LP and BP Products North America Inc. | 8-K | 10.4 | 11/1/2017 | 001-38260 | | |
| 10.6 | BP River Rouge Pipeline Company LLC Throughput and Deficiency Agreement, dated October 30, 2017, between BP Midstream Partners LP and BP Products North America Inc. | 8-K | 10.5 | 11/1/2017 | 001-38260 | | |
| 10.7 | BP D-B Pipeline Company LLC Throughput and Deficiency Agreement, dated October 30, 2017, between BP Midstream Partners LP and BP Products North America Inc. | 8-K | 10.6 | 11/1/2017 | 001-38260 | | |
| 10.8 | Second Amended and Restated Limited Liability Company Agreement of Mardi Gras Transportation System Company LLC dated October 30, 2017 by and among BP Midstream Partners LP, BP Pipelines (North America) Inc. and The Standard Oil Company | 8-K | 10.7 | 11/1/2017 | 001-38260 | | |
| 10.9* | BP Midstream Partners LP 2017 Long-Term Incentive Plan | S-8 | 4.4 | 10/30/2017 | 333-221213 | | |
| 10.10* | Form of Phantom Award Agreement (Non-Employee Directors) | S-8 | 4.5 | 10/30/2017 | 333-221213 | | |
| 10.11* | Form of Phantom Award Agreement (Non-Employee Directors Deferred Settlement) | S-8 | 4.6 | 10/30/2017 | 333-221213 | | |
| 10.12 | Term Loan Facility Agreement, dated February 24, 2020, between BP Midstream Partners LP and North America Funding Company | | | | | X | |
| 10.13 | First Amendment To Short Term Credit Facility Agreement, dated February 24, 2020, between BP Midstream Partners LP and North America Funding Company | | | | | X | |
| 21 | List of Subsidiaries of BP Midstream Partners LP | | | | | X | |
| 23.1 | Consent of Deloitte & Touche LLP, independent registered public accounting firm | | | | | X | |

Debtors' Exhibit No. 60
Page 137 of 258

| 23.2 | Consent of Ernst & Young LLP, independent registered public accounting firm | X | |
| 23.3 | Consent of Ernst & Young LLP, independent auditors | X | |
| 23.4 | Consent of Ernst & Young LLP, independent auditors | X | |
| 23.5 | Consent of Ernst & Young LLP, independent auditors | X | |
| 23.6 | Consent of Ernst & Young LLP, independent auditors | X | |
| 23.7 | Consent of Ernst & Young LLP, independent auditors | X | |
| 31.1 | Certification of Chief Executive Officer pursuant to Section 302 of the Sarbanes-Oxley Act of 2002 | X | |
| 31.2 | Certification of Chief Financial Officer pursuant to Section 302 of the Sarbanes-Oxley Act of 2002. | X | |
| 32** | Certifications pursuant to 18 U.S.C. §1350, as adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002. | | X |
| 99.1 | Mars Oil Pipeline Company, LLC Financial Statements as of December 31, 2019 and 2018 and for the fiscal years ended December 31, 2019, 2018 and 2017. | X | |
| 99.2 | Caesar Oil Pipeline Company, LLC Financial Statements as of and for the fiscal years ended December 31, 2019 and 2018. | X | |
| 99.3 | Caesar Oil Pipeline Company, LLC Financial Statements as of and for the fiscal years ended December 31, 2018 and 2017. | X | |
| 99.4 | Cleopatra Gas Gathering Company, LLC Financial Statements as of and for the fiscal years ended December 31, 2019 and 2018. | X | |
| 99.5 | Cleopatra Gas Gathering Company, LLC Financial Statements as of and for the fiscal years ended December 31, 2018 and 2017. | X | |
| 101 | The following financial information from BP Midstream Partners LP's Annual Report on Form 10-K for the fiscal year ended December 31, 2019, formatted in iXBRL (Inline Extensible Business Reporting Language) includes: (i) the Consolidated Balance Sheets, (ii) the Consolidated Statements of Operations, (iii) the Consolidated Statements of Changes in Equity, (iv) the Consolidated Statements of Cash Flows, and (v) the Notes to Consolidated Financial Statements. | X | |
| 104 | Cover page Interactive Data File (embedded within the Inline XBRL document). | X | |

\* Management Contract or Compensatory Plan

\*\* Pursuant to SEC Release No. 33-8212, this certification will be treated as "accompanying" this Annual Report on Form 10-K and not "filed" as part of such report for purposes of Section 18 of the Exchange Act or otherwise subject to the liability of Section 18 of the Exchange Act, and this certification will not be deemed to be incorporated by reference into any filing under the Securities Act, except to the extent that the registrant specifically incorporates it by reference.

**Item 16. FORM 10-K SUMMARY**

Not applicable.

Debtors' Exhibit No. 60
Page 138 of 258

Case 20-33948   Document 1620-12   Filed in TXSB on 06/16/21   Page 10 of 43

**SIGNATURES**

Pursuant to the requirements of the Securities Exchange Act of 1934, the registrant has duly caused this report to be signed on its behalf by the undersigned thereunto duly authorized.

Date: February 27, 2020

BP MIDSTREAM PARTNERS LP

By:   BP MIDSTREAM PARTNERS GP LLC,
      its general partner

By:   /s/ Craig W. Coburn
      Craig W. Coburn
      Chief Financial Officer and Director

Pursuant to the requirements of the Securities Exchange Act of 1934, this report has been signed, as of February 27, 2020, by the following persons on behalf of the registrant and in the capacities indicated.

| Name | Title |
|---|---|
| /s/ Robert P. Zinsmeister<br>Robert P. Zinsmeister | Chief Executive Officer and Director<br>(Principal Executive Officer)<br>BP Midstream Partners GP LLC |
| /s/ Craig W. Coburn<br>Craig W. Coburn | Chief Financial Officer and Director<br>(Principal Financial Officer and Principal Accounting Officer)<br>BP Midstream Partners GP LLC |
| /s/ J. Douglas Sparkman<br>J. Douglas Sparkman | Chairman of the Board of Directors<br>BP Midstream Partners GP LLC |
| /s/ Brian D. Smith<br>Brian D. Smith | Director<br>BP Midstream Partners GP LLC |
| /s/ Clive Christison<br>Clive Christison | Director<br>BP Midstream Partners GP LLC |
| /s/ Walter Clements<br>Walter Clements | Director<br>BP Midstream Partners GP LLC |
| /s/ Robert Malone<br>Robert Malone | Director<br>BP Midstream Partners GP LLC |
| /s/ Michele F. Joy<br>Michele F. Joy | Director<br>BP Midstream Partners GP LLC |

139

**Exhibit 4.1**

## DESCRIPTION OF THE REGISTRANT'S SECURITIES

## REGISTERED PURSUANT TO SECTION 12 OF THE
## SECURITIES EXCHANGE ACT OF 1934

**Common Units**

The common units and the subordinated units are separate classes of limited partner interests in us. The holders of units are entitled to participate in partnership distributions and exercise the rights or privileges available to limited partners under our partnership agreement. For a description of the relative rights and preferences of holders of common units and subordinated units in and to partnership distributions, please read this section and "How We Make Distributions to Our Partners." For a description of other rights and privileges of limited partners under our partnership agreement, including voting rights, please read "Our Partnership Agreement."

**Restrictions on Ownership of Common Units**

In order to comply with certain of the FERC's rate-making policies applicable to entities like us that pass their taxable income through to their owners, we have adopted requirements regarding who can be our owners. Our partnership agreement requires that purchasers of our common units, including those who purchase common units from underwriters, represent that they are Eligible Holders (as defined in our partnership agreement). Our general partner may require any owner of our units to recertify its status as an Eligible Holder. If a unitholder is a Non-Eligible Holder (as defined in our partnership agreement), the unitholder will have no right to receive any distributions or allocations of income or loss on its common units or to vote its units on any matter, and we will have the right to redeem such units at a price equal to the lower of the unitholder's purchase price or the then-current market price of such units, calculated in accordance with a formula specified in our partnership agreement. The redemption price will be paid in cash or by delivery of a promissory note, as determined by our general partner. Please read "—Transfer of Common Units" and "The Partnership Agreement—Non-Eligible Holders; Redemption."

**Transfer of Common Units**

Upon the transfer of a common unit in accordance with our partnership agreement, the transferee of the common unit shall be admitted as a limited partner with respect to the common units transferred when such transfer and admission are reflected in our books and records. Each transferee:

- automatically becomes bound by the terms and conditions of our partnership agreement;

- represents that the transferee has the capacity, power and authority to enter into our partnership agreement; and

- makes the consents, acknowledgments and waivers contained in our partnership agreement.

Our general partner will cause any transfers to be recorded on our books and records from time to time (or shall cause the transfer agent to do so, as applicable).

We are entitled to treat the nominee holder of a common unit as the absolute owner in the event such nominee is the record holder of such common unit. In that case, the beneficial holder's rights are limited solely to those that it has against the nominee holder as a result of any agreement between the beneficial owner and the nominee holder.

Common units are securities and any transfers are subject to the laws governing the transfer of securities. In addition to other rights acquired upon transfer, the transferor gives the transferee the right to become a substituted limited partner in our partnership for the transferred common units.

Until a common unit has been transferred on our books, we and the transfer agent may treat the record holder of the common unit as the absolute owner for all purposes, except as otherwise required by law or stock exchange regulations.

**HOW WE MAKE DISTRIBUTIONS TO OUR PARTNERS**

Set forth below is a summary of the significant provisions of our partnership agreement that relate to cash distributions.

**General**

*Cash Distribution Policy*

Our partnership agreement provides that our general partner will make a determination as to whether to make a distribution, but our partnership agreement does not require us to pay distributions at any time or in any amount. Pursuant to our cash distribution policy, within 60 days after the end of each quarter, we intend to distribute to the holders of common and subordinated units on a quarterly basis at least the minimum quarterly distribution of $0.2625 per unit, or $1.05 on an annualized basis, to the extent we have sufficient cash after establishment of cash reserves and payment of fees and expenses, including payments to our general partner and its affiliates. However, there is no guarantee that we will pay the minimum quarterly distribution on our units in any quarter. The amount of distributions paid under our cash distribution policy and the decision to make any distribution is determined by our general partner, taking into consideration the terms of our partnership agreement. Our partnership agreement does not contain a requirement for us to pay distributions to our unitholders, and there is no guarantee that we will pay the minimum quarterly distribution, or any distribution, on the units in any quarter. However, our partnership agreement does contain provisions intended to motivate our general partner to make steady, increasing and sustainable distributions over time.

Set forth below is a summary of the significant provisions of our partnership agreement that relate to cash distributions.

**Operating Surplus and Capital Surplus**

*General*

Any distributions we make are characterized as made from "operating surplus" or "capital surplus." Distributions from operating surplus are made differently than cash distributions that we would make from capital surplus. Operating surplus distributions will be made to our unitholders and, if we make quarterly distributions above the first target distribution level described below, to the holder of our incentive distribution rights. We do not anticipate that we will make any distributions from capital surplus. In such an event, however, any capital surplus distribution would be made pro rata to all unitholders, but the incentive distribution rights would generally not participate in any capital surplus distributions. Any distribution from capital surplus would result in a reduction of the minimum quarterly distribution and target distribution levels and, if we reduce the minimum quarterly distribution to zero and eliminate any unpaid arrearages, thereafter capital surplus would be distributed as if it were operating surplus and the incentive distribution rights would thereafter be entitled to participate in such distributions. Please see "—Distributions from Capital Surplus."

