**Exhibit 10.12**

*Execution Version*

## 13. CHANGES TO THE BORROWER

The Borrower may not assign any of its rights or transfer any of its rights or obligations under this Agreement.

## 14. PAYMENT MECHANICS

14.1 Payments to the Lender

(a) On each date on which the Borrower is required to make a payment under this Agreement, the Borrower shall make the same available to the Lender (unless a contrary indication appears in this Agreement) for value on the due date at the time as specified by the Lender as being customary at the time for settlement of transactions in the place of payment.

(b) Payment shall be made in US Dollars to such account with such bank as the Lender specifies.

14.2 No set-off by the Borrower

All payments to be made by the Borrower under this Agreement shall be calculated and be made without (and free and clear of any deduction for) set-off or counterclaim.

14.3 Business Days

(a) Any payment which is due to be made on a day that is not a Business Day shall be made on the next Business Day in the same calendar month (if there is one) or the preceding Business Day (if there is not).

(b) During any extension of the due date pursuant to Clause 14.3(a) for payment of any principal or unpaid sum under this Agreement, Interest shall be payable on the principal or unpaid sum at the rate payable on the original due date.

14.4 Currency of account

US Dollars are the currency of account and payment for any sum due from the Borrower under this Agreement.

## 15. SET-OFF

The Lender may set-off any matured obligation due from the Borrower under this Agreement against any obligation owed by the Lender to the Borrower (whether or not arising under this Agreement, matured or contingent and irrespective of the currency, place of payment or place of booking of either obligation). If the obligations are in different currencies, the lender may convert either obligation at a market rate of exchange in its usual course of business for the purpose of the set-off.

## 16. COSTS AND EXPENSES

The Borrower shall, within fifteen (15) Business Days of demand, pay to the Lender the amount of all loss, liability, costs and expenses (including reasonable, documented, out-of-pocket legal fees) incurred by the Lender in connection with (a) the occurrence of any Event of Default or (b) the enforcement of, or the preservation of any rights under, this Agreement.

**Exhibit 10.12**

*Execution Version*

## 17.   APPLICABLE LAW AND JURISDICTION

This Agreement and any dispute or claim of whatever nature, whether contractual or non-contractual, arising out of or in connection with it is governed by the laws of the State of New York and the Parties hereby submit to the non-exclusive jurisdiction of the State of New York courts.

## 18. NOTICES

18.1 Any notice to be given hereunder shall be given in writing and, unless otherwise stated, may be made by email or letter.

18.2 The address for notices and communication to be sent under this Agreement are as follows:

(a) to the Borrower:
       BP Midstream Partners L.P.
       501 Westlake Park Blvd.
       Houston, TX 77079
       Attn.: Treasurer

(b) to the Lender:
       North America Funding Company
       501 Westlake Park Blvd.
       Houston, TX 77079
       Attn.: Treasurer

## 19. COUNTERPARTS; ELECTRONIC DELIVERY

This Agreement may be executed in any number of counterparts, either in original or telecopy form, each of which shall constitute an original, and this has the same effect as if the signatures on the counterparts were on a single copy of the Agreement. Delivery of an executed counterpart of a signature page of this Agreement by facsimile transmission or by ".pdf" or similar electronic transmission shall be effective as delivery of a manually executed counterpart hereof.

EXECUTION

The Parties have executed this Agreement as at the date written above.

Signed for and on behalf of                                          Signed for and on behalf of
BP Midstream Partners, LP                                          North America Funding Company
By: BP Midstream Partners GP LLC,
Its general partner

By: /s/ Craig W. Coburn                                               By: /s/ Thu Dang
Name: Craig W. Coburn                                              Name: Thu Dang
Title: Chief Financial Officer                                       Title: Treasurer
Date: February 24, 2020                                              Date: February 24, 2020

**Exhibit 10.12**

*Execution Version*

**SCHEDULE 1**

**Notice**

**Disbursement Request**

From: **BP MIDSTREAM PARTNERS, LP**

To: **NORTH AMERICA FUNDING COMPANY**

Dated:

Dear Sirs

**BP MIDSTREAM PARTNERS LP TERM LOAN FACILITY AGREEMENT**
**DATED AS OF [  ]**
**(the "Agreement")**

1. We refer to the Agreement. This is a Disbursement Request. Terms defined in the Agreement have the same meaning in this Disbursement Request unless given a different meaning in this Disbursement Request.

2. We wish to borrow a Loan on the following terms:

Proposed Disbursement Date: [ ] (or, if that is not a Business Day, the next Business Day)

Amount: [ ]

Proposed Loan Repayment Date: [ ]

3. The proceeds of this Loan should be credited to [account].

4. This Disbursement Request is irrevocable.

Sincerely,

_____

Authorised signatory for

BP MIDSTREAM PARTNERS, LP

SCHEDULE 1

**Exhibit 10.13**

*Execution Version*

## FIRST AMENDMENT TO SHORT TERM CREDIT FACILITY AGREEMENT

This First Amendment to Short Term Credit Facility Agreement ("First Amendment") is dated as of February 24, 2020 between BP Midstream Partners LP (the "Borrower") and North America Funding Company (the "Lender" and together with "Borrower", the "Parties").

**WHEREAS**, Borrower and Lender executed that certain Short Term Credit Facility Agreement dated as of October 30, 2017 (the "Short Term Facility Agreement");

**WHEREAS**, the Borrower, pursuant to the terms of the Short Term Facility Agreement, delivered a borrowing request (the "2018 Utilisation Request") effective October 1, 2018 (the "Utilisation Date") for an original principal amount of $468 million (the "Loan") with a loan repayment date of March 29, 2019 (the "Original Loan Repayment Date");

**WHEREAS**, the Lender, by that certain Credit Facility Waiver Agreement dated February 20, 2019 (the "First Waiver Agreement") agreed to a waiver to certain terms of the Short Term Facility Agreement and 2018 Utilisation Request as more fully described therein;

**WHEREAS**, the Lender, by that certain Second Credit Facility Waiver Agreement dated May 3, 2019 (the "Second Waiver Agreement") agreed to a waiver to certain terms of the First Waiver Agreement as more fully described therein;

**WHEREAS,** the Parties have now agreed to amend and modify the Short Term Facility Agreement as more fully described herein;

**NOW, THEREFORE,** for good and valuable consideration, the sufficiency and receipt of which are hereby acknowledged, the parties agree as follows (terms used but not defined herein shall have the meaning as defined in the Short Term Facility Agreement and the Term Loan Facility Agreement):

1. Section 1.1 shall be amended by adding the following definitions where alphabetically appropriate:

"**Term Loan Facility**" means the term loan facility made available by Lender to Borrower pursuant to the Term Loan Facility Agreement.

"**Term Loan Facility Agreement**" means that certain Term Loan Facility Agreement, dated as of February 24, 2020 between Lender, as lender, and Borrower, as borrower.

2. Section 6(a) shall be deleted in its entirety and replaced with the following:

(a) Each Loan will be repaid in full together with accrued and unpaid Interest thereon by the Borrower on the relevant Loan Repayment Date, net of any previous prepayments made in accordance with this Agreement including for the avoidance of doubt Clause 7.3(b), provided however, the Parties may agree on any Loan Repayment Date, to further extend the then outstanding Loan for an additional 6 month period, not to extend beyond the Facility Repayment Date. All Loans, together with accrued and unpaid Interest thereon, outstanding as of the Facility Repayment Date shall immediately become due and payable to Lender on the Facility Repayment Date.

**Exhibit 10.13**

*Execution Version*

3.  Section 15.5 shall be deleted in its entirety and replaced with the following:

Section 15.5 **No additional indebtedness**

(a) The Borrower shall not incur, without the express written consent of the Lender, additional Financial Indebtedness either through loans, issuing bonds, notes, debentures, loan stock or any similar instrument, except for bank loans up to USD $200,000,000. For purposes of this clause, this restriction does not apply to other loans between the Lender and the Borrower, including the Term Loan Facility.

(b) At no time shall the aggregate outstanding amount of Borrower's indebtedness to Lender under the Short Term Facility and the Term Loan Facility (the "**Aggregate Outstanding Amount**") exceed USD $600,000,000. For purposes of this clause, this restriction shall not apply to borrowings between the Lender and Borrower which proceeds shall be used to repay outstanding borrowings, so long as, after such repayment is made, the Aggregate Outstanding Balance does not exceed USD $600,000,000.

4.  <u>No other waivers</u>. Except as agreed in herein, there are no other amendments to the terms of the Short Term Facility Agreement.

5.  <u>Governing Law</u>. This Agreement shall be governed by the laws of the state of New York.

6.  <u>Counterparts</u>. This Agreement may be executed in any number of counterparts and this has the same effect as if the signatures on the counterparts were on a single copy of this Agreement.

BP Midstream Partners, LP                                          North America Funding Company
By: BP Midstream Partners GP LLC,
Its general partner

By: <u>/s/ Craig W. Coburn</u>                                          By: <u>/s/ Thu Dang</u>
Name: Craig W. Coburn                                          Name: Thu Dang
Title: Chief Financial Officer                                          Title: Treasurer

**Exhibit 21**

**Subsidiaries of BP Midstream Partners LP**
At December 31, 2019

| Company Name | State of Organization |
| --- | --- |
| BP Two Pipeline Company LLC | Delaware |
| BP D-B Pipeline Company LLC | Delaware |
| BP River Rouge Pipeline Company LLC | Delaware |

| Joint Ventures | State of Organization |
| --- | --- |
| Mars Oil Pipeline Company LLC[1] | Delaware |
| Ursa Oil Pipeline Company LLC[2] | Delaware |
| KM Phoenix Holdings LLC[3] | Delaware |
| Mardi Gras Transportation System Company LLC[4] | Delaware |
| Caesar Oil Pipeline Company, LLC[4] | Delaware |
| Cleopatra Gas Gathering Company, LLC[4] | Delaware |
| Endymion Oil Pipeline Company, LLC[4] | Delaware |
| Proteus Oil Pipeline Company, LLC[4] | Delaware |

(1) BP Midstream Partners LP owns a 28.5% interest in Mars Oil Pipeline Company LLC.
(2) BP Midstream Partners LP owns a 22.6916% interest in Ursa Oil Pipeline Company LLC.
(3) BP Midstream Partners LP owns a 25% interest in KM Phoenix Holdings LLC.
(4) BP Midstream Partners LP owns a 65% managing member interest in Mardi Gras Transportation System Company LLC. Mardi Gras Transportation System Company LLC owns a 56% interest in Caesar Oil Pipeline Company, LLC, a 53% interest in Cleopatra Gas Gathering Company, LLC, a 65% interest in Endymion Oil Pipeline Company, LLC and a 65% interest in Proteus Oil Pipeline Company, LLC.

