the Performance Period and ending on the last day of the Vesting Period, vesting is accelerated to 100% for such Recipient upon the occurrence of the Change of Control. In the event of a Change of Control prior to the Recipient's termination of employment by reason of Retirement and after the first three (3) months of the Performance Period and ending on the last day of the Vesting Period, the Recipient shall become 100% vested upon the Recipient's termination of employment by reason of Retirement. Unless expressly otherwise provided in the Agreement with respect to Retirement and Change of Control, the applicable amount of cash, subject to required tax withholding, shall be paid by the Company to the Recipient upon the earlier to occur of a 409A Change of Control or the normal vesting dates (in the applicable percentage amounts). Payment shall be made within thirty (30) days of a 409A Change of Control or within sixty (60) days of the normal vesting dates, whichever is applicable.

**Withholding:**  The Company and the Recipient will comply with all federal and state laws and regulations respecting the required withholding, deposit and payment of any income, employment, or other taxes relating to the Grant.

**Clawback:**  This Grant is subject to the Company's Executive Compensation Clawback Policy (a copy of which is provided with this Notice) and the recoupment and reimbursement policies as provided in the Agreement.

**Dividends:**  The Company will credit each of the Recipient's Conditional Grant RSUs and RSUs, as applicable, with Dividend Equivalents. For purposes of this Grant, a Dividend Equivalent is an amount equal to the cash dividend payable per share of Stock multiplied by the number of shares of Stock then underlying such outstanding Conditional Grant RSUs or RSUs, as applicable. Such amount will be credited to a book entry account on Recipient's behalf at the time the Company pays any cash dividend on its Stock. The Recipient's rights in any such Dividend Equivalents will vest at the same time as, and only to the extent that, the underlying Conditional Grant RSUs or RSUs, as applicable, vest and will be distributed at the same time in cash (subject to applicable withholdings), and only to the extent, as the related RSUs are to be distributed to the Recipient as provided in the Agreement and to which such Dividend Equivalents apply. Dividend Equivalents on Conditional Grant RSUs will accrue and be credited by the Company but will be subject to the same performance goals, applicable performance percentage levels and applicable weighting percentages as the related Conditional Grant RSUs. Dividend Equivalents (as so adjusted) will not be paid to a Recipient until such Recipient

4

becomes vested in the related RSUs granted at the end of the Performance Period and will be forfeited in the event of the forfeiture and cancellation of the related Conditional Grant RSUs and RSUs pursuant to this Agreement.

**Acceptance**

Please complete the on-line grant acceptance as promptly as possible to accept or reject your Conditional Grant. You can access this through your account at netbenefits.fidelity.com. By accepting your Conditional Grant, you will have agreed to the terms and conditions set forth in the Agreement, including, but not limited to, the non-compete and non-disparagement provisions set forth in sections 6 and 7 of the Agreement, and the terms and conditions of the Plan. If you do not accept your grant, your Conditional Grant and the related RSUs will not vest and you will be unable to receive your Conditional Grant or the related RSUs.

5

**SCHEDULE B**

**Apache Corporation**
**2021 Performance Share Program**

**PERFORMANCE MEASURES**

Performance Goals:        *1. Total Shareholder Return*

At the end of the Performance Period, the Committee shall derive and confirm a portion of the number of Conditional Grant RSUs that will actually be awarded as RSUs to the Recipient based upon measurement of total shareholder return ("TSR") of Stock as compared to a designated Peer Group during the Performance Period, provided that the Recipient remains an Eligible Person and employed by the Company or its Affiliate as of the final day of the Performance Period.

TSR is determined by dividing (i) the sum of the cumulative amount of a company's or index fund's dividends for the performance period (assuming same-day reinvestment into the company's common stock or index fund on the ex-dividend date) and the share price of the company or index fund at the end of the performance period minus the share price at the beginning of the performance period by (ii) the share price at the beginning of the performance period.

-   <u>Begin Price</u> = Average per share closing price of a share or share equivalent on the applicable stock exchange for the month of December immediately preceding the beginning of the performance period

-   <u>End Price</u> = Average per share closing price of a share or share equivalent on the applicable stock exchange for the month in which the performance period ends

-   <u>Dividends</u> = Includes dividends paid throughout performance period

-   TSR ranking compared to designated Peer Group (25 companies and one index selected twice)

    o   Antero Resources Corp.
    o   Bonanza Creek Energy, Inc.

6

- o Cabot Oil & Gas Corporation
- o Chevron Corporation
- o Cimarex Energy Co.
- o CNX Resources Corporation
- o ConocoPhillips Company
- o Continental Resources, Inc.
- o Devon Energy Corporation
- o Diamondback Energy, Inc.
- o EOG Resources, Inc.
- o EQT Corporation
- o Exxon Mobil Corporation
- o Hess Corporation
- o Kosmos Energy Ltd.
- o Magnolia Oil & Gas Corporation
- o Matador Resources Company
- o Marathon Oil Corporation
- o Murphy Oil Corporation
- o Occidental Petroleum Corporation
- o Ovintiv Inc.
- o PDC Energy, Inc.
- o Pioneer Natural Resources Co.
- o Range Resources Corporation
- o Southwestern Energy Company
- o S&P 500 Index
- o S&P 500 Index

- Apache's performance over a three-year performance period will be directly ranked within the peer group, resulting in the application of a single multiplier to the target shares to derive the number of shares awarded. The multiplier will range from 0 for performance in the bottom 5 to 2.0 for ranking in the top 5 among the peer group.

- Should consolidation among peers in the marketplace occur, the ranking schedule would adjust to accommodate the reduced number of peers.

### 2. Business Performance

The Committee shall derive and confirm a portion of the number of Conditional Grant RSUs that will actually be awarded as RSUs to the Recipient based upon a performance target determined at the

7

beginning of the Performance Period related to the following criteria:

- Cash Return on Invested Capital

Performance is measured based on the three-year average relative to target.

The Committee will consider all of the above performance measures related to the Company as a whole as follows:

| Metric | Weighting | Threshold | Target | Max |
|---|---|---|---|---|
| Total Shareholder Return | 50% | 23rd | 14th - 15th | 1st – 5th |
| Cash Return on Invested Capital | 50% | 50% | 100% | 200% |

Performance Period:     Three calendar years
- 1/1/2021 to 12/31/2023

Measurement:     At the conclusion of the three-year performance period, a calculation of TSR performance will be made and confirmed. 50% of the total Target Amount of RSUs will be determined based upon the final TSR performance as follows:

| Rank Against Peers | Payout Multiple |
|---|---|
| 1 | 2.00 |
| 2 | 2.00 |
| 3 | 2.00 |
| 4 | 2.00 |
| 5 | 2.00 |
| 6 | 1.85 |
| 7 | 1.75 |
| 8 | 1.65 |
| 9 | 1.55 |
| 10 | 1.45 |
| 11 | 1.35 |
| 12 | 1.25 |
| 13 | 1.15 |
| 14 | 1.05 |
| 15 | 0.95 |
| 16 | 0.85 |
| 17 | 0.75 |
| 18 | 0.65 |

8

| Rank Against Peers | Payout Multiple |
|---|---|
| 19 | 0.55 |
| 20 | 0.45 |
| 21 | 0.35 |
| 22 | 0.25 |
| 23 | 0.15 |
| 24 | 0.00 |
| 25 | 0.00 |
| 26 | 0.00 |
| 27 | 0.00 |
| 28 | 0.00 |

If Apache's absolute TSR for the three-year performance period is negative, the 50% TSR portion of the total Target Amount of RSUs will be capped at the 1.00 Payout Multiple, regardless of whether the Rank Against Peers above achieved a higher Payout Multiple.

Cash Return on Invested Capital will be evaluated over the three-year Performance Period against a performance target determined prior to March 31 at the beginning of the performance period. Performance will be measured based on the three-year average relative to target. 50% of the total Target Amount of RSUs will be determined based upon the three-year average Cash Return on Invested Capital.

The three-year average performance for cash return on invested capital will be interpolated as follows to determine the final achievement percentage for each metric.

| Metric | Threshold | Target | Max |
|---|---|---|---|
| Cash Return on Invested Capital | 50% | 100% | 200% |

9

**Apache Corporation**
**2021 Performance Share Program Agreement**

This 2021 Performance Share Program Agreement (the "Agreement") relating to a conditional grant of Restricted Stock Units (as defined in the definition section of the Apache Corporation 2016 Omnibus Compensation Plan (the "Plan")) (the "Conditional Grant"), dated as of the Grant Date set forth in the Notice of Award under the 2021 Performance Share Program attached as Schedule A hereto (the "Award Notice"), is made between Apache Corporation (together with its Affiliates, the "Company") and each Recipient. The Award Notice is included in and made part of this Agreement.

In this Agreement and each Award Notice, unless the context otherwise requires, words and expressions shall have the meanings given to them in the Plan except as herein defined.

**Definitions**

"409A Change of Control" means a Change of Control that constitutes, with respect to Apache Corporation, a "change in the ownership or effective control of the corporation, or in the ownership of a substantial portion of the assets of the corporation" within the meaning of Section 409A(a)(2)(A)(v) of the Internal Revenue Code of 1986, as amended (the "Code") and Treasury Regulations Section 1.409A-3(i)(5).

"Award Notice" means the separate notice, along with Schedule B, given to each Recipient specifying the Target Amount and other applicable performance percentage levels, performance criteria and applicable weighting percentages for that individual.

"Base Salary" means, with regard to any Recipient, such Recipient's annual base compensation as an employee of the Company determined immediately prior to the beginning of the Performance Period, without regard to any bonus, pension, profit sharing, stock option, life insurance or salary continuation plan which the Recipient either receives or is otherwise entitled to have paid on his or her behalf.

"Conditional Grant" means the conditional entitlement, evidenced by this Agreement to receive all or a portion of a Target Amount and Final Amount, subject to and in accordance with the provisions of this Agreement.

"Disability" or "Disabled" means the Recipient is unable to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months. Recipient agrees that a final and binding determination of "Disability" will be made by the Company's representative under the Company's group long-term disability plan or any successor thereto or, if there is no such representative and there is a dispute as to the determination of "Disability," it will be decided in a court of law in Harris County, Texas.

"Fair Market Value" means the fair market value of a share of the Stock as determined by the Committee by the reasonable application of such reasonable valuation method, consistently applied, as the Committee deems appropriate; provided, however, that if the Committee has not

10

made such determination, such fair market value shall be the per share closing price of the Stock as reported on Nasdaq or on such other exchange or electronic trading system as, on the date in question, reports the largest number of traded shares of stock; provided further, however, that, if there are no Stock transactions on such date, the Fair Market Value shall be determined as of the immediately preceding date on which there were Stock transactions.

"Final Amount" means with regard to any Recipient, such number of shares of Restricted Stock Units ("RSUs") as specified in each Recipient's Award Notice, times the applicable multiple factor determined under the Performance Measures at the end of the Performance Period.

"Involuntary Termination" means the termination of employment of the Recipient by the Company or its successor for any reason on or after a Change of Control; provided, that the termination does not result from an act of the Recipient that (i) constitutes common-law fraud, a felony, or a gross malfeasance of duty and (ii) is materially detrimental to the best interests of the Company or its successor.

"Payout Amount" means the vested portion of the Final Amount expressed as an amount of cash equal to the Fair Market Value of the shares of Stock underlying the RSUs and related Dividend Equivalents.

"Peer Group" means the group of companies or index funds selected by the Committee for purposes of this Agreement as set forth in the Award Notice.  Should consolidation among any Peer Group companies in the marketplace occur during the Performance Period, the Committee will determine the appropriate adjustments to accommodate the reduced number of Peer Group companies for the Performance Period.  Should a Change of Control of Apache Corporation occur during the Performance Period, the Committee will determine the appropriate adjustments to measure Apache Corporation's TSR for the Performance Period.  The Peer Group companies for any particular Performance Period shall be determined at the commencement of such Performance Period.

"Performance Measures" means, as set forth in the Award Notice, (i) Apache Corporation's TSR over the Performance Period compared to the TSR of the Company's Peer Group over the Performance Period, or (ii) Apache Corporation's achievement of pre-established performance goals over the Performance Period, as applicable.  For purposes of determining TSR performance, at the end of the Performance Period, the Peer Group companies and the Company will be ranked together based on their TSR for the Performance Period from the highest TSR being number 1 to the lowest TSR being the number of Peer Group companies or index funds, including the Company, remaining in the group at the end of the Performance Period.  Based on the Company's relative TSR rank amongst the Peer Group companies or index funds for the Performance Period, a Recipient who remains employed as of the last day of the Performance Period will be issued RSUs at the close of the Performance Period as determined by the Company's percentile rank as set forth in the Award Notice (the Final Amount). At the end of the Performance Period, the Committee shall also determine and certify the levels of other specific performance goals achieved and apply the applicable performance percentage levels and weighting percentages as set forth in the Award Notice.  Based on the Company's level of goal achievement, a Recipient who remains employed as of the last day of the Performance Period will be issued RSUs on the day following

11

the close of the Performance Period as determined by the Committee as set forth in the Award Notice (the Final Amount).

"Performance Period" means the three-year period as specified in the Award Notice.

"Recipient" means an Eligible Person who has been designated to receive one or more Conditional Grants in accordance with the Plan. For purposes of this Agreement, the group of Eligible Persons shall include all full-time and designated part-time employees of the Company who are employed as employees of the Company (as designated by the Company for payroll purposes), but excluding Egyptian nationals employed outside of the United States, employees categorized by the Company (for payroll purposes) as non-exempt support and field staff, leased employees, interns, or any employee of the Company who is covered under a collective bargaining agreement, unless such collective bargaining agreement specifically provides for coverage under the Plan.

"Retirement" means, with respect to a Recipient and for purposes of this Agreement, the date the Recipient terminates employment with the Company after attaining (i) age 55 and (ii) a certain combination of age and Years of Service set forth in the Matrix in Exhibit "A" attached hereto.

"Years of Service" means the total number of months from the Recipient's date of hire by the Company to the date of termination of employment, plus any months required to be recognized under an appropriate acquisition agreement, divided by 12.

"Target Amount" means, with regard to any Recipient, such number of RSUs as specified in each Recipient's Award Notice. Such Target Amount shall be based upon a target percentage of annual Base Salary determined at the beginning of the Performance Period derived from job level.

"Total Shareholder Return" or "TSR" is determined by dividing (i) the sum of the cumulative amount of a company's dividends for the Performance Period (assuming same-day reinvestment into the company's common stock on the ex-dividend date) and the share price of the company at the end of the Performance Period minus the share price at the beginning of the Performance Period, by (ii) the share price at the beginning of the Performance Period.

"Voluntary Termination with Cause" occurs upon a Recipient's separation from service of his or her own volition and one or more of the following conditions occurs without the Recipient's consent on or after a Change of Control:

(a)     There is a material diminution in the Recipient's base compensation, compared to his or her rate of base compensation on the date of the Change of Control.

(b)     There is a material diminution in the Recipient's authority, duties or responsibilities.

(c)     There is a material diminution in the authority, duties or responsibilities of the Recipient's supervisor, such as a requirement that the Recipient (or his

12

or her supervisor) report to a corporate officer or employee instead of reporting directly to the board of directors.

(d)    There is a material diminution in the budget over which the Recipient retains authority.

(e)    There is a material change in the geographic location at which the Recipient must perform his or her service, including, for example the assignment of the Recipient to a regular workplace that is more than 50 miles from his or her regular workplace on the date of the Change of Control.

The Recipient must notify the Company of the existence of one or more adverse conditions specified in clauses (a) through (e) above within 90 days of the initial existence of the adverse condition. The notice must be provided in writing to the Company or its successor, attention: Vice President, Human Resources. The notice may be provided by personal delivery or it may be sent by email, inter-office mail, regular mail (whether or not certified), fax, or any similar method. The Company's Vice President, Human Resources, or his/her delegate shall acknowledge receipt of the notice within 5 business days; the acknowledgement shall be sent to the Recipient by certified mail. Notwithstanding the foregoing provisions of this definition, if the Company remedies the adverse condition within 30 days of being notified of the adverse condition, no Voluntary Termination with Cause shall occur.

### Terms

1.    <u>Conditional Grant of RSUs</u>. Subject to the provisions of this Agreement and the provisions of the Plan and Award Notice, the Company shall conditionally grant to the Recipient, pursuant to the Plan, a right to receive the Target Amount of RSUs set forth in the Recipient's Award Notice. Such Target Amount shall be adjusted to a Final Amount at the end of the Performance Period based upon the results of the Performance Measures, as determined by the Committee. Notwithstanding the foregoing, the Target Amount shall be adjusted to a Final Amount of RSUs at the conclusion of the Performance Period solely for each Recipient who remains employed or is deemed to be employed on account of Retirement as of the last day of the Performance Period. The award of the Final Amount shall give the Recipient the right, upon vesting, to receive an amount of cash equal to the Fair Market Value of an equal number of shares of $0.625 par value common stock of the Company ("Stock") to that of the number of RSUs comprising the Final Amount.

2.    <u>Vesting and Payment of Cash</u>. Subject to the provisions of section 3, the Payout Amounts shall be payable in increments strictly in accordance with the following schedule:

(a)    The entitlement to receive an amount of cash equal to the Fair Market Value of the number of shares of Stock pursuant to the RSUs comprising the Final Amount shall vest fifty percent (50%) and become payable as of the first day following the close of the Performance Period, provided that the Recipient remains employed as an Eligible Person on such date. Except as otherwise provided herein, such cash, subject to applicable withholding, shall be paid by the Company to the Recipient within sixty (60) days of such vesting date.

13

(b)     The entitlement to receive the remaining fifty percent (50%) of an amount in cash equal to the Fair Market Value of number of the shares of Stock pursuant to the RSUs comprising the Final Amount shall vest and become payable as of the first anniversary of the first day following the close of the Performance Period, provided that the Recipient remains employed as an Eligible Person on such applicable vesting date.  Except as otherwise provided herein, such cash, subject to applicable withholding, shall be paid by the Company to the Recipient within sixty (60) days of such vesting date.

3.     Termination of Employment, Retirement, Death, or Disability prior to the end of the Performance Period.  Except as set forth below, a cessation of employment with the Company prior to the end of the Performance Period will result in the Target Amount being forfeited for all purposes.

(a)     If the Recipient dies while employed by the Company regardless whether Recipient has accepted the Conditional Grant, or if the Recipient is no longer employed by the Company by reason of Disability (as defined in this Agreement), during the Performance Period, the Recipient shall be entitled to an amount equal to the Target Amount of RSUs and shall become 100% vested in such Target Amount.  Payment shall be made as soon as administratively practicable, but in no event (i) in the case of death, shall the payment occur later than the last day of the calendar year following the calendar year in which such death occurs or (ii) in the case of cessation of employment by reason of Disability, shall the payment occur later than thirty (30) days following the date upon which the Recipient is Disabled and is no longer employed by the Company.  If clause (ii) is applicable and the payment period spans two consecutive calendar years, payment shall be made in the second calendar year of such consecutive calendar years.  Such payment shall be made to the Recipient's designated beneficiary, legal representatives, heirs, or legatees, as applicable.  Each Recipient may designate a beneficiary on a form approved by the Committee.

