# JOINT OPERATING AGREEMENT

by and between

## NOBLE ENERGY, INC.

AIN D

## SAMSON OFFSHORE COMPANY

covering

OCS-G 28030, Mississippi Canyon Block 948

Gunflint Prospect

Gulf of Mexico

effective July 1, 2006

TABLE OF CONTENTS

ARTICLE 1 CONTRACT APPLICATION ..........................................................................

ARTICLE 2 DEFINITIONS ...............................................................................................

ARTICLE 3 EXHIBITS .................................................................................................. 7

ARTICLE 4 SELECTION OF OPERATOR .................................................................... 7

ARTICLE 5 RIGHTS AND DUTIES OF OPERATOR ................................................. 10

ARTICLE 6 EXPENDITURES AND ANNUAL OPERATLNG PLAN ........................ 13

ARTICLE 7 CONFIDENTLkLITY OF DATA ...............................................................

ARTICLE 8 VOTLNG, ELECTIONS & NOTICES ......................................................

ARTICLE 9 GEOPHYSICAL OPERATIONS .................................................................

ARTICLE 10 EXPLORATORY OPERATIONS .......................................................... 30

ARTICLE 11 APPRAISAL OPERATIONS .................................................................. 36

ARTICLE 12 PROJECT TEAM, DEVELOPMENT PLAN AND FABRICATION A.FE ..................... 44

ARTICLE 13 DEVELOPMENT OPERATIONS .......................................................... 56

ARTICLE 14 FACILITIES AND GATHERING SYSTEMS ........................................ 64

ARTICLE 15 DISPOSITION OF HYDROCARBON PRODUCTION .......................... 66

ARTICLE 16 NON-CONSENT OPERATIONS              .............................................. 67

ARTICLE 17 WITHDRAWAL FROM AGREEMENT ................................................ 79

ARTICLE 18 ABANDONMENT AND SALVAGE ..................................................... 81

ARTICLE 19 RENTALS, ROYALTIES AND MND/11..11%.4 ROYALTIES ............... 82

ARTICLE 20 TAXES ................................................................................................... 84

ARTICLE 21 INSURANCE AND BONDS .................................................................. 85

ARTICLE 22 LLABILITY, CLAIMS, LAWSUITS AND ALTERNATE DISPUTE
        RESOLUTION                    ............................................... 85

ARTICLE 23 CONTRIBUTIONS .................................................................................. 87

ARTICLE 24 AREA OF MUTUAL INTEREST, ASSIGNMENTS AND PREFRENTLAL RIGHT
        TO PURCHASE ..................................................................................... 83

ARTICLE 25 FORCE MAJEURE ................................................................................. 92

ARTICLE 26 ADMINISTRATIVE PROVISIONS ...................................................... 93

EXHIBIT "A-1."⁻    CONTRACT AREA

EXHIBIT "A-2"    WORKING DNTERESTS OF THE PARTIES, OPERATOR AND
                 REPRESENTATIVES

EXHIBIT "B·'    OFFSHORE NSURANCE PROVISIONS

**EXHIBIT** "C"    ACCOUNTING PROCEDURE

EXHIBIT "D"    GAS BALANCING AGREEMENT ("AGREEMENT')

EXHIBIT "E"    CERTIFICATION OF NONSEGRATED FACILITIES

EXHIBIT "F"    NEWS RELEASE GUIDELINE

EXHIBIT "G"    PROJECT TEAM AND TECHNOLOGY SHARING

EXHIBIT "H"    DISPUTE RESOLUTION PROCEDURE

EXHIBIT "I"    MEMORANDUM OF OPERATING AGREEMENT AND FINANCING
               STATEMENT

## JOINT OPERATING AGREEMENT
## OUTER CONTINENTAL SHELF - GULF OF MEXICO

THIS AGREEMENT is made effective as of July, 2006 by and between Noble Energy, Inc. ("Noble Energy") and Samson Offshore Company ("Samson"), the simers hereof, herein referred to collectively as "Parties" and individually as "Party."

WHEREAS, the Parties are the owners of one or more OCS oil and gas Leases identified in Exhibit "A-1" *(Description of Leases) and* desire to jointly explore, develop and operate these Leases lying within the Contract Area for the production of Hydrocarbons.

NOW, THEREFORE, in consideration of the premises and of the mutual promises exchanged and contained within this Ageement, the Parties agree to jointly explore, develop and operate the Contract Area according to the following provisions:

## ARTICLE I
## CONTRACT APPLICATION

Application in General: This Agreement applies to the joint exploration, development and operation of the Contract Area for the production of Hydrocarbons therefrom and the transportation of same by pipeline(s) or otherwise from the Contract Area.

Application to Contract Area: This Agreement shall apply to the Contract Area as defined in Article 2 below. Unless otherwise provided for in this Agreement, all the rights and obligations in and under the Lease(s) comprising the Contract Area, all joint property and all Hydrocarbons produced from the Contract Area shall be owned jointly by the Parties according to their respective Working interests in the Contract Area.

## ARTICLE 2
## DEFINITIONS

As used in this Agreement (or in the Exhibits attached hereto), the initially capitalized terms listed below shall have the following meanings:

2.1   Additional Testing. Coring or Logging: shall mean any testing (excluding production testing), coring or logging which is in addition to that approved by virtue of any previously approved AFE.

2.2   Affiliate: shall mean any corporation, limited liability company or partnership (including a limited partnership) or other entity owned or controlled by a Party to this Agreement. The term "Affiliate" of a Party includes any parent corporation, partnership or other entity that directly or indirectly owns or controls greater than fifty percent (50%) of the

outstanding stock (or other interests) having the right to vote for directors of a Party to this Ag:rcernent. and also includes any other corporation, partnership or other entity in which the parent corporation directly or indirectly owns or controls greater than fifty percent (50%) of the voting stock (or other interests) in the other corporation.

- Ownership or control by a Party is deemed to exist if a Party to this Agreement directly or indirectly owns or controls greater than fifty percent (50%) of the outstanding stock of the corporation having the right to vote for directors of the corporation (or greater than fifty percent (50%) of the interests in the partnership or other entity).

- The stock (or interests in a partnership or other entity) owned or controlled by a Party shall include all stock (or other interests) directly or indirectly owned or controlled by any other corporation, partnership or other entity owned or controlled by a Party to this Agreement.

2.3    Agreement: shall mean this Joint Operating Agreement, together with its attached Exhibits.

2.4    Annual Operating Plan: shall mean the operational plan and estimate of Costs for joint operations in the next ensuing calendar year as described in Article 6.7  *(Annual Operating* Plan).

2.5    Appraisal Operations: shall mean all operations conducted within the Contract Area subsequent to Exploratory operations and proposed pursuant to Article 11  *(Appraisal Operations)_*  The terms Appraisal Operations and Appraisal Well are interchangeable throughout this Agreement.

2.6    APPraisal Well: shall mean any well proposed and drilled as an Appraisal Operation.

.7    Authorization for Expenditure (AFE): shall mean any written proposal made by a Party for the purpose of describing an operation being proposed and estimating the costs to be incurred. The AFE, when executed by a Party, evidences that Party's Election to participate in the proposed operation and grants the Operator the authority to commit or expend funds, pursuant to this Agreement, for the account of the Participating Parties. Any AFE which proposes more than one operation shall be considered a separate AFE as to each operation only for those operations for which Parties are permitted separate Elections under the terms of this Agreement.

2.8    Confidential Data: shall mean all proprietary geophysical, geological, geochemical, drilling or engineering data owned or developed by the Parties relating to operations conducted within the Contract Area. The term shall also include (but may not be limited to):

1

- certain commercial, contractual or financial information;

- analyses, compilations, maps, models, interpretations or other documents that reflect or incorporate Confidential Information;

- both originals and copies of geological and geophysical data, and well logs; and,

- all other subsurface, seismic and related data acquired or derived from operations conducted pursuant to this Agreement.

The provisions of this Aueement with respect to Confidential Data shall not be applicable to "Confidential Work Product" as that term is defined in Exhibit *"G' (Project Team and Technology Sharing).*

2.9   Contract Area: shall mean the OCS Lease(s) described on Exhibit "A-I" limited to the areas and depths described on Exhibit "A-1".

2.10   Cost(s): shall mean the monetary amount of all expenses incurred by the Operator and the Participating Parties for (or on account of) any and all operations conducted pursuant to this Agreement.

2.11   Deepen or Deepening: shall mean any operation to drill an existing well (including sidetracking a well) deeper than the stratigraphic equivalent of the deepest formation previously encountered in such well.

2.12   Deeper D riling: shall mean the drilling of a well below the deepest Producible Reservoir penetrated by a Producible Well within the Contract Area.

[1].13   Development Operations: shall mean all operations within the Contract Area other than an Exploratory Operation or an Appraisal Operation.2.14   Development Phase: shall mean Development Operations associated with the design, fabrication or acquisition, and installation of a Production System serving the Contract Area.

2.15   Development Plan: shall mean the plan for installing a Production System and developing and producing Hydrocarbons from the Contract Area as described in Article 12 *(Project Team, Development Plan and Fabrication AFE).* The Development Plan (as defined herein) is not the Development Plan as required by the MMS under 30 CFR 250.34(a) nor under the DOCD required under 30 CFR 230.34(d) ( I).

2.16   Development Well: shall mean any well proposed within the Contract Area subsequent to the approval of a Development Plan for such Contract Area.

2.17   Disproportionate Spending Settlement: shall mean the settlement of all or a portion of the percentage recouplent by a Non-Participating Party paying a disproportionate

3

amount of Costs in the next ensuing operation in which the Non-Participating, Party makes an Election to participate.

2.1,8    Election: shall mean a decision by a Party to either participate or to become a Non-Participating Party in a proposed operation (including the AFE associated with the operation). An Election to participate is evidenced by a Party's execution of the AFE. An Election not to participate (become a Non-Participating Parry) is evidenced either by a Party's written response against a proposal or such Pasty's failure to timely execute the AFE within the applicable time limit specified in this Agreement or both.

2.19    Exploratory Operations: shall mean any operation conducted on the Contract Area pursuant to Article 10 *(Exploratory Operations).*

¹./0    Exploratory Well: shall mean any well proposed and drilled as an Exploratory Operation.

2.21    Fabrication AFE: shall mean the individual AFEs collectively submitted pursuant to an approved Development Plan for the construction, fabrication or acquisition, and installation of a Production System.

Facilities: shall mean all production equipment beyond the wellhead connections (excluding Production Systems and Subsea Production Systems, but including injection and disposal wells) installed on or outside the Contract Area to handle or service Hydrocarbon production from the Contract Area. Facilities also include (but are not limited to) the flowlines and gathering lines that transport the Hydrocarbons from the wellhead but exclude pipelines used to transport Hydrocarbons to shore except to the extent the pipeline is required by the Development Plan to transport hydrocarbons from the Contract Area to the pipeline interconnect selected in the Development Plan.

2.23    Final Desizi AFEs: shall mean the individual AFEs, collectively submitted pursuant to an approved Development Plan pursuant to Article 12.5  *(Content of the Development Plan).*

2.24    Force Majeure: shall have the meaning ascribed in Article 25.1 *(Force Majeure).*

2.25    General Matters: shall mean any matter decided by a vote of the Parties in accordance with Article 8.2 *(Voting Procedures on General Matters and Elections).*  A proposal *as* a General Matter may or may not include an AFE; depending on the type of proposal. If the nature of the proposal requires that an AFE be submitted with the proposal, an affirmative vote for such proposal shall be evidenced by a Party's execution of the AFE for the proposal.

2./6    Geonhvsical Operations: shall mean geophysical surveys proposed pursuant to Article 9 *(Geophyscial Operations).*

4

.)7    Efvdrocarbons: shall mean the oil and gas and associated liquid and gaseous by-products (except helium) which may be produced from a wellbore located on the Contract Area.

2.23    Joint Account: shall mean the account maintained by the Operator' showing_ the charges paid and credits received by each of the Parties in the conduct of the operations hereunder as provided in this Agreement.

1.19    Lease(s): shall mean each of the OCS federal oil and gas Leases (or portion thereof) identified on Exhibit "A-1" attached hereto.

1.30    Non-Consent Operations: shall mean Exploratory Operations, Appraisal Operations or Development Operations for which one or more Parties, having the contractual right to do so, makes or is deemed to have made, an Election not to participate in the proposed operation; and where the Participating Parties proceed to conduct the operation at their sole Cost and risk pursuant to provisions of Article *16 (Non-Consent Operations).*

2.31    Non-Operating Party: shall mean any Party to this Agreement other than the Operator (or a substitute Operator).

2.32    Non-Participating Party: shall mean any Party to this Ageement who, having the contractual right to do so, makes or is deemed to have made, an Election not to participate in the proposed operation and who is subject to the provisions of Article 16 *(Non-Consent Operations).*

2.33    Non-Participating Party's Share: shall mean the share of Working Interest and Costs that a Non-Participating Party would have assumed if all Parties had made an Election to participate in the proposed operation.

2.34    Objective Depth: shall mean, for any well, the shallower of the total footage to be drilled (as measured in true vertical depth) or the penetration by the drill bit sufficient to test the stratiźaphic equivalent base of the deepest target formation or interval. Said depth, formation or interval (together with a bottomhole location) shall be set forth in the proposed Well Plan and AFE.

2.35    Overator: shall mean the Party identified in Article 4.1 *(Designation of the Operator)* designated to conduct all operations pursuant to the terms of this Agreement. The term shall also refer to any successor or substitute Operator selected pursuant to Article 4.2 *(Substitute Operator)* or Article 4.5 *(Selection of Successor Operator).*

2.36    Particioatin2 Interest: shall mean a Participating Party's percentage of participation in the Costs, risks and benefits (including rights to Hydrocarbons) of an operation conducted pursuant to this A ement; that is, the proportion that the Party's Working Interest bears to the total Working Interest of all the Participating Parties or such different Cost sharing basis that has been aueed upon by the Participating Parties in such operation.

5

2.37    <u>Participating Party:</u> shall mean a Party who makes an Election to participate in sharing the Costs, risks and benefits (including rights to Hydrocarbons) of an operation conducted pursuant to this Agreement. If the Parties have agreed upon a different Cost sharing arrangement, those Parties shall be considered Participating Parties for all purposes of this Agreement.

2.33    <u>Producible Reservoir:</u> shall mean a Hydrocarbon accumulation into which a Producible Well has been drilled and which is separated from and not in oil or 2as communication with any other accumulation.

2.39    <u>Producible Well:</u> shall mean a well producing hydrocarbons or, if not producing, a well that shall meet, according to either the MMS or the Participating Parties by unanimous agreement, the "well producibility criteria" set forth in Title 30 CFR 250.116 or any succeeding order issued by an appropriate governmental authority.

2.40    <u>Production System:</u> shall mean an offshore structure (whether fixed, compliant, subsea or floating), and all associated components thereof including the associated Facilities, flowlines, gathering lines, subsea tiebacks to another production system and risers which are used for the production of Hydrocarbons from the Contract Area. This term shall also include the following defined terms:

Subsea Production System: shall mean an offshore subsea structure (i.e., where multiple wells or a single well could be utilized) or template and the components thereof (including flowlines and control systems) which are attached to the seafloor for use in obtaining Hydrocarbon production from a well not drilled from a Production System and routed to the Production System;

Initial Production System: shall mean the Production System for the Contract Area included in the first approved Development Plan;

Subsequent Production System: shall mean any new or expanded Production System proposed after the installation of the Initial Production System for the Contract Area.

2.41    <u>Project Team ("PT"):</u> shall mean the coup of employees, contract employees andior consultants of the Participating Parties assiped to assist the Operator with preparing a Development Plan for the Contract Area, and for the planning, desizn, engineering, fabrication, transportation, installation and operation of a Production System for the Contract Area as further provided for in Exhibit *"G" (Project Team and Technology Sharing Provisions).*   The PT shall be formed pursuant to Article 12  *(Project Team, Development Plan and Fabrication AFE).*

2.42    <u>Sidetrack or Sidetracking.:</u> shall mean any operation to directionally control andlor intentionally deviate a welt so as to change the bottomhole location to another bottomhole location not deeper than the stratigraphic equivalent of the ori&lal Objective Depth,

excluding intentional deviation done to straighten the hole, drill around junk or to overcome other mechanical difficulties.

7    Subsequent Exploratory Operation: shall mean any operations conducted subsequent to an Exploratory Well reaching its Objective Depth but prior to the plugzing, and abandonment of such Exploratory Well.

Well Plan: shall mean a plan for any proposed Exploratory, Appraisal or Development Well which contains at least the information defined in Article 10.2.1  *(Well Plan's Minimum Specifics).*

2.45    Withdrawing Party: shall mean a Party that withdraws from this Agreement under the conditions defined in Article 17.1 *(Right of Withdrawal)* or is deemed to have withdrawn under Article 16.2 *Ocreage Forfeiture Provisions).*

2.46    Working Interest: shall mean the leasehold interest (or when applicable the operating rights interest) of each Party in and to each Lease within the Contract Area (expressed as the percentage described in Article I of Exhibit "A-2" attached hereto).


# ARTICLE 3
# EXHIBITS

3.1    Exhibits: All references in this Agreement to "Exhibits" without further qualification shall mean the Exhibits listed below and attached to this Agreement. Each of the Exhibits listed below are made a part of this Agreement and shall be deemed incorporated into the body of this Agreement by this reference, as completely as if the full text of each Exhibit were contained within the text of this Agreement. If the provisions of any of the Exhibits conflict with any provisions of this Agreement, the provisions of this Agreement shall prevail with exception of Exhibits "C," "D," and "G", each provision of which shall prevail over any provision of the body of this Agreement. If any provision of Exhibit "C" conflicts with any provision of Exhibit "G", the provision of Exhibit "G" shall prevail. If any provision of Exhibit "C" conflicts with any provision of Exhibit "D", the provision of Exhibit "C" shall prevail.

| | |
|---|---|
| Exhibit "A-I" | Contract Area |
| Exhibit "A-2" | Working Interests of the Parties, Operator and Representatives |
| Exhibit "B" | Offshore Insurance Provisions |
| Exhibit "C" | Accounting Procedure |
| Exhibit "D" | Gas Balancing Agreement |
| Exhibit "E" | Certification of Nonsegregated Facilities |
| Exhibit "F" | News Release Guidelines |
| Exhibit "G" | Project Team and Technology Sharing |
| Exhibit "H" | Dispute Resolution Procedure |

7

Exhibit "I"          Memorandum of Operating Agreement and Financing Statement

## ARTICLE 4 SELECTION OF OPERATOR

4.1     <u>IDesienation of the Operator:</u> Noble Energy, Inc. is desigiated as the Operator for the Contract Area and shall conduct all operations within such Contract Area required or permitted by *this* Agreement except *as* rioted below in Article 4.2 *(Substitute Operator)*. This designation of operatorship is subject to approval by the Minerals Management Service (MMS), and the Parties agree to promptly execute and file such documents as may be required to gain approval of this designation of operatorship.

4.2     <u>Substitute Operator:</u> If the Operator becomes a Non-Participating Party in a Non-Consent Operation, any Participating Party may be selected by the Participating Parties as a General Matter and designated as the substitute Operator, with the same authority, rights, obligations and duties as the Operator, except when:

(a)   the drilling and other contracts for equipment and Facilities to be utilized on the Non-Consent Operation are not assignable; or

(b)   the operation is conducted from a Production System being operated by the Operator.

If no substitute Operator is designated by the Participating Parties, then the Operator, at its option, shall conduct such Non-Consent Operations at the sole risk, Costs and expense of the Participating Parties and subject to their control, supervision and direction. If the Operator conducts Non-Consent Operations on behalf of the Participating Parties (when the Operator is a Non-Participating Party), the Operator shall furnish the Participating Parties an estimate of the Costs of the Non-Consent Operation. The Operator shall not be required to proceed with such Non-Consent Operations unless and until the Costs thereof have been advanced to it by the Participating Parties, to the end that the Operator need not expend any of its own funds for such Non-Consent Operation. If a Non-Consent Operation conducted by a substitute Operator is completed or results in a producing well, said well shall be turned over to the Operator for future operations within thirty (30) days of completion of such operations.

In the event that the Operator becomes a Non-Participating Party in a Non-Consent Operation but is selected by the Participating Parties to perform the Non-Consent Operation on behalf of the Participating Parties, the Participating Parties indemnity to a Non-Participating Party as set forth in Section 22.6 shall be applicable and extend to Operator while acting on behalf on behalf of the Participating Parties except to the extent any loss or cost is caused by the gross negligence or willful misconduct of the Operator while performing the Non-Consent Operation on behalf of the Participating Parties.

8

4. ‑.1   <u>Substitute Operator if Operator Fails to Commence Operations:</u> If the Operator (or substitute Operator) fails to timely commence an Exploratory Operation in accordance with Article 10.2.4 *(Timely Operations),* an Appraisal Operation in accordance with Article 11.1.4 *(Timely Operations)* or a Development Operation in accordance with Article 13.1.2 *(Timely Operations),* the non-operating Participating Parties may select a substitute Operator in the same manner as provided above and the substitute Operator shall serve *as* the Operator only:

(a)   for such operations through the release of the rig for the operations,

Co)   of the Lease on which the operations are conducted, and

(c)  with the same authority, rights, obligations, and duties as the Operator, subject to the limitations in (a) and (b).

4.3   <u>Resiziation of Operator:</u> The Operator may resign at any time by giving written notice to the Parties; provided, however, the Operator shall not resign during a Force Majeure situation described in Article 25.1 *(Force Ailajeure).* If the Operator no longer owns an interest in the Contract Area, except as hereinafter provided the Operator shall be deemed to have resigned without any action by the Non-Operating Parties other than the selection of a successor Operator, unless the Operator is transferring its Working interest to an Affiliate.

4.4   <u>Removal of Operator:</u> The Operator may be removed either as a result of an assignment of all or a portion of the Operator's Working Interest in the Contract Area or for good cause under the following circumstances.

4.4.1   <u>Removal Upon Assiztment:</u> If the Operator assigns all or a portion of its Working Interest in the Contract Area (excluding any interest assigned to an Affiliate) which reduces the Operator's Working Interest in a Contract Area to less than the Working Interest of the Participating Party owning the next largest Working, Interest owned on the effective date of the Operator's assignment, whether accomplished by single or multiple assigiments, then the Operator may be removed by vote of the Parties as a General Matter.

4.4.2   <u>Removal for Cause by Vote:</u> The Operator may be removed for cause by vote of the Parties as a General Matter if the Operator commits any of the following acts:

(a)   allowing one (1) or more materialmens, mechanics or similar liens to be placed on and to remain on the Contract Area for more than ninety (90) days without either posting a bond or initialing other legal action to clear the liens, or becoming insolvent or unable to pay its debts as they mature, makes an assignment for the benefit of creditors, commits any act of

9

bankruptcy or seeks relief under laws providing for the relief of debtors; or.

(b)    a receiver is appointed for the Operator or for substantially all of its property and/or affairs; or,

(c)    the Operator commits an act of zoss negligence or willful misconduct; or,

(d)    the Operator fails or is unable to meet the standards of operation contained in Articles  *5.2 (Workmanlike Conduct). 5.3 (Drilling), 5.4 (Liens and Encumbrances)* and *5.6 (Reports to Government Agencies);* or,

(e)    the Operator commits a substantial breach of a material provision of this Agreement and fails to cure same within thirty (30) days after receipt of notice of such breach. However, if the breach specified in the notice is of such a nature that it reasonably cannot be corrected within the thirty (30) day **period, and the Operator within said period begins corrective action or** steps to correct the breach and **thereafter diligently carries such corrective** action to completion, the Operator shall not be removed; or

(f)    the Operator fails to timely commence operations for the production System in accordance with Article 12.14  *(Timely Operations for Production Systems).*

4.5    <u>Selection of Successor Onerator:</u> Upon resignation or removal of the Operator; a successor Operator shall be selected by the Parties **as a General Matter. If the resigned or removed Operator fails to vote or votes only to succeed itself, then the successor Operator shall be selected as a General Matter after excluding the vote of the resigned or removed Operator. In the event there** are only two Parties to **this Agreement, the Non-Operating** Party **shall become the** Operator. If no Party is willing to become Operator, this Asreement shall terminate in accordance with Article 26.1 *(Term of Agreement).*

4.6    <u>Effective Date of Resination or Removal:</u> The resignation or removal of the Operator shall become effective at 7:00 a.rn. on the first day of the month following **a period of sixty (60) days after said notice or vote to remove, unless a longer period of time is required to obtain approval by the Minerals Management Service. Prior to the successor Operator's assumption of the** Operator's duties, the previous Operator (the "outgoing Operator") shall continue to exercise its authorities and meet its duties as Operator. **Upon selection of a successor Operator, the outgoing Operator shall be bound by the terms of this Agreement as a Non-Operating Party. The resignation or removal of the** outgoing Operator shall not prejudice any **rights, obligations or liabilities which accrued** during the period when the outgoing Operator acted as the Operator. If the outgoing Operator resigns or is removed, it shall be entitled to charge the Joint Account for the reasonable Costs incurred in connection with the change of operatorship.

10

4.7 <u>Delivery of Property:</u> On the effective date of resignation or removal of the Operator, the outgoing, Operator shall deliver to the successor Operator possession of everything jointly owned by the Parties, including all funds relating to the Joint Account, all joint Hydrocarbons, ail joint equipment, materials and appurtenances used in conducting operations and all books, records and inventories relating to joint operations (other than those books, records and inventories maintained by the outgoing Operator as the owner of a Working Interest). Upon such delivery, the outgoing Operator shall be discharged from all future rights and obligations as the Operator. The outgoing Operator shall further use its reasonable efforts to transfer to the successor Operator, effective as of the effective date of such resignation or removal, its rights as the Operator under all contracts exclusively relating to joint operations and the successor Operator shall assume all obligations of the Operator thereunder. As soon as practicable after the effective date of such resignation or removal, the Parties shall audit the Joint Account and conduct an inventory of all joint property and all joint Hydrocarbons, and such inventory shall be used in the return of and the accounting for the joint property and the joint Hydrocarbons by the outgoing Operator. All Costs incurred in connection with such audit and inventory shall be charged to the Joint Account.

## ARTICLE 5
## RIGHTS AND DUTIES OF OPERATOR

5.1 <u>Exclusive Right to Operate:</u> Except as otherwise provided, the Operator shall have the exclusive right and duty to conduct (or cause to be conducted) all operations pursuant to this Agreement. The Operator shall be and is an independent contractor in the performance of the work hereunder, not subject to the general direction and control of the other Parties, except *as* specifically described in this Agreement. With the exception of any team formed pursuant to this Agreement, the number of employees or contractors used by the Operator in conducting operations hereunder, their selection, and the hours of labor and the compensation for services performed shall be determined by the Operator, and all such employees or contractors shall be the employees or contractors, respectively, of the Operator. The Operator shall contract for and employ any drilling rigs, tools, machinery, equipment, materials, supplies and personnel reasonably necessary for the Operator to conduct the operations provided for in this Agreement; however, if a substitute Operator is designated to conduct an operation, the substitute Operator may, subject to Article 5.3 *(Drilling and Well Operations),* contract for and employ any drilling rigs, tools, machinery, equipment, materials, supplies and personnel reasonably necessary for the substitute Operator to conduct such operation.

5./ <u>Workmanlike Conduct:</u> The Operator shall conduct all operations in a proper and workmanlike manner in accordance with methods and practices customarily used in sound oil and gas field practice as would a reasonable and prudent operator under the same or similar circumstances. The Operator shall not be liable to the Parties for losses sustained or liabilities incurred in the physical operation of the Contract Area, except such as may result from its gross negligence or willful misconduct. Unless otherwise

11

provided, Operator shall consult with the Parties and keep them all informed of all important matters.

5.3   <u>Drilling. and Well Operations:</u> The Operator may have all drilling and well operations conducted by qualified and responsible independent contractors who are not affiliated with the Operator and are employed under competitive contracts. A competitive contract is a contract containing current terms, rates and provisions that do not exceed those generally prevailing, on the OCS in the Gulf of Mexico for operations involving drilling rigs not over-qualified for the proposed operation in similar environments, and equipped to the Operator's standard conditions which are capable of drilling the proposed well(s) within the time schedule for the operations to be. The Operator may, however, employ its or an Affiliate's equipment and personnel in the conduct of such operations pursuant to a written agreement among the Participating Parties.

5.4   <u>Liens and Encumbrances:</u> The Operator shall use reasonable efforts to keep the Leases, Production Systems, Facilities and other equipment and any jointly owned Hydrocarbons free from all liens and encumbrances, except those provided for in Article 6.3 (Security Rights), which might arise by reason of the operations conducted under this Agreement.

5.5   <u>Records:</u> The Operator shall keep accurate books, accounts and records of operations hereunder in compliance with the Accounting Procedure in Exhibit "C" *(Accounting Procedure).* Unless otherwise provided for in this Ageement, all records of the Joint Account shall be available to a Non-Operating Party at all reasonable times during the Operator's normal office hours pursuant to the provisions contained in Exhibit "C" *(Accounting Procedure).* The Operator shall use good-faith efforts to ensure the settlements, billings, and reports rendered to each Party under this Agreement are complete and accurate. The Operator shall notify the other Parties promptly upon the discovery of any error or omission pertaining to the settlements, billings, and reports rendered to each Party. This provision does not affect a Party's audit rights under this Agreement. This provision shall also apply to each Non-Operating Party's books, accounts, and records kept to support its charges to a Project Team.

5.6   <u>Reports to Government Agencies:</u> The Operator shall make timely reports to all governmental authorities that it *has* a duty to make as Operator and shall furnish copies of such reports to the Participating Parties. The Operator shall give timely written notice to the Parties of litigation ancllor administrative proceedings of which it has notice affecting the Contract Area or operations hereunder,

5.7   <u>Information to Participating Parties:</u> The Operator shall, in a timely manner, furnish each Participating Party the following information pertaining to each well being drilled (provided such information was obtained or received by Operator):

(a)     copy of the application for permit to drill and all amendments thereto;

12

CD)     daily drilling and workover reports by facsimile or other electronic transmission by 8:00 A.. M. which shall include but not be limited to daily mud checks, mud logs. lithological, and Hydrocarbon information; daily casing and cementation tallies and cumulative Costs incurred on the operation;

      complete report of all core analysis;

(d)     copies of any logs or surveys as run (including a complete "library tape" of the di tally recorded data);

(e)     copies of well test results, bottornhole pressure surveys, gas and condensate analyses or similar information;

      copies of reports made to or notices or orders received from regulatory agencies;

(g)     43 hours advance notice of logging, coring or testing operations (or, if conditions do not permit such advance notice, as much advance notice as is reasonably possible);

(h)     upon written request, and if sufficient quantifies are available, samples of cutting and sidewall cores marked as to depth, to be packaged and shipped at expense of the requesting Party;

(i)     copies of the drilling prognosis;

0)     if conventional cores are taken, the requesting Party shall be allowed access to inspect and evaluate said cores; and

(k)     samples of gas, condensate and oil, if sufficient quantities are available.

Upon written request, the Operator shall use its reasonable efforts to furnish to a requesting Participating Party any additional available information (including a complete slabbed section of all recovered cores, if requested and available), acquired by the Operator for the Participating Parties, not otherwise furnished under this Article (not including any derivative information independently developed at Operator's sole Cost and expense). The Costs of gathering and furnishing such additional available information shall be charged to the requesting Participating Party.

5.8     <u>Completed Well Information:</u> Operator shall, in a timely manner, furnish to each participating Party the following information pertaining to each completed well:

(a)     monthly report of production and injection;

Co)     copies of reports made to regulatory agencies;

13

Debtors' Exhibit No. 102
Page 16 of 166

(⁰)     report on status of wells not producing and not abandoned;

(d)     Hydrocarbon states report;

(e)     bottomho le pressure data;

(t)     composite of all logs run (e.g., TDT, Carbon-Oxygen, Spinner Surveys, Casing Collar, etc.); and,

(g)     reports of inventory.

5.9     Information to Non-Participating Parties: The Operator shall furnish to each Non-Participating Party copies of all non-confidential reports made to regulatory agencies. A Non-Participating Party shall be entitled to receive the information specified in Articles 5.7 and 5.8 only after fulfilling the requirements specified in Article 16 *(Non-Consent Operations).* A Party which has permanently relinquished all of its Working Interest in the Contract Area shall not be entitled to receive any information specified in Articles *5.7* and 5.8.

5.10    Cost Information: Within one hundred twenty (120) days after completion of a Non-Consent Operation, the Operator shall furnish all Parties an itemized statement of the Cost of such operations and an inventory of the equipment pertaining thereto or, at its option, the Operator in lieu of an itemized statement of such Costs may submit a detailed statement of monthly billings. For the purposes of calculating recoupment of Costs pursuant to Article 16 *(Non-Consent Operations),* the Operator shall furnish to all Parties a quarterly statement showing operating expenses and the proceeds from the sale of Hydrocarbon production from the wells from which recoupment is being made.

5.11    Managing Production: All Parties shall cooperate and use due diligence to avoid gas imbalances resulting in pipeline penalties under the provisions of the applicable transportation tariffs of any transporting pipelines. Any additional costs imposed on Operator as a result of gas pipeline imbalances with transporters shall be borne by the individual Parties in the proportion that each individual Party's over and under deliveries caused such imbalance penalty, except where the imbalance is caused by the gross negligence or willful misconduct of Operator in which case the Operator shall bear the entire penalty. For purposes of this _Article, gas pipeline imbalances shall be defined as the difference between gas nominations accepted by the gas transporter and the actual volume delivered to the Ras transporter for each Party's account.

## ARTICLE 6
### EXPENDITURES AND ANNUAL OPERATING PLAN

6.1     Basis of Charges to the Parties: Except as otherwise provided, the Operator shall pay all Costs of joint operations and each Participating Party shall reimburse the Operator, in

14

proportion to its Participating Interest, for the Costs of each joint operation. The Operator shall have the right to require each Participating Party to advance its respective share or estimated expenditures, as provided in Exhibit "C" *(Accounting Procedure).* Funds received by the Operator under this Azcement *may* be commingled with Operator's own funds. All charges, credits and accounting for expenditures shall be made pursuant to Exhibit "C" *(Accounting Procedure),* attached hereto.

6.<sup>1</sup>   Authorization for Expenditure: The Operator shall not make any single expenditure or undertake any project or operation costing Two Hundred Thousand Dollars ($200,000) or more, unless an Authorization for Expenditure (AFE) has either (1) been included in a proposal for an operation and approved by the Participating Parties through their Election to participate in the operation, or (2) been approved by the Parties as a General Matter. For any single expenditure or project costing in excess of Fifty Thousand Dollars ($50,000), but less than Two Hundred Thousand Dollars ($200,000), the Operator need not submit an AFE, but shall furnish written information describing the expenditure to each of the Participating Parties. En the event of an emergency and notwithstanding the foregoing, the Operator shall be empowered to immediately make such expenditures for the Joint Account of the Participating Parties *as,* in its opinion as a reasonable and prudent Operator, are required to deal with the emergency. The Operator shall report to the Participating Parties, as promptly as possible, the nature of the emergency and action taken.

Notwithstanding anything in this Article 6.2 to the contrary, if less than all the Participating Parties in an operation elect to approve the supplemental AFE for such operation and if there is not agreement among the Parties desiring to continue such operation to each bear their revised proportionate share of one hundred percent (100%) of the liability and Costs of the continued operation, the Operator shall, unless such Parties otherwise agreed to allocate such liability and Costs, terminate the operation. If the Operator terminates the operation, each of the original Participating Parties shall be obligated to bear and pay their proportionate share of all the liabilities and Costs incurred by the Operator up to and including the termination of the operation, including, if applicable, all Costs associated with any plugging and abandonment of a well, whether or not such Costs exceed the currently approved AFE by greater than the Permitted Over-expenditure amount. Additionally, notwithstanding a Party's Election pursuant to Article 6.2.2 *(Supplemental AFE for Cost Overruns for Wells)* to become a Non-Participating Party once the Permitted Over-expenditure has been exceeded, if at the conclusion of such drilling operation the well is plugged and abandoned, each Participating Party in the original drilling operation shall continue to be obligated to pay for its respective share of all Costs of plugging and abandoning the well (except for any increased plugging and abandonment Costs associated with any subsequent well operations conducted as a Non-Consent Operation).

6.2.1   AFE Overran Notice: For informational purposes only, the Operator shall provide an AFE overrun notice to all Participating Parties whenever it appears (based

15

upon Operator's reasonable estimate) that the actual total Costs associated with any separate AFE will exceed the original AFE by more than ten percent (10%).

6.2.2 <u>Supplemental AFE for Cost Overruns for Wells</u>: If during the drilling. of Exploratory Wells, subsequent Exploratory Operations, Appraisal Wells, subsequent Appraisal Operations, Development Wells, or subsequent Development Operations, it appears (based upon Operator's reasonable estimate) that the actual Costs will exceed the latest approved AFE for the well by more than fifteen percent (15%) or three million dollars (53,000,000), whichever is less, (the "Permitted Over-expenditure" for an Exploratory Well, an Appraisal Well or a Development Well, or for operations in that well after its has reached its Objective Depth), Operator shall submit a supplemental AFE to the Participating Parties to make an Election as to their further participation in the approved welt operation. Any Participating Party which becomes a Non-Participating Party as to such further operation under this Article 6.2.2 shall be subject to (i) the provisions of Article 16 *(Non-Consent Operations)* once the actual costs expended on the activity or operation exceed the Permitted-Overexpenditure amount of the last AFE in which the Non-Participating Party elected to participate or (ii) the acreage forfeiture provisions of Article 16.4 *(Non-Consent Operations to Maintain Contact Area)*, if applicable.

6.2.3 <u>Supplemental AFE for Cost Overruns on Prof ect Team AFE</u>: If it appears (based upon Operator's reasonable estimate) that the actual Project Team Costs will exceed the latest approved AFE by more than fifteen percent (15%) or three million dollars ($3,000,000), whichever is less, (the "Permitted Over-expenditure" for a Project Team), Operator shall submit a supplemental APE to the Participating Parties to make an Election as to their further participation in the Project Team AFE. Any Participating Party which becomes a Non-Participating Party as to such further operation under this Article 6.2.3 shall be subject to the provisions of Article 16.5.3 *(Non-Consent Geophysical Operations, Feasibility Study, Project Team and/or Development P1an)* once the actual costs expended on the activity or operation exceed the Permitted-overexpenditure amount of the last AFE in which the Non-Participating Party elected to participate or (ii) the acreage forfeiture provisions of Article 16.4 *(Non-Consent Operations to Maintain Contact Area)*, if applicable.

6.2.4 <u>Supplemental AFE for Cost Overruns on Final Desizn AFE</u>: If it appears (based upon Operator's reasonable estimate) that the actual desigi Costs will exceed the latest approved Final Design AFE by more than fifteen percent (15%) or five million dollars (55,000,000), whichever is less, (the "Permitted Over-expenditure" for a Final Desizi AFE), Operator shall submit a supplemental AFE to the Participating Parties to make an Election as to their further participation in the Final Design AFE. Any Participating Party which becomes a Non-Participating Party as to such further operation under this Article 6.2.4 shall be subject to (i) the provisions of Article 16.5.3 *(Non-Consent Geophysical Operations, Feasibility*

16

*Study, Project Team and, or Development Plan)* once the actual costs expended on the activity or operation exceed the Permitted-Over-expenditure amount of the last AFE in which the Non-Participating Party elected to participate or (ii) the acreage forfeiture provisions of Article 16.4 *(.Von-Consent Operations to ,Waintain Contact Area),* if applicable.

6.2.5 <u>Supplemental AFE for Cost Overruns on Fabrication AFE:</u> If it appears (based upon Operator's reasonable estimate) that the actual Costs associated with any separate AFE submitted under the Fabrication AFE will exceed the latest approved Fabrication AFE by more than fifteen percent (15%) or twenty million dollars (520,000,000), whichever is less, (the "Permitted Over-expenditure" for a Fabrication AFE), Operator shall submit a supplemental AFE to the Participating Parties to make an Election as to their further participation in the Fabrication AFE. Any Participating Party which becomes a Non-Participating Party as to such further operation under this Article 6.2.5 shall be subject to (i) the provisions of Article 16.2 *(.lion-Consent Fabrication AFE for the Initial Production System)* for the Initial Production System, or (ii) the provisions of Article 16.5.5 *(Non-Consent Subsequent Production System and Facilities)* once the actual costs expended on the activity or operation exceed the Permitted-Overexpenditure amount of the last AFE in which the Non-Participating Party elected to participate. or (iii) the acreage forfeiture provisions of Article 16.4 *(Non-Consent Operations to Maintain Contact Area),* whichever is applicable.

6.2.6 <u>Supplemental AFE for Cost Overruns on All Other AFEs:</u> If it appears (based upon Operator's reasonable estimate) that the actual Costs will exceed the latest approved AFE for the operation by more than fifteen percent (15%) or one million dollars (S1,000,000), whichever is less, (the "Permitted Over-expenditure" for All Other AFEs), Operator shall submit a supplemental AFE to the Participating Parties to make an Election as to their further participation in the operation. Any Participating Party which becomes a Non-Participating Party as to such further operation under this Article 6.2.6 shall be subject, if applicable, to the provisions of Article 16 *(Von-Consent Operations)* once the actual costs expended on the activity or operation exceed the Permitted-Over-expenditure amount of the last AFE in which the Non-Participating Party elected to participate or (ii) the acreage forfeiture provisions of Article 16.4 *(Non-Consent Operations to Maintain Contact Area),* if applicable.

6.2.7 <u>Further Operations During a Force Majeure:</u> No Participating Party shall be allowed to make an Election not to participate in a further operations under Articles 6.2.2 *(Supplemental AFE for Cost Overruns for Wells),* 6.2.3 *(Supplemental AFE for Cost Overruns on Project Team AFE),* 6.2.4 *(Supplemental AFE for Cost Overruns on Final Design AFE),* 6.2.5 *(Supplemental AFE for Cost Overruns on Fabrication AFE)* or 6.2.6 *(Supplemental AFE for Cost Overruns on All Other AFEs)* during a Force

17

Nfajeure or other emergency as described in Article 25.1 *(Force ILfajeure).* but may make its Election not to participate after termination of such emergency.

6.3   <u>Security Rights:</u> In addition to any other security rights and remedies provided by law with respect to services rendered or materials and equipment furnished under this Agreement, the Parties shall have the following security rights:

    6.3.1   <u>Operator's First Lien:</u> Each Non-Operator grants the Operator a first lien upon each Party's Working Interest in the Leases within the Contract Area but only to the extent of the charges and expenses arising under such agreement, (including any interests in the Leases now owned or hereafter acquired), including but not limited to (a) all equipment installed on the Lease(s), (b) all Hydrocarbons or other minerals severed and extracted from or attributable to the Leases, (c) all accounts and proceeds of sale (including, but not limited to, accounts resulting from the sale of such Hydrocarbons or other minerals), contract rights and general intangibles arising in connection with the sale of such Hydrocarbons or other minerals, (d) fixtures and (e) any and all accessions, additions and attachments thereto and the proceeds and products therefrom. This first lien shall secure the payment of all charges against such Party, together with interest thereon at the rate set forth in Exhibit *"C" (Accounting Procedure)* (or the maximum rate allowed by law, whichever is the lesser), reasonable attorneys' fees, court costs and other directly related collection costs. If any Party does not pay such charges when due, the Operator shall have the additional right to collect from the purchaser of defaulting Party's Hydrocarbon production the proceeds from the sale of such Party's share of Hydrocarbon production in the Contract Area until the amount owed has been paid. Each purchaser shall be entitled to rely on the Operator's statement concerning the amount owed.

    6.3.2   <u>Non-Operating Party's Security Interest:</u> Operator grants a like security interest to the Non-Operating Parties to secure payment of Operator's proportionate share of expenses. Each Party paying its share of unpaid expenses pursuant to Section *6.5 (Unpaid Charges)* hereof shalt, to obtain reimbursement thereof, be subrogated to the security• rights described herein.

    6.3.3   <u>Recordation:</u> To provide evidence of, and to better protect the Parties' security rights created hereunder, upon request, each Party agrees to and shall execute and notarize a financing statement on a L;CC form, and the Memorandum of Joint Operating Agreement attached as Exhibit "I". The Parties hereby authorize the Operator to file the notarized Memorandum of Joint Operating Agreement to provide record notice of this Agreement in the appropriate public records.

6.4   <u>Default:</u> If any Party does not pay its share of the charges authorized under this Agreement when due, the Operator shall give that Party notice that unless payment is made within thirty (30) days, the non-paying Party shall be in default. Any Party in default shall have no further access to the rig, maps, records, data, interpretations or other

13

information obtained in connection with operations or be allowed to participate in meetings. A Party in default shall not be entitled to vote on any General Matter until such time as the Party in default is no longer in default. The voting interest of each non-defaulting Party shall be counted in the proportion its Participating Interest bears to the total non-defaulting Participating Interests. As to any operation approved during the time a Party is in default, such Party in default shall be deemed to be a Non-Participating Party. If a Party notifies the Operator in writing that all or a portion of such payment is being made subject to a good faith dispute over such charges, such dispute shall be subject to an expedited audit process as follows: 1) the Non-operator disputing the charge may require an audit of the matter in dispute be initiated within ninety (90) days after the date Operator receives the notice of the dispute, and 2) the contract committee referred to in "Addendum to Exhibit C. Section I, Paragraph 53" shall be required to act upon the audit exceptions, if any, within ninety (90) days after the date of the audit report, and 3) if the contract committee is unable to resolve the dispute within such ninety (90) day period, the dispute shall be handled in accordance with the dispute resolution procedures described in Exhibit "I".

6.5    <u>Unpaid Charges:</u> If any Participating Party fails to pay its share of the charges due hereunder within thirty (30) days after receipt of a default notice from the Operator, the Operator may take immediate steps to diligently pursue collection and to exercise the Operator's lien and security rights granted by this Agreement. The Operator shall keep an accurate account of amounts owed (plus interest and costs) by the Party in default and any amounts collected against the indebtedness. If a Party is in default and any indebtedness remains delinquent for a period of three (3) months, the other Participating Parties shall, upon the Operator's request, pay the unpaid amount in proportion that their Participating Interest bears to all paying Participating Interests. Each Participating Party paying its share of the unpaid amount shall be subrogated to the Operator's lien and security rights to the extent of such payment.

6.6    <u>Carved-out Interests:</u> The agreements creating any overriding royalty, production payment, net proceeds interest, carried interest or any other interest carved out of a Working Interest in a Lease(s) shall specifically make such interests inferior to the rights of the Parties to this Agreement. If any Party whose Participating Interest is so encumbered does not pay its share of expenses, and the proceeds from the sale of its Hydrocarbon production under Article 6.3 *(Security Rights)* are insufficient for that purpose, the security rights provided for herein may be applied against the carved-out interests with which such Working Interest is burdened. In such event, the rights of the owner of such carved-out interest shall be subordinated to the security rights granted by Article 6.3. Additionally, in the event a Party elects not to participate in any operation hereunder and becomes a Non-Participating Party pursuant hereto, then and in that event, the Participating Parties shall acquire the interests of such Non-Participating Party with respect to such Election, free and clear of any and all obligations created under or pursuant to any carved-out interest as described above.

19

6.7    <u>Annual Operating Plan:</u> Beginning in the year in which a Development Plan is approved for the Contract Area, and each subsequent year thereafter, the Operator shall develop an Annual Operating Plan. The Annual Operating Plan process will be used (I) as a reporting mechanism by which the Operator will inform the Non-Operating Parties of results of the previous year's activities, (2) to review ongoing operations and (3) to forecast activities, anticipated Hydrocarbon production volumes, operating expenses and capital expenditures for the remainder of the current year and the next succeeding calendar year.

6.7.1    <u>Development and Submission of the Annual Operating Plan:</u> Prior to May 1 of each year, the Operator will conduct a meeting with the Non-Operating Parties to review the results of the previous year. The Operator will also provide the Non-Operating Parties with its anticipated activities for the current and following year and solicit input regarding these activities from the Non-Operating Parties. After this meeting, the Operator will prepare and submit its proposed draft for the Annual Operating Plan prior to June 1 of each year.

6.7.2    <u>Review of the Annual Operating Plan:</u> The Non-Operating Parties will provide suggested changes, additions or deletions to the Annual Operating Plan to the Operator and all other Parties prior to July 15 of each year. The Operator will then make any changes it deems necessary and submit the Annual Operating Plan no later than October 1 of each year.

6.7.3    <u>Content of Annual Operating Plan:</u> The Annual Operating Plan will include an estimated capital budget, expense budget and Operator's anticipated forecast as follows:

6.7,3.1    <u>Capital Budget:</u> The Annual Operating Plan shall contain an estimated capital budget that includes the following:

(a)    a list of proposed wells to be drilled including their anticipated order, drilling time, depths, locations, objective sands, type of well (Development, Appraisal, etc.), purpose of well (production, injection, etc.) and estimated Costs;

(b)    capital workovers, which shall be defined as any workover operation conducted to recomplete a well to a new zone or install artificial lift, listed by well, with their estimated Cost;

(c)    other capital projects requiring a gross expenditure greater than three million dollars ($3,000,000). The term "capital project" shall include addition of new equipment, expansion or upgrades of existing equipment; and

(d)    an estimated total amount (in aggregate) for capital projects.

6.7.3.2   <u>Expense Budget:</u> The Annual Operating Plan shall contain an estimated expense budget that includes the following:

(a)   expense workovers, which shall be defined as any anticipated workover operation which is not a capital workover (such as repair work or reworks within the same zone), listed by well, with their estimated Cost;

(b)   all expense projects requiring a gross expenditure greater than three million dollars ($3,000,000). The term "expense project" shall include repair, replacement, inspection arid maintenance of existing equipment;

(c)   an estimated total amount (in aggregate) for expense projects; and

(d)   estimated Operations and Maintenance (O&M) expenditures for the year may be shown in the aggregate. O&M expenses shall include the ongoing, everyday expenditures necessary to operate the field.

6.7.3.3   <u>Operator Forecasts and Enformational Items:</u> The Annual Operating Plan shall contain the Operator's reasonable forecasts and projections (but are recognized as forecasts and projections only) including the following information:

(a)   production forecasts;

(b)   injection forecasts;

(c)   fuel and flare gas forecasts;

(d)   scheduled or planned downtime exceeding three (3) days;

(e)   data collection programs; and

(f)   other areas deemed of significance by the Operator.

6.7.4   <u>Effect of the Annual Operating Plan:</u> The Annual Operating Plan shall be primarily for informational and planning purposes and shall not obligate any Party to any expenditures or constitute an Election to participate in any specific operation. However, the Annual Operating Plan is recognized as the Operator's effort to forecast and plan for activities during the year while providing for input from the Non-Operators. Pursuant to the terms and conditions of this Agreement,

21

any Party may make proposals for operations which were not included in the Annual Operating Plan. Approval of any such operation. under the terms provided in Article *8 (Voting. Election & :Votices).* shall be deemed a modification to the Annual Operating. Plan.


ARTICLE 7
CONFIDENTIALITY OF DATA

7.1   <u>Confidentiality Obligation:</u> The Parties agree that all Confidential Data acquired or obtained by any Party with respect to the joint operations conducted under this Agreement shall be kept confidential during the term of this Agreement. Each Party agrees to maintain the secrecy of the Confidential Data using at least the standard of care it normally uses in protecting its own confidential information and trade secrets. The Confidential Data shall be made available to each Participating Party for its exclusive use. During the confidentiality period, the Confidential Data shall not be disclosed to any third party(ies) (unless disclosed under an "exception to confidentiality" under Article 7.1.1 or as a "permitted disclosure" under Article 7.1.2 or in accordance with Article 7.5).

   7.1.1   <u>Exceptions to Confidentiality:</u> The confidentiality obligation shall not apply to the extent that particular items of Confidential Data:

      (a)   are now or later become part of the public domain (other than as a result of a wrongful act or omission by a Party); or

      (b)   are now or later become available to a Party on a non-confidential basis from a source, other than a Party hereto, that is legally permitted to disclose the item of Confidential Data; or

      (c)   were known to a Party on. a non-confidential basis prior to the disclosure of the Confidential Data to it under the terms of this Agreement or to which such Party was otherwise entitled at the time of disclosure; or

      (d)   is independently developed by employees or contractors of a Party who have not had access to Confidential Data.

   7.1.2   <u>Permitted Disclosures:</u> The Operator may disclose items of Confidential Data to such third parties as may be necessary in connection with the operation of the Contract Area, provided such third parties are bound by written agreement to keep secret the Confidential Data for a period of time not less than two (2) years (or a lesser period if agreed by all Parties). The Operator shall promptly inform the other Parties hereto of the names of such third parties and list the items of Confidential Data disclosed. Notwithstanding anything herein to the contrary and

subject to the restrictions that: (i) the Confidential Data shall not be removed from the custody and premises of the Party making such disclosure, excepting disclosure made pursuant to items (a), (b), (c). (d) and (e) below; and (ii) that such third party be bound by written agreement not to use or disclose the Confidential Data except for the express purpose for which such disclosure is to be made, any Party may disclose, in whole or in part, the Confidential Data:

(a) to any Affiliate of such Party provided such Affiliate shall be bound by the confidentiality provision contained herein; or

(b) to any bona tide, *financially responsible,* prospective assignee of any portion of such Party's Working Interest (including but not limited to an entity with whom a Party or its Affiliates is conducting bona fide negotiations directed toward a merger, consolidation or a sale of a Party's or an Affiliate's shares or substantially all of its assets in the OCS Gulf of Mexico); or

(c) to any potential contractors or professional consultants engaged by or on behalf of such Party and acting in that capacity where such disclosure is essential to such contractor's or consultant's work; or

(d) to any bank or other financial institution to the extent appropriate to a Party arranging financing for its obligations under this Agreement; or,

(e) to the extent required by the terms of any Lease, or by law, order, decree, regulation or rule (including without limitation, those of any regulatory agency, securities commission, stock exchange, judicial or administrative proceeding). If a Party is legally compelled to disclose any Confidential Data, then such Party shall promptly provide all other Parties to this Agreement written notice of such proceedings so that the non-disclosing Parties may seek a protective order or other remedy. A disclosing Party shall furnish only such Confidential Data as is legally required and will use its reasonable efforts to obtain confidential treatment for any Confidential Data disclosed; or,

(f) to an entity desiring to transport and/or purchase Hydrocarbons produced hereunder.

7.1.3 <u>Limited Releases to Offshore Scout Association:</u> The Operator may disclose the following well information at weekly Offshore Oil Scout meetings:

7_1.3.1 <u>Well Location:</u>

(a) proposed surface location;

23

(b)      surveyed surface location with X & Y;

(c)      proposed bottom hole location;

(d)      KB and water depth;

(e)      OCS number and well number; and

(f)      actual bottom hole location (must be reported within two weeks of reaching total depth of the well).

7.1.3.2   <u>Well Operations:</u>

(a)      rig move in date;

(b)      spud date;

(c)      weekly drilling depth, MW;

(d)      casing depths, cement, EMWs;

(e)      mud weight, sidewall cores, cores, RFTs (only that they were taken);

(f)      logs (only the depths and type run);

(g)      date Total Depth is reached; and

(h)      date rig is released.

7.1.3.3   <u>Well Completion Information:</u>

(a)      **any Media Release or public filing of well completion information will be furnished at weekly Scout meetings.**

7.1.4   <u>Continuing. Confidentiality Obligation:</u> Any Party who ceases to own a Working Interest in the Contract Area shall nonetheless remain bound by the confidentiality and use obligations of this Agreement as to any Confidential Data obtained through this Agreement.

7.2   <u>Ownership of Confidential Data:</u> Except as otherwise provided for in this Article, all Confidential Data produced as a result of a joint operation shall be the joint property of all Participating Parties in that operation. Any Non-Participating Party shall have no rights in or access to Confidential Data produced or derived from a Non-Consent

2$

Operation unless and until the provisions of Article *16 (Non-Consent Operations)* are satisfied.

7.2.1 <u>Well Log and Data Trades:</u> Any Participating Party may propose the exchange or trade of any jointly owned Confidential Data for other similar data and information owned by a third party. The approval of such exchange or trade shall require unanimous approval of the Participating Parties which own such data. Upon approval of such trade by the Participating Parties, the Operator shall consummate such exchange or trade with the third party. The Operator shall promptly provide all Participating Parties copies of the third party data obtained along with copies of any agreement relating to such exchange.

7.**1.**") <u>Ownership of Non-Consent Data:</u> When the Non-Participating Party becomes a Participating Party in the operation, as provided herein, such non-consent Confidential Data and information previously withheld from such Non-Participating Party shall thereafter become jointly owned by the Party and in such event the Operator of such operation shall promptly provide the Confidential Data to such Party.

7.3 <u>Access to the Lease and Rig:</u> Each Participating Party's authorized representatives shall have access to any drilling rig, Production System or Facility serving the Contract Area to observe and inspect operations and wells in which it participates (and the records and other data pertaining thereto). Access by the Participating Party to any drilling rig, Production System or Facility serving the Contract Area shall be arranged through the Operator *twenty-four (24)' hours in* advance (or, if conditions do not permit, as much advance notice as is reasonably possible), Each Party's access will be at its sole risk and expense and at reasonable times and provided such access does not unreasonably interfere with the operations being conducted.

7.4 <u>Development of Proprietary Information and/or Technology:</u> The ownership, use, treatment and disclosure of any proprietary information and/or technology specific to drilling technology, production technology, production structure and Facilities and their transportation and installation, pipelines, flowlines and offshore oil and gas transportation which are charged to the joint account shall be handled in accordance with Exhibit "G" *(Project Team and Technolov Sharing).*

7.5 <u>News Releases:</u> The Parties shall use reasonable efforts to unanimously agree upon the timing and content of releases to the news media concerning operations covered by this Agreement. However, in the event the Parties cannot unanimously agee upon either the timing and/or content of the news release within twenty-four (24) hours of receipt of such proposed news release, then, if one (I) or more Parties still desires to make a news release, the news release may be prepared in accordance with Exhibit "F" *(News Release Guidelines).*

25

ARTICLE 8
VOTING, ELECTIONS & NOTICES

8.1     <u>Overall Sunervision of Business Affairs:</u> The activities of the Parties under this Ageernent that are not within the scope of the Operator's authority to unilaterally decide under Article  *5 (Rights and Duties of Operator)*  or Article 6.2  *(Authorization for Expenditure)* shall be divided into the following broad classes:

(a)     "General Matters" for which a vote for approval is required prior to action, but no accompanying Election regarding participation is required ), or;

(b)     Proposed operations for which both a vote for approval as a General Matter and an accompanying Election regarding participation are required prior to conducting the operation. (An example of such a General Matter is an Appraisal Well proposed, approved and elected upon under Article 11. 1), or;

(c)     Proposed operations for which a vote for approval as a General Matter is not required and where only an Election regarding participation is required for such operation. (An example of such an operation is an Election for a Fabrication AFE proposed pursuant to a previously approved Development Plan under Article 12.8 *(Fabrication AFE)* without the requirement for approval as a General Matter).

The Parties shall decide and take action upon all General Matters and Elections in accordance with the provisions of this Article 8.

8.2     <u>Voting Procedures on General Matters and Elections:</u> Any General Matter shall require the approval of the Parties and shall be decided by a vote of the Parties as follows:

8.2.1     <u>Voting and Electing Interest:</u> Each Party shall have a voting interest and/or an electing interest equal to its Working Interest in the Contract Area or, with respect to a Non-Consent Operation, its Participating Interest in such operation, as applicable.

8.2.2     <u>Vote Required:</u> The Parties shall attempt to reach  *unanimous agreement* regarding proposals requiring approval of the Parties. However, in the event that the Parties cannot unanimously agree, (except as otherwise provided in this Agreement), a General Matter shall be decided by an affirmative vote of either:

(a)     should there be only one (1) Party entitled to vote, a General Matter approval shall require an affirmative vote of one (1) Party having a voting interest of greater than zero percent (0%), including as to any of the following proposed operations which will require the affirmative vote of one (1) Party having a voting interest of greater than zero percent (0%):

Exploratory Operations (Article 10),

26

Appraisal Operations (Article 11), or

Development Operations (Article 13).

(b)    should there be two (2) or more Parties entitled to vote, a General Matter approval shall require the affirmative vote of two (2) or more of the Parties having a combined voting interest of greater than fifty percent (50%), except as to any of the following proposed operations which will require the affirmative vote of one (1) or more Parties having a combined voting interest of twenty-five percent (25.00000%) or *greater:*

Exploratory Operations (Article 10),

Appraisal Operations (Article 11), or

Development Operations (Article 13).

Each Party who voted to approve the General Matter shall execute the accompanying AFE evidencing its Election to participate in the approved proposal if an Election is necessary (i.e., proposal included AFE). For General Matters where an AFE is not required with a proposal, a Party shall evidence its vote for approval in writing. A Party failing to vote, or respond timely to a General Matter, shall be deemed to have voted against the proposal.

8.23    <u>Second Opportunity to Participate:</u> Unless otherwise provided to the contrary in this Ageement, if an activity or operation is approved by vote or Election but is not approved by all of the Parties, any Party who either:

(i)    voted against the proposal; or

(ii)    failed to vote and/or make an Election;

shall have forty eight (48) hours (exclusive of Saturdays, Sundays and federal holidays) from receipt of notice from the Operator of the original voting or Election results, to respond with a vote or Election as to its participation in the proposal. Failure to respond in a timely manner shall be deemed a vote or Election not to participate. When *a* drilling rig is on location and standby charges are accumulating, the time permitted for such a response shall not exceed twenty-four (24) hours (inclusive of Saturday, Sunday or legal holidays).

8.2.4    <u>Participation by Fewer Than All Parties:</u> Except as otherwise provided in this Am'eement, a Participating Party has the right to limit participation to its Working Interest and is riot required to assume its proportionate share of the Non-Participating Party's interest. If, after the period provided in Article 8.2.3 elapses

27

there is at least one (I) Non-Participating Party in the approved activity or operation, each Party who made an original or subsequent vote or Election to participate in the approved activity or operation shall have the option to either:

(i)     limit its participation in the approved activity or operation to its Working Interest share, or

(ii)    to assume its proportionate share of the Non-Participating Party's interest and agree to bear its Participating Interest share of the approved activity or operation

by written correspondence to the Operator. Failure to submit that written correspondence shall be deemed a vote or Election under (i). If the Participating Parties fail to assume one hundred percent (I00%) of the Cost and risk of the proposed operation within fifteen (15) days following receipt of the written correspondence, the proposal shall have no further effect and it shall be *as* if the proposal had never been made. Notwithstanding the foregoing, when a drilling rig is on location and standby charges are accumulating, the time permitted for such a response shall not exceed twenty-four (24) hours (inclusive of Saturday, Sunday or legal holidays).

8.3     <u>Response Time for General Matters and Elections:</u> After receipt of notice pursuant to this Article 8, the Parties shall either: (i) submit their vote in response to a General Matter proposal as described under Article 8. I (a) or (b), or (ii) make an Election if the proposal does not require a vote as a General Matter as described under Article 8.1(c). The Operator shall give prompt notice of the results of such voting or Elections to each Party. Unless specified otherwise herein, the response times required for each type of proposal shall be as follows:

8.3.1     <u>Well Operation Proposal:</u> When any proposed well operation does not require construction of a Production System, each Party shall respond with their vote or Election within thirty (30) days after receipt of the proposal. When a drilling rig is on location and standby charges are accumulating, a vote or an Election in response to the proposal shall be made within forty-eight (48) hours after receipt of the proposal (exclusive of Saturdays, Sundays and federal holidays); provided that the forty-eight (48) hour provision of this Article 8.3.1 shall not apply to a new well (other than a substitute well) proposed under Articles 10.2 *(Proposal of Exploratory Operations),* 11.1 *(Proposal of Appraisal Operations)* or 13.1 *(Proposal of Development Operations).*

8.3.")     <u>Production System Construction/Fabrication AFE:</u>     Elections involving the construction and installation of a Production System shall require a response within ninety (90) days after receipt of the Fabrication AF Es.

28

3.3.3   <u>Other AFE Related Operations:</u> Except as otherwise provided for in Articles 8.3.1 *(Well Operation Proposal)* and 8.3.2 *(Production System Construction),* the response time to a proposed operation will depend upon the AFE gross expenditure amount. Response times will be as follows:

   (a)   AFE of 5200,000 or more but less than $20.000,000 response will be made within thirty (30) days after receipt of said proposal.

   (b)   AFE of $20,000,000 or more but less than 550,000,000 response will be made within sixty (60) days after receipt of said proposal.

   (c)   AFE of $50,000,000 or more response will be made within ninety (90) days after receipt of said proposal.

8.3.4   <u>Other Proposals:</u> For all other proposals requiring notice, each Party shall respond with an Election or vote within thirty (30) days after receipt of the proposal.

3.3.5   <u>Failure to Respond:</u> Failure of any Party to respond to a proposal within the required period shall be deemed a vote against a General Matter (if required by the nature of the proposal) and, if applicable, an Election not to participate.

8.16   <u>Suspensions of Production and Suspensions of Operation:</u> Anything in this Article 8.3 *(Response Time for General Matters and Elections)* notwithstanding, if the MMS grants a Suspension of Production (an "SOP") or a Suspension of Operations (an "SOO") or similar regulatory grant for all or any part of the Contract Area and if the SOP, SOO or grant requires the commencement of an activity or operation before the expiration of the period for voting or making an Election for that activity or operation, the deadline for the response time shall precede the commencement date required in the SOP, SOO or grant by thirty (30) days, if reasonably possible, or otherwise any other reasonable shorter tirneframe.

8.3.7   <u>Standby Charges:</u> The Participating Parties in a prior operation shall be responsible for standby charges accrued until all Parties having a right to do so, have made an election to either participate or not participate in a subsequent proposed operation_ All standby charges accruing after the final election regarding the subsequent operation has been made, shall be the responsibility of the Participating Parties in the subsequent operation.

8.4   <u>Meetings of the Parties:</u> In addition to the annual meeting required by Article 6.7 *(Annual Operating Plan),* meetings of the Parties shall be called by the Operator upon its own motion or at the request of any Party. Except in the case of emergency, or except when agreed by unanimous consent, no meeting shall be called on less than ten (10) days (exclusive of Saturdays, Sundays and federal holidays) advance notice, and such notice shall include an agenda of the meeting. The representative of the Operator shall be chairman of each meeting and shall take minutes of each meeting. Only matters set out in

29

the agenda for the meeting shall be considered at the meeting unless unanimously agreed to by all the Parties to this A2re.ernent.

8.5     Designation of Representatives: The names, addresses, telephone numbers and facsimile numbers of the representatives to whom notices and responses should be directed are set forth in Article IV of Exhibit "A-2" attached hereto. The designated representatives may be changed by written notice to the other Parties in accordance with Article 8.7 *(Giving and Responding to Notices).*

*8.6*     Participation Elections: An Election to participate in an Exploratory Operation, an Appraisal Operation and a Development Operation shall include an Election to participate in all necessary expenditures for such operation as set out in the approved proposal for such operation; including but not limited to drilling, testing and logging an Exploratory Well, Appraisal Well and Development Well to its Objective Depth (including plu4ng¹abanclorunent) as set out in its Well Plan; subject to the provisions of Article 6.2 *(Azahori:ation for Erpenditure).*

8.7     Giving and Responding to Notices:     All notices and responses (including notices/proposals of General Matters, Elections) shall be made in writing and delivered in person or by U.S. mail, overnight express, courier service, or facsimile transmission (followed by a phone call confirming receipt), with postage and charges prepaid, addressed to the Parties at the addresses set forth in Article IV of Exhibit "A-2". When a drilling rig is on location and standby charges are accumulating, all notices and responses shall be given by telephone and immediately confirmed in writing. Any notices and responses shall be effective only when received by the Party to whom such notice, proposal or response is directed. Any notice or response transmitted by facsimile shall be deemed Riven and received only after the receiving Party has confirmed receipt of such facsimile. Any notice or response transmitted by overnight express carrier, courier, or certified mail shall be deemed given and received if delivery to the designated address is confirmed by carrier.

8.3     Content of Notice: Any notice which requires a response within a time period shall indicate which of the response times specified in Article 8.3 *(Response Time for General Matters and Elections)* is required. If a notice proposes a well operation, the notice shall include the following information:

(a)     the type of well operation being proposed, i.e., Exploratory, Appraisal or Development Operation(s);

(b)     the Well Plan for the proposed operation; and

(c)     an AFE showing the estimated Costs of the operation, including all necessary expenditures associated with the drilling, testing and completing or abandoning the well.

30

ARTICLE 9
GEOPHYSICAL OPERATIONS

9.1     <u>Geophysical Operations:</u> Any Party may propose to acquire or process geophysical surveys (other than shallow hazard surveys, velocity surveys or other similar well bore eeophysical operations) to evaluate all or any portion(s) of the Contract Area at any time during the term of this Agreement. These geophysical surveys may consist of either conducting "proprietary' surveys, purchasing "speculative" surveys from vendors or participating in "group shoot" surveys. Geophysical Operations are independent operations and are not to be considered Exploratory, Appraisal or Development Operations, and may be conducted simultaneously with Exploratory, Appraisal or Development Operations.

   9.1.1   <u>Conduct of Proprietary Geophysical Operations:</u> The Operator shall conduct all proprietary geophysical surveys (or processing) for the joint account of the Participating Parties based upon their Participating Interest share of the Costs of the surveys. The Operator shall provide the Participating Parties with copies of all field data and support documentation as appropriate for any and all seismic data collected from the geophysical survey. The Operator shall obtain all licenses and/or permits from all governmental agencies necessary to support the surveys. The joint ownership of any proprietary geophysical data derived from a proprietary survey shall be limited to the field tapes i.e., raw data and initial processing and subsequent processing conducted at joint expense (not including re-processed or interpreted data obtained by a Party at its sole cost and expense) and owned on the basis of the Parties' Participating Interests in the survey. If the geophysical data is acquired by a geophysical contractor instead of through the Operator, then wherever in this Article the word "Operator" appears "Contractor" shall be substituted therefor. If a Party elects not to participate in a proprietary geophysical survey, then a Participating Party shall elect to either: (i) proceed with the Geophysical Operation with the interest of the Non-Participating Party shared by the Participating Parties on the basis of their respective Working Interests, unless otherwise aeeed, or (ii) change its Election to become a Non-Participating Party. A Non-Participating Party shall not be entitled to any geophysical data obtained from the proprietary geophysical survey unless the Non-Participating Parry agrees to become an underinvested Party per terms of Article 16.5.3 *(Non-Consent Geophysical Operations, Feasibility Study, Project Team and/or Development Plan).*

   9.1.2   <u>Group-Shoot And Speculative Seismic Surveys:</u> The Parties shall make a good faith effort to coordinate the acquisition of any new group-shoot or speculative seismic surveys covering one or more of the Leases within the Contract Area. This shall enable all Parties who desire to acquire such data to take advantage of group or partnership rates available from most seismic contractors and will allow each Party a license to use such data. For such joint seismic data purchases

31

covering the Leases, the acquiring Parties shall mutually azee upon the Cost shares of the total licensing fee (rather than on their Working Interest shares).


# ARTICLE 10
## EXPLORATORY OPERATIONS

10.1   <u>Application:</u> The Costs, risks and obligations of Exploratory operations conducted in accordance with this Agreement shall be borne by the Parties as provided in Article 10.2.4 *(Exploratory Operations Costs)* below.

10.2   <u>Proposal of Exploratory Operations:</u> Any Party may propose to conduct an Exploratory Operation within the Contract Area by giving notice of the proposal (along with the associated AFE and Well Plan) to all other Parties Once an Exploratory Operation is approved (either as a General Matter or as an Election), the Operator (or substitute operator) shall commence the Exploratory Operation at the sole Cost and risk of the Participating Parties. Except as provided in Article 16.2 *(Acreage Forfeiture Provisions)* and Article 16.4 *(Yon-Consent Operations to Maintain Contract Area),* Costs of a non-consent Exploratory Operation will be recouped in accordance with Article 16 *(Non-Consent Operations).*

   10,2.1   <u>Well Plan's Minimum Specifics:</u> The Well Plan for any Exploratory Well(s) and any proposed Subsequent Exploratory Operation will include at least the following information:

   (a)   the surface and target bottomhole locations;

   (b)   the expected spud date and the anticipated time necessary to conclude drilling, evaluation, completion andlor abandonment operations;

   (c)   the true vertical depth to be drilled, along with the specified Objective Depth (and other target zones to be penetrated);

   (d)   the proposed drilling plan, including the casing program and any anticipated Sidetracking operations;

   (e)   details of any coring, logging or other evaluation operations to be conducted; and

32

(      information concerning the drilling rig to be used, including, day rates, water depth rating, arid other limitations relevant to the drilling operations to be conducted.

10.2.2    <u>Counter Proposals:</u>    If, within fifteen (15) days after a proposal for an Exploratory Well has been submitted, any other Party submits a counter proposal for:

(a)     an alternative surface or bottom hole location; or

(b)     an alternative Objective Depth

for the proposed Exploratory Well, then the Operator shall call for a meeting of the Parties (to be held within five (5) days of the receipt of the last counter proposal) for the purpose of determining by the Vote of the Parties, which location or Objective Depth shall be proposed. In the event neither the original proposal nor any counter proposal(s) receive approval by Vote, there shall be a period of twenty (20) days from receipt by the other Party(s) of the last counter proposal, during which the Parties shall use good faith efforts to reach agreement as to which location or Objective Depth shall be proposed for the Exploratory Well. If, at the conclusion of said twenty (20) day period the Parties have not reached agreement, the Operator shall select the proposal upon which the Parties make their Election and, notwithstanding the provisions of 8.3 *(Response Time for General Matters and Elections.),* the Parties shall have fifteen (15) days after receipt of notice of the Operator's selection in which to make an Election. After an Exploratory Well has been approved by Election and operations have commenced, the remaining counter proposals shall be deemed withdrawn.

10.2.3    <u>Pre-Spud Technical Meeting & Revision of Well Plan:</u> Subsequent to the approval of the Exploratory Operation as a General Matter, but prior to commencing such Exploratory Operation (other than a substitute operation), the Participating Parties shall meet for a "Pre-Spud Technical Meeting". The purpose of the meeting is to review the Well Plan describing the specific operations planned for the Exploratory Well. Any proposed revision to the operations specified in the original Well Plan and AFE shall require unanimous agreement of the Participating Parties. Any such revision to the Well Plan shall be evidenced by the joint signature of an amended AFE for the proposed Exploratory Operation. In the absence of agreement upon a revised Well Plan, the original Well Plan and AFE shall stand as approved. Any revisions to the original Well Plan or AFE by the Participating Parties shall not give any Non-Participating Party an additional opportunity to make a Participation Election unless the Objective Depth is changed, or the target bottom hole location is changed by more than 500 feet, in which case the Exploratory Operation shall be proposed anew. The Well Plan for an Exploratory Operation shall be

33

deemed automatically revised with each Sidetracking.. Deepening or additional Exploratory Operation approved by the Participating Parties.

10.2.4   <u>Timely Operations:</u> An Exploratory Operation shall be commenced within two hundred seventy (270) days following the end of the period for the approval of the Exploratory Operation with the exception that such commencement deadline shall be automatically extended for the time period attributable to Force Majeure (excluding the inability to secure materials or a rig) as provided in Article 25.1 *(Force Majeure).*

If the Operator, except for an occurrence of Force Majeure (excluding the inability to secure materials or a rig), fails to commence the Exploratory Operation within that two hundred seventy (270) day period, the approved Exploratory Operation shall be deemed withdrawn, with the effect as if the Exploratory Operation had never been proposed and approved, and the Non-Operating Parties may then select a substitute Operator in accordance with Article 4.2.1 *(Substitute Operator if Operator Fails to Commence Operations).*

*If* an approved original or identical Exploratory Operation is deemed withdrawn due to a failure to timely commence operations on that well, all Costs incurred, which are attributable to the preparation for, or in furtherance of, that Exploratory Operation, will be chargeable to the Participating Parties. An Exploratory Operation shall be deemed to have commenced on the date the rig arrives on location or, if the rig is already on location, the date when actual operations for the proposed Exploratory Operation are undertaken.

10.2.5   <u>Exploratory Operations Costs:</u> The Costs, risks and obligations associated with drilling, testing, logging and abandoning (whether permanent or temporary) an Exploratory Well, any substitute well and any subsequent Exploratory Operations shall be borne by the Participating Parties in proportion to their Participating Interest in such Exploratory Operation.

10.2.6   <u>AFE Overruns and Substitute Well:</u> The Operator shall timely commence an Exploratory Operation and continue the operation with due diligence to the Objective Depth or until:

(a)   a supplemental AFE is required pursuant to Article 6.2 *Outhori:ation for Ecpenditure),* or

(b)   the Operator encounters mechanical difficulties, uncontrolled influx of subsurface water, abnormal pressures, pressured or heaving shale, salt, granite or other practically impenetrable substances or other similar conditions prevail in the hole that render further drilling impracticable, or

34

(c)     the unanimous agreement of the Participating Parties to cease drilling before reaching the Objective Depth.

El the Exploratory Well is abandoned due to the conditions described under 10.2.6 (b), then the Operator or any Participating Party may propose a substitute well (with the associated AFE and Well Plan), and each Participating. Party in the abandoned Exploratory Welt shall make *an* Election whether to participate in the proposed substitute well. The proposal for a substitute Exploratory Well shall not require approval as a General Matter. The Operator (or substitute Operator) shall commence the substitute well at the sole Cost and risk of the Parties making an Election to participate. Any Party who makes an Election not to participate in either (a) above or a substitute well shall be subject to either the Cost percentage recoupment provisions or the acreage forfeiture provisions of Article 16 *(Non-Consent Operations),* whichever is applicable.

10.3    <u>Subsequent Exploratory Operations at Objective Depth:</u> After (i) the Exploratory Well (or its substitute) has been drilled to its Objective Depth, (ii) all operations in the controlling AFE and Well Plan have been completed or terminated (except plug and abandon) and (iii) all logs and tests (excluding production tests) have been distributed to the Participating Parties, the Operator, shall promptly notify the Participating Parties of the Operator's proposal for one of the following operations:

(a)     conduct Additional Testing, Coring or Logging of the formations encountered prior to setting production casing;

(b)     sidetrack the well bore to core the formations encountered;

(c)     Deepen the well to a new Objective Depth (however, if a casing string is required to Deepen the well, then option "d" shall precede Deepening the well);

(d)     Sidetrack the well to another bottomhole location not deeper than the stratigaphic equivalent of the original Objective Depth;

(e)     conduct production testing;

conduct other operations on the well not listed;

(g)     temporarily abandon the well; or

(h)     permanently plug and abandon the well.

Unless unanimously agreed otherwise by the Participating Parties, the completion of an Exploratory Well shall be proposed and conducted as a Development Operation. Notwithstanding any contrary provision of this Agreement, if one or more operations are proposed before the distribution of

35

information resulting from the previously approved operation, then the response periods set forth in this Article 10.3 shall not commence until the Parties entitled to make an Election have received the information from the previously approved operation.

10.3.1    <u>Response to Operator's Proposals:</u> Within forty-eight (43) hours (exclusive of Saturdays. Sundays and federal holidays) after receipt of Operator's proposal to conduct Subsequent Exploratory Operations, each Participating Party shall respond to the Operator's proposal by making its Election to participate in Operator's proposal or by making a counterproposal. Failure of a Participating Party to respond to a proposal (except a proposal to plug and abandon) shall be deemed an Election not to participate in the Operator's proposal and to become a Non-Participating Party from that point.

10.3.2    <u>Counterproposals:</u> If a Participating Party makes a counterproposal for Subsequent Exploratory Operations, the other Participating Parties shall have an additional twenty-four (24) hours to respond to all counterproposals. **If** conflicting proposals for Subsequent Exploratory Operations are made, preference for voting shall be given first to operation (a), next to operation (b), and so forth as set forth in Article 10.3 *(Subsequent Exploration Operations at Objective Depth).* If different depths or bottom hole locations are proposed for Subsequent Exploratory Operations, preference shall be given to the shallowest depth (or the bottom hole location nearest the existing well bore) and then to other depths or bottom hole locations in descending (or more distant) order. After a decision to conduct a Subsequent Exploratory Operation is made and the Subsequent Exploratory Operation is commenced, the remaining proposals for other types of subsequent Exploratory Operations shall be deemed withdrawn. At the completion of the Subsequent Exploratory Operation, the Operator shall again submit proposal(s) for Subsequent Exploratory Operations to the Participating Parties, through the procedure provided herein, until such time as the well is temporarily or permanently abandoned.

10.3.3    <u>Approval of Subsequent Exploratory Operations by All Parties:</u> If the proposed Subsequent Exploratory Operation is approved by all the Participating Parties, the Operator shall commence the Subsequent Exploratory Operation at the Cost(s) and risk of the Participating Parties.

10.3.4    <u>Approval of Subsequent Exploratory Operations as a General Matter by Fewer Than All Parties:</u> If a proposal for Subsequent Exploratory Operations (except a proposal to plug and abandon which shall be approved in accordance with Article 10.4 *[Permanent Plugging and Abandoning costs]* or Article 18.1 *[Abandonment of Wells],* whichever is applicable), is approved as a General Matter by fewer than all Parties, then the Operator (or substitute Operator) shall, pursuant to Article 8.13 *(Second Opportunity to Participate)* and Article 8.2_4 *(Participation by Fewer Than All Parties),* conduct the operation at the sole

36

Cost and risk of the Participating Parties. Any Non-Participating Party in a Subsequent Exploratory Operation shall be subject to Article 16.5.1 *(Von-Consent Exploratory and Subsequent Exploratory Operations).* A Non-Participatine Party in a Subsequent Exploratory Operation shall be relieved of the Costs, risks and obligations of the Subsequent Exploratory• Operation, except as to its share of the Costs of plugging and abandoning the Exploratory Well in its then current condition. No operation shall be performed on the well unless deemed by the Operator to be safe and the well bore is in a condition to perform the proposed operation.

10.3.5   <u>Subsequent Exploratory Operations If Not Approved as a General Matter:</u> If no proposed Exploratory Operation (except a proposal to plug and abandon which shall be approved in accordance with Article 10.4 *[Permanent Plugging and Abandoning Costs]* or Article 18.1 *[Abandonment of Wells],* whichever is applicable) receives sufficient vote to be approved as a General Matter pursuant to Article 10.3.4 *(Approval of Subsequent Exploratory Operations as a General Matter by Fewer Than All Parties),* then prior to an Exploratory Well being plugged and abandoned, Operator (or substitute Operator) shall conduct at the sole Cost and risk of the Participating Parties, the proposed Subsequent Exploratory Operation receiving the largest percentage of Working Interest approval, and in the event of a tie vote between two (2) or more of such proposed Subsequent Exploratory Operations, then preference shall be given first to operation (a) then (b) and so on, as set forth in Article 10.3 *(Subsequent Exploratory Operations at Objective Depth).* Any Non-Participating Party in such Subsequent Exploratory Operation shall be subject to Article 16 *(Non-Consent Operations).* Such Non-Participating Party shall be relieved of the Costs, risk and obligation of the Subsequent Exploratory Operation, except as to its share of the Costs of plugging and abandoning *the* Exploratory Well in its then-current condition. No operation shall be performed on the well unless deemed by the Operator to be safe and the well bore is in a condition to perform *the* operation.

10.4   <u>Permanent Plugging, and Abandoning Costs:</u> The peLmanent plugging and abandonment of an Exploratory Well that:

(a)      is to be plugged due to mechanical difficulties or impenetrable conditions before the well has been drilled to its Objective Depth in accordance with Article 10.2.6(b),

(b)      is to be plugged under Article 10.3 *(Subsequent Exploratory Operations at Objective Depth),* or

(c)      has been previously temporarily abandoned under Article 10.3 *(Subsequent Exploratory Operations a! Objective Depth)*

37

and has not produced Hydrocarbons (other than as a result of production testing). requires the unanimous approval of the Participating Parties except as otherwise provided in this Article 10.4. Approval to plug and abandon an Exploratory Well that has produced Hydrocarbons (other than as a result of production testing) shall be governed by Article [8.1 *(Abandonment of Wells)*.   If any Participating Party fails to respond within the applicable response period for a proposal to plug and abandon an Exploratory Well, that Participating Party shall be deemed to have approved the plugging and abandonment of that Exploratory Well. If a rig is on location and a proposal to plug and abandon an Exploratory Well under either Article 10.4(a) or 10.4(b) does not receive unanimous approval, then, if within twenty-four (24) hours (inclusive of Saturdays, Sundays and federal holidays) after receipt of that proposal no other operation is proposed (and subsequently approved) for a well by a Party entitled to make a proposal, the Operator may nonetheless proceed to plug and abandon that Exploratory Well, and shall give each Participating Party notice of that fact. If the proposal to plug and abandon an Exploratory Well that has riot produced Hydrocarbons (other than as a result of production testing) does not receive unanimous approval, but the Operator deems the well bore not to be safe or in sound enough condition for it to perform further operations, the Operator may nonetheless proceed to plug and abandon that Exploratory Well and shall give each Participating Party notice of that fact.

The Participating Parties in an Exploratory Well proposal shall pay all Costs of plugging and abandoning that Exploratory Well, except all increased plugging and abandoning Costs associated solely with a Non-Consent Operation approved under Article 10.3 *(Subsequent Exploratory Operations at Objective Depth)* or Article 6.2.2 *(Supplemental AFE for Cost Overruns for Wells).*   The Participating Parties in that Non-Consent Operation are responsible for the increased plugging and abandoning Costs attributable to that Non-Consent Operation.

10.5   Conclusion of Exploratory Operations: Except as provided in Article 10.2.6 *(AFE Overruns and Substitute Well),* Exploratory Operations shall cease after the abandonment of the first Producible Well, whether permanent or temporary, and the release of the rig from that Producible Well.

10.6   Subsurface Team: Within sixty (60) days after release of any rig that drills a newly discovered Producible Reservoir, unless otherwise mutually agreed, the Parties shall form a subsurface team. The subsurface team will include at least one (1) representative from each of the Parties. Each Party shall be responsible for designating its representative(s) for the subsurface team. A Party's representatives for the subsurface team may be changed at any time. The salaries, burdens, benefits, other compensation and expenses of each subsurface team member shall be the responsibility of the Party employing or providing the subsurface team member. The Operator shall serve as the coordinator for the subsurface team. Members of the subsurface team will work independently at office locations provided by the Party designating such member. The responsibilities of the subsurface team shall include but not be limited to the following items:

33

- making recommendations for Appraisal Operations,

- evaluating potential Producible Reservoirs within the Contract Area, and;

- advising the Project Team regarding. subsurface matters so the Project Team can more effectively assist the Operator in the preparation of the Development Plan pursuant to Article 12 *(Project Team, Development Plan and Fabrication AFE).*

The subsurface team will meet as it deems necessary to carry out the above activities. Once the subsurface team is formed, it will remain in existence until the expiration or dissolution of the Contract Area.

## ARTICLE 11
## APPRAISAL OPERATIONS

11.1   <u>Proposal of Appraisal Operations:</u> After completion of Exploratory Operations, any Party may propose to conduct an Appraisal Operation within the Contract Area by giving notice of the proposal (along with the associated AFE and Well Plan) to all other Parties. Once an Appraisal Operation is approved (either as a General Matter or as an Election), the Operator (or substitute operator) shall commence the Appraisal Operation at the sole Cost and risk of the Participating Parties. Except as provided in Article 16.2 *(Acreage Forfeiture Provisions)* and Article 16.4 *(Non-Consent Operations to Maintain Contract Area),* Costs of a non-consent Appraisal Operation will be recouped in accordance with Article 16 *(Non-Consent Operations).*

11.1.1   <u>Well Plan's Minimum Specifics:</u> The Well Plan for the Appraisal Operation shall include at least the information set forth under Article 10.2.1 *(Well Plan's Minimum Specifics).*

11.1.2   <u>Counter Proposals:</u>   If, within fifteen (15) days after a proposal for an Appraisal Well has been submitted, any other Party submits a counter proposal for:

(a)   an alternative surface or bottom hole location; or

(b)   an alternative Objective Depth

for the proposed Appraisal Well, then the Operator shall call for a meeting of the Parties (to be held within five (5) days of the receipt of the last counter proposal) for the purpose of determining by the Vote of the Parties, which location or Objective Depth shall be proposed. In the event neither the original proposal nor any counter proposal(s) receive approval by Vote, there shall be a period of twenty (20) days from receipt by the other Party(s) of the last counter proposal, during which the Parties shall use good faith efforts to reach

39

agreement as to which location or Objective Depth shall be proposed for the Appraisal Well. If, at the conclusion of said twenty (20) day period the Parties have not reached agreement, the Operator shall select the proposal upon which the Parties make their Election and, notwithstanding the provisions of 8.3 *(Response Time for General Matters and Elections),* the Parties shall have fifteen (15) days after receipt of notice of the Operator's selection in which to make an Election. After an Appraisal Well has been approved by Election and operations have commenced, the remaining counter proposals shall be deemed withdrawn.

11.1.3   <u>Pre-Spud Technical Meeting & Revision of Well Plan:</u> The Pre-spud Technical Meeting & Revision of the Well Plan shall be in accordance with Article 10.2.3 *(Pre-Spud Technical Meeting & Revision of Well Plan).*

11.1.4   <u>Timely Operations:</u> An Appraisal Operation shall be commenced within two hundred seventy (270) days following the end of the period for the approval of the Appraisal Operation with the exception that such commencement deadline shall be automatically extended for the time period attributable to Force Majeure (excluding the inability to secure materials or a rig) as provided in Article 25.1 *(Force Majeure).*

If the Operator, except for an occurrence of Force Majeure (excluding the inability to secure materials or a rig), fails to commence the Appraisal Operation within the two hundred seventy (270) day period, the approved Appraisal Operation shall be deemed withdrawn, with the effect as if the Appraisal Operation had never been proposed and approved, and the Non-Operating Parties may then select a substitute Operator in accordance with Article 4.2.1 *(Substitute Operator if Operator Fails to Commence Operations).*

*If* an approved or identical Appraisal Operation is deemed withdrawn due to a failure to timely commence operations on that well, all Costs incurred, which are attributable to the preparation for, or in furtherance of, that Appraisal Operation, will be chargeable to the Participating Parties. An Appraisal Operation shall be deemed to have commenced on the date the rig arrives on location or, if the rig is already on location, the date when actual operations for the proposed Appraisal Operation are undertaken.

11.1.5   <u>AFE Overruns and Substitute Well:</u> The Operator shall timely commence an Appraisal Operation and continue the operation with due diligence to the Objective Depth or until:

(a)      a supplemental AFE is required pursuant to Article 6.2 *(AuthorLation for Expenditure),* or

40

(o)    the Operator encounters mechanical difficulties, uncontrolled influx of subsurface water, abnormal pressures, pressured or heaving shale, salt, granite or other practicably impenetrable substances or other similar conditions prevail in the hole that render further drilling impracticable, or

(c)    the unanimous agreement of the Participating Parties to cease drilling before reaching the Objective Depth.

If the Appraisal Well is abandoned due to the conditions described under 11.1.5 (b), then the Operator or any Participating Party may propose a substitute well (with the associated AFE and Well Plan), and each Participating Party in the abandoned Appraisal Well will make an Election whether to participate in the proposed substitute well. The Operator (or substitute Operator) shall commence the substitute well at the sole Cost and risk of the Parties making an Election to participate. Any Party who makes an Election not to participate in either (a) above or a substitute well shall be subject to either the percentage Hydrocarbon recoupment provisions or the acreage forfeiture provisions of Article 16 *(Non-Consent Operations),* whichever is applicable..

11.[7] Subsequent Appraisal Operations at Objective Depth: After (1) the Appraisal Well (or its substitute) has been drilled to its Objective Depth, (ii) all operations in the controlling AFE and Well Plan have been completed or terminated (except plug and abandon) and (iii) all logs and tests (excluding production testing) have been distributed to the Participating Parties, the Operator, shall promptly notify the Participating Parties (and Non-Participating Party(ies) in the case of a proposal under 11.2 (c) and (d), if applicable) of the Operator's proposal for one of the following operations:

(a)    conduct Additional Testing, Coring or Logging of the formations encountered prior to setting production casing;

(b)    sidetrack the well bore to core the formations encountered;

(c)    Sidetrack the well to another bottomhole location not deeper than the stratigraphic equivalent of the original Objective Depth;

(d)    Deepen the well to a new Objective Depth;

(e)    conduct production testing;

(f)    conduct other operations on the well not listed;

(g)    temporarily abandon the well; or

(j)    permanently plug and abandon the well.

41

Unless unanimously agreed otherwise by the Participating Parties. the completion of an Appraisal Well shall be proposed and conducted as a Development Operation. Notwithstanding any contrary provision of this Am<sub>t</sub>ement, if one or more operations are proposed before the distribution of information resulting from the previously approved operation, then the response periods set forth in this Article 11.2 shall not commence until the Parties entitled to make an Election have received the information from the previously approved operation.

1 1.2.1    Response to Operator's Proposals: Within forty-eight (43) hours (exclusive of Saturdays, Sundays and federal holidays) after receipt of Operator's proposal to conduct subsequent Appraisal Operations, the Participating Parties shall respond to the Operator's proposal by making its Election to Operator's proposal or making a counterproposal. Failure of a Participating Party to respond to a proposal (except a proposal to plug and abandon) shall be deemed an Election not to participate in the Operator's proposal and to become a Non-Participating Party from that point.

11.'.[7] Counterproposals: If a Participating Party makes a counterproposal for a subsequent Appraisal Operation, the other Participating Parties shall have an additional twenty-four (24) hours to respond to all counterproposals.  **If** conflicting proposals for subsequent Appraisal Operations are made, preference for voting shall be given first to operation (a) above, next to operation (b) above, and so forth. If different depths or locations are proposed for subsequent Appraisal Operations, preference shall be given to the shallowest depth (or the location nearest the existing well bore) and then other depths or locations in descending (or more distant) order. After a decision to conduct a subsequent Appraisal Operation is made and the subsequent Appraisal Operation is commenced, the remaining proposals for other types of subsequent Appraisal Operations shall be deemed withdrawn. At the completion of the subsequent Appraisal Operation, the Operator shall again submit proposal(s) for subsequent Appraisal Operations to the Participating Parties, through the procedure provided herein, until such time as the well is plugged and abandoned.

11.2.3    Approval of Subsequent Appraisal Operations by All Parties: If the proposed subsequent Appraisal Operation is approved by all the then Participating Parties, the Operator shall commence the subsequent Appraisal Operation at the Cost(s) and risk of the Participating Parties.

11.2.4    Approval of Subsequent Appraisal Operations as a General Matter by Fewer Than All Parties: If a proposal for subsequent Appraisal Operations (except a proposal to plug and abandon which shall be approved in accordance with Article 11.5  *[Permanent Plugging and Abandoning Costs]*  or Article 18.1 *[Abandonment of Wells],*  whichever is applicable), is approved as a General

42

Matter by fewer than all Parties, then the Operator (or substitute Operator) shall. pursuant to Article 8.2.3 *(Second Opportunity to Participate)* and Article 8.2.4 *(Participation by Fewer Than All Parties),* conduct the operation at the sole Cost and risk of the Participating Parties. Any Non-Participating Party in a subsequent Appraisal Operation shall be subject to Article 16.5.2 *(Von-Consent Appraisal Operations).* A Non-Participating Party in a subsequent Appraisal Operation shall be relieved of the Costs, risks and obligations of the subsequent Appraisal Operation, except as to its share of the Costs of plugging and abandoning the Appraisal Well in its then-current condition. No operation shall be performed on the well unless deemed by the Operator to be safe and the well bore is in a condition to perform the proposed operation.

1 1".5    <u>Subsequent Appraisal Operations If Not Approved as a General Matter:</u> If no proposed Appraisal Operation (except a proposal to plug and abandon) receives sufficient vote to be approved as a General Matter pursuant to Article 11.2.4 *(Approval of Subsequent Appraisal Operations as a General Matter by Fewer Than All Parties),* then prior to an Appraisal Well being plugged and abandoned, Operator (or substitute Operator) shall conduct at the sole Cost and risk of the Participating Parties, the subsequent Appraisal Operation receiving the largest percentage of Working Interest approval, and in the event of a tie vote between two (2) or more of such proposed Appraisal Operations, then preference shall be given first to operation (a) then (b) and so on., as set forth in Article 11.2 *(Subsequent Appraisal Operations at Objective Depth).* Any Non-Participating Party in such subsequent Appraisal Operation shall be subject to Article *16 (Non-Consent Operations).* Such Non-Participating Party shall be relieved of the Costs, risk and obligation of the subsequent Appraisal Operation, except as to its share of the Costs of plugging and abandoning the Appraisal Well in its then-current condition. No operation shall be performed on the well unless deemed by the Operator to be safe and the well bore is in a condition to perform the operation.

11.3    <u>Election by Original  Non-Participating. Parties in Deepening or Sidetracking Appraisal Operations:</u> If an Appraisal Well is drilled to its initial Objective Depth and the Participating Parties have secured the requisite approval to either:

(a)    Sidetrack said well, or

(b)    Deepen said well,

then, contingent upon the unanimous approval of the Participating Parties in the approved Sidetrack or Deepen operation, the Operator shall notify each original Non-Participating Party of the proposal. Each original Non-Participating Party may respond with an Election regarding such a proposal to Deepen or Sidetrack by notifying the Operator of its Election within forty-eight (48) hours (exclusive of Saturdays, Sundays and federal holidays) after receiving the Operator's notice. Any original Non-Participating Party

43

making an Election to participate in the Deepening or Sidetracking of an Appraisal Well shall:

(i)     be deemed to be underinvested in an amount equal to its share of the Cost incurred in such Non-Consent Well (including but not limited to drilling. testing, logging or coring) prior to such Deepening or Sidetracking and subject to Article 16.9 *(Underz'nvestment of Costs)* (and the Parties that participated in drilling to the initial Objective Depth will be deemed overinvested in that amount), and

(ii)    remain a Non-Participating Party in the Appraisal Well to the initial Objective Depth until the Costs recoverable under Article 16 *(Non-Consent Operations).* less any payments through a Disproportionate Spending Settlement andlor Article 16.9 *(Underinvestment of Costs),* have been recouped by the original Participating Parties.

11.4    <u>Deeper Drilling:</u> A proposal to drill an Appraisal Well to an Objective Depth below the deepest Producible Reservoir penetrated by a Producible Well or to re-enter and Deepen an existing Appraisal Well to an Objective Depth below the deepest Producible Reservoir penetrated by a Producible Well shall require approval as a General Matter and shall be further subject to the following provisions.

11.4.1    <u>Limited Participation in Deeper Drilling:</u> If a proposal is made pursuant to Article 11.4 *(Deeper Drilling)* above, any Party may either:

(a)    make an Election to participate in the proposed Deeper Drilling operation; or

(b)    make an Election not to participate in the proposed Deeper Drilling operation; or

(e)    make an Election to limit its participation to drilling to the base of the deepest Producible Reservoir to be penetrated by the Deeper Drilling operation.

A party making an Election to limit its participation in a deeper Appraisal Well to the base of the deepest Producible Reservoir under (c) above shall bear its Participating interest share of the Cost and risk of drilling (including abandonment) to the base of the deepest Producible Reservoir subject to the provisions of Article 6.2.2 *(Supplemental AFE for Cost Overruns for Wells).* If a Party makes an Election not to participate in the proposed Deeper Drilling, the proposed operations shall be conducted pursuant to Article 16 *(Non-Consent Operations).*

44

11.5    <u>Permanent Plugging and Abandoning Costs:</u> The permanent plugging and abandonment of an Appraisal Well that:

    (a)    is to be plugged due to mechanical difficulties or impenetrable conditions before the well has been drilled to its Objective Depth in accordance with Article 11.1.5(b).

    (b)    is to be plugged under Article 11.2 *(Subsequent Appraisal Operations at Objective Depth),* or

    (c)    has been previously temporarily abandoned under Article 11.2 *(Subsequent Appraisal Operations at Objective Depth)*

and has not produced Hydrocarbons (other than as a result of production testing), requires the unanimous approval of the Participating Parties except as otherwise provided in this Article 11.5. Approval to plug and abandon an Appraisal Well that has produced Hydrocarbons (other than as a result of production testing) shall be governed by Article 18.1 *(Abandonment of Wells).*   If any Participating Party fails to respond within the applicable response period for a proposal to plug and abandon an Appraosal Well, that Participating Party shall be deemed to have approved the plugging and abandonment of that Appraisal Well. If a rig is on location and a proposal to plug and abandon an Appraisal Well under either Article 11.5(a) or 11.5(b) does not receive unanimous approval, then, if within twenty-four (24) hours (inclusive of Saturdays, Sundays and federal holidays) after receipt of that proposal no other operation is proposed (and subsequently approved) for a well by a Party entitled to make a proposal, the Operator may nonetheless proceed to plug and abandon that Appraisal Well, and shall give each Participating Party notice of that fact. If the proposal to plug and abandon an Appraisal Well that has not produced Hydrocarbons (other than as a result of production testing) does not receive unanimous approval, but the Operator deems the well bore not to be safe or in sound enough condition for it to perform further operations, the Operator may nonetheless proceed to plug and abandon that Appraisal Well and shall give each Participating Party notice of that fact.

The Participating Parties in an Appraisal Well proposal shall pay all Costs of plugging and abandoning that Appraisal Well, except all increased plugging and abandoning Costs associated solely with a Non-Consent Operation approved under Article 11.2 *(Subsequent Appraisal Operations at Objective Depth)* or Article 6.2.2 *(Supplemental AFE for Cost Overruns for Wells).*   The Participating Parties in that Non-Consent Operation are responsible for the increased plugging and abandoning Costs attributable to that Non-Consent Operation.

11.6    <u>Feasibility Study:</u> Any Party may propose a feasibility study (the conduct of such proposal shall not require approval as a General Matter) for any technical, engineering or other issues affecting Appraisal or future Development Operations on the Contract Area. The proposal of a feasibility study shall not cause the formation of the Project Team. A

45

feasibility study may or may not require a study team, will be of a shorter duration, and will be more narrow in scope than the Project Team. The process for approving a feasibility study to be charged to the joint account is listed below, however, any Party may prepare its own feasibility study at its sole cost.

I 1.6.1    <u>Feasibility Study Proposal and Meeting:</u> A proposal for a feasibility study shall be accomplished by a Party furnishing (1) a memo describing the scope of the feasibility study, and (2) a cost estimate of the feasibility study, to the other Parties. Within thirty (30) days after the feasibility study proposal, the Operator shall call a meeting of the Parties. At such meeting, the Parties shall discuss and resolve:

    (a)    the positions of all Parties on the proposed feasibility study,

    (b)    the necessity of the study,

    (c)    composition and organization of any study team, if applicable, associated with the proposed feasibility study, and

    (d)    any other related matter(s).

The Operator may modify any proposal for a feasibility study as a result of such meeting. Operator may, within thirty (30) days after such meeting, submit to the other Parties such feasibility study proposal along with an AFE for approval.

11.6.2    <u>Election on Proposed Feasibility Study:</u> All Parties shall notify the Operator of their Participation Election in the feasibility study within thirty (30) days after receipt of the AFE for the proposed feasibility study. If any Party makes an Election not to participate in the feasibility study, then each Participating Party shall elect to either: (i) proceed with the feasibility study with the interest of the Non-Participating Party shared by the Participating Parties on the basis of their respective Working Interests, unless otherwise agreed, or (ii) change its Election to become a Non-Participating Party. The Operator shall commence the feasibility study on behalf of all Participating Parties subject to Article 8.2.4 *(Participation by Fewer Than All Parties)*.  A Party making an Election not to participate in an approved feasibility study shall become a Non-Participating Party as to the costs of the feasibility study and shall be subject to the provisions of Article 16.5.3  *(Von-Consent Geophysical Operations, Feasibility Study, Project Team and/or Development Plan)*.   A Non-Participating Party shall not receive the data, information or results of the feasibility study until satisfaction of the requirements of Article 16.5.3  *(Von-Consent Geophysical Operations, Feasible Study, Project Team and/or Development Plan)*.

11.6.3    <u>Compensation and Costs of Feasibility Study:</u> Each Participating Party shall be responsible for designating its representative(s), if any, for the feasibility study.

46

A Party's representatives for the feasibility study may be changed at any time. The salaries, burdens, benefits, other compensation and expenses of a Party's employees, including internal engineering support staff assigned to the feasibility study, shall be the responsibility of the Party employing such representatives unless the Participating Parties unanimously agree to bill such Costs to the Participating Parties in accordance with their Participating Interest. Costs and expenses of a feasibility study charged to the Participating Parties in accordance with their Participating Interest shall include, but not be limited to, contract services and related miscellaneous expenses. All Costs and expenses of the feasibility study shall be handled in accordance with Exhibit "C" (Accounting *Procedure).*

11.7   <u>Conclusion of Appraisal Operations:</u> Any Party may propose that Appraisal Operations have been concluded on the Contract Area by notifying the other Parties. Except as provided below in this Article 11.7, Appraisal Operations shall conclude, and all subsequent operations in the Contract Area shall be Development Operations, upon the earlier of:

(a)   the approval of the conclusion of Appraisal Operations as a General Matter; or

(b)   the point in time when no new Appraisal Operation has been approved within twelve (12) months following the rig release (or the cessation of operations) from the previous Appraisal Operation;

(c)   the abandonment of the second well (Exploratory or Appraisal) which would qualify as a Producible Well unless otherwise unanimously agreed by all Parties. For counting purposes, any subsequent Exploratory Operation or subsequent Appraisal Operation or substitute well for an Exploratory Well or substitute well for an Appraisal Well shall be considered operations in the original well with the exception however that any Sidetrack or Deepening which penetrates (i) a previously encountered Producible Reservoir at a location more than 2,500 feet horizontally from the nearest previous penetration and such new penetration satisfies the criteria of a Producible Well, or (ii) a new Producible Reservoir, shall be deemed to be another well.

The formation of a Project Team shall not require the conclusion of Appraisal Operations and may occur concurrently with Appraisal Operations. After the conclusion of Appraisal Operations, but prior to the approval of a Development Plan, any Party may propose the drilling of an additional well or additional well operations as an Appraisal Operation. Unless Article 16.4 *(Non-Consent Operations to Maintain the Contract Area)* applies to the proposed operation, the proposed operation shall require the unanimous agreement of the Parties. Any such additional well or additional well operation (including a substitute well and all subsequent operations at Objective Depth conducted in or through the well bore of the well), other than an operation to complete the well which shall be considered

47

a Development Operation, shall be deemed an Appraisal Operation and shall be proposed, approved and conducted accordingly.

# ARTICLE 12
## PROJECT TEAM, DEVELOPMENT PLAN AND FABRICATION AFE

12.1  <u>Phased Development Plans:</u> The results of Exploratory and/or Appraisal Operations may justify the development of one or more Producible Reservoirs within the Contract Area. The Operator shall prepare for the approval of the Parties a Development Plan in order to pursue such development of the Contract Area. In order to provide for the orderly preparation of the Development Plan, unless otherwise mutually agreed by all the Parties, the Parties shall form art Project Team, subject to Article 12.2 *(Proposal of Project Team),* whose duties are more specifically set forth in Exhibit "G" *(Project Team and Technology Shaping)* and shall be charged with assisting the Operator in the preparation of a Development Plan and in design, engineering, fabrication, transportation, installation and operation of the Production System for the Contract Area. In view of the Costs and scope of Development Operations for the Contract Area, the Parties may agree to divide Development Operations into an initial Development Phase and one or more subsequent Development Phases. Each Development Phase shall be centered upon the installation of a new or expanded Production System for the Contract Area. A separate Development Plan shall be prepared for each Development Phase, and each Development Plan shall be developed, approved and implemented pursuant to this Article 12 *(Project Team, Development Plan and Fabrication AFE).*

12.2  <u>Proposal of Project Team:</u> The Operator shall have the exclusive right to submit a proposal for the formation of the Project Team during the first three (3) month period following rig release from the first well which would qualify as a Producible Well, however, the Operator's exclusive period shall apply only if the Operator is a Participating Party in such Producible Well. If Operator fails <u>to propose the formation of the Project Team during its exclusive proposal period,</u> then, after expiration of the Operator's exclusive proposal period, any Participating Party in such Producible Well may propose the formation of the Project Team. If the Operator's exclusive period does not apply, any Participating Party in the first Producible Well may propose the formation of a Project Team following rig release from the first Producible Well.

12.3  <u>Project Team Approval:</u> A Project Team proposal requires approval bLE1251j2li. Each Party shall have an Election as to its participation in the AFE for the Project Team, pursuant to Article 8.33 *(Other AFE Related Operations).* The formation and administration of the Project Team shall be handled in accordance with Exhibit "G" *(Project Team and Technology Sharing)* with the Costs of the Project Team being charged in accordance with Exhibit "C" *(Accounting Procedure).* A Party which makes an Election not to participate in the Project Team shall become a Non-Participating Party as to the costs of the Project Team and shall be subject to the provisions of Article 16.5.3 *(Non-Consent Geophysical Operations, Feasibility Study, Project Team and/or*

43

*Development Plan).*   A son-Participating Party shall not have access to the data or studies prepared by the Project Team until satisfaction of the requirements of Article *16.5.3 (Non-Consent Geophysical Operations, Feasibility Study, Project Team and/or Development Plan).*

12.4    <u>Proposal of a Development Plan:</u> The Operator shall have the exclusive right for a period of twelve (12) months following conclusion of the Election period for the approved Project Team to submit a Development Plan for the review and approval of the Parties, such proposed Development Plan to be based upon the work and recommendations of the Project Team, If Operator has begun preparation of a Development Plan during the first nine (9) months of such twelve (12) month period, but the Development Plan will not be completed and submitted by the end of the Operator's exclusive period, then the Operator may request an extension of the exclusive period to allow completion of the work in progress. Any request for extension shall include a report of the progress to date and specify a date for submission of the Development Plan not more than three (3) months from the expiration of the exclusive submission period. The Parties shall not arbitrarily or unreasonably refuse a request for extension of the Operator's submission period. If no Party submits a proposal for the formation of a Project Team or if a proposal(s) for the formation of a Project Team is not approved, then the Operator shall have the exclusive right to propose a Development Plan for a period of twelve (12) months following the completion of Appraisal Operations.

12.4.1    <u>Alternative Development Plans:</u> If a Development Plan is not timely submitted by the Operator or the Development Nan submitted by the Operator is not approved pursuant to Article 12.6 *(Approval of a Development Plan)* or 12.6.1 *(Amended Approval Requirement for Development Plans)* below, then any Party shall have the option to submit a Development Plan. Development Plans proposed after expiration of the Operator's exclusive period shall be considered for approval by the Parties in the order in which the Development Plans are submitted.

12.5    <u>Content of the Development Plan:</u> Any Development Plan proposed under this Agreement shall contain sufficient detail to allow the Parties to adequately evaluate the scope, timing, Costs and capacity of the proposed Development Plan and Production System. All Development Plans submitted shall include at least the following information:

(a)    <u>Production System:</u> Description of the Production System including:

(i)    the type of Production System proposed (i.e., tension leg well jacket, floating production system, spar, compliant tower, subsea, etc.), including the Production System's location, configuration (i.e., number of well slots or subsea tiebacks) and production capacity;

49

CO      a description of the Facilities, including the gathering and pipeline system necessary to transport the Hydrocarbons from the well heads to shore;

(iii)      a projected tirne schedule for designing, contracting, fabricating, constructing, or otherwise acquiring, transporting and installing the Production System;

(iv)      the estimated date of initial Hydrocarbon production and the estimated daily rate of Hydrocarbon production thereafter;

(v)      the estimated Costs of the Production System not in the form of an AFE;

(vi)      a description of any proposed hydrate or paraffin control system or technique, method of pressure maintenance, or enhanced recovery plan;

(vii)      a description of the proposed well completion techniques (i.e. dual vs. single); and

(viii)      the type of Hydrocarbon transmission system (e.g. pipeline vs. tanker, etc.)

(b)      <u>Producible Reservoirs:</u> A description of the Hydrocarbon bearing geological formations expected to be developed under the Development Plan along with the general area and depth of sands or reservoirs to be developed by the Production System;

(c)      <u>Recoverable Reserves:</u> An estimated range of recoverable reserves for the proposed Development Plan and a schedule of the initial and estimated daily rate of Hydrocarbon production thereafter;

(d)      <u>Predrilling Operations:</u> A reasonable description of predrilling operations, if any, planned in support of later development, including an estimate of the timing, Cost and location of each predrilling operation;

(e)      <u>Development Wells:</u> A reasonable description of drilling and completion plans for all Development Wells, including an estimate of the timing, Cost and location of each well;

(f)      <u>Temporarily Abandoned Exploratory and/or Appraisal Wells:</u> A reasonable description of the completion plans for any previously temporarily abandoned Exploratory Well and/or Appraisal Well(s) to be completed as part of the Development. Plan, including an estimate of the timing and cost of completing such well(s);

50

(g)     <u>Tieback Operations:</u> If the Development Plan requires the tieback or use of facilities located outside the Contract Area, a written proposal from the owner(s) of such offsite facilities to process and handle Hydrocarbon production from the Contract Area specifying the capacity to be made available at such "offsite facility" and the amount of all tariffs, processing fees, and other fees and charges to handle or process Hydrocarbon production from the Contract Area;

(h)     <u>Final Desism AFE:</u> An AFE for the completion of the detailed design of the Production System including final specifications, blueprints and models suitable for contractors to formulate their bids on the components of the Production System. The AFE shall also include the Costs of the Project Team from approval of the Development Plan through preparation and approval of the Fabrication AFE and an estimate of the Cost of contract labor and services for the design and testing. necessary to adequately define the proposed Production System for the bidding of fabrication; and

(g)     <u>Other Data:</u> Provided such information is available, any other information reasonably necessary to perform an evaluation of the technical and economic feasibility of the Production System provided for in the Development Plan.

12.6   <u>Approval of a Development Plan:</u> The Operator shall have sixty (60) days to obtain unanimous approval of the Parties for any Development Plan proposal submitted by the Operator during its exclusive period. If either (i) the Operator fails to gain the unanimous approval of the Parties or (ii) the Operator fails to submit a Development Plan, the Parties shall have a period of sixty (60) days commencing with either the expiration of the Operator's exclusive period or the failure to obtain approval in which either the Operator's Development Plan or an alternate Development Plan may be unanimously approved by the Parties.

12.6.1   <u>Amended Approval Requirement for Development Plans:</u> If a Development Plan is not unanimously approved upon conclusion of the one hundred twenty (120) day period provided in Article 116 *(Approval of Development Plan)* above, then the unanimous agreement requirement, provided for under Article 12.6 *(Approval of a Development* Plan) shall be amended as follows:

(a)    During this amended approval process, consideration for approval by the Parties shall be given first and simultaneously to any previously proposed Development Plan.

(b)    For a sixty (60) day period following expiration of the four (4) month period, approval of a Development Plan shall be by the Parties as a General Matter.

51

(c)   If a Development Plan is not approved as a General Matter during, the sixty (60) day period provided in Article I2.6.1(b). then the Development Plan shall be approved according to the following:

(i)   If there is only one (1) Development Plan submitted and such Development Plan receives an affirmative vote of at least fifty percent (50%) of the voting interest, such Development Plan shall be deemed approved by the Parties.

(ii)   If there are two (2) or more Development Plans submitted and one (i) Development Plan receives an affirmative vote of at least fifty percent (50%) of the voting interest and the other Development Plan(s) receives an affirmative vote of less than fifty percent (50%) of the voting interest, then the Development Plan receiving the affirmative vote of at least fifty percent (50%) of the voting interest shall be deemed approved by the Parties.

(iii)   If two (2) competing Development Plans each. receive an affirmative vote of fifty percent (50%) voting interest, the first proposed Development Plan shall be deemed approved.

(iv)   If no Development Plan is approved in accordance with Article 12.6.1(c)(i), Article I2.6.1(c)(ii) or Article 12.6.1(c)(iii), then the earliest proposed Development Plan which receives the affirmative vote of at least twenty-five percent (25%) shall be deemed approved.

(v)   If no Development Plan is approved in accordance with Article 12.6.1(c)(i), Article I2.6.1(c)(ii), Article 12.6.1(c)(iii) or Article 12.6.1(a)(iv), then the Parties will use reasonable efforts to approve a compromise Development Plan pursuant to the terms of Exhibit "H" *(Dispute Resolution Procedure)* attached hereto.

12.7   Approved Development Plan and Final Design AFE:

12.7.1   Final Desin AFE: Each Participating Party in an approved Development Plan has committed to participate in the Final Design AFE submitted as a part of the approved Development Plan. Any Non-Participating Party in an approved Development Plan shall be subject to the Non-Consent provisions as set forth in Article 16.5.3 *(Yon-Consent Geophysical Operations, Feasibility Study, Project Team and/or Development Plan).*   Upon approval of a Development Plan, any ori nal Non-Participating Party shall have the opportunity to elect to participate in accordance with Article 8.2.3 *(Second Opportunity to Participate).*   If fewer than all Parties approve a Development Plan, such Development Plan shall not be

52

deemed approved unless the obligations set forth in Article 8.2.4 *(Participation by Fewer Than ;411 Parries)* are satisfied.

Iona-Delivery Equicrnent AFE: Any Party shall have the right to submit to all Parties an AFE for long-delivery equipment in order to facilitate the early and orderly commencement of the design, engineering, contracting, procuring, acquiring, fabricating, constructing, transporting and/or installing of the Production System identified in an approved Development Plan. An AFE for long-delivery equipment shall require unanimous approval of the Parties.

12.8   Fabrication AFE: Within ninety (90) days from the date following approval of the Development Plan as provided in Article 12.6 *(Approval of a Development Plan),* unless such additional time is necessary due to circumstances beyond Operator's control, Operator shall submit a Fabrication AFE that conforms to the Approved Development Plan for the Production System to all Parties for their Election. The Fabrication AFE shall consist of separate AFEs for each major component in the construction, fabrication or other acquisition and installation of the Production System identified in the approved Development Plan and Final Design AFE. If the Operator does not timely submit the Fabrication AFE, any Party may submit a Fabrication AFE for the Development Plan. The Fabrication APE shall consist of a separate AFE for: (i) the structural components of the Initial Production System, (ii) the equipment and Facilities to be located on the Contract Area (or located off the Contract Area but serving the Contract Area), (iii) any pipelines or other Facilities for handling Hydrocarbon production, and (iv) installation. The Election regarding the Fabrication AFE shall be a single Election and not an Election as to the individual AFEs comprising the Fabrication AFE. Development Wells shall be subject to separate AFEs and shall not be included within the Fabrication AFE.

12.8.1   Approval of Fabrication AFE: The Parties shall make their Election as to the Fabrication AFE within the time period as described in Article 8.3.2 *(Production System Construction/Fabrication AFE).* If all the Parties make an Election to participate in the Fabrication AFE, then the Operator shall proceed to acquire. design, fabricate, construct, transport and install the Initial Production System for the Joint Account of the Parties. By making an Election to participate in the Fabrication AFE, each Participating Party commits to pay its Participating Interest share of the Costs, risks and liabilities of the Production System as set out in the Fabrication AFE subject to Article 6.2.5 *(Supplemental AFE for Cost Overruns on Fabrication AFE).* If fewer than all Parties approve the proposed Fabrication AFE, each Participating Party in the Fabrication APE shall, within fifteen (15) days (exclusive of Saturdays, Sundays and federal holidays), elect to either:

(a)   limit its participation in the proposed Fabrication AFE to its Working Interest share, or

(b)   bear its Participating Interest share of the proposed Fabrication AFE.

53

Failure to elect shall be deemed an election under (a) above. If as a result of the above Elections. *the* Participating Parties fail to agree to proportionately assume one hundred percent (100%) of the Cost and risk of the proposed Fabrication .kFE, then, unless the Participating Parties otherwise aeree within ten (l0) days (exclusive of Saturdays. Sundays and federal holidays) following the last applicable Elec.,lion under (a) or (b) above to assume one hundred percent (100%) of the Cost and risk of the proposed Fabrication AFE as set forth in Article 8.2.4 *(Parricipcztion by Fewer Than .411 Parries).* the proposal for the proposed Fabrication AFE shall be deemed withdrawn. Once the Participating Party(ies) elect to participate in and assume one hundred percent (100%) of *the* Cost and risk of the proposed Fabrication AFE, the Operator shall proceed to consa'uct, fabricate or acquire and install the Production System for the Joint Account of the Participating Party(ies).

Each Non-Operating Participating Party shall have the option to attend regularly scheduled meetings between the Operator and any contractors constructing the Production System or Facilities specified in the Fabrication AFE as well as visits to the construction sites.

12.9  <u>Assignment of Interest:</u> If any Party makes an Election not to participate in the Fabrication AFE for the Initial Production System under an approved Development Plan, then the Non-Participating Party shall be subject to Article 16.2 *(Acreage Forfeiture Provisions)* and be deemed a Withdrawing Party subject to Article *17 (Withdrawal from Agreement).* The Participating Parties shall share the interest assigned in the proportion which a Participating Party's Working Interest bears to the sum of the Working Interests of all of the Participating Parties (unless otherwise unanimously agreed by the Participating Parties). If the Operator makes an Election not to participate in the Fabrication AFE, then the Participating Parties shall select a successor Operator pursuant to Article 4.5 *(Selection of Successor Operator).* If Development Operations under the Development Plan are not timely commenced pursuant to Article 12.14 *(Timely Operations for Production Systems),* the Non-Participating Party shall be entitled to a reassignment of its Working Interest, shall not be subject to Article 16.2 *(Acreage Forfeiture Provisions)* and shall not be deemed a Withdrawing Party subject to Article 17 *(Withdrawal from Agreement).*

12.10  <u>Minor Modifications and Revisions to Development Plans:</u> In implementing the Development Plan, the Operator shall advise the Participating Parties of progress. As additional information becomes available, the Operator may make modifications and revisions to the Development Plan subject to the following.

12.10.1  <u>Minor Modifications to Develp  prnent Plans:</u> The Operator may, without the approval of the Participating Parties, make minor modifications to a Development Plan if such minor modifications are both necessary and reasonable to accomplish the Development Plan.   For purposes of this paragraph, a minor modification is one of the following:

(a)  a modification that does not cause the cumulative estimated Cost of the Fabrication AFE to increase by more than the amount provided in Article 6.2.5 *(<u>Supplemental AFE for Cost Overruns on Fabrication</u>*

54

.4FE). and is not a major modification as defined in Article 12.11 *(Major Modifications to Development Plans);* or

(b)    a modification that does not cause the cumulative estimated Cost of the Final Design APE to increase by more than the amount provided in Article 6.2.4 *(Sur:clemental AFE for Cost Overruns on Final Design AFE),* and is not a major modification as defined in Article 12.11 *(Major Modifications to Development Plans);* or

(c)    a modification that is necessary for health, safety or environmental reasons or regulatory requirements and does not exceed that does not cause the cumulative estimated Cost of the Fabrication AFE to increase by more than ten percent (10%) or ten million dollars (510,000,000), whichever is less, and is not a major modification as defined in Article 12.11 *(Major Modifications to Development Plans).*

12.10.2  <u>Revisions to Development Plans:</u> A Development Plan may be revised as needed to accommodate new data, interpretations or other changes not covered by Article 12.10.1 *(Minor Modifications to Development Plans)* or by Article 12.11 *(Major Modifications to Development Plans). Any Participating Party may propose a revision by notifying the Operator.* Any such revision pursuant to this Article 12.10.2 *(Revisions to Development Plans)* shall require General Matter approval of the Participating Parties in the Development Plan. The Operator shall provide a copy of the revised Development Plan to all Parties, except in the case when the Development Plan is automatically revised as a result of a Development Operation not included in the then current Development Plan being approved as a General Matter as provided in Article 13.1 *(Proposal of Development Operations).*

12.11  <u>Major Modifications to Development Plans:</u> Any Participating Party may propose a major modification by notifying the Operator. The Operator shall promptly notify the Participating Parties whenever a major modification to a Development Plan is proposed or anticipated and shall furnish to the Participating Parties the proposal to modify the Development Plan (and associated AFE's) along with the basis for the proposal and estimated Costs. A major modification is one of the following:

(a)    the type of Production System is changed; or

(b)    the number of well slots of the Production System is decreased by at least twenty-five percent (25%); or

(c)    the type of Hydrocarbon transmission system is changed (e.g., pipeline vs. barge, etc.); or

55

(d)     the Participating Parties in the Development Plan decide to terminate the Development Plan by not initiating, production.

12 11.1   <u>Major Modifications to Development Plans Prior to Approval of the Fabrication ,AFE</u>: Whenever a major modification to a Development Plan is proposed prior to the approval of the Fabrication AFE. the Operator shall furnish the Participating Parties in the Development Plan with the proposed modification to the Development Plan (and associated AFEs). That major modification shall require the unanimous approval of all Participating Parties in the Development Plan. Ef such major modification to the Development Plan is approved, the Operator shall immediately provide the modified Development Plan (and associated AFEs) to each Non-Participating Party in the Development Plan. The Non-Participating Party has the right for a period of thirty (30) days (exclusive of Saturdays, Sundays and federal holidays) following receipt of the modified Development Plan to notify the Operator in writing that its will participate in the modified Development Plan (and associated AFEs). If an original Non-Participating Party participates in the modified Development Plan, it shall be an under-invested Party in an amount equal to its Non-Participating Interest share of the actual Costs incurred in activities and operations associated with the original approved Development Plan (and associated AFEs). An original Nor.-Participating Party who makes an Election to participate in the modified Development Plan shall eliminate the Underinvestrnent through a settlement of Costs pursuant to Article 16.9.1 *(Settlement of Underinvestments).*

12.11.2   <u>Major Modifications to Development ,Plans After Approval of the Fabrication</u> AFE: Whenever a major modification to a Development Plan is proposed after the approval of the Fabrication AFE and prior to the installation of the Production System, the Operator shall furnish the Participating Parties in the Fabrication AFE with the proposed modification to the Development Plan (and associated AFEs). Any major modification shall require the unanimous approval of all Participating Parties in the Fabrication AFE. If a major modification to the initial Development Plan proposed pursuant to Article 12.11(a), Article 12.11 (b) or Article 12.11(c) is approved prior to the installation of the Production System, the Operator shall immediately provide the modified Development Plan (and associated AFEs) to each Non-Participating Party in the Fabrication AFE. The Non-Participating Party has the right for a period of thirty (30) days (exclusive of Saturdays, Sundays and federal holidays) following receipt of such modified Development Plan to notify the Operator in writing that its will participate in such modified Development Plan (and associated AFEs). If an original Non-Participating Party participates in such modified Development Plan, it shalt be an under-invested Party in an amount equal to its Non-Participating Interest share of the actual Costs incurred in activities and operations associated with (a) the original approved Development Plan (and associated AFEs) if it did not participate in that Development Plan and (b) the Fabrication AFE. An original Non-Participating

56

Parry who makes an Election to participate in such modified Development Plan shall eliminate the Underinvestment through a settlement of Costs pursuant to Article 16.9.1 *(Settlement of Underinvestments)*. Within thirty (30) days following the elimination of the Underinvestment, the Participating Parties in the Fabrication AFE for such initial Production System shall deliver to the original Non-Participating Party in the Fabrication AFE who elects to participate in such modified Development Plan (and associated AFEs) for the initial Production System an assignment of one hundred percent (100%) of that original Non-Participating Party's former Working Interest in the Contract Area, the wells therein and the production therefrom.

If a major modification to the initial Development Plan proposed pursuant to Article 12.11(d) is approved prior to the installation of the Production System, the Operator shall immediately provide the modified Development Plan to each Non-Participating Party in the Fabrication AFE and within thirty (30) days following such approval, the Participating Parties in the Fabrication AFE for such initial Production System shall deliver to the original Non-Participating Party in the Fabrication AFE for such initial Production System an assignment of one hundred percent (100%) of that original Non-Participating Party's former Working Interest in the Contract Area, the wells therein and the production therefrom.

If a major modification is approved, the Development Plan (and any associated AFEs) shall be deemed modified and the Operator shall carry out the modified Development Plan. In the event a major modification is not approved by all Participating Parties, the Operator shall continue to implement the approved Development Plan as it was before the proposed major modification.

A Non-Participating Party in the Fabrication AFE for a Subsequent Production System who elects to participate in a modified Development Plan (and associated AFEs) for that Subsequent Production System shall not be subject to Article 16.5.5 *(Non-Consent Subsequent Production System and Facilities)* in regard to that Subsequent Production System.

12.12   Supplemental AFE for Cost Overruns on Fabrication AFE: Cost overruns for a Fabrication AFE shall be handled in accordance with in Article 6.2.5 *(Supplemental AFE for Cost Overruns on Fabrication AFE).*

12.13   Termination of a Development Plan: An approved Development Plan shall remain in force until the earliest of:

(a)     the Participating Parties in the Fabrication AFE for the Development Plan do not a   ee to bear all costs and risks of the Fabrication AFE,

57

(b)     the construction or acquisition of the Production System is not commenced within the time Name provided in Article 12.14 *(Timely Operations far Production Systems),*

(c)     the depletion of the reservoirs covered by the Development Plan,

(d)     the approved Development Plan is superseded by a revised Development Plan, or

(e)     the Development Plan is teaaiinated by the unanimous consent of the Participating Parties.

12A 3.1   <u>Termination Prior to Approval of Fabrication AFE:</u> **The Costs, risks and liabilities of a Development Plan that is terminated before its associated Fabrication AFE has been approved shall be borne by the Participating Parties in the Development Plan.**

12.13.2   <u>Termination After Approval of Fabrication AFE:</u> The Costs, risks and liabilities of a Development Plan that is terminated after its associated Fabrication AFE has been approved shall be borne by the Participating Parties in the Fabrication AFE.

12.14   <u>Timely Operations for Production Systems:</u> The Operator shall commence, or cause to be commenced, the construction of a Production System within one hundred twenty (120) days from the last Party's Election for the Fabrication AFE. Such construction shall be deemed commenced on the date the major fabrication contract for the Production System is awarded. Except for the instance of a Force Majeure, if the Operator fails to timely commence operations for the Production System, the Non-Operating Parties may, within thirty (30) days after the expiration of the commencement period, by a majority Working Interest vote of the Participating Parties in the Fabrication AFE,

(a)     agree to extend the time period for timely operations, or

(b)     select a substitute operator to commence the construction or acquisition of the Production System, which shall be commenced within one hundred twenty (120) days after the selection of the substitute operator.

If the time period for timely operations is not extended or a substitute Operator is not selected or if such construction or acquisition is not commenced in a timely manner by the substitute Operator, then the approved Fabrication AFE shall be deemed withdrawn with the effect as if the Fabrication AFE had never been submitted. The above notwithstanding, if the MMS grants a "Suspension of Production" or a "Suspension of Operations" (an SOP/S00") for an approved Development Plan, any shorter time limits set forth as requirements of the SOP/S00 shall supersede the corresponding longer time limit set forth in this Agreement or the Development Plan.

53

12.15   <u>Subsequent Development Phases:</u> At any time after the last Party's Election under the Fabrication AFE for the Initial Production System, any Participating Party may propose an additional Development Phase(s) and the installation of a subsequent or expanded Production System(s). Upon proposal of a subsequent Development Phase, the Operator shall propose the formation of a Project Team to prepare a Development Plan for the subsequent Development Phase. The preparation and approval of the Development Plan for a subsequent Development Phase shall follow the same procedures specified in this Article 12 *(Project Team, Development Plan and Fabrication AFE)* for the preparation and approval of the initial Development Plan with the exception however that:

(a)   the Operator's exclusive period to submit a proposal for the formation of an associated Project Team shall commence immediately following rig release from the first well for such Development Phase which would qualify as a Producible Well, and

(b)   a Non-Participating Party(ies) in an approved Fabrication AFE for a Subsequent Production System shall be subject to Article 16.5.5 *(Non-Consent Subsequent Production System and Facilities).*

12.16   <u>Access to Existing Facilities:</u> Development Operations in subsequent Development Phases shall have reasonable access (on a space available basis) to gathering, processing and transportation Facilities installed for previous Development Phases.

12.16.1   <u>Non-Consent Operations in Subsequent Development Phases:</u> If fewer than all Parties make an Election to participate in a subsequent Development Phase, the Operator (or substitute Operator) shall conduct Development Operations in the subsequent Development Phase for the account of the Participating Parties and at their sole Cost and risk. The Participating Parties shall conduct the subsequent Development Operations with the benefit of the non-consent provisions specified in Article *16 (Non-Consent Operations).*   A Non-Participating Party in a subsequent Development Phase shall not be entitled to any information or data from any subsequent Development Operation associated with such Development Phase, unless the Non-Participating Party makes an Election to participate in such subsequent Development Operations pursuant to Article 16.7 *(Operations From a Subsequent Non-Consent Production System).* Any Non-Participating Party in a subsequent Development Phase may retain its Working Interest in the Contract Area. However, such a Non-Participating Party shall not unreasonably interfere with Development Operations in the subsequent Development Phase (including making any claim for drainage upon the Participating Parties in the subsequent Development Phase. so long as the subsequent Development Phase is conducted according to prudent operating. practices). In all events, the sequence and conduct of Development Operations in a subsequent Development Phase shall be controlled by the Participating Parties in the subsequent Development Operation. Hydrocarbon production

59

volumes shall be measured on the basis of well tests and operating expenses allocated upon the basis of Hydrocarbon production volume throughput.

## ARTICLE 13
## DEVELOPMENT OPERATIONS

13.1    <u>Proposal of Development Operations:</u> It is the intent of the Parties to proceed with development of the Contract Area in accordance with the approved Development Plan. Any Participating Party may propose specific Development Operations which were included in the Development Plan by giving notice of the proposal and the associated Well Plan, which shall include at least the information set out in Article 10.2.1 *(Well Plan's Minimum Specifics),* and AFE to the other Participating Parties. **Each** Development Operation included in an approved Development Plan, other than a Final Design AFE shall require approval as a General Matter except as otherwise provided herein. The Operator (or substitute Operator) shall commence the Development Operation at the sole Cost and risk of the Parties making an Election to participate. .Each Non-Participating Party in an approved Development Operation will be subject to either the acreage forfeiture provisions or the Cost percentage recoupment provisions of Article 16 *(Non-Consent Operations),* whichever is applicable. Any Participating Party in the Development Plan may propose specific Development Operations which were not included in the approved Development Plan. A proposal for a Development Operation not included in an approved Development Plan shall require approval as a General Matter and, if approved, such Development Operation not included in the approved Development Plan shall be deemed an automatic revision to the Development Plan. However, the provisions of this Article 13 *(Development Operations)* shall not apply to the proposal for the Initial Production System or Subsequent Production System in the Contract Area. The Initial Production System or Subsequent Production System shall be proposed in accordance with Article 12  *(Project Team, Development Plan and Fabrication AFE)* of this Agreement.

13.1.1    <u>AFE Overruns and Substitute Wells:</u> The Operator shall timely commence a Development Operation and continue the drilling of such well with due diligence to its Objective Depth or until:

(a)    a supplemental AFE is required pursuant to Article 6.2 *(Authorization for Expenditure),* or

(b)    the Operator encounters mechanical difficulties, uncontrolled influx of subsurface water, abnormal pressures, pressured or heaving shale, salt, granite or other practicably impenetrable substances or other similar conditions prevail in the hole that render further drilling impracticable. Or

60

(c)    the unanimous agreement of the Participating Parties to cease drilling before reaching the Objective Depth.

If the Development Well is abandoned due to the conditions described under [3.1.1 (b), then the Operator or any Participating Party may propose a substitute well (with the associated AFE and Well Plan), and each Participating Party in the abandoned Development Well shall make an Election whether to participate in the proposed substitute well. The Operator (or substitute Operator) shall commence the substitute well at the sole Cost and risk of the Parties making an Election to participate. Any Party who makes an Election not to participate in either (a) above or a substitute well shall be subject to either the percentage Hydrocarbon recoupment provisions or the acreage forfeiture provisions of Article 16 (Non-Consent Operations), whichever is applicable.

13.1.2  <u>Timely Operations:</u> A Development Operation shall be commenced within two hundred seventy (270) days following the end of the period for the approval of the Development Operation with the exception that such commencement deadline shall be automatically extended for the time period attributable to Force Majeure (excluding the inability to secure materials or a rig) as provided in Article 25.1 *(Force Majeure)*.

If the Operator, except for an occurrence of Force Majeure (excluding the inability to secure materials or a rig), fails to timely commence the Development Operation within the two hundred seventy (270) day period, the approved Development Operation shall be deemed withdrawn, with the effect as if the Development Operation had never been proposed and approved, and the Non-Operating Parties may then select a substitute Operator in accordance with Article 4.2.1 *(Substitute Operator if Operator Fails to Commence Operations)*.

If an approved or identical Development Operation is deemed withdrawn due to a failure to timely commence operations on that well, all Costs incurred, which are attributable to the preparation for, or in furtherance of, that Development Operation, will be chargeable to the Participating Parties. A Development Operation shall be deemed to have commenced on the date the rig arrives on location or, if the rig is already on location, the date when actual operations for the proposed Development Operation are undertaken.

13.2  <u>Subsequent Development Operations at Objective Depth:</u> After a Development Well (or its substitute) has been drilled to its Objective Depth as set forth in the Well Plan (and all logs and tests (excluding production tests) have been distributed to the Participating Parties), the Operator shall promptly notify the Participating Parties of the Operator's proposal for one of the following operations:

(a)    conduct Additional Testing., Coring or Logging of the formations encountered prior to setting production casing;

61

(b)      complete the well at the Objective Depth in the objective zone or formation;

(e)      Sidetrack the well to another bottomhole location not deeper than the stratigraphic equivalent of the original Objective Depth:

(d)      plug back the well and attempt a completion in a shallower zone or formation;

(e)      Deepen the well to a new Objective Depth;

(f)      conduct other operations on the well not listed;

(g)      temporarily abandon the well; or

(h)      permanently plug and abandon the well.

Notwithstanding any contrary provision of this Agreement, if one or more operations are proposed before the distribution of information resulting from the previously approved operation, then the response periods set forth in this Article 13.2 shall not commence until the Parties entitled to make an Election have received the information from the previously approved operation.

13.2.1   Response to Operator's Proposal: Within forty-eight (48) hours (exclusive of Saturdays, Sundays and federal holidays) after receipt of Operator's proposal to conduct subsequent Development Operations, each Participating Party shall respond to the Operator's proposal by making its Election to participate in Operator's proposal or by making a counterproposal. Failure of a Participating Party to respond to a proposal (except a proposal to plug and abandon) shall be deemed an Election not to participate in the Operator's proposal and to become a Non-Participating Party from that point.

13.1.2   Counterproposals: If a Participating Party makes a counterproposal for subsequent Development Operations, the other Participating Parties shall have an additional twenty four (24) hours to respond thereto. If conflicting proposals for subsequent Development Operations are made, preference shall be given first to operation (a), next to operation (b), and so forth as set forth in Article 13.2 *(Subsequent Development Operations at Objective Depth)*. If different depths or locations are proposed for subsequent Development Operations, preference for voting shall be given to the shallowest depth (or the location nearest the existing well bore) and then other depths or locations in descending (or more distant) order. After a decision to conduct a subsequent Development Operation is made and the subsequent Development Operation is commenced, the remaining proposals for other types of subsequent Development Operations shall be deemed withdrawn. At the completion of the subsequent Development Operation, the Operator shall again submit proposal(s) for subsequent

62

Development Operations to the Participating Parties, through the procedure provided herein, until such time as the well is plugged and abandoned.

13.2.3    <u>Approval of Subsequent Development Operations by All Parties:</u>    If the proposed subsequent Development Operation is approved by all the then Participating Parties. the Operator (or substitute Operator) shall commence the subsequent Development Operation at the Cost(s) and risk of the Participating Parties.

13.2.4    <u>Approval of Subsequent Development Operations as a General Matter by Fewer Than All Parties:</u> If a proposal for subsequent Development Operations (except a proposal to plug and abandon which shall be approved in accordance with Article 13.5 *[Permanent Plugging and Abandoning Costs]* or Article 18.1 *[Abandonment of Wells],* whichever is applicable), is approved as a General Matter by fewer than all Parties, then the Operator shall, pursuant to Article 8.2.3 *(Second Opportunity to Participate)* and Article 8.14 *(Participation by Fewer Than All Parties),* conduct the operation at the sole Cost and risk of the Participating Parties.    Any Non-Participating Party in a subsequent Development Operation shall be subject to Article   *16 (Non-Consent Operations).*    A Non-Participating Party in a subsequent Development Operation shall be relieved of the Costs, risks and obligations of the subsequent Development Operation, except as to its share of the Costs of plugging and abandoning the Development Well in its then-current condition. No operation shall be performed on the well unless deemed by the Operator to be safe and the well bore is in a condition to perform the proposed operation.

13.2.5    <u>Subsequent Development Operations If Not Approved as a General Matter:</u> **If** no proposed Development Operation (except a proposal to plug and abandon) receives sufficient vote to be approved as a General Matter pursuant to Article 13.2.4 *(Approval of Subsequent Development Operations as a General Matter by Fewer Than All Parties),* then prior to an Development Well being plugged and abandoned, Operator (or substitute Operator) shall conduct at the sole Cost and risk of the Participating Parties, the subsequent Development Operation receiving, the Largest percentage of Working Interest approval, and in the event of a tie vote between two (2) or more of such proposed Development Operations, then preference shall be given first to operation (a) then (b) and so on, as set forth in Article 13.2   *(Subsequent Development Operations at Objective Depth).*    Any Non-Participating Party in such subsequent Development Operation shall be subject to Article 16   *(Non-Consent Operations).*  Such Non-Participating Party shall be relieved of the Costs, risk and obligation of the subsequent Development Operation, except as to its share of the Costs of plugging and abandoning the Development Well in its then-current condition. No operation shall be performed on the well unless deemed by the Operator to be safe and the well bore is in a condition to perform the operation.

63

13.3    <u>Election by Original Non-Participating Parties in Deepening or Sidetracking Operations:</u>
If a Development Well is drilled to its initial Objective Depth and the Participating
Parties have secured the requisite approval to either:

(a)      Sidetrack said well, or

(b)      Deepen said well,

then. contingent upon the unanimous approval of the Participating Parties in the
approved Sidetrack or Deepen operation, the Operator shall notify each original Non-
Participating Party of the proposal. Each original Non-Participating Party may respond
with an Election regarding such a proposal to Deepen or Sidetrack by notifying the
Operator of its Election within forty-eight (48) hours (exclusive of Saturdays, Sundays
and federal holidays) after receiving the Operator's notice. Any original Non-
Participating Party making an Election to participate in such Deepening or Sidetracking
of a Development Well shall:

(i)      be deemed to be underinvested in an amount equal to its share of the Cost
incurred in such Non-Consent Well (including but not limited to drilling, testing,
logging or coring) prior to the Deepening or Sidetracking and subject to Article
16.9 *(Underinvestment of Costs)* (and the Parties that participated in drilling to the
initial Objective Depth will be deemed overinvested in that amount), and

(ii)     remain a Non-Participating Party in the Development Well to the initial Objective
Depth until the Costs recoverable under Article 16 *(Non-Consent Operations),*
less any payments through a Disproportionate Spending Settlement and/or Article
16.9 *(Underinvestment of Costs),* have been recouped by the original Participating
Parties.

13.4    <u>Deeper Drilling:</u> A proposal to drill a Development Well to an Objective Depth below
the deepest Producible Reservoir penetrated by a Producible Well, or to re-enter and
Deepen an existing Development Well to an Objective Depth below the deepest
Producible Reservoir penetrated by a Producible Well, shall require approval as a General
Matter and shall be further subject to the following provisions.

13.4.1   <u>Limited Participation in Deeper Drilling:</u> [f a proposal is made pursuant to
Article /3.4 *(Deeper Drilling), any* Party may either:

(a)      make an Election to participate in the proposed Deeper Drilling
operation; or

(b)      make an Election not to participate in the proposed Deeper
Drilling operation; or,

64

(c)    maze an Election to limit its participation to drilling, to the base of the deepest Producible Reservoir to be penetrated by the Deeper Drilling. operation.

A Party making an Election to limit its participation in a deeper Development Well to the base of the deepest Producible Reservoir under (c) above shall bear its Participating Interest share of the Cost and risk of drilling (including abandonment) to the base of the deepest Producible Reservoir subject to the provisions of Article 6.2.2 *(Supplemental .4 FE for Cost Overruns for Wells).*  If a Party makes an Election not to participate in the proposed Deeper Drilling, the proposed operations shall be conducted pursuant to Article 16 *('on-Consent Operations).*

13.4.2   <u>Multiple Completion Alternatives Above and Below the Deepest Producible Reservoir:</u> If a Non-Participating Party in, a Deeper Drilling operation below the deepest Producible Reservoir:

> considers the well to be capable of producing at or above the deepest Producible Reservoir, and

> has indicated in writing to the Operator a desire to complete the well at or above the deepest Producible Reservoir,

any further Deeper Drilling operations shall be conducted subject to the following provisions:

(a)   <u>Multiple Completion:</u> If all the Participating Parties in the well agree that a multiple well completion(s) is possible and practicable involving (i) a completion at or above the deepest Producible Reservoir and (ii) a completion below the deepest Producible Reservoir, the Participating Parties in the Deeper Drilling operation shall bear 100% of the Costs of drilling to an Objective Depth below the deepest Producible Reservoir that are in excess of the original Costs to drill and complete the well in the deepest Producible Reservoir.

(O)   <u>Single Completions:</u> If the Participating Parties do not unanimously agree that multiple well completions are possible or practicable, the Non-Participating Party in the Deeper Drilling operation shall be deemed overinvested in the original well in an amount equal to the Non-Participating Party's Share of the original Costs of drilling the well to the deepest Producible Reservoir. The Participating Parties in the Deeper Drilling operation shall eliminate the Non-Participating Party's overinvestment in accordance with Article 16.9.1  *(Settlement of Overinvestments).*

65

Debtors' Exhibit No. 102
Page 68 of 166

If. after having been drilled to an Objective depth deeper than the deepest Producible Reservoir, at the first occurrence of the following events:

(i)     the well is not a Producible Well at a depth deeper than the deepest Producible Reservoir and the well is plugged back to a shallower zone; or.

(ii)    the well is completed as a Producible Well at a depth deeper than the deepest Producible Reservoir, but Hydrocarbon production from the deeper zone is later depleted prior to Non-Consent Recoupment (attributable to Deeper Drilling operation) and the well is plugged back to a shallower zone; or,

(iii)   the well is completed as a Producible Well at a depth deeper than the deepest Producible Reservoir and the Participating Parties have recovered the applicable non-consent Recoupment (attributable to the Deeper Drilling operation) from Hydrocarbon production from the deeper zone; or,

(iv)    the well, although in a suitable and safe condition for a completion attempt at or above the deepest Producible Reservoir, is plugged and abandoned prior to any such completion attempt,

the Participating Parties as to the depths below the deepest Producible Reservoir shall be deemed overinvested in an amount equal to the Non-Participating Party's Share of the well's Cost down to the deepest Producible Reservoir. The overinvestment shall be depreciated at the rate of one-half percent (1/2%) per month from the date the Deeper Drilling operation commences to the earlier of the date of (1), (ii) or (iii) above, but such depreciation shall not reduce the overinvestment below forty percent (40.0%) of the original overinvestment. The Non-Participating Parties in the Deeper Drilling operation shall, upon the occurrence of one of the above-noted events, eliminate the Participating Party's overinvestment in accordance with Article 16.9.1   *(Settlement of Overinvestments).*

13.4.3   <u>Completion Attempts At or Above the Deepest Producible Reservoir:</u> If a well drilled below the deepest Producible Reservoir is not completed for production in the deeper depths, then the Participating Parties in said well down to the deepest Producible Reservoir shall have a right to utilize the well for completion in a Producible Reservoir. In the event a Participating Party(ies) in said well down to the deepest Producible Reservoir makes an Election to participate in a shallow completion in a zone above the base of the deepest Producible Reservoir, the Participating Parties in drilling below the deepest Producible Reservoir in said well shall bear the Costs (including plugging back Costs) necessary to place the well in proper condition for completion in a Producible Reservoir. In the

66

event a Participating Party(ies) in said well down to the deepest Producible Reservoir makes an Election to participate in a shallow completion in a zone above the base of the deepest Producible Reservoir, but the well drilled below the deepest Producible Reservoir is damaged to the extent that it is rendered incapable of being completed and produced at or above the deepest Producible Reservoir in that well, the Participating Parties in the Deeper Drilling operation shall be obligated, at their sole Cost and risk, to restore the well to its condition prior to the Deeper Drilling operations below the deepest Producible Reservoir. If the damage cannot be repaired, the Participating Parties in the Deeper Drilling Operation shall be obligated to pay for the entire Cost of redrilling the well to the base of the deepest Producible Reservoir less any overinvested amount previously paid pursuant to Article 16.9.1 *(Settlement of Overinvestments)* by such Participating Parties in the Deeper Drilling operation to the Participating Party(ies) in said well down to the deepest Producible Reservoir that have made an Election to participate in a shallow completion in a zone at or above the deepest Producible Reservoir. The Party(ies) that have made art Election to participate in a shallow completion in a zone at or above the deepest Producible Reservoir shall be obligated to be a Participating Party in such completion attempt subsequent to said restoration and/or redrill. Once the well has been either restored to its condition prior to the Deeper Drilling operation or redrilled to the base of the deepest Producible Reservoir, any Non-Participating Party in the completion attempt above the base of the deepest Producible Reservoir shall be subject to the provisions of Article *16 (Non-Consent Operations).*

13.5   <u>Permanent Plugging and Abandoning Costs:</u> The permanent plugging and abandonment of a Developement Well that:

(a)      is to be plugged due to mechanical difficulties or impenetrable conditions before the well has been drilled to its Objective Depth in accordance with Article 13.1.1(b),

(b)      is to be plugged under Article 13.2 *(Subsequent Developement Operations at Objective Depth),* or

(c)      has been previously temporarily abandoned under Article 13.2 *(Subsequent Developement Operations at Objective Depth)*

and has not produced Hydrocarbons (other than as a result of production testing), requires the unanimous approval of the Participating Parties except as otherwise provided in this Article 13.5. Approval to plug and abandon a Development Well that has produced Hydrocarbons (other than as a result of production testing) shall be governed by Article 18.1 *(Abandonment of Wells).*   If any Participating Party fails to respond within the applicable response period to a proposal to plug and abandon a Development Well, that Participating Party shall be deemed to have approved the plugging and abandonment of that Development Well. If a rig is on location and a proposal to plug and abandon a

67

Development Well under either Article 13,5(a) or 13.5(b) does not receive unanimous approval, then, if within twenty-four (24) hours (inclusive of Saturdays, Sundays and federal holidays) after receipt of that proposal no other operation is proposed (and subsequently approved) for a well by a Party entitled to make a proposal, the Operator may nonetheless proceed to plug and abandon that Development Well, and shall give each Participating Party notice of that fact. If the proposal to plug and abandon a Development Well that has not produced Hydrocarbons (other than as a result of production testing) does not receive unanimous approval, but the Operator deems the well bore not to be safe or in sound enough condition for it to perform further operations, the Operator may nonetheless proceed to plug and abandon that Development Well and shall give each Participating Party notice of that fact.

The Participating Parties in a Development Well shall pay all Costs of plugging and abandoning that Development Well, except all increased plugging and abandoning Costs associated solely with a Non-Consent Operation approved under Article 13.2 *(Subsequent Development Operations at Objective Depth)* or Article 6.2.2 *(Supplemental AFE for Cost Overruns for Wells).* The Participating Parties in that Non-Consent Operation are responsible for the increased plugging and abandoning Costs attributable to that Non-Consent Operation.

## ARTICLE 14
### FACILITIES AND GATHERING SYSTEMS

14.1   <u>Facilities as a Part of Development Plan:</u> The Development Plan shall provide for the installation of all basic Facilities necessary to handle or service Hydrocarbon production for the Contract Area. If the approved Development Plan provides that Hydrocarbon production from the Contract Area can most efficiently be processed and handled at Facilities located off the Contract Area (an "offsite facility"), the Development Plan shall provide for a Production System designed to utilize an "offsite facility".

14.2   <u>Use of Facilities Off the Contract Area:</u> In the event that excess capacity exists at an "offsite facility" and the approved Development Plan calls for a "tie-back" development of the Contract Area to an "offsite facility", the Operator will use reasonable efforts to secure a "Facilities Use and Production Handling Agreement" from the owners of the "offsite facility" for use in handling Hydrocarbon production from the Contract Area. However, the Operator shall have no duty (fiduciary or otherwise) beyond the obligation to utilize reasonable efforts to secure access to the "offsite facility" on behalf of the Participating Parties. Any access secured by such "Facilities Use and Production Handling Agreement" to an "offsite facility" shall be shared proportionately by the Parties on the basis of their Participating Interests in the Development Plan. This Article 14.2 shall not constitute a limit on a Party's right to install its own Facilities under Article *15 (Disposition of Hydrocarbon Production).*

68

14.3   <u>Use of Facilities Located on the Contract Area:</u> The Participating Parties hereto shall have priority access to all jointly owned Facilities and gathering system capacity for use in operating and developing the Contract Area pursuant to an approved Development Plan. Use of the Facilities on the Contract Area for handling production coming from outside the Contract Area may be granted only if Facility capacity is available beyond the requirements of an approved Development Plan for developing the Contract Area. Use of excess capacity from Facilities shall be subject to the following priority of usage:

(a)   First priority to Hydrocarbon production jointly owned by the Participating Parties in the Production System from inside the Contract Area.

(b)   Second priority to Hydrocarbon production jointly owned by all of the Participating Parties in the Production System coming from outside the Contract Area.

(c)   Third priority to Hydrocarbon production owned by at least one but less than all of the Participating Part(ies) in the Production System coming from outside the Contract Area.

(d)   Fourth priority to Hydrocarbon Production owned by third parties coming from outside the Contract Area.

Priority "a" is automatic. Priorities "b", "e" and "d" shall require unanimous approval by all the Participating Parties. In the event that unanimous approval cannot be reached by the Participating Parties under priorities "b" and "c" above, as to the means and methods for utilizing such excess capacity from Facilities, such excess capacity shall be allocated to each Party in accordance with each Party's Participating Interest in the Facilities having excess capacity, and each Party shall be entitled to use its share of excess capacity as it deems appropriate. Any Hydrocarbon production coming from outside the Contact Area which utilzes the Production System and/or Facilities shall be processed under a facilities and production handling agreement which shall be unanimously agreed to by the owners of such Production System andlor Facilities. If the owners cannot agree on a facilities and production handling agreement, the unresolved issues in such agreement shall be resolved in accordance with the Dispute Resolution Procedure set forth in Exhibit "H" to this Agreement_

14.4   <u>Approval of Additional Facilities On or Off the Contract Area:</u> This Article shall only apply to Facilities located on or off the Contract Area which were not included in the approved Development Plan. Any Party may propose the installation of additional or expanded Facilities for the Contract Area beyond those specified in the Development Plan by giving notice to the other Participating Parties together with information adequate to describe the proposed Facilities and their estimated Costs. Except as provided in Article 15.2 *(Facilities to Take In Kind),* the installation of additional Facilities on the Production System beyond the scope of the Development Plan shall require the approval of the Participating Parties in the Fabrication AFE (and all supplemental AFEs therefore)

69

for the Production 3/stern as a General Matter, and the availability of sufficient deck space and buoyancy to support the proposed additional Facilities. Upon approval, the Operator shall proceed to install the additional Facilities for the benefit of the Participating Parties provided that, in the judgment of the Operator, the additional Facilities do not interfere with continuing operations on the Contract Area. The installation of any additional Facilities shall be at the sole Cost and risk of the Participating Parties. Any Non-Participating Party shall be subject to Article 16.5.6 *(Von-Consent Subsequent Production System and Facilities)*

14.5   <u>Contract Area Production:</u> Notwithstanding any other provision of this Aueement to the contrary, production owned by the Participating Parties from the Contract Area shall at all times have first preference to use capacity over any production from outside the Contract Area. Further, any production capacity owned by the Participating Parties shall be owned on an undivided basis and any tariffs or production handling fees will be shared by the Participating Parties.

14.6   <u>Expansion. Modification or Repair of an Existing Production System:</u> Subsequent to the installation of the Production System described and approved in the first Development Plan for the Contract Area, any Party may propose the expansion, modification or repair of any existinc: Production System in which it has participated by written notice to the other Participating Parties in such Production System. Such proposal shall be presented in accordance with Articles 6.7 *(Annual Operating Plan)* and 8.3 *(Response Time for General Matters and Elections)* for approval as a General Matter. If approved as a General Matter, it will be binding on all Participating Parties in the Production System and Operator shall proceed with such project for the benefit of the Joint Account and all Cost, risk and expense of such operation shall be borne in proportion to the respective Participating Parties' Working Interest in such Production System unless otherwise aeeed. This Article 12.15 shall riot constitute a limit on a Parry's right to install its own Facilities under Article 15 *(Disposition of Hydrocarbon Production)*. The provisions of this Article 12.15 shall not apply to subsequent Development Phase(s).

14.7   <u>Additions. Expansions or Modifications of Production System or Facilities for health. safety or Environmental Reasons:</u>   If a proposal for additional Facilities or a proposal for the expansion or modification of a Production System does not receive approval as a General Matter by the Participating Parties in the Fabrication AFE (and all supplemental AFEs) for the Production System that is to receive additional Facilities or have its Production System expanded or modified, whichever is applicable, and that proposal is necessary for health, safety, or environmental reasons and has been mandated by governmental authority or judicial process, the Operator may, at its discretion, install those additional Facilities or make those expansions or modifications to the Production System. If the Operator elects to exercise its discretionary right to make those installations, modifications, or expansions, the Operator shall provide written notice of its decision to each Participating Party in the Fabrication AFE (and all supplemental AFEs) for the Production System that is to receive additional Facilities or have its Production System expanded or modified, whichever applies.

70

14.S   <u>Repairs of Production System or Facilities:</u>   The Operator at its sole discretion shall make repairs on the Production System and Facilities as needed to keep the Production System and Facilities in good working order. No approval by the Parties is required for the Operator to make those repairs.


ARTICLE 15
DISPOSITION OF HYDROCARBON PRODUCTION

15.1   <u>Duty to Take in Kind:</u> Each Party shall have the right and duty to take in kind or separately dispose of its share of the Hydrocarbons produced and saved from the Contract Area, exclusive of Hydrocarbon production which the Operator uses in production or Development Operations, in preparing and treating Hydrocarbons for marketing purposes, and Hydrocarbon production which is unavoidably lost.

152   <u>Facilities to Take in Kind:</u> Any Participating Party in Development Operations shall have the right, at its sole risk and expense, to construct Facilities for purposes of taking its share of Hydrocarbon production in kind, provided that in the judgment of the Operator, the installation of such Facilities do not interfere with continuing operations on the Production System or the Contract Area. During the construction and operation of such facilities, the Party responsible for the construction or operation shall indemnify and defend the other Parties against any claims or liabilities which may result from such construction or operation and such Party shall be responsible for any damage or losses sustained by the other Parties as a result of the construction or operation of such facilities.

15.3   <u>Failure to Take Oil and/or Condensate in Kind:</u> If any Party fails to take in kind or dispose of its share of the oil and/or condensate produced from the Contract Area, the Operator shall have the right, but never the obligation to market the non-taking Party's share of the oil and/or condensate production at the same price received by the Operator. The non-taking Parties agree to accept Operator's price it receives of the non-taking Party's share of the oil and/or condensate. If the Operator sells to an Affiliate, then the non-taking Parties shall receive without deduction the market value of the non-taking Parties' share of the oil and/or condensate. The Operator shall furnish notification to non-taking Party at the time such option is exercised. All contracts of sale by the Operator of any Party's share of oil and/or condensate production shall be only for such reasonable periods of time as are consistent with the minimum needs of the industry under the circumstances, but in no event shall any contract be for a period in excess of one (1) year. Proceeds of all sales made by the Operator pursuant to this Article shall be paid to the Parties entitled thereto once in each calendar month.

Unless required by governmental authority or judicial process, no Party shall be forced to share an available market with any non-taking Party.

71

15.4    Gas Balancing Provision: The Parties agee that in the event separate disposition of gaseous Hydrocarbons causes split-stream deliveries to separate pipelines and or deliveries which on a day to day basis for any reason are not equal to a Party's respective proportionate share of total gas sales to be allocated to it. the gas balancing or accounting between the Parties shall be handled in accordance with Exhibit "D" attached hereto, entitled "Gas Balancing Agreement."

15.5    Expenses of Delivery in Kind: Any Cost incurred by the Operator in making delivery of any Party's share of Hydrocarbon production or disposing of same shall be borne by such Party. Any extra expenditure incurred in the taking in kind or separate disposition by any Party of its proportionate share of Hydrocarbon production shall be borne by such Party.


# ARTICLE 16
## NON-CONSENT OPERATIONS

16.1    Conduct of Non-Consent Operations: If any Party makes an Election to become a Non-Participating Party in an operation, the proposed operation, if approved, shall be conducted as a Non-Consent Operation. If the Participating Parties timely commence the Non-Consent Operation, then the Non-Participating Parties shall be subject to either the acreage forfeiture provisions of Article 16.2 *(Acreage Forfeiture Provisions),* 16.4 *(Von-Consent Operations to Maintain the Contract Area)* or the Cost recoupment provisions of Article 16.5 *(Percentage Hydrocarbon Recoupment for Non-Consent Operations)* and when applicable Article 16.9 *(Underinvestment of Costs),* each reflecting the increased risks and Costs assumed by the Participating Parties. Any operation that invokes the provisions of this Article 16 must be proposed in good faith using cost estimates and Objective Depths which are reasonable for the Contract Area considering the geological and geophysical data available at the time of the proposal. If any proposed operation requires approval as a General Matter, such approval shall be obtained prior to the Participating Parties proceeding with the Non-Consent Operation. The Operator (or substitute Operator) shall conduct any Non-Consent Operation at the sole risk and expense of the Participating Parties in the Non-Consent Operation. Any Non-Consent Operations shall not unreasonably jeopardize, hinder or interfere with joint operations conducted by all Parties (unless the Non-Consent Operation will maintain all or a portion of the Contract Area under Article *16.4 (Non-Consent Operations to Maintain Contract Area).*

16.1.1    Indemnity for Non-Consent Operations: The Participating Parties shall (insofar as it may be within their control) keep the Contract Area free from all liens and encumbrances which might arise by reason of conducting the Non-Consent Operation and indemnify, defend and hold harmless the Non-Participating Parties from any such liens and encumbrances.

16.1.2    Cost Information: The Costs of any Non-Consent Operation shall be borne by the Participating Parties in the proportion that their Participating Interests bear

72

to the sum of all Participating Interests in the Non-Consent Operation (unless otherwise agreed by the Participating Parties). The Costs of a Non-Consent Operation shall include the Costs of maintaining the drilling equipment on site during the notice period for an Election or vote pursuant to Article S *(Voting, Elections and Votices).* including any response times, and no part of such Costs shall be borne by the Non-Participating Parties. Within one hundred twenty (120) days after completion of a Non-Consent Operation, the Operator shall furnish all the Parties an itemized statement of the Cost of the Non-Consent Operation and an inventory of the equipment pertaining thereto. The Operator shall furnish to all the Parties a monthly statement showing operating, maintenance and other expenses attributable to the Non-Consent Operations, and the revenues from the sale of Hydrocarbon production for the preceding month from operations subject to recoupment under this Article 16 *(Non-Consent Operations).* The Non-Operating Parties shall furnish the Operator any revenue or price information for their take in kind production. In accounting for the revenues from Non-Consent Operations, Hydrocarbon production need not be separately metered, but may be determined upon the basis of monthly well tests_

16.1.3    <u>Non-Consent Operations in Producible Well:</u> Once a Producible Well has been completed and placed on production, Non-Consent Operations shall not be conducted in that well unless approved by all the Participating Parties in such well, unless such well is not capable of producing from its current completion(s).

16.1.4    <u>Non-Consent Operations in Producible Reservoirs:</u> Unless otherwise agreed by all Parties having a Participating Interest in the production from any existing well that penetrates the subject Producible Reservoir, Non-Consent Operations for a Development Well shall not be conducted in any Producible Reservoir previously penetrated by a Producible Well drilled from or producing through the same Production System serving the Non-Consent Well and the Producible Well unless such Producible Reservoir shall have been designated as an Objective Depth or completion zone in the well proposal_

16.1.5    <u>Multiple Completions:</u> Non-Consent Operations shall not be conducted in any well having multiple completions unless:

(a)    each of the multiple completions are owned by the same Parties in the same proportion; or,

(b)    none of the previous well completions are capable of producing in paying quantities; or,

(c)    all Participating Parties in the well containing the multiple completions consent to such Non-Consent Operation(s).

73

For the purposes of this Article 16 *(Non-Consent Operations),* each completion shall be considered *as* a separate well.

16.2    <u>Acrea:le Forfeiture Provisions:</u> In view of the sigiificantly creater risks associated with the initial Exploratory Well drilled in the Contract Area and the Fabrication AFE for the Initial Production System, the Parties agee that upon timely commencement of such operations, the Participating Parties shall be entitled to an assignment of the Non-Participating Party's right, title, and interest (or operating rights if appropriate) in that portion of the Leases comprising the Contract Area. Within thirty (30) days of the timely commencement of the Non-Consent Operation, the Non-Participating Party(s) shall execute and deliver an assignment of its interest to the Participating Parties, with no reimbursement by and at no cost to the Participating Parties. If an assignment is made pursuant to this Article 16.2, then each Participating Party shall accept its Participating Interest share of the Non-Participating Party's assigned interest as determined by Article 8.2.4 *(Participation by Fewer Than All Parties).* Except as provided in Article 16.4.3 *(Limitations on Acreage Forfeiture),* the Non-Participating Party's Election not to participate in the initial Exploratory Well drilled in the Contract Area or the Fabrication AFE for the initial Production System shall be deemed a withdrawal pursuant to Article 17.0 *(Withdrawal From Agreement).*

16.2,1    <u>Non-Consent Initial Exploratory Well:</u> If one or more Participating Party(s) proceed with operations for the initial Exploratory Well on the Contract Area as a Non-Consent Operation, any Non-Participating Party(s) shall relinquish and assign to the Participating Party(s) one hundred percent (100%) of the Non-Participating Party's right, title and interest (or operating rights if appropriate) in and to that portion of the Leases comprising the Contract Area. Penalties attributable to any Non-Consent Operations performed in the initial Exploratory Well, or its substitute well(s), after the earlier of:

(a)    the initial Exploratory Well, or its substitute well, has reached its original Objective Depth, or

C₀)    the cumulative Costs of the initial Exploratory Well, and its substitute well(s), if any, equal the sum of the original approved AFE for the well plus the Permitted Over-expenditure for the well as described in Article 6.2.2 *(Supplemental AFE for Cost Overruns for Wells),*

shall be a percentage penalty in accordance with Article 16.5.1 *(Non-Consent Exploratory and Subsequent Exploratory Operations).*

16.2.⁷    <u>Non-Consent Initial Production System:</u> If one or more Participating Party(s) proceed as a Non-Consent Operation with timely operations for the Initial Production System that conforms to the approved Fabrication AFE, the Non-Participating Party(s) shall relinquish and assign to the Participating Party(s) one

74

hundred percent (100%) of the Non-Participating Party's right, title and interest (or operating rights if appropriate) in and to that portion of the Leases comprising the Contract Area.

16.2.3 <u>Costs of Prior Operations:</u> Any Non-Participating Party subject to a non-consent provision shall remain liable for its share of previously incurred Costs for operations where it was a Participating Party and there shall be no reallocation of Costs due to the Non-Participating Parry's election or assignment.

16.3 <u>Notices and Orders:</u> If the Operator is required by notice or order (including SOPs and SOOs) from any government agency having jurisdiction over the Contract Area to either drill or rework a well, or conduct other operations to maintain all or a portion of the Contract Area, the Operator shall immediately furnish each of the Parties with a copy of such order or notice.

16.4 <u>Non-Consent Oterations to Maintain Contract Area:</u> The following provisions are applicable if:

(a) an activity or operation is required, pursuant to a governmental agency order, notice, regulation, SOO or SOP requirement or Lease obligation, to maintain all or any portion of the Contract Area; or,

(b) a proposal is made for an operation within the final twelve (12) months of the primary term of a Lease which has no Producible Well and such Lease is not held by a unit, SOO or SOP,

then such operation must be timely commenced and shall be conducted pursuant to this Article 16.4. The response time for a proposal made hereunder shall be the earlier of,

(c) the response time provided in Article 8 *(Voting, Election & Notices),* or;

(d) sixty (60) days before the deadline under the order, notice, regulation, SOO or SOP requirement or Lease obligation, whichever is earlier.

If the proposal requires approval as a General Matter and such approval is not obtained within the applicable response period, then any Party who made an Election to participate in the Non-Consent Operation may proceed with such operation at their sole Cost and risk after giving notice to the other Parties of their intention to commence the activity or operation. The other Parties will have fifteen (15) days after receipt of the notice to make art Election to participate in such operation.

16.4.1 <u>Acreage Forfeiture in the Entire Contract Area:</u> If it is necessary to drill or rework a well or conduct other operations to maintain the entire Contract Area, then each Non-Participating Party in the Non-Consent Operation shall relinquish and permanently assign to the Participating Parties one hundred percent (100%)

75

Case 20-33948   Document 1625-26   Filed in TXSB on 06/16/21   Page 79 of 166

of the Non-Participating Party's Working Interest in the entire Contract Area within thirty (30) days after commencement of such well or other operation. Failure to participate in such well or other operations shall be deemed a withdrawal and the provisions of Article 17 *(Withdrawal From Agreement)* shall apply.

16.4.2 <u>Acreage Forfeiture in a Portion of the Contract Area:</u> If a well is drilled or reworked or other operations are conducted in order to maintain a portion of the Contract Area. then each Non-Participating Party in the Non-Consent Operation shall relinquish and permanently assign to the Participating Parties one hundred percent (100%) of the Non-Participating Party's Working Interest in the affected portion of the Contract Area within thirty (30) days after commencement of such well or other operation. If a Parry forfeits its Working Interest pursuant to this Article 16.4.2, then such Party shall have no further rights under this Agreement as to the portion of the Contract Area forfeited. The remaining Parties shall amend this Agreement to provide for a separate operational area for the forfeited portion of the Contract Area and this Agreement shall apply separately to such operational area.

16.4.3 <u>Limitations on Acreage Forfeiture:</u> Notwithstanding the foregoing, if more than one well is drilled or more than one operation is conducted, any of which would maintain the entire Contract Area or the affected portion of the Contract Area, an assignment shall not be required from any Participating Party in any such well or other operation. In addition, no Party shall be required to relinquish or assign all or any portion of its Working Interest in the Contract Area if the order, requiring the well or other operation, is appealed and successfully overturned.

16.5 <u>Percentage Hydrocarbon Recoupment for Non-Consent Operations:</u> Except as provided in Articles 16.2 *(Acreage Forfeiture Provisions)* and 16.4 *(Non-Consent Operations to Maintain Contract* Area), upon the timely commencement of any Non-Consent Operation, each Non-Participating Party's Working Interest and leasehold operating rights in the Non-Consent Operation along with title to any future Hydrocarbon production therefrom shall be owned by and vested in each Participating Party in the proportion that each Participating Party's Working Interest bears to the total Working Interest of all Participating Parties (unless other proportions are agreed by the Participating Parties) for as long as the Non-Consent Operation originally proposed is being conducted or Hydrocarbon production is obtained from the Non-Consent Operation. Such interest, rights and title to future Hydrocarbon production shall revert to each Non-Participating Party when the Participating Party has recouped from the Non-Participating Party's Share of proceeds of future Hydrocarbon production from such Non-Consent Operation an amount equal to the product of the Participating Party's share of the Costs of the Non-Consent Operation multiplied by the recoupment percentage for each operation set out below (the "Hydrocarbon Recoupment").

76

Debtors' Exhibit No. 102
Page 79 of 166

- The Non-Participating Party's Share of the Non-Consent Operation shall be reduced (to the extent of the Non-Participating Party's prior Working Interest) by any third-party cash contribution credited to the Non-Consent Operation.

- A Non-Participating Party's Hydrocarbon Recoupment shall be reduced by any Costs paid by such Non-Participating Party as a settlement of Costs for such Non-Consent Operation pursuant to Article 16.9 *(Underinvestment of Costs)*.

Upon recoupment by the Participating Parties of the Hydrocarbon Recoupment, the Working Interest and leasehold operating rights in the Non-Consent Operation, along with the title to any future Hydrocarbon Production therefrom, shall revert to the former Non-Participating Party and the former Non-Participating Party shall become a Participating Party in the Non-Consent Operation.

16.5.1   <u>Non-Consent Exploratory and Subsequent Exploratory Operations:</u> The Hydrocarbon Recoupment for Non-Consent Exploratory Operations, except as provided in Article 16.2.1 *(Non-Consent Initial Exploratory Well),* shall be the Non-Participating Party's share of the Costs of Non-Consent Operations conducted including, but not limited to, drilling, evaluating, completing, equipping, plugging back and plugging and abandonment of the Exploratory Operation multiplied by one thousand percent (1000%). The recoupment amount for Non-Consent Subsequent Exploratory Operations shall be the Non-Participating Party's share of the Costs of operations conducted including, but not limited to, drilling, evaluating, Deepening, Deeper Drilling, Sidetracking, completing, recompleting, equipping, plugging back and plugging and abandonment of the Subsequent Exploratory Operation multiplied by seven hundred percent (700%).

16.5.2   <u>Non-Consent Appraisal Operations:</u> The Hydrocarbon Recoupment for Non-Consent Appraisal Operations shall be the Non-Participating Party's Share of the Costs of drilling, evaluating, Deepening, Deeper Drilling, Sidetracking, completing, recompleting, equipping, plugging back and plugging and abandonment of the Appraisal Operation multiplied by five hundred percent (500%).

16.5.3   <u>Non-Consent Geophysical Operations. Feasibility Study. Project Team and/or Development Plan:</u> A Party making a revised Election not to participate (except as provided in Article 8.2.3 *[Second Opportunity to Participate])* in a Geophysical Operations, Feasibility Study, Project Team and/or Development Plan (inclusive of its Final Design AFE) will be an underinvested Party in an amount equal to two hundred percent (200%) of the amount such Party would have paid had it participated in such AFE in that Activity, operation or AFE pursuant to Article 16.9 *(Underinvestment of Costs).* Any Underinvestment for a feasibility study shall be eliminated pursuant to Article 16.9 *(Underinvestment of*

77

*Costs*) prior to the Non-Participating Party receiving such study(ies) and becoming, a Participating Party in such feasibility study. If,

(a)     a Non-Participating, Party in a feasibility study makes an Election to participate in an approved Project Team which is based on such previously non-consented feasibility study, or

(b)     a Non-Participating Party in a feasibility study and/or Project Team makes an Election to participate in an approved Development Plan which is based on such previously non-consented feasibility study and/or non-consented Project Team, or

(c)     a Non-Participating Party in a feasibility study and/or Project Team and/or Development Plan makes an Election to participate in an approved Fabrication AFE which is based on such previously non-consented feasibility study and/or non-consented Project Team and/or non-consented Development Plan,

the effect shall be as if the Non-Participating Party has revised its previous non-participation Election(s) to become a Participating (s) Party in such previous non-consented activity(ies), operation(s) and/or AFE(s) and shall be an Underinvested Party in an amount had such Party participated and shall eliminate its Underinvestment(s) pursuant to the above and Article 16.9 *(Underinvestment of Costs*

16.5.4    <u>Non-Consent Development Operations:</u> The Hydrocarbon Recoupment for Non-Consent Development Operations (including workovers) shall be the Non-Participating Party's Share of the Costs of the Non-Consent Operations, including but not limited to non-consent drilling, evaluating, Deepening, Deeper Drilling, Sidetracking, completing, recompleting, equipping, plugging back and plugging and abandoning the Development Operation multiplied by three hundred percent (300%).

16.5.5    <u>Non-Consent Subsequent Production System and Facilities:</u> The Hydrocarbon Recoupment for any non-consent Subsequent Production System or Non-Consent Facilities shall be the Non-Participating Party's Share of the Cost of designing, fabricating and installing the Subsequent Production System or Facilities, including the Cost of an injection or disposal well, multiplied by two hundred percent (200%).

16.5.6    <u>Additional Production Recoupment:</u> In addition to the Hydrocarbon Recoupment set forth above for various Non-Consent Operations, the Participating, Parties shall be entitled to recoup:

78

(a)    two hundred percent (200%) of the Non-Participating Party's Share of the Cost of Facilities necessary to carry out the Non-Consent Operation; plus,

(h)    one hundred percent (100%) of the Non-Participating Party's Share of the Cost of using any Production System already installed for the Contract Area for which the Non-Participating Party has a Participating Interest; or any modifications thereto necessary to carry out the Non-Consent Operation; plus,

(c)    one hundred percent (100%) of the Non-Participating Party's Share of the Cost of operating expenses, maintenance Costs, royalties, and severance, gathering, production taxes and other governmental fees based on production.

16.5.7    <u>Hydrocarbon Recoupment From. Hydrocarbon Production:</u>    Hydrocarbon Recoupment for a Non-Consent Operation which results in a discovery of a new Producible Reservoir or extends an existing Producible Reservoir shall be made from the following portions of the Non-Participating Party's Share of Hydrocarbon production:

(a)    <u>Non-Consent Exploratory Operations (other than for the initial Exploratory Well if forfeiture applies). Non-Consent Subsequent Exploratory Operations. Non-Consent Appraisal Operations, or Non-Consent Development Operations:</u> Each Non-Participating Party shall satisfy Hydrocarbon Recoupment from:

    (i)    one hundred percent (100%) of its the Non-Participating interest share of all Hydrocarbon production from the Non-Consent Operation (if the well is completed for Hydrocarbon production), and

    (ii)    fifty percent (50%) of its Non-Participating interest share of Hydrocarbon production from all wells subsequently drilled and completed in the Producible Reservoir discovered by said Non-Consent operations or in the extended portion of an existing Producible Reservoir discovered by said Non-Consent Operation.

(b)    <u>Non-consent Subsequent Production Systems and Facilities:</u> **If the** construction and installation of a Subsequent Production System is conducted as a Non-Consent Operation, each Non-Participating Party shall satisfy Hydrocarbon Recoupment from:

    (i)    one hundred percent (100%) of its Non-Participating interst share of Hydrocarbon production from all wells which are drilled from

79

and/or produced through the Subsequent Production System or Facilities and/or wells benefited from injection or disposal wells.

The interest shall revert to each Non-Participating Party only after the Participating Parties have completely recouped, from Hydrocarbon production, the amounts specified herein.

16.6    <u>Reversion of Interests to Non-Participatin2 Party:</u> A Non-Participating Party's Working Interest and leasehold operating rights subject to recoupment from future Hydrocarbon production and/or a Disproportionate Spending Settlement, shall revert to the Non-Participating Party upon the occurrence of the first of the following events:

(a)    the Non-Consent Operation does not appear to satisfy the qualifications of a Producible Well and upon peiniament plugging and abandonment of such non-consented interval in the wellbore; or,

(b)    Hydrocarbon production ceases prior to complete recoupment under Article 16.5.7  *(Hydrocarbon Recoupment from Hydrocarbon Production)*  by the Participating Parties; or,

(c)    the Participating Parties Sidetrack or Deepen an Exploratory Well, Appraisal Well or DevelopmentWell and such Non-Consented Operation does not satisfy the qualifications of a Producible Well; or,

(d)    upon complete Hydrocarbon Recoupment.

16.6.1    <u>Dry Hole Reversion:</u> If a Non-Consent Operation (other than a Non-Consent Operation under Articles 16.2  *(Acreage Forfeiture Provisions)*  and 16.4  *(Operations to Maintain Contract Area)* above results in a dry hole and fails to obtain Hydrocarbon production or, if Hydrocarbon production ceases prior to complete Hydrocarbon Recoupment by the Participating Parties, then the Non-Participating Party's Working Interest and leasehold operating rights which have been relinquished shall revert to the Non-Participating Party. However, all non-consent Wells, Production Systems and Facilities [and rights to future Hydrocarbon production from a Producible Reservoir under Article 16.5.7  *(Hydrocarbon Recoupment From Hydrocarbon Production)]*  shall remain vested in the Participating Parties. Any salvage value in excess of complete Hydrocarbon Recoupment shall be credited to all Parties according to their Working Interest and without regard to their participation status.

16.6.2 Sidetracking or <u>Deepening a Non-Consent Well:</u> If a Non-Participating Party entitled to do so makes an Election to participate in the Sidetracking or Deepening operation, then the Participating Parties shall be deemed overinvested to the extent of the Non-Participating Party's Share of Costs in the original Non-Consent Operation (less any amount recovered by the Participating Parties out of the Non-Participating Party's Share of Hydrocarbon production or

80

through a Disproportionate Spending. Settlement). If the Participating, Parties have recouped the Cost of the well at the time they desire to Sidetrack or Deepen the well, then the Non-Participating Party will not be an underinvested Party in the Sidetracking or Deepening of the well. However, in such case, the Participating Parties in the original well shall still be permitted complete recoupment from the other wells in the Producible Reservoir, discovered or extended by the original well as provided in Article 16.5.7 (a) *(Hydrocarbon Recoupment from Hydrocarbon Production),* until the total non-consent amount to be recouped has been recovered from the Producible Reservoir.

16.7   <u>Operations From a Subsequent Non-Consent Production System:</u> Any Party who made an Election not to participate in a Subsequent Production System may make an Election to participate in operations from such Subsequent Production System. **If a Non-**Participating Party makes an Election to participate in such operations, then the Non-Participating Party may reduce the Hydrocarbon Recoupment amount through a Disproportionate Spending Settlement in accordance with Article 16.9 *(Underinvestment of Costs)* in subsequent Development Operations conducted from the Subsequent Production System and thereby automatically revise its non-participation Election to become a Participating Party in such Subsequent Production System.   Any Disproportionate Spending Settlement amounts shall be subtracted from the Hydrocarbon Recoupment entitled to the Participating Parties in the Subsequent Production System pursuant to Article 16.5.5 *(Non-Consent Subsequent Production System and Facilities).*

16.8   <u>Allocation of Production System Costs to Non-Consent Operations:</u> In the event a Non-Consent Well is proposed to be drilled from or produced through a Production System owned by all the Parties, the rights of Participating Parties to use the Production System for the proposed Non-Consent Well and the Costs therefore shall be based on the following:

16.8.1   <u>Investment Charges:</u> If a Non-Consent Well will utilize either a Production System and/or Subsea Production System owned by all the Parties, the Non-Participating Parties in such well shall be deemed to be the overinvested Parties in such Production Systems to the extent the Participating Parties in such well would have paid a charge for the right to use the Production System and/or Subsea Production System and its Facilities as follows:

(a)   The Participating Parties shall pay a one-time slot usage fee covering its use of the Production System in an amount equal to two percent (2%) of the Cost of the Production System, the Subsea Production System and its Facilities to the owners of the Production System (to be shared in proportion to the owner's Working Interest in the Production System). For purposes of the slot usage fee, the total Cost of the Production System shall be reduced by .41667% per month commencing upon the first monthly anniversary date of when the Production System was installed and every monthly anniversary thereafter until the total Cost of

Si

the Production System is reduced to twenty-five percent (25%) of the original Cost. The Cost of additions to the Production System shall be reduced in the same manner commencing, upon the first monthly anniversary after the addition is installed. If the non-consent well is abandoned, then the right of Participating Parties to use that Production System slot shall terminate unless such Parties commence drilling a substitute well from the same slot within ninety (90) days after abandonment. The slot usage fee shall not apply to a slot which is deemed to be "surplus." A slot may be deemed surplus by the unanimous consent of all Parties owning an interest in the Production System.

(b)     If Hydrocarbon production from the non-consent well is handled through Facilities owned by all Parties, the Participating Parties shall pay to the owners of the Facilities a sum equal to that portion of the total Cost of such Facilities which one well bears to the total number of wells which the Facilities are designed to accommodate.

16.8.2     <u>Operating and Maintenance Charges:</u> The Participating Parties in a non-consent well shall pay all Costs necessary to connect their well to the Facilities and the Production System. The expense of operating and maintaining the Facilities and the Production System shall be allocated equally per active completion among all active completions served. Subsea Production System operating and maintenance expenses shall be allocated equally per active subsea completion among all active subsea well completions served by such Subsea Production System.

16.8.3     <u>Payments:</u> The payment of sums pursuant to Article 16.8.1 *(Investment Charges)* shall not be a purchase of an additional interest in the Production System or Facilities. Such payments shall be included in the total amount which the Participating Parties are entitled to recoup out of Hydrocarbon production from the non-consent well, but only to the extent of actual Costs. Such charges shall be paid by the Participating Parties in such well by allocating (in addition to any other Costs allocated to them under this Agreement) all Costs attributable to tangible, intangible and other cost categories that would otherwise be allocated to the Non-Participating Parties until all overinvestment is eliminated.

16.9     <u>Underinvestment of Costs:</u> A Non-Participating Party shall not be liable for settling any underinvestment of its share of the Costs of a Non-Consent Operation unless, having the right to do so under this Agreement,

•     the Non-Participating Party makes a revised Participation Election to become a Participating Party, and

82

f     if the applicable Non-Consent Operation is subject to Article 16.5 *(Percentage Hydrocarbon Recoupment for Non-Consent Operations),* the total Hydrocarbon Recoupment has not been recouped.

Upon making a revised Participation Election, a Non-Participating Party shall settle any Underinvestment for its share of the Costs in a Non-Consent Operation as provided in this Article 16.9 (or the balance of any Underinvestment if the applicable Non-Consent Operation is subject to Article 16.5 *(Percentage Hydrocarbon Recoupment for Non-Consent Operations)* and the total Hydrocarbon Recoupment has not been recouped) and shall settle the balance of its Hydrocarbon Recoupment as provided in Article 16.5 *(Percentage Hydrocarbon Recoupment for Non-Consent Operations).* Unless otherwise provided in this Agreement, a Non-Participating Party has the right to make a revised Election to become a Participating Party under the following Articles:

(a)    Article 9_1_1 *(Conduct of Proprietar)7 Geophysical Operations);*

('o)    Article 11.3 *(Election by Original Non-Participating Parties in Deepening or Sidetracking Appraisal Operations);*

(c)    Article 11.4 *(Deeper Drilling);*

(d)    Article 11.6.2 *(Election on Proposed Feasibility Study);*

(e)    Article 12.3 *(Project Team Election);*

(f)    Article 12.7 *(Approved Development Plan and Final Design AFL);*

(g)    Article 12.11 *(Major Modification to Development Plans);*

(h)    Article 13.3 *(Election by Original Non-Participating Parties in Deepening or Sidetracking Operations);*

(i)    Article 13.4 *(Deeper Drilling);* and

(i)    Article 16.7 *(Operations from a Non-Consent Subsequent Production System).*

16.9.1    <u>Settlement of Underinvestments:</u> Except as provided in Article 16.9.2 *(Cash Settlement of Underinvestment),* upon making a revised Participation Election, a Non-Participating Party shall settle any underinvestment for its share of the Costs in a Non-Consent Operation by either:

(a)    making a Disproportionate Spending Settlement by bearing one hundred percent (100%) of the overinvested Parties' share of the Costs (or if there are two or more underinvested Parties, a proportion of such Costs based upon each Party's underinvestment) of all future activities or operations or

83

AFE (and/or future Costs of such Non-Consent Operations if Costs are still being incurred) in which one or more of the overinvested Parties participate until the underinvestment is eliminated, (i.e. one hundred percent (100%) of the Non-Participating Party's share of the Costs of the original operation); or,

(b) making an immediate cash settlement to the original Participating Parties in the full amount of the under-investment.

Unless otherwise provided in this Ageement, each original Participating Party shall individually select the manner of eliminating the underinvestment at their sole discretion.

16.9.2    <u>Cash Settlement of Underinvestment:</u> If there are no further proposed or planned operations on the Contract Area for which Costs would be allocated toward the elimination of an under-investment, the underinvested Party shall pay any over-invested Party the remaining under-invested amount in cash. If operations on the Contract Area, for which Costs are being paid by the underinvested Party and allocated to the underinvestment, do not eliminate the underinvestment within two (2) years, or any other shorter period specified in this Agreement, from the date the underinvestment accrued, or upon final settlement of this Agreement, or the underinvested Party withdraws from this Agreement, whichever comes first, then the underinvested Party shall pay the overinvested Party the remaining underinvestment in cash. Hydrocarbon Recoupment for Non-Consent Operations under Article 16.5  *(Percentage Hydrocarbon Recoupment for Non-consent Operations)* shall not be considered an over/underinvestment.

## ARTICLE 17
## WITHDRAWAL FROM AGREEMENT

17.1   <u>Right of Withdrawal:</u> Subject to the limitations specified in this Article, any Party (the "Withdrawing Party") may withdraw from this Agreement by giving prior written notice to all other Parties (the "Remaining Parties") stating its intention to withdraw from continued joint operations under this Agreement. The withdrawal notice shall constitute an unconditional and irrevocable offer by the Withdrawing Party to convey to the Remaining Party(ies) the Withdrawing Party's entire Working Interest in all of the Leases, the Production System, the Hydrocarbon production and all other property and equipment within the Contract Area owned under the terms of this Agreement. The withdrawal notice shall specify an effective date of withdrawal which date shall be at least sixty (60) days but not more than one hundred eighty (180) days after the date of the withdrawal notice.

84

17.<sup>1</sup>   Resnonse to Withdrawal: Within thirty (30) days of receipt of the notice of withdrawal, each of the Remaining Parties shall elect in writing either to join in the withdrawal or to remain a Party to this Agreement. Failure to respond to a withdrawal notice shall be deemed an Election to remain a Party to this Azeernent.

17.2.1   Unanimous Withdrawal: If all the Parties agree to join in the withdrawal, no assignment of Working Interests shall take place and the Parties shall be deemed to have decided to abandon all joint operations within the Contract Area pursuant to Article 18 *(Abandonment and Salvage)* of this Agreement.

17.<sup>1</sup>.<sup>1</sup> Acceptance of Withdrawing Interests: If fewer than all Parties agree to join in the withdrawal, then within forty-eight (43) hours (exclusive of Saturdays, Sundays and federal holidays) of the conclusion of the thirty (30) day joining period, each of the Remaining Parties shall submit to the Operator a written rejection of acceptance of its Participating Interest share (or other share agreed to by the Remaining Parties) of the Withdrawing Party(ies)'s Working Interest(s). Failure to make the written rejection or acceptance shall be deemed acceptance of its Participating Interest share of the Withdrawing Party(ies)'s Working Interest(s). The Withdrawing Party(ies) shall take all necessary steps to accomplish the withdrawal by the effective date and execute and deliver to the Remaining Party(ies) all necessary instruments to assign its Working Interests to the Remaining Party(ies). All expenses associated with the withdrawal and the transfer of Working Interest shall be borne by the Withdrawing Party(ies). If the Remaining Parties are unable to select a successor Operator, if applicable, or the Remaining Parties do not agree to accept one hundred percent (100%) of the Withdrawing Party(ies)'s Working Interest(s) within fifteen (15) days following the conclusion of the forty-eight (48) hour period to submit a written rejection, the Remaining Parties shall be deemed to have joined the withdrawal and Article 17.2.1  *(Unanimous Withdrawal)* will apply.

17.3   Limitation Upon and Conditions of Withdrawal:

17.3.1   Current Operations and Voting: Any Party withdrawing prior to completion of any operations (pursuant to an AFE) on the Contract Area in which it had previously made an Election to participate shall remain fully liable for its share of the AFE. After giving its notification of withdrawal, the Withdrawing Party shall not be entitled to make an Election to participate or vote on any General Matter, other than General Matters for which the Withdrawing Party retains a financial responsibility.

17.3.2   Prior Expenses: The Withdrawing Party(ies) shall remain responsible for its Participating Interest share of any Costs of operations, rentals, royalties, taxes, damages or other liability or expense accruing or commencing prior to the effective date of the withdrawal. Prior to the effective date of the withdrawal,

85

the Operator shall render a final statement to the Withdrawing Party(ies) for its share of all identifiable expenses incurred prior to the notice of withdrawal, along with a statement of any deficiency in salvage value. Prior to any withdrawal, a Withdrawing Party, at its sole expense, shall satisfy or provide security satisfactory to the remaining Party(ies) for all obligations and liabilities it has incurred or which are attributable to it prior to the effective date of the withdrawal. Furthermore, any liens, charges and other encumbrances which the Withdrawing Party(ies) placed (or caused to be placed) on its Working Interest prior to its withdrawal shall be fully satisfied or released prior to its withdrawal (unless the Remaining Parties are willing to accept the Working Interest subject to such liens). Provided all such expenses (including any deficiency in abandonment Costs) have been paid, the notice of withdrawal and the assignments shall be effective upon the specified effective date.

17.3.3    <u>Abandonment Costs:</u> The Withdrawing Party(ies) shall pay to the Operator for the benefit of the Remaining Party(ies) the Withdrawing Party's pro rata Working Interest share of the estimated current Costs of plugging and abandoning all wells and removal of all Production Systems, Facilities and other material and equipment serving the Contract Area, less its pro rata share of the estimated salvage value of the assets at the time of abandonment. Such Costs and salvage value shall be prepared by the Operator according with Article IV of Exhibit "C" *(Accounting Procedure)* and approved as a General Matter.

17.3.4    <u>Confidentiality:</u> A Withdrawing Party shall continue to be bound by the confidentiality provisions of Article  *7 (Confidentiality of Data)*  after the withdrawal, but, as of the effective date of the withdrawal, shall have no further access to technical information relating to joint operations. The Withdrawing Party shall not be required to return to the Remaining Party(ies) any Confidential Data acquired prior to the effective date of the withdrawal. The Remaining Party(ies) shall have no obligation of confidentiality to the Withdrawing Party.

17.3.5    <u>Emergencies and Force Majeure:</u> No Party shall be allowed to withdraw during a Force Majeure, or other emergency as described in Article 25.1  *(Farce Majeure),*  but may withdraw from this Agreement after termination of such emergency. The Withdrawing Party shall remain liable for its share of all Costs and liabilities arising from said emergency, including but not limited to the drilling of relief wells, containment and cleanup of oil spills and pollution and all Costs of debris removal made necessary by the emergency.

ARTICLE 18
ABANDONMENT AND SALVAGE

86

IS. I   <u>Abandonment of Wells:</u> Any Participating Party may propose the permanent plugging and abandonment of a well that has produced Hydrocarbons (other than as a result of production testing) by notifying the other Participating Parties. Any Participating Party that fails to respond within the applicable response period specified in Article 8.3 *(Response Time far General Matters and Elections)* shall be deemed to have approved the permanent plugging and abandonment of the well. If the permanent plugging and abandonment proposal is unanimously agreed to by the Participating Parties in that well. the well shall be permanently plugged and abandoned under the applicable regulations at the Cost and risk of the Participating Parties. If the Participating Parties do not unanimously agree to permanently plug and abandon the well, the Operator shall prepare an estimate of the Costs of the permanent plugging and abandonment of the well less the estimated salvage value of the well, as determined under Exhibit "C", and the Participating Party desiring to permanently plug and abandon the well shall pay the Operator, for the benefit of the non-abandoning Participating Parties, its share of that estimate. If an abandoning Participating Party's respective share of the estimated salvage value is greater than its share of the estimated Costs of the permanent plugging and abandonment, the Operator, on behalf of the non-abandoning Participating Parties, shall pay the abandoning Participating Party a sum equal to the deficiency

18.2   <u>Facilities and Production System Salvage and Removal Costs:</u> When the Parties owning a Production System, Facility or Subsea Production System desire to dispose of such equipment, such equipment disposal shall be unanimously approved. Upon unanimous approval, the Operator shall dispose of such equipment in the manner approved by the Participating Parties. The Costs, risks and net proceeds, if any, resulting from such disposition shall be shared by the Participating Parties in proportion to their Participating Interests in the equipment.

18.3   <u>Approval Not Required:</u> The Operator may, without prior approval of the Parties, dispose of any items of surplus or obsolete material and equipment if the current price of new materials or equipment similar thereto is less than One Hundred Thousand Dollars (S100,000.00).

18.4   <u>Abandonment Operations Required by Governmental Authority:</u> Any well abandonment or Platform/Production System removal required by a governmental authority shall be accomplished by Operator with the Costs, risks and net proceeds, if any, to be shared by the Parties owning such well, Platform or Production System in proportion to their Participating Interest.

ARTICLE 19
RENTALS, ROYALTIES AND MINIMUM ROYALTIES

19.1   <u>Overriding Royalties and Burdens on Production:</u> If any Party has previously created or hereafter creates any overriding royalty, production payment, carried or reversionary working interest, net profits interest or other type of burden on Hydrocarbon production

87

in addition to the lessor's royalty stipulated in the Lease(s) (an "Overriding Royalty"), the Party creating the Overriding Royalty shall assume and bear all obligations of the Overriding Royalty regardless of that Party's participation status notwithstanding that an assignment of all or a portion of that Party's Working Interest is made to another Party under this Agreement. The Party creating the Overriding Royalty shall indemnify and hold all other Parties harmless from any and all claims and demands for payment asserted by the owners of the Overriding Royalty. Any such agreements creating these interests shall contain provisions to effect this.

19.1.1 <u>Subsequent Creation of Overriding Royalty:</u> Notwithstanding anything herein to the contrary, if subsequent to the execution of this Agreement, any Party should create an Overriding Royalty, such subsequently created Overriding Royalty shall be made specifically subject to all the terms and provisions of this Agreement and shall be subordinate to the rights of the other Parties to this Agreement.

19.1.2 <u>Subordination of Overriding Royalties:</u> If the Party owning the Working Interest from which the Overriding Royalty is created: (a) fails to pay when due its share of Costs, or (b) withdraws from this Agreement, then the Overriding Royalty shall be chargeable with its pro rata portion of all Costs (equal to its fractional interest in gross production) and the security rights created in Article 6.3 *(Security Rights)* shall be applicable against such Overriding Royalty. The Operator shall have the right to enforce the security rights (and all other rights granted under this Agreement) against the owners of the Overriding Royalty for the purpose of collecting Costs chargeable to the Overriding Royalty.

19.2 <u>Payment of Rentals and Royalties:</u> The Operator shall make all rental payments on behalf of the Parties for the Contract Area. The Operator shall use reasonable care to make proper and timely payment of all rentals, minimum royalties or other similar payments accruing under the terms of the Leases which are included within the Contract Area. Upon receipt of proper evidence of all such payments and the Operator's invoice for its proportionate share of all such payments, each Non-Operating Party shall reimburse the Operator for the Non-Operating Party's Working Interest share of all such payments. In the event Operator fails to make proper payment of any rental or minimum royalty or similar payments accruing under the terms of the Lease(s) through mistake or oversight where such payment is required to continue a Lease in force, then Operator shall not be liable to the other Parties for any resulting damages or any loss which results from such nonpayment unless that non-payment is due to the gross negligence or intentional misconduct of the Operator.

19.2.1 <u>Non-Participation in Payments:</u> If any Party elects not to pay its share of any rental, minimum royalty or similar payment such Non-Participating Party shall notify the other Parties of its intention not to pay its share of such payment at least sixty (60) days prior to the date on which such payment is due. Upon this occurrence, the Operator shall make such payment solely for the benefit of all

8S

the Participating_ Parties. The Non-Participating Party shall assign to the Participating Parties all of its Working. Interest in the Contract Area or portion thereof, maintained by such payment.

19.<sup>.1</sup>.<sup>.1</sup>   <u>Royalty Payments:</u> Each Party shall pay or cause to be paid all royalty and other amounts payable out of Hydrocarbon production taken from the Lease(s) for its account. During any time in which the Participating Parties in a Non-Consent Operation takes a Non-Participating Party's share of Hydrocarbon production, the Participating Parties shall bear the Lease royalty on such Hydrocarbon production. When necessary for calculating the recoupment of a Non-Consent Well, any Non-Operating Party receiving its share of Hydrocarbon production in kind shall advise the Operator (in writing on or before the tenth day of the month following the month in which the Hydrocarbon production is sold or used off the premises) of the volumes of Hydrocarbons sold or used off the premises and the prices received for such Hydrocarbon production.

19.2.3   <u>Federal Offshore Oil Pollution Compensation Fund Fee:</u> Each Party agrees to pay and bear the Federal Offshore Oil Pollution Compensation Fund Fee payable on its share of Hydrocarbon production or any fees being required by section 302 of the Outer Continental Shelf Lands Act of 1978, the Oil Pollution Act of 1990 and any subsequent statutes and regulations promulgated pursuant to those statutes. However, should the oil owned by a Party be reported to the MMS (or a successor regulatory agency) by another Party in its reporting form, the reporting Party shall pay the required fees on all volumes reported and the non-reporting Party shall reimburse the reporting Party for all fees paid on its behalf

## ARTICLE 20
## TAXES

20.1   <u>Internal Revenue Provision:</u> Notwithstanding any provisions herein that the rights and liabilities hereunder are several and not joint or collective or that the Agreement and the operations hereunder shall not constitute a partnership under state law, if, for federal income tax purposes, the Ageement and the operations hereunder are regarded as a partnership, each Party, hereby elects to be excluded from the application of all or any part of the provisions of Subchapter K, Chapter 1, Subtitle A, of the Internal Revenue Code of 1986, as amended, or similar provisions of applicable state laws.

20.2   <u>Other Taxes and Assessments:</u> The Operator, on behalf of the Joint Account, shall file all tax returns and reports required by law and shall pay all applicable taxes, other than income or other taxes provided in Article 20.2.2 *(Production and Severance Taxes),* or assessments levied with respect to operations conducted under this Agreement. The Parties shall promptly furnish the Operator with copies of any notices, assessments or tax statements received pertaining to taxes to be paid by the Operator. The Operator shall

89

charge each Party its Working Interest share of all taxes and assessments paid and, upon written request from a Non-Operating Party(ies), provide copies of all tax returns, reports, tax statements and receipts for such taxes. The Operator shall not allow any taxes to become delinquent, unless such nonpayment is approved as a General Matter.

20.2.1   <u>Property Taxes:</u> The Operator, on behalf of the Joint Account, shall render for ad valorem property tax purposes all personal property andlor real property covered by this Agreement as may be subject to such taxation and shall pay such property taxes for the benefit of each Party. The Operator shall timely and diligently protest to a final determination any valuation it deems unreasonable. Pending such determination, the Operator may elect to pay under protest. Upon final determination, the Operator shall pay the taxes and any interest, penalty or cost accrued as a result of such protest. The Operator shall charge each Party its Working Interest share of such tax payments including interest, penalties and all reasonable Costs in accordance with Exhibit "C" *(Accounting Procedure).*

")0.¹.'   <u>Production and Severance Taxes:</u> Each Party shall pay, or cause to be paid, all production, excise, severance and other similar taxes due on any Hydrocarbon production which it received pursuant to the terms of this Agreement. Any Party responsible for such tax payment shall upon written request from the Operator, provide evidence that such taxes have been paid.

## ARTICLE 21
## INSURANCE AND BONDS

21.1   <u>Insurance:</u> The Operator shall maintain the insurance coverage provided in Exhibit "B" *(Offshore Insurance Provisions)* attached hereto and charge each Party its Working Interest share of the Cost of such coverage.

21.2   <u>Bonds:</u> Operator shall obtain and maintain any and all bonds at the expense of the Joint Account required to be carried by any applicable law, regulation or rule. Operator will require all contractors to obtain and maintain all bonds required to be carried by any applicable law, regulation or rule.

## ARTICLE 22
## LIABILITY, CLAIMS, LAWSUITS AND
## ALTERNATE DISPUTE RESOLUTION

22.1   <u>Individual Obligations:</u> The obligations, duties and liabilities of the Parties shall be several and not joint or collective; and, nothing contained herein shall ever be construed

90

Debtors' Exhibit No. 102
Page 93 of 166

as creating a partnership, joint venture, association or other character of business entity recognizable in law for any purpose. Each Party shall hold all the other Parties harmless from liens and encumbrances on the Leases or in the Contract Area arising as a result of its acts or omissions.

Y[1]    Notice of Claim or Lawsuit: If a claim is made against any Party or if any Party is sued on account of any matter arising from operations hereunder, or on any matter affecting the Leases or Contract Area, or if any hearings are held pursuant to operations under this Agreement, such Party shall give written notice of the lawsuit or hearing to the other Parties as soon as reasonably practicable.

22.3    Settlements: The Operator may settle any single  damage claim or lawsuit involving operations hereunder if the expenditure does not exceed Two Hundred and Fifty Thousand Dollars ($250,000) and if the payment is in complete settlement of such claim or suit. If the amount required for settlement exceeds such amount, the Parties shall determine the further handling of the claim or suit pursuant to Article 22.4 *(Defense of Claims and Lawsuits)* below.

22.4    Defense of Claims and Lawsuits: The Operator shall supervise the conduct of any claims and litigation. Claims and suits may be settled in excess of the amount specified in Article 22.3 *(Settlements)* above only with the unanimous consent of all Participating Parties in the operation out of which the claim arose; however, any Party shall have the right to independently compromise or settle any claim or suit that is attributable to its interest alone as long as such compromise or settlement does not directly adversely affect the interest or rights of the other Parties. No charge shall be made for services performed by the staff attorneys of any Party, but all other expenses incurred by the Operator in the defense of claims and suits for the Parties, together with the amount paid for compromise, settlement or to discharge any final judgment, shalt be considered Costs of operation and shall be paid by the Parties in proportion to their Participating Interest in the operation out of which the claim arose. Outside counsel shall be employed only with the approval of the affected Parties as a General Matter under Article 8.2 *(Voting Procedures on General Matters and Elections).*  If it is agreed that outside counsel is to be employed, the fees and expenses shall be charged to the Parties in proportion to their Participating Interest in the operation out of which such claim or suit arose in accordance with Exhibit "C" *(Accounting Procedure).*  Each Party shall also have the right to hire, at its own expense, its own outside counsel with respect to its own defense.

22.5    Liability for Damactes: To the extent allowed by law, liability for losses, damages, Costs, expenses, claims, liabilities and lawsuits arising from operations under this Agreement not covered by or in excess of the insurance carried for the Joint Account shall be borne by each Party in proportion to its Participating Interest in the operations out of which such liability arises, except when such liability results from the gross negligence or willful misconduct of a Party(ies), in which case such Party(ies) shall be solely liable for same.

91

22.6    <u>Indemnification for Non-Consent Operations:</u> To the extent allowed by law, the Participating Parties agree to hold the Non-Participating Parties (and their Affiliates, agents, insurers, directors, officers and employees) harmless and to indemnify and protect them against all claims, demands, liabilities, regulatory decrees and liens **for environmental pollution and property damage or personal injury, including sickness and** death, caused by or otherwise arising out of Non-Consent Operations, and any loss and cost suffered by any Non-Participating Party as an incident thereof, except where the gross negligence or willful misconduct of any Non-Participating Party contribute to that loss or cost. Should any indemnity contained herein be determined to be in violation of law **or public policy, the Parties agree that said indemnity(ies) shall then be enforceable only to the maximum extent allowed by law.**

**22.7    <u>Indemnification for Prior Operations:</u> To the extent allowed by law,** notwithstanding **anything to the contrary in this Agreement, a Party shall not be liable to any other Party for any losses, damages, costs, expenses, claims, liabilities or lawsuits arising from operations which occurred prior to the execution of or joinder to this Agreement. Furthermore, the Parties who are responsible for such pre-execution or pre-joinder liability shall indemnify, defend and hold harmless the aforesaid non-responsible Parties. It is understood that the limitation herein provided does not apply to responsibility for existing wells and associated environmental liability, if any.**

**22.8    <u>Damage to Reservoir. Loss of Reserves and Profits:</u> Notwithstanding anything to the contrary contained herein, no Party to this Agreement shall be liable to any other Party to this Agreement for loss of or damage to a reservoir(s), loss of Hydrocarbons, or for loss of profits or for other consequential or business interruption damages.**

**/$^{1}$.9    <u>Non-Essential Personnel:</u> A Party hereto who is not the Operator and who requests transportation and/or access to a Production System, aircraft, vessel or any other Facility utilized for Lease operations for any employee, contractor, consultant or invitee of such party (hereinafter a "Boarding Party"), agrees to defend, protect and indemnify the other Parties hereto as to any cost, liability or judgment incurred as a result of a claim, demand, cause of action, suit or judgment brought or obtained by a Boarding Party and/or its successor, and assigns and relations arising out of said person's transportation and/or access to a Production System, aircraft, vessel or any Facility utilized for Lease operations regardless of the sole, concurrent, active or passive negligence or fault (including strict liability) of the indemnified parties or any third party, regardless of the unseaworthiness of any vessel or any unairworthiness of any aircraft.**

22.10    <u>Dispute Resolution Procedure:</u> **The Parties agree that any claim, controversy or** dispute arising out **of, relating to** or in connection with this Agreement, including the interpretation, validity, termination or breach thereof, shall be resolved solely in accordance with the Dispute Resolution Procedure set forth in Exhibit "H" to this Agreement.

92

ARTICLE 23
CONTRIBUTIONS

<u>Contributions from Third Parties:</u> The Parties may seek to obtain support from third parties for joint operations through contributions of cash, acreage or data. Any Party may propose to seek support for joint operations on the Contract Area through contributions from third parties. Each Party shall notify all other Parties of any contribution offers received from third parties. Any proposal or offer from third parties shall be subject to the General Matter approval of the Parties prior to either accepting the offer or making such a proposal. Upon General Matter approval, the Operator, unless otherwise agreed, shall negotiate all contributions on behalf of the Parties (with prior consultation of the Parties and the prior agreement of the cash equivalent value for any non-cash consideration offered or received). Upon receiving a response from a third party to the Operator's proposal, the Operator shall notify all of the Parties of the proposal and its terms. Within thirty (30) days of receipt of the Operator's notice, the Party's shall vote as a General Matter on the proposal. If a proposal is approved as a General Matter, any Party shall have the right to decline participation in a contribution and be relieved of any obligations and benefits thereunder. The Participating Party(s) shall not be required to obtain the consent of the Non-Participating Party regarding any contribution or trade.

23.1.1    <u>Cash Contributions:</u> In the event a cash contribution is accepted towards the drilling of a well, in which all Parties are Participating Parties, said cash contribution shall be turned over to the Operator, and the Operator shall credit the amount of the cash contribution against the Costs of the proposed joint operation in proportion to each Party's Participating Interest. In the event the Participating Parties accept a cash contribution toward the drilling of a well where fewer than all Parties are Participating Parties, the cash contribution shall be credited among the Participating Parties in such well to the extent that each Participating Parry shall receive a portion of the contribution equal to its Participating Interest in the well. The cash contribution shall be deducted from the cost of drilling and completing the well prior to computation of the Recoupment Amount Participating Parties shall be entitled to receive out of Hydrocarbon production from the Non-Participating Parties in accordance with Article 16 *(Non-Consent Operations)*.

23.1.[1] <u>Acreage Contributions:</u> Any contribution of acreage toward the drilling of a joint well shall be offered, without warranty of title, to the Participating Parties in proportion to their Participating Interests. If any acreage contribution involves one hundred percent (100%) of the interest in and to the acreage and all of the Parties to this Agreement participate in accepting their share of the assignment of the acreage, the contiguous acreage shall become a part of the Contract Area and subject to the terms of this ADcement and the non-contiguous acreage shall be deemed governed by an operating agreement incorporating identical provisions as the provisions in this Ageement, except to the extent they are clearly inappropriate. Any acreage contribution of less than

93

one hundred percent (100%) interest in and to the acreage or of contiguous or non-contiguous acreage in which less than all Parties are Participating Parties shall, to the extent possible, be subject to the terms of an Operating Agreement substantially similar to this Aueement, and shall apply separately to the acreage acquired by the Participating Parties.

23.ァ.3   Data Contributions: Contributions of geoscience or engineering data offered by third parties in support of joint operations shall be handled pursuant to Article *7 (Confidentiality of Data),* and may be accepted by the Participating Parties so long as the confidentiality of any data belonging to Non-Participating Parties is preserved. No data owned by a Non-Participating Party may be included in any data contribution without the consent of the Non-Participating Party.

Restricted Bidding: *If* at any time during the term of this Agreement, more than one of the Parties are on the list of restricted joint bidders for OCS lease sales as issued by the Minerals Management Service pursuant to 30 CFR 256.44, then the Parties agree to comply with all statutes and regulations regarding restricted joint bidders on the OCS in effect during the term of this Agreement. In the ease of multiple restricted bidders being Parties to this Agreement, the provisions of this Agreement shall be amended to delete those provisions which would otherwise require a transfer of a leasehold interest prohibited by 30 CFR 256.44(c).

## ARTICLE 24
## AREA OF MUTUAL INTEREST, ASSIGNMENTS AND PREFERENTIAL RIGHT TO PURCHASE

ⁱ4.1   Assignments and Transfers of Working Interests: Subject to the provisions of this Article 24, all of the Parties to this Agreement agree to give prior written notice to the Operator and the other Parties of any proposed assignment, transfer or other disposition of all or a portion of a Party's Working Interest covered by this Agreement. Any assignment of a Working Interest covered by this Agreement' shall be made to a financially responsible assignee and shall be farther subject to this Agreement and the following provisions:

/4).1   Exceptions to Prior Written Notice: Notwithstanding any provision of this Agreement to the contrary, an assigning Party shall not be required to provide prior written notice with respect to any of the following:

(a)   A Party seeking to mortgage, pledge, hypothecate or grant a security interest in all or a portion of its Working Interest in the Leases, any equipment or Facilities or each Party's share of Hydrocarbon production from the Contract Area. However, any encumbrance arising from the financing transaction shall be expressly subordinated to the rights of the other Parties to this Agreement, and the assigning Party shall ensure that

94

any mortgage or encumbrance shall be without prejudice to the terms of this Agreement: or,

(b)     A Party assigning all or an undivided part of its Working Interest to an Affiliate

14./.2     Effective Date of Assignments:     Except as otherwise provided in this Aueement, the effective date for any assignment shall be not more than *one hundred eighty (180)* days after the date of the written notice. No assignment, other than those allowed by Article 24.1.1 *(Exceptions to Prior Written Notice),* shall be binding upon the Parties unless and until (i) the assignor or assignee provide all remaining Parties with a photocopy of a fully executed assignment, and an executed MMS Form 1123, Designation of Operator" and (ii) receipt of any necessary approval by the Mineral Management Service. The Parties shall promptly join in such reasonable actions as may be necessary to secure such approvals and shall execute and deliver any and all documents reasonably necessary to effect any such assignment. Any costs attributable to such an assignment shall be the sole obligation of the assignor.

`)4.[1].3     Minimum Transfer of Interest: Unless unanimously agreed otherwise, no transfer to a third party shall be made that:

(a)     is less than an undivided twelve and one-half percent (12.50%) Working Interest as to all depths in the entire Contract Area, and

(b)     results in the conveying Party retaining less than an undivided twelve and one-half percent (12_50%) Working Interest in the entire Contract Area.

These limitations on any transfer, sale or farrnout shall terminate after approval of the Fabrication AFE. Unless unanimously agreed otherwise, if the Working Interest of any Party is subsequently conveyed or distributed to other entities, so that any one of them owns a Working Interest of less than twelve and one-half percent (12.50%),

(c)     such entities collectively shall be entitled to only a single joint representative at meetings of the Parties and shall vote or act collectively on all General Matters or Participation Elections, and

(d)     such Parties shall be entitled to only a single set of logs, samples, information and reports and shall be considered as only one Party for all purposes under this Agreement.

[1]4.2.4     Form of Assizmnents: Any assignment of any interest in or subject to this Agreement shall incorporate provisions that the assignment is inferior to and made expressly subject to this Agreement and providing for the assumption by

95

the assiziee of the performance of all of assignor's obligations under this Agreement and providing, that the assignor is not released from its obligations hereunder. Any assi=nent not in compliance with this provision shall be voidable by the non-assigiing Parties.

24.¹.5    Limited Warranty: Any assi   ment, vesting, or relinquishment of Working Interest between the Parties under this Agreement shall be made without warranty of title; however, all encumbrances made by assignor or known by assignor shall be disclosed to assiziee.

24.3    Preferential Right to Purchase: Subject to the provisions of this Agreement, each Party shall have the right to freely transfer and alienate its Working Interest. Any transfer of all or an undivided interest in the Party's Working Interest shall be subject to the following provisions:

24.3.1    Notice of Proposed Transaction: Should any Party (the "Assignor") desire to dispose of all or an undivided interest in its Working Interest in the Contract Area (whether offered as a single property disposition or as part of a multi-property disposition) through one of the below listed type transactions, or in any other manner not excluded under Article 24.3.3 *(Transactions Not Affected by the Preferential Right to Purchase):*

farmout(s)

cash sale(s); or,

non-simultaneous like-kind exchange(s)

and has received a bona fide offer (whether from a Party to this Agreement or from a third party) which the Assignor is willing to accept for the purchase or other acquisition of the Working Interest, each of the remaining Parties to this Agreement shall have a preferential right to purchase all or a Party's proportionate share of such Working Interest. In such case, the Assignor shall promptly give prior written notice of the proposed transaction to the other Parties. The notice of the proposed transaction shall provide full information concerning the transaction including at least:

the name and address of the prospective purchaser (who must be ready, able and willing to acquire the interest),

the purchase price or other consideration offered (which shall include the monetary equivalent in U.S. Dollars based upon the reasonable market value of any consideration other than cash and/or consideration received as a result of a transaction under Article 24.3.3 *(Transactions Not Affected by the Preferential Right to Purchase),*

96

the proposed effective date of the transaction, and

all other material terms of the offer.

**¹-1.3.¹**  Exercise of Preferential Right to Purchase: For a period of thirty (30) days from receipt of the notice, the remaining Parties shall have the optional right to elect to acquire the Working Interest offered (on the same terms and conditions. or on equivalent terms for a non-cash transaction as stated in the notice) without reservations or conditions. The Election to exercise the preferential right shall be made by the exercising Party giving the Assignor written notice of its Election to purchase prior to the expiration of the thirty (30) day period. If an Election to preferentially purchase is made, the Assignor shall be required to transfer the Working Interest to the Party at the price and on the terms specified in the notice. The transaction shall be concluded within a reasonable time, but no later than sixty (60) days after receipt of the Election to preferentially purchase (plus a reasonable time to secure all necessary governmental approvals). If more than one Party elects to acquire the Working Interest offered, then each Party shall acquire a proportion of the Working Interest offered equal to the ratio its own pre-acquisition Working Interest bears to the total pre-acquisition Working Interests of all acquiring Parties (unless the acquiring Parties agree upon a different ratio). If a non-assigning Party does not exercise its preferential right to purchase its Participating Interest share of the Working Interest offered and/or the non-assigning Parties who wish to exercise their preferential right to purchase do not agree to pay the full consideration and accept all of the terms of the offer within fifteen (15) days following the thirty (30) day period in which the non-assigning Parties may exercise their preferential right to purchase, the assigning Party may be free to complete the proposed conveyance on the terms disclosed in the notice. If only one Party elects to acquire the Working Interest offered, it may require the assignor to transfer all of the Working Interest offered, but may not require the transfer of less than all Working Interest offered.

24.3.3   Transactions Not Affected by the Preferential Right to Purchase: This preferential right to purchase shall not exist or apply when a Party proposes to:

(a)    mortgage, pledge, hypothecate or pant a security interest in all or a portion of its Working Interest (including assignments of Hydrocarbon production executed as further security for the debt secured by such device), or

(b)    exchange all or an undivided interest in its Working Interest in the Contract Area for property identified outside the Contract Area at the time of the exchange, or

97

    (c)    dispose of its Working Interest by:

        merger, reorganization or consolidation;

        a sale or other transfer of substantially all of a Party's exploration and production assets in the Gulf of Mexico; or

        a sale or other transfer to an Affiliate.

**24.3.4**   <u>Completion of the Transaction:</u> If none of the remaining Parties elect to exercise its preferential right to purchase the Working Interest offered, the Assignor shall be free to complete the proposed transaction on the terms disclosed in the notice. However, if any proposed transaction is not executed and filed of record with the Minerals Management Service within one hundred twenty (120) days from the expiration of the thirty (30) day preferential right Election period (plus a reasonable time to secure any necessary governmental approvals) or, if the terms of the proposed transaction are amended in any way, the proposed transaction shall be considered withdrawn and the Working Interest offered shall again be subject to the preferential right to purchase as if the originally proposed transaction had never been proposed.

## ARTICLE 25
## FORCE MAJEURE

**25.1**   <u>Force Majeure:</u> If as a result of Force Majeure any Party is rendered unable, wholly or in part, to carry out its obligations under this Agreement (except for the payment of money) then the obligations of the Party giving such notice, so far as and to the extent that the obligations are affected by such Force Majeure, shall be suspended during the continuance of any inability so caused, but for no longer period. For purposes of this Ageement, "Force Majeure"? shall be inclusive of but not limited to the following events: flood, hurricane or other acts of God; a fire, blowout, oil spill or other environmental catastrophe; war, civil disturbance, labor dispute, strike, lockout, compliance with any law, order, rule or regulation, governmental action or delay in granting permits or permit approvals as needed; by inability to secure materials or rig including but not limited to delays:

    (a)    in the availability of the rig or other equipment or materials,

    (b)    due to necessary repairs or modifications to the rig or other equipment, or

    (c)    caused by the completion of prior contractual commitments;

or by any other cause, whether similar or dissimilar, beyond the reasonable control of the said Party. The Party claiming Force Majeure shall notify the other Parties of the Force

98

Majeure situation within a reasonable time (not to exceed thirty (30) days) after the occurrence of the facts relied on and shall keep all Parties informed of all significant developments. The notice of Force Majeure shall give full details of said Force Majeure, and also (if possible) estimate the period of time which said Party will require to remedy the Force Majeure or to resume performance of its obligations under this Agreement. The affected Party shall use all reasonable diligence to remove or overcome the Force Majeure situation, but shall not be obligated to settle any labor dispute except on terms acceptable to it and all such disputes shall be handled within the sole discretion of the affected Party.

## ARTICLE 26
## ADMINISTRATIVE PROVISIONS

26.1   <u>Term of Agreement:</u> This Agreement shall become binding upon execution by all Parties with an effective date as set forth in the preamble to this Agreement. This Agreement shall remain in effect from the effective date and for so long as any of the Leases in the Contract Area shall remain in effect or until all assets and operations have been turned over to a single Working Interest owner. Termination of this Agreement shall not relieve any Party from any Costs or liability accrued or incurred prior to the termination of this Agreement, and the provisions of this Agreement shall continue in force for such additional time as necessary until:

(a)      all wells have been plugged and abandoned;

(b)      all property and equipment in the Contract Area belonging to the Parties are disposed of by the Operator and all claims or lawsuits have been settled or otherwise disposed of, and,

(c)      a final accounting and settlement has been made under this Agreement (including settlement of any gas imbalances pursuant to Exhibit "D").

The Operator shall have a reasonable period of time after the occurrence of an event of termination in which to conclude the administration of joint operations and to make a distribution of assets. During this period of time, the Operator shall continue to have and shall exercise all powers granted and meet all duties imposed by this Agreement until all provisions of this Agreement are fully executed. In accordance with Article 4.5 *(Selection of Successor Operator),* this Agreement will also terminate if no Party is willing to become Operator effective after all conditions of this provision have been completed.

/6.[1] <u>Time Limits:</u> Time is of the essence in this Agreement and all time limits shall be strictly construed and enforced. The failure or delay of any Party in the enforcement of the rights granted under this Agreement shall not constitute a waiver of said rights nor shall it be considered as a basis for estoppel. Such Party may exercise its rights under this Agreement despite any delay or failure to enforce the rights when the right or obligation arose.

99

T6.3   <u>Waiver of Ric2ht to Partition:</u> Each Party for itself and its successors and assigns waives the right to brim: an action for partition of its interest in the Leases and lands or personal property held subject to this Agreement, and covenants that during the existence of this Agreement it shall not resort at any time to any action at law or in equity to partition any or all of Leases and lands or personal property subject to this Agreement.

26.4   <u>Compliance With Laws and Regulations:</u> This Agreement, and all operations conducted by the Parties pursuant to this Agreement, are expressly subject to and shall comply with all laws, orders, rules and regulations of any federal, state or local governmental authority having jurisdiction over the Contract Area. No Party shall suffer a forfeiture or be liable in damages for failure to comply with any of the provisions of this Agreement if such compliance is prevented by or if such failure results from compliance with any applicable law, order, rule or regulation.

26.4.1   <u>Applicable Law:</u> THE PROVISIONS OF THIS AGREEMENT AND THE RELATIONSHIP OF THE PARTIES SHALL BE GOVERNED AND INTERPRETED ACCORDING TO FEDERAL LAWS AND LAWS OF STATE OF TEXAS WITHOUT REGARD TO PRINCIPLES OF CONFLICTS OF LAWS THAT WOULD REFER THE MATTER TO THE LAWS OF ANOTHER JURISDICTION.   UNDER NO CIRCUMSTANCES WILL ANY PARTY BE LIABLE TO THE OTHER FOR PUNITIVE DAMAGES, CONSEQUENTIAL, LNDIRECT, UNFORESEEN, LOSS OF PROFIT, OR OTHER INDIRECT OR PENALTY DAMAGES EITHER IN LAW OR EQUITY.

26.4.2   <u>Severance of Invalid Provisions:</u> In case of a conflict between the provisions of this Agreement and the provisions of any applicable laws or regulations, the provisions of the laws or regulations shall govern over the provisions of this Agreement. If, for any reason and for so long as, any clause or provision of this Agreement is held by court of competent jurisdiction to be illegal, invalid, unenforceable or unconscionable under any present or future law (or interpretation thereof), the remainder of this Agreement shall not be affected by such illegality or invalidity. Any such invalid provision shall be deemed severed from this Agreement as if this Agreement had been executed with the invalid provision eliminated. The surviving provisions of this Agreement shall remain in full force and effect unless the removal of the invalid provision destroys the legitimate purposes of this Agreement; in which event this Agreement shall be null and void. The Parties shall negotiate in good faith for any required modifications to this Agreement.

26.4.3   <u>Fair and Equal Employment:</u> Each of the Parties is an Equal Opportunity Employer. To the extent that this Agreement may be subject to Executive Order 11246, as amended, the equal opportunity provisions (41 CFR 60-1) are incorporated herein by reference. If the Non-Discrimination in the OCS

100

provisions of 30 CFR 270 apply to this Agreement and the operations conducted under it, the provisions of 30 CFR 270 are also incorporated by reference. To the extent required by applicable laws and regulations, this Agreement also includes and is subject to the affirmative action clauses concerning disabled veterans and veterans of the Vietnam era (41 CFR 60250) and the affirmative action clauses concerning, employment of the handicapped (41 CFR 60-741), which clauses are incorporated herein by reference. In performing work under this Agreement, the Parties agree to comply with (and the Operator shall require each independent contractor to comply with) the governmental requirements set forth in Exhibit "E" attached hereto, pertaining to nonsegregated facilities. This Agreement and the Parties are also subject to any other applicable rules and regulation relating to nondiscrimination that may be promulgated from time to time by any governmental body having jurisdiction over the subject matter of this Agreement.

26.5   <u>Construction and Interpretation of This Agreement:</u> The interpretation and construction of the terms of this Agreement will be governed by the following conventions:

    26.5.1   <u>Headings for Convenience:</u> Except for the definition headings contained in Article 2 *(Definitions),* all the table of contents, captions, numbering sequences and paragraph headings used in this Agreement are inserted for convenience only and shall in no way define, limit or describe the scope or intent of this Agreement or any part thereof, nor have any legal effect other than to aid a reasonable interpretation of this Agreement.

    26.5.2   <u>Gender and Number:</u> The use of pronouns in whatever gender or number shall be deemed to be a proper reference to the Parties to this Agreement though the Parties may be individuals, business entities or groups thereof. Any necessary grammatical changes required to make the provisions of this Agreement refer to the correct gender or number shall in all instances be assumed as though each case was fully expressed.

    /6.5.3   <u>Independent Representation:</u> Each Party has had the benefit of independent representation with respect to the subject matter of this Agreement. This Agreement, though drawn by one Party, shall be construed fairly and reasonably and not more strictly against one Party than another.

26.6   <u>Integrated Agreement:</u> This Agreement and the Exhibits attached thereto contain the final and entire Agreement of the Parties with respect to the subject matter of this contract. There are no representations, warranties or promises, oral or written between the Parties other than those included in this Agreement with the agreement by the Parties hereto that, upon execution of this Agreement by all Parties:

    a. **This Agreement** supersedes and replaces all previous negotiations, understandings or promises, whether written or oral, relative to the subject of this Agreement, and

101

b. with respect to the Contract Area only, this Agreement supersedes and replaces the Joint Operating Agreement attached as Exhibit "C" to that certain Joint Venture Agreement dated effective November 1, 2005 by and between the Noble Energy and Samson covering, among other lands, the Contract Area (the "Noble Energy — Samson JVA") and referred to in Article 6.2 of that certain Bidding Agreement entered into effective November 1, 2005 by and between Noble Energy and Samson covering certain blocks available for lease at OCS Sale 198, as amended by that certain Second Amendment to Joint Venture Agreement entered into effective March 20, 2007 by and between the Noble Energy and Samson covering, among other lands, the Contract Area.

Each of the Parties acknowledges that, to such Party's knowledge, no other Party has made any promise, representation or warranty that is not expressly stated in this Agreement. This Agreement shall not be modified or changed except by a written amendment signed by all the Parties.

26.7 Execution of Documents:

26.7.1 Binding Effect: This Agreement shall be binding upon and inure to the benefit of the Parties and their respective successors and assigns and shall constitute a covenant running with the land and Leases comprising the Contract Area. This Agreement does not benefit or create any rights in any person or entity not a Party to this Agreement.

26.7.2 Corporate Authority: if any Party is a legal entity, including but not limited to, an association, corporation, joint venture, limited partnership, partnership or trust, such Party represents to the other Parties that the execution and delivery of this Agreement and the completion of transactions contemplated herein have been duly authorized by all necessary corporate proceedings or have received all necessary management approvals.

26.7.3 Further Assurances: Each Party further agrees to take any and all actions necessary and sign any and all documents necessary to implement the terms of this Agreement. Any necessary documents (e.g., a Designation of Operator, etc.) shall be prepared and executed by all Parties within thirty (30) days from the receipt of a written request for same from any Party.

26.7.4 Multiple Counterparts: This Agreement may be executed by signing the original or a counterpart thereof. If this Agreement is executed in multiple counterparts, each counterpart shall be deemed an original and all of which when taken together shall constitute but one and the same Agreement with the same effect as if all Parties had signed the same instrument. This Agreement may also be ratified by separate instrument referring to this Agreement and adopting by

102

reference all the provisions of this Agreement. A ratification shall have the same effect as an execution of the original Agreement.

IN WITNESS WHEREOF, each Party, through its duly authorized agent or representative, has executed this Ageement effective as of the date first above written.

NOBLE ENERGY, LNC.                    SAMSON OFFSHORE COMPANY

BY: _____ *r/D* _____        BY: _____ 6ꞇee _____

NAME:  Rodney D. Cook          ᵥl NAME:

TITLE:  Vice President         TITLE:        ⟶6:   r  3ₑyk

103

**EXHIBIT "Al"**

Attached to and made a part of that certain Joint Operating Agreement ("JOA") dated effective
July **1,** 2006 by and between Noble Energy, Inc. and Samson Offshore Company covering OCS-G 28030, Mississippi Canyon flock 948.

**CONTRACT AREA**

| Lease No. | Block Number | Lease Effective Date | Gross Acres | Lease Royalty | Potential Lease Royalty Suspension Volume | Lease ORRIs | Area / Depth |
|---|---|---|---|---|---|---|---|
| OCS-G 28030 | MC 948 | 07-01-06 | 5,760 | 1/8 | 12 MMI30E | None | OCS-G 28030 covering **all of** Mississippi Canyon Block 948. |

EXHIBIT "A-2"

Attached to and made a part of that certain Joint Operating Agreement ("JOX) dated effective
July 1, 2006 by and between Noble Energy, Inc, and Samson Offshore Company covering OCS-G 28030,
Mississippi Canyon. Block 943.

## WORKING INTERESTS OF THE PARTIES, OPERATOR AND REPRESENTATIVES

I.      **Contract Area and Description of Lease(s):**

     See EXHIBIT "A-1"


II.     **Workina Interests of the Parties**
     Noble Energy, Inc.                           50.00%
     Samson Offshore Company              50.00%


III.    **Operator**

     Noble Energy, Inc.

IV.     **Addresses**                          **Names of Representatives**
     Noble Energy, Inc,                    Deepwater Land Manager
     100 Glenborough Drive, Suite 100      Attn.: **Daniel S. Mills**
     Houston, Texas 77067-3610
     Phone No.:    (281) 874-6063
     Fax No.:      (281) 876-6208

     Samson Offshore Company               Manager Land / Business Development
     1301 Travis, Suite 1900               Attn.: **Sonny Measley**
     Houston, Texas 77002
     Phone No.:    (713) 577-2011
     Fax No.:      (713) 577-2211

EXHIBIT "B"

Attached to and made a part of that certain Joint Operating Agreement ("JOA") dated effective
July 1, 2006 by and between Noble Energy, Inc. and Samson Offshore Company covering OCS-G 28030,
Mississippi Canyon Block 948.

## OFFSHORE INSURANCE PROVISIONS

I.   **INSURANCE OBTAINED BY OPERATOR AND CHARGED TO JOINT ACCOUNT**

At all times during the conduct of operations hereunder, Operator shall carry all insurance required
by contract or law including, but not limited to, the following:

1.   Automobile Liability Insurance covering all owned, non-owned and leased vehicles with
combined single limits of at least $1,000,000 per occurrence.

2.   Workers Compensation insurance in compliance with all State and Federal Regulations in
the jurisdiction where any of the work under this agreement shall be performed, including
the following special coverage extensions:

   A.   Employers' Liability coverage with limits of not less than $1,000,000 per accident.

   B.   U.S. Longshoremen and Harbor Workers' Act and Outer Continental Shelf Lands
Act coverage.

   C.   Employers' Liability arising out of Maritime operations including coverage for
benefits and damages under the Jones Act with limits of at least $1,000,000 per
occurrence.

   D.   "In Rem" endorsement providing that a claim "In Rem" shall be treated as a claim
against the Operator.

   E.   Waiver of Subrogation endorsement which waives the insurers rights of
subrogation against all of the Parties to this agreement.

3.   Commercial General Liability Insurance with combined single limits of at least $1,000,000
per occurrence.

Premiums for the insurance above specified shall be charged to the Joint Account, provided,
however, that if the Operator either self-insures or effectively self-insures the insurance required
in 2 above, the Operator shall charge to the joint account, in lieu of any premiums for such
insurance, an amount not to exceed the workers compensation manual rates times the payroll.

Except as provided above, Operator shall not be obligated to obtain or cause to be carried insurance for the benefit of the joint account. Operator shall not obtain or cause to be carried for the benefit of the joint account, control of well or seepage and pollution insurance nor insurance against the hazards of fire, windstorm, explosion, blowout, cratering, reservoir damage, or insurance other than specified above.

## IL  <u>INSURANCE NOT CHARGED TO THE JOINT ACCOUNT</u>

At all times while the Joint Operating Agreement is in effect, each Party to the Agreement shall insure or self-insure for their share of any liabilities assumed under the Joint Operating Agreement, The cost of these insurance or self-insurance programs shall be the individual responsibilities of each of the parties and none of the cost associated with these programs shall be charged to the Joint Account. Each party shall insure or self-insure the following coverage for the minimum limits stated.

I.   Pollution Liability insurance covering offshore oil pollution with limits of at least $10,000,000 per occurrence.

   Physical Damage insurance and coverage for Wreck Removal for Facilities covered by the Joint Operating Agreement, with limits not less than the Parties share of the replacement cost of the facility.

3.   Control of Well and Seepage and Pollution insurance with limits of at least $10,000,000 per occurrence.

4.   Non-owned aviation liability insurance in the amount of $1,000,000 per occurrence covering liability arising out of any leased aircraft used in the connection with the work to be performed under the Joint Operating Agreement.

All of the above coverages shall be endorsed to waive the insurers' rights of subrogation against Operator and all other Parties to the Az•eement. Any Party to the Agreement, at the request of any other Party to the Agreement, shall advise all of the other Parties to the Joint Operating Agreement as to whether it will insure or self-insure the above mention coverages. If Insurance is purchased, upon request, a Party will provide all other Parties to the Joint Operating Agreement with a certificate of insurance evidencing that all of the above insurance and special insuring provisions are in place.

In the event a Party elects to self-insure all or part of the above requirements, and if any of the other Parties to the Joint Operating. Agreement believe or have a concern that the Party does not have the financial capability to meet its obligations under such self-insurance programs, any Party to the Agreement may request any other Party to provide proof of its ability to self-insure these risks. If the self-insuring Party is unable to furnish adequate proof of its ability to self-insure, the other

Parties to the Agreement may, but are not required to do so, purchase any or all of the insurance that the Party elected to self-insure. The cost of said insurance shall be for the individual account of the Party on whose behalf the insurance was purchased.

## III.   CONTRACTORS INSURANCE

Operator (including any Party conducting Non-Consent Operations) shall use its best efforts to require each contractor who performs work on behalf of the Joint Operating Agreement to carry the following insurance and special insuring provisions.

1.   Workers' Compensation and Employers' Liability insurance in accordance with all State and Federal Regulations in the jurisdiction where the work is to be performed. This coverage shall contain the following special endorsements:

   a.   Employers' Liability coverage with limits of not less than $1,000,000 per accident

   b.   U.S. Longshoremen and Harbor Workers' Act and Outer Continental Shelf Lands Act coverage.

   c.   Employers' Liability arising out of Maritime operations including coverage for benefits and damages under the Jones Act with limits of at least $1,000,000 per person and $2,000,000 all persons any one occurrence.

   d.   "In Rem" endorsement providing that a claim "In Rem" shall be treated as a claim against the Contractor.

   e.   "Borrowed Servant" endorsement providing that a Workers' Compensation claim brought against Operator or any Party to the Agreement, by a Contractors employee will be treated as a claim against the Contractor.

   f.   Waiver of Subrogation endorsement which waives the insurers rights of subrogation against all of the Parties to this agreement.

   Commercial General Liability insurance and/or Excess Liability insurance, including contractual liability covering the indemnity obligations assumed in the contract with Operator, with combined single limits of $5,000,000 per occurrence for injuries to or death of persons and damage to property.

3.   Automobile Liability insurance covering all owned, non-owned and hired vehicles with combined single limits of at least $1,000,000 per occurrence for injuries to or death of persons and damage to property.

4.   In the event watercraft is used by the Contractor, contractor shall carry or require owners of such watercraft to carry Protection and Indemnity Insurance in the amount of not less than the market value of the vessel or $10,000,000, whichever is greater.

3

5.      If Contractor's operations require it to use aircraft, Contractor shall carry or require the owners of such aircraft to carry aircraft liability insurance with a combined single limit of $1,000,000 per passenger seat or $10,000,000, whichever is greater.

6.      Any other insurance that Operator deems necessary.

All of the insurance carried by Contractors pursuant to Sections 1 through 5 above shall contain endorsements waiving the insured's rights of subrogation against Operator and all other Parties to the Agreement and shall be primary to any insurance carried by Operator and all other parties to the Agreement.

Operator shall make a good faith effort to obtain all of the above required insurance and special insuring provisions. Operator shall also make a good faith effort to obtain endorsements naming the Operator as an Additional Insured on the policies of insurance where appropriate and to provide that the word 'Insured' also includes any Party, Co-Owner or Joint Venturer. However, Operator shall not be liable to non-operators or to their parent companies, subsidiaries or any affiliated companies for failure to do any of the above. It is recognized in the industry that there are certain contractors and service companies whose services are necessary to operations contemplated by the Parties, who as a matter of their policy refuse contractually to indemnify working interest owners or to carry any insurance indemnifying Working Interest owners. As to those entities, Operator may waive any requirement of contractual indemnity or any or all of the insurance or special insurance provisions required above.

IV.     <u>NOTICE</u>

Operator shall promptly notify Non-operators of any loss, damage or claim not covered by the insurance obtained hereunder for the joint account. All losses which are not covered and all losses in excess of insurance coverage shall be borne by the Parties in accordance with the terms of the Joint Operating Agreement under which said operations are being conducted by the Parties. All parties shall continue to be responsible for any "cash calls" under this Agreement, irrespective of whether there may be insurance in place for the liability, claims and losses that may be covered by insurance provided by the Operator or by any other Party to this Agreement.

4

Debtors' Exhibit No. 102
Page 112 of 166

# EXHIBIT "C"

Attached to and made a part of that certain Joint Operating. Agreement ("JOA") dated effective
July I , 21)06 by and between Noble Energy, Inc. and Samson Offshore Company covering OCS-G 28030,
Mississippi Canyon Block 948.

# ACCOUNTING PROCEDURE
# OFFSHORE JOINT OPERATIONS

# I. GENERAL PROVISIONS

1.      Definitions
        All terms used in this Accounting Procedure, if not otherwise defined below, shall have the same meaning
        as in the Agreement to which this is attached.

        'Joint Property" shall mean the real and personal property subject to the Agreement to which this
        Accounting Procedure is attached.
        "Joint Operations" shall mean all operations necessary or proper for the development, operation, protection
        and maintenance of the Joint Property.
        "Joint Account" shall mean the account showing the charges paid and credits received in the conduct of the
        Joint Operations and which are to be shared by the Parties.
        "Operator" shall mean the Party designated to conduct the Joint Operations.
        "Non-Operators" shall mean the Parties to this agreement other than the Operator.
        "Parties" shall mean legal entities signatory to the Agreement, or their successors or assigns, to which this
        Accounting Procedure is attached.
        " Supervisors" shall mean those employees whose primary function in Joint Operations is the direct
        supervision of other employees and/or contract labor directly employed on the Joint Property in a field
        operating capacity.
        "Technical Employees" shall mean those employees having special and specific engineering, geological or
        other professional skills, and whose primary function in Joint Operations is the handling of specific
        operating conditions and problems for the benefit of the Joint Property.
        "Personal Expenses" shall mean travel, temporary living expenses, relocation costs, and other reimbursable
        expenses of Operator's employees as well as Non-Operator's employees utilized for a Project Team.
        "Material" shall mean personal property, equipment, supplies, or consumables acquired or held for use on
        the Joint Property.
        "Controllable Material" shall mean Material which at the time is so classified in the Material Classification
        Manual as most recently recommended by the Council of Petroleum Accountants Societies.
        "Shore Base Facilities" shall mean onshore support facilities that during drilling, development, maintenance
        and producing operations provide such services to the Joint Property as receiving and transshipment point
        for supplies, materials and equipment; debarkation point for drilling and production personnel and services,;
        communication, scheduling and dispatching center; other associated functions benefiting the Joint Property.
        "Offshore Facilities" shall mean platforms and support systems such as oil and gas handling facilities, living
        quarters, offices, shops, cranes, electrical supply equipment and systems, fuel and water storage and piping,
        heliport, marine docking installations, cornxnunication facilities, navigation *aids, and* other similar facilities
        necessary in the conduct of offshore operations.
        "Project Team" shall mean employees of the Parties directly assigned to perform work and/or studies as
        defined under the terms of the Agreement.
        "Affiliate" shall mean, with respect to the Parties, any party directly or indirectly controlling, or controlled
        by or under common control with the Parties.

Debtors' Exhibit No. 102
Page 113 of 166

Statements and Billings

    A.    Operator shall bill Non-Operators on or before the last day of the month for their proportionate share of the Joint Account for the preceding month. Such bills shall be accompanied by statements which identify the authority for expenditure, *lease* or facility, and all charges and credits summarized by appropriate categories of investment and expense. Controllable Material shall be summarized by major Material classification. Intangible drilling costs and audit exceptions shall be separately and clearly identified.

    B.    Project Team costs incurred by Non-Operators shall be billed to the Operator, on a monthly basis, in accordance with the provisions contained herein. Operator shall reimburse Non-Operators in accordance with Section I, Paragraph 3.

**3.**    **Advances and Payments by Non-Operators**

    A.    if gross expenditures for the Joint Account are expected to exceed S 1,000,000 in the next succeeding month's operations, *the* Operator may require the Non-Operators to advance their share of the estimated cash outlay for the months operations. Unless otherwise provided in the agreement, any billing for such advance shall be payable within thirty (30) days after receipt of the advance request or by the first day of the month for which the advance is required, whichever is later. Operator shall adjust each monthly billing to reflect advances received from the Non-Operators for such month.

    B.    Each Non-Operator shall pay its proportion of all bills within thirty (30) days of receipt date. If payment is not made within such time, the unpaid balance shall bear interest compounded monthly using the prime rate in effect at Chase Manhattan Bank plus 3% in effect on the first day of the month for each month that the payment is delinquent or the maximum contract rate permitted by the applicable usury laws in the jurisdiction in which the Joint Property is located, whichever is the lesser, plus attorney's fees, court costs, and other costs in connection with the collection of unpaid amounts, Interest shall begin accruing on the first day of the month in which the payment was due.

**4.**    **Adjustments**

    A.    Payment of any such bills shall not prejudice the right of **any** Party to protest or question the correctness thereof, provided, however, all bills and statements (including payout status statements) related to expenditures rendered during any calendar year shall conclusively be presumed to be true and correct after twenty-four (24) months following the end of any such calendar year, unless within the said period a Party takes specific detailed written exception thereto **and** makes claim for adjustment.

        All adjustments initiated by the Parties except those described in (1) through **(4)** below are limited to the twenty-four month period following the end of the calendar year in which the original charge appeared or should have appeared on the Joint Account statement or payout status statement. Adjustments made beyond the twenty-four month period are limited to the following:
(1)  a physical inventory of Controllable Material as provided for in Section V.
(2)  an offsetting entry (whether in whole or in part) which is the direct result of a specific joint interest audit exception granted by the Party relating to another property.
(3)  a government/regulatory audit.
(4)  working interest ownership adjustments.

**5.**    **Expenditure Audits**

A.    A Non-Operator. upon notice in writing to Operator and other Non-Operators, shall have the right to audit Operator's accounts and records relating to the Joint Account for any calendar year within *the* twenty-four (24) month period following the end of such calendar year, provided, however, conducting an audit shall not extend the time for the taking of written exception to and the adjustment of accounts as provided for in Paragraph 4 of this Section L Where there are two or more Non-Operators, the Non-Operators shall make every reasonable effort to conduct a joint audit in a manner which will result in a minimum of inconvenience to the Operator. Operator shall bear no portion of the Non-Operator's audit cost incurred under this paragraph unless agreed to by the Operator. The audits shall not be conducted more than once each year without prior approval of Operator, except upon the resignation or removal of the Operator, and shall be made at the expense of those Non-Operators approving such audit. The lead audit company's audit report shall be issued within 180 days after completion of the audit field work provided, however, the 180 day time period shall not extend the 24 month requirement for taking specific detailed written exception as required by Paragraph 4.A. above. All claims shall be supported with sufficient documentation. Failure to issue the report within the prescribed time or to take specific written exception within 24 month period will preclude the Non-Operator from taking exception to any charge billed within the time period audited.

A timely filed audit report or any timely submitted response thereto shall suspend the running of any applicable statute of limitations regarding claims made in the audit report. While any audit claim is being resolved, the applicable statute of limitations will be suspended. Failure, however, to comply with the deadlines provided herein shall cause the statue to commence running again.

B.    The Operator shall allow or deny all exceptions in writing to an audit report within 180 days after receipt of such report. Denied exceptions should be accompanied by a substantive response. Failure to respond to an exception with substantive information on denials within the time provided will result in the Operator paying interest on that exception, if ultimately granted, from the date of the audit report. The interest charged shall be calculated in the same manner as used in Section 1, Paragraph 3.B.

C.    The lead audit company shall reply to the Operator's response to an audit report within 90 days of receipt, and the Operator shall reply to the lead audit company's follow-up response within 90 days of receipt. If the lead audit company does not provide a substantive response to an exception within 90 days, that unresolved audit exception will be disallowed. If the Operator does not provide a substantive response to lead auditor's follow-up response within 90 days, that unresolved audit exception will be allowed and credit given the Joint Account.

D.    The lead audit company or Operator may call an audit resolution conference for the purpose of resolving audit issues,'exceptions that are outstanding at least eighteen (18) months after the date of the audit report. The meeting will require one month's written notice to Operator and all audit participants, be held at the Operator's office or other mutually agreed upon location, and require the attendance of representatives of Operator and each audit participant responsible for the area(s) in which the exceptions are based and who have authority to resolve issues on behalf of their company. Any Party who fails to attend the resolution conference shall be bound by any resolution reached at the conference, The lead audit company will coordinate the response/position of the Non-Operators and continue to maintain its traditional role throughout the audit resolution process.

Attendees will make good faith efforts to resolve outstanding issues, and each Party will be required to present substantive information supporting its position. An audit resolution conference may be held as often as agreed to by the Parties. Issues unresolved at one conference can be discussed at subsequent conferences until each such issue is resolved.

E.    Non-Operator charges shall be subject to the above audit requirements.

3

F.  The preceding provisions shall not preclude the Parties from conducting revenue audits.

6.  Approval by Parties

Where an approval or other agreement of the Parties is expressly required under other sections of this Accounting Procedure and if the agreement to which this Accounting Procedure is attached contains no **contrary provisions in regard thereto, Operator shall notify all Parties of the proposal, and** the agreement or **approval of a majority in interest of the Parties shall** *be* **controlling.**

## H. DIRECT CHARGES

Operator shall charge the Joint Account with the foilowina items:

1.  **Rentals and Royalties**

Lease rentals and royalties paid by Operator for the Joint Operations.

2.  **Labor**

**A. (1) Project Team**

**AN salaries and wages, including incentive compensation** programs as set forth in COPAS Interpretation 30, for Operator's employees and/or Non-Operator's employees assigned **to the** Project Team on a full time/part-time basis shall be considered **a direct cost and shall be charged to the Joint Account. Such employees shall include personnel who are directly engaged in project management, evaluation, design, construction and installation activities regardless of location. Part time Project Team employees (excluding Technical employees not assigned to the Project Team, but working under the direction of the Project Team) shall be charged to the Joint Account, based on actual days worked, only when such time involves at Least one (1) day equivalent or more per month that is devoted to the projects. Contractor charges for personnel assigned to the Project Team are chargeable pursuant to Section II, Paragraph 5. All such charges must be reviewed and agreed to by the Project Team prior to the first meeting based on current salary and benefits.**

**(2) Labor - Other Operations**

The following salaries and wages shall be charged, when employees are not assigned to a Project Team.

(a)  **Salaries and wages of Operator's field employees directly** employed on the Joint Property **in the conduct of Joint Operations.**

(b)  **Salaries and wages of Operator's employees directly employed on Shore Base Facilities and other Offshore Facilities serving the Joint Property if such costs are not charged under Paragraph 6 of this Section II.**

(c)  Salaries **of first level Supervisors in the field.**

(d)  Salaries **and wages of Technical Employees directly employed on the Joint Property if such charges are excluded from the Overhead rates.**

(e)  Salaries and wages of Technical Employees either temporarily or permanently **assigned to and directly employed in the operation of the Joint Property if such charges are excluded from the overhead rates.**

B.  Cost **of** holiday, vacation, sickness and disability benefits and other customary allowances paid to employees whose salaries and wages are chargeable to the Joint Account under Paragraph 2.A. of this Section II. Such costs under this Paragraph 2.B. may be charged on a "when and as paid basis" or by "percentage assessment" on the amount of salaries and wages chargeable to the Joint Account under Paragraph 2.A. of this Section II. **If** percentage assessment is used, the rate shall be based on the Operator's or Non-Operator's cost experience, as appropriate.

4

C.    Expenditures or contributions made pursuant to assessments imposed by governmental authority which are applicable to costs chargeable to the Joint Account under Paragraphs 2.A .and B. of this Section II.

D.    Personal Expenses of those employees whose salaries and wages are chargeable to the Joint Account under Paragraph 2.A .of this Section II.   Relocation costs may only be charged for a domestic employee transferred within the lower forty-eight (43) states of the United States and assigned to the Project Team full-time for a minimum of twelve (12) months.

E.    Government mandated training charges shall include the wages, salaries, training course cost, and reimbursable travel, meals, and lodging incurred during the training session. The cost of the training course will be limited to prevailing commercial rates.

F.    Cost of established plans for employees' benefits as described in COPAS Interpretation No. 11 determined by applying the employee benefits percent most recently published by COPAS to the chargeable salaries and wages.

3.    Material
Material purchased or furnished by Operator for use on the Joint Property as provided under Section IV. Only such Material shall be purchased for or transferred to the Joint Property as may be required for immediate use or is reasonably practical and consistent with efficient and economical operations. The accumulation of surplus stocks shall be avoided.

4.    Transportation
Transportation of company labor, contract personnel, and Material necessary for the Joint Operations but subject to the following [imitations:

A.    If Material is moved to the Joint Property from the Operator's warehouse or other properties, no charge shall be made to the Joint Account for a distance greater than the distance from the nearest reliable supply store where like Material is normally available or railway receiving point nearest the Joint Property unless agreed to by the Parties.

B.    If surplus Material is moved to Operator's warehouse or other storage point, no charge shall be made to the Joint Account for a distance greater than the distance to the nearest reliable supply store where like Material is normally available, or railway receiving point nearest the Joint Property unless agreed to by the Parties. No charge shall be made to the Joint Account for moving Material to other properties, unless agreed to by the Parties.

C.    In the application of subparagraphs A and B above, the option to equalize or charge actual trucking cost is available when the actual charge is less than the amount most recently recommended by COPAS, excluding accessorial charges. Examples of accessorial charges are listed in COPAS Bulletin 21.

5.    Services
The cost of contract services, **equipment** and utilities provided by sources other than the Parties, except for those services covered by the Section III overhead provisions and excluded under Paragraph 9 of Section Notwithstanding anything to contrary. the cost of contract personnel assigned to the Project Team are directly chargeable to the Joint Account.

6.    **Equipment and Facilities Furnished by Operator**

A    Equipment and facilities, including Shore Base andior Offshore Facilities owned by the Operator shall be charged to the Joint Account at the average prevailing commercial rate for such

5

equipment. if an average commercial rate is used to bill the Joint Account, Operator shall adequately document and support such rate and periodically review and update the rate.

B.  In lieu of charges in Paragraph 6.A. above, or if a prevailing commercial rate is not available, equipment and facilities, including Shore Base and;or Offshore Facilities owned by the Operator. will be charged to the Joint Account at the Operator's actual cost. Such costs may include all expenses which would be chargeable pursuant to this Section LI if such equipment were jointly owned, depreciation using straight line depreciation method, interest on investment (less Gross accumulated depreciation) not to exceed  twelve  percent ( I2. %) per annum. In addition, for platforms, subsea production systems, and production facilities the rate may include an element of the estimated cost of abandonment, reclamation and dismantlement. Charges for depreciation will no longer be allowable once the equipment has been fully depreciated. Actual cost shall not exceed the average prevailing commercial rate.

C.  When applicable for Operator owned or leased motor vehicles, Operator shall use rates published by the Petroleum Motor Transport Association or such other organization recoenized by COPAS as the official source of such rates. When such rates are not available, Operator shall comply with the provisions of Paragraph A or B above.

7.  Affiliates

The use of Affiliate equipment, facilities and services provided for the benefit of the Joint Property shall be charged to the Joint Account, if allowed under the provisions of this Section II using the method(s) below. Operator shall maintain auditable records to support all Affiliates charges to the Joint Account. Such charges shall be subject to the same audit requirements provided for Operator's charges in Section I, Paragraph 5.

(  ) Cost Basis

Affiliate services may be charged on a standard hourly/daily rate or actual cost basis and include any services or materials procured for services rendered as well as charges for any specialized Affiliate-owned equipment and facilities utilized for the benefit of the Joint Property. Parties shall charge the Joint Account for the use of Affiliate-owned equipment and facilities at rates commensurate with costs of ownership and operations, in accordance with Section If, Paragraph 6.

Charges to the Joint Account for arty services or materials procured for services rendered by an Affiliate shall not exceed average commercial rates, when such rates are available. In the event a Party determines such charges to be excessive compared with third party rates, that Party shall provide sufficient documentation to support all audit claims in accordance with Section I, Paragraph 5.

( X) APE/Project Basis

Prior to the commencement of each AFE/Project, Operator shall submit an AFE which details Affiliate services, equipment and facilities to be provided and the rates charged by the Affiliate. Such AFE shall require the agreement and written approval of the Parties in accordance with the Agreement to which this is attached. Once agreed to, such Affiliate costs shall remain in effect for the duration of the APE/Project, unless amended by the Parties.

The Parties may request adjustments to Affiliate costs or rates at any time it deems appropriate. The Parties shall respond to proposals for increased Affiliate costs or rates within thirty (30) days of receipt of the request. Approval of proposed Affiliate costs or rates shall not be unreasonably withheld by the Parties.

( ) Fixed Rate Basis

Affiliate equipment, facilities and services shall be charged on an all inclusive standard hourly/daily rate. Such rate shall be commensurate with the equipment, facilities and services provided. Approval of the races shall require the agreement of the Parties and written approval of the rate is required, in accordance with the Agreement to which this is attached, to support charges to the Joint Account. Once established, rates shall

6

be subject to annual adjustment as of the first day of April each year following the effective day of the standard hourly rate agreement. The adjustment shall be computed by multiplying the rate currently in use by the percentage increase or decrease recommended by COPAS each year. The adjusted rate shall be the rates currently in use, plus or minus the computed adjustment.

The Parties may request adjustments to the rates at any time it deems appropriate, but not more than once per year. The Parties shall respond to proposals for revised rates within thirty (30) days of receipt of the request. Approval of proposed rates shall only occur by the agreement and written approval of the Parties, in accordance with the Agreement to which this is attached. Approval of proposed rates shall not be unreasonably withheld by the Parties.

8. Damages and Losses to Joint Property
All costs or expenses necessary for the repair or replacement of Joint Property resulting because of damages or losses incurred, except those resulting from Operator's gross negligence or willful misconduct.

9. Legal Expenses
Expense of handling, investigating and settling litigation or claims, discharging of liens, payments of judgments and amounts paid for settlement of claims incurred in or resulting from operations under the Agreement or necessary to protect or recover the Joint Property, except that no charge for services of Operator's legal staff or fees or expense of outside attorneys shall be made unless previously agreed to by the Parties. All other legal expense is considered to be covered by the overhead provisions of Section III unless otherwise agreed to by the Parties.

10. Taxes and Permits
All taxes and permits of every kind and nature assessed or levied upon or in connection with the Joint Property or production therefrom and which have been paid by the Operator for the benefit of the Parties, including penalties and interest, unless the penalties and interest result from Operator's gross negligence or willful misconduct.

If ad valorem taxes paid by the Operator are based in whole or in part upon separate valuations of each Party's working interest, then notwithstanding any contrary provisions, the charges to Parties will be made in accordance with the tax value generated by each Party's working interest.

11. Insurance
Coverage(s) required to be procured by Operator for the protection of the Parties herein shall be billed to the Joint Account. For Workers' Compensation and Employer's Liability, where Joint Operations are conducted in jurisdictions that permit self-insurance, Operator shall charge Joint Account manual or advisory rates (whichever is applicable) if Operator meets the self-insurance requirements in such jurisdiction. Such rate shall be adjusted for offshore operations by the U.S. Longshoreman and Harbor Workers (USL&H) or Jones Act surcharge, as appropriate. In no circumstance shall Operator charge in excess of manual or advisory rates.

12. Communications
Costs of acquiring, leasing. installing, operating, repairing and maintaining communication systems including radio and microwave facilities between the Joint Property and the Operator's office. In the event communication facilities systems serving the Joint Property are Operator-owned, charges to the Joint Account shall be made as provided in Paragraph 6 of this Section U.

13. Ecological, Environmental and Safety

(A) Costs incurred
(X) for the benefit of the Joint Property, or
( ) on the Joint Property

7

resulting from statutory regulations for archaeological and geophysical surveys relative to identification and protection of cultural resources ands or other environmental or ecological surveys as may be required by the Minerals Management Service or other regulatory authority. Also costs to provide or have available pollution containment and removal equipment plus costs of actual control and cleanup and resulting responsibilities of oil and other spills as well as discharges from permitted outtalk as required by applicable laws and regulations.

(B)     Costs incurred
( X) for the benefit of the Joint Property, or
(    ) on the Joint Property

to conduct andior implement safe operational practicesiguidelines as a result of statutory regulations, or as recommended for voluntary compliance. Examples are the requirements mandated by the Occupational Safety and Hazards Act (OSHA), Safety and Environmental Management Program (SEM?), Process Safety Management (PSM), and/or requirements which may be mandated/recommended by similar programs or by other current or successor regulatory agencies.

(C)     Technical training costs for employees whose time is chargeable under (A) or (B) above regardless of whether training is mandated by statute or regulatory agency is chargeable to the Joint Account.

(D)     Safety awards in the conduct of Joint Operations

(X) shall be chargeable to the Joint Account.
( ) shall not be chargeable to the Joint Account.

14.     Abandonment and Reclamation
Costs incurred for abandonment and reclamation of the Joint Property, including costs required by governmental or other regulatory authority.

15.     Other Expenditures
Any other expenditure not covered or dealt with in the foregoing provisions of this Section II, or in Section III and which is of direct benefit to the Joint Property and is incurred by the Operator in the necessary and proper conduct of the Joint Operations.

OVERTIE.AD

A. As compensation for administrative, supervision, office services and warehousing costs, Operator shall charge the Joint Account in accordance with this Section

Unless otherwise agreed to by the Parties, such charge shall be in lieu of costs and expenses of all offices and salaries or wages plus applicable burdens and expenses of all personnel, except those directly chargeable under Section IL The cost and expense of services from outside sources in connection with matters of taxation, traffic, accounting or matters before or involving governmental agencies shall be considered as included in the overhead rates provided for in this Section III unless directly chargeable under Section II or such costs are agreed to by the Parties as a direct charge to the Joint Account.

i.      Except as otherwise provided in Paragraph 2 of this Section III, the salaries, wages and Personal Expenses of Technical Employees and/or the cost of professional consultant services and contract services of technical personnel directly employed on the Joint Property:
(    ) shall be covered by the overhead rates.
( X ) shall not be covered by the overhead rates.

8

Debtors' Exhibit No. 102
Page 120 of 166

ii.     Except as otherwise provided in Paragraph 2 of this Section III, the salaries, wages and Personal Expenses of Technical Employees and or costs of professional consultant services and contract services of technical personnel either temporarily or permanently assigned to and directly employed in the operation of *the* Joint Property:

( ) shall be covered by the overhead rates.

(X) shall nor be covered by the overhead rates.

1.     Overhead - Project Team

To compensate the Operator for overhead costs incurred in support of a Project Team defined herein. Operator shall charge a rate of  two and one-half  Percent ( 2.5   %) of the total cost of the Project Team as defined in Section H, Paragraph 2.A( I). Where a Non-Operator(s) provides office support for its member(s) of the Project Team, the Non-Operator(s) shall likewise be compensated at the same rate(s) as the Operator for its overhead. Such overhead costs shall include, but shall not be limited to: support staff not directly assigned to the Project Team, computer equipment and supplies, office space, utilities, office furniture and equipment, cleaning and general housekeeping, office supplies, conference room facilities, facsimile machines, copy machines, telephones and other general costs supporting the Project Team.

2.     Overhead - Development and Operating

As compensation for overhead in connection with drilling and producing operations, Operator shall charge on either:

( ) Fixed Rate Basis, Paragraph 2.A.. or

( X) Percentage Basis, Paragraph 2.B.

A.     Overhead - Fixed Rate Basis

Operator shall charge the Joint Account at the following rates per well per month:

grilling Well Rate per month S_____(Prorated for less than a full month)

Producing Well Rate per month S _____

(2)     Application of Overhead - Drilling Well Rate shall be as follows:

(a)     Charges for drilling wells shalt begin on the date drilling or completion equipment arrives on location and terminate on the date the drilling or completion equipment moves off location or rig is released, whichever occurs first. No charge shall be made during suspension of drilling or completion operations for fifteen (15) or more consecutive calendar days.

(b)     Charges for wells undergoing any type of workover, recompletion, or abandonment for a period of five (5) consecutive work days or more shall be made at the drilling well rate. Such charges shall be applied for the period from date workover operations, with rig or other units used in workover, commence through date of rig or other unit release, except that no charges shalt be made during suspension of operations for fifteen (15) or more consecutive calendar days.

(3)     Application of Overhead - Producing Well Rate shall be as follows:

(a)     An active well completion for any portion of the month shall qualify for a one-well charge for the entire month. An active completion is one which is

(1)     produced,

(2)     injected into for recovery or disposal,

(3)     used to obtain water supply to support production operations,

(4)     used to maintain pressure in the producing zone, or

(5)     shut-in oil or gas wells not capable of producing against line pressure or due to market conditions.

9

    (b)    Each active completion in a multi-completed well in which production is not commingled dol.vithole shall qualify for a one-well charge providing each completion is considered a separate well by the eovemine, regulatory authority.

    (c)    A one-well charge shall be made for the month, in which plugging and abandonment operations are completed on any well. This one-well charge shall be made whether or not the well has produced except when the drilling well rate applies.

    (d)    All wells not meeting the criteria set forth in the Paragraph A.(3) (a), (b), or (c) shall not quality for a producing overhead charge.

(4)    The well rates shall be adjusted on the first day of April each year following the effective date of the agreement to which this Accounting Procedure is attached. The adjustment shall be computed by multiplying the rate currently in use by the percentage increase or decrease recommended by COPAS each year. The adjusted rates shall be the rates currently in use, plus or minus the computed adjustment.

B.    Overhead -Percentage Basis (exclusive of Project Team costs)

    ($^1$)    Operator shall charge the Joint Account at the following rates;

    (a)    Development Rate <u>two and one-half</u> percent ( <u>2.5</u> %) of the cost of development of the Joint Property exclusive of costs provided under Paragraph 9 of Section II and all salvage credits.

    (b)    Operating Rate <u>thirteen</u> percent ( <u>13</u> %) of the cost of operating the Joint Property exclusive of costs provided under Paragraphs l and 9 of Section II, all salvage credits, the value of injected substances purchased for secondary recovery and all taxes and assessments which are levied, assessed and paid upon the mineral interest in and to the Joint Property.

    ($^2$)    Application of Overhead - Percentage Basis shall be as follows:

    (a)    Development shall include all costs in connection with

    [1]    drilling, redrilling, plugging back or deepening of any or all wells,

    [2]    workover operations requiring a period of five (5) consecutive work days or more on any or all wells,

    [3]    preliminary expenditures necessary in preparation for drilling,

    [4]    expenditures incurred in abandonine when the well is not completed as a producer,

    [5]    original construction or installation of fixed assets, expansion of fixed assets and any other project clearly discernible as a fixed asset, except Major Construction as defined in Paragraph 3 of Section 'HI.

    (b)    Operating shall include all other costs in connection with Joint Operations except that catastrophe costs shall be assessed overhead as provided in Paragraph 3 of Section III.

3.    **Overhead - Major Construction**

To compensate Operator for overhead costs incurred in the construction and installation of fixed assets, the expansion of fixed assets, and any other project clearly discernible as a fixed asset required for the development and operation of the Joint Property, or in the dismantling for abandonment of platforms and related production facilities, Operator shall either negotiate a rate prior to the beginning of construction, or shall charge the Joint Account for Overhead based on the following rates for any Major Construction project in excess of S 100,000

A. If the Operator absorbs the engineering, design and drafting costs related to the project:

    (1)   5    % of total costs if such costs are more than S 100,000 but less than S500,000; plus

    (2)   <u>4</u>    % of total costs in excess of S500,000 but less than $1,000,000; plus

10

(3) __3__ % of total costs in excess of S1,000,000.

B. If the Operator charges engineering. design and drafting costs related to the project directly to the Joint .Account:

(1) __4__ % of total costs if such costs are more than $ _100.000_ but less than $500,000; plus

(2) __3__ % of total costs in excess of $500,000 but less than $1,000,000; **_plus_**

(3) __2__ % of total costs in excess of $1,000,000.

C. If Operator charges engineering, design and drafting costs associated with a Major Construction project AFE to a Project Team AFE, the overhead assessment shall be as defined in the preceding paragraph B.

Total cost shall mean the gross cost of any one project. For the purpose of this paragraph, the component parts of a single project shall not be treated separately and the cost of drilling and workover welts and artificial lift equipment shall be excluded.

On each project, Operator shall advise Non-Operator(s) in advance which of the above options shall apply. In the event of any conflict between the provisions of this paragraph and those provisions under Section II, Paragraph 2 or Paragraph 5, the provisions of this paragraph shall govern.

4.   Overhead - Catastrophe
To compensate Operator for overhead costs incurred in the event of expenditures resulting from a single occurrence due co oil spill, blowout, explosion, fire, storm, hurricane, or other catastrophes as agreed to by the Parties, which are necessary to restore the Joint Property to the equivalent condition that existed prior to the event causing the expenditures, Operator shall either negotiate a rate prior to charging the Joint Account or shall charge the Joint Account for overhead based on the following rates:

(1) __._4.__% of total costs through $500,000; plus

(2) __3__ % of total costs in excess of $500,000 but less than S1,000,000; plus

(3) __2__ % of total costs in excess of $1,000,000.

Expenditures subject to the overheads above will not be reduced by insurance recoveries, and no other overhead provisions of this Section lII shall apply.

5.   Amendment of Rates
The Overhead rates provided for in this Section III may be amended from time to time only by mutual agreement between the Parties hereto, if in practice, the rates are found to be insufficient or excessive.

## IV. MATERIAL PURCHASES, TRANSFERS AND DISPOSITION

The Operator is responsible for Joint Account Material and shall make proper and. timely charges and credits for direct purchases, transfers, and dispositions. The Operator normally provides all Material for use on the Joint Property but does not warrant the Material furnished. At the Operator's option, Material may be supplied by Non-Operators.

1.   Direct Purchases
Direct purchases shall be charged to the Joint Account at the price paid by the Operator after deduction of all discounts received. A direct purchase is determined to occur when an agreement is made between an Operator and a third party for the acquisition of Materials for a specific well

*II*

site or location. Material provided by the Operator under "vendor stocking programs," where the initial use if for a Joint Property and title of the Material does not pass from the vendor until usage, is considered a direct purchase. If Material is found to be defective or is returned to the vendor for any other reason, credit shall be passed to the Joint Account when adjustments have been received by the Operator from the manufacturer, distributor, or agent.

Transfers

A transfer is determined to occur when the Operator furnishes Material from its storage facility or from another operated property. Additionally, the Operator has assumed liability for the storage costs arid changes in value and has previously secured and held title to the transferred Material. Similarly, the removal of Material from *a* Joint Property to the Operator's facility or to another operated property is also considered a transfer. Material that is moved from the Joint Property to a temporary storage location pending disposition may remain charged to the Joint Account and is not considered a transfer.

A.   Pricing

The value of Material transferred to/from the Joint Property should generally reflect the market value on the date of transfer. Transfers of new Material will *be* priced using one of the following new Material bases:

(1)   Published prices in effect on date of movement as adjusted by the appropriate COPAS Historical Price Multiplier (HPM) or prices provided by the COPAS Computerized Equipment Pricing System (CEPS), **The HPIvis and the** associated date of published price to which they should be applied will be published by COPAS periodically.

(a)   For oil country tubulars and line pipe, the published price shall be based upon eastern mill (Houston for special end) carload base prices effective as of date of movement, plus transportation cost as defined in Section IV, Paragraph 2.B.

(b)   For other Material, the published price shall be the published list price *in* effect at date of movement, *as* listed by a supply store nearest the Joint Property (where material is normally available) capable of supplying the material, or point of manufacture, plus transportation costs as defined in Section IV, Paragraph 2.B.

(2)   A price quotation that reflects a current realistic acquisition cost may be obtained from a supplier/manufacturer.

(3)   Historical purchase price may be used, providing it reflects a current realistic acquisition cost on date of movement. Sufficient price documents should be available to Non-operators for purposes of verifying Material transfer valuation.

(4)   As agreed to by the Parties.

(5)   When higher than specification grade or size tubulars from Operator's inventory are used on the Joint Property, Operator shall charge the Joint Account at the equivalent price for well design specification tubulars.

B.   Freight

Transportation costs should be added to the Material transfer price based on one of the following:

(I)   Transportation costs for oil country tubulars and line pipe shall be calculated using the distance from eastern mill to the railway receiving point nearest the

Joint Property based on the carload weight basis as recommended by COPAS in Bulletin 21 and current interpretations.

(2)    Transportation costs for special mill items shall be calculated from that mill's shipping point to the railway receiving point nearest the Joint Property. For transportation costs from other than eastern mills, the 30,000-pound Specialized Motor Carriers interstate truck rate shall be used. Transportation costs for macaroni tubing shall be calculated based on the Specialized Motor Carriers rate per weight of tubing transferred to the railway receiving point nearest the Joint Property.

(3)    Transportation costs for special end tubular goods shall be calculated using the 30,000-pound Specialized Motor Carriers interstate truck rate from Houston, Texas, to the railway receiving point nearest the Joint Property.

(4)    Transportation costs for Material other than that described in Section IV, Paragraphs 2.3(1) through (3), if applicable, shall be calculated from the supply store or point of manufacture, whichever is appropriate, to *the* railway receiving point nearest the Joint Property.

C.    Condition

(1)    Condition "A" - New and unused Material in sound and serviceable condition shall be charged at one hundred percent of the price as determined in Section IV, Paragraphs 2.A and B. Material transferred from the Joint Property that was not placed in service on the Joint Property shall be credited as charged without gain or loss. Any unused Material that was charged to the Joint Account through a direct purchase will be credited to the Joint Account at the original cost paid less restocking charge. All refurbishing costs required or necessary to return the material to original condition, or to correct handling or transportation damages and other related costs will be born by the divesting property. The Joint Account is responsible for Material preparation, handling and transportation costs for new and unused Material charged to the property either through a direct purchase or transfer. Any preparation costs performed, including any internal or external coating and wrapping, will be credited on new Material provided these costs were not repeated for the receiving property.

(2)    Condition "B" - Used Material in sound and serviceable condition and suitable for reuse without reconditioning shall be priced at the condition percentage most recently recommended by COPAS times the price determined by the pricing guidelines in Section IV, Paragraphs 2.A arid B. All refurbishing costs required or necessary to return the material to Condition B, or to correct handling or transportation damages and other related costs will be born by the divesting property.

If the Material was originally charged to the joint Account as used Material and placed in service on the Joint Property, the Material will be credited at the condition percentage most recently recommended by COPAS times the price as determined in Section IV, Paragraphs 2.A and B.

Used Material transferred from the Joint Property that was not placed in service on the property shall be credited as charged without gain or loss.

13

Debtors' Exhibit No. 102
Page 125 of 166

(31       Condition "C' - Material that is not in sound and serviceable condition and not suitable for its original function until after reconditioning shall be priced at the condition percentag.e most recently recommended by COPAS times the price determined in Section W, Paragraphs 2.A and B. The cost of reconditioning shall be charged to the receiving property provided Condition C value, plus cost of recondition, does not exceed Condition B value.

(4)       Condition "D" - Other Material that is no longer suitable for its original purpose but usable for some other purpose is considered Condition D Material. Included under Condition "D" are also obsolete items or Material that does not meet original specifications but still has value and can be used in other services as a substitute for items with different specifications. Due to the condition or value of other used and obsolete items, it is not possible to price these items under Section IV, Paragraph 2.A. The price used should result in the Joint Account being charged or credited with the value of the service rendered or use of the Material. In some instances, it may be necessary or desirable to have the Material specially priced as agreed to by the Parties.

(5)       Condition "E" - Junk shall be priced at prevailing scrap value prices.

D.       Other Pricing Provisions

(1)       Preparations Costs
Costs incurred by the Operator in making Material serviceable including inspection, third party surveillance services, and other similar services will be charged to the Joint Account at prices reflective of the Operator's actual costs of the services. Documentation must be retained to support the cost of service. New coating and/or wrapping may be charged per Section IV, Paragraph 2.A.

(2)       Loading and Unloading Costs
Loading and unloading costs related to the movement of the Material to the Joint Property shall be charged in accordance with the methods specified in COPAS Bulletin 21.

3.       Disposition Of Surplus
Surplus Material is that Material, whether new or used, that is no longer required for Joint Operations. The Operator may purchase, but shall be under no obligation to purchase, the interest of Non-operator in surplus NIaterial.

Dispositions for the purpose of this procedure are considered to be the relinquishment of title of the Material from the Joint Property to either a third party, a Non-Operator, or to the Operator. To avoid the accumulation of surplus materials, the Operator should make good faith efforts to dispose of surplus within 12 months through buy/sale agreements, trade, sate to a third party, division in-kind, or other dispositions as agreed to by the Parties.

An Operator may, through a sale to an unrelated third party or entity, dispose of surplus Material having a gross sale value that is less than or equal to the Operator's expenditure limit as set forth in the Operating Agreement to which this Accounting Procedure is attached without the prior approval of the Non-Operator. If the gross sale value exceeds the Operating Agreement expenditure limit, the disposal must be agreed to by the Parties,

The Operator may dispose of Condition D and ' Material under procedures normally utilized by the Operator without prior approval.

14

4.      Special Pricing Provisions

A.      Premium ['nein::

Whenever Material is not readily replaceable due to national emergencies, strikes, or other unusual causes over which the Operator has no control, the Operator may charge the Joint Account for the required Material at the Operator's actual cost incurred in providing such Material, in making it suitable for *use,* and in moving it to *the* Joint Property provided notice in writing is furnished to Non-Operators of the proposed charge prior to use and to billing Non-Operators for such Material. During premium pricing periods. each Non-Operator shall have the right to furnish in-kind all or part of his share of such Material suitable for use and acceptable to the Operator by so electing and notifying the Operator within ten days after receiving notice from the Operator.

B.      Shop-Made Items

Shop-made items may be priced using the value of the Material used to construct the item plus labor costs. If the Material is from a scrap or junk account, the Material may be priced at either twenty-five percent of the current price as determined in Section IV, Paragraph 2A, or scrap value, whichever is higher, plus costs to fabricate the item.

C.      Mill Rejects

MiI1 rejects purchased as "limited service" casing or tubing shall be priced at eighty percent of K-55/J-55 price as determined in Section IV, Paragraphs 2.A and B. Line pipe converted to casing or tubing with casing or tubing couplings attached shall be priced as K-55/J-55 casing or tubing at the nearest size and weight.

## V. LNVENTORIES OF CONTROLLABLE MATERIAL

The **Operator shall maintain records of Controllable Material charged to the Joint Account, as defined in the COPAS** Material Classification Manual, with sufficient detail to perform the physical inventories requested unless directed otherwise by the Non-Operators.

Adjustments to the Joint Account by the Operator resulting from a physical inventory of jointly owned Controllable Material are limited to the six months following the taking of the inventory. Charges and credits for overages or shortages will be valued for the Joint Account based on condition **B** prices in effect on the date of physical inventory and determined in accordance with Section IV, Paragraphs 2.A and B unless the inventorying Parties can prove another Material condition applies.

**1.**      Directed Inventories

With an interval of not less than five years, physical inventories shall be performed by the Operator upon written request of **a majority in working interests of the Non-Operators.**

Expenses of directed inventories will be borne by the Joint Account and may include the following:

A.      Audit per diem rate for each inventory person in line with the auditor rates determined, adjusted, and published each April by COPAS. The per diem should also be applied to a reasonable number of days for pre-inventory work and for report preparation. The amount of time required for this additional work may vary from inventory to inventory.

B.      Actual travel including Operator-provided transportation and personal expenses for the inventory team.

15

C.        Reasonable charges for report typing and processing.

The Operator is expected to exercise judgment in keeping expenses within reasonable limits. Unless otherwise agreed, **costs in connection with any post-report follow-up** work **in settling the inventory will be** absorbed **by the Non-Operator incurring such costs. Any anticipated disproportionate costs should be** discussed **and agreed upon prior to commencement of the inventory.**

When directed inventories arc performed, all Parties shall be governed by such inventory.

**Non-Directed Inventories**

A.        Operator Inventories
          Periodic physical inventories that are not requested by the Non-Operator may be performed by the Operator at the Operator's discretion. The expenses of conducting such Operator inventories shall not be charged to the Joint Account.

**B.        Non-Operator Inventories**
          **Any Non-Operator(s) may conduct an inventory at** reasonable times, at their sole cost and risk with **prior notification** to the **Operator of at least thirty (30)** days.

C.        Other Inventories
          Other inventories may be taken whenever there is any sale or change of interest. When possible, the selling Party should notify all other owners 30 days prior to **the anticipated closing date. When there** is a change in Operator of the Joint Property, **an inventory by the former and new Operator** should be taken.
          The expenses of conducting such other inventories shall be chanted to the Joint Account.

16

EXHIBIT "D"

Attached to and made a part of that certain Joint Operating Agreement ("JOA") dated effective
July 1, 2006 by and between Noble Energy. Inc. and Samson Offshore Company covering OCS-G 28030,
Mississippi Canyon Block 948.

GAS BALANCING AGREEMENT ("AGREEMENT")

1. Ownership of Gas Production

(a) It is the intent of the parties that each party shall have the right to take in kind and separately dispose of its proportionate share of gas (including casinghead gas) produced from in each well located on acreage ("Contract Area") covered by the Operating Agreement to which this Exhibit is attached ("Operating Agreement").

(b) Operator shall control the gas production and be responsible for administering the provisions of this Agreement and shall make reasonable efforts to deliver or cause to be delivered gas to the parties' gas purchasers as may be required in order to balance the accounts of the parties in accordance with the provisions herein contained. For purposes of this Agreement, Operator shall maintain production accounts of the parties based upon the number of MMBTU's actually contained in the gas produced from a particular well and delivered at the outlet of lease equipment for each party's account regardless of whether sales of such gas are made on a volumetric or thermal, or on a wet or dry basis. All references in this Agreement to quantity or volume shall refer to the number of MMBTU's contained in the gas stream.

2. **Balancing of Production Accounts**

(a) Any time a party, or such party's purchaser, is not taking or marketing its full share of gas produced from a particular well ("non-marketing" party), the remaining parties ("marketing" parties) shall have the right, but not the obligation, to produce, take, sell and deliver for such marketing parties' accounts, in addition to the full share of gas to which the marketing parties are otherwise entitled, all or any portion of the gas attributable to a non-marketing party. (Gas attributable to a non-marketing party, taken by a marketing party, is referred to in this Agreement as "overproduction"). If there is more than one marketing party taking gas attributable to a non-marketing party, each marketing party shall be entitled to take a non-marketing party's gas in the ratio that such marketing party's interest in production bears to the total interest in production of all marketing parties.

(b) A party that has not taken its proportionate share of gas produced from a well ("Underproduced Party") shall be credited with gas in storage equal to its share of gas produced but not taken, less its share of gas used in lease operations, vented or lost ("underproduction"). Such Underproduced Party, upon giving timely written notice to Operator, shall be entitled, on a monthly basis beginning the month following receipt of notice, to produce, take, sell and deliver the full share of gas to which such party is entitled, provided, if such Underproduced Party does not nominate such volumes, or have such volumes nominated on its behalf, by the nomination deadline applicable to deliveries

1

at the beginning of such month, Operator may require that such Underproduced Party give at least twenty (20) days notice before commencing the sale of its share of gas. In addition to its full share of gas, such Underproduced Party, upon giving timely written notice to Operator, shall be entitled, on a monthly basis beginning at least twenty (20) days following Operator's receipt of notice, to produce, take, sell and deliver a quantity of gas ("make-up gas") equal to twenty-five percent (25%) of the total share of gas attributable to all parties having cumulative overproduction (individually called 'Overproduced Party").      Such make-up. gas shall be credited against such Underproduced Party's accrued underproduction in order of accrual and shall also be subtracted from each contributing Overproduced Party's accrued overproduction in the order of accrual. Notwithstanding the foregoing and subject to subsection (e) below: (i) an Overproduced Party shall never be obligated to reduce its takes to less than seventy-five percent (75%) of the quantity to which such party is otherwise entitled *and* (ii) an Underproduced Party shall not be allowed to make up underproduction during the months of December, January, February and March if such Underproduced Party has not sold or requested to sale make-up gas during the preceding months of April through November.

(c)    If there is more than one Underproduced Party desiring to make-up gas, each such Underproduced Party shall be entitled to make-up gas in the ratio that such party's interest in the production bears to the total interest in production of all parties then desiring make-up gas. Any portion of the make-up gas to which an Underproduced Party is entitled and which is not taken by such Underproduced Party may be taken by any other Underproduced Party(ies).

(d)    If there is more than one Overproduced Party required to furnish make-up gas, each such Overproduced Party shall furnish make-up gas in the ratio that such party's interest in production bears to the total interest in production of all parties then required to furnish make-up gas. Except as provided in (e) below, each Overproduced Party in a well shall be entitled, on a monthly basis, to take its full share of gas less its share of the make-up gas then being produced from the particular completion in the well in which it is overproduced.

(e)    If Operator in good faith believes that an Overproduced Party has recovered one hundred percent (100%) of such Overproduced Party's share of the recoverable reserves from a particular completion in a well, such Overproduced Party, upon being notified in writing of such fact by Operator, shall cease taking gas from such well and the remaining parties shall be entitled to take one hundred percent (100%) of such production until the accounts of the parties are balanced. Thereafter, such Overproduced Party shall again have the right to take its share of the remaining production, if any, in accordance with the provisions herein contained. Notwithstanding anything to the contrary herein, after an Overproduced Party has recovered one hundred percent (100%) of its full share of the recoverable reserves as so determined by Operator from a particular well, such Overproduced Party may continue to produce if such continued production is (1) necessary for lease maintenance purposes or (ii) permitted by a majority of interest of the parties who have not produced one hundred percent (100%) of their recoverable reserves from such completion in such well after written ballot conducted by Operator.

**3.1    Cash Balancing Upon Depletion**

(a)     If gas production from a particular well ceases and no attempt is made to restore production (or substitute therefor) within one hundred eighty (180) days, Operator shall distribute, within two hundred ten (210) days of the date the well last produced gas from such well, a statement of net unrecouped underproduction and overproduction and the months and years in which such unrecouped production accrued ("final accounting"),

(b)     Within thirty (30) days of receipt of such final accounting, each Overproduced Party shall remit to Operator for disbursement to the Underproduced Parties, a sum of money (which sum shall not include interest) equal to the amount actually received or constructively received under paragraph (e) below, by Overproduced Party for sales during the month(s) of unrecouped overproduction, calculated in order of accrual but less applicable taxes, royalties and reasonable costs of transporting such gas actually paid by such Overproduced Party. Such remittance shall be based on the number of MMBTU's of unrecouped overproduction and shall be accompanied by a statement showing volumes *and* prices for each month with accrued unrecouped overproduction.

(c)     Within thirty (30) days of receipt of any such remittance by Operator from an Overproduced Party, Operator shall disburse such funds to the Underproduced Party(ies) in the ratio of the cumulative unrecouped underproduction of the Underproduced Parties, in accordance with the final accounting. Operator assumes no liability with respect to any such payment (unless such payment is attributable to Operator's overproduction), it being *the* intent of the parties that each Overproduced Party shall be solely responsible for reimbursing each Underproduced Party for such Underproduced Party's respective share of overproduction taken by such Overproduced Party in accordance with the provisions herein contained. If any party fails to pay any sum due under the terms hereof after demand therefor by the Operator, the Operator may turn responsibility for the collection of such sum to the party or parties to whom it is owed, and Operator shall have no further responsibility for collection.

(d)     In determining the amount of overproduction for which settlement is due, the amount by which production taken during any month by an Overproduced Party is less than such Overproduced Party's share shall be treated as make-up and shall be applied to reduce prior overproduction in the order of accrual of such overproduction.

(e)     An Overproduced Party that took gas in kind for its own use, sold gas to an affiliate, or otherwise disposed of gas in other than a cash sale, shall pay for such gas at market value at the time it was produced, even if the Overproduced Party sold such gas to an affiliate at a price greater or lesser than market value.

(f)     If refunds are later required by any governmental authority, each party shall be accountable for its respective share of such refunds as finally balanced hereunder.

3.2     **Cash Balancing Upon Assignment**

(a)     If an Underproduced Party or an Overproduced Party sells, assigns, exchanges or otherwise transfers any of its working interest in the Contract Area, the assigning party shall notify the Operator in writing within ten (10) days after such assignment. Within thirty (30) days after receipt of written notice of such transfer, the Operator shall distribute an "interim accounting", similar to the final accounting described in subsection 3.1 (a) above,

3

showing such information as of the first calendar day of the month in which the assignment was effective ("Assignment Balancing Date").

(b)  (i) Within thirty (30) days of such interim accounting, if the assigning party is an Underproduced Party, each Overproduced Party shall remit to Operator for disbursement to *the* assignee of said Underproduced Party, *a* **sum** of money and statement as described in paragraph 3.1 (b) above, calculated as of the Assignment Balancing Date, but only as to the portion of such Overproduced Party's unrecouped overproduction attributable to the assigning Underproduced Party's interest, based on the ratio that such assigning Underproduced Party's cumulative unrecouped underproduction bears to the cumulative unrecouped underproduction of all Underproduced Parties.

(ii)  Within thirty (30) days of such interim accounting, if the assigning party is an Overproduced Party, such assigning party shall remit or cause to be remitted to Operator for disbursement to the Underproduced Parties, a sum of money and statement as described in paragraph 3.1 (b) above, calculated as of the Assignment Balancing Date. The provisions of paragraphs 3.1 (c), (d), (e), and (f) shall apply to Cash Balancing Upon Assignment pursuant to this subsection 3.2, except that, with respect to money that Operator receives that is to be disbursed to the assignee of an Underproduced Party, Operator shall disburse such money to such assignee and not to the other Underproduced Parties.

(iii)  Notwithstanding the foregoing, the assignee of an Overproduced Party shall be and remain liable for furnishing make-up gas and for remitting cash balancing payments described herein to the extent such payments are not remitted by the assigning Overproduced Party.

(c)  The provisions of this subsection 3.2 shall not be applicable in the event any party mortgages its interest or disposes of its interest by merger, reorganization, consolidation or sale of substantially all of its assets to a subsidiary or parent company, or to any company in which any parent or subsidiary of such party owns a majority of the stock of such company.

3.3  **Periodic Cash Balancing**

(a)  Commencing one (1) year after the first day of the next month after a party is first credited with gas in storage under this Agreement, and every yearly anniversary thereafter ("Balancing Date"), Operator shall determine whether any party has either unrecouped overproduction or unrecouped underproduction, and if so, Operator shall distribute, within ninety (90) days after the Balancing Date, an interim accounting, as described in paragraph 3.2 (a) above, showing such information as of said Balancing Date.

(b)  Within thirty (30) days of receipt of such interim accounting, each Overproduced Party shall remit to Operator for disbursement to the Underproduced Parties, a sum of money and statement as described in paragraph 3.1 (b) above, calculated as of the Balancing Date. The provisions of paragraphs 3. 1 (c) (d) , (e), and (f) shall apply to Periodic Cash Balancing pursuant to this subsection 3.3.

4.  **Nominations**

4

Each party shall, on a monthly basis, give Operator sufficient time and data either to nominate such party's respective share of gas to the transporting pipeline(s) or, if Operator is not nominating such party's gas, to inform Operator of the manner in which to dispatch such party's gas, Except as and to the extent caused by Operator's gross negligence or willful misconduct, Operator shall not be responsible for any fees and/or penalties associated with imbalances charged by any pipeline to any Underproduced or Overproduced Party(ies).

5.     Statements

(a)     If the Contract Area is located on the Outer Continental Shelf or on art offshore state lease, then on or before the fifteenth (15th) day of the month following the last month of the preceding quarter of production, Operator shall furnish to each party hereto a statement of gas taken by each party, expressed in terms of W/1E¹CJ's. If actual volume information sufficient to prepare such statement is not made available to the Operator in sufficient time to prepare it, the Operator shall nevertheless furnish a statement of its good faith estimate of volumes taken. Such statement shall also show the gas balance among the parties, including the total quantity of gas produced from each well, the portion thereof used in operations, vented or lost, and the total quantity delivered for each party's account. Any error or discrepancy in Operator's monthly statement shall be promptly reported to Operator and Operator shall make a proper adjustment thereof within thirty (30) days after final determination of *the* correct quantities involved; provided, however, that if no errors or discrepancies are reported to the Operator within two (2) years from the date of any such statement, such statement shall be conclusively deemed to be correct. Additionally, with thirty (30) days from the end of each calendar year, non-operators shall furnish to Operator, for the sole purpose of establishing records sufficient to verify cash balancing values, a statement reflecting amounts actually received or constructively received under paragraph 3.1 (e), on a monthly basis for the calendar preceding the immediately concluded calendar year. If requested by Operator, each taking party shall furnish information to Operator necessary to enable Operator to furnish monthly statements provided for herein. Such information shall be provided each month at least twenty (20) days before Operator's statement is due. Operator shall not allow a party to produce gas for its account during any month when such party is delinquent in so furnishing the monthly or annual statements.

(b)     If the Contract Area is located other than as described in paragraph 5 (a) above, Operator shall furnish such statements on a quarterly, rather than monthly, basis and references therein to "monthly statements" shall be treated as references to "quarterly statements."

6.     Payment of Taxes

Each party taking gas shall pay or cause to be paid any and all production, severance, utility, sales, excise, or other taxes due on such taken gas.

7.     Operating Expenses

5

The operating expenses are to be borne as provided in the Operating Agreement, regardless of whether all parties are selling or using gas or whether the sales and use of each are in proportion to their respective interests in such gas,

8.    Overproducing Allowable

Each party shall give Operator sufficient time and data to enable Operator to make appropriate nominations, forecasts and/or filings with the regulatory bodies having jurisdiction to establish allowables. Each party shall at all times regulate its takes and deliveries from the Contract Area so that the well(s) covered hereby shall not be curtailed and/or shut-in for overproducing the allowable production assigned thereto by the regulatory body having jurisdiction.

9.    Payment of Leasehold Burdens

At all times while gas is produced from the Contract Area, except to the extent otherwise provided by state or federal regulation, each party agrees to make appropriate settlement of all royalties, overriding royalties and other payments out of or in lieu of production for which such party is responsible just as if such party were taking or delivering to a purchaser such party's full share, and such party's full share only, of such gas production exclusive of gas used in operations, vented or lost, and each party agrees to indemnify and hold each other party harmless from and all claims relating thereto. If further commingling situations occur that require alternative methods of payment, they will be addressed and amendments made hereto as needed.

10.   **Application of Agreement**

The provisions of this Agreement shall be separately applicable and shall constitute a separate agreement with respect to gas produced from each well located on the Contract Ares_

11.   **Term**

This Agreement shall terminate when gas production under the Operating Agreement permanently ceases and the accounts of the parties are finally settled in accordance with the provisions herein contained.

12.   **Operator's Liability**

**Except** as otherwise provided herein, Operator is authorized to administer the provisions of this Agreement, but shall have no liability to the other parties for losses sustained **or** liability incurred which arise out of or in connection with the performance of Operator's duties hereunder except such as may result from Operator's gross negligence or willful misconduct.

13.   Audits

6

Any Underproduced Party shall have the right for a period of two (2) years after receipt of payment pursuant to a final or interim accounting and after giving written notice to all parties, to audit an Overproduced Party's accounts and records relating to such payment. Any Overproduced Party shall have the right for a period of two (2) years after tender of payment for unrecouped volumes and upon giving written notice to all parties, to audit an Underproduced Party's records as to volumes. The party conducting such audit shall bear its costs of the audit. Additionally, Operator shall have the right for a period of two (2) years after receipt of an annual statement from a non-operator under paragraph 5 after giving written notice to the affected non-operator, to audit such non-operator's accounts and records relating to such payment. Costs of such audit borne by the joint account.

**14.**     **Successors and Assigns**

The terms, covenants, and conditions of this Agreement shall be binding upon and shall inure to the benefit of the parties and to their respective successors and assigns, and may be assigned in whole or in part from time to time.

**15.**     **Liquid Hydrocarbons Not Covered Under Agreement**

The parties shall share proportionately in and own all liquid hydrocarbons recovered with the gas by lease separation equipment in accordance with their respective interests.

16.     Waiver

No waiver by any party hereto of any one or more defaults in the performance of any provision of this Agreement shall operate or be construed as a waiver of any future default, whether of a like or a different character.

**17.**     **Conflict**

If there is a conflict between the terms of this Agreement and the terms of any gas sales contract covering the Contract Area entered into by any party, the terms of this Agreement shall govern. If there is a conflict between the terms of this Agreement and the terms of the Operating Agreement, the terms of this Agreement shall govern.

EXHIBIT "E"

Attached to and made a part of that certain Joint Operating Agreement ("JOA") dated effective July 1. 2006 by and between Noble Enemy, Inc. and Samson Offshore Company covering OCS-G 28030, Mississippi Canyon Ego& 943.

## <u>CERTIFICATION OF NONSEGREGATED FACILITIES</u>

Contractor certifies that it does not maintain or provide for its employees any segregated facilities at any of its establishments and that it does not permit its employees to perform their services at any location under its control, where segregated facilities are maintained. Contractor certifies further that it will not maintain or provide for its employees any segregated facilities at any of its establishments and that it will not permit its employees to perform their services at any location, under its control, where segregated facilities are maintained. Contractor agrees that a breach of this certification is a violation of the Equal Opportunity Clause in any Government contract between Contractor and Operator. As used in this certification, the term "segregated facilities" means any waiting rooms, work areas, rest rooms and other storage or dressing areas, parking lots, drinking fountains, recreation or entertainment areas, transportation, and housing facilities provided for employees which are segregated by explicit directive or are in fact segregated on the basis of race, color, religion, or national origin because of habit, local custom or otherwise. Contractor further agrees that (except where it has obtained identical certifications from proposed subcontractors) prior to the award of subcontracts exceeding $10,000 which are not exempt from the provisions of the Equal Opportunity Clause; that it will retain such certifications in its files; and that it will forward the following notice to such proposed subcontractors (except where the proposed subcontractors have submitted identical certifications for specific time periods):

NOTICE TO PROSPECTIVE SUBCONTRACTORS OF REQUIREMENT FOR CERTIFICATIONS OF NONSEGREGATED FACILITIES. A Certification of Nonsegregated Facilities. as required by the May 9, 1967 order on Elimination of Segregated Facilities, by the Secretary of Labor (32 Fed. Reg. 7439, May 19, 1967), must be submitted prior to the award of a subcontract exceeding $10,000 which is not exempt from the provisions of the Equal Opportunity Clause. The certification may be submitted either for each subcontract or for all subcontracts during a period (i, e., quarterly, semi-annually or annually). (1968 NLAR.) (Note: The penalty for making false statements in offers is prescribed in 18. U.S.C. 1001.) Whenever used in the foregoing Section, the term "Contractor" refers to each Party to this Agreement.

## EXHIBIT "F"

Attached to and made a part of that certain Joint Operating Am̄cement ("JOA") dated effective
July 1, 2006 by and between Noble Energy, Inc. and Samson Offshore Company covering OCS-G 28030,
Mississippi Canyon Block 948.

## NEWS RELEASE GUIDELINES

**The Parties hereby establish the following guidelines regarding the issuing of a release to the news media concerning operations on any area affected by the Agreement to which this Exhibit is attached.**

I.  <u>News Releases:</u> No public announcement or statement concerning operations covered by this Agreement shall be issued or made except as provided in this Exhibit. The Parties shall **use** good faith efforts to unanimously agree upon releases to the news media concerning operations covered by this Agreement.

**Operator's** <u>News Release:</u> Notwithstanding the provisions above, the Operator, using the following content guidelines and notice requirement, may at any time issue a basic news release containing some or all of the following information, which release shall not require approval of the other Parties, provided, with respect to well operations, no announcement or statement will be released until all testing (excluding flow testing) and Iog ng is completed and all such tests and logs have been received by all Participating Parties:

|     |                                                        |
|-----|--------------------------------------------------------|
| (a) | Name of well, rig name and water depth;                |
| (b) | Location of well by area, block and adjacent state;    |
| (c) | Lease bonus paid and lease acquisition date;           |
| (d) | Test(s) results, if applicable;                        |
| (e) | Net feet of pay,                                       |
| (f) | Potential reserve size;                                |
| (g) | Additional drilling/appraisal plans; and               |
| (h) | Acreage controlled.                                    |

The Operator will transmit the basic news release to the other Parties by facsimile transmission or any other method provided in this Agreement for written notices (or advise that a previously transmitted news release meeting the above content guidelines will be issued as a basic news release) not less than twenty-four (24) hours (exclusive of Saturdays, Sundays, and federal holidays) before it is issued to the news media. Any Party may elect to have its name excluded from the proposed release by notifying the Operator of that desire within said period.

3.     <u>Supplemental News Release:</u> Following receipt of Operator's proposed news release, any Party may prepare its own news release ("Preparing Party") using the above provided content guidelines for Operator's basic news release. The Preparing Party shall send the other Parties a copy of the proposed supplemental news release by facsimile transmission or any other method provided in this Agreement for written notices, and the same comment period provided above for Operator's basic news release and opportunity for any Party to elect to have its name excluded from the proposed release by notifying the Preparing Party of that desire within said period shall apply. A Non-Operating Party's news release shall not be issued sooner than twenty-four (24) hours following the Operator's release.

4.     <u>No News Release by Operator:</u> If the Operator does not submit a proposed news release to the Parties within forty-eight (4S) hours (exclusive of Saturdays, Sundays, and federal holidays) following a request in writing by any Party that the Operator do so, then any Party may prepare its own news release using the above provided content guidelines for Operator's basic news release. The Preparing Party shall send the other Parties a copy of the proposed news release by facsimile transmission or any other method provided in this Agreement for written notices, and the same comment period provided above for Operator's basic news release and opportunity for any Party to elect to have its name excluded from the proposed release by notifying the Preparing Party of that desire within said period shall apply.

5.     <u>Emerzencv Release:</u> Notwithstanding any provision of this Exhibit to the contrary, in an emergency situation involving extensive property damage, operations failure, severe injury or loss of human life, or other clear emergency, and for which there is insufficient time to reasonably obtain the prior approval of the Parties, Operator may furnish the minimum, strictly factual, information necessary to satisfy the legitimate public interest of the media and governmental authorities having jurisdiction. Operator shall then promptly advise the other Parties of the information furnished in response to the emergency.

6.     <u>Injunctive Relief:</u> The Parties hereto acknowledge and agree that each would not have an adequate remedy at law and would be irreparably harmed in the event that any of the provisions of this Exhibit were not performed in accordance with the terms contained herein or were otherwise breached. Accordingly, each Party agrees that the other(s) shall be entitled to injunctive relief to prevent breaches of this Article and to specifically enforce the terms and provisions hereof, in addition to any other remedy to which such party may be entitled, at law or in equity.

## EXHIBIT "G"

Attached to and made a part of that certain Joint Operating Agreement {`50A") dated effective
July I. 2006 by and between Noble Energy, Inc. and Samson Offshore Company covering OCS-G 28030,
Mississippi Canyon Block 948.

## PROJECT TEAM and TECHNOLOGY SHARING

WHEREAS, the Parties, desire to further provide for the formation and operation of a
Project Team for the put'pose of assisting the Operator with preparing a Development Nan for the
Contract Area and in the planning, design and engineering of an Initial Production System and
any Subsequent Production System for the Contract Area; and,

WHEREAS, Each of the Parties has considerable experience in developing offshore oil
and gas properties and the design and installation of an Initial Production System will require
significant engineering effort; and,

WHEREAS, The Parties desire to establish an understanding, relating to i) the costs and
expenses of the Project Team to be charged to the Joint Account and the method in which such
costs shall be shared, ii) the overall operation, administration and management of the Project
Team, and iii) the exchange, development and use of technology collected or developed by or
through this Project Team.

**NOW, THEREFORE,** in consideration of the premises and of the mutual promises
exchanged and contained within this Project Team Exhibit, the Parties have reached the
following agreement concerning the formation and operation of the Project Team.

## SECTION 1.0 DEFINITIONS

As used in this Exhibit, the initially capitalized terms shall have the meanings assigned in Article
2.0 of the Operating Agreement or as specified below:

1.1 <u>Confidential Work Product:</u> shall mean all proprietary geophysical, geochemical,
drilling, engineering or other similar technical data, along with information, reports,
studies, analysis, models or similar data and documents that are developed by the Project
Team within the scope of its work or received from or on behalf of the Parties for use in
the Project Team's work. The term shall include all proprietary information developed by
the Project Team, the cost of which is charged to the Joint Account. The provisions of
this Exhibit shall not be applicable to "Confidential Data", as that term is defined in the
Operating Agreement.

**1.2** **<u>Project Manager:</u>** shall mean the designated representative of the Operator who will
direct, supervise and oversee the work of the Project Team.

1.3    <u>Project Team ("PT"):</u> D: shall mean the group of employees, contract employees and/or consultants of the Participating Parties assigned to assist the Operator with preparing a Development Plan for the Contract Area, and for the planning, design, engineering, fabrication, transportation, installation and operation of a Production System for the Contract Area as further provided for in Exhibit *"G ⁻ (Project Team and Technology Sharing Provisions).* The PT shall be formed pursuant to Article 12 *(Project Team, Development Plan and Fabrication AF.E).*

1.4    <u>Operating Agreement:</u> shall mean that certain Joint Operating Agreement effective July 1, 2006 to which this Exhibit "G" is attached.

1.5    <u>Background Technology:</u> shall mean any proprietary geophysical, geochemical drilling, engineering or other similar technical data, information, reports, studies, analysis, models or similar data and documents developed or obtained by a Party outside of the scope of the Operating Agreement (and this Exhibit) that is disclosed by a Party or exchanged by the Parties for use by the Project Team.

1.6    <u>Employees:</u> Employees shall mean any individual under the employment of any Party to this Operating Agreement including any Affiliate or contract employee or consultant which may represent any Party hereunder.

## SECTION 2.0 PROJECT TEAM FORMATION

**2.1**    **<u>Formation and Staffing of the Project Team:</u> A** PT of project, technical and support personnel may be established pursuant to the terms of Article 12.2 *(Proposal of Project Team)* of the Operating Agreement. Each Participating Party may nominate representatives possessing specific backgrounds as identified by the Project Manager to progress the Development Plan. Each Participating Party may nominate a number of PT members equal to its Participating Interest in the PT. Each Party shall have the right to have percentage representation on the PT tip to its respective working interest share of the total number of technical personnel to be assigned to the Project Team. However, a Party shall not be precluded from having more or less than its respective Participating Interest representation on the PT, if approved by the Project Manager and consistent with the needs of the PT. The Project Manager must approve actual participation of *any* individual nominated by a Party for participation on the PT, and such approval shall not be unreasonably withheld.

   2.1.1   <u>Employee Staff Contribution:</u> Each Participating Party in the PT AFE shall have the right (but not the obligation) to nominate its Employees as members of the PT. Nominated Employees may include project, technical or support personnel.

   2.1.2   <u>Affiliate and Contract Staff:</u> The PT may utilize the resources of Affiliates, consultants and contractors to carry out the work of the PT. Consultants or contractors nominated by Participating Parties to serve on the PT in the place of a

Participating Party's employees are included under the terms of this Section 2.1.2. The individuals nominated for participation by the Participating Parties must have experience commensurate with the position to which they are being, nominated, who could be expected to meaningfully participate and contribute to the work of the PT.

2.2   <u>Status of Team Members:</u> Each Employee member of the PT shall remain an employee of its respective company and each company shall remain responsible for their employees' salaries and benefits as well as maintaining worker's compensation insurance on their employees. Accordingly, each Party will continue to administer the compensation, benefits, allowances and staff planning of its employees on the PT. Each Party retains the right to ultimately direct the details and means by which their representatives participate on the PT. However, Employees who participate on the PT will receive team assignments and general supervision from the Project Manager in connection with their day to day work. An individual selected to the PT shall, insofar as possible, and consistent with the needs of the PT and the individual's employer, serve on the PT for the duration of the PT. Notwithstanding the above, some PT members may be selected for specific tasks or phases of PT work, and upon the conclusion of such tasks or phases these team members may be dismissed by the Project Manager.

2.3   <u>Project Manager:</u> The PT shall operate under the direction of the Project Manager, who shall be selected by the Operator of the PT. The Project Manager shall be responsible for making team assignments and shall be responsible for the overall management and supervision of specific work tasks for the PT. The Project Manager shall determine at whose offices the PT work is to be undertaken. The Project Manager shall be responsible for selecting team members from the nominations provided by Parties. The Project Manager shall also be responsible for selecting contractors to perform certain PT activities, acquiring supplies and services needed by the PT and for instituting rules and procedures for maintaining confidential information. The Project Manager shall also be responsible for making presentations on any Initial or Subsequent Production System and associated documentation at meetings which are conducted under the Operating Agreement.

2.1   <u>**Work Scope of the Project Team:**</u> The primary objective for forming any PT is to pool the talents of the Parties in preparing feasibility studies prior to Development Operations and in planning, design, engineering, fabricating, transportation and installation of any Production System. The proposal of the Development Plan (including the Initial Production System) and commitment of funds thereto shall be handled in accordance with Article 12 *(Project Team, Development Plan and Fabrication AFE)* of the Operating Agreement. For any project undertaken by the PT, the Operator shall provide: (1) a memo describing the anticipated scope of the team's work to be undertaken in reasonable detail such that the Non-Operator may make an informed decision concerning its participation in the Project Team; (2) a memo describing the type and number of staff required to complete the assignment; and (3) an AFE itemizing the Operator's estimate of

3

the Cost of the Project Team. Approval of the PT AFE (and scoping memo) shall be handled pursuant to Article 12.1.1 *(Project Team)* of the Operating Agreement.

2.5   <u>Reports by the Project Team:</u> The PT shall review the prowess of its work with all Participating Parties at least quarterly, and present the results of any studies or planning upon their conclusion. The time and place of the meetings of the PT and location for conducting PT activities shall be determined by the Project Manager.

2.6   <u>Project Team Costs:</u> The_costs and expenses for the PT shall be charged to the Joint Account pursuant to Exhibit "C", *(Accounting Procedure)* of the Operating Ageement. Each Participating Party in the PT shall be responsible for its Participating Interest share of the PT expenses, regardless of its level of Employee participation on the PT.

     2.6.1   <u>Employee Charges:</u> Each Participating Party in a PT shall recover the costs of Employees assigned to or associated with the PT through charges to the Joint Account under Exhibit "C" *(Accounting Procedure)* of the Operating Agreement.

     .7.6.2   <u>Contractors and Consultants:</u> The Project Manager may retain the services of consultants and contractors as is reasonably necessary to carry out the studies and tasks assigned to the PT. Costs of such consultants and contractors assigned to the PT shall be recovered by Operator through charges to the Joint Account under Exhibit "C" *(Accounting Procedure)* of the Operating Agreement. So long as the Costs of the consultant or contractor are within the scope and amount of an approved AFE, the Project Manager's retention of consultants shall not require additional approval by the Participating Parties.

2.7   <u>Liability of Protect Team Members:</u> Each Party agrees to defend, hold harmless and indemnify the other Parties from and against any loss, damage, claim suit, liability, judgment and expense (including attorney fees and other costs of litigation) for any personal injury (including death) of its Employees on the PT irrespective of whether any other party or its employees may have been or may be alleged to have been negligent or otherwise legally responsible.

SECTION 3.0 SECURITY PROVISIONS

3.1   <u>Security Policies:</u> All Operator and Non-Operator Employees and associates with the PT shall honor Operator's security system and shall treat all information directly or indirectly learned or received by virtue of its participation on the PT as confidential in accordance with the provisions of Operator's security manual, and all revisions thereto which are made prior to termination of this Exhibit. A copy of the security manual and any revisions thereto shall be made available to Non-Operator Employees by the Project Manager for their use during the project. This obligation of confidentiality shall also apply to any other proprietary and confidential information which may relate to matters other than the Contract Area to which PT members are exposed by virtue of working in Operator's offices. Operator will use reasonable efforts to minimize the exposure of Non-

4

Operator personnel to the Operator's proprietary and confidential information. In no event shall such confidential information be disclosed to a third party without the prior written consent of Operator and Non-Operator except as provided in the Operating Agreement.

## SECTION 4.0 CONFIDENTIALITY

4.1   **Confidentiality Obligation:** Each Party agrees to maintain as confidential and not to use or disclose to any third party the Confidential Work Product, except as expressly provided hereunder, for a confidentiality period commencing on the date of execution of the Operating Agreement and extending through the later of (i) two (2) years following the termination of the PT work pursuant to Section 8 of this Exhibit "G" or (ii) seven (7) years following the date of execution of the Operating Agreement. After expiration of the confidentiality period the receiving Party's obligations of confidentiality and restrictions on use shall cease. Each Party agrees to treat the disclosure of the Confidential Work Product in the same manner as it treats its own confidential information.

    4.1.1   **Background Technology:** The Parties shall use best efforts to declare and list Background Technology and information which will be utilized by the PT prior to establishment of the PT. However a Participating Party may declare and list additional Background Technology after establishment of the PT if it deems such technology will be beneficial to the PT. Prior to disclosing any Background Technology to the PT, the Participating Parties shall agree to exempt the Background Technology from the terms of this Exhibit and the Operating Agreement. If such agreement is not obtained, such Background Technology need not be disclosed to the PT. The receiving Party shall maintain any Background Technology received as Confidential Work Product under this Exhibit. In no event will Background Technology be disclosed to a third party without the prior written consent of the Party providing the Background Technology to the PT. Any Background Technology presently owned and developed by a Party prior to the effective date of the Operating Agreement shall remain the sole property of that Party.

    4.1.2   **Consultant Agreements:** The Project Manager and each Party soliciting work from third party contractors and consultants (or from Affiliates) in connection with the PT shall use its best efforts to secure contract terms with such third party which contain applicable confidentiality terms and which support rights to the Parties consistent with this Agreement.

4.2   **Exceptions and Permitted Disclosures:**    Any Participating Party may disclose Confidential Work Product to third parties if such disclosure is either an exception to the confidentiality obligation as listed in Article **7.1.1** *(Exceptions to Confidentiality)* or is a permitted disclosure under Article 7.1.2 *(Permitted Disclosures)* of the Operating Agreement

5

    4.2.1 <u>Patent Application Disclosures:</u> Notwithstanding the foregoing, each Party may use such Confidential Work Product under Subarticle 5.2 as reasonable necessary or appropriate to file patent applications pursuant to Article 6. Prompt notice will be provided to the other Parties of any such filing.

    **4.2.2** **Subsequent Disclosures:** Following the expiration of the period of confidentiality set forth in Section 4.1 above, each Party may freely use and disclose the Confidential Work Product without accounting to any other Party, subject only to whatever patent rights, copyright restrictions or confidentiality obligations **are** owed to third parties. Subject to the obligations of confidentiality set forth herein, each Party has the right to copy, display, publish, distribute and prepare derivative works of all documents, drawings or other writings or materials created or conveyed under this Exhibit, including the rights to license, sell or otherwise transfer such rights.

**4.3** **Supporting Agreements:** Each Party shall be responsible for insuring that its respective representatives fully abide by all obligations associated with the confidentiality of all information learned as a result of their participation on the PT and agree to convey such information to others in their company on a "need-to-know" basis only. In this regard, there shall be limited reproduction of PT generated data. Upon the Project Manager's request, each Party shall require its respective employees participating on the PT to execute a confidentiality agreement consistent with the confidentiality obligations specified in the Operating Agreement and this Exhibit and shall furnish the other Parties with a copy of same upon request. Operator shall be responsible for securing confidentiality agreements from outside contract services.

## SECTION 5.0 USE OF CONFIDENTIAL WORK PRODUCT

**5.1** **Receipt** of **Confidential Work Product:** Each Party will be entitled to receive the full reports of all technical studies, detail reports, general conclusions, numerical results, and desigi drawings from all engineering services that are charged to the Joint Account pursuant to an AFE in which it is a Participating Party, whether those engineering services are performed by a Party participating **in** the PT, an Affiliate or by a third party.

**5.2** **Right to** Use **Confidential Work Product:** Each Participating Party may use for its own account (and free of cost) all Confidential Work Product received or developed by the PT which is **(1)** Background Technology or (2) developed by the PT under this Agreement or the cost of which is charged to the Joint Account. Each Participating Party may disclose Confidential Work Product to other members of joint ventures or production sharing arrangements in which the Party or Affiliate has an ownership interest provided the other members agree to hold the Confidential Work Product in confidence arid to use it only for the benefit of that joint venture or production sharing arrangement.

**5.3** **Third Party Limitations:** The Parties acknowledge that various Background Technology may have been received from third parties under preexisting restrictions (e.g.,

6

that the Party may disclose the third party source information to a partner in a joint venture only under obligations of confidentiality and under restriction to use the information only in connection with the joint venture). Each delivering Party agrees to identify, in writing, any Background Technology subject to third party restrictions and disclose the nature of the restriction to the receiving Party prior to disclosure of the Background Technology. The delivering Party shall secure the receiving Party's acknowledgment of such restrictions prior to transmittal of such third party Background Technology. The receiving Party's acknowledgment constitutes its acceptance of such obligations and restrictions imposed upon disclosure and use of the Background Technology.

S.4   <u>Proprietary Software:</u> During the term of the PT, a Party may be authorized to use various computer software and programs which are identified as being proprietary to one of the other Parties. Such proprietary computer software and programs shall not be considered joint property and such computer software and programs are not a deliverable under this Agreement. Use of such proprietary software and programs is not a grant of license of any rights outside of this Agreement and the Parties retain all rights to such property. Computer software and programs which are not proprietary to one of the Parties, but which were developed jointly by the PT, shall be considered Confidential Work Product and joint property.

## SECTION 6.0 INVENTIONS, PATENTS AND COPYRIGHTS

6.1   <u>Patent Assignment with Right to License and Sublicense:</u> Patents on inventions which are (I) conceived solely by outside contractors or consultants employed for the Joint Account, or conceived jointly among the Parties (each including its respective Affiliates) while working on the PT and (2) from work which has been funded by the Joint Account will be assigned to the Operator. The Operator agrees to grant each Participating Party an irrevocable, non-exclusive, worldwide, royalty-free license to practice under all such patents, including the right to grant sublicenses under such patents to any third party or Affiliate an such other terms and conditions that such Party deems appropriate, without accounting to any other Party.

6.2   <u>Patent Assignment and License With Limited Right to Sublicense:</u> Patents on inventions not covered in Section 6.1, which are conceived or first reduced to practice (actual or constructive), by a Party or its Affiliate, either alone or jointly with any outside contractors or consultants, and as a direct result of work which has been funded by the Joint Account, will be owned by that Party. The Party owning any such patent agrees to grant each other Party an irrevocable, non-exclusive, worldwide, royalty-free license under all such patents to make, have made, use and have used such invention for such other Party's own business, including any joint venture or production sharing arrangement in which such other Party has an ownership interest. Further, each such other Party has the right to extend these rights to its Affiliates.

7

6.3     <u>No Commitment **to** Disclose Technology:</u> Except as expressly set forth above, nothing in this Exhibit "H" will be deemed to require any Party or Affiliate to erant any licenses under any patents to anyone. The scope and content of any Background Technology disclosed under this Agreement will be determined in the sole discretion of the disclosing Party.

## SECTION 7.0 WARRANTIES AND INDEMNITIES

7.1     **<u>Disclaimer of Warranties:</u> ALL INFORMATION DISCLOSED OR RECEIVED BY THE PARTIES HEREUNDER SHALL BE PROVIDED ON AN "AS IS" BASIS WITHOUT ANY WARRANTIES, EITHER EXPRESS OR IMPLIED, AS TO THE ACCURACY, VALIDITY OR UTILITY OF SUCH INFORMATION OR THAT IT CAN BE USED WITHOUT INFRINGING ANY THIRD PARTY PATENTS COPYRIGHTS OR OTHER PROPRIETARY RIGHT. WITHOUT LIMITING THE PRECEDING, ANY EXPRESS, IMPLIED OR STATUTORY WARRANTY OF MERCHANTABILITY AND FITNESS FOR A PARTICULAR PURPOSE ARE EXPRESSLY EXCLUDED FROM THIS AGREEMENT. IN NO EVENT SHALL A PARTY CONVEYING OR DISCLOSING INFORMATION BE LIABLE FOR ANY INCIDENTAL, CONSEQUENTIAL OR OTHER DAMAGES ARISING OUT OF OR RESULTING FROM THE USE OF INFORMATION CONVEYED OR DISCLOSED UNDER THIS EXHIBIT.**

7.2     **<u>Indemnities:</u>** Each Party agrees to defend, hold harmless and indemnify the other Parties from and against any loss, damage, claim, suit, liability, judgment and expense (including attorney fees and other costs of litigation) related to or in connection with its use (including use by others which it authorizes), outside of the Contract Area, of any Confidential Work Product, Background Technology or other information or other technology disclosed, exchanged under or developed pursuant to this Exhibit.

## SECTION 8.0 MISCELLANEOUS PROVISIONS

8.1     **<u>Export Controls:</u>** Each Party agrees to abide by the United States Department of Commerce regulations concerning the export or re-export of United States source technical data, or the direct product thereof, to unauthorized destinations and regulations in respect of information supplied by or on behalf of any other Party hereunder.

8.2     **<u>Independent Research:</u>** Nothing herein shall in any way restrict or impair the right of any Party to conduct its own independent research, development, or design activities relating to the evaluation of alternate deepwater development systems even though such activities may parallel or overlap the activities of the PT. Any such Party conducting such independent research activities shall be under no obligation pursuant to the Operating Agreement or this Exhibit to disclose any results of independent research to the other Party(ies) or with respect to the use or disposition of the results of independent research, including but not limited to all information and data resulting therefrom.

8.3     <u>Duration of the Project Team:</u> The PT shall remain in place until (1) the team has completed the work described in the PT AFE and scoping memo, or (2) the planning, design, construction, installation and start-up phase of any Production System has been completed, or (3) PT work has been terminated by approval of the Participating Parties as a General Matter, whichever is the earlier event. Upon dissolution of the PT, the Operator shall conduct any further work required for the installation of the Production System. Any AFE in progress at the time of the PT's dissolution shall continue to be accounted for under Exhibit "C" *(Accounting Procedure).*

8.4     **Assignability:** A third party (not currently a Party to this Agreement) who acquires a Working Interest in the Contract Area may join the PT upon the approval of the Participating Parties as a General Matter. A new Party joining the PT must agree, in writing, to undertake all obligations set forth for a Party under this Exhibit. Such new Party will have all rights, duties and obligations under this Exhibit regarding the use of all Confidential Work Product exchanged or developed prior to the date it joins the PT and during its participation thereunder. However, patent rights received by such new Party hereunder pursuant to Section 7.0 of this Exhibit shall be limited to patents based on developments after the date such Party joins the PT. In the event that a Party assigns its entire interest in the Leases, the assigning Party shall have all the rights specified in this Exhibit, including patent rights and license rights thereunder, based on developments and exchanges prior to the effective date of such assignment and shall continue to have all obligations and duties with respect thereto as set forth in this Exhibit "G" relating to the confidentiality, restrictions on use, patents, indemnity, and as applicable, duties to license the other Parties.

8.5     **Re-instatement of Project Team:** The PT may be reinstated by the Operator to assist in further work on the Initial Production System or planning and designing any Subsequent Production System. Any reinstated PT shall utilize the procedures of this Exhibit, with any applicable time periods in Article 12 of the Operating Agreement running from the date of reinstatement of the PT.

9

EXHIBIT "H"

Attached to and made a part of that certain Joint Operating Agreement ("JOA⁻) dated effective
July 1, 2006 by and between Noble Energy, Inc. and Samson Offshore Company covering OCS-G 28030,
Mississippi Canyon Block 948.


DISPUTE RESOLUTION PROCEDURE

I.     OVERVIEW


A_     **Description and Goals:** Arbitration as used in this statement is a procedure whereby a

three (3) member panel of arbitrators ("Panel") resolves any claim(s), controversy(ies) or

dispute(s) (the "Dispute") between Noble Enemy, Inc. and Samson Offshore Company

(hereinafter referred to singularly as "Party" and collectively as "Parties") arising out of, relating

to or in connection with that certain Joint Operating Agreement dated effective July 1, 2006

(hereinafter "Agreement") including, the interpretation, validity, termination or breach thereof.


(i)      Binding: The arbitration process is binding on the Parties and this arbitration is

intended to be a final resolution of any Dispute between the Parties as described above, to

the same extent as a final judgment of a court of competent jurisdiction. Each Party

hereby expressly covenants that it shall not resort to court remedies except as provided for

herein, and for preliminary relief in aid of arbitration.


(ii)     **Violation:** A non-prevailing Party shall pay all legal and court costs incurred by

the other Party in connection with the enforcement of the final resolution of any Dispute

under this Dispute Resolution Procedure. Suits, actions or proceedings in connection with such enforcement shall be instituted in the United States District Court located in Harris County, Texas and pursuant to Title IX of the United States Code, each Party waives any option or objection which it may now or thereafter have to the laying of the venue in any such suit, action or proceeding and irrevocably submits to the jurisdiction of such court in any such suit, action or proceeding.

B.      <u>Duty to Negotiate:</u> The Parties shall inform one another promptly following the occurrence or discovery of any item or event which might reasonably be expected to result in a Dispute in connection with the Agreement. The Parties will attempt to resolve satisfactorily any such matters.

C.      <u>Notice of Unresolved Dispute:</u> Should a Dispute arise which the Parties cannot resolve satisfactorily, either Party• may deliver to the other Party a written notice of the Dispute with supporting documentation as to the circumstances leading to the Dispute (the "Notice of Dispute"). The Parties, within ten (10) Business Days from delivery of such notice, shall then each appoint a management representative ("Management Representative') who has no prior direct involvement with the subject matter of the Notice of Dispute and who is duly authorized to investigate, negotiate and settle the Dispute. The Management Representative for each Party shall meet and confer as often as they deem reasonably necessary for a period not exceeding thirty (30) days following the delivery of the Notice of Dispute in good faith negotiations to resolve the Dispute amicably. The parties in their sole discretion may also agree to utilize the service of a

mediator pursuant to a joint engagement. Unless otherwise provided herein, all such notices shall be served in accordance with the provisions of the Agreement.

IL.    ARBITRATION PROCESS

A.    Arbitration: If the Parties are unable to resolve the Dispute within forty (40) days following the receipt of the Notice of Dispute, or such additional time as may be mutually agreed, the matter shall be submitted to arbitration in accordance with the procedures set forth below.

B.    Initiation of Arbitration: The arbitration shall be initiated by either party delivering to the other a Notice of Intention to Arbitrate.

C.    Governing Procedures: Except as expressly provided herein, the arbitration shall be conducted in accordance with procedures that are mutually acceptable to the Parties, including limited depositionless discovery.

(¹)    Governing Law: The Panel shall apply the governing substantive law of the state chosen by the Parties to the Agreement.

D.    Arbitration   Panel: There shall be three Arbitrators, all of whom shall be independent and impartial, and experienced in arbitration proceedings. For those disputes involving the transfer of, or title to, any real property rights or interests, including but not limited to mineral rights, or involving the development of a mineral interest or the marketing of mineral production, each Arbitrator shall be experienced in the oil and gas industry and knowledgeable or specializing as to the subject matter involved in the

3

dispute. The Arbitrators shall be chosen as follows: each Party shall have thirty (30) days from the delivery of a Notice of Intention to Arbitrate to designate an Arbitrator and notify the other Party of the name of such Arbitrator. If such other Party shall fail to name a second Arbitrator within thirty (12) days, then the Party who first served the notice may, within three (3) days after written notice to the other Party, apply to the American Arbitration Association as the Appointing Authority, for the appointment of such second Arbitrator for or on behalf of the other Party, and, in such case, the Arbitrator appointed by the Appointing Authority shall meet the criteria set forth in this Section II.D. and shall act as if named by the other Party.

*(0  Selection of Third Arbitrator.*  The two (2.) Arbitrators chosen as provided for above shall, within thirty (30) days after the appointment of the second Arbitrator, choose the third Arbitrator who shall meet the criteria set forth in this Section II.D., and in the event of their failure to do so within said thirty (30) days, either of the Parties hereto may in like manner, within three *a*) days after written notice to the other Party, apply to the Appointing Authority for the appointment of a third Arbitrator. The third Arbitrator shall then disclose any and all conflicts of interest as described in II.D.(ii) below, Following that disclosure, the Parties shall agree to appoint the chosen third Arbitrator or to continue the selection process in the same manner. The three (3) Arbitrators selected shall constitute the Panel. The third Arbitrator shall serve as Chairman of the Panel.

(ii)    Conflicts: Any Arbitrator, prior to his or her appointment, shall disclose to the Parties all actual or perceived conflicts of interest and business relationships involving the Dispute or the Parties, including, but not limited to, any professional or social relationships, present or past, with any Party (or its affiliates), including any Party's (or its affiliates) directors, officers and supervisory personnel and counsel. Any Party may challenge in writing the appointment or continued service

4

of any Arbitrator for lack of independence, partiality or any other cause likely to impair such Arbitrator's ability to effectively participate in the proceedings or render a fair and equitable decision. Where such challenge is made, the Appointing Authority shall uphold or dismiss the challenge. In the event a challenge is upheld, the Arbitrator shall be replaced. A replacement will be selected in the same manner as the original Arbitrator was selected. If an Arbitrator resigns or becomes unable or unwilling to continue to serve as an Arbitrator, a replacement shall be selected in the same manner as that Arbitrator was chosen.

_(iii)_     **_Multi-Party Arbitrations._** Where more than. two Parties are involved in the dispute ("Multi-Party Arbitration"), all Parties shall jointly name and agree as to the appointment of the two Arbitrators meeting the criteria set forth in Section II.D. above. The third Arbitrator shall be appointed as set forth in Section

If the Parties cannot agree as to the choice of the Arbitrators within the said thirty (3Q) days, either of the Parties hereto may in like manner, within three (3) days after written notice to the other Party, apply to the Appointing Authority for the appointment of the two Arbitrators meeting the criteria set forth in Section II.D. above.

_(iv)_     **_Management of the Arbitration._** The Panel shall actively manage the proceedings as it deems best so as to make the same expeditious, economical, and less burdensome and adversarial than litigation.

5

E.      Confidentiality: All documents, briefs, testimony, transcripts. as well as, all Panel decisions shall be confidential. Likewise, the views, suggestions, admissions, proposals and other information exchanged in the arbitration are confidential and are inadmissible in any other proceeding.

F.      Costs and Expenses: The Parties involved in the dispute shall be equally responsible for all costs, fees and expenses incurred by the Arbitrator and any other incidental costs incurred in connection with the arbitration proceeding shall also be borne equally by the Parties. Each Party is solely responsible for its own attorneys' fees and expenses incurred in the Arbitration. In the event of a Multi-Party Arbitration, all costs and expenses shall be borne equally by all Parties.

G.      Submissions: Within thirty (30) days after the selection of the Panel, each Party shall provide the Panel with a short and plain submission defining the issues to be decided and the nature of the relief that the Panel may award (the "Submission"). This Submission shall explicitly authorize the Panel to decide these issues. This authorization shall stay in force for period no longer than nine (9) months from this Submission. If the Parties are unable to reach consensus as to the issues involved, the in its sole discretion shall frame the issues through a reasonable procedure. The Panel will render decisions on the specific issues established and shall fashion any remedy that the Panel deems appropriate so long as that remedy is consistent with the Parties' Submissions hereunder. Any money judgment entered by the Panel shall be payable in U.S. dollars.

6

**H.**     <u>Transcriptions:</u>The presentations and argument will be transcribed for the benefit of the Panel and the Parties.

**I.**     <u>Discovery:</u>Commencing thirty (30) days after the receipt of the opposing Party's Submission, each Party may serve upon the other Party up to ten (10) requests for the production of documents, including subparts. The requests shall be made in good faith and not be served for the purpose of delay or harassment. Each request shall describe the type of document(s) sought and each request shall be limited to documents that are relevant to a claim or defense in the Arbitration proceeding, or reasonably calculated to lead to the discovery of admissible evidence. The requests need not be served all at once but may be served in stages.

(i)     The Party served with a request under this provision shall provide the adverse Party with copies of the requested documents, and identify the request to which each document is responsive, within twenty (20) days of the receipt of the request. If the Party served with a request objects to the production of any of the requested documents, it shall nevertheless produce within the permitted time all documents responsive to any request that is not objected to by that Party.

(ii)     A Party that is served with a request may challenge the propriety of the request within the time permitted for response by a short written objection that shall be forwarded to the adverse Party and to the Panel. The adverse Party shall submit its response, if any, to the objecting Party and the Panel within five (5)

days of receipt of the objection. The Panel shall consider the request, the objection

and the response, if any. and decide whether the production shall be allowed or

denied or whether the request should be modified within ten (1 0) days after the

submission of the adverse Party's response.

3.      <u>Presentations:</u> No later than twenty-five (25) days prior to the date that

presentations to the Panel are to begin, each Party will submit to the Panel and serve on

the other Party a written position statement. The original statement of each Party shall not

exceed thirty-five (35) typewritten letter-size pages. Each Party shall have the right to

submit reply statements no later than fifteen (15) days prior to the date of the

presentation. Such reply statements shall not exceed fifteen (15) typewritten letter-size

pages.

(i)      All documents and affidavits that a Party intends to use during its

presentation shall be submitted to the Panel and served on the other Party with the

position and reply statements. All demonstrative exhibits shall be exchanged five

(5) days in advance of the presentations.

(ii)      The presentations to the Panel shall extend for such time as the Panel

agrees to be appropriate. In the absence of any agreement, the presentations for

both Parties shall extend for no longer than two (2) days per party and shall be

concluded within six (6) months after selection of the Panel. Presentations of each

Party shall occur successively with no intervening delay.

8

(iii)     Each Party shall make an oral and/or documentary presentation of its position in such order and in accordance with the time schedule established by the Panel. The Panel may question each of the presenters during or following any and all presentations.

The Panel shall determine a reasonable time and location for the presentations.

K. <u>Decision and Award:</u> The Panel shall promptly (within sixty (60) days of conclusion of the presentations or such longer period as the Parties may mutually agree) determine the claims of the Parties and render a final decision in writing. The decision shall state with specificity the findings of fact and conclusions of law on which it rests. The decision rendered by the Panel may be enforced in accordance with Section          above, and may only be appealed pursuant to Section L below. The decision shall be served upon each of the Parties by facsimile transmission and by first class mail.

(i)     If applicable law allows pre-award interest, the Panel may, in its discretion, grant pre-award interest and, if so, such interest may be at commercial rates in the state chosen by the Parties pursuant to Section 111.C.(i) during the relevant period. Further, the Panel may, in its discretion, award to the prevailing party(ies) its (their) attorneys fees and costs of arbitration. The Panel shall not award consequential, punitive, indirect or other noncompensatory damages.

9

(ii)     Within ten (10) days of receipt of the award either side may submit a

Motion to Modify the award. A response shall be due within fifteen (15) days

thereafter and the Panel shall rule thereon within fifteen (15) days after receipt of

the response.

(iii.)     Judgment on the award may be entered in a United States District Court

located in Harris County, Texas at any time within one year after the decision is

made.

L.     <u>Vacation of Award and Appeal:</u> An appeal from an order or judgment pursuant

to this Section II.L. shall be instituted in the United States District Court for the Eastern

District of Louisiana. The court may vacate the award only if the award was procured by

or through fraud or corruption or bias or prejudice of the Panel. Each Party waives any

option or objection which it may now or thereafter have to the laying of the venue of any

such suit, action or proceeding and irrevocably submits to the jurisdiction of the court in

any such suit, action or proceeding,. Each Party agrees that a remedy at law for a violation

of this Section II.L. may not be adequate and therefore agrees that the remedies of specific

performance and injunctive relief shall be available in the event of any violation in

addition to any other right or remedy at law or in equity to which any Party may be

entitled.

10

M.      <u>Res Judicata:</u> To the extent permitted by law, any decision of the Panel shall not be *res judicata* or have any binding effect in any other litigation or arbitration where any Party to this Agreement may also be a party.

11

EXHIBIT "I"

Attached to and made a part of that certain Joint Operating Agreement ("JO.A.1 dated effective July 1, 2006 by and between Noble Energy, Inc. and Samson Offshore Company covering OCS-G 28030. Mississippi Canyon Block 948.

## MEMORANDUM OF OPERATING AGREEMENT
## AND FINANCING STATEMENT

1.0   This Memorandum of Operating Agreement and Financing Statement (hereinafter called "Memorandum") is effective as of July I, 2006. The parties hereto have entered into an Operating Agreement effective July I, 2006 (hereinafter referred to as the "Operating Agreement") providing for the development and production of crude oil, natural gas and associated substances from the lands and oil and gas leases described in Exhibit "A-1" of the Operating Agreement and as further described in Attachment " I" (hereinafter called the "Contract Area"), and designating Noble Energy, Inc. as Operator to conduct such operations for itself and the undersigned Non-Operators.

3.0   The Operating Agreement provides for certain liens, mortgages, pledges and/or security interests to secure payment by the parties of their respective share of costs under the Operating Agreement. The Operating Agreement contains an Accounting Procedure, along with other provisions, which supplement the lien, mortgage, pledge and/or security interest provisions, including non-consent clauses which provide that parties who elect not to participate in certain operations shall be deemed to have relinquished their interest in production until the carrying consenting parties are able to recover their costs of such operations plus a specified amount. Should any person or firm desire additional information regarding the Operating Agreement or the Exploration Agreement or wish to inspect a copies of such agreements, said person or firm should contact the Operator at:

> Noble Energy, Inc.
> 100 Glenborough Drive, Suite 100
> Houston, Texas 77067-3610
> Attn: Deepwater Manager

4.0   The purpose of this Memorandum is to more fully describe and implement the liens, mortgages, pledges and/or security interests provided for in the Operating Agreement, and to place third parties on notice thereof. The purpose of this Memorandum is also to place third parties on notice that the Operating Agreement does contain a Preferential Right to Purchase provision.

5.0   In consideration of the mutual rights and obligations of the parties hereunder, the parties hereto agree as follows:

5.1   The Operator shall conduct and direct and have full control of all Operations on the Contract Area as permitted and required by, and within the limits of the Operating Agreement.

5./   The liability of the parties shall be several, not joint or collective. Each party shall be responsible only for its obligations and shall be liable only for its proportionate share of costs.

5.3   Each Non-Operator grants to Operator a lien and mortgage upon all its rights, title and interests in the oil, gas and mineral leases and other real property, in the Contract Area, and a pledge and security interest in its share of oil and gas when extracted and its interest in all equipment and property whether movable or immovable, corporeal or incorporeal attached thereon, all such property being more fully described in Paragraph 6.0, to secure payment of its share of expenses and charges, arising out of the Operating Agreement and the Exploration Agreement, together with interest thereon at the rate provided in the Accounting Procedure referred to in Paragraph 3.0 above. To the extent that Operator has a security interest under the Uniform Commercial Code of the state, Operator shall be entitled to exercise the rights and remedies of a secured party under the Code. The bringing of a suit and the obtaining of judgement by Operator for the secured indebtedness shall not be deemed an election of remedies or otherwise affect the rights or security interest for the payment thereof.

5.4   If any Non-Operator fails to pay its share of costs when due, Operator may require other Non-Operators to pay their proportionate part of the unpaid share, excluding any costs or charges arising out of the Exploration Agreement, whereupon the other Non-Operators shall be subrogated to Operator's lien and security interest.

5.5   The Operator hereby grants to Non-Operators a lien, mortgage, pledge and security interest equivalent to that granted to Operator as described in Paragraph 5.3 above, except with respect to expenses and charges arising out of the Exploration Agreement, to secure payment by Operator of its own share of costs when due and all rights as a secured party pursuant to this grant and the Uniform Commercial code shall inure to the benefit of Non-operators as well as Operator.

6.0   For purposes of protecting said liens, mortgages, pledges and security interests, the parties hereto agree that the mutual lien, mortgage, pledge, security interest, and this Memorandum shall cover all right, title and interest of the debtor(s) in:

6.1   Property Subject to Liens. Pledges. and Security Interests

(A)   All personal property located upon or used in connection with the Contract Area.

(B)   All equipment, fixtures, and appurtenances upon or used in connection with the Contract Area, whether movable or immovable, corporeal or incorporeal.

2

Debtors' Exhibit No. 102
Page 160 of 166

(C)    All oil, gas and associated substances of value in, on or under the Contract Area which may be extracted therefrom.

(D)    All accounts and revenues resulting from the sale of the items described in subparagraph (C) at the wellhead of every well located on the Contract Area or on lands pooled or unitized therewith.

(E)    All items used, useful, or purchased for the production, treatment, storage, transportation, manufacture, or sale of the items described in subparagraph (C). All accounts, contract rights, rights under any gas balancing agreement, general intangibles, equipment, inventory, farmout rights, option farmout rights, acreage and or cash contributions, and conversion rights, whether now owned or existing or hereafter acquired or arising, including but not limited to all interest in any partnership, tax partnership, limited partnership, association, joint venture, or other entity or enterprise that holds, owns, or controls any interest in the Contract Area or in any property encumbered by this Memorandum.

(G)    All severed and extracted oil, gas, and associated substances now or hereafter produced from or attributable to the Contract Area, including without limitation oil, gas and associated substances in tanks or pipelines or otherwise held for treatment, transportation, manufacture, processing or sale.

(H)    All the proceeds and products of the items described in the foregoing paragraphs now existing or hereafter arising, and all substitutions therefor, replacements thereof, or accessions thereto.

(I)    All personal property and fixtures now and hereafter acquired in furtherance of the purposes of the Operating Agreement. Certain of the above-described items are or are to become fixtures on the Contract Area.

(I)    The proceeds and products of collateral are also covered.

6.2    Property Subject to Liens and Mortgages

(A)    All real property and oil and gas leases within the Contract Area, including all oil, gas and associated substances of value in, on or under the Contract Area which may be extracted therefrom,

(B)    All equipment, fixtures, and appurtenances upon or used in connection with the Contract Area, whether movable or immovable, corporeal or incorporeal.

(C)    All real property and fixtures now and hereafter acquired in furtherance of the purposes of the Operating Agreement, including any easement, right-of-way, surface leases, and fee acreage.

3

7.0     The property described in Parazaphs 6.1 and 6.2 will be financed at the wellhead of the well or wells located on the Contract Area or on lands pooled or unitized therewith, and this Memorandum is to be filed for record in the real estate records of the county or parish in which the Contract Area is located, or, in the case of offshore leases, in the county or parish adjacent thereto and in the appropriate Uniform Commercial Code records. All parties who have executed the Operating Agreement are identified on Attachment "I". All farmors and option farmors, if any, who have granted support within the Contract Area are identified on Attachment "2".

8.0     Upon default of any covenant or condition of the Operating Agreement or the Exploration Agreement, in addition to any other remedy afforded by law, each party to the Operating Agreement and any successor to such party by assignment, operation of law, or otherwise, shall have, and is hereby given and vested with, the power and authority to take possession of and sell any interest which the defaulting party has in the property described in Paragraphs 6.1 and 6.2 and to foreclose this lien, mortgage, pledge, and security interest in the manner provided by law.

9.0     Upon expiration of the subject Operating Agreement, and separately with respect to the expiration of the Exploration Agreement, and the satisfaction of all debts, the Operator shall file of record a release and termination on behalf of all parties concerned. Upon the filing of such release and termination, all benefits and obligations under this Memorandum shall terminate as to all parties who have executed or ratified this Memorandum. In addition, the Operator shall have the right to file a continuation statement on behalf of all parties who have executed or ratified this Memorandum.

10.0 It is understood and agreed by the parties hereto that if any part, term, or provision of this Memorandum is by the courts held to be illegal or in conflict with any law of the state where made, the validity of the remaining portions or provisions shall not be affected, and the rights and obligations of the parties shall be construed and enforced as if the Memorandum did not contain the particular part, term or provision held to be invalid.

I 1.0 This Memorandum shall be binding upon and shall inure to the benefit of the parties hereto and to their respective heirs, devisees, legal representatives, successors and assigns. The failure of one or more persons owning an interest in the Contract Area to execute this Memorandum shall not in any manner affect the validity of the Memorandum as to those persons who have executed this Memorandum.

12.0 A party having an interest in the Contract Area can ratify this Memorandum by execution and delivery of an instrument of ratification, adopting and entering into this Memorandum, and such ratification shall have the same effect as if the ratifying party had executed this Memorandum or a counterpart thereof. By execution or ratification of this Memorandum, such party hereby consents to its ratification and adoption by any party who may have or may acquire any interest in the Contract Area.

4

I3.0   This Memorandum may be executed or ratified in one or more counterparts and all of the executed or ratified counterparts shall together constitute one instrument. For purposes of recording, only one copy of this Memorandum with individual signature pages attached thereto needs to be filed of record.

<strong><u>Operator</u></strong>

WITNESSES                                    **NOBLE ENERGY, INC.**

_____     **BY:** _____
                                             **NAME:** _____
_____     **TITLE:** _____
                                             **DATE:** _____

<strong><u>Non-Operator</u></strong>

                                             **SAMSON OFFSHORE COMPANY**

_____     **BY:** _____
                                             **NAME:** _____
_____     **TITLE:** _____
                                             **DATE:** _____

5

ACKNOWLEDGNIENTS

STATE OF TEXAS )
55.
COUNTY OF HARRIS )

On this      day of        _____ before me, appeared_____ to me personally known, who, being by me duly sworn, did say that he is the _____ of _____, a _____ corporation, and that the foregoing instrument was sided in behalf of that corporation by authority of its Board of Directors and acknowledged the instrument to be the free act and deed of that corporation.

NOTARY PUBLIC

_____

My Commission expires:

STATE OF TEXAS
) ss.
COUNTY OF HARRIS )

On this ____ day of       _____ before me, appeared_____, to me personally known, who, being by me duly sworn, did say that he is the _____ of _____, a _____ corporation, and that the foregoing instrument was signed in behalf of that corporation by authority of its Board of Directors and acknowledged the instrument to be the free act and deed of that corporation.

NOTARY PUBLIC

_____

My Commission expires:

6

## ATTACHMENT "I" TO EXHIBIT "I"

## MEMORANDUM OF OPERATING AGREEMENT
## AND FINANCING STATEMENT

## WORKING INTERESTS OF THE PARTIES,
## OPERATOR AND REPRESENTATIVES

**Contract Area arid Description of** Lease(s):

See EXHIBIT "A-I"

**II.**   **Working Interests of the Parties**

| | |
|---|---|
| Noble Energy, Inc. | 50.00% |
| Samson Offshore Company | 50.00% |

**III.**   **Operator**

Noble Enerp, Inc.

**IV.**   **Addresses**                                                    **Names of Representatives**

**Noble Energy,** Inc.                                        Deepwater Land Manager
100 Glenborough Drive, Suite 100              Attn.:    Daniel S. Mills
Houston, Texas 77067-3610
Phone No.:    (281) 874-6063
Fax No.:       (281) 876-6208

Samson Offshore Company                       Manager **Land / Business** Development
1301 Travis, Suite 1900                            Attn.:    Sonny Measley
Houston, Texas 77002
Phone No.:    (713) 577-2011
Fax No.:       (713) 577-2211

7

Debtors' Exhibit No. 102

ATTACHMENT "A-1"

Attached to and made a part of Attachment "I" to Exhibit "1"
of Memorandum of Operating Agreement and Financing Statement

## CONTRACT AREA

| Lease No. | Block Number | Lease Effective Date | Gross Acres | Lease Royalty | Potential Lease Royalty Suspension Volume | Lease ORRIs | Area / Depth |
|---|---|---|---|---|---|---|---|
| OCS-G 28030 | MC 948 | 07-01-06 | 5,760 | 1/8 | 12 MMBOE | None | OCS-G 28030 covering all of Mississippi Canyon Block **948.** |

1