**Hess Exhibit 12**

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

|  |  §  |  |
|---|---|---|
| In re: | § | Chapter 11 |
|  | § |  |
| **FIELDWOOD ENERGY LLC,** *et al.,* | § | Case No. 20-33948 (MI) |
|  | § |  |
| Debtors.[1] | § | **(Jointly Administered)** |
|  | § | Re Docket No. 1284 |
|  | § |  |

### NOTICE OF FILING OF EXECUTED TERM SHEET BY AND BETWEEN THE DEBTORS AND ENI PETROLEUM US LLC

**PLEASE TAKE NOTICE** that on May 12, 2021, Fieldwood Energy LLC ("**Fieldwood**") and its debtor affiliates, as debtors and debtors in possession in the above-captioned chapter 11 cases (collectively, the "**Debtors**"), after extensive good faith, arm's length negotiations, executed a term sheet with Eni Petroleum US LLC ("**Eni**" and, together with the Debtors, the "**Parties**") reflecting an agreement-in-principle between the Parties with respect to the treatment under the *Fourth Amended Joint Chapter 11 Plan of Fieldwood Energy LLC and Its Affiliated Debtors* dated April 15, 2021 filed at ECF No. 1284 (including any exhibits and schedules thereto and as may be further amended, supplemented, or modified, the "**Plan**") of certain oil and gas leases and related interests and obligations, a copy of which is attached hereto as **Exhibit A** (the "**Fieldwood/Eni Term Sheet**").

**PLEASE TAKE FURTHER NOTICE** that the Fieldwood/Eni Term Sheet provides for, among other terms and conditions:

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, as applicable, are: Dynamic Offshore Resources NS, LLC (0158); Fieldwood Energy LLC (6778); Fieldwood Energy Inc. (4991); Fieldwood Energy Offshore LLC (4494); Fieldwood Onshore LLC (3489); Fieldwood SD Offshore LLC (8786); Fieldwood Offshore LLC (2930); FW GOM Pipeline, Inc. (8440); GOM Shelf LLC (8107); Bandon Oil and Gas GP, LLC (9172); Bandon Oil and Gas, LP (9266); Fieldwood Energy SP LLC (1971); Galveston Bay Pipeline LLC (5703); and Galveston Bay Processing LLC (0422). The Debtors' primary mailing address is 2000 W. Sam Houston Parkway S., Suite 1200, Houston, TX 77042.

HESS EXHIBIT 12

- an agreement-in-principle between the Parties regarding the treatment of the oil and gas leases and facilities (including but not limited to, for all purposes thereunder, any wells, pipelines, or other structures) set forth on Exhibit A attached to the Fieldwood/Eni Term Sheet previously conveyed to the Debtors by Eni and certain of its affiliates;

- Eni's agreement to withdraw any pending objections it has filed to the Plan and to not file any further objections to the Plan or support any other party in objecting to or opposing the Plan and agrees it will support confirmation of the Plan;  and

- that the Debtors, Fieldwood, Credit Bid Purchaser,[2] and Eni shall work together in good faith to negotiate the definitive documents contemplated in the Fieldwood/Eni Term Sheet and any other agreements required to implement the transactions contemplated therein, in each case in accordance with the terms and conditions set forth herein and acceptable to the Required DIP Lenders and the Requisite FLTL Lenders.

---

[2] Capitalized terms used but not defined herein have the meanings ascribed to them in the Plan.

HESS EXHIBIT 12

Dated: May 12, 2021
      Houston, Texas

                    Respectfully submitted,


               */s/ Jessica Liou*
               WEIL, GOTSHAL & MANGES LLP
               Alfredo R. Pérez (15776275)
               700 Louisiana Street, Suite 1700
               Houston, Texas 77002
               Telephone:  (713) 546-5000
               Facsimile:  (713) 224-9511
               Email:   Alfredo.Perez@weil.com

               -and-

               WEIL, GOTSHAL & MANGES LLP
               Matthew S. Barr (admitted *pro hac vice*)
               Jessica Liou (admitted *pro hac vice*)
               767 Fifth Avenue
               New York, New York 10153
               Telephone:  (212) 310-8000
               Facsimile:  (212) 310-8007
               Email:   Matt.Barr@weil.com
                      Jessica.Liou@weil.com


               *Attorneys for Debtors*
               *and Debtors in Possession*

HESS EXHIBIT 12

**<u>Certificate of Service</u>**

I hereby certify that, on May 12, 2021, a true and correct copy of the foregoing document was served by the Electronic Case Filing System for the United States Bankruptcy Court for the Southern District of Texas.

 /s/  *Jessica Liou*              
Jessica Liou

HESS EXHIBIT 12

## EXHIBIT A

**Fieldwood/Eni Term Sheet**

HESS EXHIBIT 12



Thomas R. Lamme
*Senior Vice President and General Counsel*
*Direct  713-969-1107*
*Email  TLamme@fwellc.com*

May 12, 2021

**VIA EMAIL**

Luca Pellicciotta
President and CEO
Eni Petroleum US LLC
1200 Smith Street, Suite 1700
Houston, Texas 77002
E-mail: luca.pellicciotta@eni.com

    *Re: Fieldwood/Eni Term Sheet*

Dear Mr. Pellicciotta:

Attached as Exhibit A is the agreed upon term sheet dated May 12, 2021, by and between Fieldwood Energy LLC and its affiliated debtors and Eni Petroleum US LLC ("**Eni**" and, together with the Debtors, the "**Parties**") supporting the restructuring of the portion of the Debtors' business relating to certain assets described therein as the "Abandoned Properties" (the "**Fieldwood/Eni Term Sheet**").

