**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | | |
|---|---|---|
| **In re:** | § | **Chapter 11** |
| | § | |
| **FIELDWOOD ENERGY LLC, *et al.*,** | § | **Case No. 20-33948 (MI)** |
| | § | |
| Debtors.[1] | § | **(Jointly Administered)** |
| | § | |

**PROPOSED FINDINGS OF FACT, CONCLUSIONS OF LAW, AND
ORDER (I) CONFIRMING SEVENTH AMENDED JOINT CHAPTER 11
PLAN OF FIELDWOOD ENERGY LLC AND ITS AFFILIATED
<u>DEBTORS AND (II) GRANTING RELATED RELIEF</u>[2]**

**WHEREAS**, Fieldwood Energy LLC ("**FWE**") and each of its affiliated debtors and

debtors in possession in the above-captioned chapter 11 cases (collectively, the "**Debtors**"), as

"proponents of the plan" within the meaning of section 1129 of title 11 of the United States Code

(the "**Bankruptcy Code**"), filed the *Seventh Amended Joint Chapter 11 Plan of Fieldwood Energy*

*LLC and its Affiliated Debtors*, dated June 24, 2021 (ECF No. 1716) (including any exhibits and

schedules thereto as may be further amended, supplemented, or modified, the "**Plan**") and the

*Disclosure Statement for Fourth Amended Joint Chapter 11 Plan of Fieldwood Energy LLC and*

*its Affiliated Debtors*, April 15, 2021 (ECF No. 1285) (the "**Disclosure Statement**");[3]

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, as applicable, are:  Dynamic Offshore Resources NS, LLC (0158); Fieldwood Energy LLC (6778); Fieldwood Energy Inc. (4991); Fieldwood Energy Offshore LLC (4494); Fieldwood Onshore LLC (3489); Fieldwood SD Offshore LLC (8786); Fieldwood Offshore LLC (2930); FW GOM Pipeline, Inc. (8440); GOM Shelf LLC (8107); Bandon Oil and Gas GP, LLC (9172); Bandon Oil and Gas, LP (9266); Fieldwood Energy SP LLC (1971); Galveston Bay Pipeline LLC (5703); and Galveston Bay Processing LLC (0422).  The Debtors' primary mailing address is 2000 W. Sam Houston Parkway S., Suite 1200, Houston, TX  77042.

[2] This Order remains subject to the review of the Debtors, the RSA parties, and other stakeholders, including, the review and comment of the Required DIP Lenders and Requisite FLTL Lenders.  All rights are reserved.

[3] Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to such terms in the Plan, a copy of which is annexed hereto as **<u>Exhibit A</u>**.  Any term used in the Plan or this order (the "**Order**") that is not defined in the Plan or this Order, but that is used in the Bankruptcy Code or the Federal Rules of Bankruptcy Procedure

**WHEREAS**, on April 15, 2021, after due and proper notice and a hearing, the Court entered the *Amended Order (I) Approving Disclosure Statement and Form and Manner of Notice of Disclosure Statement Hearing; (II) Establishing Solicitation and Voting Procedures; (III) Scheduling Confirmation Hearing; (IV) Establishing Notice and Objection Procedures for Confirmation of the Proposed Plan; (V) Approving Notice and Objection Procedures for the Assumption of Executory Contracts and Unexpired Leases; (VI) Approving Procedures for Objections to the Assignment and Transfer of Property of the Estate; and (VII) Granting Related Relief* (ECF No. 1286) (together with any schedules and exhibits thereto, the "**Disclosure Statement Order**"), which, pursuant to sections 105, 365, 1125, 1126, 1128, and 1145 of the Bankruptcy Code, Bankruptcy Rules 2002, 3001, 3003, 3016, 3017, 3018, 3020, 6004, and 9006, and Rules 2002-1 and 3016-1 of the Local Bankruptcy Rules for the United States Bankruptcy Court for the Southern District of Texas (the "**Local Rules**"), among other things, (i) approved the Disclosure Statement, (ii) established solicitation and voting procedures, (iii) established notice and objection procedures in respect of confirmation of the Plan, including the form and method of notice of the hearing to consider confirmation of the Plan (the "**Confirmation Hearing**"), and (iv) established procedures for the assumption and rejection of executory contracts and unexpired leases under the Plan;

**WHEREAS,** the Debtors filed and served the *Notice of Entry of Amended Order (I) Approving Disclosure Statement and Form and Manner of Notice of Disclosure Statement Hearing; (II) Establishing Solicitation and Voting Procedures; (III) Scheduling Confirmation Hearing; (IV) Establishing Notice and Objection Procedures for Confirmation of the Proposed*

---

(the "**Bankruptcy Rules**") shall have the meaning ascribed to such term in the Bankruptcy Code or the Bankruptcy Rules, as applicable.

*Plan; (V) Approving Notice and Objection Procedures for the Assumption of Executory Contracts and Unexpired Leases; (VI) Approving Procedures for Objections to the Assignment and Transfer of Property of the Estate; and (VII) Granting Related Relief* (ECF No. 1290) (the "**Confirmation Hearing Notice**") on April 15, 2021;

**WHEREAS**, pursuant to the Disclosure Statement Order, the Court set the voting deadline for the Plan at June 2, 2021 at 4:00 p.m. (prevailing Central Time) (the "**Voting Deadline**") and the deadline to file an objection to confirmation of the Plan at June 2, 2021 at 11:59 p.m. (prevailing Central Time) (the "**Plan Objection Deadline**");

**WHEREAS**, on April 19, 2021, the Debtors caused to be transmitted (i) as to holders of Claims in Class 1 (Other Secured Claims), Class 3 (FLFO Claims), Class 4 (FLTL Claims), Class 5 (SLTL Claims), Class 6A (Unsecured Trade Claims), and Class 6B (General Unsecured Claims) entitled to vote on the Proposed Plan: (a) the Confirmation Hearing Notice; (b) a USB flash drive containing the Disclosure Statement, the Plan, and the Disclosure Statement Order; (c) an appropriate ballot, substantially in the form annexed to the Disclosure Statement Order as **Exhibits 2, 3, 4, 5, 6 and 7** (a "**Ballot**"), as applicable; and (d) a postage-prepaid return envelope (all of the foregoing, collectively, the "**Solicitation Packages**"); and (ii) as to holders of Class 2 (Priority Non-Tax Claims), Class 8 (Subordinated Securities Claims) and Class 10 (Existing Equity Interests), (a) the Confirmation Hearing Notice; and (b) a notice of non-voting status (a "**Notice of Non-Voting Status**") in the form annexed to the Disclosure Statement Order as **Exhibit 8,** as set forth in the *Affidavit of Service* (ECF No. 1309) executed by Alex Orchowski of the Debtors' Court-appointed claims and noticing agent, Prime Clerk, LLC (the "**Solicitation Agent**") on April 23, 2021 (the "**Solicitation Materials Declaration**"), evidencing the timely service of the Solicitation Packages;

**WHEREAS**, on May 26, 2021, the Debtors filed the *Notice of Filing of Plan Supplement in Connection with Fourth Amended Joint Chapter 11 Plan of Fieldwood Energy LLC and its Affiliated Debtors* (ECF No. 1394) (the "**Plan Supplement**"), which includes the following documents: (i) the Amended Organizational Documents for FWE I; (ii) the Schedule of Retained Causes of Action; (iii) the Schedule of Assumed Contracts; (iv) the Credit Bid Purchase Agreement; (v) the Apache Definitive Documents; (vi) the First Lien Exit Facility Agreement; (vii) the Chevron Term Sheet; (viii) the Eni Term Sheet; (ix) the Hunt Term Sheet; and (x) the Oil and Gas Lease Schedules;

**WHEREAS**, on May 27, 2021, the Debtors filed the *Notice to Contract Parties to Executory Contracts and Unexpired Leases of the Schedule of Assumed Contracts and Cure Amounts* (ECF No. 1395) (the "**Assumption Notice**"), which includes the schedule of executory contracts and unexpired leases to be assumed by the Debtors pursuant to the Plan (as may be further amended, supplemented, or modified, the "**Schedule of Assumed Contracts**");

**WHEREAS**, on June 11, 2021, the Debtors filed the *Notice of Filing of Second Amended Schedule of Assumed Contracts and Cure Amounts* (ECF No. 1549) (the "**Amended Assumption Notice**");

**WHEREAS**, on June 15, 2021, the Debtors filed the *Notice of Filing of Amended Plan Supplement in Connection with Fourth Amended Joint Chapter 11 Plan of Fieldwood Energy LLC and its Affiliated Debtors* (ECF No. 1562) (the "**Amended Plan Supplement**"), which includes the following documents: (i) the Amended Organizational Documents for FWE I; (ii) the Schedule of Retained Causes of Action; (iii) the Schedule of Assumed Contracts; (iv) the Plan Administrator Agreement; (v) the Credit Bid Purchase Agreement; (vi) the NewCo Organizational Documents; (vii) the Apache Definitive Documents; (viii) the First Lien Exit Facility Credit Agreement;

(ix) the Second Lien Exit Facility Credit Agreement; (x) the New Money Warrant Agreement; (xi) the GUC/SLTL Form Warrant Agreement; (xii) the Chevron Definitive Documents; (xiii) the Eni Definitive Documents; (xiv) the Hunt Term Sheet; and (xv) the Oil and Gas Lease Schedules;

**WHEREAS**, on June 16, 2021, the Debtors filed the *Notice of Filing of Second Amended Plan Supplement in Connection with Fourth Amended Joint Chapter 11 Plan of Fieldwood Energy LLC and its Affiliated Debtors* (ECF No. 1587) (the "**Second Amended Plan Supplement**"); the *Notice of Filing of Third Amended Plan Supplement in Connection with Fifth Amended Joint Chapter 11 Plan of Fieldwood Energy LLC and its Affiliated Debtors* (ECF No. 1642) (the "**Third Amended Plan Supplement**"); and the *Notice of Filing of Fourth Amended Plan Supplement in Connection with Fifth Amended Joint Chapter 11 Plan of Fieldwood Energy LLC and its Affiliated Debtors* (ECF No. 1645) (the "**Fourth Amended Plan Supplement**" and, together with the Plan Supplement, First Amended Plan Supplement, Second Amended Plan Supplement, and the Third Amended Plan Supplement, and any future supplements thereto the "**Plan Supplements**"), which included the following documents: (i) the Required Disclosures Under Section 1129(a)(5); (ii) the NewCo Organizational Documents; (iii) the New Intercreditor Agreement; (iv) the GUC/SLTL Form Warrant Agreement; and (v) the Oil and Gas Lease Schedules;

**WHEREAS**, the Confirmation Hearing was held on June [21–24], 2021;

**WHEREAS**, the following declarations (collectively, the "**Declarations**") were filed in support of confirmation of the Plan and were admitted into evidence at the Confirmation Hearing:

i.   *Declaration of Alex Orchowski of Prime Clerk LLC Regarding Solicitation of Votes and Tabulation of Ballots Cast on the Fourth Amended Joint Chapter 11 Plan of Fieldwood Energy LLC and its Affiliated Debtors* (ECF No. 1521) (the "**Voting Declaration**");

ii.  *Declaration of John-Paul Hanson in Support of Confirmation of the Debtors' Fourth Amended Joint Chapter 11 Plan of Fieldwood Energy LLC and its Affiliated Debtors* (ECF No. 1556) (the "**Hanson Declaration**"); and

iii. *Declaration of Marc J. Brown in Support of Debtors' Fourth Amended Joint Chapter 11 Plan of Fieldwood Energy LLC and its Affiliated Debtors* (ECF No. 1555) (the "**Brown Declaration**").

**NOW, THEREFORE**, based on the Hanson Declaration, the Brown Declaration, the Voting Declaration, the record of the Confirmation Hearing, including all the evidence proffered or adduced, and the arguments of counsel made, at the Confirmation Hearing, and the entire record of the Chapter 11 Cases (as defined herein); and after due deliberation thereon and sufficient cause appearing therefor,

**IT IS HEREBY FOUND AND DETERMINED THAT:**

**FINDINGS OF FACT AND CONCLUSIONS OF LAW**

A.      <u>Findings of Fact and Conclusions of Law</u>.  The findings of fact and conclusions of law set forth herein, together with the findings of fact and conclusions of law set forth in the record of the Confirmation Hearing, constitute the Court's findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052, made applicable to this proceeding pursuant to Bankruptcy Rule 9014.  To the extent any of the following findings of fact constitute conclusions of law, they are adopted as such.  To the extent any of the following conclusions of law constitute findings of fact, they are adopted as such.

B.      <u>Exclusive Jurisdiction; Venue; Core Proceeding (28 U.S.C. §§ 157(b)(2), 1334(a))</u>. The Court has jurisdiction over the Chapter 11 Cases pursuant to 28 U.S.C. § 1334.  Venue is proper under 28 U.S.C. §§ 1408 and 1409.  Confirmation of the Plan is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(L), and other findings and orders contained herein are also core proceedings pursuant to 28 U.S.C. 157(b)(2) and the Court has exclusive jurisdiction to determine whether the Plan complies with the applicable provisions of the Bankruptcy Code and should be confirmed.  The Debtors consent to the entry of a final order by the Court in accordance with the terms set forth herein to the extent that it is later determined that the Court, absent consent of the

parties, cannot enter final orders or judgments consistent with Article III of the United States Constitution.  The Debtors are eligible debtors under section 109 of the Bankruptcy Code. The Debtors are proper plan proponents under section 1121(a) of the Bankruptcy Code.

C.    Chapter 11 Petitions.  On August 3, 2020 and August 4, 2020, as applicable, (the "**Petition Date**"), each Debtor commenced with this Court a voluntary case under chapter 11 of the Bankruptcy Code (the "**Chapter 11 Cases**").  The Debtors are authorized to continue to operate their businesses and manage their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  No trustee or examiner has been appointed in these Chapter 11 Cases.  The Debtors' Chapter 11 Cases are being jointly administered for procedural purposes only pursuant to Bankruptcy Rule 1015(b).

D.    The Creditors' Committee.  On August 18, 2020, the United States Trustee for Region 7 (the "**U.S. Trustee**") appointed the Creditors' Committee pursuant to section 1102 of the Bankruptcy Code (ECF No. 183).  On January 1, 2021 (ECF No. 744), and again on February 19, 2021 (ECF No. 895), the U.S. Trustee reconstituted the Creditors' Committee pursuant to section 1102 of the Bankruptcy Code.

E.    Judicial Notice.  The Court takes judicial notice of the docket of the Chapter 11 Cases maintained by the Clerk of the Court and/or its duly-appointed agent, including, without limitation, all pleadings and other documents filed, all orders entered, and the evidence and arguments made, proffered, or adduced at the hearings held before the Court during the pendency of the Chapter 11 Cases, including, but not limited to, the hearing to consider the adequacy of the Disclosure Statement and all hearings held in the adversary proceedings including the adversary proceeding styled *Fieldwood Energy, LLC and GOM Shelf LLC v. Everest Reinsurance Co., Phila. Indem. Ins. Co., HCC Int'l Ins. Co. PLC, Apache Corp., Apache Shelf, Inc., Apache Deepwater*

*LLC, and Apache Shelf Expl. LLC*, Ch. 11, Case No. 20-33948, Adv. No. 21-03418 (Bankr. S.D. Tex. 2021) (the "**Apache/Sureties Adversary Proceeding**") and the adversary proceeding styled *Fieldwood Energy LLC v. Atlantic Maritime Services, LLC*, Ch. 11, Case No. 20-33948, Adv. No. 20-03476 (Bankr. S.D. Tex. 2020) (the "**Atlantic Adversary Proceeding**").  Any resolution of objections to the confirmation of the Plan explained on the record at the Confirmation Hearing is hereby incorporated by reference.

F.      Burden of Proof.    The Debtors have satisfied their burden of proving by a preponderance of the evidence that the Plan satisfies the requirements of section 1129(a) and (b) of the Bankruptcy Code.

G.      Transmittal and Mailing of Materials; Notice.    The Solicitation Packages, which were transmitted and served as set forth in the *Affidavit of Service of Solicitation Materials* dated April 23, 2021 (ECF No. 1309-7) have been transmitted and served in compliance with the Disclosure Statement Order, the Bankruptcy Rules, and the Local Rules.  Such transmittal and service were adequate and sufficient, and no other or further notice is or shall be required.

H.      Voting.    Votes to accept or reject the Plan have been solicited and tabulated fairly, in good faith, and in a manner consistent with the Bankruptcy Code, the Bankruptcy Rules and the Disclosure Statement Order.  *See* Voting Declaration.

I.      Plan Supplements.    The Debtors filed the Plan Supplements, which include, among other things: (i) the Amended Organizational Documents; (ii) information regarding (a) the sole manager and independent director to be appointed at FWE I to the extent known and determined and other information required to be disclosed in accordance with section 1129(a)(5) of the Bankruptcy Code, (b) the Plan Administrator and other required disclosures in connection with FWE III, and (c) the sole manager to be appointed at FWE IV to the extent known and determined

and other information required to be disclosed in accordance with section 1129(a)(5) of the Bankruptcy Code; (iii) a schedule of retained Causes of Action; (iv) the Schedule of Assumed Contracts; (v) the Plan Administrator Agreement; (vi) the Credit Bid Purchase Agreement; (vii) the NewCo Organizational Documents; (viii) the First Lien Exit Facility Credit Agreement; (ix) the Second Lien Exit Facility Credit Agreement; (x) the New Intercreditor Agreement; (xi) the New Money Warrant Agreement; (xii) the GUC Warrant Agreement; (xiii) the SLTL Warrant Agreement; (xiv) the Chevron Definitive Documents; (xv) the Apache Definitive Documents; (xvi) the ENI Definitive Documents; and (xvii) the Hunt Term Sheet.  All such materials contained in any Plan Supplements comply with the terms of the Plan, and the filing and notice of such documents is good and proper in accordance with the Bankruptcy Code, the Bankruptcy Rules, the Local Rules and all other applicable rules, laws, and regulations, and no other or further notice is or shall be required.

J.      Bankruptcy Rule 3016(a).  In accordance with Bankruptcy Rule 3016(a), the Plan is dated and identifies the Debtors as the proponents of the Plan.

**Compliance with the Requirements of Section 1129 of the Bankruptcy Code**

K.      Plan Compliance with Bankruptcy Code – 11 U.S.C. § 1129(a)(1).  The Plan complies with all applicable provisions of the Bankruptcy Code, thereby satisfying section 1129(a)(1) of the Bankruptcy Code.

1.      Proper Classification – 11 U.S.C. §§ 1122, 1123(a)(1).  In addition to Administrative Expense Claims, Fee Claims, Priority Tax Claims, and DIP Claims, which need not be classified, the Plan designates the following Classes of Claims and Interests: Class 1 (Other Secured Claims), Class 2 (Priority Non-Tax Claims), Class 3 (FLFO Claims), Class 4 (FLTL Claims), Class 5 (SLTL Claims), Class 6A (Unsecured Trade Claims), Class 6B (General Unsecured Claims), Class 7 (Intercompany Claims), Class 8 (Subordinated Securities Claims),

Class 9 (Intercompany Interests), and Class 10 (Existing Equity Interests). The Claims and Interests placed in each Class are substantially similar to other Claims and Interests, as the case may be, in each such Class. Valid business, factual, and legal reasons exist for separately classifying the various Classes of Claims and Interests created under the Plan, and such classification does not unfairly discriminate between holders of Claims and Interests. Accordingly, the Plan satisfies sections 1122 and 1123(a)(1) of the Bankruptcy Code.

2. <u>Specified Unimpaired Classes – 11 U.S.C. § 1123(a)(2)</u>. Section 3 of the Plan specifies that Class 2 (Priority Non-Tax Claims), Class 7 (Intercompany Claims), and Class 9 (Intercompany Interests) are unimpaired under the Plan, thereby satisfying section 1123(a)(2) of the Bankruptcy Code.

3. <u>Specified Treatment of Impaired Classes – 11 U.S.C. § 1123(a)(3)</u>. Section 3 of the Plan designates Class 1 (Other Secured Claims), Class 3 (FLFO Claims), Class 4 (FLTL Claims), Class 5 (SLTL Claims), Class 6A (Unsecured Trade Claims), Class 6B (General Unsecured Claims), Class 8 (Subordinate Securities Claims), and Class 10 (Existing Equity Interests) as impaired, and Section 4 of the Plan specifies the treatment of Claims and Interests in such Classes, thereby satisfying section 1123(a)(3) of the Bankruptcy Code.

4. <u>No Discrimination – 11 U.S.C. § 1123(a)(4)</u>. The Plan provides for the same treatment of each Claim or Interest in each respective Class or subclass unless the holder of a particular Claim or Interest has agreed to a less favorable treatment of its Claim or Interest, thereby satisfying section 1123(a)(4) of the Bankruptcy Code.

5. <u>Implementation of Plan – 11 U.S.C. § 1123(a)(5)</u>. The Plan and the various documents and agreements referred to therein or set forth in the Plan Supplements and the exhibits and schedules to the Plan provide adequate and proper means for the Plan's implementation

(thereby satisfying section 1123(a)(5) of the Bankruptcy Code), including, without limitation: (i) the compromise and settlement of Claims, Interests, and controversies; (ii) the Credit Bid Transaction and Confirmation Outside Date; (iii) the Equity Rights Offerings; (iv) the New Equity Interests; (v) the NewCo Organizational Documents; (vi) the New Money Warrants, SLTL Warrants, and GUC Warrants; (vii) the Plan of Merger; (viii) the Single Share; (ix) the Plan Administrator; (x) the Plan funding; (xi) the Exit Facilities; (xii) the Apache Definitive Documents; (xiii) the abandonment of certain properties; (xiv) the establishment of claims reserves; (xv) the Plan Administrator Expense Reserve; (xvi) the Debtors' continued corporate existence (unless otherwise specified in the Plan); (xvii) corporate action; (xviii) the cancellation of existing securities and agreements of the Debtors; (xix) the cancellation of certain existing security interests in the Debtors; (xx) the Intercompany Interests and corporate reorganization; (xxi) the Restructuring Transactions; (xxii) securities exemptions; (xxiii) the closing of the Chapter 11 Cases; (xxiv) provisions governing distributions under the Plan; (xxv) procedures for Disputed Claims; (xxvi) the Debtors' Releases; (xxvii) the Third-Party Releases; (xxviii) the CUSA-Party Release; and (xxix) the CUSA Release-Party Release.

6.    <u>Nonvoting Equity Securities – 11 U.S.C. § 1123(a)(6)</u>.  The certificate of incorporation, articles of incorporation, limited liability company agreement, operating agreement, or similar governing document, as applicable, of each Debtor have been or shall be amended on or prior to the Effective Date to prohibit the issuance of non-voting equity securities to the extent prohibited by section 1123(a)(6) of the Bankruptcy Code, thereby satisfying section 1123(a)(6) of the Bankruptcy Code.

7.    <u>Selection of Officers, Directors, or Trustees – 11 U.S.C. § 1123(a)(7)</u>.  The Plan Supplements and Section 5.9 of the Plan contain provisions with respect to the selection of

directors and officers of the Post-Effective Date Debtors that are consistent with the interests of creditors, equity security holders, and public policy, thereby satisfying section 1123(a)(7) of the Bankruptcy Code.

       8.      <u>Impairment/Unimpairment of Classes of Claims and Equity Interests – 11 U.S.C. § 1123(b)(1)</u>.  As contemplated by section 1123(b)(1) of the Bankruptcy Code, Class 1 (Other Secured Claims), Class 3 (FLFO Claims), Class 4 (FLTL Claims), Class 5 (SLTL Claims), Class 6A (Unsecured Trade Claims), Class 6B (General Unsecured Claims), Class 8 (Subordinated Securities Claims), and Class 10 (Existing Equity Interests) are impaired under the Plan.  Class 2 (Priority Non-Tax Claims), Class 7 (Intercompany Claims) and Class 9 (Intercompany Interests) are unimpaired under the Plan.

       9.      <u>Assumption and Rejection of Executory Contracts and Unexpired Leases – 11 U.S.C. § 1123(b)(2)</u>.  Article VIII of the Plan governing the assumption and rejection of executory contracts and unexpired leases satisfies the requirements of section 365(b) of the Bankruptcy Code and is appropriate under section 1123(b)(2) of the Bankruptcy Code.

       10.      <u>Settlement of Claims and Causes of Action – 11 U.S.C. § 1123(b)(3)</u>.

       (i)      *Global Settlement and Compromise.*  The Plan, including Section 5.1 thereof, incorporates a global settlement and compromise of certain Debtor-creditor and inter-creditor issues (the "**Plan Settlement**"), among the Debtors, the Consenting Creditors and the Creditors' Committee of claims, Causes of Action and controversies among such parties, including all potential claims, Causes of Action and controversies related to the Challenge Period (as defined in the DIP Order and as modified with respect to the Creditors' Committee pursuant to certain stipulations filed with the Court) and any Challenge under the DIP Order, and are in consideration of the value provided to the Estates by the Consenting Creditors, including the value being

provided to holders of Unsecured Trade Claims and General Unsecured Claims pursuant to Sections 4.6 and 4.7 of the Plan.  The Plan is deemed to constitute a motion under section 1123(b)(3) of the Bankruptcy Code and Bankruptcy Rule 9019, seeking approval of the Plan Settlement.  Entry of this Order constitutes the Court's approval of the terms of the Plan Settlement that are set forth in the Plan.  The settlements and compromises of claims and potential causes of action among the Debtors, the Consenting Creditors and the Creditors' Committee, all as more fully set forth in the Plan and the Disclosure Statement, are integral to the Plan, are reasonable in their terms, are in the bests interests of the Debtors' estates and their creditors, and satisfy the standards for approval under Bankruptcy Rule 9019 and sections 1123(b)(3) and 1123(b)(6) of the Bankruptcy Code.  For the avoidance of doubt, nothing in this Order shall require the Creditors' Committee to take or refrain from taking any action that it determines in good faith would be inconsistent with its fiduciary duties under applicable law.  Notwithstanding the foregoing, the Creditors' Committee acknowledges that its entry into the Plan Settlement and its support for this Plan is consistent with its fiduciary duties.

(ii)     *Retained Causes of Action.*   In accordance and compliance with section 1123(b)(3)(B) of the Bankruptcy Code, certain Causes of Action of the Debtors are retained under the Plan, as more fully set forth in Section 10.11 of the Plan and Exhibit C of the Plan Supplements.

(iii)     *Representative of Estates*.  On and after the Effective Date, the Plan Administrator shall have the rights and powers of a debtor in possession under section 1107 of the Bankruptcy Code, shall be a "representative of the estate" with respect to the Debtors' Estates pursuant to section 1123(b)(3) of the Bankruptcy Code, shall be vested with the rights, powers, and benefits afforded to a "trustee" under sections 704 and 1106 of the Bankruptcy Code, and shall

have such other rights, powers, and duties incidental to causing performance of the obligations under the Plan or otherwise as may be reasonably necessary; *provided, however*, the Plan Administrator shall have no rights, powers, or duties that are inconsistent with or contrary to the Plan or this Order.

11.     <u>Modification of Rights – 11 U.S.C. § 1123(b)(5)</u>.  In accordance and in compliance with section 1123(b)(5) of the Bankruptcy Code, the Plan properly modifies the rights of holders of Class 1 (Other Secured Claims), Class 3 (FLFO Claims), Class 4 (FLTL Claims), Class 5 (SLTL Claims), Class 6A (Unsecured Trade Claims), Class 6B (General Unsecured Claims), Class 8 (Subordinated Securities Claims), and Class 10 (Existing Equity Interests).  The Plan also leaves unaffected the rights of holders of Claims in Class 2 (Priority Non-Tax Claims), Class 7 (Intercompany Claims) and Class 9 (Intercompany Interests).

12.     <u>Additional Plan Provisions – 11 U.S.C. § 1123(b)(6)</u>.  The provisions of the Plan are appropriate and not inconsistent with the applicable provisions of the Bankruptcy Code, thereby satisfying section 1123(b) of the Bankruptcy Code.  The failure to specifically address a provision of the Bankruptcy Code in this Order shall not diminish or impair the effectiveness of this Order.

13.     <u>Debtors Are Not Individuals – 11 U.S.C. § 1123(c)</u>.  The Debtors are not individuals and, accordingly, section 1123(c) of the Bankruptcy Code is inapplicable to these Chapter 11 Cases.

14.     <u>Cure of Defaults – 11 U.S.C. § 1123(d)</u>.  Section 8.2 of the Plan provides for the satisfaction of default claims associated with each executory contract and unexpired lease to be assumed pursuant to the Plan in accordance with section 365(b)(1) of the Bankruptcy Code.  All Cure Amounts will be determined in accordance with the underlying agreements and

applicable bankruptcy and non-bankruptcy law.  Thus, the Plan complies with section 1123(d) of the Bankruptcy Code.

