IN THE UNITED STATES BANKRUPTCY COURT

FOR THE SOUTHERN DISTRICT OF TEXAS

HOUSTON DIVISION

IN RE:                              § CASE NO. 21-33948
                                    § HOUSTON, TEXAS
FIELDWOOD ENERGY, LLC,              § MONDAY,
                                    § FEBRUARY 1, 2021
                DEBTORS.            § 3:57 P.M. TO 4:47 P.M.


STATUS CONFERENCE (VIA ZOOM)


BEFORE THE HONORABLE MARVIN ISGUR
UNITED STATES BANKRUPTCY JUDGE


APPEARANCES:                        SEE NEXT PAGE

LAW CLERK:                          TYLER LAWS

CASE MANAGER:                       LINHTHU DO


TRANSCRIPTION SERVICE BY:

JUDICIAL TRANSCRIBERS OF TEXAS, LLC
935 ELDRIDGE ROAD, #144
SUGAR LAND, TEXAS 77478
(281) 277-5325 (office)
www.judicialtranscribers.com


Proceedings recorded by electronic sound recording,
transcript produced by transcription service.

<u>APPEARANCES (VIA ZOOM)</u>:


FOR THE DEBTORS, FIELDWOOD          WEIL GOTSHAL & MANGES, LLP
ENERGY, LLC:                       Paul R. Genender, Esq.
                                   200 Crescent Court
                                   Suite 300
                                   Dallas, TX 75201
                                   214-746-7877


FOR BP EXPLORATION AND             GREENBERG TRAURIG, LLP
PRODUCTION, INC.:                  Shari Heyen, Esq.
                                   Karl Burrer, Esq.
                                   1000 Louisiana Street
                                   Suite 1800
                                   Houston, TX 77002
                                   713-374-3500


ALSO PRESENT:                      John Robert Sergesketter

1         <u>HOUSTON, TEXAS; MONDAY, FEBRUARY 1, 2021; 3:57 P.M.</u>

2              THE COURT:  All right.  We're here in the Fieldwood

3    Energy case, it's 20-33948.  What I'd like to do is just start

4    off with a report from lead counsel for the Debtor and lead

5    counsel from BP and see where we are.  I think I've enabled

6    your lines, but we'll see.  So let's get a report.

7              MR. GENENDER:  Your Honor, Paul Genender for the

8    Debtors.  Can you hear me okay?

9              THE COURT:  I can, Mr. Genender.

10             MR. GENENDER:  Great.  Thank you, Your Honor.  Good

11   afternoon.  We filed a supplement to our emergency this

12   afternoon at Docket 821.  Did that make it to you, Your Honor?

13             THE COURT:  Yes, I've read that.

14             MR. GENENDER:  Okay.  Thank you so much.  Your

15   Honor, we're here and we have not made -- we have not seen the

16   progress that we'd hoped would have been made in the four days

17   since we were last before you.  The -- and particularly after

18   the hearing we received an SOP schedule but, you know, within

19   an hour from BP, and it had a production date of May 31, and

20   we have an issue with that.  And I'll go back on that.

21             We also proactively reached out last Thursday and

22   Friday on a number of other matters, frankly delineating

23   matters that we'd hoped that BP would be undertaking while

24   other things were in process, while the permit that

25   (indiscernible) said they would be committing to get and take

1     all actions allowed by law to prepare to do the work

2     necessary -- as we understood it, to do the work necessary to

3     bring Genovesa on line by April 5.  We did -- the business

4     people at BP who have reached out regrettably did not receive

5     responses, and have not received responses from their business

6     counterparts at BP as they normally would have.

7            Instead we received a letter from Ms. Heyen

8     yesterday that had a couple of statements that were

9     particularly troubling, including the statement that

10    "production from Genovesa will not commence until on or about

11    May 31", and mentioning other items on the list of things we

12    thought needed to be done, or could be done while the permit

13    work was in process on a loop agreement that is not a

14    prerequisite, and frankly acting as though the SOP itself is

15    the only schedule instead of what it really is, Your Honor,

16    which is a back up in the event that the parties cannot get

17    this well on line by April 5, which, in fact, is the

18    emergency, and the emergent situation that we brought to Your

19    Honor last week.

20           The SOP is not a solution and we have SOPs ready to

21    be filed, we paid the fee, it's ready to go, the only issue is

22    we can't agree with BP on a schedule.  And, Your Honor, we

23    cannot commit a schedule with the SOP along the lines of what

24    BP has suggested because we don't think it's a realistic

25    schedule and it's not a schedule that we're comfortable

1    defending to BSEE, to the regulatory agency as an appropriate

2    schedule.  We proposed a counter-schedule and haven't heard

3    back.  In any event, the SOP, Your Honor, as we mentioned last

4    week, is something that comes into play in effect if the

5    parties fail to get this well on line.  It's not a solution by

6    any means.

