# Exhibit A

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

ENTERED
06/25/2021

| | | |
|---|---|---|
| In re: | § | **Chapter 11** |
| | § | |
| **FIELDWOOD ENERGY LLC, et al.,** | § | **Case No. 20-33948 (MI)** |
| | § | |
| Debtors.[1] | § | **(Jointly Administered)** |
| | § | |

**FINDINGS OF FACT, CONCLUSIONS OF LAW, AND
ORDER (I) CONFIRMING EIGHTH AMENDED JOINT CHAPTER 11
PLAN OF FIELDWOOD ENERGY LLC AND ITS AFFILIATED
DEBTORS AND (II) GRANTING RELATED RELIEF[2]**

**WHEREAS**, Fieldwood Energy LLC ("**FWE**") and each of its affiliated debtors and

debtors in possession in the above-captioned chapter 11 cases (collectively, the "**Debtors**"), as

"proponents of the plan" within the meaning of section 1129 of title 11 of the United States Code

(the "**Bankruptcy Code**"), filed the *Eighth Amended Joint Chapter 11 Plan of Fieldwood Energy

LLC and its Affiliated Debtors*, dated June 25, 2021 (ECF No. 1742) (including any exhibits and

schedules thereto as may be further amended, supplemented, or modified, the "**Plan**") and the

*Disclosure Statement for Fourth Amended Joint Chapter 11 Plan of Fieldwood Energy LLC and

its Affiliated Debtors*, April 15, 2021 (ECF No. 1285) (the "**Disclosure Statement**");[3]

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, as applicable, are:  Dynamic Offshore Resources NS, LLC (0158); Fieldwood Energy LLC (6778); Fieldwood Energy Inc. (4991); Fieldwood Energy Offshore LLC (4494); Fieldwood Onshore LLC (3489); Fieldwood SD Offshore LLC (8786); Fieldwood Offshore LLC (2930); FW GOM Pipeline, Inc. (8440); GOM Shelf LLC (8107); Bandon Oil and Gas GP, LLC (9172); Bandon Oil and Gas, LP (9266); Fieldwood Energy SP LLC (1971); Galveston Bay Pipeline LLC (5703); and Galveston Bay Processing LLC (0422).  The Debtors' primary mailing address is 2000 W. Sam Houston Parkway S., Suite 1200, Houston, TX  77042.

[2] This Order remains subject to the review of the Debtors, the RSA parties, and other stakeholders, including, the review and comment of the Required DIP Lenders and Requisite FLTL Lenders.  All rights are reserved.

[3] Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to such terms in the Plan, a copy of which is annexed hereto as **Exhibit A**.  Any term used in the Plan or this order (the "**Order**") that is not defined in the Plan or this Order, but that is used in the Bankruptcy Code or the Federal Rules of Bankruptcy Procedure

**WHEREAS**, on April 15, 2021, after due and proper notice and a hearing, the Bankruptcy Court entered the *Amended Order (I) Approving Disclosure Statement and Form and Manner of Notice of Disclosure Statement Hearing; (II) Establishing Solicitation and Voting Procedures; (III) Scheduling Confirmation Hearing; (IV) Establishing Notice and Objection Procedures for Confirmation of the Proposed Plan; (V) Approving Notice and Objection Procedures for the Assumption of Executory Contracts and Unexpired Leases; (VI) Approving Procedures for Objections to the Assignment and Transfer of Property of the Estate; and (VII) Granting Related Relief* (ECF No. 1286) (together with any schedules and exhibits thereto, the "**Disclosure Statement Order**"), which, pursuant to sections 105, 365, 1125, 1126, 1128, and 1145 of the Bankruptcy Code, Bankruptcy Rules 2002, 3001, 3003, 3016, 3017, 3018, 3020, 6004, and 9006, and Rules 2002-1 and 3016-1 of the Local Bankruptcy Rules for the United States Bankruptcy Court for the Southern District of Texas (the "**Local Rules**"), among other things, (i) approved the Disclosure Statement, (ii) established solicitation and voting procedures, (iii) established notice and objection procedures in respect of confirmation of the Plan, including the form and method of notice of the hearing to consider confirmation of the Plan (the "**Confirmation Hearing**"), and (iv) established procedures for the assumption and rejection of executory contracts and unexpired leases under the Plan;

**WHEREAS,** the Debtors filed and served the *Notice of Entry of Amended Order (I) Approving Disclosure Statement and Form and Manner of Notice of Disclosure Statement Hearing; (II) Establishing Solicitation and Voting Procedures; (III) Scheduling Confirmation Hearing; (IV) Establishing Notice and Objection Procedures for Confirmation of the Proposed*

---

(the "**Bankruptcy Rules**") shall have the meaning ascribed to such term in the Bankruptcy Code or the Bankruptcy Rules, as applicable.

*Plan; (V) Approving Notice and Objection Procedures for the Assumption of Executory Contracts and Unexpired Leases; (VI) Approving Procedures for Objections to the Assignment and Transfer of Property of the Estate; and (VII) Granting Related Relief* (ECF No. 1290) (the "**Confirmation Hearing Notice**") on April 15, 2021;

**WHEREAS**, pursuant to the Disclosure Statement Order, the Bankruptcy Court set the voting deadline for the Plan at June 2, 2021 at 4:00 p.m. (prevailing Central Time) (the "**Voting Deadline**") and the deadline to file an objection to confirmation of the Plan at June 2, 2021 at 11:59 p.m. (prevailing Central Time) (the "**Plan Objection Deadline**");

**WHEREAS**, on April 19, 2021, the Debtors caused to be transmitted (i) as to holders of Claims in Class 1 (Other Secured Claims), Class 3 (FLFO Claims), Class 4 (FLTL Claims), Class 5 (SLTL Claims), Class 6A (Unsecured Trade Claims), and Class 6B (General Unsecured Claims) entitled to vote on the Proposed Plan: (a) the Confirmation Hearing Notice; (b) a USB flash drive containing the Disclosure Statement, the Plan, and the Disclosure Statement Order; (c) an appropriate ballot, substantially in the form annexed to the Disclosure Statement Order as **Exhibits 2, 3, 4, 5, 6 and 7** (a "**Ballot**"), as applicable; and (d) a postage-prepaid return envelope (all of the foregoing, collectively, the "**Solicitation Packages**"); and (ii) as to holders of Class 2 (Priority Non-Tax Claims), Class 8 (Subordinated Securities Claims) and Class 10 (Existing Equity Interests), (a) the Confirmation Hearing Notice; and (b) a notice of non-voting status (a "**Notice of Non-Voting Status**") in the form annexed to the Disclosure Statement Order as **Exhibit 8**, as set forth in the *Affidavit of Service* (ECF No. 1309) executed by Alex Orchowski of the Debtors' Court-appointed claims and noticing agent, Prime Clerk, LLC (the "**Solicitation Agent**") on April 23, 2021 (the "**Solicitation Materials Declaration**"), evidencing the timely service of the Solicitation Packages;

WHEREAS, on May 26, 2021, the Debtors filed the *Notice of Filing of Plan Supplement in Connection with Fourth Amended Joint Chapter 11 Plan of Fieldwood Energy LLC and its Affiliated Debtors* (ECF No. 1394) (the "**Plan Supplement**"), which includes the following documents: (i) the Amended Organizational Documents for FWE I; (ii) the Schedule of Retained Causes of Action; (iii) the Schedule of Assumed Contracts; (iv) the Credit Bid Purchase Agreement; (v) the Apache Definitive Documents; (vi) the First Lien Exit Facility Agreement; (vii) the Chevron Term Sheet; (viii) the Eni Term Sheet; (ix) the Hunt Term Sheet; and (x) the Oil and Gas Lease Schedules;

WHEREAS, on May 27, 2021, the Debtors filed the *Notice to Contract Parties to Executory Contracts and Unexpired Leases of the Schedule of Assumed Contracts and Cure Amounts* (ECF No. 1395) (the "**Assumption Notice**"), which includes the schedule of executory contracts and unexpired leases to be assumed by the Debtors pursuant to the Plan (as may be further amended, supplemented, or modified, the "**Schedule of Assumed Contracts**");

WHEREAS, on June 11, 2021, the Debtors filed the *Notice of Filing of Second Amended Schedule of Assumed Contracts and Cure Amounts* (ECF No. 1549) (the "**Amended Assumption Notice**");

WHEREAS, on June 15, 2021, the Debtors filed the *Notice of Filing of Amended Plan Supplement in Connection with Fourth Amended Joint Chapter 11 Plan of Fieldwood Energy LLC and its Affiliated Debtors* (ECF No. 1562) (the "**Amended Plan Supplement**"), which includes the following documents: (i) the Amended Organizational Documents for FWE I; (ii) the Schedule of Retained Causes of Action; (iii) the Schedule of Assumed Contracts; (iv) the Plan Administrator Agreement; (v) the Credit Bid Purchase Agreement; (vi) the NewCo Organizational Documents; (vii) the Apache Definitive Documents; (viii) the First Lien Exit Facility Credit Agreement;

(ix) the Second Lien Exit Facility Credit Agreement; (x) the New Money Warrant Agreement; (xi) the GUC/SLTL Form Warrant Agreement; (xii) the Chevron Definitive Documents; (xiii) the Eni Definitive Documents; (xiv) the Hunt Term Sheet; and (xv) the Oil and Gas Lease Schedules;

**WHEREAS**, on June 16, 2021, the Debtors filed the *Notice of Filing of Second Amended Plan Supplement in Connection with Fourth Amended Joint Chapter 11 Plan of Fieldwood Energy LLC and its Affiliated Debtors* (ECF No. 1587) (the "**Second Amended Plan Supplement**"); the *Notice of Filing of Third Amended Plan Supplement in Connection with Fifth Amended Joint Chapter 11 Plan of Fieldwood Energy LLC and its Affiliated Debtors* (ECF No. 1642) (the "**Third Amended Plan Supplement**"); and the *Notice of Filing of Fourth Amended Plan Supplement in Connection with Fifth Amended Joint Chapter 11 Plan of Fieldwood Energy LLC and its Affiliated Debtors* (ECF No. 1645) (the "**Fourth Amended Plan Supplement**" and, together with the Plan Supplement, First Amended Plan Supplement, Second Amended Plan Supplement, and the Third Amended Plan Supplement, and any future supplements thereto the "**Plan Supplements**"), which included the following documents: (i) the Required Disclosures Under Section 1129(a)(5); (ii) the NewCo Organizational Documents; (iii) the New Intercreditor Agreement; (iv) the GUC/SLTL Form Warrant Agreement; and (v) the Oil and Gas Lease Schedules;

**WHEREAS**, the Confirmation Hearing was held on June 21–25, 2021; and

**WHEREAS**, the following declarations (collectively, the "**Declarations**") were filed in support of confirmation of the Plan and were admitted into evidence at the Confirmation Hearing:

  i. *Declaration of Alex Orchowski of Prime Clerk LLC Regarding Solicitation of Votes and Tabulation of Ballots Cast on the Fourth Amended Joint Chapter 11 Plan of Fieldwood Energy LLC and its Affiliated Debtors* (ECF No. 1521) (the "**Voting Declaration**");

  ii. *Declaration of John-Paul Hanson in Support of Confirmation of the Debtors' Fourth Amended Joint Chapter 11 Plan of Fieldwood Energy LLC and its Affiliated Debtors* (ECF No. 1556) (the "**Hanson Declaration**"); and

    iii. *Declaration of Marc J. Brown in Support of Debtors' Fourth Amended Joint Chapter 11 Plan of Fieldwood Energy LLC and its Affiliated Debtors* (ECF No. 1555) (the "**Brown Declaration**").

**NOW, THEREFORE**, based on the Hanson Declaration, the Brown Declaration, the Voting Declaration, the record of the Confirmation Hearing, including all the evidence proffered or adduced, and the arguments of counsel made, at the Confirmation Hearing, and the entire record of the Chapter 11 Cases (as defined herein); and after due deliberation thereon and sufficient cause appearing therefor,

**IT IS HEREBY FOUND AND DETERMINED THAT:**

### FINDINGS OF FACT AND CONCLUSIONS OF LAW

    A.    <u>Findings of Fact and Conclusions of Law</u>.  The findings of fact and conclusions of law set forth herein, together with the findings of fact and conclusions of law set forth in the record of the Confirmation Hearing, constitute the Bankruptcy Court's findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052, made applicable to this proceeding pursuant to Bankruptcy Rule 9014.  To the extent any of the following findings of fact constitute conclusions of law, they are adopted as such.  To the extent any of the following conclusions of law constitute findings of fact, they are adopted as such.

    B.    <u>Exclusive Jurisdiction; Venue; Core Proceeding (28 U.S.C. §§ 157(b)(2), 1334(a))</u>. The Bankruptcy Court has jurisdiction over the Chapter 11 Cases pursuant to 28 U.S.C. § 1334. Venue is proper under 28 U.S.C. §§ 1408 and 1409.  Confirmation of the Plan is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(L), and other findings and orders contained herein are also core proceedings pursuant to 28 U.S.C. 157(b)(2) and the Bankruptcy Court has exclusive jurisdiction to determine whether the Plan complies with the applicable provisions of the Bankruptcy Code and should be confirmed.  The Debtors consent to the entry of a final order by the Bankruptcy Court in accordance with the terms set forth herein to the extent that it is later determined that the

Bankruptcy Court, absent consent of the parties, cannot enter final orders or judgments consistent with Article III of the United States Constitution. The Debtors are eligible debtors under section 109 of the Bankruptcy Code. The Debtors are proper plan proponents under section 1121(a) of the Bankruptcy Code.

C.      <u>Chapter 11 Petitions</u>.  On August 3, 2020 and August 4, 2020, as applicable, (the "**Petition Date**") each Debtor commenced with this Bankruptcy Court a voluntary case under chapter 11 of the Bankruptcy Code (the "**Chapter 11 Cases**").  The Debtors are authorized to continue to operate their businesses and manage their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  No trustee or examiner has been appointed in these Chapter 11 Cases.  The Debtors' Chapter 11 Cases are being jointly administered for procedural purposes only pursuant to Bankruptcy Rule 1015(b).

D.      <u>The Creditors' Committee</u>.  On August 18, 2020, the United States Trustee for Region 7 (the "**U.S. Trustee**") appointed the Creditors' Committee pursuant to section 1102 of the Bankruptcy Code (ECF No. 183).   On January 1, 2021 (ECF No. 744), and again on February 19, 2021 (ECF No. 895), the U.S. Trustee reconstituted the Creditors' Committee pursuant to section 1102 of the Bankruptcy Code.

E.      <u>Judicial Notice</u>.  The Bankruptcy Court takes judicial notice of the docket of the Chapter 11 Cases maintained by the Clerk of the Bankruptcy Court and/or its duly-appointed agent, including, without limitation, all pleadings and other documents filed, all orders entered, and the evidence and arguments made, proffered, or adduced at the hearings held before the Bankruptcy Court during the pendency of the Chapter 11 Cases, including, but not limited to, the hearing to consider the adequacy of the Disclosure Statement and all hearings held in the adversary proceedings including the adversary proceeding styled *Fieldwood Energy, LLC and GOM Shelf*

7

*LLC v. Everest Reinsurance Co., Phila. Indem. Ins. Co., HCC Int'l Ins. Co. PLC, Apache Corp., Apache Shelf, Inc., Apache Deepwater LLC, and Apache Shelf Expl. LLC*, Ch. 11, Case No. 20-33948, Adv. No. 21-03418 (Bankr. S.D. Tex. 2021) (the "**Apache/Sureties Adversary Proceeding**") and the adversary proceeding styled *Fieldwood Energy LLC v. Atlantic Maritime Services, LLC*, Ch. 11, Case No. 20-33948, Adv. No. 20-03476 (Bankr. S.D. Tex. 2020) (the "**Atlantic Adversary Proceeding**"). Any resolution of objections to the confirmation of the Plan explained on the record at the Confirmation Hearing is hereby incorporated by reference.

F.    <u>Burden of Proof</u>.    The Debtors have satisfied their burden of proving by a preponderance of the evidence that the Plan satisfies the requirements of section 1129(a) and (b) of the Bankruptcy Code.

G.    <u>Transmittal and Mailing of Materials; Notice</u>.    The Solicitation Packages, which were transmitted and served as set forth in the *Affidavit of Service of Solicitation Materials* dated April 23, 2021 (ECF No. 1309-7) have been transmitted and served in compliance with the Disclosure Statement Order, the Bankruptcy Rules, and the Local Rules. Such transmittal and service were adequate and sufficient, and no other or further notice is or shall be required.

H.    <u>Voting</u>.    Votes to accept or reject the Plan have been solicited and tabulated fairly, in good faith, and in a manner consistent with the Bankruptcy Code, the Bankruptcy Rules and the Disclosure Statement Order. *See* Voting Declaration.

I.    <u>Plan Supplements</u>.    The Debtors filed the Plan Supplements, which include, among other things: (i) the Amended Organizational Documents; (ii) information regarding (a) the sole manager and independent director to be appointed at FWE I to the extent known and determined and other information required to be disclosed in accordance with section 1129(a)(5) of the Bankruptcy Code, (b) the Plan Administrator and other required disclosures in connection with

FWE III, and (c) the sole manager to be appointed at FWE IV to the extent known and determined and other information required to be disclosed in accordance with section 1129(a)(5) of the Bankruptcy Code; (iii) a schedule of retained Causes of Action; (iv) the Schedule of Assumed Contracts; (v) the Plan Administrator Agreement; (vi) the Credit Bid Purchase Agreement; (vii) the NewCo Organizational Documents; (viii) the First Lien Exit Facility Credit Agreement; (ix) the Second Lien Exit Facility Credit Agreement; (x) the New Intercreditor Agreement; (xi) the New Money Warrant Agreement; (xii) the GUC Warrant Agreement; (xiii) the SLTL Warrant Agreement; (xiv) the Chevron Definitive Documents; (xv) the Apache Definitive Documents; (xvi) the ENI Definitive Documents; and (xvii) the Hunt Term Sheet. All such materials contained in any Plan Supplements comply with the terms of the Plan, and the filing and notice of such documents is good and proper in accordance with the Bankruptcy Code, the Bankruptcy Rules, the Local Rules and all other applicable rules, laws, and regulations, and no other or further notice is or shall be required.

J.   <u>Bankruptcy Rule 3016(a)</u>. In accordance with Bankruptcy Rule 3016(a), the Plan is dated and identifies the Debtors as the proponents of the Plan.

## <u>Compliance with the Requirements of Section 1129 of the Bankruptcy Code</u>

K.   <u>Plan Compliance with Bankruptcy Code – 11 U.S.C. § 1129(a)(1)</u>. The Plan complies with all applicable provisions of the Bankruptcy Code, thereby satisfying section 1129(a)(1) of the Bankruptcy Code.

1.   <u>Proper Classification – 11 U.S.C. §§ 1122, 1123(a)(1)</u>. In addition to Administrative Expense Claims, Fee Claims, Priority Tax Claims, and DIP Claims, which need not be classified, the Plan designates the following Classes of Claims and Interests: Class 1 (Other Secured Claims), Class 2 (Priority Non-Tax Claims), Class 3 (FLFO Claims), Class 4 (FLTL Claims), Class 5 (SLTL Claims), Class 6A (Unsecured Trade Claims), Class 6B (General

Unsecured Claims), Class 7 (Intercompany Claims), Class 8 (Subordinated Securities Claims), Class 9 (Intercompany Interests), and Class 10 (Existing Equity Interests). The Claims and Interests placed in each Class are substantially similar to other Claims and Interests, as the case may be, in each such Class. Valid business, factual, and legal reasons exist for separately classifying the various Classes of Claims and Interests created under the Plan, and such classification does not unfairly discriminate between holders of Claims and Interests. Accordingly, the Plan satisfies sections 1122 and 1123(a)(1) of the Bankruptcy Code.

2. <u>Specified Unimpaired Classes – 11 U.S.C. § 1123(a)(2)</u>. Section 3 of the Plan specifies that Class 2 (Priority Non-Tax Claims), Class 7 (Intercompany Claims), and Class 9 (Intercompany Interests) are unimpaired under the Plan, thereby satisfying section 1123(a)(2) of the Bankruptcy Code.

3. <u>Specified Treatment of Impaired Classes – 11 U.S.C. § 1123(a)(3)</u>. Section 3 of the Plan designates Class 1 (Other Secured Claims), Class 3 (FLFO Claims), Class 4 (FLTL Claims), Class 5 (SLTL Claims), Class 6A (Unsecured Trade Claims), Class 6B (General Unsecured Claims), Class 8 (Subordinate Securities Claims), and Class 10 (Existing Equity Interests) as impaired, and Section 4 of the Plan specifies the treatment of Claims and Interests in such Classes, thereby satisfying section 1123(a)(3) of the Bankruptcy Code.

4. <u>No Discrimination – 11 U.S.C. § 1123(a)(4)</u>. The Plan provides for the same treatment of each Claim or Interest in each respective Class or subclass unless the holder of a particular Claim or Interest has agreed to a less favorable treatment of its Claim or Interest, thereby satisfying section 1123(a)(4) of the Bankruptcy Code.

5. <u>Implementation of Plan – 11 U.S.C. § 1123(a)(5)</u>. The Plan and the various documents and agreements referred to therein or set forth in the Plan Supplements and the exhibits

and schedules to the Plan provide adequate and proper means for the Plan's implementation (thereby satisfying section 1123(a)(5) of the Bankruptcy Code), including, without limitation: (i) the compromise and settlement of Claims, Interests, and controversies; (ii) the Credit Bid Transaction and Confirmation Outside Date; (iii) the Equity Rights Offerings; (iv) the New Equity Interests; (v) the NewCo Organizational Documents; (vi) the New Money Warrants, SLTL Warrants, and GUC Warrants; (vii) the Plan of Merger; (viii) the Single Share; (ix) the Plan Administrator; (x) the Plan funding; (xi) the Exit Facilities; (xii) the Apache Definitive Documents; (xiii) the abandonment of certain properties; (xiv) the establishment of claims reserves; (xv) the Plan Administrator Expense Reserve; (xvi) the Debtors' continued corporate existence (unless otherwise specified in the Plan); (xvii) corporate action; (xviii) the cancellation of existing securities and agreements of the Debtors; (xix) the cancellation of certain existing security interests in the Debtors; (xx) the Intercompany Interests and corporate reorganization; (xxi) the Restructuring Transactions; (xxii) securities exemptions; (xxiii) the closing of the Chapter 11 Cases; (xxiv) provisions governing distributions under the Plan; (xxv) procedures for Disputed Claims; (xxvi) the Debtors' Releases; (xxvii) the Third-Party Releases; (xxviii) the CUSA-Party Release; and (xxix) the CUSA Release-Party Release.

6.    Nonvoting Equity Securities – 11 U.S.C. § 1123(a)(6).  The certificate of incorporation, articles of incorporation, limited liability company agreement, operating agreement, or similar governing document, as applicable, of each Debtor have been or shall be amended on or prior to the Effective Date to prohibit the issuance of non-voting equity securities to the extent prohibited by section 1123(a)(6) of the Bankruptcy Code, thereby satisfying section 1123(a)(6) of the Bankruptcy Code.

7.      Selection of Officers, Directors, or Trustees – 11 U.S.C. § 1123(a)(7).  The Plan Supplements and Section 5.9 of the Plan contain provisions with respect to the selection of directors and officers of the Post-Effective Date Debtors that are consistent with the interests of creditors, equity security holders, and public policy, thereby satisfying section 1123(a)(7) of the Bankruptcy Code.

8.      Impairment/Unimpairment of Classes of Claims and Equity Interests – 11 U.S.C. § 1123(b)(1).  As contemplated by section 1123(b)(1) of the Bankruptcy Code, Class 1 (Other Secured Claims), Class 3 (FLFO Claims), Class 4 (FLTL Claims), Class 5 (SLTL Claims), Class 6A (Unsecured Trade Claims), Class 6B (General Unsecured Claims), Class 8 (Subordinated Securities Claims), and Class 10 (Existing Equity Interests) are impaired under the Plan.  Class 2 (Priority Non-Tax Claims), Class 7 (Intercompany Claims) and Class 9 (Intercompany Interests) are unimpaired under the Plan.

9.      Assumption and Rejection of Executory Contracts and Unexpired Leases – 11 U.S.C. § 1123(b)(2).  Article VIII of the Plan governing the assumption and rejection of executory contracts and unexpired leases satisfies the requirements of section 365(b) of the Bankruptcy Code and is appropriate under section 1123(b)(2) of the Bankruptcy Code.

10.      Settlement of Claims and Causes of Action – 11 U.S.C. § 1123(b)(3).

(i)      *Global Settlement and Compromise.*  The Plan, including Section 5.1 thereof, incorporates a global settlement and compromise of certain Debtor-creditor and inter-creditor issues (the "**Plan Settlement**"), among the Debtors, the Consenting Creditors and the Creditors' Committee of claims, Causes of Action and controversies among such parties, including all potential claims, Causes of Action and controversies related to the Challenge Period (as defined in the DIP Order and as modified with respect to the Creditors' Committee pursuant to certain

stipulations filed with the Bankruptcy Court) and any Challenge under the DIP Order, and are in consideration of the value provided to the Estates by the Consenting Creditors, including the value being provided to holders of Unsecured Trade Claims and General Unsecured Claims pursuant to Sections 4.6 and 4.7 of the Plan. The Plan is deemed to constitute a motion under section 1123(b)(3) of the Bankruptcy Code and Bankruptcy Rule 9019, seeking approval of the Plan Settlement. Entry of this Order constitutes the Bankruptcy Court's approval of the terms of the Plan Settlement that are set forth in the Plan. The settlements and compromises of claims and potential causes of action among the Debtors, the Consenting Creditors and the Creditors' Committee, all as more fully set forth in the Plan and the Disclosure Statement, are integral to the Plan, are reasonable in their terms, are in the bests interests of the Debtors' estates and their creditors, and satisfy the standards for approval under Bankruptcy Rule 9019 and sections 1123(b)(3) and 1123(b)(6) of the Bankruptcy Code. For the avoidance of doubt, nothing in this Order shall require the Creditors' Committee to take or refrain from taking any action that it determines in good faith would be inconsistent with its fiduciary duties under applicable law. Notwithstanding the foregoing, the Creditors' Committee acknowledges that its entry into the Plan Settlement and its support for this Plan is consistent with its fiduciary duties.

(ii)     *Retained Causes of Action.*   In accordance and compliance with section 1123(b)(3)(B) of the Bankruptcy Code, certain Causes of Action of the Debtors are retained under the Plan, as more fully set forth in Section 10.11 of the Plan and **Exhibit C** of the Plan Supplements.

(iii)     *Representative of Estates*.   On and after the Effective Date, the Plan Administrator shall have the rights and powers of a debtor in possession under section 1107 of the Bankruptcy Code, shall be a "representative of the estate" with respect to the Debtors' Estates

pursuant to section 1123(b)(3) of the Bankruptcy Code, shall be vested with the rights, powers, and benefits afforded to a "trustee" under sections 704 and 1106 of the Bankruptcy Code, and shall have such other rights, powers, and duties incidental to causing performance of the obligations under the Plan or otherwise as may be reasonably necessary; *provided, however*, the Plan Administrator shall have no rights, powers, or duties that are inconsistent with or contrary to the Plan or this Order.

11.     <u>Modification of Rights – 11 U.S.C. § 1123(b)(5)</u>.   In accordance and in compliance with section 1123(b)(5) of the Bankruptcy Code, the Plan properly modifies the rights of holders of Class 1 (Other Secured Claims), Class 3 (FLFO Claims), Class 4 (FLTL Claims), Class 5 (SLTL Claims), Class 6A (Unsecured Trade Claims), Class 6B (General Unsecured Claims), Class 8 (Subordinated Securities Claims), and Class 10 (Existing Equity Interests).  The Plan also leaves unaffected the rights of holders of Claims in Class 2 (Priority Non-Tax Claims), Class 7 (Intercompany Claims) and Class 9 (Intercompany Interests).

12.     <u>Additional Plan Provisions – 11 U.S.C. § 1123(b)(6)</u>.  The provisions of the Plan are appropriate and not inconsistent with the applicable provisions of the Bankruptcy Code, thereby satisfying section 1123(b) of the Bankruptcy Code.  The failure to specifically address a provision of the Bankruptcy Code in this Order shall not diminish or impair the effectiveness of this Order.

13.     <u>Debtors Are Not Individuals – 11 U.S.C. § 1123(c)</u>.  The Debtors are not individuals and, accordingly, section 1123(c) of the Bankruptcy Code is inapplicable to these Chapter 11 Cases.

14.     <u>Cure of Defaults – 11 U.S.C. § 1123(d)</u>.  Section 8.2 of the Plan provides for the satisfaction of default claims associated with each executory contract and unexpired lease

to be assumed pursuant to the Plan in accordance with section 365(b)(1) of the Bankruptcy Code. All Cure Amounts will be determined in accordance with the underlying agreements and applicable bankruptcy and non-bankruptcy law. Thus, the Plan complies with section 1123(d) of the Bankruptcy Code.

L.    <u>Debtors' Compliance with Bankruptcy Code – 11 U.S.C. § 1129(a)(2)</u>.    The Debtors have complied with the applicable provisions of the Bankruptcy Code, thereby satisfying section 1129(a)(2) of the Bankruptcy Code.  Specifically:

(i)    The Debtors are proper debtors under section 109 of the Bankruptcy Code;

(ii)    The Debtors have complied with applicable provisions of the Bankruptcy Code, except as otherwise provided or permitted by orders of this Bankruptcy Court; and

(iii)    The Debtors have complied with the applicable provisions of the Bankruptcy Code, the Bankruptcy Rules, the Local Rules, and the Disclosure Statement Order in transmitting the Disclosure Statement, the Plan, the Ballots, the Solicitation Packages, and related documents and notices and in soliciting and tabulating votes on the Plan.

M.    <u>Plan Proposed in Good Faith – 11 U.S.C. § 1129(a)(3)</u>.  The Debtors have proposed the Plan (and all other agreements, documents, and instruments necessary to effectuate the Plan) in good faith and not by any means forbidden by law, thereby satisfying section 1129(a)(3) of the Bankruptcy Code.  The Debtors' good faith is evident from the facts and record of these Chapter 11 Cases, the Disclosure Statement and the hearings thereon, and the record of the Confirmation Hearing and other proceedings held in these Chapter 11 Cases.  This Order, the Plan, the Plan Supplement, including, the Credit Bid Purchase Agreement, the Apache Implementation Agreement, the Plan of Merger, the FWE I LLC Agreement, the GUC Warrant Agreement, the New Money Warrant Agreement, the SLTL Tranche 1 Warrant Agreement, the SLTL Tranche 2

Warrant Agreement, the NewCo Organizational Documents, the Exit Facility Documents, the Restructuring Support Agreement, the Chevron Implementation Agreement, and other agreements and documents contemplated thereby (collectively, as may be amended in compliance with this Order, the foregoing are referred to as the "**Plan Documents**") are based upon extensive, arms' length negotiations between and among representatives of the Debtors, the Prepetition FLTL Lenders, the Prepetition FLFO Secured Parties, the Prepetition SLTL Lenders, the DIP Lenders, Apache, CUSA Entities, and the Creditors' Committee, and represents the culmination of months of intensive negotiations and discussions among the foregoing parties in interest. The Plan was proposed with the legitimate and honest purpose of maximizing the value of the Debtors' Estates. Further, the Plan's classification, indemnification, exculpation, release, settlement, and injunction provisions, including, without limitation, Section 3.3 and Article X of the Plan, have been negotiated in good faith and at arms' length, consistent with sections 105, 1123(b)(3)(A), 1123(b)(6), 1129, and 1142 of the Bankruptcy Code.

N. <u>Payments for Services or Costs and Expenses – 11 U.S.C. § 1129(a)(4)</u>. Any payment made or to be made by any of the Debtors for services or for costs and expenses incurred prior to the Effective Date in connection with the Chapter 11 Cases, or in connection with the Plan and incidental to the Chapter 11 Cases has been approved by, or is subject to the approval of, the Bankruptcy Court as reasonable, thereby satisfying section 1129(a)(4) of the Bankruptcy Code.

O. <u>Directors, Officers and Insiders – 11 U.S.C. § 1129(a)(5)</u>. The officers and directors of the Debtors shall be relieved of any and all duties with respect to the Debtors as of the Effective Date of the Plan. Upon and following the Effective Date, the Plan Administrator shall serve as the sole officer, director, or manager of each Post-Effective Date Debtor, other than FW GOM Pipeline, Inc. and GOM Shelf LLC (the "**Post-Effective Date FWE I Subsidiaries**"). Upon

16

and following the Effective Date, Jon Graham shall serve as the sole officer, director, or manager of each Post-Effective Date FWE I Subsidiary. The identity and affiliations of the person proposed to serve as the initial director and officer of the Post-Effective Date Debtors after confirmation of the Plan has been fully disclosed to the extent such information is available, and the appointment to, or continuance in, such office of such person is consistent with the interests of holders of Claims against and Interests in the Post-Effective Date Debtors and with public policy. The Debtors have complied with section 1129(a)(5) of the Bankruptcy Code.

P.    <u>No Rate Changes – 11 U.S.C. § 1129(a)(6)</u>. The Plan does not provide for rate changes by any of the Post-Effective Date Debtors. Thus, section 1129(a)(6) of the Bankruptcy Code is not applicable in the Chapter 11 Cases.

Q.    <u>Best Interests of Creditors – 11 U.S.C. § 1129(a)(7)</u>. The Plan satisfies section 1129(a)(7) of the Bankruptcy Code. The Disclosure Statement, the Plan Supplements, the Hanson Declaration, the Brown Declaration, the Voting Declaration, and the other evidence proffered or adduced at the Confirmation Hearing (i) are persuasive and credible, (ii) have not been controverted by other evidence, and (iii) establish that each holder of an impaired Claim or Interest either has accepted the Plan or will receive or retain under the Plan, on account of such Claim or Interest, property of a value, as of the Effective Date, that is not less than the amount such holder would receive or retain if the Debtors were liquidated under chapter 7 of the Bankruptcy Code on such date.

R.    <u>Acceptance by Certain Classes – 11 U.S.C. § 1129(a)(8)</u>. Class 2 (Priority Non-Tax Claims), Class 7 (Intercompany Claims) and Class 9 (Intercompany Interests) are unimpaired under the Plan and are deemed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code. Classes 3, 4, 5, and 6A have voted to accept the Plan in accordance with

sections 1126(c) and (d) of the Bankruptcy Code. Holders of Interests in Class 8 (Subordinated Securities Claims) and Class 10 (Existing Equity Securities) are not entitled to receive or retain any property under the Plan and, therefore, are deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code.

S.      Treatment of Administrative Expenses, Priority Tax Claims and Other Priority Claims – 11 U.S.C. § 1129(a)(9). The treatment of Administrative Expense Claims, Fee Claims, DIP Claims, and Priority Tax Claims pursuant to Sections 2.1, 2.2, 2.3, and 2.5 of the Plan, respectively, satisfies the requirements of sections 1129(a)(9)(A), (C), and (D) of the Bankruptcy Code, as applicable. The treatment of Priority Non-Tax Claims pursuant to Section 4.2 of the Plan satisfies the requirements of section 1129(a)(9)(B) of the Bankruptcy Code. On the Effective Date, the Debtors or the Post-Effective Date Debtors, as applicable, will have sufficient Cash to pay Allowed Administrative Expense Claims that are not being assumed by the Credit Bid Purchaser pursuant to the Credit Bid Purchase Agreement, Fee Claims, DIP Claims, Priority Tax Claims, and Allowed Priority Non-Tax Claims.

T.      Acceptance by Impaired Classes – 11 U.S.C. § 1129(a)(10). Class 3 (FLFO Claims), Class 4 (FLTL Claims), Class 5 (SLTL Claims), and Class 6A (Unsecured Trade Claims) of each of the Debtors voted to accept the Plan by the requisite majorities, determined without including any acceptance of the Plan by any insider, thereby satisfying the requirements of section 1129(a)(10) of the Bankruptcy Code.

U.      11 U.S.C. § 1129(a)(11). The Disclosure Statement, the Plan Supplements, the Hanson Declaration, and the Brown Declaration, and the other evidence proffered or adduced at the Confirmation Hearing (i) are persuasive and credible, (ii) have not been controverted by other evidence, and (iii) establish that confirmation of the Plan is not likely to be followed by the

liquidation or the need for further financial reorganization, thereby satisfying the requirements of section 1129(a)(11) of the Bankruptcy Code.

V.     Payment of Statutory Fees – 11 U.S.C. § 1129(a)(12).  Pursuant to Section 12.1 of the Plan, all fees payable under sections 1911 through 1930 of chapter 123 of title 28 of the United States Code will be paid on the Effective Date, and thereafter as may be required.  Thus, the Plan satisfies the requirements of section 1129(a)(12) of the Bankruptcy Code.

W.     Benefit Plans – 11 U.S.C. § 1129(a)(13).  The Debtors have no obligation to pay retiree benefits therefore section 1129(a)(13) of the Bankruptcy Code does not apply.

X.     Domestic Support Obligations – 11 U.S.C. § 1129(a)(14).  The Debtors are not required by a judicial or administrative order, or by statute, to pay any domestic support obligations, and therefore, section 1129(a)(14) of the Bankruptcy Code is inapplicable in these Chapter 11 Cases.

Y.     The Debtors Are Not Individuals – 11 U.S.C. § 1129(a)(15).  The Debtors are not individuals, and therefore, section 1129(a)(15) of the Bankruptcy Code is inapplicable in these Chapter 11 Cases.

Z.     No Applicable Nonbankruptcy Law Regarding Transfers – 11 U.S.C. § 1129(a)(16).  Each of the Debtors that is a corporation is a moneyed, business, or commercial corporation or trust, and therefore, section 1129(a)(16) of the Bankruptcy Code is inapplicable in these Chapter 11 Cases.

AA.     Fair and Equitable; No Unfair Discrimination – 11 U.S.C. § 1129(b).  Holders of Interests in Class 8 (Subordinated Securities Claims) and Class 10 (Existing Equity Interests) are deemed to reject the Plan.  Class 1 (Other Secured Claims) and Class 6B (General Unsecured Claims) are impaired and voted to reject the Plan.  However, the Plan does not discriminate unfairly

and is fair and equitable with respect to Class 8 (Subordinated Securities Claims) and Class 10 (Existing Equity Interests) as required by sections 1129(b)(2)(C)(i) and 1129(b)(2)(C)(ii) of the Bankruptcy Code.  The Plan does not discriminate and is fair and equitable with respect to Class 6B (General Unsecured Claims) as required by section 1129(b)(2)(B)(ii).  The Plan does not discriminate and is fair and equitable with respect to Class 1 (Other Secured Claims) as required by section 1129(b)(2)(A).  Thus, the Plan may be confirmed notwithstanding the Debtors' failure to satisfy section 1129(a)(8) of the Bankruptcy Code.  Upon confirmation of the Plan and the occurrence of the Effective Date, the Plan shall be binding on the members of Class 1 (Other Secured Claims), Class 6B (General Unsecured Claims), Class 8 (Subordinated Securities Claims), and Class 10 (Existing Equity Interests).

BB.　　Only One Plan – 11 U.S.C. § 1129(c).  Because the Plan is the only chapter 11 plan filed in the Chapter 11 Cases, the Plan satisfies section 1129(c) of the Bankruptcy Code.

CC.　　Principal Purpose of the Plan – 11 U.S.C. § 1129(d).  Because the principal purpose of the Plan is not the avoidance of taxes or the avoidance of the application of Section 5 of the Securities Act of 1933, the Plan satisfies section 1129(d) of the Bankruptcy Code.

DD.　　Small Business Case – 11 U.S.C. § 1129(e).  None of these Chapter 11 Cases are a "small business case," as that term is defined in the Bankruptcy Code, and, accordingly, section 1129(e) of the Bankruptcy Code is inapplicable.

EE.　　Good Faith Solicitation – 11 U.S.C. § 1125(e).  Based on the record before the Bankruptcy Court in the Chapter 11 Cases, including evidence presented at the Confirmation Hearing, the Debtors and their directors, officers, employees, members, agents, advisors, and professionals have acted in "good faith" within the meaning of section 1125(e) of the Bankruptcy Code in compliance with the applicable provisions of the Bankruptcy Code, the Bankruptcy Rules,

the Local Rules, and the Disclosure Statement Order in connection with all their respective activities relating to the solicitation of acceptances or rejections of the Plan and their participation in the activities described in section 1125 of the Bankruptcy Code, and are entitled to the protections afforded by section 1125(e) of the Bankruptcy Code and the exculpation provisions set forth in Section 10.8 of the Plan.

## Findings Relating to the Credit Bid Transaction

FF.     <u>Good Faith; No Collusion</u>.  The Credit Bid Purchase Agreement was proposed, negotiated by the Debtors party thereto, the Credit Bid Purchaser and Buyer 2 (as defined in the Credit Bid Purchase Agreement) (the Credit Bid Purchaser and Buyer 2 collectively, the "**Credit Bid Purchasers**") without collusion, in good faith, and from arm's-length bargaining positions. Neither the Credit Bid Purchaser nor any other NewCo Entity is an "insider" or "affiliate" of the Debtors, as those terms are defined in the Bankruptcy Code, and no common identity of incorporators, directors, or controlling stockholders existed between the (a) Debtors and (b) the Credit Bid Purchasers or any other NewCo Entity.  The Credit Bid Purchasers recognized that the Debtors were free to deal with any other party interested in acquiring the Credit Bid Acquired Interests, as described Section 3(C) of the Disclosure Statement.  Neither the Debtors nor the Credit Bid Purchasers engaged in any conduct that would cause or permit the Credit Bid Purchase Agreement, any documents related thereto, or the consummation of the Credit Bid Transaction to be avoided, or costs or damages to be imposed, under Bankruptcy Code section 363(n) or under any other law of the United States, any state, territory, possession thereof, the District of Columbia, or any other applicable law. As a result of the foregoing, the Credit Bid Purchasers are entitled to the protections of section 363(m) of Bankruptcy Code, including in the event this Order or any portion thereof is reversed or modified on appeal, and otherwise has proceeded in good faith in all respects in connection with these cases. The Debtors' marketing process with respect to the Credit

Bid Transaction afforded a full, fair, and reasonable opportunity for any person or entity to make a higher or otherwise better offer. No other person or entity or group of entities has offered to purchase the assets for greater overall value to the Debtors' Estates than the Credit Bid Purchaser. The Credit Bid Purchase Agreement constitutes the highest and best offer, and will provide a greater recovery for the Debtors' Estates than would be provided by any other available alternative.

GG. <u>Authority</u>. The Debtors have: (i) full power and authority to execute and assume the Credit Bid Purchase Agreement and all other documents contemplated thereby and (ii) all of the power and authority necessary to consummate the transactions contemplated by the Credit Bid Purchase Agreement subject to the terms of this Order. No consents or approvals, other than those already obtained or expressly provided for in the Credit Bid Purchase Agreement or this Order, are required for the Debtors to consummate the Credit Bid Transaction.

HH. <u>Title to Purchased Assets</u>. The Credit Bid Acquired Interests sought to be transferred and/or assigned, as applicable, by the Debtors to the Credit Bid Purchasers pursuant to the Credit Bid Purchase Agreement are property of the Debtors' Estates and good title thereto is presently vested in the Debtors' Estates within the meaning of section 541(a) of the Bankruptcy Code. Except as provided in the Credit Bid Purchase Agreement, the Debtors are the sole and rightful owners of the Credit Bid Acquired Interests with all rights, title and interests to the Credit Bid Acquired Interests, and no other person has any ownership right, title, or interest therein other than any security interests therein which secure the Debtors' obligations to the DIP Secured Parties or the Prepetition Secured Parties (each as defined in the DIP Order), as applicable.

II. <u>Adequate Marketing; Highest or Best Offer</u>. The Debtors' marketing process with respect to the Credit Bid Transaction afforded a full, fair, and reasonable opportunity for any person or entity to make a higher or otherwise better offer. The Debtors' marketing process

allowed the Debtors to consider actionable proposals, if any, from third-parties for transactions that would provide consideration to the Debtors' Estates in an amount that exceeds the Credit Bid Amount plus the value of any other consideration provided by the Credit Bid Purchaser to the Debtors pursuant to the Credit Bid Purchase Agreement and the Plan. The Debtors considered such proposals pursuant to certain procedures as provided for in the Disclosure Statement Motion (as defined in the Disclosure Statement), up through February 26, 2021, the Bid Deadline. Moreover, the procedures provided, among other things, that in evaluating whether any third-party bids qualify as a Qualified Bid (as defined in the Disclosure Statement Motion), the Debtors may consider several factors including, but not limited to, (i) the amount and form of consideration of the purchase price, (ii) the assets included in or excluded from the bid, (iii) the value to be provided to the Debtors and their Estates, (iv) the transaction structure and execution risk, and (v) the impact on all key stakeholders. The Debtors did not receive any Qualified Bids by the Bid Deadline and no other person or entity or group of entities has offered to purchase the assets for greater overall value to the Debtors' Estates than the Credit Bid Purchasers. The Credit Bid Purchase Agreement constitutes the highest and best offer, and will provide a greater recovery for the Debtors' Estates than would be provided by any other available alternative. The Debtors' determination that the Credit Bid Purchase Agreement constitutes the highest and best offer constitutes a valid and sound exercise of the Debtors' business judgment. Approval of the Credit Bid Transaction and the consummation of the Credit Bid Transaction is in the best interests of the Debtors' Estates, their creditors, and other parties in interest. The consideration provided by the Credit Bid Purchasers pursuant to the Credit Bid Purchase Agreement (a) is fair and reasonable, (b) is the highest or best offer for the Credit Bid Acquired Interests, and (c) constitutes reasonably equivalent value (as those terms are defined in each of the Uniform Voidable Transfer Act, Uniform Fraudulent

Transfer Act, Uniform Fraudulent Conveyance Act, and section 548 of the Bankruptcy Code) and fair consideration under the Bankruptcy Code and under the laws of the United States, any state, territory, possession, or the District of Columbia.

JJ.    NewCo and its Subsidiaries Not Successors.  Upon the Credit Bid Transaction Closing, neither NewCo nor any of its subsidiaries (including the Credit Bid Purchasers) will be deemed to: (a) be the successor of (other than for purposes of section 1145 of the Bankruptcy Code), or related person, successor in interest or successor employer (as described under any applicable law) to, any Debtor, any Estate, FWE I, FWE III, FWE IV, or any of the Debtors' affiliates, predecessors, successors or assigns including, with respect to any Employee Plans (as defined in the Credit Bid Purchase Agreement), other than the Assumed Employee Plans (as defined in the Credit Bid Purchase Agreement) to the extent set forth in Section 6.8 of the Credit Bid Purchase Agreement; (b) have, de facto or otherwise, merged into any Debtor, any Estate, FWE I, FWE III, FWE IV, or  any of the Debtors' affiliates, predecessors, successors or assigns; (c) be a mere continuation or substantial continuation of any Debtor, any Estate, FWE I, FWE III, FWE IV, or  any of the Debtors' affiliates, predecessors, successors or assigns or the enterprise(s) of any Debtor, any Estate, FWE I, FWE III, FWE IV, or any of the Debtors' affiliates, predecessors, successors or assigns; and (d) other than as expressly set forth in the Credit Bid Purchase Agreement, be liable for any acts or omissions of any Debtor, any Estate, FWE I, FWE III, FWE IV or any of the Debtors' affiliates, predecessors, successors or assigns, in the current or former conduct of the business of the Debtors relating to the Credit Bid Acquired Interests or arising under or related to the Credit Bid Acquired Interests.  None of the NewCo Entities are an alter ego of any Debtor, any Estate, FWE I, FWE III, FWE IV or any of the Debtors' affiliates, predecessors, successors or assigns, or are holding themselves out to the public as a successor to

or a continuation of any Debtor, any Estate, FWE I, FWE III, FWE IV or any of the Debtors' affiliates, predecessors, successors or assigns. The issuance, sale, and/or transfer of the New Equity Interests (as applicable), the New Money Warrants, the GUC Warrants or the SLTL Warrants does not amount to a consolidation, succession, merger, or de facto merger of (a) any NewCo Entity and any of (b) the Debtors, the Post-Effective Date Debtors, any Estate, FWE I, FWE III, FWE IV, or any of the Debtors' affiliates, predecessors, successors or assigns.

KK.    <u>Necessity of Order</u>. The Credit Bid Purchasers have agreed to the Credit Bid Transaction in material reliance on and with fair consideration provided for the Credit Bid Transaction being free and clear of all claims and interests relating to the Debtors arising prior to the closing of the Credit Bid Transaction, except as expressly provided under the Credit Bid Purchase Agreement and except for (i) any and all Liens securing the FLFO Claims or the obligations under the First Lien Exit Facility that attach to the Credit Bid Acquired Interests that are retained and deemed assigned to the First Lien Exit Facility Agent upon the Effective Date to secure the obligations under the First Lien Exit Facility and (ii) all Liens securing the FLTL Claims that attach to the Credit Bid Acquired Interests and are deemed assigned to the Second Lien Exit Facility Agent upon the Effective Date to secure the obligations under the Second Lien Exit Facility, including any successor or vicarious liabilities of any kind or nature, as set forth herein and in the Credit Bid Purchase Agreement, and would not agree to the Credit Bid Purchase Agreement or the Credit Bid Transaction without all of the relief provided for in this Order such terms and the findings herein.

LL.    <u>Satisfaction of Sections 363(f) and 1141(c)</u>. The conditions of section 363(f) of the Bankruptcy Code have been satisfied in full; therefore, the Debtors may sell assets and property pursuant to the Credit Bid Purchase Agreement free and clear of any claims, liens, encumbrances,

or other interests of any kind or nature whatsoever other than as expressly provided under the Credit Bid Purchase Agreement, the Plan, or this Order. In addition to and without limiting the foregoing, the proposed Credit Bid Transaction is to be consummated under the Plan, and the assets and property to be sold pursuant to the Credit Bid Transaction are dealt with by the Plan and this Order; therefore, except as expressly provided under the Credit Bid Purchase Agreement and except for (i) any and all Liens securing the FLFO Claims or the obligations under the First Lien Exit Facility that attach to the Credit Bid Acquired Interests that are retained and deemed assigned to the First Lien Exit Facility Agent upon the Effective Date to secure the obligations under the First Lien Exit Facility and (ii) all Liens securing the FLTL Claims that attach to the Credit Bid Acquired Interests and are deemed assigned to the Second Lien Exit Facility Agent upon the Effective Date to secure the obligations under the Second Lien Exit Facility, the Debtors may sell assets and property pursuant to the Credit Bid Purchase Agreement free and clear of any claims, liens, encumbrances, or other interests of any kind or nature whatsoever pursuant to section 1141(c) of the Bankruptcy Code.

MM.    <u>Free and Clear</u>.  The Debtors may sell the Credit Bid Acquired Interests free and clear of all liens, claims (including those that constitute a "claim" as defined in section 101(5) of the Bankruptcy Code), rights, liabilities, mortgages, deeds of trust, pledges, charges, security interests, of whatever kind or nature, rights of first refusal, rights of offset or recoupment, royalties, conditional sales or title retention agreements, hypothecations, preferences, debts, easements, suits, licenses, options, rights of recovery, judgments, orders and decrees of any court or foreign domestic governmental entity, taxes (including foreign, state and local taxes), covenants, restrictions, indentures, instruments, leases, options, off-sets, recoupments, claims for reimbursement or subrogation, contribution, indemnity or exoneration, encumbrances and other

interests of any kind or nature whatsoever other than as expressly provided under the Credit Bid Purchase Agreement and except for (i) any and all Liens securing the FLFO Claims or the obligations under the First Lien Exit Facility that attach to the Credit Bid Acquired Interests that are retained and deemed assigned to the First Lien Exit Facility Agent upon the Effective Date to secure the obligations under the First Lien Exit Facility and (ii) all Liens securing the FLTL Claims that attach to the Credit Bid Acquired Interests and are deemed assigned to the Second Lien Exit Facility Agent upon the Effective Date to secure the obligations under the Second Lien Exit Facility, because, in each case, one or more of the standards set forth in sections 363(f)(l)–(5), 1129(b)(2)(A)(ii), 1141(a), or 1141(c) of the Bankruptcy Code has been satisfied.  All holders of such claims, liens, encumbrances, or other interests against the Debtors, their Estates, or any of the assets subject to the Credit Bid Transaction (a) who did not object, or who withdrew their objections, to the Credit Bid Transaction are deemed to have consented pursuant to section 363(f)(2) of the Bankruptcy Code and (b) are bound by this Order or the Plan pursuant to section 1141(a) of the Bankruptcy Code. All holders of such claims, liens, encumbrances, or other interests are adequately protected by having their claims, liens, encumbrances, or other interests, if any, in each instance against the Debtors, their Estates, or any of the assets subject to the Credit Bid Transaction, attach to the net cash proceeds of the Credit Bid Transaction ultimately attributable to the assets in which such creditor alleges a claim, lien, encumbrance, or other interest, in the same order of priority, with the same validity, force, and effect that such claim, lien, encumbrance, or other interest had prior to consummation of the Credit Bid Transaction, subject to any claims and defenses the Debtors and their Estates may possess with respect thereto, and with such claims, liens, encumbrances, or other interests being treated in accordance with the Plan.  The Claims Reserve Amount set aside from the net cash proceeds of the Credit Bid Transaction for purposes

of funding the Claims Reserve, the Plan Administrator Expense Reserve amount for funding the Plan Administrator expense reserve, and funding the Decommissioning Account (as defined in the Funding Agreement, annexed to the Credit Bid Purchase Agreement) shall be funded free and clear of all liens, claims and encumbrances or other interests unless expressly provided in the Plan Documents.

NN.    <u>Modifications</u>.   Following execution, the Credit Bid Purchase Agreement and related agreements, documents or other instruments executed in connection therewith, may be modified, amended or supplemented by the parties thereto, in a writing signed by each party, and in accordance with the terms thereof, without further order of the Bankruptcy Court; *provided*, that any such modification, amendment or supplement does not materially change the economic substance of the Credit Bid Transaction.

<u>**Findings Relating to Plan of Merger**</u>

OO.    <u>Plan of Merger</u>.   The Plan of Merger Agreement satisfies the requirement of a plan of merger pursuant to sections 10.002 and 10.003 of the Texas Business Organizations Code (the "**TBOC**") and when executed will have been duly approved as required for purposes of sections 10.001, 10.002 and 10.302 of the TBOC and binding on FWE.   FWE III will be a "surviving domestic entity" as used in section 10.008 of the TBOC.

PP.    On the Effective Date, but after the consummation of the transactions contemplated by the Credit Bid Purchase Agreement, pursuant to sections 1123, 1141(b) and 1141(c) of the Bankruptcy Code, in accordance with the Plan of Merger, (i) all FWE Assets will be allocated to and vest in FWE I, FWE III, and any FWE Additional Entity pursuant to the terms of the applicable Plan of Merger, in each case, free and clear of all Liens, Claims, charges, Interests, or other encumbrances, including the Plan of Merger Consent Rights and Plan of Merger Preferential Purchase Rights; and (ii) (x) the FWE I Obligations shall be allocated to and shall vest in, and shall

constitute liabilities and obligations of, FWE I, (y) the FWE III Obligations shall be allocated to and shall vest in, and shall constitute liabilities and obligations of, FWE III (subject to further allocation and vesting as provided in any Plan of Merger other than the Initial Plan of Merger), and (z) any obligations allocated to an FWE Additional Entity pursuant to the terms of the applicable Plan of Merger shall be allocated to and shall vest in, and shall constitute liabilities and obligations of, such applicable FWE Additional Entity.

QQ.    <u>FWE I and FWE IV not Successors to the Debtors</u>.  Neither FWE I nor FWE IV is a successor or mere continuation of the Debtors or their Estates by virtue of the allocation of the FWE I Assets and the FWE I Obligations, or the FWE IV Assets and FWE IV Obligations, respectively, and there is no continuity of enterprise or common identity between the FWE I, FWE IV, and the Debtors.  Neither FWE I nor FWE IV is an alter ego of the Debtors.  Neither FWE I nor FWE IV is holding itself out to the public as a successor to or a continuation of the Debtors or their Estates.

RR.    <u>No Continuity of Enterprise or Common Identity</u>.  There is no continuity of enterprise or common identity between any of FWE I, FWE III, FWE IV or any NewCo Entity, and none of the foregoing entities are alter egos of another.

<div align="center"><b><u>Other Findings</u></b></div>

SS.    <u>Injunction, Exculpation, and Releases</u>.  The Plan is consistent with section 1123(b)(3) of the Bankruptcy Code.  Section 10.7(a) of the Plan describes certain releases granted by the, Section 10.7(b) of the Plan provides for the release of the Released Parties by the Releasing Parties, Section 10.7(d) of the Plan provides for releases by the CUSA Parties of the CUSA Release Parties, Section 10.7(e) of the Plan provides for releases by the CUSA Release Parties of the CUSA Parties,  Section 10.8 of the Plan provides for exculpation for the Exculpated Parties (the "**Exculpation**"), and Section 10.9 of the Plan provides for an injunction (the "**Injunction**").  The

Bankruptcy Court has jurisdiction under sections 1334(a) and 1334(b) of the Judicial Code and authority under section 105 of the Bankruptcy Code to approve each of the Debtor Releases, the Third-Party Release, the CUSA-Party Release, the CUSA Release-Party Release, the Exculpation, and the Injunction.  As has been established based upon the evidence presented at the Confirmation Hearing, such provisions (a) were given in exchange for good, valuable, and adequate consideration after due notice and opportunity for hearing, (b) are appropriately tailored under the facts and circumstances of the Chapter 11 Cases, (c) were integral to the agreements among the various parties in interest and are essential to the formulation and implementation of the Plan, as provided in section 1123 of the Bankruptcy Code, (d) confer substantial benefits on the Estates, (e) are fair, equitable, and reasonable, (f) were negotiated in good faith and at arm's length, and (g) are in the best interests of the Debtors, the Estates, Holders of Claims and Interests, and all other parties in interest.  Further, the failure to implement the Debtor Release, Third-Party Release, the CUSA-Party Release, the CUSA Release-Party Release, Exculpation, and Injunction would impair the Debtors' ability to confirm and implement the Plan.

TT.     Good and valid justifications have been demonstrated in support of the Debtor Releases, and the Debtors have satisfied the business judgment standard with respect to the propriety of the Debtor Releases.  The Debtor Releases represents a valid exercise of the Debtors' business judgment.  Each of the Released Parties provided good and valuable consideration in exchange for the release.  The pursuit by the Debtors of any claims against the Released Parties is not in the best interests of the Estates.  The Debtor Releases are furthermore: (a) an essential means of implementing the Plan; (b) an integral and non-severable element of the Plan and the transactions incorporated therein (c) conferring a material benefit on, and in the best interests of, the Debtors, their Estates and their creditors; (d) important to the overall objectives of the Plan to

finally resolve all Claims among or against the parties in interest in the Chapter 11 Cases with respect to the Debtors; (e) fair, equitable, and reasonable and in exchange for good and valuable consideration; (f) a good-faith settlement and compromise of the Claims released by the Debtor Release; (g) given, and made, after due notice and opportunity for hearing; and (h) consistent with sections 105, 1123, 1129, 1141, and other applicable provisions of the Bankruptcy Code.

UU.     The scope of the Debtor Releases is appropriately tailored under the facts and circumstances of the Chapter 11 Cases.  In light of, among other things, the value provided by the Released Parties to the Debtors' Estates and the critical nature of the Debtor Releases to the Plan, the Debtor Releases are approved and authorized in their entirety.

VV.     The Third-Party Release, the CUSA-Party Release, and the CUSA Release-Party Release are an essential provision of the Plan.  Accordingly, for the reasons set forth herein and in the Confirmation Brief, the Third-Party Release, the CUSA-Party Release, and the CUSA Release-Party Release are (a) an essential means of implementing the Plan, (b) fair, equitable, and reasonable and in exchange for the good and valuable consideration provided by the Released Parties, (c) a good-faith settlement and compromise of the claims and Causes of Action released thereby, (d) materially beneficial to, and in the best interests of, the Debtors, their Estates, and their stakeholders, (e) fair, equitable, and reasonable, (f) given and made after due notice and opportunity for hearing, (g) consistent with sections 105, 524, 1123, 1129, and 1141 and other applicable provisions of the Bankruptcy Code, (h) an integral and non-severable element of the Plan and the transactions incorporated therein, (i) confer a material benefit on, and is in the best interests of, the Debtors, their Estates, and all Holders of Claims and Interests, (j) specific in language and scope, and (k) important to the overall objectives of the Plan to finally resolve all Claims among or against the parties in interest in the Chapter 11 Cases with respect to the Debtors.

WW.    Like the Debtor Releases, the Third-Party Release, the CUSA-Party Release, and the CUSA-Release Party Release facilitated participation in the Plan and the Chapter 11 Cases, and are integral elements of the Plan.   The scope of the Third-Party Release, the CUSA-Party Release, the CUSA-Release Party Release are appropriately tailored under the facts and circumstances of the Chapter 11 Cases.  The Third-Party Release is consensual because all parties to be bound by the Third-Party Release either (i) voted to accept the Plan or (ii) affirmatively agreed to be a Releasing Party.  All Holders of Claims were given due and adequate notice of the Third-Party Release and sufficient opportunity and instruction to vote to accept or reject the Plan; the Third-Party Release is therefore fair to the Releasing Parties, and is appropriate.  Additionally, the release provisions of the Plan were conspicuous, emphasized with boldface type in the Plan, the Disclosure Statement, the Ballots, and the Non-Voting Status Notice (as defined in the Disclosure Statement Motion).

XX.    The Exculpation is an essential provision of the Plan.   The Exculpation is appropriate and authorized under sections 105, 1123(b)(3), and 1123(b)(6) of the Bankruptcy Code and other applicable law, including, without limitation, *In re Pacific Lumber Co.*, 584 F.3d 229 (5th Cir. 2009) and *In re Midlantic Nat'l Bank v. N.J. Dep't of Envtl. Prot.*, 474 U.S. 494, 507 (1986), because it was proposed in good faith, was formulated following extensive good-faith, arm's-length negotiations with the Debtors and the Exculpated Parties, and was agreed upon in return for the Exculpated Parties providing benefits to the Debtors, and is appropriately narrow in scope and time.   The Exculpation appropriately affords protection to those parties who constructively participated in and contributed to the Debtors' chapter 11 process and it is appropriately tailored to protect the Exculpated Parties from inappropriate litigation.   The Exculpation granted under the Plan is reasonable in scope as it does not relieve any party of liability

for an act or omission to the extent such act or omission is determined by final order to constitute intentional fraud, willful misconduct, or gross negligence.

YY.    The Injunction is essential to the Plan and is necessary to implement the Plan and to preserve and enforce the Debtor Releases, the Third-Party Release, the CUSA-Party Release, the CUSA-Release Party Release, the Exculpation, and release provisions in Section 10 of the Plan.  The Injunction is appropriately tailored to achieve those purposes.

ZZ.    The release of all mortgages, deeds of trust, Liens, pledges, or other security interests against any property of the Estates described in Section 10.7(c) of the Plan (the "**Lien Release**") is necessary to implement the Plan.  The provisions of the Lien Release are appropriate, fair, equitable, and reasonable and are in the best interests of the Debtors, the Estates, Holders of Claims and Interests, and other Entities with an interest in the Debtors' property.

AAA.   The record of the Confirmation Hearing is sufficient to support the Debtor Release, Third-Party Release, the CUSA-Party Release, the CUSA Release-Party Release, Exculpation, and Injunction.  Accordingly, based upon the representations of the parties and the evidence proffered, adduced, or presented at the Confirmation Hearing, the Debtor Release, Third-Party Release, Exculpation, and Injunction are consistent with the Bankruptcy Code and applicable law.

BBB.   Implementation.   All documents necessary to implement the Plan, including, without limitation, the Credit Bid Purchase Agreement and the other documents contained in the Plan Supplements, and all other relevant and necessary documents have been negotiated in good faith and at arms' length and shall, upon completion of documentation and execution, be valid, binding, and enforceable agreements and not be in conflict with any federal or state law.  The Debtors are hereby authorized to complete documentation and execute such documents and take

all such further actions as necessary to implement such documents, including the payment of all fees, expenses and other payments in accordance with the terms thereof.

CCC. <u>Executory Contracts and Unexpired Leases</u>. The Debtors have exercised reasonable business judgment in determining whether to assume or reject executory contracts and unexpired leases pursuant to Section 8.1 of the Plan. Each assumption of an executory contract or unexpired lease pursuant to Section 8.1 of the Plan shall be legal, valid, and binding upon the Post-Effective Date Debtors and their successors and assigns and all non-Debtor parties and their successors and assigns to such executory contract or unexpired lease, all to the same extent as if such assumption had been effectuated pursuant to an order of the Bankruptcy Court under section 365 of the Bankruptcy Code entered before entry of this Order. Moreover, the Debtors have appropriately cured, or provided adequate assurance that the Debtors, the Credit Bid Purchaser, FWE I, FWE IV, and a FWE Additional Entity, or the Post-Effective Date Debtors, as applicable, will cure, defaults (if any) under or relating to each of the executory contracts and unexpired leases that are being assumed by the Debtors pursuant to the Plan.

DDD. <u>Good Faith</u>. The Debtors, the Creditors Committee, the Consenting Creditors, Apache, the DIP Agent, DIP Lenders, NewCo and all of its subsidiaries (including the Credit Bid Purchasers), the Exit Facility Agents, the Prepetition FLTL Agents, the Exit Facility Lenders, the Second Lien Backstop Parties, the ERO Backstop Parties and each of their affiliates, each Entity that is a party to an Additional Predecessor Agreement, and each such Entity's and its affiliates respective directors, managers, officers, equity holders (regardless of whether such interests are held directly or indirectly), subsidiaries, principals, members, employees, agents, managed accounts or funds, management companies, fund advisors, investment advisors, advisory board members, financial advisors, partners (including both general and limited partners), attorneys,

accountants, investment bankers, consultants, representatives and other professionals will be acting in good faith if they proceed to (i) consummate the Plan and the agreements (including the Credit Bid Purchase Agreement and the Plan of Merger), settlements, transactions, and transfers contemplated thereby (including the Credit Bid Transaction), and (ii) take the actions authorized and directed by this Order.

EEE. <u>Conditions Precedent to Effective Date</u>. The Plan shall not become effective unless all conditions set forth in section 9.1 of the Plan have been satisfied or waived pursuant to section 9.2 of the Plan.

FFF. <u>Satisfaction of Confirmation Requirements</u>. The Plan satisfies the requirements for confirmation set forth in section 1129 of the Bankruptcy Code.

GGG. <u>Objections</u>. All parties have had a full and fair opportunity to litigate all issues raised, or which might have been raised, in any objection to the Plan, and any such objections have been fully and fairly litigated.

HHH. <u>Retention of Jurisdiction</u>. Except as set forth in paragraph 150 of this Order, the Bankruptcy Court may, and upon the Effective Date shall, retain exclusive jurisdiction over all matters arising out of, and related to, the Chapter 11 Cases, including the matters set forth in Section 11 of the Plan and section 1142 of the Bankruptcy Code.

**ACCORDINGLY, IT IS HEREBY ORDERED, ADJUDGED, AND DECREED THAT:**

1. <u>Confirmation</u>. The Plan annexed hereto as **Exhibit A** and each of its provisions, as modified pursuant to section 1127 of the Bankruptcy Code, are hereby approved and **CONFIRMED** under section 1129 of the Bankruptcy Code. The terms of the Plan, all exhibits and schedules thereto, the Plan Supplements, and the Plan Documents, each, as may be modified, are incorporated by reference into and are an integral part of the Plan and this Order.

2.      Plan Supplements and Exhibits and Schedules to the Plan.  The documents contained in the Plan Supplements, the exhibits and schedules to the Plan, and any other Plan Documents, and any amendments, modifications, and supplements thereto, and all documents and agreements introduced into evidence by the Debtors at the Confirmation Hearing (including all exhibits and attachments thereto and documents referred to therein), and the execution, delivery, and performance thereof by the Debtors, are authorized and approved.

3.      Modifications to the Plan.  The modifications to the Plan since the commencement of solicitation, including without limitation the modifications set forth in the Plan, do not materially adversely affect or change the treatment of any Claims.  Accordingly, pursuant to Bankruptcy Rule 3019 and in accordance with the Solicitation Procedures Order, such modifications do not require additional disclosure under section 1125 of the Bankruptcy Code or re-solicitation of votes under section 1126 of the Bankruptcy Code, nor do they require that holders of Claims be afforded an opportunity to change previously cast acceptances or rejections of the Plan.  To the extent any creditor or party in interest has not accepted the modifications to the Plan in writing, the treatment of Claims of any such creditors under the Plan, as modified, is not adverse and, pursuant to Local Rule 3019-1, holders of Claims who voted to accept the solicitation version of the Plan are deemed to accept the Plan as modified.

4.      Subject to (i) the consent rights set forth in the Restructuring Support Agreement, (ii) the reasonable consent of the Creditors' Committee solely to the extent that it adversely impacts the holders of General Unsecured Claims or Unsecured Trade Claims, and (iii) the reasonable consent of the Prepetition FLFO Administrative Agent, the Plan may be amended, modified, or supplemented by the Debtors in the manner provided for by section 1127 of the Bankruptcy Code

36

or as otherwise permitted by law, without additional disclosure pursuant to section 1125 of the Bankruptcy Code, except as otherwise ordered by the Bankruptcy Court.

5.      After the Confirmation Date, so long as such action does not materially and adversely affect the treatment of holders of Allowed Claims pursuant to the Plan, the Debtors, with (i) the consent of the Required DIP Lenders, and the Requisite FLTL Lenders, (ii) the reasonable consent of Apache to the extent it directly affects the structure of FWE I outlined in the Apache Term Sheet or the economic treatment of Apache, (iii) the reasonable consent of the Creditors' Committee solely to the extent that it adversely impacts the holders of General Unsecured Claims or Unsecured Trade Claims, and (iv) the reasonable consent of the Prepetition FLFO Administrative Agent, may remedy any defect or omission or reconcile any inconsistencies in the Plan or this Order with respect to such matters as may be necessary to carry out the purposes of effects of the Plan, and any holder of a Claim or Interest that has accepted the Plan shall be deemed to have accepted the Plan as amended, modified, or supplemented.

6.      The Debtors, subject to (i) the consent of the Required DIP Lenders and the Requisite FLTL Lenders and (ii) the applicable consent rights of the Prepetition FLFO Administrative Agent, shall have the right to amend and supplement the documents contained in, and exhibits and schedules to, the Plan Supplements in accordance with the terms of the Plan and the Restructuring Support Agreement or the First Lien Exit Facility Commitment Letter, as applicable, through the Effective Date.

7.      Before the Effective Date, the Debtors, subject to the consent rights set forth in the Restructuring Support Agreement, may make appropriate technical adjustments and modifications to the Plan without further order or approval of the Bankruptcy Court.

8.    <u>Objections</u>.   All objections to confirmation of the Plan that have not been withdrawn, waived, or settled, and all reservations of rights pertaining to confirmation of the Plan included therein, are overruled on the merits for the reasons stated on the record of the Confirmation Hearing.

9.    <u>Omission of Reference to Particular Plan Provisions</u>.   The failure to specifically describe or include any particular provision of the Plan in this Order shall not diminish or impair the effectiveness of such provision, it being the intent of this Bankruptcy Court that the Plan be approved and confirmed in its entirety.

10.    <u>Solicitation and Notice</u>.  The Confirmation Hearing Notice complied with the terms of the Disclosure Statement Order, was appropriate and satisfactory based on the circumstances of the Chapter 11 Cases, and was in compliance with the provisions of the Bankruptcy Code, the Bankruptcy Rules, and the Local Bankruptcy Rules.  The solicitation of votes on the Plan and the Solicitation Packages complied with the solicitation procedures in the Disclosure Statement Order, were appropriate and satisfactory based upon the circumstances of the Chapter 11 Cases, and were in compliance with the provisions of the Bankruptcy Code, the Bankruptcy Rules, and the Local Bankruptcy Rules.  The Debtors solicited acceptances of the Plan in good faith and in compliance with the applicable provisions of the Bankruptcy Code, including, without limitation, sections 1125(a) and (e) of the Bankruptcy Code, and any applicable non-bankruptcy law, rule or regulation governing the adequacy of disclosure in connection with such solicitation.  The Debtors and each of their respective directors, officers, employees, affiliates, agents, financial advisors, investment bankers, professionals, accountants, and attorneys participated in good faith and in compliance with the applicable provisions of the Bankruptcy Code in the solicitation of votes under the Plan, and therefore are not, and on account of such solicitation will not be, liable at any time for any

violation of any applicable law, rule or regulation governing the solicitation of acceptances or rejections of the Plan.

11.  <u>Vesting of Assets in Post-Effective Date Debtors</u>.  Except as otherwise provided in the Plan, including the Plan of Merger, this Order, or any Plan Supplements or Plan Documents, on and after the Effective Date, pursuant to sections 1141(b) and (c) of the Bankruptcy Code, other than the Credit Bid Acquired Interests, all Assets of the Estates, including all claims, rights, and Causes of Action and any property acquired by the Debtors or the Post-Effective Date Debtors during the Chapter 11 Cases or under or in connection with the Plan shall vest in the Debtors or the Post-Effective Date Debtors, as applicable, free and clear of all Claims, Liens, charges, other encumbrances, and interests.  Subject to the terms of the Plan, including the Plan of Merger, on and after the Effective Date, the Post-Effective Date Debtors (and the Plan Administrator, on behalf of the on behalf of the Post-Effective Date Debtors other than the Post-Effective Date FWE I Subsidiaries) may operate their businesses and may use, acquire, and dispose of property and prosecute, compromise, or settle any Claims (including any Administrative Expense Claims) and Causes of Action without notice to, supervision of or approval by the Bankruptcy Court and free and clear of any restrictions of the Bankruptcy Code or the Bankruptcy Rules other than restrictions expressly imposed by the Plan or this Order. Without limiting the foregoing, the Post-Effective Date Debtors may pay the charges that they incur on or after the Confirmation Date for Professional Persons' fees, disbursements, expenses, or related support services without application to the Bankruptcy Court, and the Plan Administrator may, consistent with the terms of the Plan, Plan Administrative Agreement, and this Order, pay after the Effective Date the reasonable and necessary expenses in connection with the performance of its duties under the Plan,

including the reasonable fees and expenses of professionals retained by the Plan Administrator, whether incurred before or after the Effective Date.

12.     Abandonment of Certain Assets.  Pursuant to this Order, the Plan, Plan Supplement, or any other implementing or supplementing Plan Documents, the Abandoned Properties and any related facilities, platforms, or other assets (the "**Abandoned Assets**"), each as determined by the Debtors, shall be abandoned pursuant to the Plan Documents without further notice to or order of the Bankruptcy Court immediately upon the occurrence of the Effective Date pursuant to sections 105(a) and 554 of the Bankruptcy Code and/or deemed rejected pursuant to Section 365 of the Bankruptcy Code, as applicable.  The Abandoned Assets, including the Abandoned Properties, shall not be allocated to nor vest in the Post-Effective Date Debtors, FWE I, FWE IV, any FWE Additional Entity or any NewCo Entity (including, without limitation, the Credit Bid Purchasers). Except as otherwise provided in the Plan Documents, none of the Debtors, their Estates, the Post-Effective Date Debtors, FWE I, FWE IV, any FWE Additional Entity nor the NewCo Entities (including, without limitation, the Credit Bid Purchasers) shall be liable for any obligations whatsoever arising from or relating to the post-Effective Date period with regards to the Abandoned Assets, including the Abandoned Properties, except that FWE III may be deemed to be the operator of Abandoned Properties that Fieldwood Energy LLC was the designated operator of immediately prior to the Effective Date.

13.     Notwithstanding anything to the contrary herein, in no event shall any NewCo Entity (including, without limitation, the Credit Bid Purchasers) be required to be, or deemed to be, the agent or designated operator of the Abandoned Properties or the assets of FWE III.

14.      Entry of this Order shall constitute: (i) approval, pursuant to sections 105(a) and 554 of the Bankruptcy Code, of the abandonment of the Abandoned Assets, including the

Abandoned Properties; and (ii) authorization to relinquish the Abandoned Assets, including the Abandoned Properties. Such abandonment and/or relinquishment does not alter the obligation of the Debtors, the Post-Effective Date Debtors, or the Plan Administrator, as applicable, to comply with laws reasonably designed to protect the public health and safety from identifiable hazards, including, but not limited to, plugging and abandonment obligations (the "**Decommissioning Obligations**") or in any manner extinguish, modify, or otherwise limit: (a) the obligations of non-Debtor third parties for Decommissioning Obligations, or (b) the rights of the United States to enforce such Decommissioning Obligations.

15. <u>Approval of Credit Bid Transaction</u>. Pursuant to Bankruptcy Code sections 105, 363, 365, 1123, 1129 and 1141, the Credit Bid Transaction, the Credit Bid Purchase Agreement, the ancillary documents related thereto, all of the terms and conditions thereof, and all of transactions contemplated thereby are hereby authorized and approved. The failure to specifically reference any particular provision of the Credit Bid Purchase Agreement or any ancillary document in this Order shall not diminish or impair the efficacy of such provision, it being the intent of this Bankruptcy Court that the Credit Bid Purchase Agreement and each and every provision, term, and condition thereof be authorized and approved in its entirety.

16. The Debtors' determination that the Credit Bid Purchase Agreement constitutes the highest and best offer constitutes a valid and sound exercise of the Debtors' business judgment. Approval of the Credit Bid Purchase and the consummation of the Sale Transaction is in the best interests of the Debtors' Estates, their creditors, and other parties in interest.

17. The Debtors and the Credit Bid Purchasers are authorized to (a) consummate the Credit Bid Transaction pursuant to and in accordance with the terms of the Credit Bid Purchase Agreement, the Plan and this Order, (b) execute, and deliver, perform under, consummate, and

implement the Credit Bid Purchase Agreement, together with all additional instruments and documents that may be reasonably necessary or desirable to implement the Credit Bid Transaction and (c) to take all further actions as may be reasonably required for the purposes of issuing, assigning, transferring, granting, conveying or conferring to the Credit Bid Purchaser the Credit Bid Acquired Interests and assumption of the Credit Bid Assumed Liabilities or as may be necessary or appropriate to perform the parties' obligations under the Credit Bid Purchase Agreement and the Plan.

18.     On the Effective Date, pursuant to sections 105, 363, 365, 1123, 1129 and 1141 of the Bankruptcy Code, in accordance with the Credit Bid Purchase Agreement, subject to the satisfaction or waiver of all applicable closing conditions under the Credit Bid Purchase Agreement, (i) all Credit Bid Acquired Interests shall be transferred to, and the Credit Bid Acquired Interests owned by the Debtors shall vest in the Credit Bid Purchasers, free and clear of all Liens (other than (x) any and all Liens securing the FLFO Claims or the obligations under the First Lien Exit Facility that attach to the Credit Bid Acquired Interests and are retained and deemed assigned to the First Lien Exit Facility Agent upon the Effective Date to secure the obligations under the First Lien Exit Facility, (y) all Liens securing the FLTL Claims that attach to the Credit Bid Acquired Interests and are deemed assigned to the Second Lien Exit Facility Agent upon the Effective Date to secure the obligations under the Second Lien Exit Facility (*provided*, that, in the case of clauses (x) and (y), which Liens securing the Exit Facilities shall be valid, binding, perfected and enforceable Liens and security interests without the need for any recordation, filing or other action, subject to the terms of the Exit Facilities, and shall be deemed to have been perfected on the date on which such Liens were first perfected, including for purposes of determining the priority of such Liens against any other Liens and securing interests, including

any mechanics' or other statutory Liens, *lis pendens*, or similar interests), and (z) Credit Bid Permitted Encumbrances, except in the case of Fieldwood U.A. Interests and the JV Interests (as defined in the Credit Bid Purchase Agreement), which shall vest free and clear of all Liens other than Liens described in clause (z) to the extent contemplated by the Credit Bid Purchase Agreement and clauses (x) and (y) above to the extent contemplated by the Exit Facility Documents), claims, charges, Interests, rights, liabilities, mortgages, deeds of trust, pledges, security interests of whatever kind or nature, rights of first refusal, rights of offset or recoupment, royalties, conditional sales or title retention agreements, hypothecations, preferences, debts, easements, suits, licenses, options, rights of recovery, judgments, orders and decrees of any court or foreign domestic governmental entity, taxes (including foreign, state and local taxes), covenants, restrictions, indentures, instruments, leases, options, off-sets, recoupments, claims for reimbursement or subrogation, contribution, indemnity or exoneration, encumbrances and other interests of any kind or nature whatsoever, including the Credit Bid Consent Rights and the Credit Bid Preferential Purchase Rights, (ii) all Credit Bid Assumed Liabilities shall be assumed by the Credit Bid Purchaser, and the sale of the Credit Bid Acquired Interests to the Credit Bid Purchasers pursuant to the Credit Bid Purchase Agreement and this Order will be a legal, valid, enforceable, and effective issuance, sale, and/or transfer of such interests, (iii) all Liens securing the FLFO Claims that attach to the Credit Bid Acquired Interests shall be retained and deemed assigned to the First Lien Exit Facility Agent upon the Effective Date to secure the obligations under the First Lien Exit Facility (which assigned Liens securing the First Lien Exit Facility shall be, subject to the terms of the First Lien Exit Facility, valid, binding, perfected and enforceable Liens and security interests without the need for any recordation, filing or other action and shall be deemed to have been perfected on the date on which such Liens were first perfected, including for purposes

of determining the priority of such Liens against any other Liens and securing interests, including any mechanics' or other statutory Liens, *lis pendens*, or similar interests), and (iv) all Liens securing the FLTL Claims that attach to the Credit Bid Acquired Interests and shall be deemed assigned to the Second Lien Exit Facility Agent upon the Effective Date to secure the obligations under the Second Lien Exit Facility (which assigned Liens securing the Second Lien Exit Facility shall be, subject to the terms of the Second Lien Exit Facility, valid, binding, perfected and enforceable Liens and security interests without the need for any recordation, filing or other action and shall be deemed to have been perfected on the date on which such Liens were first perfected, including for purposes of determining the priority of such Liens against any other Liens and securing interests, including any mechanics' or other statutory Liens, *lis pendens*, or similar interests).

19.     The transfer of the Credit Bid Acquired Assets pursuant to the Credit Bid Purchase Agreement and consummation of the Credit Bid Transaction, the Plan, and this Order do not require any consents other than as expressly provided for in the Credit Bid Purchase Agreement. Each and every federal, state, province, county, and local governmental agency or department, whether foreign or domestic, is hereby directed to accept any and all documents and instruments necessary and appropriate to consummate the transactions contemplated by the Credit Bid Purchase Agreement, the Plan and this Order.

20.     Except as expressly provided for in the Credit Bid Purchase Agreement, the Credit Bid Purchasers shall not assume or have any liability or other obligation of the Debtors arising under or related to any of the Credit Bid Acquired Interests and shall not be liable for any Encumbrances (as defined in the Credit Bid Purchase Agreement) (except Credit Bid Permitted Encumbrances (except for the Fieldwood U.A. Interests and the JV Interests, which shall not have

any Credit Bid Permitted Encumbrances)) against any Debtor, any Estate, FWE I, FWE III, FWE IV or any of the Debtors' affiliates, predecessors, successors or assigns. Neither the Credit Bid Purchasers nor any other NewCo Entity shall have any successor or vicarious liability of any kind or character whether known or unknown as of the Credit Bid Transaction Closing, or whether fixed or contingent, whether now existing or hereafter arising, with respect to the Credit Bid Acquired Interests or any Liabilities (as defined in the Credit Bid Purchase Agreement) of the Debtors arising prior to or after the Credit Bid Transaction Closing other than the Credit Bid Assumed Liabilities and Credit Bid Permitted Encumbrances (except for the Fieldwood U.A. interests and the JV Interests, which shall not have any Credit Bid Permitted Encumbrances).

21.     As of the Effective Date, and subject to the provisions of the Plan and this Order, all persons and entities are hereby forever prohibited and permanently enjoined from taking any action that would adversely affect or interfere with the consummation of the Credit Bid Transaction. Without limiting the generality of the foregoing (a) except as expressly provided for in the Credit Bid Purchase Agreement and except for (i) any and all Liens securing the FLFO Claims or the obligations under the First Lien Exit Facility that attach to the Credit Bid Acquired Interests that are retained and deemed assigned to the First Lien Exit Facility Agent upon the Effective Date to secure the obligations under the First Lien Exit Facility and (ii) all Liens securing the FLTL Claims that attach to the Credit Bid Acquired Interests and are deemed assigned to the Second Lien Exit Facility Agent upon the Effective Date to secure the obligations under the Second Lien Exit Facility, all persons or entities are hereby forever prohibited and permanently enjoined from asserting against the Credit Bid Purchasers, their successor and assigns, or the Credit Bid Acquired Interests, any liabilities, liens, claims, encumbrances, or other interests, or successor or transferee liabilities, and (b) each non-Debtor party to an executory contract or unexpired lease

being assumed and assigned to the Credit Bid Purchaser pursuant to the Credit Bid Purchase Agreement, the Plan, and this Order is hereby forever prohibited and permanently enjoined from imposing or charging against the Credit Bid Purchasers any rent accelerations, assignment fees, increases, or any other fees in connection with the specific assumed and assigned executory contract or unexpired lease by reason of the Debtors' assumption and assignment of such executory contract and unexpired lease, and the validity of such assumption and assignment, which shall in all events be effective as of the Effective Date, shall not be affected by the pendency or resolution of any dispute between the Debtors and any non-Debtor party to any such assigned executory contract or unexpired lease.

22.     Pursuant to section 363(m) of the Bankruptcy Code, the reversal or modification on appeal of the authorization provided herein to effectuate the Credit Bid Transaction and consummate the transactions contemplated by the Credit Bid Purchase Agreement shall not affect the validity of such transactions (including the assumption, assignment, and/or transfer of any executory contract or unexpired lease), unless such authorization and consummation of such transactions are duly stayed pending such appeal.

23.     No bulk sales law or any similar law of any state or other jurisdiction shall apply in any way to the Credit Bid Transaction.

24.     This Order is binding on all filing agents, filing officers, title agents, title companies, recorders of mortgages, recorders of deeds, registrars of deeds, registrars of patents, trademarks, or other intellectual property, administrative agencies, governmental departments, secretaries of state, federal and local officials, and all other Persons and Entities who may be required by operation of law, the duties of their office, or contract, to accept, file, register, or otherwise record or release any documents or instruments, or who may be required to report or

insure any title or state of title in or to any lease ("**Recordation Officers**").  Except with respect to (x) any and all Liens securing the FLFO Claim or the obligations under the First Lien Exit Facility that attach to the Credit Bid Acquired Interests and are retained and deemed assigned to the First Lien Exit Facility Agent upon the Effective Date to secure the obligations under the First Lien Exit Facility, and (y) all Liens securing the FLTL Claims that attach to the Credit Bid Acquired Interests and are deemed assigned to the Second Lien Exit Facility Agent upon the Effective Date to secure the obligations under the Second Lien Exit Facility, each and every Recordation Officer is authorized, from and after the Effective Date, to strike all Claims, interests, Liens, or other encumbrances in or against the Debtors' assets from their records, official and otherwise, without further order of the Bankruptcy Court or act of any party.  Each and every Recordation Officer is authorized (a) to file, record, and/or register any and all documents and instruments presented to consummate or memorialize the Credit Bid Purchase Agreement, the Plan and the transactions contemplated thereby (including the deemed assignment of the Liens securing the FLFO Claims and the FLTL Claims that attach to the Credit Bid Acquired Assets to the applicable Exit Facility Agents upon the Effective Date to secure the obligations under the Exit Facilities) and (b) to accept and rely on this Order as the sole and sufficient evidence of the transfer of title of the Credit Bid Acquired Interests.

25.     To the extent applicable, the terms and provisions of the Credit Bid Purchase Agreement, the Plan, and this Order shall upon the Effective Date be binding in all respects upon (a) the Debtors and their affiliates, (b) all known and unknown creditors of, and holders of equity security interests in, any Debtor, including any holders of Claims, interests, Liens, and other encumbrances, (c) the Post-Effective Date Debtors, (d) the RSA Parties, (e) the Credit Bid Purchasers, and (f) all interested parties, and all successors and assigns of any of the foregoing.

26.     <u>Section 1141</u>.  This Order is and shall be effective as a determination that the Credit Bid Purchasers, FWE I, FWE IV and/or the Post-Effective Date Debtors shall be discharged, on the Effective Date, from all Claims, interests, Liens, other encumbrances, and liabilities of any kind or nature whatsoever, to the fullest extent permitted under section 1141 of the Bankruptcy Code, except for as specifically set forth in the Credit Bid Purchase Agreement and except for (i) any and all Liens securing the FLFO Claims or the obligations under the First Lien Exit Facility that attach to the Credit Bid Acquired Interests that are retained and deemed assigned to the First Lien Exit Facility Agent upon the Effective Date to secure the obligations under the First Lien Exit Facility and (ii) all Liens securing the FLTL Claims that attach to the Credit Bid Acquired Interests and are deemed assigned to the Second Lien Exit Facility Agent upon the Effective Date to secure the obligations under the Second Lien Exit Facility, the Apache Implementation Agreement or the Plan of Merger, as applicable.  As set forth in the Plan, the Liens securing the FLFO Claims that attach to the Credit Bid Acquired Interests shall be retained and deemed assigned to the First Lien Exit Facility Agent upon the Effective Date to secure the obligations under the First Lien Exit Facility.  The Liens securing the FLTL Claims that attach to the Credit Bid Acquired Interests shall be retained and deemed assigned to the Second Lien Exit Facility Agent upon the Effective Date to secure the obligations under the Second Lien Exit Facility.

27.     Pursuant to section 1141(c) and 363(f) of the Bankruptcy Code, on the Effective Date, all Persons are forever prohibited and enjoined from taking any action against the Credit Bid Purchasers or Post-Effective Date Debtors based on any Claims, interests, Liens, and other encumbrances to the extent such Claims, interests, Liens and other encumbrances are released or discharged pursuant to the terms of the Plan.

28. <u>Plan of Merger</u>. Notwithstanding anything in the Plan or this Order, FWE IV shall not be liable for any liability or obligation on account of any Claim or Interest that is compromised, settled, released or discharged pursuant to the Plan.

29. <u>Restructuring Transactions</u>. After the Confirmation Date, the Debtors, the Post-Effective Date Debtors, the Plan Administrator, or the NewCo Entities as applicable, and the appropriate officers, representatives, and members of the boards of managers or boards of directors thereof, as applicable, shall be authorized to and may issue, execute, deliver, file, or record such contracts, documents, securities, instruments, releases, and other agreements, including those contained in the Plan Documents, and take such other actions as may be necessary and appropriate to effectuate, implement, and further evidence the terms and conditions of the Plan, including the Restructuring Transactions and all other actions defined in Article V of the Plan or otherwise contemplated by the Plan, including the conversion, merger, or dissolution of any Debtors, as applicable, without the need for further approvals, authorization, or consents, except for those expressly required pursuant to the Plan. All actions contemplated by the Plan, including all actions in connection with the Plan of Merger and related documents, Exit Facilities, and Equity Rights Offerings, are hereby effective and authorized to be taken on, prior to, or after the Effective Date, as applicable, under this Order, without further application to, or order of this Bankruptcy Court, or further action by the respective officers, directors, managers, members, or equity holders of the Debtors, the Post-Effective Date Debtors, the Plan Administrator or the NewCo Entities.

30. <u>Plan Classification Controlling</u>. The classification of Claims and Interests for purposes of the Distributions to be made under the Plan shall be governed solely by the terms of the Plan. The classifications set forth on the Ballots tendered to or returned by the Debtors' creditors in connection with voting on the Plan (a) were set forth on the Ballots for purposes of

voting to accept or reject the Plan, (b) do not necessarily represent, and in no event shall be deemed to modify or otherwise affect, the actual classification of such Claims and Interests under the Plan for Distribution purposes, and (c) shall not be binding on the Debtors.

31. Approval of Plan Settlement and Other Settlements. The entry of this Order constitutes this Bankruptcy Court's approval of the terms of the Plan Settlement that are set forth in the Plan and of all other compromises and settlements set forth in the Plan, all of which are in the best interests of the Debtors, their Estates, and holders of Claims and Interests and are fair, equitable, and reasonable.

32. Directors and Officers. The officers and directors of the Debtors shall be relieved of any and all duties with respect to the Debtors as of the Effective Date of the Plan. Upon and following the Effective Date, the Plan Administrator shall serve as the sole officer, director, or manager of each Post-Effective Date Debtor, except the Post-Effective Date FWE I Subsidiaries. The Plan Administrator may also elect such additional manager(s) and officer(s) of each Post-Effective Date Debtor (except the Post-Effective Date FWE I Subsidiaries), as the Plan Administrator deems necessary to implement the Plan and the actions contemplated herein and therein.

33. Distributions under the Plan. The provisions of Article VI of the Plan, including, without limitation, the provisions governing Distributions, are fair and reasonable and are approved.

34. Disputed Claims. The provisions of Article VII of the Plan, including, without limitation, the provisions governing procedures for resolving Disputed Claims, are fair and reasonable and are approved.

35.     <u>Executory Contracts</u>.  In accordance with Section 8.1 of the Plan, on the Effective Date, except as otherwise provided in the Plan, each executory contract and unexpired lease to which any of the Debtors are parties shall be deemed automatically rejected pursuant to sections 365 and 1123 of the Bankruptcy Code, unless such executory contract or unexpired lease: (i) was previously assumed or rejected by the Debtors pursuant to an order of the Bankruptcy Court; (ii) previously expired or terminated pursuant to its own terms or by agreement of the parties thereto; (iii) is the subject of a motion to assume filed by the Debtors on or before the Confirmation Date; (iv) is identified in Sections 8.4 or 8.5 of the Plan; or (v) is identified for assumption on the Schedule of Assumed Contracts included in the Plan Supplements, which Schedule of Assumed Contracts will identify executory contracts or unexpired leases for assumption and assignment to the Credit Bid Purchaser in accordance with the Credit Bid Purchase Agreement.  In accordance with Section 8.3 of the Plan, any proofs of Claim filed with respect to the rejection of an executory contract or unexpired lease must be filed with this Bankruptcy Court and served upon counsel for the Debtors, Post-Effective Date Debtor, or the Plan Administrator, as applicable, by the later of (i) thirty (30) days after the filing and service of the notice of the occurrence of the Effective Date; and (ii) thirty (30) days after entry of an Order rejecting such contract or lease if the contract or lease is the subject of a pending Assumption Dispute.

36.     The Debtors have cured or demonstrated their ability to cure any default with respect to any act or omission that occurred prior to the Effective Date under any of the executory contracts or unexpired leases proposed to be assumed or assumed and assigned or assumed and allocated, as applicable (collectively, the "**Assumed Contracts**"), pursuant to the terms of the Plan, the Credit Bid Purchase Agreement, and any Plan of Merger, as applicable, within the meaning of section 365(b)(1)(A) of the Bankruptcy Code.  Unless otherwise agreed to by the

parties, other than with respect to an Assumed Contract that is the subject of an Assumption Dispute (as defined below), the Cure Amounts set forth in the Schedule of Assumed Contracts are the amounts necessary to "cure" all "defaults" within the meaning of section 365(b) of the Bankruptcy Code under the Assumed Contracts. Other than with respect to an Assumed Contract that is the subject of an Assumption Dispute, the promise by the Debtors, the Post-Effective Date Debtors, FWE IV, or the Credit Bid Purchaser, as applicable, to perform the obligations under their respective Assumed Contracts after the Effective Date shall constitute adequate assurance of their future performance of and under each of their respective Assumed Contracts within the meaning of sections 365(b)(1) and 365(f)(2), as applicable.

37.     To the extent an Assumption Dispute relates solely to the Cure Amount or the nature thereof (a "**Cure Dispute**"), subject to the terms of the Credit Bid Purchase Agreement, the Debtors may assume or assume and assign, or assume and allocate the applicable executory contract or unexpired lease before the resolution of the Cure Dispute; *provided*, that the Post-Effective Date Debtors or Credit Bid Purchaser, as applicable shall be responsible to pay the determined amount to be Allowed by the Bankruptcy Court or otherwise agreed to by such non-Debtor party. The Debtors or Post-Effective Date Debtors, as applicable, subject to the terms of the Credit Bid Purchase Agreement, may settle any Cure Dispute without any further notice to any party or any action, order, or approval of the Bankruptcy Court.

38.     Subject to Section 8.2 of the Plan, upon an agreement between the Debtors and the relevant counterparty to an executory contract or unexpired lease, Assumption Disputes, may be adjourned to a hearing after the Confirmation Hearing (collectively, the "**Adjourned Assumption Disputes**"). The Debtors have agreed to Adjourned Assumption Disputes with the following parties: Nautilus Pipeline Company, L.L.C. ("**Nautilus**") (ECF No. 1428); Manta Ray Offshore

Gathering Company, L.L.C. ("**Manta Ray**") (ECF No. 1429); Multiklient Invest AS ("**MKI**") (ECF No. 1438); Enterprise Gas Processing LLC (together with each of its affiliates, collectively, "**Enterprise**") (ECF No. 1445); Helis Oil & Gas Company, L.L.C. ("**Helis**") (ECF Nos. 1475, 1508); Aker Solutions Inc. ("**Aker**") (ECF No. 1485); Sea Robin Pipeline Company, LLC, West Cameron Dehydration Company, L.L.C., Florida Gas Transmission, LLC, Stingray Pipeline Company, L.L.C., Trunkline Gas Company, LLC, and Trunkline Field Services LLC ("**Energy Transfer**") (ECF No. 1489, 1630); Fugro USA Marine, Inc. subsidiaries and related entities ("**Fugro**") (ECF No. 1490); Genesis Energy, L.P. and its affiliates, High Island Offshore System, L.L.C., Poseidon Oil Pipeline Company, L.L.C., GEL Offshore Pipeline, LLC and Manta Ray Gathering Company, L.L.C. (collectively, "**Genesis**") (ECF No. 1503); Cox Oil, LLC, Cox Operating LLC, Energy XXI GOM, LLC, Energy XXI Gulf Coast, Inc., Energy XXI Onshore, LLC, Energy XXI Pipeline, LLC, Energy XXI Pipeline I, LLC, Energy XXI Pipeline II, LLC, M21K, LLC and EPL Oil & Gas, Inc., on behalf of themselves and their applicable affiliates (collectively, the "**Cox Entities**") (ECF No. 1504); Marubeni Oil & Gas (USA) LLC ("**MOGUS**") (ECF 1509, 1515); Targa Midstream Services, LLC, Targa Liquids Marketing and Trade, LLC and Venice Energy Services Company, L.L.C. (collectively, the "**Targa Entities**") (ECF No. 1510); SBM Gulf Production, LLC ("**SBM**") (ECF No. 1512); Performance Energy Services, LLC ("**PES**") (ECF No. 1514); Walter Oil & Gas Corporation ("**Walter**") (ECF No. 1513); Ankor Energy LLC and Ankor E&P Holdings LLC (collectively, "**Ankor**") (ECF No. 1516); BP Exploration & Production Inc. ("**BP**") (ECF No. 1519); the State of Louisiana, Department of Natural Resources and the State Mineral and Energy Board ("**State**") (ECF No. 1522); Plains Gas Solutions, LLC (referred to herein as "**PGS**") (ECF No. 1523); Irongate Rental Services, LLC ("**Irongate**") (ECF No. 1524); EXPRO AMERICAS, L.L.C. ("**Expro**") (ECF No. 1525); Talos

Energy Offshore LLC, Talos Energy LLC, Talos Energy Inc., and Talos Production Inc. (collectively, "**Talos**") (ECF No. 1527); W&T Offshore, Inc., W&T Energy VI, LLC (collectively, "**W&T**") (ECF No. 1538); McMoRan Oil & Gas, LLC, Freeport-McMoRan Oil & Gas LLC (collectively, "**McMoRan**") (ECF No. 1542); Macquarie Corporate and Asset Funding, Inc. ("**Macquarie**"); and CGG Services (U.S.) Inc.

39.     The determination of assumption, assumption and assignment, assumption and allocation, and/or rejection of the executory contracts and unexpired leases relating to the Adjourned Assumption Disputes is hereby specifically reserved pending resolution of the relevant Adjourned Assumption Dispute, and any and all rights and claims of the parties with respect to such executory contracts and unexpired leases, including any and all rights afforded under the Bankruptcy Code and other applicable law, are hereby expressly reserved.

40.     If there is an Assumption Dispute, the Debtors, the Post-Effective Date Debtors, FWE I, FWE IV, or Credit Bid Purchaser, as applicable, reserve and shall have the right to reject or nullify the assumption, assumption and assignment, or assumption and allocation of the applicable executory contract or unexpired lease no later than thirty (30) days after an order of the Bankruptcy Court resolving such Assumption Dispute becomes a Final Order.

41.     Subject to the occurrence of the Effective Date, entry of this Order by the Bankruptcy Court shall constitute approval of the assumptions and assumptions and assignments provided for in the Plan pursuant to sections 365(a) and 1123 of the Bankruptcy Code and a determination by this Bankruptcy Court that the Credit Bid Purchaser, FWE I, FWE IV and/or Post-Effective Date Debtors, as applicable, have provided adequate assurance of future performance under such assumed executory contracts and unexpired leases.  In accordance with the Plan, each executory contract and unexpired lease assumed and allocated, or assumed and

assigned pursuant to the Plan shall vest in and be fully enforceable by the Credit Bid Purchasers, FWE I, FWE IV, or the Post-Effective Date Debtors, as applicable, in accordance with its terms, except as modified by the provisions of the Plan, any order of this Bankruptcy Court authorizing and providing for its assumption, or applicable law.

42.    <u>Exit Facilities</u>.  On the Effective Date, the applicable NewCo Entities are authorized execute and deliver the Exit Facility Documents and such documents shall become effective in accordance with their terms.  On and after the Effective Date, the Exit Facility Documents shall constitute legal, valid, and binding obligations of the applicable NewCo Entities and be enforceable in accordance with their respective terms and such obligations shall not be enjoined or subject to discharge, impairment, release, avoidance, recharacterization, or subordination under applicable law, the Plan or this Order, and the Credit Bid Purchaser shall be authorized to incur the loans under the Exit Facilities and use the proceeds of such loans, in each case, in accordance with the terms of this Plan and the Exit Facility Documents without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order, or rule, or the vote, consent, authorization, or approval of any Person.  The terms and conditions of the Exit Facility Documents shall bind the Credit Bid Purchaser and each other Entity that enters into the Exit Facility Documents.  The Liens securing the FLFO Claims that attach to the Credit Bid Acquired Interests shall be retained and deemed assigned to the First Lien Exit Facility Agent upon the Effective Date to secure the obligations under the First Lien Exit Facility.  The Liens securing the FLTL Claims that attach to the Credit Bid Acquired Interests shall be retained and deemed assigned to the Second Lien Exit Facility Agent upon the Effective Date to secure the obligations under the Second Lien Exit Facility.

43. This Order approves the Exit Facility Documents (including the transactions and related agreements contemplated thereby, and all actions to be taken, undertakings to be made, and obligations to be incurred and fees and expenses to be paid by the Debtors or Post-Effective Date Debtors, as applicable, in connection therewith), the First Lien Exit Facility Commitment Letter (including the transactions contemplated thereby, and all actions to be taken, undertakings to be made, and obligations and guarantees to be incurred and fees paid in connection therewith (including any payments under the First Lien Exit Facility Commitment Letter)), and the Second Lien Backstop Commitment Letter (including the transactions contemplated thereby, and all actions to be taken, undertakings to be made, and obligations and guarantees to be incurred and fees paid in connection therewith (including the Second Lien Backstop Commitment Premium and any other payments under the Backstop Agreement)), and, to the extent not approved by the Bankruptcy Court previously, the Credit Bid Purchaser and any other applicable NewCo Entity is authorized to, without further notice to the Bankruptcy Court, (i) execute and deliver those documents necessary or appropriate to obtain the Exit Facilities, including the Exit Facility Documents, each as applicable, and incur and pay any fees and expenses in connection therewith, and (ii) make any act or take any action under applicable law, regulation, order or rule or vote, consent, authorization, or approval of any Person, subject to such modifications as the Credit Bid Purchaser or any other applicable NewCo Entity may deem to be necessary to enter into the Exit Facility Documents.

44. On the Effective Date, all of the claims, liens, and security interests to be granted in accordance with the terms of the Exit Facility Documents (i) shall be legal, binding, and enforceable liens on, and security interests in, the collateral granted thereunder in accordance with the terms of the Exit Facility Documents, (ii) shall be deemed automatically attached and perfected

on the Effective Date, subject only to such liens and security interests as may be permitted under the Exit Facility Documents with the priorities established in respect thereof under applicable non-bankruptcy law and the New Intercreditor Agreement, and (iii) shall not be subject to avoidance, recharacterization, or subordination (including equitable subordination) for any purposes whatsoever and shall not constitute preferential transfers, fraudulent conveyances, or other voidable transfers under the Bankruptcy Code, this Plan, this Order or applicable non-bankruptcy law. To the extent provided in the Exit Facility Documents, the Exit Facility Agents are authorized, but not required, to file with the appropriate authorities mortgages, financing statements and other documents, and to take any other action in order to evidence, validate, and perfect such liens or security interests.

45. On the Effective Date, the applicable NewCo Entities, the First Lien Exit Facility Agent and the Second Lien Exit Facility Agent shall enter into the New Intercreditor Agreement substantially in the form contained in the Plan Supplement.

46. <u>Issuance of New Equity Interests, Subscription Rights and Warrants</u>. On or after the Effective Date, NewCo is authorized to issue or cause to be issued the New Equity Interests, the Subscription Rights, and any New Equity Interests issuable upon exercise of the Subscription Rights in accordance with the terms of the Plan, the FLTL Equity Rights Offering Procedures, FLTL ERO Backstop Agreement, the SLTL Equity Rights Offering Procedures, SLTL ERO Backstop Agreement, the Second Lien Backstop Commitment Letter and other applicable documents without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order, or rule, or the vote, consent, authorization, or approval of any Person. The New Equity Interests shall be issued and distributed free and clear of all Liens, Claims, and other Interests, and shall be duly authorized and validly issued.

47.     On the Effective Date, NewCo is authorized to issue or cause to be issued the New Money Warrants, the GUC Warrants, the SLTL Warrants (collectively, the "**Warrants**"), and any New Equity Interests issuable upon exercise of the Warrants for distribution in accordance with the terms of the Plan, the New Money Warrant Agreement, the GUC Warrant Agreement and the SLTL Warrant Agreement and the Second Lien Backstop Commitment Letter, as applicable, without the need for any further court order or corporate or shareholder action by any Person.  The Warrants shall be issued and distributed free and clear of all Liens, Claims and other Interests, and the Warrants, and all New Equity Interests issued upon exercise of the Warrants, shall be duly authorized and validly issued.

48.     On the Effective Date, the NewCo Entities and all holders of the New Equity Interests or Warrants then outstanding shall be deemed to be parties to the NewCo Organizational Documents (as applicable) without the need for execution by any such holder.  As applicable, the NewCo Organizational Documents shall be binding on the NewCo Entities Debtors and all parties receiving New Equity Interests or Warrants in connection with the Plan.  Each holder of New Equity Interests or Warrants acquired or received under the Plan, whether such holder acquired such New Equity Interests or Warrants on the Effective Date or any time or from time to time thereafter, shall be deemed to have actual knowledge of the terms, provisions, restrictions and conditions set forth in the NewCo Organizational Documents and the New Money Warrant Agreement, the GUC Warrant Agreement and the SLTL Warrant Agreement  for all purposes of thereunder and applicable law, whether or not any such holder received a separate notice of such terms, provisions, restrictions and conditions.  Without limiting the foregoing, this Order and the Plan (including the Plan Supplements) shall be deemed sufficient and adequate notice of such terms, provisions, restrictions and conditions to all holders of New Equity Interests and Warrants,

such that all such holders shall be deemed to have actual knowledge thereof and shall be deemed to have acquired (whether on the Effective Date or at any time or from time to time thereafter) such New Equity Interests or Warrants subject thereto, as applicable.

49.     The offer, issuance, and distribution of the New Equity Interests (other than the Backstop Commitment Premium Equity Interests, the New Money Warrants, or any New Equity Interests issued upon exercise of the New Money Warrants or under the Management Incentive Plan), the Subscription Rights, the SLTL Warrants, the GUC Warrants, the GUC True-Up Warrants and the New Equity Interests issuable upon exercise of the Subscription Rights, the SLTL Warrants, the GUC Warrants and the GUC True-Up Warrants, as contemplated by Sections 5.3, 5.4, and 5.6 of the Plan shall be exempt, pursuant to section 1145 of the Bankruptcy Code, without further act or actions by any Person, from registration under the Securities Act, and all rules and regulations promulgated thereunder, and any other applicable securities laws, to the fullest extent permitted by section 1145 of the Bankruptcy Code.

50.     Such New Equity Interests (other than the Backstop Commitment Premium Equity Interests, the New Money Warrants, or any New Equity Interests issued upon exercise of the New Money Warrants or under the Management Incentive Plan), the Subscription Rights, the SLTL Warrants, the GUC Warrants and the GUC True-Up Warrants and the New Equity Interests issuable upon exercise of the Subscription Rights, the SLTL Warrants, the GUC Warrants and the GUC True-Up Warrants may be resold without registration under the Securities Act or other federal securities laws pursuant to the exemption provided by section 4(a)(1) of the Securities Act, subject to (i) the holder not being an "underwriter" with respect to such securities, as that term is defined in 1145(b) of the Bankruptcy Code; (ii) the holder (A) not being "affiliate" of NewCo as defined in Rule 144(a)(1) under the Securities Act, (B) not having been such an "affiliate" within

ninety (90) days of such transfer and/or (C) not having acquired such securities from an "affiliate" within one year of such transfer (other than, with respect to clause (ii), such resales as may be permitted by and subject to the conditions of Rule 144 of the Securities Act); (iii) compliance with any rules and regulations of the Securities and Exchange Commission applicable at the time of any future transfer of such securities or instruments; (iv) any restrictions on the transferability of the New Equity Interests contained in the NewCo Organizational Documents, the GUC Warrant Agreement, New Money Warrant Agreement, SLTL Tranche 1 Warrant Agreement, SLTL Tranche 2 Warrant Agreement or pursuant to applicable securities laws; and (v) any applicable regulatory approval.  In addition, such section 1145 exempt securities generally may be resold without registration under state securities laws pursuant to various exemptions provided by the respective laws of the several states.

51.     The issuance and sale of the Backstop Commitment Premium Equity Interests, and the New Money Warrants (including any New Equity Interests issued upon exercise of the New Money Warrants) under this Plan shall be exempt from registration under the Securities Act or any other applicable securities laws to the fullest extent permitted by section 4(a)(2) of the Securities Act and/or Regulation D thereunder. The Backstop Commitment Premium Equity Interests, and the New Money Warrants (including any New Equity Interests issued upon exercise of the New Money Warrants) issued in reliance on the exemption from registration set forth in section 4(a)(2) of the Securities Act and/or Regulation D thereunder, will be considered "restricted securities" and may not be transferred except pursuant to an effective registration statement or under an available exemption from the registration requirements of the Securities Act, such as, under certain conditions, the resale provisions of Rule 144 of the Securities Act.

52.     None of the Debtors, NewCo and its subsidiaries (including the Credit Bid Purchasers), or any other Person shall be required to provide any further evidence other than the Plan or this Order with respect to the treatment of the New Equity Interests (including any New Equity Interests issued upon exercise of the Subscription Rights, the New Money Warrants, the SLTL Warrants or the GUC Warrants), the Subscription Rights, the New Money Warrants, the SLTL Warrants, or the GUC Warrants, under applicable securities laws. DTC and any transfer agent (as applicable) shall be required to accept and conclusively rely upon the Plan or this Order in lieu of a legal opinion regarding whether the New Equity Interests (including any New Equity Interests issued upon exercise of the Subscription Rights, the New Money Warrants, the SLTL Warrants or the GUC Warrants), the Subscription Rights, the New Money Warrants, the SLTL Warrants, or the GUC Warrants are exempt from registration and/or eligible for DTC book-entry delivery, settlement, and depository services (to the extent applicable).

53.     Notwithstanding anything to the contrary in this Order or the Plan, but except with respect to any opinion required by the Exit Facility Documents no Person (including DTC and any transfer agent) shall be entitled to require a legal opinion regarding the validity of any transaction contemplated by this Order or the Plan, including whether the New Equity Interests (including any New Equity Interests issued upon exercise of the Subscription Rights, the New Money Warrants, the SLTL Warrants or the GUC Warrants), the Subscription Rights, the New Money Warrants, the SLTL Warrants, or the GUC Warrants are exempt from registration and/or eligible for DTC book-entry delivery, settlement, and depository services.

54.     <u>Insurance Policies</u>.  All insurance policies to which any Debtor is a party as of the Effective Date, including any D&O Policy, shall be deemed to be and treated as executory contracts and shall be assumed by and vest in the applicable Debtors or the Post-Effective Date

Debtors and shall continue in full force and effect thereafter in accordance with their respective terms. Coverage for defense and indemnity under the D&O Policy shall remain available to all individuals within the definition of "Insured" in any D&O Policy. After the Effective Date, the Post-Effective Date Debtors or Plan Administrator shall not terminate or otherwise reduce the coverage under any D&O Policy (including any "tail policy") in effect as of the Petition Date, and any current and former directors, officers, members, managers, agents or employees of any of the Debtors who served in such capacity at any time before the Effective Date shall be entitled to the full benefits of any such D&O Policy for the full term of such policy regardless of whether such members, managers, directors, and/or officers remain in such positions after the Effective Date to the extent set forth in such policies.

        55. <u>Exemption from Certain Transfer Taxes</u>. To the fullest extent permitted by applicable law, all sale transactions and asset transfers consummated by the Debtors and approved by the Bankruptcy Court on and after the Confirmation Date through and including the Effective Date, including (a) the issuance, distribution, transfer or exchange of any securities, instruments or documents, including the receipt and distribution by the Debtors of the New Equity Interests, Warrants, Subscription Rights, and beneficial interests in the Single Share under the Plan, (b) the creation of any Lien, mortgage, deed of trust or other security interest, (c) all sale transactions and asset transfers consummated by the Debtors and approved by the Bankruptcy Court on and after the Confirmation Date through and including the Effective Date, including any transfers pursuant to the Credit Bid Transaction and the Divisive Merger or otherwise effectuated under the Plan, (d) any assumption, assignment, or sale by the Debtors of their interests in unexpired leases of nonresidential real property or executory contracts pursuant to section 365(a) of the Bankruptcy Code, (e) the grant of collateral under the Standby Loan Agreement and (f) the issuance, renewal,

modification or securing of indebtedness (including, for the avoidance of doubt, the modifications and/or securing of indebtedness contemplated by the Exit Facility Documents) by such means, and the making, delivery or recording of any deed, mortgage or other instrument of transfer under, in furtherance of, or in connection with, the Plan, including this Order, shall constitute a "transfer under a plan" within the purview of section 1146 of the Bankruptcy Code, and shall not be subject to any document recording tax, stamp tax, conveyance fee or other similar tax, mortgage tax, real estate transfer tax, mortgage recording tax, Uniform Commercial Code filing or recording fee, regulatory filing or recording fee, sales tax, use tax or other similar tax or governmental assessment. This Order is and shall be binding upon and shall govern the acts of all entities, including without limitation, all filing agents, filing officers, title agents, title companies, recorders of mortgages, recorders of deeds, registrars of deeds, administrative agencies, governmental departments, secretaries of state, federal, state, and local officials, and all other persons and entities who may be required, by operation of law, the duties of their office, or contract, to accept, file, register, or otherwise record or release any document or instrument without requiring the payment of any filing or recording fees, documentary stamp tax, document recording tax, deed stamps, stamp tax, conveyance fee or other similar tax, mortgage tax, real estate transfer tax, mortgage recording tax, sales tax, use tax, transfer tax, intangible tax or similar tax or governmental assessment.

56.     Term of Injunctions or Stays.  Unless otherwise provided in the Plan or in this Order, all injunctions or stays arising under or entered during the Chapter 11 Cases under section 105 or 362 of the Bankruptcy Code, or otherwise, and in existence on the Confirmation Date, shall remain in full force and effect until the later of the Effective Date and the date indicated in the order providing for such injunction or stay.

57.     <u>Releases, Exculpation, Injunction</u>.  Pursuant to Bankruptcy Rule 3020(c)(1), the following provisions in the Plan are hereby approved and will be immediately effective on the Effective Date without further order or action by the Bankruptcy Court, any of the parties to such releases, or any other Entity: (a) Release of Liens (Section 10.7(c)), (b) Debtor Release (Section 10.7(a)), (c) Third-Party Release (Section 10.7(b)), (d) CUSA Party Release (Section 10.7(d)), (e) CUSA-Release Party Release (Section 10.7(e)), (f) Exculpation (Section 10.8), and (g) Injunction (Section 10.9).

58.     <u>Restructuring Expenses</u>.  The Restructuring Expenses incurred, or estimated to be incurred, up to and including the Effective Date shall be paid in full in Cash by the Debtors on the Effective Date (to the extent not previously paid prior to or during the course of the Chapter 11 Cases) without the requirement to file a fee application with the Bankruptcy Court and without any requirement for review or approval by the Bankruptcy Court or any other party.  All Restructuring Expenses to be paid on the Effective Date shall be estimated prior to and as of the Effective Date and such estimates shall be delivered to the Debtors at least three Business Days before the anticipated Effective Date; *provided,* that such estimates shall not be considered an admission or limitation with respect to the fees and expenses of such parties.  In addition, the Debtors and the Post-Effective Date Debtors (as applicable) shall continue to pay post-Effective Date, when due and payable in the ordinary course, Restructuring Expenses related to implementation, consummation and defense of the Plan, whether incurred before, on, or after the Effective Date, to the extent expressly provided for under the Plan, and for which funds have been allocated to the Post-Effective Date Debtors under the Plan for such purposes.

59.     <u>Cortland</u>.  Nothing in the Plan or this Order shall, or shall be deemed, to waive or release the obligations of the Prepetition SLTL Lenders to the Prepetition SLTL Administrative

Agent pursuant to the documents executed in connection with the Prepetition SLTL Loans, including, without limitation, the Prepetition SLTL Credit Agreement.

60.     _Anadarko_.  The following agreements related to Anadarko U.S. Offshore LLC, Anadarko Petroleum Corporation, and Anadarko E&P Company (collectively, and along with affiliates and predecessors in interest, "**Anadarko**") shall be assumed and assigned or allocated to the entities identified in the Debtors' Schedule of Assumed Contracts, consistent with the Letter Agreement and subject to the amendments set forth and referenced therein: (i) Joint Operating Agreement covering all of Green Canyon Block 768, effective February 1, 2004, by and between Kerr-McGee Oil & Gas Corporation and Fieldwood Energy LLC, as successor in interest to Noble Energy Inc. (as amended, and including all exhibits and related agreements, the "**JOA**"); and (ii) Production Handling Agreement dated effective January 1, 2006 by and between Anadarko and Fieldwood governing the hydrocarbon and water production from the Ticonderoga Field, as therein defined (the "**PHA**").  Further, consistent with the Letter Agreement (defined below) and subject to the amendments set forth and referenced in the Letter Agreement (a) the Lease of Platform Space Agreement Main Pass 289C Field Platform, originally dated November 29, 2001, originally by and between Apache Corporation and Vastar Resources, Inc. et. al. as amended (the "**LOPS Agreement**") shall be assumed and allocated to FWE I; and (b) the Letter Agreement Re: Ticonderoga (GC 768) and MP 289C, dated June of 2021, by and between Anadarko and Fieldwood Energy LLC (the "**Letter Agreement**"), to the extent related to the Credit Bid Acquired Interests, shall be assumed and assigned to the Credit Bid Purchaser, and to the extent related to interests allocated to FWE I, shall be assumed and allocated to FWE I.

61.     The total stipulated allowed cure amount for the JOA, PHA, and LOPS Agreement shall be $2,231,025.42 (the "**Anadarko Cure Amount**").  The Cure Amount for the Letter

Agreement shall be $0. To the extent the Schedule of Assumed Contracts identifies agreements with Anadarko other than the agreements specifically identified herein, such agreements shall also be assumed in accordance with the Plan, *provided*, that the Debtors shall not be required to pay any cure amount with respect to such agreements other than the Anadarko Cure Amount; *provided, further*, that Anadarko expressly agrees that the Debtors have provided adequate assurance of future performance with respect to the JOA, the PHA, the LOPS Agreement, the Letter Agreement, and any other contract assumed by the Debtors pursuant to the Plan. The Debtors may amend the Schedule of Assumed Contracts consistent with the terms of these paragraphs 60 and 61.

62. Nothing within the Plan or Order constitutes a transfer of title and/or ownership or operatorship of any of the Abandoned Properties to Anadarko. Anadarko's rights, claims, defenses, and interests, if any, including, but not limited to, security interests, bonds, security rights, contract rights, setoff and recoupment rights, indemnification rights, and subrogation rights, against non-Debtor parties (other than with respect to any NewCo Entity or any Credit Bid Acquired Interests, in each case except with respect to any right, claim, or interest arising under an Anadarko agreement assumed and assigned or allocated to any NewCo Entity (which are hereby expressly reserved)), including, without limitation, predecessors and any other co-liable or jointly and severally liable parties, under operating agreements, other contracts, and applicable law are hereby reserved. For the avoidance of doubt, Anadarko shall not be a "Releasing Party" under the Plan. Nothing within the Plan or Order shall create or vest in any entity, including the Post-Effective Date Debtors, FWE I, FWE IV, or the NewCo Entities, any rights or claims against Anadarko that do not otherwise exist under applicable law or agreement, including, without limitation any rights or claims pursuant to any contracts or agreements being assumed and assigned or assumed and allocated to such entities.

63. Other than the claims preserved and allowed under this Stipulation, any Proofs of Claim filed by Anadarko shall be deemed withdrawn as of the Effective Date of the Debtors' Plan.

64. <u>Ecopetrol America LLC</u>. Upon the assumption and assignment of that certain Unit Operating Agreement Offshore Louisiana, by and between Fieldwood Energy LLC, Ecopetrol America LLC ("**Ecopetrol**") and Talos Energy Offshore LLC, dated effective January 1, 2013 (including all attachments, memoranda, and any related agreements identified on the Schedule of Assumed Contracts, the "**Gunflint UOA**") to the Credit Bid Purchaser, notwithstanding anything to the contrary contained in this Order, the Plan and the Plan Documents, on the Effective Date, the Debtors shall pay any valid amounts then due and owing, in full, as would be necessary to satisfy any and all obligations, if any, to Ecopetrol under the Gunflint UOA to effectuate such assumption and assignment and the Credit Bid Purchaser shall assume Fieldwood's obligations under the Gunflint UOA, including any indemnification and reimbursement obligations that may arise from the alleged liens and claims of, among others, Atlantic Maritime Services, LLC's alleged liens, claims and litigation against Fieldwood Energy LLC and, among others, Ecopetrol in this Bankruptcy Court and the United States District Court for the Eastern District of Louisiana. Nothing herein shall be deemed an admission by any party that any such liens and claims asserted against Fieldwood Energy LLC are valid or enforceable.

65. Notwithstanding anything to the contrary contained in this Order, the Plan, and the Plan Documents, all rights with respect to any security interests granted by Fieldwood to Ecopetrol under the Gunflint UOA shall be reserved.

66. <u>Ridgewood Katmai, LLC and ILX Prospect Katmai, LLC</u>. Upon the assumption and assignment of that certain GC 40 Unit Operating Agreement, dated effective April 1, 2018 (including all attachments, memoranda, and any related agreements identified on the Schedule of

Assumed Contracts, the "**GC 40 UOA**") to the Credit Bid Purchaser, notwithstanding anything to the contrary contained in this Order, the Plan and the Plan Documents, on the Effective Date, the Debtors shall pay any valid amounts then due and owing, in full, as would be necessary to satisfy any and all obligations, if any, to Ridgewood Katmai, LLC ("**Ridgewood**") and ILX Prospect Katmai, LLC ("**Katmai**") under the GC 40 UOA to effectuate such assumption and assignment and the Credit Bid Purchaser shall assume Fieldwood's obligations under the GC 40 UOA, including any indemnification and reimbursement obligations that may arise from the alleged liens and claims of, among others, Atlantic Maritime Services, LLC's alleged liens, claims and litigation against Fieldwood Energy LLC and, among others, Ridgewood and Katmai in this Bankruptcy Court and the United States District Court for the Eastern District of Louisiana. Nothing herein shall be deemed an admission by any party that any such liens and claims asserted against Fieldwood Energy LLC are valid or enforceable.

67. Notwithstanding anything to the contrary contained in this Order, the Plan, and the Plan Documents, all rights with respect to any security interests granted by Fieldwood to Ridgewood and Katmai under the GC 40 UOA shall be reserved.

68. <u>Houston Energy Deepwater Ventures I, LLC and Red Willow Offshore, LLC</u>. Upon assumption and assignment of the (a) Joint Operating Agreements to which Houston Energy Deepwater Ventures I, LLC ("**HEDV**") and Red Willow Offshore, LLC ("**RWO**") and one or more Debtors are parties (the "**MC 519 JOAs**")[4]; (b) the Galapagos Area Loop Subsea

---

[4] Including but not limited to: Offshore Operating Agreement dated effective January 1, 2009, originally by and between Noble Energy, Inc. (as predecessor in interest of Fieldwood), as Operator, and BP, Red Willow and HE&D Offshore, L.P., as Non-Operators, as amended by that certain First Amendment of the Unit Operating Agreement and Establishment of Lease Offshore Operating Agreements, dated effective as of October 10, 2014, by and among BP, Red Willow, HEDV, Noble Energy, Inc., Deep Gulf Energy III, LLC, Ridgewood South Santa Cruz, LLC and ILX Prospect South Santa Cruz, LLC and by that certain Second Amendment of the Offshore Operating Agreement, dated effective as of October 15, 2018, by and among BP, Red Willow, HEDV and Fieldwood, and by that certain Santiago / Santa Cruz Joint Operating Agreement made effective as of May 1, 2019 by and among Fieldwood, Red Willow and HEDV.

Production System Operating Agreement dated effective December 1, 2011 and last amended effective May 1, 2019 (the "**LSPS OA**"); and (c) the Na Kika Production Handling Agreement, dated effective as of September 21, 2010 (the "**PHA**" and, together with the MC 519 JOAs and the LSPS OA, the "**HEDV/RWO Agreements**") to the Credit Bid Purchaser, notwithstanding anything to the contrary contained in the Credit Bid Purchase Agreement, on the Effective Date, the Debtors shall pay any valid amounts then due and owing, in full, as would be necessary to satisfy any and all obligations, if any, to HEDV and RWO under the HEDV/RWO Agreements to effectuate such assumption and assignment, and the Credit Bid Purchaser shall assume Fieldwood's obligations under the HEDV/RWO Agreements, including any indemnification and reimbursement obligations that may arise from the alleged liens and claims of, among others, Atlantic Maritime Services, LLC's alleged liens, claims and potential litigation against Fieldwood Energy LLC and, among others, HEDV and RWO in this Bankruptcy Court and the United States District Court for the Eastern District of Louisiana. Nothing herein shall be deemed an admission by any party that any such liens and claims asserted against Fieldwood Energy LLC are valid or enforceable.

69. <u>Treatment With Respect to Seitel Data, Ltd</u>. All Executory Contracts, including, but not limited to, all Master Licensing Agreements and all supplements, amendments, schedules and attachments thereto (collectively, the "**Seitel Agreements**") between any of the Debtors, on the one hand, and Seitel Data, Ltd., Seitel Offshore Corp., and other affiliates (collectively, "**Seitel**"), on the other hand, shall be and hereby are rejected pursuant to Section 365 of the Bankruptcy Code as of the date of entry of this Order. To the extent necessary, the automatic stay under Section 362 of the Bankruptcy Code is hereby modified to permit the termination of the

Seitel Agreements.  The Post-Effective Date Debtors and/or the Plan Administrator shall comply with all confidentiality provisions, destruction of data and verification of destruction of data provisions required by the Seitel Agreements.

70.     <u>WesternGeco</u>.  Nothing in the Plan, Plan Supplements, any Schedule of Assumed Contracts, any Cure Notice or this Order shall be construed as authorizing, permitting, causing or resulting in: (i) the transfer of any seismic, geological or geophysical data, derivatives or interpretations thereof, or intellectual property (collectively the "**Materials**") owned by WesternGeco LLC, or its affiliates ("**WesternGeco**"); or (ii) the assumption, assumption and assignment, rejection, modification or release (including with respect to any change of ownership or control provisions) of any master license agreement, license agreement and/or supplemental or related agreements between WesternGeco and any Debtor (the "**WesternGeco Agreements**"), which such assumption or assumption and assignment, rejection, modification, or release, if any, is subject to either a stipulation between the Debtors and WesternGeco or subsequent court order after notice to WesternGeco, as applicable, and an opportunity to respond; *provided*, *however* that the Debtors and Credit Bid Purchaser are authorized to continue operating under the WesternGeco Agreements in the ordinary course of business until the earliest of (i) 12:00 p.m. on July 14, 2021, or such later date as may be agreed between the Credit Bid Purchaser and WesternGeco; *provided*, however, that the Debtors and WesternGeco shall use their best efforts to reach an agreement regarding the treatment of the WesternGeco Agreements by June 30, 2021, and (ii) the date such agreements are deemed assumed, assumed and assigned, rejected, modified or released, in which case, the order authorizing such assumption, assumption and assignment, rejection, modification, or release, when final, shall govern with respect to all matters provided for therein; provided further that all rights and defenses of the Debtors, Credit Bid Purchaser, and WesternGeco under non-

bankruptcy and bankruptcy law, and all objections of WesternGeco (and the Debtors' and Credit Bid Purchaser's rights and defenses with respect thereto) regarding assumption or assumption and assignment (including all rights and defenses under section 365 of the Bankruptcy Code and with respect to the validity and enforceability of change of ownership and control provisions), are reserved and preserved with respect to such WesternGeco Agreements. For the avoidance of doubt, notwithstanding section 8.1(a) of the Plan, the WesternGeco Agreements shall not be deemed rejected upon the occurrence of the Effective Date.

71.　　__TGS__.　On the Effective Date, the Debtors will assume and assign to the Credit Bid Purchaser that certain Master License Agreement No. HL0713-200 for Geophysical and Geological Data dated July 1, 2013 ("**MLA**") and all supplementary agreements, appendices, addenda, and other ancillary documents thereto (collectively the "**Assigned Agreements**"). The total stipulated Cure Amount to be paid for the Assigned Agreements (the "**TGS Cure Amount**") is set forth in that certain Letter Agreement dated June 14, 2021 between TGS-NOPEC Geophysical Company ASA, TGS-NOPEC Geophysical Company, and A2D Technologies, Inc. d/b/a TGS Geological Products and Services ("**TGS**") and the Debtors. The Debtors shall not be required to pay any Cure Amount with respect to the Assigned Agreements other than the TGS Cure Amount, and TGS expressly agrees that the Debtors have provided adequate assurance of future performance with respect to the Assigned Agreements.

72.　　__Valero__.　Notwithstanding anything contrary in this Order or the Plan, nothing in this Order or the Plan impairs or otherwise affects Valero's ability to assert a valid defensive setoff or recoupment right and affirmative defense, if any, as provided under applicable law, with respect to the claims asserted (to the extent such claims exist) in the adversary proceeding styled *In re: Fieldwood Energy LLC, et. al Fieldwood Energy LLC v. Valero Marketing and Supply Company*

(Adversary Case No. 20-03497); *provided*, *however*, that such valid defensive setoff and/or affirmative defense may not result in any net payment obligations to Valero; *provided*, *further*, that nothing herein limits or restricts Valero's right to assert a general unsecured claim.

73. <u>Energy Transfer</u>. Energy Transfer's valid setoff or recoupment rights, if any, with respect to the $1.125 million in cash deposits posted by Fieldwood Energy LLC prepetition and currently held by Energy Transfer (the "**Energy Transfer Cash Deposit**") are preserved pending resolution of Energy Transfer's Assumption Dispute with the Debtors, which shall be adjourned pursuant to ¶ 38 of this Order; *provided*, that, the Debtors, the Post-Effective Date Debtors, or the Credit Bid Purchaser, as applicable, reserve all rights and defenses with respect to the Energy Transfer Cash Deposit, including the right to challenge the validity of any rights to setoff or recoupment asserted by Energy Transfer in connection therewith.

74. <u>RLI</u>. RLI Insurance Company's rights, including but not limited to security interests, security rights, contract rights, valid setoff and recoupment rights, contribution rights, and subrogation rights, against non-Debtors (other than with respect to the Released Parties or any Credit Bid Acquired Interests) under surety bonds, operating agreements, other contracts, and applicable law are hereby reserved.

75. Nothing in the Plan or this Order shall modify or impair the rights and interests of RLI Insurance Company in the Panaco East Breaks Escrow Account Escrow and Security Agreement dated October 29, 1999 (the "**Panaco Escrow Agreement**") and the approximately $8.25 million presently held in an escrow account titled "RLI/BP/Fieldwood/Foothill Escrow Debtor In Possession" ("**Panaco Escrow Account**"). All funds deposited in the Panaco Escrow Account prepetition shall remain escrowed for the benefit of RLI Insurance Company to be used according to the terms of the Panaco Escrow Agreement.

76.     Maritime Plaintiffs.  Nothing in the Plan or this Order shall prejudice, release, or enjoin any postpetition claims asserted against the Debtors by: (1) Brian Cloyd ("**Cloyd**") arising from injuries sustained on or about October 28, 2020, including claims originally brought in Cause No. 2020-74133 in the 11th Judicial District of Harris County, Texas, styled as *Cloyd v. Fieldwood Energy Offshore, Inc. d/b/a Fieldwood Energy (Texas), Inc., et al.* and currently pending in Civil Action No. 4:20-CV-04032 in the United States District Court for the Southern District of Texas (the "**Cloyd Claims**"); and (2) Lewis Andrews ("**Andrews**") and Patrick Burnett ("**Burnett**" and, together with Cloyd and Andrews, the "**Maritime Injury Plaintiffs**") arising from injuries sustained on or about October 28, 2020, including claims originally brought in Cause No. 2020-73683 in the 164th Judicial District of Harris County, Texas, styled as *Andrews, et al. v. Fieldwood Energy Offshore, Inc. d/b/a Fieldwood Energy (Texas), Inc., et al.* and currently pending in Civil Action No. 4:20-CV-04009 in the United States District Court for the Southern District of Texas (the "**Andrews Claims**" and the "**Burnett Claims**" and, together with the Cloyd Claims, the "**Maritime Injury Claims**").  The Maritime Injury Claims are preserved as against the Debtors, to the extent such claims exist, including the right to proceed against insurance coverage, if any, available under insurance policies issued to the Debtors.  The Debtors and the Post-Effective Date Debtors reserve all rights and defenses with respect to the Maritime Injury Plaintiffs and the Maritime Injury Claims as available under applicable law.

77.     Texas Taxing Entities.  Notwithstanding anything to the contrary in the Plan or this Order, (i) Cypress-Fairbanks ISD, Galveston County, Harris County, Lavaca County, Live Oak CAD, Matagorda County, Rio Grande City CISD, and Starr County (collectively, the "**Taxing Authorities**") and Colorado County Tax Office, Sheldon Independent Dickinson Independent School District, Bay City Independent School District, and Burleson County Tax Office

(collectively, the "**Certain Texas Taxing Entities**" and together with the Taxing Authorities, the "**Texas Taxing Entities**") shall not be required to file any request for payment of Administrative Expense Claims that is not required to be filed by section 503(b)(1)(D) of the Bankruptcy Code and to the extent Allowed, such Administrative Expense Claims shall be treated in accordance with § 2.1 of the Plan; (ii) the Liens securing any Administrative Expense Claim held by the Texas Taxing Entities, if any, shall be retained (including against any sale proceeds) until the applicable Administrative Expense Claim is paid in full; (iii) to the extent the Texas Tax Code provides for interest or penalties with respect to any portion of an Allowed Claim of a Texas Taxing Entity (a "**Texas Taxing Entity Claim**"), nothing in the Plan or this Order prevents the inclusion of such interest or penalties in the Texas Taxing Entity Claim in accordance with section 1129(a)(9) of the Bankruptcy Code, and the Debtors' and Post-Effective Date Debtors', as applicable, defenses and rights to object to such Claim or to the inclusion of such interest or penalties in such Claim are fully preserved; (iv) to the extent a Texas Taxing Entity Claim constitutes an Allowed Secured Claim against the Debtors, such Claim shall be paid on the later of the Effective Date and the date that is ten (10) Business Days after the date on which such Claim becomes an Allowed Claim, or as soon as reasonably practicable thereafter, and the Liens securing the Texas Taxing Entity Claim, if any, shall be retained (including against any sale proceeds) until the applicable Texas Taxing Entity Claim is paid in full; and (v) with respect to any pre-petition tax return filed after the bar date for Governmental Units, for which a Texas Taxing Entity filed an estimated Claim prior to such bar date, the Texas Taxing Entities shall be permitted to amend the applicable proof of Claim after the Effective Date without permission of the Bankruptcy Court or the Post-Effective Date Debtors. All rights and defenses of the Debtors and the Post-Effective Date Debtors, as applicable,

under bankruptcy and non-bankruptcy law are reserved and preserved with respect to such Texas Taxing Entity Claims.

78.     <u>Louisiana Department of Revenue</u>.  Notwithstanding anything to the contrary in the Plan or this Order:

      i.    the Louisiana Department of Revenue (the "**LDR**") shall not be required to file any request for payment of Administrative Expense Claims that is not required to be filed by section 503(b)(1)(D);

     ii.    the LDR has opted out of the releases set forth in Section 10.7(b) of the Plan and shall not be deemed a Releasing Party under the Plan;

    iii.    to the extent applicable law provides for interest or penalties with respect to any portion of an Allowed Claim of LDR, nothing in the Plan of this Order prevents inclusion of such interest or penalties in LDR's Allowed Claim in accordance with section 1129(a)(9) of the Bankruptcy Code, and the Debtors' and Post-Effective Date Debtors', as applicable, defenses and rights to object to such Claim or to the inclusion of such interest in such Claim are fully preserved;

    iv.    to the extent LDR's Priority Tax Claims are not Allowed by or paid in full in Cash on the Effective Date, such Priority Tax Claims shall be paid by regular installment payments in Cash (including applicable interest) commencing on the 15th day of the first month following the date such Claim becomes an Allowed Claim and continuing thereafter not less than annually either on the anniversary date of the earlier of the Effective Date or the date such Claim became an Allowed Claim at a rate to insure the Claim will be paid over a period not to exceed five years from the Petition Date in accordance with section 1129(a)(9)(C) of the Bankruptcy Code; *provided* that nothing herein shall prohibit more frequent payments in the Debtors or Post-Effective Date Debtors sole discretion;

     v.    the rights of the LDR to exercise any valid rights of setoff or recoupment under the Bankruptcy Code or applicable law remain unaffected by the Plan;

    vi.    notwithstanding any provision in the Plan to the contrary, (a) any distributions on LDR's claims made after the Effective Date shall be deemed made on the date payment is issued; (b) all distributions shall be delivered to the post office box on the first page of the LDR's applicable proofs of claim; (c) no distribution owed to the LDR, regardless of amount, shall revert to the Post-Effective Date Debtors or their successors or assigns as unclaimed property; and (d) Section 6.10 of the Plan (*De Minimis* Cash Distributions) shall not apply to LDR's Allowed Claims;

vii.   with respect to any pre-petition tax return filed after the bar date for Governmental Units, for which the LDR has filed an estimated Claim prior to such bar date, the LDR shall be permitted to amend the applicable proof of Claim after the Effective Date without the permission of this Bankruptcy Court, the Debtors, or any other party in interest; and

viii.  the Debtors and the Post-Effective Date Debtors, as applicable, shall not be excused from any obligation under applicable Louisiana state law to timely submit returns (including any delinquent returns), which returns shall be filed by the later of (i) 90 days after the Effective Date or (ii) the applicable due date under Louisiana law, and shall remit payment of taxes in the ordinary course of business.

79.   Apache.  FWE shall pay up to $5.5 million (the "**Apache Fee Cap**") of reasonable and documented fees and expenses of Apache related to the formation of FWE I and FWE's restructuring, including the negotiation and preparation of the Apache Definitive Documents (collectively, the "**Apache Fees and Expenses**"); provided that amounts paid to Apache on account of the Apache Fees and Expenses shall not be subject to disgorgement unless the transactions contemplated in the Apache Definitive Documents fail to close as a result of Apache's breach of the Restructuring Support Agreement.  Any Apache Fees and Expenses in excess of the Apache Fee Cap shall be the sole responsibility of FWE I.

80.   The Prepetition FLFO Lenders, Prepetition FLTL Lenders, and Prepetition SLTL Lenders shall, simultaneously with the execution and delivery of the Apache Definitive Documents (to occur no later than the Effective Date) and the creation of FWE I LLC pursuant to the Apache Definitive Documents, be deemed to release (and/or cause the applicable administrative agent or collateral agent to release) all liens and encumbrances on, interests in, and claims against the Legacy Apache Properties (as defined in the Apache Term Sheet) and the other FWE I Assets (as defined in Part A of Schedule I to the Plan of Merger) and the Consenting Creditors (as defined in the Apache Implementation Agreement (as may be amended from time to time)) shall release the Apache PSA Parties from any and all causes of action and claims of any kind related to the Legacy

Apache Properties arising prior to the Effective Date. From the time of the entry of this Order to the Effective Date, the Debtors shall not cause, permit or otherwise allow the creation of new liens (contractual or statutory) against the Legacy Apache Properties or the other FWE I Assets except for tax liens which arise by operation of law for taxes not yet due and payable, nor shall the Prepetition FLFO Lenders, Prepetition FLTL Lenders, and Prepetition SLTL Lenders consent to same.

81.     FWE's assets to be allocated to, possessed by, assumed by, and vested in FWE I and FWE III, respectively, pursuant to the transactions contemplated by and in accordance with the Plan of Merger (the "**Divisive Merger**"), including contracts, leases, oil and gas leases and assets constituting real property interests (including all fee surface interests in land, surface leases, easements, rights of way, servitudes, licenses, franchises, road, railroad, and other surface use permits or agreements), except as otherwise provided in this Order, shall be (a) free and clear of (i) any right of consent, notice, and other similar rights, if any, that are applicable to the vesting of the assets in connection with the Divisive Merger (such rights, the "**Consent Rights**") and (ii) all preferential purchase rights, rights of first refusal, drag-along rights, tag-along rights, and other similar rights, if any, that are applicable to the vesting of the assets in connection with the Divisive Merger (such rights, the "**Preferential Purchase Rights**"), but (b) subject to and burdened by (x) the liabilities and obligations allocated to and vested in, respectively, FWE I or FWE III, as specified in the Plan of Merger, pursuant to the Divisive Merger (collectively, "**Allocated Obligations**") and (y) Permitted Post-Closing Liens (as defined in the Schedule of Defined Terms for Required Confirmation Order Provisions, attached to the Apache Implementation Agreement as **Exhibit B**).

82.     All Entities (as defined under section 101(15) of the Bankruptcy Code) or Parties that fail to timely file an objection are (a) forever barred from objecting to the allocation and vesting of the assets in connection with the Divisive Merger free and clear of all Consent Rights and Preferential Purchase Rights, and all other persons are forever barred from asserting any alleged Consent Rights or Preferential Purchase Rights with respect to the Divisive Merger, and (b) deemed to consent to and approve the allocation and vesting of the assets free and clear of all Consent Rights and Preferential Purchase Rights, regardless of whether such consent must be in writing pursuant to the terms of any agreement.  Except as otherwise provided in the Plan or this Order with respect to the Released Parties (other than with respect to any NewCo Entity or any Credit Bid Acquired Interests, in each case with respect to any right, claim, or interest arising (i) under an agreement assumed and assigned or allocated to any NewCo Entity under which FWE I or GOM Shelf LLC is a party or (ii) in connection with an obligation assumed pursuant to the Credit Bid Transaction (which all such rights, claims, or interests are hereby expressly reserved)), nothing herein shall affect or be deemed to restrict or limit Apache's, FWE I's, or GOM Shelf LLC's claims for or rights to seek payments or contribution from, and any defenses against, current or prior working interest owners, predecessors, co-owners and/or operators, or from any other parties that are contractually, legally, regulatorily or equitably liable for decommissioning or related obligations with respect to the Legacy Apache Properties and FWE I Assets.

83.     Subject to a cap of $300,000, (the "**Apache Implementation Costs Cap**") which amount shall be funded by FWE III as an Administrative Expense Claim no later than twenty-one (21) days after the Effective Date, FWE III shall, and shall cause its debtor affiliates in the above-captioned Chapter 11 Cases to, on the Effective Date, provide for the payment of any and all documentary, filing, recording, stamp, and registration fees, costs, taxes, and expenses (including

all reasonable and documented attorneys' fees and regulatory consultant fees) incurred or imposed after the Effective Time (as defined in the Plan of Merger) in connection with the filing of record by or on behalf of FWE I or GOM Shelf LLC of any instrument or instruments with the appropriate records office of any county, parish, state, federal, or other governmental unit (including the U.S. Bureau of Ocean Energy Management ("**BOEM**")) that may be required in connection with the implementation of the Divisive Merger or that either FWE I or GOM Shelf LLC determines in its respective sole discretion to be necessary or appropriate to reflect in the appropriate records of any governmental unit that as a result of the Divisive Merger (a) ownership of the FWE I Assets have been allocated to and are vested in FWE I (and to the extent appropriate to reflect ownership of the GOM Shelf Properties (as defined in the Plan of Merger) in GOM Shelf LLC), and (b) the Allocated Obligations have been allocated to and vested in, and constitute liabilities and obligations of, FWE I and FWE III, respectively (collectively, the "**Apache Implementation Costs**"). For the avoidance of doubt, the documentary, filing, recording, stamp, and registration fees of FWE I or GOM Shelf LLC, shall include such costs and expenses required to file or to cause to be filed of record in the records office, as determined by Apache to be appropriate, of any county, parish, state, federal, or other governmental unit (including BOEM) of the mortgages, security interests and similar security documentation as is contemplated by the Standby Loan Agreement and the Standby Credit Facility Documents to secure the obligations of FWE I and GOM Shelf LLC thereunder. Any Apache Implementation Costs that exceed the Apache Implementation Costs Cap shall be the sole responsibility of and paid for by FWE I.

84. Upon the Effective Date of the Plan, to the extent the Decommissioning Agreement is an executory contract, it will be assumed, with the consent of the Apache PSA Parties, by the Fieldwood PSA Parties and, upon consummation of the transactions provided for in the Plan of

Merger, become the obligation of FWE I. Upon execution of the Apache Definitive Documents, including, without limitation the granting of liens to Apache on the FWE I and GOM Shelf LLC assets contemplated thereunder, the Debtors will be deemed to have cured all defaults existing under the Decommissioning Agreement as of the Effective Date (the "**Apache Cure**") and no third party, including, without limitation, the Apache Sureties, may raise any defense to payment under the Apache Surety Bonds or letters of credit, in each case constituting Decommissioning Security, based on the agreement reached between the Debtors and Apache as to the Apache Cure.

85.     Except for the rights and remedies to enforce (a) the Decommissioning Agreement against GOM Shelf LLC and FWE I following the Divisive Merger (which agreement shall be allocated to FWE I and GOM Shelf LLC under the Divisive Merger), (b) the Plan, (c) this Order, and (d) the obligations contemplated by the Apache Definitive Documents, the Apache PSA Parties shall be deemed Releasing Parties (as defined in the Plan) under the Plan and waive and release any and all pre-Effective Date claims of any kind (including, without limitation, the Apache Audit Claims, the Apache Trust A Claims and any claims that could qualify as administrative expense claims) against the Debtors, their estates and any other Released Party in all circumstances only to the extent such claims accrued on or prior to the Effective Date and only to the extent such releases do not impair the Decommissioning Security, or Apache's ability to draw on the Decommissioning Security in any respect. For the avoidance of doubt, any and all claims the Apache PSA Parties may have against FWE I or GOM Shelf LLC related to the Decommissioning Agreement arising post-Effective Date and any security obtained, provided, or pledged in connection with the Decommissioning Agreement (the "**Decommissioning Security**") will be preserved.

86. Except for the rights and remedies to enforce (a) the Decommissioning Agreement against the Apache PSA Parties following the Divisive Merger, (b) the Plan, (c) this Order, and (d) the obligations contemplated by the Apache Definitive Documents, the Debtors shall waive and release any and all pre-Effective Date claims of any kind against the Apache PSA Parties, in all circumstances only to the extent such claims accrued on or prior to the Effective Date. For the avoidance of doubt, any and all claims FWE I may have against the Apache PSA Parties related to the Decommissioning Agreement arising post-Effective Date and the Decommissioning Security will be preserved.

87. All rights of the Apache PSA Parties with respect to bonds and letters of credit constituting security for decommissioning of the assets held by the GOM Shelf LLC or allocated to and vested in FWE I, including, without limitation, the Decommissioning Security shall be preserved as against such bonding companies and letter of credit issuers in all respects. The Debtors shall not terminate any bonds issued on behalf of the Debtors relating to the Legacy Apache Properties under which any federal, state or local governmental entity is an obligee. Except as otherwise provided in the Plan Documents, Everest reserves all rights regarding all bonds for which it issued to obligees other than Apache. For avoidance of doubt, Everest Bond No. ES00001441 in favor of Apache, as obligee, is expressly an Apache Surety Bond and subject to the Apache-Surety Term Sheet.

88. With respect to the agreements and memberships relating, in whole or in part, to well containment/control, clean-up of spills, or other pollution, or the gathering of data relating to certifications required to be made to a governmental unit with respect to the FWE I Assets (as defined in the Plan of Merger) or GOM Shelf Oil and Gas Properties (as defined in the Plan of Merger), to the extent any such agreements or memberships are also needed in respect to any

Credit Bid Acquired Interests or FWE III Assets (as defined in the Plan of Merger) that are set forth on **Exhibit 23** attached to the Apache Implementation Agreement, then on or before the Effective Date, FWE shall obtain new agreements and membership for such use with respect to the Credit Bid Acquired Interests or FWE III Assets. With respect to any Excluded Contracts (as defined in the Plan of Merger), FWE shall, on or before the Effective Date, prepare and negotiate replacement agreements with the counterparties to such Excluded Contracts upon substantially the same terms as such Excluded Contracts which may be executed by FWE I immediately following the Effective Date.

89.    The Fieldwood PSA Parties and the Apache PSA Parties may, by mutual agreement, amend and modify, without the consent of the Consenting Creditors, the forms of the agreements governing the terms of employment of the Independent Director (as defined in the Apache Term Sheet) of FWE I and of the "sole manager" (as that term is used in the Apache Term Sheet) of FWE I (the "**Sole Manager**"), and the form of the agreement with the "service provider" (as that term is used in the Apache Term Sheet) of FWE I (the "**Contract Services Provider**") to be included in the bid package for the Contract Services Provider.

90.    The Bankruptcy Court (i) approves the Apache Definitive Documents, as such documents are defined in the Apache Implementation Agreement (as amended), and all transactions contemplated thereby and thereof, including the Plan of Merger and Standby Credit Facility Documents, and all actions to be taken, undertakings to be made, and obligations to be incurred by FWE I and GOM Shelf LLC, as applicable, contemplated thereby; and (ii) authorizes FWE I and GOM Shelf LLC, following the consummation of the Plan of Merger, without further notice to or action, order, or approval of this Bankruptcy Court and without the need for any further corporate or shareholder action, to enter into, deliver, and fully perform its obligations under the

Apache Definitive Documents, including without limitation, the Standby Credit Facility Documents.  Upon entry of this Order, FWE I or the Sole Manager, as applicable, shall be authorized and empowered, without further approval of the Bankruptcy Court or any other party, to take such actions and perform such acts as may be necessary, convenient, desirable, or appropriate to execute and deliver the Apache Definitive Documents in accordance with the Plan and to execute and deliver all documents relating thereto and to perform all of their obligations thereunder.  On the Effective Date, the Apache Definitive Documents shall constitute legal, valid, binding, and authorized obligations of FWE I and GOM Shelf LLC, as applicable, enforceable in accordance with their terms, and such obligations of FWE I or GOM Shelf LLC shall not be enjoined or subject to discharge, impairment, release, avoidance, recharacterization, or subordination by FWE I or GOM Shelf LLC or the Post-Effective Date Debtors under applicable law, the Plan, or this Order.  On the Effective Date, all liens granted pursuant to, or in connection with, the Apache Definitive Documents shall be deemed granted by FWE I or GOM Shelf LLC pursuant to the Apache Definitive Documents.  On the Effective Date, all liens granted pursuant to, or in connection with Apache Definitive Documents, as applicable, (i) shall be valid, binding, perfected, enforceable liens in the property subject to a security interest granted by FWE I pursuant to the Apache Definitive Documents, as applicable, with the priorities established in respect thereof under applicable non-bankruptcy law and the Apache Definitive Documents, including, but not limited to, the Mortgages, Security Agreement or Standby Loan Agreement and (ii) shall not be enjoined or subject to discharge, impairment, release, avoidance, recharacterization, or subordination by FWE I or GOM Shelf LLC under applicable law, the Plan, or this Order.  For the avoidance of doubt, the liens granted to Apache pursuant to the Recharacterization Mortgages (as such term is defined in the Decommissioning Agreement, as amended from time to time, and as

83

supplemented by the Recharacterization Mortgages) upon any recharacterization of the Trust A or Trust A-1 NPIs (as such terms are defined in the Decommissioning Agreement, as amended from time to time, and as supplemented by the Recharacterization Mortgages) shall be senior in all respects to any other liens.

91.    The allocation of the Decommissioning Agreement to FWE I, which will occur upon the effectiveness of the Divisive Merger provided for in the Plan, is not a transfer or assignment and is not subject to any transfer or assignment consent requirement.

92.    Neither the Plan nor the Apache Implementation Agreement (including the Apache Definitive Documents attached thereto) amends or alters the Decommissioning Agreement.

93.    Neither the Plan nor the Apache Implementation Agreement (including the Apache Definitive Documents attached thereto) discharges or otherwise changes the Sureties' obligations to Apache under the Surety Bonds or impairs Apache's ability to draw on the Surety Bonds post-Effective Date.

94.    The reorganization of FWE in accordance with the Plan, including the creation of FWE I pursuant to a divisive merger and its formation under the Fieldwood Energy I LLC Agreement, does not give Apache or any of its affiliates control over FWE I in any manner that would be recognized under the Securities Act of 1934, the Bankruptcy Code, or any other applicable law, and none of the terms of the Apache Definitive Documents, including the consent rights granted to Apache thereunder, cause Apache to have any such control over FWE I.

95.    <u>Apache-Surety Term Sheet</u>.  The Bankruptcy Court (i) approves the term sheet between the Debtors and Apache, Zurich American Insurance Company ("**Zurich**"), Everest Reinsurance Company ("**Everest**"), HCC International Insurance Company ("**HCCI**"), and Philadelphia Indemnity Insurance Company ("**Philadelphia**" and together with Zurich, Everest

and HCCI, the "**Apache Sureties**" and each an "**Apache Surety**"), a copy of which is attached hereto as **Exhibit B** (the "**Apache-Surety Term Sheet**") and all actions to be taken, undertakings to be made, and obligations to be incurred contemplated thereby; (ii) authorizes the Debtors to negotiate the definitive documents in accordance with the Apache-Surety Term Sheet (the "**Apache-Surety Definitive Documents**"); and (iii) authorizes FWE I or GOM Shelf LLC, without further notice to or action, order, or approval of this Bankruptcy Court and without the need for any further corporate or shareholder action, to enter into, deliver, and fully perform its obligations under the Apache Sureties Definitive Documents, including, without limitation, the *Subrogation, Subordination and Payment Agreement* ("**SSPA**") contemplated in the Apache-Surety Term Sheet.

96.    Apache Surety Claims.  All claims against the Debtors, if any, of the Apache Sureties arising under or relating to any surety bonds, letters of credit, indemnification agreements, or other related agreements existing as of the Petition Date (including, without limitation, any claims for premiums, fees, expenses, or similar charges, whether due before, on, or after the Petition Date), including but not limited to any claims and causes of action, whether arising in contract or in tort, in law or in equity or pursuant to any other theory of law (including under any state or federal securities laws), are classified as General Unsecured Claims in Class 6B and shall be treated accordingly under the Plan.  For the avoidance of doubt, all rights and claims of the Apache Sureties set forth in the Apache-Surety Term Sheet shall be treated pursuant to the Apache-Surety Term Sheet.

97.    Non-Apache Sureties Claims.  Nothing in the Plan or this Order shall or shall be deemed to adjudicate or modify the rights of any obligees ("**Obligees**") or surety providers (other than, solely in their capacity as such, the surety providers that issued bonds in favor of Apache and

are parties to the Apache-Surety Term Sheet, such surety providers the "**Apache Sureties**" and all other surety providers, the "**Non-Apache Sureties**") as between the Obligee and the Non-Apache Surety under any surety bonds issued on behalf of the Debtors, their non-Debtor affiliates, or otherwise (the "**Non-Apache Term Sheet Surety Bonds**") or under applicable law. Other than Sections 5.13, 10.6, 10.7, 10.8, and 10.9 of the Plan, nothing in the Plan or this Order bars, impairs, enjoins, releases, alters, diminishes or enlarges any of the rights or defenses of the Non-Apache Sureties (other than a Releasing Party) against any non-Debtor Entity (other than the Post-Effective Date Debtors, FWE I, FWE IV, any NewCo Entity, or any Credit Bid Acquired Interests), including, but not limited to, any predecessors in interest or co-working interest parties with respect to any of the Debtors' assets. For the avoidance of doubt, the Non-Apache Sureties shall not be entitled, under any circumstances, to claim a right of subrogation against the Debtors, the Post-Effective Date Debtors, FWE I, any FWE Additional Entity or NewCo and its subsidiaries (including Credit Bid Purchasers), unless such subrogation rights, if any, relate to obligations that both (x) accrue post-Effective Date and (y) arise from post-Effective Date activity and, with respect NewCo and its subsidiaries (including Credit Bid Purchasers), relates to the Credit Bid Acquired Interests. Similarly, for the avoidance of doubt, nothing in this Order or the Plan, including any language referencing subrogation, shall bar, impair, enjoin, release, alter, diminish or enlarge any of the Non-Apache Sureties' rights to seek contribution from any co-working interest party, predecessor owner, or any non-Debtor Entity (other than the Post-Effective Date Debtors, FWE I, GOM Shelf LLC, FWE IV, or any NewCo Entity) for any payment by any of the Non-Apache Sureties under the Non-Apache Term Sheet Surety Bonds. To the extent of any conflict between this paragraph and paragraphs 111–18 (including any matters incorporated into paragraphs 111–18), the rights and obligations of the parties bound by the Eni Definitive

Documents and Eni Implementation Agreement (including without limitation Eni and NAS) identified in paragraphs 111–18 are governed by paragraphs 111–18.

98.　　Nothing in this Order or the Plan shall require the Non-Apache Sureties to issue any new surety bonds or extensions or renewals of the Non-Apache Term Sheet Surety Bonds.

99.　　For the avoidance of doubt, no Non-Apache Term Sheet Surety Bond under which a Debtor is the principal is being assumed, assumed and assigned, or assumed and allocated to any entity under the Plan or the Plan Documents, including Credit Bid Purchaser, FWE I, FWE III and/or FWE IV.

100.　　Nothing in this Order and/or the Plan shall, or be deemed to: bar, impair, enjoin, release, alter, diminish, or in any way affect or impact the regulatory authority of the Government, including with respect to the security and bonding requirements for owners and operators of oil and gas assets in the Gulf of Mexico.　The Government maintains its full regulatory authority to require that FWE I, Credit Bid Purchaser and/or any other entities being created under the Plan post security and bonding under the applicable regulations, and this Order and/or Plan in no way purports to infringe upon those rights.　To the extent the Government requires any such security and/or bonding consistent with law and regulations, the respective entity will obtain the required bonding, including any required supplemental bonding.

101.　　CUSA.　Chevron U.S.A. Inc., its parent and affiliates, including Noble Energy, Inc., Union Oil Company of California, Unocal Pipeline Company and Texaco Inc. (such parent and affiliates, together with CUSA, individually each a "**CUSA Entity**" and collectively the "**CUSA Entities**") shall not be deemed to be a "Released Party" or a "Releasing Party" as such terms are defined in the Plan.　For the avoidance of doubt, other than set forth expressly in the Plan, no CUSA Entity has waived or released, or shall be deemed to have waived or released, any claim,

including but not limited to any and all claims under the Bankruptcy Code, the Chevron Claims, and any and all claims related to or arising under the CUSA Implementation Agreement or the CUSA Definitive Documents, *provided* any such claims shall receive the applicable treatment set forth in the Plan. Nothing within the Plan or Order constitutes a transfer of title and/or ownership or operatorship of any of the Abandoned Properties to CUSA Entities.

102. Upon effectiveness of the CUSA Definitive Documents, pursuant to Section 8 of the CUSA Implementation Agreement, the Debtors shall be deemed to have waived any and all prepetition claims or causes of action against any of the CUSA Entities. Each CUSA Party shall be an "**Exculpated Party**" as such term is defined in the Plan (to the maximum extent permitted by the Bankruptcy Court).

103. FWE's assets to be allocated to, possessed by, assumed by, and vested in FWE I and FWE III, respectively, pursuant to the transactions contemplated by and in accordance with the Initial Plan of Merger (the "**Initial Divisive Merger**"), including contracts, permits, leases, oil and gas leases and assets constituting real property interests (including all fee surface interests in land, surface leases, easements, rights of way, servitudes, licenses, franchises, road, railroad, and other surface use permits or agreements), except as otherwise provided in this Order, shall be (a) free and clear of (i) any right of consent, notice, and other similar rights, if any, that are applicable to the vesting of the assets in connection with the Initial Divisive Merger and (ii) all preferential purchase rights, rights of first refusal, drag-along rights, tag-along rights, and other similar rights, if any, that are applicable to the vesting of the assets in connection with the Initial Divisive Merger, but (b) subject to and burdened by (x) the liabilities and obligations allocated to and vested in, respectively, FWE I or FWE III, as specified in the Initial Plan of Merger, pursuant

to the Initial Divisive Merger and (y) Permitted Post-Closing Liens (as defined in Apache Implementation Agreement).

104.    FWE III's assets to be allocated to, possessed by, assumed by, and vested in FWE IV pursuant to the transactions contemplated by and in accordance with the FWE III Plan of Merger (the "**FWE IV Divisive Merger**"), including contracts, permits, leases, oil and gas leases and assets constituting real property interests (including all fee surface interests in land, surface leases, easements, rights of way, servitudes, licenses, franchises, road, railroad, and other surface use permits or agreements), except as otherwise provided in this Order, shall be (a) free and clear of (i) any right of consent, notice, and other similar rights, if any, that are applicable to the vesting of the assets in connection with the FWE IV Divisive Merger (such rights, the "**FWE IV Consent Rights**") and (ii) all preferential purchase rights, rights of first refusal, drag-along rights, tag-along rights, and other similar rights, if any, that are applicable to the vesting of the assets in connection with the FWE IV Divisive Merger (such rights, the "**FWE IV Preferential Purchase Rights**"), but (b) subject to and burdened by the liabilities and obligations allocated to and vested in, respectively, FWE III or FWE IV, as specified in the FWE III Plan of Merger (such liability and obligations allocated to and vested in FWE IV, the "**FWE IV Allocated Obligations**").  The reorganization of FWE in accordance with the Plan, including the creation of FWE IV pursuant to a divisive merger and its formation under the Fieldwood Energy IV LLC Agreement, does not give the CUSA Entities control over FWE IV in any manner that would be recognized under the Securities Act of 1934, the Bankruptcy Code, or any other applicable law; and none of the terms of the CUSA Definitive Documents, including consent rights granted to the CUSA Entities thereunder, cause the CUSA Entities to have any such control over FWE IV.   Nothing in the Plan or this Order shall be deemed to: (a) adjudicate or modify the rights between the CUSA Entities

and their sureties under any CUSA Entities' bonds or under applicable law (as between CUSA Entities and the Sureties); (b) bar, impair, enjoin, release, alter, diminish, or enlarge any of the rights or defenses of such sureties against any non-Debtors (other than with respect to any NewCo Entity or any Credit Bid Acquired Interests); or (c) constitute a waiver or release of any rights or defenses that the sureties hold against non-Debtor Parties (other than with respect to any NewCo Entity or any Credit Bid Acquired Interests). Nothing within the Plan or Order shall create or vest in any Entity, including the Post- Effective Date Debtors, FWE I, GOM Shelf LLC, FWE IV, or the NewCo Entities, any rights or claims against CUSA Entities that do not otherwise exist under applicable law or agreement, including, without limitation any rights or claims pursuant to any contracts or agreements being assumed and assigned or assumed and allocated to such Entities.

105. Entities (as defined under section 101(15) of the Bankruptcy Code) or parties that fail to timely file an objection asserting a FWE IV Consent Right or FWE IV Preferential Purchase Right are (a) forever barred from objecting to the allocation and vesting of the assets in connection with the FWE III Plan of Merger free and clear of all FWE IV Consent Rights and FWE IV Preferential Purchase Rights, and from asserting any alleged FWE IV Consent Rights or FWE IV Preferential Purchase Rights with respect to the FWE III Plan of Merger, and (b) deemed to consent to and approve the allocation and vesting of the assets free and clear of all FWE IV Consent Rights and FWE IV Preferential Purchase Rights, regardless of whether such consent must be in writing pursuant to the terms of any agreement. For the avoidance of doubt, nothing herein, including the releases provided pursuant to Section 10.7 of the Plan, shall affect or be deemed to restrict or limit CUSA's, CUSA's affiliates, or FWE IV's claims for or rights to seek payments or contribution from any current or prior non-Debtor working interest owners, predecessors, co-owners and/or operators, or from any other non-Debtor parties that are contractually, legally,

regulatorily or equitably liable for decommissioning or related obligations, including obligations under surety bonds, letters of credit or other instruments relating thereto, with respect to the Legacy CUSA Properties or the FWE IV Assets.

106.    FWE shall, and shall cause its Debtor affiliates to, on the Effective Date, provide for the payment of any and all documentary, filing, recording, stamp, and registration fees, costs, taxes, and expenses incurred or imposed in connection with the filing of record by or on behalf of FWE III of any instrument or instruments with the appropriate records office of any county, parish, state, federal, or other governmental unit (including BOEM) that may be required in connection with the implementation of the FWE III Plan of Merger or that the applicable governmental unit or FWE III determines to be necessary or appropriate to reflect in the appropriate records of any governmental unit that as a result of the FWE IV Divisive Merger (a) ownership of the FWE IV Assets have been allocated to and are vested in FWE IV, and (b) the FWE IV Allocated Obligations have been allocated to and vested in, and constitute liabilities and obligations of, FWE III and FWE IV, respectively (collectively, the "**FWE IV Implementation Costs**"); provided, to the extent any FWE IV Implementation Costs remain unpaid as of the Effective Date, FWE shall have provided FWE IV with sufficient funds to pay any such outstanding FWE IV Implementation Costs.

107.    All rights of any applicable CUSA Entity and/or other obligee with respect to bonds and letters of credit constituting security for the decommissioning of the assets allocated to and vested in FWE IV shall be reserved as against such bonding companies and letter of credit issuers in all respects. The Debtors shall not terminate any bonds issued on behalf of the Debtors relating to such FWE IV assets under which any federal, state or local governmental entity is an obligee.

108.    The Bankruptcy Court (i) approves the CUSA Implementation Agreement and Definitive Documents and all transactions contemplated by such agreements, including the FWE III Plan of Merger, and all actions to be taken, undertakings to be made, and obligations to be incurred by FWE III or FWE IV, as applicable, contemplated thereby; and (ii) following the consummation of the FWE III Plan of Merger, authorizes FWE III or FWE IV, as applicable, without further notice to or action, order, or approval of this Bankruptcy Court and without the need for any further corporate or shareholder action, to enter into, deliver, and fully perform their obligations under the CUSA Implementation Agreement and CUSA Definitive Documents.  Upon entry of this Order, FWE III or FWE IV, as applicable, shall be authorized and empowered, without further approval of the Bankruptcy Court or any other party, to take such actions and perform such acts as may be necessary, convenient, desirable, or appropriate to execute and deliver the CUSA Implementation Agreement and CUSA Definitive Documents in accordance with the Plan and to execute and deliver all documents relating thereto and to perform all of their obligations thereunder.  On the Effective Date, the CUSA Definitive Documents shall constitute legal, valid, binding, and authorized obligations of FWE III or FWE IV, as applicable, enforceable in accordance with their terms, and such obligations of FWE III or FWE IV, as applicable, shall not be enjoined or subject to discharge, impairment, release, avoidance, recharacterization, or subordination by FWE III, FWE IV, the Post-Effective Date Debtors, or the Plan Administrator, under applicable law, the Plan, or this Order.

109.    Cures.  In accordance with the Plan, the Debtors or Post-Effective Date Debtors, as applicable, shall be responsible for paying any Cure Amounts associated with the contracts assumed by the Debtors and allocated to FWE IV pursuant to the FWE III Plan of Merger. Notwithstanding anything in the Plan Supplements (ECF No. 1394) with respect to the Schedule

of Assumed Contracts and Cure Amounts (or any subsequent schedules and notices with respect to assumed or assumed and assigned contracts and corresponding cure costs, including, without limitation, ECF Nos. 1395 and 1456) to the contrary, only the contracts to be assumed and allocated to FWE IV under the Plan of Merger shall be so assumed and allocated thereto.

110. <u>Murrayfield and Emory Peak</u>. Notwithstanding anything in the Plan or this Order to the contrary, any overriding royalty interests, mortgages, memorandums of understanding and/or UCC-1s related to security documents associated with (x) that certain Joint Operating Agreement by and between Chevron U.S.A. Inc. and Fieldwood Energy LLC, dated July 1, 2019 (as amended) or (y) that certain Joint Operating Agreement by and among Chevron U.S.A. Inc., Fieldwood Energy LLC and Ridgewood Castle Rock, LLC, dated as of August 1, 2019 (as amended), that are being assumed and assigned to Credit Bid Purchaser in connection with Murrayfield and Emory Peak, shall be Credit Bid Permitted Encumbrances and shall continue in full force and effect following the Effective Date and such assumption and assignment to Credit Bid Purchaser.

111. <u>Eni</u>. On the Effective Date, FWE shall have withdrawn as operator of the interests of the Debtors in the oil and gas leases (the "**Eni Specified Interests**") set forth on **Exhibit C** to that certain *Eni Term Sheet Implementation Agreement* (the "**Eni Implementation Agreement**") immediately prior to their abandonment pursuant to the Plan.

112. On the Effective Date, FWE III shall reimburse Eni for reasonable and documented legal fees and expenses incurred in connection with the Chapter 11 Cases in the amount of $1.5 million. Additionally, on the Effective Date, FWE III shall pay $3 million in cash to Eni to be used in connection with Actual Decommissioning Costs (as defined in the Turnkey Removal Agreement) not covered by the proceeds of Performance Bond No. 2196705 by and between

Fieldwood Energy Offshore LLC ("**FEO**") as Principal, North American Specialty Insurance Company ("**NAS**") as Surety, and Eni as Obligee (the "**NAS Bond**").

113.     On the Effective Date, FWE III shall provide for the payment of any and all documentary, filing, recording, stamp, and registration fees, costs, and expenses incurred in connection with any required filing of record by or on behalf of FWE III of any instrument or instruments with the appropriate records office of any county, parish, state, federal, or other governmental unit (including BOEM) that may be required in connection with the FWE III Plan of Merger as it relates to the Eni Specified Assets[5] or incurred in connection with the satisfaction of the Regulatory Condition.

114.     Immediately upon the occurrence of the Effective Date, FEO's interests in the Specified Assets shall be abandoned by FEO pursuant to section 554(a) of the Bankruptcy Code, the Plan, and this Order.  For the avoidance of doubt, upon abandonment of the Eni Specified Assets, no funds shall have been allocated to FEO to perform or satisfy any plugging, abandonment, or decommissioning obligations associated with the Eni Specified Assets and FEO acknowledges it will be in default of such decommissioning obligations.  Any Debtor which previously owned or operated an Eni Specified Asset shall appoint FWE III as its agent to perform the Agreed Activities (as defined in that certain Turnkey Removal Agreement attached to the Eni Implementation Agreement as **Exhibit B** (the "**Eni Turnkey Agreement**")) and the Initial Safe Out (as defined in the Eni Turnkey Agreement) work, and, subject to the commencement triggers set forth in the Eni Turnkey Agreement, FWE III shall be authorized and empowered by Eni to be its decommissioning agent in relation to the Eni Specified Assets.  For the avoidance of doubt, the

---

[5] For purposes of this Order, the term "**Eni Specified Assets**" shall refer and have the meaning ascribed to the term "**Specified Assets**" as such term is defined in the Eni Implementation Agreement.

Eni Definitive Documents (as defined in the Eni Implementation Agreement) shall be included within the definition of Additional Predecessor Agreement Documents provided in the Plan.

115.    On the Effective Date, except for the rights and remedies of Eni to enforce (i) the Plan, (ii) this Order, and (iii) the obligations contemplated by the Eni Definitive Documents (as defined in the Eni Implementation Agreement), Eni shall be deemed a Releasing Party (without submitting a ballot(s) to accept the Plan) against all Released Parties other than FEO and its Estate under the Plan for all purposes thereunder, and shall waive and release any and all pre-Effective Date claims of any kind against the Debtors, their Estates and any other Released Party, other than FEO and its Estate, including, without limitation, the Eni Claims (as defined in the Eni Implementation Agreement) and any claims for administrative expense under sections 503(b) or 507(a)(2) of the Bankruptcy Code; *provided, however,* that, upon the occurrence of (i) the Effective Date and (ii) effectiveness of the Eni Definitive Documents, notwithstanding Section 4(e) of the Eni Implementation Agreement, Eni shall be deemed to have an Allowed Class 6B General Unsecured Claim in an amount equal to the aggregate sum of the Eni Net Turnkey Amounts for the Decommissioning Projects (each as defined in the Eni Turnkey Agreement). Except as otherwise provided for hereunder with respect to the Released Parties (under and as defined in the Plan other than Apache and FEO and its Estate), nothing herein shall affect or be deemed to restrict or limit Eni's claims for or rights to seek payments or contribution from current or prior working interest owners, predecessors, co-owners and/or operators, or from any other parties that are contractually, legally, regulatorily or equitably liable for decommissioning or related obligations, including obligations under surety bonds, letters of credit or other instruments relating thereto, with respect to the Eni Specified Assets.

116.    On the Effective Date, except for the rights and remedies to enforce (i) the Plan, (ii) this Order, and (iii) the obligations contemplated by this Agreement or the Eni Definitive Documents, the Debtors shall waive and release any and all pre-Effective Date claims of any kind against Eni (including, for the avoidance of doubt, each of Eni's affiliates and each of their and their affiliates' current and former directors, managers, officers, equity holders, predecessors, successors, and assigns, subsidiaries, and each of their current and former officers, members, managers, directors, equity holders, principals, members, employees, or other agents, in each case, in their capacities as such), in all circumstances only to the extent such claims accrued on or prior to the Effective Date.

117.    All rights of Eni with respect to bonds and letters of credit constituting security for the decommissioning of the assets associated with the Eni Specified Assets shall be reserved as against such bonding companies and letter of credit issuers in all respects. The Debtors shall not terminate any bonds issued on behalf of the Debtors relating to such Eni Specified Assets under which any federal, state or local governmental entity is an obligee.

118.    The Bankruptcy Court (i) approves the Eni Definitive Documents and all transactions contemplated by this Agreement and all actions to be taken, undertakings to be made, and obligations to be incurred by the parties thereto; (ii) following the consummation of the Initial Plan of Merger, authorizes FWE III, without further notice to or action, order, or approval of this Bankruptcy Court and without the need for any further corporate or shareholder action, to enter into, deliver, and fully perform their obligations under the Eni Definitive Documents; and (iii) finds that the parties' entry into the Eni Definitive Documents and the implementation of the transactions contemplated therein shall not impair Eni's right and ability to draw on Performance Bond No. 2196705 by and between FEO as Principal, NAS as Surety, and Eni as Obligee, and

shall not impair NAS's defenses to such draw. The terms of the NAS Bond shall not be altered in any manner. Neither the Plan, this Order, nor any of the transactions contemplated or effectuated under the Plan, purport to alter or modify the rights of Eni or NAS, as between each other, under the NAS Bond. Upon entry of this Order, FWE III shall be authorized and empowered, without further approval of the Bankruptcy Court or any other party, to take such actions and perform such acts as may be necessary, convenient, desirable, or appropriate to execute and deliver the Eni Definitive Documents in accordance with the Plan and Order and to execute and deliver all documents relating thereto and to perform all of their obligations thereunder. On the Effective Date, the Eni Definitive Documents shall constitute legal, valid, binding, and authorized obligations of FWE III enforceable in accordance with their terms, and such obligations of FWE III shall not be enjoined or subject to discharge, impairment, release, avoidance, recharacterization, or subordination by FWE III, the Post- Effective Date Debtors, or the Plan Administrator, under applicable law, the Plan, or this Order.

119.    <u>Hunt</u>.  That certain Turnkey Removal Agreement by and among Hunt Oil Company ("**Hunt**") and Fieldwood Energy LLC ("**Hunt Turnkey Agreement**") (ECF No. 1743) and all transactions contemplated therein and all actions to be taken, undertakings to be made, and obligations to be incurred by the parties thereto, including the allocation of properties to FWE III contemplated therein, are approved without further notice to or action, order, or approval of this Bankruptcy Court and without the need for any further corporate or shareholder action, to enter into, deliver, and fully perform their obligations under the Hunt Turnkey Agreement.

120.    Through the divisive merger transactions contemplated in the Plan, the rights, title and interests of a Debtor or a Post-Effective Date Debtor in the properties described in the Hunt Turnkey Agreement shall be allocated to and vested in FWE III and the applicable documents in

the Plan Supplement shall be amended, revised or conformed accordingly to effectuate such allocation of properties.

121.    Subject to the effectiveness of the Hunt Turnkey Agreement, on the Effective Date, except for the rights and remedies of Hunt to enforce (i) the Plan, (ii) this Order, and (iii) the obligations contemplated in the Hunt Turnkey Agreement, each of the Hunt Released Parties (as defined below) (1) releases any claims for administrative expense under sections 503(b) or 507(a)(2) of the Bankruptcy Code; (2) shall be deemed a Releasing Party under the Plan but only as to any pre-Effective Date claims as against the following Persons only, each in their capacity as such: (a) the DIP Agent and DIP Lenders under the DIP Facility, (b) the Prepetition FLFO Secured Parties, (c) the Consenting Creditors, (d) Prepetition FLFO Collateral Agent, (e) the Prepetition FLTL Agents, (f) the Prepetition SLTL Agent, (g) NewCo and all of its subsidiaries (including the Credit Bid Purchasers), (h) the Exit Facility Agents, (i) the Exit Facility Lenders, (j) the Second Lien Backstop Parties, (k) the ERO Backstop Parties, with respect to each of the foregoing Persons in clauses (a) through (k), in each case solely in their capacity as such, (l) with respect to each of the foregoing Persons in clauses (a) through (k), each such Entity's current and former directors, managers, officers, employees, agents, fund advisors, investment advisors, advisory board members, financial advisors, attorneys, accountants, investment bankers, consultants, representatives and other professionals, such Persons' respective heirs, executors, estates, and nominees, and (m) each of the Debtor's current and former directors, managers, officers, employees, agents, fund advisors, investment advisors, advisory board members, financial advisors, attorneys, accountants, investment bankers, consultants, representatives and other professionals, such Persons' respective heirs, executors, estates, and nominees, in each case solely in their capacity as such (such persons in clauses (a) through (m), the "**Hunt Non-Debtor Released**

**Parties**"); and (3) Hunt Group is deemed to have voluntarily withdrawn its notice of opt out of third party releases (ECF No. 1422) as to the Hunt Non-Debtor Released Parties only; provided, however, and for the avoidance of doubt, Hunt Group is not a Releasing Party under the Plan as against, and does not withdraw its opt out notice as to, any Released Party other than the Hunt Non-Debtor Released Parties.

122.    Subject to the effectiveness of the Hunt Turnkey Agreement, on the Effective Date, Hunt and its affiliates (together "**Hunt Group**") (together with each of their current and former directors, managers, officers, employees, agents, fund advisors, investment advisors, advisory board members, financial advisors, attorneys, accountants, investment bankers, consultants, representatives and other professionals, such Persons' respective heirs, executors, estates, and nominees, the "Hunt Released Parties") will be deemed a Released Party under the Plan but only as to any pre-Effective Date claims of any of the Hunt Non-Debtor Released Parties, each in their capacity as Releasing Parties under the Plan; provided, however, and for the avoidance of doubt, each of the Hunt Released Parties is not a Released Party under the Plan as against any Releasing Party other than the Hunt Non-Debtor Released Parties (each in its capacity as a Releasing Party under the Plan).

123.    Upon entry of this Order, the Debtors, the Post-Effective Date Debtors (including FWE III) and Credit Bid Purchaser shall be authorized and empowered, without further approval of the Bankruptcy Court or any other party, to take such actions and perform such acts as may be necessary, convenient, desirable, or appropriate to execute and deliver the Hunt Turnkey Agreement and to execute and deliver all documents relating thereto and to perform all of their obligations thereunder; such obligations shall not be enjoined or subject to discharge, impairment,

release, avoidance, recharacterization, or subordination by FWE III, the Post-Effective Date Debtors, or the Plan Administrator, under applicable law, the Plan, or this Order.

124.    Except as otherwise provided for herein with respect to the Hunt Non-Debtor Released Parties, nothing herein shall affect or be deemed to restrict or limit each of the Hunt Released Parties' claims for or rights to seek payments or contribution from and any defenses against current or prior working interest owners, predecessors, co-owners and/or operators, or from any other parties that are contractually, legally, regulatorily or equitably liable for decommissioning or related obligations, including obligations under surety bonds, letters of credit or other instruments relating thereto.  For the avoidance of doubt, the Hunt Turnkey Agreements and any documents executed in connection therewith shall be included within the definition of Additional Predecessor Agreement Documents provided in the Plan.

125.    Any and all rights of Hunt Group, the Debtors, the Post-Effective Date Debtors (including FWE III), Credit Bid Purchaser and any Governmental Unit with respect to bonds and letters of credit constituting security for the decommissioning of the properties associated with the Hunt Turnkey Agreement shall be reserved as against such bonding companies and letter of credit issuers in all respects.

126.    On the effectiveness of the Hunt Turnkey Agreement, Hunt shall be deemed to have an Allowed Class 6B General Unsecured Claim in the amount of $22,770,453.  Prime Clerk, the Debtors' claims and noticing agent, is authorized and instructed to update the claims register in this case to include the claim allowed herein.  Hunt may elect in its unfettered discretion to forfeit or waive the claim allowed herein (or any recoveries on account of such claim), or to assign such claim to an affiliate, for any reason or for no reason, by providing written notice to the Plan Administrator under the Plan.

127. <u>XTO</u>. The terms of this paragraph shall apply to the Exxon/XTO Entities[6] and the Executory Contracts identified on the Schedule of Assumed Contracts between any of the Debtors and any one or more of the Exxon/XTO Entities (the "**Exxon/XTO Executory Contracts**"):

    i.    This Order shall not be, and shall not be construed as, a determination of the cure amount or compensation, if any, required to satisfy the provisions of sections 365(b)(1)(A) and 365(b)(1)(B) of the Bankruptcy Code for the assumption of the Exxon/XTO Executory Contracts (the "**Exxon/XTO Cure Amount**").

    ii.    The Debtors, and (a) the Post-Effective Debtors, (b) FWE I, (c) any FWE Additional Entity, or (d) the Credit Bid Purchaser, (each an "**Applicable Contract Entity**"), and the Exxon/XTO Entities shall endeavor in good faith to reach agreement as to the Exxon/XTO Cure Amount within one hundred twenty (120) days following the Effective Date (subject to extension upon mutual agreement of the parties), and if such an agreement is reached, the Debtors or Applicable Contract Entity, as applicable, and applicable Exxon/XTO Entity, shall file a stipulation with the Bankruptcy Court setting forth (i) the agreed Exxon/XTO Cure Amount, and (ii) providing for payment of such Exxon/XTO Cure Amount by the Applicable Contract Entity as a condition to the assumption and assignment of such Exxon/XTO Executory Contract. If the Debtors or Applicable Contract Entity and applicable Exxon/XTO Entity fail to reach agreement as to the Exxon/XTO Cure Amount within such one hundred twenty (120) day period (or upon the expiry of any extension thereof), the Debtors, proposed Applicable Contract Entity or applicable Exxon/XTO Entity may, on notice to the proposed Applicable Contract Entity or applicable Exxon/XTO Entity, request a hearing before the Bankruptcy Court for the determination of the Exxon/XTO Cure Amount. For purposes of determining the Exxon/XTO Cure Amount, the effective date of assumption shall be the Petition Date. Each Exxon/XTO Cure Amount shall be due and payable by the Debtors or the Applicable Contract Entity as set forth in the Plan, regardless of whether the Claims Reserve provided under Section 5.14 of the Plan for payment of cure claims is sufficiently funded.

    iii.    All valid Claims arising from and after the Petition Date under the Exxon/XTO Executory Contracts that have been assumed, assumed and assigned or assumed

---

[6] As used herein, the term "**Exxon/XTO Entities**" shall collectively mean XTO Energy, Inc., XTO Offshore, Inc., HHE Energy Company, XH, LLC, ExxonMobil Corporation, ExxonMobil Production Company, ExxonMobil Pipeline Company, ExxonMobil Oil Supply, Exxon Mobil Exploration Company, Exxon Corporation, Exxon Company, USA, Mobil Oil Corporation, Mobil Exploration Company, Inc., Mobil Exploration & Producing U.S., Inc., Mobil Producing Texas & New Mexico, Inc., Second Mobil Oil Company, Inc., Mobil Oil Exploration and Producing Southeast, Inc., as well as any parent, subsidiary, or affiliate of any of said parties. The term "**Exxon/XTO Entity**" shall refer singularly to any of the Exxon/XTO Entities that are a party to a particular Exxon/ETO Executory Contract.

and allocated shall be deemed to be Allowed Administrative Expense Claims based on a liability incurred by the Debtors in the ordinary course of their business for which no request for allowance of an administrative claim shall be necessary, as contemplated in Section 2.1 of the Plan. However, in the event the Debtors or the Applicable Contract Entity, as applicable, and the applicable Exxon/XTO Entity, are unable to agree on the amount of the Allowed Administrative Claim held by the Exxon/XTO Entity, either party may apply to the Bankruptcy Court for a review and determination thereof.

iv. To the extent that an Exxon/XTO Executory Contract is assumed, assumed and assigned or assumed and allocated, such assumption or assumption and assignment or assumption and allocation shall result in the full release and satisfaction of only those Claims based on a default existing as of the Petition Date with respect to such Exxon/XTO Executory Contract. For the avoidance of doubt, the Plan and this Order shall not alter any of the terms under the Exxon/XTO Executory Contracts.

v. The assumption, assumption and assignment, or assumption and allocation of any Exxon/XTO Executory Contract shall not alter any of the parties' respective rights and obligations under the Exxon/XTO Executory Contracts, including, without limitation, any valid netting (either based on setoff or recoupment), under the Exxon/XTO Executory Contracts or pursuant to applicable law (unless inconsistent with the applicable Exxon/XTO Executory Contract).

vi. The bar date for the Exxon/XTO Entities to file a claim based on the rejection of any executory contracts or unexpired leases between the Debtors and the Exxon/XTO Entities shall be the later of: (a) forty-five (45) days after the filing and service of the notice of the Effective Date, or (b) forty-five (45) days after entry of any order rejecting such executory contract or unexpired lease with the Exxon/XTO Entities. Claims based on the rejection of any executory contracts or unexpired leases between the Debtors and the Exxon/XTO Entities shall be treated as a Class 6B General Unsecured Claim under the Plan.

vii. Any Claim for rejection damages arising from rejection of any executory contracts or unexpired leases between the Debtors and the Exxon/XTO Entities (if any) are reserved for further hearing.

128. The Exxon/XTO Entities have opted out of all third-party releases contained in the Plan and this Order.

129. <u>XTO, RLI Insurance and Liberty</u>. Neither the Plan nor this Order shall have any effect upon or in any manner alter or impair the rights of XTO Offshore, Inc., HHE Energy Company, and XH, LLC (collectively the **"Exxon/XTO Bond Entities"**), as the obligees, or RLI

Insurance Company (**"RLI"**) or Liberty Mutual Insurance Company (**"Liberty"**) as sureties (together, the **"XTO Sureties"**), as between the Exxon/XTO Bond Entities and XTO Sureties under (i) Performance Bond No.RLB0013981 (the **"RLB Bond"**) issued pursuant to the Purchase and Sale Agreement dated effective as of August 1, 2011 (**"Dynamic PSA"**) among Dynamic Offshore Resources, LLC, as principal, the Exxon/XTO Bond Entities as the obligees, and RLI as surety, or (ii) Performance Bond No. 022220643 (the **"Liberty Bond"**), among Fieldwood Energy LLC, as principal, XH, LLC, as obligee, and Liberty Mutual Insurance Company (**"Liberty Insurance"**), as surety, issued pursuant to the agreement pursuant to which Fieldwood Energy LLC acquired XH, LLC assets from Apache Corporation on September 30, 2013 (the **"Fieldwood Agreement"**).

130.    The terms of the RLB Bond and the Liberty Bond (collectively, the **"Exxon/XTO Bonds"**) shall not be altered in any manner, and the rights of the Exxon/XTO Bond Entities and the XTO Sureties pursuant to the Exxon/XTO Bonds, Dynamic PSA, and Fieldwood Agreement, as applicable, and as between each other, shall be unaffected by the Plan and this Order.

131.    Without limiting the generality of the foregoing, nothing in the Plan or this Order shall preclude the Exxon/XTO Bond Entities from giving any notice to, or making any demand upon, the principal on any of the Exxon/XTO Bonds to the extent required by the terms of any of the Exxon/XTO Bonds, the Dynamic PSA, or the Fieldwood Agreement.

132.    Nothing in the Plan or Order shall be deemed to: (a) adjudicate or modify the rights between the Exxon/XTO Bond Entities and the XTO Sureties under the Exxon/XTO Bonds or under applicable law; (b) bar, impair, enjoin, release, alter, diminish or enlarge any of the rights or defenses of the XTO Sureties against any non-Debtors (other than with respect to any NewCo Entity or any Credit Bid Acquired Interests); or (c) constitute a waiver or release of any rights or

defenses that the XTO Sureties hold against any non-Debtor Parties (other than with respect to any NewCo Entity or any Credit Bid Acquired Interests).

133. __BP__. The terms of this paragraph shall apply to the BP Entities[7] and the Executory Contracts identified on the Schedule of Assumed Contracts between any of the Debtors and any BP Entity (the "**BP Executory Contracts**"):

i. This Order shall not be, and shall not be construed as, a determination of the cure amount or compensation, if any, required to satisfy the provisions of sections 365(b)(1)(A) and 365(b)(1)(B) of the Bankruptcy Code for the assumption of the BP Executory Contracts (the "**BP Cure Amount**").

ii. To the extent that a BP Executory Contract is assumed, assumed and assigned or assumed and allocated, such assumption or assumption and assignment or assumption and allocation shall result in the full release and satisfaction of only those Claims based on a default existing as of the Effective Date with respect to such BP Executory Contract. For the avoidance of doubt, the Plan and this Order shall not alter any of the terms under the BP Executory Contracts including, without limitation, any arbitration rights or any valid netting (either based on setoff or recoupment).

iii. The assumption, assumption and assignment, or assumption and allocation of any BP Executory Contract shall not alter, impair or otherwise affect any of the parties' respective rights and obligations under the BP Executory Contracts, including, without limitation, any valid netting (either based on setoff or recoupment) under the BP Executory Contracts or pursuant to applicable law (unless it is inconsistent with the applicable BP Executory Contract); and any rights for arbitration.

iv. The bar date for the BP Entities to file a claim based on the rejection of any executory contracts or unexpired leases between the Debtors and the BP Entities shall be the later of: (a) forty-five (45) days after the filing and service of the notice of the Effective Date, or (b) forty-five (45) days after entry of any order rejecting such executory contract or unexpired lease with the BP Entities. Claims based on the rejection of any executory contracts or unexpired leases between the Debtors and the BP Entities shall be treated as a Class 6B General Unsecured Claim under the Plan.

---

[7] The BP Entities include BP Exploration & Production Inc. and BP American Production Company, together with their successors and assigns.

134.    The BP Entities have opted out of all third-party releases contained in the Plan and this Order.

135.    <u>BP and RLI</u>. Neither the Plan nor this Order shall have any effect upon or in any manner alter or impair the rights (as against the sureties) of the BP Entities or other beneficiaries and obliges under (i) Performance Bond No. RLB0001509 (the "**Panaco/RLI Bond**") among Panaco, Inc., as principal, BP as the obligee, and RLI, as surety, or (ii) Supplemental Bond No. SUR24000026 (the "**Ironshore Bond No. 1**"), among Fieldwood Energy Offshore LLC, as principal, BOEM, as obligee, and Inonshore Indemnity Inc. ("**Ironshore Indemnity**" and, together with RLI, the "**BP Sureties**"), as surety; or (iii) Supplemental Bond No. SUR24000027 (the "**Ironshore Bond No. 2**"), among Fieldwood Energy Offshore LLC, as principal, BOEM, as obligee, and Inonshore Indemnity, as surety.

136.    The terms of the Panaco/RLI Bond, Ironshore Bond No. 1, and Ironshore Bond No. 2 (the "**BP Bonds**") shall not be altered in any manner, and the rights of the BP Entities and BP Sureties, as between each other, pursuant to the Panaco/RLI Bond, Ironshore Bond No. 1, and Ironshore Bond No. 2, as applicable, shall be unaffected by the Plan and this Order.

137.    Without limiting the generality of the foregoing, nothing in the Plan or this Order shall preclude the BP Entities from giving any notice to, or making any demand upon, the principal on any of the BP Bonds to the extent required by the terms of any of the BP Bonds or any agreements relating thereto.

138.    Nothing in the Plan or Order shall be deemed to: (a) adjudicate or modify the rights between the BP Entities and the BP Sureties under the BP Bonds or under applicable law; (b) bar, impair, enjoin, release, alter, diminish or enlarge any of the rights or defenses of the BP Sureties against any non-Debtors (other than with respect to any NewCo Entity or any Credit Bid Acquired

Interests); or (c) constitute a waiver or release of any rights or defenses that the BP Sureties hold against any non-Debtor Parties (other than with respect to any NewCo Entity or any Credit Bid Acquired Interests).

139.    <u>Nippon</u>.  Reference is hereby made for all purposes to that certain Bond No. 1149839, issued by Lexon Insurance Company to Fieldwood Energy LLC, as obligee, on which Northstar Offshore Ventures LLC (formerly, now Sanare Energy Partners LLC) is the principal ("**VR 196 Bond**").  To the extent permitted under the VR 196 Bond and any related agreements, any proceeds of the VR 196 Bond that are received by FWE III, FWE III shall apply such proceeds to Northstar Offshore Group LLC's share of costs and expenses associated with all plugging and abandonment and decommissioning obligations attributable to VR 196 in the event such costs and expenses are not paid by Northstar Offshore Group LLC or Sanare Energy Partners LLC.

140.    Upon the abandonment of certain of the Debtors' rights, title and interests in WD 121 (OCS-G 14893) and WD 122 (OCS-G 13645) (the "**WD 121/122 Leases**", and such abandoned interests in such leases being the "**WD 121/122 Abandoned Interests**"), from and after the Effective Date and until the termination or expiration of such leases, the designated operator or its agent (the "**Designated Operator**") of the WD 121/122 Leases  will periodically determine the difference between (i) the revenues attributable to the WD 121/122 Abandoned Interests over the relevant period and (ii) any costs and expenses attributable to the WD 121/122 Abandoned Interests over the same relevant period (the "**WD 121 Net Cash Amount**") and, to the extent such WD 121 Net Cash Amount is positive, such amount will be credited to a suspense account that will be applied exclusively to satisfy all costs and expenses related to the plugging and abandonment and decommissioning obligations attributable to the WD 121/122 Abandoned

Interests ("**WD 121/122 Suspense Account**") and to the extent such WD 121 Net Cash Amount is negative, such amounts will be debited from the WD 121/122 Suspense Account.  From and after the Effective Date, on a bi-annual basis, the Designated Operator will provide a written report to JX Nippon Oil Exploration (U.S.A.) Limited specifying the balance in the WD 121/122 Suspense Account, together with accounting data in support of such balance.

141.     Notwithstanding anything to the contrary in the Plan, any Plan Supplement, or this Order, neither the Plan, Order, nor any of the transactions contemplated or effectuated under the Plan, shall amend or alter the terms of Bond Nos. B008837, B008838 and B008839 (collectively, the "**Nippon Bonds**") issued by U.S. Specialty Insurance Company ("**USSIC**") to JX Nippon Oil Exploration (U.S.A.) Limited ("**Nippon**"), as obligee, on which Fieldwood Energy Offshore, LLC is the principal.  Neither the Plan, this Order, nor any of the transactions contemplated or effectuated under the Plan, is intended to alter or modify the rights of Nippon or USSIC under the Nippon Bonds, as between each other.  Without limiting the generality of the foregoing, nothing in the Plan, any Plan Supplement or this Order shall preclude Nippon from giving any notice to, or making demand upon, the principal on any of the VR 196 Bond and Nippon Bonds to the extent required by the terms of any of the VR 196 Bond and Nippon Bonds.

142.     Notwithstanding anything to the contrary contained in the Plan, any Plan Supplement, this Order or otherwise, with regard to any and all executory contracts between any of the Debtors and JX Nippon Oil Exploration (U.S.A.) Limited ("**Nippon**") that are assumed under the Plan (the "**Nippon Agreements**"), Nippon's rights are reserved with respect to any Cure Amount relating to the Nippon Agreements and the legal, equitable and contractual rights of the Debtors and Nippon under the Nippon Agreements are unaltered by the Plan, this Order, or any other Plan Documents or assignment, and nothing shall affect or otherwise impair valid common

law or contractual setoff or recoupments rights Nippon may possess. Any amounts owed under the Nippon Agreements and/or disputes thereunder will be resolved in the ordinary course of business including but not limited to resolution of the Cure Amount and for valid setoff or recoupment. Nippon has opted out of all third-party releases contained in the Plan, any Plan Supplement and this Order.

143. <u>Japex</u>. Upon the abandonment of the Debtors' rights, title and interests in WD 90 (OCS-G 1089), WD 103 (OCS-G 12360), Pipeline/ROW (SN 10068), Pipeline/ROW (SN 10069), the WD 103 F Platform located in WD Block 103, any oil and gas wells located on the WD 103-F Platform, and any associated pipelines, rights-of-way, or any other fixtures or infrastructure associated with any of the foregoing (collectively the "**WD 103-F Platform Interests**", and such abandoned interests being the "**WD 103-F Platform Abandoned Interests**"), from and after the Effective Date and until the termination or expiration of such interests, the designated operator or its agent (the "**Designated Operator**") of the WD 103-F Platform Abandoned Interests will periodically determine the difference between (i) the revenues attributable to the WD 103-F Platform Abandoned Interests over the relevant period and (ii) any costs and expenses attributable to the WD 103-F Platform Abandoned Interests over the same relevant period (the "**WD 103 Net Cash Amount**") and, to the extent such WD 103 Net Cash Amount is positive, such amount will be credited to a suspense account that will be applied exclusively to satisfy all costs and expenses related to the plugging and abandonment and decommissioning obligations attributable to the WD 103-F Platform Abandoned Interests ("**WD 103-F Platform Suspense Account**") and to the extent such WD 103 Net Cash Amount is negative, such amounts will be debited from the WD 103-F Platform Suspense Account. From and after the Effective Date, on a bi-annual basis, the Designated Operator will provide a written report to Japex (U.S.) Corp. specifying the balance in

the WD 103-F Platform Suspense Account, together with accounting data in support of such balance.

144.  <u>LLOG</u>.  The Debtors and LLOG Exploration Offshore LLC ("**LLOG**") agree to adjourn the issues raised by LLOG in its objection to the Plan (ECF No. 1481) to a later date to be agreed by the parties.  A hearing to consider the extent, validity, seniority and enforceability of LLOG's secured claim in and to the overriding royalty interest in Green Canyon Block 201 ("**GC 201 ORRI**") will be held by the Bankruptcy Court on July 8, 2021 at 12:30 p.m. (prevailing Central Time).  Notwithstanding section 8.1(a) of the Plan, that certain Offshore Operating Agreement dated December 12, 2002 (as ratified and amended, the "**LLOG Operating Agreement**") shall not be deemed rejected upon the occurrence of the Effective Date and the Debtors reserve the right to seek to assume the LLOG Operating Agreement to the extent that the Bankruptcy Court determines that LLOG holds a valid and enforceable lien in the GC 201 ORRI.

145.  <u>McMoRan, W&T, Merit, COPC, Cox Entities, Shell and Hess</u>.  The rights of McMoRan; W&T; Merit Energy Company, Merit Management Partners I, L.P, Merit Management Partners II, L.P., Merit Management Partners III, L.P., Merit Energy Partners III, L.P. MEP III GOM, LLC, Merit Energy Partners D-III, L.P., Merit Energy Partners E-III, L.P., Merit Energy Partners F-III, L.P., Devon Energy Production Co. LP., (collectively, "**Merit**"); ConocoPhillips Company, The Louisiana Land & Exploration Company and Burlington Resources Offshore (collectively, "**COPC**"); the Cox Entities; Shell Offshore Inc. ("**Shell**"); and Hess Corporation ("**Hess**"), including, but not limited to, security interests, security rights, contract rights, setoff and recoupment rights, and subrogation rights, against non-Debtors (other than with respect to any NewCo Entity or any Credit Bid Acquired Interests , in each case except with respect to any right, claim, or interest arising under an agreement assumed and assigned or allocated to any NewCo

Entity and with respect to any post Effective Date rights, including subrogation rights, arising out of any post Effective Date operations, ownership, act, event or occurrence with respect to the Credit Bid Acquired Interests) (the prior parenthetical is the "**NewCo Carve Out**") under operating agreements, other contracts, and applicable law are hereby reserved. Subject to the NewCo Carve Out, nothing contained in the Plan, Order, and related exhibits and associated transaction documents shall be deemed or construed to be a release or discharge of any liability or obligations of any third parties to McMoRan, Merit, W&T, COPC, the Cox Entities, Shell, and Hess, including with respect to decommissioning liabilities of Debtors' predecessors and any other co-liable and/or jointly and severally liable parties with respect to Debtors' assets. McMoRan's, Merit's, W&T's, COPC's, the Cox Entities', Shell's, and Hess's claims and causes of action against any such third parties are hereby reserved. For the avoidance of doubt, McMoRan, W&T, Merit, COPC, the Cox Entities, Shell and/or Hess shall not be "Releasing Parties" under the Plan.

146. <u>Shell</u>. The Plan Documents shall not have any effect upon or in any manner alter or impair the rights of USSIC, Shell or other beneficiaries and obligees (as between each other) under Performance Bond No. B009344 (the "**Shell Bond**"), or any agreements relating thereto, among Fieldwood Energy Offshore, LLC, as principal, Shell as the obligee and USSIC as surety. For the avoidance of doubt, USSIC and Shell reserve all rights as between each other under the Shell Bond. Without limiting the generality of the foregoing, nothing in the Plan Documents shall preclude Shell from giving any notice to, or making demand upon, the principal on the Shell Bond to the extent required by the terms of the Shell Bond or any agreements relating thereto.

147. <u>Cox</u>. The terms of this paragraph shall apply to the Cox Entities and the Executory Contracts identified on the Schedule of Assumed Contracts between any of the Debtors and any Cox Entity (the "**Cox Assumed Contracts**"). The assumption, assumption and assignment, or

assumption and allocation of any Cox Assumed Contract shall not alter, impair or otherwise affect any of the parties' respective rights and obligations under the Cox Assumed Contracts, including, without limitation, any valid netting (either based on setoff or recoupment) under the Cox Assumed Contracts or pursuant to applicable law (unless inconsistent with the applicable Cox Assumed Contract); and any rights for arbitration. The bar date for the Cox Entities to file a claim based on the rejection of any executory contracts or unexpired leases between the Debtors and the Cox Entities shall be the later of: (a) forty-five (45) days after the filing and service of the notice of the Effective Date, or (b) forty-five (45) days after entry of any order rejecting such executory contract or unexpired lease with the Cox Entities.

148. <u>Hess</u>. To the extent Hess elects to assume the role of decommissioning party of the Abandoned Properties and any related facilities that were previously owned by Hess, including but not limited to, any wells, pipelines, or other structures (collectively, the "**Hess Abandoned Assets**") prior to the expiration of the Transition Period (as defined in section 5.13 of the Plan), the Post-Effective Debtors shall promptly facilitate the safe and orderly transition of the Hess Abandoned Assets to Hess, and cooperate in good faith with Hess to ensure such safe and orderly transition, in compliance with applicable federal law; *provided*, *however*, that the Post-Effective Date Debtors, as applicable, shall not be required to conduct activities beyond the scope of the Transition Services and the Agreed Activities with respect to the Hess Abandoned Assets in connection with such election.

149. <u>Governmental Approvals</u>. Except as otherwise expressly provided for or contemplated in the Plan, the Plan Documents, or this Order, and except for any regulatory approvals that might be required by reason of the business conducted by the Post-Effective Date Debtors, FWE I, FWE IV, any FWE Additional Entity, or NewCo and its subsidiaries, this Order

shall constitute all approvals and consents required, if any, by the laws, rules, or regulations of any state or any other governmental authority with respect to the implementation or consummation of the Plan and any documents, instruments, or agreements, and any amendments or modifications thereto, and any other acts referred to in or contemplated by the Plan, the Plan Documents, this Order, and the Disclosure Statement, and any documents, instruments, or agreements, and any amendments or modifications thereto. Each federal, state, commonwealth, local, foreign, or other governmental agency is directed and authorized to accept the validity of (a) any and all documents, trust agreements, mortgages, and instruments, and (b) all actions of the Debtors that are necessary or appropriate to effectuate, implement, or consummate the transactions contemplated by the Plan, the Plan Documents, or this Order, and the agreements created or contemplated by the Plan or this Order, without payment of any recording tax, stamp tax, transfer tax, or similar tax imposed by state or local law.

150. <u>Reservation of Rights of any Governmental Unit, including the United States</u>. Nothing in this Order or the Plan Documents discharges, releases, precludes, or enjoins: (i) any liability to a Governmental Unit that is not a Claim; (ii) only as it relates to Governmental Units, any liability against the Debtors to maintain, monitor, plug and abandon and/or decommission offshore infrastructure as required by law, (iii) any Claim of a Governmental Unit arising on or after the Confirmation Date; (iv) any liability of any entity or person under police or regulatory statutes or regulations to a Governmental Unit as the owner or operator of property or rights to property that such entity owns or operates after the Confirmation Date; and (v) any liability to a Governmental Unit on the part of any non-Debtor (the "**Government Reservations**"). Nor shall anything in the Plan Documents enjoin or otherwise bar a Governmental Unit from asserting or enforcing, outside the Bankruptcy Court, any liability described in the first sentence of this

paragraph consistent with its terms, and nothing in the Plan Documents divests any tribunal of any jurisdiction it may have under police or regulatory law to interpret the Plan Documents or to adjudicate any defense asserted under the Plan Documents. Notwithstanding anything to the contrary in Plan Documents, nothing shall affect any of the United States' setoff and recoupment rights, or any of the Debtors', Post-Effective Date Debtors', and/or any successor(s) and assign(s) defenses thereto.

151.    Nothing in this Order shall alter, waive, or release the Debtors obligations to comply with laws reasonably designed to protect the public health or safety from the hazards to the health, safety, or the environment, including the obligation to perform any decommissioning.

152.    Notwithstanding any provision to the contrary in the Plan Documents, no sale, assignment, and/or transfer of any interest in contracts, leases, covenants, operating rights agreements, rights-of-use and easement, and rights-of-way or other interests or agreements with the federal government involving federal land or minerals in effect on or after the Confirmation Date (collectively, the "**Federal Leases**") may take place pursuant to the Plan Documents absent the consent of the United States, including any of its components, as provided for in applicable non-bankruptcy laws and regulations.

153.    Notwithstanding any provision to the contrary in the Plan Documents, the United States will retain and have the right to audit and/or perform any compliance review and, if appropriate, collect from the Debtors, Post-Effective Date Debtors, and/or any successor(s) and assign(s) in full any additional monies owed by the Debtors with respect to any assumed Federal Leases and those rights shall not be adversely affected by these bankruptcy proceedings. Such rights shall be preserved in full as if these Chapter 11 Cases had not occurred. Furthermore, nothing in the Plan Documents shall be interpreted to set Cure Amounts or require the United

States to novate, approve or consent to any sale, assignment, and/or transfer of any interests in the Federal Leases except pursuant to existing regulatory requirements and applicable law. The Debtors, Post-Effective Date Debtors, and any successor(s) and assign(s), will retain all defenses and/or rights, other than defenses and/or rights arising from these Chapter 11 Cases, to challenge any such determination; provided, however, that any such challenge, including any challenge associated with these bankruptcy cases, must be raised in the United States' administrative review process leading to a final agency determination by the Department of the Interior. The audit and/or compliance review period shall remain open for the full statute of limitations period established by the Federal Oil and Gas Royalty Simplification and Fairness Act of 1996, 30 U.S.C. § 1702, et seq.

154.    For the avoidance of doubt, only as it relates to the United States, nothing in the Plan Documents releases the Debtors or Post-Effective Date Debtors from any reclamation, plugging and abandonment, or other operational requirement under applicable federal non-bankruptcy law with respect to the Federal Leases or addresses or otherwise affects any decommissioning obligations and financial assurance requirements under the Federal Leases, as determined by the United States, that must be met by the Debtors, Post-Effective Date Debtors, or their successors and assigns on the Federal Leases going forward; *provided, however*, that upon the Effective Date, neither the Credit Bid Purchasers nor any other NewCo Entity shall have any liability to a Governmental Unit or any other third party for Federal Leases, including civil penalties, response costs, decommissioning or any other obligations including those under the Government Settlements, except for those obligations assumed under the Credit Bid Purchase Agreement by Credit Bid Purchasers in connection with the Credit Bid Acquired Interests upon

the consent by the Government Unit of the assignment of such Federal Leases in favor of the Credit Bid Purchaser.

155.  <u>Effectiveness of All Actions</u>.  All actions contemplated by the Plan, including all actions in connection with the Credit Bid Purchase Agreement, the NewCo Organizational Documents, the GUC Warrant Agreement, New Money Warrant Agreement, SLTL Tranche 1 Warrant Agreement, SLTL Tranche 2 Warrant Agreement, the Exit Facility Documents are hereby effective and authorized to be taken on, prior to, or after the Effective Date, as applicable, under this Order, without further application to, or order of the Bankruptcy Court, or further action by the respective officers, directors, managers, members, or equity holders of the Debtors or the Post-Effective Date Debtors and with the effect that such actions had been deemed taken by unanimous action of such officers, directors, managers, members, or equity holders.

156.  <u>Valid and Binding</u>.  All documents necessary to implement the Plan (including, without limitation, the Credit Bid Purchase Agreement) and all other relevant and necessary documents have been negotiated in good faith and at arm's length and shall, upon completion of documentation and execution, be valid, binding, and enforceable agreements.

157.  <u>Injunction Against Interference with Plan</u>.  Except as otherwise provided in the Plan or this Order, upon entry of this Order, all holders of Claims or Interests and other parties in interest, along with their respective present and former affiliates, employees, agents, officers, directors, and principals, shall be enjoined from taking any action to interfere with the implementation or consummation of the Plan.

158.  <u>Notice of Entry of Confirmation Order</u>.  On or before the fourteenth (14th) day following the date of entry of this Order, the Debtors shall serve notice of entry of this Order pursuant to Bankruptcy Rules 2002(f)(7), 2002(k), and 3020(c) on all creditors and interest

holders, the U.S. Trustee, and other parties in interest, by causing notice of entry of this Order (the "**Notice of Confirmation**"), to be delivered to such parties by first-class mail, postage prepaid.  The Debtors shall also post the Notice of Confirmation on the website maintained by the Solicitation Agent, at https://cases.primeclerk.com/fieldwoodenergy/ (the "**Case Website**").  The notice described herein is adequate under the circumstances, and no other or further notice is necessary.

159.   <u>Notice of Effective Date</u>.  As soon as practicable after the occurrence of the Effective Date, the Debtors shall serve notice of the Effective Date on all creditors and interest holders, the U.S. Trustee, and other parties in interest, by causing notice of the Effective Date to be delivered to such parties by first-class mail, postage prepaid.  The Debtors shall also post the Notice of Effective Date on the Case Website.  The Notice of Effective Date shall include notice of the deadline for (a) filing proofs of claim arising out of rejection of executory contracts upon the Effective Date, and (b) filing administrative expense claims.

160.   <u>Retention of Jurisdiction</u>.  Pursuant to sections 105(a) and 1142 of the Bankruptcy Code, except as set forth in paragraph 150 of this Order, this Bankruptcy Court shall retain exclusive jurisdiction with respect to all matters arising from or related to the Chapter 11 Cases, the Plan, and the implementation of this Order, including, without limitation, those matters set forth in Section 11 of the Plan.

161.   <u>Payment of Statutory Fees</u>.  On the Effective Date and thereafter as may be required, the Debtors or the Post-Effective Date Debtors, as applicable, shall pay all fees incurred pursuant to § 1930 of title 28 of the United States Code, together with interest, if any, pursuant to § 3717 of title 31 of the United States Code for each Debtor's case, or until such time as a final decree is entered closing a particular Debtor's case, a Final Order converting such Debtor's case

to a case under chapter 7 of the Bankruptcy Code is entered or a Final Order dismissing such

Debtor's case is entered.

162.    <u>Documents, Mortgages, and Instruments</u>.    Each federal, state, commonwealth,

local, foreign, or other governmental agency is hereby authorized to accept any and all documents,

mortgages, and instruments necessary or appropriate to effectuate, implement or consummate the

transactions contemplated by the Plan.

163.    <u>Activities in Anticipation of the Effective Date</u>.    The Debtors are hereby authorized

and empowered to take all necessary steps, and pay all related expenses, in anticipation of the

Effective Date, including, without limitation, effectuating the transactions contemplated by the

Plan and this Order.

164.    <u>Substantial Consummation</u>.    On the Effective Date, the Plan shall be deemed to be

substantially consummated pursuant to sections 1101 and 1127(b) of the Bankruptcy Code.

165.    <u>Severability</u>.    This Order shall constitute a judicial determination and shall provide

that each term and provision of the Plan, as it may be amended in accordance with Section 12.5 of

the Plan, is (a) valid and enforceable pursuant to its terms, (b) integral to the Plan and may not be

deleted or amended other than in accordance with Section 12.5 of the Plan, and (c) non-severable

and mutually dependent.

166.    <u>Immediate Binding Effect</u>.    To the fullest extent permitted under the Bankruptcy

Code and other applicable nonbankruptcy law on or after entry of this Order and subject to the

occurrence of the Effective Date, the terms of the Plan (including the exhibits and schedules thereto

and all documents and agreements executed pursuant thereto or in connection therewith), the Plan

Supplements, and this Order shall be immediately effective and enforceable and shall bind the

Post-Effective Date Debtors, the Released Parties, the Exculpated Parties, all holders of Claims

and Interests (irrespective of whether such Claims or Interests are impaired under the Plan or whether the holders of such Claims or Interests accepted or are deemed to have accepted the Plan), any other person giving, acquiring, or receiving property under the Plan, any and all non-Debtor parties to executory contracts and unexpired leases with any of the Debtors, any other party in interest in the Chapter 11 Cases, and the respective heirs, executors, administrators, successors, or assigns, if any, of any of the foregoing. On the Effective Date, all settlements, compromises, releases (including, without limitation, the releases set forth in Sections 10.7 of the Plan), waivers, discharges, exculpations, and injunctions set forth in the Plan shall be effective and binding on Persons who may have had standing to assert any settled, compromised, released, waived, discharged, exculpated, or enjoined Causes of Action after the Effective Date.

167. The Exculpation set forth in section 10.8 of the Plan is hereby approved entirely with respect to each of the Exculpated Parties pursuant to sections 105, 1123(b)(3), and 1123(b)(6) of the Bankruptcy Code. The scope of the Exculpation, in respect of the time period or actions covered, shall be construed in accordance with *In re Pacific Lumber Co.*, 584 F.3d 229 (5th Cir. 2009). The Bankruptcy Court retains exclusive jurisdiction to determine the scope of the Exculpation.

168. Conflicts Between Order and the Plan. To the extent of any inconsistency between the provisions of the Plan and this Order, the terms and provisions contained in this Order shall govern. The provisions of this Order are integrated with each other and are nonseverable and mutually dependent unless expressly stated by further order of this Bankruptcy Court.

169. Modifications and Amendments. The Plan may be amended, modified, or supplemented by the Debtors in accordance with Section 12.5 of the Plan.

170.   <u>Final Order</u>.  This Order is a final order and the period in which an appeal must be filed shall commence upon the entry hereof.

171.   <u>Payment of DIP Claims</u>.  Except to the extent that a holder of a DIP Claim agrees in writing to a different treatment, each holder of a DIP Claim shall be paid in full in Cash in an amount equal to the full amount of such Claims in accordance with the DIP Facility Credit Agreement and DIP Documents as provided under Section 2.3 and 2.4 of the Plan and the DIP Order.

172.   <u>Expiration of Challenge Period</u>.  The Challenge Period (as defined in the DIP Order) has expired as to all parties in interest, including the Creditors' Committee.

173.   <u>Stay of Confirmation Order</u>.  Notwithstanding anything to the contrary in the Plan, this Order shall be stayed until the expiration of 14 days after entry of this Order in accordance with Bankruptcy Rule 3020(e).

Signed: June 25, 2021

_____
Marvin Isgur
United States Bankruptcy Judge

**Exhibit A**

Plan

_

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| In re: | § | Chapter 11 |
| | § | |
| FIELDWOOD ENERGY LLC, *et al.*, | § | Case No. 20-33948 (MI) |
| | § | |
| Debtors.[1] | § | (Jointly Administered) |
| | § | |

**EIGHTH AMENDED JOINT CHAPTER 11 PLAN**
**OF FIELDWOOD ENERGY LLC AND ITS AFFILIATED DEBTORS**

**WEIL, GOTSHAL & MANGES LLP**
Alfredo R. Pérez
Clifford W. Carlson
700 Louisiana Street, Suite 1700
Houston, Texas 77002
Telephone: (713) 546-5000
Facsimile: (713) 224-9511

**WEIL, GOTSHAL & MANGES LLP**
Matthew S. Barr (admitted *pro hac vice*)
Jessica Liou (admitted *pro hac vice*)
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007

*Attorneys for Debtors*
*and Debtors in Possession*

Dated: June 25, 2021
Houston, Texas

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, as applicable, are: Dynamic Offshore Resources NS, LLC (0158); Fieldwood Energy LLC (6778); Fieldwood Energy Inc. (4991); Fieldwood Energy Offshore LLC (4494); Fieldwood Onshore LLC (3489); Fieldwood SD Offshore LLC (8786); Fieldwood Offshore LLC (2930); FW GOM Pipeline, Inc. (8440); GOM Shelf LLC (8107); Bandon Oil and Gas GP, LLC (9172); Bandon Oil and Gas, LP (9266); Fieldwood Energy SP LLC (1971); Galveston Bay Pipeline LLC (5703); and Galveston Bay Processing LLC (0422). The Debtors' primary mailing address is 2000 W. Sam Houston Parkway S., Suite 1200, Houston, TX 77042.

## Table of Contents

ARTICLE I.    Definitions and Interpretation. ........................................................................... 1
    1.1    Definitions. ................................................................................................. 1
    1.2    Interpretation; Application of Definitions; Rules of Construction. ........................ 29
    1.3    Reference to Monetary Figures. ................................................................... 30
    1.4    Controlling Document. .............................................................................. 30
    1.5    Certain Consent Rights ............................................................................. 30

ARTICLE II.    Administrative Expense Claims, Fee Claims, DIP Claims, and
               Priority Tax Claims. ....................................................................... 31
    2.1    Treatment of Administrative Expense Claims. ................................................ 31
    2.2    Treatment of Fee Claims. ........................................................................... 31
    2.3    Treatment of DIP Claims. ........................................................................... 32
    2.4    Payment of Fees and Expenses Under DIP Order. ........................................... 32
    2.5    Treatment of Priority Tax Claims. ................................................................ 33
    2.6    Restructuring Expenses. ............................................................................ 33
    2.7    Postpetition Hedge Claims. ......................................................................... 33

ARTICLE III.    Classification of Claims and Interests .................................................... 34
    3.1    Classification in General. ........................................................................... 34
    3.2    Formation of Debtor Groups for Convenience Only. ....................................... 34
    3.3    Summary of Classification of Claims and Interests. ........................................ 34
    3.4    Special Provision Governing Unimpaired Claims. .......................................... 35
    3.5    Separate Classification of Other Secured Claims. ........................................... 35
    3.6    Elimination of Vacant Classes. ................................................................... 35
    3.7    Voting Classes; Presumed Acceptance by Non-Voting Classes. ........................... 35
    3.8    Voting; Presumptions; Solicitation. .............................................................. 36
    3.9    Cramdown. ............................................................................................. 36
    3.10   No Waiver. .............................................................................................. 36

ARTICLE IV.    Treatment of Claims and Interests ......................................................... 36
    4.1    Class 1: Other Secured Claims. ................................................................... 36
    4.2    Class 2:  Priority Non-Tax Claims. ............................................................... 37
    4.3    Class 3:  FLFO Claims. .............................................................................. 37
    4.4    Class 4:  FLTL Claims. .............................................................................. 38
    4.5    Class 5:  SLTL Claims. .............................................................................. 38
    4.6    Class 6A:  Unsecured Trade Claims. ............................................................ 38
    4.7    Class 6B: General Unsecured Claims. .......................................................... 39
    4.8    Class 7:  Intercompany Claims. ................................................................... 39
    4.9    Class 8:  Subordinated Securities Claims. ..................................................... 39
    4.10   Class 9:  Intercompany Interests. ................................................................ 40
    4.11   Class 10:  Existing Equity Interests. ............................................................ 40
    4.12   Treatment of Vacant Classes. ..................................................................... 40

ARTICLE V.    Means for Implementation ........................................................................ 40
    5.1    Plan Settlement; Compromise and Settlement of Claims, Interests, and
           Controversies. ......................................................................................... 40
    5.2    Credit Bid Transaction; Confirmation Outside Date. ....................................... 41

| | | |
|---|---|---|
| 5.3 | Equity Rights Offerings. | 43 |
| 5.4 | New Equity Interests. | 44 |
| 5.5 | NewCo Organizational Documents | 44 |
| 5.6 | New Money Warrants, SLTL Warrants and GUC Warrants | 44 |
| 5.7 | Plan of Merger | 45 |
| 5.8 | Single Share | 45 |
| 5.9 | Plan Administrator | 46 |
| 5.10 | Plan Funding. | 52 |
| 5.11 | The Exit Facilities | 52 |
| 5.12 | Apache Definitive Documents. | 53 |
| 5.13 | Abandonment of Certain Properties. | 54 |
| 5.14 | Establishment of Claims Reserve. | 56 |
| 5.15 | Plan Administrator Expense Reserve. | 56 |
| 5.16 | Continued Corporate Existence; Effectuating Documents; Further Transactions. | 57 |
| 5.17 | Corporate Action. | 58 |
| 5.18 | Cancellation of Existing Securities and Agreements. | 58 |
| 5.19 | Cancellation of Certain Existing Security Interests. | 59 |
| 5.20 | Intercompany Interests; Corporate Reorganization. | 60 |
| 5.21 | Restructuring Transactions. | 60 |
| 5.22 | Liquidating Trust. | 60 |
| 5.23 | Securities Exemptions. | 61 |
| 5.24 | Closing of Chapter 11 Cases. | 62 |
| **ARTICLE VI.** | **Distributions.** | **62** |
| 6.1 | Distributions Generally. | 62 |
| 6.2 | No Postpetition Interest on Claims. | 62 |
| 6.3 | Date of Distributions. | 63 |
| 6.4 | Distribution Record Date. | 63 |
| 6.5 | Distributions after Effective Date | 63 |
| 6.6 | Delivery of Distributions. | 63 |
| 6.7 | Unclaimed Property. | 63 |
| 6.8 | Satisfaction of Claims. | 64 |
| 6.9 | Manner of Payment under Plan. | 64 |
| 6.10 | De Minimis Cash Distributions. | 64 |
| 6.11 | No Distribution in Excess of Amount of Allowed Claim. | 64 |
| 6.12 | Allocation of Distributions Between Principal and Interest. | 64 |
| 6.13 | Setoffs and Recoupments. | 65 |
| 6.14 | Withholding and Reporting Requirements. | 65 |
| 6.15 | Claims Paid by Third Parties. | 66 |
| 6.16 | Claims Payable by Third Parties. | 66 |
| **ARTICLE VII.** | **Procedures for Disputed Claims** | **66** |
| 7.1 | Allowance of Claims. | 66 |
| 7.2 | Claims Objections. | 67 |
| 7.3 | Estimation of Claims. | 67 |
| 7.4 | Adjustment to Claims Register Without Objection. | 67 |
| 7.5 | Time to File Objections to Claims. | 67 |

| | | |
|---|---|---|
| 7.6 | Disallowance of Claims. | 68 |
| 7.7 | Amendments to Claims. | 68 |
| 7.8 | No Distributions Pending Allowance. | 68 |
| 7.9 | Distributions After Allowance. | 68 |
| 7.10 | Claims Resolution Procedures Cumulative. | 68 |

**ARTICLE VIII. Executory Contracts and Unexpired Leases** ........... 68

| | | |
|---|---|---|
| 8.1 | General Treatment. | 68 |
| 8.2 | Determination of Cure Amounts and Deemed Consent. | 69 |
| 8.3 | Rejection Damages Claims. | 71 |
| 8.4 | Survival of the Debtors' Indemnification Obligations. | 71 |
| 8.5 | Insurance Policies. | 72 |
| 8.6 | Modifications, Amendments, Supplements, Restatements, or Other Agreements. | 72 |
| 8.7 | Reservation of Rights. | 72 |

**ARTICLE IX. Conditions Precedent to Occurrence of Effective Date.** ............... 73

| | | |
|---|---|---|
| 9.1 | Conditions Precedent to Effective Date. | 73 |
| 9.2 | Waiver of Conditions Precedent. | 75 |
| 9.3 | Effect of Failure of a Condition. | 75 |

**ARTICLE X. Effect of Confirmation** ........... 76

| | | |
|---|---|---|
| 10.1 | Binding Effect. | 76 |
| 10.2 | Vesting of Assets. | 76 |
| 10.3 | Discharge of Claims Against and Interests in Debtors. | 76 |
| 10.4 | Pre-Confirmation Injunctions and Stays. | 77 |
| 10.5 | Injunction Against Interference With Plan. | 77 |
| 10.6 | Plan Injunction. | 77 |
| 10.7 | Releases. | 78 |
| 10.8 | Exculpation. | 85 |
| 10.9 | Injunction Related to Releases and Exculpation. | 86 |
| 10.10 | Subordinated Securities Claims. | 86 |
| 10.11 | Retention of Causes of Action and Reservation of Rights. | 87 |
| 10.12 | Ipso Facto and Similar Provisions Ineffective. | 87 |
| 10.13 | Indemnification and Reimbursement Obligations. | 87 |

**ARTICLE XI. Retention of Jurisdiction** ........... 88

| | | |
|---|---|---|
| 11.1 | Retention of Jurisdiction. | 88 |

**ARTICLE XII. Miscellaneous Provisions** ........... 90

| | | |
|---|---|---|
| 12.1 | Payment of Statutory Fees | 90 |
| 12.2 | Exemption from Certain Transfer Taxes. | 90 |
| 12.3 | Request for Expedited Determination of Taxes. | 90 |
| 12.4 | Dates of Actions to Implement Plan. | 91 |
| 12.5 | Amendments. | 91 |
| 12.6 | Revocation or Withdrawal of Plan. | 91 |
| 12.7 | Severability. | 92 |
| 12.8 | Governing Law. | 92 |
| 12.9 | Immediate Binding Effect. | 92 |

12.10   Successors and Assigns..................................................................................... 92
12.11   Entire Agreement. ....................................................................................... 92
12.12   Computing Time. ........................................................................................ 93
12.13   Exhibits to Plan. ......................................................................................... 93
12.14   Notices. ...................................................................................................... 93
12.15   Reservation of Rights.................................................................................. 94
12.16   Dissolution of Creditors' Committee.......................................................... 95

Each of Fieldwood Energy LLC; Fieldwood Energy Inc.; Dynamic Offshore Resources NS, LLC; Fieldwood Energy Offshore LLC; Fieldwood Onshore LLC; Fieldwood SD Offshore LLC; Fieldwood Offshore LLC; FW GOM Pipeline, Inc.; GOM Shelf LLC; Bandon Oil and Gas GP, LLC; Bandon Oil and Gas, LP; Fieldwood Energy SP LLC; Galveston Bay Pipeline LLC; and Galveston Bay Processing LLC (each, a "**Debtor**" and collectively, the "**Debtors**") proposes the following joint chapter 11 plan of reorganization pursuant to section 1121(a) of the Bankruptcy Code. Capitalized terms used herein shall have the meanings set forth in Section 1.1 below.

# ARTICLE I.    DEFINITIONS AND INTERPRETATION.

## 1.1    *Definitions.*

The following terms shall have the respective meanings specified below:

*363 Credit Bid Transaction* means the sale of the Credit Bid Acquired Interests to the Credit Bid Purchasers pursuant to section 363 of the Bankruptcy Code on substantially the same terms as provided in the Credit Bid Purchase Agreement in accordance with Section 5.2(c) of this Plan.

*Abandoned Properties* means the Debtors' rights to and interests in executory contracts and unexpired federal leases, rights-of-way, and right-of-use-and-easements listed on the Schedule of Abandoned Properties (as amended, supplemented, or otherwise modified from time to time).

*Accepting Class* means a class of Claims or Interests that votes to accept this Plan in accordance with section 1126 of the Bankruptcy Code.

*Ad Hoc Group of Secured Lenders* means the ad hoc group of holders of Prepetition FLTL Loans and Prepetition SLTL Loans that is represented by the Ad Hoc Group of Secured Lenders Advisors.

*Ad Hoc Group of Secured Lenders Advisors* means Davis Polk & Wardwell LLP, Haynes and Boone LLP, Gordon, Arata, Montgomery, Barnett, McCollam, Duplantis & Eagan, LLC, Rothschild & Co US Inc. and Intrepid Financial Partners, LLC and any local or foreign advisors.

*Ad Hoc Group of Prepetition SLTL Lenders* means that certain ad hoc group of holders of Prepetition SLTL Loans that is represented by the Ad Hoc Group of Prepetition SLTL Advisors.

*Ad Hoc Group of Prepetition SLTL Lenders Advisors* means only Kasowitz Benson Torres LLP.

**Additional Predecessor Agreement** means any postpetition, consensual agreement (i) included in the Plan Supplement or (ii) that the Debtors may enter into prior to or on the Effective Date, of which notice was filed or given at least seven (7) days prior to the Effective Date, in each case with any entity or entities in the chain of title, co-working interest owner(s), or other related party for decommissioning of or transition services for any of the Abandoned Properties.

**Additional Predecessor Agreement Document** means any agreement or document entered into after the Petition Date as contemplated by and necessary to the consummation of an Additional Predecessor Agreement.

**Administrative Expense Claim** means any Claim constituting a cost or expense of administration incurred during the Chapter 11 Cases of a kind specified under section 503(b) of the Bankruptcy Code and entitled to priority under sections 507(a)(2), 507(b), or 1114(e)(2) of the Bankruptcy Code (other than DIP Claims and Postpetition Hedge Claims), including (a) the actual and necessary costs and expenses incurred after the Petition Date and through the Effective Date of preserving the Estates and operating the businesses of the Debtors (such as wages, salaries, or commissions for services and payments for goods and other services and leased premises), and (b) Fee Claims.

**Allowed** means, with respect to any Claim against or Interest in a Debtor, (a) (i) that is timely filed by the bar dates established in the Chapter 11 Cases, or (ii) as to which there exists no requirement for the holder of a Claim to file such Claim under the Plan, the Bankruptcy Code, the Bankruptcy Rules or a Final Order, (b) (i) that is listed in the Schedules as not contingent, not unliquidated, and not disputed, and (ii) for which no contrary proof of claim has been timely filed, or (c) allowed under the Plan or by a Final Order (including the DIP Order). With respect to any Claim described in clause (a) above, such Claim will be considered allowed only if, and to the extent that, (A) no objection to the allowance of such Claim has been asserted, or may be asserted, on or before the time period set forth in the Plan, and no request for estimation or other challenge, including pursuant to section 502(d) of the Bankruptcy Code or otherwise, has been interposed and not withdrawn within the applicable period fixed by the Plan or applicable law, (B) an objection to such Claim is asserted and such Claim is subsequently allowed pursuant to a Final Order, (C) such Claim is settled pursuant to an order of the Bankruptcy Court, or (D) such Claim is allowed pursuant to the Plan or any agreements related thereto and such allowance is approved and authorized by the Bankruptcy Court; *provided*, *however*, that notwithstanding the foregoing, the Post-Effective Date Debtors shall retain all claims and defenses with respect to Allowed Claims that are reinstated or otherwise unimpaired pursuant to the Plan. If a Claim is Allowed only in part, any provisions hereunder with respect to Allowed Claims are applicable solely to the Allowed portion of such Claim. Notwithstanding the foregoing, unless expressly waived herein, the Allowed amount of Claims or Interests shall be subject to and shall not exceed the limitations or maximum amounts permitted by the Bankruptcy Code, including sections 502 or 503 of the Bankruptcy Code, to the extent applicable.

**Amended Organizational Documents** means the certificates of incorporation, certificates of formation, bylaws, limited liability company agreements, stockholders agreement, and the operating agreements or other similar organizational or formation documents, as applicable, of the Post-Effective Date Debtors.

2

*Apache* means Apache Corporation.

*Apache Definitive Documents* has the meaning set forth in the Apache Implementation Agreement.

*Apache Fees and Expenses* has the meaning set forth in the Apache Implementation Agreement.

*Apache Implementation Agreement* means that certain Implementation Agreement, dated January 1, 2021, by and among Debtor Fieldwood Energy LLC and Debtor GOM Shelf LLC, on the one hand, and the Apache PSA Parties on the other hand, as may be amended, restated, or otherwise modified pursuant to the terms thereof; *provided* that such amendment, restatement, or other modification is reasonably acceptable to the Debtors, the Apache PSA Parties, the Required DIP Lenders and Requisite FLTL Lenders.

*Apache Implementation Costs* has the meaning ascribed to "Implementation Costs" in the Apache Implementation Agreement.

*Apache PSA Parties* means, collectively, Apache, Apache Shelf, Inc., Apache Deepwater LLC, and Apache Shelf Exploration LLC.

*Apache Term Sheet* has the meaning set forth in the Restructuring Support Agreement.

*Asset* means all of the rights, title, and interests of a Debtor in and to property of whatever type or nature (including real, personal, mixed, intellectual, tangible, and intangible property).

*Assumption Dispute* means an unresolved objection regarding assumption or assumption and assignment of an executory contract or unexpired lease pursuant to section 365 of the Bankruptcy Code, including objections based on the appropriate Cure Amount or "adequate assurance of future performance" (within the meaning of section 365 of the Bankruptcy Code).

*Avoidance Actions* means all claims and causes of action that may be commenced by or on behalf of the Debtors pursuant to sections 544, 545, 547, 548, 549, 550 and 551 of the Bankruptcy Code or similar nonbankruptcy law, including similar or related state or federal statute and common law.

*Backstop Commitment Premium Equity Interests* means the Second Lien Backstop Commitment Premium Equity Interests, the FLTL ERO Backstop Commitment Premium Equity Interests, and the SLTL ERO Backstop Commitment Premium Equity Interests.

*Bankruptcy Code* means title 11 of the United States Code, 11 U.S.C. §§ 101-1532, as amended from time to time, as applicable to these Chapter 11 Cases.

*Bankruptcy Court* means the United States Bankruptcy Court for the Southern District of Texas having jurisdiction over the Chapter 11 Cases and, to the extent of any reference made under section 157 of title 28 of the United States Code or the Bankruptcy Court is determined

not to have authority to enter a Final Order on an issue, the District Court having jurisdiction over the Chapter 11 Cases under section 151 of title 28 of the United States Code.

**Bankruptcy Rules** means the Federal Rules of Bankruptcy Procedure as promulgated by the Supreme Court of the United States under section 2075 of title 28 of the United States Code, as amended from time to time, applicable to the Chapter 11 Cases, and any local rules of the Bankruptcy Court.

**Business Day** means any day other than a Saturday, a Sunday or any other day on which banking institutions in New York, New York are authorized or required by law or executive order to close.

**Cash** means legal tender of the United States of America.

**Cause of Action** means any action, claim, cross-claim, third-party claim, cause of action, controversy, dispute, demand, right, Lien, indemnity, contribution, guaranty, suit, obligation, liability, loss, debt, fee or expense, damage, interest, judgment, cost, account, defense, remedy, offset, power, privilege, proceeding, license, and franchise of any kind or character whatsoever, known, unknown, foreseen or unforeseen, existing or hereafter arising, contingent or non-contingent, matured or unmatured, suspected or unsuspected, liquidated or unliquidated, disputed or undisputed, secured or unsecured, assertable directly or derivatively (including any alter ego theories), whether arising before, on, or after the Petition Date, in contract or in tort, in law or in equity or pursuant to any other theory of law (including under any state or federal securities laws). For the avoidance of doubt, Cause of Action also includes (a) any right of setoff, counterclaim, or recoupment and any claim for breach of contract or for breach of duties imposed by law or in equity, (b) the right to object to Claims or Interests, (c) any claim pursuant to section 362 or chapter 5 of the Bankruptcy Code (including claims and causes of action arising under section 544, 545, 547, 548, 549, 550, and 551 of the Bankruptcy Code), (d) any claim or defense, including fraud, mistake, duress, and usury and any other defenses set forth in section 558 of the Bankruptcy Code, and (e) any state law fraudulent transfer or preferential transfer claim.

**Chapter 11 Case(s)** means, with respect to a Debtor, such Debtor's case under chapter 11 of the Bankruptcy Code commenced on the Petition Date in the Bankruptcy Court, jointly administered with all other Debtors' cases under chapter 11 of the Bankruptcy Code.

**Claim** means a "claim," as defined in section 101(5) of the Bankruptcy Code, against any Debtor.

**Claims Reserve** means one or more segregated accounts not subject to the Liens of the Prepetition Agents or DIP Agent, which shall be established on or immediately before the Effective Date and funded on the Effective Date with Cash to pay (or reserve for payment of) any (i) Allowed Administrative Expense Claims, (ii) Allowed Priority Tax Claims, (iii) Allowed Priority Non-Tax Claims, (iv) Allowed Other Secured Claims, (v) Allowed Unsecured Trade Claims, and (vi) Cure Amounts; *provided, however*, that all Cash remaining in the Claims Reserve after payment of all relevant Allowed Claims and Cure Amounts in accordance with the terms of this Plan shall constitute Residual Distributable Value; *provided further* that the funding of the

Claims Reserve shall be consistent with the terms of the Second Lien Backstop Commitment Letter.

***Claims Reserve Amount*** means the aggregate amount of Cash, as determined by the Debtors with (i) the consent of the Required DIP Lenders and Requisite FLTL Lenders and (ii) the reasonable consent of the Creditors' Committee solely with respect to the amount of the Claims Reserve on account of Allowed Unsecured Trade Claims, necessary to satisfy all (a) Allowed Administrative Expense Claims, (b) Allowed Priority Tax Claims, (c) Allowed Priority Non-Tax Claims, (d) Allowed Other Secured Claims, (e) Allowed Unsecured Trade Claims, and (f) Cure Amounts, which aggregate amount shall be funded into the Claims Reserve on the Effective Date.

***Class*** means any group of Claims or Interests classified under the Plan pursuant to section 1122 and 1123(a)(1) of the Bankruptcy Code.

***Collateral*** means any Asset of an Estate that is subject to a Lien securing the payment or performance of a Claim, which Lien is not invalid, is properly perfected as of the Petition Date, and is not subject to avoidance under the Bankruptcy Code or applicable nonbankruptcy law.

***Confirmation Date*** means the date on which the Clerk of the Bankruptcy Court enters the Confirmation Order.

***Confirmation Hearing*** means the hearing to be held by the Bankruptcy Court regarding confirmation of the Plan, as such hearing may be adjourned or continued from time to time.

***Confirmation Order*** means the order of the Bankruptcy Court, in form and substance acceptable to the Debtors, the Required DIP Lenders, the Requisite FLTL Lenders, the Prepetition FLFO Administrative Agent, and the Creditors' Committee, confirming the Plan pursuant to section 1129 of the Bankruptcy Code.

***Confirmation Outside Date*** means June 16, 2021 or such later date as may be mutually agreed between the Debtors, the Required DIP Lenders, and the Requisite FLTL Lenders.

***Consenting Creditors*** means the Prepetition FLTL Lenders, together with their respective successors and permitted assigns, and the Prepetition SLTL Lenders, together with their respective successors and permitted assigns, that are party to, or have executed a joinder to, the Restructuring Support Agreement.

***Credit Bid Acquired Interests*** has the meaning ascribed to "Acquired Interests" set forth in the Credit Bid Purchase Agreement.

***Credit Bid Assumed Liabilities*** has the meaning ascribed to "Assumed Liabilities" set forth in the Credit Bid Purchase Agreement.

**Credit Bid Consent Rights** means any right of consent, notice, and other similar rights, if any, that are applicable to the sale of the Credit Bid Acquired Interests in connection with the Credit Bid Purchase Agreement.

**Credit Bid Permitted Encumbrances** has the meaning ascribed to "Permitted Encumbrances" set forth in the Credit Bid Purchase Agreement.

**Credit Bid Purchase Agreement** means that certain Purchase and Sale Agreement, by and between Fieldwood Energy LLC, the other seller parties, and the Credit Bid Purchasers, together with any and all related agreements, annexes, exhibits and schedules in connection therewith, as amended, supplemented or otherwise modified from time to time, which shall be in form and substance acceptable to the Debtors, the Requisite FLTL Lenders, and the Required DIP Lenders; *provided* that any modifications to the Credit Bid Purchase Agreement from the version attached to the draft of the Disclosure Statement at Docket No. 1022 shall require the consent of the Prepetition FLFO Administrative Agent (not to be unreasonably withheld with respect to the following clauses (b) and (e)) to the extent that such modification (a) individually or in the aggregate, results in a reduction of 10% or more of the total PV-10 of total 2P reserves comprising the assets acquired by the Credit Bid Purchaser (which shall be calculated by reference to the FWE YE2020 Internal Reserve Report (as of 5.1.21)), (b) results in any contract rights constituting material assets not being acquired by the Credit Bid Purchaser, (c) individually or in the aggregate, results in an increase by $40.0 million or more (which, for the avoidance of doubt, in the case of plugging and abandonment liabilities, shall be calculated on a present value basis) in liabilities assumed by the Credit Bid Purchaser, (d) relates to any change in treatment of the Prepetition FLFO Credit Agreement or First Lien Exit Facility, or (e) provide for any differences from the draft of the Disclosure Statement at Docket No. 1022 that are materially adverse to the interests of the First Lien Exit Facility Agent and the First Lien Exit Facility Lenders.

**Credit Bid Purchaser** means Mako Buyer LLC, a newly formed special purpose bidding entity, a purchaser of certain of the Debtors' assets pursuant to and in accordance with the Credit Bid Purchase Agreement.

**Credit Bid Purchasers** means Credit Bid Purchaser and Mako Buyer 2 LLC, a newly formed special purpose bidding entity, a purchaser of certain of the Debtors' assets pursuant to and in accordance with the Credit Bid Purchase Agreement.

**Credit Bid Preferential Purchase Rights** has the meaning ascribed to "Preferential Right" set forth in the Credit Bid Purchase Agreement.

**Credit Bid Transaction** means the sale of the Credit Bid Acquired Interests to the Credit Bid Purchasers pursuant to the Credit Bid Purchase Agreement.

**Credit Bid Transaction Closing** means "Closing" as defined in the Credit Bid Purchase Agreement.

**Creditors' Committee** means the Official Committee of Unsecured Creditors appointed by the U.S. Trustee in these Chapter 11 Cases pursuant to section 1102 of the Bankruptcy Code as it may be reconstituted from time to time.

**Cure Amount** means the payment of Cash or the distribution of other property (as the parties may agree or the Bankruptcy Court may order) necessary to (a) cure a monetary default by the Debtors in accordance with the terms of an executory contract or unexpired lease and (b) permit the Debtors to assume such executory contract or unexpired lease under section 365(a) of the Bankruptcy Code.

**Cure Notice** means the notice of proposed Cure Amount to be paid in connection with an executory contract or unexpired lease of the Debtors that may be assumed or assumed and assigned under the Plan pursuant to section 365 of the Bankruptcy Code, which shall include (a) procedures for objecting to proposed assumptions or assumptions and assignments of executory contracts and unexpired leases, (b) any Cure Amount to be paid in connection therewith, and (c) procedures for resolution by the Bankruptcy Court of any related disputes.

**CUSA** means Chevron U.S.A. Inc., a Pennsylvania corporation.

**CUSA Definitive Documents** has the meaning set forth in the CUSA Implementation Agreement. For the avoidance of doubt, the CUSA Definitive Documents shall constitute Additional Predecessor Agreement Documents hereunder.

**CUSA Implementation Agreement** means that certain Implementation Agreement, dated June 12, 2021, by and among Debtor Fieldwood Energy LLC, on the one hand, and CUSA on the other hand, as may be amended, restated, or otherwise modified pursuant to the terms thereof. For the avoidance of doubt, the CUSA Implementation Agreement shall constitute an Additional Predecessor Agreement hereunder.

**CUSA Parties** means, collectively, CUSA and its parent and affiliates, including but not limited to Noble Energy, Inc., Union Oil Company of California, Unocal Pipeline Company and Texaco Inc., and with respect to each of the foregoing Persons, each of their current and former affiliates, and each such Entity's and its current and former affiliates' current and former directors, managers, officers, equity holders (regardless of whether such interests are held directly or indirectly), predecessors, successors, and assigns, subsidiaries, and each of their current and former officers, members, managers, directors, equity holders (regardless of whether such interests are held directly or indirectly), principals, members, employees, agents, managed accounts or funds, management companies, fund advisors, investment advisors, advisory board members, financial advisors, partners (including both general and limited partners), attorneys, accountants, investment bankers, consultants, representatives and other professionals, such Persons' respective heirs, executors, estates, and nominees, in each case solely in their capacity as such.

**CUSA Release Parties** means collectively, and in each case solely in their capacity as such, (a) the DIP Agent and DIP Lenders under the DIP Facility, (b) the Prepetition FLFO Secured Parties, (c) the Consenting Creditors, (d) Prepetition FLFO Collateral Agent, (e) the Prepetition FLTL Agents, (f) the Prepetition SLTL Agent, (g) NewCo and all of its subsidiaries (including the Credit Bid Purchasers), (h) the Exit Facility Agents, (i) the Exit Facility Lenders, (j) the Second Lien Backstop Parties, (k) the ERO Backstop Parties, with respect to each of the

foregoing Persons in clauses (a) through (k), in each case solely in their capacity as such, (l) with respect to each of the foregoing Persons in clauses (a) through (k), each of their current and former affiliates, and each such Entity's and its current and former affiliates' current and former directors, managers, officers, equity holders (regardless of whether such interests are held directly or indirectly), predecessors, successors, and assigns, subsidiaries, and each of their current and former officers, members, managers, directors, equity holders (regardless of whether such interests are held directly or indirectly), principals, members, employees, agents, managed accounts or funds, management companies, fund advisors, investment advisors, advisory board members, financial advisors, partners (including both general and limited partners), attorneys, accountants, investment bankers, consultants, representatives and other professionals, such Persons' respective heirs, executors, estates, and nominees, in each case solely in their capacity as such, and (m) each of the Debtor's current and former officers, members, managers, directors, equity holders (regardless of whether such interests are held directly or indirectly (other than any Debtor)), principals, members, employees, agents, managed accounts or funds, management companies, fund advisors, investment advisors, advisory board members, financial advisors, partners (including both general and limited partners), attorneys, accountants, investment bankers, consultants, representatives and other professionals, such Persons' respective heirs, executors, estates, and nominees, in each case solely in their capacity as such; provided, for the avoidance of doubt, no Debtor or Post-Effective Date Debtor will be a CUSA Release Party.

*D&O Policy* means any insurance policy, including tail insurance policies, for directors', members', trustees', and officers' liability providing coverage to the Debtors and in effect or purchased as of the Petition Date.

*Debtor(s)* has the meaning set forth in the introductory paragraph of the Plan.

*Debtor in Possession* means, with respect to a Debtor, that Debtor in its capacity as a debtor in possession pursuant to sections 1101, 1107(a), and 1108 of the Bankruptcy Code.

*Decommissioning Agreement* means that Decommissioning Agreement, dated as of September 30, 2013, by and among the Apache PSA Parties, Fieldwood Energy LLC, and the other parties thereto.

*Decommissioning Security* has the meaning set forth in the Apache Implementation Agreement.

*Definitive Documents* has the meaning set forth in the Restructuring Support Agreement.

*DIP Agent* means Cantor Fitzgerald Securities, solely in its capacity as administrative agent and collateral agent under the DIP Facility Credit Agreement, its successors, assigns, or any replacement agent appointed pursuant to the terms of the DIP Facility Credit Agreement.

*DIP Claim* means any Claim held by the DIP Lenders or the DIP Agent arising under or relating to the DIP Facility Credit Agreement or the DIP Order, including any and all fees, interests, and accrued but unpaid interest and fees arising under the DIP Facility Credit Agreement.

**DIP Documents** has the meaning set forth in the DIP Order.

**DIP Facility** means the postpetition senior secured debtor-in-possession term loan credit facility approved by the DIP Order.

**DIP Facility Credit Agreement** means the credit agreement governing the terms of the DIP Facility, dated as of August 24, 2020, by and among Fieldwood Energy LLC, as borrower, FWE Parent, as holdings, the DIP Agent, and the DIP Lenders, with any amendments, restatements, amendments and restatements, modifications or supplements thereto as permitted by the DIP Order.

**DIP Lenders** means the lenders from time to time party to the DIP Facility Credit Agreement.

**DIP Order** means the *Final Order (I) Authorizing Debtors (A) to Obtain Postpetition Financing Pursuant to 11 U.S.C. §§ 105, 361, 362, 363(b), 364(c)(1), 364(c)(2), 364(c)(3), 364(d)(1) and 364(e) and (B) to Utilize Cash Collateral Pursuant to 11 U.S.C. § 363 and (II) Granting Adequate Protection to Prepetition Secured Parties Pursuant to 11 U.S.C. §§ 361, 362, 363, 364 and 507(b)* [Docket No. 346], authorizing the Debtors to enter into the DIP Facility Credit Agreement and access the DIP Facility, as may be amended, supplemented or modified from time to time.

**Disclosure Statement** means the disclosure statement in support of the Plan, in form and substance (i) acceptable to the Debtors, the Required DIP Lenders, the Requisite FLTL Lenders, (ii) reasonably acceptable to the Creditors' Committee solely for matters relating to the treatment of holders of General Unsecured Claims or Unsecured Trade Claims, and (iii) reasonably acceptable to the Prepetition FLFO Administrative Agent, which is prepared and distributed in accordance with sections 1125, 1126(b), or 1145 of the Bankruptcy Code, Bankruptcy Rules 3016 and 3018, or other applicable law, and all exhibits, schedules, supplements, modifications, amendments, annexes, and attachments to such disclosure statement.

**Disputed** means, with respect to a Claim, (a) any Claim, which Claim is disputed under this Plan (including pursuant to section 7.1 of this Plan) or otherwise or as to which the Debtors, the Post-Effective Date Debtors, or the Plan Administrator, as applicable, have interposed and not withdrawn an objection or request for estimation that has not been determined by a Final Order; (b) any Claim, proof of which was required to be filed by order of the Bankruptcy Court but as to which a proof of claim was not timely or properly filed; (c) any Claim that is listed in the Schedules, if any are filed, as unliquidated, contingent, disputed or undetermined, and as to which no request for payment or proof of claim has been filed; or (d) any Claim that is otherwise disputed by any of the Debtors or the Post-Effective Date Debtors in accordance with applicable law or contract, which dispute has not been withdrawn, resolved or overruled by a Final Order. To the extent the Debtors dispute only the amount of a Claim, such Claim shall be deemed Allowed in the amount the Debtors do not dispute, if any, and Disputed as to the balance of such Claim.

**Distribution Date** means the date or dates, including the Initial Distribution Date, as determined by the Plan Administrator in accordance with the terms of this Plan, on which the Plan Administrator makes a Distribution to holders of Allowed Claims.

**Distribution Record Date** means, except as otherwise provided in the Plan, the date that is two business days before the Effective Date or such other date as is designated by the Debtors with the consent of the Requisite FLTL Lenders and the Required DIP Lenders.

**Divisive Merger** means a divisive merger pursuant to Sections 10.001, 10.002, 10.008 and 10.302 of the Texas Business Organizations Code.

**Effective Date** means the date which is the first Business Day on which (a) all conditions to the effectiveness of the Plan set forth in Section 9.1 of the Plan have been satisfied or waived in accordance with the terms of the Plan, and (b) no stay of the Confirmation Order is in effect.

**Entity** means an "entity," as defined in section 101(15) of the Bankruptcy Code.

**Equity Rights Offerings** means, collectively, the FLTL Equity Rights Offering and the SLTL Equity Rights Offering.

**ERO Backstop Agreements** means, collectively, the FLTL ERO Backstop Agreement and the SLTL ERO Backstop Agreement.

**ERO Backstop Parties** means, collectively, the FLTL ERO Backstop Parties and the SLTL ERO Backstop Parties.

**Estate(s)** means individually or collectively, the estate or estates of the Debtors created under section 541 of the Bankruptcy Code.

**Exculpated Parties** means collectively, and in each case in their capacities as such during the Chapter 11 Cases (a) the Debtors, (b) the Post-Effective Date Debtors, (c) the Plan Administrator, (d) FWE I, (e) FWE IV, (f) the DIP Agent and DIP Lenders under the DIP Facility, (g) the Prepetition FLFO Secured Parties, (h) the Consenting Creditors, (i) the Prepetition FLFO Collateral Agent, (j) the Prepetition FLTL Agents, (k) the Prepetition SLTL Agent, (l) the Creditors' Committee and the current and former members of the Creditors' Committee (solely in their capacities as such), (m) NewCo and all of its subsidiaries (including the Credit Bid Purchasers), (n) the Exit Facility Agents, (o) the Exit Facility Lenders, (p) the Second Lien Backstop Parties, (q) the ERO Backstop Parties, (r) the Apache PSA Parties, (s) the CUSA Parties, and (t) with respect to each of the foregoing Persons in clauses (a) through (s) each of their current and former affiliates, and each such Entity's and its current and former affiliates' current and former directors, managers, officers, equity holders (regardless of whether such interests are held directly or indirectly), predecessors, successors, and assigns, subsidiaries, and each of their current and former officers, members, managers, directors, equity holders (regardless of whether such interests are held directly or indirectly), principals, members, employees, agents, managed accounts or funds, management companies, fund advisors, investment advisors, advisory board members, financial advisors, partners (including both general and limited partners), attorneys, accountants, investment bankers, consultants, representatives and other professionals, such Persons' respective heirs, executors, estates, and nominees, in each case in their capacity as such, and any and all other persons or entities that may purport to assert any cause of action derivatively, by or through the foregoing entities.

10

**Existing Equity Interests** means shares of common stock of FWE Parent that existed immediately before the Effective Date.

**Exit Facilities** means the First Lien Exit Facility and the Second Lien Exit Facility.

**Exit Facility Agents** means the First Lien Exit Facility Agent and the Second Lien Exit Facility Agent.

**Exit Facility Documents** means the First Lien Exit Facility Documents and the Second Lien Exit Facility Documents.

**Exit Facility Lenders** means the First Lien Exit Facility Lenders and the Second Lien Exit Facility Lenders.

**Fee Claim** means a Claim for professional services rendered or costs incurred on or after the Petition Date through the Effective Date by Professional Persons retained by an order of the Bankruptcy Court pursuant to sections 327, 328, 329, 330, 331, 503(b), or 1103 of the Bankruptcy Code in the Chapter 11 Cases.

**Fieldwood U.A. Interests** has the meaning ascribed to such term in the Credit Bid Purchase Agreement.

**Final Order** means an order or judgment of the Bankruptcy Court or other court of competent jurisdiction with respect to the relevant subject matter which has: (a) not been reversed, stayed, modified or amended, as to which the time to appeal, petition for certiorari or move for reargument, reconsideration or rehearing has expired and no appeal, petition for certiorari or motion for reargument, reconsideration or rehearing has been timely filed; or (b) as to which any appeal, petition for certiorari or motion for reargument, reconsideration or rehearing that has been or may be filed has been resolved by the highest court to which the order or judgment was appealed or from which certiorari, reargument, reconsideration or rehearing was sought; *provided*, *however*, that the possibility that a motion under Rules 59 or 60 of the Federal Rules of Civil Procedure or any analogous Bankruptcy Rule (or any analogous rules applicable in such other court of competent jurisdiction) may be filed relating to such order or judgment shall not cause such order or judgment not to be a Final Order.

**First Lien Exit Facility** means the facility under the First Lien Exit Facility Credit Agreement.

**First Lien Exit Facility Agent** means the administrative agent under the First Lien Exit Facility Credit Agreement.

**First Lien Exit Facility Commitment Letter** means that certain commitment letter, in form and substance acceptable to the Required DIP Lenders, the Requisite FLTL Lenders, the Debtors, the Prepetition FLFO Administrative Agent, and the First Lien Exit Facility Agent, to be entered into by and among Fieldwood Energy LLC and the First Lien Exit Facility Agent, as may be amended, supplemented, or modified from time to time, pursuant and subject to the terms thereof, pursuant to which, among other things, GS Bank (as defined therein) agreed to act as the

sole arranger, administrative agent and collateral agent in connection with the First Lien Exit Facility and to commit to provide First Lien Exit Facility in accordance with the terms and conditions set forth therein.

**First Lien Exit Facility Credit Agreement** means that certain credit agreement to be entered by the Credit Bid Purchaser, the First Lien Exit Facility Agent and the First Lien Exit Facility Lenders on the Effective Date that shall govern the First Lien Exit Facility which shall reflect and contain terms, conditions, representations, warranties, and covenants consistent with the First Lien Exit Facility Term Sheet and otherwise be in form and substance acceptable to the Prepetition FLFO Administrative Agent, the First Lien Exit Facility Agent, the Debtors, the Required DIP Lenders, and Requisite FLTL Lenders.

**First Lien Exit Facility Documents** means, collectively, the First Lien Exit Facility Credit Agreement, and any and all other agreements, documents, and instruments delivered or to be entered into in connection therewith, including any guarantee agreements, pledge and collateral agreements, intercreditor agreements, and other security documents, the terms of which documents shall be in form and substance acceptable to the Prepetition FLFO Administrative Agent, the First Lien Exit Facility Agent, the Debtors, the Required DIP Lenders, and Requisite FLTL Lenders.

**First Lien Exit Facility Lenders** means the lenders party to the First Lien Exit Facility Credit Agreement.

**First Lien Exit Facility Term Sheet** means a term sheet attached to the First Lien Exit Facility Commitment Letter and to be attached to the Disclosure Statement, as may be amended, supplemented or modified from time to time with the consent of the Prepetition FLFO Administrative Agent, the First Lien Exit Facility Agent, the Debtors, the Required DIP Lenders, and Requisite FLTL Lenders.

**FLFO Claims** means all Claims arising from or based upon the Prepetition FLFO Credit Agreement.

**FLFO Claims Allowed Amount** means the aggregate principal amount of $138,599,082.31 plus any accrued and unpaid interest (accruing at the default rate to the extent provided under the Prepetition FLFO Credit Agreement), fees, costs, and other expenses arising under, and payable pursuant to, the Prepetition FLFO Credit Agreement on or before the Effective Date, which shall not be subject to any avoidance, reduction, setoff, offset, recharacterization, subordination, counterclaims, cross claims, defenses, disallowance, impairments, or any other challenges under applicable law or regulation by any Entity. Notwithstanding the foregoing, on the Effective Date any amount accrued pursuant to Section 2.08(b) of the Prepetition FLFO Credit Agreement and any amounts accrued in respect of Yield Maintenance Premium or any Prepayment Fee (each as defined in the Prepetition FLFO Credit Agreement), if any, shall be deemed discharged, released, and waived by all holders of Allowed FLFO Claims and the FLFO Claims Allowed Amount shall not be increased on account of such amounts as a result of such discharge, release, and waiver.

**FLFO Distribution Amount** means Cash in the amount of the FLFO Claims Allowed Amount *less* the initial aggregate principal amount of the First Lien Exit Facility, as set forth in the First Lien Exit Facility Commitment Letter.

**FLTL Claims** means all Claims, other than Claims subject to subordination in accordance with section 510(b) of the Bankruptcy Code, arising from or based upon the Prepetition FLTL Credit Agreement.

**FLTL Claims Allowed Amount** means $1,142,688,815.28 in principal plus any accrued but unpaid interest or fees due under the Prepetition FLTL Credit Agreement as of the Petition Date.

**FLTL Deficiency Claim** means any FLTL Claim or portion thereof that is not Secured, if any.

**FLTL Equity Rights Offering** means that certain rights offering pursuant to which each holder of Allowed FLTL Claims is entitled to receive FLTL Subscription Rights to acquire New Equity Interests in the aggregate amount of the FLTL Equity Rights Offering Amount in accordance with the FLTL Equity Rights Offering Procedures, the terms and conditions of which shall be (i) acceptable to the Debtors, Required DIP Lenders, and Requisite FLTL Lenders, (ii) reasonably acceptable to the Prepetition FLFO Administrative Agent and the First Lien Exit Facility Agent, and (iii) reasonably acceptable to the Requisite SLTL Lenders solely to the extent that it directly and adversely impacts the holders of Allowed SLTL Claims.

**FLTL Equity Rights Offering Amount** means $20,000,000.

**FLTL Equity Rights Offering Procedures** means the procedures for the implementation of the FLTL Equity Rights Offering to be approved by the Bankruptcy Court.

**FLTL ERO Backstop Agreement** means that certain FLTL Backstop Commitment Agreement by and among Fieldwood Energy Inc. and the FLTL ERO Backstop Parties, dated as of May 27, 2021 (as amended, restated, supplemented, or otherwise modified from time to time in accordance with its terms and in form and substance (i) acceptable to the Debtors, the Required DIP Lenders, and Requisite FLTL Lenders and (ii) reasonably acceptable to the Prepetition FLFO Administrative Agent and the First Lien Exit Facility Agent), pursuant to which the FLTL ERO Backstop Parties agreed to, among other things, backstop the FLTL Equity Rights Offering with the terms and conditions set forth therein.

**FLTL ERO Backstop Commitment Percentage** has the meaning ascribed to "Backstop Commitment Percentage" in the FLTL ERO Backstop Agreement.

**FLTL ERO Backstop Commitment Premium** means a premium equal to 8% of the FLTL Equity Rights Offering Amount payable to the FLTL ERO Backstop Parties with the FLTL ERO Backstop Commitment Premium Equity Interests in accordance with the terms set forth in the FLTL ERO Backstop Agreement.

**FLTL ERO Backstop Commitment Premium Equity Interests** means an amount of New Equity Interests equal to the value of the FLTL ERO Backstop Commitment Premium as

further set forth in the FLTL ERO Backstop Agreement; *provided that* such New Equity Interests shall be issued at a 30% discount to the equity value of NewCo on the Effective Date.

*FLTL ERO Backstop Parties* means those parties that agree to backstop the FLTL Equity Rights Offering pursuant to the FLTL ERO Backstop Agreement, each in its respective capacity as such.

*FLTL Subscription Rights* means the subscription right to acquire New Equity Interests with an aggregate value equal to the FLTL Rights Offering Amount offered in accordance with the FLTL Equity Rights Offering Procedures; *provided, however,* that such New Equity Interests shall be issued at a 30% discount to the equity value of NewCo on the Effective Date.

*FLTL Unsubscribed Shares* has the meaning ascribed to "Unsubscribed Shares" in the FLTL ERO Backstop Agreement.

*FWE I* means an entity formed on the Effective Date by a Divisive Merger under the name Fieldwood Energy I LLC pursuant to the Initial Plan of Merger.

*FWE I LLC Agreement* means the limited liability company agreement of FWE I, which shall be in substantially the form attached to the Apache Implementation Agreement.

*FWE I Assets* has the meaning set forth in the Initial Plan of Merger.

*FWE I Obligations* has the meaning set forth in the Initial Plan of Merger.

*FWE I Sole Manager* has the meaning ascribed to the term "Sole Manager" in the FWE I LLC Agreement, and shall include the sole manager appointed to FWE I upon the Effective Date and any successor thereto.

*FWE III* means the surviving entity under the name Fieldwood Energy III LLC following a Divisive Merger pursuant to the Initial Plan of Merger.

*FWE III LLC Agreement* means the limited liability company agreement of FWE III, a form of which shall be included in the Plan Supplement.

*FWE III Assets* has the meaning set forth in the Initial Plan of Merger, as such meaning may be modified by any Plan of Merger, other than the Initial Plan of Merger.

*FWE III Obligations* has the meaning set forth in the Initial Plan of Merger, as such meaning may be modified by any Plan of Merger, other than the Initial Plan of Merger.

*FWE IV* means an entity formed on the Effective Date by a Divisive Merger under the name Fieldwood Energy IV LLC pursuant to a Plan of Merger.

*FWE IV LLC Agreement* means the limited liability company agreement of FWE IV.

14

**FWE IV Sole Manager** has the meaning ascribed to the term "Sole Manager" in the FWE IV LLC Agreement, and shall include the sole manager appointed to FWE IV upon the Effective Date and any successor thereto.

**FWE Additional Entity** means any Entity, other than FWE I and FWE III, formed on the Effective Date by a Divisive Merger involving FWE III (but not FWE I) pursuant to a Plan of Merger. For the avoidance of doubt, FWE IV shall constitute a FWE Additional Entity hereunder.

**FWE Assets** means, collectively, the FWE I Assets, FWE III Assets, and any assets allocated to an FWE Additional Entity from FWE III.

**FWE Parent** means Debtor Fieldwood Energy Inc.

**General Unsecured Claim** means any Claim against a Debtor, other than a DIP Claim, Postpetition Hedge Claim, Administrative Expense Claim (including a Fee Claim), FLFO Claim, FLTL Claim, SLTL Claim, Other Secured Claim, Priority Tax Claim, Priority Non-Tax Claim, Unsecured Trade Claim, Subordinated Securities Claim, or Intercompany Claim that is not entitled to priority under the Bankruptcy Code or any Final Order of the Bankruptcy Court. For the avoidance of doubt, General Unsecured Claims shall not include FLTL Deficiency Claims or SLTL Deficiency Claims.

**GUC True-Up Warrants** has the meaning set forth in the definition of GUC Warrants.

**GUC Warrant Agreement** means a warrant agreement to be entered into by and among NewCo and the warrant agent named therein that shall govern the terms of the GUC Warrants, the form of which shall be acceptable to the Debtors, Required DIP Lenders, Requisite FLTL Lenders, the Requisite SLTL Lenders and the Creditors' Committee and which shall contain provisions as favorable as the provisions in the SLTL Tranche 1 Warrant Agreement or SLTL Tranche 2 Warrant Agreement.

**GUC Warrants** means 8-year warrants for 3.5% of the New Equity Interests (calculated on a fully diluted basis giving effect to the New Equity Interests to be issued pursuant to Section 4.4(a)(i) of this Plan, the New Equity Interests issuable upon the exercise of the Subscription Rights, the Backstop Commitment Premium Equity Interests, and the New Equity Interests issuable upon the exercise of the New Money Warrants and SLTL Tranche 1 Warrants, but excluding the effect of any New Equity Interests issuable in connection with the Management Incentive Plan), with a strike price set at an equity value equal to $1,321,000,000, the terms of which shall be set forth in the GUC Warrant Agreement; *provided*, that if the SLTL Tranche 2 Warrants are exercised, the GUC Warrants shall be subject to adjustment or true-up (herein referred to as "*GUC True-Up Warrants*") as necessary to retain such percentage after giving effect to the exercise of the SLTL Tranche 2 Warrants.

**Government** means the United States of America on behalf of the Department of the Interior.

**Governmental Unit** has the meaning set forth in section 101(27) of the Bankruptcy Code.

**Impaired** means, with respect to a Claim, Interest, or a Class of Claims or Interests, "impaired" within the meaning of such term in section 1124 of the Bankruptcy Code.

**Indemnification Obligation** means any existing or future obligation of any Debtor to indemnify current and former directors, officers, members, managers, agents or employees of any of the Debtors who served in such capacity, with respect to or based upon such service or any act or omission taken or not taken in any of such capacities, or for or on behalf of any Debtor, whether pursuant to agreement, the Debtors' respective memoranda, articles or certificates of incorporation, corporate charters, bylaws, operating agreements, limited liability company agreements, or similar corporate or organizational documents or other applicable contract or law in effect as of the Effective Date.

**Initial Distribution** means the first Distribution that the Plan Administrator makes to holders of Allowed Claims.

**Initial Distribution Date** means the date on which the Plan Administrator shall make the Initial Distribution, which shall not be less than five Business Days after the Effective Date.

**Initial Plan of Merger** means any Divisive Merger(s) to be effectuated pursuant to that certain Agreement and Plan of Merger, which shall be in substantially the form attached to the Apache Implementation Agreement.

**Intercompany Claim** means any Claim against a Debtor held by another Debtor.

**Intercompany Interest** means an Interest in a Debtor other than any Existing Equity Interest.

**Interest** means any common stock, limited liability company interest, equity security (as defined in section 101(16) of the Bankruptcy Code), equity, ownership, profit interests, unit, or share in any Debtor (including all options, warrants, rights, or other securities or agreements to obtain such an interest or share in such Debtor), whether or not arising under or in connection with any employment agreement and whether or not certificated, transferable, preferred, common, voting, or denominated "stock" or a similar security.

**Lien** has the meaning set forth in section 101(37) of the Bankruptcy Code.

**Management Incentive Plan** means the post-Effective Date management incentive plan of NewCo which shall provide for up to 10% of New Equity Interests on a fully diluted basis or other equity or similar interests in NewCo to be reserved for directors, managers, officers, and employees of NewCo or a subsidiary of NewCo (including the Credit Bid Purchaser) to be distributed on terms to be determined by the board of directors of NewCo.

**New Equity Interests** means the equity interests of NewCo to be issued (i) on the Effective Date (including the Backstop Commitment Premium Equity Interests and upon the

16

exercise of the Subscription Rights), (ii) upon exercise of the New Money Warrants, the SLTL Warrants, or the GUC Warrants, (iii) under the Management Incentive Plan, or (iv) on or after the Effective Date as otherwise permitted pursuant to the NewCo Organizational Documents.

*New Intercreditor Agreement* means that certain Intercreditor Agreement, to be dated as of the Effective Date, by and among the First Lien Exit Facility Agent and the Second Lien Exit Facility Agent and the Credit Bid Purchaser, the form of which shall be contained in the Plan Supplement, acceptable to the Prepetition FLFO Administrative Agent, the First Lien Exit Facility Agent, the Requisite FLFO Lenders, the Debtors, the Required DIP Lenders, and the Requisite FLTL Lenders**.**

*NewCo* means Mako Newco Inc., which is the direct or indirect owner of 100% of the equity interests of the Credit Bid Purchasers.

*NewCo Entities* means, collectively, NewCo and each of its direct and indirect subsidiaries.

*NewCo Organizational Documents* means the form of certificate of formation, limited liability company agreement, agreement of limited partnership, articles of incorporation, bylaws, trust agreements, or such other applicable formation documents of the NewCo and any of its subsidiaries, including any shareholders' or stockholders' agreement, which shall be (i) acceptable to the Debtors, the Requisite FLTL Lenders, and the Required DIP Lenders and (ii) (a) if NewCo or any of its subsidiaries are to be formed in a jurisdiction outside of the United States, reasonably acceptable to the Prepetition FLFO Administrative Agent or (b) if NewCo or any of its subsidiaries are to be formed in a jurisdiction within the United States, reasonably acceptable to the Prepetition FLFO Administrative Agent solely to the extent that it directly and adversely impacts the holders of Allowed FLFO Claims or First Lien Exit Facility Lenders.

*New Money Consideration* means, in the aggregate, the amount of Cash provided to the Debtors by the Credit Bid Purchasers pursuant to the Credit Bid Purchase Agreement.

*New Money Investment* means the investment of up to $85 million in Cash into Credit Bid Purchaser by the New Money Second Lien Exit Facility Lenders in connection with, and upon consummation of, the Second Lien Exit Facility, subject to the terms of the Second Lien Backstop Commitment Letter.

*New Money Second Lien Exit Facility Lenders* means the lenders party to the Second Lien Exit Facility Credit Agreement participating in the New Money Investment.

*New Money Warrant Agreement* means a warrant agreement to be entered into by and among NewCo and the warrant agent named therein that shall govern the terms of the New Money Warrants, the form of which shall be acceptable to the Debtors, Required DIP Lenders and Requisite FLTL Lenders.

*New Money Warrants* means 7-year warrants for up to 24% of the New Equity Interests (calculated on a fully diluted basis giving effect to the New Equity Interests to be issued pursuant to Section 4.4(a)(i) of this Plan, the Backstop Commitment Premium Equity Interests, and the New Equity Interests issuable upon the exercise of the Subscription Rights, but excluding

the effect of any New Equity Interests issuable upon exercise of the SLTL Warrants and GUC Warrants (including the GUC True-Up Warrants) and any New Equity Interest issuable pursuant to the Management Incentive Plan), with a strike price of zero, the terms of which shall be set forth in the New Money Warrant Agreement and which shall be issued and allocated in a manner consistent with the Second Lien Backstop Commitment Letter.

*Other Secured Claim* means any Secured Claim against a Debtor other than a Priority Tax Claim, FLFO Claim, FLTL Claim, and SLTL Claim.

*Person* means an individual, corporation, partnership, joint venture, association, joint stock company, limited liability company, limited liability partnership, trust, estate, unincorporated organization, governmental unit (as defined in section 101(27) of the Bankruptcy Code), or other Entity.

*Petition Date* means, with respect to a Debtor, the date on which such Debtor commenced its Chapter 11 Case.

*Plan* means this joint chapter 11 plan, including all appendices, exhibits, schedules, and supplements hereto (including any appendices, schedules, and supplements to the Plan contained in the Plan Supplement), as may be amended, supplemented or modified from time to time in accordance with the Bankruptcy Code and the terms hereof.

*Plan Administrator* means a person or entity selected by the Creditors' Committee, subject to the consent of the Debtors, Required DIP Lenders, and Requisite FLTL Lenders, with such consent not to be unreasonably withheld, that is charged with overseeing the tasks outlined in Section 5.9 of this Plan, or any successor thereto. The identity of the Plan Administrator shall be disclosed to the Bankruptcy Court before the Confirmation Hearing.

*Plan Administrator Agreement* means an agreement setting forth the economic arrangement and terms pursuant to which the Plan Administrator will perform its duties under this Plan.

*Plan Administrator Expense Reserve* means a segregated account not subject to the Liens of the Prepetition Agents or DIP Agent established by the Plan Administrator in accordance with Section 5.15 of this Plan.

*Plan Administrator Expense Reserve Amount* means Cash in an amount equal to $8,000,000 to be funded into the Plan Administrator Expense Reserve on the Effective Date.

*Plan Distribution* means any initial or periodic payment or transfer of consideration to holders of Allowed Claims made under the Plan.

*Plan Documents* means the Confirmation Order, this Plan, the Plan Supplement, or any other documents implementing or supplementing this Plan.

*Plan of Merger* means, collectively, (a) the Initial Plan of Merger and (b) any Divisive Merger(s) involving any Debtor or any successor to any Debtor (including FWE III but

excluding FWE I) to be effectuated on the Effective Date subsequent to the effective time of the Initial Plan of Merger.

**Plan of Merger Consent Rights** means any right of consent, notice, and other similar rights, if any, that are applicable to the vesting of assets in connection with the Plan of Merger.

**Plan of Merger Preferential Purchase Rights** means any preferential right to purchase, right of first refusal, right of first offer, drag-along rights, tag-along rights, and similar right the operation of which is triggered by the vesting of the FWE Assets in connection with the Plan of Merger.

**Plan Settlement** means the settlement of certain Claims and controversies pursuant to Section 5.1 of the Plan.

**Plan Supplement** means a supplement or supplements to the Plan containing certain documents and forms of documents, schedules, and exhibits relevant to the implementation of the Plan, which shall include: (a) the Amended Organizational Documents (if any), (b) information regarding the sole manager and independent director to be appointed at FWE I to the extent known and determined and other information required to be disclosed in accordance with section 1129(a)(5) of the Bankruptcy Code, (c) a schedule of retained Causes of Action, (d) the Schedule of Assumed Contracts, (e) the Plan Administrator Agreement; (f) the Credit Bid Purchase Agreement; (g) the NewCo Organizational Documents; (h) the Apache Definitive Documents; (i) the First Lien Exit Facility Agreement; (j) the Second Lien Exit Facility Agreement; (k) the New Intercreditor Agreement; (l) the New Money Warrant Agreements; (m) the GUC Warrant Agreement; and (n) any Additional Predecessor Agreement; *provided*, *however*, that the Debtors shall have the right to amend documents contained in, and exhibits thereto, the Plan Supplement in accordance with the terms of this Plan and the Restructuring Support Agreement (including the consent rights set forth therein).

**Postpetition Hedging Agreements** has the meaning set forth in that certain *Emergency Order (I) Authorizing Debtors to (A) Enter Into and Perform Under New Postpetition Hedging Agreements and (B) Grant Related Liens and Superiority Claims, (II) Modifying Automatic Stay, and (III) Granting Related Relief* entered on August 24, 2020 (ECF No. 242).

**Postpetition Hedge Claim** means a Claim arising pursuant to any Postpetition Hedging Agreement.

**Post-Effective Date Debtors** means the Debtors, as reorganized as of the Effective Date in accordance with this Plan, including FWE III, the Post-Effective Date FWE I Subsidiaries, and any FWE Additional Entities solely to the extent consistent with the applicable Additional Predecessor Agreement Document. For the avoidance of doubt, the Post-Effective Date Debtors does not include NewCo or its subsidiaries (including the Credit Bid Purchasers), FWE I or FWE IV. Solely with respect to Section 5.9 of this Plan, Post-Effective Date Debtors shall not include the Post-Effective Date FWE I Subsidiaries.

**Post-Effective Date FWE I Subsidiary** means any Entity that becomes a subsidiary of FWE I in connection with the Restructuring Transactions, which include FW GOM Pipeline, Inc. and GOM Shelf LLC, as reorganized on the Effective Date in accordance with this Plan.

**Post-Effective Date FWE Parent** means FWE Parent, as reorganized on the Effective Date in accordance with this Plan.

**Prepetition Agents** means, collectively, the Prepetition FLFO Administrative Agent, the Prepetition FLFO Collateral Agent, the Prepetition FLTL Administrative Agent, Prepetition FLTL Subagent, and the Prepetition SLTL Agent.

**Prepetition FLFO Administrative Agent** means Goldman Sachs Bank USA, solely in its capacity as administrative agent under the Prepetition FLFO Credit Agreement.

**Prepetition FLFO Advisors** means Vinson & Elkins, LLP, Shipman & Goodwin LLP (in its capacity as counsel to the Prepetition FLFO Collateral Agent), Opportune LLP, and any local or foreign advisors.

**Prepetition FLFO Collateral Agent** means Cantor Fitzgerald Securities, solely in its capacity as collateral agent under the Prepetition FLFO Credit Agreement.

**Prepetition FLFO Credit Agreement** means that certain *Second Amended and Restated Credit Agreement- First Out*, dated as of June 28, 2019, by and among Fieldwood Energy LLC, as borrower, Fieldwood Energy Inc., as holdings, the Prepetition FLFO Administrative Agent, the Prepetition FLFO Collateral Agent, and the Prepetition FLFO Lenders, and the other parties thereto, as in effect immediately before the Effective Date.

**Prepetition FLFO Lenders** means the Lenders (as defined in the Prepetition FLFO Credit Agreement) holding Prepetition FLFO Loans immediately before the Effective Date.

**Prepetition FLFO Loans** means the Loans (under and as defined in the Prepetition FLFO Credit Agreement) outstanding immediately before the Effective Date.

**Prepetition FLFO Secured Parties** means, collectively, the Prepetition FLFO Administrative Agent, the Prepetition FLFO Lenders, and the other Secured Parties (as defined in the Prepetition FLFO Credit Agreement) under the Prepetition FLFO Credit Agreement.

**Prepetition FLTL Administrative Agent** means Cantor Fitzgerald Securities, solely in its capacity as administrative agent and collateral agent under the Prepetition FLTL Credit Agreement.

**Prepetition FLTL Agents** means the Prepetition FLTL Administrative Agent and the Prepetition FLTL Subagent.

**Prepetition FLTL Agents Advisors** means Shipman & Goodwin LLP (in its capacity as counsel to the Prepetition FLTL Administrative Agent) and Seward & Kissel LLP (in its capacity as counsel to the Prepetition Subagent).

**Prepetition FLTL Subagent** means Drivetrain Agency Services, LLC, solely in its capacity as a subagent to the Prepetition FLTL Administrative Agent under the Prepetition FLTL Credit Agreement and the Loan Documents (as such term is defined in the Prepetition FLTL Credit Agreement).

**Prepetition FLTL Credit Agreement** means that certain *Amended and Restated First Lien Term Loan Agreement*, dated as of April 11, 2018, by and among Fieldwood Energy LLC, as borrower, Fieldwood Energy Inc., as holdings, the Prepetition FLTL Administrative Agent, and the Prepetition FLTL Lenders, and the other parties thereto, as in effect immediately before the Effective Date.

**Prepetition FLTL Lenders** means the Lenders (as defined in the Prepetition FLTL Credit Agreement) holding Prepetition FLTL Loans immediately before the Effective Date.

**Prepetition FLTL Loans** means the Loans (under and as defined in the Prepetition FLTL Credit Agreement) outstanding immediately before the Effective Date.

**Prepetition SLTL Administrative Agent** means Cortland Capital Market Services LLC, solely in its capacity as administrative agent and collateral agent under the Prepetition SLTL Credit Agreement.

**Prepetition SLTL Credit Agreement** means that certain *Amended and Restated Second Lien Term Loan Agreement*, dated as of April 11, 2018, by and among Fieldwood Energy LLC, as borrower, Fieldwood Energy Inc., as holdings, the Prepetition SLTL Administrative Agent, and the Prepetition SLTL Lenders, and the other parties thereto, as in effect immediately before the Effective Date.

**Prepetition SLTL Lenders** means the Lenders (as defined in the Prepetition SLTL Credit Agreement) holding Prepetition SLTL Loans immediately before the Effective Date.

**Prepetition SLTL Loans** means the Loans (under and as defined in the Prepetition SLTL Credit Agreement) outstanding immediately before the Effective Date.

**Principal FLFO Amount** has the meaning set forth in Section 4.3.

**Priority Non-Tax Claim** means any Claim other than an Administrative Expense Claim, or a Priority Tax Claim that is entitled to priority of payment as specified in section 507(a) of the Bankruptcy Code.

**Priority Tax Claim** means any Secured Claim or unsecured Claim of a Governmental Unit of the kind entitled to priority of payment as specified in sections 502(i) and 507(a)(8) of the Bankruptcy Code.

**Pro Rata Share** means the proportion that an Allowed Claim or Interest in a particular Class bears to the aggregate amount of all Allowed Claims or Interests in that Class.

**Professional Person(s)** means any Person retained by order of the Bankruptcy Court in connection with these Chapter 11 Cases pursuant to sections 327, 328, 330, 331, 503(b),

or 1103 of the Bankruptcy Code, excluding any ordinary course professional retained pursuant to an order of the Bankruptcy Court.

*Professional Fee Escrow* means an escrow account established and funded pursuant to section 2.2 of the Plan.

*Professional Fee Escrow Amount* means the aggregate unpaid Fee Claims through the Effective Date as estimated in accordance with section 2.2 of the Plan.

*Released Parties* means, collectively, (a) the Debtors, (b) the Post-Effective Date Debtors, (c) the DIP Agent and DIP Lenders under the DIP Facility, (d) the Prepetition FLFO Secured Parties, (e) the Consenting Creditors, (f) the Prepetition FLFO Collateral Agent, (g) the Prepetition FLTL Agents, (h) the Prepetition SLTL Agent, (i) the Creditors' Committee and the current and former members of the Creditors' Committee (solely in their capacities as such), (j) NewCo and all of its subsidiaries (including, without limitation, the Credit Bid Purchasers), (k) the Exit Facility Agents, (l) the Exit Facility Lenders, (m) the Second Lien Backstop Parties, (n) the ERO Backstop Parties, (o) the Apache PSA Parties, and (p) with respect to each of the foregoing Persons in clauses (a) through (o), each of their current and former affiliates, and each such Entity's and its current and former affiliates' current and former directors, managers, officers, equity holders (regardless of whether such interests are held directly or indirectly), predecessors, successors, and assigns, subsidiaries, and each of their current and former officers, members, managers, directors, equity holders (regardless of whether such interests are held directly or indirectly), principals, members, employees, agents, managed accounts or funds, management companies, fund advisors, investment advisors, advisory board members, financial advisors, partners (including both general and limited partners), attorneys, accountants, investment bankers, consultants, representatives and other professionals, such Persons' respective heirs, executors, estates, and nominees, in each case in their capacity as such, and any and all other persons or entities that may purport to assert any cause of action derivatively, by or through the foregoing entities.

*Releasing Parties* means collectively, (a) the holders of all Claims or Interests that vote to accept the Plan, (b) the holders of all Claims or Interests whose vote to accept or reject the Plan is solicited but that do not vote either to accept or to reject the Plan, (c) the holders of all Claims or Interests that vote, or are deemed, to reject the Plan but do not opt out of granting the releases set forth herein, (d) the holders of all Claims and Interests that were given notice of the opportunity to opt out of granting the releases set forth herein but did not opt out, and (e) the Released Parties (even if such Released Party purports to opt out of the releases set forth herein).

*Required DIP Lenders* has the meaning set forth in the Restructuring Support Agreement.

*Requisite FLFO Lenders* means, as of the date of determination, Prepetition FLFO Lenders holding at least a majority of the outstanding Prepetition FLFO Loans (inclusive of validly executed but unsettled trades) held by the Prepetition FLFO Lenders as of such date.

*Requisite FLTL Lenders* has the meaning set forth in the Restructuring Support Agreement.

      ***Requisite SLTL Lenders*** has the meaning set forth in the Restructuring Support Agreement.

      ***Residual Distributable Value*** means any distributable value of the Single Share of Post-Effective Date FWE Parent held by the Plan Administrator (a) after satisfaction of Allowed Administrative Expense Claims, Allowed Other Secured Claims, Allowed Priority Tax Claims, Allowed Priority Non-Tax Claims, all Cure Amounts and (b) after satisfaction of all fees, expenses, costs and other amounts pursuant to the Plan and incurred by the Post-Effective Date Debtors and in connection with post-Effective Date operations and wind-down.

      ***Restructuring*** means the restructuring of the Debtors, the principal terms of which are set forth in this Plan and the Plan Supplement.

      ***Restructuring Expenses*** means the reasonable and documented fees and expenses incurred by (i) the Ad Hoc Group of Secured Lenders, (ii) the Prepetition FLFO Secured Parties, (iii) the Prepetition FLTL Agents, and (iv) the Ad Hoc Group of Prepetition SLTL Lenders in connection with the Chapter 11 Cases, including the fees and expenses of the Ad Hoc Group of Secured Lenders Advisors, the Prepetition FLTL Agents Advisors, the Prepetition FLFO Advisors, and Ad Hoc Group of Prepetition SLTL Lenders Advisors, in each case payable in accordance with the terms of any applicable agreements, engagement letters or fee letters executed with such parties or pursuant to the terms of the DIP Order and without the requirement for the filing of retention applications, fee applications, or any other application in the Chapter 11 Cases, which shall not be subject to any offset, defense, counterclaim, reduction, or creditor credit and, to the extent incurred prior to the Effective Date, shall be Allowed as Administrative Expense Claims upon incurrence; *provided*, *however*, Restructuring Expenses of the Ad Hoc Group of Prepetition SLTL Lenders shall be limited to and consist solely of the reasonable fees and expenses incurred by the Ad Hoc Group of Prepetition SLTL Lenders Advisors in their capacity as counsel to the Ad Hoc Group of Prepetition SLTL Lenders, and solely to the extent such fees and expenses have been incurred in support of the Restructuring Transactions and so long as the Ad Hoc Group of Prepetition SLTL Lenders are parties to the Restructuring Support Agreement.

      ***Restructuring Support Agreement*** means that certain *Restructuring Support Agreement*, dated as of August 4, 2020, by and among Debtor Fieldwood Energy LLC, certain of its affiliates specified therein, the Consenting Creditors, and Apache, as the same may be amended, restated, or otherwise modified in accordance with its terms.

      ***Restructuring Transactions*** means one or more transactions pursuant to section 1123(a)(5) of the Bankruptcy Code to occur on the Effective Date or as soon as reasonably practicable thereafter, that may be necessary or appropriate to effect any transaction described in, approved by, contemplated by, or necessary to effectuate the Plan and the Credit Bid Transaction, including (a) the consummation of the transactions provided for under or contemplated by the Plan and any mergers, divisive mergers, amalgamations, consolidations, arrangements, continuances, transfers, conversions, sales, dispositions, or other corporate transactions necessary or appropriate to implement the Plan, (b) the execution and delivery of appropriate agreements or other documents containing terms that are consistent with or reasonably necessary to implement the terms of the Plan or the Credit Bid Transaction and that satisfy the requirements of applicable law, (c) the Equity Rights Offerings, (d) the execution and delivery of appropriate instruments of

transfer, assignment, assumption, or delegation of any property, right, liability, duty, or obligation on terms consistent with the terms of the Plan, and (d) all other actions that the Debtors, the Post-Effective Date Debtors or NewCo (or any of its subsidiaries, including the Credit Bid Purchasers), as applicable, determine are necessary or appropriate and consistent with the Plan or the Credit Bid Transaction.  For the avoidance of doubt, Restructuring Transactions includes the Credit Bid Transaction and the Divisive Merger(s) effectuated pursuant to the Plan of Merger.

*Schedule of Abandoned Properties* means a schedule (as may be amended, modified, or supplemented from time to time) of the Debtors' rights to and interests in executory contracts and unexpired federal leases, rights-of-way, and right-of-use-and-easements to be abandoned pursuant to Section 5.13 of this Plan, a copy of which shall be filed with the Disclosure Statement and included in the Plan Supplement.

*Schedule of Assumed Contracts* means the schedule of executory contracts and unexpired leases to be assumed by the Debtors pursuant to this Plan, if any, as the same may be amended, modified, or supplemented from time to time.

*Schedule of FWE I Oil & Gas Lease Interests* means a schedule (as may be amended, modified, or supplemented from time to time) of the Debtors' interests in the oil and gas leases that shall constitute FWE I Assets, a copy of which shall be filed with the Disclosure Statement and included in the Plan Supplement.

*Schedule of FWE III Oil & Gas Lease Interests* means a schedule (as may be amended, modified, or supplemented from time to time) of the Debtors' interests in the oil and gas leases that shall constitute FWE III Assets, a copy of which shall be filed with the Disclosure Statement and included in the Plan Supplement.

*Schedule of FWE IV Oil & Gas Lease Interests* means a schedule (as may be amended, modified, or supplemented from time to time) of the Debtors' interests in the oil and gas leases that shall constitute assets of the FWE Additional Entity to be formed under the name Fieldwood Energy IV LLC, a copy of which shall be filed with the Disclosure Statement and included in the Plan Supplement.

*Schedule of FWE Additional Entity Oil & Gas Lease Interests* means a schedule (as may be amended, modified, or supplemented from time to time) of the Debtors' interests in the oil and gas leases that shall constitute assets of any FWE Additional Entity, a copy of which shall be included in the Plan Supplement.

*Schedule of Purchased Oil & Gas Lease Interests* means a schedule (as may be amended, modified, or supplemented from time to time) of the Debtors' interests in the oil and gas leases that will be acquired by the Credit Bid Purchaser pursuant to the Credit Bid Purchase Agreement, a copy of which shall be filed with the Disclosure Statement and included in the Plan Supplement.

*Schedules* means any schedules of assets and liabilities, schedules of executory contracts and unexpired leases, and statements of financial affairs filed by the Debtors pursuant to section 521 of the Bankruptcy Code.

***Second Lien Backstop Commitment Letter*** means that certain backstop commitment letter, in form and substance (i) acceptable to the Debtors, the Required DIP Lenders, and Requisite FLTL Lenders and (ii) reasonably acceptable to the Prepetition FLFO Administrative Agent and the First Lien Exit Facility Agent, to be entered into by and among Fieldwood Energy LLC, the Credit Bid Purchaser and the Backstop Parties, as may be amended, supplemented, or modified from time to time, pursuant to the terms thereof and consistent with the Restructuring Support Agreement, pursuant to which the Backstop Parties agreed to, among other things, backstop the Second Lien Exit Facility in accordance with the terms and conditions set forth therein.

***Second Lien Backstop Commitment Premium*** means a premium equal to 8% of the maximum principal amount of the Second Lien Exit Facility (*i.e.* $185,000,000) payable to the Backstop Parties with the Second Lien Backstop Commitment Premium Equity Interests in accordance with the terms set forth in the Second Lien Backstop Commitment Letter.

***Second Lien Backstop Commitment Premium Equity Interests*** means an amount of New Equity Interests equal to the value of the Second Lien Backstop Commitment Premium as further set forth in the Second Lien Backstop Commitment Letter; *provided that* such New Equity Interests shall be issued at a 30% discount to the equity value of NewCo on the Effective Date.

***Second Lien Backstop Party*** has the meaning set forth in the Second Lien Backstop Commitment Letter.

***Second Lien Exit Facility*** means the facility under the Second Lien Exit Facility Credit Agreement.

***Second Lien Exit Facility Agent*** means the administrative agent under the Second Lien Exit Facility Credit Agreement.

***Second Lien Exit Facility Credit Agreement*** means that certain credit agreement to be entered by the Credit Bid Purchaser, the Second Lien Exit Facility Agent and the Second Lien Exit Facility Lenders on the Effective Date that shall govern the Second Lien Exit Facility, which shall reflect and contain terms, conditions, representations, warranties, and covenants consistent with the Second Lien Exit Facility Term Sheet and otherwise be in form and substance (i) acceptable to the Debtors, the Required DIP Lenders, and Requisite FLTL Lenders and (ii) reasonably acceptable to the Prepetition FLFO Administrative Agent and the First Lien Exit Facility Agent.

***Second Lien Exit Facility Documents*** means, collectively, the Second Lien Exit Facility Credit Agreement, and any and all other agreements, documents, and instruments delivered or to be entered into in connection therewith, including any guarantee agreements, pledge and collateral agreements, intercreditor agreements, and other security documents, the terms of which documents shall be (i) acceptable to the Debtors, the Required DIP Lenders, and Requisite FLTL Lenders and (ii) reasonably acceptable to the Prepetition FLFO Administrative Agent and the First Lien Exit Facility Agent.

**Second Lien Exit Facility Lenders** means the lenders party to the Second Lien Exit Facility Credit Agreement.

**Second Lien Exit Facility Term Sheet** means the term sheet filed with the Disclosure Statement, as may be amended from time to time with (i) the consent of the Required DIP Lenders and Requisite FLTL Lenders and (ii) the reasonable consent of the Prepetition FLFO Administrative Agent and First Lien Exit Facility Agent.

**Secured** means, when referring to a Claim: (a) secured by a Lien on property of a Debtor's Estate, the amount of which is equal to or less than the value of such property as (i) set forth in the Plan, (ii) agreed to by the holder of such Claim and the Debtors, or (iii) determined by a Final Order in accordance with section 506(a) of the Bankruptcy Code, or (b) secured by the amount of any right of setoff of the holder thereof in accordance with section 553 of the Bankruptcy Code.

**Security** means any "security" as such term is defined in section 101(49) of the Bankruptcy Code.

**SLTL Claims** means all Claims, other than Claims subject to subordination in accordance with section 510(b) of the Bankruptcy Code, arising from or based upon the Prepetition SLTL Credit Agreement.

**SLTL Claims Allowed Amount** means $517,500,000.00 in principal, plus any accrued but unpaid interest or fees due under the Prepetition SLTL Credit Agreement as of the Petition Date.

**SLTL Deficiency Claim** means any SLTL Claim or portion thereof that is not Secured, if any.

**SLTL Equity Rights Offering** means that certain rights offering pursuant to which each holder of Allowed SLTL Claims is entitled to receive SLTL Subscription Rights to acquire New Equity Interests in the aggregate amount of the SLTL Equity Rights Offering Amount in accordance with the SLTL Equity Rights Offering Procedures, the terms and conditions of which shall be reasonably acceptable to the Debtors, Required DIP Lenders, Requisite FLTL Lenders, Requisite SLTL Lenders, the Prepetition FLFO Administrative Agent, and the First Lien Exit Facility Agent.

**SLTL Equity Rights Offering Amount** means $20,000,000.

**SLTL Equity Rights Offering Procedures** means the procedures for the implementation of the SLTL Equity Rights Offering to be approved by the Bankruptcy Court.

**SLTL ERO Backstop Agreement** means that certain SLTL Backstop Commitment Agreement by and among Fieldwood Energy Inc. and the SLTL ERO Backstop Parties, dated as of May 27, 2021 (as amended, restated, supplemented, or otherwise modified from time to time in accordance with its terms and in form and substance reasonably acceptable to the Debtors, the Required DIP Lenders, the Requisite FLTL Lenders, the Requisite SLTL Lenders, the Prepetition FLFO Administrative Agent, and the First Lien Exit Facility Agent), pursuant to which the SLTL

ERO Backstop Parties agreed to, among other things, backstop the SLTL Equity Rights Offering with the terms and conditions set forth therein.

*SLTL ERO Backstop Commitment Percentage* has the meaning ascribed to "Backstop Commitment Percentage" in the SLTL ERO Backstop Agreement.

*SLTL ERO Backstop Commitment Premium* means a premium equal to 8% of the SLTL Equity Rights Offering Amount payable to the SLTL ERO Backstop Parties with the SLTL ERO Backstop Commitment Premium Equity Interests in accordance with the terms set forth in the SLTL ERO Backstop Agreement.

*SLTL ERO Backstop Commitment Premium Equity Interests* means an amount of New Equity Interests equal to the value of the SLTL ERO Backstop Commitment Premium as further set forth in the SLTL ERO Backstop Agreement; *provided that* such New Equity Interests shall be issued at a 30% discount to the equity value of NewCo on the Effective Date.

*SLTL ERO Backstop Parties* means those parties that agree to backstop the SLTL Equity Rights Offering pursuant to the SLTL ERO Backstop Agreement, each in its respective capacity as such.

*SLTL Subscription Rights* means the subscription right to acquire New Equity Interests with an aggregate value equal to the SLTL Rights Offering Amount offered in accordance with the SLTL Equity Rights Offering Procedures; *provided, however*, that such New Equity Interests shall be issued at a 30% discount to the equity value of NewCo on the Effective Date.

*SLTL Tranche 1 Warrant Agreement* means a warrant agreement to be entered into by and among NewCo and the warrant agent named therein that shall govern the terms of the SLTL Tranche 1 Warrants, the form of which shall be acceptable to the Debtors, Required DIP Lenders, Requisite FLTL Lenders, the Creditors' Committee, and the Requisite SLTL Lenders.

*SLTL Tranche 1 Warrants* means 8-year warrants for 25% of the New Equity Interests (calculated on a fully diluted basis giving effect to the New Equity Interests to be issued pursuant to Section 4.4(a)(i) of this Plan, the New Equity Interests issuable upon the exercise of the Subscription Rights, the Backstop Commitment Premium Equity Interests, and the New Equity Interests issuable upon the exercise of the New Money Warrants and GUC Warrants (excluding the GUC True-Up Warrants), but excluding the effect of any New Equity Interests issuable upon exercise of the SLTL Tranche 2 Warrants or GUC True-Up Warrants and any New Equity Interests issuable in connection with the Management Incentive Plan), with a strike price set at an equity value equal to $1,321,000,000, the terms of which shall be set forth in the SLTL Tranche 1 Warrant Agreement.

*SLTL Tranche 2 Warrant Agreement* means a warrant agreement to be entered into by and among NewCo and the warrant agent named therein that shall govern the terms of the SLTL Tranche 2 Warrants, the form of which shall be acceptable to the Debtors, Required DIP Lenders, Requisite FLTL Lenders, the Creditors' Committee, and the Requisite SLTL Lenders.

*SLTL Tranche 2 Warrants* means 8-year warrants for 32.50% of the New Equity Interests (calculated on a fully diluted basis giving effect to the New Equity Interests to be issued

pursuant to Section 4.4(a)(i) of this Plan, the New Equity Interests issuable upon the exercise of the Subscription Rights, the Backstop Commitment Premium Equity Interests, and the New Equity Interests issuable upon the exercise of the New Money Warrants, the SLTL Tranche 1 Warrants, and the GUC Warrants (excluding the GUC True-Up Warrants), but excluding the effect of any New Equity Interests issuable upon exercise of the GUC True-Up Warrants and any New Equity Interests issuable in connection with the Management Incentive Plan), with a strike price set at an equity value equal to $1,585,200,000, the terms of which shall be set forth in the SLTL Tranche 2 Warrant Agreement.

*SLTL Unsubscribed Shares* has the meaning ascribed to "Unsubscribed Shares" in the SLTL ERO Backstop Agreement.

*SLTL Warrants* means, collectively, the SLTL Tranche 1 Warrants and the SLTL Tranche 2 Warrants.

*Specified Abandoned Properties* means the Abandoned Properties other than Abandoned Properties subject to a consensual agreement between the Debtors and any entity or entities in the chain of title, co-working interest owner(s), or other related party for such Abandoned Property, including any Additional Predecessor Agreements, that address any plugging and abandonment and decommissioning obligations associated with such Abandoned Properties.

*Specified Administrative Expense Claims* means Administrative Expense Claims other than (a) Administrative Expense Claims that are to be assumed by the Credit Bid Purchaser pursuant to the Credit Bid Purchase Agreement; (b) Cure Amounts; and (c) Fee Claims, Restructuring Expenses, any fees and expenses payable pursuant to sections 2.3 and 2.4 of this Plan, any fees and expenses payable or reimbursable by the Debtors or Post-Effective Date Debtors pursuant to the Second Lien Backstop Commitment Letter, Credit Bid Purchase Agreement, or First Lien Exit Facility Commitment Letter (including termination fees, if any), Apache Fees and Expenses and Apache Implementation Costs, and Statutory Fees.

*Standby Loan Agreement* has the meaning set forth in the Apache Implementation Agreement.

*Standby Credit Facility Documents* has the meaning set forth in the Apache Implementation Agreement.

*Statutory Fees* means all fees and charges assessed against the Estates pursuant to sections 1911 through 1930 of chapter 123 of title 28 of the United States Code.

*Subordinated Securities Claim* means a Claim that is subject to subordination in accordance with sections 510(b) of the Bankruptcy Code or otherwise.

*Subscription Rights* means, collectively, the FLTL Subscription Rights and SLTL Subscription Rights.

*Tax Code* means the Internal Revenue Code of 1986, as amended from time to time.

**Toggle Amount** means $35,000,000 or such higher amount as may be mutually agreed between the Debtors, the Required DIP Lenders, and the Requisite FLTL Lenders.

**Toggle Date** has the meaning set forth in Section 5.2(c).

**Toggle Motion** has the meaning set forth in Section 5.2(c)(i).

**Trade Agreement** means a trade agreement entered into or to be entered into between the Debtors, Credit Bid Purchaser, and a Trade Creditor that will be provided by the Debtors to each Trade Creditor and that provides for, among other things, waiver of any and all liens against the Debtors, their assets and any co-owned assets, or any other affiliated person or entity (including any co-working interest owner of the Debtors), or any such person's or entity's respective assets or property (real or personal), regardless of the statute or other legal authority upon which the lien is asserted, held or asserted by the Trade Creditor relating to the Unsecured Trade Claim, and an agreement by such Trade Creditor to continue to provide post-Effective Date trade terms that are no less favorable than the terms provided to the Debtors prior to the Petition Date

**Trade Creditor** means a third-party provider of goods or services to the Debtors that holds an Unsecured Trade Claim against the Debtors arising from the provision of such goods and services.

**Unimpaired** means, with respect to a Claim, Interest, or Class of Claims or Interests, not "impaired" within the meaning of sections 1123(a)(4) and 1124(2) of the Bankruptcy Code.

**Unsecured Trade Claim** means any unsecured claim (or secured claim that becomes unsecured by agreement, settlement, or order of the Bankruptcy Court) of a Trade Creditor that is held by a Trade Creditor that has elected such claim to be treated as an Unsecured Trade Claim under this Plan and enters into or agrees to enter into a Trade Agreement; *provided*, *however*, that in no event shall any claim against the Debtors that arises in connection with a joint interest billing arrangement constitute an Unsecured Trade Claim.

**U.S. Trustee** means the United States Trustee for Region 7.

**Voting Deadline** means June 2, 2021 at 4:00 p.m. (Prevailing Central Time), or such date and time as may set by the Bankruptcy Court.

### 1.2 *Interpretation; Application of Definitions; Rules of Construction.*

Unless otherwise specified, all section or exhibit references in the Plan are to the respective section in or exhibit to the Plan, as the same may be amended, waived, or modified from time to time in accordance with the terms hereof. The words "herein," "hereof," "hereto," "hereunder," and other words of similar import refer to the Plan as a whole and not to any particular section, subsection, or clause contained therein and have the same meaning as "in the Plan," "of the Plan," "to the Plan," and "under the Plan," respectively. The words "includes" and "including" are not limiting. The headings in the Plan are for convenience of reference only and shall not limit or otherwise affect the provisions hereof. For purposes herein: (a) in the appropriate context, each

term, whether stated in the singular or plural, shall include both the singular and plural, and pronouns stated in the masculine, feminine, or neuter gender shall include the masculine, feminine, and the neuter gender; (b) any reference herein to a contract, lease, instrument, release, indenture, or other agreement or document being in a particular form or on particular terms and conditions means that the referenced document shall be substantially in that form or substantially on those terms and conditions; (c) the rules of construction set forth in section 102 of the Bankruptcy Code shall apply; and (d) any term used in capitalized form herein that is not otherwise defined but that is used in the Bankruptcy Code or the Bankruptcy Rules shall have the meaning assigned to that term in the Bankruptcy Code or the Bankruptcy Rules, as the case may be.

### 1.3 *Reference to Monetary Figures.*

All references in the Plan to monetary figures shall refer to the legal tender of the United States of America unless otherwise expressly provided.

### 1.4 *Controlling Document.*

In the event of an inconsistency between the Plan and the Plan Supplement, the terms of the relevant document in the Plan Supplement shall control unless otherwise specified in such Plan Supplement document. In the event of an inconsistency between the Plan and the First Lien Exit Facility Commitment Letter, the First Lien Exit Facility Commitment Letter shall control. In the event of an inconsistency between the Plan and the Second Lien Backstop Commitment Letter, the Second Lien Backstop Commitment Letter shall control. The provisions of the Plan, the First Lien Exit Facility Commitment Letter, the Second Lien Backstop Commitment Letter, and of the Confirmation Order shall be construed in a manner consistent with each other so as to effectuate the purposes of each; *provided*, that if there is determined to be any inconsistency between (a) any provision of the Plan, the First Lien Exit Facility Commitment Letter, and any provision of the Confirmation Order that cannot be so reconciled, or (b) any provision of the Plan, the Second Lien Backstop Commitment Letter, and any provision of the Confirmation Order that cannot be so reconciled, then, solely to the extent of such inconsistency, the provisions of the Confirmation Order shall govern.

### 1.5 *Certain Consent Rights*

Notwithstanding anything herein to the contrary, and without limiting the Debtors' fiduciary duties, any and all consent rights of any party set forth in the Restructuring Support Agreement with respect to the form and substance of this Plan, the Plan Supplement, any supplement to the Disclosure Statement, any other Definitive Documents and any agreements or documents referenced in this Plan or the Plan Supplement, including any amendments, restatements, supplements, or other modifications to such documents, and any consents, waivers, or other deviations under or from any such documents, shall be incorporated herein by this reference and fully enforceable as if stated in full herein until such time as the Restructuring Support Agreement is terminated in accordance with its terms.

**ARTICLE II.**       **ADMINISTRATIVE EXPENSE CLAIMS, FEE CLAIMS, DIP CLAIMS, AND PRIORITY TAX CLAIMS.**

      2.1      *Treatment of Administrative Expense Claims.*

On (or as soon thereafter as is reasonably practicable) the later of (a) the Effective Date and (b) the first Business Day after the date that is thirty (30) calendar days after the date each Administrative Expense Claim becomes an Allowed Administrative Expense Claim, each holder of an Allowed Administrative Expense Claim (other than a Fee Claim) shall receive in full and final satisfaction of such Claim, either (x) Cash in an amount equal to the Allowed amount of such Claim or such other treatment consistent with the provisions of section 1129(a)(9) of the Bankruptcy Code or (y) such other treatment as to which the Debtors, the Post-Effective Date Debtors, or NewCo and its subsidiaries (including the Credit Bid Purchaser), as applicable, and the holder of such Allowed Administrative Expense Claim will have agreed upon in writing; *provided*, that Allowed Administrative Expense Claims representing liabilities incurred in the ordinary course of business by the Debtors, as Debtors in Possession, shall be paid by the Debtors or the Post-Effective Date Debtors, as applicable, in the ordinary course of business, consistent with past practice and in accordance with the terms and subject to the conditions of any orders or agreements governing, instruments evidencing, or other documents establishing, such liabilities; *provided, further*, that any Allowed Administrative Expense Claim assumed by the Credit Bid Purchaser pursuant to the Credit Bid Purchase Agreement shall be solely an obligation of the Credit Bid Purchaser and the holder of such assumed Claim shall have no recourse to or Claim against the Debtors or Post-Effective Date Debtors or their assets and properties.

      2.2      *Treatment of Fee Claims.*

      (a)      <u>Final Fee Applications</u>. All final requests for the allowance and payment of Fee Claims shall be filed no later than 45 days after the Effective Date unless such date is extended by order of the Bankruptcy Court.

      (b)      <u>Professional Fee Escrow Amount</u>. All Professional Persons shall estimate in good faith their unpaid Fee Claims before and as of the Effective Date and shall deliver such estimate to the Debtors at least three (3) calendar days before the Effective Date; *provided, however*, that such estimate shall not limit or be deemed to limit the amount of the fees and expenses that are the subject of the Professional Person's final request for payment of Fee Claims. If a Professional Person does not provide such estimate, the Debtors and Post-Effective Date Debtors may estimate the unbilled fees and expenses of such Professional Person; *provided, however*, that such estimate shall not be considered an admission or limitation with respect to the fees and expenses incurred by, or payable to, such Professional Person. The total amount so estimated as of the Effective Date shall comprise the Professional Fee Escrow Amount.

      (c)      <u>Professional Fee Escrow</u>. If the Professional Fee Escrow Amount is greater than zero, then as soon as reasonably practicable after the Confirmation Date and no later than the Effective Date, the Debtors will establish and fund the Professional Fee Escrow with cash equal to the Professional Fee Escrow Amount and no Liens, Claims, or interests will encumber the Professional Fee Escrow in any way. The Professional Fee Escrow (including funds held in the Professional Fee Escrow) will (i) not be and will not be deemed to be property of the Debtors or

the Post-Effective Date Debtors and (ii) will be held in trust for the Professional Persons; *provided*, *however*, that funds remaining in the Professional Fee Escrow after all Allowed Fee Claims have been irrevocably paid in full will revert to the Post-Effective Date Debtors. Allowed Fee Claims will be paid in cash to such Professional Persons from funds held in the Professional Fee Escrow as soon as reasonably practicable after such Claims are Allowed by an order of the Bankruptcy Court; *provided*, *however*, that the Debtors' obligations with respect to Fee Claims will not be limited nor deemed to be limited in any way to the balance of funds held in the Professional Fee Escrow.

If the amount of funds in the Professional Fee Escrow is insufficient to fund payment in full of all Allowed Fee Claims and any other Allowed amounts owed to Professional Persons, the deficiency will be promptly funded to the Professional Fee Escrow from the Debtors' estates and/or by Post-Effective Date Debtors without any further action or order of the Bankruptcy Court.

(d)      <u>Post-Effective Date Fees and Expenses</u>.  On and after the Effective Date, the Debtors and the Post-Effective Date Debtors, as applicable, will pay in cash in the ordinary course of business and without any further action or order of the Bankruptcy Court, the reasonable legal, professional, or other fees and expenses that are (i) related to implementation of the Plan and (ii) incurred by the Debtors or Post-Effective Date Debtors, as applicable, on and after the Effective Date.

On the Effective Date, any requirement that Professional Persons comply with sections 327 through 331 and 1103 of the Bankruptcy Code in seeking retention or compensation for services provided after such date shall terminate, and the Debtors or Post-Effective Date Debtors may employ and pay any post-Effective Date fees and expenses of any Professional Person without any further notice to or action, order, or approval of the Bankruptcy Court.

### 2.3      *Treatment of DIP Claims.*

As of the Effective Date, the DIP Claims shall be Allowed in the full amount outstanding under the DIP Credit Agreement, including principal, interest, fees, costs, other charges, and expenses provided for thereunder.  In full and final satisfaction, settlement, release, and discharge of each Allowed DIP Claim, on the Effective Date, each holder of such Allowed DIP Claim shall receive either (a) payment in full in Cash or (b) such other treatment as to which the Debtors or the Post-Effective Date Debtors, as applicable, and the holder of such Allowed DIP Claims will have agreed upon in writing.  On the Effective Date, all Liens granted to secure the Allowed DIP Claims shall be terminated and of no further force and effect.

### 2.4      *Payment of Fees and Expenses Under DIP Order.*

On the later of (a) the Effective Date and (b) the date on which such fees, expenses, or disbursements would be required to be paid under the terms of the DIP Order, the Debtors or the Post-Effective Date Debtors (as applicable) shall pay all fees, expenses, and disbursements of the DIP Agent, DIP Lenders, and Prepetition FLTL Agents, in each case that have accrued and are unpaid as of the Effective Date and are required to be paid under or pursuant to the DIP Order. After the Effective Date, the Post-Effective Date Debtors shall continue to reimburse the DIP

Agent and the DIP Lenders for the reasonable fees and expenses (including reasonable and documented legal fees and expenses) incurred by the DIP Agent and the DIP Lenders after the Effective Date in accordance with the terms of the DIP Documents.  The Post-Effective Date Debtors shall pay all of the amounts that may become payable to the DIP Agent or any of the DIP Lenders in accordance with the terms of the DIP Documents and the DIP Order.

### 2.5     *Treatment of Priority Tax Claims.*

On the Effective Date or as soon thereafter as is reasonably practicable (but in no event later than 30 days after the Effective Date), each holder of an Allowed Priority Tax Claim shall receive in full and final satisfaction of such Claim, either (a) Cash in an amount equal to the Allowed amount of such Claim or such other treatment consistent with the provisions of section 1129(a)(9) of the Bankruptcy Code or (b) or such other treatment as to which the Debtors, the Post-Effective Date Debtors or NewCo and its subsidiaries (including the Credit Bid Purchaser) as applicable, and the holder of such Allowed Priority Tax Claim will have agreed upon in writing; *provided*, that Allowed Priority Tax Claims representing liabilities incurred in the ordinary course of business by the Debtors, as Debtors in Possession, shall be paid by the Debtors or the Post-Effective Date Debtors, as applicable, in the ordinary course of business, consistent with past practice and in accordance with the terms and subject to the conditions of any orders or agreements governing, instruments evidencing, or other documents establishing, such liabilities; *provided, further*, that any Allowed Priority Tax Claim assumed by the Credit Bid Purchaser pursuant to the Credit Bid Purchase Agreement shall be solely an obligation of the Credit Bid Purchaser and the holder of such assumed Claim shall have no recourse to or Claim against the Debtors or Post-Effective Date Debtors or their assets and properties.

### 2.6     *Restructuring Expenses.*

On the Effective Date, or as soon as reasonably practicable thereafter, the Debtors or the Post-Effective Date Debtors, as applicable, shall pay in full in Cash (to the extent not previously paid during the course of the Chapter 11 Cases) all outstanding Restructuring Expenses billed through the Effective Date, in accordance with the terms of the applicable orders, engagement letters, or other applicable contractual arrangements.  All parties entitled to payment pursuant to this Section 2.6 shall estimate their accrued Restructuring Expenses before and as of the Effective Date and shall deliver such estimates to the Debtors at least three Business Days before the Effective Date; *provided,* that such estimate shall not be considered an admission or limitation with respect to the fees and expenses of such parties.  On the Effective Date, final invoices for all Restructuring Expenses incurred before and as of the Effective Date shall be submitted to the Debtors. In addition, the Debtors and the Post-Effective Date Debtors (as applicable) shall continue to pay post-Effective Date, when due and payable in the ordinary course, Restructuring Expenses related to implementation, consummation and defense of the Plan.

### 2.7     *Postpetition Hedge Claims.*

On (or as soon thereafter as is reasonably practicable) the later of (a) the Effective Date and (b) the first Business Day on which the Allowed Postpetition Hedge Claim becomes due and owing in accordance with the terms of and subject to the conditions of any orders or agreements governing, instruments evidencing, or other documents establishing, such liabilities,

each holder of an Allowed Postpetition Hedge Claim shall receive in full and final satisfaction of such Claim, either (x) Cash in an amount equal to the Allowed amount of such Claim or such other treatment consistent with the provisions of section 1129(a)(9) of the Bankruptcy Code or (y) such other treatment as to which the Debtors, the Post-Effective Date Debtors, or NewCo and its subsidiaries (including the Credit Bid Purchaser), as applicable, and the holder of such Allowed Postpetition Hedge Claim will have agreed upon in writing; *provided*, that any Allowed Postpetition Hedge Claim assumed by the Credit Bid Purchaser in accordance with the foregoing clause (y) pursuant to the Credit Bid Purchase Agreement shall be solely an obligation of the Credit Bid Purchaser and the holder of such assumed Claim shall have no recourse to or Claim against the Debtors or Post-Effective Date Debtors or their assets and properties. Nothing herein shall modify any of the contractual rights under a Postpetition Hedging Agreement of a holder of an Allowed Postpetition Hedge Claim in their capacity as a holder of an Allowed Postpetition Hedge Claim.

## ARTICLE III.   CLASSIFICATION OF CLAIMS AND INTERESTS.

### 3.1   *Classification in General.*

A Claim or Interest is placed in a particular Class for all purposes, including voting, confirmation, and distribution under the Plan and under sections 1122 and 1123(a)(1) of the Bankruptcy Code; *provided*, *however*, that a Claim or Interest is placed in a particular Class for the purpose of receiving distributions pursuant to the Plan only to the extent that such Claim or Interest is an Allowed Claim or Allowed Interest in that Class and such Claim or Interest has not been satisfied, released, or otherwise settled before the Effective Date.

### 3.2   *Formation of Debtor Groups for Convenience Only.*

The Plan groups the Debtors together solely for the purpose of describing treatment under the Plan, confirmation of the Plan, and making Plan Distributions in respect of Claims against and Interests in the Debtors under the Plan. Such groupings shall not affect any Debtor's status as a separate legal entity, change the organizational structure of the Debtors' business enterprise, constitute a change of control of any Debtor for any purpose, cause a merger of consolidation of any legal entities, or cause the transfer of any Assets; and, except as otherwise provided by or permitted under the Plan, all Debtors shall continue to exist as separate legal entities.

### 3.3   *Summary of Classification of Claims and Interests.*

The following table designates the Classes of Claims against and Interests in the Debtors and specifies which Classes are: (a) Impaired and Unimpaired under the Plan; (b) entitled to vote to accept or reject the Plan in accordance with section 1126 of the Bankruptcy Code; and (c) presumed to accept or deemed to reject the Plan. In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Expense Claims and Priority Tax Claims have not been classified. The classification of Claims and Interests set forth herein shall apply separately to each Debtor.

| **Class** | **Type of Claim or Interest** | **Impairment** | **Entitled to Vote** |
|---|---|---|---|
| Class 1 | Other Secured Claims | Impaired | Yes |
| Class 2 | Priority Non-Tax Claims | Unimpaired | No (Presumed to accept) |
| Class 3 | FLFO Claims | Impaired | Yes |
| Class 4 | FLTL Claims | Impaired | Yes |
| Class 5 | SLTL Claims | Impaired | Yes |
| Class 6A | Unsecured Trade Claims | Impaired | Yes |
| Class 6B | General Unsecured Claims | Impaired | Yes |
| Class 7 | Intercompany Claims | Unimpaired | No (Presumed to accept) |
| Class 8 | Subordinated Securities Claims | Impaired | No (Deemed to reject) |
| Class 9 | Intercompany Interests | Unimpaired | No (Presumed to accept) |
| Class 10 | Existing Equity Interests | Impaired | No (Deemed to reject) |

### 3.4 *Special Provision Governing Unimpaired Claims.*

Except as otherwise provided in this Plan, nothing under this Plan shall affect the rights of the Debtors or the Post-Effective Date Debtors, as applicable, in respect of any Unimpaired Claims, including all rights in respect of legal and equitable defenses to, or setoffs or recoupments against, any such Unimpaired Claims.

### 3.5 *Separate Classification of Other Secured Claims.*

Although all Other Secured Claims have been placed in one Class for purposes of nomenclature within the Plan, each Other Secured Claim, to the extent secured by a Lien on Collateral different from the Collateral securing a different Other Secured Claim, shall be treated as being in a separate sub-Class for the purposes of voting to accept or reject the Plan and receiving Plan Distributions.

### 3.6 *Elimination of Vacant Classes.*

Any Class that, as of the commencement of the Confirmation Hearing, does not have at least one holder of a Claim or Interest that is Allowed in an amount greater than zero for voting purposes that votes on the Plan shall be considered vacant, deemed eliminated from the Plan for purposes of voting to accept or reject the Plan, and disregarded for purposes of determining whether the Plan satisfies section 1129(a)(8) of the Bankruptcy Code with respect to such Class.

### 3.7 *Voting Classes; Presumed Acceptance by Non-Voting Classes.*

With respect to each Debtor, if a Class contained Claims eligible to vote and no holder of Claims eligible to vote in such Class votes to accept or reject the Plan, the Plan shall be presumed accepted by the holders of such Claims in such Class.

### 3.8   *Voting; Presumptions; Solicitation.*

(a)   **Acceptance by Certain Impaired Classes**.  Only holders of Allowed Claims in Classes 1, 3, 4, 5, 6A, and 6B are entitled to vote to accept or reject the Plan.  An Impaired Class of Claims shall have accepted the Plan if (i) the holders of at least two-thirds (2/3) in amount of the Allowed Claims actually voting in such Class have voted to accept the Plan and (ii) the holders of more than one-half (1/2) in number of the Allowed Claims actually voting in such Class have voted to accept the Plan.

(b)   **Presumed Acceptance by Unimpaired Classes**.  Holders of Claims and Interests in Classes 2, 7 and 9 are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.  Accordingly, such holders are not entitled to vote to accept or reject the Plan.

(c)   **Deemed Rejection by Certain Impaired Classes**.  Holders of Claims in Class 8 and Class 10 are deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code.  Accordingly, such holders are not entitled to vote to accept or reject the Plan.

### 3.9   *Cramdown.*

If any Class is deemed to reject the Plan or is entitled to vote on the Plan and does not vote to accept the Plan, the Debtors may (a) seek confirmation of the Plan under section 1129(b) of the Bankruptcy Code or (b) amend or modify the Plan in accordance with the terms hereof and the Bankruptcy Code.  If a controversy arises as to whether any Claims or Interests, or any class of Claims or Interests, are impaired, the Bankruptcy Court shall, after notice and a hearing, determine such controversy on or before the Confirmation Date.

### 3.10   *No Waiver.*

Nothing contained in the Plan shall be construed to waive a Debtor's or other Person's right to object on any basis to any Disputed Claim.

### ARTICLE IV.   TREATMENT OF CLAIMS AND INTERESTS.

### 4.1   *Class 1: Other Secured Claims.*

(a)   **Treatment**: Except to the extent that a holder of an Allowed Other Secured Claim agrees to a less favorable treatment, in full and final satisfaction of such Allowed Other Secured Claim, at the option of the Debtors or the Post-Effective Date Debtors, such holder shall receive either (i) payment in full in Cash, payable on the later of the Effective Date and the date that is ten (10) Business Days after the date on which such Other Secured Claim becomes an Allowed Other Secured Claim, in each case, or as soon as reasonably practicable thereafter, (ii) such other treatment so as to render such holder's Allowed Other Secured Claim Unimpaired, or (iii) any other treatment consistent with the provisions of section 1129 of the Bankruptcy Code, including by providing such holder with the "indubitable equivalent" of their Allowed Other Secured Claim (which, for the avoidance of doubt, may be in the form of a multi-year promissory

36

note or other financial instrument); *provided,* that any Allowed Other Secured Claim assumed by the Credit Bid Purchaser pursuant to the Credit Bid Purchase Agreement shall be solely an obligation of the Credit Bid Purchaser and the holder of such assumed Claim shall have no recourse to or Claim against the Debtors or Post-Effective Date Debtors or their assets and properties.

(b)     **Impairment and Voting**:  Allowed Other Secured Claims are Impaired. Holders of Allowed Other Secured Claims are entitled to vote on the Plan.

### 4.2     *Class 2:  Priority Non-Tax Claims.*

(a)     **Treatment**:  Except to the extent that a holder of an Allowed Priority Non-Tax Claim agrees to a less favorable treatment, in full and final satisfaction of such Allowed Priority Non-Tax Claim, each holder of an Allowed Priority Non-Tax Claim shall, at the option of the Debtors or the Post-Effective Date Debtors (i) be paid in full in Cash or (ii) otherwise receive treatment consistent with the provisions of section 1129(a)(9) of the Bankruptcy Code, payable on the later of the Effective Date and the date that is ten (10) Business Days after the date on which such Priority Non-Tax Claim becomes an Allowed Priority Non-Tax Claim, in each case, or as soon as reasonably practicable thereafter; *provided,* that any Allowed Priority Non-Tax Claim assumed by the Credit Bid Purchaser pursuant to the Credit Bid Purchase Agreement shall be solely an obligation of the Credit Bid Purchaser and the holder of such assumed Claim shall have no recourse to or Claim against the Debtors or Post-Effective Date Debtors or their assets and properties.

(b)     **Impairment and Voting**:  Allowed Priority Non-Tax Claims are Unimpaired.  In accordance with section 1126(f) of the Bankruptcy Code, the holders of Allowed Priority Non-Tax Claims are conclusively presumed to accept the Plan and are not entitled to vote to accept or reject the Plan, and the votes of such holders shall not be solicited with respect to such Allowed Priority Non-Tax Claims.

### 4.3     *Class 3:  FLFO Claims.*

(a)     **Treatment**:  Except to the extent that a holder of an Allowed FLFO Claim agrees to less favorable treatment, on the Effective Date, in full and final satisfaction of such Allowed FLFO Claim, (a) each holder of an Allowed FLFO Claim shall receive its Pro Rata Share of the FLFO Distribution Amount and (b) all remaining Allowed FLFO Claims shall be assumed by the NewCo Entities as modified to the extent set forth in the First Lien Exit Facility Documents. The Liens securing the FLFO Claims that attach to the Credit Bid Acquired Interests shall be retained and deemed assigned to the First Lien Exit Facility Agent upon the Effective Date to secure the obligations under the First Lien Exit Facility.

(b)     **Impairment and Voting**: FLFO Claims are Impaired.  Holders of Allowed FLFO Claims are entitled to vote on the Plan.

(c)     **Allowance**:  The FLFO Claims shall be deemed Allowed on the Effective Date in the FLFO Claims Allowed Amount.

### 4.4 *Class 4: FLTL Claims.*

(a) **Treatment:** Except to the extent that a holder of an Allowed FLTL Claim agrees to less favorable treatment, on the Effective Date, in full and final satisfaction of and in exchange for such Allowed FLTL Claim and in consideration for the Credit Bid Transaction, each holder of an Allowed FLTL Claim shall receive its Pro Rata Share of:

      (i)      100% of the New Equity Interests, subject to dilution by (w) the Backstop Commitment Equity Premium Interests, (x) the New Equity Interests issued upon exercise of the Subscription Rights, (y) any New Equity Interests issued upon the exercise of the New Money Warrants, SLTL Warrants, or the GUC Warrants, and (z) any New Equity Interests issued pursuant to the Management Incentive Plan; and

      (ii)      the FLTL Subscription Rights.

(b) **Impairment and Voting**: FLTL Claims are Impaired. Holders of Allowed FLTL Claims are entitled to vote on the Plan.

(c) **Allowance**: The FLTL Claims shall be deemed Allowed on the Effective Date in the aggregate amount of the FLTL Claims Allowed Amount.

### 4.5 *Class 5: SLTL Claims.*

(d) **Treatment:** Except to the extent that a holder of an Allowed SLTL Claim agrees to less favorable treatment, on the Effective Date, in full and final satisfaction of and in exchange for such Allowed SLTL Claim, each holder of an Allowed SLTL Claim shall receive its Pro Rata Share of:

      (iii)      the SLTL Warrants; and

      (iv)      the SLTL Subscription Rights.

(e) **Impairment and Voting**: SLTL Claims are Impaired. Holders of Allowed SLTL Claims are entitled to vote on the Plan.

(f) **Allowance**: The SLTL Claims shall be deemed Allowed on the Effective Date in the aggregate amount of the SLTL Claims Allowed Amount.

### 4.6 *Class 6A: Unsecured Trade Claims.*

(a) **Treatment:** Except to the extent that a holder of an Allowed Unsecured Trade Claim agrees to less favorable treatment, on the Effective Date, in full and final satisfaction of and in exchange for such Allowed Unsecured Trade Claim, each holder of an Allowed Unsecured Trade Claim that has executed a Trade Agreement shall receive:

(i)        if 14% of the aggregate amount of all Allowed Unsecured Trade Claims is less than or equal to $8,000,000, Cash in an amount equal to 14% of the Allowed amount of such holder's Allowed Unsecured Trade Claim; or

(ii)       if 14% of the aggregate amount of Allowed Unsecured Trade Claims is greater than $8,000,000, its Pro Rata share of $8,000,000.

(b)     **Impairment and Voting**: Unsecured Trade Claims are Impaired. Holders of Unsecured Trade Claims are entitled to vote on the Plan.

### 4.7    _Class 6B: General Unsecured Claims._

(c)     **Treatment:** Except to the extent that a holder of an Allowed General Unsecured Claim agrees to less favorable treatment, on or after the Effective Date, in full and final satisfaction of and in exchange for such Allowed General Unsecured Claim, each holder of an Allowed General Unsecured Claim shall receive, up to the full amount of such holder's Allowed General Unsecured Claim, its Pro Rata Share of:

(i)        the GUC Warrants; and

(ii)       any Residual Distributable Value.

(b)     **Impairment and Voting**: General Unsecured Claims are Impaired. Holders of General Unsecured Claims are entitled to vote on the Plan.

### 4.8    _Class 7: Intercompany Claims._

(a)     **Treatment**: On or after the Effective Date, all Intercompany Claims shall be adjusted, reinstated, or discharged in the Debtors' or Post-Effective Date Debtors' discretion.

(b)     **Impairment and Voting**: All Allowed Intercompany Claims are deemed Unimpaired. In accordance with section 1126(f) of the Bankruptcy Code, the holders of Allowed Intercompany Claims are conclusively presumed to accept the Plan and are not entitled to vote to accept or reject the Plan, and the votes of such holders shall not be solicited with respect to such Allowed Intercompany Claims.

### 4.9    _Class 8: Subordinated Securities Claims._

(a)     **Treatment**: All Subordinated Securities Claims, if any, shall be discharged, cancelled, released, and extinguished as of the Effective Date, and will be of no further force or effect, and holders of Allowed Subordinated Securities Claims will not receive any distribution on account of such Allowed Subordinated Securities Claims.

(b)     **Impairment and Voting**: Allowed Subordinated Securities Claims are Impaired. In accordance with section 1126(g) of the Bankruptcy Code, holders of Subordinated Securities Claims are conclusively presumed to reject the Plan and are not entitled to vote to accept

or reject the Plan, and the votes of such holders shall not be solicited with respect to Subordinated Securities Claims.

### 4.10 *Class 9: Intercompany Interests.*

(a)   **Treatment**:  On the Effective Date, all Intercompany Interests, in the Debtors' or the Post-Effective Date Debtors' discretion, shall be adjusted, reinstated, cancelled, or discharged in the Debtors' or Post-Effective Date Debtors' discretion.

(b)   **Impairment and Voting:**  Intercompany Interests are Unimpaired.  In accordance with section 1126(f) of the Bankruptcy Code, the holders of Allowed Intercompany Interests are conclusively presumed to accept the Plan and are not entitled to vote to accept or reject the Plan, and the votes of such holders shall not be solicited with respect to such Allowed Intercompany Interests.

### 4.11 *Class 10: Existing Equity Interests.*

(a)   **Treatment**:  On the Effective Date, all Existing Equity Interests shall be canceled, released, and extinguished, and will be of no further force or effect.

(b)   **Impairment and Voting**:  Allowed Existing Equity Interests are Impaired. Holders of Existing Equity Interests are not entitled to vote on the Plan.

### 4.12 *Treatment of Vacant Classes.*

Any Claim or Interest in a Class that is considered vacant under Section 3.6 of the Plan shall receive no Plan Distribution.

## ARTICLE V.        MEANS FOR IMPLEMENTATION.

### 5.1 *Plan Settlement; Compromise and Settlement of Claims, Interests, and Controversies.*

Subject to approval by the Bankruptcy Court in connection with confirmation of the Plan, the provisions of the Plan and other documents entered into in connection with the Plan constitute a good faith compromise and settlement among the Debtors, the Consenting Creditors and the Creditors' Committee of claims, Causes of Action and controversies among such parties, including all potential claims, Causes of Action and controversies related to the Challenge Period (as defined in the DIP Order) and any Challenge under the DIP Order, and are in consideration of the value provided to the Estates by the Consenting Creditors, including the value being provided to holders of Unsecured Trade Claims and General Unsecured Claims pursuant to Sections 4.6 and 4.7 hereof. The Plan shall be deemed a motion to approve the Plan Settlement and the good faith compromise and settlement of all of the claims, Causes of Action and controversies described in the foregoing sentence pursuant to sections 363 and 1123(b)(3) of the Bankruptcy Code and Bankruptcy Rule 9019. Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of the Plan Settlement, as well as a finding by the Bankruptcy Court that the Plan

Settlement is fair, equitable, reasonable, and in the best interests of the Debtors and their Estates. For the avoidance of doubt, nothing in this Plan or the Disclosure Statement shall require the Creditors' Committee to take or refrain from taking any action that it determines in good faith would be inconsistent with its fiduciary duties under applicable law. Notwithstanding the foregoing, the Creditors' Committee acknowledges that its entry into the Plan Settlement and its support for this Plan is consistent with its fiduciary duties.

Further, pursuant to sections 363 and 1123(b)(3) of the Bankruptcy Code and Bankruptcy Rule 9019 and in consideration for the distributions and other benefits provided pursuant to the Plan, the provisions of the Plan shall constitute a good faith compromise of Claims, Interests, and controversies relating to the contractual, legal, and subordination rights that a creditor or an Interest holder may have with respect to any Allowed Claim or Allowed Interest or any distribution to be made on account of such Allowed Claim or Allowed Interest. Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of the compromise or settlement of all such Allowed Claims, Allowed Interests, and controversies, as well as a finding by the Bankruptcy Court that such compromise or settlement is in the best interests of the Debtors, their Estates, and holders of such Allowed Claims and Allowed Interests, and is fair, equitable, and reasonable.

**5.2** _**Credit Bid Transaction; Confirmation Outside Date.**_

(a) If the Confirmation Date occurs on or before the Confirmation Outside Date or the Debtors, the Required DIP Lenders, and Requisite FLTL Lenders do not otherwise elect to pursue a 363 Credit Bid Transaction pursuant to Section 5.2(c) of the Plan, then, on the Effective Date, pursuant to sections 363, 1123, 1141(b) and 1141(c) of the Bankruptcy Code, in accordance with the Credit Bid Purchase Agreement, subject to the satisfaction or waiver of all applicable closing conditions under the Credit Bid Purchase Agreement, (i) all Credit Bid Acquired Interests shall be transferred to, and the Credit Bid Acquired Interests owned by the Debtors shall vest free and clear of all Liens[2] (other than (i) any and all Liens securing the FLFO Claim or the obligations under the First Lien Exit Facility, (ii) all Liens securing the FLTL Claims that attach to the Credit Bid Acquired Interests and are deemed assigned to the Second Lien Exit Facility Agent upon the Effective Date to secure the obligations under the Second Lien Exit Facility, or (iii) Credit Bid Permitted Encumbrances except in the case of Fieldwood U.A. Interests, which shall vest free and clear of all Liens other than Liens described in clauses (i) and (ii) above to the extent contemplated by the Exit Facility Documents), Claims, charges, Interests, or other encumbrances, including the Credit Bid Consent Rights and the Credit Bid Preferential Purchase Rights, and (ii) all Credit Bid Assumed Liabilities shall be assumed by the Credit Bid Purchaser.

(b) In the event that the transaction pursuant to Section 5.2(a) of the Plan is consummated and in the event of any conflict whatsoever between the terms of the Plan and the Credit Bid Purchase Agreement with respect to the Credit Bid Transaction, the terms of the Credit Bid Purchase Agreement shall control, and the Plan shall be deemed to incorporate in their entirety the terms, provisions, and conditions of the Credit Bid Purchase Agreement.

---

[2] Provided that the Retained Properties (as defined in the Apache Implementation Agreement) shall be transferred in accordance with the Decommissioning Agreement.

(c)     (x) If the Confirmation Date does not occur before the Confirmation Outside Date or (y) if the estimated amount of Allowed Specified Administrative Expense Claims to be satisfied under the Plan on or after the Effective Date is projected at any time prior to the Confirmation Date to exceed the Toggle Amount (the next Business Day after the occurrence of (x) or (y), the ("**Toggle Date**"), then, with the consent of the Required DIP Lenders and Requisite FLTL Lenders, the Debtors shall:

(i)      within 7 days of the Toggle Date, file a motion (the "**Toggle Motion**"), in form and substance acceptable to the Debtors, the Required DIP Lenders and Requisite FLTL Lenders, seeking entry of an order of the Bankruptcy Court approving a credit bid sale transaction to the Credit Bid Purchasers (or another special purpose bidding entity formed by or at the direction of the Prepetition FLTL Lenders) pursuant to section 363 of the Bankruptcy Code on substantially the same terms as provided in the Credit Bid Purchase Agreement (which terms shall be acceptable to the Debtors, the Requisite FLTL Lenders, and Required DIP Lenders), free and clear of all Liens (other than (i) any and all Liens securing the FLFO Claim or the First Lien Exit Facility, (ii) all Liens securing the FLTL Claims that attach to the Credit Bid Acquired Interests and are deemed assigned to the Second Lien Exit Facility Agent upon the Effective Date to secure the obligations under the Second Lien Exit Facility, or (iii) Credit Bid Permitted Encumbrances except in the case of Fieldwood U.A. Interests, which shall vest free and clear of all Liens other than Liens described in clauses (i) and (ii) above to the extent contemplated by the Exit Facility Documents), Claims, charges, Interests, or other encumbrances, the Credit Bid Consent Rights and the Credit Bid Preferential Purchase Rights that are applicable to the Credit Bid Acquired Interests;

(ii)     within 15 days of the Toggle Date and subject to the reasonable consent of Apache, the Requisite FLTL Lenders, the Required DIP Lenders and the Debtors, amend the Apache Definitive Documents as reasonably required to effectuate the 363 Credit Bid Transaction to the Credit Bid Purchasers (or another special purpose bidding entity formed by or at the direction of the Prepetition FLTL Lenders); provided that no such actions shall require the Apache PSA Parties to alter the economics of the Apache Definitive Documents without the Apache PSA Parties' express written consent; and

(iii)    within 35 days of the Toggle Date, obtain entry of an order of the Bankruptcy Court approving the 363 Credit Bid Transaction to the Credit Bid Purchasers (or another special purpose bidding entity formed by or at the direction of the Prepetition FLTL Lenders).

(d)     Notwithstanding anything herein to the contrary, upon the occurrence of the Toggle Date, if the transactions under the Toggle Motion (i) (a) individually or in the aggregate, results in a reduction of 10% or more of the total PV-10 of total 2P reserves comprising the assets acquired by the Credit Bid Purchaser (which shall be calculated by reference to the FWE YE2020 Internal Reserve Report (as of 5.1.21)), (b) results in any contract rights constituting material assets not being acquired by the Credit Bid Purchaser, (c) individually or in the aggregate, results in an increase by $40.0 million or more (which, for the avoidance of doubt, in the case of plugging and abandonment liabilities, shall be calculated on a present value basis) in liabilities assumed by the Credit Bid Purchaser, (d) relates to any change in treatment or recovery of the Prepetition FLFO Credit Agreement or First Lien Exit Facility, or (e) provide for any differences from the transaction under this Plan that are materially adverse to the interests of the First Lien Exit Facility Agent and the First Lien Exit Facility Lenders, and (ii) are not (a) reasonably acceptable to the Prepetition FLFO Agent with respect to the foregoing clause (i)(b) or (e), or (ii) acceptable to the Prepetition FLFO Agent with respect to the foregoing clause (i)(a),(c), or (d), then all rights of the Prepetition FLFO Secured Parties set forth in the Prepetition FLFO Credit Agreement and related documents to object to the Toggle Motion on any grounds are expressly preserved, and all of the Prepetition FLFO Secured Parties' claims, rights, and remedies are reserved for all purposes, including the right to obtain treatment and transaction structure different than as set forth in the Toggle Motion.

(e)     Notwithstanding anything in the Credit Bid Purchase Agreement or any agreement entered into pursuant to Section 5.2(c) of the Plan to the contrary, the Credit Bid Purchasers shall not be liable for any liability or obligation on account of any Claim or Interest that is compromised, settled, released or discharged pursuant to this Plan.

**5.3**     ***Equity Rights Offerings.***

(a)     On the Effective Date, the Debtors shall consummate the Equity Rights Offerings.

(b)     FLTL Equity Rights Offering.  The FLTL Equity Rights Offering shall be fully backstopped by the FLTL ERO Backstop Parties in accordance with and subject to the terms and conditions of the FLTL ERO Backstop Agreement.  The right to participate in the FLTL Equity Rights Offering may not be sold, transferred, or assigned, except in the circumstances described in the FLTL ERO Backstop Agreement.  In accordance with the FLTL ERO Backstop Agreement and subject to the terms and conditions thereof, each of the FLTL ERO Backstop Parties, among other things, has agreed, severally but not jointly, to purchase, on or prior to the Effective Date, its respective FLTL ERO Backstop Commitment Percentage of the FLTL Unsubscribed Shares.  In exchange for providing the backstop commitment for the Equity Rights Offering, the FLTL ERO Backstop Parties shall receive, among other things, the FLTL ERO Backstop Commitment Premium Equity Interests payable in accordance with the terms of the FLTL ERO Backstop Agreement.

(c)     SLTL Equity Rights Offering.  The SLTL Equity Rights Offering shall be fully backstopped by the SLTL ERO Backstop Parties in accordance with and subject to the terms and conditions of the SLTL ERO Backstop Agreement.  The right to participate in the SLTL Equity Rights Offering may not be sold, transferred, or assigned, except in the circumstances described in the SLTL ERO Backstop Agreement.  In accordance with the SLTL ERO Backstop Agreement

and subject to the terms and conditions thereof, each of the SLTL ERO Backstop Parties, among other things, has agreed, severally but not jointly, to purchase, on or prior to the Effective Date, its respective SLTL ERO Backstop Commitment Percentage of the SLTL Unsubscribed Shares. In exchange for providing the backstop commitment for the SLTL Equity Rights Offering, the SLTL ERO Backstop Parties shall receive, among other things, the SLTL ERO Backstop Commitment Premium Equity Interests payable in accordance with the terms of the SLTL ERO Backstop Agreement.

### 5.4 *New Equity Interests.*

(a) On the Effective Date, NewCo is authorized to issue or cause to be issued and shall, issue the New Equity Interests for eventual distribution in accordance with the terms of this Plan without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order, or rule, or the vote, consent, authorization, or approval of any Person. The New Equity Interests shall be issued and distributed free and clear of all Liens, Claims, and other Interests. All of the New Equity Interests issued pursuant to the Plan shall be duly authorized and validly issued.

(b) On the Effective Date, NewCo and all holders of the New Equity Interests then outstanding shall be deemed to be parties to the NewCo Organizational Documents, where applicable, substantially in the form, or consistent with the term sheets, contained in the Plan Supplement, without the need for execution by any such holder. The NewCo Organizational Documents shall be binding on NewCo and its subsidiaries (including the Credit Bid Purchasers) and all parties receiving, and all holders of, New Equity Interests.

### 5.5 *NewCo Organizational Documents*

The NewCo Organizational Documents will be in form and substance acceptable to the Debtors, Requisite FLTL Lenders, and the Required DIP Lenders. After the Effective Date, the NewCo Organizational Documents may be amended or restated as permitted by such documents and the laws of their respective states, provinces, or countries of incorporation or organization.

### 5.6 *New Money Warrants, SLTL Warrants and GUC Warrants*

On or after the Effective Date, NewCo is authorized to issue or cause to be issued and shall, as provided for in this Plan, (i) the New Money Warrants for distribution to the New Money Second Lien Exit Facility Lenders, the SLTL Warrants to the holders of Allowed SLTL Claims, and the GUC Warrants to the holders of Allowed General Unsecured Claims (or notwithstanding anything to the contrary in this Plan, such holder's designated affiliates), in each case in accordance with the terms of the Plan and Confirmation Order without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order, or rule, or the vote, consent, authorization, or approval of any Person and (ii) upon exercise of the New Money Warrants, the SLTL Warrants, or the GUC Warrants, the New Equity Interests issuable upon exercise of the New Money Warrants, the SLTL Warrants or the GUC Warrants, as applicable. The New Money Warrants, the SLTL Warrants, and GUC Warrants shall be issued and distributed free and clear of all Liens, Claims, and other Interests to the holders of the applicable Allowed

Claims pursuant to this Plan. All of the New Money Warrants, the SLTL Warrants, and GUC Warrants issued pursuant to the Plan, including as contemplated by the Credit Bid Transaction and the Second Lien Exit Facility Term Sheet, and all New Equity Interests issued upon exercise of the New Money Warrants, the SLTL Warrants, and the GUC Warrants shall be duly authorized and validly issued. On the Effective Date, all holders of the New Money Warrants, the SLTL Warrants, and the GUC Warrants shall be deemed to be parties to the NewCo Organizational Documents, where applicable, without the need for execution by any such holder.

### 5.7    *Plan of Merger*

(a)    On the Effective Date, but after the consummation of the transactions contemplated by the Credit Bid Purchase Agreement, Fieldwood Energy LLC shall adopt the Plan of Merger and, in accordance with the terms thereof and solely to the extent therein, upon the effective time of the Divisional Merger as provided for in the Plan of Merger, the (i) FWE Assets will be allocated to and vest in FWE I, FWE III, and any FWE Additional Entity pursuant to the terms of the applicable Plan of Merger, in each case, free and clear of all Plan of Merger Consent Rights and Plan of Merger Preferential Purchase Rights; and (ii) (x) the FWE I Obligations shall be allocated to and shall vest in, and shall constitute liabilities and obligations of, FWE I, (y) the FWE III Obligations shall be allocated to and shall vest in, and shall constitute liabilities and obligations of, FWE III (except as provided in any Plan of Merger other than the Initial Plan of Merger), and (z) any obligations allocated to an FWE Additional Entity pursuant to the Plan of Merger shall be allocated to and shall vest in, and shall constitute liabilities and obligations of, such applicable FWE Additional Entity. Immediately after the effective time of the Divisive Merger as provided in the Initial Plan of Merger, the only assets, properties and rights of, and the only liabilities and obligations of, (i) FWE I will be the FWE I Assets and FWE I Obligations, and (ii) FWE III will be the FWE III Assets and FWE III Obligations, and (iii) any FWE Additional Entity will be those assets and obligations allocated to such entity pursuant to the Plan of Merger. Immediately after the effective time of any Divisive Merger as provided in a Plan of Merger other than the Initial Plan of Merger, the only assets, properties and rights of, and the only liabilities and obligations of, FWE III (if a party to such Plan of Merger) and any FWE Additional Entity will be those assets and obligations allocated to such entity pursuant to such Plan of Merger.

(b)    All of the membership interests (or other equity interests, as applicable) of FWE I, FWE III, and any FWE Additional Entity shall be owned by Post-Effective Date FWE Parent.

(c)    Notwithstanding anything to the contrary in the Plan of Merger, any claim or interest that is satisfied, compromised, settled, released or discharged pursuant to the Plan shall not constitute an FWE I Obligation, FWE III Obligation, or an obligation of any FWE Additional Entity, as applicable.

### 5.8    *Single Share*

(a)    On the Effective Date, one share of Post-Effective Date FWE Parent common stock (the "**Single Share**") shall be issued to the Plan Administrator to hold in trust as custodian for the benefit of the holders of Allowed General Unsecured Claims and the Single Share shall be recorded on the books and records maintained by the Plan Administrator.

(b)     On the date that FWE Parent's Chapter 11 Case is closed in accordance with Section 5.25 of this Plan, the Single Share issued on the Effective Date pursuant to the Plan shall be deemed cancelled and of no further force and effect, provided that such cancellation does not adversely impact the Debtors' Estates.

### 5.9     *Plan Administrator*

(a)     Solely for purposes of Section 5.9 of this Plan, the definition of Post-Effective Date Debtors shall not include the Post-Effective Date FWE I Subsidiaries.

(b)     *Appointment*.  The Plan Administrator's retention shall commence on the Effective Date and shall continue until: (i) the Bankruptcy Court has entered an order or orders closing each of the Chapter 11 Cases; (ii) the Bankruptcy Court enters an order removing the Plan Administrator for cause; or (iii) the Plan Administrator voluntarily resigns, upon notice filed with the Bankruptcy Court, and a successor Plan Administrator is appointed in accordance with this Plan, the Confirmation Order, and the Plan Administrator Agreement.

(c)     *Authority*.  Subject to Section 5.9(d) of this Plan, the Plan Administrator shall have all the rights, powers, authority, and duties on behalf of each of the Debtors and Post-Effective Date Debtors, without the need for Bankruptcy Court approval (unless otherwise indicated), to carry out and implement all provisions of the Plan, including, without limitation, to:

    (i)     subject to Section 7 of the Plan, except to the extent a Claim has been previously Allowed, control and effectuate the Claims reconciliation process (including Allowance or Disallowance of Claims), in accordance with the terms of this Plan and the Confirmation Order, including to object to, seek to subordinate, compromise, estimate, or settle any and all Claims against the Debtors;

    (ii)     determine Distribution Date and make Distributions to holders of Allowed Claims and Interests in accordance with this Plan and the Confirmation Order, including distributions from the Claims Reserve, Professional Fee Escrow and Plan Administrator Expense Reserve;

    (iii)     exercise its reasonable business judgment to direct and control the Debtors or Post-Effective Date Debtors, as applicable, under this Plan and in accordance with applicable law as necessary to maximize Distributions to holders of Allowed Claims;

    (iv)     prepare, file, and prosecute any necessary filings or pleadings with the Bankruptcy Court to carry out the duties of the Plan Administrator as described in this Plan or the Plan Administrator Agreement;

    (v)     engage in the ownership, operation (including acting as agent to a designated operator), plugging and abandonment, and/or

decommissioning of the (a) FWE III Assets, including the assets listed on the Schedule of FWE III Oil & Gas Lease Interests and (b) except as otherwise agreed pursuant to an Additional Predecessor Agreement, any assets of any FWE Additional Entity;

(vi) use funds drawn pursuant to the Funding Agreement (as defined in the Credit Bid Purchase Agreement) in accordance with the terms of the Plan and the Funding Agreement;

(vii) abandon any property determined by the Plan Administrator to be of *de minimis* value or burdensome to the Estates;

(viii) donate and distribute any surplus Cash, in accordance with Section 6.10 of this Plan, to a Tax Code § 501(c)(3) tax-exempt organization selected by the Plan Administrator;

(ix) other than any Causes of Action released by the Debtors pursuant to this Plan, or otherwise, purchased by the Credit Bid Purchasers pursuant to the Credit Bid Purchase Agreement, or allocated to FWE I pursuant to the Initial Plan of Merger, prosecute all Causes of Action retained on behalf of the Debtors, elect not to pursue any Causes of Action, and determine whether and when to compromise, settle, abandon, dismiss, or otherwise dispose of any such Causes of Action, as the Plan Administrator may determine is in the best interests of the Debtors and their Estates;

(x) stand in the same position as the Debtors with respect to any claim the Debtors, their Estates, and/or the Post-Effective Date Debtors may have as to any attorney-client privilege, the work-product doctrine, or any other privilege attaching to any documents or communications (whether written or oral), and succeed to all of the rights of the Debtors, their Estates, and/or the Post-Effective Date Debtors to preserve, assert, or waive any such privilege; *provided that*, for the avoidance of doubt, any such privilege concerning assets which constitute Credit Bid Acquired Interests or the Assumed Liabilities cannot be waived, limited, or disposed of by the Plan Administrator without the express written consent of Credit Bid Purchaser or its successors and assigns;

(xi) retain, employ, terminate, or replace professionals to assist or represent it in performing its duties under the Plan Administrator Agreement, this Plan, and the Confirmation Order;

(xii) pay all fees, expenses, debts, charges, and liabilities of the Post-Effective Date Debtors (expressly excluding any Restructuring Expenses) from the Plan Administrator Expense Reserve;

(xiii)      comply with, and cause the Debtors and Post-Effective Date Debtors to comply with, the Debtors' or Post-Effective Date Debtors' continuing obligations under the Credit Bid Purchase Agreement, this Plan and the Confirmation Order; *provided that*, following the Effective Date, the Plan Administrator shall have no obligation to cause the Post-Effective Date FWE I Subsidiaries to comply with any continuing obligations under the Credit Bid Purchase Agreement, this Plan, or the Confirmation Order;

(xiv)      maintain the books and records and accounts of the Post-Effective Date Debtors;

(xv)      establish and maintain bank accounts in the name(s) of the Post-Effective Date Debtors;

(xvi)      establish the Plan Administrator Expense Reserve, deposit Cash in the Plan Administrator Expense Reserve Amount into the Plan Administrator Expense Reserve, and use the Plan Administrator Expense Reserve solely to satisfy the expenses of the Plan Administrator and the Post-Effective Date Debtors as set forth herein;

(xvii)      incur and pay reasonable and necessary expenses in connection with the performance of duties under this Plan, including the reasonable fees and expenses of professionals retained by the Plan Administrator;

(xviii)      following the Effective Date, pay any fees and expenses in Cash in accordance with Section 2.4 of this Plan;

(xix)      administer each Debtor's and Post-Effective Date Debtors' tax obligations, including (a) filing tax returns and paying tax obligations, (b) implementing tax allocation and/or tax sharing agreements among the Post-Effective Date Debtors and their subsidiaries, and (c) representing the interest and account of each Debtor, each Debtor's estate, or each Post-Effective Date Debtor before any taxing authority in all matters including, without limitation, any action, suit, proceeding or audit; *provided that*, to the extent that the FWE I Subsidiaries are not includable in any combined, consolidated, or unitary group for which the Plan Administrator is responsible, the Plan Administrator shall have no obligation to administer the Post-Effective Date FWE I Subsidiaries' tax obligations for any tax period occurring, either in whole or in part, after the Effective Date;

(xx)      prepare and file any and all informational returns, reports, statements, returns or disclosures relating to the Debtors or Post-

Effective Date Debtors that are required hereunder, by any Governmental Unit or applicable law, including any forms and filings required by the Government; *provided that* the Plan Administrator shall have no obligation to prepare or file any informational returns, reports, statements, returns or disclosures relating to the Post-Effective Date FWE I Subsidiaries for any period occurring, either in whole or in part, after the Effective Date;

(xxi) cause the Debtors or Post-Effective Date Debtors (including the Post-Effective Date FWE I Subsidiaries) to pay statutory fees in accordance with Section 12.1 of this Plan;

(xxii) file a status report with the Bankruptcy Court on a quarterly basis setting forth the activities of the Plan Administrator during such quarter, including an accounting of the Plan Administrator Expense Reserve during such quarter;

(xxiii) perform other duties and functions that are consistent with the implementation of the Plan or as the Plan Administrator reasonably deems to be necessary and proper to carry out the provisions of this Plan;

(xxiv) close the Chapter 11 Cases of the Post-Effective Date Debtors (including the Post-Effective Date FWE I Subsidiaries) pursuant to Section 5.24 of this Plan;

(xxv) hold in trust the Single Share as custodian for the benefit of the holders of Allowed General Unsecured Claims, and record the Single Share on the books and records maintained by the Plan Administrator;

(xxvi) following the Effective Date, in the Plan Administrator's sole discretion, cause each Post-Effective Date Debtor to take such actions as permitted by applicable law, the applicable Amended Organizational Documents or other applicable corporate governance documents, the Apache Definitive Documents, any Additional Predecessor Agreement Document, as such Post-Effective Date Debtor may determine is reasonable and appropriate, including causing: (a) the taking of any action contemplated by any Additional Predecessor Agreement Documents and the consummation thereof (including the formation of a new entity or consummation of a divisional merger), (b) a Post-Effective Date Debtor to be merged into another Post-Effective Date Debtor or an affiliate of a Post-Effective Date Debtor, (c) a Post-Effective Date Debtor to be dissolved, (d) the legal name of a Post-Effective Date Debtor to be changed, (e) a Post-Effective Date Debtor to convert

49

its form of entity, or (f) the closure of a Post-Effective Date Debtor's Chapter 11 Case;

(xxvii)    following the Effective Date, cause the Post-Effective Debtors to take all actions as may be necessary or appropriate to effect any transaction described in, approved by, or necessary or appropriate to effectuate this Plan, including, (a) the execution and delivery of appropriate agreements or other documents of merger, consolidation, restructuring, conversion, disposition, transfer, dissolution, or liquidation containing terms that are consistent with the terms of this Plan and that satisfy the requirements of applicable law and any other terms to which the applicable entities may agree, (b) the execution and delivery of appropriate instruments of transfer, assignment, assumption, or delegation of any Asset, property, right, liability, debt, or obligation on terms consistent with the terms of the Plan and having other terms to which the applicable parties agree, (c) the filing of appropriate organizational documents governing the Post-Effective Date Debtors, including the Post-Effective Date Debtors' respective Amended Organizational Documents, and any amendments or restatements thereto, or any amendments or restatements thereto, or any documents governing any Post-Effective Date Debtor's reincorporation, merger, consolidation, conversion, or dissolution pursuant to applicable law and, as necessary, other constituent documents, including, without limitation, the organizational documents governing non-Debtor subsidiaries, as permitted by the laws of their respective states of incorporation, (d) the Restructuring Transactions, and (e) all other actions that the applicable entities determine to be necessary or appropriate, including making filings or recordings that may be required by applicable law;

(xxviii)    issue, execute, and deliver any agreements, documents, securities and instruments contemplated herein (or necessary or desirable to effect the transactions contemplated herein);

(xxix)    cause the Post-Effective Date Debtors to take all actions consistent with this Plan and the Confirmation Order as may be necessary or appropriate to effect any transaction described in, approved by, contemplated by, or necessary to effectuate the Restructuring Transactions under and in connection with this Plan;

(xxx)    if applicable, establish and transfer certain assets to a liquidating trust for the benefit of one or more classes of Claims pursuant to and in accordance with Section 5.22 of this Plan; and

(xxxi)    submit one or more orders to the Bankruptcy Court under certification of counsel that is in form and substance acceptable to

the U.S. Trustee that closes and issues a final decree for each of the Chapter 11 Cases of the Post-Effective Date Debtors (including the Post-Effective Date FWE I Subsidiaries).

    (d)    *Board of Directors and Officers*.

        (i)    Upon the Effective Date and except as otherwise set forth in this Plan, the Plan Supplement or the Confirmation Order, the officers and directors of the Debtors existing before the Effective Date shall be relieved of any and all duties with respect to the Debtors as of the Effective Date.

        (ii)    Upon the Effective Date, the Plan Administrator shall serve as the sole officer, director, or manager of each Post-Effective Date Debtor. The Plan Administrator may also elect such additional managers(s) and officer(s) of each Post-Effective Date Debtor, as the Plan Administrator deems necessary to implement this Plan and the actions contemplated herein. The Plan Administrator shall also have the power to act by written consent to remove any officer or manager of any Post-Effective Date Debtor at any time with or without cause.

    (e)    *Post-Effective Date Operations*. After the Effective Date, pursuant to this Plan, the Plan Administrator shall operate the Post-Effective Date Debtors without any further approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules.

    (f)    *Post-Effective Date Expenses*. On and after the Effective Date, all costs, expenses and obligations incurred by the Plan Administrator in administering this Plan, the Post-Effective Date Debtors, or in any manner connected, incidental, or related thereto, in effecting distributions from the Post-Effective Date Debtors thereunder (including the reimbursement of reasonable expenses) shall be incurred and paid from the Plan Administrator Expense Reserve.

    (g)    *Indemnification*. Each of the Estates and the Post-Effective Date Debtors shall indemnify and hold harmless the Plan Administrator solely in its capacity as such for any losses incurred in such capacity, except to the extent such losses were the result of the Plan Administrator's gross negligence or willful misconduct.

    (h)    *Cooperation*. The Debtors, the Post-Effective Date Debtors, the Post-Effective Date FWE I Subsidiaries, the Plan Administrator, the FWE I Sole Manager, the FWE IV Sole Manager and their respective professionals, and, solely with respect to (ii) below, NewCo and its subsidiaries (including the Credit Bid Purchaser) and their respective professionals, as appropriate, (i) shall cooperate with each other in relation to their respective activities and obligations in respect of this Plan, including objecting to, settling or otherwise reconciling claims as provided herein, and (ii) shall provide reasonable, good-faith access to personnel, systems, and books and records and their respective personnel and consulting with each other to avoid duplication of effort; *provided*, *however*, that the Debtors, the Post-Effective Date Debtors, the

Post-Effective Date FWE I Subsidiaries, the Plan Administrator, the FWE I Sole Manager, the FWE IV Sole Manager, and NewCo and its subsidiaries (including the Credit Bid Purchaser) and in each case their advisors, if any, shall enter into a confidentiality agreement before sharing of any such documents and/or information to the extent deemed reasonably necessary by the Debtors, Post-Effective Date Debtors, the Post-Effective Date FWE I Subsidiaries, the Plan Administrator, the FWE I Sole Manager, the FWE IV Sole Manager, and NewCo and its subsidiaries (including the Credit Bid Purchaser), as applicable.

### 5.10 *Plan Funding.*

Plan Distributions of Cash shall be funded from, among other things, the Debtors' Cash on hand (including the proceeds of the DIP Facility), the New Money Consideration, and the proceeds of the Equity Rights Offerings.

### 5.11 *The Exit Facilities*

(a)     On the Effective Date, the Credit Bid Purchaser shall execute and deliver the Exit Facility Documents and such documents shall become effective in accordance with their terms. On and after the Effective Date, the Exit Facility Documents shall constitute legal, valid, and binding obligations of the Credit Bid Purchaser and be enforceable in accordance with their respective terms and such obligations shall not be enjoined or subject to discharge, impairment, release, avoidance, recharacterization, or subordination under applicable law, the Plan or the Confirmation Order, and the Credit Bid Purchaser shall be authorized to incur the loans under the Exit Facilities and use the proceeds of such loans, in each case, in accordance with the terms of this Plan and the Exit Facility Documents without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order, or rule, or the vote, consent, authorization, or approval of any Person. The terms and conditions of the Exit Facility Documents shall bind the Credit Bid Purchaser and each other Entity that enters into the Exit Facility Documents. The Liens securing the FLTL Claims that attach to the Credit Bid Acquired Interests shall be retained and deemed assigned to the Second Lien Exit Facility Agent upon the Effective Date to secure the obligations under the Second Lien Exit Facility.

(b)     Confirmation shall be deemed approval of the Exit Facility Documents (including the transactions and related agreements contemplated thereby, and all actions to be taken, undertakings to be made, and obligations to be incurred and fees and expenses to be paid by the Debtors or Post-Effective Date Debtors, as applicable, in connection therewith), the First Lien Exit Facility Commitment Letter (including the transactions contemplated thereby, and all actions to be taken, undertakings to be made, and obligations and guarantees to be incurred and fees paid in connection therewith (including any payments under the First Lien Exit Facility Commitment Letter)), and the Second Lien Backstop Commitment Letter (including the transactions contemplated thereby, and all actions to be taken, undertakings to be made, and obligations and guarantees to be incurred and fees paid in connection therewith (including the Second Lien Backstop Commitment Premium and any other payments under the Backstop Agreement)), and, to the extent not approved by the Bankruptcy Court previously, the Credit Bid Purchaser will be authorized to, without further notice to the Bankruptcy Court, (i) execute and deliver those documents necessary or appropriate to obtain the Exit Facilities, including the Exit Facility Documents, each as applicable, and incur and pay any fees and expenses in connection

52

therewith, and (ii) make any act or take any action under applicable law, regulation, order or rule or vote, consent, authorization, or approval of any Person, subject to such modifications as the Credit Bid Purchaser may deem to be necessary to enter into the Exit Facility Documents.

(c) On the Effective Date, all of the claims, liens, and security interests to be granted in accordance with the terms of the Exit Facility Documents (i) shall be legal, binding, and enforceable liens on, and security interests in, the collateral granted thereunder in accordance with the terms of the Exit Facility Documents, (ii) shall be deemed automatically attached and perfected on the Effective Date, subject only to such liens and security interests as may be permitted under the Exit Facility Documents with the priorities established in respect thereof under applicable non-bankruptcy law and the New Intercreditor Agreement, and (iii) shall not be subject to avoidance, recharacterization, or subordination (including equitable subordination) for any purposes whatsoever and shall not constitute preferential transfers, fraudulent conveyances, or other voidable transfers under the Bankruptcy Code, this Plan, the Confirmation Order or applicable non-bankruptcy law. To the extent provided in the Exit Facility Documents, the Exit Facility Agents are authorized, but not required, to file with the appropriate authorities mortgages, financing statements and other documents, and to take any other action in order to evidence, validate, and perfect such liens or security interests.

(d) On the Effective Date, the Credit Bid Purchaser, the First Lien Exit Facility Agent and the Second Lien Exit Facility Agent shall enter into the New Intercreditor Agreement substantially in the form contained in the Plan Supplement.

### 5.12 *Apache Definitive Documents.*

(a) On the Effective Date following the consummation of the Plan of Merger and the Effective Time (as defined in the Initial Plan of Merger), FWE I shall be authorized to execute, deliver, and enter into the Apache Definitive Documents, including the Standby Credit Facility Documents, without further (i) notice to or order or other approval of the Bankruptcy Court, (ii) act or omission under applicable law, regulation, order, or rule, (iii) vote, consent, authorization, or approval of any Person, or (iv) action by the holders of Claims or Interests. The Standby Loan Agreement shall constitute a legal, valid, binding and authorized obligation of FWE I, enforceable in accordance with its terms and such obligations shall not be enjoined or subject to discharge, impairment, release, avoidance, recharacterization, or subordination under applicable law, the Plan or the Confirmation Order. The financial accommodations to be extended pursuant to the Standby Loan Agreement (and other definitive documentation related thereto) are reasonable and are being extended, and shall be deemed to have been extended, in good faith and for legitimate business purposes.

(b) FWE I Sole Manager

(i) Upon the Effective Date, the FWE I Sole Manager shall be appointed. Upon the Effective Date, the new governance structure of FWE I will be set forth in the FWE I LLC Agreement.

(ii) The officers and directors of the Post-Effective Date FWE I Subsidiaries existing before the Effective Date shall be relieved of

any and all duties with the respect to the Post-Effective Date FWE I Subsidiaries as of the Effective Date.

(iii)      Upon the Effective Date, the FWE I Sole Manager shall serve as the sole officer, director, or manager of each Post-Effective Date FWE I Subsidiary. The FWE I Sole Manager may also elect such additional managers(s) and officer(s) of each Post-Effective Date FWE I Subsidiaries as the FWE I Sole Manager deems necessary to implement this Plan and the actions contemplated herein. The FWE I Sole Manager shall also have the power to act by written consent to remove any officer or manager of any Post-Effective Date FWE I Subsidiary at any time with or without cause.

(iv)      On and after the Effective Date, the FWE I Sole Manager and Plan Administrator shall mutually cooperate to establish any procedures and protocols as they deem necessary to carry out their respective duties; *provided*, *however*, that any such procedures and protocols shall be consistent with the terms of this Plan, the Plan Administrator Agreement and the Sole Manager Agreement (as defined in the Apache Implementation Agreement).

(v)      FWE I and each Post-Effective Date FWE I Subsidiary shall indemnify and hold harmless the FWE I Sole Manager solely in its capacity as such for any losses incurred in such capacity, except to the extent such losses were the result of the FWE I Sole Manager's gross negligence or willful misconduct.

### 5.13   *Abandonment of Certain Properties*

(a)      Immediately upon the occurrence of the Effective Date, the Debtors' rights to and interests in executory contracts and unexpired federal leases, rights-of-way, and right-of-use-and-easements listed on the Schedule of Abandoned Properties are abandoned pursuant to the Plan without further notice to or order of the Bankruptcy Court pursuant to Sections 105(a) and 554(a) of the Bankruptcy Code and/or deemed rejected pursuant to Section 365 of the Bankruptcy Code, as applicable. The Abandoned Properties shall not be allocated to nor vest in the Post-Effective Date Debtors or NewCo and its subsidiaries, including the Credit Bid Purchasers. Except as otherwise provided in this Plan or the Confirmation Order, the Debtors, their Estates, and the Post-Effective Date Debtors, FWE I, FWE IV, any FWE Additional Entity or any NewCo Entity (including, without limitation, the Credit Bid Purchasers) shall not be liable for any obligations whatsoever arising from or relating to the post-Effective Date period with regards to the Abandoned Properties, except that FWE III may be deemed to be the operator of properties that Fieldwood Energy LLC was the designated operator of immediately prior to the Effective Date. Nothing in this Plan, including this Section 5.13, or the Confirmation Order shall be construed as barring, waiving, or limiting the United States' rights to assert a claim or cause of action against the Debtors, the Post-Effective Date Debtors or any co-lessees or predecessors in interest with respect to the Abandoned Properties for any decommissioning obligations for the Abandoned Properties. Notwithstanding anything herein to the contrary, co-lessees of the Debtors,

predecessors in interest with respect to any of the Debtors' assets, and surety providers shall not be entitled, under any circumstances, to claim a right of subrogation, if any such right exists, against the Debtors, the Post-Effective Date Debtors, FWE I, any FWE Additional Entity or NewCo and its subsidiaries (including Credit Bid Purchasers), as to any Governmental Unit's rights, including, but not limited to, any rights provided to the United States under this Plan; except that any sureties that have furnished bonds in favor of any Governmental Unit, including the United States, on behalf of the Debtors, including for the Debtors' Decommissioning Obligations, shall retain any subrogation rights relating to obligations that both (x) accrue post-Effective Date and (y) arise from post-Effective Date activity, if any, under such bonds, as applicable and subject to the provisions of the Plan Documents.

(b)     On the Effective Date, and continuing until the operational control of the Specified Abandoned Properties is transitioned to a third-party or the conclusion of nine (9) months from the Effective Date, whichever occurs first (such period, the "**Transition Period**"), FWE III shall serve as an appointed agent of the designated operator or as the operator (if FWE III is the designated operator as of the Effective Date) of each Specified Abandoned Property in accordance with the Plan for the limited purpose of maintaining the Specified Abandoned Properties, including responding to casualty events or other events that create hazards to the safety and environment.  In connection therewith, FWE III shall perform the safeguarding and day-to-day operational and monitoring services identified on **Exhibit A** attached to this Plan (defined on **Exhibit A** collectively as the "**Transition Services**").  The purpose of the Transition Services is to (i) maintain the Specified Abandoned Properties in a safe condition as will exist on the Effective Date for the duration of the Transition Period and (ii) maintain periodic and regular monitoring of the condition of wells and infrastructure located on the Specified Abandoned Properties to identify any condition that develops during the Transition Period that could threaten public health, safety, or the environment.  FWE must also respond to a casualty event that creates a condition that threatens the public health, safety, or environment, with the reservation of all rights to seek reimbursement from responsible parties for the costs incurred in responding to the casualty event. FWE III shall not be required to perform work or services above and beyond the Transition Services, except as set forth in this Plan, and shall not be subject to enforcement actions or penalties, unless caused by FWE III's gross negligence or willful misconduct.  Nothing herein to the contrary shall prejudice FWE III's rights against any other party.  FWE III shall not be required to provide Transition Services to the extent a third party designated operator of all or any portion of the Specified Abandoned Properties is providing such services.

(c)     Notwithstanding anything to the contrary in this Plan, the Transition Period shall terminate as to a Specified Abandoned Property when a third party assumes operational control.

(d)     FWE III shall provide the Transition Services at no cost to the Government during the Transition Period; *provided* that FWE III shall not be responsible for any other costs and expenses including those that arise out of the events and conditions identified on Exhibit B attached to this Plan (each an "**Excluded Event**" and collectively, the "**Excluded Events**"), except FWE III shall promptly commence any remediation work caused by an Excluded Event that is necessary to protect the public health and safety and/or the environment from imminent hazardous conditions or to re-establish ingress or egress to facilities in order for the facilities to be safely decommissioned.

(e)     FWE III shall use reasonable efforts to assist the Government in the safe and orderly transfer of operational control of the Specified Abandoned Properties during the Transition Period to any co-owners, predecessor or other responsible party identified by the Government as the appropriate party to assume such operational control.  Notwithstanding anything herein to the contrary, except as set forth in this Plan, FWE III shall not be required to assume any obligation or liabilities of any kind with respect to the Specified Abandoned Properties other than its obligations to perform the Specified Transition Services or as necessary to respond to a casualty event or other emergency.

(f)     FWE III shall keep the Government informed as to the Transition Services and any material change to the condition of the Specified Abandoned Properties and/or the status of the Transition Services.

(g)     Notwithstanding anything to the contrary herein, in no event shall any of the NewCo Entities (including, without limitation, the Credit Bid Purchasers) be required to be, or deemed to be, the agent or designated operator of the Abandoned Properties or the assets of FWE III.

### 5.14     _Establishment of Claims Reserve._

On the Effective Date, the Debtors shall, with the consent of the Requisite FLTL Lenders and the DIP Lenders, establish and fund the Claims Reserve by depositing Cash, in the amount of the Claims Reserve Amount into the Claims Reserve.  The Claims Reserve shall be used to pay Allowed Administrative Expense Claims, Allowed Priority Tax Claims, Allowed Priority Non-Tax Claims, Allowed Other Secured Claims (to the extent such Claims do not receive other treatment), Allowed Unsecured Trade Claims, and Cure Amounts in accordance with the terms of this Plan.  Any amounts remaining in the Claims Reserve after satisfaction of all Allowed Administrative Expense Claims, Allowed Priority Tax Claims, Allowed Priority Non-Tax Claims, Allowed Other Secured Claims, Allowed Unsecured Trade Claims, and Cure Amounts shall constitute Residual Distributable Value.

### 5.15     _Plan Administrator Expense Reserve._

On or before the Effective Date, the Plan Administrator shall establish the Plan Administrator Expense Reserve.  On the Effective Date, the Plan Administrator shall deposit Cash in the Plan Administrator Expense Reserve Amount into the Plan Administrator Expense Reserve. The Plan Administrator Expense Reserve shall be used by the Plan Administrator solely to satisfy the expenses of the Plan Administrator, including any subcontractors of the Plan Administrator, and the Post-Effective Date Debtors (excluding the Post-Effective Date FWE I Subsidiaries) as set forth in this Plan.  Any amount remaining in the Plan Administrator Expense Reserve after the dissolution of all the Post-Effective Date Debtors shall constitute Residual Distributable Value.  In no event shall the Plan Administrator be required or permitted to use its personal funds or assets for the purposes of carrying out its duties under this Plan.

### 5.16 *Continued Corporate Existence; Effectuating Documents; Further Transactions.*

(a)     Except as otherwise provided in the Plan, the Debtors shall continue to exist after the Effective Date as Post-Effective Date Debtors in accordance with the applicable laws of the respective jurisdictions in which they are incorporated or organized and pursuant to the Amended Organizational Documents.

(b)     On or after the Effective Date (in any case, following the consummation of the Credit Bid Transaction), but subsequent to the consummation of the transactions contemplated by the Credit Bid Purchase Agreement if the Credit Bid Transaction occurs, without prejudice to the rights of any party to a contract or other agreement with any Post-Effective Date Debtor, each Post-Effective Date Debtor may, in the sole discretion of the Plan Administrator or the FWE IV Sole Manager, as applicable take such action as permitted by applicable law, the applicable Amended Organizational Documents or other applicable corporate governance documents, the Apache Definitive Documents, any Additional Predecessor Agreement Documents, as such Post-Effective Date Debtor may determine is reasonable and appropriate, including, causing:  (i) the consummation of a Divisional Merger(s) as contemplated by the Plan of Merger, (ii) the taking of any action contemplated by any Additional Predecessor Agreement Documents and the consummation thereof (including the formation of a new entity or consummation of a divisional merger),  (iii) a Post-Effective Date Debtor to be merged into another Post-Effective Date Debtor or an affiliate of a Post-Effective Date Debtor; (iv) a Post-Effective Date Debtor to be dissolved; (v) the legal name of a Post-Effective Date Debtor to be changed; (vi) a Post-Effective Date Debtor to convert its form of entity; or (vii) the closure of a Post-Effective Date Debtor's Chapter 11 Case on the Effective Date or any time thereafter, and such action and documents are deemed to require no further action or approval (other than any requisite filings required under the applicable state, provincial and federal or foreign law).

(c)     On the Effective Date or as soon thereafter as is reasonably practicable (in any case, following the consummation of the Credit Bid Transaction), but subsequent to the consummation of the transactions contemplated by the Credit Bid Purchase Agreement if the Credit Bid Transaction occurs, the Post-Effective Date Debtors, acting through the Plan Administrator or the FWE I Sole Manager, as applicable, may take all actions as may be necessary or appropriate to effect any transaction described in, approved by, or necessary or appropriate to effectuate the Plan, including, (i) the execution and delivery of appropriate agreements or other documents of merger, consolidation, restructuring, conversion, disposition, transfer, dissolution, or liquidation containing terms that are consistent with the terms of the Plan and the Plan Supplement and that satisfy the requirements of applicable law and any other terms to which the applicable entities may agree; (ii) the execution and delivery of appropriate instruments of transfer, assignment, assumption, or delegation of any Asset, property, right, liability, debt, or obligation on terms consistent with the terms of the Plan and having other terms to which the applicable parties agree; (iii) the filing of appropriate organizational documents governing the Post-Effective Date Debtors, including the Post-Effective Date Debtors' respective Amended Organizational Documents, and any amendments or restatements thereto, or any documents governing any Post-Effective Date Debtor's reincorporation, merger, consolidation, conversion, or dissolution pursuant to applicable law and, as necessary, other constituent documents, including, without limitation, the organizational documents governing non-Debtor subsidiaries, as permitted by the

laws of their respective states of incorporation; (iv) the Restructuring Transactions; and (v) all other actions that the applicable entities determine to be necessary or appropriate, including, making filings or recordings that may be required by applicable law.

### 5.17 *Corporate Action.*

(a)     Upon the Effective Date, all actions contemplated by this Plan shall be deemed authorized and approved in all respects, including (i) entry into or execution of the Credit Bid Purchase Agreement and consummation of the transactions contemplated therein, (ii) the assumption or assumption and assignment of executory contracts and unexpired leases as provided herein, (iii) the appointment of the Plan Administrator, the FWE I Sole Manager, and the FWE IV Sole Manager, (iv) the entry into or execution of the Apache Definitive Documents and all documentation relating thereto, including the Initial Plan of Merger and Standby Credit Facility Documents, (v) the entry into or execution of any Additional Predecessor Agreement Documents and all documentation relating thereto, including any plan of merger, divisional merger, or the creation of a new entity, (vi) entry into or execution of the Exit Facility Documents (and any other documentation related thereto, including the New Intercreditor Agreement), (vii) any other Restructuring Transaction, and (viii) all other actions contemplated by the Plan (whether to occur before, on, or after the Effective Date), in each case in accordance with and subject to the terms hereof.  All matters provided for in this Plan involving the corporate or limited liability company structure of the Debtors or the Post-Effective Date Debtors, and any corporate or limited liability company action required by the Debtors or the Post-Effective Date Debtors in connection with this Plan shall be deemed to have occurred and shall be in effect, without any requirement of further action by the security holders, directors, managers, or officers of the Debtors or the Post-Effective Date Debtors.

(b)     On or before the Effective Date, the appropriate directors, officers, and managers of the Debtors, the Plan Administrator, the FWE I Sole Manager, or the FWE IV Sole Manager, as applicable, shall be authorized and directed to issue, execute, and deliver the agreements, documents, securities, and instruments contemplated by this Plan (or necessary or desirable to effect the transactions contemplated by this Plan).  The authorizations and approvals contemplated by this Section 5.17 shall be effective notwithstanding any requirements under nonbankruptcy law.

### 5.18 *Cancellation of Existing Securities and Agreements.*

Except for the purpose of evidencing a right to and allowing holders of Claims to receive a distribution under this Plan, and except as otherwise set forth in the Plan, or in the Plan Supplement or any related agreement, instrument, or document, on the Effective Date, all agreements, instruments, notes, certificates, indentures, mortgages, security documents, reimbursement obligations, and other instruments or documents evidencing or creating any prepetition Claim or Interest (collectively, the "**Cancelled Agreements**") (except that the following shall not be Cancelled Agreements: (i) the agreements, instruments, notes, certificates, indentures, mortgages, security documents, and other instruments or documents governing, relating to and/or evidencing certain Intercompany Interests not modified by the Plan and any rights of any holder in respect thereof and (ii) the Decommissioning Agreement, and any and all bonds and letters of credit constituting Decommissioning Security) shall be deemed cancelled and

of no force or effect and the Debtors shall not have any continuing obligations thereunder; *provided*, *however*, that each of the Cancelled Agreements shall continue in effect solely for the purposes of, (x) allowing holders of Claims or Interests to receive distributions under the Plan on account of such Claims or Interests and (y) allowing and preserving the rights of the Prepetition FLFO Administrative Agent, the Prepetition FLFO Collateral Agent, the Prepetition FLTL Agents, the Prepetition SLTL Administrative Agent, and the DIP Agent, as applicable, to (1) make distributions on account of such Claims or Interests; (2) maintain, enforce, and exercise their respective liens, including any charging liens, as applicable, under the terms of the applicable agreements, or any related or ancillary document, instrument, agreement, or principle of law, against any money or property distributed or allocable on account of such Claims, as applicable; (3) seek compensation and reimbursement for any reasonable and documented fees and expenses incurred in connection with the implementation of the Plan required to be paid pursuant to the applicable agreement; (4) maintain, enforce, and exercise any right or obligation to compensation, indemnification, expense reimbursement, or contribution, or any other claim or entitlement that the Prepetition FLFO Administrative Agent, the Prepetition FLFO Collateral Agent, the Prepetition FLTL Agents, the Prepetition SLTL Administrative Agent, and the DIP Agent may have under this Plan, the applicable credit agreements, collateral agreements, pledge agreements, direction letters or other related documents; and (5) appear and raise issues in these Chapter 11 Cases or in any proceeding in the Bankruptcy Court or any other court after the Effective Date on matters relating to this Plan or the applicable credit agreements; *provided*, *further*, that the Prepetition FLFO Administrative Agent, the Prepetition FLFO Collateral Agent, the Prepetition FLTL Agents, the Prepetition SLTL Administrative Agent, and the DIP Agent may take such further action to implement the terms of the Plan, including the Restructuring Transactions, as agreed to with the Debtors or the Post-Effective Date Debtors, as applicable to the extent not inconsistent with the Confirmation Order or this Plan.

### 5.19 *Cancellation of Certain Existing Security Interests.*

Upon the full payment or other satisfaction of an Allowed Other Secured Claim, or promptly thereafter, the holder of such Allowed Other Secured Claim shall deliver to the Debtors or the Post-Effective Date Debtors, as applicable, any Collateral or other property of a Debtor held by such holder, together with any termination statements, instruments of assignment or satisfaction, or releases of all security interests with respect to its Allowed Other Secured Claim that may be reasonably required to terminate or assign any related financing statements, mortgages, mechanics' or other statutory Liens, or lis pendens, or similar interests or documents, in each case in accordance with the terms of the Confirmation Order.

Except, for the avoidance of doubt, with respect to any mortgages, deeds of trust, Liens, pledges, and any other security interests of the Prepetition FLFO Administrative Agent, the Prepetition FLTL Administrative Agent or the Exit Facility Agents, after the Effective Date and in accordance with the terms of the Confirmation Order, the Debtors or the Post-Effective Date Debtors, at their expense, may, in their sole discretion, take any action necessary to terminate, cancel, extinguish, and/or evidence the release of any and all mortgages, deeds of trust, Liens, pledges, and other security interests with respect to any Claim or Interest, including, without limitation, the preparation and filing of any and all documents necessary to terminate, satisfy, or release any mortgages, deeds of trust, Liens, pledges, and other security interests held by the

Prepetition Agents, including, without limitation, UCC-3 termination statements and mortgage release documentation.

### 5.20   *Intercompany Interests; Corporate Reorganization.*

To the extent reinstated under the Plan, on the Effective Date, the Intercompany Interests (a) shall be reinstated for the ultimate benefit of the holders of Claims and Interests as set forth in the Plan (b) without the need for any further corporate action or approval of any board of directors, board of managers, managers, management, or stockholders of any Debtor or Post-Effective Date Debtor, as applicable, the certificates and all other documents representing the Intercompany Interests shall be deemed to be in full force and effect.

### 5.21   *Restructuring Transactions.*

On the Effective Date or as soon as reasonably practicable thereafter, the Debtors or the Post-Effective Date Debtors, acting through the Plan Administrator, or the FWE I Sole Manager, as applicable, may take all actions consistent with the Plan and the Confirmation Order, as may be necessary or appropriate to effect any transaction described in, approved by, contemplated by, or necessary to effectuate the Restructuring Transactions under and in connection with the Plan.

### 5.22   *Liquidating Trust.*

In the event the Plan Administrator determines, in its discretion, that to carry out and implement the provisions of this Plan certain assets should be transferred to a liquidating trust for the benefit of one or more classes of Claims, (1) the terms of the liquidating trust shall be set forth in a liquidating trust agreement, (2) the liquidating trust shall be structured to qualify as a "liquidating trust" within the meaning of Treasury Regulations section 301.7701-4(d) and in compliance with Revenue Procedure 94-45, 1994-2 C.B. 684, and, thus, as a "grantor trust" within the meaning of sections 671 through 679 of the Tax Code of which the holders of Claims who become the liquidating trust beneficiaries (as determined for U.S. federal income tax purposes) are the owners and grantors, consistent with the terms of the Plan, (3) the sole purpose of the liquidating trust shall be the liquidation and distribution of the assets transferred to the liquidating trust in accordance with Treasury Regulations section 301.7701-4(d), including the resolution of Claims, with no objective to continue or engage in the conduct of a trade or business, (4) all parties (including the Debtors, holders of Claims, and the trustee of the liquidating trust) shall report consistently with such treatment (including the deemed receipt of the underlying assets, subject to applicable liabilities and obligations, by the holders of Allowed Claims, as applicable, followed by the deemed transfer of such assets to the liquidating trust), (5) all parties shall report consistently with the valuation of the assets transferred to the liquidating trust as determined by the trustee of the liquidating trust (or its designee), (6) the trustee of the liquidating trust shall be responsible for filing returns for the trust as a grantor trust pursuant to Treasury Regulations section 1.671-4(a), and (7) the trustee of the liquidating trust shall annually send to each holder of an interest in the liquidating trust a separate statement regarding the receipts and expenditures of the trust as relevant for U.S. federal income tax purposes.  Subject to definitive guidance from the Internal Revenue Service or a court of competent jurisdiction to the contrary (including the receipt by the trustee of the liquidating trust of a private letter ruling if the trustee so requests one, or the receipt of an

adverse determination by the Internal Revenue Service upon audit if not contested by the trustee), the trustee of the liquidating trust may timely elect to (y) treat any portion of the liquidating trust allocable to Disputed Claims as a "disputed ownership fund" governed by Treasury Regulations section 1.468B-9 (and make any appropriate elections) and (z) to the extent permitted by applicable law, report consistently with the foregoing for state and local income tax purposes. If a "disputed ownership fund" election is made, (i) all parties (including the Debtors, holders of Claims, and the trustee of the liquidating trust) shall report for U.S. federal, state, and local income tax purposes consistently with the foregoing, and (ii) any tax imposed on the liquidating trust with respect to assets allocable to Disputed Claims (including any earnings thereon and any gain recognized upon the actual or deemed disposition of such assets) will be payable out of such assets and, in the event of insufficient Cash to pay any such taxes, the trustee of the liquidating trust may sell all or part of such assets to pay the taxes. The trustee of the liquidating trust may request an expedited determination of taxes of the liquidating trust, including any reserve for Disputed Claims, under section 505(b) of the Bankruptcy Code for all tax returns filed for, or on behalf of, the liquidating trust for all taxable periods through the dissolution of the liquidating trust.

### 5.23   *Securities Exemptions.*

(a)      The offer, issuance, and distribution of the New Equity Interests (other than the Backstop Commitment Premium Equity Interests, the New Money Warrants, or any New Equity Interests issued upon exercise of the New Money Warrants or under the Management Incentive Plan), the Subscription Rights, the SLTL Warrants, and the GUC Warrants to holders of Allowed FLTL Claims, Allowed SLTL Claims, and General Unsecured Claims, as applicable, under Article IV of this Plan, and the New Equity Interests issued upon exercise of the Subscription Rights, the SLTL Warrants, or the GUC Warrants, shall be exempt, pursuant to section 1145 of the Bankruptcy Code, without further act or actions by any Person, from registration under the Securities Act, and all rules and regulations promulgated thereunder, and any other applicable securities laws, to the fullest extent permitted by section 1145 of the Bankruptcy Code. The New Equity Interests, the Subscription Rights, the SLTL Warrants, and GUC Warrants issued pursuant to section 1145(a) of the Bankruptcy Code may be resold without registration under the Securities Act or other federal securities laws pursuant to the exemption provided by section 4(a)(1) of the Securities Act, unless the holder is an "underwriter" with respect to such Securities, as that term is defined in section 1145(b) of the Bankruptcy Code. In addition, such section 1145 exempt Securities generally may be resold without registration under state securities laws pursuant to various exemptions provided by the respective laws of the several states.

(b)      The issuance and sale of the Backstop Commitment Premium Equity Interests, and the New Money Warrants (including any New Equity Interests issued upon exercise of the New Money Warrants) under this Plan shall be exempt from registration under the Securities Act or any other applicable securities laws to the fullest extent permitted by section 4(a)(2) of the Securities Act and/or Regulation D thereunder. The Backstop Commitment Premium Equity Interests, and the New Money Warrants (including any New Equity Interests issued upon exercise of the New Money Warrants) issued in reliance on the exemption from registration set forth in section 4(a)(2) of the Securities Act and/or Regulation D thereunder, will be considered "restricted securities" and may not be transferred except pursuant to an effective registration statement or under an available exemption from the registration requirements of the Securities Act, such as, under certain conditions, the resale provisions of Rule 144 of the Securities Act.

(c)     None of the Debtors, NewCo and its subsidiaries (including the Credit Bid Purchasers), or any other Person shall be required to provide any further evidence other than the Plan or the Confirmation Order with respect to the treatment of the New Equity Interests (including any New Equity Interests issued upon exercise of the Subscription Rights, the New Money Warrants, the SLTL Warrants or the GUC Warrants), the Subscription Rights, the New Money Warrants, the SLTL Warrants, or the GUC Warrants, under applicable securities laws.  DTC and any transfer agent (as applicable) shall be required to accept and conclusively rely upon the Plan or Confirmation Order in lieu of a legal opinion regarding whether the New Equity Interests (including any New Equity Interests issued upon exercise of the Subscription Rights, the New Money Warrants, the SLTL Warrants or the GUC Warrants), the Subscription Rights, the New Money Warrants, the SLTL Warrants, or the GUC Warrants are exempt from registration and/or eligible for DTC book-entry delivery, settlement, and depository services (to the extent applicable).

(d)     Notwithstanding anything to the contrary in this Plan, no Person (including DTC and any transfer agent) shall be entitled to require a legal opinion regarding the validity of any transaction contemplated by the Plan, including whether the New Equity Interests (including any New Equity Interests issued upon exercise of the Subscription Rights, the New Money Warrants, the SLTL Warrants or the GUC Warrants), the Subscription Rights, the New Money Warrants,  the SLTL Warrants, or the GUC Warrants are exempt from registration and/or eligible for DTC book-entry delivery, settlement, and depository services.

### 5.24   *Closing of Chapter 11 Cases.*

After the Effective Date, the Plan Administrator shall be authorized, but not directed, to submit an order to Bankruptcy Court under certification of counsel that is in form and substance acceptable to the U.S. Trustee that closes and issues a final decree for each of the Chapter 11 Cases.

## ARTICLE VI.        DISTRIBUTIONS.

### 6.1   *Distributions Generally.*

The Plan Administrator shall make all Distributions to the appropriate holders of Allowed Claims in accordance with the terms of this Plan.

### 6.2   *No Postpetition Interest on Claims.*

Except with respect to the FLFO Claims of the Prepetition FLFO Secured Parties or as otherwise specifically provided for in the Plan, the Confirmation Order, or another order of the Bankruptcy Court, postpetition interest shall not accrue or be paid on any Claims, and no holder of a Claim shall be entitled to interest accruing on such Claim on or after the Petition Date.

### 6.3 _Date of Distributions._

Except as otherwise provided in this Plan, the Plan Administrator shall make Plan Distributions to holders of Allowed Claims after (a) funding of the Professional Fee Escrow and (b) satisfaction in full or establishment of reserves sufficient to pay claims in the Claims Reserve, as soon as reasonably practicable after the Effective Date and thereafter, the Plan Administrator shall from time to time determine the subsequent Distribution Dates.

### 6.4 _Distribution Record Date._

As of the close of business on the Distribution Record Date, the various lists of holders of Claims in each Class as maintained by the Debtors or their agents, shall be deemed closed, and there shall be no further changes in the record holders of any Claims after the Distribution Record Date. Neither the Debtors nor the Plan Administrator shall have any obligation to recognize any transfer of a Claim occurring after the close of business on the Distribution Record Date. In addition, with respect to payment of any Cure Amounts or disputes over any Cure Amounts, neither the Debtors nor the Plan Administrator shall have any obligation to recognize or deal with any party other than the non-Debtor party to the applicable executory contract or unexpired lease, even if such non-Debtor party has sold, assigned, or otherwise transferred its Claim for a Cure Amount.

### 6.5 _Distributions after Effective Date_

Distributions made after the Effective Date to holders of Disputed Claims that are not Allowed Claims as of the Effective Date but which later become Allowed Claims shall be deemed to have been made on the Effective Date.

### 6.6 _Delivery of Distributions._

Subject to Bankruptcy Rule 9010, the Plan Administrator shall make all Distributions to any holder of an Allowed Claim as and when required by this Plan at (a) the address of such holder on the books and records of the Debtors or their agents or (b) at the address in any written notice of address change delivered to the Debtors or the Plan Administrator, including any addresses included on any transfers of Claim filed pursuant to Bankruptcy Rule 3001. In the event that any Distribution to any holder is returned as undeliverable, no Distribution or payment to such holder shall be made unless and until the Plan Administrator has been notified of the then-current address of such holder, at which time or as soon thereafter as reasonably practicable such Distribution shall be made to such holder without interest.

### 6.7 _Unclaimed Property._

One year from the later of: (a) the Effective Date and (b) the date that is ten (10) Business Days after the date a Claim is first Allowed, all distributions that remain payable on account of such Claim shall be deemed unclaimed property under section 347(b) of the Bankruptcy Code and shall revert to the Post-Effective Date Debtors or their successors or assigns, and all claims of any other Person (including the holder of a Claim in the same Class) to such distribution shall be discharged and forever barred. The Post-Effective Date Debtors and the Plan

63

Administrator shall have no obligation to attempt to locate any holder of an Allowed Claim other than by reviewing the Debtors' books and records and the Bankruptcy Court's filings.

For the avoidance of doubt, a distribution shall be deemed unclaimed if a holder has not: (a) accepted a particular distribution or, in the case of distributions made by check, negotiated such check; (b) given notice to the Plan Administrator of an intent to accept a particular distribution; (c) responded to the Debtors', the Post-Effective Date Debtors', or the Plan Administrator's requests for information necessary to facilitate a particular distribution; or (d) taken any other action necessary to facilitate such distribution.

### 6.8 *Satisfaction of Claims.*

Unless otherwise provided herein, any distributions and deliveries to be made on account of Allowed Claims under the Plan shall be in complete and final satisfaction, settlement, and discharge of and exchange for such Allowed Claims.

### 6.9 *Manner of Payment under Plan.*

Except as specifically provided herein, at the option of the Debtors, the Post-Effective Date Debtors, or the Plan Administrator, as applicable, any Cash payment to be made under the Plan may be made by a check or wire transfer or as otherwise required or provided in applicable agreements or customary practices of the Debtors.

### 6.10 *De Minimis Cash Distributions.*

The Plan Administrator shall not be required to make any payment to any holder of an Allowed Claim on any Distribution Date of Cash in an amount less than one-hundred dollars ($100); *provided*, *however*, that if any Plan Distribution is not made pursuant to this Section 6.10, such Distribution shall be added to any subsequent Plan Distribution to be made on behalf of the holder's Allowed Claim. The Plan Administrator shall not be required to make any final Plan Distributions of Cash in an amount less than fifty dollars ($50) to any holder of an Allowed Claim. If the amount of any final Plan Distributions to holders of Allowed Claims would be fifty dollars ($50) or less, then no further Plan Distribution shall be made by the Plan Administrator and any surplus Cash shall be donated and distributed to a Tax Code § 501(c)(3) tax-exempt organization selected by the Plan Administrator.

### 6.11 *No Distribution in Excess of Amount of Allowed Claim.*

Notwithstanding anything to the contrary in this Plan, no holder of an Allowed Claim shall receive, on account of such Allowed Claim, Plan Distributions in excess of the Allowed amount of such Claim.

### 6.12 *Allocation of Distributions Between Principal and Interest.*

Except with respect to the FLFO Claims of the Prepetition FLFO Secured Parties or as otherwise required by law, consideration received in respect of an Allowed Claim is allocable first to the principal amount of the Claim (as determined for U.S. federal income tax purposes) and

then, to the extent of any excess, to the remainder of the Claim, including any Claim for accrued but unpaid interest.

### 6.13    *Setoffs and Recoupments.*

Each Post-Effective Date Debtor, or such entity's designee as instructed by such Post-Effective Date Debtor or the Plan Administrator, may, pursuant to section 553 of the Bankruptcy Code or applicable nonbankruptcy law, offset or recoup against any Allowed Claim, and the distributions to be made pursuant to the Plan on account of such Allowed Claim any and all claims, rights, and Causes of Action that a Post-Effective Date Debtor or its successors may hold against the holder of such Allowed Claim after the Effective Date to the extent such setoff or recoupment is either (a) agreed in amount among the relevant Post-Effective Date Debtor(s), and holder of the Allowed Claim or (b) otherwise adjudicated by the Bankruptcy Court or another court of competent jurisdiction; *provided*, that neither the failure to effect a setoff or recoupment nor the allowance of any Claim hereunder shall constitute a waiver or release by a Post-Effective Date Debtor or its successor of any claims, rights, or Causes of Action that a Post-Effective Date Debtor or its successor or assign may possess against such holder.

### 6.14    *Withholding and Reporting Requirements.*

(a)    *Withholding Rights.*  In connection with this Plan, any party issuing any instrument or making any Plan Distribution described in this Plan shall comply with all applicable tax withholding and reporting requirements imposed by any Governmental Unit, and all Plan Distributions pursuant to this Plan and all related agreements shall be subject to any such withholding or reporting requirements.  Notwithstanding the foregoing, each holder of an Allowed Claim or any other Person that receives a Plan Distribution pursuant to this Plan shall have responsibility for any taxes imposed by any Governmental Unit, including, income, withholding, and other taxes, on account of such Plan Distribution.  Any party issuing any instrument or making any Plan Distribution pursuant to this Plan has the right, but not the obligation, to not make a Plan Distribution until such holder has made arrangements satisfactory to such issuing or disbursing party for payment of any such tax obligations.  Notwithstanding any provision in the Plan to the contrary, any party issuing any instrument or making any Plan Distribution pursuant to this Plan shall be authorized to take all actions necessary or appropriate to comply with such withholding and reporting requirements, including liquidating a portion of the distribution to be made under the Plan to generate sufficient funds to pay applicable withholding taxes, withholding distributions pending receipt of information necessary to facilitate such distributions or establishing any other mechanisms they believe are reasonable and appropriate.

(b)    *Forms.* Any party entitled to receive any property as an issuance or Plan Distribution under this Plan shall, upon reasonable request, deliver to the Plan Administrator or such other Person designated by the Plan Administrator (which entity shall subsequently deliver to the Plan Administrator or such other Person any requested applicable IRS Form W-8 or Form W-9 received) an appropriate Form W-9 or (if the payee is a non-U.S. Person) Form W-8, unless such Person is exempt under the Tax Code and so notifies the Plan Administrator or such other Person. If such request is made by the Plan Administrator or such other Person designated by the Plan Administrator and the holder fails to comply before the date that is 210 days after the request is made, the amount of such Plan Distribution shall irrevocably revert to the Debtors and any Claim

in respect of such Plan Distribution shall be discharged and forever barred from assertion against any Debtor and its respective property.

### 6.15   *Claims Paid by Third Parties.*

The Plan Administrator shall reduce in full a Claim, and such Claim shall be Disallowed without a Claims objection having to be filed and without any further notice to or action, order, or approval of the Bankruptcy Court, to the extent that the holder of such Claim receives payment in full on account of such Claim from a party that is not the Debtors or the Post-Effective Date Debtors.  If a holder of a Claim receives a Distribution from the Debtors or the Post-Effective Date Debtors on account of such Claim and also receives payment from a third party on account of such Claim, such holder shall, within fourteen (14) days of receipt thereof, repay or return the Plan Distribution to the Debtors or the Post-Effective Date Debtors, to the extent the holder's total recovery on account of such Claim from the third party and under this Plan exceeds the total Allowed amount of such Claim as of the date of any such Plan Distribution under this Plan.  The failure of such holder to timely repay or return such Distribution shall result in the holder owing the Post-Effective Date Debtors interest on such amount owed for each Business Day after the 14-day grace period specified above until the amount is repaid.

### 6.16   *Claims Payable by Third Parties.*

No Distributions shall be made on account of an Allowed Claim that is payable pursuant to one of the insurance policies to which the Debtors' are a beneficiary until the holder of such Allowed Claim has exhausted all remedies with respect to such insurance policy; *provided*, *however*, that this Section 6.16 shall not restrict Plan Distributions on an Allowed Claim that is Allowed in an amount that does not exceed an applicable self-insured retention or deductible amount under one or more such insurance policies.  To the extent that one or more of the insurers agrees to satisfy a Claim in whole or in part, then immediately upon such insurers' satisfaction, such Claim may be expunged to the extent of any agreed upon satisfaction on the Claims register by the Plan Administrator without a Claims objection having to be filed and without any further notice to or action, order, or approval of the Bankruptcy Court.

## ARTICLE VII.        PROCEDURES FOR DISPUTED CLAIMS.

### 7.1   *Allowance of Claims.*

Except as expressly provided in the Plan or in any order entered in the Chapter 11 Cases before the Effective Date (including the Confirmation Order), no Claim shall become an Allowed Claim unless and until such Claim is deemed Allowed pursuant to the Plan or a Final Order, including the Confirmation Order (when it becomes a Final Order), Allowing such Claim. On and after the Effective Date, each of the Debtors or the Post-Effective Date Debtors shall have and retain any and all rights and defenses such Debtor had with respect to any Claim immediately before the Effective Date.

### 7.2 Claims Objections.

Except insofar as a Claim is Allowed under the Plan, the Debtors or the Post-Effective Date Debtors (acting through the Plan Administrator), as applicable, shall be entitled to object to Claims. Except as otherwise expressly provided in the Plan and notwithstanding any requirements that may be imposed pursuant to Bankruptcy Rule 9019, after the Effective Date, the Post-Effective Date Debtors and the Plan Administrator shall have the authority (a) to file, withdraw, or litigate to judgment objections to Claims; (b) to settle or compromise any Disputed Claim without any further notice to or action, order, or approval by the Bankruptcy Court; and (c) to administer and adjust the Debtors' claims register to reflect any such settlements or compromises without any further notice to or action, order, or approval by the Bankruptcy Court.

### 7.3 Estimation of Claims.

Before or after the Effective Date, the Debtors, the Post-Effective Date Debtors, and the Plan Administrator may at any time request that the Bankruptcy Court estimate any Disputed Claim that is contingent or unliquidated pursuant to section 502(c) of the Bankruptcy Code for any reason, regardless of whether any party previously has objected to such Claim or whether the Bankruptcy Court has ruled on any such objection, and the Bankruptcy Court shall retain jurisdiction to estimate any such Claim, including during the litigation of any objection to any Claim or during the appeal relating to such objection. In the event that the Bankruptcy Court estimates any Disputed, contingent, or unliquidated Claim, that estimated amount shall constitute either the Allowed amount of such Claim or a maximum limitation on such Claim for all purposes under the Plan (including for purposes of distributions), as determined by the Bankruptcy Court. If the estimated amount constitutes a maximum limitation of the amount of such Claim, the Debtors, the Post-Effective Date Debtors, or the Plan Administrator, as applicable, may elect to pursue any supplemental proceedings to object to any ultimate distribution on such Claim. Notwithstanding section 502(j) of the Bankruptcy Code, in no event shall any holder of a Claim that has been estimated pursuant to section 502(c) of the Bankruptcy Code or otherwise be entitled to seek reconsideration of such estimation unless such holder has filed a motion requesting the right to seek such reconsideration on or before 21 days after the date on which such Claim is estimated.

### 7.4 Adjustment to Claims Register Without Objection.

Any duplicate Claim or Interest or any Claim or Interest that has been paid or satisfied, or any Claim that has been amended or superseded, may be adjusted or expunged on the claims register by the Debtors or the Post-Effective Date Debtors (at the direction of the Plan Administrator) upon stipulation between the parties in interest without a Claims objection having to be filed and without any further notice or action, order, or approval of the Bankruptcy Court.

### 7.5 Time to File Objections to Claims.

Any objections to a Claim shall be filed on or before the date that is the later of (a) 180 days after the Effective Date and (b) such later date as may be fixed by the Bankruptcy Court, after notice and a hearing, upon a motion by the Post-Effective Date Debtors, as such deadline may be extended from time to time.

### 7.6    *Disallowance of Claims.*

Any Claims held by Entities from which property is recoverable under sections 542, 543, 550, or 553 of the Bankruptcy Code or that is a transferee of a transfer avoidable under sections 522(f), 522(h), 544, 545, 547, 548, 549, or 724(a) of the Bankruptcy Code, shall be deemed Disallowed pursuant to section 502(d) of the Bankruptcy Code, and holders of such Claims may not receive any distributions on account of such Claims until such time as such Causes of Action against that Entity have been settled or a Bankruptcy Court order with respect thereto has been entered and all sums due, if any, to the Debtors by that Entity have been turned over or paid to the Debtors or the Post-Effective Date Debtors.

### 7.7    *Amendments to Claims.*

On or after the Effective Date, except as provided in the Plan or the Confirmation Order, a Claim may not be filed or amended without the prior authorization of the Bankruptcy Court, and the Post-Effective Date Debtors.

### 7.8    *No Distributions Pending Allowance.*

If an objection, motion to estimate, or other challenge to a Claim is filed, no payment or distribution provided under the Plan shall be made on account of such Claim unless and until (and only to the extent that) such Claim becomes an Allowed Claim.

### 7.9    *Distributions After Allowance.*

To the extent that a Disputed Claim ultimately becomes an Allowed Claim, distributions (if any) shall be made to the holder of such Allowed Claim in accordance with the provisions of the Plan. As soon as practicable after the date on which the order or judgment of the Bankruptcy Court allowing any Disputed Claim becomes a Final Order, the Plan Administrator shall provide to the holder of such Allowed Claim the distribution (if any) to which such holder is entitled under the Plan as of the Effective Date, without any interest to be paid on account of such Claim unless required by the Bankruptcy Code.

### 7.10    *Claims Resolution Procedures Cumulative.*

All of the Claims and objection, estimation, and resolution procedures are cumulative and not exclusive of one another. Claims may be estimated and subsequently compromised, settled, withdrawn, or resolved in accordance with the Plan or any mechanism approved by the Bankruptcy Court.

## ARTICLE VIII.    EXECUTORY CONTRACTS AND UNEXPIRED LEASES.

### 8.1    *General Treatment.*

(a)    As of and subject to the occurrence of the Effective Date, all executory contracts and unexpired leases to which any of the Debtors are parties shall be deemed rejected,

unless such contract or lease (i) was previously assumed or rejected by the Debtors pursuant to an order of the Bankruptcy Court; (ii) previously expired or terminated pursuant to its own terms or by agreement of the parties thereto; (iii) is the subject of a motion to assume filed by the Debtors on or before the Confirmation Date; (iv) is identified in Sections 8.4 or 8.5 of the Plan; or (v) is identified for assumption on the Schedule of Assumed Contracts included in the Plan Supplement, which Schedule of Assumed Contracts will identify executory contracts or unexpired leases for assumption and assignment to the Credit Bid Purchaser in accordance with the Credit Bid Purchase Agreement. To the extent the Decommissioning Agreement is an executory contract, it will be assumed and become the obligation of FWE I under the Initial Plan of Merger.

(b)     Subject to the occurrence of the Effective Date, entry of the Confirmation Order by the Bankruptcy Court shall constitute approval of the assumptions, assumptions and assignments, or rejections provided for in the Plan pursuant to sections 365(a) and 1123 of the Bankruptcy Code and a determination by the Bankruptcy Court that the Credit Bid Purchaser or Post-Effective Date Debtors, as applicable, have provided adequate assurance of future performance under such assumed executory contracts and unexpired leases. Each executory contract and unexpired lease assumed or assumed and assigned pursuant to the Plan shall vest in and be fully enforceable by the Credit Bid Purchaser or Post-Effective Date Debtors, as applicable, in accordance with its terms, except as modified by the provisions of the Plan, any order of the Bankruptcy Court authorizing and providing for its assumption, or applicable law.

(c)     To the maximum extent permitted by law, to the extent any provision in any executory contract or unexpired lease assumed pursuant to the Plan restricts or prevents, or purports to restrict or prevent, or is breached or deemed breached by, the assumption of such executory contract or unexpired lease (including any "change of control" provision), then such provision shall be deemed modified such that the transactions contemplated by the Plan shall not entitle the non-Debtor party thereto to terminate such executory contract or unexpired lease or to exercise any other default-related rights with respect thereto.

(d)     Subject to the terms of the Credit Bid Purchase Agreement, the Debtors reserve the right, on or before 5:00 p.m. (prevailing Central Time) on the date that is seven (7) days before the Confirmation Hearing, or such other time as may be agreed in writing between the Debtors and the applicable counterparty, to amend the Schedule of Assumed Contracts to add or remove any executory contract or unexpired lease; *provided* that if the Confirmation Hearing is adjourned or continued, such amendment right shall be extended to 5:00 p.m. (prevailing Central Time) on the date that is seven (7) days before the rescheduled or continued Confirmation Hearing, and this provision shall apply in the case of any and all subsequent adjournments and continuances of the Confirmation Hearing; *provided*, *further* that, subject to the terms of the Credit Bid Purchase Agreement, the Debtors may amend the Schedule of Assumed Contracts to add or delete any executory contracts or unexpired leases after such date to the extent agreed with the relevant counterparties and entry of an order of the Bankruptcy Court.

**8.2     *Determination of Cure Amounts and Deemed Consent.***

(a)     Any Cure Amount shall be satisfied, pursuant to section 365(b)(1) of the Bankruptcy Code, by payment of the Cure Amount, as reflected in the applicable cure notice, in Cash on the Effective Date in accordance with the terms of the Credit Bid Purchase Agreement or

on such other terms as the parties to such executory contracts or unexpired leases and the Debtors may otherwise agree.

(b)     The Debtors shall file, as part of the Plan Supplement, the Schedule of Assumed Contracts.  At least ten (10) days before the Confirmation Hearing, the Debtors shall serve a notice on parties to executory contracts or unexpired leases to be assumed or assumed and assigned reflecting the Debtors' intention to potentially assume or assume and assign to the Credit Bid Purchaser in accordance with the terms of the Credit Bid Purchase Agreement the contract or lease in connection with this Plan or the Credit Bid Purchase Agreement and, where applicable, setting forth the proposed Cure Amount (if any).  **Any objection by a counterparty to an executory contract or unexpired lease to the proposed assumption, assumption and assignment, or related Cure Amount must be filed, served, and actually received by the Debtors within ten (10) days of the service of the assumption notice, or such shorter period as agreed to by the parties or authorized by the Bankruptcy Court.**  Any counterparty to an executory contract or unexpired lease that does not timely object to the notice of the proposed assumption of such executory contract or unexpired lease shall be deemed to have assented to assumption of the applicable executory contract or unexpired lease notwithstanding any provision thereof that purports to (i) prohibit, restrict, or condition the transfer or assignment of such contract or lease; (ii) terminate or modify, or permit the termination or modification of, a contract or lease as a result of any direct or indirect transfer or assignment of the rights of any Debtor under such contract or lease or a change, if any, in the ownership or control to the extent contemplated by the Plan; (iii) increase, accelerate, or otherwise alter any obligations or liabilities of any Debtor, or any Post-Effective Date Debtor, under such executory contract or unexpired lease; or (iv) create or impose a Lien upon any property or Asset of any Debtor, or Post-Effective Date Debtor, as applicable.  Each such provision shall be deemed to not apply to the assumption of such executory contract or unexpired lease pursuant to the Plan and counterparties to assumed executory contracts or unexpired leases that fail to object to the proposed assumption in accordance with the terms set forth in this Section 8.2(b), shall forever be barred and enjoined from objecting to the proposed assumption or to the validity of such assumption (including with respect to any Cure Amounts or the provision of adequate assurance of future performance), or taking actions prohibited by the foregoing or the Bankruptcy Code on account of transactions contemplated by the Plan.

(c)     If there is an Assumption Dispute pertaining to assumption of an executory contract or unexpired lease (other than a dispute pertaining to a Cure Amount), such dispute shall be heard by the Bankruptcy Court before such assumption being effective; provided, that, subject to the terms of the Credit Bid Purchase Agreement, the Debtors or Post-Effective Date Debtors, as applicable, may settle any Assumption Dispute without any further notice to any party or any action, order, or approval of the Bankruptcy Court.

(d)     To the extent an Assumption Dispute relates solely to the Cure Amount, subject to the terms of the Credit Bid Purchase Agreement, the Debtors may assume and/or assume and assign the applicable executory contract or unexpired lease before the resolution of the Assumption Dispute; *provided*, that the Post-Effective Date Debtors or Credit Bid Purchaser, as applicable shall be responsible to pay the determined amount to be Allowed by the Bankruptcy Court or otherwise agreed to by such non-Debtor party.  The Debtors or Post-Effective Date Debtors, as applicable, subject to the terms of the Credit Bid Purchase Agreement, may settle any

dispute regarding the Cure Amount or the nature thereof without any further notice to any party or any action, order, or approval of the Bankruptcy Court.

(e) Assumption or assumption and assignment of any executory contract or unexpired lease pursuant to the Plan or otherwise shall result in the full release and satisfaction of any Claims against any Debtor or defaults by any Debtor, whether monetary or nonmonetary, including defaults of provisions restricting the change in control or ownership interest composition or other bankruptcy-related defaults, arising under any assumed executory contract or unexpired lease at any time before the date that the Debtors assume or assume and assign such executory contract or unexpired lease. Any proofs of Claim filed with respect to an executory contract or unexpired lease that has been assumed or assumed and assigned shall be deemed Disallowed and expunged, without further notice to or action, order, or approval of the Bankruptcy Court or any other Person, upon the assumption of such executory contract or unexpired leases.

### 8.3 *Rejection Damages Claims.*

**In the event that the rejection of an executory contract or unexpired lease hereunder results in damages to the other party or parties to such contract or lease, any Claim for such damages shall be classified and treated in Class 6B (General Unsecured Claims). A proof of such Claim must be filed with the Bankruptcy Court and served upon counsel for the Debtors, Post-Effective Date Debtor, or the Plan Administrator, as applicable, by the later of (i) thirty (30) days after the filing and service of the notice of the occurrence of the Effective Date; and (ii) thirty (30) days after entry of an Order rejecting such contract or lease if such contract or lease is the subject of a pending Assumption Dispute.**

### 8.4 *Survival of the Debtors' Indemnification Obligations.*

Notwithstanding anything in the Plan (including Section 10.3 of the Plan), any Indemnification Obligation to indemnify current and former officers, directors, members, managers, agents, or employees with respect to all present and future actions, suits, and proceedings against the Debtors or such officers, directors, members, managers, agents, or employees based upon any act or omission for or on behalf of the Debtors shall (a) remain in full force and effect, (b) not be discharged, impaired, or otherwise affected in any way, including by the Plan, the Plan Supplement, or the Confirmation Order, (c) not be limited, reduced or terminated after the Effective Date, and (d) survive unimpaired and unaffected irrespective of whether such Indemnification Obligation is owed for an act or event occurring before, on or after the Petition Date, *provided*, that the Post-Effective Date Debtors shall not indemnify officers, directors, members, or managers, as applicable, of the Debtors for any claims or Causes of Action that are not indemnified by such Indemnification Obligation. All such obligations shall be deemed and treated as executory contracts to be assumed by the Debtors under the Plan and shall continue as obligations of the Post-Effective Date Debtors. Any claim based on the Debtors' obligations under the Plan shall not be a Disputed Claim or subject to any objection, in either case, by reason of section 502(e)(1)(B) of the Bankruptcy Code.

**8.5** *Insurance Policies.*

(a)     All insurance policies to which any Debtor is a party as of the Effective Date, including any D&O Policy, shall be deemed to be and treated as executory contracts and shall be assumed by and vest in the applicable Debtors or the Post-Effective Date Debtors and shall continue in full force and effect thereafter in accordance with their respective terms. Coverage for defense and indemnity under the D&O Policy shall remain available to all individuals within the definition of "Insured" in any D&O Policy.

(b)     In addition, after the Effective Date, the Post-Effective Date Debtors or Plan Administrator shall not terminate or otherwise reduce the coverage under any D&O Policy (including any "tail policy") in effect as of the Petition Date, and any current and former directors, officers, members, managers, agents or employees of any of the Debtors who served in such capacity at any time before the Effective Date shall be entitled to the full benefits of any such D&O Policy for the full term of such policy regardless of whether such members, managers, directors, and/or officers remain in such positions after the Effective Date to the extent set forth in such policies.

**8.6** *Modifications, Amendments, Supplements, Restatements, or Other Agreements.*

Unless otherwise provided herein or by separate order of the Bankruptcy Court, each executory contract and unexpired lease that is assumed shall include any and all modifications, amendments, supplements, restatements, or other agreements made directly or indirectly by any agreement, instrument, or other document that in any manner affects such executory contract or unexpired lease, without regard to whether such agreement, instruments, or other document is listed in any notices of assumed contracts.

**8.7** *Reservation of Rights.*

(a)     Neither the exclusion nor the inclusion by the Debtors of any contract or lease on any exhibit, schedule, or other annex to the Plan or in the Plan Supplement, nor anything contained in the Plan, shall constitute an admission by the Debtors that any such contract or lease is or is not an executory contract or unexpired lease or that the Debtors or the Post-Effective Date Debtors or their respective affiliates has any liability thereunder.

(b)     Except as explicitly provided in the Plan, nothing in the Plan shall waive, excuse, limit, diminish, or otherwise alter any of the defenses, claims, Causes of Action, or other rights of the Debtors or the Post-Effective Date Debtors under any executory or non-executory contract or unexpired or expired lease.

(c)     Nothing in the Plan shall increase, augment, or add to any of the duties, obligations, responsibilities, or liabilities of the Debtors or the Post-Effective Date Debtors, as applicable, under any executory or non-executory contract or unexpired or expired lease.

(a)     If there is a dispute regarding whether a contract or lease is or was executory or unexpired at the time of its assumption under the Plan, the Debtors or the Post-Effective Date

Debtors, as applicable, shall have thirty (30) days following entry of a Final Order resolving such dispute to alter their treatment of such contract or lease.

## ARTICLE IX. CONDITIONS PRECEDENT TO OCCURRENCE OF EFFECTIVE DATE.

### 9.1 *Conditions Precedent to Effective Date.*

The Effective Date shall not occur unless all of the following conditions precedent have been satisfied or waived in accordance with the Plan:

(a) the Plan Supplement has been filed;

(b) the Bankruptcy Court shall have entered the Confirmation Order, which order shall be a Final Order;

(c) the Definitive Documents shall be (i) consistent with the Restructuring Support Agreement and otherwise acceptable to the parties thereto consistent with their respective consent and approval rights as set forth in the Restructuring Support Agreement and (ii) acceptable to the Prepetition FLFO Administrative Agent and the First Lien Exit Facility Agent solely to the extent provided and consistent with their consent and approval rights as set forth in this Plan;

(d) the Restructuring Support Agreement shall not have been terminated and shall remain in full force and effect;

(e) all conditions precedent to the effectiveness of the Apache Definitive Documents shall have been satisfied or waived by the party having the right to waive the same;

(f) the Debtors shall have implemented the Restructuring Transactions and all other transactions contemplated by the Plan and the Restructuring Support Agreement in a manner consistent in all respects with the Plan and Restructuring Support Agreement;

(g) the Amended Organizational Documents shall become effective and in full force and effect as of the Effective Date;

(h) the NewCo Organizational Documents shall become effective and in full force and effect as of the Effective Date;

(i) the conditions precedent to the effectiveness of the First Lien Exit Facility Commitment Letter shall have been satisfied or duly waived in writing;

(j) the conditions precedent to the effectiveness of the Second Lien Backstop Commitment Letter shall have been satisfied or duly waived in writing;

(k) the conditions precedent to the effectiveness of the FLTL ERO Backstop Agreement shall have been satisfied or duly waived in writing;

(l)　　the conditions precedent to the effectiveness of the SLTL ERO Backstop Agreement shall have been satisfied or duly waived in writing

(m)　　the conditions precedent to the effectiveness of the First Lien Exit Facility (as determined in the First Lien Exit Facility Documents and the First Lien Exit Facility Commitment Letter) shall have been satisfied or duly waived in writing and the First Lien Exit Facility Lenders and the First Lien Exit Facility shall have closed substantially simultaneously with the effectiveness of the Plan;

(n)　　the conditions precedent to the effectiveness of the Second Lien Exit Facility (as determined in the Second Lien Exit Facility Documents and the Second Lien Backstop Commitment Letter) shall have been satisfied or duly waived in writing and the Second Lien Exit Facility Lenders and the Second Lien Exit Facility shall have closed substantially simultaneously with the effectiveness of the Plan;

(o)　　the New Intercreditor Agreement shall have been executed and delivered by each of the parties thereto;

(p)　　the Equity Rights Offerings shall have been consummated;

(q)　　the conditions precedent to the effectiveness of the Credit Bid Purchase Agreement shall have been satisfied or duly waived in writing in accordance with the terms of the Credit Bid Purchase Agreement and the Credit Bid Transaction Closing shall have occurred or will occur simultaneously with the effectiveness of the Plan, including, without limitation, payment of the New Money Consideration by Buyers to Sellers at Closing pursuant to the terms thereof;

(r)　　the Debtors shall have obtained all authorizations, consents, regulatory approvals, rulings, or documents (other than any such authorization, consent, regulatory approval, ruling, or document that is customarily obtained or completed after assignment, conveyance or vesting of an applicable Asset) that, after giving effect to the entry of the Confirmation Order, are necessary to implement and effectuate the Plan, including Bankruptcy Court approval, and each of the other transactions contemplated by the Restructuring, and such authorizations, consents, regulatory approvals, rulings, or documents shall not be subject to unfulfilled conditions and shall be in full force and effect, and all applicable regulatory waiting periods shall have expired;

(s)　　no event of default under the DIP Documents shall have occurred or be continuing and an acceleration of the obligations or termination of the DIP Lenders' commitments under the DIP Documents shall not have occurred;

(t)　　all Restructuring Expenses shall have been indefeasibly paid in full in accordance with Section 2.6; and

(u)　　the Debtors shall have reached an agreement with the Government, in form and substance reasonably acceptable to the Required DIP Lenders and Requisite FLTL Lenders, regarding (i) the resolution of civil penalties for violations of the Outer Continental Shelf Lands Act, 43 U.S.C. § 1331, *et seq.*, issued prior to execution of the agreement, and (ii) the performance of decommissioning of certain specified properties, in each case as set forth in such agreement.

### 9.2    *Waiver of Conditions Precedent.*

(a)    With the prior written consent of the Required DIP Lenders, the Requisite FLTL Lenders, the conditions precedent to the occurrence of the Effective Date set forth in Section 9.1 of the Plan may be waived, in whole or in part, by the Debtors, without leave of or order of the Bankruptcy Court; *provided that*, a waiver of the conditions precedent to the occurrence of the Effective Date set forth in Sections 9.1(c), (d), (e), and (f) of the Plan shall also require the prior written consent of the Apache PSA Parties; *provided, further*, that a waiver of any of the conditions precedent to the occurrence of the Effective Date in Section 9.1 above shall also require the prior written (i) consent of the Prepetition FLFO Administrative Agent and the Exit First Lien Agent for all conditions precedent other than Section 9.1(d),(r), and (s) and (ii) reasonable consent for the conditions precedent in Section 9.1(r) and (s); *provided, further*, that a waiver of the conditions precedent to the occurrence of the Effective Date set forth in Sections 9.1(l), (p) and (t) shall also require the prior written consent of the Requisite SLTL Lenders; *provided, further* that a waiver of the conditions precedent to the occurrence of the Effective Date set forth in Section 9.1(u) shall also require the prior written consent of the Government.  If any such condition precedent is waived pursuant to this section and the Effective Date occurs, each party agreeing to waive such condition precedent shall be estopped from withdrawing such waiver after the Effective Date or otherwise challenging the occurrence of the Effective Date on the basis that such condition was not satisfied, the waiver of such condition precedent shall benefit from the "equitable mootness" doctrine, and the occurrence of the Effective Date shall foreclose any ability to challenge the Plan in any court. If the Plan is confirmed for fewer than all of the Debtors, only the conditions applicable to the Debtor or Debtors for which the Plan is confirmed must be satisfied or waived for the Effective Date to occur.

(b)    Except as otherwise provided herein, all actions required to be taken on the Effective Date shall take place and shall be deemed to have occurred simultaneously and no such action shall be deemed to have occurred before the taking of any other such action.

(c)    The stay of the Confirmation Order pursuant to Bankruptcy Rule 3020(e) shall be deemed waived by and upon the entry of the Confirmation Order, and the Confirmation Order shall take effect immediately upon its entry.

### 9.3    *Effect of Failure of a Condition.*

If the conditions listed in Section 9.1 of the Plan are not satisfied or waived in accordance with Section 9.2 of the Plan on or before the Effective Date, the Plan shall be null and void in all respects and nothing contained in the Plan or the Disclosure Statement shall (a) constitute a waiver or release of any Claims by or against or any Interests in the Debtors, (b) prejudice in any manner the rights of any Person, or (c) constitute an admission, acknowledgement, offer, or undertaking by the Debtors, any Consenting Creditors, or any other Person.

# ARTICLE X.　　EFFECT OF CONFIRMATION.

### 10.1　*Binding Effect.*

Except as otherwise provided in section 1141(d)(3) of the Bankruptcy Code, and subject to the occurrence of the Effective Date, on and after the entry of the Confirmation Order, the provisions of the Plan shall bind every holder of a Claim against or Interest in any Debtor and inure to the benefit of and be binding on such holder's respective successors and assigns, regardless of whether the Claim or Interest of such holder is Impaired under the Plan and whether such holder has accepted the Plan.

### 10.2　*Vesting of Assets.*

Except as otherwise provided in the Plan, the Confirmation Order, or any Plan Supplement, on and after the Effective Date, pursuant to sections 1141(b) and (c) of the Bankruptcy Code, all Assets of the Estates, including all claims, rights, and Causes of Action and any property acquired by the Debtors or the Post-Effective Date Debtors during the Chapter 11 Cases or under or in connection with the Plan shall vest in each respective Post-Effective Date Debtor free and clear of all Claims, Liens, charges, other encumbrances, and interests (other than any and all Liens securing the FLFO Claims, the obligations under the First Lien Exit Facility, or all Liens securing the FLTL Claims that attach to the Credit Bid Acquired Interests and are deemed assigned to the Second Lien Exit Facility Agent upon the Effective Date to secure the obligations under the Second Lien Exit Facility).  Subject to the terms of the Plan, on and after the Effective Date, the Post-Effective Date Debtors and Plan Administrator may operate their businesses and may use, acquire, and dispose of property and prosecute, compromise, or settle any Claims (including any Administrative Expense Claims) and Causes of Action without notice to, supervision of or approval by the Bankruptcy Court and free and clear of any restrictions of the Bankruptcy Code or the Bankruptcy Rules other than restrictions expressly imposed by the Plan or the Confirmation Order.  Without limiting the foregoing, the Post-Effective Date Debtors may pay the charges that they incur on or after the Confirmation Date for Professional Persons' fees, disbursements, expenses, or related support services without application to the Bankruptcy Court.

### 10.3　*Discharge of Claims Against and Interests in Debtors.*

Upon the Effective Date, except as otherwise expressly provided in the Plan or in the Confirmation Order, the distributions, rights and treatment to be made under the Plan, shall be in complete satisfaction, discharge, and release, effective as of the Effective Date, of Claims, Interests, and Causes of Action of any nature whatsoever, including any interest accrued on Claims or Interests from and after the Petition Date, whether known or unknown, against, liabilities of, Liens on, obligations of, rights against, and Interests in, the Debtors or any of their Assets or properties, regardless of whether any property shall have been distributed or retained pursuant to the Plan on account of such Claims and Interests, including demands, liabilities, and Causes of Action that arose before the Effective Date, any liability (including withdrawal liability) to the extent such Claims or Interests relate to services performed by employees of the Debtors before the Effective Date and that arise from a termination of employment, any contingent or non-contingent liability on account of representations or warranties issued on or before the Effective Date, any obligations incurred in connection with or related to bonds and letters of credit (and any

related agreements) issued before the Petition Date on behalf of the Debtors, and all debts of the kind specified in sections 502(g), 502(h), or 502(i) of the Bankruptcy Code, in each case whether or not: (a) a proof of claim based upon such debt or right is filed or deemed filed pursuant to section 501 of the Bankruptcy Code; (b) a Claim or Interest based upon such debt, right, or Interest is Allowed pursuant to section 502 of the Bankruptcy Code; or (c) the holder of such a Claim or Interest has accepted the Plan. Any default or "event of default" by the Debtors or affiliates with respect to any Claim or Interest that existed immediately before or on account of the filing of the Chapter 11 Cases shall be deemed cured (and no longer continuing) as of the Effective Date. The Confirmation Order shall be a judicial determination of the discharge of all Claims and Interests subject to the Effective Date occurring.

Each holder (as well as any trustee or agent on behalf of such holder) of a Claim or Interest, and any affiliate of such holder, shall be deemed to have forever waived, released, and discharged the Debtors, to the fullest extent permitted by section 1141 of the Bankruptcy Code, of and from any and all Claims, Interests, rights, and liabilities that arose before the Effective Date. Except as otherwise provided in the Plan, upon the Effective Date, all such holders of Claims and Interests and their affiliates shall be forever precluded and enjoined, pursuant to sections 105, 524, and 1141 of the Bankruptcy Code, from prosecuting or asserting any such discharged Claim against or terminated Interest in any Debtor or any Post-Effective Date Debtor.

## 10.4    *Pre-Confirmation Injunctions and Stays.*

Unless otherwise provided in the Plan or a Final Order of the Bankruptcy Court, all injunctions and stays arising under or entered during the Chapter 11 Cases, whether under sections 105 or 362 of the Bankruptcy Code or otherwise, and in existence on the date of entry of the Confirmation Order, shall remain in full force and effect until the later of the Effective Date and the date indicated in the order providing for such injunction or stay.

## 10.5    *Injunction Against Interference With Plan.*

Except as otherwise provided in the Plan or in the Confirmation Order, upon the entry of the Confirmation Order, all holders of Claims and Interests and all other parties in interest, along with their respective present and former affiliates, employees, agents, officers, directors, and principals, shall be enjoined from taking any action to interfere with the implementation or the occurrence of the Effective Date.

## 10.6    *Plan Injunction.*

(a)    Except as otherwise provided in the Plan or in the Confirmation Order, from and after the Effective Date, all Persons who have held, hold, or may hold Claims or Interests, and other parties in interest, along with their respective present or former employees, agents, officers, directors, principals, and affiliates, are, with respect to any such Claim or Interest, permanently enjoined after the entry of the Confirmation Order from: (i) commencing, conducting, or continuing in any manner, directly or indirectly, any suit, action, or other proceeding of any kind (including any proceeding in a judicial, arbitral, administrative, or other forum) against or affecting, directly or indirectly, a Debtor, a Post-Effective Date Debtor, or an Estate or the property of any of the foregoing, or any direct or indirect transferee of any property of, or direct or indirect

successor in interest to, any of the foregoing Persons mentioned in this subsection (i) or any property of any such transferee or successor; (ii) enforcing, levying, attaching (including any prejudgment attachment), collecting, or otherwise recovering in any manner or by any means, whether directly or indirectly, any judgment, award, decree, or order against a Debtor, a Post-Effective Date Debtor, or an Estate or its property, or any direct or indirect transferee of any property of, or direct or indirect successor in interest to, any of the foregoing Persons mentioned in this subsection (ii) or any property of any such transferee or successor; (iii) creating, perfecting, or otherwise enforcing in any manner, directly or indirectly, any encumbrance of any kind against a Debtor, a Post-Effective Date Debtor, or an Estate or any of its property, or any direct or indirect transferee of any property of, or successor in interest to, any of the foregoing Persons mentioned in this subsection (iii) or any property of any such transferee or successor; (iv) acting or proceeding in any manner, in any place whatsoever, that does not conform to or comply with the provisions of the Plan to the full extent permitted by applicable law; and (v) commencing or continuing, in any manner or in any place, any action that does not comply with or is inconsistent with the provisions of the Plan; *provided*, that nothing contained in the Plan shall preclude such Persons who have held, hold, or may hold Claims against, or Interests in, a Debtor, a Post-Effective Date Debtor, or an Estate from exercising their rights and remedies, or obtaining benefits, pursuant to and consistent with the terms of the Plan.

(b)     By accepting distributions pursuant to the Plan, each holder of an Allowed Claim or Interest shall be deemed to have affirmatively and specifically consented to be bound by the Plan, including the injunctions set forth in Section 10.6 of the Plan.

**10.7**   *Releases.*

(a)     **RELEASES BY THE DEBTORS. AS OF THE EFFECTIVE DATE, EXCEPT FOR THE RIGHTS AND REMEDIES THAT REMAIN IN EFFECT FROM AND AFTER THE EFFECTIVE DATE TO ENFORCE THE PLAN, THE CONFIRMATION ORDER, THE OBLIGATIONS CONTEMPLATED BY THE DOCUMENTS IN THE PLAN SUPPLEMENT, THE APACHE DEFINITIVE DOCUMENTS, ANY ADDITIONAL PREDECESSOR AGREEMENT DOCUMENTS, THE CREDIT BID PURCHASE AGREEMENT, THE FIRST LIEN EXIT FACILITY COMMITMENT LETTER, THE SECOND LIEN BACKSTOP COMMITMENT LETTER, THE EQUITY RIGHTS OFFERINGS, THE ERO BACKSTOP AGREEMENTS, THE EXIT FACILITY DOCUMENTS, AND THE RESTRUCTURING TRANSACTIONS, ON AND AFTER THE EFFECTIVE DATE, THE RELEASED PARTIES WILL BE DEEMED CONCLUSIVELY, ABSOLUTELY, UNCONDITIONALLY, IRREVOCABLY, AND FOREVER RELEASED AND DISCHARGED, BY THE DEBTORS, THE POST-EFFECTIVE DATE DEBTORS, AND THE ESTATES, IN EACH CASE ON BEHALF OF THEMSELVES AND THEIR RESPECTIVE SUCCESSORS, ASSIGNS, AND REPRESENTATIVES AND ANY AND ALL OTHER PERSONS THAT MAY PURPORT TO ASSERT ANY CAUSE OF ACTION DERIVATIVELY, BY OR THROUGH THE FOREGOING PERSONS, FROM ANY AND ALL CLAIMS, INTERESTS, OBLIGATIONS, SUITS, JUDGMENTS, DAMAGES, DEMANDS, DEBTS, RIGHTS, AND CAUSES OF ACTION, LOSSES, REMEDIES, OR LIABILITIES WHATSOEVER (INCLUDING ANY DERIVATIVE CLAIMS, ASSERTED OR ASSERTABLE ON BEHALF OF THE DEBTORS, THE POST-EFFECTIVE DATE DEBTORS, OR THE**

ESTATES), WHETHER LIQUIDATED OR UNLIQUIDATED, FIXED OR
CONTINGENT, MATURED OR UNMATURED, KNOWN OR UNKNOWN, FORESEEN
OR UNFORESEEN, ACCRUED OR UNACCRUED, EXISTING OR HEREINAFTER
ARISING, WHETHER IN LAW OR EQUITY, WHETHER SOUNDING IN TORT OR
CONTRACT, WHETHER ARISING UNDER FEDERAL OR STATE STATUTORY OR
COMMON LAW, OR ANY OTHER APPLICABLE INTERNATIONAL, FOREIGN, OR
DOMESTIC LAW, RULE, STATUTE, REGULATION, TREATY, RIGHT, DUTY,
REQUIREMENTS OR OTHERWISE THAT THE DEBTORS, THE POST-EFFECTIVE
DATE DEBTORS, THE ESTATES, OR THEIR AFFILIATES WOULD HAVE BEEN
LEGALLY ENTITLED TO ASSERT IN THEIR OWN RIGHT (WHETHER
INDIVIDUALLY OR COLLECTIVELY) OR ON BEHALF OF THE HOLDER OF ANY
CLAIM OR INTEREST OR OTHER PERSON, BASED ON OR RELATING TO, OR IN
ANY MANNER ARISING FROM, IN WHOLE OR IN PART, THE DEBTORS, THE
CHAPTER 11 CASES, THE RESTRUCTURING, THE PURCHASE, SALE, OR
RESCISSION OF THE PURCHASE OR SALE OF ANY SECURITY OF THE DEBTORS
OR THE POST-EFFECTIVE DATE DEBTORS, THE SUBJECT MATTER OF, OR THE
TRANSACTIONS OR EVENTS GIVING RISE TO, ANY CLAIM OR INTEREST THAT
IS TREATED IN THE PLAN, THE BUSINESS OR CONTRACTUAL ARRANGEMENTS
BETWEEN ANY DEBTOR AND ANY RELEASED PARTY, THE RESTRUCTURING OF
CLAIMS AND INTERESTS BEFORE OR DURING THE CHAPTER 11 CASES, THE
NEGOTIATION, FORMULATION, PREPARATION, OR CONSUMMATION OF THE
PLAN, THE DOCUMENTS IN THE PLAN SUPPLEMENT, THE CREDIT BID
PURCHASE AGREEMENT, THE EXIT FACILITY DOCUMENTS, THE APACHE
DEFINITIVE DOCUMENTS, ANY ADDITIONAL PREDECESSOR AGREEMENT
DOCUMENTS, THE FIRST LIEN EXIT FACILITY COMMITMENT LETTER, THE
SECOND LIEN BACKSTOP COMMITMENT LETTER, THE EQUITY RIGHTS
OFFERINGS, THE ERO BACKSTOP AGREEMENTS, THE DECOMMISSIONING
AGREEMENT, OR RELATED AGREEMENTS, INSTRUMENTS, OR OTHER
DOCUMENTS RELATING THERETO, OR THE SOLICITATION OF VOTES WITH
RESPECT TO THE PLAN, IN ALL CASES BASED UPON ANY ACT OR OMISSION,
TRANSACTION, AGREEMENT, EVENT, OR OTHER OCCURRENCE TAKING
PLACE ON OR BEFORE THE EFFECTIVE DATE.

ENTRY OF THE CONFIRMATION ORDER BY THE BANKRUPTCY
COURT SHALL CONSTITUTE THE BANKRUPTCY COURT'S APPROVAL,
PURSUANT TO BANKRUPTCY RULE 9019, OF THE RELEASES IN SECTION 10.7(a)
OF THE PLAN (the "DEBTOR RELEASES"), WHICH INCLUDES BY REFERENCE
EACH OF THE RELATED PROVISIONS AND DEFINITIONS UNDER THE PLAN, AND
FURTHER, SHALL CONSTITUTE THE BANKRUPTCY COURT'S FINDING THAT
THE DEBTOR RELEASES ARE: (I) IN EXCHANGE FOR THE GOOD, VALUABLE
AND ADEQUATE CONSIDERATION PROVIDED BY THE RELEASED PARTIES, (II)
ESSENTIAL TO THE CONFIRMATION OF THE PLAN, (III) A GOOD FAITH
SETTLEMENT AND COMPROMISE OF THE RELEASED CLAIMS RELEASED BY
THE DEBTORS, THE POST-EFFECTIVE DATE DEBTORS AND THE ESTATES, (IV)
IN THE BEST INTERESTS OF THE DEBTORS, THE ESTATES AND ALL HOLDERS
OF CLAIMS AND INTERESTS, (IV) FAIR, EQUITABLE AND REASONABLE, (V)
GIVEN AND MADE AFTER DUE NOTICE AND OPPORTUNITY FOR HEARING, AND

**(VII) A BAR TO ANY OF THE DEBTORS, THE POST-EFFECTIVE DATE DEBTORS, OR THE ESTATES ASSERTING ANY CLAIM OR CAUSE OF ACTION RELEASED PURSUANT TO THE DEBTOR RELEASE.**

       **(b)**    **RELEASES BY HOLDERS OF CLAIMS AND INTERESTS. AS OF THE EFFECTIVE DATE, EXCEPT FOR THE RIGHTS AND REMEDIES THAT REMAIN IN EFFECT FROM AND AFTER THE EFFECTIVE DATE TO ENFORCE THE PLAN, THE CONFIRMATION ORDER, THE OBLIGATIONS CONTEMPLATED BY THE DOCUMENTS IN THE PLAN SUPPLEMENT, THE APACHE DEFINITIVE DOCUMENTS, ANY ADDITIONAL PREDECESSOR AGREEMENT DOCUMENTS, THE FIRST LIEN EXIT FACILITY COMMITMENT LETTER, THE CREDIT BID PURCHASE AGREEMENT, THE SECOND LIEN BACKSTOP COMMITMENT LETTER, THE EQUITY RIGHTS OFFERINGS, THE ERO BACKSTOP AGREEMENTS, THE EXIT FACILITY DOCUMENTS, AND THE RESTRUCTURING TRANSACTIONS, ON AND AFTER THE EFFECTIVE DATE, THE RELEASED PARTIES WILL BE DEEMED CONCLUSIVELY, ABSOLUTELY, UNCONDITIONALLY, IRREVOCABLY, AND FOREVER RELEASED AND DISCHARGED BY THE RELEASING PARTIES, TO THE MAXIMUM EXTENT PERMITTED BY LAW, AS SUCH LAW MAY BE EXTENDED SUBSEQUENT TO THE EFFECTIVE DATE BY THE RELEASING PARTIES, FROM ANY AND ALL CLAIMS AND CAUSES OF ACTION WHATSOEVER (INCLUDING ANY DERIVATIVE CLAIMS, ASSERTED OR ASSERTABLE ON BEHALF OF THE DEBTORS, THE POST-EFFECTIVE DATE DEBTORS, OR THEIR ESTATES, INCLUDING ANY CAUSES OF ACTION ARISING UNDER CHAPTER 5 OF THE BANKRUPTCY CODE), WHETHER LIQUIDATED OR UNLIQUIDATED, FIXED OR CONTINGENT, MATURED OR UNMATURED, KNOWN OR UNKNOWN, FORESEEN OR UNFORESEEN, ASSERTED OR UNASSERTED, ACCRUED OR UNACRUED, EXISTING OR HEREINAFTER ARISING, IN LAW, EQUITY, CONTRACT, TORT, OR OTHERWISE BY STATUTE, WHETHER ARISING UNDER FEDERAL OR STATE, STATUTORY OR COMMON LAW, VIOLATIONS OF FEDERAL OR STATE SECURITIES LAWS, OR ANY OTHER APPLICABLE INTERNATIONAL, FOREIGN, OR DOMESTIC LAW, RULE STATUTE, REGULATION, TREATY, RIGHT, DUTY, REQUIREMENT OR OTHERWISE, THAT THE RELEASING PARTIES OR THEIR ESTATES, AFFILIATES, HEIRS, EXECUTORS, ADMINISTRATORS, SUCCESSORS, ASSIGNS, MANAGERS, ACCOUNTANTS, ATTORNEYS, REPRESENTATIVES, CONSULTANTS, AGENTS, AND ANY OTHER PERSONS CLAIMING UNDER OR THROUGH THEM WOULD HAVE BEEN LEGALLY ENTITLED TO ASSERT IN THEIR OWN RIGHT (WHETHER INDIVIDUALLY OR COLLECTIVELY) OR ON BEHALF OF THE HOLDER OF ANY CLAIM OR INTEREST OR OTHER PERSON, BASED ON OR RELATING TO, OR IN ANY MANNER ARISING FROM, IN WHOLE OR IN PART, THE DEBTORS, THE POST-EFFECTIVE DATE DEBTORS, OR THEIR ESTATES, THE CHAPTER 11 CASES, THE RESTRUCTURING, THE PURCHASE, SALE, OR RESCISSION OF THE PURCHASE OR SALE OF ANY SECURITY OF THE DEBTORS OR THE POST-EFFECTIVE DATE DEBTORS, THE SUBJECT MATTER OF, OR THE TRANSACTIONS OR EVENTS GIVING RISE TO, ANY CLAIM OR INTEREST THAT IS TREATED IN THE PLAN, THE BUSINESS OR CONTRACTUAL ARRANGEMENTS OR INTERACTIONS BETWEEN ANY DEBTOR AND ANY RELEASED PARTY, THE**

RESTRUCTURING, THE RESTRUCTURING OF ANY CLAIMS OR INTERESTS BEFORE OR DURING THE CHAPTER 11 CASES, THE NEGOTIATION, FORMULATION, PREPARATION, OR CONSUMMATION OF THE PLAN, THE DOCUMENTS IN THE PLAN SUPPLEMENT, THE CREDIT BID PURCHASE AGREEMENT, THE EXIT FACILITY DOCUMENTS, THE APACHE DEFINITIVE DOCUMENTS, ANY ADDITIONAL PREDECESSOR AGREEMENT DOCUMENTS, THE FIRST LIEN EXIT FACILITY COMMITMENT LETTER, THE SECOND LIEN BACKSTOP COMMITMENT LETTER, THE EQUITY RIGHTS OFFERINGS, THE ERO BACKSTOP AGREEMENTS, THE DECOMMISSIONING AGREEMENT OR RELATED AGREEMENTS, INSTRUMENTS, OR OTHER DOCUMENTS, RELATING THERETO, OR THE SOLICITATION OF VOTES WITH RESPECT TO THE PLAN, IN ALL CASES BASED UPON ANY ACT OR OMISSION, TRANSACTION, AGREEMENT, EVENT, OR OTHER OCCURRENCES TAKING PLACE ON OR BEFORE THE EFFECTIVE DATE.

ENTRY OF THE CONFIRMATION ORDER BY THE BANKRUPTCY COURT SHALL CONSTITUTE THE BANKRUPTCY COURT'S APPROVAL, PURSUANT TO BANKRUPTCY RULE 9019, OF THE RELEASES IN SECTION 10.7(B) OF THE PLAN (THE "THIRD-PARTY RELEASE"), WHICH INCLUDES, BY REFERENCE, EACH OF THE RELATED PROVISIONS AND DEFINITIONS UNDER THE PLAN, AND, FURTHERMORE, SHALL CONSTITUTE THE BANKRUPTCY COURT'S FINDING THAT THE THIRD-PARTY RELEASE IS (I) CONSENSUAL, (II) ESSENTIAL TO THE CONFIRMATION OF THE PLAN, (III) GIVEN IN EXCHANGE FOR THE GOOD, VALUABLE AND ADEQUATE CONSIDERATION PROVIDED BY THE RELEASED PARTIES, (IV) A GOOD FAITH SETTLEMENT AND COMPROMISE OF THE CLAIMS RELEASED BY THE THIRD-PARTY RELEASE, (V) IN THE BEST INTERESTS OF THE DEBTORS AND THEIR ESTATES, (VI) FAIR, EQUITABLE AND REASONABLE, (VII) GIVEN AND MADE AFTER DUE NOTICE AND OPPORTUNITY FOR HEARING, AND (VIII) A BAR TO ANY OF THE RELEASING PARTIES ASSERTING ANY CLAIM OR CAUSE OF ACTION RELEASED PURSUANT TO THE THIRD-PARTY RELEASE.

NOTWITHSTANDING ANYTHING TO THE CONTRARY IN THIS SECTION 10.7(B) OF THE PLAN, NO PARTY SHALL BE RELEASED TO THE EXTENT SUCH RELEASE WOULD IMPAIR THE DECOMMISSIONING SECURITY OR THE APACHE PSA PARTIES' ABILITY TO DRAW ON THE DECOMMISSIONING SECURITY, IN ANY RESPECT. FOR THE AVOIDANCE OF DOUBT, ANY AND ALL CLAIMS THE APACHE PSA PARTIES MAY HAVE AGAINST FWE I RELATED TO THE DECOMMISSIONING AGREEMENT ARISING POST-EFFECTIVE DATE AND ANY SECURITY OBTAINED, PROVIDED, OR PLEDGED IN CONNECTION WITH THE DECOMMISSIONING AGREEMENT WILL BE PRESERVED AND ANY AND ALL CLAIMS FWE I MAY HAVE AGAINST THE APACHE PSA PARTIES RELATED TO THE DECOMMISSIONING AGREEMENT ARISING POST-EFFECTIVE DATE AND THE DECOMMISSIONING SECURITY WILL BE PRESERVED.

NOTWITHSTANDING ANYTHING TO THE CONTRARY, THE UNITED STATES IS NOT A RELEASING PARTY UNDER THE PLAN AND IS NOT PROVIDING A RELEASE.

(c) *Release of Liens*. Except as otherwise specifically provided in the Plan (including all Liens securing the FLFO Claims or the First Lien Exit Facility and all Liens securing the FLTL Claims that attach to the Credit Bid Acquired Interests and are deemed assigned to the Second Lien Exit Facility Agent upon the Effective Date to secure the obligations under the Second Lien Exit Facility) or in any contract, instrument, release, or other agreement or document contemplated under or executed in connection with the Plan, on the Effective Date and concurrently with the applicable distributions made pursuant to the Plan and, in the case of a Secured Claim, satisfaction in full of the portion of the Secured Claim that is secured and Allowed as of the Effective Date, all mortgages, deeds of trust, Liens, pledges, or other security interests against any property of the estates shall be fully released and discharged, and all of the right, title, and interest of any holder of such mortgages, deeds of trust, Liens, pledges, or other security interests shall revert to the Post-Effective Date Debtors and their successors and assigns, in each case, without any further approval or order of the Bankruptcy Court and without any action or filing being required to be made by the Debtors. For the avoidance of doubt, all liens and encumbrances on, interests in, and claims against the Legacy Apache Properties (as defined in the Apache Term Sheet) and the other FWE I Assets (as defined in Part A of Schedule I of the Initial Plan of Merger) held by the Prepetition FLFO Secured Parties, Prepetition FLTL Lenders, and Prepetition SLTL Lenders shall be released, discharged, and of no further force or effect as of the Effective Date.

(d) **RELEASES BY THE CUSA PARTIES OF THE CUSA RELEASE PARTIES**. AS OF THE EFFECTIVE DATE, EXCEPT FOR THE RIGHTS AND REMEDIES THAT REMAIN IN EFFECT FROM AND AFTER THE EFFECTIVE DATE TO ENFORCE THE PLAN, THE CONFIRMATION ORDER, THE OBLIGATIONS CONTEMPLATED BY THE DOCUMENTS IN THE PLAN SUPPLEMENT, THE CUSA DEFINITIVE DOCUMENTS, THE FIRST LIEN EXIT FACILITY COMMITMENT LETTER, THE CREDIT BID PURCHASE AGREEMENT, THE SECOND LIEN BACKSTOP COMMITMENT LETTER, THE EQUITY RIGHTS OFFERINGS, THE ERO BACKSTOP AGREEMENTS, THE EXIT FACILITY DOCUMENTS, AND THE RESTRUCTURING TRANSACTIONS, ON AND AFTER THE EFFECTIVE DATE, THE CUSA RELEASE PARTIES WILL BE DEEMED CONCLUSIVELY, ABSOLUTELY, UNCONDITIONALLY, IRREVOCABLY, AND FOREVER RELEASED AND DISCHARGED BY THE CUSA PARTIES, TO THE MAXIMUM EXTENT PERMITTED BY LAW, FROM ANY AND ALL CLAIMS AND CAUSES OF ACTION WHATSOEVER (INCLUDING ANY DERIVATIVE CLAIMS, ASSERTED OR ASSERTABLE ON BEHALF OF THE DEBTORS, THE POST-EFFECTIVE DATE DEBTORS OR THEIR ESTATES, INCLUDING ANY CAUSES OF ACTION ARISING UNDER CHAPTER 5 OF THE BANKRUPTCY CODE), WHETHER LIQUIDATED OR UNLIQUIDATED, FIXED OR CONTINGENT, MATURED OR UNMATURED, KNOWN OR UNKNOWN, FORESEEN OR UNFORESEEN, ASSERTED OR UNASSERTED, ACCRUED OR UNACCRUED, EXISTING OR HEREINAFTER ARISING, IN LAW, EQUITY, CONTRACT, TORT, OR OTHERWISE BY STATUTE, WHETHER ARISING UNDER

FEDERAL OR STATE, STATUTORY OR COMMON LAW, VIOLATIONS OF FEDERAL OR STATE SECURITIES LAWS, OR ANY OTHER APPLICABLE INTERNATIONAL, FOREIGN, OR DOMESTIC LAW, RULE STATUTE, REGULATION, TREATY, RIGHT, DUTY, REQUIREMENT OR OTHERWISE, THAT THE CUSA PARTIES, AFFILIATES, HEIRS, EXECUTORS, ADMINISTRATORS, SUCCESSORS, ASSIGNS, MANAGERS, ACCOUNTANTS, ATTORNEYS, REPRESENTATIVES, CONSULTANTS, AGENTS, AND ANY OTHER PERSONS CLAIMING UNDER OR THROUGH THEM WOULD HAVE BEEN LEGALLY ENTITLED TO ASSERT IN THEIR OWN RIGHT (WHETHER INDIVIDUALLY OR COLLECTIVELY) OR ON BEHALF OF THE HOLDER OF ANY CLAIM OR INTEREST OR OTHER PERSON, BASED ON OR RELATING TO, OR IN ANY MANNER ARISING FROM, IN WHOLE OR IN PART, THE DEBTORS, THE POST-EFFECTIVE DATE DEBTORS, OR THEIR ESTATES, THE CHAPTER 11 CASES, THE RESTRUCTURING, THE PURCHASE, SALE, OR RESCISSION OF THE PURCHASE OR SALE OF ANY SECURITY OF THE DEBTORS OR THE POST-EFFECTIVE DATE DEBTORS, THE SUBJECT MATTER OF, OR THE TRANSACTIONS OR EVENTS GIVING RISE TO, ANY CLAIM OR INTEREST THAT IS TREATED IN THE PLAN, THE BUSINESS OR CONTRACTUAL ARRANGEMENTS OR INTERACTIONS BETWEEN ANY DEBTOR AND ANY CUSA PARTY, THE RESTRUCTURING, THE RESTRUCTURING OF ANY CLAIMS OR INTERESTS BEFORE OR DURING THE CHAPTER 11 CASES, THE NEGOTIATION, FORMULATION, PREPARATION, OR CONSUMMATION OF THE PLAN, THE DOCUMENTS IN THE PLAN SUPPLEMENT, THE CREDIT BID PURCHASE AGREEMENT, THE EXIT FACILITY DOCUMENTS, THE FIRST LIEN EXIT FACILITY COMMITMENT LETTER, THE SECOND LIEN BACKSTOP COMMITMENT LETTER, THE EQUITY RIGHTS OFFERINGS, THE ERO BACKSTOP AGREEMENTS, OR RELATED AGREEMENTS, INSTRUMENTS, OR OTHER DOCUMENTS, RELATING THERETO, OR THE SOLICITATION OF VOTES WITH RESPECT TO THE PLAN, IN ALL CASES BASED UPON ANY ACT OR OMISSION, TRANSACTION, AGREEMENT, EVENT, OR OTHER OCCURRENCES TAKING PLACE ON OR BEFORE THE EFFECTIVE DATE.

ENTRY OF THE CONFIRMATION ORDER BY THE BANKRUPTCY COURT SHALL CONSTITUTE THE BANKRUPTCY COURT'S APPROVAL, PURSUANT TO BANKRUPTCY RULE 9019, OF THE RELEASES IN THIS SECTION 10.7(D) OF THE PLAN (THE "CUSA-PARTY RELEASE"), WHICH INCLUDES, BY REFERENCE, EACH OF THE RELATED PROVISIONS AND DEFINITIONS UNDER THE PLAN, AND, FURTHERMORE, SHALL CONSTITUTE THE BANKRUPTCY COURT'S FINDING THAT THE CUSA-PARTY RELEASE IS (I) CONSENSUAL, (II) ESSENTIAL TO THE CONFIRMATION OF THE PLAN, (III) GIVEN IN EXCHANGE FOR THE GOOD, VALUABLE AND ADEQUATE CONSIDERATION PROVIDED BY THE RELEASED PARTIES, (IV) A GOOD FAITH SETTLEMENT AND COMPROMISE OF THE CLAIMS RELEASED BY THE CUSA-PARTY RELEASE, (V) IN THE BEST INTERESTS OF THE DEBTORS AND THEIR ESTATES, (VI) FAIR, EQUITABLE AND REASONABLE, (VII) GIVEN AND MADE AFTER DUE NOTICE AND OPPORTUNITY FOR HEARING, AND (VIII) A BAR TO ANY OF THE CUSA PARTIES ASSERTING ANY CLAIM OR CAUSE OF ACTION RELEASED PURSUANT TO THE CUSA-PARTY RELEASE

      **(e)** **RELEASES BY THE CUSA RELEASE PARTIES OF THE CUSA PARTIES. AS OF THE EFFECTIVE DATE, EXCEPT FOR THE RIGHTS AND REMEDIES THAT REMAIN IN EFFECT FROM AND AFTER THE EFFECTIVE DATE TO ENFORCE THE PLAN, THE CONFIRMATION ORDER, THE OBLIGATIONS CONTEMPLATED BY THE DOCUMENTS IN THE PLAN SUPPLEMENT, THE CUSA DEFINITIVE DOCUMENTS, THE FIRST LIEN EXIT FACILITY COMMITMENT LETTER, THE CREDIT BID PURCHASE AGREEMENT, THE SECOND LIEN BACKSTOP COMMITMENT LETTER, THE EQUITY RIGHTS OFFERINGS, THE ERO BACKSTOP AGREEMENTS, THE EXIT FACILITY DOCUMENTS, AND THE RESTRUCTURING TRANSACTIONS, ON AND AFTER THE EFFECTIVE DATE, THE CUSA PARTIES WILL BE DEEMED CONCLUSIVELY, ABSOLUTELY, UNCONDITIONALLY, IRREVOCABLY, AND FOREVER RELEASED AND DISCHARGED BY THE CUSA RELEASE PARTIES, TO THE MAXIMUM EXTENT PERMITTED BY LAW, FROM ANY AND ALL CLAIMS AND CAUSES OF ACTION WHATSOEVER (INCLUDING ANY DERIVATIVE CLAIMS, ASSERTED OR ASSERTABLE ON BEHALF OF THE DEBTORS, THE POST-EFFECTIVE DATE DEBTORS, OR THEIR ESTATES, INCLUDING ANY CAUSES OF ACTION ARISING UNDER CHAPTER 5 OF THE BANKRUPTCY CODE), WHETHER LIQUIDATED OR UNLIQUIDATED, FIXED OR CONTINGENT, MATURED OR UNMATURED, KNOWN OR UNKNOWN, FORESEEN OR UNFORESEEN, ASSERTED OR UNASSERTED, ACCRUED OR UNACCRUED, EXISTING OR HEREINAFTER ARISING, IN LAW, EQUITY, CONTRACT, TORT, OR OTHERWISE BY STATUTE, WHETHER ARISING UNDER FEDERAL OR STATE, STATUTORY OR COMMON LAW, VIOLATIONS OF FEDERAL OR STATE SECURITIES LAWS, OR ANY OTHER APPLICABLE INTERNATIONAL, FOREIGN, OR DOMESTIC LAW, RULE STATUTE, REGULATION, TREATY, RIGHT, DUTY, REQUIREMENT OR OTHERWISE, THAT THE CUSA RELEASE PARTIES, AFFILIATES, HEIRS, EXECUTORS, ADMINISTRATORS, SUCCESSORS, ASSIGNS, MANAGERS, ACCOUNTANTS, ATTORNEYS, REPRESENTATIVES, CONSULTANTS, AGENTS, AND ANY OTHER PERSONS CLAIMING UNDER OR THROUGH THEM WOULD HAVE BEEN LEGALLY ENTITLED TO ASSERT IN THEIR OWN RIGHT (WHETHER INDIVIDUALLY OR COLLECTIVELY) OR ON BEHALF OF THE HOLDER OF ANY CLAIM OR INTEREST OR OTHER PERSON, BASED ON OR RELATING TO, OR IN ANY MANNER ARISING FROM, IN WHOLE OR IN PART, THE DEBTORS, THE POST-EFFECTIVE DATE DEBTORS, OR THEIR ESTATES, THE CHAPTER 11 CASES, THE RESTRUCTURING, THE PURCHASE, SALE, OR RESCISSION OF THE PURCHASE OR SALE OF ANY SECURITY OF THE DEBTORS, THE POST-EFFECTIVE DATE DEBTORS, THE SUBJECT MATTER OF, OR THE TRANSACTIONS OR EVENTS GIVING RISE TO, ANY CLAIM OR INTEREST THAT IS TREATED IN THE PLAN, THE BUSINESS OR CONTRACTUAL ARRANGEMENTS OR INTERACTIONS BETWEEN ANY DEBTOR AND ANY CUSA RELEASE PARTY, THE RESTRUCTURING, THE RESTRUCTURING OF ANY CLAIMS OR INTERESTS BEFORE OR DURING THE CHAPTER 11 CASES, THE NEGOTIATION, FORMULATION, PREPARATION, OR CONSUMMATION OF THE PLAN, THE DOCUMENTS IN THE PLAN SUPPLEMENT, THE EXIT FACILITY DOCUMENTS, THE CREDIT BID PURCHASE AGREEMENT, THE FIRST LIEN EXIT FACILITY**

COMMITMENT LETTER, THE SECOND LIEN BACKSTOP COMMITMENT LETTER, THE EQUITY RIGHTS OFFERINGS, THE ERO BACKSTOP AGREEMENTS, OR RELATED AGREEMENTS, INSTRUMENTS, OR OTHER DOCUMENTS, RELATING THERETO, OR THE SOLICITATION OF VOTES WITH RESPECT TO THE PLAN, IN ALL CASES BASED UPON ANY ACT OR OMISSION, TRANSACTION, AGREEMENT, EVENT, OR OTHER OCCURRENCES TAKING PLACE ON OR BEFORE THE EFFECTIVE DATE.

ENTRY OF THE CONFIRMATION ORDER BY THE BANKRUPTCY COURT SHALL CONSTITUTE THE BANKRUPTCY COURT'S APPROVAL, PURSUANT TO BANKRUPTCY RULE 9019, OF THE RELEASES IN SECTION 10.7(E) OF THE PLAN (THE "CUSA RELEASE-PARTY RELEASE"), WHICH INCLUDES, BY REFERENCE, EACH OF THE RELATED PROVISIONS AND DEFINITIONS UNDER THE PLAN, AND FURTHERMORE, SHALL CONSTITUTE THE BANKRUPTCY COURT'S FINDING THAT THE CUSA RELEASE-PARTY RELEASE IS (I) CONSENSUAL, (II) ESSENTIAL TO THE CONFIRMATION OF THE PLAN, (III) GIVEN IN EXCHANGE FOR THE GOOD, VALUABLE AND ADEQUATE CONSIDERATION PROVIDED BY THE RELEASED PARTIES, (IV) A GOOD FAITH SETTLEMENT AND COMPROMISE OF THE CLAIMS RELEASED BY THE CUSA RELEASE-PARTY RELEASE, (V) IN THE BEST INTERESTS OF THE DEBTORS AND THEIR ESTATES, (VI) FAIR, EQUITABLE AND REASONABLE, (VII) GIVEN AND MADE AFTER DUE NOTICE AND OPPORTUNITY FOR HEARING, AND (VIII) A BAR TO ANY OF THE CUSA PARTIES ASSERTING ANY CLAIM OR CAUSE OF ACTION RELEASED PURSUANT TO THE CUSA RELEASE-PARTY RELEASE.

### 10.8 *Exculpation.*

TO THE MAXIMUM EXTENT PERMITTED BY APPLICABLE LAW, EXCEPT FOR THE RIGHTS THAT REMAIN IN EFFECT FROM AND AFTER THE EFFECTIVE DATE TO ENFORCE THE PLAN, THE CONFIRMATION ORDER AND THE OBLIGATIONS CONTEMPLATED BY THE DOCUMENTS IN THE PLAN SUPPLEMENT, THE APACHE DEFINITIVE DOCUMENTS, ANY ADDITIONAL PREDECESSOR AGREEMENT DOCUMENTS, THE FIRST LIEN EXIT FACILITY COMMITMENT LETTER, THE CREDIT BID PURCHASE AGREEMENT, THE SECOND LIEN BACKSTOP COMMITMENT LETTER, THE EXIT FACILITY DOCUMENTS, THE EQUITY RIGHTS OFFERINGS, THE ERO BACKSTOP AGREEMENTS, AND THE RESTRUCTURING TRANSACTIONS, NO EXCULPATED PARTY WILL HAVE OR INCUR, AND EACH EXCULPATED PARTY WILL BE RELEASED AND EXCULPATED FROM, ANY CLAIM, OBLIGATION, SUIT, JUDGMENT, DAMAGE, DEMAND, DEBT, RIGHT, REMEDY LOSS, LIABILITY AND CAUSE OF ACTION IN CONNECTION WITH OR ARISING OUT OF THE ADMINISTRATION OF THE CHAPTER 11 CASES; THE NEGOTIATION AND PURSUIT OF THE DIP FACILITY, THE CREDIT BID PURCHASE AGREEMENT, THE NEW MONEY INVESTMENT, THE EXIT FACILITY DOCUMENTS, THE FIRST LIEN EXIT FACILITY COMMITMENT LETTER, THE SECOND LIEN BACKSTOP COMMITMENT LETTER, THE EQUITY RIGHTS OFFERINGS, THE ERO BACKSTOP AGREEMENTS, THE APACHE DEFINITIVE DOCUMENTS, ANY

ADDITIONAL PREDECESSOR AGREEMENT DOCUMENTS, THE DISCLOSURE STATEMENT, THE RESTRUCTURING, THE PLAN (INCLUDING THE PLAN SUPPLEMENT), AND ALL DOCUMENTS RELATING TO THE FOREGOING, OR THE SOLICITATION OF VOTES FOR, OR CONFIRMATION OF, THE PLAN; THE FUNDING OF THE PLAN; THE OCCURRENCE OF THE EFFECTIVE DATE; THE ADMINISTRATION OF THE PLAN OR THE PROPERTY TO BE DISTRIBUTED UNDER THE PLAN; THE ISSUANCE OF SECURITIES UNDER OR IN CONNECTION WITH THE PLAN; THE PURCHASE, SALE, OR RESCISSION OF THE PURCHASE OR SALE OF ANY SECURITY OF THE DEBTORS OR THE POST-EFFECTIVE DATE DEBTORS; OR THE TRANSACTIONS IN FURTHERANCE OF ANY OF THE FOREGOING; OTHER THAN CLAIMS OR CAUSES OF ACTION ARISING OUT OF OR RELATED TO ANY ACT OR OMISSION OF AN EXCULPATED PARTY THAT CONSTITUTES INTENTIONAL FRAUD, WILLFUL MISCONDUCT, OR GROSS NEGLIGENCE AS DETERMINED BY A FINAL ORDER, BUT IN ALL RESPECTS SUCH PERSONS WILL BE ENTITLED TO REASONABLY RELY UPON THE ADVICE OF COUNSEL WITH RESPECT TO THEIR DUTIES AND RESPONSIBILITIES PURSUANT TO THE PLAN. THE EXCULPATED PARTIES HAVE ACTED IN COMPLIANCE WITH THE APPLICABLE PROVISIONS OF THE BANKRUPTCY CODE WITH REGARD TO THE SOLICITATION OF THE PLAN AND, THEREFORE, ARE NOT, AND ON ACCOUNT OF SUCH DISTRIBUTIONS WILL NOT BE, LIABLE AT ANY TIME FOR THE VIOLATION OF ANY APPLICABLE LAW, RULE, OR REGULATION GOVERNING THE SOLICITATION OF ACCEPTANCES OR REJECTIONS OF THE PLAN OR SUCH DISTRIBUTIONS MADE PURSUANT TO THE PLAN. THE EXCULPATION WILL BE IN ADDITION TO, AND NOT IN LIMITATION OF, ALL OTHER RELEASES, INDEMNITIES, EXCULPATIONS, AND ANY OTHER APPLICABLE LAW OR RULES PROTECTING SUCH EXCULPATED PARTIES FROM LIABILITY. THE EXCULPATION SET FORTH IN THIS SECTION 10.8 WILL BE EFFECTIVE WITH RESPECT TO EACH OF THE EXCULPATED PARTIES, WITH THE SCOPE OF SUCH EXCULPATION, IN RESPECT OF THE TIME PERIOD OR ACTIONS COVERED, CONSTRUED IN ACCORDANCE WITH *IN RE PACIFIC LUMBER CO.*, 584 F.3D 229 (5TH CIR. 2009). THE COURT SHALL RETAIN EXCLUSIVE JURISDICTION TO DETERMINE THE SCOPE OF THE EXCULPATION.

### 10.9    *Injunction Related to Releases and Exculpation.*

The Confirmation Order shall permanently enjoin the commencement or prosecution by any Person or entity, whether directly, derivatively, or otherwise, of any Claims, obligations, suits, judgments, damages, demands, debts, rights, Causes of Action, losses, or liabilities released pursuant to the Plan, including the claims, obligations, suits, judgments, damages, demands, debts, rights, Causes of Action, and liabilities released or exculpated in the Plan or the Confirmation Order.

### 10.10    *Subordinated Securities Claims.*

The allowance, classification, and treatment of all Allowed Claims and Interests and the respective distributions and treatments thereof under the Plan take into account and conform to the relative priority and rights of the Claims and Interests in each Class in connection

with any contractual, legal, and equitable subordination rights relating thereto, whether arising under general principles of equitable subordination, sections 510(a), 510(b), or 510(c) of the Bankruptcy Code, or otherwise. Pursuant to section 510 of the Bankruptcy Code, the Debtors reserve the right to reclassify any Allowed Claim or Interest in accordance with any contractual, legal, or equitable subordination relating thereto.

### 10.11 *Retention of Causes of Action and Reservation of Rights.*

(a)     Except as otherwise provided in the DIP Order or Plan, including Sections 10.5, 10.6, 10.7, 10.8 and 10.9, nothing contained in the Plan or the Confirmation Order shall be deemed to be a waiver or relinquishment of any rights, claims, Causes of Action, rights of setoff or recoupment, or other legal or equitable defenses that the Debtors had immediately before the Effective Date on behalf of the Estates or of themselves in accordance with any provision of the Bankruptcy Code or any applicable nonbankruptcy law. The Post-Effective Date Debtors shall have, retain, reserve, and be entitled to assert all such claims, Causes of Action, rights of setoff or recoupment, and other legal or equitable defenses as fully as if the Chapter 11 Cases had not been commenced, and all of the Debtors' legal and equitable rights in respect of any Unimpaired Claim may be asserted after the Confirmation Date and Effective Date to the same extent as if the Chapter 11 Cases had not been commenced.

(b)     Notwithstanding Section 10.11(a), on the Effective Date, the Post-Effective Date Debtors shall be deemed to have released all preference actions pursuant to section 547 of the Bankruptcy Code against the holders of Unsecured Trade Claims and General Unsecured Claims (in each case, solely in their capacity as holders of Unsecured Trade Claims and General Unsecured Claims, as applicable).

### 10.12 *Ipso Facto and Similar Provisions Ineffective.*

Any term of any prepetition policy, prepetition contract, or other prepetition obligation applicable to a Debtor shall be void and of no further force or effect with respect to any Debtor to the extent that such policy, contract, or other obligation is conditioned on, creates an obligation of the Debtor as a result of, or gives rise to a right of any entity based on any of the following: (a) the insolvency or financial condition of a Debtor; (b) the commencement of the Chapter 11 Cases; (c) the confirmation or consummation of the Plan, including any change of control that shall occur as a result of such consummation; or (d) the Restructuring.

### 10.13 *Indemnification and Reimbursement Obligations.*

For purposes of the Plan, (a) Indemnification Obligations to current and former directors, officers, members, managers, agents or employees of any of the Debtors who served in such capacity before, on or subsequent to the Petition Date shall be assumed by the Post-Effective Date Debtors and (b) Indemnification Obligations of the Debtors arising from services as current and former directors, officers, members, managers, agents or employees of any of the Debtors who served in such capacity during the period from and after the Petition Date shall be Administrative Expense Claims. In addition, after the Effective Date, the Post-Effective Date Debtors shall not terminate or otherwise reduce the coverage under any current and former directors', officers', members', managers', agents' or employees' insurance policies (including any "tail policy") in

effect as of the Petition Date, and all current and former directors, officers, members, managers, agents or employees of any of the Debtors who served in such capacity at any time before the Effective Date shall be entitled to the full benefits of any such policy for the full term of such policy regardless of whether such members, managers, directors, and/or officers remain in such positions after the Effective Date to the extent set forth in such policies.

# ARTICLE XI.    RETENTION OF JURISDICTION.

## 11.1    *Retention of Jurisdiction.*

Pursuant to sections 105(c) and 1142 of the Bankruptcy Code and notwithstanding entry of the Confirmation Order and the occurrence of the Effective Date, on and after the Effective Date, the Bankruptcy Court shall retain exclusive jurisdiction, pursuant to 28 U.S.C. §§ 1334 and 157, over all matters arising in or related to the Chapter 11 Cases for, among other things, the following purposes:

(a)    to hear and determine motions and/or applications for the assumption or rejection of executory contracts or unexpired leases and any disputes over Cure Amounts resulting therefrom;

(b)    to determine any motion, adversary proceeding, application, contested matter, and other litigated matter pending on or commenced after the entry of the Confirmation Order;

(c)    to hear and resolve any disputes arising from or related to (i) any orders of the Bankruptcy Court granting relief under Bankruptcy Rule 2004 or (ii) any protective orders entered by the Bankruptcy Court in connection with the foregoing;

(d)    to ensure that distributions to holders of Allowed Claims are accomplished as provided in the Plan and the Confirmation Order and to adjudicate any and all disputes arising from or relating to distributions under the Plan;

(e)    to consider Claims or the allowance, classification, priority, compromise, estimation, or payment of any Claim, including any Administrative Expense Claim;

(f)    to enter, implement, or enforce such orders as may be appropriate in the event that the Confirmation Order is for any reason stayed, reversed, revoked, modified, or vacated;

(g)    to issue and enforce injunctions, enter and implement other orders, and take such other actions as may be necessary or appropriate to restrain interference by any Person or other Entity with the consummation, implementation, or enforcement of the Plan, the Confirmation Order, or any other order of the Bankruptcy Court;

(h)    to hear and determine any application to modify the Plan in accordance with section 1127 of the Bankruptcy Code to remedy any defect or omission or reconcile any

inconsistency in the Plan, the Disclosure Statement, or any order of the Bankruptcy Court, including the Confirmation Order, in such a manner as may be necessary to carry out the purposes and effects thereof;

        (i)     to hear and determine all Fee Claims;

        (j)     to resolve disputes concerning any reserves with respect to Disputed Claims or the administration thereof;

        (k)     to hear and determine disputes arising in connection with the interpretation, implementation, or enforcement of the Plan, the Confirmation Order, any transactions or payments in furtherance of either, or any agreement, instrument, or other document governing or related to any of the foregoing;

        (l)     to take any action and issue such orders, including any such action or orders as may be necessary after entry of the Confirmation Order or the occurrence of the Effective Date, as may be necessary to construe, enforce, implement, execute, and consummate the Plan, including any release, exculpation, or injunction provisions set forth in the Plan, following the occurrence of the Effective Date;

        (m)     to determine such other matters and for such other purposes as may be provided in the Confirmation Order;

        (n)     to hear and determine matters concerning state, local, and federal taxes in accordance with sections 346, 505, and 1146 of the Bankruptcy Code (including any requests for expedited determinations under section 505(b) of the Bankruptcy Code);

        (o)     to hear and determine any other matters related to the Chapter 11 Cases and not inconsistent with the Bankruptcy Code or title 28 of the United States Code;

        (p)     to resolve any disputes concerning whether a Person or entity had sufficient notice of the Chapter 11 Cases, the Disclosure Statement, any solicitation conducted in connection with the Chapter 11 Cases, any bar date established in the Chapter 11 Cases, or any deadline for responding or objecting to a Cure Amount, in each case, for the purpose for determining whether a Claim or Interest is discharged hereunder or for any other purpose;

        (q)     to hear and determine any rights, Claims, or Causes of Action held by or accruing to the Debtors pursuant to the Bankruptcy Code or pursuant to any federal statute or legal theory;

        (r)     to recover all Assets of the Debtors and property of the Estates, wherever located;

        (s)     to hear and determine matters related to the DIP Facility and the DIP Order; and

        (t)     to enter a final decree closing each of the Chapter 11 Cases.

Notwithstanding anything in this Article XI to the contrary, as of the Effective Date, the Exit Facility Documents and any other documents related thereto, including the New Intercreditor Agreement, shall be governed by the jurisdictional provisions therein and the Bankruptcy Court shall not retain jurisdiction with respect thereto.

# ARTICLE XII.     MISCELLANEOUS PROVISIONS.

## 12.1     *Payment of Statutory Fees*

On the Effective Date and thereafter as may be required, the Debtors or the Post-Effective Date Debtors, as applicable, shall pay all Statutory Fees that are due and payable, together with interest, if any, pursuant to § 3717 of title 31 of the United States Code for each Debtor's case.  The obligations under this Section 12.1 shall remain for each Debtor until such time as a final decree is entered closing the Chapter 11 Case for such Debtor, a Final Order converting such Debtor's Chapter 11 Case to a case under chapter 7 of the Bankruptcy Code is entered, or a Final Order dismissing such Debtor's Chapter 11 Case is entered.

## 12.2     *Exemption from Certain Transfer Taxes.*

Pursuant to and to the fullest extent permitted by section 1146 of the Bankruptcy Code, (a) the issuance, transfer or exchange of any securities, instruments or documents, (b) the creation of any Lien, mortgage, deed of trust or other security interest, (c) all sale transactions consummated by the Debtors and approved by the Bankruptcy Court on and after the Confirmation Date through and including the Effective Date, including any transfers effectuated under the Plan, (d) any assumption, assignment, or sale by the Debtors of their interests in unexpired leases of nonresidential real property or executory contracts pursuant to section 365(a) of the Bankruptcy Code, (e) the grant of collateral under the Standby Loan Agreement and (f) the issuance, renewal, modification or securing of indebtedness by such means, and the making, delivery or recording of any deed, mortgage or other instrument of transfer under, in furtherance of, or in connection with, the Plan, including the Confirmation Order, shall not be subject to any document recording tax, stamp tax, conveyance fee or other similar tax, mortgage tax, real estate transfer tax, mortgage recording tax, Uniform Commercial Code filing or recording fee, regulatory filing or recording fee, sales tax, use tax or other similar tax or governmental assessment.  Consistent with the foregoing, each recorder of deeds or similar official for any county, parish, city or Governmental Unit in which any instrument hereunder is to be recorded shall, pursuant to the Confirmation Order, be ordered and directed to accept such instrument without requiring the payment of any document recording tax, stamp tax, conveyance fee or other similar tax, mortgage tax, real estate transfer tax, mortgage recording tax, Uniform Commercial Code filing or recording fee, regulatory filing or recording fee, sales tax, use tax or other similar tax or governmental assessment.

## 12.3     *Request for Expedited Determination of Taxes.*

The Debtors shall have the right to request an expedited determination under section 505(b) of the Bankruptcy Code with respect to tax returns filed, or to be filed, for any and all taxable periods ending after the Petition Date through the Effective Date.

### 12.4 *Dates of Actions to Implement Plan.*

In the event that any payment or act under the Plan is required to be made or performed on a date that is not a Business Day, then the making of such payment or the performance of such act may be completed on or as soon as reasonably practicable after the next succeeding Business Day but shall be deemed to have been completed as of the required date.

### 12.5 *Amendments.*

(a) <u>Plan Modifications</u>. Subject to (i) the consent rights set forth in the Restructuring Support Agreement, (ii) the reasonable consent of the Creditors' Committee solely to the extent that it adversely impacts the holders of General Unsecured Claims or Unsecured Trade Claims and (iii) the reasonable consent of the Prepetition FLFO Administrative Agent, the Plan may be amended, modified, or supplemented by the Debtors in the manner provided for by section 1127 of the Bankruptcy Code or as otherwise permitted by law, without additional disclosure pursuant to section 1125 of the Bankruptcy Code, except as otherwise ordered by the Bankruptcy Court. In addition, after the Confirmation Date, so long as such action does not materially and adversely affect the treatment of holders of Allowed Claims pursuant to the Plan, the Debtors, with (i) the consent of the Required DIP Lenders, and the Requisite FLTL Lenders, (ii) the reasonable consent of the Creditors' Committee solely to the extent that it adversely impacts the holders of General Unsecured Claims or Unsecured Trade Claims, and (iii) the reasonable consent of the Prepetition FLFO Administrative Agent, may remedy any defect or omission or reconcile any inconsistencies in the Plan or the Confirmation Order with respect to such matters as may be necessary to carry out the purposes of effects of the Plan, and any holder of a Claim or Interest that has accepted the Plan shall be deemed to have accepted the Plan as amended, modified, or supplemented. The Debtors, subject to (i) the consent of the Required DIP Lenders and the Requisite FLTL Lenders and (ii) the applicable consent rights of the Prepetition FLFO Administrative Agent, shall have the right to amend the documents contained in, and exhibits to, the Plan Supplement in accordance with the terms of the Plan and the Restructuring Support Agreement or the First Lien Exit Facility Commitment Letter, as applicable, through the Effective Date.

(b) <u>Certain Technical Amendments</u>. Before the Effective Date, the Debtors, subject to the consent rights set forth in the Restructuring Support Agreement, may make appropriate technical adjustments and modifications to the Plan without further order or approval of the Bankruptcy Court.

### 12.6 *Revocation or Withdrawal of Plan.*

The Debtors reserve the right to revoke or withdraw the Plan before the Effective Date as to any or all of the Debtors. If, with respect to a Debtor, the Plan has been revoked or withdrawn before the Effective Date, or if the confirmation or the occurrence of the Effective Date as to such Debtor does not occur on the Effective Date, then, with respect to such Debtor: (a) the Plan shall be null and void in all respects; (b) any settlement or compromise embodied in the Plan (including the fixing or limiting to an amount any Claim or Interest or Class of Claims or Interests), assumption or rejection of executory contracts or unexpired leases affected by the Plan, and any document or agreement executed pursuant to the Plan shall be deemed null and void; and

(c) nothing contained in the Plan shall (i) constitute a waiver or release of any Claim by or against, or any Interest in, such Debtor or any other Person; (ii) prejudice in any manner the rights of such Debtor or any other Person; or (iii) constitute an admission of any sort by any Debtor or any other Person.

### 12.7 *Severability.*

If, before the entry of the Confirmation Order, any term or provision of the Plan is held by the Bankruptcy Court to be invalid, void, or unenforceable, the Bankruptcy Court, at the request of the Debtors shall have the power to alter and interpret such term or provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void, or unenforceable, and such term or provision shall then be applicable as altered or interpreted. Notwithstanding any such holding, alteration, or interpretation by the Bankruptcy Court, the remainder of the terms and provisions of the Plan shall remain in full force and effect and shall in no way be affected, impaired, or invalidated by such holding, alteration, or interpretation. The Confirmation Order shall constitute a judicial determination and shall provide that each term and provision of the Plan, as it may have been altered or interpreted in accordance with this section, is (a) valid and enforceable pursuant to its terms, (b) integral to the Plan and may not be deleted or modified without the consent of the Debtors or the Post-Effective Date Debtors (as the case may be) and (c) nonseverable and mutually dependent.

### 12.8 *Governing Law.*

Except to the extent that the Bankruptcy Code or other federal law is applicable or to the extent that a Plan Supplement document provides otherwise, the rights, duties, and obligations arising under the Plan shall be governed by, and construed and enforced in accordance with, the internal laws of the State of Texas, without giving effect to the principles of conflicts of laws thereof.

### 12.9 *Immediate Binding Effect.*

Notwithstanding Bankruptcy Rules 3020(e), 6004(h), 7062, or otherwise, upon the occurrence of the Effective Date, the terms of the Plan shall be immediately effective and enforceable and deemed binding upon and inure to the benefit of the Debtors, the Post-Effective Date Debtors, the holders of Claims and Interests, the Released Parties, and each of their respective successors and assigns.

### 12.10 *Successors and Assigns.*

The rights, benefits, and obligations of any Person named or referred to in the Plan shall be binding on and shall inure to the benefit of any heir, executor, administrator, successor, or permitted assign, if any, of each such Person.

### 12.11 *Entire Agreement.*

On the Effective Date, the Plan, the Plan Supplement, and the Confirmation Order shall supersede all previous and contemporaneous negotiations, promises, covenants, agreements,

understandings, and representations on such subjects, all of which have become merged and integrated into the Plan.

### 12.12 *Computing Time.*

In computing any period of time prescribed or allowed by the Plan, unless otherwise set forth in the Plan or determined by the Bankruptcy Court, the provisions of Bankruptcy Rule 9006 shall apply.

### 12.13 *Exhibits to Plan.*

All exhibits, schedules, supplements, and appendices to the Plan (including any other documents to be executed, delivered, assumed, or performed in connection with the occurrence of the Effective Date) are incorporated into and are a part of the Plan as if set forth in full in the Plan.

### 12.14 *Notices.*

All notices, requests, and demands hereunder shall be in writing (including by facsimile or email transmission) and, unless otherwise provided herein, shall be deemed to have been duly given or made only when actually delivered or, in the case of notice by facsimile transmission, when received and telephonically confirmed, addressed as follows:

(a) If to the Debtors:

Fieldwood Energy LLC
2000 W. Sam Houston Parkway, S. Suite 1200
Houston, Texas 77042
Attention: Michael Dane and Thomas R. Lamme

– and –

WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Attn: Matthew S. Barr, Esq., Alfredo R. Pérez, Esq., and Jessica Liou, Esq.
Telephone: (212) 310-8000
Facsimile: (212) 310-8007

*Attorneys for the Debtors*

(b) If to the DIP Lenders or FLTL Lenders:

DAVIS POLK & WARDWELL LLP
450 Lexington Avenue
New York, NY 10017
Attn: Damian Schaible, Esq. and Natasha Tsiouris, Esq.
Telephone: (212) 450-4000

Facsimile: (212) 701-5800

(c)      If to the Post-Effective Date Debtors:

David M. Dunn (if appointed as Plan Administrator on the Effective Date)
Province, LLC
700 Canal Street, Suite 12E
Stamford, CT 06902
Email: ddunn@provincefirm.com
Phone: (702) 849-1271

– and –

MINTZ LEVIN COHN FERRIS GLOVSKY & POPEO, PC
3580 Carmel Mountain Road, Suite 300
San Diego, California 92130
Attn: Joseph R. Dunn, Esq., Abigail V. O'Brient, Esq.
Telephone: (858) 314-1500
Facsimile: (858) 314-1501

*Attorneys for Post-Effective Date Debtors*

A notice is deemed to be given and received (a) if sent by first-class mail, personal delivery, or courier, on the date of delivery if it is a Business Day and the delivery was made before 4:00 p.m. (local time in place of receipt) and otherwise on the next Business Day, or (b) if sent by electronic mail, when the sender receives an email from the recipient acknowledging receipt; *provided* that an automatic "read receipt" does not constitute acknowledgment of an email for purposes of this Section.  Any party may change its address for service from time to time by providing a notice in accordance with the foregoing.  Any element of a party's address that is not specifically changed in a notice will be assumed not to be changed.

After the occurrence of the Effective Date, the Post-Effective Date Debtors and Plan Administrator have authority to send a notice to entities that to continue to receive documents pursuant to Bankruptcy Rule 2002, such entities must file a renewed request to receive documents pursuant to Bankruptcy Rule 2002; *provided*, that the U.S. Trustee need not file such a renewed request and shall continue to receive documents without any further action being necessary.  After the occurrence of the Effective Date, the Post-Effective Date Debtors are authorized to limit the list of entities receiving documents pursuant to Bankruptcy Rule 2002 to the U.S. Trustee and those entities that have filed such renewed requests.

## 12.15   *Reservation of Rights.*

Except as otherwise provided herein, the Plan shall be of no force or effect unless the Bankruptcy Court enters the Confirmation Order.  None of the filing of the Plan, any statement or provision of the Plan, or the taking of any action by the Debtors with respect to the Plan shall be or shall be deemed to be an admission or waiver of any rights of (a) the Debtors with respect to

any Claims or Interests before the Effective Date or (b) any holder of a Claim or Interest or other entity before the Effective Date.

### 12.16   *Dissolution of Creditors' Committee.*

On the Effective Date, the Creditors' Committee shall dissolve, and the members thereof shall be released and discharged from all rights and duties arising from, or related to, the Chapter 11 Cases, provided that following the Effective Date, the Creditors' Committee shall continue in existence and have standing and a right to be heard for the following limited purposes: (a) Claims and/or applications, and any relief related thereto, for compensation by Professional Persons retained in the Chapter 11 Cases pursuant to sections 327, 328, 329, 330, 331, 503(b), or 1103 of the Bankruptcy Code and requests for allowance of Administrative Expense Claims for substantial contribution pursuant to section 503(b)(3)(D) of the Bankruptcy Code; and (b) any appeals of the Confirmation Order or other appeals to which the Creditors' Committee is a party.

*[Remainder of Page Intentionally Left Blank]*

Dated: June 25, 2021
      Houston, Texas

Respectfully submitted,

**FIELDWOOD ENERGY LLC**

By: Fieldwood Energy Inc., its managing member

By: _Thomas R. Lamme_
Name:  Thomas R. Lamme
Title:    Senior Vice President and General Counsel

**FIELDWOOD ENERGY INC.**

By: _Thomas R. Lamme_
Name:  Thomas R. Lamme
Title:    Senior Vice President and General Counsel

**FIELDWOOD ENERGY OFFSHORE LLC**

By: _Thomas R. Lamme_
Name:  Thomas R. Lamme
Title:    Vice President

**FIELDWOOD ONSHORE LLC**

By: _Thomas R. Lamme_
Name:  Thomas R. Lamme
Title:    Vice President

**FIELDWOOD SD OFFSHORE LLC**

By: _Thomas R. Lamme_
Name:  Thomas R. Lamme
Title:    Vice President

*[Signature Page to Eighth Amended Joint Chapter 11 Plan of Fieldwood Energy LLC and its Affiliated Debtors]*

**FIELDWOOD OFFSHORE LLC**

By: Fieldwood Energy LLC, its managing member

By: Fieldwood Energy Inc., its managing member

By: _____
Name:  Thomas R. Lamme
Title:    Senior Vice President and General Counsel

**DYNAMIC OFFSHORE RESOURCES NS, LLC**

By: _____
Name:  Thomas R. Lamme
Title:    Vice President

**FW GOM PIPELINE, INC.**

By: _____
Name:  Thomas R. Lamme
Title:    Vice President

**GOM SHELF LLC**

By: Fieldwood Energy LLC, its managing member

By: Fieldwood Energy Inc., it managing member

By: _____
Name:  Thomas R. Lamme
Title:    Senior Vice President and General Counsel

**BANDON OIL AND GAS GP, LLC**

By: _____
Name:  Thomas R. Lamme
Title:    Vice President

**BANDON OIL AND GAS, LP**

By: Bandon Oil and Gas, LLC, its general partner

By: _Thomas R. Lamme_
Name:  Thomas R. Lamme
Title:   Vice President

**FIELDWOOD ENERGY SP LLC**

By: _Thomas R. Lamme_
Name:  Thomas R. Lamme
Title:   Vice President

**GALVESTON BAY PIPELINE LLC**

By: Fieldwood Onshore LLC, its managing member

By: _Thomas R. Lamme_
Name:  Thomas R. Lamme
Title:   Vice President

**GALVESTON BAY PROCESSING LLC**

By: Fieldwood Onshore LLC, its managing member

By: _Thomas R. Lamme_
Name:  Thomas R. Lamme
Title:   Vice President

## Exhibit A

Transition Services

Commencing on the Effective Date, and continuing for the duration of the Transition Period, FWE III will undertake certain safekeeping and monitoring of the facilities, pipelines, and wells on the Specified Abandoned Properties, consisting of:

- The work identified on the agreed activities schedule attached hereto as **Schedule 1** (the "**Agreed Activities**");
- Ensuring safe access and egress to the Specified Abandoned Properties;
- Ensuring the navigation aids are operational at the Specified Abandoned Properties;
- Periodic and regular visual inspection to monitor the condition of the wells and offshore infrastructure on the Specified Abandoned Properties, in accordance with applicable regulations;
- Keeping the Government informed of the condition of the wells and offshore infrastructure on the Specified Abandoned Properties; and
- Maintaining spill readiness capabilities at the Specified Abandoned Properties.

In addition, FWE III will coordinate with the applicable BSEE or BOEM offices to:

- <u>Office of Safety Management</u>: Ensure proper Safety and Environmental Management Systems (SEMS) coverage for the Specified Abandoned Properties.
- Ensure proper Oil Spill Response Plan (OSRP) coverage is maintained for the Specified Abandoned Properties.
- Ensure proper Oil Spill Financial Responsibility (OSFR) is demonstrated for the Specified Abandoned Properties.
- Ensure that all received Inspection Fees for the Specified Abandoned Properties are paid.

**Schedule 1 to Exhibit A**

Agreed Activities

FWE III will monitor, inspect, and test components on the applicable Specified Abandoned Properties in accordance with the underlying requirements that govern the monitoring of any platforms, facilities, wells and pipelines, and further subject to the ability to safely egress or otherwise access the facilities.

- Will maintain egress to the facilities.
- Pollution inspections will be conducted for each abandoned manned and unmanned facility.
- Firefighting and lifesaving equipment will be inspected on a monthly basis, and as required annually.
- Navigational-aid and fog horn inspections will be conducted monthly and annually as required.
- Monthly 14C testing will be conducted as required depending on the status of the facility.
- Annual PSV, Stack Arrestor, and Flame Arrestor inspections will be conducted on an annual basis until the equipment is rendered inert.
- Monthly casing pressure check will be conducted and documented as required.
- SSSV inspections will be conducted as required.
- For producing wells, well tests will be conducted as required and documented accordingly.
- Active pipelines containing hydrocarbons will be inspected and maintained as required.
- If produced water is discharged, monthly samples will be taken and analyzed accordingly.
- Annual toxicity test will be taken on any facility that discharges produced water overboard.
- Variance and incidence of non-compliance extensions will be requested and documented accordingly by the compliance coordinators.
- If the facility has power generation, quarterly fire and gas detection inspections will be conducted as required.
- If applicable, facility meter proving and calibrations will be conducted as required.

## **Exhibit B**

Excluded Events

FWE III will not be responsible for the non-performance or delayed performance of the Transition Services or for taking any action or remedying any condition to the extent caused, in whole or in part, by any of the following and will not be responsible for any order or penalty for violations arising under OCSLA and its regulations arising out of the non-performance or delayed performance of the Transition Service or any cost and expense arising out of any of the following:

- adverse weather or sea conditions, loop currents, acts of God (including, but not limited to, hurricanes or other named windstorm events or other events of force majeure), fire, a terrorist act, civil disturbance, war, third party malfeasance, loss of well control, environmental catastrophe, strikes, labor disputes, and other events beyond the control of FWE III;

- any delay in the timely delivery of required permits and authorizations from federal agencies beyond the control of FW III;

- the inability to obtain the necessary labor or materials for reasons beyond the control of FW III;

- a change in the operational status of any offshore well, pipeline, or property whether due to a casualty event, windstorm event, or otherwise; or

- a change in the bonding or financial assurance regulations or law.

**Exhibit B**

Apache-Surety Term Sheet

# ***CONFIDENTIAL SETTLEMENT COMMUNICATION – FRE 408***

## Proposed FWE I Term Sheet – Between Debtors, Apache, and the Apache Sureties

*This Term Sheet constitutes a "Definitive Document" under the Restructuring Support Agreement (as defined in the Plan (as defined below)) and is subject to the consent rights set forth therein. Except as provided for herein, each party is responsible for its own costs and expenses, including those of its legal advisors in conjunction with this Term Sheet.[1]*

| Definitions | Description |
|---|---|
| | <ul><li>Apache Corporation ("**Apache**")</li><li>Credit Bid Purchaser as defined in the Plan ("**Credit Bid Purchaser**")</li><li>Zurich American Insurance Company ("**Zurich**")</li><li>Everest Reinsurance Company ("**Everest**")</li><li>HCC International Insurance Company ("**HCCI**")</li><li>Philadelphia Indemnity Insurance Company ("**Philadelphia**" and together with Zurich, Everest and HCCI, the "**Apache Sureties**") and each an "**Apache Surety**")</li><li>Any amounts for premiums accrued post-Effective Date to the Apache Sureties under the applicable surety bonds issued under or in relation to the Decommissioning Agreement (the "**Apache Surety Bonds**") and/or general indemnity agreements related to the Apache Surety Bonds (the "**General Indemnity Agreements**") (the "**FWE I Premium Claims**").</li><li>Any amounts for Letter of Credit ("**L/C**") fees accrued post-Effective Date pursuant to all Letters of Credit from Deutsche Bank for which there are Apache Surety Bonds ("**L/C Fees**").</li><li>Any indemnification claims arising under the General Indemnity Agreements (the "**FWE I Indemnification Claims**" and, together with the FWE I Premium Claims, the "**FWE I Surety Claims**").</li></ul> |
| **Surety Representative** | Description |
| | A representative shall be selected by the Apache Sureties (the "**Surety Representative**") through an Inter-Surety Agreement that shall govern the rights and relationships of the Apache Sureties. The Surety Representative shall represent the rights of the Apache Sureties, as selected in the Inter-Surety Agreement, with respect to all collective rights granted under the Term Sheet. |
| | |
| **Treatment of the FWE I Premium Claims and L/C Fees** | Description |

---

[1] Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the *Fifth Amended Joint Chapter 11 Plan of Fieldwood Energy LLC and Its Affiliated Debtors* dated June 16, 2021 filed at ECF No. 1629 (including any exhibits and schedules thereto and as may be further amended, supplemented, or modified, the "**Plan**") or the Limited Liability Company Agreement of Fieldwood Energy I LLC filed at Docket No. _____ Exhibit _____ at Ex. _____ (the "**FWE I LLC Agreement**"), as applicable.

| | FWE I shall not be required to borrow $45MM to satisfy any Cure Amount on account of the Decommissioning Agreement, and Apache shall not be required to make such loan for such purpose, with the resulting savings in annual interest being applied toward the following settlement: |
|---|---|
| | FWE I will owe $6.25MM per annum on account of the FWE I Premium Claims, payable in semi-annual installments starting 60 days after the Effective Date. |
| | On each anniversary of the Effective Date, to the extent that (1) all yearly obligations under the Decommissioning Agreement have been satisfied, and (2) FWE I has "Free Cash Flow"[2] of $20MM or more (collectively, the "**Incremental Premium Payment Conditions**"), FWE I shall owe the Apache Sureties an additional payment of $2.75MM per annum (or such lesser amount after determining available "Free Cash Flow") on account of the FWE I Premium Claims and L/C Fees (the "**Incremental Premium Payment**"). If the Incremental Premium Payment Conditions are not met on each anniversary of the Effective Date, the Incremental Premium Payment, if not otherwise payable from available "Free Cash Flow," shall accrue and become due and payable as provided for and pursuant to the terms of the SSPA (as defined herein). |
| | _Example_**:** Effective Date is July 15, 2021. FWE I shall pay Apache Sureties $3,125,000 on September 15, 2021 and $3,125,000 on March 15, 2022. FWE I shall also pay Apache Sureties $2.75MM on July 15, 2022 if the above conditions are met. |
| | The FWE I Premium Claims shall not exceed $12MM per annum. |
| | All payment of premiums shall be suspended upon the first draw by Apache under the Apache Surety Bonds. After such suspension, all FWE I Premium Claims shall accrue and become payable as a subordinated FWE I Indemnification Claim under the SSPA, it being the intent and understanding of the parties that FWE I shall not be required, and Apache shall not be obligated to fund a draw, under the Standby Facility to pay any premiums. Notwithstanding the foregoing, if following a draw upon the Apache Surety Bonds, FWE I is able to resume funding of its decommissioning obligations under the Decommissioning Agreement, and after all monetary defaults have been cured, including without limitation any obligation to deposit monies into Trust A, the Apache Surety Bond's rights to premium payments shall be reinstated under the conditions provided for herein. |
| | Any applicable Apache Surety may pay to renew any L/C or replace any L/C pursuant to the standards as set forth in the Decommissioning Agreement. |
| | |
| **Farm-In Rights** | |

---

[2] As such term is defined in the Standby Loan Facility.

| | Commencing with the second anniversary of the Effective Date, the Apache Sureties will have the right in the form of an option ("**Farm-In Option**") to farm in to FWE I new wells and recompletions on exactly the same terms as Credit Bid Purchaser according to the *Farmout Agreement*, except that the 50% profit share of the Apache Sureties (after Apache Sureties have recovered 100% of their capital investment in the project) will go first to pay any accrued but unpaid Incremental Premium Payments and the remainder of the Apache Sureties' 50% profit share will be deposited into Trust A in order to defer and potentially mitigate draws under Apache Surety Bonds and L/Cs. |
|---|---|
| | |
| **Information Sharing Agreements** | **Description** |
| | Surety Representative shall have the follow information sharing rights:<br>• *Financial Statements*– The Surety Representative shall have the same access rights as Apache as set forth in the FWE I LLC Agreement with respect to financial information.<br>• *Inspection Rights and other information* - The Surety Representative shall have the same inspection rights as Apache to inspect documents and seek other information as set forth in the FWE I LLC Agreement.<br>• *Farm-In Information Rights* - The Surety Representative shall receive from Credit Bid Purchaser summaries of any proposal made by Credit Bid Purchaser during the initial two-year term under the Farmout Agreement. The sureties may engage Credit Bid Purchaser on terms acceptable to Credit Bid Purchaser, in its sole discretion, at any time to assist the Apache Sureties upon their exercising the Farm-In Option. Otherwise, Credit Bid Purchase has no obligation to provide any information relating to operations or opportunities available under the Farm-In Option. FWE I shall provide the Surety Representative information reasonably requested in terms of scope and timelines necessary to understand any and all operations and opportunities that may be afforded under the Farm-In Option for future use and adoption.<br>• The Surety Representative shall be permitted to share all information obtained in this section with the Apache Sureties, subject to third-party contractual limitations, if any, and all reasonably and necessary confidentiality that may be required. |
| **Subordination, Subrogation and Payment Agreement** | **Description** |
| | A *Subrogation, Subordination and Payment Agreement* ("**SSPA**") shall be entered into under which the Apache Sureties' FWE I Indemnification Claims will be contractually subordinated to Apache's claims under the Decommissioning Agreement and receive the benefits of Apache's liens under the Mortgages and all other security interests, the Apache Sureties' rights, contractual and otherwise, to be subordinated to Apache as follows: Apache must be paid in full before the Apache Sureties will pursue any right to payment from FWE I with respect to its contractual |

| | |
|---|---|
| | rights of subrogation created herein, or any theory of common law rights of subrogation or indemnity, nor will the Apache Sureties have any rights to the collateral which secures FWE I's obligations to Apache under the Decommissioning Agreement or any proceeds thereof until after decommissioning under the Decommissioning Agreement is complete. The Apache Sureties will not exercise any remedies with respect to FWE I until all obligations to Apache under the Decommissioning Agreement and the Standby Facility have been satisfied. |
| | The SSPA shall provide that the FWE I Premium Claims shall not be subordinated and notwithstanding the paragraph above, the Apache Sureties may fully pursue recovery of the $6.25MM and the $2.75MM then currently due, subject to the following: (i) the Apache Sureties cannot challenge any liens granted by FWE I to Apache on assets that may have otherwise been available to satisfy the FWE I Premium Claims and (ii) the Apache Sureties will have no defense as to payment on the Apache Surety Bonds as a result of FWE I's failure to pay the FWE I Premium Claims. |
| | Any deferred Incremental Premium Payments shall be paid first through available "Free Cash Flow" in the subsequent year(s) and, if the Farm-In Option is elected, also pursuant to any available funds pursuant to the Farm-Out Agreement. |
| | The Apache Sureties' Farm-In rights and informational rights as outlined herein will also be further memorialized in the SSPA. |
| | |
| **Support of the Plan and Release of Claims** | |
| | In connection with the execution of this Term Sheet or promptly thereafter, the Apache Sureties agree to (i) announce to the Bankruptcy Court the terms of this Term Sheet and withdraw any pending objections they have filed to the Plan; (ii) not file any further objections to the Plan; (iii) support and take all actions reasonably necessary or reasonably requested by the Debtors to support incorporation of this Term Sheet into confirmation of the Plan; and (iv) not support any party in objecting to or opposing the Plan. |
| | The Apache Sureties agree that the Debtors and Apache are permitted to agree to an alternative cure to satisfy the existing defaults under the Decommissioning Agreement. Specifically, the defaults Apache asserts were caused by the Debtors' alleged failure to meet the Required Spend in 2020 and the Audit Claim, both as further detailed in Apache's proofs of claim, may be satisfied by the settlement between the Debtors and Apache contained within the Plan, the Confirmation Order, and this Term Sheet and the Apache Sureties will have no claim that Apache or any other party has impaired the Apache Sureties' subrogation rights or otherwise prejudiced the Apache Sureties' in any respect. |
| | Notwithstanding anything set forth herein to the contrary, each of the Apache Sureties agrees to be a "Releasing Party" bound by the releases |

| | set forth in section 10.7 of the Plan. For the avoidance of doubt, any defense to payment under the bonds and Letters of Credit existing as of the Effective Date will be released by the Apache Sureties. Further, nothing herein will release any claims of the parties hereto that arise post-Effective Date, including the rights of the Apache Sureties and Apache under the Apache Surety Bonds and Letters of Credit. |
| | The Debtors, the Required DIP Lenders and Requisite FLTL Lenders will fully and finally release the Apache Sureties of any and all claims existing as of the Effective Date, and only to the extent such releases do not impair the Decommissioning Security, or Apache's ability to draw on the Decommissioning Security in any respect. The NewCo Entities shall not assume any liabilities or obligations under this Term Sheet other than the information rights. |
| | A condition precedent to the effectiveness of this settlement and agreement is that the Plan shall be confirmed and the Confirmation Order (as defined herein) shall contain findings of fact and conclusions of law consistent with the findings and conclusions requested by Apache in accordance with their rights under the Implementation Agreement. |
| **Adversary Proceedings** | **Description** |
| | The Apache Sureties shall stipulate that as of the Effective Date, all claims against the Debtors and Apache, including those asserted by the Apache Sureties and described in the Debtors' Complaint filed at Docket No. 1 in Adversary Proceeding Case No. 21-3418 in the Bankruptcy Court ("**Adversary Proceeding**") shall be released. The Adversary Proceeding shall be dismissed with prejudice. |

*All disputes not set forth herein, or as set forth in any revised Term Sheet between the parties that shall be attached to the order confirming the Plan (the "**Confirmation Order**") or in the SSPA or Farm-In Option shall be resolved before the Bankruptcy Court, with all necessary powers to interpret and implement the Confirmation Order and the Plan, including the settlements set forth therein. After the closing of the Chapter 11 Cases, the parties agree that any disputes relating to this Term Sheet, the SSPA, or the Farm-In Option will be resolved in either the state or federal courts in Harris County, Texas.

** This Term Sheet and the resolution set forth herein is without admission of liability by any party. All rights not expressly defined herein are reserved.

/s/ for Apache Sureties, Apache and Debtors.