1            IN THE UNITED STATES BANKRUPTCY COURT

2            FOR THE SOUTHERN DISTRICT OF TEXAS

3                    HOUSTON DIVISION

4    IN RE:                    §      CASE NO. 20-33948-11
                               §      JOINTLY ADMINISTERED
5                              §      HOUSTON, TEXAS
     FIELDWOOD ENERGY, LLC,    §      THURSDAY,
6                              §      JUNE 24, 2021
              DEBTOR.          §      1:30 P.M. TO 3:50 P.M.

7

8            CONFIRMATION HEARING DAY FOUR (VIA ZOOM)

9            BEFORE THE HONORABLE MARVIN ISGUR
                UNITED STATES BANKRUPTCY JUDGE

10

11

12

         APPEARANCES:                 SEE NEXT PAGE

13

14

15       (Recorded via CourtSpeak; no log notes)

16

17

18

19

20              TRANSCRIPTION SERVICE BY:

21       JUDICIAL TRANSCRIBERS OF TEXAS, LLC
              935 Eldridge Road, #144
22              Sugar Land, TX 77478
                  281-277-5325
23           www.judicialtranscribers.com

24

25    Proceedings recorded by electronic sound recording;
        transcript produced by transcription service.


                  JUDICIAL TRANSCRIBERS OF TEXAS, LLC

<pre>
 1                        APPEARANCES (VIA ZOOM):

 2

 3   FOR THE DEBTOR:              WEIL GOTSHAL & MANGES, LLP
                                  Clifford W. Carlson, Esq.
 4                                Alfredo Perez, Esq.
                                  700 Louisiana
 5                                Suite 1700
                                  Houston, TX  77002
 6                                713-546-5040

 7                                WEIL GOTSHAL & MANGES, LLP
                                  Jessica Liou, Esq.
 8                                767 Fifth Avenue
                                  New York, NY 10153
 9                                212-310-8817

10

     FOR RLI INSURANCE GROUP:     KREBS FARLEY & DRY, PLLC
11                                Elliot Scharfenberg, Esq.
                                  400 Poydras, Suite 2500
12                                New Orleans, LA  70130
                                  504-299-3570
13

     FOR MCMORAN OIL AND GAS:     LOCKE LORD, LLP
14                                Omer Keubel, Esq.
                                  601 Poydras Street
15                                Suite 2660
                                  New Orleans, LA  70130
16                                504-558-5155

17   FOR ANADARKO PETROLEUM:      NORTON ROSE FULBRIGHT
                                  William R. Greendyke, Esq.
18                                1301 McKinney
                                  Suite 5100
19                                Houston, TX  77010
                                  713-651-5216
20
     FOR ECOPETROL AMERICA LLC    SQUIRE PATTON BOGGS
21                                Kelly Singer, Esq.
                                  1 East Washington Street
22                                Suite 2700
                                  Phoenix, AZ  85004
23                                602-528-4000

24

25
</pre>

```
 1                 APPEARANCES (VIA ZOOM - CONT'D):

 2

 3   FOR WESTERNGECO LLC AND        GIEGER LABORDER & LAPEROUSE
     TGS-NOPEC:                     John Baay, Esq.
 4                                  701 Poydras St.
                                    Suite 4800
 5                                  New Orleans, LA  70139
                                    504-561-0400
 6
     FOR VALERO MARKETING           DYKEMA GOSSETT
 7   AND SUPPLY COMPANY:            Deborah D. Williamson, Esq.
                                    112 E. Pecan
 8                                  Suite 1800
                                    San Antonio, TX  78205
 9                                  210-554-5528

10   FOR ENERGY TRANSFER:           KATTEN MUCHIN ROSENMAN, LLP
                                    Yelena Archiyan, Esq.
11                                  221 North Pearl Street
                                    Suite 1100
12                                  Dallas, TX  75201
                                    214-765-3600
13
     FOR COX OIL:                   LOCKE LORD, LLP
14                                  Michael B. Kind, Esq.
                                    111 South Wacker Drive
15                                  Suite 4100
                                    Chicago, IL  60606
16                                  312-201-2392

17   FOR MARITIME CLAIMANTS:        Mr. Williams

18   FOR RAILROAD COMMISSION
     OF TEXAS:                      THE ATTORNEY GENERAL OF TEXAS
19                                  Abigail Ryan, Esq.
                                    300 West 15th Street
20                                  Austin, TX  78701
                                    512-475-4936
21
     FOR ZURICH AMERICAN INS.:      CLARK HILL STRASBURG
22                                  Duane Brescia, Esq.
                                    720 Brazos Street
23                                  Suite 700
                                    Austin, TX  78701
24                                  512-499-3600

25
```

```
 1                     APPEARANCES (VIA ZOOM - CONT'D):

 2   FOR APACHE CORPORATION:        HUNTON ANDREWS KURTH, LLP
                                    Robin Russell, Esq.
 3                                  600 Travis
                                    Suite 4200
 4                                  Houston, TX  77002
                                    713-220-4086
 5

 6   FOR CHEVRON:                   ANDREWS MYERS, PC
                                    Edward Ripley, Esq.
 7                                  1885 Saint James Place
                                    15th Floor
 8                                  Houston, TX  77056
                                    713-850-4227
 9

10   FOR ENI PETROLEUM:             BRACEWELL LLP
                                    Mark Dendinger, Esq.
11                                  711 Louisiana Street
                                    Suite 2300
12                                  Houston, TX  77002
                                    713-223-2300
13

14   FOR LIBERTY MUTUAL, TRAVELERS
     HANOVER AND XL:                LANGLEY LLP
15                                  Brandon Bains, Esq.
                                    P.O. Box 94075
16                                  Southlake, TX  76092
                                    214-722-7171
17

18
     FOR NORTH AMERICAN
19   SPECIALTY INSURANCE:           ATTORNEY AT LAW
                                    Ralph J. Kooy, Esq.
20                                  100 N. LaSalle Street
                                    Suite 514
21                                  Chicago, IL  60602
                                    312-857-0910
22

23

24

25
```

```
 1                    APPEARANCES (VIA ZOOM - CONT'D):

 2
     FOR SIRUS AMERICAN INS.:      CHIESA SHAHINIAN & GIANTOMASI
 3                                 Scott Zuber, Esq.
                                   One Boland Drive
 4                                 West Orange, NJ 07052
                                   973-530-2460
 5
                                   Jay Sturm
 6
     FOR AD HOC GROUP OF SECURED
 7   LENDERS:                      DAVIS POLK & WARDWELL, LLP
                                   Damian Schaible, Esq.
 8                                 450 Lexington Avenue
                                   New York, NY  10017
 9                                 212-450-4000

10
     FOR THE US DEPT. OF
11   THE INTERIOR:                 U.S. DEPT. OF JUSTICE
                                   Zachary Balasko, Esq.
12                                 P.O. Box 875
                                   Ben Franklin Station
13                                 Washington, DC  20044
                                   202-514-7162
14
     FOR HUNT OIL COMPANY:         BAKER BOTTS, LLP
15                                 Kevin Chiu, Esq.
                                   2001 Ross Avenue
16                                 Dallas, TX  75201
                                   214-953-6612
17
     FOR XTO ENTITIES:             FORSHEY PROSTOK, LLP
18                                 Suzanne Rosen, Esq.
                                   777 Main Street
19                                 Suite 1550
                                   Fort Worth, TX  76102
20                                 817-877-8855

21   FOR BP EXPLORATION:           GREENBERG TRAURIGM LLP
                                   Craig Duewall, Esq.
22                                 Karl Burrer, Esq.
                                   300 West 6th Street
23                                 Suite 2050
                                   Austin, TX  78701
24                                 512-320-7200

25
```

```
 1              APPEARANCES (VIA ZOOM - CONT'D):

 2  FOR JX NIPPON OIL:          CARVER DARDEN
                                Leann Moses, Esq.
 3                              1100 Poydras
                                Suite 3100
 4                              New Orleans, LA  70163
                                504-585-3830
 5
    FOR SHELL OFFSHORE, INC.    NORTON ROSE FULBRIGHT US LLP
 6                              Ryan E. Manns, Esq.
                                2200 Ross Avenue
 7                              Suite 3600
                                Dallas, TX  75201
 8                              214-855-0000

 9  FOR HESS CORPORATION:       REED SMITH, LLP
                                Omar Jesus Alaniz, Esq.
10                              2850 N. Harwood
                                Suite 1500
11                              Dallas, TX  75201
                                469-680-4292
12
    FOR ATLANTIC MARITIME
13  SERVICES:                   KIRKLAND & ELLIS, LLP
                                Jeffrey Zeiger, Esq.
14                              300 North LaSalle
                                Chicago, IL  6654
15                              312-862-2000

16

17

18

19

20  (Please also see Electronic Appearances.)

21

22

23

24

25
```

1          HOUSTON, TEXAS; THURSDAY, JUNE 24, 2021; 1:30 P.M.

2          THE COURT:  All right, we're returning to the

3    Fieldwood Energy Confirmation Hearing, 20-33948.

4    Mr. Carlson, if you would press five star on your phone,

5    please.

6          (Pause in the proceedings.)

7          THE COURT:  All right, good afternoon,

8    Mr. Carlson.  Can you give me a status report on where we

9    are?

10          MR. CARLSON:  Yes, Your Honor.  Good afternoon,

11    Cliff Carlson on behalf of Fieldwood.  Your Honor, we've

12    been hard at work over the past 12 hours or so working

13    through a number of objections and language to be added to

14    the Confirmation Order.

15          And we've made a ton of progress and think that

16    we're pretty close and that this hearing should be pretty

17    streamlined with only a few discreet issues that might be

18    open.

19          And we did file -- not long before this hearing --

20    filed an amended Chapter 11 Plan and amended proposed

21    Confirmation Order.

22          The Amended Plan was filed at docket number 1716

23    with the redline at 1719.  And the Confirmation Order at

24    1718 and believe a redline should be hitting of the

25    Confirmation Order within the next few minutes.

1          THE COURT:  So how do you propose that we proceed?

2          MR. CARLSON:  I think we can start with going

3     through the changes that we made to the Plan to address the

4     Court's concerns regarding the exculpation provision, which

5     is just a few changes so it should be pretty brief.

6          And hopefully by that, we can then turn to the

7     Confirmation Order and run through the redline with the

8     Court as well, discuss the changes we made --

9          THE COURT:  Are you aware --

10         MR. CARLSON:  -- in the agreement.

11         THE COURT:  Excuse me, I didn't mean to interrupt

12    you.  Are you aware of any objections that have not been

13    resolved at this point to the form of the Confirmation

14    Order?

15         MR. CARLSON:  There are a few parties, that I

16    think, will want to see the final language and they may have

17    concerns or such light modifications to the language that

18    we've made some changes in real time and that we've

19    uploaded.  But I think by in large to the extent that we

20    haven't addressed them, we can during this hearing.

21         THE COURT:  Okay.

22       (Pause in the proceedings.)

23         THE COURT:  All right.  So I've got 1719 up on the

24    screen.

25         MR. CARLSON:  If you -- the first change is on

1    page 11 of the redline.

2          THE COURT:  I don't know if -- hold on let me be

3    sure I've got a redline.

4       (Pause in the proceedings.)

5          THE COURT:  Where would I find the redline?

6          MR. CARLSON:  It should be ECF number 1719.

7          THE COURT:  So maybe this is redline, let's see.

8    Okay, got it.  Okay.

9          MR. CARLSON:  So, Your Honor, on page 19, we have

10   clarified that the additional predecessor agreements are

11   limited to -- post petition agreements that are entered into

12   in connection with our Plan and included as part of the Plan

13   supplement documents to remove any doubt that pre-petition

14   agreements would somehow get picked up in the exculpation

15   provision.

16          And then we made sort of the same change here in

17   the additional predecessor agreement documents definition as

18   well.

19          THE COURT:  All right.

20          MR. CARLSON:  And the second change we made was to

21   the exculpation provision itself, which is on page -- if you

22   turn to page 97, which is Section 10.8.

23       (Pause in the proceedings.)

24          MR. CARLSON:  It looks like you'll see here, Your

25   Honor, we've added a provision or we've added language at

1   the end of this provision to make clear that the exculpation

2   is limited to the holding and In re Pacific Lumber and that

3   the Court will retain exclusive jurisdiction to determine

4   any issues that arise regarding the scope of exculpation.

5        (Pause in the proceedings.)

6             THE COURT:  All right.  Hold on.

7             Mr. Scharfenberg?

8             MR. SCHARFENBERG:  Yeah, good morning, Your Honor.

9   I might have an issue with the change on page 11 to

10  additional predecessor agreement.  I just got this, but at

11  least the way I'm reading it, it would apply to any type of

12  additional agreement entered into prior to or on the

13  confirmation date.

14            And as long as additional predecessor agreement is

15  limited to the ones we know about -- Chevron, any in the

16  hunt -- I don't have an issue with it, but I don't know what

17  else is there or what kind of affect it would have.

18            Just doing a quick control F through the document,

19  it looks like arguably it might, you know, there might be

20  some exculpation implications, you know, when it comes to

21  that.  And I know that in the Confirmation Order there's a

22  finding of good faith for any additional predecessor

23  agreement.  And if there hasn't been any evidence introduced

24  at trial as to these existence which might or might not be

25  in existence or filed later.

1          You know, we would just want to be able to

2    analyze --

3          THE COURT:  If it's simply added in there sort of

4    a comma that says, "of which notice has been filed or given

5    as of 1:37 p.m. on June 24th, 2021" would that resolve that

6    question?

7          MR. SCHARFENBERG:  Fantastic.  That resolves my

8    issue, Your Honor.

9          THE COURT:  And does that cause any heartburn to

10   you, Mr. Carlson?

11         MR. CARLSON:  It does not.  And just to clarify

12   just for folks, the only remaining additional predecessor

13   agreement is the one with Hunt, which we are intending to

14   file -- execute and file hopefully later today -- that

15   should be.  So that's the only remaining additional

16   predecessor agreement.

17         THE COURT:  So why don't you fix those definitions

18   to take into account anything of which notice has been given

19   or that has been filed as of 1:37 p.m. on June 24th, 2021

20   and the Hunt Agreement, a draft of which has been

21   circulated.  Something to that effect.

22         MR. CARLSON:  Yes, we're happy to do that, Your

23   Honor.

24         THE COURT:  Okay.

25       (Pause in the proceedings.)

1          MR. CARLSON:  So, Your Honor, that's the totality

2   of the changes that we made to the Plan.  I know there have

3   been -- there have been discussions up until just the moment

4   this hearing started on clarifying changes in Section 513 of

5   the Plan that the sureties have raised and I think probably

6   want to address.

7          I don't know if now is the appropriate time to do

8   that.  It's not reflected in what we filed, but there have

9   been ongoing discussions. I just don't think the language

10  has been agreed by everyone yet.

11         THE COURT:  And will that be language that would

12  go in the Plan or would that be language that would go in

13  the Confirmation Order?

14         MR. CARLSON:  That would be language in the Plan

15  in Section 513.

16      (Pause in the proceedings.)

