## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

| | | |
|---|---|---|
| | § | |
| In re: | § | Chapter 11 |
| | § | |
| **FIELDWOOD ENERGY LLC, *et al.*,**[1] | § | Case No. 20-33948 (MI) |
| | § | |
| Debtors. | § | (Jointly Administered) |
| | § | |

**EMERGENCY MOTION OF ASPEN AMERICAN INSURANCE COMPANY, BERKLEY INSURANCE COMPANY AND SIRIUS AMERICA INSURANCE COMPANY FOR A STAY, PURSUANT TO BANKRUPTCY RULE 8007, OF THE ORDER CONFIRMING EIGHTH AMENDED JOINT CHAPTER 11 PLAN OF FIELDWOOD ENERGY LLC AND ITS AFFILIATED DEBTORS, OR IN THE ALTERNATIVE, FOR AN ORDER AMENDING THE CONFIRMATION ORDER, PURSUANT TO BANKRUPTCY RULE 9023**
**(Relates to Dkt. No.  1751)**

**EMERGENCY RELIEF HAS BEEN REQUESTED. A HEARING WILL BE CONDUCTED ON THIS MATTER ON JULY 6, 2021 AT 3:30 PM IN COURTROOM 404, 4TH FLOOR, 515 RUSK STREET, HOUSTON, TEXAS 77002.  YOU MAY PARTICIPATE IN THE HEARING EITHER IN PERSON OR BY AUDIO/VIDEO CONNECTION.**

**AUDIO COMMUNICATION WILL BE BY USE OF THE COURT'S DIAL IN FACILITY. YOU MAY ACCESS THE FACILITY AT (832) 917-1510. YOU WILL BE RESPONSIBLE FOR YOUR OWN LONG DISTANCE CHARGES. ONCE CONNECTED, YOU WILL BE ASKED TO ENTER THE CONFERENCE ROOM NUMBER. JUDGE ISGUR'S CONFERENCE ROOM NUMBER IS 954554.**

**YOU MAY VIEW VIDEO VIA GOTOMEETING. TO USE GOTOMEETING, THE COURT RECOMMENDS THAT YOU DOWNLOAD THE FREE GOTOMEETING APPLICATION. TO CONNECT, YOU SHOULD ENTER THE MEETING CODE "JUDGEISGUR" IN THE GOTOMEETING APP OR CLICK THE LINK ON JUDGE ISGUR'S HOME PAGE ON THE SOUTHERN DISTRICT OF**

---

[1] The Debtors, each of which have filed a separate voluntary petition, are: Dynamic Offshore Resources NS, LLC; Fieldwood Energy LLC; Fieldwood Energy Inc.; Fieldwood Energy Offshore LLC; Fieldwood Onshore LLC; Fieldwood SD Offshore LLC; Fieldwood Offshore LLC; FW GOM Pipeline, Inc.; GOM Shelf LLC; Bandon Oil and Gas GP, LLC; Bandon Oil and Gas, LP; Fieldwood Energy SP LLC; Galveston Bay Pipeline LLC; and Galveston Bay Processing LLC.

**TEXAS WEBSITE. ONCE CONNECTED, CLICK THE SETTINGS ICON IN THE UPPER RIGHT CORNER AND ENTER YOUR NAME UNDER THE PERSONAL INFORMATION SETTING.**

**HEARING APPEARANCES MUST BE MADE ELECTRONICALLY IN ADVANCE OF THE HEARING. TO MAKE YOUR ELECTRONIC APPEARANCE, GO TO THE SOUTHERN DISTRICT OF TEXAS WEBSITE AND SELECT "BANKRUPTCY COURT" FROM THE TOP MENU. SELECT "JUDGES' PROCEDURES," THEN "VIEW HOME PAGE" FOR JUDGE ISGUR. UNDER "ELECTRONIC APPEARANCE" SELECT "CLICK HERE TO SUBMIT ELECTRONIC APPEARANCE". SELECT THE CASE NAME, COMPLETE THE REQUIRED FIELDS AND CLICK "SUBMIT" TO COMPLETE YOUR APPEARANCE.**

**IF YOU OBJECT TO THE RELIEF REQUESTED OR YOU BELIEVE THAT EMERGENCY CONSIDERATION IS NOT WARRANTED, YOU MUST EITHER APPEAR AT THE HEARING OR FILE A WRITTEN RESPONSE PRIOR TO THE HEARING. OTHERWISE, THE COURT MAY TREAT THE PLEADING AS UNOPPOSED AND GRANT THE RELIEF REQUESTED.**

Aspen American Insurance Company, Berkley Insurance Company, and Sirius America Insurance Company (collectively the "Sureties") file their *Emergency Motion for a Stay, Pursuant to Bankruptcy Rule 8007, of the Order Confirming Eighth Amended Joint Chapter 11 Plan Of Fieldwood Energy LLC and its Affiliated Debtors, or in the Alternative, for an Order Amending the Order Confirming Eighth Amended Joint Chapter 11 Plan of Fieldwood Energy LLC and its Affiliated Debtors pursuant to Bankruptcy Rule 9023* [Dkt. No. 1751] (the "Confirmation Order"). In support of this motion, the Sureties respectfully state as follows:

<u>**JURISDICTION AND VENUE**</u>

1.      This Court has jurisdiction over this motion, pursuant to 28 U.S.C. §§ 157 and 1334.

2.      Venue is proper in this District, pursuant to 28 U.S.C. §§ 1408 and 1409.

3.      This matter is a core proceeding, pursuant to 28 U.S.C. § 157(b)(2).  The statutory predicate for the relief sought in this motion is Rule 8007 of the Federal Rules of Bankruptcy Procedure. (collectively, the "Bankruptcy Rules" and individually, a "Bankruptcy Rule").

