# Exhibit 5

1              IN THE UNITED STATES BANKRUPTCY COURT

2            FOR THE SOUTHERN DISTRICT OF TEXAS

3                    HOUSTON DIVISION

4  IN RE:                    §      CASE NO. 20-33948-11
                             §      JOINTLY ADMINISTERED
5                            §      HOUSTON, TEXAS
   FIELDWOOD ENERGY LLC,     §      TUESDAY,
6                            §      JUNE 22, 2021
            DEBTOR.          §      1:44 P.M. TO 5:37 P.M.

7

8          CONFIRMATION HEARING DAY TWO (VIA ZOOM)

9          BEFORE THE HONORABLE MARVIN ISGUR
              UNITED STATES BANKRUPTCY JUDGE

10

11

12     APPEARANCES:                    SEE NEXT PAGE

13

       (Recorded via CourtSpeak)
14

15

16

17

18

19

20              TRANSCRIPTION SERVICE BY:

21        JUDICIAL TRANSCRIBERS OF TEXAS, LLC
               935 Eldridge Road, #144
22             Sugar Land, TX 77478
                  281-277-5325
23          www.judicialtranscribers.com

24
       Proceedings recorded by electronic sound recording;
25        transcript produced by transcription service.

2

```
 1                    APPEARANCES (VIA ZOOM):

 2

 3   FOR THE DEBTOR:              WEIL GOTSHAL ET AL
                                 Alfredo Perez, Esq.
 4                               700 Louisiana
                                 Suite 1700
 5                               Houston, TX  77002
                                 713-546-5040
 6
                                 WEIL GOTSHAL ET AL
 7                               Erin Choi, Esq.
                                 Paul Genender, Esq.
 8                               200 Crescent Court
                                 Suite 300
 9                               Dallas, TX  75201
                                 214-746-8184
10

11

12   FOR RIDGEWOOD KATMAI:        LOCKE LORD LLP
                                 Philip Eisenberg, Esq.
13                               J.P. Morgan Chase Tower
                                 600 Travis
14                               Suite 2800
                                 Houston, Texas 77002
15                               713-226-1304

16   FOR ECOPETROL AMERICA LLC    SQUIRE PATTON ET AL
                                 Kelly Singer, Esq.
17                               1 East Washington Street
                                 Suite 2700
18                               Phoenix, AZ  85004
                                 602-528-4000
19
     FOR BP EXPLORATION:          GREENBERG TRAURIG
20                               Craig Duewall, Esq.
                                 300 West 6th Street
21                               Suite 2050
                                 Austin, TX  78701
22                               512-320-7200

23   FOR TRAVELERS, LIBERTY MUTUAL,
     HANOVER.                     LANGLEY LLP
24                               Brandon Bains, Esq.
                                 P.O. Box 94075
25                               Southlake, TX  76092
                                 214-722-7171
```

3

```
 1                    APPEARANCES CONTINUED:

 2
    FOR RIDGEWOOD KATMAI, LLC
 3  AND ILX:                      SIDLEY AUSTIN, LLP
                                  Michael Fishel, Esq.
 4                                1000 Louisiana Street
                                  Suite 6000
 5                                Houston, TX  77002
                                  713-495-4645
 6
    FOR LLOG EXPLORATION:         GIEGER LABORDER & LAPEROUSE
 7                                John Baay, Esq.
                                  701 Poydras St.
 8                                Suite 4800
                                  New Orleans, LA  70139
 9                                504-561-0400

10

11

12

13

14  (Please also see Electronic Appearances.)

15

16

17

18

19

20

21

22

23

24

25
```

1                              INDEX

2

3    WITNESS:              Direct      Cross      Redirect      Recross

4    JOHN ANTHONY GRAHAM
       By Mr. Perez        6           .           .             .
5

6    CLAYTON GREEN
       By Ms. Choi         18          .           .             .
7      By Mr. Singer       .           41          .             .

8

     ADRIANA BONJOUR
9      By Mr. Hutton       63          .           .             .
       By Ms. Choi         .           75          .             .
10

11   JOHN-PAUL HANSON
       By Mr. Genender     82          .           .             .
12     By Mr. Duewall      .           91          .             .

13

14

15

16   EXHIBITS:                         Received

17   Exhibit 1566                      96
     Exhibits 1592-2, 1592-3, 1592-4
18    and 1592-5                       97
     Exhibits 1601-1, 1701-2 and
19    1608-1                           98
     Exhibits 1613-2, 1613-3 and
20    1613-4                           95
     Exhibits 1631-1, 1631-2          45
21   Exhibit 1620-1                    56

22

23

24

25

                    JUDICIAL TRANSCRIBERS OF TEXAS, LLC

1      <u>HOUSTON, TEXAS; TUESDAY, JUNE 22 16, 2021; 1:44 A.M.</u>

2           THE COURT: All right, we're returning to the

3    Confirmation Hearing in the Fieldwood case.  It's 20-33948.

4           Who's going to be the proponents' next witness?

5       (Pause in the proceedings.)

6           THE COURT:  Mr. Perez?

7           MR. PEREZ:  Yes, Your Honor, Alfredo Perez.  John

8    Graham was going to be our next witness, Your Honor.  I see

9    him on the screen.  I don't know whether he's on.

10          THE COURT:  Thank you.

11          Mr. Graham, if I could get you to press five star

12   one time on your line, please, sir?

13          Mr. Graham, good afternoon.  Would you raise your

14   right hand for me please?

15          MR. GRAHAM:  Good afternoon.

16          THE COURT:  Thank you.  Would you raise your right

17   hand for me, please?

18       (Witness sworn.)

19          THE COURT:  Thank you.

20          All right, let me see.  I've got someone else that

21   wishes to address the Court.  Well, Mr. Perez, I had already

22   activated your line I think before you pressed five star.

23          All right, let's move ahead then.

24          MR. PEREZ:  Thank you.  Your Honor, can you hear

25   me?

1          THE COURT:  Yes, sir.

2          MR. PEREZ:  I think you lowered my hand.  Oh, you

3  can hear me?

4          THE COURT:  I lowered your hand because I already

5  activated your line.  I'll leave it open for the hearing.

6          MR. PEREZ:  Oh, okay, okay.  I thought you were

7  trying to silence me.  But, --

8          THE COURT:  I have other ways of doing that.

9          DIRECT EXAMINATION OF JOHN ANTHONY GRAHAM

10  BY MR. PEREZ:

11  Q    Good afternoon, Mr. Graham.  Could you please state

12  your name?

13  A    John Anthony Graham.

14  Q    And, Mr. Graham, are you the individual that is

15  proposed to be the sole manager of Fieldwood One?

16  A    I am.

17  Q    Would you please tell the Court your educational

18  background?

19  A    I graduated in 1977 from the University of Missouri

20  with a Bachelors of Science degree in mechanical

21  engineering.  And then in 1983, I graduated from University

22  of Oklahoma with a Masters in Business Administration.

23      In addition, I'm a registered professional engineer in

24  the State of Texas.

25  Q    Now, when did you first obtain employment in your area

1  of expertise?

2  A    I started to work in 1977 for AMACO Production Company

3  in Tyler, Texas.

4  Q    And what was your position at that time?

5  A    I was a production engineer.

6  Q    All right, and then, what did you do after that

7  opportunity?

8  A    After joining AMACO in 1977, I had several different

9  positions relating to operations engineer, reservoir

10 engineer, reservoir engineering manager, vice president of

11 reservoir engineering, region vice president and country

12 manager, region vice president and managing director.

13 Q    All right, so let me -- let me -- so --

14 A    And also vice president of health safety security

15 environment for Apache Incorporation.

16 Q    All right.  So, what was your last employment,

17 Mr. Graham?

18 A    I retired from Apache Corporation in April of 2020

19 after serving them in five countries, seven regions, at

20 corporate office in 25 years.

21 Q    All right, so prior to the time that you went to

22 Apache, what were your positions?  What type of work did you

23 do?

24 A    I was doing petroleum engineering work primarily as an

25 operations engineer, production engineer, reservoir

1   engineering management and reservoir engineer executive.

2   Q    Okay and --

3   A    And also vice president of health, safety environment.

4   Q    Okay, so when you went to Apache, what were your

5   positions?

6   A    I went to Apache in 1994 as reservoir engineering

7   manager in the Rocky Mountain Region in Denver, Colorado.

8   Q    And then what was your next position after that?

9   A    It was Region Vice President of the Gulf Coast.

10  Q    Okay and then after that?

11  A    I was transferred as engineering general manager for

12  Apache Egypt's companies in Cairo, Egypt.

13  Q    Okay, were you ever the reservoir engineering manager

14  for the Gulf Coast region -- for the Gulf of Mexico region?

15  A    I was reservoir engineering manager for the Gulf of

16  Mexico region, yes.

17  Q    Okay.  And then after your position in Cairo, Egypt,

18  where did you go from there?

19  A    I was promoted to vice president of reservoir

20  engineering in our Canadian region in Calvary Alberta.

21  Q    Okay.  And then what did you do after that?

22  A    After three years, I was asked to transfer to Buenos

23  Aires, Argentina as the region vice president and country

24  manager for Apache Argentina.

25  Q    And then after that position, what did you do?

1   A    I was transferred back to Houston, Texas as a vice

2   president of health, safety, security, and environment for

3   Apache Corporation worldwide.

4   Q    Okay.  So at that point -- at that time did you have

5   responsibility for health, safety, security and the

6   environment for the Gulf of Mexico region?

7   A    I had -- I was the oversight for the entire company.

8   Not necessarily just the Gulf of Mexico.

9   Q    Got it.  And then what was your position after that?

10  A    After that, I was transferred to Aberdeen, Scotland as

11  region vice president and managing director of Apache North

12  Sea.

13  Q    And was that your last posting with Apache?

14  A    Yes, it was.  And I retired in April of 2020.

15  Q    Now, could you tell the Court how big the North Sea

16  region is?

17  A    When I was managing the North Sea Region, we produced

18  between 60 and 70,000 barrels of oil a day, equivalent, from

19  seven platforms.  And we would generate in the neighborhood

20  of $3 billion a year worth of revenue.  And our net revenue

21  was approximately a billion and a half dollars a year.

22  Q    Thank you.

23       Now in terms of when did you first hear about the

24  opportunity to be the sole manager?

25  A    In August of 2020 I was contacted by Anthony Lanny,

1    general counsel for Apache Corporation.  He described the

2    position they were looking to fill at Fieldwood One.  He

3    thought I had the background and expertise and experience

4    for that.  And asked me if I would be interested in

5    submitting my name for consideration.

6    Q    And so what did you do after that first initial

7    contact?

8    A    I provided Mr. Lanny with an updated résumé and he

9    explained -- he also provided me with the job description

10   and also the term sheet agreement between Apache and

11   Fieldwood Energy.

12        And he told me the situation that it was going through,

13   the bankruptcy, and that it would be some time in the first

14   quarter of 2021, you know, before Fieldwood One would emerge

15   from the bankruptcy.

16   Q    And did you indicate an interest in pursuing this

17   opportunity?

18   A    After consideration and reading the documents, I told

19   Mr. Lanny that I gave him my approval to submit my name for

20   consideration.

21   Q    And then what happened next?

22   A    I was contacted by Mr. Lanny in early December letting

23   me know that I would be contacted by Fieldwood Energy to

24   where they could have an opportunity to speak with me, get

25   to know me and understand my background and experience.

1  Q     And did that happen?

2  A     Yes, I think sometime in mid-December I had a meeting

3  with Mike Dane and Tommy Lamb to discuss the Fieldwood One

4  position.

5  Q     Okay and then what happened as a result of that

6  meeting?

7  A     After that meeting, I was next contacted and presented

8  with the job offer as sole manager for Fieldwood One and

9  also, they asked me if I would be available to come on as a

10  consultant of Fieldwood Energy until they came out of

11  bankruptcy and Fieldwood One was created.

12  Q     Okay, and then what did you do after that proposal was

13  made?

14  A     I accepted the proposal and I went to work, I believe,

15  it was January 14th of 2021 for Fieldwood Energy as a

16  consultant with primary responsibility to become familiar

17  with the Fieldwood One properties, the Fieldwood Energy

18  Organization and also have an opportunity, you know, to meet

19  the people that would be involved in operating Fieldwood

20  One.

21  Q     Okay.  And have you, in fact, been doing that since

22  that time?

23  A     Yes, I have.  I've been given the opportunity to review

24  the properties, sit down with the asset managers, review the

25  fields, the active projects, the decommissioning folks.

1  Also, most of the major functional area managers, including

2  the field operations folks as well as the vice president of

3  operations.

4       I was also provided an updated reserve report and I get

5  daily production reports on the Fieldwood One properties.

6  Q    All right, Mr. Graham, what do you understand the role

7  of the Fieldwood One sole manager to be?

8  A    Well the Fieldwood One sole manager is responsible for

9  the operations and decommissioning of the Legacy Apache

10 properties.  With the mission of decommissioning these

11 assets in a timely manner.

12 Q    Okay, and what are the considerations that will go into

13 that decommissioning?

14 A    Well, the primary responsibility of Fieldwood One is to

15 decommission the non-producing properties and then maximize

16 the cash flow from the producing properties to provide funds

17 for future decommissioning.

18 Q    All right.  And now initially, I believe, the testimony

19 has been that initially there will be Transition Services

20 Agreement with the Credit Bid Purchaser.  Are you aware of

21 that?

22 A    Yes, I am.  There's a provision that Fieldwood Energy,

23 Newco will provide contract operations for the Fieldwood One

24 properties.

25 Q    And how will you be involved with respect to that

1   Transition Services Agreement?

2   A    Well, it will be my responsibility to oversee the

3   contract operator in the operations of Fieldwood One.

4   Q    And do you have any ability to change the contract

5   operator?

6   A    Yes, I do.  As sole manager, I have the right to change

7   the contract operator.  In fact, the LLC agreement for

8   Fieldwood One stipulates that I have to bid out the contract

9   operations to at least three credible companies to ensure

10  that we're getting optimum cost for operations.

11  Q    And is that a role that you've performed before

12  assuring yourself that you were getting the maximum cost and

13  the maximum efficiency?

14  A    Yes.  Throughout my career that has been my

15  responsibility as an executive to make sure that operations

16  were run safely, environmentally responsible, and

17  economically efficient.

18  Q    Okay, now do you still -- do you currently have any

19  involvement with Apache Corporation?

20  A    No, I left them in April of 2020.

21  Q    Do you own any Apache stock?

22  A    With my 25 years of employment with Apache, yes, I have

23  accumulated some Apache stock.

24  Q    Okay, do you believe that having that stock is going to

25  influence your decision making as the sole manager?

1  A     No.  It's a minor part of my net worth and as a

2  professional manager of Fieldwood One, my responsibility and

3  loyalty is to Fieldwood One.

4  Q     Now, are you aware that Apache has certain consent

5  rights pursuant to the LLC agreement?

6  A     That's my understanding.  I think there's about 14 or

7  15 items that need Apache's consent.

8  Q     And do you believe that those consent rights will

9  influence your ability to manage Fieldwood One with the

10  objective that you've set out?

11  A     No, because I have complete responsibility of the

12  decommissioning operations as well as the production

13  operations of the producing properties.

