**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | § | |
|---|---|---|
| **In re:** | § | **Chapter 11** |
| | § | |
| **FIELDWOOD ENERGY LLC, *et al.*,** | § | **Case No. 20-33948 (MI)** |
| | § | |
| Debtors.[1] | § | **(Jointly Administered)** |
| | § | |
| | § | Re: ECF Nos. 1751 & 1796 |

**DEBTORS' OBJECTION TO EMERGENCY MOTION OF ASPEN AMERICAN INSURANCE COMPANY, BERKLEY INSURANCE COMPANY AND SIRIUS AMERICA INSURANCE COMPANY FOR A STAY, PURSUANT TO BANKRUPTCY RULE 8007, OF THE ORDER CONFIRMING EIGHTH AMENDED JOINT CHAPTER 11 PLAN OF FIELDWOOD ENERGY LLC AND ITS AFFILIATED DEBTORS, OR IN THE ALTERNATIVE, FOR AN ORDER AMENDING THE CONFIRMATION ORDER, PURSUANT TO BANKRUPTCY RULE 9023**

Fieldwood Energy LLC and its debtor affiliates in the above-captioned chapter 11 cases, as debtors and debtors in possession (collectively, the "**Debtors**") submit this objection to the motion (ECF No. 1796) (the "**Motion**") filed by Aspen American Insurance Company, Berkley Insurance Company, and Sirius America Insurance Company (collectively the "**Sureties**") requesting a stay pending appeal from this Court's *Findings of Fact, Conclusions of Law, and Order (I) Confirming Eighth Amended Joint Chapter 11 Plan of Fieldwood Energy LLC and Its Affiliated Debtors and (II) Granting Related Relief* (ECF No. 1751) (the "**Confirmation Order**").

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, as applicable, are:  Dynamic Offshore Resources NS, LLC (0158); Fieldwood Energy LLC (6778); Fieldwood Energy Inc. (4991); Fieldwood Energy Offshore LLC (4494); Fieldwood Onshore LLC (3489); Fieldwood SD Offshore LLC (8786); Fieldwood Offshore LLC (2930); FW GOM Pipeline, Inc. (8440); GOM Shelf LLC (8107); Bandon Oil and Gas GP, LLC (9172); Bandon Oil and Gas, LP (9266); Fieldwood Energy SP LLC (1971); Galveston Bay Pipeline LLC (5703); and Galveston Bay Processing LLC (0422).  The Debtors' primary mailing address is 2000 W. Sam Houston Parkway S., Suite 1200, Houston, TX  77042.

**Preliminary Statement**

1.      On June 25, 2021, this Court entered the Confirmation Order confirming the Debtors' Plan.  The Plan reflects the culmination of more than fourteen months of collective hard work among the Debtors, their advisors, as well as numerous other stakeholders and parties in interest, in this highly complex restructuring.  *See* June 21, 2021, Confirm. Hr'g Tr. 102:7; June 22, 2021 57:16-18; June 24, 2021, Confirm. Hr'g Tr. 45; June 25, 2021, Confirm. Hr'g Tr. 67:20-22.

2.      The Plan provides for a comprehensive restructuring to be accomplished through a series of transactions that will preserve over 1,000 jobs,  ensure continued, uninterrupted environmental stewardship of the companies' numerous oil and gas wells, and address 100% of the Debtors' decommissioning obligations (approximately 91% of which is addressed on a consensual basis) without imposing any liability on the U.S. taxpayer.

3.      The Plan realizes all of those goals with a high degree of consensus across the Debtors' capital structure, including support of one of the Debtors' largest sureties.  More importantly, the U.S. Government did not object to confirmation of the Plan and "is comfortable that the Plan . . . is the best solution that's possible in this case to protect health, safety and the environment and for that reason the Government is not objecting to the Plan."  June 21, 2021, Confirm. Hr'g Tr. 32:9–13.

4.      The Sureties now seek to halt implementation of the Plan on account of contingent subrogation claims and jeopardize the delicate multi-billion dollar and multi-party restructuring on account of contingent subrogation claims that the Sureties admit in their own papers may never mature.  *See* Motion ¶¶ 15 ("The Sureties do not have claims on their bonds that are associated with the good assets going to Credit Bid Purchaser, nor could they have any claims on the bonds because these are good assets and there has been no default."); 42 ("A sale cannot be

free and clear from claims that have not yet arisen, which may never arise and will only arise if Credit Bid Purchaser does not do what it is obligated to do under the Plan, the Credit Bid Purchase Agreement and the law."); 58 ("[T]he only time [the Sureties' subrogation] rights would come into play is if [Credit Bid Purchaser] intentionally disregards its legal obligation to decommission . . . or if it ultimately became insolvent or bankrupt, at which point the Sureties' subrogation rights likely would be worthless . . . ."). The Sureties, however, have failed to carry their demanding burden to show that the Confirmation Order should be stayed pending appeal—an extraordinary remedy that is not appropriate here.

5. As an initial matter, the Sureties have not made a "strong showing" that they are "likely to succeed" on the merits in their appeal. On the contrary, the Sureties are likely to lose on the merits. The Sureties argue the Credit Bid Acquired Interests cannot be sold free and clear of "future" subrogation claims against Credit Bid Purchaser. This Court ruled against the Sureties and similarly situated sureties raising the same issue multiple times during the confirmation hearing. *See, e.g.*, June 21, 2021, Confirm. Hr'g Tr. 41:6-10, 43:3-9, 63:10-13; June 24, 2021, Confirm. Hr'g Tr. 58:9-14, 85:11-15; June 25, 2021, Confirm. Hr'g Tr. 31:18-24, 32:8-12. The arguments set forth by the Sureties in support of their position in the Motion should not change the Court's conclusion. The Sureties are wrong to assert that the phrase "any interest in . . . . property of the estate," 11 U.S.C. § 363(f), is limited to *in rem* interests, notwithstanding that Congress did not include the qualifier "in rem" and instead referred expansively to "any" interest. Indeed, numerous courts have rejected the Sureties' cramped interpretation. *See, e.g.*, *In re Motors Liquidation Co.*, 829 F.3d 135, 155 (2d Cir. 2016) ("successor liability claims can be 'interests' when they flow from a debtor's ownership of transferred assets").

