1                    IN THE UNITED STATES BANKRUPTCY COURT

2                   FOR THE SOUTHERN DISTRICT OF TEXAS

3                            HOUSTON DIVISION

4   IN RE:                      §     CASE NO. 20-33948-11
                                §     JOINTLY ADMINISTERED
5                               §     HOUSTON, TEXAS
    FIELDWOOD ENERGY LLC,       §     MONDAY,
6                               §     JUNE 21, 2021
            DEBTOR.             §     8:00 A.M. TO 8:22 P.M.

7

8            CONFIRMATION HEARING DAY ONE (VIA ZOOM)

9            BEFORE THE HONORABLE MARVIN ISGUR
              UNITED STATES BANKRUPTCY JUDGE

10

11

12       APPEARANCES:                    SEE NEXT PAGE

13

14       (Recorded via CourtSpeak; No log notes)

15

16

17

18

19

20                   TRANSCRIPTION SERVICE BY:

21            JUDICIAL TRANSCRIBERS OF TEXAS, LLC
                  935 Eldridge Road, #144
22                 Sugar Land, TX 77478
                     281-277-5325
23                www.judicialtranscribers.com

24

25       Proceedings recorded by electronic sound recording;
            transcript produced by transcription service.



BP Exhibit 3
Case No. 20-33948

JUDICIAL TRANSCRIBERS OF TEXAS, LLC

1                    <u>APPEARANCES (VIA ZOOM):</u>

2

3   FOR THE DEBTOR:              WEIL GOTSHAL & MANGES, LLP
                                 Alfredo Perez, Esq.
4                                Clifford Carlson, Esq.
                                 Erin Choi, Esq.
5                                Paul Genender, Esq.
                                 700 Louisiana, Ste. 1700
6                                Houston, TX  77002
                                 713-546-5040
7

8   FOR AD HOC GROUP OF
    SECURED LENDERS:             DAVIS POLK & WARDWELL, LLP
9                                Damian S. Schaible, Esq.
                                 450 Lexington Avenue
10                               New York, NY  10017
                                 212-450-4580
11

12  FOR HUNT OIL COMPANY:        BAKER BOTTS, LLP
                                 Kevin Chiu, Esq.
13                               2001 Ross Avenue
                                 Dallas, TX 75201
14                               214-953-6612

15  FOR OFFICIAL COMMITTEE OF
    UNSECURED CREDITORS:         STROOCK & STROOCK & LAVAN, LLP
16                               Kenneth Pasquale, Esq.
                                 180 Maiden Lane
17                               New York, NY  10038-4982
                                 212-806-5400
18

19  FOR U.S. DEPARTMENT
    OF THE INTERIOR:             U.S DEPARTMENT OF JUSTICE
20                               Zachary Balasko, Esq.
                                 Matt Barr, Esq.
21                               PO Box 875
                                 Washington, DC 20044
22                               202-514-7162

23

24

25

```
 1                  APPEARANCES (CONT'D - VIA ZOOM):

 2
      FOR ASPEN AMERICAN INSURANCE
 3    COMPANY, BERKLEY INSURANCE
      COMPANY, EVEREST REINSURANCE
 4    COMPANY, AND SIRIUS AMERICA
      INSURANCE COMPANY:              CHIESA SHAHINIAN GIANTOMASI
 5                                    Scott Zuber, Esq.
                                      Darren Grzyb, Esq.
 6                                    One Boland Dr
                                      West Orange, NJ 07052
 7                                    973-530-2046

 8                                    HUSCH BLACKWELL
                                      Randall A. Rios, Esq.
 9                                    Timothy A. Million, Esq.
                                      600 Travis Street, Ste. 2350
10                                    Houston, TX  77002
                                      713-647-6800
11
12    FOR BP EXPLORATION AND
      PRODUCTION INC.:                GREENBERG TRAURIG, LLP
13                                    Shari Heyen, Esq.
                                      Karl Burrer, Esq.
14                                    Craig Duewall, Esq.
                                      John Hutton, Esq.
15                                    1000 Louisiana St., Ste. 100
                                      Houston, TX 77002
16                                    713-374-3612

17
18    FOR ENERGY TRANSFER:           KATTEN MUCHIN ROSENMAN, LLP
                                      Yelena E. Archiyan, Esq.
19                                    2121 N. Pearl St.
                                      Dallas, TX  75201
20                                    214-765-3600

21
22    FOR LEXON INSURANCE COMPANY:   HARRIS BEACH, PLLC
                                      Lee Woodard, Esq.
23                                    333 West Washington St.
                                      Syracuse, NY  13202
24                                    315-632-4125

25
```

```
1                    APPEARANCES (CONT'D - VIA ZOOM):

2

3   FOR PHILADELPHIA INSURANCE
    COMPANY:                         MANIER & HEROD
4                                    Robert W. Miller, Esq.
                                     1201 Demonbreun St., Ste. 900
5                                    Nashville, TN  37203
                                     615-244-0030
6

7   FOR XTO OFFSHORE, HHE ENERGY
    COMPANY AND XLT, LLC:            FORSHEY PROSTOCK, LLP
8                                    Suzanne K. Rosen, Esq.
                                     777 Main Street, Ste. 1550
9                                    Fort Worth, TX  76102
                                     817-877-8855
10

11  FOR ECOPETROL AMERICA:           SQUIRE PATTON BOGGS (US) LLP
                                     Kelly Singer, Esq.
12                                   1 E. Washington St., Ste. 2700
                                     Phoenix, AZ  85004
13                                   602-528-4099

14

15  FOR RIDGEWOOD KATMAI &
    ILX PROSPECT:                    SIDLEY AUSTIN, LLP
16                                   Michael Fishel, Esq.
                                     1000 Louisiana St., Ste. 5900
17                                   Houston, TX  77002
                                     713-495-4645
18

19  FOR ZURICH AMERICAN INSURANCE
    COMPANY AND SEITEL DATA
20  LIMITED:                         CLARK HILL, PLC
                                     Duane J. Brescia, Esq.
21                                   720 Brazos St., Ste. 700
                                     Austin, TX  78701
22                                   512-499-3647

23

24

25
```

```
 1                    APPEARANCES (CONT'D - VIA ZOOM):

 2

 3   FOR RLI INSURANCE COMPANY:      KREBS FARLEY & DRY, PLLC
                                     Elliot Scharfenberg, Esq.
 4                                   400 Poydras St., Ste. 2500
                                     New Orleans, LA  70130
 5                                   504-299-3583

 6

 7   FOR MARATHON OIL COMPANY:       BONDS ELLIS EPPICH SCHAFER
                                     JONES, LLP
 8                                   Clay M. Taylor, Esq.
                                     420 Throckmorton St.
 9                                   Suite 1000
                                     Fort Worth, TX  76202
10

11   FOR COX ENTITIES:              LOCKE LORD, LLP
                                     Michael Kind, Esq.
12                                   111 South Wacker Drive
                                     Suite 4100
13                                   Chicago, IL  60606
                                     312-201-2392
14

15
     FOR LLOG EXPLORATION AND
16   LLOG ENERGY:                    GEIGER LABORDE & LAPEROUSE,
                                     LLC
17                                   John E.W. Baay, II, Esq.
                                     701 Poydras Street
18                                   Suite 4800
                                     New Orleans, LA
19                                   504-654-1302

20

21   FOR HOUSTON ENERGY DEEPWATER
     VENTURES I, LLC AND RED
22   WILLOW OFFSHORE, LLC:           LAW OFFICES OF BARNET B.
                                     SKELTON, JR.
23                                   Barnet B. Skelton, Jr., Esq.
                                     815 Walker St., Ste. 1502
24                                   Houston, TX  77002

25
```

```
 1                 APPEARANCES (CONT'D - VIA ZOOM):

 2

 3   FOR NORTH AMERICA SPECIALTY
     INSURANCE COMPANY:              LAW OFFICES OF T. SCOTT LEO PC
 4                                   T. Scott Leo, Esq.
                                     100 N. LaSalle St., Ste. 514
 5                                   Chicago, IL  60602
                                     312-857-0910
 6

 7   FOR HESS CORPORATION:           REED SMITH, LLP
                                     Omar J. Alaniz, Esq.
 8                                   2850 N. Harwood Street
                                     Suite 1500
 9                                   Dallas, TX  75201
                                     469-680-4200
10
     FOR TRAVELERS CASUALTY,
11   LIBERTY MUTUAL INSURANCE
     CO., HANOVER INSURANCE CO.,
12   AND XL SPECIALTY;              LANGLEY, LLP
                                    Keith A. Langley, Esq.
13                                  PO Box 94075
                                    Southlake, TX  76092
14                                  214-722-7162

15   FOR FREEPORT MCMORAN,
     MCMORAN OIL AND GAS, LLC,
16   CONOCO PHILLIPS COMPANY,
     AND MERIT ENERGY:              LOCKE LORD, LLP
17                                  Omer F. Kuebel, III, Esq.
                                    601 Poydras Street, Ste. 2660
18                                  New Orleans, LA  70130
                                    504-558-5155
19

20   FOR GENESIS ENERGY, LP:        ZABEL FREEMAN LAW FIRM
                                    Thomas A. Zabel, Esq.
21                                  1135 Heights Blvd.
                                    Houston, TX  77008
22                                  713-802-9117

23                                  HOWLEY LAW FIRM, PLLC
                                    Tom A. Howley, Esq.
24                                  711 Louisiana St.
                                    Houston, TX  77002
25
```

<pre>
1                  APPEARANCES (CONT'D - VIA ZOOM):

2

3   FOR CGG SERVICES (US), INC.:  FROST BROWN TODD
                                  Mark Platt, Esq.
4                                 2101 Cedar Springs Road
                                  Suite 900
5                                 Dallas, TX  75201
                                  214-580-5852
6

7
    FOR VALERO MARKETING AND
8   SUPPLY COMPANY:               DYKEMA GOSSETT
                                  Deborah Williamson, Esq.
9                                 112 E. Pecan Street
                                  St. 1800
10                                San Antonio, TX  78205
                                  210-554-5500
11

12  FOR JX NIPPON OIL
    EXPLORATION, LTD:             CARVER DARDEN
13                                Leann Moses, Esq.
                                  1100 Poydras Street
14                                New Orleans, LA  70163
                                  504-585-3830
15

16  FOR BRIAN CLOYD, ANDREW
    LUIS, AND PATRICK BURNETT:    CAIN & SKARNULIS, PLLC
17                                Taylor Romero, Esq.
                                  400 W. 15th St., Ste. 900
18                                Austin, TX  78701
                                  512-477-5000
19

20

21

22

23

24  (Please also see Electronic Appearances.)

