1              IN THE UNITED STATES BANKRUPTCY COURT

2              FOR THE SOUTHERN DISTRICT OF TEXAS

3                      HOUSTON DIVISION

4   IN RE:                      §      CASE NO. 20-33948-11
                                §      JOINTLY ADMINISTERED
5                               §      HOUSTON, TEXAS
    FIELDWOOD ENERGY LLC,       §      TUESDAY,
6                               §      JUNE 22, 2021
              DEBTOR.           §      1:44 P.M. TO 5:37 P.M.
7

8         CONFIRMATION HEARING DAY TWO (VIA ZOOM)

9         BEFORE THE HONORABLE MARVIN ISGUR
              UNITED STATES BANKRUPTCY JUDGE
10

11

12       APPEARANCES:                   SEE NEXT PAGE

13

         (Recorded via CourtSpeak)
14

15

16

17

18

19

20              TRANSCRIPTION SERVICE BY:

21        JUDICIAL TRANSCRIBERS OF TEXAS, LLC
              935 Eldridge Road, #144
22            Sugar Land, TX 77478
                 281-277-5325
23         www.judicialtranscribers.com

24
       Proceedings recorded by electronic sound recording;
25       transcript produced by transcription service.



BP Exhibit 4

Case No. 20-33948 (MI)

JUDICIAL TRANSCRIBERS OF TEXAS, LLC

```
 1                        APPEARANCES (VIA ZOOM):

 2


 3   FOR THE DEBTOR:                 WEIL GOTSHAL ET AL
                                     Alfredo Perez, Esq.
 4                                   700 Louisiana
                                     Suite 1700
 5                                   Houston, TX  77002
                                     713-546-5040
 6
                                     WEIL GOTSHAL ET AL
 7                                   Erin Choi, Esq.
                                     Paul Genender, Esq.
 8                                   200 Crescent Court
                                     Suite 300
 9                                   Dallas, TX  75201
                                     214-746-8184
10

11

12   FOR RIDGEWOOD KATMAI:           LOCKE LORD LLP
                                     Philip Eisenberg, Esq.
13                                   J.P. Morgan Chase Tower
                                     600 Travis
14                                   Suite 2800
                                     Houston, Texas 77002
15                                   713-226-1304

16   FOR ECOPETROL AMERICA LLC       SQUIRE PATTON ET AL
                                     Kelly Singer, Esq.
17                                   1 East Washington Street
                                     Suite 2700
18                                   Phoenix, AZ  85004
                                     602-528-4000
19
     FOR BP EXPLORATION:             GREENBERG TRAURIG
20                                   Craig Duewall, Esq.
                                     300 West 6th Street
21                                   Suite 2050
                                     Austin, TX  78701
22                                   512-320-7200

23   FOR TRAVELERS, LIBERTY MUTUAL,
     HANOVER.                        LANGLEY LLP
24                                   Brandon Bains, Esq.
                                     P.O. Box 94075
25                                   Southlake, TX  76092
                                     214-722-7171
```

1                    <u>APPEARANCES CONTINUED</u>:

2

FOR RIDGEWOOD KATMAI, LLC
3   AND ILX:                     SIDLEY AUSTIN, LLP
                                 Michael Fishel, Esq.
4                                1000 Louisiana Street
                                 Suite 6000
5                                Houston, TX  77002
                                 713-495-4645
6
    FOR LLOG EXPLORATION:        GIEGER LABORDER & LAPEROUSE
7                                John Baay, Esq.
                                 701 Poydras St.
8                                Suite 4800
                                 New Orleans, LA  70139
9                                504-561-0400

10

11

12

13

14   (Please also see Electronic Appearances.)

15

16

17

18

19

20

21

22

23

24

25

1          MS. BONJOUR:  Can you hear me?

2          THE COURT:  Would you raise your hand for me,

3  please?

4      (Witness sworn.)

5          THE WITNESS:  Yes.  I do.

6          THE COURT:  Thank you.  All right, --

7          MR. HUTTON:  Okay.

8          THE COURT:  -- let's go ahead and proceed.

9          MR. HUTTON:  Okay.

10          DIRECT EXAMINATION OF ADRIANA BONJOUR

11  BY MR. HUTTON:

12  Q    Please state your name for the Record.

13  A    My name is Adriana Bonjour.

14  Q    And, Ms. Bonjour, by whom are you employed?

15  A    I'm employed by BP Exploration and Production.

16  Q    Okay.  And what is your what is your position with BP

17  (glitch in the audio) --

18          THE COURT:  I can't hear you, sir.

19          THE WITNESS:  Sorry, --

20          THE COURT:  Hold on.

21          THE WITNESS:  Sorry, it didn't come through.

22          THE COURT:  Yeah.

23          MR. HUTTON:  It didn't come through.

24  BY MR. HUTTON:

25  Q    Ms. Bonjour, what is your position with BP?  I'm just

ADRIANA BONJOUR - DIRECT BY MR. HUTTON                    64

1  shortening it to "BP."

