1                IN THE UNITED STATES BANKRUPTCY COURT

2               FOR THE SOUTHERN DISTRICT OF TEXAS

3                        HOUSTON DIVISION

4  IN RE:                      §      CASE NO. 20-33948-11
                               §      HOUSTON, TEXAS
5  FIELDWOOD ENERGY, LLC,      §      TUESDAY,
   ET AL,                      §      FEBRUARY 2, 2021
6         DEBTORS.             §      3:00 P.M. TO 10:03 P.M.

7

8                    MOTION HEARING (VIA ZOOM)

9             BEFORE THE HONORABLE MARVIN ISGUR
                UNITED STATES BANKRUPTCY JUDGE

10

11

12     APPEARANCES:                    SEE NEXT PAGE

13     RECORDED VIA COURTSPEAK; NO LOG NOTES

14

15

16

17

18

19

20                  TRANSCRIPTION SERVICE BY:

21           JUDICIAL TRANSCRIBERS OF TEXAS, LLC
                  935 Eldridge Road, #144
22                 Sugar Land, TX 77478
                      281-277-5325
23              www.judicialtranscribers.com

24

25       Proceedings recorded by electronic sound recording;
           transcript produced by transcription service.



BP Exhibit 5

Case No. 20-33948

```
 1                      APPEARANCES (VIA ZOOM):

 2

 3   FOR THE DEBTORS:               WEIL GOTSHAL & MANGES, LLP
                                    Paul R. Genender, Esq.
 4                                  Alfredo Perez, Esq.
                                    200 Crescent Court, Ste. 300
 5                                  Dallas, TX  75201-6950
                                    214-748-7700
 6
     FOR BP EXPLORATION &
 7   PRODUCTION, INC.:              GREENBERG TRAURIG, LLP
                                    Katie Tipper-McWhorter, Esq.
 8                                  Bill Stark, Esq.
                                    Shari L. Heyen, Esq.
 9                                  1000 Louisiana St., Ste. 1700
                                    Houston, TX  77002
10                                  713-374-3500

11   FOR RED WILLOW OFFSHORE,
     LLC AND HOUSTON ENERGY
12   DEEPWATER VENTURES I, LLC:     BARNET B. SKELTON, JR., PC
                                    Barnet B. Skelton, Esq.
13                                  712 Main Street, Ste. 1610
                                    Houston, TX  77002
14                                  713-659-8761

15

16

17

18   (Please also see Electronic Appearances.)

19

20

21

22

23

24

25
```

1                                        INDEX

2

3    <u>WITNESS:</u>          <u>Direct</u>      <u>Cross</u>      <u>Redirect</u>      <u>Recross</u>

4    MICHAEL DANE
        By Mr. Perez    7          .          .          .
5       By Mr. Stark    .          14         .          .

6    VENKATESH BHAT
        By Mr. Genender 41         .          .          .
7       By Mr. Stark    .          66         .          .

8    NATHAN MICHAEL VAUGHN
        By Mr. Genender 80         .          .          .
9       By Mr. Stark    .          85         .          .

10   KAMIL GURSES
        By Mr. Stark    98         .          143        .
11      By Mr. Genender .          110        .          146
        By Mr. Skelton  .          140        .          147
12      By Mr. Stark    .          143        .          .

13   CRAIG REDDING
        By Mr. Stark    149        .          191, 202   .
14      By Mr. Genender .          172        .          194
        By the Court    188        .          .          .
15      By Mr. Skelton  .          197        .          .

16

17

     <u>EXHIBITS:</u>                    <u>Marked</u>      <u>Offered</u>      <u>Received</u>
18

19   Defendant's Exhibit 16          55          55          55

20   832-1 through -14               209         209         209
     832-16 through -22              209         209         209
21   832-24                         209         209         209
     834-1 through -13              206         206         206
22
     BP's Exhibit 5 (832-5)         134         134         134*
23   *Received under seal

24

25

1      HOUSTON, TEXAS; TUESDAY, FEBRUARY 2, 2021; 3:00 P.M.

2        (Conference recording started.)

3          THE COURT:  All right.  We're here in the

4    Fieldwood Energy case, it's 20-33948.  I've enabled certain

5    parties that appeared yesterday phones to be activated, you

6    should have gotten the message on your phone.  If your line

7    hasn't been activated and you want to be authorized to speak

8    during the course of today's hearing, please press five star

9    one time on your phone and I will enable the additional

10   telephones.

11         Yes.  From 713-374-3672 who do we have?

12         MS. TIPPER-MCWHORTER:  Yes.  Katie

13   Tipper-McWhorter on behalf of BP.

14         THE COURT:  All right.  Good morning, or good

15   afternoon.

16         MS. TIPPER-MCWHORTER:  Good afternoon.

17         THE COURT:  From the 214 area code, it's

18   214-665-3735, who do we have?

19         MR. STARK:  Your Honor, Bill Stark with Greenberg

20   Traurig on behalf of BP Exploration and Production.

21         THE COURT:  Good afternoon, Mr. Stark.

22         MR. STARK:  Good afternoon, Your Honor.

23         THE COURT:  All right.  Mr. Genender, tell me

24   where we are?

25         MR. GENENDER:  Good afternoon, Your Honor.  Paul

1  Genender for the Debtors.

2        Your Honor, we spoke with BP's counsel around the

3  noon hour, and they indicated there were a number of issues

4  that prevent them from agreeing to the proposal or to the

5  draft -- the Court's notice of draft possible order.  And we

6  talked through those things, the Debtors are in agreement

7  with the document you filed at 825.  We would agree to be

8  bound by it, the Debtors would.  But my understanding is

9  that BP is not and we're prepared to proceed.

10        THE COURT:  All right.  Ms. Heyen, is that

11  correct?  Is that the way you think we ought to move ahead?

12        MS. HEYEN:  Yes, Your Honor.  And we sincerely

13  appreciate the Court's diligence and efforts regarding the

14  draft order, but in the limited time between last night and

15  this morning we were unable to reach an agreement.  So, Your

16  Honor, we are ready to proceed with a hearing.

17        THE COURT:  I think you have someone else that

18  wishes to participate from the 214 area code, who do we

19  have?

20      (No audible response.)

