IN THE UNITED STATES BANKRUPTCY COURT

FOR THE SOUTHERN DISTRICT OF TEXAS

HOUSTON DIVISION

| | |
|---|---|
| IN RE: | § CASE NO. 20-33948-11 |
| | § HOUSTON, TEXAS |
| FIELDWOOD ENERGY, LLC, | § FRIDAY, |
| ET AL | § JULY 9, 2021 |
| DEBTORS. | § 10:04 A.M. TO 11:22 A.M. |

MOTION HEARING (VIA ZOOM)

BEFORE THE HONORABLE MARVIN ISGUR
UNITED STATES BANKRUPTCY JUDGE

APPEARANCES:                    SEE NEXT PAGE

COURTROOM DEPUTY:               TYLER LAWS

TRANSCRIPTION SERVICE BY:

JUDICIAL TRANSCRIBERS OF TEXAS, LLC
935 Eldridge Road, #144
Sugar Land, TX 77478
281-277-5325
www.judicialtranscribers.com

Proceedings recorded by electronic sound recording,
transcript produced by transcription service.

<u>APPEARANCES (VIA ZOOM):</u>


FOR THE DEBTORS, FIELDWOOD       WEIL GOTSHAL & MANGES, LLP
ENERGY, LLC:                       Alfredo Perez, Esq.
                                 Paul Genender, Esq.
                                 700 Louisiana Street
                                 Suite 1700
                                 Houston, TX 77002
                                 713-546-5248


FOR BP:                             GREENBERG TRAURIG, LLP
                                 Craig Duewall, Esq.
                                 1000 Louisiana Street
                                 Suite 1700
                                 Houston, TX  77002
                                 713-374-3500


FOR SHELL OFFSHORE, INC.:       NORTON ROSE FULBRIGHT (US) LLP
                                 Ryan E. Manns, Esq.
                                 1301 McKinney, Ste. 5100
                                 Houston, TX  77010
                                 713-651-5151


ALSO PRESENT:                   MIKE DANE


(Please also see Electronic Appearances.)

1          HOUSTON, TEXAS; FRIDAY, JULY 9, 2021; 10:04 A.M.

2          THE COURT:  All right.  And now we're going to call

3     the Fieldwood Energy case.  It's 20-33948.

4          We'll take appearances on that case.  From

5     512-320-7211, who do we have?

6          MR. DUEWALL:  Good morning, Your Honor.  Craig

7     Duewall on behalf of BP, here, Your Honor, and prepared to

8     argue BP's motion to compel arbitration, as well as BP's

9     motion to quash the 2004 discovery request that had been

10    served.

11         THE COURT:  Thank you, Mr. Duewall.

12         Mr. Genender?

13         MR. GENENDER:  Your Honor, Paul Genender.  Good

14    morning, Your Honor.  Paul Genender, Weil, Gotshal & Manges,

15    for the Debtors.  I'm here with Mr. Perez and Ms. Choi and to

16    respond to the motions that Mr. Duewall just referenced, and

17    also to respond to the motion brought by Shell, in connection

18    with the 2004.

19         THE COURT:  Thank you.

20         Mr. Manns, let me get your line active.

21         MR. MANNS:  Sorry.

22         THE COURT:  Mr. Manns, good morning.  Let's try that

23    now.

24         MR. MANNS:  Right.  Good morning, Your Honor.  Ryan

25    Manns, Norton Rose Fulbright, on behalf of Shell Offshore,

1       Inc.

2                 THE COURT:  Thank you.

3                 Mr. Perez.

4            (No verbal response)

5                 THE COURT:  Mr. Perez?

6                 MR. PEREZ:  Good morning, Your Honor.  Alfredo

7       Perez.

8                 THE COURT:  Good morning.

9                 All right.  Have you all talked about what order you

10      want to take things in?  Why don't we start --

11                MR. GENENDER:  We have not --

12                THE COURT:  Let's start with the arbitration matter.

13                MR. GENENDER:  Thank you, Your Honor.  That was our

14      preference, to start with that motion, as well.

15                THE COURT:  All right.  Mr. Duewall.

16                MR. DUEWALL:  Thank you, Your Honor.

17                First on the docket today is BP's motion to compel

18      arbitration.  That motion is found at Docket Reference Number

19      1414, for the Court's convenience.  Fieldwood's response has

20      been filed at Docket Number 1795.  And this morning, we filed

21      a reply at Docket Number 1844.

22                As a housekeeping matter, before we begin arguing

23      the motion, Your Honor, attached to our motion as exhibits --

24      are certain exhibits in support of the motion.  Those are

25      referenced at document -- Docket 1414-3 to 1414-12.  We've

1    also filed them in conjunction with our witness statement and

2    exhibit lists for the Court at Docket 1820-2 to 1820-12.

3         We've conferred with opposing counsel before the

4    hearing.  It's my understanding that we have a stipulation to

5    admit those exhibits, as well as the exhibits that they have

6    referenced in their exhibit list and as exhibits.  And so I

7    would just move now, before we begin, to admit those for the

8    Court.

9         THE COURT:  All right.  I have an offer of 1820-2 to

10   1820-12.  Any objections?

11        MR. GENENDER:  Your Honor, Paul Genender for the

12   Debtors.

13        No objection.  Just to put a finer point, and maybe

14   we can do it all at once, the Debtors' exhibits are 1821-1

15   through 11.

16        THE COURT:  Any objection to those, Mr. Duewall, or

17   anyone else?

18        MR. DUEWALL:  No objection, Your Honor.  And we'd

19   also ask the Court to take judicial notice of any other

20   pleadings that we might reference, the disclosure statement or

21   otherwise, that are in the Court's record.  But we can address

22   those in due course if we need to.

23        THE COURT:  I'm admitting 1820-2 to 12 and I'm

24   admitting 1821-1 to 11.

25        (BP Exhibits 1820-2 through 1820-12 received in evidence)

1              (Debtors' Exhibits 1821-1 through 1821-11 received in

2      evidence)

3              THE COURT:  We will take judicial notice of the

4      filing, but not of the truth of any matter that is filed with

5      the Court.

6              MR. DUEWALL:  Thank you, Your Honor.

7              As background to the motion to compel arbitration,

8      this is a motion to compel arbitration with regard to the

9      agreement at issue, that being the Loop Subsea operating

10     agreement.  That is the Court's record 1820-2, specifically,

11     Section 22.28, titled "Dispute Resolution Therein."  That's

12     found on Page 59 of 193 of that document in the Court's

13     record.

14             The dispute resolution provision, Your Honor, is

15     very broad.  It covers all -- any claim, controversy, or

16     dispute arising out of or related to or in connection with the

17     interpretation of the agreement, or any activity or operation

18     conducted or to be conducted thereunder.  And it says that

19     those disputes shall be resolved in accordance with the

20     mediation and binding arbitration provisions set forth in

21     Exhibit F of that agreement.

22             We've separately filed, just so it's easier to find,

23     Your Honor, Exhibit F in the Court's record at 1820-3.

24     Exhibit F, much like the provision that I've just cited, is a

25     very broad arbitration agreement that governs the parties'

1   disputes or any disputes that the parties might have related

2   to or arising out of the loop system.

3          Specifically, on Page 1 of Exhibit F, it generally

4   states that arbitration, as used in this (indiscernible)

5   statement is a procedure, whereby the arbitrator resolves any

6   claims, controversies, or disputes -- and that's defined as a

7   dispute -- between the parties arising out of, relating to, or

8   in connection with the agreement, including the

9   interpretation, validity, termination, or breach thereof.

10          Just as a point of reference because I think it will

11   be relevant as we move forward with this motion and the other

12   motions today, in Exhibit F, on Page 1, there's a duty to

13   negotiate; that's Section 1(b) and 1(c).  There's a notice of

14   unresolved disputes, where the parties have a requirement to

15   promptly put each other on notice of any disputes between the

16   parties.  And then the parties are required to employ a

17   management representative who is deputized to then go try to

18   engage in a dispute resolution process to resolve the dispute.

19          The arbitration agreement covers discovery and has

20   very limited discovery that's permitted for disputes that fall

21   under the arbitration agreement.  I'm specifically referencing

22   II(C) on Page 2 of Exhibit F, where it talks about deposition-

23   less discovery:

24          "Except as expressly provided herein, the

25   arbitration shall be conducted in accordance with the

1    procedures that are mutually acceptable to the parties,

2    including limited deposition-less discovery."

3           So no depositions.

4           And then, in Section II(I) -- and that's Page 4 of

5    Exhibit F -- it specifically references discovery, stating

6    that, commencing 30 days after receipt of the submission, each

7    party may serve upon the other ten requests for production,

8    including subparts.  And then it generally recites the Federal

9    Rules regarding relevance, that the request shall be made in

10    good faith and not served for delay or harassment, each

11    request shall describe the type of documents sought, and each

12    request shall be limited to documents that are relevant to a

13    claim or defense in the arbitration or leads to or is likely

14    to lead to discovery of admissible evidence.  And so the

15    agreement between the parties covers arbitration -- I mean

16    covers discovery and it's very broad in its scope with regard

17    to the disputes that it relates to and that its applicable to.

