# EXHIBIT "B"

1              IN THE UNITED STATES BANKRUPTCY COURT

2             FOR THE SOUTHERN DISTRICT OF TEXAS

3                      HOUSTON DIVISION

4    IN RE:                    §     CASE NO. 20-33948-11
                               §     JOINTLY ADMINISTERED
5                              §     HOUSTON, TEXAS
     FIELDWOOD ENERGY LLC,     §     MONDAY,
6                              §     JUNE 21, 2021
              DEBTOR.          §     8:00 A.M. TO 8:22 P.M.

7

8           CONFIRMATION HEARING DAY ONE  (VIA ZOOM)

9          BEFORE THE HONORABLE MARVIN ISGUR
              UNITED STATES BANKRUPTCY JUDGE

10

11

12      APPEARANCES:                    SEE NEXT PAGE

13

14      (Recorded via CourtSpeak; No log notes)

15

16

17

18

19

20              TRANSCRIPTION SERVICE BY:

21        JUDICIAL TRANSCRIBERS OF TEXAS, LLC
              935 Eldridge Road, #144
22            Sugar Land, TX 77478
                 281-277-5325
23         www.judicialtranscribers.com

24
     Proceedings recorded by electronic sound recording;
25      transcript produced by transcription service.

```
 1                    APPEARANCES (VIA ZOOM):

 2

 3   FOR THE DEBTOR:               WEIL GOTSHAL & MANGES, LLP
                                   Alfredo Perez, Esq.
 4                                 Clifford Carlson, Esq.
                                   Erin Choi, Esq.
 5                                 Paul Genender, Esq.
                                   700 Louisiana, Ste. 1700
 6                                 Houston, TX  77002
                                   713-546-5040
 7

 8   FOR AD HOC GROUP OF
     SECURED LENDERS:              DAVIS POLK & WARDWELL, LLP
 9                                 Damian S. Schaible, Esq.
                                   450 Lexington Avenue
10                                 New York, NY  10017
                                   212-450-4580
11

12   FOR HUNT OIL COMPANY:         BAKER BOTTS, LLP
                                   Kevin Chiu, Esq.
13                                 2001 Ross Avenue
                                   Dallas, TX 75201
14                                 214-953-6612

15   FOR OFFICIAL COMMITTEE OF
     UNSECURED CREDITORS:          STROOCK & STROOCK & LAVAN, LLP
16                                 Kenneth Pasquale, Esq.
                                   180 Maiden Lane
17                                 New York, NY  10038-4982
                                   212-806-5400
18

19   FOR U.S. DEPARTMENT
     OF THE INTERIOR:              U.S DEPARTMENT OF JUSTICE
20                                 Zachary Balasko, Esq.
                                   Matt Barr, Esq.
21                                 PO Box 875
                                   Washington, DC 20044
22                                 202-514-7162

23

24

25
```

```
 1                APPEARANCES (CONT'D - VIA ZOOM):

 2

   FOR ASPEN AMERICAN INSURANCE
 3 COMPANY, BERKLEY INSURANCE
   COMPANY, EVEREST REINSURANCE
 4 COMPANY, AND SIRIUS AMERICA
   INSURANCE COMPANY:            CHIESA SHAHINIAN GIANTOMASI
 5                               Scott Zuber, Esq.
                                 Darren Grzyb, Esq.
 6                               One Boland Dr
                                 West Orange, NJ 07052
 7                               973-530-2046

 8                               HUSCH BLACKWELL
                                 Randall A. Rios, Esq.
 9                               Timothy A. Million, Esq.
                                 600 Travis Street, Ste. 2350
10                               Houston, TX  77002
                                 713-647-6800

11

12 FOR BP EXPLORATION AND
   PRODUCTION INC.:              GREENBERG TRAURIG, LLP
13                               Shari Heyen, Esq.
                                 Karl Burrer, Esq.
14                               Craig Duewall, Esq.
                                 John Hutton, Esq.
15                               1000 Louisiana St., Ste. 100
                                 Houston, TX 77002
16                               713-374-3612

17

18 FOR ENERGY TRANSFER:          KATTEN MUCHIN ROSENMAN, LLP
                                 Yelena E. Archiyan, Esq.
19                               2121 N. Pearl St.
                                 Dallas, TX  75201
20                               214-765-3600

21

22 FOR LEXON INSURANCE COMPANY:  HARRIS BEACH, PLLC
                                 Lee Woodard, Esq.
23                               333 West Washington St.
                                 Syracuse, NY  13202
24                               315-632-4125

25
```

```
 1                    APPEARANCES (CONT'D - VIA ZOOM):

 2

 3   FOR PHILADELPHIA INSURANCE
     COMPANY:                        MANIER & HEROD
 4                                   Robert W. Miller, Esq.
                                     1201 Demonbreun St., Ste. 900
 5                                   Nashville, TN  37203
                                     615-244-0030
 6

 7   FOR XTO OFFSHORE, HHE ENERGY
     COMPANY AND XLT, LLC:           FORSHEY PROSTOCK, LLP
 8                                   Suzanne K. Rosen, Esq.
                                     777 Main Street, Ste. 1550
 9                                   Fort Worth, TX  76102
                                     817-877-8855
10

11   FOR ECOPETROL AMERICA:          SQUIRE PATTON BOGGS (US) LLP
                                     Kelly Singer, Esq.
12                                   1 E. Washington St., Ste. 2700
                                     Phoenix, AZ  85004
13                                   602-528-4099

14

15   FOR RIDGEWOOD KATMAI &
     ILX PROSPECT:                   SIDLEY AUSTIN, LLP
16                                   Michael Fishel, Esq.
                                     1000 Louisiana St., Ste. 5900
17                                   Houston, TX  77002
                                     713-495-4645
18

19   FOR ZURICH AMERICAN INSURANCE
     COMPANY AND SEITEL DATA
20   LIMITED:                        CLARK HILL, PLC
                                     Duane J. Brescia, Esq.
21                                   720 Brazos St., Ste. 700
                                     Austin, TX  78701
22                                   512-499-3647

23

24

25
```

```
 1                   APPEARANCES (CONT'D - VIA ZOOM):

 2

 3   FOR RLI INSURANCE COMPANY:      KREBS FARLEY & DRY, PLLC
                                     Elliot Scharfenberg, Esq.
 4                                   400 Poydras St., Ste. 2500
                                     New Orleans, LA  70130
 5                                   504-299-3583

 6

 7   FOR MARATHON OIL COMPANY:       BONDS ELLIS EPPICH SCHAFER
                                     JONES, LLP
 8                                   Clay M. Taylor, Esq.
                                     420 Throckmorton St.
 9                                   Suite 1000
                                     Fort Worth, TX  76202
10

11   FOR COX ENTITIES:              LOCKE LORD, LLP
                                    Michael Kind, Esq.
12                                  111 South Wacker Drive
                                    Suite 4100
13                                  Chicago, IL  60606
                                    312-201-2392
14

15
     FOR LLOG EXPLORATION AND
16   LLOG ENERGY:                   GEIGER LABORDE & LAPEROUSE,
                                     LLC
17                                  John E.W. Baay, II, Esq.
                                    701 Poydras Street
18                                  Suite 4800
                                    New Orleans, LA
19                                  504-654-1302

20

21   FOR HOUSTON ENERGY DEEPWATER
     VENTURES I, LLC AND RED
22   WILLOW OFFSHORE, LLC:          LAW OFFICES OF BARNET B.
                                    SKELTON, JR.
23                                  Barnet B. Skelton, Jr., Esq.
                                    815 Walker St., Ste. 1502
24                                  Houston, TX  77002

25
```

```
 1              APPEARANCES (CONT'D - VIA ZOOM):

 2

 3   FOR NORTH AMERICA SPECIALTY
     INSURANCE COMPANY:            LAW OFFICES OF T. SCOTT LEO PC
 4                                 T. Scott Leo, Esq.
                                   100 N. LaSalle St., Ste. 514
 5                                 Chicago, IL  60602
                                   312-857-0910
 6

 7   FOR HESS CORPORATION:         REED SMITH, LLP
                                   Omar J. Alaniz, Esq.
 8                                 2850 N. Harwood Street
                                   Suite 1500
 9                                 Dallas, TX  75201
                                   469-680-4200
10
     FOR TRAVELERS CASUALTY,
11   LIBERTY MUTUAL INSURANCE
     CO., HANOVER INSURANCE CO.,
12   AND XL SPECIALTY;            LANGLEY, LLP
                                  Keith A. Langley, Esq.
13                                PO Box 94075
                                  Southlake, TX  76092
14                                214-722-7162

15   FOR FREEPORT MCMORAN,
     MCMORAN OIL AND GAS, LLC,
16   CONOCO PHILLIPS COMPANY,
     AND MERIT ENERGY:           LOCKE LORD, LLP
17                               Omer F. Kuebel, III, Esq.
                                 601 Poydras Street, Ste. 2660
18                               New Orleans, LA  70130
                                 504-558-5155
19

20   FOR GENESIS ENERGY, LP:     ZABEL FREEMAN LAW FIRM
                                 Thomas A. Zabel, Esq.
21                               1135 Heights Blvd.
                                 Houston, TX  77008
22                               713-802-9117

23                               HOWLEY LAW FIRM, PLLC
                                 Tom A. Howley, Esq.
24                               711 Louisiana St.
                                 Houston, TX  77002
25
```

```
 1                   APPEARANCES (CONT'D - VIA ZOOM):

 2

 3   FOR CGG SERVICES (US), INC.:  FROST BROWN TODD
                                   Mark Platt, Esq.
 4                                 2101 Cedar Springs Road
                                   Suite 900
 5                                 Dallas, TX  75201
                                   214-580-5852
 6

 7
     FOR VALERO MARKETING AND
 8   SUPPLY COMPANY:               DYKEMA GOSSETT
                                   Deborah Williamson, Esq.
 9                                 112 E. Pecan Street
                                   St. 1800
10                                 San Antonio, TX  78205
                                   210-554-5500
11

12   FOR JX NIPPON OIL
     EXPLORATION, LTD:             CARVER DARDEN
13                                 Leann Moses, Esq.
                                   1100 Poydras Street
14                                 New Orleans, LA  70163
                                   504-585-3830
15

16   FOR BRIAN CLOYD, ANDREW
     LUIS, AND PATRICK BURNETT:    CAIN & SKARNULIS, PLLC
17                                 Taylor Romero, Esq.
                                   400 W. 15th St., Ste. 900
18                                 Austin, TX  78701
                                   512-477-5000
19

20

21

22

23

24   (Please also see Electronic Appearances.)

25
```

1                           INDEX

2   OPENING STATEMENTS:
      By Mr. Perez                13
3     By Mr. Schaible             23
      By Mr. Chiu                 27
4     By Mr. Pasquale             29
      By Mr. Balasko              30
5     By Mr. Zuber                33
      By Ms. Heyen                44
6     By Mr. Burrer               53
      By Mr. Eisenberg            58
7     By Ms. Archiyan             65
      By Mr. Woodard              66
8     By Mr. Grzyb                73
      By Mr. Miller               74
9     By Ms. Rosen                75
      By Mr. Singer               76
10    By Mr. Fishel               78
      By Mr. Brescia              79
11    By Mr. Scharfenberg         82
      By Mr. Taylor               84
12    By Mr. Kind                 85
      By Mr. Baay                 87
13    By Mr. Skelton              88
      By Mr. Leo                  88
14    By Mr. Alaniz               96
      By Mr. Langley              97
15    By Mr. Kuebel               98
      By Mr. Zabel               103
16    By Mr. Platt               105
      By Ms. Williamson          106
17    By Ms. Moses               106
      By Ms. Romero              107

18

19  WITNESS:          Direct   Cross   Redirect   Recross

20  MICHAEL DANE
      By Mr. Perez       117       .        .          .
21    By Mr. Woodward      .      208        .          .
      By Mr. Duewall       .      218        .          .
22    By Mr. Alaniz        .      273        .          .
      By Mr. Kuebel        .      288        .          .
23    By Mr. Eisenberg     .      297        .          .
      By Mr. Baay          .      307        .          .
24    By Ms. Hayden        .      325        .          .

25

1                          INDEX (CONT'D)

2

3    EXHIBITS:                        Received

4    Exhibit 1155                        116
     Exhibit 108, ECF 1646-3             138
5
     BP Exhibit 5 to 23                  229
6    BP Exhibit 25 to 35                 229

7    LLOG Exhibit 1603-1 and 1603-2      309
     LLOG Exhibit 1603-4 and 1603-6      309
8    LLOG Exhibit 1603-8 and 1603-21     310
     LLOG Exhibit 1603-25 and 1603-41    311
9
     XH Exhibit 1665-15 and 1665-16      325
10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1     <u>HOUSTON, TEXAS; MONDAY, JUNE 21, 2021; 8:00 A.M.</u>

2          THE COURT:  All right.  Good morning, we're here

3   for the Confirmation Hearing, and a couple of other matters,

4   in the Fieldwood Energy case.  It's 20-33948, appearances

5   have been made electronically.  If you haven't yet made your

6   electronic appearance, at some point this morning, please go

7   to my home page, you'll find a link in order to make you're

8   electronic appearance.

9          I know that we have various matters concerning

10  exhibits and other issues today.  But we're going to start

11  with opening statements.  Let me get whoever is going to

12  make the opening statement for the lead proponent, which I

13  assume is the Debtor, to go ahead and press five-star on

14  your phone.  We'll then allow anyone else that wishes to

15  make an opening statement, in favor of confirmation, to make

16  their opening statement and then we'll take those that

17  oppose.

18          From 713-546-5271.

19          MR. PEREZ:  Good morning, Your Honor.  Alfredo

20  Perez on behalf of the Debtors.  Can you hear me?

21          THE COURT:  I can, Mr. Perez, good morning.

22          MR. PEREZ:  Good morning.  Would you mind giving

23  Mr. Carlson the ability to put the slides on the screen?

24          THE COURT:  Of course.

25          All right.  Mr. Carlson, you're enabled.

1        Mr. Carlson, if you will unclick "use presenter

2   view," we'll see the full screen I think.  It's up in the

3   top middle.  There's a little check box right below the --

4   it's in the gray area, under monitors.  Down.  Down to the

5   left.  Left.  Down.  Nope.  Way up.  In the gray area, not

6   the red area.  Now over.  Go over to the left in the gray

7   area, you see where it says, "Use presenter view."  You're

8   in the white area, I'm talking the gray area.  Up in the

9   menu section gray, left, down a little bit.  There you ought

10  to see it right there.

11        There's a checkbox "use presenter view."  About

12  one inch below where your pointer is.  Yep.  Okay.  Now

13  press five-star -- F5 and it will go.

14      (Pause in the proceedings.)

15        MR. PEREZ:  Well, Your Honor, I think we've maxed

16  out Mr. Carlson's technology capabilities once again, so if

17  we could --

18        THE COURT:  Sure.

19        MR. PEREZ:  -- if we could just go-forward --

20        THE COURT:  Sure.  Let's go.

21        MR. PEREZ:  -- that might do it.

22        THE COURT:  Let's go.

23        MR. PEREZ:  All right.  Apologize.

24        So Your Honor, thank you for seeing us.  I think

25  we're here in a good -- we're in a good place.  And I'd like

1   to start by saying that we didn't waste the time over the

2   weekend that we had to start, and I think we've made

3   significant progress with respect to some of the remaining

4   outstanding issues.  We haven't resolved them all, but I do

5   believe that, as a result of the work that's been done over

6   the last three days, hopefully we will significantly narrow

7   the issues in dispute during this Confirmation Hearing and

8   move forward.

9          We are still in the process of documenting many of

10  the agreements that have been reached over the weekend and

11  so obviously we're going to need to work through that.

12  Hopefully, that will happen during the course of the

13  morning, but I think everybody has been working diligently

14  over the weekend and late last night, through the night, to

15  be able to -- to get to a place where we have a

16  significantly -- and I mean, significantly more agreement

17  than we had, had we started on Friday.

18         So, Your Honor, I believe Mr. Carlson is getting a

19  helper here to help him do this.

20         THE COURT:  The good news is we have until

21  4:00 o'clock and then only probably a fairly short

22  interruption.  So we'll get this done.  We'll get this done.

23  Let's just take our time, we'll get it right.

24         MR. PEREZ:  All right.  I'll tell you what, could

25  we make -- well, let's just go-forward.

1        Okay.  So turn to the next page, please.

2            OPENING STATEMENT ON BEHALF OF DEBTORS

3        MR. PEREZ:  All right.  So Your Honor, our Plan

4   really is a combination of transactions that has three main

5   objectives.  One, is to the safe and orderly decommissioning

6   of all of Fieldwood's assets and at no cost to the taxpayer.

7   Number two, to preserve the deepwater business with over a

8   thousand jobs, you know, employing probably a group of

9   people that have done more P&A in the Gulf of Mexico than

10  anyone else, and as a result -- and keeping and maximizing

11  the value for our stakeholders.

12       Your Honor, the Plan has significant support.  It

13  has support from the, you know, our first lien, first out

14  lenders, our first lien term loan lenders with whom we did

15  the RSA and have substantial consent rights over a lot of

16  the Plan documents.  Third, it has support of the second

17  lien term loan, which is, YOU KNOW, about half a billion

18  dollars' worth.  And the three funded debt element at the

19  top of the structure total of approximately in excess of a

20  billion dollars -- A billion eight, I'm sorry.

21       Can we go back a page?

22       We also have the support of the Creditors

23  Committee and significant support from trade creditors who

24  have supported the business while it's been in bankruptcy

25  and will continue to support the business on a go-forward

1  basis.

2         Additionally, Your Honor, we have the support and

3  have entered into transactions with multiple predecessors

4  including Apache, Chevron, Eni and Hunt and let me digress

5  here for a minute.

6         On Friday, one of the sureties, referred to as

7  "NAS," I think North American Specialty, filed a lawsuit in

8  federal court basically alleging that as a result of Chevron

9  and Eni entering into these transactions that we -- that

10 they are in violation of their bonds and therefore, their

11 bonds should be discharged if you will.  We are filing later

12 this morning a declaratory judgment action, we think this is

13 both a stay violation and it creates -- it creates

14 significant issues that are -- basically they filed an

15 objection making all these arguments and then they filed a

16 lawsuit in federal court.  So we'll address that in due

17 course, during the course of the day.

18        It also -- it also has the support of US Specialty

19 Lines, one of Mr. Eisenberg's clients who is providing

20 additional surety bonding availability to Credit Bid NewCo.

21 Furthermore, Your Honor, and I'm sure you'll hear from the

22 Government themselves, they are not objecting to the Plan.

23 We're still -- you know, they still want to make sure that

24 the Confirmation Order embodies all of the requests that

25 they've made, but they will not be objecting to the Plan.

1           And then, Your Honor, what has taken us the most

2    time during the weekend is we've had very, very productive

3    discussions with the four Apache sureties that support the

4    approximately $498 million in LCs and letters of -- in LCs

5    and bonds.  And we think that we have an agreement with them

6    in principle that we're in the process of documenting that

7    agreement would -- once it's kind of -- it's finalized would

8    remove the objections that were filed by Everest,

9    Philadelphia, HCCI, and Zurich to the Plan and in particular

10   to the -- you know, to Fieldwood One and many of the items

11   associated with Fieldwood One.  And hopefully we'll get that

12   documented and that will significantly streamline the

13   presentation of the testimony during the case.

14           So if you'll turn to the next page?

15           Your Honor, and I apologize it is kind of small if

16   you can't see it.  But in essence what this does is it shows

17   kind of what the structure is, what the various transactions

18   are, and, you know, we take our shelf assets with Fieldwood

19   de Mexico and the deepwater assets.  The deepwater assets

20   are primarily going to Credit Bid Purchaser in connection

21   with a sale transaction as is Fieldwood de Mexico.  There

22   are certain specified shelf assets that are also going to

23   Credit Bid Purchaser.  And then the balance of the shelf

24   assets are going into Fieldwood One, which is the Apache

25   legacy assets.  And then Fieldwood Three, which is going to

1   independently plug and abandon certain assets for which

2   there is no financially responsible predecessor.  In

3   addition to that, it's also doing work that was requested by

4   the Government with respect to certain other assets.

5          You have Fieldwood Four, which is the legacy

6   Chevron assets, and then you have the remaining abandoned

7   assets.  And with respect to the remaining abandoned assets,

8   Your Honor, we have deals in place with Eni and Hunt.  And

9   so that leaves really three primary predecessors: BP, XTO

10  which is Exxon, and Hess -- and I'll say something about

11  them later.

12         Your Honor, if you turn to the next page, this is

13  the slide that we have been working on.  So we think we've

14  solved for 91 percent.  There's about 9 percent left.  The

15  bulk --

16         If you go to the next page.

17         -- Your Honor, approximately 4 of that 90 -- of

18  that 9 percent, approximately 4 is BP, approximately 2 is

19  Hess, 1 is XTO, and the other ones are actually smaller ones

20  all around.

21         XTO, Your Honor, we work with extensively.  They

22  are in kind of a unique position in that they likely have

23  more bonding coverage than they have exposure under their --

24  under their potential decommissioning skills.  They are --

25  so, Your Honor, they are -- we've worked with them to make

1  sure that all their rights are preserved in the Plan and

2  that their ability rides through.

3          And, Your Honor, the one thing I would mention

4  that, of the remaining predecessors, these are all certainly

5  financially responsible individuals and -- they are

6  financially responsible individuals and they are all under

7  the CFR jointly and separately liable for the commissioning

8  -- for the commission obligations that accrue during their

9  ownership, Your Honor.

10          As it relates to the proposals that we've made to

11  the Government, they're primarily embodied in Section 5.13

12  of the Plan, Exhibit A to the Plan, as well as paragraphs

13  99, 100, 101, 102, 103 in the Confirmation Order.

14          With respect to that remaining 9 percent, Your

15  Honor, we proposed to enter into a Transition Services

16  Agreement, you know, for up to a period of 9 months where we

17  will, in essence, safeguard the assets and conduct the

18  day-to-day operational and monitoring services, maintain

19  certain standards, respond in the event that there is a

20  response needed, and do this for a period of 9 months at our

21  cost.  You know, without any cost to the Government and

22  while they issue orders for the predecessors to begin

23  decommissioning.

24          In addition, Your Honor, a little earlier in the

25  year, we had actually entered into what we refer to as the

1  "Agreed Activities" with the -- with BSEE, pursuant to which

2  we would in essence conduct certain work that was needed in

3  order to go ahead and create egress and fix certain

4  safety-related instances of non-compliance.  And that work

5  is well underway and we're going forward.

6           Your Honor, if you turn to the next page, you look

7  at Fieldwood One.  The purpose of Fieldwood One is to plug

8  and abandon and then decommission the legacy Apache

9  property.  That's what it's -- that's what it's LLC

10 agreement says, and that entity will be wound down after it

11 conducts all of the -- you know, all of the -- production

12 ceases and all of the plug and abandonment and

13 decommissioning of the legacy assets are done.  This is an

14 entity that its sole purpose is to maximize its cash flow so

15 that it can effectively and safely decommission the Apache

16 assets on a go-forward basis.  And Your Honor, as the Court

17 knows, that's about 60-plus percent of all of our ARO.

18           If you go to the next page, Your Honor, the --

19 Fieldwood One will have one employee.  That employee is John

20 Graham.  He retired from Apache last year, you know, well

21 before this opportunity came up.  He has 43 years'

22 experience in the oil and gas industry, he was head of HS&E,

23 and he's managed a workforce and led certain parts of the

24 business that have had significant production and

25 significant employees.

1          In addition, Your Honor, he is a -- he is a

2    reservoir engineer.  Mr. Graham will serve kind of as an

3    independent fiduciary to carry out the objectives of

4    Fieldwood One.

5          Initially, Your Honor, the Credit Bid Purchaser

6    will enter into a Transition Services Agreement, pursuant to

7    which the work will be performed, and Mr. Graham will have

8    the ability to bid out the Contract Services Agreement in

9    order to make sure that the cash flow for this entity is

10   maximized.

11         Your Honor, Apache does have certain consent

12   rights under the LLC agreement and in essence the consent

13   rights relate to the -- you know, ensuring that the

14   objectives of Fieldwood One are, in fact, carried out.  I

15   think that it's in essence what you would call negative

16   control, to make sure that Fieldwood One doesn't do

17   something that isn't within its scope.

18         You go to the next page, Your Honor.

19         We believe the evidence will show that none of the

20   surety's rights are impaired as a result of this --

21         THE COURT:  Mr. Perez, let me --

22         MR. PEREZ:  -- and hopefully, Your Honor --

23         THE COURT:  Let me ask you.  I thought you had

24   indicated earlier that the Apache sureties were now on

25   board.

1          MR. PEREZ:  Right.

2          THE COURT:  Are we going to end up crossing the

3  bridge of the slide we're on, or are you telling me we now

4  have sort of a consensus that this slide is accurate?

5          MR. PEREZ:  Yeah.  I think, Your Honor, we have a

6  consensus that this slide will probably be --

7          THE COURT:  Uncontested basically?

8          MR. PEREZ:  -- it will become moot.  It will

9  become moot later in the day.

10          THE COURT:  Okay.

11          MR. PEREZ:  I'm confident, Your Honor.

12          THE COURT:  Yeah.  I still want to see it, I just

13  I was asking that, because I want to be sure I understood

14  what you told me earlier.

15          MR. PEREZ:  Yeah.  Right.  Right.  And so I'll go

16  -- let's go ahead and -- I will go through this, Your Honor.

17          And then the -- this next line shows what the

18  decommissioning collateral is, and again, hopefully this

19  will become a moot point.

20          So let's go to the next slide.

21          So focusing on Fieldwood Three, Your Honor.  The

22  purpose of Fieldwood Three is to decommission the assets.

23  The Plan Administrator, Mr. Dunn, will be empowered to

24  conduct -- you know, to basically oversee this work and it

25  will retain Credit Bid Purchaser to decommission the work.

1  Fieldwood Three will be capitalized with $12 million,

2  $5 million in cash up front, in addition to the amounts

3  associated with the Credit Bid Purchaser -- I'm sorry, in

4  amounts -- in addition to the $8 million that is going to be

5  advanced for the Plan Administrator, as well as all of the

6  various reserves.  But each one of those categories of

7  assets will be basically held in trust for purposes of what

8  the -- what the purpose indicated.  So the 12 million will

9  be for decommissioning, obviously the 8 million Plan

10  Administrator will be for those fees, and then the various

11  reserves that will be funded will be for purposes of what

12  they were intended -- either a claims reserve or

13  administrative expense reserve and those various items.

14          Substantially, all of the Fieldwood Three assets

15  have been shut in, so there's virtually no production there.

16  And, Your Honor, the Fieldwood Three will conduct the work

17  as a designated operator with respect to both Eni and Hunt,

18  which are abandoned assets, but they will conduct the work

19  and Mr. Dane will testify about that.

20          Then going to Fieldwood Four, Your Honor, that is

21  after Apache, the Chevron assets are the next largest piece

22  of the puzzle, Your Honor.  And so Fieldwood Four would

23  carry out and decommission those assets, pursuant to a

24  turnkey removal agreement between Credit Bid Purchaser and

25  Fieldwood Four.  And again that will serve to decommission,

1    in essence, our next largest piece.

2           So, Your Honor, in essence, when we're talking

3    about what the evidence will show, we think that the

4    evidence will show that we have created a Plan that achieves

5    what it's intended to achieve.  The principal objectors are

6    the non-settling predecessors, as well as some of the

7    sureties relating to some of the assets.  Some of the assets

8    hopefully will have, you know, significant consensus with

9    respect to the Apache sureties, which are, in fact, by far

10   the largest number in amount of the surety that's been

11   issued.

12          And Your Honor, I think that the Plan maximizes

13   value and more importantly it satisfies all of the

14   *Midlantic* Standards in order to get approval.  And Your

15   Honor, we believe that the evidence will show that the Plan

16   should be confirmed.

17          Thank you, Your Honor.

18          THE COURT:  Mr. Perez, thank you.

19          Mr. Perez, would you have someone either email or

20   deliver a copy of your PowerPoint to Ms. Do?

21          MR. PEREZ:  Yes, ma'am.  Yes, sir.

22          THE COURT:  Thank you.

23          All right.  Are there any other proponents, as of

24   today, of confirmation who would like to make an opening

25   statement?  If so, please press five-star.

1          I do have some folks.  Let me just take you one at

2  a time.

3          Mr. Schaible, good morning.

4          MR. SCHAIBLE:  Good morning, Your Honor.  Thank

5  you for hearing me.  Damian Schaible of Davis Polk here on

6  behalf of, as Your Honor knows, first lien term lenders and

7  the DIP lenders.

8          Your Honor, I'm going to be -- I'm going to be

9  brief today, as you know I'm fairly good at being, and

10 really just --

11         THE COURT:  Mr. Schaible, your audio is not good.

12         MR. SCHAIBLE:  Okay.  Hold one second, Your Honor.

13         Your Honor, is that better?

14         THE COURT:  A little bit.

15         MR. SCHAIBLE:  Okay.  I'm sorry, Your Honor.

16         THE COURT:  That is better.  That is better.

17         MR. SCHAIBLE:  That is better?  Okay.

18         THE COURT:  Yes, sir.  Thank you.

19         MR. SCHAIBLE:  Thank you, Your Honor.  Sorry about

20 that.  So again for the Record Damian Schaible on behalf of

21 the first lien term lenders and DIP lenders.

22              OPENING STATEMENT ON BEHALF OF FIRST LIEN

23                   TERM LENDERS AND DIP LENDERS

24         MR. SCHAIBLE:  Your Honor, we echo all of the

25 Debtors' points and as you know we've been a supporter of

1  the Plan since the time that the case filed.  And so I would

2  just like to raise a few brief comments by way of -- by way

3  of background from the lenders' perspective.

4          So, Your Honor, you know, if you step back to

5  where we were at the filing, there was a deal with Apache,

6  there wasn't even a fully based Plan with our clients and

7  what was going to be a marketing process was going to be

8  undertaken to find out if anyone was going to be able to

9  come in and decommission these assets in a way that would

10 not require stepping back to the predecessors and the

11 sureties.

12         And that marketing process ran its course and

13 unfortunately was unsuccessful.  Our clients agreed as part

14 of a Plan that was negotiated and was finalized during the

15 case, as Your Honor will remember, to not only put in

16 $100 million DIP, put in necessary at the outset of the

17 case, but to commit to $200 million of additional money that

18 would be needed both for the ongoing business Credit Bid

19 NewCo, but also for -- before agreed decommissioning and to

20 support the settlements that were undertaken.

21         Your Honor will remember a rather vociferous

22 Disclosure Statement hearing with a lot of objectors and a

23 lot of issues.  And Your Honor said something that I thought

24 made a lot of sense is that, you know -- I'm paraphrasing of

25 course -- but that you wanted us to go get deals done.  That

1  you were not going to let this case be held up for the final

2  deal.

3        In other words, parties were going to need to dig

4  in and get deals done and then at the end there was a chance

5  that people would give us a high vote.  Your Honor, I told

6  you, if I remember at the DIP hearing, that you took very

7  seriously getting to deals wherever possible.  I told you

8  again at the Disclosure Statement hearing and, Your Honor,

9  today we've been working with the Debtors since the initial

10 filing of the case to try to get deals wherever we could.

11       And so as Your Honor knows, we received the

12 support of the second lien lenders.  That was a hard-fought

13 negotiation.  We received the support of the Creditors

14 Committee, another very hard-fought negotiation.

15 Settlements with -- as Mr. Perez mentioned, the largest part

16 of predecessors accounting for more than 91 percent of the

17 interest liability and now we're working on the settlement

18 with some of the larger sureties.

19       In addition, Your Honor, we've been spending a

20 great deal of time with the Government and (indiscernible)

21 today.  I'm amazed and really impressed and appreciate the

22 amount of time that they have been willing to put in with

23 us.  We've spent hours and hours and hours on Zoom calls.

24 They tend to like Zoom calls, which is bad for anyone who

25 has been out for a run and hasn't been able to shower -- but

1  we've had lots and lots and lots of Zoom calls to try to --

2  to try to get to resolution.  And I think that the deal for

3  -- or I guess you can't call it a deal -- but the proposal

4  from the Debtors and from Credit Bid NewCo that provide the

5  support that's going to be required in the near term ahead

6  of being able to deal with the remaining sureties and

7  predecessors, which we understand subject to documentation

8  the Government would intend not to object to.  We came to a

9  really elegant solution that gets -- if not on board,

10  non-objecting the last big party that we were really focused

11  on.

12          Your Honor, we remain open for business and would

13  love to reach resolution from the sureties and predecessors,

14  but it is time, I believe, to do as Your Honor suggested at

15  the Disclosure Statement hearing, which is to move to

16  Confirmation, seek to confirm this Plan.  This Plan saves

17  jobs, this Plan provides for safe decommissioning, this Plan

18  has the support of all the major creditor constituencies,

19  and frankly, Your Honor, there are just no alternatives.

20          If the Plan were -- cannot be confirmed, with the

21  marketing process having already been undertaken and failed,

22  we're left with really a 363 sale of collateral, and

23  effectively a liquidation that we would have to start

24  negotiating with the Government, which would be worse for

25  everyone in this virtual room.

1          And so, Your Honor, we would respectfully request

2     that after hearing all the evidence you consider entering

3     the Confirmation Order.

4          Thank you, Your Honor.

5          THE COURT:  Mr. Schaible, thank you.

6          From 469-387-8891.

7          MR. CHIU:  Thank you.  Good morning, Your Honor.

8     Kevin Chiu, Baker Botts on behalf of Hunt Oil Company and

9     subsidiaries.

10          Can you hear me clearly?

11          THE COURT:  I can, Mr. Chiu, good morning.

12          MR. CHIU:  Good morning.

13       OPENING STATEMENT ON BEHALF OF HUNT OIL COMPANY

14          MR. CHIU:  Your Honor, as you may be aware, Hunt

15     Oil Company and subsidiaries has entered into a term sheet

16     with the Debtors which is filed at Docket No. 1392.  And we

17     believe that the term sheet represents a deal that is the

18     result of a good faith and arm's length negotiations between

19     parties, and provides an agreement principle that treats the

20     certain oil and gas assets for which Hunt or its affiliates

21     previously held in interest properly.

22          As agreed upon under the term sheet, Hunt is here

23     to support confirmation of the Plan.  And as Mr. Schaible

24     noted just now, that it's argued that there are no other

25     alternatives to properly treat and deal with these

1   environmental obligations that such -- the decommissioning

2   of these assets are not an issue that will come down years

3   down the road, but should happen in the near future.  And as

4   such, this arrangement represents the only viable means of

5   safely and efficiently decommissioning these properties.

6          We are here today to also clarify some of the

7   points of the term sheet and so the Debtors' statement for

8   the confirmation brief filed at Docket 1563.  Two key

9   points, Your Honor, just for your attention.  First, in

10  regards to the turnkey agreement that was mentioned there,

11  that would be part of the implementation of the

12  decommissioning.  The term sheet is currently still being

13  finalized between the parties and the process currently

14  awaits final comments from the Debtors' and their

15  professionals in hopes that this will be finalized in short

16  order and filed with the Court.

17         Additionally, the Debtors' oil and gas lease

18  Schedules for Fieldwood Three and those properties will need

19  to be updated accordingly to capture the terms of the deal.

20  They're presently filed at Docket Nos. 1562 and 1587.  These

21  Schedules don't fully capture the allocation of certain Hunt

22  properties under the term sheet, but we understand the

23  complex cases and certainly the heavy lift that the Debtors'

24  face, but there are such documents already caused a motion

25  and we hope that the Debtors will update these documents

1    properly and file them with the Court.

2              As we fully stand here today and support

3    confirmation, we believe that this deal represents the best

4    alternative solution for Hunt and these various properties.

5              Thank you.

6              THE COURT:  Mr. Chiu, thank you.

7              Mr. Pasquale.

8              MR. PASQUALE:  Good morning, Your Honor.  Ken

9    Pasquale from Stroock & Stroock & Lavan for the Creditors

10   Committee.

11             Can you hear me okay, Your Honor?

12             THE COURT:  I can, good morning.

13                  OPENING STATEMENT ON BEHALF OF THE

14                  OFFICIAL COMMITTEE OF UNSECURED CREDITORS

15             MR. PASQUALE:  Good morning.  Your Honor, I'm

16   going to reserve most of my comments for closing.  I did

17   just want to officially say what you've already heard and

18   know, that is the Committee does support the Plan.

19             We are in the process, as everyone is at this

20   point, of evaluating the settlement that you've heard about

21   with the sureties to Apache and with that small caveat which

22   will get back to the Court and the parties on.  I did just

23   want to say for now that we support the Plan and we'll save

24   the rest of our comments for later.

25             Thank you, Your Honor.

1          THE COURT:  Thank you, Mr. Pasquale.

2          Mr. Balasko.

3          MR. BALASKO:  Thank you, Your Honor.  Zach Balasko

4    for the Department of the Interior.

5                OPENING STATEMENTS ON BEHALF OF THE

6                   US DEPARTMENT OF THE INTERIOR

7          MR. BALASKO:  As the Court knows this has been a

8    unique and challenging case, largely due to the sheer

9    magnitude, you know.  BSEE's estimates for the Debtors'

10   decommissioning obligations in total is around $7 billion.

11   So this has been a very important case for the Department

12   and one that we are working very hard with the Debtors, with

13   the lenders, and with the predecessor to reach as many

14   potential deals on decommissioning as possible.

15          When the Plan was filed was filed in January, the

16   Apache deal was in place in the deal and Fieldwood Three

17   were in place representing about 80 percent of the Debtors'

18   total decommissioning liability.  And partly, at that time,

19   as to the remaining 20 percent of the property that was

20   proposed to be abandoned, there was no funding in place or a

21   Plan in place to address the transition period between the

22   effective date of the Plan and when Interior could order the

23   jointly and severally liable predecessors, to appoint new

24   operators on these properties and perform decommissioning.

25   We've made it clear to the Debtors at that time and we've

1   made it clear to Your Honor at the Disclosure Statement that

2   we weren't there yet in terms of Government supporting the

3   Plan.

4        And since that time, the Debtors and their

5   professionals, the lenders and their professionals, and all

6   of the predecessors have gone to great lengths and many,

7   many, many hours on Zoom calls, as Mr. Schaible said, to

8   attempt to reach the maximum number of potential

9   arrangements.  We're up to 91 percent, as Mr. Perez detailed

10  to the Court.  And of the remaining 9 percent, again, most

11  of those are properties for which BP, Hess, and XTO are the

12  principle predecessors.

13       Interior is confident that BP, Hess, and XTO in

14  order to do so, will step up to the plate and perform the

15  decommissioning on their property.  But unfortunately they

16  were not able to get to consensual agreements with the

17  Debtor and we understand that that's not always possible.

18       Perhaps more importantly in the imminent term, the

19  Debtors have agreed to continue to maintain and monitor

20  these properties for nine months, following the effective

21  date, to allow Interior the time that will be necessary to

22  order collateral parties to take over the operatorship of

23  these properties and perform the decommissioning.  This

24  eliminates the risk that we're going to have, you know,

25  unmaintained and unmonitored properties in the Gulf as of

1  the effective date and the Debtors are going to continue to

2  fulfill their obligations while responding to do that for

3  the nine-month period the Interior believes will be enough

4  time to get other parties on board on these properties.

5          You know, it's been a long way to get to this

6  point and the Plan is not perfect from Interior's

7  perspective.  You know, we would have liked to have seen a

8  100 percent solution, but, you know, that's not always

9  possible.  And we've reached a point that the Government is

10  comfortable that the Plan data is satisfied and that this is

11  the best solution that's possible in this case to protect

12  health, safety and the environment and for that reason the

13  Government is not objecting to the Plan.

14          THE COURT:  Mr. Balasko, thank you.

15          Mr. Zuber.

16      (Pause in the proceedings.)

17          THE COURT:  Mr. Zuber.  Mr. Zuber, I can see you,

18  but can't hear you.

19          MR. ZUBER:  Thank you, Your Honor.  I'm sorry.

20  Good morning, Your Honor.

21          THE COURT:  Good morning.  I can hear you know.

22          MR. ZUBER:  Okay.  Thank you.  I'm with a law firm

23  in New Jersey of Chiesa Shahinian and Giantomasi and along

24  with the Husch Blackwell firm, Randy Rios and Tim Million,

25  we represent four pre-petition surety bond providers, which

1  include Aspen American Insurance Company, Berkley Insurance

2  Company, Sirius America Insurance Company, and Everest

3  Reinsurance Company.

4     OPENING STATEMENT ON BEHALF OF ASPEN AMERICAN INSURANCE

5        COMPANY, BERKLEY INSURANCE COMPANY, SIRIUS AMERICA

6        INSURANCE COMPANY, AND EVEREST REINSURANCE COMPANY

7           MR. ZUBER:  As stated at the outset, there has

8  been an agreement in principle reached with respect to

9  Everest's objections as they relate to the Fieldwood One

10 structure.  And my colleague, Darren Grzyb, will address any

11 issues related to that.  But at this point Everest does not

12 intend to go forward with its objections with respect to any

13 aspect of the Plan, but our other three sureties do continue

14 to -- will not object to the Fieldwood One structure, but do

15 continue to preserve arguments with respect to other

16 matters.

17           Your Honor, we filed a Plan Objection at Docket

18 No. 1461.  We filed yesterday a supplemental objection at

19 Docket No. 1664.  Many creditors and parties in the group

20 have also filed confirmation objections, some of which,

21 particularly those filed by other sureties and

22 predecessors-in-interest, our clients have joined to the

23 extent not inconsistent with our client's position.

24           I'm not going to go into too much detail regarding

25 our legal arguments, Your Honor, that we made in our filing,

1  but with the Court's indulgence, I would like to present a

2  couple of overriding bigger picture concerns that we have.

3          So first, you know, it's our view that any party

4  -- whether the Debtor, a divisive merger entity, a

5  predecessor, or anyone else exploiting assets for their

6  benefit should be obligated to pay decommissioning costs and

7  acquire with an applicable law.  And if they fail to do so,

8  we sureties may be called upon to pay.  And if we are called

9  upon to pay, we are entitled to step into the shoes of the

10 Government to be repaid.  We're talking about properties

11 which the Debtors or their designees continue to exploit for

12 their benefit.  If they're going to do so, Your Honor, they

13 need to accept the burdens associated with the benefits they

14 intend to derive.

15         If this were a liquidation, which at least in part

16 seems like it may be, and a third party were to acquire

17 assets in this case, they would need to comply with

18 applicable law.  If they're going to deride benefits they

19 need to take the burdens.

20         Respectfully, Your Honor, bankruptcy is not a

21 license to violate or be exempt from the law, which imposes

22 decommissioning obligations upon those who choose to avail

23 themselves of the privilege of exploiting natural resources.

24         The Debtors can choose to abandon wells and the

25 globe will sort out which third parties have to pay and who

1    has obligations as between them.  Respectfully, Your Honor,

2    we submit it's not the Bankruptcy Court's role in that

3    process to sort out disputes amongst parties with the

4    respective liabilities and rights against each other.  And

5    there's nothing in the Bankruptcy Code or in the law which

6    authorizes a Bankruptcy Court to declare a forfeiture of

7    rights by some third parties against others, including

8    subrogation rights.  And I would note, as set forth in our

9    papers, the U.S. Supreme Court case of *Pearlman vs Reliance*

10   *Insurance Company* at 371 US 132 (1962).

11             THE COURT:  Mr. Zuber --

12             MR. ZUBER:  Nothing in the Code or the law --

13             THE COURT:  Mr. Zuber, I think that -- and I just

14   want to be sure I'm understanding the argument.

15             Are you not receiving an unsecured claim if you

16   have to fund money, and if you are, why isn't that identical

17   to the amount you would receive in subrogation rights?  At

18   least my holding has been you get monetary subrogation, you

19   don't get regulatory subrogation.  And I wanted to

20   understand -- the argument to me in your objection wasn't

21   entirely clear about making a distinction between monetary

22   and regulatory, and I want to get a good understanding

23   before we proceed with the hearing.

24             MR. ZUBER:  Your Honor, we don't claim that we get

25   regulatory subrogation rights, we don't secede to the

1   Governments regulatory powers, but we belief that we

2   preserve all of our subrogation rights with respect to third

3   parties obligees stepping into the Debtors' shoes and

4   others.  We don't understand why rights are proposed to be

5   taken away from the sureties.  You know, the risk these

6   sureties took when they issued bonds was not that they would

7   be deprived of the ability to litigate damages from

8   enforcement of subrogation rights, so that the Court would

9   approve a Plan that provides for forfeiture.  That was not

10  bargained --

11          THE COURT:  Which rights are being taken away, ise

12  I guess then -- if you're not looking for a regulatory right

13  and you are getting an unsecured claim, what right is being

14  taken away?  I just want to get a little better definition

15  of that.

16          MR. ZUBER:  The right to, down the road, to defend

17  claims with respect to the Credit Bid Purchaser, Your Honor.

18  You know, we believe that that --

19          THE COURT:  I did not know that your right to

20  defend claims against the policy were being taken away.  And

21  that's -- I want to get to the definition because I need to

22  understand the argument.  And if you're not seeking

23  regulatory subrogation and if you are getting an unsecured

24  claim, I do want to know what rights are being taken away

25  with some specificity, because your argument has some force

1  with it, but the force is going to be in the details I'm

2  afraid.

3         MR. ZUBER:  Your Honor, any and all rights, other

4  than what our claims are against the Debtor should be

5  preserved.  Rights against obligees, rights against the

6  Government, rights against the Credited Bid Purchaser.  The

7  law is pretty clear in the Fifth Circuit, Your Honor, that

8  the -- you know, we were able to opt out of third party

9  releases under this Plan, and we submit, as we briefed, that

10 we should be able to opt out of exculpations and injunction

11 provision.  We don't want anything in this Plan to impair

12 our rights as to any party, other than the Debtors, as set

13 forth in the Plan.

14        I'm not talking about a pre-petition unsecured

15 claim.  I'm talking about down the road, you know, five

16 years from now when a claim is made on one of our bonds, we

17 should not be prohibited by an injunction under the Plan

18 from defending that claim and saying that we should have to

19 pay on that claim when we think that a bond obligee may have

20 impaired our rights.  There should be no impairment of

21 surety rights as to anyone other than the Debtors.  There

22 should be no exculpations and injunctions that protect the

23 Credit Bid Purchaser down the road.

24     (Pause in the proceedings.)

25        MR. ZUBER:  For example, Your Honor, Credit Bid

1    Purchaser is going to acquire some leases, it would then be

2    its responsibility to do decommissioning obligations.  If

3    the Credit Bid Purchaser down the road does not do it, it

4    will default to other entities.  BOEM could then order

5    others to do that.  They could order Fieldwood One, but for

6    the bankruptcy, and they could order our obligee -- for

7    example, Noble.  We need to be able to stand in the shoes of

8    principle and the obligee to assert any rights we may have

9    against the credit purchaser down the road, such as --

10           THE COURT:  So wait -- I just want to be sure I

11   understand.  This is not a present right to sue a purchaser.

12   This is, if we do a sale under 363, we can't do it free and

13   clear.  It has to be subject to your future rights that

14   wouldn't come into being until the sale was consummated,

15   right?

16           MR. ZUBER:  Correct, Your Honor.

17           THE COURT:  Well, that argument will not carry the

18   day.  So tell me another argument.

19           MR. ZUBER:  Well, Your Honor, I submit that there

20   are -- there should be --

21           THE COURT:  363 -- unless I'm missing it, 363

22   allows the Court to order the sale of property free and

23   clear of liens, claims, and encumbrances, and you're talking

24   about a claim that goes with the sale, not a claim you

25   presently have.  I thought you were telling me that we might

1  be impairing a claim you presently have, not that we can tie

2  up a property and never have it sold and never have it

3  cleaned up in a way that doesn't make your life -- your

4  client's life any worse.  And I'm trying to figure out how

5  does the sale make your client's life any worse than if we

6  didn't have the sale, and so far I'm not hearing it.

7         MR. ZUBER:  It doesn't today, but it may down the

8  road.

9         THE COURT:  Well, how down the road would it make

10  your life worse than it is today?

11         MR. ZUBER:  But for the bankruptcy, we would have

12  claims of defenses.  If an obligee impairs our rights we can

13  claim that we shouldn't have to pay a claim on the bond.

14         THE COURT:  Right.  And which obligee is impairing

15  your rights?

16         MR. ZUBER:  The obligees on the bonds such -- our

17  current obligees.  No they're not impairing our rights, we

18  need to be able to step into the shoes of our obligee to

19  defend claims against the Credit Bid Purchaser.

20         THE COURT:  Defend claims against the Credit Bid

21  Purchaser?  I don't under -- the Credit Bid Purchaser isn't

22  going to make you do anything, right?  You're talking about

23  prosecuting claims against the Credit Bid Purchaser, not

24  defending them, or else I'm misunderstanding the Plan.  I

25  did not believe the Credit Bid Purchaser has rights against

1  you under the Plan.

2          MR. ZUBER:  The Plan seeks to take away our

3  subrogation rights.  There is no jurisdiction of this Court

4  to take away our subrogation rights.  We should retain

5  those, whatever they are.

6          THE COURT:  Yeah, but I'm asking you to tell me

7  what subrogation rights these are.  It's not a subrogation

8  right against a future purchase.  I'm not taking that away,

9  because it doesn't exist right now.

10          Is there a present subrogation right that's being

11  taken away against an obligee?

12          MR. ZUBER:  No, Your Honor.

13          THE COURT:  Because I didn't think there was.

14          MR. ZUBER:  Future subrogation rights.  There have

15  been no claims on the bond.  If at some point in the future

16  there's a claim on the bond and we have to pay on that bond,

17  we have, as a matter of law, the right to step into the

18  shoes of the principle and the obligee for all purposes.

19  And we shouldn't lose any of those rights simply because a

20  chapter -- where the Debtor can't meet its obligations.

21  These are disputes that will arise -- or may arise, may not

22  arise, but may arise in the future between non-Debtor

23  parties.  And there's nothing in the Plan should impair our

24  ability to exercise our subrogation rights five years from

25  now when a claim is made on a bond and we have to pay that

1  claim and then we would try to exercise our subrogation

2  rights, and then someone would say you can't exercise those

3  rights because they've been enjoined under the Plan.

4          THE COURT:  And that's what I'm trying --

5          MR. ZUBER:  Inappropriate.

6          THE COURT:  -- what I'm trying to define is -- I

7  do understand your argument that you might have rights in a

8  future lawsuit against somebody that isn't yet an owner, a

9  future purchaser, and I'm telling you I believe the

10  Bankruptcy Code allows those rights to be cut off.

11          What I'm looking for is, if you have a right, for

12  example, to subrogate against a current obligee, if that's

13  being taken away, I really do want to know that.  And I

14  didn't think it was being taken away.  Tell me how it is.

15          MR. ZUBER:  That's not being taken away, Your

16  Honor.

17          THE COURT:  Well then, what is being taken away

18  besides your right to sue a future purchaser?

19          MR. ZUBER:  They're attempting, under the Plan,

20  Your Honor, to take our future subrogation rights --

21          THE COURT:  Against --

22          MR. ZUBER:  -- not rights -- the right --

23          THE COURT:  Against -- but is that only against a

24  future purchaser?  I'm trying to tell you -- get you to tell

25  me is there any right you have that's being taken away,

1  other than the rights against a future purchaser?

2          MR. ZUBER:  It would be against Credit Bid

3  Purchaser, Your Honor, and also being able to stand in

4  BOEM's shoes as the obligee in some of the bonds.

5          THE COURT:  Okay.

6          MR. ZUBER:  So, Your Honor, you know, we

7  respectfully submit that the exculpation should not go

8  beyond the normal exculpations of Creditors Committees and

9  Creditors Committee members acting in that capacity and

10  Debtors' management.  There shouldn't be any third-party

11  exculpations of impairment of rights by third parties

12  against other third parties.

13          So we have proposed some reservation of rights

14  language in our supplemental objection, Your Honor, at

15  paragraph 21 of our supplemental objection.  I'm not going

16  to read it for the Record, but it would go a long way if we

17  could make clear that this Plan is not impairing future

18  rights as between non-Debtor entities.

19          THE COURT:  Well let me -- just so you know where

20  at least I think the Plan is going -- and I'm going to need

21  you, as we proceed with today, to show me that I'm wrong.  I

22  think the Plan does impair your ability to take affirmative

23  action against someone that is not today an owner of the

24  property, i.e. a future purchaser.  Otherwise, I am not

25  aware of rights that are being taken away and I need those

1    explained to me as we go through documents and witnesses

2    today.

3         Because if all that we're looking at is, the

4    363(k) rights are being preserved, because you're not

5    telling me you have a claim against the future purchaser,

6    you're telling me you have a claim against the future

7    purchaser arising by their purchase of the assets, and

8    Section 363 allows the assets to be sold free and clear of

9    those claims.  That's an issue with Congress, not with me.

10        If there is another issue out there, I need it

11   defined as we go through today.  I got it, I think it's an

12   important question.  I just don't understand it in the

13   context of the case other than against the future creditors.

14        MR. ZUBER:  Okay.  We'll develop that as we go,

15   Your Honor, and we'll give you some more specific examples.

16        THE COURT:  Mr. Zuber, thank you, sir.

17        All right.

18        MR. ZUBER:  Thank you.

19        THE COURT:  Does anyone else wish to make a

20   statement now in opposition to Confirmation of the Plan?

21        All right.  I do have some folks.  And let me get

22   their lines activated.

23        Ms. Heyen, good morning.

24        MS. HEYEN:  Good morning, Your Honor.  Shari Heyen

25   at Greenberg Traurig on behalf of BP Exploration and

1   Production.

2           Can you hear me okay, Your Honor?

3           THE COURT:  I can.  Good morning.

4           MS. HEYEN:  Thank you.

5       OPENING STATEMENTS ON BEHALF OF BP EXPLORATION

6                   AND PRODUCTION, INC.

7           MR. HEYEN:  I'm also joined by my colleagues,

8   Mr. Craig Duewall, Mr. Karl Burrer, and Mr. John Hutton also

9   of Greenberg Traurig.  And Your Honor I'm sure you've read

10  and heard form a number of objectors and we're opposing this

11  Fifth Amended Proposed Plan.

12          I'm not here to restate or relitigate those, argue

13  those objections, but instead, Your Honor, BP rises this

14  morning to propose a commercially reasonable solution to the

15  11th hour legally dense and complex documents and

16  information filed by the Debtors and others.

17          And Your Honor we understand this morning from the

18  opening statements that the Debtors and others are still

19  documenting agreements, that not all the definitive

20  documents have yet been reduced to writing, and those

21  documents are not yet made public.

22          Your Honor, there's no question that Fieldwood

23  seeks Court approval of an unprecedented and historic scope

24  of abandonment of wells, platforms, and pipelines in the

25  Gulf of Mexico.  This means that, if the Plan is confirmed,

1  that BP, along with other similarly situated predecessors

2  and co-interest owners will be left to tackle certain P&A

3  obligations in the Gulf of Mexico.  Your Honor, for BP

4  alone, our estimated P&A obligations exceed $300 million.

5       And Judge, by our objection and our proposed

6  language that we filed this morning, we're seeking to

7  preserve important bargained-for rights in our commercial

8  contracts and agreements with Fieldwood, with third parties,

9  with our sureties, and with those parties who are receiving

10  an assignment of our contracts.

11       This morning, in an effort to solve some of these

12  commercial issues with the Plan, BP filed proposed language,

13  it's at Docket No. 1673, and it's proposed language we would

14  like included in this Confirmation Order, which we have not

15  yet seen.  And if Your Honor accepts that language, it would

16  resolve all but one of BP's confirmation objections.

17       BP's proposed language, Your Honor, essentially

18  does four things.  Number one, it memorializes and confirms

19  that BP has opted out of the third-party releases.  Number

20  two, it preserves any subrogation claims by ensuring that

21  the Debtors' new language that was recently added in

22  Section 5.13(a) of the Fifth Amended Plan is applicable to

23  three of our bonds.  Number three, it ensures that BP's

24  contractual right, including its right of arbitration, is

25  not impaired by the Plan Injunction.  And then number four,

1  it preserves BP's rights regarding -- by ensuring that the

2  Plan does not simply eliminate or set off rights by virtue

3  of the NewCo sale.

4         Again, Your Honor, if accepted by the Court we

5  believe that this language will significantly narrow the

6  scope and length of this complicated and dense hearing.  BP

7  is prepared, however, Your Honor, to present evidence and

8  arguments on each one of these issues, but we believe that

9  the proposed language and its resolution are commercially

10  reasonable, are commercially fair, and would obviate the

11  need for extensive proceedings on issues that are really

12  capable of a commercial resolution.

13         Your Honor, our language is supported by

14  well established United States Supreme Court law, by Fifth

15  Circuit law, and by Bankruptcy Court decisions.  And I'll

16  just briefly go through each of the four points that I

17  previously raised, Your Honor.

18         First, with respect to the proposed third-party

19  releases:  BP does not believe that it is a, quote,

20  "Releasing Party," close quote, under the Plan, but in an

21  abundance of caution we filed an opt-out notice at Docket

22  No. 1437, and we also included our opt-out objection in our

23  filed objection.

24         Accordingly, Your Honor, this Confirmation Order,

25  we submit, should recognize that BP is not bound by the

1  third-party releases proposed in the Plan.  BP's proposed

2  language clarifies and confirms that nothing in the Plan,

3  the Confirmation Order, or these cases will impair or modify

4  BP's rights with respect to any non-Debtor parties,

5  including any other predecessors or other co-liable or

6  jointly and severally liable parties.

7          Nothing in the Plan or Confirmation Order should

8  be deemed to be construed as a release or a discharge of any

9  liability or obligation of any third party with respect to

10  any decommissioning liabilities associated with the Debtors'

11  assets.  And frankly, the claims and causes of action held

12  by BP against any all third parties should be reserved and

13  preserved.

14          And Your Honor, our proposed language is not

15  controversial, it preserves private rights and remedies

16  among non-Debtor parties.

17          Second, Your Honor, the proposed language by BP

18  preserves BP's subrogation claims.  And we think, you know,

19  perhaps Your Honor, most astonishingly about five days ago,

20  the Debtors filed a Fifth Amended Plan that contains

21  language in Section 5.13(a) that purports to waive every

22  person's relevant, you know, subrogation rights.  We think

23  that 5.13(a), the language that was included at the 11th

24  hour, purports to act as an absolute bar to any person's

25  subrogation rights in violation of well-established Fifth

1  Circuit law.

2          BP's proposed solution is that the Confirmation

3  Order preserve subrogation claims by ensuring that the

4  Debtors' new language in Section 5.13(a) is not applicable

5  to three of BP's bonds.  That BP's bonds are unaltered and

6  the rights of BP and other beneficiaries and obligees,

7  pursuant to the BP bonds, are unaffected by the Plan, the

8  Confirmation Order, or any of the proposed transactions.

9          THE COURT:  What would BP's language do with

10  respect to a purchaser of the assets?

11          MS. HEYEN:  So Your Honor, obviously we've

12  assembled our legal team here today to address these issues.

13  You know, we're happy to answer any questions that the Court

14  may have.  Obviously, given the density and the sheer volume

15  of the documents, including some that have been filed and

16  will be filed with the Court, we've divided and allocated a

17  lot of these issues among various Greenberg Traurig team

18  members.  And so if I may, Your Honor, Mr. Karl Burrer will

19  take that issue up with the Judge.

20          THE COURT:  All right.  We can come back to it.

21  If you want to finish your statement and then we'll go to

22  Mr. Burrer.

23          But my question to you is very similar to the one

24  that Mr. Zuber, it's one thing to tell me that you want to

25  be sure that your existing subrogation rights against an

1  existing party are maintained.  It's another to say that we

2  can't order the sale of an asset free and clear of liens,

3  claims, and encumbrances, which the statute says we can do.

4  And that's what I want to learn in terms of the proposed

5  language that you have and see whether it's broad or narrow

6  in that sense.

7       MS. HEYEN:  Very good, Your Honor, we will -- I'll

8  have Mr. Burrer address that at the conclusion of my opening

9  statements.

10       Third, Your Honor, BP's proposed language

11  preserves contractual and bargained for rights, which must

12  be preserved.  And here I'm going to turn to Section 10.6 of

13  the Plan, which seeks to enjoin claims, rights, and remedies

14  with respect to rejected contracts, with respect to future

15  contractual relationships, and also with respect to

16  contribution subrogation rights.

17       So BP has proposed language that preserves

18  pre-petition claims, rights, and defenses by ensuring that

19  the Plan Injunction is limited to pre-petition claims

20  against the Debtors.

21       And let me explain what I mean here, Judge.

22       A number of our contracts are being rejected and

23  whatever claims rights and defenses we now have as a result

24  of that rejection, we just want to make sure that those are

25  preserved for later adjudication.

1          Next, the Debtors are assuming and assigning

2    approximately 168 of our contracts to new parties.  The

3    Confirmation Order should clarify that the Plan Injunction

4    is not so expansive as to enjoin ongoing future

5    relationships with our new contract counterparties.

6          And in addition, Your Honor, BP has proposed

7    language that clarifies that the Plan Injunction should not

8    limit BP's right to arbitration.  There is currently a

9    dispute between BP and Fieldwood over the LSPS Operating

10   Agreement.  BP properly invoked the arbitration provision

11   under that contract.  However, Fieldwood refuses to

12   acknowledge that the arbitration provision exists.

13         So consequently, BP was forced to file a motion to

14   lift the automatic stay to compel arbitration.  That Motion

15   is pending and will be heard by the Court on July 9th.  Our

16   Motion is filed at Docket No. 1414.  BP's proposed language

17   simply clarifies, Your Honor, that none of BP's claims or

18   arbitration rights will be eliminated -- will be limited or

19   eliminated by the Plan Injunction.  The Court can decide the

20   merits of the arbitration issue at the hearing on the Motion

21   to Compel Arbitration, which again, Your Honor, is set to be

22   heard in two weeks on July 9th.

23         THE COURT:  Let me just ask you this.  And I had

24   not focused at all on the arbitration issue, I'll just tell

25   you, Ms. Heyen.  So this question is a practical one.

1          If we get down to that hearing and determine that

2    under Fifth Circuit law, we're not going to go to

3    arbitration, we're going to retain it here, could then the

4    Confirmation Order have an effect or are you saying even

5    then it would not have an effect?

6          Does that question make sense?

7          MS. HEYEN:  Yeah, I'm trying to think through it,

8    Your Honor.  I think, you know, what we're asking is that

9    whatever we -- whatever Your Honor decides on July 9th is

10   what we'd like to do.  We understand that that issue has

11   been tabled until July 9th.  We just want to make sure that

12   whatever rights we're arguing and remedies we're arguing for

13   under those Agreements that they are preserved and reserved

14   for later adjudication.

15         THE COURT:  Okay.  Got it.  Thank you.

16         MS. HEYEN:  Yeah, they're teed up before

17   Your Honor to be heard.

18         And finally with respect to 10.6 of the Plan

19   Injunction, there are certain properties that are being

20   abandoned, as Your Honor is well aware, and BP simply

21   requests the Confirmation Order clarify that BP's rights of

22   contribution, for example, against other predecessors and

23   co-interest owners, are preserved and are not enjoined and

24   that also BP's subrogation rights are likewise not enjoined.

25         Fourth, with respect to setoff, the Debtors should

1  not be permitted to sell assets free and clear of BP's

2  secured setoff rights.  BP has filed a separate motion for

3  stay relief seeking authority to implement its setoff

4  rights.  That's filed at Docket No. 1666 and that's set for

5  a hearing on July the 16th.

6          And we understand from Debtors' counsel that all

7  rejection claims will be heard separately and at a later

8  date and accordingly we're simply asking that the Court

9  include a provision in the Confirmation Order that

10 preserves, reserves and protects BP's contractual statutory

11 right of setoff.

12         Again, Your Honor, that is teed up for hearing on

13 July the 16th.  However, if Your Honor would like to hear

14 evidence with respect to setoff rights, we are prepared to

15 present those evidentiary issues and facts to the Judge --

16 to Your Honor today.  We're prepared to go forward with

17 them.  We're here at Your Honor's pleasure with respect to

18 the setoff rights.  They have been teed up for a hearing on

19 July the 16th.

20         So, Your Honor, with the adoption by the Court of

21 that language and certainly we understand that Your Honor

22 may have questions about it, we've got colleagues in the

23 room who can drill down on some of these issues and how

24 those languages is a commercially responsible and reasonable

25 resolution of our objection.  And so with the adoption of

1   that language, that will BP with only one evidentiary issue

2   today and that is the adequate assurance of future

3   performance by NewCo and specifically, Your Honor, we

4   question whether NewCo can satisfy its burden of adequate

5   assurance of future performance.

6            So for example, Your Honor, that's a $75 million

7   in new bonding commitments cover the approximate 10 million

8   of future P&A obligations under the MC519 and we need some

9   time to explore that with Mr. Dane today.

10           We're not privy to the bonding commitment.  We

11  have not seen it.  We do not know if it's a binding

12  commitment, whether it's a non-binding commitment, but -- so

13  we'd like some time with Mr. Dane on that issue today.

14           Your Honor, we're all present and assembled in our

15  virtual courtroom and are happy to answer any questions.

16  And if, Your Honor, I may yield the virtual podium to

17  Mr. Burrer who will address your specific subrogation

18  questions.

19           THE COURT:  Thank you.

20           MS. HEYEN:  Thank you.

21           MR. BURRER:  Good morning, Your Honor.

22           THE COURT:  Good morning, Mr. Burrer.

23           MR. BURRER:  Karl Burrer for BP.

24               OPENING STATEMENT ON BEHALF OF BP

25           MR. BURRER:  Your Honor, I think stepped back on

1    the subrogation issues makes sense and going to the Court's

2    *Tri-Union* Opinion, subrogation is just a creditor stepping

3    into the shoes of another party when that party pays the

4    debt.  So if you're selling free and clear of the rights

5    that they're subrogated to, here that would require the

6    Court to sell free and clear of the performance obligations

7    with the Federal Government, and that's not what this Plan

8    provides.

9           The second to last sentence of Section 5.13(a)

10   provides nothing in this Plan, including the Section 5.13 or

11   the Confirmation Order shall be construed as borrowing,

12   waiving or limiting the United States' rights to assert a

13   claim or cause of action against the Debtors, the post-

14   effective date Debtors or any co-lessee or predecessors-in-

15   interest with respect to the abandoned properties for any

16   decommissioning obligations on the abandoned properties.

17          That's the right you would have to sell free and

18   clear of, not the subrogation right.  Subrogation is just

19   you step into the shoes of the party that you step into, and

20   that's the Federal Government.  5.13 does not sell free and

21   clear of the Federal Government's performance obligations.

22          In the Debtors' brief, they try to distinguish

23   between regulatory obligations and the Government's

24   unsecured claims and that's a misnomer.  The Government

25   doesn't just retain the right to tell Fieldwood Three or

1    Fieldwood One or NewCo to go and do work.  If the work's not

2    done and the Federal Government does this, the Federal

3    Government has a claim against those entities, a damages

4    claim, and it results from the performance obligations.

5    It's not discharged.  And a subrogated party that comes in

6    and performs the work, such as a surety, such as BP, such as

7    any predecessor, steps into those shoes as they are when

8    they do the work.

9         THE COURT:  So let me just get this straight,

10   Mr. Burrer.  You're telling me that I have the authority

11   under 363(k) to say that if a purchaser purchases the

12   property, no one could assert any duty on their part to

13   clean it up, at which point your client would have no

14   rights, because I'm giving some rights to the Government

15   that your rights should get enhanced even those I have the

16   absolute statutory right to take them fully away.

17            Is that your argument?

18            MR. BURRER:  Your Honor, I believe the argument is

19   that the Government's rights are nondischargeable, so if the

20   Government --

21            THE COURT:  Well, that's not -- no, just -- I have

22   the right -- you know, I maybe shouldn't do it because of

23   some nondischargeable issue, but the Government can waive

24   those.

25            If I can order a 363 sale free and clear of liens,

1   claims and encumbrances and did do so, your client would

2   have no right against the future purchaser, right?

3          MR. BURRER:  Your Honor, I would need to brief

4   that more, but I think here the Plan is not doing that and I

5   think --

6          THE COURT:  Yeah, I want you to answer my

7   question, Mr. Burrer.

8          MR. BURRER:  Oh, okay.

9          THE COURT:  I have the authority under Section 363

10  to order the sale of property free and clear of liens,

11  claims and encumbrances that go with the property.

12         MR. BURRER:  Your Honor, I think if this Court

13  were to enter an order selling this property free and clear

14  of any and all liens, claims and encumbrances in compliance

15  with 363, including providing adequate protection,

16  indubitable equivalent or other, you know, relief necessary

17  to sell property free and clear, I think the Court certainly

18  could sell the property free and clear as we sit here right

19  now.  I don't think that --

20         THE COURT:  And your client -- and your client

21  right now has zero rights against that future purchaser,

22  right?  So it wouldn't get any adequate protection.

23         MR. BURRER:  Correct.  Any rights that we have

24  right now are contingent rights and I would align them with

25  interests and I would align the Government's rights with

1  interest and I would say, if you're going to sell free and

2  clear of a performance obligation, that the performance

3  obligation is a currently existing performance obligation in

4  favor of the Federal Government that would be entitled to

5  adequate protection, would be entitled to consent or not

6  consent.  And I did not hear the Federal Government, which

7  is why given the sureties' defenses, say they are agreeing

8  to this claim.  They're not consenting.  They're not

9  consenting under 363(f).  There are a lot --

10          THE COURT:  No, I'm talking about my power, not

11  theirs.  Different branch of Government.

12          MR. BURRER:  Understood.  I believe if the Court

13  was able to satisfy 363(f), the Court could sell the

14  property free and clear.

15          THE COURT:  Okay.  Look, I'll let you file your

16  supplemental brief if you want to, but I don't understand

17  how your client gets to complain if I have the authority to

18  do something and I do it and then I give somebody else a

19  right that you wouldn't have otherwise had.  So I'll let you

20  file your brief, but I think it's a problematic issue.

21          The whole idea of 363 is to allow a new purchaser

22  to come and start fresh.  We can limit starting fresh

23  because of a deal, if you will, but we can limit it and we

24  can say to the Government, "You have this right and no one

25  else does," because if your client doesn't have a present

1  right, it's a different story than us taking away a present

2  right to your client.  I think it's a tough brief, but go

3  ahead and write it.

4          MR. BURRER:  And, Your Honor --

5          THE COURT:  I think, Mr. Burrer, you probably

6  wrote the *Tri-Union* Opinion when you were my law clerk so

7  you ought to know what --

8          MR. BURRER:  Yeah.

9          THE COURT:  -- you're doing on this, so go ahead,

10 take your shot.  I think you'll not get there.

11         MR. BURRER:  And, Your Honor, I'm not so sure that

12 all of the Plan transactions have been proposed under 363.

13         THE COURT:  It doesn't --

14         MR. BURRER:  And I think the Plan --

15         THE COURT:  We're dealing with -- it doesn't

16 matter how they define it.  It matters how I define it.

17         MR. BURRER:  Understood, Your Honor.

18         THE COURT:  All right.  Thank you.

19         Mr. Eisenberg.

20         MR. EISENBERG:  Thank you, Your Honor.

21              OPENING STATEMENTS ON BEHALF OF

22              US SPECIALTY INSURANCE COMPANY

23         MR. EISENBERG:  Philip Eisenberg.  I represent a

24 number of clients.  As accurately reflected by Mr. Perez,

25 one of my clients, US Specialty Insurance Company, has

1  withdrawn its objections and we have entered into an ongoing

2  arrangement contingent upon the effective date and certain

3  things happening for an additional bonding facility for

4  NewCo.  And so that is -- that has been noticed on the

5  Docket and Mr. Perez has accurately described that.

6          With regard to Houston HCCI International, I will

7  simply point out that we are finalizing our documentation,

8  Your Honor.  I will significantly streamline any proceedings

9  before Your Honor.  Once our discussions here on opening are

10 done, I think it may be appropriate to take a brief recess,

11 Your Honor, to allow the final ink to dry on those things

12 because I think it will make for a more comfortable day for

13 everybody.

14         And I'm sure that Mr. Brescia and Mr. Miller will

15 have more to say about that.  They are the ones who are set

16 up to do opening on those arguments, Your Honor, and I think

17 they would if it was Your Honor's pleasure --

18         THE COURT:  Let me ask, Mr. Eisenberg.

19         Does it make some sense to postpone those opening

20 arguments to wait to see if the deal gets done and if it

21 doesn't, let them come back and make their opening

22 statements at that point?

23         MR. EISENBERG:  Absolutely, Your Honor.  And I was

24 just going to do cleanup on that, so I appreciate that

25 courtesy as well, Your Honor, and I think that Mr. Miller is

1  smiling and so I appreciate that.

2      For my other clients, which are W&T Offshore and

3  Merit Energy, I was -- of course, the *Tri-Union* Opinion I

4  was -- Mr. Burrer wrote it, okay, so.

5      THE COURT:  It's been about 15 years, but my guess

6  is he did all the drafting on that and I probably cleaned up

7  a verb or two, but that's probably about it.

8      MR. EISENBERG:  Right, right.  So for W&T, the --

9      THE COURT:  He was like 26 years old and now it's

10  going to get thrown back at him, I believe.

11      MR. EISENBERG:  He still looks 26 years old.  That

12  is a compliment so -- maybe not so much.  So you know, we

13  have been working very diligently with the Debtors.  We have

14  language that we thought was finally approved.  We're

15  waiting on the Confirmation Order to come for W&T and Merit

16  and for two of our other clients as well, McMoRan and

17  Conoco, that Mr. Kuebel and Mr. Knapp have been dealing

18  with.  And so that language is pretty much the basis for

19  what BP put in there for one of its legs of its four points,

20  and so we also think that we need to have that come to

21  ground here.  Those are very important issues.

22      I wasn't sure about the argument, Your Honor, with

23  regard to -- and I think Your Honor is thinking about it the

24  same way I am and that is:  If an entity buys a property

25  from the Federal Government and signs on, and says, "I am

1 now liable for whatever obligations go with that lease that

2 I just got assigned," then on a going forward basis, if the

3 Government were to call on another party in the future to do

4 decommissioning on that property, then that company that did

5 the decommissioning would have whatever rights it would be

6 subrogated to not because of an arrangement before this

7 bankruptcy, before the effective date, before the 363 sale,

8 but it would be subrogation rights for having performed on

9 the demand from the Government because the NewCo agreed on a

10 going forward basis to comply with the obligations under the

11 lease and be obligated to the Government.  So it's not the

12 old obligations that they're subrogated to, but the new ones

13 that they're signing onto, Your Honor.  And we don't know

14 whether or not and when that would happen, but it certainly

15 has --

16          THE COURT:  Here's the problem, Mr. Eisenberg,

17 which is:  If NewCo, let's say, puts in some new platforms

18 out there after they acquire, I agree.  As to those new

19 platforms, that's new operations and whoever has subrogation

20 rights will have subrogation rights as to the new platforms.

21          As to the old platforms, those are rights that we

22 could cut off and because we could cut them off, we can also

23 cut them off less than totally.  And if you're telling me

24 that you want subrogation rights against the new platform, I

25 got it, but if you're telling me you want subrogation rights

1   against the historic work, that would get in the way

2   obviously of meeting the Government's goal that is preserved

3   in *Midlantic* and that is actually contrary to the language

4   of 363 and contrary to abandonment language, but the Supreme

5   Court can do that, I can't.  And so once the Government

6   isn't going to insist on its *Midlantic* rights, I can use

7   abandonment and I can use 363.

8            MR. EISENBERG:  Two observations on that.  One, on

9   any new platforms or wells that are drilled, the Government

10  has no rights against the predecessors going back.

11           Second, on the new stuff --

12           THE COURT:  No, I understand that.

13           MR. EISENBERG:  Okay.

14           THE COURT:  But to the extent that the

15  predecessors want to assert some rights there, I'm not

16  cutting those off.  It's historic ones.  It's the ones that

17  go with the property where I can order the property sold

18  free and clear.  They can't --

19           MR. EISENBERG:  But the -- right, they could be

20  sold free and clear, but they still own them and they own

21  them subject to the regulations on a going forward basis.

22  And as part of that bundle of rights that they're getting,

23  they have the obligation as the current operator and current

24  record title owner to decommission.  And to the extent that

25  they did not perform in the future, right, and --

1        THE COURT:  I understand your argument.  It's

2   wrong, but I understand it.

3        MR. EISENBERG:  Okay, Your Honor.  I don't

4   necessarily agree with you on that and I --

5        THE COURT:  I know.  I know you don't.

6        MR. EISENBERG:  And so -- and I don't know how you

7   can cut something off that hasn't arisen because it can't

8   arise until after the effective date.

9        THE COURT:  Because it goes with the property.  It

10   doesn't exists in the ether.  It's a right that goes with

11   the sale of the property and Congress decided to write a

12   provision that allows Debtors to abandon the property, that

13   allows Debtors to sell property free and clear.  In either

14   of those instances, these rights wouldn't exist.

15        MR. EISENBERG:  Well, then if the Government did

16   that, they'd be cutting people's subrogation rights off and

17   they'd have a hard time coming against them, but we'll see

18   how that works out years from now.

19        THE COURT:  I got it.

20        MR. EISENBERG:  Okay.  So anyway, going back to

21   agreed language, Your Honor, the -- you know, we're just

22   waiting to get the ink to dry on that, as well, and so I

23   just wanted to let Your Honor know that, as well, which is

24   why we're kind of standing down here and just trying to get

25   this to be as consensual as possible and to shove off

1  whatever we don't have to decide today.

2            THE COURT:  I appreciate that.

3            MR. EISENBERG:  Okay.  Thank you, Your Honor.

4  I'll pass the podium.

5            THE COURT:  Thank you.

6            MR. EISENBERG:  Uh-huh.

7            THE COURT:  All right.  Mr. Langley?

8            MR. LANGLEY:  (No audible response).

9            THE COURT:  Mr. Langley, I don't hear you.  Let

10 me --

11           MR. LANGLEY:  Oh, I'm sorry, Your Honor.

12           THE COURT:  There we go.

13           MR. LANGLEY:  Do you hear me now?

14           THE COURT:  Yes, sir.  It's better when you unmute

15 it.

16           MR. LANGLEY:  Oh, thank you.

17           I'd like to defer to Mr. Grzyb, if I can.

18           THE COURT:  Of course.

19      (Pause in the proceedings.)

20           THE COURT:  Do you know what phone number

21 Mr. Grzyb is dialing in from today?  It looks like it might

22 be a different number than what I have him down on.  I have

23 a whole bunch of people that want to speak, so why don't we

24 do this: We'll get to him.  Whoever has pressed five star is

25 just -- his name isn't associated with whatever number he's

1    dialing in from today.  So I'm just going to go to the next

2    one on the list and then -- but Mr. Grzyb will eventually

3    speak, if that's okay.  I've got a lot of people on the

4    line.

5            MR. LANGLEY:  Thank you.

6            THE COURT:  Thank you.

7            MR. LANGLEY:  I'd like to go later.  Thank you,

8    Your Honor.

9            THE COURT:  All right.  From 214-765-3657, who do

10   we have?

11           MS. ARCHIYAN:  Your Honor, good morning.

12           Yelena Archiyan, on behalf of Sea Robin and

13   certain other affiliates of Energy Transfer.

14        OPENING STATEMENT ON BEHALF OF ENERGY TRANSFER

15           MS. ARCHIYAN:  Your Honor, I will be very, very

16   brief.  Energy Transfer filed a cure objection on June 4th

17   and a reservation of rights on June 16th.  The issue at this

18   time, Your Honor, is that the parties are in the midst of

19   reconciling Energy Transfer's contracts and cure amounts as

20   well as negotiating a series of trade agreements.

21           Energy Transfer is sitting on some cash

22   collateral, but it would like the status of preserved

23   funding those negotiations and the renegotiation process and

24   have requested some protective language in the Confirmation

25   Order with respect to that cash collateral, including the

1    right to use that setoff against any claims for rejection

2    damages should it be determined that the Debtors are

3    rejecting any of Energy Transfer's contracts.

4         We reached out to Debtors' counsel last week and I

5    understand that they are working on it.  We haven't seen a

6    proposed Confirmation Order yet and it's possible that this

7    language be in there or will be in there, but we didn't want

8    to waive any rights by not speaking up today.

9         That's all, Your Honor.  Thank you.

10         THE COURT:  Ms. Archiyan, thank you.

11         From 315-632-4125?

12         MR. WOODARD:  Good morning, Your Honor.  This is

13    Lee Woodard on behalf of Lexon Insurance Company.

14         THE COURT:  Mr. Woodard, good morning.

15      OPENING STATEMENT ON BEHALF OF LEXON INSURANCE COMPANY

16         MR. WOODARD:  Good morning.  I thought I would

17    throw myself into the same barrel with the other -- my

18    surety folk, as well, and just had very -- hopefully very

19    briefly a couple of items.

20         One is, obviously this language that was just put

21    forth by the Debtor in the Fifth Plan at 5.13(a) is a bit of

22    a lightning rod over the subrogation rights of sureties.

23         And while you were talking to Mr. Zuber, there

24    was -- one question that you kept asking was:  What current

25    rates would be impacted by this insertion of this in the

1   Plan?

2          THE COURT:  Right.

3          MR. WOODARD:  The answer is:  Lexon, about

4   99 percent of our $90 million worth of bonds are all with

5   just the Government as the obligee.  And so what this

6   Section 5.13(a) of the new -- of the latest version of the

7   Plan does is it removes our rights, any Governmental rights

8   including but not limited to any rights provided for under

9   the Plan.  So those are our existing rights.

10          Now if the -- all we're seeking in the language

11   that Aspen put forth in that -- in their supplemental

12   objection at Document 1664 is that whatever our rights that

13   exist, roll forward.

14          I can't disagree with the Court's view on a 363

15   sale.  The Court has the power to be able to do a number of

16   things.  The part that gets lost I think in that whole

17   scenario, I think 363 can cut it off.  However, NewCo is

18   going to need funds to be able to go-forward to do anything

19   it wants to do and either they're going to replace our bonds

20   or they're going to have to cut a deal with the existing

21   sureties to be able to do -- change name rider or something

22   along those lines that would allow them to continue forward

23   or theoretically, I suppose, the Government can waive them.

24          But if there's a sale and it does not encompass

25   our bonds, they can't be assumed, transferred or assigned,

1   they're cut off.  So there wouldn't be any subsequent issues

2   that we'd have with NewCo because our bonds would be cut

3   off.  It'd be a defense against the claims by the Government

4   to us.

5           But at the end of the day, our -- all we're really

6   seeking is to have our rights, whatever they exist today

7   pre-petition, should ride through the Plan to the extent

8   they're allowed.  If there's a 363 cutoff, then we're cut

9   off on that.  That raises new defenses for us, but

10  doesn't --

11          THE COURT:  Is anyone arguing that you don't get

12  monetary subrogation to the Government's rights?  Maybe they

13  are.

14          MR. WOODARD:  Well, I think we do get monetary

15  only.  I don't think we have the ability to claim

16  regulatory.

17          THE COURT:  Okay.  And that bond and your

18  reimbursement agreement on it come from Fieldwood; is that

19  right?

20          MR. WOODARD:  Fieldwood is the principal, that's

21  correct.

22          THE COURT:   So you would have --

23          MR. WOODARD:  And the Government is the obligee,

24  though.

25          THE COURT:  Right.  So if it's called upon, you

1  would have an unsecured claim against Fieldwood and you're

2  saying you want one against the purchaser as well.

3          MR. WOODARD:  I'm saying, Judge, that if -- I

4  don't see how the purchaser gets our bonds, right, so unless

5  they have some agreement with Lexon.

6          THE COURT:  Right.

7          MR. WOODARD:  When the purchaser buys and it's

8  approved by the 363 sale, it doesn't get our bonds.

9          THE COURT:  Correct.

10          MR. WOODARD:  That is -- our bonds are there --

11          THE COURT:  No, your bonds remain payable only to

12  the United States, right?

13          MR. WOODARD:  Absolutely correct.

14          THE COURT:  So the United States goes to Fieldwood

15  and says --

16          MR. WOODARD:  And if they've now consented in

17  that --

18          THE COURT:  But the United States goes to

19  Fieldwood and says, "Can up," Fieldwood doesn't, you may

20  have to fund the bond or maybe not, but your defense isn't

21  that there was a sale, right?

22          MR. WOODARD:  Correct.  Well, ultimately the

23  defense as to the Government?  Maybe because it's a sale

24  because it was the sale that cut off our liability as to

25  NewCo.  We wouldn't have any privy with NewCo, but we may

1   have a defense now.  If the Government has consented to let

2   them proceed without bonding, without whatever else, we may

3   have another defense as to the Government.  But it has

4   nothing to do with the 363 sale or NewCo.

5           THE COURT:  I got it.  And that's probably one

6   reason why Mr. Balasko isn't consenting, right?

7           MR. WOODARD:  Right.

8           THE COURT:  So they're going to sell.  It violates

9   your bond.  The Government's going to call in the bond and

10  you may have some defense to it, but otherwise, you would

11  get an unsecured claim for the amounts you fund if you don't

12  have a defense.

13          MR. WOODARD:  All correct.

14          THE COURT:  Okay.  Yeah.

15          MR. WOODARD:  But largely the sureties are going

16  to (indiscernible) though through most of the objections

17  that we filed anyway are that they can't -- this Plan can't

18  just transfer our bond, can't assume or assign, they can't

19  do any of those things and --

20          THE COURT:  So I didn't think it was and I

21  probably -- maybe I misunderstood that, so I'm going to --

22  when we're done, I need the Debtor to clarify whether your

23  bonds are being transferred to the purchaser because I did

24  not believe that they were.  I just didn't think that they

25  were being dealt with and so they're selling property to the

1  purchaser.  The Government isn't consenting to that.  You

2  may or may not have liability, but if you do, it isn't

3  vis-à-vis the purchaser.  It's vis-à-vis, Fieldwood and the

4  Government.

5           MR. WOODARD:  Correct.  And, Judge --

6           THE COURT:  I apologize --

7           MR. WOODARD:  -- you've hit the nail on the head

8  as far as our objections go.  We've been trying to figure

9  out what this Plan actually does --

10           THE COURT:  Well, let me go back --

11           MR. WOODARD:  -- to the variety of bonds.

12           THE COURT:  I'm going to interrupt everybody else

13  making a presentation and ask Mr. Perez if I've got that

14  right.

15           MR. WOODWARD:  Okay.

16           THE COURT:  There is no assumption or transfer of

17  the bonds to the -- any NewCo, right?  It's the bonds are

18  there and they just exist, but you're not transferring them

19  over, right, Mr. Perez, or do I have that wrong?

20           MR. PEREZ:  No, you have that correct, Your Honor.

21  There's no transfer of the bonds.  The bonds exist, they

22  continue to exist.  They're in favor of various parties and

23  they will -- they're out there on a go-forward basis.

24           THE COURT:  Okay.  Look I'm going to hear from

25  everybody else but, Mr. Perez, I do think whatever portion

1  of your team is working on things with respect to an awful

2  lot of what we've heard today, we need clarity in the

3  Confirmation Order I think as to termination of rights that

4  could be exercised today versus termination of rights

5  against entities that don't currently own the properties

6  because I think that my authority is vastly different in

7  those two circumstances.  Mr. Woodard is bringing it to a

8  head, but so did the others.  And I want to know for sure at

9  the end of the day what this language is doing.

10        And if you're asking me -- if BP, for example, has

11  a current contribution right against one of its other

12  predecessors-in-interest, if you're asking me to cut that

13  off, I need to know that because I don't think you can do

14  that.  If you're asking me to cut off the rights against a

15  future purchaser, I think I've been pretty clear that I

16  think under *Midlantic* and abandonment and 363, I can.

17        I think Mr. Woodard is largely in agreement with

18  that.  I know the others aren't.  That just may make him

19  smarter, I don't know, or joining my camp, whichever one,

20  Mr. Woodard, you want to do.

21        MR. WOODARD:  That's only because you don't know

22  me well enough, Judge, but thank you.

23      (Laughter.)

24        THE COURT:  All right.

25        MR. WOODARD:  Thank you, Judge.

1         THE COURT:  I do need that worked through,

2    Mr. Perez, because I don't want there to be confusion at the

3    end of the day about it.

4         MR. PEREZ:  Yes, Your Honor.  I believe that

5    Ms. Liou and Mr. Carlson are the ones that are primarily

6    focused on that and hopefully will have more success than

7    showing slides.

8         THE COURT:  Thank you.

9         MR. WOODARD:  Thank you, Your Honor.

10        THE COURT:  Mr. Grzyb, I do have you here.  Thank

11   you.

12        MR. GRZYB:  Good morning, Your Honor.

13          OPENING STATEMENT ON BEHALF OF SURETIES

14        MR. GRZYB:  Darren Grzyb, along with Scott Zuber

15   and Mr. Rios and Mr. Million of the Husch Blackwell firm

16   representing four sureties identified by Mr. Zuber

17   previously.

18        I have been sort of spearheading along with my

19   colleagues on the Apache bonds deal that has been in the

20   process of being negotiated and I was -- and that was my

21   opening as it relates to the common law bond associated with

22   the Apache structure and Fieldwood One structure and the

23   deal that's being discussed with the Debtors currently.

24        And I would sort of echo what Mr. Eisenberg said

25   that -- well, I do have an opening and I can -- we have had

1  some discourse during this proceeding about the issues

2  particular to those four bonds and letters of credit.  I

3  would ask that they be -- my opening be abated pending

4  further documentation of the deal that is almost there,

5  Your Honor.

6            THE COURT:  That's granted.

7            MR. GRZYB:  Thank you.

8            THE COURT:  Thank you.

9            Mr. Miller?

10            MR. MILLER:  (No audible response).

11            THE COURT:  Mr. Miller, I'm not hearing you.

12            MR. MILLER:  Good morning, Your Honor.

13            THE COURT:  Good morning, Mr. Miller.

14            MR. MILLER:  Robert Miller for Philadelphia

15  Indemnity Insurance Company.

16            THE COURT:  Good morning.

17          OPENING STATEMENT ON BEHALF OF PHILADELPHIA

18                 INDEMNITY INSURANCE COMPANY

19            MR. MILLER:  I'll keep it brief.  I will echo

20  Mr. Grzyb and Mr. Eisenberg's comments.  I have some

21  beautiful slide decks that is ready and hopefully able to be

22  shown, but with that being said, I think it would be

23  appropriate and also saving use of resources and time to

24  abate it until we can hopefully paper this agreement that is

25  almost there.

1          THE COURT:  Mr. Miller, thank you.

2          That motion is granted as well.

3          814-456-2294.

4          MS. ROSEN:  Good morning, Your Honor.  Suki Rosen

5    on behalf of Forshey and Prostok for XTO Offshore, HHE

6    Energy Company and XH, LLC.

7          Can you hear me, Your Honor?

8          THE COURT:  I can, Ms. Rosen, and good morning to

9    you.

10         MS. ROSEN:  Thank you.  Your Honor, due to a

11   previously-scheduled appointment, I'm going to have to miss

12   part of the hearing this afternoon and Mr. Forshey of our

13   firm is going to step in at that time, if that's okay.

14         THE COURT:  Of course.

15         OPENING STATEMENT ON BEHALF OF XTO OFFSHORE,

16              HHE ENERGY COMPANY AND XH, LLC

17         MS. ROSEN:  Okay.  And then I just wanted to let

18   the Court know, as Mr. Perez stated, that we have been

19   working with the Debtors for the inclusion of some language

20   in the proposed Confirmation Order that would resolve our

21   objections related to mostly the Debtors' proposed cure

22   amounts and providing that the terms of the XTO contracts

23   remain unchanged and also our objection related to the

24   third-party releases.

25         In addition, we've asked the Debtors to include

1   language in the proposed Confirmation Order that says that

2   we're not precluded from making demand on the Debtors if

3   necessary as a condition precedent under our bonds and I

4   believe that they have agreed to do that.

5          We are not able to resolve the remainder of our

6   objections and XTO just in -- and generally does not agree.

7   We did not consent to the Plan.  However, I think our

8   objections are going to be duplicative of what other parties

9   will raise, and therefore, we don't intend to present any

10   additional argument on that and we'll just reserve anything

11   else for closing argument.

12          THE COURT:  Ms. Rosen, thank you.

13          Mr. Singer?

14          MR. SINGER:  (No audible response).

15          THE COURT:  Mr. Singer?  There we go.  Good

16   morning.

17          MR. SINGER:  Good morning, Your Honor.

18          Can you hear me?

19          THE COURT:  I can.  Good morning.

20          MR. SINGER:  Good.  Good morning, Your Honor.

21   Thank you.  Kelly Singer on behalf of Ecopetrol America.

22        OPENING STATEMENT ON BEHALF OF ECOPETROL AMERICA

23          MR. SINGER:  Your Honor, an update and then also a

24   reminder.  I'll start with the reminder.  At the pretrial

25   conference, Your Honor, you asked me to remind you to --

1  remind you about giving my witness an hour's notice before

2  she needed to appear at today's hearing so I just wanted to

3  remind you about that.

4           The update, Your Honor, is that we did have --

5           THE COURT:  That's a reminder for Mr. Perez, how's

6  that?  So he needs to -- he'll give you that hour update

7  because I'm not going to know when it happens, but you'll

8  get the hour.

9           MR. SINGER:  Among the three of us, we should

10  figure it out.  I appreciate that.

11           Your Honor, the update is we did have a productive

12  exchange of language to put into an order that I think would

13  resolve our objections.  We were confirming some things and

14  then we got some last-minute changes late last night I

15  believe by lenders' counsel, which kind of drastically

16  changed the language, in our opinion at least, so we don't

17  have consensual language yet.  I think we're still working

18  on it.  I'm not sure where that puts us today.

19           We've obviously filed an objection.  There's been

20  no substantive response to our objection.  I think the

21  parties were hoping on just working this out through

22  language, but that has not happened as of last night.

23           So that's the update, Your Honor.

24           THE COURT:  Mr. Singer, thank you.

25           From 713-294-0379?

1          MR. FISHEL:  Good morning, Your Honor.

2          Michael Fishel from Sidley Austin, on behalf of

3    Ridgewood Katmai and ILX Prospect.

4          THE COURT:  Mr. Fishel, good morning.

5        OPENING STATEMENT ON BEHALF OF RIDGEWOOD KATMAI

6                        & ILX PROSPECT

7          MR. FISHEL:  And I just -- I stand here to pretty

8    much echo Mr. Singer's comments.  We're kind of in the same

9    boat.  We had what I thought was a resolution on the

10   Confirmation Order language on Friday and late last night we

11   received language that was severely scaled back what we had

12   agreed to and understandably so.  You know, it was subject

13   to everyone's approval, but this was a little bit of a

14   surprise.

15         So we're kind of in the same boat of where we

16   stand right now.  We're hoping that for the rest of the day

17   we can in the background get the final agreed language.  But

18   like Mr. Singer's comment, we haven't received a substantive

19   response to our objection and as of right now, we -- at the

20   appropriate time we'll need to prosecute it.

21         THE COURT:  Thank you, Mr. Fishel.

22         MR. FISHEL:  Thank you.

23         THE COURT:  Mr. Brescia?

24         MR. BRESCIA:  Your Honor, this is Duane Brescia.

25         Did you call on me?

1          THE COURT:  I did, Mr. Brescia.  Good morning.

2          MR. BRESCIA:  Okay.  Thank you.  I apologize,

3   Your Honor.  Sometimes you wait long enough in these

4   hearings and you don't know if your five star was received

5   or not, so you start pressing it several times to be heard

6   so I appreciate Your Honor --

7          THE COURT:  Let me just warn you that if you press

8   it an even number of times, there is no five star.  You have

9   to press it only an odd number of times so I would --

10  usually if someone --

11         MR. BRESCIA:  Yeah, I know.

12         THE COURT:  -- sat on it anymore, anybody else

13  that wants to speak, but anyway that's what's going on.

14         MR. BRESCIA:  I was trying to look back at my --

15  yeah, I was trying to look back at my history to count those

16  myself.

17         OPENING STATEMENT ON BEHALF OF ZURICH AMERICAN

18              INSURANCE COMPANY AND SEITEL DATA LIMITED

19         MR. BRESCIA:  So, Your Honor, Duane Brescia, on

20  behalf of Zurich American Insurance Company.  And I actually

21  have another client, Seitel Data Limited, and I'll get to

22  Seitel in a minute.

23         But I did just want to speak along with the other

24  surety counsels along with what Mr. Perez said so -- and I

25  did raise my star five as an objecting party because I think

1    the Agenda that was filed still lists us as an objecting

2    party so we're kind of in that situation where we have an

3    agreement in principle.  We are working on papering a term

4    sheet.  That term sheet is not complete, but we are very,

5    very close and part of that term sheet requires us not to

6    oppose the Plan.  So in the spirit of trying to continue

7    that settlement, I did not want to present my opening

8    argument at this point as well, so I also ask the Court's

9    permission to be able to present that either at the opening

10   of our evidence or at a later time when appropriate.

11          And barring that, Your Honor, you know, I think

12   part of the term sheet, which isn't disputed, requires

13   definitive documents to be entered into later prior to the

14   effective date.

15          I think the parties understood that, you know,

16   once we enter into a term sheet and the Plan gets confirmed,

17   if there's a dispute on something that wasn't contemplated

18   or there is a disagreement that we could come back to Your

19   Honor to resolve those disputes if we cannot do it

20   ourselves.

21          And so one of those two options would be

22   satisfactory to Zurich to get to the end result, either

23   continue our opening for later, perhaps allowing a small

24   break to see how far the parties can get.  And barring that

25   with Mr. Perez's consent, that any open items or issues that

1  can't be resolved today will be resolved in front of Your

2  Honor later on.

3          THE COURT:  I'll let you do whichever those works

4  out at your option is what we'll do so you preserve all your

5  rights.  Thank you.

6          MR. BRESCIA:  Your Honor, with respect to Seitel

7  Data Limited, they are a contract party that was originally

8  on the assumed list and then put on the rejection list.

9  Seitel is a seismic data licensing company and were usually

10  involved in many of these trying to resolve those at the

11  last minute.

12          This Debtor has agreed to reject the Licensing

13  Agreement from Seitel, so that puts us in a -- not needing

14  to assume it anymore, but because of the verification of

15  destruction of data issues, we did ask for some language

16  that merely states that the parties can agree to reject,

17  terminate as necessary, and that there will be a

18  verification of destruction signed.  I think the parties

19  have agreed on language, but they were pending confirmation

20  from the other, I guess, consenting parties and I did not

21  get a response on that.

22          Having said that, too, I think there is an

23  agreement in principle between Seitel and the Credit Bid

24  Purchaser to start a new license agreement going forward.  I

25  can't comment on the details of that yet, but I would just

1  request that either the rejecting language that we propose

2  just be assented to or that I can raise these issues later

3  on in the hearing if we cannot get to appropriate language

4  approved by all necessary parties.

5          THE COURT:  Mr. Brescia, you can raise it later.

6  Thank you.

7          All right.  Mr. Scharfenberg?

8          MR. SCHARFENBERG:  Good morning, Your Honor.

9          Can you hear me okay?

10         THE COURT:  Good morning.  I can,

11 Mr. Scharfenberg.

12         MR. SCHARFENBERG:  Perfect.  Thank you.

13    OPENING STATEMENT ON BEHALF OF RLI INSURANCE COMPANY

14         MR. SCHARFENBERG:  Elliot Scharfenberg, on behalf

15 of RLI Insurance Company.  I rise here today to address an

16 RLI specific issue relating to approximately $8.25 million

17 of escrow funds held by an escrow agent pursuant to the 1999

18 Escrow Agreement that relate to plugging and abandonment

19 obligations on a bond that RLI issued in favor of BP.

20         What we're looking for is some language in the

21 Confirmation Order to expressly provide that any rights we

22 have under those escrow funds, which are not property of the

23 Estate, not be impaired in any way by the Plan.

24 Specifically we're concerned with Section 10.6 of the Plan,

25 which deals with the Plan Injunction.  It might be arguably

1  broad enough to accept our language or somehow modify or

2  impair any rights that we otherwise have and that shouldn't

3  be impaired under 524.

4       We have reached -- we have both briefed this in

5  our objection and we have reached out to the Debtors.  My

6  understanding is that the Debtors are going to send us some

7  Confirmation Order language that they might propose.  We

8  have not received anything yet and we have not seen the

9  issues substantively briefed by the Debtors.

10       We are prepared to put on evidence showing that

11 this property is not property of the Estate, if need be, but

12 I suppose in the absence of getting some type of consensual

13 language, we would like somewhere between 15 and 20 minutes

14 to put on evidence of the opposing sections of this case.

15       THE COURT:  Of course, you'll have the chance to

16 do that.  Thank you.

17       Mr. Taylor, let me get your line active.

18       Mr. Taylor, go ahead please.

19       MR. TAYLOR:  Good morning, Your Honor.

20       Can you hear me?

21       THE COURT:  I can.  Good morning.

22       MR. TAYLOR:  Your Honor, I represent Marathon Oil

23 Company, who is a predecessor-in-interest.  We have filed an

24 objection.  It's found at Docket 1554.

25       THE COURT:  Right.

1              OPENING ON BEHALF OF MARATHON OIL COMPANY

2          MR. TAYLOR:  Marathon does not maintain any

3    presence in the Gulf of Mexico currently and by that I mean

4    no longer holds any record titles in the Gulf of Mexico and

5    is no longer an operator, but it did hold assets previously

6    arising from leases dating all the way back to the '60s and

7    '70s across the spectrum of the structure proposed by this

8    Plan and that is they have assets going into Fieldwood One

9    and to NewCo and also presumably into Fieldwood Four.

10         We've reached a deal in principle with Chevron to

11   include that -- some assets where we held in that title in

12   conjunction with Chevron and is now going to be included in

13   Fieldwood Four.  It was previously going to be an abandoned

14   bucket.  And that's good news for all the parties here

15   today.

16         However, we do still have other assets that are

17   going into the abandoned bucket.  Those include assets where

18   we held title with Hess, also with Shell where Fieldwood is

19   not the operator but rather LLOG is.  Then there's some

20   other miscellaneous assets.  Therefore, we still do have a

21   live objection and still do join in Hess' objection as to

22   those assets.

23         I did want to note for the Court that Marathon has

24   opted out of the third-party releases.  We've objected to

25   that issue, but I presume Your Honor's going to hear a lot

1   about that, but since we have affirmatively opted out and so

2   noted in our objection also, that therefore, we're not going

3   to be making any evidentiary presentation regarding that.

4           And with that, Your Honor, we have nothing

5   further.

6           THE COURT:  Mr. Taylor, thank you.

7           From 847-363-6644, let me get your line active.

8   Hold on.  Go ahead, please.  Who do we have on that line?

9           MR. KIND:  Good morning, Your Honor.  My name is

10  Michael Kind representing the Cox entities.

11          THE COURT:  Mr. Kind, good morning.

12      OPENING STATEMENT ON BEHALF OF THE COX ENTITIES

13          MR. KIND:  Good morning, Your Honor.  Thank you

14  for the opportunity to speak.  I want to add our chorus to

15  some of the other creditors who have spoken.  We filed a

16  limited objection at Docket 1454 raising some issues

17  concerning setoff rights.

18          We've also exchanged language with members of the

19  Debtors' team.  We're hoping to reach resolution on language

20  but, Your Honor, we wanted to reserve our rights to present

21  a more substantive opening later if we don't reach an

22  agreement and I'm just flagging that for Your Honor.  But in

23  the interest of time, we want to just raise our hand, but

24  not go too deep into that argument.

25          But we're hopeful that the Debtors can work with

 1  us on a reciprocal setoff provision in the Plan instead of

 2  sort of way it's framed now.

 3          Thank you, Your Honor.

 4          THE COURT:  Mr. Kind, like others, if you don't

 5  work that out with the Debtors, you're welcome to make your

 6  opening later.  I do want to remind you -- I don't think

 7  I've already done it because I don't have a list printed in

 8  the last two hours.  As of the time I printed my list, you

 9  hadn't made an electronic appearance yet, so if you'd please

10  be sure and do that.  You just go to my home page and do it.

11  You may have already done it, so if you have, don't worry

12  about it.

13          MR. KIND:  Thank you, Your Honor.

14          THE COURT:  Thank you.

15          MR. KIND:  Thank you, Your Honor.

16          THE COURT:  From 832-255-6000, let me get that

17  line active.  Go ahead please.

18      (No audible response.)

19          THE COURT:  Who do we have from 832-255-6000?

20      (No audible response.)

21          THE COURT:  You may have your own line muted.  I

22  have you unmuted from here, if that's you.

23      (No audible response.)

24          THE COURT:  Well, we're going to move ahead.  I

25  don't know who that was.  Let's see, Mr. Baay, I can see

1    your lips moving, but I can't hear you.  Was that you?

2              MR. BAAY:  Well, that's not my phone number,

3    Your Honor, but my line just became unmuted.

4              Can you hear me?

5              THE COURT:  Yes, sir.  I don't know -- it's

6    showing up that way.  I don't know what that's about, but

7    why don't you go ahead, Mr. Baay?

8                   OPENING STATEMENT ON BEHALF OF

9              LLOG EXPLORATION OFFSHORE AND LLOG ENERGY

10             MR. BAAY:  Okay.  Your Honor, like others that

11   you've heard from this morning, again for the Record, I'm

12   John Baay from Gieger Laborde & Laperouse, on behalf of LLOG

13   Exploration Offshore and LLOG Energy.  And I believe we

14   reached an agreement with Debtors' counsel yesterday evening

15   to sort of push our issue off.  You got a preview of that

16   issue when you heard the motion for adequate protection back

17   in January.

18             It's a very discrete issue about the nature of our

19   claim and whether or not it's secured.  And I believe we

20   have an agreement to have a separate hearing on that and

21   push that issue off.  I've not seen language for the

22   Confirmation Order yet, but I understand that that's coming.

23   So again like others, we'll reserve our opening and any

24   evidence assuming that can't be reached.  Thank you.

25             THE COURT:  Mr. Baay, thank you.

1          And of course that's granted.

2          Mr. Skelton, let me get your line turned on.

3          Go ahead, Mr. Skelton.

4     OPENING STATEMENT ON BEHALF OF HOUSTON ENERGY DEEPWATER

5          VENTURES I, LLC AND RED WILLOW OFFSHORE, LLC

6          MR. SKELTON:  Yes, Your Honor.  This is Barnet B.

7     Skelton, Jr.  I'm appearing here today for Houston Energy

8     Deepwater Ventures I, LLC and Red Willow Offshore, LLC.

9     Both of these entities are co-working interest owners with

10    the Debtors on the MC519 lease.  We filed cure objections at

11    Docket 1433 and 1472.

12         I am pleased to say that I've been working with

13    Weil on this and some language for the Confirmation Order

14    has been exchanged.  We've also agreed that the cure hearing

15    itself would be adjourned to a date reasonably soon after

16    the Confirmation Hearing.

17         That's all we have right now, but we're working on

18    this behind the scenes trying to resolve it.

19         THE COURT:  I appreciate the announcement.  Thank

20    you, Mr. Skelton.

21         MR. SKELTON:  Thank you.

22         THE COURT:  From 312-857-0910, let me get that

23    line active.  Go ahead please.

24        OPENING STATEMENT ON BEHALF OF NORTH AMERICA

25               SPECIALTY INSURANCE COMPANY

1          MR. LEO:  Good morning, Your Honor.  Scott Leo, on

2    behalf of North America Specialty Insurance Company.

3          THE COURT:  Good morning.

4          MR. LEO:  I am one of the surety representatives.

5    We have (glitch in the audio) bonds.  One (glitch in the

6    audio) the other obligees.  I'd like to follow up maybe on

7    some of the things that Mr. Woodard had said earlier and

8    also some of the things that Mr. Zuber has said earlier.  I

9    would like the Court to know that Mr. Zuber's suggested

10   language in Document 1664 about the reservation of rights

11   for the surety is something we agree to that North America

12   Specialty would sign on to.

13          I would also point out to the Court in Document

14   1640, I filed a clarification on the objections -- the

15   response to objections that the Debtor made in the matrix

16   and really they were questions about suretyship that I

17   believe the Court kind of alluded to when you suggested to

18   Mr. Perez that perhaps these issues ought to be addressed.

19          One of the things in terms of the current

20   obligations of the Debtor to the surety that dawn on me is

21   its default versus payment of a loss and in many instances a

22   surety's rights arise upon default.  Now the Debtor had said

23   it's possible for BOEM to issue decommissioning orders as of

24   the effective date, which tells me there must be a current

25   default.  And the Debtors filed a suit to enforce their own

1  bonds on which their principle (glitch in the audio) and

2  that is the procedure, Your Honor, I had never seen before.

3  It's effectively the principal suing oneself because the

4  principal is a party to the bond.

5          So some of the questions I pondered over, you

6  know, and this is -- I've practiced surety law a long time

7  and this is a very unique situation and I would love to hear

8  the answers myself.  How the Debtor use surety credit post-

9  confirmation?  If security credit is applied post-

10 confirmation, why does the surety lose its rights to

11 recourse?

12         And I mentioned in my brief that, okay, throw out

13 the indemnity agreement, but if you're using surety credit

14 for an existing platform on which a subsequent owner bought,

15 the bond is called upon, why doesn't the surety have the

16 rights of reimbursement, exoneration, (indiscernible), which

17 is enforcing your exoneration right by requiring collateral

18 or even for that matter, restitution?

19         If there are no post-confirmation defaults, why

20 would BOEM -- or no pre-confirmation defaults, why would

21 they have the capacity to take issue of those demands on the

22 effective date?

23         And if the underlying leases are assumed, you

24 know, which in one case my bond is several bond.  It assigns

25 specific penal sums to sets of leases, why wouldn't then the

1  surety's rights of recourse go with it if they are assuming

2  something?

3          Now they clarified in a way that's confusing to me

4  that there's no transfer, there's no assignment, there's no

5  what you would call "assumption" of surety credit yet the

6  bond somehow mystically transferred over to the post-

7  confirmation world.  And I think you've seen all the

8  sureties briefing on this, but you know.

9          THE COURT:  Yeah, I'm not understanding and this

10  is sort of the same question.  I don't think they're

11  transferring into the post-confirmation world.  They are a

12  thing in existence today and they don't go out of existence

13  if we confirm.

14          MR. LEO:  Well, that's -- my understanding of what

15  Mr. Perez has said, I just don't understand how that works

16  without the sureties preserving their right of recourse

17  against whoever uses the surety credit at the time it's

18  called upon and that's one --

19          THE COURT:  When you say, "Whoever uses," I don't

20  understand the surety credit concept either.  The sureties

21  aren't providing credit.  The sureties might be called upon

22  to pay a penal sum under their bond, but that's not a

23  provision of credit.  That will then result in either a

24  reimbursement obligation or a common law right of

25  reimbursement or both from the maker of the -- from

1  Fieldwood, but that's not an extension of credit.  That is a

2  debt obligation that arises by operation either contract or

3  of law against Fieldwood, right?

4           MR. LEO:  It is an extension of credit,

5  Your Honor.  That's our position and --

6           THE COURT:  How is it an extension of credit?  I'm

7  not understanding that.  You're not being required by this

8  Plan to extend any credit.

9           MR. LEO:  The bond requires the surety to perform

10  upon the default of another.  It is --

11           THE COURT:  That's not an extension of credit.

12  That's a performance under your bond.

13           MR. LEO:  Yeah, but a surety --

14           THE COURT:  If you coincidentally then have a

15  reimbursement obligation, which you will, I think, against

16  Fieldwood, that's still not an extension of credit.  We

17  are -- if there's anything in the Plan that requires you to

18  extend credit, I need to see that because it was not my

19  intention to do that if we confirm.

20           MR. LEO:  Well, suretyship in itself is an

21  extension of credit.  Bonds are written as financial

22  obligations because --

23           THE COURT:  No, you extended credit when you wrote

24  the bond.  I got that.

25           MR. LEO:  Yeah.

1          THE COURT:  The payment on the bond is not an

2    extension of credit.  The payment on the bond is performance

3    under the bond.  It may result -- and almost always does

4    result -- in either a common law or contractual

5    reimbursement obligation.

6          MR. LEO:  But covering a post-confirmation use of

7    the surety credit post-confirmation default would be the use

8    of surety credit by whoever --

9          THE COURT:  There is -- I think as a matter of law

10   that description is flawed.

11         MR. LEO:  Well, that's probably the --

12         THE COURT:  You are simply not extending credit.

13   You already extended the bond.  Performance under the bond

14   is your performance to the Government, not your performance

15   to the party that requested that you issue the bond.  You're

16   certainly not extending credit to the Government and they're

17   the ones that are going to be demanding payment, right?  Or

18   to the -- if there's a predecessor that has a demand against

19   your bond and the predecessor isn't asking you to extend

20   them credit.  It's telling you, "Pay me your appeal sum

21   requirement," or part of it.

22         MR. LEO:  But in doing so in this extent on post-

23   petition or post-confirmation, there is an existing source

24   of credit that covers a default by the principal and gives

25   rise to a right of recourse.  That's the very reason why a

1   bond -- and I note that at one point the Debtor referred to

2   the independence principle and I was hoping they referred to

3   a city in Missouri and not a surety bond because there is no

4   independence principle when it comes to a bond.

5          The independence principle applies to standby

6   letters of credit and is the principle that you can't --

7   it's an independent obligation between the issuing bank and

8   the beneficiary.  That is not a suretyship relationship.

9   Suretyship relationship includes the right to recourse

10  reimbursement, exoneration, (indiscernible) that the surety

11  would have --

12         THE COURT:  Are you telling me that your

13  obligation -- and I don't know who your bonds are payable

14  to, but let me assume for a minute they're payable to

15  Mr. Velasco.  Are you telling me that if Mr. Velasco demands

16  payment, that you could assert a defense against payment if

17  Mr. Velasco did nothing wrong?  Because that's what's meant

18  by the independence in this concept of a surety bond is that

19  you have an independent duty to the beneficiary of the bond

20  to pay.  Now the beneficiary itself might breach their right

21  to demand payment, but that can't come about from, for

22  example, Fieldwood's breach.  That would have to come about

23  from Mr. Velasco's breach or his client.

24         MR. LEO:  Yeah, there are basically four

25  suretyship defenses and modifications, impairments, release

1  and extension of time.

2          THE COURT:  Right.

3          MR. LEO:  It's a general ruling.  I agree with

4  you, Your Honor, this would involve really kind of an

5  arrangement between the obligee and the principal that

6  prejudices the surety's rights.  There's an exception where

7  if there is a modification of the underlying obligation, the

8  obligee can be completely innocent and yet they're

9  discharged at that point.

10          THE COURT:  But that deals with your independent

11  obligations written into the suretyship to Mr. Velasco and

12  it is independent.  It may rely on what somebody else does,

13  but your obligation to him is one that he can call in on

14  independent of any action by the requesting party.

15          MR. LEO:  Yeah, they're not necessarily written

16  into the bond itself, Your Honor, but the suretyship

17  defenses give -- provide by virtue of suretyship standard.

18  So there -- whether they're written in the bond or not, they

19  are common law rights which exists by virtue of suretyship

20  standard.

21          And I'm just pointing out to the Court that these

22  are some of the questions we have had.  I would conclude

23  that, yes, we did file a lawsuit on Friday.  I don't believe

24  it violates the automatic stay.  I waited until the Debtor

25  very clearly in response to our objections said it doesn't

1  impair any of our defenses against the obligees -- that the

2  Plan does not impair any of our defenses against the

3  obligees.

4          And with respect to the bonds themselves --

5          THE COURT:  So that you know, I was unaware until

6  Mr. Perez said something that you had filed a lawsuit.  I

7  read the lawsuit.  I have no idea if you violated the stay.

8  Hope you didn't.

9          MR. LEO:  I hope I didn't either, Your Honor, but

10  I would also point out that that does not mean we are

11  unwilling to talk.  In fact, we've been talking with Eni

12  Petroleum to try and resolve things and I hope it's kind of

13  a precursor to some more productive discussions so that

14  maybe we can resolve everything.

15          THE COURT:  All right.  Thank you.

16          MR. LEO:  That's all I have.

17          THE COURT:  We have Mr. Alaniz.  Let me get his

18  line active.  Hold on.

19          Mr. Alaniz, good morning.  Go ahead, Mr. Alaniz.

20      OPENING STATEMENT ON BEHALF OF HESS CORPORATION

21          MR. ALANIZ:  Yes.  Good morning, Your Honor.  Omer

22  Alaniz of Reed Smith, on behalf of Hess Corporation.

23          Your Honor, I was planning to forego an opening

24  argument.  We do intend to cross Mr. Dane and to make a

25  closing argument, but I did want to latch onto an exchange

1   you had a little while ago with Mr. Perez.  I was concerned

2   when I heard counsel for BP mention the proposed language in

3   the Confirmation Order saying something like nothing would

4   prejudice BP from seeking contribution against other

5   predecessors.

6           My concern including that language specifically

7   mentioning BP was found by negative implication that Hess

8   would not be able to seek such contribution.  I don't know

9   that Mr. Taylor would do that, but he's a smart lawyer so I

10  wouldn't put it past him.

11          We haven't seen the proposed Confirmation Order.

12  I wouldn't think that the Confirmation Order would dictate

13  who has financial responsibility as a result of the Debtors'

14  abandonment, but I agree with Your Honor that a provision in

15  the Confirmation Order clarifying those issues is important.

16          THE COURT:  Mr. Alaniz, thank you.

17          Mr. Langley?

18          MR. LANGLEY:  Your Honor, thank you very much.

19          Can you hear me now?

20          THE COURT:  I can, Mr. Langley.  And then we're

21  going to go to Mr. Kuebel when you're finished.

22          MR. LANGLEY:  Thank you.

23      OPENING STATEMENT ON BEHALF OF TRAVELERS CASUALTY,

24              LIBERTY MUTUAL INSURANCE CO.,

25          HANOVER INSURANCE COMPANY, AND XL SPECIALTY

1          MR. LANGLEY:  All right.  I don't want to repeat

2    things.  All I have to say is that there are issues with the

3    abandonment of responsibilities in the Gulf and I think you

4    have heard all the surety issues about the treatment of the

5    bonds and the future in the Gulf.  And we do believe that

6    there are *Midlantic* issues that the creditors have here.

7    And that's all I have, Your Honor.

8          THE COURT:  Mr. Langley, thank you.

9          Mr. Kuebel, I'm coming to you.  With an awful lot

10   of people on the phone, that's making the software respond a

11   little bit slowly, but I will get to you.  Give me one

12   moment.

13         Mr. Kuebel, good morning.  Oops, that didn't work.

14   Hold on.

15         MR. KUEBEL:  Good morning, Your Honor.

16         THE COURT:  Oh, it did work.  Okay.  Go ahead

17   please.

18         MR. KUEBEL:  Good morning, Your Honor.

19         Can you hear me well?

20         THE COURT:  I can.  Good morning.

21     OPENING STATEMENT ON BEHALF OF MCMORAN OIL AND GAS

22                 AND CONOCOPHILLIPS COMPANY

23         MR. KUEBEL:  Thank you, Your Honor.

24         Omer S. Kuebel, III specifically rising on behalf

25   of our clients, McMoRan Oil and Gas and their affiliates and

1  the ConocoPhillips Company and its affiliates.  Your Honor,

2  first let me say that throughout the last few months, there

3  has been a tremendous amount of progress in evolving this

4  Plan to something that I think is much more responsible for

5  the transition of these decommissioning activities and the

6  Debtors' assets and including those that are to be abandoned

7  and a lot of credit goes to the Debtor and the Debtors'

8  team, the Department of Justice, and all the predecessors

9  who participated for many, many hours in trying to move this

10  Plan in a proper direction.

11        Your Honor, on behalf of our clients, we had filed

12  limited objections.  At this point going into confirmation,

13  we have one open issue that deals with the breadth of the

14  leases and exculpation clauses.  We have proposed language

15  to the Debtors to resolve that objection.  I think we're

16  close if not in agreement with language.  We do have an

17  issue for McMoRan Oil and Gas with fuel that I think is

18  going to be set to another day.

19        With respect to the breadth of the releases and

20  particularly the exculpation clauses in Section 10.8 of the

21  Plan, I just wanted to make sure that Your Honor is clear

22  from our perspective, it is not exclusively or perhaps not

23  at all a subrogation issue with respect to which rights are

24  being subrogated to.  It's really a contract issue.  These

25  assets at their core, Your Honor, as you might know, are

1   creatures of contract and those contracts include mineral

2   leases, they include operating agreements, they include

3   production handling agreements, transportation agreements,

4   and the like.

5          And what we are concerned about with respect to

6   the scope and the breadth of the exculpation and release

7   clauses is that those various contracts that creates a

8   fabric of these assets are not distorted in a way that third

9   parties are released from those contracts.  We understand

10  even with respect to abandoned property, the Debtors' going

11  to reject this interest in those contracts.

12         And I would focus the Court on a particular

13  defined term in the exculpation clauses "additional

14  predecessor breaches" and that term is incredibly broad.  We

15  can get into it if we need to.  But the point is, Your

16  Honor, from our perspective, both with respect to assumed

17  agreements and even rejected agreements, we want to make

18  sure that the non-Debtor rights are preserved.

19         And this is important, Your Honor, because

20  historically when the Government comes calling on the

21  predecessors who are working interest owners, they still use

22  these contracts and agreements and particularly the

23  operating agreements to decide amongst themselves, "How are

24  we going to fix this or how are we going to address this?"

25         And so it's important from our perspective as we

1    deal with reservation of rights language to make sure that

2    those third-party rights are not impaired, they're not

3    impaired for assuming agreements or even rejected agreements

4    because it's really through those contract rights that the

5    other parties, the predecessors, the working interest owners

6    are going to have to define how exactly they react to these

7    orders from the Government.

8         So I just wanted to make that point clear that

9    it's -- from our perspective, the breadth of the exculpation

10   is beyond just a subrogation issue, but it's also about

11   trying to maintain the integrity of the contracts

12   particularly the operating agreement as between the parties

13   to those agreements that in the future may include or reject

14   the Debtor, but there are still parties that have to figure

15   out how to get contribution, how to get the P&A done.

16        And typically in my experience, those parties are

17   going to go back to the DLA and we want to make sure that

18   the Plan doesn't inadvertently shift around those third-

19   party liabilities under those various agreements and the

20   obligations under those agreements.

21        THE COURT:  Look I think it's a fair comment,

22   Mr. Kuebel.  I did not believe the Plan did.  I may be wrong

23   about that if it does, and we certainly -- I'll ask

24   Mr. Perez as he's working on the language that's going to

25   clarify existing rights that could be exercised if a call

1   were today versus something in the future that you add to it

2   contractual rights as well, Mr. Perez, just so we know

3   clearly what we're doing.

4          MR. PEREZ:  All right.

5          THE COURT:  But I didn't think you were impairing

6   the rights that Mr. Kuebel is talking about invading, but

7   this is a complicated deal and we ought to be sure that I'm

8   understanding it correctly as is he.

9          MR. PEREZ:  Yeah.  And, Your Honor, in the context

10  of rejecting -- the Debtor rejecting an operating agreement

11  in an abandoned property, we're reaching.  That's what that

12  is, but that agreement still exists just as among the other

13  parties, so I don't think the Plan is purporting to do that

14  at all.

15         THE COURT:  Yeah.  I think he's worried about some

16  particular language in that exculpation agreement that might

17  do that and I'll just let you all work through that.  But I

18  didn't think it was doing it.  I don't even know that

19  Mr. Kuebel thinks it's doing it.  He wants to be sure it's

20  not doing it and there's a slight difference there.

21         MR. PEREZ:  Understood.

22         MR. KUEBEL:  And, Your Honor, even if that wasn't

23  the intention, the breadth, for example, of that definition

24  of "additional predecessor agreements" is just such that

25  it's a red flashing light.

1          THE COURT:  Yeah, let's get some clarity on it to

2    where we all can agree what it says.  And you know, it may

3    be we all agree it says something somebody doesn't like, but

4    I don't want there to be ambiguity about what it says.

5          MR. PEREZ:  Yes.  Thank you, Your Honor.

6          THE COURT:  Thank you.

7          Mr. Zabel?

8          MR. ZABEL:  (No audible response).

9          THE COURT:  Mr. Zabel for Genesis.

10         OPENING STATEMENT ON BEHALF OF GENESIS ENERGY, LP

11         MR. ZABEL:  Yes.  Good morning, Your Honor.  Thank

12   you.  Tom Zabel, Zabel Freeman, co-counsel with Tom Howley

13   at the Howley Law Firm for Genesis Energy, LP and its

14   affiliates.

15         Your Honor, Genesis and its affiliates own and

16   operate oil and gas pipeline facilities offshore that

17   transport oil and gas from Fieldwood's platforms.  Fieldwood

18   has been working diligently with Genesis to resolve the

19   objection.  We have an objection on Document 1503.

20         I noticed in the notice of Agenda that was filed

21   early this morning in footnote 3, they have communicated

22   that there has been an agreed adjournment of our objection

23   and about 22 other objections until a later date.  And if

24   Your Honor is agreeable to that, which we are by the way, we

25   would reserve any opening or any argument until the

1   adjourned matters are taken up with the hopes that we

2   resolve all of our objection issues with Fieldwood before

3   that date.

4           THE COURT:  So both for you and for others that

5   have mentioned -- but your objection issue, you're asking if

6   I'm agreeable to that.  Yes.  If the parties have reached an

7   agreement that on a particular matter, the cure objection

8   can be deferred without getting in the way of the

9   Confirmation Hearing, it's going to be just fine with me.

10  But there may be some of the cure objections that need to be

11  resolved in order to determine confirmation and for those

12  we'll need to proceed because we have to -- we may have to

13  determine some to determine if the Plan is confirmable.

14          But if you have a cure objection where it isn't

15  going to affect whether the Plan can be confirmed or not,

16  just fine with me.  It'll be postponed, all of them that are

17  listed in footnote 3 of the Agenda.

18          Thank you, Mr. Zabel.

19          MR. ZABEL:  Thank you, Your Honor.

20          THE COURT:  From 214-580-5852, who do have?

21          MR. PLATT:  Good morning, Your Honor.

22          Mark Platt.  Can you hear me?

23          THE COURT:  I can, Mr. Platt.  Good morning.  And,

24  Mr. Platt, before you speak, you're the last person that I

25  show wants to speak in opening statements so I'm going to

1  let you take all the time you want.  But if somebody else

2  believes that they had their hand raised, please one time

3  only press five star because you're it in terms of clearing

4  out my backlog.

5      OPENING STATEMENT ON BEHALF OF CGG SERVICES (US), INC.

6          MR. PLATT:  Well, I appreciate the invitation,

7  Your Honor, but I will be brief.  I represent CGG Services

8  (US), Inc., which like Mr. Brescia -- one of Mr. Brescia's

9  clients, is a seismic data licensor.  Our licenses we

10 believe are being assumed and assigned to the Credit Bid

11 Purchaser and we have an agreement in principle but are

12 working on papering that agreement, so it is my

13 understanding that we are among the group that is being

14 pushed off to a future hearing of assumption disputes and we

15 are agreeable to that and just simply wanted to preserve our

16 objections until that date.

17          THE COURT:  Mr. Platt, thank you.

18          MR. PLATT:  We were just hoping we would get a

19 date certain for that, Your Honor.

20          THE COURT:  Well, let's see if we confirm.  And if

21 we confirm, once we do, why don't you all then tell me we

22 need some dates and we'll get you dates.  If we don't

23 confirm, it's a different story.

24          So I've got two more people that I see.

25          Ms. Williamson first followed by Ms. Moses.

1          Go ahead, Ms. Williamson.

2          OPENING STATEMENT ON BEHALF OF VALERO MARKETING

3                     AND SUPPLY COMPANY

4          MS. WILLIAMSON:  Yes, Your Honor.  I apologize.

5   Again Ms. Williamson, representing -- Deborah Williamson

6   representing Valero Marketing and Supply Company.  And we

7   are listed on the Agenda at item No. 32.  Mr. Green and I

8   did reach some language that we thought would resolve the

9   Valero objection, which was filed at 1334, but I understand

10  that we got some additional language from, I believe, the

11  consenting lenders, which was not on its face acceptable to

12  us.  We proposed some additional language back and hopefully

13  today we'll be able to announce an agreement on that.

14         THE COURT:  Thank you.  Again, like others, if you

15  don't, you can make your opening at that point.

16         Ms. Moses?

17         MS. WILLIAMSON:  Thank you, Your Honor.

18         MS. MOSES:  (No audible response).

19         THE COURT:  Ms. Moses, I can't hear you.  You may

20  have your own phone muted.

21         MS. MOSES:  I'm sorry, Your Honor.

22         Is that better?

23         THE COURT:  It is, but you're probably going to

24  have to look that way I'm afraid so -- but go ahead.

25         OPENING STATEMENT ON BEHALF OF JX NIPPON

1                    OIL EXPLORATION LIMITED

2          MS. MOSES:  Yes, I'll try.  Thank you, Your Honor.

3    We have made this on behalf of JX Nippon Oil Exploration

4    Limited.  We just want to reserve our rights.  We have

5    resolved our objections with the Debtor, but there is a

6    footnote in the Agenda that indicates that even if that

7    language has been agreed to, that it's subject to ongoing

8    review and signoff by the consenting creditors under the

9    Restructuring Support Agreement.  So just wanted to reserve

10   our rights for objection in the event that any of the

11   language needs to change that we would present it to the

12   Court.

13          THE COURT:  Of course, Ms. Moses.  If it doesn't

14   work out, you can make your opening at that point and your

15   rights are going to be preserved.

16          Thank you.

17          MS. MOSES:  Thank you, Your Honor.

18          THE COURT:  I do have one more person that wishes

19   to speak.  From 512-217-5738.

20          OPENING STATEMENT ON BEHALF OF BRIAN CLOYD,

21               ANDREW LUIS, AND PATRICK BURNETT

22          MS. ROMERO:  Yes, Your Honor.  This is

23   Taylor Romero on behalf of post-petition maritime tort

24   claimants, Brian Cloyd, Andrew Luis, and Patrick Burnett.

25   Similar to the folks that just went previously, we're listed

1    on the Agenda at Nos. 28 and 29.  We reached, we believe, an

2    agreement that also is subject to final review and approval,

3    and we just wanted to preserve our rights to make objections

4    to the extent that approval is not reached.

5         THE COURT:  Ms. Romero, that is granted.  Thank

6    you.

7         MS. ROMERO:  Thank you.

8         THE COURT:  All right.  I show that -- if there's

9    anyone else that wishes to speak in opening statements,

10   please press five star one time on your phone.

11       (No audible response.)

12        THE COURT:  Okay.  For what it's worth, Mr. Perez,

13   you managed to produce more opening statements than I've

14   ever had in my 17 years on the Bench.  So what we're going

15   to do is take a break until 10:35.  We're going to return at

16   10:35.

17        That may be a request by you at that point after

18   you've conferred with parties to continue for a much longer

19   period of time than that, but probably everybody needs a

20   break and so we'll come back at 10:35.  If we then want to

21   take a couple-hour break or whatever you need, I'll listen

22   to your announcement at that point and then from anyone

23   else, but hopefully we'll be able to move ahead.

24        What I'm going to do for those of you that -- I've

25   activated all those lines.  I'm now going to re-mute all the

1  lines so you'll need to request to speak again.  Otherwise,

2  we'll get too much background noise during the day so

3  everyone's about to get re-muted.

4          Mr. Perez, if you'll press five star when you come

5  back, I'll need to find you.

6          See you all at 10:35.  Thank you.

7      (Recess taken from 10:18 a.m. to 10:35 a.m.)

8                          AFTER RECESS

9          THE COURT:  All right.  We're going to go back on

10  the Record on the Fieldwood case.

11          Mr. Perez, do you have any request as to how we

12  proceed?

13          MR. PEREZ:  Yes, Your Honor.  If we could have a

14  one-hour extension.  I think it's important to try to

15  finalize the APA Surety Term Sheet.  I think everything else

16  will probably fall in much quicker after that.

17          So if we could come back at quarter of 12:00, if

18  that's possible?

19          THE COURT:  All right.  Does anyone object?  If

20  so, press five star one time.

21      (No audible response.)

22          THE COURT:  Okay.  We'll return at 11:45.

23          I'm going to leave all the lines active, so you

24  may disconnect and reconnect or you can just stay connected,

25  whatever you prefer.

1              Thank you.

2              MR. PEREZ:  Thank you, Your Honor.

3         (Recess taken from 10:36 a.m. to 11:45 a.m.)

4                          AFTER RECESS

5              THE COURT:  All right.  We're going to go back on

6    the Record in the Fieldwood Energy case.

7              Let me ask Mr. Perez or someone else from his firm

8    to tell me what our current status is.

9         (Pause in the proceedings.)

10             THE COURT:  I apologize.  I'm having a little

11   trouble with my phone controller again.  Let me get back

12   into it.

13        (Pause in the proceedings.)

14             THE COURT:  Mr. Barr, I'm not seeing Mr. Perez

15   here.  I'm going to go ahead and activate your line and

16   maybe you can give me an update on where we are -- oh,

17   there's Mr. Perez now.

18             MR. BARR:  Your Honor, if you can hear me, it's

19   Mr. Barr from Weil.  I was just letting you know Mr. Perez

20   is having some technical difficulties, but I do see him now.

21             THE COURT:  All right.  And I've got his phone

22   here, as well.

23             MR. BARR:  Thank you, sir.

24             THE COURT:  Thank you.

25             Mr. Perez?

1          MR. PEREZ:  Yes, Your Honor.

2          Yes, Your Honor.  Can you hear me?

3          THE COURT:  I can.  Thank you.

4          MR. PEREZ:  All right.  Your Honor, first let me

5     apologize for being late.  I'm generally not late, but I

6     apologize.

7          Your Honor, I think we used the -- probably more

8     than allotted time and I do believe that as it relates to

9     the surety term sheet, we now have -- as among the lawyers,

10    a substantially negotiated term sheet, subject to obviously

11    final client sign-off.

12         And we had a -- basically we were on the phone the

13    entire time.  So that part of the -- that part of the

14    hearing, I think is going to be resolved and so that leaves

15    us the other parts, but obviously I would welcome, you know,

16    the other surety counterparties to speak to that, but I

17    think we're substantially resolved right now on a fully

18    negotiated term sheet.

19         THE COURT:  So let's assume that's correct.  What

20    do you want to then proceed to do?  Are you now wanting time

21    to work things out with predecessors or others?  Or do you

22    want to proceed into the evidence.

23         MR. PEREZ:  Your Honor, I think we can proceed

24    into the evidence.  Obviously it depends on your Court's

25    pleasure.  I know you have a 4:00 o'clock stop.  We could --

1  we could take an early lunch and come back and go straight

2  through, or we could start with Mr. Dane (phonetic) and then

3  take a lunch break and then come back.

4          I think whatever is the Court's pleasure, but I

5  think Mr. Dane is probably going to be -- my Direct will

6  probably be about an hour with him.  So if we could take an

7  early lunch and come back, that would definitely help clear

8  some of the other underbrush.  But I think -- and I would

9  very much like to be able to finish Mr. Dane today.  I know

10 he's got commitments -- business commitments later in the

11 week.

12         THE COURT:  All right.  We're adjourned until

13 1:20.  I will resume at 1:20.  You will need to reconnect

14 your phone lines.  I'm going to restart the whole phone

15 system.

16         We'll see you all then.  Thank you.

17         MR. PEREZ:  And I apologize --

18         THE COURT:  No.

19         MR. PEREZ:  -- I apologize, Your Honor, for being

20 so -- asking for another continuance at this point.  It

21 wasn't our intent, but --

22         THE COURT:  Nah.  As we said at the last hearing,

23 it's a moving problem and it ought to be.  And so you don't

24 need to apologize for things that are supposed to move are

25 moving.

1         We'll talk to everybody at 1:20.  You'll need to

2    reconnect on your phone lines.

3         Thank you.

4         MR. PEREZ:  Thank you.  Bye.

5      (Recess taken from 11:51 a.m. to 1:19 p.m.)

6                        AFTER RECESS

7         THE COURT:  All right.  We're going to go back on

8    the Record in the Fieldwood case.

9         Ms. Rosen, you had pressed five star on your line?

10        MS. ROSEN:  Yes.  Thank you, Your Honor.  Can you

11   hear me?

12        THE COURT:  I can.

13        MS. ROSEN:  Okay.  Thank you.

14        Cynthia Rosen, Your Honor, on behalf of the XTO

15   entities.

16        I just very briefly, Your Honor, wanted to let the

17   Court know that we've been going back and forth with the

18   Debtors for, you know, about a week on some proposed

19   language for the Confirmation Order that we think will

20   resolve a number of our objections.  And we, if we could,

21   like to try to get some resolution on that with the Debtors

22   before we get into the evidence.  We think it will affect

23   our -- even somewhat our evidentiary presentation.

24        I know the Debtors have spent the last couple of

25   hours with the sureties trying to get to a resolution on

1  some of their objections and I think that's great.  And I

2  think that we would just like the same courtesy and would

3  ask for maybe an hour to visit with the Debtors' counsel and

4  try to get some resolution on our proposed objections before

5  we move forward with the evidence.

6             I think there may be other predecessors who may

7  feel the same way.

8             THE COURT:  I'm not going to delay the evidentiary

9  hearing, given the witness's availability that was described

10  by Mr. Perez.  But I will direct Mr. Perez to have someone

11  from his office begin contacting people during the hearing.

12  They've got enough people.  They can have somebody contact

13  you.  And if you'll delegate someone for him, just send him

14  an email who you want him to call.

15             Thank you.

16             MS. ROSEN:  Thank you.

17             THE COURT:  Mr. Scharfenberg?

18             MR. SCHARFENBERG:  Oh, yeah.  Yes, Your Honor.  I

19  was just going to speak up because the confirmation language

20  that XTO is requesting might materially impact different

21  bond defenses and we would just want to be a part of that

22  discussion.  But I think I can take that up with

23  Ms. Rosen --

24             THE COURT:  Okay.  Thank you.

25             MR. SCHARFENBERG:  -- offline here.

1          THE COURT:  Okay.  Thank you.

2          Mr. Perez?

3          MR. PEREZ:  Good afternoon, Your Honor.  Alfredo

4   Perez.  I think we're prepared to move forward with

5   Mr. Dane's testimony.

6          I did have one housekeeping question.  One of our

7   witnesses, Mr. Brown, who is the -- who prepared the

8   liquidation analysis, we -- the parties agreed that his

9   Declaration could be admitted into evidence and he is in

10  another trial, as well, so we wanted to -- to the extent

11  anybody is going to cross-examine him, we'd like to know

12  that so that we can arrange -- you know, work around his

13  other trial, as well.

14          To the extent nobody is going to cross-examine the

15  liquidation analysis, then obviously that would come in.

16          But if we could -- somebody could tell us that --

17          THE COURT:  Are you offering --

18          MR. PEREZ:  -- it would be very helpful.

19          THE COURT:  Are you offering Mr. Brown's

20  Declaration into evidence?

21          MR. PEREZ:  Yes, Your Honor, we are and it's

22  without objection that it's coming in.  The issue is --

23          THE COURT:  Well, I've got a lot of people here.

24          Does anyone object to the admission of Mr. Brown's

25  Declaration?

1             What's its ECF number?

2             MR. PEREZ:  1555, Your Honor.

3             THE COURT:  Anyone object to 1555 being admitted

4   as substantive evidence at today's hearing?

5             Ms. Heyen?

6             MS. HEYEN:  (No audible response.)

7             THE COURT:  Ms. Heyen?

8             MR. DUVAL:  This is Mr. Duval, Your Honor.  No

9   objection to that issue.  We had raised our hand only to say

10  that we were supporting Ms. Suki and that someone from our

11  office will be reaching out to opposing counsel, as well.

12            We're ready to go-forward with the evidence.

13            THE COURT:  Thank you, sir.

14            All right.  There is no objection.  No. 1555 is

15  admitted.

16       (Exhibit 1555 received in evidence.)

17            THE COURT:  Is there any cross-examination of

18  Mr. Brown?

19       (No audible response.)

20            THE COURT:  All right.  Mr. Brown is excused from

21  the witness stand.

22            Who is your next witness?

23            MR. PEREZ:  Thank you.

24            Your Honor, Mike Dane.

25            THE COURT:  All right.  Mr. Dane, if you would

1    please press five star one time on your phone?

2            Mr. Dane, good afternoon.  Would you raise your

3    hand for me, please?

4        (Witness sworn.)

5            MR. DANE:  Yes.  I do.

6            THE COURT:  Okay.  Thank you.

7            All right.  Who is going to examine Mr. Dane?

8            MR. PEREZ:  Your Honor, I am.

9            THE COURT:  All right.  Go ahead, please.

10               DIRECT EXAMINATION OF MICHAEL DANE

11   BY MR. PEREZ:

12   Q    Would you please state your name?

13   A    Michael Dane.

14   Q    And how are you currently employed?

15   A    I'm the Senior Vice President and Chief Financial

16   Officer of Fieldwood.

17   Q    And when did you become the Chief Financial Officer?

18   A    March 2016.

19   Q    And do you hold any other executive positions at

20   Fieldwood?

21   A    I'm a member of the company's Executive Leadership

22   Team.

23   Q    And would you tell the Court what the Executive

24   Leadership Team is?

25   A    The Executive Leadership Team is comprised of myself,

1  our General Counsel, Tommy Lamb, and our Senior Vice

2  President of Production, Gary Mitchell.  And this group is

3  in charge of the duties and responsibilities of the office

4  of the Chief Executive Officer.

5  Q    And when was the Executive Leadership Team created?

6  A    I believe it was in July of 2020.

7  Q    All right.  Now, Mr. Dane, have you been involved in

8  these bankruptcy cases?

9  A    Yes, I have.

10 Q    And what is the nature of your involvement?

11 A    I've been involved --

12       THE COURT:  Let me ask you -- let me ask you to

13 pause -- let me get you to pause one second, Mr. Dane.

14       Mr. Eisenberg, do you have an objection?

15       MR. EISENBERG:  No, Your Honor, I don't have an

16 objection.  I just wanted to have my line ready just in case

17 something came out on the direct testimony that I felt

18 compelled to object to on behalf of one of my oil and gas

19 clients.

20       THE COURT:  Thank you.

21       For everyone else listening, I have done away with

22 sustaining an objection to asked and answered.  If you have

23 an objection and I don't get to you, I'm going to let you

24 come back and make the objection.  We'll strike an answer

25 and then let the answer be given.

 1          Mr. Eisenberg, I'll leave your line open, but for

 2   others, I'll recognize you as promptly as I can.  You'll be

 3   able to object retroactively even if an answer has come out.

 4          Go ahead, please --

 5          MR. EISENBERG:  Appreciate that, Your Honor.

 6   Thank you.

 7          THE COURT:  Thank you.  Go ahead, Mr. Dane.

 8          THE WITNESS:  I'm sorry, Mr. Perez, could you

 9   repeat the question?

10   BY MR. PEREZ:

11   Q    Yes.  Have you been involved in these bankruptcy cases?

12   A    Yes.  I have.  I've been involved prior to the company

13   filing for Chapter 11, some of the early discussions leading

14   up to the bankruptcy, and then I've been involved in most of

15   the major negotiations during the bankruptcy process.

16   Q    All right.  And so could you describe in a little bit

17   more detail what parts of the bankruptcy case you have been

18   involved in?

19   A    The various conversations with the major stakeholders,

20   which I would characterize as a group of clearly the

21   Government, the creditors, surety bond providers, vendors

22   and predecessors.

23   Q    All right.  So what are your responsibilities as the

24   CFO of the company?

25   A    I've got a number of departs that report to me.  That

1  includes finance and planning, accounting, treasury, tax,

2  IT, procurement, and then my role in the Executive

3  Leadership Team has brought oversite of the general

4  operations of the business.

5  Q    All right.  And does Fieldwood on a yearly basis

6  prepare a business plan?

7  A    Yes.  Fieldwood does.

8  Q    And what is your involvement in the development of the

9  business plan?

10  A    We have a finance and planning group that is

11  responsible for putting together and organizing our

12  forecasts and our business plans.  They work with a broad

13  group of subject matter experts at the company.  It's a

14  process.  They ultimately assemble our projections and our

15  forecasts working with the various subject matter experts

16  and I review and approve those plans.

17  Q    All right.  And who is the person at the company

18  ultimately responsible for the Debtors' financial reporting?

19  A    The management is responsible for the company's

20  financial reporting.  We have an accounting group, which is

21  led by our Chief Accounting Officer, Bill Swindle

22  (phonetic).  They prepare our financials.  Mr. Swindle signs

23  off on those financials, alongside the Executive Leadership

24  Team after they are audited by our third-party auditors,

25  Ernst & Young, and ultimately they're approved by our Board

1  of Directors on an annual basis.

2  Q    And what is your involvement in the preparation of the

3  financial reporting?

4  A    There's various elements of the financial reporting

5  that I directly review.  I review the overall financial

6  statements, along with our Chief Accounting Officer to

7  understand the assumptions and the inputs and that I approve

8  -- or I approve the financial statements as CFO and as a

9  member of our Executive Leadership Team prior to their

10  submission for our audit.

11  Q    All right.  Mr. Dane, do you know why we're here today?

12  A    I do.  I understand we're here for Fieldwood's

13  Confirmation Hearing.

14  Q    And are you familiar with the Debtors' Plan?

15  A    Yes.  I am.

16  Q    Did you review the Plan?

17  A    I did.

18  Q    And were you involved in the negotiations of the

19  various transactions that are reflected in the Plan?

20  A    Yes.  I was.

21  Q    All right.  And then do you know why Fieldwood has

22  filed for bankruptcy?

23  A    Yes.

24  Q    Can you tell the Court why?

25  A    In early 2020, around the March time period, there was

1   some very significant strains that the business was facing.

2   At the time, particularly due to the significant commodity

3   price collapse and other challenges that were presented by

4   the global pandemic.  The company engaged at that time in a

5   number of conversations with its lender group and progressed

6   those conversations.  Ultimately it was understood that the

7   company wasn't able to meet all of its obligations.  And the

8   company pursued a Chapter 11 restructuring as a result.

9   Q    All right.  And what obligation are you talking about

10  that the company wasn't able to satisfy?

11  A    The company has a number of obligations.  The two major

12  categories are financial debt obligations and then also

13  plugging and abandonment obligations with respect to its

14  assets.

15  Q    All right.  Now with respect to the funded debt

16  obligations, can you tell the Court what the company's

17  capital structure is?

18  A    Currently and prior to filing of our restructuring, the

19  company's capital structure consisted of $1.8 million in

20  total funded debt.  There was three million tranches of

21  debt.  There was a first lien, first out facility, which has

22  a $139 million balance.  There's a first lien term loan,

23  which has a $1.4 billion balance.  And then there's a second

24  lien term loan that has a $518 million balance.

25          And all of those three tranches comprise our

1  $1.8 billion capital structure today.

2  Q    All right.  And then could you describe the plugging

3  and abandonment liabilities?

4  A    The company has significant plugging and abandonment

5  liabilities associated with its wells, platforms, and

6  pipelines in the Gulf of Mexico.  These are -- the company

7  has over 400 platforms, over 1,000 wells.  It's a

8  significant asset base, one of the largest asset bases in

9  the Gulf of Mexico.  So the obligation associated with the

10 physical infrastructure at the end of its useful life is

11 associated with plugging and abandonment and decommissioning

12 those assets.

13 Q    Okay.  As part of the company's financial reporting,

14 does it report its estimated plugging and abandonment

15 liabilities?

16 A    It does.

17 Q    And are you involved in that process?

18 A    Yes.  I am.

19 Q    And how does the company go about estimating its

20 plugging and abandonment liabilities?

21 A    The company has a decommissioning team as a part of --

22 as one of our departments.  It's led by -- we have a Vice

23 President of Decommissions, Brandon DeWolfe (phonetic).  He

24 oversees a group of folks both in the office and offshore.

25 It's a very sizable group of about 80 employees.  In the

MICHAEL DANE - DIRECT BY MR. PEREZ                    124

1  office we have about a dozen professionals that focus on

2  exclusively estimating and performing plugging and

3  abandonment work.

4      Under the oversight of Mr. DeWolfe, that team is

5  responsible for preparing these estimates.  They're based on

6  assumptions that are updated on an annual basis.  I review

7  those assumptions and the outputs with Mr. DeWolfe and then

8  they're ultimately incorporated into our annual financial

9  statements.

10 Q    All right.  And are those estimates reviewed by anyone?

11 A    Yes.  They're also in addition to management.  They are

12 also reviewed and the assumptions are tested as part of our

13 annual audit process, which has historically been done and

14 is currently done by Ernst & Young.

15 Q    All right.  Now do you remember what the most current

16 number for the plugging and abandonment liabilities that

17 Fieldwood has on its balance sheet?  Do you remember -- do

18 you recall that number?

19 A    I believe I'd have to look at the balance sheet.  I

20 believe that the discounted error on the balance sheet is

21 just over a billion dollars.  I think it's between a billion

22 and a billion two, and I believe that corresponds to a

23 undiscounted value of around a billion eight in principle

24 and interest.

25 Q    Okay.  And let me just make sure of that.  Is that in

1  eight eights or is that just net to the company's interest?

2  A    That's net to the company's interest.

3  Q    All right.  Now are you familiar with BSEE?

4  A    Yes.  I am.

5  Q    All right.  And does BSEE provide estimates of plugging

6  and abandonment liability?

7  A    They do.

8  Q    And do they do it the same way that Fieldwood does, or

9  do they do it differently, or do you know?

10 A    I don't exactly know how BSEE drives their estimates.

11 I know that -- I'm pretty certain that it's not the same way

12 that Fieldwood drives its estimates, but I am generally

13 familiar with BSEE estimates.

14 Q    Could you tell the Court how Fieldwood derives its

15 estimates?

16 A    So for purposes of our audited financials and the

17 numbers that are included on our financial statements, these

18 estimates are generated pursuant to models that Fieldwood

19 maintains, which estimates costs associated with the

20 different type of asset, whether it's the well, platform, or

21 pipeline, depending on the type of well, platform, or

22 pipeline.  These models are updated with current assumptions

23 each year based on the cost of goods and services and

24 equipment, as well as Fieldwood's recent experience with

25 decommissioning assets of a like nature, and that forms the

1   basis of the model which is tested by Uniline (phonetic)

2   incorporated in our financial statements.

3        Also, we have business plans which look at these

4   estimates on a much more granular project level basis and

5   these business plans are high-quality estimates that we

6   believe the work can be executed on in a more precise

7   fashion.

8   Q    And does Fieldwood have experience in decommissioning

9   assets in the Gulf?

10  A    Yes.  Fieldwood has very extensive experience doing

11  decommissioning in the Gulf of Mexico.

12  Q    Can you roughly tell the Court either in terms of

13  number of assets or in dollar amount what Fieldwood's

14  experience has been?

15  A    Since 2013 Fieldwood has done over a billion and a half

16  dollars of plugging and abandonment work and that's

17  associated with over 400 platforms, over 400 pipelines and

18  over 1200 wells.  And to my knowledge, that's the most of

19  any operator in the Gulf of Mexico and potentially in many

20  of those years and periods, probably greater than industry

21  combined.

22  Q    Now have you reviewed BSEE estimates with respect to

23  some of the Fieldwood assets?

24  A    I've seen certain BSEE estimates associated with the

25  Fieldwood assets, yes.

MICHAEL DANE - DIRECT BY MR. PEREZ                127

1   Q    And are these -- and are these estimates the same or

2   different than Fieldwood's estimates?

3   A    Generally speaking, I would say that they're different.

4   Overall, they're certainly different.  In some cases they

5   may be similar, but it really runs the whole gamut.  I would

6   say on the whole of things, it is probably meaningfully

7   different.

8   Q    And is it meaningfully lower or meaningfully higher?

9   A    BSEE produces a range of estimates.  They've updated

10  their methodology.  They used to just provide a single

11  number, but more recently they now provide a distribution.

12  There's P-50 numbers, there's P-90 numbers.  I think it

13  really depends on the specific number that's being reviewed

14  and the specific asset.

15  Q    So how would the BSEE P-50 number compare to the

16  Fieldwood plugging and abandonment estimate?

17  A    We haven't -- I haven't reviewed recently if a P-50

18  number for all of BSEE's estimates relative to the entirety

19  of Fieldwood.  I would imagine it would be somewhat higher

20  because in general some of these numbers have been higher.

21  So the BSEE estimates are not a number that Fieldwood relies

22  on for any reason because we have a team that performs this

23  on a just more granular basis and there's a familiarity with

24  our specific assets that are (indiscernible).  So from

25  Fieldwood's perspective, there's not much utility to the

1  BSEE estimates due to our expertise in this area.

2  Q    And what would be your answer with respect to the BSEE

3  P-90 estimate?

4  A    So BSEE P-90 estimates that I have reviewed are

5  meaningfully higher than most cases that I've seen, which

6  would make sense because a P-90 estimate is an extremely

7  high level of confidence.

8  Q    All right.  So let's go back to March of 2020.  Can you

9  tell the Court what was going on in the oil and gas industry

10 -- not that the Court isn't aware, but just for the Record,

11 please.

12 A    Around the March timeframe, there was an onset of the

13 COVID-19 global pandemic and one of the ways in which our

14 industry was impacted by that was certainly with respect to

15 commodity prices.  Commodity prices have gone from the

16 mid-50's to at one point as low as negative $37, so the

17 primary revenue source of our product was really

18 significantly impacted.

19      In addition to that, just managing the business in

20 terms of the disruption to the business caused by COVID and

21 the ability to deal with a large workforce offshore, there

22 was a significant amount of disruption that the business

23 suffered.

24      And then further to that, this took place at a time

25 where there was a lot of uncertainty in the market and a lot

MICHAEL DANE - DIRECT BY MR. PEREZ                              129

1  of uncertainty with oil and gas prices and it was a time at

2  which Fieldwood needed to engage in discussions with its

3  lenders.  And so capital availability was significantly

4  strained in the oil and gas space overall

5  Q    And so what did the company do in response to all of

6  these challenges?

7  A    So initially in March of 2020, it became clear that the

8  company needed to have some initial conversations with its

9  lender group.  The first impetus for those conversations was

10 the company was concerned that as a part of its annual audit

11 process, it may not be able to get an unqualified audit

12 opinion or an audit that did not have a going concern

13 qualification.  The going concern qualified audited opinion

14 was a potential default under its credit agreements.

15       And so Fieldwood originally approached its lenders in

16 late March seeking a waiver of that going concern

17 qualification.  Those conversations progressed and then

18 ultimately developed into a conversation around forbearance

19 around an upcoming interest payment which was due at the end

20 of April.  And the company ultimately ended up entering into

21 a forbearance agreement with its lenders, and one of the

22 conditions of that forbearance agreement was that the

23 company provide a comprehensive Plan of restructuring to its

24 lenders.

25 Q    All right.  And so what happened?  Were you able to

1  obtain the forbearance?

2  A    Yes.  The company did obtain the forbearance.

3  Q    And what about the -- did you make the interest

4  payment?

5  A    No.  The interest payment that was owed at the end of

6  April was not made and the lenders agreed to forbear their

7  rights with respect to that interest payment.

8  Q    And did you begin preparing a restructuring proposal?

9  A    Yes.  We did.

10  Q    And so what happened after you started doing that?

11  What was the next step?

12  A    There was a recognition by the management team at that

13  point that based on feedback with respect to the lenders,

14  the lenders had provided very clear guidance on what they

15  were willing to support or not in order to contribute new

16  capital into the company, which was going to be a key part

17  of any restructuring the company needed to reorganize with

18  new capital in order to recapitalize the company and object

19  to liquidity.

20      The lenders were very clear about the fact that they

21  were not willing to capitalize the company with significant

22  new money unless it addressed its legacy P&A obligations and

23  weren't willing to continue funding those obligations in the

24  context of the whole company.

25      So kind of given that feedback and those parameters,

1  the company recognized that it was very important to try and

2  get some alignment with Fieldwood's largest

3  predecessor-in-interest, which was Apache.  Apache

4  represents about two-thirds of the company's overall shelf

5  plugging and abandonment liabilities, a little over

6  60 percent in total of the company's total liabilities.  And

7  so following the direction of the lenders and the fact that

8  we have to deliver a comprehensive term sheet that was

9  something that we thought we could execute on, the company

10 engaged in conversations with Apache to see if there was a

11 potential mutually consensual solution that the parties

12 might be able to reach and that was around the May

13 timeframe.

14 Q    All right.  Now you mentioned new capital.  Why did the

15 company need new capital?

16 A    In line with the need to forbear upon interest in the

17 April time frame, the company had a $35 million interest

18 payment that was due.  The company had limited sources of

19 liquidity.  The company was concerned that those sources of

20 liquidity would be further constrained.  If it had a default

21 under its credit agreements, prices had sunk pretty

22 dramatically, so there's a number of steps the company took

23 to try and support its liquidity.

24      There was some changes to the company's hedge programs

25 and terminations, cost reductions, that were pursued, but it

1  ultimately just given the magnitude of the need of capital

2  and also the severity of the price environment, the company

3  recognized its liquidity runway and that period was going to

4  be uncomfortably short.

5            And any meaningful recapitalization of the

6  business was going to require an injection of new capital.

7  Q    Now let me just fast forward for a minute.  Does the

8  current Plan provide for any new capital?

9  A    Yes.  It does.

10 Q    And could you tell the Court what that is?

11 A    So the Plan contemplates that there's going to be

12 $225 million of new money contributed.  That's in the form

13 of a second lien term loan facility for up to $185 million.

14 And then two equity rights offerings of $20 million each for

15 a total of $40 million provided by the first lien term loan

16 lenders and the second lien term loan lenders.

17 Q    All right.  Now let's go back to Apache.  You indicated

18 that Apache was your single largest predecessor.  What did

19 you do in order to try to implement the proposal that you

20 had made to the banks?

21 A    So this was pretty even.  Making a proposal to the

22 banks, this was more in the formulation stage of

23 understanding what a potential proposal could look like

24 before something was required to be delivered to the lenders

25 under the forbearance agreement.

1       And then early May, the company reached out to Apache

2   and their advisors -- Parkland & Welling (phonetic) was

3   their advisors at the time who had worked with the company

4   previously -- worked with Apache previously.  And Fieldwood

5   expressed the desire to meet and get a situation update on

6   the company's staff discussion with the lenders, the

7   requirements under the forbearance agreement, and explore

8   consensual alternatives.

9       Apache was very immediately responsive and they were

10  prepared to engage with Fieldwood.  Fieldwood had something

11  that they wanted to discuss and so we prepared a

12  presentation that provided a situation update and provided

13  several potential alternatives to explore in terms of mutual

14  consensual solutions with respect to the assets that

15  Fieldwood had acquired from Apache back in 2013.

16      And those conversations went on for a couple of months.

17  Q   All right.  And so let's talk a little bit about the

18  transaction in 2013.  Can you describe the transaction back

19  in 2013?

20  A   In 2013 Fieldwood had purchased the Gulf of Mexico

21  Shelf Business Unit from Apache.  This was an acquisition

22  that the company's private equity sponsor at the time had

23  identified.  That was a nearly four-billion-dollar

24  acquisition.  It was a very, very significant asset base.

25  It was the largest asset base in the Gulf of Mexico Shelf.

1    And the company had purchased the entire asset base,

2   which was producing -- this was a $110 oil price

3   environment, so it was a very significant time -- it was a

4   very different time than the current market today.  That

5   asset base was very large, very, very profitable.  It had

6   approximately 90,000 barrels of oil a day and over a billion

7   dollars of EBITDA, and that's how the company came to own

8   the Apache assets.

9   Q    All right.  Are you familiar with the BSEE regulations

10  regarding legacy properties?

11  A    I'm familiar with the regulations around liabilities,

12  if that's what you're referring to.

13  Q    Yes.  I am.  So could you tell the Court what your

14  understanding is with respect those regulations?

15  A    My understanding is the regulations provide that all

16  lease owners, lease holders are jointly and severally

17  responsible for decommissioning obligations.  This

18  responsibility extends to any period, even if the lease

19  holders assign their leases at a subsequent point.  And

20  that's been kind of a foundation of Gulf of Mexico

21  regulatory framework for quite some time and certainly since

22  all of the Fieldwood assets and Fieldwood's predecessors

23  have entered into transactions in the Gulf of Mexico.

24  Q    All right.  And so at the time that Fieldwood purchased

25  those assets, had Apache acrued any asset retirement

1  liabilities?

2  A    Yes.  Effectively all of the asset retirement

3  obligations that Fieldwood has today that came through the

4  Apache acquisition were assets for which Apache is jointly

5  and severally liable for.

6  Q    All right.  Did Apache take any steps in order to

7  protect themselves against that liability?

8  A    Yes.  So Apache was very thoughtful and focused on its

9  potential liability at the time of the 2013 acquisition.

10  One of the foundational documents as a part of that

11  acquisition was the Decommissioning Agreement and the

12  security that was required to be provided pursuant to the

13  Decommissioning Agreement, which governs certain aspects of

14  Fieldwood's obligations related to decommissioning that it

15  acquired from Apache.

16       This was something that was a substantial area of focus

17  during the original negotiations of that deal between the

18  parties.

19  Q    All right.  Now, could you tell the Court what security

20  backs the Decommissioning Agreement?

21  A    Apache negotiated for some very substantial security in

22  2013 in the event that there was ever a default, since they

23  were required to satisfy the obligations for which they are

24  jointly and severally liable for.  And so that security

25  today comprises a cash escrow account, which is called

1  "Trust A."  It has $238 million of cash.  That cash balance

2  was built up over time by a net profits interest that was

3  granted over all of the Apache-related properties.  It's

4  called the "Trust A."

5       Net Profits Interest, or "NPI," and that is a Net

6  Profits Interest that on a monthly basis requires the

7  crediting of the Trust A account for any net profits that

8  are generated and so over time that's built up to the

9  $238 million of cash and will continue in the future to the

10 extent that it continues to generate positive net profits.

11      In addition to the Trust A cash escrow account, NPI

12 construct, there's also $497 million of bonds and letters of

13 credit that are outstanding, as well.  So in total there's

14 $736 million of security that Apache holds related to the

15 original 2013 transaction with Fieldwood.

16 Q    All right.  So Mr. Dane, in connection with reaching

17 out to Apache, did you come to any understanding with them

18 with respect to the Apache legacy assets?

19 A    Yes.  There was a number of meetings and conversations,

20 both with Apache and with their advisors and through a very

21 constructive process, despite the challenges that were

22 obviously presented for Apache at the time.  The parties

23 were able to get an understanding of the mutual objectives

24 and this culminated in a term sheet that was negotiated,

25 which formed the basis of the Fieldwood One entities and

1  formed the basis of Apache's support under the Restructuring

2  Support Agreement that was ultimately filed at the time of

3  Fieldwood's Chapter 11 filing.

4  Q    All right.  Let me ask you to turn to Debtors'

5  Exhibit 28 and I believe that is found at Docket 1562-1 and

6  I think 1562-2 because they're so long.

7           MR. PEREZ:  And Your Honor, I gave Mr. Dane a book

8  with his exhibits, so he has that in front of him.

9           THE COURT:  Thank you.

10          THE WITNESS:  All right.

11 BY MR. PEREZ:

12 Q    Could you identify Exhibit No. 28, Mr. Dane?

13 A    Exhibit 28 is the Apache definitive documentations --

14 documents.

15 Q    Okay.

16          MR. PEREZ:  And Your Honor, I am told that --

17 Ms. Choi corrected me.  It's Document 1616-7 and 1616-8.

18          THE COURT:  Thank you.

19 BY MR. PEREZ:

20 Q    All right.  And what was your involvement in the

21 negotiation of those documents, Mr. Dane?

22 A    I was involved along with some other senior executives

23 of Fieldwood in negotiating various parts of the definitive

24 documentation associated with this transaction.

25 Q    Okay.

 1          THE COURT:  So let me just ask you to hold for one

 2   second.

 3          You said 1615-7?

 4          MR. PEREZ:  1616-7 and 1616-8.

 5          THE COURT:  I've got it.  Thank you.

 6          MR. PEREZ:  And Your Honor, I believe that those

 7   documents are stipulated into evidence.  I don't believe

 8   that there's any objection to them.

 9          THE COURT:  So the Debtors filed at ECF No. 1672 a

10   list of exhibits that they believe to be, as I understand

11   it, stipulated as to admissibility.  Maybe we should take up

12   now whether anyone disputes whether all of the documents

13   that are listed on pages 5 through 12 of 1672, are they all

14   being offered?

15          Mr. Perez, are you offering them all?

16          MR. PEREZ:  Yes.  They are, Your Honor.  Yes.

17   They are, Your Honor.

18          THE COURT:  Does anyone object to the admission of

19   any of the documents on those -- on that lengthy Exhibit

20   List?

21      (No audible response.)

22          THE COURT:  All right.  All of exhibits that are

23   listed on pages 5 to 12 of 1672 are all admitted.

24      (ECF 1672, exhibits listed on pages 5 through 12

25   received in evidence.)

1          THE COURT:  Thank you.

2          MR. PEREZ:  Thank you, Your Honor.

3    BY MR. PEREZ:

4    Q    All right.  So Mr. Dane, I know this is probably

5    several hundred pages, but what was the purpose of entering

6    into this transaction in connection with the Plan?

7    A    This was viewed as one of the cornerstone transactions

8    of our Plan because it addressed a significant amount of the

9    total liabilities.  As I mentioned, the Apache assets

10   represent two-thirds, 75 percent of the company's shelf

11   liabilities and well over 60 percent of the company's total

12   liabilities.  So the purpose of this transaction per the

13   term sheet was ultimately to be able to consensually resolve

14   a significant amount of the Debtors liabilities and this

15   documentation was following the terms outlined in the term

16   sheet.

17   Q    Okay.  And what were the goals that you were trying to

18   achieve in doing this transaction?

19   A    There was a number of important goals.  Both Fieldwood

20   and Apache had certain objectives with respect to handling

21   these liabilities.  The real goal is to create a framework

22   that was able to comprehensively address all of the

23   obligations associated with the properties that Apache had

24   joint and several liability for.

25        The goal was to look at this holistically, identify all

1   the sources that could be contributed to addressing the

2   significant liabilities and so the parties were able to find

3   common ground on a structure that became the Fieldwood One

4   entity.  The objectives were to take all the assets that

5   Apache had joint and several liability for, put them in a

6   separate entity, which was this Fieldwood One entity, and be

7   able to maximize the cash flow of this entity in order to

8   provide for operations and decommissioning of these assets.

9       The mandate of this entity is to handle its

10  decommissioning obligations and wind itself down.  And any

11  other objectives that was clear focus of the parties, given

12  Apache's willingness to engage only on certain terms was to

13  make sure that the structure didn't jeopardize their ability

14  to protect the security that they had bargained for in 2013.

15      Those were the main objectives in the Fieldwood One.

16  Q    And I meant to ask you:  Fieldwood previously filed for

17  bankruptcy; is that correct?

18  A    Yes.  Fieldwood had a restructuring in 2001.

19  Q    And what happened to the Decommissioning Agreement in

20  connection with that restructuring?

21  A    That restructuring was a pre-packaged restructuring

22  where it was basically a balance sheet reduction.  That

23  reduction exercise and all of their obligations of the

24  company were assumed so every other contract in the company

25  and obligation other than the debt that was being

MICHAEL DANE - DIRECT BY MR. PEREZ                    141

1  restructured was assumed by Fieldwood and as part of the

2  restructuring company, including the Decommissioning

3  Agreement.

4  Q    All right.

5  A    With certain modifications that the parties had

6  mutually agreed at the time.

7  Q    Okay.  So let's talk a little bit about how Fieldwood

8  One is going to operate in the future.  Are you aware of how

9  Fieldwood One is going to operate in the future?

10 A    Yes.

11 Q    And could you tell the Court how that's going to work?

12 A    Generally speaking the goal of this entity is to

13 utilize any available cash flow that it has in order to

14 conduct decommissioning and provide just the ordinary

15 expenses of operations.  This entity is going to be managed

16 by a sole manager.  That individual was selected as John

17 Graham through a selection process amongst the parties.

18      It's going to be capitalized originally by Fieldwood

19 pursuant to the agreement that we have with Apache as

20 outlined in these definitive documentation.  Fieldwood is

21 going to contribute the difference between $50 million and

22 the amount of P&A that it had spent money on between the

23 filing date and the effective date.  We estimate that that's

24 going to be a contribution at exit of between $15-20

25 million.  Apache is going to provide a standby facility for

1   $400 million.  That standby facility is available under

2   certain conditions for plugging and abandonment obligations,

3   and the Credit Bid Purchase is going to serve as the

4   original contract operator pursuant to a Transition Services

5   Agreement that the parties negotiated so the employees that

6   are going to be a Credit Bid Purchaser who had familiarity

7   with these assets are going to provide all these services

8   associated with operating these assets and administering the

9   assets because the only employee in the vicinity is going to

10  be the sole manager.

11       This entity is going to be entirely focused on doing as

12  much decommissioning as possible and providing funds for

13  decommissioning and providing a framework for

14  comprehensively addressing the decommissioning utilizing,

15  you know, all available sources that are available for that

16  purpose.

17  Q    Can you tell the Court about the process to select the

18  sole manager?

19  A    Yes.  So originally the Fieldwood One term sheet

20  contemplated a process where Fieldwood and Apache had the

21  right to nominate parties and then there has to be a mutual

22  agreement, otherwise it would be determined by, I believe,

23  an outside party or the judge.

24       Fieldwood had proposed three candidates.  Apache had

25  offered as their proposal, John Graham.  Fieldwood had

1   reviewed John Graham's résumé.  Fieldwood conducted several

2   interviews of John Graham and after assessing all the

3   candidates and getting a better understanding of John

4   Graham's qualifications and having discussed in the

5   interviews his insights into these properties to determine

6   that Fieldwood is comfortable supporting John Graham as the

7   sole manager and so the parties agreed that Mr. Graham was

8   going to be selected as the sole manager.

9   Q    All right.  And could you tell the Court what in

10  Mr. Graham's background made you think that he was an

11  appropriate person to be the sole manager?

12  A    Yeah.  I think it was not only his background, but also

13  his individual characteristics that I think that everyone

14  felt like qualified him.  Yeah, Mr. Graham has an extensive

15  experience in the oil and gas states.  He has over 40 years

16  of experience.  A significant portion of that was spent

17  working at Apache Corp over the last 25 years.  He retired

18  in April, but at Apache, he had experience that we thought

19  was very meaningful and unique for this role.  He has

20  experience with these particular assets in the Gulf of

21  Mexico, just a significant asset base, and we thought that

22  experience with respect to these specific assets that are

23  going to be a part of Fieldwood One was very valuable in

24  terms of an understanding of the actual assets.  He was a

25  reservoir engineer manager years ago over the Gulf of

1    Mexico.

2        Also, Mr. Graham has run several significant business

3    units for Apache, some very complicated and large businesses

4    with significant assets in terms of, you know, volume and

5    production and also employees.

6        He ran Apache's North Sea business most recently.  He

7    was responsible for managing a part of their Canadian

8    operations, their Argentinian business, I believe at one

9    point their Canadian business, and then probably most

10   importantly to me, Mr. Graham mentored a number of folks on

11   our team.

12          Mr. Graham had an extensive background in HSE at

13   Apache.  He had helped to form and lead of a group of their

14   HSE department at Apache for a number of years.  I believe

15   it's in the post-McCondo era.  And his understanding and

16   focus on HSE-related areas was something that was very

17   important to the company.

18       Aside from that, I think would a number of our team

19   felt that they took away from the interviews and was

20   appreciative of his name being put forward in the selection

21   process was that he came across as a person that had a high

22   level of integrity and was -- you know, he expressed his

23   commitment to working for all parties to get the best

24   possible answer to meet the mandate of this entity, and we

25   believe that he was a good candidate to do that.

MICHAEL DANE - DIRECT BY MR. PEREZ                        145

1  Q     Do you believe that he will be under the control of

2  Apache in connection with his role as the sole manager?

3  A     No.  I don't believe that.

4  Q     And why do you say that?

5  A     Well, one, based on his -- based on our conversations

6  with Mr. Graham, particularly at the interview phase,

7  Mr. Graham was clearly interviewing with Fieldwood for this

8  role and he was very upfront about the fact that he

9  understands his role is to be a fiduciary to this entity, to

10 operate within the mandate and the constraints of what his

11 duty and responsibilities are to this entity.

12      So I think, you know, his integrity and character gives

13 me some comfort there.  I also don't believe that Apache has

14 control of Fieldwood One.  They have reasonable consent

15 rights that provide them oversight of the entities to ensure

16 that, in my opinion, to ensure that it's operating within

17 its mandate.  And so I think Mr. Graham is going to operate

18 as an independent sole manager.  He has been working as a

19 consultant for Fieldwood for the last several months because

20 we determined it would be helpful for him to get up-to-speed

21 on the asset base, given the significance of this position

22 and the post-effective company.  And he's been working very

23 constructively with our employees to get his arms around

24 this very complicated situation.

25 Q     And Mr. Dane, does the sole manager have the ability to

1  change who the contract operator is?

2  A    Yes.  Not only does -- he does have that ability, and

3  that's part of his responsibility is to ensure that the most

4  effective, sufficient cost effective services are being

5  provided to the entities.  He's going to be incentivized in

6  a manner that ensures that, as well.

7       And so it is his responsibility, just like it's his

8  responsibility to ensure that all costs are appropriate for

9  that entity.  He has the ability to replace the sole service

10  provider.  That is something that requires Apache's consent,

11  but that's within his responsibilities and he has been

12  upfront about the fact, both with us and Apache, that he's

13  going to be evaluating who the appropriate service provider

14  is on a long-term basis after the initial period that

15  Fieldwood is going to be providing these services so we have

16  a Plan that's confirmed.

17  Q    All right.  In connection with the Disclosure

18  Statement, did Fieldwood prepare projections of the

19  Fieldwood One entity?

20  A    Yes.  It did.

21  Q    All right.  Can I ask you to turn to Exhibit No. 17?

22           MR. PEREZ:  And I believe, Your Honor, that is

23  16 -- yes, 1620, Your Honor.

24  BY MR. PEREZ:

25  Q    Okay.  Mr. Dane, were you involved in the preparation

1   of these financial projections?

2   A    Yes.  I was.

3   Q    And when were these projections prepared?

4   A    These projections, so that the Disclosure Statement was

5   ultimately filed -- or that these projections were filed in

6   April.  The Disclosure Statement projections were updated

7   throughout this process because the process timeline got

8   extended for various reasons.  Originally it was expected

9   that we would have these filings done in the fourth quarter

10  of 2020, but ultimately the solicitation and the Final

11  Disclosure Statement was provided much later than that at

12  the beginning of the second quarter.

13       So they were updated and these projections that were

14  included in this final draft were prepared around the

15  March/April time frame over the course of several months

16  leading up to that, as well.

17  Q    All right.  And could you tell the Court how these

18  projections were prepared?

19  A    So in line with how I was describing our finance and

20  planning group and their responsibilities earlier, our

21  finance and planning group is responsible for preparing our

22  plans and projections.  They work with a wide range of

23  subject matter experts at the company.  This includes

24  reservoir engineers, geologists and geophysicists, our asset

25  team managers, production engineers, landmen, our marketing

1  department, et cetera.

2      All of these folks -- certainly our production

3  operations and operation groups, all of these folks provide

4  the relevant input.  This is a bottoms-up forecasting effort

5  like most of our planning and forecasting.  And so this

6  bottoms up effort takes -- bottoms up analysis takes the

7  inputs from the various subject matter experts and they're

8  consolidated by our finance and planning group.  It's an

9  iterative process where our financing and planning group

10 assembles this information and tests assumptions, make sure

11 that it works within the context, the bottom context of what

12 the objective is, and then ultimately management reviews

13 these projections and as a part of my oversight of that

14 finance and planning group, I was involved in that process,

15 reviewed their work, and ultimately approved the projections

16 that we've been using.

17 Q   All right.  Let me ask you to turn to the very last

18 page.  Could you tell the Court what that is?

19 A   These are the projections associated with the Fieldwood

20 entity, the Fieldwood One entity that we prepared.

21 Q   All right.  I'm not going to go through each line.  I

22 think that substantial part of the testimony as a result of

23 the settlement, I'm not going to go through it.  I just want

24 to highlight a couple of lines.

25      Do you see kind of toward the middle of the page there

1   is a change in networking capital, 36.  Do you see that?

2   A    Yes.  I do.

3   Q    Could you explain to the Court what that is?

4   A    So that number represents the estimated change in

5   networking capital that this entity is going to experience

6   as a result of these transactions.  It's obviously a

7   meaningful, positive number, and the reason -- but the basis

8   for this number is there is a pre- and post-effective date

9   construct that's assumed as a part of all these

10  transactions.  Fieldwood One entity is going to start with a

11  very clean working capital balance because under our Plan

12  it's contemplated that the Credit Bid Purchaser is going to

13  assume effectively all of the working capital associated

14  with Fieldwood.

15       And so at the time of the effective date, the Fieldwood

16  One entity is not really going to have any payables.  It is

17  only going to be responsible for post-effective date

18  payables and when we look at our estimates for the cash

19  impact of these transactions and the fact that the Credit

20  Bid Purchaser is going to be assuming all the payables at

21  the time of exit that are pre-effective date, and when we

22  look at and make our estimates for the fact that revenue is

23  received on a much more current basis then payables are paid

24  when you start with a clean balance sheet, it results in a

25  meaningful positive working capital balance.

1     So for instance, if a transaction was to be effective

2   at August 1st as an example, then Fieldwood One's first

3   revenue payment for the month of August would be received in

4   the month of September.  Fieldwood One's payables would

5   likely not be paid for many, many months after that because

6   if for a payable for the service month of August probably

7   wouldn't be received until September and due until October.

8     So there's a working capital benefit that this entity

9   receives.  It's the opposite of the working capital impacts

10  to the NewCo, which is expected to be about a $50-plus

11  million negative working capital result as a result of these

12  transactions.

13  Q   All right.  And also, could you tell the Court what the

14  R&M expenses are that's kind of toward the top of the page?

15  A   R&M stands for "Repair and Maintenance."  And these are

16  basically non-recurring major projects spends associated

17  with remediating and maintaining the facilities to include

18  everything from general maintenance of the facilities, for

19  corrosion, because these facilities require ongoing upkeep.

20  It could include repairs related to hurricanes or other

21  storms, so it's a broad category of repair and maintenance

22  that's required on this asset base.

23  Q   All right.  And then finally, --

24        THE COURT:  Mr. Dane, if you would look at -- I

25  need to be sure I understand how this page works.  Tell me

1   where the change in networking capital line item comes from,

2   if you don't mind?  We can take May to December.

3              THE WITNESS:  Sure.

4              THE COURT:  Where does that 36 million come from?

5              THE WITNESS:  So that is -- Your Honor, we look at

6   the various cash-related items that will implement Fieldwood

7   One's networking capital balance as a result of these

8   transactions and so it's a function of the timing of revenue

9   and the timing of expenses.  So when we look at on a cash

10  basis when revenue is actually received versus the expenses

11  when they're actually paid because indemnity is going to be

12  starting with a clean working capital balance, and it's not

13  going to be responsible for any pre-effective date

14  obligations associated with the payables.  This is basically

15  the benefit that this entity gets because it effectively

16  receives the revenue more currently then it will pay the

17  payables and that will result in a meaningful initial

18  working capital benefit because you're getting two or three

19  months of revenue before you're having to pay expenses at

20  the beginning.

21             THE COURT:  So in effect, that 36 million is

22  largely a bill of accounts payable?

23             THE WITNESS:  Yes.  It's the benefit of getting

24  revenue without having to pay expenses for an extended

25  period of time and it's the opposite for the NewCo, where

MICHAEL DANE - DIRECT BY MR. PEREZ                    152

1  NewCo is going to forgo the future revenue, but it's going

2  to maintain responsibility for pre-effective date payables,

3  which have to be paid over time.

4           THE COURT:  All right.  Go ahead.

5           Thank you.

6  BY MR. PEREZ:

7  Q    Okay.  So Mr. Dane, last thing I'm going to ask you

8  about this is:  Could you explain to the Court what the

9  standby credit facility is?

10 A    The standby credit facility is something that was a

11 component of the Fieldwood One/Apache Fieldwood transaction

12 whereby Apache has agreed to provide a $400 million standby

13 facility.  This standby facility is available for plugging

14 and abandonment upon certain conditions -- major provisions

15 associated with these funds is that other sources of

16 security that are in favor of Apache are required to be

17 exhausted prior to this facility being able to be drawn,

18 other than in certain other circumstances that the lender

19 may consent to for utilizing these funds.

20 Q    All right.  And so when we're looking at does Fieldwood

21 have an estimate of what they believe the asset retirement

22 obligations for Fieldwood One is?

23 A    Yes.  Fieldwood has done a number of different analysis

24 on the Fieldwood One obligations and generally the estimates

25 are between 950 million in total to around 1.2 billion, has

1  been the numbers that we do in our various estimates, and in

2  these projections -- I'm sorry, in the forecast period that

3  goes from May '21 to the end of 2025, there were around

4  410 million, I believe, dollars of projects that were

5  identified under these assumptions that are associated with

6  activity that could be performed in this period.

7  Q     Okay.  And to address those obligations, what sources

8  of revenue exists to address those obligations?

9  A     So it's sources obviously beyond revenue, but the

10 various sources -- I mentioned that this Fieldwood One

11 entity, the objective was to create a framework in order to

12 address all of the decommissioning obligations.  And you

13 know, we looked at the resources in a holistic manner.

14     And those resources comprised certainly as a part of

15 this transaction, I mentioned that Fieldwood is going to be

16 contributing cash at exist to this Fieldwood One entity.

17 That's going to be, in our estimate, $15-20 million.  That's

18 going to provide the initial capitalization of Fieldwood

19 One.  This entity is going to -- under these projections and

20 these assumptions it's going to generate cash flow of that's

21 going to enable approximately $170 million of P&A to be

22 accomplished while maintaining an adequate minimum cash

23 balance in this entity.  So the cash flow from the entity

24 itself is a resource.

25          The amount that is -- the security arrangements

1  that Apache has in place, pursuant to the Decommissioning

2  Agreement, which comprise the Trust A balance of

3  $238 million, which will grow over time.  If as under these

4  assumptions the Net Profits Interest continues to generate

5  in that process and these projections, there is a forecast

6  that that Net Profits Interest will generate over

7  $40 million of additional Net Profits Interest that will be

8  deposited into Trust A over this period and that obviously

9  extends into the future, as well.

10       There is the $497 million of bonds and LCs that are an

11  available resource pursuant to the terms of those

12  agreements.  There is the $400 million standby facility that

13  Apache has made available.  And then certainly behind all of

14  those sources, which in and of themselves add up to a

15  meaningful number and a number that we believe is in excess

16  of the total liabilities of Fieldwood One net related

17  properties, certainly behind all those numbers is Apache,

18  who has joint and several liability and it's very well

19  capitalized, nearly $20 billion enterprise value company.

20  Q    All right.  Mr. Dane, I'm going to switch gears a

21  little bit and talk about the sale transaction to Credit Bid

22  NewCo.

23       Could you give the Court an overview of that

24  transaction?

25  A    So early in this process, one of the components of the

1  original Plan was a dual track marketing effort of certain

2  of the company's deepwater assets or a potential

3  recapitalization of certain of the company's assets, and

4  this was going to be at the lender's decision ultimately.

5  The company engaged in a third-party -- you know, multiple

6  third-party marketing efforts.  Those marketing efforts were

7  being developed in a way that was acceptable to the parties,

8  and the lenders decided to pursue the reorganization and

9  recapitalization of certain assets that the company owns.

10      The company performed an evaluation with its lenders

11 and advisors and other stakeholders as to the assets that

12 were going to be recapitalized and that were going to form

13 the basis of the new money that the lenders were going to be

14 willing to support as a part of that transaction.

15      And so the Credit Bid Purchase transaction contemplates

16 the sale of certain assets through our Plan to the Credit

17 Bid Purchaser to effectively substantially of the company's

18 deepwater business and 13 shelf properties to the Credit Bid

19 Purchaser.

20 Q    All right.  And what consideration is the Credit Bid

21 Purchaser paying for those assets?

22 A    So the Plan states that there's an aggregate

23 consideration of approximately $1.03 billion related to the

24 Credit Bid Purchaser transaction.  That consideration is in

25 the form of first cash.  There is up to $125 million of

1   cash.  There is the allowed first lien term loan claims,

2   their credit bid.  There's the Gulf warrants, the second

3   lien term loan warrants.  There is the allowed first

4   lien/first out claims.  There is the assumption of

5   meaningful liabilities, which is effectively the working

6   capital and that's the working capital that Your Honor asked

7   about.  It's the assumption of those working capitals that

8   are pre-effective date working capital of effectively all of

9   the companies' liabilities associated with that

10  post-effective date payables.

11       And that's broadly the categories of the consideration.

12  Q    All right.  And what do you think the amount of the

13  current liabilities that the Credit Bid Purchaser will be

14  assuming?  What is the amount of that?

15  A    I believe it's approximately $350 million of asset

16  retirement obligations.  But in addition to -- that's asset

17  retirement obligations by our estimates associated with

18  those deepwater properties and 13 shelf properties, but in

19  addition to that, there's other categories of obligations.

20       I'm not sure if your question was just asset retirement

21  obligations.  There's also the Fieldwood Three related

22  properties the company is going to continue to support

23  certain properties in Fieldwood Three.  As of right now,

24  those Fieldwood Three properties are nine platforms and ten

25  wells for which it's providing $5 million at exit and credit

1  support of up to $8 million for.

2      There's obligations under the various predecessor

3  consensual arrangements that the company is going to support

4  to handle P&A.  There's the working capital obligations it's

5  assuming.  There's obviously the new data obligations that

6  are going to be created in the pro forma capital structure.

7      So those are the obligations that the Credit Bid

8  Purchaser is going to be assuming.

9  Q   And specifically as it relates to the working capital

10 items that it will be assuming, what do you believe that

11 number will be?

12 A   I estimate that's $50-60 million.

13 Q   Thank you.

14      Let me ask you to turn to Exhibit No. 26, which is

15 1616-5.

16      Can you identify that document, sir?

17 A   This document is the Credit Bid Purchase Agreement.

18 Q   Okay.  And were you involved in the negotiation of that

19 document?

20          THE COURT:  I'm sorry.  Which ECF number is this

21 again?  I've turned to the wrong one is what this means.

22          MR. PEREZ:  1616-5, I think, Your Honor.

23          THE COURT:  No.  I went to 1615-5.  I just

24 misheard you.  Let me get the right one open.

25          I've got it now.  Thank you.

1         THE WITNESS:  Yes, Mr. Perez.  I was involved in

2    certain elements of the negotiation around this agreement.

3    BY MR. PEREZ:

4    Q    All right.  Now who will be managing the team at the

5    new Credit Bid Purchaser?

6    A    So our Plan and the conversations that we've had with

7    our stakeholders contemplate that the management team of

8    Fieldwood today will continue to be the management team of

9    the Credit Bid Purchaser.

10   Q    And how much debt will the Credit Bid Purchaser have

11   upon funded debt once the transaction is concluded?

12   A    The Credit Bid Purchaser will have up to $304 million

13   of debt.  That's comprised of $119 million first lien term

14   loan and that is -- there is a second lien term loan of up

15   to $185 million.  The final amount of that second lien term

16   loan will be determined by the final sources and uses of the

17   transaction, so it would be up to $304 million of funded

18   debt.

19   Q    And how does that compare to Fieldwood's current

20   capital structure?

21   A    It's substantially less.  Fieldwood has $1.8 billion of

22   funded debt, as I was mentioning, so it's over 80 percent

23   reduction in the company's debt.

24   Q    Are you familiar with the capital structures of other

25   operators in the Gulf?

1  A    I am.

2  Q    And how was the new Credit Bid Purchaser compared to

3  those?

4  A    I believe that the Credit Bid Purchaser is going to

5  have a leading balance sheet amongst its peer group.  Peers

6  in the Gulf of Mexico have -- our closest peers in the Gulf

7  of Mexico has capital structures that have a leverage

8  profile --

9          THE COURT:  Let me -- Mr. Dane, I'm going to

10  interrupt you for a minute.

11          Let's go ahead and take the objection from

12  Mr. Duewall.

13          MR. DUEWALL:  Objection, hearsay, Your Honor; it's

14  outside the scope of the --

15          THE COURT:  Sustained.

16          MR. DUEWALL:  -- witness's knowledge.

17          THE COURT:  Sustained.

18  BY MR. PEREZ:

19  Q    Mr. Dane, can you turn to Exhibit 17 again?  In

20  particular, page 9.

21  A    Yes.  I have that available.

22  Q    All right.  Can you tell the Court what this is?

23  A    These are the projections associated with NewCo.

24  Q    All right.  And --

25  A    I'm sorry, Credit Bid Purchaser.

1  Q    Okay.  And did you -- what was your involvement in

2  preparing these projections?

3  A    Similar to what I described earlier about our overall

4  general planning and projection process and the Fieldwood

5  One planning and projection process, it was the same process

6  where finance and planning group assembled a bottoms up

7  analysis collectively with all the subject matter experts.

8       I assembled it.  I reviewed -- I was involved in that

9  effort and I reviewed and approved these projections

10 Q    Do you feel that the Credit Bid Purchaser will be able

11 perform on these projections?

12 A    I believe that these are very reasonable projections

13 that are a very fair set of projections and very much in

14 line with all the reasonable assumptions that are forecasted

15 here.  I think that the company right now is very well

16 positioned to accomplish these objectives that are outlined

17 in the projections.  The company has been working very

18 actively throughout this very long process to try and

19 position itself to be able to be successful and accomplish a

20 business plan that's in line with these projections.

21      I do feel very comfortable with these projections given

22 where we are today and how the assets are performing.

23 Q    All right.

24          THE COURT:  So I just want to make one comment for

25 the appellate record and that is that what we're looking at,

1   as I understand it, is 1615-20 ECF page 8, not ECF page 9,

2   but it is Document page --

3            MR. PEREZ:  9.

4            THE COURT:  -- well, there's a 9 at the bottom,

5   but it also says, "Page 8 of 9" at the bottom.  That's where

6   the confusion is coming in.

7            These are called "NewCo Projections," is what

8   we're looking at and I think the page references might not

9   have been accurate that we were making.

10           But I want to be sure you're looking at the page

11   that's labeled "NewCo Projections," right, Mr. Dane?

12           THE WITNESS:  Yes, Your Honor.

13           THE COURT:  Okay.  Thank you.

14   BY MR. PEREZ:

15   Q    All right.  Let me ask you a question.  On the P&A

16   line, which is in the middle of the page, do you see that

17   line?

18   A    I do.

19   Q    Okay.  And it shows, you know, relatively modest

20   amounts of single-digits.  Why is that -- why are those

21   amounts the amounts needed for the asset retirement

22   liability on these assets?

23   A    They are certainly modest compared to Fieldwood's

24   overall obligations today, but with respect to the assets

25   that this work is attributable to is a significant amount of

MICHAEL DANE - DIRECT BY MR. PEREZ                162

1   the work associated with Fieldwood's shelf asset retirement

2   obligations that this entity is going to be assuming.

3       The nature of the assets that are going into the NewCo

4   that are being acquired pursuant to the Credit Bid Purchase

5   are that they are generally assets that have a significant

6   reserve life and the asset retirement obligations are

7   generally not going to be realized until much further down

8   the road once those assets deplete and the P&A is ripe for

9   being conducted.

10       The P&A that's forecast in these periods --

11           THE COURT:  Let me -- Mr. Dane, I'm going to

12   interrupt you again.

13           Mr. Duewall, go ahead, please.

14           MR. DUEWALL:  So Your Honor, he's not there now.

15   Previously he was drifting into an area that I think had

16   been limineed out by the Court's previous Order regarding

17   what he couldn't testify to with regard to feasibility, but

18   he has since backed away from that.  That was the nature of

19   my -- what was going to be my objection.

20           THE COURT:  So as I've indicated, I'm not going to

21   do waivers based on an answer already given.

22           Do you think any of his answers already given

23   crossed the line?  I'm not sure they did.  I gotcha that you

24   were worried about them getting close, but if you want to

25   make that objection, you're still free to do so.

MICHAEL DANE - DIRECT BY MR. PEREZ                    163

1          MR. DUEWALL:  No, Your Honor.  He's -- no, Your

2    Honor.

3          THE COURT:  Okay, thanks.

4          Mr. Duewall, I'm leaving your line active so you

5    will not need to press five star to speak.  Just speak up if

6    you wish.

7          MR. DUEWALL:  Thank you, Your Honor.

8          THE COURT:  If you remember where you were,

9    Mr. Dane, you can finish that answer.  If not, we'll have

10   Mr. Perez repeat it.  This is just the awkwardness of the

11   COVID hearing.

12         THE WITNESS:  That's no problem.  Thank you, Your

13   Honor.

14         So the -- now I forget.  The projections over this

15   five-year period are effectively associated with -- even

16   though there's a long reserve line associated with most of

17   Fieldwood's -- most of the assets that are going to comprise

18   the NewCo entities.  The rejections that are shown for P&A

19   work over the five years were estimates that were assuming

20   that the company has a very pro-active idle iron campaign

21   with respect to the Shelf assets that it's retaining, the

22   reason that they're relatively small is there's not a

23   significant amount of P&A work that needs to be done.

24   There's not a substantial amount of idle iron.

25         There's also other factors that can feature --

1  that can be a function of how significant the annual

2  spending is.  Like, for instance, a number of the Credit Bid

3  Purchaser's assets are going to be assets that have a lower

4  working interest.

5          One of the significant fields is Grand Isle 43

6  that has a significant amount of the idle iron that's going

7  to be accomplished over this period.  The Credit Bid

8  Purchaser only has a 25 percent interest in that field, so

9  the gross number of projects continue in full, but the net

10  dollar spend would not be that significant.

11          But generally speaking the reason the amounts here

12  are low is because of the fact that the nature of the assets

13  that are going to be owned by the Credit Bid Purchaser do

14  not have meaningful near term P&A.

15  BY MR. PEREZ:

16  Q    Okay.  And what is the current asset retirement

17  obligation on the Debtors' books and records with respect to

18  these assets?  The total amount.  I think you may have

19  mentioned it before, but I just want to have a clear

20  estimate.

21  A    Approximately -- I'm sorry.  Approximately $350

22  million, I believe.

23  Q    All right.  Thank you.

24          Now one last question about Credit Bid NewCo, do you

25  believe that Credit Bid NewCo will have sufficient funding

1  capability to carry out its business plan?

2  A    I do.

3  Q    And why do you say that?

4  A    We're aware of the bond that we know are required to

5  provide as a part of these transactions that we've been made

6  aware of.  We have been engaged in a number of conversations

7  with surety parties.  We have a commitment from one of the

8  surety providers that was a recent consensual solution that

9  was able to be worked out between the Debtor and this party,

10 USSIC, in order to provide for a $75 million facility --

11 committed facility for two years, which is a very meaningful

12 amount and it more than satisfies, at least initially, what

13 we know we need to provide and we're engaged in other

14 conversations that may result in incremental capacity, as

15 well, to the extent it's necessary.

16 Q    Thank you.

17      Now let me turn to other transactions.  Has Fieldwood

18 entered into other consensual transactions addressing the

19 ARO obligations with other predecessors?

20 A    It has.

21 Q    Okay.  Let me ask you to turn to Exhibit No. 18, which

22 is 1615-21.

23      And ask if you could identify that.

24 A    This is the Fieldwood/Chevron term sheet.

25 Q    All right.  And could you tell the Court in general

1  terms what the term sheet provides for?

2  A    Well, Fieldwood was obviously interested in continuing

3  to find as many consensual solutions as it could with major

4  predecessors or all predecessors and Chevron represented in

5  our view the second largest predecessor after Apache.

6  Fieldwood engaged in very constructive conversations with

7  Chevron around the 3Q 1420 period of time of 2020 and was

8  able to ultimately come to a term sheet, which has

9  subsequently then incorporated into the definitive

10  documentation that was recently filed, related to assets in

11  which Chevron is a predecessor.

12      The main contours of the agreement between the Debtors

13  and Chevron comprised a Fieldwood Four entity, which is

14  going to be made up of certain properties that Chevron is

15  the primary predecessor-in-interest of, related to Fieldwood

16  Shelf asset base.  It's a meaningful position.  It's I

17  believe over 25 platforms, over 100 wells.

18      The Fieldwood Four construct contemplates that those

19  assets are going to be put into Fieldwood Four.  The Credit

20  Bid Purchaser is going to conduct the contract operations of

21  that entity, pursuant to a contract operating agreement.

22      The Credit Bid Purchaser is going to enter into a

23  turnkey P&A Agreement with Chevron, where the Credit Bid

24  Purchaser is going to perform the P&A on the Fieldwood Four

25  asset pursuant to that turnkey agreement that has that has a

1   specified price that's been negotiated for every individual

2   pipeline, platform, and well associated with the Fieldwood

3   Four properties.

4        There's going to be an amount of money and to the

5   extent that Credit Bid Purchaser can do the work on each

6   individual property for less than that money, it would be

7   able to realize a profit.  To the extent that it spends more

8   than that stated turnkey number, then it's going to be

9   susceptible for any overages, subject to qualified

10  conditions that the parties negotiated which allowed the

11  parties to renegotiate the turnkey numbers or agree on an

12  alternative structure for payment, such as costs -- you

13  know, being done on a cost basis or cost-plus basis or some

14  other way.

15       The qualified conditions account for if there are

16  changes in the nature of the assets due to storms or if

17  there's well-related conditions like sustained casing

18  pressure issues or other changes in the regulatory

19  environment.  It's a comprehensive qualified condition

20  turnkey arrangement.

21       Also as part of the Fieldwood Four structure, Fieldwood

22  agreed -- Chevron agreed to maintain the direct

23  decommissioning of one of the company's largest liabilities,

24  which was the *Neptune Spar* and the *Swordfish Field*.  That's

25  a very significant deepwater facility.  It's one of the only

1   properties that's not going to be a part of the deepwater

2   asset base that's associated with the Credit Bid Purchase

3   arrangement and Chevron is going to conduct that

4   decommissioning directly over the near term.

5       In between when Chevron conducts that decommissioning,

6   Fieldwood is -- or excuse me, Credit Bid Purchaser is going

7   to provide the contract operating services to continue

8   operating and maintaining that facility subject to

9   reimbursement of costs.

10      Chevron is also going to be responsible for all the

11  operating expenses associated with the Fieldwood Four

12  entity.  And Fieldwood is going to contribute $5 million at

13  exit to the Fieldwood Four structure.  That money is going

14  to be utilized in order to stake out the properties over the

15  remainder of this year.

16      Fieldwood is also -- subsequent to the original term

17  sheet, Fieldwood agreed that properties that were originally

18  going to be the responsibility of Credit Bid Purchaser and

19  were going to be the responsibility of Credit Bid Purchaser

20  and were going to reside in Fieldwood Three, the parties

21  agreed to take those properties, along with $15 million that

22  the Credit Bid Purchaser was going to earmark for those

23  property's P&A and contribute that into Fieldwood Four.  It

24  made more sense to adapt the construct because those

25  properties also had Chevron as a major predecessor-in-

1  interest, so Fieldwood is contributing $15 million more into

2  Fieldwood Four and those properties and it's going to

3  decommission those properties at cost.

4      Chevron is going to receive two years after the

5  effective date, the $25 million bond from the Credit Bid

6  Purchaser.  And that was something that was agreed to

7  between the parties as Chevron had a desire for more

8  security and they recognize that the properties underlying

9  the NewCo asset base were largely properties for which they

10  had joint and several liabilities for.

11      So that's the general contours of the Chevron

12  agreement.

13  Q    So --

14  A    I'm sorry.  One other point:  These properties are

15  going to be decommissioning in Fieldwood Four over the next

16  three to five years probably.

17  Q    And do you believe that the Credit Bid Purchaser will

18  be able to perform the work under this agreement?

19  A    Yes.  I'm confident.  The Credit Bid Purchaser has

20  already made advanced plans to commence this work as soon as

21  we have a confirmed Plan.  There's a number of wells,

22  pipelines, and platforms, that are in the queue to get

23  underway and complete as soon as possible and there's a

24  long-term plan to conduct the rest of this work.

25      So we've engaged in advanced planning efforts to

1  conduct this as expeditiously as possible, which was the

2  main motivation of the parties.

3  Q    And so did you also enter into a term sheet with Eni?

4  A    Yes.  That was another consensual arrangement.

5  Q    All right.  Would you please turn to Exhibit No. 40 and

6  that is 1616-21?

7  A    Okay.  I have that here.

8  Q    All right.  And would you tell the Court what the terms

9  of this term sheet -- its general terms?

10  A    So the major terms of the Eni agreement contemplates

11  that the Credit Bid Purchaser is going to enter into a

12  turnkey arrangement with Eni related to certain properties

13  which Eni is the primary predecessor-in-interest, properties

14  that Fieldwood had acquired from Eni.

15        The turnkey arrangement is a little bit different from

16  the Chevron arrangement, just based on what the parties

17  negotiated in their different objectives with respect to

18  these specific assets and Eni's objectives in this

19  transaction.

20        But it is a turnkey arrangement.  There is a total of

21  $57 million turnkey value associated with all of these

22  properties.  The properties comprise around a dozen

23  platforms, 35 or so wells.

24        Similar to the Chevron transaction, to the extent the

25  Credit Bid Purchaser can conduct the work for less than the

1   turnkey amount, which I mentioned is $57 million, it'd be

2   able to realize a profit.  If it would cost more than that,

3   it would be an exposure of the Credit Bid Purchaser.

4       There are certain more limited qualified conditions in

5   this arrangements, more limited to regulatory standards in

6   the future or windstorm events that would change the nature

7   of the assets.  You know, under those conditions there is an

8   agreed upon adjusted upward amount that could be added to

9   the $57 million turnkey amount.

10      That $57 million turnkey amount is net to Eni's

11  interest in these properties.  And so this work is going to

12  be conducted over the next -- it should be completed within

13  the next two to three years.  It's going to get started as

14  early as the effective date.  There is a plan to do material

15  work on these assets this year, assuming that we have an

16  effective date that provides the ability to do this work

17  during the summer P&A season.

18      The final kind of, I think, meaningful points of this

19  arrangement are that Fieldwood agreed to contribute

20  $3 million at exit as a contribution towards the P&A of

21  these assets and agreed to a $1-1/2 million legal fee

22  reimbursement for Eni as a result of reaching this

23  consensual solution.

24  Q    And is that money coming from Credit Bid Purchaser's

25  funding of the Plan?

1   A    Yes.  All of the contributions associated with these

2   consensual arrangements and then obviously a number of other

3   expenses associated with the Plan are being funded through

4   the new money that is going to be contributed by the lenders

5   under the Plan, the $225 million in new money.

6   Q    Thank you.

7        Now --

8   A    Not all of it, a substantial portion of it.

9   Q    All right.  Did you also reach a consensual agreement

10  with Hunt?

11  A    Yes.  We did.

12  Q    All right.  And can you turn to Exhibit No. 41?

13  A    Okay.  I have that here.

14  Q    And that's ECF No. 1616-22.  Can you tell the Court

15  generally about the Hunt agreement?

16  A    So the Hunt agreement is another consensual solution.

17  There is an element of a turnkey arrangement contemplated

18  under the Hunt agreement, as well, there Hunt is going to

19  pay the Fieldwood or the Credit Bid Purchaser -- depending

20  on the timing because this is activity that's imminently

21  underway.  A $5.4 million amount associated with three

22  platforms and one Grand Island 63.  This activity is in

23  process right now in the early stages.  The actual projects

24  could be completed within the next month to two months,

25  depending on whether an equipment availability and these

1  platforms will be removed.

2      Fieldwood is going to contribute $375,000 towards the

3  decommissioning.  And there are other properties that

4  Fieldwood has agreed to maintain, financial responsibility

5  for decommissioning as a part of its Fieldwood Three

6  agreement and that was also agreed as part of the Hunt term

7  sheet.  There's several properties for which Hunt is the

8  primary predecessor that Fieldwood will conduct the P&A out

9  over the next couple of years as well.

10     So those are the major components of the Hunt

11 transaction.

12 Q   And is there any importance of doing the P&A in short

13 order?

14 A   With respect to -- in general obviously, to the extent

15 we have the capability to do the P&A, we want to get it done

16 as soon as possible because there's a limited window to be

17 able to do your platform removal work.  And that work is

18 typically done during the summer months.  The reason it's

19 done during the summer months is because you're using

20 equipment that is more effective to work in seascapes that

21 are calmer.  You're utilizing dairy barges and other heavy

22 lift vessels that can't operate in heavy sea storm months.

23 There's better weather for that.

24     It would not be cost effective or safe to operate that

25 equipment in winter months.  So we generally do platform

1  removal work during the summer months.

2       In order to be able to do the platform removal work,

3  you need to complete the well work on a platform and so to

4  the extent there's ever delays that delay the well work, it

5  delays potential platform removal work which can only happen

6  during the summer.

7       With respect to these particular properties under the

8  Hunt agreement, the Island 63 platforms, those three

9  platforms had permit exploration considerations that we

10 needed to be mindful of.  They had permits that were

11 expiring at the beginning of July and if we had not

12 completed the work prior to that time, then it was going to

13 require Fieldwood to re-apply for permits and re-applying

14 for those permits is a lengthy process that could take up to

15 six months or longer for platform removal permits, which

16 would have compromised our ability to get this work done in

17 this summer months season.

18      So Hunt and the Debtor worked very constructively, kind

19 of recognizing the benefit of trying to remove these

20 facilities sooner rather than later, which is beneficial

21 because it removes risk, it removes costs, it accomplishes

22 the objectives of the Government.

23 Q   Thank you.

24      Let's turn now to Fieldwood Three.  Can you describe

25 what Fieldwood Three is going to do?

1  A    So originally Fieldwood Three contemplated properties

2  that were not a part of the Fieldwood One transaction or the

3  consensual solutions or the abandoned properties.  These

4  were a set of properties that Fieldwood had identified that

5  the Credit Bid Purchaser was going to not assume, but

6  maintain responsibility for the decommissioning of -- there

7  were properties that decommissioning was imminent.  They

8  weren't -- they were either expired leases or about to be

9  expired, and it was obligations that the stakeholders felt

10 that in addition to all of the other arrangements, they

11 could put aside capital to support.

12      They were also -- it was also earmarked to be a

13 resource to be available to the extent there was leases or,

14 you know, wells, pipelines, platforms, that were -- that had

15 problematic predecessors in the chain of title.  So

16 originally there was $27 million worth of properties that

17 Fieldwood thought it identified that method's parameters or

18 it could just handle the decommissioning in an expedited

19 way.

20      The $27 million was intended to be funded by originally

21 -- under the original Plan, $5-15 million of cash

22 contributed by exit to the Fieldwood Three entity in credit

23 support from the NewCo entity for the remaining amount.  As

24 the Plan evolved, and as I mentioned, the number of these

25 properties, the parties agreed to contribute to the

1  Fieldwood Four structure, which is beneficial for all the

2  parties.  The remaining amount of the properties in the

3  Fieldwood Three pool shrunk.  And so as a result right now,

4  the remaining Fieldwood Three properties comprise ten wells,

5  I believe, and nine platforms.  Those properties we are

6  earmarking $5 million at exit to be contributed to the

7  Fieldwood Three entity, and then credit support for between

8  $7-to-8 million of credit support that the Fieldwood wanted

9  -- excuse me, that the Credit Bid Purchaser will maintain to

10  conduct the P&A.

11      The P&A on those assets is well underway.  Over the

12  last two months, we have engaged on trying to proactively

13  address this P&A as we've gotten more comfort in our process

14  and visibility as to the other moving parts of the other

15  entities.  We made the decision that we thought was prudent

16  and comfortable to move forward with trying to do this P&A,

17  to extinguish it sooner rather than later.

18      And also so that we could feel comfortable that the

19  $12 million plus the $8 million of credit support, that

20  $13 million was going to be adequate to do all this P&A.

21  Our current estimate for the liability post-effective date

22  for these remaining properties is $7 million.

23      So we feel very comfortable that the work is going to

24  be able to get done, particularly given that it's already

25  underway.  There's also $12 million bond that are behind

1  this, the third parties.

2  Q    Mr. Dane, there was some activity in the Gulf last

3  week.  Did that have any impact on Fieldwood's operations?

4  A    It did.  It was -- unfortunately this is the start of

5  hurricane season and there was a weak tropical event where

6  it crossed through the Central Gulf of Mexico.  Fieldwood

7  took a very cautious approach with this storm and in

8  hindsight maybe over cautious.  It ended up not being much

9  of a storm.  It was only reaching 30-to-40 knot winds, which

10 is not that severe, but Fieldwood evacuated effectively all

11 of its personnel from the Gulf.  We evacuated 800 folks

12 offshore, which is a very -- a very entailed evacuation

13 protocol.  We've evacuated everything other than our

14 western-most area.

15      This effectively took down a very significant portion

16 of Fieldwood's production and that decision was made just

17 because the company felt it was the prudent thing to do.

18 The company felt that we have extremely low risk tolerance

19 at this stage, and despite the fact that I think industry in

20 general did not really mobilize to evacuate to the extent

21 Fieldwood did.  Fieldwood thought that that was appropriate

22 under our circumstance, but this obviously is going to have

23 an impact on our cash and our revenue for the month of June.

24      But I think this event will be hopefully short-lived

25 because we're in the process of remanning as we speak and we

MICHAEL DANE - DIRECT BY MR. PEREZ                     178

1  don't expect there to be damage from the storm.

2  Q    Thank you.

3  A    It does impact -- I'm sorry.  One other thing I wanted

4  to say.  It does impact our ability to get underway with

5  certain projects like P&A projects.

6  Q    So Mr. Dane, has the Debtors been in conversations with

7  the Government regarding the Plan?

8  Q    Yes.  The Debtor has engaged in conversations with the

9  Government well ahead of the company's ultimate filing in

10  August.  I think we engaged the Government -- various

11  regulatory entities and various departments in the

12  Government several months ahead of ultimately filing.  You

13  know, once it became clear that there was a restructuring

14  that was going to be a part of the Plan in court, the

15  Debtors engaged with various regulatory entities and stayed

16  engaged, in pretty close contact.

17  Q    And has Fieldwood agreed to do certain things pursuant

18  to the Plan to address the Government's concerns?

19  A    Yes.  Fieldwood has agreed to do a number of things

20  based on the Government's concerns and conversations that

21  Fieldwood has had with the Government.

22  Q    Okay.  Let me ask you:  Are you familiar with the term,

23  "Agreed Activities"?

24  A    Yes.

25  Q    And what are the Agreed Activities?

A     Unfortunately I think we use this term to define a
couple of different things.  But the major component of
Agreed Activities was initially back in the first quarter of
this year, Fieldwood had discussed with the Government
certain remediation and maintenance activities that it was
committing to undertake related to the abandoned properties
and the Agreed Activities was a schedule that Fieldwood had
provided to the Government that listed all of the abandoned
property's platforms and the projects associated with the
Agreed Activities that Fieldwood was going to endeavor to
commit to performing on those platforms.

     The work scope effectively was re-establishing egress
and resolving certain safety-related instances of
non-compliance.  A number of Fieldwood's platforms had
sustained very substantial damage over the course of the
2020 hurricane season.  There was an unprecedented number of
storms.  You know, Fieldwood has almost 500 platforms today
and there was damage on 97 percent of the company's
platforms.

     So, you know, we wish we could have just snapped our
fingers, put aside a pot of money, and resolved all the
related damage, but unfortunately, given the volume of
platforms and the need to ensure that we're handling all of
these operations safely and given just limitations on the
amount of repair and maintenance crews and the ability to

1   properly manage repair and maintenance crews and the number

2   of equipment availability in the Gulf of Mexico for

3   equipment like list those that are required.

4        Fieldwood is at capacity with respect to doing repair

5   and maintenance and basically has been since the end of the

6   last hurricane season doing work on all 500 of its

7   platforms.

8        So the Agreed Activities list was a schedule of

9   activities associated with abandoned properties comprising

10  $6 million of activities to re-establish egress and clear

11  certain safety-related (indiscernible), most all of which

12  was related to hurricane-related damage.

13       And just for the Court's clarification, egress is the

14  ability to access a platform.  There has to be, I believe,

15  two methods of being able to evacuate a platform.  It's

16  usually ensuring that boat landings and, you know, ladders

17  and stairways and other means of -- the heliports provide

18  accessibility to a platform.

19  Q    And let me ask you to turn to Exhibit No. 99, which is

20  625-23 -- 1625-23.

21  A    Yes.  I have that.

22  Q    And can you tell the Court what this is?

23  A    This is the schedule of Agreed Activities that the

24  company provided and discussed with the Government.  Back

25  in, I believe it was, the first quarter of 2020, it also

MICHAEL DANE - DIRECT BY MR. PEREZ                    181

1  provided the schedule to the various stakeholders and then

2  we have the predecessors that had properties that were

3  included in the abandoned properties.

4  Q    All right.

5  A    It described property and the amount that was allocated

6  to each property and the high level description of the

7  activity that's going to take place.

8  Q    All right.  Are there any other proposals that

9  Fieldwood has made to the Government in connection with the

10 Plan?

11 A    Yes.  One clarification in the Agreed Activities

12 exhibit you just asked, that was the original Agreed

13 Activities -- original abandoned property list.  Obviously

14 through a number of these consensual agreements, that list

15 of platforms has shrunk meaningfully.  So for instance all

16 of the Chevron/Noble, any Hunt platforms that were on that

17 last are now resolved pursuant to the consensual

18 arrangements.

19     To answer your questions, Mr. Perez, is another major

20 proposal that the company discussed with the Government and

21 is incorporated in its Plan is the "Transition Services

22 Arrangement."  The Transition Services Agreement

23 contemplates that for a period of up to nine months,

24 post-effective date, that Credit Bid Purchaser is going to

25 -- or Fieldwood is going to maintain operations, maintenance

MICHAEL DANE - DIRECT BY MR. PEREZ                    182

1  and safe-keeping of the remaining abandoned properties.  It

2  is the earlier of nine months or when a predecessor will

3  assume operational control of those facilities and the

4  activities that the -- that Fieldwood is required to conduct

5  pursuant to that Transition Services Agreement are detailed

6  under our proposal in our Plan.

7       I mentioned that that's another area where there's a

8  defined term, "Agreed Activities," but it's defined, "Agreed

9  Activities pursuant to the Transition Services arrangement"

10 in that case.

11 Q    All right.  And is that implemented -- will that be

12 implemented through the Plan?

13 A    It will be, or its contemplated.

14 Q    Okay.  All right.  And are there any other proposals

15 that Fieldwood has made to the Government in connection with

16 the Plan?

17 A    The Government had expressed to Fieldwood that there

18 were certain assets for which it would like to see Fieldwood

19 maintain responsibility for the decommissioning and

20 expediently address the decommissioning.  This was namely

21 four specific wells and four pipelines that are right-of-

22 ways.

23      Fieldwood agreed to do that activity and in fact has

24 already been underway with that activity, even though those

25 conversations develops relatively recently.  We are on

1   location working on three of those four wells.

2        Currently we've already abandoned at least one of the

3   right-of-way pipelines and I think we may have been in more

4   than that and all of that activity, I believe, is

5   contemplated to be completed in the next couple of months.

6        Fieldwood is also talking to the Government about a

7   civil penalty settlement addressing all civil penalties that

8   the company has outstanding and a schedule related to

9   resolving other incidents of non-compliance that remain

10  outstanding.

11  Q    And do you believe that Fieldwood would have sufficient

12  resources in order to carry out all of these proposals to

13  the Government and to the various other deals that you've

14  described?

15  A    I do.  We obviously have spent a significant amount of

16  time analyzing not only the ability to all the various costs

17  and expenses associated with this Plan and the new money

18  need and the cost and expenses to exit and the ongoing

19  obligations with a value of each of these consensual

20  arrangements and our ability to satisfy them, the risk to

21  Credit Bid Purchaser and the stakeholder's willingness to

22  assume those risks and then also accept the profit

23  opportunities, I'm confident that we're going to be able to

24  meet those needs.

25  Q    Mr. Dane, do you believe that the Plan as drafted

1  accomplishes the intended purposes that it was intended to

2  achieve?

3  A    Yes.  I do.

4  Q    And why do you say that, sir?

5  A    The objectives of Fieldwood and our stakeholders --

6            THE COURT:  Mr. Dane, let me interrupt you for a

7  moment.

8            Mr. Eisenberg?

9            MR. EISENBERG:  Yes, Your Honor.  That question is

10 objectionable as just totally vague.  And lacking foundation

11 at this point.

12           THE COURT:  I'm going to sustain the way that was

13 asked.  You've asked all the detailed questions, Mr. Perez,

14 and asking the big general one, I'm not sure what that does

15 for us.

16           MR. PEREZ:  All right.  Let me then ask some of

17 the more detailed questions.

18 BY MR. PEREZ:

19 Q    Mr. Dane, is one of the goals of the Plan to

20 decommissioning the assets that comprise the former

21 Fieldwood One?

22 A    Yeah.

23 Q    The former Fieldwood, I'm sorry.  The former Fieldwood.

24 A    Yeah, said a bit differently, I think one of the

25 principle goals of the restructuring was to comprehensively

1    address all of the company's P&A liabilities and to do so in

2    a manner that protected the US taxpayer.  That was amongst

3    other important goals, that was one of the principle goals.

4    Q    And you believe the Plan accomplishes that goal?

5    A    I do.  We have consensually resolved approximately

6    90 percent of all of Fieldwood's liabilities and I believe

7    we've resolved the other amounts, as well.  Unfortunately

8    they just weren't able to be resolved consensually, but

9    there is a Plan that provides for the abandonment of all of

10   the outsets that comprise Fieldwood pursuant to the Plan

11   that we've put forth.

12   Q    Now does the Plan provide releases and exculpations?

13   A    It does.

14   Q    All right.  And does it provide for Debtor releases?

15   A    It does.

16   Q    And how did the Debtors determine that the releases

17   were appropriate?

18   A    There was a number of factors that the Debtors

19   evaluated to make that determination.  There was an

20   investigation that took place where company's counsel

21   evaluated any potential claims that they be colorable or

22   relevant.  That analysis was conducted through a lengthy

23   interview process and investigatory process.  It was

24   presented to our lead independent board member.  He agreed

25   with the conclusion that there weren't any valuable claims

1    or concerns and he made that recommendation to the board.

2    That was an important part of that consideration and then

3    obviously just the consideration of the contribution that a

4    number of the parties -- had a number of the parties'

5    contribution to achieving an overall successful Plan.

6    Q    And what were the parties' contributions?

7    A    The parties' contributions were, you know, broadly

8    bringing the business to the state where we have the ability

9    to address all of these obligations successfully, to achieve

10   all the goals of the Plan.  You know, the goals of the Plan

11   being in my mind not only what we discussed, but in terms

12   comprehensively addressing all of the company's P&A, but

13   also finding new capital of hundreds of millions of dollars

14   during this really challenging time in order to recapitalize

15   the NewCo business in order to save the jobs of thousands of

16   people in order to create a business with new capital that

17   was capable of satisfying all these various predecessor

18   arrangements.

19        The predecessor arrangements are utility the Credit Bid

20   Purchaser's employees in order to do that so the Credit Bid

21   Purchaser and the new capital is kind of an instrumental

22   part.  In order to recognize the contributions of the

23   parties that reached the consensual arrangements in order to

24   get us to this point, so those were some of the

25   considerations.

1   Q    Thank you.

2        Are there third-party releases also in the Plan?

3   A    Yes.

4   Q    All right.  And is it your understanding that these

5   releases are consensual releases?

6   A    It is.

7   Q    And are you aware that certain parties have opted out

8   of those releases?

9   A    Yes.  I am.

10  Q    All right.  Next, Mr. Dane, are you aware that the

11  unsecured creditors are classified in two classes, Class 6A

12  and Class 6B?

13  A    Yes.  That's what I understand.

14  Q    All right.  And what is the purpose for having a

15  Class 6A?

16  A    The Class 6A creditors represent trade creditors that

17  is a separate group and if those trade creditors sign a

18  trade agreement that will ensure that Fieldwood will be able

19  to continue receiving services and good from these vendors,

20  then in exchange for a 14-cent payout, they participate in

21  that class and the significance of it is these vendors are

22  critical for our ongoing operations.  This business is not

23  capable of functioning with our vendors, but importantly,

24  the future certainties that the vendors that participate in

25  this class, provides the company to know that it's going to

1   be able to rely on this vendor group to service the outset

2   is a critical thing that the company feels that it needed to

3   get comfortable with to ensure it continued to operate.

4   Q    Now during the course of the bankruptcy, has the

5   company entered into any trade agreements with vendors?

6   A    Yes.  Pursuant to the vendor motion that was issued on

7   the First Day Hearing, the company has entered into 100-and

8   -- I believe over 165 trade agreements with vendors and it

9   has -- that's associated with, I believe, $145 million of

10  pre-petition claims which represents, according to our

11  analysis, approximately 70 percent of the total pre-petition

12  claims that were outstanding.

13  Q    All right.  You mean pre-petition trade claims,

14  correct?

15  A    Correct, sorry.  It's pre-petition trade claims.

16  Q    All right.  And so let me ask you this question:  Why

17  is it important for the ongoing business a Credit Bid

18  Purchaser to have the support of the trade vendors?

19  A    The certainty that these agreements provide the vendors

20  that agreed to enter into the trade agreements, gives the

21  business the certainty that we know we can rely on these

22  vendors to support the business.  The Gulf of Mexico vendor

23  community is not, I would say, broadly commoditized.  There

24  are, in some cases sole service providers, in other cases

25  limited options.

1        And so that's certainty that we can rely on for these

2   vendors is very meaningful.

3        Also, you know, as a part of these trade agreements,

4   they are agreeing to release any claims and liens.  That's

5   something that allows the company and its advisors and staff

6   to focus on other matters, as opposed to addressing those

7   concerns.

8   Q    All right.  And then do you consider that the trade

9   vendors that sign trade agreements in Class 6A are critical

10  to the look forward business?

11  A    I think that the certainty that these trade agreements

12  provide is critical to the go-forward business and these

13  vendors signing these trade agreements giving the business

14  that certainty that they are going to be there to service

15  the company is something that's critical for successful

16  operation.

17  Q    Thank you.

18       Mr. Dane, let me ask you to turn to Exhibit No. 108.

19            MR. PEREZ:  And Your Honor, this is a

20  demonstrative.  It is not admitted into evidence.

21            THE COURT:  So --

22            MR. PEREZ:  It is, I'm sorry, 108 is 1646-3.

23            THE COURT:  1644-3 maybe?  1643 doesn't have a

24  dash three is the problem.

25            MR. PEREZ:  No.  I'm sorry.  1546-3.

1          THE COURT:  1646 -- okay.  I have that open.

2          MR. PEREZ:  Okay.

3    BY MR. PEREZ:

4    Q    Mr. Dane, do you have that?

5    A    I do.

6    Q    All right.  And I'm going -- and can you just briefly

7    tell the Court what this is?

8    A    This is a Schedule that reflects the estimated exit

9    cost associated with the Plan as prepared by the company and

10   its advisors.

11   Q    Okay.  All right.  And I'm going to focus you on the

12   right-hand column and ask you to go down through what these

13   various payments are.

14        So what is the Fieldwood One exit payment?

15   A    The Fieldwood One exit payment, as I described earlier,

16   is the payment that Fieldwood agreed to as a part of this

17   overall Apache agreement which established that Fieldwood

18   was required to pay the difference between $50 million and

19   however much money it actually paid related to P&A costs

20   between filing date and the effective date, plus some other

21   minor adjustments.

22        And that cost estimate of $10-to-20 million reflects

23   the arrangement that Fieldwood expressed to have to

24   contribute at exit pursuant to that agreement.

25   Q    And what is the Fieldwood Three exit payment?

1  A      The Fieldwood Three exit payment is the money that

2  Fieldwood is leaving behind associated with the nine

3  platforms and ten wells for which it also is maintaining

4  future credit support.  At Fieldwood Three that Fieldwood

5  Three money will be used to reimburse the Credit Bid

6  Purchaser for any costs associated with completing that

7  work.

8  Q    What is the Fieldwood Four exit payment?

9  A      The Fieldwood Four exit payment is pursuant to the

10 consensual agreement reached between Chevron and Fieldwood

11 whereby Fieldwood agreed to contribute $5 million at exit

12 and that is going to be used in order to pay for safety

13 costs associated with the 25 platforms -- or 20-or-so

14 platforms associated with the Chevron/Fieldwood Four

15 transaction.

16 Q    All right.  And then what about the next $5 million of

17 Fieldwood Four's exit payment?

18 A      Oh, I'm sorry.  I read the wrong -- the lines the wrong

19 way.

20 Q    Okay.

21 A      What I just described was the $5 million payment.  The

22 $14-1/2 million payment is associated with properties that

23 Fieldwood is going to -- properties that are going to be a

24 part of the Fieldwood Four divisive merger entity, which

25 previously were associated with Fieldwood Three and by

1  virtue of agreeing to place them in Fieldwood Four, that

2  $14-1/2 million was the allocated amount of P&A that

3  Fieldwood had otherwise earmarked for those properties and

4  it's the amount that's going to be contributed at exit for

5  Fieldwood Four to address those specific properties.

6  Q    All right.  And then what about the Eni exit payment?

7  A    Eni exit payment is a combination of capital that's

8  being contributed towards the decommissioning and legal fee

9  reimbursement that was contemplated under our agreement with

10 Eni.

11 Q    And so what is the paydown of the FLFO facility?

12 A    The negotiations around Fieldwood's future capital

13 structure, the current first lien/first out facility is

14 $139 million and it was a condition as a part of those

15 negotiations that there was a required paydown of

16 $20 million, plus some accrued interest expense that's

17 associated with that facility -- that exit.

18 Q    And what about the DIP repayment?

19 A    So the company had $10 million it was required to draw

20 at the approval of the DIP.  $90 million remains undrawn,

21 was never drawn and $10 million plus accrued interest is

22 contemplated as being repaid at exit.

23 Q    What are the sale reserve costs?

24 A    Sale reserve costs are certain costs that under the

25 Plan agreement, the Fieldwood is leaving behind to satisfy

1  certain deductibles associated with interest-related

2  deductibles associated with personal injury policies and

3  other excluded assets that are going with the Credit Bid

4  Purchaser.

5  Q    What about the implementation fees?

6  A    Implementation and filing fees are associated with

7  implementing certain of these transactions and being able to

8  conduct the required filings associated with the

9  transaction.

10 Q    And what about the premiums?

11 A    Premiums are bond premiums pursuant to the deal that

12 Fieldwood has in principle with USSIC for $75 million of new

13 bonding capacities.  These are premiums associated with

14 bonds that the parties agreed that the Credit Bid Purchaser

15 would assume under modified indemnity agreements.  And these

16 are the annual premium that is due on the effective date

17 associated with those bonds being assumed, pursuant to the

18 modified indemnity agreement.

19 Q    All right.  Let me drop you down to Plan Administrator

20 Expense Reserve.  Do you see that?

21 A    I do.  At the very --

22 Q    And what is that?

23 A    That's the amount that was negotiated between the

24 company and the UCC and determined to be remaining for the

25 Plan Administrator to be able to conduct all the Plan

1  Administrator activities post-effective date.

2  Q    All right.  So on the column on the left-hand side,

3  those are the various claim reserves; is that correct?

4  A    That's right.

5  Q    Okay.  If we assume the high number for the claim

6  reserves, what is the total cash that you would need at

7  exist, either to pay or to reserve?

8  A    Total exit costs are $168-1/2 million under these

9  assumptions on the end.

10 Q    Okay.  Would you turn to the next slide, sir?

11 A    Mr. Perez, I don't believe those were included in my --

12 Q    It's on the back side -- it's on the back side of that

13 one.

14 A    Oh.  Thank you.  I found it.

15 Q    All right.  Did the company prepare a 13-week cash flow

16 budget?

17 A    It does.  It prepares that every two weeks.

18 Q    Okay.  And to answer my question, every two weeks.  And

19 is that -- but it's presented to the lenders every two

20 weeks?

21 A    It is.

22 Q    All right.  And what the company project to be its cash

23 amount for the next two months?

24 A    Over the course, the company obviously has variability

25 in its weekly ending cash balances as timing of when it

1  receives its revenue, which is predominately one week of the

2  two days of the month, the 20th and 25th, and the timing of

3  which it needs to make its disbursements, which is every

4  week of the month.

5       So the company's cash balance over this period is

6  projected to be between approximately 50 million to as high

7  as $120 million.

8  Q    All right.  And so what would -- what is the four-week

9  average from -- you know, during July?

10 A    A four-week average during July is $72 million.

11 Q    All right.  So if you use that amount as the balance

12 sheet cash, based on the numbers on the preceding page, does

13 the Debtor have enough cash at exit to actually exit

14 bankruptcy?

15 A    Yes.  If we use that amount and we assume a full draw

16 on the $185 million available to the facility and the

17 company allocates $120 million to the Credit Bid Purchaser

18 opening cash balance, which it's required to do under its

19 agreements, which at the discretion of the lenders is

20 actually able to be reduced to 100.

21      And we assume the high amount of expenses of almost

22 $169 million, then assuming all of those assumptions, there

23 is excess cash that's available to fund all of the various

24 needs.

25 Q    Do you believe that you're going to be at the high end

1   of the expenses?

2   A    It's not my expectation that we're going to be at the

3   high end of the expense.

4   Q    And then currently what are the -- what is the buffer

5   assuming that you have the full $120 million on the balance

6   sheet?

7   A    That buffer is $5 million.

8   Q    And if you only had to put --

9            THE COURT:  I'm sorry.  I just didn't hear the

10  answer, Mr. Dane.  The buffer is about what?

11           THE WITNESS:  Sorry, Your Honor.  The buffer is

12  $5 million.

13           THE COURT:  MS. TOGNETTI:

14  BY MR. PEREZ:

15  Q    Okay.  And if you only had to put 100 million on the

16  balance sheet of Credit Bid Purchaser, what would the buffer

17  be?

18  A    The buffer would be $25 million.

19  Q    All right.  Now on a go-forward basis, is the Credit

20  Bid Purchaser generating positive cash?

21  A    Yes.  The Credit Bid Purchaser is expected to generate

22  meaningful positive cash.  Initially as I mentioned, it's

23  going to be -- the cash flow is going to be burdened by

24  significant expenses that is pertaining -- as far as these

25  transactions affect the working capital, but even in the

1  first period under our projections that were included in the

2  exhibit, the projections exhibit, there's positive cash

3  flows.

4  Q    All right.  Could you actually turn to page 8 of 9 in

5  Exhibit 16-15 of -- 1615-20?

6  A    I'm sorry, Mr. Perez.  What is that exhibit number?

7  Q    17 -- Exhibit 17, page 8 of 9.

8  A    Found it.  Thank you.

9  Q    Okay.  And what does that show to be the ending cash

10 balance at the end of the projection period in 2025?

11 A    It shows $876 million of ending cash.

12 Q    And what would the total debt be at that time?

13 A    Total debt in these projections is shown as

14 $194 million.

15 Q    All right.

16          MR. PEREZ:  Your Honor, I have no further

17 questions of this witness.

18          THE COURT:  Thank you.

19          Are there any proponents of the Plan that have any

20 questions for Mr. Dane?  If so, please press five star.

21     (No audible response.)

22          THE COURT:  All right.  I'm showing no other

23 proponents have any questions, so we'll move to opponents of

24 Confirmation.

25          I'm not sure how long do you want to -- whether

MICHAEL DANE - DIRECT BY MR. PEREZ                    198

1   you want to take a break now or what you want to do.  I've

2   got a 4:00 o'clock hearing.  I don't know how long that's

3   going to last.

4           Mr. Dane, are you available to return at 5:00 if

5   we take a break now?

6           THE WITNESS:  Yes, Your Honor.  I can return at

7   any time.

8           THE COURT:  And how late can you stay tonight?

9           THE WITNESS:  I can stay as long as the Court has

10  the patience for me.

11          THE COURT:  Okay.  Why don't we do this?  Just so

12  that maybe the opponents can organize who's going to go

13  first and what all -- how it's going to be divided up, let's

14  adjourn.  I'll call my 4:00 o'clock hearing on time at 4:00.

15  I don't know how long it's going to last.  I will not recall

16  Fieldwood prior to 5:00 so that you all can plan to have an

17  hour and a half break.

18          At 5:00 I would just ask you to start tuning in

19  and watching what's happening to the *Country Fresh* hearing.

20  I suspect it will end around then, but if not, we may not

21  really get to you until, you know, 5:15 or 5:30.

22          Does anyone have any problem where that won't work

23  for your particular schedules?

24          I do have someone that has pressed five star.

25          Mr. Alaniz?

1          MR. DUEWALL:  Your Honor?

2          THE COURT:  Was that Mr. Duewall?

3          MR. DUEWALL:  Yes, Your Honor.  I had a quick

4    housekeeping matter before we broke --

5          THE COURT:  Yeah, go ahead and then we'll --

6          MR. DUEWALL:  -- for a break.

7          THE COURT:  -- then we'll hear from Mr. Alaniz

8    next, so what do you have Mr. Duewall?

9          MR. DUEWALL:  Thank you, Your Honor.  In Debtors'

10   exhibits were authorized, I wanted to make sure the Record

11   was clear, and we're talking about Document 1672 in the

12   Court's Record, specifically on page 5 of that document.

13   The Debtors have done a nice job of color coordinating their

14   Exhibit List to reflect the documents where the Court is

15   taking judicial notice, the documents where the parties had

16   agreed were admissible, and the documents where we agreed

17   there would be admissible for a new purpose.  They're a

18   demonstrative aid.  I just wanted to make sure that the

19   Court's previous ruling admitting their exhibits was

20   reflective of what was intended in that document (glitch in

21   the audio) --

22         THE COURT:  I should have made that clear and yes,

23   I'm admitting 1672 -- all of the documents from 1672 as

24   indicated on 1672 and not differently than what's indicated

25   there.

1          Thank you.

2          Anything else, Mr. Duewall, or should we move to

3    Mr. Alaniz?

4          MR. DUEWALL:  No, Your Honor.

5          THE COURT:  Thank you.

6          Mr. Alaniz?

7          MR. ALANIZ:  Yes, Your Honor.  Omar Alaniz on

8    behalf of Hess Corporation.

9          Your Honor, I actually just wanted to get into the

10   queue as a cross-examiner of Mr. Dane, and also the break is

11   good for us because we -- Mr. Bred and I were expecting

12   consensual resolution during the last break and I couldn't

13   get to my client in time.

14         We do have an outstanding email to him during the

15   examination.  This is a good time for us to go back and see

16   if we can resolve before the next examination.

17         THE COURT:  All right.  That's fine, or if you

18   just want to give Mr. Dane a hard time, that's fine, too.

19   We'll see where we go.

20       (Laughter.)

21         THE COURT:  Mr. Singer?

22         MR. SINGER:  Hello, Your Honor, Kelly Singer on

23   behalf of Ecopetrol.

24         Your Honor, we've been waiting patiently and I

25   don't know if my witness is going to be available after

1  5:00 o'clock today.  I'm going to follow up with them, but I

2  just wanted to -- I just didn't want that to prejudice us in

3  case we intended to finish everything today.

4          We still have our issue and our objection.  We're

5  hopeful that we can get it resolved, but we're not there

6  yet.  So I wanted to throw that out there, Your Honor, just

7  so that --

8          THE COURT:  It will not -- if we get to the end of

9  the day and your issue is not resolved, we will schedule

10 your witness not today.

11         MR. SINGER:  Thank you, Judge.

12         THE COURT:  Anyone else?

13     (No audible response.)

14         THE COURT:  Okay.  Wait, I do have one more

15 person.

16         Mr. Baay?

17         MR. BAAY:  (No audible response.)

18         THE COURT:  Mr. Baay?

19         MR. BAAY:  Yes, Your Honor, we are in --

20         THE COURT:  Go ahead, please.

21         MR. BAAY:  Can you hear me now?

22         THE COURT:  I can.  Thank you.

23         MR. BAAY:  We are in close with witnesses that may

24 or may not be available tomorrow and we also have, I think,

25 some language that we're working on with Debtors, so I guess

MICHAEL DANE - DIRECT BY MR. PEREZ                202

1  we are -- want the same consideration, I guess, if we need

2  to go forward, we'll be able to set a time that is available

3  for us and our witnesses?

4          THE COURT:  You said he's not available tomorrow?

5          MR. BAAY:  I'm sorry, later today.

6          THE COURT:  Okay.

7          MR. BAAY:  I'm not sure about tomorrow.  We're

8  just --

9          THE COURT:  What we'll do is we're going to try

10 and finish Mr. Dane today and maybe make some more progress,

11 but I'm not going to count on finishing everything today and

12 so we'll find some time at the end of the day to come back

13 with your other witnesses.

14         MR. BAAY:  Thank you, Your Honor.

15         THE COURT:  Mr. Genender?

16         MR. GENENDER:  (No audible response.)

17         THE COURT:  Mr. Genender?

18         MR. GENENDER:  Your Honor, I think you answered

19 the point I wanted to make, which is our next witnesses are

20 not available this evening.  So I'm assuming if Mr. Dane is

21 the last witness then for the day, then it's not an issue.

22 I just wanted to alert the Court of that.

23         THE COURT:  That's fine with me.  I didn't know

24 that, but that's fine with me.  And we're going to find time

25 to finish this hearing, but there's no point in us being

MICHAEL DANE - DIRECT BY MR. PEREZ                    203

1   here until midnight when we've also got 18 balls up in the

2   air where other things are going to get resolved and we're

3   not going to sign the Order today for sure, so we'll find a

4   way to get it finished.

5           MR. GENENDER:  Thank you, Judge.

6           THE COURT:  Mr. Fishel?

7           MR. FISHEL:  Thank you, Your Honor.  Mr. Fishel on

8   behalf of Ridgewood.

9           Same issue as Mr. Singer.  Witness won't be

10  available after 6:00 o'clock, but if we're not signing the

11  Order today, that shouldn't be a problem.  Hopefully it's

12  all resolved before them.

13          THE COURT:  Well, I mean, from the announcement

14  Mr. Genender has made, it's clear the Debtors aren't going

15  to rest, so I don't think anyone needs to worry at all about

16  your witnesses being available, other than when we're going

17  to finish the Debtors' case-in-chief, and then we'll line up

18  with enough notice that your witnesses can participate.

19          Anybody else?

20          MR. FISHEL:  Thank you, Your Honor.

21          THE COURT:  Okay.  We will adjourn your hearing

22  till 5:00.  We're going to adjourn court till 4:00.  I don't

23  promise I'm going to restart at 5:00.  What I promise is I

24  won't restart before 5:00 on your hearing.  And then we'll

25  see where we go.

1          Thank you.

2          I'm going to go ahead and mute everyone that is on

3  the line right now so that you're not making noise during my

4  other hearings and then you'll need to repress five star

5  when we come back.

6       (Recess taken from 3:36 p.m. to 4:59 p.m.)

7                        AFTER RECESS

8          THE COURT:   All right.  We're going to go back on

9  the Record in Fieldwood.  Mr. Dane, I've reactivated your

10 line and you remain under oath from the earlier session.

11         I assume that the opposing parties have worked out

12 who will begin the cross-examination of Mr. Dane.  Whoever

13 wants to begin that, if you would please press five star one

14 time -- one time on your line.

15      (Pause in the proceedings.)

16         THE COURT:  I'm not sure who wants to take the lead

17 on cross-examining Mr. Dane.  If you would press five star

18 one time, please.

19      (Pause in the proceedings.)

20         THE COURT:  Mr. Dane, are you able to hear me all

21 right?

22         THE WITNESS:  I am, Your Honor.

23         THE COURT:  All right.  There we go, I've got

24 somebody here.  All right.

25         MR. DUEWALL:  Your Honor?

1          THE COURT:  Yes, go ahead.

2          MR. DUEWALL:  Your Honor, Craig Duewall with

3   Greenberg Traurig on behalf of BP.  During the break we have

4   reached out to the sureties.  It is my understanding that

5   they as a group were going to go first.  I don't know if I'm

6   wrong in that regard, but that's why we were pausing there

7   and waiting for them to begin.

8          THE COURT:  Thank you.

9          Let me -- I've got somebody else that's pressed five

10  star, now let me see who -- well, that was Mr. Perez.  Let

11  me see, do I have anybody on behalf of the sureties that has

12  any questions that you wish to ask Mr. Dane?  If so, please

13  press five star one time on your phone.

14      (Pause in the proceedings.)

15         THE COURT:  So I suspect somebody is having a

16  problem.  If you're representing the sureties and you want to

17  cross-examine, and I'm not seeing any five star, can you turn

18  on your camera and just wave at me and I'll find you.

19      (Pause in the proceedings.)

20         THE COURT:  Mr. Million, I'm going to impose on you

21  because I hear -- yours is the first line I found for a

22  surety, do you know who's going to take the lead for the

23  sureties, Mr. Million?

24         MR. MILLION:  (No audible response.)

25         THE COURT:  Mr. Million?

1          MR. MILLION:  (No audible response.)

2          THE COURT:  Mr. Perez?

3          MR. MILLION:  I apologize, Your Honor.  I am not

4   sure.  I will be happy to find out as quickly as possible

5   though.

6          THE COURT:  Okay.  Thank you.

7          Mr. Perez?

8          MR. PEREZ:  Your Honor --

9          THE COURT:  Go ahead.

10          MR. PEREZ:  -- yeah, Your Honor, I didn't

11   understand that the sureties were going to cross-examine

12   Mr. Dane at this time, but I may be mistaken about that.

13   But I thought that it was BP and Hess that were going to do

14   the cross-examination.

15          THE COURT:  That's fine.  I'm just -- I'm not going

16   to stop anyone from cross-examining him.  I mean if you

17   think it breaches an agreement, I'll let you reach -- you

18   know, make that objection then.  But I know that they --

19          MR. PEREZ:  Oh, I --

20          THE COURT:  -- it wasn't like you had a deal with

21   100 percent of the sureties I don't think so.

22          Okay.  Let's wait just a second.  We're only at you

23   know, three after 5:00, so.

24          There we go, I've got somebody now.

25          Mr. Woodard, were you taking the lead on the

MICHAEL DANE - DIRECT BY MR. PEREZ                    207

1    cross-examination?

2         MR. WOODARD:  (No audible response.)

3         THE COURT:  Mr. Woodard, I think you may have your

4    own line muted.

5         MR. WOODARD:  I did.  I have to be smarter than

6    the phone unfortunately, but --

7         THE COURT:  That's right.

8         MR. WOODARD:   -- I hadn't planned on taking the

9    lead, but rather than have everybody sit around and twiddle

10   their thumbs, we might as well -- I can take the first shot

11   and then hopefully some of my brethren will show up along

12   the way.

13        THE COURT:  Yeah, but look, COVID's tough enough, I

14   mean if we're having some problems, somebody getting hooked

15   up, I'm going to just wait a minute for them to get here.  If

16   you're expecting them, let's give people a minute --

17        MR. WOODARD:  Oh, I mean, I haven't heard from

18   them, any of them, so I don't know.

19        THE COURT:  Okay.

20        MR. WOODARD:  And so --

21        THE COURT:  Well, do you have some questions that

22   you want to ask anyway?

23        MR. WOODARD:  Yeah, I do actually.

24        THE COURT:  Okay.

25        MR. WOODARD:  That's not part of the Apache group

1    so I can do that.

2              THE COURT:  Go ahead.

3              MR. WOODARD:  Okay.  Thank you, Your Honor.

4                   CROSS-EXAMINATION OF MICHAEL DANE

5    BY MR. WOODARD:

6    Q     This is Lee Woodard, Harris Beach, PLLC, on behalf of

7    Lexon Insurance Company, Mr. Dane.

8          Good afternoon where you are, it's good evening where I

9    am.  But you've had a long day of testimony already, so I'm

10   going to try to be as brief as I can.  But you're familiar

11   with the bonding requirements.  Right?  You testified to

12   that earlier.  That Fieldwood has been subject to leading up

13   to the bankruptcy.  Right?

14   A     Yes, sir.

15   Q     Did you ever sign any indemnity agreements with any of

16   the -- with any of the sureties on behalf of Fieldwood?

17   A     I believe I did, but I don't recall.  We had a number

18   of folks that had signed indemnity agreements here.

19   Q     But you're familiar with those as well?

20   A     Yes, I am.

21   Q     Have you ever seen any bonds issued without an

22   indemnity agreement?

23   A     No, I've never seen a bond issued without an indemnity

24   agreement.

25   Q     And you would agree with me, would you not, that

1   Fieldwood would not have been able to operate pre-bankruptcy

2   without all of the bonding that it had in place.  Right?

3   A    I think, well it's a hypothetical.  It's hard for me to

4   know if we weren't able to produce all of the bonds that we

5   needed, if there wouldn't have been other ways to satisfy

6   them or if we wouldn't have been able to negotiate something

7   different with the Government or with the other parties,

8   private parties that those bonds are in favor of.

9   Q    Okay.  And if there are certainly other ways to

10  satisfy the financial accommodation, other than by bond.

11  But as you sit here, you didn't have any of those, you just

12  had the bond.  Right?

13          MR. PEREZ:  I'm going to object, Your Honor, to the

14  form of the question.  I don't know what he meant by

15  "financial accommodation" in connection with that.  I think

16  it's vague.

17          THE COURT:  Sustained.

18  BY MR. WOODARD:

19  Q    The -- it doesn't matter.  These are all leading up to

20  another thing.

21          What I need to find out, Mr. Dane, is all my questions

22  are going to be directed to is exactly what happens to the

23  bonds under the Plan.  All right?  So that's where we're going

24  to be going.

25          Let's start -- I mean, let's try to go by bucket if we

1  can.  So we're going to have the Credit Bid NewCo.  It's going

2  to need bonds to operate going forward, wouldn't you agree?

3  A     Yes.

4  Q     And is, in fact, arranged, we heard earlier in the

5  testimony that there is $75 million of new bonding being

6  arranged for this; is that right?

7  A     That's right.  As you mentioned earlier there are other

8  ways to satisfy financial security requirements.

9  Q     Yet your testimony was that they have agreed to --

10  with one of the companies, to get $75 million worth of new

11  bonds.  Right?  That was your testimony.

12  A     Fieldwood had a commitment from USSIC to provide

13  $75 million upon capacity to purchase the agreement.

14  Q     Okay.  And we haven't seen the terms so that's why I'm a

15  little confused as to between who.  What about the existing

16  bonds on the leases that are going to NewCo as part of the

17  purchase, what happens to those?

18  A     Well, I defer to our counsel on the treatment of the

19  contracts themselves.  But as I understand it, the indemnity

20  agreements are pre-petition claims that are going to be

21  treated under the Plan.  The bonds are not something in

22  favor of Fieldwood, and even Fieldwood is not the obligee or

23  beneficiary of the bonds.  The bonds were issued and our

24  security outstanding in the favor of the obligee, and

25  Fieldwood doesn't have the ability to implement that.

1  Fieldwood's Plan addresses the pre-petition indemnity

2  agreements, and so asking mutual agreement with the bonding

3  provider, or the surety, Fieldwood's Plan does not

4  contemplate any allocation, assignment or other transfer of

5  any bonds.

6  Q    So that the -- is it your testimony that the existing

7  bonds, while they will still be in existence because they

8  don't get cancelled, they'll just remain there, but not be at

9  the disposal of the Credit Bid Purchaser?

10 A    I don't think any bond is ever at the disposal of the

11 obligor.

12 Q    Well -- well, that wouldn't be the obligor.  Right?

13 That would be the principal.  But the -- if the principal is

14 going to be credit -- is still going to be Fieldwood.

15 Right?

16 A    The principal on the bond is going to be whoever the

17 principal that was originally on the bond when it was issued

18 is going to be.  And like I said, the Plan doesn't

19 contemplate any non-consensual transfer, allocation,

20 assignment of any bonds.  So the bonds would remain in the

21 hands of the beneficiary, or the obligee as they were, you

22 know, as they were when they were issued.  It's not security

23 of Fieldwood.

24 Q    And Fieldwood is not going to be in control of the

25 property -- or of the lease that that bond would be

1    purported to be the financial accommodation for, is it?

2              MR. PEREZ:  The same objection, Your Honor.  I

3    don't know what he means by "financial accommodation."

4              THE COURT:  Overruled.

5              THE WITNESS:  Those properties are falling into

6    various different categories that I described in my earlier

7    testimony.  There's a Fieldwood One entity, there's a

8    Fieldwood Four entity, there's the Credit Bid Purchaser

9    entity, there's going to be a couple of free properties,

10   there's going to be abandoned properties.  And so I'm not sure

11   what you mean by in the control of.  Certain -- each of

12   those entities is going to have properties on them.

13   BY MR. WOODARD:

14   Q    Mr. Dane, I said we were talking about the Credit Bid

15   Purchasers.  We're at bucket number one.  We haven't moved on

16   to any of the other buckets yet.

17            And in bucket number one we have the Credit Bid

18   Purchaser is, according to its purchase contract, right, is

19   going to buy the assignment of a number of leases.  My

20   question to you was, is Fieldwood the principal on those

21   bonds that cover those leases?  They're not going to have

22   anything remaining to do with those leases, are they?

23   A    The Credit Bid Purchaser is going to be the owner of

24   the leases that is required under the Plan, which is the

25   Credit Bid Purchaser is not the same entity as Fieldwood.

1    Q      Thank you.

2          And is it also not true that the Credit Bid Purchaser

3    is not seeking to substitute itself on those bonds?

4    A      They're -- Fieldwood has had a number of conversations

5    with the surety providers, but asking mutual consent, or

6    some mutually acceptable arrangement, there's nothing, as I

7    said several times, there's nothing under the Plan that

8    contemplates non-consensual assignment, allocation, transfer

9    of any bonds.

10   Q      Right.  I've heard that, yeah, I've heard that statement

11   numbers of times.  But so at the end of the day the point is

12   that the bonds that cover -- or that relate to the leases

13   that will now be owned, operated by the Credit Bid

14   Purchaser, there will be a transfer of the principal.

15          MR. PEREZ:  Object to the form of the questions,

16   calls for a legal conclusion and it misstates his testimony.

17          THE COURT:  I'm going to sustain as to calling for

18   a legal conclusion.  I don't think it's a valid objection that

19   it misstates his testimony.  It didn't attempt to state his

20   testimony.  But it does call for a legal conclusion.

21          MR. WOODARD:  I understand, Your Honor.  Thank

22   you.

23   BY MR. WOODARD:

24   Q      Let's see, let's move on then to Fieldwood One that we

25   were talking about before.  Is Fieldwood One planning on

1  acquiring new bonds to operate its stated purpose?

2  A     Fieldwood One is going to -- needs to procure whatever

3  financial assurance the Government requires of it in order

4  to be able to operate, so it does intend to, yes, bonding or

5  otherwise.

6  Q     Well, what does Fieldwood One believe happens to the

7  existing bonds that are issued to the leases that will be

8  held then in the name of the divisibly emerged entity,

9  Fieldwood One?

10 A     I did mention that, I don't believe the bonds are held

11 by the principal, but the bond is held by the obligee.

12 Q     Okay.  Let me ask it a different way.  Fieldwood One

13 you indicated needs -- will need bonding to do what it needs

14 to do if the Government requires it.  Correct?

15 A     Fieldwood will have to satisfy any financial assurance

16 regulations that the Government imposes on an entity.

17 Q     And if the Government imposes a requirement of

18 financial assurance, does Fieldwood One believe it can

19 utilize the existing bonds to the leases it then holds?

20 A     I don't think -- when you say "use," I'm not sure I'm

21 completely aligned with what you're saying there.  You -- the

22 bonds are going to exist independent of Fieldwood's

23 decision -- the bonds will just exist because they've been

24 issued.  The bonds will be outstanding.  If the bond -- if

25 the -- maybe to answer your question a little more directly,

1    I think if BOEM requires certain financial assurance, I do

2    not think that Fieldwood One can non-consensually require

3    the existing bonds that are outstanding to be transferred to

4    a new principal, other than by mutual consent.

5    Q    Okay.  Thank you.

6         And is that the position that is held in the Plan?

7    A    The position that's held in the Plan is that there's no

8    non-consensual assignment allocation or other transfer of

9    any bonds.

10   Q    Is that also true for Fieldwood Three?

11   A    That's true for every entity.

12   Q    Okay.  Now there are a number of leases that the Plan

13   purports to split in different percentages.  Correct?

14        MR. PEREZ:  Object to the question.  I think that

15   misstates the Plan.

16        THE COURT:  Overruled.  This is cross-examination.

17   The witness can answer.

18        THE WITNESS:  There are -- the way that the -- the

19   way that certain leases are being allocated through the

20   divisive mergers to the different entities is based upon the

21   working interest in each lease and where it was acquired.

22   So for instance, if there was a lease where a working

23   interest was acquired 75 percent by Fieldwood One and

24   represents a legacy Apache obligation, 75 percent of the

25   working interest in that lease pursuant to the divisive

1  merger is being transferred to Fieldwood One, and that the

2  other 25 percent interest, as an example, is something that

3  the Credit Bid Purchaser is acquiring, then that other

4  25 percent interest would be allocated through the divisive

5  merger, in that example, through the Credit Bid Purchase

6  arrangement purchased by the Credit Bid Purchaser.

7          So in the example I just gave you there's a field,

8  Grand Isle 43, that is exactly like that.  In other cases an

9  interest may be allocated through the divisive merger to

10 Fieldwood One or Fieldwood Four and then another interest

11 that came from another party that was unrelated to the chain

12 of title predecessor for which the entity is being allocated

13 pursuant to the divisive merger, it may be abandoned.  It

14 depends on who the relevant predecessor is to what entity it

15 is being allocated to.

16 BY MR. WOODARD:

17 Q     But maybe your prior question may have answered the

18 same way.  I just wanted to spread it over for this as well.

19 But the -- if the Debtor is not seeking to force non-

20 consensual retention of the bonding, it doesn't matter if the

21 leases are split because you're not trying to split the

22 lease -- I'm sorry, sir, you're not trying to split the bond?

23 A     Yes, I think you're conflating allocating a working

24 interest on a lease with the fact that the property that

25 that lease -- that that bond is related to is not -- it's not

1  related.  They're two different things.

2  Q    But if two different things --

3  A    It's not an allocation -- I'm sorry, in other words it's

4  not an allocation of the bond because the leasehold interest

5  in getting split and allocated pursuant to divisive merger.

6  The bond stays in the hands of the obligee and the obligee

7  continues to possess the bond.

8  Q    Okay.  I understand.  But the bond is not

9  extinguished.  Whether or not there are other defenses that

10 come into existence because of the dissolution or no longer

11 holding the lease is a different story.  I'm not asking you

12 to opine on that, that would be legal conclusion that you

13 don't need to do.

14       MR. WOODARD:  All right.  Your Honor, I will -- I

15 think that's all the questions I have.  I've got my questions

16 answered.  Thank you.

17       THE COURT:  Mr. Woodard, thank you.

18       MR. WOODARD:  Thank you, Mr. Dane.

19       THE COURT:  So I know that we have -- Greenberg

20 has questions.  Does anyone else have any questions before

21 we go to them for Mr. Dane?  If so, please press five star

22 one time on your phone.  He wanted to wait till the end.

23     (Pause in the proceedings.)

24       THE COURT:  All right.  We do have someone.

25 Mr. Alaniz, go ahead, please.

1          MR. ALANIZ:  Your Honor, Omer Alaniz from the Hess

2     Corporation.  I just want to make sure again that I'm in the

3     queue, and I'm happy to let BP proceed and I can follow BP's

4     examination.

5          THE COURT:  All right.  Mr. Kuebel.

6          MR. KUEBEL:  (No audible response.)

7          THE COURT:  Mr. Kuebel?

8          MR. KUEBEL:  (No audible response.)

9          MR. DUEWALL:  Good evening, Your Honor.  Can you

10    hear me?

11         THE COURT:  I can.  Good evening to you.

12         MR. DUEWALL:  Thank you very much, Your Honor.

13              CROSS-EXAMINATION OF MICHAEL DANE

14    BY MR. DUEWALL:

15    Q    Mr. Dane, taking a few steps back and looking at the

16    Plan as a whole, do you agree we're essentially engaged --

17    Fieldwood's essentially engaged in a liquidation of its

18    assets?

19         MR. PEREZ:  Objection to the form of the question.

20    Calls for a legal conclusion, but --

21         THE COURT:  Hold on.  The question broke up for

22    me.  Let me just get you to re-ask the question if you

23    would, please.

24         MR. DUEWALL:  Thank you, Your Honor.

25              Taking a few steps back and looking at the Plan as

MICHAEL DANE - CROSS BY MR. DUEWALL                    219

1  a whole, I asked Mr. Dane if he would agree with me that

2  Fieldwood is essentially engaged, or attempting a

3  liquidation of its assets.

4          MR. PEREZ:  And I objected that it calls for a

5  legal conclusion.

6          THE COURT:  I'm going to overrule it.  We're not

7  asking about Chapter 7 liquidation, Chapter 11 liquidation.

8  We're just asking a common language, so I'm going to allow him

9  to answer it.  Go ahead.

10          THE WITNESS:  Yeah, I think -- I believe that is,

11  you know, a strong mischaracterization of the Plan.  I think

12  it ignores many features of the Plan that would be entirely

13  different than a liquidation.  Frankly I think, you know, in

14  a liquidation every party, every stakeholder in this process

15  for the most part, maybe not everyone, but most all of them,

16  are worse off in a liquidation.  A liquidation would not

17  bring in new capital into the business.

18          There's $225 million of new money that's being

19  contributed.  That new money is being utilized in order to

20  fund a variety of different things under this Plan.  That

21  starts with being able to capitalize a NewCo business to

22  employ thousands of employees and contractors.  The NewCo

23  business is assuming its own significant obligations.

24          That new money is also being utilized to fund the

25  various expenses under the Plan, to fund these consensual

1  arrangements, the NewCo entities is a material component of

2  being able to satisfy all the consensual arrangements as to

3  whether the NewCo entity that was capable of raising new

4  capital, it wouldn't be able to conduct the decommissioning

5  on all these various assets.

6          There wouldn't be a proposal with respect to the

7  Government that safely addressed all the abandoned

8  properties, and was able to, in an organized and orderly

9  fashion, hand over the very reduced set of abandoned

10 properties that at this point is somewhere around 28-29

11 platforms.  So I think it is -- I think that there's very few

12 things that this Plan accomplishes that are not exactly

13 better than a liquidation.

14 BY MR. DUEWALL:

15 Q    Mr. Dane, Fieldwood's transferring assets that

16 Fieldwood One by the divisive merger; is that correct?

17 A    Yes.

18 Q    And Fieldwood's transferring assets to Fieldwood Three

19 by divisive merger; is that correct?

20         MR. PEREZ:  Your Honor, let me just make an

21 objection, I mean, I'm objecting to the word "transfer"

22 because I think that is calling for a legal conclusion as to

23 what a divisive merger does.  So I'm objecting to the extent

24 it calls for a legal conclusion as to what a divisive merger

25 does.

1          THE COURT:  Are you asking for it in a legal

2    sense, or are you asking for it in a non-legal determination

3    of whether this is a transfer, Mr. Duewall?

4          MR. DUEWALL:  Non-legal, Your Honor.  I was just

5    asking if that -- this was going from Fieldwood to Fieldwood

6    One by divisive merger.  I can say it that way if that's

7    better.

8          THE COURT:  Either way I'm going to overrule the

9    objection.  I don't think you're asking for the legal

10   conclusion.

11         Mr. Dane.

12         THE WITNESS:  Yes, so I don't know if the correct

13   terminology is being allocated through the divisive merger

14   or being transferred, but the interests are going to land in

15   the various entities through the divisive merger.

16   BY MR. DUEWALL:

17   Q     Correct.  And so the divisive merger applies to

18   Fieldwood One, Fieldwood Three and Fieldwood Four; is that

19   correct?

20   A     Yes.

21   Q     And the Credit Bid Purchase that's assets going from

22   Fieldwood to NewCo.  Correct?  The Credit Bid Purchases only

23   apply to NewCo.

24   A     Correct.

25   Q     All right.  I'd like to transition to just asking some

1   questions to you regarding some of the objections that BP

2   has asserted with regard to set off.

3          So, Mr. Dane, do you have personal knowledge that on

4   May -- on or about May 17, 2019 Fieldwood Energy, LLC and BP

5   Exploration and Production, Inc. entered into the Purchase

6   and Sale Agreement in respect to the Mississippi Canyon

7   Block 519?

8   A      Yes.

9   Q      Okay.  And I may return -- I may refer to that as

10  MSC -- or "MC519 PSA."  Is that all right?

11  A      Yes, sir, I understand.

12  Q      Okay.  Thank you.

13         And under the terms of the MC519 PSA Fieldwood agreed,

14  among other things, to pay BP $30 million; is that correct?

15            MR. PEREZ:  Your Honor, I'm going to object to

16  the -- I'm going to object to the question for a couple of

17  reasons.  Number one, the document speaks for itself.

18  Number two, we have a dispute as to these issues that

19  obviously will come before the Court.  They've filed a motion

20  to be able to effectuate a set off, and in essence they're

21  taking discovery right now with respect to that.

22            I think this is inappropriate.  Number one, I'm not

23  sure it's really relevant for purposes of the Confirmation

24  Hearing.  But it's highly inappropriate for him to be

25  questioning a witness, not showing him the document and

1  relating to a dispute that's going to be heard at another

2  time as Ms. Heyen had indicated.

3          THE COURT:  Well, let me ask you, Mr. Perez, do

4  you agree that the set off rights will be unaffected by

5  confirmation of the Plan?

6          MR. PEREZ:  No, Your Honor, we're not -- I don't

7  know that I can take that position.  I mean we -- they've

8  taken that position but I don't know that they have set off

9  rights.  To the extent that they have valid set off rights

10 currently, they may be affected by the Plan.  So I'm not

11 prepared to make that statement.

12         THE COURT:  I'm overruling the objection on it's

13 inappropriate to be asking the questions, because if the

14 Plan might affect the set off rights, he absolutely has the

15 right to ask questions about it.  I'm sustaining the

16 objection that you're asking about a document not in

17 evidence.

18         MR. DUEWALL:  Your Honor, I'll re-ask the question.

19 BY MR. DUEWALL:

20 Q    Mr. Dane, under the terms of the MC519 PSA Fieldwood

21 agreed, among other things, to pay BP $30 million; is that

22 correct?

23 A    Fieldwood agreed as a part of that agreement to a

24 contingent payment.  A contingent payment was related to

25 certain payment conditions, so I would -- it's under those

MICHAEL DANE - CROSS BY MR. DUEWALL                    224

1  contingent payment terms there was a payment that is

2  described in the PSA.  But I don't -- I think it's -- I think

3  you're saying they agreed, or it's agreed pursuant to the

4  contingent terms that need to arise in order for that

5  payment to be payable and due.

6  Q     And as the CFO, do you recall if you booked that

7  payment as due and owing when the contract was executed?

8  A     I don't recall the financial counter-treatment of that

9  payment.

10 Q     Do you recall when the payment comes due under the

11 terms and conditions of the parties' agreement?  Is it your

12 testimony it's due to be paid 180 days after production from

13 the Genovesa well?

14 A     To my recollection --

15        MR. PEREZ:  Let me make a -- Your Honor, I guess

16 I'm -- is that a question or is that a comment?  I mean

17 Mr. Duewall is in essence testifying.  I don't know where he

18 said, Is it your testimony that, I don't know where that

19 comes from.  I don't believe he was -- there's been any

20 deposition testimony taken on this.  So I'm not quite sure

21 where that -- I guess the objection is it's an inappropriate

22 question.

23        THE COURT:  I'll just get you to --

24        MR. DUEWALL:  I can rephrase, Your Honor.

25        THE COURT:  Yeah, thank you, Mr. Duewall.

1   BY MR. DUEWALL:

2   Q    Do you have an opinion as to when the $30 million

3   comes due and payable under the MC519 PSA?

4            MR. PEREZ:  Yes, Your Honor, I'm going to object to

5   the question.  It actually calls for an interpretation of

6   the document, which I don't believe -- I'm not sure is in

7   evidence.  But, you know, again, it's just calling for a

8   legal conclusion, an interpretation of the document.

9            THE COURT:  Sustained.

10            MR. DUEWALL:  All right.  Your Honor, I'll try to

11   short circuit the document issues.  We'll pull up documents

12   -- or I think it's been filed under seal but I'd refer the

13   Court to our Exhibit 1607-27.

14            THE COURT:  All right.  Hold on.

15        (Pause in the proceedings.)

16            MR. DUEWALL:  And, Mr. Dane, are you able to have

17   that document pulled up for you?

18            THE COURT:  I have Exhibit --

19            THE WITNESS:  I need to --

20            THE COURT:   -- 27 in front of me.

21            MR. DUEWALL:  Your Honor, we will -- it'll take us

22   a minute to email that document to Mr. Dane.

23            THE COURT:  All right.

24            MR. DUEWALL:  I believe Ms. Choi can do it.

25            MR. PEREZ:  And while we're waiting for that, Your

1  Honor, if I could have the Court make Ms. Hymel, H-Y-M-E-L,

2  of our office a presenter.  There will be some documents

3  here in a moment and I'll have her share her screen with --

4            THE COURT:  Sure.

5            MR. PEREZ:   -- for.

6       (Pause in the proceedings.)

7            THE COURT:  Can I get you to turn on your camera,

8  please, Ms. Hymel, and then we'll make you the presenter, and

9  then you can turn your camera back off.  It's just that I've

10 got about 150 initials that I have to sort through.

11           MR. PEREZ:  She's working on that right now, Your

12 Honor.

13           THE COURT:  Thank you.

14      (Pause in the proceedings.)

15           THE COURT:  If she can't do that, she doesn't have a

16 camera, I need to know her initials.

17      (Pause in the proceedings.)

18           THE COURT:  Here we go.  Ms. Hymel, let me get you

19 now the presenter.  Thank you.

20           All right.  Ms. Hymel is now the presenter.  And

21 let's wait for Mr. Dane to get Exhibit 27 in front of him.

22      (Pause in the proceedings.)

23           MR. DUEWALL:  And I think we have an agreement,

24 Your Honor, with Debtors regarding the admissibility of the

25 BP exhibits.  So if it's appropriate to do it now, I would --

MICHAEL DANE - CROSS BY MR. DUEWALL                    227

1   Exhibit Numbers 1, 2, 3 and 4 from our list are all

2   demonstrative and they're only offered for demonstrative

3   purposes.  And I believe the remainder of the exhibits on

4   our list they did not find objectionable except for No. 24,

5   which is the methodology paper regarding decommissioning and

6   we would not move to admit that exhibit at this time.

7            THE COURT:  So you're moving for --

8            MR. DUEWALL:  We would move --

9            THE COURT:   -- 5 through -- let's be sure -- it's 5

10  though 35 with the exception of 24?

11           MR. DUEWALL:  Yes, Your Honor.

12           THE COURT:  Any objections?

13           MR. PEREZ:  Your Honor, Ms. Choi probably needs to

14  weigh in.

15           THE COURT:  All right.  Ms. Choi, let me get your

16  line active.

17           Mr. Million, I see that you have raised your hand

18  and I want you to be aware that you're free to speak at any

19  point.

20           Mr. Genender, I've activated your line.  And I'm

21  looking --

22           MR. GENENDER:  Ms. Choi's with me.  Ms. Choi's with

23  me, Your Honor, same line.

24           THE COURT:  Okay.

25           MR. GENENDER:  First of all, just a housekeeping

MICHAEL DANE - CROSS BY MR. DUEWALL                228

1    matter.  The document on the screen is a document that's

2    highly confidential so it shouldn't be shown.  I wanted to

3    point that out.  And Ms. Choi can speak to the other

4    documents.

5            MS. CHOI:  Your Honor, Erin Choi, Weil Gotshal, on

6    behalf of the Debtors.  I agree with Exhibits 5 through 35,

7    except for 24 --

8            THE COURT:  Okay.  BP --

9            MS. CHOI:  -- line.

10           THE COURT:   -- BP 5 through 23 and BP 25 through

11   35 are admitted.

12       (BP Exhibit Nos. 5 through 23 and 25 through 35

13   received in evidence.)

14           MR. PEREZ:  Yeah, we can't show that one.

15           MR. GENENDER:  Your Honor, Paul Genender for

16   Debtors.  I just want to make sure 27 is going to come down.

17   Thank you.

18           MR. PEREZ:  Thank you.

19           MR. GENENDER:  Here it is.

20           THE COURT:  All right.  Let's just -- Mr. Dane, do

21   you have 27 now in front of you?

22           THE WITNESS:  I haven't received it yet, Your

23   Honor.

24           THE COURT:  It's --

25           THE WITNESS:  Ms. Choi, have you sent it?

1        MS. CHOI:  Yes, I sent it.  It's just a large file,

2   so it's coming.

3      (Pause in the proceedings.)

4        THE WITNESS:  I still haven't received the

5   document.

6        Ms. Choi, do you want to put it in Dropbox for me?

7   I can access it there, or I have a copy of the document.  It

8   should be the same.  Oh, I got it.

9        MS. CHOI:  Mr. Dane --

10       THE COURT:  Wait a minute.

11       MS. CHOI:  -- it's going to be the

12   (indiscernible).

13       THE COURT:  I think he said he just --

14       THE WITNESS:  I got it.

15       THE COURT:  -- got it.  Right?  Did you get it,

16   Mr. Dane?

17       THE WITNESS:  Thank you.  Yes, I'm pulling it up

18   right now.

19       THE COURT:  Thank you.

20      (Pause in the proceedings.)

21       THE WITNESS:  Unfortunately the (indiscernible)

22   has significant security restrictions, so now I'm just

23   waiting for the password.

24      (Pause in the proceedings.)

25        MR. DUEWALL:  And, Your Honor, when he's received

1  that document we're going to be talking about Section 3.1(b)

2  which is on Page 17.

3          THE COURT:  Thank you.

4          THE WITNESS:  The document's downloading right now.

5  Just a minute.

6          THE COURT:  Okay.

7      (Pause in the proceedings.)

8          THE WITNESS:  Okay.  Mr. Duewall, can you tell me

9  the section again?

10         MR. DUEWALL:  Yes, Page 17, Section 3.1(b).

11     (Pause in the proceedings.)

12         THE WITNESS:  Okay.  I have the deal.  Thank you.

13 BY MR. DUEWALL:

14 Q    Okay.  Now that you've been given an opportunity to

15 look at Exhibit 1607-27, specifically page 17,

16 Section 3.1(b), does that refresh your recollection as to

17 when the $30 million became due and payable as it related to

18 the MC519 agreement?

19 A    Yes.

20 Q    Okay.  And generally speaking, is it your

21 understanding that that payment, that $30 million, became

22 due and payable 180 days after the completion of the

23 Genovesa well?

24 A    I think there's some more specifics that are important

25 to consider there.

MICHAEL DANE - CROSS BY MR. DUEWALL                    231

1  Q     Can you tell me, excuse me, your understanding of when

2  the $30 million became due and payable, or owed?

3            MR. PEREZ:  Your Honor, again, it calls for a

4  legal conclusion, interpreting the document, so that's the

5  objection.

6            THE COURT:  Sustained.

7  BY MR. DUEWALL:

8  Q     Mr. Dane, do you believe the $30 million became due

9  and payable on March 27th of this year?

10  A     No, I don't.

11  Q     But for the fact that Fieldwood has rejected that

12  contract, do you think the $30 million would be due and

13  payable?

14  A     No.

15            MR. PEREZ:  Object to the form -- Your Honor,

16  object to the form of the question.  Fieldwood hasn't

17  rejected any contract yet.  It's going to be done in

18  connection with Confirmation.  So that's a false promise.

19  BY MR. DUEWALL:

20  Q     Well, let's just walk off through 3.1(b) then,

21  Mr. Dane.  Do you see where it says, "A one-time payment of

22  $30 million which becomes payable and owing to seller on

23  successful completion of the Genovesa well?"

24        Did I read that correctly?

25  A     You read the first part of that correctly.

1  Q     Right.  And it continues to say, "Or any other well

2  within the Genovesa formation and shall be due and paid --

3  and shall be due and paid to seller within the first 180

4  days of production (whether consecutive or not) of

5  hydrocarbons from any such well, which is defined as the

6  contingent payment."

7        Did I read that correctly?

8  A     That's what the document says in that section.

9  Q     Thank you.  And it says, "That payment shall be made

10 by buyer to seller by wire transfer of immediately available

11 funds to the account designated pursuant to Section 9.8."

12       Did I read that correctly?

13 A     I'm not checking verbatim, but that's what it looks like

14 it says.

15 Q     Okay.  And continues to say, "Provided, however, that

16 buyer delivers to seller within notice -- written notice

17 within 6 months.  Within such 6-month period a buyer's

18 election to offset the contingent payment against the

19 outstanding amount of the cash consideration (as defined in

20 the cash consideration exchange agreement) then due by

21 seller to buyer under Section 3.1 of the exchange agreement,

22 then" --

23            THE COURT:  Mr. Genender?

24            MR. DUEWALL:  Was there an objection?  I'm sorry.

25            MR. GENENDER:  Your Honor, I apologize.  Paul

1   Genender for the Debtors, I apologize for interrupting, but

2   Mr. Duewall is basically reading from a highly confidential

3   document on the Record.  And we had an understanding that

4   questions could be asked about the documents and not

5   publishing them.  We're in effect unnecessarily revealing the

6   contents of them.  In the way he's asking questions, he's

7   basically publishing the contents of the document.

8          THE COURT:  Overruled.

9          This part of the document as to how you measure

10  and things of this nature, I mean it may be confidential

11  that it was 30 million, but everybody's decided to put that

12  out in the public record.  I don't think this part's

13  confidential and I wouldn't seal it if I had to, so -- if I

14  was asked to.

15         So I'm going to allow the questions to be asked

16  that way.  Particularly in light of the objections that are

17  being raised, which is when he asks for the end result, he's

18  being told it's a legal conclusion.  He now needs to go

19  through to see whether the facts meet what this says.  And I

20  don't know how else he can do it.

21         So I'm going to overrule it.  You can ask the

22  questions, Mr. Duewall.  Go ahead.

23         MR. GENENDER:  Thank you.

24         MR. DUEWALL:  Thank you, Your Honor.  I'm going to

25  try to short circuit again.  If I get another objection, I'll

1    start reading again.

2    BY MR. DUEWALL:

3    Q      But, Mr. Dane, generally speaking did the $30 million

4    become due and payable 180 days after the Genovesa well was

5    completed?

6    A      No, not in my opinion.

7    Q      Okay.  When in your opinion did it become due and

8    payable?

9    A      Well, it has not become due and payable in my opinion.

10   Q      Can you tell me why in your opinion that's the case?

11   A      Yes.  For several reasons.  First of all, the payment

12   in this section, it becomes due and payable upon the

13   production -- upon 180 days of production, whether

14   consecutive or not, which is what you stated.  The well came

15   online on March 27th, 180 days from March 27th, assuming

16   that there was no interruption at all in production, would

17   be I believe September 23rd of this year.

18          There have been -- well has not produced so it

19   would be at some point later than that that it would become

20   due and payable.  There's not a certainty that this well will

21   produce for 180 days.  There's a number of things that could

22   happen in the future that causes this well to not have

23   produced for 180 days.

24          As of today this well has not satisfied the

25   conditions that would have resulted, in my opinion, a

MICHAEL DANE - CROSS BY MR. DUEWALL                    235

1  $30 million payment being owed.  If the well successfully

2  produced for 180 days, whether consecutive or not, if it

3  took 5 years for that 180 days, or 10 years, or in the

4  extreme if it never produced for 180 days, it wouldn't be

5  owed in my opinion.  But I think that that's one reason I

6  don't believe this payment is due and payable.

7          The other reason is that there's essential ongoing

8  litigation under this same document, there are writs and

9  warranties that are described, and that's the focus of the

10 company's Rule 2004 request that it's seeking more information

11 in order to understand if there's been other breaches.  So

12 the disputed amount on my mind, to the extent that it ever

13 did become due and payable, it would be at a later date.

14 Q     And is this a contract -- and do you know if this is

15 the contract, the MC519 PSA, that Fieldwood has designated

16 for rejection under the Plan?

17 A     Yes, it has been designated as -- to be rejected.

18 Q     Thank you.  Do you have a copy -- or actually were you

19 sent all of BP's exhibits now, or do -- I'd like you to turn

20 to 1607-28.

21 A     I don't.  This is the only exhibit I have, but I have

22 access to the portal, so if someone from counsel could

23 upload it, I can easily get it.

24     (Pause in the proceedings.)

25          THE WITNESS:  I'm sorry, Mr. Duewall, what exhibit

MICHAEL DANE - CROSS BY MR. DUEWALL                    236

 1  did you say that was?

 2        MR. DUEWALL:  We're now moving to 28, it's -- on the

 3  Court's record it's 1607-28 filed under seal.

 4      (Pause in the proceedings.)

 5        THE WITNESS:  Yeah, I'm pulling it up that

 6  document. I have that document.

 7  BY MR. DUEWALL:

 8  Q    Okay.  Can you generally identify what Exhibit 28 is?

 9  A    This is the cash consideration exchange agreement

10  between BP and Fieldwood with respect to Mississippi Canyon

11  562, the developed property.

12  Q    Thank you.  And I understand this has been filed under

13  seal so I'll try to do a better job with regard to this one

14  than I did the last one.  But is it generally your

15  understanding that this agreement calls for amounts to be

16  paid from BP to Fieldwood; is that correct?

17  A    That's correct.

18  Q    Okay.  And do you have a position as to whether or not

19  amounts are still due and owing under this agreement from BP

20  to Fieldwood?

21  A    Yes, there's approximately 12- to $13 million of

22  amounts that are still owing from  BP to Fieldwood this

23  year.

24  Q    And is it your understanding that this contract has

25  not been rejected under the Plan?

1  A      Correct, there's no (indiscernible).

2  Q      And do you recall when you were CFO did Fieldwood book

3  amounts due and owing under this contract as a receivable

4  when it was executed by the parties?

5  A      Yes, I do know that that is on our balance sheet.

6  Q      And to the best of your knowledge do you think it was

7  booked as a receivable when it was executed?

8  A      I believe it -- I believe that it was booked as a

9  receivable when the transaction closed.

10  Q      And that would have been in October of 2018, do you

11  recall that?

12  A      I don't recall if it closed in October, but it was -- I

13  would have to check it on the agreement.

14  Q      I'm going to try to do that for you.  Could you turn to

15  Page 1 of the agreement?

16  A      Yes, I did.

17  Q      Okay.  And just so the Court's Record is clear, the

18  date of the agreement is October 25, 2018 there in the first

19  paragraph.  Do you see that?

20  A      I see that the signing date was October 25, 2018.

21  Q      Okay.  And have BP and Fieldwood had a general course

22  of dealing with the parties with net amounts due and owing

23  in the normal course of business?

24  A      The parties have netted against each other, which has

25  been the subject of separate disputes to which there's quite

1  a bit of history.  And the main -- the main observation I

2  have about the difference of opinion on the netting was that

3  BP was very vociferous that the payments shouldn't be netted.

4  However, Fieldwood was netting payments because it wasn't

5  receiving money that it was owed from BP.  So I wouldn't say

6  it was -- it happens, I wouldn't say it was -- I'm aware of

7  many letters in which BP protested of the netting of

8  payments of unpaid amounts to those.

9  Q    Okay.  So it's happened in the past; is that correct?

10 The netting?

11 A    Yes.

12 Q    Okay.  Now next I'd like to turn to the list of assumed

13 contracts.  Before we go to that, Mr. Dane, as it relates to

14 the MC519 do you think that we are within 180 days -- as we

15 sit here today, do you think we're within 180 days of

16 production?

17 A    I know we are not within 180 days of production.

18 Q    Okay.

19        THE COURT:  Wait, wait.  When you say within 180

20 days of production, do you mean are we less than 180 days

21 from the date of first production, or did you mean something

22 else by that question, Mr. Duewall?

23        MR. DUEWALL:  No, that was it, Your Honor.  That

24 was it.

25        THE COURT:  So you're saying -- I want to be sure

1   Mr. Dane, because it means I misunderstood something you

2   said before, we are not less than 180 days from the date of

3   first production?

4                THE WITNESS:  I'm sorry, Your Honor.  We are

5   certainly less than 180 days from first production.  The

6   well began to produce on March 27 or 28.

7                THE COURT:  Okay.  Thank you.

8                MR. DUEWALL:  Thank you, Mr. Dane.

9                We're going to turn next, Your Honor, to Exhibit

10  1616-3.

11               THE COURT:  Is that sealed or unsealed?

12               MR. DUEWALL:  I don't believe it's sealed.

13               THE COURT:  All right.

14        (Pause in the proceedings.)

15               MR. PEREZ:  Mr. Duewall, what exhibit number is

16  that in your exhibits?

17               THE COURT:  It's one of your exhibits, Mr. Perez.

18               MR. PEREZ:  Oh, okay.  I'm sorry.

19        (Pause in the proceedings.)

20               THE COURT:  And I think she has up on the screen.

21  Right?

22               MR. DUEWALL:  She does.  We're going to try to --

23  we're going to go to Page 9, Line 225.

24               THE COURT:  Mr. Dane, if you hover over the right

25  side of your screen there will be a Zoom feature to make

1  this bigger.

2         THE WITNESS:  Thank you, Your Honor.

3      (Pause in the proceedings.)

4  BY MR. DUEWALL:

5  Q    So, Mr. Dane, the reason I brought up Exhibit 1616-3,

6  the list of assumed contracts that are being assumed by

7  NewCo, and I wanted to pull up for you the entity, 519 loop

8  agreement contract.  Do you see that there on your screen?

9  A    I do.

10  Q    Okay.  I was going to try to avoid having to pull the

11  contract up, but we'll do that if we need to, but just so

12  that the Record is clear, NewCo's assuming the entity 519

13  loop agreement that's referenced there on Line 225 of

14  Exhibit 1616-3 as the -- as a Joint Operating Agreement.  Do

15  you see that in front of you?

16  A    Yes, I do.

17  Q    Okay.  And so you agree this was an assumed contract.

18  Correct?

19  A    If it's listed on the schedule as a new contract, then

20  I believe it is and I believe it is something that we would

21  intend to assume.

22  Q    Okay.  Thank you.  To the best of your knowledge does

23  this contract contain a dispute resolution provision between

24  the parties?

25  A    I believe it does.

1  Q     Okay.  And to the best of your knowledge does that

2  both include a -- when I say dispute resolution provision I'm

3  speaking in terms of an agreement to arbitrate disputes

4  under that contact?

5  A     I understand --

6              MR. PEREZ:  Your Honor --

7              THE WITNESS:   -- the provision.

8  MR. DUEWALL:

9  Q     Okay.  Thank you.

10 Next, Mr. Dane, I'd like to turn to Debtor's Exhibit 105

11 that's found I believe at 1646-2.  Specifically in that

12 document Page 105.

13     (Pause in the proceedings.)

14 BY MR. DUEWALL:

15 Q     Do you see that -- we brought that up on our screen,

16 Mr. Dane.  Can you see that on your screen?

17 A     Yes, sir, I could.

18              MR. DUEWALL:  Do you want to make it bigger?

19 Thank you.

20 BY MR. DUEWALL:

21 Q     I understand from your -- I understand that you've been

22 working with the Government to try to -- well, strike that.

23 Exhibit B on this exhibit, Mr. Dane, is titled, Excluded

24 Events.  Do you see that at the top?

25 A     I do.

MICHAEL DANE - CROSS BY MR. DUEWALL                242

1    Q      Okay.  And it says, Fieldwood 3 will not be

2    responsible for the non-performance or delay in performance

3    of the transition services, or for not taking any action, or

4    meet any condition to the extent called in whole or in part

5    by any of the following, and then it lists certain events

6    there on that document.  Do you see that?

7    A      I do.

8    Q      Okay.  On the first one it says, Adverse weather or

9    sea conditions, loop current, acts of God, including but not

10   limited to hurricanes.  Do you see where I read that?

11   A      Yes.

12   Q      So my question, Mr. Dane, is simply if there's a

13   hurricane during this hurricane season and it impacts assets

14   that are abandoned under this Plan, who has the obligation

15   to go out there and take care of that?

16   A      So under the Plan and the proposals that are included

17   as a part of the Plan, the exhibit -- this exhibit has a

18   transition services description of all the services that

19   Fieldwood will continue to support the abandoned properties

20   upon the effective date.  It describes the way that

21   Fieldwood will need to respond to any issue should they

22   develop.

23          But the Plan contemplates that these are abandoned

24   properties, they're going to be abandoned at exit, that's what

25   the Plan contemplates.  And I would think that, you know,

1   responsible co-predecessors would assist with the

2   transition.  That's what -- it's intended to be a transition

3   service.

4           So to the extent that there's an issue that needs

5   to be remediated that has an imminent impact to the

6   environment or safety, under the -- if it's still within the

7   9-month period that's contemplated under the transition

8   services, Fieldwood would respond to that incident, which

9   it's Fieldwood's position, and I would expect, although I

10  obviously don't speak for the Government, but I believe that

11  I heard the Government say that they expected that

12  responsible predecessors would efficiently transition these

13  assets pursuant to their joint and several liability.

14          MR. DUEWALL:  Objection, non-responsive, Your

15  Honor, to the extent it tries to rephrase any statements

16  that were made by the Government representatives.

17          THE COURT:  Sustained.

18  BY MR. DUEWALL:

19  Q    So just that I'm clear, Mr. Dane, before I move on,

20  Fieldwood 3 under this excluded events exhibit is expressly

21  excluding any type of liability for hurricanes or any other

22  act of God during hurricane season?

23  A    The properties are intended to be abandoned pursuant

24  to the Plan.  Fieldwood is going to be operating a

25  transition services arrangement proposal, and it will

1  respond to any events that pose an imminent risk to the

2  environment or safety.  But the properties are abandoned.

3          So these excluded events were reviewed with the

4  Government, that was a part of the discussion with the

5  Government under what conditions would they be comfortable

6  that Fieldwood could provide transition services,

7  recognizing that the properties are abandoned.  I think that

8  the Exhibit A and B are pretty self-explanatory.

9  Q    When you say respond what does respond mean, what do

10 you understand that to mean?

11 A    I understand it to mean that if there is an event that

12 would cause a risk, event risk to the environment, health,

13 safety, that Fieldwood would take the actions necessary to

14 make sure that those issues were mitigated or resolved.

15 Q    Okay.  Earlier in your testimony, and it's not my

16 intent to quote you verbatim, you were testifying about the

17 amount of P&A that Fieldwood had done since 2013.  Do you

18 remember that?

19 A    Yes, I do.

20 Q    And it's my recollection that you provide -- that you

21 stated generally, and correct me again if I'm wrong, but that

22 amount was generally $1.5 billion?

23 A    Yes, in excess of 1-1/2 billion.

24 Q    How much has -- how much has Fieldwood spent or

25 incurred doing P&A work in this year, 2021?

1  A     I'd have to consult our records to get the exact

2  number.

3  Q     And what I'm trying to determine, Mr. Dane, just to be

4  up front with you, is I'm trying to determine over what

5  course of time that that 1.5 spent.  Was it primarily in

6  2013 and '14, many years ago, or is that amount that has been

7  spent primarily in the last 2 or 3 years?

8  A     I believe in 2013 for a sub-period, because the

9  transaction with Apache closed in 2013, there was a couple

10 of hundred million dollars spent over less than a 6-month

11 period.  I believe in 2014 there was over $400 million

12 spent, within the next year it was 2- to $300 million.  It

13 was 100 to -- 150- to $200 million a year in the subsequent

14 years.  Last year we spent $70 million.

15 Q     Okay.  Now on day one when NewCo -- if this Plan is

16 approved, on day one NewCo by your own estimates I believe

17 is going to have approximately $350 million of day one P&A

18 liability; is that correct?

19 A     That's correct.

20 Q     And is that -- does that represent a nominal net value

21 to NewCo?

22 A     That represents the net working interest owner

23 expected to pay RO costs based on our estimates, net to the

24 NewCo's working interest ownership in each of the leases.

25 Q     Okay.  Is there any reason why when you're preparing

1 those cost estimates you don't use a P50 valuation?

2 A    I don't know that we don't use a P50 valuation.  I think

3 we use a -- P50 means the most likely case.  P50, that's not

4 the methodology that we adopted, the same as BSEE.  We don't

5 have a P50, a P90.  We have an estimate that's based on

6 certain assumptions.  I think it probably does approximate a

7 P50 case, which is the most likely case.

8 Q    Let me make sure I understand your testimony.  Is it

9 your testimony that the 350 million that you estimated at

10 day one NewCo P&A net liability is reflective of a P50

11 estimate?

12 A    No, our -- my testimony is that Fieldwood would have

13 its own methodology for establishing its P&A estimates.

14 There's a number of assumptions which I reviewed earlier that

15 are the basis for generating those estimates.  And those

16 estimates and assumptions are refreshed on an annual basis

17 and updated for what we expect the cost to be for -- to

18 conduct the abandonment.  We don't have a distribution where

19 we have P50 number and a P90 number.  We just have an

20 estimate that we believe is a reasonable estimate.

21 Q    Did you have a chance to read your expert's rebuttal

22 report in this case, Mr. Hanson's rebuttal report?

23 A    I did.

24 Q    And we're going to pull up Exhibit 1620-1.  And

25 specifically Page 105.

1        (Pause in the proceedings.)

2             MR. PEREZ:  So, Your Honor, is this exhibit coming

3    into evidence?

4             MR. DUEWALL:  No, Your Honor, we're using it as a

5    demonstrative as Plaintiffs -- or as Debtors have stipulated

6    in their designation of their own exhibits.

7             THE COURT:  I don't understand what that means

8    actually, but I don't think I have an objection, so I'll wait

9    and see if I get one.

10        (No audible response.)

11             THE COURT:  Go ahead.

12   BY MR. DUEWALL:

13   Q    Mr. Dane, we're going to highlight or make --

14             THE COURT:  Yeah, I don't think I have a question

15   pending, I don't think I have an objection pending.  You all

16   just move ahead and I'll see if I get a question -- if I get

17   an objection.

18             MR. DUEWALL:  Thank you, Your Honor.

19   BY MR. DUEWALL:

20   Q    Do you see what we've highlighted there, Mr. Dane, and

21   I'm -- there it goes, my screen's a little bit far away.  It

22   says -- your own expert says there, at least states on that

23   exhibit, Debtor's exhibit, it is P50 cost estimates that

24   actually reflects -- I'm sorry, I've not stated that

25   correctly.  I'm going to start over.

1          It states it is P50 cost estimates that actually

2   reflect the "most probable outcome".  Do you see where it

3   says that in your expert's report?

4          MR. PEREZ:  I'm sorry, Your Honor, I don't see it.

5          THE WITNESS:  Exactly.  I see where it states

6   that, I think --

7          THE COURT:  Hold on just -- wait just a minute.

8          Mr. Perez, you have your Zoom too high, lower your

9   Zoom and you'll see --

10         MR. PEREZ:  Ah, okay.  Got it.  Got it.  Okay.

11         THE COURT:  Or move the document.

12         MR. PEREZ:  All right.  Okay.

13         THE COURT:  Okay.  Then did you have an objection

14  to the question?

15         MR. PEREZ:  No, Your Honor.

16         THE COURT:  All right.  Go ahead, please.

17         MR. DUEWALL:  Thank you, Your Honor.

18  BY MR. DUEWALL:

19  Q    My question, Mr. Dane, is if it's your expert's opinion

20  that P50 reflects the most probable outcome, is there any

21  reason why NewCo in their own financial projects are using a

22  nominal value for P&A estimates?

23         MR. PEREZ:  Your Honor, I'm going to object to the

24  question.  I mean there's really no foundation as to what

25  this P50 is.  I mean Mr. Dane testified that they used a P50

1  base on their estimates.  I'm going to object to the

2  question.

3          THE COURT:  Can I just get you to repeat the

4  question, Mr. Duewall.  You can repeat it just the same way

5  it was, I just want to hear the question in light of the

6  objection.

7          MR. DUEWALL:  Sure, Your Honor.  It might be

8  easier to read it back, but I'll try it.  My question is, if

9  Mr. Dane had a reason why they didn't use P50 in the NewCo

10 financial projections when the expert report reflects that

11 P50 cost estimates are actually the most probable outcome,

12 that's my question.

13         MR. PEREZ:  And, Your Honor, a further objection

14 as to -- I mean taking -- this is kind of being taken out of

15 context as to, you know, "most probable outcome".  And

16 Mr. Hanson's going to testify.

17         THE COURT:  If that's the objection, I'm going to

18 overrule it.  Go ahead, Mr. Dane.

19         THE WITNESS:  I think when I read this sentence, I

20 think it is defining what P50 says.  I don't think it's

21 stating that the BSEE P50 estimate is the most probable

22 outcome.  I think when I read this sentence I interpret it

23 as P50 is by definition the most probable outcome.  It

24 defines what P50 means.

25         Our expert is not a P&A expert.  Fieldwood One

1  believe is a P&A expert and we develop our own estimates.

2  And so if your question is why would we not use -- we are

3  using what we believe to be the most reliable estimate.

4  That's my response.

5  BY MR. DUEWALL:

6  Q     If your expert's not a P&A expert, do you know where he

7  got this information to put in his report?

8  A     I believe he's stating a definition in this report.  It

9  is P50 cost estimates that actually reflect the most

10  probable outcome, and when I read that bullet I think it's a

11  relevant statement, it means relative to a P90 case.  P90

12  represents a 90th percentile probability, it's a much, much

13  more than probable case.  P50 is most probable.

14        I don't think that this statement says that the

15  BSEE P50 estimates are the most probable outcome with

16  respect to the actual costs that will be associated with the

17  NewCo entity, and as such they should be the basis for the

18  NewCo projections.  That's not how I interpret this.

19        I think that's consistent with our expert who,

20  doing the same report, stated that Fieldwood has a

21  decommissioning group through its experts and their

22  estimates have more utility for purposes of developing

23  projections than BSEE estimates which are done a broad basis

24  for all assets in the entire Gulf of Mexico and not specific

25  to the actual assets of Fieldwood.

1  Q      If P50 is applied to your financial -- have you ever

2  applied P50 to your financial projections in this case?

3  A      Well, we have analyzed them mainly in the context of

4  just understanding what the BSEE numbers show and in the

5  context of evaluating your expert's report.  But we don't

6  believe that they are -- we believe that, like I already

7  stated, that the Fieldwood estimates that are done specific

8  to the Fieldwood assets being performed by the internal

9  expert at Fieldwood on decommissioning are what's relevant

10 for purposes of us understanding.

11 Q      Have you ever applied the P50 estimates to your

12 revenue projections or your cost projections that you've done

13 in this case?

14 A      Our projections go back 5 years.  As I stated earlier,

15 there is a very limited amount of P&A that takes place in

16 those years.  So there's very little measure with respect to

17 our overall P&A, with respect to our projections.  But our

18 projections largely do not include P&A given that it's not

19 necessary within the time frame of the projections that we

20 included.  So, I'm sorry, to answer your question, it's not --

21 it wasn't applied because it largely falls outside the

22 forecast period.  And, no, we haven't done that in any event.

23 Q      Using your nominal net P&A estimate of 350, how much

24 of that is represented what I would call legacy properties,

25 properties where there's been another operator somewhere in

1  the chain of title?

2  A    There's only -- Fieldwood, that's the basis that's going

3  to comprise the -- that's the basis that's going to comprise

4  the Credit Bid Purchaser has very few wells that don't have

5  any other parties in the chain of title.  The only -- I don't

6  know that I can think of a well that Fieldwood has drilled

7  that does not have another party in the chain of title

8  somewhere.

9  Q    So for example for the Katmai 1, is that a well that

10 Fieldwood drilled itself?

11 A    No, it's not.

12 Q    Okay.  And the Orlov, is that a well that Fieldwood

13 drilled itself?

14 A    Yes, it did.

15 Q    Okay.  So what I'm trying to determine, and maybe --

16 A    No, I'm sorry, Fieldwood drilled the well and did not

17 drill by itself.  Fieldwood had two co-working interest

18 owners in the properties.

19 Q    But you testified earlier that the 350 P&A was a net

20 to Fieldwood number.  Correct?

21 A    It is, yes.

22 Q    Okay.  So what I'm trying to determine is if I was to

23 make three buckets of potential NewCo assets, and if I

24 called the first bucket legacy properties similar to the

25 properties you're abandoning in this case, that would be

1  bucket Number 1; Bucket Number 2 would be wells that

2  Fieldwood has drilled; and then Bucket Number 3 would be

3  wells that you plan to drill in the future.  Are you

4  following me?

5  A    Somewhat.  Your second category, I'm sorry, is wells

6  that Fieldwood would have drilled, but there's no other

7  party, or it's just wells that Fieldwood would have drilled?

8  Q    Wells that Fieldwood would have drilled as the

9  operator.

10 A    Okay.  I understand.

11 Q    What I'm trying to determine is that on day one of --

12 if this Plan is confirmed by the Court, on day one it's my

13 understanding that there's 350 -- based upon your testimony

14 there's $350 million of net P&A liability on day one to

15 NewCo.  Correct?

16 A    That's -- yes, that's Fieldwood's estimate.

17 Q    Okay.  And so what I'm trying to determine is how much

18 of that, if Fieldwood as to declare bankruptcy again, they

19 can try to abandon, as it is in this case, and how much of

20 that liability it cannot abandon.  Does that -- are you

21 following me?

22        MR. PEREZ:  Yeah, object, Your Honor, it wouldn't

23 be -- I think he's talking about credit bit purchaser, he's

24 not talking about Fieldwood.  So I object to the form of the

25 question.

MICHAEL DANE - CROSS BY MR. DUEWALL                   254

1          THE COURT:  Sustained.

2          MR. DUEWALL:  I was talking about NewCo, Your

3  Honor.  And if I mis-spoke, I'll rephrase.

4          THE COURT:  Go ahead.

5  BY MR. DUEWALL:

6  Q    Mr. Dane, I'll try again.  On -- if the Plan is

7  confirmed, on day one of NewCo's existence what percent of

8  the $350 million of net P&A liability is represented by

9  properties that were originally drilled by another operator?

10  A    Fieldwood drilled four wells that I can think of in

11  that asset base that it operated.

12  Q    Are there any wells on day one of -- if the Plan's

13  confirmed by the Court, on day one are there any wells that

14  NewCo is going to operate that were drilled by another

15  operator in the chain of title?

16  A    Yes, every other well other than those four that come

17  to my mind.

18  Q    Okay.  And can you identify those four for me, please?

19  A    The four that I were thinking about -- that I was

20  thinking about that Fieldwood drilled as the operator was

21  Genovesa, the Tri 2 well, the Tri 3 well, and Orlov.

22  Q    So just to rephrase, the Orlov well, the two Troica

23  wells and the Genovesa well represent wells that Fieldwood

24  drilled itself.  Correct?

25  A    Fieldwood operated the drilling of those wells.  It

1  did not drill those wells by itself in all cases.

2  Q     Fieldwood was the operator when the Orlov, the two

3  Troica wells, the Genovesa well were drilled.  Did I say

4  that properly?

5  A     Yes.

6  Q     Okay.  And how much of the $350 million of P&A

7  liability do those four wells represent?

8  A     I would have to consult our records to give you an

9  exact number.

10 Q     Do you have a ballpark or percentage?

11 A     10 percent.  That's an estimate.

12 Q     And does that mean that the remaining 90 percent are

13 in the bucket of to-be-drilled, or is the remaining 90

14 percent in properties that are -- were drilled by another

15 operator?

16 A     Well, a to-be-drilled well doesn't have a liability

17 associated with it --

18 Q     Okay.

19 A      -- so everything else would fall into the other

20 category.

21 Q     So I'll put a zero in the to-be-drilled bucket.  And in

22 the -- so 90 percent of the $350 million of P&A liability on

23 day one of NewCo is liability for properties that were

24 originally drilled or developed by another operator; is that

25 correct?

1  A      Roughly speaking that -- based on my assumption on

2  those other four wells and not being able to identify off

3  the top of my head any other wells that Fieldwood operated

4  itself, with respect to that subset of assets I think that

5  that's probably fair.

6  Q      Okay.  And it's my understanding that Fieldwood has $75

7  million of bonding lined up; is that correct?  Or NewCo, I'm

8  sorry, has -- strike that -- has $75 million of bonding

9  lined up; is that correct?

10  A      Yes, we have a committed -- we entered into a term

11  sheet for -- that provides for a committed $75 million

12  amount for the next couple of years.

13  Q      How much of NewCo's value is made up of the new

14  drilling program versus existing wells on day one?

15  A      That's not a number I can give you off the top of my

16  head.  There's substantial value in each and it depends

17  obviously upon how much future activity happens, it depends

18  on prices, it depends on a number of factors.  Both

19  categories have very significant value.

20  Q      Based upon the financial projections that have been

21  done in this case, are the new wells essential to Fieldwood's

22  payments to bills in the ordinary course of business?

23          MR. PEREZ:  Objection, Your Honor, they --

24          THE COURT:  By Fieldwood do you mean NewCo, or do

25  you mean somebody else?

 1          MR. DUEWALL:  NewCo, Your Honor.  I'm going to

 2     write that at the top of my page now, NewCo.  I'm sorry.

 3          THE COURT:  I'll just get you to re-ask the

 4     question and then I think it'll be a lot less vague so.

 5          MR. DUEWALL:  Thank you, Your Honor.

 6     BY MR. DUEWALL:

 7     Q    Are the new wells that are proposed by NewCo essential

 8     for NewCo to meet its financial projections that have been

 9     made in this case?

10     A    The new wells are an assumption that is included in

11     the financial projections.  In other words, the business

12     Plan contemplates -- the projection contemplates additional

13     wells.

14     Q    Have you done any -- have you done any business

15     planning or modeling that does not account for any of the

16     new wells?

17     A    Yes.

18     Q    What happens to NewCo's cash flow at the end of Year 5

19     if none of the new wells are brought online?

20     A    Early on in our evaluation.  There hasn't been a

21     scenario that I've reviewed recently, but early on in our

22     evaluation we performed a case where there was -- I don't

23     know if it was no, I think it was little to no -- maybe one

24     well, or zero wells.  And the high commodity prices which is

25     probably lower today, and I believe that was one of our best

1 sets of projections compared to the others.

2 Q    Do you have an opinion as to whether or not there's

3 negative cash flow at the end of Year 5 of your model,

4 NewCo's model, if the new wells do not come online?

5 A    I have seen the BP expert report that shows positive

6 cash flow for four years, and then a $20 million negative

7 cash flow in the fifth period.  And I believe that if the

8 company was to operate the business such that it understood

9 it was not going to be drilling any more wells, that that's

10 not an appropriate set of projections.

11        The company would re-evaluate a number of other

12 assumptions that are embedded within that business plan, and

13 given the fact that fifth period is only $20 million

14 negative and every other period is substantially positive,

15 which if I recall off memory, had built a cumulative cash

16 balance of $550 million.  I think that there would be ways

17 to be accretive to that forecast which to begin with is

18 actually not that bad.

19 Q    But that's not the forecast that you put forward as

20 your financial projections.  Your financial projections

21 assume that all of the new wells will come online; is that

22 correct?

23 A    The projections assume a business plan that drills one

24 to two wells a year, has a disciplined amount of capital

25 spending that generates such cash flow every year and it

1   does assume that the wells are drilled and producing.

2   Q     And can you identify for us the wells that are

3   presumed to come online in the financial projections that

4   you've shared with us?  Is it -- and I'll just try to do it as

5   quickly as I can.  Are those wells the Katmai 2, the Katmai

6   3, the Katmai 4, the Big Bend, the Gunflint and the CPN, are

7   those the wells that we're talking about?

8   A     For the projections that were included in the

9   Disclosure Statement, in addition to some other work-over

10  activity and simulations, those are the wells that were

11  included as adding additional volumes.

12  Q     And as we sit here today have any of the wells that

13  were identified been permitted?

14  A     They have not, but I think that that's a misleading

15  question because permitting multi-year programs in the Gulf

16  of Mexico for deepwater does not happen in advance in that

17  manner.  You need to identify a specific rig, you need to

18  include that rig on your permit, that rig's BOP

19  qualifications, and other equipment on the rig need to

20  specifically be aligned with the particular project once it's

21  been fully engineered.  So it's not a common practice for

22  most independent operators to permit a multi-well program

23  when you don't have a rig under contract.  It's a waste of

24  time.

25  Q     What is the first well that you're proposing to drill

1  in NewCo?

2  A    I believe -- the projections that you're referring to

3  I've seen that there's a -- that there Is a work-over and a

4  simulation in the Gunflint deal.  Those aren't drilling

5  activities, but those are activities that require a rig in

6  the capital activities.  Those activities were scheduled for

7  late this year.  In 2022 the only project that was scheduled

8  was the Katmai Number 2 well.  I believe in 2023 there was a

9  Gunflint in-field well and a Big Bend well followed by a

10  Katmai well, then CPN, followed by another Katmai well in

11  '25.

12  Q    So let's just talk about the first two that you

13  identified then.  The Gunflint later this year, will that

14  require any type of permitting or pre-permitting for

15  environmental issues?

16  A    Every operation in the Gulf of Mexico generally

17  requires some level of permitting.

18  Q    And based upon your financial projections in this case

19  what are you assuming to be the approximate month that you

20  can show production from the Gunflint activity that you just

21  described?

22  A    I believe in the -- I'm sorry, can you repeat the

23  question for me?

24  Q    Sure.

25  A    Are you asking me about the projections or are you

1   asking about given where we stand today when we think we'd be

2   able to produce?

3   Q     No, I'm talking about the projections you'd made.  What

4   do they presume in terms of when the Gunflint will come

5   online and who production?

6   A     I don't specifically remember, but I believe it's

7   somewhere between 4Q of this year and 1Q of next year.

8   Q     Do you believe that's on time or do you believe it's

9   behind schedule?

10  A     Yeah, I believe relatively on time.

11  Q     And when you begin your permitting for Gunflint, what's

12  your expectation for how long that'll take?

13  A     That's a work-over operation, it's a replacement of a

14  subsea safety valve that failed.  It's not a drilling

15  operation.  I think that permitting should not be a complex

16  permitting exercise, but all permitting takes time.

17  Q     Do you have any estimation in terms of your operations

18  as to how long that will take given the new regulatory

19  environment that we're in now?

20  A     I believe that if we had a Plan confirmed and we were

21  able to locate and tender for a rig that met the

22  requirements for that project and the campaign that they

23  follow, which we're in the process of evaluating, that that

24  project could be conducted as early as November-December,

25  maybe more likely December-January, which is relatively in

1  line with those projections.  And that we would be able to

2  obtain the permitting and other equipment that's required to

3  conduct that activity, that initial activity in that time

4  frame, which is what our team has been focused on.

5  Q     And I think you testified -- or didn't -- strike that.

6  Tell me when you think the -- your projections call for the

7  Katmai 2 to be drilled when?

8  A     As early as 2022 I believe.

9  Q     And that was when you expected it to be drilled.

10  Correct?

11  A     Yes.

12  Q     And as we sit here today could you tell us when you

13  expect that well to be drilled?

14  A     Are you the owner?  They're going to assess their

15  appetite for these types of capital projects, they

16  understand these projections in the business plan, they

17  understand the prospectivity of that particular project,

18  which is a meaningful -- a meaningful well.  They have

19  reviewed these same projections, they understand the

20  business plan that we're looking to implement.

21       That's a part of the reason why they are putting

22  several hundred million dollars in new capital into this

23  business, understanding that opportunity and those risks.

24  If that well ultimately gets drilled in that time frame, it's

25  going to be subject to board approvals, it's going to be

1  subject to business conditions at the time, the risk

2  appetite of the stakeholders that are in strategic

3  opportunities.

4       But right now as we sit here today, we are planning to

5  be able to be in a position to drill that well within that

6  time frame.

7  Q     And that time frame would be early 2022?

8  A     We would like to be in a position to be able to drill

9  that well in the first half of 2022, you know, all those

10  other considerations that I mentioned, you know, pending.

11  Q     Is it your testimony that the drilling program that's

12  put forth in the financial projection is still subject to

13  approval by the individuals who would be making the

14  decisions for NewCo?

15  A     Of course.

16  Q     But it's also correct, isn't it, that unless you drill

17  those wells and achieve production from those wells that

18  we've identified here within that 5-year period, you are cash

19  flow negative by Year 5?

20  A     No, that's -- I answered that question and I stated

21  that if Fieldwood was -- if the Credit Bid Purchaser was to

22  pursue a business plan and never drill another well, that

23  would be an entirely different business plan than what the

24  projections contemplate.  Under the -- under what I reviewed

25  in BP's expert report, under the scenario that doesn't account

1    for that being the strategy that I think the Credit Bid

2    Purchaser would pursue, and not incorporating all the

3    corresponding adjustments, every other variable that would

4    be required to be reviewed in that scenario, it still looks

5    like a very profitable business to me.

6          And I believe that that modest negative free cash flow

7    in that one year would likely not be the result because the

8    company would ensure that it wasn't producing negative cash

9    flow, it would likely have less expenses and other, you

10   know, other factors that would support a business plan that

11   doesn't drill more wells.

12   Q    As we sit here today are there still questions

13   regarding what the business plan of NewCo is going to be?

14   A    Any business requires its stakeholders, whether it's

15   its board of directors, its owners to approve its Plan, I

16   believe every business has a board that reviews at least an

17   annual business plan and approves those business plans.  I

18   would expect that NewCo is going to have a board that's going

19   to want to review all of its capital investment

20   opportunities and have the board approve the business plan.

21   So I think that that's just consistent with how businesses

22   are generally run.  I don't know of a business that doesn't

23   have some level of oversight with respect to how it spends

24   its capital.

25   Q    The bonding that you've obtained for NewCo is that

1  bonding that includes adequate assurance for the loop system

2  that we were talking about earlier this evening?

3            MR. PEREZ:  Object to the form of the question,

4  calls for a legal conclusion.

5            THE COURT:  Sustained as asked.  You can re-word

6  it.

7  BY MR. DUEWALL:

8  Q     Mr. Dane, did you obtain bonding that includes the

9  loop system that we've previously discussed this evening?

10 A     I'm not aware of a need to obtain bonding for the loop

11 system that we discussed.

12 Q     Do you know how much of the 75 million in new bonds

13 for NewCo are allocated to the MC519?

14 A     New bonds to NewCo are allocated to any asset.

15 Q     Mr. Dane, --

16 A     Excuse me, I'm sorry, other than -- we know that we

17 have a bond that needs to be procured for Apache, which was

18 a part of our transaction with Apache, the similar 308

19 facility is going to be included in Credit Bid Purchase

20 assets, and a bond is going to be given to Apache for

21 $13.2 million.

22 Q     I understood you to say earlier that yourself,

23 Mr. Lemay and Mr. Mitchell will be part of the management

24 team going forward; is that correct?

25 A     I stated that it's contemplated that the employees and

1  management team of Fieldwood are going to have continuity

2  through the -- through the Credit Bid Purchaser.

3  Q     Is it contemplated that you'll be the CEO of NewCo?

4  A     The lenders have had that discussion with me, and

5  that's what is currently contemplated.

6  Q     And is it contemplated that Mr. Lemay will be the

7  general counsel of NewCo?

8  A     It's contemplated that Mr. Lamb is going to be the

9  president/general counsel of NewCo.

10 Q     Mr. Lamb, I'm sorry.  And Mr. Mitchell, will he, with

11 NewCo, remain in his position as vice president of

12 production?

13 A     We would hope that Mr. Mitchell would remain in that

14 position or a comparable position.  Mr. Mitchell is

15 determining it.  He's had a long distinguished career and at

16 some point he has the desire to retire, but to the extent

17 that Mr. Mitchell would indulge us for a longer period of

18 time, we would be really grateful to have Mr. Mitchell

19 continue.

20 Q     And were all three of you also part of the management

21 team in 2018 when the company declared bankruptcy?

22 A     No.

23 Q     Were you the CFO in 2018?

24 A     I was.

25 Q     Was Mr. Lamb the general counsel?

1  A      I believe it was Mr. Black at that time, or around

2  that time.

3  Q      But Mr. Lamb was with Fieldwood in 2018 during that

4  time?

5  A      Yes, he was.

6  Q      And was Mr. Mitchell also part of the executive team

7  in 2018 when the first bankruptcy was filed?

8  A      No, he was not.

9  Q      Was he the vice president of production or in some

10 other capacity?

11 A      I don't believe he -- I believe he joined after 2018.

12 Q      And then all three of you were with the company when

13 the second bankruptcy was filed clearly.  Correct?

14 A      Yes.

15 Q      Okay.  As part of the first bankruptcy being filed, do

16 you recall making financial projections during that

17 bankruptcy as well?

18 A      I do.

19 Q      And were you the CFO when that was done?

20 A      I was.

21 Q      And did you do that in a similar fashion as the

22 financial projections you made for this bankruptcy when it

23 was filed too?

24 A      In a sense that, yeah, there was a number of folks

25 that were involved at the time.  It was a collaborative

1  effort to develop those projections.  It was probably a

2  little bit -- there was other elements that the -- the

3  management was meaningfully different at that time, there

4  was a number of folks that were part of the company that are

5  no longer a part of the company, and vice-versa.  So the

6  people involved are slightly different.  Generally the

7  process is putting together estimates.  Yeah, we've

8  maintained kind of an approach where a number of departments

9  are involved, not necessarily the same people.  Certainly

10  the asset base is very different.

11  Q     What was your role I doing the financial statements in

12  2018?  Did you engage in the same process as you did when

13  you did for this bankruptcy filing?

14  A     No, I think I just answered your question.  I wouldn't

15  describe it as exactly the same process.  There was some

16  level of different people, there was certainly a different

17  level of assets.  It was similar in the sense that there was

18  a number of departments involved to help produce estimates.

19  I was a part of that process.

20  Q     Were you responsible for the accuracy of the financial

21  projections that were done when the 2018 bankruptcy was

22  filed?

23  A     I'm not sure what you mean by "responsible for."  Do

24  you mind clarifying that for me?

25  Q     Sure.  I was trying to determine who the person was

MICHAEL DANE - CROSS BY MR. DUEWALL                    269

1  who was responsible for putting it together.

2  A    As I mentioned, there was an effort that involves a

3  number of people who also had a financial advisor at the

4  time.

5  Q    Were you responsible for putting together the

6  financial projections for this bankruptcy filing?

7  A    I was involved in the effort to put together these

8  financial projections, I oversaw part of that effort, I

9  approved these projections.

10 Q    And have you had an opportunity to go back and look at

11 whether or not the projections that you did as the CFO in

12 2018 were accurate as it related to revenue or EBITDA?

13 A    I've reviewed the projections that the team generated

14 as a part of that financial statement, and I have looked at

15 them relative to actual results over time.

16 Q    So just to be clear, when you did your financial

17 projections for the bankruptcy, it was filed in 2018.  You

18 made projections for performance throughout the remainder of

19 2018 and then also in 2019 and subsequent years.

20      Do you remember that?

21 A    I do.

22 Q    Okay.  And looking back when you compare those

23 projections to your audited financial reports, are you aware

24 that in 2018 you missed revenue by 9 percent?

25 A    I'm familiar with the numbers that were cited in the

1   expert report, I don't agree that they're correct.  But I

2   believe it was a 9 percent -- I'd have to see the exact

3   numbers, I apologize, the variances were less than the

4   numbers that were cited in the expert report that you were

5   citing to me.

6   Q     And so your response to that -- so you've read that

7   report; is that correct?

8   A     I have.

9   Q     And you familiarized yourself with it?

10         THE COURT:  I didn't hear you.

11         THE WITNESS:  I'm sorry?

12  BY MR. DUEWALL:

13  Q     Did you familiarize yourself with it, did you take the

14  time, spent some time with it?

15  A     I have.

16  Q     And then you know that in 2018 that report suggests

17  that you missed your revenue projection by 9 percent.

18         Do you remember it saying that?

19  A     Yeah, there was some times, I don't know if that

20  variance was exactly correct.  I know that when I looked at

21  their expert's report, the production and the EBITDA

22  variances were more exaggerated than actual.  And most

23  importantly it was missing some important lines like cash

24  flow that told a very different story than several top line

25  numbers.

1  Q      And same question with regard to 2019, that report,

2  are you familiar with the fact that that report suggests

3  that you missed your revenue projection by 16 percent in

4  2019 with regard to the projections that you were making

5  when you declared bankruptcy in 2018?

6  A      Yeah, their response, I reviewed their report, I don't

7  specifically remember, if people want to show me I can more

8  specifically tell you which numbers I thought were

9  incorrect.  But same observation was that the variances that

10 we understood for production of EBITDA were not as

11 significant as the variances we have in the expert report.

12 But there was a negative -- there was a negative variance in

13 2019 with respect to production and EBITDA.

14 Q      And in 2018 do you have any response for the

15 missing -- the projected EBITDA by 21 percent?

16 A      Yes.  I don't know that that's correct.  The EBITDA

17 number you had for 2018 was not correct in your expert

18 report.  I don't think someone tabulated the EBITDA

19 correctly.  But I thought the more relevant number for 2018

20 was frankly the period that reflected the best of the

21 projections.

22        The Disclosure Statement projections for 2018, I

23 believe, had around $390 million of free cash flow, and the

24 business generated, I think, around $370 million of free

25 cash flow having spent half as much capital in that year.

1  But I thought -- my observation was -- to answer your

2  question, my observation was 2018 was a successful year and

3  very much in line with the overall business plan objectives

4  for that loan year.

5  Q    And was 2019 a successful year when EBITDA was missed

6  by 47 percent of the --

7  A    No -- I'm sorry, I cut you off.

8       No, 2018 was not at a greater variance than the

9  Disclosure Statement projections.  I wouldn't consider 2019 a

10 particularly successful year, although I do think that there

11 is -- there was several variables, for instance, the lack of

12 capital spending the previous year, that they weren't apples-

13 to-apples comparisons.  There was substantially less capital

14 spending in 2018 and that's where the lower production

15 results in 2019 and lower EBITDA.

16      A number of those things were intended to -- the

17 2020 period prior to all the strains the business

18 experienced in the first quarter, a number of the executive

19 variances were expected to be corrected in that period.

20 Obviously ultimately the business environment changed

21 significantly.  2019 was impacted by other external factors,

22 as well.

23 Q    Have you gone back and synthesized the projections you

24 did in this case with kind of the analysis we just did with

25 regard to revenue misses to determine performance, if that

1  has any impact on your projected performance?

2  A    We haven't done a specific analysis to synthesize it,

3  but, you know, we've discussed and we understand some of the

4  major drivers of the variances.

5           MR. DUEWALL:  Those are all my questions, Your

6  Honor.  Thank you.

7           THE COURT:  Mr. Duewall, thank you.

8           All right.  Mr. Alaniz.

9           MR. ALANIZ:  Your Honor, can you hear me?

10           THE COURT:  Yes.

11              CROSS-EXAMINATION OF MICHAEL DANE

12  BY MR. ALANIZ:

13  Q    Mr. Dane, you and I have met before.  Correct?

14  A    Yes, sir.

15  Q    Over the past -- over the past couple of months we've

16  had roughly, you know, five or so conversations?

17  A    Yes, sounds about right.

18  Q    Mr. Dane, based on your testimony earlier it sounds

19  like you're familiar with the Bureau of Safety and

20  Environmental Enforcement, or BSEE.

21  A    Yes, I am.

22  Q    Do you recall using the term "INC" in your testimony

23  with Mr. Perez?

24  A    I do, yes.

25  Q    Can you describe for the Court the meaning of an INC?

MICHAEL DANE - CROSS BY MR. ALANIZ                    274

1   A      INC is an acronym of an Incident of Non-Compliance.

2   An Incident of Non-Compliance is a -- it is something that

3   is issued generally pursuant to offshore inspections.  We

4   have facilities that are inspected on -- local facilities

5   probably on a daily basis.  There's active inspections that

6   are ongoing at all times in the Gulf of Mexico.  And to the

7   extent that the regular course inspections result in the

8   inspector determining that there's something that they

9   determine to not be in compliance, then they can issue you

10  an Incident of Non-Compliance, and that's a standard part of

11  operations in the regulatory environment in the Gulf of

12  Mexico.

13  Q      Thank you, Mr. Dane.

14         Can I turn your attention to Debtor's Exhibit 99, which

15  is also, I believe, 1625-23.  If I've got that right.

16         Do you have that in front of you, Mr. Dane?

17  A      I do not.  Can you remind me which one it is again,

18  please?

19  Q      It's Debtor's Exhibit 99, it's also Exhibit -- Docket

20  No. 1625-23.

21         THE COURT:  So 1625-23 is under seal.

22         MR. PEREZ:  Your Honor, it's in his book as

23  Exhibit 99.

24         THE COURT:  It's in whose book?

25         MR. PEREZ:  The book that I used with him.  I

1  think that's it.

2          THE COURT:  All right.

3          THE WITNESS:  Yes, sir, I have it here.

4  BY MR. ALANIZ:

5  Q     Okay.  Mr. Dane, do you recall testifying from this

6  document in Mr. Perez's examination of you?

7  A     Yes, I do.

8  Q     Are you able to refer to the properties, or identify

9  the properties in which Hess was the predecessor on this

10 chart?

11 A     Yes.  That is the West Delta properties at the bottom,

12 West Delta 79A, B, C, F.  E I believe was mistakenly

13 included in this chart, we believe that facility is removed.

14 And then West Delta A, B, D, 86A and B.

15 Q     Thank you, Mr. Dane.

16        So when I refer -- when I say, "West Delta

17 properties," you understand that I mean the properties in

18 which Hess was a predecessor.

19 A     Yes, I do.

20 Q     According to this chart, are there any un-resolved

21 INCs on the West Delta properties?

22 A     On this chart there are a couple of INCs that are

23 labeled as items that are going to be performed pursuant to

24 the Agreed Activities.  I see them listed on West Delta 79A,

25 and I see one listed on West Delta 79C, and I see one listed

1  on West Delta 86A.

2  Q     Okay.  So the work that is mentioned in the comments

3  deal has not yet been performed?

4  A     This list, which is what we refer to as the "Agreed

5  Activity Schedule," was provided to the regulatory agencies

6  and discussed, and I believe it was around the first quarter

7  time frame of this year.  I think it was around maybe March

8  or so.  And this was -- the comments referred to the

9  activities that are contemplated to be completed under the

10 Agreed Activity Schedule.  The costs are what is associated

11 with the activities that are described upon it, most of

12 which relate to re-establishing egress that was compared to

13 somewhat due to hurricanes and then resolved in certain

14 safety-related activities.

15 Q     Okay.  Thank you.

16       Do you know if the INCs that you identified a moment

17 ago will be resolved once the Debtors perform these

18 activities?

19 A     I do, one of -- I know that -- my understanding is

20 that there are only two INCs that are currently remaining

21 outstanding on the properties, and one of them has been

22 satisfied, the work has been completed, that is in the

23 process of approving it.  I believe that is the West

24 Delta 79C facility.  100 percent of the work has been

25 completed on that facility and is pending at BSEE according

1   to the update that I had heard from our team.

2            And the activity associated with the other

3   facility, West Delta 86A, it's 50 percent complete, there is

4   pending the remaining operations on that activity, it would

5   have been complete but there was another issue that came up

6   which requires addressing that issue before additional hard

7   work can be performed on that facility.  And so pending that

8   repair, which we anticipate doing in the coming couple of

9   months, the rest of that activity will be completed in very

10  short order since it's only around ten days of activity.  It's

11  50 percent complete.

12  Q    Okay.

13  A    And it has been re-established on all the rest of

14  these properties where there's a comment about re-

15  establishing egress.  That has all been completed.

16  Q    Okay.  So the Debtors are committed to resolving the

17  INC on that West Delta 86A?

18  A    Yes, sir.  And as a part of Agreed Activities and

19  that's something that we've already conducted half the work on

20  and intend to complete.

21  Q    Thank you.

22       Mr. Dane, in Mr. Perez's examination of you, you

23  mentioned the term sheet with Eni Petroleum US, LLC.

24  Correct?

25  A    Yes, I did.

1  Q      Eni's term sheet contained an initial phase out

2  concept.  Correct?

3  A      It does, yes.

4  Q      Can you describe what that means?

5  A      So part of the -- part of the negotiation with -- the

6  Eni transaction happened subsequent to the Chevron

7  transaction.  And as I'm sure everyone is familiar with, you

8  know, whenever there's a publicly filed arrangement, folks

9  like to look at the previous deals and identify things that

10  they prefer that are publicly part of other deals.

11      And so by, you know, by observation of the previous

12  deal in respect to Chevron, in the Chevron transaction

13  Fieldwood agreed to contribute $5 million and Chevron's

14  preference was for that contribution to be utilized in order

15  to take out the properties.  The Credit Bid Purchaser is

16  going to be performing that work pursuant to a contract

17  operation agreement.  That was in -- within the context of a

18  broader commercial solution where there's a term sheet

19  arrangement and, you know, all the other mechanisms.

20      So Eni had observed that provision, and what they had

21  requested in the Eni term sheet was that the contribution

22  was not directly identified I don't believe in the Eni term

23  sheet with the data.  However, as a part of the broad

24  turnkey arrangement, they had asked that the properties be

25  staked out prior to year end, which is an activity that

1   Fieldwood would conduct in any event under the turnkey --

2   under a turnkey deal where it is responsible for P&A.  The

3   stake-out operation is a precursor to P&A activity.

4   Q     Well, now I'm going to ask you if you could give the

5   Court maybe a contract the agreed activity versus the

6   stakeout.

7   A     Sure.  The Agreed Activity Schedule contemplates re-

8   establishing egress, which typically is associated with most

9   of the egress re-establishment associated with these

10  properties.  And as I mentioned, this was the original

11  Agreed Activities list.  This has a number of properties on

12  it that are now being handled pursuant to consensual

13  solutions.  So for instance the list gets cuts down I think

14  by about half when you remove the Chevron, Noble, Eni, Hunt

15  properties from this list.

16       The egress re-establishment with respect to the rest

17  of these properties is physically associated with preparing

18  Gulf landings, repairing heliports, repairing some

19  stairwells, you know, ladders to be able to access the

20  platform to be able to -- to be able to observe any

21  compliance related maintenance items that you need to

22  establish that you need to be able to conduct.  So the

23  Agreed Activities here contemplates generally re-

24  establishing egress, and there was certain safety related

25  INCs that were identified that would be completed as well.

1       Staking out a facility is a much more expensive work

2   scope.  Staking out, generally in my mind when I understand

3   the term -- what I understand the term staking out a

4   facility to mean is that you are preparing the facility to

5   be able to be completely decommissioned, and particularly

6   with respect to the platform abandonment, a critical element

7   of that decommissioning work is rendering the platform

8   completely hydrocarbon free, completely flushing and filling

9   and draining all of the lines and vessels, all of the piping

10  equipment.

11      It is a series of steps that is a much more extensive

12  campaign that's necessary in order to ultimately conduct the

13  plugging and abandonment, but not required to maintain the

14  site in a way that it could anything for ordinary safety.

15  Q    Thank you.

16      I think you may have answered my next question, but I'm

17  going to ask it anyway, it's just more direct.  There's a

18  reference in the Eni term sheet, which we can look at if you

19  need to refresh your recollection, but there's a reference to

20  leaving the properties hydrocarbon free, and I wanted you to

21  explain what that means to leave a property hydrocarbon

22  free.

23  A    I believe, in my opinion, leaving a property fully

24  hydrocarbon free suggests that that is the equivalent of a

25  true safe operation where you are flushing, filling,

1  draining the vessels, you're drilling them at the low points,

2  you are doing a number of other activities in order to

3  prepare the facility for platform abandonment work, such

4  that you can abandon the actual platform without needing to

5  take any further steps prior to removing the physical

6  structure.

7  Q     And this activity is not part of the agreed activity

8  that the Debtors have agreed to perform on the West Delta

9  properties.  Correct?

10 A     No, that is not, it's specifically not.  The company

11 had a number of conversations and discussions with the

12 Government internally as to what the appropriate status of

13 these facilities was at the time of abandonment, and the

14 company committed to maintain the facilities in a state that

15 did not -- that it does not represent any imminent harm to

16 safety or the environment, and the list of activities that

17 the company believes accomplishes that is addressed through

18 both this list of Agreed Activities and also the transition

19 services list that outlines what type of safety thing and

20 regular maintenance activities would be expected.

21 Q     Okay.  And thank you.  I appreciate the explanation.

22 I think my simple question, though, is with respect to the

23 West Delta properties, those will not be left hydrocarbon

24 free.

25 A     No, they are not contemplated to be left hydrocarbon

1  free.  They -- the West Delta properties at the request of

2  Hess have been shut in and are in a state in which they are

3  not operating and there's -- the facilities are being

4  remediated pursuant to the schedule that we just discussed

5  with the fact that I was just advising you of.  But, no,

6  they're not intended to be left fully hydrocarbon free at the

7  time of abandonment.

8  Q     Okay.  Thank you.

9        So moving on, Mr. Dane, I only have a couple more

10 questions.  With respect to Chevron, are the Debtors also

11 performing a stake out for Chevron?

12 A     Pursuant to the agreement that's contemplated for that,

13 that we have definitive documentation that is executed,

14 there is a provision that the -- that we will be staking out

15 all the properties by no later than year end the properties

16 that are not intending to produce any longer.  Plus, there

17 are properties in Fieldwood for an entity that has

18 meaningful future production, those are not going to be

19 staked out.  The properties that are going to be scheduled

20 for future abandon will be staked out.  And that is --

21 that's -- you're correct, that is a part of that transaction.

22 Q     Is the stake out activities similar to what the

23 Debtors are doing for Eni?

24 A     Yes, it is.

25 Q     As you sit here today, Mr. Dane, are the Debtors

1  willing to perform those stake out activities on the West

2  Delta properties at the Debtor's expense?

3  A     So the way I've been described, the stake out

4  activities that we discussed is a much more significant

5  scope of work than what's contemplated under the Plan that

6  would have been discussed with Government as the appropriate

7  status of these facilities.  That's a significant incremental

8  commitment.

9          And as you know, Fieldwood's position as we have

10  discussed, you know, very recently is that we would

11  certainly contemplate -- we've updated -- our objective has

12  been defined as many consensual solutions and possible

13  process of every counterparty.  We understand that at this

14  point it's something that Hess is focused on.  But for

15  meaningful incremental commitments of capital beyond what

16  the parties -- the company believes is a safe status of the

17  facility and the Government understands the proposal to be,

18  so we would be willing to do that in the context of a

19  broader arrangement to the extent that there would be one

20  just to make that incremental commitment is not something

21  that is contemplated by the Plan.

22  Q     So what I'm hearing you say is that Hess would have to

23  agree to some longer term arrangement with Fieldwood in

24  order for the Debtors to review the property as hydrocarbon

25  free.

1  A     I don't think that -- yeah, I think that that's

2  generally correct.  I think when we discussed the Chevron

3  transactions, the Eni transactions, the reason that there

4  was a contribution associated with those transactions is

5  because it was in the context of a broader framework.

6       The broader framework established all the different

7  ways that those properties are going to be P&A, it

8  established that those parties were going to provide funding

9  for the ultimate P&A, it established the timing of how those

10 facilities were going to be P&A, and each of the parties'

11 response -- respective obligations to each other.

12      What I understand Hess to be asking is just for an

13 incremental commitment without any obligation to each other.

14 What I understand Hess to be asking is just for an

15 incremental commitment without any obligation -- to settle

16 on what a more comprehensive solution for the entire field

17 would be.  And so I think that that's not something that

18 contemplated under this Plan because we don't think it's

19 necessary for purposes of leaving the facilities in a safe

20 state.  But it certainly is something that the company would

21 be willing to contemplate.

22      The other thing that has been discussed with your

23 client specifically is the company now has a very

24 significant number of projects that it needs to conduct.

25 Safe activity is a very delicate activity.  You're removing

1  hydrocarbons from a facility.  It needs to be done in a very

2  careful manner with very qualified individuals.

3       Due to the fact that Fieldwood has now an agreement

4  with Chevron, now an agreement with Eni, it's going to be

5  assisting with the Fieldwood One properties, there's a very

6  significant amount of activity that Fieldwood is going to be

7  conducting, and the credit bit purchaser, et cetera is going

8  to be conducting on stake out.  There's an allocation of

9  recourse consideration that we're very thoughtful about in

10 order to utilize those crews.

11      We are basically at full capacity in terms of viewing

12 the stake out work that we can handle for the foreseeable

13 future.  It may be possible to squeeze in a double project

14 here or there, but it's not possible to vastly increase the

15 scale of stake out activities the company is doing, which is

16 why the company encouraged predecessors to engage earlier

17 than within the last couple of weeks.

18 Q    Well, and going back to my earlier question, we have

19 been -- we have been communicating for at least a couple of

20 months.  Correct, Mr. Dane?

21 A    I don't think that there was any substantive

22 conversations until very recently with respect to Hess.

23 Q    Okay.

24 A    But there have been over the course of the last month,

25 I would agree with that.  Over the course of the last month

1    essentially, if I was to just go by memory, there's been a

2    willingness to discuss context that may result in consensual

3    solutions.

4    Q     Thank you for your time, Mr. Dane.

5              MR. ALANIZ:  Pass the witness, Your Honor.

6              THE COURT:  Thank you, Mr. Alaniz.

7              THE WITNESS:  Thank you very much.

8              THE COURT:  Does anyone else have any questions

9    for Mr. Dane this evening?

10             MR. KUEBEL:  Your Honor?

11             THE COURT:  Yes.  Who was that?

12             MR. KUEBEL:  This is Rick Kuebel.

13             THE COURT:  All right.  Go ahead, Mr. Kuebel.

14             MR. KUEBEL:  Your Honor, before I get started just

15   by way of a process check.  I think that's some questions for

16   the witness.  Maybe the infamous 20 questions or so, most of

17   which deal with the release and exculpation issues that I

18   had raised with the Court earlier.  I know there are a few

19   other predecessors that will be interest owners that have

20   indicated they may have similar questions.

21             We were supposed to have a 7:00 p.m. call with the

22   Debtors, and specifically Mr. Carlson, to try to knock out

23   language.  We've been going back and forth with language that

24   could be inserted in the Confirmation Order that would

25   resolve this part of our objection.  And so by way of

1   process check, I thought I'd kind of poll the Debtor and the

2   Court and ask whether -- since it's after 7:00 already

3   tonight, if the preference is for us to try to use time to

4   resolve language that will obviate the need for myself and

5   potentially others to question Mr. Dane about these issues

6   or whether the preference is to just proceed ahead?

7           THE COURT:  I'm thinking it's getting pretty late,

8   and if you're on the verge of thinking you're going to

9   minimize that, it may make some sense.

10          Does anybody -- Mr. Baay, I know that you wanted

11  to address that.  I'll activate your line and we'll hear from

12  others.  It may make some sense to come back tomorrow.

13          Does anybody believe we should just continue on

14  tonight?

15          MR. PEREZ:  Your Honor, I hate to be the party

16  pooper, but to the extent that we're only talking about two

17  additional individuals I don't think at this point I'm going

18  to have any Redirect.  I would rather try to get Mr. Dane

19  off the witness stand.

20          THE COURT:  All right.  Let's take a 10-minute

21  break, we'll come back at 7:20 and we'll pick it up then.

22  Thank you.

23          MR. PEREZ:  Thank you.

24      (Recess taken from 7:11 p.m. to 7:20 p.m.)

25                          AFTER RECESS

1            THE COURT:  All right.  Let's go back on the

2    Record and we'll resume the Fieldwood hearing.

3            Mr. Kuebel.

4        (No verbal response)

5            THE COURT:  I can't hear you.  I don't know, you

6    may have your own line muted because I didn't touch

7    anything.  There we go, hold on.

8            All right.  Mr. Kuebel, go ahead, please.

9            MR. KUEBEL:  Your Honor, can you hear me?

10           THE COURT:  I can.  Yes, sir.

11           MR. KUEBEL:  Can you hear me now, Your Honor?

12           THE COURT:  I can.  Thank you.

13           MR. KUEBEL:  Okay.  Thank you.  Thank you, Your

14    Honor.  Just making sure that we have Mr. Dane.  There he

15    is, great.  Thank you, Your Honor.

16               CROSS-EXAMINATION OF MICHAEL DANE

17    BY MR. KUEBEL:

18    Q    Good evening, Mr. Dane.  My name is Omer Kuebel, III.

19    As you may know, I go by "Rick."  I'm representing a number

20    of predecessors and working interest owners in this

21    bankruptcy, including McMoRan Oil and Gas, Freeport McMoRan,

22    and ConocoPhillips.  You may recall that -- I don't know

23    that we've personally met, but I believe we've been on a

24    number of phone calls or Zoom calls during the course of

25    this case.

1   A      I do.

2   Q      Do you recall?

3   A      I do.  Nice to see you.  Thank you.

4   Q      Great.

5          Are you aware that the Debtor is a member of operating

6   agreements or Joint Operating Agreements with McMoRan?

7   A      I am aware there's various agreements within the

8   company.

9   Q      Well, specifically, are you aware that there are

10  operating agreements that govern the operations of OCS

11  leases?

12  A      Yes.

13  Q      I take it the Debtor is a party to a number of such

14  operating agreements; is that correct?

15  A      Yes, they have quite a few.

16  Q      Is it fair to say that those operating agreements work

17  in tandem with other types of agreements, like production

18  handling agreements or marketing agreements or

19  transportation agreements?

20          MR. PEREZ:  Object to the form of the question,

21  Your Honor.  Vague.

22          THE COURT:  Sustained.

23  BY MR. KUEBEL:

24  Q      Mr. Dane, are you aware that the Debtor is also a party

25  to production handling agreements or farm-out agreements

1    with McMoRan?

2    A    I'm not -- I'm not specifically aware of production

3    handling agreements that are outstanding with McMoRan, but

4    it wouldn't surprise me if there were.

5    Q    Okay.  Well, have you personally been involved in the

6    decision on deciding which operating agreements to assume or

7    reject?

8    A    I've been a part of a team that evaluates that, but I

9    haven't reviewed every agreement to determine if we should

10   assume or reject it.  I -- we -- we have a large group of

11   people that did that evaluation, and I certainly provided

12   input on a number of contracts, but definitely by no means

13   all of them.

14   Q    There are a very large number of such agreements, are

15   there not?

16   A    Yes, there are.

17   Q    Mr. Dane, for purposes of my next handful of questions,

18   I'm going to refer to the Debtors' Plan.  And when I mean

19   the term "Plan," I'm specifically referring to the Fifth

20   Amended Plan that the Debtors filed, I believe it's at

21   Docket No. 1629.  It has also been referred to, I think

22   today, as Exhibit 105.

23         Do you have a copy of that Plan, the Fifth Amended

24   Plan, with you?

25   A    I believe I do.  Sorry.  Can you give me the -- the

1  docket number again?

2  Q    I believe it was referred to as "Exhibit 105" in your

3  book by Mr. Perez.  It was Docket No. 1629 as filed.  And I

4  believe it may have another docket number with the Debtors'

5  Witness List, maybe 1646.

6  A    I'm looking at 1641, which I believe was the Fifth

7  Amended Plan.

8  Q    All right.  Thank you.

9  A    Is that (glitch in the audio).

10 Q    Mr. Dane, during your direct examination by Mr. Perez,

11 Mr. Perez asked you questions regarding the release -- asked

12 you questions about the release and exculpation provisions

13 of the Plan.

14      Do you recall those questions?

15 A    I do.

16 Q    I take it that you have reviewed Section 10.7 of the

17 Plan that contains the Plan releases?

18 A    I have at various times, yes.

19 Q    Does the Plan contain third-party releases or

20 non-Debtor releases?

21 A    I believe it does.

22 Q    And are those third-party releases consensual?

23 A    Yes.

24 Q    And did creditors such as McMoRan have an opportunity

25 to opt out of the releases in Section 10.7 of the Plan?

1  A     Yes, I believe they did.

2  Q     And in fact, are you aware of whether McMoRan opted

3  out?

4  A     I do not know, but I imagine they did, given that they

5  objected.

6  Q     Are you familiar with the exculpation provisions of the

7  Plan in Section 10.8?

8  A     Yes, I am.  I've -- I've reviewed them at various

9  times.

10 Q     Does the exculpation provision in Section 10.8 of the

11 Plan exculpate or release third parties?

12         MR. PEREZ:  I object to the form of the question,

13 Your Honor.  I think it calls for a legal conclusion.  I

14 believe the document speaks for itself.

15         THE COURT:  The question, as worded, calls for a

16 legal conclusion, Mr. Kuebel.  I'm not trying to keep you

17 out of this area, if you want to reword it.  But I think, as

18 worded, you've asked --

19         MR. KUEBEL:  Well, let me --

20         THE COURT:  -- him what it legally is, so.

21         MR. KUEBEL:  I will be happy to reword it, Your

22 Honor.  I'll withdraw the question and ask another one.

23         THE COURT:  Thank you.

24 BY MR. KUEBEL:

25 Q     Mr. Dane, do you know the identity of the parties that

1  are exculpated by Section 10.8 of the Plan?

2  A    I believe that's included in -- in the Plan.  And I --

3  you know, I would want to refer to the document in order to

4  provide you with a list of the parties because I know that

5  there's a number of them.

6  Q    And do you recall whether a number of those parties are

7  non-Debtor parties?

8  A    Yes.

9  Q    And I don't want you to engage in a guessing game.  I

10 -- by my number, the definition of "exculpated parties" as

11 defined in the Plan, I've got it on page 15.

12 A    I think I'm looking at a -- I'm looking at a redline of

13 the document.  Are you -- can you give me a specific section

14 or definition?

15        THE COURT:  So he's looking actually at page 10 of

16 the Plan; it's ECF page 15.  And the definition is

17 "exculpated parties."

18        THE WITNESS:  Thank you, Your Honor.

19        Okay.  I have that, Mr. Kuebel.

20 BY MR. KUEBEL:

21 Q    Is it your view that every one of these exculpated

22 parties made a substantial contribution to the Plan process?

23 A    My understanding of -- of the basis for the parties

24 that the Plan contemplates being defined as "exculpated

25 parties" is consistent with what you're saying, which is

1  that these parties contributed in a meaningful way to the

2  Plan process.

3  Q    Mr. Dane, has Fieldwood One been formed yet?

4  A    No, it has not.

5  Q    Has Fieldwood Four been formed yet?

6  A    No, it has not.

7  Q    Has Fieldwood Three been formed yet?

8  A    No, it has not.  Well, Fieldwood Three is technically

9  Fieldwood Energy, Inc, so it exists, but it is not going to

10 exist in the same way after the effect of the divisive

11 mergers, where properties that were allocated out of it.

12 Q    Are these Plan exculpation provisions set forth in

13 Section 10.8 consensual?

14       MR. PEREZ:  Object to the form of the question.

15 Calls for a legal conclusion.

16       THE COURT:  Overruled.

17       THE WITNESS:  I would defer to our counsel on

18 that.  I know that -- I know that there are -- when I look

19 at this list of exculpated parties, I know that many of the

20 releases related to these parties were consensual.  But I

21 don't know -- I don't know if -- if that is -- if it's by

22 definition under the Plan that it was consensual or not.  I

23 would defer to our counsel.

24 BY MR. KUEBEL:

25 Q    Well, do you know whether there was an opt-out for

1  working interest owners and predecessors to these

2  exculpation provisions?

3  A    I'm not aware.

4  Q    Mr. Dane, while we're looking at the definition

5  section, could I ask you to maybe scroll a page or so

6  forward and look at the Plan definition of "Additional

7  Predecessor Agreement Documents?"

8        (Pause in proceedings)

9  A    Okay.  I have that.

10 Q    Do you understand or do you know whether these

11 Additional Predecessor Agreement Documents are addressed or

12 fall within the scope of the Plan exculpation provisions?

13 A    I would defer to our counsel on that.  I'm not -- I

14 don't -- I would need to see where that definition traces

15 back to, to give you an answer.

16 Q    Did you have any understanding of what documents are

17 covered by this definition of "Additional Predecessor

18 Agreement Documents?"

19 A    I -- I believe that it's consistent with the definition

20 that's directly above it, which is any consensual agreement

21 that the Debtors may enter into prior to the confirmation

22 date with any entity or entities in the chain of title for

23 working interest owner or other related party for any of the

24 properties.

25 Q    And that definition --

MICHAEL DANE - CROSS BY MR. KUEBEL                     296

1  A    And --

2  Q    I'm sorry.  Go ahead.  I don't want -- I'm sorry, I

3  didn't mean to interrupt you.

4  A    Oh, I'm sorry.  My understanding is it's just the

5  documents associated with additional predecessor agreement.

6       (Pause in proceedings)

7  Q    Mr. Dane, do you know whether it's the Debtors' intent

8  to include predecessor contracts such as operating

9  agreements or PSAs or PHAs inside of the ambit of this

10 definition?

11 A    I would have to consult with our counsel, but I believe

12 that those are independent contracts.  There -- there was a

13 separate determination of all of the contracts that the

14 company currently has, as to whether it's going to be

15 assumed or rejected.  That's also the case with respect to

16 consensual agreements that we have reached with

17 predecessors.  In many of those cases, those are contracts

18 to which there may some applicability to the properties that

19 are a part of the consensual solutions are still being

20 rejected.  In some cases, there are contracts that are being

21 assumed and allocated.

22      So I think it -- I think it is -- that there's not a

23 single answer to that.  I think it's a contract-by-contract

24 evaluation with respect to the agreement that the -- well,

25 whatever the terms of the consensual agreements that were

1   contemplated.  I've seen it both ways.

2   Q    Okay.  Thank you, Mr. Dane.  I do not have any further

3   questions for you at this time.

4              THE COURT:  Mr. Kuebel, thank you.

5              THE WITNESS:  Thank you very much.

6              THE COURT:  Does any other party have any

7   questions for Mr. Dane this evening?  If so, please press

8   five-star one time on your phone.

9        (Pause in proceedings)

10             THE COURT:  Mr. Eisenberg.

11             MR. EISENBERG:  Your Honor, Philip Eisenberg on

12   behalf of W&T Offshore and Merritt Energy.

13             THE COURT:  Go ahead, please, Mr. Eisenberg.

14             MR. EISENBERG:  May I proceed?  Thank you.

15                CROSS-EXAMINATION OF MICHAEL DANE

16  BY MR. EISENBERG:

17  Q    Mr. Dane, I'll try to be brief, as well.

18       Do you understand that the exculpation provision covers

19  performance under agreements even after the effective date

20  of the Plan?

21             MR. PEREZ:  Your Honor, there's no foundation for

22  Mr. Dane to answer this question, you know, the

23  interpretation of a legal document.

24             THE COURT:  Overruled.

25             THE WITNESS:  Mr. Eisenberg, I would -- I would

1  defer to our counsel to answer that question.

2  BY MR. EISENBERG:

3  Q    Yeah, but I wanted to know your understanding.  If you

4  have no understanding, that's fine.

5  A    I don't want to speculate.  I would -- I would defer to

6  counsel and want to review the document.

7  Q    Well, you just had the document in front of you.  Can

8  we pull it back up, so we can look at it, or will that not

9  help you at all?

10  A    I -- I think, to answer that question, I would want to

11  consult with our counsel.  I wouldn't feel comfortable

12  providing you an answer just based on my own knowledge --

13          THE COURT:  Yeah, I'm going to --

14  A    -- right now.

15          THE COURT:  I'm going to go back and now sustain

16  the objection.  You asked him what his understanding was,

17  and now you're asking him to read the document to form the

18  understanding.  Those are -- the second question does ask

19  for the legal conclusion; the initial one did not.

20          MR. EISENBERG:  Thank you, Your Honor.

21          He said that I would need to read it, and so I

22  just offered --

23          THE COURT:  I --

24          MR. EISENBERG:  -- for him to have an

25  understanding.

1            THE COURT:  This isn't your fault.  I'm just

2   saying it still leads to the same conclusion.

3        (Laughter)

4            MR. EISENBERG:  I gotcha.

5   BY MR. EISENBERG:

6   Q    Mr. Dane, you know who W&T Offshore is, right?

7   A    Yes, I do.

8   Q    They're a counterparty to many Joint Operating

9   Agreements with the Fieldwood entities.

10  A    Yes, that's right.

11  Q    And those agreements contain various provisions.

12  Pretty standard to have lien provisions in there, correct?

13  A    I -- that's a very broad question.  But there's

14  concepts and general ways that incorporate concepts around

15  liens, so if there is lien language in general.

16  Q    All right.  And so -- and you're aware that there are

17  multiple agreements with W&T, some of which are on your

18  executory contract lists and some of which are not, correct?

19  A    I would -- I would have to see the lists in order to be

20  able to answer that question, but it would not surprise me

21  that there are -- if you're asking are there contracts that

22  are being assumed and -- and both rejected with respect to

23  W&T, I would say the answer is probably "yes."

24  Q    Okay.  And the operating agreements that Fieldwood has,

25  in many occasions, Fieldwood was not the original party to

1  those operating agreements, correct?

2  A    That's correct.

3  Q    Right.  In fact, like many of them they bought from

4  Apache, so Apache was a party and Apache might have bought

5  it from somebody else.  And so there might have been parties

6  down the chain that were parties to that operating agreement

7  before Fieldwood, correct?

8  A    Yes, that's not uncommon.

9  Q    And the same thing with W&T, right?  They may not have

10 been the original parties, as well.

11 A    I haven't reviewed those specific documents, but as I

12 said, that that's not an uncommon thing to see.

13 Q    And do you know, also, that Fieldwood currently owns

14 properties on which W&T is a predecessor?

15 A    I do, that's correct.

16 Q    And there are several of those properties, correct?

17 A    I believe so, yes.

18 Q    In fact, as part of your discussions with many of the

19 operators or producers, you've sent packets to them, right,

20 and formulated lists of those properties as part of your

21 review?

22 A    That's right.  When we -- when we had a -- our Plan --

23 when we filed our Plan in January -- even prior to January,

24 we contacted a number of parties in the months in the -- in

25 the late third quarter, early fourth quarter, and then those

1  conversations continued through the early part of this year.

2  So, yes, there was various presentations, packages, and

3  other information exchanged with respect to how predecessors

4  were going to be impacted by various properties under the

5  different categories of our Plan.

6  Q    All right.  And Merritt was a predecessor on several of

7  the properties that are currently owned by Fieldwood, as

8  well, correct?

9  A    I -- I don't know the answer to that question.

10  Q    You don't know, one way or the other?

11  A    I -- I am not -- I'm not aware, not having reviewed our

12  Schedules, of Merritt being a direct predecessor or not.  I

13  couldn't -- I couldn't tell you one way or -- I know Merritt

14  has, you know, had a meaningful presence in the Gulf of

15  Mexico.  I know that we have a very substantial asset base.

16  So it wouldn't surprise me, but I just -- I can't

17  definitively tell you that answer, having not reviewed the

18  schedule.

19       We've got -- I know that Merritt is probably a

20  significant predecessor or predecessor that -- that I

21  understand has an operating interest that Fieldwood is

22  abandoning.  So, in the context of understanding every

23  single predecessor, I don't have that answer without looking

24  at the detailed Schedules.

25  Q    All right.  Okay.  So let's talk about the Schedules.

1   And when you say "Schedules," you understand that each of

2   the Debtor entities filed Schedules as part of the matters

3   that it had to provide to the Court, Schedules of Financial

4   Affairs, Schedules of assets and things of that nature,

5   correct, sir?

6   A    I understand that there's been many filings of many

7   Schedules throughout this process.

8   Q    Were you the person who certified those of verified

9   them?

10  A    Yes.  Would you mind asking me about a specific

11  document?

12          MR. EISENBERG:  Well, I don't have a specific one,

13  Your Honor.

14  BY MR. EISENBERG:

15  Q    Do you recall verifying any of the Statements of

16  Financial Affairs or other Schedules of assets that

17  Fieldwood filed in this case?

18  A    Again, that's a very broad question.  I know we have

19  Monthly Operating Reports, which I sign, sometimes our Chief

20  Accounting Officer signs.  I know that, when we have filed

21  major documents, like our various versions of our Plan and

22  our Disclosure Statement and the supplements that have

23  various Schedules attached to the supplements of contracts,

24  I've reviewed those.

25          I don't know -- I'm -- your particular language around

1  certification, the only -- the only thing that I recall I

2  specifically certified or signed are my declarations, my --

3  the Monthly Operating Reports.  There may be other

4  documents, but those are the ones that I recall specifically

5  signing prior to filing, other that reviewing everything

6  with our counsel.

7  Q    All right.  I know it's late, but I'm just trying to

8  wrap this up for you.

9      (Pause in proceedings)

10 Q    All right.  So you know what an opt-out is with regard

11 to the releases, right?  It was a form that said opt out,

12 right, of the releases, right?

13 A    Yeah.  That -- that's what I understand.

14 Q    Okay.  Was a similar form -- or did that form include

15 the exculpation provisions in 10.8, to the best of your

16 knowledge?

17 A    I would have the same question earlier, that I would

18 have to consult counsel to -- to answer that question.  I --

19 I don't know the answer offhand.

20     (Pause in proceedings)

21 Q    Is it your understanding that the exculpation

22 provisions of a contract impair or affect the rights of

23 parties to pursue claims against non-Debtor third parties?

24         MR. PEREZ:  Object to the question, Your Honor.

25 Calls for a legal conclusion.

1          THE COURT:  Sustained.

2    BY MR. EISENBERG:

3    Q    Do you personally know why the exculpations were

4    written the way they were?

5    A    The exculpations were an important point to the various

6    parties that are identified as exculpated parties.  This was

7    something that -- exculpations and releases were generally

8    heavily negotiated provisions of various agreements,

9    particularly with respect to the parties that were integral

10   to our restructuring.  So I think they were negotiated as

11   part of the various transactions that we did in order to

12   establish an overall Plan.

13   Q    But do you know personally know why they say what they

14   say?

15   A    Well, I understand why someone would want to be

16   released or exculpated.

17   Q    But do you understand why the specific words in the

18   particular exculpation provisions in 10.8 are in 10.8?

19   A    I'm having a hard time with that question.  It feels a

20   little vague to me.  I mean, I -- I know that I -- the

21   process by which we negotiate the documents it is we hire

22   counsel, who has broad experience with respect to

23   restructuring processes, generating Plans and Disclosure

24   Statements, negotiating with parties through a restructuring

25   transaction.  They start with language that would be, in

1    their minds, acceptable for purposes of a Plan, based on, I

2    assume, their experience.  And I know that these provisions

3    are specifically negotiated with the parties that need to be

4    released or exculpated, and there's adjustment to the

5    language to accomplish the parties' objectives.  But based

6    on that process, that's how I understand these documents,

7    like most negotiated documents get crafted.

8    Q    And do you have any personal knowledge of whether

9    adjustments were made to the language in that process?

10   A    I would refer to the various redlines that we've

11   posted.  I don't recall offhand the iterations of these

12   particular sections, other than the additions of additional

13   parties as appropriate, once we reached -- once we reached

14   further consensual solutions and it was appropriate.

15   Q    Okay.  Well, let's talk about those additional parties.

16   Chevron just got added to the exculpation provision?

17   A    I believe they are an exculpated party.

18   Q    And Chevron, the predecessor is co-liable on the

19   properties that are going into Fieldwood Four, correct?

20   A    As -- as I testified earlier, the basis for the

21   properties that comprise Fieldwood Four are certain

22   properties which Chevron has joint and several liabilities

23   for.

24   Q    And that's the same for Apache and Fieldwood One?

25   A    The basis for the Fieldwood One entity was properties

1   for which Apache had joint and several liability.

2   Q    And that's another way of saying they are already

3   liable for the P&A, correct?

4   A    They have joint and several liability under the

5   regulations, so with respect to decommissioning for assets

6   in which they're in the chain of -- they were in a chain of

7   title.

8          MR. EISENBERG:  All right.  I have no further

9   questions, Your Honor.

10          THE COURT:  Thank you.

11          Mr. Baay.

12      (No verbal response)

13          THE COURT:  Mr. Baay?

14          MR. EISENBERG:  I thought you said goodbye to me,

15   Judge.  I think --

16      (Laughter)

17          MR. EISENBERG:  Which you may have, which, at this

18   time of night, that's --

19          THE COURT:  Mr. Baay, do you have any questions?

20   I think you need to unmute your own line, Mr. Baay.

21      (No verbal response)

22          THE COURT:  Well, let's see.  Okay.  So you dialed

23   back in.  Let me get you hooked up here.  I apologize.

24   Mr. Baay.

25          MR. BAAY:  Thank you, Your Honor.

1          THE COURT:  Yeah, let's try it now.  Go ahead,

2   please.

3          MR. BAAY:  Can you hear me, Your Honor?

4          THE COURT:  I can.  Thank you.

5          MR. BAAY:  Okay.  Your Honor.  I don't know.

6   Somehow I got dropped and dialed back in.  Thank you, Your

7   Honor.

8          And again, this is John Baay for LLOG Exploration

9   Offshore and LLOG Energy.

10               CROSS-EXAMINATION OF MICHAEL DANE

11  BY MR. BAAY:

12  Q    Good evening, Mr. Dane.  How are you?

13  A    I'm well.  Thank you very much.  Good evening.

14  Q    Mr. Dane, I apologize.

15  A    Okay.

16  Q    Do you recall testifying in January regarding LLOG and

17  -- you know what I'm talking about if I say "LLOG,"

18  obviously, right?

19  A    Yes, I do.

20  Q    Okay.  LLOG's motion for adequate protection and motion

21  to lift stay, you provided some testimony, correct?

22  A    Yes, I did.

23  Q    And that's Central time?

24  A    I'm sorry.  Would you mind repeating the question,

25  please?

1  Q    I'm just asking if you have reviewed that testimony,

2  that transcript since you gave it back in January?

3  A    No, I did not.

4         MR. BAAY:  Okay.  Your Honor, LLOG filed its

5  Exhibit List at 1603, and we're not going to use very many

6  of these exhibits.  Can I -- but I wanted to go ahead, just

7  a housekeeping matter, and offer the exhibits that we have

8  an agreement with Debtors' counsel, so that we get those

9  into evidence.  And I may use a couple of them this evening,

10 if that's okay.

11         THE COURT:  Which ones are there an agreement on?

12         MR. BAAY:  The ones agreement are our L-1 and L-2

13 to 1 and 2.

14         THE COURT:  So you're offering 1603-1 and 1603-2?

15         MR. BAAY:  Yes, Your Honor.

16         THE COURT:  Any objection to the admission of

17 1603-1 and 1603-2?

18         Hold on.  Ms. Hayden, I actually think you're

19 calling to ask your own questions, but I need to know if you

20 have any objections to those, since you raised your hand, as

21 well.

22     (No verbal response)

23          THE COURT:  Does any party object to 1603-1 or 2?

24         MR. PEREZ:  Do you have any objection?

25         MS. CHOI:  Yes.

 1              MR. PEREZ:  Your Honor, Ms. Choi is --

 2              MS. CHOI:  No objection.

 3         (Participants speak simultaneously)

 4              MR. PEREZ:  We have no objection, Your Honor.

 5              MR. BAAY:  The next set is L-4 through L --

 6         (Participants speak simultaneously)

 7              THE COURT:  Hold on, hold on.  Wait, wait, wait.

 8    I've got somebody else that wants to speak.  Let me find

 9    them.

10              Mr. Genender, your line is active already.  You

11    don't need to press five-star.  Go ahead.

12              UNIDENTIFIED:  No objection, Your Honor.

13              THE COURT:  Thank you.  All right.  There are no

14    objections, 1603-1 and 2 are admitted.

15         (LLOG Exhibits 1603-1 and 1603-2 received in evidence.)

16              THE COURT:  Go ahead, please, Mr. Baay.

17              MR. BAAY:  The next set is L-4 through L-6, which

18    is at 1603-4 through 1603-6.

19              THE COURT:  Any objection to 1603-4, 5, and 6?

20         (No verbal response)

21              THE COURT:  All right.  They are admitted.

22         (LLOG Exhibits 1603-4 through 1603-6 received in

23    evidence.)

24              MR. BAAY:  So Exhibits L-8 through L-20 is at

25    1603-8 through 1603-21.

1          THE COURT:  Any objection to 1603-8 through 21?

2          THE COURT:  We do have --

3          MS. CHOI:  No objection.

4          THE COURT:  We do have an objection.  Hold on, let

5   me see who we have.

6          Ms. Hayden, your line is active.  Go ahead, you

7   don't need to press five-star again.  Do you have an

8   objection?

9      (No verbal response)

10         THE COURT:  Ms. Hayden?

11     (No verbal response)

12         THE COURT:  Ms. Hayden, you may have your own line

13  muted.

14         MS. HAYDEN:  I apologize.  I was not meaning to

15  object to this, Your Honor.  I apologize.

16         THE COURT:  Oh, no problem.

17         MS. HAYDEN:  I was really meaning --

18         THE COURT:  I'm going to leave your line active,

19  so that you can ask questions when Mr. Baay is done.

20         MS. HAYDEN:  Okay.  Thank you.

21         THE COURT:  Thank you.

22         All right.  1603-8 through 21 are admitted.

23     (LLOG Exhibits 1603-8 and 1603-21 received in

24  evidence.)

25         MR. BAAY:  And the last set, Your Honor, is L-24

1    through L-40, which are found at Docket 1603-25 through

2    1603-41.

3            THE COURT:  Any objection to 25 through 41?

4        (No verbal response)

5            THE COURT:  1603-25 through 41 are admitted.

6        (LLOG Exhibits 1603-25 through 1603-41 received in

7    evidence.)

8            MR. BAAY:  Thank you, Your Honor.

9    BY MR. BAAY:

10   Q    Mr. Dane, are you familiar with Fieldwood overriding

11   royalty interest in Green Canyon 201 in the northeast corner

12   of 17,000 feet?

13   A    Yes, I'm -- yes, I am.

14   Q    Okay.  That is an overriding royalty interest that was

15   acquired from Shell in 2015, correct?

16   A    I believe so.

17   Q    And based on the Amended Disclosure Statement, that

18   interest is being sold to the Credit Bid Purchaser, correct?

19   A    Correct.

20   Q    And it's being sold free and clear of any liens,

21   correct?

22   A    That's my understanding.

23   Q    And it's Fieldwood's position that I believe you

24   learned during your testimony in January that Fieldwood was

25   taking the position that LLOG does not have a security

1  interest or a mortgage on that royalty -- overriding royalty

2  interest, correct?

3  A    Yes.

4  Q    And you were aware, back in January and currently, that

5  LLOG took that position that claims in overriding royalty

6  interests -- claimed that this overriding royalty interest

7  secures Fieldwood's obligations under the Offshore Operating

8  Agreement that covered Green Canyon 201 and Green

9  Canyon 157, correct?

10 A    I -- I understand that LLOG has that interpretation.

11 Q    We're working on a deal to deal with these issues post-

12 confirmation, so I will -- I'm hoping that that goes

13 through, but wanted to get these questions in and just be

14 sure to make a record in case something happens.

15      The Credit Bid Purchasers don't have any kind of

16 security interest or lien on this overriding royalty

17 interest, correct?

18 A    I'm sorry.  Do you mind specifying?  Are you asking

19 about the current lenders under the current Fieldwood credit

20 agreements, or are you asking about the future Credit Bid

21 Purchasers with respect to the lien position that they'll

22 have under their new facility?

23 Q    That's a very good point.  The -- I'm talking about the

24 current lenders who are making a bid for that certain group

25 of assets that are described in the Disclosure Statement, to

1  include this overriding royalty interest.

2  A    I -- I don't know.

3  Q    (Indiscernible).

4  A    I would have to consult our --

5  Q    (Indiscernible).

6  A    I would have to consult our --

7  Q    Do you know if there are certain assets that are being

8  purchased by the lenders that are going to NewCo that

9  they're just purchasing as part of the assets, not because

10 they have any kind of a security interest in them?

11 A    I -- I would have to review the Schedules to check

12 which -- which properties specifically have liens, versus

13 what interest -- what assets are being transferred that may

14 not have liens.  It's just there's a number of properties

15 and I don't know off the top of my head.

16 Q    All right.  Do you know how much is being paid for this

17 overriding royalty interest?

18 A    No.

19 Q    If -- assuming that it is not part of the secured

20 assets, but it is an unencumbered asset that is going to

21 NewCo, do you know how much, if any, of the $105 million in

22 cash has been allocated to this override?

23 A    No.

24 Q    Do you know how much Fieldwood is currently receiving

25 each month as a result of this override?

1  A    I -- I reviewed the Schedules at the time of the last

2  hearing, but I don't -- I don't recall what the amount is

3  for that.

4  Q    Okay.  Is this a valuable asset for the Debtors?

5  A    I think it has value, which is why it is something

6  that's contemplated being owned by NewCo.  But you know,

7  frankly, any override has value because it's not burdened by

8  -- by cost.  Most of -- I believe most of the Debtors'

9  overrides that are not a portion of the Fieldwood One entity

10  are being acquired by the Credit Bid Purchaser, and this is

11  one of those overrides.

12  Q    Okay.  How does Fieldwood value assets like this

13  override?

14  A    Field -- in the same way Fieldwood would value any oil

15  and gas interest.  It would look at its estimation of future

16  reserves.  It would conduct an analysis consistent with how

17  we value our reserves, whether we -- we look at the Klein

18  curve analysis or volumetric analysis.  We have our

19  corporate reserves team value reserves; in some cases,

20  they're audited.  So we would look at the properties that

21  this override is attached to, understand the performance,

22  the -- the expected recoveries, any future potential upside.

23  Q    Okay.  Are you familiar then with the terms proved,

24  proven, probable, and proved, probable, and possible?

25  You're familiar with those valuation concepts?

1  A     Yes, I am.

2  Q     Okay.  Do you know how -- whether this override is

3  valued by Fieldwood as a proved or one P or two P proved,

4  plus probable, or three P proved, plus probable, plus

5  possible?

6  A     Generally speaking, for most assets that Fieldwood

7  owns, it values -- it -- "value" may not be the right word.

8  But if performs -- it performs reserve estimation that would

9  allow it to understand proved reserves, probable reserves,

10  and possible reserves.

11      In some cases, for assets that we don't have as much

12  knowledge of or data to support, assets that may just be an

13  override or may be a non-operated working interest owner,

14  there's not always a separate proved, probable, possible

15  evaluation done.  And I'm not aware specifically of this

16  asset, if we have multiple reserve estimations done at

17  different reserve category levels or not.

18  Q     Okay.  Are you aware that Fieldwood used the two P, or

19  proved plus probable values from its reserve report for

20  valuations associated with the Plan in this case, in

21  general?

22  A     Yes.  I -- I'm sorry, let me qualify that.  I

23  understand that our expert's report considered in its net

24  asset valuation probable reserves.

25  Q     Okay.  Which would include proved reserves.

1   A     Right, it --

2   Q     Proved plus --

3   A     Well, it is a -- probable reserve category is its own

4   category.

5   Q     Right.

6         Under the Plan, assuming this asset gets sold to the

7   Credit Bid Purchasers, are the Debtors holding any cash

8   proceeds from the sale to satisfy LLOG's claims, should it

9   be determined that those claims are, in fact, secured by

10  this override?

11  A     I'm sorry.  Can you -- can you repeat that for me?  Are

12  the Debtors holding any?

13  Q     All right.  So the Debtors are receiving some cash as

14  part of the sale.  We went through the -- all the

15  considerations that's been received by the Debtors as part

16  of the Credit Bid Purchase, correct?  Do you remember that

17  testimony?

18  A     Yes.

19  Q     So part of that was $105 million in cash?

20  A     The -- the cash that's being provided is being used to

21  pay various Plan expenses.  It has a variety -- we reviewed

22  the sources and uses statement.  There is not currently

23  anything contemplated to set aside funds related to this

24  particular dispute.  And I don't think that -- I understand

25  that was the basis of the adequate protection motion that

MICHAEL DANE - CROSS BY MR. BAAY                    317

1  LLOG filed, but I -- I thought -- I -- as I understand it, I

2  think that that issue is not resolved.

3  Q    Correct, okay.

4       Do you know how much LLOG is claiming as unpaid joint

5  interest billings under the Offshore Operating Agreement?

6  A    I know that LLOG is claiming that it's owed roughly

7  $900,000, which is an amount that's significantly in

8  dispute.  And that has been in dispute.

9  Q    Okay.

10 A    Fieldwood was aware of this balance for a long time,

11 and it was trying to negotiate with LLOG for a long period

12 of time to pay this balance, you know, before it entered

13 into Chapter 11, and it would have been paid.  I think we

14 reviewed with the Court during the last hearing the specific

15 discrepancies.  And there's a very simple schedule that

16 outlines those discrepancies.  And we've never been provided

17 with a reasonable answer as to why the balance is two times

18 higher.

19      But notwithstanding all that, given that we could never

20 understand and reconcile the Schedule with LLOG and so much

21 time elapsed, the company ended up filing for bankruptcy.

22 And at that point, it determined that those properties

23 probably ought to just be abandoned in any event, so it

24 largely became irrelevant in our -- in our opinion.  But we

25 dispute the -- the balance.

1  Q    Okay.  And it have those adjustments that Fieldwood

2  believed are appropriate in this case, have those changed

3  since your testimony in January or are they roughly the same

4  as they were?

5  A    I'm not aware of any changes.  I -- I think I

6  understand -- this hasn't been an issue that I've been

7  particularly focused on since the hearing, but I think I

8  understand that Fieldwood believes the -- the Fieldwood

9  undisputed balance, I think, was around a half a million

10 dollars.  But again, it was associated with a -- an interest

11 that the company was contemplating abandoning or rejecting.

12 Q    Okay.  The last thing I want to ask you about are the

13 P&A liabilities associated with Green Canyon 201 and 157.

14 Are you familiar with those amounts?

15 A    Are you asking -- this -- sorry, just to clarify.  Are

16 you asking about the properties in which Fieldwood non-

17 consented and it has a 15 percent working interest in the

18 157 and 201 leases?

19 Q    Absolutely.

20 A    I have a -- I have a vague understanding, I think, of

21 what I recall some of those values potentially being.

22 Q    Okay.  And is that based on a BOEM estimate or a BSEE

23 estimate or some combination?

24 A    This isn't an overly material asset.  So I know that

25 I've seen the values at one point in time.  I think that I

1  recall that Fieldwood's 15 percent interest in these two

2  wells was something on the order of magnitude of

3  $2-3 million.  But I -- I, frankly, don't recall.  This is a

4  -- again, this is a small, non-operated working interest.

5  Q   Okay.  So I mean, as we sit here today, you don't know

6  what Fieldwood's liability is or, even as Fieldwood

7  calculates it, whether it's 15 percent of the total P&A in

8  Green Canyon 201 and 157; you can't provide us with that

9  number, correct?

10  A   Fieldwood has thousands of wells.

11  Q   No, no.

12  A   This is a -- this is a well which we non-consented and

13  are rejecting.  I would -- I -- there -- the estimate

14  exists, we have an estimate.  I don't recall it off the top

15  of my head.  I believe that it's somewhere in the

16  neighborhood of $3 million.

17      I know I've seen astronomical values that have been

18  published in -- in your objections, which would equate to

19  two wells having an abandonment value of a hundred-plus

20  million dollars on a gross basis, which I don't think LLOG

21  truly believes.

22      I think that, if I understand correctly what I think

23  the liability is here is it's a 15 percent interest in two

24  deepwater sub-sea wells.  And if that's correct, then an

25  approximate $3 million abandonment liability seems

1  reasonable, if I have all my assumptions correct.

2  Q    Okay.  Did Fieldwood cure those liabilities on its

3  balance sheet?

4  A    With -- the company -- prior to having rejected those

5  interests, the company would carry all liabilities.  I

6  haven't specifically looked at this particular liability.

7  But I assume, if it's a liability of the company, then it

8  would be -- it should be incorporated.

9  Q    Okay.  And the company doesn't consider in those

10  obligations and those liabilities, doesn't consider them to

11  be contingent liabilities, do they?

12  A    I would need to check the accounting treatment.  I

13  think that P&A liabilities are an obligation of the company.

14  Obviously, the effect of this restructuring is going to

15  change the nature of those liabilities if -- if we have a

16  Plan that gets confirmed.

17  Q    Sure, I understand.  But those -- but pre-petition, I'm

18  talking about.  The liability arises for that P&A when

19  Fieldwood enters into an operating agreement like it did for

20  Green Canyon 201 and 157, correct?

21  A    I don't believe --

22  Q    Was it --

23  A    -- this was a contingent liability.  I would have to --

24  I would have to consult with our Chief Accounting Officer.

25  I believe that -- that Fieldwood previously had a working

```
 1   interest in this -- I understand that Fieldwood previously

 2   had a working interest in these wells, that Fieldwood non-

 3   consented its interest in these wells.  And that non-

 4   consent, in and of itself, I don't believe would have

 5   eliminated a plugging and abandonment liability.

 6        But I do know that these wells were sidetracked and

 7   that it's a complicated -- it's a more complicated issue

 8   because additional and subsequent plugging and abandonment

 9   liability was created.  So this unique situation, I think,

10   is one that I would need to explore further to be able to

11   answer that question.

12            MR. BAAY:  Okay.  That's all the questions I have.

13   Thank you very much.

14            THE COURT:  Mr. Baay, thank you.

15            Ms. Hayden.

16            MR. PEREZ:  Your Honor, before we leave that, I

17   think that, with respect to two of the exhibits, they were

18   only admitted as -- for a limited purpose.  I think 1630-40

19   and 1630-41.  I don't know if that's correct or not.

20            THE COURT:  Mr. Baay, were they offered for all

21   purposes or for a limited purpose?

22            MR. BAAY:  I believe they were offered for all

23   purposes, but I'll -- I will -- let me just look and see

24   which ones those are.

25            I'm sorry.  Tell me the numbers again, Mr. Perez.
```

1          THE COURT:  1603-40 and 1603-41.

2      (Pause in proceedings)

3          MR. BAAY:  Those are business records that were

4  offered for all purposes.  I don't know what limited purpose

5  it would be.

6          THE COURT:  What do you believe the limit --

7          MS. CHOI:  Your Honor?

8          THE COURT:  -- should be?

9          Ms. Choi?

10         MS. CHOI:  Your Honor, this is Erin Choi on behalf

11  of the Debtors.

12         We think these letters should not be admitted for

13  the truth, but only for the fact that they were sent.

14      (Pause in proceedings)

15         MR. BAAY:  Your Honor, and I think they're

16  business records, they're two letters.  I think they'll --

17         THE COURT:  Yeah, I'm looking at them.

18         MR. BAAY:  For this objection, they're a business

19  record.

20         MS. CHOI:  They haven't been proven up.

21         MR. BAAY:  I know that.  But I thought that's why

22  we had an -- I thought that's what our agreement was other

23  day, is that we didn't have to prove these up.

24         THE COURT:  So 41.  The only -- I think the only

25  statements of fact in there are they consider it closed,

323

1   right?  I mean, is there really a problem with 41?  I'm just

2   trying to understand what we got.

3            MS. CHOI:  Your Honor, 41, it's probably fine.

4   It's 40 that we're concerned mostly about here.

5        (Pause in proceedings)

6            THE COURT:  Tell me why it's not a business

7   record, even though you all were stipulating.  Are you

8   alleging it's not a business record and you want them to

9   prove that up?  I mean, I may go there, but is that the

10  issue?

11           MS. CHOI:  Your Honor, in our agreement, we agreed

12  to admit this for a limited purpose, so.

13           THE COURT:  Is there some writing on that or was

14  this all done orally?

15           MS. CHOI:  Let me check, Your Honor.

16           THE COURT:  Okay.

17       (Pause in proceedings)

18           MS. CHOI:  Your Honor, it appears that we -- this

19  was discussed orally.

20           THE COURT:  Okay.  I'm going to leave it admitted.

21  I'm going to ask Mr. Baay to file a business records

22  affidavit, and then we'll determine if we're admitting it

23  for all purposes or for limited purposes.  I'll listen to

24  the argument on that when we get to the close.

25           MS. CHOI:  Okay.

324

1          THE COURT:  Ms. Rosen, did you have a comment

2  about that issue?

3          MS. ROSEN:  I'm sorry, Your Honor.  Are you

4  speaking to me?

5          THE COURT:  Yes, you pressed five-star.

6          MS. ROSEN:  Oh.  Yeah, I did, Your Honor.  Thank

7  you.

8          I just had -- actually, it wasn't about that

9  issue.  I just -- I had an agreement with the Debtors on the

10  admission of two exhibits.  I wanted to offer them now, and

11  I think that would dispense with my need to present -- ask

12  Mr. Dane any questions.

13          THE COURT:  Okay.

14          MS. ROSEN:  And those exhibits are -- yes, Your

15  Honor.  It's Exhibits Nos. 11 and 12, and they are at Docket

16  Nos. 1665-16 and 1665-17.

17          THE COURT:  Do we have a stipulation on 1665-16 --

18  wait, I've only got -- I don't have a 1665-17.

19          MS. ROSEN:  Sorry.  Let me look.  I'm sorry, Your

20  Honor.  It's the two Declarations.  And maybe -- it looks to

21  me like it's Part 16 and 17 of exhibit -- of Docket 1665.

22          THE COURT:  1665 doesn't have a 17.

23          MS. ROSEN:  Okay.  Then it would be 15 and 16,

24  Your Honor.

25          THE COURT:  Let's see.  Exhibit 15 is the Karen

325

1  Jones Declaration, and Exhibit 16 --

2          MS. ROSEN:  That's --

3          THE COURT:  -- is the Michael Jori Declaration.

4          Are there objections to the substantive admission

5  of the two Declarations?

6          MS. CHOI:  No objection, Your Honor.

7          THE COURT:  All right.  We're admitting 1665-15

8  and 16.  Thank you.

9      (XH Exhibits 1665-15 and 1665-16 received in evidence.)

10         THE COURT:  Ms. Hayden, go ahead, please.

11         MS. ROSEN:  Thank you, Your Honor.

12         THE COURT:  Thank you.

13         MS. HAYDEN:  Your Honor, I just have like two

14  questions for the witness.  And I apologize for doing this

15  so late.  I think I --

16         THE COURT:  I don't think you -- I don't think you

17  can get blamed for that.  We can find other people to blame

18  on that.

19     (Laughter)

20         MS. HAYDEN:  And I will.  I'll blame everybody,

21  but I think I have just two questions.

22              CROSS-EXAMINATION OF MICHAEL DANE

23  BY MS. HAYDEN:

24  Q    One, I think I understand exculpated party, and please

25  correct me if I'm wrong because I've read, you know, the

1  brief, I've listened to Mr. Eisenberg and I've listened to

2  Mr. Kuebel examine you, and I also listened to your counsel

3  examine you.

4      This exculpated party are those parties who

5  participated in the Plan process and helped you like reach

6  the agreements that have resulted in this Plan.

7      I know that's not great legalese.

8  A    The exculpated parties are the parties that are defined

9  in the exculpated parties' definition.

10  Q    Okay.  Now then let me ask you this.  Well, then, under

11  the terms of 10.8, it released those parties of claims.  And

12  those claims arise out of a whole series of about 20 or 30

13  claims that all seem to relate to the conception of the

14  Plan.  And I'm just maybe jumping to conclusions, correct me

15  if I'm wrong.

16      But why did you include Additional Predecessor

17  Agreement Documents in that list of 20 some-odd items that

18  claims arise out of?

19  A    I would have to defer to our counsel about that

20  particular provision.  But it seems like that is something

21  that is a part of the Plan process.

22  Q    Okay.  So, other than what they would tell me, you

23  really don't know.  Would that be fair?

24  A    The answer I -- I just provided is the answer that I

25  would give you.

1  Q    Okay.  Thank you.

2           MS. HAYDEN:  And Your Honor, that's it for my

3  questions.  Thank you for your patience.

4           THE COURT:  Ms. Hayden, thank you.

5           Is there any Redirect?

6           MR. PEREZ:  No, Your Honor.

7           THE COURT:  All right.  We're adjourned until 1:45

8  tomorrow.  We'll have some interruptions, I'm afraid, in the

9  afternoon.  I don't think they'll be lengthy.

10          I, again, need to have an understanding with

11 respect to pre-petition obligations and post-petition events

12 on what the Plan is purporting to do with releases,

13 injunctions, exculpations, all of that stuff.  I thought

14 that I was told that, if someone had an obligation that

15 existed pre-petition, for example, to contribute to a P&A

16 obligation, that that was not being eliminated by the Plan,

17 but now I'm concerned that the additional predecessor

18 documents would do just that.

19          I want unambiguous statements in the Confirmation

20 Order, as I mentioned yesterday, so that -- I think it was

21 yesterday, whenever we talked about.  I mean, I guess it was

22 Thursday.  I need to understand it.  And I don't yet

23 understand it and I don't -- and you know, Mr. Dane

24 correctly says that's largely a legal issue that I've left

25 up to my lawyers.  I don't have a problem with that, but I

1    need a definition, so I know what I'm being asked to do.

2         If I am being asked to say that, if I have two

3    predecessors-in-interest, one who participates and one who

4    doesn't, and I'm cutting off the other predecessor's rights

5    of contribution against the one that's participating, I need

6    to understand why I can do that under the law.  That's a lot

7    different than saying events in the future.

8         But if you think I can do that, I want plain

9    language that that's what you're asking me to do and I want

10   to know the basis on which I can do it.  So, again, I need

11   to have those definitions clearly known.  And I know that I

12   haven't looked at what you've done.  You may have already

13   made all those clarifications.  I'm just reiterating that,

14   you know, that's a pretty significant issue for me that I

15   need to worry about.

16        I'll see you all at 1:45 tomorrow.  Thank you.

17      (The parties thank the Court.)

18        THE COURT:  Goodnight.

19       (Proceedings concluded at 8:22 p.m.)

20

21

22

23

24

25              * * * * *

1          *I certify that the foregoing is a correct*
2     *transcript to the best of my ability due to the condition of*
3     *the electronic sound recording of the ZOOM/telephonic*
4     *proceedings in the above-entitled matter.*
5     */S/ MARY D. HENRY*
6     *CERTIFIED BY THE AMERICAN ASSOCIATION OF*
7     *ELECTRONIC REPORTERS AND TRANSCRIBERS, CET\*\*337*
8     *JUDICIAL TRANSCRIBERS OF TEXAS, LLC*
9     *JTT TRANSCRIPT #64127*
10    *DATE FILED:  JUNE 26, 2021*
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

1              IN THE UNITED STATES BANKRUPTCY COURT

2             FOR THE SOUTHERN DISTRICT OF TEXAS

3                      HOUSTON DIVISION

4   IN RE:                      §      CASE NO. 20-33948-11
                                §      JOINTLY ADMINISTERED
5                               §      HOUSTON, TEXAS
    FIELDWOOD ENERGY LLC,       §      TUESDAY,
6                               §      JUNE 22, 2021
             DEBTOR.            §      1:44 P.M. TO 5:37 P.M.
7

8            CONFIRMATION HEARING DAY TWO (VIA ZOOM)

9            BEFORE THE HONORABLE MARVIN ISGUR
                UNITED STATES BANKRUPTCY JUDGE
10

11

12      APPEARANCES:                   SEE NEXT PAGE

13
          (Recorded via CourtSpeak)
14

15

16

17

18

19

20              TRANSCRIPTION SERVICE BY:

21         JUDICIAL TRANSCRIBERS OF TEXAS, LLC
                935 Eldridge Road, #144
22               Sugar Land, TX 77478
                    281-277-5325
23            www.judicialtranscribers.com

24
       Proceedings recorded by electronic sound recording;
25        transcript produced by transcription service.

```
 1                          APPEARANCES (VIA ZOOM):

 2

 3   FOR THE DEBTOR:                  WEIL GOTSHAL ET AL
                                      Alfredo Perez, Esq.
 4                                    700 Louisiana
                                      Suite 1700
 5                                    Houston, TX  77002
                                      713-546-5040
 6
                                      WEIL GOTSHAL ET AL
 7                                    Erin Choi, Esq.
                                      Paul Genender, Esq.
 8                                    200 Crescent Court
                                      Suite 300
 9                                    Dallas, TX  75201
                                      214-746-8184
10

11

12   FOR RIDGEWOOD KATMAI:           LOCKE LORD LLP
                                     Philip Eisenberg, Esq.
13                                   J.P. Morgan Chase Tower
                                     600 Travis
14                                   Suite 2800
                                     Houston, Texas 77002
15                                   713-226-1304

16   FOR ECOPETROL AMERICA LLC       SQUIRE PATTON ET AL
                                     Kelly Singer, Esq.
17                                   1 East Washington Street
                                     Suite 2700
18                                   Phoenix, AZ  85004
                                     602-528-4000
19
     FOR BP EXPLORATION:             GREENBERG TRAURIG
20                                   Craig Duewall, Esq.
                                     300 West 6th Street
21                                   Suite 2050
                                     Austin, TX  78701
22                                   512-320-7200

23   FOR TRAVELERS, LIBERTY MUTUAL,
     HANOVER.                        LANGLEY LLP
24                                   Brandon Bains, Esq.
                                     P.O. Box 94075
25                                   Southlake, TX  76092
                                     214-722-7171
```

3

1                        APPEARANCES CONTINUED:

2

  FOR RIDGEWOOD KATMAI, LLC
3 AND ILX:                        SIDLEY AUSTIN, LLP
                                  Michael Fishel, Esq.
4                                 1000 Louisiana Street
                                  Suite 6000
5                                 Houston, TX  77002
                                  713-495-4645
6
  FOR LLOG EXPLORATION:           GIEGER LABORDER & LAPEROUSE
7                                 John Baay, Esq.
                                  701 Poydras St.
8                                 Suite 4800
                                  New Orleans, LA  70139
9                                 504-561-0400

10

11

12

13

14  (Please also see Electronic Appearances.)

15

16

17

18

19

20

21

22

23

24

25

1                          INDEX

2

3    WITNESS:           Direct     Cross     Redirect     Recross

4    JOHN ANTHONY GRAHAM
       By Mr. Perez       6          .          .            .
5

6    CLAYTON GREEN
       By Ms. Choi       18          .          .            .
7      By Mr. Singer      .         41          .            .

8

     ADRIANA BONJOUR
9      By Mr. Hutton     63          .          .            .
       By Ms. Choi        .         75          .            .
10

11   JOHN-PAUL HANSON
       By Mr. Genender   82          .          .            .
12     By Mr. Duewall     .         91          .            .

13

14

15

16   EXHIBITS:                        Received

17   Exhibit 1566                        96
     Exhibits 1592-2, 1592-3, 1592-4
18    and 1592-5                         97
     Exhibits 1601-1, 1701-2 and
19    1608-1                             98
     Exhibits 1613-2, 1613-3 and
20    1613-4                             95
     Exhibits 1631-1, 1631-2            45
21   Exhibit 1620-1                      56

22

23

24

25

1       HOUSTON, TEXAS; TUESDAY, JUNE 22 16, 2021; 1:44 A.M.

2           THE COURT: All right, we're returning to the

3   Confirmation Hearing in the Fieldwood case.  It's 20-33948.

4           Who's going to be the proponents' next witness?

5       (Pause in the proceedings.)

6           THE COURT:  Mr. Perez?

7           MR. PEREZ:  Yes, Your Honor, Alfredo Perez.  John

8   Graham was going to be our next witness, Your Honor.  I see

9   him on the screen.  I don't know whether he's on.

10          THE COURT:  Thank you.

11          Mr. Graham, if I could get you to press five star

12  one time on your line, please, sir?

13          Mr. Graham, good afternoon.  Would you raise your

14  right hand for me please?

15          MR. GRAHAM:  Good afternoon.

16          THE COURT:  Thank you.  Would you raise your right

17  hand for me, please?

18      (Witness sworn.)

19          THE COURT:  Thank you.

20          All right, let me see.  I've got someone else that

21  wishes to address the Court.  Well, Mr. Perez, I had already

22  activated your line I think before you pressed five star.

23          All right, let's move ahead then.

24          MR. PEREZ:  Thank you.  Your Honor, can you hear

25  me?

1          THE COURT:  Yes, sir.

2          MR. PEREZ:  I think you lowered my hand.  Oh, you

3   can hear me?

4          THE COURT:  I lowered your hand because I already

5   activated your line.  I'll leave it open for the hearing.

6          MR. PEREZ:  Oh, okay, okay.  I thought you were

7   trying to silence me.  But, --

8          THE COURT:  I have other ways of doing that.

9          DIRECT EXAMINATION OF JOHN ANTHONY GRAHAM

10  BY MR. PEREZ:

11  Q    Good afternoon, Mr. Graham.  Could you please state

12  your name?

13  A    John Anthony Graham.

14  Q    And, Mr. Graham, are you the individual that is

15  proposed to be the sole manager of Fieldwood One?

16  A    I am.

17  Q    Would you please tell the Court your educational

18  background?

19  A    I graduated in 1977 from the University of Missouri

20  with a Bachelors of Science degree in mechanical

21  engineering.  And then in 1983, I graduated from University

22  of Oklahoma with a Masters in Business Administration.

23       In addition, I'm a registered professional engineer in

24  the State of Texas.

25  Q    Now, when did you first obtain employment in your area

1  of expertise?

2  A    I started to work in 1977 for AMACO Production Company

3  in Tyler, Texas.

4  Q    And what was your position at that time?

5  A    I was a production engineer.

6  Q    All right, and then, what did you do after that

7  opportunity?

8  A    After joining AMACO in 1977, I had several different

9  positions relating to operations engineer, reservoir

10  engineer, reservoir engineering manager, vice president of

11  reservoir engineering, region vice president and country

12  manager, region vice president and managing director.

13  Q    All right, so let me -- let me -- so --

14  A    And also vice president of health safety security

15  environment for Apache Incorporation.

16  Q    All right.  So, what was your last employment,

17  Mr. Graham?

18  A    I retired from Apache Corporation in April of 2020

19  after serving them in five countries, seven regions, at

20  corporate office in 25 years.

21  Q    All right, so prior to the time that you went to

22  Apache, what were your positions?  What type of work did you

23  do?

24  A    I was doing petroleum engineering work primarily as an

25  operations engineer, production engineer, reservoir

1  engineering management and reservoir engineer executive.

2  Q    Okay and --

3  A    And also vice president of health, safety environment.

4  Q    Okay, so when you went to Apache, what were your

5  positions?

6  A    I went to Apache in 1994 as reservoir engineering

7  manager in the Rocky Mountain Region in Denver, Colorado.

8  Q    And then what was your next position after that?

9  A    It was Region Vice President of the Gulf Coast.

10 Q    Okay and then after that?

11 A    I was transferred as engineering general manager for

12 Apache Egypt's companies in Cairo, Egypt.

13 Q    Okay, were you ever the reservoir engineering manager

14 for the Gulf Coast region -- for the Gulf of Mexico region?

15 A    I was reservoir engineering manager for the Gulf of

16 Mexico region, yes.

17 Q    Okay.  And then after your position in Cairo, Egypt,

18 where did you go from there?

19 A    I was promoted to vice president of reservoir

20 engineering in our Canadian region in Calvary Alberta.

21 Q    Okay.  And then what did you do after that?

22 A    After three years, I was asked to transfer to Buenos

23 Aires, Argentina as the region vice president and country

24 manager for Apache Argentina.

25 Q    And then after that position, what did you do?

1  A    I was transferred back to Houston, Texas as a vice

2  president of health, safety, security, and environment for

3  Apache Corporation worldwide.

4  Q    Okay.  So at that point -- at that time did you have

5  responsibility for health, safety, security and the

6  environment for the Gulf of Mexico region?

7  A    I had -- I was the oversight for the entire company.

8  Not necessarily just the Gulf of Mexico.

9  Q    Got it.  And then what was your position after that?

10  A    After that, I was transferred to Aberdeen, Scotland as

11  region vice president and managing director of Apache North

12  Sea.

13  Q    And was that your last posting with Apache?

14  A    Yes, it was.  And I retired in April of 2020.

15  Q    Now, could you tell the Court how big the North Sea

16  region is?

17  A    When I was managing the North Sea Region, we produced

18  between 60 and 70,000 barrels of oil a day, equivalent, from

19  seven platforms.  And we would generate in the neighborhood

20  of $3 billion a year worth of revenue.  And our net revenue

21  was approximately a billion and a half dollars a year.

22  Q    Thank you.

23      Now in terms of when did you first hear about the

24  opportunity to be the sole manager?

25  A    In August of 2020 I was contacted by Anthony Lanny,

1   general counsel for Apache Corporation.  He described the

2   position they were looking to fill at Fieldwood One.  He

3   thought I had the background and expertise and experience

4   for that.  And asked me if I would be interested in

5   submitting my name for consideration.

6   Q     And so what did you do after that first initial

7   contact?

8   A     I provided Mr. Lanny with an updated résumé and he

9   explained -- he also provided me with the job description

10  and also the term sheet agreement between Apache and

11  Fieldwood Energy.

12        And he told me the situation that it was going through,

13  the bankruptcy, and that it would be some time in the first

14  quarter of 2021, you know, before Fieldwood One would emerge

15  from the bankruptcy.

16  Q     And did you indicate an interest in pursuing this

17  opportunity?

18  A     After consideration and reading the documents, I told

19  Mr. Lanny that I gave him my approval to submit my name for

20  consideration.

21  Q     And then what happened next?

22  A     I was contacted by Mr. Lanny in early December letting

23  me know that I would be contacted by Fieldwood Energy to

24  where they could have an opportunity to speak with me, get

25  to know me and understand my background and experience.

1  Q     And did that happen?

2  A     Yes, I think sometime in mid-December I had a meeting

3  with Mike Dane and Tommy Lamb to discuss the Fieldwood One

4  position.

5  Q     Okay and then what happened as a result of that

6  meeting?

7  A     After that meeting, I was next contacted and presented

8  with the job offer as sole manager for Fieldwood One and

9  also, they asked me if I would be available to come on as a

10 consultant of Fieldwood Energy until they came out of

11 bankruptcy and Fieldwood One was created.

12 Q     Okay, and then what did you do after that proposal was

13 made?

14 A     I accepted the proposal and I went to work, I believe,

15 it was January 14th of 2021 for Fieldwood Energy as a

16 consultant with primary responsibility to become familiar

17 with the Fieldwood One properties, the Fieldwood Energy

18 Organization and also have an opportunity, you know, to meet

19 the people that would be involved in operating Fieldwood

20 One.

21 Q     Okay.  And have you, in fact, been doing that since

22 that time?

23 A     Yes, I have.  I've been given the opportunity to review

24 the properties, sit down with the asset managers, review the

25 fields, the active projects, the decommissioning folks.

1  Also, most of the major functional area managers, including

2  the field operations folks as well as the vice president of

3  operations.

4      I was also provided an updated reserve report and I get

5  daily production reports on the Fieldwood One properties.

6  Q    All right, Mr. Graham, what do you understand the role

7  of the Fieldwood One sole manager to be?

8  A    Well the Fieldwood One sole manager is responsible for

9  the operations and decommissioning of the Legacy Apache

10 properties.  With the mission of decommissioning these

11 assets in a timely manner.

12 Q    Okay, and what are the considerations that will go into

13 that decommissioning?

14 A    Well, the primary responsibility of Fieldwood One is to

15 decommission the non-producing properties and then maximize

16 the cash flow from the producing properties to provide funds

17 for future decommissioning.

18 Q    All right.  And now initially, I believe, the testimony

19 has been that initially there will be Transition Services

20 Agreement with the Credit Bid Purchaser.  Are you aware of

21 that?

22 A    Yes, I am.  There's a provision that Fieldwood Energy,

23 Newco will provide contract operations for the Fieldwood One

24 properties.

25 Q    And how will you be involved with respect to that

1  Transition Services Agreement?

2  A    Well, it will be my responsibility to oversee the

3  contract operator in the operations of Fieldwood One.

4  Q    And do you have any ability to change the contract

5  operator?

6  A    Yes, I do.  As sole manager, I have the right to change

7  the contract operator.  In fact, the LLC agreement for

8  Fieldwood One stipulates that I have to bid out the contract

9  operations to at least three credible companies to ensure

10  that we're getting optimum cost for operations.

11  Q    And is that a role that you've performed before

12  assuring yourself that you were getting the maximum cost and

13  the maximum efficiency?

14  A    Yes.  Throughout my career that has been my

15  responsibility as an executive to make sure that operations

16  were run safely, environmentally responsible, and

17  economically efficient.

18  Q    Okay, now do you still -- do you currently have any

19  involvement with Apache Corporation?

20  A    No, I left them in April of 2020.

21  Q    Do you own any Apache stock?

22  A    With my 25 years of employment with Apache, yes, I have

23  accumulated some Apache stock.

24  Q    Okay, do you believe that having that stock is going to

25  influence your decision making as the sole manager?

A     No.  It's a minor part of my net worth and as a

professional manager of Fieldwood One, my responsibility and

loyalty is to Fieldwood One.

Q     Now, are you aware that Apache has certain consent

rights pursuant to the LLC agreement?

A     That's my understanding.  I think there's about 14 or

15 items that need Apache's consent.

Q     And do you believe that those consent rights will

influence your ability to manage Fieldwood One with the

objective that you've set out?

A     No, because I have complete responsibility of the

decommissioning operations as well as the production

operations of the producing properties.

Q     All right, now in terms of compensation, how are you --

how will you be compensated as the sole manager?

A     According to the letter agreement that I signed, I'll

have a base salary -- a monthly base salary.  And then there

are some long term incentives to -- if I fulfill this

position for three years, there's a bonus stipulation and

then another one at five years.

      There's also a long term incentive to maximize the cash

flow.  And if we hit $400 million of excess cash flow as

defined in the standby credit agreement, there's an

additional compensation available.

Q     And how would you achieve that $400 million of excess

1  cash flow?

2  A    By optimizing and maximizing the cash flow from the

3  producing properties.

4  Q    And what about --

5  A    And also decommissioning the non-producing properties.

6  Q    Okay.  And will you have control over some of the

7  expense items as well?

8  A    Yes.  My responsibility will be to manage not only the

9  production and the review, but also -- excuse me just a

10  second.  To manage the expenses and G&A involved with

11  operating the Fieldwood One properties.

12  Q    Mr. Graham, do you believe that based on your

13  experience and qualifications that you are qualified to do

14  the tasks required of the Fieldwood One manager?

15  A    Yes, I have the background, the expertise to manage the

16  properties.  I've done it for many years.  I have

17  approximately 44 years of experience in the industry doing

18  exactly what's been required of the Fieldwood One.

19       MR. PEREZ:  Thank you, Your Honor.  I have no

20  further questions of this witness.

21       THE COURT:  Thank you, Mr. Perez.

22       Are there any proponents of the Plan that have

23  questions for Mr. Graham?  If so, please press five star one

24  time on your line.

25       (Pause in the proceedings.)

1        THE COURT:  All right, are there any persons in

2   opposition to confirmation of the Plan that have any

3   questions for Mr. Graham?

4        (Pause in the proceedings.)

5        THE COURT:  Mr. Eisenberg?

6        MR. EISENBERG:  Yes, good afternoon, Your Honor.

7   Philip Eisenberg.  I am not here to oppose the Plan for

8   ATCI.  I wanted to alert the Court that we had been --

9   before the confirmation hearing started, we had made an

10  arrangement with Debtors for them to make Mr. Graham

11  available for testimony in our case.

12       And they told me that they were going to put him

13  on in direct and if I wanted to I could cross him.  But we

14  have reached our arraignments and TCI will not availing

15  themselves of that and would be releasing Mr. Graham from

16  our case-in-chief.

17       I just wanted to, if Your Honor would indulge me,

18  wish Mr. Graham luck.  He's a very impressive man and I hope

19  he gets all his --

20       THE COURT:  So you hope he gets a lot of his

21  incentive payments?

22       MR. EISENBERG:  Yes, Your Honor.  I do.

23       THE COURT:  All right.  Mr. Eisenberg, thank you

24  for the comment and the courtesy of releasing him.

25       Is there any other party that has any questions

1  for Mr. Graham?  If so, you'll need to press five star one

2  time on your phone, please.

3        (Pause in the proceedings.)

4             THE COURT:  Mr. Graham, I don't have any questions

5  for you.  Thank you for coming.  You're welcome to observe

6  the balance of the hearing if you wish and you're welcome to

7  leave if you wish.  It's public courtroom.

8             THE WITNESS:  Thank you, Your Honor.

9             THE COURT:  Thank you, sir.

10        (Witness excused.)

11            THE COURT:  Who's going to be the next witness,

12  Mr. Perez?

13            MR. PEREZ:  Ms. Choi, I think is up next Your

14  Honor.

15            THE COURT:  All right, Ms. Choi if you would press

16  five star, please.

17        (Pause in the proceedings.)

18            THE COURT:  Ms. Choi, good afternoon.

19            MS. CHOI:  Good afternoon, Your Honor, Erin Choi

20  Weil, Gotshal & Manages on behalf of the Debtors.  At this

21  time I would like to call Mr. Clayton Green to testify in

22  support of Plan Confirmation.

23            THE COURT:  Thank you.

24            Mr. Green, could I get you to press five star one

25  time on your phone, please, sir?

CLAYTON GREEN - DIRECT BY MS. CHOI                          18

1        (Pause in the proceedings.)

2            THE COURT:  Mr. Green, good afternoon.  Would you

3   raise your right hand, please?

4        (Witness sworn.)

5            THE COURT:  I couldn't hear that.  You may have

6   your own line muted.

7            THE WITNESS:  I apologize, Your Honor.  Yes, I do.

8            THE COURT:  Thank you sir.

9            All right, Ms. Choi, go ahead, please.

10            DIRECT EXAMINATION OF CLAYTON GREEN

11  BY MS. CHOI:

12  Q    Please state your name for the Record.

13  A    My name is Clayton Green.

14            MALE SPEAKER MALE:  Your Honor, I'm having a hard

15  time --

16            THE COURT:  Can I get you to move little closer to

17  your mic?

18            THE WITNESS:  Is that better?

19            THE COURT:  It is.  Even closer would be better.

20            THE WITNESS:  Okay.  Is that loud enough?

21            THE COURT:  That is.  Thank you.

22            THE WITNESS:  Okay.

23            THE COURT:  I'll look at your bald head as you

24  bend over, Mr. Green.

25            THE WITNESS:  Exactly.

CLAYTON GREEN - DIRECT BY MS. CHOI                    19

1          THE COURT:  Go ahead, please, Ms. Choi.

2   BY MS. CHOI:

3   Q    Mr. Green, where are you currently employed?

4   A    With AlixPartners, LLP.

5   Q    And how long have you been employed there?

6   A    Throughout my career for approximately 15 years.

7   Q    What position do you hold at AlixPartners?

8   A    I'm a managing director.

9   Q    And Mr. Green, what is your role in this bankruptcy?

10  A    AlixPartners was retained as financial advisor to

11  Fieldwood to assist the company with the bankruptcy

12  proceeding.

13  Q    Mr. Green, are you here today as an expert witness?

14  A    I'm not.

15  Q    Did you calculate how much to reserve for the claims

16  reserve purposes in this case?

17  A    Yes.

18          MS. CHOI:  Your Honor, if I may ask that you give

19  control of the screen to Kevin Simmons?

20          THE COURT:  All right, Mr. Simmons, can I get you

21  to turn your camera on just for a moment so I can find you?

22  Thank you.

23      (Pause in the proceedings.)

24          THE COURT:  All right, Mr. Simmons is now the

25  presenter.

1            MS. CHOI:  Thank you, Your Honor.

2   BY MS. CHOI:

3   Q    If I may share on the screen a demonstrative that is

4   ECF No. 1646-3, which is Debtor's Exhibit 108.  This is a

5   demonstrative that was used yesterday.

6         Mr. Green were you involved in the preparation of the

7   numbers that are reflected on the left side of this

8   demonstrative?

9   A    Yes, I was.

10  Q    And were you also involved in the preparation of

11  certain numbers on the right side of this demonstrative?

12  A    Yes, I was.  Just one line item on the right-hand side,

13  the sale reserve costs.

14  Q    Thank you.

15        And for the sale reserve cost, can you please explain

16  to the Court what estimates -- what numbers are included in

17  that estimate?

18  A    Yeah, for the sale reserve costs, it's made up of two

19  separate categories of estimates.  The first is accrued and

20  unpaid taxes as of the emergence state.  And the second is

21  the amount calculated for personal injury matters that the

22  company is dealing with.

23        So the latter there's an estimate of $1.4 million in

24  that and that takes $100,000 deductible and applies it to 14

25  personal injury matters that the company is handling at the

1    present.

2    Q    And what else --

3    A    The second -- I was going to say, sorry, the second

4    component of the sellers cost the accrued and unpaid taxes

5    there's an estimate of $1.1-to-1.3 million in those numbers.

6         With respect to, again, taxes that are -- with the

7    accrued or estimate the accrued and unpaid as of a potential

8    emergence date.

9    Q    Thank you.

10        And what creates the variability in this range in this

11   estimate?

12   A    It's just a matter of an emergence date.  And so to the

13   extent the company will emerge sometime in June, that

14   estimate was 1.1 million.  If the company were to emerge

15   sometime in July, the estimate was 1.3 million as

16   calculated.

17   Q    So that amounts to what -- what amount did you

18   calculate for the sale reserve?

19   A    2.5 on the low side and 2.7 million on the high side.

20   Q    Thank you.

21        So turning now to the left side of this demonstrative,

22   the claims reserve section, what categories did you include

23   in the claims reserve?

24   A    On the left-hand side of the page, each category that's

25   listed, the professional fee escrow, other exit fees and

1    costs, cure amounts, 503(b)(9) claims.  In addition, amounts

2    estimated for allowed priority tax claims, allowed other

3    priority claims, allowed other secured claims and finally

4    the 6A cash coordinates.

5    Q    Now if we could just start walking through each of

6    these categories?  So for professional fees escrow, can you

7    describe how you've calculated how much to escrow for

8    professional fees?

9    A    Yes, for professional escrow, the estimate is arrived

10   by simply looking at historical invoices that have been sent

11   to the company throughout the pendency of the case.  And in

12   looking at those invoices, identifying a high and a low

13   range for invoices that have been submitted.  And then to

14   come up with an ultimate estimate that you see on the screen

15   there is trying to identify or understand activity level by

16   firm, as the case draws to the close, and what the amount

17   outstanding would be as an emergence date and the amounts

18   that will be funded into the escrow account.

19   Q    Thank you.

20        And based on those calculations, what was the high and

21   low range of what Fieldwood needs to escrow for professional

22   fees?

23   A    On the low side, just over $15 and half million and on

24   the high side, just over $27 and half million.

25   Q    Turning to the next category, other exit fees and

1  costs, what kinds of cost fit into this category?

2  A    It's largely the same as the line above with respect to

3  how the calculation was made.  It's primarily made up of

4  professional firms that would not be subjected to funds

5  coming out of the escrow account.

6       However, there are other amounts in there.  For

7  instances, there are small amounts relating to

8  (indiscernible) and we also have an amount for US Trustee

9  fees that would be outstanding as of emergence as well.

10 Q    And the calculations what was the estimate for other

11 exit fees?

12 A    On the low side, just over 11-1/2 million and on the

13 high side, just under 18 million.

14 Q    Turning next to the cure amounts, can you describe how

15 you calculated this category?

16 A    Yes.  Contract assumption schedules that were filed

17 with the Court, what I did was identify any open pay

18 structure -- well actually two steps if you'll allow me.

19      Initially the contract assumption schedules that were

20 filed with the Court, we looked at the open payables for any

21 of the contract counterparties for those contracts that are

22 marked as assumed and had an estimate of about 500 -- excuse

23 me, $5-1/2 as a cure amount.

24      Subsequent to those Schedules being filed, the company

25 received objections to cure amounts.  Me and members of my

1  team looked at those objections and worked with the company

2  to understand which of those objections are called out

3  amounts that could potentially be held as pre-petition

4  obligations associated with those contracts that are listed

5  on the assumption schedule.

6       On the low side, identified about $1.2 million

7  additionally that we added to the estimates.  And on the

8  high side it was close to $2 million that were added to the

9  estimates.

10      So in total that's the number that you see there, it's

11 5-1/2 plus those objections on the low and high side, we

12 arrive at $6.8-to-7.5 million.

13 Q    Can you next describe how you calculated the reserve

14 for the 503(b)(9) claims, please?

15 A    Yes.  Claims that were asserted for administrative

16 amounts, were reviewed by me or members of my team.  We ran

17 it through various -- I guess we could review it in a couple

18 different ways.

19      First, of the claims that were asserted for

20 administrative amounts and for 503(b)(9) amounts

21 specifically, initially identified those claims that me or

22 members of my team had marked as set for non-substantive

23 objections.

24      And what I mean by that are claims that are

25 duplicative -- literally duplicative, had been filed

1  multiple times or are redundant in nature or to the extent

2  the claims had been amended over time -- amended with

3  subsequently filed claims, that is.

4      We took those -- asserted amounts for those claims

5  specifically and removed them from the estimate.  With the

6  claims that remain that had asserted 503(b)(9) amounts to

7  the extent the proofs of claims also provided invoice

8  detail, looked at the invoices to determine first, if the

9  invoices were for physical goods and products as opposed to

10 just services -- which is a requirement for 503(b)(9) claim.

11 And second, identified per the invoices it the goods or

12 products were delivered to the company within the 20 days

13 prior to filing.

14 Q    Did you do anything else?

15 A    With respect to the 503(b)(9) claims?

16 Q    Yes.

17 A    If we did, it might be slipping my mind.  I know that

18 we removed non-substantive objections and any claims that

19 were -- and any other asserted claims that we made

20 adjustments for, that fall in the buckets of either, you

21 know, having to require for physical -- requiring physical

22 goods or products or were adjusted for the 20 days window.

23 Q    And what was the result of these adjustments?

24 A    An estimate on low side about $400,000 and high side

25 about $600,000.

1  Q    Turning next to the allowed priority tax liens.  Can

2  you please describe how you calculated this category?

3  A    Yes. Similar to the 503(b)(9) claims, me and members of

4  my team reviewed any claims that were asserted for priority

5  amounts and identified which of those claims were asserted

6  for outstanding tax liabilities.  After performing that

7  review, we only identified two claims -- well I guess before

8  that review and also worked with the company and their tax

9  group to understand which amounts are asserted were either

10 invalid or had already been paid or have not yet come due.

11       After performing that review, we calculated an

12 estimate.  While there it looks like zero on the page, is on

13 the high side it's about $11,000.  On the low side, it is

14 zero.

15 Q    Turning now to allowed other priority claims.  Did you

16 consider this category as well?

17 A    I did consider this category.  As part of the review of

18 any claims asserted for priority amounts me and members of

19 my team, we did not identify any claims asserted for

20 anything outside of tax that would warrant priority

21 treatment under the Plan.

22 Q    Thank you, Mr. Green.  Now did you also look at a class

23 of claims called, "allowed other secured claims?"

24 A    Yes.

25 Q    And how did you calculate for this group?

1  A     Additionally there was close to 1,000 claims filed

2  against Fieldwood for -- in the neighborhood of $45 billion.

3  Just like with the 503(b)(9) and the priority claims, we

4  identified the claims that were asserted for secured amounts

5  to start -- to begin the analysis.  And that population

6  totaled to about $15 billion.

7  Q     Did you make any adjustments from there?

8  A     Yes.  So, the $15 billion was really the starting point

9  to the secured claims estimates.  We made adjustment from

10 there and bucketed claims depending on what they were

11 asserting.

12        But initially the adjustments to the entire population

13 of $15 billion claims, the first adjustment we made was, as

14 I mentioned earlier with non-substantive objections in the

15 503(b)(9) claims, there were multiple claims filed for --

16 asserting for secured amounts that were also marked for non-

17 substantive objections.

18        Again, those are claims that are duplicative or

19 redundant in nature, claims that had been amended over time,

20 claims were the certain claimant had agreed to a certain

21 trade agreement.

22        So we removed those claims, the asserted amounts and we

23 adjusted the total.  That adjustment by itself was about

24 $11 billion.

25 Q     And what adjustment, if any, did you make next?

1  A    We identified of the secured claims that were asserted,

2  identified which ones were related to secured or bank debt

3  and removed those from the estimates as well.  That's about

4  $2 billion of asserted claims.

5  Q    And why did you remove those?

6  A    My understanding of the Plan is that those -- the

7  amounts owed to those parties are treated separately and are

8  not to be included in the claims reserve.

9  Q    What adjustment, if any, did you make from there?

10 A    Identified claims that were to withdrawn.  Certain of

11 the claims that were asserted secured claims, agreed to

12 withdraw their claims.  And that amount added up to about

13 $750 million.

14     And there was one final adjustment that we made to the

15 overall $50 billion asserted, which was claims for -- claims

16 served by taxing authorities or claims for royalty interest.

17 And after investigation with the company, found that those

18 claims are invalid.  So we adjusted those out as well.

19     I think I mentioned that the withdrawn claims totaled

20 $750 million if I did not I apologize.  But that was a $750

21 million adjustment.  The adjustment I just mentioned with

22 respect to the tax and royalty claims is about $1 million.

23 Q    So how much unsecured claims was left after these

24 adjustments were made?

25 A    In the range of a billion to a billion and one.

1  Q     Did you calculations stop there?

2  A     No.  As I mentioned earlier, we started to get into

3  claims depending on what was asserted and the nature of the

4  asserted claim.

5      And so, I arrived at three buckets.  The first were

6  claims asserted by working interest owners.  That was about

7  a billion dollars.  The second bucket were claims that were

8  asserted for outstanding DIP amounts or pre-petition amounts

9  owed for gathering and transportation agreements.

10     And the third bucket were claims asserted by vendors

11  where the vendor asserted a lien on the property.  The

12  bucket for the JIBS and gathering transportation agreements

13  is about $13 million.  For the vendor asserted claims,

14  totaled about $22 million.

15  Q     Thank you.

16     So let's talk first about the working interest owner

17  bucket.  The first bucket of the three.  What kinds of

18  claims did the working interest owners assert?

19  A     They asserted three claims -- three types of claims

20  primarily.  So we created some buckets, if you will.  The

21  first type of asserted claim was for P&A obligations.

22     The second bucket or some bucket, I should say, was

23  with respect to cash advances to the operator or cash calls.

24  And the third bucket or the third sum bucket was claims

25  filed with respect to the underlying vendor liens.

1  Q    And --

2          THE COURT:  I'm sorry I missed that last word.

3  Something filed with respect to the underlying indemnity,

4  you said?

5          THE WITNESS:  I'm sorry, Your Honor.  Underlying

6  vendor liens.  These are claims that were asserted by --

7          THE COURT:  Yeah, I just didn't hear the word.

8  Thank you.

9  BY MS. CHOI:

10 Q    Mr. Green, what steps did you take to calculated the

11 secured working interest owner claims?

12 A    Of the $1 billion that were asserted, we made

13 adjustments to similar tax and highlights in the other

14 categories.  The first thing just sort of going in order,

15 was looking at the claims asserted for contingent fee

16 allegations.  There was claims asserted total about $950

17 million.  According to the Plan and step we took in the

18 estimation was to remove those claims asserted for

19 contingency obligations entirely.  And that was an

20 adjustment of about $950 million.

21 Q    What did you do next?

22 A    With respect to the claims asserted for cash advances

23 to the operator or cash calls, there was one claim asserted

24 for just over $2 million by Valero.  It alleged the right to

25 secured claims via right to set off.

1    My understanding of the claim and the situation with

2    Valero is that no additional funding would be required to

3    claims reserve regardless of how the -- regardless of the

4    outcome of that claim.

5         And so, we removed that amount from the estimate and

6    total as well.  Again, that was about a $2 million

7    adjustment.

8    Q    And then what did you do with respect to the third

9    sub-bucket?

10   A    The claims asserted for underlying vendor liens --

11   totally asserted was about $70 million.  Me and members of

12   my team look at each one of those claims that were asserted

13   and the proofs of claims themselves provided detail with

14   respect to the actual vendors that made up the claim.

15        And in looking at that detail we were able to identify

16   basically two adjustments to those asserted amounts.  The

17   first, although the claims were filed by different working

18   interest owners, but in certain cases, they would assert the

19   same amount for the same vendor obligation.

20        And so we removed from the estimates the amounts that

21   were duplicative in the sense that they were filed for the

22   same amount with the same vendor in case there were multiple

23   proofs of claims.

24        Making that sort of duplicate adjustment, backed out

25   $35 million from the asserted total of underlying vendor

1  lien claims.

2      And another thing in looking at the underlying vendor

3  lien claims is identifying which of those vendors had signed

4  trade agreements with the company and removing those

5  asserted amounts from the estimate as well.  And that

6  adjustment added up to $20 million -- roughly $20 million.

7  Q    What did you do after that?

8  A    That left about $14 million with respect to the4

9  underlying vendor lien claims asserted after the duplicate

10  and trade agreement adjustments.

11      For the purposes of this estimate, we calculated a low

12  estimate for the underlying vendor lien claims as zero and a

13  high estimate for the full $14 million.

14      My understanding is that there's a decision yet to be

15  rendered on the underlying vendor lien claims and to the

16  extent or whether or not those other claims will be fully

17  extinguished through the Plan or not.

18      If not, the $14 million is in the high total.  If they

19  will be extinguished in their entirety, zero is where it

20  comes into account for the low estimate.

21  Q    Thank you.  So turning to then the second bucket, the

22  JIB and gathering agreement bucket.  What analysis or

23  calculations did you perform with respect to this bucket?

24  A    The JIB and gathering transportation agreement bucket,

25  excuse me, was about $13 million asserted.  The first item

1   that was identified were any outstanding -- any JIB's

2   amounts that were claimed or asserted or had already been

3   paid throughout the pendency of the case.  Or the company's

4   books and records did not match what was -- what had been

5   asserted in the proof of claim.

6        So Collin just wasn't showing up in the company's books

7   and records.  We made that adjustment and that was an

8   adjustment of about $7 million off the $13 million total.

9   Q    Did you make any other adjustments?

10  A    Yes.  With respect to -- yes with the JIB, yes we did.

11  So we identified certain claims that were disputed -- excuse

12  me that were duplicated with the JIB amount.  And that

13  amount was about $1 million that we adjusted out.

14  Q    And did -- sorry, go ahead.

15  A    Yes, we did.  One more adjustment with respect to the

16  Valero claim which is bucketed in this claim, we removed $2

17  million that was asserted.

18  Q    So what was the result of these adjustments?

19  A    We came up with an estimate for the JIB -- the JIB

20  amounts are anywhere from $600,000 to about $30 million.

21  And the difference between the high and the low.  My

22  understanding that the company in conversations with certain

23  parties that asserted secured claims for JIB or gathering

24  transportation amounts, to the extent agreements were

25  reached and payments were made to satisfy these claims.  We

1   removed those balances from the low case.

2       To the extent they are not, then their resolution --

3   there's no resolution arrived before the emergence date,

4   there's an answer in the high case.

5   Q    Thank you.  Turning now to the third and final bucket,

6   the vendor bucket.  How much was asserted in these vendor

7   claims?

8   A    The amount that was asserted in the claims was about

9   $23 million.  And in similar fashion we made adjustments to

10  that as well.

11  Q    What adjustments did you make?

12  A    First for the vendor claims, we identified any claims

13  asserted by vendor that had agreed to unsecured treatment.

14  And we removed those claims from the total -- the total

15  estimate.  And that was about a $14 million adjustment.

16  Q    Did you make any additional adjustments?

17  A    Yes, any claims that were asserted for amounts that the

18  company did not reflect in their books and records, we

19  adjusted that amount out as well.  And that was an

20  adjustment of about $2 million.

21  Q    And were there any further adjustments?

22  A    With respect to the claims that were filed with the

23  vendors, and if the claims still remained in the

24  estimate -- if I could say it that way -- they still remain

25  in the estimate after those first two adjustments I

1  mentioned.

2      In looking at the proofs of claim, vendors often times

3  will provide invoice support and identify which of the

4  properties the claims were being asserted against.

5      As we looked at the properties specifically, we look at

6  the mortgage date of those properties and compare that to

7  the MSA date of the vendor that is asserting the claim.

8  (Indiscernible) to the mortgage date, preceded the MSA date.

9  We removed those amounts from the claim yesterday.  And that

10 was another adjustment of about $2 million.

11 Q    And were there any additional adjustments or was that

12 all of them?

13 A    There was one more -- one that we made in addition,

14 which is looking at the properties individually.  To the

15 extent the properties had an estimated PV10 value that was

16 negative, we removed those amounts asserted against those

17 specific properties as well.  That adjustment was about

18 $600,000.

19 Q    And why did you use the PV10 estimated?

20 A    The PV10 report was provided to us from the company to

21 the extent that there was a negative value found in the PV10

22 report for a specific property, again, made the conclusion

23 that the security interest didn't have any value to it and

24 so adjusted that amount out of the estimate for the secured

25 claims.

1  Q     So what was the resulting estimate for this vendor

2  bucket after you made these adjustments?

3  A     The vendor bucket didn't have a low, high range on it.

4  It was just -- it was right at $3 million.

5  Q     And what was the overall then result of your

6  calculations after you performed all these adjustments we

7  just discussed?

8  A     In taking those three buckets added together after all

9  of the adjustments we came up with the range that you see on

10  the screen of $4 million in a low case and $21 million on

11  the high.

12  Q     And is there a single source for most of the difference

13  between the four and the 21 million?

14  A     Primarily it's a zero to $14 million range that we

15  talked about with the underlying vendor liens.  Again, in

16  the low case having zero to the extent that vendor claims

17  are extinguished through the Plan.

18        In the high case, they're full $14 million which is the

19  asserted amounts for their vendor claims -- underlying

20  vendor lien claims, excuse me.  It has the full amount in

21  the high case estimate.

22  Q     Thank you, Mr. Green.

23        Let's turn next to Class 6A cash pool.  Can you

24  described how you calculated this 6A claims?

25  A     Yes.  The 6A cash pool amount is made up of claims

1   asserted by trade vendors that opted in to Class 6A.  We

2   received a report from Prime Clerk, indicating which trade

3   vendors chose to participate in Class 6A.

4       Looking at the asserted claims and matching that to the

5   company's books and records, the estimate has in the low

6   case about $8 million of trade claim.  And in the high case

7   about $11 million.

8       To arrive at the estimate of 1.2 to 1.7 we applied the

9   14 percent recovery that I understand is outlying the Plan.

10  And the 14 percent, multiple that low and high -- low case

11  of 8 and high case of 11 gets you to about the 1.2 to 1.7.

12  Q    And so then what is the total amount that Fieldwood

13  needs for its claims reserve based on all these

14  calculations?

15  A    Based on all those calculations, the estimated claims

16  reserve is calculated to be 39.4 million to 76.1 million.

17  Q    Thank you.

18      Mr. Green, did you also review claims for holders in

19  Class 1 that voted to reject the Plan?

20  A    Yes.

21  Q    And if I call it the company's rejecting the claimants,

22  will you understand what I mean by that term?

23  A    Yes.

24  Q    So which companies were rejecting the Plan?

25  A    There were seven parties in total.  It was Conoco,

1  Burlington, land and exploration, Ecopetrol, Valero, W&T and

2  McMoRan.

3  Q    And did you calculate an estimated amount potentially

4  owed to these rejecting claimants?

5  A    Yes.

6  Q    So, what did you do to calculate this?

7  A    Look at each of the claims that were asserted and

8  depending on what the claim was asserted for, made

9  adjustments for the estimate depending on either company

10 books and records or depending on what the claim was

11 asserted for, remove them from the estimate entirely.

12 Q    So starting with Valero.  I believe we spoke about this

13 a moment ago.  But if you could just remind the Court what

14 calculation you determined with respect to Valero?

15 A    Yes, for Valero, the amount that was asserted, $2.1

16 million, was removed in its entirety from the estimate

17 again, because my understanding of the outcome of that claim

18 regardless of what happens, no additional funding will be

19 required to reserve.

20 Q    What about Ecopetrol?

21 A    Ecopetrol is working interest owner that filed a claim

22 that we had included in the bucket for underlying vendor

23 liens.  And so in total that claim was asserted for $7

24 million.

25      The first adjustment that was made was understanding

1  which of those vendors that make up the claim had trade

2  agreement.  And that took that claim from $7 million

3  asserted down to about $5.8 million.

4      And then my understanding of the JOA, is that the

5  claims only secured for the Debtor's portion share of the

6  property.  And so, applying that proportionate share to the

7  balance of 5.8 million would arise at an estimated value of

8  $325 million.

9  Q    And with respect to the remaining rejecting claimants,

10 what did you do to calculate amounts potentially owed to

11 them?

12 A    The remaining other seven -- of the group of seven, the

13 remaining claims were asserted for continuing P&A

14 obligations.

15     As discussed earlier, those amounts were removed in

16 total from the claims adjustment.

17 Q    Thank you for your time, Mr. Green.

18          MS. CHOI:  No further questions.

19          THE COURT:  Mr. Green, on the rejecting claimant

20 amounts, where would I see those on this sheet?  Where does

21 the cash part --

22          THE WITNESS:  I'm sorry, Your Honor.

23          THE COURT:  Where's the cash requirement appear on

24 the sheet that we were looking at?  Is it here for the

25 rejected claimants?

1          THE WITNESS:  For specifically the rejected

2   claimants, Ecopetrol's amount would be factored into the

3   other secured claims within the range of 4 to $21 million.

4          And all the rest of the --

5          THE COURT:  So that's already -- so the amount

6   that you're talking about for rejected claimants, there was

7   no amount over and above what was already listed in the

8   other amounts?

9          THE WITNESS:  That is correct.

10         THE COURT:  Okay.  I just wanted to -- I couldn't

11  see where it filled in here and if it was incorporated in

12  here, that's fine.

13         All right is there any proponent of the Plan that

14  has any questions for Mr. Green?  If so, please press five

15  star one time.

16     (Pause in the proceedings.)

17         THE COURT:  All right, is there any party in

18  opposition to confirmation that has any questions for

19  Mr. Green?

20     (Pause in the proceedings.)

21         THE COURT:  Mr. Green, thank you.  Once again,

22  you're more than welcome -- oh wait, we do have someone.

23  Let me see who we have.  Hold on.

24     (Pause in the proceedings.)

25         THE COURT:  Mr. Singer?

1           MR. SINGER:  Good afternoon, Your Honor.  Kelly

2    Singer on behalf of Ecopetrol.  I just had a question for

3    the witness and before I get into that, we have -- status

4    update.  We have just negotiated consensual language that I

5    thought -- I think resolves Ecopetrol's objection.

6           But some of the testimony has caused me to ask

7    some questions about that, so.  If I may ask a question of

8    the witness a couple questions?

9           THE COURT:  Of course.

10              CROSS-EXAMINATION OF CLAYTON GREEN

11   BY MR. SINGER:

12   Q    Mr. Green, you had testified that you had estimated

13   Ecopetrol's claims to be somewhere around $3 million based

14   on the value of its working interest, correct?

15   A    Yes.  Although just to clarify, with respect to the

16   low, high estimates, we've have in there whole range of

17   anything from zero dollars all the way up to the total

18   asserted amounts.

19   Q    Okay, so is it your understanding that if the operating

20   agreement associated with Ecopetrol is assumed, that the

21   amount to be paid is whatever the amount that is owed under

22   that agreement?  It's not associated with the value of the

23   working interest, correct?

24   A    I don't -- my understanding is with respect to the

25   decision, I believe, on the United Maritime matter is in

1  direct connection with the Ecopetrol claim as well.

2      I don't know that I have, honestly an opinion or answer

3  for you on how it's going to turn out.  Just enough to say

4  that anywhere from zero dollars to the total asserted

5  amounts are in the claims estimate.

6  Q   Okay.

7          MR. SINGER:  Your Honor, I don't think I have any

8  other questions.

9          THE COURT:  Mr. Singer, thank you.  Does any other

10 party have any questions for Mr. Green?

11     (No audible response.)

12          Mr. Green, thank you for attending.  You're

13 welcome to stay, it's a public hearing.  You're welcome to

14 go about your business.

15          THE WITNESS:  Thank you, Your Honor.

16     (Witness is excused.)

17          THE COURT:  Ms. Choi, who's going to be the next

18 witness?

19          MR. GENENDER:  Your Honor, Paul Genender for the

20 Debtors.  Our next witness is J.P. Hanson.  However, Your

21 Honor he is not available until 5:00 o'clock.  And I

22 apologize for that, but that is just -- he had things he

23 could not move until 5:00 and we didn't know how quickly

24 these witnesses were going to go and what the cross was

25 going to be on them.

1        So I'm open to any ideas as to how to proceed.
2    Other than proceeding at 5:00 o'clock.
3        THE COURT:  Is he also your -- is he your last
4    witness?
5        MR. GENENDER:  Yes, Your Honor.
6        THE COURT:  All right.  I'm going to leave your
7    direct case open.  And now I'm going to ask if there's
8    anyone that wishes to present any further evidence in
9    support of confirmation knowing that there will still be
10   another witness coming.  You'll need to press five star.
11       (Pause in the proceedings.)
12       And now as to any -- there are none.  I'm going to
13   show that the cases in chief have rested with the right to
14   still call Mr. Hanson; is that correct?
15       MR. GENENDER:  Yes, Your Honor.
16       THE COURT:  And I'm not going to ask for the
17   parties that oppose confirmation, you're option.  You can
18   proceed right now and call some witnesses or you can wait
19   until after Mr. Hanson.  I'm not going to make you go out of
20   order.
21       But if somebody wants to, I'm going to let you go
22   out of order.  So I'll just leave it up to each party as to
23   what they wish to do.
24       Why don't you press five star if you want to go
25   now to put on your witnesses?

1          MR. GENENDER:  And Your Honor, I forgot to warn

2    Mr. Singer about the one hour rule.

3          THE COURT:  Well, I assume he doesn't need his

4    witness any more given that you made a deal with him.

5    But, Mr. Singer, you have your hour's notice if you want it.

6          Mr. Duewall, go ahead.

7          Are you going to call anybody, Mr. Singer, or are

8    you done?

9          MR. SINGER:  No, Your Honor, I just wanted to say

10   that I do believe that we do have a resolution on the

11   language so I don't think there's any point for me of

12   calling my witness or pursuing my objection, subject to how

13   things play out here.

14         THE COURT:  Thank you.

15         MR. SINGER:  But we do have resolution and I

16   believe Ridgewood, Mr. Fishel's client does, as well.

17         THE COURT:  Thank you.

18         Mr. Duewall, you've got the floor at this point.

19   I think you have your own line muted though.

20      (Pause in the proceedings.)

21         THE COURT:  Well, let me try that again.

22      (Pause in the proceedings.)

23         THE COURT:  If there's someone else's line I

24   unmuted, I thought it was Mr. Duewall, but before you talk,

25   Mr. Duewall, is there anyone else that I've already unmutued

1    your line that wishes to address the Court?

2         (Pause in the proceedings.)

3              MR. BAINS:  Yes, Your Honor, good afternoon this

4    is Brandon Bains, counsel for Travelers, Liberty Mutual,

5    Hanover, and Excel.

6              I was going to use just a little bit of this time

7    to do a minor housekeeping matter.  We had agreed with the

8    Debtors on the admissibility of some exhibits.  And we just

9    wanted to offer those as part of the evidence and take care

10   of that while we had a little bit of a lull.  If that was

11   okay with the Court.

12             THE COURT:  All right, can you identify the

13   exhibits that you think you have a stipulation on?

14             MR. BAINS:  Yes, sir.  It is Docket 1631 and it's

15   going to be 1631-1 and 1631-2.  And those are the bonds and

16   GIA's I believe that Ms. Choi confirmed the stipulation as

17   to admissibility.

18             THE COURT:  All right, has the Debtor stipulated

19   to the admission of 1631-1 and -2?

20             MS. CHOI:  Erin Choi on behalf of the Debtors.

21             Yes, Your Honor, we stipulate to that.

22             THE COURT:  Is there any party that objects to

23   1631 or 2?

24        (No audible response.)

25             THE COURT:  Okay, they are both admitted.

1        (ECF 1631-1 and 1632-2 received in evidence.)

2            THE COURT:  Mr. Bain, anything else?  Thank you.

3            MR. BAINS:  No, sir, Your Honor, thank you very

4    much.

5            And thank you, Ms. Choi.

6            THE COURT:  Thank you.

7            Mr. Duewall, sorry about the confusion on that.  I

8    think you're live now.

9            MR. DUEWALL:  Thank you, Your Honor.  Can you hear

10   me?

11           THE COURT:  I can, thank you.

12           MR. DUEWALL:  Would the Court be agreeable to give

13   an estimated five or 10 minutes to make a strategic decision

14   as to whether or not we call our witness now and if we do,

15   to get set up?

16           THE COURT:  Sure.

17           MR. DUEWALL:  So I can confirm with my other

18   counsel.

19           THE COURT:  Yeah, I'll give you time to get set

20   up, too.

21           I've got a couple other people that may be making

22   some elections and let me see what they want to do, but why

23   don't you take some time and we'll just get back to you?

24           MR. DUEWALL:  Thank you, Your Honor.

25           THE COURT:  Thank you.  All right, Mr. Baay, you

1  had pressed your five star, but had apparently pressed it a

2  second time.

3          Press it one more time, please.   There we go.

4          Mr. Baay, go ahead, please.

5          MR. BAAY:  Thank you, Your Honor.

6          If it will help from a timing standpoint, we are

7  still working with Debtors' Counsel on trying to make an

8  arrangement with respect to our witnesses -- if we can get

9  that hammered out.

10          We would be available to start at 4:00 o'clock.

11  We would have at least three witnesses and I'm sure -- I

12  mean, I would think that they would be pretty much five

13  minutes.  So if that will help from everybody's schedule to

14  fill that gap, we're happy to do it if we can start at 4:00.

15  I just need to get them a heads up to everybody, so.

16          THE COURT:  I think 4:00 will work fine.  I think

17  that works.  So, if you can work things out; otherwise,

18  that's fine.  Otherwise, you can call your witnesses at 4:00

19  unless we're in the middle of another witness, but sure.

20          MR. BAAY:  Maybe if I could get (indiscernible) or

21  not that would be great.

22          THE COURT:  Well let's go ahead and get --

23  Mr. Fishel wanted to make an announcement.  Let me get him

24  back on.

25          Mr. Fishel, go ahead.

1          MR. FISHEL:  Good afternoon, Your Honor, Michael

2   Fishel from Sidley on behalf of Ridgewood and ILX.  And I

3   meant to chime in earlier after Mr. Singer, but Ridgewood

4   and ILX also have an agreement with the Debtors.  And

5   subject to seeing the Confirmation Order.  So I just did

6   want to confirm that.

7          THE COURT:  All right.  Does anyone else intend to

8   introduce any witnesses at this stage either before or after

9   we hear from Mr. Hanson?

10       (No audible response.)

11         THE COURT:  Okay, we're going to come back at 4:00

12  for Mr. Baay and I'm going to wait here for just a minute or

13  two and let's see what Mr. Duewall wants to do.

14         And Mr. Duewall, if you want to wait and make your

15  announcement at 4:00, that's fine as well.

16         Let me go ahead, though, and talk to you-all about

17  the schedule.  It's not anything I need to leave sharply

18  for, but I was planning on adjourning around 6:00.  So we're

19  not going to go till 8:00.

20         But if we're in the middle of a witness that we

21  can finish, you know, at 6:15 or 6:20, I can make people

22  wait for me.

23         With respect to tomorrow morning, I'm hoping that

24  we will finish the evidence and do closing arguments

25  starting in the morning.  And I doubt we have a problem with

1    that given what people are telling me on time.

2          So I would suggest that we start at 9:45 in the

3    morning.  And want to know if anyone is going to have a

4    conflict with starting at 9:45 in the morning?

5        (Pause in the proceedings.)

6          MR. PEREZ:  That's perfect, Your Honor.  Thank

7    you.

8          THE COURT:  Let's just stick around a minute until

9    Mr. Duewall can decide what he wants to do.  We're taking a

10   break at 3:00 no matter what because I've got another case I

11   need to call.  And then we can either call Mr. Duewall's

12   witness a little before 4:00 o'clock or after the

13   5:00 o'clock.

14         Mr. Genender?

15         MR. GENENDER:  Your Honor, well what I was going

16   to say I don't want to say if Mr. Duewall is not on.

17   Because it relates to some logistics that he and I were

18   discussing.  So I'll just hold my thought.

19         THE COURT:  He's back.  He's back.

20         MR. DUEWALL:  I'm back, Your Honor.  I'm happy

21   to -- let's start with Mr. Genender.

22         MR. GENENDER:  I think we're still -- I was just

23   going to -- I was just going to say that I understood -- it

24   might make sense for Mr. Duewall and I to speak off line.

25   But I understood as related to Mr. Hanson that Mr. Duewall

1    doesn't have an objection to Mr. Hanson coming in by his

2    Declaration.

3         And that was news to me.  Which is okay, welcome

4    news.  But if that's the case, I want to -- I'd like to have

5    some guidance if anyone else has an objection to that.  So

6    that I can plan accordingly.

7         We probably would have a little bit of live

8    direct, but it would not be very much compared to what it

9    would have been.

10        MR. DUEWALL:  That is correct, Your Honor.

11   Mr. Genender and I did conference before the hearing last

12   week and it was our position then and remains now that

13   Mr. Hanson's Declaration was acceptable.

14        There are other parties that have since settled

15   that were objecting to him being brought by Declaration.  So

16   I'm happy to confer with Mr. Genender during the break and

17   try to shorten up that presentation as much as possible.

18        I might have a short cross-examination, but I

19   think we can get through that relatively quickly unless

20   someone else is still objecting.

21        THE COURT:  Thank you.

22        And I think he said he's also going to have a

23   direct to add on to the Declaration.  Just so you -- I'm not

24   sure you heard that.

25        So while you were conferring, Mr. Baay is going to

1  call his witnesses starting at 4:00.  Why don't I let you

2  take as much time as you want and you can decide when

3  Mr. Baay is finished with his witnesses, whether you want to

4  proceed or whether you want to do it after Mr. Hanson?

5          I'm not going to work until 8:00 tonight.  If we

6  get to a stopping point, you know, around 6:00, we'll then

7  resume tomorrow morning at 9:45 and let all the witnesses

8  finish.  At which point, we'll do closing arguments.

9          Does all that fit with your schedule, Mr. Duewall?

10         MR. DUEWALL:  Yes, Your Honor.  I think starting

11 our witness or coming back and doing it at 4:00 is perfectly

12 all right.  I think that works better for us.  We've

13 provided language to the Debtors yesterday and then we tried

14 to connect with them many times yesterday.

15         I know we went long.  We tried to connect with

16 them and had a short discussion with them this morning.  So

17 I think if the parties can continue to -- we'll keep our

18 telephone lines open to work that commercial resolution and

19 maybe there may not be a need for our witness at 4:00.  I

20 think -- we're waiting on language back from (indiscernible)

21 and over the break we might be able to make some progress.

22         THE COURT:  It's a long break so hopefully you

23 can.  I suspect if you put Ms. Hine (phonetic) and

24 Mr. Carlson on the phone, they can work out anything between

25 the two of them.

1          MS. HEYEN:  Yes, Your Honor.  We've had a

2     conversation with Weil and the secured lenders this morning.

3     They promised that they would get us their proposed language

4     this morning.

5          We're standing by.  We're happy to have a further

6     conversation.  We're happy to, you know, of course, see the

7     language, but we are waiting on that language.

8          We also understand from the lenders this morning

9     that there has been additional language that has been worked

10    out with the Government.  We're also supposed to receive

11    that language so that will help resolve some of the issues

12    for Your Honor and some of the other parties.

13         We have not seen that yet, nor have we seen the

14    Confirmation Order that we were supposed to receive a copy

15    of that this morning as well.

16         So there are some outstanding items I think that

17    would help, you know, streamline this afternoon, this

18    evening.  So we're still waiting for their, we're waiting.

19         THE COURT:  Great.  So look it may make some sense

20    and it's just going to be something you'll have to control

21    because I have no idea how that's going.

22         If you choose to wait until after Mr. Hanson

23    testifies in chief you can then either work things out over

24    night or call your witnesses starting at 9:45 in the

25    morning.  So I'm not going to insist you proceed this

1  afternoon.

2          And if you think you're on the cup of getting the

3  lip of the cup of getting something done, then we might as

4  well let you start at 9:45.

5          We'll have a couple of interruptions if we go into

6  the afternoon, but it's -- we will definitely finish closing

7  arguments tomorrow if we start witnesses at 9:45.

8          So I'm just going to let it up to you.  And you

9  can surprise me when we're done with Mr. Baay's witnesses at

10  4:00 as to which of those makes the most sense.  How's that.

11          MALE SPEAKER:  Fine, Your Honor.

12          THE COURT:  From --

13          MALE SPEAKER:  Your Honor, may I -- oh, I

14  apologize.

15          THE COURT:  I've got a couple other people that

16  want to schedule things maybe.

17          From 713-228-4101, who do we have?

18          MR. OKIN:  Your Honor, that's Matthew Okin.  I was

19  actually just going to chime in and let you know since we're

20  the next hearing, if it helps with scheduling that we're

21  going to be very quick.  So if you need more time.

22          THE COURT:  I appreciate that, but I think we'll

23  start you on time is what it's looking like, Mr. Okin.  Will

24  you be ready on time?

25          MR. OKIN:  We'll be ready, but we're probably

1  going to ask you to push us out a week and I'll tell you

2  where we are.  But again what I'm saying you don't need to

3  wait until 4:00 to start again.

4        THE COURT:  Yeah, no they need to wait until 4:00

5  so I appreciate that.  But we'll go ahead and call you on

6  time 3:00 and if you give me some time to breath, that would

7  be a nice way to spend part of today.  So thank you.

8        And then Mr. Kuebel had something he wanted to

9  add.  Go ahead, Rick.

10        MR. KUEBEL:  Good afternoon, Your Honor.  We still

11  have our open case on exculpation and releases we had

12  provided some language to the Debtor.  Haven't heard back.

13        But the reason I raised my hand that particularly

14  with respect to oral argument tomorrow on closing arguments.

15  We had not seen the Confirmation Order, a draft and even if

16  we are able to get to the right place on our language

17  reservation, still have not seen how it fits in with the

18  balance of the Confirmation Order.

19        And I don't know exactly where the Debtor stands

20  with that, but I think it would be important to all the

21  parties to have an opportunity to review the proposed

22  Confirmation Order in conjunction with and in advance of

23  closing arguments.

24        THE COURT:  Or I could sign the official form of

25  Confirmation Order.

1          Hopefully they will get you that so that we have

2   due process.  I'll definitely not -- I'm not going to make

3   you consent to things you haven't seen with an opportunity

4   to digest them.

5          It may -- I think we will still start with closing

6   arguments at 9:45.  We may just not finish until after

7   you've had a reasonable opportunity to see the Confirmation

8   Order itself.

9          So let's think of those as potentially divisible,

10  but hopefully you'll get a Confirmation Order soon, very

11  soon.

12         In fairness to the Debtors, by the way, because I

13  understand the frustration.  I've been there.  They've had a

14  lot of moving pieces.  So getting a final Confirmation Order

15  is probably pretty hard over the last, you know, 12 hours.

16         But they need to get you one.  And they need to

17  get you one with a reasonable opportunity to review it and

18  to digest it before they ask me to sign.  So we'll get

19  there.

20         MR. KUEBEL:  Thank you, Your Honor.

21         THE COURT:  Okay.  Unless -- Mr. Genender, you had

22  one other thing you wanted to add to that?

23         MR. GENENDER:  Not to that, Your Honor, but in

24  connection with Mr. Hanson's testimony and as a follow on to

25  Mr. Duewall's courtesy about his Declaration.

1          It would be helpful to the Debtors if we -- for

2     the Record his Declaration is Debtor's Exhibit 52,

3     ECF 1620-1.  It would be helpful if we knew if anyone had an

4     objection to that coming in.  If I can ask that now.

5          THE COURT:  Well, why don't you just -- let's just

6     do this in the real way?  I'm going to adjourn the hearing

7     at 3:00 until 4:00 and your witness isn't going to be called

8     live until 5:00.

9          You've not called him as a witness.  You're

10    offering his Declaration.  Let's see if anyone objects to --

11         MR. GENENDER:  Thank you, Your Honor.

12         THE COURT:  -- 1620-1.  Does any one object to

13    1620-1 as coming in as substantive evidence, subject to

14    cross-examination at today's hearing?  If so please press

15    five star on your line.

16         (No audible response.)

17         THE COURT:  1620-1 is admitted as substantive

18    evidence at today's hearing.

19         We're now adjourning --

20         (Exhibit 1620-1 is received in evidence.)

21         MR. GENENDER:  Thank you Judge.

22         THE COURT:  We're adjourning the Fieldwood hearing

23    until 4:00 o'clock.  At 4:00 o'clock, Mr. Baay will have the

24    opportunity to call his witnesses.  When he is complete with

25    that, if it is before 5:00 by a reasonable period of time,

1  we're then going to give Mr. Duewall the option of either

2  calling his witnesses or waiting until Mr. Hanson.

3        Then Mr. Hanson will be called at 5:00 or upon

4  conclusion of Mr. Duewall's witnesses whichever is correct

5  order given Mr. Duewall's option.

6        And then at that point we're going to adjourn

7  6:00, 6:15 something like.  And then we'll resume at 9:45 in

8  the morning.  You will not have interruptions prior to

9  lunch, from the 9:45 and then I don't know how long the 1:30

10 *Sanchez* hearing is, but usually those are long.  So we might

11 have to come back in mid afternoon to finish if we're not

12 done with closing arguments.

13       Since I think you've been picking off objecting

14 parties, Mr. Perez, it may be we don't need the same

15 2-1/2 hours for closing that we did for opening.  But I'm

16 also not going to cut people off.  This is hard and it's

17 complicated and people are going to be allowed to take as

18 much time as they need at closing arguments.

19       So no one needs -- you know, I would appreciate

20 your making closing arguments that are concise.  I'm not

21 encouraging the contrary.  But no one needs to worry about

22 getting cut off of the hearing.

23       I'm going to hear this until we're done with it

24 and I understand it.

25       MR. PEREZ:  And Your Honor, maybe you won't say

1   you haven't seen so many closing arguments before.

2           THE COURT:  I never had seen that many opening

3   arguments.  It was an Isgur record.  I'm sure it's not a

4   real record.  But it's an Isgur record.  But we'll see what

5   happens.

6           MALE SPEAKER:  And, Your Honor, we're all glad to

7   know that Mr. Perez is going to make us work until midnight

8   tonight.

9           THE COURT:  What happens at midnight?

10          MALE SPEAKER:  I said we're glad to know that

11  Mr. Perez is going to make us work until midnight tonight

12  like he almost did last night.

13          THE COURT:  Well if you don't get the damn

14  confirmation out, you don't get to go to sleep at midnight.

15      (Pause in the proceedings.)

16          THE COURT:  All right, we're adjourning for three

17  minutes.  At 3:00 o'clock, we will call Mr. Okin's case.

18          Thank you.

19          MR. PEREZ:  Thank you, Your Honor.

20      (Recess taken from 2:56 p.m. to 3:59 p.m.)

21                      AFTER RECESS

22          THE COURT:  All right.  We're going to go back on

23  the Record in the Fieldwood case.

24          Mr. Baay.

25          MR. BAAY:  (No audible response)

1          THE COURT:  Mr. Baay.

2          MR. BAAY:  Can you hear me?

3          THE COURT:  I can.  Thank you.

4          MR. BAAY:  Thank you, Your Honor.  During the

5   break, we have worked out an agreement with Debtors' counsel

6   to adjourn our particular discreet issue for a hearing at a

7   separate date over the next couple of weeks.  So we are not

8   going to call our witnesses at this time and we'll reserve

9   our evidence until that hearing.

10          THE COURT:  And what about your confirmation

11  objection?

12          MR. BAAY:  We are withdrawing our confirmation

13  objection subject to a hearing, Your Honor.  So we are not

14  going to object to confirmation as long as we get a hearing

15  on our issue, and the Court can decide our issue and we will

16  let the chips fall where they may.

17          THE COURT:  That's fine, Mr. Baay.

18          MR. PEREZ:  So, Your Honor, --

19          THE COURT:  Mr. Perez, go ahead.

20          MR. PEREZ:  Yeah.  Just to give it a little bit of

21  context, Your Honor, as the Court is aware, several months

22  ago you heard the dispute as to the Oarie (phonetic).  And

23  so I think our agreement is that we will endeavor to get

24  that dispute resolved before the Plan goes effective.  And

25  determining on how the Court rules, then with respect to the

1  operating agreement it'll be either assumed or rejected,

2  depending on the Court's ruling.  So what we would need to

3  do is to get a date certain from the Court, you know, early,

4  you know, certainly by the 15th of July, if possible, to get

5  a -- so that we can have some definition on that before we

6  go effective.

7          THE COURT:  Okay.  Mr. Baay and Mr. Perez, are you

8  all available July the 8th at 1:30 in the afternoon?

9          MR. PEREZ:  Should ask Ms. Choi and Mr. Carlson

10 but I suspect they are.

11         THE COURT:  I suspect they just became free with

12 that statement.  Mr. Baay, how about you?

13         MR. BAAY:  That one's good for me.  I will

14 hopefully by -- our witnesses are available, that's a good

15 date for me --

16         THE COURT:  Okay.  If you guys have witness

17 availability problems or seriously if Weil Gotshal doesn't

18 have enough lawyers to attend the hearing, whatever comes

19 up, we'll move it to another day.  But let me give you that

20 day and then you all can contact Ms. Do if you need to move

21 it.

22         MR. PEREZ:  All right.  And we'll -- I will -- and

23 we'll work together with -- and Mr. Baay to figure out what

24 additional pleadings need to be filed so that we can frame

25 the issues.  I think the Court got a flavor for it last time

1  but we will do that as well.

2         THE COURT:  All right.  Thank you.  Ms. Heyen or

3  Mr. Duewall.  I'm not sure who that is.

4         MR. DUEWALL:  Thank you, Your Honor.  It is Craig

5  Duewall on behalf of BP reporting back to the Court.  Our

6  phone lines remain open but no comments or language has yet

7  been received.  We are, however, prepared to go forward with

8  our witness at this time in order to try to make a push to

9  get this finished today.  So that is our Plan.

10        One housekeeping matter before we get there is

11  that before we broke, during the last break we were

12  discussing Exhibit 1620-1, which is the Declaration of

13  Mr. Hanson.  I must admit, Your Honor, I didn't realize I

14  didn't have it front of me that attached to that Declaration

15  were his two expert reports, and we had admitted those

16  yesterday as demonstratives, and just wanted to confirm with

17  the Court that we were -- that they were manning -- were

18  continuing to be admitted only for demonstrative purposes.

19  Otherwise, I don't have an objection to the 1620-1 that we

20  were discussing previously.

21        THE COURT:  And, Mr. Genender, I think that was

22  you that was handling that, don't have your line active.  I

23  just need you to confirm that that was the admission that

24  you were offering.  Can you -- there we go.  Mister --

25        MR. GENENDER:  Yes, Your Honor, to the extent

1  there was any ambiguity, we agree with Mr. Duewall's

2  clarification, that's fine that those are -- the attachments

3  are in for demonstratives, but what is testimony and

4  admitted evidence are the actual texts, the text of the

5  Declaration, the seven or eight pages of the document.

6          Thank you, Judge.

7          THE COURT:  Thank you.

8          And thank you for the clarification, Mr. Duewall.

9          All right, Mr. Duewall, who's going to be your

10  witness?

11          MR. DUEWALL:  Thank you, Your Honor.  My colleague

12  will present this witness on Direct.

13          THE COURT:  All right.  Thank you.

14          MR. HUTTON:  Yeah, thank you, Your Honor, John

15  Hutton from Greenberg Traurig.  And, Your Honor, on behalf

16  of BP, Your Honor, we're going to call our first witness who

17  is Adriana Bonjour.

18          THE COURT:  All right.

19          MR. HUTTON:  I think perhaps we need a minute to

20  have her set up.  Okay, there we go.

21          THE COURT:  Ms. Bonjour, good afternoon.

22          Ms. Bonjour, can I get you to press five, star on

23  your phone, please, Ms. Bonjour, or whoever's there in the

24  meeting with you?  There we go.

25          Good afternoon.

1        MS. BONJOUR:  Can you hear me?

2        THE COURT:  Would you raise your hand for me,

3   please?

4    (Witness sworn.)

5        THE WITNESS:  Yes.  I do.

6        THE COURT:  Thank you.  All right, --

7        MR. HUTTON:  Okay.

8        THE COURT:  -- let's go ahead and proceed.

9        MR. HUTTON:  Okay.

10       DIRECT EXAMINATION OF ADRIANA BONJOUR

11   BY MR. HUTTON:

12   Q    Please state your name for the Record.

13   A    My name is Adriana Bonjour.

14   Q    And, Ms. Bonjour, by whom are you employed?

15   A    I'm employed by BP Exploration and Production.

16   Q    Okay.  And what is your what is your position with BP

17   (glitch in the audio) --

18       THE COURT:  I can't hear you, sir.

19       THE WITNESS:  Sorry, --

20       THE COURT:  Hold on.

21       THE WITNESS:  Sorry, it didn't come through.

22       THE COURT:  Yeah.

23       MR. HUTTON:  It didn't come through.

24   BY MR. HUTTON:

25   Q    Ms. Bonjour, what is your position with BP?  I'm just

1  shortening it to "BP."

2  A    My position at BP is senior controller.

3  Q    And how long have you worked as senior controller for

4  BP?

5  A    I've been a senior controller for BP for five years, at

6  BP for a total of 15 years in controller roles.  Before

7  that, I was an auditor and in public accounting for ten

8  years, and I'm a CPA.

9  Q    Okay.  Thank you.  Ms. Bonjour, do you hold any

10  certifications?

11  A    I'm sorry, it's hard to hear.

12  Q    I'm sorry, you --

13          THE COURT:  Yeah.  I just --

14  Q    -- do you hold any certifications?

15          THE COURT:  I'm going to interrupt you both for a

16  minute.  Let's take a minute and get both your sound working

17  because you're both coming through really poorly.  Can we

18  get your microphone moved closer to you, please,

19  Ms. Bonjour?

20          MR. HUTTON:  Okay.  Your Honor, is this better?

21          THE COURT:  No.

22          THE WITNESS:  Is this better?

23          THE COURT:  Let's do this one at a time.

24  Ms. Bonjour, let's get yours squared away first.

25          THE WITNESS:  Can you hear me okay now?

1           THE COURT:  That is better, thank you.  And now
2  let's go to Greenberg.
3           MR. HUTTON:  Okay.  What about now, Your Honor, is
4  this clear?
5           THE COURT:  It is.
6           MR. HUTTON:  Can you hear okay?
7           THE COURT:  Why don't you sit up and let's just
8  see if we can hear you in a -- we ought to be able to hear
9  you normally.  I mean, try it now.
10          MR. HUTTON:  Okay.  Testing again.
11          THE COURT:  Yeah, that seems better.  Let's go
12 ahead then.  And --
13          MR. HUTTON:  Okay.
14          THE COURT:  -- if you all can't hear each other,
15 it's essential that you tell each other you can't understand
16 it, by the way, and we'll just take the time to get it
17 fixed.  I don't want you all to get too frustrated about
18 this because I'm not going to get frustrated with a COVID
19 technology problem.  We'll just -- patience is the only
20 thing I've learned in the last 18 months, so take your time
21 and let's get it right.
22          MR. HUTTON:  Thank you, Your Honor, and I
23 appreciate that.
24 BY MR. HUTTON:
25 Q    Ms. Bonjour, what are your responsibilities as senior

1  controller at BP?

2  A    As senior controller at BP, it's my job to ensure that

3  the financial statements are represented fairly and reflect

4  the business transactions.  And I'm also responsible for

5  ensuring a sound control environment.

6  Q    Okay.  Does your role as senior controller at BP

7  involve reporting on transactions based upon agreements with

8  Fieldwood Energy, LLC?

9  A    Yes, under my remit (phonetic), I'm responsible for

10  reviewing the agreements between Fieldwood and BP to ensure

11  that they're reported accurately in financial statements.

12  Q    Ms. Bonjour, are you familiar with the Purchase and

13  Sale Agreement with Fieldwood Energy, LLC and BP Exploration

14  and Production, Inc. --

15        THE COURT:  I couldn't understand --

16  Q    -- dated May --

17        THE COURT:  I can't understand you.

18  Q    Ms. Bonjour, are you familiar with the Purchase and

19  Sale Agreement by and between Fieldwood --

20        THE COURT:  No, that's worse.  Let's just --

21        MR. HUTTON:  Okay.

22        THE COURT:  It may be you just have a bad line

23  calling in.  I don't know.  But let's take a moment, let's

24  get it right because it's not right.  And I know you want it

25  right more than I do so let's just take a moment, let's get

ADRIANA BONJOUR - DIRECT BY MR. HUTTON                    67

1    your tech people there to fix it, or just redial it --

2              MR. HUTTON:  Okay.

3              THE COURT:  -- that because it's a bad connection.

4              MR. HUTTON:  Okay.  All right.  Your Honor, I

5    think we're going to try to dial back in.

6         (Pause from 4:08 p.m. to 4:09 p.m.)

7              THE COURT:  Mr. Genender, I am also picking up

8    noise from your line.  I'm not sure where that's coming

9    from.

10             MR. GENENDER:  Okay.  I'm in the same room as

11   Ms. Choi who's going to be handling objections for this

12   witness so I can't -- it's coming from -- we'll --

13             THE COURT:  Okay.  Well I need you all to stop --

14             MR. GENENDER:  Did it stop?

15             THE COURT:  -- moving papers and stuff.

16             MR. GENENDER:  We'll do it.

17             THE COURT:  Thank you.

18             MR. GENENDER:  Okay.

19        (Pause in the proceeding.)

20             THE COURT:  All right.  Let's try that again then.

21             MR. HUTTON:  Okay, Your Honor, this is John

22   Hutton.  I dialed back in.  I don't know if -- hopefully the

23   connection's better now.

24             THE COURT:  I think it is.  Let's try it.

25             MR. HUTTON:  Okay.

1  BY MR. HUTTON:

2  Q    Ms. Bonjour, are you familiar with the Purchase and

3  Sale Agreement by and between Fieldwood Energy, LLC and BP

4  Exploration and Production, Inc. dated May 17th of 2019

5  which appears as BP Exhibit 27?

6           MR. HUTTON:  And for Your Honor, that's Docket

7  Entry 1607-27.

8  A    Yes, I am.

9           MR. HUTTON:  And actually we'll -- this is a

10 highly confidential document so we're not going to put up on

11 the screen.  Will you take it down?  Oh, okay.

12 Q    Ms. Bonjour, are you familiar with that document?

13 A    Yes, I am.

14 Q    Okay.  Are you also familiar with the cash

15 consideration exchange agreement by and between Fieldwood

16 Energy, LLC and BP Production -- Exploration Production,

17 Inc. dated -- well, relating to the Mississippi Block Canyon

18 562 dated October 15th of 2018, which we refer to as the

19 Isabella PSA and which appears as BP Exhibit 28?

20           MR. HUTTON:  And, Your Honor, that is Docket Entry

21 1607-28.

22 A    Yes, I am.

23 Q    Okay.  And, Ms. Bonjour, how did you become familiar

24 with the MC519 PSA and the Isabella PSA?

25 A    In my role, it's my responsibility to review those when

1   they're signed to look at the transactions to make sure that

2   they're recorded properly in the financial statement.

3   Q    Okay.  And are you familiar with the payment terms of

4   the MC519 PSA, including Section 3.1 of that agreement?

5   A    Yes, I am.

6   Q    And, Ms. Bonjour, what are those payment terms?

7   A    So in that agreement, Fieldwood agreed, among other

8   things, to pay $30 million to BP upon the completion of the

9   Genovesa well, and with payment remitted within 180 days of

10  production.

11  Q    And when was the Genovesa well brought online?

12           THE COURT:  I didn't hear that, I'm sorry.

13  A    On the 27th.

14           THE COURT:  I just didn't hear it.

15  Q    When was the Genovesa well brought online?

16           THE COURT:  I didn't hear it.

17  A    March 27th --

18           THE COURT:  Sorry.

19  Q    Ms. Bonjour, when was the Genovesa well brought online?

20  A    March 27th, 2021.

21  Q    And when did the $30 million obligation become payable

22  and owing?

23           MS. CHOI:  Objection, Your Honor.  That calls for

24  a legal conclusion.

25           THE COURT:  Sustained.

1  BY MR. HUTTON:

2  Q    Your -- Ms. Bonjour, when, for purposes of accounting,

3  do you treat this as a matured obligation?

4  A    So under IRS accounting rules, it is a contingent

5  receivable upon signing that's due and payable when the well

6  is completed, which would have been March 27th, 2021.

7            THE COURT:  I'm going to --

8  Q    And --

9            THE COURT:  I'm going to strike the latter part of

10  the answer.  That went beyond your question and it resulted

11  in a legal conclusion.

12  Q    Ms. Bonjour, for accounting purposes, is the $30

13  million obligation a matured obligation?

14  A    For accounting purposes, yes.

15  Q    Was the $30 million obligation a contingent obligation

16  at the time the MC519 PSA was signed, for accounting

17  purposes?

18  A    Yes.  It was a contingent receivable when the agreement

19  was signed.

20  Q    Has Fieldwood made any (glitch in the audio) on the

21  MC519 -- on the $30 million obligation contained in the

22  MC519 PSA?

23  A    No.

24  Q    Ms. Bonjour, are you also familiar with the payment

25  terms of the Isabella PSA, including Section 3.1 of that

1  agreement?

2  A    Yes, I am.

3  Q    Okay.  What are the payment terms on the Isabella PSA?

4         MS. CHOI:  Objection, Your Honor, calls for a

5  legal conclusion.

6         MR. HUTTON:  Your Honor, I'm not asking for a

7  legal conclusion.  She is a senior controller at BP,

8  responsible for reporting and recording the transactions

9  between BP and Fieldwood and the books and record and the

10  financial statements of BP, and in that capacity she has

11  testified that she has responsibility for reviewing

12  agreements and for reporting them accurately.  And I think

13  given her experience and her role, it is appropriate for her

14  to provide testimony regarding these transactions.

15         THE COURT:  Sustain the objection.

16  BY MR. HUTTON:

17  Q    Ms. Bonjour, as a senior controller for BP, when did

18  the receivable due to BP under the Isabella PSA?

19  A    Under the Isabella PSA, we recorded the liability when

20  the agreement was signed in 2018 for $66 million.

21  Q    And what is the remaining obligation due under the

22  Isabella PSA from BP to Fieldwood?

23  A    As of today, there's 12.7 million remaining to be paid.

24  Q    Are the parties to the MC519 PSA and Isabella PSA the

25  same?

1   A     Yes, Fieldwood and BP.

2   Q     In your review of transactions between BP and

3   Fieldwood, have the parties ever netted out amounts due from

4   one against amounts due to the other?

5   A     Yes.  In the normal course of business, various

6   transactions will arise net one between the other.

7   Q     And can you please provide some examples of that?

8   A     Sure.  One of the first examples I have is we submit

9   invoices to Fieldwood for payment, and under the agreement,

10  Fieldwood paid a hundred percent of that.  If there are any

11  questions about what's on the invoice for the agreements say

12  that we would discuss that after payment --

13              MR. SPEAKER:  Kesha, --

14  A     -- and then decide how to --

15              MS. CHOI:  Your Honor?

16  A     -- payment (glitch in the audio)

17              MS. CHOI:  Sorry.  I'm having trouble hearing the

18  witness, she's breaking up.  And also I think there may have

19  been a legal conclusion in there.  But I'm having trouble

20  hearing, it's breaking up.

21              THE COURT:  I am, too.  I am, too.  Is there a

22  reason why we can't put the phone right near you,

23  Ms. Bonjour?

24              THE WITNESS:  Right -- I've got it right here

25  close to me.

1          THE COURT:  When you picked it up there it was

2    sure a lot more clear.  Let's -- I hate to have you hold it

3    but --

4          THE WITNESS:  I need to hold it up.  Okay.  I'll

5    do my best.  I can hold it here.  Is this better?

6          THE COURT:  It is better.  I hate to have you hold

7    it.  You want to maybe --

8          THE WITNESS:  Okay.

9          THE COURT:  -- put it on top --

10         THE WITNESS:  All right.  That's okay.

11         THE COURT:  -- of a book or something like that?

12   Because it -- I don't need to inconvenience you either while

13   we're doing this but we get -- we do have to hear you

14   better.

15         THE WITNESS:  Okay.  Here we go.  I'll hold it up.

16   Is this better?

17         THE COURT:  We'll try it, we'll try it.  So I'm

18   going to --

19         THE WITNESS:  Okay.

20         THE COURT:  -- whatever that answer was, I had

21   trouble hearing it as well, I'm going to ask that we re-ask

22   the question, we'll redo the answer, and the prior answer

23   will not be recorded for -- in my notes or for the record so

24   that we can get an answer that we can all hear.

25         MR. HUTTON:  Okay.  Thank you, Your Honor.

1          THE COURT:  You remember the question, you can re-

2    give the answer, or else he can re-ask the question,

3    Ms. Bonjour, whatever's most convenient for you.

4          THE WITNESS:  Please re-ask the question.

5          MR. HUTTON:  Certainly.

6    BY MR. HUTTON:

7    Q    Ms. Bonjour, in your review of transactions between BP

8    and Fieldwood, have the parties ever netted out amounts due

9    from one against amounts due to the other?

10   A    Yes.  In the normal course of business we have netted

11   amounts out between each other.

12   Q    Okay.  And can you please provide some examples of

13   that?

14   A    Sure.  We submit invoices to Fieldwood for payment, and

15   where there are questions that Fieldwood has, they are to

16   pay the invoice in full, we discuss any questions they have,

17   and agree how to remit the payment back.  And many times, if

18   there was a valid refund that was due, we would go ahead and

19   net it against the next jib, "jib" being invoice.

20   Q    Any other examples?

21   A    Sure.  Another example was when Fieldwood elected to

22   participate in an exploration well last year; then, after

23   work commenced, they decided to back out and we allowed

24   that.  And so they were obligated to pay their share of

25   expenses up to that time.  An agreement was made to forego

1   that and let them not pay, and we allowed them to net that

2   against their invoice.

3        And then another example is one that I -- is when BP

4   still owned an interest, working interest in the MC519

5   assets, where BP would invoice Fieldwood as the operator,

6   Fieldwood would then pay that in full and then bill BP for

7   its working interest share in the MC519 well.  In September

8   of 2018, Fieldwood asked if we could begin to net those,

9   although they're separate agreements.  We responded by

10  saying we had just put in a new accounting system, can we

11  pick it up in January of 2019 to discuss netting.  And

12  Fieldwood went ahead and began to start netting in October,

13  which continued until we sold our working interest in those

14  wells in May of 2019.

15           MR. HUTTON:  Okay.  Thank you, Ms. Bonjour.  No

16  further questions at this time, Your Honor.

17           THE COURT:  Thank you.

18           Any Cross-Examination, Ms. Choi?

19           MS. CHOI:  Yes, Your Honor.  Erin Choi on behalf

20  of the Debtors.

21              CROSS-EXAMINATION OF ADRIANA BONJOUR

22  BY MS. CHOI:

23  Q    Ms. Bonjour, isn't it the case that there were delays

24  in BP's part in paying undisputed jibs to Fieldwood?

25  A    Can you repeat the question?

1  Q     Yes.  I said, Ms. Bonjour, isn't it the case that there

2  were delays on BP's part in paying undisputed jibs to

3  Fieldwood?

4  A     Which specific jibs?

5  Q     In connection with the Isabella agreement.

6  A     In connection with the Isabella agreement, no, I don't

7  recall anything with Isabella agreement with unpaid or late

8  jib.

9  Q     In 2019, isn't it the case that there were delays on

10  BP's part in paying undisputed jibs to Fieldwood?

11  A     I think you're referring to the MC519 assets, which is

12  separate from the Isabella.  And on those, that is when

13  Fieldwood began to net and we asked -- the amounts do not

14  calculate properly so we would ask for information in order

15  to substantiate the amount that they had billed.  So there

16  were some delays on both sides.

17  Q     But there were delays on BP's part in paying those jibs

18  to Fieldwood; isn't that right?

19  A     Yes.  As we worked --

20  Q     Yes.

21  A     -- through how they were netting the jibs.

22  Q     Isn't it the case that BP outsources its accounting

23  services?

24  A     Yes, partially.

25  Q     And isn't it the case that there were delays in upwards

ADRIANA BONJOUR - CROSS BY MS. CHOI                    77

1  of a year in fact in BP paying Fieldwood the money owed

2  under the agreements that we were just discussing?

3  A    No.  There was a final settlement statement.  Are you

4  referring to the final settlement statement?  Because there

5  were no delays of up to a year for regular invoices.

6  Q    There were delays up to nine months.

7  A    It's possible nine months.  I don't recall exactly

8  without knowing the specific invoices that you're referring

9  to.

10 Q    And this was money that Fieldwood had essentially

11 loaned to BP; isn't that right?

12 A    Not the way -- I don't see it that way.  I don't know

13 which invoices you're speaking of specifically.

14 Q    Because Fieldwood had paid BP's share for these wells

15 during this time; isn't that right?

16 A    We were getting delays on payment from Fieldwood as

17 well during that time so it's hard to say that we were

18 loaning them money when there was a lot of delays in

19 payments on both sides.

20 Q    The BP payments that were delayed, isn't it true that

21 at a certain point Fieldwood tried to net what it owed BP

22 against what BP owed Fieldwood?

23 A    Fieldwood began netting way before that happened.  We

24 were current up until that point.  And then Fieldwood began

25 to net and the calculation did not add up, so then there

1  were delays on both sides where BP said, Fieldwood, you

2  haven't paid us for the full amount, and then Fieldwood

3  said, you're not paying us for that money that we couldn't

4  get the calculation for.  So it was on both sides.

5  Q    Isn't it true, though, that BP objected to netting and

6  didn't agree to it?

7  A    No.  What BP said is the agreements do not allow

8  netting and if they would live -- let us speak about it in

9  January, because we had just input a new accounting system

10 in September of 2018, we responded and said, can we have a

11 conversation in January, 2019 to let us talk to our legal

12 team, as well as to kind of settle out our accounting

13 system.

14 Q    Ms. Bonjour, there's a difference between netting and

15 credit, would you agree?

16 A    That's the difference, yeah, yes.

17 Q    And in this case, there is a disagreement about

18 netting; is that your testimony?

19 A    There was a disagreement about the netting, yeah, two

20 different invoices from two different agreements.

21        MS. CHOI:  Excuse me, one moment.

22 Q    Ms. Bonjour, there was not in fact a course of dealing

23 on netting, was there?

24        THE COURT:  I'm sorry, I didn't hear.  There --

25 A    Can you repeat that?

1             THE COURT:  -- was not a what on netting?

2   Ms. Choi, I just didn't hear the word.

3   Q    There was not a course of dealing between these parties

4   with respect to netting, was there?

5   A    I'm sorry, I don't understand the question, there was

6   not a course of dealing.  Can you repeat the question or

7   restate it?

8   Q    Ms. Bonjour, in your testimony you testified that there

9   was in the normal course some kind of netting that happened.

10  But it is not the case that there was in fact a course of

11  dealing between these parties respect to netting, was there?

12  A    Yes, there was plenty of times where we received

13  payment from Fieldwood on invoices where items were netted

14  out.  That was per course of business the way it's been for

15  as long as we've been in business with Fieldwood.

16  Q    But there were no disagreements, were there or were

17  they?

18  A    There were conversations.  I don't know if I would call

19  them disagreements but there are conversations when

20  Fieldwood asked to begin to net two separate agreements

21  against each other where BP said, that's not allowed, we can

22  talk about it in a couple months, give us some time, and

23  then netting happened anyway.  So I don't know if I would

24  call that a disagreement as much as I would call it let's

25  have a conversation, but Fieldwood went ahead and net anyway

1  without letting us have that conversation.  So if that's the

2  disagreement, then yes.

3          MS. CHOI:  No further questions.

4          THE COURT:  Thank you.

5          Any follow-up?

6          MR. HUTTON:  No Redirect, Your Honor.

7          THE COURT:  Thank you.

8          Ms. Bonjour, sorry it was so hard to do it, but

9  once we got it going it seemed to work well.  Thank you for

10 coming today.  If you want to stay for the balance of the

11 hearing, it's a public courtroom; otherwise, you're free to

12 go about your business.

13         THE WITNESS:  All right.  Thank you so much.

14         THE COURT:  Thank you.

15     (Witness excused.)

16         MR. DUEWALL:  Your Honor, Ms. Bonjour is our only

17 witness, so I suppose we stand in recess until 5:00.

18         THE COURT:  All right.  Let me just be sure so

19 that we are at least being reasonably efficient about this.

20 Is there any other party that has any other witnesses that

21 they want to introduce at today's hearing, besides the one

22 witness we know that we're going to get from the Debtor,

23 Mr. Hanson?

24     (No audible response)

25         THE COURT:  All right.  I'm going to show that all

1   opponents to confirmation have now rested their case in

2   chief.  Subject to rebuttal, the last witness will be

3   Mr. Hanson.  And we'll -- do we have an update on when he'll

4   be available, Mr. Genender?

5            MR. GENENDER:  Your Honor, Paul Genender.  I've

6   been checking with him and the latest I've heard is not

7   before 5:00 but at 5:00.  And so that's the best I have.

8   I --

9            THE COURT:  That's fine.  I don't have a problem

10  with that if -- but I didn't want him just cooling his heels

11  for 20 minutes either.  So we'll come back at 5:00 and we'll

12  call the case at 5:00.  We'll adjourn until then.

13           MR. GENENDER:  Thank you, Judge.

14           THE COURT:  Thank you.

15       (Recess taken from 4:27 p.m. to 5:03 p.m.)

16                      AFTER RECESS

17           THE COURT:  All right.  We're going back on the

18  Record in the Fieldwood case.  If I could get Mr. Hanson,

19  please, to press five, star on his phone, we'll get him

20  recognized, as well as counsel that wishes to examine him,

21  and anyone else that wants their line enabled.

22           Mr. Hanson, do we have you there?  Good afternoon.

23           MR. HANSON:  Hello, Your Honor.

24           THE COURT:  Afternoon.  Mr. Genender, I think I've

25  got your line down.  And Mr. Zuber wants his line activated

1  as well.  Mr. Zuber, good afternoon.

2          MR. ZUBER:  Good afternoon, Your Honor.

3          THE COURT:  All right.  Are we ready to proceed?

4          MR. GENENDER:  Yes, Your Honor.  May I proceed?

5          THE COURT:  All right, Mister --

6          MR. GENENDER:  Oh, I guess he needs to be -- yes,

7  all right.

8          THE COURT:  Thank you.

9          MR. GENENDER:  My questions won't do a lot before

10  you swear him in so thank you, Judge.

11      (Witness sworn.)

12          THE COURT:  Thanks, Mr. Hanson.  Go ahead, please,

13  Mr. Genender.

14          MR. GENENDER:  Thank you, Your Honor.  Paul

15  Genender, Weil, Gotshal, and Manges for the Debtors.  Good

16  afternoon, Mr. Hanson.

17          THE WITNESS:  Hello, Mr. Genender.

18          DIRECT EXAMINATION OF JOHN-PAUL HANSON

19  BY MR. GENENDER:

20  Q    Could you please state your full name for the Record?

21  A    Yeah.  It's John-Paul, J-O-H-N hyphen P-A-U-L, Hanson,

22  H-A-N-S-O-N.

23  Q    Mr. Hanson, you understand that the Declaration that

24  you prepared and filed -- and was filed as of June 13th,

25  2021, at Debtors' Exhibit 52, the eight-page Declaration,

1  has already been admitted into evidence as your testimony;

2  are you aware of that?

3  A    Yes.  That's my understanding.

4  Q    Okay.  And that the reports that you prepared that were

5  attached to that Declaration as Exhibits 1 and 2 are

6  admitted for demonstrative purposes only; are you aware of

7  that?

8  A    Yes, I'm aware of that.

9  Q    And are you also aware that Debtors' Exhibit 107, which

10 is ECF 1625-31, is also admitted for demonstrative purposes?

11 A    That's my understanding as well.

12 Q    Okay.  And those are the -- those are that -- that's

13 the universe of documents I'm going to reference in my short

14 direct, supplementary direct of you, okay?

15 A    Okay.

16 Q    As it relates to Exhibits 1 and 2 to your Declaration,

17 do those documents fairly and accurately reflect your

18 opinions that you're offering on valuation in this case?

19 A    Yes, they do.

20          MR. GENENDER:  And if we can put up Debtors'

21 Exhibit 107 on the screen, Your Honor, would you mind to

22 make Mr. Miller, Ron Miller, share the screen with him,

23 please?  Or make him the presenter I should say.

24          THE COURT:  I am doing that right now.

25          MR. GENENDER:  I should know how to say that --

1            THE COURT:  All right.

2            MR. GENENDER:  I should know how to say that,

3  Judge, by now.

4            THE COURT:  One day.  You're getting old, hard to

5  remember those things.  Mr. Miller now has the presenter

6  role.

7            MR. GENENDER:  Thank you, Judge.  Mr. Hanson, if

8  we can go to the second page, I'm going to walk through this

9  briefly.

10  BY MR. GENENDER:

11  Q    Second page of demonstrative Debtors' Exhibit 107,

12  entitled:  "Key Assumptions;" do you see that?

13  A    Yes, I do.

14  Q    Okay.  And what's the significance, Mr. Hanson, of

15  relying on the midyear 2020 database as opposed to the

16  yearend 2020 database?

17  A    When we first formulated the valuation opinions, the

18  yearend database was not yet complete and it had not been

19  audited by the third party auditor, Ryder Scott.  And so

20  what we did was utilized the midyear 2020 report, we rolled

21  forward production, applied the forecasted expenses to that,

22  and ran it at the then-appropriate commodity price strip or

23  forward curves as of March 5th, and provided our valuation,

24  draft valuation opinions at that time.  Subsequent to

25  working on those drafts, the company and its auditors

1   finalized the yearend reserve report.  We reviewed that

2   yearend reserve report, did a compare and contrast to ensure

3   that the conclusions of valuation wouldn't be materially

4   impacted.  They in fact were not and so we continued to rely

5   upon the midyear report only because the basis of our work

6   had been conducted in that database file and the yearend

7   report was not materially different than our roll forward.

8            MR. GENENDER:  Thank you.  If we can turn to the

9   third page of the demonstrative.

10  BY MR. GENENDER:

11  Q    Mr. Hanson, does this page fairly and accurately

12  summarize your valuation conclusions?

13  A    Yes, it does.

14  Q    All right.  Can you explain to the Court why you used

15  certain of the valuation methodologies for certain of the

16  entities and not for others?  If I could ask it that way.

17  A    In an ideal scenario we would have utilized all of the

18  methodologies for each of the entities.  However, only

19  select methodologies for Fieldwood One, Fieldwood Three, and

20  Fieldwood Four were in fact applicable.  NewCo, or Credit

21  Bid Purchaser, however you would like to term it, we were

22  able to utilize all three methodologies because it is a

23  going concern.

24       There are not only relevant underlying assumptions

25  against which we can apply the net asset valuation

1  methodology but also precedent transactions that are

2  relevant, as well as publicly traded comparable companies.

3  For Fieldwood One, we were able to utilize the net asset

4  value, or NAV, approach methodology.  And there are a couple

5  of precedent transactions that we were able to utilize

6  because there were some -- a couple of comparable

7  transactions with heavy weighting on P and A.

8       But for Fieldwood Three and Fieldwood Four, there

9  really are no comparable transactions and no public trading

10 comps for any of Fieldwood One, Fieldwood Three, or

11 Fieldwood Four as none of those three entities are going

12 concerns.  And Fieldwood Three and Fieldwood Four do not

13 contain any producing assets.

14 Q    Thank you.  In terms of where you weighted for net

15 asset value 70 percent for NewCo and for Fieldwood One, can

16 you walk the Court through your judgment in arriving at that

17 weighting?

18 A    It is fairly typical for oil and gas valuation experts

19 to rely upon the net asset valuation methodology greater

20 than the other methodologies.  The oil and gas assets are of

21 their own right, they're all bespoke (phonetic).  There is

22 no -- and, you know, a hundred percent comparable asset one

23 from the other, there is no hundred percent comparable

24 operating Plan or development Plan from one company to the

25 next.

1      And so it is typical that there would be a heavier

2   weighting on the net asset valuation methodology relative to

3   the two other methodologies, particularly when you're

4   dealing with offshore oil and gas in conventional reserves.

5   That is even more the case, and particularly where there's a

6   limited subset of precedent transactions or publicly traded

7   comparable companies.  As a result, where a typical range of

8   weighting would be between 50 and 70 percent on the NAV

9   relative to the other methodologies, we went at the high end

10  of that typical practitioner's range at 70 percent, given

11  the very cost of a bespoken nature of these assets and the

12  lack of comparability in operating and development Plan for

13  Fieldwood -- for NewCo or Fieldwood One, Fieldwood Three,

14  and Fieldwood Four relative to other companies.

15  Q    Thank you.  Mr. Hanson, referring to pages four and

16  five of Exhibit Demonstrative 107, do those reflect the

17  detail that you used that -- your detail in connection with

18  your net asset value opinions for NewCo and Fieldwood One

19  respectively?

20  A    Well, I would say that this is a summary buildup.

21  There obviously is a lot more detailed work that went into

22  it but this is a summary buildup to the NAV for each of

23  NewCo and Fieldwood One, yes.

24  Q    And are these opinions net of ARO, Asset Retirement

25  Obligations?

1  A    Yes.  They are inclusive, they incorporate the ARO

2  liabilities.

3  Q    Thank you.  Did you also opine on residual

4  distributable value in connection with your work?

5  A    Yes, I did.

6  Q    And did you do that -- for which of the entities did

7  you do that for?

8  A    Well, ideally we would have done it for each of

9  Fieldwood One, Fieldwood Three, and Fieldwood Four.

10 Basically the residual distributable value is a means of

11 valuing the membership interests that will be owned or held

12 by the unsecured creditors.

13      It really is an option value.  However, at this stage,

14 given that the midpoint valuation for each of Fieldwood One,

15 Fieldwood Three, and Fieldwood Four is negative, and

16 Fieldwood Three and Fieldwood Four, given that they have no

17 producing assets, they have no inherent positive value.

18      And so while ideally Fieldwood Three and Fieldwood Four

19 would have been contributors to that residual distributable

20 value, the reality is that a hundred percent of this value

21 came from Fieldwood One in an option value context.

22 Q    And on the screen is page seven of the demonstrative

23 Debtors' 107; what does that reflect in connection with your

24 residual distributable value analysis?

25 A    Well, as mentioned, the residual distributable value

1  really is option value given at the midpoint for each of the

2  three entities.  The midpoint valuation is negative.  So

3  what the reason there is option value, however, in Fieldwood

4  One is because under certain commodity priced circumstances,

5  under operating costs, improvements, or where operating

6  costs or Asset Retirement Obligations come in below what is

7  forecast and therefore there is more cash and more cash flow

8  from Fieldwood One than currently forecast, then the

9  membership interest in Fieldwood One would actually have

10 value.

11      And so what we did was a -- utilized a typical option

12 value methodology, which is the Black-Scholes Formula.  And

13 this page seven highlights the underlying assumptions on a

14 range of values for that residual distributable value or

15 membership interest on an option basis.

16 Q    Thank you.  Mr. Hanson, did you hear Mr. Dane's

17 testimony about the use of P50 versus P90 that he offered

18 yesterday?

19 A    Yes, I did.

20 Q    Do you agree with it?

21 A    I do, yes, entirely.

22          MR. GENENDER:  If we'll turn to page nine of the

23 demonstrative, please, Exhibit 107, Debtors' 107.

24 Q    Mr. Hanson, does this picture on the right of the page

25 fairly and accurately describe which reserves in your view

1  should be included in valuing the assets?

2  A    This demonstrates the reserves that should be included,

3  which in my expert opinion includes the proved, or P90,

4  reserves and the probable, or P50, reserves.  One aspect

5  that Mr. Dane spoke about yesterday is that P50 is at its

6  heart in a definition probable.  It is greater than a 50

7  percent probability.  It's not proved, it's not certain.

8          A P90 is greater than a 90 percent probability

9  and, therefore, there is almost a certainty of outcome, or

10 it is a proved outcome, where a 50 percent or greater

11 probability, or P50, is in fact by definition the most

12 probable of outcomes.

13         MR. GENENDER:  Thank you.  I will pass the

14 witness.  Thank you, Mr. Hanson.

15         THE COURT:  Thank you.  Are there any advocates of

16 confirmation that have questions for Mr. Hanson?  If so,

17 please press five, star one time.

18     (No audible response)

19         All right.  Are there any opponents to

20 confirmation that have questions for Mr. Hanson?

21     (No audible response)

22         Mr. Duewall, I've got your line active.

23         MR. DUEWALL:  Thank you, Your Honor.

24         Craig Duewall on behalf of BP.

25         Good afternoon, Mr. Hanson.

1          THE WITNESS:  Hello, Mr. Duewall.

2            CROSS-EXAMINATION OF JOHN-PAUL HANSON

3  BY MR. DUEWALL:

4  Q    Mr. Hanson, you'll agree that your opinions are limited

5  strictly to valuation.

6  A    That's correct.

7  Q    And in your report and your testimony, you've expressed

8  no opinions regarding the feasibility of NewCo.

9  A    No, I have not.

10 Q    And in your reports and testimony you've expressed no

11 opinions regarding whether or not the confirmation of the

12 proposed Plan is likely to be followed by a liquidation of

13 NewCo; is that correct?

14 A    That's correct.

15 Q    And in your testimony and reports, you've expressed no

16 opinions regarding whether or not the confirmation of the

17 proposed Plan is likely to be followed by the need for

18 further financial reorganization of NewCo; is that correct?

19 A    I have not expressed any of those opinions.

20          MR. DUEWALL:  That's all I have, Your Honor, I

21 pass the witness.

22          THE COURT:  Thank you.

23          Are there further questions for Mr. Hanson by any

24 party?

25     (No audible response)

1          THE COURT:  All right.  Mr. Hanson, thank you for

2   coming in.

3          THE WITNESS:  Thank you.

4       (Witness excused.)

5          THE COURT:  Does the Debtor rest?

6          MR. GENENDER:  Yes, Your Honor.

7          THE COURT:  Do any proponents of confirmation have

8   any additional evidence that they wish to introduce?  Hold

9   on just a moment.  Ms. Archiyan.

10          MS. ARCHIYAN:  (No audible response)

11          THE COURT:  Ms. Archiyan.

12          MS. ARCHIYAN:  Your Honor (glitch in the audio).

13   Good afternoon, Your Honor, Yelena Archiyan on behalf of

14   (glitch in the audio) other affiliates of Energy Transfer.

15          Your Honor, I apologize, but I was caught off-

16   guard before the last break when you asked if anyone from

17   the opposition had witnesses to call.  I didn't have a

18   witness to call and I don't have one to call now, but I was

19   going to request that you take notice of the schedule of

20   assets and liabilities for Fieldwood Energy, LLC, which is

21   at Docket No. 429.  And that establishes Energy Transfer's

22   cash deposit.

23          THE COURT:  Hold on.

24          ECF 429 is Schedule A and B filed by Fieldwood.

25   What -- it's 463 pages.  What part of it do you want me to

1  notice?

2         MS. ARCHIYAN:  I believe it's pages 15 and 17, the

3  Debtors' assets and cash deposits that they're holding.

4         THE COURT:  So ECF --

5         MS. ARCHIYAN:  Or that they (glitch in the audio).

6         THE COURT:  Page 15?

7         MS. ARCHIYAN:  I believe it's page 15.  Hold on.

8      (Pause in the proceeding.)

9         THE COURT:  So I've searched for the words "Energy

10  Transfer" and don't see them -- those words with the search

11  of the 463 pages.  I need more detail on what you want me to

12  look at.

13         MS. ARCHIYAN:  Yes.  If you search Sea Robin

14  (phonetic), I -- it's either page 15 or 17.  And I'm pulling

15  it up right now, I apologize.

16         THE COURT:  That's okay.  Sea Robin?

17         MS. ARCHIYAN:  Yes.

18         THE COURT:  Okay.  Sea Robin Pipeline --

19         MS. ARCHIYAN:  Yes.

20         THE COURT:  -- is listed as a deposit, including

21  security deposits and utility deposits.  At line 717, Sea

22  Robin Pipeline Company, LLC, $975,000 is listed as the

23  current value of the Debtors -- I'm sorry, yeah, is listed

24  as a deposit by the Debtor, right?

25         MS. ARCHIYAN:  Correct.  Yes, so it's page ECF 17.

 1   So and line 726 is Florida Gas Transmission, that's another

 2   affiliate of Energy Transfer, and the corresponding amount

 3   there is $150,000.

 4          THE COURT:  So these are the Debtors' deposits

 5   with your clients.

 6          MS. ARCHIYAN:  Correct.

 7          THE COURT:  Okay.  Is there any objection to me

 8   taking notice that the Debtor has represented that with her

 9   clients there are two deposits:  one totaling 975 with Sea

10   Robin and another totaling 150,000 with Florida Gas

11   Transmission?

12          MS. CHOI:  No objection, Your Honor.  This is Erin

13   Choi from the Debtors.

14          THE COURT:  We'll take notice that those two

15   deposits are listed in the Debtors' schedules.

16          MS. ARCHIYAN:  Thank you so much, Your Honor.

17   We're making progress with Debtors' counsel on the proposed

18   language, and this all may be moot by the end of the day

19   today.  But just in case, thank you very much.

20          THE COURT:  The end of the day is coming soon, so

21   all right.

22          MS. ARCHIYAN:  Well, midnight is coming up.

23          THE COURT:  All right.  Mr. Scharfenberg, go

24   ahead.

25          MR. SCHARFENBERG:  Yeah, good afternoon, Your

1    Honor.  And, I'm sorry, I think I'm in a similar position.

2    I was pressing star five instead of five star earlier.  Just

3    as a --

4              THE COURT:  That'll do it.

5              MR. SCHARFENBERG:  -- matter of housekeeping --

6    yeah.  Just as a matter of housekeeping, I wanted to admit a

7    few exhibits that I understand the Debtors have no

8    opposition to.

9              It is at record document 1613, Exhibits 2, 3,

10   and 4.

11             THE COURT:  All right.  Is -- these are Zurig

12   documents 16, I'm sorry, 16 -- I apologize, --

13             MR. SCHARFENBERG:  Thirteen, one, three.

14             THE COURT:  -- 1613-2, -3, and -4 are being

15   offered.  Any objection?  The indemnity agreement, the

16   escrow agreement, and the bond are being offered into

17   evidence.  All right, we --

18             MS. CHOI:  Your Honor, Erin Choi, no objections,

19   sorry.

20             THE COURT:  All right.

21             MR. SCHARFENBERG:  Thank you.

22             THE COURT:  We're admitting 1613-2, -3, and -4.

23         (Exhibits Nos. 1613-2, 1613-3, and 1613-4 received in

24   evidence.)

25              THE COURT:  Mr. Scharfenberg, anything further?

1          MR. SCHARFENBERG:  Nothing further.  Thank you,

2    Your Honor.

3          THE COURT:  So next time, by the way, I've had

4    people where they get their phone out of sync.  There are

5    two solutions to that.  One is hang up and dial back in once

6    you realize that.  But the other is turn on your camera and

7    wave and I'll eventually find you, Mr. Scharfenberg.

8          MR. SCHARFENBERG:  Sounds great, thank you.

9          THE COURT:  Mr. Woodard.

10          MR. WOODARD:  (No audible response)

11          THE COURT:  Mr. Woodard.

12          MR. WOODARD:  Yes, Your Honor.  I'm in the same

13    boat as my fellow sureties.  We just have our indemnity

14    agreement that was attached as Exhibit Docket Number 1566-1

15    that Ms. Choi graciously consented to the other day but I

16    had not moved the admission.

17          THE COURT:  Is there any objection --

18          MR. WOODARD:  And I would like to do so.

19          THE COURT:  -- to the admission of 1566-1?

20          MS. CHOI:  No objection.

21          THE COURT:  All right, --

22          MR. WOODARD:  Thank you, Your Honor.

23          THE COURT:  -- 1566-1 is admitted.  Thank you.

24        (Exhibit No. 1566-1 received in evidence.)

25          THE COURT:  Does any other party have any evidence

1  or do all parties rest?

2        MR. ZUBER:  Your Honor, this is Scott Zuber.  May

3  I be heard, please?

4        THE COURT:  I'm sorry, who was that?

5        MR. ZUBER:  Scott Zuber.

6        THE COURT:  Mr. Zuber, go ahead, please.

7        MR. ZUBER:  Hi, Your Honor, good afternoon, Your

8  Honor.  Very quickly, again we would also ask that our

9  bonds, indemnity agreements, and certain exhibits be

10 admitted to evidence.  I'm not aware of any objection.  I

11 believe they're Exhibits B, C, D, and E in Document Number

12 1591, one, five, nine, one.

13        THE COURT:  We have an offer of 1591-2, -3, -4,

14 and -5.  Any objection?

15        MS. CHOI:  Your Honor, if Mr. Zuber, you could

16 just remind me which entity you represent?  I apologize.

17        MR. ZUBER:  We represent Aspen, Everest, Berkley.

18     (Pause in the proceeding.)

19        MS. CHOI:  No objection, Your Honor.  Thank you.

20        THE COURT:  Fifteen ninety-one two, three, four,

21 and five are admitted.  Anything further, Mr. Zuber?

22     (Exhibits Nos. 1591-2, 1591-3, 1591-4, and 1591-5

23 received in evidence.)

24        MR. ZUBER:  Yes, Your Honor.  I don't have any

25 witnesses or any cross-examination of any of the witnesses,

1  but I just wanted to make sure that we'll have an

2  opportunity during closing arguments to make other legal

3  arguments in furtherance of what we stated at the opening.

4          We've got, you know, some legal arguments only.

5  And we'll just be referring to documents already in

6  evidence, such as the Plan, the Credit Bid Purchase

7  Agreement.  But just wanted to make sure that we'll have

8  that opportunity in the morning just to make further legal

9  argument, no evidentiary --

10         THE COURT:  You're going to have a chance to make

11 your closing argument tomorrow morning.

12         MR. ZUBER:  Thank you, Your Honor.

13         THE COURT:  Thank you.  Mr. Knapp.

14         MR. KNAPP:  Good afternoon, Your Honor.  Appearing

15 for McMoRan Oil and Gas, we'd like to admit the exhibits

16 attached as 1601 and 1608; 1601 has Exhibits 1 and 2, 1608

17 has Exhibit 3.  My understanding -- these are all operating

18 agreements.  My understanding is the Debtors have no

19 objection.

20         THE COURT:  So I'm going to offer 1601-1, 1601-2,

21 and 1608-1.  Any objection to those three exhibits?

22         MS. CHOI:  No objection, Your Honor.

23         THE COURT:  All three are admitted.  Anything

24 further, Mr. Knapp?

25

1          (Exhibits Nos. 1601-1, 1601-2, and 1608-1 received in

2    evidence.)

3               MR. KNAPP:  That's all.  Thank you.

4               THE COURT:  So this is actually working by me

5    continuing to say this.  I'll say it another time.  Does

6    anyone have any additional evidence to introduce?  Because

7    we're about to close the record.  But feel free if you've

8    got something else that we need to put in the record.  Once

9    it's closed, it's going to stay closed.

10          (No audible response)

11              THE COURT:  Press five star one time on your phone

12   if you wish to speak.

13          (No audible response)

14              THE COURT:  All right.  I'm going to show that all

15   the evidence is in and closed and that all parties have

16   rested.  Closing arguments will begin tomorrow morning at

17   9:45.  We're going to start with the Debtor.  We'll then

18   have any other proponents of confirmation.  We will then

19   have opponents of confirmation.  And then we'll have final

20   rebuttal by the Debtor in the closing arguments.  That'll be

21   the order of presentation.

22              If anyone has any questions, comments, or

23   objections to that, now is a good time so that I can figure

24   that out and you all can figure that out overnight if we

25   have a problem with it.

1          (No audible response)

2          THE COURT:  All right.  Parties are going to be

3     allowed to --

4          MR. GENENDER:  Your Honor, --

5          THE COURT:  -- use their PowerPoints if you wish

6     tomorrow.  Just be prepared to show them.  And we'll make

7     whoever you want as the presenter.  Mr. Genender.

8          MR. GENENDER:  Your Honor, can you -- you said

9     this earlier but I did not write it down, and I apologize.

10    What's the Court's schedule in the morning?  There was a

11    block of time, right?

12         THE COURT:  Yes, sir.  So we're going to start at

13    9:45 and work until noon.  Beyond that, I'm not sure what

14    the calendar will look like tomorrow afternoon.  And if -- I

15    am not asking folks to limit their closing.  These are

16    important closing arguments as far as I'm concerned.  And if

17    I need to go in the afternoon or if I can't finish in the

18    afternoon, go until, you know, the next day, we're going to

19    do that.  But everyone's going to get a chance to do full

20    closings.  This is a long, complicated deal and I am not

21    going to cut people short on this.

22         MR. GENENDER:  Thank you, Judge.

23         THE COURT:  When will the proposed -- the final

24    version of the proposed Confirmation Order be filed?

25         (No audible response)

1          THE COURT:  There's a lot of silence out there.

2   Mr. Perez, your line seems muted.  Hold on.  Mr. Carlson has

3   pressed five, star.  Let me get his line active.  Mr. Perez,

4   I don't see you as having pressed five, star.  I'll need you

5   to do that if you want to speak.  Mr. Carlson.

6          MR. CARLSON:  Good evening, Your Honor, Cliff

7   Carlson for the Debtors.  We Plan to file a proposed order

8   later this evening.  It may be later.  But we expect there

9   may be some further changes overnight after we file that.

10  But we are working with several different parties on various

11  inserts, and the goal and intention is to file it tonight.

12          THE COURT:  So, Mr. Perez, you wanted to speak to

13  that as well, right?

14          MR. PEREZ:  No.  I was actually going to say that

15  either Mr. Carlson or Ms. Liou are probably the closest to

16  it.

17          THE COURT:  So, look, I think it might be very

18  helpful to parties -- and I got it that there may be changes

19  made during closing arguments tomorrow to the Confirmation

20  Order.  Can we file a version at some time certain tonight

21  so that parties can see what the current status is?  And

22  then you can file another one, you know, overnight if you

23  want to that is redlined against that one.  But let's get

24  people something they can start reading.  I'm inclined to --

25  and I don't want to insist on a particular time, but I'm

1  inclined to think, you know, sometime around 8:30 or

2  9:00 o'clock tonight you all file the current status of the

3  Confirmation Order.  And then whatever you file after that

4  would be redlined against that current status.  And I don't

5  know if that works for you all.  I'm not looking to, you

6  know, make double work but people need a chance to prepare.

7  Ms. Liou.

8        MS. LIOU:  Yes, Your Honor, Jessica Liou from

9  Weil, Gotshal, Manges on behalf of the Debtors.  That's fine

10  with us.  We can file a form of proposed Confirmation Order

11  tonight by that deadline.  And, Your Honor, we will also be

12  filing some very minor amendments to the Plan as well,

13  cleanup changes that we've been considering with the

14  lenders.

15        THE COURT:  And those will be redlined, right?

16        MS. LIOU:  Those will be redlined.  And there will

17  be one other change, which it's just on reservation of

18  rights language that got added into the Plan as a result of

19  our continuing discussions with the government.

20        THE COURT:  Okay.  So not later than 9:00 p.m.

21  tonight I want the Debtors to file the latest version of the

22  proposed Confirmation Order and the latest changes to the

23  Plan that are in existence as of 9:00 o'clock.  And I am not

24  suggesting that you're then stuck with that permanently as

25  you continue to try and work through problems.  But I need

1  people to see what they're shooting at.  That is without

2  prejudice --

3          MS. LIOU:  Can do.

4          THE COURT:  -- to the rights of parties tomorrow

5  to argue they haven't had a reasonable opportunity to review

6  what those are.  But, I mean, I haven't anybody -- had

7  anybody that's trying to delay this hearing so -- but I

8  think that gives people a fair chance.

9          And then we'll see what happens as we move into

10 closing arguments tomorrow.  The closing arguments can focus

11 mostly on whether we ought to confirm or not and not what

12 the Confirmation Order says.  So we may really split that

13 into saying, should we confirm the arguments.  And then if

14 it turns out that there is controversy about the order, I

15 could do different arguments about what particular

16 provisions of the order maybe should say.

17          But it just depends.  I don't know how many

18 changes you're going to make.  And I, along with everybody

19 else, can look at redlines and try and make a reasonable

20 decision about that.

21          Anybody have any problem with that game plan?

22          Mr. Balasko, I saw you just turned on your camera.

23 I don't see that you pressed five star.  Did you need to

24 address anything with us?

25          MR. BALASKO:  (No audible response)

1          THE COURT:  Mr. Balasko?

2          MR. BALASKO:  Zach Balasko, Department of the

3    Interior.  No, Your Honor, Ms. Liou just mentioned the

4    Government language, and I did not know if we wanted to

5    discuss that.  But I certainly don't need to.

6          THE COURT:  All right.  Okay.  We're in

7    adjournment.  I'm resuming court in the morning at 9:00 a.m.

8    Closing arguments in this case will be at 9:45, and we'll

9    see you all then.

10         Thank you.

11        (Proceeding adjourned at 5:37 p.m.)

12                    *  *  *  *  *

13         *I certify that the foregoing is a correct*

14   *transcript to the best of my ability due to the condition of*

15   *the electronic sound recording of the ZOOM/telephonic*

16   *proceedings in the above-entitled matter.*

17   */S/ MARY D. HENRY*

18   *CERTIFIED BY THE AMERICAN ASSOCIATION OF*

19   *ELECTRONIC REPORTERS AND TRANSCRIBERS, CET**337*

20   *JUDICIAL TRANSCRIBERS OF TEXAS, LLC*

21   *JTT TRANSCRIPT #64152*

22   *DATE FILED:  JUNE 28, 2021*

23

24

25

1            IN THE UNITED STATES BANKRUPTCY COURT

2            FOR THE SOUTHERN DISTRICT OF TEXAS

3                    HOUSTON DIVISION

4    IN RE:                    §      CASE NO. 20-33948-11
                               §      JOINTLY ADMINISTERED
5    FIELDWOOD ENERGY, LLC,    §      HOUSTON, TEXAS
     ET AL,                    §      WEDNESDAY,
6                              §      JUNE 23, 2021
              DEBTORS.         §      9:57 A.M. TO 4:53 P.M.

7

8            CONFIRMATION HEARING DAY THREE --
                CLOSING ARGUMENTS (VIA ZOOM)
9
            BEFORE THE HONORABLE MARVIN ISGUR
10             UNITED STATES BANKRUPTCY JUDGE

11

12      APPEARANCES:                 SEE NEXT PAGE

13      COURTROOM DEPUTY:            TYLER LAWS

14      (Recorded via CourtSpeak; No log notes)

15

16

17

18

19

20            TRANSCRIPTION SERVICE BY:

21        JUDICIAL TRANSCRIBERS OF TEXAS, LLC
               935 Eldridge Road, #144
22             Sugar Land, TX 77478
                  281-277-5325
23            www.judicialtranscribers.com

24

25    Proceedings recorded by electronic sound recording;
         transcript produced by transcription service.

<pre>
 1                    APPEARANCES (VIA ZOOM):

 2

 3  FOR THE DEBTOR:            WEIL GOTSHAL & MANGES, LLP
                              Alfredo Perez, Esq.
 4                            Clifford Carlson, Esq.
                              Jessica Liou, Esq.
 5                            700 Louisiana, Ste. 1700
                              Houston, TX  77002
 6                            713-546-5040

 7  FOR AD HOC GROUP OF
    SECURED LENDERS:          DAVIS POLK & WARDWELL, LLP
 8                            Damian S. Schaible, Esq.
                              450 Lexington Avenue
 9                            New York, NY  10017
                              212-450-4580
10
    FOR HUNT OIL COMPANY:     BAKER BOTTS, LLP
11                            Kevin Chiu, Esq.
                              2001 Ross Avenue
12                            Dallas, TX 75201
                              214-953-6612
13
    FOR OFFICIAL COMMITTEE OF
14  UNSECURED CREDITORS:      STROOCK & STROOCK & LAVAN, LLP
                              Kenneth Pasquale, Esq.
15                            180 Maiden Lane
                              New York, NY  10038-4982
16                            212-806-5400

17  FOR U.S. DEPARTMENT
    OF THE INTERIOR:          U.S DEPARTMENT OF JUSTICE
18                            Zachary Balasko, Esq.
                              PO Box 875
19                            Washington, DC 20044
                              202-514-7162
20
    FOR ASPEN AMERICAN INSURANCE
21  COMPANY, BERKLEY INSURANCE
    COMPANY, EVEREST REINSURANCE
22  COMPANY, AND SIRIUS AMERICA
    INSURANCE COMPANY:        CHIESA SHAHINIAN GIANTOMASI
23                            Scott Zuber, Esq.
                              Darren Grzyb, Esq.
24                            One Boland Dr
                              West Orange, NJ 07052
25                            973-530-2046
</pre>

1                    APPEARANCES (CONT'D - VIA ZOOM):

2

3   FOR BP EXPLORATION AND
    PRODUCTION INC.:              GREENBERG TRAURIG, LLP
4                                 Shari Heyen, Esq.
                                  John Hutton, Esq.
5                                 1000 Louisiana St., Ste. 100
                                  Houston, TX 77002
6                                 713-374-3612

7

8   FOR ENERGY TRANSFER:          KATTEN MUCHIN ROSENMAN, LLP
                                  Yelena E. Archiyan, Esq.
9                                 2121 N. Pearl St.
                                  Dallas, TX  75201
10                                214-765-3600

11

12  FOR PHILADELPHIA INSURANCE
    COMPANY:                      MANIER & HEROD
                                  Robert W. Miller, Esq.
13                                1201 Demonbreun St., Ste. 900
                                  Nashville, TN  37203
14                                615-244-0030

15

16  FOR XTO OFFSHORE, HHE ENERGY
    COMPANY AND XLT, LLC:         FORSHEY PROSTOCK, LLP
                                  Suzanne K. Rosen, Esq.
17                                777 Main Street, Ste. 1550
                                  Fort Worth, TX  76102
18                                817-877-8855

19

20  FOR ZURICH AMERICAN INSURANCE
    COMPANY AND SEITEL DATA
    LIMITED:                      CLARK HILL, PLC
21                                Duane J. Brescia, Esq.
                                  720 Brazos St., Ste. 700
22                                Austin, TX  78701
                                  512-499-3647

23

24

25

```
 1              APPEARANCES (CONT'D - VIA ZOOM):

 2

 3  FOR COX ENTITIES:              LOCKE LORD, LLP
                                   Michael Kind, Esq.
 4                                 111 South Wacker Drive
                                   Suite 4100
 5                                 Chicago, IL  60606
                                   312-201-2392
 6

 7
    FOR HESS CORPORATION:          REED SMITH, LLP
 8                                 Omar J. Alaniz, Esq.
                                   2850 N. Harwood Street
 9                                 Suite 1500
                                   Dallas, TX  75201
10                                 469-680-4200

11  FOR TRAVELERS CASUALTY,
    LIBERTY MUTUAL INSURANCE
12  CO., HANOVER INSURANCE CO.,
    AND XL SPECIALTY;              LANGLEY, LLP
13                                 Keith A. Langley, Esq.
                                   PO Box 94075
14                                 Southlake, TX  76092
                                   214-722-7162
15
    FOR FREEPORT MCMORAN,
16  MCMORAN OIL AND GAS, LLC,
    CONOCO PHILLIPS COMPANY,
17  AND MERIT ENERGY:              LOCKE LORD, LLP
                                   Omer F. Kuebel, III, Esq.
18                                 601 Poydras Street, Ste. 2660
                                   New Orleans, LA  70130
19                                 504-558-5155

20
    FOR APACHE CORPORATION:        HUNTON ANDREWS KURTH, LLP
21                                 Robin Russell, Esq.
                                   600 Travis St., Ste. 4200
22                                 Houston, TX  77002
                                   713-220-4200
23

24

25
```

1                       APPEARANCES (CONT'D - VIA ZOOM):

2

3   FOR ENI PETROLEUM US LLC AND
    ENI US OPERATING CO., INC.:    BRACEWELL, LLP
4                                  Mark E. Dendinger, Esq.
                                   185 Asylum Street
5                                  City Place I, 34th Fl.
                                   Hartford, CN  06103
6                                  860-256-8541

7

    FOR HCCI INTERNATIONAL, LTD.: LOCKE LORD, LLP
8                                  Philip Eisenberg, Esq.
                                   600 Travis, Ste. 2800
9                                  Houston, TX  77002
                                   713-226-1304
10

11  FOR ATLANTIC MARITIME
    SERVICES:                      KIRKLAND & ELLIS, LLP
12                                 Jeffrey J. Zeiger, P.C.
                                   300 North LaSalle
13                                 Chicago, IL  60654
                                   312-862-3237
14

15

16

17

18  (Please also see Electronic Appearances.)

19

20

21

22

23

24

25

1                                    INDEX

2    CLOSING ARGUMENTS:
     By Mr. Perez                    11
3    By Ms. Liou                     30
     By Mr. Schaible                 57
4    By Mr. Balasko                  69
     By Mr. Pasquale                 74
5    By Ms. Russell                  76
     By Mr. Grzyb                    82
6    By Mr. Brescia                  84
     By Mr. Eisenberg                85
7    By Mr. Miller                   87
     By Mr. Chiu                     88
8    By Ms. Heyen                    91
     By Mr. Carlson                  92
9    By Mr. Alaniz                   96
     By Mr. Zuber                    110
10   By Mr. Langley                  113
     By Mr. Kooy                     125

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1      HOUSTON, TEXAS; WEDNESDAY, JUNE 23, 2021; 9:57 A.M.

2          THE COURT:  Now we're going to go to closing

3   arguments in the Fieldwood case.  It's my understanding from

4   my case manager is there may be a request to continue this

5   morning's hearing.  I don't really -- I didn't understand it

6   in terms of why that was being requested.  Perfectly happy

7   to listen to that, but I wanted to do it on the Record at

8   9:45.  So let me ask Mr. Genender to tell me what's going

9   on.  Go ahead, please.

10          MR. GENENDER:  Your Honor, Paul Genender.  I'm

11   actually -- was going to give you a courtesy reminder or

12   notice on the *Speedcast* matter with Mr. Dockerman's

13   permission, a hearing we have tomorrow at 4:00.  You had

14   asked us to submit stipulated facts by 9:00 o'clock this

15   morning.  Mr. Dockerman and I were working late last night

16   on them.  He's in a hearing in Delaware.  We're finalizing

17   them, but I wanted -- he -- with his permission, I wanted to

18   let you know that we will get them to you shortly.  But

19   obviously hasn't happened by 9:00 o'clock this morning.

20          THE COURT:  Thank you.  I appreciate that notice.

21          Mr. Perez.

22          MR. GENENDER:  Very welcome.

23          MR. PEREZ:  Your Honor, Alfredo Perez.  Your

24   Honor, I apologize.  This is a little bit my fault.  I

25   missed an email where one of the parties indicated that they

1  were unavailable from 10:00 to 11:00.  And that's when I

2  realized that last night, we -- that's when Mr. Carlson sent

3  the email.  But one of the key parties was unavailable at

4  that -- at this time.  And, you know, I apologize, it was my

5  fault for missing that email.

6              THE COURT:  So this is somebody that needs to be

7  here to hear your closing so they can respond to it; is that

8  the issue?

9              MR. PEREZ:  No.  It's Mr. Schaible.  He will, you

10  know, kind of be the second person up.

11             THE COURT:  Got it.  We're going to work from

12  11:00 to 12:00.  We're going to return at 3:15 and we'll

13  stay until we're finished with closing arguments.  Sorry

14  about if there's any confusion on my part, but Mr. Schaible

15  is a key player in the case.  I'm going to let him be

16  here --

17             MR. PEREZ:  Yeah.

18             THE COURT:  -- throughout.  So we'll adjourn --

19             MR. PEREZ:  Again, Your Honor, this is my fault.

20  I just missed an email.  So I apologize to the Court and to

21  all the parties.

22             THE COURT:  Yeah.  It's fine with me.  But we'll

23  adjourn until 11:00 o'clock this morning and we'll start

24  sharply at 11:00.  Thank you.

25             (Recess taken from 10:00 a.m. to 10:59 a.m.)

```
 1                    AFTER RECESS

 2         THE COURT:  All right.  We're going to return to

 3  the Fieldwood Confirmation Hearing.  As I had indicated

 4  yesterday, we're going to start with closing arguments by

 5  the Debtor and then we'll move to closing arguments by any

 6  other proponent.  We will then move to closing arguments by

 7  any opponent.  And then we're going to allow a rebuttal by

 8  the Debtor only.

 9         So whoever is going to take the lead for the

10  Debtor, if you'll press five star one time on your phone,

11  also let me know who you want to have the presenter role.

12         Mr. Perez, good morning.

13         MR. PEREZ:  Good morning, Your Honor, Alfredo

14  Perez on behalf of the Debtors.  Your Honor, if you could

15  give the presenter role to Ms. Choi?

16         THE COURT:  All right.  Ms. Choi has the screen.

17         MR. PEREZ:  Thank you, Your Honor.

18         THE COURT:  Hold on one second, please.  I was

19  handed a note that I'm supposed to turn on my cam.

20         MR. PEREZ:  That -- it's okay by me, Your Honor.

21         THE COURT:  All right.  Let's move ahead.

22         MR. PEREZ:  Thank you, Your Honor.  Again, Your

23  Honor, Alfredo Perez on behalf of the Debtors.

24              CLOSING ARGUMENTS ON BEHALF OF DEBTORS

25              BY MR. PEREZ:  We want to first thank you for
```

1    accommodating the short pause this morning.  And again I

2    apologize to everyone for having missed that.

3            Your Honor, I think we're here, you know, after a

4    very, very seems like very long and unfortunately somewhat

5    contentious case that I think has come to a point where I

6    think that the evidence and the actions taken by the Debtors

7    and the other parties that are really key, key to this kind

8    of mosaic put together to address some very significant

9    business and other related issues that I would think that

10   the evidence overwhelmingly establishes that the Plan should

11   be confirmed.  If you turn to the next slide, please?

12           Your Honor, I described this as a mosaic because I

13   think the evidence is uncontroverted that each of these

14   participants really contributed to the Plan.  And without

15   any of these participants, it's like the stool would have

16   lost one of its legs and we wouldn't have been able to be in

17   the position where we are today.

18           As the evidence indicated, you know, back in March

19   of last year, Fieldwood started experiencing problems.  And

20   obviously the Court is well aware of what was going on in

21   the energy business at that time.  And it reached out to its

22   first lien term loan lenders represented by Davis, Polk and

23   began, you know, the process.  And it was key -- and as

24   Mr. Dane testified, it was key for this business to survive

25   to get additional capital.  It needed that capital.

1          It wouldn't have been able to survive, it wouldn't

2   have been able to accomplish what it's seeking to accomplish

3   pursuant to the Plan without that additional capital.  And I

4   think the lenders were very clear that in Order to do that,

5   we needed to address all of the various legacy issues that

6   were addressed.

7          So, Your Honor, in terms of we wouldn't be here

8   but for the sale, but for the significant cash that the

9   lenders are contributing, but for the first lien first out

10  lenders agreeing to roll over their debt, but for the second

11  lien lenders agreeing to compromise, and most importantly

12  but for, you know, the very significant contribution that

13  the first lien term lenders are making in providing up to

14  $105 million of cash so that we can exit, by agreeing to

15  assume all the working capital obligations, by doing all of

16  the things that they're doing in order to make this work.

17  So but for those participants, we wouldn't be here, this

18  Plan would not be confirmable.

19         Second, Your Honor, again, we wouldn't be here but

20  for the Apache, you know, agreeing to assume

21  responsibilities and as of last night -- and, Your Honor, we

22  filed at Docket Number 1700 the term sheet with the Apache

23  sureties.  That single transaction addresses almost, you

24  know, two-thirds of all of our decommissioning obligations.

25  And that was a key centerpiece to the Plan.  And, again, but

1    for having done this, we wouldn't have been able -- we would

2    not have been able to be here where we are today.

3           USCCI, Your Honor, they provided -- they're the

4    only surety that's provided bonding on a go forward basis.

5    We have a term sheet.  Credit bid purchaser needs that in

6    order to operate to be able to go forward.  Again, but for

7    that we wouldn't have been able to be here.

8           You know, the Unsecured Creditors Committee

9    obviously were key.  We signed 165 trade credit agreements

10   compromising over $145 million of claims.  And in addition,

11   but for the support of our vendors, again we wouldn't be

12   here.  If all of our vendors -- if we didn't have the vendor

13   support that we had during the case and the vendor support

14   that we're going to have -- that Credit Bid Purchaser is

15   going to have after the case, this wouldn't have been

16   feasible credit -- a Credit Bid Purchaser wouldn't have been

17   able to raise the money that they did.

18          Your Honor, next I want to talk about the

19   predecessors that we have consensual agreements with.  And,

20   Your Honor, if you will recall, at one of the hearings it

21   was very clear that, you know, that we came in with

22   approximately 80 percent or a little bit under 80 percent of

23   our liabilities, of our asset retirement liabilities

24   resolved.  And it was very clear from what the Government

25   was saying and some comments from the Court that, you know,

1   we needed to make the Government comfortable, number one,

2   and we needed to try to resolve as many of these consensual

3   obligations as possible.  So, Your Honor, we think that

4   again but for the consensual arrangements that we have with

5   Chevron, Eni, and Hunt which resolve, which get us into that

6   90, 91 percent, that we wouldn't be here with a Plan that

7   the Government doesn't object to.

8           And, Your Honor, and they've kind of paid the

9   price already for having done that.  They've already paid

10  the price by being sued by one of the insurers that -- on a

11  non-confirmed Plan.  They're already saying that they've

12  been discharged on their bonds.  So, you know, but for this

13  arrangement, we wouldn't be able to do -- we wouldn't be

14  able to confirm a Plan.  And they've already paid the price,

15  Your Honor.  You know, this is an integral part of our Plan,

16  it is integral to the success of the Plan, it is integral to

17  the Government's non-objection to our Plan.  And but for

18  having these consensual agreements, we wouldn't be able to

19  confirm this Plan.

20          And then finally, Your Honor, with respect to the

21  Government, obviously as testified by Mr. Dane, we've had

22  extensive, productive discussions with the Government and,

23  you know, there have been, and as the Court recalls, you

24  know, at the disclosure statement hearing, they totally

25  reserved their rights.  And I think as a result of the steps

1   that we have taken since that time, that the Government is

2   in a position where they're not objecting to the Plan.  And

3   in particular, Your Honor, the key aspects of what the

4   agreements that the proposal that we have made that have

5   satisfied the Government, that we meet our *Midlantic*

6   standards, are embodied in Section 5.13 of the Plan.  And

7   that is at Document 1697, and pages 216 of 218, as well as

8   paragraphs 141 to 144 of the proposed Confirmation Order.

9   Again, but for the Government's, you know, non-objection to

10  the Plan and having worked with us extensively to make sure

11  that they were satisfied that we didn't violate the

12  *Midlantic* standards, again we wouldn't be here.  We would be

13  facing a different Plan confirmation.

14          So, Your Honor, I'm going to come back to each one

15  of these.  But, again, the key, key view in my mind is that

16  any one of these -- if we knocked out any one of these, Your

17  Honor, we wouldn't be able to -- for this Plan to be

18  successful, we wouldn't be able to confirm this Plan.  I

19  think that they're all integrally tied together.  And if you

20  knock one out, I think you knock out the whole thing.  So,

21  Your Honor, let me go next to the next slide, please.

22          And, again, just to -- and this is the slide that

23  we've probably shown at every hearing, that nine percent is

24  primarily composed of three individual predecessors.  And

25  I'll get to that next time.  But in essence, we have

1   resolved all but nine percent of our liability.  If you go

2   to the next slide.

3         And, Your Honor, I had this in the -- in our

4   opening, and this kind of -- and I'll go through each one of

5   these transactions, but I think the evidence, you know,

6   overwhelmingly establishes that we will be able to address

7   the asset retirement obligations, that we will be able to

8   accomplish the goals of the Plan.

9         And, Your Honor, basically what we have left, if

10  you go to the very far right at the bottom in the abandoned

11  properties, we have the remaining predecessors, and those

12  are principally, you know, three large, multinational energy

13  companies with a combined -- with a market cap of 93

14  billion, 28 billion, and 272 billion combined that are the

15  ones that are objecting to the Plan for having to respond to

16  joint and several liability that they had before Fieldwood

17  was ever Fieldwood, Your Honor.  This is not a situation

18  where this liability is something that is new to them.

19  They've had this liability.  They are jointly and severally

20  liable.  That's what happens when you operate in the Gulf.

21  And those are in essence the three main predecessor

22  objectors to the Plan.  Next slide, please.

23         Your Honor, I'm going to only focus on the areas

24  that I thought were contested in terms of the Evidentiary

25  Record.  I think many of the other items are probably more

1  legal argument.  And I neglected to say, Your Honor, that

2  I'm going to address the evidence, Ms. Liou is going to

3  address the legal issues, and Mr. Carlson will address any

4  questions with respect to the Order.  And I think on a

5  couple of things Ms. Choi will address them.  But I'm going

6  to focus -- I'm focusing on the evidence.

7          So, Your Honor, again, I think the evidence

8  overwhelmingly demonstrates that we've complied with 1129

9  and that the Plan should be confirmed.  I'm only going to

10  really focus on a couple of three prongs of 1129 which there

11  was actually evidence or, you know, there was something with

12  respect to whether we had met our evidentiary burden.

13          And I think the first one, Your Honor, is whether

14  we satisfied the adequate assurances provision of 365.  And,

15  again, I think there -- and I'll get to it when I get to

16  credit bid NewCo, but I think again the uncontroverted

17  testimony from Mr. Dane is that there will be sufficient

18  resources in order to satisfy, and that there's really no

19  question that as it relates to the contracts that will be

20  assumed, that those -- that that Credit Bid Purchaser will

21  be able to perform.

22          Second, Your Honor, I think that there was

23  allegations that the Plan was not proposed in good faith.  I

24  frankly think that, you know, the definition of good faith

25  is does the Plan address what it's intended to address.

1    Here, the Plan very clearly intended to address the ARO,

2    intended to create a sustainable entity, intended to

3    preserve the jobs.  And all of the things that it was

4    intended to do, I think the Plan addresses.  And I think

5    that meets the good faith standard.

6          Your Honor, there has also been questions about

7    1129(a)(11).  And, Your Honor, I'll address that in the

8    context of all of the various entities.  But, Your Honor,

9    again, I think that we provide a means to address all of the

10   various objectives of the Plan, and that to that extent I

11   think the Plan complies with 1129(a)(11).

12         Finally, Your Honor, there were seven other

13   secured creditors that were -- that objected, and so we

14   would have to cram them down.  And, again, I think the

15   uncontroverted testimony from Mr. Green was that we would be

16   able to do that based on the estimate of their claims and

17   the reserves that we had set up.  So again I think the

18   Evidentiary Record is that we would be able to meet the

19   cramdown.  So if you turn to the next page, please.

20         So with respect to an asset sale, Your Honor,

21   which is what we're doing with credit purchaser -- and let

22   me just digress here for a minute because -- and I believe

23   Ms. Liou is going to really address this.  But, you know,

24   the premise and the fundamental aspect of this Plan is that

25   Credit Bid Purchaser is willing to provide $105 million of

1  cash, is willing to assume all the working capital

2  liability, is willing to provide the credit support for the

3  various activities, is willing to do all of the things that

4  it's willing to do so that we can make, you know, Fieldwood

5  Three successful, so that Fieldwood Four can implement, if

6  in fact they get the assets free and clear of liens, claims,

7  and encumbrances.  And that's the fundamental premise.  And

8  that is an aspect of this that is kind of at the heart of

9  what I think, you know, disputed.  It's the -- it's what

10 does it mean to have an asset sale free and clear of liens

11 versus, you know, what are the other potential obligations

12 and what, in essence, is right and that's really the heart

13 of the issue here.

14          But clearly in terms of the intended purchase, can

15 Credit Bid Purchaser close this transaction?  And I think

16 the evidence is overwhelmingly yes.  You know, we looked at

17 the sources and uses with Mr. Dane yesterday.  There was at

18 the -- even at the high end and at an average cash, not at

19 the high cash, we were -- at the high end of expenses and at

20 an average cash, not the high cash, this -- we were

21 comfortably able to make all of the Plan payments that were

22 needed at exit, as well as the reserves.  So there's no

23 question but that they can accomplish this.  If you turn to

24 the next slide.

25          You know, we actually don't think that 1129(a)(11)

1  applies to the Credit Bid Purchaser on the other side.
2  Nevertheless, Your Honor, I think the uncontroverted
3  evidence is that even in the scenario, I mean, where they
4  don't drill, Mr. Dane testified that that was one of the
5  most attractive cash positions.  The Credit Bid Purchaser is
6  going to generate cash.  They're -- it -- they're going to,
7  you know, this company is going to, you know, be valued at
8  in excess of a billion dollars.  And it will be a standalone
9  independent oil and gas company.  So you turn to the next
10 page.

11        And, again, we don't think this is applicable.
12 But if you turn to the -- they're going to be well-
13 capitalized.  They're only going to have about 300 million
14 of funded debt.  They're going to have a -- they're going to
15 raise 40 million in equity, which is quite astounding.
16 They're going to have at least -- up to 120 million on the
17 balance sheet but at least a hundred million on the balance
18 sheet.

19        They're going to have significant cashflow and --
20 in the hundreds of millions.  That's what exhibit page eight
21 of nine shows as it related to them.  And as Mr. Dane
22 testified, if you stop the drilling, that they would also
23 have, you know, significant cashflow and that that was a
24 very attractive -- that was also very attractive, you know,
25 business Plan and depending on what the owners decided to

1  do.

2          In addition, Your Honor, it has the bonding

3  capability to go forward on an ongoing basis to the extent

4  that, you know, people were alleging that somehow that was a

5  bar.

6          But, Your Honor, in addition to the significant,

7  and I mean significant, support the Credit Bid Purchaser is

8  providing in order for us -- in order for Fieldwood to

9  emerge from bankruptcy, to confirm this Plan, including the

10  cash, the assumption of the working capital, the other

11  agreements with Fieldwood Three and Fieldwood Four, I think,

12  Your Honor, that this company on a standalone basis, even if

13  we had to meet that test, there's no question based on the

14  evidence that it complies.

15          Let me then turn to Fieldwood One.  And

16  fortunately, Your Honor, I'm not going to dwell on Fieldwood

17  One.  But the issue here, and I think we've largely resolved

18  that as a result of the agreement with Apache and with the

19  Apache sureties, but the purpose of Fieldwood One, as

20  testified to by Mr. Graham, is to decommission, maximize

21  cashflow, and then wind this company down.  It's going to be

22  done over a period of time.  And at least in a --

23  Mr. Graham, you know, has indicated that the way his

24  contract works, has to stay here for five years in order to

25  accomplish the goals of that contract.  And so we're really

1  talking about a situation where I think now largely

2  uncontested we think that Fieldwood One would be, you know,

3  accomplishes the goals that it's intended to accomplish.

4         Then let's turn to Fieldwood Four.  And Fieldwood

5  Four again is to wind down the legacy Chevron properties,

6  CUSA properties primarily, and many of the Noble properties.

7  And, again, they -- we're -- that is being done pursuant to

8  a fixed -- a turnkey contract with Credit Bid Purchaser that

9  Mr. Dane testified to.  And here we have a situation where

10  we have one of the most sophisticated energy companies that

11  has -- that currently has joint and several liability that

12  will be paying the amounts in a situation where there are

13  significant conditions that would adjust the turnkey price,

14  depending on factors beyond everyone's control.  So if you

15  turn to the next page.

16         The Credit Bid Purchaser will decommission the

17  legacy CUSA property pursuant to that turnkey agreement.

18  And the -- in essence, protects that exit.  Money will come

19  from Credit Bid Purchaser to fund the 15 -- the five million

20  in cash contribution.  And then in addition, there'll be

21  another 14 million that at one time had been scheduled to go

22  into Fieldwood Three that now is going into Fieldwood Four

23  to plug and abandon certain assets in which Chevron had been

24  a predecessor in interest.  So I think that the evidence

25  obviously in my mind overwhelmingly demonstrates that

1  Fieldwood Four with all those factors will be able to

2  accomplish what it's intended to accomplish.

3          Then additionally, Your Honor, if you turn the

4  page, we have the other existing consensual deals with Eni

5  and with Hunt, and these again we have turnkey agreements

6  pursuant to which most of the Hunt work is being done

7  currently simply, you know, because we had a current permit

8  to actually do the work.  And that will be done currently.

9          And then with respect to Eni, we have a agreement

10 where they will fund up to $57 million, and the work will be

11 done.  And in each one of those, the money coming from

12 Credit Bid Purchaser at exit will fund a contribution to the

13 -- those amounts.

14          Finally, Your Honor, we get to -- if you go to the

15 next page, we get to Fieldwood Three.  And Fieldwood Three

16 obviously is the balance of the bucket.  But as a result of

17 moving some of the assets from Fieldwood Three to Fieldwood

18 Four, the remaining -- and I think the testimony was that

19 the credit support was up to $12 million, including five

20 million in cash at exit and an additional amount, an

21 additional seven million amount, that would be provided from

22 Credit Bid Purchaser.  But I think Mr. Dane's testimony,

23 again uncontroverted, was that the post-effective date

24 liability was approximately $7 million, and that there were

25 $4 million of bonds to accomplish this.  So, again, you

1  know, these are assets that the -- that a -- that Fieldwood

2  and the lenders in connection with, you know, the proposals

3  made to the Government decided that they were going to offer

4  to plug and abandon these assets in Fieldwood Three.

5       And then finally, Your Honor, if you go to the

6  next slide, I'm going to turn to the abandoned properties

7  because this is obviously as we sit today where most of the

8  dissent exists.  So, number one, and I'm sure we'll hear

9  from Mr. Balasko, but the Government does not object to the

10 Plan.  The company has done significant work, made

11 significant concessions, and has done, you know, a lot of

12 discussion and made proposals to the Government in order to

13 be in a position where the Government does not object.

14 That's not where we found ourselves at the disclosure

15 statement hearing.  That's not in essence at the time when

16 the Court directed us to address the Government's concerns.

17 That's what we did and that's what we accomplished, Your

18 Honor.

19       So one of the key aspects of the proposals that

20 we've made to the Government which have resulted in their

21 not objecting, first, Your Honor, is the transition services

22 for the specified abandoned properties.  And, again, at

23 Docket Number 697 of the Plan, Sections 513 in Exhibit A,

24 which have the -- in fact what the agreed activities are --

25 and, Your Honor, this includes the safeguarding of the day-

1  to-day operational monitoring, maintaining egress of

2  pollution inspections, and to ensure, you know, proper

3  response.  And, yes, the exhibit and what was testified to

4  is that Fieldwood, you know, is abandoning these properties.

5  They are agreeing to undertake these transition services,

6  they are agreeing to respond to the -- to, you know, certain

7  events.  But because these are abandoned properties, to the

8  extent that the events are, in essence, in excess of what

9  the Government and Fieldwood agreed to, those are not

10  necessarily for our account and they're not at our cost.

11  But it's not a situation we meet the *Midlantic* standards

12  because there isn't going to be any slip between the lip and

13  the cup.  We are going to provide, to respond.  And the

14  responsible, you know, the party that the property's

15  abandoned to will obviously be responsible for that.

16         Your Honor, in addition to the transition services

17  which really, --

18         THE COURT:  Yeah, --

19         MR. PEREZ:  -- you know, the core of --

20         THE COURT:  -- Mr. Perez, I'm not sure that's the

21  *Midlantic* standard.  And I just think the *Midlantic* standard

22  is actually less than what you have described, not more than

23  what you've described.  But I want to be sure --

24         MR. PEREZ:  I --

25         THE COURT:  -- that parties are aware --

1          MR. PEREZ:  Oh, I --

2          THE COURT:  -- of what I think it is.  The --

3          MR. PEREZ:  Yes.

4          THE COURT:  A Debtor --

5          MR. PEREZ:  Yes.

6          THE COURT:  -- under the Bankruptcy Code can

7   abandon an environmentally troubled property and does not

8   under the Bankruptcy Code then have a duty to provide the

9   transition services or to respond at all or after is

10  abandoned to provide any support.

11          However, the Supreme Court has held that the

12  environmental concerns that both State and local Governments

13  can have may preclude the Debtor from engaging in the

14  abandonment.  But if the abandonment is not precluded by the

15  Government's concerns, then frankly I don't think that I am

16  charged with assuring that post-abandonment that the

17  response will be proper.  That's Mr. Balasko's problem.

18  Now, the fact that he has solved that with the deal with you

19  is fine with me.  But you're sort of saying that in order to

20  meet *Midlantic*, that the Court needs to be assured of what

21  the future environmental issues are.

22          I don't think that's what the Bankruptcy Code

23  says.  And I just want it clear the way that I'm going to be

24  applying the law, unless somebody can persuade me that I am

25  wrong about this.  But I don't think it's the standard that

1  you're setting up.  I don't think that the Government is

2  going to agree to allow the abandonment unless they have a

3  solution to these things.  That's their decision.  And I

4  don't think under *Midlantic* I look behind their decision.

5  So a little different than what you're describing.  And I

6  think it may matter in terms of where this deal goes.

7           MR. PEREZ:  Thank you, Your Honor.

8           And we actually -- I think we agree that the

9  *Midlantic* standard is, you know, imminent harm.  And but I

10 think what we're doing here is just to take this issue off

11 the table, you know, we've entered into a nine-month

12 Transition Services Agreement.  And, remember, primarily for

13 these three very substantial companies that have, you know,

14 predecessor liability we've entered into this transition

15 services to really take anything having to do with *Midlantic*

16 off the table.  It's not -- it -- I agree with you, Your

17 Honor, that it goes way beyond *Midlantic*.  To the extent

18 that --

19           THE COURT:  But I guess I'm telling --

20           MR. PEREZ:  -- in my view we --

21           THE COURT:  -- you and I'm telling others, I do

22 not intend to review the Transition Services Agreement or

23 the agreed activities to determine if I think it's feasible,

24 if I think it works, if I think it's adequate.  The Code

25 allows abandonment.  Abandonment can be precluded by

1   environmental regulators.  But if it isn't, the

2   environmental regulators may need to worry about that.  And

3   I don't -- the Court doesn't babysit them.  You know, it's

4   just a different story.  I mean, you could even be in a

5   potential situation, which I've been in in some other cases,

6   where the Government actually will take over the cleanup and

7   allow an abandonment in exchange for a huge amount of money

8   going to solve the problem that they wouldn't otherwise

9   have.

10          They just get to make a decision as to what's best

11   for them.  And it's like me looking behind somebody's vote

12   to say, well, you know, I think that was kind of a foolish

13   vote, they voted for the Plan, they could have held out for

14   a better deal.  You know, no.  And I'm not looking if

15   they're in support of the Plan.  I'm looking at whether

16   they're going to veto the Plan is what I'm looking at at the

17   Government.  If they choose not to veto the Plan on an

18   environmental bases, then that's their choice and I am not

19   going to be second-guessing the Government's decision.  So I

20   don't care -- the fact that you may want to try and persuade

21   me of that is not going to help your case.

22          You may want it on appeal in case I'm wrong about

23   that.  But I'm not looking at the issue that you're

24   describing.  And I'm for better or for worse --

25          MR. PEREZ:  Well, thank you -- okay, thank you,

1   Your Honor.  Then I think we should have -- this slide

2   should have stopped after the first bullet.  The Government

3   does not object to the Plan.  Okay.  I blame Mr. Carlson for

4   the balance so --

5           THE COURT:  Look, you're welcome to talk about it.

6   I just -- I don't want others --

7           MR. PEREZ:  No, no, no, I look --

8           THE COURT:  -- believing that the standard that

9   you're announcing is a standard that I think is one that I'm

10  going to adopt.  And I'm --

11          MR. PEREZ:  I'm not suggesting at all that this is

12  the standard you should adopt.  All I'm saying, Your Honor,

13  is that the Government doesn't object and here are the

14  things that we have done to address their concerns.  And

15  that's the extent of my --

16          THE COURT:  I thought you --

17          MR. PEREZ:  -- remarks, Your Honor.

18          THE COURT:  I thought you crossed the line from

19  saying not only are these the things we've done to address

20  their concerns but the things that you've done to address

21  their concerns will work.  And I'm not willing to cross the

22  bridge into whether they'll work.

23          MR. PEREZ:  Okay.  Understood, Your Honor.  So,

24  Your Honor, I think in terms of the evidentiary support for

25  meeting the requirements of 1129, Your Honor, I think that

1  I've gone through kind of the areas that were contested and

2  the areas that I believe that the evidence overwhelmingly

3  supports confirmation of the Plan large -- based largely on

4  what appears to be an uncontested Record.

5          So with that, Your Honor, let me turn it over to

6  Ms. Liou who will address the legal issues that have been

7  raised.  To the extent the Court has any evidentiary issues,

8  obviously I'll be happy to address them at an appropriate

9  time.  But I think that in terms of meeting the evidentiary

10  basis for meeting the 1129 standard on a substantially

11  uncontested Record, we have done.  And I've highlighted the

12  areas where there was some concern or some, you know,

13  allegation that we didn't meet the Evidentiary Record, Your

14  Honor.

15          THE COURT:  So if this is for Ms. Liou to do or

16  for Mr. Carlson to do, that's fine.  But who is going to

17  handle the question of third-party versus third-party

18  rights; is that by you, by Ms. Liou, by Mr. Carlson?

19          MR. PEREZ:  Ms. Liou.

20          THE COURT:  All right.  Ms. Liou, if you would

21  press five star one time on your phone, please?  There we

22  go.  Thank you.

23          From 862-228-0079, is that you, Ms. Liou?

24          MS. LIOU:  Yes, that is me.  Apologies, give us

25  one minute to work through some technical difficulties.

1          THE COURT:  Of course.

2          MS. LIOU:  Your Honor, I have to apologize.  The

3    vagaries of technology, we had a fancy setup here and I'm

4    now talking through an iPhone.

5          Good morning, Your Honor.  Jessica Liou from Weil

6    Gotshal & Manges on behalf of the Fieldwood Debtors.

7          Notwithstanding the Record that we set on the

8    first day of the hearing in terms of the number of opening

9    arguments presented and the number of objections filed for

10   our Plan, I think that after three days of hearings and many

11   good faith discussions that the Debtors have had with the

12   many parties in this case over the last several days, there

13   really are only two main contested legal issues in this

14   case.  I think Mr. Perez has done a pretty good job of

15   covering the first.  And frankly there isn't much that I

16   would add regarding the point about compliance with Section

17   1129(a)(11) of the Bankruptcy Code.

18         But I will comment on the fact that in connection

19   with the sources and uses, the sources that we are talking

20   about for the Debtors' restructuring are sources coming from

21   fully committed, Court-approved, binding commitments or

22   backstops associated with the $119 million of debt, proceeds

23   funded through the first lien exit facility, and up to $185

24   million in proceeds funded through the second lien exit

25   facility, and the $40 million of proceeds funded through the

1  equity rights offering that will be coming in the door and

2  coming over to the Debtors as consideration of a part of the

3  credit bid transaction to fund the Chapter 11 cases, pay

4  creditors, and capitalize Credit Bid Purchaser for future

5  success.

6          I'd like to cover the second issue which deals

7  with the appropriateness and the scope of the releases,

8  exculpations, and discharge under the Plan.  As apparent

9  from some of the opening statements and the objections

10 filed, there remain I think a few conceptual

11 misunderstandings about what the Plan does and is intended

12 to do, which I'd like to clear up today.  Although the Plan

13 seeks to achieve an extraordinary result in terms of the

14 sheer complexity and magnitude of the restructuring, its

15 release, exculpation, and discharge provisions are fairly

16 standard.

17         So what does the Plan actually provide for?  It

18 does provide for discharge of prepetition claims.  It does

19 not, as some have said or suggested, discharge post-petition

20 claims or post-effective date obligations unless there is a

21 specific agreement between relevant parties pursuant to a

22 settlement.  In section 2.1 of the Plan in particular,

23 there's provision for administrative expense claims.  And

24 any ordinary course administrative expense claim that's

25 incurred by the Debtor effectively gets satisfied in the

1  ordinary course post-effective date as well to the extent

2  that it is not an obligation that's otherwise picked up by

3  Credit Bid Purchaser.  To the extent that it is an

4  obligation that is assumed by Credit Bid Purchaser, as

5  Mr. Perez has indicated and as Mr. Dane has testified, it's

6  going to constitute the working capital that's assumed by

7  Credit Bid Purchaser and fully paid for pursuant to, you

8  know, the terms of the Credit Bid Purchase agreement and in

9  the ordinary course.

10        The Plan does provide for clear voluntary third-

11  party releases that have been broad notice.  What it does

12  not provide for are non-consensual releases of third

13  parties.  And I'll come back to that point in a little bit.

14        The third item, the Plan does provide for a

15  process under which the Debtors may assume, assume and

16  assign or assume and allocate executory contracts.  But it

17  does not, either through that process or any other

18  provision, provide for a blanket impairment, modification,

19  or alteration of the terms of any third-party agreement as

20  between non-Debtor parties.

21        And as the evidence demonstrated, in particular

22  the surety bonds, they will continue to exist and be

23  outstanding.  Any indemnification claim that arises against

24  the Debtor as discussed, so those agreements will be treated

25  in accordance with the terms of the Plan like any other

1   claim against the Debtors.  And in fact, Your Honor, the

2   Debtors have worked with multiple parties over the course of

3   the last several days to include reservations of rights

4   language in the proposed Confirmation Order that makes this

5   abundantly clear.

6          Next, on the exculpation.  As I will explain later

7   in further detail, the Plan does provide for appropriately

8   tailored exculpations for certain non-estate fiduciaries

9   based upon the substantial contributions made by those

10  parties integral to the success of this restructuring.  It

11  does not, again, provide for non-consensual releases to the

12  third-party.

13         THE COURT:  What are the exculpation, --

14         MS. LIOU:  (Glitch in the audio) --

15         THE COURT:  -- what does it mean -- and maybe

16  you're going to show me this and, if so, that's fine -- the

17  exculpation provisions that exculpate obligations under

18  prepetition agreements by third parties; how does that work?

19         MS. LIOU:  Which prepetition agreements by third

20  parties, Your Honor, are in particular?

21         THE COURT:  Well, you have the -- there's a

22  definition that then got carried forward into the

23  exculpation provision and it defines as some of what is

24  exculpated will be some prepetition agreements.  Is there

25  any exculpation with respect to any prepetition agreement?

1          MS. LIOU:  I believe Your Honor may be referring

2    to the confusion around the defined term for "additional

3    predecessor agreements."

4          THE COURT:  Yes.

5          MS. LIOU:  That term relates solely to agreements

6    struck by the Debtor during the course of the Chapter 11

7    cases with other predecessors prior to confirmation in

8    support of the Plan.  And so, for example, that defined term

9    solely relates to Apache, Hunt, Eni, and Chevron.  The

10   additional predecessor agreements are the agreements between

11   the Debtors and each of those respective parties.

12         THE COURT:  What about prepetition agreements with

13   those parties?

14         MS. LIOU:  There -- the exculpation does not cover

15   the scope of those prepetition agreements, Your Honor.

16         THE COURT:  And where do I get clarity on that?

17   Because when I read it, I thought it did.  I accept your

18   statement to me but there was going to be some language

19   added that made that clear.  Is that now clear in the

20   Confirmation Order?

21         MS. LIOU:  I believe it's clear, Your Honor, as

22   it's written; although we are happy to consider potential

23   language.  But let me explain why I believe it's clear.  We

24   had indicated in the Plan that as a part of the Plan

25   supplement, we would file the additional predecessor

1   agreements.  And we have done that.

2          THE COURT:  And you're telling me there are no

3   additional predecessor agreements that were in existence

4   prepetition.

5          MS. LIOU:  I'm sure that there were other

6   agreements between the parties prepetition but those are not

7   captured by the defined term and those were not agreements

8   that were filed as part of the Plan supplement.

9          THE COURT:  Sorry.  I meant as the defined term,

10  and my bad wording choice.  You're telling me at this point

11  additional predecessor agreements include no prepetition

12  agreements.

13          MS. LIOU:  Correct.

14          THE COURT:  Okay.

15          MS. LIOU:  Correct, at this point.  Your Honor,

16  that's absolutely correct.  If what you would like us to do

17  is add a word to the definition of "additional predecessor

18  agreements" to indicate that it constitutes solely post-

19  petition agreements that the Debtors have entered into, I

20  think that that would probably be acceptable for the

21  parties.  I'll have to make sure but that seems to me to be

22  a non-controversial change.

23          THE COURT:  And have you added any language -- and

24  I haven't looked at what you've done in your Confirmation

25  Order.  I want to be certain that the exculpations will be

1 applied only in a manner that is consistent with the Fifth

2 Circuit's *Pacific Lumber* opinion.  So the language may be

3 fine so long as -- because it says in accordance with

4 applicable law or language to that effect.  I want it to

5 specifically say that the exculpations are limited to

6 exculpations that are permitted under *Pacific Lumber*.  Is

7 there any problem with that?

8         MS. LIOU:  Not from the Debtors' perspective, Your

9 Honor.

10         THE COURT:  Okay.  Go ahead then.

11         MS. LIOU:  The last -- excuse me.  The last set of

12 topics that I'd like to cover are the treatment of the

13 sureties, Your Honor.  The Plan does provide the Debtors the

14 ability to allocate their own property interest as a

15 beneficiary under certain bonds to different entities.  But

16 very importantly, and this is a very, very important

17 distinction because I think there was a lot of confusion

18 that arose out of this, the Plan does not allocate,

19 transfer, or provide any surety bond to any entity under the

20 Plan under which the Debtor is a principal.  I think that

21 was also made very clear by Mr. Dane's testimony.

22         The Plan and the credit bid transactions do

23 provide that credit bid-acquired assets will be sold free

24 and clear of claims, liens, and interests.  But as Your

25 Honor noted yourself on the first day, that is permitted by

1    Section 363 of the Bankruptcy Code.

2           I'd like to now focus a little bit more on the

3    consensual third-party releases.

4           THE COURT:  Before we go there, the other sort of

5    big issue back on the prior page that we spent a lot of time

6    on are subrogation rights or duties that might exist with

7    respect to properties that are being sold.  Do you want to

8    tell me what your -- and you may remember the colloquy of

9    subrogation rights as to the Government since we could in

10   fact have allowed an abandonment or allowed a sale free and

11   clear.  And the issue that I raised was can we go ahead and

12   leave the Government in place, but since without the

13   Government in place there wouldn't have been subrogation

14   rights, still cut off subrogation rights?  What is the

15   Debtors' argument on that issue?

16          MS. LIOU:  So, Your Honor, we actually have

17   specific --

18          THE COURT:  You need a minute?  We'll take a

19   minute.

20          MS. LIOU:  (Coughing.)

21          THE COURT:  Why don't you take a minute?

22          MS. LIOU:  No, I'm sorry (glitch in the audio).

23   Everybody else that I've been working with knows that I have

24   this persistent cough.

25          Section 513 of the Plan actually has some language

1 that addresses this, Your Honor, which we heavily negotiated

2 with the RSA parties and this also with the Government.

3           THE COURT:  Five point --

4           MS. LIOU:  And it does provide that --

5           THE COURT:  So I need to look at 5.13 to answer

6 that.  Let me just open that.

7           MS. LIOU:  Okay.

8           THE COURT:  I want to understand exactly what

9 you're telling me you think I can do so that I'm going to

10 understand the arguments of others that say that I can't do

11 it.

12           MS. LIOU:  Sure.

13           THE COURT:  Let me open the Plan.  Okay.  I'm

14 looking at 5.13.

15           MS. LIOU:  Subparagraph "A," Your Honor.

16           THE COURT:  Okay.

17           MS. LIOU:  It's in this Plan.

18        (Pause in the proceeding.)

19           THE COURT:  So, again, this is clarity.  I want to

20 be sure I understand it.  So a surety -- I'm looking at the

21 very last clause.  So a surety furnishes a bond to the

22 United States and pays on that bond.  Are they subrogated to

23 the United States' financial recovery rights against anyone?

24           MS. LIOU:  I think the answer depends, Your Honor.

25 What the Plan does is it preserves whatever subrogation

1  rights they may have had at that time if those bonds are

2  drawn.  I don't think we're making a determination at this

3  point in time, and the Plan certainly doesn't prescribe one

4  way or another whether or not those surety parties would

5  lose their subrogation rights or gain extra rights.

6          What we wanted to do was put this back to a mutual

7  position and make very clear that the Plan is not interring

8  their ability to assert a subrogation right post the draw of

9  the bond that occurs post-effective date.

10         THE COURT:  So should that eventuality occur, the

11 surety may assert a financial subrogation right to the

12 Government, and any party or non-party may contest that

13 subrogation right.

14         MS. LIOU:  That's correct, Your Honor.

15         THE COURT:  Okay.  Thank you.

16         MS. LIOU:  Your Honor, I think we've covered

17 expenses, so I don't know that we need to dwell on it but I

18 did want to go to the third-party release provision slide.

19 As the evidence demonstrates and as the docket also

20 demonstrates, the third-party release provisions are fully

21 consensual and they were exclusively noticed.  This Court

22 had approved our process for noticing out the ballots, which

23 included the provisions of the releases in them, and

24 approved the notice of the confirmation -- also has

25 provisions, copies of the releases in them as well.  It was

1  very expensive.

2            THE COURT:  Yeah.  I'm --

3            MS. LIOU:  -- all of the (glitch in the audio) --

4            THE COURT:  -- actually not aware of anyone that

5  has objected to the third-party releases except for people

6  that opted out of them.  And people that opted out of them

7  of course aren't bound by them.  Am I missing something?

8            MS. LIOU:  Okay.

9            THE COURT:  Is there an objection by any party to

10 the third-party release that is the ones that -- has anybody

11 objected to third-party release that also then didn't opt

12 out of it?  Because I didn't think we did.

13            MS. LIOU:  Your Honor, I'm not aware of any party

14 who has not affirmatively opted out or made clear to the

15 Debtors by filing an opt-out notice on the docket that they

16 have opted out.

17            THE COURT:  Okay.  Thank you.

18            MS. LIOU:  I will take that as a not so subtle

19 hint to move on --

20            THE COURT:  Well, I'm just -- I'm not sure --

21            MS. LIOU:  -- to the next slide.

22            THE COURT:  -- why I care about something that no

23 one is objecting to when the Fifth Circuit has said you

24 could do a consensual third-party release and, I mean, which

25 they have.  There is always an issue as to whether opt-in,

1    opt-out is correct.  And I understand that issue.  People

2    can argue whether we meet the Fifth Circuit.  But if no

3    one's arguing against it, I'm not sure why I want to spend a

4    lot of time on it.  I want to be sure that people that want

5    to opt out have opted out.  And I don't think anyone's --

6              MS. LIOU:  Yeah.

7              THE COURT:  -- objecting who didn't also opt out

8    and which I'm not a -- I don't understand the issue if

9    that's where we are.  So --

10              MS. LIOU:  Your Honor, we addressed it simply

11    because it was raised as an objection.  But I completely

12    agree with your position which is folks had the opportunity

13    to opt out.  And to the extent that they did exercise that

14    right to opt out, then they are not forced to provide these

15    releases to third parties under the Plan.

16              THE COURT:  It's more that I think that right now

17    no one that is objecting didn't also opt out.  And that's

18    slightly different than what you're saying.  But someone

19    that opted out can't then come in and say you shouldn't have

20    given us the option to participate in a third-party release.

21    I mean, it didn't hurt them to get the option to

22    participate.  So -- and I don't think we have anyone like

23    that that's doing it so --

24              MS. LIOU:  Yes.  I think if we do, they should be

25    at the proper hearing, but I am not aware of any party who

1  has complained about these releases and has not already

2  opted out.

3         So, Your Honor, I think we can move on to the next

4  slide which deals with the exculpation provisions.  As I

5  mentioned before, in our view the exculpation provision sets

6  a standard of care, it's not really a release per se for the

7  conduct during the Chapter 11 cases, the acts arising out of

8  the restructuring itself.  The exculpation certainly covers

9  Debtors' estates and creditors' Committee and members of the

10  creditors' Committee.  But it also covers certain non-

11  fiduciaries who nevertheless were incredibly integral to the

12  Plan process.

13         As Mr. Perez has already explained, each of those

14  parties participated in one aspect or another in ensuring

15  the success of this restructuring, whether providing some

16  form of exit financing, negotiating relevant documents and

17  providing the voting support needed to get the Plan

18  confirmed, or negotiating with us like the predecessors, the

19  relevant predecessors, did on very complex arrangements

20  under which they would effectively work consensually with

21  the Debtors and the Credit Bid Purchaser to address much of

22  the decommissioning obligations that are present here, over

23  90 percent of the decommissioning obligations that are

24  present in this case.

25                THE COURT:  What happens --

1          MS. LIOU:  The parties acted --

2          THE COURT:  -- what happens if there is a future

3   dispute over the exculpation provision?  Is it coming back

4   here for a decision as to whether the dispute is within or

5   outside of the exculpation, or is that not addressed in the

6   Confirmation Order?

7          MS. LIOU:  Your Honor, I would expect that because

8   the exculpation provisions are a part of the Plan, they

9   would be addressed before this Court at the time, and if a

10  dispute were to arise regarding the scope of the

11  exculpation.

12         THE COURT:  So when you draft the language that

13  I've asked you to draft that deals with *Pacific Lumber*, I

14  want to be certain that there is a gatekeeping function so

15  that, for example, no one uses the exculpation when they

16  shouldn't be using it.  And if we were to determine that

17  some action is not exculpated, then I don't want somebody

18  trying to defend on something where they claim it's

19  exculpated -- or vice-versa.  You know, if somebody got

20  exculpated, they shouldn't be sued at all for the

21  exculpation.  So include a gate keeping function to be sure

22  that *Pacific Lumber* is fully and faithfully adhered to.

23         MS. LIOU:  We will do so, Your Honor

24         THE COURT:  Thank you.

25         MS. LIOU:  I did also want to point out that there

1  is carved intentional fraud, unlawful conduct and that

2  generally the exculpation, in our views, are a pretty common

3  feature in complex cases like this.  And the purpose of it

4  is obvious, because there are many parties who can work with

5  the Debtor to arrive at consensual arrangements, which are

6  to the benefit of all the creditors in the case, and

7  maximize value for the Debtors' estate.  And by allowing

8  those parties to be exculpated protects -- the exculpation

9  you facilitate the consensual process, that I think

10 Chapter 11 is designed hold.

11        Your Honor, with that I think we can turn to the

12 next slide.  I don't necessarily belabor the point, because

13 I know Mr. Brescia did a really great job of laying out each

14 of these parties provided in their own unique way support

15 for the Plan and how that value was integral to the success

16 of the restructuring.  And how like a four-legged stool, if

17 you pull one leg out, the stool is not going to stand.

18        THE COURT:  I think we might call those

19 three-legged stools here in Texas, but that's okay.

20        MS. LIOU:  Given the number of parties here I

21 opted for a four-legged stool.

22        Your Honor, lastly, I just want to make a couple

23 of points before I close.  As we iterated throughout the

24 case, and I think as you've heard from Mike Dane in his

25 testimony, the Plan is designed to accomplish three very

1   important goals.

2          It was important from the beginning -- even before

3   the cases were filed that the Debtors be positioned to

4   withdraw all of their decommissioning obligations with as

5   little impact to the taxpayer as possible.  This was an

6   important goal, not only of the Debtors but also of the

7   Government, and the Debtors have heeded that concern that

8   the Government had.

9          In addition this restructure maximizes value for

10  creditors.  I think testimony -- uncontroverted testimony

11  was presented, but the alternatives really are potential for

12  (indiscernible) effectively.  Chapter 7 liquidation or a 363

13  sale without this financing provided to ensure that the

14  Debtors were able to provide the coverage of creditors under

15  their Plan.  I don't think it's a value maximizing

16  proposition for all of the parties in this case.

17         And last thing I think, most importantly from the

18  Debtors' perspective, it does preserve thousands of jobs and

19  it preserves the Debtors' deepwater business.  It is in line

20  with the rehabilitative purposes of Chapter 11 and they have

21  an opportunity for a fresh start.

22         And I know that it has been an incredibly long

23  odyssey for management, especially who have been extremely

24  dedicated to working nights, weekends and as you saw from

25  the dedications Mr. Dane testified all day on Monday.  They

1  are eager to emerge from Chapter 11.  They are eager to have

2  that fleshed out, the Chapter 11 offer, and look forward to

3  the future of successfully continuing their operations in

4  the Gulf of Mexico.

5          And with that, Your Honor, I think we would press

6  our case ask that you confirm the Chapter 11 Plan.

7          THE COURT:  Ms. Liou, thank you.

8          Mr. Carlson, will you be ready to address the

9  Confirmation Order issues at 3:00 o'clock?

10          I'm not seeing Mr. Carlson.  Hold on.  There we

11  go.

12          Mr. Carlson, will you be ready to address the

13  Confirmation Order issues at 3:00 o'clock?

14          MR. CARLSON:  Yes, Your Honor.  I will.  We are

15  continuing to work with several different parties on

16  provisions even as this hearing is ongoing and will be ready

17  to address any questions that the Court has and to kind of

18  give a status update on where we are with various parties

19  and negotiating language and finalizing it.

20          THE COURT:  All right.  If the parties that will

21  oppose even after whatever deals get made by Mr. Carlson,

22  can we organize how those opposing arguments will be -- have

23  you-all decided who's going first, second, third, things

24  like that?  It will take a minute just to get the afternoon

25  organized.

1          UNIDENTIFIED MALE:  No, Your Honor.  We haven't
2    yet finalized Order --
3          THE COURT:  Well, no, that's for others to see how
4    they've organized it.
5          Let's see, Mr. Schaible, I thought you were not
6    going to be opposing, but maybe you're going to surprise me.
7          MR. SCHAIBLE:  I'm not opposing, Your Honor.  I
8    would like to just ask for a few minutes at 3:00 o'clock if
9    that's okay, Your Honor.
10         THE COURT:  Of course.  Did you want to go before
11   or after Mr. Carlson?
12         MR. SCHAIBLE:  After Mr. Carlson is always a heavy
13   opportunity, I think I should go after Mr. Carlson.
14         THE COURT:  Okay.  That's fine.
15         Mr. Balasko.
16         MR. BALASKO:  Thank you, Your Honor.  Zach Balasko
17   for the Department of the Interior.
18         Like Mr. Schaible, I would like just a brief
19   opportunity before the opponents go, to go over the reasons
20   why the Government has decided not to object to this Plan.
21         THE COURT:  Of course, thank you, Mr. Balasko.
22         Mr. Pasquale.
23         MR. PASQUALE:  Well, Your Honor, Ken Pasquale
24   Stroock and Stroock and Lavan for the Official Committee of
25   Unsecure Creditors.

1           I, too, will just have a very short statement if I

2   may.

3           THE COURT:  Of course.  Thank you.

4           Mr. Zuber.

5           MR. ZUBER:  Good afternoon, Your Honor.  Yes.

6   Scott Zuber.  I will have a little bit of argument when

7   everybody else is through on the proponent's side and

8   opponent on behalf of several surety clients.

9           THE COURT:  All right.  And are you planning to go

10  first Mr. Zuber, or will you work that out with the other

11  opponents?  I don't care who goes first.  Maybe between now

12  and 3:00 --

13          MR. ZUBER:  I'm happy to --

14          THE COURT:  -- you can work out an Order of who's

15  going to go first, second, third, et cetera, I'm not going

16  to cut anyone off.

17          MR. ZUBER:  Sure.  I'm happy to go first, and I'm

18  not sure at this point how many other sureties are planning

19  to make arguments, but we can try to coordinate that during

20  the recess.  But I'm happy to go first if that works.

21          THE COURT:  Why don't we do this?  Let's take in

22  terms of opponents, we'll take all of the sureties, whoever

23  wants to make any statements, followed by predecessors-in-

24  interest.

25          So do we have any predecessors-in-interest that

1  intend to make arguments?

2          Mr. Alaniz.

3          MR. ALANIZ:  Good afternoon, Your Honor.  Omar

4  Alaniz on behalf of the Hess Corporation.

5          Yes.  We do intend to make a short closing

6  argument.  And I did coordinate with BP and I believe BP

7  will be going first, but maybe they should just confirm.

8          THE COURT:  Okay.  Can I just get you-all to

9  coordinate on the predecessors so that we've got that

10 organized for this afternoon?

11         MR. ALANIZ:  Sure.  I don't know if the other

12 predecessors.  I believe that counsel for Exxon and Marathon

13 made some opening statements and I wasn't sure if they were

14 going to make closing arguments, but I'll send an email out

15 to some of those parties and coordinate.

16         THE COURT:  All right.  Thank you.

17         Mr. Kuebel.

18         MR. KUEBEL:  Yes.  Good afternoon, Your Honor.

19 Omer F. Kuebel, III, on behalf of McMoRan and its affiliates

20 and ConocoPhillips and its affiliates.

21         I certainly do intend to have closing arguments

22 directed almost exclusively to the scope of the exculpation

23 clause, Your Honor.  I'm happy to slot in after BP and Hess,

24 or if anyone else wants to go forward.

25         And I do think that the guidance that Your Honor

1  has given on these issues, were they implemented in the

2  Confirmation Order, into language that we've requested,

3  would actually solve a lot of our objections.  But for

4  whatever reason we have unfortunately not been able to

5  engage with the Debtor over the last few days over those

6  issues.  But as of this moment, we certainly Plan to go

7  forward and address the breadth of the exculpation clauses

8  in the Plan.

9       THE COURT:  So as you know, I've been known to put

10  an Order on the screen and put my own language in it,

11  Mr. Kuebel.  I intend to do what I said I'm going to do

12  there.  They don't have exclusive drafting rights on that

13  Confirmation Order.  And I'm saying that for everyone's

14  benefit, so that, you know, maybe between now and

15  3:00 o'clock, Mr. Carlson and you can have a conversation.

16       MR. KUEBEL:  We would certainly welcome that, Your

17  Honor.

18       THE COURT:  Thank you.

19       From 713-374-3674.

20       MR. HUTTON:  Your Honor, John Hutton on behalf of

21  BP.

22       Your Honor, I think we're prepared to move closing

23  arguments on all the issues raised.  I think the scope of

24  what they present is potentially impacted by the language

25  that was filed last night with the proposed Confirmation

1 Order, which includes some of our language that we've

2 proposed.  And I think, depending on some clarifications we

3 hope to get, to go a ways towards resolving it.

4          But I think it's subject to some ambiguity, but we

5 will seek to clarify.  And if it means what we think it

6 means and accomplishes what we think it's intended to

7 accomplish, it may go a long way towards resolving our

8 issues, but that's something we would like to have the

9 opportunity to flesh out with the Debtors and have not had

10 that opportunity as of yet.

11          THE COURT:  All right.  Thank you.

12          And finally, Ms. Rosen wanted to speak.

13          MS. ROSEN:  Thank you, Your Honor.  Suki Rosen on

14 behalf of XTO entities.  We're in somewhat of the same boat.

15 We've been working with the Debtors on language for the

16 Confirmation Order and we've gotten close, there's a couple

17 of remaining issues and we're going to try to have a

18 conference with the Debtors this afternoon to try to resolve

19 those remaining issues.

20          THE COURT:  Thank you.

21          I was wrong, you weren't last.

22          Mr. Eisenberg.

23          MR. EISENBERG:  Thank you, Your Honor.  I was

24 waiting for Ms. Guffy to chime in and she didn't, so I took

25 the opportunity.

1        Obviously, we coordinated with Mr. Kuebel and

2   Ms. Guffy, and Mr. Kuebel will go first for McMoRan a lot of

3   what he'll do obviously will also bear on our clients, W and

4   T, Merit, and ConocoPhillips.  Ms. Guffy will be speaking on

5   the exculpations, as well, and I also be speaking, Your

6   Honor.  But with regard to 513 -- and we did see the changes

7   they made last night -- we also will be speaking to the

8   language that the Debtors put into their proposed

9   Confirmation Order and will look forward to trying to work

10  that out between now and 3:00 o'clock if we can.

11        We've obviously proposed our own language, we will

12  have that available for the Court as well.  There is some

13  confusions that we have with regard to contracts that are

14  executory contracts that have been assumed and are somehow

15  being affected.

16        And so, but we do appreciate Your Honor's guidance

17  and we do have that split up amongst ourselves today as

18  well.

19        THE COURT:  All right.  Thank you.

20        Ms. Archiyan.

21        MS. ARCHIYAN:  Good afternoon, Your Honor.  Yelena

22  Archiyan on behalf of the Energy Transfer affiliates.

23        Unfortunately, we have unable to come to a

24  resolution with counsel for the Debtors with respect to an

25  agreed form of language to be included in the Confirmation

1  Order.  So I will also like to make a few statements at the

2  appropriate time.  Our issue is a little different from the

3  issues that the sureties and predecessors-in-interest, so

4  I'm happy to wait until the very end or whenever you think

5  is appropriate.

6           THE COURT:  That makes sense to me.  Thank you.

7           Mr. Chiu.

8           MR. CHIU:  Yes.  Thank you, Your Honor.  Kevin

9  Chiu, Baker Botts, on behalf of Hunt Oil Company and

10  subsidiaries.

11           Your Honor, we've been working as well with the

12  Debtors similarly to Mr. Carlson with regards to the

13  language in the Confirmation Order for the Hunt turnkey

14  agreements and the various provisions and terms under the

15  Hunt deal.  I think we are certainly close, and we will work

16  closely with Mr. Carlson and his team to confirm a couple

17  things and making sure that the right documents are being

18  filed in front of Your Honor and the Court.  But we

19  certainly do like to preserve our rights and if any items

20  need to be brought to your attention, we anticipate in doing

21  so this afternoon while Mr. Carlson is going through the

22  Confirmation Order.

23           THE COURT:  Thank you.

24           Ms. Russell.

25           MS. RUSSELL:  Good afternoon, Your Honor.  Robin

1  Russell, Hunton Andrews Kurth, on behalf of Apache

2  Corporation.

3          We may have a very brief statement in support of

4  the Plan and the recently filed Apache surety term sheet.

5  We also have a few minor issues that we're working out on

6  the Confirmation Order, and we will do that with the Debtor

7  during our recess.

8          THE COURT:  Thank you.

9          Mr. Dendinger.  Mr. Dendinger.

10          MR. DENDINGER:  Yes.  Thank you, Your Honor.  Good

11  afternoon, Mark Dendinger on behalf of Eni Petroleum US LLC

12  and Eni US Operating Co., Inc.

13          We've been working closely with the Debtors on

14  language to resolve the remaining concerns in the

15  Confirmation Order.  We would simply like to reserve our

16  rights with regard to making any closing arguments if we

17  cannot resolve those concerns, but we expect to be able to

18  resolve them prior to confirmation of the Plan.

19          THE COURT:  All right.  Thank you for that

20  announcement.

21          Mr. Zeiger.

22          MR. ZEIGER:  Good afternoon, Your Honor.  It's

23  Jeffrey Zeiger, Kirkland and Ellis, on behalf of Atlantic

24  Maritime Services.

25          We filed a very limited objection that frankly has

1  been addressed based on comments during the hearing as well

2  as changes to the Plan since we filed.  So I was going to

3  spend 30 seconds informing the Court of that, but since I

4  just did, I'm happy to handle it however you want.  Less

5  than a minute at most, Your Honor.

6            THE COURT:  Thank you, Mr. Zeiger.

7            All right.  Mr. Carlson, would you arrange to have

8  someone walk over here at 3:00 o'clock?  It may be you know,

9  five after 3:00, they may walk in whenever it is they walk

10 in with a flash drive with the Word version of the

11 Confirmation Order, so that we're not just fighting -- me

12 fighting to try to get it in an editable form.  I'll edit on

13 the word version, I'll put it up on the screen.

14            MR. CARLSON:  Yes, Your Honor.  We're happy to do

15 that.

16            THE COURT:  All right.  Thank you.

17            From 847-363-6644.

18            MR. KIND:  Yes, Your Honor.  This is Michael Kind

19 for the Cox entities.

20            THE COURT:  Yes, sir.

21            MR. KIND:  We wanted to also reserve the right to

22 make a short closing statement.

23            THE COURT:  Thank you.  At which point did you

24 want to have it?

25            MR. KIND:  We're hoping to resolve our issues as

1  well, Your Honor, so we could go at the end.  We're hoping

2  that others will cover some of our arguments, we might not

3  be able to -- we might not have to repeat a lot of what's

4  argued previously.

5         THE COURT:  All right.  I appreciate all the

6  announcements and all the work that's going into this.  We

7  will adjourn --

8         MR. PEREZ:  Your Honor?

9         THE COURT:  Yes.  Mr. Perez.

10        MR. PEREZ:  Your Honor, this is Alfredo Perez.  I

11 apologize, I have been side barring with Mr. Schaible and it

12 might make sense for the other supportive of the Plan to go

13 first before Mr. Carlson goes through the Order, just in the

14 interest of -- the Court hearing all the arguments first and

15 then we can go through the Order before the objectors come

16 on.

17        THE COURT:  That actually makes sense.

18        Then, Mr. Carlson, why don't you -- I have a

19 feeling, during that, you're still going to be working on

20 the Confirmation Order so forget my 3:05 time deadline.  Get

21 it to me at a point you think I need it, so that I'm working

22 with a live but editable version of the Confirmation Order,

23 okay.

24        MR. CARLSON:  Yep.  Will do.

25        THE COURT:  Okay.  Thank you.

JUDICIAL TRANSCRIBERS OF TEXAS, LLC

1          Court's in adjournment until 1:30.  This hearing

2   is in adjournment until 3:00.

3        (Recess taken from 12:15 p.m. to 3:08 p.m.)

4                         AFTER RECESS

5          THE COURT:  We don't need new appearances.  I

6   think what we are now going to do is to go to the first

7   proponent that wishes to speak in favor of confirmation.  So

8   if that individual would please press five star one time on

9   their phone.

10         Mr. Schaible, good afternoon.

11         MR. SCHAIBLE:  Good afternoon, Your Honor.  Damian

12  Schaible with Davis Polk on behalf of the First Lien Term

13  Loan Lenders and the DIP lenders.

14         Can you hear me okay, Your Honor?

15         THE COURT:  Yes, sir.

16         MR. SCHAIBLE:  Okay.  Perfect.

17       CLOSING ARGUMENTS ON BEHALF OF THE FIRST LIEN

18             TERM LOAN LENDERS AND DIP LENDERS

19         MR. SCHAIBLE:  Your Honor, first I want to

20  apologize to the Court and the other parties for

21  inadvertently inconveniencing everyone this morning with the

22  schedule.  I was moderating an ABI panel on commercial real

23  estate, which as Your Honor knows I've been learning a

24  little bit, so I wasn't able to change that and I apologize.

25             THE COURT:  You don't owe me an apology.  It was I

1  believe Mr. Perez fell on the sword as his fault.

2       MR. SCHAIBLE:  Mr. Perez is kind.  There's a lot

3  of emails flying around so.  But again apologies for that.

4       Your Honor, I virtually rise and obviously to

5  support the arguments made by the Debtors.  I thought that

6  Mr. Perez and Ms. Liou --

7       THE COURT:  I need to interrupt you a minute,

8  Mr. Schaible, Mr. Chiu has apparently an objection.

9       Mr. Chiu.

10      MR. CHIU:  Oh.  Sorry about that, Your Honor.  No

11 objections, merely throwing my name in to make a statement

12 during the proponent's phase, but (glitch in the audio) I

13 have no objections to --

14      THE COURT:  Okay.  I'll go ahead -- if I can get

15 you to press it when the time comes.  Thank you.

16      Sorry to interrupt, Mr. Schaible, just wanted to

17 be sure if somebody had an objection to you, they could

18 voice it.

19      MR. SCHAIBLE:  Your Honor, lots of people have

20 objections to me, that's a little --

21      So, Your Honor, I rise virtually to support the --

22 obviously to support the Debtors' case.  I thought that

23 obviously Mr. Perez and Ms. Liou did a terrific job of

24 laying out the arguments, and I'm not going to bore Your

25 Honor with them.  I rise virtually merely to make a few

1  points and really by way of emphasis of a few points that

2  Mr. Perez and Ms. Liou raised and to ask Your Honor for some

3  guidance on one point.

4           So Your Honor, as Your Honor has heard at length

5  over the past many months that we've been before you, you've

6  heard a lot about the successes of the cases and the

7  significant contributions that our group has made.  But just

8  to remind -- and there's a reason for this -- as Your Honor,

9  knows our group first negotiated the RSA and the cornerstone

10  deal with Apache prepetition when we had no idea where the

11  case was going to go.  But that deal was important and

12  formed a cornerstone of what ended up becoming the Plan.  We

13  backstopped $100 million DIP and provided that to the

14  Debtors to permit the cases to proceed.

15           We supported the Debtors in difficult negotiations

16  with all the additional predecessors and stand here now with

17  the vast lion's share of Fieldwood's P&A obligations

18  consensually spoken for.  We worked hard with the Debtors

19  and the Government to get to the non-objection that we've

20  received from the Government, and we've been working with

21  the Debtors' sureties throughout.  We are, as was mentioned,

22  both backstopping the exit financing and putting in over

23  $100 million of new money, much of which will be used to not

24  only capitalize the new co-entity but also to ensure that

25  the decommissioning will be done.

1        I say all of this Your Honor to remind the context

2   -- and this is where we believe it's important to remember

3   that, in addition to having provided all the DIP, this is

4   not one of those cases where someone's standing here saying

5   hey Your Honor we have another idea, we have another

6   solution that we can offer the Court that is better or

7   different from the solution that's being offered by the

8   Plan.  Unfortunately, I think everyone agrees that this

9   really is the only solution that exists to avoid a

10  liquidation and additional hardships all around.

11        So the nature of the objections that Your Honor is

12  dealing with today are legal objections that obviously we

13  have different disagreements with and again I think that the

14  Weil team ably handled what we would have said on all those

15  points.  And then objections where people are seeking -- and

16  I think when Mr. Carlson takes over to talk through the

17  Order -- I think you're going to see that we've done further

18  work, during the period of time you gave us early afternoon,

19  Your Honor, we were able to reach additional agreements on

20  language.  But some agreements -- disagreements on language

21  may continue to exist.  And I think that those exist in a

22  couple of places that I wanted to touch base with Your Honor

23  about this afternoon.

24        The first -- and I'll deal with it quickly -- is

25  the exculpation.  I heard Your Honor's point when Ms. Liou

1  was handling the exculpation point.  I think you get the

2  fact that our group in addition to other groups have

3  provided what I would describe as extraordinary support and

4  have played a critical role in the Plan, and the exculpation

5  is appropriately limited both in time and in scope.  And so

6  we believe it quickly and quickly passes the *Pacific Lumber*

7  standard.

8          And Your Honor said, you know, add language to the

9  Plan to make clear that I get to decide whether a given

10  exculpation is to be covered or not.  I think that makes

11  perfect sense.  And the Debtors have proposed some language

12  that I think Your Honor will soon see.

13          The one thing I wanted to be clear about, because

14  I just want to avoid any ambiguity here, by referring to

15  *Pacific Lumber* standard, as Your Honor notes, people throw

16  around the *Pacific Lumber* standard often times as a way to

17  argue the only safe fiduciaries can be and receive an

18  exculpation.  I don't think that's right, and I don't think

19  that's what Your Honor has ruled in prior cases and I know

20  that Your Honor and the Southern District of Texas, more

21  generally, has permitted in call it extraordinary cases

22  third-party non-fiduciaries to get the benefit of

23  exculpation.

24          And so I would love for us to be able to, when you

25  get to the Order, consider language that would make clear

1  that while the *Pacific Lumber* standard will be the standard

2  for Your Honor to call balls and strikes, if you need to

3  with respect to exculpation, we don't have to relitigate

4  whether our holders would fit within that standard.  In

5  other words we very much would like Your Honor to rule today

6  that our group is entitled to the exculpation.  And the

7  question is just what is the scope of the exculpation under

8  controlling law?  And so that's the first point I wanted to

9  make, Your Honor.

10        THE COURT:  So when we get there, and I need to

11  hear argument about it, but here's been my concern about --

12  I have to rely on *Pacific Lumber* and I will apply *Pacific*

13  *Lumber*.  But *Pacific Lumber* isn't the only law that is used

14  when thinking about what fits within a *Pacific Lumber*.  And

15  in my view *Midlantic* plays a relatively major role in what

16  we ought to be doing here.

17        I want to go back and talk about *Midlantic* for

18  just a moment.  Where what the Supreme Court did was said

19  that the public policy behind our environmental laws was so

20  important that we're going to make it preeminent over

21  enforcement of specific language within the bankruptcy code.

22  And the evidence is now closed and so far the evidence is

23  that the parties who are participating in the cleanup

24  effort, which includes your client, have played a really

25  significant role in furthering the public policy of the

1  United States a *Midlantic*.  So when you think about who the
2  critical players are that would fall within *Pacific Lumber*,
3  I think that you have to think about that in the context of
4  *Midlantic*, which would in fact educate the Court that your
5  client does fall within *Pacific Lumber* read in the context
6  of *Midlantic*.

7          So as to -- I want to hear arguments about this,
8  but the concept to me that you can be sued for what you did
9  in the case -- your client could be sued for what they did
10 in the case.  I'm not talking about before the case and I'm
11 not talking about what they might do after the case, but the
12 concept they can be sued for what they did within the case
13 when it was in effect mandated by *Midlantic* if we were going
14 to ever clean these matters up.  With counsel heavily in
15 favor of being certain it applies to you.  I don't know that
16 I want to put particular language in there, as opposed to
17 the comment that I'm making now, because it's awfully
18 difficult to draw where the lines are.  I don't know what
19 your client did two years ago, and I don't know what your
20 client will do two years from now.

21         But I don't read *Pacific Lumber* as being some far
22 out of the market opinion where I need to worry about it
23 being cabined narrowly by what was occurring in *Pacific
24 Lumber*, which is vastly different than what is happening
25 here.  I mean just on a superficial level it was (glitch in

1   the audio) even not by me I don't -- it's not that I have an

2   opinion on this, this is an anti-environmental case, whereas

3   *Midlantic* says that we should counsel pro-environmental

4   cases.

5          So this isn't a hard call for me right now to know

6   that.  I want to hear argument about it.  I'm not sure that

7   I want to give the definition you want to give only because

8   the difficulty of anything that we say and then when

9   something becomes fact specific, you know, how we apply it

10  may be difficult, but I'm perfectly willing to listen to the

11  argument about it.  But it has been my view throughout, and

12  based on the evidence that I've heard which was undisputed,

13  is that without the efforts of your clients and others but

14  I'll take yours since you're the one I'm looking at, we

15  would not have a solution to a major environmental problem

16  in the Gulf of Mexico that *Midlantic* tells me to utilize the

17  Bankruptcy Code in a manner to solve the problem.

18         So with that, we'll worry about the particular

19  language when we get there, but I very appreciate and you're

20  not -- I hope you realize you're not making me think about

21  this for the first time, right.  I've been worried about

22  this throughout the case and how *Midlantic* plays into

23  *Pacific Lumber*, and I do think it clearly does from what I'm

24  seeing.

25         MR. SCHAIBLE:  Okay.  Okay, Your Honor.

1   Understood.  I think at the right time I would love the

2   opportunity to try to convince Your Honor that -- and by the

3   way I was saying my group, but what I really mean as you

4   know is the ad hoc group and credited purchaser, which

5   obviously both are what you are talking about.

6                THE COURT:  Right.

7                MR. SCHAIBLE:  And I do think that the exculpation

8   provision does not exculpate anyone for anything they did

9   before the case and does not exculpate anyone for anything

10  they would do after the case.  So I would ask Your Honor to

11  consider at the right time -- again my only request would be

12  that I don't have to relitigate two years from now whether

13  our clients were covered by the exculpation at all.  I think

14  that's something that Your Honor is ably able to determine

15  today.  The scope of that exculpation would remain an open

16  question, I understand that, but we can get to that when

17  you've heard the argument, Your Honor, and we can --

18                THE COURT:  And I think you've heard what I'm

19  saying about it.  I don't know that it's inconsistent with

20  what you're saying at all, but it may be difficult writing

21  it, but that's -- that is how I view under applicable law.

22                MR. SCHAIBLE:  Understood.  Understood and we can

23  discuss it when we get to the language, Your Honor.

24                The other point, and I think you're going to hear

25  about this again Your Honor, and again I almost said nothing

1    about it because Ms. Liou handled it so well during her

2    closing.  But during some of the conversations that we've

3    had over the past couple of hours it's sort remained an

4    issue.  And this is effectively the free and clear sell kind

5    of issue here.  And again, Your Honor, we're not looking for

6    third-party releases -- non-consensual third-party releases

7    of the ad hoc group or of credited purchaser or of anyone,

8    but we do need to know that with respect to the claims that

9    are being addressed in the case and with respect to assets

10   that are being purchased by credited purchaser and with

11   respect to credited purchaser as a purchaser of assets free

12   and clear that there aren't obligations or claims that are

13   somehow riding through.

14           And this is one of those topics, it's very easy to

15   talk about in theory.  I think it's so obvious in theory

16   it's almost a waste of Your Honor's time.  But when you

17   start to look at the breadth of some of the language, then

18   in particular some of the sureties are pushing for as carve

19   outs under their sureties policies, what I would -- what I

20   would ask Your Honor to consider as you're hearing the

21   arguments -- and we can talk further about -- is we

22   understand and want to be crystal clear that with respect to

23   any contract, surety bonds, any agreements that are being

24   achieved and assigned to credited purchaser, no one is

25   looking to impact anyone's rights under those agreements and

1    that's an absolutely imperative completely understood.  We

2    are not looking for a free pass with respect to any

3    agreements that we are purchasing on a go forward basis.

4           All of that said, we can't stand by carve outs --

5    and you'll see it when you see the language -- that might

6    suggest that somehow with respect to agreements that were

7    not assumed and assigned, third parties have the right to

8    come after a credited purchaser or come after the purchased

9    assets on account of those non-assumed and defined

10   agreements.

11          And so what we have proposed, and you'll see it in

12   the language, is that we need very broad carve outs that are

13   being sought by a number of the sureties that basically say

14   not withstanding anything that exists in the Plan,

15   effectively we maintain all of our rights under all of our

16   agreements with respect to any third parties.  We have

17   proposed that third parties, other than credited purchaser

18   and with respect to the purchased assets, except to the

19   extent that it's on account of assumed and assigned

20   agreements and subrogation.

21          And anything that comes along with those assumed

22   and assigned agreements we are 100 percent on the hook for

23   and we're not looking to impact anyone's rights with respect

24   to.  But with respect to prepetition agreements that the

25   Debtors had merely to the extent that we are purchasing

1   those assets those obligations should not ride along they

2   should be addressed in the Plan as we believe they would be

3   as unsecured claims.

4           THE COURT:  Let's look at the language.  We've had

5   an extensive discussion about that on the Record, if we

6   approve this Plan, your client is buying free and clear of

7   the kinds of claims you're describing, period.

8           MR. SCHAIBLE:  Correct.  Okay.  Thank you, Your

9   Honor.  And that's really -- and you'll see as it comes down

10  to it.  Other than that, Your Honor, I'm going to let you

11  get on to others.  But we do appreciate Your Honor's time

12  and the Court's time, and this is incredibly complex.  Those

13  of us who have spent, you know, the better part of

14  nine months on this day-in-day-out sort of lose sight of the

15  bigger picture sometimes.  But when you do look at the

16  bigger picture this is a Plan that really does show the best

17  of a lot of people on this Zoom call, those I agree with and

18  disagree with.  Thank you, Your Honor.

19          THE COURT:  Thank you.

20          Mr. Balasko, if you would go ahead and press

21  five star I would appreciate it.  I made comments about how

22  I thought *Midlantic* should be applied to further the

23  interest of the people of the United States.  And in fact if

24  we're going to utilize it properly, that it does influence

25  the application of the bankruptcy code to particular

1  situations.  It dawns on me that because I'm saying how I

2  believe you are acting in terms of implementing this, I

3  should confirm that I'm reading, if you will, the United

4  States correctly that you have determined that you're not

5  objecting, because this in fact furthers the kind of

6  principles of *Midlantic*.  Because if not then the decision

7  that I'm telling Mr. Schaible that I think is correct, could

8  be incorrect.  Because it depends on -- in fact I've read

9  the Department of Justice correctly.  So go ahead, please,

10 if you would, Mr. Balasko.

11            MR. BALASKO:  Thank you, Your Honor.  Zach Balasko

12 on behalf of the Department of the Interior.

13                  CLOSING ARGUMENTS ON BEHALF OF

14                   THE DEPARTMENT OF INTERIOR

15            MR. BALASKO:  I think Your Honor's understanding

16 of *Midlantic* is correct.  The Bankruptcy Code under

17 Section 554 gives Debtors -- or trustees and those in

18 possession a very broad right to abandon property if it's a

19 burden to the estate.  You know, in recognition of the

20 overwhelmingly important public policy considerations of

21 particularly environmental laws, the Supreme Court created a

22 -- judge made exception to that to the management standard

23 in *Midlantic*, where --

24            THE COURT:  Probably wouldn't happen with the

25 current Supreme Court, right?  But I think I need to rule on

1  the way they've already ruled and not the way they might

2  rule today, right?

3         MR. BALASKO:  Your Honor, as a proud graduate of

4  Washington and Lee school of law, I would have to note that

5  this is one of Justice Powell's my fellow WNL graduate, I

6  think.  But I agree with you, Your Honor.

7         But *Midlantic* exception -- if a regulator raises

8  an objection under *Midlantic* that an abandonment would

9  violate a law that's designed to protect public health and

10  safety, abandonment is not permitted.  The Supreme Court

11  found that Congress didn't intend to advocate a Debtors'

12  plausibility to comply with these environmental laws in

13  particular while we're in Bankruptcy Code.

14         As Your Honor noted earlier and noted in the

15  American Coastal opinion, *Midlantic* doesn't call on the

16  Bankruptcy Court to replace its judgment with the judgment

17  of the regulator or with Congress when enacting statutes and

18  enforcing regulations.  It's the prerogative of the

19  regulator to decide whether or not to assert *Midlantic*

20  claims, and it's analogous of whether or not a particular

21  Bankruptcy Plan proposed abandonment protects the Gulf, the

22  environment.

23         In this case, Interior has thought long and hard

24  about the decision and reviewed the Debtors' Plan, gone back

25  and forth with the Debtor for many, many months to determine

1   that this Plan is the best practical solution to protect

2   health, safety, and environment in this case.  We are

3   confident that the properties will continue to be maintained

4   and monitored as there would be no gap in which -- you know,

5   after the effective date there's a property that's out in

6   the Gulf unmonitored.  That's a very, very important

7   consideration, even before we get to decommissioning that

8   someone is watching these properties to make sure there

9   aren't vessel collisions or oil spills.

10          We're also confident that 91 percent of these

11   properties there are already agreements in place, or there

12   will be on the effective date that the decommissioning will

13   be performed.  And as to the remaining 9 percent, the

14   predecessors-in-interest on those properties have recognized

15   their obligation to perform the decommissioning as joint and

16   several with the Debtor, and when called upon to do so by

17   Interior, we're confident that they will perform the

18   decommissioning.

19          Your Honor, we haven't looked at the Confirmation

20   Order yet, but it's also important to note that under

21   paragraphs 142 to 146 of the current Confirmation Order, the

22   Debtors aren't being released of their obligations to comply

23   with the decommissioning obligations and other regulations,

24   and neither are the post effective date Debtors.  This is

25   also very important from Interior's perspective that there

1  is no release of liability happening here.

2          And finally as Your Honor noted earlier in the

3  discussion with Mr. Perez, this court is not charged with

4  determining whether or not the post-effective date Debtors

5  ultimately comply with the regulations or with the

6  transition services.  The Confirmation Order also makes it

7  explicitly clear that the applicable tribunal, whether they

8  be Interior's Administrative process or an article three

9  court, will be where the United States goes to make sure

10  that the Debtor is complying with the environmental

11  obligations.  Which I think is how Congress intended the

12  process to work, and that's not the type of thing that I

13  think this court wants to get involved in.

14          Your Honor this has been, as I said at the

15  beginning of my presentation yesterday, a long and

16  challenging case, but I think that this a solution that

17  protects the environment and protects health and safety, and

18  for that reason the Government's not objecting to the Plan.

19  They could not have gotten here without the many, many hours

20  of work from the Debtors, from the lenders, from the

21  predecessors, and all their counsel, and I would be remiss

22  if I didn't mention my co-counsel at Justice Serajul Ali, as

23  well as Casey Hines and of Interior Ryan lamb all of us have

24  put in many hours to get to this point.  And we are

25  approaching and confirmed we're not objecting to it and

1   happy to answer any questions the Court may have.

2          THE COURT:  So in the last part of your statement,

3   you were thinking people that if we wouldn't have gotten the

4   deal or you wouldn't have gotten the deal done without them.

5   With respect to Mr. Schaible's clients for example, I think

6   the evidence shows, not only that you wouldn't have gotten

7   the deal done with out them, but that they wouldn't have

8   done the deal without having appropriate exculpation for

9   doing the deal.  And that the deal is --

10          MR. BALASKO:  Absolutely, Your Honor.

11          THE COURT:  -- in furtherance of *Midlantic*.  Is

12   that your view as well?

13          MR. BALASKO:  That is my view, Your Honor.  Now it

14   is important to note that this transition services you know,

15   the reason that the Plan worked that was before Your Honor

16   in January didn't provide for those services, was that there

17   was no money with which to provide the services.  And you

18   know, that money has to come from somewhere and I believe

19   that money is in fact coming from Mr. Schaible's clients.

20   And I believe that this Debtor would not be able to comply

21   with *Midlantic* without the support of the lenders.

22          THE COURT:  Thank you, I just wanted to be sure I

23   wasn't out to far over my sleeves.  I'm going to go ahead

24   and mute your line, Mr. Balasko.

25          Mr. Pasquale, let me get your line active.  There

1  we go.  Mr. Pasquale, sorry.

2           MR. PASQUALE:  There we go.  Thank you, Your

3  Honor.  Can you hear me okay?

4           THE COURT:  I can.

5           MR. PASQUALE:  Thank you, Your Honor.  Ken

6  Pasquale at Strook and Strook and Lavan for the Official

7  Committee of Unsecured Creditors.

8                 CLOSING ARGUMENTS ON BEHALF OF THE

9                 OFFICIAL COMMITTEE OF UNSECURED CREDITORS

10          MR. PASQUALE:  Your Honor, I will be very brief.

11 The Committee filed a statement in support of confirmation

12 at Docket No. 1552 which outlines the Committee's actions

13 and diligence, as well as the Committee's Planned settlement

14 with the Debtors and lenders, which resulted in the

15 treatment provided in the Plan for general unsecured

16 creditors in classes 6(a) and 6(b).

17          Your Honor, this case presented some difficult

18 facts for unsecured creditors.  In addition to the P&A

19 issues, there was 1.8 billion in prepetition secured debt, a

20 proposed credit bid transaction, and a valuation that did

21 not seem to leave room to satisfy general unsecured claims.

22 In these circumstances, the Committee was able to achieve

23 what we believe is very favorable treatment for general

24 unsecured claims and important structural concessions.  Such

25 as the opportunity to select the Plan administrator, and the

1  release by the estate of any possible preference claims

2  against holders of general unsecured claims.

3       I won't burden the Record here, Your Honor, by

4  reciting each term of the Plan settlement.  The complete

5  terms are set forth in the disclosure statement, that's

6  Docket No. 1285 at page 16.  We do believe it's significant

7  however that many of the objections that were initially

8  filed against the Plan -- of the many objections, excuse me,

9  Your Honor, none of the objections took issue with the Plan

10  settlement and the treatment of general unsecured claims.

11       Your Honor, I mentioned at the start of the

12  hearing that the Committee was in the process of evaluating

13  the Apache-sureties settlement for which the term sheet was

14  filed by the Debtors last night.  Just for the Record, the

15  Committee supports that settlement and Your Honor we

16  respectfully request that the Plan be confirmed.  Thank you

17  very much.

18       THE COURT:  Thank you, Mr. Pasquale.

19       All right.  Who next wants to address from a

20  proponent's point of view advocacy of the Plan?

21       Ms. Russell.

22       MS. RUSSELL:  Good afternoon, Your Honor.

23       THE COURT:  Good afternoon.

24             CLOSING ARGUMENTS ON BEHALF OF

25                   APACHE CORPORATION

1          MS. RUSSELL:  I'll start by saying that I'm proud

2     that Lewis Powell was a partner at Hunton before he went on

3     the Bench.

4          After many months of litigation and negotiation,

5     the Apache sureties, the Debtors on behalf of Fieldwood One,

6     and Apache reached an agreement as to the terms for settling

7     the disputes among them, including the adversary proceeding

8     that was filed with this court.  The Apache surety term

9     sheet was filed early this morning, as just noted.  It

10    contemplates that between now and the effective date the

11    parties will further memorialize the settlement in a

12    subrogation, subordination, and payment agreement.  And the

13    parties have agreed that if we have any problems or disputes

14    arising from turning the term sheet into that agreement, we

15    will come back to you for resolution.

16         So I would like to briefly walk through the terms

17    of that agreement and address questions that I have.  There

18    are four sureties that are parties to this agreement.  Two

19    of them issued bonds directly to Apache, two of them stand

20    behind the Deutsche Bank letters of credit that were issued

21    to Apache, and that's bundled together with what we call

22    Trust A constitutes the decommissioning security which you

23    will see referenced in the Confirmation Order.

24         In order to implement this, the sureties are going

25    to enter into an inter-surety agreement and designate one

1  representative, the surety representative to on an ongoing

2  basis work with Fieldwood One and Apache.  There are several

3  important things that wrote out of this.

4          The first, Apache had a claim against the Debtors

5  for the short fall in the decommissioning funding for 2020,

6  and that was in the range of $50 million.  The sureties

7  asserted that, that had to be strictly cured and Fieldwood

8  One was going to have to borrow money in order to effectuate

9  that cure.  But as a result of the settlement, the sureties

10  have agreed that Fieldwood One and Apache can agree to an

11  alternative cure.  And the cure being the entire settlement

12  that was reached between the Debtors and Apache before this

13  case began.

14          As a result, Fieldwood One will not have to borrow

15  money to make the cure.  That money was going to go into

16  Trust A which was going to be sitting for awhile until it

17  had to be drawn on.  And so through that savings, Fieldwood

18  One will be able to make payments to the sureties which we

19  are calling the Fieldwood One premium claims.  Now these

20  claims are not at the same level as the premiums that were

21  due prepetition, but it is an amount that has been agreed to

22  by the sureties and they will allocate it amongst themselves

23  under their surety agreement.

24          The way it's set up 6.25 million will be paid in

25  semi-annual payments for a total of 6.25 a year that starts

1  60 days after the effective date.  And then, if there is

2  sufficient free cash flow above the 20 million mark that is

3  going to be set aside for working capital, then the sureties

4  will be entitled to additional 2.75 million on an annual

5  basis.  And this total of 9 million will not be subject to

6  the subordination that I'm going to reference momentarily.

7        So the sureties are also going to be allowed to

8  opt into the farm end that was negotiated between Fieldwood

9  One and NewCo.  So that agreement those farm end rights last

10  for two years, and at the end of the two year mark the

11  sureties can elect -- they're not obligated to -- but they

12  can elect to step into that agreement.  And if they do and

13  things work out well, they will recover their initial

14  capital investment.  Then 50 percent of the profits, above

15  their initial investment return, they can use those funds to

16  top up to their premium, if free cash flow wasn't otherwise

17  available to do that.  And then the other 50 will go into

18  Trust A.

19        So Fieldwood One will get the benefit of working

20  capital of 50, once the sureties get back their capital and

21  they get their pre- (indiscernible) topped up, the other

22  50 percent will got into Trust A, which will be used for

23  decommissioning as well.  So it's really a win, win

24  situation all around.  The Surety representative will have

25  information rights similar to Apache's and will be allowed

1  to distribute that information that's subject to appropriate

2  confidentiality with the other sureties.

3         And then we get to this agreement, this

4  subrogation and subordination and payment agreement.  And

5  that agreement is intended to grant to the sureties a

6  contractual right of subrogation, if and when all the bonds

7  and LCs have been drawn on, that has been agreed to by

8  Fieldwood One.  And they will step in with a claim for the

9  amount that has been drawn plus any premium fees up to $12

10  million that they have not previously been paid.  That

11  agreement will have very standard subordination provisions,

12  as well, so that it's clear that nothing will be paid out on

13  that subrogation claim to the sureties until Apache has been

14  fully repaid on the standby facility that it has offered,

15  there's no future commitment to lend, and all the

16  decommissioning has been completed on the Legacy Apache

17  property.

18         In connection with this the sureties have agreed

19  to support the Plan, provide the releases as outlined there

20  in, and this is what we view as a great resolution for

21  everyone.  The adversary proceeding will be dismissed,

22  Apache will get the comfort that it needs in connection with

23  the Plan.

24         I'll stop at that point and ask the Court if it

25  has questions.

1          THE COURT:  Not many and I don't think I should

2    ask many, I want to be sure of a couple of things.  Number

3    one, I know of no difference -- sitting here right now

4    without studying it -- between the words you used today and

5    the words that are written on the paper, but it would be my

6    understanding between you and the sureties that, if there is

7    any difference between what you said today and what is on

8    the paper that was filed, that the paper would control.

9          MS. RUSSELL:  Absolutely.

10          THE COURT:  And second, I want to understand, if

11   there is a dispute over how to document the final contract,

12   which I understand you're going to bring back to the

13   Bankruptcy Court, and if there are some holes in the

14   agreement that just have to be filled in, in order to be

15   able to make it final, are the parties agreeing that they

16   have a sufficiently documented deal that I am empowered to

17   fill in the blanks that need to be filled in if there's

18   something just completely missing but that's absolutely

19   necessary?  O does the deal fail if you have that situation?

20   I just want to -- I'm not -- I don't want to change what

21   you-all have agreed to do, but to me that is the hardest

22   question.  This is really complicated, there's probably some

23   holes, I think you'll work through them, but if you can't, I

24   want to know if I'm supposed to fill them in or not.

25   Whether that's what you are empowering me to do.

1          MS. RUSSELL:  Your Honor, from Apache's

2    perspective, we are empowering you to do that.  We feel like

3    this is a deal, where we can't see it but there's a lot of

4    blood on this term sheet, a lot of people have looked at it

5    for a long time, and so I'll defer to Mr. Perez and the

6    counsel for the sureties, but from Apache's perspective we

7    would rely upon the Court understanding the history of this

8    bankruptcy and the issues here to fill in those blanks.

9          THE COURT:  Mr. Grzyb, what is the sureties'

10   position on that?

11         MR. GRZYB:  Well, I think Ms. Russell has

12   accurately captured, I think, the proper response now.  I

13   would probably, to the extent he has raised his hand

14   virtually, defer to Mr. Brescia to go first because he's

15   been sort of leading the charge with respect to negotiating

16   this term sheet.  So if he has raised his hand, I would

17   defer to him.  If --

18         THE COURT:  You know with that --

19         MR. GRZYB:  -- Your Honor can see if he's --

20         THE COURT:  -- you know, with that, I'm always

21   going to call on you first, so you have this sort of built

22   in problem Mr. Grzyb, so.

23      (Laughter.)

24         MR. GRZYB:  Well, I will say that I think that job

25   sort of started to really accelerate the process of this

1  term sheet, so Marvin will forever be a legend in sureties.

2  Going forward.  But thank you, Your Honor.

3          THE COURT:  But as far as you're concerned though,

4  if there are holes in the deal, you want them filled in by

5  me as opposed to saying that the deal fails because there's

6  a hole?

7                  CLOSING ARGUMENTS ON BEHALF OF

8                  ASPEN AMERICAN INSURANCE COMPANY,

9      BERKLEY INSURANCE COMPANY, EVEREST REINSURANCE COMPANY,

10               AND SIRIUS AMERICA INSURANCE COMPANY

11          MR. GRZYB:  We very much want to see this deal

12  concluded as part of this bankruptcy case.  My comment would

13  be sort of two-fold.  The deal the subordination agreement

14  with Apache and the Debtor, I think we want to have

15  confirmed and part of the Plan of Reorganization.  As part

16  of the Confirmation Order, I think that the term sheet also

17  makes clear that, after the effective date, should a dispute

18  arise there is a venue selection clause outside of the

19  Bankruptcy Court.  And hopefully that doesn't happen or it

20  doesn't happen for a number of years.

21          The second aspect that I don't think is absolutely

22  necessary and may take some time to figure out if he -- it

23  references an inter-surety agreement with no terms

24  whatsoever.  I don't think that hole or that gap needs to be

25  filled, that was to be the deal among the four sureties.

1 That hole does not require us to get sign off from the

2 Bankruptcy Court.

3          THE COURT:  Right.  But with respect to the

4 dispute that you might have with Apache -- and if we knew

5 what the hole was right now, we would all fill it in, right?

6 But let's assume something comes up as you-all do the formal

7 documentation, there's a hole you-all are going to work

8 through it, probably work it out, but if you don't, does the

9 agreement fail because there's a hole or do you want me to

10 fill it in?  I also need to tell you that you just said

11 something different than what the way that I read the term

12 sheet.  You said after the effective date matters would

13 return to state court.  This says after the case is closed,

14 those are two different things.  I don't care what your deal

15 is, I don't want there to be ambiguity.

16          MR. GRZYB:  Yeah.  And the actual different term

17 was after the case was closed, so I would defer to the term

18 sheet on that and I apologize for the --

19          THE COURT:  No problem.  And again I just -- my

20 whole -- the reason I'm asking these questions is I don't

21 want to get down the road once there's a dispute and then

22 figure out whether I've got authority to deal with it.  Let

23 go ahead and -- let me go ahead and --

24          MR. GRZYB:  To answer your question --

25          THE COURT:  -- Mr. Brescia's line, you wanted to

 1  defer to him, it looks like you're thinking about, let's see

 2  what he says and see where we go.

 3          Mr. Brescia.  Your camera is off, Mr. Brescia, if

 4  you care, but your line is now activated.

 5          MR. BRESCIA:  Yeah.  Thank you, Your Honor.  This

 6  is Duane Brescia for Zurich American Insurance Company.

 7  I've been trying for the last 10 minutes to get my video

 8  working and I'm not sure why it's not.  So I'll try to speak

 9  and hope that, that satisfies the Court.

10                  CLOSING ARGUMENTS ON BEHALF OF

11                  ZURICH AMERICAN INSURANCE COMPANY

12          MR. BRESCIA:  On behalf of all the sureties and

13  for my client Zurich, I do think that what Ms. Russell

14  stated was accurate is that we do have a deal.  There is, I

15  guess, the gap filler, Zurich is okay with the Court filling

16  those.  Although we think we've filled it in ourselves and

17  believe me we're going to give the next round of documents

18  the same attention to detail and professionalism that all

19  the parties have shown in this to try to get to that, so we

20  don't have to go to you.

21          Quite a bit of care over the weekend to make sure

22  at least the broad brushes would cover anything so there's

23  not any ambiguity as to what is intended how it's said.

24  Obviously, we have yet to deal with that.  So with those

25  issues I would agree with the Court's comment that they can

1  fill in the gaps.  With the exclusion of the

2  inter-surety we're just not there yet on those terms but the

3  role of the surety representative is in place.

4         The final thing to add, Your Honor, is simply just

5  more of a mechanical issue.  We're talking about this term

6  sheet, I just did not see -- and I've reached out to

7  counsel, I'm not saying that they've avoided me they just --

8  I know they're doing a lot of different things here -- we

9  just want to make sure that there's a spot in the Plan

10  Confirmation Order where the term sheet is officially

11  adopted, and I'm not sure I saw that.  So I just open that

12  request to the other counsel involved in the term sheet.

13         THE COURT:  Yeah.  I'll direct Mr. Carlson to the

14  extent that he hasn't already done so to be sure that's

15  there.

16         Mr. Eisenberg.

17         MR. EISENBERG:  Yes.  Thank you, Your Honor.

18  Philip Eisenberg on behalf of HCCI International Limited.

19                CLOSING ARGUMENTS ON BEHALF OF

20                  HCCI INTERNATIONAL LIMITED

21         MR. EISENBERG:  We echo Mr. Brescia's sentiments,

22  and we also confirm that Your Honor would be the gap filler

23  here, I actually had a situation like this in front of Judge

24  Steen many years ago where he had to do that and the parties

25  presented their views and the Court came up with a process

1   for doing that and -- but we ought to be able to --

2              THE COURT:  Yeah.  Maybe I should just --

3              MR. EISENBERG:  -- afford it.

4              THE COURT:  -- just call Judge Steen and see if he

5   wants to do that.

6              MR. EISENBERG:  Yeah.  That would be fine by me.

7   And Your Honor, on the inter-surety agreement yeah that is

8   not something we would bring to the Court.

9              THE COURT:  No.  I agree.  With respect to

10  disputes with Apache for example or with the Debtor, if the

11  final agreements require hole filling and I know no one

12  wants them to be there, but we've all been there where we

13  didn't think of something, I'm supposed to fill in the gap.

14             MR. EISENBERG:  Right.  Exactly, Your Honor, when

15  we're doing -- if we have to do the subordination agreement

16  and if there's something that one thinks goes one way and

17  one goes the other way and we can't agree, we'll have to

18  bring that to the Court.

19             THE COURT:  Mr. Miller.

20             MR. MILLER:  Good afternoon, Your Honor.  Robert

21  Miller on behalf of Philadelphia Indemnity Insurance

22  Company.

23             Can you hear me okay?

24             THE COURT:  Good afternoon.  I can hear you fine.

25                   CLOSING ARGUMENTS ON BEHALF OF

1              PHILADELPHIA INDEMNITY INSURANCE COMPANY

2          MR. MILLER:  Excellent.  I will confirm our

3    agreements with statements made on the Record by Mr. Brescia

4    and Mr. Eisenberg and Mr. Grzyb that you are the appropriate

5    person to fill in the gaps there, and to see if they exist,

6    we certainly hope there will not be.  And as to the inter-

7    surety agreement we also agree that, that's outside the

8    scope of your gap filing purview.  So I would like to say

9    that all four sureties are on board with the statements that

10   Ms. Russell made with the obviously the caveat in regards to

11   the inter-surety agreement.

12          THE COURT:  Thank you.

13          All right.  Ms. Russell, I think what you said has

14   been adopted by everybody.  Is there anything else you want

15   to add or should we move to Mr. Chiu and see what he has to

16   say?

17          MS. RUSSELL:  If you'll indulge me just briefly.

18   We do need the surety representative designated to us at the

19   effective date so that we know who information needs to be

20   provided to.  And finally I would like to think the sureties

21   counsel and the Debtors' counsel for getting this done with

22   us and particular I would like to thank Mike Dane and Tommy

23   Lamb from Fieldwood and Anthony Langley (phonetic) and Brett

24   Cupid (phonetic) from Apache, who were very creative and

25   constructive in helping structure this agreement.

1          So thank you.

2          THE COURT:  Ms. Russell, I suspect that you were,

3    too, but thank you.

4          MS. RUSSELL:  Thank you, Your Honor.

5          THE COURT:  All right.  Mr. Chiu, if I can get you

6    to press five star.  Sorry to interrupt you before, I only

7    get a -- it's the same signal I get if somebody wants to

8    talk or somebody objects, so I try and keep that cleared out

9    so that I don't have any pending objections.

10         I didn't mean to cut you off otherwise, Mr. Chiu.

11         MR. CHIU:  No.  Not at all, Your Honor.  And

12   apologies again to Mr. Schaible for temporarily stealing his

13   thunder a little bit, so hopefully we can proceed as is.

14         But again, Kevin Chiu Baker Botts on behalf of

15   Hunt Oil Company and subsidiaries.

16      CLOSING ARGUMENTS ON BEHALF OF HUNT OIL COMPANY

17         MR. CHIU:  As Your Honor, is aware Hunt is one of

18   the predecessors of consensual agreements with the Debtors,

19   and as indicated before going into the break that Hunt does

20   have a deal with the Debtors and intends to honor that deal.

21   And we certainly stand, as far as that agreement, in support

22   of confirmation of the Plan.

23         We did reach out to the Debtors' counsel

24   Mr. Carlson and his team before going into -- you know,

25   going into the break with regards to certain mechanical

1  issues that we had with regards to the Confirmation Order
2  language, and also some other documents include the Plan
3  supplements and the turnkey agreements.  I don't know if
4  Your Honor wants to wait until Mr. Carlson is going to be
5  going through and addressing each of those provisions in the
6  Confirmation Order for us to raise our issue, or if we
7  should go ahead and raise them now so you can correct
8  Mr. Carlson accordingly.
9        THE COURT:  I'm a little inclined to wait to where
10 I've got the document, I've got it on the screen, and if we
11 direct a resolution, I can just type it in so everybody
12 knows what it is.  Is that okay with you, Mr. Chiu?
13       MR. CHIU:  Yes.  That works for the Confirmation
14 Order.
15       With regards to some of the other documents, we do
16 want to make sure that, when it comes to that point in time,
17 there's a Hunt turnkey agreement that was alluded to
18 throughout this hearing by, you know, Mr. Dane and Debtors'
19 counsel.  Hopefully once that gets resolved with regards to
20 the confirmation language, the Order language that is part
21 of that agreement will get filed promptly before entry of
22 the Confirmation Order.  And that the Plan supplement
23 documents that particularly the oil and gas lease schedules
24 for Fieldwood Three and the abandoned properties, will be
25 updated accordingly to encapsulate the terms of our

1  agreement with the Debtors.  But other than that, we

2  certainly thank the Debtors for their ongoing efforts to

3  move this deal forward and stand in support of confirmation.

4          THE COURT:  Mr. Chiu, thank you.

5          Mr. Carlson, when we get to you, I will need to

6  understand whether the Plan supplement is going to all be

7  updated before an Order would be entered.  So you can wait

8  and address that, but let's not forget the issue that

9  Mr. Chiu is addressing.

10         Thank you, Mr. Chiu.

11         MR. CHIU:  Thank you very much, Your Honor.

12         THE COURT:  All right.  Who else do we have that

13 wishes to make any statement in support of confirmation?

14     (No audible response.)

15         THE COURT:  All right.  Does it make some sense to

16 sort of abort the game Plan and now go to statements in

17 opposition of confirmation, and then take up the

18 Confirmation Order?  Because I think a lot of people have

19 told me their objections are close to getting resolved, and

20 it may make some sense to hear those and then be sure we can

21 fix it in the Confirmation Order.  So unless there's a

22 problem by the Debtor, I think I'm just going to come back

23 to Mr. Carlson while he continues to work on revisions as

24 people tell me their objections.

25         So let me ask the first party that wishes to speak

 1  in opposition to confirmation to do so?

 2          All right.  Yeah.  Let's hear from BP.  Go ahead,

 3  please.

 4          MS. HEYEN:  Thank you, Your Honor.  Shari Heyen

 5  for BP.

 6                  CLOSING ARGUMENTS ON BEHALF OF BP

 7          MS. HEYEN:  We were able, likewise, to speak

 8  during the break with Mr. Carlson and we've made some

 9  progress on our language as well.  And so I just rise to let

10  Your Honor know that if the language -- if we're close on

11  our language, I don't really know how much time we're going

12  to need for our closing.  So it might be helpful to find out

13  where Mr. Carlson is with respect to our language.  And we

14  can do that now.

15          THE COURT:  So what you're telling me is that

16  we're better off going to Mr. Carlson before I listen to the

17  objections, I'm perfectly happy to do that.

18          MS. HEYEN:  Yes, Your Honor.  From where we sit,

19  yes.  Because we're pretty close.

20          THE COURT:  I'll change course.  We'll go back to

21  that.

22          All right.  Mr. Carlson --

23          I'm going to leave you on, Ms. Heyen.

24          Let's get Mr. Carlson on.

25          MS. HEYEN:  Thank you.

1          THE COURT:  And then we'll come back and pick up
2    other objecting parties.

3          So I'm going to not recognize Mr. Alaniz and
4    Mr. Kuebel

5          I want to go to Mr. Carlson before we get to them.

6          And then we'll come back and you're going to have
7    a full chance to make your objections.

8          All right.  Mr. Carlson, where are we on the
9    Confirmation Order?  Let's start with the BP disputed
10   provisions or whatever we want to call them.

11         MR. CARLSON:  So Your Honor, yeah, we have made
12   quite a bit of progress and we're working through several
13   objections.  For BP I do think we're very close.  We have
14   narrowed it down to just two issues.  And not long before
15   this call, some revised language was sent around, and I
16   think we are -- I think from the Debtors' perspective the
17   revisions are acceptable, but we are waiting for sign off
18   from other consenting stakeholders.

19         THE COURT:  Do you have those in a form right now
20   on your screen that you can show me?

21         MR. CARLSON:  Yes.  Just give me one second.

22       (Pause in proceedings.)

23         MR. CARLSON:  Sorry, just one second, I'm trying
24   to find the email here.  It never came in.

25         I would ask Ms. Heyen, which associate sent across

1   that language, I'm just having trouble finding it right now.

2            MS. HEYEN:  It was Mr. Ryan Wagner of Greenberg

3   Traurig.

4            MR. CARLSON:  Ah.  Thank you.

5         (Pause in proceedings.)

6            MR. CARLSON:  So Your Honor, I think it's really

7   just two issues we're down to.  Number one, this reservation

8   of rights language regarding arbitration rights.  And then

9   number two, they're set off and so this is proposed -- BP's

10  proposed addition to 128(9).

11           THE COURT:  And is the Debtor okay with that

12  revision?

13           MR. CARLSON:  Yes, Your Honor.  We're fine with

14  this.  We think it's not doing anything other than to the

15  extent they have arbitration rights are valid in any rights.

16  That this Order would not upset those rights.

17           THE COURT:  So hold up then --

18           MR. CARLSON:  -- but I haven't --

19           THE COURT:  Mr. Kuebel and Mr. Alaniz, I'm about

20  to not recognize you-all on purpose.  So I'm going to make

21  you-all repress five star, when you need to, which may be

22  right now.

23           Is there any party that has any problem with the

24  language shown on the screen in proposed paragraph 128

25  sub (9)?  If so, please press five star.

1          Mr. Perez.  Mr. Perez, you pressed five star.

2          MR. PEREZ:  Yes, Your Honor.  Obviously, I don't

3  have any issue with it, but we do -- this is part of the

4  consent that the FLT lenders have pursuant to the RSA, so I

5  want to make sure that --

6          THE COURT:  Right.  I want to hear not consent or

7  consent.  We can't just -- I don't know else to get that

8  sub.  I'm about to talk about doing another thing than the

9  way we're going on it.  But on this one, if they've got a

10  problem, press five star and let me hear it.  If they're

11  okay with it, they're okay with it.

12          Okay.  Let's go to the next BP issue and then I

13  want to maybe change course a little bit.  What's the next

14  BP issue?

15          MR. CARLSON:  So I think that captures it.  Then

16  the rest of the changes that you see here on the screen, I

17  think we're fine with the changes in 10 as well.  The only

18  question I have here, I think, is as permitted under the

19  Plan language regarding set off has been a -- has been a

20  subject of dispute and discussion involving lender's counsel

21  as well, so I'm not prepared to say that we're signed off on

22  that language yet.

23          THE COURT:  What's going to take -- who needs to

24  sign off on that or reject it from your team?

25          MR. CARLSON:  We have a similar language issue

1  with XTO, and I think there's been back and forth emails on

2  that point where we had said -- and I don't want to get out

3  of focus -- but I think we had said something a little bit

4  differently.  I would ask the Davis Polk team, I think that

5  they may have proposed language here that may have resolved

6  this whole complaint.

7          THE COURT:  Let me go where I was going to go

8  then.  I really do want to end the Confirmation Hearing at

9  some point, and there may be people that have objections

10  where they don't anticipate that they are resolvable through

11  the Confirmation Order.  Someone has a substantive objection

12  that we're taking away one of their rights for example.

13  Other people believe it's going to get resolved in the

14  Confirmation Order.

15          Here's what I would like to propose, and I want to

16  see if this works without causing undue delay.  I know it's

17  expensive every time we adjourn.  Is let your people who

18  believe that they have objections that are not resolvable by

19  language in the Confirmation Order.  If we sustain an

20  objection or overrule an objection, that will then inform

21  where we need to go.  And then adjourn until 1:30 tomorrow

22  to let the balance of the language work or not work,

23  preserving for everyone, for example, Ms. Heyen, if the

24  netting language can't be worked out, she can make her full

25  objection without any waiver tomorrow, but that way she'll

1  know for sure whether it's made.  So I'm not going to cut

2  off anybody's rights to make their full objection tomorrow

3  if they don't make it today.

4        But I'm sure we have some people that think their

5  objection is not resolvable in the Confirmation Order and,

6  you know, that they need to be totally cut out of the

7  provisions of the Plan or the Plan shouldn't be confirmed or

8  something like that.  If there's somebody that thinks they

9  can't resolve it by working with the Order, let's hear from

10  you now.  And does anyone have any problem then coming back

11  at 1:30, and we will then -- we'll then know if there are

12  things that you-all can't voluntarily work out and we'll

13  take them up at 1:30.  Looks like nobody has a real problem

14  with that.

15        So let me now hear from anyone that has a

16  non-resolvable objection.

17        Mr. Alaniz, a non-resolvable objection by you.

18        MR. ALANIZ:  Yes, Your Honor.  Omar Alaniz on

19  behalf of Hess Corporation.

20     CLOSING ARGUMENTS ON BEHALF OF HESS CORPORATION

21        MR. ALANIZ:  Well, I want to be clear, I -- well,

22  we have an issue that I think is resolvable with language,

23  and I emailed Mr. Carlson, and I know he's got a lot going

24  on, but I've not heard back.  So I think we can work out some

25  language in the Confirmation Order.

1          I do, however, have a very short closing argument,

2    and so I will just take the Court's direction as to when you

3    want to hear that.

4          THE COURT:  Now.  Let's do it now.

5          MR. ALANIZ:  You want to hear it now?  Sure.

6          THE COURT:  Yeah, because I assume it's closing --

7          MR. ALANIZ:  Okay, Your Honor.

8          THE COURT:  -- argument where you're telling me

9    that I shouldn't confirm the Plan as it is and it's not going

10   to be worked out with confirmation language.  Right?

11         MR. ALANIZ:  Correct, and then I think we have

12   some that will be fruitful.

13         THE COURT:  Right.

14         MR. ALANIZ:  Hopefully it'll be resolved.

15         THE COURT:  I got it.  I got it.  Go ahead.

16         MR. ALANIZ:  Okay.  So, Your Honor, I would like

17   to begin by being clear about what we are not arguing.  We

18   are -- well, we are disappointed that Fieldwood is not

19   complying with obligations under regulations and contractual

20   agreements to P&As.  We understand that Hess has obligations

21   under applicable regulations which include decommissioning.

22   Hess is not trying to escape its obligations.

23         And we very much appreciate the Government's

24   efforts to negotiate the agreed activities.  We appreciate

25   the Debtors agreement to perform the agreed activities which

1  does ameliorate some of our health and safety concerns.  The

2  health and safety concerns have been paramount to Hess

3  throughout the entire time that we've been in dialogue with

4  the Debtors.

5           In my examination of Mr. Dane, Your Honor heard

6  him discuss outstanding income to West Delta properties, and

7  as Your Honor reads the comments in the Debtor's Exhibit 99

8  that correspond to those things, you'll see some of those

9  health and safety concerns.  Mr. Dane testified that he was

10 committed to performing those activities to clear up those

11 things, and that representation was very important to Hess.

12          I then moved on in my examination to address the

13 fact that the Debtors intend to abandon the West Delta

14 properties and leave those properties with hydrocarbons.

15 And Mr. Dane testified that he knew that it's been a focus to

16 Hess, that in connection with the Debtors' abandonment that

17 the properties be left hydrocarbon free.

18          And, Your Honor, I went back and I looked into

19 Mr. Dane's testimony last night, which is at Docket K4, and

20 if Your Honor were to go back and listen at the second hour,

21 10:18, you'll hear him say these words, he says, Safe-out

22 activity is a very delicate activity.  You're removing

23 hydrocarbons from a facility.  It needs to be done in a very

24 careful manner with very qualified individuals.

25          And, Your Honor, we couldn't agree more.  It is a

1  delicate activity.  And Hess's focus, as corroborated by

2  Mr. Dane, has been this hydrocarbon issue precisely because

3  of the delicate nature of handling hydrocarbons.  And I

4  would also encourage Your Honor to listen to Mr. Dane's

5  testimony that begins about the two-hour mark where I asked

6  Mr. Dane a series of questions regarding the Debtors'

7  willingness to perform the safe-out work, specifically the

8  hydrocarbon free work for any in Chevron's but not for Hess.

9       And he had two responses.  His first response was

10 that the Debtors believe that to safe-out the properties at

11 their cost was in the context of a broader commercial term

12 fee arrangement and Hess and the Debtors simply could not

13 come to that agreement.  In other words, and these are not

14 his words, these are my words, the Debtors are saying that

15 if Newco can profit off a long term commercial arrangement

16 to perform P&A, then they will perform the safe-out at their

17 cost, and leaving those properties hydrocarbon free.

18      His second response was that they're basically

19 stretched too thin with other commitments and they can't

20 handle the additional RCL safe-out work.  And so those two

21 statements to me are a little bit contradictory.  So on the

22 one hand he's saying, Well, we would do it if you would give

23 us a proper opportunity, at least that's my interpretation.

24 But on the other hand we actually don't have the bandwidth to

25 do it.

1          And so given all this testimony, Your Honor, so

2    the Court's really -- ultimately what our legal arguments

3    that we set out in our brief, which is that the Debtors' not

4    treating similarly situated creditors in a similar way.  And

5    this isn't a classic disparate treatment issue where the

6    Debtors are agreeing to pay one creditor 75 cents and the

7    other one, this claim contemplates arrangements with some

8    predecessors to perform certain work.  Literally safe is in

9    that title.  Safe out work.  But they're essentially throwing

10   the keys to others with platforms that are filled with

11   leftover fuel hydrocarbons that Mr. Dane testified need to

12   be removed in a very careful manner with qualified

13   individuals.

14          So to be clear, this isn't a concern of one

15   creditor getting more money in their pockets than Hess.  It's

16   that the Debtors are agreeing to perform environmental safe

17   activity for some predecessors but not others.   And those

18   facts also support Hess's argument that as a legal matter the

19   Debtors' Plan cannot be confirmed because of *Midlantic,* which

20   says that the Debtor cannot abandon properties in

21   contravention of a regulation designed for health and

22   safety.

23          Now I heard Your Honor loud and clear this

24   morning, and I understand this Court's interpretation of

25   *Midlantic* and the fact that the Government isn't objecting to

1    the Plan under this, Your Honor -- it sounds like Your Honor

2    is going to hold that *Midlantic* does not preclude

3    confirmation.  We respectfully disagree but we understand

4    it's going to be an issue that we'll need to take up on

5    appeal.

6              But before I rest, Your Honor, the last thing I

7    want to leave the Court with --

8              THE COURT:  I want to go back to before you even

9    leave the argument.  You're right, I'm going to overrule your

10   *Midlantic* objection you made in the brief.  I don't think

11   that you have the -- you can't assert the Government's

12   *Midlantic* rights.  The Government needs to use its *Midlantic*

13   rights as it determines it needs to do to maximize the

14   health, safety of the environment.  I don't think that you

15   can assert them, you particularly can't assert them in a case

16   where the Government has, in fact, ostentatiously not

17   objected for lack of a better description of what they have

18   done.

19             With respect to the equal treatment, I don't

20   understand where that falls under 1129 when you're not

21   identically situated to someone else.  You have an analogous

22   situation to someone else.  Safe-out of your facility is

23   different from than the safe-out of their facility.  They're

24   just both safe-outs.

25             So where under 1129 does this objection fall?

1        MR. ALANIZ:  Yeah, Your Honor, the tie here was

2  1129(a)(1), the Plan does not comply with the applicable

3  provisions of this title, and then we tied that to

4  1123(a)(4) that says a Plan must provide the same treatment

5  for each claim of a particular class.

6        And you're right, Your Honor, this is sort of an

7  analogous argument in that, you know, really it's just a

8  matter of sort of the unequal treatment in the fact that

9  you're treating one creditor like Eni or Chevron in a way

10  that is very different than the way that they're treating us.

11        And that's the argument.  I understand (glitch in

12  the audio) --

13        THE COURT:  So, look, I think that your client is

14  an unsecured creditor and you should be getting the same

15  unsecured type claim that everyone else gets.  But if in

16  furtherance of *Midlantic*, in keeping with priorities that

17  the Government doesn't object to, their decision is to safe-

18  out one and not safe-out another.  I don't see how that fits

19  into equal class treatment, and you're saying it doesn't, it's

20  just kind of analogous to equal class treatment, and I think

21  that fails under a *Midlantic* -- specifically fails under a

22  *Midlantic* standard.  We need to maximize environmental

23  protections.

24        And I haven't heard, in addition to sort or on a

25  general good faith standard, that there has been a

1  comparable commercial reason to do yours as there has been

2  to do others.  And, you know, if you want to put up the kind

3  of money, or make the kind of concessions others are making,

4  I might cross into some good faith area, but I've heard no

5  evidence about that.

6          So as to that objection I'm going to overrule it

7  and let you move down to your final -- or however many more

8  you have.  I think you said you have one more.

9          MR. ALANIZ:  Well, no, Your Honor, it's really just

10  to make a point that I -- we hope is non-controversial, but,

11  you know, just the statement that the Plan should not set

12  off Hess and the other predecessors in the chain of title

13  with an increased risk that a man or woman that they are

14  forced to send out to one of these facilities to remove --

15  deal with hydrocarbons does not come home at night, like if

16  either of us commits to do with other predecessors which is

17  commit to remove hydrocarbons from the West Delta property,

18  and that's the only statement that we wanted to make, Your

19  Honor.  So that --

20          THE COURT:  So I am going to require that a

21  provision go in the confirm Order that to the extent that

22  Hess elects, and Hess is not required to elect, but to the

23  extent that Hess elects to take immediate or at some point

24  down the road later possession of the property, that it is

25  required to administer as a predecessor-in-interest.

1          The provision will require that the Debtor

2   promptly cooperate in transferring the assets to them that

3   require retirement work to be done, and to do so with all

4   due haste in compliance with applicable federal regulations.

5   So that if Hess believes for example that it is being

6   required to send an employee into a dangerous situation, I

7   want it as quickly as it can under federal law to be able to

8   take over the asset and the Debtor shouldn't be able to stand

9   in the way by delaying the abandonment.  The Debtor has to

10  cooperate with immediate abandonment consistent with federal

11  law if Hess so demands.

12          And I think that then resolves that by putting

13  control in Hess's hands to the maximum extent it can be.  Is

14  there any objection to that either by Hess or by the Debtor

15  to including such a provision?

16          MR. PEREZ:  Your Honor, --

17          MR. ALANIZ:  No problem here, Your Honor.

18          THE COURT:  Mr. Perez?

19          MR. PEREZ:  (No audible response.)

20          THE COURT:  I think I heard Mr. Alaniz say, No

21  problem here, and I didn't hear Mr. Perez.

22          MR. PEREZ:  Yes, Your Honor.  Am I on the line?

23          THE COURT:  You are.

24          MR. PEREZ:  Okay.  Your Honor, we don't have any

25  objection, but that is, in fact, what the transition

1  services are intended to do.  And we will obviously

2  cooperate and provide and, you know, provide what's required

3  under the transition services.  I certainly don't want

4  Mr. Alaniz to think that what the Court has ruled is that we

5  have to safe-out these properties before --

6          THE COURT:  No, I didn't say --

7          MR. ALANIZ:   -- before they are transitioned.

8          THE COURT:   -- no, no, no, I didn't say that at

9  all.  What I'm saying is if Hess believes that you're putting

10 some of its employees in danger, unless I'm misunderstanding

11 the whole purpose of the transition agreement, the minute

12 Hess is ready to take over, the transition service agreement

13 at that point terminates as to the Hess properties.  This is

14 the way I think that that works.

15         And what I'm saying is that once Hess is ready, I

16 don't want their employees endangered either, nor do you.

17 And at that point you can't delay them, there's not going to

18 be any further negotiations, consistent with federal

19 regulations in terms of how you would do the transition to

20 Hess, and --

21         MR. ALANIZ:  Right.

22         THE COURT:   -- I don't know what type of permits

23 they would need to have in order to take over, Mr. Alaniz,

24 but whatever you all need to do to be able to take it over,

25 they have to immediately engage in compliance with that.

1         And, Mr. Perez, I think that's consistent, not

2    inconsistent, with the Transition Services Agreement.  But I

3    don't remember anything in the Plan that is part of the

4    abandonment that requires you to engage in a transition to

5    the predecessor-in-interest on a hasty basis.  I'm saying as

6    hastily as you can so long as it's consistent with the

7    transition required by Mr. Velasco's friends.

8         MR. PEREZ:  Absolutely, Your Honor.  Obviously

9    we're spending, you know, a million-plus dollars a month to

10   make payments during the transition, so if everybody was

11   prepared to do the transition on the effective date, I'm sure

12   Mr. Dane would welcome that.

13        THE COURT:  I got that.  I just -- we've all been

14   in situations where someone can then say, Well, let's reopen

15   the negotiations about how this ought to happen.  And I'm

16   saying, No, when they're ready, they get it.

17        MR. PEREZ:  Okay.

18        THE COURT:  Okay.  Let's put that in the Order.

19        And then, Mr. Alaniz, tomorrow you'll be able to

20   worry about the language in the Confirmation Order not only

21   on that issue but on other issues.  And if they don't satisfy

22   any other issues, you can then make your further objection

23   if that works for you.

24        MR. ALANIZ:  Yes, Your Honor.  Thank you.

25        THE COURT:  All right.  Does anyone else have what

1  I will call an unresolvable objection with respect to

2  negotiating terms of the Confirmation Order?  We do have

3  someone.  Let me see who that is.  I don't know if that was

4  Mr. Perez raising his hand again when he was already

5  authorized to speak.

6         Okay.  So no one else has something that they

7  think isn't going to -- wait, Mr. Eisenberg, you do.

8  Mr. Eisenberg, go ahead, please.

9         MR. EISENBERG:  Thank you, Your Honor.  Are you

10 able to hear me?

11        THE COURT:  I can.

12        MR. EISENBERG:  Thank you, Your Honor.  Just I'm

13 not sure if my technology may work or not.

14        We had sent language to the Debtors and I don't

15 know if this is unresolvable, but we have -- we've been

16 talking to them about Paragraph 13A, particularly the

17 subrogating -- the language with regard to the claims for

18 subrogation and the recent occupation and things of that

19 nature.

20        And certainly we think we can -- I think there's

21 language that satisfies me, I don't know if the same language

22 satisfies them.  We're certainly willing to spend some time

23 talking about it with them and then preserving the argument

24 for tomorrow, Your Honor, so.

25        And I know also my colleague, Mr. Kuebel, is

1  taking his wife out for her birthday tonight, and so I don't

2  want to (indiscernible).

3            THE COURT:  Look, we've talked quite a bit about

4  what that language needs to look like today.  That may help

5  inform some overnight negotiations.  But all of your rights

6  to make objections are going to be preserved if you don't get

7  the language there.  That's language that I think ought to be

8  worked out that sort of said in about 18 different ways what

9  I think it needs -- what I'm going to order that it says.

10           It may very well be, and, Mr. Eisenberg, I would

11  regard this as totally fair, that you -- and the same goes

12  for you, Mr. Perez, I know I've said some things that both

13  sides don't particularly like in this area, so you can each

14  agree to language that you think is consistent with the way

15  that I have ruled, and preserve your right to object to the

16  ruling, you're not agreeing to the outcome, you're only

17  agreeing to language and what I've ruled.  That may make this

18  a little bit easier because I'm not looking to have you be

19  kowtowed into waiving some appellate right because you're

20  complying with an Order that I've already made.

21           MR. EISENBERG:  We understand that, Your Honor.

22  We appreciate that, and will continue to talk with the

23  Debtors and the other parties constructively to try to close

24  whatever gaps that exist.  Thank you.

25           THE COURT:  All right.  So I did receive from

1 | Locke Lord an envelope with a flash drive, and I've received

2 | from Weil an envelope with a flash drive.  I've opened the

3 | envelopes and I've not looked at the flash drives.  I'm going

4 | to assume that they are irrelevant now and just throw the

5 | away and not make them part of the Record, because overnight

6 | I assume that whatever you sent me will now change.

7 | So if you would send me new flash drives tomorrow,

8 | but for now I'm going to toss them.  Unless somebody thinks I

9 | need them as part of the Record.  I do not think I do.  They

10 | weren't shown, I haven't read them, they weren't filed.

11 | (No audible response.)

12 | THE COURT:  Okay.  They're gone.  Anyone else have

13 | anything you want to talk -- oh, let's see, I do have

14 | somebody else.  Mr. Kuebel.

15 | MR. KUEBEL:  (No audible response.)

16 | THE COURT:  You've got your own line muted.

17 | MR. KUEBEL:  Oh, I certainly do.  I apologize,

18 | Your Honor.  Can you hear me?

19 | THE COURT:  I can.  Would you wish your wife well

20 | tonight?

21 | MR. KUEBEL:  Thank you.  It's a milestone birthday

22 | for her this evening.  I appreciate that, Your Honor.

23 | I actually think it's a very constructive idea to

24 | come back at 1:30.  We do have language outstanding.  We did

25 | send over to the Court language that we thought was

JUDICIAL TRANSCRIBERS OF TEXAS, LLC

1    consistent with the Court's instruction, and if we have to

2    take it up tomorrow, we can take it up tomorrow.  Hopefully

3    it'll be resolved in between now and then.

4              THE COURT:  Thank you, sir.

5              Mr. Zuber.

6              MR. ZUBER:  Good afternoon, Your Honor.  Scott

7    Zuber --

8              THE COURT:  Good afternoon.

9              MR. ZUBER:   -- on behalf of Berkley and Sirius.

10                  CLOSING ARGUMENTS ON BEHALF OF

11                     BERKLEY AND SIRIUS

12             MR. ZUBER:  We also have had some discussions with

13   Debtors' counsel and other stakeholders involving some

14   language, in particular with respect to Paragraph 5.13A of

15   the Plan, and we also suggested some minor tweaks to

16   Paragraph 10K of the Plan Confirmation Order.  And I thought

17   we had made pretty progress, but we didn't really connect

18   with what we hear on the Zoom so I think that given the

19   opportunity to continue this hearing till tomorrow may be

20   helpful to get resolution there.

21             The other issue, I'm not sure if it's resolvable or

22   not, is we still have a standing objection with respect to

23   the exculpation provisions.  Perhaps we can work that out as

24   well.  Perhaps we'll have to do that tomorrow, unless Your

25   Honor required that be done now.  But I think reserving our

1  arguments for tomorrow makes sense and see what works out.

2          THE COURT:  No, look, I just want to trust

3  everybody's judgment on this.  If you think that there's a

4  decent chance you're going to work it out, and let -- you can

5  make your argument tomorrow.  And I'm not going to second

6  guess your judgment that you thought you'd work it out.  But,

7  you know, if you want to make an argument right now, I'll

8  listen to it right now, but it makes more sense if you think

9  you're going to work it out to just defer the argument

10  without prejudice till tomorrow.  So let me just trust your

11  judgment and not my own.

12          MR. ZUBER:  Yeah, as long as we reserve all

13  arguments for tomorrow I'd prefer to reserve and see what we

14  can get accomplished.

15          THE COURT:  You and all others do, so thank you.

16          I show --

17          MR. ZUBER:  Thank you, Your Honor.

18          THE COURT:   -- Mr. Peck has an issue.

19          MR. KADDEN:  Good afternoon, Your Honor.  This is

20  actually Benjamin Kadden --

21          THE COURT:  Mr. Kadden.

22          MR. KADDEN:   -- on behalf of Atlantic Maritime

23  Services.

24          I wanted to just confirm that -- the Court's intent

25  to take up our motion for relief from stay at the conclusion

1  of the Confirmation Hearing tomorrow, at the same time of

2  confirmation.  Just wanted to confirm that timing.

3          THE COURT:  I have not been thinking about that.

4  I know that I promised to take it up at the end of

5  confirmation.  Does it make the most sense to do it

6  tomorrow, or to do it now?  I think tomorrow, but if you

7  think it makes more sense now, let me know.  I know I made

8  you the promise, I just haven't worried about it.  But I'm

9  going to keep my promise.

10          MR. KADDEN:  At the conclusion of confirmation is

11  fine, Your Honor.

12          THE COURT:  Thank you, Mr. Kadden.

13          Mr. Langley.

14          MR. LANGLEY:  (No audible response.)

15          THE COURT:  Mr. Langley?

16          MR. LANGLEY:  (No audible response.)

17          THE COURT:  I think you may have your own line

18  muted, Mr. Langley.

19          MR. LANGLEY:  You are correct, Your Honor.  Do you

20  h hear me now?

21          THE COURT:  I can.  Thank you.

22          MR. LANGLEY:  We do have some legal objections to

23  the Plan pending.  Do you want to hear those now or

24  tomorrow?

25          THE COURT:  I want to hear them now, unless you

1 believe that they're resolvable by Confirmation Order

2 language.

3          MR. LANGLEY:  I do not.

4          THE COURT:  Then let's hear them now.  Go ahead.

5          MR. LANGLEY:  Thank you.  And we do have some

6 language issues pending, and so I'll leave those aside.  And,

7 Your Honor, Keith Langley on behalf of Travelers, Liberty

8 Mutual, Hanover and XL.

9          CLOSING ARGUMENTS ON BEHALF OF TRAVELERS,

10            LIBERTY MUTUAL, HANOVER AND XL

11          MR. LANGLEY:  We are four sureties that have

12 issued approximately 220 million in private bonds on behalf

13 of the Debtors.  And I have three issues to present to the

14 Court.

15          The first issue is jurisdictional.  I'm here to

16 change your mind on *Midlantic*, and so I'm going to talk about

17 that.  I then want to talk about oil and the Gulf and

18 suretyship.  And with Your Honor's permission I'll address

19 those issues.

20          THE COURT:  Thank you, Mr. Langley.  Go ahead.

21          MR. LANGLEY:  Your Honor, the first issue is the

22 impacts of the Debtors in seeking to abandon depleted assets

23 without addressing the environmental responsibilities

24 required of an oil and gas operator in the Gulf.  If a Plan

25 violates the law, which the abandonment of these properties

1  would, the Plan cannot be confirmed under 1129(a)(3).

2          The Debtors have not established that the Plan is

3  in the best interest of creditors versus a liquidation under

4  1129(a)(7).  And the treatment of surety bonds across the

5  board including a mistaken belief that a bond issued on

6  behalf of Fieldwood can remain in force and can be used by a

7  successor entity without assumption, cure or indemnity.

8          A surety bond -- we've heard about policy and a

9  surety bond is not insurance, and there can be no bond

10  without a principal.  Yet here the Plan envisions that the

11  bonds continue to exist without a principal, and this would

12  violate the law about suretyship and makes the Plan

13  unconfirmable under 1129(a)(3).  And the --

14          THE COURT:  Well, what happens --

15          MR. LANGLEY:   -- probably the Plan --

16          THE COURT:   -- what happens under applicable non-

17  bankruptcy law if a principal induces a surety to issue a

18  bond and a surety issues the bond, and the principal then

19  dissolves its existence.  So they just go to state law --

20          MR. LANGLEY:  Thank you --

21          THE COURT:   -- you know, let's take a Delaware

22  corporation and they go dissolve.  What happens to the bond?

23          MR. LANGLEY:  The bond is a tri-part by a three-

24  party agreement and it runs to the obligee on behalf of the

25  principal.  So we could talk about that a lot, but I think

1  where Your Honor is going is a jurisdictional issue, a

2  *Midlantic* issue and how that impacts suretyship and

3  bankruptcy --

4          THE COURT:  Well, no, I'm not.  I'm actually trying

5  to deal with -- you said as a matter of law that a bond does

6  not exist if there isn't a principal.  I think that's pretty

7  much a quotation of what you just said.  My question to you

8  is --

9          MR. LANGLEY:  Yes, sir?

10          THE COURT:   -- under applicable non-bankruptcy

11  law if the principal dissolves, what happens to the bond?

12

13          MR. LANGLEY:  The bond is still there, Your Honor.

14          THE COURT:  So how is your statement accurate?

15          MR. LANGLEY:  The fact -- because you -- to have a

16  new -- a bond in existence for a risk, you have to have a

17  principal.  And here there's no principal.  Newco would take

18  assets without being liable on the bond.

19          THE COURT:  But Fieldwood was the one that was

20  liable on the bond, and Fieldwood remains liable via an

21  unsecured claim.  Right?

22          MR. LANGLEY:  Yes, sir.

23          THE COURT:  So I don't understand -- I just

24  didn't -- I don't think that your statement of law is

25  consistent with what you're telling me because it means that

1  just as in applicable non-bankruptcy law, if there is a

2  dissolution, that your client's obligation under the bond

3  would not be altered.  Under bankruptcy law their obligation

4  under the bond isn't altered either.  It's not enhanced

5  either, but it's not altered merely by dissolution or merely

6  by confirmation of a Plan.

7          Unless there is an alteration, and maybe there is.

8  But I don't see what that alteration is from merely the

9  dissolution/confirmation.

10         MR. LANGLEY:  I think that's a good argument.  I

11 think there's 50 percent on the right hand that you're arguing

12 and 50 percent on the left hand, and without a principal you

13 don't have a bond.  And here I think the Plan does impair

14 those rights.

15         THE COURT:  No, I --

16         MR. LANGLEY:  And I think that --

17         THE COURT:   -- but I guess I'm -- you just said

18 this again, without a principal you don't have a bond.

19 Without a principal you don't start a bond, but you've issued

20 your bond.  How is it possible under your answer to my

21 question that without a principal you don't have a bond?

22 That can't be an accurate statement.

23         MR. LANGLEY:  Well, imagine two things.  In

24 Fieldwood One, Fieldwood, where they abandon an asset like

25 the Spar, the Spar is abandoned.  Now the bond is still in

1    effect and the issue is a jurisdictional issue going to

2    clean up of oil in the Gulf.  And then you have Newco, which

3    might take over an asset, and in that instance the

4    Government looks to Newco and the existing assets, which

5    include an argument about the bond.  We don't think it's an

6    asset of Fieldwood and we think that produces a problem,

7    Judge.

8              THE COURT:  You're making several arguments and I'm

9    trying to deal with them one at a time.  I want to deal with

10   your issue that says no principal, no bond.  And I don't

11   understand that that is the law.  And from what you've told

12   me, if there is a dissolution, there is no principal, but

13   there is still a bond.  And then we can move to your

14   jurisdictional argument, which is a completely different

15   argument.  And I'm happy to move there.  But I'm telling you,

16   I don't understand the no principal, no bond argument as

17   being consistent with non-bankruptcy law.

18             MR. LANGLEY:  Well, just thinking on that one no

19   principal, no bond issue, Judge, the problem is tomorrow

20   with Newco there's no principal but there is an asset which

21   is covered by the bond.  So you have an argument about does

22   the bond continue in full force and does that provide a

23   protection to the Government.  Now we argue the answer is

24   no.

25             THE COURT:  So what does that have to do with the

1  no principal, no bond issue?  I understand your argument

2  that the transfer of the asset might obviate the bond, but

3  that's not the argument you're making.  You're telling me no

4  principal, no bond.  Those are different issues.  Tell me

5  why this -- why no principal, no bond concept matters to me.

6           MR. LANGLEY:  Well, I think I am saying that,

7  Judge.  I might not be saying it very well, but I think the

8  problem becomes when Fieldwood exits stage left, and the

9  permission is given by this Court to exit stage left, you're

10 left with a surety and an issue of where do you get

11 indemnity rights, subrogation, and exoneration on that bond

12 other than -- no one is left --

13          THE COURT:  Well, no, there's an unsecured claim

14 against Fieldwood.  That's the credit risk your client took.

15          MR. LANGLEY:  There's an issue as to who owes what

16 relative to that oil in the Gulf.

17          THE COURT:  And what does the oil in the Gulf?

18 Okay.  So I am -- I will just tell you, I don't understand no

19 principal, no bond.  I'm overruling that as an objection

20 because the argument makes no sense to me.

21          So let's go to your next argument, which may be

22 that the transfer from what you're telling me causes a

23 problem separate from that.  So what happens under

24 applicable non-bankruptcy law if your principal transfers an

25 asset in violation of the bond?  What happens to your bond?

1          MR. LANGLEY:  You have a bond defense issue there,

2   Your Honor, and that is an increase in the risk on the bond

3   and a material --

4          THE COURT:  So I have an obligee that got your

5   bond, you guaranteed to pay you told me $220 million in

6   clean up costs, and your obligee does not make -- does not

7   do anything, they sit still, and the borrower transfers --

8   I'm sorry, the principal transfers the asset.  You're telling

9   me the obligee loses its bond under that situation under

10  non-bankruptcy law?

11         MR. LANGLEY:  You have an issue there, Judge,

12  about the amount that the bonding company owes in that

13  circumstance and who else owes in that circumstance.

14         THE COURT:  Well, let's start with whether the

15  obligee can collect its $220 million.  So the Debtor, the

16  principal, transfers its asset on its own, that's not

17  illegal, it simply violates your contract.  Does it -- do

18  you have an argument that your client's penal sum is not

19  still callable by the obligee?

20         MR. LANGLEY:  If the obligee is a party to that

21  issue you mentioned, yes.

22         THE COURT:  They're not.  The Government has not

23  authorized --

24         MR. LANGLEY:  In your hypo, they're not --

25         THE COURT:   -- that the Government has simply not

1  objected to it.

2          MR. LANGLEY:  If the Government -- the Government

3  gets to set under its regulatory powers the amount of

4  financial responsibility to operate that asset.  And so

5  setting that financial responsibility amount impacts the

6  liability on the bond.

7          THE COURT:  What does that have to do with whether

8  the principal transferred the asset in violation of the bond

9  but not in violation of the law?

10          MR. LANGLEY:  Well, we argue that a transfer is in

11  violation of the law, Your Honor.

12          THE COURT:  Okay.  What law does it violate?

13          MR. LANGLEY:  *Midlantic*.

14          THE COURT:  I am overruling an objection that the

15  transfer of --

16          MR. LANGLEY:  Got it.

17          THE COURT:   -- an asset that is environmentally

18  troubled violates *Midlantic* unless those who are responsible

19  in the Governmental regulatory position in both in *Midlantic*

20  rights, I do not believe as a matter of law that a bond

21  issuer may invoke *Midlantic* rights for a number of reasons.

22          First, the situation in *Midlantic* is not a bond

23  issue.  The situation in *Midlantic* in terms of being fact

24  specific were Governmental entities that were objecting.

25              *Midlantic* makes clear that it is inconsistent

1  with the language of the Bankruptcy Code and therefore its

2  exception to the Bankruptcy Code should be extremely

3  narrowly tailored.  I am extremely narrowly tailoring it and

4  holding that it applies to Governmental units.

5          Number two, the public policy reason behind

6  *Midlantic* was to encourage and make available clean up of

7  environmentally hazardous sites as -- if regulators

8  otherwise objected.  If, in fact, we allowed parties other

9  than the Government to exercise those rights, we're going to

10 end up with orphaned properties.

11          By way of example, in this case there simply are

12 not enough assets in Fieldwood's possession and control.  And

13 by the way, its asset do not include the penal sums on the

14 bonds, and never did.  They have no right to the penal sums

15 on the bonds.  It would mean that we were left with

16 environmental hazards if those were ratably put across all

17 environmental issues.

18          And so if we did that, we would have orphaned

19 properties that could not be cleaned up because they will be

20 properties without predecessors-in-interest available

21 potentially to clean them up.  And the Government needs to

22 exercise its discretion as to when and how to apply

23 *Midlantic* to maximize the environmental rights.

24          The Supreme Court has simply not ruled that a

25 private litigant can overrule the determination of the

1   Government with respect to how to handle environmental

2   matters and simultaneously ask a Bankruptcy Court not to

3   invoke the provisions of the Bankruptcy Code.  There's no

4   Supreme Court authority for that, not 5th Circuit authority

5   for that.  And I am not doing that.  I'm overruling the

6   objection.

7           Go ahead.

8           MR. LANGLEY:  Okay.  Thank you, Your Honor.  The

9   issue that -- I want to make sure if I stated clearly or

10  properly is that a transfer to a new principal does result

11  in discharge of the surety, and we have public policy issues

12  around that that sureties are key to operations in the Gulf

13  to --

14          THE COURT:  Wait, wait, wait, wait, you're telling

15  me --

16          MR. LANGLEY:   -- contain it --

17          THE COURT:   -- that this goes back to the example

18  where I thought you said it didn't.  I'm talking -- the

19  example we have here is the principal transfers a property

20  in violation of the bond, the obligee does not do that, that

21  you're telling me that under non-bankruptcy law the surety's

22  obligation to the obligee is discharged because the

23  principal did something that's inconsistent with the bond?

24          MR. LANGLEY:  I think that, Your Honor, the

25  obligee had a duty under the bond to act responsibly and had

1  to act in this bankruptcy case responsibly on that issue.

2  So, yes, I think there's a fact issue as to what the obligee

3  has done to permit a transfer of the principal.

4       THE COURT:  Great.  Tell me what evidence you have

5  to support that argument then, because if you're telling me

6  that there is evidence that the obligee has acted in a

7  manner in bad faith under the bonds, what was the evidence

8  that was introduced at the hearing to support that argument?

9       MR. LANGLEY:  Your Honor, I don't know that it's a

10 bad faith issue, I think it's a totality of the circumstances

11 of what is done as it relates to the bond in default.

12      THE COURT:  What's the evidence then?  Give me the

13 totality of the circumstances of it.  I don't know of any

14 evidence that you introduced, or that anyone else did, that

15 supports the argument.  But I'm willing to have you refresh

16 my recollection.  Tell me the evidence that under the

17 totality of the circumstances that something has occurred

18 here where I should determine that the bonds would not be

19 enforceable.

20      MR. LANGLEY:  I don't think you would determine

21 that, Your Honor.  I think that would be an issue of --

22 between the surety and the obligee, and it would be the

23 actions taken in this bankruptcy.

24      THE COURT:  What evidence is there that any

25 actions in this bankruptcy would precipitate that result?

1          MR. LANGLEY:  I'm not in a position to go into

2  that, Judge.

3          THE COURT:  Okay.  I'm going to overrule as a

4  matter of law that the actions that are being undertaken by

5  the Debtor and by all of the parties to the bankruptcy case

6  that are acting in cooperation with the Debtor have been

7  undertaken in the utmost good faith to maximize the

8  principles of *Midlantic*, and that no party who failed to

9  introduce any evidence in support of what I regard as a

10  specious argument, may subsequently raise the issue that

11  there was any wrongdoing that occurred in the bankruptcy

12  case.  The evidence is overwhelming that it's not.

13          And that is one of the reasons why, in furtherance

14  of *Midlantic* and in furtherance of 5th Circuit law, I'm

15  ordering exculpation for these actions.  We're never going to

16  get matters cleaned up if we allow parties to put up road

17  blocks and say, If you work on cleaning up the environment

18  publicly in good faith with the cooperation of all parties

19  concerned and with the Government not objecting, we can't let

20  private parties endanger the environment the way your client

21  is trying to do it.

22          I'm overruling the objection and I'm finding this is

23  not subsequently challengeable.   What's your next argument?

24          MR. LANGLEY:  Then I rest, Your Honor.

25          THE COURT:  All right.  Mr. Langley, I'm being very

1   blunt because I want you to have a good Appellate Record,

2   and I think I'm ruling correctly.

3           MR. LANGLEY:  I appreciate that.

4           THE COURT:  I have zero problem that you're making

5   the arguments, but without evidence, you know, I'm not sure

6   on what basis I would ever rule any other way when there was

7   a complete absence of evidence of anything other than utmost

8   good faith.

9           All right.  Let me move to the next person.  From

10  630-790-0261.

11          MR. KOOY:  Good morning, Your Honor -- or good

12  afternoon, Your Honor.  Ralph Kooy on behalf of one of the

13  other non-Apache sureties, North American Specialty Company.

14  I'm in a similar situation as Mr. Zuber.

15                  CLOSING ARGUMENTS ON BEHALF OF

16                  NORTH AMERICAN SPECIALTY COMPANY

17          MR. KOOY:  We've been exchanging language with

18  respect to the subrogation, and actually my partner's been

19  involved in those discussions.  And with respect to the

20  reservation of the surety's rights with respect to other

21  obligees.  In our specific cases E&I and Chevron and Union,

22  I believe we're going to resolve those, but I just wanted to

23  reserve the right to make our argument tomorrow.

24          THE COURT:  Of course.  Thank you for letting me

25  know, Mr. Kooy, and your rights are reserved.  And hopefully

1   the language will get worked out.

2          Mr. Perez?

3          MR. KOOY:  Thank you very much, Your Honor.

4          MR. PEREZ:  Did you call on me, Your Honor?

5          THE COURT:  Yes, sir.

6          MR. PEREZ:  Yes.  So, Your Honor, just for to

7   inform the Court, I think it was appropriate to go after

8   counsel.  We did file an adversary proceeding and a motion

9   to impose the automatic stay with respect to the lawsuit

10  that NAS filed over -- last Friday against Eni and Chevron

11  because of their actions in furtherance of the Plan.

12          So, Your Honor, we've requested an expedited

13  hearing.  Obviously to the extent that we can solve --

14  resolve this consensually, that's great.  If we can't, as you

15  know we'd request that the Court set it for a hearing perhaps

16  after the end of the Confirmation Hearing.

17          UNIDENTIFIED SPEAKER:  And, Your Honor, I

18  apologize, I haven't had an opportunity to review that yet,

19  having just came in.

20          THE COURT:  I'm not going to set it right now, and

21  I haven't read it.  And when -- I would really doubt that

22  there is going to be somebody else -- as I recall, you

23  removed the lawsuit into Federal Court anyway.  Isn't that

24  correct?  Or no?

25          UNIDENTIFIED SPEAKER:  Your Honor, the -- yes, the

1  lawsuit was filed on Friday in Federal Court.  It's not a

2  removed case, it's a new lawsuit.

3          THE COURT:  Sorry, in Federal Court here or in

4  Federal Court somewhere else?

5          UNIDENTIFIED SPEAKER:  No, in Federal Court

6  upstairs here.  I believe it was filed as an adversary in

7  the bankruptcy, wasn't it?

8          UNIDENTIFIED SPEAKER:  I don't believe so.

9          THE COURT:  So --

10          UNIDENTIFIED SPEAKER:  The United Stated

11  Bankruptcy Court -- it was filed as an adversary.  Let me --

12  I'll -- I have to strike that.  I apologize, that is not the

13  case.  No, it was just filed in the District Court.  You're

14  correct.

15          THE COURT:  So I mean in terms of setting

16  something for an emergency hearing, are you going to try and

17  get any relief from the District Court in the next seven

18  days?

19          UNIDENTIFIED SPEAKER:  I do not believe so, no.

20          THE COURT:  All right.  I'm going to Order that if

21  you do intend to change -- you're welcome to change your

22  mind, if you decide to change your mind, I'm going to require

23  you and Mr. Perez jointly to get with my case manager and to

24  schedule an emergency hearing before me prior to the date on

25  which you schedule anything with the District Court.  Fair

1   enough?

2          UNIDENTIFIED SPEAKER:  Okay.  Very good.

3          THE COURT:  Okay.  Thank you.

4          All right.  What do we have next?  Let me see, I've

5   got Ms. Rosen.

6          MS. ROSEN:  Thank you, Your Honor.  I just wanted

7   to speak up on behalf of XTO entities.  This is Suki Rosen

8   of Forshey Prostok.

9          I just wanted to make sure, I believe the Court

10  said earlier that all the parties could reserve their rights

11  if they're dealing with the Debtors on language for the

12  Confirmation Order.  And while we don't consent to the Plan,

13  we are possibly working out language with the Debtors.  I

14  just wanted to make sure we could reserve our rights as

15  well.

16         THE COURT:  You do and so does everyone else who

17  is within the range of my voice which is pretty broad right

18  now.

19         MS. ROSEN:  Thank you, Your Honor.

20         THE COURT:  Thank you.

21         All right.  Anyone else believe they have anything

22  we should address today, otherwise we'll go ahead and adjourn

23  till 1:30.

24         Mr. Carlson, if you want to use this opportunity

25  to schedule anything with people to talk to you about the

1   Order, or you want to just continue to move where you're

2   going.  I'm leaving it up to you as -- do you want to talk to

3   everybody while you have everybody here listening.  Or are

4   you just going to do it all by email?

5            MR. CARLSON:  I'm happy to reach out by email and

6   set up calls this evening.

7            THE COURT:  Okay.  I will see you all tomorrow at

8   1:30.  Thank you everyone.

9            We're in adjournment for the day.

10           MR. CARLSON:  Thank you.

11        (Hearing adjourned 4:53 p.m.)

12                        * * * * *

13          *I certify that the foregoing is a correct*

14   *transcript to the best of my ability due to the condition of*

15   *the electronic sound recording of the ZOOM/telephonic*

16   *proceedings in the above-entitled matter.*

17   */S/  MARY  D.  HENRY*

18   *CERTIFIED BY THE AMERICAN ASSOCIATION OF*

19   *ELECTRONIC REPORTERS AND TRANSCRIBERS, CET**337*

20   *JUDICIAL TRANSCRIBERS OF TEXAS, LLC*

21   *JTT TRANSCRIPT #64167*

22   *DATE FILED:  JUNE 29, 2021*

23

24

25

1              IN THE UNITED STATES BANKRUPTCY COURT

2              FOR THE SOUTHERN DISTRICT OF TEXAS

3                       HOUSTON DIVISION

4   IN RE:                    §     CASE NO. 20-33948-11
                              §     JOINTLY ADMINISTERED
5                             §     HOUSTON, TEXAS
    FIELDWOOD ENERGY, LLC,    §     THURSDAY,
6                             §     JUNE 24, 2021
            DEBTOR.           §     1:30 P.M. TO 3:50 P.M.

7

8            CONFIRMATION HEARING DAY FOUR (VIA ZOOM)

9             BEFORE THE HONORABLE MARVIN ISGUR
               UNITED STATES BANKRUPTCY JUDGE

10

11

12

         APPEARANCES:               SEE NEXT PAGE
13

14

15      (Recorded via CourtSpeak; no log notes)

16

17

18

19

20               TRANSCRIPTION SERVICE BY:

21        JUDICIAL TRANSCRIBERS OF TEXAS, LLC
               935 Eldridge Road, #144
22             Sugar Land, TX 77478
                  281-277-5325
23           www.judicialtranscribers.com

24

25    Proceedings recorded by electronic sound recording;
         transcript produced by transcription service.


                 JUDICIAL TRANSCRIBERS OF TEXAS, LLC

2

```
 1                      APPEARANCES (VIA ZOOM):

 2

 3   FOR THE DEBTOR:              WEIL GOTSHAL & MANGES, LLP
                                  Clifford W. Carlson, Esq.
 4                                Alfredo Perez, Esq.
                                  700 Louisiana
 5                                Suite 1700
                                  Houston, TX  77002
 6                                713-546-5040

 7                                WEIL GOTSHAL & MANGES, LLP
                                  Jessica Liou, Esq.
 8                                767 Fifth Avenue
                                  New York, NY 10153
 9                                212-310-8817

10
     FOR RLI INSURANCE GROUP:     KREBS FARLEY & DRY, PLLC
11                                Elliot Scharfenberg, Esq.
                                  400 Poydras, Suite 2500
12                                New Orleans, LA  70130
                                  504-299-3570
13
     FOR MCMORAN OIL AND GAS:     LOCKE LORD, LLP
14                                Omer Keubel, Esq.
                                  601 Poydras Street
15                                Suite 2660
                                  New Orleans, LA  70130
16                                504-558-5155

17   FOR ANADARKO PETROLEUM:      NORTON ROSE FULBRIGHT
                                  William R. Greendyke, Esq.
18                                1301 McKinney
                                  Suite 5100
19                                Houston, TX  77010
                                  713-651-5216
20
     FOR ECOPETROL AMERICA LLC    SQUIRE PATTON BOGGS
21                                Kelly Singer, Esq.
                                  1 East Washington Street
22                                Suite 2700
                                  Phoenix, AZ  85004
23                                602-528-4000

24

25
```

```
 1              APPEARANCES (VIA ZOOM - CONT'D):

 2

 3   FOR WESTERNGECO LLC AND      GIEGER LABORDER & LAPEROUSE
     TGS-NOPEC:                   John Baay, Esq.
 4                                701 Poydras St.
                                  Suite 4800
 5                                New Orleans, LA  70139
                                  504-561-0400
 6
     FOR VALERO MARKETING         DYKEMA GOSSETT
 7   AND SUPPLY COMPANY:          Deborah D. Williamson, Esq.
                                  112 E. Pecan
 8                                Suite 1800
                                  San Antonio, TX  78205
 9                                210-554-5528

10   FOR ENERGY TRANSFER:         KATTEN MUCHIN ROSENMAN, LLP
                                  Yelena Archiyan, Esq.
11                                221 North Pearl Street
                                  Suite 1100
12                                Dallas, TX  75201
                                  214-765-3600
13
     FOR COX OIL:                 LOCKE LORD, LLP
14                                Michael B. Kind, Esq.
                                  111 South Wacker Drive
15                                Suite 4100
                                  Chicago, IL  60606
16                                312-201-2392

17   FOR MARITIME CLAIMANTS:      Mr. Williams

18   FOR RAILROAD COMMISSION
     OF TEXAS:                    THE ATTORNEY GENERAL OF TEXAS
19                                Abigail Ryan, Esq.
                                  300 West 15th Street
20                                Austin, TX  78701
                                  512-475-4936
21
     FOR ZURICH AMERICAN INS.:    CLARK HILL STRASBURG
22                                Duane Brescia, Esq.
                                  720 Brazos Street
23                                Suite 700
                                  Austin, TX  78701
24                                512-499-3600

25
```

```
 1                APPEARANCES (VIA ZOOM - CONT'D):

 2   FOR APACHE CORPORATION:        HUNTON ANDREWS KURTH, LLP
                                    Robin Russell, Esq.
 3                                  600 Travis
                                    Suite 4200
 4                                  Houston, TX  77002
                                    713-220-4086
 5

 6   FOR CHEVRON:                   ANDREWS MYERS, PC
                                    Edward Ripley, Esq.
 7                                  1885 Saint James Place
                                    15th Floor
 8                                  Houston, TX  77056
                                    713-850-4227
 9

10   FOR ENI PETROLEUM:             BRACEWELL LLP
                                    Mark Dendinger, Esq.
11                                  711 Louisiana Street
                                    Suite 2300
12                                  Houston, TX  77002
                                    713-223-2300
13

14   FOR LIBERTY MUTUAL, TRAVELERS
     HANOVER AND XL:                LANGLEY LLP
15                                  Brandon Bains, Esq.
                                    P.O. Box 94075
16                                  Southlake, TX  76092
                                    214-722-7171
17

18
     FOR NORTH AMERICAN
19   SPECIALTY INSURANCE:           ATTORNEY AT LAW
                                    Ralph J. Kooy, Esq.
20                                  100 N. LaSalle Street
                                    Suite 514
21                                  Chicago, IL  60602
                                    312-857-0910
22

23

24

25
```

```
 1                   APPEARANCES (VIA ZOOM - CONT'D):

 2
     FOR SIRUS AMERICAN INS.:        CHIESA SHAHINIAN & GIANTOMASI
 3                                   Scott Zuber, Esq.
                                     One Boland Drive
 4                                   West Orange, NJ 07052
                                     973-530-2460
 5
                                     Jay Sturm
 6
     FOR AD HOC GROUP OF SECURED
 7   LENDERS:                        DAVIS POLK & WARDWELL, LLP
                                     Damian Schaible, Esq.
 8                                   450 Lexington Avenue
                                     New York, NY  10017
 9                                   212-450-4000

10
     FOR THE US DEPT. OF
11   THE INTERIOR:                   U.S. DEPT. OF JUSTICE
                                     Zachary Balasko, Esq.
12                                   P.O. Box 875
                                     Ben Franklin Station
13                                   Washington, DC  20044
                                     202-514-7162
14
     FOR HUNT OIL COMPANY:           BAKER BOTTS, LLP
15                                   Kevin Chiu, Esq.
                                     2001 Ross Avenue
16                                   Dallas, TX  75201
                                     214-953-6612
17
     FOR XTO ENTITIES:               FORSHEY PROSTOK, LLP
18                                   Suzanne Rosen, Esq.
                                     777 Main Street
19                                   Suite 1550
                                     Fort Worth, TX  76102
20                                   817-877-8855

21   FOR BP EXPLORATION:             GREENBERG TRAURIGM LLP
                                     Craig Duewall, Esq.
22                                   Karl Burrer, Esq.
                                     300 West 6th Street
23                                   Suite 2050
                                     Austin, TX  78701
24                                   512-320-7200

25
```

<pre>
 1                      APPEARANCES (VIA ZOOM - CONT'D):

 2   FOR JX NIPPON OIL:            CARVER DARDEN
                                   Leann Moses, Esq.
 3                                 1100 Poydras
                                   Suite 3100
 4                                 New Orleans, LA  70163
                                   504-585-3830
 5
     FOR SHELL OFFSHORE, INC.      NORTON ROSE FULBRIGHT US LLP
 6                                 Ryan E. Manns, Esq.
                                   2200 Ross Avenue
 7                                 Suite 3600
                                   Dallas, TX  75201
 8                                 214-855-0000

 9   FOR HESS CORPORATION:         REED SMITH, LLP
                                   Omar Jesus Alaniz, Esq.
10                                 2850 N. Harwood
                                   Suite 1500
11                                 Dallas, TX  75201
                                   469-680-4292
12
     FOR ATLANTIC MARITIME
13   SERVICES:                     KIRKLAND & ELLIS, LLP
                                   Jeffrey Zeiger, Esq.
14                                 300 North LaSalle
                                   Chicago, IL  6654
15                                 312-862-2000

16

17

18

19

20   (Please also see Electronic Appearances.)

21

22

23

24

25
</pre>

7

1       HOUSTON, TEXAS; THURSDAY, JUNE 24, 2021; 1:30 P.M.

2            THE COURT:  All right, we're returning to the

3    Fieldwood Energy Confirmation Hearing, 20-33948.

4    Mr. Carlson, if you would press five star on your phone,

5    please.

6         (Pause in the proceedings.)

7            THE COURT:  All right, good afternoon,

8    Mr. Carlson.  Can you give me a status report on where we

9    are?

10           MR. CARLSON:  Yes, Your Honor.  Good afternoon,

11   Cliff Carlson on behalf of Fieldwood.  Your Honor, we've

12   been hard at work over the past 12 hours or so working

13   through a number of objections and language to be added to

14   the Confirmation Order.

15           And we've made a ton of progress and think that

16   we're pretty close and that this hearing should be pretty

17   streamlined with only a few discreet issues that might be

18   open.

19           And we did file -- not long before this hearing --

20   filed an amended Chapter 11 Plan and amended proposed

21   Confirmation Order.

22           The Amended Plan was filed at docket number 1716

23   with the redline at 1719.  And the Confirmation Order at

24   1718 and believe a redline should be hitting of the

25   Confirmation Order within the next few minutes.

1          THE COURT:  So how do you propose that we proceed?

2          MR. CARLSON:  I think we can start with going

3    through the changes that we made to the Plan to address the

4    Court's concerns regarding the exculpation provision, which

5    is just a few changes so it should be pretty brief.

6          And hopefully by that, we can then turn to the

7    Confirmation Order and run through the redline with the

8    Court as well, discuss the changes we made --

9          THE COURT:  Are you aware --

10          MR. CARLSON:  -- in the agreement.

11          THE COURT:  Excuse me, I didn't mean to interrupt

12    you.  Are you aware of any objections that have not been

13    resolved at this point to the form of the Confirmation

14    Order?

15          MR. CARLSON:  There are a few parties, that I

16    think, will want to see the final language and they may have

17    concerns or such light modifications to the language that

18    we've made some changes in real time and that we've

19    uploaded.  But I think by in large to the extent that we

20    haven't addressed them, we can during this hearing.

21          THE COURT:  Okay.

22      (Pause in the proceedings.)

23          THE COURT:  All right.  So I've got 1719 up on the

24    screen.

25          MR. CARLSON:  If you -- the first change is on

1   page 11 of the redline.

2          THE COURT:  I don't know if -- hold on let me be

3   sure I've got a redline.

4       (Pause in the proceedings.)

5          THE COURT:  Where would I find the redline?

6          MR. CARLSON:  It should be ECF number 1719.

7          THE COURT:  So maybe this is redline, let's see.

8   Okay, got it.  Okay.

9          MR. CARLSON:  So, Your Honor, on page 19, we have

10  clarified that the additional predecessor agreements are

11  limited to -- post petition agreements that are entered into

12  in connection with our Plan and included as part of the Plan

13  supplement documents to remove any doubt that pre-petition

14  agreements would somehow get picked up in the exculpation

15  provision.

16          And then we made sort of the same change here in

17  the additional predecessor agreement documents definition as

18  well.

19          THE COURT:  All right.

20          MR. CARLSON:  And the second change we made was to

21  the exculpation provision itself, which is on page -- if you

22  turn to page 97, which is Section 10.8.

23      (Pause in the proceedings.)

24          MR. CARLSON:  It looks like you'll see here, Your

25  Honor, we've added a provision or we've added language at

1  the end of this provision to make clear that the exculpation

2  is limited to the holding and In re Pacific Lumber and that

3  the Court will retain exclusive jurisdiction to determine

4  any issues that arise regarding the scope of exculpation.

5      (Pause in the proceedings.)

6          THE COURT:  All right.  Hold on.

7          Mr. Scharfenberg?

8          MR. SCHARFENBERG:  Yeah, good morning, Your Honor.

9  I might have an issue with the change on page 11 to

10 additional predecessor agreement.  I just got this, but at

11 least the way I'm reading it, it would apply to any type of

12 additional agreement entered into prior to or on the

13 confirmation date.

14      And as long as additional predecessor agreement is

15 limited to the ones we know about -- Chevron, any in the

16 hunt -- I don't have an issue with it, but I don't know what

17 else is there or what kind of affect it would have.

18      Just doing a quick control F through the document,

19 it looks like arguably it might, you know, there might be

20 some exculpation implications, you know, when it comes to

21 that.  And I know that in the Confirmation Order there's a

22 finding of good faith for any additional predecessor

23 agreement.  And if there hasn't been any evidence introduced

24 at trial as to these existence which might or might not be

25 in existence or filed later.

1        You know, we would just want to be able to

2  analyze --

3        THE COURT:  If it's simply added in there sort of

4  a comma that says, "of which notice has been filed or given

5  as of 1:37 p.m. on June 24th, 2021" would that resolve that

6  question?

7        MR. SCHARFENBERG:  Fantastic.  That resolves my

8  issue, Your Honor.

9        THE COURT:  And does that cause any heartburn to

10 you, Mr. Carlson?

11       MR. CARLSON:  It does not.  And just to clarify

12 just for folks, the only remaining additional predecessor

13 agreement is the one with Hunt, which we are intending to

14 file -- execute and file hopefully later today -- that

15 should be.  So that's the only remaining additional

16 predecessor agreement.

17       THE COURT:  So why don't you fix those definitions

18 to take into account anything of which notice has been given

19 or that has been filed as of 1:37 p.m. on June 24th, 2021

20 and the Hunt Agreement, a draft of which has been

21 circulated.  Something to that effect.

22       MR. CARLSON:  Yes, we're happy to do that, Your

23 Honor.

24       THE COURT:  Okay.

25     (Pause in the proceedings.)

1          MR. CARLSON:  So, Your Honor, that's the totality

2    of the changes that we made to the Plan.  I know there have

3    been -- there have been discussions up until just the moment

4    this hearing started on clarifying changes in Section 513 of

5    the Plan that the sureties have raised and I think probably

6    want to address.

7          I don't know if now is the appropriate time to do

8    that.  It's not reflected in what we filed, but there have

9    been ongoing discussions. I just don't think the language

10   has been agreed by everyone yet.

11         THE COURT:  And will that be language that would

12   go in the Plan or would that be language that would go in

13   the Confirmation Order?

14         MR. CARLSON:  That would be language in the Plan

15   in Section 513.

16      (Pause in the proceedings.)

17         THE COURT:  Mr. Perez, good afternoon.

18         MR. PEREZ:  Your Honor, this is Alfredo Perez.

19   Your Honor, with respect to the definition of predecessor.

20   Obviously we're perfectly fine with the comment the Court

21   made.  But, you know, it will take a little bit of time to

22   implement this Plan.  And we would obviously love to have

23   more predecessor deals so long as we're not precluded from

24   coming back to the Court to do that.

25         I think it -- I'm fine with that.  But I certainly

1    don't want to be precluded.

2          THE COURT:  I think that's fine.  But why don't --

3    then let's not, then, amend the Plan again.  Let's include

4    language in the Confirmation Order that says notwithstanding

5    anything in the Plan those agreements are limited to the

6    following matters.  You know, matters for -- that have been

7    filed of record of which notice have been given.  The Hunt

8    Agreement and any other matter subsequently filed for which

9    the Court has given it's approval.

10          And we can put all that in a Confirmation Order

11   and accomplish the same thing, I think.  Does that work?

12          Mr. Scharfenberg, let me make sure that same

13   concept works for you so long as we're doing it that way.  I

14   think it meets the principal.

15          MR. SCHARFENBERG:  That concept works.  Yeah, we

16   just want an opportunity to review and really understand

17   what's been put up.

18          THE COURT:  Mr. Kuebel?

19       (Pause in the proceedings.)

20          THE COURT:  Mr. Keubel?  I think you have your own

21   line muted.

22          MR. KEUBEL:  Oh, I'm sorry, Your Honor.  Omer

23   Keubel, III.  For this issue, McMoran Oil and Gas.  Your

24   Honor's proposed solution is acceptable for us.  This is an

25   issue that we've looked at.

1           I think when we sent comments over to the Debtor

2    on this provision, we had even suggested that instead of the

3    petition date we could go out to the effective date.

4    Obviously, as a predecessor that has exchanged term sheets

5    back and forth with the Debtor but hasn't reached a final

6    agreement like some of the others.

7           So I do think that Mr. Perez is right that there's

8    a contemplation both with the debt, my clients and probably

9    Government that some of the other smaller predecessor

10   agreements can be reached between now and the time the plan

11   goes effective.

12          And so I think Your Honor's proposed solution on

13   how to keep the door open to do that works for everyone.

14          THE COURT:  Okay, good.  Thank you.  So, what is

15   the best way then to address the 5.13 problems until we get

16   some new language?  Do you want to move to everything else

17   and we'll come back to 5.13 in a few minutes?

18          Or do people want to raise Plan objections right

19   now?  I've told everyone if their problems aren't worked

20   out, you can -- you're free to raise objections today.  So

21   if anyone wants to raise the objection instead of trying to

22   keep working on language, that's fine.

23          But if you want to wait and see if the language

24   really does get finalized under 5.13 that's fine too.

25   People are being pretty quiet, Mr. Carlson.

1          Why don't we leave 5.13 behind and we'll come back
2    to it?

3          MR. CARLSON:  That works.

4          THE COURT:  Okay, where do you want to go next?

5          MR. CARLSON:  Well I think we can turn to the
6    Confirmation Order and I'm hoping a redline was filed.  Let
7    me just check to see.

8       (Pause in the proceedings.)

9          MR. CARLSON:  That was filed at 1720.

10          THE COURT:  All right.

11       (Pause in the proceedings.)

12          MR. CARLSON:  Your Honor, I'm happy to proceed
13    either by doing a page flip or we can organize it
14    differently and go by objecting party and perhaps maybe
15    start with various objecting parties, like BP or we can flip
16    through.  It's up to the Court on how to proceed there.

17          THE COURT:  So, it's probably better for me to do
18    a page flip and better for them to do it by party.  So we'll
19    do what's better for me.  How's that?

20          MR. CARLSON:  That works for us.

21          THE COURT:  All right.  And then if any party
22    needs to go back over it, you know, we'll do that as much as
23    people need.  But I really need to see it, I think, in a
24    bigger context, so.

25       (Pause in the proceedings.)

1          THE COURT:  I'm leaving it up to you to tell me

2     where to go, Mr. Carlson.

3          MR. CARLSON:  So I think the first sort of

4     substantive change here would be --

5        (Pause in the proceedings.)

6          MR. CARLSON:  This should be non-controversial but

7     it's O -- actually I'm sorry, it's M, the good faith

8     section.  This is definitional what we define Plan documents

9     broadly and that'll be used later on.

10         THE COURT:  Hold on.  So I may be on the wrong

11    page.  There was representative of the states has been added

12    in.  Is that before or after where we're going?

13         MR. CARLSON:  That is actually -- we'll start

14    there.

15         THE COURT:  Okay.

16       (Pause in the proceedings.)

17         MR. CARLSON:  So this was a provision added to

18    finding these plan administrators, Risen Powers.  Not aware

19    of any issues raised with respect to this, but.

20       (Pause in the proceedings.)

21         THE COURT:  All right.

22       (Pause in the proceedings.)

23         MR. CARLSON:  And here we define Plan documents

24    broadly to make sure we can -- we capture everything and

25    that'll be used throughout.

1              THE COURT:  Okay.

2              MR. CARLSON:  In Section O here, we are simply

3    just carving out the field with one subsidiaries from the

4    Plan Administrators obligations and role.  And indicating

5    that John Grannel Services (phonetic) is the officer and

6    director, manager.

7         (Pause in the proceedings.)

8              MR. CARLSON:  Section KK is the next change.

9         (Pause in the proceedings.)

10             MR. CARLSON:  But I don't believe there's been any

11   issues with that language.  And so we made that same change

12   in the next few paragraphs here you'll see.

13             THE COURT:  Right.  Okay.

14        (Pause in the proceedings.)

15             MR. CARLSON:  And X, that's the next, that's the

16   application provision we added some language here consistent

17   with the Court's ruling on limiting it to the Pacific Lumber

18   and Mid-Atlantic ruling.

19        (Pause in the proceedings.)

20             THE COURT:  All right.

21        (Pause in the proceedings.)

22             MR. CARLSON:  I believe paragraph 21 is the next

23   stop where -- let's see.  This is the same language.

24        (Pause in the proceedings.)

25             THE COURT:  All right.

1          (Pause in the proceedings.)

2               MR. CARLSON:  This matches the same change we had

3    in the recitals that --

4               THE COURT:  All right.

5          (Pause in the proceedings.)

6               MR. CARLSON:  On the next page, Your Honor,

7    starting in paragraph 38, we have a number of counter

8    parties that were in discussion with regarding cure amounts.

9    And so we've listed out the parties that we've adjourned

10   their cure objections for.  And we've added additional

11   parties since the previous version that was filed.

12        (Pause in the proceedings.)

13              THE COURT:  Okay.  And with respect to those, just

14   to be sure that I'm on the same page as you are.  We decide

15   the cure amount, the Plan will be effective no matter what

16   amount we decide.

17              The amount we decide may alter your decision about

18   whether you're going to assume a contract.  But that's it in

19   terms of where the range of latitude is.  Is that fairly the

20   way this is written?

21              MR. CARLSON:  That's correct.  That's how I

22   understand it.

23              THE COURT:  Okay.  All right.

24        (Pause in the proceedings.)

25              MR. CARLSON:  And then starting in paragraph 60 is

1  where we start to have the negotiated inserts for each of

2  the various parties.  And we can --

3       (Pause in the proceedings.)

4           MR. CARLSON:  And starting with Anadarko.  The

5  Debtors have resolve with Anadarko under Mr. Greendyke or

6  Mr. Bruner as to the best resolves all issues with Anadarko.

7           Next we go to Ecopetrol and Ridgewood, which has

8  also been agree with counsel for each of those parties.

9       (Pause in the proceedings.)

10          THE COURT:  I don't see any change in the

11 Ecopetrol language.  Did it occur in the prior version?

12          MR. CARLSON:  It was.  It was attached in the

13 prior version, that's right.

14          THE COURT:  Okay.  Hold on.  Mr. Greendyke?

15          MR. GREENDYKE:  good afternoon, Judge.  Bill

16 Greendyke, Norton Rose Fulbright on behalf of Anadarko

17 Petroleum Corporation and Anadarko US Offshore.

18          I just wanted to confirm what Mr. Carlson had said

19 that we've got an agreement on the language.

20          THE COURT:  Mr. Greendyke, thank you.

21          MR. GREENDYKE:  Thank you, Judge.

22       (Pause in the proceedings.)

23          THE COURT:  Mr. Singer?

24          MR. SINGER:  Good, Judge.  Kelly Singer on behalf

25 of Ecopetrol.  I felt the necessity to extend the courtesy

1  in saying the same thing.  We have agreed on it and the

2  explanation for paragraph 65 is notwithstanding what's

3  happening with the credit bid document or I'm sorry with the

4  credit bid purchase agreement, the access facilities.

5          Our security interest and our rights in the

6  security interest including the priority are just being

7  reserved for right now.  There's a question that -- as to

8  whether or not our interest are actually senior to all the

9  vendors involved here.

10          And so, all those issues are just being reserved

11  at this point.  Hopefully it doesn't make any difference as

12  we move on in the future.

13          THE COURT:  Thank you, Mr. Singer.  All right, so

14  now we're on Ridgewood.

15          MR. CARLSON:  That's Mr. Fishel's client.  Same, I

16  understand Ridgewood signed off on that.

17          THE COURT:  Okay.

18          MR. CARLSON:  At paragraph 68, this is

19  Mr. Skelton's client.  Houston Energy and Red Willow.  We

20  have agreed to some additional language in this paragraph

21  that was agreed just a few minutes before the call that will

22  be reflected in a further revised.

23          But understand that we are in agreement now with

24  Mr. Skelton on those changes.

25          THE COURT:  And, Mr. Baay?

1        MR. BAAY:  Yes.  Thank you, Your Honor.  We are

2   getting to my paragraph -- I'm in paragraph 70 so I was just

3   raising my hand for when we get there.

4        THE COURT:  All right.  Do you want to go ahead

5   and read to me the language you've agreed to with

6   Mr. Skelton's client, Mr. Carlson, so we know whether

7   there's, in fact, an agreement?

8        MR. CARLSON:  Sure.  So it is -- let me just pull

9   it up here.  At the very end, we add, "including any

10  indemnification reimbursement allegations that may arise

11  from the alleged names and claims of among others the

12  Atlantic Maritime Services LLC alleged liens, claims and

13  potential litigation against Fieldwood Energy, LLC and among

14  other HEDV and ROW in this Bankruptcy Court and the United

15  States District Court for the Eastern District of Louisiana.

16  Nothing herein shall be deemed an admission by any party

17  that any such liens and claims against Fieldwood Energy are

18  valid or enforceable."

19        THE COURT:  Thank you.  And does anyone object to

20  these provisions with that addition?

21     (No audible response.)

22        THE COURT:  All right.

23     (Pause in the proceedings.)

24        THE COURT:  So footnote five will come out, right?

25        MR. CARLSON:  Correct.

1          THE COURT:  Okay.

2       (Pause in the proceedings.)

3          MR. CARLSON:  So then I think from there we go to

4   Mr. Baay's client, Westerngeco.  Where we've bracketed the

5   date, the July 14, 2021 date.  If you scroll up to

6   paragraph 70.

7       (Pause in the proceedings.)

8          THE COURT:  And you say that's bracketed because?

9          MR. CARLSON:  We're working with Westerngeco to

10  finalize an arrangement for the use of the seismic data

11  here.  And this provision is intended just to keep the

12  status quo.  We're not assuming or rejecting these

13  agreements under the Confirmation Order and intend to

14  finalize that agreement.

15          And I think the -- I think Mr. Baay will tell you

16  that they would like that date to be sooner than July 14th.

17  But I'll let Mr. Baay speak to that.  And if --

18          THE COURT:  Mr. Baay.

19          MR. BAAY:  Your Honor, John Baay for Westerngeco.

20  The reason why -- we had originally agreed back at the

21  beginning of June to this language and a June 30th deadline.

22          And then we got the revision, we saw July 14th.

23  And the reason that June 30th is important because it

24  enables them to recognize revenue in this quarter and that's

25  important from a commercial standpoint for these guys.

1          My understanding is that the agreements have been

2     essentially agreed to.  So I don't think there's anything

3     that's going to prevent that from happening.  I would prefer

4     to keep the July 30th deadline in there and sort of keep

5     everybody's feet to the fire and hope that we can get

6     everything done.

7          I don't see a reason why it can't be done.

8     There's some issues about proving a gap between when the new

9     entities will be created.  But I think we can do that in the

10    document.  We just need a signature before June 30th to be

11    able to go forward and book this revenue even though it's

12    not going to be collected for another 30 days.

13         So, that's why the date is important to us.  We

14    were hoping we could leave it June 30th and work together to

15    make that happen.

16         THE COURT:  What happens under the agreement if we

17    put in June 30 and the deal doesn't get done?  Do they have

18    to stop using the data?

19         MR. BAAY:  Yes.  Yeah, unless we agree otherwise.

20    Yeah, at such later date as may be agreed between and Credit

21    Bid Purchaser and Westerngeco.  So, certainly either one of

22    us, I think, from a commercial standpoint wants that to

23    happen, but we would like to at least, you know, keep it --

24    keep everybody working towards the June 30th deadline which

25    we have been working towards since June 2nd when we agreed

1    to this language.

2            And so, you know, --

3            THE COURT:  Mr. Baay, can I ask if the following

4    would work and it may not.  Put in July 14th, right after

5    where it says, "Westerngeco" put a semicolon and say

6    provided that Fieldwood entities are ordered to use their

7    best efforts to complete the agreement by June 30th of 2021.

8            MR. BAAY:  That works, Your Honor.  I appreciate

9    it.

10           THE COURT:  Mr. Carlson?

11           MR. CARLSON:  That works for Fieldwood as well.

12           THE COURT:  Okay, let's include that then in the

13   final draft in the Confirmation Order.  Thank you.

14           MR. BAAY:  Thank you, Judge.

15           THE COURT:  Okay.

16           MR. CARLSON:  This is a similar arrangement with

17   TGS.  I believe we've agreed on this provision as well.

18           MR. BAAY:  That's correct, Your Honor.  That's

19   also my client.  And we have agreed to this document.  Thank

20   you.

21           THE COURT:  Mr. Baay, I'm going to go ahead and

22   remute your line.  Feel free to buzz back in if you need to.

23           MR. BAAY:  Thanks, Your Honor.  I think I'm done

24   with this.

25           THE COURT:  Thank you.

1          MR. BAAY:  Thank you.

2       (Pause in the proceedings.)

3          THE COURT:  Ms. Williamson?  Ms. Williamson, I

4   can't hear you.  You might want to see if your own line is

5   muted.

6          MS. WILLIAMSON:  Oh.  No, Your Honor, I'm not

7   muted.  I was raising my hand in connection to paragraph 72.

8          THE COURT:  Okay.  I think we're going there then,

9   so.

10      (Pause in the proceedings.)

11         THE COURT:  Mr. Carlson, Ms. Williamson.

12   Paragraph 72.

13         MR. CARLSON:  Yes I had -- I think I -- I believe

14   we're agreed on this paragraph, as well.  But Ms. Williamson

15   will correct me if I'm wrong about that.

16         MS. WILLIAMSON:  No, Your Honor, we've reached an

17   agreement as to the language in paragraph 72.  That resolves

18   Valero's objection.

19         THE COURT:  Thank you for the announcement,

20   Ms. Williamson.  I'm going to again mute your line and let

21   you click back in if you need to speak again just to try and

22   keep down background noise.

23         MS. WILLIAMSON:  Thank you, Your Honor.

24         THE COURT:  All right, 73 with Energy Transfer.

25         MR. CARLSON:  Yes, this is meant to Ms. Archiyna's

1  client.  I believe we're agreed on this as well, but we'll

2  let Ms. Archiyna confirm, if she is on.

3        MS. ARCHIYNA:  Good afternoon, Your Honor.  Yes, I

4  am confirming that we have reviewed this language, it is

5  acceptable and that resolves our concerns.  Thank you very

6  much.

7        THE COURT:  Thank you, Ms. Archiyna.

8      (Pause in the proceedings.)

9        MR. CARLSON:  So, Your Honor, you'll see the Cox

10 paragraph was deleted, but we have a broader paragraph that

11 applies to several different predecessors in working with

12 interest owners we'll get to later.

13       We do have a discreet -- a separate discussion

14 ongoing with Cox to address the contract issue that we're

15 working through as well.

16       THE COURT:  So how will that be addressed today?

17       MR. CARLSON:  I think we can -- I think we've

18 agreed on language that I can -- that I'd like to -- I'm not

19 sure we've got -- we've confirmed.

20       THE COURT:  I've got Mr. Kind on the phone.

21 Mr. Kind good afternoon.

22       MR. KIND:  Good afternoon, Your Honor.  I'd like

23 to confirm what Mr. Carlson said.  That's all correct, Your

24 Honor.  We've got -- reached an agreement to be part of a

25 different paragraph.  I think it's new, paragraph 145 or

1  perhaps when we get to there we'll, you know, that will be

2  discussed in more detail.  But we agree with the language in

3  that paragraph.

4          And in addition to that, Mr. Carlson and our team

5  have exchanged language just minutes before the hearing that

6  I think we're close to agreement on.  That'll resolve some

7  of the set off concerns that we raised with the Debtor's

8  counsel.

9          And I think in the next turn of the redline of the

10 Confirmation Order, we should have -- I'm hopeful we'll have

11 agreed language by then.

12         THE COURT:  Mr. Kind, thank you.  All right, it

13 sounds like you may need to click back in when we get back

14 down to 145, but I'm going to mute you for now just to be

15 sure that I don't have 100 people at one time.

16         MR. KIND:  Sure.

17         THE COURT:  All right.  Mr. Carlson?

18         MR. CARLSON:  This next paragraph, 75, this is --

19 74 and 75 this is language we've agreed to with RLI's

20 counsel.  Believe we're agreed on that as well, but Elliott

21 can confirm.

22         MR. SCHARFENBERG:  Yes, that is confirmed, thank

23 you.

24         THE COURT:  Mr. Scharfenberg, thank you.  Okay.

25         MR. CARLSON:  And then the same goes, I believe,

1   for the Maritime Claimant's paragraph as well.  I'm not sure

2   if counsel is on this call, but I believe we're resolved

3   here as well.

4           THE COURT:  If anyone wishes to speak up with

5   respect to the treatment of the Maritime Claimant's under

6   the Confirmation Order, please press five star.

7        (No audible response.)

8           THE COURT:  All right, I'll assume that it's okay.

9        (Pause in the proceedings.)

10          MR. CARLSON:  And then we've also agreed to

11  language with the State of Texas.  I believe it's in Valdez

12  in this paragraph to be resolved there as well.

13          THE COURT:  Is there anyone -- there we go.

14  Mr. Williams?

15          MR. WILLIAMS:  This is Randy Williams.  I was on

16  paragraph 76 confirming that that was the language that the

17  Maritime claimants had agreed to.

18          THE COURT:  All right, thank you Mr. Williams.  I

19  appreciate the confirmation.

20          MR. WILLIAMS:  Thank you.

21          THE COURT:  All right, is there anyone here on

22  behalf of the State of Texas or its entities?

23        (No audible response.)

24          THE COURT:  Okay, I'm going to assume this

25  language is agreeable to them.  If they're not -- oh wait,

1  we do have somebody.  Ms. Ryan from the Attorney General's

2  office, in fact.

3           Ms. Ryan, good afternoon.

4           MS. RYAN:  Judge, good afternoon Judge Isgur.

5  This is Abigail Ryan on behalf of the Railroad Commission of

6  Texas.  Again the Texas tax claims is not my wheel well.

7  Our section does everything non-tax bankruptcy.

8           And so I had nothing to do with the language that

9  is in paragraph 78.  And I don't know if we have another AG

10 for this taxing side.  I am here, though, to represent the

11 Attorney General and the Railroad Commission if you have any

12 questions, Your Honor.

13          THE COURT:  All right, I'm just going to assume

14 this is okay unless, you know, you get somebody -- you can

15 get somebody on to object before we get to the end of the

16 order, but otherwise I assume they've reached agreement as

17 Mr. Carlson has announced.  So, I'm going to leave it alone.

18          MS. RYAN:  I'll put out an email, Your Honor, to

19 our group and see if anyone has any objections.

20          THE COURT:  All right thank you Ms. Ryan.  Do you

21 want me to go ahead and remute your line or did you want to

22 stay on for any of the other paragraphs?

23          MS. RYAN:  You can remute me.  That is fine.

24 Thank you, Your Honor.

25          THE COURT:  Thank you.  All right, Mr. Carlson?

1          MR. CARLSON:  So same goes as I understand for

2    Louisiana, Department of Revenue.  We should be resolved

3    with the Louisiana DOR.  Counsel's name is escaping me right

4    now, but I should be okay there.

5          THE COURT:  I know those folks well.  Is there

6    anybody here from LDR?

7        (No audible response.)

8          THE COURT:  All right, I'm going to assume that

9    we're okay with them.  They participate regularly when they

10   have an issue and I think they'll be fine if they're not

11   here.  Okay.

12         MR. CARLSON:  So the next set of paragraphs here

13   are the Apache Sureties -- sorry the Apache paragraphs that

14   there have been some changes to that if you folks want to

15   read through, but.

16         THE COURT:  Hold on a second.  Mr. Brescia?

17         MR. BRESCIA:  Yes, good afternoon, Your Honor.

18   Duane Brescia for Zurich American Insurance Company.  Just

19   raised my hand as we're discussing these.

20         I think Ms. Russell has received consent from two,

21   maybe all four of the sureties to proposed language that was

22   circulated only about 30 minutes ago, 45 minutes ago.

23         I don't know if that's going to be read in today.

24   I'll defer to Ms. Russell first.

25         THE COURT:  All right, Ms. Russell we'll let you

1  go first then.  Good afternoon.

2       MS. RUSSELL:  Good afternoon, Your Honor.  A lot

3  going on behind the scenes here.  We actually have some

4  language that we requested to 82, which I proposed we work

5  out with the Debtor in the -- in the next break.

6       And if the Court will bear with me, I will find

7  the language that Mr. Brescia is referring to.  And it

8  relates subrogation rights.  Is this what you were referring

9  to Duane?

10      MR. BRESCIA:  Yes, I think there are edits to

11 paragraph -- I believe they are 81, 92 and I guess there's a

12 new paragraph 90 -- excuse me.  New paragraph 95 are the

13 ones I think we're in agreement on.

14      MS. RUSSELL:  Okay, Your Honor.  If you would

15 indulge us.  If we could skip over the Apache section.  We

16 were negotiating this even as the hearing was ongoing.  And

17 we need some time to get organized to walk through this with

18 you.

19      THE COURT:  It's only $600 million, Ms. Russell.

20 Let's try and get it done.

21      MS. RUSSELL:  I apologize.

22      THE COURT:  All right.  Just -- look do you want

23 to try and make the announcements on the record?  You guys

24 have been working hand-in-hand now for awhile or do you want

25 to just put it in the next form of order?  I really think

1  that as long as I understand what you've done, that I'm not

2  going to intervene on whether I approve of the business

3  decision between, you know, two non-Debtor entities.

4        So it's only going to be one -- I'm only going to

5  look to be sure that I don't think it's ambiguous so that I

6  can enforce it if a dispute arises.

7        So I'm inclined to think that you-all can just

8  agree and put it in there and I'll look at it on the final

9  version that gets uploaded.

10        MS. RUSSELL:  I think that would be a good plan.

11  I didn't know if you planned on entering this at the end of

12  the hearing today.  But if we have the ability to make these

13  final fine tuned language then I think that would be the

14  most efficient use of the Court's time.

15        THE COURT:  So unless something surprises me,

16  which it hasn't yet, it's my intention to allow one more

17  version to be uploaded but not to hold another hearing on

18  it.  That I can then just review -- if you upload a regular

19  and a black line version, I'll review to be sure that I

20  understand it.  And then I will have it entered without

21  another hearing.

22        And I know that we still have -- everyone still

23  has the ability at the end of this hearing to voice their

24  objections if things haven't gotten resolved.  So, that may

25  get upset before we get to the end of the day.  But so far I

1    haven't heard a reason to come back.

2          I mean, because again, my interest in -- I don't

3    get to say whether I think you and Mr. Brescia have reached

4    a good deal.  It's only its impact on the estate that I can

5    review in priority for the purpose of being sure that I can

6    enforce it, so.

7          I haven't heard anything that the estate should,

8    you know, needs a hearing about is my view.  Are you okay

9    with that?

10         MS. RUSSELL:  Yes, Your Honor.  And if we, for

11   some reason feel like things cannot resolve, we will ask for

12   a very short audience with you.

13         THE COURT:  No, I'll give you an emergency hearing

14   if you want and I'll even give you one now as a contingent

15   hearing if you want it.  I just don't think it's necessary

16   and it'll just make you spend more money and time and I'm

17   thinking by, you know, 5:00 or 5:30 you-all will have an

18   order uploaded and Ms. Doe never sleeps so she'll get it

19   entered tonight.

20         MS. RUSSELL:  All right, thank you, Your Honor.

21         THE COURT:  Thank you.

22         MR. BRESCIA:  Thank you, Your Honor.

23         THE COURT:  So I'm going to go ahead and mute both

24   of your lines so you-all can go do work.  And we did have

25   somebody from New York that has a comment they want to make.

1  Who do we have?

2       MS. LIOU:  Yes, Your Honor, Jessica Liou from

3  Weil, Gotshal & Manges.  I did want to echo what Ms. Russell

4  said which is are actually still are working with Apache and

5  Blenders on some language for this section.

6       So to the extent that we can't come to an

7  agreement -- and I'm confident that we will -- then that may

8  be an issue that we'll have to address at another time.

9       THE COURT:  Look I want to get an order entered.

10 This has dragged on awhile.  If you-all can't reach an

11 agreement, I want you contacting Ms. Doe and we will come

12 back tonight.  So, I say that --

13      MS. LIOU:  Absolutely, Your Honor.

14      THE COURT:  -- and I want you to understand.  I'm

15 not even a little bit impatient about it.  It's amazing all

16 the progress you've made.  But I think the way to treat all

17 the progress you've made is to recognize that you're doing

18 that for a reason and everybody wants to get this done.

19      And so it's really out of respect for what you've

20 done.  And I don't have any impatience about it.  If you-all

21 were literally to come back and say you needed another day,

22 I got it.  But you probably more need time --

23      MS. LIOU:  No Your Honor I do not expect us to

24 need another day.  We just need probably another hour to

25 work it out.

1          THE COURT:  Okay.  Well, I just want -- assuming

2   that we conclude today with no outstanding objections, when

3   you get it filed please contact Ms. Doe and I will look at

4   it right away.

5          I do have a 4:00 o'clock hearing.  And so I expect

6   that hearing to take less than an hour, but I may be wrong

7   about that.  But it's not like I'm going anywhere.  I

8   just -- I may have an hour when I can't look at whatever you

9   submit.  But beyond that I'm pretty free.

10         Okay, let's move ahead.  Where are you next,

11  Mr. Carlson?

12         MR. CARLSON:  From there, Your Honor, I go to

13  paragraph 97.  This is the non-Apache sureties reservation

14  rights language.

15         And here --

16         THE COURT:  Wait a minute.

17         MR. CARLSON:  -- we have received.

18         THE COURT:  Hold on.  I ended up in the wrong

19  place.

20      (Pause in the proceedings.)

21         THE COURT:  Okay, I'm about there.  There we go.

22         MR. CARLSON:  Your Honor, this paragraph I think

23  is kind of (glitch in the audio) reservation of rights the

24  way I see it.  Number one, that nothing in the Plan document

25  modify the rights as between obligees and sureties.  That's

1    sort of what's captured in A.

2          B is nothing requires non-Apache Sureties to

3    extend additional new surety credit.  And then C is nothing

4    in the order or Plan documents increase or decrease rights

5    of sureties against non-Debtor parties for the

6    post-effective date Debtors, Fieldwood One, Two and Four,

7    and the NewCo entity with the reservation of rights with

8    respect to assumed contracts.

9          And I think --

10          THE COURT:  So tell me -- I don't understand how A

11   works in combination with the exculpation clause.

12          MR. CARLSON:  So A is limited to the non-Apache

13   sureties.  Nothing is adjudicating or modifying their rights

14   as between only those non-Apache sureties and the obligees

15   under their respective bonds.

16          THE COURT:  But does that mean that there can be a

17   dispute between the obligees and the non-Apache sureties as

18   to matters that are exculpated in the Plan?  Or does the

19   exculpation clause control over A?

20          Because I think both have not withstanding

21   anything else and I'm a little nervous about having

22   contradictory paragraphs that say notwithstanding anything

23   else.

24          What's the deal on how this interacts with that?

25          MR. CARLSON:  Yeah, I think your right.  I think

1   it's -- we do have that language on the less expressly

2   provided the contrary in the Plan documents.  Language here

3   and I think you're right that if there is an expressed

4   provision that does impact that, that would supersede this

5   language in A.

6           THE COURT:  I mean, it says unless expressly

7   provided and then it says nothing in the exculpation

8   provision does these things.  I do not want the ambiguity.

9   I want to have you guys apparently talk some more to be sure

10  that I don't have cross conflicts like that.

11          I'm happy with however you-all resolve it.  And

12  maybe you-all have an agreement that I'm not fully

13  appreciating.  Let's see, Mr. Ripley?

14      (Pause in the proceedings.)

15          THE COURT:  Mr. Ripley?

16          MR. RIPLEY:  Oh, good afternoon, Your Honor.  Ed

17  Ripley with Andrews Myers on behalf of Chevron and various

18  affiliates.

19          Judge this whole paragraph first came about last

20  afternoon.  And the first introductory clause is a problem.

21  Because what it does is it basically takes away the

22  reservation of rights language.  I think there's some other

23  provision that's buried in the thousands and thousands and

24  thousands of pages of other documents that people met all

25  the transactions under the Plan.

1          It's overly broad in and it's completely
2    unnecessary.  The -- this was added in because one
3    particular obligees and predecessor had worked out
4    additional language.  And so there's a way to deal with that
5    parties unique issues without having this.
6          Because right now -- particularly under
7    subparagraph A -- my client is an obligee under various
8    bonds and we have no idea, again if anything in any of the -
9    - for example Fieldwood Energy One or the Newco Credit Bid
10   transaction documents has some effect on our bonds.
11         We haven't checked all those pages.  We shouldn't
12   be forced to check all those pages.
13         Again, that first clause needs to come out.  It's
14   unnecessary.
15         THE COURT:  Which first clause?
16         MR. RIPLEY:  The "unless expressly provided to the
17   contrary in the Plan documents."
18         THE COURT:  But then if it says, "the exculpation
19   provision doesn't effect people's rights under the deal in
20   the Plan."  And it does effect people's rights under the
21   deal in the Plan.
22         I mean we are ordering that no one can
23   subsequently challenge the deal.  The deal is protected.
24         MR. RIPLEY:  Yeah, I think -- Judge I think you
25   raise a good issue that no one else had raised yesterday in

1  the discussions amongst all different parties.  They ought

2  to be able to carve in the exculpation because -- to make

3  sure that there isn't some gap or inconsistency.

4         But that introductory clause was not raised in

5  connection with the exculpation in all the discussions

6  yesterday.  Again it was added solely to deal with one

7  individual obligee and predecessors peculiar issues and

8  there is easier ways to deal with that.

9         THE COURT:  Mr. Bains.   Mr. Bains?

10        MR. BAINS:  Good afternoon, yeah good afternoon,

11  Your Honor.  Brandon Bains on behalf of Travelers, Liberty,

12  Hanover and XL.

13        I just wanted to echo Mr. Ripley's comments.  You

14  know we had some discussion about this language.  In fact,

15  Mr. Ripley's clients, Chevron, is an obligee for all four of

16  my sureties.

17        I think the intention here, Your Honor, is simply

18  that if we get down the road and there is a bond claim by

19  Chevron, I think all parties agree that nothing in the plan,

20  nothing in the order impacts Chevron's rights under the

21  bonds, impacts our defenses under the bonds.  And I think

22  that's what we're trying to accomplish here.

23        I would agree with him that I think the first

24  clause should be taken out because it just adds to confusion

25  and we really seek to adjudicate something that is outside

1  the purview of this Court when it comes to any of those bond

2  claims two or three years from now.

3           THE COURT:  Yeah, that makes a lot of sense.  So

4  just to put that sort of in a hypothetical example.  If the

5  obligee a year ago did something that would preclude your

6  liability to the obligee that argument remains.

7           But the obligees participation in the Plan would

8  not be a defense.  And if we can say those, I think that's

9  consistent with what I'm intending to order.  I don't think

10  this says that.

11          MR. RIPLEY:  And Judge, -- yeah that is the

12  intent.

13          THE COURT:  Great.  I don't know how to say that.

14  We can all take a stab at it, but should I let you-all take

15  a stab all together without me.

16          MR. RIPLEY:  Yes, Your Honor, we'll take a stab at

17  it.

18          THE COURT:  Mr. Dendinger?   Mr. Dendinger?

19          MR. DENDINGER:  Yes, good afternoon, Your Honor.

20  I guess for the record, Mark Dendinger, Bracewell for ENI

21  Petroleum US LLC and ENI US Operating Company.  May I be

22  heard?

23          THE COURT:  Yes, sir.

24          MR. DENDINGER:  I believe Mr. Ripley is

25  generically referring to -- for my clients as the obligee

1 with the peculiar language.

2       I didn't realize that it expressly provided to the

3 contrary in the Plan documents was solely put in for my

4 clients benefits.

5       But the reason that lead in was important to us is

6 without some version of a lead in that would say, "except

7 expressly provide to the contrary" in paragraphs X to Y of

8 this Order and the ENI definitive documentation are

9 concerned with me this entire paragraph and my client's

10 rights as obligee and the non-Apache's sureties rights would

11 vitiate the paragraph that we negotiated that we'll come to

12 later on in the Order.

13       I believe the paragraph range is 118 -- 111 to

14 118.  I apologize, Your Honor.  So Mr. Ripley has made a

15 sound deduction --

16       THE COURT:  Could it say, for example -- and I

17 haven't read 111 to 118 -- subject to paragraphs 111 to 118.

18 Would that have the same effect?

19       MR. DENDINGER:  Yes, yes.  And that would be fine,

20 Your Honor.  I would prefer that it also maybe use the

21 phrase "and the ENI definitive documentation."

22       THE COURT:  It doesn't bother me as long as it's

23 limited to ENI.  All right, from Chicago, 502-2956.

24       MR. KOOY:  Yes, Your Honor.  Ralph Kooy on behalf

25 of North American Specialty.  I did want to add our

1   agreement with Mr. Bains and Mr. Ripley that we didn't

2   understand the need for that first clause.

3          You know, one of the entries our client continues

4   to have and we say it's advisable to half of -- or on behalf

5   of Fieldwood, but namely Chevron and ENI as obligee.

6          You know, we still have our larger objection.  And

7   it relates, you know, to the term sheets that have been

8   entered that we sort of, you know, obtuse or abstruse

9   references to the surety providing money for clean up.

10         We still don't think there's, you know, a clear

11  understanding of how these bonds survive and under what

12  basis.  I have not reviewed paragraph 111 through 118, but

13  our -- you know, we're happy with the language that nothing

14  in the order or plan shall be deemed to modify, you know,

15  our defenses should these obligees specifically any and

16  Chevron make a claim because we want to be able to preserve

17  our surety defenses.

18         We're still hesitant, you know, we agree that that

19  last provision should be removed consistent with Mr. Bains

20  and his position on behalf of his clients.  We would have to

21  take at look at 111 and 118 and I assume that means we'll be

22  doing that offline here.

23         THE COURT:  All right.  Let me just be sure that

24  you're telling me the same thing others are.  You're not

25  looking -- well.  I know they argued against this.  I've

1    overruled the question of whether you can have a defense

2    based on what's occurring in the Plan itself.

3            So to the extent that that's your objection, I'm

4    substantively overruling it.  But I am sustaining any

5    objection that says that I should effect rights other than

6    were determined in the Plan.

7            And I don't think paragraph 97 is correct in that

8    regard on any side of that.  So hopefully you-all can work

9    through that some more.  And that may take more than this

10   afternoon and I understand that.  But it's an important

11   paragraph.

12           MR. KOOY:  All right.

13           THE COURT:  Is that -- and I know that you have

14   that objection.  I want there to be a clear record.  You can

15   appeal it.  I've got zero problem with that.

16           But I agree that your defenses that existed when

17   this case was filed, we should not be adjudicating or

18   altering at all.  It's only the Plan itself that we're

19   approving can't then serve as the defense.

20           And I know that you disagree with that.  I've got

21   no problem with you disagreeing with that.  But that's the

22   part I'm overruling and only that part.

23           MR. KOOY:  Understood.

24           THE COURT:  Thank you.  All right.

25           MR. BAINS:  Your Honor, Brandon Bains, if I may.

1          THE COURT:  Sure, Mr. Bains.

2          MR. BAINS:  And just, Your Honor on that point for

3  purposes of the record, I did want to make clear, at least

4  on behalf of my clients, that we do still have substantive

5  legal objections to the Plan.

6          We understand the Court has overruled those.

7  Obviously all of this is subject to those objections.  But

8  trying to get to the language that we're not opposed to as

9  part of the Confirmation Order.  I think you said that

10 before, but I just wanted to make that clear.

11         THE COURT:  I did and I'll reiterate it now.  I

12 made substantive rulings during the hearing.  Perhaps just

13 clarified one so that there could be no ambiguity about what

14 I meant to say.

15         And then I ordered the parties -- like you and

16 your client, Mr. Bains, -- to agree on a form that would

17 implement the rulings.  And you are not waiving

18 anything -- it's not my intent that you're ruling anything

19 by agreeing to the form of the order in a manner that is

20 consistent with the Court's rulings.  And your objections

21 previously made are preserved in that regard.

22         And that is true for everyone that is, you know,

23 working as best I can tell in absolute good faith to try and

24 implement the Court's orders.  I have no problem with what

25 anybody is doing or saying here.  And expect that no

1 Appellate Court would think that the work of fine lawyers

2 implementing a Court order shouldn't be a waiver.  It's just

3 not.

4          MR. KOOY:  Your Honor, I don't know if I'm still

5 unmated.  This is Ralph Kooy again.

6          THE COURT:  No, you're still live.

7          MR. KOOY:  Okay.  I just -- I appreciate that

8 clarification and we had not, you know, officially made our

9 closing voicing and continuing our objection.  But based on

10 your (indiscernible) that that applies to North American

11 Specialty as well.

12          THE COURT:  It applies to them and to all the

13 others that raised objections that I overruled.  You know,

14 this is a really hard long complicated thing. And for your

15 clients too, you want a clear order even for appellate

16 purposes.

17          And compliance with my direction to try and work

18 on getting something that clarifies and implements the

19 Court's rulings only shows good lawyering and not waiver as

20 far as I'm concerned.  And I make that as to all --

21          MR. KOOY:  Thank you very much, Your Honor.

22          THE COURT:  -- all parties.  Thank you.  All

23 right, so I'm going to let everybody tell me if this means

24 that want a little -- maybe overnight -- to work on that

25 paragraph and come back in the morning or something.

1          But I am worried about getting this one done with

2    this many parties that really care about how that language

3    is going to fit in.

4          So let's go on down.  What do you have next?

5          MR. CARLSON:  Well, I think these next couple of

6    paragraphs were also a part of those same discussions.  I

7    think paragraph 98 is really clarification that -- you heard

8    a lot of testimony and discussion on this.  None of the nine

9    Apache bonds where the Debtor is the principal are being

10   allocated or assigned pursuant to the Plan.

11         I don't think there's anything controversial about

12   98, but folks can speak up if so.

13         And then paragraph 99 is really intended to try

14   and address what is being dealt -- what subrogation rights

15   are being dealt with under the Plan and what aren't for the

16   pre-post subrogation rights discussion that we've had.

17       (Pause in the proceedings.)

18         THE COURT:  I'm not sure what 99 means.

19       (Pause in the proceedings.)

20         MR. CARLSON:  What this is intended to say is that

21   any post-effective date subrogation rights are not being.

22   The way I read this anyway, others can disagree but, are not

23   being dealt with or are not being enjoined release, altered

24   or diminished not by the non-Apache Surety subrogation

25   rights.

1          THE COURT:  So, if money is paid to the Government

2    under the Plan, by a bonding company, can they come back

3    against NewCo?  Because my ruling was they couldn't and this

4    paragraph seems to say they can.

5          I don't think it's consistent with my ruling.

6          MR. CARLSON:  They cannot.  They cannot, Your

7    Honor.  I think that's right and if we need to fix this to

8    be consistent we will.

9          THE COURT:  I read this to say that if a

10   subrogation right arises on the effective date and on the

11   effective date Newco will be an owner, if they're preserved.

12   And that is not my intention.

13         I believe it is inconsistent with Mid Atlantic.

14         MR. BAINS:  Your Honor, Brandon Bains, if I may?

15         THE COURT:  Yes, sir.

16         MR. BAINS:  Let me just say for my four sureties,

17   Your Honor, we do not have any Government bonds.  All of our

18   bonds are on behalf or excuse me, on behalf of Fieldwood in

19   favor of private entities.

20         THE COURT:  Right.

21         MR. BAINS:  I can say for my purposes, we're

22   simply trying to preserve those subrogation rights.  I think

23   it's maybe a different issue than the Court is hitting on.

24   So I do think the folks that have the Government bonds can

25   speak up if they need to on that.

1          But I do think it's important for any of the other

2   subrogation rights for sureties that private bonds be

3   preserved after the effective dates, which is what this

4   language is at least attempting to get do.

5          THE COURT:  So, is Newco buying any of the

6   property on which your client can assert subrogation rights?

7          MR. BAINS:  There are assets bonded by my clients

8   that are flowing to Newco, yes.

9          THE COURT:  Yeah, I am --

10          MR. BAINS:  I still have -- I mean --

11          THE COURT:  -- so this is a ruling I tried to make

12   before.  Newco buys free and clear.

13          MR. BAINS:  I don't know that that's the issue

14   that we're fighting about.  I think the issue is more if,

15   for instance Mr. Ripley's client, Chevron, if we pay out on

16   that bond on an asset that has gone to Newco, we're

17   subrogated to Chevron's rights or the other obligee.

18          THE COURT:  This has being bought free and clear

19   of Chevron's rights, right?  Newco isn't taking it and then

20   having to pay other than what they've agreed to pay.  They

21   don't have to pay extra via subrogation.

22          MR. BAINS:  No, I think I'm saying something

23   different, Your Honor.

24          THE COURT:  Okay.

25          MR. BAINS:  I think I'm talking about in the

1   future lets say if Newco otherwise did not perform long

2   after the effective date for their own obligations with the

3   Government.  If the Government issued some sort of order

4   that flowed back to Chevron in the chain of title or not.

5   However we come to pay under our bond, we're just simply

6   saying we maintain those subrogation rights against our

7   private obligees.

8          I don't know that it's impacting the free and

9   clear concept that the Court is worried about.

10         THE COURT:  I think it depends if what you're

11   describing is Newco post effective date puts up a new

12   platform.  That's Newco's problem.  I don't know that anyone

13   has bonded that.  But that's Newco's problem.  And people

14   are going to be subrogated.

15         But people are not going to be able to sue Newco

16   for a error obligation that arose before their acquisition.

17         MR. BAINS:  That arose before the acquisition is

18   that what you said?

19         THE COURT:  Right.  If the error obligation

20   existed on the date, you know, prior to the date of Newco's

21   acquisition, Newco can't be forced to pay that other than

22   what the Plan says.  That's the whole fundamental --

23         MR. BAINS:  Yeah I understand.

24         THE COURT:  -- premises of the Plan.

25         MR. BAINS:  I would agree that's the premise of

1  the Plan.  I don't think that's what this is saying.  This

2  is saying subrogation rights that would arise after that.

3        THE COURT:  No it says other than those

4  subrogation that arose on or before the effective date.

5        MR. BAINS:  Well the -- I think Ms. Loui or

6  Mr. Carlson talked to this.  The intention was saying

7  nothing is going to impact the subrogation rights other than

8  those ones that came before.  Those are the ones that are

9  being impacted.  Those are the ones that are being cut off.

10        The intention was to keep the ones afterwards.

11  And I don't believe I'm misrepresenting Ms. Loui.

12        THE COURT:  I got it.  I got it.  Okay, so I maybe

13  just misreading this.  Thank you.  I think I was misreading

14  it.  Let me try again.

15      (Pause in the proceedings.)

16        THE COURT:  I was misreading it.  I think you're

17  right.  I'm going to withdraw my comment.

18        MR. BAINS:  Thank you.

19        THE COURT:  Thank you.  Sorry, Mr. Carlson, about

20  that diversion scary statement by me.  I got it wrong.

21        MR. CARLSON:  No problem.

22        THE COURT:  Let's go ahead.  Hold on.  Ms. Ryan,

23  welcome back.

24        MS. RYAN:  Thank you, Judge Isgur.  Again for the

25  record this is Abigail Ryan on behalf of the Railroad

1   Commission of Texas.

2           I can conferred with my colleagues on the tax

3   bankruptcy side here at the Attorney General's Office, Your

4   Honor.  And the taxing entity referred to -- and I believe

5   it's paragraph 78 or 77 -- are ad valorem taxes.  And so, we

6   don't represent each and every separate county or school

7   district that has taxing issues.

8           What is -- that was handled by -- let me pull it

9   up there.  (Glitch in the audio) by a private law firm and

10  filed an objection and that firm is the Perdue, Brandon,

11  Fielder, Collins and Mott law firm.  It looks like Ellen

12  Connex filed an objection and this is Melissa Valdez also on

13  their signatory block.  So, this is out of the Attorney

14  General's purview for today.

15          THE COURT:  Thank you for the announcement.  I'm

16  taking, though, that the Attorney General -- perhaps because

17  it doesn't have an assignment, perhaps because it hasn't

18  been called on to act -- the Attorney General is not

19  asserting an objection to those paragraphs, right?

20          MS. RYAN:  Correct.  In fact, I just received an

21  email as you were speaking from the manager of the taxing

22  section of our office.  And he looked at the Order and he

23  doesn't have a problem with that provision of the proposed

24  Order or the one addressing Louisiana's taxing concerns.

25          And so that's from Mr. John Stern.  He's the

1  manager of the bankruptcy tax section of Attorney General's

2  Office.

3          THE COURT:  All right, thank you Ms. Ryan.

4          MS. RYAN:  Thank you, Your Honor.

5          THE COURT:  Mr. Zuber?

6      (Pause in the proceedings.)

7          THE COURT:  Mr. Zuber, if you're talking your line

8  is muted.

9          MR. ZUBER:  I'm sorry, Your Honor.  I was just

10 going to arise to address Your Honor's concern about

11 paragraph 99, but those have now been resolved.  So I don't

12 need to address at this point.

13         THE COURT:  Thank you.   Mr. Schaible?

14     (Pause in the proceedings.)

15         THE COURT:  Mr. Schaible?

16         MR. SCHAIBLE:  Your Honor, I was just going to ask

17 with respect to that paragraph, I think that everyone on

18 this call expectation and understanding is clear.  But later

19 in the Order, we have somewhat similar language and what we

20 did there was clarify that with respect to post-effective

21 date activities.  And I'm wondering if we could add -- if we

22 could add that in the paragraph?

23         Again, I think everyone understands the point, but

24 the language -- as Your Honor pointed out -- could actually

25 benefit from being clearer.

1          In other words, to the extent that subrogation

2   started -- to the extent that work on account of

3   pre-effective date activities occurs post-effective date and

4   therefore the subrogation could theoretically arise

5   post-effective date, but it's with regard to pre-effective

6   date obligations, credit bid Newco should not be on the hook

7   is your point.

8          And I'm wondering if just the addition of, you

9   know, with respect to post-effective date activities may

10  solve that ambiguity.

11         THE COURT:  Sounds like that makes some sense to

12  me.  Let's see if it causes anybody any problem because

13  you-all are going to have a bunch of discussions.

14         Ms. Loui, did you have a comment about that as

15  well?

16         MS. LOUI:  Yes, Your Honor.  I was actually going

17  to say exactly what Mr. Schaible said.  So I think we're in

18  agreement that we have some clarifying to do on the language

19  in paragraph 99.

20         THE COURT:  Thank you.  All right, let's move to

21  paragraph -- I'm sorry, go ahead.

22         MR. BAINS:  I'm sorry, Your Honor, Brandon Bains.

23  I don't want to belabor this point too much, but I do want

24  to make sure that I understand what Mr. Schaible is saying.

25         If he's simply saying that they want to make clear

1  that it's post-effective date activities, I think that's

2  consistent with everything we've talked about.  One concern

3  is he seemed to make a comment about pre-effective date

4  obligations and those are two different things.

5       I mean there's no dispute, obviously, all bonds

6  are pre-effective date otherwise we wouldn't be

7  participating in this joyous process.

8       So yeah we're going to have bonds that are

9  pre-effective date.  The question is going to become whether

10  the obligations under those bonds arise post-effective date,

11  therefore giving rise to the subrogation rights.

12       If we're all on the same page that that's fine,

13  okay.  I think that's what we're saying, but I want to make

14  sure I understood him correctly.

15       THE COURT:  Yeah, so look there's the argument

16  that I think we all know which is that the owner of property

17  has a continuing duty to clean it up.  And so one could

18  argue that post-effective date an obligation arose.  They're

19  saying that they shouldn't have liability for those.  I

20  think that's right.

21       On the other hand, there could be activity they

22  engage in post-effective date.  Let's say they go, you know,

23  disturb a pipe or they go install a new platform and for

24  that they should have liability.

25       And so that's what I think the purpose of

1 Mr. Schaible's comment was.  I don't know if that's

2 inconsistent with what you're saying.

3         MR. BAINS:  I think all I'm simply saying is yes

4 that's what you just captured is the understanding of the

5 provision.  But if there was some notion that because a bond

6 was issued pre-effective date that it never has any

7 subrogation rights I do not agree with that.

8         MR. SCHAIBLE:  No, that is not -- that is not what

9 I intended, sorry.  Literally the addition would be just the

10 words "on account of post-effective date activities" into

11 the existing language.  That's all.

12         MR. BAINS:  Understood, Mr. Schaible.  I think we

13 can look at that then.  We have to do it anyways.  Thank

14 you.

15         THE COURT:  Thank you.  All right, let's go to

16 paragraph 100.  Hold on, I've got somebody else.  Mr. Zuber

17 go ahead, your line is remaining active.  Mr. Zuber?

18      (Pause in the proceedings.)

19         THE COURT:  Mr. Balasko?

20      (Pause in the proceedings.)

21         THE COURT:  Mr. Balasko?

22         MR. BALASKO:  Thank you, Your Honor.  Zach Balasko

23 for the Department of the Interior.  As to paragraph 100 is

24 a very, very minor change.  I don't think the terms BOEM and

25 BSEE are defined anywhere in the Order or the Plan.  So,

1  somewhere either in the Plan or in this Order those terms

2  need to be defined.

3          THE COURT:  Except we all know them.

4          MR. BALASKO:  That's true, Your Honor, but

5  whoever's looking at this in the future might not.

6          THE COURT:  All right.  Mr. Carlson, where do you

7  want to go next?

8          MR. CARLSON:  Your Honor, the next I think nine

9  or ten paragraphs are the Chevron specific paragraphs.  I am

10 not aware of any objections.  But -- and they haven't

11 changed.  But would -- I guess Mr. Ripley may have something

12 to say about it, but from our perspective these are --

13         MR. RIPLEY:  Yes, Your Honor.  Ed Ripley, Your

14 Honor, Andrews and Myers on behalf of Chevron.  Yeah, we had

15 provided for example, in what's now paragraph 101.  We had

16 provided additional protective language that would go in at

17 the end.

18         That language comes from other parts of the exact

19 same order.  And so we don't understand why that would not

20 be included there.

21         And we've provided the redlines to Mr. Carlson and

22 his team.  I can -- I can even have it brought up if you

23 want to see it Judge.  But it is a literally a cut and paste

24 from other provisions in the exact same order -- in this

25 order.

1          And it's protective language and reservation of

2     rights language.

3          THE COURT:  Let me give Mr. Carlson a minute to

4     look at it.

5        (Pause in the proceedings.)

6          MR. CARLSON:  Yeah, I don't think we're agreed on

7     this language yet.  We're going to have to look at it.

8          MR. RIPLEY:  Right, I think it slightly changed in

9     your new paragraph 62.  But whatever that language is, we

10    just wanted to have the exact same language.  Wherever you

11    come down on that.

12         MR. CARLSON:  Okay, Mr. Ripley, it sounds like we

13    can work this out.

14         THE COURT:  Thank you.  Mr. Zuber?

15         MR. STURM:  Good afternoon, Judge.  This is Jay

16    Strum for Aspen, Berkley and Sirius Insurance companies.

17         I apologize, Judge.  I tried to raise my hand a

18    minute ago to speak on 99.  We were just a little bit

19    confused as to the ruling with respect to 99, Judge.

20         Our understanding and based on our negotiations

21    with the other parties is that what is being preserved is

22    any subrogation rights that arise post-effective date -- and

23    that would be for any operations by the credited purchaser.

24    You know, it's really geared toward if the credited

25    purchaser doesn't comply with the -- with their obligations

1  under the BOEM regulations and they don't do their

2  decommissioning, an surety has to step in and perform, then

3  the surety should be subrogated to -- as against the

4  credited purchaser.

5           That was what that was aimed at and Your Honor's

6  comments with respect to new wells, new platforms and I just

7  want to make sure it would be as to any obligee.

8           THE COURT:  I am overruling that objection now for

9  the fourth time.  The purchasers are not undertaking an

10  obligation to do error work other than as specifically

11  provided in the Plan.

12          And you are not subrogated to the right to sue

13  them for failure to do error work if that error work existed

14  prior to the effective date.  I understand that the sureties

15  massively object to that ruling, but that's the ruling.

16          MR. STRUM:  Understood Judge.  We appreciate the

17  clarity.

18          THE COURT:  Thank you.  All right, let's go back,

19  Mr. Carlson?

20          MR. CARLSON:  So from there, Your Honor, I would

21  go to paragraph 111 through --

22          MR. RIPLEY:  Actually we have some other Chevron

23  issues, Your Honor.

24          THE COURT:  Go ahead, Mr. Ripley.

25          MR. RIPLEY:  Judge, what is now paragraph 105, we

1   have again -- we provided similar protective language that

2   comes from another provision in the Order.  The exact same

3   language.

4          And Mr. Carlson, again, this is the language that

5   we sent you.  I'm not clear if that slightly changed, but

6   wherever you land on with that, we just wanted to have that

7   exact same language in.  And again I'm glad to talk with you

8   separately.

9          But that's the redline that we had provided

10  yesterday.  And would come in at the end of what is now

11  paragraph 105.  I'm sorry, yes previously 101 is now 105.

12          MR. CARLSON:  Understood, we'll have to talk off

13  line, Mr. Ripley.  I just haven't had a chance to review it.

14  Apologies.

15          MR. RIPLEY:  Sure.  Understood.  Judge, the next

16  is paragraph 107 in the current Order.  In the very

17  beginning of that, after "all rights of any applicable

18  proofs of entity.

19          We needed to insert "and/or other applicable

20  obligees" because some of our bonds there are more than one

21  party as an obligee on the bond.  We are not the sole

22  obligee.

23      (Pause in the proceedings.)

24          THE COURT:  Mr. Carlson?

25          MR. CARLSON:  Yes, I don't think we have a problem

1 with that addition, but I only speak for the Debtors, so.

2        THE COURT:  Thank you.  Mr. Ripley?

3        MR. RIPLEY:  And Judge, the last -- well it's not

4 the last.  The next paragraph which is now 104 -- I'm sorry,

5 108.

6        In the very beginning, the Court is approving

7 certain of the field documents.  And we need to insert the

8 Coosa (phonetic) implementation agreement into I in the

9 whole and then following in.

10       That document by its own terms requires Court

11 approval.  And of course Section 363 would require to be

12 approved.

13       So again, we've provided comments to the Weil

14 team.  So right after "approves the" and before "Coosa

15 definitive documents" we would insert "Coosa Implementation

16 Agreement and."

17       And then just that same insert "Coosa

18 Implementation Agreement and" would fall in the same place

19 in two ii in two different places.

20       And again, I'm glad to work with Mr. Carlson off

21 line, but we had provided that change yesterday.

22       MR. CARLSON:  That change is fine with the

23 Debtors.  I think the other ones -- the other changes you

24 discussed we'll have to discuss separately off line, but

25 that one is fine.

1        MR. RIPLEY:  Sure.  Appreciate it.  Thank you.

2   And then the last is what is now paragraph 106.  Judge there

3   are a couple of interests that are being acquired by Newco

4   Credit Bid Purchaser.

5        And those interests are riding through and would

6   be permitted encumbrances.  So to make that clear at the

7   very end of the paragraph --

8        THE COURT:  I think this must not be 106.  What

9   paragraph are you in?

10        MR. RIPLEY:  I'm sorry, it's now 110.  My

11   apologies, Judge.

12        THE COURT:  That's okay.

13        MR. RIPLEY:  Toggling between the old and the new.

14   So at the very end, that last clause should -- we think the

15   easiest fix "shall be" -- this is a defined term -- "credit

16   bid permitted encumbrances."

17     (Pause in the proceedings.)

18        MR. RIPLEY:  I don't think there's any dispute

19   because these are riding through.

20     (Pause in the proceedings.)

21        MR. CARLSON:  That change is fine as well, but I'd

22   like to just confirm with others.  I know these paragraphs

23   have been very heavily negotiated.

24        MR. RIPLEY:  There's another way to fix it.  But

25   we thought this was the simplest way to do it Judge just to

1  make sure.

2        THE COURT:  All right, then let's move ahead.

3        MR. RIPLEY:  Thank you Judge and thank you

4  Mr. Carlson.

5        THE COURT:  Thank you.  So I think we were going

6  to talk about 111 to 118 on the EIN deal and said we would

7  back to that, which we're there now.

8        MR. DENDINGER:  Yes, Your Honor, again for the

9  record -- sorry Mr. Carlson.

10        MR. CARLSON:  No, go ahead Mr. Dendinger.

11        MR. DENDINGER:  I apologize for interrupting,

12  Mr. Carlson.  Again, for the record Mark Dendinger from

13  Bracewell for EIN.

14        Your Honor, these paragraphs, 111 to 118, are the

15  paragraphs that I referenced that were of concern.

16        Just for Your Honor's benefit these paragraphs

17  other than the new change in 118 -- which I think is an

18  asset change -- these were included in the form of

19  implementation agreement that was filed with the Court as

20  part of the Plan supplement.

21        That was filed on June 15th at docket 1562

22  approximately nine days ago.  So again, this has been a

23  matter of public record for some time.  I believe how

24  they've been woven into the Confirmation Order is -- if

25  there are any changes to what was in the implementation

1 agreement they simply are conforming comments and/or I've

2 additional changes to make it read well and in accord with

3 other defined terms in the Confirmation Order.

4        So these have been substantially and heavily

5 negotiated at good faith as part of all of the EIN

6 definitive documentation.  And so I just want to put those

7 comments on the record.

8        With regard to the new change in 188 -- which

9 appears in the redline -- this is -- this was included in

10 the form of implementation -- not included in the form of

11 implementation agreement.  It was included last night and is

12 included in the execution now of the implementation

13 agreement.

14       And I believe ought to allay the concerns of the

15 bonding company.  This was really meant to provide comfort

16 language to both parties -- my client as obligee and the

17 bonding company -- that there's nothing about the Plan, this

18 Order or the transactions contemplated effectually under the

19 Plan are going to modify rights with regard to the specific

20 bond.

21       And that was included, Your Honor, in some regard

22 because of the recently filed lawsuit against my client.

23       THE COURT:  Thank you, Mr. Dendinger.  Any

24 objection to that?

25    (No audible response.)

1           THE COURT:  All right, good.  Let's move ahead.

2           MR. CARLSON:  Your Honor, the next paragraphs 119

3   through 124 are paragraphs that negotiated with Hunt as part

4   of the settlement that was reached with them.

5           I believe we are agreed on these paragraphs as

6   well and we'll let Mr. Chiu confirm.

7           THE COURT:  Mr. Chiu?

8           MR. CHIU:  Good afternoon, Your Honor.  Kevin

9   Chiu, Baker Botts on behalf of Hunt Oil Company just rising

10  to confirm Mr. Carlson's statements with regards to the

11  language in the Confirmation Order on paragraph 119 through

12  the remainder of the Hunt provisions ending at currently

13  paragraph 126.

14          With respect to some of the outstanding items that

15  we spoke of early on during that period, this language will

16  be reflected in the Hunt agreement that Mr. Carlson alluded

17  to earlier today.

18          We do ask that given the sort of placeholder

19  bracket that's in place at 118 right now, that the term

20  agreement be filed prior to the next turn of the

21  Confirmation Order so that the docket number can be filed in

22  properly and reflected accordingly.

23          When we did receive confirmation from Mr. Carlson

24  and his team earlier today and with regards to the Plan

25  supplement documents that we alluded to earlier, and those

1   will be hopefully updated accordingly to reflect the

2   allocation of certain properties under the Hunt turnkey

3   agreement and the Hunt term sheet with respect to Fieldwood

4   Three and the abandoned properties.

5          Other than that, we certainly reserve our rights

6   to any changes in this language with respect to Hunt if

7   there are any further movements in the next turn, but I

8   believe we are fully resolved on these issues.

9          THE COURT:  Mr. Chiu, thank you.

10         Mr. Carlson?

11         MR. CARLSON:  Yeah I can confirm the changes we

12  discussed to the schedule, fuel and gas schedules and the

13  intention to finalize and file the turnkey agreement.

14         THE COURT:  Thank you.  So that takes us to Exxon,

15  right?

16         MR. CARLSON:  That's right.  And these

17  provisions -- we'll let Ms. Rosen address --

18         THE COURT:  Ms. Rosen, good afternoon again.

19         MS. ROSEN:  Thank you, Your Honor.  Suki Rosen on

20  behalf of XTO entities.  I think we're fine until we've got

21  one small nit when you go down to paragraph 127, romanette

22  V.

23         Those changes are fine except for the change from

24  the or to an and.  Basically all of our respective rights

25  and obligations we want them to be referred as they are

1  under the terms of the contract or applicable law.

2         I don't know if we have any rights, you know,

3  offset or recoupment that arise under applicable law that

4  don't arise under the contracts.  But we'd rather have that

5  be in the disjunctive instead of the -- instead of requiring

6  it to be both.

7         And I'm not sure why that change is there.  When I

8  look through the remainder of the proposed Confirmation

9  Order it's in the disjunctive in paragraph 142 and so I'm

10  just -- I'm not sure why that was changed to an and.

11         MR. CARLSON:  Well, Your Honor, I think it's --

12  well it wasn't in 142 I think we meant to have it as and in

13  there, but I think from our perspective that any netting

14  rights that are going to be asserted should be in accordance

15  with law and the contract and the F4 contract.

16         THE COURT:  Well let's assume that they have an

17  agreement.  It's allowed by applicable law, but not

18  addressed by the contract.  That's her argument.

19         MR. CARLSON:  I guess I don't -- in my mind it

20  still would need to be consistent with the terms of the

21  agreement.  It couldn't override what the terms of the

22  agreement provide for.

23         THE COURT:  So let's change the and to an or.  And

24  after the word law, put in a parenthetical that says in a

25  manner that is consistent with the contract.  That is not

1   inconsistent with the contract, I guess.  Because if it's

2   missing from the contract, we're going to use applicable

3   law.

4           If it's in both the contract and applicable law,

5   we're going to use the contract.  So just include the

6   parenthetical that says unless it's inconsistent with the

7   contract.

8           I assume that works for you, Ms. Rosen; is that

9   right?

10          MS. ROSEN:  I think that's fine, Your Honor.

11  Thank you.

12          THE COURT:  That work for you Mr. Carlson?

13          MR. CARLSON:  Yes that works for us.

14          THE COURT:  Thank you.  What do you have next?

15          MR. CARLSON:  From there, Your Honor, --

16          THE COURT:  Go ahead.

17          MR. CARLSON:  -- from there we go to BP language

18  which is 135 through 138.

19          MS. ROSEN:  Oh, I'm sorry to interrupt,

20  Mr. Carlson, but there were a couple of other changes that

21  were made to paragraph 129.  That was some language that had

22  been provided to XTO from our surety counsel.  And we

23  certainly wanted to make sure -- we haven't had an

24  opportunity to discuss that with counsel for the sureties.

25  I know Mr. Scharfenberg and Mr. Bain and Mr. Langley are

1  both on and so I wanted to see if they had any comments to

2  those changes.

3          UNKNOWN:  Yeah, from our wise perspective we don't

4  have an issue with those changes, thank you.

5          THE COURT:  Does anyone have any objection to

6  those changes?

7          MR. BAINS:  This is Brandon Bains.  I'm looking at

8  those now.  Your Honor, I don't really see any objection to

9  those.

10          THE COURT:  Thank you.   All right.

11          MS. ROSEN:  Thank you, Your Honor.

12          THE COURT:  Let's go to BP.

13          MR. CARLSON:  So, Your Honor, I understand did

14  have a conversation with Mr. Burrer last night.  Encore

15  resolved on this language.  She did point out that I was

16  missing a few of the BP entities in the defined terms of the

17  BP entities, but otherwise my understanding is we're agreed

18  on the language, but we'll let Mr. Burrer address the Court.

19          MR. DUEWALL:  Good afternoon, Your Honor.

20          THE COURT:  I'm not sure if we have Mr. Burrer --

21  okay go ahead please.

22          MR. DUEWALL:  Good afternoon, Your Honor, Craig

23  Duewall with Greenberg Traurig on behalf of BP.

24          When BP made it's opening statements to the Court

25  on Monday, BP identified important commercial issues that it

1  sought to protect and preserve and hopefully if given the

2  opportunity could resolve those before the end of the week.

3         I'm pleased to inform the Court that with the

4  additional time provided, the Debtors have incorporated the

5  language in the Order that addresses the concerns, the

6  commercial issues that BP raised.  It's my understanding

7  that the language confirms that BP's opted out of a third

8  party releases.

9         The language confirms that BP's set off rights are

10  reserved and preserved, which is the subject of the motion

11  at docket entry 1666 is set for hearing the set off -- the

12  motion to lift stay related to set off that's set for July

13  16th.

14         And it is further my understanding that the

15  language confirms that BP's arbitration rights are reserved

16  and preserved which the subject of BP's pending motion to

17  lift stay, related to arbitration at docket entry 1414.  And

18  that's set for hearing on July 9th.

19         So having said those things, Your Honor, it's my

20  understanding that the language does reflect the parties

21  understanding.  Mr. Burrer, I believe, has one issue related

22  to footnote 13 that he wanted to address the Court about.

23         MR. BURRER:  Thank you, Your Honor.  Karl Burrer

24  for BP.  As Mr. Carlson correctly stated footnote 13, we're

25  just catching the BP entities.  And hearing the colloquia

1  between Mrs. Rosen and the Court, I didn't interpret the and

2  versus or issue as she did.

3         But given the change in the and or or, and new

4  paragraph 133, romanette III, we'd request that language as

5  well just to avoid any conclusion which is the same and or

6  or on the nettings contract first applicable law.

7         MR. PEREZ:  Your Honor, may I be heard?

8         THE COURT:  Go ahead Mr. --

9         MR. PEREZ:  Yeah, Your Honor, I was going to raise

10  my hand, but I don't think we can agree to that change.  I

11  think that, you know, this is the discussion that we talked

12  about.  This is when you heard testimony about we take very

13  different view.

14         So, I think that that change with respect to this

15  provision, you know, it has a material impact or a potential

16  material impact or a potential material impact.  And I don't

17  think we agree to that.

18         And, Your Honor, I'm a little concerned as to

19  what's happening here is we negotiated things with

20  everybody.  Now that everybody's seen the Confirmation

21  Order, it's like they want an MSN.

22         And so at some point, you know, we negotiate

23  things, we put them to bed and now people are saying oh

24  somebody else got something better and I want it.  And at

25  some point we just have to stop that.

1      But I would -- this is language we negotiated, we

2  reached an agreement.  And I think --

3      THE COURT:  Let me catch up with the language.

4  Mr. Burrer, where is the particular language that you're

5  talking about?

6      MR. BURRER:  It is 133, romanette III.  And the

7  only request that I would have to the language change is

8  just the parties understanding that the contract has to say

9  "set off" and you have to have the right under the law.

10  Even if the law doesn't say your contract must have the word

11  set off in it in order to exercise the set off.

12      I didn't read the and as requiring that.  It was

13  solely based on the statements from Ms. Rosen that she

14  thought it could be read in that manner.

15      So if the applicable law gives me the right for

16  set off, but my contract doesn't say set off, I've got that

17  right under applicable law, I think that should be

18  preserved.  And that shouldn't create a barrier that doesn't

19  exist under applicable law.

20      MR. PEREZ:  Well it is pursuant to applicable law

21  and as a contract doesn't prohibit it, that's one thing,

22  Your Honor.  But again we're basically arguing that -- later

23  on --

24      THE COURT:  So, hold on.  First of all, Mr. Perez

25  this is just a problem having to do it in a Confirmation

1    Order.  And once one person gets something, it can effect

2    somebody else's rights where they need to come in because if

3    you have inconsistent paragraphs another Court may interpret

4    those differences as having meaning.

5           So I'm overruling your statement that people can't

6    speak up just because they agreed to something if it's based

7    on another change.

8           Second, let's use the same language we used.  If

9    applicable law isn't consistent with the contract, the

10   contract will govern.  But if it is not inconsistent with

11   the contract, they can do it under applicable law.  The same

12   language we used before.

13          I'm going to overrule the Debtor's objection.

14          MR. PEREZ:  Your Honor, one more comment.  I

15   understand the Court has ruled.  But then we also have to

16   put unless there's no course of dealing to that effect.

17   Because in essence, you know, what is -- if there's a course

18   of dealing under the contract that's one thing.

19          It may not be perfect and it may not be prevented

20   by the contract or prohibited by the contract, but if

21   there's a course of dealing, you know, we also want to be

22   able to make that argument here.

23          So, if we're going to put --

24          THE COURT:  You can make that argument under

25   applicable law.  But if it's inconsistent with the contract,

1  it may be different.  I'm not going to change the language

2  again.  Thank you.

3          What do you have next, Mr. Carlson?

4          MR. CARLSON:  Your Honor, from there after the BP

5  paragraphs, we go to the Nippon language and 139 through

6  142.

7          I believe there is a -- I think as Ms. Rosen

8  pointed out there was that same and applicable law where we

9  had it differently here.  I'm just trying to find where that

10  is, but aside from the one change where we want to conform

11  to the Court's ruling on the BP and XM language, I think

12  we're other wised agreed and we'll let Ms. Moses confirm.

13          THE COURT:  Ms. Moses?

14          MS. MOSES:  Thank you, Your Honor.  That is

15  correct.  Right now the Order has all of the changes that we

16  negotiated with the Debtors.  To the extent they're going to

17  want to add any other language in based on the recent

18  conversation, we'd just like to see it to make sure it

19  works.

20          THE COURT:  Thank you.  All right, let's go to

21  McMoRan.

22          MR. CARLSON:  There is also a (glitch in the

23  audio) and LLOG in between those two.  I don't think -- I

24  don't think there's any open issues from our perspective.

25          The only thing I would say for LLOG is setting a

1   hearing date to review the dispute that I think you got a

2   preview of from Mr. Baay.

3           MR. BAAY:  I thought that was set, Your Honor, on

4   the 8th.

5           MR. CARLSON:  Oh, my apologies that's right.

6   Yeah.

7           THE COURT:  I thought we actually set it and we

8   ought to go ahead and put that date in there.

9           MR. CARLSON:  Yes, we'll put that.

10          THE COURT:  Thank you.  I don't remember when we

11  set it for.

12          MR. BAAY:  July 8th, Your Honor.

13          THE COURT:  Okay.  Thank you.  All right.

14          MR. CARLSON:  And then from there, Your Honor, we

15  go to the background language which --

16      (Pause in the proceedings.)

17          MR. CARLSON:  I think some parties are signed off

18  on and some may not have.  So I don't know if you want to

19  just allow folks to -- if there are objecting parties to

20  this language let them speak up.

21      (No audible response.)

22          THE COURT:  All right, I don't see anyone seeking

23  to speak about them.  Go ahead.

24          MR. CARLSON:  Great.  Then from there we go to

25  146, the Shell language.  Reserving rights with respect to

1   the Shell bond.  I believe we're also agreed on this with

2   Shell and Shell's counsel.  But Shell's counsel can correct

3   me if I'm wrong about that, Mr. Manns.

4           THE COURT:  All right go ahead, please, Shell.

5       (Pause in the proceedings.)

6           THE COURT:  Mr. Zuber, your line remains open, go

7   ahead.

8           MR. ZUBER:  Thank you, Your Honor.  Your Honor, we

9   thought we had an agreement with all parties with respect to

10  the Shell free and clear and there being no impact upon post

11  effective date subrogation rights.

12          And I'm not sure we have that agreement anymore.

13  So I just wanted to be clear for the record just to make

14  some arguments and have the opportunity to create that

15  record.

16      (Pause in the proceedings.)

17          MR. ZUBER:  Your Honor, it's our client's view

18  that this Debtor cannot sell the Credit Bid Purchaser free

19  and clear of future subrogation rights.  There's no

20  provision of Section 363(f) that would allow that.

21          That's one provide that it can be free and clear

22  of interest, it's applicable non-bankruptcy law permits the

23  sale to the contrary non-bankruptcy law as set forth in

24  the -- by US Supreme Court in Pearlman versus Alliance

25  Insurance Company at 371 US 132.

1          It states that there are a few doctrine that are

2  established than a surety that pays the debts of another is

3  entitled to all the rights of the person he paid to enforce

4  his right to be reimbursed.

5          So I don't think applicable non-bankruptcy law

6  permits the sale free and clear of future rights.  Two, such

7  entity contends.  The sureties have not consented.

8          Three, the interest is a lien and the price of

9  which such property to be sold is greater than the aggregate

10  value of all liens on the property.  Future subrogation

11  rights are not liens.

12          Four, such interest in a bonafide dispute.

13  There's no dispute at this point about subrogation rights

14  which are not yet even arisen.

15          And five, such entity could be compelled to hold

16  legal or equitable proceedings to accept the money

17  satisfaction.  By their very nature subrogation rights are

18  equitable rights and therefore there could be no money

19  satisfaction to collect the surety.

20          Your Honor, we respectfully submit that a 363 sale

21  cannot be seen clear of future claims and rights such as

22  subrogation rights.  With that proposition, I would

23  respectfully direct the Court's attention to the matter of

24  Mooney Aircraft, 730 F2d 367, Fifth Circuit 1984.  Similarly

25  in re Oil Style Plastic 227 BR 797 which is a case out of

1  the Western District of Michigan.  And <u>Ninth Avenue Remedial</u>

2  <u>Group versus Alice Chalmers</u>, 195 BR 716.

3        All of which states that a sale free and clear

4  does not include future claims that does not arise until

5  after conclusion of a bankruptcy proceeding.

6        From a factual standpoint, Your Honor, Credit Bid

7  Purchaser will acquire assets and then immediately is

8  required to comply with all applicable laws due to

9  decommissioning on those assets and the leases that it takes

10  over.

11        If they were to default in the future down the

12  road five years from now, the obligee will make the claim

13  against the surety on its bond, on the field bond as a

14  predecessor owner operator.

15        The surety would then have the legal right to step

16  into the shoes of both the principal Fieldwood Energy and

17  the obligee and go against the defaulting entity, here the

18  Credit Bid Purchaser.

19        The Credit Bid Purchaser says that it can and it

20  will perform its legally required decommission obligations.

21  If it takes over the leases it has to perform going forward.

22        If it does not, the sureties are called upon to

23  pay, the sureties must have the rights under non-bankruptcy

24  laws to step into the shoes of the obligee or the principal,

25  including the Federal Government.

1          Subrogation is a creature of equity.  The credited

2    purchaser does not perform, equity requires that anyone that

3    steps up and performs the Credit Bid Purchaser obligation be

4    entitled to reimbursement from the Credit Bid Purchaser.

5          This is especially important in this case, Your

6    Honor, because the Credit Bid Purchaser is a special purpose

7    entity.  It is not a long term entity.

8          It may pull as much money out of the operation as

9    it can and then default and then file bankruptcy, leaving

10   the surety holding the bag.

11         This Court should require the credited purchaser

12   to set aside funds to decommission.  It makes no sense,

13   respectfully, to my clients that the credit bit purchaser

14   could take all the leases, derive revenue, not meet its

15   legal obligations to perform and have a surety pay and do so

16   and leave the surety with no remedy.

17         If the Credit Bid Purchaser wants to acquire these

18   assets, it must accept the burdens along with benefits.  The

19   loan proposes decommissioning obligations on lease holders.

20   That obligation cannot be excused under a bankruptcy plan

21   filed by others.

22         And if the entity that seeks to acquire leases

23   from an insolvent entity does not perform its statutory and

24   regulatory obligations, the surety must satisfy those

25   obligations.  It must be able to step into the shoes of the

1  obligee and assert rights against the defaulting Credit Bid

2  Purchaser.

3          Very, very briefly, Your Honor, if the sureties

4  lose their subrogation rights, they arguably will lose their

5  rights of contributions from jointly and several liable

6  parties such as predecessors.

7          Which requires, in order to preserve those

8  contribution rights, that the surety stand in its shoes of

9  others, in this case the obligees and the principals.

10          It would be very bad public policies, we submit,

11  Your Honor and may very well destroy surety credit in the

12  Gulf of Mexico.  Subrogation is essential the surety market

13  place.

14          If this Court is going to allow an oil and gas

15  company to declare bankruptcy, assign or sale its leases to

16  another party that has then the right to extract oil and gas

17  without the need to comply with the law and take

18  responsibility as set forth in the law for all

19  decommissioning obligations not only would that fly in the

20  face of applicable law, but it would end the surety market

21  for the bonding.

22          It will cripple both smaller operators who rely on

23  surety credit that they would be unable to provide the

24  financial assurance required by law but it would also

25  cripple the ability of current operators to transfer

1    leasehold interest.

2         Bonds were issued on the assumption that the law

3    would be enforced and that those who would choose to extract

4    revenue based upon the bond and obligation, it would be

5    obligated to decommission all structures then in existence

6    and those structures that they install.

7         If they do not want to do that, then they have the

8    right to extract -- then they do not have the right to

9    extract as a matter of statute and regulations.

10        All the sureties are saying is that the Credit Bid

11   Purchaser must comply with the law and if it chooses to

12   acquire leases that does not excuse them from the obligation

13   to comply with the law.

14        And if in the future they fail to -- excuse me

15   Your Honor.  And if in the future they fail to do so, and

16   the surety has to pay for the failure to do so, the sureties

17   rights, whatever those rights are, must be preserved.

18        If the secured creditors don't want to comply with

19   the law, they don't have to acquire with these leases and

20   they should be sold to those who are willing to comply.

21        Your Honor, in this particular case the Credit Bid

22   Purchaser essentially is -- the equity is owned by the

23   pre-petition lenders.  If those lenders wanted to protect

24   their rights, they could have foreclosed their security

25   interests under non-bankruptcy law and taken over the

1  operations and these assets.  In that case, they would not

2  be excused and not be protected from the surtey subrogation

3  rights.

4       The whole point of surety as explained by the

5  Supreme Court is that if a surety sustains a loss, then it's

6  subrogated to the rights of the obligee to reimbursement and

7  all parties who own such reimbursement obligations.

8       And if it acquires leases and doesn't perform

9  statutory obligations in the future, there is no provision

10  of the Plan that should exonerate them from the financial

11  responsibilities that accompany their right to extract

12  revenue -- to extract minerals in the Gulf.

13       Bankruptcy is not a license for assignees to not

14  comply with the law with respect to future activities.  That

15  is not the purpose of free and clear dictates of the code.

16       The purpose to free and clear under 363(f), we

17  submit, is to allow a fresh start so that the buyer is not

18  encumbered by the seller, Debtor pre-petition obligations.

19  If there is a pre-petition blanket lien on assets of the

20  Debtors and the Debtor sells to a third party, of course

21  they shouldn't be saddled with the liens and encumbrances on

22  the property that they acquire.

23       But once they acquire that property and they move

24  and they're required to comply with the law, it's

25  inappropriate, Your Honor, that they should be -- get a free

1  pass and not have to be responsible for their legal

2  obligations.

3         So, Your Honor, so to the extent -- and I know

4  you've already ruled on this, -- but to the extent the Court

5  rules against this or my argument has not persuaded the

6  Court to reconsider this issue, we would just ask that the

7  Plan Confirmation Order not contain waivers of rights under

8  Bankruptcy Rule 320(e).

9         We would ask the Court to not stay -- to stay this

10  order for 14 days and not waive that as to Rule 320(e) and

11  if the Court is not inclined to do that, we would ask for a

12  stay pending appeal so that we make sure that we don't have

13  any negative impact of Section 363(m).  Thank you, Your

14  Honor.

15         THE COURT:  Thank you.  Is there any evidence that

16  there was another buyer that would buy and would in fact

17  perform all the P&A and error obligations?  Because I don't

18  recall any evidence to that effect.

19         I don't recall your client bidding and they could

20  have as well.  Did anyone make the bid that you're talking

21  about under the evidentiary record that's before us?

22         MR. ZUBER:  You know, the Credit Bid Purchaser and

23  lenders chose to go down this path.  The could have

24  foreclosed their security interests under non-bankruptcy --

25         THE COURT:  I'm asking on the evidentiary record

1   that you helped create, is there any evidence that there was

2   anyone that was willing to do what you suggested would be a

3   better alternative?

4           MR. ZUBER:  Not that I'm aware of, Your Honor.

5           THE COURT:  Okay.

6           MR. ZUBER:  But I respectfully submit that that

7   doesn't excuse the requirements to comply with the law.

8           THE COURT:  Well, I mean there's just no evidence

9   to support the theory.  Here's the problem.  The bonds are

10  not being sold free and clear of liens, claims and

11  encumbrances.  The assets are being sold free of liens,

12  claims and encumbrances.

13          So the 363 cases that you're worried about, there

14  is no sale of your bond.  If your bond was being sold, it

15  would be a completely different question.  The bond is not

16  being sold.  The assets are being sold.

17          MR. ZUBER:  The bonds --

18          THE COURT:  I'm making my ruling now.  The assets

19  are being sold not the bond.  The sureties took credit risk

20  when they issued the bonds.  It is not that they are without

21  a principal to pay, they have a principal to pay.  That

22  principal they can file a proof of claim against and that's

23  the Fieldwood entity that induced them to issue the bonds.

24          And they will be repaid their prorated share as an

25  unsecured claimant for any allow claim that they file.  So I

1  find the argument that the sureties are being stuck to be

2  the same as any other unsecured creditor that says that they

3  are stuck.  There is no question in my mind but that the law

4  allows the sale free and clear.

5          With respect to compliance with applicable law,

6  under Midlantic -- I'm going to go back to where we were.

7  The Bankruptcy Code allows the sale of assets free and

8  clear.  The Bankruptcy Code allows the abandonment of assets

9  all together.

10          And if the Court had ordered either of those two

11  alternatives without an environmental remedy, the sureties

12  would have had to have paid.

13          Accordingly, once the Government and the exercise

14  of its discretion with respect to its regulatory power and

15  they are the ones charged with protecting the environment

16  not the sureties.

17          Once the Government determines that it does not

18  object to the process that is being followed, the sureties

19  do not have the private right to assert performance under

20  various environmental obligations.

21          I am recognizing that we are, in fact, doing more

22  regulation than we are required to do absent Midlantic.

23  Because without Midlantic, we could just do this.  With

24  Midlantic, we give the regulators ability to assure that the

25  environment is protected.

1         With respect to the argument that the market for

2    surety ship will dry up, I'll say a couple things.  First,

3    there is zero evidence to support that argument.  None.  And

4    if there was evidence of that, somebody should have put it

5    in and to the extent that we are going to deal in

6    speculation, you know, this isn't the first time I've ruled

7    this way.  I've ruled this way before.

8         And guess what, surety bonds kept coming on into

9    the Gulf of Mexico.  There's a new surety bond in this case

10   that's coming in after I've already ruled this way before.

11        I am overruling, once again, a sureties argument

12   that we are going to saddle a purchaser with a pre-effective

13   date error obligation or that they will have the right to

14   assert obligations that existed pre-effective date based on

15   post-effective date ownership.

16        That is part of the exculpation that we are

17   granting and we are doing so because of Midlantic and the

18   need to protect the environment.

19        So the objection is overruled.  With respect to

20   motion to stay pending appeal.  If your client wants to file

21   an appeal, they may.  I have not yet gotten any portion of

22   the Order that has me waive 3020.  And when we get down

23   there, I'll listen to the argument there as to whether there

24   ought to be a waiver.

25        If an appeal is filed and if you want a stay

1  pending appeal, I'll take that up and see what kind of

2  evidence you can adduce in support of that.

3          I don't know what it would be.  I mean, maybe you

4  can show me some environmental harm that would come about.

5  Your clients have an unsecured claim.  They're an unsecured

6  claimant.

7          That's what we're dealing with.  But I'm not

8  inclined to rush this through.  So we'll see where we go on

9  that.

10          Yeah, go ahead Mr. Zuber.

11          MR. ZUBER:  Can I get some clarity on --

12      (Pause in the proceedings.)

13          THE COURT:  Go ahead Mr. Zuber.

14          MR. ZUBER:  Your Honor, can I get some clarity on

15  the impact of your ruling on contribution rights?  I mean,

16  those have nothing to do with the Credit Bid Purchaser.  But

17  if our subrogation rights are impaired or go away, we then

18  arguably would be loosing our rights to contribution against

19  other joint and several liable parties who are not the

20  Credit Bid Purchaser and are not buying free and clear of

21  liens and claims and interest.  So I just want --

22          THE COURT:  I am -- it is has not been my intent

23  and I have never suggested that I was effecting contribution

24  rights.  What is happening to you is happening over your

25  objection and involuntarily.  You are not waiving any rights

1  here.  You're asserting them.  I'm overruling them.

2         You keep your claim against the principal fully.

3  Presumably that will be vindicated through a proof of claim.

4  But I'm not suggesting that contribution rights as against,

5  for example, co-sureties or co-predecessors wouldn't exist

6  unless there is a provision in the Plan that specifically

7  holds to the contrary.  And I don't -- generally there is

8  not.

9         All right.

10        MR. ZUBER:  Thank you, Your Honor.  I appreciate

11 it.

12        THE COURT:  Mr. Manns, let me get your line open.

13 Go ahead, Mr. Manns.

14        MR. MANNS:  Good afternoon, Your Honor.  Ryan

15 Manns on behalf of Shell Offshore, Inc.  Shell is agreeable

16 to paragraphs 145 and 146.  Thank you very much.

17        THE COURT:  Thank you, Mr. Manns.

18        MR. SCHAIBLE: Your Honor, Damian Schaible, may I

19 be heard briefly?

20        THE COURT:  I'm sorry, who is that?

21        MR. SCHAIBLE:  This is Damian Schaibel from Davis

22 Polk.

23        THE COURT:  Mr. Schaible, go ahead.

24        MR. SCHAIBLE:  Sorry, I'm very sorry to do this,

25 Your Honor.  It's just your so kind in being -- digging into

1    the words with us.

2         May I ask Your Honor to just go back to paragraph

3    127 whenever convenient now or later?

4         THE COURT:  We will.  At some point, though, I

5    want to look at the provision Mr. Zuber was concerned about

6    which was whether we were going to do something

7    precipitously that might cut off his clients appellate

8    rights.

9         So let's look at 127, but I don't want to forget

10   to go back there.

11      (Pause in the proceedings.)

12         MR. SCHAIBLE:  Yes, Your Honor.  This is the

13   XTO -- this is the XTO language that Your Honor was just

14   talking about.  The assumption -- assumption and assignment

15   and allocation language that Mr. Perez was talking to you

16   about where we changed the word and -- the and to or.

17         THE COURT:  Yes, sir.

18         MR. SCHAIBLE:  So, Your Honor, I'm not -- I

19   understand your ruling with respect to what Mr. Perez is

20   raising and I'm not asking for a wording change.

21         But I do want to just, if you don't mind, Your

22   Honor, just discuss on the record what we think this means.

23   The reason that we had put in and was because the concern is

24   there are multiple contracts, right.  And some of the

25   contracts the Credit Bid Purchaser is taking, some of the

1  contracts they're not taking.

2         And what we are -- our concern, limited concern,

3  was that there may be an argument that Exxon could step off

4  against or net against one contract that was taken vis-a-vie

5  another contract that wasn't taken.

6         And so we were the and pursuant to applicable law

7  was a reference to, you know, what effectively the effect of

8  this plan would be.

9         I do think that any valid netting solves the

10 problem as long as everyone sort of understands the point.

11 Which is you wouldn't have valid netting even if the

12 contract provides for cross contract netting if one of the

13 contracts was taken and one of the contracts was not taken.

14         And I just wanted to clarify our understanding on

15 the record.

16         THE COURT:  Thank you.  Look other -- and pursuant

17 to applicable law, you'll notice, does not say pursuant to

18 applicable non-bankruptcy law.

19         So, you know, there is this set off issue under

20 the Bankruptcy Code as to whether you could set off an

21 assumed contract versus an non-assume contract and that's

22 carried forward to another day.

23         MR. SCHAIBLE:  Correct, Your Honor, but my worry

24 is that we were talking about changing it or and so then it

25 could be well we are allowed to net under the contracts even

1   if we can't net under -- pursuant to applicable law.

2           And so I just wanted to clarify that if we're

3   going to make that change that it's valid netting under the

4   contracts.  And it wouldn't be valid --

5           THE COURT:  If it says "or" but you're trying to

6   off set effectively, you know, for lack of a better

7   description, but just sort of the shorthand of pre-petition

8   obligation versus a post-petition obligation.

9           That's part of applicable law too.  And so you

10  wouldn't necessarily be able to do it in that sense.  So I

11  think we're going to have to wait and see how the facts come

12  in.  But I've got your point.

13          MR. SCHAIBLE:  Okay, thank you Judge.  I

14  appreciate it.

15          THE COURT:  Thank you.  Let me see I've got

16  another person that wishes to comment.  Ms. Rosen, go ahead.

17          MS. ROSEN:  Thank you, Your Honor.  I agree with

18  the Court's comments.  I mean, with the language in there

19  then that issue is just reserved for another day.  I just

20  wanted to say on the record.  I didn't necessarily agree

21  with everything that Mr. Schaible said, but I do agree that

22  this is probably an issue for another day.

23          THE COURT:  Okay, thank you.  All right.  Hold on.

24      (Pause in the proceedings.)

25          THE COURT:  Mr. Carlson?

1          MR. CARLSON:  Thank you, Your Honor.  From there
2  we go to paragraph 147.  And this is intended to capture the
3  Court's ruling yesterday with respect to the Hess -- the
4  instrument Mr. Alaniz has raised.

5      (Pause in the proceedings.)

6          THE COURT:  Mr. Alaniz, do you see any problem?
7  Mr. Alaniz, I think I've got you now, go ahead.

8          MR. ALANIZ:  I apologize, Your Honor.  Omar Alaniz
9  on behalf of Hess Corporation.  We actually have negotiated
10 some updates to this language.  And I can walk the Court
11 through this or if anybody from Weil team wants to do it, I
12 think we have an agreement on -- they're very minor changes.

13         THE COURT:  Look if you-all have agreed on how
14 this works, I don't know that it's any problem at all for me
15 if you want to read it, that's fine.  If you just want to
16 put it in the final revision that's fine.

17         Same thing as I've said before.  I just want to
18 know that I don't have ambiguity in what it says.

19         MR. ALANIZ:  I don't and thanks, Your Honor.  I'm
20 happy to walk through it.  And we did have one source of
21 contention but I said I would just read a statement on the
22 record and then we can just kind of put that to bed.

23         In that first sentence where it says, "To the
24 extent Hess elects to assume."  Instead of possession and
25 operational control, we're going to insert the role of

1   decommissioning party.

2          And then the next sentence where it follows

3   abandoned properties we're going to add the "and any related

4   facilities" right after the abandoned properties reference

5   just to make the sentence flow a little bit better.

6          And then in that same sentence also it has -- the

7   previous language said "properties conveyed to the Debtors

8   by Hess."  But that's actually not factually true.  There

9   were some intermediate predecessors.

10          So we're changing the language conveyed to the

11   Debtors by Hess to owned by Hess so that's clearer.

12          And then in the next sentence, after "Hess

13   abandoned property"  or no I apologize.  "Hess abandoned

14   assets to Hess" we're going to insert a comma so that the

15   following phrase "and cooperate in good faith with Hess to

16   ensure such safe and orderly transition,"

17          I'm just trying to make sure that that phrase is

18   separated by commas.  And it may just be over lawyering, but

19   the next part of that sentence is very important to us.

20   It's part of this Court's ruling.  In compliance with

21   applicable federal law.

22          And I wanted to make sure that that was clear that

23   that modified the earlier part of the sentence which is the

24   safe and orderly transition in compliance with applicable

25   federal law.

1          THE COURT:  That's certainly what I intended to

2    say.

3          MR. ALANIZ:  And Your Honor I'm sorry?

4          THE COURT:  I said that's certainly what I

5    intended to say.

6          MR. ALANIZ:  Okay, thank you Your Honor.  And then

7    at the very end of the provision, the last three words say

8    have to abandoned properties.  I asked to add in connection

9    with such election.  And the Debtors were agreeable to that.

10          I had a sentence that followed that provision.

11    The Debtors were not agreeable to add that sentence which

12    was nothing here to limit the Court's ruling on June 23rd

13    with respect to these matters.

14          They are not agreeable to that addition.  And I'm

15    okay with that.  I just said I would read a statement into

16    the record and then I think we can be done.

17          THE COURT:  That's fine.  I'm not going to include

18    that language because I want it captured in the written

19    order.

20          MR. ALANIZ:  Fair enough, Your Honor.  Right after

21    the Court made its ruling yesterday, Mr. Perez appropriately

22    raised his concern that he didn't want the ruling to be

23    construed that the Debtors had to do something else like a

24    safe-out work.  And this Court confirmed.

25          And I'm just kind of worried about the opposite.

1  I'm worried that the Debtors could construe this ruling to

2  limit what the Debtors are obligated to do under 5.13 of the

3  Plan.  And, of course, also the properties need to be

4  transferred in the safe and orderly manner under any

5  scenario.

6        I just wanted to be clear that Hess hasn't been on

7  these properties for over 15 years and so as a general

8  proposition, we don't think it's safe to send out Hess

9  employees to properties prior to the expiration of the

10 transition period.

11       But we appreciate the Court's ruling in giving

12 Hess some protections in case circumstances present

13 themselves in which Hess may make the election in the

14 interest of health and safety.

15       And the only other item I wanted to clarify is

16 that we don't want the Debtor or the Government to think

17 that anything that's transpired in these bankruptcy cases or

18 this confirmation hearing suggests that Hess intends to take

19 over these properties.

20       There are other predecessors in the chain of title

21 and, you know, for example we've provided the Debtors and

22 the Government with information regarding some orphan

23 liability.  We have a dispute on that.

24       But -- and none of these are issues for the Court

25 today.  I'm sure all this will be sorted out post effective

1  date when we get the orders from BESSIE, but we just wanted

2  to be clear about these issues on the record.

3          And with that, I think we can move on.

4          THE COURT:  Thank you.  I appreciate the

5  statement.  Mr. Carlson.

6          MR. CARLSON:  The Debtor's are fine with the

7  changes that Mr. Alaniz just walked the Court through.

8          THE COURT:  Thank you.

9          MR. CARLSON:  And Your Honor, from there we go to

10  just the Government provision from 148 thru I believe it's

11  153.  My understanding is we are agreed with the Government,

12  but Mr. Balasko can confirm that.

13      (Pause in the proceedings.)

14          MR. BALASKO:  Good afternoon, Your Honor, Zack

15  Balasko for the Department of the Interior.  That is

16  correct.

17          THE COURT:  Thank you.

18      (Pause in the proceedings.)

19          THE COURT:  Can you take -- is there anything else

20  or can we go on down to the 320 issue?

21          MR. CARLSON:  The only thing that did change was

22  paragraph 149 which is captured --

23      (Pause in the proceedings.)

24          MR. CARLSON:  I think we just need to make a

25  conforming change to 513 -- the changes we made to -- sorry.

1          (Pause in the proceedings.)

2               MR. CARLSON:  We'll get back to the Court on that,

3     but there's one paragraph that changed here and we'll, of

4     course, run it by the Government to make sure they're

5     agreeable to it.

6               THE COURT:  Okay.

7          (Pause in the proceedings.)

8               THE COURT:  Where's the waiver of the 14 day

9     language in here?

10              MR. CARLSON:  Your Honor, the Debtors are not

11    seeking a waiver.

12              THE COURT:  Let me just hear from Mr. Zuber.  I

13    hadn't seen it in here, but if there's something in here

14    somewhere in here in the Plan that doesn't preserve your

15    full 14 day appellate right, I do want to know that.

16              Because as I said before I want to look at that

17    and understand why we would do something like that.

18              MR. ZUBER:  Yes, Your Honor.  I'm trying to find

19    it.  I do believe that there is waiver, 14 day status.  Let

20    me see if I can -- if Your Honor will bear with me for a

21    second.

22              MR. CARLSON:  Your Honor, Mr. Zuber is right.

23    There is a paragraph here on that.  I don't think that was

24    the intention.

25              THE COURT:  There it is.

1          MR. CARLSON:  Yeah, so my apologies there, but we

2   do not --

3          THE COURT:  Is there any reason we need that?

4   Let's take out --

5          MR. ZUBER:  Texas code?

6          THE COURT:  Yep, I'm going to sustain your

7   objection.  I haven't seen any evidence that we should waive

8   the 14 day stay and it's 168 is going to be deleted.

9          MR. ZUBER:  Thank you, Your Honor.

10      (Pause in the proceedings.)

11          THE COURT:  All right, does anyone else wish to

12   raise -- well let me, again.  All objections previously

13   raised and overruled remain previously raised and overruled

14   and need not be raised again.

15          But I did promise everyone that if we couldn't

16   work things out in the Confirmation Order, people would

17   still be able to raise objections today.

18          Is there anyone that wishes to raise an objection

19   where we haven't already ruled upon it?  And again, all of

20   your objection rights for appellate purposes, I'm not trying

21   to take those away.  If you raise an objection, overruled,

22   you don't need to raise it again.

23          I want to know something new that we haven't

24   addressed.

25      (Pause in the proceedings.)

THE COURT: All right. Well you're not going to get this done by 5:00. So let's figure out when we can come back tomorrow. And I think the issues expanded some from what I expected them to be.

Can we -- will you be ready by 10:00 o'clock in the morning, Mr. Carlson?

MR. CARLSON: Yes, Your Honor.

THE COURT: Okay, I want to -- let's see. I've got somebody else that has an issue with that. Let's see.

UNKNOWN: Your Honor, is there any possibility we could start earlier? Unfortunately I have an unavoidable conflict at 10:30.

THE COURT: How early would you-all be ready? Do you want to start at 8:00?

UNKNOWN: That would be great. Thank you, Your Honor.

THE COURT: All right. Mr. Zuber?

MR. ZUBER: Yes, Your Honor. I just wanted to make sure we had the opportunity between now and tomorrow so we can negotiate some language regarding the contribution rights preservation that Your Honor has ruled?

THE COURT: Of course. So and you can raise that in the morning if that doesn't get --

MR. ZUBER: Thank you.

THE COURT: I don't think there's anything there

1   that takes them away and so maybe that's where the focus

2   should be, but we'll see.  We'll continue until 8:00 in the

3   morning.

4           I've got from 773-263-2745.  Who do we have on the

5   phone.

6           MR. ZEIGER:  Yes, Your Honor, good afternoon.

7   It's Jeffrey Zeiger, Kirkland and Ellis on half of Atlantic

8   Martime Services.  Can you hear me okay, Your Honor?

9           THE COURT:  I can Mr. Zeiger.

10          MR. ZEIGER:  Thank you.  I promised yesterday if I

11  could just take 30 seconds to close the loop on our very

12  limited objection.

13          As Your Honor is well aware, the substantive

14  issues regarding the effect of the Plan of Reorganization of

15  the dispute between Atlantic and Fieldwood are the before

16  the Court in the Adversary proceeding.

17          There's been a couple of developments the last

18  couple of days that impact the adversary proceeding in what

19  I think is a positive way.

20          As Your Honor saw earlier, the Confirmation Order

21  now provides that to the extent Atlantic is successful on

22  its lien claims against the third parties, either the

23  Debtors or the Credit Bid Purchaser will reimburse the

24  working interest owners.

25          The Court also heard testimony from Mr. Gregg

1   (phonetic) that the Debtors have reserved $14 million on the

2   lien claims in the event that we are successful.

3           That eliminates some of the concerns the Court

4   heard at the end of our arguments on the motion to dismiss,

5   the motion for summary judgment regarding potential double

6   payment from the working interest owners.

7           Respect for the Plan itself, we voted to reject

8   the Plan and opted out of the leases.  We filed a very

9   limited objection to ensure that nothing in the Plan or the

10  related documents would negate out opt out rights from the

11  third party releases.

12          Based on the statements from the Debtors counsel

13  yesterday, principally Ms. Loui, we are comfortable that

14  nothing in the Plan is seeking to negate our opt out of the

15  third party releases.

16          Thank you very much, Your Honor.

17          THE COURT:  All right.  Thank you.  All right, the

18  hearing on confirmation is continued until 8:00 a.m.

19  tomorrow morning.

20          Let's take up the Motion for relief from the stay

21  and see if we want to continue that until 8:00 a.m. as well.

22      (Pause in the proceedings.)

23          MR. ZEIGER:  Yeah, I believe Mr. Caden (phonetic)

24  is going to handle that.

25          THE COURT:  Thank you.  Mr. Caden?

1          (Pause in the proceedings.)

2                THE COURT:  Hold on.

3                MR. CADEN:  Good afternoon, Your Honor. We're

4    comfortable proceeding with the lift stay motion at the

5    conclusion of tomorrow's confirmation hearing.  It is a long

6    week for the Court, 143 parties participating today and

7    we're happy to take it up at the end if that's convenient

8    for the Court.

9                Also happy to do it now if you prefer.

10               THE COURT:  No in the morning is fine.  I do have

11   an 11:00 o'clock hearing tomorrow that I'll need to be ready

12   for.  But beyond that we're good.

13               You're not anticipating needing very long, right,

14   Mr. Caden?

15               MR. CADEN:  No, Your Honor, quite frankly I think

16   it will be very short and brief.

17               THE COURT:  Thank you.  We'll carry it until in

18   the morning.  All right.  Mr. Carlson I'm not going to

19   finish today since I made fun of you for the way that you

20   handled PowerPoint.  It was a masterful job on the

21   Confirmation Order so far.

22               So I know there's still some more work to do.  But

23   you're better off being able to handle the Confirmation

24   Order than a PowerPoint.  So thank you for all the hard

25   work.

1          MR. CARLSON:  Thank you, Your Honor.

2          MR. PEREZ:  Your Honor, may I just respond real

3  briefly to Mr. Zeiger.  Your Honor, I don't we've waived

4  anything with respect to Atlantic.  I think that what we did

5  in our presentation was to indicate that even if we lost

6  there was sufficient amount to satisfy it.

7          So I think we made our evidentiary showing, but I

8  don't think it went to any issue regarding the merits or

9  anything like that regarding Atlantic.  So I just wanted to

10  make sure that the Record is clear on that.

11          THE COURT:  Thank you.  You've both made your

12  statements and they both are in the Record.  Thank you.

13          We're in adjournment until 8:00 in the morning.  I

14  do have a hearing that starts in 10 minutes.  We're going to

15  recess for 10 minutes and we'll return at 4:00 o'clock on

16  the *SpeedCast* hearing.

17          Thank you-all.

18      (The parties thank the Court.)

19      (Proceeding adjourned at 3:50 p.m.)

20

21

22

23

24

25                    *  *  *  *  *

1           I certify that the foregoing is a correct

2    transcript to the best of my ability due to the condition of

3    the electronic sound recording of the ZOOM/telephonic

4    proceedings in the above-entitled matter.

5    /S/ MARY D. HENRY

6    CERTIFIED BY THE AMERICAN ASSOCIATION OF

7    ELECTRONIC REPORTERS AND TRANSCRIBERS, CET**337

8    JUDICIAL TRANSCRIBERS OF TEXAS, LLC

9    JTT TRANSCRIPT #64187

10   DATE FILED:  JULY 1, 2021

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

IN THE UNITED STATES BANKRUPTCY COURT

FOR THE SOUTHERN DISTRICT OF TEXAS

HOUSTON DIVISION

| | | |
|---|---|---|
| IN RE: | § | CASE NO. 21-33948-11 |
| | § | JOINTLY ADMINISTERED |
| | § | HOUSTON, TEXAS |
| FIELDWOOD ENERGY, LLC, | § | FRIDAY, |
| | § | JUNE 25, 2021 |
| DEBTORS. | § | 7:59 A.M. TO 9:45 A.M. |

CONFIRMATION HEARING DAY FIVE (VIA ZOOM)

BEFORE THE HONORABLE MARVIN ISGUR
UNITED STATES BANKRUPTCY JUDGE

APPEARANCES:                          SEE NEXT PAGE

COURTROOM DEPUTY:                     TYLER LAWS

(Recorded via CourtSpeak; no log notes)

TRANSCRIPTION SERVICE BY:

JUDICIAL TRANSCRIBERS OF TEXAS, LLC
935 ELDRIDGE ROAD, #144
SUGAR LAND, TEXAS 77478
(281) 277-5325 (office)
www.judicialtranscribers.com

Proceedings recorded by electronic sound recording,
transcript produced by transcription service.

<u>APPEARANCES (VIA ZOOM)</u>:

FOR THE DEBTORS, FIELDWOOD
ENERGY, LLC:

WEIL GOTSHAL & MANGES, LLP
Clifford Carlson, Esq.
Alfredo Perez, Esq.
700 Louisiana Street
Suite 1700
Houston, TX 77002
713-546-5248

WEIL GOTSHAL & MANGES, LLP
Jessica Liou, Esq.
767 Fifth Avenue
New York, NY 10153
212-310-8817

FOR US DEPARTMENT OF THE
INTERIOR:

DEPARTMENT OF JUSTICE
John Zachary Balasko, Esq.
P.O. Box 875
Ben Franklin Station
Washington, DC 20044
202-514-7162

FOR APACHE CORPORATION:

HUNTON ANDREW KURTH, LLP
Robin Russell, Esq.
600 Travis Street
Suite 4200
Houston, TX 77002
713-220-4086

FOR THE AD HOC GROUP OF
SECURED LENDERS:

DAVIS POLK & WARDWELL, LLP
Damian Schaible, Esq.
450 Lexington Avenue
New York, NY 10017
212-450-4580

FOR EVEREST REINSURANCE
COMPANY:

CHIESA SHAHINIAN & GIANTOMASI
Darren Grzyb, Esq.
Scott Zuber, Esq.
One Boland Drive
West Orange, NJ 07052
973-530-2077

FOR TRAVELERS CASUALTY,
LIBERTY MUTUAL INS. CO.,
THE HANOVER INS. CO.,
AND XL SPECIALTY INS.:

LANGLEY, LLP
Brandon Bains, Esq.
1301 Solana Blvd.
Bldg. 1, Suite 1545
Westlake, TX 76262
214-722-7171

<u>APPEARANCES (CONT'D VIA ZOOM)</u>:

```
FOR ENI PETROLEUM US, LLC      BRACEWELL, LLP
AND ENI US OPERATING CO,       Mark Dendinger, Esq.
INC.:                          185 Asylum Street, 34th Floor
                               Hartford, CT 06103
                               860-256-8541


FOR NORTH AMERICAN SPECIALTY   LAW OFC OF T. SCOTT LEO, PC
INSURANCE COMPANY:             Ralph Kooy, Esq.
                               100 N. LaSalle St., Suite 51
                               Chicago, IL 60602
                               312-857-0910


FOR LEXON INSURANCE COMPANY:   HARRIS BEACH, PLLC
                               Lee Woodard, Esq.
                               333 W. Washington St., Ste. 200
                               Syracuse, NY 13202
                               315-423-7100


FOR COX OIL, LLC:              LOCKE LORD, LLP
                               Michael Kind, Esq.
                               111 S. Wacker Drive, Ste. 4100
                               Chicago, IL 60606
                               312-201-2392


FOR CHEVRON USA:               ANDREWS MYERS, PC
                               Edward Ripley, Esq.
                               1885 St. James Place, 15th Fl.
                               Houston, TX 77056
                               713-850-4200


FOR XTO OFFSHORE, INC.:        FORSHEY PROSTOK, LLP
                               Suzanne Rosen, Esq.
                               777 Main Street, Suite 1550
                               Forth Worth, TX 76012
                               817-877-8855


FOR CONOCOPHILLIPS COMPANY     LOCKE LORD, LLP
AND McMORAN OIL AND GAS, LLC:  Omer F. Kuebel, III, Esq.
                               601 Poydras Street, Ste. 2660
                               New Orleans, LA 70130
                               504-558-5155


FOR ATLANTIC MARITIME          LUGENBUHL WHEATON, ET AL.
SERVICES:                      Benjamin Kadden, Esq.
                               601 Poydras Street, Ste. 2775
                               New Orleans, LA 70130
                               504-568-1990
```

4

1          <u>HOUSTON, TEXAS; FRIDAY, JUNE 25, 2021; 7:59 A.M.</u>

2          THE COURT: All right.  Good morning everybody.

3     We're going to go back on the Record from yesterday's

4     confirmation hearing in Fieldwood.

5          Mr. Carlson, can you tell me where we are?

6          MR. CARLSON:  Good morning, Your Honor.  Cliff

7     Carlson on behalf of Fieldwood.  So, Your Honor, I think we've

8     made a lot of progress overnight.  We've continued to work

9     with the parties and I think we've narrowed the issues to

10    either three or four, three or four issues that we'll see and

11    we'll beat them up before we're through, and we may need just

12    a little bit of guidance from the Court on those issues.  But

13    we did, as you have up here, we did file the amended

14    confirmation order, and then we've also filed an Amended Plan

15    and blackline at 1731 and 1732.

16          But I think it's essentially in the order the Apache

17    provisions in Paragraph 82, the non-Apache sureties claim

18    reservation of rights that was the subject of a lot of

19    discussion yesterday, and Paragraph 97.  One potential issue

20    with the Chevron paragraph, and then to the extent that the

21    Court deems it necessary some type of -- the issue raised by

22    Mr. Bains I think at the end of the hearing regarding

23    contribution and whether any reservation of rights are

24    necessary there.

25          So in my mind those are sort of the four open issues

1       that we have.  Others can correct me if they think there's

2       anything else outstanding, but I think that's where we are.

3               THE COURT:  All right.  Well, why don't we -- I've

4       got somebody else that wants to be activated.  Hold on.

5           (Pause in the proceedings.)

6               THE COURT:  Oh, that was just you pressing -- after

7       I already had you activated.

8               All right.  Look, I think what's going to make the

9       most sense is let you walk us through, and as we get to areas

10      that people -- the areas you've just identified, or any other

11      area that anyone wants to talk about, people can press five

12      star and we'll hear what they have to say.  And on the ones

13      that you've just identified we'll obviously, you know, expect

14      it, but on others people may have other issues.

15              MR. CARLSON:  That works.

16              THE COURT:  So I notice that you changed Court to

17      Bankruptcy Court everywhere.  I assume nobody cares about

18      that.  There's a reference to Paragraph 149 that I believe

19      should be 150, but we'll get there in a moment.

20              MR. CARLSON:  Okay.

21          (Reviewing document.)

22              THE COURT:  I think that this reference in HHH, and

23      maybe we ought to have Mr. Balasko be the one to confirm it,

24      should refer to Paragraph 150 and not to Paragraph 149.  I may

25      be wrong about that.

6

1          MR. CARLSON:  That's very possible.  We did get that

2     comment from Mr. Balasko and I think the paragraph moved by

3     one, and that's the --

4          THE COURT:  That's what it looks like happened.  I

5     just want to be sure we get it right so.

6          Mr. Balasko, should that say 150 or 149?

7          MR. BALASKO:  Yes, Your Honor, that should be 150,

8     it looks like the paragraphs moved after I sent that change

9     over.

10          THE COURT:  All right.  Thank you.

11          MR. BALASKO:  And I apologize, Your Honor, that

12     change appears in one other spot, so it needs to be consistent

13     in both changes.

14          THE COURT:  I didn't get through the whole redline

15     before I had to come out, so that's the first place I found

16     it.

17        (Reviewing document.)

18          MR. CARLSON:  This is just a definitional change.

19          THE COURT:  All right.

20        (Reviewing document.)

21          MR. CARLSON:  And this would be the addition for

22     Mr. Skelton's client that we added in.

23        (Reviewing document.)

24          MR. CARLSON:  Your Honor, I think this may be the

25     first point of potential contention, but we may be resolved,

1      but I think this is the -- this is the Apache language that I

2      was referencing.

3                  THE COURT:  Okay.

4              (Reviewing document.)

5                  MR. CARLSON:  Because I think Ms. Russell had just a

6      change, I don't know if she would like to comment on whether

7      we're -- or whether there is an additional change here that --

8                  THE COURT:  Ms. Russell, good morning.

9                  MS. RUSSELL:  Good morning, Your Honor.  We have

10     minor changes to this which shifted it to the lender.  The

11     Debtor has signed off.  I don't think they are controversial,

12     but they are further modifications to the new language that

13     you have on the screen.  And we can read it or we can wait

14     until the end of the hearing, see if the lenders have had a

15     chance to reply to it.

16                 THE COURT:  Now's the time, so why don't you read it

17     in and let's see what the lenders think.

18                 MS. RUSSELL:  Okay.  So I'm going to begin with the

19     parenthetical other than with respect to any new co-entity.

20                 THE COURT:  All right.

21                 MS. RUSSELL:  Okay.  And I'll stop when I get to the

22     additions.  So --

23                 THE COURT:  And let me just say --

24                 MS. RUSSELL:   -- other than --

25                 THE COURT:   -- Ms. Russell, if it is easier for you

1     to display it, I can also just have your screen show up.  So

2     you can either read it or display, whichever one you want.  I

3     just want to resolve it.

4          MS. RUSSELL:  All right.  Let's see then if we can

5     display it.  I have it in an email, but I can maximize my

6     screen.

7          THE COURT:  Okay.  You need to accept sharing.

8          MS. RUSSELL:  All right.

9          THE COURT:  There we go.

10         MS. RUSSELL:  Right.  So legal fees here are in red.

11    The Fieldwood One entity has a subsidiary, Shelf, that will go

12    with it, so we needed to capture that this provision would

13    also apply to that subsidiary.  And then ii in bold is just a

14    further clarification.

15         THE COURT:  All right.  Are there objections to the

16    Apache proposed language?

17         (No audible response.)

18         THE COURT:  Mr. Zuber, I see you talking, I want to

19    be sure you're not talking to me, because I can't hear you.

20         (No audible response.)

21         THE COURT:  Mr. Schaible.

22         MR. SCHAIBLE:  Your Honor, we have no objection to

23    this language.

24         THE COURT:  All right.  If anyone has any objection

25    to this language, please press five star.

1          (No audible response.)

2          THE COURT:  All right.  I will incorporate the

3    language proposed by Apache into the confirmation order.

4    Thank you, Ms. Russell.

5          MS. RUSSELL:  You're welcome, Your Honor.

6          THE COURT:  We'll go back now to my screen and we'll

7    look at the redline again.  Okay.

8          (Reviewing document.)

9          THE COURT:  So I don't know that means.  Our order

10   deals pretty extensively with the affect of the order and

11   confirmation itself.  Does Everest's reservation of rights

12   mean that they are not bound by the order, Mr. Carlson?  Or

13   are they still bound by the order and subject to the order

14   whatever rights they have, they have?

15         MR. CARLSON:  The latter, Your Honor, they are bound

16   by the order.  Plan documents should be defined to capture the

17   order so it reads (glitch in the audio).

18         THE COURT:  Would you just look at the -- I don't

19   want to lose where we are on my screen, do you know if Plan

20   documents includes this order?

21         MR. CARLSON:  It should.  Let me confirm it.  One

22   second.

23         THE COURT:  All right.  Mr. Grzyb, go ahead, please.

24         MR. GRZYB:  Yeah, just by way of context there's --

25   Everest obviously has the bond that we issued in favor of

1    Apache that was part of the Apache term sheet, and we also

2    have issued a number of other bonds that are not -- that does

3    not mean Apache is an obligee and we're just clarifying that.

4    Only the bond in favor of Apache was part of the term sheet

5    and everything else is subject to the Plan documents,

6    including this order.  I have no problem if the provision

7    includes the order.

8              THE COURT:  I'm good.  Thank you, sir.

9              MR. Carlson.

10             MR. GRZYB:  Thank you.

11             MR. CARLSON:  Yes, and I have confirmed in

12   Paragraph -- on the order --

13             THE COURT:  Thank you.

14             MR. CARLSON:   -- it does that.

15         (Reviewing document.)

16             THE COURT:  All right.  I think this was also one

17   that you said might be controversial.  Let me hear from

18   parties about this.

19             Mr. Bains and Mr. Dendinger, let me enable both of

20   your lines.  Go ahead, please.

21             MR. BAINS:  Good morning, Your Honor.  Brandon Bains

22   on behalf of Travelers, Liberty, Hanover and XL.  Really just

23   a clarifying question regarding what's on your screen right

24   now that I raised with the Debtors and the lenders.  I have

25   not heard back.  I'm unclear what the difference is, the

1        distinction that's trying to be drawn between X and Y.  I

2        certainly recall the conversation we had yesterday with

3        Mr. Schaible on post-effective date activities.  I understand

4        that's been the Court's ruling.  So I'm not clear what we're

5        trying to do there and what we're trying to cover.

6                THE COURT:  Let me tell you what I meant because I

7        think this does capture what I meant, and then we'll see if

8        you have an objection to this.  So there's a pretty good body

9        of law that says that an owner of property has a continuing

10       duty that arises constantly to comply with, you know,

11       applicable law with respect to health and safety issues.

12               So there's an argument that the day after the

13       effective date the credit bid purchaser would have a P&A

14       obligation with respect to predecessor activity, and that

15       would accrue every day.  This says that the subrogation rights

16       will only apply if both accrues and relates to activity

17       itself, not mere ownership of the property.

18               That's why I think it probably does capture it.  But

19       if you think that's incorrect, then why don't you go ahead.

20       But that's what I'm intending and I think this captured what I

21       intended.

22               MR. BAINS:  I think there, Your Honor, then Y should

23       probably say relates to post-effective date activities as

24       opposed to arises from, and I think that's what you just said,

25       to be consistent with what your intentions are.  Obviously we

1    have all our objections to all of this stuff, we --

2         THE COURT:  All right.  I got that.  Tell me the

3    difference between -- in your mind and then let me hear from

4    others the difference between relates to post-effective date

5    activity and arises from post-effective date activity.  I'm

6    not sure I'm appreciating the difference and I want the

7    parties to be able to articulate that.

8         MR. BAINS:  To be completely frank, I was parroting

9    back what your language was there, just making sure you

10   thought there was a difference, that it was clear based on

11   what you just said that the order reflected that.  I'm not

12   near enough of a scholar of the English language to be able to

13   pontificate on arise versus relate.  But I just wanted to make

14   sure it conformed with your intentions.

15        THE COURT:  No, I think this -- I think the language

16   there is good for what I intend.  So if that's what we're

17   doing, then I'm going to leave this language alone.

18        All right.  Any other objections to it with that

19   clarification by the Court?

20        (No audible response.)

21        THE COURT:  Okay.  Thank you.

22        Sorry, Mr. Dendinger, you did not speak up, but I

23   enabled your line.  Did you have something you wanted to add?

24        MR. DENDINGER:  Yes, Your Honor.  Thank you.  For

25   the Record, Mark Dendinger, Bracewell, for ENI Petroleum US,

1    LLC and ENI US Operating Co, Inc.  Your Honor, we have
2    suggested two changes to this paragraph of the order that we
3    believe is consistent with the Court's thinking yesterday.
4         During the course of the hearing one of those
5    changes the Weil team has signed off on, the Davis Polk team,
6    or the other folks on the line have not necessarily signed off
7    on.  And I gather it's just a new change that I think is
8    consistent with the Court's ruling.  So if we could scroll up,
9    I could walk the Court through both suggested revisions to
10   this order.
11        THE COURT:  Yeah, is this something that we should
12   do like we did with Ms. Russell and let you show them to
13   everyone, or do you want to read them?  What's going to be
14   best?
15        MR. DENDINGER:  I think I could read them into the
16   Record, I think that will be fine.
17        THE COURT:  Okay.
18        MR. DENDINGER:  Okay.  All right.  Mr. Carlson, if
19   you wouldn't mind scrolling up to the first change that
20   Ms. Liou signed off on.
21        THE COURT:  Yeah, I'm the --
22        MR. DENDINGER:  There, thank you.
23        THE COURT:   -- I'm the scroller, so tell me where
24   you want to be.
25        MR. DENDINGER:  Okay.  I apologize.  The sentence

1    Your Honor, that starts -- well, looks like maybe this change

2    was already made.  Okay.  I apologize, Your Honor.  So the

3    only change that I think that we would request would be we

4    want this paragraph to be subject to our specifically

5    negotiated paragraphs and our -- ENI definitive documentation.

6         And so what we would suggest is a new sentence at

7    the end of Paragraph 97 that would say, For the avoidance of

8    doubt this Paragraph 97 shall be subject to the ENI paragraphs

9    in 111-18 of this order, the ENI implementation agreements,

10   and the ENI definitive documents.

11        THE COURT:  I think so long as you say -- clarify

12   that it's subject to those only with respect to ENI, so not

13   with respect to everybody.  If you can fix that -- you follow

14   what I'm saying?  You're making everybody subject to the ENI

15   paragraphs.  Can you say, For the purpose of this Paragraph 97

16   ENI's rights and obligations are governed by those other

17   paragraphs to the extent of any conflict?

18        MR. DENDINGER:  Your Honor, may I suggest the

19   parties referenced in those particular paragraphs because

20   there are other parties referenced in those paragraphs besides

21   ENI

22        THE COURT:  Fair enough.  Yeah, I just don't want to

23   make it so broad that it swallows everybody else into it.  But

24   that's fine.

25        Let me see if anyone has any objection to language

1   of that nature.

2          MR. SCHAIBLE:  Your Honor, it's Damian Schaible.

3   May I be heard?

4          THE COURT:  Yes, Mr. Schaible.

5          MR. SCHAIBLE:  The only thing that -- and I'm sorry

6   to be (glitch in the audio) but we were fine with the first

7   change which was put in.  The only thing that gives me a

8   minute of pause, and unfortunately I don't have a good answer

9   for it, is, well, this paragraph was important obviously

10  because it's clarifying subrogation rights, moving what

11  subrogation rights don't move.

12          In one of the documents that -- and I'm now worried

13  at all about the paragraph, but in one of the documents that

14  Mr. Dendinger is referring to, there's broader subrogation

15  rights.  Are we saying that this gets overridden?  That's the

16  part that's giving me a little bit of pause, Your Honor.

17          THE COURT:  Mr. Dendinger, I assume that we're only

18  talking about things that have already been written down in

19  these paragraphs.  Do we need to incorporate the documents

20  themselves?  The paragraphs allow the documents but only

21  consistent with the paragraphs.  Right?

22          MR. DENDINGER:  That's correct, Your Honor.  And the

23  paragraphs, in my mind, incorporate the documents because the

24  documents are referenced in the paragraphs.  These are simply

25  the definitive documents that we had negotiated with the Weil

1    team and the Davis Polk team.  They are unexecuted versions of

2    those documents now and upon the effective date the Davis Polk

3    team's client will be signing a joinder for those documents.

4    So those are the parties that are bound in those documents

5    that are being referenced in those paragraphs.

6         THE COURT:  Got it.  Okay.  I didn't realize they

7    were finalized.

8         MS. LIOU:  Your Honor?  Your Honor, it's Jessica

9    Liou from Weil Gotshal & Manges, on behalf of the Debtors.

10        THE COURT:  Yeah, hold on just a minute.  I want to

11   hear from Mr. Schaible about that before we come to you.

12        Mr. Schaible?

13        MS. LIOU:  Sure.

14        MR. SCHAIBLE:  As we said, well, subject to

15   Ms. Liou's idea I think if Mr. Dendinger doesn't mind, I'd

16   love to do it Your Honor's way and refer to the paragraph.

17   The paragraph then refers to the documents.  So we're

18   comfortable with just the paragraph, you know, not limiting

19   rights.  So I think if we just refer to the paragraphs and

20   that might be easier.

21        THE COURT:  All right.  Ms Liou?

22        MS. LIOU:  Yes, Your Honor.  I'm fine with

23   Mr. Schaible's approach.  I think that is the better approach

24   here.  And I wanted to clarify that it really should only be

25   the parties that are bound to any definitive documents, other

1       than subject to whatever carve outs exist in those documents.

2               THE COURT:  Ms. Russell?

3               MS. RUSSELL:  (No audible response.)

4               THE COURT:  Ms. Russell?

5               MS. RUSSELL:  Yes, Your Honor.  This relates to a

6       different issue, but still in Paragraph 97.  If I could ask

7       the Court to please scroll up just slightly so that we can

8       see -- yes.  Let's see --

9           (Reviewing document.)

10              MS. RUSSELL:  All right.  Thank you, Your Honor.  It

11      has been dealt with.

12              THE COURT:  All right.  Everybody hold on just a

13      second.

14          (Pause in the proceedings.)

15              THE COURT:  Mr. Dendinger, what are the paragraphs

16      that you mentioned before, the paragraph numbers?

17              MR. DENDINGER:  Yes, Your Honor, they're Paragraphs

18      111 to 118.

19              THE COURT:  Thank you.

20          (Pause in the proceedings.)

21              THE COURT:  I think that's what everybody is saying,

22      and should resolve it.  But I don't want to leave the hearing

23      without knowing we have a resolution.  Can I hear objections

24      to the language I've just put on the screen?

25              MS. LIOU:  Your Honor, Jessica Liou on behalf of the

1    Debtors.  I think the language that says the rights and
2    obligations of the parties bound by Paragraph whatever
3    whatever should actually say, The rights and obligations of
4    the parties bound by the agreement or any definitive documents
5    referenced in Paragraph 118 to  -- sorry, 111 to 118.
6            THE COURT:  The rights in paragraphs of the parties
7    bound by --
8            MS. LIOU:  Any definitive documents.
9         (Pause in the proceedings.)
10           MS. LIOU:  And any implementation agreement.
11        (Pause in the proceedings.)
12           MS. LIOU:  Oh, sorry, it should be and ENI
13    implementation agreement.  Apologies.
14           THE COURT:  It's all right.
15        (Pause in the proceedings.)
16           THE COURT:  Is that what you're asking, Ms. Liou?
17           MS. LIOU:  That's right.  Thank you.  Yes, yes,
18    thank you, Your Honor.
19           THE COURT:  All right.  Mr. Dendinger, does that
20    work?
21           MR. DENDINGER:  Your Honor, I would ask that NAS be
22    added there.  There are rights and obligations being spoken of
23    of our surety provider in those paragraphs, and so if we could
24    add NAS in, that would resolve my issue.
25        (Pause in the proceedings.)

1          THE COURT:  Does that work?

2          MR. DENDINGER:  That works for ENI, Your Honor.

3          THE COURT:  Does that work for the Debtor?

4          MS. LIOU:  Your Honor --

5          THE COURT:  Go ahead.

6          MS. LIOU:   -- two minors points.  I believe the

7    second line, the beginning that should be Matter with two Ts,

8    and the third line, the ENI implementation agreement is just a

9    singular agreement.

10          THE COURT:  All right.  Mr. Schaible.

11          MR. SCHAIBLE:  This works fine for me, Your Honor.

12    Thank you.

13          THE COURT:  Mr. Kooy.

14          MR. KOOY:  Yes, Your Honor.  This debates then your

15    prior comments, I just want to -- I don't even know that this

16    necessary, I just want to maintain -- I represent NAS -- to

17    maintain and make sure we're preserving our objections to the

18    extent the Paragraphs 111 through 118 indicate.  And I think

19    as everybody is aware of here we have a declaratory judgment

20    action against ENI and Chevron.

21          We're objecting to the statement that their

22    participation and agreement here has no impact on our rights

23    to surety and our right to assert defenses including, you

24    know, the expansion of liability here.  It's the same general

25    objection we've had.  I just want to make sure we're

1     preserving that, Your Honor.

2               THE COURT:  It's preserved, and overruled.

3               MR. KOOY:  Very good, Your Honor.

4               THE COURT:  Thank you.

5               All right.  Are you all able to take a screen shot

6      of this, or how am I going to get this information over to the

7      Debtor to incorporate it?  Somebody take out their iPhone and

8      take a picture of it?

9               MR. CARLSON:  That should work.

10              THE COURT:  Mr. Perez?

11              MR. PEREZ:  Your Honor, there's a little camera

12     function on the side there and if you hit that, it takes a

13     screen shot.

14              THE COURT:  I know, but you all need a screen shot,

15     not me.

16              MR. PEREZ:  I could take -- I took one, Your Honor,

17     and sent it.

18              THE COURT:  Okay.  Good.  I just want to be sure you

19     all have this to incorporate in the final version.  Okay.

20     Let's move ahead.

21          (Reviewing document.)

22              MR. BAINS:  Your Honor, if I may while we're on that

23     paragraph?

24              THE COURT:  Of course.

25              MR. BAINS:  Again, Brandon Bains.  Mr. Carlson

1    referenced earlier a conversation yesterday about contribution

2    rights.  We did circulate some folks language for Paragraph

3    99.  Now I will say that was actually Mr. Zuber that initially

4    raised that issue, so I might defer to him.  But we did have

5    some proposed language that was sent to the Debtor yesterday

6    evening simply noting that contribution rights were preserved

7    and not subject to any of the restrictions on the subrogation

8    language, and Mr. Zuber might not characterize your argument

9    properly.

10           THE COURT:  Mr. Zuber, can I get you to share a

11   screen that would show us that language?  Your line has

12   remained active.

13           MR. ZUBER:  I know.

14           THE COURT:  Yeah, so you won't need to press five

15   star again I don't think, Mr. Zuber.

16           MR. ZUBER:  Judge Isgur, I have that language in

17   front of me as well, if you want to give me the screen.

18           THE COURT:  Sure.  So I've got Mr. Zuber's line

19   active, as well as I'll go ahead, Mr. Bains --

20           MR. ZUBER:  Your Honor --

21           THE COURT:   -- and I'll make you're line active.

22           Go ahead, Mr. Zuber.

23           MR. ZUBER:  Your Honor, I defer to Mr. Bains on this

24   issue.  While I believe that Your Honor's ruling with respect

25   to preservation of contribution rights was crystal clear, I

1    think that the language in Paragraph 97 which provides that

2    there's a preservation of any of the rights or defenses of the

3    non-Apache sureties against any non-debtor entity, including

4    but not limited to any predecessors-in-interest or co-working

5    interest parties with respect to the Debtor's assets would

6    cover contribution rights.

7         I certainly have no objection to making that more

8    expressed.  If Mr. Bains would like to provide some language,

9    but I believe that this language is broad enough and is

10   consistent with Your Honor's ruling.  I have a clear record

11   that we are not waiving any contribution rights.

12        THE COURT:  Can I -- I'm not sure why we have in

13   there post-effective date.  And maybe -- I don't have a

14   problem including clarifying language, but I think you're

15   actually limiting what I said.  So if you have a contribution

16   right that already arose, I'm not intending to limit those

17   either.  And I'm a little bit inclined to take out the

18   language, this post-effective date.

19        MR. ZUBER:  That'll be okay with us, Your Honor.

20        THE COURT:  Let me hear from anyone that believes

21   this language is inappropriate.  I mean we are doing things

22   here that are difficult and hard and I think that I want to be

23   sure we have clarity, and I don't believe that it would

24   reasonable to alter or diminish third party versus third party

25   contribution rights that exist as of today.

1          MR. CARLSON:  Your Honor, I don't think we -- this

2     language works.  I think -- and I guess -- well first off, we

3     think that -- we don't think that language is necessary.  We

4     think the Record and the documents don't affect the

5     contribution rights.  But I think here the issue with this

6     language is that it would eviscerate or override certain

7     provisions of the Plan.  Here we're saying that nothing in the

8     Plan impacts their right to seek contribution from any

9     interest party or predecessor.  I don't think that that's

10    necessarily a right.

11         THE COURT:  Well, how are you trying to affect those

12    contribution rights?  I thought you weren't and I don't think

13    I was intending to authorizing you to affect those

14    contribution rights.

15         MR. CARLSON:  I think if we carve out or we just

16    make clear that we're only talking about non-debtors or NewCo

17    or the post-effective date entities.  I think if we carve all

18    of those parties out, this would work.  But that's me speaking

19    and others can disagree, but --

20         THE COURT:  I got it.

21         MR. CARLSON:   -- it doesn't --

22         THE COURT:  No, no, no, that makes sense.  Obviously

23    the Plan will affect the contribution rights from, you know, a

24    debtor or a reorganized entity under this.  It's the third

25    party rights that we're not affecting.

1          I got it, but I do want to give them the clarifying

2     language.  I've given other people clarifying language to be

3     sure they're comfortable.  This has been -- I know this is

4     hard on the sureties and I want to be sure that they leave

5     understanding, you know, appropriately what they're getting.

6          Mr. Bains, can we add in language here, I'll let you

7     type it in, that makes it clear that you're not trying to

8     retain a contribution right, you know, against the entities

9     that Mr. Carlson has identified.  Do you want to take a few

10    minutes and draft that and I'll come back to you?  Because I

11    think that may be hard to draft.

12         MR. BAINS:  Well, and I believe we had that same

13    language back up in 97 or somewhere that we were talking about

14    the original rights.  I don't know, there's -- I think there's

15    a parenthetical that has some language on the Debtor and the

16    NewCo entities.  Is that what you're envisioning, I guess both

17    to Mr. Carlson and to the Judge.

18         MR. CARLSON:  I think that's right, just to say, I

19    think it can be clear that it doesn't -- that if we're carving

20    out the Debtors, the post-effective date Debtors, Fieldwood

21    One, Fieldwood Four and the NewCo entities, I think that -- I

22    think that's everyone.

23         THE COURT:  So --

24         MR. BAINS:  Your Honor, I can certainly, after I get

25    control back, or you get control back of the screen, I can

1    incorporate that language and Mr. Carlson and I can email it

2    to you.  If you'll give me about four minutes and then we can

3    go from there.  If that works, however you want to handle it,

4    Judge.

5           THE COURT:  Yeah, why don't we come back and we'll

6    do it all on the screen.  I'll take back the screen now so

7    that you don't have to show everybody you're drafting efforts,

8    but then when you're ready just tell me and we'll come back

9    and we'll all look at it together and then let's decide.  I

10   really don't want to put things off so that, you know,

11   somebody else then has a problem with what you draft so.

12          Okay.  Let me see.  Okay.  So you got back your own

13   screen, we can't see it, I'll let you do some drafting.

14          Mr. Woodard, I think you wanted to speak.

15          MR. WOODARD:  Thank you, Your Honor.  Maybe if I can

16   take about half of Mr. Bains four minutes, maybe that'll help

17   everybody fill the void.  I have the unenviable task, Your

18   Honor, of being Number 6 in asking you to listen just for a

19   moment, if I could, on a slightly different aspect of what has

20   been overruled, the objection that's been overruled five times

21   previously and no doubt will be again now.

22          But I need to put on the Record a couple of things

23   if --

24          THE COURT:  Go --

25          MR. WOODARD:   -- I have been --

1          THE COURT:   -- go right ahead, Mr. Woodard.

2          MR. WOODARD:   -- first of all --

3          THE COURT:  Go back -- although I've been overruling

4     people, I'm doing my best to preserve all -- everybody's

5     appellate rights.  My goal shouldn't be to stop you from

6     preserving your objections.  So go ahead and --

7          MR. WOODARD:  And I --

8          THE COURT:   -- maybe you've got some new argument

9     and you can carry the day for everybody.  We'll see.

10         MR. WOODARD:  It is a slightly new argument, Judge.

11    I started this off with -- on Monday of actually being in your

12    camp, and I think I'm slipping a little bit.  However, all of

13    the things that I agreed with you are still there.  So all of

14    the items that the Court has the ability to do under 363, the

15    Debtor.  The facts are that the bonds continue to exist,

16    notwithstanding the fact of the loss of the principal.  All of

17    those things I still agree with.

18         But at the end of the day every day this week I've

19    had this dilemma trying to figure out, because while I wear

20    the hat of a bankruptcy counsel, I understand the concepts of

21    elimination of debt and going through the confirmation process

22    and discharge and all that.  As I wear the hat of a surety

23    counsel, however, the idea of losing the ability to maintain

24    the suretyship rights of a surety is just contrary to basic

25    surety law.

1        So each day as I listen to the variety of the five

2    arguments before mine, I've struggled each night trying to

3    figure out how it is that I reconcile all those things.  And I

4    think that I've finally come to what I believe to be a viable

5    solution to it, but as I say, I would anticipate no different

6    end result, but let's give it a run.

7        The acquisition of the leases on the effective date

8    carries with it certain obligations that take effect whether

9    the leases -- take effect when the leases are actually

10    transferred to any of the post-confirmation entities.  There

11    are -- and that has nothing to do with the sureties.  These

12    are obligations that come into existence under -- whether it's

13    the outer Continentals shell pack, whether it's any of the CFR

14    provisions that place a variety of maintenance,

15    decommissioning, safety obligation on any owner/operator of a

16    lease.

17        So the moment that the entities actually take over

18    on behalf of -- that take the assignment of these leases and

19    become owner/operator they have a new set of obligations that

20    don't relate to the sureties, that relate solely to the

21    Government.  It is only the DOI, BSEE, BOEM in any of their

22    pieces.  So that is a straight line of liability from the

23    credit bit purchaser, from Fieldwood One, Three, Four directly

24    to the Government.

25        Mr. Dane testified during his direct testimony that

1      NewCo is going to be responsible for someplace between 330-

2      and $350 million of P&A liability, and that that was part of

3      their entire deal and it was -- it's a wonderful thing what

4      NewCo was going to be doing for everybody.  All of those post-

5      petition -- post-effective date.  Once they take those on, new

6      obligations.

7           He also testified the same was going to be true

8      under Fieldwood One, Three and Four just that he said that

9      they are taking assignment of leases as well.

10          And all of that liability is completely independent

11     of the bonds.  So if just assuming for moment that the

12     regulators, upon the default, right, one of those entities

13     doesn't do what they're supposed to do under the CFR and the

14     regulators declare a default, they could look to those

15     entities directly from themselves, from the Government and

16     declare the default and seek the monetary whatever,

17     restitution, clean up, whatever they be directly to

18     themselves.  They don't need to call the bond, they don't need

19     to do anything else.  And that right exists the moment they

20     sign those leases.

21          Now we also agree on Monday, and I still do today,

22     that the bond continues.  We don't get out from under it.  The

23     bond will live on indefinitely until we're released from our

24     obligee, which in our case is the Government.  So the

25     Government can also turn around and say to Lexon, Okay, Lexon,

1    these bonds are still in existence, there's a violation of

2    that lease that's being conducted by credit bid NewCo.  You

3    pay us the money.  And we won't -- whether we have a defense

4    or not we'll deal with that at that time.

5          But assuming that we don't and we have to pay that

6    money, now we flip back to straight surety law because that

7    bond is still there, it is still under surety law.  And so our

8    obligation runs directly to the Government.  The NewCo 1, 3, 4

9    run directly to the Government.  Now the Government takes the

10   money.  Suretyship law.  It's very simple in this regard.

11   When you boil it all the way down what subrogation is, is the

12   surety case but under the rights of the obligee.

13         It is not a claim by the surety itself.  It is a

14   claim using the Government's rights in order to reimburse the

15   Government and the surety from the party that has done the

16   wrong.  So at the end of the day here you've got a post-

17   petition obligation that's a direct line obligation to the

18   Government and you have what is -- well, it was a pre-petition

19   original bond, it has lived on post-petition and has been

20   certainly -- continued to be ratified by the Government, but

21   they're not going to let us off the hook.

22         So we have a post-effective date default, payment

23   and the surety would be only exercising the direct rights from

24   the NewCo, whoever it might be, to the Government and that's

25   why, at least in my mind, Your Honor, that's why when you come

1       to the end of the day, I come back around to say the

2       suretyship's still there.

3              The suretyship doesn't get eliminated by the

4       confirmation.  The rights are still there and going forward.

5       Now I understand what the language is, and we're trying to

6       hammer that out as best we can.  But I needed to get this on

7       the Record and also to acknowledge that we're joining in what

8       Mr. Zuber had to say yesterday.  But it is a slight different

9       argument, and I wanted the Court to be aware of it.

10             THE COURT:  Mr. Woodard --

11             MR. WOODARD:  Thank you, Your Honor.

12             THE COURT:   -- first of all, thank you, I think

13      it's a really clear statement of the argument.  I'm not sure

14      that I believe it to be different than at least the way that I

15      heard and that I've been considering the argument.  So I've

16      certainly thought about the issue that you are raising.

17             And again, I want to, because you've raised it

18      again, which is more than fair, I want to again explain why I

19      believe what we're doing is correct so that there is a Record

20      of our decision that you can appeal if your client determines

21      that's the best thing to do.

22             The sureties today right now can liquidate their

23      claim and have a claim against Fieldwood that is the principal

24      on the bonds.  That claim may be for the full amount of the

25      bonds.  And if so, you will get a claim for the full amount of

1    the bonds.  I'm not liquidating it right now.  But you have

2    the right to assert that full claim.  No one is taking away

3    any of your rights against the principal.  And I understand

4    that's in part not your argument, but it's important to put in

5    context that all the principal rights are there.

6         Now the principal can't pay in full, but you can get

7    a liquidated claim against the principal for whatever it is

8    that you're entitled to.  And under the bankruptcy law we can

9    determine the amount of the claim that will exist in the

10   future whether or not you have yet paid it, because all of

11   that falls within the definition of a claim.

12        So 100 percent of the sureties' rights can be

13   vindicated against the Debtors.  The rights that you have

14   described, which arise in favor of the Government, arise under

15   28 USC 959 in my view.  And you have described that the

16   acquiring entity will have a continuing obligation to BOEM and

17   BSEE and the Department of the Interior.

18        The issue that you're asking me to rule on, and that

19   I am ruling on, is whether the Bankruptcy Court is empowered

20   as part of the Plan's adjudication and Plan process to say

21   that you're not going to get subrogation rights to the

22   Government if they come back against the acquiring entity.  I

23   rely in large part on our ability to do that, on the

24   Bankruptcy Code, and in large part on *Midlantic*.

25        Finally, I rely on the really complete evidentiary

1    record that we have.  The evidentiary record that we have is

2    that there will not be an acquirer of these entities if they

3    will then be subject to subrogation by the surety.  So the

4    sureties are in a position where if we don't do the Plan, you

5    will just have an eminent default and the entire surety issue

6    will be, you know, available subject to whatever defenses you

7    have if the Government calls it.

8         Under the Bankruptcy Code we could authorize, and

9    may authorize the sale of the property, the *en rem* property

10   free and clear of all liens, claims and encumbrances.  That

11   includes equitable rights including the equitable right of

12   subrogation.  So what do we do when we have subrogation law

13   that comes into conflict with the ability to sale under

14   Section 363 free and clear of those types of equitable rights.

15        And that is informed by *Midlantic*, which is we

16   should apply the Bankruptcy Code in a manner that allows the

17   Government to maximize the environmental consequences that are

18   facing the country and in this case the Gulf of Mexico if we

19   don't do the right thing.  Accordingly, when you look at 363

20   and 959 and *Midlantic* and the evidentiary record we have, this

21   is the only solution to the problem.

22        I do not make the sureties worse off by confirming

23   the Plan, I make them better off by confirming the Plan.  I am

24   true to the requirements of *Midlantic* and I am true to the

25   language of the Code.  And for that reason I overrule the

1    objection.

2              I appreciated the statement in the way in which it

3    was made, Mr. Woodard.  Thank you.

4              MR. WOODARD:  Thank you, Judge.  I appreciate the

5    opportunity to put it on the Record.

6              THE COURT:  Absolutely.

7              Mr. Liou, go ahead.

8              MS. LIOU:  Your Honor, may I take a moment perhaps

9    for my comment.  It was regarding an earlier paragraph and I

10   believe that the parties are going to work separately on

11   language and come back to you on that.  So I'm okay with that.

12             THE COURT:  Thank you.

13             By the way, for those of you whose lines have

14   remained active, you don't need to press five star again.  You

15   can simply, you know, speak up at the right time.

16             Mr. Bains, I'm going to come back to you and see if

17   we're -- are you ready to show us a document at this point?

18             MR. BAINS:  Yes, Your Honor.

19             THE COURT:  Thank you.  Mr. Woodard took longer than

20   he forecast, so I figured you'd be ready by now.

21             MR. BAINS:  Good argument, Mr. Woodard.

22             THE COURT:  It was a --

23             MR. BAINS:  I at least believe you.

24             THE COURT:  It was a good argument from Mr. Woodard,

25   and I appreciated hearing it.  But nevertheless it took longer

1      than two minutes, so I figured you'd be finished.

2                  MR. BAINS:  True.  I'm putting it up now.

3            (Pause in the proceedings.)

4                  THE COURT:  Let me hear from parties that might

5      object to Mr. Bains's language.

6            (Pause in the proceedings.)

7                  THE COURT:  Mr. Carlson, you okay?

8                  MR. CARLSON:  Yes, that captures what we discussed.

9                  THE COURT:  Mr. Schaible?

10                 MR. SCHAIBLE:  Yes, Your Honor.  Thank you.

11                 THE COURT:  Mr. Bains, we're going to order the

12     incorporation of the language on the screen into the

13     confirmation final draft.  Thank you for doing that.

14                 Do you all have a picture of that so that we can

15     move ahead?

16                 MR. CARLSON:  Yes, we took one.

17                 THE COURT:  Thank you.

18                 MR. BAINS:  I'll email it to you as well so that

19     would just make it easier to cut and paste.

20                 MR. CARLSON:  Thank you, Mr. Bains.

21

22                 THE COURT:  Okay.  We're going to back into my

23     screen now and the -- I have to say, isn't the technology just

24     amazing that we can do all of this?  In some sense it's

25     actually better than being live in court.  Right?  Where, you

1    know, Mr. Bains can sit at his desk and he can draft

2    something, and Mr. Carlson can get it and -- I don't know.  I

3    mean, you know, we're going to have an interesting hybrid life

4    come January -- excuse me, September 7 as far as I'm

5    concerned.

6              MR. CARLSON:  I'm just glad my kids and dog aren't

7    coming into the background, so that's appreciated.

8         (Laughter.)

9              MR. DENDINGER:  Your Honor, it's Mark Dendinger.

10   May I be heard briefly on that language?

11             THE COURT:  Yes.  And Ms. Russell also wanted to be

12   heard, and your -- both of your lines are active, so go ahead.

13             MS. RUSSELL:  Your Honor --

14             MR. DENDINGER:  Thank you, Your Honor.

15             MS. RUSSELL:  -- if we could put up the last -- if

16   we could bring up the language that we've seen blasted.  In

17   looking at that language we need to add GOM Shelf behind

18   Fieldwood One in the parenthetical.

19             THE COURT:  Are you -- are you in the language

20   Mr. Bains drafted, or some other language?  I apologize.

21             MS. RUSSELL:  Yes, what Mr. Bains was drafting.  If

22   that can come back up on the screen for just a moment.

23             THE COURT:  We'll try.

24         (Pause in the proceedings.)

25             MS. RUSSELL:  So in the parenthetical where it says,

1   Debtors Fieldwood One, if we could, after Fieldwood One put in
2   GOM Shelf.
3        (Pause in the proceedings.)
4           MR. CARLSON:  Like that?
5           MS. RUSSELL:  Yes.  And, Your Honor, we're going to
6   do one very close final review to make sure that this is
7   not -- that GOM Shelf doesn't need to be added in other
8   places.  But that is the intent of the Plan since it is a
9   subsidiary of Fieldwood One that it be captured in these
10  tasks.
11          THE COURT:  So, Mr. Carlson, in each instance in
12  which it is appropriate to add clarification that Fieldwood
13  One includes GOM Shelf I'm ordering you to include it in the
14  final confirmation order.
15          We had someone else though that wanted to speak.  Go
16  ahead.
17          MR. DENDINGER:  Yes, Your Honor.  Mark Dendinger at
18  Bracewell for ENI.
19          THE COURT:  Yes.
20          MR. DENDINGER:  If it isn't included in Paragraph
21  97, that will be fine.  If it's not included in Paragraph 97 I
22  need for this to be subject to the same sentence we just
23  negotiated that to the extent of any conflict, ENI the
24  paragraph shall survive, or shall control.
25          THE COURT:  Let's make this easy, Mr. Carlson.  Put

1    that language that Mr. Bains drafted into Paragraph 97 so that

2    we don't have to do brain surgery to get it in the right

3    place.  Thank you.

4             MR. DENDINGER:  Thank you, Your Honor.

5             THE COURT:  All right.  We're now going to go back

6    to the proposed confirmation order.

7             (Pause in the proceedings.)

8             MR. CARLSON:  So, Your Honor, the next set of

9    paragraphs are the Chevron paragraphs, and I think we've,

10   during this hearing resolved the open issue on this point, and

11   I'm hesitant to do this, given my track record, but I think I

12   can put the language on the screen that hopefully resolves the

13   issues.

14            THE COURT:  We'll let you try and redeem yourself.

15            (Pause in the proceedings.)

16            THE COURT:  Look at that.

17            (Pause in the proceedings.)

18            MR. CARLSON:  I think we need to include GOM Shelf,

19   Your Honor.

20            THE COURT:  Mr. Ripley?

21            MR. RIPLEY:  Yes.  Yes, good morning, Your Honor.

22   It's Ed Ripley --

23            THE COURT:  Good morning.

24            MR. RIPLEY:   -- Andrews Myers, on behalf of

25   Chevron.  Good morning.

1            THE COURT:  Good morning.

2            Does anyone have any problem with this addition to

3    the CUSA (phonetic) section?

4            MR. RIPLEY:  Yeah, Judge, where I think we've

5    landed -- and I really appreciate both the Weil team and the

6    Davis Polk team -- yes, it starts right there.

7            Mr. Carlson, we're just going to include that last

8    sentence starting with the, Nothing within.

9            MR. CARLSON:  Yes, it looks like I missed an email.

10    Right.

11            MR. RIPLEY:  Yeah, no problem.  Judge, we've been

12    using the time as you've been working through other things,

13    it's a lot of moving parts.

14            THE COURT:  I got it.

15            Does anyone object to this inclusion?

16        (No audible response.)

17            THE COURT:  Okay.  We'll include it.  Thank you.

18        (Pause in the proceedings.)

19            THE COURT:  This language, however, is staying in

20    104 and then you're just adding to this.  Is that correct?

21            MR. CARLSON:  That's correct.

22            MR. RIPLEY:  Correct, Your Honor.  Yeah, the

23    additional language that we've agreed on.

24            THE COURT:  And does anyone have any objection to

25    this plus the add-on that we just saw?

1          (No audible response.)

2                THE COURT:  All right.

3                MR. BAINS:  Your Honor, Brandon Bains.  I guess my

4      question, I have not see this language before. I'm not sure

5      what is different here than what we had in Paragraph 97.

6          Certainly, Mr. Ripley, if I'm missing something, but I

7      know that we already tried to reserve all of our rights

8      between our respective clients.  Is there something different

9      here that's being reserved or is this proverbial belt and

10     suspenders?

11               MR. RIPLEY:  Well, this all originated before the

12     new paragraphs, so there's no attempt to try and change if I

13     remember what was now, what, Paragraph 97.  This may well be

14     belts and suspenders, but take a look and let me know if you

15     think there's something different.

16               MR. BAINS:  I don't necessarily, I just didn't know

17     how that came about, if you were trying to modify what was

18     already up there on the reservation between sureties and

19     obligees.  But that was my only question.

20               MR. RIPLEY:  Yeah.  No, this all originated before

21     that new paragraph even came in.

22               MR. BAINS:  Understood.

23               MR. RIPLEY:  Thank you, Judge, for letting us have

24     some discussion while we're going through this.

25               THE COURT:  Thank you.

1           (Pause in the proceedings.)

2               MR. RIPLEY:  Judge, the only other open change is in

3      Paragraph 108, and if you'll scroll down from where you see

4      the one insert on implementation agreement, the second insert,

5      right there, so one, two, three, four lines down there's

6      another CUSA definitive documents.  So just two more lines

7      down.  Yeah, if you go down to the -- two more lines.

8      Correct.  We need to insert the saying, CUSA implementation

9      agreement and.  So the sentence that starts, Execute and

10     deliver --

11              THE COURT:  Is there any issue with that,

12     Mr. Carlson?

13              MR. CARLSON:  No, no issue.

14              THE COURT:  Thank you.  All right.

15              MR. RIPLEY:  And that was it.  And again, Judge, we

16     really appreciate both the Weil team and the Davis Polk team

17     working with us.

18              THE COURT:  Thank you.

19          (Pause in the proceedings.)

20              THE COURT:  Do we need to put a time in for that

21     hearing or --

22              MR. CARLSON:  I was just -- I just wondered that

23     myself.  We'll add the time.

24              THE COURT:  Thank you.

25          (Pause in the proceedings.)

1          MR. CARLSON:  This additional paragraph addresses --

2     it should potentially mirror the BP and XTO paragraphs on this

3     issue.  And we'll look to Mr. Kind to confirm whether or not

4     they're signed off, I'm just not sure.

5          THE COURT:  Let me get Mr. Kind's line active.  Hold

6     on.

7          (Pause in the proceedings.)

8          THE COURT:  Mr. Kind -- and, Ms. Rogers --

9     Ms. Rosen, I just saw your line, I'll come back to you in just

10    a second, I apologize, I didn't see it before.

11         Mr. Kind.

12         MR. KIND:  Your Honor, good morning.  Thank you.  We

13    think this language largely accomplishes what we were

14    discussing with counsel.  However, we had one lingering issue

15    that the protective language as written only applies to

16    assumed contracts, and we wanted to make clear that the

17    recoupment is available for the purposes of reconciling and

18    resolving rejection claims as well in connection with rejected

19    contacts.  That's really the only lingering and open issue.

20         MR. CARLSON:  So, Your Honor, on that point I think

21    a couple of things. I think, you know, as of the effective

22    date on a rejected contract, you know, we think obviously all

23    the contractual rights fall off including any set off rights.

24    And we think the Plan is pretty clear on how we treat

25    rejection damages, so didn't think that there was any need to

1      preserve any rights here on this point.

2              MR. KIND:  I think, Your Honor, just to clarify I

3      think, we know that, you know, per Section 363 sales can

4      proceed free and clear.  I think what our concern is about is

5      about making sure that the valid set off and vetting process

6      for pre-effective date and pre-rejection amounts are included

7      in the type of the protective language that is in that

8      paragraph.  And, you know, we aren't looking to get any extra

9      right, it's just about making sure that the ballot itself

10     right up to the rejection part are respective.

11             THE COURT:  So I'm not sure what happens on a pre-

12     effective date set off -- a post-petition, pre-effective date

13     set off on a rejected contract.  So let's start with I don't

14     know the answer to that question.  Are you asking me to

15     resolve it right now, or what are you asking me to do about

16     that?

17             MR. KIND:  Well, Your Honor, you know what, I would

18     propose just a couple of -- you know, maybe changing seven

19     words to make clear that this paragraph then refers to all

20     executory contracts between Cox and the Debtors.  If the

21     Debtors --

22             THE COURT:  Yeah, but that asks me -- that asks me

23     to resolve it today in a way and I don't -- that may be the

24     correct resolution.  I don't know is the problem.  So what do

25     you think I should do?  Do you think this cuts off those

43

1    rights as opposed to -- I just think it leaves them wherever

2    they are.  I'm saying that these don't adversely affect the

3    assumed ones, and I actually don't know what the Plan's going

4    to do, or what the effect of the Plan is on a post-petition

5    pre-rejection motion filing pre-effective date but rejection

6    could be retroactively effective.

7         I mean there are just so many permutations there,

8    doesn't that wait for another day to determine what occurs, or

9    am I missing your point?  Because I don't think I can resolve

10   it if I don't know the whole law on it, and I don't mean to be

11   too ignorant about it, but I don't know it.

12        MR. KIND:  No, Your Honor, those points are well

13   taken.  I think that the concern is that when the Plan

14   specifies a rejection, damages claims can be brought but that

15   will be classified as an unsecured claim, I think there's a

16   concern about, well, you know, in order to prepare that claim

17   are we allowed -- you know, are they trying to cut off our

18   right to take into effect the vetting that we assert, you

19   know, we're entitled to per the contract before they were

20   rejected.  But, Your Honor --

21        THE COURT:  So, let me go back to Mr. Perez on this

22   one.  This has been sort of your bailiwick so far.  What do we

23   do on a provision in the Plan like what Mr. Kind is

24   referencing where -- you know, I don't know if you can do that

25   or not, you certainly -- it's a fair provision in a Plan, but

44

1      if he's saying he's not sure that you can cut off his secured

2      rights, if he has them, how do you think we ought to handle

3      that?

4              MR. PEREZ:  Two things, Your Honor.  Number one, I

5      don't think the paragraph cuts off whatever right of whatever

6      rights he has.  And to the extent that he's allowed -- he's

7      entitled to file a claim as a result of the rejection damages,

8      and for instance even if we say in the Plan that he's entitled

9      to file a claim, you know, they're holding a deposit, I don't

10     think the Plan would be able to vitiate that hold -- the

11     deposit.

12             And to the extent that he has a valid claim for a

13     set off, again, I don't think we -- I don't think that the

14     Plan would cut that off on a pre basis, Your Honor.

15             THE COURT:  So he's -- what he -- and I haven't

16     looked at this provision, he's telling me the Plan itself says

17     that damages from a -- from the rejection of a contract will

18     be treated solely as an unsecured claim.  So if they have

19     damages for which they have set off rights, and again, those

20     may not be effective, I don't know, but what do we do so that

21     that argument gets preserved?

22             MR. PEREZ:  Well, Your Honor, I think we're having

23     this colloquy on the Record, but normally when you file a --

24     when you get a claim it does give rise to an unsecured claim.

25     To the extent somebody I guess is holding security, then that

1    unsecured claim would have whatever security that person is

2    holding.  It's kind of how the Plan purports to strip any of

3    that security.

4           THE COURT:  Mr. Kind, it is 9:10 in the morning

5    Central Time, with Mr. Perez estopping his client.  Are you

6    okay with that?

7           MR. KIND:  Your Honor, I think, you know, I think

8    those statements mean that we kind of -- we resolve these

9    issues in the context of resolving whatever claim we filed,

10    you know, in connection with the rejection.  So, Your Honor, I

11    think I'm satisfied with that understanding.  But I think what

12    I would ask is perhaps that we have a, you know, a provision

13    that gives us 45 days to file such a claim which mirrors what

14    was done for BP in Paragraph 133, sub 4, which is pretty

15    much -- you know, mirrors what's in the Plan but provides an

16    extra 15 days.

17           THE COURT:  Any problem with --

18           MR. KIND:  And I --  with that --

19           THE COURT:   -- giving them 45 days to file a

20    rejection claim, Mr. Carlson?

21           MR. CARLSON:  No, no, Your Honor, that's perfectly

22    fine.

23           THE COURT:  Okay.  Yeah, add that language, please.

24    Thank you.

25           Are we okay, Mr. Kind?  All right.

1            MR. KIND:  I think so with those understandings,

2      Your Honor.

3            THE COURT:  All right.  Thank you.

4            Ms. Rosen.

5            MS. ROSEN:  Thank you, Your Honor.  I just -- I

6      wanted to clarify back on Paragraph 127 V --

7            (Pause in the proceedings.)

8            MS. ROSEN:  Okay.  Thank you, Your Honor.  I know --

9      and there were a lot of changes going around yesterday and I

10     believe the language that we agreed to for that parenthetical

11     was to say, "In a manner that is not inconsistent with the

12     applicable XTO -- Exxon/XTO executory contract."  I don't know

13     this necessarily is a change from that, but I just wanted to

14     clarify that I can see a situation where the applicable law

15     may not identical to the language of the contract, and I just

16     wanted to make sure that it was clear that we are preserving

17     our rights to exercise any valid netting under applicable law.

18     I would prefer it to say, "In a manner that is not

19     inconsistent with our contracts," because otherwise I think it

20     runs a risk of making it an and instead of an or.

21            THE COURT:  Yeah, I'm not going to do in a manner

22     because that involves -- or implicates procedural issues

23     rather than substantive ones, and I think unless incorporates

24     both.

25            MS. ROSEN:  Okay.

1          THE COURT:  So I'm going to overrule the objection
2     on that.
3          MS. ROSEN:  Okay.  Thank -- okay.
4          THE COURT:  Thank you.
5          MS. ROSEN:  Thank you, Your Honor.
6          THE COURT:  Thank you.
7          MR. CARLSON:  So, Your Honor, from the Debtor's
8     perspective I believe that counseling, which was the only --
9     the last open issue, we do have a few more changes we can walk
10    the Court through here, but --
11         THE COURT:  I may want to --
12         MR. CARLSON:  -- otherwise --
13         THE COURT:  -- make sure that all the parties here
14    have a chance to object to everything, so I'm going to just
15    keep going page-by-page --
16         MR. CARLSON:  Understood.
17         THE COURT:  -- on this.
18         MR. KIND:  Your Honor --
19         THE COURT:  Yes.
20         MR. KIND:  -- I'm sorry to interrupt but I just
21    wanted to clarify.  Is the language that Mr. Carlson's going
22    to add to the Cox paragraph, I'm sure he'll send it over, but
23    is it going to reflect our understanding on the Record that
24    we'll -- that any set off issues on the rejection claims would
25    be resolved in the claims reconciliation process.

1          THE COURT:  No, we're not going to include any

2    language about that.  We're going to deal with estoppel from

3    what Mr. Perez said.  That language is simply going to give

4    them 45 days to file a claim.

5          MR. KIND:  Okay, Your Honor.  Thank you.

6          THE COURT:  Thank you.

7      (Pause in the proceedings.)

8          MR. CARLSON:  We'll change that to 150.

9          THE COURT:  Thank you.

10      (Pause in the proceedings.)

11          THE COURT:  All right.  This is -- all objections

12    previously made and overruled are preserved.  Does anyone have

13    any new objection that they wish to voice to the form or the

14    substance of the confirmation order?

15      (No audible response.)

16          THE COURT:  All right.  Look, I owe a debt of

17    gratitude to everybody on the call for all of your

18    professionalism, and as I said yesterday, I think especially

19    to Mr. Carlson.

20          I also want to mention the sureties who, as far as

21    I'm concerned, have presented their case in such a

22    professional way to preserve their objections and have

23    consistently recognized that their duties as officers of the

24    court is to implement the Court's orders.  And I think they

25    have done their best to do that, and I very much appreciate

1    that.

2              So the professionalism of everyone in the whole

3    hearing, this has been a long, hard hearing, is just

4    completely appreciated by the Court and I appreciate the

5    lawyers who are here.

6              Mr. Carlson, what I would like for you to do is to

7    file one integrated document so that you have all of the

8    attachments with it, non-redlined, that I can sign that is

9    everything without me needing to add any additional

10   attachments to it so that I don't get that wrong.  And when

11   you get that filed, if you would contact Ms. Do, I'm not going

12   to hold another hearing, I'm going to sign the order.

13             MR. CARLSON:  That sounds great.  We'll do that.  I

14   do want to point you to a few changes we've made to the Plan

15   just so the Court is aware and not surprised by that.  But it

16   shouldn't be controversial changes I don't think.

17             THE COURT:  So let me get the redline.

18        (Pause in the proceedings.)

19             THE COURT:  All right.  Go ahead, please.

20             MR. CARLSON:  Sure.  So on Page 7 is the additional

21   predecessor agreement definition.  There was discussion with

22   Ms. Liou and Mr. Perez yesterday on that point.  We think this

23   is consistent -- if you'll go up, I'm sorry, to --

24             THE COURT:  Oh, ECF Page 7?

25             MR. CARLSON:  Page 7, ECF Page -- that's right.

1       (Pause in the proceedings.)

2               THE COURT:  All right.

3               MR. CARLSON:  And then I believe the only other

4       change is inside Section 5.13A, which should be conforming to

5       97 of the order.

6           (Pause in the proceedings.)

7               THE COURT:  All right.  Thank you.

8               MR. CARLSON:  Yeah.

9               THE COURT:  So I mean this from the -- with all

10      sincerity, what I think is being accomplished in the

11      Bankruptcy Court is in the best interest of the United States,

12      is in the best interest of the creditors of this estate, and I

13      very much appreciate all of the hard work and effort done.

14              Mr. Kuebel, you had something you wanted to add.  Go

15      ahead.

16              MR. KUEBEL:  Yes, Your Honor.  If you wouldn't mind,

17      could -- this is Rick Kuebel on behalf of McMoran and

18      ConocoPhillips companies.  Could I impose on the Court to go

19      back to the definition language of the additional predecessor

20      agreements for one second?

21              THE COURT:  Yes, sir.

22              MR. KUEBEL:  The new language with it.

23          (Pause in the proceedings.)

24              MR. KUEBEL:  And I just wanted to point out to the

25      Court that I think the change of moving it to the effective

1       date is probably better as it does give us some time if

2       Mr. Perez still wants to speak to me to try to work out

3       agreements for some of the other predecessors.  But when we

4       talked about this with the Court I believe yesterday, I think

5       we also talked about that there would be some process for

6       filing notice and bringing those back in front of the Court.

7              I just wanted to make sure that this language was

8       consistent with the Court's expectations in that regard.

9              THE COURT:  I actually noticed that too but if no

10      one was going to object, I wasn't going to raise it.  I do

11      think that's what we said.  Let's go ahead and I think, what,

12      give notice seven days prior to the effective date and that

13      should give everybody enough time to come into court if they

14      want to come in.  That cause any heartburn for anybody?

15           (No audible response.)

16              THE COURT:  Mr. Carlson, Mr. Perez, you all okay

17      with that?

18              MR. CARLSON:  I think the Debtors are fine with it.

19              MS. LIOU:  Yes, Your Honor.

20              THE COURT:  Mr. Kuebel, does that work for your

21      client?

22              MR. KUEBEL:  Yes.  Thank you, Your Honor.  And I

23      apologize for interrupting and --

24              THE COURT:  No --

25              MR. KUEBEL:   -- thank Your Honor for the courtesy

1    that --

2              THE COURT:  No, I think it's --

3              MR. KUEBEL:   -- you gave --

4              THE COURT:   -- the right thing to do.  I was going

5    to raise something on my own that I thought the parties would

6    agree to, but I didn't realize that was -- remained as an

7    issue, but I do think what you've raised is consistent with

8    what I said, and if we make it seven days, we'll get there.

9              I do have somebody from 504-832-0680 --

10             MR. KUEBEL:  Thank you.

11             THE COURT:   -- that wants to address an issue.

12             MR. FORSYTH:  Yes, Your Honor, this is David

13   Forsyth, I represent (indiscernible) Oil Company.  I just have

14   a question.  When will the new Plan supplement be filed?  I

15   know that we have one issue, that there was a production

16   handling agreement that was not scheduled, was being assumed,

17   but it was listed on Exhibit 3F to the Apache agreement, and

18   the way the documents read is that would prevail.  I had

19   understood that that was going to be changed and deleted from

20   the -- from Exhibit 3F.  And I'm sure there are other things

21   like that, I just wondering when those kinds of things will be

22   taken care of.

23             THE COURT:  Ms. Liou, is that in your bailiwick?

24             MS. LIOU:  Yes, Your Honor.  We are working on

25   updating documents and hoping to get that on file today.

1           THE COURT:  Good.  Thank you.

2           MR. FORSYTH:  Thank you.

3           THE COURT:  Thank you.

4           From 504-458-0820?

5           MR. NORTH:  Hi, Your Honor.  This is Tom North

6     (phonetic) for ROI Insurance Company.  I was just going to

7     raise the same point about the language on the additional

8     predecessor agreement, but it looks like that's been resolved.

9           THE COURT:  Are you okay with the seven days to

10    where if you have a problem, you can come on in and get a

11    hearing on it?

12          MR. NORTH:  Yeah, we are, Your Honor.  Thank you.

13          THE COURT:  Okay.  Thank you.

14          All right.  I am concluding the confirmation hearing

15    and I am moving the motion for relief from the stay hearing in

16    this same case.  Mr. Kadden, if could get you to press five

17    star, please.

18          Those of you that don't want to stick around to hear

19    Mr. Kadden, it's going to be interesting, but you can leave,

20    you don't need permission, just hang up your phone and

21    disconnect your camera and we're going to move to the motion

22    for relief from the stay.

23          Mr. Kadden, Good morning.

24          MR. KADDEN:  Well, good morning, Your Honor.

25    Benjamin Kadden.  I'm a little saddened by the number of

54

1     people who are dropping who don't want to watch my

2     performance.

3           Your Honor, we're here today after a very lengthy

4     and complicated confirmation hearing, and on behalf of

5     Atlantic Maritime Services, asking for what we believe to be

6     very targeted and limited relief from the automatic stay.  The

7     issue, Your Honor, that it mainly gets faced with is that we

8     are about approaching on July 16th and July 23rd, the one-year

9     deadlines for filing suit on our Louisiana oil well liens in

10    either State or Federal Court.

11          As Your Honor is well aware, we had initially sued a

12    number of non-debtor working interest working interest owners

13    to protect and preserve our rights vis-à-vis those entities.

14    Those matters have been stayed by agreement of the parties,

15    and following the hearing with Your Honor in November have

16    indicated and multiple times extended.  And most recently the

17    stay extension order now runs through the effective date of

18    the Plan.

19          The issue, Your Honor, is that we're now about three

20    weeks from the first set of liens expiring, the one is

21    expiring beyond the second set of liens July 23rd, a little

22    less than a month.  And quite frankly, Your Honor, insofar as

23    the effective date that comes prior to those dates, we

24    probably do not have an issue because the stay seems to have

25    effect under 362(c)(2)(C).

1    However, given that the Plan includes I think 21
2    contingent precedents, many of which are indeterminable on
3    their face, we're faced with the prospect of the effective
4    date not occurring prior to those one-year deadlines.

5    And so therefore what we ask, Your Honor, is to give
6    us authority and lift the automatic stay to do four things.
7    First, to amend the complaint that was filed against Ecopetrol
8    to name Talos as an individual party.  Second, to amend the
9    lease to name Talos.  Third and fourth, to file suit against
10   and file notice of lis pendens again to Houston Energy and Red
11   Willow with respect to our liens on Mississippi Canyon 519.

12   Thereafter, Your Honor, we would agree to re-
13   implement the automatic stay and extend the extension order to
14   the new lawsuit on MT519 unless and until the occurrence of
15   the effective date, that there wouldn't be any further
16   distraction in the (indiscernible) and Debtors, et cetera.

17   Your Honor, in the opposition filed by the Debtors,
18   albeit prior to confirmation, prior to the tremendous amount
19   of work and hard effort in getting to a largely consensual
20   confirmation order, the Debtors filed an objection really
21   based on three items.  First, they were concerned about the
22   Debtors being distracted during confirmation.  I will say I
23   believe the limited relief we've requested could have likely
24   been done by a stipulation and avoided briefing and a hearing,
25   but they opted not to get on that tab, and that's their

1  prerogative.

2          However, the distraction factor has now been mooted.

3  The case has been confirmed and we're now moving to a

4  confirmation order.

5          Second, they argue that the -- or the determination

6  on the policies on the dispositive motions in the pending

7  adversary we need relief from requested relief.  Your Honor,

8  we respond only to say that even insofar as Your Honor were to

9  rule in favor of the Debtors, our appeal period on such a

10  ruling would still not expire until after the applicable one-

11  year deadline.  And so in order to preserve our rights we

12  still need to file those lawsuits on or before July 16 and

13  July 23.

14          And then finally, Your Honor, they've raised the

15  prospects of Section 108(c), extending the deadline by 30

16  days.  And we set forth in our papers Section 108(c) is clear

17  that it's only applicable to claims against the Debtor.  And

18  while they cited no authority, we both have an found an

19  authority that it's specifically protected and they can give

20  us an additional 30 days.

21          And therefore, Your Honor, we would ask to take the

22  four limited steps set forth in our motion and we would agree

23  to reimposition of the automatic stay and application of the

24  stay extension order pending the effective date of the Plan.

25          THE COURT:  Mr. Kadden, thank you.

1          Who's going to respond for the Debtor?

2          MR. PEREZ:  Your Honor, I am.

3          THE COURT:  Go ahead, please.

4          MR. PEREZ:  Your Honor, a couple of points.  Number

5     one, obviously to the extent that the Court rules in our favor

6     with respect to any one of our summary judgments, this would

7     in essence moot it.  I understand Mr. Ord's (phonetic)

8     comments that they would want to preserve their ability to

9     appeal.  They don't have to do that right now, Your Honor.  At

10    the earliest they would be time barred in mid-July.  So

11    certainly to the extent that the Court rules between now and,

12    you know, even a few days before the 16th, the playing field

13    would be completely different.

14          And, Your Honor, the prejudice to us comes with the

15    incremental costs that we risk incurring if we lose.  And that

16    is -- that to the extent that there is an indemnification

17    obligation, that indemnification obligation would go -- would,

18    you know, continue to accrue even after we would -- you know,

19    even if we prevail that they're allowed to go forward at this

20    time.

21          So, Your Honor, at a minimum we would request that

22    if there is a -- that if the Court is inclined to lift the

23    stay before the Court rules that the stay not be lifted until,

24    you know, some time shortly before the 16th and shortly before

25    the 23rd so we minimize any impact and costs that potentially

1    the Debtors would be liable for, Your Honor.

2          THE COURT:  So, Mr. Kadden, what do you think of --

3    if we entered an order today and it stayed for 14 days, we're

4    talking about the 9th, if we did what you asked for and make

5    it explicit that the effect of the order, you know, occurs on

6    the 10th, because that would I think be what it would be as a

7    matter of law, we'll just make that clear, but in the meantime

8    we'll go ahead and hold the summary judgment hearing and see

9    what happens, which could moot it and no point in anybody

10   wasting money.  But assuming that you prevail on the summary

11   judgment, then on the 10th you could file what you need to

12   file.  Does that work, Mr. Kadden?

13         MR. KADDEN:  Your Honor, two comments.  One, I think

14   for purposes of timeliness that does, in fact, work.  Summary

15   judgment hearing has already been had, the matter's under

16   advisement, and so my only concern is even insofar as you were

17   to rule on or before July 10, we still need the ability to go

18   ahead and file those suits on or before the 16th.  Because the

19   appeal period will have not run in the period, even if you

20   were to issue a ruling this afternoon, we would still be

21   within the appeal period.

22         THE COURT:  You make a good point, Mr. Kadden.

23   First, and among other things, I didn't remember we'd already

24   had that hearing, so I'm going to have to go back and see what

25   the status of that is too.  What do you think of an order that

1     allows them to do that limited activity starting on the 10th

2     of July, Mr. Perez?

3               MR. PEREZ:  Your Honor, I think that's fine.  And

4     let me make one other point.  I would fully expect, Your

5     Honor, that if we go effective and the Court hasn't ruled, or

6     even if the Court has ruled, that we would seek to continue to

7     impose this -- you know, a stay pending, you know, final

8     resolution of that issue.  And it's probably the single

9     largest dollar amount in our -- in the comments, you know,

10    Mr. Green and Mr. Dane, so I really do think that the fact

11    that there is -- that we would go effective and the stay would

12    no longer affect, I clearly think that we would request that

13    that -- you know, that the whole thing be stayed until the

14    Court's able to --

15              THE COURT:  Yeah --

16              MR. PEREZ:   -- rule on our motion.

17              THE COURT:   -- I appreciate the heads up, and I'll

18    let you take that up when you get there.

19              For now I'm going to go ahead and grant the limited

20    relief requested by the movant.  I want the order to recite,

21    not just to rely on this 14-day stay so there's no confusion

22    about it.  And that the first day on which you can act under

23    it will be July 10.  I don't want to address the issue that

24    Mr. Perez is raising as to whether we would then extend the

25    stay past some effective date.  We'll deal with that when I

1    get an appropriate motion and can consider it.

2            So if you all can agree on the form of order, that

3    would be great.  It will be on the 10th and not 14 days.  So

4    if you takes you all five days to agree on a form of an order,

5    it's not going to cost you five days, Mr. Kadden, it'll -- I

6    want the specific date recited so that we don't have that kind

7    of an issue.  Okay?

8            MR. KADDEN:  Understood, Your Honor.  Thank you very

9    much.

10            THE COURT:  All right.  I show that concludes all

11    matters that we have.  Oh, wait, I have a motion to extend

12    time.  I'm not sure what that is.  Let me just see.

13        (Pause in the proceedings.)

14            THE COURT:  I didn't hear you?

15            UNIDENTIFIED SPEAKER:  I was going to ask one of the

16    Debtors (glitch in the audio), Your Honor.

17            THE COURT:  Just a minute.

18        (Pause in the proceedings.)

19            THE COURT:  It was a motion to extend time to file a

20    late filed objection to the Plan.  That is orally granted and

21    was considered.

22            All right.

23            MR. CARLSON:  Your Honor, we may --

24            MR. KADDEN:  I just want to quickly apologize.  I

25    did not realize I had failed to turn on my camera.  My

1    apologies, Your Honor.

2            THE COURT:  Yeah, we might have all been better off

3    that way, Mr. Kadden.  We just don't know.

4            (Laughter.)

5            MR. KADDEN:  Thank you, Your Honor.

6            MR. CARLSON:  Again, on behalf of everyone on our

7    team and all of our, you know, all of our clients, we really

8    want to thank you for all the time and effort that you put

9    into this and we really appreciate that we've gotten to this

10   point.  I believe that Mr. Dane wanted to say a couple few

11   words, if that's possible, Your Honor.

12           THE COURT:  Mr. Dane, good morning.  Let me get your

13   line active.  Good morning, Mr. Dane.  A pretty major

14   accomplishment for your company.  Congratulations.

15           MR. DANE:  Thank you very much, Your Honor.  I don't

16   want to take up too much more of the Court's time beyond the

17   year or so that this company has already taken in your court,

18   but I agree with you.  I did want to just take a couple of

19   minutes to acknowledge some of the parties that were involved

20   in this process.

21           Obviously, as Your Honor noted and many of the

22   parties noted, this has been a very long, very long process,

23   very complicated process with a lot of stakeholders.  As a

24   start we want to acknowledge the Court for the court and Your

25   Honor's time and dedication to this case.  We know that we've

1      put many, many issues in front of Your Honor and appreciate

2      all the thoughtfulness on each of the various topics.

3              I can say personally from me it's been a year-long

4      education process, and we all appreciate everything that the

5      Court has helped us accomplish through this restructuring.  We

6      did want you --

7              THE COURT:  Just don't come back for a graduate

8      degree, please.

9          (Laughter.)

10             MR. DANE:  I hope not.  It's not the intention, Your

11     Honor.

12             I did want to also acknowledge -- and I'm glad to

13     see Mr. Balasko joined us again -- the various folks that

14     Fieldwood has been engaged with at the Government.  I think

15     Mr. Balasko mentioned yesterday that the Government has spent

16     many hours working on this, I think that that's a patent

17     understatement.  I know that he's spent many, many hours and

18     it's been a momentous effort, took a lot of  patience.

19             And it's not just Mr. Balasko and his colleagues,

20     but also folks at the region as well whose job unfortunately

21     doesn't end here with the implementation of this Plan.  It's

22     going to require a lot of effort from those folks as well.

23     And so we appreciate all that effort.  And the Government was

24     very clear with Fieldwood from the outset about their

25     expectations for what this Plan needed to accomplish.

1            And there was frankly some very challenging

2     conversations, but what was apparent to the Fieldwood team was

3     how the folks that we worked with were just incredible

4     advocates for their department's interests.  You know, at

5     times almost too incredible for what we were hoping to

6     accomplish early on in getting this Plan pushed through

7     quickly.  But they did an amazing job, and they were very

8     important facilitators of the consensual arrangements that we

9     were able to accomplish that I know that we wouldn't have been

10    able to accomplish without their involvement.

11           And I'm pleased that my opinion, like I think I

12    heard Your Honor say, that I believe that this Plan is in the

13    best interest of the US, the Government, and we're excited to

14    be able to implement it.

15           One of the other things I wanted to mention, Your

16    Honor, at the outset of this case we made the comment that we

17    understood that our case presented a number of challenges to

18    many stakeholders, and that we were committed to finding as

19    many consensual resolutions as possible with this Plan, and I

20    believe we do do that.  But we're still committed to

21    continuing to resolve any parties' issues.  The company is

22    actively engaged in working with additional parties whose

23    issues may not have been resolved to their satisfy through

24    this order.  And our lines remain open to do so.  We're hoping

25    to put as many parties in the best possible place as we

1    possible can.

2            I did want to also acknowledge certain companies

3    that were instrumental in this Plan, and that's namely Apache,

4    Chevron, ENI and Hunt and their counsel.  These companies

5    recognized the challenges early on and they -- in my opinion

6    they stepped up and engaged with us in a very constructive way

7    to make this Plan happen.  I believe that they represent

8    really good corporate citizens and good overall business

9    people.

10            And so our commitment from Fieldwood's perspective

11   and the NewCo's perspective is to making sure that we can

12   successfully live up to the expectations that are outlined in

13   the Plan and that are outlined in these various consensual

14   arrangements.  And we appreciate the efforts of those various

15   companies and their contributions to this Plan.

16            Second to the last, Your Honor, Your Honor

17   acknowledged all the professionals in this case and this

18   really wouldn't have been possible without their effort.  I

19   would say it was a Herculean effort from the standpoint of the

20   professionals.

21            And that's really on all sides, I'm not only

22   speaking to the company and lenders' counsel, but all the

23   various professionals in this case.  I personally found it

24   very educational and enjoyable to get to understand all the

25   various parties and personalities and get to learn more about

1    those folks.   The intellectual horsepower that I observed
2    from this group was very intimidating, but also very, very
3    impressive.
4         So I really do want to say thank you to the Debtors'
5    and the lenders' professionals in particular because it's --
6    their contribution is really indescribable and it wouldn't
7    have been achievable without their amazing efforts.
8         And then lastly, Your Honor, the employees and
9    contractors of this company.  I know that we have -- we've
10   told Your Honor many times how vast, you know, our operations
11   are, but there's literally thousands of folks that have been
12   watching this process unfold for a very, very long time, and I
13   wanted to acknowledge those employees and contractors for
14   their dedication and efforts, despite all the challenges.
15        And there really was so many things that came to pop
16   up over the last year starting with the price challenges and
17   then we had COVID and then we had the continuing uncertainty
18   of this process.  We had an unprecedented hurricane season
19   last year.  There was just a number of things that continued
20   to present themselves as challenges throughout the course of
21   the last year or so.
22        We committed to communicating with these parties as
23   best as we could throughout the process.  I hope that we lived
24   up to their expectations from that standpoint.  But they were
25   all watching this for a very long time.  And these people

1    supported the business in an unbelievable way throughout all

2    these challenges.  It wouldn't have been possible to maintain

3    this business without their dedication.  And I know we all

4    know this, but the decisions that are made through this

5    process amongst all the parties have a very real impact on all

6    these people.

7            So I wanted to -- speaking on behalf of all of

8    Fieldwood employees and contractors, I did want to thank the

9    Court and all the other parties for providing an opportunity

10   for us to be able to look forward to the future of this

11   company and what we're able to accomplish under this Plan.  So

12   thank you very much, Your Honor.

13           THE COURT:  Mr. Dane, thank you so much for the

14   comments.  They are not unexpected given the quality that you

15   and your staff have shown throughout this case, that you would

16   recognize others, and it's very appreciated.  Thank you.

17           MR. DANE:  Thank you, Your Honor.

18           THE COURT:  Anybody else?  Ms. Russell, I see you

19   there, and I think about people like, you know, you and

20   Mr. Schaible who I will just highlight where you all don't

21   speak a whole lot at the hearings because you got all your

22   work done behind the scenes, as you typically do.  And so

23   we've got lawyers that don't get that well recognized at

24   hearings because the big heavy lifting in a case like this

25   isn't at the hearings, it's getting deals done.

1          And when I think of how you and Mr. Schaible must

2     have worked hand-in-hand to get that done as sort of the two-

3     lead outside counsel, it's just so impressive that -- what you

4     all did.  I know he's not here, but I hope you'll pass on to

5     him that I recognize that the two of you were in large part,

6     as you usually are, making deals behind the scenes, and it's

7     appreciated.

8          All right.  Yes, somebody else wanted to speak.  Go

9     ahead.  Ms. Russell, that's you.  Go ahead.

10          MS. RUSSELL:  Yes, Your Honor.  Thank you for your

11     kind comments.  And we echo then (indiscernible).  There were

12     so many wonderful professionals involved in this case, and we

13     appreciate all that Weil and Davis Polk and the company did to

14     get across the line.  But you, Your Honor, were perhaps the

15     most important piece of this, giving people hearings quickly

16     and considering all the different complicated arguments and

17     getting us to the right place.  Thank you.

18          THE COURT:  Well, that's actually not accurate.  I

19     mean in fairness I mean judges do play a major role in a case

20     like this, but we can't determine the outcome.  The outcome is

21     determined is by the parties that are able to put together

22     such a complicated transaction.

23          You know, I've spoken before, and I believe even in

24     these hearings, that people think that the Government is just

25     full of mindless bureaucrats, and when you look at what the

1    Government has done in a case like this to represent the

2    interests of the people in the United States, not in a

3    mindlessly bureaucratic way but in a way where they have, you

4    know, maximized the outcome.  And, you know, that's a credit

5    to Mr. Balasko.

6           He stands on the shoulders of Ms. Hudson, who I

7    think paved the way for this type of effort to occur where the

8    Government has decided to take a realistic approach to having

9    to solve problems.  And when we think of all the people that

10   came together on this, it wasn't me.  It was you and the

11   Debtors and the Government and everyone.

12          So I appreciate the comments and I may have given you

13   all the ability to go get a deal done, but I didn't get the

14   deal done.  You all got the deal done, and it's very

15   appreciated.

16          All right.  Well, hold on, I've got one other person

17   that wants to talk.  Oh, that was just you again.  Okay.

18          Thank you.  We're in adjournment until 11:00 o'clock

19   this morning.

20          (Hearing adjourned 9:45 a.m.)

21

22

23

24

25                         * * * * *

1    I certify that the foregoing is a correct transcript

2  to the best of my ability due to the condition of the

3  electronic sound recording of the ZOOM/telephonic proceedings

4  in the above-entitled matter.

5   /S./ MARY D. HENRY

6  CERTIFIED BY THE AMERICAN ASSOCIATION OF

7  ELECTRONIC REPORTERS AND TRANSCRIBERS, CET**337

8  JUDICIAL TRANSCRIBERS OF TEXAS, LLC

9  JTT TRANSCRIPT #64188

10  DATE FILED:  JULY 1, 2021

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25