**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | | |
|---|---|---|
| In re: | § | **Chapter 11** |
| | § | |
| **FIELDWOOD ENERGY LLC, *et al.*,** | § | **Case No. 20-33948 (MI)** |
| | § | |
| | § | **(Jointly Administered)** |
| Debtors.[1] | § | |
| | § | |

**<u>LLOG'S RESPONSE TO DEBTORS' REPLY
TO LLOG'S CONFIRMATION OBJECTION</u>**
**[Related to Docket No. 1826]**

LLOG Exploration Offshore, L.L.C. and LLOG Energy, L.L.C (collectively, "**LLOG**")

file this Response to *Debtors' Reply to LLOG's Confirmation Objection* (Docket No. 1826)

("**Reply**") and in support of a determination that LLOG has a valid mortgage and security interests

in the GC 201 ORRI (as defined herein).  Accordingly, LLOG avers as follows:

**<u>INTRODUCTION</u>**

LLOG  can show, and has provided evidence sufficient to demonstrate, that it has a valid

mortgage lien and security interest in the GC 201 ORRI.  Rather, than refute this evidence, Debtors

have spent an inordinate amount of its Reply claiming that LLOG's mortgage and/or security rights

are invalid because Fieldwood's interest in the GC 201 ORRI is merely an interest in sublease rent.

This argument is unavailing and serves only as a red herring to distract from the evidence

supporting LLOG's valid mortgage lien and security interests in the GC 201 ORRI.  Debtors'

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, as applicable, are: Fieldwood Energy LLC (6778), Fieldwood Energy Inc. (4991), Fieldwood Onshore LLC (3489), Fieldwood SD Offshore LLC (8786), Fieldwood Energy Offshore LLC (4494), Fieldwood Offshore LLC (2930), GOM Shelf LLC (8107), FW GOM Pipeline, Inc. (8440), Galveston Bay Procession LLC (5703), Galveston Bay Procession LLC (0422), Fieldwood Energy SP LLC (1971), Dynamic Offshore Resources NS, LLC (0158), Bandon Oil and Gas, LP (9266), and Bandon Oil and Gas GP, LLC (9172). The Debtors' primary mailing address is 2000 W. Sam Houston Parkway S., Suite 1200, Houston, TX 77042.

remaining arguments regarding the scope of LLOG's secured claim likewise fail, for all the reasons set forth more specifically below.

## FACTUAL AND PROCEDURAL BACKGROUND

1.      LLOG Exploration Offshore, L.L.C. (formerly LLOG Exploration Offshore Inc. and sometimes referred to herein as "**LEO Inc**."), as Operator, and Fieldwood Energy Offshore LLC  ("**Fieldwood**"), as Non-Operator and successor to Davis Offshore, L.P. ("**Davis**"), entered into that certain Offshore Operating Agreement dated December 12, 2002 (the "**GC OOA**").[2]

2.      Under the GC OOA, Fieldwood, as Non-Operating Party, granted to LLOG Exploration Offshore, L.L.C., as Operating Party, a mortgage in and over:

> [A]ll of its rights, titles, and interests in and to (a) the Lease(s), (b) the oil and gas in, on, under and that may be produced from the lands covered by the Lease or included within the Contract Area, and (c) all other immovable property susceptible of mortgage situated within the Contract Area.[3]

3.      The GC OOA provides that "this mortgage is given to secure the complete and timely performance of and payment by each Non-Operating Party of all obligations and indebtedness of every kind and nature, whether now owed by such Non-Operating Party or hereafter arising pursuant to this Agreement."[4]

4.      In addition, under the GC OOA, Fieldwood, as non-operator, granted to LLOG Exploration Offshore, L.L.C., as operator, "a continuing security interest in and to all of its rights, titles, interests, claims, general intangibles, proceeds, and the products thereof, whether now existing or hereinafter acquired," including "in and to (a) all oil and gas produced from the lands or offshore blocks covered by the Lease[s] or the Contract Area or attributable to the lease or the Contract Area when produced, (b) all accounts receivable accruing or arising as a result of the sale

---

[2] Docket No. 1603-1.
[3] Docket No. 1603-1 at p 178.
[4] Docket No. 1603-1 at p. 178.

of such oil and gas . . . , (c) all cash and other proceeds from the sale of such oil and gas once produced, and (4) all platforms, wells, facilities, fixtures, other corporeal property . . . ."[5]

5.      Initially,      the      "Contract      Area"      as      set      forth      in      Exhibit      "A" to the GC OOA included only the following offshore lease (referred to herein as "**GC 157**"):

> Oil and Gas Lease dated effective June 1, 2002, bearing Serial No. OCS-G 24154, between the United States of America, acting though the Regional Director, Gulf of Mexico OCS Region, Mineral Management Service, as Lessor, LLOG Exploration Offshore Inc. and Davis Offshore, L.P., as Lessee, covering and affecting lands described as Green Canyon Block 157, Official Protraction Diagram, NG 15-03 and containing 5,760.00 acres, more or less.[6]

6.      Subsequently, in 2009, LEO Inc. and Davis entered into that certain Farmout Agreement, dated effective October 1, 2008, with Shell Offshore Inc. ("**SOI**") and Marathon Oil Company ("**Marathon**") (the "**Farmout Agreement**").[7]

7.      Pursuant to the Farmout Agreement, LEO Inc. and Davis earned SOI's and Marathon's operating interest in the following lease (referred to herein as "**GC 201**"):

