```
                    UNITED STATES BANKRUPTCY COURT
                   SOUTHERN DISTRICT OF TEXAS (HOUSTON)


                               .    Case No. 20-33948
IN RE:                         .    Chapter 11
                               .    (Jointly administered)_
FIELDWOOD ENERGY, LLC,         .
et al.,                        .    515 Rusk Street
                               .    Houston, TX  77002
               Debtors.        .
                               .    Monday, July 19, 2021
. . . . . . . . . . . . . . .  .    1:58 p.m.

            TRANSCRIPT OF CONTINUED CONFIRMATION HEARING
      BEFORE THE HONORABLE MARVIN ISGUR (VIA VIDEOCONFERENCE)
             UNITED STATES BANKRUPTCY COURT JUDGE


TELEPHONIC APPEARANCES:

For the Debtors:          Weil, Gotshal & Manges LLP
                          By:  ALFREDO R. PEREZ, ESQ.
                               CLIFFORD W. CARLSON, ESQ.
                          700 Louisiana, Suite 1700
                          Houston, TX 77002
                          (713) 546-5040

                          Weil, Gotshal & Manges LLP
                          By:  ERIN MARIE CHOI, ESQ.
                          200 Crescent Court, Suite 300
                          Dallas, TX 75201-6950
                          (214) 746-8184

For LLOG Exploration      Gieger, Laborde & Laperouse L.L.C.
Offshore, L.L.C.:         By:  JOHN E.W. BAAY, II, ESQ.
                          701 Poydras Street, Suite 4800
                          New Orleans, LA 70139
                          (504) 561-0400


APPEARANCES CONTINUED.

Audio Operator:           Melissa Morgan, ECR

Transcription Company:    Access Transcripts, LLC
                          10110 Youngwood Lane
                          Fishers, IN 46038
                          (855) 873-2223
                          www.accesstranscripts.com


Proceedings recorded by electronic sound recording,
transcript produced by transcription service.
```

```
TELEPHONIC APPEARANCES (Continued):                         2

For the Ad Hoc Group      Haynes and Boone, LLP
of Secured Lenders:       By:  DAVID TRAUSCH, ESQ.
                          1221 McKinney Street, Suite 4000
                          Houston, TX 77010
                          (713) 547-2000

                          Davis Polk & Wardwell LLP
                          By:  MICHAEL PERA, ESQ.
                               NATASHA TSIOURIS, ESQ.
                          450 Lexington Avenue
                          New York, NY  10017
                          (212) 450-4000

For the Official          Pachulski Stang Ziehl & Jones LLP
Committee of Unsecured    By:  AYALA A. HASSELL, ESQ.
Creditors:                440 Louisiana Street, Suite 900
                          Houston, TX 77002
                          (713) 691-9385

For Cantor Fitzgerald     Shipman & Goodwin LLP
Securities:               By:  KATHLEEN M. LAMANNA, ESQ.
                          One Constitution Plaza
                          Hartford, CT 06103-1919
                          (860) 251-5603
```

1        (Proceedings commence at 1:58 p.m.)

2                THE COURT:  All right.  Good afternoon.  We're here

3    in the <u>Fieldwood Energy</u> case.  I've opened up Ms. Choi's line,

4    Mr. Perez's line, and Mr. Baay's line.  If anybody else needs

5    their line opened up for today's hearing, please press "five

6    star" on your phone.  Otherwise, we're going to proceed and let

7    Mr. Baay start the day.  Let's see who we have.

8                Mr. Carlson, good afternoon to you, as well.

9                All right.  Mr. Baay, go ahead.

10               MR. BAAY:  Good morning, Your Honor.  And may it

11   please the Court, John Baay for LLOG Exploration Offshore.  We

12   are here this morning on an adjourned motion that was started

13   -- I'm getting a lot of feedback.  Hold on.

14               THE COURT:  Yeah, let me see whose line -- that could

15   be from one of the other lines.  Hold on.  Let me see.

16               Who's going to be speaking from the debtors' side?

17   Is that going to be -- who's going to take the lead?

18               MS. CHOI:  Your Honor, Erin Choi on behalf of the

19   debtors.  Me and Cliff Carlson will be handling the

20   presentation on our end.

21               THE COURT:  I'm going to go ahead and mute

22   Mr. Perez's line, in case that was coming from him.  Let's try

23   again, Mr. Baay.  That may have been Mr. Perez.  I don't know.

24               MR. BAAY:  Okay.  Thank you, Your Honor.  Again, John

25   Baay on behalf of LLOG Exploration Offshore.  We are here today

4

1  on the adjourned motion that we began during the confirmation

2  hearing.  And just for Your Honor's recollection, we at that

3  point offered and accepted a number of exhibits that were --

4  began at 1603-1, and we'll be using those throughout the course

5  of this hearing today.

6          The only additional exhibit that we'd like to offer

7  now, before we get started, is 1603-7, which is the Declaration

8  of Allyson Bolton Peters, and I believe there has been an

9  agreement as to that document coming into evidence.

10         THE COURT:  Ms. Choi, Mr. Carlson, any objection to

11  the admission of 1603-7?

12         MS. CHOI:  No objection, Your Honor.

13         THE COURT:  All right.  1603-7 is admitted.

14      (ECF 1603-7 admitted into evidence)

15      MR. BAAY:  Next, Your Honor, if you could please

16  assign Stephanie Franks the presenter's rights.

17         THE COURT:  All right.  Hold on.

18      (Pause)

19         THE COURT:  All right.  Ms. Franks is now the

20  presenter.

21         MR. BAAY:  Thank you.

22         Stephanie, can you pull up our PowerPoint, please.

23         Your Honor, we're here today on a relatively narrow

24  focus to determine the validity and effect of a security

25  interest that LLOG believes it has in an overriding royalty

1   interest in Green Canyon 201, the Northeast Quarter from the

2   surface to 17,000 feet.

3         We have, as previously mentioned, entered and

4   introduced a number of documents into the record, and we'll go

5   through those in just a minute.  But the main points that got

6   us from Point A to Point B are the following:  And the first is

7   that LLOG and Fieldwood are parties to an offshore operating

8   agreement that dates back to December 12th, 2002.  They weren't

9   the original parties, but we'll walk through how that happened,

10  and that fact is not in dispute.

11        The second fact is the contract area under the

12  operating agreement includes two blocks, Green Canyon 157,

13  Green Canyon 201, the Northeast Quarter from the surface to

14  17,000 feet.  And again, this fact is not in dispute.  It's not

15  established by one document, but by a series of transactions

16  that happened.  But again, there's no dispute in that.

17        The next slide.

18        The next point, and what we're here about today, is

19  that there's a mortgage that secures the obligations under

20  these operating agreements.  And as we'll discuss, this is a

21  very common practice offshore, especially with companies such

22  as Fieldwood and LLOG, where one company is an operator and one

23  is a non-operator.

24        Fieldwood, as the non-operator, has obligations to

25  pay its share of operating costs that are incurred, and those

1  costs include the abandonment costs under this operating

2  agreement.

3          Fieldwood granted LLOG a mortgage to secure

4  Fieldwood's obligations under the operating agreement.  And

5  again, just like the other points that we've made, this didn't

6  happen in one document.  It happened in a series of

7  transactions.  But we'll walk through those.  And the end

8  result is that Fieldwood granted LLOG a mortgage to secure its

9  obligations.

10          What did that mortgage cover?  Well, it covered all

11  of Fieldwood's interests to and among other things "all other

12  immovable properties susceptible of mortgage situated with the

13  contract area."  So, this is taken straight from the operating

14  agreement.  They give -- the mortgage covers several things

15  that they own.  And then, under the After-Acquired Title

16  Doctrine, says, "any other immovable properties now owned or

17  acquired in the future that are susceptible of mortgage" -- so

18  those are going to be immovable property, whether it's real or

19  -- what (indiscernible) say in Louisiana?  Corporeal or

20  incorporeal, that are situated within the contract area.  And

21  we'll see, as we walk through this, that the overriding royalty

22  interest is clearly immovable property, susceptible of

23  mortgage, that's situated within the contract area.

24          THE COURT:  So, Mr. Baay --

25          MR. BAAY:  Go to the next slide.

1          THE COURT:  One of the things that Fieldwood has said

2    is that in the assignment of the ORRI that it excludes

3    consideration of any other agreement that might affect the

4    ORRI.  And they quote me a section out of that in Paragraph 22

5    of their memo.

6          How, under Louisiana law, do I deal with -- that the

7    mortgage covers everything and then I have the assignment of

8    the ORRI that says that it doesn't?

9          MR. BAAY:  Let me look and see which paragraph

10   they're talking about --

11         THE COURT:  Their Paragraph 22 of their brief.  I

12   haven't looked at the underlying document yet.

13         MR. BAAY:  Okay.  So here's the basic -- this --

14   their whole argument that you're referring to is based on one

15   premise, and that is that the override, as it's created, is not

16   subject -- it's proof that they own it free and clear.  And

17   when Shell took the override, it was not subject to any

18   mortgage, right?

19         And that was, in fact, true.  Shell had not given a

20   mortgage over this override to LLOG or anybody else.  Shell

21   owned it free and clear.  And not only that, the override was

22   by its very nature not subject to the cost and expenses -- like

23   they said, exploring, developing, and producing in the contract

24   area.

25         That's what makes this override valuable.  It's

1 because it's not subject to those costs.  And it wasn't subject

2 to any lien or mortgage when it was given to Shell.

3         So when it falls underneath the mortgage, it's

4 because Fieldwood gives a mortgage to LLOG.  And then it says,

5 if I acquire anything else, then that -- whatever I acquire of

6 value -- so the override has got value -- then that's going to

7 fall underneath your mortgage.

8         And they talked about it as being an unintended

9 consequence.  Whether it's intended or not doesn't matter.

10 That's the consequence.  And they did it in that order.  They

11 granted the mortgage, and then --

12         THE COURT:  No, no.  Here's --

13         MR. BAAY:  -- they bought this override.

14         THE COURT:  This says -- and I don't know if y'all

15 are even bound by this provision.  So, I mean, maybe that's

16 where we ought to start, is whether you're bound by the

17 provision in the Shell Marathon ORRI assignment or not.  I

18 thought LLOG was bound by this.

19         But it says there are "no further understandings,

20 representations, warranties, or obligations pertaining to the

21 ORRIs, and this conveyance supersedes and replaces any and all

22 prior agreements, written or oral, between the parties."

