# EXHIBIT B

IN THE UNITED STATES BANKRUPTCY COURT

FOR THE SOUTHERN DISTRICT OF TEXAS

HOUSTON DIVISION

IN RE:                              § CASE NO. 20-33948-11
                                    § HOUSTON, TEXAS
FIELDWOOD ENERGY, LLC,              § TUESDAY,
ET AL                               § JULY 6, 2021
            DEBTORS.                § 3:59 P.M. TO 5:39 P.M.

MOTION HEARING (VIA ZOOM)

BEFORE THE HONORABLE MARVIN ISGUR
UNITED STATES BANKRUPTCY JUDGE

APPEARANCES:                        SEE NEXT PAGE

COURTROOM DEPUTY:                   TYLER LAWS

TRANSCRIPTION SERVICE BY:

JUDICIAL TRANSCRIBERS OF TEXAS, LLC
935 ELDRIDGE ROAD, #144
SUGAR LAND, TEXAS 77478
(281) 277-5325 (office)
www.judicialtranscribers.com

Proceedings recorded by electronic sound recording,
transcript produced by transcription service.

<u>APPEARANCES (VIA ZOOM)</u>:


FOR THE DEBTORS, FIELDWOOD          WEIL GOTSHAL & MANGES, LLP
ENERGY, LLC:                        Alfredo Perez, Esq.
                                    700 Louisiana Street
                                    Suite 1700
                                    Houston, TX 77002
                                    713-546-5248


FOR EVEREST REINSURANCE            CHIESA SHAHINIAN & GIANTOMASI
COMPANY:                            Scott Zuber, Esq.
                                    One Boland Drive
                                    West Orange, NJ 07052
                                    973-530-2077

FOR LEXON INSURANCE COMPANY:        HARRIS BEACH, PLLC
                                    Lee Woodard, Esq.
                                    333 W. Washington St., Ste. 200
                                    Syracuse, NY 13202
                                    315-423-7100


FOR NORTH AMERICAN SPECIALTY        ATTORNEY AT LAW
INSURANCE COMPANY:                  Thomas Leo, Esq.
                                    100 N. LaSalle Street
                                    Suite 514
                                    Chicago, IL 60602
                                    312-857-0910

ALSO PRESENT:                       MIKE DANE



(Please also see Electronic Appearances.)

<u>INDEX</u>

| WITNESSES: | <u>Direct</u> | <u>Cross</u> | <u>Redirect</u> | <u>Recross</u> | <u>VOIR DIRE</u> |
|---|---|---|---|---|---|
| MICHAEL DANE | | | | | |
| By Mr. Perez | 23 | . | . | . | . |
| By Mr. Zuber | . | 28 | . | 52 | . |
| By Mr. Woodard | . | 38 | . | . | . |
| By Mr. Leo | . | 43 | . | . | . |

| EXHIBITS: | <u>Admitted</u> |
|---|---|
| Debtor's Exhibit 1806 | 22 |
| Movant's Exhibits 1807-1 through 1807-6 | 38 |

...

4

1          HOUSTON, TEXAS; TUESDAY, JULY 6, 2021; 3:59 P.M.

2          THE COURT:  All right.  We're going to call

3    Fieldwood Energy, it is 20-33948.  I'd like to start, if we

4    could, Mr. Zuber and Mr. Perez, with housekeeping as to what

5    you all are believing we are covering today.  I think we have

6    two matters.  One is whether we should issue a stay and the

7    other is, if we do issue a stay, how big, if any, should the

8    bond be as a condition of the stay.

9          And I didn't know if you all were intending to

10   introduce evidence on those, if you thought we were taking

11   both things up today or just one.  And I wanted to just

12   understand where all thought we were so that I'm hearing what

13   you all intend for me to hear.  I'm then going to ask the two

14   joinder parties to, anyone else, to expand on whatever you all

15   tell me.

16          But, Mr. Zuber, we'll start with you, it's your

17   motion.

18          MR. ZUBER:  Thank you, Your Honor.  We filed an

19   emergency motion for a stay pending appeal, or alternatively

20   for new consider of that portion of that portion of the

21   confirmation order that allowed the sale or transfer of

22   certain leases to the credit bid purchaser free and clear of a

23   surety's future subrogation rights.

24          We really would suggest that we could avoid this

25   whole fight over a stay pending appeal if we can address the

1    reconsideration.  We respectfully submit, I know Your Honor's

2    decided this several times, we submit, Your Honor, that we

3    would like to argue the merits that the sale to a credit bid

4    purchaser should not be free and clear of these subrogation

5    rights.  I'd also like to get in a little bit to Section 365

6    instead of 363.

7         So from my perspective, you know, if Your Honor

8    would be willing to reconsider the ruling, that portion of the

9    ruling that dealt with the free and clear, then we don't need

10   a stay pending appeal and we can just have the confirmation

11   order modified accordingly.

12        We've also asked for a stay pending appeal, and we

13   will -- do not intend to put any testimony or evidence on but

14   rather to argue the merits of the -- the likelihood of success

15   on the merits in the standard four-part test that has been set

16   forth in various papers.  We would submit that Your Honor can

17   consider his ruling and make a more narrow determination here

18   such that we don't really need to get into the need for a stay

19   pending appeal and perhaps the closings can take place and the

20   plan can go forward provided that we have some relief.

21        Again, you know, we're not looking to upset the

22   entire plan or the entire confirmation order necessarily, but

23   rather that we've got a narrow issue, and quite frankly, Your

24   Honor, we don't really understand why this issue came up at

25   such a late time and why the credit bid purchaser never even

1    cared about this issue.

2         But, you know, it is an important issue for the

3    sureties, and we're hoping to prevail upon Your Honor that if

4    you'd reconsider the arguments and take a look at some of the

5    arguments I'm going to make and were in our papers

6    specifically with respect to assumption and time with respect

7    to 365 with what that means (indiscernible), you know.  And

8    then ultimately arguing under 363(s) and that these are not

9    claims that can be sold free and clear, these are not

10   interests of the Debtor.  These are future potential claims

11   against a third party, not the Debtor.

12        So anyway, to answer your question, I think we would

13   ask the Court to reconsider that portion of the confirmation

14   order and to not allow the sale to the credit bid purchaser

15   free and clear of the subrogation rights.  We don't think that

16   these issues were really consideration, we don't -- they're

17   requiring them under the credit bid purchase agreement, or

18   under a related Disclosure Statement, or in the plan, or

19   anywhere here.

20        I mean these really came up at the 11th hour and we

21   don't believe that the credit bid purchaser would not have

22   done this deal or was looking to not do a deal, because it

23   was -- you know, had some important -- you know, it needs

24   obtain these leases free and clear of surety subrogation

25   rights.  Again, this came out of -- you know, from what I

1    understand, this issue really only arose a couple of days

2    before the confirmation hearing.

3         And we don't think it's a condition.  There's a

4    whole parade of horribles that the Debtors set forth in their

5    papers that were filed just, you know, in the past hour or

6    two, and, you know, we don't think that that's, you know,

7    that's really something that's going to happen here.  And I'd

8    be prepared to argue why, you know, (indiscernible) under 363

9    there should be no sale free and clear of subrogation rights.

10   That's not something that was ever really contemplated or was

11   very important and integral to the deal.

12        I mean the Debtors are trying to argue that this all

13   inter-related, the entire case is going to fall apart.  We

14   don't think that's the case.  I don't know, quite frankly, why

15   the credit bid purchaser even cares about the subrogation

16   rights.  They only arise if the credit bid purchaser doesn't

17   perform.  And the credit bid purchaser was paying a billion

18   dollars for assets with liabilities that they agree to assume

19   on $350 million.  I mean we can obviously have significant

20   value.

21        So to try to, you know, create an issue that, you

22   know, if you want a stay pending appeal, you've got to post

23   some, you know, new bonds because we have a billion dollars

24   damages.  You know, there are no damages today.  There'll

25   probably be no damages ever.  I mean if there were any

1      damages, it would be directly attributable to the credit bid

2      purchaser's failure to perform as the primary obligor on

3      leases that it has assumed.

4            So I think that I'd really, you know, ask the Court

5      to consider 365 arguments and then go into the 363(s)

6      arguments, because at the end of the day I think really I'm

7      having a difficult time understanding, you know, why the

8      credit bid purchaser cares and what it is that it's trying to

9      protect, and how Your Honor respectfully had the authority to

10     allow a sale to the credit bid purchaser free and clear of the

11     surety subrogation rights.  These are not claims against the

12     Debtor.

13           THE COURT:  So, Mr. Zuber, I've been trying not to

14     interrupt you, but I really wish you would answer the question

15     I asked.  You're making a substantive argument and I wanted to

16     know what we're going to cover today.  I think you've told me

17     you want to cover reconsider of the stay, you -- I'm asking do

18     you want to put on evidence, are we also going to take up the

19     amount of any bond if that's where we go?  What is it that you

20     hope to cover today, not the substantive arguments which I'm

21     not going to make you repeat it --

22           MR. ZUBER:  We would like --

23           THE COURT:  -- but I think you need to take --

24           MR. ZUBER:  -- we'd like --

25           THE COURT:  -- that into account when we get there.

1       But I want to start by getting a roadmap for what we're doing

2       that the parties are agreed on.

3               MR. ZUBER:  Well, I would like to argue

4       reconsideration, a more narrow form of relief.  If the Court

5       is not inclined to modify the confirmation order in a more

6       narrow way, then we would ask for a stay pending appeal.  And

7       then if Your Honor is inclined to grant the stay pending

8       appeal, we would ask for some time to discuss with our clients

9       as an appropriate position on a bond.  We don't think any bond

10      should be required, but if Your Honor's going to require a

11      bond, we'd like the opportunity to discuss that with our

12      clients because we have not had an opportunity to do so in any

13      meaningful way.

14              So we would ask that you hear argument on

15      reconsideration, argument in favor of the stay pending appeal,

16      and if Your Honor's inclined to --

17              THE COURT:  So, Mr. Zuber --

18              MR. ZUBER:   -- require --

19              THE COURT:   -- if that's where we go, it seems to

20      me that when -- and what I normally do when I balance the four

21      factors is one of the factors with respect to harm to others

22      is generally offset for lack of a better word by the amount of

23      the bond that would be proposed to be put up.

24              So the argument that they made in their response

25      that was filed earlier today was that the whole deal crashes

1    and therefore the bond should be equal to the whole deal.  If

2    you put up a bond for the whole deal, then it seems to me that

3    the harm to them is minimal.  And if you don't, then that's a

4    different issue, and I'm trying to understand how you can

5    proceed on the four factors without me knowing the amount of

6    the bond.

7              MR. ZUBER:  Your Honor, I don't think there should

8    be any bond here.  I don't think there's any problem, I don't

9    think the credit bid purchaser -- I don't think any of the

10   parade of horribles will occur, I don't think a bond should

11   have to be posted, I don't -- I think we can --

12             THE COURT:  So do you want to take up the amount --

13             MR. ZUBER:   -- run through --

14             THE COURT:   -- of the bond today, or are you asking

15   that we do that on another day if you win your motion for

16   stay?

17             MR. ZUBER:  Yes, Your Honor, I would respectfully

18   ask that if we win our motion for stay, that we get -- have a

19   short opportunity to come back tomorrow, or when Your Honor's

20   calendar permits it, to argue the amount of the bond, whether

21   our clients are prepared to post a bond --

22             THE COURT:  All right.

23             MR. ZUBER:   -- in an equal amount.

24             THE COURT:  Mr. Perez, what do you think we're doing

25   today?

1          MR. PEREZ:  Your Honor, I thought we were here to

2     argue their substantive motion which includes, you know,

3     basically reconsideration, asking you to vacate the

4     confirmation order, which is what that is, number one.  Number

5     two, the stay pending appeal, and then number three, you know,

6     we have Mr. Dane, he submitted a declaration, he's available

7     to testify as to what the amount of the bond should be, in

8     essence what our -- what we would lose if -- not only if it's

9     stayed but -- during the interim, but also if we're not able

10    to go forward with this plan, which we think is very, very,

11    very substantial.  And we're prepared to go forward on all

12    three of those, Your Honor.

13          THE COURT:  All right.  Let me hear from anyone else

14    that wants to pitch in on what we're doing today.  If so,

15    please press five star one time on your line.

16          (Pause in the proceedings.)

17          THE COURT:  Mr. Woodard, good afternoon.

18          MR. WOODARD:  Good afternoon, Your Honor.  This is

19    Lee Woodard.  We filed our joinder along with Mr. Zuber's

20    papers as well.  I guess I -- my thought was that the stay

21    doesn't necessarily have to be in a totality of the

22    circumstances.  In other words, I don't see that -- I think

23    Your Honor has the ability to be able to issue a limited stay

24    that would address the concerns of the sureties without

25    cratering the entire plan or any of the other horrible things,

1     that the Debtors certainly correctly pointed out that if

2     everything cratered, all of those bad things could happen.

3          They were very careful throughout their discussion

4     to limit their comments to what could happen, or if it were to

5     happen, or always in the conjunctive of not necessarily

6     happening.  And I think that's much more realistic --

7          THE COURT:  Well, yeah, that means you wouldn't have

8     to pay on the bond if it didn't happen.  The question is, the

9     bond should protect them against the possibilities of what

10    might go wrong.  You only have to pay on a bond if those

11    possibilities happen.  Right?  But I've got to worry about the

12    possibilities.

13         MR. WOODARD:  Judge, I'm sorry, that wasn't what I

14    was talking about what may not happen.  I'm saying the whole

15    purpose of this issue is what I've been trying to figure out

16    for all of these weeks is does the credit bid purchaser really

17    take the position that it will not close if these future

18    suretyship rights are still in existence.  I have never seen

19    an answer to that.  There's been no testimony to it, the

20    credit bid purchaser hasn't testified.

21         There are lots of allegations of what could happen

22    if that were to take place.  I totally agree there's a lot of

23    bad things that could happen if that's the case.  This is --

24    this discussion should be limited only to those few issues

25    that arise out of the loss of the future suretyship rights.

1          THE COURT:  Yeah, but let's assume that I were to

2     stay that one part of the order and then everyone said, We're

3     not going to close.  If that happened, then according to

4     Mr. Dane's affidavit, or declaration, there's a billion

5     dollars worth of damages.  Right?  I understand you're telling

6     me that isn't going to happen.  But don't you have to put up

7     the bond and then when it doesn't happen, you don't have to

8     pay on it?  Isn't that what I'm supposed to figure out?

9          And do you want to put on somebody from the

10    purchaser, because I don't know that we have to do this today.