*Operating Surplus*

We define operating surplus with respect to any period as:

• $110.0 million (as described below); plus

• all of the cash receipts of us and our subsidiaries (as defined below) after October 30, 2017, the closing date of our initial public offering ("IPO"), through the last day of such period, excluding cash from interim capital transactions (as defined below) and provided that cash receipts from the termination of any hedge contract prior to its stipulated settlement or termination date will be included in equal quarterly installments over the remaining scheduled life of such hedge contract had it not been terminated; plus

• cash distributions paid in respect of equity issued (including incremental distributions on incentive distribution rights) to finance all or a portion of expansion capital expenditures in respect of the period that

commences when we enter into a binding obligation for the acquisition, construction, development or expansion of an asset and ending on the earlier to occur of the date any acquisition, construction, development or expansion commences commercial service and the date that it is disposed of or abandoned; plus cash distributions paid in respect of equity issued (including incremental distributions on incentive distribution rights) to pay the construction period interest on debt incurred, or to pay construction period distributions on equity issued, to finance the expansion capital expenditures referred to above, in each case, in respect of the period that commences when we enter into a binding obligation for the acquisition, construction, development or expansion and ending on the earlier to occur of the date any acquisition, construction, development or expansion commences commercial service and the date that it is disposed of or abandoned; less

• all of our operating expenditures (as defined below) after the closing of our IPO; less

• the amount of cash reserves established by our general partner to provide funds for future operating expenditures; less

• all working capital borrowings not repaid within twelve months after having been incurred or repaid within such twelve month period with the proceeds of additional working capital borrowings; less

• any cash loss realized on disposition of an investment capital expenditure.

For purposes of our partnership agreement, Mars, Mardi Gras and each of the Mardi Gras Joint Ventures will be deemed subsidiaries.

Disbursements made, cash received (including working capital borrowings) or cash reserves established, increased or reduced after the end of a period but on or before the date on which cash or cash equivalents will be distributed with respect to such period shall be deemed to have been made, received, established, increased or reduced, for purposes of determining operating surplus, within such period if our general partner so determines. Furthermore, cash received from an interest in an entity for which we account using the equity method will not be included to the extent it exceeds our proportionate share of that entity's operating surplus (calculated as if the definition of operating surplus applied to such entity from the date of our acquisition of such an interest without any basket similar to that described in the first bullet above). Operating surplus does not reflect actual cash generated by our operations. For example, it includes a basket of $110.0 million that enables us, if we choose, to distribute as operating surplus cash we receive in the future from non-operating sources such as asset sales, issuances of securities and long-term borrowings that would otherwise be distributed as capital surplus. In addition, the effect of including, as described above, certain cash distributions on equity interests in operating surplus will be to increase operating surplus by the amount of any such distributions. As a result, we may also distribute as operating surplus up to the amount of any such cash that we receive from non-operating sources.

The proceeds of working capital borrowings increase operating surplus and repayments of working capital borrowings are generally operating expenditures, as described below, and thus reduce operating surplus when made. However, if a working capital borrowing is not repaid during the twelve-month period following the borrowing, it will be deducted from operating surplus at the end of such period, thus decreasing operating surplus at such time. When such working capital borrowing is in fact repaid, it will be excluded from operating expenditures because operating surplus will have been previously reduced by the deduction.

We define operating expenditures in our partnership agreement, and it generally means all of our cash expenditures, including, but not limited to, taxes, fees and reimbursement of expenses to our general partner or its affiliates, payments made under hedge contracts (provided that (1) with respect to amounts paid in connection with the initial purchase of a hedge contract such amounts will be amortized over the life of the applicable hedge contract and (2) payments made in connection with the termination of any hedge contract prior to the expiration of its stipulated settlement or termination date will be included in operating expenditures in equal quarterly installments over the remaining scheduled life of such hedge contract), officer compensation, repayment of working capital borrowings, interest and principal on indebtedness and Estimated Total Maintenance Spend (as discussed in further detail below), provided that operating expenditures will not include:

• repayment of working capital borrowings deducted from operating surplus pursuant to the penultimate bullet point of the definition of operating surplus above when such repayment actually occurs;

• payments (including prepayments and prepayment penalties and the purchase price of indebtedness that is repurchased and canceled) of principal of and premium on indebtedness, other than working capital borrowings;

• expansion capital expenditures;

• actual maintenance capital expenditures;

• investment capital expenditures;

• payment of transaction expenses relating to interim capital transactions;

• distributions to our partners (including distributions in respect of our incentive distribution rights); or

• repurchases of equity interests except to fund obligations under employee benefit plans.

**Capital Surplus**

Capital surplus is defined in our partnership agreement as any cash distributed in excess of our operating surplus. Accordingly, capital surplus would generally be generated only by the following (which we refer to as "interim capital transactions"):

• borrowings other than working capital borrowings;

• sales of our equity interests; and

• sales or other dispositions of assets for cash, other than inventory, accounts receivable and other assets sold in the ordinary course of business or as part of normal retirement or replacement of assets.

*Characterization of Cash Distributions*

Our partnership agreement provides that we treat all cash distributed as coming from operating surplus until the sum of all cash distributed since October 30, 2017, the closing date of our IPO (other than any distributions of proceeds of our IPO) equals the operating surplus from the closing of our IPO. Our partnership agreement provides that we treat any amount distributed in excess of operating surplus, regardless of its source, as distributions of capital surplus. We do not anticipate that we will make any distributions from capital surplus.

*Estimated Total Maintenance Spend and Expansion Capital Expenditures*

Estimated Total Maintenance Spend consists of the sum of maintenance expenses and maintenance capital expenditures as estimated by the board of directors of our general partner. Estimated Total Maintenance Spend reduces operating surplus, but expansion capital expenditures and investment capital expenditures do not. Estimated Total Maintenance Spend are those maintenance capital expenditures and maintenance expenses we incur to maintain our near term and long term operating capacity or operating income. Examples of Estimated Total Maintenance Spend includes expenditures associated with the repair and replacement of our assets as well as safety and environmental costs, whether expensed or capitalized for accounting purposes.

Because our maintenance costs are irregular, the amount of our Total Maintenance Spend may differ substantially from period to period. This may be the result of scheduled safety and environmental integrity expenses which occur on a scheduled, multi‑year cycle and require substantial outlays. The irregular nature of these maintenance requirements would result in fluctuations in the amounts of operating surplus, adjusted operating surplus and cash available for distribution to unitholders if we subtracted actual Total Maintenance Spend from operating surplus.

Our partnership agreement will require that an estimate of the average annual Total Maintenance Spend necessary to maintain our operating capacity or operating income over the long term be subtracted from operating surplus each quarter as opposed to actual amounts spent. The board of directors of our general partner will be permitted to make such estimate in any manner it determines reasonable. The amount of Estimated Total Maintenance Spend deducted from operating surplus will be made at least annually and whenever an event occurs that is likely to result in a material adjustment to the amount of our Total Maintenance Spend, such as a major acquisition or the introduction of new governmental regulations that will impact our business. For purposes of calculating operating surplus, any adjustment to this estimate will be prospective only.

The use of Estimated Total Maintenance Spend in calculating operating surplus will have the following effects:

• it will reduce the risk that Total Maintenance Spend in any quarterly or annual period will be large enough to render operating surplus less than the minimum quarterly distribution to be paid on all the units for the quarter and subsequent quarters;

• it will increase our ability to distribute as operating surplus cash we receive from non‑operating sources; and

• it will be more difficult for us to raise our distribution above the minimum quarterly distribution and pay incentive distributions on the incentive distribution rights.

Expansion capital expenditures are those cash expenditures, including transaction expenses, made to increase our operating capacity or operating income over the long term. Examples of expansion capital expenditures include the acquisition of equipment, the development of a new facility or the expansion of an existing facility, in each case to the extent such expenditures are expected to expand our long‑term operating capacity or increase our operating income. Expansion capital expenditures will also include interest (and related fees) on debt incurred to finance all or any portion of such acquisition, development or expansion in respect of the period that commences when we enter into a binding obligation for the acquisition, construction, development or expansion of an asset and ending on the earlier to occur of the date any acquisition, construction, development or expansion commences commercial service and the date that it is disposed of or abandoned. Expenditures made solely for investment purposes are not considered expansion capital expenditures.

Investment capital expenditures are those capital expenditures, including transaction expenses, that are neither maintenance capital expenditures nor expansion capital expenditures. Investment capital expenditures largely consist of capital expenditures made for investment purposes. Examples of investment capital expenditures include traditional capital expenditures for investment purposes, such as purchases of securities, as well as other capital expenditures that might be made in lieu of such traditional investment capital expenditures, such as the acquisition of an asset for investment purposes or development of assets that are in excess of the maintenance of our existing operating capacity or net income, but which are not expected to expand, for more than the short term, our operating capacity or net income.

As described above, neither investment capital expenditures nor expansion capital expenditures are operating expenditures, and thus do not reduce operating surplus. Because expansion capital expenditures include interest payments (and related fees) on debt incurred to finance all or a portion of an acquisition, development or expansion in respect of a period that begins when we enter into a binding obligation for an acquisition, construction, development or expansion and ending on the earlier to occur of the date on which such acquisition, construction, development or expansion commences commercial service and the date that it is abandoned or disposed of, such interest payments also do not reduce operating surplus. Losses on disposition of an investment capital expenditure will reduce operating surplus when realized and cash receipts from an investment capital expenditure are treated as a cash receipt for purposes of calculating operating surplus only to the extent the cash receipt is a return on principal.

Cash expenditures that are made in part for maintenance capital purposes, investment capital purposes or expansion capital purposes are allocated as maintenance capital expenditures, investment capital expenditures or expansion capital expenditures by our general partner.

**Subordination Period**

*General*

Our partnership agreement provides that, during the subordination period (which we describe below), the common units have the right to receive distributions from operating surplus each quarter in an amount equal to $0.2625 per common unit plus any arrearages in the payment of the minimum quarterly distribution on the common units from prior quarters, before any distributions from operating surplus may be made on the subordinated units. These units are deemed "subordinated" because for a period of time, referred to as the subordination period, the subordinated units will not be entitled to receive any distribution from operating surplus for any quarter until the common units have received the minimum quarterly distribution from operating surplus for such quarter plus any arrearages in the payment of the minimum quarterly distribution from prior quarters. Furthermore, no arrearages will be paid on the subordinated units. The practical effect of the subordinated units is to increase the likelihood that during the subordination period, there will be sufficient cash from operating surplus to pay the minimum quarterly distribution on the common units.

*Subordination Period*

Except as described below, the subordination period began on the closing date of the IPO and expires on the first business day after the distribution to unitholders in respect of any quarter, beginning with the quarter ending December 31, 2020, if each of the following has occurred:

- for each of the three consecutive, non‑overlapping four‑quarter periods immediately preceding that date, aggregate distributions from operating surplus equaled or exceeded the sum of the minimum quarterly distribution multiplied by the total number of common and subordinated units outstanding in each quarter in each period;

- for the same three consecutive, non‑overlapping four‑quarter periods, the adjusted operating surplus equaled or exceeded the sum of the minimum quarterly distribution multiplied by the total number of common and subordinated units outstanding during each quarter on a fully diluted weighted average basis; and

- there are no arrearages in payment of the minimum quarterly distribution on the common units.

*Early Termination of Subordination Period*

Notwithstanding the foregoing, the subordination period will automatically terminate, and all of the subordinated units will convert into common units on a one‑for‑one basis, on the first business day after the distribution to unitholders in respect of any quarter, beginning with the quarter ending December 31, 2019, if each of the following has occurred:

- for one four‑quarter period immediately preceding that date, aggregate distributions from operating surplus exceeded 150.0% of the minimum quarterly distribution multiplied by the total number of common units and subordinated units outstanding in each quarter in the period;

- for the same four‑quarter period, the "adjusted operating surplus" (as described below) equaled or exceeded 150.0% of the sum of the minimum quarterly distribution multiplied by the total number of common and subordinated units outstanding during each quarter on a fully diluted weighted average basis, plus the related distribution on the incentive distribution rights; and

- there are no arrearages in payment of the minimum quarterly distributions on the common units.

*Expiration of the Subordination Period*

When the subordination period ends, each outstanding subordinated unit will convert into one common unit and will then participate pro rata with the other common units in distributions.

*Adjusted Operating Surplus*

Adjusted operating surplus is intended to generally reflect the cash generated from operations during a particular period and therefore excludes net increases in working capital borrowings and net drawdowns of reserves of cash generated in prior periods if not utilized to pay expenses during that period. Adjusted operating surplus for any period consists of:

- operating surplus generated with respect to that period (excluding any amounts attributable to the items described in the first bullet point under "—Operating Surplus and Capital Surplus—Operating Surplus" above); less

- any net increase during that period in working capital borrowings; less

- any net decrease during that period in cash reserves for operating expenditures not relating to an operating expenditure made during that period; plus

- any net decrease during that period in working capital borrowings; plus

- any net increase during that period in cash reserves for operating expenditures required by any debt instrument for the repayment of principal, interest or premium; plus

- any net decrease made in subsequent periods in cash reserves for operating expenditures initially established during such period to the extent such decrease results in a reduction of adjusted operating surplus in subsequent periods pursuant to the third bullet point above.