**Exhibit 23.1**

**CONSENT OF INDEPENDENT REGISTERED PUBLIC ACCOUNTING FIRM**

We consent to the incorporation by reference in Registration Statement No. 333-221213 on Form S-8 of our reports dated February 27, 2020, relating to the consolidated financial statements of BP Midstream Partners LP and subsidiaries and the effectiveness of BP Midstream Partners LP's internal control over financial reporting, appearing in this Annual Report on Form 10-K of BP Midstream Partners LP for the year ended December 31, 2019.

/s/ DELOITTE & TOUCHE LLP

Houston, Texas
February 27, 2020

**Exhibit 23.2**

**Consent of Independent Registered Public Accounting Firm**

We consent to the incorporation by reference in the Registration Statement (Form S-8 No. 333-221213) pertaining to the 2017 Long Term Incentive Plan of BP Midstream Partners LP of our report dated March 22, 2018 with respect to the consolidated statements of operations, changes in equity and cash flows of BP Midstream Partners LP for the year ended December 31, 2017 included in this Annual Report (Form 10-K) for the year ended December 31, 2019.

/s/ Ernst & Young LLP

Chicago, Illinois
February 27, 2020

**Exhibit 23.3**

### Consent of Independent Auditors

We consent to the incorporation by reference in the Registration Statement (Form S-8 No. 333-221213) of BP Midstream Partners LP of our report dated February 14, 2020, with respect to the financial statements of Mars Oil Pipeline Company LLC, included in this Annual Report (Form 10-K) of BP Midstream Partners LP for the years ended December 31, 2019.

/s/ Ernst & Young LLP

Houston, Texas
February 27, 2020

**Exhibit 23.4**

### Consent of Independent Auditors

We consent to the incorporation by reference in the Registration Statement (Form S-8 No. 333-221213) of BP Midstream Partners LP of our report dated February 18, 2020, with respect to the financial statements of Caesar Oil Pipeline Company, LLC, included in this Annual Report (Form 10-K) of BP Midstream Partners LP for the year ended December 31, 2019.

/s/ Ernst & Young LLP

Houston, Texas
February 27, 2020

**Exhibit 23.5**

**Consent of Independent Auditors**

We consent to the incorporation by reference in the Registration Statement (Form S-8 No. 333-221213) of BP Midstream Partners LP of our report dated February 18, 2019, with respect to the financial statements of Caesar Oil Pipeline Company, LLC, included in this Annual Report (Form 10-K) of BP Midstream Partners LP for the year ended December 31, 2019.

/s/ Ernst & Young LLP

Houston, Texas
February 27, 2020

**Exhibit 23.6**

**Consent of Independent Auditors**

We consent to the incorporation by reference in the Registration Statement (Form S-8 No. 333-221213) of BP Midstream Partners LP of our report dated February 18, 2020, with respect to the financial statements of Cleopatra Gas Gathering Company, LLC, included in this Annual Report (Form 10-K) of BP Midstream Partners LP for the year ended December 31, 2019.

/s/ Ernst & Young LLP

Houston, Texas
February 27, 2020

**Exhibit 23.7**

**Consent of Independent Auditors**

We consent to the incorporation by reference in the Registration Statement (Form S-8 No. 333-221213) of BP Midstream Partners LP of our report dated February 18, 2019, with respect to the financial statements of Cleopatra Gas Gathering Company, LLC, included in this Annual Report (Form 10-K) of BP Midstream Partners LP for the year ended December 31, 2019.

/s/ Ernst & Young LLP

Houston, Texas
February 27, 2020

**Exhibit 31.1**

**CERTIFICATION PURSUANT TO SECTION 302 OF
THE SARBANES-OXLEY ACT OF 2002**

I, Robert P. Zinsmeister, certify that:

1.    I have reviewed this Annual Report on Form 10-K of BP Midstream Partners LP;

2.    Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3.    Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4.    The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

    1.    Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

    2.    Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

    3.    Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

    4.    Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5.    The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

    1.    All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

    2.    Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

Date: February 27, 2020

    /s/ Robert P. Zinsmeister
    ————————————————————
    Robert P. Zinsmeister
    Chief Executive Officer and Director
    BP Midstream Partners GP LLC
    *(the general partner of BP Midstream Partners LP)*

**Exhibit 31.2**

**CERTIFICATION PURSUANT TO SECTION 302 OF**
**THE SARBANES-OXLEY ACT OF 2002**

I, Craig W. Coburn, certify that:

1.      I have reviewed this Annual Report on Form 10-K of BP Midstream Partners LP;

2.      Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3.      Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4.      The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

   1.      Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

   2.      Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

   3.      Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

   4.      Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5.      The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

   1.      All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

   2.      Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

Date: February 27, 2020

/s/ Craig W. Coburn
Craig W. Coburn
Chief Financial Officer and Director
BP Midstream Partners GP LLC
*(the general partner of BP Midstream Partners LP)*

**Exhibit 32**

**CERTIFICATIONS PURSUANT TO**
**18 U.S.C. SECTION 1350,**
**AS ADOPTED PURSUANT TO**
**SECTION 906 OF THE SARBANES-OXLEY ACT OF 2002**

In connection with the Annual Report of BP Midstream Partners LP (the "Partnership") on Form 10-K for the fiscal year ended December 31, 2019, as filed with the Securities and Exchange Commission on the date hereof (the "Report"), each of the undersigned hereby certify, pursuant to 18 U.S.C. Section 1350, as adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002, that to his knowledge:

(1)     the Report fully complies with the requirements of Section 13(a) or 15(d) of the Securities Exchange Act of 1934, as amended; and

(2)     the information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of the Partnership.

Date: February 27, 2020

/s/ Robert P. Zinsmeister
Robert P. Zinsmeister
Chief Executive Officer and Director
BP Midstream Partners GP LLC
*(the general partner of BP Midstream Partners LP)*

/s/ Craig W. Coburn
Craig W. Coburn
Chief Financial Officer and Director
BP Midstream Partners GP LLC
*(the general partner of BP Midstream Partners LP)*



**Exhibit 99.1**

**MARS OIL PIPELINE COMPANY LLC**
**Financial Statements**
**Years Ended December 31, 2019, 2018, and 2017**

**Exhibit 99.1**

MARS OIL PIPELINE COMPANY LLC
Financial Statements
Years Ended December 31, 2019, 2018 and 2017

Table of Contents

| | |
|---|---|
| Report of Independent Auditors | 1 |
| Balance Sheets | 2 |
| Statements of Income | 3 |
| Statements of Members' Capital | 4 |
| Statements of Cash Flows | 5 |
| Notes to Financial Statements | 6 |

**Exhibit 99.1**

### Report of Independent Auditors

To the Management Committee and Members
Mars Oil Pipeline Company LLC

We have audited the accompanying financial statements of Mars Oil Pipeline Company LLC, which comprise the balance sheets as of December 31, 2019 and 2018, and the related statements of income, members' capital and cash flows for each of the three years in the period ended December 31, 2019, and the related notes to the financial statements.

**Management's Responsibility for the Financial Statements**

Management is responsible for the preparation and fair presentation of these financial statements in conformity with U.S. generally accepted accounting principles; this includes the design, implementation, and maintenance of internal control relevant to the preparation and fair presentation of financial statements that are free from material misstatement, whether due to fraud or error.

**Auditor's Responsibility**

Our responsibility is to express an opinion on the financial statements based on our audits. We conducted our audits in accordance with auditing standards generally accepted in the United States. Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free from material misstatement.

An audit involves performing procedures to obtain audit evidence about the amounts and disclosures in the financial statements. The procedures selected depend on the auditor's judgment, including the assessment of the risks of material misstatement of the financial statements, whether due to fraud or error. In making those risk assessments, the auditor considers internal control relevant to the entity's preparation and fair presentation of the financial statements in order to design audit procedures that are appropriate in the circumstances, but not for the purpose of expressing an opinion on the effectiveness of the entity's internal control. Accordingly, we express no such opinion. An audit also includes evaluating the appropriateness of accounting policies used and the reasonableness of significant accounting estimates made by management, as well as evaluating the overall presentation of the financial statements.

We believe that the audit evidence we have obtained is sufficient and appropriate to provide a basis for our audit opinion.

**Opinion**

In our opinion, the financial statements referred to above present fairly, in all material respects, the financial position of Mars Oil Pipeline Company LLC at December 31, 2019 and 2018, and the results of its operations and its cash flows for each of the three years in the period ended December 31, 2019 in conformity with U.S. generally accepted accounting principles.

**Adoption of ASU No. 2014-09**

As discussed in Note 7 to the financial statements, the Company changed its method of accounting for recognizing revenue as a result of the adoption of Accounting Standards Update (ASU) No. 2014-09, Revenue from Contracts with Customers (Topic 606), and the amendments in ASUs 2015-14, 2016-08, 2016-10 and 2016-12 effective January 1, 2018. Our opinion is not modified with respect to this matter.