(b)     If the Recipient leaves the employment of the Company by reason of Retirement after the first three (3) months of the Performance Period (and not before) and prior to the end of the Performance Period, any Final Amounts not previously vested shall continue to vest following the Recipient's termination of employment by reason of Retirement as if the Recipient remained an Eligible Person in the employ of the Company until the vesting dates set forth in section 2 above, provided that such Recipient shall be entitled to continue vesting only if such Recipient satisfies the Retirement Conditions set forth in section 6 below (except in the case of death) and only with respect to the specified percentage of such unvested Final Amounts set forth in Exhibit "A" for a certain combination of age and Years of Service attained by the Recipient as of the Recipient's Retirement under the Matrix set forth in Exhibit "A".  An amount of cash equal to the Fair Market Value of an equal number of shares of Stock that vests pursuant to this section 3(b) and subject to applicable withholding, shall be paid by the Company to the Recipient who is retired, within sixty (60) days of such vesting date.

4.     Termination of Employment, Retirement, Death or Disability after the end of the Performance Period.  Except as set forth below, each Conditional Grant shall be subject to the condition that the Recipient has remained an Eligible Person from the award of the Conditional Grant of RSUs until the applicable vesting date as follows:

14

(a)     If the Recipient voluntarily leaves the employment of the Company (other than for reason of Retirement), or if the employment of the Recipient is terminated by the Company for any reason or no reason, any Final Amounts not previously vested shall thereafter be void and forfeited for all purposes.

(b)     A Recipient shall become 100% vested in all Final Amounts on the date the Recipient dies while employed by the Company regardless whether Recipient has accepted the Conditional Grant (or while continuing to vest pursuant to section 4(c) below), or on the date the Recipient is no longer employed by the Company by reason of Disability.  Payment shall be made as soon as administratively practicable, but in no event (i) in the case of death, shall the payment occur later than the last day of the calendar year following the calendar year in which such death occurs or (ii) in the case of cessation of employment by reason of Disability, shall the payment occur later than thirty (30) days following the date upon which the Recipient is Disabled and is no longer employed by the Company.  If clause (ii) is applicable and the payment period spans two consecutive calendar years, payment shall be made in the second calendar year of such consecutive calendar years.  Such payment shall be made to the Recipient's designated beneficiary, legal representatives, heirs, or legatees, as applicable.  Each Recipient may designate a beneficiary on a form approved by the Committee.

(c)     If the Recipient leaves the employment of the Company by reason of Retirement after the end of the Performance Period, any Final Amounts not previously vested shall continue to vest following the Recipient's termination of employment by reason of Retirement after the end of the Performance Period as if the Recipient remained an Eligible Person in the employ of the Company until the vesting date set forth in section 2(b) above, provided that such Recipient shall be entitled to continue vesting only if such Recipient satisfies the Retirement Conditions set forth in section 6 below (except in the case of death) and only with respect to the specified percentage of such unvested Final Amounts set forth in Exhibit "A" for a certain combination of age and Years of Service attained by the Recipient as of the Recipient's Retirement under the Matrix set forth in Exhibit "A".  An amount of cash equal to the Fair Market Value of an equal number of shares of Stock that vests pursuant to this section 4(c) and subject to applicable withholding, shall be paid by the Company to the Recipient who is retired, within sixty (60) days of such vesting date.

5.     Change of Control.

(a)     Pursuant to Section 13.1(c)(iii) and (d) of the Plan, the following provisions of this section 5 of the Agreement shall supersede Sections 13.1(a), (b) and (c) of the Plan.  Without any further action by the Committee or the Board, in the event of the Recipient's Involuntary Termination or Voluntary Termination with Cause which occurs (i) on or after a Change of Control and (ii) prior to the end of the Performance Period, the Recipient shall become 100% vested as of the date of such Involuntary Termination or Voluntary Termination with Cause in the number of RSUs determined by applying the multiple of 1.00 to the Target Amount.  Subject to section 12(b) of this Agreement, payment shall occur within thirty (30) days of the date of such Involuntary Termination or Voluntary Termination with Cause, subject to required tax withholding.

(b)     In the event of a Recipient's Involuntary Termination or Voluntary Termination with Cause occurring on or after a Change of Control which occurs after the end of the

15

Performance Period, the Recipient shall become 100% vested in the Final Amount of RSUs as of the date of such Involuntary Termination or Voluntary Termination with Cause. Subject to section 12(b) of this Agreement, payment shall occur within thirty (30) days of the date of such Involuntary Termination or Voluntary Termination with Cause, subject to required tax withholding.

(c)   In the event of a Change of Control following the Recipient's termination of employment by reason of Retirement, after the first three (3) months of the Performance Period and ending on the last day of the Vesting Period, the Recipient, shall become 100% vested in the unvested Final Amount of RSUs as of the date of the Change of Control. Subject to section 12(b) of this Agreement, payment shall occur within thirty (30) days of a 409A Change of Control provided that if no 409A Change of Control occurs during the Performance Period, nor during the period of continued vesting as set forth in section 3(b) and 4(c) of this Agreement, then the Final Amount shall be paid by the Company to the Recipient who is retired, within sixty (60) days of the vesting dates (in the applicable percentage amounts) set forth in section 2 of this Agreement, subject to required tax withholding. In the event of a Change of Control prior to the Recipient's termination of employment by reason of Retirement and after the first three (3) months of the Performance Period and ending on the last day of the Vesting Period, the Recipient shall become 100% vested in the unvested Final Amount of RSUs as of the date that the Recipient terminates employment by reason of Retirement. For the purpose of vesting as set forth in the prior sentence, a Recipient's Involuntary Termination or Voluntary Termination with Cause after a Change of Control shall be deemed a termination by reason of Retirement. Subject to section 12(b) of this Agreement, if the Recipient terminates employment by reason of Retirement after a Change of Control, the Recipient shall receive payment with respect to 100% of such Final Amount within sixty (60) days of the vesting dates (in the applicable percentage amounts) as set forth in section 2 of this Agreement, subject to required tax withholding.

6.   <u>Conditions to Post-Retirement Vesting</u>. If the Recipient has attained age 55 and a certain combination of age and Years of Service set forth in the Matrix in Exhibit "A" attached hereto and terminates employment with the Company and the Affiliates by reason of Retirement after the first three (3) months of the Performance Period, it is agreed by the Company and the Recipient that:

(a)   subject to the provisions of this section 6(a) and sections 6(b) and 6(c), such Recipient shall continue to vest in the specified percentage of the unvested Final Amount of RSUs set forth in Exhibit "A", for the combination of age and Years of Service attained by such Recipient as of his or her Retirement under the Matrix set forth in Exhibit "A", following the date of his or her termination by reason of Retirement as if the Recipient continued in employment as an Eligible Person provided that the Grant Date of the unvested RSUs is prior to such termination date in an amount of time which allows the Recipient to provide the written notice as follows and the Recipient has provided advance written notice not before three (3) months following the Grant Date and not less than the number of months prior to such termination date as set forth in the Schedule below to Apache Corporation's Vice President, Human Resources, or his or her delegate, and to his or her direct manager, regarding the Recipient's intent to terminate employment for reason of Retirement; <u>provided</u>, <u>however</u>, a Recipient who is at least age 55 and attained the necessary combination of age and Years of Service under the Matrix set forth in Exhibit "A" for Retirement need not provide such advance written notice of his or her intent to terminate employment by reason of Retirement if the Company elects to require such Recipient to, or (as

16

part of a reduction in force or otherwise in writing in exchange for a written release) offers such Recipient the opportunity to, terminate employment with the Company by reason of Retirement:

| Age | Advance Written Notice |
|---|---|
| 65 or older | 3 months |
| between (and including) 55 and 64 | 6 months |

; and it is further agreed that

(b)     in consideration for the continued vesting treatment afforded to the Recipient under section 6(a), Recipient shall, after Retirement and during the period commencing on the first day following the first three (3) months of the Performance Period and ending on the last day of the Vesting Period (the "Continued Vesting Period"), refrain from becoming employed by, or consulting with, or becoming substantially involved in the business of, any business that competes with the Company or its Affiliate in the business of exploration or production of oil or natural gas wherever from time to time conducted throughout the world (a "Competitive Business") and Recipient shall provide to the Company, upon Company's request, (x) a written certification, in a form provided by or satisfactory to the Company, as to Recipient's compliance with the forgoing conditions and/or (y) his/her U.S. Individual Income Tax Return for any return filed by the Recipient which relates to any time during the Continued Vesting Period to allow the Company to verify that Recipient has complied with the foregoing conditions; provided, that the Recipient may purchase and hold for investment purposes less than five percent (5%) of the shares of any Competitive Business whose shares are regularly traded on a national securities exchange or inter-dealer quotation system, and provided further, that the Recipient may provide services solely as a director of any Competitive Business whose shares are regularly traded on a national securities exchange or inter-dealer quotation system if, during the Continued Vesting Period, (i) the Recipient only attends board and board committee meetings, votes on recommendations of management, and discharges his/her fiduciary obligations under the law and (ii) the Recipient is not involved in, and does not advise or consult on, the marketing, government relations, customer relations, or the day-to-day management, supervision, or operations of such Competitive Business; and it is further agreed that

(c)     in consideration for the continued vesting treatment afforded to the Recipient under section 6(a), Recipient shall, during the Continued Vesting Period, refrain from making, or causing or assisting any other person to make, any oral or written communication to any third party about the Company, any Affiliate and/or any of the employees, officers or directors of the Company or any Affiliate which impugns or attacks, or is otherwise critical of, the reputation, business or character of such entity or person; or that discloses private or confidential information about their business affairs; or that constitutes an intrusion into their seclusion or private lives; or that gives rise to unreasonable publicity about their private lives; or that places them in a false light before the public; or that constitutes a misappropriation of their name or likeness.

Notwithstanding the foregoing provisions of this section 6 of the Agreement, (i) in the event that the Recipient fails to satisfy any of the conditions set forth in sections 6(a), (b) and (c) above, the Recipient shall not be entitled to vest in the specified percentage under the Matrix set forth in Exhibit "A" in any unvested Final Amount of RSUs after the date of Retirement and the unvested

17

Final Amount of RSUs subject to this Agreement shall be forfeited and (ii) the Recipient shall not have any right to continue to vest upon Retirement in any future awards granted under the Plan once the Recipient provides the notice of Retirement as set forth in section 6(a) above.

7.     Prohibited Activity.  In consideration for this Grant and except as permitted by Section 6(b) above, the Recipient agrees not to engage in any "Prohibited Activity" while employed by the Company or within three years after the date of the Recipient's termination of employment.  A "Prohibited Activity" will be deemed to have occurred, as determined by the Committee in its sole and absolute discretion, if the Recipient (i) divulges any non-public, confidential or proprietary information of the Company, but excluding information that (a) becomes generally available to the public other than as a result of the Recipient's public use, disclosure, or fault, or (b) becomes available to the Recipient on a non-confidential basis after the Recipient's employment termination date from a source other than the Company prior to the public use or disclosure by the Recipient, provided that such source is not bound by a confidentiality agreement or otherwise prohibited from transmitting the information by contractual, legal or fiduciary obligation; (ii) directly or indirectly, consults with or becomes affiliated with, participate or engage in, or becomes employed by any business that is competitive with the Company, wherever from time to time conducted throughout the world, including situations where the Recipient solicits or participates in or assists in any way in the solicitation or recruitment, directly or indirectly, of any employees of the Company; or (iii) engages in publishing any oral or written statements about the Company, and/or any of its directors, officers, or employees that are disparaging, slanderous, libelous, or defamatory; or that disclose private or confidential information about their business affairs; or that constitute an intrusion into their seclusion or private lives; or that give rise to unreasonable publicity about their private lives; or that place them in a false light before the public; or that constitute a misappropriation of their name or likeness.

8.     Payment and Tax Withholding.  Upon receipt of any entitlement to cash under this Agreement and, if applicable, upon the Recipient's attainment of eligibility to terminate employment by reason of Retirement pursuant to section 4(c), the Recipient shall make appropriate arrangements with the Company to provide for the amount of minimum tax and social security withholding, if any, required by law, including without limitation Sections 3102 and 3402 or any successor section(s) of the Internal Revenue Code and applicable state and local income and other tax laws.  The payment of a Payout Amount shall be based on the Fair Market Value of the shares of Stock on the applicable date of vesting to which such tax withholding relates.  Where appropriate, cash shall be withheld by the Company to satisfy applicable tax withholding requirements rather than paid directly to the Recipient.

9.     Non-Transferability of Conditional Grant and Unvested Final Amount.  The Conditional Grant and any unvested Final Amount shall not be transferable otherwise than by testamentary will or the laws of descent and distribution, or in accordance with a valid beneficiary designation on a form approved by the Committee, subject to the conditions and exceptions set forth in Section 15.2 of the Plan.

10.     No Right to Continued Employment.  Neither the RSUs or the cash payment pursuant to a Conditional Grant nor any terms contained in this Agreement shall confer upon the Recipient any express or implied right to be retained in the employment or service of the Company for any period, nor restrict in any way the right of the Company, which right is hereby expressly

18

reserved, to terminate the Recipient's employment or service at any time for any reason or no reason.  The Recipient acknowledges and agrees that any right to receive RSUs or cash pursuant to a Conditional Grant is earned only by continuing as an employee of the Company at the will of the Company, or satisfaction of any other applicable terms and conditions contained in the Plan and this Agreement, and not through the act of being hired, being granted the Conditional Grant, or acquiring RSUs or cash pursuant to the Conditional Grant hereunder.

11.     The Plan.  In consideration for this Conditional Grant, the Recipient agrees to comply with the terms of the Plan and this Agreement.  This Agreement is subject to all the terms, provisions and conditions of the Plan, which are incorporated herein by reference, and to such regulations as may from time to time be adopted by the Committee. The Conditional Grant is a Cash-Based Award under Section 10 of the Plan and is subject to the provisions of the Plan governing Performance Awards. Unless defined herein, capitalized terms are used herein as defined in the Plan. In the event of any conflict between the provisions of the Plan and this Agreement, the provisions of the Plan shall control, and this Agreement shall be deemed to be modified accordingly.  The Plan and the prospectus describing the Plan can be found on the Company's HR intranet and the Plan document can be found on Fidelity's website (netbenefits.fidelity.com).  A paper copy of the Plan and the prospectus shall be provided to the recipient upon the Recipient's written request to the Company at 2000 Post Oak Blvd., Suite 100, Houston, Texas 77056-4400, Attention: Corporate Secretary.

12.     Compliance with Laws and Regulations.

(a)     The Conditional Grant and any obligation of the Company to deliver RSUs and cash hereunder shall be subject in all respects to (i) all applicable laws, rules and regulations and (ii) any registration, qualification, approvals or other requirements imposed by any government or regulatory agency or body which the Committee shall, in its discretion, determine to be necessary or applicable.

(b)     This Conditional Grant is intended to comply with, or be exempt from, the applicable requirements of Section 409A of the Code and the rules and regulations issued thereunder and shall be administered accordingly.  Notwithstanding anything in this Agreement to the contrary, if the RSUs constitute "deferred compensation" under Section 409A of the Code and any RSUs become payable pursuant to the Recipient's termination of employment, settlement of the RSUs shall be delayed for a period of six months after the Recipient's termination of employment if the Recipient is a "specified employee" as defined under Code Section 409A(a)(2)(B)(i) and if required pursuant to Section 409A of the Code.  If settlement of the RSUs is delayed, the RSUs shall be settled on the first day of the first calendar month following the end of the six-month delay period.  If the Recipient dies during the six-month delay, the RSUs shall be settled and paid to the Recipient's designated beneficiary, legal representatives, heirs or legatees, as applicable, as soon as practicable after the date of death.  Notwithstanding any provision to the contrary herein, payments made with respect to this Conditional Grant may only be made in a manner and upon an event permitted by Section 409A of the Code, and all payments to be made upon a termination of employment hereunder may only be made upon a "separation from service," as such term is defined in Section 11.1 of the Plan.  Recipient shall not have any right to determine a date of payment of any amount under this Agreement.  This Agreement may be amended without the consent of the Recipient in any respect deemed by the Board or the Committee to be necessary

19

in order to preserve compliance with Section 409A of the Code. If the Grant and this Agreement is subject to Section 409A of the Code and the rules and regulations issued thereunder, and, except as set forth in section 5(a), the vesting date shall be the "designated payment date" or "specified date" under Treasury Regulation 1.409A-3(d).

13.     Notices. Unless otherwise provided in this Agreement, all notices by the Recipient or the Recipient's assignees shall be addressed to the Administrative Agent, Fidelity, through the Recipient's account at netbenefits.fidelity.com, or such other address as the Company may from time to time specify. All notices to the Recipient shall be addressed to the Recipient at the Recipient's address in the Company's records.

14.     Other Plans. The Recipient acknowledges that any income derived from the Conditional Grant shall not affect the Recipient's participation in, or benefits under, any other benefit plan or other contract or arrangement maintained by the Company or any Affiliate.

15.     Terms of Employment. The Plan is a discretionary plan. The Recipient hereby acknowledges that neither the Plan nor this Agreement forms part of the Recipient's terms of employment and nothing in the Plan may be construed as imposing on the Company or any Affiliate a contractual obligation to offer participation in the Plan to any employee of the Company or any Affiliate. The Company or any Affiliate is under no obligation to make further Grants to any Recipient under the Plan. The Recipient hereby acknowledges that if the Recipient ceases to be an employee of the Company or any Affiliate for any reason or no reason, the Recipient shall not be entitled by way of compensation for loss of office or otherwise howsoever to any sum.

16.     Data Protection. By accepting this Agreement (whether by electronic means or otherwise), the Recipient hereby consents to the holding and processing of personal data provided by the Recipient to the Company for all purposes necessary for the operation of the Plan. These include, but are not limited to:

(a)     administering and maintaining Recipient records;

(b)     providing information to any registrars, brokers or third party administrators of the Plan; and

(c)     providing information to future purchasers of the Company or the business in which the Recipient works.

17.     Clawback Policy. If required by the Sarbanes-Oxley Act of 2002 and/or by the Dodd-Frank Wall Street Reform and Consumer Protection Act of 2010, each Recipient's Award shall be conditioned on repayment or forfeiture in accordance with applicable law. In addition, the Company's Executive Compensation Clawback Policy is hereby incorporated by reference and shall form a part of this Agreement and each Recipient's Award shall be subject to such Policy. In connection with a material negative accounting restatement by the Company as the result of fraud, intentional misconduct, or gross negligence by the Recipient, Awards and payments in connection with Awards granted under this Agreement may be subject to recovery and Recipient may be required to repay to the Company all or a portion of any Award or payments received in connection with any Award hereunder. In the event that the Company determines to seek recovery with respect to an Award under this Agreement, an affected Recipient may elect to repay the

20

applicable clawback amount in cash or, if shares of Stock received pursuant to an affected Award are still owned by the Recipient, in net after-tax shares of Stock received pursuant to the Award. The date for determination of the value of the applicable compensation to be repaid shall be the vesting date of the affected Award and the amount of any applicable repayment shall be determined based upon the net after-tax amount realized by the Recipient as income on such vesting date, applying the highest marginal tax rate for federal, state and local income taxes.