By executing this letter agreement, each of the undersigned Parties agrees (i) to work to implement the terms of the Fieldwood/Eni Term Sheet and (ii) to negotiate the definitive documents described therein in good faith and in accordance with the terms of the Fieldwood/Eni Term Sheet.

The Parties may execute and deliver this letter agreement by electronic reproduction and in multiple counterparts, each of which shall constitute an original and all of which shall be one and the same document.  This letter agreement shall be governed by the laws of the State of Texas without regard to any choice of law principles.

[Signature Pages Follow]

Enclosure

cc: Michael T. Dane, *via email* MDane@Fwellc.com

**HESS EXHIBIT 12**

IN WITNESS WHEREOF, the undersigned Parties have executed this letter agreement as of the date first written above.

**FIELDWOOD ENERGY LLC**

By: _Thomas R. Lamme_

Name: Thomas R. Lamme
Title: Senior Vice President and General Counsel

**HESS EXHIBIT 12**

**ENI**:

**ENI PETROLEUM US, LLC**

By: _____

Name:   Luca Pelicciotta
Title:   President and CEO

HESS EXHIBIT 12

# EXHIBIT A

FIELDWOOD/ENI TERM SHEET

HESS EXHIBIT 12

*This Term Sheet is an expression of interest only and creates no legally binding commitment by either party to negotiate any specific transaction or enter into any agreement. It is expressly understood that no liability or obligation of Fieldwood Energy LLC and its affiliated debtors (collectively, the "**Debtors**") or Eni Petroleum US LLC ("**Eni**") of any nature whatsoever is intended to or will be created hereunder with respect to this Term Sheet or related discussions or writings or the transactions contemplated hereby and that this Term Sheet is neither a contract nor a binding offer. It is understood and agreed that any transaction is expressly conditioned, among others, upon approval by the Debtors and Eni, the execution and delivery by the Debtors and Eni or their affiliates of definitive written agreements, in form and substance satisfactory to the Debtors and Eni in their sole discretion, the satisfaction of the conditions set forth therein, and Bankruptcy Court approval. The Debtors and Eni expressly agree that this Term Sheet does not contain all terms that would be required to be agreed to in order to enter into any definitive agreement. Without prejudice to the foregoing, this Term Sheet constitutes a "Definitive Document" under the Restructuring Support Agreement (as defined in the Plan (as defined below)) and is subject to the consent rights set forth therein. Except as provided for herein, each party is responsible for its own costs and expenses, including those of its legal advisors in conjunction with this Term Sheet.* [1]

| **ENI / FIELDWOOD COMMERCIAL TERM SHEET** |
|---|
| Through the Initial Plan of Merger contemplated under the *Fourth Amended Joint Chapter 11 Plan of Fieldwood Energy LLC and Its Affiliated Debtors* dated April 15, 2021 filed at ECF No. 1284 (including any exhibits and schedules thereto and as may be further amended, supplemented, or modified, the "**Plan**"), Fieldwood Energy III LLC ("**FWE III**") will, subject to the terms and conditions set forth herein, decommission the oil and gas leases and facilities (including but not limited to, for all purposes hereunder, any wells, pipelines, or other structures) set forth on **Exhibit A** attached hereto (collectively, the "**Abandoned Properties**" and each individually, an "**Abandoned Property**") previously conveyed to Debtors by Eni and certain of its affiliates. |
| **Term Sheet Expiration Date** |
| The Debtors, FWE, Credit Bid Purchaser, and Eni shall work together in good faith to negotiate the definitive documents contemplated below and any other agreements required to implement the transactions contemplated in this Term Sheet, in each case in accordance with the terms and conditions set forth herein and acceptable to the Required DIP Lenders and the Requisite FLTL Lenders ("**Definitive Documents**"), provided that this Term Sheet shall terminate if the parties have not fully agreed and finalized all such required Definitive Documents on or before the Effective Date of the Plan (such date, the "**Termination Date**"). |
| **Conditions Precedent to Effectiveness** |
| In addition to any other conditions precedent that may be agreed by the parties, it shall be a condition precedent to the effectiveness of the Definitive Documents that FWE III will have been granted to the satisfaction of the parties to the Definitive Documents all necessary approvals by applicable regulatory authorities to act as a qualified operator in the Gulf of Mexico.  In the event that FWE III has not been granted such approval(s) by September 30, 2021, this Term Sheet and any and all executed Definitive Documents shall automatically terminate on such date. For the avoidance of doubt, in no event shall the failure to consummate any Definitive Document result in any such extension after the Termination Date. |
| **Closing** |

---

[1] Capitalized terms used but not defined herein have the meanings ascribed to them in the Plan.

**HESS EXHIBIT 12**

"**Closing**" shall take place in conjunction with the effectiveness of the divisive merger and simultaneous execution and delivery of the Definitive Documents.

**FWE III Governance and Operations**

1. FWE III will provide Eni with regular informational updates, including monthly, quarterly, and annual financial reports. Eni shall have the right but not the obligation to share such information with the sureties.

2. As a condition precedent to the effectiveness of the Turnkey Removal Agreement (and the other Definitive Documents), FWE III will become a qualified operator in the Gulf of Mexico.