L.      Debtors' Compliance with Bankruptcy Code – 11 U.S.C. § 1129(a)(2).  The Debtors have complied with the applicable provisions of the Bankruptcy Code, thereby satisfying section 1129(a)(2) of the Bankruptcy Code.  Specifically:

(i)      The Debtors are proper debtors under section 109 of the Bankruptcy Code;

(ii)     The Debtors have complied with applicable provisions of the Bankruptcy Code, except as otherwise provided or permitted by orders of this Court; and

(iii)    The Debtors have complied with the applicable provisions of the Bankruptcy Code, the Bankruptcy Rules, the Local Rules, and the Disclosure Statement Order in transmitting the Disclosure Statement, the Plan, the Ballots, the Solicitation Packages, and related documents and notices and in soliciting and tabulating votes on the Plan.

M.      Plan Proposed in Good Faith – 11 U.S.C. § 1129(a)(3).  The Debtors have proposed the Plan (and all other agreements, documents, and instruments necessary to effectuate the Plan) in good faith and not by any means forbidden by law, thereby satisfying section 1129(a)(3) of the Bankruptcy Code.  The Debtors' good faith is evident from the facts and record of these Chapter 11 Cases, the Disclosure Statement and the hearings thereon, and the record of the Confirmation Hearing and other proceedings held in these Chapter 11 Cases.  This Order, the Plan, the Plan Supplement, including, the Credit Bid Purchase Agreement, the Apache Implementation Agreement, the Plan of Merger, the FWE I LLC Agreement, the GUC Warrant Agreement, the New Money Warrant Agreement, the SLTL Tranche 1 Warrant Agreement, the SLTL Tranche 2 Warrant Agreement, the NewCo Organizational Documents, the Exit Facility Documents, the Restructuring Support Agreement, the Chevron Implementation Agreement, and other

15

agreements and documents contemplated thereby (collectively, as may be amended in compliance with this Order, the foregoing are referred to as the "**Plan Documents**") are based upon extensive, arms' length negotiations between and among representatives of the Debtors, the Prepetition FLTL Lenders, the Prepetition FLFO Secured Parties, the Prepetition SLTL Lenders, the DIP Lenders, Apache, CUSA Entities, and the Creditors' Committee, and represents the culmination of months of intensive negotiations and discussions among the foregoing parties in interest. The Plan was proposed with the legitimate and honest purpose of maximizing the value of the Debtors' Estates. Further, the Plan's classification, indemnification, exculpation, release, settlement, and injunction provisions, including, without limitation, Section 3.3 and Article X of the Plan, have been negotiated in good faith and at arms' length, consistent with sections 105, 1123(b)(3)(A), 1123(b)(6), 1129, and 1142 of the Bankruptcy Code.

N.      Payments for Services or Costs and Expenses – 11 U.S.C. § 1129(a)(4).   Any payment made or to be made by any of the Debtors for services or for costs and expenses incurred prior to the Effective Date in connection with the Chapter 11 Cases, or in connection with the Plan and incidental to the Chapter 11 Cases has been approved by, or is subject to the approval of, the Court as reasonable, thereby satisfying section 1129(a)(4) of the Bankruptcy Code.

O.      Directors, Officers and Insiders – 11 U.S.C. § 1129(a)(5).   The officers and directors of the Debtors shall be relieved of any and all duties with respect to the Debtors as of the Effective Date of the Plan.   Upon and following the Effective Date, the Plan Administrator shall serve as the sole officer, director, or manager of each Post-Effective Date Debtor, other than FW GOM Pipeline, Inc. and GOM Shelf LLC (the "**Post-Effective Date FWE I Subsidiaries**").   Upon and following the Effective Date, Jon Graham shall serve as the sole officer, director, or manager of each Post-Effective Date FWE I Subsidiary.   The identity and affiliations of the person proposed

to serve as the initial director and officer of the Post-Effective Date Debtors after confirmation of the Plan has been fully disclosed to the extent such information is available, and the appointment to, or continuance in, such office of such person is consistent with the interests of holders of Claims against and Interests in the Post-Effective Date Debtors and with public policy.  The Debtors have complied with section 1129(a)(5) of the Bankruptcy Code.

P.      No Rate Changes – 11 U.S.C. § 1129(a)(6).  The Plan does not provide for rate changes by any of the Post-Effective Date Debtors.  Thus, section 1129(a)(6) of the Bankruptcy Code is not applicable in the Chapter 11 Cases.

Q.      Best Interests of Creditors – 11 U.S.C. § 1129(a)(7).  The Plan satisfies section 1129(a)(7) of the Bankruptcy Code.  The Disclosure Statement, the Plan Supplements, the Hanson Declaration, the Brown Declaration, the Voting Declaration, and the other evidence proffered or adduced at the Confirmation Hearing (i) are persuasive and credible, (ii) have not been controverted by other evidence, and (iii) establish that each holder of an impaired Claim or Interest either has accepted the Plan or will receive or retain under the Plan, on account of such Claim or Interest, property of a value, as of the Effective Date, that is not less than the amount such holder would receive or retain if the Debtors were liquidated under chapter 7 of the Bankruptcy Code on such date.

R.      Acceptance by Certain Classes – 11 U.S.C. § 1129(a)(8).  Class 2 (Priority Non-Tax Claims), Class 7 (Intercompany Claims) and Class 9 (Intercompany Interests) are unimpaired under the Plan and are deemed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.  Classes 3, 4, 5, and 6A have voted to accept the Plan in accordance with sections 1126(c) and (d) of the Bankruptcy Code.  Holders of Interests in Class 8 (Subordinated Securities Claims) and Class 10 (Existing Equity Securities) are not entitled to receive or retain

17

any property under the Plan and, therefore, are deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code.

        S.      <u>Treatment of Administrative Expenses, Priority Tax Claims and Other Priority Claims – 11 U.S.C. § 1129(a)(9)</u>.  The treatment of Administrative Expense Claims, Fee Claims, DIP Claims, and Priority Tax Claims pursuant to Sections 2.1, 2.2, 2.3, and 2.5 of the Plan, respectively, satisfies the requirements of sections 1129(a)(9)(A), (C), and (D) of the Bankruptcy Code, as applicable.  The treatment of Priority Non-Tax Claims pursuant to Section 4.2 of the Plan satisfies the requirements of section 1129(a)(9)(B) of the Bankruptcy Code.  On the Effective Date, the Debtors or the Post-Effective Date Debtors, as applicable, will have sufficient Cash to pay Allowed Administrative Expense Claims that are not being assumed by the Credit Bid Purchaser pursuant to the Credit Bid Purchase Agreement, Fee Claims, DIP Claims, Priority Tax Claims, and Allowed Priority Non-Tax Claims.

        T.      <u>Acceptance by Impaired Classes – 11 U.S.C. § 1129(a)(10)</u>.  Class 3 (FLFO Claims), Class 4 (FLTL Claims), Class 5 (SLTL Claims), and Class 6A (Unsecured Trade Claims) of each of the Debtors voted to accept the Plan by the requisite majorities, determined without including any acceptance of the Plan by any insider, thereby satisfying the requirements of section 1129(a)(10) of the Bankruptcy Code.

        U.      <u>11 U.S.C. § 1129(a)(11)</u>.  The Disclosure Statement, the Plan Supplements, the Hanson Declaration, and the Brown Declaration, and the other evidence proffered or adduced at the Confirmation Hearing (i) are persuasive and credible, (ii) have not been controverted by other evidence, and (iii) establish that confirmation of the Plan is not likely to be followed by the liquidation or the need for further financial reorganization, thereby satisfying the requirements of section 1129(a)(11) of the Bankruptcy Code.

V.      Payment of Statutory Fees – 11 U.S.C. § 1129(a)(12).  Pursuant to Section 12.1 of the Plan, all fees payable under sections 1911 through 1930 of chapter 123 of title 28 of the United States Code will be paid on the Effective Date, and thereafter as may be required.  Thus, the Plan satisfies the requirements of section 1129(a)(12) of the Bankruptcy Code.

W.      Benefit Plans – 11 U.S.C. § 1129(a)(13).  The Debtors have no obligation to pay retiree benefits therefore section 1129(a)(13) of the Bankruptcy Code does not apply.

X.      Domestic Support Obligations – 11 U.S.C. § 1129(a)(14).  The Debtors are not required by a judicial or administrative order, or by statute, to pay any domestic support obligations, and therefore, section 1129(a)(14) of the Bankruptcy Code is inapplicable in these Chapter 11 Cases.

Y.      The Debtors Are Not Individuals – 11 U.S.C. § 1129(a)(15).  The Debtors are not individuals, and therefore, section 1129(a)(15) of the Bankruptcy Code is inapplicable in these Chapter 11 Cases.

Z.      No Applicable Nonbankruptcy Law Regarding Transfers – 11 U.S.C. § 1129(a)(16).  Each of the Debtors that is a corporation is a moneyed, business, or commercial corporation or trust, and therefore, section 1129(a)(16) of the Bankruptcy Code is inapplicable in these Chapter 11 Cases.

AA.     Fair and Equitable; No Unfair Discrimination – 11 U.S.C. § 1129(b).  Holders of Interests in Class 8 (Subordinated Securities Claims) and Class 10 (Existing Equity Interests) are deemed to reject the Plan.  Class 1 (Other Secured Claims) and Class 6B (General Unsecured Claims) are impaired and voted to reject the Plan.  However, the Plan does not discriminate unfairly and is fair and equitable with respect to Class 8 (Subordinated Securities Claims) and Class 10 (Existing Equity Interests) as required by sections 1129(b)(2)(C)(i) and 1129(b)(2)(C)(ii) of the

Bankruptcy Code.  The Plan does not discriminate and is fair and equitable with respect to Class 6B (General Unsecured Claims) as required by section 1129(b)(2)(B)(ii).  The Plan does not discriminate and is fair and equitable with respect to Class 1 (Other Secured Claims) as required by section 1129(b)(2)(A).  Thus, the Plan may be confirmed notwithstanding the Debtors' failure to satisfy section 1129(a)(8) of the Bankruptcy Code.  Upon confirmation of the Plan and the occurrence of the Effective Date, the Plan shall be binding on the members of Class 1 (Other Secured Claims), Class 6B (General Unsecured Claims), Class 8 (Subordinated Securities Claims), and Class 10 (Existing Equity Interests).

BB.    <u>Only One Plan – 11 U.S.C. § 1129(c)</u>.  Because the Plan is the only chapter 11 plan filed in the Chapter 11 Cases, the Plan satisfies section 1129(c) of the Bankruptcy Code.

CC.    <u>Principal Purpose of the Plan – 11 U.S.C. § 1129(d)</u>.  Because the principal purpose of the Plan is not the avoidance of taxes or the avoidance of the application of Section 5 of the Securities Act of 1933, the Plan satisfies section 1129(d) of the Bankruptcy Code.

DD.    <u>Small Business Case – 11 U.S.C. § 1129(e)</u>.  None of these Chapter 11 Cases are a "small business case," as that term is defined in the Bankruptcy Code, and, accordingly, section 1129(e) of the Bankruptcy Code is inapplicable.

EE.    <u>Good Faith Solicitation – 11 U.S.C. § 1125(e)</u>.  Based on the record before the Court in the Chapter 11 Cases, including evidence presented at the Confirmation Hearing, the Debtors and their directors, officers, employees, members, agents, advisors, and professionals have acted in "good faith" within the meaning of section 1125(e) of the Bankruptcy Code in compliance with the applicable provisions of the Bankruptcy Code, the Bankruptcy Rules, the Local Rules, and the Disclosure Statement Order in connection with all their respective activities relating to the solicitation of acceptances or rejections of the Plan and their participation in the activities described

in section 1125 of the Bankruptcy Code, and are entitled to the protections afforded by section 1125(e) of the Bankruptcy Code and the exculpation provisions set forth in Section 10.8 of the Plan.

### Findings Relating to the Credit Bid Transaction

FF.     Good Faith; No Collusion.  The Credit Bid Purchase Agreement was proposed, negotiated by the Debtors party thereto, the Credit Bid Purchaser and Buyer 2 (as defined in the Credit Bid Purchase Agreement) (the Credit Bid Purchaser and Buyer 2 collectively, the "**Credit Bid Purchasers**") without collusion, in good faith, and from arm's-length bargaining positions. Neither the Credit Bid Purchaser nor any other NewCo Entity is an "insider" or "affiliate" of the Debtors, as those terms are defined in the Bankruptcy Code, and no common identity of incorporators, directors, or controlling stockholders existed between the (a) Debtors and (b) the Credit Bid Purchasers or any other NewCo Entity.  The Credit Bid Purchasers recognized that the Debtors were free to deal with any other party interested in acquiring the Credit Bid Acquired Interests, as described Section 3(C) of the Disclosure Statement.  Neither the Debtors nor the Credit Bid Purchasers engaged in any conduct that would cause or permit the Credit Bid Purchase Agreement, any documents related thereto, or the consummation of the Credit Bid Transaction to be avoided, or costs or damages to be imposed, under Bankruptcy Code section 363(n) or under any other law of the United States, any state, territory, possession thereof, the District of Columbia, or any other applicable law. As a result of the foregoing, the Credit Bid Purchasers are entitled to the protections of section 363(m) of Bankruptcy Code, including in the event this Order or any portion thereof is reversed or modified on appeal, and otherwise has proceeded in good faith in all respects in connection with these cases. The Debtors' marketing process with respect to the Credit Bid Transaction afforded a full, fair, and reasonable opportunity for any person or entity to make a higher or otherwise better offer.  No other person or entity or group of entities has offered to

purchase the assets for greater overall value to the Debtors' Estates than the Credit Bid Purchaser. The Credit Bid Purchase Agreement constitutes the highest and best offer, and will provide a greater recovery for the Debtors' Estates than would be provided by any other available alternative.

GG.     <u>Authority</u>.  The Debtors have: (i) full power and authority to execute and assume the Credit Bid Purchase Agreement and all other documents contemplated thereby and (ii) all of the power and authority necessary to consummate the transactions contemplated by the Credit Bid Purchase Agreement subject to the terms of this Order.  No consents or approvals, other than those already obtained or expressly provided for in the Credit Bid Purchase Agreement or this Order, are required for the Debtors to consummate the Credit Bid Transaction.

HH.     <u>Title to Purchased Assets</u>.  The Credit Bid Acquired Interests sought to be transferred and/or assigned, as applicable, by the Debtors to the Credit Bid Purchasers pursuant to the Credit Bid Purchase Agreement are property of the Debtors' Estates and good title thereto is presently vested in the Debtors' Estates within the meaning of section 541(a) of the Bankruptcy Code. Except as provided in the Credit Bid Purchase Agreement, the Debtors are the sole and rightful owners of the Credit Bid Acquired Interests with all rights, title and interests to the Credit Bid Acquired Interests, and no other person has any ownership right, title, or interest therein other than any security interests therein which secure the Debtors' obligations to the DIP Secured Parties or the Prepetition Secured Parties (each as defined in the DIP Order), as applicable.

II.     <u>Adequate Marketing; Highest or Best Offer</u>.  The Debtors' marketing process with respect to the Credit Bid Transaction afforded a full, fair, and reasonable opportunity for any person or entity to make a higher or otherwise better offer.  The Debtors' marketing process allowed the Debtors to consider actionable proposals, if any, from third-parties for transactions that would provide consideration to the Debtors' Estates in an amount that exceeds the Credit Bid

Amount plus the value of any other consideration provided by the Credit Bid Purchaser to the Debtors pursuant to the Credit Bid Purchase Agreement and the Plan. The Debtors considered such proposals pursuant to certain procedures as provided for in the Disclosure Statement Motion (as defined in the Disclosure Statement), up through February 26, 2021, the Bid Deadline.  Moreover, the procedures provided, among other things, that in evaluating whether any third-party bids qualify as a Qualified Bid (as defined in the Disclosure Statement Motion), the Debtors may consider several factors including, but not limited to, (i) the amount and form of consideration of the purchase price, (ii) the assets included in or excluded from the bid, (iii) the value to be provided to the Debtors and their Estates, (iv) the transaction structure and execution risk, and (v) the impact on all key stakeholders.  The Debtors did not receive any Qualified Bids by the Bid Deadline and no other person or entity or group of entities has offered to purchase the assets for greater overall value to the Debtors' Estates than the Credit Bid Purchasers.  The Credit Bid Purchase Agreement constitutes the highest and best offer, and will provide a greater recovery for the Debtors' Estates than would be provided by any other available alternative.  The Debtors' determination that the Credit Bid Purchase Agreement constitutes the highest and best offer constitutes a valid and sound exercise of the Debtors' business judgment.  Approval of the Credit Bid Transaction and the consummation of the Credit Bid Transaction is in the best interests of the Debtors' Estates, their creditors, and other parties in interest. The consideration provided by the Credit Bid Purchasers pursuant to the Credit Bid Purchase Agreement (a) is fair and reasonable, (b) is the highest or best offer for the Credit Bid Acquired Interests, and (c) constitutes reasonably equivalent value (as those terms are defined in each of the Uniform Voidable Transfer Act, Uniform Fraudulent Transfer Act, Uniform Fraudulent Conveyance Act, and section 548 of the Bankruptcy Code) and

fair consideration under the Bankruptcy Code and under the laws of the United States, any state, territory, possession, or the District of Columbia.

JJ.     NewCo and its Subsidiaries Not Successors.  Upon the Credit Bid Transaction Closing, neither NewCo nor any of its subsidiaries (including the Credit Bid Purchasers) will be deemed to: (a) be the successor of (other than for purposes of section 1145 of the Bankruptcy Code), or related person, successor in interest or successor employer (as described under any applicable law) to, any Debtor, any Estate, FWE I, FWE III, FWE IV, or any of the Debtors' affiliates, predecessors, successors or assigns including, with respect to any Employee Plans (as defined in the Credit Bid Purchase Agreement), other than the Assumed Employee Plans (as defined in the Credit Bid Purchase Agreement) to the extent set forth in Section 6.8 of the Credit Bid Purchase Agreement; (b) have, de facto or otherwise, merged into any Debtor, any Estate, FWE I, FWE III, FWE IV, or  any of the Debtors' affiliates, predecessors, successors or assigns; (c) be a mere continuation or substantial continuation of any Debtor, any Estate, FWE I, FWE III, FWE IV, or  any of the Debtors' affiliates, predecessors, successors or assigns or the enterprise(s) of any Debtor, any Estate, FWE I, FWE III, FWE IV, or any of the Debtors' affiliates, predecessors, successors or assigns; and (d) other than as expressly set forth in the Credit Bid Purchase Agreement, be liable for any acts or omissions of any Debtor, any Estate, FWE I, FWE III, FWE IV or any of the Debtors' affiliates, predecessors, successors or assigns, in the current or former conduct of the business of the Debtors relating to the Credit Bid Acquired Interests or arising under or related to the Credit Bid Acquired Interests.  None of the NewCo Entities are an alter ego of any Debtor, any Estate, FWE I, FWE III, FWE IV or any of the Debtors' affiliates, predecessors, successors or assigns, or are holding themselves out to the public as a successor to or a continuation of any Debtor, any Estate, FWE I, FWE III, FWE IV or any of the Debtors'

affiliates, predecessors, successors or assigns.  The issuance, sale, and/or transfer of the New Equity Interests (as applicable), the New Money Warrants, the GUC Warrants or the SLTL Warrants does not amount to a consolidation, succession, merger, or de facto merger of (a) any NewCo Entity and any of (b) the Debtors, the Post-Effective Date Debtors, any Estate, FWE I, FWE III, FWE IV, or any of the Debtors' affiliates, predecessors, successors or assigns.

KK.    <u>Necessity of Order</u>.  The Credit Bid Purchasers have agreed to the Credit Bid Transaction in material reliance on and with fair consideration provided for the Credit Bid Transaction being free and clear of all claims and interests relating to the Debtors arising prior to the closing of the Credit Bid Transaction, except as expressly provided under the Credit Bid Purchase Agreement and except for (i) any and all Liens securing the FLFO Claims or the obligations under the First Lien Exit Facility that attach to the Credit Bid Acquired Interests that are retained and deemed assigned to the First Lien Exit Facility Agent upon the Effective Date to secure the obligations under the First Lien Exit Facility and (ii) all Liens securing the FLTL Claims that attach to the Credit Bid Acquired Interests and are deemed assigned to the Second Lien Exit Facility Agent upon the Effective Date to secure the obligations under the Second Lien Exit Facility, including any successor or vicarious liabilities of any kind or nature, as set forth herein and in the Credit Bid Purchase Agreement, and would not agree to the Credit Bid Purchase Agreement or the Credit Bid Transaction without all of the relief provided for in this Order such terms and the findings herein.

LL.    <u>Satisfaction of Sections 363(f) and 1141(c)</u>.  The conditions of section 363(f) of the Bankruptcy Code have been satisfied in full; therefore, the Debtors may sell assets and property pursuant to the Credit Bid Purchase Agreement free and clear of any claims, liens, encumbrances, or other interests of any kind or nature whatsoever other than as expressly provided under the

Credit Bid Purchase Agreement, the Plan, or this Order. In addition to and without limiting the foregoing, the proposed Credit Bid Transaction is to be consummated under the Plan, and the assets and property to be sold pursuant to the Credit Bid Transaction are dealt with by the Plan and this Order; therefore, except as expressly provided under the Credit Bid Purchase Agreement and except for (i) any and all Liens securing the FLFO Claims or the obligations under the First Lien Exit Facility that attach to the Credit Bid Acquired Interests that are retained and deemed assigned to the First Lien Exit Facility Agent upon the Effective Date to secure the obligations under the First Lien Exit Facility and (ii) all Liens securing the FLTL Claims that attach to the Credit Bid Acquired Interests and are deemed assigned to the Second Lien Exit Facility Agent upon the Effective Date to secure the obligations under the Second Lien Exit Facility, the Debtors may sell assets and property pursuant to the Credit Bid Purchase Agreement free and clear of any claims, liens, encumbrances, or other interests of any kind or nature whatsoever pursuant to section 1141(c) of the Bankruptcy Code.

MM.   <u>Free and Clear</u>.  The Debtors may sell the Credit Bid Acquired Interests free and clear of all liens, claims (including those that constitute a "claim" as defined in section 101(5) of the Bankruptcy Code), rights, liabilities, mortgages, deeds of trust, pledges, charges, security interests, of whatever kind or nature, rights of first refusal, rights of offset or recoupment, royalties, conditional sales or title retention agreements, hypothecations, preferences, debts, easements, suits, licenses, options, rights of recovery, judgments, orders and decrees of any court or foreign domestic governmental entity, taxes (including foreign, state and local taxes), covenants, restrictions, indentures, instruments, leases, options, off-sets, recoupments, claims for reimbursement or subrogation, contribution, indemnity or exoneration, encumbrances and other interests of any kind or nature whatsoever other than as expressly provided under the Credit Bid

Purchase Agreement and except for (i) any and all Liens securing the FLFO Claims or the obligations under the First Lien Exit Facility that attach to the Credit Bid Acquired Interests that are retained and deemed assigned to the First Lien Exit Facility Agent upon the Effective Date to secure the obligations under the First Lien Exit Facility and (ii) all Liens securing the FLTL Claims that attach to the Credit Bid Acquired Interests and are deemed assigned to the Second Lien Exit Facility Agent upon the Effective Date to secure the obligations under the Second Lien Exit Facility, because, in each case, one or more of the standards set forth in sections 363(f)(l)–(5), 1129(b)(2)(A)(ii), 1141(a), or 1141(c) of the Bankruptcy Code has been satisfied.  All holders of such claims, liens, encumbrances, or other interests against the Debtors, their Estates, or any of the assets subject to the Credit Bid Transaction (a) who did not object, or who withdrew their objections, to the Credit Bid Transaction are deemed to have consented pursuant to section 363(f)(2) of the Bankruptcy Code and (b) are bound by this Order or the Plan pursuant to section 1141(a) of the Bankruptcy Code. All holders of such claims, liens, encumbrances, or other interests are adequately protected by having their claims, liens, encumbrances, or other interests, if any, in each instance against the Debtors, their Estates, or any of the assets subject to the Credit Bid Transaction, attach to the net cash proceeds of the Credit Bid Transaction ultimately attributable to the assets in which such creditor alleges a claim, lien, encumbrance, or other interest, in the same order of priority, with the same validity, force, and effect that such claim, lien, encumbrance, or other interest had prior to consummation of the Credit Bid Transaction, subject to any claims and defenses the Debtors and their Estates may possess with respect thereto, and with such claims, liens, encumbrances, or other interests being treated in accordance with the Plan.  The Claims Reserve Amount set aside from the net cash proceeds of the Credit Bid Transaction for purposes of funding the Claims Reserve, the Plan Administrator Expense Reserve amount for funding the

Plan Administrator expense reserve, and funding the Decommissioning Account (as defined in the Funding Agreement, annexed to the Credit Bid Purchase Agreement) shall be funded free and clear of all liens, claims and encumbrances or other interests unless expressly provided in the Plan Documents.

NN.     <u>Modifications</u>.   Following execution, the Credit Bid Purchase Agreement and related agreements, documents or other instruments executed in connection therewith, may be modified, amended or supplemented by the parties thereto, in a writing signed by each party, and in accordance with the terms thereof, without further order of the Court; provided, that any such modification, amendment or supplement does not materially change the economic substance of the Credit Bid Transaction.

## Findings Relating to Plan of Merger

OO.     <u>Plan of Merger</u>.   The Plan of Merger Agreement satisfies the requirement of a plan of merger pursuant to sections 10.002 and 10.003 of the Texas Business Organizations Code (the "**TBOC**") and when executed will have been duly approved as required for purposes of sections 10.001, 10.002 and 10.302 of the TBOC and binding on FWE.   FWE III will be a "surviving domestic entity" as used in section 10.008 of the TBOC.

PP.     On the Effective Date, but after the consummation of the transactions contemplated by the Credit Bid Purchase Agreement, pursuant to sections 1123, 1141(b) and 1141(c) of the Bankruptcy Code, in accordance with the Plan of Merger, (i) all FWE Assets will be allocated to and vest in FWE I, FWE III, and any FWE Additional Entity pursuant to the terms of the applicable Plan of Merger, in each case, free and clear of all Liens, Claims, charges, Interests, or other encumbrances, including the Plan of Merger Consent Rights and Plan of Merger Preferential Purchase Rights; and (ii) (x) the FWE I Obligations shall be allocated to and shall vest in, and shall constitute liabilities and obligations of, FWE I, (y) the FWE III Obligations shall be allocated to

and shall vest in, and shall constitute liabilities and obligations of, FWE III (subject to further allocation and vesting as provided in any Plan of Merger other than the Initial Plan of Merger), and (z) any obligations allocated to an FWE Additional Entity pursuant to the terms of the applicable Plan of Merger shall be allocated to and shall vest in, and shall constitute liabilities and obligations of, such applicable FWE Additional Entity.

QQ. <u>FWE I and FWE IV not Successors to the Debtors</u>.  Neither FWE I nor FWE IV is a successor or mere continuation of the Debtors or their Estates by virtue of the allocation of the FWE I Assets and the FWE I Obligations, or the FWE IV Assets and FWE IV Obligations, respectively, and there is no continuity of enterprise or common identity between the FWE I, FWE IV, and the Debtors.  Neither FWE I nor FWE IV is an alter ego of the Debtors.  Neither FWE I nor FWE IV is holding itself out to the public as a successor to or a continuation of the Debtors or their Estates.

RR. <u>No Continuity of Enterprise or Common Identity</u>.  There is no continuity of enterprise or common identity between any of FWE I, FWE III, FWE IV or any NewCo Entity, and none of the foregoing entities are alter egos of another.