7              The loop agreement I mentioned is not a prerequisite

8    to going forward with these other matters.  We do think that

9    the letter we received yesterday speaks volumes and

10   regrettably that BP is not acting as if this is an emergent

11   situation.  Mr. Heyen mentioned to Mr. Perez about a call

12   earlier today, but she wanted all communications between the

13   parties to go through lawyers.  We said we thought -- Mr.

14   Perez and I indicated that's a bad idea, that will slow things

15   down, and that we think that the communications should go

16   between business people so that the problems are solved,

17   instead of slow down.

18             As I think frankly more on the situation, Your

19   Honor, well, we do need a hearing to get direction from the

20   Court to direct the parties -- direct BP to bring this well on

21   line by April 5, or -- and/or to allow us to do it and compel

22   them to cooperate in letting us doing it.

23             This is a situation in which BP is frankly acting --

24   choosing to not make this a priority and we -- in Fieldwood's

25   perspective, we don't have that luxury.  They have said many

1      times that they want to make sure this is all done in a safe

2      manner.  Of course.  But safety's not an issue here.  We're

3      not suggesting, nor would we ever suggest this be done in an

4      unsafe manner.  And this has just not been a high enough

5      priority based on the conduct that we've seen.

6              Your Honor, I'm not talking about pre-January 28

7      conduct because I know the Court doesn't want to hear it.  I'm

8      talking about post-January 28 conduct.  And as the Court

9      correctly said last Thursday, you know, days are precious

10     here.  And before they -- we haven't seen the progress in

11     these four days that we certainly would have wanted to.  So

12     I'll stop there and everything else is in the status update

13     and I'm happy to answer questions, Your Honor.

14              THE COURT:  One more question for you, then we'll

15     hear from Ms. Heyen.  When do you want your hearing?

16              MR. GENENDER:  We'd like it tomorrow afternoon, if

17     possible.

18              THE COURT:  Ms. Heyen?

19              MS. HEYEN:  Thank you, Your Honor.

20              MR. GENENDER:  Thank you.

21              MS. HEYEN:  Shari Heyen and Karl Burrer for BP

22     Exploration and Production.  Your Honor, BP has laser focused

23     on this.  We are not dragging, we are moving forward with due

24     haste.  We are delivering on what we've said that we would

25     deliver.  For example, one of -- one thing that we said that e

1    would pull were the permits.  We've pulled the two permits,

2    those have been filed, those applications have been filed and

3    they are pending.

4         Fieldwood committed to file two permits as well.  I

5    don't know where that stands.  But we would like to find that

6    out by the end of this hearing whether Fieldwood has filed its

7    permits that it is supposed to file with the requisite

8    authorities.

9         Your Honor, we did say that we would take all action

10   allowed by law to prepare to do the work.  We have started --

11   we sent over the sole benefit AFEs in draft form.  We sent

12   over the Fieldwood commitment for the restoration obligation

13   with respect to -- or we sent the restoration agreement, the

14   draft, as a Rule 408 communication to Mr. Genender.  We have

15   not received any comments back to it.  Mr. Genender did file

16   our Rule 408 communications with the Court.  I'm not sure why

17   he did that, but he had done that.

18        In terms of the SOP we did send over an SOP schedule

19   as requested.  We think that to do the work it could be done

20   responsibly and safely by the end of May which is the reason

21   why an SOP is filed with BSEE in the first place.  The

22   response that we got back was that they didn't -- that

23   Fieldwood did not think that the SOP schedule that we sent

24   over was good enough, and they think that we could -- we

25   should be able to get this on line by April 5, whether it's

1    safe or not.

2          But the reason why the parties probably can't agree

3    on an SOP schedule is because we think it's going to take

4    until the end of May, they think it's going to take until

5    April 5, in which case they don't need to file an SOP

6    application with BSEE, which defeats the sole purpose of that.

7    And that's one thing that, you know, Fieldwood committed to do

8    at the hearing last week, was to file the SOP with BSEE.

9          Your Honor, we believe that in terms of

10   communication we've been hit with a barrage of emails and

11   telephone calls, some of which have been to people in the

12   organization at BP that don't know what's going on here in

13   terms of they're not involved with this particular process.

14   For example a communication was sent by someone at Fieldwood

15   to our marketing manager, who is, you know, he doesn't know,

16   you know, how to respond to that because he's not even

17   involved in this.