17         THE COURT:  Mr. Perez, good afternoon.

18         MR. PEREZ:  Your Honor, this is Alfredo Perez.

19  Your Honor, with respect to the definition of predecessor.

20  Obviously we're perfectly fine with the comment the Court

21  made.  But, you know, it will take a little bit of time to

22  implement this Plan.  And we would obviously love to have

23  more predecessor deals so long as we're not precluded from

24  coming back to the Court to do that.

25         I think it -- I'm fine with that.  But I certainly

1  don't want to be precluded.

2        THE COURT:  I think that's fine.  But why don't --

3  then let's not, then, amend the Plan again.  Let's include

4  language in the Confirmation Order that says notwithstanding

5  anything in the Plan those agreements are limited to the

6  following matters.  You know, matters for -- that have been

7  filed of record of which notice have been given.  The Hunt

8  Agreement and any other matter subsequently filed for which

9  the Court has given it's approval.

10        And we can put all that in a Confirmation Order

11  and accomplish the same thing, I think.  Does that work?

12        Mr. Scharfenberg, let me make sure that same

13  concept works for you so long as we're doing it that way.  I

14  think it meets the principal.

15        MR. SCHARFENBERG:  That concept works.  Yeah, we

16  just want an opportunity to review and really understand

17  what's been put up.

18        THE COURT:  Mr. Kuebel?

19     (Pause in the proceedings.)

20        THE COURT:  Mr. Keubel?  I think you have your own

21  line muted.

22        MR. KEUBEL:  Oh, I'm sorry, Your Honor.  Omer

23  Keubel, III.  For this issue, McMoran Oil and Gas.  Your

24  Honor's proposed solution is acceptable for us.  This is an

25  issue that we've looked at.

1          I think when we sent comments over to the Debtor

2    on this provision, we had even suggested that instead of the

3    petition date we could go out to the effective date.

4    Obviously, as a predecessor that has exchanged term sheets

5    back and forth with the Debtor but hasn't reached a final

6    agreement like some of the others.

7          So I do think that Mr. Perez is right that there's

8    a contemplation both with the debt, my clients and probably

9    Government that some of the other smaller predecessor

10   agreements can be reached between now and the time the plan

11   goes effective.

12         And so I think Your Honor's proposed solution on

13   how to keep the door open to do that works for everyone.

14         THE COURT:  Okay, good.  Thank you.  So, what is

15   the best way then to address the 5.13 problems until we get

16   some new language?  Do you want to move to everything else

17   and we'll come back to 5.13 in a few minutes?

18         Or do people want to raise Plan objections right

19   now?  I've told everyone if their problems aren't worked

20   out, you can -- you're free to raise objections today.  So

21   if anyone wants to raise the objection instead of trying to

22   keep working on language, that's fine.

23         But if you want to wait and see if the language

24   really does get finalized under 5.13 that's fine too.

25   People are being pretty quiet, Mr. Carlson.

1          Why don't we leave 5.13 behind and we'll come back

2   to it?

3          MR. CARLSON:  That works.

4          THE COURT:  Okay, where do you want to go next?

5          MR. CARLSON:  Well I think we can turn to the

6   Confirmation Order and I'm hoping a redline was filed.  Let

7   me just check to see.

8       (Pause in the proceedings.)

9          MR. CARLSON:  That was filed at 1720.

10         THE COURT:  All right.

11      (Pause in the proceedings.)

12         MR. CARLSON:  Your Honor, I'm happy to proceed

13  either by doing a page flip or we can organize it

14  differently and go by objecting party and perhaps maybe

15  start with various objecting parties, like BP or we can flip

16  through.  It's up to the Court on how to proceed there.

17         THE COURT:  So, it's probably better for me to do

18  a page flip and better for them to do it by party.  So we'll

19  do what's better for me.  How's that?

20         MR. CARLSON:  That works for us.

21         THE COURT:  All right.  And then if any party

22  needs to go back over it, you know, we'll do that as much as

23  people need.  But I really need to see it, I think, in a

24  bigger context, so.

25      (Pause in the proceedings.)

1        THE COURT:  I'm leaving it up to you to tell me

2   where to go, Mr. Carlson.

3        MR. CARLSON:  So I think the first sort of

4   substantive change here would be --

5      (Pause in the proceedings.)

6        MR. CARLSON:  This should be non-controversial but

7   it's O -- actually I'm sorry, it's M, the good faith

8   section.  This is definitional what we define Plan documents

9   broadly and that'll be used later on.

10        THE COURT:  Hold on.  So I may be on the wrong

11   page.  There was representative of the states has been added

12   in.  Is that before or after where we're going?

13        MR. CARLSON:  That is actually -- we'll start

14   there.

15        THE COURT:  Okay.

16      (Pause in the proceedings.)

17        MR. CARLSON:  So this was a provision added to

18   finding these plan administrators, Risen Powers.  Not aware

19   of any issues raised with respect to this, but.

20      (Pause in the proceedings.)

21        THE COURT:  All right.

22      (Pause in the proceedings.)

23        MR. CARLSON:  And here we define Plan documents

24   broadly to make sure we can -- we capture everything and

25   that'll be used throughout.

1           THE COURT:  Okay.

2           MR. CARLSON:  In Section O here, we are simply

3   just carving out the field with one subsidiaries from the

4   Plan Administrators obligations and role.  And indicating

5   that John Grannel Services (phonetic) is the officer and

6   director, manager.

7       (Pause in the proceedings.)

8           MR. CARLSON:  Section KK is the next change.

9       (Pause in the proceedings.)

10          MR. CARLSON:  But I don't believe there's been any

11  issues with that language.  And so we made that same change

12  in the next few paragraphs here you'll see.

13          THE COURT:  Right.  Okay.

14      (Pause in the proceedings.)

15          MR. CARLSON:  And X, that's the next, that's the

16  application provision we added some language here consistent

17  with the Court's ruling on limiting it to the Pacific Lumber

18  and Mid-Atlantic ruling.

19      (Pause in the proceedings.)

20          THE COURT:  All right.

21      (Pause in the proceedings.)

22          MR. CARLSON:  I believe paragraph 21 is the next

23  stop where -- let's see.  This is the same language.

24      (Pause in the proceedings.)

25          THE COURT:  All right.

1          (Pause in the proceedings.)

2          MR. CARLSON:  This matches the same change we had

3    in the recitals that --

4          THE COURT:  All right.

5          (Pause in the proceedings.)

6          MR. CARLSON:  On the next page, Your Honor,

7    starting in paragraph 38, we have a number of counter

8    parties that were in discussion with regarding cure amounts.

9    And so we've listed out the parties that we've adjourned

10   their cure objections for.  And we've added additional

11   parties since the previous version that was filed.

12         (Pause in the proceedings.)

13         THE COURT:  Okay.  And with respect to those, just

14   to be sure that I'm on the same page as you are.  We decide

15   the cure amount, the Plan will be effective no matter what

16   amount we decide.

17         The amount we decide may alter your decision about

18   whether you're going to assume a contract.  But that's it in

19   terms of where the range of latitude is.  Is that fairly the

20   way this is written?

21         MR. CARLSON:  That's correct.  That's how I

22   understand it.

23         THE COURT:  Okay.  All right.

24         (Pause in the proceedings.)

25         MR. CARLSON:  And then starting in paragraph 60 is

1  where we start to have the negotiated inserts for each of

2  the various parties.  And we can --

3        (Pause in the proceedings.)

4        MR. CARLSON:  And starting with Anadarko.  The

5  Debtors have resolve with Anadarko under Mr. Greendyke or

6  Mr. Bruner as to the best resolves all issues with Anadarko.

7        Next we go to Ecopetrol and Ridgewood, which has

8  also been agree with counsel for each of those parties.

9        (Pause in the proceedings.)

10       THE COURT:  I don't see any change in the

11  Ecopetrol language.  Did it occur in the prior version?

12       MR. CARLSON:  It was.  It was attached in the

13  prior version, that's right.

14       THE COURT:  Okay.  Hold on.  Mr. Greendyke?

15       MR. GREENDYKE:  good afternoon, Judge.  Bill

16  Greendyke, Norton Rose Fulbright on behalf of Anadarko

17  Petroleum Corporation and Anadarko US Offshore.

18       I just wanted to confirm what Mr. Carlson had said

19  that we've got an agreement on the language.

20       THE COURT:  Mr. Greendyke, thank you.

21       MR. GREENDYKE:  Thank you, Judge.

22       (Pause in the proceedings.)

23       THE COURT:  Mr. Singer?

24       MR. SINGER:  Good, Judge.  Kelly Singer on behalf

25  of Ecopetrol.  I felt the necessity to extend the courtesy

1    in saying the same thing.  We have agreed on it and the

2    explanation for paragraph 65 is notwithstanding what's

3    happening with the credit bid document or I'm sorry with the

4    credit bid purchase agreement, the access facilities.

5           Our security interest and our rights in the

6    security interest including the priority are just being

7    reserved for right now.  There's a question that -- as to

8    whether or not our interest are actually senior to all the

9    vendors involved here.

10          And so, all those issues are just being reserved

11   at this point.  Hopefully it doesn't make any difference as

12   we move on in the future.

13          THE COURT:  Thank you, Mr. Singer.  All right, so

14   now we're on Ridgewood.

15          MR. CARLSON:  That's Mr. Fishel's client.  Same, I

16   understand Ridgewood signed off on that.

17          THE COURT:  Okay.

18          MR. CARLSON:  At paragraph 68, this is

19   Mr. Skelton's client.  Houston Energy and Red Willow.  We

20   have agreed to some additional language in this paragraph

21   that was agreed just a few minutes before the call that will

22   be reflected in a further revised.

23          But understand that we are in agreement now with

24   Mr. Skelton on those changes.

25          THE COURT:  And, Mr. Baay?

1          MR. BAAY:  Yes.  Thank you, Your Honor.  We are

2    getting to my paragraph -- I'm in paragraph 70 so I was just

3    raising my hand for when we get there.

4          THE COURT:  All right.  Do you want to go ahead

5    and read to me the language you've agreed to with

6    Mr. Skelton's client, Mr. Carlson, so we know whether

7    there's, in fact, an agreement?

8          MR. CARLSON:  Sure.  So it is -- let me just pull

9    it up here.  At the very end, we add, "including any

10   indemnification reimbursement allegations that may arise

11   from the alleged names and claims of among others the

12   Atlantic Maritime Services LLC alleged liens, claims and

13   potential litigation against Fieldwood Energy, LLC and among

14   other HEDV and ROW in this Bankruptcy Court and the United

15   States District Court for the Eastern District of Louisiana.

16   Nothing herein shall be deemed an admission by any party

17   that any such liens and claims against Fieldwood Energy are

18   valid or enforceable."

19          THE COURT:  Thank you.  And does anyone object to

20   these provisions with that addition?

21       (No audible response.)

22          THE COURT:  All right.

23       (Pause in the proceedings.)

24          THE COURT:  So footnote five will come out, right?

25          MR. CARLSON:  Correct.

1                THE COURT:  Okay.

2           (Pause in the proceedings.)

3                MR. CARLSON:  So then I think from there we go to

4    Mr. Baay's client, Westerngeco.  Where we've bracketed the

5    date, the July 14, 2021 date.  If you scroll up to

6    paragraph 70.

7           (Pause in the proceedings.)

8                THE COURT:  And you say that's bracketed because?

9                MR. CARLSON:  We're working with Westerngeco to

10   finalize an arrangement for the use of the seismic data

11   here.  And this provision is intended just to keep the

12   status quo.  We're not assuming or rejecting these

13   agreements under the Confirmation Order and intend to

14   finalize that agreement.

15               And I think the -- I think Mr. Baay will tell you

16   that they would like that date to be sooner than July 14th.

17   But I'll let Mr. Baay speak to that.  And if --

18               THE COURT:  Mr. Baay.

19               MR. BAAY:  Your Honor, John Baay for Westerngeco.

20   The reason why -- we had originally agreed back at the

21   beginning of June to this language and a June 30th deadline.

22               And then we got the revision, we saw July 14th.

23   And the reason that June 30th is important because it

24   enables them to recognize revenue in this quarter and that's

25   important from a commercial standpoint for these guys.

1          My understanding is that the agreements have been

2     essentially agreed to.  So I don't think there's anything

3     that's going to prevent that from happening.  I would prefer

4     to keep the July 30th deadline in there and sort of keep

5     everybody's feet to the fire and hope that we can get

6     everything done.

7          I don't see a reason why it can't be done.

8     There's some issues about proving a gap between when the new

9     entities will be created.  But I think we can do that in the

10    document.  We just need a signature before June 30th to be

11    able to go forward and book this revenue even though it's

12    not going to be collected for another 30 days.

13          So, that's why the date is important to us.  We

14    were hoping we could leave it June 30th and work together to

15    make that happen.

16          THE COURT:  What happens under the agreement if we

17    put in June 30 and the deal doesn't get done?  Do they have

18    to stop using the data?

19          MR. BAAY:  Yes.  Yeah, unless we agree otherwise.

20    Yeah, at such later date as may be agreed between and Credit

21    Bid Purchaser and Westerngeco.  So, certainly either one of

22    us, I think, from a commercial standpoint wants that to

23    happen, but we would like to at least, you know, keep it --

24    keep everybody working towards the June 30th deadline which

25    we have been working towards since June 2nd when we agreed

1  to this language.

2          And so, you know, --

3          THE COURT:  Mr. Baay, can I ask if the following

4  would work and it may not.  Put in July 14th, right after

5  where it says, "Westerngeco" put a semicolon and say

6  provided that Fieldwood entities are ordered to use their

7  best efforts to complete the agreement by June 30th of 2021.

8          MR. BAAY:  That works, Your Honor.  I appreciate

9  it.

10         THE COURT:  Mr. Carlson?

11         MR. CARLSON:  That works for Fieldwood as well.

12         THE COURT:  Okay, let's include that then in the

13  final draft in the Confirmation Order.  Thank you.

14         MR. BAAY:  Thank you, Judge.

15         THE COURT:  Okay.

16         MR. CARLSON:  This is a similar arrangement with

17  TGS.  I believe we've agreed on this provision as well.

18         MR. BAAY:  That's correct, Your Honor.  That's

19  also my client.  And we have agreed to this document.  Thank

20  you.

21         THE COURT:  Mr. Baay, I'm going to go ahead and

22  remute your line.  Feel free to buzz back in if you need to.

23         MR. BAAY:  Thanks, Your Honor.  I think I'm done

24  with this.

25         THE COURT:  Thank you.

1          MR. BAAY:  Thank you.

2       (Pause in the proceedings.)

3          THE COURT:  Ms. Williamson?  Ms. Williamson, I

4  can't hear you.  You might want to see if your own line is

5  muted.

6          MS. WILLIAMSON:  Oh.  No, Your Honor, I'm not

7  muted.  I was raising my hand in connection to paragraph 72.

8          THE COURT:  Okay.  I think we're going there then,

9  so.

10      (Pause in the proceedings.)

11          THE COURT:  Mr. Carlson, Ms. Williamson.

12  Paragraph 72.

13          MR. CARLSON:  Yes I had -- I think I -- I believe

14  we're agreed on this paragraph, as well.  But Ms. Williamson

15  will correct me if I'm wrong about that.