## PROCEDURAL AND FACTUAL BACKGROUND

4.      On August 3, 2020, the Debtors each filed a voluntary petition for relief pursuant to chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101-1532 (as amended, the "Bankruptcy Code").

5.      The Debtors' chapter 11 cases are being jointly administered for procedural purposes only pursuant to Bankruptcy Rule 1015(b) of the Bankruptcy Rule and Rule 1015-1 of the Bankruptcy Local Rules for the United States Bankruptcy Court for the Southern District of Texas.

6.      The Debtors continue to operate their businesses and manage their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  No trustee or examiner has been appointed in these chapter 11 cases.

7.      Pre-petition the Sureties issued numerous bonds on behalf of the Debtors, most of which assure decommissioning obligations of the Debtors, which the Debtors owe to both the government and private parties.  **Exhibit 1**, Surety Bonds and Surety Bond Spreadsheet.

8.      On January 1, 2021, the Debtors filed their original Plan of Reorganization [Dkt. No. 722], which was subsequently amended several times (as amended, the "Plan").

9.      On June 2, 2021, the Sureties filed their Objection to Confirmation of the Fourth Amended Chapter 11 Plan.  [Dkt. No. 1461].

10.      On June 16, 2021, two days prior to the scheduled commencement of the Confirmation Hearing, the Debtors inserted language into their Fifth Amended Chapter 11 Plan

proposing to take away certain subrogation rights of the Sureties.  [Dkt. No. 1629, p. 59, Section 5.13(a)].[2]

11.     On June 20, 2021, the Sureties filed a Supplemental Objection to Confirmation of the Plan objecting to the new language in the Plan to the extent it could be construed as taking away potential future surety subrogation rights that had not yet arisen, and argued that the Court did not have the authority to take away those potential future rights.  [Dkt. No. 1664].

12.     On June 21, 2021, the Confirmation Hearing commenced and in their opening argument the Sureties, and other sureties, argued that surety subrogation rights with respect to post-Effective Date operations of Credit Bid Purchaser[3] (*e.g.* arising by virtue of Credit Bid Purchaser's failure to meet its own obligations) could not be taken away.  **Exhibit 2,** June 21, 2021 Confirmation Hearing Transcript, *passim*.

13.     On June 24, 2021, on the fourth day of the Confirmation Hearing, the Sureties again repeated their argument in closing that the Court did not possess the requisite authority to take away surety subrogation rights against Credit Bid Purchaser for Credit Bid Purchaser's failure to perform obligations under assumed leases and for subrogation rights that had not yet arisen.  **Exhibit 3**, June 24, 2021 Confirmation Hearing Transcript, 57:14-58:17, 75:6-86:9.  The Court disagreed, in part.  The Court held that surety subrogation rights as against Credit Bid Purchaser with respect to new wells, new platforms, new pipelines, etc. were not being taken away.  *Id.* at 58:5-15.  However, the Court held that surety subrogation rights as against Credit Bid Purchaser for decommissioning existing wells, existing platforms, existing pipelines, etc. were being taken

---

[2]  The Confirmation Hearing was scheduled to commence on June 18, but the day prior to the Confirmation Hearing President Joe Biden signed a law declaring June 19 a federal holiday, which meant that the Confirmation Hearing could not begin until the following Monday, June 21.

[3]  Any capitalized terms not otherwise defined herein shall have the meaning ascribed to them in the Confirmation Order [Dkt. No. 1751] and/or Plan [Dkt. No. 1731].

away.[4]  *Id.*  The Court based its ruling taking away surety subrogation rights against Credit Bid

Purchaser for post-Effective Date operations of existing infrastructure on its authority under

section 363(f) of the Bankruptcy Code, as well as its authority under *Midlantic Nat. Bank v. New*

*Jersey Dep't of Envtl. Prot.*, 474 U.S. 494 (1986).  June 24, 2021 Confirmation Hearing Transcript,

84:5-25, **Exhibit 4,** June 25, 2021 Confirmation Hearing Transcript, 30:12-33:1.  The Court held

that its ruling protected the environment, (June 25, 2021 Confirmation Hearing Transcript, 32:15-

21) and that "[t]he evidentiary record that we have is that there will not be an acquirer of these

entities if they will then be subject to subrogation by the surety."  June 25, 2021 Confirmation

Hearing Transcript, 32:1-3.

14.    There is nothing in the record that supports the holding that there will not be an

acquirer of the assets being purchased by Credit Bid Purchaser if Credit Bid Purchaser is subject

to the potential future subrogation rights of the sureties, which subrogation rights have not yet

arisen and may never arise.  There is nothing in the Confirmation Hearing Transcripts to that effect.

June 21, 2021 Confirmation Hearing Transcript, **Exhibit 5,** June 22, 2021 Confirmation Hearing

Transcript, **Exhibit 6,** June 23, 2021 Confirmation Hearing Transcript, June 24, 2021

Confirmation Hearing Transcript, June 25, 2021 Confirmation Hearing Transcript.  There is

nothing in the Disclosure Statement or Plan to that effect. [Dkt. Nos. 1285, 1742].  And there is

nothing in the Credit Bid Purchase Agreement to that effect. [Dkt. 1394-1, p. 133].

15.    The Sureties do not have claims on their bonds that are associated with the good

assets going to Credit Bid Purchaser, nor could they have any claims on the bonds because these

---

[4]  As a practical matter, this Court's preservation of surety subrogation rights for future wells, future pipelines, future platforms, etc. has no impact on any of the surety creditors because none of the existing surety bonds would cover future wells, future pipelines, future platforms, etc.  The principals on the existing bonds are the Debtors, and post-Effective Date, the Debtors will be the predecessor owners on the leases and the period of liability on the bonds will be cut off.  The existing bonds will not cover any new wells, new pipelines or new platforms installed by Credit Bid Purchaser.

are good assets and there has been no default.  And even if there was a default, these assets are being assumed and assigned to Credit Bid Purchaser which would require any default to be cured. 11 U.S.C. § 365(b)(1).