14  Q     All right, now in terms of compensation, how are you --

15  how will you be compensated as the sole manager?

16  A     According to the letter agreement that I signed, I'll

17  have a base salary -- a monthly base salary.  And then there

18  are some long term incentives to -- if I fulfill this

19  position for three years, there's a bonus stipulation and

20  then another one at five years.

21      There's also a long term incentive to maximize the cash

22  flow.  And if we hit $400 million of excess cash flow as

23  defined in the standby credit agreement, there's an

24  additional compensation available.

25  Q     And how would you achieve that $400 million of excess

1  cash flow?

2  A    By optimizing and maximizing the cash flow from the

3  producing properties.

4  Q    And what about --

5  A    And also decommissioning the non-producing properties.

6  Q    Okay.  And will you have control over some of the

7  expense items as well?

8  A    Yes.  My responsibility will be to manage not only the

9  production and the review, but also -- excuse me just a

10  second.  To manage the expenses and G&A involved with

11  operating the Fieldwood One properties.

12  Q    Mr. Graham, do you believe that based on your

13  experience and qualifications that you are qualified to do

14  the tasks required of the Fieldwood One manager?

15  A    Yes, I have the background, the expertise to manage the

16  properties.  I've done it for many years.  I have

17  approximately 44 years of experience in the industry doing

18  exactly what's been required of the Fieldwood One.

19          MR. PEREZ:  Thank you, Your Honor.  I have no

20  further questions of this witness.

21          THE COURT:  Thank you, Mr. Perez.

22          Are there any proponents of the Plan that have

23  questions for Mr. Graham?  If so, please press five star one

24  time on your line.

25      (Pause in the proceedings.)

1          THE COURT:  All right, are there any persons in

2    opposition to confirmation of the Plan that have any

3    questions for Mr. Graham?

4          (Pause in the proceedings.)

5          THE COURT:  Mr. Eisenberg?

6          MR. EISENBERG:  Yes, good afternoon, Your Honor.

7    Philip Eisenberg.  I am not here to oppose the Plan for

8    ATCI.  I wanted to alert the Court that we had been --

9    before the confirmation hearing started, we had made an

10   arrangement with Debtors for them to make Mr. Graham

11   available for testimony in our case.

12          And they told me that they were going to put him

13   on in direct and if I wanted to I could cross him.  But we

14   have reached our arraignments and TCI will not availing

15   themselves of that and would be releasing Mr. Graham from

16   our case-in-chief.

17          I just wanted to, if Your Honor would indulge me,

18   wish Mr. Graham luck.  He's a very impressive man and I hope

19   he gets all his --

20          THE COURT:  So you hope he gets a lot of his

21   incentive payments?

22          MR. EISENBERG:  Yes, Your Honor.  I do.

23          THE COURT:  All right.  Mr. Eisenberg, thank you

24   for the comment and the courtesy of releasing him.

25          Is there any other party that has any questions

1  for Mr. Graham?  If so, you'll need to press five star one

2  time on your phone, please.

3       (Pause in the proceedings.)

4            THE COURT:  Mr. Graham, I don't have any questions

5  for you.  Thank you for coming.  You're welcome to observe

6  the balance of the hearing if you wish and you're welcome to

7  leave if you wish.  It's public courtroom.

8            THE WITNESS:  Thank you, Your Honor.

9            THE COURT:  Thank you, sir.

10       (Witness excused.)

11            THE COURT:  Who's going to be the next witness,

12  Mr. Perez?

13            MR. PEREZ:  Ms. Choi, I think is up next Your

14  Honor.

15            THE COURT:  All right, Ms. Choi if you would press

16  five star, please.

17       (Pause in the proceedings.)

18            THE COURT:  Ms. Choi, good afternoon.

19            MS. CHOI:  Good afternoon, Your Honor, Erin Choi

20  Weil, Gotshal & Manages on behalf of the Debtors.  At this

21  time I would like to call Mr. Clayton Green to testify in

22  support of Plan Confirmation.

23            THE COURT:  Thank you.

24            Mr. Green, could I get you to press five star one

25  time on your phone, please, sir?

1        (Pause in the proceedings.)

2            THE COURT:  Mr. Green, good afternoon.  Would you

3    raise your right hand, please?

4        (Witness sworn.)

5            THE COURT:  I couldn't hear that.  You may have

6    your own line muted.

7            THE WITNESS:  I apologize, Your Honor.  Yes, I do.

8            THE COURT:  Thank you sir.

9            All right, Ms. Choi, go ahead, please.

10              DIRECT EXAMINATION OF CLAYTON GREEN

11   BY MS. CHOI:

12   Q    Please state your name for the Record.

13   A    My name is Clayton Green.

14           MALE SPEAKER MALE:  Your Honor, I'm having a hard

15   time --

16           THE COURT:  Can I get you to move little closer to

17   your mic?

18           THE WITNESS:  Is that better?

19           THE COURT:  It is.  Even closer would be better.

20           THE WITNESS:  Okay.  Is that loud enough?

21           THE COURT:  That is.  Thank you.

22           THE WITNESS:  Okay.

23           THE COURT:  I'll look at your bald head as you

24   bend over, Mr. Green.

25           THE WITNESS:  Exactly.

1              THE COURT:  Go ahead, please, Ms. Choi.

2     BY MS. CHOI:

3     Q    Mr. Green, where are you currently employed?

4     A    With AlixPartners, LLP.

5     Q    And how long have you been employed there?

6     A    Throughout my career for approximately 15 years.

7     Q    What position do you hold at AlixPartners?

8     A    I'm a managing director.

9     Q    And Mr. Green, what is your role in this bankruptcy?

10    A    AlixPartners was retained as financial advisor to

11    Fieldwood to assist the company with the bankruptcy

12    proceeding.

13    Q    Mr. Green, are you here today as an expert witness?

14    A    I'm not.

15    Q    Did you calculate how much to reserve for the claims

16    reserve purposes in this case?

17    A    Yes.

18             MS. CHOI:  Your Honor, if I may ask that you give

19    control of the screen to Kevin Simmons?

20             THE COURT:  All right, Mr. Simmons, can I get you

21    to turn your camera on just for a moment so I can find you?

22    Thank you.

23        (Pause in the proceedings.)

24             THE COURT:  All right, Mr. Simmons is now the

25    presenter.

 1          MS. CHOI:  Thank you, Your Honor.

 2   BY MS. CHOI:

 3   Q    If I may share on the screen a demonstrative that is

 4   ECF No. 1646-3, which is Debtor's Exhibit 108.  This is a

 5   demonstrative that was used yesterday.

 6        Mr. Green were you involved in the preparation of the

 7   numbers that are reflected on the left side of this

 8   demonstrative?

 9   A    Yes, I was.

10   Q    And were you also involved in the preparation of

11   certain numbers on the right side of this demonstrative?

12   A    Yes, I was.  Just one line item on the right-hand side,

13   the sale reserve costs.

14   Q    Thank you.

15        And for the sale reserve cost, can you please explain

16   to the Court what estimates -- what numbers are included in

17   that estimate?

18   A    Yeah, for the sale reserve costs, it's made up of two

19   separate categories of estimates.  The first is accrued and

20   unpaid taxes as of the emergence state.  And the second is

21   the amount calculated for personal injury matters that the

22   company is dealing with.

23        So the latter there's an estimate of $1.4 million in

24   that and that takes $100,000 deductible and applies it to 14

25   personal injury matters that the company is handling at the

1   present.

2   Q    And what else --

3   A    The second -- I was going to say, sorry, the second

4   component of the sellers cost the accrued and unpaid taxes

5   there's an estimate of $1.1-to-1.3 million in those numbers.

6        With respect to, again, taxes that are -- with the

7   accrued or estimate the accrued and unpaid as of a potential

8   emergence date.

9   Q    Thank you.

10       And what creates the variability in this range in this

11  estimate?

12  A    It's just a matter of an emergence date.  And so to the

13  extent the company will emerge sometime in June, that

14  estimate was 1.1 million.  If the company were to emerge

15  sometime in July, the estimate was 1.3 million as

16  calculated.

17  Q    So that amounts to what -- what amount did you

18  calculate for the sale reserve?

19  A    2.5 on the low side and 2.7 million on the high side.

20  Q    Thank you.

21       So turning now to the left side of this demonstrative,

22  the claims reserve section, what categories did you include

23  in the claims reserve?

24  A    On the left-hand side of the page, each category that's

25  listed, the professional fee escrow, other exit fees and

1   costs, cure amounts, 503(b)(9) claims.  In addition, amounts

2   estimated for allowed priority tax claims, allowed other

3   priority claims, allowed other secured claims and finally

4   the 6A cash coordinates.

5   Q    Now if we could just start walking through each of

6   these categories?  So for professional fees escrow, can you

7   describe how you've calculated how much to escrow for

8   professional fees?

9   A    Yes, for professional escrow, the estimate is arrived

10  by simply looking at historical invoices that have been sent

11  to the company throughout the pendency of the case.  And in

12  looking at those invoices, identifying a high and a low

13  range for invoices that have been submitted.  And then to

14  come up with an ultimate estimate that you see on the screen

15  there is trying to identify or understand activity level by

16  firm, as the case draws to the close, and what the amount

17  outstanding would be as an emergence date and the amounts

18  that will be funded into the escrow account.

19  Q    Thank you.

20       And based on those calculations, what was the high and

21  low range of what Fieldwood needs to escrow for professional

22  fees?

23  A    On the low side, just over $15 and half million and on

24  the high side, just over $27 and half million.

25  Q    Turning to the next category, other exit fees and

1  costs, what kinds of cost fit into this category?

2  A    It's largely the same as the line above with respect to

3  how the calculation was made.  It's primarily made up of

4  professional firms that would not be subjected to funds

5  coming out of the escrow account.

6       However, there are other amounts in there.  For

7  instances, there are small amounts relating to

8  (indiscernible) and we also have an amount for US Trustee

9  fees that would be outstanding as of emergence as well.

10  Q    And the calculations what was the estimate for other

11  exit fees?

12  A    On the low side, just over 11-1/2 million and on the

13  high side, just under 18 million.

14  Q    Turning next to the cure amounts, can you describe how

15  you calculated this category?

16  A    Yes.  Contract assumption schedules that were filed

17  with the Court, what I did was identify any open pay

18  structure -- well actually two steps if you'll allow me.

19       Initially the contract assumption schedules that were

20  filed with the Court, we looked at the open payables for any

21  of the contract counterparties for those contracts that are

22  marked as assumed and had an estimate of about 500 -- excuse

23  me, $5-1/2 as a cure amount.

24       Subsequent to those Schedules being filed, the company

25  received objections to cure amounts.  Me and members of my

1  team looked at those objections and worked with the company

2  to understand which of those objections are called out

3  amounts that could potentially be held as pre-petition

4  obligations associated with those contracts that are listed

5  on the assumption schedule.

6       On the low side, identified about $1.2 million

7  additionally that we added to the estimates.  And on the

8  high side it was close to $2 million that were added to the

9  estimates.

10      So in total that's the number that you see there, it's

11  5-1/2 plus those objections on the low and high side, we

12  arrive at $6.8-to-7.5 million.

13 Q   Can you next describe how you calculated the reserve

14 for the 503(b)(9) claims, please?

15 A   Yes.  Claims that were asserted for administrative

16 amounts, were reviewed by me or members of my team.  We ran

17 it through various -- I guess we could review it in a couple

18 different ways.

19      First, of the claims that were asserted for

20 administrative amounts and for 503(b)(9) amounts

21 specifically, initially identified those claims that me or

22 members of my team had marked as set for non-substantive

23 objections.

24      And what I mean by that are claims that are

25 duplicative -- literally duplicative, had been filed

1  multiple times or are redundant in nature or to the extent

2  the claims had been amended over time -- amended with

3  subsequently filed claims, that is.

4      We took those -- asserted amounts for those claims

5  specifically and removed them from the estimate.  With the

6  claims that remain that had asserted 503(b)(9) amounts to

7  the extent the proofs of claims also provided invoice

8  detail, looked at the invoices to determine first, if the

9  invoices were for physical goods and products as opposed to

10 just services -- which is a requirement for 503(b)(9) claim.

11 And second, identified per the invoices it the goods or

12 products were delivered to the company within the 20 days

13 prior to filing.

14 Q    Did you do anything else?

15 A    With respect to the 503(b)(9) claims?

16 Q    Yes.

17 A    If we did, it might be slipping my mind.  I know that

18 we removed non-substantive objections and any claims that

19 were -- and any other asserted claims that we made

20 adjustments for, that fall in the buckets of either, you

21 know, having to require for physical -- requiring physical

22 goods or products or were adjusted for the 20 days window.

23 Q    And what was the result of these adjustments?

24 A    An estimate on low side about $400,000 and high side

25 about $600,000.

1  Q    Turning next to the allowed priority tax liens.  Can

2  you please describe how you calculated this category?

3  A    Yes. Similar to the 503(b)(9) claims, me and members of

4  my team reviewed any claims that were asserted for priority

5  amounts and identified which of those claims were asserted

6  for outstanding tax liabilities.  After performing that

7  review, we only identified two claims -- well I guess before

8  that review and also worked with the company and their tax

9  group to understand which amounts are asserted were either

10 invalid or had already been paid or have not yet come due.

11      After performing that review, we calculated an

12 estimate.  While there it looks like zero on the page, is on

13 the high side it's about $11,000.  On the low side, it is

14 zero.

15 Q    Turning now to allowed other priority claims.  Did you

16 consider this category as well?

17 A    I did consider this category.  As part of the review of

18 any claims asserted for priority amounts me and members of

19 my team, we did not identify any claims asserted for

20 anything outside of tax that would warrant priority

21 treatment under the Plan.

22 Q    Thank you, Mr. Green.  Now did you also look at a class

23 of claims called, "allowed other secured claims?"

24 A    Yes.

25 Q    And how did you calculate for this group?

1  A     Additionally there was close to 1,000 claims filed

2  against Fieldwood for -- in the neighborhood of $45 billion.

3  Just like with the 503(b)(9) and the priority claims, we

4  identified the claims that were asserted for secured amounts

5  to start -- to begin the analysis.  And that population

6  totaled to about $15 billion.

7  Q     Did you make any adjustments from there?

8  A     Yes.  So, the $15 billion was really the starting point

9  to the secured claims estimates.  We made adjustment from

10 there and bucketed claims depending on what they were

11 asserting.

12       But initially the adjustments to the entire population

13 of $15 billion claims, the first adjustment we made was, as

14 I mentioned earlier with non-substantive objections in the

15 503(b)(9) claims, there were multiple claims filed for --

16 asserting for secured amounts that were also marked for non-

17 substantive objections.

18       Again, those are claims that are duplicative or

19 redundant in nature, claims that had been amended over time,

20 claims were the certain claimant had agreed to a certain

21 trade agreement.

22       So we removed those claims, the asserted amounts and we

23 adjusted the total.  That adjustment by itself was about

24 $11 billion.

25 Q     And what adjustment, if any, did you make next?

1  A    We identified of the secured claims that were asserted,

2  identified which ones were related to secured or bank debt

3  and removed those from the estimates as well.  That's about

4  $2 billion of asserted claims.