3

6.      Next, the Sureties have failed to establish that they will be irreparably harmed if a stay is not granted.  The only potential injury the Sureties point to is the risk that their appeal becomes moot if the stay is not granted.[2]  Multiple courts, including those within the Fifth Circuit, have held that a risk of mootness alone is insufficient to constitute irreparable harm necessary to justify a stay pending appeal.  *See, e.g.*, *In re Scotia Dev. LLC*, 2008 Bankr. LEXIS 5127, at \*14 (Bankr. S.D. Tex. July 15, 2008).  Any potential harm to the Sureties is, at best, speculative and theoretical because Credit Bid Purchaser will be a well-capitalized business and there is nothing in the record that suggests Credit Bid Purchaser will default on its decommissioning obligations in the future.  The Sureties also overlook that they already have a remedy: They may file an unsecured claim against the Debtors and recover in the same way as all other unsecured creditors.  The Sureties provide no sound basis for concluding that they will be irreparably harmed absent a stay when they already have a remedy.  And, in fact, the Court found that the Sureties would be better off if the Plan is confirmed.  *See* June 25, 2021 Confirm. Hr'g Tr. 32:22-23 ("I do not make the sureties worse off by confirming the Plan, I make them better off by confirming the Plan.").

7.      Lastly, the public interest and the balance of the equities weigh heavily against staying implementation of the Plan.  Indeed, the Sureties' Motion notably overlooks the obvious harm to the Debtors and others, including the public, were the Court to grant a stay of the Confirmation Order.  The success of the Debtors' Plan hinges on settlements with multiple predecessors that consensually resolve decommissioning liabilities associated with the Debtors' properties.  If any of the Predecessor settlements falls apart, it could undermine the Debtors' ability

---

[2] The Credit Bid Purchaser is providing in excess of $1 billion in consideration including funding at least $105 million of cash plus assuming certain working capital obligations and will be afforded good faith purchaser status under section 363(m) of the Bankruptcy Code.

to close other transactions and successfully emerge from chapter 11. Such a result would put the environment at risk, which would be particularly unwarranted when the Government has determined that the current Plan is the "best solution that's possible in this case to protect health, safety and the environment." June 21, 2021, Confirm. Hr'g Tr. 32:9–13. A stay would also jeopardize new funding commitments secured by the Debtors, would burden the estate with additional administrative costs, and would only serve to delay the decommissioning of the Debtors' assets.

8.    Failure to establish any of the elements necessary for a stay pending appeal is grounds to deny the request for a stay. *See Arnold v. Garlock Inc.*, 278 F.3d 426, 438-39 (5th Cir. 2001). Here, the Sureties cannot establish any of the elements, and the balance of the equities strongly disfavors the extraordinary remedy of a stay pending appeal. The Motion should be denied.

9.    In any event, the Sureties have not even attempted to meet their burden of showing the amount of security that would be required. The declaration of Michael Dane filed contemporaneously herewith (the "**Dane Declaration**") indicates that the potential damages are in excess of $1 billion. *See* Dane Decl. ¶ 14.

### Background

10.    Commencing on August 3, 2020 (the "**Petition Date**"), the Debtors each filed with this Court a voluntary case under chapter 11 of title 11 of the United States Code (the "**Bankruptcy Code**").

11.    The Debtors continue to operate their businesses and manage their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

12.    The Debtors' chapter 11 cases are being jointly administered for procedural purposes only pursuant to Rule 1015(b) of the Federal Rules of Bankruptcy Procedure

(the "**Bankruptcy Rules**") and Rule 1015-1 of the Bankruptcy Local Rules for the United States Bankruptcy Court for the Southern District of Texas (the "**Bankruptcy Local Rules**").

13.    On August 18, 2020, the United States Trustee for Region 7 (the "**U.S. Trustee**") appointed an official committee of unsecured creditors (the "**Creditors' Committee**") pursuant to section 1102 of the Bankruptcy Code.  No trustee or examiner has been appointed in these chapter 11 cases.

14.    On January 1, 2021, the Debtors filed the *Joint Chapter 11 Plan of Fieldwood Energy LLC and Its Affiliated Debtors* (ECF No. 722) and the *Disclosure Statement for Joint Chapter 11 Plan of Fieldwood Energy LLC and Its Affiliated Debtors* (ECF No. 723) (including any exhibits and schedules thereto and as may be further amended, supplemented, or modified, the "**Disclosure Statement**").

15.    On April, 15, 2021, the Court entered the *Amended Order (I) Approving Disclosure Statement and Form and Manner of Notice of Disclosure Statement Hearing; (II) Establishing Solicitation and Voting Procedures; (III) Scheduling Confirmation Hearing; (IV) Establishing Notice and Objection Procedures for Confirmation of the Proposed Plan; (V) Approving Notice and Objection Procedures for the Assumption of Executory Contracts and Unexpired Leases; (VI) Approving Procedures for Objections to the Assignment and Transfer of Property of the Estate; and (VII) Granting Related Relief* (ECF No. 1286) approving the Debtors' Disclosure Statement.

16.     On June 25, 2021, the Debtors filed the *Eighth Amended Joint Chapter 11 Plan of Fieldwood Energy LLC and Its Affiliated Debtors* (ECF No. 1742) (including any exhibits and schedules thereto and as may be further amended, supplemented, or modified, the "**Plan**").[3]

17.     From June 21 through 25, 2021, the Court held a hearing on confirmation of the Plan.  Starting on the first day, and throughout the confirmation hearing, numerous parties, including the Sureties, argued that the Credit Bid Acquired Interests could not be sold free and clear of the Sureties' contingent subrogation claims.  *See, e.g.*, June 21, 2021, Confirm. Hr'g Tr. 37:25 – 38:9, 53:35 – 55:8, 60:22 – 61:25; June 24, 2021, Confirm. Hr'g Tr. 57:24 – 58:4, 75:17 – 82:14; June 25, 2021, Confirm. Hr'g Tr. 11:26 – 30:9.  Each time, the Court carefully considered the arguments and overruled the objections with detailed explanations.  *See, e.g.*, June 21, 2021, Confirm. Hr'g Tr. 41:6-10 ("I do understand your argument that you might have rights in a future lawsuit against somebody that isn't yet an owner, a future purchaser, and I'm telling you I believe the Bankruptcy Code allows those rights to be cut off."), 43:3-9 ("[Y]ou're telling me you have a claim against the future purchaser arising by their purchase of the assets, and Section 363 allows the assets to be sold free and clear of those claims. That's an issue with Congress, not with me."); 63:10-13 ("It's a right that goes with the sale of the property and Congress decided to write a provision that allows Debtors to abandon the property, that allows Debtors to sell property free and clear."); June 24, 2021, Confirm. Hr'g Tr. 58:9-14 ("The purchasers are not undertaking an obligation to do [ARO] work other than as specifically provided in the Plan.  And you are not subrogated to the right to sue them for failure to do [ARO] work if that [ARO] work existed prior to the effective date."), 85:11-15 ("I am overruling, once again, a sureties argument that we are

---

[3] Capitalized terms used but not otherwise defined herein shall have the meaning ascribed to such terms under the Plan.

going to saddle a purchaser with a pre-effective date [ARO] obligation or that they will have the right to assert obligations that existed pre-effective date based on post-effective date ownership."); June 25, 2021, Confirm. Hr'g Tr. 31:18-24 ("The issue . . . is whether the Bankruptcy Court is empowered as part of the Plan's adjudication and Plan process to say that you're not going to get subrogation rights to the Government if they come back against the acquiring entity. I rely in large part on our ability to do that, on the Bankruptcy Code, and in large part on *Midlantic*."), 32:8-12 ("Under the Bankruptcy Code we could authorize, and may authorize the sale of the property, the [*in*] *rem* property free and clear of all liens, claims and encumbrances. That includes equitable rights including the equitable right of subrogation.").