25
</pre>

1          MR. ALANIZ:  Your Honor, Omer Alaniz from the Hess

2   Corporation.  I just want to make sure again that I'm in the

3   queue, and I'm happy to let BP proceed and I can follow BP's

4   examination.

5          THE COURT:  All right.  Mr. Kuebel.

6          MR. KUEBEL:  (No audible response.)

7          THE COURT:  Mr. Kuebel?

8          MR. KUEBEL:  (No audible response.)

9          MR. DUEWALL:  Good evening, Your Honor.  Can you

10  hear me?

11         THE COURT:  I can.  Good evening to you.

12         MR. DUEWALL:  Thank you very much, Your Honor.

13              CROSS-EXAMINATION OF MICHAEL DANE

14  BY MR. DUEWALL:

15  Q    Mr. Dane, taking a few steps back and looking at the

16  Plan as a whole, do you agree we're essentially engaged --

17  Fieldwood's essentially engaged in a liquidation of its

18  assets?

19         MR. PEREZ:  Objection to the form of the question.

20  Calls for a legal conclusion, but --

21         THE COURT:  Hold on.  The question broke up for

22  me.  Let me just get you to re-ask the question if you

23  would, please.

24         MR. DUEWALL:  Thank you, Your Honor.

25              Taking a few steps back and looking at the Plan as

1  a whole, I asked Mr. Dane if he would agree with me that

2  Fieldwood is essentially engaged, or attempting a

3  liquidation of its assets.

4           MR. PEREZ:  And I objected that it calls for a

5  legal conclusion.

6           THE COURT:  I'm going to overrule it.  We're not

7  asking about Chapter 7 liquidation, Chapter 11 liquidation.

8  We're just asking a common language, so I'm going to allow him

9  to answer it.  Go ahead.

10          THE WITNESS:  Yeah, I think -- I believe that is,

11 you know, a strong mischaracterization of the Plan.  I think

12 it ignores many features of the Plan that would be entirely

13 different than a liquidation.  Frankly I think, you know, in

14 a liquidation every party, every stakeholder in this process

15 for the most part, maybe not everyone, but most all of them,

16 are worse off in a liquidation.  A liquidation would not

17 bring in new capital into the business.

18          There's $225 million of new money that's being

19 contributed.  That new money is being utilized in order to

20 fund a variety of different things under this Plan.  That

21 starts with being able to capitalize a NewCo business to

22 employ thousands of employees and contractors.  The NewCo

23 business is assuming its own significant obligations.

24          That new money is also being utilized to fund the

25 various expenses under the Plan, to fund these consensual

1  arrangements, the NewCo entities is a material component of

2  being able to satisfy all the consensual arrangements as to

3  whether the NewCo entity that was capable of raising new

4  capital, it wouldn't be able to conduct the decommissioning

5  on all these various assets.

6          There wouldn't be a proposal with respect to the

7  Government that safely addressed all the abandoned

8  properties, and was able to, in an organized and orderly

9  fashion, hand over the very reduced set of abandoned

10  properties that at this point is somewhere around 28-29

11  platforms.  So I think it is -- I think that there's very few

12  things that this Plan accomplishes that are not exactly

13  better than a liquidation.

14  BY MR. DUEWALL:

15  Q      Mr. Dane, Fieldwood's transferring assets that

16  Fieldwood One by the divisive merger; is that correct?

17  A      Yes.

18  Q      And Fieldwood's transferring assets to Fieldwood Three

19  by divisive merger; is that correct?

20          MR. PEREZ:  Your Honor, let me just make an

21  objection, I mean, I'm objecting to the word "transfer"

22  because I think that is calling for a legal conclusion as to

23  what a divisive merger does.  So I'm objecting to the extent

24  it calls for a legal conclusion as to what a divisive merger

25  does.

1           THE COURT:  Are you asking for it in a legal

2    sense, or are you asking for it in a non-legal determination

3    of whether this is a transfer, Mr. Duewall?

4           MR. DUEWALL:  Non-legal, Your Honor.  I was just

5    asking if that -- this was going from Fieldwood to Fieldwood

6    One by divisive merger.  I can say it that way if that's

7    better.

8           THE COURT:  Either way I'm going to overrule the

9    objection.  I don't think you're asking for the legal

10   conclusion.

11          Mr. Dane.

12          THE WITNESS:  Yes, so I don't know if the correct

13   terminology is being allocated through the divisive merger

14   or being transferred, but the interests are going to land in

15   the various entities through the divisive merger.

16   BY MR. DUEWALL:

17   Q    Correct.  And so the divisive merger applies to

18   Fieldwood One, Fieldwood Three and Fieldwood Four; is that

19   correct?

20   A    Yes.

21   Q    And the Credit Bid Purchase that's assets going from

22   Fieldwood to NewCo.  Correct?  The Credit Bid Purchases only

23   apply to NewCo.

24   A    Correct.

25   Q    All right.  I'd like to transition to just asking some

1  questions to you regarding some of the objections that BP

2  has asserted with regard to set off.

3        So, Mr. Dane, do you have personal knowledge that on

4  May -- on or about May 17, 2019 Fieldwood Energy, LLC and BP

5  Exploration and Production, Inc. entered into the Purchase

6  and Sale Agreement in respect to the Mississippi Canyon

7  Block 519?

8  A      Yes.

9  Q      Okay.  And I may return -- I may refer to that as

10 MSC -- or "MC519 PSA."  Is that all right?

11 A      Yes, sir, I understand.

12 Q      Okay.  Thank you.

13       And under the terms of the MC519 PSA Fieldwood agreed,

14 among other things, to pay BP $30 million; is that correct?

15            MR. PEREZ:  Your Honor, I'm going to object to

16 the -- I'm going to object to the question for a couple of

17 reasons.  Number one, the document speaks for itself.

18 Number two, we have a dispute as to these issues that

19 obviously will come before the Court.  They've filed a motion

20 to be able to effectuate a set off, and in essence they're

21 taking discovery right now with respect to that.

22            I think this is inappropriate.  Number one, I'm not

23 sure it's really relevant for purposes of the Confirmation

24 Hearing.  But it's highly inappropriate for him to be

25 questioning a witness, not showing him the document and

1  relating to a dispute that's going to be heard at another

2  time as Ms. Heyen had indicated.

3          THE COURT:  Well, let me ask you, Mr. Perez, do

4  you agree that the set off rights will be unaffected by

5  confirmation of the Plan?

6          MR. PEREZ:  No, Your Honor, we're not -- I don't

7  know that I can take that position.  I mean we -- they've

8  taken that position but I don't know that they have set off

9  rights.  To the extent that they have valid set off rights

10  currently, they may be affected by the Plan.  So I'm not

11  prepared to make that statement.

12          THE COURT:  I'm overruling the objection on it's

13  inappropriate to be asking the questions, because if the

14  Plan might affect the set off rights, he absolutely has the

15  right to ask questions about it.  I'm sustaining the

16  objection that you're asking about a document not in

17  evidence.

18          MR. DUEWALL:  Your Honor, I'll re-ask the question.

19  BY MR. DUEWALL:

20  Q    Mr. Dane, under the terms of the MC519 PSA Fieldwood

21  agreed, among other things, to pay BP $30 million; is that

22  correct?

23  A    Fieldwood agreed as a part of that agreement to a

24  contingent payment.  A contingent payment was related to

25  certain payment conditions, so I would -- it's under those

1  contingent payment terms there was a payment that is

2  described in the PSA.  But I don't -- I think it's -- I think

3  you're saying they agreed, or it's agreed pursuant to the

4  contingent terms that need to arise in order for that

5  payment to be payable and due.

6  Q     And as the CFO, do you recall if you booked that

7  payment as due and owing when the contract was executed?

8  A     I don't recall the financial counter-treatment of that

9  payment.

10 Q     Do you recall when the payment comes due under the

11 terms and conditions of the parties' agreement?  Is it your

12 testimony it's due to be paid 180 days after production from

13 the Genovesa well?

14 A     To my recollection --

15        MR. PEREZ:  Let me make a -- Your Honor, I guess

16 I'm -- is that a question or is that a comment?  I mean

17 Mr. Duewall is in essence testifying.  I don't know where he

18 said, Is it your testimony that, I don't know where that

19 comes from.  I don't believe he was -- there's been any

20 deposition testimony taken on this.  So I'm not quite sure

21 where that -- I guess the objection is it's an inappropriate

22 question.