2  A    My position at BP is senior controller.

3  Q    And how long have you worked as senior controller for

4  BP?

5  A    I've been a senior controller for BP for five years, at

6  BP for a total of 15 years in controller roles.  Before

7  that, I was an auditor and in public accounting for ten

8  years, and I'm a CPA.

9  Q    Okay.  Thank you.  Ms. Bonjour, do you hold any

10 certifications?

11 A    I'm sorry, it's hard to hear.

12 Q    I'm sorry, you --

13          THE COURT:  Yeah.  I just --

14 Q    -- do you hold any certifications?

15          THE COURT:  I'm going to interrupt you both for a

16 minute.  Let's take a minute and get both your sound working

17 because you're both coming through really poorly.  Can we

18 get your microphone moved closer to you, please,

19 Ms. Bonjour?

20          MR. HUTTON:  Okay.  Your Honor, is this better?

21          THE COURT:  No.

22          THE WITNESS:  Is this better?

23          THE COURT:  Let's do this one at a time.

24 Ms. Bonjour, let's get yours squared away first.

25          THE WITNESS:  Can you hear me okay now?

 1          THE COURT:  That is better, thank you.  And now
 2  let's go to Greenberg.
 3          MR. HUTTON:  Okay.  What about now, Your Honor, is
 4  this clear?
 5          THE COURT:  It is.
 6          MR. HUTTON:  Can you hear okay?
 7          THE COURT:  Why don't you sit up and let's just
 8  see if we can hear you in a -- we ought to be able to hear
 9  you normally.  I mean, try it now.
10          MR. HUTTON:  Okay.  Testing again.
11          THE COURT:  Yeah, that seems better.  Let's go
12  ahead then.  And --
13          MR. HUTTON:  Okay.
14          THE COURT:  -- if you all can't hear each other,
15  it's essential that you tell each other you can't understand
16  it, by the way, and we'll just take the time to get it
17  fixed.  I don't want you all to get too frustrated about
18  this because I'm not going to get frustrated with a COVID
19  technology problem.  We'll just -- patience is the only
20  thing I've learned in the last 18 months, so take your time
21  and let's get it right.
22          MR. HUTTON:  Thank you, Your Honor, and I
23  appreciate that.
24  BY MR. HUTTON:
25  Q    Ms. Bonjour, what are your responsibilities as senior

1  controller at BP?

2  A    As senior controller at BP, it's my job to ensure that

3  the financial statements are represented fairly and reflect

4  the business transactions.  And I'm also responsible for

5  ensuring a sound control environment.

6  Q    Okay.  Does your role as senior controller at BP

7  involve reporting on transactions based upon agreements with

8  Fieldwood Energy, LLC?

9  A    Yes, under my remit (phonetic), I'm responsible for

10 reviewing the agreements between Fieldwood and BP to ensure

11 that they're reported accurately in financial statements.

12 Q    Ms. Bonjour, are you familiar with the Purchase and

13 Sale Agreement with Fieldwood Energy, LLC and BP Exploration

14 and Production, Inc. --

15           THE COURT:  I couldn't understand --

16 Q    -- dated May --

17           THE COURT:  I can't understand you.

18 Q    Ms. Bonjour, are you familiar with the Purchase and

19 Sale Agreement by and between Fieldwood --

20           THE COURT:  No, that's worse.  Let's just --

21           MR. HUTTON:  Okay.

22           THE COURT:  It may be you just have a bad line

23 calling in.  I don't know.  But let's take a moment, let's

24 get it right because it's not right.  And I know you want it

25 right more than I do so let's just take a moment, let's get

1  your tech people there to fix it, or just redial it --

2           MR. HUTTON:  Okay.

3           THE COURT:  -- that because it's a bad connection.

4           MR. HUTTON:  Okay.  All right.  Your Honor, I

5  think we're going to try to dial back in.

6       (Pause from 4:08 p.m. to 4:09 p.m.)