21        THE COURT:  All right.  I don't know who that was.

22  Let me try that again.

23        From the 214 area code, do we have someone else

24  who wishes to speak?

25      (No audible response.)

1          THE COURT:  All right.  Who's going to be your

2   first witness, Mr. Genender?

3          MR. GENENDER:  Your Honor, we're going to call

4   Mike Dane and my partner, Alfredo Perez, is going to handle

5   Mr. Dane's examination.

6          THE COURT:  All right.  Mr. Dane, would you raise

7   your hand please, sir?  Oh.  I don't have my camera on, I

8   apologize for that, hold on.

9          Okay.  Let's try that again, Mr. Dane.

10         Do you swear to tell the truth, the whole truth,

11   and nothing but the truth -- and I guess I need you to

12   activate your line before you can answer that.

13       (No audible response.)

14         THE COURT:   All right.  Mr. Dane?

15       (Witness sworn.)

16         THE WITNESS:  Yes, I do.  Thank you, Your Honor.

17         THE COURT:  Thank you, sir.

18         All right.  Mr. Genender.

19         MR. GENENDER:  Your Honor, Mr. Perez is going to

20   proceed.

21         THE COURT:  I'm sorry, Mr. Perez.

22         MR. PEREZ:  Good afternoon, Your Honor.  Can you

23   hear me?

24         THE COURT:  I can.

25         MR. PEREZ:  Thank you, Your Honor.

1              DIRECT EXAMINATION OF MICHAEL T. DANE

2    BY MR. PEREZ:

3    Q     Would you please state your name?

4    A     Michael T. Dane.

5    Q     Mr. Dane, how are you employed?

6    A     I'm the Senior Vice President, Chief Financial Officer

7    at Fieldwood.

8    Q     And are you familiar with the motion that brings us

9    here today?

10   A     Yes.  I am.

11   Q     All right.  What is the nature of the emergency relief

12   being sought, Mr. Dane?

13   A     Fieldwood has a well, which is a very important asset

14   to the company, to our estate, it's called the Genovesa

15   well.  And do the timing that we face today, which

16   compounded by recent Department of Interior orders that have

17   been issued, we have serious concern about our ability to

18   bring that well online in a timely basis in order to

19   maintain the value of that lease in that well.

20   Q     And what is the precise nature of the emergency?

21   A     So there's a critical date, which is April 5th, which

22   is a date in which our lease is subject to expire subject to

23   an extension on the lease, which comes in from the

24   Suspension of Production and if our -- Right now we're in a

25   period of heightened uncertainty given the Department of

1   Interior recent orders, which have introduced a lot of

2   ambiguity as to if and how a Suspension of Production can be

3   obtained, and denotes no sure course of action to make sure

4   that we can maintain the value of our well just to make sure

5   that this well is brought online prior to that date.  Which

6   we think, given where we sit today is very reasonable.

7              So we are seeking action in order to bring our

8   well online to make sure that we don't risk any value that's

9   associated with that really important well, Genovesa.

10  Q    Okay.  And  when was the Genovesa well drilled?

11  A    It was drilled between June to July of 2019.

12  Q    All right.  And what have you done since that time with

13  respect to trying to bring it online?  I'm sorry.

14  A    Sure.  Thank you.  So the well was drilled in June to

15  July of 2019 and, then since that time, pending completion

16  operations and some other activities that were necessary to

17  help with this well produce.  We thought that this well

18  would have been capable producing at the very end of 2019.

19  We are, the well produces into the BP operated subsea loop

20  system which we are also co-owner in.  And it will produce

21  into the operating ECO facility.  So we did need some level

22  of cooperation from BP in order to assist with the post

23  drilling and completion activities to bring the well online.

24  And those are the challenges that we have been facing since

25  we drilled this well in July of 2019.

1  Q    Has Fieldwood attempted to tie the Genovesa well into

2  the subsea loop system?

3  A    We have.  We have conducted a number of activities

4  since we drilled and completed the well.  The last activity

5  that we directly completed to attempt to tie this well into

6  -- to produce into (indiscernible) was an activity that BP

7  permitted Fieldwood to take, to tie the well in.  This

8  happened in April of 2020.  And during that time of that

9  activity, there was an anomaly that was observed.  A well

10  into the subsea system at the Fieldwood and BP.  This

11  anomaly was acknowledged not to be the result of any actions

12  taken by Fieldwood in those operations that was something

13  that was stated by both parties.  But as a result of that

14  anomaly, which was observed, we have been pursuing other

15  activities to be able to produce the well since April of

16  2020 in conjunction with BP.

17  Q    So have you tried to work around the anomaly in order

18  to bring the well into production?

19  A    Yes.  We have.

20  Q    And what have you done?

21  A    So we've been in a very lengthy and ongoing dialogue

22  with BP, since we need them to assist us with completing the

23  operations that would allow us to tie in the well at this

24  point.  Since April of 2020, there have been a number of

25  activities.  Initially there was -- there was some finger

1    pointing and uncertainty as to what caused the anomaly that

2    was observed in which was previously determined not to be

3    anything that Fieldwood caused.  There was some

4    investigation that took place over that period of time.

5              There were a number of campaigns that took place

6    over a lengthy period of time during the summer.

7    Ultimately, in the September-October time period it was

8    identified as the best option to bring the well online, as

9    identified by the Fieldwood and BP, was what we call a

10   single flow line option.  Which is what BP and Fieldwood

11   have been working towards since that time and what Fieldwood

12   formerly proposed back in November of 2020.

13   Q    And when BP proposed that in November of 2020, what did

14   Fieldwood do?

15   A    So this was something that had been verbally discussed

16   as the best option back, I believe and to my knowledge, in

17   the September-October time frame.  In October of 2020 during

18   an update meeting between our operations team, BP had more

19   formally suggested that the single flow line plan was their

20   recommendation for the best way to address the issues that

21   we were having.  That aligned with the discussions that we

22   had, had with BP over the couple months since some of these

23   issues have been better understood given the operational

24   activity that took place prior to September.

25              And in order to push that solution forward, which

1   BP had suggested in October would be completed, in the first

2   quarter of this year, through written materials that they

3   provided us in discussion, Fieldwood took the initiative to

4   do everything within our capabilities to move forward with

5   that action.  We submitted a formal proposal on November 2nd

6   to BP outlining every step that was necessary, in order to

7   accomplish certain tasks.  And in order to make certain that

8   they happened as expedited manner as possible, Fieldwood

9   actually committed significant resources both financial and

10  operational to advancing these work streams.