18           So, with regarding to framing the dispute, on May

19    14th of 2001, turning the Court's record 1820-7, BP received a

20    notice of removal of operator for cause from Fieldwood,

21    generally stating the reasons they believed that they were

22    permitted or allowed to remove BP as operator of the loop

23    system without the necessity of a vote.  This triggered the

24    dispute between the parties relating to the operatorship of

25    the loop system, the reported removal of BP as operator of the

1       loop, and the ability to remove BP as operator of the loop

2       without the necessity of a vote.  So that's found at 1820-7 of

3       the Court's record.

4               On May 19th -- Document, for the Court's record,

5       1820-8 -- BP responded to Fieldwood's letter.  BP generally

6       set out there, in 1820-8, its position statement with regard

7       to its purported removal as operator and the action that

8       Fieldwood was taking.

9               But most importantly, at least in terms of

10      background, Your Honor, on Page 4 of 4 there, in 1820-8, BP

11      put Fieldwood on notice of a dispute, saying that this shall

12      serve as notice of a dispute pursuant to Exhibit F of the

13      dispute resolution procedures attached to the LSPS operating

14      agreements that we already talked about.  BP goes on to say:

15              "Please advise us of who your management

16      representative is going to be for purposes of seeking to

17      resolve the dispute."

18              And BP identifies Richard Eaton as the person BP is

19      putting forward to comply with the parties' agreement and to

20      comply with the dispute resolution procedures found in the

21      applicable contracts.

22              Then, Your Honor, on May 21st -- 1820-9 -- we

23      received word back from Fieldwood's counsel, stating their

24      position as it relates to the applicability of Exhibit F and

25      the dispute resolution procedures imparted in the agreement.

1   They inform us there, in Paragraph 3, that arbitration is not

2   required.  However, they're willing to put forward Mr. Dane,

3   the Vice President and Chief Financial Officer, to discuss the

4   next steps.  But to be clear, however -- the last sentence of

5   the fourth paragraph:

6           "Any such meeting would not necessarily" -- "any

7   such meeting would occur outside of the dispute resolution

8   procedures of the parties' agreement."

9           So, early on, they're refusing to comply with the

10  parties' agreement and Exhibit F of that agreement.

11          Then, on May 21st, Exhibit 1820-10, is my letter

12  back to Fieldwood's counsel, saying:

13          "Just want to make sure we understand your position.

14  Are you refusing to comply with the dispute resolution

15  provisions in the LSPS?  Please tell us" --

16          Citing -- quoting now from Paragraph 2:

17          "Please confirm to us that our interpretation is

18  correct, that you're refusing to comply."

19          And then they write back to us, Your Honor, a few

20  days later on May 24th, which is Exhibit 1820-11, again, a

21  letter from Fieldwood's counsel stating that they disagree

22  with our positions, naturally.  But in the title paragraph

23  there, they say, but under -- they reiterate that Mr. Dane is

24  going to be available to speak to us, but not under the

25  dispute resolution procedures that they believe BP is trying

1    to improperly invoke.

2         So we clearly have a dispute regarding operatorship

3    of the loop.  We probably have a dispute as to whether or not

4    we have a dispute and whether or not we even have to go

5    through the dispute resolution procedures.  But in any event,

6    we file our motion on 5/28, since we're unable to agree to it

7    and resolve it between the parties.  And so here we are, Your

8    Honor.

9         The standard, as it relates to a -- to a motion to

10   compel arbitration like this one, Your Honor, that standard

11   was articulated clearly by this Court last year in the In Re

12   EXCO Services case that we cite in our motion and also in our

13   reply.  The Court articulated and echoed that there was a

14   clear policy favoring enforcement of contractual arbitration

15   provisions, stated that generally arbitration is mandatory

16   when a dispute falls within the scope of the arbitration

17   agreement, and that so much so that the (indiscernible) of the

18   Bankruptcy Court may decline to enforce the arbitration

19   agreement and must determine whether the proceeding derives

20   exclusively from the Bankruptcy Code; and, if so, moves to the

21   second prong of the analysis as to whether or not arbitration

22   conflicts with the purpose of the Code.  And I think -- and

23   that's generally referred to, as the Court recognized in EXCO,

24   as the "National Gypsum standard."

25        This dispute, Your Honor, concerns operatorship and

1    their intent to remove us as operator of the loop system.

2    It's a simple contract dispute, and the contract states that

3    maritime law applies.  It does not derive exclusively from the

4    Bankruptcy Code.  And for that reason, Your Honor, I don't

5    believe you get past the first element of the National Gypsum

6    standard.  But even if the Court looks at the second standard,

7    compelling arbitration here surely doesn't conflict with any

8    purpose of the Bankruptcy Code.

9           The bottom line, Your Honor, is that we've got a

10    dispute over operatorship of the loop.  The loop agreement

11    calls for arbitration of all disputes, all disagreements

12    regarding breach, interpretation of the agreement, any

13    activity to be conducted pursuant to the loop agreement.  The

14    arbitration agreement is broad and the dispute clearly falls

15    within the four corners of the agreement and the arbitration

16    provision in that agreement governing this disagreement and

17    dispute between the parties.

18           In response -- excuse me, Your Honor -- Fieldwood

19    has clearly presented three arguments:

20           First, they say we failed to show cause under the In

21    Re Sonnax case, which is the Second Circuit case outlining the

22    12 factors regarding relief from stay that they maintain apply

23    to any relief seeking lifting of the stay.

24           And simply stated, Your Honor, Sonnax does not apply

25    to our request for arbitration.  Fieldwood does not cite a

1     case applying Sonnax to arbitration.  This Court's EXCO case

2     that I previously discussed and that we cite in our brief --

3     not in our brief -- in our motion and our reply clearly adopts

4     the appropriate standard as the standard that we articulated,

5     and it's the standard that we satisfy.

6           And if there's any doubts, Your Honor, in the reply

7     that we filed this morning in Paragraph 4 and Paragraph 11, we

8     cite numerous cases for the position that Sonnax doesn't apply

9     in this circumstance, and even Second Circuit cases saying

10    that Sonnax doesn't apply when you are compelling arbitration

11    issues that are before the Court today.

12          Second, Fieldwood alleges that BP is trying to

13    collaterally attack the Court's February 3rd order, and Your

14    Honor, Fieldwood is just plain wrong.  This isn't true.

15    Fieldwood sought an emergency order to bring the Genovesa well

16    online by April 5th, and that was accomplished.  The Court

17    granted the request, the emergency relief to bring that well

18    online, BP complied with those orders.

19          THE COURT:  So --

20          MR. DUEWALL:  And Your Honor --

21          THE COURT:  -- Mr. Duewall --

22          MR. DUEWALL:  -- both parties --

23          THE COURT:  -- let me talk to you about this because

24    I got to tell you that, walking out today, one of my big

25    concerns is what do I do about the orders I made, and I want

1      to make a distinction of two parts of that order:

2              One is, in issuing the order, we made findings of

3      fact and conclusions of law.  I don't believe that order got

4      appealed.  And in fact, I think you've told me -- and I

5      haven't seen a dispute about this -- that you guys complied in

6      good faith with the order.  I don't see how, given that that

7      occurred without arbitration -- maybe it should have, maybe it

8      shouldn't have, but it occurred -- how I can now say that an

9      arbitrator is authorized to not give -- for lack of a better

10     description -- full recognition to the findings of fact or how

11     you all could challenge it, or the conclusions of law we

12     reached.

13             Conversely, you are arguing that -- or there's an

14     argument about whether our order, in fact, precludes this

15     additional relief that Fieldwood is not seeking; and, by not

16     having sought it earlier, I think you're arguing our order

17     might very well preclude them now seeking to remove you

18     because they brought a complaint, they got the relief, and

19     it's over.

20             As to the first issue, I got to tell you I have a

21     hard time thinking that you can challenge those things.  As to

22     the second, I would like to hear a little bit more depth on

23     that question because at least I start the hearing by thinking

24     that, because this occurred after we issued the order -- and

25     that is their demand that you are gone as the operator -- that

1     you, in fact, could have arbitration to determine whether our

2     order precludes them from doing that on a *res judicata* effect.

3          I'm not sure that you don't want me reaching that

4     decision, but I think you get the decision is who makes that

5     decision.  But I'd make a distinction between those two

6     issues.  And I would like you for you to explain -- I think

7     your position in the letters is you get to challenge

8     everything we do, although you're also saying you get to

9     enforce what we did.

10         I'm not sure you get to challenge what we did by

11    saying that, in fact, you weren't in -- and I don't want --

12    whatever words I used about the breach, it seems to me can't

13    be revisited or set aside by the arbitrator.  Whether there is

14    a preclusive effect of the order, maybe that is arbitrable.