> Oil and Gas Lease of Submerged Lands under the Outer Continental Shelf Lands Act between the United States of America, as Lessor, and BP Exploration Inc., as original Lessee, dated effective May 1, 1990, covering all of Block 201 Green Canyon, OCS Official Protraction Diagram, NG 15-3, containing approximately 5,760 acres, insofar as and only insofar as to the northeast quarter (NE/4) of said Lease, covering those depths down to 17,000 feet true vertical depth subsea.[8]

8.      Section 1.10 of the Farmout Agreement expressly states that operations on GC 201 "shall be governed pursuant to the terms of the Green Canyon Block 157 Offshore Operating Agreement  . . . between LLOG and Davis that covers all of Green Canyon Block 157."[9]

---

[5] Docket No. 1603-1 at p. 179.
[6] Docket No. 1603-1 at p. 156.
[7] Docket No. 1603-5.
[8] Docket No. 1603-5 at p. 31.
[9] Docket No. 1603-5 at p. 7.

295149v1

9.      In December 2014 and effective as of December 12, 2002, LLOG and Fieldwood entered into that certain Ratification and First Amendment to Operating Agreement (the "**GC OOA Ratification**").[10]

10.      Pursuant to the terms  of  the GC OOA Ratification, the GC OOA was amended to add GC 201 to the Contract Area.[11]

11.      On February 19, 2009, and effective as of October 1, 2008, LEO Inc., Davis, SOI, and Marathon entered in that certain Assignment and Conveyance of Overriding Royalty Interest (the "**GC 201 ORRI Assignment**").[12]

12.      Pursuant to the GC 201 ORRI Assignment, LEO Inc. and Davis, as Assignors, assigned to SOI and Marathon, as Assignees, "an overriding royalty interest . . .  in, to and under the Contract Area on all oil, gas, and associated liquid hydrocarbons produced on the Contract Arear, as all calculated and set forth [in the GC 201 ORRI Assignment]."[13]

13.      In July of 2009, LEO Inc. and Davis entered in that certain Memorandum of Operating Agreement and Financing Statement (Louisiana), effective as of December 12, 2002, and signed by LEO Inc., as Operator, on July 21, 2009, and by Davis, as Non-Operating Party, on July 21, 2009, (the "**MOA**"), which was then promptly corrected by that certain Correction to Memorandum of Operating Agreement and Financing Statement (Louisiana), signed by LEO Inc. on September 9, 2009, and  Davis on September 1, 2009, (the "**Correction to MOA**") (the MOA as corrected by the Correction to MOA, is referred to herein as the "**Corrected MOA**").[14]

---

[10] Docket No. 1603-2.
[11] Docket No. 1603-2 at p. 1.
[12] Docket No. 1603-6.
[13] Docket No. 1603-6 at p. 1.
[14] *See* Docket Nos. 1603-8, 1603-9.  The correction merely changed the GC 201 lease reference from Garden Banks to Green Canyon.

14.     The Corrected MOA includes, at Section 5.3, a grant by Davis of mortgage liens and security interests in favor of LEO Inc., as Operator, to secure the following obligations of Davis, as a Non-Operating Party:

(a)  [T]he complete and timely performance of and payment by such Non-Operating Party to the Operator of all of its obligations and indebtedness of every kind and nature, whether now owed by such Non-Operating Party or hereafter arising pursuant to the Operating Agreement and this Memorandum; and

(b)  the payment of all expenses incurred by the Operator and the Participating party (or on account of ) any and all operations conducted pursuant to the Operating Agreement [the OOA] ('Costs') and other expenses properly charged to such Non-Operating Party. . . .[15]

15.     LLOG and Fieldwood also entered into that certain Amendment and Ratification of Memorandum of Operating Agreement and Financing Statement (Louisiana), dated effective June 1, 2014, signed by LLOG Exploration Offshore, L.L.C. on December 16, 2014, and by Fieldwood on December 2, 2014 (and LLOG Energy, L.L.C., on December 16, 2104, as it relates to GC 157) (the "**Ratification of Corrected MOA**").[16]

16.     The Ratification of Corrected MOA states "[t]his amendment and ratification is to be recorded in the Conveyance Records and in the Mortgage Records of Terrebonne Parish, Louisiana, and in the Uniform Commercial Code Records of the Louisiana Secretary of State, through the Terrebonne Parish Clerk of Court, thereby providing notice of the mutual liens and security interest now held by the parties to the MOA."[17]   As such, Fieldwood ratified all acknowledgments and grants of mortgages and security interests provided for Davis previously.

---

[15] Docket No. 1603-8 at pp. 7 – 8.
[16] Docket No. 1603-20.
[17] Docket No. 1603-20 at p. 3.