23         Was LLOG a party to this document?  And if so, why

24 wouldn't this override and replace a mortgage that would affect

25 the ORRI?

1          MR. BAAY:  Because, Your Honor, there are two totally

2 separate things.  One of -- what you're talking about is if

3 this override, when it's created, and when there is an

4 assignment of the override from LLOG and Davis back to Shell

5 and Marathon, they're saying you have this override and it's

6 not subject to any mortgage or lien or anything like that.  And

7 that's what gives that override value.

8          And you're absolutely correct.  What it does, it

9 falls underneath the mortgage that Fieldwood has given, because

10 Fieldwood says I'm going to give you a mortgage on everything I

11 own in 201, and if I acquire anything else --

12          THE COURT:  I got that Fieldwood said that.  I'm

13 trying to deal with the conflict between the two agreements.

14 One says I'm giving you a mortgage on whatever I acquire in the

15 future, and the other one says anything I agreed to do

16 previously doesn't count.

17          MR. BAAY:  Yeah, but -- you know, you're right.  But

18 Fieldwood is not a party to that, the document you're talking

19 about, where the original assignment was made from LLOG and

20 Davis to Shell and Marathon.  That's where the original

21 creation of the --

22          THE COURT:  Well, yeah, but you've made it really

23 clear that Fieldwood is bound by whatever Davis obligations

24 were and whatever Davis's benefits were.  So Davis was a party,

25 right?

1          MR. BAAY:  Sure.  Davis is a party, and they owe --

2    right.  So the override is created.  Davis is a party.  And

3    Shell and Marathon and LLOG are -- those are the four parties

4    to that original assignment that creates that override.  That's

5    correct.

6          And so -- and you go on down the road, and the next

7    thing that happens in the timeline is that Fieldwood changes

8    places with Davis.  Right?

9          THE COURT:  Right.

10         MR. BAAY:  So, if you walk through the timeline, the

11   next thing that happens is Fieldwood changes places with Davis.

12   At that point, Shell still owns the override, right?  Shell and

13   Marathon are still receiving payments from the override.  And

14   it's not encumbered by anything, right?  Fieldwood hasn't --

15   it's not encumbered by Fieldwood's mortgage.

16         So the override is out there.  Shell owns it.  And

17   it's not encumbered.  Okay?

18         THE COURT:  Okay.

19         MR. BAAY:  So that's the state of the world at the

20   end of 2014.  Fieldwood is now in Davis's shoes and --

21         THE COURT:  And the ORRI --

22         MR. BAAY:  -- and the override --

23         THE COURT:  And the ORRI assignment replaced and

24   superseded all prior agreements, written or oral.  But you're

25   telling me --

1           MR. BAAY:  That's right.

2           THE COURT:  -- you're telling me it didn't, really.

3           MR. BAAY:  No, it did.  It did.

4           THE COURT:  Okay.

5           MR. BAAY:  It did.  So there's not any other --

6   nobody's presented any other documents, any other that says

7   that the override is subject to anything else, any costs or --

8   development costs.  The override is valued as it's valued.

9   It's defined as it's defined in that assignment.  And that

10  never changes.  That's what gives that override value.  Right?

11          So the override has value, because it's not subject

12  to any other costs.  It's owned free and clear by Shell.  And

13  it is paid by LLOG and now Fieldwood as they develop 201.  So

14  that's the current state.  LLOG and Fieldwood -- LLOG as

15  operator, Fieldwood as non-operator, are operating 201.  They

16  go through 2014, and the override is being paid.  It's not

17  subject -- exactly like you said.  It was created -- it's not

18  subject to any other encumbrances.  And so that's what it is,

19  right there.  So you're exactly right.  That's the override.

20          Then what happened is there's another transaction

21  that happens.  And the next transaction that happens is in

22  2015, Fieldwood acquires from Shell several different

23  interests.  And let's look at what they got.  We're skipping

24  around a little bit here.

25          Effective January 1st, 2015, Fieldwood acquires from

1  Shell a set of properties.  Let's see.

2              And, Stephanie, could you go to 1603-21.  And next

3  page -- okay.

4              Okay.  So now everything is the way we just described

5  it.  Now Shell enters into a transaction with Fieldwood.  And

6  as part of that transaction, effective January 1st, 2015 -- so

7  this is, you know, literally a couple months after Fieldwood

8  has done the transaction with Davis, has mortgaged what it owns

9  in Green Canyon 201.  It enters into a transaction now with

10 Shell.

11             And go to the next page.  I'm sorry.  Go to Page 5,

12 please.

13             So it was signed in July by Fieldwood and Shell,

14 effective January 1st, 2015.

15             And go to Page 6.

16             Okay.  So this is what it describes -- so this is

17 what Fieldwood acquired.  In a separate transaction with Shell,

18 it acquired an overriding royalty interest in Lease 11043.

19 That's the first block.  And in the second block, we find our

20 override.  That's the override that was originally created that

21 you talked about earlier.  It wasn't susceptible to any other

22 agreements.  It was unencumbered.  So this is the override.

23             And it has value, obviously, because it's part of

24 this transaction.  Fieldwood is paying for it.  There's an

25 exchange for consideration.  And they're getting these

1  overrides.  They also get an override in their Vermillion

2  block.  But the one we're concerned about is the Northeast

3  Quarter of Green Canyon 201.

4       And so Fieldwood acquires that interest as part of

5  this transaction.  And at that point, this interest becomes

6  subject to the mortgage that Fieldwood has given to LLOG as

7  part of the operating agreement that dates all the way back to

8  2002.  And the reason it does that is because Fieldwood says,

9  look, I've got these obligations under this operating

10  agreement.  And if I -- I'll give you my -- a mortgage on what

11  I own.  And if I acquire anything else, any other interests

12  susceptible of mortgage, in Block 201, then my mortgage is

13  going to cover that, as well.

14       And as soon as this was purchased by Fieldwood, it

15  falls underneath their mortgage.  It's still -- I mean, it's

16  still -- the override as it's defined is, of course, still free

17  and clear of any costs.  So it is paid.  You know, it doesn't

18  change how it's paid.  It doesn't change how it's valued.  It's

19  still a valuable asset that Fieldwood owns.  And it's paid to

20  them.  Nothing changes with respect to the override.  It just

21  becomes part of the security package that Fieldwood has given

22  and granted to LLOG as part of being a non-operator under the

23  offshore operating agreement.

24       THE COURT:  No, and I understand that argument as to

25  Subparagraph 1 of the ORRI assignment.  But they're referring

1 me to Subparagraph 7 of the ORRI assignment, and that's where

2 I'm having difficulty understanding -- if the mortgage predated

3 the assignment, and the assignment to which your client was a

4 party says that mortgage will never affect this ORRI.  And now

5 you're telling me, well, it will never affect the ORRI unless

6 Fieldwood is the one that acquires it.  But I don't think

7 that's what Subparagraph 7 says.

8         MR. BAAY:  Okay.  Tell me -- I'm sorry.  Which --

9 Paragraph 7 of which document?  Just so that I can have it

10 pulled up.

11         THE COURT:  Well, again, if you'll go to their

12 Paragraph 21 and 22 of their brief, I asked you to look at 22,

13 and you're quoting to me out of Paragraph 21.  I understand the

14 Paragraph 21 argument.  That's out of Subparagraph 1 of the

15 assignment.  That's quoted in Paragraph 21.  But in Paragraph

16 -- and that says that the ORRI itself won't be subject to these

17 charges, sort of in the internal calculation of it.

18         Paragraph 22 says the ORRI isn't subject to any prior

19 agreement.  And you're telling me, well, it is subject to the

20 prior mortgage if Fieldwood is the one that acquires it.

21 That's why I'm having trouble reconciling what you're telling

22 me.

23         MR. BAAY:  Okay.  It's not -- I guess the thing that

24 is a little bit tricky to understand.  It's not -- it's not the

25 overriding royalty interest that's subject to any liens that

1  happened earlier.  It's -- that's the reason why it has value,

2  right?  So it's -- so you're exactly right --

3          THE COURT:  21 is the --

4          MR. BAAY:  It has no --

5          THE COURT:  No.  21 is the reason that it has value.

6  22 is the one that says it's free of any prior agreement.

7          21 says you can't charge me for any operating costs

8  pertaining to the property.  You can't charge me for P&A.  You

9  can't charge me for anything.

10         You're saying fair enough, we agree with that.  But

11 our mortgage takes the ORRI itself.

12         And they're arguing that Paragraph 22 took away your

13 right to get the ORRI itself because it says if there's

14 something that's a mortgage, it doesn't count as to the ORRI.

15         And you, I believe, are saying unless it's Fieldwood

16 that it acquires it, and then it would count.  And I don't see

17 the "unless it's Fieldwood that acquires it, it would count"

18 language.

19         MR. BAAY:  I'm sorry.  I misunderstood.  No.  What

20 they're saying is that, look, we are representing to you that

21 this overriding royalty interest is not subject and we will --

22 and we are pledging, and representing, warranting, that this

23 override is not subject to any other or previous prior

24 agreements so that you -- so what it's telling Shell is, Shell,

25 you, as the owner, right?  That's who it's pledging.  It's

1  saying, Shell, you, as the owner of this override, can be

2  confident that there's no mortgage that applies to this

3  override that you own.

4              THE COURT:  Unless you sell --

5              MR. BAAY:  Right?

6              THE COURT:  -- it to somebody that has a preexisting

7  mortgage.  And it doesn't say that.

8              MR. BAAY:  No.  Even if you sell it to somebody who

9  has a preexisting mortgage, the only reason it falls underneath

10 that preexisting mortgage is because it's after-acquired

11 property.  So it doesn't -- so Fieldwood doesn't buy it and

12 then all of a sudden say, oh, well, you know, you promised

13 Shell that there was no mortgage on this, so it can't fall

14 under my mortgage.  That's their argument.

15             Well, that's not what that means.  What they're

16 saying is they're representing to Shell that there's no

17 mortgage.  There's no prior document.  There's nothing out

18 there that --

19             THE COURT:  This says it supersedes --

20             MR. BAAY:  -- somebody (audio interference) --

21             THE COURT:  -- it supersedes and replaces all prior

22 agreements.

23             MR. BAAY:  Right.

24             THE COURT:  Why is the mortgage not a prior

25 agreement?