11    And if evidence is needed -- let me back up.  I'm taking this

12    motion really seriously.  I'm going to take the

13    reconsideration seriously, I'm going to take the motion for

14    stay seriously.  If you're telling me that you want to put up

15    the purchaser as part of your motion for stay, let me hear

16    that, and I want to hear from others as to whether you're

17    entitled to evidence at that point, but I don't know why you

18    wouldn't be, and we'll put them up.

19         But if you just want me to guess, then I've already

20    said that I think the evidence shows that.  I know you all

21    don't think it does, but I think you're wrong about that.  But

22    I think it shows there isn't a purchaser that's going to buy

23    and do better than what the current offer is.  And so if you

24    think that you want evidence on, I don't think I'm going to

25    want to stand in the way of that.  And maybe somebody can give

1    me some case law that says I have to; that's a different

2    issue.

3              But do you want some evidence today or do you want

4    to just argue?  It sounds like Mr. Zuber just wants to argue,

5    and that's okay.  But if you're just going to argue, then

6    you're going to have to convince me I looked at the evidence

7    wrong I think, not that the evidence is wrong.  And however

8    you all want to -- I just want to know what you want to do.

9    If you're telling me no evidence on your motion for

10   reconsideration or for stay, okay.

11             MR. WOODARD:  I think what I was arguing, Your

12   Honor, although we can certainly discuss such a thing amongst

13   the sureties, I think those arguments was is that there hadn't

14   been any evidence of it put forth already.

15             THE COURT:  I think that is incorrect, and I think

16   you know I think that's incorrect.  But if you want to merely

17   argue that the evidence doesn't support this in your motion

18   for reconsideration and motion for stay, that's fine.  If you

19   want to tell me that you want to introduce evidence that shows

20   my conclusion based on the circumstances that I've heard and

21   the facts I've heard that my conclusion is just wrong, tell me

22   you want to put on some more evidence.

23             But it -- I want you all to put on the case you want

24   to put on so that I can take this seriously, but I'm not going

25   to give you sequential bites at the apple.  Right?

1          MR. WOODARD:  I understand, Your Honor.  And

2    unfortunately at this point I can't tell you that we are

3    prepared because we didn't subpoena anyone from the credit

4    purchaser to be able to solicit that testimony today.  We were

5    all under the impression we were just going to argue the

6    motion and -- so I have to admit that we are not prepared to

7    call a witness --

8          THE COURT:  Do you want more --

9          MR. WOODARD:   -- today.

10          THE COURT:  Well, you all asked me for an emergency

11    hearing, I gave you an emergency hearing.  Do you want more

12    time?  I can, you know, come back in a couple of days.  I am

13    to looking to push something through if I've got it wrong.

14          MR. ZUBER:  Your Honor, my concern obviously is

15    Section 363 and, you know, we don't know as a matter of law.

16    There appears to be a split in the Circuits, but we are

17    concerned that if we don't get a stay pending appeal that our

18    appellate rights will be foreclosed.  And, you know, having a

19    bond of a huge magnitude should not be able to foreclose our

20    rights.  So I think that as Mr. Woodard argued, and I would

21    agree, that --

22          THE COURT:  Mr. Zuber, in all fairness, your clients

23    are in the business of putting up future bonds.  I'm not --

24    I'm going to set the bond in the amount of economic damages

25    and if your clients don't want to take that risk, that's their

16

1      issue.  I'm not going to worry about that.  I mean they can

2      put up a big bond if that's what's required.

3              MR. ZUBER:  But I -- understood, Your Honor, but I

4      think that the bond can be limited to the narrow issue of

5      selling free and clear of these subrogation rights.  It's

6      (indiscernible) close.  I mean --

7              THE COURT:  Right.  Right, but --

8              MR. ZUBER:  -- these are rights that --

9              THE COURT:  -- no, but if they won't close, that's

10     where the damage is.  You're assuming they're going to close.

11     I have to assume they don't.

12             MR. ZUBER:  There's no -- there's no -- well,

13     there's no evidence in the Record where anybody testified that

14     nobody would close.  I mean this issue, in my view, came up at

15     the 11th hour.

16             THE COURT:  Would you like --

17             MR. ZUBER:  I mean two days before the hearing.

18             THE COURT:  -- would you like to introduce some

19     evidence as to whether or not they would close?

20             MR. ZUBER:  No, but I can introduce evidence that

21     the Disclosure Statement, the plan, the credit bid purchase

22     agreement and the DIP credit facility and the exit financing,

23     none of them are contingent upon this sale being free and

24     clear of subrogation rights.  This issue came up at the 11th

25     hour and it --

1          THE COURT:  There's -- my understanding --

2          MR. ZUBER:    -- and quite frankly --

3          THE COURT:   -- is they were subject -- that it was

4    a total free and clear sale and the question of subrogation

5    rights was brought up by you, that you wanted to be sure free

6    and clear didn't mean free and clear of your subrogation

7    rights.  And I said, Yes, it does.  Free and clear is free and

8    clear.

9          So I don't want to -- I believe that that is a

10   requirement.  If you believe that selling something free and

11   clear is not a requirement, I'll let you show me that.  I

12   think we're arguing over whether free and clear includes

13   subrogation rights or not, an issue that you all raised, not

14   them.

15         MR. ZUBER:  Well, but, you know, they never said --

16   I mean the documents say free and clear and they track in line

17   with 363(f).

18         THE COURT:  Right.

19         MR. ZUBER:  We never viewed free of liens, claims

20   and encumbrances as applying to subrogation rights.  These are

21   not claims against the Debtor.  I'll argue that

22   (indiscernible).

23         THE COURT:  Why did you bring it up then?  It's the

24   way I read it.

25         MR. ZUBER:  Because two days before the -- because

1       two days before the hearing the Debtor filed an amended plan

2       in which they said, For the avoidance of doubt, the sale is

3       free and clear of all subrogation rights.  And what is this?

4                    THE COURT:  Well, you had --

5                    MR. ZUBER:  Where did this come from?

6                    THE COURT:  -- you had brought up --

7                    MR. ZUBER:  That was not --

8                    THE COURT:  -- you had brought up subrogation

9       before they did that I believe, Mr. Zuber.  Am I wrong about

10      that?  You had brought up --

11                   MR. ZUBER:  Respectfully, Your Honor --

12                   THE COURT:  -- that you wanted --

13                   MR. ZUBER:  -- I don't think that --

14                   THE COURT:  -- to be sure that you preserved all

15      your subrogation rights.  And they were being up front in

16      saying --

17                   MR. ZUBER:  Right, because two --

18                   THE COURT:  -- no, you're not.

19                   MR. ZUBER:  Yes, because two days before the hearing

20      it became an issue when they amended Section 5.13 of the plan.

21      That was not in there two days before they amended it.  And

22      they amended, then we said, Whoa.

23                   THE COURT: So you think that --

24                   MR. ZUBER:  Yeah, I can --

25                   THE COURT:  -- you can show me a contract that says

1    it sold free and clear, and I should read that as saying it's

2    sold free and clear of everything other than subrogation

3    rights.  And you're going to win on that basis?

4              MR. ZUBER:  It has to be -- I think that it has to

5    be free and clear of an interest of the Debtor and property.

6    There isn't -- subrogation rights are not an interest -- we

7    have no interest in any property of the Debtor.  These are

8    rights against a third party, non-Debtor purchaser who assumed

9    valuable leases by paying significant dollars, you know, they

10   paid a billion dollars and they assumed $350 million in

11   liabilities for P&A.

12             And if they their P&A as they're obligated to do,

13   and that they've admitted they must do, these subrogation

14   rights never come into existence.  They don't exist.  It's

15   irrelevant.  The only time our subrogation rights will arise

16   against a non-Debtor assignee of leases which has an

17   obligation to perform going forward, is if that primary

18   obligor does not perform.  And if they don't perform because

19   they're insolvent, then what do they care.  Our subrogation

20   rights have no value.

21             THE COURT:  So I want to back up --

22             MR. ZUBER:  They don't perform --

23             THE COURT:   -- I want to back up.  You were quoting

24   363(f) and I think you quoted it by inserting some additional

25   words.  So let's get a real quote of 363(f).

1          MR. ZUBER:  All right.  Your Honor, the Trustee may

2   sell property under Section (b) or (c) of this section free

3   and clear of any interest in such property of an entity other

4   than the estate, only if --

5          THE COURT:  Right.  And you said free and clear

6   of --

7          MR. ZUBER:  You're talking --

8          THE COURT:   -- the estate's interest in such

9   property.  That's not what it says.  It's free and clear of

10  any interest by anybody in the property.

11         MR. ZUBER:  Yeah, but in what property?  This is --

12         THE COURT:  The property being sold.

13         MR. ZUBER:  I think it's *in rem* right and we're

14  talking about *in personam* rights against the credit bid

15  purchaser.  We cited case law to this effect, Your Honor, it's

16  in our papers.

17         THE COURT:  I got it.

18         MR. ZUBER:  And I'll take the --

19         THE COURT:  I know that.

20         MR. ZUBER:   -- (indiscernible).

21         THE COURT:  Okay.  So are you all going to proceed

22  with or without evidence today?  What do you want to do?  And

23  again, if you want to come back for a day when you can have

24  evidence, I don't want to stand in the way of that.  I just

25  need a decision as to how we're going to litigate this.

1          MR. ZUBER:  I would prefer to just make our legal

2     arguments.  I think the Record is sufficient and the arguments

3     which (indiscernible) I think that we can make without any --

4          THE COURT:  And on the bond are you going to want

5     evidence on the bond, or no evidence on the bond?

6          MR. ZUBER:  No evidence, Your Honor.

7          THE COURT:  All right.

8          MR. ZUBER:  I mean I would just like an

9     opportunity -- well, I would like an opportunity obviously, if

10    Your Honor's going to grant the stay and will require that we

11    post a bond, that we have an opportunity obviously to go to

12    our client to discuss that.

13         THE COURT:  No, look, if there isn't going to be any

14    evidence on it, I'm going to decide on what evidence I have.

15         So, Mr. Woodard, what do you want to do?

16         MR. WOODARD:  Your Honor, we are joinders, so I will

17    go along with Mr. Zuber.

18         THE COURT:  All right.  And we have another joinder

19    as well from Mr. Leo.  Do you all want to proceed without

20    evidence?  Hold on, I'm going to get your line active.  I'll

21    find you.  All right.  Mr. Leo, go ahead, please.

22         MR. LEO:  Yes, Your Honor, I will proceed as

23    Mr. Zuber has outlined on behalf of North American Specialty.

24         THE COURT:  And do you want to proceed without

25    evidence as well?

1          MR. LEO:  I do, Your Honor.

2          THE COURT:  All right.  And the Debtors, the only

3     evidence -- what evidence are the Debtors going to introduce

4     then, Mr. Perez, assuming they are having none, they rest on

5     their evidentiary record, what evidence are you all going to

6     have today?  You said you're prepared.

7          MR. PEREZ:  Yes, Your Honor.  So we would request

8     that the declaration of Mr. Dane be admitted into evidence,

9     and then we would have some very, very short direct of

10    Mr. Dane.

11         THE COURT:  All right.  Any objection to the

12    admission of 1806?

13         MR. LEO:  I can't (indiscernible) opportunity to get

14    through the papers, so we'll just cross-examine Mr. Dane as

15    appropriate.

16         THE COURT:  I'm not going to rush you through the

17    hearing.  If you want a moment to read it before you decide

18    whether you're going to object, take a moment.

19         MR. LEO:  Thank you.

20       (Pause in the proceedings.)

21         MR. LEO:  Your Honor, I'm not going to object to the

22    admission of the Dane declaration as long as I have an

23    opportunity to ask Mr. Dane questions.

24         THE COURT:  All right.  1806 is admitted.

25       (Debtor's Exhibit No. 1806 received in evidence.)

1          THE COURT:  Mr. Dane, would you raise your hand,

2     please, sir?  You're right, I've got to get your line active.

3     Hold on.

4          (Witness sworn.)

5          THE COURT:  Thank you.

6          Mr. Perez, I want you to finish whatever direct you

7     have in addition to the declaration and then we'll do the

8     cross.

9          MR. PEREZ:  Yes, Your Honor.

10                    DIRECT EXAMINATION

11    BY MR. PEREZ:

12    Q    Mr. Dane, would please state your name for the Record?

13    A    It's Michael Dane.

14    Q    All right.  Did you have an opportunity to review and

15    get -- in connection with the preparation of your declaration?

16    A    I did.

17    Q    Do you have an opinion as to what will happen if the

18    confirmation were stayed for a period of time?

19    A    Yes, I do.

20    Q    Okay.  And what is that opinion, sir?

21    A    I think there's significant risk to the overall viability

22    of our plan.  This plan has been over a year in the making,

23    it's required a significant amount of consensual support from

24    a wide range of stakeholders that includes the government, a

25    number of predecessors, a surety company, hundreds of vendors,

1    amongst other stakeholders in this process, managing all those

2    stakeholders and the significant consensus that we've been

3    able to achieve.

4            It's been a significant task and we're really at the

5    doorstep of completing this process and being able to

6    accomplish all the important goals that were a part of this

7    restructuring starting with addressing comprehensively the

8    decommissioning liabilities that are associated with Fieldwood

9    today.  I think if this plan were to not close timely, I think

10   that it significantly jeopardizes all of those important goals

11   of the process.

12   Q    All right.  And do you -- and are there significant costs

13   associated just with the delay of the closing?

14   A    Yes, there are.

15   Q    And could you tell the Court what some of those costs

16   are?

17   A    Well, clearly being involved in this process in general

18   is a very expensive proposition.  We have millions of dollars

19   a month, generally between 5- to $10 million a month of

20   process related costs associated with the restructuring in

21   terms of advisor and professional fees.  We have a very

22   significant cost associated with maintaining this entire asset

23   base, the restructuring contemplates a variety of entities

24   which are necessary in order to conduct the decommissioning,

25   but also to pay for the ongoing operations and maintenance of

1     the asset base.  That's one of the reasons that we're needing
2     to conduct this restructuring.

3          The total cost of managing this business, just in
4     terms of operating expenses and maintenance expenses is around
5     $40 million a month associated with all of our assets today.
6     The vast, vast majority of that amount is associated with
7     properties that are not going to be a part of the credit bid
8     purchaser.

9          In addition to that, we spend money outside of
10    operating expenses each month on things like capital expenses,
11    on other G&A which is going to be significantly reduced after
12    we enter into some of these arrangements, and there's cost
13    sharing that's going to take place.  There's P&A expenses that
14    the company conducts now that others are going to be
15    responsible for post-effective date.