Any disbursements made, cash received (including working capital borrowings) or cash reserves established, increased or reduced after the end of a period that the general partner determines to include in operating surplus for such period shall also be deemed to have been made, received or established, increased or reduced in such period for purposes of determining adjusted operating surplus for such period.

## Distributions From Operating Surplus During the Subordination Period

If we make a distribution from operating surplus for any quarter ending before the end of the subordination period, our partnership agreement requires that we make the distribution in the following manner:

- *first*, to the common unitholders, pro rata, until we distribute for each common unit an amount equal to the minimum quarterly distribution for that quarter and any arrearages in payment of the minimum quarterly distribution on the common units for any prior quarters;

- *second*, to the subordinated unitholders, pro rata, until we distribute for each subordinated unit an amount equal to the minimum quarterly distribution for that quarter; and

- *thereafter*, in the manner described in "—Incentive Distribution Rights" below.

## Distributions From Operating Surplus After the Subordination Period

If we make distributions of cash from operating surplus for any quarter ending after the subordination period, our partnership agreement requires that we make the distribution in the following manner:

- *first*, to all common unitholders, pro rata, until we distribute for each common unit an amount equal to the minimum quarterly distribution for that quarter; and

- *thereafter*, in the manner described in "—Incentive Distribution Rights" below.

## General Partner Interest

Our general partner owns a non-economic general partner interest in us, which does not entitle it to receive cash distributions. However, our general partner owns the incentive distribution rights and may in the future own common units or other equity interests in us and will be entitled to receive distributions on any such interests.

**Incentive Distribution Rights**

Incentive distribution rights represent the right to receive increasing percentages (15.0%, 25.0% and 50.0%) of quarterly distributions from operating surplus after the minimum quarterly distribution and the target distribution levels have been achieved. Our general partner currently holds the incentive distribution rights, but may transfer these rights separately from its general partner interest or any equity interests it subsequently acquires.

If for any quarter:

• we have distributed cash from operating surplus to the common and subordinated unitholders in an amount equal to the minimum quarterly distribution; and

• we have distributed cash from operating surplus to the common unitholders in an amount necessary to eliminate any cumulative arrearages in payment of the minimum quarterly distribution;

then we will make additional distributions from operating surplus for that quarter among the unitholders and the holders of the incentive distribution rights in the following manner:

• *first*, to all unitholders, pro rata, until each unitholder receives a total of $0.3019 per unit for that quarter (the "first target distribution");

• *second*, 85.0% to all common unitholders and subordinated unitholders, pro rata, and 15.0% to the holders of our incentive distribution rights, until each unitholder receives a total of $0.3281 per unit for that quarter (the "second target distribution");

• *third*, 75.0% to all common unitholders and subordinated unitholders, pro rata, and 25.0% to the holders of our incentive distribution rights, until each unitholder receives a total of $0.3938 per unit for that quarter (the "third target distribution"); and

• *thereafter*, 50.0% to all common unitholders and subordinated unitholders, pro rata, and 50.0% to the holders of our incentive distribution rights.

**Percentage Allocations of Distributions From Operating Surplus**

The following table illustrates the percentage allocations of distributions from operating surplus between the unitholders and the holders of our incentive distribution rights based on the specified target distribution levels. The amounts set forth under the column heading "Marginal Percentage Interest in Distributions" are the percentage interests of the holders of our incentive distribution rights and the unitholders in any distributions from operating surplus for the increment of the per unit distribution specified in the column titled "Total Quarterly Distribution Per Unit." The percentage interests set forth below assume there are no arrearages on common units.

| | Total Quarterly Distribution Per Unit | Marginal Percentage Interest in Distributions | |
| --- | --- | --- | --- |
| | | Common Unitholders | IDR Holders |
| Minimum Quarterly Distribution | up to $0.2625 | 100.0 % | 0 % |
| First Target Distribution | above $0.2625 up to $0.3019 | 100.0 % | 0 % |
| Second Target Distribution | above $0.3019 up to $0.3281 | 85.0 % | 15.0 % |
| Third Target Distribution | above $0.3281 up to $0.3938 | 75.0 % | 25.0 % |
| Thereafter | above $0.3938 | 50.0 % | 50.0 % |

**Incentive Distribution Right Holders' Right to Reset Incentive Distribution Levels**

Our general partner, as the initial holder of our incentive distribution rights, has the right under our partnership agreement to elect to relinquish the right to receive incentive distribution payments based on the initial target distribution levels and to reset, at higher levels, the minimum quarterly distributions and the target distribution levels upon which the incentive distribution payments would be set. If our general partner transfers all or a portion of the incentive distribution rights in the future, then the holder or holders of a majority of our incentive distribution rights will be entitled to exercise this right. The following discussion assumes that our general partner holds all of the incentive distribution rights at the time that a reset election is made.

The right to reset the minimum quarterly distributions and the target distribution levels upon which the incentive distributions are based may be exercised, without approval of our unitholders or the conflicts committee of our general partner, at any time when there are no subordinated units outstanding and we have made cash distributions at or in excess of the highest then-applicable target distribution for the prior four consecutive fiscal quarters (and the aggregate amounts distributed in such four quarters did not exceed adjusted operating surplus for such four-quarter period). The reset target distribution levels will be higher than the most recent per unit distribution level prior to the reset election and higher than the target distribution levels prior to the reset such that there will be no incentive distributions paid under the reset target distribution levels until cash distributions per unit following the reset event increase as described below. Because the reset target distribution levels will be higher than the most recent per unit distribution level prior to the reset, if we were to issue additional common units after the reset and maintain the per unit distribution level, no additional incentive distributions would be payable. By contrast, if there were no such reset and we were to issue additional common units and maintain the per unit distribution level, additional incentive distributions would have to be paid based on the additional number of outstanding common units and the percentage interest of the incentive distribution rights above the target distribution levels. Thus, the exercise of the reset right would lower our cost of equity capital. We anticipate that our general partner would exercise this reset right, it would do so in order to facilitate acquisitions or internal growth projects that would otherwise not be sufficiently accretive to cash distributions per common unit, taking into account the existing levels of incentive distribution payments being made.

In connection with the resetting of the target distribution levels and the corresponding relinquishment by our general partner of incentive distribution payments based on the target cash distributions prior to the reset, our general partner will be entitled to receive a number of newly issued common units based on the formula described below that takes into account the "cash parity" value of the cash distributions related to the incentive distribution rights for the quarter prior to the reset event as compared to the cash distribution per common unit in such quarter.

The number of common units to be issued in connection with a resetting of the minimum quarterly distribution amount and the target distribution levels would equal the quotient determined by dividing (x) the amount of cash distributions received in respect of the incentive distribution rights for the fiscal quarter ended immediately prior to the date of such reset election by (y) the amount of cash distributed per common unit with respect to such quarter.

Following a reset election, the reset minimum quarterly distribution will be calculated and the target distribution levels will be reset to be correspondingly higher such that we would make distributions from operating surplus for each quarter thereafter as follows:

• *first*, to all common unitholders, pro rata, until each unitholder receives an amount per unit for that quarter equal to 115.0% of the reset minimum quarterly distribution;

• *second*, 85.0% to all common unitholders, pro rata, and 15.0% to the holders of our incentive distribution rights, until each unitholder receives an amount per unit for that quarter equal to 125.0% of the reset minimum quarterly distribution;

• *third*, 75.0% to all common unitholders, pro rata, and 25.0% to the holders of our incentive distribution rights, until each unitholder receives an amount per unit for that quarter equal to 150.0% of the reset minimum quarterly distribution; and

• *thereafter*, 50.0% to all common unitholders, pro rata, and 50.0% to the holders of our incentive distribution rights.

Because a reset election can only occur after the subordination period expires, the reset minimum quarterly distribution will have no significance except as a baseline for the target distribution levels.

The following table illustrates the percentage allocation of distributions from operating surplus between the unitholders and the holders of our incentive distribution rights at various distribution levels (1) pursuant to the distribution provisions of our partnership agreement in effect at the closing of our IPO, as well as (2) following a hypothetical reset of the target distribution levels based on the assumption that the quarterly distribution amount per common unit during the fiscal quarter immediately preceding the reset election was $0.4000.

| | Quarterly Distribution Per Unit Prior to Reset | Unitholders | | Incentive Distribution Rights Holders | | Quarterly Distribution Per Unit Following Hypothetical Reset | |
|---|---|---|---|---|---|---|---|
| Minimum Quarterly Distribution | Up to $0.2625 | 100.0 | % | 0.0 | % | Up to $0.4000 | (1) |
| First Target Distribution | Above $0.2625 and up to $0.3019 | 100.0 | % | 0.0 | % | Above $0.4000 and up to $0.4600 | (2) |
| Second Target Distribution | Above $0.3019 and up to $0.3281 | 85.0 | % | 15.0 | % | Above $0.4600 and up to $0.5000 | (3) |
| Third Target Distribution | Above $0.3281 and up to $0.3938 | 75.0 | % | 25.0 | % | Above $0.5000 and up to $0.6000 | (4) |
| Thereafter | Above $0.3938 | 50.0 | % | 50.0 | % | Above $0.6000 | |

(1) This amount is equal to the hypothetical reset minimum quarterly distribution.

(2) This amount is 115.0% of the hypothetical reset minimum quarterly distribution.

(3) This amount is 125.0% of the hypothetical reset minimum quarterly distribution.

(4) This amount is 150.0% of the hypothetical reset minimum quarterly distribution.

The following table illustrates the total amount of distributions from operating surplus that would be distributed to the unitholders and the holders of incentive distribution rights, based on the amount distributed for the quarter immediately prior to the reset. The table assumes that immediately prior to the reset there would be 104,754,820 common units outstanding and the distribution to each common unit would be $0.4000 for the quarter prior to the reset.

| | Quarterly Distribution Per Unit | Cash Distributions to Common Unitholders | | Cash Distributions to Holders of Incentive Distribution Rights | | Total Distributions | |
|---|---|---|---|---|---|---|---|
| Minimum Quarterly Distribution | Up to $0.2625 | $ | 27,498,140 | $ | — | $ | 27,498,140 |
| First Target Distribution | Above $0.2625 and up to $0.3019 | | 4,124,721 | | — | | 4,124,721 |
| Second Target Distribution | Above $0.3019 and up to $0.3281 | | 2,749,814 | | 485,261 | | 3,235,075 |
| Third Target Distribution | Above $0.3281 and up to $0.3938 | | 6,874,535 | | 2,291,512 | | 9,166,047 |
| Thereafter | Above $0.3938 | | 654,718 | | 654,718 | | 1,309,436 |
| | | $ | 41,901,928 | $ | 3,431,491 | $ | 45,333,419 |

The following table illustrates the total amount of distributions from operating surplus that would be distributed to the unitholders and the holders of our incentive distribution rights, with respect to the quarter in which the reset occurs. The table reflects that as a result of the reset there would be 104,754,820 common units outstanding and the distribution to each common unit would be $0.4000. The number of common units to be issued upon the reset was calculated by dividing (1) the amount received in respect of the incentive distribution rights for the quarter prior to the reset as shown in the table above, or $3,431,491, by (2) the amount of cash distributed on each common unit for the quarter prior to the reset as shown in the table above, or $0.4000.

| | Quarterly Distribution Per Unit Prior to Reset | Cash Distributions to Existing Common Unitholders | Cash Distributions to Holders of Incentive Distribution Rights | | | Total Distributions |
|---|---|---|---|---|---|---|
| | | | Common Units | Incentive Distribution Rights | Total | |
| Minimum Quarterly Distribution | Up to $0.4000 | $ 41,901,928 | $ 3,431,491 | $ — | $ 3,431,491 | $ 45,333,419 |
| First Target Distribution | Above $0.4000 and up to $0.4600 | — | — | — | — | — |
| Second Target Distribution | Above $0.4600 and up to $0.5000 — | — | — | — | — | — |
| Third Target Distribution | Above $0.5000 and up to $0.6000 | — | — | — | — | — |
| Thereafter | Above $0.6000 | — | — | — | — | — |
| | | $ 41,901,928 | $ 3,431,491 | $ — | $ 3,431,491 | $ 45,333,419 |

(1) Represents distributions in respect of the common units issued upon the reset.