/s/ Ernst & Young LLP

Houston, TX
February 14, 2020

**Exhibit 99.1**

MARS OIL PIPELINE COMPANY LLC
BALANCE SHEETS

| | | December 31, | | |
|---|---|---|---|---|
| | | **2019** | | **2018** |
| **ASSETS** | | | | |
| **Current assets** | | | | |
| Cash and cash equivalents | $ | 29,348,638 | $ | 20,203,226 |
| Accounts receivable, net | | | | |
| Related parties | | 18,585,209 | | 16,447,473 |
| Third parties | | 5,461,901 | | 4,909,253 |
| Materials and supplies inventory | | 110,979 | | 224,264 |
| Allowance oil, net | | 2,759,770 | | 8,277,550 |
| Other current assets | | 1,039,264 | | 3,068,969 |
| **Total current assets** | | 57,305,761 | | 53,130,735 |
| Property, plant and equipment | | 302,076,157 | | 301,094,414 |
| Accumulated depreciation | | (137,985,182) | | (128,735,564) |
| Property, plant and equipment, net | | 164,090,975 | | 172,358,850 |
| Advance for operations due from related party | | 538,000 | | 538,000 |
| Other assets | | 8,334,109 | | 5,303,402 |
| **Total assets** | $ | 230,268,845 | $ | 231,330,987 |
| **LIABILITIES and MEMBERS' CAPITAL** | | | | |
| **Current liabilities** | | | | |
| Accounts payable and accrued liabilities | $ | 1,161,981 | $ | 411,354 |
| Payable to related parties | | 6,623,373 | | 5,021,923 |
| **Total current liabilities** | | 7,785,354 | | 5,433,277 |
| Long-term liabilities and deferred revenue | | 22,890,167 | | 18,376,417 |
| Commitments and contingencies (Note 6 & 9) | | | | |
| **Members' capital** | | 199,593,324 | | 207,521,293 |
| **Total liabilities and members' capital** | $ | 230,268,845 | $ | 231,330,987 |

The accompanying notes are an integral part of these financial statements.

2

**Exhibit 99.1**

MARS OIL PIPELINE COMPANY LLC
STATEMENTS OF INCOME
Years Ended December 31, 2019, 2018 and 2017

|  | 2019 | 2018 | 2017 |
|---|---|---|---|
| **Revenue** | | | |
| Operating revenue - related parties | $ 197,531,039 | $ 167,277,925 | $ 191,252,314 |
| Operating revenue - third parties | 65,326,677 | 62,225,748 | 64,200,542 |
| Product revenue - related parties | 18,867,918 | 11,801,170 | — |
| Total revenue | 281,725,634 | 241,304,843 | 255,452,856 |
| **Costs and expenses** | | | |
| Operations | 65,825,668 | 58,098,841 | 61,184,407 |
| Maintenance | 4,916,293 | 5,065,247 | 3,892,738 |
| Cost of product sold | 14,686,124 | 11,128,238 | — |
| General and administrative | 6,160,632 | 4,824,553 | 4,244,373 |
| Depreciation and amortization | 10,004,993 | 9,998,461 | 10,880,406 |
| Property taxes | 2,551,078 | 2,427,553 | 2,357,117 |
| Net (gain) from pipeline operations | (596,967) | (4,142,396) | (691,635) |
| Total costs and expenses | 103,547,821 | 87,400,497 | 81,867,406 |
| **Operating income** | 178,177,813 | 153,904,346 | 173,585,450 |
| Other income | — | — | 83 |
| Interest income | 1,304,218 | 14,686 | 10,876 |
| **Net Income** | $ 179,482,031 | $ 153,919,032 | $ 173,596,409 |

The accompanying notes are an integral part of these financial statements.

3

**Exhibit 99.1**

MARS OIL PIPELINE COMPANY LLC
STATEMENTS OF MEMBERS' CAPITAL
Years Ended December 31, 2019, 2018 and 2017

| | Shell Midstream Partners, L.P. | Shell Pipeline Company LP | BP Offshore Pipelines, Inc. / BP Midstream Partners, L.P. [2] | Total |
|---|---|---|---|---|
| Members' capital at December 31, 2016 | $ 112,965,691 | $ 53,228,689 | $ 66,245,313 | $ 232,439,693 |
| Net income before December 1, 2017 | 77,772,866 | 36,646,063 | 45,607,546 | 160,026,475 |
| Cash distributions before December 1, 2017 | (64,152,000) | (30,228,000) | (37,620,000) | (132,000,000) |
| Equity transfer on December 1, 2017 [1] | 59,646,752 | (59,646,752) | — | — |
| Net income after December 1, 2017 | 9,702,503 | — | 3,867,431 | 13,569,934 |
| Cash distributions after December 1, 2017 | (31,460,000) | — | (12,540,000) | (44,000,000) |
| Members' capital at December 31, 2017 | $ 164,475,812 | $ — | $ 65,560,290 | $ 230,036,102 |
| Impact of change in accounting principle [3] | (6,888,196) | — | (2,745,645) | (9,633,841) |
| Net income | 110,052,108 | — | 43,866,924 | 153,919,032 |
| Cash distributions | (119,262,000) | — | (47,538,000) | (166,800,000) |
| Members' capital at December 31, 2018 | $ 148,377,724 | $ — | $ 59,143,569 | $ 207,521,293 |
| Net income | 128,329,652 | — | 51,152,379 | 179,482,031 |
| Cash distributions | (133,998,150) | — | (53,411,850) | (187,410,000) |
| Members' capital at December 31, 2019 | $ 142,709,226 | $ — | $ 56,884,098 | $ 199,593,324 |

[1] On December 1, 2017, Shell Pipeline Company LP contributed its remaining 22.9% ownership to Shell Midstream Partners, L.P. ("Shell Midstream"). As a result of these contributions, Shell Midstream owns a 71.5% interest in Mars Oil Pipeline Company LLC ("Mars").
[2] On October 25, 2017, BP Offshore Pipelines, Inc. contributed its 28.5% membership interest in Mars to BP Midstream Holdings LLC ("BP Holdco") and BP Holdco then contributed its 28.5% membership interest in Mars to BP Midstream Partners LP.
[3] Impact of adoption of Topic 606, "Revenue from Contracts with Customers" effective January 1, 2018.

The accompanying notes are an integral part of these financial statements.

4

**Exhibit 99.1**

MARS OIL PIPELINE COMPANY LLC
STATEMENTS OF CASH FLOWS
Years Ended December 31, 2019, 2018 and 2017

| | | 2019 | | 2018 | | 2017 |
|---|---|---|---|---|---|---|
| **Cash flows from operating activities** | | | | | | |
| Net income | $ | 179,482,031 | $ | 153,919,032 | $ | 173,596,409 |
| Adjustments to reconcile net income to net cash provided by operating activities: | | | | | | |
| Depreciation and amortization | | 10,004,993 | | 9,998,461 | | 10,880,406 |
| Net (gain) from pipeline operations | | (596,967) | | (4,142,396) | | (691,635) |
| Increase in deferred charges | | 4,513,750 | | 8,742,574 | | — |
| Bad debt expense | | — | | — | | (83) |
| Changes in operating assets and liabilities | | | | | | |
| (Increase) decrease in accounts receivable, net | | (2,690,386) | | (2,284,404) | | (143,481) |
| (Increase) decrease in materials and supplies inventory and allowance oil, net | | 6,228,033 | | (8,493) | | (687,193) |
| (Increase) in other assets | | (1,756,378) | | (2,221,159) | | (8,356) |
| Increase (decrease) in accounts payable and accrued liabilities | | 1,911,371 | | 275,166 | | (498,312) |
| Net cash provided by operating activities | | 197,096,447 | | 164,278,781 | | 182,447,755 |
| **Cash flows from investing activities** | | | | | | |
| Capital expenditures | | (541,035) | | (570,711) | | (444,414) |
| Net cash used in investing activities | | (541,035) | | (570,711) | | (444,414) |
| **Cash flows from financing activities** | | | | | | |
| Distributions to members | | (187,410,000) | | (166,800,000) | | (176,000,000) |
| Net cash used in financing activities | | (187,410,000) | | (166,800,000) | | (176,000,000) |
| (Decrease) increase in cash and cash equivalents | | 9,145,412 | | (3,091,930) | | 6,003,341 |
| Cash and cash equivalents at the beginning of the period | | 20,203,226 | | 23,295,156 | | 17,291,815 |
| Cash and cash equivalents at the end of the period | $ | 29,348,638 | $ | 20,203,226 | $ | 23,295,156 |
| | | | | | | |
| **Supplemental cash flow disclosures** | | | | | | |
| Change in accrued capital expenditures | $ | (440,708) | $ | (36,739) | $ | (571,978) |

The accompanying notes are an integral part of these financial statements.

5

**Exhibit 99.1**

MARS OIL PIPELINE COMPANY LLC
NOTES TO FINANCIAL STATEMENTS
December 31, 2019, 2018 and 2017

**1. Organization and Business**

As of June 1, 2017, Mars Oil Pipeline Company changed from a Texas general partnership, formed in 1996, to a Delaware limited liability company ("LLC"), Mars Oil Pipeline Company LLC ("Mars," "we," "us" or "our") and continues to own and operate a pipeline system for the transportation of crude oil from Mississippi Canyon Block 807 in the Gulf of Mexico, offshore Louisiana, to Clovelly, Louisiana. The Mars pipeline system is approximately 160 miles in length and has 16-, 18- and 24-inch diameter lines with mainline capacity of up to 600,000 barrels per day. Since we are an LLC, no member is liable for debts, obligations or liabilities, including under a judgment decree or order of a court; and we shall continue until such time as a certificate of cancellation is filed with the Secretary of the State of Delaware. The Mars pipeline system is regulated by the Federal Energy Regulatory Commission ("FERC"), where applicable, and tariff rates are calculated in accordance with guidelines established by the FERC.

Upon formation, we were owned by Shell Pipeline Company LP ("Shell Pipeline," "Operator"), an indirect wholly-owned subsidiary of Shell Oil Company ("Shell Oil"), and BP Offshore Pipelines, Inc. ("BP"), (collectively, the "Members"). Each Member contributed cash and certain pipeline related assets. In accordance with the LLC agreement, the historical relative sharing ratios between the Members for all revenues, costs and expenses were 71.5% to Shell Pipeline and 28.5% to BP.

On October 28, 2014, Shell Pipeline contributed 28.6% ownership interest in Mars to Shell Midstream Partners, L.P. ("Shell Midstream"). On October 3, 2016, Shell Pipeline contributed an additional 20% ownership to Shell Midstream and on December 1, 2017, contributed the remaining 22.9% ownership to Shell Midstream. As a result of these contributions, Shell Midstream owned a 71.5% interest in Mars as of December 31, 2017.