18.     Severability.  If any provision of this Agreement is held invalid or unenforceable, the remainder of this Agreement shall nevertheless remain in full force and effect, and if any provision is held invalid or unenforceable with respect to particular circumstances, it shall nevertheless remain in full force and effect in all other circumstances, to the fullest extent permitted by law.

*****

21

**Apache Corporation**
**Executive Compensation Clawback Policy**

Should the Company's reported financial or operating results be subject to a material negative restatement as the result of fraud, intentional misconduct, or gross negligence of an executive officer, the Company has the right to recover from such executive officer an amount corresponding to any incentive award or portion thereof (including any cash bonus or equity-based award) that the Company determines would not have been granted, vested, or paid had the Company's results as originally reported been equal to the Company's results as subsequently restated.  The Company will apply a three-year lookback period from the date of any such material negative restatement. Subject to applicable law, the Company has the right to recover such amount by requiring the executive officer to re-pay such amount to the Company by direct payment to the Company or such other means or combination of means as the Company determines to be appropriate.

If the Company determines to seek a recovery pursuant to this policy, it shall make a written demand for repayment from the executive officer and, if such person does not, within a reasonable period of time following such demand, tender repayment in response to such demand, and the Company determines that he or she is unlikely to do so, the Company may seek a court order against the executive officer for such repayment.

The Company may not seek recovery to the extent it determines (i) that to do so would not be cost effective or (ii) that it would be better for the Company not to do so. In making such determination, the Company shall take into account such considerations as it deems appropriate, including, without limitation, (A) the likelihood of success under governing law versus the cost and effort involved, (B) whether the assertion of a claim may prejudice the interests of the Company, including in any related proceeding or investigation, (C) the passage of time since the occurrence of the act in the event of fraud or intentional illegal conduct, and (D) any pending legal proceeding relating to such fraud or intentional illegal conduct.

This Policy applies to any incentive compensation for years commencing after the adoption of this Policy.

22

## Exhibit "A"

**Apache Corporation**
**Retirement Matrix**

| | | 60 | 61 | 62 | 63 | 64 | 65 | 66 | 67 | 68 | 69 | 70 | 71 | 72 | 73 | 74 | 75 | 76 | 77 | 78 | 79 | 80 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | | | | | Points (Age at Retirement + Years of Service) | | | | | | | | | |
| | 70 | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 100% | 100% | 100% | 100% | 100% | 100% |
| | 69 | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 100% | 100% | 100% | 100% | 100% | 100% | 100% |
| | 68 | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 100% | 100% | 100% | 100% | 100% | 100% | 100% | 100% |
| | 67 | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 100% | 100% | 100% | 100% | 100% | 100% | 100% | 100% | 100% |
| Age at Retirement | 66 | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 100% | 100% | 100% | 100% | 100% | 100% | 100% | 100% | 100% | 100% |
| | 65 | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 100% | 100% | 100% | 100% | 100% | 100% | 100% | 100% | 100% | 100% | 100% |
| | 64 | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 50% | 75% | 75% | 75% | 75% | 75% | 75% | 75% | 75% | 75% | 100% |
| | 63 | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 50% | 50% | 75% | 75% | 75% | 75% | 75% | 75% | 75% | 75% | 75% | 75% | 100% |
| | 62 | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 50% | 50% | 50% | 75% | 75% | 75% | 75% | 75% | 75% | 75% | 75% | 75% | 75% | 100% |
| | 61 | 0% | 0% | 0% | 0% | 0% | 0% | 50% | 50% | 50% | 50% | 75% | 75% | 75% | 75% | 75% | 75% | 75% | 75% | 75% | 75% | 100% |
| | 60 | 0% | 0% | 0% | 0% | 0% | 50% | 50% | 50% | 50% | 50% | 75% | 75% | 75% | 75% | 75% | 75% | 75% | 75% | 75% | 75% | 100% |
| | 59 | 0% | 0% | 0% | 0% | 0% | 50% | 50% | 50% | 50% | 50% | 50% | 50% | 50% | 50% | 50% | 75% | 75% | 75% | 75% | 75% | 100% |
| | 58 | 0% | 0% | 0% | 0% | 0% | 50% | 50% | 50% | 50% | 50% | 50% | 50% | 50% | 50% | 50% | 75% | 75% | 75% | 75% | 75% | 100% |
| | 57 | 0% | 0% | 0% | 0% | 0% | 50% | 50% | 50% | 50% | 50% | 50% | 50% | 50% | 50% | 50% | 75% | 75% | 75% | 75% | 75% | 100% |
| | 56 | 0% | 0% | 0% | 0% | 0% | 50% | 50% | 50% | 50% | 50% | 50% | 50% | 50% | 50% | 50% | 75% | 75% | 75% | 75% | 75% | 100% |
| | 55 | 0% | 0% | 0% | 0% | 0% | 50% | 50% | 50% | 50% | 50% | 50% | 50% | 50% | 50% | 50% | 75% | 75% | 75% | 75% | 75% | 100% |



| |
|---|
| 0% |
| 50% |
| 75% |
| 100% |

23

Exhibit 10.44

## SCHEDULE A

## Apache Corporation

### Restricted Stock Unit Award Agreement

#### GRANT NOTICE

| | |
|---|---|
| **Recipient Name:** | [Name] |
| **Company:** | Apache Corporation |
| **Notice:** | A summary of the terms of your grant of Restricted Stock Units ("RSUs") is set out in this notice (the "Grant Notice") but subject always to the terms of the Apache Corporation 2016 Omnibus Compensation Plan (the "Plan") and the Restricted Stock Unit Award Agreement (the "Agreement").   In the event of any inconsistency between the terms of this Grant Notice, the terms of the Plan and the Agreement, the terms of the Plan and the Agreement shall prevail. The Grant is a Cash-Based Award under Section 10 of the Plan and is subject to the provisions of the Plan governing RSUs. |
| | You have been awarded a grant of Altus Midstream Company RSUs in accordance with the terms of the Plan and the Agreement. |
| | Details of the RSUs which you are entitled to receive is provided to you in this Grant Notice and maintained on your account at netbenefits.fidelity.com. |
| **Type of Award:** | Restricted Stock Unit(s) |
| **Restricted Stock Unit:** | A Restricted Stock Unit ("RSU") under this Agreement means the right granted to the Recipient to receive the cash equivalent of one share of Stock (as defined below) for each RSU at the end of the specified Vesting Period. |
| **Stock:** | The $0.0001 par value Class A common stock of Altus Midstream Company. |
| **Grant:** | A Grant related to _____ Restricted Stock Units. |
| **Grant Date:** | [Date] |
| **Conditions:** | The Recipient may elect, at the time of the grant, to have his or her RSUs deferred into the Deferred Delivery Plan (the "DDP") when the RSUs vest, in which case the Recipient will receive the value of |

1

the RSUs in cash at the times specified pursuant to the DDP.  For RSUs that are not deferred, once the RSU vests, the Recipient shall be paid the value of his or her RSUs in cash (net of cash withheld for applicable tax withholdings).

**Vesting Period:** RSUs granted shall vest (i.e., restrictions shall lapse) in accordance with the following schedule (the "Vesting Period"), provided that the Recipient remains employed as an Eligible Person as of such vesting date:

First day of the month following the first anniversary of the Grant Date – 1/3 vested.

Second anniversary of the Grant Date – an additional 1/3 vested.

Third anniversary of the Grant Date – an additional 1/3 vested.

Notwithstanding the foregoing, if the Recipient's termination of employment from the Company and the Affiliates occurs by reason of his or her Retirement, the Recipient shall be deemed to continue to be employed as an Eligible Person for purposes of this Grant and shall continue to vest with respect to a specified percentage of RSUs over the Vesting Period set forth above provided that the Recipient meets the Retirement Conditions set forth in section 5 of the Agreement.

Upon vesting (other than upon death or Disability), the applicable amount of cash, subject to required tax withholding, shall be paid by the Company to the Recipient within thirty (30) days of the vesting date, unless the Recipient had elected to defer such RSUs into the DDP, in which case the applicable amount of cash shall be paid to the DDP on the vesting date and paid out according to the provisions of the DDP.

Vesting is accelerated to 100% upon the Recipient's death or cessation of employment by reason of Disability while an Eligible Person (or, only in the case of death, while treated as an Eligible Person following Retirement as described above) during the Vesting Period.  Upon vesting, the applicable amount of cash, subject to required tax withholding, shall be paid by the Company to the Recipient's designated beneficiary, legal representatives, heirs, or legatees, as applicable, in accordance with the terms of the Plan and this Agreement.  The Recipient can name a beneficiary on a form approved by the Committee.

Vesting is accelerated to 100% upon the Recipient's Involuntary Termination or Voluntary Termination with Cause occurring on or after a Change of Control that occurs during the Vesting Period.

2

With respect to a Recipient who continues to vest following his or her termination due to Retirement, vesting is accelerated to 100% upon a Change of Control that occurs during the Vesting Period and on or after such termination by reason of Retirement.  With respect to a Recipient who terminates employment by reason of Retirement after a Change of Control, vesting is accelerated to 100% upon the Recipient's termination of employment by reason of Retirement. Unless expressly otherwise provided in the Agreement with respect to Retirement and Change of Control, the applicable amount of cash, subject to required tax withholding, shall be paid by the Company to the Recipient within thirty (30) days of the vesting date, unless the Recipient had elected to defer such RSUs into the DDP, in which case the applicable amount of cash shall be paid to the DDP on the vesting date and paid out according to the provisions of the DDP.

**Withholding:**

The Company and the Recipient will comply with all federal and state laws and regulations respecting the required withholding, deposit, and payment of any income, employment, or other taxes relating to the Grant.

**Dividends:**

The Company will credit each of the Recipient's RSUs with Dividend Equivalents.  For purposes of this Grant, a Dividend Equivalent is an amount equal to the cash dividend payable per share of Stock multiplied by the number of shares of Stock then underlying such outstanding RSUs.  Such amount will be credited to a book entry account on Recipient's behalf at the time Altus Midstream Company pays any cash dividend on its Stock.  The Recipient's rights in any such Dividend Equivalents will vest at the same time as, and only to the extent that, the underlying RSUs vest and will be distributed at the same time in cash (subject to applicable withholdings), and only to the extent, as the related RSUs are to be distributed to the Recipient as provided in the Agreement and to which such Dividend Equivalents apply.

**Acceptance:**

Please complete the on-line grant acceptance as promptly as possible to accept or reject your Grant.  You can access this through your account at netbenefits.fidelity.com.  By accepting your Grant, you will have agreed to the terms and conditions set forth in the Agreement, including, but not limited to, the non-compete and non-disparagement provisions set forth in sections 5 and 6 of the Agreement, and the terms and conditions of the Plan.  If you do not accept your Grant, your RSUs will not vest and you will be unable to receive your RSUs.

3

**Apache Corporation**

**Restricted Stock Unit Award Agreement**

This Restricted Stock Unit Award Agreement (the "Agreement") relating to a grant of Restricted Stock Units is a Cash-Based Award under Section 10 of the Apache Corporation 2016 Omnibus Compensation Plan (the "Plan") (the "Grant"), dated as of the Grant Date set forth in the Notice of Award under the Agreement attached as Schedule A hereto (the "Grant Notice"), and is made between Apache Corporation (together with its Affiliates, the "Company") and each Recipient. The Grant Notice is included in and made part of this Agreement.

In this Agreement and each Grant Notice, unless the context otherwise requires, words and expressions shall have the meanings given to them in the Plan except as herein defined.

**Definitions**

"409A Change of Control" means a Change of Control that constitutes, with respect to Apache Corporation, a "change in the ownership or effective control of the corporation, or in the ownership of a substantial portion of the assets of the corporation" within the meaning of Section 409A(a)(2)(A)(v) of the Internal Revenue Code of 1986, as amended (the "Code") and Treasury Regulations Section 1.409A-3(i)(5).

"Disability" or "Disabled" means the Recipient is unable to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months. Recipient agrees that a final and binding determination of "Disability" will be made by the Company's representative under the Company's group long-term disability plan or any successor thereto or, if there is no such representative and there is a dispute as to the determination of "Disability," it will be decided in a court of law in Harris County, Texas.

"Grant Notice" means the separate notice given to each Recipient specifying the number of RSUs granted to the Recipient (the "Grant").

"Fair Market Value" means the fair market value of a share of the Stock as determined by the Committee by the reasonable application of such reasonable valuation method, consistently applied, as the Committee deems appropriate; provided, however, that if the Committee has not made such determination, such fair market value shall be the per share closing price of the Stock as reported on Nasdaq or on such other exchange or electronic trading system as, on the date in question, reports the largest number of traded shares of stock; provided further, however, that if there are no Stock transactions on such date, the Fair Market Value shall be determined as of the immediately preceding date on which there were Stock transactions.

"Involuntary Termination" means the termination of employment of the Recipient by the Company or its successor for any reason on or after a Change of Control; provided, that the termination does not result from an act of the Recipient that (i) constitutes common-law fraud, a felony, or a gross malfeasance of duty and (ii) is materially detrimental to the best interests of the Company or its successor.

4

"Payout Amount" means the vested portion of the Grant expressed as an amount of cash equal to the Fair Market Value of the shares of Stock underlying the RSUs and related Dividend Equivalents.

"Recipient" means an Eligible Person designated by the Committee at the Grant Date to receive one or more Grants under the Plan.

"Retirement" means, with respect to a Recipient and for purposes of this Agreement, the date the Recipient terminates employment with the Company after attaining (i) age 55 and (ii) a certain combination of age and Years of Service set forth in the Matrix in Exhibit "A" attached hereto.

"Years of Service" means the total number of months from the Recipient's date of hire by the Company to the date of termination of employment, plus any months required to be recognized under an appropriate acquisition agreement, divided by 12.

"Voluntary Termination with Cause" occurs upon a Recipient's separation from service of his or her own volition and one or more of the following conditions occurs without the Recipient's consent on or after a Change of Control:

(a)     There is a material diminution in the Recipient's base compensation, compared to his or her rate of base compensation on the date of the Change of Control.

(b)     There is a material diminution in the Recipient's authority, duties or responsibilities.

(c)     There is a material diminution in the authority, duties or responsibilities of the Recipient's supervisor, such as a requirement that the Recipient (or his or her supervisor) report to a corporate officer or employee instead of reporting directly to the board of directors.

(d)     There is a material diminution in the budget over which the Recipient retains authority.

(e)     There is a material change in the geographic location at which the Recipient must perform his or her service, including, for example the assignment of the Recipient to a regular workplace that is more than 50 miles from his or her regular workplace on the date of the Change of Control.

The Recipient must notify the Company of the existence of one or more adverse conditions specified in clauses (a) through (e) above within 90 days of the initial existence of the adverse condition. The notice must be provided in writing to the Company or its successor, attention: Vice President, Human Resources. The notice may be provided by personal delivery or it may be sent by email, inter-office mail, regular mail (whether or not certified), fax, or any similar method. The Company's Vice President, Human Resources, or his/her delegate shall acknowledge receipt of the notice within 5 business days; the acknowledgement shall be sent to the Recipient by certified mail. Notwithstanding the

5

foregoing provisions of this definition, if the Company remedies the adverse condition within 30 days of being notified of the adverse condition, no Voluntary Termination with Cause shall occur.

**Terms**

1.      Grant of RSUs.  Subject to the provisions of this Agreement and the provisions of the Plan and Grant Notice, the Company shall grant to the Recipient, pursuant to the Plan, a right to receive the number of RSUs set forth in the Recipient's Grant Notice.  The Grant shall give the Recipient the right, upon vesting, to receive an amount in cash equal to the Fair Market Value of an equal number of shares of $0.0001 par value Class A common stock of Altus Midstream Company ("Stock") to that of the number of RSUs set forth in the Recipient's Grant Notice.  At the time of the Grant, the Recipient may elect to defer all or any portion of the RSUs in the Deferred Delivery Plan (the "DDP").

2.      Vesting and Payment of Cash.  Subject to the provisions of sections 3 and 4 of this Agreement, the entitlement to receive an amount of cash equal to the Fair Market Value of the number of shares of Stock pursuant to the RSUs comprising the Grant Amount shall vest in accordance with the schedule set forth in the Grant Notice (the "Vesting Period"); provided that the Recipient remains employed as an Eligible Person on such applicable vesting dates.  Unless the Recipient elected to defer the RSU into the DDP, such cash, subject to applicable withholding, shall be paid by the Company to the Recipient within thirty (30) days of the vesting date (other than upon death or Disability).  To the extent that the Recipient elected to defer the RSUs into the DDP and sections 3 and 4 do not apply, when the RSUs vest, an amount of cash equal to the Fair Market Value of the number of shares of Stock that have vested pursuant to the RSUs comprising the Grant Amount shall be paid to the DDP and paid thereafter to the Recipient as specified under the terms of the DDP.

3.      Termination of Employment, Retirement, Death, or Disability.  Except as set forth below in this section 3 and in section 4 of this Agreement, each Grant shall be subject to the condition that the Recipient has remained an Eligible Person from the award of the Grant of RSUs until the applicable vesting date as follows:

(a)      If the Recipient voluntarily leaves the employment of the Company (other than for reason of Retirement), or if the employment of the Recipient is terminated by the Company for any reason or no reason, any RSUs granted to the Recipient pursuant to the Grant Notice not previously vested shall thereafter be void and forfeited for all purposes.

(b)      If the Recipient leaves the employment of the Company by reason of Retirement, the RSUs granted to the Recipient pursuant to the Grant Notice not previously vested shall continue to vest following the Recipient's termination of employment by reason of Retirement as if the Recipient remained an Eligible Person in the employ of the Company, provided that such Recipient shall be entitled to continue vesting only if such Recipient satisfies the Retirement Conditions set forth in section 5 below (except in the case of death) and only with respect to the specified percentage of such unvested RSUs set forth in Exhibit "A" for a certain combination of age and Years of Service attained by the Recipient as of the Recipient's Retirement under the Matrix set forth in Exhibit "A".

6

(c)     A Recipient shall become 100% vested in all RSUs under the Grant Notice on the date the Recipient dies while employed by the Company regardless whether Recipient has accepted the Grant, or on the date the Recipient is no longer employed by the Company by reason of Disability, or, only in the case of death, while continuing to vest pursuant to section 3(b) of this Agreement.  Payment shall be made as soon as administratively practicable, but in no event (i) in the case of death, shall the payment occur later than the last day of the calendar year following the calendar year in which such death occurs or (ii) in the case of cessation of employment by reason of Disability, shall the payment occur later than thirty (30) days following the date the Recipient is determined to be Disabled and is no longer employed by the Company.  If clause (ii) is applicable and the period from the date on which the Recipient is determined to be Disabled and is no longer employed by the Company to the date under clause (ii) spans two consecutive calendar years, payment shall be made in the second calendar year of such consecutive calendar years.  Such payment shall be made to the Recipient's designated beneficiary, legal representatives, heirs, or legatees, as applicable.  Each Recipient may designate a beneficiary on a form approved by the Committee.