3. FWE III will use reasonable efforts to obtain reimbursement/contribution for decommissioning activity that is available under contract or applicable law, including any other record title and/or operating rights interest holders and predecessors-in-interest other than Eni to the extent practicable and available surety bonding other than Eni's bonds; provided that, for the avoidance of doubt, FWE III shall not be required to incur any out-of-pocket costs or obligations in connection with such efforts.

4. FWE III shall obtain the written consent of Eni (not to be unreasonably withheld) prior to entering settlement negotiation(s) or agreeing to a settlement and/or initiating dispute resolution regarding the Abandoned Properties, including with respect to obtaining contributions from other record title and/or operating rights interest holders and predecessors-in-interest for decommissioning or funds from surety bonds for decommissioning.

5. The Debtors and FWE III will be responsible for all costs associated with formation of FWE III in connection with the Initial Plan of Merger as contemplated in the Plan. Funds required for the ongoing operations of FWE III shall be provided as set forth in the "Implementation and Funding Agreement" below.

6. FWE III will provide all funds for any premiums for organizational/area-wide bonding requirements.

**Withdrawal of Objections and Support of the Plan**

In conjunction with the execution of this Term Sheet or promptly thereafter, Eni will withdraw any pending objections it has filed to the Plan, and agree not to file any further objections to the Plan or to support any other party in objecting to or opposing the Plan and agrees it will support confirmation of the Plan.

**Turnkey Removal Agreement**

1. *Total Turnkey Amount*.

   a. Eni, FWE III and Credit Bid Purchaser agree to enter into a Turnkey Removal Agreement acceptable to Eni, FWE III, Credit Bid Purchaser, the Required DIP Lenders, and the Requisite FLTL Lenders, whereby Credit Bid Purchaser will decommission the Abandoned Properties on a turnkey payment basis, and Credit Bid Purchaser will earn a turnkey amount in exchange for completing each such decommissioning project. The total turnkey amount for each lease or facility comprising an Abandoned Property shall be set forth (i) on a gross 8/8ths basis (the "**Gross Decom Amount**") and (ii) on a net basis to Eni (such amount, the "**Eni (Net) Costs**"). The sum of each Gross Decom Amount for each lease and/or facility located at the Abandoned Properties shall not exceed $95,755,436.46 (the "**Total Decom Cost**"). The sum of all Eni (Net) Costs for each lease and/or facility located at the Abandoned Properties shall not exceed $57,325,130.98 ("**Total Eni (Net) Costs**"). The Total Decom Cost and Total Eni Cost

2

HESS EXHIBIT 12

may be adjusted for the Qualified Conditions and/or Regulatory Changes, as set forth below.  For the avoidance of doubt, each Gross Decom Amount for each Abandoned Property shall be inclusive of all operating expenses and all costs and expenses of decommissioning as required to meet the Performance Standard defined below. Subject to Section 1.b and Section 4 below, Eni shall have no obligation to pay the parties to this Term Sheet any costs or liability to perform any obligations associated with the decommissioning of any lease or facility comprising an Abandoned Property once Eni has paid Credit Bid Purchaser the applicable turnkey costs, as adjusted hereunder, for such lease or facility, as applicable.

b.  In order to facilitate the diligent and continuous performance of the decommissioning obligations set forth in this Term Sheet, Credit Bid Purchaser, FWE III, and Eni agree that Eni shall have the right, but not the obligation (in Eni's sole discretion) to make an irrevocable election to agree to pay to Credit Bid Purchaser the Gross Decom Amount for any such lease or facility comprising an Abandoned Property (such election, the "**Turnkey Election**"). In the event that Eni desires to make such a Turnkey Election, Eni shall provide Credit Bid Purchaser and FWE III written notice of its intent (a "**Turnkey Notice**") and Credit Bid Purchaser shall promptly commence the decommissioning contemplated for any such lease or facility. The decommissioning project schedule contained in the Turnkey Removal Agreement shall be modified to address any such Turnkey Election. Notwithstanding anything to the contrary contained in this Term Sheet or any other Definitive Document, in the event Eni makes a Turnkey Election, (i) Eni agrees to pay Credit Bid Purchaser the applicable Gross Decom Amount, as it may be increased, (ii) in the event  the actual cost to decommission the lease or facility, as applicable, associated with such Turnkey Election and excluding the costs addressed in Section 4 in accordance with the Performance Standard exceeds the Gross Decom Amount, as adjusted for the Qualified Conditions and/or Regulatory Changes, Credit Bid Purchaser shall assume the risk of any costs in excess of the Gross Decom Amount, as such amounts may be adjusted as a result of a Qualified Condition and/or Regulatory Changes, and (iii) Eni shall have the right to seek contribution from third parties for any share of the  Gross Decom Amount for any lease or facility comprising an Abandoned Property.  In the event Eni makes a Turnkey Election, it may assign its interest in the Turnkey Removal Agreement insofar as it covers such asset (to the extent it relates to Eni's prior undivided interests in the Abandoned Property) to any third party or parties with joint and several liability for such decommissioning, provided that Eni shall remain responsible for all of its obligations.