**Other Findings**

SS. <u>Injunction, Exculpation, and Releases</u>.  The Plan is consistent with section 1123(b)(3) of the Bankruptcy Code.  Section 10.7(a) of the Plan describes certain releases granted by the, Section 10.7(b) of the Plan provides for the release of the Released Parties by the Releasing Parties, Section 10.7(d) of the Plan provides for releases by the CUSA Parties of the CUSA Release Parties, Section 10.7(e) of the Plan provides for releases by the CUSA Release Parties of the CUSA Parties,  Section 10.8 of the Plan provides for exculpation for the Exculpated Parties (the "**Exculpation**"), and Section 10.9 of the Plan provides for an injunction (the "**Injunction**").  The Bankruptcy Court has jurisdiction under sections 1334(a) and 1334(b) of the Judicial Code and

authority under section 105 of the Bankruptcy Code to approve each of the Debtor Releases, the Third-Party Release, the CUSA-Party Release, the CUSA Release-Party Release, the Exculpation, and the Injunction.  As has been established based upon the evidence presented at the Confirmation Hearing, such provisions (a) were given in exchange for good, valuable, and adequate consideration after due notice and opportunity for hearing, (b) are appropriately tailored under the facts and circumstances of the Chapter 11 Cases, (c) were integral to the agreements among the various parties in interest and are essential to the formulation and implementation of the Plan, as provided in section 1123 of the Bankruptcy Code, (d) confer substantial benefits on the Estates, (e) are fair, equitable, and reasonable, (f) were negotiated in good faith and at arm's length, and (g) are in the best interests of the Debtors, the Estates, Holders of Claims and Interests, and all other parties in interest.  Further, the failure to implement the Debtor Release, Third-Party Release, the CUSA-Party Release, the CUSA Release-Party Release, Exculpation, and Injunction would impair the Debtors' ability to confirm and implement the Plan.

TT.    Good and valid justifications have been demonstrated in support of the Debtor Releases, and the Debtors have satisfied the business judgment standard with respect to the propriety of the Debtor Releases.  The Debtor Releases represents a valid exercise of the Debtors' business judgment.  Each of the Released Parties provided good and valuable consideration in exchange for the release.  The pursuit by the Debtors of any claims against the Released Parties is not in the best interests of the Estates.  The Debtor Releases are furthermore: (a) an essential means of implementing the Plan; (b) an integral and non-severable element of the Plan and the transactions incorporated therein (c) conferring a material benefit on, and in the best interests of, the Debtors, their Estates and their creditors; (d) important to the overall objectives of the Plan to finally resolve all Claims among or against the parties in interest in the Chapter 11 Cases with

respect to the Debtors; (e) fair, equitable, and reasonable and in exchange for good and valuable consideration; (f) a good-faith settlement and compromise of the Claims released by the Debtor Release; (g) given, and made, after due notice and opportunity for hearing; and (h) consistent with sections 105, 1123, 1129, 1141, and other applicable provisions of the Bankruptcy Code.

UU.     The scope of the Debtor Releases is appropriately tailored under the facts and circumstances of the Chapter 11 Cases.  In light of, among other things, the value provided by the Released Parties to the Debtors' Estates and the critical nature of the Debtor Releases to the Plan, the Debtor Releases are approved and authorized in their entirety.

VV.     The Third-Party Release, the CUSA-Party Release, and the CUSA Release-Party Release are an essential provision of the Plan.  Accordingly, for the reasons set forth herein and in the Confirmation Brief, the Third-Party Release, the CUSA-Party Release, and the CUSA Release-Party Release are (a) an essential means of implementing the Plan, (b) fair, equitable, and reasonable and in exchange for the good and valuable consideration provided by the Released Parties, (c) a good-faith settlement and compromise of the claims and Causes of Action released thereby, (d) materially beneficial to, and in the best interests of, the Debtors, their Estates, and their stakeholders, (e) fair, equitable, and reasonable, (f) given and made after due notice and opportunity for hearing, (g) consistent with sections 105, 524, 1123, 1129, and 1141 and other applicable provisions of the Bankruptcy Code, (h) an integral and non-severable element of the Plan and the transactions incorporated therein, (i) confer a material benefit on, and is in the best interests of, the Debtors, their Estates, and all Holders of Claims and Interests, (j) specific in language and scope, and (k) important to the overall objectives of the Plan to finally resolve all Claims among or against the parties in interest in the Chapter 11 Cases with respect to the Debtors.

WW.   Like the Debtor Releases, the Third-Party Release, the CUSA-Party Release, and the CUSA-Release Party Release facilitated participation in the Plan and the Chapter 11 Cases, and are integral elements of the Plan.   The scope of the Third-Party Release, the CUSA-Party Release, the CUSA-Release Party Release are appropriately tailored under the facts and circumstances of the Chapter 11 Cases.   The Third-Party Release is consensual because all parties to be bound by the Third-Party Release either (i) voted to accept the Plan or (ii) affirmatively agreed to be a Releasing Party.   All Holders of Claims were given due and adequate notice of the Third-Party Release and sufficient opportunity and instruction to vote to accept or reject the Plan; the Third-Party Release is therefore fair to the Releasing Parties, and is appropriate.   Additionally, the release provisions of the Plan were conspicuous, emphasized with boldface type in the Plan, the Disclosure Statement, the Ballots, and the Non-Voting Status Notice (as defined in the Disclosure Statement Motion).

XX.   The Exculpation is an essential provision of the Plan.   The Exculpation is appropriate and authorized under sections 105, 1123(b)(3), and 1123(b)(6) of the Bankruptcy Code and other applicable law, including, without limitation, *In re Pacific Lumber Co.*, 584 F.3d 229 (5th Cir. 2009) and *In re Midlantic Nat'l Bank v. N.J. Dep't of Envtl. Prot.*, 474 U.S. 494, 507 (1986), because it was proposed in good faith, was formulated following extensive good-faith, arm's-length negotiations with the Debtors and the Exculpated Parties, and was agreed upon in return for the Exculpated Parties providing benefits to the Debtors, and is appropriately narrow in scope and time.   The Exculpation appropriately affords protection to those parties who constructively participated in and contributed to the Debtors' chapter 11 process and it is appropriately tailored to protect the Exculpated Parties from inappropriate litigation.   The Exculpation granted under the Plan is reasonable in scope as it does not relieve any party of liability

for an act or omission to the extent such act or omission is determined by final order to constitute intentional fraud, willful misconduct, or gross negligence.

YY.     The Injunction is essential to the Plan and is necessary to implement the Plan and to preserve and enforce the Debtor Releases, the Third-Party Release, the CUSA-Party Release, the CUSA-Release Party Release, the Exculpation, and release provisions in Section 10 of the Plan.  The Injunction is appropriately tailored to achieve those purposes.

ZZ.     The release of all mortgages, deeds of trust, Liens, pledges, or other security interests against any property of the Estates described in Section 10.7(c) of the Plan (the "**Lien Release**") is necessary to implement the Plan.  The provisions of the Lien Release are appropriate, fair, equitable, and reasonable and are in the best interests of the Debtors, the Estates, Holders of Claims and Interests, and other Entities with an interest in the Debtors' property.

AAA.  The record of the Confirmation Hearing is sufficient to support the Debtor Release, Third-Party Release, the CUSA-Party Release, the CUSA Release-Party Release, Exculpation, and Injunction.  Accordingly, based upon the representations of the parties and the evidence proffered, adduced, or presented at the Confirmation Hearing, the Debtor Release, Third-Party Release, Exculpation, and Injunction are consistent with the Bankruptcy Code and applicable law.

BBB.  Implementation.  All documents necessary to implement the Plan, including, without limitation, the Credit Bid Purchase Agreement and the other documents contained in the Plan Supplements, and all other relevant and necessary documents have been negotiated in good faith and at arms' length and shall, upon completion of documentation and execution, be valid, binding, and enforceable agreements and not be in conflict with any federal or state law.  The Debtors are hereby authorized to complete documentation and execute such documents and take

all such further actions as necessary to implement such documents, including the payment of all fees, expenses and other payments in accordance with the terms thereof.

CCC.  Executory Contracts and Unexpired Leases.    The Debtors have exercised reasonable business judgment in determining whether to assume or reject executory contracts and unexpired leases pursuant to Section 8.1 of the Plan.  Each assumption of an executory contract or unexpired lease pursuant to Section 8.1 of the Plan shall be legal, valid, and binding upon the Post-Effective Date Debtors and their successors and assigns and all non-Debtor parties and their successors and assigns to such executory contract or unexpired lease, all to the same extent as if such assumption had been effectuated pursuant to an order of the Court under section 365 of the Bankruptcy Code entered before entry of this Order.  Moreover, the Debtors have appropriately cured, or provided adequate assurance that the Debtors, the Credit Bid Purchaser, FWE I, FWE IV, and a FWE Additional Entity, or the Post-Effective Date Debtors, as applicable, will cure, defaults (if any) under or relating to each of the executory contracts and unexpired leases that are being assumed by the Debtors pursuant to the Plan.

DDD.  Good Faith.  The Debtors, the Creditors Committee, the Consenting Creditors, Apache, the DIP Agent, DIP Lenders, NewCo and all of its subsidiaries (including the Credit Bid Purchasers), the Exit Facility Agents, the Prepetition FLTL Agents, the Exit Facility Lenders, the Second Lien Backstop Parties, the ERO Backstop Parties and each of their affiliates, each Entity that is a party to an Additional Predecessor Agreement, and each such Entity's and its affiliates respective directors, managers, officers, equity holders (regardless of whether such interests are held directly or indirectly), subsidiaries, principals, members, employees, agents, managed accounts or funds, management companies, fund advisors, investment advisors, advisory board members, financial advisors, partners (including both general and limited partners), attorneys,

accountants, investment bankers, consultants, representatives and other professionals will be acting in good faith if they proceed to (i) consummate the Plan and the agreements (including the Credit Bid Purchase Agreement and the Plan of Merger), settlements, transactions, and transfers contemplated thereby (including the Credit Bid Transaction), and (ii) take the actions authorized and directed by this Order.

EEE.    <u>Conditions Precedent to Effective Date</u>.  The Plan shall not become effective unless all conditions set forth in section 9.1 of the Plan have been satisfied or waived pursuant to section 9.2 of the Plan.

FFF.    <u>Satisfaction of Confirmation Requirements</u>.  The Plan satisfies the requirements for confirmation set forth in section 1129 of the Bankruptcy Code.

GGG.    <u>Objections</u>.  All parties have had a full and fair opportunity to litigate all issues raised, or which might have been raised, in any objection to the Plan, and any such objections have been fully and fairly litigated.

HHH.    <u>Retention of Jurisdiction</u>.  The Court may, and upon the Effective Date shall, retain exclusive jurisdiction over all matters arising out of, and related to, the Chapter 11 Cases, including the matters set forth in Section 11 of the Plan and section 1142 of the Bankruptcy Code.

**ACCORDINGLY, IT IS HEREBY ORDERED, ADJUDGED, AND DECREED THAT:**

1.    <u>Confirmation</u>.  The Plan annexed hereto as **<u>Exhibit A</u>** and each of its provisions, as modified pursuant to section 1127 of the Bankruptcy Code, are hereby approved and **CONFIRMED** under section 1129 of the Bankruptcy Code.  The terms of the Plan, all exhibits and schedules thereto, the Plan Supplements, and the Plan Documents, each, as may be modified, are incorporated by reference into and are an integral part of the Plan and this Order.

2.      Plan Supplements and Exhibits and Schedules to the Plan.   The documents contained in the Plan Supplements, the exhibits and schedules to the Plan, and any other Plan Documents, and any amendments, modifications, and supplements thereto, and all documents and agreements introduced into evidence by the Debtors at the Confirmation Hearing (including all exhibits and attachments thereto and documents referred to therein), and the execution, delivery, and performance thereof by the Debtors, are authorized and approved.

3.      Modifications to the Plan.  The modifications to the Plan since the commencement of solicitation, including without limitation the modifications set forth in the *Fifth Amended Joint Chapter 11 Plan of Fieldwood Energy LLC and Its Affiliated Debtors*, dated June 16, 2021 (ECF No. 1629) and the *Seventh Amended Joint Chapter 11 Plan of Fieldwood Energy LLC and Its Affiliated Debtors*, dated June 24, 2021 (ECF No. 1716), do not materially adversely affect or change the treatment of any Claims.  Accordingly, pursuant to Bankruptcy Rule 3019 and in accordance with the Solicitation Procedures Order, such modifications do not require additional disclosure under section 1125 of the Bankruptcy Code or re-solicitation of votes under section 1126 of the Bankruptcy Code, nor do they require that holders of Claims be afforded an opportunity to change previously cast acceptances or rejections of the Plan.  To the extent any creditor or party in interest has not accepted the modifications to the Plan in writing, the treatment of Claims of any such creditors under the Plan, as modified, is not adverse and, pursuant to Local Rule 3019-1, holders of Claims who voted to accept the solicitation version of the Plan are deemed to accept the Plan as modified.

4.      Subject to (i) the consent rights set forth in the Restructuring Support Agreement, (ii) the reasonable consent of the Creditors' Committee solely to the extent that it adversely impacts the holders of General Unsecured Claims or Unsecured Trade Claims or otherwise modifies the

terms of the Plan Settlement, and (iii) the reasonable consent of the Prepetition FLFO Administrative Agent, the Plan and Plan Documents may be amended, modified, or supplemented by the Debtors in the manner provided for by section 1127 of the Bankruptcy Code or as otherwise permitted by law, without additional disclosure pursuant to section 1125 of the Bankruptcy Code, except as otherwise ordered by the Bankruptcy Court.

5.     After the Confirmation Date, so long as such action does not materially and adversely affect the treatment of holders of Allowed Claims pursuant to the Plan, the Debtors, with (i) the consent of the Required DIP Lenders, and the Requisite FLTL Lenders, (ii) the reasonable consent of Apache to the extent it directly affects the structure of FWE I outlined in the Apache Term Sheet or the economic treatment of Apache, (iii) the reasonable consent of the Creditors' Committee solely to the extent that it adversely impacts the holders of General Unsecured Claims or Unsecured Trade Claims, and (iv) the reasonable consent of the Prepetition FLFO Administrative Agent, may remedy any defect or omission or reconcile any inconsistencies in the Plan, any Plan Supplement document, any other Plan Document or the Order with respect to such matters as may be necessary to carry out the purposes of effects of the Plan, and any holder of a Claim or Interest that has accepted the Plan shall be deemed to have accepted the Plan as amended, modified, or supplemented.

6.     The Debtors, subject to (i) the consent of the Required DIP Lenders and the Requisite FLTL Lenders and (ii) the applicable consent rights of the Prepetition FLFO Administrative Agent, shall have the right to amend and supplement the documents contained in, and exhibits and schedules to, the Plan Supplements in accordance with the terms of the Plan and the Restructuring Support Agreement or the First Lien Exit Facility Commitment Letter, as applicable, through the Effective Date.

7.      Before the Effective Date, the Debtors, subject to the consent rights set forth in the Restructuring Support Agreement, may make appropriate technical adjustments and modifications to the Plan without further order or approval of the Bankruptcy Court.

8.      Objections.   All objections to confirmation of the Plan that have not been withdrawn, waived, or settled, and all reservations of rights pertaining to confirmation of the Plan included therein, are overruled on the merits for the reasons stated on the record of the Confirmation Hearing.

9.      Omission of Reference to Particular Plan Provisions.   The failure to specifically describe or include any particular provision of the Plan in this Order shall not diminish or impair the effectiveness of such provision, it being the intent of this Court that the Plan be approved and confirmed in its entirety.

10.     Solicitation and Notice.   The Confirmation Hearing Notice complied with the terms of the Disclosure Statement Order, was appropriate and satisfactory based on the circumstances of the Chapter 11 Cases, and was in compliance with the provisions of the Bankruptcy Code, the Bankruptcy Rules, and the Local Bankruptcy Rules.   The solicitation of votes on the Plan and the Solicitation Packages complied with the solicitation procedures in the Disclosure Statement Order, were appropriate and satisfactory based upon the circumstances of the Chapter 11 Cases, and were in compliance with the provisions of the Bankruptcy Code, the Bankruptcy Rules, and the Local Bankruptcy Rules.   The Debtors solicited acceptances of the Plan in good faith and in compliance with the applicable provisions of the Bankruptcy Code, including, without limitation, sections 1125(a) and (e) of the Bankruptcy Code, and any applicable non-bankruptcy law, rule or regulation governing the adequacy of disclosure in connection with such solicitation.   The Debtors and each of their respective directors, officers, employees, affiliates, agents, financial advisors, investment

bankers, professionals, accountants, and attorneys participated in good faith and in compliance with the applicable provisions of the Bankruptcy Code in the solicitation of votes under the Plan, and therefore are not, and on account of such solicitation will not be, liable at any time for any violation of any applicable law, rule or regulation governing the solicitation of acceptances or rejections of the Plan.

11.     <u>Vesting of Assets in Post-Effective Date Debtors</u>.  Except as otherwise provided in the Plan, including the Plan of Merger, this Order, or any Plan Supplements or Plan Documents, on and after the Effective Date, pursuant to sections 1141(b) and (c) of the Bankruptcy Code, other than the Credit Bid Acquired Interests, all Assets of the Estates, including all claims, rights, and Causes of Action and any property acquired by the Debtors or the Post-Effective Date Debtors during the Chapter 11 Cases or under or in connection with the Plan shall vest in the Debtors or the Post-Effective Date Debtors, as applicable, free and clear of all Claims, Liens, charges, other encumbrances, and interests.  Subject to the terms of the Plan, including the Plan of Merger, on and after the Effective Date, the Post-Effective Date Debtors (and the Plan Administrator, on behalf of the on behalf of the Post-Effective Date Debtors other than the Post-Effective Date FWE I Subsidiaries) may operate their businesses and may use, acquire, and dispose of property and prosecute, compromise, or settle any Claims (including any Administrative Expense Claims) and Causes of Action without notice to, supervision of or approval by the Bankruptcy Court and free and clear of any restrictions of the Bankruptcy Code or the Bankruptcy Rules other than restrictions expressly imposed by the Plan or the Order. Without limiting the foregoing, the Post-Effective Date Debtors may pay the charges that they incur on or after the Confirmation Date for Professional Persons' fees, disbursements, expenses, or related support services without application to the Bankruptcy Court, and the Plan Administrator may, consistent with the terms of

the Plan, Plan Administrative Agreement, and this Order, pay after the Effective Date the reasonable and necessary expenses in connection with the performance of its duties under the Plan, including the reasonable fees and expenses of professionals retained by the Plan Administrator, whether incurred before or after the Effective Date.

12.     <u>Abandonment of Certain Assets</u>.  Pursuant to the Order, the Plan, Plan Supplement, or any other implementing or supplementing Plan Documents, the Abandoned Properties and any related facilities, platforms, or other assets (the "**Abandoned Assets**"), each as determined by the Debtors, shall be abandoned pursuant to the Plan Documents without further notice to or order of the Court immediately upon the occurrence of the Effective Date pursuant to sections 105(a) and 554 of the Bankruptcy Code and/or deemed rejected pursuant to Section 365 of the Bankruptcy Code, as applicable.  The Abandoned Assets, including the Abandoned Properties, shall not be allocated to nor vest in the Post-Effective Date Debtors, FWE I, FWE IV, any FWE Additional Entity or any NewCo Entity (including, without limitation, the Credit Bid Purchasers).  Except as otherwise provided in the Plan Documents, none of the Debtors, their Estates, the Post-Effective Date Debtors, FWE I, FWE IV, any FWE Additional Entity nor the NewCo Entities (including, without limitation, the Credit Bid Purchasers) shall be liable for any obligations whatsoever arising from or relating to the post-Effective Date period with regards to the Abandoned Assets, including the Abandoned Properties, except that FWE III may be deemed to be the operator of Abandoned Properties that Fieldwood Energy LLC was the designated operator of immediately prior to the Effective Date.

13.     Notwithstanding anything to the contrary herein, in no event shall any NewCo Entity (including, without limitation, the Credit Bid Purchasers) be required to be, or deemed to be, the agent or designated operator of the Abandoned Properties or the assets of FWE III.

14.     Entry of this Order shall constitute: (i) approval, pursuant to sections 105(a) and 554 of the Bankruptcy Code, of the abandonment of the Abandoned Assets, including the Abandoned Properties; and (ii) authorization to relinquish the Abandoned Assets, including the Abandoned Properties.  Such abandonment and/or relinquishment does not alter the obligation of the Debtors, the Post-Effective Date Debtors, or the Plan Administrator, as applicable, to comply with laws reasonably designed to protect the public health and safety from identifiable hazards, including, but not limited to, plugging and abandonment obligations (the "**Decommissioning Obligations**") or in any manner extinguish, modify, or otherwise limit: (a) the obligations of non-Debtor third parties for Decommissioning  Obligations, or (b) the rights of the United States to enforce such Decommissioning Obligations.

15.     _Approval of Credit Bid Transaction_.  Pursuant to Bankruptcy Code sections 105, 363, 365, 1123, 1129 and 1141, the Credit Bid Transaction, the Credit Bid Purchase Agreement, the ancillary documents related thereto, all of the terms and conditions thereof, and all of transactions contemplated thereby are hereby authorized and approved.  The failure to specifically reference any particular provision of the Credit Bid Purchase Agreement or any ancillary document in this Order shall not diminish or impair the efficacy of such provision, it being the intent of this Court that the Credit Bid Purchase Agreement and each and every provision, term, and condition thereof be authorized and approved in its entirety.

16.     The Debtors' determination that the Credit Bid Purchase Agreement constitutes the highest and best offer constitutes a valid and sound exercise of the Debtors' business judgment. Approval of the Credit Bid Purchase and the consummation of the Sale Transaction is in the best interests of the Debtors' Estates, their creditors, and other parties in interest.

17.     The Debtors and the Credit Bid Purchasers are authorized to (a) consummate the Credit Bid Transaction pursuant to and in accordance with the terms of the Credit Bid Purchase Agreement, the Plan and this Order, (b) execute, and deliver, perform under, consummate, and implement the Credit Bid Purchase Agreement, together with all additional instruments and documents that may be reasonably necessary or desirable to implement the Credit Bid Transaction and (c) to take all further actions as may be reasonably required for the purposes of issuing, assigning, transferring, granting, conveying or conferring to the Credit Bid Purchaser the Credit Bid Acquired Interests and assumption of the Credit Bid Assumed Liabilities or as may be necessary or appropriate to perform the parties' obligations under the Credit Bid Purchase Agreement and the Plan.

18.     On the Effective Date, pursuant to sections 105, 363, 365, 1123, 1129 and 1141 of the Bankruptcy Code, in accordance with the Credit Bid Purchase Agreement, subject to the satisfaction or waiver of all applicable closing conditions under the Credit Bid Purchase Agreement, (i) all Credit Bid Acquired Interests shall be transferred to, and the Credit Bid Acquired Interests owned by the Debtors shall vest in the Credit Bid Purchasers, free and clear of all Liens (other than (x) any and all Liens securing the FLFO Claims or the obligations under the First Lien Exit Facility that attach to the Credit Bid Acquired Interests and are retained and deemed assigned to the First Lien Exit Facility Agent upon the Effective Date to secure the obligations under the First Lien Exit Facility, (y) all Liens securing the FLTL Claims that attach to the Credit Bid Acquired Interests and are deemed assigned to the Second Lien Exit Facility Agent upon the Effective Date to secure the obligations under the Second Lien Exit Facility (provided, that, in the case of clauses (x) and (y), which Liens securing the Exit Facilities shall be valid, binding, perfected and enforceable Liens and security interests without the need for any recordation, filing

or other action, subject to the terms of the Exit Facilities, and shall be deemed to have been perfected on the date on which such Liens were first perfected, including for purposes of determining the priority of such Liens against any other Liens and securing interests, including any mechanics' or other statutory Liens, *lis pendens*, or similar interests), and (z) Credit Bid Permitted Encumbrances, except in the case of Fieldwood U.A. Interests and the JV Interests (as defined in the Credit Bid Purchase Agreement), which shall vest free and clear of all Liens other than Liens described in clause (z) to the extent contemplated by the Credit Bid Purchase Agreement and clauses (x) and (y) above to the extent contemplated by the Exit Facility Documents), claims, charges, Interests, rights, liabilities, mortgages, deeds of trust, pledges, security interests of whatever kind or nature, rights of first refusal, rights of offset or recoupment, royalties, conditional sales or title retention agreements, hypothecations, preferences, debts, easements, suits, licenses, options, rights of recovery, judgments, orders and decrees of any court or foreign domestic governmental entity, taxes (including foreign, state and local taxes), covenants, restrictions, indentures, instruments, leases, options, off-sets, recoupments, claims for reimbursement or subrogation, contribution, indemnity or exoneration, encumbrances and other interests of any kind or nature whatsoever, including the Credit Bid Consent Rights and the Credit Bid Preferential Purchase Rights, (ii) all Credit Bid Assumed Liabilities shall be assumed by the Credit Bid Purchaser, and the sale of the Credit Bid Acquired Interests to the Credit Bid Purchasers pursuant to the Credit Bid Purchase Agreement and this Order will be a legal, valid, enforceable, and effective issuance, sale, and/or transfer of such interests, (iii) all Liens securing the FLFO Claims that attach to the Credit Bid Acquired Interests shall be retained and deemed assigned to the First Lien Exit Facility Agent upon the Effective Date to secure the obligations under the First Lien Exit Facility (which assigned Liens securing the First Lien Exit Facility shall be, subject to

the terms of the First Lien Exit Facility, valid, binding, perfected and enforceable Liens and security interests without the need for any recordation, filing or other action and shall be deemed to have been perfected on the date on which such Liens were first perfected, including for purposes of determining the priority of such Liens against any other Liens and securing interests, including any mechanics' or other statutory Liens, *lis pendens*, or similar interests), and (iv) all Liens securing the FLTL Claims that attach to the Credit Bid Acquired Interests and shall be deemed assigned to the Second Lien Exit Facility Agent upon the Effective Date to secure the obligations under the Second Lien Exit Facility (which assigned Liens securing the Second Lien Exit Facility shall be, subject to the terms of the Second Lien Exit Facility, valid, binding, perfected and enforceable Liens and security interests without the need for any recordation, filing or other action and shall be deemed to have been perfected on the date on which such Liens were first perfected, including for purposes of determining the priority of such Liens against any other Liens and securing interests, including any mechanics' or other statutory Liens, *lis pendens*, or similar interests).

19.     The transfer of the Credit Bid Acquired Assets pursuant to the Credit Bid Purchase Agreement and consummation of the Credit Bid Transaction, the Plan, and this Order do not require any consents other than as expressly provided for in the Credit Bid Purchase Agreement. Each and every federal, state, province, county, and local governmental agency or department, whether foreign or domestic, is hereby directed to accept any and all documents and instruments necessary and appropriate to consummate the transactions contemplated by the Credit Bid Purchase Agreement, the Plan and this Order.

20.     Except as expressly provided for in the Credit Bid Purchase Agreement, the Credit Bid Purchasers shall not assume or have any liability or other obligation of the Debtors arising

under or related to any of the Credit Bid Acquired Interests and shall not be liable for any Encumbrances (as defined in the Credit Bid Purchase Agreement) (except Credit Bid Permitted Encumbrances (except for the Fieldwood U.A. Interests and the JV Interests, which shall not have any Credit Bid Permitted Encumbrances)) against any Debtor, any Estate, FWE I, FWE III, FWE IV or any of the Debtors' affiliates, predecessors, successors or assigns. Neither the Credit Bid Purchasers nor any other NewCo Entity shall have any successor or vicarious liability of any kind or character whether known or unknown as of the Credit Bid Transaction Closing, or whether fixed or contingent, whether now existing or hereafter arising, with respect to the Credit Bid Acquired Interests or any Liabilities (as defined in the Credit Bid Purchase Agreement) of the Debtors arising prior to or after the Credit Bid Transaction Closing other than the Credit Bid Assumed Liabilities and Credit Bid Permitted Encumbrances (except for the Fieldwood U.A. interests and the JV Interests, which shall not have any Credit Bid Permitted Encumbrances).

21.     As of the Effective Date, and subject to the provisions of the Plan and this Order, all persons and entities are hereby forever prohibited and permanently enjoined from taking any action that would adversely affect or interfere with the consummation of the Credit Bid Transaction. Without limiting the generality of the foregoing (a) except as expressly provided for in the Credit Bid Purchase Agreement and except for (i) any and all Liens securing the FLFO Claims or the obligations under the First Lien Exit Facility that attach to the Credit Bid Acquired Interests that are retained and deemed assigned to the First Lien Exit Facility Agent upon the Effective Date to secure the obligations under the First Lien Exit Facility and (ii) all Liens securing the FLTL Claims that attach to the Credit Bid Acquired Interests and are deemed assigned to the Second Lien Exit Facility Agent upon the Effective Date to secure the obligations under the Second Lien Exit Facility, all persons or entities are hereby forever prohibited and permanently enjoined

from asserting against the Credit Bid Purchasers, their successor and assigns, or the Credit Bid Acquired Interests, any liabilities, liens, claims, encumbrances, or other interests, or successor or transferee liabilities, and (b) each non-Debtor party to an executory contract or unexpired lease being assumed and assigned to the Credit Bid Purchaser pursuant to the Credit Bid Purchase Agreement, the Plan, and this Order is hereby forever prohibited and permanently enjoined from imposing or charging against the Credit Bid Purchasers any rent accelerations, assignment fees, increases, or any other fees in connection with the specific assumed and assigned executory contract or unexpired lease by reason of the Debtors' assumption and assignment of such executory contract and unexpired lease, and the validity of such assumption and assignment, which shall in all events be effective as of the Effective Date, shall not be affected by the pendency or resolution of any dispute between the Debtors and any non-Debtor party to any such assigned executory contract or unexpired lease.