18          So in terms of the lines of communication we thought

19   it would be prudent to have conversation with Mr. Genender

20   with respect to the lines of communications, continue the

21   Rule 408 negotiations.  I'm not sure that he wants to continue

22   those -- that line of communication.  But what I would suggest

23   is that we would like to have a single point of contact at

24   Fieldwood so that we can direct the communications through

25   that person.  If it's going to be a business person, then so

1    be it.  But we would like to get some feedback from Fieldwood.

2         We did send over like I said the restoration

3    agreement.  It was in draft form as were the Draft A and B.

4    But instead of giving us comments, they signed Draft A and B

5    and sent them back to us.  So that's kind of -- that's

6    unfortunately where we find ourselves.  We do think that we

7    are in compliance with what we told the Court last week.

8         I also think, Judge, by just a way of a suggestion,

9    it might be helpful for the parties to get -- if they can

10   resolve it through a quick mediation with a federal judge.

11   And if we can't get that done tomorrow, then, you know, we can

12   proceed with an evidentiary hearing.

13        THE COURT:  All right.  I'm not passing this off to

14   somebody else.  I'm going to handle it tomorrow.  I'm going to

15   allow people to put on their defenses, I'm going to allow

16   people to put on their case.

17        I am not sure whether we have a dispute, or whether

18   we have a contest that isn't a dispute.  And I've drafted an

19   order that may actually be acceptable to all parties.  I don't

20   know.  I'm not telling you that this is the order that's going

21   to come out of any hearing.  There may be no order come out of

22   a hearing.  I may deny the relief altogether.

23        But just so that it's helpful to you all, I'm going

24   to show you what I've drafted so that in anticipation of

25   tomorrow's hearing you know at least what I'm thinking of.

1    And again, this may be acceptable to both parties.  I'm going

2    to put this on the screen and see where we go.

3          (Pause in the proceedings.)

4          THE COURT:  So the first paragraph orders BP to

5    comply with its contracts.  I don't think that should be

6    controversial.  The second paragraph says BP only has to do

7    things that are safe and that are in compliance with all

8    regulations.  The third allows BP to obtain a suspension of

9    production or operations and requires the Debtor to cooperate

10   in that.

11         The fourth requires BP to proceed to come on line by

12   April 5, 2021 until such time as you get the extension.  If

13   you get the extension, you can lay off.  But that you've got

14   to take all the steps necessary to come on line by April 5.

15         The fifth paragraph says that if the Debtors make a

16   bonafide effort -- offer rather that they will do the work,

17   that BP either has to accept that offer or cause itself to

18   complete it on time.  And finally, setting a deadline for the

19   3rd for the filing of critical path charts demonstrating how

20   it will come on line by April 5 of 2021.

21         I have to say that I've read the letters, Ms. Heyen,

22   as not being very eager to do everything that was required to

23   get there by April 5 of 2021.  But this seems to leave you

24   lots of options.

25         So I want to know if the parties want their hearing

1    tomorrow or if you think doesn't accomplish what you're both

2    telling me, but I think it allows us to move down both paths

3    and see which one works.  And either one that works --

4              MR. GENENDER:  Your Honor --

5              THE COURT:  -- is fine.

6              Mr. Genender.

7              MR. GENENDER:  Your Honor, I apologize.  Paul

8    Genender for the Debtors.  Could I ask, or suggest that we

9    take 10 minutes and visit, 10 or 15 minutes to visit offline

10   then come back to you.  I think that might make sense because

11   I think you've given us some stuff to consider here.

12             THE COURT:  Ms. Heyen?

13             MS. HEYEN:  Your Honor, that works fine for us, a 10

14   or 15 minute break is fine.  Maybe we should come back at

15   4:30?

16             THE COURT:  So may I ask whether you're talking

17   about a 10 or 15 break to meet with your own teams or to meet

18   with each other?  I'm not sure what you all mean.

19             MS. HEYEN:  I think we're --

20             MR. GENENDER:  Your Honor --

21             MS. HEYEN:  -- meeting with our side, our clients.

22             MR. GENENDER:  Your Honor, Paul Genender.  I was

23   thinking that we would confer internally on the Fieldwood

24   side.

25             THE COURT:  So you both want to do your own internal

1    conferences to see if what I've suggested might make sense?

2    And I got it that you --

3                MS. HEYEN:  Yes, Your Honor.

4                MR. GENENDER:  Yes, and --

5                THE COURT:  And I've got time tomorrow afternoon.

6    I've cleared out some other times so that we can start a

7    little earlier than expected if we need to.

8                Sure, we'll come back -- what time did you suggest,

9    Ms. Heyen?

10               MS. HEYEN:  4:30 p.m., Your Honor.

11               THE COURT:  See you all then.  Thank you.

12               MS. HEYEN:  Thank you.

13               MR. GENENDER:  Thank you, Judge.

14                   (Recess from 4:12 p.m. to 4:30 p.m.)