16          MS. WILLIAMSON:  No, Your Honor, we've reached an

17  agreement as to the language in paragraph 72.  That resolves

18  Valero's objection.

19          THE COURT:  Thank you for the announcement,

20  Ms. Williamson.  I'm going to again mute your line and let

21  you click back in if you need to speak again just to try and

22  keep down background noise.

23          MS. WILLIAMSON:  Thank you, Your Honor.

24          THE COURT:  All right, 73 with Energy Transfer.

25          MR. CARLSON:  Yes, this is meant to Ms. Archiyna's

1  client.  I believe we're agreed on this as well, but we'll

2  let Ms. Archiyna confirm, if she is on.

3  　　　　MS. ARCHIYNA:  Good afternoon, Your Honor.  Yes, I

4  am confirming that we have reviewed this language, it is

5  acceptable and that resolves our concerns.  Thank you very

6  much.

7  　　　　THE COURT:  Thank you, Ms. Archiyna.

8  　　(Pause in the proceedings.)

9  　　　　MR. CARLSON:  So, Your Honor, you'll see the Cox

10  paragraph was deleted, but we have a broader paragraph that

11  applies to several different predecessors in working with

12  interest owners we'll get to later.

13  　　　　We do have a discreet -- a separate discussion

14  ongoing with Cox to address the contract issue that we're

15  working through as well.

16  　　　　THE COURT:  So how will that be addressed today?

17  　　　　MR. CARLSON:  I think we can -- I think we've

18  agreed on language that I can -- that I'd like to -- I'm not

19  sure we've got -- we've confirmed.

20  　　　　THE COURT:  I've got Mr. Kind on the phone.

21  Mr. Kind good afternoon.

22  　　　　MR. KIND:  Good afternoon, Your Honor.  I'd like

23  to confirm what Mr. Carlson said.  That's all correct, Your

24  Honor.  We've got -- reached an agreement to be part of a

25  different paragraph.  I think it's new, paragraph 145 or

1   perhaps when we get to there we'll, you know, that will be

2   discussed in more detail.  But we agree with the language in

3   that paragraph.

4           And in addition to that, Mr. Carlson and our team

5   have exchanged language just minutes before the hearing that

6   I think we're close to agreement on.  That'll resolve some

7   of the set off concerns that we raised with the Debtor's

8   counsel.

9           And I think in the next turn of the redline of the

10  Confirmation Order, we should have -- I'm hopeful we'll have

11  agreed language by then.

12          THE COURT:  Mr. Kind, thank you.  All right, it

13  sounds like you may need to click back in when we get back

14  down to 145, but I'm going to mute you for now just to be

15  sure that I don't have 100 people at one time.

16          MR. KIND:  Sure.

17          THE COURT:  All right.  Mr. Carlson?

18          MR. CARLSON:  This next paragraph, 75, this is --

19  74 and 75 this is language we've agreed to with RLI's

20  counsel.  Believe we're agreed on that as well, but Elliott

21  can confirm.

22          MR. SCHARFENBERG:  Yes, that is confirmed, thank

23  you.

24          THE COURT:  Mr. Scharfenberg, thank you.  Okay.

25          MR. CARLSON:  And then the same goes, I believe,

1  for the Maritime Claimant's paragraph as well.  I'm not sure

2  if counsel is on this call, but I believe we're resolved

3  here as well.

4          THE COURT:  If anyone wishes to speak up with

5  respect to the treatment of the Maritime Claimant's under

6  the Confirmation Order, please press five star.

7      (No audible response.)

8          THE COURT:  All right, I'll assume that it's okay.

9      (Pause in the proceedings.)

10          MR. CARLSON:  And then we've also agreed to

11  language with the State of Texas.  I believe it's in Valdez

12  in this paragraph to be resolved there as well.

13          THE COURT:  Is there anyone -- there we go.

14  Mr. Williams?

15          MR. WILLIAMS:  This is Randy Williams.  I was on

16  paragraph 76 confirming that that was the language that the

17  Maritime claimants had agreed to.

18          THE COURT:  All right, thank you Mr. Williams.  I

19  appreciate the confirmation.

20          MR. WILLIAMS:  Thank you.

21          THE COURT:  All right, is there anyone here on

22  behalf of the State of Texas or its entities?

23      (No audible response.)

24          THE COURT:  Okay, I'm going to assume this

25  language is agreeable to them.  If they're not -- oh wait,

1    we do have somebody.  Ms. Ryan from the Attorney General's

2    office, in fact.

3           Ms. Ryan, good afternoon.

4           MS. RYAN:  Judge, good afternoon Judge Isgur.

5    This is Abigail Ryan on behalf of the Railroad Commission of

6    Texas.  Again the Texas tax claims is not my wheel well.

7    Our section does everything non-tax bankruptcy.

8           And so I had nothing to do with the language that

9    is in paragraph 78.  And I don't know if we have another AG

10   for this taxing side.  I am here, though, to represent the

11   Attorney General and the Railroad Commission if you have any

12   questions, Your Honor.

13          THE COURT:  All right, I'm just going to assume

14   this is okay unless, you know, you get somebody -- you can

15   get somebody on to object before we get to the end of the

16   order, but otherwise I assume they've reached agreement as

17   Mr. Carlson has announced.  So, I'm going to leave it alone.

18          MS. RYAN:  I'll put out an email, Your Honor, to

19   our group and see if anyone has any objections.

20          THE COURT:  All right thank you Ms. Ryan.  Do you

21   want me to go ahead and remute your line or did you want to

22   stay on for any of the other paragraphs?

23          MS. RYAN:  You can remute me.  That is fine.

24   Thank you, Your Honor.

25          THE COURT:  Thank you.  All right, Mr. Carlson?

1      MR. CARLSON:  So same goes as I understand for

2 Louisiana, Department of Revenue.  We should be resolved

3 with the Louisiana DOR.  Counsel's name is escaping me right

4 now, but I should be okay there.

5      THE COURT:  I know those folks well.  Is there

6 anybody here from LDR?

7    (No audible response.)

8      THE COURT:  All right, I'm going to assume that

9 we're okay with them.  They participate regularly when they

10 have an issue and I think they'll be fine if they're not

11 here.  Okay.

12      MR. CARLSON:  So the next set of paragraphs here

13 are the Apache Sureties -- sorry the Apache paragraphs that

14 there have been some changes to that if you folks want to

15 read through, but.

16      THE COURT:  Hold on a second.  Mr. Brescia?

17      MR. BRESCIA:  Yes, good afternoon, Your Honor.

18 Duane Brescia for Zurich American Insurance Company.  Just

19 raised my hand as we're discussing these.

20      I think Ms. Russell has received consent from two,

21 maybe all four of the sureties to proposed language that was

22 circulated only about 30 minutes ago, 45 minutes ago.

23      I don't know if that's going to be read in today.

24 I'll defer to Ms. Russell first.

25      THE COURT:  All right, Ms. Russell we'll let you

1    go first then.  Good afternoon.

2          MS. RUSSELL:  Good afternoon, Your Honor.  A lot

3    going on behind the scenes here.  We actually have some

4    language that we requested to 82, which I proposed we work

5    out with the Debtor in the -- in the next break.

6          And if the Court will bear with me, I will find

7    the language that Mr. Brescia is referring to.  And it

8    relates subrogation rights.  Is this what you were referring

9    to Duane?

10         MR. BRESCIA:  Yes, I think there are edits to

11   paragraph -- I believe they are 81, 92 and I guess there's a

12   new paragraph 90 -- excuse me.  New paragraph 95 are the

13   ones I think we're in agreement on.

14         MS. RUSSELL:  Okay, Your Honor.  If you would

15   indulge us.  If we could skip over the Apache section.  We

16   were negotiating this even as the hearing was ongoing.  And

17   we need some time to get organized to walk through this with

18   you.

19         THE COURT:  It's only $600 million, Ms. Russell.

20   Let's try and get it done.

21         MS. RUSSELL:  I apologize.

22         THE COURT:  All right.  Just -- look do you want

23   to try and make the announcements on the record?  You guys

24   have been working hand-in-hand now for awhile or do you want

25   to just put it in the next form of order?  I really think

1    that as long as I understand what you've done, that I'm not

2    going to intervene on whether I approve of the business

3    decision between, you know, two non-Debtor entities.

4            So it's only going to be one -- I'm only going to

5    look to be sure that I don't think it's ambiguous so that I

6    can enforce it if a dispute arises.

7            So I'm inclined to think that you-all can just

8    agree and put it in there and I'll look at it on the final

9    version that gets uploaded.

10           MS. RUSSELL:  I think that would be a good plan.

11   I didn't know if you planned on entering this at the end of

12   the hearing today.  But if we have the ability to make these

13   final fine tuned language then I think that would be the

14   most efficient use of the Court's time.

15           THE COURT:  So unless something surprises me,

16   which it hasn't yet, it's my intention to allow one more

17   version to be uploaded but not to hold another hearing on

18   it.  That I can then just review -- if you upload a regular

19   and a black line version, I'll review to be sure that I

20   understand it.  And then I will have it entered without

21   another hearing.

22           And I know that we still have -- everyone still

23   has the ability at the end of this hearing to voice their

24   objections if things haven't gotten resolved.  So, that may

25   get upset before we get to the end of the day.  But so far I

1   haven't heard a reason to come back.

2          I mean, because again, my interest in -- I don't

3   get to say whether I think you and Mr. Brescia have reached

4   a good deal.  It's only its impact on the estate that I can

5   review in priority for the purpose of being sure that I can

6   enforce it, so.

7          I haven't heard anything that the estate should,

8   you know, needs a hearing about is my view.  Are you okay

9   with that?

10         MS. RUSSELL:  Yes, Your Honor.  And if we, for

11  some reason feel like things cannot resolve, we will ask for

12  a very short audience with you.

13         THE COURT:  No, I'll give you an emergency hearing

14  if you want and I'll even give you one now as a contingent

15  hearing if you want it.  I just don't think it's necessary

16  and it'll just make you spend more money and time and I'm

17  thinking by, you know, 5:00 or 5:30 you-all will have an

18  order uploaded and Ms. Doe never sleeps so she'll get it

19  entered tonight.

20         MS. RUSSELL:  All right, thank you, Your Honor.

21         THE COURT:  Thank you.

22         MR. BRESCIA:  Thank you, Your Honor.

23         THE COURT:  So I'm going to go ahead and mute both

24  of your lines so you-all can go do work.  And we did have

25  somebody from New York that has a comment they want to make.

1   Who do we have?

2          MS. LIOU:  Yes, Your Honor, Jessica Liou from

3   Weil, Gotshal & Manges.  I did want to echo what Ms. Russell

4   said which is are actually still are working with Apache and

5   Blenders on some language for this section.

6          So to the extent that we can't come to an

7   agreement -- and I'm confident that we will -- then that may

8   be an issue that we'll have to address at another time.

9          THE COURT:  Look I want to get an order entered.

10  This has dragged on awhile.  If you-all can't reach an

11  agreement, I want you contacting Ms. Doe and we will come

12  back tonight.  So, I say that --

13         MS. LIOU:  Absolutely, Your Honor.

14         THE COURT:  -- and I want you to understand.  I'm

15  not even a little bit impatient about it.  It's amazing all

16  the progress you've made.  But I think the way to treat all

17  the progress you've made is to recognize that you're doing

18  that for a reason and everybody wants to get this done.

19         And so it's really out of respect for what you've

20  done.  And I don't have any impatience about it.  If you-all

21  were literally to come back and say you needed another day,

22  I got it.  But you probably more need time --

23         MS. LIOU:  No Your Honor I do not expect us to

24  need another day.  We just need probably another hour to

25  work it out.

1          THE COURT:  Okay.  Well, I just want -- assuming

2    that we conclude today with no outstanding objections, when

3    you get it filed please contact Ms. Doe and I will look at

4    it right away.

5          I do have a 4:00 o'clock hearing.  And so I expect

6    that hearing to take less than an hour, but I may be wrong

7    about that.  But it's not like I'm going anywhere.  I

8    just -- I may have an hour when I can't look at whatever you

9    submit.  But beyond that I'm pretty free.

10         Okay, let's move ahead.  Where are you next,

11   Mr. Carlson?

12         MR. CARLSON:  From there, Your Honor, I go to

13   paragraph 97.  This is the non-Apache sureties reservation

14   rights language.

15         And here --

16         THE COURT:  Wait a minute.

17         MR. CARLSON:  -- we have received.

18         THE COURT:  Hold on.  I ended up in the wrong

19   place.

20      (Pause in the proceedings.)

21         THE COURT:  Okay, I'm about there.  There we go.

22         MR. CARLSON:  Your Honor, this paragraph I think

23   is kind of (glitch in the audio) reservation of rights the

24   way I see it.  Number one, that nothing in the Plan document

25   modify the rights as between obligees and sureties.  That's

1    sort of what's captured in A.

2         B is nothing requires non-Apache Sureties to

3    extend additional new surety credit.  And then C is nothing

4    in the order or Plan documents increase or decrease rights

5    of sureties against non-Debtor parties for the

6    post-effective date Debtors, Fieldwood One, Two and Four,

7    and the NewCo entity with the reservation of rights with

8    respect to assumed contracts.

9         And I think --

10        THE COURT:  So tell me -- I don't understand how A

11   works in combination with the exculpation clause.

12        MR. CARLSON:  So A is limited to the non-Apache

13   sureties.  Nothing is adjudicating or modifying their rights

14   as between only those non-Apache sureties and the obligees

15   under their respective bonds.

16        THE COURT:  But does that mean that there can be a

17   dispute between the obligees and the non-Apache sureties as

18   to matters that are exculpated in the Plan?  Or does the

19   exculpation clause control over A?

20        Because I think both have not withstanding

21   anything else and I'm a little nervous about having

22   contradictory paragraphs that say notwithstanding anything

23   else.

24        What's the deal on how this interacts with that?

25        MR. CARLSON:  Yeah, I think your right.  I think

1    it's -- we do have that language on the less expressly

2    provided the contrary in the Plan documents.  Language here

3    and I think you're right that if there is an expressed

4    provision that does impact that, that would supersede this

5    language in A.

6              THE COURT:  I mean, it says unless expressly

7    provided and then it says nothing in the exculpation

8    provision does these things.  I do not want the ambiguity.

9    I want to have you guys apparently talk some more to be sure

10   that I don't have cross conflicts like that.

11             I'm happy with however you-all resolve it.  And

12   maybe you-all have an agreement that I'm not fully

13   appreciating.  Let's see, Mr. Ripley?

14        (Pause in the proceedings.)

15             THE COURT:  Mr. Ripley?

16             MR. RIPLEY:  Oh, good afternoon, Your Honor.  Ed

17   Ripley with Andrews Myers on behalf of Chevron and various

18   affiliates.

19             Judge this whole paragraph first came about last

20   afternoon.  And the first introductory clause is a problem.

21   Because what it does is it basically takes away the

22   reservation of rights language.  I think there's some other

23   provision that's buried in the thousands and thousands and

24   thousands of pages of other documents that people met all

25   the transactions under the Plan.

1          It's overly broad in and it's completely

2    unnecessary.  The -- this was added in because one

3    particular obligees and predecessor had worked out

4    additional language.  And so there's a way to deal with that

5    parties unique issues without having this.