16.     The moment the leases are assumed and assigned to Credit Bid Purchaser, Credit Bid Purchaser is responsible for decommissioning all existing wells, pipelines, platforms, etc., as well as any new wells, pipelines, platforms, etc. installed by Credit Bid Purchaser.  30 C.F.R. § 556.713 ("As assignee, you . . . are liable for all obligations that accrue after the effective date of your assignment . . .  you must remedy all existing environmental and operational problems on the lease, properly abandon all wells, and reclaim the site . . ."); 30 C.F.R. § 250.1702 ("You accrue decommissioning obligations when you do any of the following: . . . (d) Are or become a lessee or the owner of operating rights of a lease on which there is a well that has not been permanently plugged . . . a platform, a lease term pipeline, or other facility, or an obstruction . . .").

17.     Credit Bid Purchaser expressly agreed under the Credit Bid Purchase Agreement to assume "all Liabilities (whether arising before or after the Closing) to the extent arising out of the plugging, abandonment and decommissioning of, and all related salvage, site clearance and surface restoration activities for, any Field Assets that are Acquired Interests to the extent required under Applicable Law or the terms of the applicable Leases.").  Credit Bid Purchase Agreement, Dkt. No. 1394-1, p. 213, Section 11.1 Buyer's Assumption of Liabilities.

18.     Credit Bid Purchaser will be the primary obligor for the decommissioning of the leases and the predecessor owners will be secondarily liable.  30 C.F.R. § 556.710 ("Even after assignment, BOEM or BSEE may require you to bring the lease into compliance if your assignee or any subsequent assignee fails to perform any obligation under the lease, to the extent the obligation accrued before approval of your assignment."); *In re Tri-Union Dev. Corp.*, 03-44908,

6

2015 WL 5730745, *8 (Bankr. S.D. Tex. Sept. 28, 2015) ("The Code of Federal Regulations states

that predecessors-in-interest such as Apache will only be secondarily liable for lease obligations.").

The current sureties with bonds in favor of the Debtors (soon to be predecessor owners) will also

be secondary obligors.

19.     The Debtors have admitted in this bankruptcy that post-Effective Date, Credit Bid

Purchaser will be the primary obligor and will be assuming approximately $350MM in

decommissioning liabilities with respect to the assumed assets.   In fact, at the Confirmation

Hearing the Debtors described this as part of the consideration being given to the Debtors' estate

for the Credit Bid Purchaser's purchase of the Credit Bid Acquired Interests.

> Q: All right. And what consideration is the Credit Bid Purchaser paying for those assets?
>
> A: So the Plan states that there's an aggregate consideration of approximately $1.03 billion related to the Credit Bid Purchaser transaction. That consideration is in the form of first cash. There is up to $125 million of cash. There is the allowed first lien term loan claims, their credit bid. There's the Gulf warrants, the second lien term loan warrants. There is the allowed first lien/first out claims. There is the assumption of meaningful liabilities, which is effectively the working capital and that's the working capital that Your Honor asked about. It's the assumption of those working capitals that are pre-effective date working capital of effectively all of the companies' liabilities associated with that post-effective date payables. And that's broadly the categories of the consideration.
>
> Q: All right. And what do you think the amount of the current liabilities that the Credit Bid Purchaser will be assuming? What is the amount of that?
>
> A: I believe it's approximately $350 million of asset retirement obligations. But in addition to -- that's asset retirement obligations by our estimates associated with those deepwater properties and 13 shelf properties, but in addition to that, there's other categories of obligations. I'm not sure if your question was just asset retirement obligations.

6-21-21 Confirmation Hearing Transcript, Mike Dane Direct Examination, 155:20-156:21.

20.     The Credit Bid Purchase Agreement also states that the Credit Bid Purchaser's

assumption of both pre- and post-Effective Date decommissioning obligations associated with the

Credit Bid Acquired Interests is part of the consideration being given for the purchase of the assets. Credit Bid Purchase Agreement, Dkt. No. 1394-1, pp. 151-52 Section 2.1 ("The aggregate consideration to be paid by [Credit Bid Purchasers] shall consist of the following: . . . (6) Buyer's assumption of the Assumed Liabilities.").

21.     The Court also stated at the Confirmation Hearing that "[t]he evidentiary record that we have is that there will not be an acquirer of these entities if they will then be subject to subrogation by the surety." June 25, 2021 Confirmation Hearing Transcript, 32:1-3.  But there is nothing in the record that supports this statement by the Court.  There is nothing in the Confirmation Hearing Transcripts to that effect.  June 21, 2021 Confirmation Hearing Transcript, June 22, 2021 Confirmation Hearing Transcript, June 23, 2021 Confirmation Hearing Transcript, June 24, 2021 Confirmation Hearing Transcript, June 25, 2021 Confirmation Hearing Transcript. There is nothing in the Disclosure Statement or Plan to that effect.  [Dkt. No. 1285, 1742].  And there is nothing in the Credit Bid Purchase Agreement to that effect.  [Dkt. 1394-1, p. 133].

22.     The Credit Bid Purchase Agreement, as well as the testimony cited above from Mike Dane, establish that the total consideration for the assets being acquired by Credit Bid Purchaser is $1.03 billion.  6-21-21 Confirmation Hearing Transcript, Mike Dane Direct Examination, p. 155:20-156:21; Credit Bid Purchase Agreement, Dkt. No. 1394-1, p. 152, n. 4. The decommissioning liabilities being assumed are approximately $350MM.  6-21-21 Confirmation Hearing Transcript, Mike Dane Direct Examination, p. 155:20-156:21.  This does not comport with the Court's ruling that the record reflects that there would not be an acquirer of these assets if they would be subject to the future subrogation rights of the sureties.  The amount paid by Credit Bid Purchaser for the assumed leases is far greater than the amount of any potential future subrogation claims of the sureties.