5  Q    And why did you remove those?

6  A    My understanding of the Plan is that those -- the

7  amounts owed to those parties are treated separately and are

8  not to be included in the claims reserve.

9  Q    What adjustment, if any, did you make from there?

10  A    Identified claims that were to withdrawn.  Certain of

11  the claims that were asserted secured claims, agreed to

12  withdraw their claims.  And that amount added up to about

13  $750 million.

14      And there was one final adjustment that we made to the

15  overall $50 billion asserted, which was claims for -- claims

16  served by taxing authorities or claims for royalty interest.

17  And after investigation with the company, found that those

18  claims are invalid.  So we adjusted those out as well.

19      I think I mentioned that the withdrawn claims totaled

20  $750 million if I did not I apologize.  But that was a $750

21  million adjustment.  The adjustment I just mentioned with

22  respect to the tax and royalty claims is about $1 million.

23  Q    So how much unsecured claims was left after these

24  adjustments were made?

25  A    In the range of a billion to a billion and one.

1  Q     Did you calculations stop there?

2  A     No.  As I mentioned earlier, we started to get into

3  claims depending on what was asserted and the nature of the

4  asserted claim.

5       And so, I arrived at three buckets.  The first were

6  claims asserted by working interest owners.  That was about

7  a billion dollars.  The second bucket were claims that were

8  asserted for outstanding DIP amounts or pre-petition amounts

9  owed for gathering and transportation agreements.

10      And the third bucket were claims asserted by vendors

11 where the vendor asserted a lien on the property.  The

12 bucket for the JIBS and gathering transportation agreements

13 is about $13 million.  For the vendor asserted claims,

14 totaled about $22 million.

15 Q     Thank you.

16      So let's talk first about the working interest owner

17 bucket.  The first bucket of the three.  What kinds of

18 claims did the working interest owners assert?

19 A     They asserted three claims -- three types of claims

20 primarily.  So we created some buckets, if you will.  The

21 first type of asserted claim was for P&A obligations.

22      The second bucket or some bucket, I should say, was

23 with respect to cash advances to the operator or cash calls.

24 And the third bucket or the third sum bucket was claims

25 filed with respect to the underlying vendor liens.

1   Q    And --

2            THE COURT:  I'm sorry I missed that last word.

3   Something filed with respect to the underlying indemnity,

4   you said?

5            THE WITNESS:  I'm sorry, Your Honor.  Underlying

6   vendor liens.  These are claims that were asserted by --

7            THE COURT:  Yeah, I just didn't hear the word.

8   Thank you.

9   BY MS. CHOI:

10  Q    Mr. Green, what steps did you take to calculated the

11  secured working interest owner claims?

12  A    Of the $1 billion that were asserted, we made

13  adjustments to similar tax and highlights in the other

14  categories.  The first thing just sort of going in order,

15  was looking at the claims asserted for contingent fee

16  allegations.  There was claims asserted total about $950

17  million.  According to the Plan and step we took in the

18  estimation was to remove those claims asserted for

19  contingency obligations entirely.  And that was an

20  adjustment of about $950 million.

21  Q    What did you do next?

22  A    With respect to the claims asserted for cash advances

23  to the operator or cash calls, there was one claim asserted

24  for just over $2 million by Valero.  It alleged the right to

25  secured claims via right to set off.

1      My understanding of the claim and the situation with

2  Valero is that no additional funding would be required to

3  claims reserve regardless of how the -- regardless of the

4  outcome of that claim.

5      And so, we removed that amount from the estimate and

6  total as well.  Again, that was about a $2 million

7  adjustment.

8  Q    And then what did you do with respect to the third

9  sub-bucket?

10 A    The claims asserted for underlying vendor liens --

11 totally asserted was about $70 million.  Me and members of

12 my team look at each one of those claims that were asserted

13 and the proofs of claims themselves provided detail with

14 respect to the actual vendors that made up the claim.

15     And in looking at that detail we were able to identify

16 basically two adjustments to those asserted amounts.  The

17 first, although the claims were filed by different working

18 interest owners, but in certain cases, they would assert the

19 same amount for the same vendor obligation.

20     And so we removed from the estimates the amounts that

21 were duplicative in the sense that they were filed for the

22 same amount with the same vendor in case there were multiple

23 proofs of claims.

24     Making that sort of duplicate adjustment, backed out

25 $35 million from the asserted total of underlying vendor

1  lien claims.

2       And another thing in looking at the underlying vendor

3  lien claims is identifying which of those vendors had signed

4  trade agreements with the company and removing those

5  asserted amounts from the estimate as well.  And that

6  adjustment added up to $20 million -- roughly $20 million.

7  Q    What did you do after that?

8  A    That left about $14 million with respect to the4

9  underlying vendor lien claims asserted after the duplicate

10 and trade agreement adjustments.

11      For the purposes of this estimate, we calculated a low

12 estimate for the underlying vendor lien claims as zero and a

13 high estimate for the full $14 million.

14      My understanding is that there's a decision yet to be

15 rendered on the underlying vendor lien claims and to the

16 extent or whether or not those other claims will be fully

17 extinguished through the Plan or not.

18      If not, the $14 million is in the high total.  If they

19 will be extinguished in their entirety, zero is where it

20 comes into account for the low estimate.

21 Q    Thank you.  So turning to then the second bucket, the

22 JIB and gathering agreement bucket.  What analysis or

23 calculations did you perform with respect to this bucket?

24 A    The JIB and gathering transportation agreement bucket,

25 excuse me, was about $13 million asserted.  The first item

1  that was identified were any outstanding -- any JIB's

2  amounts that were claimed or asserted or had already been

3  paid throughout the pendency of the case.  Or the company's

4  books and records did not match what was -- what had been

5  asserted in the proof of claim.

6       So Collin just wasn't showing up in the company's books

7  and records.  We made that adjustment and that was an

8  adjustment of about $7 million off the $13 million total.

9  Q    Did you make any other adjustments?

10 A    Yes.  With respect to -- yes with the JIB, yes we did.

11 So we identified certain claims that were disputed -- excuse

12 me that were duplicated with the JIB amount.  And that

13 amount was about $1 million that we adjusted out.

14 Q    And did -- sorry, go ahead.

15 A    Yes, we did.  One more adjustment with respect to the

16 Valero claim which is bucketed in this claim, we removed $2

17 million that was asserted.

18 Q    So what was the result of these adjustments?

19 A    We came up with an estimate for the JIB -- the JIB

20 amounts are anywhere from $600,000 to about $30 million.

21 And the difference between the high and the low.  My

22 understanding that the company in conversations with certain

23 parties that asserted secured claims for JIB or gathering

24 transportation amounts, to the extent agreements were

25 reached and payments were made to satisfy these claims.  We

1  removed those balances from the low case.

2      To the extent they are not, then their resolution --

3  there's no resolution arrived before the emergence date,

4  there's an answer in the high case.

5  Q    Thank you.  Turning now to the third and final bucket,

6  the vendor bucket.  How much was asserted in these vendor

7  claims?

8  A    The amount that was asserted in the claims was about

9  $23 million.  And in similar fashion we made adjustments to

10  that as well.

11  Q    What adjustments did you make?

12  A    First for the vendor claims, we identified any claims

13  asserted by vendor that had agreed to unsecured treatment.

14  And we removed those claims from the total -- the total

15  estimate.  And that was about a $14 million adjustment.

16  Q    Did you make any additional adjustments?

17  A    Yes, any claims that were asserted for amounts that the

18  company did not reflect in their books and records, we

19  adjusted that amount out as well.  And that was an

20  adjustment of about $2 million.

21  Q    And were there any further adjustments?

22  A    With respect to the claims that were filed with the

23  vendors, and if the claims still remained in the

24  estimate -- if I could say it that way -- they still remain

25  in the estimate after those first two adjustments I

1  mentioned.

2      In looking at the proofs of claim, vendors often times

3  will provide invoice support and identify which of the

4  properties the claims were being asserted against.

5      As we looked at the properties specifically, we look at

6  the mortgage date of those properties and compare that to

7  the MSA date of the vendor that is asserting the claim.

8  (Indiscernible) to the mortgage date, preceded the MSA date.

9  We removed those amounts from the claim yesterday.  And that

10  was another adjustment of about $2 million.

11  Q    And were there any additional adjustments or was that

12  all of them?

13  A    There was one more -- one that we made in addition,

14  which is looking at the properties individually.  To the

15  extent the properties had an estimated PV10 value that was

16  negative, we removed those amounts asserted against those

17  specific properties as well.  That adjustment was about

18  $600,000.

19  Q    And why did you use the PV10 estimated?

20  A    The PV10 report was provided to us from the company to

21  the extent that there was a negative value found in the PV10

22  report for a specific property, again, made the conclusion

23  that the security interest didn't have any value to it and

24  so adjusted that amount out of the estimate for the secured

25  claims.

1  Q    So what was the resulting estimate for this vendor

2  bucket after you made these adjustments?

3  A    The vendor bucket didn't have a low, high range on it.

4  It was just -- it was right at $3 million.

5  Q    And what was the overall then result of your

6  calculations after you performed all these adjustments we

7  just discussed?

8  A    In taking those three buckets added together after all

9  of the adjustments we came up with the range that you see on

10 the screen of $4 million in a low case and $21 million on

11 the high.

12 Q    And is there a single source for most of the difference

13 between the four and the 21 million?

14 A    Primarily it's a zero to $14 million range that we

15 talked about with the underlying vendor liens.  Again, in

16 the low case having zero to the extent that vendor claims

17 are extinguished through the Plan.

18      In the high case, they're full $14 million which is the

19 asserted amounts for their vendor claims -- underlying

20 vendor lien claims, excuse me.  It has the full amount in

21 the high case estimate.

22 Q    Thank you, Mr. Green.

23      Let's turn next to Class 6A cash pool.  Can you

24 described how you calculated this 6A claims?

25 A    Yes.  The 6A cash pool amount is made up of claims

1  asserted by trade vendors that opted in to Class 6A.  We

2  received a report from Prime Clerk, indicating which trade

3  vendors chose to participate in Class 6A.

4      Looking at the asserted claims and matching that to the

5  company's books and records, the estimate has in the low

6  case about $8 million of trade claim.  And in the high case

7  about $11 million.

8      To arrive at the estimate of 1.2 to 1.7 we applied the

9  14 percent recovery that I understand is outlying the Plan.

10  And the 14 percent, multiple that low and high -- low case

11  of 8 and high case of 11 gets you to about the 1.2 to 1.7.

12  Q    And so then what is the total amount that Fieldwood

13  needs for its claims reserve based on all these

14  calculations?

15  A    Based on all those calculations, the estimated claims

16  reserve is calculated to be 39.4 million to 76.1 million.

17  Q    Thank you.

18      Mr. Green, did you also review claims for holders in

19  Class 1 that voted to reject the Plan?

20  A    Yes.

21  Q    And if I call it the company's rejecting the claimants,

22  will you understand what I mean by that term?

23  A    Yes.

24  Q    So which companies were rejecting the Plan?

25  A    There were seven parties in total.  It was Conoco,

1 Burlington, land and exploration, Ecopetrol, Valero, W&T and

2 McMoRan.

3 Q    And did you calculate an estimated amount potentially

4 owed to these rejecting claimants?

5 A    Yes.

6 Q    So, what did you do to calculate this?

7 A    Look at each of the claims that were asserted and

8 depending on what the claim was asserted for, made

9 adjustments for the estimate depending on either company

10 books and records or depending on what the claim was

11 asserted for, remove them from the estimate entirely.

12 Q    So starting with Valero.  I believe we spoke about this

13 a moment ago.  But if you could just remind the Court what

14 calculation you determined with respect to Valero?

15 A    Yes, for Valero, the amount that was asserted, $2.1

16 million, was removed in its entirety from the estimate

17 again, because my understanding of the outcome of that claim

18 regardless of what happens, no additional funding will be

19 required to reserve.

20 Q    What about Ecopetrol?

21 A    Ecopetrol is working interest owner that filed a claim

22 that we had included in the bucket for underlying vendor

23 liens.  And so in total that claim was asserted for $7

24 million.

25        The first adjustment that was made was understanding

1  which of those vendors that make up the claim had trade

2  agreement.  And that took that claim from $7 million

3  asserted down to about $5.8 million.

4       And then my understanding of the JOA, is that the

5  claims only secured for the Debtor's portion share of the

6  property.  And so, applying that proportionate share to the

7  balance of 5.8 million would arise at an estimated value of

8  $325 million.

9  Q    And with respect to the remaining rejecting claimants,

10 what did you do to calculate amounts potentially owed to

11 them?

12 A    The remaining other seven -- of the group of seven, the

13 remaining claims were asserted for continuing P&A

14 obligations.

15      As discussed earlier, those amounts were removed in

16 total from the claims adjustment.

17 Q    Thank you for your time, Mr. Green.

18           MS. CHOI:  No further questions.

19           THE COURT:  Mr. Green, on the rejecting claimant

20 amounts, where would I see those on this sheet?  Where does

21 the cash part --

22           THE WITNESS:  I'm sorry, Your Honor.

23           THE COURT:  Where's the cash requirement appear on

24 the sheet that we were looking at?  Is it here for the

25 rejected claimants?

1          THE WITNESS:  For specifically the rejected

2   claimants, Ecopetrol's amount would be factored into the

3   other secured claims within the range of 4 to $21 million.

4          And all the rest of the --

5          THE COURT:  So that's already -- so the amount

6   that you're talking about for rejected claimants, there was

7   no amount over and above what was already listed in the

8   other amounts?

9          THE WITNESS:  That is correct.

10          THE COURT:  Okay.  I just wanted to -- I couldn't

11   see where it filled in here and if it was incorporated in

12   here, that's fine.

13          All right is there any proponent of the Plan that

14   has any questions for Mr. Green?  If so, please press five

15   star one time.

16      (Pause in the proceedings.)

17          THE COURT:  All right, is there any party in

18   opposition to confirmation that has any questions for

19   Mr. Green?

20      (Pause in the proceedings.)

21          THE COURT:  Mr. Green, thank you.  Once again,

22   you're more than welcome -- oh wait, we do have someone.

23   Let me see who we have.  Hold on.

24      (Pause in the proceedings.)

25          THE COURT:  Mr. Singer?

1          MR. SINGER:  Good afternoon, Your Honor.  Kelly

2  Singer on behalf of Ecopetrol.  I just had a question for

3  the witness and before I get into that, we have -- status

4  update.  We have just negotiated consensual language that I

5  thought -- I think resolves Ecopetrol's objection.

6          But some of the testimony has caused me to ask

7  some questions about that, so.  If I may ask a question of

8  the witness a couple questions?

9          THE COURT:  Of course.

10                CROSS-EXAMINATION OF CLAYTON GREEN

11 BY MR. SINGER:

12 Q    Mr. Green, you had testified that you had estimated

13 Ecopetrol's claims to be somewhere around $3 million based

14 on the value of its working interest, correct?

15 A    Yes.  Although just to clarify, with respect to the

16 low, high estimates, we've have in there whole range of

17 anything from zero dollars all the way up to the total

18 asserted amounts.

19 Q    Okay, so is it your understanding that if the operating

20 agreement associated with Ecopetrol is assumed, that the

21 amount to be paid is whatever the amount that is owed under

22 that agreement?  It's not associated with the value of the

23 working interest, correct?