18.     On June 25, 2021, the Court entered the Confirmation Order confirming the Plan.  The Confirmation Order contains the following with respect to the Sureties' subrogation rights:

> [T]he Non-Apache Sureties shall not be entitled, under any circumstances, to claim a right of subrogation against the Debtors, the Post-Effective Date Debtors, FWE I, any FWE Additional Entity or NewCo and its subsidiaries (including Credit Bid Purchasers), unless such subrogation rights, if any, relate to obligations that both (x) accrue post-Effective Date and (y) arise from post-Effective Date activity and, with respect NewCo and its subsidiaries (including Credit Bid Purchasers), relates to the Credit Bid Acquired Interests.

Confirmation Order ¶ 97.

19.     Five days later, and ten days after the Court first rejected their arguments, on June 30, 2021, the Sureties filed the *Notice of Appeal* (ECF No. 1776) (the "**Notice of Appeal**"). The Notice of Appeal challenges any findings of fact or conclusions of law in the Confirmation Order that "authorizes (a) any assumption by the Debtor(s) and assignment to Credit Bid Purchaser(s) of any leases or, (b) any sale of assets to Credit Bid Purchaser(s), in each case free

and clear of [the Sureties'] future subrogation rights, pursuant to 11 U.S.C. §§ 363 or 365 or otherwise." Notice of Appeal, Part 2.

20.     On July 2, 2021, the Sureties filed the Motion and set the hearing on the Motion for July 6, 2021 at 3:30 pm CT.

21.     On July 5, 2021, Lexon Insurance Company, Ironshore Indemnity Inc. and Ironshore Specialty Insurance Company filed the *Joinder of Lexon Insurance Company, Ironshore Indemnity Inc. and Ironshore Specialty Insurance Company to the Emergency Motion of Aspen American Insurance Company, Berkley Insurance Company and Sirius America Insurance Company for a Stay, pursuant to Bankruptcy Rule 8007, of the Order Confirming Eighth Amended Joint Chapter 11 Plan of Fieldwood Energy LLC and Its Affiliated Debtors, or in the alternative, for an Order Amending the Confirmation Order, pursuant to Bankruptcy Rule 9023* (ECF No. 1801).

22.     On July 6, 2021, North American Specialty Insurance Company filed the *Joinder of North American Specialty Insurance Company to the Emergency Motion of Aspen American Insurance Company, Berkley Insurance Company and Sirius America Insurance Company for a Stay, pursuant to Bankruptcy Rule 8007, of the Order Confirming Eighth Amended Joint Chapter 11 Plan of Fieldwood Energy LLC and Its Affiliated Debtors, or in the alternative, for an Order Amending the Confirmation Order, pursuant to Bankruptcy Rule 9023 and Joinder in the Grounds Set for in the Joinder of Lexon Insurance Company, Ironshore Indemnity Inc. and Ironshore Speciality Insurance Company in that Motion* (ECF No. 1802).

23.     For the reasons stated herein, the Sureties are not entitled to the relief requested in the Motion.

<u>**Argument**</u>

## I. THE SURETIES HAVE FAILED TO SATISFY THE HIGH STANDARD FOR A STAY PENDING APPEAL

24.     A stay pending appeal is an "extraordinary remedy" that is never granted as

a matter of right.  *Belcher v. Birmingham Trust Nat'l Bank*, 395 F.2d 685, 686 (5th Cir. 1968); *see

also Nken v. Holder*, 556 U.S. 418, 433 (2009) ("A stay is not a matter of right . . . . It is instead

an exercise of judicial discretion, and the propriety of its issue is dependent upon the circumstances

of the particular case.").  When seeking such relief, the moving party bears the burden of showing

that the circumstances justify an imposition of a stay. *See Ruiz v. Estelle*, 666 F.2d 854, 856 (5th

Cir. 1982) ("The party who seeks a stay bears the burden.").

25.     Bankruptcy courts employ a four-factor test when determining whether to

grant a stay pending appeal:

> (1) whether the movant has made a showing of likelihood of success on the merits;
> (2) whether the movant has made a showing of irreparable injury if the stay is not
> granted;
> (3) whether the granting of the stay would substantially harm the other parties; and
> (4) whether the granting of the stay would serve the public interest.

*Id*.  The first two factors "are the most critical."  *Barber v. Bryant,* 833 F.3d 510, 511 (5th Cir.

2016) (quoting *Nken v. Holder*, 556 U.S. at 434).  However, the movant must satisfy all four

criteria to prevail.  *See Arnold*, 278 F.3d at 438-39; *Enter. Int'l, Inc. v. Corporacion Estatal

Petrolera Ecuatoriana*, 762 F.2d 464, 472 (5th Cir. 1985).  In this case, all four of the factors

weigh heavily against the Sureties' Motion for a stay pending appeal.

### A.     The Sureties Are Not Likely to Succeed on the Merits

26.     A movant bears the burden of demonstrating a "strong showing" that it is

likely to succeed on the merits.  *See O'Donnell v. Goodhart*, 900 F.3d 220, 223 (5th Cir. 2018).

"It is not enough that the chance of success on the merits be better than negligible."  *Nken v.*

*Holder*, 556 U.S. 418, 434 (2009).  Here, the Sureties appeal the Court's ruling that the Credit Bid Acquired Interests can be sold free and clear of the Sureties' subrogation claims.  The Sureties make three primary contentions in their Motion: (i) the Sureties' subrogation claims are not "interests" that the Credit Bid Acquired Interests can be sold free and clear of; (ii) the Sureties' subrogation claims do not arise until post-bankruptcy and, therefore, are not subject to a 363 sale; and (iii) none of the section 363(f) conditions are applicable that would permit a sale of the Credit Bid Acquired Interests free and clear of the Sureties' subrogation claims.  *See* Motion ¶¶ 36-44. "However, this Court carefully considered and rejected every one of these arguments after hearing evidence at the Confirmation Hearing[.]"  *In re Scotia Dev. LLC*, 2008 Bankr. LEXIS 5127, at *13; *see also* June 21, 2021, Confirm. Hr'g Tr. 41:6-10, 43:3-9, 63:10-13; June 24, 2021, Confirm. Hr'g Tr. 58:9-14, 85:11-15; June 25, 2021, Confirm. Hr'g Tr. 31:18-24, 32:8-12.