23        THE COURT:  I'll just get you to --

24        MR. DUEWALL:  I can rephrase, Your Honor.

25        THE COURT:  Yeah, thank you, Mr. Duewall.

1  BY MR. DUEWALL:

2  Q    Do you have an opinion as to when the $30 million

3  comes due and payable under the MC519 PSA?

4           MR. PEREZ:  Yes, Your Honor, I'm going to object to

5  the question.  It actually calls for an interpretation of

6  the document, which I don't believe -- I'm not sure is in

7  evidence.  But, you know, again, it's just calling for a

8  legal conclusion, an interpretation of the document.

9           THE COURT:  Sustained.

10           MR. DUEWALL:  All right.  Your Honor, I'll try to

11  short circuit the document issues.  We'll pull up documents

12  -- or I think it's been filed under seal but I'd refer the

13  Court to our Exhibit 1607-27.

14           THE COURT:  All right.  Hold on.

15       (Pause in the proceedings.)

16           MR. DUEWALL:  And, Mr. Dane, are you able to have

17  that document pulled up for you?

18           THE COURT:  I have Exhibit --

19           THE WITNESS:  I need to --

20           THE COURT:   -- 27 in front of me.

21           MR. DUEWALL:  Your Honor, we will -- it'll take us

22  a minute to email that document to Mr. Dane.

23           THE COURT:  All right.

24           MR. DUEWALL:  I believe Ms. Choi can do it.

25           MR. PEREZ:  And while we're waiting for that, Your

1  Honor, if I could have the Court make Ms. Hymel, H-Y-M-E-L,

2  of our office a presenter.  There will be some documents

3  here in a moment and I'll have her share her screen with --

4          THE COURT:  Sure.

5          MR. PEREZ:  -- for.

6      (Pause in the proceedings.)

7          THE COURT:  Can I get you to turn on your camera,

8  please, Ms. Hymel, and then we'll make you the presenter, and

9  then you can turn your camera back off.  It's just that I've

10 got about 150 initials that I have to sort through.

11         MR. PEREZ:  She's working on that right now, Your

12 Honor.

13         THE COURT:  Thank you.

14     (Pause in the proceedings.)

15         THE COURT:  If she can't do that, she doesn't have a

16 camera, I need to know her initials.

17     (Pause in the proceedings.)

18         THE COURT:  Here we go.  Ms. Hymel, let me get you

19 now the presenter.  Thank you.

20         All right.  Ms. Hymel is now the presenter.  And

21 let's wait for Mr. Dane to get Exhibit 27 in front of him.

22     (Pause in the proceedings.)

23         MR. DUEWALL:  And I think we have an agreement,

24 Your Honor, with Debtors regarding the admissibility of the

25 BP exhibits.  So if it's appropriate to do it now, I would --

1  Exhibit Numbers 1, 2, 3 and 4 from our list are all

2  demonstrative and they're only offered for demonstrative

3  purposes.  And I believe the remainder of the exhibits on

4  our list they did not find objectionable except for No. 24,

5  which is the methodology paper regarding decommissioning and

6  we would not move to admit that exhibit at this time.

7          THE COURT:  So you're moving for --

8          MR. DUEWALL:  We would move --

9          THE COURT:   -- 5 through -- let's be sure -- it's 5

10 though 35 with the exception of 24?

11         MR. DUEWALL:  Yes, Your Honor.

12         THE COURT:  Any objections?

13         MR. PEREZ:  Your Honor, Ms. Choi probably needs to

14 weigh in.

15         THE COURT:  All right.  Ms. Choi, let me get your

16 line active.

17         Mr. Million, I see that you have raised your hand

18 and I want you to be aware that you're free to speak at any

19 point.

20         Mr. Genender, I've activated your line.  And I'm

21 looking --

22         MR. GENENDER:  Ms. Choi's with me.  Ms. Choi's with

23 me, Your Honor, same line.

24         THE COURT:  Okay.

25         MR. GENENDER:  First of all, just a housekeeping

MICHAEL DANE - CROSS BY MR. DUEWALL                          228

1  matter.  The document on the screen is a document that's

2  highly confidential so it shouldn't be shown.  I wanted to

3  point that out.  And Ms. Choi can speak to the other

4  documents.

5           MS. CHOI:  Your Honor, Erin Choi, Weil Gotshal, on

6  behalf of the Debtors.  I agree with Exhibits 5 through 35,

7  except for 24 --

8           THE COURT:  Okay.  BP --

9           MS. CHOI:  -- line.

10          THE COURT:   -- BP 5 through 23 and BP 25 through

11 35 are admitted.

12     (BP Exhibit Nos. 5 through 23 and 25 through 35

13 received in evidence.)

14          MR. PEREZ:  Yeah, we can't show that one.

15          MR. GENENDER:  Your Honor, Paul Genender for

16 Debtors.  I just want to make sure 27 is going to come down.

17 Thank you.

18          MR. PEREZ:  Thank you.

19          MR. GENENDER:  Here it is.

20          THE COURT:  All right.  Let's just -- Mr. Dane, do

21 you have 27 now in front of you?

22          THE WITNESS:  I haven't received it yet, Your

23 Honor.

24          THE COURT:  It's --

25          THE WITNESS:  Ms. Choi, have you sent it?

1          MS. CHOI:  Yes, I sent it.  It's just a large file,

2    so it's coming.

3        (Pause in the proceedings.)

4          THE WITNESS:  I still haven't received the

5    document.

6          Ms. Choi, do you want to put it in Dropbox for me?

7    I can access it there, or I have a copy of the document.  It

8    should be the same.  Oh, I got it.

9          MS. CHOI:  Mr. Dane --

10          THE COURT:  Wait a minute.

11          MS. CHOI:  -- it's going to be the

12    (indiscernible).

13          THE COURT:  I think he said he just --

14          THE WITNESS:  I got it.

15          THE COURT:  -- got it.  Right?  Did you get it,

16    Mr. Dane?

17          THE WITNESS:  Thank you.  Yes, I'm pulling it up

18    right now.

19          THE COURT:  Thank you.

20        (Pause in the proceedings.)

21          THE WITNESS:  Unfortunately the (indiscernible)

22    has significant security restrictions, so now I'm just

23    waiting for the password.

24        (Pause in the proceedings.)

25          MR. DUEWALL:  And, Your Honor, when he's received

1  that document we're going to be talking about Section 3.1(b)

2  which is on Page 17.

3              THE COURT:  Thank you.

4              THE WITNESS:  The document's downloading right now.

5  Just a minute.

6              THE COURT:  Okay.

7        (Pause in the proceedings.)

8              THE WITNESS:  Okay.  Mr. Duewall, can you tell me

9  the section again?

10             MR. DUEWALL:  Yes, Page 17, Section 3.1(b).

11        (Pause in the proceedings.)

12             THE WITNESS:  Okay.  I have the deal.  Thank you.

13  BY MR. DUEWALL:

14  Q    Okay.  Now that you've been given an opportunity to

15  look at Exhibit 1607-27, specifically page 17,

16  Section 3.1(b), does that refresh your recollection as to

17  when the $30 million became due and payable as it related to

18  the MC519 agreement?

19  A    Yes.

20  Q    Okay.  And generally speaking, is it your

21  understanding that that payment, that $30 million, became

22  due and payable 180 days after the completion of the

23  Genovesa well?

24  A    I think there's some more specifics that are important

25  to consider there.

1  Q     Can you tell me, excuse me, your understanding of when

2  the $30 million became due and payable, or owed?

3         MR. PEREZ:  Your Honor, again, it calls for a

4  legal conclusion, interpreting the document, so that's the

5  objection.

6         THE COURT:  Sustained.

7  BY MR. DUEWALL:

8  Q     Mr. Dane, do you believe the $30 million became due

9  and payable on March 27th of this year?

10 A     No, I don't.

11 Q     But for the fact that Fieldwood has rejected that

12 contract, do you think the $30 million would be due and

13 payable?

14 A     No.

15        MR. PEREZ:  Object to the form -- Your Honor,

16 object to the form of the question.  Fieldwood hasn't

17 rejected any contract yet.  It's going to be done in

18 connection with Confirmation.  So that's a false promise.

19 BY MR. DUEWALL:

20 Q     Well, let's just walk off through 3.1(b) then,

21 Mr. Dane.  Do you see where it says, "A one-time payment of

22 $30 million which becomes payable and owing to seller on

23 successful completion of the Genovesa well?"

24        Did I read that correctly?

25 A     You read the first part of that correctly.

1   Q    Right.  And it continues to say, "Or any other well

2   within the Genovesa formation and shall be due and paid --

3   and shall be due and paid to seller within the first 180

4   days of production (whether consecutive or not) of

5   hydrocarbons from any such well, which is defined as the

6   contingent payment."

7         Did I read that correctly?

8   A    That's what the document says in that section.

9   Q    Thank you.  And it says, "That payment shall be made

10  by buyer to seller by wire transfer of immediately available

11  funds to the account designated pursuant to Section 9.8."

12        Did I read that correctly?

13  A    I'm not checking verbatim, but that's what it looks like

14  it says.

15  Q    Okay.  And continues to say, "Provided, however, that

16  buyer delivers to seller within notice -- written notice

17  within 6 months.  Within such 6-month period a buyer's

18  election to offset the contingent payment against the

19  outstanding amount of the cash consideration (as defined in

20  the cash consideration exchange agreement) then due by

21  seller to buyer under Section 3.1 of the exchange agreement,

22  then" --

23              THE COURT:  Mr. Genender?

24              MR. DUEWALL:  Was there an objection?  I'm sorry.

25              MR. GENENDER:  Your Honor, I apologize.  Paul

1  Genender for the Debtors, I apologize for interrupting, but

2  Mr. Duewall is basically reading from a highly confidential

3  document on the Record.  And we had an understanding that

4  questions could be asked about the documents and not

5  publishing them.  We're in effect unnecessarily revealing the

6  contents of them.  In the way he's asking questions, he's

7  basically publishing the contents of the document.