7           THE COURT:  Mr. Genender, I am also picking up

8  noise from your line.  I'm not sure where that's coming

9  from.

10          MR. GENENDER:  Okay.  I'm in the same room as

11 Ms. Choi who's going to be handling objections for this

12 witness so I can't -- it's coming from -- we'll --

13          THE COURT:  Okay.  Well I need you all to stop --

14          MR. GENENDER:  Did it stop?

15          THE COURT:  -- moving papers and stuff.

16          MR. GENENDER:  We'll do it.

17          THE COURT:  Thank you.

18          MR. GENENDER:  Okay.

19      (Pause in the proceeding.)

20          THE COURT:  All right.  Let's try that again then.

21          MR. HUTTON:  Okay, Your Honor, this is John

22 Hutton.  I dialed back in.  I don't know if -- hopefully the

23 connection's better now.

24          THE COURT:  I think it is.  Let's try it.

25          MR. HUTTON:  Okay.

1  BY MR. HUTTON:

2  Q    Ms. Bonjour, are you familiar with the Purchase and

3  Sale Agreement by and between Fieldwood Energy, LLC and BP

4  Exploration and Production, Inc. dated May 17th of 2019

5  which appears as BP Exhibit 27?

6           MR. HUTTON:  And for Your Honor, that's Docket

7  Entry 1607-27.

8  A    Yes, I am.

9           MR. HUTTON:  And actually we'll -- this is a

10 highly confidential document so we're not going to put up on

11 the screen.  Will you take it down?  Oh, okay.

12 Q    Ms. Bonjour, are you familiar with that document?

13 A    Yes, I am.

14 Q    Okay.  Are you also familiar with the cash

15 consideration exchange agreement by and between Fieldwood

16 Energy, LLC and BP Production -- Exploration Production,

17 Inc. dated -- well, relating to the Mississippi Block Canyon

18 562 dated October 15th of 2018, which we refer to as the

19 Isabella PSA and which appears as BP Exhibit 28?

20           MR. HUTTON:  And, Your Honor, that is Docket Entry

21 1607-28.

22 A    Yes, I am.

23 Q    Okay.  And, Ms. Bonjour, how did you become familiar

24 with the MC519 PSA and the Isabella PSA?

25 A    In my role, it's my responsibility to review those when

1  they're signed to look at the transactions to make sure that

2  they're recorded properly in the financial statement.

3  Q    Okay.  And are you familiar with the payment terms of

4  the MC519 PSA, including Section 3.1 of that agreement?

5  A    Yes, I am.

6  Q    And, Ms. Bonjour, what are those payment terms?

7  A    So in that agreement, Fieldwood agreed, among other

8  things, to pay $30 million to BP upon the completion of the

9  Genovesa well, and with payment remitted within 180 days of

10 production.

11 Q    And when was the Genovesa well brought online?

12          THE COURT:  I didn't hear that, I'm sorry.

13 A    On the 27th.

14          THE COURT:  I just didn't hear it.

15 Q    When was the Genovesa well brought online?

16          THE COURT:  I didn't hear it.

17 A    March 27th --

18          THE COURT:  Sorry.

19 Q    Ms. Bonjour, when was the Genovesa well brought online?

20 A    March 27th, 2021.

21 Q    And when did the $30 million obligation become payable

22 and owing?

23          MS. CHOI:  Objection, Your Honor.  That calls for

24 a legal conclusion.

25          THE COURT:  Sustained.

1  BY MR. HUTTON:

2  Q    Your -- Ms. Bonjour, when, for purposes of accounting,

3  do you treat this as a matured obligation?

4  A    So under IRS accounting rules, it is a contingent

5  receivable upon signing that's due and payable when the well

6  is completed, which would have been March 27th, 2021.

7            THE COURT:  I'm going to --

8  Q    And --

9            THE COURT:  I'm going to strike the latter part of

10  the answer.  That went beyond your question and it resulted

11  in a legal conclusion.

12  Q    Ms. Bonjour, for accounting purposes, is the $30

13  million obligation a matured obligation?

14  A    For accounting purposes, yes.

15  Q    Was the $30 million obligation a contingent obligation

16  at the time the MC519 PSA was signed, for accounting

17  purposes?

18  A    Yes.  It was a contingent receivable when the agreement

19  was signed.

20  Q    Has Fieldwood made any (glitch in the audio) on the

21  MC519 -- on the $30 million obligation contained in the

22  MC519 PSA?

23  A    No.

24  Q    Ms. Bonjour, are you also familiar with the payment

25  terms of the Isabella PSA, including Section 3.1 of that

1  agreement?