11          We submitted purchase orders for the material, we

12  started our vendors with respect to fabrication efforts that

13  were required.  We began doing the work that was required

14  for various permitting processes.  So it was our attempt all

15  along to try to move this forward on a parallel path,

16  recognizing that the dates we were looking at in the October

17  time frame, as suggested by BP, was the first quarter.  At

18  that point in time, we believed that it was very reasonable

19  we could have had this well online prior to the end of the

20  year, but we know that BP was operating under different

21  timing assumptions.

22  Q    All right.  Does BP have any wells tied to the loop

23  system, the subsea loop system?

24  A    They do.  They have a well called Isabella which is

25  also tied into the subsea loop system.

1  Q    And was that well impacted by the anomaly?

2  A    That well was.  The whole loop system was impacted by

3  the anomaly.  However, BP undertook, on a much expedited

4  basis, the activities, which were required to be able to

5  produce their own well Isabella, through a separate single

6  flow line on the loop, which is similar to what Fieldwood is

7  trying to accomplish on the other side of the loop, albeit

8  it, it's a somewhat different operational activity necessary

9  to establish that production.  And to my knowledge they've

10 been producing that well since the fourth quarter of last

11 year.

12 Q    Now from a -- from the standpoint of agreeing to the

13 various agreements that existed between BP and Fieldwood.

14 Is Fieldwood prepared to abide by those agreements in

15 connection with the single flow line and the other items

16 that have to be done in connection with the loop system?

17 A    Certainly.  We recognize that.

18 Q    And has that ever been communicated to BP?

19 A    Absolutely.  We have talked on an ongoing basis about

20 our obligations under these agreements.  And that's been

21 well communicated to BP.

22 Q    Now speaking from a financial standpoint, does

23 Fieldwood have the resources in order to complete the

24 various work that needs to be done?

25 A    Yes.  As I mentioned, back in early November, alongside

1  submitting a very detailed operational plan and proposal to

2  BP, outlining every step that was required to be taken to

3  bring our well online through the single flow line option,

4  which we both identified as being a solution.  Fieldwood

5  also offered on an ongoing basis to conduct those activities

6  ourselves in a similar manner to how Fieldwood conducted

7  previous operations which BP consented to Fieldwood

8  operating.  So that has been something we have been standing

9  by ready to do if given consent by BP in order to operate

10 and we've clearly had our plans on how we would accomplish

11 those operations.

12 Q    Is the Genovesa well material to BP's -- I'm sorry --

13 to Fieldwood's ongoing plan of reorganization?

14 A     Yeah.  So this is a very material well for Fieldwood.

15 Fieldwood and our partners have invested over $160 million

16 in this project to date.  We own, as I mentioned, 65 percent

17 of this well in terms of our working interest.  Our co-

18 working interest owners own 35 percent in this well.  So our

19 net investment is over $100 million.  The production that is

20 associated with this well is a very significant amount of

21 our production today and what is going to be our reorganized

22 company.  Is a very important driver of not only our near-

23 term production but our long-term value.  And I think that

24 the delays that we've been experiencing have a cash flow

25 impact on the company.  But more so than that, the status of

1  this lease potentially be in jeopardy as would have you the

2  very serious potentially irreparable consequences to our

3  overall restructuring.

4  Q    And do you have an estimate as to what you think the

5  overall value of this lease and this prospects are with

6  respect to the company on a go forward basis?

7  A    So I mentioned we've invested, us and our partners,

8  over $150 million.  I think that our view of the value of

9  this well is multiples of that.  We certainly think that

10  this is a very, very material contributor in the hundreds of

11  millions of dollars to the value of our estate and to the

12  reorganized company which is a critical part of our

13  restructuring -- our contemplated restructuring plan.

14          MR. PEREZ:  Nothing further, Your Honor.  I pass

15  the witness.

16          THE COURT:  All right.  Thank you.

17          Who's going to cross-examine Mr. Dane.

18          MR. STARK:  Yes, Your Honor.  This is Bill Stark,

19  I will.

20          THE COURT:  Thank you, Mr. Stark.

21          MR. STARK:  Thank you, Your Honor.

22          CROSS-EXAMINATION OF MICHAEL T. DANE

23  BY MR. STARK:

24  Q    Thank you, Mr. Dane.  I want to make sure I accurately

25  understand the nature of the emergency that's brought us

1   here today.  I believe you testified that's as a result of

2   the recent January DOI order is that correct?

3   A    That's one reason that we feel that there's such

4   emergency.

5   Q    Okay.  What are the other reasons that there's an

6   emergency?

7   A    Well as of -- we have certain standards under

8   agreements of how operators need to conduct operations.  In

9   the ordinary course, we would never put a lease potentially

10  in jeopardy or susceptible to only having it extended by

11  virtue of having an SOP granted.  In any event, where it's

12  within certain operator controls to not suspect a leak to

13  that type of jeopardy.  So just being in this circumstance

14  in the first place, where we have a lease that's coming up

15  on a critical lease expiration date at a point when it's

16  been a year-and-a-half since that well has been drilled is

17  not how we view certain operations.

18          The DOI order activates this issue to an even

19  greater magnitude, because there's been a tremendous amount

20  out of uncertainty that's been introduced as to how and

21  under what conditions leases will be granted, extended, and

22  how regulators will be doing things going forward.  That may

23  be different than they've done in the past.  I think

24  industry in general is pretty unanimous with respect to the

25  fact that the ambiguity through some of these orders that

1  have been issued is just an unknown and we don't quite know

2  how it will all work going forward.

3  Q    Okay.  I want to make sure I understand everything I

4  heard.  Other reasons that you believe create an emergency

5  (indiscernible)?

6  A    The nature of the timing of the lease, both with

7  respect to the lease expiration date and the uncertainty of

8  getting an SOP, is why we feel -- and the timing in which we

9  will know when we would get an SOP which is typically only

10 at or around the actual date of the expiration of the lease.

11 So that's predominantly the reasons why we are here today on

12 an emergency basis.