15    And if you can just spend a little bit of time talking to me

16    about that because it's a -- frankly, a fascinating cases.  I

17    don't think -- I don't think any of the cases you cite or they

18    cite deal with one where we've already issued an order for at

19    least part of this.

20         MR. DUEWALL:  Thank you, Your Honor.  And I -- what

21    I'd like to do is address both of those points.  And if I

22    don't answer your question, just let me know and redirect me -

23    -

24         THE COURT:  I got it, mister --

25         MR. DUEWALL:  -- because I'm not trying to be --

1          THE COURT:  You've --

2          MR. DUEWALL:  -- evasive.

3          THE COURT:  You've never been evasive about anything

4     before me, so go right ahead.

5          MR. DUEWALL:  First, Your Honor, BP is not

6     questioning your order.  BP is not challenging your right to

7     enforce your order.  BP is not second-guessing any of the

8     findings of fact or conclusions that you made in your order.

9     That's not --

10          THE COURT:  So --

11          MR. DUEWALL:  -- I don't think --

12          THE COURT:  So when you go to the arbitration, is

13     the arbitrator bound by those because all of the parties are

14     bound by those findings, or not bound by those?

15          MR. DUEWALL:  The parties -- yes.  I mean, we had an

16     opportunity to appeal that order, Your Honor, and BP didn't

17     appeal that order, that much is clear.  There is no dispute

18     going forward as to whether or not you found that we were in

19     breach of contract or any of the other findings that you made

20     in February.

21          THE COURT:  Right.

22          MR. DUEWALL:  That --

23          THE COURT:  So my question --

24          MR. DUEWALL:  That --

25          THE COURT:  -- is at least one degree removed from

1      that, which is:  Could the arbitrator say, look, the

2      Bankruptcy Court found that there was a breach, the Bankruptcy

3      Court -- I recognize that's what the Bankruptcy Court found,

4      but my review of the evidence shows that the Bankruptcy Court

5      was wrong and I'm going to find there wasn't a breach, and

6      therefore, there can't be a removal; or is the arbitrator

7      limited to determining was that breach adequate to enable the

8      removal or does our order preclude the removal.  But that's

9      different than saying the arbitrator can revisit whether there

10     was a breach.  Now I want to really get down to the finest

11     point we can on that because it -- of course, I can condition

12     any relief from the stay, and so that's part of what I'm

13     worried about.

14            The issue is whether or not the breach that the

15     Court found was a continuing breach under the agreement that

16     allows removal as operator --

17            THE COURT:  Right.  So the --

18            MR. DUEWALL:  -- or allows --

19            THE COURT:  So the arbitrator --

20            MR. DUEWALL:  -- the (indiscernible).

21            THE COURT:  -- could determine that there -- he

22     can't redetermine whether there was a breach; he can determine

23     whether it's a continuing breach, or she could.  I don't have

24     any issue with that.  But are you in agreement that the

25     arbitrator doesn't get to revisit whether the breaches that we

1     found, whatever words we used about those, in fact, occurred,

2     not just agree that we found them, but -- they have to agree

3     that they actually occurred.  We can't revisit it at this

4     point, I don't think.

5          MR. DUEWALL:  I think that's correct, Your Honor, I

6     think that's exactly correct.  I mean, we --

7          THE COURT:  Okay.

8          MR. DUEWALL:  Taking a step back, you know, we had

9     an opportunity to appeal that order --

10         THE COURT:  Right.  No, no, I think we're on the

11    same page.

12         And then -- so we then get down to a defense you're

13    making -- and I mean, obviously, I'm talking to Mr. Genender

14    at the same time I'm talking to you -- which is, look, the

15    Bankruptcy Court's order was a final order on this dispute and

16    it precludes additional relief.  And I think you want the

17    arbitrator to decide that and not me.  It's a little bit weird

18    because I don't think that the fact that it is arbitrable

19    necessarily means that I lose the jurisdiction to enforce my

20    own orders.  But in this case, of course, it would be an

21    enforcement in your favor if that's what happened.  But I

22    guess I could rule against that, and at which point that might

23    preclude an arbitrator.

24         So what do you think about figuring out whether my -

25    - who has the authority to figure out whether my order

19

1     precludes this action under *res judicata* theories that they

2     came in, they got relief, if they didn't get what they wanted,

3     that's tough, they don't get to come back?  That's, I think,

4     your -- I'm putting words in your mouth and I think that's

5     what you're saying.

6            MR. DUEWALL:  I think that's going to be -- well, I

7     don't think anyone is precluded from making that argument at

8     the arbitration, and I don't think making that arbitration --

9     that argument at the arbitration offends the findings of facts

10    that you made in your order.  I think the arb -- the issue for

11    arbitration, in my mind, is the removal as operator or who is

12    going to be the operator or the election of the operator or

13    how this asset is going to be operated on a going-forward

14    basis.  It's kind of all tied up into the idea of operatorship

15    and the right to remove us --

16            THE COURT:  So you --

17            MR. DUEWALL:  -- as operator --

18            THE COURT:  So you -- and I'm not sure I disagree

19    with this at all.  I just want to talk -- I'm -- it's a

20    confusing question for me.  I think what you're telling me --

21    and I think you're right, but I want to hear argument to the

22    contrary -- that the arbitrator, because the removal issue

23    arose after we issued our order, would be authorized to

24    determine whether our order precludes the removal is what

25    you're telling me, I think.

1          MR. DUEWALL:  That's correct, because the order, by

2     its own clear language, shows that nothing therein shall

3     create or is intended to create any rights in favor of or

4     enhance the status of any claim held by any party.

5          You know, taking it a step further from what the

6     Court just said, if they had wanted to remove us as operator

7     back in February, they had the opportunity to try to do that.

8     They didn't.  The parties' agreement, in Section 3.02(a),

9     which is the removal provision, or a definition of a "default"

10    under 1.01, both those provisions talk about -- the removal

11    talks about the continuation of any of the following

12    circumstances.  Default talks about a material breach or

13    nonperformance that occurs for more than 30 days.

14         So there's an idea within the parties' agreement

15    that, if there's a breach or if there's a default, whether

16    it's been found by the Court or alleged by one of the parties,

17    that a court has to -- not the Court -- the party has to

18    assert their rights in a timely manner before that default is

19    cured.  I think that's going to be the scope or one of the --

20    that's going to be one of the questions of the arbitration,

21    and that's outside of the scope of the Court's previous order,

22    is whether or not I wait 100 days, you know, over 3 months

23    after the alleged breach was cured, the parties worked

24    together, worked hard together to bring the Genovesa well

25    online.

1          And let's be clear, Fieldwood worked hard and so did

2     BP.  The Court's order was a call to action, it was heard loud

3     and clear.  The Genovesa well was brought online before the

4     April deadline to do so, through hard work of both parties.

5     They recite that fact in their disclosure statement, and I

6     don't think it's disputed that the parties worked

7     cooperatively to bring the well online by March 20 -- March

8     27th.  That's Page 49 of their disclosure statement, in our

9     record at 1820-12.

10          And so I don't -- but at the same time, when they

11     went to the Court before, the issue was very narrow as to

12     whether or not they were entitled to emergency relief to

13     preserve what they believed and what the Court determined was

14     a valuable asset of the estate, whether extraordinary relief

15     was required to preserve that asset.  The Court found that it

16     was, made certain findings with regard to --

17          THE COURT:  Right.

18          MR. DUEWALL:  -- to that issue.

19          And now, 100 days later, they want -- and this, I

20     think, is the subject of the arbitration -- they want to pull

21     a gotcha out of their back pocket and say you're removed,

22     you're removed without a vote, you're removed as a matter of

23     the findings that were made, without any allegation of a

24     continuing default under the parties' agreement.

25          And I think we can have both here.  We can have the

1    Court's order, which they believe -- and I suspect, in

2    arbitration, they're going to file a dispositive motion early

3    on in the process and say, as a matter of law, we win because

4    the arb -- because these findings have been made.  And our

5    response is going to be the -- what I've articulated to the

6    Court already.  And those two things can coexist, based upon

7    the Court's own finding that, by brining this well online and

8    granting this extraordinary relief, they weren't being given

9    any other rights or their status wasn't being enhanced at the

10   same time.

11            THE COURT:  So, Mr. Duewall --

12            MR. DUEWALL:  But I am --

13            THE COURT:  -- you wanted to make sure you answered

14   my question.  You have thoroughly answered my question and I

15   will let you return to your presentation --

16            MR. DUEWALL:  Okay.

17            THE COURT:  -- and I appreciate the forthrightness -

18   -

19            MR. DUEWALL:  Okay.

20            THE COURT:  -- of the answer.

21            MR. DUEWALL:  Thank you, Your Honor.  And so that, I

22   think, covers the collateral attack issue.