295149v1

17.     On August 5, 2014, Davis Petroleum Acquisition Corp, as Seller, Davis Offshore Partners, LLC and Davis entered into that certain Equity Purchase Agreement with Fieldwood, as Buyer.[18]

18.     By Assignment, Bill of Sale and Conveyance, dated effective June 1, 2014, by and among Davis, a Davis affiliate, and Fieldwood, signed by Davis and Fieldwood on October 22 (the "**Davis to Fieldwood GC 201 Lease Assignment**"), Davis conveyed to Fieldwood all of Davis' right, title and interest in and to the Contract Area, as well as agreements and contracts to which Davis was a party pertaining to the assigned interests.[19]

19.     The Davis to Fieldwood GC 201 Lease Assignment expressly provides that Fieldwood, as Assignee, "shall be responsible for all Operating Expenses, as well as capital costs and abandonment costs, attributable, in each case, to the period after [June 1, 2014]"[20]   As Assignee, Fieldwood likewise assumed and agreed  to "fulfill, perform, pay, and discharge all of the Assumed Obligations."[21]  Assumed Obligations, as defined under the Davis to Fieldwood GC 201 Lease Assignment, includes "P&A Obligations (regardless of whether incurred prior to, on or after [June 1, 2014]."[22]

20.      Pursuant to that certain Overriding Royalty Assignment (the "**SOI Assignment of the GC 201 ORRI**") effective as of January 1, 2015, by and between SOI, as Assignor, and Fieldwood, as Assignee, SOI assigned and conveyed to Fieldwood all of SOI's right, title and interest in the "**GC 201 ORRI**" (as defined below).[23]

---

[18] Docket Nos. 1603-18, 1603-19.
[19] Docket No. 1603-17.
[20] Docket No. 1603-17 at p. 4.
[21] Docket No. 1603-17 at p. 5.
[22] Docket No. 1603-17 at p. 5
[23] Docket No. 1603-21 at pp. 2,6.

295149v1

21.     The GC 201 ORRI is described in Attachment "A" to the SOI Assignment of the GC 201 ORRI as an overriding royalty interest equal to 4.87999%, reserved by SOI in that certain Assignment and Conveyance of Overriding Royalty Interest dated effective October 1, 2008, by and between LEO Inc., Davis, SOI and Marathon[24], "covering the NE/4 Green Canyon Block 201 from the surface to 17,000' subsea TVD."[25]

22.     During the period of July 2009 through February 2018, the following documents related to LLOG's mortgage lien and security rights were filed in the public records of Terrebonne Parish, Louisiana, as described and indicated below:

A.  On July 27, 2009, that certain Memorandum of Operating Agreement and Financing Statement (Louisiana), dated effective December 12, 2002, and signed by LEO Inc., as Operator, on July 15, 2009, and by Davis, as Non-Operating Party, on July 21, 2009, (as referred to herein as the "MOA") was recorded in the public records of Terrebonne Parish, Louisiana under Mortgage Book 2201, Page 579, File No. 1328132.[26]

B.  On September 16, 2009, that certain Correction to Memorandum of Operating Agreement and Financing Statement (Louisiana), signed by LEO Inc. on September 9, 2009, and by Davis on September 1, 2009 (as referred to herein as the "Correction to the MOA"), was recorded in the public records of Terrebonne Parish, Louisiana under Mortgage Book 2215, Page 126, File No. 133165.[27]

C.  On August 16, 2013, the certain UCC Financing Statement (Form UCC1), with a copy of both the MOA and the Correction to MOA attached, was recorded under UCC File No. 1434772 of the records of Terrebonne Parish, Louisiana, and under File No. 55-1434772

---

[24] The  GC 201 ORRI Assignment is filed at Docket No. 1603-6.
[25] Docket No. 1603-21 at p. 6.
[26] Docket No. 1603-8.
[27] Docket No. 1603-9.

of the UCC records maintained by the Louisiana Secretary of State (the "**Initial Financing Statement**").[28]

D.  On April 8, 2014, a Notice and Request of Reinscription, dated April 1, 2014, signed by the secured party LLOG (successor by conversion to LEO Inc.), was recorded in Terrebonne Parish, Louisiana, under Mortgage Book 2645, Page 470, File No. 1450879 (the "**Notice of Reinscription**").[29]

E.  On February 3, 2015, that certain Amendment and Ratification of Memorandum of Operating Agreement and Financing Statement (Louisiana), dated effective June 1, 2014, signed by LLOG Exploration Offshore, L.L.C. on December 16, 2014, and by Fieldwood on December 2, 2014 (as referred to herein as the "Ratification of Corrected MOA") was recorded in Terrebonne Parish, Louisiana under Mortgage Book 2716, Page 268, File No. 1473360.[30]

F.  On February 3, 2015, a Form UCC-3 referencing the Initial Financing Statement, with attached copy of Ratification of Corrected MOA was filed in the UCC Records of Terrebonne Parish, Louisiana, under UCC File No. 1473361 and in the State of Louisiana UCC Records under File No. 55-1473361.[31]

G.  On February 3, 2015, a UCC Financing Statement Amendment, referencing the Initial Financing Statement was filed  under UCC File No. 1473362, and in the State of Louisiana UCC Records under File No. 55-1473362.[32]

---

[28] Docket No. 1603-10.
[29] Docket No. 1603-16.
[30] Docket No. 1603-20.
[31] Docket No. 1603-11.
[32] Docket No. 1603-12.

H. On February 3, 2015, a UCC Financing Statement Amendment, referencing the Initial Financing Statement was filed under UCC File No. 1473363, and in the State of Louisiana UCC Records under File No. 55-1473363.[33]

I. On February 3, 2015, a UCC Financing Statement Amendment, referencing the Initial Financing Statement was filed under UCC File No. 1473364, in the State of Louisiana UCC Records under File No. 55-1473364.[34]

J. The Initial Financing Statement was continued on February 29, 2018, by filing of the that certain UCC Financing Statement Amendment (Form UCC3), marked as a Continuation of Initial Financing Statement No. 55-1434772, recorded under UCC File No. 1552263 of the records of Terrebonne Parish, Louisiana, and under File No. 55-1552263 of the UCC records maintained by the Louisiana Secretary of State (the "**Continuation Statement**").[35]

23.      On August 3 and 4, 2020, Fieldwood and its affiliated Debtors (collectively, the "**Debtors**") each commenced with this Court voluntary cases under Chapter 11 of the United States Bankruptcy Code.