1          MR. BAAY:  That's as to Shell.  That's not as to

2   Fieldwood.

3          THE COURT:  It doesn't say that.

4          MR. BAAY:  That's as to Shell.

5          THE COURT:  Look.  I assume, and I haven't looked at

6   it, that you made these representations to Shell, their

7   successors and assigns.  And so Fieldwood becomes their

8   successor and assign.  Whether you say it specifically or not,

9   sort of by operation of law.  When you give somebody -- fee

10  simple title to somebody, it applies to them, and all their

11  successors and assigns.

12         Maybe Louisiana law is different, and you should

13  explain that to me if it is.  But I'm trying to understand why

14  Shell's successor can't rely -- you're telling me -- you'll

15  remember this conversation started with, look, they're saying

16  it's an unintended consequence.

17         Well, it may be that the unintended consequence is in

18  Paragraph 7.  And you don't get to step in and say, well, we're

19  going to take advantage of Unintended Consequence 1, which is

20  Fieldwood is the acquirer, but we can ignore the language of

21  the fact that it was supposed to be free and clear of all prior

22  agreements as to both Shell and its successors.

23         And I don't -- that's the argument I'm having trouble

24  following.  I think I need to follow these pretty literally and

25  not worry about unintended consequences one way or the other.

1          MR. BAAY:  No, I agree.  I absolutely agree.  So what
2     this is representing is -- and you're exactly right.  What this
3     is representing to Shell -- and I need to look through the rest
4     of this and see whether it's representing to their successors
5     and assigns, but let's assume that it is.  All this is doing is
6     saying to Shell that you own this -- that we haven't -- by any
7     prior agreement, we haven't mortgaged this, and it's not
8     subject to any mortgage.

9          And then what happens in the transaction with
10    Fieldwood is --

11         THE COURT:  It says a whole lot more than just
12    mortgage.  It's "any and all prior agreements."

13         MR. BAAY:  Right.  Okay.  Even broader than mortgage.
14    So any other -- it's not encumbered by any other prior
15    agreements.  So, Shell, you can own this confidently, that
16    there's not any prior agreements.  And you can sell this to a
17    successor like Fieldwood, and you can then in turn represent to
18    Fieldwood that there's no prior agreements that are going to
19    encumber this -- that are out there that are going to encumber
20    this override.  Right?  That's -- Shell can make that
21    representation to Fieldwood.

22         But that doesn't prevent Fieldwood from turning
23    around and saying, I have this great, valuable override that I
24    just got from Shell.  I know from the representation from the
25    original assignment that it's not encumbered by any prior

1  agreements or mortgages.  But now I'm going to take it and I'm

2  going to take it and I'm going to put it in, and I'm going to

3  put it as part of my mortgaged property to LLOG.  That's what

4  happened.  So --

5          THE COURT:  Okay.  I thought the argument was they

6  had previously given a mortgage to LLOG.  Did they give their

7  mortgage to LLOG after they acquired the interest?  Because I

8  thought they had given the mortgage previous to this agreement.

9          MR. BAAY:  No.  They give the mortgage previous to

10 the agreement.  Of course.  So this is after-acquired property,

11 right?

12         THE COURT:  Right.

13         MR. BAAY:  So you can go to the bank -- right.  So

14 you can go to the bank.  This is exactly what happened.  You go

15 to the bank and you can give a mortgage on the city block.

16 Okay?  And then you can go in and you don't own any of it, and

17 you can start buying one lot, and then you can go buy the next

18 lot, then you go buy the next lot.

19         And as you buy each lot from the seller of each one

20 of those, you say, hey, you've got to tell me -- you've got to

21 represent to me that there are no other mortgages on this, no

22 prior agreements that are going to come up and --

23         THE COURT:  I guess it depends on --

24         MR. BAAY:  -- encumber this --

25         THE COURT:  -- what does "between the parties" mean

1  is maybe what we're coming down to.  You're telling me "between

2  the parties" means between Shell and the others.  Fieldwood is

3  saying -- Fieldwood is a party.  They get to rely on this, too.

4          MR. BAAY:  Fieldwood was not a party to this

5  document.  This is the document that creates the --

6          THE COURT:  Davis was a party, right?

7          MR. BAAY:  That's right.  Davis was a party and so

8  Davis is --

9          THE COURT:  So Fieldwood and Davis are stuck in the

10  same boat.  You told me that specifically in your brief, that

11  Fieldwood inherits all of their rights and all of their

12  obligations of Davis, because they acquired the equity.  So if

13  Davis was a party, for all intents and purposes, Fieldwood was

14  a party.

15          MR. BAAY:  That's right.

16          THE COURT:  Okay.  So Fieldwood was, for all intents

17  and purposes, a party to Paragraph 7, not just Shell.

18          MR. BAAY:  That's right.  And so -- that's right.  So

19  even -- I hadn't thought it through to that extent, but assume

20  that's the case.  Fieldwood can represent to Shell that the

21  override that it is getting is free and clear of any -- and

22  supersedes and replaces any prior agreement.  That does not

23  prevent Fieldwood from then including it as part of the

24  property that it mortgages.

25          THE COURT:  I understand that a subsequent mortgage

1  -- Fieldwood could have come in and modified the paragraph.

2  But you're telling me there was an existing mortgage.

3          MR. BAAY:  Right.  But all -- and that's fine,

4  because all that happens is this unencumbered override becomes

5  after-acquired property.  That's all it is.  It's just like a

6  developer that buys the next lot.

7          THE COURT:  I agree.  I understand that.  But why

8  does the -- why is it that the after-acquired property clause

9  gets excluded from there are no prior agreements?

10         MR. BAAY:  Because the "no prior agreements" refers

11 to an encumbered of the override.  Right?  So there's no prior

12 agreement that encumbers this override.  There's no document

13 out there that says that the override on the Northeast Quarter

14 of GC 201 is subject to my mortgage or has -- there is no other

15 or any other agreement.  But that doesn't prevent Fieldwood

16 from then mortgaging that, once it owns it.  That's all that's

17 (audio interference) --

18         THE COURT:  But I just want to be sure we're dealing

19 in tenses here, and be sure I'm understanding the facts.  There

20 can't -- I don't believe there can be a dispute that Fieldwood

21 could subsequently execute a new mortgage over the property.

22         When you started off with "unintended consequences,"

23 your "unintended consequence" statement meant it might become

24 after-acquired property under a preexisting mortgage.  And

25 that's why I wanted to focus on this, because this seems to say

22

1  that anything that existed between those four parties --
2  Davis/Fieldwood on one hand, LLOG, Shell, and Marathon --
3  everything is hands-off as to the ORRI.  Not internal to the
4  ORRI.  That's Paragraph 21.  External to the ORRI.  And I'm not
5  sure that we're not talking in circles here.

6          MR. BAAY:  No, I mean --

7          THE COURT:  It may make sense to move ahead, but
8  that's -- I'm trying to express the concern really clearly to
9  you that they've raised.

10         MR. BAAY:  No.  I understand.  I understand the
11 concern.  And I think it's taking two different things -- it's
12 taking that "all prior agreements" out of context.  The
13 document that they're talking -- I mean, the agreements that
14 they're talking about are anything that would encumber the ORRI
15 as part of its assignment, but that the new --

16         THE COURT:  Maybe we should bring up that agreement
17 so I can look at it in context.  What's that exhibit number and
18 I'll take a look?

19         MR. BAAY:  Okay.  It's 130 -- pardon me.  1603 --
20 hang on one second.

21         THE COURT:  Sure.

22         MR. BAAY:  1303-6.

23         THE COURT:  All right.  Let me bring that up.

24     (Pause)

25         THE COURT:  Okay.

1          MR. BAAY:  So Paragraph (vii) is where you're

2    focused.

3          THE COURT:  Right.

4          MR. BAAY:  (Audio interference) "there are no further

5    understandings, representations, warranties, or obligations

6    pertaining to the ORRI, and this conveyance supersedes and

7    replaces any and all prior agreements, whether written or oral,

8    between the parties."

9          THE COURT:  Right.  So Fieldwood has an agreement --

10         MR. BAAY:  And I think --

11         THE COURT:  -- that if it acquires any new property

12   within the area of interest, it will be subject to your

13   mortgage.  They're a party to this --

14         MR. BAAY:  That's correct.

15         THE COURT:  They're a party to this agreement.  So

16   are you.  If they acquire an ORRI within the area, it's going

17   to be subject to the prior mortgage.  This supersedes and

18   replaces anything that says it's going to be subject to a prior

19   mortgage.  How does your prior mortgage apply?

20         MR. BAAY:  Well, Your Honor, I think we need we need

21   to go back and look -- I'm not -- one of the points that you

22   made, and that we've made, is that Davis and Fieldwood are the

23   same.  I think if we're getting down to this level, that only

24   applies in the operating agreement and the documents where they

25   specifically -- I mean, there are specific documents where

24

1  Fieldwood comes in and takes an assignment from -- buys the

2  equity of Davis and then, in the next step, takes an assignment

3  of Davis's interest in the operating agreement.

4          THE COURT:  Okay.

5          MR. BAAY:  There's no document that -- where

6  Fieldwood came in and became a party to this assignment.  So

7  this assignment -- the only parties to this assignment now or

8  ever are Fieldwood -- I mean, I'm sorry, Davis and LLOG on the

9  one hand, and Shell and Marathon on the other hand.

10         So, you know, Fieldwood is going to come into this

11 document.  There's no document that -- where Fieldwood is a

12 party.  I mean, there are no documents -- prior agreement where

13 Fieldwood is a party that would apply here.

14         THE COURT:  Okay.

15         MR. BAAY:  "Whether written or oral between the

16 parties."  Fieldwood is not a party to this document.  So the

17 override gets created, and then subsequently sold to Fieldwood.

18 And Shell represents to Fieldwood, because it was represented

19 to Shell, that there is no prior agreements -- there are no,

20 whether written or oral.

21         Shell says look, when I acquired this from LLOG and

22 Davis, I got a representation from them that there were no

23 prior agreements, whether written or oral, that -- regarding

24 this override.  And Fieldwood can take it -- and it can take it

25 and be satisfied that it's getting an override as it's assigned

1  without any other encumbrances.

2          But that doesn't prevent Fieldwood from then

3  encumbering what it has just purchased.  And that's all that

4  happens.  Fieldwood comes in.  It buys this override, effective

5  January 1st, 2015.  And at that point, the After-acquired Title

6  Doctrine applies, and the operating agreement that it is a

7  party to says if you acquire something else in this field, then

8  our mortgage applies to that override.  (Audio interference)

9  mortgages, right?  Just this Fieldwood mortgage.