16         All of those things add up to in some months tens of
17    millions of dollars a month as well.  So the ongoing cost
18    until we exit is tens of millions of dollars a month amongst
19    all of those factors.

20    Q    All right.  Now let me just switch topics just for one
21    minute.  Have you ever had any discussion -- did the credit
22    bid purchaser ever express a desire to purchase the asset in
23    connection with a 363 sale?

24    A    Yes.

25    Q    And was -- is the free and clear aspect of a 363 sale one

1    of the things that they expressed an interest in?

2    A    I think that in our discussions and my understanding of

3    the credit bid purchaser's expectations, purchasing these

4    assets free and clear was paramount to their consideration of

5    how they would be willing to proceed with purchasing these

6    assets and contributing capital for all purposes of the plan.

7    Q    And how much capital is the credit bid purchaser

8    contributing?

9    A    The direct new money that's being contributed under the

10   plan is $225 million in addition to a host of other retained

11   obligations.

12   Q    And how much are the retained obligations?

13   A    The retained obligations take many different forms.

14   There is the working capital that the credit bid purchaser is

15   going to be -- continue to be responsible for.  That working

16   capital is I would estimate somewhere between 50- to $70

17   million at least of working capital that comprises Fieldwood

18   payables today that the credit bid purchaser will support

19   post-effective date.

20            There's also a number of contributions that is being

21   made pursuant to the plan.  The new money that's coming in is

22   going to be used to fund significant P&A for the Fieldwood 3

23   assets.  It's also going to satisfy all of the various amounts

24   that are owed under the predecessor arrangements at exit.  We

25   had estimated in our confirmation hearing that there was

1    nearly $170 million of exit costs associated with various

2    claims associated with professional fees associated with exit

3    costs under these arrangements.

4    Q    All right.  And do you believe that the Court can make

5    one change to the confirmation order and not upset the entire

6    confirmation?

7    A    My understanding of the importance of the free and clear

8    language like I mentioned was that this was very paramount to

9    our lenders, to any buyer of these assets, the risk that not

10   acquiring these assets free and clear, particularly given the

11   restructuring that we've been going through, is something that

12   I think would cause great pause and concern and that's the

13   reason that it was specifically identified in our plan,

14   particularly given the comments of the sureties throughout

15   this process.

16   Q    Mr. Dane, with respect to the amounts that are being

17   assumed by credit bid purchaser, are any of those amounts

18   related to assets other than the assets that are being

19   purchased?  I'm sorry, (indiscernible)?

20   A    Yes, with respect to the -- the working capital is

21   associated with all of Fieldwood's working capital today

22   irrespective of the assets that are going to be going to

23   Newco.

24   Q    All right.

25        MR. PEREZ:  Nothing further, Your Honor.

1          THE COURT:  Thank you.  Is there any party that

2     opposes a stay pending on appeal that has any additional

3     direct testimony from Mr. Dane?  If so, please press five star

4     one time on your phone.

5          (No audible response.)

6          THE COURT:  All right.  Mr. Zuber.

7          MR. ZUBER:  Thank you, Your Honor.

8                          CROSS-EXAMINATION

9     BY MR. ZUBER:

10    Q    Mr. Dane, the purchase price here in excess of

11    $1 billion.  Correct?

12    A    That's correct.

13    Q    And the assumed liabilities for P&A is approximately $350

14    million.  Correct?

15    A    Yes, that's Fieldwood's estimate for the P&A associated

16    with the credit bid purchased assets.

17    Q    So would you agree then that buying -- paying a billion

18    dollars for these assets and assuming $350 million in P&A,

19    that the credit bid purchaser believes that these assets have

20    cumulative value?

21    A    Yes, I think that -- I think that the assets certainly

22    have value in excess of the liabilities and that's the reason

23    why they are a part of the credit bid purchased assets.

24    Q    Why would the credit bid purchaser care about a surety's

25    future subrogation rights?

1          MR. PEREZ:  Objection, Your Honor, calls for

2      speculation.

3          THE COURT:  Mr. Zuber?

4          MR. ZUBER:  Your Honor, he's raised -- he's raised

5      the doubt about, you know, that the subrogation -- free and

6      clear subrogation rights was a paramount important

7      consideration for the sale.  I want to understand why.

8          THE COURT:  Given that the questions were asked, I

9      think this is a reasonable follow-up.  I was surprised that

10     the other testimony wasn't objected to, but since it came in

11     I'm going to let the -- basically the hearsay cross-

12     examination come in as well.

13         You can answer, Mr. Dane.

14         THE WITNESS:  So, Mr. Zuber, I think I said that

15     it -- the concept in general of buying the assets free and

16     clear of all liens, claims, encumbrances was what was of

17     paramount importance, including any claims that could come by

18     subrogation.  I think that we certainly don't intend to

19     default on these assets.

20         The purchase of credit bid purchaser is that it's an

21     entity that the stakeholders that, particularly the ones that

22     are investing new money into that business, believe is going

23     to be an attractive investment, otherwise they wouldn't be

24     making the investment that they are and supporting the plan in

25     the way that they are.  But the unknowns of what claims may

1    come against them by buying these assets, even if they don't

2    intend to default, is important for them to understand that

3    they're buying them free of all of those potential

4    circumstances.

5              I think it's the exact fact that there is an unknown

6    circumstance that could develop that may give rise to someone

7    potentially being able to assert a claim, and that claim may

8    be disputed.  There may not be, in the credit bid purchaser's

9    opinion, a valid subrogation claim.  But if that claim is just

10   being made against it, and that party has that right to make a

11   claim, that's introducing significantly more risk than what

12   the expectation of a buyer that's buying assets free and clear

13   of all liens, claims, encumbrances would be expecting.

14   BY MR. ZUBER:

15   Q    Would you agree, Mr. Dane, that once this closing takes

16   place and the credit bid purchaser becomes the lessee of these

17   leases that it's primarily liable for all decommissioning

18   obligations that are up under BOEM regulations?

19   A    It's liable to the extent of that liability under the

20   lease and it would be joint and severally liable with any

21   other lease holder that is in the chain of title in that

22   lease.  It's certainly -- a credit bid purchaser --

23   Q    But wouldn't it be primarily liable ahead of other

24   predecessors and surety bond providers for a predecessor?

25              MR. PEREZ:  Objection, Your Honor, calls for a legal

1    conclusion.  I think he's answered the question.

2              THE COURT:  Sustained.

3    BY MR. ZUBER:

4    Q    So, Mr. Dane, is there anything in the credit bid

5    purchase agreement that says the credit bid purchase is

6    contingent upon a sale free and clear of a surety's future

7    subrogation rights?

8    A    As I understand how the parties understand subrogation

9    rights, I believe that they put that into the bucket of free

10   and clear.  I don't -- I'm not aware if subrogation is

11   explicitly mentioned as something that is a part of liens,

12   claims, encumbrances, but I -- and my understanding is that

13   that falls within those categories, and I believe that's how

14   the stakeholders interpret it.

15   Q    So the answer is you're not aware of anything

16   specifically in the credit bid purchase agreement that says

17   the sale must be free and clear of future subrogation rights

18   of the Debtors' pre-petition sureties.  Correct?

19             MR. PEREZ:  Objection --

20             THE COURT:  Sustained.

21             MR. PEREZ:   -- to the form of the question.

22             THE COURT:  Sustained.

23   BY MR. ZUBER:

24   Q    Is there anything in the credit bid purchase agreement to

25   your knowledge that says the sale must be free and clear of

1    surety subrogation rights?

2              MR. PEREZ:  Objection, Your Honor, asked and

3    answered.

4              THE COURT:  Sustained.

5    BY MR. ZUBER:

6    Q    Is there anything in the exit financing facility that

7    says that the exit financing will only be provided if the sale

8    is free and clear of surety subrogation rights?

9    A    It's an order of the plan, I believe that the parties

10   understand the free and clear language to be inclusive of

11   potential claims like subrogation.  I don't think that until

12   the sureties raised trying to preserve these rights that folks

13   thought it was necessary to explicitly call it out and that's

14   why it was contained within broader free and clear language.

15             So I think the free and clear of liens, claims and

16   encumbrances is thought by the parties to include things like

17   subrogation rights.  But it was viewed as prudent to expand

18   upon that given the evolution of the arguments that were being

19   made and in order to be clear.

20   Q    Is there anything -- any of the DIP financing motions or

21   orders that say that the DIP financing will only be provided

22   if the sale is free and clear of surety subrogation rights?

23             MR. PEREZ:  Objection, Your Honor, asked and

24   answered.

25             THE COURT:  Sustained.

1    BY MR. ZUBER:

2    Q    Mr. Dane, what's your understanding of when any surety

3    subrogation rights would arise, when would that happen?

4               MR. PEREZ:  Your Honor, I'm going to object to the

5    extent it calls for a legal conclusion.  It's an improper

6    question.  If he's asking for his layman's opinion of that,

7    Your Honor, I think it's irrelevant.

8               THE COURT:  Mr. Zuber?

9               MR. ZUBER:  Your Honor, it's not irrelevant.  He's

10   testifying that he viewed the sale free and clear to include

11   subrogation rights, although it was never expressly stated.  I

12   want to know what his understanding of when a subrogation

13   right would arise because he's saying it was very important,

14   it was paramount that the sale take place free and clear of

15   subrogation rights.  I want his understanding of when such

16   subrogation rights arose or may rise.

17              THE COURT:  Yeah, and I do understand that's what

18   you're asking, but Mr. Perez's objection was a little narrower

19   than that.  I want to get your answer to it.  But if you're

20   not asking for a legal conclusion as to when they arise, why

21   does his personal view of it matter as to what we ought to be

22   doing?

23              MR. ZUBER:  Well, you know, he's going to be the CEO

24   of the credit bid purchaser, I'd like his understanding of why

25   it's so important that the sale take place free and clear of

1          my client's subrogation rights and when he believes those

2          rights exist.  If he believes those rights exist now than to

3          believe those rights exist some time in the future --

4                    THE COURT:  So you just told me --

5                    MR. ZUBER:   -- I want his understanding --

6                    THE COURT:   -- what you want to understand, I'm

7          asking you why is what you want to understand relevant to the

8          decision that I need to make?

9                    MR. ZUBER:  I'll move on, Your Honor.

10                   THE COURT:  Thank you.

11         BY MR. ZUBER:

12         Q    Mr. Dane, there was some discussion on direct about the

13         assets that are being acquired.  Those assets include many

14         lease hold interests.  Is that correct?

15         A    I'm sorry, I couldn't hear all the words.  Do you mind --

16         those assets include what?

17         Q    They include many lease hold interests.  Correct?

18         A    Yes.

19         Q    And isn't it true that most, if not all, except for maybe

20         some working capital of the assets being acquired, all are

21         related to and integral to the oil and gas operations?

22                   MR. PEREZ:  I'm going to object to the question,

23         Your Honor, as vague.

24                   THE COURT:  Overruled.

25                   THE WITNESS:  Yeah, I'm not sure I understood your

1      question, but the assets that are comprised -- that are going

2      to comprise the credit bid purchaser are various assets that

3      are going to form the basis of the credit bid purchase

4      business.  It's a number of properties, they're all

5      (indiscernible) because they complement the business.

6      BY MR. ZUBER:

7      Q    But they all relate largely to the oil and gas leases

8      being acquired, don't they?

9      A    I don't know, I'm not sure I appreciate the distinction.

10     What, the assets related to the leases?  Is that your

11     question?

12     Q    Yes.  Did it include -- that the assets include oil and

13     gas leases.  Correct?

14     A    Yes.

15     Q    And rights-of-way, easements, service leases, subsurface

16     agreements and similar rights and agreements related to or

17     held for use in connection with the various leases?

18     A    Many of the assets have those types of oil and gas

19     interests that were acquired are subject to various leases,

20     those leases have associated agreements like, in certain cases

21     like what you describe, but not in all.

22     Q    And they're also acquiring wells operated in conjunction

23     with these leases?

24     A    In some cases, yes.

25     Q    And equipment, machinery, structures, fixtures, and other

1    things that are all used in connection with these leases.

2    Correct?

3    A    In general the assets the credit bid purchaser is

4    acquiring has those types of assets, not every lease has those

5    assets that you described.

6    Q    But when you're paying -- when the credit bid purchaser

7    is paying over a billion dollars for these assets, isn't that

8    largely comprised of the leases and related rights and

9    interests?

10   A    The consideration is in respect of the value of the oil

11   and gas properties.  And the business.

12   Q    And you will be the CEO of the credit bid purchaser once

13   this deal -- sale closes.  Is that correct?

14   A    My discussions with the lenders contemplate that that's

15   the position that I'm going to have with the credit bid

16   purchaser.

17            MR. ZUBER:  Your Honor, if I may just have a minute

18   or so, I'd appreciate it.  It's just --

19            THE COURT:  Sure.

20            MR. ZUBER:   -- I want to make sure if I have any

21   other questions.

22            THE COURT:  Of course.

23       (Pause in the proceedings.)

24   BY MR. ZUBER:

25   Q    Mr. Dane, the leases that the credit bid purchaser is

1    acquiring, these are all leases that are not being abandoned

2    or sought to be abandoned.  Correct?

3    A    Right.  They're being acquired so they're not being

4    abandoned.

5    Q    Right.  So the are good and valuable leases, not leases

6    that the Debtor is seeking to abandon.  Correct?

7    A    They are not leases that the Debtor has abandoned.

8         (Pause in the proceedings.)

9    BY MR. ZUBER:

10   Q    I know you're not a lawyer but, and I think I've asked

11   this several times but is it your understanding that surety

12   subrogation rights would arise only upon the surety paying --

13   making a payment or performing under a bond?

14             MR. PEREZ:  Same objection, Your Honor.

15             THE COURT:  Same ruling.

16             MR. ZUBER:  All right.  Nothing further.  Thank you,

17   Mr. Dane.

18             Thank you, Your Honor.

19             THE COURT:  Thank you.

20             Mr. Woodard?

21             MR. ZUBER:  Your Honor, I'm sorry, before I forget,

22   can I move into evidence our exhibits, they're at Document

23   1807-1, Exhibits 1 through 6.

24             THE COURT:  Any objection to 1807-1 through 6?

25             MR. PEREZ:  No, Your Honor.

1            THE COURT:  1807-1 through 6 are admitted.

2          (Movant's Exhibit Nos. 1807-1 through -6 received in

3      evidence.)