The holders of incentive distribution rights are entitled to cause the target distribution levels to be reset on more than one occasion.

## Distributions From Capital Surplus

### How Distributions From Capital Surplus Will Be Made

Our partnership agreement requires that we make distributions from capital surplus, if any, in the following manner:

- *first*, to all common unitholders and subordinated unitholders, pro rata, until the minimum quarterly distribution is reduced to zero, as described below;

- *second*, to the common unitholders, pro rata, until we distribute for each common unit an amount from capital surplus equal to any unpaid arrearages in payment of the minimum quarterly distribution on the common units; and

- *thereafter*, we will make all distributions from capital surplus as if they were from operating surplus.

### Effect of a Distribution from Capital Surplus

Our partnership agreement treats a distribution from capital surplus as the repayment of the initial unit price from our IPO, which is a return of capital. Each time a distribution from capital surplus is made, the minimum quarterly distribution and the target distribution levels will be reduced in the same proportion as the distribution from capital surplus to the fair market value of the common units prior to the announcement of the distribution. Because distributions of capital surplus will reduce the minimum quarterly distribution and target distribution levels after any of these distributions are made, it may be easier for our general partner to receive incentive distributions and for the subordinated units to convert into common units. However, any distribution from capital surplus before the minimum quarterly distribution is reduced to zero cannot be applied to the payment of the minimum quarterly distribution or any arrearages.

Once we reduce the minimum quarterly distribution and target distribution levels to zero, all future distributions will be made such that 50.0% is paid to all unitholders, pro rata, and 50.0% is paid to the holder or holders of incentive distribution rights.

**Adjustment to the Minimum Quarterly Distribution and Target Distribution Levels**

In addition to adjusting the minimum quarterly distribution and target distribution levels to reflect a distribution from capital surplus, if we combine our common units into fewer common units or subdivide our common units into a greater number of common units, our partnership agreement specifies that the following items will be proportionately adjusted:

• the minimum quarterly distribution;

• the target distribution levels;

• the initial unit price, as described below under "—Distributions of Cash Upon Liquidation";

• the per unit amount of any outstanding arrearages in payment of the minimum quarterly distribution on the common units; and

• the number of subordinated units.

For example, if a two-for-one split of the common units should occur, the minimum quarterly distribution, the target distribution levels and the initial unit price would each be reduced to 50.0% of its initial level. If we combine our common units into a lesser number of units or subdivide our common units into a greater number of units, we will combine or subdivide our subordinated units using the same ratio applied to the common units. We will not make any adjustment by reason of the issuance of additional units for cash or property.

In addition, if, as a result of a change in law or interpretation thereof, we or any of our subsidiaries is treated as an association taxable as a corporation or is otherwise subject to additional taxation as an entity for U.S. federal, state, local or non-U.S. income or withholding tax purposes, our general partner may, in its sole discretion, reduce the minimum quarterly distribution and the target distribution levels for each quarter by multiplying each distribution level by a fraction, the numerator of which is cash for that quarter (after deducting our general partner's estimate of our additional aggregate liability for the quarter for such income and withholding taxes payable by reason of such change in law or interpretation) and the denominator of which is the sum of (1) cash for that quarter, plus (2) our general partner's estimate of our additional aggregate liability for the quarter for such income and withholding taxes payable by reason of such change in law or interpretation thereof.

**Distributions of Cash Upon Liquidation**

*General*

If we dissolve in accordance with the partnership agreement, we will sell or otherwise dispose of our assets in a process called liquidation. We will first apply the proceeds of liquidation to the payment of our creditors. We will distribute any remaining proceeds to the unitholders and the holders of the incentive distribution rights, in accordance with their capital account balances, as adjusted to reflect any gain or loss upon the sale or other disposition of our assets in liquidation.

The allocations of gain and loss upon liquidation are intended, to the extent possible, to entitle the holders of units to a repayment of the initial value contributed by unitholders for their units, which we refer to as the "initial unit price" for each unit. The allocations of gain and loss upon liquidation are also intended, to the extent possible, to entitle the holders of common units to a preference over the holders of subordinated units upon our liquidation, to the extent required to permit common unitholders to receive their initial unit price plus the minimum quarterly distribution for the quarter during which liquidation occurs plus any unpaid arrearages in payment of the minimum quarterly distribution on the common units. However, there may not be sufficient gain upon our liquidation to enable the common unitholders to fully recover all of these amounts, even though there may be cash available for distribution to the holders of subordinated units. Any further net gain recognized upon liquidation will be allocated in a manner that takes into account the incentive distribution rights.

*Manner of Adjustments for Gain*

The manner of the adjustment for gain is set forth in the partnership agreement. If our liquidation occurs before the end of the subordination period, we will generally allocate any gain to the partners in the following manner:

• *first*, to our general partner to the extent of certain prior losses specially allocated to our general partner;

• *second*, to the common unitholders, pro rata, until the capital account for each common unit is equal to the sum of: (1) the initial unit price; (2) the amount of the minimum quarterly distribution for the quarter during which our liquidation occurs; and (3) any unpaid arrearages in payment of the minimum quarterly distribution;

• *third*, to the subordinated unitholders, pro rata, until the capital account for each subordinated unit is equal to the sum of: (1) the initial unit price; and (2) the amount of the minimum quarterly distribution for the quarter during which our liquidation occurs;

• *fourth*, to all unitholders, pro rata, until we allocate under this bullet an amount per unit equal to: (1) the sum of the excess of the first target distribution per unit over the minimum quarterly distribution per unit for each quarter of our existence; less (2) the cumulative amount per unit of any distributions from operating surplus in excess of the minimum quarterly distribution per unit that we distributed to the unitholders, pro rata, for each quarter of our existence;

• *fifth*, 85.0% to all unitholders, pro rata, and 15.0% to the holders of our incentive distribution rights, until we allocate under this bullet an amount per unit equal to: (1) the sum of the excess of the second target distribution per unit over the first target distribution per unit for each quarter of our existence; less (2) the cumulative amount per unit of any distributions from operating surplus in excess of the first target distribution per unit that we distributed 85.0% to the unitholders, pro rata, and 15.0% to the holders of our incentive distribution rights for each quarter of our existence;

• *sixth*, 75.0% to all unitholders, pro rata, and 25.0% to the holders of our incentive distribution rights, until we allocate under this bullet an amount per unit equal to: (1) the sum of the excess of the third target distribution per unit over the second target distribution per unit for each quarter of our existence; less (2) the cumulative amount per unit of any distributions from operating surplus in excess of the second target distribution per unit that we distributed 75.0% to the unitholders, pro rata, and 25.0% to the holders of our incentive distribution rights for each quarter of our existence; and

• *thereafter*, 50.0% to all unitholders, pro rata, and 50.0% to holders of our incentive distribution rights.

If the liquidation occurs after the end of the subordination period, the distinction between common units and subordinated units will disappear, so that clause (3) of the second bullet point above and all of the third bullet point above will no longer be applicable.

We may make special allocations of gain among the partners in a manner to create economic uniformity among the common units into which the subordinated units convert and the common units held by public unitholders.

### Manner of Adjustments for Losses

If our liquidation occurs before the end of the subordination period, we will generally allocate any loss to our general partner and the unitholders in the following manner:

• *first*, to holders of subordinated units in proportion to the positive balances in their capital accounts until the capital accounts of the subordinated unitholders have been reduced to zero;

• *second*, to the holders of common units in proportion to the positive balances in their capital accounts, until the capital accounts of the common unitholders have been reduced to zero; and

• *thereafter*, 100.0% to our general partner.

If the liquidation occurs after the end of the subordination period, the distinction between common units and subordinated units will disappear, so that all of the first bullet point above will no longer be applicable.

We may make special allocations of loss among the partners in a manner to create economic uniformity among the common units into which the subordinated units convert and the common units held by public unitholders.

*Adjustments to Capital Accounts*

Our partnership agreement requires that we make adjustments to capital accounts upon the issuance of additional units. In this regard, our partnership agreement specifies that we allocate any unrealized and, for federal income tax purposes, unrecognized gain resulting from the adjustments to the unitholders and the holders of our incentive distribution rights in the same manner as we allocate gain upon liquidation. In the event that we make positive adjustments to the capital accounts upon the issuance of additional units, our partnership agreement requires that we generally allocate any later negative adjustments to the capital accounts resulting from the issuance of additional units or upon our liquidation in a manner that results, to the extent possible, in the partners' capital account balances equaling the amount that they would have been if no earlier positive adjustments to the capital accounts had been made. In contrast to the allocations of gain, and except as provided above, we generally will allocate any unrealized and unrecognized loss resulting from the adjustments to capital accounts upon the issuance of additional units to the unitholders and the holders of our incentive distribution rights based on their respective percentage ownership of us. In this manner, prior to the end of the subordination period, we generally will allocate any such loss equally with respect to our common and subordinated units. If we make negative adjustments to the capital accounts as a result of such loss, future positive adjustments resulting from the issuance of additional units will be allocated in a manner designed to reverse the prior negative adjustments, and special allocations will be made upon liquidation in a manner that results, to the extent possible, in our unitholders' capital account balances equaling the amounts they would have been if no earlier adjustments for loss had been made.

## OUR PARTNERSHIP AGREEMENT

The following is a summary of the material provisions of our partnership agreement that relate to ownership of our common units.

### Capital Contributions

Unitholders are not obligated to make additional capital contributions, except as described below under "—Limited Liability."

### Voting Rights

The following is a summary of the unitholder vote required for approval of the matters specified below. Matters that call for the approval of a "unit majority" require:

• during the subordination period, the approval of a majority of the outstanding common units, excluding those common units whose vote is controlled by our general partner or its affiliates, and a majority of the subordinated units, voting as separate classes; and

• after the subordination period, the approval of a majority of the outstanding common units.

In voting their common and subordinated units, our general partner and its affiliates will have no duty or obligation whatsoever to us or the limited partners, including any duty to act in the best interests of us or the limited partners.

The incentive distribution rights may be entitled to vote in certain circumstances.

| | |
|---|---|
| Issuance of additional units | No approval right. |
| Amendment of the partnership agreement | Certain amendments may be made by our general partner without the approval of the unitholders. Other amendments generally require the approval of a unit majority. Please read "—Amendment of Our Partnership Agreement." |
| Merger of our partnership or the sale of all or substantially all of our assets | Unit majority in certain circumstances. Please read "—Merger, Consolidation, Conversion, Sale or Other Disposition of Assets." |
| Dissolution of our partnership | Unit majority. Please read "—Dissolution." |
| Continuation of our business upon dissolution | Unit majority. Please read "—Dissolution." |
| Withdrawal of our general partner | Under most circumstances, the approval of a majority of the common units, excluding common units held by our general partner and its affiliates, is required for the withdrawal of our general partner prior to December 31, 2027 in a manner that would cause a dissolution of our partnership. Please read "—Withdrawal or Removal of Our General Partner." |
| Removal of our general partner | For cause with not less than 66 2/3% of the outstanding units, voting as a single class, including units held by our general partner and its affiliates. In addition, any vote to remove our general partner during the subordination period must provide for the election of a successor general partner by the holders of a majority of the common units and a majority of the subordinated units, voting as separate classes. Please read "—Withdrawal or Removal of Our General Partner." |
| Transfer of our general partner interest | No approval right. |
| Transfer of incentive distribution rights | No approval right. |
| Transfer of ownership interests in our general partner | No approval right. |

If any person or group other than our general partner and its affiliates acquires beneficial ownership of 20% or more of any class of units, that person or group loses voting rights on all of its units. This loss of voting rights does not apply to any person or group that acquires the units from our general partner or its affiliates and any transferees of that person or group approved by our general partner or to any person or group who acquires the units with the specific prior approval of our general partner.