On October 25, 2017, BP contributed its 28.5% membership interest in Mars to BP Midstream Holdings LLC ("BP Holdco") and BP Holdco then contributed its 28.5% membership interest in Mars to BP Midstream Partners, L.P. ("BP Midstream"). As a result of these contributions, BP Midstream owned a 28.5% ownership interest in Mars as of December 31, 2017.

Upon formation, we entered into an Operating Agreement (the "Operating Agreement") with Shell Pipeline to operate, on our behalf, the Mars assets and the Mars Cavern System at Louisiana Offshore Oil Port LLC's ("LOOP") Clovelly Storage Terminal, which consists of crude petroleum storage caverns and all ancillary components.

**2. Recent Accounting Pronouncements**

Standards Not Adopted as of December 31, 2019

In February 2016, the FASB issued ASU 2016-02 to Topic 842, Leases, which requires lessees to recognize right-of-use assets and lease liabilities on the balance sheet for all leases with terms longer than 12 months. Leases will be classified as either a finance lease or operating lease with classification affecting the pattern of expense recognition in the statements of income and presentation of cash flows in the statements of cash flows. This update also requires improved disclosures to help users of financial statements better understand the amount, timing and uncertainty of cash flows arising from leases. For lessors, this update modifies the classification criteria and the accounting for sales-type and direct finance leases. This update is effective on a modified retrospective basis for fiscal years, and interim periods within those fiscal years, beginning after December 15, 2019. We are adopting the new standard using the modified retrospective transition approach, effective January 1, 2020. We do not expect to recognize any cumulative effect of initially applying the standard for periods prior to January 1, 2020. We have completed the identification and aggregation of our lease contract population. We have also completed our review of these lease contracts to determine the transition approach as well as any necessary changes to existing processes and controls. The adoption will impact our financial statements and related disclosures as we will recognize right-of-use assets of approximately $58 million and corresponding lease liabilities for operating lease liabilities (where we are the lessee) of approximately $58 million.

We will elect the practical expedients upon transition that will retain the lease classification and initial direct costs for any leases that exist prior to adoption. As such, we are not required to reassess whether any contracts entered into prior to adoption are leases. In January 2018, the FASB issued ASU 2018-01 to provide an optional transition practical expedient to not evaluate existing or expired land easements that were not previously accounted for as leases under existing guidance. We will elect this practical expedient. In July 2018, the FASB issued ASU 2018-11 which provides entities an optional transitional relief method that allows entities to not apply the new guidance in the comparative periods they present in their financial statements in the

6

**Exhibit 99.1**

year of adoption. This update also provides an optional practical expedient for lessors to avoid separating lease and associated non-lease components within a contract if certain criteria are met. We will elect all these most recent practical expedients with the exception of the practical expedient to avoid separating lease and non-lease components within a contract and will continue to evaluate all other available transition practical expedients offered in connection with the new lease standards.

In June 2016, the FASB issued ASU 2016-13 to Topic 326, Financial Instruments — Credit Losses: Measurement of Credit Losses on Financial Instruments, which replaces the current incurred loss impairment method with a method that reflects expected credit losses on financial instruments. For trade receivables, entities will be required to estimate lifetime expected credit losses. This update is effective for fiscal years, and interim periods within those fiscal years, beginning after December 15, 2019. We are adopting this new standard effective January 1, 2020 and we do not expect the adoption of ASU 2016-13 to have a material impact on our financial statements and related disclosures.

### 3. Summary of Significant Accounting Policies

We practice the following significant accounting policies, which are presented as an aid to understanding the financial statements.

**Basis of Presentation**

The accompanying financial statements have been prepared in accordance with generally accepted accounting principles in the United States ("U.S. GAAP").

**Use of Estimates**

The preparation of financial statements in conformity with U.S. GAAP requires management to make estimates and assumptions that affect the amounts reported in the financial statements and accompanying notes. Actual results could differ from those estimates. Management believes the estimates are reasonable.

**Cash and Cash Equivalents**

Cash and cash equivalents are comprised of cash on deposit at the bank.

**Accounts Receivable**

Our accounts receivable are primarily from purchasers and shippers of crude oil. These purchasers include, but are not limited to refiners, producers, marketing and trading companies and financial institutions that are active in the physical and financial commodity markets. The majority of our accounts receivable relate to our crude oil supply and logistics activities that can generally be described as high volume and low margin activities.

We review all outstanding accounts receivable balances on a monthly basis and record a reserve for amounts that we expect will not be fully recovered. We do not apply actual balances against the reserve until we have exhausted substantially all collection efforts. We had no allowance for doubtful accounts at December 31, 2019 and 2018.

**Inventories**

Inventories of materials and supplies are carried at the lower of average cost or net realizable value.

**Allowance Oil**

A loss allowance factor of 0.1% to 0.015% per transported barrel is incorporated into applicable crude oil tariffs to offset evaporation and other losses in transit. Allowance oil represents the net difference between the tariff pipeline loss allowance ("PLA") volumes and the actual volumetric losses. We take title to any excess loss allowance when product losses are within an allowed level and we convert that product to cash periodically at prevailing market prices. Crude oil is also stored within the Mars pipeline system in an underground cavern (the "Mars Cavern"). Gains and losses related to the Mars Cavern, including a standard loss accrual of 0.05% of net crude oil receipts, also cause the allowance oil balance to increase or decrease, respectively.

Allowance oil is valued at cost using the average market price for the relevant type of crude oil during the month product was transported. At the end of each reporting period, we assess the carrying value of our allowance oil and make any adjustments necessary to reduce the carrying value to the applicable net realizable value. Management records estimated losses expected to arise upon emptying the Mars Cavern, derived from historical net losses. As a result, Allowance oil, net as presented on the Balance Sheets included net cavern loss accruals of $635,300 and $126,968 at December 31, 2019 and 2018, respectively.

7

**Exhibit 99.1**

Cost of product sold in 2019 and 2018 presented within the Statements of Income represent the cost of sales of allowance oil and any net realizable value adjustments recorded during the reporting period. See Revenue Recognition discussed below.

**Other Current Assets**

We executed a rental agreement with LOOP, an affiliate of Shell Pipeline, for the terminalling of crude oil in the Mars Cavern, which is renewed annually. Rental expense of $1,459,315, $1,321,894 and $1,269,244 for the rental agreement is included in the accompanying Statements of Income within "Operations" expenses for December 31, 2019, 2018 and 2017, respectively. The expense for 2020 is included in the table for future minimum lease payments in Note 6 – Leases. At December 31, 2019 and 2018, the prepaid rent on the cavern lease of $1,039,264 and $940,321, respectively, was included in "Other current assets" within the accompanying Balance Sheets.

**Property, Plant and Equipment**

Property, plant and equipment is stated at its historical cost of construction, or upon acquisition, at either the fair value of the assets acquired or the historical carrying value to the entity that placed the asset in service. Expenditures for major renewals and betterments are capitalized while minor replacements, maintenance and repairs which do not improve or extend asset life are expensed when incurred. For constructed assets, all construction-related direct labor and material costs, as well as indirect construction costs are capitalized. Gains and losses on the disposition of assets are recognized on the Balance Sheets against the accumulated depreciation unless the retirement was an abnormal or extraordinary item.

We compute depreciation using the straight-line method based on estimated economic lives. We have historically computed depreciation using the straight-line method based on estimated economic lives prescribed by the FERC, which are 30 years for right of way, line pipe, line pipe fittings, pipeline construction, buildings, pumping equipment, other station equipment, oil tanks and delivery facilities; 20 years for office furniture and equipment; 15 years for communication systems and other work equipment; and 5 years for vehicles. We apply composite depreciation rates to functional groups of property having similar economic characteristics. These rates have historically ranged from 3.33% to 20%.

In late 2017, we contracted an independent energy consulting firm to perform a depreciation study which provided new average remaining lives for our current property, plant and equipment. The results of the study reflect the following new average remaining lives approved by FERC effective January 1, 2018: 18 to 23 years for right of way, line pipe, line pipe fittings, pipeline construction; 12 to 15 years for buildings, pumping equipment, other station equipment, office furniture and equipment; and 5 to 8 years for communication systems, vehicles and other work equipment (oil tanks and delivery facilities are no longer applicable to our assets). The new composite depreciation rates were also effective January 1, 2018 and range from 1.8% to 13.3%. This was a prospective change in accounting estimates that has been applied to the period beginning January 1, 2018 and thereafter.

**Other Assets**

During 2015, we paid $7,553,757 to LOOP for replacing a Brine pipeline (also known as the "Brine String Project") owned by LOOP. We were contractually obligated to make capital improvements to the asset as part of the terms of the operating agreement with LOOP. The costs associated with the Brine String Project have been deferred and are being amortized over 10 years. Amortization expense of $755,376 was recorded for each of the years ended December 31, 2019, 2018 and 2017, respectively, and is included in the accompanying Statements of Income as "Depreciation and amortization".

**Asset Retirement Obligations**

Asset retirement obligations represent contractual or regulatory obligations associated with the retirement of long-lived assets that result from acquisition, construction, development and/or normal use of the asset. We record liabilities for obligations related to the retirement and removal of long-lived assets used in our businesses at fair value on a discounted basis when they are incurred and can be reasonably estimated. Amounts recorded for the related assets are increased by the amount of these obligations. Over time, the liabilities increase due to the change in their present value and the initial capitalized costs are depreciated over the useful lives of the related assets. The liabilities are eventually extinguished when settled at the time the asset is taken out of service.

We continue to evaluate our asset retirement obligations and future developments could impact the amounts we record. The demand for our pipelines depends on the ongoing demand to move crude oil through the system. Although individual assets will be replaced as needed, we expect our pipelines will continue to exist for an indeterminate economic life. As such, there is uncertainty around the timing of any asset retirement activities. As a result, we determined that there is not sufficient information to make a reasonable estimate of the asset retirement obligations for our assets and we have not recognized any asset retirement obligations as of December 31, 2019 and 2018.