4.     Change of Control.  Pursuant to Section 13.1(c)(iii) and (d) of the Plan, the following provisions of this section 4 of the Agreement shall supersede Sections 13.1(a), (b) and (c) of the Plan.  Without any further action by the Committee or the Board, in the event of a Recipient's Involuntary Termination or Voluntary Termination with Cause occurring on or after a Change of Control during the Vesting Period, the Recipient shall become 100% fully vested in the unvested RSUs granted to the Recipient pursuant to the Grant Notice as of the date of his or her Involuntary Termination or Voluntary Termination with Cause.  Subject to section 11(b) of this Agreement, payment shall occur within thirty (30) days following the date of such Involuntary Termination or Voluntary Termination with Cause, subject to required tax withholding.  Further, in the event of a Change of Control following the Recipient's termination of employment by reason of Retirement while the Recipient is continuing to vest in the RSUs pursuant to section 3(b) of this Agreement, the Recipient shall become 100% fully vested in the unvested RSUs granted to the Recipient pursuant to the Grant Notice as of the date of the Change of Control (including those excluded by the specified percentage set forth in Exhibit "A").  Subject to section 11(b) of this Agreement, the Recipient, if the Recipient terminates employment on account of Retirement prior to the occurrence of a Change of Control, shall receive payment with respect to 100% of the fully vested RSUs within thirty (30) days of the date of a 409A Change of Control, or if the Change of Control is not a 409A Change of Control, on the remaining vesting dates during the Vesting Period in the amount of 1/3 (on each of the remaining vesting dates) of the RSUs awarded as of the Grant Date, subject to required tax withholding.  Further still, in the event of a Change of Control prior to the Recipient's termination of employment by reason of Retirement during the Vesting Period, the Recipient shall become 100% fully vested in the unvested RSUs granted to the Recipient pursuant to the Grant Notice as of the date the Recipient terminates employment by reason of Retirement (including those excluded by the specified percentage set forth in Exhibit "A").  For the purpose of vesting as set forth in the prior sentence, a Recipient's Involuntary Termination or Voluntary Termination with Cause after a Change of Control shall be deemed a termination by reason of Retirement.  Subject to section 11(b) of this Agreement, the Recipient, who terminates employment by reason of Retirement after a Change of Control, shall receive payment with respect to 100% of the fully vested RSUs on the remaining vesting dates during the Vesting Period in the amount of 1/3 (on each of the remaining vesting dates) of the RSUs awarded as of the Grant Date, subject to required tax withholding.

7

5.   <u>Conditions to Post-Retirement Vesting</u>.  If the Recipient has attained age 55 and a certain combination of age and Years of Service set forth in the Matrix in Exhibit "A" attached hereto and terminates employment with the Company and the Affiliates by reason of Retirement, it is agreed by the Company and the Recipient that:

(a)    subject to the provisions of this section 5(a) and sections 5(b) and 5(c), such Recipient shall continue to vest in the specified percentage of unvested RSUs set forth in Exhibit "A", for the combination of age and Years of Service attained by such Recipient as of his or her Retirement under the Matrix set forth in Exhibit "A", following the date of his or her termination by reason of Retirement as if the Recipient continued in employment as an Eligible Person provided that the Grant Date of the unvested RSUs is prior to such termination date in an amount of time which allows the Recipient to provide the written notice as follows and the Recipient has provided advance written notice not before three (3) months following the Grant Date and not less than the number of months prior to such termination date as set forth in the Schedule below to Apache Corporation's Vice President, Human Resources, or his or her delegate, and to his or her direct manager, regarding the Recipient's intent to terminate employment for reason of Retirement; <u>provided</u>, <u>however</u>, a Recipient who is at least age 55 and attained the necessary combination of age and Years of Service under the Matrix set forth in Exhibit "A" for Retirement need not provide such advance written notice of his or her intent to terminate employment by reason of Retirement if the Company elects to require such Recipient to, or (as part of a reduction in force or otherwise in writing in exchange for a written release) offers such Recipient the opportunity to, terminate employment with the Company by reason of Retirement:

| Age | Advance Written Notice |
|---|---|
| 65 or older | 3 months |
| between (and including) 55 and 64 | 6 months |

; and it is further agreed that

(b)    in consideration for the continued vesting treatment afforded to the Recipient under section 5(a), Recipient shall, during the continuing Vesting Period after Retirement (the "Continued Vesting Period"), refrain from becoming employed by, or consulting with, or becoming substantially involved in the business of, any business that competes with the Company or its Affiliate in the business of exploration or production of oil or natural gas wherever from time to time conducted throughout the world (a "Competitive Business") and Recipient shall provide to the Company, upon Company's request, (x) a written certification, in a form provided by or satisfactory to the Company, as to Recipient's compliance with the forgoing conditions and/or (y) his/her U.S. Individual Income Tax Return for any return filed by the Recipient which relates to any time during the Continued Vesting Period to allow the Company to verify that Recipient has complied with the foregoing conditions; <u>provided</u>, that the Recipient may purchase and hold for investment purposes less than five percent (5%) of the shares of any Competitive Business whose shares are regularly traded on a national securities exchange or inter-dealer quotation system, and <u>provided further</u>, that the Recipient may provide services solely as a director of any Competitive Business whose shares are regularly traded on a national securities exchange or inter-dealer quotation system if, during the Continued Vesting Period, (i) the Recipient only attends board and board committee meetings, votes on recommendations of management, and discharges his/her

8

fiduciary obligations under the law and (ii) the Recipient is not involved in, and does not advise or consult on, the marketing, government relations, customer relations, or the day-to-day management, supervision, or operations of such Competitive Business; and it is further agreed that

      (c)    in consideration for the continued vesting treatment afforded to the Recipient under section 5(a), Recipient shall, during the Continued Vesting Period, refrain from making, or causing or assisting any other person to make, any oral or written communication to any third party about the Company, any Affiliate and/or any of the employees, officers or directors of the Company or any Affiliate which impugns or attacks, or is otherwise critical of, the reputation, business or character of such entity or person; or that discloses private or confidential information about their business affairs; or that constitutes an intrusion into their seclusion or private lives; or that gives rise to unreasonable publicity about their private lives; or that places them in a false light before the public; or that constitutes a misappropriation of their name or likeness.

Notwithstanding the foregoing provisions of this section 5 of the Agreement, (i) in the event that the Recipient fails to satisfy any of the conditions set forth in sections 5(a), (b) and (c) above, the Recipient shall not be entitled to vest in any unvested RSUs after the date of Retirement and the unvested RSUs subject to this Agreement shall be forfeited and (ii) the Recipient shall not have any right to continue to vest upon Retirement in any future awards granted under the Plan once the Recipient provides the notice of Retirement as set forth in section 5(a) above.

      6.    Prohibited Activity. In consideration for this Grant and except as permitted under section 5(b) above, the Recipient agrees not to engage in any "Prohibited Activity" while employed by the Company or within three years after the date of the Recipient's termination of employment. A "Prohibited Activity" will be deemed to have occurred, as determined by the Committee in its sole and absolute discretion, if the Recipient (i) divulges any non-public, confidential or proprietary information of the Company, but excluding information that (a) becomes generally available to the public other than as a result of the Recipient's public use, disclosure, or fault, or (b) becomes available to the Recipient on a non-confidential basis after the Recipient's employment termination date from a source other than the Company prior to the public use or disclosure by the Recipient, provided that such source is not bound by a confidentiality agreement or otherwise prohibited from transmitting the information by contractual, legal or fiduciary obligation; (ii) directly or indirectly, consults with or becomes affiliated with, participate or engage in, or becomes employed by any business that is competitive with the Company, wherever from time to time conducted throughout the world, including situations where the Recipient solicits or participates in or assists in any way in the solicitation or recruitment, directly or indirectly, of any employees of the Company; or (iii) engages in publishing any oral or written statements about the Company, and/or any of its directors, officers, or employees that are disparaging, slanderous, libelous, or defamatory; or that disclose private or confidential information about their business affairs; or that constitute an intrusion into their seclusion or private lives; or that give rise to unreasonable publicity about their private lives; or that place them in a false light before the public; or that constitute a misappropriation of their name or likeness.

      7.    Payment and Tax Withholding. Upon receipt of any entitlement to cash under this Agreement and, if applicable, upon the Recipient's attainment of eligibility to terminate employment by reason of Retirement pursuant to section 3(b), the Recipient shall make appropriate arrangements with the Company to provide for the amount of minimum tax and social security

Debtors' Exhibit No. 64
Page 168 of 413

withholding, if any, required by law, including without limitation Sections 3102 and 3402 or any successor section(s) of the Internal Revenue Code and applicable state and local income and other tax laws. The payment of a Payout Amount shall be based on the Fair Market Value of the shares of Stock on the applicable date of vesting to which such tax withholding relates. Where appropriate, cash shall be withheld by the Company to satisfy applicable tax withholding requirements rather than paid directly to the Recipient.

8.  Non-Transferability of Grant.  A Grant shall not be transferable otherwise than by testamentary will or the laws of descent and distribution, or in accordance with a valid beneficiary designation on a form approved by the Committee, subject to the conditions and exceptions set forth in Section 15.2 of the Plan.

9.  No Right to Continued Employment.  Neither the RSUs or the cash payment pursuant to a Grant nor any terms contained in this Agreement shall confer upon the Recipient any express or implied right to be retained in the employment or service of the Company for any period, nor restrict in any way the right of the Company, which right is hereby expressly reserved, to terminate the Recipient's employment or service at any time for any reason or no reason. The Recipient acknowledges and agrees that any right to receive RSUs or cash pursuant to a Grant is earned only by continuing as an employee of the Company at the will of the Company, or satisfaction of any other applicable terms and conditions contained in the Plan and this Agreement, and not through the act of being hired, being granted the Grant, or acquiring RSUs or cash pursuant to the Grant hereunder.

10.  The Plan.  In consideration for this Grant, the Recipient agrees to comply with the terms of the Plan and this Agreement. This Agreement is subject to all the terms, provisions and conditions of the Plan, which are incorporated herein by reference, and to such regulations as may from time to time be adopted by the Committee. The Grant is a Cash-Based Award under Section 10 of the Plan and is subject to the provisions of the Plan governing RSUs. Unless defined herein, capitalized terms are used herein as defined in the Plan. In the event of any conflict between the provisions of the Plan and this Agreement, the provisions of the Plan shall control, and this Agreement shall be deemed to be modified accordingly. The Plan and the prospectus describing the Plan can be found on the Company's HR intranet and the Plan document can be found on Fidelity's website (netbenefits.fidelity.com). A paper copy of the Plan and the prospectus shall be provided to the recipient upon the Recipient's written request to the Company at 2000 Post Oak Blvd., Suite 100, Houston, Texas 77056-4400, Attention: Corporate Secretary.

11.  Compliance with Laws and Regulations.

(a)  The Grant and any obligation of the Company to deliver RSUs and cash hereunder shall be subject in all respects to (i) all applicable laws, rules and regulations and (ii) any registration, qualification, approvals or other requirements imposed by any government or regulatory agency or body which the Committee shall, in its discretion, determine to be necessary or applicable.

(b)  This Grant is intended to comply with, or be exempt from, the applicable requirements of Section 409A of the Code and the rules and regulations issued thereunder and shall be administered accordingly. Notwithstanding anything in this Agreement to the contrary, if

10

the RSUs constitute "deferred compensation" under Section 409A of the Code and any RSUs become payable pursuant to the Recipient's termination of employment, settlement of the RSUs shall be delayed for a period of six months after the Recipient's termination of employment if the Recipient is a "specified employee" as defined under Code Section 409A(a)(2)(B)(i) and if required pursuant to Section 409A of the Code.  If settlement of the RSU is delayed, the RSUs shall be settled on the first day of the first calendar month following the end of the six-month delay period.  If the Recipient dies during the six-month delay, the RSUs shall be settled and paid to the Recipient's designated beneficiary, legal representatives, heirs or legatees, as applicable, as soon as practicable after the date of death.  Notwithstanding any provisions to the contrary herein, payments made with respect to this Grant may only be made in a manner and upon an event permitted by Section 409A of the Code, and all payments to be made upon a termination of employment hereunder may only be made upon a "separation from service", as such term is defined in Section 11.1 of the Plan.  Recipient shall not have any right to determine a date of payment of any amount under this Agreement.  This Agreement may be amended without the consent of the Recipient in any respect deemed by the Board or the Committee to be necessary in order to preserve compliance with Section 409A of the Code. If the Grant and this Agreement is subject to Section 409A of the Code and the rules and regulations issued thereunder, then the vesting date shall be the "designated payment date" or "specified date" under Treasury Regulation 1.409A-3(d).

      12.    Notices.  Unless otherwise provided in this Agreement, all notices by the Recipient or the Recipient's assignees shall be addressed to the Administrative Agent, Fidelity, through the Recipient's account at netbenefits.fidelity.com, or such other address as the Company may from time to time specify.  All notices to the Recipient shall be addressed to the Recipient at the Recipient's address in the Company's records.

      13.    Other Plans.  The Recipient acknowledges that any income derived from the Grant shall not affect the Recipient's participation in, or benefits under, any other benefit plan or other contract or arrangement maintained by the Company or any Affiliate.

      14.    Terms of Employment.  The Plan is a discretionary plan.  The Recipient hereby acknowledges that neither the Plan nor this Agreement forms part of the Recipient's terms of employment and nothing in the Plan may be construed as imposing on the Company or any Affiliate a contractual obligation to offer participation in the Plan to any employee of the Company or any Affiliate.  The Company or any Affiliate is under no obligation to make further Grants to any Recipient under the Plan.  The Recipient hereby acknowledges that if the Recipient ceases to be an employee of the Company or any Affiliate for any reason or no reason, the Recipient shall not be entitled by way of compensation for loss of office or otherwise howsoever to any sum.

      15.    Data Protection.  By accepting this Agreement (whether by electronic means or otherwise), the Recipient hereby consents to the holding and processing of personal data provided by the Recipient to the Company for all purposes necessary for the operation of the Plan.  These include, but are not limited to:

      (a)    administering and maintaining Recipient records;

      (b)    providing information to any registrars, brokers or third party administrators of the Plan; and

11

(c)     providing information to future purchasers of the Company or the business in which the Recipient works.

16.    <u>Severability</u>.  If any provision of this Agreement is held invalid or unenforceable, the remainder of this Agreement shall nevertheless remain in full force and effect, and if any provision is held invalid or unenforceable with respect to particular circumstances, it shall nevertheless remain in full force and effect in all other circumstances, to the fullest extent permitted by law.

*****

12

Exhibit "A"

**Apache Corporation**
**Retirement Matrix**

| Age at Retirement | Points (Age at Retirement + Years of Service) | | | | | | | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | 60 | 61 | 62 | 63 | 64 | 65 | 66 | 67 | 68 | 69 | 70 | 71 | 72 | 73 | 74 | 75 | 76 | 77 | 78 | 79 | 80 |
| 70 | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 100% | 100% | 100% | 100% | 100% | 100% |
| 69 | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 100% | 100% | 100% | 100% | 100% | 100% | 100% |
| 68 | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 100% | 100% | 100% | 100% | 100% | 100% | 100% | 100% |
| 67 | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 100% | 100% | 100% | 100% | 100% | 100% | 100% | 100% | 100% |
| 66 | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 100% | 100% | 100% | 100% | 100% | 100% | 100% | 100% | 100% | 100% |
| 65 | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 100% | 100% | 100% | 100% | 100% | 100% | 100% | 100% | 100% | 100% | 100% |
| 64 | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 50% | 75% | 75% | 75% | 75% | 75% | 75% | 75% | 75% | 75% | 75% | 100% |
| 63 | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 50% | 50% | 75% | 75% | 75% | 75% | 75% | 75% | 75% | 75% | 75% | 75% | 100% |
| 62 | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 50% | 50% | 50% | 75% | 75% | 75% | 75% | 75% | 75% | 75% | 75% | 75% | 75% | 100% |
| 61 | 0% | 0% | 0% | 0% | 0% | 0% | 50% | 50% | 50% | 50% | 75% | 75% | 75% | 75% | 75% | 75% | 75% | 75% | 75% | 75% | 100% |
| 60 | 0% | 0% | 0% | 0% | 0% | 50% | 50% | 50% | 50% | 50% | 75% | 75% | 75% | 75% | 75% | 75% | 75% | 75% | 75% | 75% | 100% |
| 59 | 0% | 0% | 0% | 0% | 0% | 50% | 50% | 50% | 50% | 50% | 50% | 50% | 50% | 50% | 50% | 75% | 75% | 75% | 75% | 75% | 100% |
| 58 | 0% | 0% | 0% | 0% | 0% | 50% | 50% | 50% | 50% | 50% | 50% | 50% | 50% | 50% | 50% | 75% | 75% | 75% | 75% | 75% | 100% |
| 57 | 0% | 0% | 0% | 0% | 0% | 50% | 50% | 50% | 50% | 50% | 50% | 50% | 50% | 50% | 50% | 75% | 75% | 75% | 75% | 75% | 100% |
| 56 | 0% | 0% | 0% | 0% | 0% | 50% | 50% | 50% | 50% | 50% | 50% | 50% | 50% | 50% | 50% | 75% | 75% | 75% | 75% | 75% | 100% |
| 55 | 0% | 0% | 0% | 0% | 0% | 50% | 50% | 50% | 50% | 50% | 50% | 50% | 50% | 50% | 50% | 75% | 75% | 75% | 75% | 75% | 100% |



| |
|---|
| 0% |
| 50% |
| 75% |
| 100% |

13

Exhibit 10.45

## SCHEDULE A

**Apache Corporation**

**Restricted Stock Unit Award Agreement**

### GRANT NOTICE

| | |
|---|---|
| **Recipient Name:** | [Name] |
| **Company:** | Apache Corporation |
| **Notice:** | A summary of the terms of your grant of Restricted Stock Units ("RSUs") is set out in this notice (the "Grant Notice") but subject always to the terms of the Apache Corporation 2016 Omnibus Compensation Plan (the "Plan") and the Restricted Stock Unit Award Agreement (the "Agreement").   In the event of any inconsistency between the terms of this Grant Notice, the terms of the Plan and the Agreement, the terms of the Plan and the Agreement shall prevail. The Grant is a Cash-Based Award under Section 10 of the Plan and is subject to the provisions of the Plan governing RSUs. |
| | You have been awarded a grant of Apache Corporation RSUs in accordance with the terms of the Plan and the Agreement. |
| | Details of the RSUs which you are entitled to receive is provided to you in this Grant Notice and maintained on your account at netbenefits.fidelity.com. |
| **Type of Award:** | Restricted Stock Unit(s) |
| **Restricted Stock Unit:** | A Restricted Stock Unit ("RSU") as defined in the Plan and meaning the right granted to the Recipient to receive one share of Stock or the cash equivalent thereof for each RSU at the end of the specified Vesting Period. |
| **Stock:** | The $0.625 par value common stock of the Company or as otherwise defined in the Plan. |
| **Grant:** | A Grant related to _____ Restricted Stock Units. |
| **Grant Date:** | [Date] |
| **Conditions:** | The Recipient may elect, at the time of the grant, to have his or her RSUs deferred into the Deferred Delivery Plan (the "DDP") when |

1

the RSUs vest, in which case the Recipient will receive the value of the RSUs in cash at the times specified pursuant to the DDP. For RSUs that are not deferred, once the RSU vests, the Recipient shall be paid the value of his or her RSUs in cash (net of cash withheld for applicable tax withholdings).