c.  Subject to the Qualified Conditions and Regulatory Changes provisions, Credit Bid Purchaser shall assume the risk that the costs of decommissioning each lease or facility comprising an Abandoned Property exceeds (i) the Eni (Net) Costs attributable to Eni's prior interest in such lease or facility, as applicable, in the event no Turnkey Election is made, or (ii) the Gross Decom Amount attributed to such lease or facility, as applicable, in the event a Turnkey Election is made. In the event of a Qualified Condition (as defined in Section 3 below), Eni and Credit Bid Purchaser shall share in any costs related to the Qualified Condition(s) in excess of the relevant Eni (Net) Costs (or the Gross Decom Amount if the Turnkey Election is made) up to, on an aggregated basis of all Abandoned Properties, $15,000,000 (the "**Qualified Condition Cap**") as follows: (i) Eni shall be responsible for the first $5,000,000 of costs related to Qualified Conditions, and (ii) Eni and Credit Bid Purchaser shall be responsible 75% / 25% respectively for the remaining cost up to the Qualified Condition Cap.  Eni's responsibility for any costs related to a Qualified Condition shall not commence until the full amount of the relevant Eni (Net) Costs, or if the Turnkey Election is made the relevant Gross Decom Amount, have been

HESS EXHIBIT 12

incurred. The calculation and application of these amounts (including such Qualified Condition Cap) shall be limited to the portion allocated to the Eni (Net Costs) in the event Eni did not elect to pay the Gross Decom Amount with regard to such asset. In the event that one or more Qualified Conditions results in costs that exceed the Qualified Condition Cap, Eni's liability for any additional costs shall terminate once the Qualified Condition Cap has been reached and Eni shall have no further liability for any costs or the performance of any obligations associated with any Qualified Condition.

d.   Credit Bid Purchaser will have profit opportunity following the completion of decommissioning for any lease or facility comprising an Abandoned Property if it is able to decommission any lease or facility comprising an Abandoned Property for a lower cost than the  (i) the Eni (Net) Costs, provided that Eni did not make a Turnkey Election for such asset or (ii) the Gross Decom Amount if a Turnkey Election was  made by Eni (including any increases to the applicable Eni (Net) Costs or Gross Decom Amount, respectively, for any Qualified Conditions or Regularly Conditions) attributed to such lease or facility comprising an Abandoned Property.

e.   FWE III's obligations under the Turnkey Removal Agreement for any specific Abandoned Property shall commence upon the earlier of (i) receipt by Eni and other joint and several liable parties of a BOEM/BSEE order requiring decommissioning of such Abandoned Property and after full funding for the project has been finalized, or (ii) a Turnkey Election by Eni for such Abandoned Property; provided that the decommissioning project schedule contained in the Turnkey Removal Agreement shall be modified to address either such event.

2.   *Services*. Services provided by Credit Bid Purchaser pursuant to the Turnkey Removal Agreement will include performing decommissioning operations at the Abandoned Properties to an agreed operational and regulatory performance standard on behalf of FWE III and Eni agree that Credit Bid Purchaser will meet such required standard if it performs such decommissioning operations consistent with required laws, rules and regulations promulgated by governing regulatory agencies, including but not limited to BOEM and BSEE, and consistent with any applicable third party contracts (the "**Performance Standards**").

3.   *Qualified Conditions*. At or before Closing, Credit Bid Purchaser and Eni shall determine the turnkey amounts on a project-by-project basis for all decommissioning projects under the Turnkey Removal Agreement (leases and facilities to be operated by FWE III) and shall agree on a decommissioning project schedule consistent with the terms set forth in Section 7 below, all of which shall be attached to the Turnkey Removal Agreement. The parties shall also agree upon certain qualified conditions for the decommissioning projects ("**Qualified Conditions**"), which such Qualified Conditions, if present, can, at the election of either Credit Bid Purchaser or Eni, as applicable, and subject to the notice requirements set forth in the Definitive Documents, cause the parties to adjust the applicable turnkey amount for a particular project or agree on alternative cost arrangement; provided that such Qualified Conditions shall be set forth in the Definitive Documents and shall be limited to the items listed on **Schedule 1** attached hereto. In the event the parties are unable to agree to the adjusted turnkey amount or an alternative cost arrangement due to an occurrence of a Qualified Condition, the parties shall follow the method set forth in the Definitive Documents.

4.   *Temporary Abandoned Wells and Excluded Wells*. Credit Bid Purchaser and Eni acknowledge and agree that there may be decommissioning obligations attributable to the wells identified on **Exhibit B** attached hereto which were purported to have been temporarily

4

plugged and abandoned as of the effective date of that certain *Purchase and Sale Agreement by and among Eni Petroleum US LLC and Eni US Operating Co. Inc., as Seller, and Fieldwood Energy Offshore LLC, a Purchaser, dated as of December 1, 2015* (the "**Comal PSA**"). Eni will be solely responsible for the costs associated with the decommissioning of the "Excluded Wells" (as such term is defined in the Comal PSA) and shall be solely responsible for the "Eligible Well Intervention Costs" (as such term is defined in the Comal PSA) for any "Temporary Abandoned Well" (as such term is defined in the Comal PSA) as provided in the following sentence.  Notwithstanding the foregoing, Eni shall have no obligation for (i) any costs or obligations attributable to any Temporary Abandoned Well in excess of the "Eligible Well Intervention Costs" associated with any such Temporary Abandoned Well, or (ii) any costs or obligations attributable to a Temporary Abandoned Well for which Eni's liability terminated pursuant to Section 7.19(e) of the Comal PSA. Notwithstanding anything herein to the contrary, in the event the Credit Bid Purchaser is required to handle Eni's obligations as addressed in this section, Eni shall promptly reimburse Credit Bid Purchaser for all costs and expenses incurred in connection therewith, together with a reasonable overhead charge in accordance with the COPAS attached to the Contract Operating Agreement defined in Section 2 of the Implementation and Funding Agreement and, for the avoidance of doubt, none of such costs, expenses or overhead shall be considered in the calculation of the Qualified Condition Cap. Such payment shall occur promptly upon completion of the work set forth in this section.