22.     Pursuant to section 363(m) of the Bankruptcy Code, the reversal or modification on appeal of the authorization provided herein to effectuate the Credit Bid Transaction and consummate the transactions contemplated by the Credit Bid Purchase Agreement shall not affect the validity of such transactions (including the assumption, assignment, and/or transfer of any executory contract or unexpired lease), unless such authorization and consummation of such transactions are duly stayed pending such appeal.

23.     No bulk sales law or any similar law of any state or other jurisdiction shall apply in any way to the Credit Bid Transaction.

24.     This Order is binding on all filing agents, filing officers, title agents, title companies, recorders of mortgages, recorders of deeds, registrars of deeds, registrars of patents, trademarks, or other intellectual property, administrative agencies, governmental departments,

secretaries of state, federal and local officials, and all other Persons and Entities who may be required by operation of law, the duties of their office, or contract, to accept, file, register, or otherwise record or release any documents or instruments, or who may be required to report or insure any title or state of title in or to any lease ("**Recordation Officers**").  Except with respect to (x) any and all Liens securing the FLFO Claim or the obligations under the First Lien Exit Facility that attach to the Credit Bid Acquired Interests and are retained and deemed assigned to the First Lien Exit Facility Agent upon the Effective Date to secure the obligations under the First Lien Exit Facility, and (y) all Liens securing the FLTL Claims that attach to the Credit Bid Acquired Interests and are deemed assigned to the Second Lien Exit Facility Agent upon the Effective Date to secure the obligations under the Second Lien Exit Facility, each and every Recordation Officer is authorized, from and after the Effective Date, to strike all Claims, interests, Liens, or other encumbrances in or against the Debtors' assets from their records, official and otherwise, without further order of the Court or act of any party.  Each and every Recordation Officer is authorized (a) to file, record, and/or register any and all documents and instruments presented to consummate or memorialize the Credit Bid Purchase Agreement, the Plan and the transactions contemplated thereby (including the deemed assignment of the Liens securing the FLFO Claims and the FLTL Claims that attach to the Credit Bid Acquired Assets to the applicable Exit Facility Agents upon the Effective Date to secure the obligations under the Exit Facilities) and (b) to accept and rely on this Order as the sole and sufficient evidence of the transfer of title of the Credit Bid Acquired Interests.

25.     To the extent applicable, the terms and provisions of the Credit Bid Purchase Agreement, the Plan, and this Order shall upon the Effective Date be binding in all respects upon (a) the Debtors and their affiliates, (b) all known and unknown creditors of, and holders of equity

security interests in, any Debtor, including any holders of Claims, interests, Liens, and other encumbrances, (c) the Post-Effective Date Debtors, (d) the RSA Parties, (e) the Credit Bid Purchasers, and (f) all interested parties, and all successors and assigns of any of the foregoing.

26.     Section 1141.  This Order is and shall be effective as a determination that the Credit Bid Purchasers, FWE I, FWE IV and/or the Post-Effective Date Debtors shall be discharged, on the Effective Date, from all Claims, interests, Liens, other encumbrances, and liabilities of any kind or nature whatsoever, to the fullest extent permitted under section 1141 of the Bankruptcy Code, except for as specifically set forth in the Credit Bid Purchase Agreement and except for (i) any and all Liens securing the FLFO Claims or the obligations under the First Lien Exit Facility that attach to the Credit Bid Acquired Interests that are retained and deemed assigned to the First Lien Exit Facility Agent upon the Effective Date to secure the obligations under the First Lien Exit Facility and (ii) all Liens securing the FLTL Claims that attach to the Credit Bid Acquired Interests and are deemed assigned to the Second Lien Exit Facility Agent upon the Effective Date to secure the obligations under the Second Lien Exit Facility, the Apache Implementation Agreement or the Plan of Merger, as applicable.  As set forth in the Plan, the Liens securing the FLFO Claims that attach to the Credit Bid Acquired Interests shall be retained and deemed assigned to the First Lien Exit Facility Agent upon the Effective Date to secure the obligations under the First Lien Exit Facility.  The Liens securing the FLTL Claims that attach to the Credit Bid Acquired Interests shall be retained and deemed assigned to the Second Lien Exit Facility Agent upon the Effective Date to secure the obligations under the Second Lien Exit Facility.

27.     Pursuant to section 1141(c) and 363(f) of the Bankruptcy Code, on the Effective Date, all Persons are forever prohibited and enjoined from taking any action against the Credit Bid Purchasers or Post-Effective Date Debtors based on any Claims, interests, Liens, and other

encumbrances to the extent such Claims, interests, Liens and other encumbrances are released or discharged pursuant to the terms of the Plan.

28.     <u>Plan of Merger</u>.  Notwithstanding anything in the Plan or this Order, FWE IV shall not be liable for any liability or obligation on account of any Claim or Interest that is compromised, settled, released or discharged pursuant to the Plan.

29.     <u>Restructuring Transactions</u>.  After the Confirmation Date, the Debtors, the Post-Effective Date Debtors, the Plan Administrator, or the NewCo Entities as applicable, and the appropriate officers, representatives, and members of the boards of managers or boards of directors thereof, as applicable, shall be authorized to and may issue, execute, deliver, file, or record such contracts, documents, securities, instruments, releases, and other agreements, including those contained in the Plan Documents, and take such other actions as may be necessary and appropriate to effectuate, implement, and further evidence the terms and conditions of the Plan, including the Restructuring Transactions and all other actions defined in Article V of the Plan or otherwise contemplated by the Plan, including the conversion, merger, or dissolution of any Debtors, as applicable, without the need for further approvals, authorization, or consents, except for those expressly required pursuant to the Plan.  All actions contemplated by the Plan, including all actions in connection with the Plan of Merger and related documents, Exit Facilities, and Equity Rights Offerings, are hereby effective and authorized to be taken on, prior to, or after the Effective Date, as applicable, under this Order, without further application to, or order of this Court, or further action by the respective officers, directors, managers, members, or equity holders of the Debtors, the Post-Effective Date Debtors, the Plan Administrator or the NewCo Entities.

30.     <u>Plan Classification Controlling</u>.  The classification of Claims and Interests for purposes of the Distributions to be made under the Plan shall be governed solely by the terms of

the Plan.  The classifications set forth on the Ballots tendered to or returned by the Debtors' creditors in connection with voting on the Plan (a) were set forth on the Ballots for purposes of voting to accept or reject the Plan, (b) do not necessarily represent, and in no event shall be deemed to modify or otherwise affect, the actual classification of such Claims and Interests under the Plan for Distribution purposes, and (c) shall not be binding on the Debtors.

31. <u>Approval of Plan Settlement and Other Settlements</u>.  The entry of this Order constitutes this Court's approval of the terms of the Plan Settlement that are set forth in the Plan and of all other compromises and settlements set forth in the Plan, all of which are in the best interests of the Debtors, their Estates, and holders of Claims and Interests and are fair, equitable, and reasonable.

32. <u>Directors and Officers</u>.  The officers and directors of the Debtors shall be relieved of any and all duties with respect to the Debtors as of the Effective Date of the Plan.  Upon and following the Effective Date, the Plan Administrator shall serve as the sole officer, director, or manager of each Post-Effective Date Debtor, except the Post-Effective Date FWE I Subsidiaries. The Plan Administrator may also elect such additional manager(s) and officer(s) of each Post-Effective Date Debtor (except the Post-Effective Date FWE I Subsidiaries), as the Plan Administrator deems necessary to implement the Plan and the actions contemplated herein and therein.

33. <u>Distributions under the Plan</u>.  The provisions of Article VI of the Plan, including, without limitation, the provisions governing Distributions, are fair and reasonable and are approved.

34.     Disputed Claims.  The provisions of Article VII of the Plan, including, without limitation, the provisions governing procedures for resolving Disputed Claims, are fair and reasonable and are approved.

35.     Executory Contracts.  In accordance with Section 8.1 of the Plan, on the Effective Date, except as otherwise provided in the Plan, each executory contract and unexpired lease to which any of the Debtors are parties shall be deemed automatically rejected pursuant to sections 365 and 1123 of the Bankruptcy Code, unless such executory contract or unexpired lease: (i) was previously assumed or rejected by the Debtors pursuant to an order of the Bankruptcy Court; (ii) previously expired or terminated pursuant to its own terms or by agreement of the parties thereto; (iii) is the subject of a motion to assume filed by the Debtors on or before the Confirmation Date; (iv) is identified in Sections 8.4 or 8.5 of the Plan; or (v) is identified for assumption on the Schedule of Assumed Contracts included in the Plan Supplements, which Schedule of Assumed Contracts will identify executory contracts or unexpired leases for assumption and assignment to the Credit Bid Purchaser in accordance with the Credit Bid Purchase Agreement.  In accordance with Section 8.3 of the Plan, any proofs of Claim filed with respect to the rejection of an executory contract or unexpired lease must be filed with this Court and served upon counsel for the Debtors, Post-Effective Date Debtor, or the Plan Administrator, as applicable, by the later of (i) thirty (30) days after the filing and service of the notice of the occurrence of the Effective Date; and (ii) thirty (30) days after entry of an Order rejecting such contract or lease if the contract or lease is the subject of a pending Assumption Dispute.

36.     The Debtors have cured or demonstrated their ability to cure any default with respect to any act or omission that occurred prior to the Effective Date under any of the executory contracts or unexpired leases proposed to be assumed or assumed and assigned or assumed and

allocated, as applicable (collectively, the "**Assumed Contracts**"), pursuant to the terms of the Plan, the Credit Bid Purchase Agreement, and any Plan of Merger, as applicable, within the meaning of section 365(b)(1)(A) of the Bankruptcy Code.  Unless otherwise agreed to by the parties, other than with respect to an Assumed Contract that is the subject of an Assumption Dispute (as defined below), the Cure Amounts set forth in the Schedule of Assumed Contracts are the amounts necessary to "cure" all "defaults" within the meaning of section 365(b) of the Bankruptcy Code under the Assumed Contracts.  Other than with respect to an Assumed Contract that is the subject of an Assumption Dispute, the promise by the Debtors, the Post-Effective Date Debtors, FWE IV, or the Credit Bid Purchaser, as applicable, to perform the obligations under their respective Assumed Contracts after the Effective Date shall constitute adequate assurance of their future performance of and under each of their respective Assumed Contracts within the meaning of sections 365(b)(1) and 365(f)(2), as applicable.

37.     To the extent an Assumption Dispute relates solely to the Cure Amount or the nature thereof (a "**Cure Dispute**"), subject to the terms of the Credit Bid Purchase Agreement, the Debtors may assume or assume and assign, or assume and allocate the applicable executory contract or unexpired lease before the resolution of the Cure Dispute; *provided*, that the Post-Effective Date Debtors or Credit Bid Purchaser, as applicable shall be responsible to pay the determined amount to be Allowed by the Bankruptcy Court or otherwise agreed to by such non-Debtor party.  The Debtors or Post-Effective Date Debtors, as applicable, subject to the terms of the Credit Bid Purchase Agreement, may settle any Cure Dispute without any further notice to any party or any action, order, or approval of the Bankruptcy Court.

38.     Subject to Section 8.2 of the Plan, upon an agreement between the Debtors and the relevant counterparty to an executory contract or unexpired lease, Assumption Disputes, may be

adjourned to a hearing after the Confirmation Hearing (collectively, the "**Adjourned Assumption Disputes**").  The Debtors have agreed to Adjourned Assumption Disputes with the following parties: Nautilus Pipeline Company, L.L.C. ("**Nautilus**") (ECF No. 1428); Manta Ray Offshore Gathering Company, L.L.C. ("**Manta Ray**") (ECF No. 1429); Multiklient Invest AS ("**MKI**") (ECF No. 1438); Enterprise Gas Processing LLC (together with each of its affiliates, collectively, "**Enterprise**") (ECF No. 1445); Helis Oil & Gas Company, L.L.C. ("**Helis**") (ECF Nos. 1475, 1508); Aker Solutions Inc. ("**Aker**") (ECF No. 1485); Sea Robin Pipeline Company, LLC, West Cameron Dehydration Company, L.L.C., Florida Gas Transmission, LLC, Stingray Pipeline Company, L.L.C., Trunkline Gas Company, LLC, and Trunkline Field Services LLC ("**Energy Transfer**") (ECF No. 1489, 1630); Fugro USA Marine, Inc. subsidiaries and related entities ("**Fugro**") (ECF No. 1490); Genesis Energy, L.P. and its affiliates, High Island Offshore System, L.L.C., Poseidon Oil Pipeline Company, L.L.C., GEL Offshore Pipeline, LLC and Manta Ray Gathering Company, L.L.C. (collectively, "**Genesis**") (ECF No. 1503); Cox Oil, LLC, Cox Operating LLC, Energy XXI GOM, LLC, Energy XXI Gulf Coast, Inc., Energy XXI Onshore, LLC, Energy XXI Pipeline, LLC, Energy XXI Pipeline I, LLC, Energy XXI Pipeline II, LLC, M21K, LLC and EPL Oil & Gas, Inc., on behalf of themselves and their applicable affiliates (collectively, the "**Cox Entities**") (ECF No. 1504); Marubeni Oil & Gas (USA) LLC ("**MOGUS**") (ECF 1509, 1515); Targa Midstream Services, LLC, Targa Liquids Marketing and Trade, LLC and Venice Energy Services Company, L.L.C. (collectively, the "**Targa Entities**") (ECF No. 1510); SBM Gulf Production, LLC ("**SBM**") (ECF No. 1512); Performance Energy Services, LLC ("**PES**") (ECF No. 1514); Walter Oil & Gas Corporation ("**Walter**") (ECF No. 1513); Ankor Energy LLC and Ankor E&P Holdings LLC (collectively, "**Ankor**") (ECF No. 1516); BP Exploration & Production Inc. ("**BP**") (ECF No. 1519); the State of Louisiana, Department of

Natural Resources and the State Mineral and Energy Board ("**State**") (ECF No. 1522); Plains Gas Solutions, LLC (referred to herein as "**PGS**") (ECF No. 1523); Irongate Rental Services, LLC ("**Irongate**") (ECF No. 1524); EXPRO AMERICAS, L.L.C. ("**Expro**") (ECF No. 1525); Talos Energy Offshore LLC, Talos Energy LLC, Talos Energy Inc., and Talos Production Inc. (collectively, "**Talos**") (ECF No. 1527); W&T Offshore, Inc., W&T Energy VI, LLC (collectively, "**W&T**") (ECF No. 1538); McMoRan Oil & Gas, LLC, Freeport-McMoRan Oil & Gas LLC (collectively, "**McMoRan**") (ECF No. 1542); Macquarie Corporate and Asset Funding, Inc. ("**Macquarie**"); and CGG Services (U.S.) Inc.

39.     The determination of assumption, assumption and assignment, assumption and allocation, and/or rejection of the executory contracts and unexpired leases relating to the Adjourned Assumption Disputes is hereby specifically reserved pending resolution of the relevant Adjourned Assumption Dispute, and any and all rights and claims of the parties with respect to such executory contracts and unexpired leases, including any and all rights afforded under the Bankruptcy Code and other applicable law, are hereby expressly reserved.

40.     If there is an Assumption Dispute, the Debtors, the Post-Effective Date Debtors, FWE I, FWE IV, or Credit Bid Purchaser, as applicable, reserve and shall have the right to reject or nullify the assumption, assumption and assignment, or assumption and allocation of the applicable executory contract or unexpired lease no later than thirty (30) days after an order of the Bankruptcy Court resolving such Assumption Dispute becomes a Final Order.

41.     Subject to the occurrence of the Effective Date, entry of this Order by the Court shall constitute approval of the assumptions and assumptions and assignments provided for in the Plan pursuant to sections 365(a) and 1123 of the Bankruptcy Code and a determination by this Court that the Credit Bid Purchaser, FWE I, FWE IV and/or Post-Effective Date Debtors, as

applicable, have provided adequate assurance of future performance under such assumed executory contracts and unexpired leases.  In accordance with the Plan, each executory contract and unexpired lease assumed and allocated, or assumed and assigned pursuant to the Plan shall vest in and be fully enforceable by the Credit Bid Purchasers, FWE I, FWE IV, or the Post-Effective Date Debtors, as applicable, in accordance with its terms, except as modified by the provisions of the Plan, any order of this Court authorizing and providing for its assumption, or applicable law.

42.     <u>Exit Facilities</u>.  On the Effective Date, the applicable NewCo Entities are authorized execute and deliver the Exit Facility Documents and such documents shall become effective in accordance with their terms.  On and after the Effective Date, the Exit Facility Documents shall constitute legal, valid, and binding obligations of the applicable NewCo Entities and be enforceable in accordance with their respective terms and such obligations shall not be enjoined or subject to discharge, impairment, release, avoidance, recharacterization, or subordination under applicable law, the Plan or this Order, and the Credit Bid Purchaser shall be authorized to incur the loans under the Exit Facilities and use the proceeds of such loans, in each case, in accordance with the terms of this Plan and the Exit Facility Documents without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order, or rule, or the vote, consent, authorization, or approval of any Person.  The terms and conditions of the Exit Facility Documents shall bind the Credit Bid Purchaser and each other Entity that enters into the Exit Facility Documents.  The Liens securing the FLFO Claims that attach to the Credit Bid Acquired Interests shall be retained and deemed assigned to the First Lien Exit Facility Agent upon the Effective Date to secure the obligations under the First Lien Exit Facility.  The Liens securing the FLTL Claims that attach to the Credit Bid Acquired Interests shall be retained and deemed

assigned to the Second Lien Exit Facility Agent upon the Effective Date to secure the obligations under the Second Lien Exit Facility.

43.    This Order approves the Exit Facility Documents (including the transactions and related agreements contemplated thereby, and all actions to be taken, undertakings to be made, and obligations to be incurred and fees and expenses to be paid by the Debtors or Post-Effective Date Debtors, as applicable, in connection therewith), the First Lien Exit Facility Commitment Letter (including the transactions contemplated thereby, and all actions to be taken, undertakings to be made, and obligations and guarantees to be incurred and fees paid in connection therewith (including any payments under the First Lien Exit Facility Commitment Letter)), and the Second Lien Backstop Commitment Letter (including the transactions contemplated thereby, and all actions to be taken, undertakings to be made, and obligations and guarantees to be incurred and fees paid in connection therewith (including the Second Lien Backstop Commitment Premium and any other payments under the Backstop Agreement)), and, to the extent not approved by the Bankruptcy Court previously, the Credit Bid Purchaser and any other applicable NewCo Entity is authorized to, without further notice to the Bankruptcy Court, (i) execute and deliver those documents necessary or appropriate to obtain the Exit Facilities, including the Exit Facility Documents, each as applicable, and incur and pay any fees and expenses in connection therewith, and (ii) make any act or take any action under applicable law, regulation, order or rule or vote, consent, authorization, or approval of any Person, subject to such modifications as the Credit Bid Purchaser or any other applicable NewCo Entity may deem to be necessary to enter into the Exit Facility Documents.

44.    On the Effective Date, all of the claims, liens, and security interests to be granted in accordance with the terms of the Exit Facility Documents (i) shall be legal, binding, and

enforceable liens on, and security interests in, the collateral granted thereunder in accordance with the terms of the Exit Facility Documents, (ii) shall be deemed automatically attached and perfected on the Effective Date, subject only to such liens and security interests as may be permitted under the Exit Facility Documents with the priorities established in respect thereof under applicable non-bankruptcy law and the New Intercreditor Agreement, and (iii) shall not be subject to avoidance, recharacterization, or subordination (including equitable subordination) for any purposes whatsoever and shall not constitute preferential transfers, fraudulent conveyances, or other voidable transfers under the Bankruptcy Code, this Plan, this Order or applicable non-bankruptcy law.  To the extent provided in the Exit Facility Documents, the Exit Facility Agents are authorized, but not required, to file with the appropriate authorities mortgages, financing statements and other documents, and to take any other action in order to evidence, validate, and perfect such liens or security interests.

45.    On the Effective Date, the applicable NewCo Entities, the First Lien Exit Facility Agent and the Second Lien Exit Facility Agent shall enter into the New Intercreditor Agreement substantially in the form contained in the Plan Supplement.

46.    <u>Issuance of New Equity Interests, Subscription Rights and Warrants</u>.  On or after the Effective Date, NewCo is authorized to issue or cause to be issued the New Equity Interests, the Subscription Rights, and any New Equity Interests issuable upon exercise of the Subscription Rights in accordance with the terms of the Plan, the FLTL Equity Rights Offering Procedures, FLTL ERO Backstop Agreement, the SLTL Equity Rights Offering Procedures, SLTL ERO Backstop Agreement, the Second Lien Backstop Commitment Letter and other applicable documents without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order, or rule, or the vote, consent, authorization, or approval of any

Person.  The New Equity Interests shall be issued and distributed free and clear of all Liens, Claims, and other Interests, and shall be duly authorized and validly issued.

47.     On the Effective Date, NewCo is authorized to issue or cause to be issued the New Money Warrants, the GUC Warrants, the SLTL Warrants (collectively, the "**Warrants**"), and any New Equity Interests issuable upon exercise of the Warrants for distribution in accordance with the terms of the Plan, the New Money Warrant Agreement, the GUC Warrant Agreement and the SLTL Warrant Agreement and the Second Lien Backstop Commitment Letter, as applicable, without the need for any further court order or corporate or shareholder action by any Person.  The Warrants shall be issued and distributed free and clear of all Liens, Claims and other Interests, and the Warrants, and all New Equity Interests issued upon exercise of the Warrants, shall be duly authorized and validly issued.

48.     On the Effective Date, the NewCo Entities and all holders of the New Equity Interests or Warrants then outstanding shall be deemed to be parties to the NewCo Organizational Documents (as applicable) without the need for execution by any such holder.  As applicable, the NewCo Organizational Documents shall be binding on the NewCo Entities Debtors and all parties receiving New Equity Interests or Warrants in connection with the Plan.  Each holder of New Equity Interests or Warrants acquired or received under the Plan, whether such holder acquired such New Equity Interests or Warrants on the Effective Date or any time or from time to time thereafter, shall be deemed to have actual knowledge of the terms, provisions, restrictions and conditions set forth in the NewCo Organizational Documents and the New Money Warrant Agreement, the GUC Warrant Agreement and the SLTL Warrant Agreement  for all purposes of thereunder and applicable law, whether or not any such holder received a separate notice of such terms, provisions, restrictions and conditions.  Without limiting the foregoing, this Order and the

Plan (including the Plan Supplements) shall be deemed sufficient and adequate notice of such terms, provisions, restrictions and conditions to all holders of New Equity Interests and Warrants, such that all such holders shall be deemed to have actual knowledge thereof and shall be deemed to have acquired (whether on the Effective Date or at any time or from time to time thereafter) such New Equity Interests or Warrants subject thereto, as applicable.

49.     The offer, issuance, and distribution of the New Equity Interests (other than the Backstop Commitment Premium Equity Interests, the New Money Warrants, or any New Equity Interests issued upon exercise of the New Money Warrants or under the Management Incentive Plan), the Subscription Rights, the SLTL Warrants, the GUC Warrants, the GUC True-Up Warrants and the New Equity Interests issuable upon exercise of the Subscription Rights, the SLTL Warrants, the GUC Warrants and the GUC True-Up Warrants, as contemplated by Sections 5.3, 5.4, and 5.6 of the Plan shall be exempt, pursuant to section 1145 of the Bankruptcy Code, without further act or actions by any Person, from registration under the Securities Act, and all rules and regulations promulgated thereunder, and any other applicable securities laws, to the fullest extent permitted by section 1145 of the Bankruptcy Code.

50.     Such New Equity Interests (other than the Backstop Commitment Premium Equity Interests, the New Money Warrants, or any New Equity Interests issued upon exercise of the New Money Warrants or under the Management Incentive Plan), the Subscription Rights, the SLTL Warrants, the GUC Warrants and the GUC True-Up Warrants and the New Equity Interests issuable upon exercise of the Subscription Rights, the SLTL Warrants, the GUC Warrants and the GUC True-Up Warrants may be resold without registration under the Securities Act or other federal securities laws pursuant to the exemption provided by section 4(a)(1) of the Securities Act, subject to (i) the holder not being an "underwriter" with respect to such securities, as that term is

defined in 1145(b) of the Bankruptcy Code; (ii) the holder (A) not being "affiliate" of NewCo as defined in Rule 144(a)(1) under the Securities Act, (B) not having been such an "affiliate" within ninety (90) days of such transfer and/or (C) not having acquired such securities from an "affiliate" within one year of such transfer (other than, with respect to clause (ii), such resales as may be permitted by and subject to the conditions of Rule 144 of the Securities Act); (iii) compliance with any rules and regulations of the Securities and Exchange Commission applicable at the time of any future transfer of such securities or instruments; (iv) any restrictions on the transferability of the New Equity Interests contained in the NewCo Organizational Documents, the GUC Warrant Agreement, New Money Warrant Agreement, SLTL Tranche 1 Warrant Agreement, SLTL Tranche 2 Warrant Agreement or pursuant to applicable securities laws; and (v) any applicable regulatory approval.  In addition, such section 1145 exempt securities generally may be resold without registration under state securities laws pursuant to various exemptions provided by the respective laws of the several states.

51.     The issuance and sale of the Backstop Commitment Premium Equity Interests, and the New Money Warrants (including any New Equity Interests issued upon exercise of the New Money Warrants) under this Plan shall be exempt from registration under the Securities Act or any other applicable securities laws to the fullest extent permitted by section 4(a)(2) of the Securities Act and/or Regulation D thereunder. The Backstop Commitment Premium Equity Interests, and the New Money Warrants (including any New Equity Interests issued upon exercise of the New Money Warrants) issued in reliance on the exemption from registration set forth in section 4(a)(2) of the Securities Act and/or Regulation D thereunder, will be considered "restricted securities" and may not be transferred except pursuant to an effective registration statement or under an available

exemption from the registration requirements of the Securities Act, such as, under certain conditions, the resale provisions of Rule 144 of the Securities Act.

52.      None of the Debtors, NewCo and its subsidiaries (including the Credit Bid Purchasers), or any other Person shall be required to provide any further evidence other than the Plan or this Order with respect to the treatment of the New Equity Interests (including any New Equity Interests issued upon exercise of the Subscription Rights, the New Money Warrants, the SLTL Warrants or the GUC Warrants), the Subscription Rights, the New Money Warrants, the SLTL Warrants, or the GUC Warrants, under applicable securities laws. DTC and any transfer agent (as applicable) shall be required to accept and conclusively rely upon the Plan or this Order in lieu of a legal opinion regarding whether the New Equity Interests (including any New Equity Interests issued upon exercise of the Subscription Rights, the New Money Warrants, the SLTL Warrants or the GUC Warrants), the Subscription Rights, the New Money Warrants, the SLTL Warrants, or the GUC Warrants are exempt from registration and/or eligible for DTC book-entry delivery, settlement, and depository services (to the extent applicable).

53.      Notwithstanding anything to the contrary in this Order or the Plan, but except with respect to any opinion required by the Exit Facility Documents no Person (including DTC and any transfer agent) shall be entitled to require a legal opinion regarding the validity of any transaction contemplated by this Order or the Plan, including whether the New Equity Interests (including any New Equity Interests issued upon exercise of the Subscription Rights, the New Money Warrants, the SLTL Warrants or the GUC Warrants), the Subscription Rights, the New Money Warrants, the SLTL Warrants, or the GUC Warrants are exempt from registration and/or eligible for DTC book-entry delivery, settlement, and depository services.

54.  <u>Insurance Policies</u>.  All insurance policies to which any Debtor is a party as of the Effective Date, including any D&O Policy, shall be deemed to be and treated as executory contracts and shall be assumed by and vest in the applicable Debtors or the Post-Effective Date Debtors and shall continue in full force and effect thereafter in accordance with their respective terms.  Coverage for defense and indemnity under the D&O Policy shall remain available to all individuals within the definition of "Insured" in any D&O Policy.  After the Effective Date, the Post-Effective Date Debtors or Plan Administrator shall not terminate or otherwise reduce the coverage under any D&O Policy (including any "tail policy") in effect as of the Petition Date, and any current and former directors, officers, members, managers, agents or employees of any of the Debtors who served in such capacity at any time before the Effective Date shall be entitled to the full benefits of any such D&O Policy for the full term of such policy regardless of whether such members, managers, directors, and/or officers remain in such positions after the Effective Date to the extent set forth in such policies.