15               THE COURT:  All right.  Mr. Genender and Ms. Heyen,

16   let's move ahead with the hearing if we could, please.

17               MR. GENENDER:  Thank you, Your Honor.  Your Honor,

18   who do you want to proceed?

19               THE COURT:  Probably Ms. Heyen ought to go first

20   because I think that your needs are more obvious than hers.

21   So I'm going to let her go first.

22               MS. HEYEN:  Great.  Thank you, Your Honor.  So we

23   have some questions just for clarification with respect to the

24   outline here.  So if you're -- I'll just address those.  The

25   first point which is that BP is obligated to perform under the

1    LOPS agreement and the PHA, should we make that BP and

2    Fieldwood are both ordered to perform under the contracts and

3    agreements?

4              THE COURT:  Yes, I think we should.

5              MS. HEYEN:  Thank you, Your Honor.  With respect to

6    Paragraph Number 2 --

7              THE COURT:  I think it ought to be joint as well.

8              MS. HEYEN:  Thank you.

9              THE COURT:  All right.

10         (Pause in the proceedings.)

11             THE COURT:  All right.

12             MS. HEYEN:  And when you say applicable safety

13   protocols BP has internal safety protocols so if we could get

14   some clarity as to the term applicable.

15             THE COURT:  I'm not going to require you to violate

16   any safety protocols, but I may make you work 24 hours a day.

17   And so I just -- it's not that I'm going to -- I don't know

18   that safety protocols that can be implemented if you work 24

19   hours a day don't need to be followed.  But I'm not going to

20   make you  violate either an internal or an external safety

21   protocol.  But I'm not going to just say -- look, you want

22   more time to do it, you got to do your best to meet the

23   contract and the safety protocols, you've got to do them both.

24             MS. HEYEN:  Thank you, Your Honor.  With respect to

25   Paragraph Number 3, I think that Fieldwood -- it's Fieldwood's

1    obligation to obtain the suspension of production from BSEE.

2    And we are happy to fully cooperate with the Debtors to obtain

3    the SOP.  The breakdown has been that in terms of reaching an

4    agreement with respect to what is a -- what the deadline

5    should be.  So for example Fieldwood says April 4 or 5, we say

6    it's May 31.  And if it's -- it seems like it's all parties'

7    best interest to obtain an extension through and including

8    May 31.  Otherwise why apply?

9                THE COURT:  What I'm worried about is --

10               MR. GENENDER:  Do you --

11               THE COURT:  I'm going to get to you, Mr. Genender.

12               What I'm worried about is if you do get an

13    extension, a lot of this problem goes away.  I am worried

14    about anything that says, We're going to take the foot off the

15    pedal until you actually have that extension in hand.  And

16    we'll go -- I don't know how we deal with a date, and we can

17    go back and talk about that.  But what I don't want to do is

18    for, BP, since I'm talking to you, to say, Well, we can't make

19    it by April 5 unless do we X, Y and Z.  And what I'm telling

20    you is, I need you to do X, Y and Z.  We're going to meet

21    April 5 until the relief is granted by the United States.

22               MS. HEYEN:  And I guess what I'm struggling with,

23    Your Honor, is that we all agree that -- well, we think that

24    the Debtors should apply for the SOP and the problem with that

25    is, is that to get the extension we need to put forth a time

1    line by which we think that the well could come on line

2    safely.  And so how do we come to an agreement?  I mean if

3    Fieldwood says April 5 and we say it's May 31, how do we reach

4    agreement on that point is what I'm trying to fall for.

5            THE COURT:  I will just tell you that my

6    experience --

7            MR. GENENDER:  Your Honor --

8            THE COURT:  -- with the federal regulators has been

9    that they are rational players.  And if you tell them it's

10   going to be a stretch, we're going to do our best to get this

11   done by April 15 -- April 5, but we know things go wrong.  And

12   so we're asking for an extension in case things go wrong.

13   Maybe that doesn't work.  I mean I haven't read the regs here,

14   but I have not found these regulators to be irrational.  And

15   so I don't know that this date disagreement should play as

16   hard for a role as what you are.  But maybe I am wrong about

17   that, and I'm perfectly willing to listen to it.

18           But it can't be that you have to tell them that, you

19   know, if things go well, we can meet it, but if we have a

20   glitch, we can't, and then they would say, Well, then you

21   can't have an extension because we're going to insist no

22   glitches.  But that's just not been my experience with them

23   and they have been rational players out there.