6          Because right now -- particularly under

7    subparagraph A -- my client is an obligee under various

8    bonds and we have no idea, again if anything in any of the -

9    - for example Fieldwood Energy One or the Newco Credit Bid

10   transaction documents has some effect on our bonds.

11         We haven't checked all those pages.  We shouldn't

12   be forced to check all those pages.

13         Again, that first clause needs to come out.  It's

14   unnecessary.

15         THE COURT:  Which first clause?

16         MR. RIPLEY:  The "unless expressly provided to the

17   contrary in the Plan documents."

18         THE COURT:  But then if it says, "the exculpation

19   provision doesn't effect people's rights under the deal in

20   the Plan."  And it does effect people's rights under the

21   deal in the Plan.

22         I mean we are ordering that no one can

23   subsequently challenge the deal.  The deal is protected.

24         MR. RIPLEY:  Yeah, I think -- Judge I think you

25   raise a good issue that no one else had raised yesterday in

1  the discussions amongst all different parties.  They ought

2  to be able to carve in the exculpation because -- to make

3  sure that there isn't some gap or inconsistency.

4          But that introductory clause was not raised in

5  connection with the exculpation in all the discussions

6  yesterday.  Again it was added solely to deal with one

7  individual obligee and predecessors peculiar issues and

8  there is easier ways to deal with that.

9          THE COURT:  Mr. Bains.  Mr. Bains?

10          MR. BAINS:  Good afternoon, yeah good afternoon,

11  Your Honor.  Brandon Bains on behalf of Travelers, Liberty,

12  Hanover and XL.

13          I just wanted to echo Mr. Ripley's comments.  You

14  know we had some discussion about this language.  In fact,

15  Mr. Ripley's clients, Chevron, is an obligee for all four of

16  my sureties.

17          I think the intention here, Your Honor, is simply

18  that if we get down the road and there is a bond claim by

19  Chevron, I think all parties agree that nothing in the plan,

20  nothing in the order impacts Chevron's rights under the

21  bonds, impacts our defenses under the bonds.  And I think

22  that's what we're trying to accomplish here.

23          I would agree with him that I think the first

24  clause should be taken out because it just adds to confusion

25  and we really seek to adjudicate something that is outside

1  the purview of this Court when it comes to any of those bond

2  claims two or three years from now.

3          THE COURT:  Yeah, that makes a lot of sense.  So

4  just to put that sort of in a hypothetical example.  If the

5  obligee a year ago did something that would preclude your

6  liability to the obligee that argument remains.

7          But the obligees participation in the Plan would

8  not be a defense.  And if we can say those, I think that's

9  consistent with what I'm intending to order.  I don't think

10 this says that.

11         MR. RIPLEY:  And Judge, -- yeah that is the

12 intent.

13         THE COURT:  Great.  I don't know how to say that.

14 We can all take a stab at it, but should I let you-all take

15 a stab all together without me.

16         MR. RIPLEY:  Yes, Your Honor, we'll take a stab at

17 it.

18         THE COURT:  Mr. Dendinger?   Mr. Dendinger?

19         MR. DENDINGER:  Yes, good afternoon, Your Honor.

20 I guess for the record, Mark Dendinger, Bracewell for ENI

21 Petroleum US LLC and ENI US Operating Company.  May I be

22 heard?

23         THE COURT:  Yes, sir.

24         MR. DENDINGER:  I believe Mr. Ripley is

25 generically referring to -- for my clients as the obligee

1  with the peculiar language.

2      I didn't realize that it expressly provided to the

3  contrary in the Plan documents was solely put in for my

4  clients benefits.

5      But the reason that lead in was important to us is

6  without some version of a lead in that would say, "except

7  expressly provide to the contrary" in paragraphs X to Y of

8  this Order and the ENI definitive documentation are

9  concerned with me this entire paragraph and my client's

10  rights as obligee and the non-Apache's sureties rights would

11  vitiate the paragraph that we negotiated that we'll come to

12  later on in the Order.

13      I believe the paragraph range is 118 -- 111 to

14  118.  I apologize, Your Honor.  So Mr. Ripley has made a

15  sound deduction --

16      THE COURT:  Could it say, for example -- and I

17  haven't read 111 to 118 -- subject to paragraphs 111 to 118.

18  Would that have the same effect?

19      MR. DENDINGER:  Yes, yes.  And that would be fine,

20  Your Honor.  I would prefer that it also maybe use the

21  phrase "and the ENI definitive documentation."

22      THE COURT:  It doesn't bother me as long as it's

23  limited to ENI.  All right, from Chicago, 502-2956.

24      MR. KOOY:  Yes, Your Honor.  Ralph Kooy on behalf

25  of North American Specialty.  I did want to add our

1   agreement with Mr. Bains and Mr. Ripley that we didn't

2   understand the need for that first clause.

3           You know, one of the entries our client continues

4   to have and we say it's advisable to half of -- or on behalf

5   of Fieldwood, but namely Chevron and ENI as obligee.

6           You know, we still have our larger objection.  And

7   it relates, you know, to the term sheets that have been

8   entered that we sort of, you know, obtuse or abstruse

9   references to the surety providing money for clean up.

10          We still don't think there's, you know, a clear

11  understanding of how these bonds survive and under what

12  basis.  I have not reviewed paragraph 111 through 118, but

13  our -- you know, we're happy with the language that nothing

14  in the order or plan shall be deemed to modify, you know,

15  our defenses should these obligees specifically any and

16  Chevron make a claim because we want to be able to preserve

17  our surety defenses.

18          We're still hesitant, you know, we agree that that

19  last provision should be removed consistent with Mr. Bains

20  and his position on behalf of his clients.  We would have to

21  take at look at 111 and 118 and I assume that means we'll be

22  doing that offline here.

23          THE COURT:  All right.  Let me just be sure that

24  you're telling me the same thing others are.  You're not

25  looking -- well.  I know they argued against this.  I've

1   overruled the question of whether you can have a defense

2   based on what's occurring in the Plan itself.

3          So to the extent that that's your objection, I'm

4   substantively overruling it.  But I am sustaining any

5   objection that says that I should effect rights other than

6   were determined in the Plan.

7          And I don't think paragraph 97 is correct in that

8   regard on any side of that.  So hopefully you-all can work

9   through that some more.  And that may take more than this

10  afternoon and I understand that.  But it's an important

11  paragraph.

12          MR. KOOY:  All right.

13          THE COURT:  Is that -- and I know that you have

14  that objection.  I want there to be a clear record.  You can

15  appeal it.  I've got zero problem with that.

16          But I agree that your defenses that existed when

17  this case was filed, we should not be adjudicating or

18  altering at all.  It's only the Plan itself that we're

19  approving can't then serve as the defense.

20          And I know that you disagree with that.  I've got

21  no problem with you disagreeing with that.  But that's the

22  part I'm overruling and only that part.

23          MR. KOOY:  Understood.

24          THE COURT:  Thank you.  All right.

25          MR. BAINS:  Your Honor, Brandon Bains, if I may.

1          THE COURT:  Sure, Mr. Bains.

2          MR. BAINS:  And just, Your Honor on that point for

3   purposes of the record, I did want to make clear, at least

4   on behalf of my clients, that we do still have substantive

5   legal objections to the Plan.

6          We understand the Court has overruled those.

7   Obviously all of this is subject to those objections.  But

8   trying to get to the language that we're not opposed to as

9   part of the Confirmation Order.  I think you said that

10   before, but I just wanted to make that clear.

11          THE COURT:  I did and I'll reiterate it now.  I

12   made substantive rulings during the hearing.  Perhaps just

13   clarified one so that there could be no ambiguity about what

14   I meant to say.

15          And then I ordered the parties -- like you and

16   your client, Mr. Bains, -- to agree on a form that would

17   implement the rulings.  And you are not waiving

18   anything -- it's not my intent that you're ruling anything

19   by agreeing to the form of the order in a manner that is

20   consistent with the Court's rulings.  And your objections

21   previously made are preserved in that regard.

22          And that is true for everyone that is, you know,

23   working as best I can tell in absolute good faith to try and

24   implement the Court's orders.  I have no problem with what

25   anybody is doing or saying here.  And expect that no

1  Appellate Court would think that the work of fine lawyers

2  implementing a Court order shouldn't be a waiver.  It's just

3  not.

4          MR. KOOY:  Your Honor, I don't know if I'm still

5  unmated.  This is Ralph Kooy again.

6          THE COURT:  No, you're still live.

7          MR. KOOY:  Okay.  I just -- I appreciate that

8  clarification and we had not, you know, officially made our

9  closing voicing and continuing our objection.  But based on

10 your (indiscernible) that that applies to North American

11 Specialty as well.

12         THE COURT:  It applies to them and to all the

13 others that raised objections that I overruled.  You know,

14 this is a really hard long complicated thing. And for your

15 clients too, you want a clear order even for appellate

16 purposes.

17         And compliance with my direction to try and work

18 on getting something that clarifies and implements the

19 Court's rulings only shows good lawyering and not waiver as

20 far as I'm concerned.  And I make that as to all --

21         MR. KOOY:  Thank you very much, Your Honor.

22         THE COURT:  -- all parties.  Thank you.  All

23 right, so I'm going to let everybody tell me if this means

24 that want a little -- maybe overnight -- to work on that

25 paragraph and come back in the morning or something.

1          But I am worried about getting this one done with

2   this many parties that really care about how that language

3   is going to fit in.

4          So let's go on down.  What do you have next?

5          MR. CARLSON:  Well, I think these next couple of

6   paragraphs were also a part of those same discussions.  I

7   think paragraph 98 is really clarification that -- you heard

8   a lot of testimony and discussion on this.  None of the nine

9   Apache bonds where the Debtor is the principal are being

10  allocated or assigned pursuant to the Plan.

11         I don't think there's anything controversial about

12  98, but folks can speak up if so.

13         And then paragraph 99 is really intended to try

14  and address what is being dealt -- what subrogation rights

15  are being dealt with under the Plan and what aren't for the

16  pre-post subrogation rights discussion that we've had.

17     (Pause in the proceedings.)

18         THE COURT:  I'm not sure what 99 means.

19     (Pause in the proceedings.)

20         MR. CARLSON:  What this is intended to say is that

21  any post-effective date subrogation rights are not being.

22  The way I read this anyway, others can disagree but, are not

23  being dealt with or are not being enjoined release, altered

24  or diminished not by the non-Apache Surety subrogation

25  rights.

1          THE COURT:  So, if money is paid to the Government

2    under the Plan, by a bonding company, can they come back

3    against NewCo?  Because my ruling was they couldn't and this

4    paragraph seems to say they can.

5          I don't think it's consistent with my ruling.

6          MR. CARLSON:  They cannot.  They cannot, Your

7    Honor.  I think that's right and if we need to fix this to

8    be consistent we will.

9          THE COURT:  I read this to say that if a

10   subrogation right arises on the effective date and on the

11   effective date Newco will be an owner, if they're preserved.

12   And that is not my intention.

13         I believe it is inconsistent with Mid Atlantic.

14         MR. BAINS:  Your Honor, Brandon Bains, if I may?

15         THE COURT:  Yes, sir.

16         MR. BAINS:  Let me just say for my four sureties,

17   Your Honor, we do not have any Government bonds.  All of our

18   bonds are on behalf or excuse me, on behalf of Fieldwood in

19   favor of private entities.

20         THE COURT:  Right.

21         MR. BAINS:  I can say for my purposes, we're

22   simply trying to preserve those subrogation rights.  I think

23   it's maybe a different issue than the Court is hitting on.

24   So I do think the folks that have the Government bonds can

25   speak up if they need to on that.

1           But I do think it's important for any of the other

2    subrogation rights for sureties that private bonds be

3    preserved after the effective dates, which is what this

4    language is at least attempting to get do.

5           THE COURT:  So, is Newco buying any of the

6    property on which your client can assert subrogation rights?

7           MR. BAINS:  There are assets bonded by my clients

8    that are flowing to Newco, yes.

9           THE COURT:  Yeah, I am --

10          MR. BAINS:  I still have -- I mean --

11          THE COURT:  -- so this is a ruling I tried to make

12    before.  Newco buys free and clear.

13          MR. BAINS:  I don't know that that's the issue

14    that we're fighting about.  I think the issue is more if,

15    for instance Mr. Ripley's client, Chevron, if we pay out on

16    that bond on an asset that has gone to Newco, we're

17    subrogated to Chevron's rights or the other obligee.

18          THE COURT:  This has being bought free and clear

19    of Chevron's rights, right?  Newco isn't taking it and then

20    having to pay other than what they've agreed to pay.  They

21    don't have to pay extra via subrogation.

22          MR. BAINS:  No, I think I'm saying something

23    different, Your Honor.

24          THE COURT:  Okay.

25          MR. BAINS:  I think I'm talking about in the

1  future lets say if Newco otherwise did not perform long

2  after the effective date for their own obligations with the

3  Government.  If the Government issued some sort of order

4  that flowed back to Chevron in the chain of title or not.

5  However we come to pay under our bond, we're just simply

6  saying we maintain those subrogation rights against our

7  private obligees.

8          I don't know that it's impacting the free and

9  clear concept that the Court is worried about.

10         THE COURT:  I think it depends if what you're

11  describing is Newco post effective date puts up a new

12  platform.  That's Newco's problem.  I don't know that anyone

13  has bonded that.  But that's Newco's problem.  And people

14  are going to be subrogated.

15         But people are not going to be able to sue Newco

16  for a error obligation that arose before their acquisition.

17         MR. BAINS:  That arose before the acquisition is

18  that what you said?

19         THE COURT:  Right.  If the error obligation

20  existed on the date, you know, prior to the date of Newco's

21  acquisition, Newco can't be forced to pay that other than

22  what the Plan says.  That's the whole fundamental --

23         MR. BAINS:  Yeah I understand.

24         THE COURT:  -- premises of the Plan.

25         MR. BAINS:  I would agree that's the premise of

1  the Plan.  I don't think that's what this is saying.  This

2  is saying subrogation rights that would arise after that.

3         THE COURT:  No it says other than those

4  subrogation that arose on or before the effective date.

5         MR. BAINS:  Well the -- I think Ms. Loui or

6  Mr. Carlson talked to this.  The intention was saying

7  nothing is going to impact the subrogation rights other than

8  those ones that came before.  Those are the ones that are

9  being impacted.  Those are the ones that are being cut off.

10        The intention was to keep the ones afterwards.

11 And I don't believe I'm misrepresenting Ms. Loui.

12        THE COURT:  I got it.  I got it.  Okay, so I maybe

13 just misreading this.  Thank you.  I think I was misreading

14 it.  Let me try again.

15     (Pause in the proceedings.)

16        THE COURT:  I was misreading it.  I think you're

17 right.  I'm going to withdraw my comment.

18        MR. BAINS:  Thank you.

19        THE COURT:  Thank you.  Sorry, Mr. Carlson, about

20 that diversion scary statement by me.  I got it wrong.

21        MR. CARLSON:  No problem.

22        THE COURT:  Let's go ahead.  Hold on.  Ms. Ryan,

23 welcome back.

24        MS. RYAN:  Thank you, Judge Isgur.  Again for the

25 record this is Abigail Ryan on behalf of the Railroad

1    Commission of Texas.

2         I can conferred with my colleagues on the tax

3    bankruptcy side here at the Attorney General's Office, Your

4    Honor.  And the taxing entity referred to -- and I believe

5    it's paragraph 78 or 77 -- are ad valorem taxes.  And so, we

6    don't represent each and every separate county or school

7    district that has taxing issues.