23.     On June 25, 2021, the Debtors filed their Eighth Amended Chapter 11 Plan of Reorganization.  [Dkt. No. 1731].

24.     On June 25, 2021, the Court entered the Confirmation Order confirming the Eighth Amended Chapter 11 Plan of Reorganization, memorializing its ruling at paragraph 97 that:

> For the avoidance of doubt, the Non-Apache Sureties shall not be entitled, under any circumstances, to claim a right of subrogation against the Debtors, the Post-Effective Date Debtors, FWE I, any FWE Additional Entity or NewCo and its subsidiaries (including Credit Bid Purchasers), unless such subrogation rights, if any, relate to obligations that both (x) accrue post-Effective Date and (y) arise from post-Effective Date activity and, with respect NewCo and its subsidiaries (including Credit Bid Purchasers), relates to the Credit Bid Acquired Interests.

[Dkt. No. 1751, ¶ 97].

25.     On June 30, 2021, the Sureties filed a Notice of Appeal of the Confirmation Order to the extent it affects Sureties' potential future rights of subrogation as against Credit Bid Purchaser with respect to assumed leases.  [Dkt. No. 1776].

## REQUESTED RELIEF

26.     The Sureties respectfully request the entry of an order staying the Confirmation Order and specifically the consummation of the Plan pending final resolution of the Sureties' appeal of the Confirmation Order, or in the alternative, an Order amending the Confirmation Order.

## BASIS FOR RELIEF

27.     A party appealing an order of the bankruptcy court may move the court to issue a stay of its order or otherwise suspend proceedings in the case during the pendency of the appeal to protect the rights of all parties in interest.  Fed. R. Bankr. P. 8007(a) and (e).

28.      In the matter of *Faulkner v. Kornman*, this Court recognized the four factors used by the Fifth Circuit Court of Appeals to determine whether a stay pending appeal is warranted. No. MISC. 10-301, 2012 WL 293230, at *7 (Bankr. S.D. Tex. Jan. 30, 2012).  The factors are:

(1) Whether the movant has made a showing of likelihood of success on the merits;

(2) Whether the movant has made a showing of irreparable injury if the stay is not granted;

(3) Whether the granting of the stay would substantially harm the other parties; and

(4) Whether the granting of the stay would serve the public interest.

*Id.* (citing *In re First South Sav. Ass'n*, 820 F.2d 700, 704 (5th Cir. 1987)); *see also Ruiz v. Estelle*, 666 F.2d 854, 856 (5th Cir. 1982).

29.     Additionally, Bankruptcy Rule 9023 adopts Federal Rule of Civil Procedure 59. Federal Rule of Procedure 59 states that "A motion to alter or amend a judgment must be filed no later than 28 days after the entry of judgment."  Fed. R. Civ. P. 59.   In order to prevail on a motion for reconsideration under Rule 59(e), a movant must (1) clearly establish a manifest error of law or fact, (2) present newly discovered evidence, or (3) demonstrate that there has been an intervening change in the controlling law.   *Simon v. United States,* 891 F.2d 1154, 1159 (5th Cir. 1990) (internal quotation marks and citation omitted); *Schiller v. Physicians Res. Group Inc.,* 342 F.3d 563, 567 (5th Cir. 2003).

30.     Bankruptcy Rule 8002(b)(2) permits this Court to rule on a motion for reconsideration, notwithstanding that a notice of appeal has been filed.   Fed. R. Bankr. P. 8002(b)(2) ("If a party files a notice of appeal after the court announces or enters a judgment, order, or decree—but before it disposes of any motion listed in subdivision(b)(1)—the notice becomes effective when the order disposing of the last such remaining motion is entered.").

## ARGUMENT

### I.    The Sureties Will Likely Succeed on the Merits on Appeal

31.    With regard to the first factor governing the application of a stay pending appeal, the Sureties submit that they are likely to prevail in their appeal before the United States District Court for the Southern District of Texas (the "District Court").

32.    "The movant need not always show a 'probability' of success on the merits; instead, the movant need only present a substantial case on the merits when a serious legal question is involved and show that the balance of the equities weighs heavily in favor of granting the stay." *In re Spillman Dev. Grp., Ltd.*, No. 05-14415-CAG, 2010 WL 4411955, at *2 (Bankr. W.D. Tex. Oct. 29, 2010) (citing *Ruiz v. Estelle,* 650 F.2d 555, 565 (5th Cir. 1981)).

33.    Moreover, "if the balance of the equities (*i.e.* consideration of the other three factors) is not heavily tilted in the movant's favor, the movant must then make a more substantial showing of likelihood of success on the merits in order to obtain a stay pending appeal." *Ruiz v. Estelle*, 650 F.2d at 565.  In other words, the burden on the movant to show a substantial likelihood of success on the merits can increase or decrease depending on the other three factors.  *In re Spillman*, 2010 WL 4411955, at *2.

34.    This Court based its ruling stripping the Sureties of their future subrogation rights against Credit Bid Purchaser on section 363(f) of the Bankruptcy Code and *Midlantic Nat. Bank v. New Jersey Dep't of Envtl. Prot.*, 474 U.S. 494 (1986) ("*Midlantic*").    June 24, 2021 Confirmation Hearing Transcript, 84:5-25, June 25, 2021 Confirmation Hearing Transcript 30:12-33:1.