24 A    I don't -- my understanding is with respect to the

25 decision, I believe, on the United Maritime matter is in

1  direct connection with the Ecopetrol claim as well.

2      I don't know that I have, honestly an opinion or answer

3  for you on how it's going to turn out.  Just enough to say

4  that anywhere from zero dollars to the total asserted

5  amounts are in the claims estimate.

6  Q    Okay.

7          MR. SINGER:  Your Honor, I don't think I have any

8  other questions.

9          THE COURT:  Mr. Singer, thank you.  Does any other

10  party have any questions for Mr. Green?

11     (No audible response.)

12          Mr. Green, thank you for attending.  You're

13  welcome to stay, it's a public hearing.  You're welcome to

14  go about your business.

15          THE WITNESS:  Thank you, Your Honor.

16     (Witness is excused.)

17          THE COURT:  Ms. Choi, who's going to be the next

18  witness?

19          MR. GENENDER:  Your Honor, Paul Genender for the

20  Debtors.  Our next witness is J.P. Hanson.  However, Your

21  Honor he is not available until 5:00 o'clock.  And I

22  apologize for that, but that is just -- he had things he

23  could not move until 5:00 and we didn't know how quickly

24  these witnesses were going to go and what the cross was

25  going to be on them.

1           So I'm open to any ideas as to how to proceed.

2    Other than proceeding at 5:00 o'clock.

3           THE COURT:  Is he also your -- is he your last

4    witness?

5           MR. GENENDER:  Yes, Your Honor.

6           THE COURT:  All right.  I'm going to leave your

7    direct case open.  And now I'm going to ask if there's

8    anyone that wishes to present any further evidence in

9    support of confirmation knowing that there will still be

10   another witness coming.  You'll need to press five star.

11       (Pause in the proceedings.)

12          And now as to any -- there are none.  I'm going to

13   show that the cases in chief have rested with the right to

14   still call Mr. Hanson; is that correct?

15          MR. GENENDER:  Yes, Your Honor.

16          THE COURT:  And I'm not going to ask for the

17   parties that oppose confirmation, you're option.  You can

18   proceed right now and call some witnesses or you can wait

19   until after Mr. Hanson.  I'm not going to make you go out of

20   order.

21          But if somebody wants to, I'm going to let you go

22   out of order.  So I'll just leave it up to each party as to

23   what they wish to do.

24          Why don't you press five star if you want to go

25   now to put on your witnesses?

1          MR. GENENDER:  And Your Honor, I forgot to warn

2     Mr. Singer about the one hour rule.

3          THE COURT:  Well, I assume he doesn't need his

4     witness any more given that you made a deal with him.

5     But, Mr. Singer, you have your hour's notice if you want it.

6          Mr. Duewall, go ahead.

7          Are you going to call anybody, Mr. Singer, or are

8     you done?

9          MR. SINGER:  No, Your Honor, I just wanted to say

10    that I do believe that we do have a resolution on the

11    language so I don't think there's any point for me of

12    calling my witness or pursuing my objection, subject to how

13    things play out here.

14         THE COURT:  Thank you.

15         MR. SINGER:  But we do have resolution and I

16    believe Ridgewood, Mr. Fishel's client does, as well.

17         THE COURT:  Thank you.

18         Mr. Duewall, you've got the floor at this point.

19    I think you have your own line muted though.

20        (Pause in the proceedings.)

21         THE COURT:  Well, let me try that again.

22        (Pause in the proceedings.)

23         THE COURT:  If there's someone else's line I

24    unmuted, I thought it was Mr. Duewall, but before you talk,

25    Mr. Duewall, is there anyone else that I've already unmuted

1   your line that wishes to address the Court?

2       (Pause in the proceedings.)

3           MR. BAINS:  Yes, Your Honor, good afternoon this

4   is Brandon Bains, counsel for Travelers, Liberty Mutual,

5   Hanover, and Excel.

6           I was going to use just a little bit of this time

7   to do a minor housekeeping matter.  We had agreed with the

8   Debtors on the admissibility of some exhibits.  And we just

9   wanted to offer those as part of the evidence and take care

10  of that while we had a little bit of a lull.  If that was

11  okay with the Court.

12          THE COURT:  All right, can you identify the

13  exhibits that you think you have a stipulation on?

14          MR. BAINS:  Yes, sir.  It is Docket 1631 and it's

15  going to be 1631-1 and 1631-2.  And those are the bonds and

16  GIA's I believe that Ms. Choi confirmed the stipulation as

17  to admissibility.

18          THE COURT:  All right, has the Debtor stipulated

19  to the admission of 1631-1 and -2?

20          MS. CHOI:  Erin Choi on behalf of the Debtors.

21          Yes, Your Honor, we stipulate to that.

22          THE COURT:  Is there any party that objects to

23  1631 or 2?

24      (No audible response.)

25          THE COURT:  Okay, they are both admitted.

1          (ECF 1631-1 and 1632-2 received in evidence.)

2               THE COURT:  Mr. Bain, anything else?  Thank you.

3               MR. BAINS:  No, sir, Your Honor, thank you very

4   much.

5               And thank you, Ms. Choi.

6               THE COURT:  Thank you.

7               Mr. Duewall, sorry about the confusion on that.  I

8   think you're live now.

9               MR. DUEWALL:  Thank you, Your Honor.  Can you hear

10  me?

11              THE COURT:  I can, thank you.

12              MR. DUEWALL:  Would the Court be agreeable to give

13  an estimated five or 10 minutes to make a strategic decision

14  as to whether or not we call our witness now and if we do,

15  to get set up?

16              THE COURT:  Sure.

17              MR. DUEWALL:  So I can confirm with my other

18  counsel.

19              THE COURT:  Yeah, I'll give you time to get set

20  up, too.

21              I've got a couple other people that may be making

22  some elections and let me see what they want to do, but why

23  don't you take some time and we'll just get back to you?

24              MR. DUEWALL:  Thank you, Your Honor.

25              THE COURT:  Thank you.  All right, Mr. Baay, you

1  had pressed your five star, but had apparently pressed it a

2  second time.

3          Press it one more time, please.   There we go.

4          Mr. Baay, go ahead, please.

5          MR. BAAY:  Thank you, Your Honor.

6          If it will help from a timing standpoint, we are

7  still working with Debtors' Counsel on trying to make an

8  arrangement with respect to our witnesses -- if we can get

9  that hammered out.

10          We would be available to start at 4:00 o'clock.

11  We would have at least three witnesses and I'm sure -- I

12  mean, I would think that they would be pretty much five

13  minutes.  So if that will help from everybody's schedule to

14  fill that gap, we're happy to do it if we can start at 4:00.

15  I just need to get them a heads up to everybody, so.

16          THE COURT:  I think 4:00 will work fine.  I think

17  that works.  So, if you can work things out; otherwise,

18  that's fine.  Otherwise, you can call your witnesses at 4:00

19  unless we're in the middle of another witness, but sure.

20          MR. BAAY:  Maybe if I could get (indiscernible) or

21  not that would be great.

22          THE COURT:  Well let's go ahead and get --

23  Mr. Fishel wanted to make an announcement.  Let me get him

24  back on.

25          Mr. Fishel, go ahead.

1          MR. FISHEL:  Good afternoon, Your Honor, Michael

2    Fishel from Sidley on behalf of Ridgewood and ILX.  And I

3    meant to chime in earlier after Mr. Singer, but Ridgewood

4    and ILX also have an agreement with the Debtors.  And

5    subject to seeing the Confirmation Order.  So I just did

6    want to confirm that.

7          THE COURT:  All right.  Does anyone else intend to

8    introduce any witnesses at this stage either before or after

9    we hear from Mr. Hanson?

10        (No audible response.)

11         THE COURT:  Okay, we're going to come back at 4:00

12   for Mr. Baay and I'm going to wait here for just a minute or

13   two and let's see what Mr. Duewall wants to do.

14         And Mr. Duewall, if you want to wait and make your

15   announcement at 4:00, that's fine as well.

16         Let me go ahead, though, and talk to you-all about

17   the schedule.  It's not anything I need to leave sharply

18   for, but I was planning on adjourning around 6:00.  So we're

19   not going to go till 8:00.

20         But if we're in the middle of a witness that we

21   can finish, you know, at 6:15 or 6:20, I can make people

22   wait for me.

23         With respect to tomorrow morning, I'm hoping that

24   we will finish the evidence and do closing arguments

25   starting in the morning.  And I doubt we have a problem with

1  that given what people are telling me on time.

2          So I would suggest that we start at 9:45 in the

3  morning.  And want to know if anyone is going to have a

4  conflict with starting at 9:45 in the morning?

5      (Pause in the proceedings.)

6          MR. PEREZ:  That's perfect, Your Honor.  Thank

7  you.

8          THE COURT:  Let's just stick around a minute until

9  Mr. Duewall can decide what he wants to do.  We're taking a

10  break at 3:00 no matter what because I've got another case I

11  need to call.  And then we can either call Mr. Duewall's

12  witness a little before 4:00 o'clock or after the

13  5:00 o'clock.

14          Mr. Genender?

15          MR. GENENDER:  Your Honor, well what I was going

16  to say I don't want to say if Mr. Duewall is not on.

17  Because it relates to some logistics that he and I were

18  discussing.  So I'll just hold my thought.

19          THE COURT:  He's back.  He's back.

20          MR. DUEWALL:  I'm back, Your Honor.  I'm happy

21  to -- let's start with Mr. Genender.

22          MR. GENENDER:  I think we're still -- I was just

23  going to -- I was just going to say that I understood -- it

24  might make sense for Mr. Duewall and I to speak off line.

25  But I understood as related to Mr. Hanson that Mr. Duewall

1  doesn't have an objection to Mr. Hanson coming in by his

2  Declaration.

3          And that was news to me.  Which is okay, welcome

4  news.  But if that's the case, I want to -- I'd like to have

5  some guidance if anyone else has an objection to that.  So

6  that I can plan accordingly.

7          We probably would have a little bit of live

8  direct, but it would not be very much compared to what it

9  would have been.

10          MR. DUEWALL:  That is correct, Your Honor.

11  Mr. Genender and I did conference before the hearing last

12  week and it was our position then and remains now that

13  Mr. Hanson's Declaration was acceptable.

14          There are other parties that have since settled

15  that were objecting to him being brought by Declaration.  So

16  I'm happy to confer with Mr. Genender during the break and

17  try to shorten up that presentation as much as possible.

18          I might have a short cross-examination, but I

19  think we can get through that relatively quickly unless

20  someone else is still objecting.

21          THE COURT:  Thank you.

22          And I think he said he's also going to have a

23  direct to add on to the Declaration.  Just so you -- I'm not

24  sure you heard that.

25          So while you were conferring, Mr. Baay is going to

1   call his witnesses starting at 4:00.  Why don't I let you

2   take as much time as you want and you can decide when

3   Mr. Baay is finished with his witnesses, whether you want to

4   proceed or whether you want to do it after Mr. Hanson?

5            I'm not going to work until 8:00 tonight.  If we

6   get to a stopping point, you know, around 6:00, we'll then

7   resume tomorrow morning at 9:45 and let all the witnesses

8   finish.  At which point, we'll do closing arguments.

9            Does all that fit with your schedule, Mr. Duewall?

10           MR. DUEWALL:  Yes, Your Honor.  I think starting

11   our witness or coming back and doing it at 4:00 is perfectly

12   all right.  I think that works better for us.  We've

13   provided language to the Debtors yesterday and then we tried

14   to connect with them many times yesterday.

15           I know we went long.  We tried to connect with

16   them and had a short discussion with them this morning.  So

17   I think if the parties can continue to -- we'll keep our

18   telephone lines open to work that commercial resolution and

19   maybe there may not be a need for our witness at 4:00.  I

20   think -- we're waiting on language back from (indiscernible)

21   and over the break we might be able to make some progress.

22           THE COURT:  It's a long break so hopefully you

23   can.  I suspect if you put Ms. Hine (phonetic) and

24   Mr. Carlson on the phone, they can work out anything between

25   the two of them.

1          MS. HEYEN:  Yes, Your Honor.  We've had a

2  conversation with Weil and the secured lenders this morning.

3  They promised that they would get us their proposed language

4  this morning.

5          We're standing by.  We're happy to have a further

6  conversation.  We're happy to, you know, of course, see the

7  language, but we are waiting on that language.

8          We also understand from the lenders this morning

9  that there has been additional language that has been worked

10  out with the Government.  We're also supposed to receive

11  that language so that will help resolve some of the issues

12  for Your Honor and some of the other parties.

13          We have not seen that yet, nor have we seen the

14  Confirmation Order that we were supposed to receive a copy

15  of that this morning as well.

16          So there are some outstanding items I think that

17  would help, you know, streamline this afternoon, this

18  evening.  So we're still waiting for their, we're waiting.

19          THE COURT:  Great.  So look it may make some sense

20  and it's just going to be something you'll have to control

21  because I have no idea how that's going.

22          If you choose to wait until after Mr. Hanson

23  testifies in chief you can then either work things out over

24  night or call your witnesses starting at 9:45 in the

25  morning.  So I'm not going to insist you proceed this

1  afternoon.

2         And if you think you're on the cup of getting the

3  lip of the cup of getting something done, then we might as

4  well let you start at 9:45.

5         We'll have a couple of interruptions if we go into

6  the afternoon, but it's -- we will definitely finish closing

7  arguments tomorrow if we start witnesses at 9:45.

8         So I'm just going to let it up to you.  And you

9  can surprise me when we're done with Mr. Baay's witnesses at

10  4:00 as to which of those makes the most sense.  How's that.

11         MALE SPEAKER:  Fine, Your Honor.

12         THE COURT:  From --

13         MALE SPEAKER:  Your Honor, may I -- oh, I

14  apologize.

15         THE COURT:  I've got a couple other people that

16  want to schedule things maybe.

17         From 713-228-4101, who do we have?

18         MR. OKIN:  Your Honor, that's Matthew Okin.  I was

19  actually just going to chime in and let you know since we're

20  the next hearing, if it helps with scheduling that we're

21  going to be very quick.  So if you need more time.

22         THE COURT:  I appreciate that, but I think we'll

23  start you on time is what it's looking like, Mr. Okin.  Will

24  you be ready on time?

25         MR. OKIN:  We'll be ready, but we're probably

1  going to ask you to push us out a week and I'll tell you

2  where we are.  But again what I'm saying you don't need to

3  wait until 4:00 to start again.

4          THE COURT:  Yeah, no they need to wait until 4:00

5  so I appreciate that.  But we'll go ahead and call you on

6  time 3:00 and if you give me some time to breath, that would

7  be a nice way to spend part of today.  So thank you.

8          And then Mr. Kuebel had something he wanted to

9  add.  Go ahead, Rick.

10          MR. KUEBEL:  Good afternoon, Your Honor.  We still

11  have our open case on exculpation and releases we had

12  provided some language to the Debtor.  Haven't heard back.

13          But the reason I raised my hand that particularly

14  with respect to oral argument tomorrow on closing arguments.

15  We had not seen the Confirmation Order, a draft and even if

16  we are able to get to the right place on our language

17  reservation, still have not seen how it fits in with the

18  balance of the Confirmation Order.