27.     Specifically, the Court considered the Sureties' arguments on several occasions throughout the confirmation hearing and correctly determined that section 363(f) of the Bankruptcy Code permits the sale of property free and clear of liens, claims and encumbrances, and therefore, the Court could authorize the sale of the Credit Bid Acquired Interests free and clear of claims, including the Sureties' subrogation claims.  *See* June 25, 2021, Confirm. Hr'g Tr. 32:8-14.  The Court held that the "idea of 363 is to allow a new purchaser to . . . start fresh[,]" and that the Court could condition a sale on the Government retaining certain rights while cutting off others' rights.  *See* June 21, 2021, Confirm. Hr'g Tr. 57:21-25.  Furthermore, the Court held that its ruling was informed by the Supreme Court's holding in *Midlantic*, which requires Courts to apply the Bankruptcy Code in a manner that allows the Government to minimize consequences to the environment.  *See* June 25, 2021, Confirm. Hr'g Tr. 32:15-21.  The Court found that the Debtors' Plan was the "only solution" to the Debtors' decommissioning obligations.  *See id*. 32:21.

28.     As the Court held, each of the Sureties' arguments fails on the merits. Accordingly, the Sureties are unlikely to succeed on appeal.

   **i.     *The Sureties' subrogation claims qualify as "interests" under section 363(f) of the Bankruptcy Code***

29.     The Sureties are incorrect that section 363(f) of the Bankruptcy Code only applies to *in rem* property interests and not *in personam* claims.   Section 363(f) provides, in relevant part, that a debtor "may sell property . . . section free and clear of any interest in such property of an entity other than the estate . . . ."  11 U.S.C. § 363(f).  The Sureties cite to only a single case that was subsequently vacated on other grounds (*In re Fairchild Aircraft Corp.*, 184 B.R. 910 (Bankr. W.D. Tex. 1995)) to support their position that section 363(f) only applies to *in rem* property interests.  *See* Motion ¶ 36.  But Congress did not include the qualifier "in rem" in the statute, and instead enacted a statute that reaches "any" interest in property.  11 U.S.C. § 363(f).  "Read naturally, the word 'any' has an expansive meaning, that is, 'one or some indiscriminately of whatever kind.'" *Ali v. Federal Bureau of Prisons*, 552 U.S. 214, 219 (2008) (citation omitted). Many courts in turn have rejected the position that section 363(f) only covers *in rem* interests, and instead courts have employed "a broader definition [of 'interest'] that encompasses other obligations that may flow from ownership of the property."  3 Collier on Bankruptcy ¶ 363.06 (16th ed. 2021); s*ee, e.g.*, *In re Motors Liquidation Co.*, 829 F.3d 135, 155 (2d Cir. 2016) ("successor liability claims can be 'interests' when they flow from a debtor's ownership of transferred assets"); *In re PBBPC, Inc.*, 484 B.R. 860, 869 (B.A.P. 1st Cir. 2013) ("We conclude that the more expansive reading of the term 'any interest' advanced by the Seventh, Fourth, Third, and Second Circuits in the cases cited above is more consistent with the language of the Bankruptcy Code and the policy expressed in § 363."); *In re TWA*, 322 F.3d 283, 288-90 (3d Cir. 2003) (the term "interest" should be read broadly, in order "to authorize a bankruptcy court to bar

any interest that could potentially travel with the property being sold."); *In re Leckie Smokeless Coal Co.*, 99 F.3d 573, 582 (4th Cir. 1996) ("Congress did not expressly indicate that, by employing such language, it intended to limit the scope of section 363(f) to *in rem* interests, strictly defined, and we decline to adopt such a restricted reading of the statute here.").   Those courts have found that "the term 'interest' . . . refer[s] to obligations that are connected to, or arise from, the property being sold."  3 Collier on Bankruptcy ¶ 363.06 (16th ed. 2021).

30.    Here, the Sureties' asserted subrogation rights are interests in property that arise from ownership of the Credit Bid Acquired Interests.   Under applicable regulations, the Debtors, as lessees and owners of operating rights, are required to decommission the Credit Bid Acquired Interests.  *See* 30 C.F.R. § 250.1702 ("You accrue decommissioning obligations when you do any of the following: . . . (d) Are or become a lessee or the owner of operating rights of a lease on which there is a well that has not been permanently plugged . . . a platform, a lease term pipeline, or other facility, or an obstruction . . .").   That liability will transfer to Credit Bid Purchaser upon its acquisition of the Credit Bid Acquired Interests.  *See* 30 C.F.R. § 556.604(d). If Credit Bid Purchaser fails to decommission the Credit Bid Acquired Interests, obligees may call on the Sureties' bonds to pay for the decommissioning, and the Sureties could assert subrogation claims, absent a free and clear sale.   Accordingly, the Sureties' asserted subrogation rights both are connected to and arise from ownership of the Credit Bid Acquired Interests, and thus are interests in property subject to a section 363(f) sale, free and clear.  *See* June 21, 2021 Confirm. Hr'g Tr. 63:9-14 ("Because [subrogation rights] go[] with the property.  [They don't] exist[] in the ether. It's a right that goes with the sale of the property and Congress decided to write a provision that allows Debtors to . . . sell property free and clear.").

ii.      ***The Sureties' subrogation claims fall within the broad definition of "claims" under the Bankruptcy Code***

31.     The Sureties next argue that their subrogation claims are not "claims" because they are claims that will not arise until after the Debtors' bankruptcy and therefore cannot be barred by a section 363(f) sale.  This argument is misplaced, as a future claim is a kind of "claim."

32.     The Bankruptcy Code defines the term "claim" broadly.  *See* 11 U.S.C. § 101(5)(A) ("The term 'claim' means . . . right to payment, whether or not such right is reduced to judgment, unliquidated, fixed, contingent, matured, disputed, undisputed, legal, equitable, secured, or unsecured.").  The Fifth Circuit follows the pre-petition relationship test to determine whether a future claimant may have a 'claim' under the Code.  *See In re Northstar Offshore Grp., LLC*, 2018 Bankr. LEXIS 2801, at *15 (Bankr. S.D. Tex. September 14, 2018) (Isgur, J.) (citing *Lemelle v. Universal Mfg. Corp.*, 18 F.3d 1268, 1277 (5th Cir. 1994)); *see also In re Trevino*, 535 B.R. 110, 148 (Bankr. S.D. Tex. 2015) (Isgur, J.) ("The Fifth Circuit has adopted the 'pre-petition relationship' test").  Under this test, the fact that a cause of action may not accrue until after the petition date does not mean that a 'claim' does not exist.  *Id*. at 147-48 (noting that the accrual test has been universally rejected); *see also In re National Gypsum Co.*, 139 B.R. 397, 405 (N.D. Tex. 1992) ("the creditor need not have a cause of action that is ripe for suit outside of bankruptcy in order for it to have a pre-petition claim for purposes of the Code.").  Instead, "in order for a future claimant to have a pre-petition claim under the Code, 'there must be some prepetition relationship, such as contact, exposure, impact, or privity, between the debtor's prepetition conduct and the claimant.'" *Id*. at 148 (quoting *Lemelle v. Universal Mfg. Corp.*, 18 F.3d 1268, 1277 (5th Cir. 1994)).  Moreover, in order for a 'claim' to arise, "[the claim] must have been within the fair contemplation of the parties at the time of bankruptcy." *Id*. at 148 (internal citations omitted).