8            THE COURT:  Overruled.

9            This part of the document as to how you measure

10 and things of this nature, I mean it may be confidential

11 that it was 30 million, but everybody's decided to put that

12 out in the public record.  I don't think this part's

13 confidential and I wouldn't seal it if I had to, so -- if I

14 was asked to.

15            So I'm going to allow the questions to be asked

16 that way.  Particularly in light of the objections that are

17 being raised, which is when he asks for the end result, he's

18 being told it's a legal conclusion.  He now needs to go

19 through to see whether the facts meet what this says.  And I

20 don't know how else he can do it.

21            So I'm going to overrule it.  You can ask the

22 questions, Mr. Duewall.  Go ahead.

23            MR. GENENDER:  Thank you.

24            MR. DUEWALL:  Thank you, Your Honor.  I'm going to

25 try to short circuit again.  If I get another objection, I'll

1  start reading again.

2  BY MR. DUEWALL:

3  Q     But, Mr. Dane, generally speaking did the $30 million

4  become due and payable 180 days after the Genovesa well was

5  completed?

6  A     No, not in my opinion.

7  Q     Okay.  When in your opinion did it become due and

8  payable?

9  A     Well, it has not become due and payable in my opinion.

10 Q     Can you tell me why in your opinion that's the case?

11 A     Yes.  For several reasons.  First of all, the payment

12 in this section, it becomes due and payable upon the

13 production -- upon 180 days of production, whether

14 consecutive or not, which is what you stated.  The well came

15 online on March 27th, 180 days from March 27th, assuming

16 that there was no interruption at all in production, would

17 be I believe September 23rd of this year.

18        There have been -- well has not produced so it

19 would be at some point later than that that it would become

20 due and payable.  There's not a certainty that this well will

21 produce for 180 days.  There's a number of things that could

22 happen in the future that causes this well to not have

23 produced for 180 days.

24        As of today this well has not satisfied the

25 conditions that would have resulted, in my opinion, a

1   $30 million payment being owed.  If the well successfully

2   produced for 180 days, whether consecutive or not, if it

3   took 5 years for that 180 days, or 10 years, or in the

4   extreme if it never produced for 180 days, it wouldn't be

5   owed in my opinion.  But I think that that's one reason I

6   don't believe this payment is due and payable.

7          The other reason is that there's essential ongoing

8   litigation under this same document, there are writs and

9   warranties that are described, and that's the focus of the

10  company's Rule 2004 request that it's seeking more information

11  in order to understand if there's been other breaches.  So

12  the disputed amount on my mind, to the extent that it ever

13  did become due and payable, it would be at a later date.

14  Q    And is this a contract -- and do you know if this is

15  the contract, the MC519 PSA, that Fieldwood has designated

16  for rejection under the Plan?

17  A    Yes, it has been designated as -- to be rejected.

18  Q    Thank you.  Do you have a copy -- or actually were you

19  sent all of BP's exhibits now, or do -- I'd like you to turn

20  to 1607-28.

21  A    I don't.  This is the only exhibit I have, but I have

22  access to the portal, so if someone from counsel could

23  upload it, I can easily get it.

24       (Pause in the proceedings.)

25          THE WITNESS:  I'm sorry, Mr. Duewall, what exhibit

1   did you say that was?

2          MR. DUEWALL:  We're now moving to 28, it's -- on the

3   Court's record it's 1607-28 filed under seal.

4       (Pause in the proceedings.)

5          THE WITNESS:  Yeah, I'm pulling it up that

6   document. I have that document.

7   BY MR. DUEWALL:

8   Q     Okay.  Can you generally identify what Exhibit 28 is?

9   A     This is the cash consideration exchange agreement

10  between BP and Fieldwood with respect to Mississippi Canyon

11  562, the developed property.

12  Q     Thank you.  And I understand this has been filed under

13  seal so I'll try to do a better job with regard to this one

14  than I did the last one.  But is it generally your

15  understanding that this agreement calls for amounts to be

16  paid from BP to Fieldwood; is that correct?

17  A     That's correct.

18  Q     Okay.  And do you have a position as to whether or not

19  amounts are still due and owing under this agreement from BP

20  to Fieldwood?

21  A     Yes, there's approximately 12- to $13 million of

22  amounts that are still owing from  BP to Fieldwood this

23  year.

24  Q     And is it your understanding that this contract has

25  not been rejected under the Plan?

1  A      Correct, there's no (indiscernible).

2  Q      And do you recall when you were CFO did Fieldwood book

3  amounts due and owing under this contract as a receivable

4  when it was executed by the parties?

5  A      Yes, I do know that that is on our balance sheet.

6  Q      And to the best of your knowledge do you think it was

7  booked as a receivable when it was executed?

8  A      I believe it -- I believe that it was booked as a

9  receivable when the transaction closed.

10  Q      And that would have been in October of 2018, do you

11  recall that?

12  A      I don't recall if it closed in October, but it was -- I

13  would have to check it on the agreement.

14  Q      I'm going to try to do that for you.  Could you turn to

15  Page 1 of the agreement?

16  A      Yes, I did.

17  Q      Okay.  And just so the Court's Record is clear, the

18  date of the agreement is October 25, 2018 there in the first

19  paragraph.  Do you see that?

20  A      I see that the signing date was October 25, 2018.

21  Q      Okay.  And have BP and Fieldwood had a general course

22  of dealing with the parties with net amounts due and owing

23  in the normal course of business?

24  A      The parties have netted against each other, which has

25  been the subject of separate disputes to which there's quite

1   a bit of history.  And the main -- the main observation I

2   have about the difference of opinion on the netting was that

3   BP was very vociferous that the payments shouldn't be netted.

4   However, Fieldwood was netting payments because it wasn't

5   receiving money that it was owed from BP.  So I wouldn't say

6   it was -- it happens, I wouldn't say it was -- I'm aware of

7   many letters in which BP protested of the netting of

8   payments of unpaid amounts to those.

9   Q    Okay.  So it's happened in the past; is that correct?

10  The netting?

11  A    Yes.

12  Q    Okay.  Now next I'd like to turn to the list of assumed

13  contracts.  Before we go to that, Mr. Dane, as it relates to

14  the MC519 do you think that we are within 180 days -- as we

15  sit here today, do you think we're within 180 days of

16  production?

17  A    I know we are not within 180 days of production.

18  Q    Okay.

19       THE COURT:  Wait, wait.  When you say within 180

20  days of production, do you mean are we less than 180 days

21  from the date of first production, or did you mean something

22  else by that question, Mr. Duewall?

23       MR. DUEWALL:  No, that was it, Your Honor.  That

24  was it.

25       THE COURT:  So you're saying -- I want to be sure

1    Mr. Dane, because it means I misunderstood something you

2    said before, we are not less than 180 days from the date of

3    first production?

4              THE WITNESS:  I'm sorry, Your Honor.  We are

5    certainly less than 180 days from first production.  The

6    well began to produce on March 27 or 28.

7              THE COURT:  Okay.  Thank you.

8              MR. DUEWALL:  Thank you, Mr. Dane.

9              We're going to turn next, Your Honor, to Exhibit

10   1616-3.

11             THE COURT:  Is that sealed or unsealed?

12             MR. DUEWALL:  I don't believe it's sealed.

13             THE COURT:  All right.

14        (Pause in the proceedings.)

15             MR. PEREZ:  Mr. Duewall, what exhibit number is

16   that in your exhibits?

17             THE COURT:  It's one of your exhibits, Mr. Perez.

18             MR. PEREZ:  Oh, okay.  I'm sorry.

19        (Pause in the proceedings.)

20             THE COURT:  And I think she has up on the screen.

21   Right?

22             MR. DUEWALL:  She does.  We're going to try to --

23   we're going to go to Page 9, Line 225.

24             THE COURT:  Mr. Dane, if you hover over the right

25   side of your screen there will be a Zoom feature to make

1    this bigger.

2            THE WITNESS:  Thank you, Your Honor.

3        (Pause in the proceedings.)

4    BY MR. DUEWALL:

5    Q    So, Mr. Dane, the reason I brought up Exhibit 1616-3,

6    the list of assumed contracts that are being assumed by

7    NewCo, and I wanted to pull up for you the entity, 519 loop

8    agreement contract.  Do you see that there on your screen?

9    A    I do.

10   Q    Okay.  I was going to try to avoid having to pull the

11   contract up, but we'll do that if we need to, but just so

12   that the Record is clear, NewCo's assuming the entity 519

13   loop agreement that's referenced there on Line 225 of

14   Exhibit 1616-3 as the -- as a Joint Operating Agreement.  Do

15   you see that in front of you?

16   A    Yes, I do.

17   Q    Okay.  And so you agree this was an assumed contract.

18   Correct?

19   A    If it's listed on the schedule as a new contract, then

20   I believe it is and I believe it is something that we would

21   intend to assume.

22   Q    Okay.  Thank you.  To the best of your knowledge does

23   this contract contain a dispute resolution provision between

24   the parties?

25   A    I believe it does.

1  Q     Okay.  And to the best of your knowledge does that

2  both include a -- when I say dispute resolution provision I'm

3  speaking in terms of an agreement to arbitrate disputes

4  under that contact?