2  A    Yes, I am.

3  Q    Okay.  What are the payment terms on the Isabella PSA?

4          MS. CHOI:  Objection, Your Honor, calls for a

5  legal conclusion.

6          MR. HUTTON:  Your Honor, I'm not asking for a

7  legal conclusion.  She is a senior controller at BP,

8  responsible for reporting and recording the transactions

9  between BP and Fieldwood and the books and record and the

10 financial statements of BP, and in that capacity she has

11 testified that she has responsibility for reviewing

12 agreements and for reporting them accurately.  And I think

13 given her experience and her role, it is appropriate for her

14 to provide testimony regarding these transactions.

15         THE COURT:  Sustain the objection.

16 BY MR. HUTTON:

17 Q    Ms. Bonjour, as a senior controller for BP, when did

18 the receivable due to BP under the Isabella PSA?

19 A    Under the Isabella PSA, we recorded the liability when

20 the agreement was signed in 2018 for $66 million.

21 Q    And what is the remaining obligation due under the

22 Isabella PSA from BP to Fieldwood?

23 A    As of today, there's 12.7 million remaining to be paid.

24 Q    Are the parties to the MC519 PSA and Isabella PSA the

25 same?

1  A    Yes, Fieldwood and BP.

2  Q    In your review of transactions between BP and

3  Fieldwood, have the parties ever netted out amounts due from

4  one against amounts due to the other?

5  A    Yes.  In the normal course of business, various

6  transactions will arise net one between the other.

7  Q    And can you please provide some examples of that?

8  A    Sure.  One of the first examples I have is we submit

9  invoices to Fieldwood for payment, and under the agreement,

10 Fieldwood paid a hundred percent of that.  If there are any

11 questions about what's on the invoice for the agreements say

12 that we would discuss that after payment --

13         MR. SPEAKER:  Kesha, --

14 A    -- and then decide how to --

15         MS. CHOI:  Your Honor?

16 A    -- payment (glitch in the audio)

17         MS. CHOI:  Sorry.  I'm having trouble hearing the

18 witness, she's breaking up.  And also I think there may have

19 been a legal conclusion in there.  But I'm having trouble

20 hearing, it's breaking up.

21         THE COURT:  I am, too.  I am, too.  Is there a

22 reason why we can't put the phone right near you,

23 Ms. Bonjour?

24         THE WITNESS:  Right -- I've got it right here

25 close to me.

1          THE COURT:  When you picked it up there it was

2    sure a lot more clear.  Let's -- I hate to have you hold it

3    but --

4          THE WITNESS:  I need to hold it up.  Okay.  I'll

5    do my best.  I can hold it here.  Is this better?

6          THE COURT:  It is better.  I hate to have you hold

7    it.  You want to maybe --

8          THE WITNESS:  Okay.

9          THE COURT:  -- put it on top --

10         THE WITNESS:  All right.  That's okay.

11         THE COURT:  -- of a book or something like that?

12   Because it -- I don't need to inconvenience you either while

13   we're doing this but we get -- we do have to hear you

14   better.

15         THE WITNESS:  Okay.  Here we go.  I'll hold it up.

16   Is this better?

17         THE COURT:  We'll try it, we'll try it.  So I'm

18   going to --

19         THE WITNESS:  Okay.

20         THE COURT:  -- whatever that answer was, I had

21   trouble hearing it as well, I'm going to ask that we re-ask

22   the question, we'll redo the answer, and the prior answer

23   will not be recorded for -- in my notes or for the record so

24   that we can get an answer that we can all hear.

25         MR. HUTTON:  Okay.  Thank you, Your Honor.

1        THE COURT:  You remember the question, you can re-

2   give the answer, or else he can re-ask the question,

3   Ms. Bonjour, whatever's most convenient for you.

4        THE WITNESS:  Please re-ask the question.

5        MR. HUTTON:  Certainly.

6   BY MR. HUTTON:

7   Q    Ms. Bonjour, in your review of transactions between BP

8   and Fieldwood, have the parties ever netted out amounts due

9   from one against amounts due to the other?

10  A    Yes.  In the normal course of business we have netted

11  amounts out between each other.

12  Q    Okay.  And can you please provide some examples of

13  that?