13 Q    What was the first time that Fieldwood alleged that BP

14 failed to act as a reasonably prudent operator?

15           MR. PEREZ:  -- the question.

16           THE COURT:  Sustained.

17           MR. PEREZ:  Object to the form of the question.

18 Misstates --

19           THE COURT:  Sustained.

20           MR. PEREZ:  -- the testimony.

21           THE COURT:  Sustained.

22 BY MR. STARK:

23 Q    Is it Fieldwood's contention that BP has failed to act

24 as a reasonably prudent operator?

25 A    In my view, jeopardizing a lease with this significant

1  value by inaction is not acting as a reasonably prudent

2  operator.

3  Q    So is that a yes?

4  A    I'm sorry, could you repeat your question?

5  Q    Is that a yes that you are -- that Fieldwood is

6  alleging that BP has failed to act as a reasonably prudent

7  operator?

8  A    Yes.

9  Q    When was the first time Fieldwood made that allegation?

10  A    Fieldwood expressed its concerns about how operations

11  had been handled with respect to Genovesa, dating back all

12  the way to after having drilled and completed this well, and

13  then having had an experience of in excess of a year in

14  which we have not been able to bring this well online.  So

15  it's been a continuous dialog with respect to BP as to their

16  inaction to allow us to produce this well.

17  Q    I appreciate that.  My question is a little different.

18  When was the first time that Fieldwood made the allegation

19  that BP failed to act as a reasonably prudent operator?

20          MR. PEREZ:  Objection to form of the question.

21  Misstates the testimony.

22          THE COURT:  Sustained.  I'm sustaining not because

23  it misstates the testimony, but because it assumes a fact

24  not in evidence.

25  BY MR. STARK:

1  Q    Has Fieldwood alleged that BP has failed to act as a

2  reasonably prudent operator?

3         MR. GENENDER:  Object to the form of the question,

4  Your Honor, vague.

5         THE COURT:  Overruled.

6  BY MR. STARK:

7  A    With all companies that we try and operate with --

8  excuse me Your Honor -- have partnerships with, we don't

9  usually start from the posture of trying to go down a legal

10  road and make allegations that folks aren't operating within

11  the requirements of certain agreements.  I can't tell you

12  that from the beginning of this process we have alleged that

13  BP has not been acting as a reasonably prudent operator,

14  because our objective throughout this entire year-and-a-half

15  long process has been to work as constructively as we can in

16  order to get this well online and not to be sitting here

17  today with the types of risks we're facing.  So the

18  allegations have arisen, because over an extended period of

19  time with this inaction, and we're sitting here today with a

20  very real deadline which we can avoid by working

21  cooperatively over several months --

22         THE COURT:  Mr. Dane, I'm going to --

23  BY MR. STARK:

24  A    -- and our view today --

25         THE COURT:  Mr. Dane, I'm going to interrupt you.

1  I made Mr. Stark ask the right question.  He asked the right

2  question, go ahead and answer his question please.

3  BY MR. STARK:

4  A    I'm sorry, Mr. Stark.  Can you repeat the question?

5  Q    I'm not sure I remember.  I'll give it a shot.  Has

6  Fieldwood alleged that BP failed to act as a reasonably

7  prudent operator?

8  A    I believe that our motion that we filed has that

9  allegation in it.

10 Q    In fact, the emergency motion was the first time

11 Fieldwood made that allegation, isn't it?

12 A    It's the first -- that motion is the first time that we

13 brought this issue in front of the Court.

14 Q    And it's also the first time that Fieldwood's alleged

15 that BP failed to act as a reasonably prudent operator isn't

16 it?

17           MR. PEREZ:  Object to the question.  Ask and

18 answered, Your Honor.

19           THE COURT:  Overruled.

20 BY MR. STARK:

21 A    I'm not aware if we made that formal allegation.  I

22 know that -- I know that our legal department has exchanged

23 a number of notices over the course of many months.  I'm not

24 aware if specifically identifying failure to act as a

25 reasonably prudent operator was in those notices or not.

MICHAEL T. DANE - CROSS BY MR. STARK                    20

1   Q    You discussed the anomaly that was discovered in April

2   of 2020, do you recall that?

3   A    Yes, sir.

4   Q    Was it reasonably prudent for BP to investigate the

5   nature of that anomaly?

6   A    Absolutely.

7   Q    Was it reasonably prudent for BP to investigate

8   ultimately the source of a leak?

9   A    Yes.

10  Q    Was it reasonably prudent not to flow the Genovesa well

11  during those investigations?

12  A    Yes.

13  Q    Was it reasonably prudent for BP to suggest the single

14  flow line alternative?

15  A    Yes.  Although I believe that, that was something that

16  was suggested by both parties.

17  Q    Are you aware of the bolt tightening attempt?

18  A    Yes.  I am.

19  Q    And that occurred in early January of this year, is

20  that correct?

21  A    Yes.

22  Q    Was it reasonably prudent for BP to attempt the bolt

23  tightening?

24  A    Fieldwood would have likely attempted that same

25  operation.  I think that, that was reasonably prudent.

1 Q    You're aware that -- notwithstanding the fact that it

2 was reasonably prudent to attempt that ultimately was not

3 successful.  Are you aware of that?

4 A    I am aware.

5 Q    And you're aware that BP suggested that Fieldwood

6 should engage with the regulators at BSEE regarding an SOP,

7 are you aware of that?

8 A    Yes.

9 Q    Was it reasonably prudent for BP to suggest that

10 Fieldwood engage with BSEE regarding an SOP?

11 A    Yes.

12 Q    And in fact Fieldwood attempted to engage with BSEE

13 regarding an SOP in mid to late January, is that correct?

14 A    I'm sorry can you repeat that question one more time?

15 Q    Fieldwood intended to engage with BSEE regarding an SOP

16 in mid to late January of this year, correct?

17        THE COURT:  So Mr. Stark, I just want to -- the

18 first time you asked the question you said attempted and

19 this time you said intended, I just want a clear record as

20 to what question you were asking him.  Sometimes it's tough

21 on the recording and I may have heard you wrong.  But let me

22 just get you to try again, just to be sure we get the right

23 question.

24        MR. STARK:  Thank you, Your Honor.  I apologize.

25 BY MR. STARK:

1  Q    Fieldwood intended to engage with BSEE regarding an SOP

2  in mid to late January of this year, correct?