23            And the last issue, Your Honor, that they assert is

24   a waiver.  They allege that we've waived the right to invoke

25   arbitration.  And again, Your Honor, I think the argument

1    fails because it doesn't satisfy the standard that they set

2    out in their own papers.

3           Number one, BP hasn't substantially invoked the

4    judicial process.  BP has never, I don't believe, invoked the

5    judicial process.  By showing up to the hearing on the

6    emergency relief issue, we haven't waived or invoked the

7    judicial process or these other issues that should be subject

8    to arbitration.

9           And number two, there's been no prejudice based upon

10   invocation of the judicial process.  And that's the standard

11   for prejudice that the Court -- this Court set out, again, in

12   the EXCO case, that -- whether or not there's an inherent

13   unfairness caused by one party's reliance on the judicial

14   process.

15          And finally, Your Honor, that's their burden to

16   prove, and I don't think they've proved it in the papers that

17   they've set out before the Court or with any evidence of undue

18   burden or prejudice based upon having to take this issue, the

19   discrete issue of removal of operatorship, to arbitration.

20          Now -- and so, Your Honor, based upon the fact that

21   we have a clear dispute/disagreement that falls within the

22   parties' arbitration agreement, we respectfully request that

23   the Court lift the stay and refer the dispute regarding the

24   operatorship of the loop system to arbitration, so the parties

25   can move forward under the terms and conditions of Exhibit F

1       of the loop system agreement.

2                   THE COURT:  Very well.  Thank you.

3                   Mr. Genender.

4                   MR. GENENDER:  Thank you, Your Honor.  Paul Genender

5       for the Debtors.  Can I ask you to make Kevin Simmons the

6       presenter, please?

7                   THE COURT:  Yes, sir.

8               (Pause)

9                   THE COURT:  I got him.

10                  MR. GENENDER:  Thank you, Judge.

11                  THE COURT:  All right.

12                  MR. GENENDER:  Great.

13                  Your Honor, we have a few -- a short few slides I

14      want to walk through in connection with the arbitration

15      motion.  And your discussion with Mr. Duewall, I think, was

16      helpful, in terms of -- you addressed several of the points we

17      wanted to make, so thank for that.  But to start, we can just,

18      you know, hit this just to level-set.

19                  I feel as though Mr. Duewall, his argument reminded

20      me of the Faulkner books I used to read when I was in college

21      because it kind of started in the middle of the plot with the

22      May 14th termination.  And I think it really needed to start

23      with the hearing before Your Honor on February 2nd, which led

24      to the order you entered on February 3rd.

25                  So, as we all -- as everyone agrees, you found that

1     they wilfully -- that BP wilfully failed to comply with the

2     contract and they did it for their own economic benefit.

3     That's at ECF 854, the transcript at Page 229.

4            Looking at the operating agreement at ECF 1821-4 --

5     and this addresses a point, without your order, Your Honor,

6     there could be no right to remove BP as operator because, in

7     effect, they could be removed based on having been found

8     liable by a final judgment of a court of competent

9     jurisdiction or an arbitration panel for an act of gross

10    negligence or wilful misconduct hereunder.

11            THE COURT:  So what --

12            MR. GENENDER:  I think the --

13            THE COURT:  -- do I --

14            MR. GENENDER:  -- record is --

15            THE COURT:  What do I do about the reservation

16    contained within the order that says that it's not going to --

17    we can look at the words -- you know, "create" or "enhance"

18    any rights that you might have?  And now you're telling me it

19    directly does that.

20            MR. GENENDER:  Yes, let's turn to that because it

21    does say that -- I want to put that language up.  Thank you.

22    Okay.  Let me get --

23            THE COURT:  Paragraph 6, it's up.

24        "Notwithstanding the entry of this final order, nothing

25          herein shall create, nor is intended to create any rights

1          in favor of enhance the status of any claim by" -- "held

2          by any party."

3              Doesn't someone, whether it is me or an arbitrator,

4    have to decide whether Paragraph 6 precludes you from doing

5    exactly what you were doing, which is relying solely on the

6    order to remove them and not on something else?

7              MR. GENENDER:  Well, I think -- I read Paragraph 6,

8    Your Honor, to relate to a claim of any party; and, at that

9    time, the claim that we're talking about here did not exist.

10   And then I --

11             THE COURT:  Well, it says --

12             MR. GENENDER:  -- would read it --

13             THE COURT:  It says --

14             MR. GENENDER:  -- in conjunction --

15             THE COURT:  -- "any rights in favor or enhance the

16   status of any claim held by any party" -- or "by any party" --

17   yeah, "held by any party."

18             MR. GENENDER:  I --

19             THE COURT:  Somebody needs to --

20             MR. GENENDER:  I --

21             THE COURT:  -- figure out what that means, right?

22   So who decides --

23             MR. GENENDER:  Sure.

24             THE COURT:  Who decides -- and this is part of what

25   I was asking Mr. Duewall before.  Does -- isn't -- would the

1       arbitrator have the ability to look at Paragraph 6 and say you

2       are using the order as a whole to remove them, and it isn't

3       the underlying facts about anything, it's merely the existence

4       of the order, and that's precluded by Paragraph 6; or the

5       arbitrator could say, no, no, no, this deals with whether

6       there is some claim out there, some economic claim, the

7       argument that maybe you're making.  Who decides that, me or

8       the arbitrator or either one of us?

9              MR. GENENDER:  Your Honor, we submit you do.  And

10      two things:

11             To get to your point on Number 6, that is not a new

12      -- it's not a new claim.  Fieldwood had a contractual right

13      that arose by virtue of your order.  But I also would point

14      the Court to Paragraph 10, where it says this Court -- of that

15      same order:

16          "This Court shall retain jurisdiction to hear and

17           determine all matters arising from or related to the

18           implementation, interpretation, and/or enforcement of

19           this order."

20             I think that actually answers your last question,

21      Your Honor, about who would make that decision.  I think the

22      answer, from the face of your order, is you.

23             And obviously, the issue of waiver of arbitration

24      speaks to this because it is our view, Your Honor, that there

25      is not a new dispute that arose by virtue of the removal of BP

1   as operator, is a continuation of this; and, therefore,

2   frankly, we don't believe there is a pending issue.  They are

3   removed, they have been removed.

4           And I agree with Mr. Duewall that there is a -- when

5   he said, in his straightforward and candid manner -- and I,

6   for the record, mean that as a compliment -- that there is a

7   dispute as to whether there is a dispute.  I agree with that.

8   We don't think there's a dispute.

9           THE COURT:  So you think --

10          MR. GENENDER:  We have, because of --

11          THE COURT:  You think --

12          MR. GENENDER:  -- 3.02.

13          THE COURT:  You think they're not the operator; they

14   think they are the operator.  Why isn't that a dispute?  I

15   mean, I --

16          MR. GENENDER:  Well --

17          THE COURT:  What are we going to do?

18          MR. GENENDER:  -- I --

19          THE COURT:  Are we going to send out two armies --

20          MR. GENENDER:  No --

21          THE COURT:  -- and resolve this?  I mean, it's --

22   somehow, there is a dispute.

23          MR. GENENDER:  I don't think we should send out two

24   armies, I'm going to -- I'm going to answer that one first.

25          Your Honor, yes, I think that that, in and of

1       itself, is a dispute as to whether there's a dispute.  I

2       think, under Paragraph 10, you have jurisdiction to address

3       that issue.  I also think you have jurisdiction to address the

4       arbitrability of any such dispute.  And we would submit that

5       they have waived that right to arbitrate because it is -- this

6       relates back to what was considered before Your Honor, and

7       they consented to that.

8                   THE COURT:  So, look --

9                   MR. GENENDER:  And actually, Your Honor --

10                  THE COURT:  Can I just --

11                  MR. GENENDER:  -- if removal is --

12                  THE COURT:  I want to push back on that a little

13      bit.  Under just the standard --

14                  MR. GENENDER:  Sure.

15                  THE COURT:  -- waiver definition, I didn't know that

16      I was determining whether they were removed as an operator.

17      So was there a knowing and wilful abandonment of a right by

18      them -- and I may have those words slightly wrong, but you

19      know what cases I'm referring to -- when I didn't know --

20                  MR. GENENDER:  Yeah, I do.

21                  THE COURT:  -- we were litigating it?  Are we -- are

22      they supposed to figure it out when I didn't?

23                  MR. GENENDER:  Yes, because they're bound to know

24      what's in their contract, even if they -- even -- and I submit

25      the Court was understanding -- it was understandable that the

1       Court wouldn't know they were giving up their right to

2       arbitrate because they never raised the issue of arbitration

3       throughout that very intense period of time when we were

4       before you, Your Honor, he record will reflect it, but several

5       days in the course of the week.

6               And if we can move ahead to Slide 12, please, Mr.

7       Simmons.  Your Honor, I want to -- if I could move into -- if

8       I could move into this -- next slide, please.  Yes.

9               So they never -- BP -- I want to address what you

10      were -- because I think it goes to your point, Your Honor.