24.      Debtors' *Eighth Amended Joint Chapter 11 Plan of Fieldwood Energy LLC and its Affiliated Debtors* (the "**Plan**") provides, in sum, that "as of and subject to the occurrence of the Effective Date" all executory contracts not, among other things, "previously assumed or rejected by Debtors" or "identified . . . for assumption and assignment to the Credit Bid Purchaser in accordance with the Credit Bid Purchase Agreement" shall be deemed rejected.[36]

---

[33] Docket No. 1603-13.
[34] Docket No. 1603-14.
[35] Docket No. 1603-15.
[36] Docket No. 1751-1 at pp. 74 – 75.

295149v1

25.     Debtors did not identify the GC OOA on their *Notice of Assumption of Executory Contracts in Schedule of Assumed Contracts* as amended (Docket Nos. 1395 and 1456); nor have Debtors taken any other steps to assume the GC OOA, to date.

26.     As to treatment of the covered leases, Debtors' Plan indicates Fieldwood intends to abandon its fifteen percent (15%) record title interest in GC 157.[37]  The Plan further indicates that Fieldwood intends to essentially bifurcate its interest in GC 201 – assigning Fieldwood's one hundred (100%) percent record title interest in all portions of GC 201, except for the NE/4, to the Credit Bid Purchaser,  while abandoning the remainder of its working interest in GC 201 (including Fieldwood's operating rights in the northeast quadrant).[38]  Debtors likewise intend to assign Fieldwood's interest in the GC 201 ORRI (defined herein) to the Credit Bid Purchaser, which is only associated with the aliquots and depths it is abandoning in the GC 201 lease block.[39]

27.     On June 2, 2021, LLOG filed its Plan Objection (Docket No. 1464) asserting that the GC 201 lease, GC 201 ORRI included, is burden by LLOG's valid and perfected mortgage lien and security rights.[40]  LLOG's Plan Objection indicated that it intended to file a secured claim for rejection damages which, based on Debtors' proposed plan treatment, would include Fieldwood's proportionate share of P&A obligations for GC 201 and GC 157.[41]

28.     Accordingly, on July 17, 2021, LLOG filed a proof of claim against Fieldwood, in the total amount of $15,479,579.87, for rejection damages (the "**Rejection Damages Claim**").[42]

29.     The Rejection Damages Claim is comprised of $902,490.92 in unpaid joint interest billings and Fieldwood's proportional share of the future plugging and abandonment and

---

[37] Docket No. 1756 at p. 309.
[38] Docket No. 1587 at p. 165; Docket No. 1756 at p. 309.
[39] Docket No. 1587 at p. 165.
[40] Docket No. 1464 at p. 7.
[41] Docket No. 1464 at p. 8.
[42] *See* Claim No. 132 as filed on the claims register in the Main Bankruptcy Case.

295149v1

decommissioning obligations associated with GC 201 and GC 157 totaling approximately $14,577,088.95, secured up to the value of LLOG's collateral.

30.     On June 25, 2021, this Court confirmed the Plan (the "**Confirmation Order**").[43] The Confirmation Order provides that Debtors and LLOG "agree to adjourn the issues raised by LLOG in its [Plan Objection] to a later date," including the extent to which "LLOG holds a valid and enforceable lien in the GC 201 ORRI."[44]

## ARGUMENT

## A.  LLOG's Mortgage And Security Rights Filings Are Consistent With Louisiana Law.

31.     The elements of a mortgage under Louisiana law are straightforward.   Under Louisiana Civil Code article 3288, titled "Requirements of contract of mortgage," a mortgage contract need only "state precisely the nature and situation of each of the immovables or other property over which it is granted; state the amount of the obligation, or the maximum amount of the obligations that may be outstanding at any time and from time to time that the mortgage secures; and be signed by the mortgagor."[45]   Debtors cannot, and have not, disputed that the Corrected MOA and Correction to MOA contain these elements.[46]   Instead, without any legal support, Debtors attack LLOG's filings solely on the basis that Corrected MOA and the Correction to MOA were attached to UCC forms as they were filed in the appropriate mortgage records.   The mortgages are valid notwithstanding the fact that UCC cover pages were included in the filings.

---

[43] Docket Nos. 1742, 1751.
[44] Docket No. 1751 at p. 109.
[45] La. Civ. Code art. 3288.
[46] To the extent Debtors maintain that LLOG's filings are invalid because originals of the Corrected MOA and the Correction to MOA were not filed in the Mortgage Records of Terrebonne Parish (*see* Docket No. 757 at pp. 20-21, Docket No. 1826 at p. 14, ¶ 39), LLOG has introduced evidence to the contrary which has not been refuted by Debtors. *See* Declaration of Allyson Bolton Peter at Docket No. 1603-7.

11

32.     Debtors' argument that the filings are somehow ineffective against third parties because they contain UCCs is likewise unconvincing.  Under Louisiana law, a mortgage is effective against third parties "from the time it is filed for registry in the parish where the property is located."[47]  LLOG's mortgages, therefore, became effective against third parties when they were filed.  The simple inclusion of a UCC in those filings does not invalidate the effect of the underlying mortgage on third parties.