10          And Fieldwood had the opportunity -- at that point,

11  Fieldwood could have said before it took the assignment, or it

12  could have gone along and said, look, I'm getting ready to

13  acquire this.  I don't want this to fall within my mortgage.

14  There's no other mortgages on this override.  It's a valuable

15  asset for me, and I don't want this to come into the mortgage

16  that I've already granted.

17          That's what it could have done.  But it didn't do

18  that.  It took the override.  It's clearly part of the

19  definition of the grant.  It's incorporeal removal.  It's

20  subject to mortgage.  And it's clearly called out in the --

21  it's within the contract area.

22          So when they purchased it, they now -- it now falls

23  underneath.  And when they purchase it as an unencumbered,

24  valuable override, it then becomes at that point subject to

25  their mortgage.  It wasn't subject to it before.  It becomes

26

1   subject to it then.

2          So the representations and warranties are correct,

3   both on this side and when they acquire it.  But they can

4   certainly have the right to go acquire more property, and

5   they've given a mortgage to LLOG that says if I go acquire

6   anything more in this field, in this contract area, then that

7   falls underneath my mortgage.  And that's all that's happening

8   here.

9          So, you know, the override before Fieldwood owns it

10  is unencumbered, and this paragraph doesn't change that.  But

11  it certainly doesn't prevent LLOG from having it come under its

12  mortgage that it has already given to LLOG.

13         THE COURT:  Did Fieldwood execute that mortgage with

14  the "after-acquired" provision or did Davis?

15         MR. BAAY:  Davis did it, and then Fieldwood came back

16  and ratified it.

17         THE COURT:  Right.  Did they ratify it after -- that

18  this conveyance superseded and replaced all prior agreements?

19         MR. BAAY:  Let me look to make sure of the exact

20  date.

21         No.  Fieldwood signed the ratification on December

22  2nd, 2014 is when it amended and ratified the memorandum of

23  assignment and financing agreement.  That's 1603-20.

24         THE COURT:  So after --

25         MR. BAAY:  Can you put that up --

1          THE COURT:  So after this assignment and conveyance
2    of the ORRI, which superseded that agreement, they ratified the
3    superseded agreement.

4          MR. BAAY:  That's right.  I think -- if I'm following
5    you, I think that's right.

6          THE COURT:  I'm not sure what that legal effect is,
7    but it's an interesting sequence.  Okay.  I think we've sort of
8    beaten this -- you're welcome to spend as much time as you want
9    on it, but I think I understand what the problem is.  I don't
10   know what the answer is, but I got it, and it's an interesting
11   problem.

12         MR. BAAY:  Okay.  Again, I think -- I think you're
13   exactly right.  We've beaten that horse.

14         THE COURT:  Let me go back and get your person back
15   in control of the presentation again.  Hold on.

16         MR. BAAY:  Okay.  Thanks.

17         THE COURT:  That was Ms. Franks, right?

18         MR. BAAY:  Correct.

19         THE COURT:  Okay.  She's back in control.

20         MR. BAAY:  Okay.  One of the other arguments that
21   they make is that assuming that we did get a mortgage, and if
22   we cross that hurdle, that it was not properly perfected in the
23   mortgage (audio interference) -- and again, the declaration
24   that we just introduced (audio interference) appears, along
25   with the documents that are attached thereto, walk through each

1  of those file documents.  The only issue that they raise with

2  respect to those is that there's a UCC filing statement that

3  was attached along with the -- some MOA and corrected MOA.  And

4  we'll take a look at that real quick.

5          So, Stephanie, let's look at 1603-8.  We'll start

6  there.

7          So this is the original filing in the Terrebonne

8  records.  Let's go to the next page.

9          And right -- so the next two, three pages are the UCC

10  filing statements that were also filed with the Secretary of

11  State.  And then, after those pages, the next page after that,

12  there's a memorandum of operating agreement and financing

13  statement.

14          So they are considering this a -- just an exhibit to

15  the financing statement.  And really, those financing

16  statements, the UCCs are superfluous cover pages.  But this

17  document is clearly filed in the mortgage records, and it

18  clearly applies to the operating agreement that was signed on

19  October 12th, 2002, between Davis and LLOG.

20          If you'll go to Pages 7 and 8 -- do you have 8-78,

21  Section 5.3.  There we go.

22          So here's the original memorandum -- the "MOA," I'll

23  call it.  And this is clearly filed in the mortgage records of

24  Terrebonne Parish.  It describes the non-operating party and

25  the operating agreement.  It describes what is being secured.

1  The complete and timely performance of any payment by the
2  non-operating party to the operator.  Payment of all expenses
3  incurred by the operator.

4         And then go to 16.39.  So this is filed in the
5  mortgage record.  And then, again, if you go through the next
6  page, you'll see the UCCs, cover pages, and then the corrected
7  MOA.  And the only thing that happened here is it represented
8  -- in the original, it called it Garden Bank instead of Green
9  Canyon, and so that was fixed.

10         So there's no question that in the mortgage records,
11  the MOA is filed.  There are no other filings.  There are no
12  other -- there's no other claim being made to this override and
13  in this mortgage.  So there is a perfected position, first
14  position, by LLOG in this asset.

15         The next argument that they make is that somehow this
16  was improperly perfected because it's rent, and that we didn't
17  do exactly what we needed for rent.  And all I can say is they
18  didn't provide any cases that suggest that override is not an
19  incorporeal removable subject to mortgage, and that this
20  mortgage is not affected as to that interest, whether it's
21  called rent or otherwise.  The mortgage clearly describes the
22  contract area, and the contract area is well defined as
23  Sections 157 and 201.  So a valid mortgage is in place on all
24  of those interests; and that includes, obviously, the override.
25         The last thing that they argued is that the lien does

1  not secure future P&A.  And this is pretty easily handled under

2  the Tri-Union case.  Because what they're saying is this is

3  going to be disallowed, so there's no reason to continue with a

4  security interest.  And I think the Tri-Union case, Your Honor,

5  made a good point there.  It said that what happens is even if

6  it's contingent, because it's contingent and disallowed, that

7  doesn't mean you lose your security interest.  It just -- the

8  security interest carries forward, and is effective when that

9  liability becomes known and certain and due and payable.

10       So, you know, they sort of stop short of saying what

11  happened because it's contingent.  Just because it's contingent

12  and may be disallowed does not mean that they lose their

13  security rights in the override.  Thank you, Your Honor.

14       THE COURT:  All right.  I want to -- you sort of

15  started off your presentation by saying we're here today to

16  figure out if we have a secured claim.  Are we also here to

17  figure out if you have a claim?

18       MR. BAAY:  My understanding is that we were not.  I

19  mean, there's been a proof of claim that was filed as to two

20  things:  One, our outstanding joint interest billings, and

21  there is a dispute over some offsets to those.  And my

22  understanding was -- from discussions with the Fieldwood

23  lawyers, if there is a decision that we do have a security

24  interest in the override, that the most likely step will be

25  they will assume and assign the operating agreement, and then

1  we'll be back for another hearing on a cure.  That there are

2  some outstanding joint interest billings, they have a claim for

3  some offsets, and we'll just deal with those at another time.

4  But that was -- my understanding is that those -- that

5  discussion was not up for today.

6        THE COURT:  That's fine with me, if that's what y'all

7  think you're all litigation.  I probably need Ms. Choi or

8  Mr. Carlson to confirm that.  Because the 502(e) issue does get

9  raised, and your response to it is -- and I'm paraphrasing a

10 bit here -- it doesn't really matter.  Because even if it's

11 disallowed under 502(e), it's secured, and therefore it will --

12 our security interest will remain.

13        But I didn't know if you also --

14        MR. BAAY:  That's exactly right.

15        THE COURT:  -- wanted to argue that under 502(e) that

16 you still have a claim, or if you basically are saying we agree

17 we don't have a claim under 502(e), but it's secured, so it

18 doesn't matter.  I think you're saying the latter, but I'm not

19 sure --

20        MR. BAAY:  I think we're saying the latter, Your

21 Honor.  But again, that's not what I understood the point of

22 today's hearing was.

23        THE COURT:  Fair enough.  Thank you.

24        Ms. Choi, Mr. Carlson.

25        MS. CHOI:  Yes, Your Honor.  Erin Choi on behalf of

1  the debtors.  Your Honor, could you please make Ron Miller the

2  presenter.

3       (Pause)

4            THE COURT:  All right.  He's the presenter.

5            MS. CHOI:  Thank you, Your Honor.  We have a

6  presentation, and I'm going to be handling the first half of

7  the presentation speaking to a general overview of the

8  timeline, and the fact that LLOG has not demonstrated a valid

9  lien in the ORRI, and that the terms of the ORRI bar relief to

10 LLOG.  And then Mr. Carlson will handle the issue regarding the

11 fact that there's no pledge or assignment of the ORRI rents,

12 and that LLOG's security interests do not extend to future

13 contingent obligations.

14            So, turning to the next slide, so here is the

15 transaction timeline, which we've covered extensively, so I

16 won't belabor the point here.  But just to note, you know, the

17 December 2002 is when there was the operating agreement between

18 LLOG and Davis, when LLOG granted the security interest in the

19 contract area, which was at the time the 157 lease.

20            October 2008 is when the farmout agreement was

21 entered into between Shell and Marathon, and LLOG and Davis,

22 with respect to the 201 lease.  And at that time is when Shell

23 and Marathon reserved the cost-free ORRI in the 201 lease.

24            Fast forward to 2014 is when Fieldwood acquired

25 Davis, and at that time is when Fieldwood and LLOG amended the

1 operating agreement.  And it wasn't until 2015 when Shell

2 assigned its interest in the ORRI to Fieldwood in connection

3 with the APA.

4      So turning to the next slide -- Mr. Miller, if you

5 could turn to the next slide, please.

6      Okay.  So -- and we've gone through this, but in

7 2002, Davis and LLOG entered into the operating agreement.  And

8 pursuant to that agreement, this is the language of the

9 security interest in the contract area, which was the 157.

10 Notably, this language does not include a grant of an interest

11 in rent.

12      Going to the next slide, Section 19.1 of OOA has --

13 relates to the overriding royalties and burdens on production.

14 And our position -- at the last hearing, Your Honor had asked

15 about the meaning of "subsequently created interest" under this

16 provision.  And our position, Your Honor, is that you don't

17 need to look outside the language here to see that an

18 overriding royalty is a subsequently created interest as

19 described herein.