4            THE COURT:  Mr. Woodard.

5            MR. WOODARD:  Thank you, Your Honor.

6                      CROSS-EXAMINATION

7      BY MR. WOODARD:

8      Q    Good afternoon still, Mr. Dane.  I just have a very few

9      questions for you.  You had testified under Mr. Perez's Direct

10     that your opinion was that a stay of the plan would have dire

11     consequences.  My question is, would your opinion change if

12     the stay were limited to just future suretyship rights rather

13     than the entire plan?

14     A    The lenders would need to make a determination if they

15     are prepared to close on this plan, if they're prepared to

16     move forward with this uncertainty, that's -- I'd be

17     speculating if I was speaking on their behalf.  I do know that

18     in all the conversations that we've had with them to date and

19     in developing the plan and the various considerations of the

20     plan, that the premise of the plan is that they're acquiring

21     these assets free and clear.  So I think that that's a

22     significant consideration for those parties.

23     Q    Okay.  You were involved in the negotiation with the

24     purchase agreement with the credit bid purchaser.  Right?

25     A    Yes, I was.

39

1    Q    At any time during the negotiations were there any

2    discussions over future suretyship rights?

3              MR. PEREZ:  I'm going to object to the -- I'm going

4    to object to the form of the question, Your Honor, as vague.

5              THE COURT:  Overruled.

6              THE WITNESS:  I think there was a number of

7    conversations in general about the treatment of surety bonds

8    and how they were contemplated under the plan.  That was, as

9    everyone is aware, this was a significant overall element of

10   the contested nature of our confirmation and various other

11   arguments that have come before the Court throughout the time

12   that we've been in Chapter 11.  So generally speaking  there

13   was a lot of dialogue with respect to how the parties

14   understood that the sureties were contemplated to be treated

15   under the plan.

16   BY MR. WOODARD:

17   Q    Okay.  And in any of those conversations did you learn

18   that the discussion concerned the obligations that would arise

19   owing by the credit bid purchaser under 30 CFR and the variety

20   of sections that it has, in the -- for the future obligations,

21   was there any discussions of that?

22             MR. PEREZ:  Objection, Your Honor, vague.

23             THE COURT:  Overruled.

24             THE WITNESS:  I believe that the parties had a

25   consistent understanding of how they all thought that the

1    treatment of the surety bonds would be handled under the plan,

2    and I don't know that there was -- I don't recall speculation

3    on alternative outcomes.  I think that the way that the plan

4    was approved was what was contemplated.

5           There was discussion going all the way back to

6    before the company filed bankruptcy about the legal treatment

7    of surety bonds, the view that these indemnity agreements were

8    pre-petition unsecured claims, how they would be treated

9    through the bankruptcy, that that was the parties' view of the

10   correct treatment.  I don't think that there was direct

11   discussion or speculation that I can recall that contemplated

12   alternative outcomes to that.

13   BY MR. WOODARD:

14   Q    Okay.  And all of the obligations you're talking about

15   that were discussed were actually obligations of the Debtors

16   with the sureties.  Is that correct?

17   A    The Debtor is the principal on these bonds, the

18   obligations under the bonds as they existed -- or as they

19   exist, you know, relate to the Debtors.  And I know that the

20   conversations that have been had with respect to credit bid

21   purchaser's obligations arose -- needs to be separated from

22   the Debtor's obligations under their bonds.

23   Q    And the credit bid purchaser is aware, is it not, that

24   the execution of the assumption of the leases obligates that

25   entity directly with the government?

1          MR. PEREZ:  Again, Your Honor, I think that's

2    calling for a legal conclusion.

3          THE COURT:  Sustained.

4          MR. PEREZ:  And I'm not sure that's actually

5    correct.

6          THE COURT:  I'm sustaining it.  It calls for a legal

7    conclusion the way the way the question was asked.

8    BY MR. WOODARD:

9    Q    So was it not, Mr. Dane, that the Debtors' obligations to

10   the government was cut off by the free and clear language that

11   was discussed?

12         MR. PEREZ:  Objection, Your Honor, I think it mis-

13   states the testimony.

14         THE COURT:  Yeah, I don't even understand the

15   question, Mr. Woodard.  Free and clear has nothing to do with

16   the Debtors' obligations, it has to do with acquirer's

17   obligations.  So I don't know what the question means.

18         MR. WOODARD:  Your Honor, I think that the testimony

19   was that the free and clear language had been discussed for

20   all the iterations of the plan.

21         THE COURT:  Correct.

22         MR. WOODARD:  And I believe you -- that the real

23   problem here is that the free and clear language that everyone

24   assumed was the case was regarding the Debtors' obligations.

25   As Mr. Dane just testified to the indemnity agreements and the

1        bonds themselves that that is what ultimately they believe

2        they were cutting off.

3                THE COURT:  I misunderstood your question.  Let me

4        get -- if you would just re-word it, I do understand what

5        you're asking now and I didn't understand it before.  So if

6        you can just re-word it.

7                MR. WOODARD:  Thank you, Your Honor.

8        BY MR. WOODARD:

9        Q    Well, Mr. Dane, you just listened to my own testimony

10       apparently of what I was trying to get to.  Wasn't it your

11       understanding that what was being cut off by the 363 sale and

12       the free and clear language was the obligation of the Debtors'

13       bonds and the indemnity agreements that ran to the Debtors?

14               MR. PEREZ:  Your Honor, I'm going to object.  I

15       don't -- I still don't understand the question.  It's talking

16       about the discharge, but that's not what free and clear is.

17       And so it's like listing apples and oranges here, Your Honor.

18       I don't think it's a fair question.

19               THE COURT:  So I do understand the clarification he

20       made, I'm going to see if Mr. Dane does.

21               Mr. Dane, if you can answer that question, I want

22       you to answer it.

23               THE WITNESS:  I don't know what the -- what all the

24       parties that represent the credit bid purchaser contemplated

25       free and clear to include or exclude, but I think the concept

1    in general is intended to be very broad and it's intended to
2    ensure that the assets are acquired free and clear of any
3    claims whether they are -- originated directly or indirectly
4    as a result of the Debtor's pre-petition business.
5    BY MR. WOODARD:
6    Q    Is there a date set at this point to close the
7    transaction and the sale to the credit bid purchaser?
8    A    The goal is pending completing all the different
9    transactions that need to be completed as a part of this plan
10   pending various regulatory filings and administration that
11   needs to be completed that the closing would take place at the
12   end of this month.
13        MR. WOODARD:  I don't have any further, Your Honor.
14   Thank you.
15            THE COURT:  Thank you.  Mr. Leo?
16            MR. LEO:  Thank you, Your Honor.  I have just a very
17   few questions.
18                       CROSS-EXAMINATION
19   BY MR. LEO:
20   Q    Mr. Dane, your -- the Debtors' counsel's filed a brief
21   objecting to the relief sought here, the stay.  And you have
22   given the opinion that the stay will trap the plan.  At Page
23   18 of that brief there's a statement that there is an
24   objective basis to dispute the validity of any subrogation
25   claim held by the sureties because the Debtors do not believe

1     that the sureties will ever have to pay out on their bond.

2              Do you agree with that?

3              MR. PEREZ:  Objection, Your Honor, relevance.

4              MR. LEO:  Well, I can tie it up with the fact that

5     Mr. Dane has been quoted at some June 21 hearing where

6     Mr. Dane states, I believe that these are very reasonable

7     projections, they're a very fair set of projections and very

8     much in line with all the reasonable assumptions that are

9     forecasted here.

10    BY MR. LEO:

11    Q    So my question is, do you believe as stated in the brief,

12    that there is a very remote chance that there will be any

13    claim on the bonds?

14    A    I believe that the credit bid purchaser believes that

15    it's going to have a very solid business and it certainly

16    doesn't intend to default on its obligations, and a default

17    seems like the most likely scenario that would result in a

18    party claiming subrogation rights, and because the credit bid

19    purchaser is certainly not intending to default upon its

20    obligations, that there would be certainly an expectation that

21    it wouldn't give rise to claims on bonds related to credit bid

22    purchased assets absent disputes or other circumstances that

23    may give a party a claim under the bonds.

24    Q    And if, as you state, that a default is the event that

25    gives rise to the obligation to pay to the bond, and the

1          credit bid purchaser's chances of default are very remote,

2          then there's very likely very little harm from the stay that

3          relates only to the suretyship issue, is there?

4                    MR. PEREZ:  Objection, Your Honor, I think it's

5          calling for speculation.  I mean the premise -- I object to

6          the premise of the question.

7                    MR. LEO:  His opinion was the stay will --

8                    THE COURT:  Now hold on.  I'm going to -- I'm

9          overruling the objection.  The question isn't focused on

10         whether the Debtors would suffer injury if there was a

11         default, but on the probability that the purchaser would

12         suffer injury if there was a default.  And to that extent I'm

13         going to allow the question, it goes to the statements made

14         that the credit bid purchaser is regarding the free and clear

15         language as extremely important and this basically says why is

16         that.  So I'm going to allow it.  It's impeachment.

17                   Go ahead, Mr. Dane.

18                   THE WITNESS:  The credit bid purchaser certainly

19         doesn't intend to default on these obligations.  They've

20         viewed that as a very low risk, particularly as we assess the

21         business today.  But similar to the credit bid purchaser

22         electing not to assume these bonds and the related indemnity

23         agreements, these are things that impose additional

24         obligations on the business, the obligations that it was not

25         required to assume though this comprehensive restructuring.

MICHAEL DANE    CROSS BY MR. LEO

46

1        To the extent that there is potential subrogation

2    claims in the future, even if they're disputed and not because

3    the Debtor believes that they've defaulted, but another party

4    who controls the bonds is making a claim and that claim is

5    successfully paid on, to the extent that a surety can

6    subrogate in those instances, even if it may be disputed or

7    maybe as a result of some unforeseen circumstance, that

8    clearly has a negative impact on the credit bid purchaser's

9    business and I don't think it's in line with what the credit

10    bid purchaser was expecting when it was negotiating the

11    purchase of these assets free and clear.

12    BY MR. LEO:

13    Q    Well, just in terms of economics, Mr. Dane, if you could

14    isolate the surety recourse issues if there's a default by the

15    credit bidder or Newco from the other issues in the plan that

16    would cost tens of millions of dollars, do you think it's wise

17    to delay that closing, if you can compartmentalize that issue

18    for appeal?

19        MR. PEREZ:  Your Honor, objection as to relevance.

20    What Mr. --

21        THE COURT:  Sustained.  Sustained.

22    BY MR. LEO:

23    Q    You said the plan reflects the correct understanding of

24    surety credit.  Can you tell me what that understanding is?

25        THE COURT:  Mr. Leo, just so that you know, you're

1    coming across very faintly, and I think if you could get a

2    little closer to your phone, you'll have a little better

3    record of what the question was.  Thank you.

4             MR. LEO:  I'm sorry, Your Honor.

5             THE COURT:  It's okay.

6    BY MR. LEO:

7    Q   You testified that the plan reflects the correct

8    understanding of surety credit, and I think you said that in

9    response to a question from Mr. Woodard.  And I want to know

10   what that understanding is.

11            MR. PEREZ:  Objection, Your Honor.  I don't believe

12   Mr. Dane ever used the term surety credit.  So I'm going to

13   object to the form of the question -- statement.

14            THE COURT:  All right.  I agree, and I'll sustain

15   the objection on that basis.  I don't think he said that.

16            MR. LEO:  The treatment of surety bonds then, it

17   reflects the correct treatment of surety bonds.  I just want

18   to know what his understanding is of that.

19            THE WITNESS:  I think -- I believe that my testimony

20   was that the parties had discussed what they believed the

21   correct or appropriate legal treatment is of surety bonds

22   through a Chapter 11 restructuring, and that the plan was

23   consistent with what the expectation of those parties was,

24   which is that the Debtors' bonds represent pre-petition

25   unsecured claims and that they're going to be treated as such

1       as a claim under the plan.

2       Q    Let me ask you a hypothetical.  Under the plan as it's

3       currently contemplated credit purchasers are making $350

4       million available to decommissioning, for decommissioning

5       costs.  Could the credit purchasers apply that $350 million to

6       non-bonded obligations and then leave the bonded obligations

7       in -- create a default giving rise to the sureties making

8       payments, could they make that election?

9                MR. PEREZ:  Your Honor, I'm going to object to the

10      question.  I think, in addition to being a hypothetical, which

11      I guess this is cross-examination, but the premise that

12      they're setting aside $350 million for decommissioning I'm not

13      sure that's the correct premise.

14               THE COURT:  Overruled.  Mr. Dane, you can answer.

15               THE WITNESS:  I do think that the question is

16      certainly hypothetical.  That's not in line with the business

17      plan, that's not in line with the strategic objectives of what

18      the stakeholders have expressed that they are intending to do

19      while operating this business.  This business is going to be

20      focused on certainly meeting all of its new obligations.  So

21      hypothetically could it do that?  I don't know, I think that

22      that would probably be a legal question.

23               If -- you know, it sounds like what you're

24      describing is somewhat of a fraudulent conveyance.  If it was

25      taking assets out of a not satisfying liability, I don't know

1    the answer to that.  That's a legal -- it's not -- it's

2    certainly not the business strategy.  The credit bid purchaser

3    intends to meet its obligations.

4    BY MR. LEO:

5    Q    And this may be a legal question, but I'll leave it

6    hanging out there and see if you can answer it.  If that were

7    to happen, given your understanding of how adamant the credit

8    purchasers were about the liens stripping language, being free

9    and clear of all liens, if there was this election not to pay

10   bonded obligations, does that leave the surety that pays the

11   obligation without recourse against the credit purchaser and

12   Newco?

13            MR. PEREZ:  It calls for a legal conclusion, Your

14   Honor.

15            THE COURT:  Sustained.

16            MR. LEO:  I have no further questions, Your Honor.

17            THE COURT:  Mr. Dane --

18            UNIDENTIFIED SPEAKER:  Your Honor, can I ask a few

19   follow-up questions?

20            THE COURT:  In a minute.  Mr. Dane, I want to back

21   up quite a ways.  Can you tell me in the capital stack of the

22   current Fieldwood whether you have identified a fulcrum

23   creditor, or set of creditors?

24            THE WITNESS:  Yes, Your Honor, the creditors that

25   represent the first lien term loan lenders, which is the $1.15

1    billion principal amount of debt, are considered the fulcrum.

2    They are also the parties that are contributing the vast

3    majority of all the new money.  They're contributing 205 of

4    the 220 million -- $25 million of new money.

5                THE COURT:  So --

6                THE WITNESS:  And their claims are, you know,

7    impaired in the 40 to 60 percent -- 35 to 60 percent range.