**Applicable Law; Forum, Venue and Jurisdiction**

Our partnership agreement is governed by Delaware law. Our partnership agreement requires that any claims, suits, actions or proceedings:

• arising out of or relating in any way to the partnership agreement (including any claims, suits or actions to interpret, apply or enforce the provisions of the partnership agreement or the duties, obligations or liabilities among limited partners or of limited partners to us, or the rights or powers of, or restrictions on, the limited partners or us);

• brought in a derivative manner on our behalf;

• asserting a claim of breach of a duty owed by any director, officer or other employee of us or our general partner, or owed by our general partner, to us or the limited partners;

• asserting a claim arising pursuant to any provision of the Delaware Act; or

• asserting a claim governed by the internal affairs doctrine

shall be exclusively brought in the Court of Chancery of the State of Delaware (or, if such court does not have subject matter jurisdiction thereof, any other court located in the State of Delaware with subject matter jurisdiction), regardless of whether such claims, suits, actions or proceedings sound in contract, tort, fraud or otherwise, are based on common law, statutory, equitable, legal or other grounds, or are derivative or direct claims. In addition, our partnership agreement provides that each limited partner irrevocably waives the right to trial by jury in any such claim, suit, action or proceeding.

**Reimbursement of Partnership Litigation Costs**

Our partnership agreement provides that if limited partners or any persons holding a beneficial interest in us file a claim, suit, action or proceeding against us of a type identified in the bullet points under the above heading "—Applicable Law; Forum, Venue and Jurisdiction" and do not obtain a judgment on the merits that substantially achieves, in substance and amount, the full remedy sought in any such claim, suit, action or proceeding, then such partners or persons will be obligated to reimburse us and our affiliates, including our general partner, the owners of our general partner and any officer or director of our general partner, for all fees, costs and expenses of every kind and description, including but not limited to all reasonable attorneys' fees and other litigation expenses, that the parties may incur in connection with such claim, suit, action or proceeding. Our partnership agreement does not define what constitutes a judgment that "substantially achieves, in substance and amount, the full remedy sought," though we intend to apply a broad interpretation to such provision in order to apply the fee-shifting provision broadly. However, there is no precise established definition of the phrase under applicable law. As a result, whether a specific judgment satisfies the foregoing criteria will be subject to judicial interpretation. By purchasing a common unit, a limited partner is irrevocably consenting to these reimbursement obligations as set forth in our partnership agreement.

**Limited Liability**

Assuming that a limited partner does not participate in the control of our business within the meaning of the Delaware Act and that he otherwise acts in conformity with the provisions of the partnership agreement, his liability under the Delaware Act is limited, subject to possible exceptions, to the amount of capital he is obligated to contribute to us for his common units plus his share of any undistributed profits and assets. However, if it were determined that the right, or exercise of the right, by the limited partners as a group:

• to remove or replace our general partner;

• to approve some amendments to our partnership agreement; or

• to take other action under our partnership agreement;

constituted "participation in the control" of our business for the purposes of the Delaware Act, then the limited partners could be held personally liable for our obligations under the laws of Delaware, to the same extent as our general partner. This liability would extend to persons who transact business with us under the reasonable belief that the limited partner is a general partner. Neither our partnership agreement nor the Delaware Act specifically provides for legal recourse against our general partner if a limited partner were to lose limited liability through any fault of our general partner. While this does not mean that a limited partner could not seek legal recourse, we know of no precedent for this type of a claim in Delaware case law.

Under the Delaware Act, a limited partnership may not make a distribution to a partner if, after the distribution, all liabilities of the limited partnership, other than liabilities to partners on account of their partnership interests and liabilities for which the recourse of creditors is limited to specific property of the partnership, would exceed the fair value of the assets of the limited partnership. For the purpose of determining the fair value of the assets of a limited partnership, the Delaware Act provides that the fair value of property subject to liability for which recourse of creditors is limited shall be included in the assets of the limited partnership only to the extent that the fair value of that property exceeds the nonrecourse liability. The Delaware Act provides that a limited partner who receives a distribution and knew at the time of the distribution that the distribution was in violation of the Delaware Act shall be liable to the limited partnership for the amount of the distribution for three years.

Our subsidiaries conduct business in several states and we may have subsidiaries that conduct business in other states or countries in the future. Maintenance of our limited liability as owner of our operating subsidiaries may require compliance with legal requirements in the jurisdictions in which the operating subsidiaries conduct business, including qualifying our subsidiaries to do business there.

Limitations on the liability of members or limited partners for the obligations of a limited liability company or limited partnership have not been clearly established in many jurisdictions. If, by virtue of our ownership interest in our subsidiaries or otherwise, it were determined that we were conducting business in any jurisdiction without compliance with the applicable limited partnership or limited liability company statute, or that the right or exercise of the right by the limited partners as a group to remove or replace our general partner, to approve some amendments to our partnership agreement, or to take other action under our partnership agreement constituted "participation in the control" of our business for purposes of the statutes of any relevant jurisdiction, then the limited partners could be held personally liable for our obligations under the law of that jurisdiction to the same extent as our general partner under the circumstances. We will operate in a manner that our general partner considers reasonable and necessary or appropriate to preserve the limited liability of the limited partners.

**Issuance of Additional Interests**

Our partnership agreement authorizes us to issue an unlimited number of additional partnership interests for the consideration and on the terms and conditions determined by our general partner without the approval of the unitholders.

It is possible that we will fund acquisitions through the issuance of additional common units, subordinated units or other partnership interests. Holders of any additional common units we issue will be entitled to share equally with the then-existing common unitholders in our distributions. In addition, the issuance of additional common units or other partnership interests may dilute the value of the interests of the then-existing common unitholders in our net assets.

In accordance with Delaware law and the provisions of our partnership agreement, we may also issue additional partnership interests that, as determined by our general partner, may have rights to distributions or special voting rights to which the common units are not entitled. In addition, our partnership agreement does not prohibit our subsidiaries from issuing equity interests, which may effectively rank senior to the common units.

Our general partner will have the right, which it may from time to time assign in whole or in part to any of its affiliates, to purchase common units, subordinated units or other partnership interests whenever, and on the same terms that, we issue partnership interests to persons other than our general partner and its affiliates, to the extent necessary to maintain the percentage interest of our general partner and its affiliates, including such interest represented by common and subordinated units, that existed immediately prior to each issuance. The common unitholders will not have preemptive rights under our partnership agreement to acquire additional common units or other partnership interests.

**Amendment of Our Partnership Agreement**

*General*

Amendments to our partnership agreement may be proposed only by our general partner. However, our general partner has no duty or obligation to propose any amendment and may decline to do so free of any duty or obligation whatsoever to us or the limited partners, including any duty to act in the best interests of us or the limited partners. In order to adopt a proposed amendment, other than the amendments discussed below, our general partner is required to seek written approval of the holders of the number of units required to approve the amendment or to call a meeting of the limited partners to consider and vote upon the proposed amendment. Except as described below, an amendment must be approved by a unit majority.

*Prohibited Amendments*

No amendment may be made that would:

- enlarge the obligations of any limited partner without his consent, unless approved by at least a majority of the type or class of limited partner interests so affected; or

- enlarge the obligations of, restrict in any way any action by or rights of, or reduce in any way the amounts distributable, reimbursable or otherwise payable by us to our general partner or any of its affiliates without the consent of our general partner, which consent may be given or withheld in its sole discretion.

The provision of our partnership agreement preventing the amendments having the effects described in the clauses above can be amended upon the approval of the holders of at least 90.0% of the outstanding units, voting as a single class (including units owned by our general partner and its affiliates).

### *No Unitholder Approval*

Our general partner may generally make amendments to our partnership agreement without the approval of any limited partner to reflect:

- a change in our name, the location of our principal place of business, our registered agent or our registered office;

- the admission, substitution, withdrawal or removal of partners in accordance with our partnership agreement;

- a change that our general partner determines to be necessary or appropriate to qualify or continue our qualification as a limited partnership or other entity in which the limited partners have limited liability under the laws of any state or to ensure that neither we nor any of our subsidiaries will be treated as an association taxable as a corporation or otherwise taxed as an entity for federal income tax purposes (to the extent not already so treated or taxed);

- cause us to be treated or restructured into an entity taxable as a corporation for US, federal or applicable state and local income tax purposes if our general partner determines it would be adverse to our interests not to do so;

- a change in our fiscal year or taxable year and related changes;

- an amendment that is necessary, in the opinion of our counsel, to prevent us or our general partner or its directors, officers, agents or trustees from in any manner being subjected to the provisions of the Investment Company Act of 1940, the Investment Advisers Act of 1940 or "plan asset" regulations adopted under the Employee Retirement Income Security Act of 1974, or ERISA, whether or not substantially similar to plan asset regulations currently applied or proposed;

- an amendment that our general partner determines to be necessary or appropriate in connection with the creation, authorization or issuance of additional partnership interests or the right to acquire partnership interests;

- any amendment expressly permitted in our partnership agreement to be made by our general partner acting alone;

- an amendment effected, necessitated or contemplated by a merger agreement that has been approved under the terms of our partnership agreement;

- any amendment that our general partner determines to be necessary or appropriate for the formation by us of, or our investment in, any corporation, partnership or other entity, as otherwise permitted by our partnership agreement;

• conversions into, mergers with or conveyances to another limited liability entity that is newly formed and has no assets, liabilities or operations at the time of the conversion, merger or conveyance other than those it receives by way of the conversion, merger or conveyance; or

• any other amendments substantially similar to any of the matters described in the clauses above.

In addition, our general partner may make amendments to our partnership agreement, without the approval of any limited partner, if our general partner determines that those amendments:

• do not adversely affect the limited partners, considered as a whole, or any particular class of limited partners, in any material respect;

• are necessary or appropriate to satisfy any requirements, conditions or guidelines contained in any opinion, directive, order, ruling or regulation of any federal or state agency or judicial authority or contained in any federal or state statute;

• are necessary or appropriate to facilitate the trading of limited partner interests or to comply with any rule, regulation, guideline or requirement of any securities exchange on which the limited partner interests are or will be listed for trading;

• are necessary or appropriate for any action taken by our general partner relating to splits or combinations of units under the provisions of our partnership agreement; or

• are required to effect the intent expressed in the prospectus used in connection with our IPO or the intent of the provisions of our partnership agreement or are otherwise contemplated by our partnership agreement.

### *Opinion of Counsel and Unitholder Approval*

Any amendment that our general partner determines adversely affects in any material respect one or more particular classes of limited partners, and is not permitted to be adopted by our general partner without limited partner approval, requires the approval of at least a majority of the class or classes so affected, but no vote is required by any class or classes of limited partners that our general partner determines are not adversely affected in any material respect. Any such amendment that would have a material adverse effect on the rights or preferences of any type or class of outstanding units in relation to other classes of units requires the approval of at least a majority of the type or class of units so affected. Any such amendment that reduces the voting percentage required to take any action other than to remove the general partner or call a meeting of unitholders is required to be approved by the affirmative vote of limited partners whose aggregate outstanding units constitute not less than the voting requirement sought to be reduced. Any such amendment that increases the percentage of units required to remove the general partner or call a meeting of unitholders must be approved by the affirmative vote of limited partners whose aggregate outstanding units constitute not less than the percentage sought to be increased. For amendments of the type not requiring unitholder approval, our general partner is not required to obtain an opinion of counsel that an amendment will neither result in a loss of limited liability to the limited partners nor result in our being treated as a taxable entity for federal income tax purposes in connection with any of the amendments. No other amendments to our partnership agreement will become effective without the approval of holders of at least 90% of the outstanding units, voting as a single class, unless we first obtain an opinion of counsel to the effect that the amendment will not affect the limited liability under applicable law of any of our limited partners.

### Merger, Consolidation, Conversion, Sale or Other Disposition of Assets

A merger, consolidation or conversion of us requires the prior consent of our general partner. However, our general partner has no duty or obligation to consent to any merger, consolidation or conversion and may decline to do so free of any duty or obligation whatsoever to us or the limited partners, including any duty to act in the best interest of us or the limited partners.