**Exhibit 99.1**

**Impairments of Long-Lived Assets**

Long lived assets of identifiable business activities are evaluated for impairment when events or changes in circumstances indicate, in our management's judgment, that the carrying value of such assets may not be recoverable. These events include market declines that are believed to be other‑than‑temporary, changes in the manner in which we intend to use a long‑lived asset, decisions to sell an asset and adverse changes in the legal or business environment, such as adverse actions by regulators. If an event occurs, which is a determination that involves judgment, we evaluate the recoverability of our carrying values based on the long‑lived asset's ability to generate future cash flows on an undiscounted basis. When an indicator of impairment has occurred, we compare our management's estimate of forecasted undiscounted future cash flows attributable to the assets to the carrying value of the assets to determine whether the assets are recoverable (i.e., the undiscounted future cash flows exceed the net carrying value of the assets). If the assets are not recoverable, we determine the amount of the impairment recognized in the financial statements by estimating the fair value of the assets and recording a loss for the amount that the carrying value exceeds the estimated fair value. We determined that there were no asset impairments in the years ended December 31, 2019, 2018 and 2017.

**Fair Value of Financial Instruments**

Assets and liabilities requiring fair value presentation or disclosure are measured using an exit price (i.e., the price that would be received to sell an asset or paid to transfer a liability) and are disclosed according to the quality of valuation inputs under the following hierarchy:

Level 1 Quoted prices in an active market for identical assets or liabilities.
Level 2 Inputs other than quoted prices that are directly or indirectly observable.
Level 3 Unobservable inputs that are significant to the fair value of assets or liabilities.

The fair value of an asset or liability is classified based on the lowest level of input significant to its measurement. A fair value initially reported as Level 3 will be subsequently reported as Level 2 if the unobservable inputs become inconsequential to its measurement or corroborating market data becomes available. Asset and liability fair values initially reported as Level 2 will be subsequently reported as Level 3 if corroborating market data becomes unavailable.

The carrying amounts of our Accounts receivable, net, Other current assets, Accounts payable and accrued liabilities and Payables to related parties approximate their carrying values due to their short‑term nature.

Nonrecurring fair value measurements are applied with respect to our nonfinancial assets and liabilities measured on a nonrecurring basis, which includes the determination of the fair value for impairment of our long‑lived assets.

**Concentration of Credit and Other Risks**

A significant portion of our revenues and receivables are from related parties and other oil and gas companies. Although collection of these receivables could be influenced by economic factors affecting the oil and gas industry, management believes the risk of significant loss to be remote.

The following table shows revenues from third and related parties that accounted for 10% or more of "Total revenue" for the indicated dates:

| | December 31, | | | | | |
|---|---|---|---|---|---|---|
| | **2019** | | **2018** | | **2017** | |
| Shipper A [1] | $ 160,177,153 | 56.8 % | $ 128,332,363 | 55.2 % | $ 132,326,693 | 51.8 % |
| Shipper B [1] | 56,566,806 | 20.0 % | 51,013,830 | 21.9 % | 58,925,621 | 23.1 % |
| Shipper C [2] | 19,259,883 | 6.8 % | 29,194,008 | 12.6 % | 28,343,302 | 11.1 % |

[1] Related party shipper
[2] Third party shipper

There were no receivables from third parties that accounted for 10% or more of "Accounts receivable, net" as of December 31, 2019 and 2018. The following table shows receivables from related parties that accounted for 10% or more of "Accounts receivable, net" for the indicated dates:

9

**Exhibit 99.1**

| | December 31, | | | | |
|---|---|---|---|---|---|
| | **2019** | | | **2018** | |
| Shipper A | $ | 13,956,228 | 58.0 % | $ | 10,687,569 | 50.0 % |
| Shipper B | | 5,451,978 | 22.7 % | | 5,073,147 | 23.8 % |

Development and production of crude oil in the service area of the pipeline are subject to, among other factors, prices of crude oil, as well as federal and state energy policy, none of which are within our control.

We have concentrated credit risk for cash by maintaining deposits in a major bank, which may at times exceed amounts covered by insurance provided by the United States Federal Deposit Insurance Corporation ("FDIC"). We monitor the financial health of the bank and have not experienced any losses in such accounts and believe we are not exposed to any significant credit risk. As of December 31, 2019 and 2018, we had $29,098,638 and $19,953,226, respectively, in cash and cash equivalents in excess of FDIC limits.

**Net (Gain) Loss from Pipeline Operations**
We experience volumetric gains and losses from our pipeline operations that may arise from factors such as shrinkage or measurement inaccuracies within tolerable limits. Gains and losses from pipeline operations related to allowance oil are presented net in the Statements of Income as "Net (gain) loss from pipeline operations." Beginning January 1, 2018, volumetric losses are recorded within "Product revenue – related parties" in the Statements of Income (previously reported under "Net (gain) loss from pipeline operations").

**Revenue Recognition**
Our revenues are primarily generated from the transportation and storage of crude oil through our pipelines and storage caverns. We recognize revenue when we transfer promised goods or services to customers in an amount that reflects the consideration to which we expect to be entitled in exchange for those goods or services. We recognize revenue through the application of a five-step model, which includes: identification of the contract; identification of the performance obligations; determination of the transaction price; allocation of the transaction price to the performance obligations; and recognition of revenue as the entity satisfies the performance obligations.

See Note 7 – Revenue Recognition for information and disclosures related to revenue from contracts with customers.

**Taxes**
We have not historically incurred income tax expense, as LLCs, in accordance with the provisions of the Internal Revenue Code, are not subject to U.S. federal income taxes. Rather, each Member includes its allocated share of our income or loss in its own federal and state income tax returns. We are responsible for various state property and ad valorem taxes, which are recorded in the accompanying Statements of Income as "Property taxes."

On December 22, 2017, the Tax Cuts and Jobs Act bill was enacted, which includes a broad range of tax reform legislation affecting businesses, including reducing the corporate tax rate, changes to business deductions and sweeping changes to international tax provisions. We analyzed the effects of this tax reform and concluded the impact would be on the Members and not the entity itself. As such, no adjustment was made to our financial statements in relation to the tax reform.

10

**Exhibit 99.1**

## 4. Property, Plant and Equipment

Property, plant and equipment consisted of the following at December 31, 2019 and 2018:

| | December 31, | |
|---|---|---|
| | **2019** | **2018** |
| Rights-of-way | $ 10,384,612 | $ 10,384,612 |
| Buildings | 5,670,551 | 5,670,551 |
| Line pipe, equipment and other pipeline assets | 283,952,441 | 283,952,441 |
| Office, communication and data handling equipment | 1,086,810 | 1,086,810 |
| Construction work-in progress | 981,743 | — |
| Total | 302,076,157 | 301,094,414 |
| Accumulated depreciation | (137,985,182) | (128,735,564) |
| **Property, plant and equipment, net** | **$ 164,090,975** | **$ 172,358,850** |

Depreciation expense on property, plant and equipment is included in "Depreciation and amortization" in the accompanying Statements of Income for the years ended December 31, 2019, 2018 and 2017 in the amounts of $9,249,618, $9,243,085 and $10,125,030, respectively.

## 5. Related Party Transactions

We derive a significant portion of our operating and product revenues from related parties ("affiliates"), which are based on published tariffs and contractual agreements, and amounted to $216,398,957, $179,079,095 and $191,252,314 for the years ended December 31, 2019, 2018 and 2017, respectively. All such transactions are within the ordinary course of business. At December 31, 2019 and 2018, we had affiliate receivables of $18,585,209 and $16,447,473, respectively.

We have no employees and rely on the Operator to provide personnel who perform daily operating and administrative duties on our behalf. In accordance with the terms of the Operating Agreement, we were charged aggregate expenses, which were incurred by the Operator on our behalf, of $13,395,904, $14,175,386 and $9,659,674 for the years ended December 31, 2019, 2018 and 2017, respectively. These expenses are individually included within "Operations," "Maintenance," or "General and administrative" expenses in the accompanying Statements of Income. Payments made by Shell Pipeline on our behalf for capital projects totaled $185,781, $128,730 and $66,270 for the years ended December 31, 2019, 2018 and 2017, respectively.

Substantially all the expenses we incur are paid by Shell Pipeline on our behalf. At December 31, 2019 and 2018, we owed $607,914 and $387,557, respectively, to reimburse Shell Pipeline for these expenses. As of December 31, 2019 and 2018, we had a receivable balance of $538,000 from Shell Pipeline, which is comprised of advance payments we made to Shell Pipeline to fund operating expenses. This balance is presented as "Advance for operations due from related party" on the accompanying Balance Sheets.

Employees who directly or indirectly support our operations participate in the pension, postretirement health and life insurance and defined contribution benefit plans sponsored by Shell Oil, which includes other Shell Oil subsidiaries. Our share of pension and postretirement health and life insurance costs for the years ended December 31, 2019, 2018 and 2017 were $569,997, $445,300 and $486,021, respectively. Our share of defined contribution benefit plan costs for the same periods were $228,889, $177,465 and $192,915, respectively. Pension and defined contribution benefit plan expenses are included in "General and administrative" in the accompanying Statements of Income.

We have several lease agreements with a related party for cavern space. At December 31, 2019 and 2018, we owed $5,443,289 and $3,914,909, respectively, to LOOP for these expenses. During the years ended December 31, 2019, 2018 and 2017, payments made to our related party for costs associated with cavern operations and usage were $61,914,343, $54,653,722 and $54,139,320, respectively, and are included primarily in "Operations" expenses within the accompanying Statements of Income.

We also have a lease agreement with a related party for usage of space located at the West Delta 143 "A" and "C" offshore platform. At December 31, 2019 and 2018, we owed $556,120 and $281,515, respectively, for the related lease expenses. For

11

Exhibit 99.1

the years ended December 31, 2019, 2018 and 2017, payments made to our related party for costs associated with the Lease of Platform Space ("LOPS") and Common Facility Fees ("CFF") at West Delta 143 "A" and "C" were $6,768,648, $6,578,933 and $5,022,702, respectively.

For further discussion of the lease arrangements with our related parties, refer to Note 6 - Leases.