**Vesting Period:** RSUs granted shall vest (i.e., restrictions shall lapse) in accordance with the following schedule (the "Vesting Period"), provided that the Recipient remains employed as an Eligible Person as of such vesting date:

First day of the month following the first anniversary of the Grant Date – 1/3 vested.

Second anniversary of the Grant Date – an additional 1/3 vested.

Third anniversary of the Grant Date – an additional 1/3 vested.

Notwithstanding the foregoing, if the Recipient's termination of employment from the Company and the Affiliates occurs by reason of his or her Retirement, the Recipient shall be deemed to continue to be employed as an Eligible Person for purposes of this Grant and shall continue to vest with respect to a specified percentage of RSUs over the Vesting Period set forth above provided that the Recipient meets the Retirement Conditions set forth in section 5 of the Agreement.

Upon vesting (other than upon death or Disability), the applicable amount of cash, subject to required tax withholding, shall be paid by the Company to the Recipient within thirty (30) days of the vesting date, unless the Recipient had elected to defer such RSUs into the DDP, in which case the applicable amount of cash shall be paid to the DDP on the vesting date and paid out according to the provisions of the DDP.

Vesting is accelerated to 100% upon the Recipient's death or cessation of employment by reason of Disability while an Eligible Person (or, only in the case of death, while treated as an Eligible Person following Retirement as described above) during the Vesting Period. Upon vesting, the applicable amount of cash, subject to required tax withholding, shall be paid by the Company to the Recipient's designated beneficiary, legal representatives, heirs, or legatees, as applicable, in accordance with the terms of the Plan and this Agreement. The Recipient can name a beneficiary on a form approved by the Committee.

Vesting is accelerated to 100% upon the Recipient's Involuntary Termination or Voluntary Termination with Cause occurring on or

2

after a Change of Control that occurs during the Vesting Period. With respect to a Recipient who continues to vest following his or her termination due to Retirement, vesting is accelerated to 100% upon a Change of Control that occurs during the Vesting Period and on or after such termination by reason of Retirement.  With respect to a Recipient who terminates employment by reason of Retirement after a Change of Control, vesting is accelerated to 100% upon the Recipient's termination of employment by reason of Retirement.   Unless expressly otherwise provided in the Agreement with respect to Retirement and Change of Control, the applicable amount of cash, subject to required tax withholding, shall be paid by the Company to the Recipient within thirty (30) days of the vesting date, unless the Recipient had elected to defer such RSUs into the DDP, in which case the applicable amount of cash shall be paid to the DDP on the vesting date and paid out according to the provisions of the DDP.

**Withholding:**

The Company and the Recipient will comply with all federal and state laws and regulations respecting the required withholding, deposit, and payment of any income, employment, or other taxes relating to the Grant.

**Dividends:**

The Company will credit each of the Recipient's RSUs with Dividend Equivalents.  For purposes of this Grant, a Dividend Equivalent is an amount equal to the cash dividend payable per share of Stock multiplied by the number of shares of Stock then underlying such outstanding RSUs.  Such amount will be credited to a book entry account on Recipient's behalf at the time the Company pays any cash dividend on its Stock.  The Recipient's rights in any such Dividend Equivalents will vest at the same time as, and only to the extent that, the underlying RSUs vest and will be distributed at the same time in cash (subject to applicable withholdings), and only to the extent, as the related RSUs are to be distributed to the Recipient as provided in the Agreement and to which such Dividend Equivalents apply.

**Acceptance:**

Please complete the on-line grant acceptance as promptly as possible to accept or reject your Grant.  You can access this through your account at netbenefits.fidelity.com.  By accepting your Grant, you will have agreed to the terms and conditions set forth in the Agreement, including, but not limited to, the non-compete and non-disparagement provisions set forth in sections 5 and 6 of the Agreement, and the terms and conditions of the Plan. If you do not accept your Grant, your RSUs will not vest and you will be unable to receive your RSUs.

3

**Apache Corporation**

**Restricted Stock Unit Award Agreement**

This Restricted Stock Unit Award Agreement (the "Agreement") relating to a grant of Restricted Stock Units (as defined in the definition section of the Apache Corporation 2016 Omnibus Compensation Plan (the "Plan")) (the "Grant"), dated as of the Grant Date set forth in the Notice of Award under the Agreement attached as Schedule A hereto (the "Grant Notice"), is made between Apache Corporation (together with its Affiliates, the "Company") and each Recipient. The Grant Notice is included in and made part of this Agreement.

In this Agreement and each Grant Notice, unless the context otherwise requires, words and expressions shall have the meanings given to them in the Plan except as herein defined.

<u>Definitions</u>

"<u>409A Change of Control</u>" means a Change of Control that constitutes, with respect to Apache Corporation, a "change in the ownership or effective control of the corporation, or in the ownership of a substantial portion of the assets of the corporation" within the meaning of Section 409A(a)(2)(A)(v) of the Internal Revenue Code of 1986, as amended (the "Code") and Treasury Regulations Section 1.409A-3(i)(5).

"<u>Disability</u>" or "<u>Disabled</u>" means the Recipient is unable to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months. Recipient agrees that a final and binding determination of "Disability" will be made by the Company's representative under the Company's group long-term disability plan or any successor thereto or, if there is no such representative and there is a dispute as to the determination of "Disability," it will be decided in a court of law in Harris County, Texas.

"<u>Grant Notice</u>" means the separate notice given to each Recipient specifying the number of RSUs granted to the Recipient (the "<u>Grant</u>").

"<u>Fair Market Value</u>" means the fair market value of a share of the Stock as determined by the Committee by the reasonable application of such reasonable valuation method, consistently applied, as the Committee deems appropriate; provided, however, that if the Committee has not made such determination, such fair market value shall be the per share closing price of the Stock as reported on Nasdaq or on such other exchange or electronic trading system as, on the date in question, reports the largest number of traded shares of stock; provided further, however, that if there are no Stock transactions on such date, the Fair Market Value shall be determined as of the immediately preceding date on which there were Stock transactions.

"<u>Involuntary Termination</u>" means the termination of employment of the Recipient by the Company or its successor for any reason on or after a Change of Control; provided, that the termination does not result from an act of the Recipient that (i) constitutes common-law fraud, a felony, or a gross malfeasance of duty and (ii) is materially detrimental to the best interests of the Company or its successor.

4

"Payout Amount" means the vested portion of the Grant expressed as an amount of cash equal to the Fair Market Value of the shares of Stock underlying the RSUs and related Dividend Equivalents.

"Recipient" means an Eligible Person designated by the Committee at the Grant Date to receive one or more Grants under the Plan.

"Retirement" means, with respect to a Recipient and for purposes of this Agreement, the date the Recipient terminates employment with the Company after attaining (i) age 55 and (ii) a certain combination of age and Years of Service set forth in the Matrix in Exhibit "A" attached hereto.

"Years of Service" means the total number of months from the Recipient's date of hire by the Company to the date of termination of employment, plus any months required to be recognized under an appropriate acquisition agreement, divided by 12.

"Voluntary Termination with Cause" occurs upon a Recipient's separation from service of his or her own volition and one or more of the following conditions occurs without the Recipient's consent on or after a Change of Control:

(a)     There is a material diminution in the Recipient's base compensation, compared to his or her rate of base compensation on the date of the Change of Control.

(b)     There is a material diminution in the Recipient's authority, duties or responsibilities.

(c)     There is a material diminution in the authority, duties or responsibilities of the Recipient's supervisor, such as a requirement that the Recipient (or his or her supervisor) report to a corporate officer or employee instead of reporting directly to the board of directors.

(d)     There is a material diminution in the budget over which the Recipient retains authority.

(e)     There is a material change in the geographic location at which the Recipient must perform his or her service, including, for example the assignment of the Recipient to a regular workplace that is more than 50 miles from his or her regular workplace on the date of the Change of Control.

The Recipient must notify the Company of the existence of one or more adverse conditions specified in clauses (a) through (e) above within 90 days of the initial existence of the adverse condition.  The notice must be provided in writing to the Company or its successor, attention: Vice President, Human Resources. The notice may be provided by personal delivery or it may be sent by email, inter-office mail, regular mail (whether or not certified), fax, or any similar method.  The Company's Vice President, Human Resources, or his/her delegate shall acknowledge receipt of the notice

5

within 5 business days; the acknowledgement shall be sent to the Recipient by certified mail.  Notwithstanding the foregoing provisions of this definition, if the Company remedies the adverse condition within 30 days of being notified of the adverse condition, no Voluntary Termination with Cause shall occur.

**Terms**

1.      Grant of RSUs.  Subject to the provisions of this Agreement and the provisions of the Plan and Grant Notice, the Company shall grant to the Recipient, pursuant to the Plan, a right to receive the number of RSUs set forth in the Recipient's Grant Notice.  The Grant shall give the Recipient the right, upon vesting, to receive an amount in cash equal to the Fair Market Value of an equal number of shares of $0.625 par value common stock of the Company ("Stock") to that of the number of RSUs set forth in the Recipient's Grant Notice.  At the time of the Grant, the Recipient may elect to defer all or any portion of the RSUs in the Deferred Delivery Plan (the "DDP").

2.      Vesting and Payment of Cash.  Subject to the provisions of sections 3 and 4 of this Agreement, the entitlement to receive an amount of cash equal to the Fair Market Value of the number of shares of Stock pursuant to the RSUs comprising the Grant Amount shall vest in accordance with the schedule set forth in the Grant Notice (the "Vesting Period"); provided that the Recipient remains employed as an Eligible Person on such applicable vesting dates.  Unless the Recipient elected to defer the RSU into the DDP, such cash, subject to applicable withholding, shall be paid by the Company to the Recipient within thirty (30) days of the vesting date (other than upon death or Disability).  To the extent that the Recipient elected to defer the RSUs into the DDP and sections 3 and 4 do not apply, when the RSUs vest, an amount of cash equal to the Fair Market Value of the number of shares of Stock that have vested pursuant to the RSUs comprising the Grant Amount shall be paid to the DDP and paid thereafter to the Recipient as specified under the terms of the DDP.

3.      Termination of Employment, Retirement, Death, or Disability.  Except as set forth below in this section 3 and in section 4 of this Agreement, each Grant shall be subject to the condition that the Recipient has remained an Eligible Person from the award of the Grant of RSUs until the applicable vesting date as follows:

(a)      If the Recipient voluntarily leaves the employment of the Company (other than for reason of Retirement), or if the employment of the Recipient is terminated by the Company for any reason or no reason, any RSUs granted to the Recipient pursuant to the Grant Notice not previously vested shall thereafter be void and forfeited for all purposes.

(b)      If the Recipient leaves the employment of the Company by reason of Retirement, the RSUs granted to the Recipient pursuant to the Grant Notice not previously vested shall continue to vest following the Recipient's termination of employment by reason of Retirement as if the Recipient remained an Eligible Person in the employ of the Company, provided that such Recipient shall be entitled to continue vesting only if such Recipient satisfies the Retirement Conditions set forth in section 5 below (except in the case of death) and only with respect to the specified percentage of such unvested RSUs set forth in Exhibit "A" for a certain combination of

6

age and Years of Service attained by the Recipient as of the Recipient's Retirement under the Matrix set forth in Exhibit "A".

(c)     A Recipient shall become 100% vested in all RSUs under the Grant Notice on the date the Recipient dies while employed by the Company regardless whether Recipient has accepted the Grant, or on the date the Recipient is no longer employed by the Company by reason of Disability, or, only in the case of death, while continuing to vest pursuant to section 3(b) of this Agreement.  Payment shall be made as soon as administratively practicable, but in no event (i) in the case of death, shall the payment occur later than the last day of the calendar year following the calendar year in which such death occurs or (ii) in the case of cessation of employment by reason of Disability, shall the payment occur later than thirty (30) days following the date the Recipient is determined to be Disabled and is no longer employed by the Company.  If clause (ii) is applicable and the period from the date on which the Recipient is determined to be Disabled and is no longer employed by the Company to the date under clause (ii) spans two consecutive calendar years, payment shall be made in the second calendar year of such consecutive calendar years.  Such payment shall be made to the Recipient's designated beneficiary, legal representatives, heirs, or legatees, as applicable.  Each Recipient may designate a beneficiary on a form approved by the Committee.

4.     Change of Control.  Pursuant to Section 13.1(c)(iii) and (d) of the Plan, the following provisions of this section 4 of the Agreement shall supersede Sections 13.1(a), (b) and (c) of the Plan.  Without any further action by the Committee or the Board, in the event of a Recipient's Involuntary Termination or Voluntary Termination with Cause occurring on or after a Change of Control during the Vesting Period, the Recipient shall become 100% fully vested in the unvested RSUs granted to the Recipient pursuant to the Grant Notice as of the date of his or her Involuntary Termination or Voluntary Termination with Cause. Subject to section 11(b) of this Agreement, payment shall occur within thirty (30) days following the date of such Involuntary Termination or Voluntary Termination with Cause, subject to required tax withholding. Further, in the event of a Change of Control following the Recipient's termination of employment by reason of Retirement while the Recipient is continuing to vest in the RSUs pursuant to section 3(b) of this Agreement, the Recipient shall become 100% fully vested in the unvested RSUs granted to the Recipient pursuant to the Grant Notice as of the date of the Change of Control (including those excluded by the specified percentage set forth in Exhibit "A"). Subject to section 11(b) of this Agreement, the Recipient, if the Recipient terminates employment on account of Retirement prior to the occurrence of a Change of Control, shall receive payment with respect to 100% of the fully vested RSUs within thirty (30) days of the date of a 409A Change of Control, or if the Change of Control is not a 409A Change of Control, on the remaining vesting dates during the Vesting Period in the amount of 1/3 (on each of the remaining vesting dates) of the RSUs awarded as of the Grant Date, subject to required tax withholding.  Further still, in the event of a Change of Control prior to the Recipient's termination of employment by reason of Retirement during the Vesting Period, the Recipient shall become 100% fully vested in the unvested RSUs granted to the Recipient pursuant to the Grant Notice as of the date the Recipient terminates employment by reason of Retirement (including those excluded by the specified percentage set forth in Exhibit "A").  For the purpose of vesting as set forth in the prior sentence, a Recipient's Involuntary Termination or Voluntary Termination with Cause after a Change of Control shall be deemed a termination by reason of Retirement.   Subject to section 11(b) of this Agreement, the Recipient, who terminates

7

employment by reason of Retirement after a Change of Control, shall receive payment with respect to 100% of the fully vested RSUs on the remaining vesting dates during the Vesting Period in the amount of 1/3 (on each of the remaining vesting dates) of the RSUs awarded as of the Grant Date, subject to required tax withholding.

5. <u>Conditions to Post-Retirement Vesting</u>. If the Recipient has attained age 55 and a certain combination of age and Years of Service set forth in the Matrix in Exhibit "A" attached hereto and terminates employment with the Company and the Affiliates by reason of Retirement, it is agreed by the Company and the Recipient that:

(a) subject to the provisions of this section 5(a) and sections 5(b) and 5(c), such Recipient shall continue to vest in the specified percentage of unvested RSUs set forth in Exhibit "A", for the combination of age and Years of Service attained by such Recipient as of his or her Retirement under the Matrix set forth in Exhibit "A", following the date of his or her termination by reason of Retirement as if the Recipient continued in employment as an Eligible Person provided that the Grant Date of the unvested RSUs is prior to such termination date in an amount of time which allows the Recipient to provide the written notice as follows and the Recipient has provided advance written notice not before three (3) months following the Grant Date and not less than the number of months prior to such termination date as set forth in the Schedule below to Apache Corporation's Vice President, Human Resources, or his or her delegate, and to his or her direct manager, regarding the Recipient's intent to terminate employment for reason of Retirement; <u>provided</u>, <u>however</u>, a Recipient who is at least age 55 and attained the necessary combination of age and Years of Service under the Matrix set forth in Exhibit "A" for Retirement need not provide such advance written notice of his or her intent to terminate employment by reason of Retirement if the Company elects to require such Recipient to, or (as part of a reduction in force or otherwise in writing in exchange for a written release) offers such Recipient the opportunity to, terminate employment with the Company by reason of Retirement:

| Age | Advance Written Notice |
|---|---|
| 65 or older | 3 months |
| between (and including) 55 and 64 | 6 months |

; and it is further agreed that

(b) in consideration for the continued vesting treatment afforded to the Recipient under section 5(a), Recipient shall, during the continuing Vesting Period after Retirement (the "Continued Vesting Period"), refrain from becoming employed by, or consulting with, or becoming substantially involved in the business of, any business that competes with the Company or its Affiliate in the business of exploration or production of oil or natural gas wherever from time to time conducted throughout the world (a "Competitive Business") and Recipient shall provide to the Company, upon Company's request, (x) a written certification, in a form provided by or satisfactory to the Company, as to Recipient's compliance with the forgoing conditions and/or (y) his/her U.S. Individual Income Tax Return for any return filed by the Recipient which relates to any time during the Continued Vesting Period to allow the Company to verify that Recipient has complied with the foregoing conditions; <u>provided</u>, that the Recipient may purchase and hold for investment purposes less than five percent (5%) of the shares of any

8

Competitive Business whose shares are regularly traded on a national securities exchange or inter-dealer quotation system, and provided further, that the Recipient may provide services solely as a director of any Competitive Business whose shares are regularly traded on a national securities exchange or inter-dealer quotation system if, during the Continued Vesting Period, (i) the Recipient only attends board and board committee meetings, votes on recommendations of management, and discharges his/her fiduciary obligations under the law and (ii) the Recipient is not involved in, and does not advise or consult on, the marketing, government relations, customer relations, or the day-to-day management, supervision, or operations of such Competitive Business; and it is further agreed that

(c)      in consideration for the continued vesting treatment afforded to the Recipient under section 5(a), Recipient shall, during the Continued Vesting Period, refrain from making, or causing or assisting any other person to make, any oral or written communication to any third party about the Company, any Affiliate and/or any of the employees, officers or directors of the Company or any Affiliate which impugns or attacks, or is otherwise critical of, the reputation, business or character of such entity or person; or that discloses private or confidential information about their business affairs; or that constitutes an intrusion into their seclusion or private lives; or that gives rise to unreasonable publicity about their private lives; or that places them in a false light before the public; or that constitutes a misappropriation of their name or likeness.

Notwithstanding the foregoing provisions of this section 5 of the Agreement, (i) in the event that the Recipient fails to satisfy any of the conditions set forth in sections 5(a), (b) and (c) above, the Recipient shall not be entitled to vest in any unvested RSUs after the date of Retirement and the unvested RSUs subject to this Agreement shall be forfeited and (ii) the Recipient shall not have any right to continue to vest upon Retirement in any future awards granted under the Plan once the Recipient provides the notice of Retirement as set forth in section 5(a) above.