5. ***Regulatory Changes***.  In addition to the Qualified Conditions described on **Schedule 1** attached hereto, if any regulatory body either (i) issues new regulations that increase or materially change the cost to conduct decommissioning or (ii) designates additional sand sediment areas requiring pipeline removal as opposed to abandonment in place (if the turnkey amount for the particular pipeline assumes abandonment in place), Eni and Credit Bid Purchaser shall negotiate in good faith to adjust the applicable Gross Decom Amount to take into account the incremental costs to complete the project under the Turnkey Removal Agreement.  For the avoidance of doubt, new regulations include but are not limited to, NTLs, BSEE or BOEM national, regional or district policies, executive orders and new regulations in the CFRs that govern decommissioning. If the parties cannot agree on a revised Gross Decom Amount, the project shall be completed on a cost-plus 15% basis.

6. ***Surety Bonds***.  Eni may apply any available proceeds from bonds that cover the decommissioning costs associated with the Abandoned Properties to any amounts owed hereunder.  Eni will bear all costs and risks associated with such bonds and notwithstanding its failure to recover all or any bond proceeds, Eni will be required to pay the Total Eni (Net) Costs or Gross Decom Amount, as applicable pursuant to terms and conditions of this Term Sheet.

7. ***Payments***. Subject to Section 1.b and without limitation of Credit Bid Purchaser's obligation to perform the Initial Safe Out as provided in Section 9 below, Credit Bid Purchaser shall not undertake the applicable decommissioning project until full funding of the applicable Gross Decom Amount has been agreed to by Eni and Credit Bid Purchaser, including receiving or securing a contractual commitment (such as a decommissioning agreement) from applicable third parties. Eni will be required to pay Credit Bid Purchaser the Eni (Net) Costs or Gross Decom Amount (in the event a Turnkey Election was made pursuant to this Term Sheet), as applicable, attributable to the decommissioning activities performed for each lease or facility comprising an Abandoned Property upon delivery to FWE III and to Eni of the filings and other evidence (i) required by BOEM and/or BSEE or any other applicable governmental authority, including requisite approvals or regulatory concurrence, with regard to the satisfaction of decommissioning obligations with respect to the applicable asset to

HESS EXHIBIT 12

support Credit Bid Purchaser's representation that the applicable project has been completed; and (ii) an invoice and/or billing statement outlining in detail the decommissioning work actually performed for such lease or facility along with supporting documentation. Notwithstanding anything to the contrary herein, the payments made by Eni in satisfaction of the obligations set forth herein, shall not exceed $20,000,000 on an annual basis for any given year; provided that (i) if Eni has delivered the Turnkey Notice as provided in this Term Sheet or (ii) if Eni is required, pursuant to an order from any governmental or regulatory authority, to perform any decommissioning project on a schedule that is more accelerated than contemplated in the schedule set forth in the Turnkey Removal Agreement, then such annual limitation will be increased above $20,000,000 to the extent such increase is necessitated to perform the decommissioning activities contemplated in subparts (i) and (ii) of this sentence.

8. **Termination**. Eni retains the right to terminate the Turnkey Removal Agreement as to any particular lease or facility located at the Abandoned Properties and/or require FWE III to competitively bid the decommissioning services with respect to any particular lease or facility attributable to an Abandoned Property in the event Credit Bid Purchaser is in material breach of the Turnkey Removal Agreement in relation to the particular lease or facility. Credit Bid Purchaser or Eni may terminate the Turnkey Removal Agreement as to any particular lease or facility located at the Abandoned Properties if, within three (3) years from the effective date of the Turnkey Removal Agreement, a Turnkey Election is not made for such lease or facility or contractual commitments for full funding of the applicable Gross Decom Amount for such lease or facility have not been received.

9. **Initial Safe Out**. With respect to the Abandoned Properties, FWE III will engage Credit Bid Purchaser to promptly perform, operations necessary to safe-out and otherwise perform preparatory activities to put such Abandoned Properties, subject to Section 4, into a mechanical and operational state such that they are hydrocarbon free and ready to be decommissioned (the "**Initial Safe Out**"); provided, however that such Initial Safe Out shall be completed no later than December 31, 2021, unless agreed to in writing by Eni (such consent not to be unreasonably withheld, delayed or conditioned).

10. **Right of First Offer and Notice of Sale**. To the extent that any other predecessor-in-interest, in connection with the decommissioning of such predecessor-in-interest's prior assets, is granted a right of first offer, right of first refusal, or similar preferential purchase right in connection with any assets transferred to Credit Bid Purchaser pursuant to the Plan, Credit Bid Purchaser shall grant Eni rights that are substantially similar in connection with the Abandoned Properties.  After the Effective Date of the Plan, in the event that Credit Bid Purchaser desires to sell, transfer or otherwise dispose of any portion of its interests in any assets transferred to Credit Bid Purchaser pursuant to the Plan through a public marketing process utilizing a third party agent, investment bank, or similar service, Credit Bid Purchaser shall use reasonable efforts to cause such agent or investment bank to provide Eni with written notice and an opportunity to participate in any related sales process.