55.  <u>Exemption from Certain Transfer Taxes</u>.  To the fullest extent permitted by applicable law, all sale transactions and asset transfers consummated by the Debtors and approved by the Bankruptcy Court on and after the Confirmation Date through and including the Effective Date, including (a) the issuance, distribution, transfer or exchange of any securities, instruments or documents, including the receipt and distribution by the Debtors of the New Equity Interests, Warrants, Subscription Rights, and beneficial interests in the Single Share under the Plan, (b) the creation of any Lien, mortgage, deed of trust or other security interest, (c) all sale transactions and asset transfers consummated by the Debtors and approved by the Bankruptcy Court on and after the Confirmation Date through and including the Effective Date, including any transfers pursuant to the Credit Bid Transaction and the Divisive Merger or otherwise effectuated under the Plan,

(d) any assumption, assignment, or sale by the Debtors of their interests in unexpired leases of nonresidential real property or executory contracts pursuant to section 365(a) of the Bankruptcy Code, (e) the grant of collateral under the Standby Loan Agreement and (f) the issuance, renewal, modification or securing of indebtedness (including, for the avoidance of doubt, the modifications and/or securing of indebtedness contemplated by the Exit Facility Documents) by such means, and the making, delivery or recording of any deed, mortgage or other instrument of transfer under, in furtherance of, or in connection with, the Plan, including this Order, shall constitute a "transfer under a plan" within the purview of section 1146 of the Bankruptcy Code, and shall not be subject to any document recording tax, stamp tax, conveyance fee or other similar tax, mortgage tax, real estate transfer tax, mortgage recording tax, Uniform Commercial Code filing or recording fee, regulatory filing or recording fee, sales tax, use tax or other similar tax or governmental assessment. This Order is and shall be binding upon and shall govern the acts of all entities, including without limitation, all filing agents, filing officers, title agents, title companies, recorders of mortgages, recorders of deeds, registrars of deeds, administrative agencies, governmental departments, secretaries of state, federal, state, and local officials, and all other persons and entities who may be required, by operation of law, the duties of their office, or contract, to accept, file, register, or otherwise record or release any document or instrument without requiring the payment of any filing or recording fees, documentary stamp tax, document recording tax, deed stamps, stamp tax, conveyance fee or other similar tax, mortgage tax, real estate transfer tax, mortgage recording tax, sales tax, use tax, transfer tax, intangible tax or similar tax or governmental assessment.

56.    <u>Term of Injunctions or Stays</u>.   Unless otherwise provided in the Plan or in this Order, all injunctions or stays arising under or entered during the Chapter 11 Cases under section

105 or 362 of the Bankruptcy Code, or otherwise, and in existence on the Confirmation Date, shall remain in full force and effect until the later of the Effective Date and the date indicated in the order providing for such injunction or stay.

57.     <u>Releases, Exculpation, Injunction</u>.  Pursuant to Bankruptcy Rule 3020(c)(1), the following provisions in the Plan are hereby approved and will be immediately effective on the Effective Date without further order or action by the Court, any of the parties to such releases, or any other Entity: (a) Release of Liens (Section 10.7(c)), (b) Debtor Release (Section 10.7(a)), (c) Third-Party Release (Section 10.7(b)), (d) CUSA Party Release (Section 10.7(d)), (e) CUSA-Release Party Release (Section 10.7(e)), (f) Exculpation (Section 10.8), and (g) Injunction (Section 10.9).

58.     <u>Restructuring Expenses</u>.  The Restructuring Expenses incurred, or estimated to be incurred, up to and including the Effective Date shall be paid in full in Cash by the Debtors on the Effective Date (to the extent not previously paid prior to or during the course of the Chapter 11 Cases) without the requirement to file a fee application with the Bankruptcy Court and without any requirement for review or approval by the Bankruptcy Court or any other party.  All Restructuring Expenses to be paid on the Effective Date shall be estimated prior to and as of the Effective Date and such estimates shall be delivered to the Debtors at least three Business Days before the anticipated Effective Date; *provided,* that such estimates shall not be considered an admission or limitation with respect to the fees and expenses of such parties.  In addition, the Debtors and the Post-Effective Date Debtors (as applicable) shall continue to pay post-Effective Date, when due and payable in the ordinary course, Restructuring Expenses related to implementation, consummation and defense of the Plan, whether incurred before, on, or after the

Effective Date, to the extent expressly provided for under the Plan, and for which funds have been allocated to the Post-Effective Date Debtors under the Plan for such purposes.

59.     <u>Cortland</u>.  Nothing in the Plan or this Order shall, or shall be deemed, to waive or release the obligations of the Prepetition SLTL Lenders to the Prepetition SLTL Administrative Agent pursuant to the documents executed in connection with the Prepetition SLTL Loans, including, without limitation, the Prepetition SLTL Credit Agreement.

60.     <u>Anadarko</u>.  The following agreements related to Anadarko U.S. Offshore LLC, Anadarko Petroleum Corporation, and Anadarko E&P Company (collectively, and along with affiliates and predecessors in interest, "**Anadarko**") shall be assumed and assigned or allocated to the entities identified in the Debtors' schedule of assumed contracts (as amended, modified, or supplemented from time to time, the "**Schedule of Assumed Contracts**") annexed as **<u>Exhibit A</u>** to the *Notice of Filing of Amended Schedule of Assumed Contracts and Cure Amounts* filed on June 2, 2021 as ECF No. 1456, consistent with the Letter Agreement and subject to the amendments set forth and referenced therein: (i) Joint Operating Agreement covering all of Green Canyon Block 768, effective February 1, 2004, by and between Kerr-McGee Oil & Gas Corporation and Fieldwood Energy LLC, as successor in interest to Noble Energy Inc. (as amended, and including all exhibits and related agreements, the "**JOA**"); and (ii) Production Handling Agreement dated effective January 1, 2006 by and between Anadarko and Fieldwood governing the hydrocarbon and water production from the Ticonderoga Field, as therein defined (the "**PHA**").  Further, consistent with the Letter Agreement (defined below) and subject to the amendments set forth and referenced in the Letter Agreement (a) the Lease of Platform Space Agreement Main Pass 289C Field Platform, originally dated November 29, 2001, originally by and between Apache Corporation and Vastar Resources, Inc. et. al. as amended (the "**LOPS**

**Agreement**") shall be assumed and allocated to FWE I; and (b) the Letter Agreement Re: Ticonderoga (GC 768) and MP 289C, dated June of 2021, by and between Anadarko and Fieldwood Energy LLC (the "**Letter Agreement**"), to the extent related to the Credit Bid Acquired Interests, shall be assumed and assigned to the Credit Bid Purchaser, and to the extent related to interests allocated to FWE I, shall be assumed and allocated to FWE I.

61.     The total stipulated allowed cure amount for the JOA, PHA, and LOPS Agreement shall be $2,231,025.42 (the "**Anadarko Cure Amount**").  The Cure Amount for the Letter Agreement shall be $0.  To the extent the Schedule of Assumed Contracts identifies agreements with Anadarko other than the agreements specifically identified herein, such agreements shall also be assumed in accordance with the Plan, *provided*, that the Debtors shall not be required to pay any cure amount with respect to such agreements other than the Anadarko Cure Amount; *provided, further*, that Anadarko expressly agrees that the Debtors have provided adequate assurance of future performance with respect to the JOA, the PHA, the LOPS Agreement, the Letter Agreement, and any other contract assumed by the Debtors pursuant to the Plan.  The Debtors may amend the Schedule of Assumed Contracts consistent with the terms of these paragraphs 57 and 58.

62.     Nothing within the Plan or Order constitutes a transfer of title and/or ownership or operatorship of any of the Abandoned Properties to Anadarko.  Anadarko's rights, claims, defenses, and interests, if any, including, but not limited to, security interests, bonds, security rights, contract rights, setoff and recoupment rights, indemnification rights, and subrogation rights, against non-Debtor parties (other than with respect to any NewCo Entity or any Credit Bid Acquired Interests, in each case except with respect to any right, claim, or interest arising under an Anadarko agreement assumed and assigned or allocated to any NewCo Entity (which are hereby expressly reserved)), including, without limitation, predecessors and any other co-liable or jointly

and severally liable parties, under operating agreements, other contracts, and applicable law are hereby reserved.  For the avoidance of doubt, Anadarko shall not be a "Releasing Party" under the Plan.  Nothing within the Plan or Order shall create or vest in any entity, including the Post-Effective Date Debtors, FWE I, FWE IV, or the NewCo Entities, any rights or claims against Anadarko that do not otherwise exist under applicable law or agreement, including, without limitation any rights or claims pursuant to any contracts or agreements being assumed and assigned or assumed and allocated to such entities.

63.     Other than the claims preserved and allowed under this Stipulation, any Proofs of Claim filed by Anadarko shall be deemed withdrawn as of the Effective Date of the Debtors' Plan.

64.     <u>Ecopetrol America LLC</u>.  Upon the assumption and assignment of that certain Unit Operating Agreement Offshore Louisiana, by and between Fieldwood Energy LLC, Ecopetrol America LLC ("**Ecopetrol**") and Talos Energy Offshore LLC, dated effective January 1, 2013 (including all attachments, memoranda, and any related agreements identified on the Schedule of Assumed Contracts, the "**Gunflint UOA**") to the Credit Bid Purchaser, notwithstanding anything to the contrary contained in this Order, the Plan and the Plan Documents, on the Effective Date, the Debtors shall pay any valid amounts then due and owing, in full, as would be necessary to satisfy any and all obligations, if any, to Ecopetrol under the Gunflint UOA to effectuate such assumption and assignment and the Credit Bid Purchaser shall assume Fieldwood's obligations under the Gunflint UOA, including any indemnification and reimbursement obligations that may arise from the alleged liens and claims of, among others, Atlantic Maritime Services, LLC's alleged liens, claims and litigation against Fieldwood Energy LLC and, among others, Ecopetrol in this Bankruptcy Court and the United States District Court for the Eastern District of

Louisiana.  Nothing herein shall be deemed an admission by any party that any such liens and claims asserted against Fieldwood Energy LLC are valid or enforceable.

65.     Notwithstanding anything to the contrary contained in this Order, the Plan, and the Plan Documents, all rights with respect to any security interests granted by Fieldwood to Ecopetrol under the Gunflint UOA shall be reserved.

66.     <u>Ridgewood Katmai, LLC and ILX Prospect Katmai, LLC</u>.  Upon the assumption and assignment of that certain GC 40 Unit Operating Agreement, dated effective April 1, 2018 (including all attachments, memoranda, and any related agreements identified on the Schedule of Assumed Contracts, the "**GC 40 UOA**") to the Credit Bid Purchaser, notwithstanding anything to the contrary contained in this Order, the Plan and the Plan Documents, on the Effective Date, the Debtors shall pay any valid amounts then due and owing, in full, as would be necessary to satisfy any and all obligations, if any, to Ridgewood Katmai, LLC ("**Ridgewood**") and ILX Prospect Katmai, LLC ("**Katmai**") under the GC 40 UOA to effectuate such assumption and assignment and the Credit Bid Purchaser shall assume Fieldwood's obligations under the GC 40 UOA, including any indemnification and reimbursement obligations that may arise from the alleged liens and claims of, among others, Atlantic Maritime Services, LLC's alleged liens, claims and litigation against Fieldwood Energy LLC and, among others, Ridgewood and Katmai in this Bankruptcy Court and the United States District Court for the Eastern District of Louisiana.  Nothing herein shall be deemed an admission by any party that any such liens and claims asserted against Fieldwood Energy LLC are valid or enforceable.

67.     Notwithstanding anything to the contrary contained in this Order, the Plan, and the Plan Documents, all rights with respect to any security interests granted by Fieldwood to Ridgewood and Katmai under the GC 40 UOA shall be reserved.

68.     [Houston Energy Deepwater Ventures I, LLC and Red Willow Offshore, LLC.
Upon assumption and assignment of the (a) Joint Operating Agreements to which Houston Energy
Deepwater Ventures I, LLC ("**HEDV**") and Red Willow Offshore, LLC ("**RWO**") and one or
more of Debtors are parties (the "**MC 519 JOAs**")[4]; (b) the Galapagos Area Loop Subsea
Production System Operating Agreement dated effective December 1, 2011 and last amended
effective May 1, 2019 (the "**LSPS OA**"); and (c) the Na Kika Production Handling Agreement,
dated effective as of September 21, 2010 (the "**PHA**" and, together with the MC 519 JOAs and
the LSPS OA, the "**HEDV/RWO Agreements**") to the Credit Bid Purchaser, notwithstanding
anything to the contrary contained in the Credit Bid Purchase Agreement, on the Effective Date,
the Debtors shall pay any valid amounts then due and owing, in full, as would be necessary to
satisfy any and all obligations, if any, to HEDV and RWO under the HEDV/RWO Agreements to
effectuate such assumption and assignment, and the Credit Bid Purchaser shall assume
Fieldwood's obligations under the HEDV/RWO Agreements.][5]

69.     Treatment With Respect to Seitel Data, Ltd.  All Executory Contracts, including,
but not limited to, all Master Licensing Agreements and all supplements, amendments, schedules
and attachments thereto (collectively, the "**Seitel Agreements**") between any of the Debtors, on
the one hand, and Seitel Data, Ltd., Seitel Offshore Corp., and other affiliates (collectively,

---

[4] Including but not limited to: Offshore Operating Agreement dated effective January 1, 2009, originally by and
between Noble Energy, Inc. (as predecessor in interest of Fieldwood), as Operator, and BP, Red Willow and HE&D
Offshore, L.P., as Non-Operators, as amended by that certain First Amendment of the Unit Operating Agreement and
Establishment of Lease Offshore Operating Agreements, dated effective as of October 10, 2014, by and among BP,
Red Willow, HEDV, Noble Energy, Inc., Deep Gulf Energy III, LLC, Ridgewood South Santa Cruz, LLC and ILX
Prospect South Santa Cruz, LLC and by that certain Second Amendment of the Offshore Operating Agreement, dated
effective as of October 15, 2018, by and among BP, Red Willow, HEDV and Fieldwood, and by that certain
Santiago / Santa Cruz Joint Operating Agreement made effective as of May 1, 2019 by and among Fieldwood, Red
Willow and HEDV.

[5] This paragraph 68 is subject to continued review and sign off by the Debtors and HEDV and RWO and the consent
rights of certain parties in interest, with all rights reserved.

"**Seitel**"), on the other hand, shall be and hereby are rejected pursuant to Section 365 of the Bankruptcy Code as of the date of entry of this Order.  To the extent necessary, the automatic stay under Section 362 of the Bankruptcy Code is hereby modified to permit the termination of the Seitel Agreements.  The Post-Effective Date Debtors and/or the Plan Administrator shall comply with all confidentiality provisions, destruction of data and verification of destruction of data provisions required by the Seitel Agreements.

70.     [WesternGeco.  Nothing in the Plan, Plan Supplements, any Schedule of Assumed Contracts, any Cure Notice or this Order shall be construed as authorizing, permitting, causing or resulting in: (i) the transfer of any seismic, geological or geophysical data, derivatives or interpretations thereof, or intellectual property (collectively the "**Materials**") owned by WesternGeco LLC, or its affiliates ("**WesternGeco**"); or (ii) the assumption, assumption and assignment, rejection, modification or release (including with respect to any change of ownership or control provisions) of any master license agreement, license agreement and/or supplemental or related agreements between WesternGeco and any Debtor (the "**WesternGeco Agreements**"), which such assumption or assumption and assignment, rejection, modification, or release, if any, is subject to either a stipulation between the Debtors and WesternGeco or subsequent court order after notice to WesternGeco, as applicable, and an opportunity to respond; *provided*, *however* that the Debtors and Credit Bid Purchaser are authorized to continue operating under the WesternGeco Agreements in the ordinary course of business until the earliest of (i) [12:00 p.m. on July 14, 2021], or such later date as may be agreed between the Credit Bid Purchaser and WesternGeco, and (ii) the date such agreements are deemed assumed, assumed and assigned, rejected, modified or released, in which case, the order authorizing such assumption, assumption and assignment, rejection, modification, or release, when final, shall govern with respect to all matters provided for therein;

provided further that all rights and defenses of the Debtors, Credit Bid Purchaser, and WesternGeco under non-bankruptcy and bankruptcy law, and all objections of WesternGeco (and the Debtors' and Credit Bid Purchaser's rights and defenses with respect thereto) regarding assumption or assumption and assignment (including all rights and defenses under section 365 of the Bankruptcy Code and with respect to the validity and enforceability of change of ownership and control provisions), are reserved and preserved with respect to such WesternGeco Agreements. For the avoidance of doubt, notwithstanding section 8.1(a) of the Plan, the WesternGeco Agreements shall not be deemed rejected upon the occurrence of the Effective Date.][6]

71.     TGS.  On the Effective Date, the Debtors will assume and assign to the Credit Bid Purchaser that certain Master License Agreement No. HL0713-200 for Geophysical and Geological Data dated July 1, 2013 ("**MLA**") and all supplementary agreements, appendices, addenda, and other ancillary documents thereto (collectively the "**Assigned Agreements**").  The total stipulated Cure Amount to be paid for the Assigned Agreements (the "**TGS Cure Amount**") is set forth in that certain Letter Agreement dated June 14, 2021 between TGS-NOPEC Geophysical Company ASA, TGS-NOPEC Geophysical Company, and A2D Technologies, Inc. d/b/a TGS Geological Products and Services ("**TGS**") and the Debtors.  The Debtors shall not be required to pay any Cure Amount with respect to the Assigned Agreements other than the TGS Cure Amount, and TGS expressly agrees that the Debtors have provided adequate assurance of future performance with respect to the Assigned Agreements.

72.     Valero.   Notwithstanding anything contrary in this Order or the Plan, nothing in this Order or the Plan impairs or otherwise affects Valero's ability to assert a valid defensive setoff

---

[6] This paragraph 70 is subject to continued review and sign off by the Debtors, the WesternGeco and the consent rights of certain parties in interest, with all rights reserved.

or recoupment right and affirmative defense, if any, as provided under applicable law, with respect to the claims asserted (to the extent such claims exist) in the adversary proceeding styled *In re: Fieldwood Energy LLC, et. al Fieldwood Energy LLC v. Valero Marketing and Supply Company* (Adversary Case No. 20-03497); *provided*, *however*, that such valid defensive setoff and/or affirmative defense may not result in any net payment obligations to Valero; *provided*, *further*, that nothing herein limits or restricts Valero's right to assert a general unsecured claim.

73.    <u>Energy Transfer</u>.  Energy Transfer's valid setoff or recoupment rights, if any, with respect to the $1.125 million in cash deposits posted by Fieldwood Energy LLC prepetition and currently held by Energy Transfer (the "**Energy Transfer Cash Deposit**") are preserved pending resolution of Energy Transfer's Assumption Dispute with the Debtors, which shall be adjourned pursuant to ¶ 38 of this Order; *provided*, that, the Debtors, the Post-Effective Date Debtors, or the Credit Bid Purchaser, as applicable, reserve all rights and defenses with respect to the Energy Transfer Cash Deposit, including the right to challenge the validity of any rights to setoff or recoupment asserted by Energy Transfer in connection therewith.

74.    <u>RLI</u>.  RLI Insurance Company's rights, including but not limited to security interests, security rights, contract rights, valid setoff and recoupment rights, contribution rights, and subrogation rights, against non-Debtors (other than with respect to the Released Parties or any Credit Bid Acquired Interests) under surety bonds, operating agreements, other contracts, and applicable law are hereby reserved.

75.    Nothing in the Plan or this Confirmation Order shall modify or impair the rights and interests of RLI Insurance Company in the Panaco East Breaks Escrow Account Escrow and Security Agreement dated October 29, 1999 (the "**Panaco Escrow Agreement**") and the approximately $8.25 million presently held in an escrow account titled

"RLI/BP/Fieldwood/Foothill Escrow Debtor In Possession" ("**Panaco Escrow Account**"). All funds deposited in the Panaco Escrow Account prepetition shall remain escrowed for the benefit of RLI Insurance Company to be used according to the terms of the Panaco Escrow Agreement.

76.     <u>Maritime Plaintiffs</u>.  Nothing in the Plan or this Order shall prejudice, release, or enjoin any postpetition claims asserted against the Debtors by: (1) Brian Cloyd ("**Cloyd**") arising from injuries sustained on or about October 28, 2020, including claims originally brought in Cause No. 2020-74133 in the 11th Judicial District of Harris County, Texas, styled as *Cloyd v. Fieldwood Energy Offshore, Inc. d/b/a Fieldwood Energy (Texas), Inc., et al.* and currently pending in Civil Action No. 4:20-CV-04032 in the United States District Court for the Southern District of Texas (the "**Cloyd Claims**"); and (2) Lewis Andrews ("**Andrews**") and Patrick Burnett ("**Burnett**" and, together with Cloyd and Andrews, the "**Maritime Injury Plaintiffs**") arising from injuries sustained on or about October 28, 2020, including claims originally brought in Cause No. 2020-73683 in the 164th Judicial District of Harris County, Texas, styled as *Andrews, et al. v. Fieldwood Energy Offshore, Inc. d/b/a Fieldwood Energy (Texas), Inc., et al.* and currently pending in Civil Action No. 4:20-CV-04009 in the United States District Court for the Southern District of Texas (the "**Andrews Claims**" and the "**Burnett Claims**" and, together with the Cloyd Claims, the "**Maritime Injury Claims**")*.*  The Maritime Injury Claims are preserved as against the Debtors, to the extent such claims exist, including the right to proceed against insurance coverage, if any, available under insurance policies issued to the Debtors.  The Debtors and the Post-Effective Date Debtors reserve all rights and defenses with respect to the Maritime Injury Plaintiffs and the Maritime Injury Claims as available under applicable law.

77.     <u>Texas Taxing Entities</u>.  Notwithstanding anything to the contrary in the Plan or this Order, (i) Cypress-Fairbanks ISD, Galveston County, Harris County, Lavaca County, Live Oak

CAD, Matagorda County, Rio Grande City CISD, and Starr County (collectively, the "**Taxing Authorities**") and Colorado County Tax Office, Sheldon Independent Dickinson Independent School District, Bay City Independent School District, and Burleson County Tax Office (collectively, the "**Certain Texas Taxing Entities**" and together with the Taxing Authorities, the "**Texas Taxing Entities**") shall not be required to file any request for payment of Administrative Expense Claims that is not required to be filed by section 503(b)(1)(D) of the Bankruptcy Code and to the extent Allowed, such Administrative Expense Claims shall be treated in accordance with § 2.1 of the Plan; (ii) the Liens securing any Administrative Expense Claim held by the Texas Taxing Entities, if any, shall be retained (including against any sale proceeds) until the applicable Administrative Expense Claim is paid in full; (iii) to the extent the Texas Tax Code provides for interest or penalties with respect to any portion of an Allowed Claim of a Texas Taxing Entity (a "**Texas Taxing Entity Claim**"), nothing in the Plan or this Order prevents the inclusion of such interest or penalties in the Texas Taxing Entity Claim in accordance with section 1129(a)(9) of the Bankruptcy Code, and the Debtors' and Post-Effective Date Debtors', as applicable, defenses and rights to object to such Claim or to the inclusion of such interest or penalties in such Claim are fully preserved; (iv) to the extent a Texas Taxing Entity Claim constitutes an Allowed Secured Claim against the Debtors, such Claim shall be paid on the later of the Effective Date and the date that is ten (10) Business Days after the date on which such Claim becomes an Allowed Claim, or as soon as reasonably practicable thereafter, and the Liens securing the Texas Taxing Entity Claim, if any, shall be retained (including against any sale proceeds) until the applicable Texas Taxing Entity Claim is paid in full; and (v) with respect to any pre-petition tax return filed after the bar date for Governmental Units, for which a Texas Taxing Entity filed an estimated Claim prior to such bar date, the Texas Taxing Entities shall be permitted to amend the applicable proof of Claim

after the Effective Date without permission of the Bankruptcy Court or the Post-Effective Date Debtors. All rights and defenses of the Debtors and the Post-Effective Date Debtors, as applicable, under bankruptcy and non-bankruptcy law are reserved and preserved with respect to such Texas Taxing Entity Claims.

78.     <u>Louisiana Department of Revenue</u>.  Notwithstanding anything to the contrary in the Plan or this Order:

i.      the Louisiana Department of Revenue (the "**LDR**") shall not be required to file any request for payment of Administrative Expense Claims that is not required to be filed by section 503(b)(1)(D);

ii.     the LDR has opted out of the releases set forth in Section 10.7(b) of the Plan and shall not be deemed a Releasing Party under the Plan;

iii.    to the extent applicable law provides for interest or penalties with respect to any portion of an Allowed Claim of LDR, nothing in the Plan of this Order prevents inclusion of such interest or penalties in LDR's Allowed Claim in accordance with section 1129(a)(9) of the Bankruptcy Code, and the Debtors' and Post-Effective Date Debtors', as applicable, defenses and rights to object to such Claim or to the inclusion of such interest in such Claim are fully preserved;

iv.     to the extent LDR's Priority Tax Claims are not Allowed by or paid in full in Cash on the Effective Date, such Priority Tax Claims shall be paid by regular installment payments in Cash (including applicable interest) commencing on the 15th day of the first month following the date such Claim becomes an Allowed Claim and continuing thereafter not less than annually either on the anniversary date of the earlier of the Effective Date or the date such Claim became an Allowed Claim at a rate to insure the Claim will be paid over a period not to exceed five years from the Petition Date in accordance with section 1129(a)(9)(C) of the Bankruptcy Code; *provided* that nothing herein shall prohibit more frequent payments in the Debtors or Post-Effective Date Debtors sole discretion;

v.      the rights of the LDR to exercise any valid rights of setoff or recoupment under the Bankruptcy Code or applicable law remain unaffected by the Plan;

vi.     notwithstanding any provision in the Plan to the contrary, (a) any distributions on LDR's claims made after the Effective Date shall be deemed made on the date payment is issued; (b) all distributions shall be delivered to the post office box on the first page of the LDR's applicable proofs of claim; (c) no distribution owed to the LDR, regardless of amount, shall revert to the

Post-Effective Date Debtors or their successors or assigns as unclaimed property; and (d) Section 6.10 of the Plan (*De Minimis* Cash Distributions) shall not apply to LDR's Allowed Claims;

vii.    with respect to any pre-petition tax return filed after the bar date for Governmental Units, for which the LDR has filed an estimated Claim prior to such bar date, the LDR shall be permitted to amend the applicable proof of Claim after the Effective Date without the permission of this Court, the Debtors, or any other party in interest; and

viii.   the Debtors and the Post-Effective Date Debtors, as applicable, shall not be excused from any obligation under applicable Louisiana state law to timely submit returns (including any delinquent returns), which returns shall be filed by the later of (i) 90 days after the Effective Date or (ii) the applicable due date under Louisiana law, and shall remit payment of taxes in the ordinary course of business.

79.    <u>Apache</u>.  FWE shall pay up to $5.5 million (the "**Apache Fee Cap**") of reasonable and documented fees and expenses of Apache related to the formation of FWE I and FWE's restructuring, including the negotiation and preparation of the Apache Definitive Documents (collectively, the "**Apache Fees and Expenses**"); provided that amounts paid to Apache on account of the Apache Fees and Expenses shall not be subject to disgorgement unless the transactions contemplated in the Apache Definitive Documents fail to close as a result of Apache's breach of the Restructuring Support Agreement.  Any Apache Fees and Expenses in excess of the Apache Fee Cap shall be the sole responsibility of FWE I.

80.    The Prepetition FLFO Lenders, Prepetition FLTL Lenders, and Prepetition SLTL Lenders shall, simultaneously with the execution and delivery of the Apache Definitive Documents (to occur no later than the Effective Date) and the creation of FWE I LLC pursuant to the Apache Definitive Documents, be deemed to release (and/or cause the applicable administrative agent or collateral agent to release) all liens and encumbrances on, interests in, and claims against the Legacy Apache Properties (as defined in the Apache Term Sheet) and the other FWE I Assets (as defined in Part A of Schedule I to the Plan of Merger) and the Consenting Creditors (as defined in

the Apache Implementation Agreement (as may be amended from time to time)) shall release the Apache PSA Parties from any and all causes of action and claims of any kind related to the Legacy Apache Properties arising prior to the Effective Date.  From the time of the entry of the Order to the Effective Date, Debtors shall not cause, permit or otherwise allow the creation of new liens (contractual or statutory) against the Legacy Apache Properties or the other FWE I Assets except for tax liens which arise by operation of law for taxes not yet due and payable, nor shall the Prepetition FLFO Lenders, Prepetition FLTL Lenders, and Prepetition SLTL Lenders consent to same.