24           So I wonder if we shouldn't have the folks that are

25   experts in this confer, and, you know, maybe they're all here

1    online with us, and talk about whether you can't

2    simultaneously have a plan to get it done by April 5 and file

3    an application for an SOP.  I don't know why they have to be

4    exclusive.

5             Mr. Genender, go ahead.  Well, I mean he's eager.

6             MR. GENENDER:  Your Honor, you know, can I make a

7    suggestion because I think I'd love to hear Ms. Heyen's

8    comments on 4 through 6.  And then can we get back to 3

9    because I may have an idea that might work if we can get her

10   comments on 4 through 6.

11            THE COURT:  Sure.

12            MS. HEYEN:  Thank you, Your Honor.  I was just going

13   to say that our experience is typical of what you have

14   described.  But I think where the communication has broken

15   down is, you know, getting that insurance and, you know, if

16   something does wrong, the, you know, we need this outside

17   date.  And so that's what we're having a problem with.  But we

18   can come back to that if --

19            THE COURT:  Okay.

20            MS. HEYEN:  -- Mr. Genender wants to.

21            THE COURT:  Okay.

22            MS. HEYEN:  On Number 4 --

23         (Pause in the proceedings.)

24            MS. HEYEN:  -- so under the LOPS agreements

25   Fieldwood is supposed to pay for -- here, I've got the

1    document right here -- it has to bear the sole risk cost and

2    expense and future cost of restoring the LSPS to its condition

3    prior to the conduct of the sole benefit operation.

4         So my question is, who is going to pay for these

5    repairs.  We need to make it clear as to whoever's going to

6    pay for these repairs, how are they going to be -- when are

7    those payments going to be made.  If there is a liability --

8    if there -- you know, I mean something happens out there, who

9    is going to take on that liability.

10        THE COURT:  I would have thought, and, you know, if

11   we need to make it more clear, we can, but I would have

12   thought that Paragraph 1 that says both parties have to comply

13   with the contract, that whatever the contract says, the

14   contract says in that regard and both parties have to comply

15   with it.  Does that not cover that?

16        (Pause in the proceedings.)

17        THE COURT:  We'll come back to it.

18        MS. HEYEN:  Okay.  Yeah, well, --

19        THE COURT:  Let's go -- let's go to the other

20   comments because --

21        MS. HEYEN:  Right.

22        THE COURT:   -- you know, it may be

23        MS. HEYEN:  Okay.

24        THE COURT:   --  I'm missing something here.

25        MS. HEYEN:  Okay.  Thank you, Your Honor.

1        (Pause in the proceedings.)

2        MS. HEYEN:  I don't know about Number 5 in terms of

3    I don't know that the Debtors have made a bonafide offer.  But

4    we can table that.  Are they -- is the Court -- with respect

5    to Number 6 is the Court asking that BP file all critical path

6    charts with the Bankruptcy Court?

7        THE COURT:  That's what I'd written.  I think

8    eventually, if there's a dispute about whether the critical

9    path is being met, I'm going to have to look at those.  I

10   don't know if there's anything confidential about how to get

11   this done, but those can be filed under seal if that's

12   proprietary as to how you meet it.

13       But what I want -- when I read what Mr. Genender

14   filed and when I'm reading the correspondence, it looks like

15   people are almost talking past each other.  You know, one side

16   is saying, Well, we don't need to start mobilizing a vessel

17   until after we get a permit, or things of that nature.  I

18   want -- the people that do this I believe do it with critical

19   path charting.  And it actually shows, if you start on April 5

20   and say, Okay, we've got to get everything done by April 5,

21   what's our last date to start, you know, getting a vessel

22   under contract.

23       And that's why I wanted to see a critical path chart

24   to be sure people have thought through it and I'm not going to

25   get down to April 5 and somebody says, Well, it's just not

1    possible at this late date to contract someone to put the

2    safety lights up on time so that we can, you know, use the

3    platform.  I mean I don't know what the issues are going to

4    be.  But that's why I wanted a critical path to be thought of

5    now instead of later.

6         We don't have much time and without a critical path

7    I don't think we'll have a way of everybody cooperating and

8    getting it done.  That was why I was suggesting that, and it

9    is irrelevant to me whether it is filed under seal if it's

10   proprietary, filed publicly, exchanged between the parties.

11   But then, you know, if you all have a complaint about it, it's

12   very hard for me to see it that way.

13        MS. HEYEN:  Thank you, Your Honor.  And under the

14   LOPS agreement there is a requirement that a reinstatement

15   agreement be memorialized, because what is happening with this

16   temporary flow line is it takes -- it creating a different

17   pathway for this.  So this is a loop system, and so the

18   temporary fix would change that configuration and so the

19   configuration needs to restore -- be restored to its original

20   configuration which is a loop system.  And so part of the

21   bigger issue is once we -- once the temporary fix is in place,

22   they'll have to restore it to its original configuration to

23   the loop system.  And so we need the commitment by Fieldwood

24   to get it back, to restore it to its original condition.