8         What is -- that was handled by -- let me pull it

9    up there.  (Glitch in the audio) by a private law firm and

10   filed an objection and that firm is the Perdue, Brandon,

11   Fielder, Collins and Mott law firm.  It looks like Ellen

12   Connex filed an objection and this is Melissa Valdez also on

13   their signatory block.  So, this is out of the Attorney

14   General's purview for today.

15        THE COURT:  Thank you for the announcement.  I'm

16   taking, though, that the Attorney General -- perhaps because

17   it doesn't have an assignment, perhaps because it hasn't

18   been called on to act -- the Attorney General is not

19   asserting an objection to those paragraphs, right?

20        MS. RYAN:  Correct.  In fact, I just received an

21   email as you were speaking from the manager of the taxing

22   section of our office.  And he looked at the Order and he

23   doesn't have a problem with that provision of the proposed

24   Order or the one addressing Louisiana's taxing concerns.

25        And so that's from Mr. John Stern.  He's the

1  manager of the bankruptcy tax section of Attorney General's

2  Office.

3          THE COURT:  All right, thank you Ms. Ryan.

4          MS. RYAN:  Thank you, Your Honor.

5          THE COURT:  Mr. Zuber?

6      (Pause in the proceedings.)

7          THE COURT:  Mr. Zuber, if you're talking your line

8  is muted.

9          MR. ZUBER:  I'm sorry, Your Honor.  I was just

10  going to arise to address Your Honor's concern about

11  paragraph 99, but those have now been resolved.  So I don't

12  need to address at this point.

13          THE COURT:  Thank you.   Mr. Schaible?

14      (Pause in the proceedings.)

15          THE COURT:  Mr. Schaible?

16          MR. SCHAIBLE:  Your Honor, I was just going to ask

17  with respect to that paragraph, I think that everyone on

18  this call expectation and understanding is clear.  But later

19  in the Order, we have somewhat similar language and what we

20  did there was clarify that with respect to post-effective

21  date activities.  And I'm wondering if we could add -- if we

22  could add that in the paragraph?

23          Again, I think everyone understands the point, but

24  the language -- as Your Honor pointed out -- could actually

25  benefit from being clearer.

1          In other words, to the extent that subrogation

2    started -- to the extent that work on account of

3    pre-effective date activities occurs post-effective date and

4    therefore the subrogation could theoretically arise

5    post-effective date, but it's with regard to pre-effective

6    date obligations, credit bid Newco should not be on the hook

7    is your point.

8          And I'm wondering if just the addition of, you

9    know, with respect to post-effective date activities may

10   solve that ambiguity.

11         THE COURT:  Sounds like that makes some sense to

12   me.  Let's see if it causes anybody any problem because

13   you-all are going to have a bunch of discussions.

14         Ms. Loui, did you have a comment about that as

15   well?

16         MS. LOUI:  Yes, Your Honor.  I was actually going

17   to say exactly what Mr. Schaible said.  So I think we're in

18   agreement that we have some clarifying to do on the language

19   in paragraph 99.

20         THE COURT:  Thank you.  All right, let's move to

21   paragraph -- I'm sorry, go ahead.

22         MR. BAINS:  I'm sorry, Your Honor, Brandon Bains.

23   I don't want to belabor this point too much, but I do want

24   to make sure that I understand what Mr. Schaible is saying.

25         If he's simply saying that they want to make clear

1    that it's post-effective date activities, I think that's

2    consistent with everything we've talked about.  One concern

3    is he seemed to make a comment about pre-effective date

4    obligations and those are two different things.

5          I mean there's no dispute, obviously, all bonds

6    are pre-effective date otherwise we wouldn't be

7    participating in this joyous process.

8          So yeah we're going to have bonds that are

9    pre-effective date.  The question is going to become whether

10   the obligations under those bonds arise post-effective date,

11   therefore giving rise to the subrogation rights.

12         If we're all on the same page that that's fine,

13   okay.  I think that's what we're saying, but I want to make

14   sure I understood him correctly.

15         THE COURT:  Yeah, so look there's the argument

16   that I think we all know which is that the owner of property

17   has a continuing duty to clean it up.  And so one could

18   argue that post-effective date an obligation arose.  They're

19   saying that they shouldn't have liability for those.  I

20   think that's right.

21         On the other hand, there could be activity they

22   engage in post-effective date.  Let's say they go, you know,

23   disturb a pipe or they go install a new platform and for

24   that they should have liability.

25         And so that's what I think the purpose of

1  Mr. Schaible's comment was.  I don't know if that's

2  inconsistent with what you're saying.

3      MR. BAINS:  I think all I'm simply saying is yes

4  that's what you just captured is the understanding of the

5  provision.  But if there was some notion that because a bond

6  was issued pre-effective date that it never has any

7  subrogation rights I do not agree with that.

8      MR. SCHAIBLE:  No, that is not -- that is not what

9  I intended, sorry.  Literally the addition would be just the

10 words "on account of post-effective date activities" into

11 the existing language.  That's all.

12     MR. BAINS:  Understood, Mr. Schaible.  I think we

13 can look at that then.  We have to do it anyways.  Thank

14 you.

15     THE COURT:  Thank you.  All right, let's go to

16 paragraph 100.  Hold on, I've got somebody else.  Mr. Zuber

17 go ahead, your line is remaining active.  Mr. Zuber?

18     (Pause in the proceedings.)

19     THE COURT:  Mr. Balasko?

20     (Pause in the proceedings.)

21     THE COURT:  Mr. Balasko?

22     MR. BALASKO:  Thank you, Your Honor.  Zach Balasko

23 for the Department of the Interior.  As to paragraph 100 is

24 a very, very minor change.  I don't think the terms BOEM and

25 BSEE are defined anywhere in the Order or the Plan.  So,

1  somewhere either in the Plan or in this Order those terms

2  need to be defined.

3            THE COURT:  Except we all know them.

4            MR. BALASKO:  That's true, Your Honor, but

5  whoever's looking at this in the future might not.

6            THE COURT:  All right.  Mr. Carlson, where do you

7  want to go next?

8             MR. CARLSON:  Your Honor, the next I think nine

9  or ten paragraphs are the Chevron specific paragraphs.  I am

10  not aware of any objections.  But -- and they haven't

11  changed.  But would -- I guess Mr. Ripley may have something

12  to say about it, but from our perspective these are --

13            MR. RIPLEY:  Yes, Your Honor.  Ed Ripley, Your

14  Honor, Andrews and Myers on behalf of Chevron.  Yeah, we had

15  provided for example, in what's now paragraph 101.  We had

16  provided additional protective language that would go in at

17  the end.

18            That language comes from other parts of the exact

19  same order.  And so we don't understand why that would not

20  be included there.

21            And we've provided the redlines to Mr. Carlson and

22  his team.  I can -- I can even have it brought up if you

23  want to see it Judge.  But it is a literally a cut and paste

24  from other provisions in the exact same order -- in this

25  order.

1          And it's protective language and reservation of

2    rights language.

3          THE COURT:  Let me give Mr. Carlson a minute to

4    look at it.

5       (Pause in the proceedings.)

6          MR. CARLSON:  Yeah, I don't think we're agreed on

7    this language yet.  We're going to have to look at it.

8          MR. RIPLEY:  Right, I think it slightly changed in

9    your new paragraph 62.  But whatever that language is, we

10   just wanted to have the exact same language.  Wherever you

11   come down on that.

12         MR. CARLSON:  Okay, Mr. Ripley, it sounds like we

13   can work this out.

14         THE COURT:  Thank you.  Mr. Zuber?

15         MR. STURM:  Good afternoon, Judge.  This is Jay

16   Strum for Aspen, Berkley and Sirius Insurance companies.

17         I apologize, Judge.  I tried to raise my hand a

18   minute ago to speak on 99.  We were just a little bit

19   confused as to the ruling with respect to 99, Judge.

20         Our understanding and based on our negotiations

21   with the other parties is that what is being preserved is

22   any subrogation rights that arise post-effective date -- and

23   that would be for any operations by the credited purchaser.

24   You know, it's really geared toward if the credited

25   purchaser doesn't comply with the -- with their obligations

1   under the BOEM regulations and they don't do their

2   decommissioning, an surety has to step in and perform, then

3   the surety should be subrogated to -- as against the

4   credited purchaser.

5          That was what that was aimed at and Your Honor's

6   comments with respect to new wells, new platforms and I just

7   want to make sure it would be as to any obligee.

8          THE COURT:  I am overruling that objection now for

9   the fourth time.  The purchasers are not undertaking an

10  obligation to do error work other than as specifically

11  provided in the Plan.

12         And you are not subrogated to the right to sue

13  them for failure to do error work if that error work existed

14  prior to the effective date.  I understand that the sureties

15  massively object to that ruling, but that's the ruling.

16         MR. STRUM:  Understood Judge.  We appreciate the

17  clarity.

18         THE COURT:  Thank you.  All right, let's go back,

19  Mr. Carlson?

20         MR. CARLSON:  So from there, Your Honor, I would

21  go to paragraph 111 through --

22         MR. RIPLEY:  Actually we have some other Chevron

23  issues, Your Honor.

24         THE COURT:  Go ahead, Mr. Ripley.

25         MR. RIPLEY:  Judge, what is now paragraph 105, we

1   have again -- we provided similar protective language that

2   comes from another provision in the Order.  The exact same

3   language.

4           And Mr. Carlson, again, this is the language that

5   we sent you.  I'm not clear if that slightly changed, but

6   wherever you land on with that, we just wanted to have that

7   exact same language in.  And again I'm glad to talk with you

8   separately.

9           But that's the redline that we had provided

10  yesterday.  And would come in at the end of what is now

11  paragraph 105.  I'm sorry, yes previously 101 is now 105.

12          MR. CARLSON:  Understood, we'll have to talk off

13  line, Mr. Ripley.  I just haven't had a chance to review it.

14  Apologies.

15          MR. RIPLEY:  Sure.  Understood.  Judge, the next

16  is paragraph 107 in the current Order.  In the very

17  beginning of that, after "all rights of any applicable

18  proofs of entity.

19          We needed to insert "and/or other applicable

20  obligees" because some of our bonds there are more than one

21  party as an obligee on the bond.  We are not the sole

22  obligee.

23      (Pause in the proceedings.)

24          THE COURT:  Mr. Carlson?

25          MR. CARLSON:  Yes, I don't think we have a problem

1  with that addition, but I only speak for the Debtors, so.

2              THE COURT:  Thank you.  Mr. Ripley?

3              MR. RIPLEY:  And Judge, the last -- well it's not

4  the last.  The next paragraph which is now 104 -- I'm sorry,

5  108.

6              In the very beginning, the Court is approving

7  certain of the field documents.  And we need to insert the

8  Coosa (phonetic) implementation agreement into I in the

9  whole and then following in.

10             That document by its own terms requires Court

11  approval.  And of course Section 363 would require to be

12  approved.

13             So again, we've provided comments to the Weil

14  team.  So right after "approves the" and before "Coosa

15  definitive documents" we would insert "Coosa Implementation

16  Agreement and."

17             And then just that same insert "Coosa

18  Implementation Agreement and" would fall in the same place

19  in two ii in two different places.

20             And again, I'm glad to work with Mr. Carlson off

21  line, but we had provided that change yesterday.

22             MR. CARLSON:  That change is fine with the

23  Debtors.  I think the other ones -- the other changes you

24  discussed we'll have to discuss separately off line, but

25  that one is fine.

1          MR. RIPLEY:  Sure.  Appreciate it.  Thank you.

2    And then the last is what is now paragraph 106.  Judge there

3    are a couple of interests that are being acquired by Newco

4    Credit Bid Purchaser.

5          And those interests are riding through and would

6    be permitted encumbrances.  So to make that clear at the

7    very end of the paragraph --

8          THE COURT:  I think this must not be 106.  What

9    paragraph are you in?

10         MR. RIPLEY:  I'm sorry, it's now 110.  My

11   apologies, Judge.

12         THE COURT:  That's okay.

13         MR. RIPLEY:  Toggling between the old and the new.

14   So at the very end, that last clause should -- we think the

15   easiest fix "shall be" -- this is a defined term -- "credit

16   bid permitted encumbrances."

17      (Pause in the proceedings.)

18         MR. RIPLEY:  I don't think there's any dispute

19   because these are riding through.

20      (Pause in the proceedings.)

21         MR. CARLSON:  That change is fine as well, but I'd

22   like to just confirm with others.  I know these paragraphs

23   have been very heavily negotiated.

24         MR. RIPLEY:  There's another way to fix it.  But

25   we thought this was the simplest way to do it Judge just to

1 | make sure.

2 |         THE COURT:  All right, then let's move ahead.

3 |         MR. RIPLEY:  Thank you Judge and thank you

4 | Mr. Carlson.

5 |         THE COURT:  Thank you.  So I think we were going

6 | to talk about 111 to 118 on the EIN deal and said we would

7 | back to that, which we're there now.

8 |         MR. DENDINGER:  Yes, Your Honor, again for the

9 | record -- sorry Mr. Carlson.

10 |         MR. CARLSON:  No, go ahead Mr. Dendinger.

11 |         MR. DENDINGER:  I apologize for interrupting,

12 | Mr. Carlson.  Again, for the record Mark Dendinger from

13 | Bracewell for EIN.

14 |         Your Honor, these paragraphs, 111 to 118, are the

15 | paragraphs that I referenced that were of concern.

16 |         Just for Your Honor's benefit these paragraphs

17 | other than the new change in 118 -- which I think is an

18 | asset change -- these were included in the form of

19 | implementation agreement that was filed with the Court as

20 | part of the Plan supplement.

21 |         That was filed on June 15th at docket 1562

22 | approximately nine days ago.  So again, this has been a

23 | matter of public record for some time.  I believe how

24 | they've been woven into the Confirmation Order is -- if

25 | there are any changes to what was in the implementation

1  agreement they simply are conforming comments and/or I've

2  additional changes to make it read well and in accord with

3  other defined terms in the Confirmation Order.

4         So these have been substantially and heavily

5  negotiated at good faith as part of all of the EIN

6  definitive documentation.  And so I just want to put those

7  comments on the record.

8         With regard to the new change in 188 -- which

9  appears in the redline -- this is -- this was included in

10  the form of implementation -- not included in the form of

11  implementation agreement.  It was included last night and is

12  included in the execution now of the implementation

13  agreement.

14         And I believe ought to allay the concerns of the

15  bonding company.  This was really meant to provide comfort

16  language to both parties -- my client as obligee and the

17  bonding company -- that there's nothing about the Plan, this

18  Order or the transactions contemplated effectually under the

19  Plan are going to modify rights with regard to the specific

20  bond.

21         And that was included, Your Honor, in some regard

22  because of the recently filed lawsuit against my client.

23         THE COURT:  Thank you, Mr. Dendinger.  Any

24  objection to that?

25      (No audible response.)

1            THE COURT:  All right, good.  Let's move ahead.

2            MR. CARLSON:  Your Honor, the next paragraphs 119

3    through 124 are paragraphs that negotiated with Hunt as part

4    of the settlement that was reached with them.