35.    Section 363(f) of the Bankruptcy Code states as follows:

(f) The trustee may sell property under subsection (b) or (c) of this section free and clear of any interest in such property of an entity other than the estate, only if—

(1) applicable nonbankruptcy law permits sale of such property free and clear of such interest;

(2) such entity consents;

(3) such interest is a lien and the price at which such property is to be sold is greater than the aggregate value of all liens on such property;

(4) such interest is in bona fide dispute; or

(5) such entity could be compelled, in a legal or equitable proceeding, to accept a money satisfaction of such interest.

11 U.S.C. § 363(f).

### a.  The Sureties Do Not Hold an "Interest in [the] Property" and thus Section 363(f) Does Not Apply

36.     For section 363(f) to apply the creditor must have an "interest in [the] property" being sold.  11 U.S.C. § 363(f); *In re Fairchild Aircraft Corp.*, 184 B.R. 910, 917-18 (Bankr. W.D. Tex. 1995), *vacated on other grounds*, 220 B.R. 909 (Bankr. W.D. Tex. 1998) (holding that 363(f) only applies to *in rem* property interests and not *in personam* claims—"were we to allow 'any interests' to sweep up *in personam* claims as well, we would render the words 'in such property' a nullity. No one can seriously argue that *in personam* claims have, of themselves, an *interest in such property*."); *Matter of Sherwin Alumina Co., L.L.C.*, 932 F.3d 404, 409 (5th Cir. 2019), *opinion amended and superseded on other grounds*, *Matter of Sherwin Alumina Co., L.L.C.*, 952 F.3d 229 (5th Cir. 2020) ("Section 363(f) specifically provides that, in exercising core *in rem* jurisdiction over the bankruptcy estate, the court may strip others' interests—that is, property rights—in that *res*.").

37.     The Sureties do not hold an *in rem* property interest in the leases being transferred, and in fact do not presently hold any interest at all.  Thus, section 363(f) does not apply to the Sureties' potential future subrogation rights against Credit Bid Purchaser.

**b.**   **Section 363 Does Not Apply to Future Surety Subrogation Claims Which Have Not Arisen and May Never Arise**

38.     As stated by the United States Supreme Court in *Pearlman v. Reliance Ins. Co.*, "there are few doctrines better established than that a surety who pays the debt of another is entitled to all the rights of the person he paid to enforce his right to be reimbursed. This rule, widely applied in this country and generally known as the right of subrogation."  371 U.S. 132, 136-37 (1962); *see also Am. Sur. Co. of New York v. Bethlehem Nat. Bank of Bethlehem, Pa.*, 314 U.S. 314, 317 (1941) (describing a surety's subrogation rights as "one of the[] oldest doctrines . . .").

39.     "The essential element to acquiring a right of subrogation is that the person seeking subrogation must have made a payment, or had his funds or other property applied to discharge another's obligation."  *Salzman v. Holiday Inns, Inc.*, 369 N.Y.S.2d 238, 243 (App. Div. 1975), *modified,* 358 N.E.2d 268 (N.Y. 1976); *In re ML & Associates, Inc.*, 320 B.R. 109, 115–16 (Bankr. N.D. Tex. 2005) (same).

40.     When a surety obtains subrogation rights, by payment or performance under its bond, it steps into the shoes of both its principal and its obligee.  *Cont'l Cas. Co. v. Ryan Inc. E.*, 974 So. 2d 368, 380 (Fla. 2008) ("When a surety performs or pays on behalf of its principal, it becomes subrogated to the rights of both its principal and its obligee."); *Travelers Indem. Co. v. Evans Pipe Co.*, 432 F.2d 211, 212–13 (6th Cir. 1970) ("Travelers was subrogated not only to the rights of its principal (Mitchell) but also to the rights of its obligee (Country Club)."); *Fid. & Deposit Co. of Maryland v. Westra Const., Inc.*, CIV.A. 1:08-CV-1219, 2010 WL 1904524, at *4 (M.D. Pa. May 10, 2010) ("The subrogation right is an expansive one, and when a surety has paid claims, it succeeds both to the rights of the principal and obligee.").

41.     Section 363 does not apply to claims that have not yet arisen.  *In re AutoStyle Plastics, Inc.*, 227 B.R. 797, 800 (Bankr. W.D. Mich. 1998) ("Bankruptcy courts have the power

to approve sales of assets free and clear of any interest that could be brought against the bankruptcy estate during bankruptcy, either through 11 U.S.C. § 363(f) or the bankruptcy court's equitable powers.  However, a sale free and clear does not include future claims that do not arise until after the conclusion of the bankruptcy proceeding.") (citing *Ninth Avenue Remedial Group v. Allis–Chalmers Corp.,* 195 B.R. 716, 732 (N.D. Ind. 1996)); *Matter of Mooney Aircraft, Inc.*, 730 F.2d 367, 375 (5th Cir. 1984) (holding that a bankruptcy court could not sell free and clear of claims that did not arise until five years after the sale); *Ninth Ave. Remedial Grp. v. Allis-Chalmers Corp.*, 195 B.R. 716, 732 (N.D. Ind. 1996) ("While the bankruptcy courts might have the power to sell assets free and clear of any interest that could be brought against the bankruptcy estate during bankruptcy, either through section 363(f) or through the powers of the bankruptcy court under other sections of the Code, a sale free and clear does not include future claims that did not arise until after the bankruptcy proceedings concluded.").

42.     The Sureties do not have any claims on their bonds that are associated with the good assets going to Credit Bid Purchaser, nor could they have any claims on the bonds because these are good assets and there has been no default.  Indeed, the Sureties may never have claims on their bonds associated with Credit Bid Purchaser.  As set forth above, a subrogation claim does not arise until a claim is made on a surety bond and a surety has made payment or otherwise performed under its bond.  Indeed, the only way a claim can arise here is if the Credit Bid Purchaser does not do what it has promised to do and spend the $350 million it has said is being supplied as consideration for its acquisition of the leases and earmarked to pay for decommissioning obligations which accompany those assumed leases.  A sale cannot be free and clear from claims that have not yet arisen, which may never arise and will only arise if Credit Bid Purchaser does not do what it is obligated to do under the Plan, the Credit Bid Purchase Agreement and the law.