19          And I don't know exactly where the Debtor stands

20  with that, but I think it would be important to all the

21  parties to have an opportunity to review the proposed

22  Confirmation Order in conjunction with and in advance of

23  closing arguments.

24          THE COURT:  Or I could sign the official form of

25  Confirmation Order.

1       Hopefully they will get you that so that we have

2  due process.  I'll definitely not -- I'm not going to make

3  you consent to things you haven't seen with an opportunity

4  to digest them.

5       It may -- I think we will still start with closing

6  arguments at 9:45.  We may just not finish until after

7  you've had a reasonable opportunity to see the Confirmation

8  Order itself.

9       So let's think of those as potentially divisible,

10  but hopefully you'll get a Confirmation Order soon, very

11  soon.

12      In fairness to the Debtors, by the way, because I

13  understand the frustration.  I've been there.  They've had a

14  lot of moving pieces.  So getting a final Confirmation Order

15  is probably pretty hard over the last, you know, 12 hours.

16      But they need to get you one.  And they need to

17  get you one with a reasonable opportunity to review it and

18  to digest it before they ask me to sign.  So we'll get

19  there.

20      MR. KUEBEL:  Thank you, Your Honor.

21      THE COURT:  Okay.  Unless -- Mr. Genender, you had

22  one other thing you wanted to add to that?

23      MR. GENENDER:  Not to that, Your Honor, but in

24  connection with Mr. Hanson's testimony and as a follow on to

25  Mr. Duewall's courtesy about his Declaration.

1        It would be helpful to the Debtors if we -- for

2   the Record his Declaration is Debtor's Exhibit 52,

3   ECF 1620-1.  It would be helpful if we knew if anyone had an

4   objection to that coming in.  If I can ask that now.

5        THE COURT:  Well, why don't you just -- let's just

6   do this in the real way?  I'm going to adjourn the hearing

7   at 3:00 until 4:00 and your witness isn't going to be called

8   live until 5:00.

9        You've not called him as a witness.  You're

10  offering his Declaration.  Let's see if anyone objects to --

11        MR. GENENDER:  Thank you, Your Honor.

12        THE COURT:  -- 1620-1.  Does any one object to

13  1620-1 as coming in as substantive evidence, subject to

14  cross-examination at today's hearing?  If so please press

15  five star on your line.

16      (No audible response.)

17        THE COURT:  1620-1 is admitted as substantive

18  evidence at today's hearing.

19        We're now adjourning --

20      (Exhibit 1620-1 is received in evidence.)

21        MR. GENENDER:  Thank you Judge.

22        THE COURT:  We're adjourning the Fieldwood hearing

23  until 4:00 o'clock.  At 4:00 o'clock, Mr. Baay will have the

24  opportunity to call his witnesses.  When he is complete with

25  that, if it is before 5:00 by a reasonable period of time,

1  we're then going to give Mr. Duewall the option of either

2  calling his witnesses or waiting until Mr. Hanson.

3         Then Mr. Hanson will be called at 5:00 or upon

4  conclusion of Mr. Duewall's witnesses whichever is correct

5  order given Mr. Duewall's option.

6         And then at that point we're going to adjourn

7  6:00, 6:15 something like.  And then we'll resume at 9:45 in

8  the morning.  You will not have interruptions prior to

9  lunch, from the 9:45 and then I don't know how long the 1:30

10 *Sanchez* hearing is, but usually those are long.  So we might

11 have to come back in mid afternoon to finish if we're not

12 done with closing arguments.

13        Since I think you've been picking off objecting

14 parties, Mr. Perez, it may be we don't need the same

15 2-1/2 hours for closing that we did for opening.  But I'm

16 also not going to cut people off.  This is hard and it's

17 complicated and people are going to be allowed to take as

18 much time as they need at closing arguments.

19        So no one needs -- you know, I would appreciate

20 your making closing arguments that are concise.  I'm not

21 encouraging the contrary.  But no one needs to worry about

22 getting cut off of the hearing.

23        I'm going to hear this until we're done with it

24 and I understand it.

25        MR. PEREZ:  And Your Honor, maybe you won't say

1  you haven't seen so many closing arguments before.

2         THE COURT:  I never had seen that many opening

3  arguments.  It was an Isgur record.  I'm sure it's not a

4  real record.  But it's an Isgur record.  But we'll see what

5  happens.

6         MALE SPEAKER:  And, Your Honor, we're all glad to

7  know that Mr. Perez is going to make us work until midnight

8  tonight.

9         THE COURT:  What happens at midnight?

10        MALE SPEAKER:  I said we're glad to know that

11 Mr. Perez is going to make us work until midnight tonight

12 like he almost did last night.

13        THE COURT:  Well if you don't get the damn

14 confirmation out, you don't get to go to sleep at midnight.

15     (Pause in the proceedings.)

16        THE COURT:  All right, we're adjourning for three

17 minutes.  At 3:00 o'clock, we will call Mr. Okin's case.

18        Thank you.

19        MR. PEREZ:  Thank you, Your Honor.

20     (Recess taken from 2:56 p.m. to 3:59 p.m.)

21                      AFTER RECESS

22        THE COURT:  All right.  We're going to go back on

23 the Record in the Fieldwood case.

24        Mr. Baay.

25        MR. BAAY:  (No audible response)

1          THE COURT:  Mr. Baay.

2          MR. BAAY:  Can you hear me?

3          THE COURT:  I can.  Thank you.

4          MR. BAAY:  Thank you, Your Honor.  During the

5 break, we have worked out an agreement with Debtors' counsel

6 to adjourn our particular discreet issue for a hearing at a

7 separate date over the next couple of weeks.  So we are not

8 going to call our witnesses at this time and we'll reserve

9 our evidence until that hearing.

10         THE COURT:  And what about your confirmation

11 objection?

12         MR. BAAY:  We are withdrawing our confirmation

13 objection subject to a hearing, Your Honor.  So we are not

14 going to object to confirmation as long as we get a hearing

15 on our issue, and the Court can decide our issue and we will

16 let the chips fall where they may.

17         THE COURT:  That's fine, Mr. Baay.

18         MR. PEREZ:  So, Your Honor, --

19         THE COURT:  Mr. Perez, go ahead.

20         MR. PEREZ:  Yeah.  Just to give it a little bit of

21 context, Your Honor, as the Court is aware, several months

22 ago you heard the dispute as to the Oarie (phonetic).  And

23 so I think our agreement is that we will endeavor to get

24 that dispute resolved before the Plan goes effective.  And

25 determining on how the Court rules, then with respect to the

1   operating agreement it'll be either assumed or rejected,

2   depending on the Court's ruling.  So what we would need to

3   do is to get a date certain from the Court, you know, early,

4   you know, certainly by the 15th of July, if possible, to get

5   a -- so that we can have some definition on that before we

6   go effective.

7           THE COURT:  Okay.  Mr. Baay and Mr. Perez, are you

8   all available July the 8th at 1:30 in the afternoon?

9           MR. PEREZ:  Should ask Ms. Choi and Mr. Carlson

10  but I suspect they are.

11          THE COURT:  I suspect they just became free with

12  that statement.  Mr. Baay, how about you?

13          MR. BAAY:  That one's good for me.  I will

14  hopefully by -- our witnesses are available, that's a good

15  date for me --

16          THE COURT:  Okay.  If you guys have witness

17  availability problems or seriously if Weil Gotshal doesn't

18  have enough lawyers to attend the hearing, whatever comes

19  up, we'll move it to another day.  But let me give you that

20  day and then you all can contact Ms. Do if you need to move

21  it.

22          MR. PEREZ:  All right.  And we'll -- I will -- and

23  we'll work together with -- and Mr. Baay to figure out what

24  additional pleadings need to be filed so that we can frame

25  the issues.  I think the Court got a flavor for it last time

1  but we will do that as well.

2          THE COURT:  All right.  Thank you.  Ms. Heyen or

3  Mr. Duewall.  I'm not sure who that is.

4          MR. DUEWALL:  Thank you, Your Honor.  It is Craig

5  Duewall on behalf of BP reporting back to the Court.  Our

6  phone lines remain open but no comments or language has yet

7  been received.  We are, however, prepared to go forward with

8  our witness at this time in order to try to make a push to

9  get this finished today.  So that is our Plan.

10          One housekeeping matter before we get there is

11  that before we broke, during the last break we were

12  discussing Exhibit 1620-1, which is the Declaration of

13  Mr. Hanson.  I must admit, Your Honor, I didn't realize I

14  didn't have it front of me that attached to that Declaration

15  were his two expert reports, and we had admitted those

16  yesterday as demonstratives, and just wanted to confirm with

17  the Court that we were -- that they were manning -- were

18  continuing to be admitted only for demonstrative purposes.

19  Otherwise, I don't have an objection to the 1620-1 that we

20  were discussing previously.

21          THE COURT:  And, Mr. Genender, I think that was

22  you that was handling that, don't have your line active.  I

23  just need you to confirm that that was the admission that

24  you were offering.  Can you -- there we go.  Mister --

25          MR. GENENDER:  Yes, Your Honor, to the extent

1   there was any ambiguity, we agree with Mr. Duewall's

2   clarification, that's fine that those are -- the attachments

3   are in for demonstratives, but what is testimony and

4   admitted evidence are the actual texts, the text of the

5   Declaration, the seven or eight pages of the document.

6                Thank you, Judge.

7                THE COURT:  Thank you.

8                And thank you for the clarification, Mr. Duewall.

9                All right, Mr. Duewall, who's going to be your

10  witness?

11               MR. DUEWALL:  Thank you, Your Honor.  My colleague

12  will present this witness on Direct.

13               THE COURT:  All right.  Thank you.

14               MR. HUTTON:  Yeah, thank you, Your Honor, John

15  Hutton from Greenberg Traurig.  And, Your Honor, on behalf

16  of BP, Your Honor, we're going to call our first witness who

17  is Adriana Bonjour.

18               THE COURT:  All right.

19               MR. HUTTON:  I think perhaps we need a minute to

20  have her set up.  Okay, there we go.

21               THE COURT:  Ms. Bonjour, good afternoon.

22               Ms. Bonjour, can I get you to press five, star on

23  your phone, please, Ms. Bonjour, or whoever's there in the

24  meeting with you?  There we go.

25               Good afternoon.

1        MS. BONJOUR:  Can you hear me?

2        THE COURT:  Would you raise your hand for me,

3   please?

4      (Witness sworn.)

5        THE WITNESS:  Yes.  I do.

6        THE COURT:  Thank you.  All right, --

7        MR. HUTTON:  Okay.

8        THE COURT:  -- let's go ahead and proceed.

9        MR. HUTTON:  Okay.

10        DIRECT EXAMINATION OF ADRIANA BONJOUR

11   BY MR. HUTTON:

12   Q    Please state your name for the Record.

13   A    My name is Adriana Bonjour.

14   Q    And, Ms. Bonjour, by whom are you employed?

15   A    I'm employed by BP Exploration and Production.

16   Q    Okay.  And what is your what is your position with BP

17   (glitch in the audio) --

18        THE COURT:  I can't hear you, sir.

19        THE WITNESS:  Sorry, --

20        THE COURT:  Hold on.

21        THE WITNESS:  Sorry, it didn't come through.

22        THE COURT:  Yeah.

23        MR. HUTTON:  It didn't come through.

24   BY MR. HUTTON:

25   Q    Ms. Bonjour, what is your position with BP?  I'm just

1  shortening it to "BP."

2  A     My position at BP is senior controller.

3  Q     And how long have you worked as senior controller for

4  BP?

5  A     I've been a senior controller for BP for five years, at

6  BP for a total of 15 years in controller roles.  Before

7  that, I was an auditor and in public accounting for ten

8  years, and I'm a CPA.

9  Q     Okay.  Thank you.  Ms. Bonjour, do you hold any

10  certifications?

11  A     I'm sorry, it's hard to hear.

12  Q     I'm sorry, you --

13          THE COURT:  Yeah.  I just --

14  Q     -- do you hold any certifications?

15          THE COURT:  I'm going to interrupt you both for a

16  minute.  Let's take a minute and get both your sound working

17  because you're both coming through really poorly.  Can we

18  get your microphone moved closer to you, please,

19  Ms. Bonjour?

20          MR. HUTTON:  Okay.  Your Honor, is this better?

21          THE COURT:  No.

22          THE WITNESS:  Is this better?

23          THE COURT:  Let's do this one at a time.

24  Ms. Bonjour, let's get yours squared away first.

25          THE WITNESS:  Can you hear me okay now?

1              THE COURT:  That is better, thank you.  And now

2  let's go to Greenberg.

3              MR. HUTTON:  Okay.  What about now, Your Honor, is

4  this clear?

5              THE COURT:  It is.

6              MR. HUTTON:  Can you hear okay?

7              THE COURT:  Why don't you sit up and let's just

8  see if we can hear you in a -- we ought to be able to hear

9  you normally.  I mean, try it now.

10              MR. HUTTON:  Okay.  Testing again.

11              THE COURT:  Yeah, that seems better.  Let's go

12  ahead then.  And --

13              MR. HUTTON:  Okay.

14              THE COURT:  -- if you all can't hear each other,

15  it's essential that you tell each other you can't understand

16  it, by the way, and we'll just take the time to get it

17  fixed.  I don't want you all to get too frustrated about

18  this because I'm not going to get frustrated with a COVID

19  technology problem.  We'll just -- patience is the only

20  thing I've learned in the last 18 months, so take your time

21  and let's get it right.

22              MR. HUTTON:  Thank you, Your Honor, and I

23  appreciate that.

24  BY MR. HUTTON:

25  Q    Ms. Bonjour, what are your responsibilities as senior

1  controller at BP?

2  A    As senior controller at BP, it's my job to ensure that

3  the financial statements are represented fairly and reflect

4  the business transactions.  And I'm also responsible for

5  ensuring a sound control environment.

6  Q    Okay.  Does your role as senior controller at BP

7  involve reporting on transactions based upon agreements with

8  Fieldwood Energy, LLC?

9  A    Yes, under my remit (phonetic), I'm responsible for

10  reviewing the agreements between Fieldwood and BP to ensure

11  that they're reported accurately in financial statements.

12  Q    Ms. Bonjour, are you familiar with the Purchase and

13  Sale Agreement with Fieldwood Energy, LLC and BP Exploration

14  and Production, Inc. --

15          THE COURT:  I couldn't understand --

16  Q    -- dated May --

17          THE COURT:  I can't understand you.

18  Q    Ms. Bonjour, are you familiar with the Purchase and

19  Sale Agreement by and between Fieldwood --

20          THE COURT:  No, that's worse.  Let's just --

21          MR. HUTTON:  Okay.

22          THE COURT:  It may be you just have a bad line

23  calling in.  I don't know.  But let's take a moment, let's

24  get it right because it's not right.  And I know you want it

25  right more than I do so let's just take a moment, let's get

1  your tech people there to fix it, or just redial it --

2          MR. HUTTON:  Okay.

3          THE COURT:  -- that because it's a bad connection.

4          MR. HUTTON:  Okay.  All right.  Your Honor, I

5  think we're going to try to dial back in.

6      (Pause from 4:08 p.m. to 4:09 p.m.)

7          THE COURT:  Mr. Genender, I am also picking up

8  noise from your line.  I'm not sure where that's coming

9  from.