33.     The Sureties' subrogation claims clearly meet the definition of "claim" under the Bankruptcy Code.  The subrogation claims arose at the time the Sureties issued their bonds securing the Debtors' decommissioning obligations, which was prior to the Petition Date. At that point, the Sureties had a prepetition, contractual relationship with the Debtors with respect to the bonded properties, including the Credit Bid Acquired Interests.  The Sureties were aware at the time of issuing their bonds that were the Debtors to default under the bonds, they may hold subrogation claims against the Debtors or any other party primarily liable for the decommissioning obligations.    Therefore, the Sureties' subrogation claims, including claims against future purchasers, are within the fair contemplation of the parties, and meet the prepetition relationship test.

34.     The Sureties argue that their subrogation claims will not "arise until a claim" is made on a bond.  *See* Motion ¶ 42 ("subrogation claim does not arise until a claim is made on a surety bond and a surety has made payment or otherwise performed under its bond"). The Sureties, however, provide no legal support for their position.  In fact, their Motion does not even discuss the test utilized for determining whether a party holds a "claim" as defined by the Bankruptcy Code, which includes "unliquidated," "contingent," "unmatured," and "disputed" claims. 11 U.S.C. 101(5)(A).  Instead, the Sureties provide conclusory statements that their subrogation claims are not "claims" because they do not arise until a claim is made on a bond. However, that interpretation appears to follow the accrual test, which as stated above, has been universally rejected.  The fact that a creditor does not have a cause of action ripe for suit does not mean that the creditor does not hold a bankruptcy claim.  *See In re National Gypsum Co.*, 139 B.R. at 405.

35.     The Sureties' subrogation claims are contingent claims that are treated under Class 6B of the Plan.  Under the Bankruptcy Code, contingent and unliquidated claims can be estimated for allowance purposes.  *See* 11 U.S.C. § 502(c).  Accordingly, the contingent nature of the subrogation claims does not mean the claims are not "claims" that are subject to a section 363(f) sale.  *See* 11 U.S.C. § 101(5).  Should the Sureties want to seek a recovery on account of their subrogation claims, their remedy is to assert a general unsecured claim against the Debtors' estates, which will be treated in Class 6B under the Plan.  *See* June 25, 2021 Confirm. Hr'g Tr. 30:22-31:11.

36.     Because the Sureties' contingent subrogation claims are "claims" as defined under the Bankruptcy Code that have already arisen or will arise during this case, they are subject to a free and clear sale.  The Sureties' remedy is to assert that claim *against the Debtors* as an unsecured claim—not as a claim that rides through the bankruptcy and can be asserted against Credit Bid Purchaser arising from its ownership of the interests, when it purchased those assets "free and clear." 11 U.S.C. § 363(f).

   iii.     ***The Sureties' subrogation claims can be satisfied monetarily and are in bona fide dispute***

37.     A debtor can sell property free and clear of interests under section 363(f) only if one or more of five conditions identified under section 363(f) are present:

> (1) applicable nonbankruptcy law permits sale of such property free and clear of such interest;
> (2) such entity consents;
> (3) such interest is a lien and the price at which such property is to be sold is greater than the aggregate value of all liens on such property;
> (4) such interest is in bona fide dispute; or
> (5) such entity could be compelled, in a legal or equitable proceeding, to accept a money satisfaction of such interest.

11 U.S.C. § 363(f)(i)-(v).  The Sureties argue none of the above conditions apply to their subrogation claims, but conditions four and five are both present.

38.     A sale can be free and clear of an interest if an entity holding such an interest "could be compelled, in a legal or equitable proceeding, to accept a money satisfaction of such interest."  11 U.S.C. § 363(f)(v).  This condition is met if the interests are subject to monetary valuation.  *See In re TWA*, 322 F.3d at 290-91.  The Sureties argue this condition is not met because their subrogation claims are not "quantifiable."  *See* Motion ¶ 44.  The claims, however, are clearly quantifiable, as they are simply claims for money damages.  Also, the Bankruptcy Code provides the Court with ample tools to quantify such claims.  *See* 11 U.S.C. § 502(c)(1) (providing for estimation of contingent, unliquidated claims).  In fact, the Sureties filed proofs of claim alleging amounts in the aggregate of approximately $165 million.  *See* Claim 475 (claims of Aspen American Insurance Company); Claims 514, 550, and 558 (claims of Berkley Insurance Company); Claims 554, 552, and 553 (claims of Sirius America Insurance Company).  The claims can be quantified by estimating the total decommissioning obligations associated with the Credit Bid Acquired Interests and determining the likelihood that Credit Bid Purchaser defaults on those obligations in the future.  Even if that analysis is complex, this Court regularly engages in complex valuation and nothing about the Sureties' claims makes them impossible to quantify.  The Sureties can quantify those claims—and recover on them—by filing an unsecured claim against the Debtors.  Accordingly, the fifth condition under 363(f) for a sale free and clear of the Sureties' subrogation claims is met.

39.     A sale can also be free and clear of an interest if such interest is in bona fide dispute.  *See* 11 U.S.C. § 363(f)(iv).  An interest is in bona fide dispute if "there is an objective basis for either a factual or legal dispute as to the validity of the debt."  3 Collier on Bankruptcy ¶

363.06 (16th ed. 2021); *In re Patriot Place, Ltd.*, 486 B.R. 773, 815 (Bankr. W.D. Tex. 2013) (a bona fide dispute exists "when there is an objective basis for a factual or legal dispute as to the validity of the asserted interest"); *see also Matter of Sims*, 994 F.2d 210, 221 (5th Cir. 1993) (finding, in the context of 11 U.S.C. § 303(b)(1), that a bona fide dispute exists where "there is an objective basis for either a factual or legal dispute as to the validity of the debt").  There is an objective basis to dispute the validity of any subrogation claim held by the Sureties because the Debtors do not believe that the Sureties will ever have to pay out on their bonds.  The record of the Confirmation Hearing is clear that Credit Bid Purchaser will be a well-capitalized business that will be fully capable of fulfilling all of the obligations associated with the Credit Bid Acquired Interests.  *See* June 21, 2021, Confirm. Hr'g Tr. 160:12–15 (referring to the Debtors' financial projections, Mr. Dane: "I believe that these are very reasonable projections that are a very fair set of projections and very much in line with all the reasonable assumptions that are forecasted here.").  Additionally, the Sureties' subrogation claims are in dispute because they are subject to disallowance under section 502(e)(1)(B) of the Bankruptcy Code.  Accordingly, the Sureties' subrogation claims are subject to bona fide dispute such that section 363(f)(iv) is satisfied.