5  A     I understand --

6             MR. PEREZ:  Your Honor --

7             THE WITNESS:   -- the provision.

8  MR. DUEWALL:

9  Q     Okay.  Thank you.

10  Next, Mr. Dane, I'd like to turn to Debtor's Exhibit 105

11  that's found I believe at 1646-2.  Specifically in that

12  document Page 105.

13      (Pause in the proceedings.)

14  BY MR. DUEWALL:

15  Q     Do you see that -- we brought that up on our screen,

16  Mr. Dane.  Can you see that on your screen?

17  A     Yes, sir, I could.

18             MR. DUEWALL:  Do you want to make it bigger?

19  Thank you.

20  BY MR. DUEWALL:

21  Q     I understand from your -- I understand that you've been

22  working with the Government to try to -- well, strike that.

23  Exhibit B on this exhibit, Mr. Dane, is titled, Excluded

24  Events.  Do you see that at the top?

25  A     I do.

1  Q     Okay.  And it says, Fieldwood 3 will not be

2  responsible for the non-performance or delay in performance

3  of the transition services, or for not taking any action, or

4  meet any condition to the extent called in whole or in part

5  by any of the following, and then it lists certain events

6  there on that document.  Do you see that?

7  A     I do.

8  Q     Okay.  On the first one it says, Adverse weather or

9  sea conditions, loop current, acts of God, including but not

10 limited to hurricanes.  Do you see where I read that?

11 A     Yes.

12 Q     So my question, Mr. Dane, is simply if there's a

13 hurricane during this hurricane season and it impacts assets

14 that are abandoned under this Plan, who has the obligation

15 to go out there and take care of that?

16 A     So under the Plan and the proposals that are included

17 as a part of the Plan, the exhibit -- this exhibit has a

18 transition services description of all the services that

19 Fieldwood will continue to support the abandoned properties

20 upon the effective date.  It describes the way that

21 Fieldwood will need to respond to any issue should they

22 develop.

23        But the Plan contemplates that these are abandoned

24 properties, they're going to be abandoned at exit, that's what

25 the Plan contemplates.  And I would think that, you know,

1   responsible co-predecessors would assist with the

2   transition.   That's what -- it's intended to be a transition

3   service.

4           So to the extent that there's an issue that needs

5   to be remediated that has an imminent impact to the

6   environment or safety, under the -- if it's still within the

7   9-month period that's contemplated under the transition

8   services, Fieldwood would respond to that incident, which

9   it's Fieldwood's position, and I would expect, although I

10  obviously don't speak for the Government, but I believe that

11  I heard the Government say that they expected that

12  responsible predecessors would efficiently transition these

13  assets pursuant to their joint and several liability.

14          MR. DUEWALL:   Objection, non-responsive, Your

15  Honor, to the extent it tries to rephrase any statements

16  that were made by the Government representatives.

17          THE COURT:   Sustained.

18  BY MR. DUEWALL:

19  Q    So just that I'm clear, Mr. Dane, before I move on,

20  Fieldwood 3 under this excluded events exhibit is expressly

21  excluding any type of liability for hurricanes or any other

22  act of God during hurricane season?

23  A    The properties are intended to be abandoned pursuant

24  to the Plan.   Fieldwood is going to be operating a

25  transition services arrangement proposal, and it will

1  respond to any events that pose an imminent risk to the

2  environment or safety.  But the properties are abandoned.

3           So these excluded events were reviewed with the

4  Government, that was a part of the discussion with the

5  Government under what conditions would they be comfortable

6  that Fieldwood could provide transition services,

7  recognizing that the properties are abandoned.  I think that

8  the Exhibit A and B are pretty self-explanatory.

9  Q    When you say respond what does respond mean, what do

10 you understand that to mean?

11 A    I understand it to mean that if there is an event that

12 would cause a risk, event risk to the environment, health,

13 safety, that Fieldwood would take the actions necessary to

14 make sure that those issues were mitigated or resolved.

15 Q    Okay.  Earlier in your testimony, and it's not my

16 intent to quote you verbatim, you were testifying about the

17 amount of P&A that Fieldwood had done since 2013.  Do you

18 remember that?

19 A    Yes, I do.

20 Q    And it's my recollection that you provide -- that you

21 stated generally, and correct me again if I'm wrong, but that

22 amount was generally $1.5 billion?

23 A    Yes, in excess of 1-1/2 billion.

24 Q    How much has -- how much has Fieldwood spent or

25 incurred doing P&A work in this year, 2021?

1  A      I'd have to consult our records to get the exact

2  number.

3  Q      And what I'm trying to determine, Mr. Dane, just to be

4  up front with you, is I'm trying to determine over what

5  course of time that that 1.5 spent.  Was it primarily in

6  2013 and '14, many years ago, or is that amount that has been

7  spent primarily in the last 2 or 3 years?

8  A      I believe in 2013 for a sub-period, because the

9  transaction with Apache closed in 2013, there was a couple

10  of hundred million dollars spent over less than a 6-month

11  period.  I believe in 2014 there was over $400 million

12  spent, within the next year it was 2- to $300 million.  It

13  was 100 to -- 150- to $200 million a year in the subsequent

14  years.  Last year we spent $70 million.

15  Q      Okay.  Now on day one when NewCo -- if this Plan is

16  approved, on day one NewCo by your own estimates I believe

17  is going to have approximately $350 million of day one P&A

18  liability; is that correct?

19  A      That's correct.

20  Q      And is that -- does that represent a nominal net value

21  to NewCo?

22  A      That represents the net working interest owner

23  expected to pay RO costs based on our estimates, net to the

24  NewCo's working interest ownership in each of the leases.

25  Q      Okay.  Is there any reason why when you're preparing

1  those cost estimates you don't use a P50 valuation?

2  A    I don't know that we don't use a P50 valuation.  I think

3  we use a -- P50 means the most likely case.  P50, that's not

4  the methodology that we adopted, the same as BSEE.  We don't

5  have a P50, a P90.  We have an estimate that's based on

6  certain assumptions.  I think it probably does approximate a

7  P50 case, which is the most likely case.

8  Q    Let me make sure I understand your testimony.  Is it

9  your testimony that the 350 million that you estimated at

10 day one NewCo P&A net liability is reflective of a P50

11 estimate?

12 A    No, our -- my testimony is that Fieldwood would have

13 its own methodology for establishing its P&A estimates.

14 There's a number of assumptions which I reviewed earlier that

15 are the basis for generating those estimates.  And those

16 estimates and assumptions are refreshed on an annual basis

17 and updated for what we expect the cost to be for -- to

18 conduct the abandonment.  We don't have a distribution where

19 we have P50 number and a P90 number.  We just have an

20 estimate that we believe is a reasonable estimate.

21 Q    Did you have a chance to read your expert's rebuttal

22 report in this case, Mr. Hanson's rebuttal report?

23 A    I did.

24 Q    And we're going to pull up Exhibit 1620-1.  And

25 specifically Page 105.

1          (Pause in the proceedings.)

2          MR. PEREZ:  So, Your Honor, is this exhibit coming

3    into evidence?

4          MR. DUEWALL:  No, Your Honor, we're using it as a

5    demonstrative as Plaintiffs -- or as Debtors have stipulated

6    in their designation of their own exhibits.

7          THE COURT:  I don't understand what that means

8    actually, but I don't think I have an objection, so I'll wait

9    and see if I get one.

10         (No audible response.)

11         THE COURT:  Go ahead.

12   BY MR. DUEWALL:

13   Q    Mr. Dane, we're going to highlight or make --

14         THE COURT:  Yeah, I don't think I have a question

15   pending, I don't think I have an objection pending.  You all

16   just move ahead and I'll see if I get a question -- if I get

17   an objection.

18         MR. DUEWALL:  Thank you, Your Honor.

19   BY MR. DUEWALL:

20   Q    Do you see what we've highlighted there, Mr. Dane, and

21   I'm -- there it goes, my screen's a little bit far away.  It

22   says -- your own expert says there, at least states on that

23   exhibit, Debtor's exhibit, it is P50 cost estimates that

24   actually reflects -- I'm sorry, I've not stated that

25   correctly.  I'm going to start over.

1              It states it is P50 cost estimates that actually

2    reflect the "most probable outcome".  Do you see where it

3    says that in your expert's report?

4              MR. PEREZ:  I'm sorry, Your Honor, I don't see it.

5              THE WITNESS:  Exactly.  I see where it states

6    that, I think --

7              THE COURT:  Hold on just -- wait just a minute.

8              Mr. Perez, you have your Zoom too high, lower your

9    Zoom and you'll see --

10             MR. PEREZ:  Ah, okay.  Got it.  Got it.  Okay.

11             THE COURT:  Or move the document.

12             MR. PEREZ:  All right.  Okay.

13             THE COURT:  Okay.  Then did you have an objection

14   to the question?

15             MR. PEREZ:  No, Your Honor.

16             THE COURT:  All right.  Go ahead, please.

17             MR. DUEWALL:  Thank you, Your Honor.

18   BY MR. DUEWALL:

19   Q    My question, Mr. Dane, is if it's your expert's opinion

20   that P50 reflects the most probable outcome, is there any

21   reason why NewCo in their own financial projects are using a

22   nominal value for P&A estimates?

23             MR. PEREZ:  Your Honor, I'm going to object to the

24   question.  I mean there's really no foundation as to what

25   this P50 is.  I mean Mr. Dane testified that they used a P50

1  base on their estimates.  I'm going to object to the

2  question.

3          THE COURT:  Can I just get you to repeat the

4  question, Mr. Duewall.  You can repeat it just the same way

5  it was, I just want to hear the question in light of the

6  objection.