14  A    Sure.  We submit invoices to Fieldwood for payment, and

15  where there are questions that Fieldwood has, they are to

16  pay the invoice in full, we discuss any questions they have,

17  and agree how to remit the payment back.  And many times, if

18  there was a valid refund that was due, we would go ahead and

19  net it against the next jib, "jib" being invoice.

20  Q    Any other examples?

21  A    Sure.  Another example was when Fieldwood elected to

22  participate in an exploration well last year; then, after

23  work commenced, they decided to back out and we allowed

24  that.  And so they were obligated to pay their share of

25  expenses up to that time.  An agreement was made to forego

1  that and let them not pay, and we allowed them to net that

2  against their invoice.

3      And then another example is one that I -- is when BP

4  still owned an interest, working interest in the MC519

5  assets, where BP would invoice Fieldwood as the operator,

6  Fieldwood would then pay that in full and then bill BP for

7  its working interest share in the MC519 well.  In September

8  of 2018, Fieldwood asked if we could begin to net those,

9  although they're separate agreements.  We responded by

10  saying we had just put in a new accounting system, can we

11  pick it up in January of 2019 to discuss netting.  And

12  Fieldwood went ahead and began to start netting in October,

13  which continued until we sold our working interest in those

14  wells in May of 2019.

15          MR. HUTTON:  Okay.  Thank you, Ms. Bonjour.  No

16  further questions at this time, Your Honor.

17          THE COURT:  Thank you.

18          Any Cross-Examination, Ms. Choi?

19          MS. CHOI:  Yes, Your Honor.  Erin Choi on behalf

20  of the Debtors.

21              CROSS-EXAMINATION OF ADRIANA BONJOUR

22  BY MS. CHOI:

23  Q    Ms. Bonjour, isn't it the case that there were delays

24  in BP's part in paying undisputed jibs to Fieldwood?

25  A    Can you repeat the question?

1    Q    Yes.  I said, Ms. Bonjour, isn't it the case that there

2    were delays on BP's part in paying undisputed jibs to

3    Fieldwood?

4    A    Which specific jibs?

5    Q    In connection with the Isabella agreement.

6    A    In connection with the Isabella agreement, no, I don't

7    recall anything with Isabella agreement with unpaid or late

8    jib.

9    Q    In 2019, isn't it the case that there were delays on

10   BP's part in paying undisputed jibs to Fieldwood?

11   A    I think you're referring to the MC519 assets, which is

12   separate from the Isabella.  And on those, that is when

13   Fieldwood began to net and we asked -- the amounts do not

14   calculate properly so we would ask for information in order

15   to substantiate the amount that they had billed.  So there

16   were some delays on both sides.

17   Q    But there were delays on BP's part in paying those jibs

18   to Fieldwood; isn't that right?

19   A    Yes.  As we worked --

20   Q    Yes.

21   A    -- through how they were netting the jibs.

22   Q    Isn't it the case that BP outsources its accounting

23   services?

24   A    Yes, partially.

25   Q    And isn't it the case that there were delays in upwards

ADRIANA BONJOUR - CROSS BY MS. CHOI                    77

1  of a year in fact in BP paying Fieldwood the money owed

2  under the agreements that we were just discussing?

3  A    No.  There was a final settlement statement.  Are you

4  referring to the final settlement statement?  Because there

5  were no delays of up to a year for regular invoices.

6  Q    There were delays up to nine months.

7  A    It's possible nine months.  I don't recall exactly

8  without knowing the specific invoices that you're referring

9  to.

10 Q    And this was money that Fieldwood had essentially

11 loaned to BP; isn't that right?

12 A    Not the way -- I don't see it that way.  I don't know

13 which invoices you're speaking of specifically.

14 Q    Because Fieldwood had paid BP's share for these wells

15 during this time; isn't that right?

16 A    We were getting delays on payment from Fieldwood as

17 well during that time so it's hard to say that we were

18 loaning them money when there was a lot of delays in

19 payments on both sides.

20 Q    The BP payments that were delayed, isn't it true that

21 at a certain point Fieldwood tried to net what it owed BP

22 against what BP owed Fieldwood?

23 A    Fieldwood began netting way before that happened.  We

24 were current up until that point.  And then Fieldwood began

25 to net and the calculation did not add up, so then there

1  were delays on both sides where BP said, Fieldwood, you

2  haven't paid us for the full amount, and then Fieldwood

3  said, you're not paying us for that money that we couldn't

4  get the calculation for.  So it was on both sides.

5  Q    Isn't it true, though, that BP objected to netting and

6  didn't agree to it?