3  A    No.  So an SOP is only required when you don't believe

4  that you can conduct the operations in time in order to

5  accomplish preserving a lease without the need for an SOP.

6  And so Fieldwood's primary objective was to encourage the

7  actions that are required in order to avoid an SOP, and

8  utilize an SOP in the point in time when it's clear that

9  those actions will not be successful with meeting the

10 deadlines that are otherwise required.

11         And so there's been a difference of opinion about

12 what the appropriate time is to apply for an SOP.  We've had

13 a lot of dialog with respect to the regulators about what

14 that timing is.  But to be clear we believe it is -- if it

15 becomes to necessary to get an SOP it's absolutely something

16 that we will and should do.  We don't believe it's necessary

17 to get an SOP, when you can take other actions that would

18 avoid the need for an SOP.  And that's the same way that the

19 regulators view the process for receiving an SOP as we

20 understand it.

21 Q    Just so I'm clear, it is your testimony that Fieldwood

22 did not intend to engage with BSEE in mid to late January of

23 this year regarding an SOP is that correct?

24 A    That's not correct?

25 Q    So Fieldwood did intend to engage with BSEE mid to late

1  January of this year regarding an SOP?

2          MR. PEREZ:  Objection to the question, Your Honor.

3  Asked and answered.

4          THE COURT:  Overruled.

5          You can answer, Mr. Dane.

6  BY MR. STARK:

7  A    So Fieldwood has engaged with BSEE --

8          THE WITNESS:  I'm sorry, Your Honor.

9          THE COURT:  I just said you can answer.

10         THE WITNESS:  Okay.  Thank you.

11 BY MR. STARK:

12 A    So Fieldwood has engaged with BSEE on the appropriate

13 way to obtain an SOP.  We've had dialog with the department

14 that issues those SOPs where we sought guidance from them.

15 We have filled out an application and paid for it and taken

16 a number of steps to submit an SOP, if and when that SOP

17 becomes necessary, under the terms of which the regulators

18 have explained to Fieldwood is the appropriate way to submit

19 an SOP.

20 Q    Well help me understand.  We're having an emergency

21 hearing, is this not the time to submit an SOP?

22 A    In our opinion, this is not the time to submit an SOP.

23 Q    Why is that?

24 A    The regulators have told us, and it is our experience

25 through SOP submissions on a host of other leases over an

1   extended period of time, that an SOP is supposed to be

2   submitted once it becomes clear that the activities that

3   would otherwise require the SOP can't be conducted.  So if

4   the lease -- if the operations can be conducted that

5   mitigate the need for an SOP, an SOP is not supposed to be

6   submitted until that time -- until that time at which is

7   becomes clear that the actions will not be successful, by

8   the key milestone dates.

9            What we have been advised and we have seen

10  published literature by BOEM and BSEE is that typically SOPs

11  are submitted three to four weeks ahead of the lease

12  expiration deadlines, and that they require a schedule that

13  shows how the activities that will be conducted in order to

14  (indiscernible) production.

15  Q    Now although three to four weeks may be typical, this

16  is an untypical time if I understand your prior testimony

17  regarding the January DOI order, is that correct?

18  A    That's correct.

19  Q    So not withstanding what may be typical but why would

20  Fieldwood not yet submitted for an SOP?

21  A    Fieldwood hasn't submitted an SOP, because we can't

22  seem to get alignment with BP on a schedule to attach to

23  that SOP.  It's our view that the schedule that BP is

24  seeking to impose upon Fieldwood, artificially extends the

25  timing that's necessary to conduct these operations.  And

1  our concern is that, if we submit that SOP, which would not

2  be following the regular guidance that we've gotten from

3  BSEE about the timing and conditions under which you're

4  supposed to, but nevertheless if we submit that SOP with

5  this artificially extended timing that BP will not work

6  towards a reasonable schedule to preserve the lease.

7         And in any event the decision on an SOP will not

8  be given until the time at which the lease is otherwise set

9  to expire.  Which gives us even further concern about the

10 schedule that BP is suggesting that Fieldwood attach to that

11 SOP.  But to be clear, Mr. Stark, we don't have an issue

12 with submitted an SOP.

13 Q    Now you don't know when an SOP would be granted or

14 denied do you?

15 A    No.  That's precisely the problem.

16 Q    So Fieldwood could submit for an SOP today and it could

17 be granted later this week?

18 A    Correct.  And if we had an agreed schedule, Fieldwood

19 would do exactly that.

20 Q    What is Fieldwood's objections -- or excuse me -- what

21 are Fieldwood's objections to the schedule BP provided?

22 A    The schedule that BP provided has a number of

23 activities, particularly the things that happen after the

24 lease expiration date, which are clearly entirely with in

25 the control of BP.  And those activities are things that in

1    our view take a very abbreviated amount of time in order to

2    do.  Things that should have been already done or can be

3    done today and over the course of a very brief period of

4    time.  And so to put those activities at the very end of the

5    schedule and suggest that's not within our control to do

6    that today, we think is disingenuous and unnecessary.

7    Q    Which activities specifically are those?

8    A    Those specific activities were the host readiness

9    activities that -- I'm doing from memory because I don't

10   have the schedule right in front of me -- but it's the last

11   activity that was in the BP schedule.  That's not the only

12   activity, we have a general disagreement with respect to the

13   activity schedule, but that specific activity we feel like

14   is an item that should be brought forward.

15   Q    What are the other disagreements?

16   A    Well the disagreements are the activities that would

17   not take place sooner than the schedule that Fieldwood has

18   submitted to BP since November.

19   Q    So any date that doesn't meat Fieldwood's schedule of

20   November is objectionable, is that correct?

21   A    No.

22   Q    Well, apparently, I don't understand.  What are the

23   other disagreements Fieldwood has with the schedule BP

24   proposed?

25   A    Well the primary --

 1          MR. PEREZ:  Object to the question.  Asked and

 2  answered.

 3          THE COURT:  Sustained.

 4          And Mr. Stark, the reason I'm sustaining, I just

 5  want to explain it so if you want to redo your question you

 6  can.  He said from memory this one, but if I see the

 7  schedule there's more.  And then you're asking him for more

 8  without showing him the schedule.  He's already answered

 9  that.  But if you were to show him the schedule I would let

10  you then ask him more questions.  I just don't want you to

11  be misled about what my ruling means.