11      They never invoked arbitration at any hearing.  They did

12      invoke the Court's jurisdiction.  They didn't, obviously,

13      appeal the Court's finding or order.  And as we have here,

14      Your Honor, this is ECF 816, the transcript at Page 8, Lines

15      10 through 11, an excerpt from January 28th, before the

16      hearing.  Ms. Heyen says:

17          "The second prong would be that Fieldwood must take the

18          initiative to request and use good faith efforts to

19          obtain a suspension of production or SOP.  Fieldwood's

20          statement that it doesn't think that it can be an SOP

21          shouldn't count by the Court.  We think Fieldwood should

22          be compelled to start that process."

23              Now that is BP seeking relief from the Court.

24              February 1st, this is the day before the hearing,

25      Your Honor, where you may recall that you submitted, and then

1     I think filed a draft order for the parties to consider.  We -
2     - it was acceptable to Fieldwood; it was not acceptable to BP;
3     and, therefore, we had the hearing on February 2nd.  But that
4     February 1st status at ECF 827, this is the recording.
5     Ms. Heyen says:
6          "It might be helpful for the parties to see if they can
7          resolve this through a quick mediation for a Federal
8          Judge.  And if we can't get that done tomorrow, then, you
9          know, we can proceed with the evidentiary hearing."
10         Seek -- requesting mediation is a form of seeking
11    relief.
12         Going to the next page, February 2nd, at the actual
13    evidentiary hearing, at the threshold, Your Honor, this is ECF
14    854, Page 5 of the transcript.  You said:
15         "All right.  Ms. Heyen, is that correct?  Is that the way
16         you think we ought to move ahead?"
17         Ms. Heyen says:
18         "Yes, Your Honor.  And we sincerely appreciate the
19         Court's diligence and efforts regarding the draft order.
20         But in that limited time between last night and this
21         morning, we were unable to reach an agreement.  So, Your
22         Honor, we are ready to proceed with a hearing."
23         Thereafter, same hearing, Mr. Stark, a colleague of
24    Mr. Duewall and Ms. Heyen, states -- two different portions.
25    We're still within ECF 854, on Page 94.  And he moves for a

1       directed verdict, a form -- I submit a form of relief.  Page

2       229 -- and this is in closing, Your Honor.

3                    THE COURT:  I have to say --

4                    MR. GENENDER:  This is --

5                    THE COURT:  -- just so you -- just so you know,

6       you're never going to convince me that a directed verdict --

7                    MR. GENENDER:  I --

8                    THE COURT:  -- you lose is seeking a form of relief.

9       So --

10                   MR. GENENDER:  I --

11                   THE COURT:  -- you should --

12                   MR. GENENDER:  I -- Judge, there's a reason that's

13      the shortest excerpt.  And if I were going to rank arguments

14      on strength, that should be at the end.  I'm not going to --

15      I'm not going to hang my hat on that, Your Honor, I understand

16      that.  It might be indicative, but I don't think it's

17      dispositive to be -- in all candor.  Okay?

18                   I do think, however, getting to the last excerpt I

19      want to point the Court to, where he asks would the Court --

20      would the Court require -- asked the Court -- Your Honor to

21      require Fieldwood to post a substantial bond -- that is a form

22      of relief -- in the event you ruled in Fieldwood's favor.  And

23      he then says:

24           "But I would also ask Your Honor to compel Fieldwood to

25           immediately submit an SOP application."

1          Again, another form of relief.  They're asking you

2     to make -- to do -- not just say -- they're not just a passive

3     bystander here.

4          And also, Your Honor, just to take a step back.

5     What were we talking about?  The relief that clearly -- first

6     of all, it goes without saying that, in none of those

7     instances, did BP invoke arbitration.  Did they say, you know

8     what, Your Honor, you don't have jurisdiction, we have this

9     clause under the operating agreement, Exhibit F, there's a

10    very detailed, four-to-six-page arbitration agreement, we

11    shouldn't -- you shouldn't be deciding it, you don't have

12    jurisdiction?  But they didn't do that.  They clearly waived

13    that as it relates to what happened in late January, early

14    February, leading up to your order on February 3rd.

15         THE COURT:  So I have to -- let me just say this.

16    And again, I'm talking to Mr. Duewall at the same time I'm

17    talking to you.  I think this is a significant question for me

18    as to whether, by proceeding in the hearing, there was a

19    waiver.  I don't know a pretty fine area of the law that I

20    would like you all to explain to me, and maybe even a little

21    bit of post-hearing briefing on the waiver question.

22         Backing up, they didn't seek affirmative relief,

23    Mr. Genender.  Seeking to limit what you're getting and to

24    limit damages to them from what you're getting is not seeking

25    affirmative relief.  It's participating in a hearing therein.

1      So what I'm worried about is --

2           MR. GENENDER:  Sure.

3           THE COURT:  What I'm worried about is waiver.

4           But you come to court and you look at the Fifth

5 Circuit case law and you're aware of the exigent

6 circumstances.  And you say, look, we're not going to win an

7 arbitration motion on an emergency basis on January 28th, so

8 we're not going to do it.  And then somebody removes you as

9 operator and you say this is a horse of a different color,

10 it's squarely within what we want to do, now we want to revoke

11 it.

12           I am not convinced that, when the remedies are that

13 far different, and when you have to deal in an area of -- and

14 I'm not being critical of the Fifth Circuit in this at all --

15 but ambiguous law as to what to do in those situations, that,

16 if BP says, as to the first hearing, it just -- we're going to

17 end up losing an arbitration motion, we're going to look bad,

18 this is an emergency, if what they say is right, you know, we

19 got to go ahead with that hearing, and later say, okay, now

20 this has gotten to this stage where we're no longer in that

21 ambiguous area, we're now in a clear area of arbitration,

22 maybe that is a waiver.

23           Maybe making that strategic decision, assuming they

24 made it -- and I -- it's also possible, and I'm not going to

25 ask them -- maybe they didn't know about the arbitration

1      provision, I don't know.  But if they made a strategic

2      decision or didn't know about it, and then the nature of the

3      relief that your client is demanding, not in court, but

4      demanding in communications materially changes, does the

5      waiver -- is the waiver permanent in there?

6              And I don't know that answer, but I want to hear you

7      all talk about it or tell me you want to chance to look and

8      see if there's any case law about that because it is a -- it

9      may be the same facts and circumstances, there may be a

10     preclusion question -- and I have that.  But if there isn't a

11     preclusion question, which would only go in their favor, then

12     is there a waiver question which could only go in your favor?

13             MR. GENENDER:  So, Your Honor, I think it may make

14     sense to consider it further after the hearing.  But I also

15     would offer the following in response to your question, and I

16     would say this.  And I have certainly done a lot of injunction

17     work in State and Federal Court over the course of my law

18     career, and I get how that interplays with arbitration.  And

19     oftentimes, as the Court knows, there's -- the dispute

20     provisions say you have to arbitrate, unless it's a matter of

21     equity, where you've got to run to the courthouse.  Okay?

22     This provision doesn't say that, to my reading.

23             But let -- I want to work off your hypothesis.

24     Okay?  Which is did -- and getting back to basic, you know,

25     black-letter law:  What is "waiver"?  Waiver is a

1    relinquishment of a known right.  Okay?  We don't have to know
2    whether BP was aware of what's in its contract or not because
3    it's charged -- I submit it's charged with knowing what's in
4    its contract.  And when we litigated issues under that
5    contract, it's charged with knowing it and knowing that
6    there's a six-page arbitration provision.

7         Now we're in here.  And of course, Your Honor, we
8    were telling you it was an emergency.  They were telling you
9    it was not an emergency.  That's important, Judge.  They were
10   actually -- the record is replete with BP saying there's not
11   an emergency here.  And we were saying it was and you agreed
12   with us.  Okay?  And you made a finding that it was an
13   emergency.

14        So, if they are making a finding or taking a
15   position it's not an emergency, then they should have been
16   invoking the arbitration clause, if they wanted to have the
17   right to do it later with something that arose as an outgrowth
18   under the same contract, where your order, by contract, is a
19   prerequisite to being able to remove them as operator.

20        Was it foreseeable?  Absolutely.  Your Honor made a
21   finding that they placed their own interests ahead of the
22   contractual obligations to Fieldwood.  The fact that they
23   allowed Fieldwood to get the Genovesa well online and
24   cooperated in that and didn't violate your order doesn't mean
25   that the relief that you provided was finite.  The reality is

1    the damage that they did that was partially addressed by your

2    order is still ongoing.

3          And we have the right -- and it was a right we had

4    before we came to Your Honor -- this goes back to your

5    Paragraph 6 question.  We had the right to remove them as

6    operator if there was a judgment that they engaged in wilful

7    misconduct.  So you didn't create an additional -- we're not

8    creating an additional right beyond that.  And then I would go

9    to Paragraph 10, in terms of your enforcement.