33.     Indeed, courts have consistently declined to find that a mortgage is ineffective against third parties where third parties were sufficiently put on notice.  For example, in *Carr v. Oaktree Apartments*, a Louisiana appellate court considered whether a judicial mortgage filing was ineffective against third parties because it contained erroneous spellings.[48]  The appellate court found that the lower court committed manifest error in holding the mortgage was ineffective against third parties, reasoning that: "an inaccurate or faulty description of real property in a mortgage or deed may suffice as notice to third parties if the description is 'adequate to enable the court to locate and identify the property with certainty, and if it is not so inaccurate or faulty as to be misleading.'"[49]  The court further noted that "errors in a recorded document do not automatically preclude the effectiveness of the document against third persons;" rather, "the issue is whether a recorded document provides 'sufficient notice' to a third party."[50]  Applying these guidelines, the court determined that the filing was sufficient notice of the judicial mortgage affecting the relevant property interest.[51]

---

[47] La. Civ. Code art. 1839.
[48] *Carr v. Oaktree Apartments*, 45,514 (La. App. 2 Cir. 8/11/10), 46 So. 3d 793, 795, writ denied, 2010-2092 (La. 11/12/10), 49 So. 3d 896.
[49] *Id.* (citing *Voelkel v. Harrison*, 572 So. 2d 724, 727 (La. Ct. App. 1990)).
[50] *Id.* at 797.
[51] *Carr,* 46 So. 3d 793 at 799.

34.     Similar to *Carr,* the instruments recorded in the Mortgage Records of Terrebonne Parish under File Nos. 1328132 and 1331665 – the Corrected MOA and the Correction to MOA, respectfully – give third persons full knowledge of the existence and contents of the mortgage granted thereunder and the property encumbered thereby.[52]   The inclusion of cover pages in the form of standard UCCs does not nullify or otherwise diminish such notice to third parties.  To hold otherwise would have a sweeping effect as all mortgage filings which attach UCC forms would be deemed ineffective against third parties.

**B.  Debtors' Rent Arguments Are Unpersuasive And Do Not Serve To Invalidate LLOG's Mortgage Lien And Security Interests.**

35.     Rather than addressing the ample evidence LLOG has provided in support of its valid and perfected mortgage and security interests in the GC 201 ORRI[53], Debtors have shifted their focus to arguing that LLOG failed to meet the requirements for creating and perfecting an assignment or pledge for rents.  Specifically, Debtors claim that "each of LLOG's attempts to perfect its alleged Security Rights in the [GC 201] ORRI failed under Louisiana law" because "Fieldwood's interest in the [GC 201] ORRI constitute 'rent' derived from the sublease created as part of the 2008 Shell Transaction under Louisiana law."[54]

36.     None of the precedent cited by Debtors in support of this position suggest that, assuming a sublease can be created through the reservation of an overriding royalty interest, such

---

[52] The MOA and the Correction to MOA were attached to the form financing statements when filed and recorded in the Mortgage Records of Terrebonne Parish, Louisiana, and as such these agreements became, in their entirety, a part of the filings made under File Nos 1328132 and 1331665, in the same manner that Louisiana law recognizes that other writings attached to a document become part of the document to which they are attached with the same force and effect as if the provisions of the attached document had been set forth therein in full.  *See, e.g., Russelville Steele Co. v. A & R Excavating*, 624 So. 2d 11, 13-14 (La. App. 5 Cir. 1993); *Action Finance Corporation v. Nichols*, 180 So. Ed 81, 83-84 (La. App. 2 Cir. 1965).

[53] LLOG has provided Debtors with recordation and other supporting documentation sufficient to show that it maintains valid and perfected mortgage liens and security interests.  *See* Docket Nos. 1603-1 through 1603-20.

[54] Docket No. 1826 at p. 14, ¶ 40. Though not expressly defined by Debtors, LLOG understands the "2008 Shell Transaction" to mean the Farmout Agreement and GC 201 ORRI Assignment.

sublease exists, and the reserved overriding royalty is considered rent, for all purposes. A review of the cases cited by Debtor suggest that, where Louisiana courts have considered whether a reservation of an overriding royalty creates a sublease, it has done so in the context of issues not germane to those currently before this Court – such as determining whether the creation of a sublease creates obligations as between the sublessor and overriding royalty interest holder or in distinguishing between a sublease or assignment for purposes of determining whether a lease was maintained by production.[55]

37.     More importantly, Debtors fail to show how or why  these cases displace well established Louisiana precedent showing that the GC 201 ORRI is a real right and an incorporeal immovable susceptible to mortgage.[56]

38.     The Louisiana Supreme Court has explained that an overriding royalty interest is an appendage to the mineral lease out of which it is created, and is effective as an accessory right, with the overriding royalty interest's continued existence dependent on the continued existence of such mineral lease.[57]  Like the mineral lease itself, and the lessee's interest in a mineral lease, the overriding royalty interest is classified as a mineral right, a real right and an incorporeal

---

[55] *See, e.g., Tidelands Royalty B Corp. v. Gulf Oil Corp*., 804 F.2d 1344 (5th Cir. 1986) (whether there exists any implied obligations from lessee to overriding royalty holders); *Smith v. Sun Oil Co.*, 165 La. 907, 116 So. 379 (1928) (whether the subject transaction was a sublease or assignment for purposes of determining whether lease expired for lack of production); *Bond v. Midstates Oil Corp.*, 219 La. 415 (1951) (whether production in paying quantities ceased on lease turned upon whether certain instrument an assignment or a sublease); *Broussard v. Hassie Hunt Tr*., 231 La. 474, 477, 91 So. 2d 762, 763 (1956) (considered distinction between assignment and sublease for purposes of determining whether lessor entitled to cancellation of lease against defendant for failure to properly develop same); *see also NGP Capital Resources Company v. ATP oil & Gas Corp.*, 804 F.2d 1344, 1349 (5th Cir. 1986), Docket No. 145 at pp. 12 - 13 (considering whether there was a genuine issue of material fact as to whether the transaction consistent with term ORRI with a loan under Louisiana law).