20      And this provision also makes clear that -- by way of

21 example, the Davis overriding royalty interest was not a

22 subsequently created interest.  But the point being that

23 subsequently created interest is essentially broader than

24 overriding royalty, but overriding royalty is a subsequently

25 created interest.

1          Next slide.

2          THE COURT:  Where is the term "subsequently" -- can

3   he go back a page? -- "subsequently created interest" utilized

4   in the document so that it matters whether it is a subsequently

5   created interest or not?

6          MS. CHOI:  Your Honor, the only place this term

7   appears is in Section 19.1 with the capital SCI.  And we can

8   see here, it describes, you know, overriding royalty is defined

9   in the beginning.  And then it says, "and such overriding

10  royalty shall be considered a subsequently created interest."

11         So my understanding in reading this is that the

12  party, you know, creating an overriding royalty shall assume

13  and bear all obligations of the overriding royalty, regardless

14  of the parties participation status.  And there's some

15  indemnification language, as well.

16         This provision goes on to then say, again, (audio

17  interference) overriding royalties shall not be considered a

18  subsequently created interest.  This is where -- the only place

19  where that specific term is used.

20         However, if you turn to the next slide, which shows

21  19.1.1 -- Mr. Miller, if you could please turn to the next

22  slide.  Thank you.

23         Here, the term "overriding royalty" is used.  And as

24  we talked about on the prior slide, override royalty is a

25  subsequently created interest.  And this is talking about a

1  subsequently created overriding royalty being made specifically

2  subject to all the terms and provisions of this agreement.

3  However, this specifically excludes the Davis overriding

4  royalty interest, which, as we mentioned on the prior slide,

5  was not a subsequently created interest.

6        THE COURT:  Sorry.  Which agreement is -- what are we

7  looking at here?

8        MS. CHOI:  This is the OOA from 2002, the original

9  OOA.

10        THE COURT:  Okay.

11        MS. CHOI:  This just covers 157.

12        Okay.  So turning to the next slide now.  So in 2008,

13  as we discussed, there's a farmout agreement that required LLOG

14  and Davis to sign an ORRI (audio interference) Marathon farmout

15  agreement with LLOG and Davis getting the 201.  And this

16  language here, you can see the creation and reservation of the

17  ORRI in this section.

18        Turning to the next slide, Shell and Marathon's

19  assignment of the operating rights to LLOG and Davis in the 201

20  lease also made clear that the assignment was subject to the

21  ORRI.  But the assignment of operating rights was not made

22  subject to the OOA.  So in looking -- the ORRI was recited with

23  each assignment of operating rights, that was not subject to

24  the OOA.

25        And going to the next slide -- and I think even

1  Mr. Baay conceded as much, but the 2008 documents reflect and

2  made very clear that the ORRI was granted free and clear, and

3  so this free and clear language is used throughout the farmout

4  -- it's used in the farmout agreement.  It's also used in the

5  assignment and conveyance of the ORRI.  You can see this

6  language on the screen.

7           THE COURT:  Look.  On this one, he's agreeing that

8  the internal calculation of how much is due on the ORRI isn't

9  charged by anything.  You don't have a dispute about that.

10          His argument is that the ORRI, once you receive a

11 payment on it, can be subject to an after-acquired property

12 mortgage.  And according to Mr. Baay, you are not a subsequent

13 party, an assignee, of Davis for the purpose of the language

14 that we were looking at before that says that it supersedes and

15 replaces.

16          And so only if you can assert Davis's supersede and

17 replacement rights would you be free from your after-acquired

18 problem as to the ORRI itself, as opposed to the calculation of

19 how much is due under the ORRI.  I think he -- in fairness,

20 Mr. Baay, even disputes that.  But that is -- I think he

21 disputes that the other agreement exclusionary language, right

22 there, would exclude subsequent acquired property generally.

23 But he certainly says you're not a successor to Davis's rights

24 here.

25          MS. CHOI:  Yes, Your Honor.  And with respect to

1  that, the agreement -- if you turn to the farmout agreement

2  Exhibit C1 at -- I'm not sure exactly the page.

3          But, Mr. Miller, I believe you have the language

4  available.

5          But there's a provision here that says that the

6  "assignment and the rights (audio interference) interests and

7  obligations assigned, reserved, accepted, or retained in this

8  assignment shall enure to the benefit of and shall be binding

9  upon the successors and assigns of the assignor and the

10  assignee."

11          THE COURT:  Is your client a successor or assign of

12  an assignor or an assignee?

13          MS. CHOI:  Your Honor, the assignor here (audio

14  interference) assignee was LLOG and Davis, and so would

15  acquired Davis, making us the assignee.

16          MR. CARLSON:  Your Honor, Mr. Carlson here.  Do you

17  mind -- may I be heard on this for just a moment?

18          THE COURT:  Yes, sir.  Go ahead.

19          MR. CARLSON:  So, Your Honor, Fieldwood was an

20  assignee of the ORRI in the ORRI assignment here.  So we --

21  Fieldwood was assigned the ORRI by Shell in the 2015

22  transaction, and stepped into the shoes of Shell as the holder

23  of the ORRI.  And that's in LLOG Exhibit -- I think it's

24  1603-21.  This is the assignment of the ORRI from Shell to

25  Fieldwood.

1          THE COURT:  Yeah.  But as to Davis that had the

2     after-acquired property provision that you're trying to get rid

3     of, were you their assignee, as well?

4          MR. CARLSON:  We were their assignee in connection

5     with the Davis equity purchase transaction.  We acquired their

6     working interests in 157 -- Green Canyon 157.

7          THE COURT:  You acquired their working interest or

8     you acquired the equity interest in Davis?  Those are different

9     things.

10         MR. CARLSON:  We acquired the equity interest in

11    Davis.  If you'll just give me one second, I think we can find

12    the proper exhibit here.

13         THE COURT:  So you became the owner of Davis in its

14    totality?

15         MR. CARLSON:  That's my understanding, yes.

16         MS. CHOI:  Yes.  Your Honor, we acquired all issued

17    and outstanding equity in Davis Offshore Partners and Davis

18    Offshore, pursuant to that EPA -- or equity purchase agreement

19    which was dated August 5, 2014.

20         THE COURT:  Okay.  All right.

21         MS. CHOI:  So if we turn back to the presentation,

22    Mr. Miller.

23         So the documents are consistent that the parties

24    wanted to exclude the ORRI from the terms of the OOA.  And this

25    provision we've looked at already, of course, but there being

1 "no further understandings, representations, warranties, or

2 obligations pertaining to the ORRIs, and this conveyance

3 supersedes and replaces any and all prior agreements, whether

4 written or oral, between the parties."

5         Ratifying, of course -- when the ratification

6 happened, they were ratifying a 2002 agreement, so it was still

7 a preexisting agreement.  When Fieldwood ratified the MOA, the

8 effective date of the ratification was backdated to 2002, so as

9 to step into the shoes of Davis.  And so, either way, the 2008

10 language that you see on the screen here still applies to the

11 ratification under the express terms of the document.

12         So turning now, if you will, Mr. Miller, to the next

13 slide.

14         So here is where we have the 2014 amendment to the

15 operating agreement, which excludes the ORRI from being subject

16 to the OOA.  The language that was used here specifically

17 states that the parties -- the desire of LLOG, LLOG Energy and

18 Fieldwood, to amend the OA to, among other things, "provide

19 that the former's ORRI is not to be considered a subsequently

20 created interest under the OA."

21         And Your Honor, it's clear just from this and

22 consistent with the documents that we've seen before, parties

23 did not intend to have this be included within and being

24 subject to the OOA.

25         And at this time, Fieldwood did not own the ORRI.  It

1  wasn't until 2015 when Fieldwood acquired Shell's interest in

2  the ORRI.

3          But, Mr. Miller, if you want to turn to the next

4  slide.

5          Just in looking at all of these documents, together,

6  and the time line of how these things played out, as well as

7  the effective dates of these various agreements and the

8  ratification that we just discussed, it's clear that the

9  parties agree that the ORRI is not subject to the OOA's grant

10 of security interest.

11         And indeed, from a practical standpoint, doesn't make

12 sense that the subsequently -- that the -- excuse me -- that we

13 would pay for something that -- that Fieldwood would pay for

14 something separate like an ORRI, and then allow them to have a

15 mortgage on it, when that wasn't the parties' intent.  And all

16 the documents speak to the contrary.

17         The documents consistently say "free and clear," and

18 the OOA states in Article 19 that the subsequently created ORRI

19 shall be subject to the terms of the OOA and rights granted the

20 parties therein, but when Fieldwood ratified the OOA, the

21 parties agreed that the ORRI would not be treated as a

22 subsequently created ORRI.  So the --

23             THE COURT:  But subsequent creation --

24             MS. CHOI:  -- (audio interference) would not be --

25             THE COURT:  But as I understand it, the OOA doesn't

1  refer to subsequently created events, right?  This is language

2  that -- we've got to figure out what it means, but it's not

3  like it has some meaning within the OOA, right?

4          MS. CHOI:  Your Honor, it appears as though the

5  parties intended to treat this ORRI similar to how it was

6  carved out the day that the ORRI was carved out, and not

7  subject to the other provisions of the OOA, and that being the

8  parties' intent with respect to calling it --

9          THE COURT:  I do understand your argument about --

10         MS. CHOI:  -- subsequently created --

11         THE COURT:  I do understand your argument about it

12  then.  I'm trying to figure out, though, the documents

13  themselves don't say it.  You're saying because of the

14  ambiguity, I should infer the intent.  Is that fair?

15         MS. CHOI:  Your Honor, that is fair.  The words are

16  less than perfect.  But it's -- that is fair, and I think --

17  when you look at all the agreements as a whole, and the

18  parties', you know, purpose of doing this, that's the correct

19  interpretation.

20         THE COURT:  Can I do that at a hearing like this,

21  without more?

22         MS. CHOI:  Well, Your Honor, based on the evidence

23  that's in the record, I think it is reasonable to have that

24  interpretation.  And if you find it's ambiguous, we are happy

25  to put on evidence, if that would be helpful -- you know, to

42

1  explain that.  But just based on what reasonably makes sense

2  and the evidence within the record, we think that that's the

3  proper interpretation.