8                THE COURT:  I want you to assume for a moment that

9    there is a purchaser that is willing to pay $10 million more

10   than the credit bid purchaser for the exact same assets and

11   terms, who would get that $10 million under this current

12   capital stack?

13               THE WITNESS:  It would be the same fulcrum creditors

14   because due to how impaired they are.

15               THE COURT:  So out of that logic is the way that I

16   concluded that no one would buy this asset and assume any

17   additional obligations because the testimony is undisputed

18   that this was fully marketed and this was the best deal.  How

19   would it be possible to find a buyer who would assume these

20   obligations without having the first lien term loan creditors

21   claiming entitlement to the money?  If somebody's willing to

22   pay more, it isn't going to go to pay P&A.  Right?  It's going

23   to the (indiscernible).  Am I missing something about this?

24        (No audible response)

25               THE COURT:  Sorry, Mr. Dane, that was for you.

1          THE WITNESS:  Yeah, you know, not only did the

2   company conduct several robust sales processes and was unable

3   to find an adequate buyer, but the company, through this very

4   long and complicated process also took into account

5   significant stakeholder input such as the input of the

6   government who expressed strong opinions on the sale process,

7   particularly given the nature of needing to solve for all the

8   decommissioning liabilities.

9          THE COURT:  Right.

10          THE WITNESS:  But I do agree that the fulcrum

11   security is very substantially under water, which is

12   recognized by the treatment of the second lien lenders in

13   terms of the --

14          THE COURT:  Yeah, but I'm --

15          THE WITNESS:  -- significantly (indiscernible)

16          THE COURT:  I'm trying to figure out if I have

17   something wrong because there's a pretty strident argument

18   that's getting made that, when I concluded that the evidence

19   is overwhelming that no one would buy this and assume

20   additional liabilities, given that there was full marketing

21   and any additional money would go down -- any additional value

22   would flow to the first lien term lender creditors, I'm trying

23   to figure out if I reached the conclusion that is inescapable

24   -- which I think I did -- or if I missed the conclusion.  And

25   that's why I'm asking you as the person probably closest to

1      the finances:  Did I miss something when I made that

2      conclusion?  Because, if so, I need you to fix it.

3               THE WITNESS:  I think that, in order for value to

4      accrue further up the capital structure, a buyer would need to

5      be willing to pay a very, very large sum above what the plan

6      value is, something of the order of magnitude of under $600

7      million before it would even become a discussion.

8               THE COURT:  Thank you.

9               All right.  Mr. Perez, I think you had some follow-

10     up questions.

11              MR. PEREZ:  No, Your Honor.

12              MR. ZUBER:  No --

13              THE COURT:  I'm sorry.

14              MR. ZUBER:   -- that was me, Mr. Zuber --

15              THE COURT:  Oh, I'm sorry, Mr. Zuber.

16              MR. ZUBER:  -- (indiscernible)

17              THE COURT:  Well, let me -- we're going to -- we'll

18     do this in order.

19              So, Mr. Zuber, go ahead.

20                        RECROSS-EXAMINATION

21     BY MR. ZUBER:

22     Q    Mr. Dane, you talked about consideration being

23     free and clear of all claims, including subrogation rights.

24     Was there any discussion that you're aware of with anyone that

25     the subrogation rights that you were looking sell free and

1       clear of were rights that arose from the credit bid

2       purchaser's default, as opposed to any existing defaults by

3       the Debtor?

4       A    As I've stated, I -- the -- the -- I don't recall the

5       specific conversation related to subrogation as a

6       consideration with respect to the credit bid purchase

7       negotiations because it was a premise from the beginning of

8       those discussions that the assets were being sold free and

9       clear of all liens, claims, and encumbrances.  And there was

10      an understanding amongst the parties of what they expected the

11      treatment of the indemnity agreements associated with the

12      surety bonds and surety bonds overall, the treatment of those

13      -- of the bonds and the associated indemnity agreements to be

14      for the restructuring.  So I think it was assumed as a part of

15      the broader discussion with respect to free and clear

16      expectation and bond treatment under the plan.

17      Q    But there was no -- there was never an expectation that

18      the sale would be free and clear of the lease obligations

19      under the assumed leases, right?

20      A    I can tell you (indiscernible)

21              MR. PEREZ:  Well, let me object.

22              THE COURT:  I'm sorry.  I didn't --

23              MR. PEREZ:  I think --

24              THE COURT:  I didn't understand your answer,

25      Mr. Dane.

1          THE WITNESS:  I think it was the expectation of the

2     credit bid purchaser that they were going to have to meet all

3     of their obligations under assumed contracts, including the

4     leases.

5     BY MR. ZUBER:

6     Q    All right.  So that would include that all defaults under

7     the leases would have to be cured as a condition precedent to

8     the assumption by the Debtor and the assignment to the credit

9     bid purchaser, correct?  That's what the Bankruptcy Code

10    requires.

11         MR. PEREZ:  Objection, Your Honor.  I think that,

12    you know, the term "lease" is often used differently under

13    365.  And these are federal leases, which are in the nature of

14    a license.  So I'm not sure that the 365 analogy as to the

15    federal leases is particularly applicable, so I'm going to

16    object on that basis.

17         THE COURT:  Mr. Zuber.

18         MR. ZUBER:  Well, I would disagree.  These are

19    federal leases.  Leases are governed by Section 365 that deals

20    with assumption or rejection of contracts and unexpired

21    leases.  These are unexpired federal leases.  I'm asking if

22    Mr. Dane understood that, in order to have a lease assumed and

23    assigned, defaults would have to be cured.

24         THE COURT:  Well --

25         MR. PEREZ:  Your Honor, again, I'm not sure that's a

1    correct statement of law.  Just because something is called a

2    "lease" -- all Texas oil and gas leases are called "leases,"

3    and they're not subject to 365 --

4              THE COURT:  Well --

5              MR. PEREZ:  -- so I'm not sure that's correct.

6              THE COURT:  -- I'm not sure it's a lease, but it's

7    either a lease or an executory contract one.  So I'm going to

8    go ahead and let him ask the question.  Go ahead and answer

9    it, Mr. Dane.

10             THE WITNESS:  We certainly understand that there --

11   to the extent that there appears cure amounts that are

12   required associated with assuming contracts or leases, that

13   that's something that is required at exit.  I don't believe

14   that we view there to be any cure amounts associated with the

15   leases that are being purchased and assumed by the credit bid

16   purchaser.

17   BY MR. ZUBER:

18   Q    Okay.  So there were no defaults under the leases being

19   assumed by the credit bid purchaser, correct?  The Debtor was

20   not in default on those leases being assumed and assigned,

21   correct?

22   A    We have hundreds of leases and -- under these agreements.

23   I don't -- I don't recall any specific default associated with

24   our -- with our leases.  But obviously, that would -- if we're

25   talking about default on P&A liability, then there's not an,

1      you know, outstnading default that is cured upon a -- upon

2      assignment.

3      Q     Okay.  And then, upon assignment, as you've just stated,

4      the credit bid purchaser is obligated to perform going

5      forward, right?

6      A     The credit bid purchaser is going to be obligated to --

7      to appropriately address all of its obligations under its

8      assumed contracts, including its leases.

9      Q     Is it your view that, when the credit bid purchaser

10     acquires these leases, that buying or acquiring these leases

11     or contracts free and clear of any defaults that it is

12     responsible for, as opposed to the Debtor being responsible

13     for?

14                UNIDENTIFIED:  I --

15                MR. PEREZ:  Object to the --

16                UNIDENTIFIED:  Your Honor --

17                MR. PEREZ:  Object to the question.

18                UNIDENTIFIED:  -- I think it's irrelevant.

19                MR. ZUBER:  Your Honor, I respectfully disagree.

20     It's not irrelevant.  He -- this is -- you know, the testimony

21     is that, you know, nobody was going to buy these assets unless

22     it was free and clear of subrogation rights.  What I'm trying

23     to understand is the subrogation rights, they're not defaults

24     that had to be cured as a condition to assumption.  And the

25     only default that would ever give rise to subrogation would be

1       the credit bid purchaser's own default.  I want to understand

2       if his view is that the purchaser is free and clear of those

3       defaults by the credit bid purchaser, if ever.

4                   THE COURT:  I'm not -- let me get you to ask the

5       question where it becomes relevant to what we're deciding

6       today.  And seriously, asking him -- and you did this before -

7       - what his view of something is doesn't pertain to anything

8       we're doing.  There may be something substantive here, and I

9       want to be able to get to it.  But I think it's going to be a

10      legal conclusion, that's why I want to get a clear question.

11      So ask a question that is relevant to what we're doing, and

12      we'll see.

13      BY MR. ZUBER:

14      Q   Does the credit bid purchaser acquire these leases under

15      the credit bid purchase agreement free and clear of any

16      defaults of its own, as opposed to somebody else's default?

17                  MR. PEREZ:  Objection, Your Honor.  I'm not even

18      sure what that means.  And obviously, the document speaks for

19      itself.  He's asking for a legal conclusion.

20                  THE COURT:  Sustained that that's requesting a legal

21      conclusion.

22      BY MR. ZUBAR:

23      Q   I may have asked you this.  Is it your testimony that the

24      credit bid purchaser would not have purchased the assets if

25      the sale wasn't free and clear of surety subrogation rights?

1              MR. PEREZ:  Objection, Your Honor.  Asked and
2      answered.
3              THE COURT:  Sustained.
4              MR. ZUBER:  I have no further questions.  Thank you,
5      Mr. Dane.  Thank you, Your Honor.
6              THE COURT:  Thank you.
7              Mr. Woodard.
8              MR. WOODARD:  Your Honor, I don't have any questions
9      of Mr. Dane.  I would like a shot at throwing myself on the
10     floor before the Court.  I'd like to try to answer the Court's
11     question.
12             THE COURT:  Well, we're going to -- let's -- I want
13     to close an evidentiary record and I don't think --
14             MR. WOODARD:  But it --
15             THE COURT:  -- you're volunteering to testify, but
16     we'll see in a moment.  If you want to, we'll let you call
17     yourself --
18             MR. WOODARD:  May --
19             THE COURT:  -- as a witness.
20             Mr. Rios.
21             MR. RIOS:  No further questions, Your Honor.
22             THE COURT:  Mr. Perez?
23             MR. PEREZ:  Nothing further, Your Honor.  Thank you.
24             THE COURT:  Thank you.  Mr. Dane -- or does any
25     other party have any questions for Mr. Dane?  If so, please

1    press five-star.

2         (No verbal response)

3         THE COURT:  All right.  No other questions,

4    Mr. Dane.  You're excused as a witness.  Obviously, you're

5    welcome to stay in the hearing.

6         (Witness excused)

7         THE COURT:  Any further evidence by the Debtor?  I

8    think the sureties did not wish to offer evidence today.

9         MR. PEREZ:  Your Honor, other than Mr. Dane's

10   declaration and his direct testimony, no further evidence.

11        THE COURT:  All right.  Is there any rebuttal

12   evidence?

13        (No verbal response)

14        THE COURT:  All right.  I'm going to show the

15   evidentiary record as closed.

16        I do think that the -- and tell me if I'm wrong --

17   the motion for reconsideration and factor one of the motion

18   for the stay pending appeal are essentially identical, in

19   terms of the arguments that support them.  And if somebody

20   believes that there is any difference, then we can take them

21   separately, but I think it's the identical argument.

22        So, Mr. Zuber, if you want to -- if you think

23   they're different, you can do them separately.  But if you

24   think they're the same, I'm going to let you argue those two

25   things together, just so you're not having to tell me the same

1    thing twice to preserve your record.

2          MR. ZUBER:  No, Your Honor, I think they're

3    essentially the same issue.

4          THE COURT:  Okay.  Well, then let's go to the

5    argument then.

6          MR. ZUBER:  Your Honor, we've been talking a bit

7    about Section 363 and Section 365.  And you know, I addressed

8    the arguments that the confirmation hearing largely with

9    respect to sale free and clear under Section 363(f), and

10   whether any of the plain language applied or if any of the

11   subsections of 363(f) were applicable.

12         But I would like to talk a little bit -- and I know

13   a lot of this has been brought up in the examination -- about

14   something more fundamental, which is essentially Section 365,

15   Your Honor.  And you know, the Debtor has many federal leases.

16   And under the plan, it has an opportunity under the Bankruptcy

17   Code, under Section 365, to either assume certain leases or to

18   reject certain leases; it has that choice.  And it decided

19   that certain leases were burdensome and had no value and chose

20   to abandon them.

21         And it chose, also, to seek to assume and

22   subsequently assign certain leases to the credit bid

23   purchaser.  Those leases were deemed to be very valuable or

24   saleable, and they were specifically chosen and designated to

25   be assumed and assigned.

1          As a condition for assumption and assignment of a

2     contract or a lease under Section 365, all defaults have to be

3     cured and there needs to be a showing adequate assurance of

4     future performance under the lease.  And I believe, Your

5     Honor, it is black-letter law that a lease must be assumed or

6     rejected in its entirety.  The assignee must accept both the

7     benefits and the burdens of the assumption.

8          Here, the credit bid purchaser paid over a billion

9     dollars for the assets that it elected to acquire, comprised

10    largely of these leases and related rights.  So the leases

11    obviously have significant value and the $350 million in

12    assumed liabilities was part of the consideration.  Once the

13    leases are assumed and the credit bid purchaser decides to

14    move forward, it doesn't get a free pass.  It has to comply

15    with the law and to pay its rent, so to speak.  It has a legal

16    obligation to perform.  So, once those leases are assumed and

17    assigned to the credit bid purchaser, the credit bid purchaser

18    becomes the primary obligor under federal law for all

19    decommissioning obligations as to all existing wells,

20    pipelines, platforms, et cetera, as well as for any new wells

21    and structures.

22         The credit bid purchase agreement expressly provides

23    that the credit bid purchaser will assume all liability,

24    whether arising before or after the (indiscernible) to the

25    extent arising out of the plugging, abandonment, and

62

1    decommissioning of any and all related salvage, site

2    clearance, and surface restoration activities from field

3    assets that are acquired interests, to the extent required

4    under applicable law.  And that is in the credit bid purchase

5    agreement, Section 11.1, dealing with the buyer's assumption

6    of liabilities.