In addition, our partnership agreement generally prohibits our general partner, without the prior approval of the holders of a unit majority, from causing us to sell, exchange or otherwise dispose of all or substantially all of our

assets in a single transaction or a series of related transactions, including by way of merger, consolidation or other combination. Our general partner may, however, mortgage, pledge, hypothecate or grant a security interest in all or substantially all of our assets without such approval. Our general partner may also sell all or substantially all of our assets under a foreclosure or other realization upon those encumbrances without such approval. Finally, our general partner may consummate any merger without the prior approval of our unitholders if we are the surviving entity in the transaction, our general partner has received an opinion of counsel regarding limited liability and tax matters, the transaction would not result in a material amendment to the partnership agreement (other than an amendment that the general partner could adopt without the consent of other partners), each of our units will be an identical unit of our partnership following the transaction and the partnership interests to be issued do not exceed 20% of our outstanding partnership interests (other than incentive distribution rights) immediately prior to the transaction.

If the conditions specified in our partnership agreement are satisfied, our general partner may convert us or any of our subsidiaries into a new limited liability entity or merge us or any of our subsidiaries into, or convey all of our assets to, a newly formed entity, if the sole purpose of that conversion, merger or conveyance is to effect a mere change in our legal form into another limited liability entity, we have received an opinion of counsel regarding limited liability and tax matters and the governing instruments of the new entity provide the limited partners and our general partner with the same rights and obligations as contained in our partnership agreement. Our unitholders are not entitled to dissenters' rights of appraisal under our partnership agreement or applicable Delaware law in the event of a conversion, merger or consolidation, a sale of substantially all of our assets or any other similar transaction or event.

**Dissolution**

We will continue as a limited partnership until dissolved under our partnership agreement. We will dissolve upon:

• the election of our general partner to dissolve us, if approved by the holders of units representing a unit majority;

• there being no limited partners, unless we are continued without dissolution in accordance with applicable Delaware law;

• the entry of a decree of judicial dissolution of our partnership; or

• the withdrawal or removal of our general partner or any other event that results in its ceasing to be our general partner other than by reason of a transfer of its general partner interest in accordance with our partnership agreement, unless a successor is elected and admitted pursuant to the partnership agreement.

Upon a dissolution under the last clause above, the holders of a unit majority may also elect, within specific time limitations, to continue our business on the same terms and conditions described in our partnership agreement by appointing as a successor general partner an entity approved by the holders of units representing a unit majority, subject to our receipt of an opinion of counsel to the effect that:

• the action would not result in the loss of limited liability under Delaware law of any limited partner; and

• neither our partnership nor any of our subsidiaries would be treated as an association taxable as a corporation or otherwise be taxable as an entity for federal income tax purposes upon the exercise of that right to continue (to the extent not already so treated or taxed).

**Liquidation and Distribution of Proceeds**

Upon our dissolution, unless our business is continued, the liquidator authorized to wind up our affairs will, acting with all of the powers of our general partner that are necessary or appropriate, liquidate our assets and apply the proceeds of the liquidation as described in "How We Make Distributions to Our Partners—Distributions of Cash Upon Liquidation." The liquidator may defer liquidation or distribution of our assets for a reasonable period of time

or distribute assets to partners in kind if it determines that a sale would be impractical or would cause undue loss to our partners.

**Withdrawal or Removal of Our General Partner**

Because the withdrawal of our general partner can cause our dissolution without the approval of our limited partners, our general partner has agreed not to withdraw voluntarily as our general partner prior to December 31, 2027 without obtaining the approval of the holders of at least a majority of the outstanding common units, excluding common units held by our general partner and its affiliates, and furnishing an opinion of counsel regarding limited liability and tax matters. On or after December 31, 2027, our general partner may withdraw as general partner without first obtaining approval of any unitholder by giving 90 days' written notice, and that withdrawal will not constitute a violation of our partnership agreement. Our general partner's agreement not to withdraw prior to December 31, 2027 does not restrict the sale of the general partner or the transfer of the general partner interest to a third party without unitholder consent because such transfer would not cause our dissolution. Notwithstanding the information above, our general partner may withdraw without unitholder approval upon 90 days' notice to the limited partners if at least 50% of the outstanding common units are held or controlled by one person and its affiliates, other than our general partner and its affiliates. In addition, our partnership agreement permits our general partner, in some instances, to sell or otherwise transfer all of its general partner interest in us without the approval of the unitholders.

Upon withdrawal of our general partner under any circumstances, other than as a result of a transfer by our general partner of all or a part of its general partner interest in us, the holders of a unit majority may select a successor to that withdrawing general partner. If a successor is not elected, or is elected but an opinion of counsel regarding limited liability and tax matters cannot be obtained, we will be dissolved, wound up and liquidated, unless within a specified period after that withdrawal, the holders of a unit majority agree in writing to continue our business and to appoint a successor general partner. Please read "—Dissolution."

Our general partner may not be removed unless that removal is for cause and is approved by the vote of the holders of not less than 66 2/3% of the outstanding units, voting together as a single class, including units held by our general partner and its affiliates, and we receive an opinion of counsel regarding limited liability and tax matters. Any removal of our general partner is also subject to the approval of a successor general partner by the vote of the holders of a majority of the outstanding common units, voting as a class, and the outstanding subordinated units, voting as a class. The ownership of more than 33 1/3% of the outstanding units by our general partner and its affiliates gives them the ability to prevent our general partner's removal.

In the event of the removal of our general partner or withdrawal of our general partner where that withdrawal violates our partnership agreement, a successor general partner will have the option to purchase the general partner interest and incentive distribution rights of the departing general partner and its affiliates for a cash payment equal to the fair market value of those interests. Under all other circumstances where our general partner withdraws, the departing general partner has the option to require the successor general partner to purchase the general partner interest and the incentive distribution rights of the departing general partner and its affiliates for fair market value. In each case, this fair market value will be determined by agreement between the departing general partner and the successor general partner. If no agreement is reached, an independent investment banking firm or other independent expert selected by the departing general partner and the successor general partner will determine the fair market value. Or, if the departing general partner and the successor general partner cannot agree upon an expert, then an expert chosen by agreement of the experts selected by each of them will determine the fair market value.

If the option described above is not exercised by either the departing general partner or the successor general partner, the departing general partner's general partner interest and all its and its affiliates' incentive distribution rights will automatically convert into common units equal to the fair market value of those interests as determined by an investment banking firm or other independent expert selected in the manner described in the preceding paragraph.

In addition, we will be required to reimburse the departing general partner for all amounts due the departing general partner, including, without limitation, all employee-related liabilities, including severance liabilities,

incurred as a result of the termination of any employees employed for our benefit by the departing general partner or its affiliates.

**Change of Management Provisions**

Our partnership agreement contains specific provisions that are intended to discourage a person or group from attempting to remove BP Midstream Partners GP LLC as our general partner or from otherwise changing our management. Please read "—Withdrawal or Removal of Our General Partner" for a discussion of certain consequences of the removal of our general partner. If any person or group, other than our general partner and its affiliates, acquires beneficial ownership of 20% or more of any class of units, that person or group loses voting rights on all of its units. This loss of voting rights does not apply in certain circumstances.

**Limited Call Right**

If at any time our general partner and its affiliates own more than 80% of the then-issued and outstanding limited partner interests of any class, our general partner will have the right, which it may assign in whole or in part to any of its affiliates or to us, to acquire all, but not less than all, of the limited partner interests of the class held by unaffiliated persons, as of a record date to be selected by our general partner, on at least 10, but not more than 60, days' notice. The purchase price in the event of this purchase is the greater of:

• the highest price paid by our general partner or any of its affiliates for any limited partner interests of the class purchased within the 90 days preceding the date on which our general partner first mails notice of its election to purchase those limited partner interests; and

• the average of the daily closing prices of the partnership securities of such class over the 20 trading days preceding the date that is three days before the date the notice is mailed.

As a result of our general partner's right to purchase outstanding limited partner interests, a holder of limited partner interests may have his limited partner interests purchased at an undesirable time or at a price that may be lower than market prices at various times prior to such purchase or lower than a unitholder may anticipate the market price to be in the future. The tax consequences to a unitholder of the exercise of this call right are the same as a sale by that unitholder of his common units in the market.

**Non-Eligible Holders; Redemption**

To avoid any adverse effect on the maximum applicable rates chargeable to customers by us or any of our subsidiaries, or in order to reverse an adverse determination that has occurred regarding such maximum rates, we require purchasers of our units (including purchasers from the underwriters in offerings) to certify that they are Eligible Holders (as defined in our partnership agreement and described herein). By acquiring a unit, each purchaser is deemed to certify that it is an Eligible Holder. Our general partner may at any time require unitholders to re-certify that they are Eligible Holders.

Non-Eligible Holders include unitholders, or types of unitholders, whose U.S. federal income tax status (or lack of proof thereof) creates, in the determination of our general partner, a substantial risk of an adverse effect on the rates that can be charged to our customers by us or our subsidiaries, as the case may be. Unitholders will be Eligible Holders unless they are determined by the general partner to be Non-Eligible Holders, including because they are of a type of entity (such as real estate investment trusts, governmental entities and agencies and S corporations with ESOP shareholders) that are not Eligible Holders. A list of types of unitholders and whether they are of the type currently determined by the general partner to be Eligible Holders or Non-Eligible Holders is included in this prospectus as Appendix B. Our general partner may change its determination of what types of unitholders are considered Eligible Holders and Non-Eligible Holders at any time. We will make an updated list of such types of unitholders available to our unitholders and prospective unitholders.

If a unitholder is determined by our general partner to be a Non-Eligible Holder, then we will have the right to acquire all but not less than all of the units held by such unitholder. Further, the units will not be entitled to any allocations of income or loss, distributions or voting rights while held by such unitholder. The purchase price in the

event of such an acquisition for each unit held by such unitholder will be the average of the daily closing prices of the partnership securities of such class for the 20 consecutive trading days preceding the date fixed for redemption.

The purchase price will be paid in cash or by delivery of a promissory note, as determined by our general partner. Any such promissory note will bear interest at the rate of 5% annually and be payable in three equal annual installments of principal and accrued interest, commencing one year after the redemption date.

**Non-Citizen Assignees; Redemption**

If our general partner, with the advice of counsel, determines we are subject to federal, state or local laws or regulations that, in the reasonable determination of our general partner, create a substantial risk of cancellation or forfeiture of any property that we have an interest in because of the nationality, citizenship or other related status of any limited partner (or its owners, to the extent relevant), then our general partner may adopt such amendments to our partnership agreement as it determines necessary or advisable to:

• obtain proof of the nationality, citizenship or other related status of our limited partners (or their owners, to the extent relevant); and

• permit us to redeem the units held by any person whose nationality, citizenship or other related status creates substantial risk of cancellation or forfeiture of any property or who fails to comply with the procedures instituted by the general partner to obtain proof of the nationality, citizenship or other related status. The redemption price in the case of such a redemption will be the average of the daily closing prices per unit for the 20 consecutive trading days immediately prior to the date set for redemption.

**Status as Limited Partner**

By transfer of common units in accordance with our partnership agreement, each transferee of common units shall be admitted as a limited partner with respect to the common units transferred when such transfer and admission are reflected in our books and records. Except as described under "—Limited Liability," the common units will be fully paid, and unitholders will not be required to make additional contributions.

**Exhibit 10.12**

*Execution Version*

### BP MIDSTREAM PARTNERS LP
### TERM LOAN FACILITY AGREEMENT

This BP Midstream Partners LP Term Loan Facility Agreement (this "Agreement") is dated as of February 24, 2020 and made between:

(1) BP Midstream Partners L.P., a company formed under the laws of the State of Delaware (the "Borrower"); and

(2) North America Funding Company, a company incorporated under the laws of the State of Delaware (the "Lender" and together with the Borrower, the "Parties" and each a "Party").

It is agreed as follows:

## 1. DEFINITIONS AND INTERPRETATION

In this Agreement:

**"Agreement"** has the meaning given it in the preamble above, as amended, novated, supplemented, extended or restated from time to time.

**"Business Day"** means a day on which banks in New York are open for the transaction of the business contemplated by this Agreement.