### 6. Leases

Effective April 1, 1996, we entered into an agreement to lease usage of offshore platform space located at West Delta 143 ("WD 143") from affiliates of Shell Oil and BP. The agreement, as amended on December 1, 2015, requires annual minimum lease payments of $1,809,370 for LOPS at WD143 "B" related to the pump station and $32,800 for LOPS related to the drag reducing agent at WD 143 "A", adjusted annually based on the Wage Index Adjustment, as published by the Council of Petroleum Accountants Society ("COPAS"). In addition, the amendment requires an added minimum lease payment of $1,159,950 per year adjusted annually based on the Wage Index Adjustment for LOPS at WD 143 "C" related to the Olympus pipeline. The agreements for WD 143 A, B and C shall terminate upon removal of the operating equipment located on each of the platforms as specified in the terms of the agreement. Total expenses incurred under the agreement for LOPS at WD 143, inclusive of rentals and CFF, for the years ended December 31, 2019, 2018 and 2017 were $6,768,648, $6,578,933 and $5,022,702, respectively. Total amounts owed to related parties relating to the agreement, inclusive of rentals and CFF, were $556,120 and $281,515 as of December 31, 2019 and 2018, respectively.

Effective June 10, 1994, we entered into a lease agreement to use a cavern owned by LOOP as a crude oil storage facility where LOOP shall receive and store Mars crude petroleum on a continuous basis. The initial lease term of the agreement ended December 31, 2011 and will continue for four separate five-year terms through 2031. Mars is currently in the fourth year of a second term five-year lease extension; set to expire October 31, 2022, with an additional automatic extension for one more term. The agreement is cancellable at our discretion by giving notice of termination not less than one year prior to the end of the initial term or any subsequent term of the lease. The terms of the agreement require an annual prepayment of the lease amount; and these payments were $1,556,982, $1,410,482 and $1,277,600 for the years ended December 31, 2019, 2018 and 2017, respectively. The annual rental expense for the years ended December 31, 2019, 2018 and 2017 were $1,459,315, $1,321,894 and $1,269,244, respectively. The agreement also requires an annual fixed base service fee in addition to variable charges based on throughput. The agreement requires a minimum base service fee of $400,000 per year adjusted by the change in the Gross Domestic Project-Implicit Price Deflator as published by the United States Government. The 2019 adjusted minimum base service fee payment under the agreement was $602,245.

Effective March 11, 2011, we entered into an agreement with LOOP to lease additional cavern space for crude oil storage for a period of one month, with an option to renew the agreement on a monthly basis if the following conditions are met: (a) if LOOP elects to offer to renew the agreement for another month term; and (b) if we elect to accept LOOP's offer, it shall do so in writing not later than 35 days before the first day of such renewal term. This agreement requires a fixed fee of $1,200,000 per month and the lease has been continually renewed since inception; and was amended as of November 1, 2014 such that the term of the agreement remained in effect through October 31, 2016. Effective November 1, 2016, we entered into a new agreement with LOOP to continue leasing cavern space for crude oil storage. The primary term of the agreement is a one-year commitment to lease the cavern space from November 1, 2016 through August 31, 2017 at a cost of $1,200,000 per month, plus CFF. We elected not to extend the terms of this agreement and exited the cavern by August 31, 2017. Total related expense for the year ended December 31, 2017, was $9,600,000, exclusive of the minimum service fees.

All lease agreements that we have entered into are classified as operating leases. As of December 31, 2019, future minimum payments related to these leases were as follows:

| ($ in millions) | | Total |
|---|---|---|
| 2020 | $ | 5.0 |
| 2021 | | 5.0 |
| 2022 | | 5.0 |
| 2023 | | 5.0 |
| 2024 | | 5.0 |
| Thereafter | | 65.4 |
| Total future minimum lease payments | $ | 90.4 |

**Exhibit 99.1**

(1) Lease payments adjust annually based on the Wage Index Adjustment, as published by COPAS.

**7. Revenue Recognition**

***Adoption of Topic 606 "Revenue from Contracts with Customers"*** – On January 1, 2018, we adopted Topic 606, Revenue from Contracts with Customers, and all related ASUs to this Topic (collectively, the "revenue standard") by applying the modified retrospective method to all contracts that were not completed on January 1, 2018. Results for reporting periods beginning after January 1, 2018 are presented in accordance with the revenue standard, while prior period amounts are not adjusted and continue to be reported in accordance with our historic accounting under previous U.S. GAAP.

Upon the adoption of the revenue standard, we recorded a non-cash cumulative effect transition adjustment to decrease the opening balance of Members' capital by $9,633,841, which is related to the deferral of revenue under the revenue standard for certain long-term transportation and dedication agreements for which revenue is recognized over time.

***Revenue Recognition*** – The revenue standard's core principle is that a company will recognize revenue when it transfers promised goods or services to customers in an amount that reflects the consideration to which the company expects to be entitled in exchange for those goods or services. The revenue standard requires entities to recognize revenue through the application of a five-step model, which includes: identification of the contract; identification of the performance obligations; determination of the transaction price; allocation of the transaction price to the performance obligations; and recognition of revenue as the entity satisfies the performance obligations.

Our "Operating revenues", as presented within the Statements of Income, are primarily generated from the transportation and storage of crude oil through our pipelines and storage facilities. To identify the performance obligations, we considered all the products or services promised in the contracts with customers, whether explicitly stated or implied based on customary business practices. Revenue is recognized when each performance obligation is satisfied under the terms of the contract. Each barrel of product transported or day of services provided is considered a distinct service that represents a performance obligation that would be satisfied over time if it were accounted for separately. The services provided over the contract period are a series of distinct services that are substantially the same, have the same pattern of transfer to the customer, and therefore, qualify as a single performance obligation. Since the customer simultaneously receives and consumes the benefits of services, we recognize revenue over time based on a measure of progress of volumes transported for transportation services contracts, number of days elapsed for stand ready-transportation service contracts or number of days elapsed for storage services contracts.

Product revenue related to allowance oil sales is recognized at the point in time when the control of the oil transfers to the customer.

For all performance obligations, payment is typically due in full within 30 days of the invoice date.

***Disaggregation of Revenue*** – The following table provides information about disaggregated revenue by service type and customer type:

| ($ in millions) | | **2019** | | **2018** | | **2017** [(1)] |
|---|---|---|---|---|---|---|
| Transportation services revenue - third parties | $ | 63.8 | $ | 59.9 | $ | 59.4 |
| Transportation services revenue - related parties | | 196.1 | | 164.3 | | 181.8 |
| Total transportation services revenue | | 259.9 | | 224.2 | | 241.2 |
| | | | | | | |
| Storage services revenue - third parties | | 1.5 | | 2.3 | | 4.8 |
| Storage services revenue - related parties | | 1.4 | | 3.0 | | 9.4 |
| Total storage services revenue | | 2.9 | | 5.3 | | 14.2 |
| | | | | | | |
| Product revenue - related parties | | 18.9 | | 11.8 | | — |
| Total product revenue [(2)] | | 18.9 | | 11.8 | | — |
| | | | | | | |
| Total revenue | $ | 281.7 | $ | 241.3 | $ | 255.4 |

[(1)] As noted above, prior period amounts have not been adjusted under the modified retrospective method.

13

**Exhibit 99.1**

(2) Product revenue for 2019 and 2018 is comprised of allowance oil sales.

***Transportation services revenue –*** We have both long‑term transportation contracts and month‑to‑month contracts for spot shippers that make nominations on our pipelines. Some of the long‑term contracts entitle the customer to a specified amount of guaranteed capacity on the pipeline. Transportation services are charged at a per barrel rate or number of days elapsed. We apply the allocation exception guidance for variable consideration related to market indexing for long‑term transportation contracts because (a) the variable payment relates specifically to our efforts to transfer the distinct service and (b) we allocate the variable amount of consideration entirely to the distinct service which is consistent with the allocation objective. Transportation services are billed monthly as services are rendered.

Our contracts and tariffs contain terms for the customer to reimburse us for losses from evaporation or other loss in transit in the form of allowance oil. Allowance oil represents the net difference between the tariff PLA volumes and the actual volumetric losses. We obtain control of the excess oil not lost during transportation, if any. Under the revenue standard, we include the excess oil retained during the period, if any, as non‑cash consideration and include this amount in the transaction price for transportation services on a net basis. Our allowance oil is valued at the lower of cost or net realizable value using the average market price of the relevant type of crude oil during the month product was transported. Gains from pipeline operations that relate to allowance oil are recorded in "Net (gain) loss from pipeline operations" in the accompanying Statements of Income.

As a result of FERC regulations, revenues we collect may be subject to refund. We establish reserves for these potential refunds based on actual expected refund amounts on the specific facts and circumstances. We had no reserves for potential refunds as of December 31, 2019 and 2018.

***Deferred revenue –*** Prior to January 1, 2018, deferred revenue under our transportation services arrangements was previously recognized into revenue once all contingencies or potential performance obligations associated with the related volumes had been satisfied or expired. Under the revenue standard, we are required to estimate the likelihood that unused volumes will be shipped or forfeited at each reporting period based on additional data that becomes available and only to the extent that it is probable that a significant reversal of revenue will not occur. In some cases, this estimate could result in the earlier recognition of revenue.

***Storage services revenue –*** Storage services are provided under a monthly spot‑rate for uncommitted storage. Since the customer simultaneously receives and consumes the benefits of services, we recognize revenue over time based on the number of days elapsed. Storage services are billed monthly as services are rendered.

***Product revenue –*** We generate revenue by selling accumulated allowance oil inventory to customers. Sale of allowance oil is recorded as product revenue, with specific cost based on a weighted average price per barrel recorded as cost of product sold. Prior to the adoption of the revenue standard, allowance oil received was recorded as revenue on a gross basis with the resulting actual gain or loss recorded in "Operations" expenses. The subsequent sale of allowance oil, net of the product cost, was recorded as "Operations" expenses.