6.      Prohibited Activity. In consideration for this Grant and except as permitted under section 5(b) above, the Recipient agrees not to engage in any "Prohibited Activity" while employed by the Company or within three years after the date of the Recipient's termination of employment. A "Prohibited Activity" will be deemed to have occurred, as determined by the Committee in its sole and absolute discretion, if the Recipient (i) divulges any non-public, confidential or proprietary information of the Company, but excluding information that (a) becomes generally available to the public other than as a result of the Recipient's public use, disclosure, or fault, or (b) becomes available to the Recipient on a non-confidential basis after the Recipient's employment termination date from a source other than the Company prior to the public use or disclosure by the Recipient, provided that such source is not bound by a confidentiality agreement or otherwise prohibited from transmitting the information by contractual, legal or fiduciary obligation; (ii) directly or indirectly, consults with or becomes affiliated with, participate or engage in, or becomes employed by any business that is competitive with the Company, wherever from time to time conducted throughout the world, including situations where the Recipient solicits or participates in or assists in any way in the solicitation or recruitment, directly or indirectly, of any employees of the Company; or (iii) engages in publishing any oral or written statements about the Company, and/or any of its directors, officers, or employees that are disparaging, slanderous, libelous, or defamatory; or that disclose private or confidential information about their business affairs; or that constitute an

9

intrusion into their seclusion or private lives; or that give rise to unreasonable publicity about their private lives; or that place them in a false light before the public; or that constitute a misappropriation of their name or likeness.

7.     Payment and Tax Withholding.  Upon receipt of any entitlement to cash under this Agreement and, if applicable, upon the Recipient's attainment of eligibility to terminate employment by reason of Retirement pursuant to section 3(b), the Recipient shall make appropriate arrangements with the Company to provide for the amount of minimum tax and social security withholding, if any, required by law, including without limitation Sections 3102 and 3402 or any successor section(s) of the Internal Revenue Code and applicable state and local income and other tax laws.  The payment of a Payout Amount shall be based on the Fair Market Value of the shares of Stock on the applicable date of vesting to which such tax withholding relates.  Where appropriate, cash shall be withheld by the Company to satisfy applicable tax withholding requirements rather than paid directly to the Recipient.

8.     Non-Transferability of Grant.  A Grant shall not be transferable otherwise than by testamentary will or the laws of descent and distribution, or in accordance with a valid beneficiary designation on a form approved by the Committee, subject to the conditions and exceptions set forth in Section 15.2 of the Plan.

9.     No Right to Continued Employment.  Neither the RSUs or the cash payment pursuant to a Grant nor any terms contained in this Agreement shall confer upon the Recipient any express or implied right to be retained in the employment or service of the Company for any period, nor restrict in any way the right of the Company, which right is hereby expressly reserved, to terminate the Recipient's employment or service at any time for any reason or no reason.  The Recipient acknowledges and agrees that any right to receive RSUs or cash pursuant to a Grant is earned only by continuing as an employee of the Company at the will of the Company, or satisfaction of any other applicable terms and conditions contained in the Plan and this Agreement, and not through the act of being hired, being granted the Grant, or acquiring RSUs or cash pursuant to the Grant hereunder.

10.    The Plan.  In consideration for this Grant, the Recipient agrees to comply with the terms of the Plan and this Agreement.  This Agreement is subject to all the terms, provisions and conditions of the Plan, which are incorporated herein by reference, and to such regulations as may from time to time be adopted by the Committee.  The Grant is a Cash-Based Award under Section 10 of the Plan and is subject to the provisions of the Plan governing RSUs.  Unless defined herein, capitalized terms are used herein as defined in the Plan.  In the event of any conflict between the provisions of the Plan and this Agreement, the provisions of the Plan shall control, and this Agreement shall be deemed to be modified accordingly.  The Plan and the prospectus describing the Plan can be found on the Company's HR intranet and the Plan document can be found on Fidelity's website (netbenefits.fidelity.com).  A paper copy of the Plan and the prospectus shall be provided to the recipient upon the Recipient's written request to the Company at 2000 Post Oak Blvd., Suite 100, Houston, Texas 77056-4400, Attention: Corporate Secretary.

11.    Compliance with Laws and Regulations.

10

Debtors' Exhibit No. 64
Page 182 of 413

(a)      The Grant and any obligation of the Company to deliver RSUs and cash hereunder shall be subject in all respects to (i) all applicable laws, rules and regulations and (ii) any registration, qualification, approvals or other requirements imposed by any government or regulatory agency or body which the Committee shall, in its discretion, determine to be necessary or applicable.

(b)      This Grant is intended to comply with, or be exempt from, the applicable requirements of Section 409A of the Code and the rules and regulations issued thereunder and shall be administered accordingly.  Notwithstanding anything in this Agreement to the contrary, if the RSUs constitute "deferred compensation" under Section 409A of the Code and any RSUs become payable pursuant to the Recipient's termination of employment, settlement of the RSUs shall be delayed for a period of six months after the Recipient's termination of employment if the Recipient is a "specified employee" as defined under Code Section 409A(a)(2)(B)(i) and if required pursuant to Section 409A of the Code.  If settlement of the RSU is delayed, the RSUs shall be settled on the first day of the first calendar month following the end of the six-month delay period.  If the Recipient dies during the six-month delay, the RSUs shall be settled and paid to the Recipient's designated beneficiary, legal representatives, heirs or legatees, as applicable, as soon as practicable after the date of death.  Notwithstanding any provisions to the contrary herein, payments made with respect to this Grant may only be made in a manner and upon an event permitted by Section 409A of the Code, and all payments to be made upon a termination of employment hereunder may only be made upon a "separation from service", as such term is defined in Section 11.1 of the Plan.  Recipient shall not have any right to determine a date of payment of any amount under this Agreement. This Agreement may be amended without the consent of the Recipient in any respect deemed by the Board or the Committee to be necessary in order to preserve compliance with Section 409A of the Code. If the Grant and this Agreement is subject to Section 409A of the Code and the rules and regulations issued thereunder, then the vesting date shall be the "designated payment date" or "specified date" under Treasury Regulation 1.409A-3(d).

12.      Notices.  Unless otherwise provided in this Agreement, all notices by the Recipient or the Recipient's assignees shall be addressed to the Administrative Agent, Fidelity, through the Recipient's account at netbenefits.fidelity.com, or such other address as the Company may from time to time specify.  All notices to the Recipient shall be addressed to the Recipient at the Recipient's address in the Company's records.

13.      Other Plans.  The Recipient acknowledges that any income derived from the Grant shall not affect the Recipient's participation in, or benefits under, any other benefit plan or other contract or arrangement maintained by the Company or any Affiliate.

14.      Terms of Employment.  The Plan is a discretionary plan.  The Recipient hereby acknowledges that neither the Plan nor this Agreement forms part of the Recipient's terms of employment and nothing in the Plan may be construed as imposing on the Company or any Affiliate a contractual obligation to offer participation in the Plan to any employee of the Company or any Affiliate.  The Company or any Affiliate is under no obligation to make further Grants to any Recipient under the Plan.  The Recipient hereby acknowledges that if the Recipient ceases to be an employee of the Company or any Affiliate for any reason or no reason, the

11

Recipient shall not be entitled by way of compensation for loss of office or otherwise howsoever to any sum.

15.     <u>Data Protection</u>.  By accepting this Agreement (whether by electronic means or otherwise), the Recipient hereby consents to the holding and processing of personal data provided by the Recipient to the Company for all purposes necessary for the operation of the Plan.  These include, but are not limited to:

(a)     administering and maintaining Recipient records;

(b)     providing information to any registrars, brokers or third party administrators of the Plan; and

(c)     providing information to future purchasers of the Company or the business in which the Recipient works.

16.     <u>Severability</u>.  If any provision of this Agreement is held invalid or unenforceable, the remainder of this Agreement shall nevertheless remain in full force and effect, and if any provision is held invalid or unenforceable with respect to particular circumstances, it shall nevertheless remain in full force and effect in all other circumstances, to the fullest extent permitted by law.

*****

12

Exhibit "A"

**Apache Corporation**
**Retirement Matrix**

| Age at Retirement | Points (Age at Retirement + Years of Service) | | | | | | | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | 60 | 61 | 62 | 63 | 64 | 65 | 66 | 67 | 68 | 69 | 70 | 71 | 72 | 73 | 74 | 75 | 76 | 77 | 78 | 79 | 80 |
| 70 | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 100% | 100% | 100% | 100% | 100% | 100% | 100% |
| 69 | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 100% | 100% | 100% | 100% | 100% | 100% | 100% | 100% |
| 68 | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 100% | 100% | 100% | 100% | 100% | 100% | 100% | 100% | 100% |
| 67 | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 100% | 100% | 100% | 100% | 100% | 100% | 100% | 100% | 100% | 100% |
| 66 | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 100% | 100% | 100% | 100% | 100% | 100% | 100% | 100% | 100% | 100% | 100% |
| 65 | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 100% | 100% | 100% | 100% | 100% | 100% | 100% | 100% | 100% | 100% | 100% |
| 64 | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 50% | 75% | 75% | 75% | 75% | 75% | 75% | 75% | 75% | 75% | 75% | 100% |
| 63 | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 50% | 50% | 75% | 75% | 75% | 75% | 75% | 75% | 75% | 75% | 75% | 75% | 100% |
| 62 | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 50% | 50% | 50% | 75% | 75% | 75% | 75% | 75% | 75% | 75% | 75% | 75% | 75% | 100% |
| 61 | 0% | 0% | 0% | 0% | 0% | 0% | 50% | 50% | 50% | 50% | 75% | 75% | 75% | 75% | 75% | 75% | 75% | 75% | 75% | 75% | 100% |
| 60 | 0% | 0% | 0% | 0% | 0% | 50% | 50% | 50% | 50% | 50% | 75% | 75% | 75% | 75% | 75% | 75% | 75% | 75% | 75% | 75% | 100% |
| 59 | 0% | 0% | 0% | 0% | 0% | 50% | 50% | 50% | 50% | 50% | 50% | 50% | 50% | 50% | 50% | 75% | 75% | 75% | 75% | 75% | 100% |
| 58 | 0% | 0% | 0% | 0% | 0% | 50% | 50% | 50% | 50% | 50% | 50% | 50% | 50% | 50% | 50% | 75% | 75% | 75% | 75% | 75% | 100% |
| 57 | 0% | 0% | 0% | 0% | 0% | 50% | 50% | 50% | 50% | 50% | 50% | 50% | 50% | 50% | 50% | 75% | 75% | 75% | 75% | 75% | 100% |
| 56 | 0% | 0% | 0% | 0% | 0% | 50% | 50% | 50% | 50% | 50% | 50% | 50% | 50% | 50% | 50% | 75% | 75% | 75% | 75% | 75% | 100% |
| 55 | 0% | 0% | 0% | 0% | 0% | 50% | 50% | 50% | 50% | 50% | 50% | 50% | 50% | 50% | 50% | 75% | 75% | 75% | 75% | 75% | 100% |



| 0% |
| 50% |
| 75% |
| 100% |

13

Exhibit 10.46

**SCHEDULE A**

**Apache Corporation**

**Restricted Stock Unit Award Agreement**

**GRANT NOTICE**

| | |
|---|---|
| **Recipient Name:** | [Name] |
| **Company:** | Apache Corporation |
| **Notice:** | A summary of the terms of your grant of Restricted Stock Units ("RSUs") is set out in this notice (the "Grant Notice") but subject always to the terms of the Apache Corporation 2016 Omnibus Compensation Plan (the "Plan") and the Restricted Stock Unit Award Agreement (the "Agreement").  In the event of any inconsistency between the terms of this Grant Notice, the terms of the Plan and the Agreement, the terms of the Plan and the Agreement shall prevail. |
| | You have been awarded a grant of Apache Corporation RSUs in accordance with the terms of the Plan and the Agreement. |
| | Details of the RSUs which you are entitled to receive is provided to you in this Grant Notice and maintained on your account at netbenefits.fidelity.com. |
| **Type of Award:** | Restricted Stock Unit(s) |
| **Restricted Stock Unit:** | A Restricted Stock Unit ("RSU") as defined in the Plan and meaning the right granted to the Recipient to receive one share of Stock for each RSU at the end of the specified Vesting Period. |
| **Stock:** | The $0.625 par value common stock of the Company or as otherwise defined in the Plan. |
| **Grant:** | A Grant related to _____ Restricted Stock Units. |
| **Grant Date:** | [Date] |
| **Conditions:** | The Recipient may elect, at the time of the grant, to have his or her RSUs deferred into the Deferred Delivery Plan (the "DDP") when the RSUs vest, in which case the Recipient will receive the value of the RSUs at the times specified pursuant to the DDP.  For RSUs that are not deferred, once the RSU vests, the Recipient shall be |

1

paid the value of his or her RSUs in shares of Stock (net of shares withheld for applicable tax withholdings).

**Vesting Period:** RSUs granted shall vest (i.e., restrictions shall lapse) in accordance with the following schedule (the "Vesting Period"), provided that the Recipient remains employed as an Eligible Person as of such vesting date:

First day of the month following the first anniversary of the Grant Date – 1/3 vested.

Second anniversary of the Grant Date – an additional 1/3 vested.

Third anniversary of the Grant Date – an additional 1/3 vested.

Notwithstanding the foregoing, if the Recipient's termination of employment from the Company and the Affiliates occurs by reason of his or her Retirement, the Recipient shall be deemed to continue to be employed as an Eligible Person for purposes of this Grant and shall continue to vest with respect to a specified percentage of RSUs over the Vesting Period set forth above provided that the Recipient meets the Retirement Conditions set forth in section 5 of the Agreement.

Upon vesting (other than upon death or Disability), the applicable shares of Stock, subject to required tax withholding, shall be transferred by the Company to the Recipient within thirty (30) days of the vesting date, unless the Recipient had elected to defer such RSUs into the DDP, in which case the RSUs shall be transferred to the DDP on the vesting date and paid out according to the provisions of the DDP.

Vesting is accelerated to 100% upon the Recipient's death or cessation of employment by reason of Disability while an Eligible Person (or, only in the case of death, while treated as an Eligible Person following Retirement as described above) during the Vesting Period. Upon vesting, the applicable shares of Stock, subject to required tax withholding, shall be transferred by the Company to the Recipient's designated beneficiary, legal representatives, heirs, or legatees, as applicable, in accordance with the terms of the Plan and this Agreement. The Recipient can name a beneficiary on a form approved by the Committee.

Vesting is accelerated to 100% upon the Recipient's Involuntary Termination or Voluntary Termination with Cause occurring on or after a Change of Control that occurs during the Vesting Period. With respect to a Recipient who continues to vest following his or her termination due to Retirement, vesting is accelerated to 100%

2

upon a Change of Control that occurs during the Vesting Period and on or after such termination by reason of Retirement. With respect to a Recipient who terminates employment by reason of Retirement after a Change of Control, vesting is accelerated to 100% upon the Recipient's termination of employment by reason of Retirement. Unless expressly otherwise provided in the Agreement with respect to Retirement and Change of Control, the applicable amount of shares of Stock, subject to required tax withholding, shall be transferred by the Company to the Recipient within thirty (30) days of the vesting date, unless the Recipient had elected to defer such RSUs into the DDP, in which case the RSUs shall be transferred to the DDP on the vesting date and paid out according to the provisions of the DDP.

**Withholding:** The Company and the Recipient will comply with all federal and state laws and regulations respecting the required withholding, deposit, and payment of any income, employment, or other taxes relating to the Grant.

**Dividends:** The Company will credit each of the Recipient's RSUs with Dividend Equivalents. For purposes of this Grant, a Dividend Equivalent is an amount equal to the cash dividend payable per share of Stock multiplied by the number of shares of Stock then underlying such outstanding RSUs. Such amount will be credited to a book entry account on Recipient's behalf at the time the Company pays any cash dividend on its Stock. The Recipient's rights in any such Dividend Equivalents will vest at the same time as, and only to the extent that, the underlying RSUs vest and will be distributed at the same time in cash (subject to applicable withholdings), and only to the extent, as the related RSUs are to be distributed to the Recipient as provided in the Agreement and to which such Dividend Equivalents apply.

**Acceptance:** Please complete the on-line grant acceptance as promptly as possible to accept or reject your Grant. You can access this through your account at netbenefits.fidelity.com. By accepting your Grant, you will have agreed to the terms and conditions set forth in the Agreement, including, but not limited to, the non-compete and non-disparagement provisions set forth in sections 5 and 6 of the Agreement, and the terms and conditions of the Plan. If you do not accept your Grant, your RSUs will not vest and you will be unable to receive your RSUs.

3

**Apache Corporation**

**Restricted Stock Unit Award Agreement**

This Restricted Stock Unit Award Agreement (the "Agreement") relating to a grant of Restricted Stock Units (as defined in the definition section of the Apache Corporation 2016 Omnibus Compensation Plan (the "Plan")) (the "Grant"), dated as of the Grant Date set forth in the Notice of Award under the Agreement attached as Schedule A hereto (the "Grant Notice"), is made between Apache Corporation (together with its Affiliates, the "Company") and each Recipient. The Grant Notice is included in and made part of this Agreement.

In this Agreement and each Grant Notice, unless the context otherwise requires, words and expressions shall have the meanings given to them in the Plan except as herein defined.

<u>Definitions</u>

"<u>409A Change of Control</u>" means a Change of Control that constitutes, with respect to Apache Corporation, a "change in the ownership or effective control of the corporation, or in the ownership of a substantial portion of the assets of the corporation" within the meaning of Section 409A(a)(2)(A)(v) of the Internal Revenue Code of 1986, as amended (the "Code") and Treasury Regulations Section 1.409A-3(i)(5).

"<u>Disability</u>" or "<u>Disabled</u>" means the Recipient is unable to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months. Recipient agrees that a final and binding determination of "Disability" will be made by the Company's representative under the Company's group long-term disability plan or any successor thereto or, if there is no such representative and there is a dispute as to the determination of "Disability," it will be decided in a court of law in Harris County, Texas.

"<u>Grant Notice</u>" means the separate notice given to each Recipient specifying the number of RSUs granted to the Recipient (the "<u>Grant</u>").

"<u>Fair Market Value</u>" means the fair market value of a share of the Stock as determined by the Committee by the reasonable application of such reasonable valuation method, consistently applied, as the Committee deems appropriate; provided, however, that if the Committee has not made such determination, such fair market value shall be the per share closing price of the Stock as reported on Nasdaq or on such other exchange or electronic trading system as, on the date in question, reports the largest number of traded shares of stock; provided further, however, that if there are no Stock transactions on such date, the Fair Market Value shall be determined as of the immediately preceding date on which there were Stock transactions.

"<u>Involuntary Termination</u>" means the termination of employment of the Recipient by the Company or its successor for any reason on or after a Change of Control; provided, that the termination does not result from an act of the Recipient that (i) constitutes common-law fraud, a felony, or a gross malfeasance of duty and (ii) is materially detrimental to the best interests of the Company or its successor.

4

Debtors' Exhibit No. 64
Page 189 of 413

"Payout Amount" means the vested portion of the Grant, along with any Dividend Equivalents related thereto as specified in the Grant Notice, expressed as shares of Stock underlying the RSUs and related Dividend Equivalents.