11. **Mutual Indemnity**. Credit Bid Purchaser and Eni shall indemnify one another for a material breach of their respective obligations under the Turnkey Removal Agreement; provided, however, the indemnity obligations set forth herein shall not include lost profit opportunity, indirect damages, consequential damages, third party claims, fines or penalties (except to the extent directly resulting from a material breach by the other party), attorney's fees, or any other third party costs.

12. **Audit Rights**. For each year the Turnkey Removal Agreement remains in effect and for up to twelve (12) months following the completion of the decommissioning obligations

6

|  | contemplated in this Term Sheet, Eni shall have the right to conduct, during normal business hours upon at least thirty (30) days' prior notice, an audit of Credit Bid Purchaser's records to the extent related to any amount charged to Eni hereunder. |

**Implementation and Funding Agreement**

1. ***Funding Contribution***. Without limitation of FWE's obligation to perform the Agreed Activities pursuant to the Plan, FWE will contribute on the Effective Date $3 million to FWE III (the "**Contribution Amount**"), which amount will be used solely in connection with the Abandoned Properties and partially in satisfaction of Eni's obligation to pay the Total Eni (Net) Costs.

2. ***Operating Costs***.  From and after the Effective Date and subject to Section 4 above, Credit Bid Purchaser will manage on behalf of FWE III the Abandoned Properties until the commencement of the decommissioning pursuant to a mutually acceptable contract operating agreement between FWE III and Credit Bid Purchaser (the "**Contract Operating Agreement**").  Except as set forth in Section 4 above, Eni shall not be responsible for any operating costs associated with Eni's interests in the Abandoned Properties. Management of the properties shall include, but not be limited to, as services provided: operations, production marketing (for producing assets), accounting and land administration.

3. ***Legal Fees***.  FWE/FWE III, as applicable, will pay for Eni's reasonable and documented legal fees incurred in connection with the Debtors' chapter 11 cases, up to a cap of $1.5 million.

4. ***ORRI***. To the extent that any other predecessor-in-interest is granted an overriding royalty interest or similar future interest in Credit Bid Purchaser's production prior to the Effective Date in connection with the decommissioning of such predecessor-in-interest's prior assets, FWE shall grant Eni a similar and proportionate interest in connection with Eni's turnkey removal payments.

HESS EXHIBIT 12

**Exhibit "A"**
**Abandoned Properties**

| Block | Lease |
|-------|-------|
| SS 246 | OCS-G 01027 |
| VR 313 | OCS-G 01172 |
| SS 247 | OCS-G 01028 |
| SS 248 | OCS-G 01029 |
| SS 249 | OCS-G 01030 |
| SS 270 | OCS-G 01037 |
| WC 72 | OCS-G 23735 |

End of Exhibit "A"

HESS EXHIBIT 12

**Exhibit "B"**
**Temporary Abandoned Wells**

HESS EXHIBIT 12

## EXHIBIT B
## TEMPORARY ABANDONED WELLS

| API | LEASE | AREA | BLOCK | WELL NAME | SUFFIX | Status |
|---|---|---|---|---|---|---|
| 42-706-40442-00 | OCS-G15740 | Galveston | 151 | 5 | ST00BP00 | Temporarily Abandoned. Operated by Fieldwood. |
| 17-712-40057-00 | OCS-G 01027 | Ship Shoal | 246 | A-001 | ST00BP00 | TA 2010. 13 3/8" CICR @ 164' BML with 120' surface cement plug f/ 164' to 44' BML. 13 3/8" and 20" removed to 25' BML. Top of 30" is +/ 5" AML. Need to remove 30" to 15' BML when platform is removed. |
| 17-712-40074-00 | OCS-G 01027 | Ship Shoal | 246 | A-002 | ST00BP02 | TA 2001. LS@ 1357', SS@ 1424'. Spotted cmt plugs in LS 10100'-9800' and 3100' - 2800'. CICR @ 1300' with 200' cmt on top f/ 1300' - 1100'. Need to PT & BT annuli, set surface cmt plug and remove 7", 9 5/8", 13 3/8", 20" and 26" casings to 15' BML. |
| 17-712-40102-00 | OCS-G 01027 | Ship Shoal | 246 | A-009 | ST00BP00 | TA 2001. Casing damage at 9764'. 7", 29# CIBP at 9000' with 200' cement plug f/ 8800' - 9000'. Displace well w/ 13.5ppg WBM. Test cmt plug w/ 1000 psi. Need to PT & BT annuli and set additional cement plugs as required by BSEE. Remove 7", 9 5/8", 13 3/8", 20", and 26" at 15' BML. |
| 17-712-40224-00 | OCS-G01028 | Ship Shoal | 247 | F-010 | ST00BP00 | TA 2013. Surface cement plug @ 70' BML. Need to cut 7 5/8", 10 ¾", 16" & 26" at 15' BML |
| 17-712-40221-00 | OCS-G01029 | Ship Shoal | 248 | F-008 | ST00BP00 | TA 2000. 197' surface cement plug at 81' - 278' BML. 7 5/8" casing cut at 276' and 186' BML, could not pull. Cemented to surface. Need to PT & BT all annuli and remove 7 5/8", 10 3/4", 16" and 26" to 15' BML. |
| 17-712-40131-00 | OCS-G01028 | Ship Shoal | 247 | D-003 | ST00BP02 | TA 2013. 205' surface cement plug f/ 50' - 255' BML in 7". Need to PT & BT all annuli and remove 7", 9 5/8", 13 3/8", 20" and 26" casings to 15' BML. |
| 17-712-40156-00 | OCS-G01028 | Ship Shoal | 247 | D-007 | ST00BP03 | TA 2013. Surface cement plug @ 100' BML. Need to cut 10 ¾", 16", & 26" at 15' BML. |
| 17-712-40166-00 | OCS-G01028 | Ship Shoal | 247 | D-009 | ST00BP00 | TA 1999. Casing restriction @ 11195'. CICR @ 11150' with 370' cement plug on top f/ 11150' - 10780'. 7" wellbore has 13.0 ppg WBM. Need to PT & BT all annuli, set additional cmt plugs as required by BSEE and remove 7", 9 5/8", 13 3/8" 20" and 26" to 15' BML. |
| 17-712-40179-03 | OCS-G01028 | Ship Shoal | 247 | D-012 | ST03BP00 | TA 2013. Highest cement plug @ 789' BML. Need to set surface cement plug. PT & BT. Cut 9 5/8", 13 3/8", 18 5/8" & 26" at 15' BML. |
| 17-712-40150-0 | OCS-G01029 | Ship Shoal | 248 | D-006 | ST00BP00 | TA 1977. Drilled and TA'd 1977. Highest cement plug (150') f/ 420' - 540' RKB (150' - 300' BML). 17.5 ppg WBM in wellbore. Need to tag cement plug at 150' BML, circulate clean with seawater, set 9 5/8" CIBP at TOC and spot +/- 50' cement on top. PT & BT annuil. Remove 9 5/8", 13 3/8", 20" and 26" casings to 15' BML. |