81.    FWE's assets to be allocated to, possessed by, assumed by, and vested in FWE I and FWE III, respectively, pursuant to the transactions contemplated by and in accordance with the Plan of Merger (the "**Divisive Merger**"), including contracts, leases, oil and gas leases and assets constituting real property interests (including all fee surface interests in land, surface leases, easements, rights of way, servitudes, licenses, franchises, road, railroad, and other surface use permits or agreements), except as otherwise provided in this Order, shall be (a) free and clear of (i) any right of consent, notice, and other similar rights, if any, that are applicable to the vesting of the assets in connection with the Divisive Merger (such rights, the "**Consent Rights**") and (ii) all preferential purchase rights, rights of first refusal, drag-along rights, tag-along rights, and other similar rights, if any, that are applicable to the vesting of the assets in connection with the Divisive Merger (such rights, the "**Preferential Purchase Rights**"), but (b) subject to and burdened by (x) the liabilities and obligations allocated to and vested in, respectively, FWE I or FWE III, as specified in the Plan of Merger, pursuant to the Divisive Merger (collectively, "**Allocated Obligations**") and (y) Permitted Post-Closing Liens (as defined in the Schedule of Defined Terms

for Required Confirmation Order Provisions, attached to the Apache Implementation Agreement as **Exhibit B**).

82.     All Entities (as defined under section 101(15) of the Bankruptcy Code) or Parties that fail to timely file an objection are (a) forever barred from objecting to the allocation and vesting of the assets in connection with the Divisive Merger free and clear of all Consent Rights and Preferential Purchase Rights, and all other persons are forever barred from asserting any alleged Consent Rights or Preferential Purchase Rights with respect to the Divisive Merger, and (b) deemed to consent to and approve the allocation and vesting of the assets free and clear of all Consent Rights and Preferential Purchase Rights, regardless of whether such consent must be in writing pursuant to the terms of any agreement.  Except as otherwise provided in the Plan or this Order with respect to the Released Parties, nothing herein shall affect or be deemed to restrict or limit Apache's or FWE I's claims for or rights to seek payments or contribution from, and any defenses against, current or prior working interest owners, predecessors, co-owners and/or operators, or from any other parties that are contractually, legally, regulatorily or equitably liable for decommissioning or related obligations with respect to the Legacy Apache Properties and FWE I Assets.

83.     Subject to a cap of $300,000, (the "**Apache Implementation Costs Cap**") which amount shall be funded by FWE III as an Administrative Expense Claim no later than twenty-one (21) days after the Effective Date, FWE III shall, and shall cause its debtor affiliates in the above-captioned Chapter 11 Cases to, on the Effective Date, provide for the payment of any and all documentary, filing, recording, stamp, and registration fees, costs, taxes, and expenses (including all reasonable and documented attorneys' fees and regulatory consultant fees) incurred or imposed after the Effective Time (as defined in the Plan of Merger) in connection with the filing of record

by or on behalf of FWE I or GOM Shelf LLC of any instrument or instruments with the appropriate records office of any county, parish, state, federal, or other governmental unit (including BOEM) that may be required in connection with the implementation of the Divisive Merger or that either FWE I or GOM Shelf LLC determines in its respective sole discretion to be necessary or appropriate to reflect in the appropriate records of any governmental unit that as a result of the Divisive Merger (a) ownership of the FWE I Assets have been allocated to and are vested in FWE I (and to the extent appropriate to reflect ownership of the GOM Shelf Properties (as defined in the Plan of Merger) in GOM Shelf LLC), and (b) the Allocated Obligations have been allocated to and vested in, and constitute liabilities and obligations of, FWE I and FWE III, respectively (collectively, the "**Apache Implementation Costs**").   For the avoidance of doubt, the documentary, filing, recording, stamp, and registration fees of FWE I or GOM Shelf LLC, shall include such costs and expenses required to file or to cause to be filed of record in the records office, as determined by Apache to be appropriate, of any county, parish, state, federal, or other governmental unit (including BOEM) of the mortgages, security interests and similar security documentation as is contemplated by the Standby Loan Agreement and the Standby Credit Facility Documents to secure the obligations of FWE I and GOM Shelf LLC thereunder.  Any Apache Implementation Costs that exceed the Apache Implementation Costs Cap shall be the sole responsibility of and paid for by FWE I.

84.     Upon the Effective Date of the Plan, to the extent the Decommissioning Agreement is an executory contract, it will be assumed, with the consent of the Apache PSA Parties, by the Fieldwood PSA Parties and, upon consummation of the transactions provided for in the Plan of Merger, become the obligation of FWE I.  Upon execution of the Apache Definitive Documents, including, without limitation the granting of liens to Apache on the FWE I assets contemplated

thereunder, the Debtors will be deemed to have cured all defaults existing under the Decommissioning Agreement as of the Effective Date (the "**Apache Cure**") and no third party, including, without limitation, the Apache Sureties, may raise any defense to payment under the Apache Surety Bonds or letters of credit, in each case constituting Decommissioning Security, based on the agreement reached between the Debtors and Apache as to the Apache Cure.

85.     Except for the rights and remedies to enforce (a) the Decommissioning Agreement against GOM Shelf LLC and FWE I following the Divisive Merger (which agreement shall be allocated to FWE I and GOM Shelf LLC under the Divisive Merger), (b) the Plan, (c) the Order, and (d) the obligations contemplated by the Apache Definitive Documents, the Apache PSA Parties shall be deemed Releasing Parties (as defined in the Plan) under the Plan and waive and release any and all pre-Effective Date claims of any kind (including, without limitation, the Apache Audit Claims, the Apache Trust A Claims and any claims that could qualify as administrative expense claims) against the Debtors, their estates and any other Released Party in all circumstances only to the extent such claims accrued on or prior to the Effective Date and only to the extent such releases do not impair the Decommissioning Security, or Apache's ability to draw on the Decommissioning Security in any respect.  For the avoidance of doubt, any and all claims the Apache PSA Parties may have against FWE I related to the Decommissioning Agreement arising post-Effective Date and any security obtained, provided, or pledged in connection with the Decommissioning Agreement (the "**Decommissioning Security**") will be preserved.

86.     Except for the rights and remedies to enforce (a) the Decommissioning Agreement against the Apache PSA Parties following the Divisive Merger, (b) the Plan, (c) the Order, and (d) the obligations contemplated by the Apache Definitive Documents, the Debtors shall waive and release any and all pre-Effective Date claims of any kind against the Apache PSA Parties, in

all circumstances only to the extent such claims accrued on or prior to the Effective Date.  For the avoidance of doubt, any and all claims FWE I may have against the Apache PSA Parties related to the Decommissioning Agreement arising post-Effective Date and the Decommissioning Security will be preserved.

87.     All rights of the Apache PSA Parties with respect to bonds and letters of credit constituting security for decommissioning of the assets held by the GOM Shelf LLC or allocated to and vested in FWE I, including, without limitation, the Decommissioning Security shall be preserved as against such bonding companies and letter of credit issuers in all respects.  The Debtors shall not terminate any bonds issued on behalf of the Debtors relating to the Legacy Apache Properties under which any federal, state or local governmental entity is an obligee.

88.     With respect to the agreements and memberships relating, in whole or in part, to well containment/control, clean-up of spills, or other pollution, or the gathering of data relating to certifications required to be made to a governmental unit with respect to the FWE I Assets (as defined in the Plan of Merger) or GOM Shelf Oil and Gas Properties (as defined in the Plan of Merger), to the extent any such agreements or memberships are also needed in respect to any Credit Bid Acquired Interests or FWE III Assets (as defined in the Plan of Merger) that are set forth on **Exhibit 23** attached to the Apache Implementation Agreement, then on or before the Effective Date, FWE shall obtain new agreements and membership for such use with respect to the Credit Bid Acquired Interests or FWE III Assets.  With respect to any Excluded Contracts (as defined in the Plan of Merger), FWE shall, on or before the Effective Date, prepare and negotiate replacement agreements with the counterparties to such Excluded Contracts upon substantially the same terms as such Excluded Contracts which may be executed by FWE I immediately following the Effective Date.

89.     The Fieldwood PSA Parties and the Apache PSA Parties may, by mutual agreement, amend and modify, without the consent of the Consenting Creditors, the forms of the agreements governing the terms of employment of the Independent Director (as defined in the Apache Term Sheet) of FWE I and of the "sole manager" (as that term is used in the Apache Term Sheet) of FWE I (the "**Sole Manager**"), and the form of the agreement with the "service provider" (as that term is used in the Apache Term Sheet) of FWE I (the "**Contract Services Provider**") to be included in the bid package for the Contract Services Provider.

90.     The Bankruptcy Court (i) approves the Apache Definitive Documents, as such documents are defined in the Apache Implementation Agreement (as amended), and all transactions contemplated thereby and thereof, including the Plan of Merger and Standby Credit Facility Documents, and all actions to be taken, undertakings to be made, and obligations to be incurred by FWE I contemplated thereby; and (ii) authorizes FWE I, following the consummation of the Plan of Merger, without further notice to or action, order, or approval of this Bankruptcy Court and without the need for any further corporate or shareholder action, to enter into, deliver, and fully perform its obligations under the Apache Definitive Documents, including without limitation, the Standby Credit Facility Documents.  Upon entry of the Order, FWE I or the Sole Manager, as applicable, shall be authorized and empowered, without further approval of the Bankruptcy Court or any other party, to take such actions and perform such acts as may be necessary, convenient, desirable, or appropriate to execute and deliver the Apache Definitive Documents in accordance with the Plan and to execute and deliver all documents relating thereto and to perform all of their obligations thereunder.  On the Effective Date, the Apache Definitive Documents shall constitute legal, valid, binding, and authorized obligations of FWE I, enforceable in accordance with their terms, and such obligations of FWE I shall not be enjoined or subject to

discharge, impairment, release, avoidance, recharacterization, or subordination by FWE I or the Post-Effective Date Debtors under applicable law, the Plan, or the Order.  On the Effective Date, all liens granted pursuant to, or in connection with, the Apache Definitive Documents shall be deemed granted by FWE I pursuant to the Apache Definitive Documents.  On the Effective Date, all liens granted pursuant to, or in connection with Apache Definitive Documents, as applicable, (i) shall be valid, binding, perfected, enforceable liens in the property subject to a security interest granted by FWE I pursuant to the Apache Definitive Documents, as applicable, with the priorities established in respect thereof under applicable non-bankruptcy law and the Apache Definitive Documents, including, but not limited to, the Mortgages, Security Agreement or Standby Loan Agreement and (ii) shall not be enjoined or subject to discharge, impairment, release, avoidance, recharacterization, or subordination by FWE I under applicable law, the Plan, or the Order.  For the avoidance of doubt, the liens granted to Apache pursuant to the Recharacterization Mortgages (as such term is defined in the Decommissioning Agreement, as amended from time to time, and as supplemented by the Recharacterization Mortgages) upon any recharacterization of the Trust A or Trust A-1 NPIs (as such terms are defined in the Decommissioning Agreement, as amended from time to time, and as supplemented by the Recharacterization Mortgages) shall be senior in all respects to any other liens.

91.     The allocation of the Decommissioning Agreement to FWE I, which will occur upon the effectiveness of the Divisive Merger provided for in the Plan, is not a transfer or assignment and is not subject to any transfer or assignment consent requirement.

92.     Neither the Plan nor the Apache Implementation Agreement (including the Apache Definitive Documents attached thereto) amends or alters the Decommissioning Agreement.

93.     Neither the Plan nor the Apache Implementation Agreement (including the Apache Definitive Documents attached thereto) discharges or otherwise changes the Sureties' obligations to Apache under the Surety Bonds or impairs Apache's ability to draw on the Surety Bonds post-Effective Date.

94.     The reorganization of FWE in accordance with the Plan, including the creation of FWE I pursuant to a divisive merger and its formation under the Fieldwood Energy I LLC Agreement, does not give Apache or any of its affiliates control over FWE I in any manner that would be recognized under the Securities Act of 1934, the Bankruptcy Code, or any other applicable law, and none of the terms of the Apache Definitive Documents, including the consent rights granted to Apache thereunder, cause Apache to have any such control over FWE I.

95.     **Apache-Surety Term Sheet.** The Bankruptcy Court (i) approves the term sheet between the Debtors and Apache, Zurich American Insurance Company ("**Zurich**"), Everest Reinsurance Company ("**Everest**"), HCC International Insurance Company ("**HCCI**"), and Philadelphia Indemnity Insurance Company ("**Philadelphia**" and together with Zurich, Everest and HCCI, the "**Apache Sureties**" and each an "**Apache Surety**"), a copy of which is attached hereto as **Exhibit B** (the "**Apache-Surety Term Sheet**") and all actions to be taken, undertakings to be made, and obligations to be incurred contemplated thereby; (ii) authorizes the Debtors to negotiate the definitive documents in accordance with the Apache-Surety Term Sheet (the "**Apache-Surety Definitive Documents**"); and (iii) authorizes FWE I, without further notice to or action, order, or approval of this Bankruptcy Court and without the need for any further corporate or shareholder action, to enter into, deliver, and fully perform its obligations under the Apache Sureties Definitive Documents, including, without limitation, the Subrogation, Subordination and Payment Agreement ("**SSPA**") contemplated in the Apache-Surety Term Sheet.

96.     <u>Apache Surety Claims</u>.  All claims against the Debtors, if any, of the Apache Sureties arising under or relating to any surety bonds, letters of credit, indemnification agreements, or other related agreements existing as of the Petition Date (including, without limitation, any claims for premiums, fees, expenses, or similar charges, whether due before, on, or after the Petition Date), including but not limited to any claims and causes of action, whether arising in contract or in tort, in law or in equity or pursuant to any other theory of law (including under any state or federal securities laws), are classified as General Unsecured Claims in Class 6B and shall be treated accordingly under the Plan.  For the avoidance of doubt, all rights and claims of the Apache Sureties set forth in the Apache-Surety Term Sheet shall be treated pursuant to the Apache-Surety Term Sheet.

97.     [<u>Non-Apache Sureties Claims</u>.  Unless expressly provided to the contrary in the Plan Documents, nothing in this Order and the Plan, including any release, injunction, or exculpation provisions, shall or shall be deemed to: (a) adjudicate or modify the rights of any obligee (the "**Obligees**") or surety provider other than the sureties that issued bonds in favor of Apache and are parties to the Apache Sureties Term Sheet (the "**Non-Apache Sureties**") as between the Non-Apache Sureties and the Obligees under any surety bonds issued by the Sureties on behalf of the Debtors, their non-Debtor affiliates, or otherwise (the "**Non-Apache Term Sheet Surety Bonds**") or under applicable law; (b) require the Non-Apache Sureties to issue any new surety bonds or extensions or renewals of the Non-Apache Term Sheet Surety Bonds; (c) bar, impair, enjoin, release, alter, diminish or enlarge any of the rights or defenses of the Non-Apache Sureties (other than a Releasing Party) against any non-Debtor Entity (other than with respect to FWE I, FWE III, FWE IV, or any NewCo Entity or any Credit Bid Acquired Interests, in each case except with respect to any right arising under an agreement assumed and assigned to any NewCo

Entity), including, but not limited to, any predecessors in interest or co-working interest parties with respect to any of the Debtors' assets.

98.     For the avoidance of doubt, no Non-Apache Term Sheet Surety Bond under which a Debtor is the principal is being assumed and/or assigned and/or allocated to any entity under the Plan or the Plan Documents, including Credit Bid Purchaser, FWE I, FWE III and/or FWE IV.

99.     For the avoidance of doubt, nothing in this Order or the Plan shall bar, impair, enjoin, release, alter, diminish or enlarge any of the Non-Apache Sureties' subrogation rights, if any, other than those subrogation rights that arose on or before the Effective Date and those subrogation rights described in section 5.13(a) of the Plan, which such pre-Effective Date subrogation rights shall be addressed under the Plan.][7]

100.    Nothing in this Confirmation Order and/or the Plan shall, or be deemed to: bar, impair, enjoin, release, alter, diminish, or in any way affect or impact the regulatory authority of BOEM and/or BSEE, including with respect to the security and bonding requirements for owners and operators of oil and gas assets in the Gulf of Mexico.  BOEM and BSEE maintain their full regulatory authority to require that FWE I, Credit Bid Purchaser and/or any other entities being created under the Plan post security and bonding under the applicable regulations, and this Confirmation Order and/or Plan in no way purports to infringe upon those rights.  To the extent BOEM and/or BSEE require any such security and/or bonding consistent with law and regulations, the respective entity will obtain the required bonding, including any required supplemental bonding.

---

[7] These paragraphs 97–99 are subject to continued review and sign off by the Debtors and Non-Apache Sureties and the consent rights of certain parties in interest, with all rights reserved.

101.    <u>CUSA</u>.  Chevron U.S.A. Inc., its parent and affiliates, including Noble Energy, Inc.,

Union Oil Company of California, Unocal Pipeline Company and Texaco Inc. (such parent and

affiliates, together with CUSA, individually each a "**CUSA Entity**" and collectively the "**CUSA**

**Entities**") shall not be deemed to be a "Released Party" or a "Releasing Party" as such terms are

defined in the Plan.  For the avoidance of doubt, other than set forth expressly in the Plan, no

CUSA Entity has waived or released, or shall be deemed to have waived or released, any claim,

including but not limited to any and all claims under the Bankruptcy Code, the Chevron Claims,

and any and all claims related to or arising under the CUSA Implementation Agreement or the

CUSA Definitive Documents, *provided* any such claims shall receive the applicable treatment set

forth in the Plan.

102.    Upon effectiveness of the CUSA Definitive Documents, pursuant to Section 8 of

the CUSA Implementation Agreement, the Debtors shall be deemed to have waived any and all

prepetition claims or causes of action against any of the CUSA Entities.  Each CUSA Party shall

be an "**Exculpated Party**" as such term is defined in the Plan (to the maximum extent permitted

by the Bankruptcy Court).

103.    FWE's assets to be allocated to, possessed by, assumed by, and vested in FWE I

and FWE III, respectively, pursuant to the transactions contemplated by and in accordance with

the Initial Plan of Merger (the "**Initial Divisive Merger**"), including contracts, permits, leases, oil

and gas leases and assets constituting real property interests (including all fee surface interests in

land, surface leases, easements, rights of way, servitudes, licenses, franchises, road, railroad, and

other surface use permits or agreements), except as otherwise provided in this Order, shall be

(a) free and clear of (i) any right of consent, notice, and other similar rights, if any, that are

applicable to the vesting of the assets in connection with the Initial Divisive Merger and (ii) all

preferential purchase rights, rights of first refusal, drag-along rights, tag-along rights, and other similar rights, if any, that are applicable to the vesting of the assets in connection with the Initial Divisive Merger, but (b) subject to and burdened by (x) the liabilities and obligations allocated to and vested in, respectively, FWE I or FWE III, as specified in the Initial Plan of Merger, pursuant to the Initial Divisive Merger and (y) Permitted Post-Closing Liens (as defined in Apache Implementation Agreement).

104.    FWE III's assets to be allocated to, possessed by, assumed by, and vested in FWE IV pursuant to the transactions contemplated by and in accordance with the FWE III Plan of Merger (the "**FWE IV Divisive Merger**"), including contracts, permits, leases, oil and gas leases and assets constituting real property interests (including all fee surface interests in land, surface leases, easements, rights of way, servitudes, licenses, franchises, road, railroad, and other surface use permits or agreements), except as otherwise provided in this Order, shall be (a) free and clear of (i) any right of consent, notice, and other similar rights, if any, that are applicable to the vesting of the assets in connection with the FWE IV Divisive Merger (such rights, the "**FWE IV Consent Rights**") and (ii) all preferential purchase rights, rights of first refusal, drag-along rights, tag-along rights, and other similar rights, if any, that are applicable to the vesting of the assets in connection with the FWE IV Divisive Merger (such rights, the "**FWE IV Preferential Purchase Rights**"), but (b) subject to and burdened by the liabilities and obligations allocated to and vested in, respectively, FWE III or FWE IV, as specified in the FWE III Plan of Merger (such liability and obligations allocated to and vested in FWE IV, the "**FWE IV Allocated Obligations**").  The reorganization of FWE in accordance with the Plan, including the creation of FWE IV pursuant to a divisive merger and its formation under the Fieldwood Energy IV LLC Agreement, does not give the CUSA Entities control over FWE IV in any manner that would be recognized under the

Securities Act of 1934, the Bankruptcy Code, or any other applicable law; and none of the terms of the CUSA Definitive Documents, including consent rights granted to the CUSA Entities thereunder, cause the CUSA Entities to have any such control over FWE IV.

105.    Entities (as defined under section 101(15) of the Bankruptcy Code) or parties that fail to timely file an objection asserting a FWE IV Consent Right or FWE IV Preferential Purchase Right are (a) forever barred from objecting to the allocation and vesting of the assets in connection with the FWE III Plan of Merger free and clear of all FWE IV Consent Rights and FWE IV Preferential Purchase Rights, and from asserting any alleged FWE IV Consent Rights or FWE IV Preferential Purchase Rights with respect to the FWE III Plan of Merger, and (b) deemed to consent to and approve the allocation and vesting of the assets free and clear of all FWE IV Consent Rights and FWE IV Preferential Purchase Rights, regardless of whether such consent must be in writing pursuant to the terms of any agreement.  For the avoidance of doubt, nothing herein, including the releases provided pursuant to Section 10.7 of the Plan, shall affect or be deemed to restrict or limit CUSA's, CUSA's affiliates, or FWE IV's claims for or rights to seek payments or contribution from any current or prior non-Debtor working interest owners, predecessors, co-owners and/or operators, or from any other non-Debtor parties that are contractually, legally, regulatorily or equitably liable for decommissioning or related obligations, including obligations under surety bonds, letters of credit or other instruments relating thereto, with respect to the Legacy CUSA Properties or the FWE IV Assets.

106.    FWE shall, and shall cause its Debtor affiliates to, on the Effective Date, provide for the payment of any and all documentary, filing, recording, stamp, and registration fees, costs, taxes, and expenses incurred or imposed in connection with the filing of record by or on behalf of FWE III of any instrument or instruments with the appropriate records office of any county, parish,

state, federal, or other governmental unit (including BOEM) that may be required in connection with the implementation of the FWE III Plan of Merger or that the applicable governmental unit or FWE III determines to be necessary or appropriate to reflect in the appropriate records of any governmental unit that as a result of the FWE IV Divisive Merger (a) ownership of the FWE IV Assets have been allocated to and are vested in FWE IV, and (b) the FWE IV Allocated Obligations have been allocated to and vested in, and constitute liabilities and obligations of, FWE III and FWE IV, respectively (collectively, the "**FWE IV Implementation Costs**"); provided, to the extent any FWE IV Implementation Costs remain unpaid as of the Effective Date, FWE shall have provided FWE IV with sufficient funds to pay any such outstanding FWE IV Implementation Costs.

107.    All rights of any applicable CUSA Entity with respect to bonds and letters of credit constituting security for the decommissioning of the assets allocated to and vested in FWE IV shall be reserved as against such bonding companies and letter of credit issuers in all respects. The Debtors shall not terminate any bonds issued on behalf of the Debtors relating to such FWE IV assets under which any federal, state or local governmental entity is an obligee.

108.    The Bankruptcy Court (i) approves the CUSA Definitive Documents and all transactions contemplated by this Agreement, including the FWE III Plan of Merger, and all actions to be taken, undertakings to be made, and obligations to be incurred by FWE III or FWE IV, as applicable, contemplated thereby; and (ii) following the consummation of the FWE III Plan of Merger, authorizes FWE III or FWE IV, as applicable, without further notice to or action, order, or approval of this Bankruptcy Court and without the need for any further corporate or shareholder action, to enter into, deliver, and fully perform their obligations under the CUSA Definitive Documents.  Upon entry of the Order, FWE III or FWE IV, as applicable, shall be

authorized and empowered, without further approval of the Bankruptcy Court or any other party, to take such actions and perform such acts as may be necessary, convenient, desirable, or appropriate to execute and deliver the CUSA Definitive Documents in accordance with the Plan and to execute and deliver all documents relating thereto and to perform all of their obligations thereunder. On the Effective Date, the CUSA Definitive Documents shall constitute legal, valid, binding, and authorized obligations of FWE III or FWE IV, as applicable, enforceable in accordance with their terms, and such obligations of FWE III or FWE IV, as applicable, shall not be enjoined or subject to discharge, impairment, release, avoidance, recharacterization, or subordination by FWE III, FWE IV, the Post-Effective Date Debtors, or the Plan Administrator, under applicable law, the Plan, or the Order.

109.    _Cures_.  In accordance with the Plan, the Debtors or Post-Effective Date Debtors, as applicable, shall be responsible for paying any Cure Amounts associated with the contracts assumed by the Debtors and allocated to FWE IV pursuant to the FWE III Plan of Merger. Notwithstanding anything in the Plan Supplements (ECF No. 1394) with respect to the Schedule of Assumed Contracts and Cure Amounts (or any subsequent schedules and notices with respect to assumed or assumed and assigned contracts and corresponding cure costs, including, without limitation, ECF Nos. 1395 and 1456) to the contrary, only the contracts to be assumed and allocated to FWE IV under the Plan of Merger shall be so assumed and allocated thereto.

110.    _Murrayfield and Emory Peak_.  Notwithstanding anything in the Plan or this Order to the contrary, any overriding royalty interests, mortgages, memorandums of understanding and/or UCC-1s related to security documents associated with (x) that certain Joint Operating Agreement by and between Chevron U.S.A. Inc. and Fieldwood Energy LLC, dated July 1, 2019 (as amended) or (y) that certain Joint Operating Agreement by and among Chevron U.S.A. Inc.,

Fieldwood Energy LLC and Ridgewood Castle Rock, LLC, dated as of August 1, 2019 (as amended), that are being assumed and assigned to Credit Bid Purchaser in connection with Murrayfield and Emory Peak, shall be permitted encumbrances and shall continue in full force and effect following the Effective Date and such assumption and assignment to Credit Bid Purchaser.

111.    <u>Eni</u>.  On the Effective Date, FWE shall have withdrawn as operator of the interests of the Debtors in the oil and gas leases (the "**Eni Specified Interests**") set forth on **Exhibit C** to that certain *Eni Term Sheet Implementation Agreement* (the "**Eni Implementation Agreement**") immediately prior to their abandonment pursuant to the Plan.

112.    On the Effective Date, FWE III shall reimburse Eni for reasonable and documented legal fees and expenses incurred in connection with the Chapter 11 Cases in the amount of $1.5 million.  Additionally, on the Effective Date, FWE III shall pay $3 million in cash to Eni to be used in connection with Actual Decommissioning Costs (as defined in the Turnkey Removal Agreement) not covered by the proceeds of Performance Bond No. 2196705 by and between Fieldwood Energy Offshore LLC ("**FEO**") as Principal, North American Specialty Insurance Company ("**NAS**") as Surety, and Eni as Obligee (the "**NAS Bond**").

113.    On the Effective Date, FWE III shall provide for the payment of any and all documentary, filing, recording, stamp, and registration fees, costs, and expenses incurred in connection with any required filing of record by or on behalf of FWE III of any instrument or instruments with the appropriate records office of any county, parish, state, federal, or other governmental unit (including BOEM) that may be required in connection with the FWE III Plan of Merger as it relates to the Eni Specified Assets[8] or incurred in connection with the satisfaction of the Regulatory Condition.

---

[8] For purposes of this Order, the term "**Eni Specified Assets**" shall refer and have the meaning ascribed to the term "**Specified Assets**" as such term is defined in the Eni Implementation Agreement.

114.    Immediately upon the occurrence of the Effective Date, FEO's interests in the Specified Assets shall be abandoned by FEO pursuant to section 554(a) of the Bankruptcy Code, the Plan, and the Order.  For the avoidance of doubt, upon abandonment of the Eni Specified Assets, no funds shall have been allocated to FEO to perform or satisfy any plugging, abandonment, or decommissioning obligations associated with the Eni Specified Assets and FEO acknowledges it will be in default of such decommissioning obligations.  Any Debtor which previously owned or operated an Eni Specified Asset shall appoint FWE III as its agent to perform the Agreed Activities (as defined in that certain Turnkey Removal Agreement attached to the Eni Implementation Agreement as **Exhibit B** (the "**Eni Turnkey Agreement**")) and the Initial Safe Out (as defined in the Eni Turnkey Agreement) work, and, subject to the commencement triggers set forth in the Eni Turnkey Agreement, FWE III shall be authorized and empowered by Eni to be its decommissioning agent in relation to the Eni Specified Assets.  For the avoidance of doubt, the Eni Definitive Documents (as defined in the Eni Implementation Agreement) shall be included within the definition of Additional Predecessor Agreement Documents provided in the Plan.