25        THE COURT:  All right.

1          MS. HEYEN:  And so that was part of it.  We sent

2     over a draft agreement, a draft restoration agreement and we

3     also sent over draft A and Bs.  So those are in Fieldwood's

4     court right now.  But that's part of the LOPS agreement

5     requirement.

6          THE COURT:  Okay.  Mr. Genender.

7          MR. GENENDER:  Your Honor, I think that the

8     changes -- the changes that have been made are, I think are

9     acceptable to the Debtors.  I think including to Paragraph 3,

10    I'm confident that the -- you know -- you know, they attempt

11    to obtain any, I think that's fine.  I think that as it is I

12    think that the Debtors would agree this provides them with a

13    certainty and pick an option that they want and need to

14    address this emergent situation.

15         THE COURT:  And what is your client's determination

16    or judgment about whether one can simultaneously have a really

17    tight critical path to finishing something by April 5 and also

18    applying for an SOP in case you miss that critical path?

19         MR. GENENDER:  I think Fieldwood's view is that it

20    can do both and that we -- BSEE will address the SOP and it,

21    you know, so be it, but it is okay to do both.  And frankly,

22    Your Honor, what you've rolled out here I think addresses the

23    concerns, some of the concerns we had with the schedule sent

24    over, that would go with the SOP because it clarifies what

25    we're trying to do, and then makes clear that the SOP is

1    backup, not Plan A.

2          THE COURT:  And what is your answer with respect to

3    the temporary fix that's going to destroy the normal pathway

4    and therefore you have to agree to restore the loop.

5          MR. GENENDER:  We disagree with it.  And if it's

6    okay I might let Mr. Sergesketter speak to that, if that's

7    okay, Your Honor.

8          THE COURT:  It's fine, although clearly I'm not

9    going to get this resolved on that question this afternoon.

10   I'm happy to hear him.  I'm also happy to let the parties

11   confer about that.  But maybe it makes some sense to hear him

12   so that Ms. Heyen can talk to her clients about that.

13         Let me go ahead and get his line activated.  What is

14   the restoration issue, Mr. Sergesketter?

15         MR. SERGESKETTER:  John Robert Sergesketter.  The

16   loop already had had its integrity violated because of the

17   leak that was discovered in it.  And so we're not violating

18   the integrity or use of the loop as a whole.  That already has

19   happened.  We are fully in agreement that we do want that loop

20   restored and that is the long term plan.  Right?  So we're

21   fully on board with that.

22         As far as having to get that agreement fully nailed

23   down before we go forward with the single flow line project,

24   absolutely does not have to happen.  We've told BP over and

25   over we are on board with that loop repair being done.  But

1      let's -- first the deadline we are facing now is bringing

2      Genovesa on so we don't lose the lease.

3              THE COURT:  So, Mr. Sergesketter, do you agree that

4      if there are any incremental costs caused by this order for

5      bringing the loop back on line that those are your

6      responsibility?

7              MR. SERGESKETTER:  Your Honor, we absolutely are

8      taking the costs that are involved with the single flow line

9      project, yes.  That's going to be on us and our co-interest

10     workers in the Genovesa well.  There will be no other --

11             THE COURT:  Including any incremental costs of the

12     restoration of the loop?

13             MR. SERGESKETTER:  Your Honor, I need to be careful

14     when I answer that because I don't want my Ops guys to pull me

15     here, but I don't believe there will be any.  There are some

16     costs that are going to have to be incurred to get that loop

17     restored.  Some of those will happen now, some will happen

18     down the road.  But we've already worked out who are fine for

19     the costs.

20             The dispute, Your Honor, isn't on the cost, it's on

21     whether we should float BP's portion of the loop restoration

22     costs now or should they have to pay them now and not later.

23     We could work through that issue, Your Honor.  That's not a

24     deal breaker at all.  Leave that to the parties, we'll get

25     that part done.

1      (Pause in the proceedings.)

2           MR. SERGESKETTER:  And, Your Honor, may we confer

3      internally on that new addition you just added, if you don't

4      mind, before I say yes, that's fine.  I want to be cautious.

5           THE COURT:  No, you may, but it seems to me that

6      it's fair for BP to say, If you're going to order us to call -

7      - to cause incremental costs to be incurred, that shouldn't be

8      our problem.  And I think that's probably right.  On the other

9      hand, if they already have a duty to restore it based on the

10     leak, and I don't know who does or doesn't, that's not an

11     incremental cost of this, that's a cost that's already in

12     existence.  And so it's -- I should say today it is the

13     incremental costs.