5            I believe we are agreed on these paragraphs as

6    well and we'll let Mr. Chiu confirm.

7            THE COURT:  Mr. Chiu?

8            MR. CHIU:  Good afternoon, Your Honor.  Kevin

9    Chiu, Baker Botts on behalf of Hunt Oil Company just rising

10   to confirm Mr. Carlson's statements with regards to the

11   language in the Confirmation Order on paragraph 119 through

12   the remainder of the Hunt provisions ending at currently

13   paragraph 126.

14           With respect to some of the outstanding items that

15   we spoke of early on during that period, this language will

16   be reflected in the Hunt agreement that Mr. Carlson alluded

17   to earlier today.

18           We do ask that given the sort of placeholder

19   bracket that's in place at 118 right now, that the term

20   agreement be filed prior to the next turn of the

21   Confirmation Order so that the docket number can be filed in

22   properly and reflected accordingly.

23           When we did receive confirmation from Mr. Carlson

24   and his team earlier today and with regards to the Plan

25   supplement documents that we alluded to earlier, and those

1  will be hopefully updated accordingly to reflect the

2  allocation of certain properties under the Hunt turnkey

3  agreement and the Hunt term sheet with respect to Fieldwood

4  Three and the abandoned properties.

5          Other than that, we certainly reserve our rights

6  to any changes in this language with respect to Hunt if

7  there are any further movements in the next turn, but I

8  believe we are fully resolved on these issues.

9          THE COURT:  Mr. Chiu, thank you.

10         Mr. Carlson?

11         MR. CARLSON:  Yeah I can confirm the changes we

12  discussed to the schedule, fuel and gas schedules and the

13  intention to finalize and file the turnkey agreement.

14         THE COURT:  Thank you.  So that takes us to Exxon,

15  right?

16         MR. CARLSON:  That's right.  And these

17  provisions -- we'll let Ms. Rosen address --

18         THE COURT:  Ms. Rosen, good afternoon again.

19         MS. ROSEN:  Thank you, Your Honor.  Suki Rosen on

20  behalf of XTO entities.  I think we're fine until we've got

21  one small nit when you go down to paragraph 127, romanette

22  V.

23          Those changes are fine except for the change from

24  the or to an and.  Basically all of our respective rights

25  and obligations we want them to be referred as they are

1  under the terms of the contract or applicable law.

2          I don't know if we have any rights, you know,

3  offset or recoupment that arise under applicable law that

4  don't arise under the contracts.  But we'd rather have that

5  be in the disjunctive instead of the -- instead of requiring

6  it to be both.

7          And I'm not sure why that change is there.  When I

8  look through the remainder of the proposed Confirmation

9  Order it's in the disjunctive in paragraph 142 and so I'm

10 just -- I'm not sure why that was changed to an and.

11         MR. CARLSON:  Well, Your Honor, I think it's --

12 well it wasn't in 142 I think we meant to have it as and in

13 there, but I think from our perspective that any netting

14 rights that are going to be asserted should be in accordance

15 with law and the contract and the F4 contract.

16         THE COURT:  Well let's assume that they have an

17 agreement.  It's allowed by applicable law, but not

18 addressed by the contract.  That's her argument.

19         MR. CARLSON:  I guess I don't -- in my mind it

20 still would need to be consistent with the terms of the

21 agreement.  It couldn't override what the terms of the

22 agreement provide for.

23         THE COURT:  So let's change the and to an or.  And

24 after the word law, put in a parenthetical that says in a

25 manner that is consistent with the contract.   That is not

1    inconsistent with the contract, I guess.  Because if it's

2    missing from the contract, we're going to use applicable

3    law.

4              If it's in both the contract and applicable law,

5    we're going to use the contract.  So just include the

6    parenthetical that says unless it's inconsistent with the

7    contract.

8              I assume that works for you, Ms. Rosen; is that

9    right?

10             MS. ROSEN:  I think that's fine, Your Honor.

11   Thank you.

12             THE COURT:  That work for you Mr. Carlson?

13             MR. CARLSON:  Yes that works for us.

14             THE COURT:  Thank you.  What do you have next?

15             MR. CARLSON:  From there, Your Honor, --

16             THE COURT:  Go ahead.

17             MR. CARLSON:  -- from there we go to BP language

18   which is 135 through 138.

19             MS. ROSEN:  Oh, I'm sorry to interrupt,

20   Mr. Carlson, but there were a couple of other changes that

21   were made to paragraph 129.  That was some language that had

22   been provided to XTO from our surety counsel.  And we

23   certainly wanted to make sure -- we haven't had an

24   opportunity to discuss that with counsel for the sureties.

25   I know Mr. Scharfenberg and Mr. Bain and Mr. Langley are

1   both on and so I wanted to see if they had any comments to

2   those changes.

3          UNKNOWN:  Yeah, from our wise perspective we don't

4   have an issue with those changes, thank you.

5          THE COURT:  Does anyone have any objection to

6   those changes?

7          MR. BAINS:  This is Brandon Bains.  I'm looking at

8   those now.  Your Honor, I don't really see any objection to

9   those.

10          THE COURT:  Thank you.   All right.

11          MS. ROSEN:  Thank you, Your Honor.

12          THE COURT:  Let's go to BP.

13          MR. CARLSON:  So, Your Honor, I understand did

14   have a conversation with Mr. Burrer last night.  Encore

15   resolved on this language.  She did point out that I was

16   missing a few of the BP entities in the defined terms of the

17   BP entities, but otherwise my understanding is we're agreed

18   on the language, but we'll let Mr. Burrer address the Court.

19          MR. DUEWALL:  Good afternoon, Your Honor.

20          THE COURT:  I'm not sure if we have Mr. Burrer --

21   okay go ahead please.

22          MR. DUEWALL:  Good afternoon, Your Honor, Craig

23   Duewall with Greenberg Traurig on behalf of BP.

24          When BP made it's opening statements to the Court

25   on Monday, BP identified important commercial issues that it

1  sought to protect and preserve and hopefully if given the

2  opportunity could resolve those before the end of the week.

3          I'm pleased to inform the Court that with the

4  additional time provided, the Debtors have incorporated the

5  language in the Order that addresses the concerns, the

6  commercial issues that BP raised.  It's my understanding

7  that the language confirms that BP's opted out of a third

8  party releases.

9          The language confirms that BP's set off rights are

10  reserved and preserved, which is the subject of the motion

11  at docket entry 1666 is set for hearing the set off -- the

12  motion to lift stay related to set off that's set for July

13  16th.

14          And it is further my understanding that the

15  language confirms that BP's arbitration rights are reserved

16  and preserved which the subject of BP's pending motion to

17  lift stay, related to arbitration at docket entry 1414.  And

18  that's set for hearing on July 9th.

19          So having said those things, Your Honor, it's my

20  understanding that the language does reflect the parties

21  understanding.  Mr. Burrer, I believe, has one issue related

22  to footnote 13 that he wanted to address the Court about.

23          MR. BURRER:  Thank you, Your Honor.  Karl Burrer

24  for BP.  As Mr. Carlson correctly stated footnote 13, we're

25  just catching the BP entities.  And hearing the colloquia

1  between Mrs. Rosen and the Court, I didn't interpret the and

2  versus or issue as she did.

3         But given the change in the and or or, and new

4  paragraph 133, romanette III, we'd request that language as

5  well just to avoid any conclusion which is the same and or

6  or on the nettings contract first applicable law.

7         MR. PEREZ:  Your Honor, may I be heard?

8         THE COURT:  Go ahead Mr. --

9         MR. PEREZ:  Yeah, Your Honor, I was going to raise

10 my hand, but I don't think we can agree to that change.  I

11 think that, you know, this is the discussion that we talked

12 about.  This is when you heard testimony about we take very

13 different view.

14        So, I think that that change with respect to this

15 provision, you know, it has a material impact or a potential

16 material impact or a potential material impact.  And I don't

17 think we agree to that.

18        And, Your Honor, I'm a little concerned as to

19 what's happening here is we negotiated things with

20 everybody.  Now that everybody's seen the Confirmation

21 Order, it's like they want an MSN.

22        And so at some point, you know, we negotiate

23 things, we put them to bed and now people are saying oh

24 somebody else got something better and I want it.  And at

25 some point we just have to stop that.

1          But I would -- this is language we negotiated, we

2   reached an agreement.  And I think --

3          THE COURT:  Let me catch up with the language.

4   Mr. Burrer, where is the particular language that you're

5   talking about?

6          MR. BURRER:  It is 133, romanette III.  And the

7   only request that I would have to the language change is

8   just the parties understanding that the contract has to say

9   "set off" and you have to have the right under the law.

10  Even if the law doesn't say your contract must have the word

11  set off in it in order to exercise the set off.

12          I didn't read the and as requiring that.  It was

13  solely based on the statements from Ms. Rosen that she

14  thought it could be read in that manner.

15          So if the applicable law gives me the right for

16  set off, but my contract doesn't say set off, I've got that

17  right under applicable law, I think that should be

18  preserved.  And that shouldn't create a barrier that doesn't

19  exist under applicable law.

20          MR. PEREZ:  Well it is pursuant to applicable law

21  and as a contract doesn't prohibit it, that's one thing,

22  Your Honor.  But again we're basically arguing that -- later

23  on --

24          THE COURT:  So, hold on.  First of all, Mr. Perez

25  this is just a problem having to do it in a Confirmation

1   Order.  And once one person gets something, it can effect

2   somebody else's rights where they need to come in because if

3   you have inconsistent paragraphs another Court may interpret

4   those differences as having meaning.

5          So I'm overruling your statement that people can't

6   speak up just because they agreed to something if it's based

7   on another change.

8          Second, let's use the same language we used.  If

9   applicable law isn't consistent with the contract, the

10  contract will govern.  But if it is not inconsistent with

11  the contract, they can do it under applicable law.  The same

12  language we used before.

13         I'm going to overrule the Debtor's objection.

14         MR. PEREZ:  Your Honor, one more comment.  I

15  understand the Court has ruled.  But then we also have to

16  put unless there's no course of dealing to that effect.

17  Because in essence, you know, what is -- if there's a course

18  of dealing under the contract that's one thing.

19         It may not be perfect and it may not be prevented

20  by the contract or prohibited by the contract, but if

21  there's a course of dealing, you know, we also want to be

22  able to make that argument here.

23         So, if we're going to put --

24         THE COURT:  You can make that argument under

25  applicable law.  But if it's inconsistent with the contract,

1   it may be different.  I'm not going to change the language

2   again.  Thank you.

3         What do you have next, Mr. Carlson?

4         MR. CARLSON:  Your Honor, from there after the BP

5   paragraphs, we go to the Nippon language and 139 through

6   142.

7         I believe there is a -- I think as Ms. Rosen

8   pointed out there was that same and applicable law where we

9   had it differently here.  I'm just trying to find where that

10  is, but aside from the one change where we want to conform

11  to the Court's ruling on the BP and XM language, I think

12  we're other wised agreed and we'll let Ms. Moses confirm.

13        THE COURT:  Ms. Moses?

14        MS. MOSES:  Thank you, Your Honor.  That is

15  correct.  Right now the Order has all of the changes that we

16  negotiated with the Debtors.  To the extent they're going to

17  want to add any other language in based on the recent

18  conversation, we'd just like to see it to make sure it

19  works.

20        THE COURT:  Thank you.  All right, let's go to

21  McMoRan.

22        MR. CARLSON:  There is also a (glitch in the

23  audio) and LLOG in between those two.  I don't think -- I

24  don't think there's any open issues from our perspective.

25        The only thing I would say for LLOG is setting a

1   hearing date to review the dispute that I think you got a

2   preview of from Mr. Baay.

3             MR. BAAY:  I thought that was set, Your Honor, on

4   the 8th.

5             MR. CARLSON:  Oh, my apologies that's right.

6   Yeah.

7             THE COURT:  I thought we actually set it and we

8   ought to go ahead and put that date in there.

9             MR. CARLSON:  Yes, we'll put that.

10            THE COURT:  Thank you.  I don't remember when we

11  set it for.

12            MR. BAAY:  July 8th, Your Honor.

13            THE COURT:  Okay.  Thank you.  All right.

14            MR. CARLSON:  And then from there, Your Honor, we

15  go to the background language which --

16        (Pause in the proceedings.)

17            MR. CARLSON:  I think some parties are signed off

18  on and some may not have.  So I don't know if you want to

19  just allow folks to -- if there are objecting parties to

20  this language let them speak up.

21        (No audible response.)

22            THE COURT:  All right, I don't see anyone seeking

23  to speak about them.  Go ahead.

24            MR. CARLSON:  Great.  Then from there we go to

25  146, the Shell language.  Reserving rights with respect to

1  the Shell bond.  I believe we're also agreed on this with

2  Shell and Shell's counsel.  But Shell's counsel can correct

3  me if I'm wrong about that, Mr. Manns.

4        THE COURT:  All right go ahead, please, Shell.

5     (Pause in the proceedings.)

6        THE COURT:  Mr. Zuber, your line remains open, go

7  ahead.

8        MR. ZUBER:  Thank you, Your Honor.  Your Honor, we

9  thought we had an agreement with all parties with respect to

10 the Shell free and clear and there being no impact upon post

11 effective date subrogation rights.

12        And I'm not sure we have that agreement anymore.

13 So I just wanted to be clear for the record just to make

14 some arguments and have the opportunity to create that

15 record.

16     (Pause in the proceedings.)

17        MR. ZUBER:  Your Honor, it's our client's view

18 that this Debtor cannot sell the Credit Bid Purchaser free

19 and clear of future subrogation rights.  There's no

20 provision of Section 363(f) that would allow that.

21        That's one provide that it can be free and clear

22 of interest, it's applicable non-bankruptcy law permits the

23 sale to the contrary non-bankruptcy law as set forth in

24 the -- by US Supreme Court in Pearlman versus Alliance

25 Insurance Company at 371 US 132.

1          It states that there are a few doctrine that are
2    established than a surety that pays the debts of another is
3    entitled to all the rights of the person he paid to enforce
4    his right to be reimbursed.
5          So I don't think applicable non-bankruptcy law
6    permits the sale free and clear of future rights.  Two, such
7    entity contends.  The sureties have not consented.
8          Three, the interest is a lien and the price of
9    which such property to be sold is greater than the aggregate
10   value of all liens on the property.  Future subrogation
11   rights are not liens.
12         Four, such interest in a bonafide dispute.
13   There's no dispute at this point about subrogation rights
14   which are not yet even arisen.
15         And five, such entity could be compelled to hold
16   legal or equitable proceedings to accept the money
17   satisfaction.  By their very nature subrogation rights are
18   equitable rights and therefore there could be no money
19   satisfaction to collect the surety.
20         Your Honor, we respectfully submit that a 363 sale
21   cannot be seen clear of future claims and rights such as
22   subrogation rights.  With that proposition, I would
23   respectfully direct the Court's attention to the matter of
24   Mooney Aircraft, 730 F2d 367, Fifth Circuit 1984.  Similarly
25   in re Oil Style Plastic 227 BR 797 which is a case out of

1   the Western District of Michigan.  And <u>Ninth Avenue Remedial</u>

2   <u>Group versus Alice Chalmers</u>, 195 BR 716.