**c.  <u>None of the Conditions in Section 363(f) of the Bankruptcy Code are Satisfied</u>**

43.     For the Court to permit a sale free and clear of "interests in . . . property," one of the conditions in section 363(f) of the Bankruptcy Code must be satisfied.  Even assuming, *arguendo*, the Sureties' have an "interest in . . . property," none of the conditions in section 363(f) are satisfied.

44.     With respect to the first condition, that "applicable nonbankruptcy law permits sale of such property free and clear of such interest," the Sureties are unaware of any nonbankruptcy law that permits sale of property free and clear of future surety subrogation rights that do not currently exist, and will only exist in the event of a future default by the transferee.  With respect to the second condition, the Sureties clearly do not consent to any "interest"—even though the Sureties do not have any current "interest"—being discharged.  The third condition is that "such interest is a lien and the price at which such property is to be sold is greater than the aggregate value of all liens on such property."  This condition is not satisfied because potential future surety subrogation rights which have not yet arisen, and may never arise, do not constitute liens on the property.  In fact, such rights would never arise unless Credit Bid Purchaser itself defaults on its obligations, which default does not relate in any way to the default of the Debtors.  The Debtors have assumed these leases and thus there can be no default by the Debtors.  Future performance will only be by the Credit Bid Purchaser and it is only the Credit Bid Purchaser that can default, whereupon the surety subrogation rights will arise against it and not against the Debtors and will be created by virtue of the Credit Bid Purchaser's failures, not those of Debtors.  The fourth condition is that "such interest is in bona fide dispute."  There is no bona fide dispute as to the Sureties' present subrogation rights, because they have none.  And the fifth condition is that "such entity could be compelled, in a legal or equitable proceeding, to accept a money satisfaction of

such interest." This condition is not satisfied because there is no current "interest," and even if there was an "interest," it is not quantifiable. The ultimate claim on the bonds, if there is any, could be $1, or it could be $100MM. The Sureties could not be compelled to accept a money satisfaction of such interest when no claim currently exists, and may never exist, and if it ultimately does exist, it would be as against a third-party for post-Effective Date behavior of that third-party. That third-party (Credit Bid Purchaser) is not receiving, nor is it entitled to, a discharge in this bankruptcy.

## II.     The Sureties Will Suffer Irreparable Injury If A Stay Is Not Granted

45.     With regard to the second factor governing the application of a stay pending appeal, the Sureties submit that they will be irreparably harmed if a stay of the Confirmation Order is not issued because their appeal may be considered statutorily moot by the time it is heard in the District Court.

46.     The Confirmation Order, which proposes a free and clear sale of the Credit Bid Acquired Interests pursuant to section 363(f) of the Bankruptcy Code (the "Credit Bid Transaction") is automatically stayed until July 12, 2021 in accordance with Bankruptcy Rule 3020(e).

47.     In the context of a motion for a stay pending appeal of a sale in a bankruptcy proceeding, "whether the movant has made a showing of irreparable harm—the Fifth Circuit applies the finality rule, meaning that an appeal of a bankruptcy court's order authorizing sale is usually moot pursuant to section 363(m) once the sale has occurred." *In re Texas Equip. Co., Inc.*, 283 B.R. 222, 228 (Bankr. N.D. Tex. 2002) (citing *Ginther v. The Ginther Trusts (In the Matter of The Ginther Trusts)*, 238 F.3d 686, 688-89 (5th Cir. 2001)).

48.     Section 363(m) of the Bankruptcy Code states that "the reversal or modification on appeal of an authorization under subsection (b) or (c) of this section of a sale or lease of property does not affect the validity of a sale or lease under such authorization to an entity that purchased or leased such property in good faith, whether or not such entity knew of the pendency of the appeal, unless such authorization and such sale or lease were stayed pending appeal." 11 U.S.C. § 363(m).   As such, generally speaking, "a failure to obtain a stay is fatal to a challenge of a bankruptcy court's authorization of the sale of property." *Ginther*, 238 F.3d 689.[5]

49.     Due to the fact that the Confirmation Order is stayed until July 12, 2021, the Credit Bid Transaction cannot close until that date.   On July 12, 2021, the Plan can be consummated, and the Credit Bid Transaction can go forward.   Moreover, the Confirmation Order expressly grants the protection of section 363(m) to the Credit Bid Purchaser.   As such, it is imperative that a stay of the Confirmation Order be granted immediately so that the Sureties' appeal is not at risk of being rendered moot by consummation of the Plan, specifically the closing of the Credit Bid Transaction, which would irreparably harm the Sureties because their subrogation rights against Credit Bid Purchaser would be taken away.

**III.    Granting a Stay Will Simply Preserve the Status Quo and Not Substantially Harm Any Other Parties in the Case**

50.     This Court granting a stay of the Confirmation Order will not substantially harm any other parties in this case.   The Debtors have $107MM in cash on hand per their most recent Operating Report [Dkt. No. 1781, p. 3] and they have not drawn against their $10MM DIP facility [Dkt. No. 1781, p.4].   The Debtors continue to operate the Credit Bid Acquired Interests, as well as their other assets, in the ordinary course and those operations will continue while the Sureties

---

[5] Should the Sureties be denied their request for a stay pending appeal, the Sureties will certainly argue that section 363(m) does not render the appeal moot, however that argument could fail.

pursue an appeal with respect to their potential future subrogation rights, which may arise in the event of a default by Credit Bid Purchaser, to the extent the Plan and Confirmation Order could be construed to impair such future subrogation rights.  There is no reason to believe that anything would change in the time period required for the Sureties to pursue an emergency appeal of the subrogation rights issue.  The Debtors will maintain their status quo, as they have throughout the course of these proceedings.  The Debtors are currently benefitting from ~$75/barrel oil prices, so they are not strapped for cash and can certainly hold off consummating a sale for a short period of time while the Sureties pursue their appeal on future subrogation rights.