10         MR. GENENDER:  Okay.  I'm in the same room as

11 Ms. Choi who's going to be handling objections for this

12 witness so I can't -- it's coming from -- we'll --

13         THE COURT:  Okay.  Well I need you all to stop --

14         MR. GENENDER:  Did it stop?

15         THE COURT:  -- moving papers and stuff.

16         MR. GENENDER:  We'll do it.

17         THE COURT:  Thank you.

18         MR. GENENDER:  Okay.

19     (Pause in the proceeding.)

20         THE COURT:  All right.  Let's try that again then.

21         MR. HUTTON:  Okay, Your Honor, this is John

22 Hutton.  I dialed back in.  I don't know if -- hopefully the

23 connection's better now.

24         THE COURT:  I think it is.  Let's try it.

25         MR. HUTTON:  Okay.

1   BY MR. HUTTON:

2   Q    Ms. Bonjour, are you familiar with the Purchase and

3   Sale Agreement by and between Fieldwood Energy, LLC and BP

4   Exploration and Production, Inc. dated May 17th of 2019

5   which appears as BP Exhibit 27?

6            MR. HUTTON:  And for Your Honor, that's Docket

7   Entry 1607-27.

8   A    Yes, I am.

9            MR. HUTTON:  And actually we'll -- this is a

10  highly confidential document so we're not going to put up on

11  the screen.  Will you take it down?  Oh, okay.

12  Q    Ms. Bonjour, are you familiar with that document?

13  A    Yes, I am.

14  Q    Okay.  Are you also familiar with the cash

15  consideration exchange agreement by and between Fieldwood

16  Energy, LLC and BP Production -- Exploration Production,

17  Inc. dated -- well, relating to the Mississippi Block Canyon

18  562 dated October 15th of 2018, which we refer to as the

19  Isabella PSA and which appears as BP Exhibit 28?

20           MR. HUTTON:  And, Your Honor, that is Docket Entry

21  1607-28.

22  A    Yes, I am.

23  Q    Okay.  And, Ms. Bonjour, how did you become familiar

24  with the MC519 PSA and the Isabella PSA?

25  A    In my role, it's my responsibility to review those when

1  they're signed to look at the transactions to make sure that

2  they're recorded properly in the financial statement.

3  Q    Okay.  And are you familiar with the payment terms of

4  the MC519 PSA, including Section 3.1 of that agreement?

5  A    Yes, I am.

6  Q    And, Ms. Bonjour, what are those payment terms?

7  A    So in that agreement, Fieldwood agreed, among other

8  things, to pay $30 million to BP upon the completion of the

9  Genovesa well, and with payment remitted within 180 days of

10 production.

11 Q    And when was the Genovesa well brought online?

12        THE COURT:  I didn't hear that, I'm sorry.

13 A    On the 27th.

14        THE COURT:  I just didn't hear it.

15 Q    When was the Genovesa well brought online?

16        THE COURT:  I didn't hear it.

17 A    March 27th --

18        THE COURT:  Sorry.

19 Q    Ms. Bonjour, when was the Genovesa well brought online?

20 A    March 27th, 2021.

21 Q    And when did the $30 million obligation become payable

22 and owing?

23        MS. CHOI:  Objection, Your Honor.  That calls for

24 a legal conclusion.

25        THE COURT:  Sustained.

1  BY MR. HUTTON:

2  Q    Your -- Ms. Bonjour, when, for purposes of accounting,

3  do you treat this as a matured obligation?

4  A    So under IRS accounting rules, it is a contingent

5  receivable upon signing that's due and payable when the well

6  is completed, which would have been March 27th, 2021.

7            THE COURT:  I'm going to --

8  Q    And --

9            THE COURT:  I'm going to strike the latter part of

10  the answer.  That went beyond your question and it resulted

11  in a legal conclusion.

12  Q    Ms. Bonjour, for accounting purposes, is the $30

13  million obligation a matured obligation?

14  A    For accounting purposes, yes.

15  Q    Was the $30 million obligation a contingent obligation

16  at the time the MC519 PSA was signed, for accounting

17  purposes?

18  A    Yes.  It was a contingent receivable when the agreement

19  was signed.

20  Q    Has Fieldwood made any (glitch in the audio) on the

21  MC519 -- on the $30 million obligation contained in the

22  MC519 PSA?

23  A    No.

24  Q    Ms. Bonjour, are you also familiar with the payment

25  terms of the Isabella PSA, including Section 3.1 of that

1  agreement?

2  A    Yes, I am.

3  Q    Okay.  What are the payment terms on the Isabella PSA?

4           MS. CHOI:  Objection, Your Honor, calls for a

5  legal conclusion.

6           MR. HUTTON:  Your Honor, I'm not asking for a

7  legal conclusion.  She is a senior controller at BP,

8  responsible for reporting and recording the transactions

9  between BP and Fieldwood and the books and record and the

10 financial statements of BP, and in that capacity she has

11 testified that she has responsibility for reviewing

12 agreements and for reporting them accurately.  And I think

13 given her experience and her role, it is appropriate for her

14 to provide testimony regarding these transactions.

15           THE COURT:  Sustain the objection.

16 BY MR. HUTTON:

17 Q    Ms. Bonjour, as a senior controller for BP, when did

18 the receivable due to BP under the Isabella PSA?

19 A    Under the Isabella PSA, we recorded the liability when

20 the agreement was signed in 2018 for $66 million.

21 Q    And what is the remaining obligation due under the

22 Isabella PSA from BP to Fieldwood?

23 A    As of today, there's 12.7 million remaining to be paid.

24 Q    Are the parties to the MC519 PSA and Isabella PSA the

25 same?

1  A    Yes, Fieldwood and BP.

2  Q    In your review of transactions between BP and

3  Fieldwood, have the parties ever netted out amounts due from

4  one against amounts due to the other?

5  A    Yes.  In the normal course of business, various

6  transactions will arise net one between the other.

7  Q    And can you please provide some examples of that?

8  A    Sure.  One of the first examples I have is we submit

9  invoices to Fieldwood for payment, and under the agreement,

10 Fieldwood paid a hundred percent of that.  If there are any

11 questions about what's on the invoice for the agreements say

12 that we would discuss that after payment --

13          MR. SPEAKER:  Kesha, --

14 A    -- and then decide how to --

15          MS. CHOI:  Your Honor?

16 A    -- payment (glitch in the audio)

17          MS. CHOI:  Sorry.  I'm having trouble hearing the

18 witness, she's breaking up.  And also I think there may have

19 been a legal conclusion in there.  But I'm having trouble

20 hearing, it's breaking up.

21          THE COURT:  I am, too.  I am, too.  Is there a

22 reason why we can't put the phone right near you,

23 Ms. Bonjour?

24          THE WITNESS:  Right -- I've got it right here

25 close to me.

1          THE COURT:  When you picked it up there it was

2     sure a lot more clear.  Let's -- I hate to have you hold it

3     but --

4          THE WITNESS:  I need to hold it up.  Okay.  I'll

5     do my best.  I can hold it here.  Is this better?

6          THE COURT:  It is better.  I hate to have you hold

7     it.  You want to maybe --

8          THE WITNESS:  Okay.

9          THE COURT:  -- put it on top --

10          THE WITNESS:  All right.  That's okay.

11          THE COURT:  -- of a book or something like that?

12     Because it -- I don't need to inconvenience you either while

13     we're doing this but we get -- we do have to hear you

14     better.

15          THE WITNESS:  Okay.  Here we go.  I'll hold it up.

16     Is this better?

17          THE COURT:  We'll try it, we'll try it.  So I'm

18     going to --

19          THE WITNESS:  Okay.

20          THE COURT:  -- whatever that answer was, I had

21     trouble hearing it as well, I'm going to ask that we re-ask

22     the question, we'll redo the answer, and the prior answer

23     will not be recorded for -- in my notes or for the record so

24     that we can get an answer that we can all hear.

25          MR. HUTTON:  Okay.  Thank you, Your Honor.

1        THE COURT:  You remember the question, you can re-

2    give the answer, or else he can re-ask the question,

3    Ms. Bonjour, whatever's most convenient for you.

4        THE WITNESS:  Please re-ask the question.

5        MR. HUTTON:  Certainly.

6    BY MR. HUTTON:

7    Q    Ms. Bonjour, in your review of transactions between BP

8    and Fieldwood, have the parties ever netted out amounts due

9    from one against amounts due to the other?

10   A    Yes.  In the normal course of business we have netted

11   amounts out between each other.

12   Q    Okay.  And can you please provide some examples of

13   that?

14   A    Sure.  We submit invoices to Fieldwood for payment, and

15   where there are questions that Fieldwood has, they are to

16   pay the invoice in full, we discuss any questions they have,

17   and agree how to remit the payment back.  And many times, if

18   there was a valid refund that was due, we would go ahead and

19   net it against the next jib, "jib" being invoice.

20   Q    Any other examples?

21   A    Sure.  Another example was when Fieldwood elected to

22   participate in an exploration well last year; then, after

23   work commenced, they decided to back out and we allowed

24   that.  And so they were obligated to pay their share of

25   expenses up to that time.  An agreement was made to forego

1  that and let them not pay, and we allowed them to net that

2  against their invoice.

3       And then another example is one that I -- is when BP

4  still owned an interest, working interest in the MC519

5  assets, where BP would invoice Fieldwood as the operator,

6  Fieldwood would then pay that in full and then bill BP for

7  its working interest share in the MC519 well.  In September

8  of 2018, Fieldwood asked if we could begin to net those,

9  although they're separate agreements.  We responded by

10 saying we had just put in a new accounting system, can we

11 pick it up in January of 2019 to discuss netting.  And

12 Fieldwood went ahead and began to start netting in October,

13 which continued until we sold our working interest in those

14 wells in May of 2019.

15            MR. HUTTON:  Okay.  Thank you, Ms. Bonjour.  No

16 further questions at this time, Your Honor.

17            THE COURT:  Thank you.

18            Any Cross-Examination, Ms. Choi?

19            MS. CHOI:  Yes, Your Honor.  Erin Choi on behalf

20 of the Debtors.

21                CROSS-EXAMINATION OF ADRIANA BONJOUR

22 BY MS. CHOI:

23 Q   Ms. Bonjour, isn't it the case that there were delays

24 in BP's part in paying undisputed jibs to Fieldwood?

25 A   Can you repeat the question?

1  Q     Yes.  I said, Ms. Bonjour, isn't it the case that there

2  were delays on BP's part in paying undisputed jibs to

3  Fieldwood?

4  A     Which specific jibs?

5  Q     In connection with the Isabella agreement.

6  A     In connection with the Isabella agreement, no, I don't

7  recall anything with Isabella agreement with unpaid or late

8  jib.

9  Q     In 2019, isn't it the case that there were delays on

10 BP's part in paying undisputed jibs to Fieldwood?

11 A     I think you're referring to the MC519 assets, which is

12 separate from the Isabella.  And on those, that is when

13 Fieldwood began to net and we asked -- the amounts do not

14 calculate properly so we would ask for information in order

15 to substantiate the amount that they had billed.  So there

16 were some delays on both sides.

17 Q     But there were delays on BP's part in paying those jibs

18 to Fieldwood; isn't that right?

19 A     Yes.  As we worked --

20 Q     Yes.

21 A     -- through how they were netting the jibs.

22 Q     Isn't it the case that BP outsources its accounting

23 services?

24 A     Yes, partially.

25 Q     And isn't it the case that there were delays in upwards

1  of a year in fact in BP paying Fieldwood the money owed

2  under the agreements that we were just discussing?

3  A    No.  There was a final settlement statement.  Are you

4  referring to the final settlement statement?  Because there

5  were no delays of up to a year for regular invoices.

6  Q    There were delays up to nine months.

7  A    It's possible nine months.  I don't recall exactly

8  without knowing the specific invoices that you're referring

9  to.

10 Q    And this was money that Fieldwood had essentially

11 loaned to BP; isn't that right?

12 A    Not the way -- I don't see it that way.  I don't know

13 which invoices you're speaking of specifically.

14 Q    Because Fieldwood had paid BP's share for these wells

15 during this time; isn't that right?

16 A    We were getting delays on payment from Fieldwood as

17 well during that time so it's hard to say that we were

18 loaning them money when there was a lot of delays in

19 payments on both sides.

20 Q    The BP payments that were delayed, isn't it true that

21 at a certain point Fieldwood tried to net what it owed BP

22 against what BP owed Fieldwood?

23 A    Fieldwood began netting way before that happened.  We

24 were current up until that point.  And then Fieldwood began

25 to net and the calculation did not add up, so then there

1 were delays on both sides where BP said, Fieldwood, you

2 haven't paid us for the full amount, and then Fieldwood

3 said, you're not paying us for that money that we couldn't

4 get the calculation for.  So it was on both sides.

5 Q    Isn't it true, though, that BP objected to netting and

6 didn't agree to it?

7 A    No.  What BP said is the agreements do not allow

8 netting and if they would live -- let us speak about it in

9 January, because we had just input a new accounting system

10 in September of 2018, we responded and said, can we have a

11 conversation in January, 2019 to let us talk to our legal

12 team, as well as to kind of settle out our accounting

13 system.

14 Q    Ms. Bonjour, there's a difference between netting and

15 credit, would you agree?

16 A    That's the difference, yeah, yes.

17 Q    And in this case, there is a disagreement about

18 netting; is that your testimony?

19 A    There was a disagreement about the netting, yeah, two

20 different invoices from two different agreements.

21        MS. CHOI:  Excuse me, one moment.

22 Q    Ms. Bonjour, there was not in fact a course of dealing

23 on netting, was there?

24        THE COURT:  I'm sorry, I didn't hear.  There --

25 A    Can you repeat that?

1          THE COURT:  -- was not a what on netting?

2   Ms. Choi, I just didn't hear the word.

3   Q    There was not a course of dealing between these parties

4   with respect to netting, was there?

5   A    I'm sorry, I don't understand the question, there was

6   not a course of dealing.  Can you repeat the question or

7   restate it?

8   Q    Ms. Bonjour, in your testimony you testified that there

9   was in the normal course some kind of netting that happened.

10  But it is not the case that there was in fact a course of

11  dealing between these parties respect to netting, was there?

12  A    Yes, there was plenty of times where we received

13  payment from Fieldwood on invoices where items were netted

14  out.  That was per course of business the way it's been for

15  as long as we've been in business with Fieldwood.

16  Q    But there were no disagreements, were there or were

17  they?

18  A    There were conversations.  I don't know if I would call

19  them disagreements but there are conversations when

20  Fieldwood asked to begin to net two separate agreements

21  against each other where BP said, that's not allowed, we can

22  talk about it in a couple months, give us some time, and

23  then netting happened anyway.  So I don't know if I would

24  call that a disagreement as much as I would call it let's

25  have a conversation, but Fieldwood went ahead and net anyway

ADRIANA BONJOUR - CROSS BY MS. CHOI                    80

1  without letting us have that conversation.  So if that's the

2  disagreement, then yes.

3          MS. CHOI:  No further questions.

4          THE COURT:  Thank you.

5          Any follow-up?

6          MR. HUTTON:  No Redirect, Your Honor.

7          THE COURT:  Thank you.

8          Ms. Bonjour, sorry it was so hard to do it, but

9  once we got it going it seemed to work well.  Thank you for

10 coming today.  If you want to stay for the balance of the

11 hearing, it's a public courtroom; otherwise, you're free to

12 go about your business.