### B.    The Sureties Will Suffer No Irreparable Harm

40.    "[T]o establish irreparable harm, '[s]peculative injury is not sufficient; there must be more than an unfounded fear on the part of the applicant.'"  *Walker v. Epps*, 287 F. App'x 371, 376 (5th Cir. 2008) (quoting *United States v. Emerson*, 270 F.3d 203, 262 (5th Cir. 2001).  The irreparable harm showing that is required for a stay is "inversely proportional" to the likelihood of success on the merits—"more of one excuses less of the other."  *Revel AC, Inc. v. IDEA Boardwalk LLC*, 802 F.3d 558, 570 (3d Cir. 2015) (citation omitted); *see also In re Friendship Diaries*, No. 12-20405, 2014 WL 527232, at *2 (Bankr. N.D. Tex. Feb. 10, 2014)

(acknowledging that other courts "have looked to the probability-of-success factor and stated that the extent to which it must be demonstrated is inversely proportional to the amount of irreparable injury suffered by the moving party absent the stay . . . more of one excuses less of the other"); *Collier v. Hodge*, No. 15-CV-2119, 2015 WL 5016485, at *5 (Dist. W.D. La. Aug. 21, 2015) (same).  Here, the Sureties would need a substantial showing of irreparable harm to obtain a stay because, as explained above, it has little if any chance of success on the merits.

41.     The Sureties allege they will experience irreparable harm because their appeal may become moot.  *See* Motion ¶ 45.  However, mootness alone is insufficient to establish irreparable harm.  *See In re Scotia Dev. LLC*, 2008 Bankr. LEXIS 5127, at *14 (Bankr. S.D. Tex. July 15, 2008) ("the risk of equitable mootness alone does not constitute irreparable harm sufficient to justify a stay pending appeal"); *see also In re Color Spot Holdings, Inc.*, 2018 WL 3996938, at *3 (D. Del. Aug. 21, 2018); *In re Calpine Corp.*, 2008 WL 207841, at *4 (Bankr. S.D.N.Y. Jan. 24, 2008).  "If the risk of equitable mootness alone were sufficient to constitute irreparable harm, virtually every confirmation order in every bankruptcy case would be subject to a stay pending appeal."  *In re Scotia Dev. LLC*, 2008 Bankr. LEXIS 5127, at *15.  The Sureties have not alleged any other harm besides the possibility that their appeal may become moot.  Therefore, they have not established irreparable harm.

42.     Further, any potential harm to the Sureties is speculative, remote, and may have no economic consequences at all.  *See, e.g., In re Scotia Dev. LLC*, 2008 Bankr. LEXIS 5127, at *16 (denying motion for stay pending appeal where court found that "[a]ny harm to the [movant] is speculative").  As the Sureties themselves recognize, even if the Sureties were to prevail on the merits, they may never have to pay out on their surety bonds and their subrogation claims "may never arise."  *See* Motion § I.B.  Accordingly, any potential harm to the Sureties by the Court

denying their request for stay is pure speculation, and the Sureties have introduced no record evidence showing otherwise.

43.     Last, the Court during the Confirmation Hearing found that confirmation of the Plan is in the interests of all parties, including the Sureties.  *See* June 24, 2021, Confirm. Hr'g Tr. 84:7-12 ("The Bankruptcy Code allows the sale of assets free and clear. The Bankruptcy Code allows the abandonment of assets all together. And if the Court had ordered either of those two alternatives without an environmental remedy, the sureties would have had to have paid."); June 25, 2021, Confirm. Hr'g Tr. 32:22–23 ("I do not make the sureties worse off by confirming the Plan, I make them better off by confirming the Plan."), 50:9–13 ("[W]hat I think is being accomplished in the Bankruptcy Court is in the best interest of the United States, is in the best interest of the creditors of this estate[.]").  If the Plan is not implemented and the Debtors were to liquidate, the Sureties' bonds would very likely be drawn in the near term, under a liquidation scenario where even claims with senior priorities would likely receive only partial recoveries.  *See* Dane Decl. ¶ 12.  The Plan at least gives the Sureties a chance against such financial loss. Accordingly, the Sureties themselves could be harmed if the Confirmation Order is stayed and the Plan does not go effective.

**C.     A Stay Will Result in Substantial Harm to the Debtors and the Other Parties**

44.     In contrast, imposition of a stay would substantially harm the Debtors and other parties in interest, including the public through possible environmental harm. *See* Dane Decl. ¶¶ 6-15.  The Debtors' Plan, once consummated, will achieve the goals of ensuring continued environmental protections of the Debtors' properties and resolving 100% of the Debtors' decommissioning obligations associated with its oil and gas leases.  The Debtors are confident the Plan will accomplish those crucial goals.  However, the Plan is also delicate.  The uncontroverted

evidence at the Confirmation Hearing is that the Debtors' restructuring transactions, including the Apache transaction and the Additional Predecessor Agreements, are highly interdependent. *See* Dane Decl. ¶¶ 6-8; June 21, 2021, Confirm. Hr'g Tr. 168:16–169:3 (discussing the interaction between the various agreements and new companies), 186:19–22 ("The predecessor arrangements [use] the Credit Bid Purchaser's employees in order to do that so the Credit Bid Purchaser and the new capital is kind of an instrumental part."). If any one of the interdependent transactions contemplated under the Plan fails to close, it could cause other transactions to fall through, potentially preventing the Debtors from emerging from chapter 11 and achieving the environmental protections that led to the Government not objecting to the proposed Plan. *See* Dane Decl. ¶ 7.

45.    The Debtors have agreed to certain outside dates with respect to the various restructuring transactions contemplated by the Plan, including outside dates of July 31, 2021 (i) under the Restructuring Support Agreement for the Plan to go effective, *see* Dane Decl. ¶ 8; (ii) under the Credit Bid Purchase Agreement for the Credit Bid Transaction to close, *see* Plan Supplement (ECF No. 1394-1), at Ex. F; and (iii) for the commitment letters for the first and second lien exit financings, *see* Dane Decl. ¶ 8; Backstop Commitment Letter (ECF No. 1023-2); Commitment Letter (ECF No. 1165-1). The Debtors cannot consummate the Plan without those financings. If those financing commitments were to terminate, there is a significant possibility that the Debtors would not be able to obtain similar financing for consummating the Plan at a later date or pursuing any alternative reorganization plan in the future. *See* Dane Decl. ¶ 8.