7          MR. DUEWALL:  Sure, Your Honor.  It might be

8  easier to read it back, but I'll try it.  My question is, if

9  Mr. Dane had a reason why they didn't use P50 in the NewCo

10 financial projections when the expert report reflects that

11 P50 cost estimates are actually the most probable outcome,

12 that's my question.

13         MR. PEREZ:  And, Your Honor, a further objection

14 as to -- I mean taking -- this is kind of being taken out of

15 context as to, you know, "most probable outcome".  And

16 Mr. Hanson's going to testify.

17         THE COURT:  If that's the objection, I'm going to

18 overrule it.  Go ahead, Mr. Dane.

19         THE WITNESS:  I think when I read this sentence, I

20 think it is defining what P50 says.  I don't think it's

21 stating that the BSEE P50 estimate is the most probable

22 outcome.  I think when I read this sentence I interpret it

23 as P50 is by definition the most probable outcome.  It

24 defines what P50 means.

25         Our expert is not a P&A expert.  Fieldwood One

1  believe is a P&A expert and we develop our own estimates.

2  And so if your question is why would we not use -- we are

3  using what we believe to be the most reliable estimate.

4  That's my response.

5  BY MR. DUEWALL:

6  Q     If your expert's not a P&A expert, do you know where he

7  got this information to put in his report?

8  A     I believe he's stating a definition in this report.  It

9  is P50 cost estimates that actually reflect the most

10 probable outcome, and when I read that bullet I think it's a

11 relevant statement, it means relative to a P90 case.  P90

12 represents a 90th percentile probability, it's a much, much

13 more than probable case.  P50 is most probable.

14        I don't think that this statement says that the

15 BSEE P50 estimates are the most probable outcome with

16 respect to the actual costs that will be associated with the

17 NewCo entity, and as such they should be the basis for the

18 NewCo projections.  That's not how I interpret this.

19        I think that's consistent with our expert who,

20 doing the same report, stated that Fieldwood has a

21 decommissioning group through its experts and their

22 estimates have more utility for purposes of developing

23 projections than BSEE estimates which are done a broad basis

24 for all assets in the entire Gulf of Mexico and not specific

25 to the actual assets of Fieldwood.

1   Q      If P50 is applied to your financial -- have you ever

2   applied P50 to your financial projections in this case?

3   A      Well, we have analyzed them mainly in the context of

4   just understanding what the BSEE numbers show and in the

5   context of evaluating your expert's report.  But we don't

6   believe that they are -- we believe that, like I already

7   stated, that the Fieldwood estimates that are done specific

8   to the Fieldwood assets being performed by the internal

9   expert at Fieldwood on decommissioning are what's relevant

10  for purposes of us understanding.

11  Q      Have you ever applied the P50 estimates to your

12  revenue projections or your cost projections that you've done

13  in this case?

14  A      Our projections go back 5 years.  As I stated earlier,

15  there is a very limited amount of P&A that takes place in

16  those years.  So there's very little measure with respect to

17  our overall P&A, with respect to our projections.  But our

18  projections largely do not include P&A given that it's not

19  necessary within the time frame of the projections that we

20  included.  So, I'm sorry, to answer your question, it's not --

21  it wasn't applied because it largely falls outside the

22  forecast period.  And, no, we haven't done that in any event.

23  Q      Using your nominal net P&A estimate of 350, how much

24  of that is represented what I would call legacy properties,

25  properties where there's been another operator somewhere in

1  the chain of title?

2  A     There's only -- Fieldwood, that's the basis that's going

3  to comprise the -- that's the basis that's going to comprise

4  the Credit Bid Purchaser has very few wells that don't have

5  any other parties in the chain of title.  The only -- I don't

6  know that I can think of a well that Fieldwood has drilled

7  that does not have another party in the chain of title

8  somewhere.

9  Q     So for example for the Katmai 1, is that a well that

10 Fieldwood drilled itself?

11 A     No, it's not.

12 Q     Okay.  And the Orlov, is that a well that Fieldwood

13 drilled itself?

14 A     Yes, it did.

15 Q     Okay.  So what I'm trying to determine, and maybe --

16 A     No, I'm sorry, Fieldwood drilled the well and did not

17 drill by itself.  Fieldwood had two co-working interest

18 owners in the properties.

19 Q     But you testified earlier that the 350 P&A was a net

20 to Fieldwood number.  Correct?

21 A     It is, yes.

22 Q     Okay.  So what I'm trying to determine is if I was to

23 make three buckets of potential NewCo assets, and if I

24 called the first bucket legacy properties similar to the

25 properties you're abandoning in this case, that would be

1   bucket Number 1; Bucket Number 2 would be wells that

2   Fieldwood has drilled; and then Bucket Number 3 would be

3   wells that you plan to drill in the future.  Are you

4   following me?

5   A    Somewhat.  Your second category, I'm sorry, is wells

6   that Fieldwood would have drilled, but there's no other

7   party, or it's just wells that Fieldwood would have drilled?

8   Q    Wells that Fieldwood would have drilled as the

9   operator.

10  A    Okay.  I understand.

11  Q    What I'm trying to determine is that on day one of --

12  if this Plan is confirmed by the Court, on day one it's my

13  understanding that there's 350 -- based upon your testimony

14  there's $350 million of net P&A liability on day one to

15  NewCo.  Correct?

16  A    That's -- yes, that's Fieldwood's estimate.

17  Q    Okay.  And so what I'm trying to determine is how much

18  of that, if Fieldwood as to declare bankruptcy again, they

19  can try to abandon, as it is in this case, and how much of

20  that liability it cannot abandon.  Does that -- are you

21  following me?

22          MR. PEREZ:  Yeah, object, Your Honor, it wouldn't

23  be -- I think he's talking about credit bit purchaser, he's

24  not talking about Fieldwood.  So I object to the form of the

25  question.

1          THE COURT:  Sustained.

2          MR. DUEWALL:  I was talking about NewCo, Your

3    Honor.  And if I mis-spoke, I'll rephrase.

4          THE COURT:  Go ahead.

5    BY MR. DUEWALL:

6    Q    Mr. Dane, I'll try again.  On -- if the Plan is

7    confirmed, on day one of NewCo's existence what percent of

8    the $350 million of net P&A liability is represented by

9    properties that were originally drilled by another operator?

10   A    Fieldwood drilled four wells that I can think of in

11   that asset base that it operated.

12   Q    Are there any wells on day one of -- if the Plan's

13   confirmed by the Court, on day one are there any wells that

14   NewCo is going to operate that were drilled by another

15   operator in the chain of title?

16   A    Yes, every other well other than those four that come

17   to my mind.

18   Q    Okay.  And can you identify those four for me, please?

19   A    The four that I were thinking about -- that I was

20   thinking about that Fieldwood drilled as the operator was

21   Genovesa, the Tri 2 well, the Tri 3 well, and Orlov.

22   Q    So just to rephrase, the Orlov well, the two Troica

23   wells and the Genovesa well represent wells that Fieldwood

24   drilled itself.  Correct?

25   A    Fieldwood operated the drilling of those wells.  It

1  did not drill those wells by itself in all cases.

2  Q    Fieldwood was the operator when the Orlov, the two

3  Troica wells, the Genovesa well were drilled.  Did I say

4  that properly?

5  A    Yes.

6  Q    Okay.  And how much of the $350 million of P&A

7  liability do those four wells represent?

8  A    I would have to consult our records to give you an

9  exact number.

10 Q    Do you have a ballpark or percentage?

11 A    10 percent.  That's an estimate.

12 Q    And does that mean that the remaining 90 percent are

13 in the bucket of to-be-drilled, or is the remaining 90

14 percent in properties that are -- were drilled by another

15 operator?

16 A    Well, a to-be-drilled well doesn't have a liability

17 associated with it --

18 Q    Okay.

19 A     -- so everything else would fall into the other

20 category.

21 Q    So I'll put a zero in the to-be-drilled bucket.  And in

22 the -- so 90 percent of the $350 million of P&A liability on

23 day one of NewCo is liability for properties that were

24 originally drilled or developed by another operator; is that

25 correct?

MICHAEL DANE - CROSS BY MR. DUEWALL                        256

1  A     Roughly speaking that -- based on my assumption on

2  those other four wells and not being able to identify off

3  the top of my head any other wells that Fieldwood operated

4  itself, with respect to that subset of assets I think that

5  that's probably fair.

6  Q     Okay.  And it's my understanding that Fieldwood has $75

7  million of bonding lined up; is that correct?  Or NewCo, I'm

8  sorry, has -- strike that -- has $75 million of bonding

9  lined up; is that correct?

10 A     Yes, we have a committed -- we entered into a term

11 sheet for -- that provides for a committed $75 million

12 amount for the next couple of years.

13 Q     How much of NewCo's value is made up of the new

14 drilling program versus existing wells on day one?

15 A     That's not a number I can give you off the top of my

16 head.  There's substantial value in each and it depends

17 obviously upon how much future activity happens, it depends

18 on prices, it depends on a number of factors.  Both

19 categories have very significant value.

20 Q     Based upon the financial projections that have been

21 done in this case, are the new wells essential to Fieldwood's

22 payments to bills in the ordinary course of business?

23            MR. PEREZ:  Objection, Your Honor, they --

24            THE COURT:  By Fieldwood do you mean NewCo, or do

25 you mean somebody else?

1          MR. DUEWALL:  NewCo, Your Honor.  I'm going to

2     write that at the top of my page now, NewCo.  I'm sorry.

3          THE COURT:  I'll just get you to re-ask the

4     question and then I think it'll be a lot less vague so.