7  A    No.  What BP said is the agreements do not allow

8  netting and if they would live -- let us speak about it in

9  January, because we had just input a new accounting system

10 in September of 2018, we responded and said, can we have a

11 conversation in January, 2019 to let us talk to our legal

12 team, as well as to kind of settle out our accounting

13 system.

14 Q    Ms. Bonjour, there's a difference between netting and

15 credit, would you agree?

16 A    That's the difference, yeah, yes.

17 Q    And in this case, there is a disagreement about

18 netting; is that your testimony?

19 A    There was a disagreement about the netting, yeah, two

20 different invoices from two different agreements.

21         MS. CHOI:  Excuse me, one moment.

22 Q    Ms. Bonjour, there was not in fact a course of dealing

23 on netting, was there?

24         THE COURT:  I'm sorry, I didn't hear.  There --

25 A    Can you repeat that?

1          THE COURT:  -- was not a what on netting?

2  Ms. Choi, I just didn't hear the word.

3  Q    There was not a course of dealing between these parties

4  with respect to netting, was there?

5  A    I'm sorry, I don't understand the question, there was

6  not a course of dealing.  Can you repeat the question or

7  restate it?

8  Q    Ms. Bonjour, in your testimony you testified that there

9  was in the normal course some kind of netting that happened.

10 But it is not the case that there was in fact a course of

11 dealing between these parties respect to netting, was there?

12 A    Yes, there was plenty of times where we received

13 payment from Fieldwood on invoices where items were netted

14 out.  That was per course of business the way it's been for

15 as long as we've been in business with Fieldwood.

16 Q    But there were no disagreements, were there or were

17 they?

18 A    There were conversations.  I don't know if I would call

19 them disagreements but there are conversations when

20 Fieldwood asked to begin to net two separate agreements

21 against each other where BP said, that's not allowed, we can

22 talk about it in a couple months, give us some time, and

23 then netting happened anyway.  So I don't know if I would

24 call that a disagreement as much as I would call it let's

25 have a conversation, but Fieldwood went ahead and net anyway

1  without letting us have that conversation.  So if that's the

2  disagreement, then yes.

3           MS. CHOI:  No further questions.

4           THE COURT:  Thank you.

5           Any follow-up?

6           MR. HUTTON:  No Redirect, Your Honor.

7           THE COURT:  Thank you.

8           Ms. Bonjour, sorry it was so hard to do it, but

9  once we got it going it seemed to work well.  Thank you for

10 coming today.  If you want to stay for the balance of the

11 hearing, it's a public courtroom; otherwise, you're free to

12 go about your business.

13          THE WITNESS:  All right.  Thank you so much.

14          THE COURT:  Thank you.

15      (Witness excused.)

16          MR. DUEWALL:  Your Honor, Ms. Bonjour is our only

17 witness, so I suppose we stand in recess until 5:00.

18          THE COURT:  All right.  Let me just be sure so

19 that we are at least being reasonably efficient about this.

20 Is there any other party that has any other witnesses that

21 they want to introduce at today's hearing, besides the one

22 witness we know that we're going to get from the Debtor,

23 Mr. Hanson?

24      (No audible response)

25          THE COURT:  All right.  I'm going to show that all

1          THE COURT:  Mr. Balasko?

2          MR. BALASKO:  Zach Balasko, Department of the

3   Interior.  No, Your Honor, Ms. Liou just mentioned the

4   Government language, and I did not know if we wanted to

5   discuss that.  But I certainly don't need to.

6          THE COURT:  All right.  Okay.  We're in

7   adjournment.  I'm resuming court in the morning at 9:00 a.m.

8   Closing arguments in this case will be at 9:45, and we'll

9   see you all then.

10          Thank you.

11       (Proceeding adjourned at 5:37 p.m.)

12                        *  *  *  *  *

13          *I certify that the foregoing is a correct*

14   *transcript to the best of my ability due to the condition of*

15   *the electronic sound recording of the ZOOM/telephonic*

16   *proceedings in the above-entitled matter.*

17   */S/ MARY D. HENRY*

18   *CERTIFIED BY THE AMERICAN ASSOCIATION OF*

19   *ELECTRONIC REPORTERS AND TRANSCRIBERS, CET**337*

20   *JUDICIAL TRANSCRIBERS OF TEXAS, LLC*

21   *JTT TRANSCRIPT #64152*

22   *DATE FILED:  JUNE 28, 2021*

23

24

25