12          MR. STARK:  Thank you, Your Honor.  I appreciate

13  that.

14          Rachel, if you will, please pull Exhibit 23?

15          THE COURT:  I need to give her the presenter role,

16  who is -- what's the name of the person I'm looking for?

17          MR. STARK:  Rachel Himmel (phonetic).

18          THE COURT:  All right. Just a moment.

19          MR. STARK:  Thank you, Your Honor.

20          MS. HIMMEL:  Bill, do you want the most recent

21  schedule proposal pulled up?

22          MR. STARK:  It's Exhibit 23.

23          MS. HIMMEL:  Yeah.  Okay.  Got it, just a second.

24          THE COURT:  In the meantime, Mr. Dane, you're

25  going to get a message on your phone, I want you to go ahead

1  and ignore it, just trying to get my system online.

2              THE WITNESS:  All right.

3              MR. GENENDER:  Your Honor, Paul Genender.  I don't

4  have an Exhibit 23.  The list that I have from BP says

5  Exhibit 23 is not used.

6              I think it's Exhibit 24, Mr. Stark.

7              THE COURT:  What got put up on the --

8              MR. STARK:  I apologize --

9              THE COURT:  -- screen is called Exhibit 20.

10             MR. STARK:  It's 24, I apologize.

11             THE COURT:  So what's this exhibit number again?

12             MR. STARK:  24, Your Honor.

13             THE COURT:  24.  Thank you.

14             MR. STARK:  Can we blow that up?  Can we zoom in

15 on this?

16             THE COURT:  Ms. Himmel, I think, if you'll see to

17 it that, that exhibit takes up more of your screen, it will

18 then take up more of our screen.  I think you can make it

19 bigger on your computer screen.  Like the whole page bigger.

20 Maybe not.  Okay.

21 BY MR. STARK:

22 Q    So, Mr. Dane, if I understand you correctly, Fieldwood

23 disagreed with the health facility readiness and well start

24 up date of May 15, 2021, is that correct?

25 A    That's one item on the schedule that we disagree with,

1  correct.

2  Q    What are the other items on the schedule that Fieldwood

3  disagrees with?

4  A    So I'm not the operational expert.  We have -- we've

5  laid out a very detailed critical path plan that BP's had

6  since November, and we've also proposed a separate SOP

7  schedule, which again in our view is not the schedule that

8  should dictate the operational timing, but it's the back-up

9  plan in the event that it doesn't happen.  And the schedule

10 that we proposed is the schedule that we think is

11 immediately achievable and any discrepancies between the two

12 are what we believe are not reasonable.

13 Q    So do I understand you correctly, that looking at this

14 exhibit you can't identify for me the other items Fieldwood

15 finds objectionable?

16 A    I know that from conversation the timing of the host

17 facility readiness and well startup, it's the timing and

18 duration is one of the more significant variances between

19 our schedules.  And I believe that the timing with respect

20 to a number of these other items is slightly different than

21 what Fieldwood believes is appropriate.

22 Q    Which other items are those?

23 A    I would have to see our schedule to be able to compare

24 them.

25 Q    What about the health facility readiness and well start

1  up that Fieldwood believes is objectionable in terms of

2  timing and duration?

3  A    So that's outside my area of expertise.

4  Q    Fair enough.

5         Other than Fieldwood's subjective concern with the

6  January DOI order, what else is there to substantiate

7  Fieldwood's fear that there's been some sort of change in

8  how the DOI issues SOPs?

9  A    I think SOPs, in general, are not a place that you want

10 to find yourself with respect to critical lease situations.

11 It's an extension when you cannot conduct an activity, and

12 there's never an assurance that an SOP will be granted.

13 Today's environment and that order and the several orders

14 that we've seen from the Department of Interior and the

15 Executive order that's been issued, introduces additional

16 uncertainty that we think is unnecessary given the fact that

17 we know these activities can be conducted in a way that

18 doesn't introduce that type of risk.

19 Q    Now you reference other orders, which other orders are

20 those?

21 A    There was an executive order that was issued on climate

22 day surrounding leasing moratoriums and other fossil fuels,

23 you know, changes to the regulatory framework.

24 Q    What sort of changes to regulatory framework?

25 A    We know that there's going to be a moratorium on

1  leasing subject to further review.  We know that there's

2  going to be a review of loyalty rates, there's going to be a

3  review of fossil fuel subsidies, a review of emissions.

4  Q    Mr. Dane, have you ever personally been involved in

5  applying for an SOP?

6  A    Would you mind clarifying for me what that means?

7  Q    Have you personally been involved in creating materials

8  that are submitted in hopes of obtaining an SOP?

9  A    I've not personally filled out a form, but I've been

10 involved in the process of submitting an SOP.

11 Q    When you say involved in the process, what was your

12 involvement?

13 A    To understand this SOP was necessary, when and how we

14 would (indiscernible), and following up on the process to

15 understand if it was granted or denied.

16 Q    Did you ever discuss SOPs with anyone at BSEE?

17 A    I have not personally discussed SOPs with anyone at

18 BSEE.

19 Q    Are you aware that notwithstanding Fieldwood's November

20 proposal regarding the single flow line, BP continued to

21 request additional information from Fieldwood?

22 A    We have an ongoing relationship with the teams, and I

23 know that requests on both sides have been a feature of that

24 relationship.

25 Q    You said that Fieldwood has -- strike that.  I recall

1  you testified that Fieldwood has the resources necessary to

2  complete the single flow line, is that correct?

3  A    That's right.

4  Q    In the unfortunate event that something goes wrong

5  during the process to implement the single flow line, who

6  pays for that?

7           MR. PEREZ:  Objection to the question, Your Honor,

8  to the extent it calls for a legal conclusion.

9           THE COURT:  Sustained.

10 BY MR. STARK:

11 Q    In the event something goes horribly wrong during the

12 operations to implement the single flow line, do you have an

13 understanding of who would be responsible to pay for it?