10          But Your Honor, had they said on January 28th

11    through the commencement of the hearing on February 2nd -- and

12    my memory is it started in the middle of the afternoon and it

13    went past ten o'clock that night; it was a full day and

14    evening.  Had they said, Your Honor, we object to you

15    proceeding because of the arbitration clause and this, that,

16    and the other -- and presumably, Your Honor, we might have

17    opposed that because of the emergent situation.  And they

18    would have said -- because they did say it's not an emergent

19    situation, Judge, there's no emergency, and they said that.

20    And you would have made a decision, one way or another.  You

21    would have said I have jurisdiction, I'm going to go forward

22    because there's -- I find, as a threshold matter, it's an

23    emergency.  Ten they would preserve their right to arbitrate

24    today.

25          THE COURT:  Well, I'm not --

1          MR. GENENDER:  Then --

2          THE COURT:  Are you sure that's right?

3          MR. GENENDER:  I would submit they --

4          THE COURT:  So, if they argued arbitration then and

5     I issued the judgment, wouldn't they have to appeal that maybe

6     to preserve the right?  I don't know.

7          MR. GENENDER:  Well, I certainly think they would

8     have had -- yeah, well, I think their failure to appeal is

9     also another act of waiver, absolutely.  I think all that --

10    and Judge, I was talking -- whether the points are seeking

11    affirmative relief or active participation, I -- it's by --

12    active participation is enough.  We can certainly brief that.

13    And they -- we can certainly brief -- I'm sorry.  I didn't

14    mean to --

15         MR. GENENDER:  -- cut you --

16         THE COURT:  No, I didn't --

17         MR. GENENDER:  -- off, Judge.

18         THE COURT:  I didn't expect these issues to converge

19    like they are in my mind with hearing the argument and hearing

20    Mr. Duewall's argument.  But let me throw out this

21    convergence.

22         If this was the same dispute, then you might be *res*

23    *judicata*'ed out; and, if it's a different dispute, then I

24    don't understand how there is waiver.  Are you telling me that

25    waiver can carry from Dispute A over to Dispute B; i.e., that

1    the case law says, if, in one dispute, you don't invoke

2    arbitration, you have now forfeited arbitration for all future

3    disputes?  I really doubt that's the law.

4              MR. GENENDER:  I --

5              THE COURT:  So, if it's the same dispute --

6              MR. GENENDER:  Sure.

7              THE COURT:  -- you didn't get removal, then maybe

8    your argument is you weren't -- there wasn't a dispute about

9    that at all and I got it; and, therefore, you don't -- didn't

10   need that in the order because that was a natural consequence.

11   But it still then becomes a dispute later when they say we're

12   not leaving.

13             MR. GENENDER:  So, Your Honor, you -- to answer your

14   -- we are not saying this is a distinct dispute, they waived

15   the first one; and, therefore, because they waived arbitration

16   as to a distinct dispute, they've waived it as to this later,

17   different -- we're not saying that, right?

18             THE COURT:  Okay.

19             MR. GENENDER:  A hundred percent.

20             However, we are saying that it is the same dispute,

21   it's a continuation of it.  It arises -- this issue of removal

22   is a foreseeable consequence of the dispute that you decided

23   and that you retain jurisdiction over and that they did waive

24   their right to seek arbitration; therefore, they don't have

25   cause to have the stay lifted.

1          THE COURT:  So, look, I -- can I dispel the

2     jurisdiction question?  Me retaining jurisdiction, I still

3     have it.  An arbitrator has no jurisdiction.  Jurisdiction

4     arises under -- exists in the Courts of the United States.

5     That's why you can't take the arbitrator's award and do

6     anything with it, other than get a judgment that confirms the

7     arbitrator's award.  So the jurisdictional paragraph isn't

8     going to carry the day because that's dealing with whether I

9     have power and authority, and I do.  That doesn't mean that

10    there wouldn't be arbitration, and I didn't rule no

11    arbitration, and I do still have jurisdiction.

12          MR. GENENDER:  Yes.  And Your Honor, you didn't rule

13    no arbitration.  You weren't asked --

14          THE COURT:  I wasn't.

15          MR. GENENDER:  -- by --

16          THE COURT:  And they're not --

17          MR. GENENDER:  -- by --

18          THE COURT:  And they're not contesting the

19    enforceability of what I did.

20          MR. GENENDER:  Which I think cuts in favor of the

21    fact that there is waiver, in our view, on these facts through

22    their participation and through their action and inaction in

23    the dispute; inaction being failure to appeal, failure to

24    request arbitration, failure to raise the issue, failure to

25    preserve the issue.  And that's their right to make those

1    decisions.  But they do have consequences when it -- when we -

2    - when the removal under 3.02 of the operating agreement is a

3    natural consequence of your order.

4         By definition, we could not have requested that they

5    be removed until we had your finding that day.

6         THE COURT:  I got it.

7         MR. GENENDER:  And --

8         THE COURT:  I don't know that that means you win.  I

9    -- you're right.

10        MR. GENENDER:  Well, so I -- if I could have a

11   minute just to look at my notes.

12        THE COURT:  Sure.

13        MR. GENENDER:  And I appreciate doing this in Q-and-

14   A format because I think it, not only made it better, it made

15   it more streamlined.

16        (Pause in proceedings)

17        MR. GENENDER:  I think the -- I think the -- a

18   couple of points.  The letters that went back and forth, they

19   say what they say --

20        THE COURT:  Right.

21        MR. GENENDER:  -- they're in evidence.  I think the

22   record would reflect that we were not taken up on the offer

23   for Mr. Dane and Mr. -- I think it's Eaton, to speak.  That

24   just didn't happen.  We weren't trying to prevent a

25   conversation; we were preserving a right.  I think the record

1    -- I just want to make that point, I think that's clear from

2    the letters.

3        (Pause in proceedings)

4        MR. GENENDER:  Bear with me, Judge.  I don't think I

5    have anything to add, Your Honor.  Thank you very much for the

6    opportunity to talk through these with you.

7        THE COURT:  Thank you.

8        Mr. Duewall.

9        MR. DUEWALL:  Thank you, Your Honor.

10       I'll just cut to the chase.  And I think that the

11   waiver issue is addressed, if the Court would look at 1820-3,

12   Page 1 of Exhibit F.  And I'll give the Court a moment to turn

13   through.

14       THE COURT:  I'm on Page 1 of Exhibit F.

15       MR. DUEWALL:  Thank you, Your Honor.

16       Mr. Genender -- well, much like Mr. Genender, I've

17   been involved in many cases where you're running down to the

18   courthouse to get a TRO or injunctive relief to try to

19   preserve the status quo that exists; and, in doing so, you do

20   not later waive your right to later seek arbitration over the

21   dispute, especially when it's a separate dispute than the one

22   that exists like here, where we have two different disputes.

23       But under I(A)(I) there at the top, about halfway

24   through that paragraph, it recites that standard that I just

25   articulated, that Mr. Genender spoke to, as well, where it

1    says:

2         "Each party hereby expressly covenants that it shall not

3         resort to court remedy, except as provided for herein and

4         for preliminary relief in aid of arbitration."

5         Either party could go to the courthouse, even under

6    this agreement, and seek a TRO and seek extraordinary relief,

7    seek a mandatory injunction, which is what they did.  They

8    sought a mandatory injunction to bring the well online by a

9    date certain.  The issued its call to action.  The parties

10   cooperated.  That was accomplished.  And so, by the very terms

11   of the agreement, we're not waiving our right to then

12   arbitrate separate disputes later on.  In fact, I'd argue we

13   didn't waive the right to arbitrate that very same dispute.

14   But here, I think we don't even have to get there because it's

15   a different dispute over operatorship.

16        In fact, as we've been talking, my associate has

17   done a little bit of research and he was going to hand me a

18   case.  We found a couple of cases citing that very point that

19   Mr. Genender was making and that I just made that state, even

20   the parties state that, quote:

21        "Any and all issues under this contract shall be resolved

22        by arbitration."

23        Courts have found that a party can seek injunctive

24   relief to prevent irreparable injury, so long as the Court is

25   not deciding (indiscernible) through arbitration.  That's

1    Merrill Lynch v. Bradley, 756 F.2d 1048, 1053.  It's a Fourth

2    Circuit case from '85.

3         I think, if we had a little more time, we could

4    probably cite plenty of Southern District and Fifth Circuit

5    cases making the exact same point because I think the

6    principle is largely recognized that I can go to the

7    courthouse and preserve the status quo without jeopardizing my

8    right to later arbitrate those issues, especially here, when

9    I'm not even in the party that's running to the courthouse to

10   begin with.

11        You know, BP showed up for the hearing, did its

12   best.  You ruled against it, you ruled against BP.  We're not

13   seeking to re-litigate those issues.  If anything, it sounds

14   to me like Fieldwood is the entity that's seeking to re-

15   litigate the February hearing.