[56] *See In re ATP Oil & Gas Corp*., No. 12-36187, ADV 12-03443, 2014 WL 61408, at *8 (Bankr. S.D. Tex. Jan. 6, 2014) ("Under Louisiana law, an overriding royalty is classified as a 'real right' in 'incorporeal immovable property.'"); *Robichaux v. Pool*, 209 So. 2d 77, 79 (La. Ct. App. 1968) ("Overriding royalty interests are classified as real rights and incorporeal immovable property."); *Yellow Rock, L.L.C. v. Sasol N. Am., Inc.*, No. CV 05-1443, 2006 WL 8456079, at *3 (W.D. La. Aug. 16, 2006), *report and recommendation adopted*, No. CV 05-1443, 2006 WL 8456139 (W.D. La. Sept. 27, 2006) (same).

[57] *Fontenot v. Sun Oil Company*, 257 La. 642, 651, 243, So. 2d 783, 786 (La 1971); *Ascher v. Midstates Oil Corp.*, 222 La. 812, 823-824, 64 So. 2d 182, 186 (La 1953); *see also* La. R.S. § 31:126 and Comments.

immovable.[58]  Accordingly, a mortgage may be established over an overriding royalty interest in the same manner that a mortgage may be established over the lessee's working interest in a mineral lease.[59]

39.     Even assuming that the reservation of an overriding royalty interest could create a sublease and sublease rent for purposes of the mortgage and security issues presently before this Court, the precedent cited by Debtors remains unpersuasive.  For example, in *Sun Oil Company* (a case upon which Debtors principally rely), plaintiff landowner leased to defendant Sun Oil Company the right to produce oil and gas and other minerals.[60]  Defendant thereafter subleased its rights to certain acreage to another individual, Elliot.[61]  The issue before the court was whether the subject oil and gas lease had been forfeited for lack of production which turned upon whether Elliot had acquired a sublease or an assignment of the original lease.[62]  The court ultimately determined:

> The conditions of and in the contract between the Sun Company and Elliott which made it a sublease, and not merely an assignment, were that the Sun Company did not dispose of all of its rights and obligations under the original lease on the 20 acres of land, but granted to Elliott ***an interest less than its own***, ***and imposed upon him obligations under penalty of reversion to the Sun Company***, in addition to the obligations which Elliott assumed in favor of the original lessor.[63]

40.     Under the Farmout Agreement, SOI and Marathon did not convey to LLOG and Davis an operating rights interest in an amount less than what they owned, as was the case in *Sun Oil Company*.  Rather, Section 1.3 of the Farmout Agreement provides that, upon LLOG and Davis establishing an Earning Well on the Contract Area, the following would occur:

---

[58] *Terry v. Terry*, 565 So. 2d 997, 1000 (La .App. 1 Cir. 1990).
[59] La R.S. § 31:203, and Comments.
[60] *Sun Oil Co*., 165 La at 908.
[61] *Id*. at 909.
[62] *Id.* at 910.
[63] *Id.* at 912 (emphasis added).

[LOGG and Davis] shall earn and [SOI and Marathon] shall assign to [LOGG and Davis] . . . ***an undivided one hundred percent (100% 8/8ths) operating rights interest in the Lease***, insofar and only insofar as the Contract Area, reserving unto [SOI and Marathon] a six and one-half percent (6.5% of 8/8ths) overriding royalty interest ("ORRI") in and to all production from said operating rights interests.[64]

41.     Nor did the Farmout Agreement "impose[] upon [LLOG and/or Davis] obligations under penalty of reversion to [SOI and/or Marathon]."[65] To the contrary, LLOG and Davis only earned 100% of SOI's and Marathon's operating rights interest to the extent that they established the Earning Well.

42.     Further, to the extent that the Farmout Agreement terminated thereafter, the expectation was not that the operating rights interests would simply revert back to SOI and Marathon.  Rather, in the event of termination of the Farmout Agreement following assignment of 100% of SOI's and Marathon's operating rights interests to LLOG and Davis, Section 4 of the Farmout Agreement contemplates "an assignment re-conveying . . . the operating rights interest . . . previously received."[66] Thus, the conditions that rendered the transaction a sublease as opposed to an assignment in *Sun Oil Company* are not present here.

43.     Even assuming *arguendo* that the 2008 Shell Transaction created a sublease, there is no basis for determining that the SOI Assignment of the GC 201 ORRI – an assignment of a real property right under Louisiana law – assigned only a right to receive rental payments.[67] Debtors summarily conclude that "[u]nder the original sublease, LLOG and Davis were the sublessees and

---

[64] *See* Farmout Agreement Section 1.3;  *see also* "Exhibit A" to Farmout Agreement.  Docket No. 1603-5 at pp. 3, 23.
[65] *Sun Oil Co.*, 165 La. at 912.
[66] *See* Farmout Agreement, Section 4.1; *see also* Section 4.2 (providing that, in the event of default, SOI may "request a re-conveyance" of the subject operating right.  Docket No. 1603-5 at pp. 10 – 11.
[67] *See In re ATP Oil & Gas Corp.*, 2014 WL 61408, at *8 ("Under Louisiana law, an overriding royalty is classified as a 'real right' in 'incorporeal immovable property.'"); *Robichaux*, 209 So. 2d 77 at  79 ("Overriding royalty interests are classified as real rights and incorporeal immovable property.").