4            THE COURT:  Okay.

5            MS. CHOI:  And Your Honor, in addition, just the

6  terms of the ORRI themselves bar the relief that LLOG seeks

7  because the terms make clear that this is free and clear --

8  these are free and clear, and that was always the intent, and

9  the documents are consistent that the parties wanted to exclude

10 the ORRI from the terms.  So --

11           THE COURT:  Yeah, look, it's --

12           MS. CHOI:  -- with that, I will (audio interference)

13 over --

14           THE COURT:  No, it's clear and they acknowledge that

15 Shell got the ORRI free and clear of whatever liens there might

16 have been.  The question is when Fieldwood subsequently

17 acquires it, does it get captured by the after-acquired

18 property clause.  And as to whether after-acquired property and

19 subsequently created property have the same meaning, they

20 don't.  But maybe that's the best meaning to give it.

21           I understand your argument.  But you need to deal

22 with his argument that says, yes, it went to Shell free and

23 clear.  But that doesn't mean if Shell transferred it to

24 somebody else --

25           Can I tell you what's confusing about this for me is

43

1  I've got four parties to it.  I've got their successors and
2  assigns.  But let's call them just four parties.  If this had
3  gone to a fifth party, and they had had a subsequent assignment
4  or a subsequent acquisition provision in their mortgage, no
5  question that the ORRI gets captured.

6         The issue is whether within this small box of four,
7  adding to it their successors and assigns, did we eliminate the
8  "subsequently acquired property" clause.  Maybe we did and
9  maybe we didn't.  But I have a very narrow question about that,
10 I think.

11        Do you think I'm wrong on that question, or about
12 what my question is, I should say?

13             MS. CHOI:  No, Your Honor --

14             THE COURT:  Don't you agree that if this -- let's
15 assume that Shell had transferred it to Exxon, and that Exxon
16 had given LLOG an "after-acquired property" provision for
17 anything acquired within this block.  You agree it would be
18 subject to an Exxon "after-acquired" provision, right?

19             MS. CHOI:  Right, Your Honor.  I think, you know,
20 here -- the fact that we have the ratification that was
21 backdated to 2002 is important, and I think that under the
22 express terms of the document, that the language still applies
23 to this, because of that language.

24             And in any event, we don't think there is a valid
25 mortgage because these are -- there's no pledge of rent.

44

1  Mr. Carlson will discuss this further, but -- happy to answer

2  any further questions on this.

3          THE COURT:  No.  Let's move ahead.  Thank you.

4          Mr. Carlson.

5          MR. CARLSON:  Thanks, Your Honor.  Before we move

6  ahead with the pledge argument, one thing I wanted to point out

7  is just even if the subsequently created interest argument, if

8  we're wrong on that, you know, the assignment of the ORRI

9  itself from Shell to Fieldwood provides -- and we can pull it

10  up -- 1603-21.

11          So here, assignor is Shell and assignee is Fieldwood.

12  Wait.  I'm sorry.  I believe it's the next one.  I'm sorry.

13  It's -- yeah, this is it.

14          So here's where Shell assigns its interest in the

15  ORRI to Fieldwood, assigns all of its rights, title, and

16  interest in the ORRI.  And then if you scroll -- in this

17  "whereas" clause.  And then if you scroll down to Paragraph 3,

18  at the very end of this -- the last sentence in Paragraph 3

19  makes clear that Fieldwood assignee has the right of "full

20  substitution and subrogation in and to any and all rights and

21  actions of warranty which assignor, assignees, affiliates, or

22  subsidiaries may have in the ORRI" -- "may have against any and

23  all preceding owners or vendors of the ORRI."

24          And so what I would argue here, even if we're wrong

25  about the other arguments, that we're taking this interest from

1   Shell with all of the same rights and interests and

2   subrogations (audio interference) Shell's interest, which was

3   clearly, you know, free and clear, as we pointed out.

4              THE COURT:  All right.

5              MR. CARLSON:  So turning back to the presentation.

6   So, Your Honor, there's a few deficiencies in our mind, even if

7   we -- that (audio interference) LLOG does not have a valid and

8   perfect lien, in our opinion.

9              Number one is if a valid -- LLOG did not file a valid

10  mortgage.  The filing that Mr. Baay walked you through -- the

11  UCC financing statements that were filed --

12             THE COURT:  It was filed in the --

13             MR. CARLSON:  -- that's number one, and I'll --

14             THE COURT:  It was filed in the right place, right?

15  If all they filed was the mortgage, you don't have a dispute

16  about it.

17             MR. CARLSON:  That's fair.  If it was just -- if it

18  was filing the mortgage, the mortgage itself.  But here, it

19  filed -- LLOG filed a UCC 1 financing statement and it -- you

20  know, from the purposes of describing the collateral, it

21  attaches the memorandum, the memorandum of operating agreement,

22  and then even in Section 5A of the financing statement provides

23  that it's covering fixtures and as-extracted collateral.

24             So the UCC financing statement that describes -- that

25  checks the boxes for fixtures and as-extracted collateral, and

1  then describes -- you know, for purposes of describing the

2  collateral, attaches the MOA.  We just don't think under

3  Louisiana law that that is -- that creates a valid mortgage.

4          THE COURT:  Is there a case that holds that?  I mean,

5  Mr. Baay points out that you didn't give me any case that said

6  that filing a mortgage with an attached UCC isn't as good as

7  filing a mortgage without an attached UCC.

8          MR. CARLSON:  There's no case that directly says

9  that.  But it's not that -- it's not that a mortgage was filed

10 with UCC attached.  The whole point of -- the whole point of

11 noticing is that it's got to put the world on notice.  It's got

12 to be a reasonable for a third party to look at the filing and

13 come to the conclusion that there's a preexisting security

14 interest.

15         Here, if you look at what's filed, it's a UCC

16 Financing 1 statement that was filed.  It describes -- it

17 checks the fixtures and as-extracted collateral boxes in the

18 UCC 1 financing agreement, and then says oh, for -- you know,

19 for a description of the collateral, see -- you know, see the

20 attached MOA.

21         And so, you know, the --

22         THE COURT:  I'm missing some -- I'm just missing some

23 words you're saying.  I heard you say it checks the fixture

24 box.  What other box does it check?  Or let me see it, if I

25 could.

1          MR. CARLSON:  Sure.  This is LLOG Exhibit 7.

2          THE COURT:  So do you want me to pull it up, or is

3  Mr. Miller going to pull it up?

4          MR. CARLSON:  If Mr. Miller has it handy.

5          THE COURT:  It's --

6          MR. CARLSON:  1603-7 is the --

7          THE COURT:  Yeah, I've got it up.  No, that's a

8  declaration of --

9          MR. CARLSON:  It's attached to the declaration.  It's

10  attached --

11          THE COURT:  Got it.  I'm looking at it.

12          MR. CARLSON:  So then if you look at the -- starting

13  with the parish recording page, it certifies that the attached

14  document was filed for registry and recorded (audio

15  interference) office for Terrebonne Parish, Louisiana.  And

16  then it attached the UCC 1 financing statement.

17          THE COURT:  Right.  And it checks fixture filing and

18  as-extracted collateral.

19          MR. CARLSON:  Right.  And then it just has a

20  reference, "Attached is the memorandum of operating agreement

21  and financing statement."  And so it's really -- it's a

22  purported -- the way I read it, it's a purported UCC filing.

23  And these terms, fixture and as-extracted collateral, that was

24  filed in the wrong -- in the wrong spot.

25          THE COURT:  But what does -- Louisiana law may be

1  different about this.  And I haven't done any research on it.

2  I don't think either of your briefs addressed this.  But in

3  Texas, you could be put on notice pleading, even if the --

4  inquiry notice, even if you had an imperfect pleading.

5          I'm not sure what "as-extracted collateral" means

6  under Louisiana law.  And I don't know what it means when the

7  box that says the debtors do not have an interest of record in

8  the real property is not checked.  One would presume that means

9  they do have an interest of record in the real property.  And

10 as-extracted collateral, presumably, is going to be the

11 minerals.  But maybe I'm reading that wrong.

12         So does that tell people, from looking at the UCC,

13 we're asserting an interest in as-extracted minerals?  And so

14 you say, well, what does that mean from an inquiry notice?  And

15 I don't know if you do inquiry notice under Louisiana law.  But

16 if you do, you would then say, well, what does it say?  And you

17 would then read the mortgage.

18         MR. CARLSON:  So the as-extracted collateral is a

19 term of art that's defined under the Louisiana UCC.

20         THE COURT:  Okay.  And what does it mean?

21         MR. CARLSON:  And it means -- let me just pull up

22 their definition here.

23     (Pause)

24         THE COURT:  Let me back up for a minute.  Paragraph 4

25 -- you had me focused on 5.  4 says, in terms of what's the

1  collateral, "See the attached."  So see what we have in the

2  attached memorandum of operating agreement to identify the

3  collateral.

4           MR. CARLSON:  Right.  So I guess the point is that

5  it's not -- it's not that it's filing the MOA and attaching the

6  UCC.  It's the opposite.  It's the UCC financing statement

7  that's attaching the MOA here.

8           And you know, we weren't able to find a case exactly

9  on point.  But we did -- you know, we did find in a -- we did

10 find in a secondary source, the Louisiana Practice Secured

11 Transactions, that the filing of a UCC 1 financing statement in

12 the real property record, even in a case the fixtures (audio

13 interference) as-extracted collateral and other property-

14 related collateral is without effect and is necessary -- is

15 neither necessary nor sufficient with respect to security

16 interests.

17          THE COURT:  Do we have inquiry notice in Louisiana?

18          MR. CARLSON:  I don't know the answer to that off the

19 top of my head, but let me --

20          THE COURT:  All right.  I'm going to give you and

21 Mr. Baay both a chance to file something after this hearing, to

22 clarify whatever you want.  But that's going to be one thing we

23 need to clarify, because it looks to me like -- first of all,

24 I'm not sure that I accept that this isn't good enough just on

25 its face.  But even if I accept that it's not good enough on

1  its face, I think under Texas law this would certainly be

2  enough to put you on inquiry notice.  And if Louisiana has

3  inquiry notice, I'm not sure where you would go from there.  So

4  I'm going to want to understand that better, for sure.

5          MR. CARLSON:  Understood, Your Honor.

6          So, Your Honor, the second and more problematic part

7  of this filing is that it doesn't -- the actual -- and this

8  isn't just a perfection issue.  This is a grant issue.  The

9  actual grant on a security interest does not have express

10  language for the assignment or pledge of rents included in the

11  operating agreement, which is required under Louisiana law.