7            Upon assumption and assignment, the credit bid

8    purchaser becomes the primary obligor for all decommissioning

9    on these leases, and the predecessor owners and the sureties

10   become secondarily liable.  Once the credit bid purchaser

11   takes assignment of these valuable leases, it has the full and

12   complete obligation to confirm.  And if it's going to look to

13   the surety for the Debtors, which is secondarily liable to the

14   credit bid purchaser's primary obligations, there's nothing in

15   the Bankruptcy Code or any other law that would excuse the

16   credit bid purchaser's obligation to a secondary obligor when

17   it defaults.  The surety did not guarantee the credit bid

18   purchaser's primary obligations.  And the bonds, although they

19   may be noncancellable, they remain secondary obligations, in

20   the event that the credit bid purchaser, the primary obligor,

21   doesn't perform.

22           The Debtors chose to assume and assign to the credit

23   bid purchaser valuable leases.  These leases were unabandoned,

24   they have significant value.  Assumption requires the credit

25   bid purchaser to perform.  There's significant value here.

1    The only time surety subrogation rights may arise is if the

2    credit bid purchaser, as assignee, as -- and in its capacity

3    as the primary obligor does not perform its assumed

4    obligations as required by the law, and which it proposes to

5    meet as part of the asset purchase agreement of -- as part of

6    the assumed liabilities.

7         A guarantee of a future lease obligation by a

8    guarantor to a predecessor is not a guarantee that can be

9    utilized by the assignee of an assumed lease.  The assignee

10   has primary obligation -- primary obligations.  If it doesn't

11   perform as it says it's going to perform and as it's required

12   to perform, there's nothing in the code that, as a matter of

13   equity, that should allow that the ultimate loss to be borne

14   by a predecessor surety, and that the credit bid purchaser

15   should be excused from the consequences of its own breach of

16   its lease obligations that it has voluntarily chosen to assume

17   in exchange for the enjoyment of the benefits and the value of

18   those leases.

19        So I think that, before we get into 363(f), which

20   I'm going to turn to momentarily, I believe that, under

21   Section 365, once those leases are assumed and assigned and

22   defaults have been cured, the assignee has an obligation to

23   perform.

24        As set forth, Your Honor, in our arguments with

25   respect to 363(f) --

1          THE COURT:  Well, before we leave 365 --

2          MR. ZUBER:  Yes.  Yes, Your Honor.

3          THE COURT:  -- I think the way I -- the way I've

4     been looking at this -- and I need you to address this

5     specifically -- is the Debtor has an obligation to perform

6     under the federal leases.  And what we are terminating by the

7     order is your right to step into the Federal Government's

8     shoes.  And I know you think we shouldn't do that, but I don't

9     see how that violates 365.

10         I got it that they may have other problems that you

11    want to identify.  But take me specifically into 365, since

12    that's where you started your argument.  And unless -- and

13    tell me, first of all, if I'm wrong, if the Debtor isn't

14    agreeing to perform under the federal leases.  I think they

15    are.  So that meets their duty under 365.  What, under 365, do

16    the surety bonds hold as rights, other than the right to step

17    into the Federal Government's shoes, which is what we're

18    cutting off?  But that's not a 365 right, is it?

19         MR. ZUBER:  It's an obligation under Section 365.

20    When a third party takes assignment of a lease from the

21    Debtor, the defaults have to be cured, and then the buyer, the

22    assignee, takes free and clear and moves on its merry way to

23    operate the leasehold or to enjoy the assets that it

24    purchased.  So, at that point, going forward, it is now the

25    primary obligor under the assumed and assigned leases.

1            If it doesn't perform, there must be consequences.

2   They shouldn't be able to take assignment of these leases when

3   there's --

4            THE COURT:  Take --

5            MR. ZUBER:  -- no default by the Debtor --

6            THE COURT:  Take me into the light, which is 365 --

7   I mean, this is where you started -- and show me how the

8   termination of subrogation rights is a violation of any part

9   of 365.

10            MR. ZUBER:  There's nothing in the Bankruptcy Code

11   that allows for a purchaser --

12            THE COURT:  No, let's answer --

13            MR. ZUBER:  -- to take free --

14            THE COURT:  -- my question, Mr. Zuber.  Take me into

15   --

16            MR. ZUBER:  Oh --

17            THE COURT:  -- 365 --

18            MR. ZUBER:  -- excuse me.

19            THE COURT:  -- and show me which part of 365 is

20   violated by a termination of a subrogation right where they're

21   agreeing to perform under the lease, which language?

22            MR. ZUBER:  365 -- 365 says that you can only assume

23   a lease or a contact if there has been default if, at the time

24   of the assumption, the default is cured and there's adequate

25   assurance of future performance.

1           THE COURT:  Right.

2           MR. ZUBER:  So (indiscernible) future performance

3     and now they are required to adequately perform.  And if they

4     don't perform, why should that cut off rights of third

5     parties?  I don't --

6           THE COURT:  My question is --

7           MR. ZUBER:  There's nothing in the Code --

8           THE COURT:  You're asking me a question.  I'm asking

9     you a question.  Which part of 365 says you can't cut off a

10    subrogation right.  That's -- this is where you started.  Read

11    me the language that they're violating.

12          MR. ZUBER:  It doesn't say it in there that you --

13    it -- I'm going -- I'm talking about what 365 requires.  It

14    requires a cure of default and performance going forward.  The

15    purpose of free and clear -- well, I'm going to back up on

16    free and clear for a moment.

17          365 allows for assumption and assignment if you cure

18    a default and you perform going forward.  There were no

19    defaults to be cured.  So they were able to assume and assign

20    these leases where the Debtor was not in default and allow a

21    third-party assignee to move forward and to perform.  If it

22    doesn't perform, there's nothing in the Cod that says you take

23    it now free and clear of rights (indiscernible)

24          THE COURT:  Look, we're getting circular here.

25    That's why I keep asking you.  You're telling me there's

1    nothing in the Code that allows me to do this, and I

2    understand that argument.  That's a different argument than

3    whether it's prohibited under 365.  You started off by saying

4    this is prohibited under 365, and I'm asking you to read me

5    the provision of 365 that prohibits this.

6        MR. ZUBER:  I think you're asking me to find the

7    negative when I'm saying there is an affirmative obligation

8    when you assume under 365, when read in conjunction with 363,

9    to assume and assign leases and to perform going forward, make

10   adequate --

11       THE COURT:  Where is there an affirmative obligation

12   to the bondholders?  Not if there is an affirmative obligation

13   to the feds.  Where is the affirmative obligation to your

14   clients under 365?

15       MR. ZUBER:  They have an obligation to perform under

16   the lease.  The lease -- they have to perform under federal

17   law and the leases.  They don't perform, then the remedies of

18   those who are aggrieved should be preserved.  I don't know --

19   I mean, 365 is the process for assuming and assigning

20   contracts.  Contracts are assumed, there's no default --

21       THE COURT:  The feds aren't --

22       MR. ZUBER:  -- they were assigned (indiscernible)

23       THE COURT:  -- objecting.  The feds aren't

24   objecting, are they?  I mean, the feds aren't objecting,

25   apparently believing they have adequate assurance of future

1      performance.  You're not a party.

2                 MR. ZUBER:  Oh --

3                 THE COURT:  Where is the 365 obligation?

4                 MR. ZUBER:  There is -- there -- I'm not saying

5      there's a violation of 365.  I'm saying 365 requires the

6      assignee to perform going forward.  And they need to perform -

7      -

8                 THE COURT:  Okay.

9                 MR. ZUBER:  -- and they don't get the right to

10     perform free and clear of their own defaults.

11                THE COURT:  Correct.  Okay.  Let's move to your next

12     section, the next argument you want to make then.

13                MR. ZUBER:  Thank you.  So, as we've stated in our

14     papers, there's really nothing that, in our view, under

15     Section 363, that would allow a sale free and clear of surety

16     subrogation rights.

17                And in order for 363(f) to apply, the creditor must

18     have an interest in the property being sold.  We would argue

19     and we cited two Texas cases for the proposition that, under

20     Section 363(f), you're only dealing with *in rem* property

21     interest, not *in personam* claims.

22                This is a plain language argument, Your Honor, under

23     the plain language of 363(f).  The Code says the trustee may

24     sell free and clear of any interest in such property.  The

25     sureties have no interest in the property being sold.  The

1    sureties rights of subrogation are future rights against

2    (indiscernible) Debtor third party, they are not claims

3    against the Debtor.  They don't exist today, they may never

4    exist.  And if they do exist, they will only exist by virtue

5    of the assignee's default under an assumed lease.

6                 We're not aware of anything under (f)(1), which says

7    you can sell free and clear if non-bankruptcy law would permit

8    the sale free and clear.  We're not aware of any non-

9    bankruptcy law that would permit that.

10               The sureties do not consent, so they haven't

11   satisfied (f)(2).

12               Future subrogation rights are not liens under the

13   definition under the Bankruptcy Code or any other

14   construction.

15               There's no bonafide dispute over these future

16   rights.  They don't even exist, they may never come into

17   existence.  These are not claims that can be sold free and

18   clear.  You know, there is no claim, there is no current

19   interest, there is no right; therefore, we couldn't be

20   compelled in a proceeding to accept a money satisfaction

21   because our interest hasn't even arisen yet.

22               So I would argue, Your Honor, that the Debtors

23   cannot sell free and clear of future claims against a

24   nonDebtor third party that do not currently exist, may never

25   exist.

1          THE COURT:  Okay.  So let's --

2          MR. ZUBER:  And if they do exist, they only --

3          THE COURT:  Let's back up a minute.  Your client has

4    no rights against the credit bid purchaser, except as pertains

5    to the credit bid purchaser's performance on the property,

6    right?  Because your bond only applies to performance on the

7    property.

8          MR. ZUBER:  (Indiscernible).

9          THE COURT:  The same is true for the feds.

10   Everything is linked to --

11         MR. ZUBER:  Yeah, I'm not --

12         THE COURT:  -- the property.  These are -- you have

13   the right -- the feds have the right personally to sue the

14   owner of the property because they own the property.  It's not

15   that there is suddenly some duty, if they didn't acquire the

16   property of the credit bid purchaser, to pay for P&A.  They

17   owe the P&A because they're acquiring the property.

18         So, if you take a look at the language under (f),

19   "free and clear of any interest in such property."  Why are

20   the rights of the feds and your clients' rights not linked to

21   the fact that they are going to own the property?

22         MR. ZUBER:  Well, it's not a right that arises in

23   connection with the property, it's a right that arises in

24   connection with the conduct of the acquirer of the property

25   who defaults in its obligations to perform.

1             THE COURT:  But only --

2             MR. ZUBER:  Don't -- I mean --

3             THE COURT:  -- pertaining to the property, right?

4     If they didn't buy the property, they wouldn't have a duty.

5             MR. ZUBER:  But it's not a lien, it doesn't seem to

6     fit anywhere into 363(f) anywhere.  It's not --

7             THE COURT:  It's not a lien.

8             MR. ZUBER:  Our subrogation --

9             THE COURT:  It says:

10            "-- free and clear of any interest in such property

11    of an entity other than the estate."

12            THE COURT:  You have an equitable interest in what

13    they do on this property, I got that.

14            MR. ZUBER:  And I don't -- we respectfully disagree,

15    Your Honor.  I don't think this is any right -- it's not even

16    a right that exists today.  It may never exist.  How can it be

17    sold free and clear of a claim against a third party?  These

18    are not -- these are not claims against the Debtor.

19            The purpose of 363(f) is to allow the sale free and

20    clear of claims against the Debtors, so that the Debtor -- so

21    that the purchaser of the assets is not saddled with the

22    Debtor's obligations.  The Debtors' obligations were never in

23    default, they take these going forward.  There should be a

24    line in the sand.  Once the sale closes and they take over

25    these leases and they have to perform, they have to perform.

1    They shouldn't get a free pass if they default and don't

2    perform and we have to step up and pay somebody on a guaranty

3    that we issued to someone else.  I just don't see how these

4    are claims or interests or anything that can be sold free and

5    clear.  And I think that these are --

6              THE COURT:  So take --

7              MR. ZUBER:  -- not even contingent claims.

8              THE COURT:  Take me to (f)(5) for a minute.  You

9    said pretty quickly that you can't be compelled to take a

10   money satisfaction.  I assume, if you pay money, you can be

11   compelled to take money in satisfaction.  I'm a little

12   confused about how you're reading (f)(5).

13             MR. ZUBER:  Well, (f)(5) says you have to be

14   compelled to accept a money satisfaction of your interest.

15   There is no current interest.  There is -- and even if there

16   were, it's not even quantifiable at this point.

17             THE COURT:  Well, but if you have to pay --

18             MR. ZUBER:  It begs the question.

19             THE COURT:  If you have to pay, you could be

20   compelled to accept money in satisfaction of the payment,

21   right?

22             MR. ZUBER:  Only if you -- only if you were -- only

23   if you could be compelled to accept the satisfaction of your

24   interest.  We can't compelled to accept the satisfaction of

25   our interest because our interest doesn't even exist right

1    now.  How would we even know what our interest is?

2                THE COURT:  Well, we may --

3                MR. ZUBER:  The only -- our interest only --

4                THE COURT:  Well, we estimate --

5                MR. ZUBER:  -- (indiscernible) in default.

6                THE COURT:  -- things all the time, right?  But

7    okay.  I'm just trying to understand your (5) argument.

8                But go ahead then with the rest of your argument.

9                MR. ZUBER:  I think that there's case law, I think

10   we cited several cases out of Texas that say you can't sell

11   free and clear of future rights, things that don't exist.  We

12   don't think these rights exist.

13               And I keep coming back to it, Your Honor, and I know

14   I said it three times, is these rights will only exist in the

15   future if the credit bid purchaser defaults.  How does a court

16   of equity believe it to be equitable that our rights will be

17   lost when our rights only arise because the purchaser didn't

18   do what it was legally obligated to do and which it said it

19   would do?

20               THE COURT:  So --

21               MR. ZUBER:  So I don't understand --

22               THE COURT:  So I --

23               MR. ZUBER:  -- the credit --

24               THE COURT:  You asked --

25               MR. ZUBER:  -- bid purchaser --

1          THE COURT:  -- me a question, so I want to skip

2     ahead to the third factor for a moment.  Tell me what, on the

3     evidentiary record we have -- I want you to stick with what

4     the evidence shows -- what's the financial cost to your client

5     of us doing this?  How much is the financial loss to your

6     client?