**"Commitment"** means four hundred sixty-eight million US Dollars (USD 468,000,000), to the extent not cancelled or reduced by the Lender under this Agreement.

**"Commitment Period"** means the period from the Effective Date up to and including February 24, 2025.

**"Disbursement Date"** means the day on which a Loan is made or to be made under this Agreement.

**"Disbursement Request"** means a notice from the Borrower requesting a drawdown under the Term Loan Facility in the form attached to Schedule 1.

**"Disruption Event"** means either or both of:

(a) a material disruption to those payment or communications systems or to those financial markets which are, in each case, required to operate in order for payments to be made in connection with the Loan (or otherwise in order for the transactions contemplated by this Agreement to be carried out) which disruption is not caused by, and is beyond the control of, either of the Parties; or

(b) the occurrence of any other event which results in a disruption (of a technical or systems-related nature) to the treasury or payments operations of a Party preventing either Party:

(i) from performing its payment obligations under this Agreement; or

(ii) from communicating with other Parties in accordance with the terms of this Agreement, and which (in either such case) is not caused by, and is beyond the control of, the Party whose operations are disrupted.

**"Effective Date"** means the date of this Agreement above.

"**Equity Interests**" means shares of capital stock, partnership interests, membership interests in a limited liability company, beneficial interests in a trust or other equity ownership interests in a person, and any

Exhibit 10.12

*Execution Version*

warrants, options or other rights entitling the holder thereof to purchase or acquire any such Equity Interest.

**"Event of Default"** means any event or circumstance specified as such in Clause 9.

**"Final Repayment Date"** means February 24, 2025 or if that is not a Business Day, the next Business Day in that calendar month (if there is one) or the preceding Business Day (if there is not).

**"Financial Indebtedness"** means any indebtedness for or in respect of:

    (a)  moneys borrowed;

    (b)  any amount raised by acceptance under any acceptance credit facility;

    (c)  any amount raised pursuant to any note purchase facility or the issuance of bonds, notes debentures, loan stock or any similar instrument;

    (d)  the amount of any liability in respect of any lease or hire purchase contract which would, in accordance with GAAP, be treated as a finance or capital lease;

    (e)  receivables sold or discounted (other than any receivables to the extent they are sold on a non-recourse basis);

    (f)  any amount raised under any other transaction (including any forward sale or purchase agreement) having the commercial effect of a borrowing; or

    (g)  the amount of any liability in respect of any guarantee or indemnity for any items referred to in paragraphs (a) to (f) above.

**"Floating Interest Rate"** means 3-month LIBOR (as of the Quotation Day) + 0.73% (eighty five bps) per annum.

**"Group Company"** means and includes BP plc and any entity (other than the Lender) which BP plc from time to time directly or indirectly controls. For this purpose:

    (a)  an entity directly controls another entity if it owns more than fifty percent (50%) of the voting rights of the other entity; and

    (b)  an entity indirectly controls another entity if a series of entities can be specified beginning with the first entity and ending with the other entity, so related that each entity of the series (except the ultimate controlling entity) is directly controlled by one or more of the entities earlier in the series.

**"Increased Cost"** means:

    (a)  an additional or increased cost; or

    (b)  a reduction of an amount due and payable under this Agreement,

which is incurred by the Lender but only to the extent attributable to the Lender having entered into this Agreement or funding or performing its obligations under this Agreement.

**"Interest Payment Date"** means, in relation to each Loan the twenty-fifth (25th) day of April, July, October and January in each year or, if that is not a Business Day, the next Business Day in that calendar month (if there is one) or the preceding Business Day (if there is not), and the relevant Repayment Date

**"Interest Period"** means each period by reference to which interest is calculated and payable in respect of a Loan, as determined in accordance with Clause 4.3.

**"Loan"** means each loan made or to be made by the Lender to the Borrower under the Term Loan Facility or the principal amount outstanding for the time being of that loan.

**"Material Adverse Effect"** means a material adverse effect on the ability of the Borrower to perform its payment obligations under this Agreement.

**"Quotation Day"** means, in relation to any Interest Period, the day which is two (2) Business Days before the first day of such Interest Period.

**Exhibit 10.12**

*Execution Version*

**"Repayment Date"** means, in relation to a Loan, the repayment date for that Loan:

    (a) specified by the Borrower in the notice referred to under Clause 3.1 or if that is not a Business Day, the next Business Day in that calendar month (if there is one) or the preceding Business Day (if there is not), and which shall be a date on or before the Final Repayment Date; or

    (b) If not specified by the Borrower in the notice referred to under Clause 3.1, the Final Repayment Date.

**"Restricted Payment"** means any dividend or other distribution (whether in cash, securities or other property) with respect to any Equity Interests in the Borrower or any of its Subsidiaries, or any payment (whether in cash, securities or other property), including any sinking fund or similar deposit, on account of the purchase, redemption, retirement, acquisition, cancellation or termination of any such Equity Interests in the Borrower or any of its Subsidiaries or any option, warrant or other right to acquire any such Equity Interests in the Borrower or any of its Subsidiaries.

**"Security"** means a mortgage, charge, pledge, lien or other security interest securing any obligation of any person or any other agreement or arrangement having a similar effect.

**"Short Term Facility"** means the credit facility made available by Lender to Borrower pursuant to the Short Term Facility Agreement.

**"Short Term Facility Agreement"** means that certain Short Term Credit Facility Agreement, dated as of October 30, 2017 between Lender, as lender, and Borrower, as borrower.

**"Subsidiary"** means with respect to any person (the "*parent*") at any date, any corporation, limited liability company, partnership, association or other entity the accounts of which would be consolidated with those of the parent in the parent's consolidated financial statements if such financial statements were prepared in accordance with GAAP as of such date, as well as any other corporation, limited liability company, partnership, association or other entity of which securities or other ownership interests representing more than 50% of the equity or more than 50% of the ordinary voting power or, in the case of a partnership, more than 50% of the general partnership interests are, as of such date, owned, or held by the parent or one or more subsidiaries of the parent or by the parent and one or more subsidiaries of the parent. Unless otherwise specified, all references herein to a "*Subsidiary*" or to "*Subsidiaries*" shall refer to a Subsidiary or Subsidiaries of the Borrower.

**"Term Loan Facility"** means the term loan facility made available under this Agreement as described in Clause 2.

## 2. THE TERM LOAN FACILITY

Subject to the terms of this Agreement, the Lender makes available to the Borrower a US Dollar long term credit facility in an aggregate amount not exceeding the Commitment.

## 3. DRAWDOWNS

3.1. Subject to the terms of this Agreement, the Borrower shall be entitled during the Commitment Period to borrow up to an aggregate amount not exceeding the Commitment provided that the Borrower has delivered a completed Disbursement Request (in the form attached to this Agreement as Schedule 1) to the Lender by not less than two (2) Business Days before the proposed Disbursement Date (or such shorter time as agreed to by the Parties), such notice specifying the proposed Disbursement Date which shall be a Business Day, the amount of the Loan and the Repayment Date, and provided further that at the time of drawdown, no Event of Default has occurred or would result therefrom.

**Exhibit 10.12**

*Execution Version*

3.2. A Disbursement Request shall be irrevocable; <u>provided</u>, that a Disbursement Request will not be regarded as having been duly completed unless (a) the proposed Disbursement Date is a business day within the Commitment Period; (b) the amount of the requested Loan plus any prior Loans extended under this Term Loan Facility must be an amount which is not more than the Commitment Amount; and (c) it specifies the account and bank to which the proceeds of the Loan are to be credited

3.3. Subject to the terms of this Agreement, the Lender shall make available to the Borrower each Loan referred to in Clause 3.1, before the close of business on the requested Disbursement Date by transferring funds to the bank account designated in the relevant Disbursement Request.

## 4. INTEREST

4.1 The rate of interest for each Loan for its Interest Period shall be the Floating Interest Rate.

4.2 The Borrower shall pay interest on the respective Loans for each Interest Period in arrears on each Interest Payment Date.

4.3 Each Interest Period shall start on an Interest Payment Date and end on the next following Interest Payment Date except that the first Interest Period in respect of each Loan shall start on its Disbursement Date and end on the next Interest Payment Date and any Interest Period which would otherwise extend beyond the Final Repayment Date for any Loan shall instead end on that date.

4.4 If the Borrower fails to pay any amount payable by it under this Agreement on its due date, interest shall accrue on the overdue amount from the due date up to the date of actual payment (both before and after judgment) at a rate which, subject to paragraph 4.5 below, is two percent (2%) per annum higher than the rate which would have been payable if the overdue amount had, during the period of non-payment, constituted a Loan for successive Interest Periods. Any interest accruing under this Clause 4.4 shall be immediately payable by the Borrower on demand by the Lender.

4.5 Default interest (if unpaid) arising on an overdue amount will be compounded with the overdue amount at the end of each Interest Period applicable to that overdue amount but will remain immediately due and payable.

4.6 Interest shall accrue on a daily basis and be calculated on the basis of a three hundred and sixty (360) day year.

## 5. REPAYMENT AND PREPAYMENT

5.1 Each Loan will be repaid in full together with accrued and unpaid Interest thereon by the Borrower on the relevant Repayment Date, net of any previous prepayments made in accordance with this Agreement including for the avoidance of doubt Clause 5.5(b). All Loans, together with accrued and unpaid Interest thereon, outstanding as of the Final Repayment Date shall immediately become due and payable to Lender on the Final Repayment Date.

5.2 There will be no issuance fee due from Borrower.

5.3 Illegality

5.3.1  If at any time prior to the Final Repayment Date, it becomes unlawful in any applicable jurisdiction for the Lender to perform any of its obligations as contemplated by this Agreement or to fund or maintain its participation in any Loan:

(a) the Lender shall promptly notify the Borrower upon becoming aware of that event;

**Exhibit 10.12**

*Execution Version*

(b) the Commitment will be immediately cancelled; and

(c)  the Borrower shall prepay the Loan in full, together with all accrued Interest and fees payable hereunder, on the date specified by the Lender in the notice delivered to the Borrower (being no earlier than the last day of any applicable grace period permitted by law).

5.4 Voluntary prepayment of Loans

The Borrower may prepay the whole or any part of any Loan by giving at least two (2) Business Days' written notice to the Lender.

5.5 Restrictions

(a) Any notice of cancellation or prepayment given by any Party under this Clause 5 shall be irrevocable and, unless a contrary indication appears in this Agreement, shall specify the date or dates upon which the relevant cancellation or prepayment is to be made and the amount of that cancellation or prepayment.

(b) Any prepayment under this Agreement shall be made together with accrued Interest on the amount prepaid and without premium or penalty.

(c) Any amounts repaid by the Borrower under this Agreement may not be re-borrowed.

5.2 Any notice of prepayment shall be irrevocable and shall require the Borrower to make the payment on the date specified unless the Lender, at its sole discretion, agrees otherwise in writing.

5.3   Any prepayment must be accompanied by accrued interest calculated in accordance with the provisions of this Agreement up to the day of prepayment on the amount prepaid.

5.4 Loans prepaid may not be re-borrowed.


**6. INCREASED COSTS**

6.1 Increased costs

Subject to Clause 6.2 the Borrower shall, within three (3) Business Days of a demand by the Lender, pay the amount of any Increased Costs incurred by the Lender or any of its Affiliates as a result of (i) the introduction of or any change in (or in the interpretation, administration or application of) any applicable law or regulation or (ii) compliance with any applicable law or regulation made after the date of this Agreement.

6.2 Exceptions

Clause 6.1 does not apply to the extent any Increased Cost is attributable to the willful breach by the Lender or its Affiliates of any law or regulation or to the transfer, assignment or sub-participation of this Term Loan Facility in accordance with Clause 12.


**7. TAX GROSS-UP AND INDEMNITY**

7.1 No deduction

All payments by the Borrower under this Agreement shall be made without any deduction and free and clear of and without deduction for or on account of any Taxes, except to the extent that the Borrower is required by law to make payment subject to any Taxes.

7.2 Indemnity

**Exhibit 10.12**

*Execution Version*

(a) If any relevant Tax or amounts in respect of relevant Tax must be deducted from any amounts payable or paid by the Borrower to the Lender under this Agreement, the Borrower shall pay such additional amounts as may be necessary to ensure that the Lender receives on the due date a net amount equal to the full amount which it would have received had the payment not been made subject to the relevant Tax.