***Impact of adoption –*** In accordance with the revenue standard, the following tables, which only include line items impacted by Topic 606, summarize the impact of adoption on our financial statements as of and for the years ended December 31, 2019 and 2018:

| | 2019 | | |
|---|---|---|---|
| **Statement of Income** | **As Reported Under Topic 606** | **Amounts Without Adoption of Topic 606** | **Effect of Change Increase/(Decrease)** |
| **Revenue** | | | |
| Operating revenue - related parties | $            197.5 | $            205.6 | $              (8.1) |
| Operating revenue - third parties | 65.3 | 68.3 | (3.0) |
| Product revenue - related parties | 18.9 | — | 18.9 |
| **Costs and expenses** | | | |
| Operations | 65.8 | 65.8 | — |
| Cost of product sold | 14.7 | — | 14.7 |
| Net (gain) from pipeline operations | (0.6) | 1.8 | (2.4) |
| **Net Income** | $            179.5 | $            184.0 | $              (4.5) |

14

**Exhibit 99.1**

| Statement of Income | | 2018 | | | | |
|---|---|---|---|---|---|---|
| | | As Reported Under Topic 606 | | Amounts Without Adoption of Topic 606 | | Effect of Change Increase/(Decrease) |
| **Revenue** | | | | | | |
| Operating revenue - related parties | $ | 167.3 | $ | 178.3 | $ | (11.0) |
| Operating revenue - third parties | | 62.2 | | 64.1 | | (1.9) |
| Product revenue - related parties | | 11.8 | | — | | 11.8 |
| **Costs and expenses** | | | | | | |
| Operations | | 58.1 | | 58.1 | | 0.0 |
| Cost of product sold | | 11.1 | | — | | 11.1 |
| Net (gain) from pipeline operations | | (4.1) | | (0.6) | | (3.5) |
| **Net Income** | $ | 153.9 | $ | 162.6 | $ | (8.7) |

***Contract Balances –*** We perform our obligations under a contract with a customer by providing services in exchange for consideration from the customer. The timing of our performance may differ from the timing of the customer's payment, which results in the recognition of a contract asset or a contract liability. Although we did not have any contract assets as of December 31, 2019 and 2018, we recognize a contract asset when we transfer goods or services to a customer and contractually bill an amount which is less than the revenue allocated to the related performance obligation. We recognize deferred revenue (contract liability) when the customer's payment of consideration precedes our performance.

The following table provides information about receivables and contract liabilities from contracts with customers:

| ($ in millions) | | January 1, 2019 | | December 31, 2019 |
|---|---|---|---|---|
| Receivables from contract with customers - third parties | $ | 4.9 | $ | 5.5 |
| Receivables from contract with customers - related parties | | 15.2 | | 18.4 |
| Deferred revenue - related party | | 18.3 | | 22.8 |

| ($ in millions) | | January 1, 2018 | | December 31, 2018 |
|---|---|---|---|---|
| Receivables from contract with customers - third parties | $ | 3.3 | $ | 4.9 |
| Receivables from contract with customers - related parties | | 15.7 | | 15.2 |
| Deferred revenue - related party | | 9.6 | | 18.3 |

Significant changes in the deferred revenue balances with customers during the periods are as follows:

| ($ in millions) | | December 31, 2017 | | Transition Adjustments | | 2018 Additions [1] | | December 31, 2018 | | 2019 Additions [1] | | December 31, 2019 [2] |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Deferred revenue - related party | $ | — | $ | 9.6 | $ | 8.7 | $ | 18.3 | $ | 4.5 | $ | 22.8 |

[1] Contract liability additions resulted from collection of cash for unsatisfied performance obligations.
[2] There were no contract liability reductions during the years ended December 31, 2019 and 2018.

We currently have no assets recognized from the costs to obtain or fulfill a contract as of December 31, 2019 and 2018.

***Remaining Performance Obligations -*** As of December 31, 2019, contracts with remaining performance obligations primarily include long-term dedication and transportation agreements.

The following table includes revenue expected to be recognized in the future related to performance obligations exceeding one year of their initial terms that are unsatisfied or partially unsatisfied as of December 31, 2019:

15

**Exhibit 99.1**

| ($ in millions) | Total | | 2020 | | 2021 | | 2022 | | 2023 | | 2024 and beyond |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Revenue expected to be recognized on long-term dedication and transportation agreements | $ | 353.7 | $ | 39.3 | $ | 39.3 | $ | 39.3 | $ | 39.3 | $ | 196.5 |

As an exemption, we do not disclose the amount of remaining performance obligations for contracts with an original expected duration of one year or less or for variable consideration that is allocated entirely to a wholly unsatisfied promise to transfer a distinct service that forms part of a single performance obligation.

**8. Environmental Remediation Costs**

We are subject to federal, state and local environmental laws and regulations. We routinely conduct reviews of potential environmental issues and claims that could impact our assets or operations. These reviews assist us in identifying environmental issues and estimating the costs and timing of remediation efforts. In making environmental liability estimations, we consider the material effect of environmental compliance, pending legal actions against us and potential third-party liability claims. Often, as the remediation evaluation and effort progresses, additional information is obtained, requiring revisions to estimated costs. These revisions are reflected in our net income in the period in which they are probable and reasonably estimable. No expenses were incurred for the years ended December 31, 2019, 2018 and 2017 in relation to environmental clean-up costs.

**9. Commitments and Contingencies**

In the ordinary course of business, the Company is subject to various laws and regulations, including regulations of the FERC. In the opinion of management, the Company is in compliance with existing laws and regulations and is not aware of any violations that will materially affect the financial position, results of operations, or cash flows of the Company. We are subject to several lease agreements which are accounted for as operating leases and the minimum lease payments over the next five years are disclosed in Note 6 - Lease Commitments.

**10. Subsequent Events**

In preparing the accompanying financial statements, we have reviewed events that have occurred subsequent to December 31, 2019 through February 14, 2020, which is the date of the issuance of these financial statements. Any material subsequent event that occurred during this time has been properly disclosed in the financial statements.

16

**Exhibit 99.2**

# Caesar Oil Pipeline Company, LLC
**Financial Statements**
**December 31, 2019 and 2018**

**Exhibit 99.2**

Caesar Oil Pipeline Company, LLC
Financial Statements
Years Ended December 31, 2019 and 2018

### Contents

Report of Independent Auditors......................................................................................................................... 1

Financial Statements

Balance Sheets.................................................................................................................................................. 2
Statements of Income....................................................................................................................................... 3
Statements of Members' Capital.................................................................................................... 4
Statements of Cash Flows............................................................................................................................... 5
Notes to Financial Statements....................................................................................................................... 6

**Exhibit 99.2**

**Report of Independent Auditors**

The Management Committee and Members
Caesar Oil Pipeline Company, LLC

We have audited the accompanying financial statements of Caesar Oil Pipeline Company, LLC, which comprise the balance sheets as of December 31, 2019 and 2018, and the related statements of income, members' capital and cash flows for the years then ended and the related notes to the financial statements.

**Management's Responsibility for the Financial Statements**

Management is responsible for the preparation and fair presentation of these financial statements in conformity with U.S. generally accepted accounting principles; this includes the design, implementation, and maintenance of internal control relevant to the preparation and fair presentation of financial statements that are free of material misstatement, whether due to fraud or error.

**Auditor's Responsibility**

Our responsibility is to express an opinion on the financial statements based on our audits. We conducted our audits in accordance with auditing standards generally accepted in the United States. Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement.

An audit involves performing procedures to obtain audit evidence about the amounts and disclosures in the financial statements. The procedures selected depend on the auditor's judgment, including the assessment of the risks of material misstatement of the financial statements, whether due to fraud or error. In making those risk assessments, the auditor considers internal control relevant to the entity's preparation and fair presentation of the financial statements in order to design audit procedures that are appropriate in the circumstances, but not for the purpose of expressing an opinion on the effectiveness of the entity's internal control. Accordingly, we express no such opinion. An audit also includes evaluating the appropriateness of accounting policies used and the reasonableness of significant accounting estimates made by management, as well as evaluating the overall presentation of the financial statements.

We believe that the audit evidence we have obtained is sufficient and appropriate to provide a basis for our audit opinion.

**Opinion**

In our opinion, the financial statements referred to above present fairly, in all material respects, the financial position of Caesar Oil Pipeline Company, LLC at December 31, 2019 and 2018, and the results of its operations and its cash flows for the years then ended in conformity with U.S. generally accepted accounting principles.

/s/ Ernst & Young LLP

Houston, Texas
February 18, 2020

Exhibit 99.2

Caesar Oil Pipeline Company, LLC
Balance Sheets

| | | December 31 | | |
|---|---|---|---|---|
| | | **2019** | | **2018** |
| **Assets** | | | | |
| Current assets: | | | | |
| Cash and cash equivalents | $ | 4,644,834 | $ | 2,970,407 |
| Accounts receivable | | | | |
| Related parties | | 2,827,084 | | 3,352,239 |
| Third parties | | 659,482 | | 754,709 |
| Other current assets | | 6,827 | | — |
| **Total current assets** | | **8,138,227** | | **7,077,355** |
| | | | | |
| Pipelines and equipment | | 317,139,311 | | 324,651,080 |
| Accumulated depreciation | | (115,015,409) | | (110,180,468) |
| Pipelines and equipment, net | | 202,123,902 | | 214,470,612 |
| | | | | |
| **Total assets** | $ | **210,262,129** | $ | **221,547,967** |
| | | | | |
| **Liabilities and members' capital** | | | | |
| Current liabilities: | | | | |
| Payable to related parties | $ | 591,093 | $ | 343,408 |
| Accounts payable and accrued liabilities | | 39,353 | | 710,031 |
| **Total current liabilities** | | **630,446** | | **1,053,439** |
| | | | | |
| Asset retirement obligation | | — | | 7,297,402 |
| Members' Capital | | 209,631,683 | | 213,197,126 |
| **Total liabilities and members' capital** | $ | **210,262,129** | $ | **221,547,967** |

The accompanying notes are an integral part of these financial statements.