"Recipient" means an Eligible Person designated by the Committee at the Grant Date to receive one or more Grants under the Plan.

"Retirement" means, with respect to a Recipient and for purposes of this Agreement, the date the Recipient terminates employment with the Company after attaining (i) age 55 and (ii) a certain combination of age and Years of Service set forth in the Matrix in Exhibit "A" attached hereto.

"Years of Service" means the total number of months from the Recipient's date of hire by the Company to the date of termination of employment, plus any months required to be recognized under an appropriate acquisition agreement, divided by 12.

"Voluntary Termination with Cause" occurs upon a Recipient's separation from service of his or her own volition and one or more of the following conditions occurs without the Recipient's consent on or after a Change of Control:

(a)     There is a material diminution in the Recipient's base compensation, compared to his or her rate of base compensation on the date of the Change of Control.

(b)     There is a material diminution in the Recipient's authority, duties or responsibilities.

(c)     There is a material diminution in the authority, duties or responsibilities of the Recipient's supervisor, such as a requirement that the Recipient (or his or her supervisor) report to a corporate officer or employee instead of reporting directly to the board of directors.

(d)     There is a material diminution in the budget over which the Recipient retains authority.

(e)     There is a material change in the geographic location at which the Recipient must perform his or her service, including, for example the assignment of the Recipient to a regular workplace that is more than 50 miles from his or her regular workplace on the date of the Change of Control.

The Recipient must notify the Company of the existence of one or more adverse conditions specified in clauses (a) through (e) above within 90 days of the initial existence of the adverse condition. The notice must be provided in writing to the Company or its successor, attention: Vice President, Human Resources. The notice may be provided by personal delivery or it may be sent by email, inter-office mail, regular mail (whether or not certified), fax, or any similar method. The Company's Vice President, Human Resources, or his/her delegate shall acknowledge receipt of the notice

5

within 5 business days; the acknowledgement shall be sent to the Recipient by certified mail.  Notwithstanding the foregoing provisions of this definition, if the Company remedies the adverse condition within 30 days of being notified of the adverse condition, no Voluntary Termination with Cause shall occur.

**Terms**

1.       Grant of RSUs.  Subject to the provisions of this Agreement and the provisions of the Plan and Grant Notice, the Company shall grant to the Recipient, pursuant to the Plan, a right to receive the number of RSUs set forth in the Recipient's Grant Notice.  The Grant shall give the Recipient the right, upon vesting, to an equal number of shares of $0.625 par value common stock of the Company ("Stock").  At the time of the Grant, the Recipient may elect to defer all or any portion of the RSUs in the Deferred Delivery Plan (the "DDP").

2.       Vesting and Payment of Stock.  Subject to the provisions of sections 3 and 4 of this Agreement, the entitlement to receive the number of shares of Stock pursuant to the RSUs comprising the Grant Amount shall vest in accordance with the schedule set forth in the Grant Notice (the "Vesting Period"); provided that the Recipient remains employed as an Eligible Person on such applicable vesting dates.  Unless the Recipient elected to defer the RSU into the DDP, such Stock, subject to applicable withholding, shall be transferred by the Company to the Recipient within thirty (30) days of the vesting date (other than upon death or Disability).  To the extent that the Recipient elected to defer the RSUs into the DDP and sections 3 and 4 do not apply, when the RSUs vest, they shall be transferred to the DDP and paid thereafter to the Recipient as specified under the terms of the DDP.

3.       Termination of Employment, Retirement, Death, or Disability.  Except as set forth below in this section 3 and in section 4 of this Agreement, each Grant shall be subject to the condition that the Recipient has remained an Eligible Person from the award of the Grant of RSUs until the applicable vesting date as follows:

(a)       If the Recipient voluntarily leaves the employment of the Company (other than for reason of Retirement), or if the employment of the Recipient is terminated by the Company for any reason or no reason, any RSUs granted to the Recipient pursuant to the Grant Notice not previously vested shall thereafter be void and forfeited for all purposes.

(b)       If the Recipient leaves the employment of the Company by reason of Retirement, the RSUs granted to the Recipient pursuant to the Grant Notice not previously vested shall continue to vest following the Recipient's termination of employment by reason of Retirement as if the Recipient remained an Eligible Person in the employ of the Company, provided that such Recipient shall be entitled to continue vesting only if such Recipient satisfies the Retirement Conditions set forth in section 5 below (except in the case of death) and only with respect to the specified percentage of such unvested RSUs set forth in Exhibit "A" for a certain combination of age and Years of Service attained by the Recipient as of the Recipient's Retirement under the Matrix set forth in Exhibit "A".

(c)       A Recipient shall become 100% vested in all RSUs under the Grant Notice on the date the Recipient dies while employed by the Company regardless whether Recipient has

6

accepted the Grant, or on the date the Recipient is no longer employed by the Company by reason of Disability, or, only in the case of death, while continuing to vest pursuant to section 3(b) of this Agreement.  Payment shall be made as soon as administratively practicable, but in no event (i) in the case of death, shall the payment occur later than the last day of the calendar year following the calendar year in which such death occurs or (ii) in the case of cessation of employment by reason of Disability, shall the payment occur later than thirty (30) days following the date the Recipient is determined to be Disabled and is no longer employed by the Company.  If clause (ii) is applicable and the period from the date on which the Recipient is determined to be Disabled and is no longer employed by the Company to the date under clause (ii) spans two consecutive calendar years, payment shall be made in the second calendar year of such consecutive calendar years.  Such payment shall be made to the Recipient's designated beneficiary, legal representatives, heirs, or legatees, as applicable.  Each Recipient may designate a beneficiary on a form approved by the Committee.

4.     Change of Control.  Pursuant to Section 13.1(c)(iii) and (d) of the Plan, the following provisions of this section 4 of the Agreement shall supersede Sections 13.1(a), (b) and (c) of the Plan.  Without any further action by the Committee or the Board, in the event of a Recipient's Involuntary Termination or Voluntary Termination with Cause occurring on or after a Change of Control during the Vesting Period, the Recipient shall become 100% fully vested in the unvested RSUs granted to the Recipient pursuant to the Grant Notice as of the date of his or her Involuntary Termination or Voluntary Termination with Cause. Subject to section 12(d) of this Agreement, payment shall occur within thirty (30) days following the date of such Involuntary Termination or Voluntary Termination with Cause, subject to required tax withholding. Further, in the event of a Change of Control following the Recipient's termination of employment by reason of Retirement while the Recipient is continuing to vest in the RSUs pursuant to section 3(b) of this Agreement, the Recipient shall become 100% fully vested in the unvested RSUs granted to the Recipient pursuant to the Grant Notice as of the date of the Change of Control (including those excluded by the specified percentage set forth in Exhibit "A"). Subject to section 12(d) of this Agreement, the Recipient, if the Recipient terminates employment on account of Retirement prior to the occurrence of a Change of Control, shall receive payment with respect to 100% of the fully vested RSUs within thirty (30) days of the date of a 409A Change of Control, or if the Change of Control is not a 409A Change of Control, on the remaining vesting dates during the Vesting Period in the amount of 1/3 (on each of the remaining vesting dates) of the RSUs awarded as of the Grant Date, subject to required tax withholding.   Further still, in the event of a Change of Control prior to the Recipient's termination of employment by reason of Retirement during the Vesting Period, the Recipient shall become 100% fully vested in the unvested RSUs granted to the Recipient pursuant to the Grant Notice as of the date the Recipient terminates employment by reason of Retirement (including those excluded by the specified percentage set forth in Exhibit "A").  For the purpose of vesting as set forth in the prior sentence, a Recipient's Involuntary Termination or Voluntary Termination with Cause after a Change of Control shall be deemed a termination by reason of Retirement.   Subject to section 12(d) of this Agreement, the Recipient, who terminates employment by reason of Retirement after a Change of Control, shall receive payment with respect to 100% of the fully vested RSUs on the remaining vesting dates during the Vesting Period in the amount of 1/3 (on each of the remaining vesting dates) of the RSUs awarded as of the Grant Date, subject to required tax withholding.

7

5.    <u>Conditions to Post-Retirement Vesting</u>.  If the Recipient has attained age 55 and a certain combination of age and Years of Service set forth in the Matrix in Exhibit "A" attached hereto and terminates employment with the Company and the Affiliates by reason of Retirement, it is agreed by the Company and the Recipient that:

(a)    subject to the provisions of this section 5(a) and sections 5(b) and 5(c), such Recipient shall continue to vest in the specified percentage of unvested RSUs set forth in Exhibit "A", for the combination of age and Years of Service attained by such Recipient as of his or her Retirement under the Matrix set forth in Exhibit "A", following the date of his or her termination by reason of Retirement as if the Recipient continued in employment as an Eligible Person provided that the Grant Date of the unvested RSUs is prior to such termination date in an amount of time which allows the Recipient to provide the written notice as follows and the Recipient has provided advance written notice not before three (3) months following the Grant Date and not less than the number of months prior to such termination date as set forth in the Schedule below to Apache Corporation's Vice President, Human Resources, or his or her delegate, and to his or her direct manager, regarding the Recipient's intent to terminate employment for reason of Retirement; <u>provided</u>, <u>however</u>, a Recipient who is at least age 55 and attained the necessary combination of age and Years of Service under the Matrix set forth in Exhibit "A" for Retirement need not provide such advance written notice of his or her intent to terminate employment by reason of Retirement if the Company elects to require such Recipient to, or (as part of a reduction in force or otherwise in writing in exchange for a written release) offers such Recipient the opportunity to, terminate employment with the Company by reason of Retirement:

| Age | Advance Written Notice |
|---|---|
| 65 or older | 3 months |
| between (and including) 55 and 64 | 6 months |

; and it is further agreed that

(b)    in consideration for the continued vesting treatment afforded to the Recipient under section 5(a), Recipient shall, during the continuing Vesting Period after Retirement (the "Continued Vesting Period"), refrain from becoming employed by, or consulting with, or becoming substantially involved in the business of, any business that competes with the Company or its Affiliate in the business of exploration or production of oil or natural gas wherever from time to time conducted throughout the world (a "Competitive Business") and Recipient shall provide to the Company, upon Company's request, (x) a written certification, in a form provided by or satisfactory to the Company, as to Recipient's compliance with the forgoing conditions and/or (y) his/her U.S. Individual Income Tax Return for any return filed by the Recipient which relates to any time during the Continued Vesting Period to allow the Company to verify that Recipient has complied with the foregoing conditions; <u>provided</u>, that the Recipient may purchase and hold for investment purposes less than five percent (5%) of the shares of any Competitive Business whose shares are regularly traded on a national securities exchange or inter-dealer quotation system, and <u>provided further</u>, that the Recipient may provide services solely as a director of any Competitive Business whose shares are regularly traded on a national securities exchange or inter-dealer quotation system if, during the Continued Vesting Period, (i) the Recipient only attends board and board committee meetings, votes on recommendations of

8

management, and discharges his/her fiduciary obligations under the law and (ii) the Recipient is not involved in, and does not advise or consult on, the marketing, government relations, customer relations, or the day-to-day management, supervision, or operations of such Competitive Business; and it is further agreed that

(c)     in consideration for the continued vesting treatment afforded to the Recipient under section 5(a), Recipient shall, during the Continued Vesting Period, refrain from making, or causing or assisting any other person to make, any oral or written communication to any third party about the Company, any Affiliate and/or any of the employees, officers or directors of the Company or any Affiliate which impugns or attacks, or is otherwise critical of, the reputation, business or character of such entity or person; or that discloses private or confidential information about their business affairs; or that constitutes an intrusion into their seclusion or private lives; or that gives rise to unreasonable publicity about their private lives; or that places them in a false light before the public; or that constitutes a misappropriation of their name or likeness.

Notwithstanding the foregoing provisions of this section 5 of the Agreement, (i) in the event that the Recipient fails to satisfy any of the conditions set forth in sections 5(a), (b) and (c) above, the Recipient shall not be entitled to vest in any unvested RSUs after the date of Retirement and the unvested RSUs subject to this Agreement shall be forfeited and (ii) the Recipient shall not have any right to continue to vest upon Retirement in any future awards granted under the Plan once the Recipient provides the notice of Retirement as set forth in section 5(a) above.

6.     Prohibited Activity.  In consideration for this Grant and except as permitted under section 5(b) above, the Recipient agrees not to engage in any "Prohibited Activity" while employed by the Company or within three years after the date of the Recipient's termination of employment.  A "Prohibited Activity" will be deemed to have occurred, as determined by the Committee in its sole and absolute discretion, if the Recipient (i) divulges any non-public, confidential or proprietary information of the Company, but excluding information that (a) becomes generally available to the public other than as a result of the Recipient's public use, disclosure, or fault, or (b) becomes available to the Recipient on a non-confidential basis after the Recipient's employment termination date from a source other than the Company prior to the public use or disclosure by the Recipient, provided that such source is not bound by a confidentiality agreement or otherwise prohibited from transmitting the information by contractual, legal or fiduciary obligation; (ii) directly or indirectly, consults with or becomes affiliated with, participate or engage in, or becomes employed by any business that is competitive with the Company, wherever from time to time conducted throughout the world, including situations where the Recipient solicits or participates in or assists in any way in the solicitation or recruitment, directly or indirectly, of any employees of the Company; or (iii) engages in publishing any oral or written statements about the Company, and/or any of its directors, officers, or employees that are disparaging, slanderous, libelous, or defamatory; or that disclose private or confidential information about their business affairs; or that constitute an intrusion into their seclusion or private lives; or that give rise to unreasonable publicity about their private lives; or that place them in a false light before the public; or that constitute a misappropriation of their name or likeness.

9

7.  <u>Payment and Tax Withholding</u>.  Upon receipt of any entitlement to Stock under this Agreement and, if applicable, upon the Recipient's attainment of eligibility to terminate employment by reason of Retirement pursuant to section 3(b), the Recipient shall make appropriate arrangements with the Company to provide for the amount of minimum tax and social security withholding, if any, required by law, including without limitation Sections 3102 and 3402 or any successor section(s) of the Internal Revenue Code and applicable state and local income and other tax laws.  Upon receipt of entitlement to Stock under this Agreement, each payment of the Payout Amount shall be made in shares of Stock, determined by the Committee, such that the withheld number of shares of Stock shall be sufficient to cover the withholding amount required by this section (including any amount to cover benefit tax charges arising thereon).  The payment of a Payout Amount shall be based on the Fair Market Value of the shares of Stock on the applicable date of vesting to which such tax withholding relates.  Where appropriate, shares of Stock shall be withheld by the Company to satisfy applicable tax withholding requirements rather than paid directly to the Recipient.

8.  <u>No Ownership Rights Prior to Issuance of Stock</u>.  Neither the Recipient nor any other person shall become the beneficial owner of the Stock underlying the Grant, nor have any rights of a shareholder (including, without limitation, dividend and voting rights) with respect to any such Stock, unless and until and after such Stock has been actually issued to the Recipient and transferred on the books and records of the Company or its agent in accordance with the terms of the Plan and this Agreement.

9.  <u>Non-Transferability of Grant</u>.  A Grant shall not be transferable otherwise than by testamentary will or the laws of descent and distribution, or in accordance with a valid beneficiary designation on a form approved by the Committee, subject to the conditions and exceptions set forth in Section 15.2 of the Plan.

10.  <u>No Right to Continued Employment</u>.  Neither the RSUs or Stock issued pursuant to a Grant nor any terms contained in this Agreement shall confer upon the Recipient any express or implied right to be retained in the employment or service of the Company for any period, nor restrict in any way the right of the Company, which right is hereby expressly reserved, to terminate the Recipient's employment or service at any time for any reason or no reason.  The Recipient acknowledges and agrees that any right to receive RSUs or Stock pursuant to a Grant is earned only by continuing as an employee of the Company at the will of the Company, or satisfaction of any other applicable terms and conditions contained in the Plan and this Agreement, and not through the act of being hired, being granted the Grant, or acquiring RSUs or Stock pursuant to the Grant hereunder.

11.  <u>The Plan</u>.  In consideration for this Grant, the Recipient agrees to comply with the terms of the Plan and this Agreement.  This Agreement is subject to all the terms, provisions and conditions of the Plan, which are incorporated herein by reference, and to such regulations as may from time to time be adopted by the Committee.  Unless defined herein, capitalized terms are used herein as defined in the Plan.  In the event of any conflict between the provisions of the Plan and this Agreement, the provisions of the Plan shall control, and this Agreement shall be deemed to be modified accordingly.  The Plan and the prospectus describing the Plan can be found on the Company's HR intranet and the Plan document can be found on Fidelity's website (netbenefits.fidelity.com).  A paper copy of the Plan and the prospectus shall be provided to the

10

recipient upon the Recipient's written request to the Company at 2000 Post Oak Blvd., Suite 100, Houston, Texas 77056-4400, Attention: Corporate Secretary.

      12.    Compliance with Laws and Regulations.

      (a)    The Grant and any obligation of the Company to deliver RSUs or Stock hereunder shall be subject in all respects to (i) all applicable laws, rules and regulations and (ii) any registration, qualification, approvals or other requirements imposed by any government or regulatory agency or body which the Committee shall, in its discretion, determine to be necessary or applicable.  Moreover, the Company shall not deliver any certificates for Stock to the Recipient or any other person pursuant to this Agreement if doing so would be contrary to applicable law.  If at any time the Company determines, in its discretion, that the listing, registration or qualification of Stock upon any national securities exchange or under any applicable law, or the consent or approval of any governmental regulatory body, is necessary or desirable, the Company shall not be required to deliver any certificates for Stock to the Recipient or any other person pursuant to this Agreement unless and until such listing, registration, qualification, consent or approval has been effected or obtained, or otherwise provided for, free of any conditions not acceptable to the Company.

      (b)    It is intended that the issuance of any Stock received in respect of the Grant shall have been registered under the Securities Act of 1933 ("Securities Act").  If the Recipient is an "affiliate" of the Company, as that term is defined in Rule 144 under the Securities Act ("Rule 144"), the Recipient may not sell the Stock received except in compliance with Rule 144. Certificates representing Stock issued to an "affiliate" of the Company may bear a legend setting forth such restrictions on the disposition or transfer of the Stock as the Company deems appropriate to comply with Federal and state securities laws.

      (c)    If, at any time, a registration statement with respect to the issuance of the Stock is not effective under the Securities Act, and/or there is no current prospectus in effect under the Securities Act with respect to the Stock, the Recipient shall execute, prior to the delivery of any Stock to the Recipient by the Company pursuant to this  Agreement, an agreement (in such form as the Company may specify) in which the Recipient represents and warrants that the Recipient is purchasing or acquiring the Stock acquired under this Agreement for the Recipient's own account, for investment only and not with a view to the resale or distribution thereof, and represents and agrees that any subsequent offer for sale or distribution of any kind of such Stock shall be made only pursuant to either (i) a registration statement on an appropriate form under the Securities Act, which registration statement has become effective and is current with regard to the Stock being offered or sold, or (ii) a specific exemption from the registration requirements of the Securities Act, but in claiming such exemption the Recipient shall, prior to any offer for sale of such Stock, obtain a prior favorable written opinion, in form and substance satisfactory to the Company, from counsel for or approved by the Company, as to the applicability of such exemption thereto.