1 of 3

HESS EXHIBIT 12

## EXHIBIT B
## TEMPORARY ABANDONED WELLS

| API | LEASE | AREA | BLOCK | WELL NAME | SUFFIX | Status |
|-----|-------|------|-------|-----------|--------|--------|
| 17-712-40206-00 | OCS-G01029 | Ship Shoal | 248 | D-015 | ST00BP00 | TA 2013. Highest cement plug @ 900' RKB (620' BML). Need to set surface cement plug. PT & BT. Cut 7 5/8", 10 ¾", 16" & 26" at 15' BML. |
| 17-712-40210-00 | OCS-G01029 | Ship Shoal | 248 | D-016 | ST00BP00 | TA 2014. Highest cement plug @ 670' RKB (390' BML). Need to set surface cement plug. PT & BT. Cut 7 5/8", 10 ¾", 16" & 26" at 15' BML. |
| 17-712-40211-00 | OCS-G01029 | Ship Shoal | 248 | D-018 | ST00BP00 | TA 2013. Highest cement plug @ 900' RKB (620' BML). Need to set surface cement plug. PT & BT. Cut 7 5/8", 10 ¾", 16" & 26" at 15' BML. |
| 17-712-40530-00 | OCS-G01029 | Ship Shoal | 248 | G-002 | ST00BP00 | TA 2013. Surface cement plug @ 124' BML. Need to cut 9 5/8", 13 3/8" & 26" at 15' BML. |
| 17-712-40533-00 | OCS-G01029 | Ship Shoal | 248 | G-003 | ST00BP00 | TA 2013. Surface cement plug @ 45' BML. Need to cut 9 5/8", 13 3/8", 20" & 26" at 15' BML. |
| 17-712-40120-00 | OCS-G01030 | Ship Shoal | 249 | D-002 | ST00BP00 | TA 2013. Highest cement plug @ 620' BML. Need to set surface cement plug. PT & BT. Cut 7", 9 5/8", 13 3/8", 20" & 26" at 15' BML. |
| 17-712-40159-00 | OCS-G01030 | Ship Shoal | 249 | D-008 | ST00BP00 | TA 2013. Surface cement plug @ 90' BML. Need to cut 7", 9 5/8", 13 3/8", 20" & 26" at 15' BML. |
| 17-712-40171-00 | OCS-G01030 | Ship Shoal | 249 | D-004 | ST00BP00 | TA 1978. Drilled and TA'd in 1978. Highest cement plug (150') at 465' - 315' RKB (185' - 35' BML). Plug tested 1000 psi. 15.9 ppg WBM in wellbore. Need to PT & BT annuli and remove 9 5/8", 13 3/8", 20" and 26" casings to 15' BML. |
| 17-712-40192-00 | OCS-G01030 | Ship Shoal | 249 | D-014 | ST00BP01 | TA 1978. Drilled and TA'd in 1978. Highest cement plug f/ 10120' to 10389' (269'). Set 9 5/8" CICR @ 10170'. Squeeze 61 sxs below (219') and spot 50' on top of CR.  9 5/8" shoe @ 10239'. 16.8 ppg WBM in wellbore. Need to PT & BT annuli, spot additional cement plugs as required by BSEE and remove 9 5/8", 13 3/8", 20" and 26" casings to 15' BML. |
| 17-712-40208-00 | OCS-G01030 | Ship Shoal | 249 | D-017 | ST00BP00 | TA 2013. Highest cement plug @ 620' BML. Need to set surface cement plug. PT & BT. Cut 7 5/8", 10 ¾", 16" & 26" at 15' BML. |
| 17-712-40215-00 | OCS-G01030 | Ship Shoal | 249 | D-019 | ST00BP00 | TA 2013. Highest cement plug @ 820' BML. Need to set surface cement plug. PT & BT. Cut 7", 9 5/8", 13 3/8", 20" & 26" at 15' BML. |
| 17-712-40622-00 | OCS-G04421 | Ship Shoal | 249 | 6 | ST00BP00 | TA 2001. 7 5/8" CIBP set at 200' BML, no cement.  Need to spot surface cement plug on CIBP.  Cut 16" and 24" at 15' BML. |
| 17-705-40778-00 | OCS-G04421 | Vermilion | 78 | A001 | ST00BP00 | Temporarily Abandoned.  Operated by Fieldwood. |
| 17-706-40281-00 | OCS-G01172 | Vermilion | 313 | B001 | ST00BP01 | TA 2014.  Surface cement plug @ 110' BML. Need to cut 10 ¾", 16" & 26" at 15' BML. |
| 17-706-40297-00 | OCS-G01172 | Vermilion | 313 | B002 | ST00BP00 | TA 2014.  Surface cement plug @ 110' BML. Need to cut 7 5/8", 10 ¾", 16" & 26" at 15' BML. |