115.    On the Effective Date, except for the rights and remedies of Eni to enforce (i) the Plan, (ii) the Order, and (iii) the obligations contemplated by the Eni Definitive Documents (as defined in the Eni Implementation Agreement), Eni shall be deemed a Releasing Party (without submitting a ballot(s) to accept the Plan) against all Released Parties other than FEO and its Estate under the Plan for all purposes thereunder, and shall waive and release any and all pre-Effective Date claims of any kind against the Debtors, their Estates and any other Released Party, other than FEO and its Estate, including, without limitation, the Eni Claims (as defined in the Eni Implementation Agreement) and any claims for administrative expense under sections 503(b) or 507(a)(2) of the Bankruptcy Code; *provided, however,* that, upon the occurrence of (i) the

Effective Date and (ii) effectiveness of the Eni Definitive Documents, notwithstanding Section 4(e) of the Eni Implementation Agreement, Eni shall be deemed to have an Allowed Class 6B General Unsecured Claim in an amount equal to the aggregate sum of the Eni Net Turnkey Amounts for the Decommissioning Projects (each as defined in the Eni Turnkey Agreement). Except as otherwise provided for hereunder with respect to the Released Parties (under and as defined in the Plan other than Apache and FEO and its Estate), nothing herein shall affect or be deemed to restrict or limit Eni's claims for or rights to seek payments or contribution from current or prior working interest owners, predecessors, co-owners and/or operators, or from any other parties that are contractually, legally, regulatorily or equitably liable for decommissioning or related obligations, including obligations under surety bonds, letters of credit or other instruments relating thereto, with respect to the Eni Specified Assets.

116.    On the Effective Date, except for the rights and remedies to enforce (i) the Plan, (ii) the Order, and (iii) the obligations contemplated by this Agreement or the Eni Definitive Documents, the Debtors shall waive and release any and all pre-Effective Date claims of any kind against Eni (including, for the avoidance of doubt, each of Eni's affiliates and each of their and their affiliates' current and former directors, managers, officers, equity holders, predecessors, successors, and assigns, subsidiaries, and each of their current and former officers, members, managers, directors, equity holders, principals, members, employees, or other agents, in each case, in their capacities as such), in all circumstances only to the extent such claims accrued on or prior to the Effective Date.

117.    All rights of Eni with respect to bonds and letters of credit constituting security for the decommissioning of the assets associated with the Eni Specified Assets shall be reserved as against such bonding companies and letter of credit issuers in all respects. The Debtors shall not

terminate any bonds issued on behalf of the Debtors relating to such Eni Specified Assets under which any federal, state or local governmental entity is an obligee.

118.    The Bankruptcy Court (i) approves the Eni Definitive Documents and all transactions contemplated by this Agreement and all actions to be taken, undertakings to be made, and obligations to be incurred by the parties thereto; (ii) following the consummation of the Initial Plan of Merger, authorizes FWE III, without further notice to or action, order, or approval of this Bankruptcy Court and without the need for any further corporate or shareholder action, to enter into, deliver, and fully perform their obligations under the Eni Definitive Documents; and (iii) finds that the parties' entry into the Eni Definitive Documents and the implementation of the transactions contemplated therein shall not impair Eni's right and ability to draw on Performance Bond No. 2196705 by and between FEO as Principal, NAS as Surety, and Eni as Obligee, and shall not impair NAS's defenses to such draw.  The terms of the NAS Bond shall not be altered in any manner. Neither the Plan, this Order, nor any of the transactions contemplated or effectuated under the Plan, purport to alter or modify the rights of Eni or NAS, as between each other, under the NAS Bond.  Upon entry of the Order, FWE III shall be authorized and empowered, without further approval of the Bankruptcy Court or any other party, to take such actions and perform such acts as may be necessary, convenient, desirable, or appropriate to execute and deliver the Eni Definitive Documents in accordance with the Plan and Order and to execute and deliver all documents relating thereto and to perform all of their obligations thereunder. On the Effective Date, the Eni Definitive Documents shall constitute legal, valid, binding, and authorized obligations of FWE III enforceable in accordance with their terms, and such obligations of FWE III shall not be enjoined or subject to discharge, impairment, release, avoidance, recharacterization,

or subordination by FWE III, the Post- Effective Date Debtors, or the Plan Administrator, under applicable law, the Plan, or the Order.

119.    Hunt.  That certain Turnkey Removal Agreement by and among Hunt Oil Company ("**Hunt**") and Fieldwood Energy LLC ("**Hunt Turnkey Agreement**") (ECF No. [●]) and all transactions contemplated therein and all actions to be taken, undertakings to be made, and obligations to be incurred by the parties thereto, including the allocation of properties to FWE III contemplated therein, are approved without further notice to or action, order, or approval of this Bankruptcy Court and without the need for any further corporate or shareholder action, to enter into, deliver, and fully perform their obligations under the Hunt Turnkey Agreement.

120.    Through the divisive merger transactions contemplated in the Plan, the rights, title and interests of a Debtor or a Post-Effective Date Debtor in the properties described in the Hunt Turnkey Agreement shall be allocated to and vested in FWE III and the applicable documents in the Plan Supplement shall be amended, revised or conformed accordingly to effectuate such allocation of properties.

121.    Subject to the effectiveness of the Hunt Turnkey Agreement, on the Effective Date, except for the rights and remedies of Hunt to enforce (i) the Plan, (ii) the Confirmation Order, and (iii) the obligations contemplated in the Hunt Turnkey Agreement, each of the Hunt Released Parties (as defined below) (1) releases any claims for administrative expense under sections 503(b) or 507(a)(2) of the Bankruptcy Code; (2) shall be deemed a Releasing Party under the Plan but only as to any pre-Effective Date claims as against the following Persons only, each in their capacity as such:  (a) the DIP Agent and DIP Lenders under the DIP Facility, (b) the Prepetition FLFO Secured Parties, (c) the Consenting Creditors, (d) Prepetition FLFO Collateral Agent, (e) the Prepetition FLTL Agents, (f) the Prepetition SLTL Agent, (g) NewCo and all of its

subsidiaries (including the Credit Bid Purchasers), (h) the Exit Facility Agents, (i) the Exit Facility Lenders, (j) the Second Lien Backstop Parties, (k) the ERO Backstop Parties, with respect to each of the foregoing Persons in clauses (a) through (k), in each case solely in their capacity as such, (l) with respect to each of the foregoing Persons in clauses (a) through (k), each such Entity's current and former directors, managers, officers, employees, agents, fund advisors, investment advisors, advisory board members, financial advisors, attorneys, accountants, investment bankers, consultants, representatives and other professionals, such Persons' respective heirs, executors, estates, and nominees, and (m) each of the Debtor's current and former directors, managers, officers, employees, agents, fund advisors, investment advisors, advisory board members, financial advisors, attorneys, accountants, investment bankers, consultants, representatives and other professionals, such Persons' respective heirs, executors, estates, and nominees, in each case solely in their capacity as such (such persons in clauses (a) through (m), the "**Hunt Non-Debtor Released Parties**"); and (3) Hunt Group is deemed to have voluntarily withdrawn its notice of opt out of third party releases (ECF No. 1422) as to the Hunt Non-Debtor Released Parties only; provided, however, and for the avoidance of doubt, Hunt Group is not a Releasing Party under the Plan as against, and does not withdraw its opt out notice as to, any Released Party other than the Hunt Non-Debtor Released Parties.

122.    Subject to the effectiveness of the Hunt Turnkey Agreement, on the Effective Date, Hunt and its affiliates (together "**Hunt Group**") (together with each of their current and former directors, managers, officers, employees, agents, fund advisors, investment advisors, advisory board members, financial advisors, attorneys, accountants, investment bankers, consultants, representatives and other professionals, such Persons' respective heirs, executors, estates, and nominees, the "Hunt Released Parties") will be deemed a Released Party under the

Plan but only as to any pre-Effective Date claims of any of the Hunt Non-Debtor Released Parties, each in their capacity as Releasing Parties under the Plan; provided, however, and for the avoidance of doubt, each of the Hunt Released Parties is not a Released Party under the Plan as against any Releasing Party other than the Hunt Non-Debtor Released Parties (each in its capacity as a Releasing Party under the Plan).

123.    Upon entry of the Confirmation Order, the Debtors, the Post-Effective Date Debtors (including FWE III) and Credit Bid Purchaser shall be authorized and empowered, without further approval of the Bankruptcy Court or any other party, to take such actions and perform such acts as may be necessary, convenient, desirable, or appropriate to execute and deliver the Hunt Turnkey Agreement and to execute and deliver all documents relating thereto and to perform all of their obligations thereunder; such obligations shall not be enjoined or subject to discharge, impairment, release, avoidance, recharacterization, or subordination by FWE III, the Post-Effective Date Debtors, or the Plan Administrator, under applicable law, the Plan, or the Confirmation Order.

124.    Except as otherwise provided for herein with respect to the Hunt Non-Debtor Released Parties, nothing herein shall affect or be deemed to restrict or limit each of the Hunt Released Parties' claims for or rights to seek payments or contribution from and any defenses against current or prior working interest owners, predecessors, co-owners and/or operators, or from any other parties that are contractually, legally, regulatorily or equitably liable for decommissioning or related obligations, including obligations under surety bonds, letters of credit or other instruments relating thereto.  For the avoidance of doubt, the Hunt Turnkey Agreements and any documents executed in connection therewith shall be included within the definition of Additional Predecessor Agreement Documents provided in the Plan.

125.     Any and all rights of Hunt Group, the Debtors, the Post-Effective Date Debtors (including FWE III), Credit Bid Purchaser and any Governmental Unit with respect to bonds and letters of credit constituting security for the decommissioning of the properties associated with the Hunt Turnkey Agreement shall be reserved as against such bonding companies and letter of credit issuers in all respects.

126.     On the effectiveness of the Hunt Turnkey Agreement, Hunt shall be deemed to have an Allowed Class 6B General Unsecured Claim in the amount of $22,770,453.  Prime Clerk, the Debtors' claims and noticing agent, is authorized and instructed to update the claims register in this case to include the claim allowed herein.  Hunt may elect in its unfettered discretion to forfeit or waive the claim allowed herein (or any recoveries on account of such claim), or to assign such claim to an affiliate, for any reason or for no reason, by providing written notice to the Plan Administrator under the Plan.

127.     <u>XTO</u>.  The terms of this paragraph shall apply to the Exxon/XTO Entities[9] and the Executory Contracts identified on the Schedule of Assumed Contracts between any of the Debtors and any one or more of the Exxon/XTO Entities (the "**Exxon/XTO Executory Contracts**"):

    i.     This Confirmation Order shall not be, and shall not be construed as, a determination of the cure amount or compensation, if any, required to satisfy the provisions of sections 365(b)(1)(A) and 365(b)(1)(B) of the Bankruptcy Code for the assumption of the Exxon/XTO Executory Contracts (the "**Exxon/XTO Cure Amount**").

    ii.     The Debtors, and (a) the Post-Effective Debtors, (b) FWE I, (c) any FWE Additional Entity, or (d) the Credit Bid Purchaser, (each an "**Applicable**

---

[9] As used herein, the term "**Exxon/XTO Entities**" shall collectively mean XTO Energy, Inc., XTO Offshore, Inc., HHE Energy Company, XH, LLC, ExxonMobil Corporation, ExxonMobil Production Company, ExxonMobil Pipeline Company, ExxonMobil Oil Supply, Exxon Mobil Exploration Company, Exxon Corporation, Exxon Company, USA, Mobil Oil Corporation, Mobil Exploration Company, Inc., Mobil Exploration & Producing U.S., Inc., Mobil Producing Texas & New Mexico, Inc., Second Mobil Oil Company, Inc., Mobil Oil Exploration and Producing Southeast, Inc., as well as any parent, subsidiary, or affiliate of any of said parties.  The term "**Exxon/XTO Entity**" shall refer singularly to any of the Exxon/XTO Entities that are a party to a particular Exxon/ETO Executory Contract.

**Contract Entity**"), and the Exxon/XTO Entities shall endeavor in good faith to reach agreement as to the Exxon/XTO Cure Amount within one hundred twenty (120) days following the Effective Date (subject to extension upon mutual agreement of the parties), and if such an agreement is reached, the Debtors or Applicable Contract Entity, as applicable, and applicable Exxon/XTO Entity, shall file a stipulation with the Court setting forth (i) the agreed Exxon/XTO Cure Amount, and (ii) providing for payment of such Exxon/XTO Cure Amount by the Applicable Contract Entity as a condition to the assumption and assignment of such Exxon/XTO Executory Contract.  If the Debtors or Applicable Contract Entity and applicable Exxon/XTO Entity fail to reach agreement as to the Exxon/XTO Cure Amount within such one hundred twenty (120) day period (or upon the expiry of any extension thereof), the Debtors, proposed Applicable Contract Entity or applicable Exxon/XTO Entity may, on notice to the proposed Applicable Contract Entity or applicable Exxon/XTO Entity, request a hearing before the Court for the determination of the Exxon/XTO Cure Amount.  For purposes of determining the Exxon/XTO Cure Amount, the effective date of assumption shall be the Petition Date. Each Exxon/XTO Cure Amount shall be due and payable by the Debtors or the Applicable Contract Entity as set forth in the Plan, regardless of whether the Claims Reserve provided under Section 5.14 of the Plan for payment of cure claims is sufficiently funded.

iii.    All valid Claims arising from and after the Petition Date under the Exxon/XTO Executory Contracts that have been assumed, assumed and assigned or assumed and allocated shall be deemed to be Allowed Administrative Expense Claims based on a liability incurred by the Debtors in the ordinary course of their business for which no request for allowance of an administrative claim shall be necessary, as contemplated in Section 2.1 of the Plan.  However, in the event the Debtors or the Applicable Contract Entity, as applicable, and the applicable Exxon/XTO Entity, are unable to agree on the amount of the Allowed Administrative Claim held by the Exxon/XTO Entity, either party may apply to the Court for a review and determination thereof.

iv.    To the extent that an Exxon/XTO Executory Contract is assumed, assumed and assigned or assumed and allocated, such assumption or assumption and assignment or assumption and allocation shall result in the full release and satisfaction of only those Claims based on a default existing as of the Petition Date with respect to such Exxon/XTO Executory Contract.  For the avoidance of doubt, the Plan and this Order shall not alter any of the terms under the Exxon/XTO Executory Contracts.

v.    The assumption, assumption and assignment, or assumption and allocation of any Exxon/XTO Executory Contract shall not alter any of the parties' respective rights and obligations under the Exxon/XTO Executory Contracts, including, without limitation, any valid netting (either based on setoff or recoupment), under the Exxon/XTO Executory Contracts and pursuant to applicable law.

vi.   The bar date for the Exxon/XTO Entities to file a claim based on the rejection of any executory contracts or unexpired leases between the Debtors and the Exxon/XTO Entities shall be the later of: (a) forty-five (45) days after the filing and service of the notice of the Effective Date, or (b) forty-five (45) days after entry of any order rejecting such executory contract or unexpired lease with the Exxon/XTO Entities. Claims based on the rejection of any executory contracts or unexpired leases between the Debtors and the Exxon/XTO Entities shall be treated as a Class 6B General Unsecured Claim under the Plan.

vii.  Any Claim for rejection damages arising from rejection of any executory contracts or unexpired leases between the Debtors and the Exxon/XTO Entities (if any) are reserved for further hearing.

128.   The Exxon/XTO Entities have opted out of all third-party releases contained in the Plan and this Order.

129.   [XTO, RLI Insurance and Liberty.  Neither the Plan nor this Order shall have any effect upon or in any manner alter or impair the rights of XTO Offshore, Inc., HHE Energy Company, and XH, LLC (collectively the **"Exxon/XTO Bond Entities"**), as the obligees, or RLI Insurance Company (**"RLI"**) or Liberty Mutual Insurance Company (**"Liberty"**) as sureties (together, the **"XTO Sureties"**), as between the Exxon/XTO Bond Entities and XTO Sureties under (i) Performance Bond No.RLB0013981 (the **"RLB Bond"**) issued pursuant to the Purchase and Sale Agreement dated effective as of August 1, 2011 (**"Dynamic PSA"**) among Dynamic Offshore Resources, LLC, as principal, the Exxon/XTO Bond Entities as the obligees, and RLI as surety, or (ii) Performance Bond No. 022220643 (the **"Liberty Bond"**), among Fieldwood Energy LLC, as principal, XH, LLC, as obligee, and Liberty Mutual Insurance Company (**"Liberty Insurance"**), as surety, issued pursuant to the agreement pursuant to which Fieldwood Energy LLC acquired XH, LLC assets from Apache Corporation on September 30, 2013 (the **"Fieldwood Agreement"**).

130.   The terms of the RLB Bond and the Liberty Bond (collectively, the **"Exxon/XTO Bonds"**) shall not be altered in any manner, and the rights of the Exxon/XTO Bond Entities and

the XTO Sureties pursuant to the Exxon/XTO Bonds, Dynamic PSA, and Fieldwood Agreement, as applicable, and as between each other, shall be unaffected by the Plan and this Confirmation Order.

131.    Without limiting the generality of the foregoing, nothing in the Plan or this Order shall preclude the Exxon/XTO Bond Entities from giving any notice to, or making any demand upon, the principal on any of the Exxon/XTO Bonds to the extent required by the terms of any of the Exxon/XTO Bonds, the Dynamic PSA, or the Fieldwood Agreement.

132.    Nothing in the Plan or Confirmation Order shall be deemed to: (a) adjudicate or modify the rights between the Exxon/XTO Bond Entities and the XTO Sureties under the Exxon/XTO Bonds or under applicable law; (b) bar, impair, enjoin, release, alter, diminish or enlarge any of the rights or defenses of the XTO Sureties against any non-Debtors (other than with respect to any NewCo Entity or any Credit Bid Acquired Interests); or (c) constitute a waiver or release of any rights or defenses that the XTO Sureties hold against any non-Debtor Parties (other than with respect to any NewCo Entity or any Credit Bid Acquired Interests).][10]

133.    <u>BP</u>. The terms of this paragraph shall apply to the BP Entities and the Executory Contracts identified on the Schedule of Assumed Contracts between any of the Debtors and any BP Entity (the "**BP Executory Contracts**"):

      i.    This Confirmation Order shall not be, and shall not be construed as, a determination of the cure amount or compensation, if any, required to satisfy the provisions of sections 365(b)(1)(A) and 365(b)(1)(B) of the Bankruptcy Code for the assumption of the BP Executory Contracts (the "**BP Cure Amount**").

      ii.    To the extent that a BP Executory Contract is assumed, assumed and assigned or assumed and allocated, such assumption or assumption and assignment or assumption and allocation shall result in the full release and satisfaction of only

---

[10] These paragraphs 129–32 are subject to continued review and sign off by the Debtors and XTO and the consent rights of certain parties in interest, with all rights reserved.

those Claims based on a default existing as of the Effective Date with respect to such BP Executory Contract. For the avoidance of doubt, the Plan and this Order shall not alter any of the terms under the BP Executory Contracts including, without limitation, any arbitration rights or any valid netting (either based on setoff or recoupment).

iii. The assumption, assumption and assignment, or assumption and allocation of any BP Executory Contract shall not alter, impair or otherwise affect any of the parties' respective rights and obligations under the BP Executory Contracts, including, without limitation, any valid netting (either based on setoff or recoupment) under the BP Executory Contracts and pursuant to applicable law; and any rights for arbitration.

iv. The bar date for the BP Entities to file a claim based on the rejection of any executory contracts or unexpired leases between the Debtors and the BP Entities shall be the later of: (a) forty-five (45) days after the filing and service of the notice of the Effective Date, or (b) forty-five (45) days after entry of any order rejecting such executory contract or unexpired lease with the BP Entities. Claims based on the rejection of any executory contracts or unexpired leases between the Debtors and the BP Entities shall be treated as a Class 6B General Unsecured Claim under the Plan.

134.    The BP Entities have opted out of all third-party releases contained in the Plan and this Order.

135.    <u>BP and RLI</u>. Neither the Plan nor this Order shall have any effect upon or in any manner alter or impair the rights (as against the sureties) of the BP Entities or other beneficiaries and obliges under (i) Performance Bond No. RLB0001509 (the "**Panaco/RLI Bond**") among Panaco, Inc., as principal, BP as the obligee, and RLI, as surety, or (ii) Supplemental Bond No. SUR24000026 (the "**Ironshore Bond No. 1**"), among Fieldwood Energy Offshore LLC, as principal, BOEM, as obligee, and Inonshore Indemnity Inc. ("**Ironshore Indemnity**" and, together with RLI, the "**BP Sureties**"), as surety; or (iii) Supplemental Bond No. SUR24000027 (the "**Ironshore Bond No. 2**"), among Fieldwood Energy Offshore LLC, as principal, BOEM, as obligee, and Inonshore Indemnity, as surety.

136.    The terms of the Panaco/RLI Bond, Ironshore Bond No. 1, and Ironshore Bond No. 2 (the "**BP Bonds**") shall not be altered in any manner, and the rights of the BP Entities and BP

Sureties, as between each other, pursuant to the Panaco/RLI Bond, Ironshore Bond No. 1, and Ironshore Bond No. 2, as applicable, shall be unaffected by the Plan and this Confirmation Order.

137.     Without limiting the generality of the foregoing, nothing in the Plan or this Order shall preclude the BP Entities from giving any notice to, or making any demand upon, the principal on any of the BP Bonds to the extent required by the terms of any of the BP Bonds or any agreements relating thereto.

138.     Nothing in the Plan or Confirmation Order shall be deemed to: (a) adjudicate or modify the rights between the BP Entities and the BP Sureties under the BP Bonds or under applicable law; (b) bar, impair, enjoin, release, alter, diminish or enlarge any of the rights or defenses of the BP Sureties against any non-Debtors (other than with respect to any NewCo Entity or any Credit Bid Acquired Interests); or (c) constitute a waiver or release of any rights or defenses that the BP Sureties hold against any non-Debtor Parties (other than with respect to any NewCo Entity or any Credit Bid Acquired Interests).

139.     Nippon.  Reference is hereby made for all purposes to that certain Bond No. 1149839, issued by Lexon Insurance Company to Fieldwood Energy LLC, as obligee, on which Northstar Offshore Ventures LLC (formerly, now Sanare Energy Partners LLC) is the principal ("**VR 196 Bond**").  To the extent permitted under the VR 196 Bond and any related agreements, any proceeds of the VR 196 Bond that are received by FWE III, FWE III shall apply such proceeds to Northstar Offshore Group LLC's share of costs and expenses associated with all plugging and abandonment and decommissioning obligations attributable to VR 196 in the event such costs and expenses are not paid by Northstar Offshore Group LLC or Sanare Energy Partners LLC.

140.    Upon the abandonment of certain of the Debtors' rights, title and interests in WD 121 (OCS-G 14893) and WD 122 (OCS-G 13645) (the "**WD 121/122 Leases**", and such abandoned interests in such leases being the "**WD 121/122 Abandoned Interests**"), from and after the Effective Date and until the termination or expiration of such leases, the designated operator or its agent (the "**Designated Operator**") of the WD 121/122 Leases  will periodically determine the difference between (i) the revenues attributable to the WD 121/122 Abandoned Interests over the relevant period and (ii) any costs and expenses attributable to the WD 121/122 Abandoned Interests over the same relevant period (the "**WD 121 Net Cash Amount**") and, to the extent such WD 121 Net Cash Amount is positive, such amount will be credited to a suspense account that will be applied exclusively to satisfy all costs and expenses related to the plugging and abandonment and decommissioning obligations attributable to the WD 121/122 Abandoned Interests ("**WD 121/122 Suspense Account**") and to the extent such WD 121 Net Cash Amount is negative, such amounts will be debited from the WD 121/122 Suspense Account.  From and after the Effective Date, on a bi-annual basis, the Designated Operator will provide a written report to JX Nippon Oil Exploration (U.S.A.) Limited specifying the balance in the WD 121/122 Suspense Account, together with accounting data in support of such balance.

141.    Notwithstanding anything to the contrary in the Plan, any Plan Supplement, or this Order, neither the Plan, Order, nor any of the transactions contemplated or effectuated under the Plan, shall amend or alter the terms of Bond Nos. B008837, B008838 and B008839 (collectively, the "**Nippon Bonds**") issued by U.S. Specialty Insurance Company ("**USSIC**") to JX Nippon Oil Exploration (U.S.A.) Limited ("**Nippon**"), as obligee, on which Fieldwood Energy Offshore, LLC is the principal.  Neither the Plan, this Order, nor any of the transactions contemplated or effectuated under the Plan, is intended to alter or modify the rights of Nippon or USSIC under the

Nippon Bonds, as between each other.  Without limiting the generality of the foregoing, nothing in the Plan, any Plan Supplement or this Order shall preclude Nippon from giving any notice to, or making demand upon, the principal on any of the VR 196 Bond and Nippon Bonds to the extent required by the terms of any of the VR 196 Bond and Nippon Bonds.

142.    Notwithstanding anything to the contrary contained in the Plan, any Plan Supplement, this Order or otherwise, with regard to any and all executory contracts between any of the Debtors and JX Nippon Oil Exploration (U.S.A.) Limited ("**Nippon**") that are assumed under the Plan (the "**Nippon Agreements**"), Nippon's rights are reserved with respect to any Cure Amount relating to the Nippon Agreements and the legal, equitable and contractual rights of the Debtors and Nippon under the Nippon Agreements are unaltered by the Plan, this Order, or any other Plan Documents or assignment, and nothing shall affect or otherwise impair valid common law or contractual setoff or recoupments rights Nippon may possess.  Any amounts owed under the Nippon Agreements and/or disputes thereunder will be resolved in the ordinary course of business including but not limited to resolution of the Cure Amount and for valid setoff or recoupment.  Nippon has opted out of all third-party releases contained in the Plan, any Plan Supplement and this Order.

143.    Japex.  Upon the abandonment of the Debtors' rights, title and interests in WD 90 (OCS-G 1089), WD 103 (OCS-G 12360), Pipeline/ROW (SN 10068), Pipeline/ROW (SN 10069), the WD 103 F Platform located in WD Block 103, any oil and gas wells located on the WD 103-F Platform, and any associated pipelines, rights-of-way, or any other fixtures or infrastructure associated with any of the foregoing  (collectively the "**WD 103-F Platform Interests**", and such abandoned interests being the "**WD 103-F Platform Abandoned Interests**"), from and after the Effective Date and until the termination or expiration of such interests, the designated operator or

its agent (the "**Designated Operator**") of the WD 103-F Platform Abandoned Interests will periodically determine the difference between (i) the revenues attributable to the WD 103-F Platform Abandoned Interests over the relevant period and (ii) any costs and expenses attributable to the WD 103-F Platform Abandoned Interests over the same relevant period (the "**WD 103 Net Cash Amount**") and, to the extent such WD 103 Net Cash Amount is positive, such amount will be credited to a suspense account that will be applied exclusively to satisfy all costs and expenses related to the plugging and abandonment and decommissioning obligations attributable to the WD 103-F Platform Abandoned Interests ("**WD 103-F Platform Suspense Account**") and to the extent such WD 103 Net Cash Amount is negative, such amounts will be debited from the WD 103-F Platform Suspense Account. From and after the Effective Date, on a bi-annual basis, the Designated Operator will provide a written report to Japex (U.S.) Corp. specifying the balance in the WD 103-F Platform Suspense Account, together with accounting data in support of such balance.

144. <u>LLOG</u>. The Debtors and LLOG Exploration Offshore LLC ("**LLOG**") agree to adjourn the issues raised by LLOG in its objection to the Plan (ECF No. 1481) to a later date to be agreed by the parties. A hearing to consider the extent, validity, seniority and enforceability of LLOG's secured claim in and to the overriding royalty interest in Green Canyon Block 201 ("**GC 201 ORRI**") will be held by the Court [on or before July 15, 2021]. Notwithstanding section 8.1(a) of the Plan, that certain Offshore Operating Agreement dated December 12, 2002 (as ratified and amended, the "LLOG Operating Agreement") shall not be deemed rejected upon the occurrence of the Effective Date and the Debtors reserve the right to seek to assume the LLOG Operating Agreement to the extent that the Court determines that LLOG holds a valid and enforceable lien in the GC 201 ORRI.