14          And then I agree with you, I think that the business

15     folks ought to be able to meet and decide whether a cost is

16     incremental or not, and if not, you know, that's what trials

17     are about.  But it shouldn't --

18          MR. SERGESKETTER:  Judge --

19          THE COURT:   -- be ambiguous to BP that -- you know,

20     I shouldn't make them bear additional costs that are yours to

21     bear.

22          MR. SERGESKETTER:  The concept, Your Honor, makes

23     absolute sense.  I just want to make sure we do tighten up the

24     language so it doesn't come back to bite us.  But the concept

25     we're on board with I believe.

1              THE COURT:  Yeah, I'm not going to sign --

2              MR. SERGESKETTER:  I'm not going to --

3              THE COURT:  -- I'm not signing an order this

4       afternoon.  I put this out so that parties could think about

5       whether this made sense, and it sounds like it's making some

6       sense to let you all work through this is what it's sounding

7       like to me.

8              MR. GENENDER:  Your Honor, Paul Genender.  Can I

9       make a suggestion to which, Your Honor -- to Paragraph 7

10      subject to Mr. Sergesketter's comment?  It seems like it might

11      make sense to say it, to the extent that there are incremental

12      loop restoration costs incurred as a either direct or sole

13      consequence of the order so that it's clear that it's

14      something -- something like that -- certain clarification

15      might help, Your Honor.

16             THE COURT:  It can also hurt.  I think if there's a

17      cost incurred, there's a cost incurred and I shouldn't try and

18      define that on the spur of the moment.  I'm perfectly happy

19      for the parties to work through the concept.

20             Let me ask this, I appreciate what both parties are

21      telling me about my probably clumsy draft, and what I would

22      like to do is to get you all copies of this draft into your

23      hands this afternoon and then schedule a hearing tomorrow

24      where either you all have an agreement at the beginning of the

25      hearing, or we call, you know, the first witness so that we

1    can decide what to do.  But to give you all enough time with

2    the business people to work through it as Mr. Sergesketter

3    suggested.  And frankly I think as Ms. Heyen suggested.  You

4    know, they don't know some stuff here and it's fair that they

5    don't know it at this point.  Does that --

6         MR. SERGESKETTER:  Your Honor, it seems to me, I was

7    concerned when you first typed 7 because it was happening so

8    quickly.  As I read it now, I think we're fine with that.  So

9    to be perfectly honest with you, with the changes you've

10   already made to this order based on Ms. Heyen's request, I

11   think we're on board.

12        THE COURT:  Well, that's -- I need Ms. Heyen -- you

13   know, Fieldwood's a big company, they're bigger, but let's let

14   her get all of her approvals too and see what we need to get

15   done.

16        Ms. Heyen, are you okay with working on this

17   overnight and into the morning and then we either have an

18   agreement or not tomorrow afternoon, and if we don't, we, you

19   know, we start the witnesses?

20        MS. HEYEN:  Your Honor, we will work on this

21   overnight.  That's fine, and I appreciate the -- Your Honor's

22   attention to this.  I think in Number 3 I think it needs to be

23   filled with must attempt to pay the SOP for one thing and then

24   we'll walk through the other points in this proposal with our

25   client and we can come back to the Court tomorrow.

1          THE COURT:  I actually think, when I'd first drafted

2     it, that it was you doing it.  I wanted to a may, but I think

3     if it's them doing it, it probably ought to be a must.  So

4     I've made that change in the temporary draft.

5          MR. SERGESKETTER:  That's perfect.

6          MS. HEYEN:  Thank you.

7          MR. SERGESKETTER:  And, Judge, that -- Judge, I

8     always thought it was -- must or shall will be fine with the

9     Debtors, so that's fine.  Thank you.

10          THE COURT:  I don't -- I do my very best never to

11     use the word shall because nobody knows what it means.

12        (Laughter.)

13          THE COURT:  I try to cross that out when you put it

14     in the proposed orders.

15          MR. SERGESKETTER:  And must is a shorter -- and must

16     is a shorter word, which is a good thing.

17          THE COURT:  Okay.  Why don't I just call this

18     Court's notice of draft of possible --  and that way I can

19     just have that filed on the docket sheet and everybody who's

20     listening can have a copy of it and I'm not going to sign it

21     and no one will then -- everyone will then have a fair

22     opportunity.  Is that okay if we do something like that?

23          MR. GENENDER:  Yes, Your Honor.

24          MR. SERGESKETTER:  Fine, Your Honor.

25          MS. HEYEN:  That's fine, Your Honor.  Thank you.

1        THE COURT:  So I haven't let anybody talk but the

2    two of you all in terms of sides.  I've got a lot of other

3    people on the phone.  If anyone else wants to have a say this

4    afternoon, would you please press five star on your phone.