3          All of which states that a sale free and clear

4   does not include future claims that does not arise until

5   after conclusion of a bankruptcy proceeding.

6          From a factual standpoint, Your Honor, Credit Bid

7   Purchaser will acquire assets and then immediately is

8   required to comply with all applicable laws due to

9   decommissioning on those assets and the leases that it takes

10  over.

11         If they were to default in the future down the

12  road five years from now, the obligee will make the claim

13  against the surety on its bond, on the field bond as a

14  predecessor owner operator.

15         The surety would then have the legal right to step

16  into the shoes of both the principal Fieldwood Energy and

17  the obligee and go against the defaulting entity, here the

18  Credit Bid Purchaser.

19         The Credit Bid Purchaser says that it can and it

20  will perform its legally required decommission obligations.

21  If it takes over the leases it has to perform going forward.

22         If it does not, the sureties are called upon to

23  pay, the sureties must have the rights under non-bankruptcy

24  laws to step into the shoes of the obligee or the principal,

25  including the Federal Government.

1           Subrogation is a creature of equity.  The credited

2    purchaser does not perform, equity requires that anyone that

3    steps up and performs the Credit Bid Purchaser obligation be

4    entitled to reimbursement from the Credit Bid Purchaser.

5           This is especially important in this case, Your

6    Honor, because the Credit Bid Purchaser is a special purpose

7    entity.  It is not a long term entity.

8           It may pull as much money out of the operation as

9    it can and then default and then file bankruptcy, leaving

10   the surety holding the bag.

11          This Court should require the credited purchaser

12   to set aside funds to decommission.  It makes no sense,

13   respectfully, to my clients that the credit bit purchaser

14   could take all the leases, derive revenue, not meet its

15   legal obligations to perform and have a surety pay and do so

16   and leave the surety with no remedy.

17          If the Credit Bid Purchaser wants to acquire these

18   assets, it must accept the burdens along with benefits.  The

19   loan proposes decommissioning obligations on lease holders.

20   That obligation cannot be excused under a bankruptcy plan

21   filed by others.

22          And if the entity that seeks to acquire leases

23   from an insolvent entity does not perform its statutory and

24   regulatory obligations, the surety must satisfy those

25   obligations.  It must be able to step into the shoes of the

1  obligee and assert rights against the defaulting Credit Bid

2  Purchaser.

3          Very, very briefly, Your Honor, if the sureties

4  lose their subrogation rights, they arguably will lose their

5  rights of contributions from jointly and several liable

6  parties such as predecessors.

7          Which requires, in order to preserve those

8  contribution rights, that the surety stand in its shoes of

9  others, in this case the obligees and the principals.

10          It would be very bad public policies, we submit,

11  Your Honor and may very well destroy surety credit in the

12  Gulf of Mexico.  Subrogation is essential the surety market

13  place.

14          If this Court is going to allow an oil and gas

15  company to declare bankruptcy, assign or sale its leases to

16  another party that has then the right to extract oil and gas

17  without the need to comply with the law and take

18  responsibility as set forth in the law for all

19  decommissioning obligations not only would that fly in the

20  face of applicable law, but it would end the surety market

21  for the bonding.

22          It will cripple both smaller operators who rely on

23  surety credit that they would be unable to provide the

24  financial assurance required by law but it would also

25  cripple the ability of current operators to transfer

1  leasehold interest.

2       Bonds were issued on the assumption that the law

3  would be enforced and that those who would choose to extract

4  revenue based upon the bond and obligation, it would be

5  obligated to decommission all structures then in existence

6  and those structures that they install.

7       If they do not want to do that, then they have the

8  right to extract -- then they do not have the right to

9  extract as a matter of statute and regulations.

10      All the sureties are saying is that the Credit Bid

11 Purchaser must comply with the law and if it chooses to

12 acquire leases that does not excuse them from the obligation

13 to comply with the law.

14      And if in the future they fail to -- excuse me

15 Your Honor.  And if in the future they fail to do so, and

16 the surety has to pay for the failure to do so, the sureties

17 rights, whatever those rights are, must be preserved.

18      If the secured creditors don't want to comply with

19 the law, they don't have to acquire with these leases and

20 they should be sold to those who are willing to comply.

21      Your Honor, in this particular case the Credit Bid

22 Purchaser essentially is -- the equity is owned by the

23 pre-petition lenders.  If those lenders wanted to protect

24 their rights, they could have foreclosed their security

25 interests under non-bankruptcy law and taken over the

1    operations and these assets.  In that case, they would not

2    be excused and not be protected from the surtey subrogation

3    rights.

4           The whole point of surety as explained by the

5    Supreme Court is that if a surety sustains a loss, then it's

6    subrogated to the rights of the obligee to reimbursement and

7    all parties who own such reimbursement obligations.

8           And if it acquires leases and doesn't perform

9    statutory obligations in the future, there is no provision

10   of the Plan that should exonerate them from the financial

11   responsibilities that accompany their right to extract

12   revenue -- to extract minerals in the Gulf.

13          Bankruptcy is not a license for assignees to not

14   comply with the law with respect to future activities.  That

15   is not the purpose of free and clear dictates of the code.

16          The purpose to free and clear under 363(f), we

17   submit, is to allow a fresh start so that the buyer is not

18   encumbered by the seller, Debtor pre-petition obligations.

19   If there is a pre-petition blanket lien on assets of the

20   Debtors and the Debtor sells to a third party, of course

21   they shouldn't be saddled with the liens and encumbrances on

22   the property that they acquire.

23          But once they acquire that property and they move

24   and they're required to comply with the law, it's

25   inappropriate, Your Honor, that they should be -- get a free

1  pass and not have to be responsible for their legal

2  obligations.

3          So, Your Honor, so to the extent -- and I know

4  you've already ruled on this, -- but to the extent the Court

5  rules against this or my argument has not persuaded the

6  Court to reconsider this issue, we would just ask that the

7  Plan Confirmation Order not contain waivers of rights under

8  Bankruptcy Rule 320(e).

9          We would ask the Court to not stay -- to stay this

10  order for 14 days and not waive that as to Rule 320(e) and

11  if the Court is not inclined to do that, we would ask for a

12  stay pending appeal so that we make sure that we don't have

13  any negative impact of Section 363(m).  Thank you, Your

14  Honor.

15          THE COURT:  Thank you.  Is there any evidence that

16  there was another buyer that would buy and would in fact

17  perform all the P&A and error obligations?  Because I don't

18  recall any evidence to that effect.

19          I don't recall your client bidding and they could

20  have as well.  Did anyone make the bid that you're talking

21  about under the evidentiary record that's before us?

22          MR. ZUBER:  You know, the Credit Bid Purchaser and

23  lenders chose to go down this path.  The could have

24  foreclosed their security interests under non-bankruptcy --

25          THE COURT:  I'm asking on the evidentiary record

1  that you helped create, is there any evidence that there was

2  anyone that was willing to do what you suggested would be a

3  better alternative?

4          MR. ZUBER:  Not that I'm aware of, Your Honor.

5          THE COURT:  Okay.

6          MR. ZUBER:  But I respectfully submit that that

7  doesn't excuse the requirements to comply with the law.

8          THE COURT:  Well, I mean there's just no evidence

9  to support the theory.  Here's the problem.  The bonds are

10  not being sold free and clear of liens, claims and

11  encumbrances.  The assets are being sold free of liens,

12  claims and encumbrances.

13          So the 363 cases that you're worried about, there

14  is no sale of your bond.  If your bond was being sold, it

15  would be a completely different question.  The bond is not

16  being sold.  The assets are being sold.

17          MR. ZUBER:  The bonds --

18          THE COURT:  I'm making my ruling now.  The assets

19  are being sold not the bond.  The sureties took credit risk

20  when they issued the bonds.  It is not that they are without

21  a principal to pay, they have a principal to pay.  That

22  principal they can file a proof of claim against and that's

23  the Fieldwood entity that induced them to issue the bonds.

24          And they will be repaid their prorated share as an

25  unsecured claimant for any allow claim that they file.  So I

1   find the argument that the sureties are being stuck to be

2   the same as any other unsecured creditor that says that they

3   are stuck.  There is no question in my mind but that the law

4   allows the sale free and clear.

5            With respect to compliance with applicable law,

6   under Midlantic -- I'm going to go back to where we were.

7   The Bankruptcy Code allows the sale of assets free and

8   clear.  The Bankruptcy Code allows the abandonment of assets

9   all together.

10           And if the Court had ordered either of those two

11  alternatives without an environmental remedy, the sureties

12  would have had to have paid.

13           Accordingly, once the Government and the exercise

14  of its discretion with respect to its regulatory power and

15  they are the ones charged with protecting the environment

16  not the sureties.

17           Once the Government determines that it does not

18  object to the process that is being followed, the sureties

19  do not have the private right to assert performance under

20  various environmental obligations.

21           I am recognizing that we are, in fact, doing more

22  regulation than we are required to do absent Midlantic.

23  Because without Midlantic, we could just do this.  With

24  Midlantic, we give the regulators ability to assure that the

25  environment is protected.

1          With respect to the argument that the market for

2    surety ship will dry up, I'll say a couple things.  First,

3    there is zero evidence to support that argument.  None.  And

4    if there was evidence of that, somebody should have put it

5    in and to the extent that we are going to deal in

6    speculation, you know, this isn't the first time I've ruled

7    this way.  I've ruled this way before.

8          And guess what, surety bonds kept coming on into

9    the Gulf of Mexico.  There's a new surety bond in this case

10   that's coming in after I've already ruled this way before.

11          I am overruling, once again, a sureties argument

12   that we are going to saddle a purchaser with a pre-effective

13   date error obligation or that they will have the right to

14   assert obligations that existed pre-effective date based on

15   post-effective date ownership.

16          That is part of the exculpation that we are

17   granting and we are doing so because of Midlantic and the

18   need to protect the environment.

19          So the objection is overruled.  With respect to

20   motion to stay pending appeal.  If your client wants to file

21   an appeal, they may.  I have not yet gotten any portion of

22   the Order that has me waive 3020.  And when we get down

23   there, I'll listen to the argument there as to whether there

24   ought to be a waiver.

25          If an appeal is filed and if you want a stay

1   pending appeal, I'll take that up and see what kind of

2   evidence you can adduce in support of that.

3           I don't know what it would be.  I mean, maybe you

4   can show me some environmental harm that would come about.

5   Your clients have an unsecured claim.  They're an unsecured

6   claimant.

7           That's what we're dealing with.  But I'm not

8   inclined to rush this through.  So we'll see where we go on

9   that.

10          Yeah, go ahead Mr. Zuber.

11          MR. ZUBER:  Can I get some clarity on --

12      (Pause in the proceedings.)

13          THE COURT:  Go ahead Mr. Zuber.

14          MR. ZUBER:  Your Honor, can I get some clarity on

15  the impact of your ruling on contribution rights?  I mean,

16  those have nothing to do with the Credit Bid Purchaser.  But

17  if our subrogation rights are impaired or go away, we then

18  arguably would be loosing our rights to contribution against

19  other joint and several liable parties who are not the

20  Credit Bid Purchaser and are not buying free and clear of

21  liens and claims and interest.  So I just want --

22          THE COURT:  I am -- it is has not been my intent

23  and I have never suggested that I was effecting contribution

24  rights.  What is happening to you is happening over your

25  objection and involuntarily.  You are not waiving any rights

1   here.  You're asserting them.  I'm overruling them.

2              You keep your claim against the principal fully.

3   Presumably that will be vindicated through a proof of claim.

4   But I'm not suggesting that contribution rights as against,

5   for example, co-sureties or co-predecessors wouldn't exist

6   unless there is a provision in the Plan that specifically

7   holds to the contrary.  And I don't -- generally there is

8   not.

9              All right.

10             MR. ZUBER:  Thank you, Your Honor.  I appreciate

11  it.

12             THE COURT:  Mr. Manns, let me get your line open.

13  Go ahead, Mr. Manns.

14             MR. MANNS:  Good afternoon, Your Honor.  Ryan

15  Manns on behalf of Shell Offshore, Inc.  Shell is agreeable

16  to paragraphs 145 and 146.  Thank you very much.

17             THE COURT:  Thank you, Mr. Manns.

18             MR. SCHAIBLE: Your Honor, Damian Schaible, may I

19  be heard briefly?

20             THE COURT:  I'm sorry, who is that?

21             MR. SCHAIBLE:  This is Damian Schaibel from Davis

22  Polk.

23             THE COURT:  Mr. Schaible, go ahead.

24             MR. SCHAIBLE:  Sorry, I'm very sorry to do this,

25  Your Honor.  It's just your so kind in being -- digging into

1    the words with us.

2           May I ask Your Honor to just go back to paragraph

3    127 whenever convenient now or later?

4           THE COURT:  We will.  At some point, though, I

5    want to look at the provision Mr. Zuber was concerned about

6    which was whether we were going to do something

7    precipitously that might cut off his clients appellate

8    rights.

9           So let's look at 127, but I don't want to forget

10   to go back there.

11       (Pause in the proceedings.)

12          MR. SCHAIBLE:  Yes, Your Honor.  This is the

13   XTO -- this is the XTO language that Your Honor was just

14   talking about.  The assumption -- assumption and assignment

15   and allocation language that Mr. Perez was talking to you

16   about where we changed the word and -- the and to or.

17          THE COURT:  Yes, sir.

18          MR. SCHAIBLE:  So, Your Honor, I'm not -- I

19   understand your ruling with respect to what Mr. Perez is

20   raising and I'm not asking for a wording change.

21          But I do want to just, if you don't mind, Your

22   Honor, just discuss on the record what we think this means.

23   The reason that we had put in and was because the concern is

24   there are multiple contracts, right.  And some of the

25   contracts the Credit Bid Purchaser is taking, some of the

1   contracts they're not taking.

2          And what we are -- our concern, limited concern,

3   was that there may be an argument that Exxon could step off

4   against or net against one contract that was taken vis-a-vie

5   another contract that wasn't taken.

6          And so we were the and pursuant to applicable law

7   was a reference to, you know, what effectively the effect of

8   this plan would be.

9          I do think that any valid netting solves the

10  problem as long as everyone sort of understands the point.

11  Which is you wouldn't have valid netting even if the

12  contract provides for cross contract netting if one of the

13  contracts was taken and one of the contracts was not taken.

14         And I just wanted to clarify our understanding on

15  the record.

16         THE COURT:  Thank you.  Look other -- and pursuant

17  to applicable law, you'll notice, does not say pursuant to

18  applicable non-bankruptcy law.

19         So, you know, there is this set off issue under

20  the Bankruptcy Code as to whether you could set off an

21  assumed contract versus an non-assume contract and that's

22  carried forward to another day.

23         MR. SCHAIBLE:  Correct, Your Honor, but my worry

24  is that we were talking about changing it or and so then it

25  could be well we are allowed to net under the contracts even

1    if we can't net under -- pursuant to applicable law.

2              And so I just wanted to clarify that if we're

3    going to make that change that it's valid netting under the

4    contracts.  And it wouldn't be valid --

5              THE COURT:  If it says "or" but you're trying to

6    off set effectively, you know, for lack of a better

7    description, but just sort of the shorthand of pre-petition

8    obligation versus a post-petition obligation.