**IV.**     **Granting A Stay Will Serve The Public Interest Because Taking Away Surety Subrogation Rights for Post-Effective Date Operations Improperly Treats Surety Subrogation Rights, Incentivizes Unscrupulous Behavior by the Credit Bid Purchaser and Does Nothing to Protect the Environment which was Part of the Basis for the Court's Ruling**

51.     Credit Bid Purchaser (*i.e.* the secured lenders) is acquiring the good leases from the Debtors.  The moment those leases are assumed and assigned to Credit Bid Purchaser, Credit Bid Purchaser is responsible for decommissioning all existing wells, pipelines, platforms, etc., as well as any new wells, pipelines, platforms, etc. installed by Credit Bid Purchaser.

52.     Credit Bid Purchaser will be the primary obligor for the decommissioning of the leases and the predecessor owners will be secondarily liable.  The current sureties with bonds in favor of the Debtors (soon to be predecessor owners) will also be secondary obligors.

53.     The Debtors have admitted in these bankruptcy cases that post-Effective Date, Credit Bid Purchaser will be the primary obligor and will be assuming approximately $350MM in decommissioning liabilities with respect to the assumed assets.  This was described at both the Confirmation Hearing and in the Credit Bid Purchase Agreement as the consideration being given to the Debtors' estate for the Credit Bid Purchaser's purchase of the Credit Bid Acquired Interests.

Notwithstanding the Debtors' representation in Court that Credit Bid Purchaser was assuming the existing $350 million in asset retirement obligations associated with the assumed assets, this Court found at the Confirmation Hearing that the existing sureties, as secondary obligors, held no subrogation rights as against Credit Bid Purchaser for post-Effective Date operations.

54.     This Court based its ruling, in part, on section 363(f) of the Bankruptcy Code which is discussed above, and which the Sureties do not believe applies to *in personam* rights that do not currently exist.   June 24, 2021 Confirmation Hearing Transcript, 84:5-25, June 25, 2021 Confirmation Hearing Transcript 30:12-33:1.   Additionally, the Court ruled that it was permitted to strip the Sureties' of their post-Effective Date subrogation rights because it served as a means of protecting the environment under *Midlantic*.  *Id.*

55.     The Sureties respectfully disagree with these rulings.   The only circumstance in which the Sureties' subrogation rights would arise post-Effective Date is if Credit Bid Purchaser fails to perform its decommissioning obligations for which it is the primary obligor under the BOEM regulations, and for which it agreed to perform as consideration for the purchase of the Credit Bid Acquired Interests.   If Credit Bid Purchaser defaults on its obligations, that would presumably mean that it is either (a) insolvent or (b) bankrupt.   If such a default occurs, the sureties would be required to pay on their bonds.   And the sureties would subrogate to the rights of the bond obligee the sureties paid as against Credit Bid Purchaser, and those subrogation rights would have little-to-no value as against Credit Bid Purchaser because Credit Bid Purchaser would be insolvent or bankrupt.   But in light of the Court's ruling, the Court has created a situation where Credit Bid Purchaser now has an incentive to engage in unscrupulous activity, potentially conspiring with the obligees on the bonds and attempting to use the existing surety credit to pay for the decommissioning obligations for which Credit Bid Purchaser is primarily liable.   And the

Sureties would have limited recourse against Credit Bid Purchaser if it were to engage in such activity, because this Court held that the Sureties' post-Effective Date subrogation rights were preemptively extinguished – even though such rights had not yet arisen.

56.     This Court held that its ruling was based, in part on *Midlantic*, and the Court's desire to protect the environment, but this ruling provides no protection to the environment at all. There is no extra funding to protect the environment or remediate environmental liabilities.   In fact, the ruling arguably creates *less* protection for the environment because it incentivizes Credit Bid Purchaser not to perform its decommissioning obligations and instead to rely on the Debtors' sureties while depriving those sureties of rights long enshrined by the United States Supreme Court— subrogation rights which form the basis of sureties' decisions regarding underwriting oil and gas bonds.   With the surety subrogation rights preserved, the environment is protected because Credit Bid Purchaser has every incentive to comply with BOEM regulations and perform its decommissioning obligations with the surety bonds remaining in place at their full value.   So the Court's ruling, as a practical matter, is difficult to understand, and the Sureties respectfully submit that it was improper under both section 363(f) of the Bankruptcy Code and *Midlantic*.

57.     The Court also stated at the Confirmation Hearing that "[t]he evidentiary record that we have is that there will not be an acquirer of these entities if they will then be subject to subrogation by the surety."   But there was no proof of this at all.   In fact, simple math using the evidence on the record proves this conclusion to be wrong.   The acquisition of the assumed leases is for an amount in excess of $1 billion dollars, with decommissioning costs of only $350 million. Thus, the Credit Bid Purchaser has agreed to pay far more than the amount of any potential subrogation rights that will arise if it does not pay and do what it has promised.   As stated previously, the Sureties did not even know future surety subrogation rights not yet arisen were at

issue until two days prior to the scheduled Confirmation Hearing when the Debtors amended the Plan and attempted to take away certain future surety subrogation rights [Dkt. No. 1641, p. 65, Section 5.13(a)], which is what precipitated the entire subrogation dispute and is what led the Sureties to filing their Supplemental Objection to Plan Confirmation.  [Dkt. No. 1664].