13         THE WITNESS:  All right.  Thank you so much.

14         THE COURT:  Thank you.

15     (Witness excused.)

16         MR. DUEWALL:  Your Honor, Ms. Bonjour is our only

17 witness, so I suppose we stand in recess until 5:00.

18         THE COURT:  All right.  Let me just be sure so

19 that we are at least being reasonably efficient about this.

20 Is there any other party that has any other witnesses that

21 they want to introduce at today's hearing, besides the one

22 witness we know that we're going to get from the Debtor,

23 Mr. Hanson?

24     (No audible response)

25         THE COURT:  All right.  I'm going to show that all

1 opponents to confirmation have now rested their case in

2 chief.  Subject to rebuttal, the last witness will be

3 Mr. Hanson.  And we'll -- do we have an update on when he'll

4 be available, Mr. Genender?

5          MR. GENENDER:  Your Honor, Paul Genender.  I've

6 been checking with him and the latest I've heard is not

7 before 5:00 but at 5:00.  And so that's the best I have.

8 I --

9          THE COURT:  That's fine.  I don't have a problem

10 with that if -- but I didn't want him just cooling his heels

11 for 20 minutes either.  So we'll come back at 5:00 and we'll

12 call the case at 5:00.  We'll adjourn until then.

13          MR. GENENDER:  Thank you, Judge.

14          THE COURT:  Thank you.

15      (Recess taken from 4:27 p.m. to 5:03 p.m.)

16                      AFTER RECESS

17          THE COURT:  All right.  We're going back on the

18 Record in the Fieldwood case.  If I could get Mr. Hanson,

19 please, to press five, star on his phone, we'll get him

20 recognized, as well as counsel that wishes to examine him,

21 and anyone else that wants their line enabled.

22          Mr. Hanson, do we have you there?  Good afternoon.

23          MR. HANSON:  Hello, Your Honor.

24          THE COURT:  Afternoon.  Mr. Genender, I think I've

25 got your line down.  And Mr. Zuber wants his line activated

1  as well.  Mr. Zuber, good afternoon.

2           MR. ZUBER:  Good afternoon, Your Honor.

3           THE COURT:  All right.  Are we ready to proceed?

4           MR. GENENDER:  Yes, Your Honor.  May I proceed?

5           THE COURT:  All right, Mister --

6           MR. GENENDER:  Oh, I guess he needs to be -- yes,

7  all right.

8           THE COURT:  Thank you.

9           MR. GENENDER:  My questions won't do a lot before

10 you swear him in so thank you, Judge.

11      (Witness sworn.)

12          THE COURT:  Thanks, Mr. Hanson.  Go ahead, please,

13 Mr. Genender.

14          MR. GENENDER:  Thank you, Your Honor.  Paul

15 Genender, Weil, Gotshal, and Manges for the Debtors.  Good

16 afternoon, Mr. Hanson.

17          THE WITNESS:  Hello, Mr. Genender.

18            DIRECT EXAMINATION OF JOHN-PAUL HANSON

19 BY MR. GENENDER:

20 Q   Could you please state your full name for the Record?

21 A   Yeah.  It's John-Paul, J-O-H-N hyphen P-A-U-L, Hanson,

22 H-A-N-S-O-N.

23 Q   Mr. Hanson, you understand that the Declaration that

24 you prepared and filed -- and was filed as of June 13th,

25 2021, at Debtors' Exhibit 52, the eight-page Declaration,

1  has already been admitted into evidence as your testimony;

2  are you aware of that?

3  A    Yes.  That's my understanding.

4  Q    Okay.  And that the reports that you prepared that were

5  attached to that Declaration as Exhibits 1 and 2 are

6  admitted for demonstrative purposes only; are you aware of

7  that?

8  A    Yes, I'm aware of that.

9  Q    And are you also aware that Debtors' Exhibit 107, which

10 is ECF 1625-31, is also admitted for demonstrative purposes?

11 A    That's my understanding as well.

12 Q    Okay.  And those are the -- those are that -- that's

13 the universe of documents I'm going to reference in my short

14 direct, supplementary direct of you, okay?

15 A    Okay.

16 Q    As it relates to Exhibits 1 and 2 to your Declaration,

17 do those documents fairly and accurately reflect your

18 opinions that you're offering on valuation in this case?

19 A    Yes, they do.

20        MR. GENENDER:  And if we can put up Debtors'

21 Exhibit 107 on the screen, Your Honor, would you mind to

22 make Mr. Miller, Ron Miller, share the screen with him,

23 please?  Or make him the presenter I should say.

24        THE COURT:  I am doing that right now.

25        MR. GENENDER:  I should know how to say that --

1          THE COURT:  All right.

2          MR. GENENDER:  I should know how to say that,

3   Judge, by now.

4          THE COURT:  One day.  You're getting old, hard to

5   remember those things.  Mr. Miller now has the presenter

6   role.

7          MR. GENENDER:  Thank you, Judge.  Mr. Hanson, if

8   we can go to the second page, I'm going to walk through this

9   briefly.

10  BY MR. GENENDER:

11  Q    Second page of demonstrative Debtors' Exhibit 107,

12  entitled:  "Key Assumptions;" do you see that?

13  A    Yes, I do.

14  Q    Okay.  And what's the significance, Mr. Hanson, of

15  relying on the midyear 2020 database as opposed to the

16  yearend 2020 database?

17  A    When we first formulated the valuation opinions, the

18  yearend database was not yet complete and it had not been

19  audited by the third party auditor, Ryder Scott.  And so

20  what we did was utilized the midyear 2020 report, we rolled

21  forward production, applied the forecasted expenses to that,

22  and ran it at the then-appropriate commodity price strip or

23  forward curves as of March 5th, and provided our valuation,

24  draft valuation opinions at that time.  Subsequent to

25  working on those drafts, the company and its auditors

1   finalized the yearend reserve report.  We reviewed that

2   yearend reserve report, did a compare and contrast to ensure

3   that the conclusions of valuation wouldn't be materially

4   impacted.  They in fact were not and so we continued to rely

5   upon the midyear report only because the basis of our work

6   had been conducted in that database file and the yearend

7   report was not materially different than our roll forward.

8           MR. GENENDER:  Thank you.  If we can turn to the

9   third page of the demonstrative.

10  BY MR. GENENDER:

11  Q    Mr. Hanson, does this page fairly and accurately

12  summarize your valuation conclusions?

13  A    Yes, it does.

14  Q    All right.  Can you explain to the Court why you used

15  certain of the valuation methodologies for certain of the

16  entities and not for others?  If I could ask it that way.

17  A    In an ideal scenario we would have utilized all of the

18  methodologies for each of the entities.  However, only

19  select methodologies for Fieldwood One, Fieldwood Three, and

20  Fieldwood Four were in fact applicable.  NewCo, or Credit

21  Bid Purchaser, however you would like to term it, we were

22  able to utilize all three methodologies because it is a

23  going concern.

24        There are not only relevant underlying assumptions

25  against which we can apply the net asset valuation

1   methodology but also precedent transactions that are

2   relevant, as well as publicly traded comparable companies.

3   For Fieldwood One, we were able to utilize the net asset

4   value, or NAV, approach methodology.  And there are a couple

5   of precedent transactions that we were able to utilize

6   because there were some -- a couple of comparable

7   transactions with heavy weighting on P and A.

8        But for Fieldwood Three and Fieldwood Four, there

9   really are no comparable transactions and no public trading

10  comps for any of Fieldwood One, Fieldwood Three, or

11  Fieldwood Four as none of those three entities are going

12  concerns.  And Fieldwood Three and Fieldwood Four do not

13  contain any producing assets.

14  Q    Thank you.  In terms of where you weighted for net

15  asset value 70 percent for NewCo and for Fieldwood One, can

16  you walk the Court through your judgment in arriving at that

17  weighting?

18  A    It is fairly typical for oil and gas valuation experts

19  to rely upon the net asset valuation methodology greater

20  than the other methodologies.  The oil and gas assets are of

21  their own right, they're all bespoke (phonetic).  There is

22  no -- and, you know, a hundred percent comparable asset one

23  from the other, there is no hundred percent comparable

24  operating Plan or development Plan from one company to the

25  next.

1      And so it is typical that there would be a heavier

2   weighting on the net asset valuation methodology relative to

3   the two other methodologies, particularly when you're

4   dealing with offshore oil and gas in conventional reserves.

5   That is even more the case, and particularly where there's a

6   limited subset of precedent transactions or publicly traded

7   comparable companies.  As a result, where a typical range of

8   weighting would be between 50 and 70 percent on the NAV

9   relative to the other methodologies, we went at the high end

10  of that typical practitioner's range at 70 percent, given

11  the very cost of a bespoken nature of these assets and the

12  lack of comparability in operating and development Plan for

13  Fieldwood -- for NewCo or Fieldwood One, Fieldwood Three,

14  and Fieldwood Four relative to other companies.

15  Q    Thank you.  Mr. Hanson, referring to pages four and

16  five of Exhibit Demonstrative 107, do those reflect the

17  detail that you used that -- your detail in connection with

18  your net asset value opinions for NewCo and Fieldwood One

19  respectively?

20  A    Well, I would say that this is a summary buildup.

21  There obviously is a lot more detailed work that went into

22  it but this is a summary buildup to the NAV for each of

23  NewCo and Fieldwood One, yes.

24  Q    And are these opinions net of ARO, Asset Retirement

25  Obligations?

1   A     Yes.  They are inclusive, they incorporate the ARO

2   liabilities.

3   Q     Thank you.  Did you also opine on residual

4   distributable value in connection with your work?

5   A     Yes, I did.

6   Q     And did you do that -- for which of the entities did

7   you do that for?

8   A     Well, ideally we would have done it for each of

9   Fieldwood One, Fieldwood Three, and Fieldwood Four.

10  Basically the residual distributable value is a means of

11  valuing the membership interests that will be owned or held

12  by the unsecured creditors.

13        It really is an option value.  However, at this stage,

14  given that the midpoint valuation for each of Fieldwood One,

15  Fieldwood Three, and Fieldwood Four is negative, and

16  Fieldwood Three and Fieldwood Four, given that they have no

17  producing assets, they have no inherent positive value.

18        And so while ideally Fieldwood Three and Fieldwood Four

19  would have been contributors to that residual distributable

20  value, the reality is that a hundred percent of this value

21  came from Fieldwood One in an option value context.

22  Q     And on the screen is page seven of the demonstrative

23  Debtors' 107; what does that reflect in connection with your

24  residual distributable value analysis?

25  A     Well, as mentioned, the residual distributable value

1   really is option value given at the midpoint for each of the

2   three entities.  The midpoint valuation is negative.  So

3   what the reason there is option value, however, in Fieldwood

4   One is because under certain commodity priced circumstances,

5   under operating costs, improvements, or where operating

6   costs or Asset Retirement Obligations come in below what is

7   forecast and therefore there is more cash and more cash flow

8   from Fieldwood One than currently forecast, then the

9   membership interest in Fieldwood One would actually have

10  value.

11      And so what we did was a -- utilized a typical option

12  value methodology, which is the Black-Scholes Formula.  And

13  this page seven highlights the underlying assumptions on a

14  range of values for that residual distributable value or

15  membership interest on an option basis.

16  Q    Thank you.  Mr. Hanson, did you hear Mr. Dane's

17  testimony about the use of P50 versus P90 that he offered

18  yesterday?

19  A    Yes, I did.

20  Q    Do you agree with it?

21  A    I do, yes, entirely.

22          MR. GENENDER:  If we'll turn to page nine of the

23  demonstrative, please, Exhibit 107, Debtors' 107.

24  Q    Mr. Hanson, does this picture on the right of the page

25  fairly and accurately describe which reserves in your view

1  should be included in valuing the assets?

2  A    This demonstrates the reserves that should be included,

3  which in my expert opinion includes the proved, or P90,

4  reserves and the probable, or P50, reserves.  One aspect

5  that Mr. Dane spoke about yesterday is that P50 is at its

6  heart in a definition probable.  It is greater than a 50

7  percent probability.  It's not proved, it's not certain.

8         A P90 is greater than a 90 percent probability

9  and, therefore, there is almost a certainty of outcome, or

10 it is a proved outcome, where a 50 percent or greater

11 probability, or P50, is in fact by definition the most

12 probable of outcomes.

13         MR. GENENDER:  Thank you.  I will pass the

14 witness.  Thank you, Mr. Hanson.

15         THE COURT:  Thank you.  Are there any advocates of

16 confirmation that have questions for Mr. Hanson?  If so,

17 please press five, star one time.

18     (No audible response)

19         All right.  Are there any opponents to

20 confirmation that have questions for Mr. Hanson?

21     (No audible response)

22         Mr. Duewall, I've got your line active.

23         MR. DUEWALL:  Thank you, Your Honor.

24         Craig Duewall on behalf of BP.

25         Good afternoon, Mr. Hanson.

1           THE WITNESS:  Hello, Mr. Duewall.

2              CROSS-EXAMINATION OF JOHN-PAUL HANSON

3    BY MR. DUEWALL:

4    Q    Mr. Hanson, you'll agree that your opinions are limited

5    strictly to valuation.

6    A    That's correct.

7    Q    And in your report and your testimony, you've expressed

8    no opinions regarding the feasibility of NewCo.

9    A    No, I have not.

10   Q    And in your reports and testimony you've expressed no

11   opinions regarding whether or not the confirmation of the

12   proposed Plan is likely to be followed by a liquidation of

13   NewCo; is that correct?

14   A    That's correct.

15   Q    And in your testimony and reports, you've expressed no

16   opinions regarding whether or not the confirmation of the

17   proposed Plan is likely to be followed by the need for

18   further financial reorganization of NewCo; is that correct?

19   A    I have not expressed any of those opinions.

20           MR. DUEWALL:  That's all I have, Your Honor, I

21   pass the witness.

22           THE COURT:  Thank you.

23           Are there further questions for Mr. Hanson by any

24   party?

25        (No audible response)

1          THE COURT:  All right.  Mr. Hanson, thank you for

2     coming in.

3          THE WITNESS:  Thank you.

4        (Witness excused.)

5          THE COURT:  Does the Debtor rest?

6          MR. GENENDER:  Yes, Your Honor.

7          THE COURT:  Do any proponents of confirmation have

8     any additional evidence that they wish to introduce?  Hold

9     on just a moment.  Ms. Archiyan.

10          MS. ARCHIYAN:  (No audible response)

11          THE COURT:  Ms. Archiyan.

12          MS. ARCHIYAN:  Your Honor (glitch in the audio).

13     Good afternoon, Your Honor, Yelena Archiyan on behalf of

14     (glitch in the audio) other affiliates of Energy Transfer.

15          Your Honor, I apologize, but I was caught off-

16     guard before the last break when you asked if anyone from

17     the opposition had witnesses to call.  I didn't have a

18     witness to call and I don't have one to call now, but I was

19     going to request that you take notice of the schedule of

20     assets and liabilities for Fieldwood Energy, LLC, which is

21     at Docket No. 429.  And that establishes Energy Transfer's

22     cash deposit.