46.    In addition, the Chevron Implementation Agreement contemplates an outside date of August 10, 2021 for effectiveness of the Chevron Definitive Documents and the Eni Implementation Agreement contemplates an outside date of September 30, 2021 for execution

of the Eni Definitive Documents.  *See* Amended Plan Supplement (ECF No. 1562-2), at Ex. N1; Fifth Plan Supplement (ECF No. 1756), at Ex. N2.  The U.S. Government's lack of objection to the Plan is premised on these transactions closing.  *See* June 21, 2021, Confirm. Hr'g Tr. 32:9–13. Accordingly, if any of the Predecessor agreements or the Credit Bid Purchase Agreement fails to consummate timely, it is possible the Government will no longer support the Debtors' restructuring efforts.

47.     If the Debtors cannot confirm a chapter 11 plan and convert to chapter 7, that could potentially trigger grave impacts.  *See* Dane Decl. ¶ 9.  The Debtors carefully crafted their Plan to ensure continued environmental stewardship of the Debtors' properties and address all of the Debtors' decommissioning obligations.  *See id*.  The transactions contemplates by the Plan involve a highly organized process for decommissioning the Debtors' assets and no other workable alternative has been proposed that would address the Debtors' extensive decommissioning obligations.  *See id*.; s*ee also* June 24, 2021, Confirm. Hr'g Tr. 83:1–4 (Court: "[I]s there any evidence that there was anyone that was willing to do what you suggested would be a better alternative? MR. ZUBER [Sureties' counsel]: Not that I'm aware of, Your Honor."). Accordingly, a stay of the Confirmation Order would put the environment at risk and also increase the risk that taxpayers may need to fund the necessary decommissioning work.  *See* Dane Decl. ¶ 9.  Furthermore, it could result in the loss of $225 million in new money commitments by the Debtors' secured lenders that provides the foundation for any potential restructuring as well as employee resignations and layoffs, and dramatic reduction of recoveries available for all of the Debtors' creditors.  *See id*.

48.     In addition to the sale value being lost, the potential loss of value as a result of a stay includes: loss of the $100 million DIP facility, the continued burden of attorneys' fees, greater

than $40 million in the Debtors' monthly expenses to maintain and operate all of the Debtors' assets for the duration of the appeal, loss of the $57.7 million Eni turnkey amount, loss of the Chevron turnkey amount, loss of the assumption of the Debtors' working capital obligations by the Credit Bid Purchaser, loss of $225 million in new money commitments by the Debtors' secured lenders, and loss of the $400 million standby loan facility from Apache.  In total, a stay would result in an estimated loss of in excess of $1 billion to the Debtors.  *See* Dane Decl. ¶ 14.

49.    Courts have recognized the definitive and concrete harm that debtors, creditors, and other constituencies suffer when a stay would deprive parties of the ability to consummate transactions necessary to settle the bankruptcy estate and successfully resolve bankruptcy proceedings.  *See, e.g.*, *In re TransTexas Gas Corp.*, No. 99-21550-C-11, slip op. at 6-7 (Bankr. S.D. Tex. Feb. 15, 2000) (denying a stay because it would result in lost financing); *see also In re Calpine Corp.*, 2008 WL 207841, at *5 (holding that granting a stay "would pose very real and significant harm to the [d]ebtors and other stakeholders" because debtors would lose exit financing).  Here, the harm is even greater due to the potential increased environmental risk associated with staying confirmation of the Plan.  *See* Dane Decl. ¶ 9-10.

50.    Courts are also cognizant that any delay in distribution to creditors under a plan constitutes substantial harm to creditors that militates against a stay.  *See In re Dernick*, No. 18-32494, 2019 WL 236999, at *4 (Bankr. S.D. Tex. Jan. 16, 2019) ("[C]ourts have generally found that a significant delay in the administration of an estate, or a delay in the distribution to creditors under a plan generally satisfies the criterion of harm to other parties."); *see also In re F.G. Metals, Inc.*, 2008 WL 2440708, at *9 (Bankr. M.D. Fla. May 16, 2008); *In re Salvo*, 2008 Bankr. LEXIS 1142, 2008 WL 938585, at *4 (Bankr. N.D. Ohio Apr. 4, 2008) (holding that a stay could injure all creditors by delaying their potential payments through a confirmed plan); *In re The*

*Charter Company*, 72 B.R. 70, 72 (Bankr. M.D. Fla. Mar. 20, 1987) (holding that claimants will suffer substantial harm as a result of a stay because of the resulting delay in their receipt of settlement funds).  This potential for harm to the Debtors' creditors also weighs against the stay.

        **D.**     **The Public Interest Overwhelmingly Favors Denying a Stay**

        51.     Finally, the Sureties have not and cannot show that imposing a stay is in the public interest.  Indeed, a stay would be contrary to the public interest.  The public interest generally favors "the expeditious administration of bankruptcy cases as well as . . . the preservation of the bankrupt's assets for purposes of paying creditors, rather than litigation of claims lacking a substantial possibility of success."  *In re Metiom, Inc.*, 318 B.R. 263, 272 (S.D.N.Y. 2004); *accord W.R. Grace & Co.*, 475 B.R. at 208 ("Public policy weighs in favor of facilitating quick and successful reorganizations of financially troubled companies." (citation omitted)); *see also Bullard v. Blue Hills Bank*, 135 S. Ct. 1686, 1694 (2015) ("[E]xpedition is always an important consideration in bankruptcy.").  In assessing negative effects to the public interest, Courts have also considered the risk that "environmental risks will be exacerbated" if a plan is not consummated.  *In re Scotia Dev. LLC*, 2008 Bankr. LEXIS 5127, at *21–24 (finding that a stay pending appeal would "substantially and negatively impact the public interest" where failure to consummate the plan would exacerbate environmental risks).

        52.     The Sureties' argument on public interest is largely focused on the merits of their appeal—that a section 363(f) sale cannot bar their subrogation claims—rather than any public interest being served by staying the Confirmation Order.  *See generally* Motion ¶¶ 51-60.  As evidenced by the lack of objection to the Confirmation Order by the Government, the agencies charged with protecting the public interest view implementation of the Plan as beneficial.  Not only is there no public interest served by staying the Confirmation Order, but the potential harm

of staying the Confirmation Order to the public interest is evident.  If the Confirmation Order were

stayed, the Debtors may not be able to consummate the transactions contemplated by the Plan and

would be forced into a chapter 7 liquidation.  *See* Dane Decl. ¶ 11.  Should that happen, the Debtors

would not have the ability or funds to complete all of their decommissioning obligations and U.S.

taxpayers may have to pay for the Debtors' remaining decommissioning obligations.  *See id.*

Additionally, the Debtors' inability to meet its decommissioning obligations in a chapter 7

liquidation would create a significant risk to health, safety, and the environment.  *See id.*  Resolving

decommissioning obligations is clearly within the public's interest.  *See In re Halo Wireless, Inc.*,

684 F.3d 581, 594-95 (5th Cir. 2012) (recognizing that a regulatory agency's exercise of its

regulatory mandate is in the public interest); *Lopez v. Heckler*, 713 F.2d 1432, 1437 (9th Cir. 1983)

("In a broader sense, however, the government's interest is the same as the public interest. The

government must be concerned not just with the public fisc but also with the public weal."); *see

also In re Scotia Dev. LLC*, 2008 Bankr. LEXIS 5127, at *22 (finding that the public interest factor

weighed against a stay pending appeal of a confirmation order when a plan "ensure[d] that an

experienced and environmentally conscious" operator would run properties "in accordance with

applicable regulations").