5          MR. DUEWALL:  Thank you, Your Honor.

6     BY MR. DUEWALL:

7     Q    Are the new wells that are proposed by NewCo essential

8     for NewCo to meet its financial projections that have been

9     made in this case?

10    A    The new wells are an assumption that is included in

11    the financial projections.  In other words, the business

12    Plan contemplates -- the projection contemplates additional

13    wells.

14    Q    Have you done any -- have you done any business

15    planning or modeling that does not account for any of the

16    new wells?

17    A    Yes.

18    Q    What happens to NewCo's cash flow at the end of Year 5

19    if none of the new wells are brought online?

20    A    Early on in our evaluation.  There hasn't been a

21    scenario that I've reviewed recently, but early on in our

22    evaluation we performed a case where there was -- I don't

23    know if it was no, I think it was little to no -- maybe one

24    well, or zero wells.  And the high commodity prices which is

25    probably lower today, and I believe that was one of our best

1  sets of projections compared to the others.

2  Q     Do you have an opinion as to whether or not there's

3  negative cash flow at the end of Year 5 of your model,

4  NewCo's model, if the new wells do not come online?

5  A     I have seen the BP expert report that shows positive

6  cash flow for four years, and then a $20 million negative

7  cash flow in the fifth period.  And I believe that if the

8  company was to operate the business such that it understood

9  it was not going to be drilling any more wells, that that's

10 not an appropriate set of projections.

11         The company would re-evaluate a number of other

12 assumptions that are embedded within that business plan, and

13 given the fact that fifth period is only $20 million

14 negative and every other period is substantially positive,

15 which if I recall off memory, had built a cumulative cash

16 balance of $550 million.  I think that there would be ways

17 to be accretive to that forecast which to begin with is

18 actually not that bad.

19 Q     But that's not the forecast that you put forward as

20 your financial projections.  Your financial projections

21 assume that all of the new wells will come online; is that

22 correct?

23 A     The projections assume a business plan that drills one

24 to two wells a year, has a disciplined amount of capital

25 spending that generates such cash flow every year and it

1  does assume that the wells are drilled and producing.

2  Q    And can you identify for us the wells that are

3  presumed to come online in the financial projections that

4  you've shared with us?  Is it -- and I'll just try to do it as

5  quickly as I can.  Are those wells the Katmai 2, the Katmai

6  3, the Katmai 4, the Big Bend, the Gunflint and the CPN, are

7  those the wells that we're talking about?

8  A    For the projections that were included in the

9  Disclosure Statement, in addition to some other work-over

10 activity and simulations, those are the wells that were

11 included as adding additional volumes.

12 Q    And as we sit here today have any of the wells that

13 were identified been permitted?

14 A    They have not, but I think that that's a misleading

15 question because permitting multi-year programs in the Gulf

16 of Mexico for deepwater does not happen in advance in that

17 manner.  You need to identify a specific rig, you need to

18 include that rig on your permit, that rig's BOP

19 qualifications, and other equipment on the rig need to

20 specifically be aligned with the particular project once it's

21 been fully engineered.  So it's not a common practice for

22 most independent operators to permit a multi-well program

23 when you don't have a rig under contract.  It's a waste of

24 time.

25 Q    What is the first well that you're proposing to drill

1  in NewCo?

2  A    I believe -- the projections that you're referring to

3  I've seen that there's a -- that there Is a work-over and a

4  simulation in the Gunflint deal.  Those aren't drilling

5  activities, but those are activities that require a rig in

6  the capital activities.  Those activities were scheduled for

7  late this year.  In 2022 the only project that was scheduled

8  was the Katmai Number 2 well.  I believe in 2023 there was a

9  Gunflint in-field well and a Big Bend well followed by a

10  Katmai well, then CPN, followed by another Katmai well in

11  '25.

12  Q    So let's just talk about the first two that you

13  identified then.  The Gunflint later this year, will that

14  require any type of permitting or pre-permitting for

15  environmental issues?

16  A    Every operation in the Gulf of Mexico generally

17  requires some level of permitting.

18  Q    And based upon your financial projections in this case

19  what are you assuming to be the approximate month that you

20  can show production from the Gunflint activity that you just

21  described?

22  A    I believe in the -- I'm sorry, can you repeat the

23  question for me?

24  Q    Sure.

25  A    Are you asking me about the projections or are you

1  asking about given where we stand today when we think we'd be

2  able to produce?

3  Q     No, I'm talking about the projections you'd made.  What

4  do they presume in terms of when the Gunflint will come

5  online and who production?

6  A     I don't specifically remember, but I believe it's

7  somewhere between 4Q of this year and 1Q of next year.

8  Q     Do you believe that's on time or do you believe it's

9  behind schedule?

10  A     Yeah, I believe relatively on time.

11  Q     And when you begin your permitting for Gunflint, what's

12  your expectation for how long that'll take?

13  A     That's a work-over operation, it's a replacement of a

14  subsea safety valve that failed.  It's not a drilling

15  operation.  I think that permitting should not be a complex

16  permitting exercise, but all permitting takes time.

17  Q     Do you have any estimation in terms of your operations

18  as to how long that will take given the new regulatory

19  environment that we're in now?

20  A     I believe that if we had a Plan confirmed and we were

21  able to locate and tender for a rig that met the

22  requirements for that project and the campaign that they

23  follow, which we're in the process of evaluating, that that

24  project could be conducted as early as November-December,

25  maybe more likely December-January, which is relatively in

1  line with those projections.  And that we would be able to

2  obtain the permitting and other equipment that's required to

3  conduct that activity, that initial activity in that time

4  frame, which is what our team has been focused on.

5  Q     And I think you testified -- or didn't -- strike that.

6  Tell me when you think the -- your projections call for the

7  Katmai 2 to be drilled when?

8  A     As early as 2022 I believe.

9  Q     And that was when you expected it to be drilled.

10 Correct?

11 A     Yes.

12 Q     And as we sit here today could you tell us when you

13 expect that well to be drilled?

14 A     Are you the owner?  They're going to assess their

15 appetite for these types of capital projects, they

16 understand these projections in the business plan, they

17 understand the prospectivity of that particular project,

18 which is a meaningful -- a meaningful well.  They have

19 reviewed these same projections, they understand the

20 business plan that we're looking to implement.

21       That's a part of the reason why they are putting

22 several hundred million dollars in new capital into this

23 business, understanding that opportunity and those risks.

24 If that well ultimately gets drilled in that time frame, it's

25 going to be subject to board approvals, it's going to be

1  subject to business conditions at the time, the risk

2  appetite of the stakeholders that are in strategic

3  opportunities.

4       But right now as we sit here today, we are planning to

5  be able to be in a position to drill that well within that

6  time frame.

7  Q    And that time frame would be early 2022?

8  A    We would like to be in a position to be able to drill

9  that well in the first half of 2022, you know, all those

10 other considerations that I mentioned, you know, pending.

11 Q    Is it your testimony that the drilling program that's

12 put forth in the financial projection is still subject to

13 approval by the individuals who would be making the

14 decisions for NewCo?

15 A    Of course.

16 Q    But it's also correct, isn't it, that unless you drill

17 those wells and achieve production from those wells that

18 we've identified here within that 5-year period, you are cash

19 flow negative by Year 5?

20 A    No, that's -- I answered that question and I stated

21 that if Fieldwood was -- if the Credit Bid Purchaser was to

22 pursue a business plan and never drill another well, that

23 would be an entirely different business plan than what the

24 projections contemplate.  Under the -- under what I reviewed

25 in BP's expert report, under the scenario that doesn't account

1  for that being the strategy that I think the Credit Bid

2  Purchaser would pursue, and not incorporating all the

3  corresponding adjustments, every other variable that would

4  be required to be reviewed in that scenario, it still looks

5  like a very profitable business to me.

6       And I believe that that modest negative free cash flow

7  in that one year would likely not be the result because the

8  company would ensure that it wasn't producing negative cash

9  flow, it would likely have less expenses and other, you

10 know, other factors that would support a business plan that

11 doesn't drill more wells.

12 Q    As we sit here today are there still questions

13 regarding what the business plan of NewCo is going to be?

14 A    Any business requires its stakeholders, whether it's

15 its board of directors, its owners to approve its Plan, I

16 believe every business has a board that reviews at least an

17 annual business plan and approves those business plans.  I

18 would expect that NewCo is going to have a board that's going

19 to want to review all of its capital investment

20 opportunities and have the board approve the business plan.

21 So I think that that's just consistent with how businesses

22 are generally run.  I don't know of a business that doesn't

23 have some level of oversight with respect to how it spends

24 its capital.

25 Q    The bonding that you've obtained for NewCo is that

1  bonding that includes adequate assurance for the loop system

2  that we were talking about earlier this evening?

3           MR. PEREZ:  Object to the form of the question,

4  calls for a legal conclusion.

5           THE COURT:  Sustained as asked.  You can re-word

6  it.

7  BY MR. DUEWALL:

8  Q    Mr. Dane, did you obtain bonding that includes the

9  loop system that we've previously discussed this evening?

10 A    I'm not aware of a need to obtain bonding for the loop

11 system that we discussed.

12 Q    Do you know how much of the 75 million in new bonds

13 for NewCo are allocated to the MC519?

14 A    New bonds to NewCo are allocated to any asset.

15 Q    Mr. Dane, --

16 A    Excuse me, I'm sorry, other than -- we know that we

17 have a bond that needs to be procured for Apache, which was

18 a part of our transaction with Apache, the similar 308

19 facility is going to be included in Credit Bid Purchase

20 assets, and a bond is going to be given to Apache for

21 $13.2 million.