14           MR. PEREZ:  Same objection, Your Honor.

15           THE COURT:  I'm going to overrule it and I want to

16 explain why, because usually I do sustain when you get those

17 follow up questions.  But Mr. Dane is said to the have the

18 resources in order to do this and within that I need to know

19 whether his understanding of the required resources includes

20 the ability to handle any sort of catastrophic leak that

21 might occur.  I don't know whether that was included or not

22 included, so it's a fair question given his testimony.

23 Therefore, I'm going to allow his understanding to come in,

24 not as to the legal conclusion of the actual facts but as to

25 what he's thinking of when he says they have resources.  So

1  the objection's overruled on that limited basis.

2          Mr. Dane.

3  BY MR. STARK:

4  A    Mr. Stark, do you mind repeating the question one more

5  time?

6  Q    I'll do my best, sir.  In the event something goes

7  horribly wrong during the installation of the single flow

8  line, do you have an understanding as to who would be

9  responsible for those costs?

10 A    So our agreements govern the liability of certain

11 parties and the indemnifications that may be appropriate.  I

12 think it depends -- I can't tell you if things go horribly

13 wrong, I think that would depend on the circumstances that

14 cause that issue to arise.  But I do generally -- what

15 Fieldwood has proposed in doing these operations is

16 indemnifying BP in the same manner in which it has -- BP has

17 agreed for Fieldwood to do these similar types of operations

18 in the past.  And I think your statement of, if things go

19 horribly wrong, needs to be put in the context of the type

20 of operation that we're discussing which are not down hole

21 operations or drilling operations, it is the replacement of

22 a piece of empty pipe to another pipe.

23 Q    So in the event something does go horribly wrong, does

24 Fieldwood have the resources to pay for that should they be

25 found liable?

1  A    So Fieldwood has extensive insurance, we have a very

2  adequate current liquidity and resources in order to conduct

3  these types of operations.  And we believe we do have the

4  resources required with reasonable -- with the reasonable

5  risks that we think that these operations entail, which we

6  don't view any different than the ordinary risks that we

7  assume by being a current operator in the shallow and

8  deepwater of the Gulf of Mexico.

9  Q    So I understand you correctly, Fieldwood specifically

10  has insurance coverage that would cover the unfortunate

11  event that something went horribly wrong and Fieldwood were

12  determined to be responsible, is that correct?

13            MR. PEREZ:  Object to the form of the question, I

14  think it misstates his testimony.

15            THE COURT:  Sustained.

16  BY MR. STARK:

17  Q    Does Fieldwood have insurance policies that would cover

18  the unfortunate event where there were a catastrophic

19  failure or a catastrophic result during the installation of

20  the single flow line and Fieldwood was determined to be

21  responsible?

22            MR. PEREZ:  Same objection, Your Honor.

23            THE COURT:  I need to understand better what

24  you're getting at Mr. Stark.  He testified that this is only

25  the laying of an empty pipe.  And so if you're talking about

1   a catastrophic result, I could think of, you know, a diver

2   perishing through an accident.  I can think of the pipe not

3   working, because you can't connect one end to the other.

4   Which is you know, sort of catastrophic for the project but

5   not catastrophic for life.

6           I have difficulty thinking of a catastrophic

7   environmental problem if all that we're doing is laying an

8   empty pipe.  So I want you to define a little better what

9   you're asking him about in a context of his testimony.  Or

10  maybe you want to disagree and push him a little bit on

11  whether all this is, is the laying of any empty pipe.  But

12  the risks are different between laying an empty pipe and

13  laying a pipe that is under pressure where you're doing

14  repair to it.

15          MR. STARK:  I appreciate that, Your Honor.

16  BY MR. STARK:

17  Q    Mr. Dane, on what do you base the belief that this is

18  an empty pipe?

19  A    Well on facts.  And it's not a pipe that has

20  hydrocarbons in it.  It's a pipe that to my knowledge --

21  again I'm not the operational expert.  This is an activity

22  that we've run numerous times.  This is a piece of pipe

23  that's being connected from on piece of the subsea

24  infrastructure to another piece of subsea the

25  infrastructure.  These types of operations to my knowledge

 1  never involve a piece of -- a pipe that has hydrocarbons at

 2  the time of installation.

 3  Q    So I appreciate that you are not a technical expert in

 4  this area.  So if the technical experts in this area told us

 5  that the pipe did contain hydrocarbons, would you defer to

 6  their expertise?

 7  A    Yes.

 8  Q    And what sort of insurance coverage is available if

 9  these pipes to contain hydrocarbons and there were a

10  catastrophic event?

11  A    So I don't have all the details of our various

12  insurance policies, but we have a very, very robust set of

13  policies.  All operators in the Gulf of Mexico are required

14  to have a minimum level of insurance which we do.  And so I

15  would have to defer to our risk management group on the

16  specifics of our insurance policies.

17  Q    Do you know the policy limits on the policies?

18  A    Off hand, I cannot tell you the policy limits under

19  each of our policies here today.

20  Q    Can you tell us under any of them?

21  A    Yes.  I can.

22  Q    What are those?

23  A    We have a wind storm insurance which doesn't which

24  doesn't seem like it's appropriate here, but has a 300 plus

25  million dollar limit.  We have operators extra expense and

1  general liability which I believe has a $500 billion limit

2  offhand.  We have numerous other policies, but I can't tell

3  you the details of them without consulting our risk

4  management group or for all our policies and such.

5  Q    Does Fieldwood intend to reject the LSP operating

6  agreement?

7        MR. PEREZ:  Object to the form of the question,

8  Your Honor, relevancy.

9        THE COURT:  Tell me the relevance, Mr. Stark?

10        MR. STARK:  Your Honor, it's relevant to the

11  extent that there are obligations under the operating

12  agreement for Fieldwood to be responsible for the cost of

13  these sorts of events.  And if we begin taking the event and

14  Fieldwood rejects the policy, then BP may be left holding

15  the bag.

16        THE COURT:  I'm not entering an order that leaves

17  BP holding the bag.  I made clear yesterday that any order

18  that I entered, that any risk that you are asked to take by

19  Fieldwood post-petition, will be a post-petition payment

20  obligation against Fieldwood and I will not back off that

21  position.  So I think we can move ahead.  Because I'm not

22  ask -- I will not ask you to do that.