16        So, Your Honor, unless you have any other questions

17   for me, if you think we need or if you would want some

18   briefing on that discrete waiver issue that you discussed,

19   we're happy to submit a short statement in that regard to the

20   Court.

21        THE COURT:  Let me ask -- let me ask Mr. Genender to

22   respond to that last sentence under I(A)(I).

23        MR. GENENDER:  Yeah, thank you, Judge.

24        I read it differently.  First of all, I read it to

25   each -- well, I think the first sentence is important.  But

1    the second sentence:
2         "Each party expressly covenants that it shall not resort
3         to court remedies" --
4              THE COURT:  Right.  So you --
5              MR. GENENDER:  "-- except" --
6              THE COURT:  You had a covenant --
7              MR. GENENDER:  -- "as provided" --
8              THE COURT:  You had a covenant that you wouldn't
9    come here, right?  Unless you needed preliminary relief in aid
10   of arbitration.  Why shouldn't we assume that's exactly what
11   you did?  You didn't --
12             MR. GENENDER:  They didn't --
13             THE COURT:  -- breach your --
14             MR. GENENDER:  -- object --
15             THE COURT:  You didn't breach your -- no, you didn't
16   breach your covenant.  You came for preliminary relief in aid
17   of arbitration.  How is that a waiver on their part?
18             MR. GENENDER:  Well, on their part -- well, Judge,
19   first of all, it's -- they could have -- they could have taken
20   the position that we didn't come for preliminary relief in aid
21   of arbitration.  They could have take -- they could and should
22   have taken the position --
23             THE COURT:  What if they didn't want --
24             MR. GENENDER:  -- if they --
25             THE COURT:  -- to take --

1          MR. GENENDER:  -- were to --

2          THE COURT:  -- a position --

3          MR. GENENDER:  -- preserve --

4          THE COURT:  -- that you were breaching anything,

5     they just recognized that you were honoring your obligations.

6     You had a covenant to arbitrate, unless you needed preliminary

7     relief in aid of arbitration.  And why couldn't they assume

8     you were doing what you had promised to do?

9          MR. GENENDER:  They could, Judge, but that's -- but

10    they also run the risk of having --

11         THE COURT:  You broke up.  Of having -- your line

12    cut off.  You said "of having," and then you went away.

13         MR. GENENDER:  Okay.  Sorry.

14         They run the risk of relinquish -- of doing what I

15    believe they did, which is relinquishing a known right to

16    arbitrate that dispute.

17         And Judge, Mr. Duewall talked in terms of an

18    injunction.  You didn't -- I don't believe you issued a

19    mandatory injunction.  You didn't -- you compelled them to

20    bring the well online and gave them the option to -- if they

21    didn't want to do it, to let us do it, and then had some other

22    conditions associated with it.  Obviously, your written ruling

23    incorporates your findings on the Record, Findings and

24    Conclusions on the Record, but it wasn't an injunction.

25         You declined to issue -- to require Fieldwood to

1       post a bond.  You ordered BP to live up to its contract that

2       you found it breached.  So we don't take issue with anything

3       you did in connection with that.

4               THE COURT:  I know that part, so.

5               MR. GENENDER:  Yes, sir.  Yes.

6               And I think the -- and I think the Record would

7       reflect that the result was -- most importantly, that the

8       result that -- as far -- in terms of the well coming online

9       was good for the estate.  However, I think -- I believe, if my

10      memory serves, you made reference that there might be an issue

11      as to damages that wasn't before you at that point and --

12      because we were looking at an immediate -- a narrower issue.

13      But this issue, in terms of removing them as an operator, does

14      arise from what happened on the 2nd and 3rd -- or 2nd,

15      February 2nd.

16               THE COURT:  Okay.

17               MR. GENENDER:  I hope --

18               THE COURT:  Let me --

19               MR. GENENDER:  -- I answered your question.

20               THE COURT:  So let me tell you all what I would like

21      to do, and then I want to see if anybody has any real problem

22      with this.  I am very worried about the waiver issue.  I am

23      very focused, and hadn't been until he brought it up, on the

24      last sentence of I(A)(I), and I want to get briefing on that,

25      so that I don't blow the waiver issue.  So I would like

1    briefing to come in within a week, so next Friday.

2         Second thing, we have a time deadline for when BP

3    may have to be departing.  I want to freeze and extend time,

4    so that I can make a decision.  So I want to issue an order, a

5    preliminary order, that says that whatever the time deadlines

6    are, are extended for a period running July 9th until I issue

7    an order determining whether to compel arbitration, so that if

8    -- and I haven't calculated the date.  If August 1 is the

9    magic date, and if it takes me two weeks to make a decision,

10   that's going to then be August 15th, if Fieldwood prevails.

11   And obviously, if they prevail, then you're going to have an

12   arbitration over what that date is.

13        Third, I want to compel, under my preliminary

14   authority, if nothing else, a meeting between Mr. Dane and Mr.

15   Eaton, so that the parties are meeting, not under the

16   arbitration provision -- which I got why you wouldn't want to

17   do that, Mr. Genender, I don't have a problem that you're

18   trying to protect those rights.  But I want them to at least

19   meet.  And so, if they're doing it under my order, perhaps

20   this can result in a commercial resolution to the problem,

21   where I think I just have the authority to make people do

22   that, without anybody having to worry about whether they're

23   waiving rights to comply with the order.

24        And I want to send a message with that, if it hasn't

25   been very clear from this.  Mr. Dane, if I were to rule right

1    now because people don't like this and I have to rule right

2    now, you're going to lose and I'm going to send it to

3    arbitration.  I'm not sure that's the right ruling, which is

4    why I want to take this time.

5         But Mr. Duewall, I think, if it goes to arbitration,

6    you guys may lose in the arbitration.  I think your client has

7    a big risk here that what I did, even though I -- I mean, and

8    I think you know I didn't know the consequence of the

9    operatorship removal.  You all have big risks because the

10   arbitrator, who I think has to recognize my more, will just

11   say it's game, set, and match.

12        So I'm not sure that losing -- that winning today

13   doesn't put your client still in a bad position, but that will

14   be up to an arbitrator.  I express no view on whether that's

15   the correct decision by an arbitrator or not, none.  I don't

16   know if that's the correct decision.  I just know that,

17   looking at this stuff, there's something here for everybody to

18   be worried about.  So I want parties to meet in the context of

19   those concerns.

20        Now you all can argue against what I think I'm going

21   to do, and I think you can sort of make me make a ruling

22   today, if you were to demand it.  I would much prefer that I

23   get to the right position, so that, on appeal, it's going to

24   be a lot more defensible.

25        Let me hear from Mr. Duewall and Mr. Genender,

1    whether you all have any objection to that kind of a

2    preliminary freezing order and meet-and-confer by the

3    principals for a commercial resolution.

4            MR. DUEWALL:  I don't have any objection, Your

5    Honor.  We can submit that followup brief by next Friday.

6    Does the Court have any preference as to how long?  Three or

7    four pages probably at the max, I'm assuming.

8            THE COURT:  I --

9            MR. DUEWALL:  We can --

10           THE COURT:  Look, this is a big, important issue, so

11   take ten.  How is that?

12           THE COURT:  Mr. Genender?

13           MR. DUEWALL:  Thank you, Your Honor.  We have no

14   objection to freezing -- the freezing the status quo.

15           And with regard to a meet-and-confer between Mr.

16   Dane and Mr. Eaton, does the Court have a preference on how

17   quickly the Court would like to see it occur?

18           THE COURT:  Well, I want it to occur before I issue

19   a ruling, so that you all can try and reach a commercial

20   resolution.  And I don't know what their schedules are.  I

21   have no concern, especially over what happened from my last

22   order, that everyone, in good faith, will try and have such a

23   meeting.  So, you know, they're busy people, you all work out

24   a time for it, and file something with me that tells me that

25   the meeting has concluded without a resolution or with a

1      resolution.  I won't issue a ruling until I get that kind of a

2      statement.  Does that work?

3              MR. DUEWALL:  Thank you, Your Honor, it does.

4              THE COURT:  Mr. Genender, are you okay with that?

5              MR. GENENDER:  Yes, I am.

6              Your Honor, can I make -- can I correct something I

7      said earlier or maybe complete something I said earlier, as

8      consistent --

9              THE COURT:  Sure.

10             MR. GENENDER:  -- with what I hope -- well,

11     consistent with what I hope the Court thinks is my continuing

12     duty of -- my continuing actions of candor to the Court.