16

Shell and Marathon were the sublessors, and Fieldwood's receipt of the assignment of the [GC 201] ORRI was a transfer of the sublessor's (Shell's) right to rents."[68]

44.     Notably, Debtors make no reference to the transaction under which Fieldwood acquired its interest in the GC 201 ORRI. This is likely because the SOI Assignment of the GC 201 ORRI is even further removed from the transaction considered in *Sun Oil Company* than the 2008 Shell Transaction, as the former coincided with SOI's assignment of its entire interest in the GC 201 Lease to Fieldwood.[69]  Given that SOI transferred its entire interest in the GC 201 Lease to Fieldwood, it cannot be construed as having transferred to Fieldwood "an interest less than its own."[70]

**C. Regardless Of Whether There Is Ultimately A Determination That The 2008 Shell Transaction Created A Sublease And That Fieldwood's Interest In The GC 201 ORRI Is In Fact A Right To Receive Rent, Fieldwood's ORRI Burdens Only LLOG's 85% Working Interest.**

45.     Regardless of whether there is ultimately a determination that the 2008 Shell Transaction created a sublease and that Fieldwood's interest in the GC 201 ORRI is in fact a right to receive rent, Fieldwood's ORRI burdens only LLOG's 85% working interest because the ORRI was extinguished by confusion as to Fieldwood's 15% working interest the moment that Fieldwood replaced SOI as Assignee (and therefore the recipient of proceeds) of the GC 201 ORRI. Louisiana law is clear—when an obligee becomes an obligor of a secured obligation, such right is extinguished by confusion.  Fieldwood was both Obligor and Obligee as to 15% of the GC 201 ORRI.

---

[68] Docket No. 1826 at p. 14.
[69] The terms of the SOI Assignment of the GC 201 ORRI rendered it effective as of January 1, 2015. Per BOEM/BSEE records, SOI assigned its 49.99999% record title interest to Fieldwood Energy Offshore LLC effective January 1, 2015.
[70] *Sun Oil Co*., 165 La. at 912.

46.     When Fieldwood acquired Davis in 2009, Fieldwood acquired a 15% working interest in the operating rights over the NE/4 of GC 201; thus, Fieldwood became an Obligor for 15% of the GC 201 ORRI (with the other 85% burdening LLOG's working interest). When Fieldwood acquired the GC 201 ORRI from SOI in 2015, Fieldwood became the Obligee of such override.

47.     When the identity of Obligor and Obligee are one in the same, the obligation is extinguished by the doctrine of confusion under Louisiana law; therefore, the GC 201 ORRI was extinguished as to Fieldwood's 15% working interest in the operating rights of the NE/4 of GC 201.[71] Thus, Fieldwood is entitled to, at most, an overriding royalty interest covering only LLOG's 85% working interest, as Fieldwood extinguished the overriding royalty interest over its 15% working interest when it assumed the role of Obligee of the overriding royalty interest as a result of the assignment from SOI in 2015.

**D. Debtors' Suggestion That LLOG Is Precluded From Enforcing Its Mortgage And Security Rights Under The Terms Of The GC 201 ORRI And/Or The GC OOA Are Likewise Unavailing.**

48.     Debtors' Reply fundamentally mischaracterizes the impact of the GC OOA on the GC 201 ORRI, particularly with regard to Section 19.1 of the GC OOA.  Contrary to Debtors' assertions, Section 19.1 does not exclude any interest, whether subsequently created or not, from grants of mortgage liens or security interests.  Nor does any other provision found in the GC OOA (or any of the related agreements), including Section 19.1.1 of the GC OOA, provide for such an exclusion.

---

[71] La. Civ. Code  arts. 1903; 1905.

295149v1

49.     Rather, Section 19.1 was intended to cover circumstances where a party elects to go non-consent as to specific operations, which is made clear by the section's reference to participation status.  Specifically, Section 19.1 provides as follows:

> If any Party has previously created or hereinafter creates any overriding royalty . . . or other type of burden on Hydrocarbon production in addition to the lessor's royalty stipulated in the Lease(s) (an "Overriding Royalty"), the Party creating the Overriding Royalty shall assume and bear all obligations of the Overriding Royalty ***regardless of the Party's participation status***. . . . [The] Davis Overriding Royalty Interest shall not be considered a Subsequently Created Interest under the terms of this Agreement.  The Participating Parties in any operation conducted pursuant to this Agreement shall assume and bear all obligations of such Davis Overriding Royalty Interest according to their elections to participate. ***Additionally, [a] Non participating Party in an operation conducted pursuant to this agreement shall not bear any part of such Davis Overriding Royalty Interest while it is a non-participating party in such operation***.[72]

Indeed, Section 19.1 has worked consistent with this understanding with regard to treatment of the "Davis Overriding Royalty."  Specifically, when Fieldwood went non-consent on GC 201 operations, LLOG began carrying Fieldwood's payment obligations in connection with original Davis Overriding Royalty Interest and the GC 201 ORRI.

50.     Fieldwood's continued emphasis on Section 19.1 as a mechanism to limit LLOG's express mortgage and security rights is thus unpersuasive.