12          Here, the 2008 transaction -- and we'll walk through

13  this -- where Shell and Marathon assign its operating interests

14  to LLOG and Davis, but retain an overriding royalty interest,

15  it creates a sublease under Louisiana law.  And Louisiana law,

16  we think, is clear that there has to be actually be express

17  language pledging or assigning rent to grant -- to grant, much

18  less perfect, the security interest in rent.

19          And so when Fieldwood then acquired its interest from

20  Shell, and essentially it got sub -- you know, its rights to

21  receive sublessor's rent pursuant to this transaction -- and

22  the sublease.

23          And so if we could move to the next slide,

24  Mr. Miller.  I think we can go to the next slide, as well,

25  here.

1           Here's a Fifth Circuit case applying Louisiana law

2    that held that the assignment of a lease with a retention of an

3    overriding royalty creates a sublease, regardless of how the

4    parties file it.  There are several -- there are other

5    Louisiana law cases that we cite, as well, for this concept.

6           And so turning to the next slide, which is the actual

7    assignment language, where here, again, LLOG and Davis are

8    assigning -- sorry, Shell and Marathon are granting their

9    operating rights to LLOG and Davis and reserving overriding

10   royalty interest in the same -- as part of the transaction

11   here.

12          And so then moving to the next slide, we'll go

13   through the Louisiana Civil Code provisions, but we think it's

14   pretty clear under Louisiana Civil Code, Article 3172:  "By

15   express provision in a contract establishing a pledge, the

16   owner of land or holder may pledge bonuses, delay rentals,

17   royalties, and shut-in payments arising from mineral leases, as

18   well as other payments that are classified as rent under the

19   Mineral Code."

20          And then if you read Comment B to this provision, it

21   says -- you know, it makes (audio interference) makes clear,

22   however, that a contract or pledge that encumbers mineral

23   payments, only if the contract includes an express statement to

24   that effect.

25          And so if you review -- if you take a look at the

1  operating agreement and the memorandum of agreement, neither of

2  them contain an express pledge or assignment of rent.  There is

3  a general pledge or mortgage of immovables, but there's no --

4  again, there's no express language pledging or assigning rent.

5              THE COURT:  Can you go back up to 3172 comment again?

6  Let me take another look at that.  One page before.

7              MR. CARLSON:  Sure.

8              THE COURT:  And what does our pledge say?

9              MR. CARLSON:  Our pledge says -- we can pull it up.

10  It's going to be Exhibit 2 -- LLOG Exhibit 2.  And so the

11  only language that I think here, this first part, A1, each

12  non-operating party grant a mortgage (audio interference) and

13  pledge (audio interference) title and interest in the lease --

14  all -- and then C is the all other individual property

15  susceptible to mortgage.

16             THE COURT:  So whether it -- as I understand your

17  argument, is whether it's rents or not, it's not adequately

18  pledged.  Is that your argument?

19             MR. CARLSON:  Correct.  Even if it is rent --

20             THE COURT:  If it's not rent.  Assume with me it's

21  not rent.

22             MR. CARLSON:  If it's not rent -- if it isn't rent,

23  it's still not adequately perfected, because there's no valid

24  mortgage.

25             THE COURT:  Because why?

1          MR. CARLSON:  For the reasons we discussed, that the

2  -- the UCC Financing 1 statement filing in the record -- in the

3  mortgage records did not create a valid mortgage.

4          THE COURT:  No, but under 3172(b) -- I want to

5  compare 3172(b) with what got pledged here.  I'm not sure why

6  it's mattering that it's rents.  It encumbers mineral payments

7  only if --

8          MR. CARLSON:  (Audio interference) mineral payment.

9          THE COURT:  Is this a mineral payment, the ORRI?

10  Forget whether it's rent or not.  Is it a mineral payment?

11          MR. CARLSON:  Yeah.  If it's not rent, then it would

12  -- I think -- I think our position would be that it would

13  constitute a mineral payment.  That also falls under 3172.

14          THE COURT:  Can you have something under Louisiana

15  law that is both an immovable and a mineral payment?  Or are

16  they mutually exclusive?

17          MR. CARLSON:  I don't know that we found case law

18  that they have to be mutually exclusive, but here, there's a --

19  the way we read this is that there's got to be a very -- here,

20  the type of ORRI that's been granted creates a rent or creates

21  a mineral payment.  And so it has to be -- it has to be -- have

22  this -- these magic words.  It has to have a pledge of rent or

23  mineral payments, you know, so it's not an either/or.

24          THE COURT:  Okay.

25          MR. CARLSON:  And we'll show you -- under the UCC, on

1  the next slide -- I'm sorry.  One more slide after that.

2          So pledges and assignments of rent are taken right

3  out of (audio interference) -- sorry.

4          Here.  The Louisiana UCC takes pledges and

5  assignments of rent out of (audio interference) they have to be

6  filed in the mortgage records.  So this is intended to show

7  that the filings in the UCC wouldn't -- wouldn't perfect a

8  security interest in rent either.

9          So then moving on to the next slide.

10         THE COURT:  I want to back up a minute, because --

11 under Louisiana law, is there a difference between someone

12 taking an ORRI and whatever rights that ORRI might have, which

13 would include a payment right, or taking the payments from the

14 ORRI, so that somebody could have a lien interest in the

15 immovable ORRI.  And once they take it, they get whatever

16 rights go with that.  But they wouldn't have an interest in the

17 rent or the mineral payments under that ORRI until they took

18 the ORRI itself.

19         Is that what we have under Louisiana law?

20         MR. CARLSON:  The way I read the case law together

21 with this statute, the Louisiana statute that we just had up,

22 is that it creates -- an ORRI can still be a real property

23 right.  But by how it was created in connection with the 2008

24 transaction, it created a sublease.  And so what Fieldwood

25 acquired was its right to receive rents under that sublease.

1  And so it needed to be perfected by an express pledge of right

2  to the rent -- the rental payments.

3           THE COURT:  Okay.

4           MR. CARLSON:  So then moving on to the next slide.

5  So here, this is in response to an argument that LLOG raised

6  that -- essentially, that the way the interest was acquired,

7  that it extinguished by confusion our argument that was raised

8  here.  We don't think extinguishment by confusion applies --

9  you know, if you just look at exactly how the Louisiana Civil

10 Code says here, that it has to be a situation where the

11 "dominant and subservient estates are acquired in their

12 entirety" by the same person.

13          That's not what we have here.  Fieldwood acquired a

14 50 percent interest in the ORRI from Shell.  And so we don't

15 think extinguishment by confusion applies here.

16          And then moving to the next slide.  So, Your Honor,

17 even if -- even if LLOG is able to overcome all of the barriers

18 and arguments that we've already raised here, and they do have

19 a valid and perfected lien, we don't think that that valid and

20 perfected lien would extend to future P&A obligations, for a

21 couple different reasons.

22          The first is the disallowance argument under

23 502(e)(1)(B) that we've (audio interference) and then second is

24 just by the express terms of the memorandum of operating

25 agreement that was filed.

1          THE COURT:  Yeah, I want to start with the (e)(1)(B)

2   argument.  The express terms may matter.  But if we disallow a

3   claim under 502(e)(1)(B), and then we look at 502 -- let me

4   find it.  The provision that deals with the effect on liens.

5          MR. CARLSON:  (Audio interference)

6          THE COURT:  No.  On liens.

7          MR. CARLSON:  506(d)?

8          THE COURT:  506(d) excludes 502(e) from the provision

9   that says the lien goes away.  So the lien remains, if all you

10  have is a 502(e) disallowance.  That's what we didn't try -- I

11  don't understand why 502(d)(1) would not govern and say even if

12  the claim is disallowed that the lien would remain.

13          That's different than if the lien is disallowed

14  because it doesn't exist, like you're saying.  There is no lien

15  on a future obligation, under the terms of the lien.  But I

16  think that the idea that the lien would go away because of the

17  502(e)(1)(B) disallowance is just wiped out by the 506(d)(1)

18  provision.

19          MR. CARLSON:  Sure.  But I think what's different

20  here, I think, is that -- well, I guess a couple of different

21  things.  Here, the contingency -- I think in Tri-Union, you

22  know, the lien was preserved until -- unless and until the

23  contingency occurred.

24          Here, the contingency really can't occur because,

25  number one, the -- you know, the agreement -- the operating

1  agreement would be rejected.  And then, number two is the

2  Fieldwood's interest in the ORRI would be transferred on the

3  effective date.

4          THE COURT:  Different question.  I'm trying to deal

5  with if, under 502 -- the separate argument.  If we disallowed

6  the claim under 502(e)(1)(B), doing that in and by itself does

7  not eliminate the lien that normally would be eliminated under

8  506, because of 506(d)(1).

9          That lien may go away for other reasons.  But I don't

10 think we need to deal it very long here, unless you can really

11 persuade me that I'm misreading (d)(1) -- (d)(1) simply does

12 not -- it's very explicit that the lien remains if a

13 disallowance is solely because of 502(e).

14         Now, you have a separate argument that says there

15 isn't a claim here.  And I got that.  And if there isn't a

16 claim, then the lien does go away under 506.  But I don't think

17 it goes away because of 506 -- if the sole reason is

18 506(e)(1)(B).  If that makes sense.

19         MR. CARLSON:  No, it does.  It makes sense, Your

20 Honor.  And I think -- I think we have to read it again

21 together with the next argument that we'll walk you through,

22 which is based on the MOA that was filed.

23         And so I think Mr. Baay had walked you through 5.2 of

24 the MOA, which has the broader after-acquired security

25 interest, whether acquired now -- I'm sorry, 5.3 -- "whether

58

1  acquired now or in the future" language.  But then, if you read

2  a few provisions down to this 5.5, it seems to be qualifying or

3  limiting that broader grant to future acquired -- or future

4  obligations to suggest -- "actual obligations and indebtedness

5  that are outstanding and unpaid, and that are attributable to

6  or charged pursuant to the interest of such non-operating

7  party, pursuant to the operating agreement."

8           And here, of course, we're talking about -- what LLOG

9  is saying, they view in the future will be future P&A expenses

10 that have to incur, and then turn around and, you know, seek

11 payment for.  So that's not -- that obviously, that doesn't

12 fall under 5.5 of the MOA.

13          So if we're in a world where they're correct that

14 they do have a valid mortgage or valid security interest, our

15 position is that they're relying on this MOA that limits their

16 security interest to just what's outstanding and unpaid.

17          So (audio interference) --

18          THE COURT:  But if they -- let's say that the P&A is

19 done in five years.  Would they then have the claim?  Five

20 years hence?  That is secured?