7          MR. ZUBER:  It could be the complete penal sum --

8          THE COURT:  No, no, no.

9          MR. ZUBER:  -- of their bond, Your Honor --

10         THE COURT:  No, no, no.

11         MR. ZUBER:  -- which is a hundred --

12         THE COURT:  No, no, no, sir.  Stick to the

13    evidentiary record.  What, under the evidentiary record, is

14    the financial loss to your client?  I don't want some

15    speculation of something.  We've -- you've had plenty of

16    chances throughout the case --

17         MR. ZUBER:  (Indiscernible)

18         THE COURT:  -- to present evidence and I recall none

19    that show that this costs your client anything.  And you all

20    have spent quite a bit of time today trying to prove that

21    there won't be a default; and, therefore, it won't cost your

22    client anything.

23         MR. ZUBER:  Well --

24         THE COURT:  How do you meet Factor three?  You're

25    asking me about what's fair --

1          MR. ZUBER:  Your Honor, I'll --

2          THE COURT:  -- when I'm dealing with the evidentiary

3     record to figure out what's fair.  You don't have a loss here.

4          MR. ZUBER:  Our --

5          THE COURT:  You're just trying to stand --

6          MR. ZUBER:  Our bonds are --

7          THE COURT:  -- in the way of a sale.

8          MR. ZUBER:  We don't want to --

9          THE COURT:  Good.  Then tell me --

10         MR. ZUBER:  -- stand in the way --

11         THE COURT:  -- what your economic --

12         MR. ZUBER:  -- of a sale.

13         THE COURT:  -- loss --

14         MR. ZUBER:  We just don't want them to --

15         THE COURT:  Tell me what the evidentiary record

16    shows your economic loss will be under Factor three.

17         MR. ZUBER:  Our bonds and indemnity agreements are

18    part of the evidentiary record, they were admitted at the

19    confirmation hearing.

20         THE COURT:  Your bonds are there.

21         MR. ZUBER:  Our evidence --

22         THE COURT:  What's the expected loss under your bond

23    if we confirm the plan?  What does the evidence show?

24         MR. ZUBER:  It depends on whether the credit bid

25    purchaser performs.

1          THE COURT:  That's not --

2          MR. ZUBER:  If the credit bid --

3          THE COURT:  That's not --

4          MR. ZUBER:  -- purchaser performs --

5          THE COURT:  What does the evidence --

6          MR. ZUBER:  -- then we would --

7          THE COURT:  -- show about performance then?  The

8    evidence --

9          MR. ZUBER:  The evidence --

10         THE COURT:  -- is undisputed --

11         MR. ZUBER:  -- shows that --

12         THE COURT:  -- that they're going to perform.  So

13   what's the evidence of your loss?

14         MR. ZUBER:  The evidence shows that our loss will be

15   what -- our loss is contingent upon the credit bid purchaser

16   failing to perform.  If they perform, we won't have a loss,

17   that would be great.

18         THE COURT:  But I need to know --

19         MR. ZUBER:  If they don't perform --

20         THE COURT:  -- under the current evidentiary record

21   -- you're telling me I'm hurting your clients.  And what

22   you're describing is maybe some day there will be an injury

23   that the evidence shows there won't be.  So I'm trying to

24   figure out, under Factor three of stay pending appeal --

25   you're saying, Judge, you need to act like you're a court of

1    equity.  The evidence is this will stop the sale and that it

2    will do so with no injury to your client.  Maybe I'm missing

3    the evidence.  Tell me the evidence that shows injury to your

4    client.

5          MR. ZUBER:  The evidence is that they're acquiring

6    the assets free and clear of our subrogation rights.  And if

7    and when they default, we will have an injury to the full

8    extent of our penal sum of our bond --

9          THE COURT:  And quantify --

10          MR. ZUBER:  -- $140 million.

11          THE COURT:  Quantify for me, under the evidentiary

12    record, whether they're going to default; and, if so, what the

13    cost will be.  We deal in evidence, not in guesswork.  What's

14    the evidence?

15          MR. ZUBER:  They say they're not -- I don't -- they

16    say they're going to perform.  If they perform, there's no

17    damages.  If they don't perform, we're trying to preserve our

18    rights.

19          THE COURT:  Yeah, but you --

20          MR. ZUBER:  The evidence shows --

21          THE COURT:  You got to --

22          MR. ZUBER:  -- that they're --

23          THE COURT:  Factor three says that you have to show

24    me -- I have to weigh what is the injury to your client.  What

25    does the evidence show --

1          MR. ZUBER:  The injury --

2          THE COURT:  -- that it will be?

3          MR. ZUBER:  The injury (indiscernible) it's a legal

4     injury under Section 363(m), that, if the Circuit Court were

5     to follow certain circuits and we don't get a stay pending

6     appeal, then our rights, even if they're ultimately vindicated

7     by the District Court or the Circuit Court or the U.S. Supreme

8     Court will have little or no value to us because it will be

9     statutorily moot under Section 363(m).  So the injury is the

10    loss of an appellate process, an appellate review

11    (indiscernible) if the credit bid purchaser defaults.

12         THE COURT:  Okay.  Go ahead then.

13         MR. ZUBER:  So I think I've made my arguments, Your

14    Honor.  And for those reasons (indiscernible) you'll

15    reconsider your determination of sale free and clear of --

16         THE COURT:  So do you want to deal with factors two

17    and four or --

18         MR. ZUBER:  -- (indiscernible).

19         THE COURT:  -- or not?

20         MR. ZUBER:  Well, as far as factor two, irreparable

21    injury, I've argued already that irreparable injury would be

22    largely premised upon Section 363(m), the loss of our

23    appellate rights.  If we're denied a stay pending appeal, the

24    Debtors presumably will move to dismiss the appeal as

25    statutorily moot, and that result, which we will oppose, if

1      achieved, will constitute irreparable harm, and the sureties

2      would be left with no remedy from an appellate court.

3              In terms of balancing the harms, we see little or no

4      harm.  The Debtor has $107 million in cash.  It's got an

5      undrawn line of credit.  Oil prices are very high.  There's no

6      reason that the Debtor can't continue to operate in the

7      ordinary course of business for a relatively short period of

8      time, profits will continue to be derived.  And this narrow

9      issue is not going to ever impact the credit bid purchaser's

10     rights in the short term, if ever.  But if it does, it will be

11     down the road and only --

12             THE COURT:  Let's talk about --

13             MR. ZUBER:  -- (indiscernible).

14             THE COURT:  -- short term.  What -- are you only

15     looking for a short-term stay?  I thought you wanted a stay

16     pending the conclusion of the appeal.  So how long do you

17     think that's going to take to get up to the Fifth Circuit and

18     back?

19             MR. ZUBER:  I don't know, Your Honor.  My

20     expectation is that we can seek expedited review and an

21     emergency hearing and we can get this done in a couple of

22     months, but I would have to rely upon Mr. Rios or Mr. Million

23     to give me guidance on the timing.  But I would not anticipate

24     that this would be a very, very lengthy stay.  And we believe

25     that, in the short term, with the price of oil and the current

1    operations and the Debtor has, in its last operating report, I

2    believe, $107 million in cash, it's got a ten-million-dollar

3    DIP loan, so I don't believe it's (indiscernible).

4              THE COURT:  So how long of a stay do you want?

5              MR. ZUBER:  I don't see any --

6              THE COURT:  How many days of a stay do you want?

7    Because I think it will be a two-year appeal, given what I've

8    seen.  How many days of stay do you want?

9              MR. ZUBER:  Your Honor, I would anticipate until we

10   get a determination from the last appellate court.  You know,

11   perhaps if I had an opportunity to speak with my clients, I --

12   you know, perhaps we could agree to some short (indiscernible)

13   appeal that we could recommend to Your Honor.  But at this

14   point, I --

15             THE COURT:  Okay.  Thank you.

16             Mr. Woodard.

17             MR. WOODARD:  And Your Honor, I'm not going to

18   recite all of what Mr. Zuber had to say.  I just wanted to --

19   I wanted to have the opportunity to take a swing at answering

20   the Court's questions that was openly posed and directed to

21   Mr. Dane to have to field.  But -- and I believe the Court's

22   question was:  Why would any other buyer assume more

23   obligations at the time of this closing?  And I think the

24   answer is they don't, no other buyer would assume any old

25   obligations, but this buyer did assume all new obligations.

1      And I harken back, Judge, to my sixth -- I was number six in
2      the line to try to convince the Court that these are all post-
3      confirmation, post-effective-date obligations.
4              You also asked Mr. Zuber about the -- aren't --
5      isn't everything tied to the interest in the property.  And I
6      think the answer from the surety side, as we sit here today,
7      is we're not tied to the property.  We are tied solely to an
8      obligation to the Government.  We don't have anything to do
9      with that property, realistically.  We have -- there's no --
10     anything -- there's no direct ties, those have all been cut
11     off.
12             What we do have is an obligation to the United
13     States Government -- at least Lexon does -- as to the U.S.
14     Government.  And if the U.S. Government acts on its post-
15     effective-date obligations to make a demand on us, while there
16     may be a relationship between the property and the Government,
17     there isn't between us, so that our payment --
18             THE COURT:  I thought that --
19             MR. WOODARD:  -- goes to --
20             THE COURT:  So I may have this wrong then.  I
21     thought, under the bonds, the Government was only entitled to
22     make a demand if the property wasn't properly retired.  Is
23     that wrong?
24             MR. WOODARD:  No, I think that -- I think that
25     that's correct.  But that relationship is solely between the

1    credit bid purchaser and the Government now because our

2    indemnity is gone.  While the bonds continue on, we don't have

3    any claim over or against them for the -- they -- for the

4    Debtors' obligations.  These are all new obligations that the

5    -- and that's what I'm saying.

6         When the Court wondered why would a buyer assume

7    more liability, I couldn't answer that question.  I mean, I

8    think the answer is because it's the difference between 250

9    million and 1 billion, I think is the answer.  But that's up

10   to them.  You know, P.T. Barnum had lots of good phrases to

11   say about fools born every minute.

12        But the bottom line is this buyer chose to assume

13   new obligations.  We didn't ask them to do it, but they do it.

14   And those obligations run directly from the new buyer, from

15   the credit bid purchaser or its affiliates, to the United

16   States Government.  We didn't create those.  Those are there

17   by operation of the 30 C.F.R. 546, et seq.  And at the end of

18   the day, the Government can call directly on them.  As

19   Mr. Dane said, they were -- they are going to be living up to

20   the terms of that because they have a direct obligation to the

21   Government.

22        The Government can also, because of our remaining

23   now, new continuing obligation post-confirmation, post-

24   effective-date, they can call our bonds if, under the

25   obligations from new buyer, post-petition, post-effective-date

1   obligations are defaulted.

2         THE COURT:  Pertaining to the property.

3         MR. WOODARD:  Pertaining to the property, as between

4   the Government and new buyer.

5         THE COURT:  But if they don't buy the property, the

6   Government can't make a claim against the buyer, right?  They

7   have to buy the property for the Government to make a claim

8   against them.

9         MR. WOODARD:  Correct because the moment they signed

10  those leases --

11        THE COURT:  Okay.

12        MR. WOODARD:  -- the statutory scheme makes them

13  fully --

14        THE COURT:  Right.

15        MR. WOODARD:  -- liable.

16        THE COURT:  And their call on your bond is -- they

17  may make a wrongful call, and you may have a third-party

18  obligation even if they make a wrongful call, I got that.  But

19  their contractual right to calling the bond is only if there

20  is a property-related failing to plug and abandon and retire

21  the asset, right?

22        MR. WOODARD:  That is true, but that is a post-

23  petition, post-effective-date obligation.

24        THE COURT:  I got that, I got that.

25        MR. WOODARD:  So, I mean, if --

1          THE COURT:  Okay.

2          MR. WOODARD:  Thank you.

3          THE COURT:  And anything further, Mr. Woodard?

4          MR. WOODARD:  Nothing, Judge.

5          THE COURT:  Thank you.

6          Mr. Rios?

7          MR. RIOS:  Thank you, Your Honor.  I won't belabor

8     the points already being made by Mr. Zuber and Mr. Woodard.  I

9     would just point out that one of the things that

10    (indiscernible) the sureties' obligation is a default; that,

11    when we bonded the Debtor, we did not anticipate we would be

12    conditioning our obligation on a default of a future credit

13    purchaser who has assumed the obligation.

14          One of the things I point out in my very short

15    joinder is that the structure here has changed.  You know, the

16    real harm is the impairment of suretyship status; that the

17    surety has certain rights by virtue of being a surety, and

18    those are being removed by the Court in exercising lien

19    stripping powers, which of course we disagree with.

20          But it can lead to absurd consequences.  I want to

21    -- the effect of surety -- the impairment of suretyship status

22    is -- it will decrease the incentive of the party obligated to

23    perform to perform and increase the likelihood of the loss to

24    the surety.  And I guess I --

25          THE COURT:  Do I have any evidence of that?

1          MR. RIOS:  You have evidence that this is changing

2      the structure of the relationship because we have no recourse

3      --

4          THE COURT:  Do I have any evidence that --

5          MR. RIOS:  -- against the party that --

6          THE COURT:  Do I have any evidence that the

7      purchaser is less likely to perform than the current owner?

8      It seems to me I have the opposite.

9          MR. RIOS:  Yeah, but the -- what I'm talking about

10     here is the recourse in the event there is nonperformance.

11     And --

12         THE COURT:  So if there were --

13         MR. RIOS:  -- the change --

14         THE COURT:  If there were --

15         MR. RIOS:  -- in the (indiscernible).

16         THE COURT:  And this is why I -- what I ruled

17     before.  And let me -- if there were -- if we don't approve

18     this deal, versus if we do approve the deal, what I held

19     before was that you're more likely to pay on your bond if we

20     don't approve it than if we do approve it, meaning that you

21     were better off by us approving it.  So are you telling me

22     that I've got that backwards; and that, if we approve the

23     deal, your bond is more likely to be called than if we don't

24     approve the deal?

25         MR. RIOS:  With respect to the property the credit

1      purchaser is acquiring --

2              THE COURT:  So --

3              MR. RIOS:  -- I don't know that the --

4              THE COURT:  No, I'm just saying --

5              MR. RIOS:  It is --

6              THE COURT:  -- I have an evidentiary record, I have

7      two possibilities:  One is I confirm the plan and authorize

8      the sale, and the other is I don't and the Debtor liquidates.

9      If I don't, the conclusion I've reached is the bonds are more

10     likely to be called than if I do.  And the evidence of whether

11     the bonds are likely to be called if I do approve the plan is

12     they're unlikely to be called.  So I'm trying to figure out

13     how this hurts the bonds overall because the evidence seems to

14     show it helps them, but you're arguing the opposite.  Tell me

15     how that's in the evidentiary record.