(b) Borrower's obligation to pay additional amounts pursuant to Clause 7.2(a) shall not apply to the extent that such additional amounts are the result of, with respect to the Lender, (i) income or franchise Taxes imposed on (or measured by) its net income by the United States of America, or by any laws of the jurisdiction in which the Lender is located, (ii) any branch profits Taxes imposed by the United States of America, (iii) any United States federal withholding Tax payable as a result of the Lender's failure to comply with Clause 7.3, or (iv) due to the transfer, assignment or sub-participation of this Term Loan Facility in accordance with Clause 12.

7.3 Exemptions

If the Lender is entitled to an exemption from or reduction of withholding tax under any law of the jurisdiction in which the Borrower is located, or any treaty to which such jurisdiction is a party, with respect to payments under this Agreement, it shall deliver to the Borrower, prior to the first Disbursement Request and at such other time(s) prescribed by law or reasonably requested by the Borrower, such properly completed and executed documentation prescribed by law as will permit such payments to be made without withholding or at a reduced rate.

## 8. REPRESENTATIONS

The Borrower makes the representations and warranties set out in this Clause 8 to the Lender on the date of this Agreement.

8.1 Due Incorporation. Borrower is a limited partnership duly organized, validly existing and in good standing under the law of its jurisdiction of incorporation and has the power to own its assets and carry on its business as it is being conducted.

8.2 Binding obligations. The obligations expressed to be assumed by it in this Agreement are legal, valid, binding and enforceable obligations, except as limited by bankruptcy, insolvency or other laws of general application relating to or affecting the enforcement of creditors' rights generally and general principles of equity.

8.3 Non-conflict with other obligations. The entry into and performance by it of, and the transactions contemplated by, this Agreement do not and will not conflict with (a) any law or regulation applicable to it; (b) its constitutional documents; or (c) any agreement or instrument binding upon it or any of its subsidiaries or any of its assets.

8.4 Power and authority. It has the power to enter into, perform and deliver, and has taken all necessary action to authorize its entry into, performance and delivery of, this Agreement.

8.5 Validity and admissibility in evidence. All authorizations required or desirable to (a) enable it lawfully to enter into, exercise its rights and comply with its obligations in this Agreement; and (b) make this Agreement admissible in evidence in its jurisdiction of formation, have been obtained or effected and are in full force and effect.

**Exhibit 10.12**

*Execution Version*

8.6  Deduction of Tax. Subject to receipt by the Borrower from the Lender of the documents referred to in Clause 7.3, it is not required to make any deduction for or on account of tax from any payment it may make under this Agreement.

8.7  No filing or stamp taxes. Under the law of its jurisdiction of formation it is not necessary that this Agreement be filed, recorded or enrolled with any court or other authority in that jurisdiction or that any stamp, registration or similar tax be paid on or in relation to this Agreement or the transactions contemplated thereby.

8.8  No Default.

(a)  No Event of Default is continuing or might reasonably be expected to result from the making of any Disbursement Request.

(b)  No other event or circumstance is outstanding, which constitutes a default under any other agreement or instrument which is binding on it or any of its subsidiaries or to which its (or any of its subsidiaries') assets are subject which might reasonably be expected to have a Material Adverse Effect.

8.9  Pari passu ranking. Borrower's payment obligations under this Agreement rank at least pari passu with the claims of all its other unsecured and unsubordinated creditors, except for obligations mandatorily preferred by law applying to companies generally. In the event that a lender is permitted to and receives Security under the terms of any other Financial Indebtedness of the Borrower (other than Security in respect of capital leases), the Lender shall be secured hereunder on substantially similar terms.

8.10  No proceedings pending or threatened. No litigation, arbitration or administrative proceedings of or before any court, arbitral body or agency which, if adversely determined, might reasonably be expected to have a Material Adverse Effect have (to the best of its knowledge and belief) been started or threatened in writing against Borrower or any of its subsidiaries.

8.11  Authorizations. Under the relevant laws of the jurisdiction of formation all authorizations required on its part in the United States of America with its entry into, performance and validity and enforceability of this Agreement have been obtained or effected (as appropriate) and are in full force and effect.

8.12  No Misleading Information.

(a)  Any factual information provided by Borrower to the Lender in connection with this Agreement was true and accurate in all material respects as at the date it was provided or as at the date (if any) at which it is stated.

(b)  Nothing has occurred or been omitted from the information provided to the Lender in connection with this Agreement and no information has been given or withheld that results in the information provided being untrue or misleading in any material respect.

8.13  Compliance with Law. Borrower and its subsidiaries have complied in all respects with all laws to which it may be subject, if failure to comply would materially impair its ability to perform its obligations under this Agreement.

8.14  Repetition. These representations are deemed to be made by the Borrower on the date of this Agreement and on each Disbursement Date.

**9. EVENTS OF DEFAULT**

**Exhibit 10.12**

*Execution Version*

Each of the events or circumstances set out in this Clause 9 is an "Event of Default", and the consequence of such an Event of Default being continuing is that the Lender may refuse to make further Loans, may reduce the Commitment to zero and/or may require the immediate repayment of all or any Loans already made together with all interest accrued (if any) and all other sums that may be due or payable under the terms of this Agreement. The Borrower shall promptly upon becoming aware of the same, notify the Lender in writing of the occurrence of an Event of Default, or an event which would with the lapse of time or giving of notice or both be an Event of Default.

9.1 Non-payment

The Borrower does not pay on the due date any amount payable pursuant to this Agreement at the place in which it is required to be paid unless its failure to pay is caused by:

(a) an administrative or technical error; or

(b) a Disruption Event,

and repayment is made within two (2) Business Days of its due date.

9.2 Breach of a Covenant

If there is a material breach of any of the covenants in Clause 10, which if capable of remedy, is not remedied within ten (10) Business Days of receipt of written notice from the Lender, requiring such breach to be remedied.

9.3 Misrepresentation

Any representation or statement made or deemed to have been made by the Borrower in this Agreement or any other document delivered by or on behalf of the Borrower under or in connection with this Agreement is or proves to have been materially incorrect or misleading when made or deemed to have been made.

9.4 Unlawfulness or Invalidity

Any governmental or other authority having jurisdiction over the Borrower institutes any action or legislation forcing the Borrower to cease all or a substantial part of its normal business, or withdraws or withholds any authorization or consent obtained or required by the Borrower for the due performance of its business and its obligations under this Agreement; or all or a substantial part of the business or assets of the Borrower is nationalized, involuntarily liquidated or otherwise compulsorily withdrawn from the control of the Borrower.

9.5 Cross Default

(a)  Any Financial Indebtedness of the Borrower is not paid when due nor within any originally applicable grace period.

(b)  Any Financial Indebtedness of the Borrower is declared to be or otherwise becomes due and payable prior to its specified maturity as a result of an event of default (however described).

(c)  Any commitment for any Financial Indebtedness of the Borrower is cancelled or suspended by a creditor of the Borrower as a result of an event of default (however described).

(d)  Any creditor of the Borrower becomes entitled to declare any Financial Indebtedness of the Borrower due and payable prior to its specified maturity as a result of an event of default (however described).

(e)  No Event of Default will occur under this clause 9.5 if the aggregate amount of Financial Indebtedness or commitment for Financial Indebtedness falling within clauses 9.5(a) to 9.5(d)

**Exhibit 10.12**

*Execution Version*

above is less than seventy-five million US Dollars (USD 75,000,000) (or its equivalent in any other currency or currencies).

9.6  Insolvency proceedings

Any corporate action, legal proceeding, filing or other procedure or step is taken in relation to:

(a)  the suspension (provisional or otherwise) of payments, a moratorium of any Financial Indebtedness, the bankruptcy, winding-up, dissolution, administration or reorganization (by way of voluntary arrangement, scheme of arrangement or otherwise) of the Borrower or any of its assets;

(b) the making of a general assignment for the benefit of its creditors;

(c)  the appointment of a liquidator, receiver, administrative receiver, administrator, trustee in bankruptcy, compulsory manager or other similar officer in respect of the Borrower or any of its assets; or

(d)  enforcement of any Security over any assets of the Borrower, or any analogous procedure or step is taken in any jurisdiction.

9.7 Creditors' process

Any expropriation, attachment, sequestration, distress or execution either before judgment or under an execution, affecting any asset or assets of the Borrower having a book value of ten million US Dollars (USD $10,000,000) or more, excluding any such action which is being contested in good faith by appropriate proceedings promptly instituted and diligently conducted.

## 10. GENERAL COVENANTS

The undertakings in this Clause 10 remain in force for the date of this Agreement for so long as any amount is outstanding under this Agreement.

10.1 Authorizations

The Borrower shall promptly:

(a)  obtain, comply with, and do all that is necessary to maintain in full force and effect; and

(b) supply certified copies to the Lender of,

any authorization required by any law or regulation of its jurisdiction of formation to enable it to perform its obligations under this Agreement and to ensure the legality, validity, enforceability, or admissibility in evidence in its jurisdiction of incorporation of this Agreement;

10.2 Compliance with laws

The Borrower shall comply in all respects with all the laws to which it may be subject, if failure to so comply would impair its ability to perform its obligations under this Agreement;

10.3 Negative Pledge

The Borrower shall not create or permit to subsist any Security over any of its assets other than such Security (a) securing obligations under capital leases and (b) as agreed between the Lender and the Borrower.

10.4 Pari Passu Ranking

**Exhibit 10.12**

*Execution Version*

The Borrower shall procure that its payment obligations under this Agreement do and will rank at least pari passu with all its other present and future unsecured and unsubordinated obligations, except for obligations mandatorily preferred by laws of general application.

10.5 No additional indebtedness

The Borrower shall not incur, without the express written consent of the Lender, additional Financial Indebtedness either through loans, issuing bonds, notes, debentures, loan stock or similar instrument, except for bank Loans up to two hundred million United States Dollars (USD 200,000,000) . For purposes of this clause, this restriction does not apply to other loans between the Lender and the Borrower, including the Short Term Facility.

10.6 Consolidated Leverage Ratio

The Borrower will not permit the Consolidated Leverage Ratio as of the last day of any fiscal quarter (beginning with the fiscal quarter ending December 31, 2019) to exceed 5.00 to 1.00 (the "Required Threshold"), provided, however, that to the extent that the Borrower or any of its subsidiaries (i) consummates (A) during any fiscal quarter, an individual acquisition for which the aggregate consideration is $50,000,000 or more (to the extent that the Borrower makes an Increase Election (as defined below) in respect thereof, a "Material Acquisition") or (B) in any twelve-month period, one or more acquisitions (excluding Material Acquisitions) for which the aggregate consideration is $100,000,000 or more and (ii) notifies the Lender that the Borrower elects to increase the Required Threshold as a result thereof (an "Increase Election"), which notice may be given by the Borrower at any time, then the Required Threshold for such fiscal quarter in which such individual acquisition described in clause (A) occurred or in which the aggregate consideration for such acquisitions described in clause (B) equaled or exceeded $100,000,000 and in either case the immediately three following fiscal quarters shall be increased to 5.50:1.00. Upon the expiration of said three fiscal quarters, the Required Threshold shall return to 5.00:1.00.

10.7 Restricted Payments

The Borrower will not declare or make, directly or indirectly, any Restricted Payment , or incur any obligation (contingent or otherwise) to do so, unless no Event of Default has occurred and is continuing under Clauses 9.1, 9.4, 9.7 or under Clause 9.2 as a result of a breach of Clause 10.6.

## 11. TERMINATION EVENT

In the event the Group Companies dispose of their aggregate shareholding in the Borrower (whether held directly or indirectly), the Lender shall have the right to terminate the Term Loan Facility by giving the Borrower forty-five (45) days' prior written notice requiring repayment of all outstanding amounts by the end of that forty-five day period or as otherwise agreed between the Borrower and the Lender.

## 12. CHANGES TO THE LENDER

The Lender may transfer, assign or sub-participate all or any part of its commitments under the Term Loan Facility to a Group Company with the Borrower's prior written consent, such consent not to be unreasonably withheld or delayed.