2

**Exhibit 99.2**

Caesar Oil Pipeline Company, LLC
Statements of Income

| | | Year Ended December 31 | | |
|---|---|---|---|---|
| | | 2019 | | 2018 |
| **Revenue** | | | | |
| Transportation revenue | | | | |
| Related parties | $ | 36,693,017 | $ | 35,815,594 |
| Third parties | | 7,520,193 | | 9,258,527 |
| | | 44,213,210 | | 45,074,121 |
| **Costs and expenses** | | | | |
| Operating and maintenance expenses | | 6,833,404 | | 8,306,242 |
| General and administrative expenses | | 1,605,868 | | 1,577,788 |
| Depreciation and amortization | | 4,834,941 | | 4,930,303 |
| Accretion expense - asset retirement obligation | | 214,367 | | 404,944 |
| **Total costs and expenses** | | 13,488,580 | | 15,219,277 |
| **Operating income** | | 30,724,630 | | 29,854,844 |
| Other income | | 509,927 | | 75,471 |
| **Net income** | $ | 31,234,557 | $ | 29,930,315 |

The accompanying notes are an integral part of these financial statements.

Exhibit 99.2

Caesar Oil Pipeline Company, LLC
Statements of Members' Capital
Years Ended December 31, 2019 and 2018

| | Mardi Gras Transportation System, Inc. | BHP Billiton Petroleum, Inc. | Shell Pipeline Company, Inc. | Union Oil Company of California | Total |
|---|---|---|---|---|---|
| **Members' capital at January 1, 2018** | $ 123,586,294 | $ 55,172,453 | $ 33,103,472 | $ 8,827,592 | $ 220,689,811 |
| Members distributions | (20,956,880) | (9,355,750) | (5,613,450) | (1,496,920) | (37,423,000) |
| Net income | 16,760,976 | 7,482,579 | 4,489,547 | 1,197,213 | 29,930,315 |
| **Members' capital at December 31, 2018** | **119,390,390** | **53,299,282** | **31,979,569** | **8,527,885** | **213,197,126** |
| Members distributions | (19,488,000) | (8,700,000) | (5,220,000) | (1,392,000) | (34,800,000) |
| Net income | 17,491,352 | 7,808,639 | 4,685,184 | 1,249,382 | 31,234,557 |
| **Members' capital at December 31, 2019** | $ **117,393,742** | $ **52,407,921** | $ **31,444,753** | $ **8,385,267** | $ **209,631,683** |

The accompanying notes are an integral part of these financial statements.

4

**Exhibit 99.2**

Caesar Oil Pipeline Company, LLC
Statements of Cash Flows
December 31, 2019 and 2018

| | | Year Ended December 31 | | |
|---|---|---|---|---|
| | | **2019** | | **2018** |
| **Cash flows from operating activities** | | | | |
| Net income | $ | 31,234,557 | $ | 29,930,315 |
| Adjustments to reconcile net income to net cash provided by operating activities: | | | | |
| Depreciation and amortization | | 4,834,941 | | 4,930,303 |
| Accretion expense - asset retirement obligation | | 214,367 | | 404,944 |
| Changes on working capital: | | | | |
| Decrease (increase) in accounts receivable - affiliates | | 525,155 | | (131,052) |
| Decrease in accounts receivable - third parties | | 95,227 | | 240,990 |
| Increase in accounts payable - affiliates | | 247,685 | | 19,592 |
| (Decrease) increase in accounts payable and accrued liabilities | | (670,678) | | 224,579 |
| (Increase) in other current assets | | (6,827) | | — |
| **Net cash provided by operating activities** | | **36,474,427** | | **35,619,671** |
| | | | | |
| **Cash flows from financing activities** | | | | |
| Members distributions | | (34,800,000) | | (37,423,000) |
| **Net cash used in financing activities** | | **(34,800,000)** | | **(37,423,000)** |
| | | | | |
| Net increase (decrease) in cash and cash equivalents | | 1,674,427 | | (1,803,329) |
| Cash and cash equivalents at beginning of year | | 2,970,407 | | 4,773,736 |
| **Cash and cash equivalents at end of year** | $ | **4,644,834** | $ | **2,970,407** |

The accompanying notes are an integral part of these financial statements.

5

**Exhibit 99.2**

Caesar Oil Pipeline Company, LLC
Notes to Financial Statements
December 31, 2019 and 2018

## 1. Organization and Nature of Business

Caesar Oil Pipeline Company, LLC (the Company) was formed as a Delaware limited liability
company on June 15, 2001.

As of December 31, 2019 and 2018 the ownership interest in the Company is: Mardi Gras Transportation System, Inc. (MGTSI) – 56%, BHP Billiton Petroleum (Deepwater), Inc. – 25%, Shell Pipeline Company, LP (SPLC) – 15%, and Union Oil Company of California – 4% (collectively, the Members). Contributions and distributions, as well as profits and losses, are required to be allocated among the Members on a pro rata basis in accordance with their respective ownership interests. As the Company is a limited liability company, no member is liable for debts, obligations, or liabilities, including under a judgment decree or order of a court. The Company shall continue until such time as a certificate of cancellation is filed with the Secretary of the State of Delaware.

The purpose and business of the Company is to plan, design, construct, acquire, own, maintain, and operate the crude oil pipeline system (the Pipeline), to market the services of the Pipeline, and to engage in any activities directly or indirectly relating thereto. The 24-inch and 28-inch diameter, 115-mile-long Pipeline delivers crude oil from the Holstein, Mad Dog, Atlantis, Neptune and Heidelberg fields in Southern Green Canyon to the Manta Ray Pipeline System in Ship Shoal Block 332 and is designed to deliver a maximum of 450,000 barrels per day.

### Operating Agreements

On February 11, 2002, the Company entered into the Operating, Management, and Administrative Agreement (prior Operating Agreement) with MGTSI, which provides the guidelines under which MGTSI is to operate and maintain the Pipeline and perform all required administrative functions. This agreement was cancelled on July 1, 2017, with the transition of operatorship to SPLC.

On July 1, 2017, the Company entered into the Operating and Administrative Management Agreement (the Operating Agreement) with SPLC, which provides the guidelines under which SPLC is to operate and maintain the Pipeline and perform all required administrative functions.

## 2. Recent Accounting Pronouncements

In May 2014, the Financial Accounting Standards Board (FASB) issued ASU 2014-09 to Topic 606, Revenue from Contracts with Customers, which superseded nearly all revenue recognition guidance in Topic 605, Revenue Recognition, under U.S. GAAP. See Note 3 - Summary of Significant Accounting Policies, Revenue Recognition section for additional information and disclosures required by the new standard.

### Standards Not Yet Adopted

In February 2016, the FASB issued ASU 2016-02 to Topic 842, Leases, which requires lessees to recognize right-of-use assets and lease liabilities on the balance sheet for all leases with terms longer than 12 months. Leases will be classified as either a financing lease or operating lease with classification affecting the pattern of expense recognition in the statements of income and presentation of cash flows in the statements of cash flows. This update also requires improved disclosures to help users of financial statements better understand the amount, timing and uncertainty of cash flows arising from leases. For lessors, this update modifies the classification criteria and the accounting for sales-type and direct financing leases. This update is effective on a modified retrospective basis for fiscal years, and interim periods within those fiscal years, beginning after December 15, 2019. We are adopting the new standard using the modified retrospective transition approach, effective January 1, 2020. We do not expect to recognize any cumulative effect of initially applying the standard for periods prior to January 1, 2020. We have completed the identification and aggregation of our lease contract population. We have also completed our review of these lease contracts to determine the transition approach as well as any necessary changes to existing processes and controls. Based on our review, none of the existing contracts of the Company qualify as a lease contract, hence there was no impact in the adoption.

6

Debtors' Exhibit No. 60
Page 214 of 258

**Exhibit 99.2**

In June 2016, the FASB issued ASU 2016-13 to Topic 326, Financial Instruments - Credit Losses: Measurement of Credit Losses on Financial Instruments, which replaces the current incurred loss impairment method with a method that reflects expected credit losses on financial instruments. For trade receivables, entities will be required to estimate lifetime expected credit losses. The update is effective for fiscal years, and interim periods within those fiscal years, beginning after December 15, 2020. While our evaluation is ongoing, we do not expect the adoption of ASU 2016-13 to have a material impact on our financial statements and related disclosures.

### 3. Summary of Significant Accounting Policies

The following significant accounting policies are practiced by the Company and are presented as an aid to understanding the financial statements.

**Basis of Presentation**

The accompanying financial statements have been prepared in accordance with U.S. GAAP.

**Use of Estimates**

The preparation of financial statements in conformity with U.S. GAAP requires management to make estimates and assumptions that affect the amounts reported in the financial statements and accompanying notes. Actual results could differ from those estimates. Management believes that these estimates are reasonable.

**Cash and Cash Equivalents**

Cash and cash equivalents are comprised of cash on deposit at bank.

**Accounts Receivable**

The Company's accounts receivable represents valid claims against customers for logistic activities.

We review all outstanding accounts receivable balances on a monthly basis and record a reserve for amounts that we expect will not be fully recovered. We do not apply actual balances against the reserve until we have exhausted substantially all collection efforts. Our allowance for doubtful accounts totaled $0 at December 31, 2019 and December 31, 2018.

**Pipelines and Equipment, Net**

Pipelines and equipment are stated at its historical cost of construction, or upon acquisition, at either the fair value of the assets acquired or the historical carrying value to the entity that placed the asset in service. Expenditures for major renewals and betterments are capitalized while minor replacements, maintenance and repairs, which do not improve or extend asset life are expensed when incurred. For constructed assets, all construction-related direct labor and material costs, as well as indirect construction costs, are capitalized. Gains and losses on the disposition of assets are recognized on the Balance Sheets against the accumulated depreciation unless the retirement was an abnormal or extraordinary item.

We compute depreciation using the straight-line method based on estimated economic lives. The Company uses one estimated useful life for the pipelines and equipment, which is based on the longest useful life of the connecting platforms. On July 1, 2019, asset retirement obligations (ARO) were derecognized which was justified by the changes in the future economics associated with oil production in the Gulf of Mexico. The impact of the change was applied prospectively in the financial statements beginning on July 1, 2019. As of December 31, 2019, the remaining estimated useful life of the pipelines and equipment was 39 years.

**Asset Retirement Obligation**

Asset retirement obligations represent contractual or regulatory obligations associated with the retirement of long-lived assets that result from acquisition, construction, development and/or normal use of the asset. We record liabilities for obligations related to the retirement and removal of long-lived assets used in our businesses at fair value on a discounted basis when they are incurred and can be reasonably estimated. Amounts recorded for the related assets are increased by the amount of these