      (d)    This Grant is intended to comply with, or be exempt from, the applicable requirements of Section 409A of the Code and the rules and regulations issued thereunder and shall be administered accordingly.  Notwithstanding anything in this Agreement to the contrary, if the RSUs constitute "deferred compensation" under Section 409A of the Code and any RSUs

11

become payable pursuant to the Recipient's termination of employment, settlement of the RSUs shall be delayed for a period of six months after the Recipient's termination of employment if the Recipient is a "specified employee" as defined under Code Section 409A(a)(2)(B)(i) and if required pursuant to Section 409A of the Code.  If settlement of the RSU is delayed, the RSUs shall be settled on the first day of the first calendar month following the end of the six-month delay period.  If the Recipient dies during the six-month delay, the RSUs shall be settled and paid to the Recipient's designated beneficiary, legal representatives, heirs or legatees, as applicable, as soon as practicable after the date of death.  Notwithstanding any provisions to the contrary herein, payments made with respect to this Grant may only be made in a manner and upon an event permitted by Section 409A of the Code, and all payments to be made upon a termination of employment hereunder may only be made upon a "separation from service", as such term is defined in Section 11.1 of the Plan.  Recipient shall not have any right to determine a date of payment of any amount under this Agreement. This Agreement may be amended without the consent of the Recipient in any respect deemed by the Board or the Committee to be necessary in order to preserve compliance with Section 409A of the Code. If the Grant and this Agreement is subject to Section 409A of the Code and the rules and regulations issued thereunder, then the vesting date shall be the "designated payment date" or "specified date" under Treasury Regulation 1.409A-3(d).

13.     Notices.   Unless otherwise provided in this Agreement, all notices by the Recipient or the Recipient's assignees shall be addressed to the Administrative Agent, Fidelity, through the Recipient's account at netbenefits.fidelity.com, or such other address as the Company may from time to time specify.  All notices to the Recipient shall be addressed to the Recipient at the Recipient's address in the Company's records.

14.     Other Plans.   The Recipient acknowledges that any income derived from the Grant shall not affect the Recipient's participation in, or benefits under, any other benefit plan or other contract or arrangement maintained by the Company or any Affiliate.

15.     Terms of Employment.   The Plan is a discretionary plan.  The Recipient hereby acknowledges that neither the Plan nor this Agreement forms part of the Recipient's terms of employment and nothing in the Plan may be construed as imposing on the Company or any Affiliate a contractual obligation to offer participation in the Plan to any employee of the Company or any Affiliate.  The Company or any Affiliate is under no obligation to grant further RSUs or Stock to any Recipient under the Plan.  The Recipient hereby acknowledges that if the Recipient ceases to be an employee of the Company or any Affiliate for any reason or no reason, the Recipient shall not be entitled by way of compensation for loss of office or otherwise howsoever to any sum.

16.     Data Protection.   By accepting this Agreement (whether by electronic means or otherwise), the Recipient hereby consents to the holding and processing of personal data provided by the Recipient to the Company for all purposes necessary for the operation of the Plan.  These include, but are not limited to:

(a)     administering and maintaining Recipient records;

(b)     providing information to any registrars, brokers or third party administrators of the Plan; and

12

(c)     providing information to future purchasers of the Company or the business in which the Recipient works.

17.     <u>Severability</u>.  If any provision of this Agreement is held invalid or unenforceable, the remainder of this Agreement shall nevertheless remain in full force and effect, and if any provision is held invalid or unenforceable with respect to particular circumstances, it shall nevertheless remain in full force and effect in all other circumstances, to the fullest extent permitted by law.

\*\*\*\*\*

13

Debtors' Exhibit No. 64
Page 198 of 413

**Exhibit "A"**

**Apache Corporation**
**Retirement Matrix**



| Age at Retirement | Points (Age at Retirement + Years of Service) | | | | | | | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | 60 | 61 | 62 | 63 | 64 | 65 | 66 | 67 | 68 | 69 | 70 | 71 | 72 | 73 | 74 | 75 | 76 | 77 | 78 | 79 | 80 |
| 70 | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 100% | 100% | 100% | 100% | 100% | 100% | 100% |
| 69 | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 100% | 100% | 100% | 100% | 100% | 100% | 100% | 100% |
| 68 | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 100% | 100% | 100% | 100% | 100% | 100% | 100% | 100% | 100% |
| 67 | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 100% | 100% | 100% | 100% | 100% | 100% | 100% | 100% | 100% | 100% |
| 66 | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 100% | 100% | 100% | 100% | 100% | 100% | 100% | 100% | 100% | 100% | 100% |
| 65 | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 100% | 100% | 100% | 100% | 100% | 100% | 100% | 100% | 100% | 100% | 100% |
| 64 | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 50% | 75% | 75% | 75% | 75% | 75% | 75% | 75% | 75% | 75% | 100% |
| 63 | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 50% | 50% | 75% | 75% | 75% | 75% | 75% | 75% | 75% | 75% | 75% | 100% |
| 62 | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 50% | 50% | 50% | 75% | 75% | 75% | 75% | 75% | 75% | 75% | 75% | 75% | 100% |
| 61 | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 50% | 50% | 50% | 50% | 75% | 75% | 75% | 75% | 75% | 75% | 75% | 75% | 75% | 100% |
| 60 | 0% | 0% | 0% | 0% | 0% | 0% | 50% | 50% | 50% | 50% | 50% | 75% | 75% | 75% | 75% | 75% | 75% | 75% | 75% | 75% | 100% |
| 59 | 0% | 0% | 0% | 0% | 0% | 50% | 50% | 50% | 50% | 50% | 50% | 50% | 50% | 50% | 50% | 75% | 75% | 75% | 75% | 75% | 100% |
| 58 | 0% | 0% | 0% | 0% | 50% | 50% | 50% | 50% | 50% | 50% | 50% | 50% | 50% | 50% | 50% | 75% | 75% | 75% | 75% | 75% | 100% |
| 57 | 0% | 0% | 0% | 50% | 50% | 50% | 50% | 50% | 50% | 50% | 50% | 50% | 50% | 50% | 50% | 75% | 75% | 75% | 75% | 75% | 100% |
| 56 | 0% | 0% | 50% | 50% | 50% | 50% | 50% | 50% | 50% | 50% | 50% | 50% | 50% | 50% | 50% | 75% | 75% | 75% | 75% | 75% | 100% |
| 55 | 0% | 50% | 50% | 50% | 50% | 50% | 50% | 50% | 50% | 50% | 50% | 50% | 50% | 50% | 50% | 75% | 75% | 75% | 75% | 75% | 100% |

Legend:

| |
|---|
| 0% |
| 50% |
| 75% |
| 100% |

14

Exhibit 21.1

**Apache Corporation (a Delaware corporation)**
**Listing of Subsidiaries as of December 31, 2020**

| Exact Name of Subsidiary and Name under which Subsidiary does Business | Jurisdiction of Incorporation or Organization |
| --- | --- |
| Alta Vista Oil Corporation | Delaware |
| *Altus Midstream Company | Delaware |
|   *Altus Midstream GP LLC | Delaware |
|     **Altus Midstream Subsidiary GP LLC | Delaware |
| Apache Alaska Corporation | Delaware |
| Apache Corporation (New Jersey) | New Jersey |
| Apache Crude Oil Marketing, Inc. | Delaware |
| Apache Deepwater LLC | Texas |
| Apache Dominican Republic Corporation LDC | Cayman Islands |
| Apache Fertilizer Holdings II Corporation LDC | Cayman Islands |
| Apache Finance Louisiana Corporation | Delaware |
| Apache Foundation | Minnesota |
| Apache Finance Pty Limited | Australia Capital Territory |
| Apache Gathering Company | Delaware |
| Apache Holdings, Inc. | Delaware |
| Apache International Employment Inc. | Delaware |
| Apache Louisiana Holdings LLC | Delaware |
| Apache Louisiana Minerals LLC | Delaware |
| Apache Marketing, Inc. | Delaware |
| Apache Midstream LLC | Delaware |
|   Alpine High Oil Pipeline LLC | Delaware |
| Apache Natural Gas Transportation Fuels LLC | Delaware |
| Apache North America LLC | Delaware |
| Apache Oil Corporation | Texas |
| Apache Overseas, Inc. | Delaware |
|   Apache Asia Pacific Corporation LDC | Cayman Islands |
|   Apache East Ras Budran Corporation LDC | Cayman Islands |
|   Apache Egypt Investment Corporation LDC | Cayman Islands |
|     Apache Egypt Holdings III Corporation LDC | Cayman Islands |
|       Apache Egypt GP Corporation LDC | Cayman Islands |
|       Apache Egypt Holdings II Corporation LDC | Cayman Islands |
|         Apache Abu Gharadig Corporation LDC | Cayman Islands |
|         Apache East Bahariya Corporation LDC | Cayman Islands |
|         Apache El Diyur Corporation LDC | Cayman Islands |
|         Apache Faiyum Corporation LDC | Cayman Islands |
|         Apache Khalda Corporation LDC | Cayman Islands |
|           Apache Egypt Midstream Holdings I LDC | Cayman Islands |
|           Apache Khalda II Corporation LDC | Cayman Islands |
|       Apache Matruh Corporation LDC | Cayman Islands |
|       Apache Mediterranean Corporation LDC | Cayman Islands |
|       Apache North Bahariya Corporation LDC | Cayman Islands |
|       Apache North El Diyur Corporation LDC | Cayman Islands |
|       Apache North Tarek Corporation LDC | Cayman Islands |

Exhibit 21.1

**Apache Corporation (a Delaware corporation)**
**Listing of Subsidiaries as of December 31, 2020**

| Exact Name of Subsidiary and Name under which Subsidiary does Business | Jurisdiction of Incorporation or Organization |
| --- | --- |
| Apache Qarun Corporation LDC | Cayman Islands |
| Apache Qarun Exploration Company LDC | Cayman Islands |
| Apache Shushan Corporation LDC | Cayman Islands |
| Apache South Umbarka Corporation LDC | Cayman Islands |
| Apache Umbarka Corporation LDC | Cayman Islands |
| Apache West Kalabsha Corporation LDC | Cayman Islands |
| Apache West Kanayis Corporation LDC | Cayman Islands |
| Apache UK Consolidated Holdings Corporation LDC | Cayman Islands |
| Apache UK Corporation LDC | Cayman Islands |
| Apache International Corporation LDC | Cayman Islands |
| Apache North Sea Limited | England and Wales |
| Apache UK Pension Trustee Ltd. | England and Wales |
| Apache North Sea Production Limited | England and Wales |
| Apache UK Investment Limited | England and Wales |
| Apache Beryl I Limited | Cayman Islands |
| Apache EMEA Corporation LDC | Cayman Islands |
| Apache Exploration LDC | Cayman Islands |
| Apache Fertilizer Holdings Corporation LDC | Cayman Islands |
| Apache International Finance S.a.r.l. | Luxembourg |
| Apache International Finance II S.a.r.l. | Luxembourg |
| Apache Latin America II Corporation LDC | Cayman Islands |
| Apache Netherlands Investment B.V. | The Netherlands |
| Apache Suriname Corporation LDC | Cayman Islands |
| Apache Netherlands Investment II B.V. | The Netherlands |
| Apache Suriname 58 Holdings Corporation LDC | Cayman Islands |
| Apache Suriname 58 Corporation LDC | Cayman Islands |
| Apache Overseas Holdings LLC | Delaware |
| Apache Switzerland Holdings AG | Switzerland |
| Apache Overseas Holdings II, Inc. | Delaware |
| Apache Ravensworth Corporation LDC | Cayman Islands |
| Apache Shady Lane Ranch Inc. | Delaware |
| Apache Shelf Exploration LLC | Texas |
| Apache Shelf, Inc. | Delaware |
| Apache Texas Property Holding Company LLC | Delaware |
| Apache UK Limited | England and Wales |
| Apache Well Containment LLC | Delaware |
| Apache Western Exploration LLC | Delaware |
| BLPL Holdings LLC | Delaware |
| Clear Creek Hunting Preserve, Inc. | Wyoming |
| Cordillera Energy Partners III, LLC | Colorado |
| Cottonwood Aviation, Inc. | Delaware |
| CV Energy Corporation | Delaware |
| DEK Energy LLC | Delaware |

Exhibit 21.1

**Apache Corporation (a Delaware corporation)**
**Listing of Subsidiaries as of December 31, 2020**

| Exact Name of Subsidiary and Name under which Subsidiary does Business | Jurisdiction of Incorporation or Organization |
| --- | --- |
| Apache Finance Canada LLC | Delaware |
| Apache Permian Basin Investment LLC | Delaware |
| Apache Permian Basin Corporation | Delaware |
| Apache Permian Exploration and Production LLC | Delaware |
| LeaCo New Mexico Exploration and Production LLC | Delaware |
| Permian Basin Joint Venture LLC (95%) | Delaware |
| ZPZ Delaware I LLC | Delaware |
| Apache Canada Management LLC | Delaware |
| Apache Canada Holdings LLC | Delaware |
| Apache Canada Management II LLC | Delaware |
| Apache Finance Canada III LLC | Delaware |
| Apache Finance Canada IV LLC | Delaware |
| Stallion Canada Holdings LLC | Delaware |
| Edge Petroleum Exploration Company | Delaware |
| Granite Operating Company | Texas |
| Phoenix Exploration Resources, Ltd. | Delaware |
| Texas International Company | Delaware |
| Texas and New Mexico Exploration LLC | Delaware |
| ZPZ Acquisitions, Inc. | Delaware |
| ZPZ Delaware II LLC | Delaware |
| ZPZ Delaware III LLC | Delaware |
| Phoenix Exploration Louisiana C LLC (75%) | Delaware |

**\*Apache Corporation owns a 79.19% voting interest and a 9.76% economic interest.**
**\*\*Apache Corporation owns a 79.19% voting and economic interest.**

**Exhibit 23.1**

**Consent of Independent Registered Public Accounting Firm**

We consent to the incorporation by reference in the following Registration Statements:

(1) Registration Statement (Form S-3 No. 333-239558) of Apache Corporation,
(2) Registration Statements (Form S-4 Nos. 333-107934, and 333-166964) of Apache Corporation, and
(3) Registration Statements (Form S-8 Nos. 33-37402, 33-59721, 33-63817, 333-26255, 333-32557, 333-36131, 333-31092, 333-48758, 333-97403, 333-102330, 333-103758, 333-106213, 333-125232, 333-125233, 333-135044, 333-143115, 333-170533, 333-175250, 333-178672, 333-190619, and 333-212237) of Apache Corporation;

of our reports dated February 25, 2021, with respect to the consolidated financial statements of Apache Corporation and subsidiaries and the effectiveness of internal control over financial reporting of Apache Corporation and subsidiaries, included in this Annual Report (Form 10-K) of Apache Corporation for the year ended December 31, 2020.

/s/ ERNST & YOUNG LLP

Houston, Texas
February 25, 2021



TBPE REGISTERED ENGINEERING FIRM F-1580 FAX (713) 651-0849
1100 LOUISIANA SUITE 4600 HOUSTON, TEXAS 77002-5294 TELEPHONE (713) 651-9191

**EXHIBIT 23.2**

### Consent of Ryder Scott Company, L.P.

As independent petroleum engineers, we hereby consent to the incorporation by reference in this Form 10-K of Apache Corporation to our Firm's name and our Firm's review of the proved oil and gas reserve quantities of Apache Corporation as of December 31, 2020, to the incorporation by reference of our Firm's name and review into Apache Corporation's previously filed Registration Statements on Form S-3 (Nos. 333-57785, 333-75633, 333-32580, 333-105536, 333-155884, 333-174429, 333-197491, 333-219345, and 333-239558), on Form S-4 (Nos. 333-107934 and 333-166964), and on Form S-8 (Nos. 33-59721, 33-63817, 333-26255, 333-32557, 333-36131, 333-31092, 333-48758, 333-97403, 333-102330, 333-103758, 333-106213, 333-125232, 333-125233, 333-135044, 333-143115, 333-170533, 333-175250, 333-178672, 333-190619, and 333-212237), and to the inclusion of our report, dated January 25, 2021, as an exhibit to this Form 10-K filed with the Securities and Exchange Commission.

/s/ Ryder Scott Company, L.P.

**RYDER SCOTT COMPANY, L.P.**
TBPE Firm Registration No. F-1580

Houston, Texas
February 25, 2021

SUITE 2800, 350 7TH AVENUE, S.W. CALGARY, ALBERTA T2P 3N9 TEL (403) 262-2799
633 17TH STREET, SUITE 1700 DENVER, COLORADO 80202 TEL (303) 339-8110

**EXHIBIT 31.1**

### CERTIFICATIONS

I, John J. Christmann IV, certify that:

1.  I have reviewed this Annual Report on Form 10-K of Apache Corporation;
2.  Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;
3.  Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;
4.  The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

    (a)  Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

    (b)  Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

    (c)  Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

    (d)  Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5.  The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

    (a)  All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

    (b)  Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

Date: February 25, 2021

/s/ John J. Christmann IV
_____
John J. Christmann IV
Chief Executive Officer and President
(principal executive officer)

EXHIBIT 31.2

## CERTIFICATIONS

I, Stephen J. Riney, certify that:

1.  I have reviewed this Annual Report on Form 10-K of Apache Corporation;

2.  Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3.  Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4.  The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

    (a)  Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

    (b)  Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

    (c)  Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

    (d)  Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5.  The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

    (a)  All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

    (b)  Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

Date: February 25, 2021

/s/ Stephen J. Riney
_____
Stephen J. Riney
Executive Vice President and Chief Financial Officer
(principal financial officer)

EXHIBIT 32.1

**APACHE CORPORATION**

**Certification of Principal Executive Officer
and Principal Financial Officer**

I, John J. Christmann IV, certify pursuant to 18 U.S.C. Section 1350, as adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002, that, to my knowledge, the Annual Report on Form 10-K of Apache Corporation for the period ending December 31, 2020, fully complies with the requirements of Section 13(a) or 15(d) of the Securities Exchange Act of 1934 (15 U.S.C. §78m or §78o (d)) and that information contained in such report fairly represents, in all material respects, the financial condition and results of operations of Apache Corporation.

Date: February 25, 2021

/s/ John J. Christmann IV
| | |
|---|---|
| By: | John J. Christmann IV |
| Title: | Chief Executive Officer and President |
| | (principal executive officer) |

I, Stephen J. Riney, certify pursuant to 18 U.S.C. Section 1350, as adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002, that, to my knowledge, the Annual Report on Form 10-K of Apache Corporation for the period ending December 31, 2020, fully complies with the requirements of Section 13(a) or 15(d) of the Securities Exchange Act of 1934 (15 U.S.C. §78m or §78o (d)) and that information contained in such report fairly represents, in all material respects, the financial condition and results of operations of Apache Corporation.
Date: February 25, 2021

/s/ Stephen J. Riney
| | |
|---|---|
| By: | Stephen J. Riney |
| Title: | Executive Vice President and Chief Financial Officer |
| | (principal financial officer) |