2 of 3

**HESS EXHIBIT 12**

# EXHIBIT B
## TEMPORARY ABANDONED WELLS

| API | LEASE | AREA | BLOCK | WELL NAME | SUFFIX | Status |
|---|---|---|---|---|---|---|
| 17-706-40314-00 | OCS-G01172 | Vermilion | 313 | B004 | ST00BP00 | Listed in BSEE database (and OWL) as P&A in 1978. HOWEVER THE CASINGS AND WELLHEADS ARE STILL IN PLACE ON PLATFORM. SO IT IS ACTUALLY TA'd. Drilled and TA'd in 1978. Set 10 3/4" CICR at 3425'. Squeezed 75 sxs cmt below CR and left 25 sxs on top. Highest cement plug (155') f/ 605' - 450' RKB (322'- 167' BML). Surface plug tested to 2000 psi. 13.8 ppg WBM left in wellbore. Need to PT & BT annuli, tag plug at 450', circulate clean with seawater, complete surface plug with additional +/- 60' of cement and remove 10 3/4", 16" and 26" casings to 15' BML. |
| 17-706-40319-00 | OCS-G01172 | Vermilion | 313 | B006 | ST00BP00 | TA 2014. Surface cement plug @ 110' BML. Need to cut 7 5/8", 10 ¾", 16" & 26" at 15' BML. |
| 17-706-40327-00 | OCS-G01172 | Vermilion | 313 | B007 | ST00BP00 | TA 1978. Drilled and TA'd in 1978. Highest cement plug (150') at 450'-600' RKB (167' - 317' BML). 13.7ppg WBM in wellbore. Need to spot additional +/- 50' cement to complete surface plug, PT & BT annuli and remove 10 3/4", 16" and 26" casings to 15' BML. |
| 17-706-40338-01 | OCS-G01172 | Vermilion | 313 | B009 | ST01BP00 | TA 2014. Surface cement plug @ 110' BML. Need to cut 7 5/8", 10 ¾", 16" & 26" at 15' BML. |
| 17-706-40371-00 | OCS-G01172 | Vermilion | 313 | B011 | ST00BP00 | TA 2014. Surface cement plug @ 110' BML. Need to cut 7 5/8", 10 ¾", 16" & 26" at 15' BML. |
| 17-706-40719-00 | OCS-G01172 | Vermilion | 313 | C002 | ST00BP00 | TA 2014. Surface cement plug @ 98' BML. Need to cut 7", 10 ¾", 16" & 30' at 15' BML. |
| 17-706-40722-00 | OCS-G01172 | Vermilion | 313 | C003 | ST00BP00 | TA 2014. Surface cement plug @ 96' BML. Need to cut 7", 10 ¾", 16" & 30' at 15' BML. |
| 17-706-40720-00 | OCS-G01172 | Vermilion | 313 | C004 | ST00BP00 | TA 2014. Surface cement plug @ 100' BML. Need to cut 7", 10 ¾", 16" & 30' at 15' BML. |

3 of 3

HESS EXHIBIT 12

**Schedule 1**

Qualified Conditions

1) To the extent that any well comprising an Abandoned Property that is not assigned a Gross Decom Amount requires the performance of any decommissioning activities, Eni and Credit Bid Purchaser shall agree to a Gross Decom Amount before commencing any decommissioning activities; provided, however, Temporary Abandoned with no estimated cost will not be subject to the Qualified Condition Cap.

2) For a period of up to eighteen (18) months after the effective date of the Turnkey Removal Agreement, any damage to an Abandoned Property due to a wind-storm, weather damage, or other casualty events associated with severe tropical weather arising after the effective date of the Turnkey Removal Agreement; provided, however, any damage to any platform related to ingress and egress shall not be a Qualified Condition.

3) To the extent that any pipeline comprising an Abandoned Property is required  to be buried where the Turnkey Removal Agreement does not already assume burial, the incremental cost (above the agreed Gross Decom Amount) shall be performed at cost and the Gross Decom Amounts and Eni (Net) Costs shall be proportionately adjusted subject to Section 1.c of the Term Sheet, provided that Eni and Credit Bid Purchaser shall agree to a Gross Decom Amount before commencing any such activities.

End of Schedule "1"

HESS EXHIBIT 12