145. <u>McMoRan, W&T, Merit, COPC, Cox Entities, Shell and Hess</u>. The rights of McMoRan; W&T; Merit Energy Company, Merit Management Partners I, L.P, Merit Management Partners II, L.P., Merit Management Partners III, L.P., Merit Energy Partners III, L.P. MEP III GOM, LLC, Merit Energy Partners D-III, L.P., Merit Energy Partners E-III, L.P., Merit Energy Partners F-III, L.P., Devon Energy Production Co. LP., (collectively, "**Merit**"); ConocoPhillips Company, The Louisiana Land & Exploration Company and Burlington Resources Offshore (collectively, "**COPC**"); the Cox Entities; Shell Offshore Inc. ("**Shell**"); and Hess Corporation ("**Hess**"), including, but not limited to, security interests, security rights, contract rights, setoff and recoupment rights, and subrogation rights, against non-Debtors (other than with respect to any NewCo Entity or any Credit Bid Acquired Interests , in each case except with respect to any right, claim, or interest arising under an agreement assumed and assigned or allocated to any NewCo Entity and with respect to any post Effective Date rights, including subrogation rights, arising out of any post Effective Date operations, ownership, act, event or occurrence with respect to the Credit Bid Acquired Interests) (the prior parenthetical is the "**NewCo Carve Out**") under operating agreements, other contracts, and applicable law are hereby reserved. Subject to the NewCo Carve Out, nothing contained in the Plan, Confirmation Order, and related exhibits and associated transaction documents shall be deemed or construed to be a release or discharge of any liability or obligations of any third parties to McMoRan, Merit, W&T, COPC, the Cox Entities, Shell, and Hess, including with respect to decommissioning liabilities of Debtors' predecessors and any other co-liable and/or jointly and severally liable parties with respect to Debtors' assets. McMoRan's, Merit's, W&T's, COPC's, the Cox Entities', Shell's, and Hess's claims and causes of action against any such third parties are hereby reserved. For the avoidance of doubt,

McMoRan, W&T, Merit, COPC, the Cox Entities, Shell and/or Hess shall not be "Releasing Parties" under the Plan.

146.    [Shell.  The Plan Documents shall not have any effect upon or in any manner alter or impair the rights of USSIC, Shell or other beneficiaries and obligees (as between each other) under Performance Bond No. B009344 (the "**Shell Bond**"), or any agreements relating thereto, among Fieldwood Energy Offshore, LLC, as principal, Shell as the obligee and USSIC as surety.  For the avoidance of doubt, USSIC and Shell reserve all rights as between each other under the Shell Bond.  Without limiting the generality of the foregoing, nothing in the Plan Documents shall preclude Shell from giving any notice to, or making demand upon, the principal on the Shell Bond to the extent required by the terms of the Shell Bond or any agreements relating thereto.][11]

147.    Hess.  To the extent Hess elects to assume possession and operational control of the Abandoned Properties that were previously conveyed to the Debtors by Hess and any related facilities, including but not limited to, any wells, pipelines, or other structures (collectively, the "**Hess Abandoned Assets**") prior to the expiration of the Transition Period (as defined in section 5.13 of the Plan), the Post-Effective Debtors shall promptly facilitate the safe and orderly transition of the Hess Abandoned Assets to Hess and cooperate in good faith with Hess to ensure such safe and orderly transition in compliance with applicable federal law; provided, however, that the Post-Effective Date Debtors, as applicable, shall not be required to conduct activities beyond the scope of the Transition Services and the Agreed Activities with respect to the Hess Abandoned Assets.

148.    Governmental Approvals.    Except as otherwise expressly provided for or contemplated in the Plan, the Plan Documents, or this Order, and except for any regulatory

---

[11] These paragraphs 146 is subject to continued review and sign off by the Debtors, Shell and the consent rights of certain parties in interest, with all rights reserved.

approvals that might be required by reason of the business conducted by the Post-Effective Date Debtors, FWE I, FWE IV, any FWE Additional Entity, or NewCo and its subsidiaries, this Order shall constitute all approvals and consents required, if any, by the laws, rules, or regulations of any state or any other governmental authority with respect to the implementation or consummation of the Plan and any documents, instruments, or agreements, and any amendments or modifications thereto, and any other acts referred to in or contemplated by the Plan, the Plan Documents, this Order, and the Disclosure Statement, and any documents, instruments, or agreements, and any amendments or modifications thereto.  Each federal, state, commonwealth, local, foreign, or other governmental agency is directed and authorized to accept the validity of (a) any and all documents, trust agreements, mortgages, and instruments, and (b) all actions of the Debtors that are necessary or appropriate to effectuate, implement, or consummate the transactions contemplated by the Plan, the Plan Documents, or this Order, and the agreements created or contemplated by the Plan or this Order, without payment of any recording tax, stamp tax, transfer tax, or similar tax imposed by state or local law.

149.    <u>Reservation of Rights of any Governmental Unit, including the United States</u>. Nothing in this Order or the Plan Documents discharges, releases, precludes, or enjoins: (i) any liability to a Governmental Unit that is not a Claim; (ii) only as it relates to Governmental Units, any liability against the Debtors to maintain, monitor, plug and abandon and/or decommission offshore infrastructure as required by law, (iii) any Claim of a Governmental Unit arising on or after the Confirmation Date; (iv) any liability of any entity or person under police or regulatory statutes or regulations to a Governmental Unit as the owner or operator of property or rights to property that such entity owns or operates after the Confirmation Date; and (v) any liability to a Governmental Unit on the part of any non-Debtor (the "**Government Reservations**").  Nor shall

anything in the Plan Documents enjoin or otherwise bar a Governmental Unit from asserting or enforcing, outside the Bankruptcy Court, any liability described in the first sentence of this paragraph consistent with its terms, and nothing in the Plan Documents divests any tribunal of any jurisdiction it may have under police or regulatory law to interpret the Plan Documents or to adjudicate any defense asserted under the Plan Documents.  Notwithstanding anything to the contrary in Plan Documents, nothing shall affect any of the United States' setoff and recoupment rights, or any of the Debtors', Post-Effective Date Debtors', and/or any successor(s) and assign(s) defenses thereto.

150.    Nothing in this Order shall alter, waive, or release the Debtors obligations to comply with laws reasonably designed to protect the public health or safety from the hazards to the health, safety, or the environment, including the obligation to perform any decommissioning.

151.    Notwithstanding any provision to the contrary in the Plan Documents, no sale, assignment, and/or transfer of any interest in contracts, leases, covenants, operating rights agreements, rights-of-use and easement, and rights-of-way or other interests or agreements with the federal government involving federal land or minerals in effect on or after the Confirmation Date (collectively, the "**Federal Leases**") may take place pursuant to the Plan Documents absent the consent of the United States, including any of its components, as provided for in applicable non-bankruptcy laws and regulations.

152.    Notwithstanding any provision to the contrary in the Plan Documents, the United States will retain and have the right to audit and/or perform any compliance review and, if appropriate, collect from the Debtors, Post-Effective Date Debtors, and/or any successor(s) and assign(s) in full any additional monies owed by the Debtors with respect to any assumed Federal Leases and those rights shall not be adversely affected by these bankruptcy proceedings.  Such

rights shall be preserved in full as if these Chapter 11 Cases had not occurred.  Furthermore, nothing in the Plan Documents shall be interpreted to set Cure Amounts or require the United States to novate, approve or consent to any sale, assignment, and/or transfer of any interests in the Federal Leases except pursuant to existing regulatory requirements and applicable law. The Debtors, Post-Effective Date Debtors, and any successor(s) and assign(s), will retain all defenses and/or rights, other than defenses and/or rights arising from these Chapter 11 Cases, to challenge any such determination; provided, however, that any such challenge, including any challenge associated with these bankruptcy cases, must be raised in the United States' administrative review process leading to a final agency determination by the Department of the Interior. The audit and/or compliance review period shall remain open for the full statute of limitations period established by the Federal Oil and Gas Royalty Simplification and Fairness Act of 1996, 30 U.S.C. § 1702, et seq.

153.    For the avoidance of doubt, only as it relates to the United States, nothing in the Plan Documents releases the Debtors or Post-Effective Date Debtors from any reclamation, plugging and abandonment, or other operational requirement under applicable federal non-bankruptcy law with respect to the Federal Leases or addresses or otherwise affects any decommissioning obligations and financial assurance requirements under the Federal Leases, as determined by the United States, that must be met by the Debtors, Post-Effective Date Debtors, or their successors and assigns on the Federal Leases going forward; *provided, however*, that upon the Effective Date, neither the Credit Bid Purchasers nor any other NewCo Entity shall have any liability to a Governmental Unit or any other third party for Federal Leases, including civil penalties, response costs, decommissioning or any other obligations including those under the Government Settlements, except for those obligations assumed under the Credit Bid Purchase

Agreement by Credit Bid Purchasers in connection with the Credit Bid Acquired Interests upon the consent by the Government Unit of the assignment of such Federal Leases in favor of the Credit Bid Purchaser.

154.   <u>Effectiveness of All Actions</u>.  All actions contemplated by the Plan, including all actions in connection with the Credit Bid Purchase Agreement, the NewCo Organizational Documents, the GUC Warrant Agreement, New Money Warrant Agreement, SLTL Tranche 1 Warrant Agreement, SLTL Tranche 2 Warrant Agreement, the Exit Facility Documents are hereby effective and authorized to be taken on, prior to, or after the Effective Date, as applicable, under this Order, without further application to, or order of the Court, or further action by the respective officers, directors, managers, members, or equity holders of the Debtors or the Post-Effective Date Debtors and with the effect that such actions had been deemed taken by unanimous action of such officers, directors, managers, members, or equity holders.

155.   <u>Valid and Binding</u>.  All documents necessary to implement the Plan (including, without limitation, the Credit Bid Purchase Agreement) and all other relevant and necessary documents have been negotiated in good faith and at arm's length and shall, upon completion of documentation and execution, be valid, binding, and enforceable agreements.

156.   <u>Injunction Against Interference with Plan</u>.  Except as otherwise provided in the Plan or this Order, upon entry of the Order, all holders of Claims or Interests and other parties in interest, along with their respective present and former affiliates, employees, agents, officers, directors, and principals, shall be enjoined from taking any action to interfere with the implementation or consummation of the Plan.

157.   <u>Notice of Entry of Confirmation Order</u>.  On or before the fourteenth (14th) day following the date of entry of this Order, the Debtors shall serve notice of entry of this Order

pursuant to Bankruptcy Rules 2002(f)(7), 2002(k), and 3020(c) on all creditors and interest holders, the U.S. Trustee, and other parties in interest, by causing notice of entry of this Order (the "**Notice of Confirmation**"), to be delivered to such parties by first-class mail, postage prepaid. The Debtors shall also post the Notice of Confirmation on the website maintained by the Solicitation Agent, at https://cases.primeclerk.com/fieldwoodenergy/ (the "**Case Website**"). The notice described herein is adequate under the circumstances, and no other or further notice is necessary.

158.    <u>Notice of Effective Date</u>.    As soon as practicable after the occurrence of the Effective Date, the Debtors shall serve notice of the Effective Date on all creditors and interest holders, the U.S. Trustee, and other parties in interest, by causing notice of the Effective Date in the form annexed hereto as **<u>Exhibit B</u>** ("**Notice of Effective Date**") to be delivered to such parties by first-class mail, postage prepaid. The Debtors shall also post the Notice of Effective Date on the Case Website. The Notice of Effective Date shall include notice of the deadline for (a) filing proofs of claim arising out of rejection of executory contracts upon the Effective Date, and (b) filing administrative expense claims.

159.    <u>Retention of Jurisdiction</u>.    Pursuant to sections 105(a) and 1142 of the Bankruptcy Code, this Court shall retain exclusive jurisdiction with respect to all matters arising from or related to the Chapter 11 Cases, the Plan, and the implementation of this Order, including, without limitation, those matters set forth in Section 11 of the Plan.

160.    <u>Payment of Statutory Fees</u>.    On the Effective Date and thereafter as may be required, the Debtors or the Post-Effective Date Debtors, as applicable, shall pay all fees incurred pursuant to § 1930 of title 28 of the United States Code, together with interest, if any, pursuant to § 3717 of title 31 of the United States Code for each Debtor's case, or until such time as a final

decree is entered closing a particular Debtor's case, a Final Order converting such Debtor's case to a case under chapter 7 of the Bankruptcy Code is entered or a Final Order dismissing such Debtor's case is entered.

161. <u>Documents, Mortgages, and Instruments</u>. Each federal, state, commonwealth, local, foreign, or other governmental agency is hereby authorized to accept any and all documents, mortgages, and instruments necessary or appropriate to effectuate, implement or consummate the transactions contemplated by the Plan.

162. <u>Activities in Anticipation of the Effective Date</u>. The Debtors are hereby authorized and empowered to take all necessary steps, and pay all related expenses, in anticipation of the Effective Date, including, without limitation, effectuating the transactions contemplated by the Plan and this Order.

163. <u>Substantial Consummation</u>. On the Effective Date, the Plan shall be deemed to be substantially consummated pursuant to sections 1101 and 1127(b) of the Bankruptcy Code.

164. <u>Severability</u>. This Order shall constitute a judicial determination and shall provide that each term and provision of the Plan, as it may be amended in accordance with Section 12.5 of the Plan, is (a) valid and enforceable pursuant to its terms, (b) integral to the Plan and may not be deleted or amended other than in accordance with Section 12.5 of the Plan, and (c) non-severable and mutually dependent.

165. <u>Immediate Binding Effect</u>. To the fullest extent permitted under the Bankruptcy Code and other applicable nonbankruptcy law on or after entry of this Order and subject to the occurrence of the Effective Date, the terms of the Plan (including the exhibits and schedules thereto and all documents and agreements executed pursuant thereto or in connection therewith), the Plan Supplements, and this Order shall be immediately effective and enforceable and shall bind the

Post-Effective Date Debtors, the Released Parties, the Exculpated Parties, all holders of Claims and Interests (irrespective of whether such Claims or Interests are impaired under the Plan or whether the holders of such Claims or Interests accepted or are deemed to have accepted the Plan), any other person giving, acquiring, or receiving property under the Plan, any and all non-Debtor parties to executory contracts and unexpired leases with any of the Debtors, any other party in interest in the Chapter 11 Cases, and the respective heirs, executors, administrators, successors, or assigns, if any, of any of the foregoing.  On the Effective Date, all settlements, compromises, releases (including, without limitation, the releases set forth in Sections 10.7 of the Plan), waivers, discharges, exculpations, and injunctions set forth in the Plan shall be effective and binding on Persons who may have had standing to assert any settled, compromised, released, waived, discharged, exculpated, or enjoined Causes of Action after the Effective Date.

166.    The Exculpation set forth in section 10.8 of the Plan is hereby approved entirely with respect to each of the Exculpated Parties pursuant to sections 105, 1123(b)(3), and 1123(b)(6) of the Bankruptcy Code.  The scope of the Exculpation, in respect of the time period or actions covered, shall be construed in accordance with *In re Pacific Lumber Co.*, 584 F.3d 229 (5th Cir. 2009).  The Court retains exclusive jurisdiction to determine the scope of the Exculpation.

167.    <u>Conflicts Between Order and the Plan</u>.  To the extent of any inconsistency between the provisions of the Plan and this Order, the terms and provisions contained in this Order shall govern.  The provisions of this Order are integrated with each other and are nonseverable and mutually dependent unless expressly stated by further order of this Court.

168.    <u>Stay of Confirmation</u>.  The requirements under Bankruptcy Rule 3020(e) that an order confirming a plan is stayed until the expiration of 14 days after entry of the order are hereby

waived.  This Order shall take effect immediately and shall not be stayed pursuant to Bankruptcy Rules 3020(e), 6004(g), 6006(d), or 7062.

169.  <u>Modifications and Amendments</u>.  The Plan may be amended, modified, or supplemented by the Debtors in accordance with Section 12.5 of the Plan.

170.  <u>Final Order</u>.  This Order is a final order and the period in which an appeal must be filed shall commence upon the entry hereof.

171.  <u>Payment of DIP Claims</u>.  Except to the extent that a holder of a DIP Claim agrees in writing to a different treatment, each holder of a DIP Claim shall be paid in full in Cash in an amount equal to the full amount of such Claims in accordance with the DIP Facility Credit Agreement and DIP Documents as provided under Section 2.3 and 2.4 of the Plan and the DIP Order.

172.  <u>Expiration of Challenge Period</u>.  The Challenge Period (as defined in the DIP Order) has expired as to all parties in interest, including the Creditors' Committee.


Dated: _____, 2021
         Houston, Texas

_____
     THE HONORABLE MARVIN ISGUR
     UNITED STATES BANKRUPTCY JUDGE

## **Exhibit A**

Plan

## **Exhibit B**

Apache Sureties Term Sheet

**Proposed FWE I Term Sheet – Between Debtors, Apache, and the Apache Sureties**

*This Term Sheet constitutes a "Definitive Document" under the Restructuring Support Agreement (as defined in the Plan (as defined below)) and is subject to the consent rights set forth therein. Except as provided for herein, each party is responsible for its own costs and expenses, including those of its legal advisors in conjunction with this Term Sheet.[1]*

| Definitions | Description |
|---|---|
| | • Apache Corporation ("**Apache**") <br> • Credit Bid Purchaser as defined in the Plan ("**Credit Bid Purchaser**") <br> • Zurich American Insurance Company ("**Zurich**") <br> • Everest Reinsurance Company ("**Everest**") <br> • HCC International Insurance Company ("**HCCI**") <br> • Philadelphia Indemnity Insurance Company ("**Philadelphia**" and together with Zurich, Everest and HCCI, the "**Apache Sureties**") and each an "**Apache Surety**") <br> • Any amounts for premiums accrued Post-Effective Date to the Apache Sureties under the applicable surety bonds issued under or in relation to the Decommissioning Agreement (the "**Apache Surety Bonds**") and/or general indemnity agreements related to the Apache Surety Bonds (the "**General Indemnity Agreements**") (the "**FWE I Premium Claims**"). <br> • Any amounts for Letter of Credit ("**L/C**") fees accrued post-Effective Date pursuant to all Letters of Credit from Deutsche Bank for which there are Apache Surety Bonds ("**L/C Fees**"). <br> • Any indemnification claims arising under the General Indemnity Agreements (the "**FWE I Indemnification Claims**" and, together with the FWE I Premium Claims, the "**FWE I Surety Claims**"). |
| **Surety Representative** | Description |
| | A representative shall be selected by the Apache Sureties (the "**Surety Representative**") through an Inter-Surety Agreement that shall govern the rights and relationships of the Apache Sureties. The Surety Representative shall represent the rights of the Apache Sureties, as selected in the Inter-Surety Agreement, with respect to all collective rights granted under the Term Sheet. |
| | |
| **Treatment of the FWE I Premium Claims and L/C Fees** | Description |
| | FWE I shall not be required to borrow $45MM to satisfy any Cure Amount on account of the Decommissioning Agreement, and Apache |

---

[1] Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the *Fifth Amended Joint Chapter 11 Plan of Fieldwood Energy LLC and Its Affiliated Debtors* dated June 16, 2021 filed at ECF No. 1629 (including any exhibits and schedules thereto and as may be further amended, supplemented, or modified, the "**Plan**") or the Limited Liability Company Agreement of Fieldwood Energy I LLC filed at Docket No. _____ Exhibit _____ at Ex. _____ (the "**FWE I LLC Agreement**"), as applicable.

|  | shall not be required to make such loan for such purpose, with the resulting savings in annual interest being applied toward the following settlement:<br><br>FWE I will owe $6.25MM per annum on account of the FWE I Premium Claims, payable in semi-annual installments starting 60 days after the Effective Date.<br><br>On each anniversary of the Effective Date, to the extent that (1) all yearly obligations under the Decommissioning Agreement have been satisfied, and (2) FWE I has "Free Cash Flow"[2] of $20MM or more (collectively, the "**Incremental Premium Payment Conditions**"), FWE I shall owe the Apache Sureties an additional payment of $2.75MM per annum (or such lesser amount after determining available "Free Cash Flow") on account of the FWE I Premium Claims and L/C Fees (the "**Incremental Premium Payment**").  If the Incremental Premium Payment Conditions are not met on each anniversary of the Effective Date, the Incremental Premium Payment, if not otherwise payable from available "Free Cash Flow," shall accrue and become due and payable as provided for and pursuant to the terms of the SSPA (as defined herein).<br><br>*Example***:**  Effective Date is July 15, 2021.  FWE I shall pay Apache Sureties $3,125,000 on September 15, 2021 and $3,125,000 on March 15, 2022.  FWE I shall also pay Apache Sureties $2.75MM on July 15, 2022 if the above conditions are met.<br><br>The FWE I Premium Claims shall not exceed $12MM per annum.<br><br>All payment of premiums shall be suspended upon the first draw by Apache under the Apache Surety Bonds.  After such suspension, all FWE I Premium Claims shall accrue and become payable as a subordinated FWE I Indemnification Claim under the SSPA, it being the intent and understanding of the parties that FWE I shall not be required, and Apache shall not be obligated to fund a draw, under the Standby Facility to pay any premiums. Notwithstanding the foregoing, if following a draw upon the Apache Surety Bonds, FWE I is able to resume funding of its decommissioning obligations under the Decommissioning Agreement, and after all monetary defaults have been cured, including without limitation any obligation to deposit monies into Trust A, the Apache Surety Bond's rights to premium payments shall be reinstated under the conditions provided for herein.<br><br>Any applicable Apache Surety may pay to renew any L/C or replace any L/C pursuant to the standards as set forth in the Decommissioning Agreement. |
| **Farm-In Rights** |  |
|  | Commencing with the second anniversary of the Effective Date, the Apache Sureties will have the right in the form of an option ("**Farm-In** |

---

[2] As such term is defined in the Standby Loan Facility.

| | |
|---|---|
| | **Option**") to farm in to FWE I new wells and recompletions on exactly the same terms as Credit Bid Purchaser according to the *Farmout Agreement*, except that the 50% profit share of the Apache Sureties (after Apache Sureties have recovered 100% of their capital investment in the project) will go first to pay any accrued but unpaid Incremental Premium Payments and the remainder of the Apache Sureties' 50% profit share will be deposited into Trust A in order to defer and potentially mitigate draws under Apache Surety Bonds and L/Cs. |
| **Information Sharing Agreements** | **Description** |
| | Surety Representative shall have the follow information sharing rights:<br>• *Financial Statements*– The Surety Representative shall have the same access rights as Apache as set forth in the FWE I LLC Agreement with respect to financial information.<br>• *Inspection Rights and other information* - The Surety Representative shall have the same inspection rights as Apache to inspect documents and seek other information as set forth in the FWE I LLC Agreement.<br>• *Farm-In Information Rights* - The Surety Representative shall receive from Credit Bid Purchaser summaries of any proposal made by Credit Bid Purchaser during the initial two-year term under the Farmout Agreement.  The sureties may engage Credit Bid Purchaser on terms acceptable to Credit Bid Purchaser, in its sole discretion, at any time to assist the Apache Sureties upon their exercising the Farm-In Option.  Otherwise, Credit Bid Purchase has no obligation to provide any information relating to operations or opportunities available under the Farm-In Option. FWE I shall provide the Surety Representative information reasonably requested in terms of scope and timelines necessary to understand any and all operations and opportunities that may be afforded under the Farm-In Option for future use and adoption.<br>• The Surety Representative shall be permitted to share all information obtained in this section with the Apache Sureties, subject to third-party contractual limitations, if any, and all reasonably and necessary confidentiality that may be required. |
| **Subordination, Subrogation and Payment Agreement** | **Description** |
| | A *Subrogation, Subordination and Payment Agreement* ("**SSPA**") shall be entered into under which the Apache Sureties'  FWE I Indemnification Claims will be contractually subordinated to Apache's claims under the Decommissioning Agreement and receive the benefits of Apache's liens under the Mortgages and all other security interests, the Apache Sureties' rights, contractual and otherwise, to be subordinated to Apache as follows:  Apache must be paid in full before the Apache Sureties will pursue any right to payment from FWE I with respect to its contractual rights of subrogation created herein, or any theory of common law rights of subrogation or indemnity, nor will the Apache Sureties have any rights |

| | |
|---|---|
| | to the collateral which secures FWE I's obligations to Apache under the Decommissioning Agreement or any proceeds thereof until after decommissioning under the Decommissioning Agreement is complete. The Apache Sureties will not exercise any remedies with respect to FWE I until all obligations to Apache under the Decommissioning Agreement and the Standby Facility have been satisfied.<br><br>The SSPA shall provide that the FWE I Premium Claims shall not be subordinated and notwithstanding the paragraph above, the Apache Sureties may fully pursue recovery of the $6.25MM and the $2.75MM then currently due, subject to the following: (i) the Apache Sureties cannot challenge any liens granted by FWE I to Apache on assets that may have otherwise been available to satisfy the FWE I Premium Claims and (ii) the Apache Sureties will have no defense as to payment on the Apache Surety Bonds as a result of FWE I's failure to pay the FWE I Premium Claims.<br><br>Any deferred Incremental Premium Payments shall be paid first through available "Free Cash Flow" in the subsequent year(s) and, if the Farm-In Option is elected, also pursuant to any available funds pursuant to the Farm-Out Agreement.<br><br>The Apache Sureties' Farm-In rights and informational rights as outlined herein will also be further memorialized in the SSPA. |
| | |
| **Support of the Plan and Release of Claims** | |
| | In connection with the execution of this Term Sheet or promptly thereafter, the Apache Sureties agree to (i) announce to the Bankruptcy Court the terms of this Term Sheet and withdraw any pending objections they have filed to the Plan; (ii) not file any further objections to the Plan; (iii) support and take all actions reasonably necessary or reasonably requested by the Debtors to support incorporation of this Term Sheet into confirmation of the Plan; and (iv) not support any party in objecting to or opposing the Plan.<br><br>The Apache Sureties agree that the Debtors and Apache are permitted to agree to an alternative cure to satisfy the existing defaults under the Decommissioning Agreement. Specifically, the defaults Apache asserts were caused by the Debtors' alleged failure to meet the Required Spend in 2020 and the Audit Claim, both as further detailed in Apache's proofs of claim, may be satisfied by the settlement between the Debtors and Apache contained within the Plan, the Confirmation Order, and this Term Sheet and the Apache Sureties will have no claim that Apache or any other party has impaired the Apache Sureties' subrogation rights or otherwise prejudiced the Apache Sureties' in any respect.<br><br>Notwithstanding anything set forth herein to the contrary, each of the Apache Sureties agrees to be a "Releasing Party" bound by the releases set forth in section 10.7 of the Plan.  For the avoidance of doubt, any defense to payment under the bonds and Letters of Credit existing as of |

4

|  | the Effective Date will be released by the Apache Sureties. Further, nothing herein will release any claims of the parties hereto that arise post-Effective Date, including the rights of the Apache Sureties and Apache under the Apache Surety Bonds and Letters of Credit. |
|  | The Debtors, the Required DIP Lenders and Requisite FLTL Lenders will fully and finally release the Apache Sureties of any and all claims existing as of the Effective Date, and only to the extent such releases do not impair the Decommissioning Security, or Apache's ability to draw on the Decommissioning Security in any respect. The NewCo Entities shall not assume any liabilities or obligations under this Term Sheet other than the information rights. |
|  | A condition precedent to the effectiveness of this settlement and agreement is that the Plan shall be confirmed and the Confirmation Order (as defined herein) shall contain findings of fact and conclusions of law consistent with the findings and conclusions requested by Apache in accordance with their rights under the Implementation Agreement. |
| **Adversary Proceedings** | **Description** |
|  | The Apache Sureties shall stipulate that as of the Effective Date, all claims against the Debtors and Apache, including those asserted by the Apache Sureties and described in the Debtors' Complaint filed at Docket No. 1 in Adversary Proceeding Case No. 21-3418 in the Bankruptcy Court ("**Adversary Proceeding**") shall be released. The Adversary Proceeding shall be dismissed with prejudice. |

*All disputes not set forth herein, or as set forth in any revised Term Sheet between the parties that shall be attached to the order confirming the Plan (the "**Confirmation Order**") or in the SSPA or Farm-In Option shall be resolved before the Bankruptcy Court, with all necessary powers to interpret and implement the Confirmation Order and the Plan, including the settlements set forth therein. After the closing of the Chapter 11 Cases, the parties agree that any disputes relating to this Term Sheet, the SSPA, or the Farm-In Option will be resolved in either the state or federal courts in Harris County, Texas.

** This Term Sheet and the resolution set forth herein is without admission of liability by any party. All rights not expressly defined herein are reserved.

/s/ for Apache Sureties, Apache and Debtors.