5        (Pause in the proceedings.)

6        THE COURT:  All right.  Let me get to you now.  Mr.

7    Skelton.

8        MR. SKELTON:  Yes, Judge.  As stated at the previous

9    status conference, I represent the two other working interest

10   owners in this prospect, and as the Court's suggested, the

11   path is a good one, it will collaborate and (glitch in the

12   audio) and see if we can get something worked out here on this

13   order.

14       THE COURT:  Okay.  So I want to set enough time to

15   leave you all as much time as I can to work and then enough

16   time to finish the hearing if this doesn't work.  I would

17   suggest we come back tomorrow at 3:00, but we can come back a

18   little earlier or a little later if I haven't calibrated that

19   the way that you all think it ought to be.  Let me hear about

20   three o'clock tomorrow for -- either we have an agreement --

21       MS. HEYEN:  Your Honor, that works --

22       THE COURT:   -- or we proceed.  I'm sorry, go ahead.

23       MS. HEYEN:  Thank you, Your Honor.  Shari Heyen for

24   BP.  That works for us to come back at 3:00 p.m.

25       MR. GENENDER:  Your Honor, it works great if you

1      have an agreement, but if it doesn't, it might be tight,

2      depending on how the evidence goes so.  But I guess it's fine.

3      I'm not getting any major head nods or otherwise from my

4      teammates, so that's fine.  Let's just do it, Judge.

5              THE COURT:  Okay.  Mr. Barr just gave you a --

6              MR. GENENDER:  Your Honor, what they --

7              THE COURT:   -- he gave me a thumbs up and that

8      meant he gave you a thumbs down.  So I'll set it for 3:00.

9          (Laughter.)

10             MR. GENENDER:  Right.  Judge, I called him after the

11     last hearing and I told him he'd be allowed to catch -- or

12     he'd only call curve balls on the inside or something like

13     that.

14             Your Honor, one thing I meant to tell you at the

15     outset, which is, is that we did work out with the US Trustee

16     agreement on the sealing order and that that will forthcoming.

17     But I wanted to let the Court know that, and we very much

18     appreciate the US Trustee's cooperation in that regard.

19             THE COURT:  Thank you.  I know Mr. Statham is on the

20     phone, and if he wishes to speak, he can press five star,

21     although I'm not going to require that at all.

22             If anybody else wants to speak, please press five

23     star one time on your phone.  Otherwise we'll adjourn till

24     tomorrow at 3:00

25         (No audible response.)

1      THE COURT:  All right.  We are --

2      MS. HEYEN:  Thank you, Your Honor.

3      THE COURT:   -- we're adjourned till 3:00 tomorrow.

4  I am -- never done one like this before on this program.  Let

5  me just -- Ms. Do, if --

6      MR. GENENDER:  Judge, you have a double apostrophe

7  instead of one apostrophe --

8      THE COURT:  Whoops.

9      MR. GENENDER:   -- on the Court's --

10      THE COURT:  Thank you.

11      Ms. Do, if you're listening, can you come out for a

12  second?

13      (Pause in the proceedings.)

14      THE COURT:  Can that happen, can you docket this as

15  a Court's notice of a proposed order?

16      THE CLERK:  I think you have notice, Judge.

17      THE COURT:  Okay.  Okay.  She said she can do that

18  off what I've done.  I just didn't want to mess up the

19  technology.  You'll get it in just a few minutes.  I've sent

20  it to docketing.  Okay.  Thank you all.

21      MR. GENENDER:  Thank you, Your Honor.

22      MS. HEYEN:  Thank you, Your Honor.

23      MR. SERGESKETTER:  Thank you, Your Honor.

24      THE COURT:  Thank you.  Good night.

25      MR. GENENDER:  Have a good night.

30

1          (Hearing adjourned 4:56 p.m.)

2                        * * * * *

3          *I certify that the foregoing is a correct transcript*

4     *to the best of my ability due to the condition of the*

5     *electronic sound recording of the ZOOM/telephonic proceedings*

6     *in the above-entitled matter.*

7      */S./   MARY D. HENRY*

8     *CERTIFIED BY THE AMERICAN ASSOCIATION OF*

9     *ELECTRONIC REPORTERS AND TRANSCRIBERS, CET\*\*337*

10    *JUDICIAL TRANSCRIBERS OF TEXAS, LLC*

11    *JTT TRANSCRIPT #64177*

12    *DATE FILED:  JULY 1, 2021*

13

14

15

16

17

18

19

20

21

22

23

24

25