9              That's part of applicable law too.  And so you

10   wouldn't necessarily be able to do it in that sense.  So I

11   think we're going to have to wait and see how the facts come

12   in.  But I've got your point.

13             MR. SCHAIBLE:  Okay, thank you Judge.  I

14   appreciate it.

15             THE COURT:  Thank you.  Let me see I've got

16   another person that wishes to comment.  Ms. Rosen, go ahead.

17             MS. ROSEN:  Thank you, Your Honor.  I agree with

18   the Court's comments.  I mean, with the language in there

19   then that issue is just reserved for another day.  I just

20   wanted to say on the record.  I didn't necessarily agree

21   with everything that Mr. Schaible said, but I do agree that

22   this is probably an issue for another day.

23             THE COURT:  Okay, thank you.  All right.  Hold on.

24        (Pause in the proceedings.)

25             THE COURT:  Mr. Carlson?

1          MR. CARLSON:  Thank you, Your Honor.  From there

2   we go to paragraph 147.  And this is intended to capture the

3   Court's ruling yesterday with respect to the Hess -- the

4   instrument Mr. Alaniz has raised.

5       (Pause in the proceedings.)

6          THE COURT:  Mr. Alaniz, do you see any problem?

7   Mr. Alaniz, I think I've got you now, go ahead.

8          MR. ALANIZ:  I apologize, Your Honor.  Omar Alaniz

9   on behalf of Hess Corporation.  We actually have negotiated

10  some updates to this language.  And I can walk the Court

11  through this or if anybody from Weil team wants to do it, I

12  think we have an agreement on -- they're very minor changes.

13         THE COURT:  Look if you-all have agreed on how

14  this works, I don't know that it's any problem at all for me

15  if you want to read it, that's fine.  If you just want to

16  put it in the final revision that's fine.

17         Same thing as I've said before.  I just want to

18  know that I don't have ambiguity in what it says.

19         MR. ALANIZ:  I don't and thanks, Your Honor.  I'm

20  happy to walk through it.  And we did have one source of

21  contention but I said I would just read a statement on the

22  record and then we can just kind of put that to bed.

23         In that first sentence where it says, "To the

24  extent Hess elects to assume."  Instead of possession and

25  operational control, we're going to insert the role of

1    decommissioning party.

2           And then the next sentence where it follows

3    abandoned properties we're going to add the "and any related

4    facilities" right after the abandoned properties reference

5    just to make the sentence flow a little bit better.

6           And then in that same sentence also it has -- the

7    previous language said "properties conveyed to the Debtors

8    by Hess."  But that's actually not factually true.  There

9    were some intermediate predecessors.

10          So we're changing the language conveyed to the

11   Debtors by Hess to owned by Hess so that's clearer.

12          And then in the next sentence, after "Hess

13   abandoned property"  or no I apologize.  "Hess abandoned

14   assets to Hess" we're going to insert a comma so that the

15   following phrase "and cooperate in good faith with Hess to

16   ensure such safe and orderly transition,"

17          I'm just trying to make sure that that phrase is

18   separated by commas.  And it may just be over lawyering, but

19   the next part of that sentence is very important to us.

20   It's part of this Court's ruling.  In compliance with

21   applicable federal law.

22          And I wanted to make sure that that was clear that

23   that modified the earlier part of the sentence which is the

24   safe and orderly transition in compliance with applicable

25   federal law.

1          THE COURT:  That's certainly what I intended to

2  say.

3          MR. ALANIZ:  And Your Honor I'm sorry?

4          THE COURT:  I said that's certainly what I

5  intended to say.

6          MR. ALANIZ:  Okay, thank you Your Honor.  And then

7  at the very end of the provision, the last three words say

8  have to abandoned properties.  I asked to add in connection

9  with such election.  And the Debtors were agreeable to that.

10          I had a sentence that followed that provision.

11  The Debtors were not agreeable to add that sentence which

12  was nothing here to limit the Court's ruling on June 23rd

13  with respect to these matters.

14          They are not agreeable to that addition.  And I'm

15  okay with that.  I just said I would read a statement into

16  the record and then I think we can be done.

17          THE COURT:  That's fine.  I'm not going to include

18  that language because I want it captured in the written

19  order.

20          MR. ALANIZ:  Fair enough, Your Honor.  Right after

21  the Court made its ruling yesterday, Mr. Perez appropriately

22  raised his concern that he didn't want the ruling to be

23  construed that the Debtors had to do something else like a

24  safe-out work.  And this Court confirmed.

25          And I'm just kind of worried about the opposite.

1  I'm worried that the Debtors could construe this ruling to

2  limit what the Debtors are obligated to do under 5.13 of the

3  Plan.  And, of course, also the properties need to be

4  transferred in the safe and orderly manner under any

5  scenario.

6           I just wanted to be clear that Hess hasn't been on

7  these properties for over 15 years and so as a general

8  proposition, we don't think it's safe to send out Hess

9  employees to properties prior to the expiration of the

10 transition period.

11          But we appreciate the Court's ruling in giving

12 Hess some protections in case circumstances present

13 themselves in which Hess may make the election in the

14 interest of health and safety.

15          And the only other item I wanted to clarify is

16 that we don't want the Debtor or the Government to think

17 that anything that's transpired in these bankruptcy cases or

18 this confirmation hearing suggests that Hess intends to take

19 over these properties.

20          There are other predecessors in the chain of title

21 and, you know, for example we've provided the Debtors and

22 the Government with information regarding some orphan

23 liability.  We have a dispute on that.

24          But -- and none of these are issues for the Court

25 today.  I'm sure all this will be sorted out post effective

1    date when we get the orders from BESSIE, but we just wanted

2    to be clear about these issues on the record.

3             And with that, I think we can move on.

4             THE COURT:  Thank you.  I appreciate the

5    statement.  Mr. Carlson.

6             MR. CARLSON:  The Debtor's are fine with the

7    changes that Mr. Alaniz just walked the Court through.

8             THE COURT:  Thank you.

9             MR. CARLSON:  And Your Honor, from there we go to

10   just the Government provision from 148 thru I believe it's

11   153.  My understanding is we are agreed with the Government,

12   but Mr. Balasko can confirm that.

13        (Pause in the proceedings.)

14             MR. BALASKO:  Good afternoon, Your Honor, Zack

15   Balasko for the Department of the Interior.  That is

16   correct.

17             THE COURT:  Thank you.

18        (Pause in the proceedings.)

19             THE COURT:  Can you take -- is there anything else

20   or can we go on down to the 320 issue?

21             MR. CARLSON:  The only thing that did change was

22   paragraph 149 which is captured --

23        (Pause in the proceedings.)

24             MR. CARLSON:  I think we just need to make a

25   conforming change to 513 -- the changes we made to -- sorry.

1          (Pause in the proceedings.)

2          MR. CARLSON:  We'll get back to the Court on that,

3     but there's one paragraph that changed here and we'll, of

4     course, run it by the Government to make sure they're

5     agreeable to it.

6          THE COURT:  Okay.

7          (Pause in the proceedings.)

8          THE COURT:  Where's the waiver of the 14 day

9     language in here?

10          MR. CARLSON:  Your Honor, the Debtors are not

11     seeking a waiver.

12          THE COURT:  Let me just hear from Mr. Zuber.  I

13     hadn't seen it in here, but if there's something in here

14     somewhere in here in the Plan that doesn't preserve your

15     full 14 day appellate right, I do want to know that.

16          Because as I said before I want to look at that

17     and understand why we would do something like that.

18          MR. ZUBER:  Yes, Your Honor.  I'm trying to find

19     it.  I do believe that there is waiver, 14 day status.  Let

20     me see if I can -- if Your Honor will bear with me for a

21     second.

22          MR. CARLSON:  Your Honor, Mr. Zuber is right.

23     There is a paragraph here on that.  I don't think that was

24     the intention.

25          THE COURT:  There it is.

1          MR. CARLSON:  Yeah, so my apologies there, but we

2    do not --

3          THE COURT:  Is there any reason we need that?

4    Let's take out --

5          MR. ZUBER:  Texas code?

6          THE COURT:  Yep, I'm going to sustain your

7    objection.  I haven't seen any evidence that we should waive

8    the 14 day stay and it's 168 is going to be deleted.

9          MR. ZUBER:  Thank you, Your Honor.

10      (Pause in the proceedings.)

11         THE COURT:  All right, does anyone else wish to

12   raise -- well let me, again.  All objections previously

13   raised and overruled remain previously raised and overruled

14   and need not be raised again.

15         But I did promise everyone that if we couldn't

16   work things out in the Confirmation Order, people would

17   still be able to raise objections today.

18         Is there anyone that wishes to raise an objection

19   where we haven't already ruled upon it?  And again, all of

20   your objection rights for appellate purposes, I'm not trying

21   to take those away.  If you raise an objection, overruled,

22   you don't need to raise it again.

23         I want to know something new that we haven't

24   addressed.

25      (Pause in the proceedings.)

1          THE COURT:  All right.  Well you're not going to

2    get this done by 5:00.  So let's figure out when we can come

3    back tomorrow.  And I think the issues expanded some from

4    what I expected them to be.

5          Can we -- will you be ready by 10:00 o'clock in

6    the morning, Mr. Carlson?

7          MR. CARLSON:  Yes, Your Honor.

8          THE COURT:  Okay, I want to -- let's see.  I've

9    got somebody else that has an issue with that.  Let's see.

10          UNKNOWN:  Your Honor, is there any possibility we

11    could start earlier?  Unfortunately I have an unavoidable

12    conflict at 10:30.

13          THE COURT:  How early would you-all be ready?  Do

14    you want to start at 8:00?

15          UNKNOWN:  That would be great.  Thank you, Your

16    Honor.

17          THE COURT:  All right.  Mr. Zuber?

18          MR. ZUBER:  Yes, Your Honor.  I just wanted to

19    make sure we had the opportunity between now and tomorrow so

20    we can negotiate some language regarding the contribution

21    rights preservation that Your Honor has ruled?

22          THE COURT:  Of course.  So and you can raise that

23    in the morning if that doesn't get --

24          MR. ZUBER:  Thank you.

25          THE COURT:  I don't think there's anything there

1   that takes them away and so maybe that's where the focus

2   should be, but we'll see.  We'll continue until 8:00 in the

3   morning.

4         I've got from 773-263-2745.  Who do we have on the

5   phone.

6         MR. ZEIGER:  Yes, Your Honor, good afternoon.

7   It's Jeffrey Zeiger, Kirkland and Ellis on half of Atlantic

8   Martime Services.  Can you hear me okay, Your Honor?

9         THE COURT:  I can Mr. Zeiger.

10         MR. ZEIGER:  Thank you.  I promised yesterday if I

11   could just take 30 seconds to close the loop on our very

12   limited objection.

13         As Your Honor is well aware, the substantive

14   issues regarding the effect of the Plan of Reorganization of

15   the dispute between Atlantic and Fieldwood are the before

16   the Court in the Adversary proceeding.

17         There's been a couple of developments the last

18   couple of days that impact the adversary proceeding in what

19   I think is a positive way.

20         As Your Honor saw earlier, the Confirmation Order

21   now provides that to the extent Atlantic is successful on

22   its lien claims against the third parties, either the

23   Debtors or the Credit Bid Purchaser will reimburse the

24   working interest owners.

25         The Court also heard testimony from Mr. Gregg

1    (phonetic) that the Debtors have reserved $14 million on the

2    lien claims in the event that we are successful.

3            That eliminates some of the concerns the Court

4    heard at the end of our arguments on the motion to dismiss,

5    the motion for summary judgment regarding potential double

6    payment from the working interest owners.

7            Respect for the Plan itself, we voted to reject

8    the Plan and opted out of the leases.  We filed a very

9    limited objection to ensure that nothing in the Plan or the

10   related documents would negate out opt out rights from the

11   third party releases.

12           Based on the statements from the Debtors counsel

13   yesterday, principally Ms. Loui, we are comfortable that

14   nothing in the Plan is seeking to negate our opt out of the

15   third party releases.

16           Thank you very much, Your Honor.

17           THE COURT:  All right.  Thank you.  All right, the

18   hearing on confirmation is continued until 8:00 a.m.

19   tomorrow morning.

20           Let's take up the Motion for relief from the stay

21   and see if we want to continue that until 8:00 a.m. as well.

22       (Pause in the proceedings.)

23           MR. ZEIGER:  Yeah, I believe Mr. Caden (phonetic)

24   is going to handle that.

25           THE COURT:  Thank you.  Mr. Caden?

1        (Pause in the proceedings.)

2             THE COURT:  Hold on.

3             MR. CADEN:  Good afternoon, Your Honor. We're

4    comfortable proceeding with the lift stay motion at the

5    conclusion of tomorrow's confirmation hearing.  It is a long

6    week for the Court, 143 parties participating today and

7    we're happy to take it up at the end if that's convenient

8    for the Court.

9             Also happy to do it now if you prefer.

10            THE COURT:  No in the morning is fine.  I do have

11   an 11:00 o'clock hearing tomorrow that I'll need to be ready

12   for.  But beyond that we're good.

13            You're not anticipating needing very long, right,

14   Mr. Caden?

15            MR. CADEN:  No, Your Honor, quite frankly I think

16   it will be very short and brief.

17            THE COURT:  Thank you.  We'll carry it until in

18   the morning.  All right.  Mr. Carlson I'm not going to

19   finish today since I made fun of you for the way that you

20   handled PowerPoint.  It was a masterful job on the

21   Confirmation Order so far.

22            So I know there's still some more work to do.  But

23   you're better off being able to handle the Confirmation

24   Order than a PowerPoint.  So thank you for all the hard

25   work.

1          MR. CARLSON:  Thank you, Your Honor.

2          MR. PEREZ:  Your Honor, may I just respond real

3    briefly to Mr. Zeiger.  Your Honor, I don't we've waived

4    anything with respect to Atlantic.  I think that what we did

5    in our presentation was to indicate that even if we lost

6    there was sufficient amount to satisfy it.

7          So I think we made our evidentiary showing, but I

8    don't think it went to any issue regarding the merits or

9    anything like that regarding Atlantic.  So I just wanted to

10   make sure that the Record is clear on that.

11         THE COURT:  Thank you.  You've both made your

12   statements and they both are in the Record.  Thank you.

13         We're in adjournment until 8:00 in the morning.  I

14   do have a hearing that starts in 10 minutes.  We're going to

15   recess for 10 minutes and we'll return at 4:00 o'clock on

16   the *SpeedCast* hearing.

17         Thank you-all.

18      (The parties thank the Court.)

19      (Proceeding adjourned at 3:50 p.m.)

20

21

22

23

24

25                    *  *  *  *  *

1              I certify that the foregoing is a correct

2    transcript to the best of my ability due to the condition of

3    the electronic sound recording of the ZOOM/telephonic

4    proceedings in the above-entitled matter.

5    /S/ MARY D. HENRY

6    CERTIFIED BY THE AMERICAN ASSOCIATION OF

7    ELECTRONIC REPORTERS AND TRANSCRIBERS, CET**337

8    JUDICIAL TRANSCRIBERS OF TEXAS, LLC

9    JTT TRANSCRIPT #64187

10   DATE FILED:  JULY 1, 2021

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25