58.     As a practical matter it is nonsensical that the section 363 sale would hinge on future surety subrogation rights that have not yet arisen.  The Credit Bid Purchaser should be completely indifferent as to whether the Sureties maintain subrogation rights against it—the only time those rights would come into play is if it intentionally disregards its legal obligation to decommission, in which case it would be in violation of BOEM regulations and the Credit Bid Purchase Agreement, or if it ultimately became insolvent or bankrupt, at which point the Sureties' subrogation rights likely would be worthless as to Credit Bid Purchaser and would inflict no harm whatsoever on it.  The Sureties' subrogation rights cannot inflict harm on Credit Bid Purchaser in any event because the Credit Bid Purchaser already owes the obligation to decommission as a matter of law.  The only incentive Credit Bid Purchaser would have in seeking to take away surety subrogation rights that have not yet arisen is if it intends to engage in unscrupulous behavior and conspire with obligees on the bonds to default on its primary obligations and draw on the surety bonds, which is something this Court should not sanction and it is something that goes against the public interest.  But unfortunately, that is the situation that has been created by this Court's ruling, to the extent it can be construed as taking away future surety subrogation rights which have not yet arisen as against Credit Bid Purchaser.

59.     By way of analogy, assume a commercial tenant has leased space in an office building.  The tenant has a guarantor/surety, with the guaranty running in favor of the landlord, guaranteeing that the tenant will comply with all of its obligations under the lease.  The tenant files

for bankruptcy, and during the course of the bankruptcy, the tenant assumes and assigns the lease to a new tenant, and the tenant cures all defaults, if any. And if the new tenant fails to pay rent and the guarantor/surety for the prior tenant is called upon to pay and pays the rent that was not paid by the assignee, this Court has held that the guarantor/surety for the original tenant cannot recover against the assignee tenant, notwithstanding that the tenant failed to fulfill its promise to pay the rent following assumption and assignment.

60.     Thus, that assignee tenant is effectively told that it is entitled to occupy the premises rent free simply because the initial tenant had a guarantor. The fundamental right of subrogation, recognized repeatedly by the United States Supreme Court, is that the guarantor/surety under the foregoing situation has the right to recover from the assignee tenant following that assignee tenant's failure to pay rent and following payment by the surety for the original tenant. Nothing in the Bankruptcy Code would countenance a different result. The surety had no claim at the time of the assignment because there was no default at that time; and if there had been a default, it would have had to be cured by the original tenant (or assignee) prior to the assignment or there could be no assumption and assignment. Thus, as of the date of the plan and assignment to the tenant the surety had no claim as it had paid nothing. The Bankruptcy Code does not allow the Court to authorize the sale of the lease without the accompanying obligation of the tenant to pay rent regardless of whether the original non-defaulting tenant had a guarantor/surety. And if the assignee tenant acquiring the lease breaches its obligation to pay that which the lease requires, it remains liable to the guarantor called upon to pay in its stead. The Court's conclusion to the contrary with respect to potential future subrogation rights which would arise only if the Credit Bid Purchaser defaults under the obligations flowing with the lease is supported nowhere in the Bankruptcy Code or in the law of subrogation.

**V.**     **In the Alternative, the Sureties Request that the Court Amend the Confirmation Order to Reflect that the Sureties' Post-Effective Date Subrogation Rights as against Credit Bid Purchaser, Which Do Not Yet Exist and May Never Exist, Are Unaffected by the Plan or the Confirmation Order**

61.    In the alternative to granting a Motion for a Stay Pending Appeal, and for the same reasons set forth above, the Sureties request that the Court amend the Confirmation Order to reflect that the Sureties' Post-Effective Date Subrogation Rights as against Credit Bid Purchasers, which rights do not currently exist, are unaffected by the Plan or the Confirmation Order. This relief is requested because the Sureties believe there was a manifest error of law and fact with respect to the Sureties' future subrogation rights, which rights do not currently exist and which may never exist, as against Credit Bid Purchasers.

<u>CONCLUSION</u>

For the reasons set forth above, the Sureties respectfully request that this Court enter an order (i) granting a stay pending the Sureties' appeal of the Confirmation Order, or in the alternative, (ii) amending the Confirmation Order as set forth above, and (iii) granting such other and further relief as is just and proper.

Dated: July 2, 2021

Respectfully submitted,

HUSCH BLACKWELL LLP

By: /s/ *Randall A. Rios*
Randall A. Rios
State Bar No. 16935865
Timothy A. Million
State Bar No. 24051055
600 Travis, Suite 2350
Houston, Texas 77002
Tel: 713-525-6226
Fax: 713-647-6884
Email: randy.rios@huschblackwell.com
Email: tim.million@huschblackwell.com

**CO-COUNSEL FOR ASPEN AMERICAN INSURANCE COMPANY, BERKLEY INSURANCE COMPANY, AND SIRIUS AMERICA INSURANCE COMPANY**

**-AND-**

Armen Shahinian, Esq. (admitted *pro hac vice*)
(ashahinian@csglaw.com)
Scott A. Zuber, Esq. (admitted *pro hac vice*)
(szuber@csglaw.com)
Jase A. Brown, Esq. (admitted *pro hac vice*)
(jbrown@csglaw.com)

Chiesa Shahinian & Giantomasi PC
One Boland Drive
West Orange, New Jersey 07052

**ATTORNEY FOR ASPEN AMERICAN INSURANCE COMPANY, BERKLEY INSURANCE COMPANY, AND SIRIUS AMERICA INSURANCE COMPANY**

## <u>CERTIFICATE OF SERVICE</u>

I certify that on July 2, 2021, a true and correct copy of the foregoing document was served upon all parties receiving electronic notice *via* the Court's ECF/CM filing and notification system.

/s/  *Timothy A. Million*
Timothy A. Million