23          THE COURT:  Hold on.

24          ECF 429 is Schedule A and B filed by Fieldwood.

25     What -- it's 463 pages.  What part of it do you want me to

1  notice?

2          MS. ARCHIYAN:  I believe it's pages 15 and 17, the

3  Debtors' assets and cash deposits that they're holding.

4          THE COURT:  So ECF --

5          MS. ARCHIYAN:  Or that they (glitch in the audio).

6          THE COURT:  Page 15?

7          MS. ARCHIYAN:  I believe it's page 15.  Hold on.

8      (Pause in the proceeding.)

9          THE COURT:  So I've searched for the words "Energy

10  Transfer" and don't see them -- those words with the search

11  of the 463 pages.  I need more detail on what you want me to

12  look at.

13          MS. ARCHIYAN:  Yes.  If you search Sea Robin

14  (phonetic), I -- it's either page 15 or 17.  And I'm pulling

15  it up right now, I apologize.

16          THE COURT:  That's okay.  Sea Robin?

17          MS. ARCHIYAN:  Yes.

18          THE COURT:  Okay.  Sea Robin Pipeline --

19          MS. ARCHIYAN:  Yes.

20          THE COURT:  -- is listed as a deposit, including

21  security deposits and utility deposits.  At line 717, Sea

22  Robin Pipeline Company, LLC, $975,000 is listed as the

23  current value of the Debtors -- I'm sorry, yeah, is listed

24  as a deposit by the Debtor, right?

25          MS. ARCHIYAN:  Correct.  Yes, so it's page ECF 17.

1   So and line 726 is Florida Gas Transmission, that's another

2   affiliate of Energy Transfer, and the corresponding amount

3   there is $150,000.

4           THE COURT:  So these are the Debtors' deposits

5   with your clients.

6           MS. ARCHIYAN:  Correct.

7           THE COURT:  Okay.  Is there any objection to me

8   taking notice that the Debtor has represented that with her

9   clients there are two deposits:  one totaling 975 with Sea

10  Robin and another totaling 150,000 with Florida Gas

11  Transmission?

12          MS. CHOI:  No objection, Your Honor.  This is Erin

13  Choi from the Debtors.

14          THE COURT:  We'll take notice that those two

15  deposits are listed in the Debtors' schedules.

16          MS. ARCHIYAN:  Thank you so much, Your Honor.

17  We're making progress with Debtors' counsel on the proposed

18  language, and this all may be moot by the end of the day

19  today.  But just in case, thank you very much.

20          THE COURT:  The end of the day is coming soon, so

21  all right.

22          MS. ARCHIYAN:  Well, midnight is coming up.

23          THE COURT:  All right.  Mr. Scharfenberg, go

24  ahead.

25          MR. SCHARFENBERG:  Yeah, good afternoon, Your

1  Honor.  And, I'm sorry, I think I'm in a similar position.

2  I was pressing star five instead of five star earlier.  Just

3  as a --

4          THE COURT:  That'll do it.

5          MR. SCHARFENBERG:  -- matter of housekeeping --

6  yeah.  Just as a matter of housekeeping, I wanted to admit a

7  few exhibits that I understand the Debtors have no

8  opposition to.

9          It is at record document 1613, Exhibits 2, 3,

10 and 4.

11         THE COURT:  All right.  Is -- these are Zurig

12 documents 16, I'm sorry, 16 -- I apologize, --

13         MR. SCHARFENBERG:  Thirteen, one, three.

14         THE COURT:  -- 1613-2, -3, and -4 are being

15 offered.  Any objection?  The indemnity agreement, the

16 escrow agreement, and the bond are being offered into

17 evidence.  All right, we --

18         MS. CHOI:  Your Honor, Erin Choi, no objections,

19 sorry.

20         THE COURT:  All right.

21         MR. SCHARFENBERG:  Thank you.

22         THE COURT:  We're admitting 1613-2, -3, and -4.

23      (Exhibits Nos. 1613-2, 1613-3, and 1613-4 received in

24 evidence.)

25          THE COURT:  Mr. Scharfenberg, anything further?

1          MR. SCHARFENBERG:  Nothing further.  Thank you,

2     Your Honor.

3          THE COURT:  So next time, by the way, I've had

4     people where they get their phone out of sync.  There are

5     two solutions to that.  One is hang up and dial back in once

6     you realize that.  But the other is turn on your camera and

7     wave and I'll eventually find you, Mr. Scharfenberg.

8          MR. SCHARFENBERG:  Sounds great, thank you.

9          THE COURT:  Mr. Woodard.

10         MR. WOODARD:  (No audible response)

11         THE COURT:  Mr. Woodard.

12         MR. WOODARD:  Yes, Your Honor.  I'm in the same

13     boat as my fellow sureties.  We just have our indemnity

14     agreement that was attached as Exhibit Docket Number 1566-1

15     that Ms. Choi graciously consented to the other day but I

16     had not moved the admission.

17         THE COURT:  Is there any objection --

18         MR. WOODARD:  And I would like to do so.

19         THE COURT:  -- to the admission of 1566-1?

20         MS. CHOI:  No objection.

21         THE COURT:  All right, --

22         MR. WOODARD:  Thank you, Your Honor.

23         THE COURT:  -- 1566-1 is admitted.  Thank you.

24         (Exhibit No. 1566-1 received in evidence.)

25         THE COURT:  Does any other party have any evidence

1 | or do all parties rest?

2 | MR. ZUBER:  Your Honor, this is Scott Zuber.  May

3 | I be heard, please?

4 | THE COURT:  I'm sorry, who was that?

5 | MR. ZUBER:  Scott Zuber.

6 | THE COURT:  Mr. Zuber, go ahead, please.

7 | MR. ZUBER:  Hi, Your Honor, good afternoon, Your

8 | Honor.  Very quickly, again we would also ask that our

9 | bonds, indemnity agreements, and certain exhibits be

10 | admitted to evidence.  I'm not aware of any objection.  I

11 | believe they're Exhibits B, C, D, and E in Document Number

12 | 1591, one, five, nine, one.

13 | THE COURT:  We have an offer of 1591-2, -3, -4,

14 | and -5.  Any objection?

15 | MS. CHOI:  Your Honor, if Mr. Zuber, you could

16 | just remind me which entity you represent?  I apologize.

17 | MR. ZUBER:  We represent Aspen, Everest, Berkley.

18 | (Pause in the proceeding.)

19 | MS. CHOI:  No objection, Your Honor.  Thank you.

20 | THE COURT:  Fifteen ninety-one two, three, four,

21 | and five are admitted.  Anything further, Mr. Zuber?

22 | (Exhibits Nos. 1591-2, 1591-3, 1591-4, and 1591-5

23 | received in evidence.)

24 | MR. ZUBER:  Yes, Your Honor.  I don't have any

25 | witnesses or any cross-examination of any of the witnesses,

 1  but I just wanted to make sure that we'll have an

 2  opportunity during closing arguments to make other legal

 3  arguments in furtherance of what we stated at the opening.

 4          We've got, you know, some legal arguments only.

 5  And we'll just be referring to documents already in

 6  evidence, such as the Plan, the Credit Bid Purchase

 7  Agreement.  But just wanted to make sure that we'll have

 8  that opportunity in the morning just to make further legal

 9  argument, no evidentiary --

10          THE COURT:  You're going to have a chance to make

11  your closing argument tomorrow morning.

12          MR. ZUBER:  Thank you, Your Honor.

13          THE COURT:  Thank you.  Mr. Knapp.

14          MR. KNAPP:  Good afternoon, Your Honor.  Appearing

15  for McMoRan Oil and Gas, we'd like to admit the exhibits

16  attached as 1601 and 1608; 1601 has Exhibits 1 and 2, 1608

17  has Exhibit 3.  My understanding -- these are all operating

18  agreements.  My understanding is the Debtors have no

19  objection.

20          THE COURT:  So I'm going to offer 1601-1, 1601-2,

21  and 1608-1.  Any objection to those three exhibits?

22          MS. CHOI:  No objection, Your Honor.

23          THE COURT:  All three are admitted.  Anything

24  further, Mr. Knapp?

25

1          (Exhibits Nos. 1601-1, 1601-2, and 1608-1 received in

2    evidence.)

3               MR. KNAPP:  That's all.  Thank you.

4               THE COURT:  So this is actually working by me

5    continuing to say this.  I'll say it another time.  Does

6    anyone have any additional evidence to introduce?  Because

7    we're about to close the record.  But feel free if you've

8    got something else that we need to put in the record.  Once

9    it's closed, it's going to stay closed.

10          (No audible response)

11               THE COURT:  Press five star one time on your phone

12    if you wish to speak.

13          (No audible response)

14               THE COURT:  All right.  I'm going to show that all

15    the evidence is in and closed and that all parties have

16    rested.  Closing arguments will begin tomorrow morning at

17    9:45.  We're going to start with the Debtor.  We'll then

18    have any other proponents of confirmation.  We will then

19    have opponents of confirmation.  And then we'll have final

20    rebuttal by the Debtor in the closing arguments.  That'll be

21    the order of presentation.

22               If anyone has any questions, comments, or

23    objections to that, now is a good time so that I can figure

24    that out and you all can figure that out overnight if we

25    have a problem with it.

1        (No audible response)

2            THE COURT:  All right.  Parties are going to be

3    allowed to --

4            MR. GENENDER:  Your Honor, --

5            THE COURT:  -- use their PowerPoints if you wish

6    tomorrow.  Just be prepared to show them.  And we'll make

7    whoever you want as the presenter.  Mr. Genender.

8            MR. GENENDER:  Your Honor, can you -- you said

9    this earlier but I did not write it down, and I apologize.

10   What's the Court's schedule in the morning?  There was a

11   block of time, right?

12           THE COURT:  Yes, sir.  So we're going to start at

13   9:45 and work until noon.  Beyond that, I'm not sure what

14   the calendar will look like tomorrow afternoon.  And if -- I

15   am not asking folks to limit their closing.  These are

16   important closing arguments as far as I'm concerned.  And if

17   I need to go in the afternoon or if I can't finish in the

18   afternoon, go until, you know, the next day, we're going to

19   do that.  But everyone's going to get a chance to do full

20   closings.  This is a long, complicated deal and I am not

21   going to cut people short on this.

22           MR. GENENDER:  Thank you, Judge.

23           THE COURT:  When will the proposed -- the final

24   version of the proposed Confirmation Order be filed?

25       (No audible response)

1          THE COURT:  There's a lot of silence out there.
2  Mr. Perez, your line seems muted.  Hold on.  Mr. Carlson has
3  pressed five, star.  Let me get his line active.  Mr. Perez,
4  I don't see you as having pressed five, star.  I'll need you
5  to do that if you want to speak.  Mr. Carlson.
6          MR. CARLSON:  Good evening, Your Honor, Cliff
7  Carlson for the Debtors.  We Plan to file a proposed order
8  later this evening.  It may be later.  But we expect there
9  may be some further changes overnight after we file that.
10  But we are working with several different parties on various
11  inserts, and the goal and intention is to file it tonight.
12          THE COURT:  So, Mr. Perez, you wanted to speak to
13  that as well, right?
14          MR. PEREZ:  No.  I was actually going to say that
15  either Mr. Carlson or Ms. Liou are probably the closest to
16  it.
17          THE COURT:  So, look, I think it might be very
18  helpful to parties -- and I got it that there may be changes
19  made during closing arguments tomorrow to the Confirmation
20  Order.  Can we file a version at some time certain tonight
21  so that parties can see what the current status is?  And
22  then you can file another one, you know, overnight if you
23  want to that is redlined against that one.  But let's get
24  people something they can start reading.  I'm inclined to --
25  and I don't want to insist on a particular time, but I'm

1   inclined to think, you know, sometime around 8:30 or

2   9:00 o'clock tonight you all file the current status of the

3   Confirmation Order.  And then whatever you file after that

4   would be redlined against that current status.  And I don't

5   know if that works for you all.  I'm not looking to, you

6   know, make double work but people need a chance to prepare.

7   Ms. Liou.

8          MS. LIOU:  Yes, Your Honor, Jessica Liou from

9   Weil, Gotshal, Manges on behalf of the Debtors.  That's fine

10  with us.  We can file a form of proposed Confirmation Order

11  tonight by that deadline.  And, Your Honor, we will also be

12  filing some very minor amendments to the Plan as well,

13  cleanup changes that we've been considering with the

14  lenders.

15         THE COURT:  And those will be redlined, right?

16         MS. LIOU:  Those will be redlined.  And there will

17  be one other change, which it's just on reservation of

18  rights language that got added into the Plan as a result of

19  our continuing discussions with the government.

20         THE COURT:  Okay.  So not later than 9:00 p.m.

21  tonight I want the Debtors to file the latest version of the

22  proposed Confirmation Order and the latest changes to the

23  Plan that are in existence as of 9:00 o'clock.  And I am not

24  suggesting that you're then stuck with that permanently as

25  you continue to try and work through problems.  But I need

1  people to see what they're shooting at.  That is without

2  prejudice --

3     MS. LIOU:  Can do.

4     THE COURT:  -- to the rights of parties tomorrow

5  to argue they haven't had a reasonable opportunity to review

6  what those are.  But, I mean, I haven't anybody -- had

7  anybody that's trying to delay this hearing so -- but I

8  think that gives people a fair chance.

9     And then we'll see what happens as we move into

10 closing arguments tomorrow.  The closing arguments can focus

11 mostly on whether we ought to confirm or not and not what

12 the Confirmation Order says.  So we may really split that

13 into saying, should we confirm the arguments.  And then if

14 it turns out that there is controversy about the order, I

15 could do different arguments about what particular

16 provisions of the order maybe should say.

17    But it just depends.  I don't know how many

18 changes you're going to make.  And I, along with everybody

19 else, can look at redlines and try and make a reasonable

20 decision about that.

21    Anybody have any problem with that game plan?

22    Mr. Balasko, I saw you just turned on your camera.

23 I don't see that you pressed five star.  Did you need to

24 address anything with us?

25    MR. BALASKO:  (No audible response)

```
 1            THE COURT:  Mr. Balasko?

 2            MR. BALASKO:  Zach Balasko, Department of the

 3   Interior.  No, Your Honor, Ms. Liou just mentioned the

 4   Government language, and I did not know if we wanted to

 5   discuss that.  But I certainly don't need to.

 6            THE COURT:  All right.  Okay.  We're in

 7   adjournment.  I'm resuming court in the morning at 9:00 a.m.

 8   Closing arguments in this case will be at 9:45, and we'll

 9   see you all then.

10            Thank you.

11        (Proceeding adjourned at 5:37 p.m.)

12                        *  *  *  *  *

13         I certify that the foregoing is a correct

14   transcript to the best of my ability due to the condition of

15   the electronic sound recording of the ZOOM/telephonic

16   proceedings in the above-entitled matter.

17   /S/ MARY D. HENRY

18   CERTIFIED BY THE AMERICAN ASSOCIATION OF

19   ELECTRONIC REPORTERS AND TRANSCRIBERS, CET**337

20   JUDICIAL TRANSCRIBERS OF TEXAS, LLC

21   JTT TRANSCRIPT #64152

22   DATE FILED:  JUNE 28, 2021

23

24

25
```