53.    Even if the Debtors ultimately prevail on their appeal, as they fully expect,

and the Plan ultimately goes into effect without falling apart in the interim, a stay of the

Confirmation Order would only serve to delay decommissioning projects that are currently

scheduled and can be completed in the near term.  *See* Dane Decl. ¶ 15.  Such a delay is against

the public's interest because it would only increase the risk of potential harm to the environment

and public safety.  A multi-month delay pending appeal will prevent the Debtors from beginning

decommissioning work that needs to commence promptly, before the end of the summer

decommissioning season, which would result in at least a year delay in currently scheduled activity. *See id*. And as set forth above, the stay could cause the Plan to fail, causing even broader harm.

## II.  IF THE COURT ISSUES A STAY, THE SURETIES MUST POST A BOND SUFFICIENT TO PROTECT THE DEBTORS

54.    For all the reasons stated above, this Court should deny the stay pending appeal. This Court properly confirmed the Plan, because it met the legal requirements for confirmation, it represents the best available real-world option to the Debtors' decommissioning obligations, it was carefully negotiated with many stakeholders, including environmental regulators, and staying the Confirmation Order would only threaten to drive the Debtors into liquidation, which would be much worse for creditors, the environment, and the public.

55.    If this Court nonetheless issues a stay, it should require the Sureties to post a sufficient bond to cover the extensive harm a stay would cause. The Sureties have failed to even acknowledge that a party seeking a stay pending appeal may be required to post a supersedeas bond in order "to preserve the status quo while protecting the non-appealing party's rights pending appeal." *In re Texas Equip. Co., Inc.*, 283 B.R. 222, 229 (Bankr. M.D. Tex. 2002) (citing *Poplar Grove Planting and Ref. Co. Inc. v. Bache Halsey Stuart Inc.*, 600 F.2d 1189, 1190-91 (5th Cir. 1979)); *see also W.R. Grace & Co.*, 475 B.R. 34, 209 (D. Del. 2012). If the Court does stay the Confirmation Order—which for all of the reasons set forth above, it should not—such a stay must be conditioned on the Sureties first "filing a bond or other security with the bankruptcy court," Fed. R. Bankr. P. 8007(c), with the amount set "at or near the full potential harm to [] parties in interest." *In re Scotia Dev. LLC*, 2008 Bankr. LEXIS 5127, at *26; *see also In re Adelphia Commc'ns Corp.*, 361 B.R. 337, 351 (S.D.N.Y. 2007). The Sureties bear "the burden of demonstrating why the court should deviate from the ordinary full security requirement." *W.R.*

*Grace & Co.*, 475 B.R. at 209 (citation omitted); *accord de la Fuente v. DCI Telecomms., Inc.*, 269 F. Supp. 2d 237, 240 (S.D.N.Y. 2003) ("Because a supersedeas bond is designed to protect the appellee, the party seeking the stay without a bond has the burden of providing specific reasons why the court should depart from the standard requirement of granting a stay only after posting of a supersedeas bond in the full amount of the judgment."); *see also Poplar Grove Planting & Refining Co. v. Bache Halsey Stuart, Inc.*, 600 F.2d at 1191–92 ("If a court chooses to depart from the usual requirement of a full security supersedeas bond . . . it should place the burden on the moving party to objectively demonstrate the reasons for such a departure.").

56.     As explained above, the amount necessary to fully secure the Debtors during the pending appeal is at least $1 billion.  *See* Dane Decl. ¶ 14.  Ultimately, however, the correct response is simply to deny the Motion for a stay.

## III. THE COURT SHOULD NOT AMEND THE CONFIRMATION ORDER

57.     For similar reasons, the Court should deny the Sureties' request to amend the Confirmation Order as an alternative to granting a stay pending appeal. The Sureties have failed to show that any manifest error of law or fact exists with respect to the Court's ruling that the Sureties' contingent subrogation rights against Credit Bid Purchaser are subject to sale under sections 363(f) and 1129 of the Bankruptcy Code.  To the contrary, the Sureties are simply rehashing arguments that this Court already correctly rejected.

## Conclusion

58.     Accordingly, the Debtors respectfully request that the Court deny the Sureties' Motion and grant such further relief as may be just and necessary under the circumstances.

*[Remainder of the Page Intentionally Left Blank]*

Dated:  July 6, 2021
         Houston, Texas

                              Respectfully submitted,

                              /s/ Alfredo R. Pérez
                              WEIL, GOTSHAL & MANGES LLP
                              Alfredo R. Pérez (15776275)
                              Clifford W. Carlson (24090024)
                              700 Louisiana Street, Suite 1700
                              Houston, Texas 77002
                              Telephone:  (713) 546-5000
                              Facsimile:  (713) 224-9511
                              Email:   Alfredo.Perez@weil.com
                                       Clifford.Carlson@weil.com

                              -and-

                              WEIL, GOTSHAL & MANGES LLP
                              Matthew S. Barr (admitted *pro hac vice*)
                              Jessica Liou (admitted *pro hac vice*)
                              767 Fifth Avenue
                              New York, New York 10153
                              Telephone:  (212) 310-8000
                              Facsimile:  (212) 310-8007
                              Email:   Matt.Barr@weil.com
                                       Jessica.Liou@weil.com

                              -and-

                              WEIL, GOTSHAL & MANGES LLP
                              Paul R. Genender (00790758)
                              Erin M. Choi (24079436)
                              200 Crescent Court, Suite 300
                              Dallas, Texas 75201
                              Telephone: (214) 746-7700
                              Facsimile: (214) 746-7777
                              Email:   Paul.Genender@weil.com
                                       Erin.Choi@weil.com

## Certificate of Conference

I hereby certify that, in accordance with Local Rule 9013-1(g), on July 5, 2021, I conferred with Jase Brown by phone in an attempt to resolve the Motion without the necessity of a hearing, but was unable to resolve the Motion.

 /s/ Alfredo R. Pérez
Alfredo R. Pérez

## Certificate of Service

I hereby certify that on July 6, 2021, a true and correct copy of the foregoing document was served by the Electronic Case Filing System for the United States Bankruptcy Court for the Southern District of Texas.

 /s/ Alfredo R. Pérez
Alfredo R. Pérez