22 Q    I understood you to say earlier that yourself,

23 Mr. Lemay and Mr. Mitchell will be part of the management

24 team going forward; is that correct?

25 A    I stated that it's contemplated that the employees and

1  management team of Fieldwood are going to have continuity

2  through the -- through the Credit Bid Purchaser.

3  Q     Is it contemplated that you'll be the CEO of NewCo?

4  A     The lenders have had that discussion with me, and

5  that's what is currently contemplated.

6  Q     And is it contemplated that Mr. Lemay will be the

7  general counsel of NewCo?

8  A     It's contemplated that Mr. Lamb is going to be the

9  president/general counsel of NewCo.

10 Q     Mr. Lamb, I'm sorry.  And Mr. Mitchell, will he, with

11 NewCo, remain in his position as vice president of

12 production?

13 A     We would hope that Mr. Mitchell would remain in that

14 position or a comparable position.  Mr. Mitchell is

15 determining it.  He's had a long distinguished career and at

16 some point he has the desire to retire, but to the extent

17 that Mr. Mitchell would indulge us for a longer period of

18 time, we would be really grateful to have Mr. Mitchell

19 continue.

20 Q     And were all three of you also part of the management

21 team in 2018 when the company declared bankruptcy?

22 A     No.

23 Q     Were you the CFO in 2018?

24 A     I was.

25 Q     Was Mr. Lamb the general counsel?

1  A     I believe it was Mr. Black at that time, or around

2  that time.

3  Q     But Mr. Lamb was with Fieldwood in 2018 during that

4  time?

5  A     Yes, he was.

6  Q     And was Mr. Mitchell also part of the executive team

7  in 2018 when the first bankruptcy was filed?

8  A     No, he was not.

9  Q     Was he the vice president of production or in some

10 other capacity?

11 A     I don't believe he -- I believe he joined after 2018.

12 Q     And then all three of you were with the company when

13 the second bankruptcy was filed clearly.  Correct?

14 A     Yes.

15 Q     Okay.  As part of the first bankruptcy being filed, do

16 you recall making financial projections during that

17 bankruptcy as well?

18 A     I do.

19 Q     And were you the CFO when that was done?

20 A     I was.

21 Q     And did you do that in a similar fashion as the

22 financial projections you made for this bankruptcy when it

23 was filed too?

24 A     In a sense that, yeah, there was a number of folks

25 that were involved at the time.  It was a collaborative

1  effort to develop those projections.  It was probably a

2  little bit -- there was other elements that the -- the

3  management was meaningfully different at that time, there

4  was a number of folks that were part of the company that are

5  no longer a part of the company, and vice-versa.  So the

6  people involved are slightly different.  Generally the

7  process is putting together estimates.  Yeah, we've

8  maintained kind of an approach where a number of departments

9  are involved, not necessarily the same people.  Certainly

10  the asset base is very different.

11  Q    What was your role I doing the financial statements in

12  2018?  Did you engage in the same process as you did when

13  you did for this bankruptcy filing?

14  A    No, I think I just answered your question.  I wouldn't

15  describe it as exactly the same process.  There was some

16  level of different people, there was certainly a different

17  level of assets.  It was similar in the sense that there was

18  a number of departments involved to help produce estimates.

19  I was a part of that process.

20  Q    Were you responsible for the accuracy of the financial

21  projections that were done when the 2018 bankruptcy was

22  filed?

23  A    I'm not sure what you mean by "responsible for."  Do

24  you mind clarifying that for me?

25  Q    Sure.  I was trying to determine who the person was

1  who was responsible for putting it together.

2  A    As I mentioned, there was an effort that involves a

3  number of people who also had a financial advisor at the

4  time.

5  Q    Were you responsible for putting together the

6  financial projections for this bankruptcy filing?

7  A    I was involved in the effort to put together these

8  financial projections, I oversaw part of that effort, I

9  approved these projections.

10 Q    And have you had an opportunity to go back and look at

11 whether or not the projections that you did as the CFO in

12 2018 were accurate as it related to revenue or EBITDA?

13 A    I've reviewed the projections that the team generated

14 as a part of that financial statement, and I have looked at

15 them relative to actual results over time.

16 Q    So just to be clear, when you did your financial

17 projections for the bankruptcy, it was filed in 2018.  You

18 made projections for performance throughout the remainder of

19 2018 and then also in 2019 and subsequent years.

20      Do you remember that?

21 A    I do.

22 Q    Okay.  And looking back when you compare those

23 projections to your audited financial reports, are you aware

24 that in 2018 you missed revenue by 9 percent?

25 A    I'm familiar with the numbers that were cited in the

1  expert report, I don't agree that they're correct.  But I

2  believe it was a 9 percent -- I'd have to see the exact

3  numbers, I apologize, the variances were less than the

4  numbers that were cited in the expert report that you were

5  citing to me.

6  Q     And so your response to that -- so you've read that

7  report; is that correct?

8  A     I have.

9  Q     And you familiarized yourself with it?

10         THE COURT:  I didn't hear you.

11         THE WITNESS:  I'm sorry?

12  BY MR. DUEWALL:

13  Q     Did you familiarize yourself with it, did you take the

14  time, spent some time with it?

15  A     I have.

16  Q     And then you know that in 2018 that report suggests

17  that you missed your revenue projection by 9 percent.

18         Do you remember it saying that?

19  A     Yeah, there was some times, I don't know if that

20  variance was exactly correct.  I know that when I looked at

21  their expert's report, the production and the EBITDA

22  variances were more exaggerated than actual.  And most

23  importantly it was missing some important lines like cash

24  flow that told a very different story than several top line

25  numbers.

1   Q      And same question with regard to 2019, that report,

2   are you familiar with the fact that that report suggests

3   that you missed your revenue projection by 16 percent in

4   2019 with regard to the projections that you were making

5   when you declared bankruptcy in 2018?

6   A      Yeah, their response, I reviewed their report, I don't

7   specifically remember, if people want to show me I can more

8   specifically tell you which numbers I thought were

9   incorrect.  But same observation was that the variances that

10  we understood for production of EBITDA were not as

11  significant as the variances we have in the expert report.

12  But there was a negative -- there was a negative variance in

13  2019 with respect to production and EBITDA.

14  Q      And in 2018 do you have any response for the

15  missing -- the projected EBITDA by 21 percent?

16  A      Yes.  I don't know that that's correct.  The EBITDA

17  number you had for 2018 was not correct in your expert

18  report.  I don't think someone tabulated the EBITDA

19  correctly.  But I thought the more relevant number for 2018

20  was frankly the period that reflected the best of the

21  projections.

22        The Disclosure Statement projections for 2018, I

23  believe, had around $390 million of free cash flow, and the

24  business generated, I think, around $370 million of free

25  cash flow having spent half as much capital in that year.

1   But I thought -- my observation was -- to answer your

2   question, my observation was 2018 was a successful year and

3   very much in line with the overall business plan objectives

4   for that loan year.

5   Q     And was 2019 a successful year when EBITDA was missed

6   by 47 percent of the --

7   A     No -- I'm sorry, I cut you off.

8         No, 2018 was not at a greater variance than the

9   Disclosure Statement projections.  I wouldn't consider 2019 a

10  particularly successful year, although I do think that there

11  is -- there was several variables, for instance, the lack of

12  capital spending the previous year, that they weren't apples-

13  to-apples comparisons.  There was substantially less capital

14  spending in 2018 and that's where the lower production

15  results in 2019 and lower EBITDA.

16         A number of those things were intended to -- the

17  2020 period prior to all the strains the business

18  experienced in the first quarter, a number of the executive

19  variances were expected to be corrected in that period.

20  Obviously ultimately the business environment changed

21  significantly.  2019 was impacted by other external factors,

22  as well.

23  Q     Have you gone back and synthesized the projections you

24  did in this case with kind of the analysis we just did with

25  regard to revenue misses to determine performance, if that

1   has any impact on your projected performance?

2   A     We haven't done a specific analysis to synthesize it,

3   but, you know, we've discussed and we understand some of the

4   major drivers of the variances.

5           MR. DUEWALL:  Those are all my questions, Your

6   Honor.  Thank you.

7           THE COURT:  Mr. Duewall, thank you.

8           All right.  Mr. Alaniz.

9           MR. ALANIZ:  Your Honor, can you hear me?

10          THE COURT:  Yes.

11              CROSS-EXAMINATION OF MICHAEL DANE

12  BY MR. ALANIZ:

13  Q     Mr. Dane, you and I have met before.  Correct?

14  A     Yes, sir.

15  Q     Over the past -- over the past couple of months we've

16  had roughly, you know, five or so conversations?

17  A     Yes, sounds about right.

18  Q     Mr. Dane, based on your testimony earlier it sounds

19  like you're familiar with the Bureau of Safety and

20  Environmental Enforcement, or BSEE.

21  A     Yes, I am.

22  Q     Do you recall using the term "INC" in your testimony

23  with Mr. Perez?

24  A     I do, yes.

25  Q     Can you describe for the Court the meaning of an INC?

1          I certify that the foregoing is a correct

2   transcript to the best of my ability due to the condition of

3   the electronic sound recording of the ZOOM/telephonic

4   proceedings in the above-entitled matter.

5   /S/ MARY D. HENRY

6   CERTIFIED BY THE AMERICAN ASSOCIATION OF

7   ELECTRONIC REPORTERS AND TRANSCRIBERS, CET**337

8   JUDICIAL TRANSCRIBERS OF TEXAS, LLC

9   JTT TRANSCRIPT #64127

10  DATE FILED:  JUNE 26, 2021

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25