23        MR. STARK:  Thank you, Your Honor.

24        Pass the witness.

25        THE COURT:  Mr. Dane, I don't know if this is a

1  question for you or if it needs to be differed for a

2  technical person.  How long is this pipe, roughly?  Are we

3  talking a 100-yard pipe or a 100-mile pipe?

4          THE WITNESS:  We have our expert Venkatesh Bhat on

5  the phone.  I believe that he would have the correct answer

6  to that question.  It is not a multi-mile section of pipe.

7  But Mr. Bhat would be the correct person to answer that

8  question.

9          THE COURT:  And the procedure -- in the terms of

10  the process where you said that Fieldwood will undertake it.

11  In my own mind, I'm thinking of the following, and maybe I'm

12  thinking of this wrong.  I've got a piece of pipe.  And on

13  one end it's going to connect up to the production from the

14  well, and on the other end it's going to connect up to some

15  sort of a gathering system.  Is Fieldwood proposing to lay

16  the pipe to hook up on the production end or to hook up on

17  the gathering end?  You know, which of those, if I can

18  divide this into those three major tasks, is Fieldwood

19  saying it will undertake?

20          THE WITNESS:  So the piece of pipe that's being

21  replaced is a jumper, which is a small section of pipe

22  between the well head and another subsea piece of

23  infrastructure.  We're basically just rerouting one section

24  of pipe that's already in place, due to where the leak event

25  is.  And we are taking -- the connections don't happen

1  directly to the loop system, they happen to various

2  components of subsea infrastructure, and we're just

3  rerouting two jumpers to form one connection.  I believe we

4  have a schematic that may be helpful.

5          THE COURT:  But are you -- is Fieldwood proposing

6  -- first of all are those three broad components of work

7  that I described a reasonable way for a lay guy like me to

8  think of this?

9          THE WITNESS:  It is, Your Honor.

10          THE COURT:  So I know that -- or at least I think

11  you're proposing that you'll lay the pipe, right?

12          THE WITNESS:  Correct.  The operation is taking an

13  existing jumper and removing it and connecting a new jumper

14  in a different location.

15          THE COURT:  So let's start then with connecting it

16  to the well head.  Under your proposal, who connects it at

17  the well head?

18          THE WITNESS:  So Fieldwood is the operator of the

19  well itself.  But because BP is the operator of the loop

20  system which Fieldwood owns an interest in, BP as operator

21  of that loop system under our agreements as they are today

22  would be the one that would conduct those operations.  In

23  the past, BP has agreed to let Fieldwood do these operations

24  and the operation that we did in April of this year was

25  effectively the same operation that we're talking about

1  doing now.  So BP would do it --

2          THE COURT:  I'm asking -- I'm asking are you

3  volunteering or offering to lay the pipe?  To lay the pipe

4  and hook it up at the well head?  Or to lay the pipe and

5  hook it up to the well head and hook it up at the other end

6  of the jumper.  I just want to know what it is that

7  Fieldwood is saying it can do if BP doesn't want to do it?

8          THE WITNESS:  The technicalities of where these

9  jumpers intersect the different subsea equipment is the only

10 thing that's giving me pause to answer your question.  But

11 to answer your question, we are proposing to undertake all

12 of the operational activities associated with removing the

13 jumper that needs to be removed and then replacing it with

14 the rerouted jumper to make the correct connection.  So all

15 the subsea activities is what Fieldwood would be providing.

16         THE COURT:  Thank you.

17         All right.  Any follow ups, Mr. Perez?

18         MR. PEREZ:  Nothing else, Your Honor, thank you.

19         THE COURT:  Mr. Stark any follow ups with the

20 questions that I asked?

21         MR. STARK:  Not at this time, Your Honor.

22         THE COURT:  Thank you, Mr. Perez.

23         MR. PEREZ:  Your Honor, nothing further.  May

24 Mr. Dane be excused?

25         THE COURT:  Yes.  Thank you.

1          THE WITNESS:  Thank you.

2          MR. PEREZ:  -- going anywhere but --

3          MR. GENENDER:  Your Honor, may I call my next

4   witness?

5          THE COURT:  Yes.

6          MR. GENENDER:  Thank you, Your Honor.  Paul

7   Genender for the Debtors we would call Venkatesh Bhat

8   please, Your Honor.

9          THE COURT:  Mr. Bhat, would you press five-star

10  one time on your phone please?  Thank you.

11      (Witness sworn.)

12          THE COURT:  Thank you, Mr. Bhat

13          Go ahead please, Mr. Genender.

14          MR. GENENDER:  Thank you, Your Honor.  Could I ask

15  that Ms. Choi -- Erin Choi, be the presenter?

16          THE COURT:  Of course.  All right.  She's a

17  presenter.

18          MR. GENENDER:  Thank you, Your Honor.

19            DIRECT EXAMINATION OF VENKATESH BHAT

20  BY MR. GENENDER:

21  Q   Mr. Bhat can you please state your full name for the

22  record, and for the benefit of the record can you spell your

23  first and last name please?

24  A   Venkatesh Bhat.  V-E-N-K-A-T-E-S-H that's my first

25  name.  Last name is Bhat, B-H-A-T.

1        I don't want any interference with this.  I'm not

2   ordering anything about the SOPs.  It's up to Fieldwood as

3   to what it wants to do with the SOP.  They are not the

4   defendant here.  BP is the bad actor, BP is going to do the

5   work, BP is capable of doing the work and it should do the

6   work.  That is the order.

7        We are adjourned.

8        MR. GENENDER:  Thank you, Your Honor.  Good

9   evening.

10       MR. STARK:  Thank you, Your Honor.

11      (Proceedings concluded at 10:03 p.m.)

12                              *  *  *  *  *

13       *I certify that the foregoing is a correct*

14   *transcript to the best of my ability produced from the*

15   *electronic sound recording of the ZOOM/telephonic*

16   *proceedings in the above-entitled matter.*

17   */S/ MARY D. HENRY*

18   *CERTIFIED BY THE AMERICAN ASSOCIATION OF*

19   *ELECTRONIC REPORTERS AND TRANSCRIBERS, CET**337*

20   *JUDICIAL TRANSCRIBERS OF TEXAS, LLC*

21   *JTT TRANSCRIPT #63433*

22   *DATE FILED:  FEBRUARY 4, 2021*

23

24

25