13             The things that I said, where BP didn't invoke

14     arbitration at the hearings, is true.  I do want to, however,

15     note that there was a reference to arbitration in one of BP's

16     pleadings --

17             THE COURT:  That's in --

18             MR. GENENDER:  -- leading --

19             THE COURT:  That's actually in --

20             MR. GENENDER:  -- up to --

21             THE COURT:  -- your brief, Mr. Genender.  You put

22     down that they --

23             MR. GENENDER:  Yeah.

24             THE COURT:  -- that they had --

25             MR. GENENDER:  Yeah.

1          THE COURT:  -- they had mentioned it, but hadn't

2    really --

3          MR. GENENDER:  Then I --

4          THE COURT:  -- raised it in the evidentiary hearing,

5    and I appreciate you bringing --

6          MR. GENENDER:  I don't think -- I don't think my

7    comment earlier today was consistent with what was in our

8    brief, and I want to make sure that I am consistent with

9    what's correct and what's in our brief.

10          THE COURT:  I appreciate that.

11          MR. GENENDER:  Thank you.  Okay.

12          THE COURT:  So, if you all are both okay with that,

13    will you all upload an order that implements that, so that you

14    can -- especially the freezing.  Everything else, I'm not

15    worried about, but I want to put that freezing part in

16    writing, so that there is an order that freezes things.  So

17    why don't you just put all three features in writing and put

18    down how this notice will get filed and stuff like that?  And

19    just upload an agreed order, if you would, as to form.

20          MR. GENENDER:  Judge, are you -- sorry.  Judge, Paul

21    Genender.

22          Are you contemplating simultaneous briefing next

23    Friday?  If so, should we just pick a time?

24          THE COURT:  Yeah.  How about two o'clock, so that

25    you can't make an associate work late?

1          MR. GENENDER:  I like that.

2          THE COURT:  The guy that is sitting --

3          MR. GENENDER:  I got a --

4          THE COURT:  The guy that --

5          MR. GENENDER:  -- couple of people --

6          THE COURT:  -- is sitting off Mr. Duewall's left

7    shoulder just got a big smile on his face, right?

8          MR. DUEWALL:  Well, Judge, I've got someone at two

9    o'clock and three o'clock from me that are both smiling, so

10   thank you.

11         THE COURT:  Okay.  Thank you.

12         So, on the motions to quash, if these commercial

13   meetings result in a resolution, do we still need that

14   discovery or will that moot the need for discovery?

15         MR. GENENDER:  Well, Judge, we do need the

16   discovery.  And that's -- that discovery is not under the

17   operating agreement; that discovery is under the PSA.  And

18   that discovery relates to claims that the estate has against

19   BP and potentially Shell, investigating those claims for

20   delays, representations, et cetera, inducement, and actions

21   pre-petition and continuing, in connection with the PSA, in

22   connection with the delays to get Genovesa online.

23         THE COURT:  No, I --

24         MR. GENENDER:  And --

25         THE COURT:  I got that, I just -- the fact is you're

1    not going to reach a commercial resolution with BP, I don't

2    think, that leaves those issues as an open issue.  Those

3    people aren't going to -- neither Mr. Dane, nor Mr. Eaton are

4    going to -- they could.  But in all likelihood, if you're

5    going to resolve things, you're going to resolve everything.

6         And Mr. Manns, why don't I invite you all to the

7    meeting, too?  And let's have a commercial meeting that tries

8    to get everything out of the way, and then we'll come back on

9    the motions to quash.  And in the meantime, I will suspend

10   performance, seeing if there's a commercial resolution.  Does

11   that work?

12        MR. MANNS:  I think that's a -- I think that's a

13   reasonable approach, Your Honor.

14        And if I could make a request, if we're going to

15   come back.  And I know my schedule is probably the least

16   important of any of the parties on the call.  But if we have

17   to come back for a hearing on that motion to quash issue, I'd

18   respectfully request that we not do it the week of July 19th,

19   if at all possible.  I know I can discuss that with

20   Mr. Genender offline.

21        But I appreciate the Court's approach.  I think

22   sending the parties to a meeting may offer a level of detente

23   that could perhaps -- well, how knows -- reach some of these

24   other issues, as well.

25        THE COURT:  Mr. Manns, do you have any problem

1      bringing a client represent to a commercial meeting, so that

2      everything can be on the table?

3              MR. MANNS:  I do not, Your Honor.  I think that

4      would be productive, and I'll request my client to confirm.

5              THE COURT:  So, Mr. Duewall, the earliest that I

6      will issue a ruling is going to be the 23rd of July on the

7      arbitration issue, by the time you brief it and then you all

8      have your meeting.  So I'm not going to schedule a hearing on

9      the motion to quash until after I get a notice that the

10     meeting failed.  So, if you don't mind, when you all file that

11     notice, if the meeting fails, tell me whether I need to set

12     hearings on the two motions to quash, and that, you know, the

13     parties are available on X date.  If you all -- if the three

14     of you all will get on the phone with Ms. Do, she'll give you

15     a date when you're all available.  I'm not going to schedule

16     this where you're not.

17             MR. MANNS:  That sounds good, Your Honor.  We will

18     do that.

19             MR. GENENDER:  Your Honor, can I speak to this for a

20     moment, Your Honor?

21             THE COURT:  Yes.

22             MR. GENENDER:  Paul Genender for the Debtors.

23             I have -- the Debtors are fine with what you

24     outlined as it relates to the lift-stay arbitration motion.

25     As it relates to the 2004 motions, these are different issues

1     on different time lines.  I noted in papers BP filed this

2     morning that they're taking issue with timing and the amount

3     of time -- we disagree with the amount of time.  And I'm

4     concerned about that, I'm concerned about the Debtors being

5     prejudiced by the passage of even a couple of weeks before

6     getting Your Honor to address these issues.

7              We've submit -- these have been pending -- we served

8     drafts of them on May 14th, we served them on May 21st.  And

9     we do -- we're -- there's a concern about us being prejudiced

10    if these aren't -- if these couldn't be addressed for a few

11    more weeks.

12             THE COURT:  What's the prejudice?

13             MR. GENENDER:  Your Honor, I think --

14             THE COURT:  If the prejudice is these aren't going

15    to be your claims anymore, then that's not much prejudice

16    because it means you're going to waste your time by getting

17    the information.

18             MR. GENENDER:  Well, they're going to be someone's

19    claims, Your Honor.  And could I ask Your Honor take a short

20    recess, so I can visit with our clients on this issue.

21             THE COURT:  No, I'm not going to change that ruling.

22    I'm going to postpone that decision.  I want there to be a

23    commercial meeting.  I got it that this may put somebody else

24    there.  I'm perfectly empowered to allow discovery to occur by

25    the Debtor's successor if I caused the delay, so that it

1    couldn't happen.

2            MR. GENENDER:  Right.

3            THE COURT:  I don't know that I will do that, but

4    the law allows me to order, you know, pre-suit discovery in

5    any event.  So let's not get too worried about who's going to

6    be in possession and control of the right to get information.

7    I don't see that what Shell and BP are doing is trying to run

8    out the clock on you.  And I think that, if I say that you're

9    entitled to the information, they're going to give it to you.

10   We'll cross that bridge.

11           I want there to be a commercial meeting where we

12   have people that can reach a commercial decision without

13   having ongoing production under the 2004 right now.  And I'm -

14   - you know I'm not very bashful about doing things, so I'm not

15   going to let the clock run out and that have a bad

16   consequence.

17           MR. GENENDER:  Well, Judge, I appreciate your

18   comments.  They, to a degree, assuage my concern, so I thank

19   the Court for that.  And I don't know that I could ask -- I

20   mean, you've made your decision, so I'm not going to --

21           THE COURT:  Yeah.  I mean, look --

22           MR. GENENDER:  I'm not going to --

23           THE COURT:  -- Mister --

24           MR. GENENDER:  -- argue with you.

25           THE COURT:  -- Mr. Dane is here and you'll do your

1    job.  Sorry, Dane, I'm just not going to do that today.  I

2    want you all to meet and I want you to meet in good faith and

3    let's -- I know you've got a very busy schedule, as well,

4    trying to get things closed.  So we may be a little optimistic

5    on getting this done in two weeks, as you're trying to get to

6    an effective date.  But for the same reason, let's put

7    everything off.

8         Okay.  Boy it's a mess.  I sure appreciate the

9    quality of the argument that everybody made.  And I am just

10   not prepared to be confident in a decision today, but we'll

11   get there and I'll get to a level of confidence where I can do

12   it.

13        Thank you.  Good luck in your meeting.  And we're in

14   adjournment.

15        (The parties thank the Court.)

16        (Proceedings concluded at 11:22 a.m.)

17                        * * * * *

18        *I certify that the foregoing is a correct transcript*

19   *to the best of my ability due to the condition of the*

20   *electronic sound recording of the ZOOM/telephonic proceedings*

21   *in the above-entitled matter.*

22    */S./  MARY D. HENRY*

*CERTIFIED BY THE AMERICAN ASSOCIATION OF*
*ELECTRONIC REPORTERS AND TRANSCRIBERS, CET**337*
*JUDICIAL TRANSCRIBERS OF TEXAS, LLC*
*JTT TRANSCRIPT #64259*
*DATE FILED:  JULY 14, 2021*