**E.  Debtors' Arguments Suggesting That LLOG's Valid Mortgage And Security Interests Do Not Secure Fieldwood's Future P&A Obligations Fail.**

51.     Finally, Debtors assert that LLOG's security interest does not secure Fieldwood's proportionate share of P&A obligations for GC 201 and GC 157.  Debtors assert two bases of this position, both of which are unavailing.

52.     Debtors first suggest that LLOG's lien in the GC 201 ORRI "would not extend to future obligations, plugging and abandonment or otherwise," on the basis that LLOG's P&A claim

---

[72] Docket No. 1603-1 at p. 132 (emphasis added).

is contingent and should be disallowed under section 502(e)(1)(B).[73] This argument is unpersuasive because, even assuming LLOG's claim is deemed contingent, this Court has allowed creditors to maintain rights in collateral under similar circumstances.

53.    Specifically, in *In re Tri-Union Development Corporation*, this Court concluded that the surety's lien survived a determination that its claims were disallowed under section 502(e) and allowed the surety to "retain its lien position until such time as its contingent liability is eliminated."[74]  Here, LLOG seeks only the same treatment afforded to the surety in *Tri-Union* – that, to the extent its claim for P&A is deemed contingent, this Court find LLOG may retain its interest in the GC 201 ORRI until the contingency is eliminated.

54.    Debtors' second argument that Corrected MOA and/or the GC OOA limit the scope of LLOG's secured claim is equally unconvincing.[75] The Corrected MOA expressly grants mortgage liens and security interests in favor of LLOG as Operator to secure "the complete and timely performance of and payment by such Non-Operating Party to the Operator **of all of its obligations and indebtedness of every kind and nature,** *whether now owed by such Non-Operating Party or hereafter arising pursuant to the Operating Agreement and this Memorandum*."[76]

55.    Likewise, Exhibit "I" to the GC OOA provides that LLOG's mortgage and security interests are "given to secure the complete and timely performance of and payment by each Non-

---

[73] Docket No. 1826 at p. 20, ¶ 55 (citing to *In re Falcon V, L.L.C.*, 620 B.R. 256, 270 (Bankr. M.D. La. 2020)).

[74] *In re Tri-Union Dev. Corp.*, 314 B.R. 611, 622 (Bankr. S.D. Tex. 2004).

[75] Docket No. 1826 at p. 21, ¶ 57.

[76] *See* Section 5.3 of Corrected MOA at Docket No. 1603-8 at p. 7 (emphasis added). When Fieldwood ratified the Corrected MOA (*see* Ratification of Corrected MOA, Docket No. 1603-20), it could have expressly provided that any interests in GC 201, whether then owned or thereafter acquired, other than the GC 201 Lease Operating Rights Interest, were understood and agreed not to be encumbered under the mortgage of the Corrected MOA.  However, Fieldwood did not do so, even though this Ratification of Corrected MOA was entered into by Fieldwood just under 9 months prior to Fieldwood acquiring the GC 201 ORRI.

Operating Party of all obligations and indebtedness of every kind and nature, whether now owed by such Non-Operating Party or hereafter arising pursuant to this Agreement."[77]

56.     Under Section 18.5 of the GC OOA, Fieldwood is required to bear its proportional share of plugging and abandonment and decommissioning costs.   Specifically, Section 18.5 provides as follows:

> Any wellbore abandonment or Platform/Production System removal required by a governmental authority shall be accomplished by operator with the Costs, risks, and net proceeds, if any, to be shared by the Parties owning such wellbore, Platform or Production System in proportion to their Participating Interest.[78]

57.     Therefore, according to the language of the Corrected MOA as well as the relevant provisions of the GC OOA itself, the P&A obligations fall squarely within the scope of LLOG's secured claim.

## CONCLUSION

Accordingly, for all the reasons set forth herein, LLOG respectfully requests a determination from this Court that LLOG has a valid mortgage and security interests in the GC 201 ORRI, and any other related relief that this Court deems appropriate.

---

[77] *See* Exhibit I to GC OOA at Section (A)(i)-(ii), Docket No. 1603-1 at pp. 178 - 79.
[78] Docket No. 1603-1 at pp. 131 – 32.

Dated: July 18, 2021.

Respectfully Submitted,

*/s/ John E. W. Baay  II*
JOHN E. W. BAAY, II
Texas State Bar No. 798042
GIEGER, LABORDE & LAPEROUSE, L.L.C.
Suite 4800, 701 Poydras Street
New Orleans, Louisiana 70139-4800
Telephone: (504) 561-0400
Facsimile: (504) 561-0100
Email: jbaay@glllaw.com

-and-

**LOOPER GOODWINE P.C.**

*/s/ Paul J. Goodwine*
Paul J. Goodwine (La. Bar No. 23757)
SDTX Federal ID No. 437800
Lindsey M. Johnson (La. Bar No. 34610)
SDTX Federal ID No. 2127344
650 Poydras Street, Suite 2400
New Orleans, Louisiana 70130
Telephone: (504) 503-1500
Facsimile:  (504) 503-1501
Email: pgoodwine@loopergoodwine.com
Email: ljohnson@loopergoodwine.com

*Counsel for* LLOG Energy, L.L.C. & LLOG
Exploration Offshore, L.L.C.

### CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the above and foregoing was served via the

Court's CM/ECF system on the  18th day of July 2021, which automatically provided electronic

notice upon all parties in interest listed on the ECF service list.

*/s/ John E. W. Baay II*

295149v1