21          MR. CARLSON:  I don't think they would by virtue of

22 what -- of what we have here, which is, you know, the agreement

23 would be rejected and the ORRI would be transferred --

24          THE COURT:  But if you reject --

25          MR. CARLSON:  -- as part of the --

1          THE COURT:  If you reject the agreement, then they're

2   entitled to a damages hearing on what that is.  And that would

3   then bring into present those future obligations as a result of

4   the rejection.  What gets rid of their lien?

5          MR. CARLSON:  Well, I'm not sure -- I'm not sure that

6   the rejection damages claim would capture all future P&A in

7   light of this provision.

8          THE COURT:  Well, isn't that what we have to decide?

9   Because if, in fact, it would capture it, I don't see this

10   argument goes very far.  If you're telling me at a damages

11   hearing from rejection they wouldn't get damages arising out of

12   a future payment obligation, why is that any different than any

13   other future, you know, "take and pay" obligation where we

14   bring everything back to the present?  What does this do to get

15   rid of that?

16          I understand it's nowhere near take and pay.  But we

17   bring things back to the present all the time, where the

18   obligation hasn't yet arisen.  We're trying to figure out what

19   are the damages from rejection?  In doing that, we always look

20   at what are the future losses.

21          MR. CARLSON:  Understood.  I think it would come down

22   to the question of whether or not -- whether or not, in light

23   of this provision and the other provisions, it would really be

24   -- it should be included as part of its expectation damages.

25          THE COURT:  Okay.  Got it.

1          MR. CARLSON:  Yeah.

2          THE COURT:  All right.  Anything further,

3    Mr. Carlson?

4          MR. CARLSON:  That's the totality of our

5    presentation.

6          THE COURT:  Thank you.

7          Mr. Baay, anything further you want to add?  I'm

8    going to give each side really however much time you all want.

9    I don't know if you want, you know, ten days, two weeks, three

10   weeks, to file a follow-on brief so that you can cover anything

11   that -- because I know I asked some questions today people

12   didn't necessarily expect.  So I want to get this right, and

13   I'm going to give you some follow-on briefing opportunity.  But

14   if you want to make some additional oral arguments now, you can

15   do so, as well, Mr. Baay.

16         MR. BAAY:  Thank you, Your Honor.  Can you please

17   make Stephanie Franks the presenter again for me?

18         THE COURT:  Of course.

19      (Pause)

20         THE COURT:  She should be the presenter now.

21         MR. BAAY:  Okay.  Stephanie, if you could please pull

22   up 1603-1, Page 132.  Yeah, and highlight there.

23         And I'll be brief, Your Honor, and I appreciate the

24   opportunity for further briefing, so I will make this brief.

25   The way 19.1 reads, and the reason that it talks about

1  subsequently created interest is -- and where that term is --

2  you know, it's not defined as classically as we would normally

3  see.  But right in the middle of that paragraph where it says,

4  "The party creating the override shall indemnify and hold other

5  parties harmless from any and all claims, demands for payment,

6  asserted by the owners of the override, and such overriding

7  royalty shall be considered a subsequent created interest."

8        So I guess I started, you know, one paragraph up

9  early.  You know, at the very beginning of this, "if any party

10 has previously created or hereafter creates an override," so

11 that's what this is talking about.  It's saying if one party to

12 the agreement says, man, I'm broke.  I need some money.  I've

13 got to go, I'm going to create an override and go mortgage it

14 to the bank, then that's going to be considered a subsequent

15 created interest, and that party is responsible for

16 indemnifying the others if it has to be paid.

17       And what Shell was saying when it took the override

18 as part of the transaction with LLOG and Davis, it says, I

19 don't want my override treated like a subsequently created

20 override.  I want it to be above, and I want it to be -- have

21 to be paid by everybody, not just -- you know, I don't want to

22 hear later that this was created by one person or another.  Or

23 if somebody comes in later, that they didn't create it.  This

24 is -- this was to be treated like the Davis override.  And the

25 Davis override gets paid above, and is not subject to, you

1  know, one party or another having created it, and then owing it

2  and having to indemnify the other party.

3          That's the whole point of the subsequently created

4  interest.  And Shell, you know, smartly said I don't want to

5  treat this override like that.  So when it got transferred to

6  LLOG -- or I mean when it got transferred to Fieldwood or if

7  they'd sold it to anybody else or if they'd mortgage it to the

8  bank, it would have that additional value, because it's not a

9  subsequently created interest.

10          And you know, as Your Honor pointed out, this is

11  clearly a distinct concept in this document (audio

12  interference) after-acquired property that is pledged and is

13  clearly -- we think falls under any -- Fieldwood's grant when

14  they acquired this.  It's after-acquired property, and so it

15  should fall under our agreement.

16          With respect to the MOA that's filed in the mortgage

17  records, we cited, Your Honor to the <u>Carr</u> case.  And in that

18  case, the standard is cited as "sufficient notice to third

19  parties."  So clearly, you know, anybody looking at the

20  mortgage record to find this would come across this mortgage

21  agreement.  Collateral is well defined.  And we actually did

22  both.  We filed this along with the UCC statement,

23  superfluously, in the mortgage records, and we filed the UCC in

24  the -- with the Secretary of State, where the UCCs are to be

25  filed.

1          So the mortgage covers the override and the UCC
2    covers the as-extracted, as that -- as those -- as that oil and
3    gas gets produced.  They actually take it in (audio
4    interference).

5          Thank you, Your Honor.  That's all I would add, and
6    we'll address the other questions that you had in our follow-up
7    brief.

8          THE COURT:  How long do you want to get that done?
9    Two weeks, ten days, three weeks?  I want to be flexible where
10   people aren't killing themselves.  I don't think there was that
11   much we covered, but definitely some stuff I need to read
12   about.  What do you want?  Couple weeks?

13         MR. BAAY:  Yes.  I think two weeks from today is
14   fine.

15         THE COURT:  Mr. Carlson, are you okay with that?

16         MR. CARLSON:  Your Honor, the one -- the way we sort
17   of tried to -- we tried to bifurcate the issues and have a set
18   of issues heard today.  We are -- this will essentially inform
19   the decision of whether to assume the operating agreement, and
20   we have a -- you know, we're aiming to close by the end of the
21   month.  And so what -- from the debtors' perspective, a little
22   bit shorter time frame than two weeks would be preferred.

23         THE COURT:  Yeah, I don't think you're going to get a
24   decision from me by the end of the month.

25         MR. CARLSON:  Okay.

64

1          THE COURT:  But I would assume -- let me ask.  I

2 shouldn't make that assumption.

3          Mr. Baay and Mr. Carlson, does it make sense to agree

4 on some order that would defer the assumption and rejection

5 question until after we make a decision, so that y'all both

6 have the benefits of that?  So that, you know, notwithstanding

7 any deadline in the plan or the confirmation order, that it

8 will -- the actual deadline will be, whatever y'all want to

9 say, 10 or 14 days after we issue an opinion?  Or what do you

10 all want to do for that deadline?

11          MR. BAAY:  I think that makes sense.  I'll have to

12 check with my client, but I think that makes sense.

13          MR. CARLSON:  I agree, Your Honor.  I'll check with

14 my clients, as well, but that does make sense, because my

15 understanding is that the decision was going to depend on --

16 whether to assume an assignment was going to depend on the

17 outcome of your ruling.  So I'm -- that's fine.

18          THE COURT:  Okay.  Look, if your clients won't both

19 agree to this within the next two or three days, then I'm just

20 going to decide on the record that we have, because we're sort

21 of forced to do that by the clients, and file something in the

22 next two or three days to say y'all can't agree to some sort of

23 an extension.

24          I don't think either of you want me deciding on the

25 record we have.  It's -- this is a very hard question.  Y'all

1  may think it's simple from your own clients' point of view.  I

2  will tell you from mine, it's not.  And I want to try and get

3  it right.  And I would rather take more time.  But you know, I

4  also understand people need to move ahead with business.  And

5  if y'all -- if either client wants to do it -- I don't want to

6  know who agrees, who doesn't agree.  If either side -- you

7  know, no subsequent briefing, go ahead and make your decision,

8  we'll get you something done, and we'll get it by the end of

9  the month so that y'all can move ahead.  It just -- it won't be

10  as thorough.  But I'll still, you know, work hard to get it

11  done right.  Okay.

12          So within the next --

13          COUNSEL:  Thank you, Your Honor.

14          THE COURT:  By Wednesday at 5, the parties will file

15  any statement that says you need an immediate decision or a

16  proposed order that will extend the deadline for assumption and

17  rejection.  I will give you the two weeks, until the 2nd, but I

18  would ask whether y'all would prefer to have noon on the 30th,

19  so that you don't have your associates working all weekend.

20  But I'll leave that up to Mr. Carlson and Mr. Baay, what y'all

21  want to do about that question.

22          MR. BAAY:  Noon on the 30th is fine with us, Your

23  Honor.

24          MR. CARLSON:  And for the debtor --

25          THE COURT:  Noon on the 30th, Mr. Carlson?

1          MR. CARLSON:  That works for us, yes.

2          THE COURT:  All right.  Noon on the 30th will be the

3  deadline for any subsequent briefing.  We'll take it under

4  advisement on the afternoon of the 30th.  But I don't think I'm

5  going to have a decision a week later.  I think this is hard.

6  And I want people to be aware of that.  If I need to make a

7  decision, I've got to start now to try and get you something

8  out by the 30th.

9          Okay.  Thank you all for --

10          COUNSEL:  Thank you, Your Honor.  Appreciate your

11  time this afternoon.

12          THE COURT:  No, I really appreciate your argument.  I

13  learned a lot, and it's going to be a hard question.  I'll get

14  it done, though.  Thank you.

15          MR. CARLSON:  Thank you.

16          MR. BAAY:  Thank you.

17      (Proceedings concluded at 3:49 p.m.)

18                        * * * * *

19

20

21

22

23

24

25

1  **C E R T I F I C A T I O N**

2

3      I, Michelle Costantino, court-approved transcriber, hereby

4  certify that the foregoing is a correct transcript from the

5  official electronic sound recording of the proceedings in the

6  above-entitled matter.

7

8  *Michelle Costantino*

9  _____

10  MICHELLE COSTANTINO, AAERT NO. 589     DATE: July 21, 2021

11  ACCESS TRANSCRIPTS, LLC

12

13

14

15

16

17

18

19

20

21

22

23

24

25