16             MR. RIOS:  Well, I'm not sure the effect to the

17     sureties in the event there is a liquidation is in the

18     evidentiary record at all.  But I can tell you that the

19     nickel, as it flows through the plan -- let's assume the

20     sureties get their 14 percent as a Class 6B creditor after

21     surviving the objections the Debtor is surely to raise that

22     the -- our claims are contingent.  But let's assume the nickel

23     doesn't flow through the plan that way, that you have a

24     trustee.  There are certain obligations that can't be

25     abandoned, there are certain properties that are going to be

1    sold off, that the credit purchaser would have then the

2    decision to, you know, acquire the properties through

3    foreclosure and potentially put themselves in the line of

4    title.  I think the nickel flows a lot differently under those

5    circumstances, Your Honor, and I don't think that is in the

6    record.

7              THE COURT:  I think there's a pretty extensive --

8              MR. RIOS:  And I --

9              THE COURT:  -- liquidation analysis in the record,

10   and I think we have testimony that the Debtor won't be able to

11   perform the P&A and the ARO if they don't bring in new

12   capital.  Maybe I'm wrong about that, but I think that's in

13   the record.

14             MR. RIOS:  But I believe there's a subset of assets

15   that would be sold, namely the NewCo assets, that would

16   probably meet those obligations, the decommissioning

17   obligations, and be sold to someone who would be a new

18   successor in the --

19             THE COURT:  Well --

20             MR. RIOS:  -- chain of title.

21             THE COURT:  -- where is that in the record?

22             MR. RIOS:  I mean -- I don't know that it's in the

23   record, Your Honor; I don't know that it's not.

24             THE COURT:  Well, what's in the record -- and this

25   is what I went over with Mr. Dean -- was they maximized the

1    amount they could get.  If they can ever get more -- and he

2    testified -- I didn't know this -- up to four or $500 million

3    will go out to the lienholders, so there won't be protection

4    for you guys.  I really don't understand why you all don't

5    think you're better off with the plan.  But you know, I'm not

6    hearing it in the record, in any event.

7         MR. RIOS:  Yeah.  Well, how does the money get to

8    the lienholders if the decommissioning obligations have to be

9    met because they can't be abandoned?

10        THE COURT:  Well, the --

11        MR. RIOS:  Then the --

12        THE COURT:  -- lienholders will --

13        MR. RIOS:  -- (indiscernible).

14        THE COURT:  -- take the assets.

15        MR. RIOS:  Well --

16        THE COURT:  I mean -- I'm sorry -- they take the

17   proceeds of whatever sale there are, right?

18        MR. RIOS:  Yes, but there would still be obligations

19   that could not be abandoned and would have to be met.

20        THE COURT:  Correct.

21        MR. RIOS:  And I --

22        THE COURT:  And the Debtor --

23        MR. RIOS:  Fourteen --

24        THE COURT:  -- can't meet them, so -- what happens

25   when the Debtor can't meet them, which is what the evidence

1    shows?  Guess what, the bonds get called.  The evidence shows
2    the bonds aren't going to get called here, but --
3              MR. RIOS:  But the -- what the harm is to the
4    sureties here is changing the incentive of new (indiscernible)
5    what I put in my brief was, you know, it's like selling an
6    indulgence for a future sin.  They could default, not use the
7    $350 million on the surety bond obligations, and we would be
8    left with the anomalous situation where the sureties don't
9    have a right of restitution or subrogation or reimbursement
10   against the party that defaulted.  That's the real harm here.
11   It's the changing in the structure.
12             I think Your Honor referred to it in the adversary
13   between the Apache sureties and the Debtor at a June 10th
14   hearing.  Perhaps there's a change in the structure that would
15   affect the sureties.  And that's really what we're -- our
16   gripe is about.  And I don't think there's a binary choice
17   between this plan and (indiscernible) our appeal and
18   liquidation.  I think the surety issues can be carved out for
19   consideration on appeal, without affecting the overriding --
20             THE COURT:  What is the --
21             MR. RIOS:  -- (indiscernible).
22             THE COURT:  What is the evidence that supports what
23   you're telling me?
24             MR. RIOS:  Well, just that the surety issues can be
25   carved out.  And as Mr. Dane testified, obligations are going

1      to met for a long period of time, given the amount of funding

2      they have available, that these subrogation rights probably

3      aren't going to come up for the two years Your Honor is

4      talking about for the appeal to be resolved.

5              THE COURT:  Yeah.  But if they won't close not

6      knowing if they have the obligation, what good does this do?

7              MR. RIOS:  Well, I don't know why they would not

8      close under those circumstances --

9              THE COURT:  Well --

10             MR. RIOS:  -- where it's --

11             THE COURT:  -- is there any evidence --

12             MR. RIOS:  -- so remote --

13             THE COURT:  Is -- do you have any evidence that they

14     will?

15             MR. RIOS:  I -- no.  I mean, that's their decision.

16             THE COURT:  Well, I think that --

17             MR. RIOS:  I --

18             THE COURT:  -- the testimony I have so far is they

19     won't.  That may be wrong, but that's at least all that I've

20     got.

21             MR. RIOS:  No, I understand that.  But you know, I -

22     - as I tried to point out in examining Mr. Dane, I think, you

23     know, one of the issues here is:  If you can carve out the

24     surety issues and they're a sufficiently remote risk for the

25     present, and it's going to cost tens of millions of dollars to

1    you if you don't close, why wouldn't you close and just see

2    what happens on the sureties issue?  That seems like a logical

3    punt (indiscernible) to this whole thing.  You -- it wouldn't

4    require, you know, any risk to any party.

5              THE COURT:  Thank you, sir.

6              MR. RIOS:  Thank you.

7              THE COURT:  Mr. Perez.

8              MR. PEREZ:  Yes, Your Honor, very briefly.

9              Your Honor, as it relates to Section 365, I'm not

10   quite sure that I really understood the argument.  We are not

11   assuming or assigning any of the surety -- you know, the

12   agreements, the indemnity or anything like that.  They are not

13   -- that's not part of what the credit bid purchaser is

14   assigning.  I'm not quite sure exactly what the exact argument

15   is, but I just don't view that as under 365.

16             Furthermore, Your Honor, I -- again, you know, we

17   never listed the federal leases for assignment under 365, on

18   the assumption -- on the assumption schedules.  I think that

19   they are being sold and there's a procedure pursuant to, you

20   know, the regulations, for -- to basically change the owner of

21   those leases.  But again, I'm not sure that's even relevant

22   because I'm not quite sure exactly what the 365 argument is.

23             With respect to 363, Your Honor, if you look at the

24   evidence, number one, I don't think that they've shown that

25   there's going to be any harm to them.  Number -- and whereas,

1    in most cases, people do argue harm and the public interest, I

2    really think, in this case, we do have, you know, significant

3    unrefuted testimony as to the harm and the public interest.

4         I think, in Mr. Dane's declaration, he pointed out

5    that, if -- even if we delay this for a few months, we'll

6    lose, you know, the summer decommissioning period, and that

7    creates significantly more risk.  And I think the only

8    testimony is, is that all of these various items are

9    interrelated, and you can't just, you know, basically -- I

10   think, in connection with the motion to reconsider, they're

11   not really asking you to reconsider.  I think what they're

12   asking you is to vacate the confirmation order.  And I'm not

13   quite sure that the Court, you know, can take like a pencil to

14   it.

15        So, Your Honor, I think that, based on the

16   evidentiary record and the four factors, that they haven't met

17   their burden.  And again, the potential harm to staying this

18   and this plan unraveling is significant, both based on the --

19   basically unrefuted testimony from Mr. Dane as to what would

20   happen if this unravels and we have to file a Chapter 7, both

21   in his declaration and his life testimony.

22        Thank you, Your Honor.  We would request that the

23   Court deny the motion, both for stay and to reconsider.

24        THE COURT:  Thank you.

25        All right.  I'm denying the motion on the following

1    grounds:

2         First, I find that there is no injury whatsoever to

3    the parties who are complaining.  The evidence demonstrates

4    that the plan is designed to maximize the application of

5    resources to plugging and abandonment and asset retirement

6    obligations, some of which are the subject of the surety bonds

7    issued by the moving parties.  Conversely, the evidence is

8    undisputed that, if the plan is confirmed, performance of

9    those obligations is more likely than not going to occur.

10   There is no guarantee they're going to occur, but there is

11   actually zero evidence in the record that they will not occur.

12        So I have a situation where the bonding companies

13   may have their bond obligations eliminated or minimized if

14   this plan is carried into action.  And I have undisputed

15   evidence that this took years, months to develop; that the

16   Debtor will not be able to meet the plugging and abandonment

17   and ARO obligations if we don't confirm a plan; that

18   liquidation will not result in the high value that is being

19   achieved.  And I conclude that, if we don't confirm the plan,

20   there is a great likelihood that the bonds will, in fact, be

21   called.

22        The return to the bonds for amounts that are called,

23   but also for amounts that are forecast to be called in the

24   future, which we can estimate, becomes an unsecured claim.

25   That unsecured claim in the amount of their claim that is

1    allowed, after appropriate hearing, will result in some

2    return.  But I find that the amount that will be called on the

3    bonds is higher in the undisputed record if we don't proceed

4    with confirmation than if we do.

5         Now that covers a lot of what I'm doing here.  It

6    decimates the third factor of whether granting the stay would

7    substantially -- excuse me -- the second factor of whether the

8    movant has made a showing of irreparable injury.  They are not

9    injured, they are benefitted by what we are doing.

10         Now the argument is that this may all become moot on

11    appeal.  If it becomes moot on appeal, that is an injury, but

12    not a very big one under the evidentiary record.  They should

13    have perhaps some ability as interested parties in trying to

14    determine what the future rights are, even if they are

15    benefitted by confirmation of the plan, but it's not much in

16    the way of injury.

17         The first factor, which the Fifth Circuit regards as

18    the most important for a stay pending appeal, is whether the

19    movement -- movant has made a showing of likelihood of success

20    on the merits.  Frankly, they haven't made any showing of

21    that, none.

22         The Court, in making its initial decision,

23    extensively referenced Midlantic, and that Midlantic has to

24    color how we apply the Bankruptcy Code to particular factual

25    situations.  I'm not going to belabor the entire Midlantic

1    discussion we've had before, other than to say that nothing
2    I've heard today does anything other than strengthen my view
3    of the application of midlantic.
4          365, I agree with Mr. Perez, is irrelevant to the
5    sureties' rights.  No one is transferring the bonds to
6    anywhere; they're staying the same.  All that we are doing is
7    saying that property-related claims that exist today for
8    damages, ARO obligations, plugging and abandonment, the
9    purchaser may not be sued by the surety bond by any sort of
10   subrogation right if those were claims that could have been
11   liquidated and funded today.  363(f) allows that.  363(f) says
12   that, if there is something -- and it doesn't need to be a
13   lien; it can be any interest -- that is property-linked, we
14   can order the sale free and clear.  That is all that we are
15   doing, and they are not being injured by that sale free and
16   clear.
17         We can only do that if one of the factors are met,
18   and one of those is that they could be compelled in a legal or
19   equitable proceeding to accept a money satisfaction of their
20   interest.  Well, their interest is a subrogation right that
21   constitutes a debt.  They compelled to take money in exchange
22   for the debt that they have to fund.  I don't understand the
23   argument that we can't do a 363(f) sale, and I particularly
24   don't understand that in light of Midlantic.
25         The third factor is whether granting the stay would

1    substantially harm the other parties.  I think it is fanciful

2    to think that it -- an appeal like this could make its way

3    through the last appellate court, which is the Supreme Court,

4    in the next couple of months.  I think that my two-year

5    estimate is fanciful, if that's what we're being asked to do,

6    is to wait until cert is granted or denied.

7         And I accept Mr. Dane's testimony, although I'm

8    going to go on the low side of the testimony and find that the

9    deal is unlikely to close if we change it, modify our order,

10   and that the cost would be approximately $350 million to the

11   estate.  That is also the amount of the bond that I would

12   hypothetically require, if I granted the motion, which I'm not

13   going to grant.  But for the purposes of the complete record,

14   if the District Court is reviewing whether this should occur

15   and determines that there should be a stay, my finding under

16   the evidentiary record is that the appropriate bond would be

17   $350 million.

18        And finally, a factor that's normally not at the

19   forefront here is, and it here is at the forefront because of

20   Midlantic, and that is whether the granting of the stay would

21   serve the public interest.

22        The evidence, the position of the United States, the

23   position of all of the parties in the case is that this is the

24   only way of addressing the largest environmental obligor in

25   the Gulf of Mexico.  This is the solution.  Granting the

1    motion for reconsideration, so as to minimize the likelihood

2    that the solution would come about, would severely injure the

3    public interest.  A stay of allowing a closing would severely

4    interest -- would severely injure the public interest.

5         Although, ordinarily, this is not the most important

6    factor, in this case, in my mind, it is a critical factor

7    because of what we are dealing with:  Multiple entities,

8    multiple obligations, and ultimate responsibility of the

9    Government of the United States to protect the citizens of

10   this country.  And I think I would do a great disservice if I

11   ignored the fourth factor or gave it simple lip service.  This

12   is a major effort, it is in the public interest of the United

13   States.

14        I am denying the motion for reconsideration, I am

15   denying the motion for a stay pending appeal.  And I am

16   alternatively finding that if a bond -- if a stay should be

17   granted, that the appropriate bond is $350 million.

18        Mr. Perez, I'll ask you to upload a form of order

19   that denies this.  I don't want it to repeat any of the

20   reasons.  I just want it to say for the reasons set forth on

21   the Record.  And I'll get that entered tomorrow, if you'll get

22   it filed by noon tomorrow.

23        MR. PEREZ:  Yes, Your Honor.

24        THE COURT:  Thank you.  We're in adjournment.

25        MR. PEREZ:  Thank you, Your Honor.

1          THE COURT:  Thank you.

2          COUNSEL:  Thank you, Your Honor.  Thank you, Your

3   Honor.

4      (Proceedings concluded at 5:39 p.m.)

5                              * * * * *

6          *I certify that the foregoing is a correct transcript*

7   *to the best of my ability due to the condition of the*

8   *electronic sound recording of the ZOOM/telephonic proceedings*

9   *in the above-entitled matter.*

10     */S./   MARY D. HENRY*

11  *CERTIFIED BY THE AMERICAN ASSOCIATION OF*

12  *ELECTRONIC REPORTERS AND TRANSCRIBERS, CET**337*

13  *JUDICIAL TRANSCRIBERS OF TEXAS, LLC*

14  *JTT TRANSCRIPT #64229*

15  *DATE FILED:  JULY 9, 2021*

16

17

18

19

20

21

22

23

24

25