**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | | |
|---|---|---|
| | § | |
| In re: | § | Chapter 11 |
| | § | |
| **FIELDWOOD ENERGY LLC**, *et al.*, | § | Case No. 20-33948 (MI) |
| | § | |
| Debtors.[1] | § | (Jointly Administered) |
| | § | |

**ORDER (I) AUTHORIZING AND APPROVING SIDE
PURCHASE AGREEMENT, INCLUDING (A) SALE OF DEBTORS' ASSETS
FREE AND CLEAR OF ALL LIENS, CLAIMS, ENCUMBRANCES, AND
OTHER INTERESTS AND (B) ASSUMPTION AND ASSIGNMENT OF
KEY CONTRACTS, (II) APPROVING FORM AND MANNER OF NOTICE
OF SIDE PURCHASE AGREEMENT, AND (III) GRANTING RELATED RELIEF**

Upon the motion, dated August 14, 2021 (the "**Motion**"),[2] of Fieldwood Energy

LLC and its debtor affiliates, as debtors and debtors in possession (collectively, the "**Debtors**"),

pursuant to sections 105(a), 363, and 365 of title 11 of the United States Code (the "**Bankruptcy

Code**"), Rules 2002, 6004, 6006, 9007, 9013, and 9014 of the Federal Rules of Bankruptcy

Procedure (the "**Bankruptcy Rules**"), and Rules 2002-1 and 9013-1 of the Local Bankruptcy

Rules for the United States Bankruptcy Court for the Southern District of Texas (the "**Local

Rules**") seeking entry of an order (i) authorizing and approving that certain *Purchase Agreement*

(together with all ancillary documents, as may be amended, modified, or supplemented, the "**Side

Purchase Agreement**" and, all transactions contemplated thereby, collectively, the "**Mexico**

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, as applicable, are:  Dynamic Offshore Resources NS, LLC (0158); Fieldwood Energy LLC (6778); Fieldwood Energy Inc. (4991); Fieldwood Energy Offshore LLC (4494); Fieldwood Onshore LLC (3489); Fieldwood SD Offshore LLC (8786); Fieldwood Offshore LLC (2930); FW GOM Pipeline, Inc. (8440); GOM Shelf LLC (8107); Bandon Oil and Gas GP, LLC (9172); Bandon Oil and Gas, LP (9266); Fieldwood Energy SP LLC (1971); Galveston Bay Pipeline LLC (5703); and Galveston Bay Processing LLC (0422).  The Debtors' primary mailing address is 2000 W. Sam Houston Parkway S., Suite 1200, Houston, TX  77042.

[2] Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to such terms in the Motion or the Side Purchase Agreement (as defined below), as applicable.

Transaction") by and between Fieldwood Energy LLC (the "**Seller**"), LUKOIL International Holding GMBH (the "**Purchaser**"), and Credit Bid Purchaser, a copy of which is attached hereto as **Exhibit A**, including (a) the sale of the Debtors' Assets free and clear of all Encumbrances and Liabilities (each as defined in Paragraph 6 below), other than the Assumed Obligations and as set forth in the Side Purchase Agreement, and other interests, and (b) the assumption and assignment of the Key Contracts; (ii) approving the form and manner of notice of the Mexico Transaction; and (iii) granting related relief, all as more fully set forth in the Motion; and this Court having jurisdiction to consider the Motion and the relief requested therein pursuant to 28 U.S.C. § 1334; and consideration of the Motion and the requested relief being a core proceeding pursuant to 28 U.S.C. § 157(b); and it appearing that venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409; and due and proper notice of the Motion having been provided; and such notice having been adequate and appropriate under the circumstances, and it appearing that no other or further notice need be provided; and this Court having reviewed the Motion, and upon the Purchaser and the Debtors having agreed to the terms of the Side Purchase Agreement; and this Court having reviewed the [●] Declaration; and this Court having conducted a hearing on September 7, 2021 (the "**Sale Hearing**") to consider the relief requested in the Motion as set forth in this order (the "**Sale Order**"); and all parties in interest having been heard or having had the opportunity to be heard regarding the Motion, the Mexico Transaction, Side Purchase Agreement, and all relief set forth herein; and all objections, if any, to the Motion having been withdrawn, resolved, or overruled on the merits except as set forth herein; and upon the record of the Sale Hearing and all of the proceedings had before this Court; and this Court having determined that the legal and factual bases set forth in the Motion establish just cause for the relief granted herein; and it appearing that the relief requested in the Motion is in the best interest of the Debtors and

2

their respective estates and creditors; and upon all of the proceedings had before this Court and after due deliberation and sufficient cause appearing therefor,

**IT IS HEREBY FOUND AND DETERMINED THAT:**

A.    **Fed. R. Bankr. P. 7052**.  The findings and conclusions set forth herein constitute this Court's findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052, made applicable to this proceeding pursuant to Bankruptcy Rule 9014.  To the extent any of the following findings of fact constitute conclusions of law, they are adopted as such.  To the extent any of the following conclusions of law constitute findings of fact, they are adopted as such.

B.    **Jurisdiction**.  The Court has jurisdiction to hear and determine the Motion and to grant the relief requested in the Motion pursuant to 28 U.S.C. § 1334.  Without limiting the generality of the foregoing, this Court has exclusive *in rem* jurisdiction over the Assets pursuant to 28 U.S.C. § 1334(e), as such Assets are property of the Debtors' chapter 11 estates and, as a result of such jurisdiction, this Court has all necessary power and authority to grant the relief contained herein.  This is a core proceeding within the meaning of 28 U.S.C. § 157(b) and, as such, this Court has the authority to enter a final order.

C.    **Venue**.  Venue of these chapter 11 cases and the Motion in this district is proper under 28 U.S.C. §§ 1408 and 1409.

D.    **Statutory Predicates**.  The statutory and legal predicates for the relief requested in the Motion are sections 105, 363, and 365 of the Bankruptcy Code, Rules 2002, 6004, 6006, 9007, and 9014 of the Bankruptcy Rules, Rule 2002-1 of the Local Rules, and the *Procedures for Complex Cases in the Southern District of Texas*.

E.    **Notice and Opportunity to Object**.  As evidenced by the certificates of service previously filed with the Court, proper, timely, adequate, and sufficient notice of the

Motion, the Side Purchase Agreement, the Sale Hearing, the Mexico Transaction, and the deadlines related thereto, was provided in accordance with sections 102(1), 105(a), 363 and 365 of the Bankruptcy Code, Bankruptcy Rules 2002, 6004, 6006, and 9007, and Local Rules 2002-1 and 9013-1(d).  The Debtors also posted the Motion and the Side Purchase Agreement on the case website (https://cases.primeclerk.com/fieldwoodenergy/).  The notice described above was good, sufficient, and appropriate under the circumstances, provided a reasonable and adequate opportunity to object, and no other or further notice of the Motion, the Side Purchase Agreement, the Sale Hearing, or the Mexico Transaction is or shall be required.

F.      The Debtors have served and posted on the case website (https://cases.primeclerk.com/fieldwoodenergy/) the notice of potential assumption and assignment of the Key Contracts, which identifies that, in the event the Completion Date occurs prior to the Effective Date of the *Eighth Amended Joint Chapter 11 Plan of Fieldwood Energy LLC and Its Affiliated Debtors* (ECF No. 1742) (the "**Plan**"), the Key Contracts will be assumed and assigned to the Purchaser (the "**Assumption Notice**"),[3] which notice identified the amount required to cure any and all defaults and actual pecuniary losses to the non-Debtor counterparty to the Key Contracts resulting from such defaults, including, but not limited to, all claims, demands, charges, rights to refunds, and monetary and non-monetary obligations that the non-Debtor counterparties can assert under the Key Contracts, whether legal or equitable, secured or unsecured, matured or unmatured, contingent or non-contingent, liquidated or unliquidated, senior or subordinate, relating to money now owing or owing in the future, arising under or out of, in connection with, or in any way relating to, the Key Contracts (the foregoing Liabilities, collectively

---

[3] In the event the Effective Date occurs prior to the Completion Date, the Schedule of Assumed Contracts (as defined in the Plan) and cure notices previously served in connection with the confirmation of the Plan (ECF Nos. 1395, 1549) will control.

as stated in the Assumption Notice, the "**Mexico Transaction Cure Costs**") upon each non-Debtor counterparty to a Key Contract.  The service and provision of the Assumption Notice was good, sufficient, and appropriate under the circumstances, and no further notice need be given in respect of assumption and assignment of the Key Contracts or establishing the Mexico Transaction Cure Cost for any respective Key Contract.  Non-Debtor counterparties to the Key Contracts have had or will have, as applicable, an adequate opportunity to object to assumption and assignment of the applicable Key Contract and the Mexico Transaction Cure Cost set forth in the Assumption Notice (including objections related to the adequate assurance of future performance and objections based on whether applicable law excuses the non-Debtor counterparty from accepting performance by, or rendering performance to, the Purchaser for purposes of section 365(c)(1) of the Bankruptcy Code).  The deadline for a non-Debtor counterparty to file an objection to the stated Mexico Transaction Cure Costs in the Assumption Notice (a "**Cure Objection")** has expired and, to the extent any such party timely filed a Cure Objection, all such Cure Objections have been resolved, withdrawn, overruled, or continued to a later hearing by agreement of the parties.  To the extent that any non-Debtor counterparty does not timely file a Cure Objection by the applicable objection deadline listed in the Assumption Notice (the "**Cure Objection Deadline**"), such party shall be deemed to have consented to the (x) assumption and assignment of the Key Contract and (y) proposed Mexico Transaction Cure Cost set forth on the Assumption Notice.

G.      The notice described in the foregoing paragraphs is good, sufficient, and appropriate under the circumstances, and no other or further notice of the Motion, the Side Purchase Agreement, the assumption and/or assignment to the Purchaser of the Assets (including

the Key Contracts), the Sale Hearing, the Mexico Transaction, the Mexico Transaction Cure Costs, the deadlines to submit an objection, and all other deadlines related thereto, is or shall be required.

H.    **Assets Property of the Estate**.   The Assets sought to be sold and/or assigned by the Seller to the Purchaser pursuant to the Side Purchase Agreement are property of the Seller's estate and title thereto is vested in the Seller's estate.

I.    **Sufficiency of Marketing**.   The Assets were marketed as set forth in, and in accordance with, the process described in the Motion and a fair and open marketing and sale process was conducted.

J.    **Side Purchase Agreement**.   On July 2, 2021, the Seller and the Purchaser agreed to the terms of the Side Purchase Agreement, attached hereto as **Exhibit A**.

K.    **Corporate Authority**.   In the event the Effective Date of the Plan and the Credit Bid Transaction Closing (as defined in the Plan) have not occurred, subject to and giving effect to the entry of this Sale Order, the Seller (i) has full corporate power and authority to execute, deliver and perform its obligations under the Side Purchase Agreement and all other documents contemplated thereby and by this Sale Order, and the Seller's sale of the Assets has been duly and validly authorized by all necessary corporate or similar action, (ii) has all of the power and authority necessary to consummate the Mexico Transaction, and (iii) has taken all corporate action necessary to authorize and approve the Side Purchase Agreement and any actions required to be performed by the Seller or the other Debtors to consummate the Mexico Transaction.  No consents or approvals of the Seller or the other Debtors, other than those expressly provided for in the Side Purchase Agreement or this Sale Order are required for the Seller or the other Debtors to consummate the Mexico Transaction.

L.      The Side Purchase Agreement was not entered into for the purpose of hindering, delaying, or defrauding creditors under the Bankruptcy Code or under the laws of the United States, any state, territory, possession, or the District of Columbia.  Neither the Seller nor Purchaser is entering into the transactions contemplated by the Side Purchase Agreement fraudulently, including but not limited to, for the purpose of statutory and common law fraudulent conveyance and fraudulent transfer claims.

M.      The Seller is the sole and lawful owner of the Assets.  Subject to sections 363(f) and 365(a) of the Bankruptcy Code, the transfer of each of the Assets to Purchaser, in accordance with the Side Purchase Agreement and this Sale Order will be, as of the Completion Date, a legal, valid, binding and effective transfer of the Assets, which transfer vests or will vest Purchaser with all right, title, and interest to the Assets free and clear of all Encumbrances and Liabilities (other than the Assumed Obligations and as set forth in the Side Purchase Agreement). Encumbrances and Liabilities (other than the Assumed Obligations and as set forth in the Side Purchase Agreement), shall include, but not be limited to, all debts arising under, relating to, or in connection with any act of the Seller or another Debtor or claims, liabilities, obligations, demands, guaranties, options, rights, contractual commitments, restrictions, restrictive covenants, covenants not to compete, rights to refunds, escheat obligations, interests, and matters of any kind and nature, whether arising prior to or subsequent to the commencement of these chapter 11 cases, and whether imposed by agreement, applicable law, equity, or otherwise (including, without limitation, rights with respect to claims, Encumbrances and Liabilities (i) that purport to give to any party a right of setoff or recoupment against, or a right or option to effect any forfeiture, modification, profit sharing interest, right of first refusal, purchase or repurchase right or option, or termination of, any of the Debtors' or Purchaser's interests in the Assets, or any similar rights, (ii) in respect of taxes

owed by the Debtors for periods prior to the Completion Date, including, but not limited to, sales, income, use, or any other type of tax, or (iii) in respect of restrictions, rights of first refusal, charges, or interests of any kind or nature, if any, including, without limitation, any restriction of use, voting, transfer, receipt of income, or other exercise of any attributes of ownership relating to, accruing, or arising any time prior to the Completion Date, with the exception of the Assumed Obligations).

N.    **Sound Business Purpose; Sale Highest or Best Offer**.  Entry into the Side Purchase Agreement and consummation of the Mexico Transaction constitutes the exercise by the Seller of sound business judgment, and such acts are in the best interests of the Seller, its estate, creditors, and all parties in interest.  This Court finds that, in the event the Effective Date of the Plan and the Credit Bid Transaction Closing have not occurred, good and sufficient business reasons justifying the sale of the Assets to the Purchaser pursuant to the terms and conditions set forth in the Side Purchase Agreement have been articulated.

O.    The Seller has demonstrated compelling circumstances and a good, sufficient, and sound business purpose and justification for consummating the Mexico Transaction prior to the Effective Date of the Plan, as confirmed by this Court pursuant to the *Findings of Fact, Conclusions of Law, and Order (I) Confirming Eighth Amended Joint Chapter 11 Plan of Fieldwood Energy LLC and Its Affiliated Debtors and (II) Granting Related Relief* (ECF No. 1751) (the "**Confirmation Order**").  The Seller's decision to enter into the Side Purchase Agreement and consummate the Mexico Transaction constitutes a proper exercise of the fiduciary duties of the Seller and its directors, managers, and officers.  Because the entry into the Side Purchase Agreement and consummation of the Mexico Transaction constitutes the exercise by the Seller of sound business judgment, the Seller, its current and former members, managers, officers, directors,

employees, advisors, professionals or agents, shall have or incur no liability to the Seller's estate or any holder of a claim against or interest in the Seller for any act or omission in connection with, related to, or arising out of the negotiations of the Side Purchase Agreement or the consummation of the Mexico Transaction contemplated thereunder, other than liability of the Seller or the other Debtors arising out of or relating to any act or omission that constitutes a breach of the Side Purchase Agreement, gross negligence, or willful misconduct, in each case as determined by a court of competent jurisdiction.

P.      The consummation of the Mexico Transaction and the assumption and assignment of the Key Contracts on the terms set forth in the Side Purchase Agreement are legal, valid, and properly authorized under all applicable provisions of the Bankruptcy Code, including, without limitation, sections 105(a), 363(b), 363(f), 363(m), and 365 of the Bankruptcy Code, and all of the applicable requirements of such sections have been complied with in respect of the Side Purchase Agreement and the transactions contemplated thereby.

Q.      **Arm's-Length Sale and Purchaser's Good Faith**.  The Side Purchase Agreement was negotiated, proposed, and entered into by the Seller and the Purchaser, their management and their respective boards of directors or equivalent governing bodies, officers, directors, employees, agents, professionals, and representatives, without collusion or fraud, in good faith within the meaning of section 363(m) of the Bankruptcy Code, and as the result of arm's length bargaining positions and is substantively and procedurally fair to all parties.  The Purchaser is not an "insider" of any of the Debtors, as that term is defined in section 101(31) of the Bankruptcy Code.  All payments to be made by the Purchaser and other agreements or arrangements entered into by the Purchaser in connection with the Mexico Transaction have been disclosed and the Purchaser has not engaged in any conduct that would cause or permit the Mexico

Transaction or the Side Purchase Agreement to be avoided or subject to monetary damages under section 363(n) of the Bankruptcy Code.  Specifically, the Purchaser has not acted in a collusive manner with any person and the Purchase Price was not controlled by any agreement among potential purchasers.  The Purchaser is purchasing the Assets, in accordance with the Side Purchase Agreement, in good faith, and is a "good faith purchaser" within the meaning of section 363(m) of the Bankruptcy Code and is therefore entitled to all of the protections afforded thereby, including in the event this Sale Order or any portion thereof is reversed or modified on appeal, and the Purchaser has proceeded in good faith in all respects in connection with the Mexico Transaction specifically and these chapter 11 cases generally.

R.    **No Fraudulent Transfer**.    The total consideration provided by the Purchaser pursuant to the Side Purchase Agreement constitutes reasonably equivalent value and fair consideration under the Bankruptcy Code, the Uniform Fraudulent Transfer Act, the Uniform Fraudulent Conveyance Act, the Texas Uniform Fraudulent Transfer Act, Tex. Bus. & Com. Code Ann. § 24.004-006 (West 2019), and any other applicable law and may not be avoided under section 363(n) of the Bankruptcy Code or any other applicable law.  The Side Purchase Agreement was not entered into, and the Mexico Transaction is not being consummated, for the purpose of hindering, delaying, or defrauding creditors of the Debtors under the Bankruptcy Code or under the laws of the United States, any state, territory, possession thereof, or the District of Columbia, or any other applicable law.  Neither the Debtors nor the Purchaser have entered into the Side Purchase Agreement or is consummating the Mexico Transaction with any fraudulent or otherwise improper purpose.

S.    **Free and Clear Transfer Required by Purchaser**.  Without selling the Assets free and clear of all Encumbrances and Liabilities (other than the Assumed Obligations and

as set forth in the Side Purchase Agreement), the Purchaser would not have entered into the Side Purchase Agreement and would not consummate the Mexico Transaction.

T.     **Vesting of Assets**.  As of the Completion Date, pursuant and subject to the terms of the Side Purchase Agreement and this Sale Order, the Mexico Transaction will effect a legal, valid, enforceable, and effective transfer of the Assets and will vest the Purchaser with all rights, title, and interests in the Assets free and clear of all Encumbrances and Liabilities of any kind or nature whatsoever (other than the Assumed Obligations and as set forth in the Side Purchase Agreement) with such Encumbrances and Liabilities attaching to the proceeds with the same nature, validity, priority, extent, perfection, force and effect that such Encumbrances and Liabilities encumbered the Assets immediately prior to the entry of this Sale Order.

U.     **Satisfaction of Section 363(f) Standards**.  The Debtors are authorized to sell the Assets free and clear of all Encumbrances and Liabilities (other than Assumed Obligations and as set forth in the Side Purchase Agreement) (with such Encumbrances and Liabilities attaching to the proceeds with the same nature, validity, priority, extent, perfection, and force and effect that such Encumbrances or Liabilities encumbered the Assets immediately prior to the entry of this Sale Order) because, with respect to each creditor or other person or entity asserting an Encumbrance or Liability, one or more of the standards set forth in section 363(f)(l)-(5) of the Bankruptcy Code has been satisfied.   Each creditor or other person or entity asserting an Encumbrance or Liability in the Assets (i) has, subject to the terms and conditions of this Sale Order, consented to the Mexico Transaction or is deemed to have consented to the Mexico Transaction, (ii) could be compelled in a legal or equitable proceeding to accept money satisfaction of such Encumbrances or Liabilities, or (iii) otherwise falls within the provisions of section 363(f) of the Bankruptcy Code.  Those holders of Encumbrances or Liabilities who did not object (or who

ultimately withdrew their objections, if any) to the Mexico Transaction or the Motion are deemed, subject to the terms of this Sale Order, to have consented to the Motion and the Mexico Transaction pursuant to section 363(f)(2) of the Bankruptcy Code.  All holders of Encumbrances or Liabilities (other than the Assumed Obligations and as set forth in the Side Purchase Agreement) are adequately protected by having their Encumbrances or Liabilities, if any, attach to the proceeds received by the Debtors (if any) that are ultimately attributable to the Assets against or in which such Encumbrances or Liabilities are asserted, subject to the terms of such Encumbrances or Liabilities, with the same nature, validity, priority, extent, perfection, and force and effect that such Encumbrances or Liabilities encumbered the Assets immediately prior to the entry of this Sale Order, subject to any claims and defenses the Debtors or their estates, as applicable, may possess with respect thereto.

V.   **Personally Identifiable Information**.  The sale, conveyance, assignment and transfer of any personally identifiable information pursuant to the terms of the Side Purchase Agreement and this Sale Order complies with the terms of the Debtors' policy regarding the transfer of such personally identifiable information as of the Petition Date and, as a result, consummation of the Mexico Transaction is permitted pursuant to section 363(b)(1)(A) of the Bankruptcy Code.  Accordingly, appointment of a consumer privacy ombudsman in accordance with sections 363(b)(1) or 332 of the Bankruptcy Code is not required with respect to the Mexico Transaction.

W.   **No Successor Liability**.  Neither the Purchaser nor any of its Affiliates are successors to the Debtors or their estates by reason of any theory of law or equity, and neither the Purchaser nor any of its Affiliates shall assume, or in any way be responsible for, any liability or obligation of any of the Debtors and/or their estates, other than the Assumed Obligations, to the

extent provided in the Side Purchase Agreement; *provided* that nothing in this Sale Order or the Side Purchase Agreement:  releases, nullifies, precludes, or enjoins the enforcement of any police or regulatory liability to a Governmental Authority that any entity would be subject to as the post-sale owner or operator of property after the date of entry of this Sale Order; authorizes the transfer or assignment of any governmental (a) license, (b) permit, (c) registration, (d) authorization, or (e) approval, or the discontinuation of any obligation thereunder, without compliance with all applicable legal requirements and approvals under police or regulatory law; or divests any tribunal of any jurisdiction it may have under police or regulatory law to interpret this Sale Order or to adjudicate any defense asserted under this Sale Order.

X.   **Assigned Contracts**.  Each and every provision of the Key Contracts or applicable non-bankruptcy law that purports to prohibit, restrict, or condition, or could be construed as prohibiting, restricting, or conditioning assignment of any Key Contract has been satisfied or is otherwise unenforceable under section 365 of the Bankruptcy Code.   All counterparties of the Key Contracts that did not timely file an objection to the assumption and/or assignment of the Key Contract(s) to which they are a counterparty are deemed to consent to the assumption and/or assignment by the Debtors of their Key Contract to the Purchaser or its designee(s), and the Purchaser shall enjoy all of the rights and benefits under each such Key Contract as of the applicable date of assumption and assignment without the necessity of obtaining such non-Debtor party's written consent to the assumption or assignment thereof.   Upon the assignment and sale to the Purchaser or its designee(s) in accordance with the terms of the Side Purchase Agreement, the Key Contracts shall be deemed valid and binding, in full force and effect in accordance with their terms, subject to the provisions of this Sale Order, and shall be assigned and transferred to the Purchaser or its designee(s), notwithstanding any provision in the Key

Contracts prohibiting or otherwise restricting assignment or transfer, and the Debtors, their estates, or any of their predecessors, successors, or assigns, shall have no further liability or obligation under the Key Contracts other than as to any Retained Obligations thereunder.  The Debtors have demonstrated that it is an exercise of their sound business judgment to assume and/or assign the Key Contracts to the Purchaser or its designee(s) in connection with the consummation of the Mexico Transaction, and the assumption and/or assignment of the Key Contracts is in the best interests of the Debtors, their estates, their creditors, and other parties in interest.  The Key Contracts being assigned to the Purchaser or its designee(s) are an integral part of the Mexico Transaction and, accordingly, their assumption and/or assignment is reasonable.

    Y. **Cure/Adequate Assurance**.  The assumption and assignment of the Key Contracts is integral to the Mexico Transaction and the transactions contemplated by the Side Purchase Agreement, and is in the best interests of the Debtors and their estates, their creditors, and all other parties in interest, and represents a reasonable exercise of sound and prudent business judgment by the Debtors.  Pursuant to the Side Purchase Agreement, the Mexico Transaction Cure Costs, if any, will be paid by the Debtors in accordance with the terms of the Side Purchase Agreement.  The Purchaser or its designee(s) has demonstrated adequate assurance of future performance of each Key Contract within the meaning of section 365 of the Bankruptcy Code, by the Purchaser or any of its permitted designee(s) to which such Key Contract is assumed and assigned by the Seller, including a commitment of performance with respect to the Key Contracts from and after the Completion Date.  The Mexico Transaction Cure Costs are deemed the amounts necessary to "cure" (within the meaning of section 365(b)(l) of the Bankruptcy Code) all "defaults" (within the meaning of section 365(b) of the Bankruptcy Code) under such Key Contracts.  Except as set forth herein, any objections to the Mexico Transaction Cure Costs with respect to the Key

Contracts are hereby overruled.  The Debtors are authorized to resolve any pending disputes with respect to any Mexico Transaction Cure Cost without need for further order of the Court.  To the extent that any counterparty failed to timely object to its Mexico Transaction Cure Cost or to raise any other alleged default or breach of contract, such counterparty is deemed to have consented to such Mexico Transaction Cure Cost and to the assignment of its respective Key Contract(s) to the Purchaser or its designee(s) and to have waived any other defaults or breaches.  The Court finds that with respect to all Key Contracts, the payment of the Mexico Transaction Cure Costs as provided in the Side Purchase Agreement is reasonable and appropriate and is deemed to fully satisfy the Debtors' obligations under sections 365(b) and 365(f) of the Bankruptcy Code. Accordingly, all of the requirements of sections 365(b) and 365(f) of the Bankruptcy Code have been satisfied for the assumption by the Debtors, and the assignment to the Purchaser or its designee(s), of each Key Contract to be assumed and assigned to the Purchaser or its designee(s) as of the Completion Date.

Z.     **Assets Assignable**.  Each and every provision of the documents governing the Assets or applicable non-bankruptcy law (other than this Sale Order and the Side Purchase Agreement) that purports to prohibit, restrict, or condition, or could be construed as prohibiting, restricting, or conditioning assignment of any of the Assets, if any, have been, or will be, satisfied or are otherwise unenforceable under section 365 of the Bankruptcy Code.

AA.     **Final Order**.  This Sale Order constitutes a final order within the meaning of 28 U.S.C. § 158(a).  Notwithstanding Bankruptcy Rules 6004(h) and 6006(d), and to any extent necessary under Bankruptcy Rule 9014 and Rule 54(b) of the Federal Rules of Civil Procedure, as made applicable by Bankruptcy Rule 7054, this Court expressly finds that there is no just reason for delay in the implementation of this Sale Order, waives any stay, and expressly directs entry of

15

judgment as set forth herein.  Purchaser, being a good faith purchaser under section 363(m) of the Bankruptcy Code, may close the transactions contemplated by the Side Purchase Agreement at any time subject to the terms and conditions of the Side Purchase Agreement.

**IT IS THEREFORE ORDERED, ADJUDGED AND DECREED THAT:**

1.     **Objections Overruled**.  All objections, if any, to the entry of this Sale Order or with regard to the relief granted herein and requested in the Motion that have not been withdrawn, waived, settled, or otherwise resolved as expressly provided herein, on the record at the Sale Hearing (the full record of which is incorporated herein by reference), by stipulation filed with the Court, or by representation by the Debtors in a separate pleading, and all reservations of rights included therein, if any, are hereby overruled on the merits, with prejudice.  All objections to the entry of this Sale Order or to the relief granted herein that were not timely filed are hereby forever barred.

2.     **Approval**.  Pursuant to sections 105, 363, and 365 of the Bankruptcy Code, the Side Purchase Agreement, the other Purchase Documents, the sale, assignment, conveyance and deliverance of all right, title, and interest in and to the Assets to the Purchaser as of the Completion Date are hereby approved, and the Debtors are authorized and directed to consummate the Mexico Transaction, including the sale, assignment, conveyance and deliverance of all of the Seller's right, title, and interest in, to, and under the Assets to the Purchaser free and clear of any and all Encumbrances or Liabilities (other than the Assumed Obligations and as set forth in the Side Purchase Agreement) in accordance with the terms of and subject to the satisfaction or waiver of the conditions to the Seller's obligations to consummate the Mexico Transaction set forth in the Side Purchase Agreement, with such Encumbrances or Liabilities attaching to the proceeds with the same nature, validity, priority, extent, perfection, and force and effect that such Encumbrances

or Liabilities encumbered the Assets immediately prior to the entry of this Sale Order.  Pursuant

to sections 105, 363, and 365 of the Bankruptcy Code, the Debtors and the Purchaser are each

hereby authorized and directed to take any and all actions necessary or appropriate to

(i) consummate the Mexico Transaction, (ii) enter into the Purchase Documents, (iii) assume

and/or assign the Key Contracts, (iv) perform the obligations of the Debtors under the Side

Purchase Agreement, the other Purchase Documents, and any and all additional instruments and

documents that may be contemplated by or reasonably necessary or desirable to implement the

Side Purchase Agreement and consummate, implement, and close fully the Mexico Transaction

and the other transactions contemplated by the Side Purchase Agreement prior to or after the

Completion Date without further order of this Court, and (v) enforce the terms of this Sale Order.

The Purchaser and the Debtors shall have no obligation to consummate the Mexico Transaction

except as is contemplated by and provided for in the Side Purchase Agreement.  The Purchaser

shall not be required to seek or obtain relief from the automatic stay under section 362 of the

Bankruptcy Code to enforce any of its remedies under the Side Purchase Agreement or any other

Purchase Document.  The automatic stay imposed by section 362 of the Bankruptcy Code is

modified solely to the extent necessary to implement the provisions of this Sale Order.

        3.      **Binding Effect of Sale Order**.  This Sale Order and the Side Purchase

Agreement shall be binding in all respects, subject to Paragraph 4 below, upon the Debtors, their

estates, all creditors of, and holders of equity interests in, the Debtors, any holders of

Encumbrances or Liabilities in, against, or on all or any portion of the Assets (whether known or

unknown), the Purchaser and respective successors and permitted assigns of the Purchaser

notwithstanding the dismissal of any of the Debtors' cases or any subsequent appointment of any

trustees, examiners, "responsible persons," or other fiduciaries in these chapter 11 cases or upon a

conversion to a case under chapter 7 of the Bankruptcy Code, and the Side Purchase Agreement shall not be subject to rejection or avoidance under any circumstances. If any order under section 1112 of the Bankruptcy Code is entered, such order shall provide, or be deemed to provide (in accordance with sections 105 and 349 of the Bankruptcy Code) that this Sale Order, including the rights granted to the Purchaser hereunder, shall remain effective and, notwithstanding such dismissal, shall remain binding on parties in interest. This Sale Order and the Side Purchase Agreement shall inure to the benefit of the Debtors, their estates and creditors, the Purchaser, and the respective successors and assigns of each of the foregoing.

4. In the event the Completion Date occurs prior to the Effective Date of the Plan and the Credit Bid Transaction Closing, the Confirmation Order, the Plan, and the Credit Bid Purchase Agreement shall be subject to the terms of this Sale Order and the Side Purchase Agreement. In the event the Effective Date of the Plan and the Credit Bid Transaction Closing occurs prior to the Completion Date of the Side Purchase Agreement, and therefore the Credit Bid Purchaser becomes the owner of, among other things, the Assets, this Sale Order shall be null and void, and the Confirmation Order, the Plan, and the Credit Bid Purchase Agreement shall control. Except as provided in Paragraphs 4 and 31, the Side Purchase Agreement, this Sale Order, and obligations therein and herein shall not be altered, impaired, amended, rejected, discharged, or otherwise affected by any subsequent order of this Court, except as specifically provided for in the Side Purchase Agreement, without the prior written consent of the Purchaser; *provided* that nothing herein (including the nullification of this Sale Order) shall effect the validity or the enforceability of the Side Purchase Agreement as between Purchaser and the Credit Bid Purchaser.

5. **No Material Modifications**. The Side Purchase Agreement and any related agreements, documents, or other instruments in effect as of the date hereof may be modified,

amended, or supplemented through a written document signed by the parties thereto in accordance with the terms thereof without further order of this Court; *provided* that any such modification, amendment, or supplement does not have a material adverse effect on the Debtors or their estates.

6.     **Transfer of Assets Free and Clear**.  Pursuant to sections 105(a), 363(b), and 363(f) of the Bankruptcy Code, the Seller is authorized to transfer the Assets to Purchaser in accordance with the Side Purchase Agreement, and such transfer shall constitute a legal, valid, binding, and effective transfer of such Assets and shall vest Purchaser with title in and to the Assets and, other than the Assumed Obligations, Purchaser shall take title to and possession of the Assets free and clear of all Encumbrances, Liabilities and other interests of any kind or nature whatsoever (other than the Assumed Obligations and as set forth in the Side Purchase Agreement.  For purposes of this Sale Order, "Encumbrance," and "Liability" shall mean:

(i)     with respect to any property or asset, any charge, lien (including a "lien" as defined in section 101(37) of the Bankruptcy Code), claim (including a "claim" as defined in section 101(5) of the Bankruptcy Code), mortgage, lease, sublease, hypothecation, deed of trust, pledge, security interest, option, attachment, security interest, right to acquire, right of usufruct, right of use or possession, right of first offer or first refusal, drag-along or tag-along right, preemptive right, easement, right of way, servitude, restrictive covenant, encroachment, encumbrance, community property interest, third party interest or other restriction or limitation of any kind (including any restriction on use, voting, transfer, receipt of income, or exercise of any other attribute of ownership), whether arising prior to or after the commencement of the chapter 11 cases and whether voluntarily incurred or arising by operation of Law (each, an "**Encumbrance**" and collectively, "**Encumbrances**");

(ii)    any debt, obligation, duty, commitment or liability of any nature (including any unknown, undisclosed, unliquidated, unmatured, unaccrued, unasserted, contingent, indirect, conditional, implied, vicarious, derivative, joint, several or secondary liability), regardless of whether such debt, obligation, duty, commitment or liability would be required to be disclosed on in financial statements prepared in accordance with applicable generally accepted accounting principles or disclosed in the notes thereto and regardless of whether such debt, obligation, duty or liability is immediately due and payable (each a "**Liability**" and collectively, "**Liabilities**");

in each case, whether in law or in equity, known or unknown, choate or inchoate, filed or unfiled, scheduled or unscheduled, noticed or unnoticed, recorded or unrecorded, perfected or unperfected, allowed or disallowed, contingent or non-contingent, liquidated or unliquidated, matured or unmatured, material or non-material, disputed or undisputed, direct or indirect, and whether arising by agreement, understanding, law, equity or otherwise, and whether occurring or arising before, on or after the Petition Date, or occurring or arising prior to the Completion Date and including, but not limited to, successor or successor-in-interest liability.   Any and all Encumbrances and Liabilities (other than the Assumed Obligations and as set forth in the Side Purchase Agreement) shall attach to the proceeds with the same nature, validity, priority, extent, perfection, and force and effect that such Encumbrances or Liabilities encumbered the Assets immediately prior to the entry of this Sale Order, subject to any claims, defenses, and objections, if any, that the Debtors or their estates may possess with respect thereto.

7.       All persons and entities that are in possession of some or all of the Assets on the Completion Date are directed to surrender possession of such Assets to Purchaser in accordance with the Side Purchase Agreement on the Completion Date or at such time thereafter as Purchaser may request.   On the Completion Date, each of the Debtors' creditors is authorized to execute such documents and take all other actions as may be reasonably necessary to release its Encumbrances, Liabilities or other interests in the Assets, if any, other than Assumed Obligations, as such Encumbrances or Liabilities may have been recorded or may otherwise exist.

8.       If any person or entity that has filed statements or other documents or agreements evidencing Encumbrances or Liabilities (other than Assumed Obligations) on, against, or in, all or any portion of the Assets (other than statements or documents with respect to the Assumed Obligations) shall not have delivered to the Debtors prior to the Completion Date, in

proper form for filing and executed by the appropriate parties, termination statements, instruments of satisfaction, releases of liens and easements, and any other documents necessary for the purpose of documenting the release of such Encumbrances, Liabilities, liens, claims, interests, or other interests that the person or entity has or may assert with respect to all or any portion of the Assets, the Debtors are hereby authorized, and Purchaser is hereby authorized, to execute and file such statements, instruments, releases, and other documents on behalf of such person or entity with respect to the Assets and otherwise seek relief from the Court pursuant to this Sale Order, if necessary.

9.      **No Bulk Sales**.  No bulk sales laws or any similar law of any state or other jurisdiction shall apply in any way to the Mexico Transaction, the Motion, or this Sale Order.

10.     **Valid Transfer**.  Effective upon the Completion Date, the transfer to the Purchaser of the Debtors' right, title, and interest in the Assets pursuant to the Side Purchase Agreement shall be, and hereby is deemed to be, a legal, valid, and effective transfer of the Debtors' right, title, and interest in the Assets, and vests with, or will vest in, the Purchaser all right, title, and interest of the Debtors in the Assets, free and clear of all Encumbrances and Liabilities (other than the Assumed Obligations as set forth in the Side Purchase Agreement).

11.     **Transfer of Title**.  On the Completion Date, this Sale Order shall be construed and shall constitute for any and all purposes a full and complete general assignment, conveyance, and transfer of all of the Seller's right, title, and interest in the Assets (as of the date hereof) pursuant to the terms of the Side Purchase Agreement.  This Sale Order is and shall be effective as a determination that, on the Completion Date, all Encumbrances, Liabilities or other interests of any kind or nature whatsoever existing as to the Assets prior to the Completion Date, other than the Assumed Obligations, shall have been unconditionally released, discharged, and

terminated, and that the conveyances described herein have been effected. This Sale Order shall be binding upon and govern the acts of all persons and entities, including, without limitation, all filing agents, filing officers, title agents, title companies, recorders of mortgages, recorders of deeds, registrars of deeds, administrative agencies, governmental departments, secretaries of state, federal, state, and local officials, and all other persons and entities who may be required by operation of law, the duties of their office, or contract, to accept, file, register, or otherwise record or release any documents or instruments, or who may be required to report or insure any title or state of title in or to any lease, and each of the foregoing persons and entities is hereby directed to accept for filing any and all of the documents and instruments necessary and appropriate to consummate the transactions contemplated by the Side Purchase Agreement. A certified copy of this Sale Order may be filed with the appropriate clerk and/or recorded with the recorder to act to cancel any Encumbrances, Liabilities and other interests of record except those assumed as Assumed Obligations.

12.  **Governmental Authorization to Effectuate Sale and Assignments**.

[Each and every federal, state, and governmental agency or department, and any other person or entity, is hereby authorized to accept any and all documents and instruments in connection with or necessary to consummate the Mexico Transaction. Except as otherwise provided in this Sale Order, to the greatest extent available under applicable law upon the Completion Date, the Purchaser shall be authorized, as of the Completion Date, to operate under any license, permit, registration, and governmental authorization or approval of the Debtors with respect to the Assets, and all such licenses, permits, registrations, and governmental authorizations and approvals are deemed to have been, and hereby are, deemed to be transferred to the Purchaser as of the Completion Date. No Governmental Authority may revoke or suspend any lawful right, license,

trademark, or other permission relating to the use of the Assets sold, transferred, or conveyed to the Purchaser on account of the filing or pendency of these chapter 11 cases or the consummation of the Mexico Transaction.  For the avoidance of doubt, the Mexico Transaction authorized herein shall be of full force and effect, regardless of whether the Debtors or any of their Affiliates lack good standing in any jurisdiction in which such entity is formed or is authorized to transact business.]

13.     **Authorization to Assign**.  Notwithstanding any provision of any contract governing the Assets, including any Key Contract to be assumed and/or assigned to the Purchaser or its designee(s) as of the Completion Date, pursuant to section 365(f) of the Bankruptcy Code or applicable non–bankruptcy law that prohibits, restricts, or conditions the assignment of the Assets, including any Key Contract, at or after the Completion Date, the Debtors are authorized to (i) assign the Assets to the Purchaser and (ii) assume and/or assign the Key Contracts to the Purchaser or its designee(s) as of the Completion Date, in each case, which assignments shall take place on and be effective as of the Completion Date or such other date after the Completion Date, in each case, as provided in the Side Purchase Agreement or as otherwise provided by a separate order of this Court.

(i)     With respect to the Key Contracts:  (a) each Key Contract is an executory contract or unexpired lease under section 365 of the Bankruptcy Code; (b) the Debtors may assume each of the Key Contracts in accordance with section 365 of the Bankruptcy Code; (c) the Debtors may assign each Key Contract in accordance with sections 363 and 365 of the Bankruptcy Code, and any provisions in any Key Contract that prohibit or condition the assignment of such Key Contract or allow the party to such Key Contract to terminate, recapture, impose any penalty, condition, renewal, or extension, or modify any term or condition upon the assignment of such Key Contract, constitute unenforceable anti-assignment provisions which are void and of no force and effect; (d) all other requirements and conditions under sections 363 and 365 of the Bankruptcy Code for the assumption by the Debtors and assignment to Purchaser of each Key Contract, in accordance with the Side Purchase Agreement, have been satisfied; (e) the Key Contracts shall be

transferred and assigned to, and following the Completion Date, remain in full force and effect for the benefit of Purchaser in accordance with the Side Purchase Agreement, notwithstanding any provision in any such Key Contract (including those of the type described in sections 365(b)(2) and (f) of the Bankruptcy Code) that prohibits, restricts, or conditions such assignment or transfer and, pursuant to section 365(k) of the Bankruptcy Code, the Debtors shall be relieved from any further liability with respect to the Key Contracts after such assignment to and assumption by the Purchaser in accordance with the Side Purchase Agreement; and (f) upon the Completion Date, in accordance with sections 363 and 365 of the Bankruptcy Code, the Purchaser shall be fully and irrevocably vested in all right, title, and interest of each Key Contract.

(ii)   There shall be no accelerations, assignment fees, increases, or any other fees charged to the Purchaser or the Debtors as a result of the assignment of the Assets or the assumption and/or assignment of the Key Contracts.

(iii)   The Debtors have met all of the requirements of section 365(b) of the Bankruptcy Code for each of the Key Contracts to be assumed and assigned to the Purchaser as of Completion Date.  Notwithstanding the foregoing, unless required by the Purchaser under the Side Purchase Agreement for the Debtors to assume and/or assign any Key Contract, no Debtor shall be required by the Court to assume and/or assign any Key Contract, and, if no such assumption and assignment occurs, no Mexico Transaction Cure Costs shall be due and no adequate assurance of future performance shall be required with respect to any such Key Contract.

(iv)   In respect of the assignment pursuant to the Mexico Transaction, any provisions in any of the Key Contracts that prohibit or condition the assignment of such Key Contract on the consent of a non-Debtor counterparty to such Key Contract thereto or allow the non-Debtor counterparty to such Key Contract to terminate, recapture, impose any penalty, condition, renewal or extension, or modify any term or condition upon the assignment of such Key Contract, shall constitute unenforceable anti-assignment provisions which are expressly preempted under section 365 of the Bankruptcy Code and be void and of no force or effect.

(v)   The Debtors' assumption and/or assignment of the Key Contracts is subject to the consummation of the Mexico Transaction with the Purchaser.  To the extent that an objection by a counterparty to any Key Contract related to the applicable Mexico Transaction Cure Cost, is not resolved prior to the Completion Date, the Purchaser may, without any further approval of the Court or notice to any party, elect to (a) not have the Debtors assume and/or assign such Key Contract to it, or (b) have the Debtors postpone the assumption and/or assignment of such Key Contract until the resolution of such objection; *provided*, *however,* that the Debtors, the Purchaser, and the relevant non-debtor counterparty under each Key Contract shall have

24

authority to compromise, settle, or otherwise resolve any objections to proposed Mexico Transaction Cure Costs without further order of, or notice to, this Court, with any such agreed upon Mexico Transaction Cure Costs being paid to the appropriate counterparty by the Debtors as a condition subsequent to such assumption and/or assignment of the relevant Key Contract.

14.     **Assigned Contracts**.  Subject to the provisions of this Sale Order and in accordance with the Side Purchase Agreement and sections 105(a) and 365 of the Bankruptcy Code, the Seller is authorized to (a) assume and assign to the Purchaser, in accordance with the Side Purchase Agreement, effective upon the Completion Date, all Key Contracts and other Assets, including Assets constituting real property interests (including any and all interests, rights, and related agreements with respect to the Sublease Agreement), free and clear of all Encumbrances or Liabilities (other than any Assumed Obligations) and (b) execute and deliver to the Purchaser such documents or other instruments as Purchaser deems may be reasonably necessary to assign and transfer the Key Contracts and Assumed Obligations to the Purchaser in accordance with the Side Purchase Agreement.  As of the Completion Date, the Purchaser shall succeed to the entirety of the Debtors' rights and obligations in the Key Contracts to be assumed and assigned to the Purchaser first arising and attributable to the time period occurring on or after the Completion Date and shall have all rights thereunder.

(i)     Upon the Completion Date, (a) all defaults (monetary and non-monetary) arising or accruing prior on or prior to the Completion Date (without giving effect to any acceleration clauses or any default provisions of the kind specified in section 365(b)(2) of the Bankruptcy Code) under the Key Contracts shall be deemed cured and satisfied in full through the payment of the Mexico Transaction Cure Costs in accordance with the Side Purchase Agreement, (b) no other amounts will be owed by the Debtors, their estates, or, other than the Assumed Obligations, the Purchaser with respect to amounts first arising or accruing, during, or attributable or related to, the period before Completion Date with respect to such Key Contracts, and (c) any and all persons or entities shall be forever barred and estopped from asserting a claim against the Debtors, their estates, the Purchaser, or the Assets that any additional amounts are due or defaults exist under such Key Contracts that arose or accrued, or relate to or are attributable to the period

before the Completion Date (other than claims against Purchaser with respect to the Assumed Obligations).

(ii)    Upon assumption of those Key Contracts to be assumed by the Debtors and/or assigned to the Purchaser as of the Completion Date, such Key Contracts shall be deemed valid and binding, in full force and effect in accordance with their terms, subject to the provisions of this Sale Order, and shall be assigned and transferred to the Purchaser, notwithstanding any provision in such Key Contract or other restrictions prohibiting assignment or transfer. To the extent any Key Contract is assumed and/or assigned to the Purchaser under this Sale Order, such assumption and/or assignment will not take effect until the Completion Date. Furthermore, other than the Key Contracts, no other contract shall be deemed assumed by the Debtors and/or assigned to the Purchaser pursuant to section 365 of the Bankruptcy Code under this Sale Order. The failure of the Debtors or the Purchaser to enforce at any time one or more terms or conditions of any Key Contract shall not be a waiver of such terms or conditions, or of the Debtors' and the Purchaser's rights to enforce every term and condition of such Key Contract.

(iii)   All counterparties to the Key Contracts to be assumed and assigned to Purchaser as of the Completion Date shall cooperate and expeditiously execute and deliver, upon the reasonable request of the Purchaser, and shall not charge the Debtors or the Purchaser for, any instruments, applications, consents, or other documents which may be required or requested by any public or quasi-public authority or other party or entity to effectuate the applicable transfers in connection with the Mexico Transaction.

(iv)    Upon the Debtors' assignment of the Key Contracts to the Purchaser under the provisions of this Sale Order and any additional orders of this Court and payment of any Mexico Transaction Cure Costs by the Debtors, no default shall exist under any Key Contract, and no counterparty to any Key Contract shall be permitted (a) to declare a default by Purchaser under such Key Contract or (b) otherwise take action against the Purchaser as a result of Debtors' financial condition, bankruptcy, or failure to perform any of their obligations under the relevant Key Contract. Each non-Debtor party to a Key Contract hereby is also forever barred, estopped, and permanently enjoined from (x) asserting against the Debtors or Purchaser, or the property of any of them, any default or claim arising out of any indemnity obligation or warranties for acts or occurrences arising prior to or existing as of the Completion Date, including those constituting Retained Obligations or, against Purchaser, any counterclaim, defense, setoff, recoupment, or any other Claim asserted or assertable against the Debtors, and (y) imposing or charging against Purchaser any rent accelerations, assignment fees, increases, or any other fees as a result of the Debtors' assumption and assignment to Purchaser of any Key Contract in accordance with the Side Purchase Agreement. The validity of such assumption and assignment of

each Key Contract shall not be affected by any dispute between the Debtors and any non-Debtors party to a Key Contract relating to such contract's respective Mexico Transaction Cure Costs.

15.      **No Successor Liability**.  Neither the Purchaser nor any of its Affiliates are or shall be deemed, as a result of the consummation of the Mexico Transaction, to (i) be legal successors to the Seller or any of the other Debtors or their respective estates by reason of any theory of law or equity, (ii) have, de facto or otherwise, merged with or into the Seller or any of the other Debtors, (iii) be an alter ego or a mere continuation or substantial continuation or successor of the Seller or any of the other Debtors in any respect, or (iv) be liable or have any Liability for any acts or omissions of Seller or any of the other Debtors in the conduct of their businesses or arising under or related to the Assets other than as expressly set forth and agreed in the Side Purchase Agreement.  Neither the Purchaser nor any of its Affiliates shall assume or in any way be responsible for any liability or obligation of any of the Debtors or their estates, other than the Assumed Obligations, to the extent provided in the Side Purchase Agreement.  Without limiting the generality of the foregoing, and except as otherwise expressly provided in the Side Purchase Agreement, the Parties intend that Purchaser shall have no Liability for any Encumbrance (other than the Assumed Obligations) against Seller or any of Seller's predecessors or Affiliates, and Purchaser shall have no successor or vicarious liability of any kind or character whether known or unknown as of the Completion Date or in connection with the transactions contemplated to occur on the Completion Date, whether now existing or hereafter arising, or whether fixed or contingent, with respect to the businesses of Seller, the Assets or any Liability of Seller arising prior to, or relating to any period occurring prior to, the Completion Date.

16.      **Release of Interests**.  Effective upon the Completion Date, this Sale Order (i) is and shall be effective as a determination that all Encumbrances or Liabilities (other than the Assumed Obligations) of any kind or nature whatsoever existing as to the Assets prior to the

Completion Date have been unconditionally released, discharged, and terminated (with such Encumbrances or Liabilities, if any, attaching to the proceeds with the same nature, validity, priority, extent, perfection, force and effect that such Encumbrances or Liabilities encumbered the Assets immediately prior to the entry of this Sale Order) and that the conveyances described herein have been effected, (ii) is and shall be binding upon and shall govern the acts of all entities, including all filing agents, filing officers, title agents, title companies, recorders of mortgages, recorders of deeds, registrars of deeds, administrative agencies or units, governmental departments or units, secretaries of state, federal, state and local officials and all other persons and entities who may be required by operation of law, the duties of their office, or contract, to accept, file, register or otherwise record or release any documents or instruments, or who may be required to report or insure any title or state of title in or to the Assets conveyed to the Purchaser, and all recorded Encumbrances or Liabilities (other than the Assumed Obligations) against the Assets shall be deemed stricken from such entities records, official and otherwise.

17.   **Approval to Release Interests**.  If any person or entity that has filed financing statements, mortgages, mechanic's liens, or other documents or agreements evidencing Encumbrances or Liabilities against or on the Assets shall not have delivered to the Debtors before the Completion Date, in proper form for filing and executed by the appropriate parties, termination statements, instruments of satisfaction, releases of liens and easements, and any other documents necessary for the purpose of documenting the release of all Encumbrances or Liabilities (other than Assumed Obligations) that the person or entity has or may assert with respect to the Assets, the Debtors and the Purchaser are each hereby authorized to execute and file such statements, instruments, releases, and other documents on behalf of such person or entity with respect to the Assets.  The Purchaser is hereby authorized to file, register, or otherwise record a certified copy

of this Sale Order, which, once filed, registered, or otherwise recorded, shall constitute conclusive evidence of the release of all Encumbrances or Liabilities against the Assets (other than the Assumed Obligations).  This Sale Order is deemed to be in recordable form sufficient to be placed in the filing or recording system of each and every federal, state, or local government agency, department, or office.

18.    **Surrender of Possession**.  Any and all Assets in the possession or control of any person or entity, including any vendor, supplier, or employee of the Debtors shall be transferred to the Purchaser free and clear of all Encumbrances [or Liabilities], except for the Assumed Obligations, with such Encumbrances [or Liabilities] attaching to the proceeds with the same nature, validity, priority, extent, perfection, and force and effect that such Encumbrances [or Liabilities] encumbered the Assets immediately prior to the entry of this Sale Order, and shall be delivered to the Purchaser and deemed delivered at the time of Completion Date (or such other time as provided in the Side Purchase Agreement).

19.    **Exculpation**.  Because the entry into the Side Purchase Agreement and the other Purchase Documents, and the consummation of the Mexico Transaction constitute the exercise by the Debtors of sound business judgment, the Debtors, their respective current and former members, managers, officers, directors, employees, advisors, professionals or agents, shall neither have, nor incur, any liability to the estates or any holder of a claim against or interest in the Debtors for any act or omission in connection with, related to, or arising out of the negotiations of the Side Purchase Agreement or the consummation of the Mexico Transaction contemplated thereunder, other than liability of the Debtors arising out of or relating to any act or omission that constitutes a breach of the Side Purchase Agreement, gross negligence, or willful misconduct, in each case as determined by a court of competent jurisdiction pursuant to a final order.

20.      **Governmental Liabilities**.  Nothing in this Sale Order or the Side Purchase Agreement releases, nullifies, precludes or enjoins the enforcement of any police or regulatory liability to a governmental unit that any entity would be subject to as the post-sale owner or operator of property after the date of entry of this Sale Order.  Nothing in this Sale Order or the Side Purchase Agreement authorizes the transfer or assignment of any governmental (a) license, (b) permit,  (c) registration,  (d) authorization,  or  (e) approval,  or  the  discontinuation  of  any obligation thereunder, without compliance with all applicable legal requirements and approvals under police or regulatory law.  Nothing in this Sale Order divests any tribunal of any jurisdiction it may have under police or regulatory law to interpret this Sale Order or to adjudicate any defense asserted under this Sale Order.

21.      **Prohibition of Actions Against Purchaser**.  Except for the Assumed Obligations, or as expressly permitted or otherwise specifically provided for in the Side Purchase Agreement or this Sale Order, the Purchaser and its Affiliates shall have no liability or responsibility for any liability or other obligation of the Debtors arising under or related to the Assets, the Retained Obligations or otherwise, including, but not limited to, any liability for any Encumbrances or Liabilities (other than the Assumed Obligations).  Without limiting the generality of the foregoing, and except as otherwise expressly provided herein and in the Side Purchase Agreement, the Purchaser and its Affiliates shall not be liable for any claims against the Debtors or any of their predecessors or Affiliates, and the Purchaser and its Affiliates shall have no successor or vicarious liabilities of any kind or character including, without limitation, any theory of antitrust, warranty, product liability, environmental, successor or transferee liability, labor law, ERISA, *de facto* merger, mere continuation, or substantial continuity, whether known or unknown as of the Completion Date, now existing or hereafter arising, whether fixed or contingent, with

respect to the Debtors or any obligations of the Debtors, including, without limitation, liabilities on account of any taxes arising, accruing, or payable under, out of, in connection with, or in any way relating to the operation of the Debtors' business prior to the Completion Date or any claims under the WARN Act or any claims related to wages, benefits, severance or vacation pay owed to employees or former employees of the Debtors.  Effective upon the Completion Date, with the sole exception of any enforcement of rights related to the Assumed Obligations, all persons and entities shall be, and hereby are, forever barred, estopped and permanently enjoined from asserting against the Purchaser, its successors and assigns, its property or the Assets from (i) taking any action that would adversely affect or interfere with the transfer of the Assets to the Purchaser in accordance with the terms of this Sale Order and the Side Purchase Agreement and (ii) asserting, prosecuting, or otherwise pursuing, whether in law or in equity, in any judicial, administrative, arbitral or other proceeding, any Encumbrances or Liabilities of any kind or nature whatsoever against the Purchaser and its successors, designees, assigns, or property, or the Assets conveyed under this Sale Order in accordance with the Side Purchase Agreement.

22.     The consideration given by the Purchaser shall constitute valid and valuable consideration for the releases of any potential Encumbrances or Liabilities pursuant to this Sale Order, which releases shall be deemed to have been given in favor of the Purchaser by all holders of Encumbrances, Liabilities or liens against or interests in, or claims against, any of the Debtors or any of the Assets, other than with respect to the Assumed Obligations.  The consideration provided by the Purchaser for the Assets under the Side Purchase Agreement is fair and reasonable and may not be avoided under section 363(n) of the Bankruptcy Code.

23.     None of the Purchaser or its Affiliates, successors, assigns, equity holders, employees or professionals shall have or incur any liability to, or be subject to any action by any

of the Debtors or any of their estates, predecessors, successors or assigns, arising out of the negotiation, investigation, preparation, execution, delivery of the Side Purchase Agreement and the entry into and consummation of the sale of the Assets, except as expressly provided in the Side Purchase Agreement and this Sale Order.

24.   **No Interference**.   Following the Completion Date, no holder of an Encumbrance or Liability in or against the Debtors or the Assets shall interfere with the Purchaser's title to or use and enjoyment of the Assets based on or related to such Encumbrance or Liability.

25.   **Retention of Jurisdiction**.  This Court retains exclusive jurisdiction prior to, on, and after Completion Date to, among other things, interpret, enforce and implement the terms and provisions of this Sale Order and the Side Purchase Agreement, all amendments thereto, any waivers and consents thereunder, and each of the agreements executed in connection therewith in all respects, including retaining jurisdiction to (i) compel delivery of the Assets or performance of other obligations owed to the Purchaser, (ii) compel performance of obligations owed to the Debtors, (iii) resolve any disputes arising under or related to the Side Purchase Agreement or the Mexico Transaction, (iv) interpret, implement, and enforce the provisions of this Sale Order, (v) compel delivery of any waivers, releases, or other related documentation reasonably requested by the Debtors or the Purchaser to evidence the release of any Encumbrances or Liabilities in the Assets, (vi) protect the Purchaser and its Affiliates against (a) any Encumbrances or Liabilities in or against the Debtors or the Assets of any kind or nature whatsoever and (b) any creditors, equity interest holders, or other parties in interest regarding the turnover of the Assets that may be in their possession, and (vii) protect the Debtors and their Affiliates against any liabilities (other than any liabilities retained by the Debtors under the Side Purchase Agreement) in any way relating to the

Assets arising on or after the Completion Date other than to the Purchaser pursuant to the Side Purchase Agreement.

26.     **Immediate Effect**.   Notwithstanding the provisions set forth in Rules 6004(h) and 6006(d) of the Bankruptcy Rules, this Sale Order shall be immediately effective and enforceable and its provisions shall be self-executing.  The Debtors and the Purchaser are free to close the Mexico Transaction under the Side Purchase Agreement at any time in accordance with the terms of the Side Purchase Agreement.

27.     **Good Faith Purchaser**.   The transactions contemplated by the Side Purchase Agreement are undertaken by the Purchaser in good faith, as that term is used in section 363(m) of the Bankruptcy Code, and the Purchaser has acted without collusion in undertaking the transactions contemplated by the Side Purchase Agreement.   Accordingly, the reversal or modification on appeal of the authorization provided herein to consummate the Mexico Transaction shall not affect the validity of the sale of the Assets to the Purchaser (including the assumption and assignment of any of the Key Contracts), unless such authorization is duly stayed pending such appeal.  The Purchaser is a good faith purchaser of the Assets, and is entitled to all of the benefits and protections afforded by section 363(m) of the Bankruptcy Code.

28.     There has been no showing that the Debtors or the Purchaser engaged in any action or inaction that would cause or permit either the Mexico Transaction or any of the underlying transactions contemplated by the Side Purchase Agreement to be avoided or costs or damages to be imposed under section 363(n) of the Bankruptcy Code.

29.     **Further Assurances**.  From time to time, as and when requested by the Seller or Purchaser, the Seller or Purchaser shall execute and deliver, or cause to be executed and delivered, all such documents and instruments as provided for in the Side Purchase Agreement and

shall take, or cause to be taken, all such further or other actions as provided for in the Side Purchase Agreement that the Seller or Purchaser may reasonably deem necessary or desirable to consummate the transactions contemplated by the Side Purchase Agreement, including such actions as may be necessary to vest, perfect, or confirm, of record or otherwise, in Purchaser its right, title, and interest in and to the Assets.

30. **Excluded Assets Held in Trust**.  The Assets sold pursuant to this Sale Order and the terms of the Side Purchase Agreement shall not include unclaimed property held in trust by the Seller, as defined pursuant to Texas state unclaimed property laws, including Texas Property Code, Title 6, Chapter 72-76, and other applicable Texas laws.

31. **Inconsistencies with Agreements**.  To the extent of any conflict between the Side Purchase Agreement and this Sale Order, the terms of this Sale Order shall govern.  In the event the Effective Date of the Plan and the Credit Bid Transaction Closing occurs prior to the Completion Date of the Side Purchase Agreement, and therefore the Credit Bid Purchaser becomes the owner of, among other things, the Assets, the terms of the Confirmation Order, the Plan, and the Credit Bid Purchase Agreement, in that order, shall control and this Sale Order shall be null and void; *provided* that nothing herein (including the nullification of this Sale Order) shall effect the validity or the enforceability of the Side Purchase Agreement as between Purchaser and the Credit Bid Purchaser.  In the event the Completion Date of the Side Purchase Agreement occurs prior to the Effective Date of the Plan, the terms of this Sale Order and the Side Purchase

Agreement shall control to the extent of any conflict with the Confirmation Order, the Plan, and the Credit Bid Purchase Agreement.

32. **Subsequent Orders and Plan Provisions**.  Unless otherwise agreed to by the Debtors and the Purchaser, this Sale Order shall not be modified by any subsequent order(s) of this Court, except as specifically provided in the Side Purchase Agreement.

33. **Failure to Specify Provisions**.  The failure to specifically reference any particular provisions of the Side Purchase Agreement or other related documents in this Sale Order shall not diminish or impair the effectiveness of such provisions, it being the intent of the Court that the Side Purchase Agreement and other related documents be authorized and approved in their entirety.

34. **Satisfaction of Conditions Precedent**.  Neither the Purchaser nor the Seller shall have an obligation to close the Mexico Transaction until all conditions precedent in the Side Purchase Agreement to each of their respective obligations to close the Mexico Transaction have been satisfied or waived in accordance with the terms of the Side Purchase Agreement.

35. **Provisions Non-Severable**.  The provisions of this Sale Order are non-severable and mutually dependent.

Dated: _____, 2021
      Houston, Texas

                             _____
                             THE HONORABLE MARVIN ISGUR
                             UNITED STATES BANKRUPTCY JUDGE

## Exhibit A

**Side Purchase Agreement**

**PURCHASE AGREEMENT**

**by and between**

**FIELDWOOD ENERGY LLC,**

**as Seller,**

**MAKO BUYER LLC,**

**as Credit Bid Purchaser,**

**and**

**LUKOIL INTERNATIONAL HOLDING GMBH,**

**as Purchaser**

_____

**Dated as of**

**July 2, 2021**

# TABLE OF CONTENTS

Page

1.    INTERPRETATION ....................................................................................5

2.    SALE AND PURCHASE ..........................................................................15

3.    CONDITIONS AND TERMINATION .....................................................17

4.    CONSIDERATION...................................................................................19

5.    COMPLETION.........................................................................................20

6.    SELLER'S AND CREDIT BID PURCHASER'S WARRANTIES................................23

7.    SELLER'S AND CREDIT BID PURCHASER'S UNDERTAKINGS............................31

8.    PURCHASER WARRANTIES .................................................................35

9.    LIMITATION ON LIABILITY ...............................................................38

10.   CERTAIN MATTERS.............................................................................43

11.   CONFIDENTIALITY..............................................................................47

12.   EFFECT OF COMPLETION ..................................................................48

13.   REMEDIES AND WAIVERS .................................................................48

14.   ASSIGNMENT........................................................................................49

15.   ENTIRE AGREEMENT .........................................................................49

16.   INVALIDITY..........................................................................................50

17.   NOTICES................................................................................................50

18.   COSTS AND EXPENSES.......................................................................52

19.   COUNTERPARTS..................................................................................52

20.   AMENDMENTS AND VARIATION .....................................................52

21.   GOVERNING LAW ...............................................................................52

22.   FURTHER ASSURANCES.....................................................................53

1

**<u>Schedules and Exhibits</u>**

Schedule I           Assets
Schedule II          Available Employees
Schedule III         Form of Cure Schedule
Schedule IV          Conduct of Business


Exhibit A           Form of Sale Order
Exhibit B           Form of Assignment and Assumption of Services Agreement
Exhibit C           Form of Assignment and Assumption of Sublease Agreement
Exhibit D           Form of Assignment Deed

526786.000002 24561360.32

**THIS AGREEMENT** is made on the 2nd day of July 2021

**BY AND BETWEEN**

(1)    **FIELDWOOD ENERGY LLC**, a Delaware limited liability company ("**Seller**");

(2)    **MAKO BUYER LLC**, a Delaware limited liability company **("Credit Bid Purchaser")**; and

(3)    **LUKOIL INTERNATIONAL HOLDING GMBH**, a private company with limited liability under the laws of Austria ("**Purchaser**" and, collectively with Seller and Credit Bid Purchaser, the "**Parties**").

**RECITALS:**

WHEREAS, Seller owns equity interests (*partes sociales*) with a nominal value of $30.00 (Thirty 00/100 Pesos) and representing one percent or less of the issued and outstanding capital and described in detail in <u>Schedule I</u> (collectively, the "**Interests**") in each of Fieldwood Energy de Mexico, S. de R.L. de C.V., a Mexico company ("**Mexico Holdco**"), Fieldwood Energy E&P Mexico, S. de R.L. de C.V., a Mexico company ("**Mexico E&P**"), and Fieldwood Energy Services de Mexico, S. de R.L. de C.V., a Mexico company (together with Mexico Holdco and Mexico E&P, the "**Mexico Companies**" and, each individually, a "**Mexico Company**");

WHEREAS, Fieldwood Mexico, B.V., a private limited liability company formed under Dutch law ("**Fieldwood Mexico**"), is the direct and indirect owner of all of the equity interests of the Mexico Companies not owned by Seller;

WHEREAS, Seller owns a membership interest (including all membership rights attached thereto) in Fieldwood Cooperatief U.A., a cooperative with excluded liability formed under Dutch law, and Fieldwood Offshore LLC, a Delaware limited liability company and wholly owned subsidiary of Seller, owns the remaining membership interest (including all membership rights attached thereto) in Fieldwood Cooperatief U.A. (collectively with the membership interest owned by Seller, which together are all of the membership interests issued and outstanding in Fieldwood Cooperatief U.A., the "**Fieldwood U.A. Interests**");

WHEREAS, Fieldwood Cooperatief U.A., FWE Mexico Management LLC, a Delaware limited liability company, Riverstone V Fieldwood Mexico Investment Management Cooperatief U.A. (f/k/a Riverstone Sparta Cooperatief U.A.), a cooperative with excluded liability formed under Dutch law, Fieldwood Mexico and LUKOIL International Upstream Holding B.V. ("**LIU**") have entered into a Share Purchase Agreement, dated as of the date hereof (the "**FM Purchase Agreement**"), whereby LIU agreed to acquire all of the shares of Fieldwood Mexico pursuant to the terms and conditions thereunder, and, therefore, directly or indirectly, all of the equity interests in each of the Mexico Companies that are not owned by Seller (the "**FM Transaction**");

WHEREAS, Seller is a party to certain Key Contracts (as defined herein) that relate to, and are necessary for, the operations of the business of the Mexico Companies;

3

WHEREAS, Seller and Fieldwood Offshore LLC, together with certain of their Affiliates (each, a "**Debtor**" and, collectively, the "**Debtors**"), commenced voluntary cases under title 11 of the United States Code, 11 U.S.C. §§ 101, et seq. (the "**Bankruptcy Code**"), in the United States Bankruptcy Court for the Southern District of Texas (the "**Bankruptcy Court**") under Case No. 20-33948 (MI) (such cases, the "**Chapter 11 Cases**") on August 3, 2020 and August 4, 2020;

WHEREAS, in furtherance of the FM Transaction, Seller, and, solely if applicable, Credit Bid Purchaser, desires to sell, transfer and assign to Purchaser, and Purchaser desires to purchase from Seller, the Assets (as defined herein) pursuant to the terms and subject to the conditions of this Agreement (the "**Transaction**");

WHEREAS, on June 25, 2021 the Bankruptcy Court entered its *Findings of Fact, Conclusions of Law and Order (I) Confirming Eighth Amended Joint Chapter 11 Plan of Fieldwood Energy LLC and Its Affiliated Debtors and (II) Granting Related Relief* [Docket No. 1751] (the "**Confirmation Order**") confirming the *Eighth Amended Joint Chapter 11 Plan of Fieldwood Energy LLC and its Affiliated Debtors* [Docket No. 1742] (including any exhibits and schedules thereto and as may be further amended, supplemented, or modified, the "**Plan**") and approving the Credit Bid Transaction (as defined in the Plan) pursuant to which the Debtors will transfer, among other things, the Assets and the Fieldwood U.A. Interests to Credit Bid Purchaser;

WHEREAS, the occurrence of the Effective Date (as defined in the Plan) may occur prior to Completion Date (as defined herein), in which case the Credit Bid Purchaser (or its permitted designee) will consummate the Transaction, pursuant to the terms and conditions of this Agreement;

WHEREAS, if the Completion Date occurs prior to the Effective Date, Seller and Purchaser intend to effectuate the Transaction through the sale of the Assets free and clear of all Encumbrances and Liabilities, other than the Assumed Obligations (each as defined herein) pursuant sections 105, 363 and 365 of the Bankruptcy Code;

WHEREAS, Seller believes, following consultation with its financial advisors and consideration of available alternatives, that, in light of the current circumstances, the Transaction as provided herein is necessary to preserve and maximize value, and is in the best interests of Seller, its creditors and its equity holders;

WHEREAS, the execution and delivery of this Agreement, Seller's ability to consummate the Transaction if the Completion Date occurs prior to the Effective Date, and LIU's obligations under the FM Purchase Agreement and Purchaser's obligations under this Agreement are subject to, among other things, the entry of the Sale Order; and

WHEREAS, the consummation of the Transaction is a condition precedent to the completion of the transactions under the FM Purchase Agreement.

NOW, THEREFORE, for and in consideration of the above premises and the mutual covenants, representations, warranties and agreements contained herein, the benefits to be derived by Seller and Purchaser hereunder and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties agree as follows:

4

## 1.     INTERPRETATION

1.1     In this Agreement, capitalized terms shall have the meaning set forth below.

| | |
|---|---|
| "ABC Representatives" | means, with respect to any person, (a) its Affiliates, (b) any and all of its and its Affiliates' respective directors, managers, officers and employees, and (c) such other persons who have performed services for or on behalf of such person or any of its Affiliates in respect of its or its Affiliates' business in Mexico that, in the performance of such services, could subject such person to liability under Anti-Corruption Laws or Anti-Money Laundering Laws; |
| "Action" | means any claim, action, charge, suit, arbitration, inquiry, audit, proceeding or investigation by or before any Governmental Authority, arbitrator, mediator or person; |
| "Affiliate" | means, in relation to a referenced person, any other person that directly or indirectly controls that referenced person or is controlled by that referenced person or by a another person that directly or indirectly controls the referenced person;<br><br>For this purpose:<br><br>(a)     a company is directly controlled by another person if the latter person beneficially owns fifty per cent or more of the voting rights attached to the issued share capital of the first mentioned company; and<br><br>(b)     a company is indirectly controlled by another person if a series of persons can be specified, beginning with that latter person and ending with the particular company, that are related so that each person of the series (excluding the latter person) is directly controlled by one or more of the companies earlier in the series; |
| "Agreement" | means this agreement, including the schedules and attachments to this Agreement, all as amended from time to time; |
| "Anti-Corruption Laws" | mean any Laws or Orders relating to anti-bribery or anti-corruption (governmental or commercial), which apply to the business and dealings of Seller, its Affiliates, the Mexico Companies and their respective ABC Representatives, including any Laws or Orders that prohibit the corrupt or inappropriate payment, offer, promise, or authorization of the |

5

| | |
|---|---|
| | payment or transfer of anything of value (including gifts or entertainment), directly or indirectly, to any Government Official or any other person to obtain an improper business advantage; including the Mexico General Law of the National Anticorruption System (*Ley General del Sistema Nacional Anticorrupción*), the Mexico Federal Criminal Code, the Mexico General Law of Administrative Responsibilities *(Ley General de Responsabilidades Administrativas*), the U.S. Foreign Corrupt Practices Act of 1977, the U.K. Bribery Act of 2010, any laws of any jurisdiction enacted to implement the OECD Convention on Combating Bribery of Foreign Officials in International Business Transactions, and any related or similar law issued, administered or enforced by any Governmental Authority with jurisdiction over any of Seller and its Affiliates, Purchaser and its Affiliates, the Mexico Companies, and their respective ABC Representatives; in each case, as amended from time to time; |
| **"Anti-Money Laundering Laws"** | means any Laws, rules or guidelines relating to money laundering, including financial recordkeeping and reporting requirements, which apply to the business and dealings of Seller, its Affiliates, the Mexico Companies and their respective ABC Representatives, including the Mexico Federal Law for Prevention and Identification of Operations with Resources of Illegal Origin (*Ley Federal para la Prevención e Identificación de Operaciones con Recursos de Procedencia Ilícita*), the U.S. Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism Act of 2001, Public Law 107-56, the U.S. Currency and Foreign Transaction Reporting Act of 1970, the U.S. Money Laundering Control Act of 1986, the U.K. Proceeds of Crime Act 2002, the U.K. Terrorism Act 2000, any laws of any European Union member state enacted to implement European Union Directive (EU) 2015/849 on the prevention of the use of the financial system for the purposes of money laundering or terrorist financing as may be amended from time to time, all money laundering-related laws of other jurisdictions where Seller, its Affiliates, or the Mexico Companies conduct business or own assets, and any related or similar Law issued, administered or enforced by any Governmental Authority with jurisdiction over of Seller and its Affiliates, Purchaser and its Affiliates, the Mexico Companies, and their |

6

| | respective ABC Representatives; in each case, as amended from time to time; |
|---|---|
| "**Assets**" | means, collectively, all of Seller's rights, title and interests in the Interests, the Key Contracts, the Records, and the Equipment, together with all rights attached or accruing thereto as at or after Completion; |
| "**Assignment and Assumption of Services Agreements**" | means the Assignment and Assumption of Services Agreements, substantially in the form attached hereto as <u>Exhibit B</u>; |
| "**Assignment and Assumption of Sublease Agreement**" | means the Assignment and Assumption of Sublease Agreement, substantially in the form attached hereto as <u>Exhibit C</u>; |
| "**Assignment Deeds**" | means the equity interest assignment agreements governed by Mexican law (*convenio de cesión de parte social*), substantially in the form attached hereto as <u>Exhibit D</u>, pursuant to which Seller will transfer the Interests to Purchaser or its designee(s) in the agreed form; |
| "**Assumed Obligations**" | has the meaning given to it in <u>clause 2.1(c)</u>; |
| "**Assurance**" | means any warranty, representation, statement, promise, arrangement, assurance, covenant, agreement, undertaking, indemnity, guarantee or commitment of any nature whatsoever and whether or not in writing; |
| "**Attachment**" | means the attachments, schedules, and exhibits to this Agreement; |
| "**Available Employees**" | has the meaning given to it in <u>clause 7.1</u>; |
| "**Bankruptcy Code**" | has the meaning given to it in the Recitals; |
| "**Bankruptcy Court**" | has the meaning given to it in the Recitals; |
| "**Bankruptcy Outside Date**" | has the meaning given to it in <u>clause 3.5(f)</u>; |
| "**Business Day**" | means a day, between 9:00 a.m. and 5:00 p.m., other than a Saturday or Sunday, on which banks are open for ordinary banking business in New York, USA, London, England, Moscow, Russia, Amsterdam, the Netherlands and Mexico City, Mexico; *provided that*, to the extent any action required under this Agreement must be taken at the offices of a Governmental Authority on or by a day that would otherwise |

7

| | |
|---|---|
| | be a Business Day and such Governmental Authority is not open for ordinary business on that day, then the day on or by which this Agreement requires that such action be taken shall be deemed to be the next Business Day thereafter on which the offices of such Governmental Authority are open for ordinary business; |
| **"Chapter 11 Cases"** | has the meaning given to it in the Recitals; |
| **"Completion"** | means completion of the sale and purchase of the Assets under this Agreement; |
| **"Completion Date"** | means the date on which Completion occurs; |
| **"Confidential Information"** | has the meaning given to it in clause 11.1; |
| **"Contract"** | means any contract, agreement, indenture, note, bond, loan, lease, sublease, conditional sales contract, mortgage, license, sublicense, franchise agreement, obligation, promise, undertaking, commitment or other binding arrangement (in each case, whether written or oral); |
| **"Credit Bid Purchase Agreement"** | means the Purchase and Sale Agreement to be entered into by and among Seller (and certain of its Affiliates) and Credit Bid Purchaser in substantially the form attached as Exhibit F to the *Notice of Filing of Amended Plan Supplement in Connection with Fourth Amended Joint Chapter 11 Plan of Fieldwood Energy LLC and its Affiliated Debtors* [Docket No. 1562]; *provided* that, any change thereto that is reasonably expected to have a material impact on the Transaction shall be subject to the reasonable written consent, including by e-mail, of Purchaser; |
| **"Credit Bid Purchaser"** | has the meaning given to it in the Preamble; |
| **"Credit Bid Purchaser's Warranties"** | means the representations and warranties set out in clause 6.2 and **"Credit Bid Purchaser's Warranty"** shall be construed accordingly; |
| **"Cure Costs"** | has the meaning given to it in clause 10.1(b); |
| **"Cure Notice"** | has the meaning given to it in clause 10.1(b); |
| **"Cure Schedule"** | means the schedule of Cure Costs, substantially in the form attached hereto as Schedule III; |
| **"Debtor" or "Debtors"** | has the meaning given to it in the Recitals; |

8

| | |
|---|---|
| "Direct Claim" | has the meaning given to it in clause 9.9; |
| "Encumbrance" | means any charge, lien (including a "lien" as defined in section 101(37) of the Bankruptcy Code), claim (including a "claim" as defined in section 101(5) of the Bankruptcy Code), mortgage, lease, sublease, hypothecation, deed of trust, pledge, security interest, option, attachment, security interest, right to acquire, right of usufruct, right of use or possession, right of first offer or first refusal, drag-along or tag-along right, preemptive right, easement, right of way, servitude, restrictive covenant, encroachment, encumbrance, community property interest, third party interest or other restriction or limitation of any kind (including any restriction on use, voting, transfer, receipt of income, or exercise of any other attribute of ownership), whether arising prior to or after the commencement of the Chapter 11 Cases and whether voluntarily incurred or arising by operation of Law; |
| "Equipment" | means all equipment, fixtures, improvements, computers and associated equipment, software, office furniture and other personal property to the extent the same is located in the Houston Office and/or is primarily used or held for use by the Transferred Employees in connection with the performance of their work or the services under the Key Contracts as listed in Schedule I; |
| "Fieldwood Mexico" | has the meaning given to it in the Recitals; |
| "Fieldwood U.A. Interests" | has the meaning given to it in the Recitals; |
| "Final Order" | means an Order of the Bankruptcy Court or a court of competent jurisdiction that has been entered on the docket maintained by the clerk of such court, which has not been reversed, vacated, or stayed and as to which the time to appeal, petition for *certiorari*, or move for a new trial, reargument, or rehearing has expired and (i) as to which no appeal, petition for *certiorari*, or other proceedings for a new trial, reargument, or rehearing shall then be pending, or (ii) if an appeal, writ of *certiorari*, new trial, reargument, or rehearing thereof has been sought, such Order shall have been affirmed by the highest court to which such Order was appealed, or *certiorari* shall have been denied, or a new trial, reargument, or rehearing shall have been denied or resulted in no modification of such Order, and the time to take any further appeal, petition for certiorari, or move for a new trial, reargument, or rehearing shall have expired; *provided* that no Order shall fail to be a "Final Order" solely because of the |

9

| | possibility that a motion under Rules 59 or 60 of the Federal Rules of Civil Procedure (as promulgated by the United States Supreme Court under section 2072 of title 28 of the United States Code), under any analogous Federal Rules of Bankruptcy Procedure (as promulgated by the United States Supreme Court under section 2075 of title 28 of the United States Code) (or any analogous rules applicable in another court of competent jurisdiction) or under Bankruptcy Code sections 502(j) or 1144 has been or may be filed with respect to such Order; |
|---|---|
| **"FM Purchase Agreement"** | has the meaning given to it in the Recitals; |
| **"FM Transaction"** | has the meaning given to it in the Recitals; |
| **"Fundamental Warranties"** | means:<br><br>(i) if the Completion Date occurs prior to the Effective Date, the Seller's Warranties listed in clauses 6.1(a)-6.1(d), 6.1(g) and 6.1(k)-6.1(p); or<br><br>(ii) if the Effective Date occurs prior to the Completion Date, the Credit Bid Purchaser's Warranties listed in clauses 6.1(a)(i)-(ii), 6.1(d)(i)-(iii), 6.2(b)(vi) and 6.2(b)(x)-(xv); |
| **"Government Official"** | means (i) any official, officer, employee or representative of, or any person acting in an official capacity for or on behalf of, any Governmental Authority; (ii) any political party or party official or candidate for political office; (iii) a Politically Exposed Person as defined by the Financial Action Task Force or Groupe d'action Financière sur le Blanchiment de Capitaux; or (iv) any official, officer, employee, or representative of a company, business, enterprise, person or other entity owned, in whole or in part, or controlled by any Governmental Authority; |
| **"Governmental Authority"** | means (a) any federal, provincial, state, local, municipal, national or international government or governmental authority, regulatory or administrative agency, governmental commission, department, board, bureau, agency or instrumentality, court, tribunal, arbitrator or arbitral body (public or private), (b) any self-regulatory organization, or (c) any political subdivision of any of the foregoing; |
| **"Governmental Order"** | means any order, writ, judgment, injunction, decree, stipulation, determination, award, approval, consent, |

| | |
|---|---|
| | authorization or agreement entered by or with any Governmental Authority or arbitrator; |
| **"Houston Office"** | means the office space located at One Briarlake Plaza, 2000 West Sam Houston Parkway South, Suite 320, Houston, Texas 77042 and leased pursuant to the Sublease Agreement; |
| **"Interests"** | has the meaning set forth in the Recitals; |
| **"Key Contracts"** | means the Sublease Agreement and Services Agreements; |
| **"Law"** | means any law, treaty, statute, ordinance, code, directive, decree, Order, injunction, award, determination, regulation, rule or other requirement of any Governmental Authority applicable to the referenced matter; |
| **"Liability"** | means any debt, obligation, duty, commitment or liability of any nature (including any unknown, undisclosed, unliquidated, unmatured, unaccrued, unasserted, contingent, indirect, conditional, implied, vicarious, derivative, joint, several or secondary liability), regardless of whether such debt, obligation, duty, commitment or liability would be required to be disclosed on in financial statements prepared in accordance with applicable generally accepted accounting principles or disclosed in the notes thereto and regardless of whether such debt, obligation, duty or liability is immediately due and payable; |
| **"LIU"** | has the meaning given to it in the Recitals; |
| **"Long Stop Date"** | means March 4, 2022; |
| **"Mexico Company"** or **"Mexico Companies"** | has the meaning given to it in the Recitals; |
| **"Mexico E&P"** | has the meaning given to it in the Recitals; |
| **"Mexico Holdco"** | has the meaning given to it in the Recitals; |
| **"Order"** | means any order, writ, judgment, decree, injunction or similar order, decision, ruling, subpoena, precept, consent, approval, award, directive or other requirement, determination or finding entered, issued, made, or rendered by the Bankruptcy Court or any other Governmental Authority (in each such case whether preliminary or final); |
| **"Party"** or **"Parties"** | has the meaning given to it in the Preamble; |

11

| | |
|---|---|
| "**Plan**" | has the meaning given to it in the Recitals; |
| "**Pre-contractual Statement**" | has the meaning given to it in <u>clause 15.1</u>; |
| "**Prepetition FLTL Administrative Agent**" | has the meaning given to it in the Recitals; |
| "**Purchase Documents**" | means this Agreement, the Sale Order, the Credit Bid Purchase Agreement, the Assignment Deeds, the Assignment and Assumption of Sublease Agreement, each Assignment and Assumption of Services Agreement and any other document or agreement delivered by a Party pursuant to, or in connection with, this Agreement; |
| "**Purchase Price**" | has the meaning given to it in <u>clause 4.1</u>; |
| "**Purchaser**" | has the meaning given to it in the Preamble; |
| "**Purchaser Group**" | means Purchaser, LIU and their Affiliates, including the Mexico Companies after Completion; |
| "**Purchaser Warranties**" | means the representations and warranties set out in <u>clause 8</u> and "Purchaser Warranty" shall be construed accordingly; |
| "**Records**" | means originals or copies (to the extent originals are not available) of all books, records, files, documents, information, contract files, work orders, operational and technical records, invoices and data (including tax records, lease files and accounting records), whether stored physically or electronically, to the extent pertaining or relating to the Interests or the Key Contracts; |
| "**Released Claims**" | has the meaning given to it in <u>clause 7.5</u>; |
| "**Releasing Party**" | has the meaning given to it in <u>clause 7.5</u>; |
| "**Representatives**" | means, with respect to any person, any and all directors, managers, officers and employees of such person; |
| "**Retained Obligations**" | has the meaning given to it in <u>clause 2.1(d)</u>; |
| "**Sale Order**" | means a Final Order negotiated by Seller and Purchaser, substantially in the form attached hereto as <u>Exhibit A</u>, which shall contain, among other things, provisions approving this Agreement and authorizing the Debtors to take all necessary actions to implement the Transaction and permit their non-Debtor Affiliates to consummate the FM Transaction; |

12

| | |
|---|---|
| | *provided that* any change thereto must be reasonably acceptable to Seller, Credit Bid Purchaser and Purchaser and the Sale Order may be filed with, and entered by, the Bankruptcy Court as contemplated in <u>clause 10</u>; |
| **"Sanctions Laws"** | means any economic sanctions Laws, Orders, embargoes or restrictive measures, as amended from time to time, administered, enacted or enforced by any of the following:<br><br>(i)     the United States;<br><br>(ii)    the United Nations;<br><br>(iii)   the European Union or any member state thereof;<br><br>(iv)   the United Kingdom;<br><br>(v)    Governmental Authorities in Mexico;<br><br>(vi)   any other Governmental Authority under whose jurisdiction either Purchaser, Seller, or the Mexico Companies operate; or<br><br>(vii)  the respective governmental institutions and agencies of any of the foregoing responsible for administering, enacting or enforcing sanctions, including the Office of Foreign Assets Control of the US Department of the Treasury, the US Department of State and the UK Office of Financial Sanctions Implementation; |
| **"Sanctions Target"** | means:<br><br>(i)     any person that is listed on any sanctions list administered by any Governmental Authority under whose jurisdiction either Purchaser, Seller, or the Mexico Companies operate, or owned or controlled by such a person;<br><br>(ii)    an entity located in, or resident in or incorporated under the laws of any country or territory that is the target of comprehensive Sanctions Laws, which for the purposes of this Agreement, as at the date of signature of this Agreement by the last of its signatories are Iran, Syria, Cuba, the Crimea region of Ukraine and North Korea; or<br><br>(iii)   any person that is otherwise the target of enforcement under Sanctions Laws, in each case, only to the extent |

13

| | |
|---|---|
| | that any of Purchaser, Seller, or any Mexico Company would be prohibited or restricted by Sanctions Laws from transacting or dealing with (including being a Party) or otherwise exercising any rights in respect of, or fulfilling any duties or obligations owed to, such a person; |
| "**Seller**" | has the meaning given to it in the Preamble; |
| "**Seller's Warranties**" | means the representations and warranties set out in clause 6.1 and "**Seller's Warranty**" shall be construed accordingly; |
| "**Services Agreements**" | means (i) that certain Category 1 Services Agreement, by and between Seller and Mexico E&P, dated as of January 7, 2016, (ii) that certain Category 2 Services Agreement, by and between Seller and Mexico E&P, dated as of January 7, 2016, and (iii) that certain Category 2 Engineering, Procurement, Construction and Installation Services Agreement by and between Seller and Mexico E&P, dated as of February 21, 2018, in each case, as amended prior to the date of this Agreement; |
| "**Sublease Agreement**" | means that certain Sublease (LX#G1854231) dated December 22, 2018, by and among One Briarlake Plaza Owner, LLC, as the landlord, The Lubrizol Corporation as Sublandlord, and Seller as Subtenant, as amended; |
| "**Third Party Claim**" | has the meaning given to it in clause 9.8; |
| "**Transaction**" | has the meaning given to it in the Recitals; |
| "**Transferred Employees**" | has the meaning given to it in clause 7.2; |
| "**Undertakings**" | means any undertaking or covenant given by or on behalf of any Party in or pursuant to any of the Purchase Documents; and |
| "**Warranties**" | means, collectively, Seller's Warranties, Credit Bid Purchaser's Warranties and Purchaser Warranties. |

1.2     In this Agreement, unless otherwise specified:

(a)     references to a "person" shall be construed so as to include any individual, firm, company, limited liability company, partnership, Governmental

14

Authority, joint venture, association or partnership or other entity (whether or not having separate legal personality);

(b)     a "day" (including within the expression "Business Day") shall mean a period of twenty-four (24) hours running from midnight to midnight;

(c)     references to clauses and Attachments are to clauses of, and Attachments to, this Agreement and a reference to a paragraph is to a paragraph of the clause or Attachment (as the case may be) in which such reference appears;

(d)     "including" means "including without limitation" and does not limit any general statement;

(e)     words, regardless of the number and gender specifically used, will be construed to include any other number, singular or plural, and any gender, masculine, feminine, or neuter, as the context requires;

(f)     unless otherwise specified, all references to currency herein shall be to US dollars, and all payments required hereunder, shall be paid in US dollars; and

(g)     headings are for convenience only and do not affect the interpretation of this Agreement.

**2.     SALE AND PURCHASE**

2.1     If the Completion Date occurs prior to the Effective Date, then, on the terms and subject to the conditions of this Agreement,  the other Purchase Documents and the Sale Order, at Completion:

(a)     Seller shall assign, sell, convey and deliver to Purchaser, and Purchaser shall purchase and accept from Seller, all of Seller's rights, title and interests to the Assets (including the Interests), free and clear of all Encumbrances and Liabilities, other than the Assumed Obligations;

(b)     Purchaser shall provide offers of employment to each Available Employee, subject to <u>clause 7.1</u>;

(c)     Purchaser shall assume, and agree to pay, perform and fulfill and discharge (or cause to be paid, performed, fulfilled or discharged) when due (in accordance with their respective terms and subject to the respective conditions thereof), all Liabilities arising from, related to or associated with the Assets, arising after the Completion Date (collectively, the "**Assumed Obligations**"); and.

(d)     any and all Liabilities arising from, related to, or associated with, the Assets, incurred or accrued on or prior to the Completion Date, including the Cure Costs, are excluded from the Transaction and shall remain for Seller's

15

account (the "**Retained Obligations**"); specifically, the Retained Obligations shall only include those related to the ownership of the Assets and shall not include the Liabilities of the Mexico Companies which are addressed in the FM Transaction.

2.2   If the Effective Date occurs on or before the Completion Date, then, on the terms and conditions of this Agreement and the other Purchase Documents, at Completion:

(a)   Credit Bid Purchaser shall assign, sell, convey and deliver to Purchaser, and Purchaser shall purchase and accept from Credit Bid Purchaser, all of Credit Bid Purchaser's rights, title and interests to the Assets (including the Interests), free and clear of all Encumbrances and Liabilities, other than Assumed Obligations;

(b)   Purchaser shall provide offers of employment to each Available Employee, subject to clause 7.1;

(c)   Purchaser shall assume, and agree to pay, perform and fulfill and discharge (or cause to be paid, performed, fulfilled or discharged) when due (in accordance with their respective terms and subject to the respective conditions thereof), the Assumed Obligations; and.

(d)   the Retained Obligations, are excluded from the Transaction and shall remain for Credit Bid Purchaser's account; specifically, the Retained Obligations shall only include those related to the ownership of the Assets and shall not include the Liabilities of the Mexico Companies which are addressed in the FM Transaction.

2.3   No Party shall be obliged to complete the transactions set forth in clause 2 unless the FM Transaction contemplated under the FM Purchase Agreement is completed simultaneously in accordance with the terms set forth thereunder.

2.4   Each Party acknowledges and understands that:

(a)   if the Completion Date occurs prior to the Effective Date, at the Completion Date, the Credit Bid Purchaser shall no longer be a Party to this Agreement, or have any rights or obligations under this Agreement; and

(b)   if the Effective Date occurs prior to the Completion Date, at the Effective Date, (i) the Credit Bid Purchaser will acquire all of the rights of the Seller under this Agreement and assume the obligations and responsibilities of the Seller hereunder, except as expressly set forth herein including in clause (ii) (including, for the avoidance of doubt, Seller's obligations under clause 10 (but excluding clause 10.1)), (ii) Credit Bid Purchaser shall not assume any obligations or responsibility with respect to representations and warranties

16

of Seller set forth in clause 6.1, and (iii) Seller shall no longer be a Party to this Agreement, or have any rights or obligations hereunder.

## 3. CONDITIONS AND TERMINATION

The respective obligations of Seller (or, solely if applicable, Credit Bid Purchaser) and Purchaser to consummate the Transaction are subject to the satisfaction of the following conditions at or prior to Completion:

3.1     <u>Conditions to Obligations of Purchaser</u>.

    (a)    The Fundamental Warranties shall be true and correct in all respects at and as of the date of this Agreement and at and as of the Completion Date, as if made at and as of such time;

    (b)    If the Effective Date has not yet occurred at the time of determination, Seller's Warranties, or, if the Effective Date has occurred at the time of determination, Credit Bid Purchaser's Warranties, (in either case, other than those included in the Fundamental Warranties) shall be true and correct in all respects at and as of the date of this Agreement and at and as of the Completion Date, as if made at and as of such time (except to the extent in either case that any such Seller's Warranties or Credit Bid Purchaser's Warranties, as applicable, speak as of another date, in which case such Seller's Warranties or Credit Bid Purchaser's Warranties shall be true and correct in all respects at and as of the date specified therein), unless any breach of any such Seller's Warranty or Credit Bid Purchaser Warranty, or the cumulative effect of all such breaches of all such Seller's Warranties or Credit Bid Purchaser's Warranties, as applicable, is not likely, or would not reasonably be expected, individually or in the aggregate, to have a material adverse effect with respect to Completion or the Assets;

    (c)    the Undertakings that Seller and, solely if applicable, Credit Bid Purchaser, are required to perform or to comply with pursuant to this Agreement at or prior to Completion shall have been performed and complied with in all material respects;

    (d)    the Key Contracts shall remain valid, and in full force and effect;

    (e)    if the Completion Date occurs before the Effective Date, Seller shall have obtained the required consents or Bankruptcy Court Approval to assign the Sublease Agreement to Purchaser; and

    (f)    no material adverse effect on the Assets shall have occurred.

3.2     <u>Conditions to Obligations of Seller and, if applicable, Credit Bid Purchaser</u>.

    (a)    Purchaser Warranties shall be true and correct in all respects at and as of the date of this Agreement and at and as of the Completion Date, as if made at

17

and as of such time (except to the extent in either case that any such Purchaser Warranties speak as of another date, in which case such Purchaser Warranties shall be true and complete in all respects at and as of the date specified therein), unless any breach of any such Purchaser Warranty, or the cumulative effect of all such breaches of all such Purchaser Warranties, is not likely to have a material adverse effect with respect to Completion or the Assets; and

(b)   the Undertakings that Purchaser is required to perform or to comply with pursuant to this Agreement at or prior to Completion shall have been performed and complied with in all material respects.

3.3   <u>Conditions to Obligations of Seller, Credit Bid Purchaser, if applicable, and Purchaser</u>.

(a)   all conditions precedent to the closing of the FM Transaction pursuant to the FM Purchase Agreement shall be satisfied or waived and the parties thereto shall close the FM Transaction simultaneously with the Completion;

(b)   if the Completion Date occurs before the Effective Date, the Bankruptcy Court shall have entered the Sale Order;

(c)   no Law or Governmental Order shall be pending or threatened to be, or have been, enacted, entered, promulgated or enforced by any Governmental Authority that prohibits, restrains or enjoins the consummation of the Transaction; and

(d)   no Action shall be pending or threatened that seeks to restrain, enjoin or otherwise prohibit the consummation of the Transaction, or to recover substantial damages in connection therewith.

3.4   <u>Condition Notices</u>. If at any time any Party becomes aware:

(a)   of a fact or circumstance that could reasonably be expected to prevent any of the conditions set out in <u>clause 3</u> being satisfied; or

(b)   that any of the conditions set out in <u>clause 3</u> has been satisfied,

it shall promptly inform the other Parties in writing; *provided, however*, that the delay or failure to so inform the other Parties shall not constitute a waiver or modify any right or obligation hereunder, or serve as the basis of, or be admissible with respect to, any Action against such Party.

3.5   <u>Termination</u>. The Parties may terminate this Agreement prior to Completion pursuant to the following (from and after the Effective Date, unless the Completion Date has occurred prior to the Effective Date, references to "Seller" in this <u>clause 3.5</u> will be read as "Credit Bid Purchaser"):

18

(a)     Seller may terminate this Agreement by written notice to Purchaser at any time after the Long Stop Date if on the Long Stop Date any condition in clauses 3.2 or 3.3 is not satisfied or validly waived, except where the failure to satisfy such condition has been caused by Seller or its failure to act.

(b)     Purchaser may terminate this Agreement by written notice to Seller at any time after the Long Stop Date if on the Long Stop Date any condition in clauses 3.1 or 3.3 is not satisfied or validly waived, except where the failure to satisfy such condition has been caused by Purchaser or its failure to act.

(c)     Purchaser may terminate this Agreement at any time prior to Completion by written notice to Seller in the event of any Action, *provided* it is either (i) actual or (ii) threatened in writing to Seller or any Mexico Company, by any Governmental Authority relating to the actual or alleged violation of Anti-Corruption Laws, Anti-Money Laundering Laws or Sanctions Laws by Seller or any ABC Representative thereof.

(d)     Seller may terminate this Agreement at any time prior to Completion by written notice to Purchaser in the event of any actual violation of Anti-Corruption Laws, Anti-Money Laundering Laws or Sanctions Laws by Purchaser, or any ABC Representative thereof which violation relates to the business in Mexico of Purchaser or its Affiliates and renders it unlawful for Seller to proceed to Completion.

(e)     Purchaser may terminate this Agreement at any time if the FM Purchase Agreement is terminated prior to the completion of the transactions contemplated hereunder and thereunder.

(f)     Purchaser may terminate this Agreement at any time if (i) on or after 12:01 A.M. (prevailing Central Time) on August 15, 2021, (A) the Effective Date has not occurred and (B) a motion seeking entry of a Sale Order has not been filed with the Bankruptcy Court; or (ii) on or after 12:01 A.M. (prevailing Central Time) on September 15, 2021, (A) the Sale Order has not been entered by the Bankruptcy Court and (B) the Effective Date has not occurred, (in each case subject to extension by Purchaser at its sole discretion, the "**Bankruptcy Outside Date**").

## 4.     CONSIDERATION

**(from and after the Effective Date, unless the Completion Date has occurred prior to the Effective Date, references to "Seller" in this clause 4 will be read as "Credit Bid Purchaser")**

4.1     The consideration for the sale and assignment of the Assets shall be the payment by Purchaser by wire transfer of immediately available funds to Seller of Five Million US dollars (US$5,000,000.00) (the "**Purchase Price**") and the assumption of the Assumed Obligations.

19

4.2    Any payment due to Seller under this Agreement shall be paid to the bank account nominated by Seller, details of which shall be provided by Seller to Purchaser at least five (5) Business Days prior to the due date for payment. Payment to such account shall satisfy Purchaser's obligation to make such payment.

4.3    The Parties agree and acknowledge that the Purchase Price includes, and Seller shall be liable for, any and all taxes, including transfer taxes, stamp taxes, value added taxes, sales taxes, capital gains taxes and any other similar taxes, levies, tariffs, imposts, duties, charges and similar costs, imposed upon or resulting directly from the Transaction and the sale and purchase of the Assets at Completion under this Agreement, to the extent such costs are not the result of Purchaser's failure to comply with applicable law and excluding (a) any taxes resulting from disposition of the Assets by Purchaser or any change in the Assets occurring on or after the Completion Date that are not contemplated in this Agreement and (b) notary, registration or other fees (excluding taxes thereunder) contemplated by clause 5.5(a).

5.    **COMPLETION**

**(from and after the Effective Date, unless the Completion Date has occurred prior to the Effective Date, references to "Seller" in this clause 5 (except clause 5.3) will be read as "Credit Bid Purchaser")**

5.1    Completion with respect to (i) the Interests shall take place at the offices of Mexico E&P, and (ii) the other Assets shall take place at the offices of Thompson & Knight LLP, 811 Main Street, Suite 2500, Houston, Texas 77002, simultaneously with the closing of the FM Transaction, on the tenth (10th) Business Day after the fulfilment of the conditions set forth in clause 3 (or at such other place or time as Purchaser and Seller may agree in writing) or

(a)    in the case of any of the conditions set out in clause 3.1 such conditions being waived by Purchaser;

(b)    in the case of any of the conditions set out in clause 3.2, such conditions being waived by Seller; and

(c)    in the case of any of the conditions set out in clause 3.3, such conditions being waived by Purchaser and Seller.

5.2    At Completion, Seller shall deliver or cause to be delivered to Purchaser the following:

(a)    a certificate duly executed by an authorized officer of Seller certifying, on behalf of Seller, that the conditions set forth in clauses 3.1 and 3.3 have been fulfilled in respect of Seller as of the Completion Date;

(b)    a certificate duly executed by an authorized officer of Seller certifying as to (i) the resolutions of Seller's board of directors or other governing body

20

authorizing the execution, delivery and performance of this Agreement and each of the Purchase Documents to which it is a Party or by which it is bound, and the consummation of the Transaction as contemplated hereby and thereby, and (ii) the incumbency of the officers authorized to execute this Agreement or any other Purchase Documents to which Seller is or is required to be a Party or by which Seller is, or is required to be, bound;

(c)    (i) to the extent in possession of Seller, the original most recent partners' registry book (*libro especial de socios*) of each Mexico Company which reflects Seller as the owner of the Interests, (ii) duly executed copies of the Assignment Deeds conveying the Interests to Purchaser or its designee duly executed by an attorney in fact of Seller with authority for acts of ownership, (iii) a draft of the closing resolutions for each of the Mexico Companies, and (iv) evidence of such ownership transfer to Purchaser or its designee reflected in the partners' registry book (*libro especial de socios*) of each Mexico Company;

(d)    a duly executed copy of the Assignment and Assumption of Services Agreements, substantially in the form of <u>Exhibit B</u>;

(e)    a duly executed copy of the Assignment and Assumption of Sublease Agreement, substantially in the form of <u>Exhibit C</u>;

(f)    a power of attorney duly executed on behalf of Seller granting authority, including acts of ownership (*actos de dominio*), in favor of its legal representative or attorney-in-fact to enter into and execute the Assignment Deeds on its behalf; and

(g)    such other documents reasonably requested by Purchaser.

5.3    At Completion, Seller shall:

(a)    deliver to the Purchaser powers of attorney from Seller, duly legalized, notarized with a Mexican notary public, and apostilled, with respect to each Assignment Deed relating to the Interests, in form and substance as required by Law;

(b)    instruct its legal representative or attorney-in-fact to execute the Assignment Deeds with regard to the Interests, make the relevant registrations in the partners' registry book of each Mexico Company; and

(c)    to the extent not provided in connection with the completion under the FM Purchase Agreement, procure that all minute books (which shall be written up to, but not including, the date of Completion) of each such Mexico Company are delivered to the Purchaser.

21

5.4   Before Completion, Purchaser shall:

(a)   take all necessary steps and provide all such information as may be reasonably requested by Seller to effect the transfer of the Assets; and

(b)   take all other commercially reasonable necessary steps and provide all such information required from Purchaser under applicable Law to obtain entry of the Sale Order.

5.5   At Completion, Purchaser shall:

(a)   instruct its legal representative or attorney-in-fact to execute the Assignment Deeds with regard to the Interests, and pay one hundred percent (100%) of the applicable notary, registration or other fees;

(b)   deliver to Seller a certificate duly executed by its secretary certifying as to (i) the resolutions of its board of directors or other governing body authorizing the execution, delivery and performance of this Agreement and each of the Purchase Documents to which it is a party or by which it is bound, and the consummation of the Transaction as contemplated hereby and thereby, and (ii) the incumbency of the officers authorized to execute this Agreement or any other Purchase Documents to which Purchaser is or is required to be a party or by which Purchaser is, or is required to be, bound;

(c)   deliver to Seller a certificate duly executed by an authorized officer of Purchaser certifying, on behalf of Purchaser, that all Purchaser's conditions set forth in clauses 3.1 and 3.3 have been fulfilled by Purchaser as of the Completion Date;

(d)   deliver to Seller a duly executed copy of each Assignment and Assumption of Services Agreement, substantially in the form attached hereto as Exhibit B;

(e)   deliver to Seller a duly executed copy of the Assignment and Assumption of Sublease Agreement, substantially in the form attached hereto as Exhibit C;

(f)   deliver the Purchase Price by wire transfer of immediately available funds to the bank account of Seller as notified to Purchaser pursuant to clause 4.2;

(g)   deliver to Seller a power of attorney duly executed on behalf of Purchaser and, as and where required by the law, legalized and apostilled, authorizing its legal representative or attorney-in-fact to enter into and execute the Assignment Deeds on its behalf; and

(h)   deliver such other documents reasonably requested by Seller.

22

5.6     At Completion, each Party shall instruct its legal representative or attorney-in-fact to execute the Assignment Deeds with regard to the Interests and to make the relevant registrations in the partners' registry book of each Mexico Company.

5.7     If the respective obligations of Seller or Purchaser under <u>clause 3</u> are not complied with on the date set for Completion under <u>clause 5.1</u>, the non-defaulting Party may by notice to the other Party:

(a)     defer Completion (in which case this <u>clause 5</u> shall apply to the Completion as so deferred); or

(b)     waive all or any such requirements and proceed to Completion as far as practicable (without limiting its rights under this Agreement); or

(c)     subject to Completion having first been deferred in accordance with <u>clause 5.7(a)</u>, terminate this Agreement.

## 6.     SELLER'S AND CREDIT BID PURCHASER'S WARRANTIES

6.1     Seller (and not Credit Bid Purchaser) represents and warrants to Purchaser as of the date of this Agreement as follows:

(a)     It is a limited liability company duly organized and validly existing under the laws of the State of Delaware and has all necessary company power and authority to own, lease and operate its assets and to carry on its business as it is now being conducted.

(b)     Subject to entry of the Sale Order and such other authorization as may be required by the Bankruptcy Court, it has full company power and authority to execute and deliver this Agreement and each of the Purchase Documents to which it will be a party, to perform its obligations hereunder and thereunder and to consummate the Transaction. The execution, delivery and performance by it of this Agreement and each of the Purchase Documents to which it will be a party and the consummation by it of the Transaction (assuming entry of the Sale Order) have been duly and validly authorized by all necessary company actions and no other company proceedings or actions on its part are necessary to authorize the consummation of the Transaction. This Agreement has been, and upon its execution each of the Purchase Documents to which it will be a party will have been, duly executed and delivered by it and (assuming entry of the Sale Order) this Agreement constitutes, and upon its execution each of the Purchase Documents to which it will be a party will constitute, the legal, valid and binding obligations of it, enforceable against it in accordance with its and their respective terms, subject to general principles of equity, including principles of commercial reasonableness, good faith and fair dealing (regardless of whether enforcement is sought in a proceeding at law or in equity).

(c)     Except for entry of the Sale Order, no consent is required to be obtained by it in connection with the execution or delivery by it of, or the performance by it of its obligations under, this Agreement, except where the failure to obtain any such consent would not, individually or in the aggregate, have a material adverse effect on the Transaction, the Mexico Companies, or the Assets.

(d)     It is the record and beneficial owner of the Interests, subject to section 363(f) of the Bankruptcy Code and has the company power and authority to sell, transfer, assign and deliver the Interests, subject to entry of the Sale Order, and such delivery will convey to Purchaser good and marketable title to the Interests, free and clear of any and all Encumbrances and Liabilities.

(e)     The execution and delivery of, and the performance by Seller of its obligations under, this Agreement and each of the Purchase Documents to which it is a party will not:

   (i)     result in a breach of any provision of the constitutional documents of Seller;

   (ii)     result in a breach of, or constitute a default under, any Contract to which Seller is a party or by which Seller is bound and which is material in the context of the Transaction, or Seller's or its Affiliates' business;

   (iii)     result in a breach of any Governmental Order to which Seller is a party or by which Seller is bound and which is material in the context of the Transaction; or

   (iv)     save as provided herein, require Seller to obtain any consent of any Governmental Authority which has not been obtained or made at the date of this Agreement both on an unconditional basis and on a basis which cannot be revoked.

(f)     True and complete copies of all Key Contracts have been furnished to Purchaser. Each Key Contract is valid, subsisting, in full force and effect and binding upon Seller and, to the knowledge of Seller, the other parties thereto in accordance with its terms. None of the Key Contracts is currently being renegotiated, and the validity, effectiveness and continuation of each of the Key Contracts will not be materially adversely affected by the Transaction. All Key Contracts were obtained and are maintained in accordance in all material respects with applicable Law. Seller is not in material breach of, or default under, any Key Contract, nor, to Seller's knowledge, is any other party to a Key Contract in breach of or in default thereunder. There are no amounts past due and owed by Seller under any Key Contract that (i) are not reflected on the Cure Schedule and (ii) will not be satisfied at or before Completion in accordance with the terms hereof

24

and the Sale Order. Seller has not entered into any Contracts with any third party to provide any services, in whole or in part, under the Service Agreements. The Houston Office is and has been operated in compliance in all material respects with the terms and provisions of the Sublease Agreement.

(g)     Neither Seller nor any of its Affiliates has entered into any Contract with any person that would require the payment, after Completion, by Purchaser Group or any Mexico Company of any brokerage fee, finders' fee or other commission in connection with the Transaction.

(h)     There are no actions, Order(s), or claims (i) challenging or otherwise affecting Seller's execution and delivery of this Agreement or any Purchase Document or (ii) seeking to prevent Seller's consummation of any transaction contemplated hereby or thereby, in each case, pending or threatened in writing against Seller.

(i)      To the knowledge of Seller, there is no law or Governmental Order which has been enacted, entered, promulgated or enforced by any Governmental Authority that prohibits, restrains or enjoins, or could be reasonably expected to prohibit, restrain or enjoin, the consummation of the Transaction.

(j)      Seller has conducted all services and operations under the Service Agreements in accordance with applicable Law, including obtaining and maintaining all necessary permits and authorizations required by applicable Governmental Authorities.

(k)     In relation to the performance of the services and obligations under the Service Agreements, neither Seller nor any of its Affiliates or their respective ABC Representatives have (i) violated any Anti-Corruption Laws, Anti-Money Laundering Laws or Sanctions Laws or (ii) made any offer, payment or promise, or authorized the offer, payment or promise, of any money or other property, gift or anything of value, regardless of form, directly or indirectly, to any Government Official or person related to any Government Official for purposes of influencing any act or decision of such Government Official in his or her official capacity to secure an improper advantage, obtain or retain business or direct business to any person or away from any person, or procure or access confidential or restricted information in violation of (or that could be reasonably expected to violate) applicable Anti-Corruption Laws, Sanctions Laws or Anti-Money Laundering Laws.

(l)      No principal, owner, officer, director or employee of Seller is a Government Official, and no such person has any legal or beneficial interest in this Agreement or in any payments to be made to it hereunder.

(m)     Neither Seller nor any of its Affiliates or their respective ABC Representatives is or has been at any time, in relation to or associated with this Agreement and the Key Contracts and their negotiation, execution and completion, the Transaction, the Assets, the activities of the Mexico Companies, or the oil and gas industry in Mexico, the subject of any Action by any Governmental Authority or any person regarding any offense or alleged offense under any Anti-Corruption Laws, Sanctions Laws or Anti-Money Laundering Laws, and no such Action has been threatened or is pending, and, to the knowledge of Seller, there are no circumstances likely to give rise to any such Action.

(n)     Neither Seller nor any of its Affiliates, or their respective ABC Representatives, (i) is a person that is a Sanctions Target, (ii) is located or organized in any Sanctions Target, or (iii) has engaged in any direct or indirect dealings or transactions in or with a Sanctions Target that would constitute a violation of the Sanctions Laws.

(o)     Neither Seller nor any of its Affiliates has, directly or indirectly, used, lent, contributed or otherwise made available funds to, directly or indirectly, fund or facilitate (i) any activities or business of or with any Sanctions Target; (ii) any money laundering or terrorist financing activities or business; or (iii) any other activities in any other manner that would result in a violation of any Anti-Corruption Laws, Anti-Money Laundering Laws or Sanctions Laws.

(p)     To the knowledge of the Seller, no Anti-Corruption Laws, Anti-Money Laundering Laws or Sanctions Laws prohibit or restrict Seller from performing its obligations under this Agreement or the Purchase Documents.

(q)     The Liability of Seller under this Agreement in relation to the Seller's Warranties, the Seller's Undertakings and all other claims under this Agreement shall be limited as set out in clause 9; *provided however* that any claims under this Agreement that arise as a result of fraud or fraudulent misrepresentation, or willful concealment, in each case, by Seller, any Affiliate of Seller, or any present or former officer, director or employee of any of the foregoing, shall not be limited as set out in clause 9 unless and only to the extent expressly stated under clause 9.

6.2     Credit Bid Purchaser Warranties.

(a)     Credit Bid Purchaser (and not Seller) represents and warrants to Purchaser as of the date of this Agreement as follows:

(i)      It is a limited liability company duly organized and validly existing under the laws of the State of Delaware and has all necessary

26

company power and authority to own, lease and operate its assets and to carry on its business as it is now being conducted.

(ii)    It has full company power and authority to execute and deliver this Agreement and to perform its obligations hereunder.. The execution, delivery and performance by it of this Agreement have been duly and validly authorized by all necessary company actions and no other company proceedings or actions on its part are necessary to authorize the consummation of the Transaction. This Agreement has been duly executed and delivered by it and constitutes the legal, valid and binding obligations of it, enforceable against it in accordance with its and their respective terms, subject to general principles of equity, including principles of commercial reasonableness, good faith and fair dealing (regardless of whether enforcement is sought in a proceeding at law or in equity).

(b)    Upon and subject to the occurrence of the Effective Date prior to the Completion Date, Credit Bid Purchaser (and not Seller) represents and warrants to Purchaser as of the date of the Effective Date as follows:

(i)    It has full company power and authority to execute and deliver each of the Purchase Documents to which it will be a party, to perform its obligations thereunder and to consummate the Transaction. The execution, delivery and performance by it of each of the Purchase Documents to which it will be a party and the consummation by it of the Transaction have been duly and validly authorized by all necessary company actions and no other company proceedings or actions on its part are necessary to authorize the consummation of the Transaction. Upon its execution and delivery of each of the Purchase Documents to which it will be a party, such documents will have been, duly executed and delivered by it and upon its execution each of the Purchase Documents to which it will be a party will constitute, the legal, valid and binding obligations of it, enforceable against it in accordance with its and their respective terms, subject to general principles of equity, including principles of commercial reasonableness, good faith and fair dealing (regardless of whether enforcement is sought in a proceeding at law or in equity).

(ii)    No consent is required to be obtained by it in connection with the execution or delivery by it of, or the performance by it of its obligations under, this Agreement, except where the failure to obtain any such consent would not, individually or in the aggregate, have a material adverse effect on the Transaction, the Mexico Companies, or the Assets.

27

(iii)    It will be the record and beneficial owner of the Interests, and have the company power and authority to sell, transfer, assign and deliver the Interests, and such delivery will convey to Purchaser good and marketable title to the Interests, free and clear of any and all Encumbrances and Liabilities, other than the Assumed Obligations.

(iv)    The execution and delivery of, and the performance by Credit Bid Purchaser of its obligations under, this Agreement and each of the Purchase Documents to which it is a party will not:

    (1)    result in a breach of any provision of the constitutional documents of Credit Bid Purchaser;

    (2)    result in a breach of, or constitute a default under, any Contract to which Credit Bid Purchaser is a party or by which Credit Bid Purchaser is bound and which is material in the context of the Transaction, or Seller's or its Affiliates' business;

    (3)    result in a breach of any Governmental Order to which Credit Bid Purchaser is a party or by which Credit Bid Purchaser is bound and which is material in the context of the Transaction; or

    (4)    save as provided herein, require Credit Bid Purchaser to obtain any consent of any Governmental Authority which has not been obtained or made at the date of this Agreement both on an unconditional basis and on a basis which cannot be revoked.

(v)    Upon and subject to occurrence of the Effective Date prior to the Completion Date,

    (1)    each Key Contract will be valid, subsisting, in full force and effect and binding upon Credit Bid Purchaser and, to the knowledge of Credit Bid Purchaser, the other parties thereto in accordance with its terms.

    (2)    None of the Key Contracts will be subject to renegotiation, and the validity, effectiveness and continuation of each of the Key Contracts will not be materially adversely affected by the Transaction.

    (3)    Credit Bid Purchaser will be not in material breach of, or default under, any Key Contract, nor, to Credit Bid Purchaser's knowledge, will any other party to a Key Contract be in breach of or in default thereunder.

(4)    There will be no amounts past due and owed by Credit Bid Purchaser under any Key Contract that will not be satisfied at or before Completion in accordance with the terms hereof.

(5)    Credit Bid Purchaser will not have entered into any Contracts with any third party to provide any services, in whole or in part, under the Service Agreements.

(6)    The Houston Office will be operated in compliance in all material respects with the terms and provisions of the Sublease Agreement.

(vi)    Neither Credit Bid Purchaser nor any of its Affiliates has entered into any Contract with any person that would require the payment, after Completion, by Purchaser Group or any Mexico Company of any brokerage fee, finders' fee or other commission in connection with the Transaction.

(vii)    There are no actions, Order(s), or claims (i) challenging or otherwise affecting Credit Bid Purchaser's execution and delivery of this Agreement or any Purchase Document or (ii) seeking to prevent Credit Bid Purchaser's consummation of any transaction contemplated hereby or thereby, in each case, pending or threatened in writing against Credit Bid Purchaser.

(viii)    To the knowledge of Credit Bid Purchaser, there is no law or Governmental Order which has been enacted, entered, promulgated or enforced by any Governmental Authority that prohibits, restrains or enjoins, or could be reasonably expected to prohibit, restrain or enjoin, the consummation of the Transaction.

(ix)    From and after, and subject to the occurrence of, the Effective Date and prior to the Completion Date, Credit Bid Purchaser will have conducted all services and operations under the Service Agreements in accordance with applicable Law, including obtaining and maintaining all necessary permits and authorizations required by applicable Governmental Authorities.

(x)    From and after, and subject to the occurrence of, the Effective Date and prior to the Completion Date, in relation to the performance of the services and obligations under the Service Agreements, neither Credit Bid Purchaser nor any of its Affiliates or their respective ABC Representatives will (i) violate any Anti-Corruption Laws, Anti-Money Laundering Laws or Sanctions Laws or (ii) make any offer, payment or promise, or authorized the offer, payment or promise, of any money or other property, gift or anything of value,

29

regardless of form, directly or indirectly, to any Government Official or person related to any Government Official for purposes of influencing any act or decision of such Government Official in his or her official capacity to secure an improper advantage, obtain or retain business or direct business to any person or away from any person, or procure or access confidential or restricted information in violation of (or that could be reasonably expected to violate) applicable Anti-Corruption Laws, Sanctions Laws or Anti-Money Laundering Laws.

(xi)   No principal, owner, officer, director or employee of Credit Bid Purchaser is a Government Official, and no such person has any legal or beneficial interest in this Agreement or in any payments to be made to it hereunder.

(xii)   Neither Credit Bid Purchaser nor any of its Affiliates or their respective ABC Representatives is or has been at any time, in relation to or associated with this Agreement and the Key Contracts and their negotiation, execution and completion, the Transaction, the Assets, the activities of the Mexico Companies, or the oil and gas industry in Mexico, the subject of any Action by any Governmental Authority or any person regarding any offense or alleged offense under any Anti-Corruption Laws, Sanctions Laws or Anti-Money Laundering Laws, and no such Action has been threatened or is pending, and, to the knowledge of Credit Bid Purchaser, there are no circumstances likely to give rise to any such Action.

(xiii)   Neither Credit Bid Purchaser nor any of its Affiliates, or their respective ABC Representatives, (i) is a person that is a Sanctions Target, (ii) is located or organized in any Sanctions Target, or (iii) has engaged in any direct or indirect dealings or transactions in or with a Sanctions Target that would constitute a violation of the Sanctions Laws.

(xiv)   Neither Credit Bid Purchaser nor any of its Affiliates has, directly or indirectly, used, lent, contributed or otherwise made available funds to, directly or indirectly, fund or facilitate (i) any activities or business of or with any Sanctions Target; (ii) any money laundering or terrorist financing activities or business; or (iii) any other activities in any other manner that would result in a violation of any Anti-Corruption Laws, Anti-Money Laundering Laws or Sanctions Laws.

(xv)   To the knowledge of the Credit Bid Purchaser, no Anti-Corruption Laws, Anti-Money Laundering Laws or Sanctions Laws prohibit or

restrict Credit Bid Purchaser from performing its obligations under this Agreement or the Purchase Documents.

(c)    The Liability of Credit Bid Purchaser under this Agreement in relation to the Credit Bid Purchaser's Warranties, the Seller's Undertakings and all other claims under this Agreement shall be limited as set out in clause 9; *provided however* that any claims under this Agreement that arise as a result of fraud or fraudulent misrepresentation, or willful concealment, in each case, by Credit Bid Purchaser, any Affiliate of Credit Bid Purchaser, or any present or former officer, director or employee of any of the foregoing, shall not be limited as set out in clause 9 unless and only to the extent expressly stated under clause 9.

**6.3    EXCEPT FOR THE REPRESENTATIONS AND WARRANTIES CONTAINED IN THIS <u>CLAUSE 6</u>, NEITHER SELLER, CREDIT BID PURCHASER, NOR ANY OTHER PERSON HAS MADE OR MAKES ANY OTHER EXPRESS OR IMPLIED REPRESENTATION OR WARRANTY, EITHER WRITTEN OR ORAL, ON BEHALF OF SELLER OR CREDIT BID PURCHASER, INCLUDING ANY REPRESENTATION OR WARRANTY AS TO THE ACCURACY OR COMPLETENESS OF ANY INFORMATION REGARDING THE ASSETS OR ANY MEXICO COMPANY FURNISHED OR MADE AVAILABLE TO PURCHASER AND ITS REPRESENTATIVES (INCLUDING ANY INFORMATION MEMORANDUM OR ANY INFORMATION, DOCUMENTS OR MATERIAL DELIVERED TO PURCHASER/MADE AVAILABLE TO PURCHASER IN A VIRTUAL DATA ROOM, MANAGEMENT PRESENTATIONS OR IN ANY OTHER FORM IN EXPECTATION OF THE TRANSACTION) OR AS TO THE FUTURE REVENUE, PROFITABILITY OR SUCCESS OF ANY MEXICO COMPANY, OR ANY REPRESENTATION OR WARRANTY ARISING FROM STATUTE OR OTHERWISE IN LAW. PURCHASER ACKNOWLEDGES AND AGREES TO THIS <u>CLAUSE 6.3</u>.**

6.4    The Seller's Warranties, provided that the Completion Date occurs prior to the Effective Date, and the Credit Bid Purchaser's Warranties, provided that the Effective Date occurs prior to the Completion Date, shall be deemed to be repeated immediately before Completion by reference to the facts and circumstances then existing, and any reference made to the date of this Agreement (whether express or implied) in relation to any Seller's Warranty (or if applicable, any Credit Bid Purchaser's Warranty) shall be construed, in relation to such repetition, as a reference to the Completion Date.

**7.    SELLER'S AND CREDIT BID PURCHASER'S UNDERTAKINGS**

**(from and after the Effective Date, unless the Completion Date has occurred prior to the Effective Date, references to "Seller" in this clause 7 (except <u>clause 7.6</u>, <u>clause 7.8</u> and <u>clause 7.9</u>) will be read as "Credit Bid Purchaser")**

31

7.1    From and after the date hereof, Seller shall make available, and Purchaser or its Affiliates may interview, Seller's or Seller's Affiliates' employees listed in Schedule II (the "**Available Employees**") during normal business hours. To the extent that the Available Employees comply with the Purchaser Group's customary pre-employment background check (as conducted in the ordinary course of business by the Purchaser Group), then the Purchaser shall, directly or indirectly, offer employment to such Available Employees, including such Available Employees who are absent due to vacation, family leave, short-term disability or other approved leave of absence, for a minimum term of six (6) months after the Completion Date subject to the following conditions:

(a)    the base salary or hourly wages, target bonus opportunities (if any), retirement and welfare benefits, and severance benefits should not be less favourable in the aggregate than those provided by Seller for such Available Employee immediately prior to the Completion;

(b)    continued employment shall be subject to compliance with the terms and conditions set forth in the employment offer, the relevant employee handbook or similar internal documents of the Purchaser Group and applicable law;

(c)    the Purchaser Group may terminate any Transferred Employee at any time for cause (in accordance with the relevant employee handbook or similar internal documents of the Purchaser Group and applicable law); and

(d)    the agreements set forth under this clause 7.1 are intended for the benefit of Seller and Purchaser only, and are not intended for the benefit of, nor any provision hereof may be enforced, by any other person (including any Available Employee or Transferred Employee);

7.2    Seller or its Affiliates, as applicable, shall terminate all Available Employees that received and accepted an employment offer from Purchaser or its Affiliates (the "**Transferred Employees**") effective as of 12:00 a.m. CST on the Completion Date. Seller or its Affiliates, as the case may be, shall only be responsible for all salaries, wages, and benefits and all other claims, costs, expenses, liabilities and other obligations, accruing before the Completion Date related to the employment of the Transferred Employees. Purchaser or its Affiliates, as applicable, shall become responsible for payment of all salaries, wages, and benefits and all other claims, costs, expenses, liabilities and other obligations, related to the Transferred Employees accruing from and after the Completion Date, and any severance and termination payments related to any Transferred Employees accruing at any time.

7.3    For the period from the date of this Agreement to the Completion Date and for a period of one (1) year from and after the Completion Date, neither Seller nor any of its Affiliates shall, whether for their own account or for the account of any person, (a) induce or attempt to induce any Available Employee or any employee of the Mexico Companies to leave the employment of its corresponding employer

32

(other than solicitations to the general public such as "help wanted" advertisements, job fairs, internet searches and similar solicitations); or (b) induce or attempt to induce any customer or supplier or contractor under the Key Contracts or of any Mexico Company to cease or refrain from doing business under the Key Contracts or with such Mexico Company.

7.4     For the period from the date of this Agreement to the Completion Date, during normal business hours and upon at least seventy-two (72) hours' written notice, Seller shall give Purchaser and its Representatives reasonable access to all of the Assets.

7.5     Effective on and from Completion, and without the necessity of any further action, Seller, for itself and its Affiliates (other than the Mexico Companies), and each of their respective Representatives and their respective successors and assigns (each, a "**Releasing Party**"), shall irrevocably release and forever discharge each Mexico Company from any and all Actions, suits, claims, controversies, rights, promises, debts, demands, obligations, costs, expenses, judgments or Liabilities of any kind, and causes of action of every nature, character and description, at law or in equity, whether known or unknown, vested or contingent, accrued or unaccrued, suspected or unsuspected, which such Releasing Party may own or hold or acquire, or has at any time owned or held, against any Mexico Company (collectively, the "**Released Claims**"). Seller, for itself, its Affiliates and their respective successors, assigns and Representatives, covenants not to bring any claim or to make any Action of any type against the Purchaser Group or the Mexico Companies relating to or in connection with the Released Claims. Seller's release and discharge in this clause 7.5 or otherwise shall not apply to such Actions, suits, claims, controversies, rights, promises, debts, liabilities, demands, obligations, costs, expenses, judgments or liabilities that relate to or arise out of this Agreement for any actions, omissions or occurrences by the Mexico Companies after Completion.

7.6     For the period from the date of this Agreement to the earlier to occur of the Effective Date and the Completion Date, Seller, and, if the Effective Date occurs prior to the Completion Date, from the Effective Date to the Completion Date, Credit Bid Purchaser, agrees to the following unless (i) expressly permitted under this Agreement, (ii) required under applicable Law or (iii) consented to in writing by Purchaser (such consent not to be unreasonably withheld, conditioned or delayed):

(a)     maintain its existence and good standing as required under applicable Law and its organizational documents;

(b)     maintain the Records in the usual, regular and ordinary course of business consistent with past practices;

(c)     maintain insurance coverage substantially similar to that in effect on the date of this Agreement;

33

(d)     maintain and operate the Assets in the ordinary course of business consistent with past practices;

(e)     comply in all material respects with all applicable Laws and Governmental Orders to which it and the Assets are subject;

(f)     comply in all material respects with the Key Contracts and maintain them in full force and effect;

(g)     give written notice to Purchaser as soon as practicable of any written notice received or given by Seller with respect to any alleged material breach of any Key Contract;

(h)     not sell, assign, transfer or dispose of any of the Assets, directly or indirectly;

(i)     not create any Encumbrance on any of the Assets that would not be released as of the Completion;

(j)     not amend, modify, terminate or renegotiate any Key Contract;

(k)     not amend, modify or increase the remuneration (including base salary, wages, benefits or bonuses) or other terms and conditions of employment of any Available Employee from the amounts, terms and conditions provided to Purchaser prior to the date hereof, unless in the ordinary course of business and in accordance with past practices, as required under applicable Law, or with prior consent of Purchaser;

(l)     not grant any right to, or interest in, the Assets that would not be released as of the Completion, except as permitted under clause 10.4;

(m)     comply with the relevant provisions under Schedule IV; and

(n)     not authorize, or commit or agree to take, any of the foregoing actions that are prohibited by this clause 7.6.

7.7     If the Completion Date occurs prior to the Effective Date, Seller shall, and if the Effective Date occurs prior to the Completion Date, Credit Bid Purchaser shall, use commercially reasonable efforts to obtain the required consents to assign the Sublease Agreement to Purchaser and, to the extent applicable, extend the term of the Sublease Agreement as directed by Purchaser.

7.8     To the extent that, prior to the Completion Date, Seller sells, transfers or assigns any of the Interests to Credit Bid Purchaser pursuant to the Plan, the Credit Bid Purchase Agreement or otherwise, Credit Bid Purchaser shall:

(a)     concurrently therewith accept assignment from Seller of all of the Interests, as well as all of the other Assets (including the Key Contracts);

34

(b)    at least five (5) Business Days prior thereto, provide Purchaser with notice of such contemplated sale, transfer or assignment and a copy of the underlying transaction documents therefore;

(c)    not assign, sell, transfer or otherwise dispose of any of the Assets to any third party without the prior written consent of Purchaser (which consent may be withheld in Purchaser's sole discretion);

(d)    not take any action which is intended to, or fail to take any action the intent of which failure to act is to, result in the breach or termination of the FM Purchase Agreement or this Agreement, or the non-occurrence of the Completion Date; and

(e)    at Completion, assign, sell, convey and deliver to Purchaser all of the rights, title and interests to the Assets (including the Interests), free and clear of all Encumbrances and Liabilities, other than the Assumed Obligations.

7.9    Credit Bid Purchaser shall, at the request and expense of the Seller, (i) provide Purchaser with all necessary documents and information in the possession of the Credit Bid Purchaser for Purchaser to make all necessary filings and, to the extent required to be submitted by Credit Bid Purchaser by applicable law, to submit all such information, documents and powers of attorney that are required by any Governmental Authority to obtain the COFECE Approval (as defined in the FM Purchase Agreement) and (ii) shall also provide reasonable assistance in a timely manner to the Purchaser with respect to any additional information or clarification request from any Governmental Authority in order to obtain the COFECE Approval.

## 8.    PURCHASER WARRANTIES

8.1    Purchaser represents and warrants to Seller and Credit Bid Purchaser as of the date of this Agreement as follows:

(a)    Purchaser has the requisite power and authority to enter into and perform this Agreement and each of the Purchase Documents to which it is a party and Purchaser is acting as principal for its sole account.

(b)    This Agreement and each of the Purchase Documents to which Purchaser is a party constitutes legal, valid, binding and enforceable obligations of Purchaser in accordance with their respective terms, except as enforcement may be limited by applicable bankruptcy, insolvency, reorganization, moratorium or similar laws affecting creditors' rights generally and by general principles of equity (regardless of whether considered in a proceeding in equity or at law); no order has been made and no resolution has been passed for the winding up or liquidation of Purchaser or for a provisional liquidator to be appointed in respect of it and no petition has

35

been presented and no meetings have been convened for the purpose of winding up or liquidating Purchaser.

(c)    Purchaser:

    (i)    has such knowledge and experience in financial and business matters that it is capable of evaluating the merits and risks of its investment in the Assets, and is able to bear the economic risk of such investment indefinitely;

    (ii)    has had the opportunity to meet with representative officers and other representatives of Seller and received all materials, documents and other information that Purchaser deems necessary or advisable to evaluate the Interests;

    (iii)    has made its own independent examination, investigation, analysis and evaluation of the Interests, including its own estimate of the value of the Interests; and

    (iv)    has undertaken such due diligence pertaining to the Assets as Purchaser deems adequate, including that described above.

(d)    The execution and delivery of, and the performance by Purchaser of its obligations under, this Agreement and each of the Purchase Documents to which it is a party will not:

    (i)    result in a breach of any provision of the constitutional documents of Purchaser;

    (ii)    result in a breach of, or constitute a default under, any contract to which Purchaser is a party or by which Purchaser is bound (other than the Key Contracts) and which is material in the context of the Transaction;

    (iii)    result in a breach of any Governmental Order to which Purchaser is a party or by which Purchaser is bound and which is material in the context of the Transaction; or

    (iv)    save as provided herein, require Purchaser to obtain any consent of any Governmental Authority with respect to the Assets, which has not been obtained or made at the date of this Agreement both on an unconditional basis and on a basis which cannot be revoked.

(e)    No administration order has been made and no petition for such an order has been presented in respect of Purchaser.

(f)    In relation to or associated with activities conducted in the oil and gas industry in Mexico, Purchaser, and to the knowledge of Purchaser, its

36

Affiliates and their respective ABC Representatives have not at any time: (i) violated any applicable Anti-Corruption Laws, Anti-Money Laundering Laws or Sanctions Laws; or (ii) made any offer, payment or promise, or authorized the offer, payment or promise, of any money or other property, gift or anything of value, regardless of form, directly or indirectly, to any Government Official or person related to any Government Official for purposes of influencing any act or decision of such Government Official in his or her official capacity to secure an improper advantage, obtain or retain business or direct business to any person or away from any person, or procure or access confidential or restricted information related to the Assets, in each case, in violation of applicable Anti-Corruption Laws, Sanctions Laws or Anti-Money Laundering Laws.

(g)     To Purchaser's knowledge, no Anti-Corruption Laws, Anti-Money Laundering Laws or Sanctions Laws prohibit or restrict Purchaser from performing its obligations under this Agreement.

(h)     In relation to or associated with activities conducted in the oil and gas industry in Mexico, none of Purchaser, nor, to the knowledge of Purchaser, its Affiliates or their ABC Representatives are or have been the subject of any Action by any Governmental Authority regarding any offense or alleged offense under any Anti-Corruption Laws, Sanctions Laws or Anti-Money Laundering Laws, and no such Action has been threatened in writing or is pending, and, to the knowledge of Purchaser, there are no circumstances likely to give rise to any such Action.

(i)     To the extent this would prohibit or restrict Purchaser from fulfilling its obligations under this Agreement, neither Purchaser nor any of its Affiliates has, directly or indirectly, used, lent, contributed or otherwise made available funds to, directly or indirectly, fund or facilitate: (i) any activities or business of or with any Sanctions Target; (ii) any money laundering or terrorist financing activities or business; or (iii) any other activities in any other manner that could reasonably result in a violation of any applicable Anti-Corruption Laws, Anti-Money Laundering Laws or Sanctions Laws.

8.2     **EXCEPT FOR THE REPRESENTATIONS AND WARRANTIES CONTAINED IN THIS <u>CLAUSE 8</u> AND IN THE PURCHASE DOCUMENTS, NEITHER PURCHASER, NOR ANY OTHER PERSON HAS MADE OR MAKES ANY OTHER EXPRESS OR IMPLIED REPRESENTATION OR WARRANTY, EITHER WRITTEN OR ORAL, ON BEHALF OF PURCHASER, INCLUDING ANY REPRESENTATION OR WARRANTY ARISING FROM STATUTE OR OTHERWISE IN LAW. SELLER AND CREDIT BID PURCHASER ACKNOWLEDGE AND AGREE TO THIS <u>CLAUSE 8.2</u>.**

8.3     The Purchaser Warranties shall be deemed to be repeated immediately before Completion by reference to the facts and circumstances then existing, and any

reference made to the date of this Agreement (whether express or implied) in relation to any Purchaser Warranty shall be construed, in relation to such repetition, as a reference to the Completion Date.

## 9.    LIMITATION ON LIABILITY

9.1    Neither Seller nor Credit Bid Purchaser shall be liable for any individual claim or series of related claims, taken as a whole, that do not exceed $50,000.

9.2    The Fundamental Warranties shall survive Completion and continue in full force and effect indefinitely or until the date that is six (6) months after the applicable statute of limitations. Subject to clause 2.4, the Seller's Warranties (other than the Fundamental Warranties), the Credit Bid Purchaser's Warranties (other than Fundamental Warranties) and the Purchaser Warranties contained in this Agreement or in any instrument delivered under this Agreement shall survive and continue in full force and effect for twelve (12) months after the Completion Date, and no Party shall have any right or claim with respect to any such Seller's Warranties, Credit Bid Purchaser's Warranties or Purchaser Warranties thereafter, except to the extent arising out of fraud. Seller's Undertakings set forth in clause 7.6 shall survive Completion and terminate on the date that is six (6) months after the Completion Date. The Undertakings of the parties to this Agreement which, by their terms, contemplate performance after Completion shall survive Completion until, and shall expire when, fully performed. In the event that notice of any claim for breach of a Warranty or an Undertaking has been given within the applicable survival period and specifies (in reasonable detail) the matter which gives rise to such claim for breach, the nature of the breach and the amount claimed in respect thereof (detailing the calculation of the loss thereby alleged to have been suffered by the party seeking damages or any Mexico Company, in the case of a claim by Purchaser) the Warranties and Undertakings that are the subject of such claim (and the right to pursue such claim) shall survive with respect to such claim until such time as such claim is fully, finally and indefeasibly resolved and (if applicable) satisfied.

9.3    Without limiting the rights or obligations of any Party under any Purchase Document, Purchaser acknowledges that (a) it has had independent legal, accounting, financial, technical and other relevant expert advice relating to the purchase of the Assets and the terms of the Purchase Documents, including the terms of this clause 9.3, and (b) this Agreement is entered into on the basis and condition that neither Seller, the Credit Bid Purchaser, any of their respective Representatives, nor any of their respective directors, officers, employees or advisers has made or makes any Assurance as to the accuracy or completeness of information provided to Purchaser, or accepts any duty of care in relation to Purchaser or any other person in respect of the provision of such information and that none of such persons shall be under, or subject to, any Liability to Purchaser or any other person in the event that, for whatever reason, any of such information is or becomes inaccurate, incomplete or misleading in any particular manner.

38

9.4     The maximum aggregate Liability of Seller, and, solely if applicable, Credit Bid Purchaser under or in connection with this Agreement, whether in tort, contract, under statute or otherwise, shall not exceed one hundred percent (100%) of the Purchase Price.  Notwithstanding anything that may be expressed or implied in this Agreement or any ancillary document, each Party, on behalf of itself and its affiliates and their respective representatives, covenants, agrees and acknowledges that no person other than the Parties (and their respective successors or assignees, as applicable) has any obligation hereunder and that, neither any Party, their respective affiliates or their respective representatives, shall have any right of recovery under this Agreement or any ancillary document against, and no personal liability under this Agreement or any ancillary document shall attach to, any Party's former, current or future debt or equity financing sources, equity holders, controlling Persons, directors, officers, employees, general or limited partners, members, managers, affiliates or agents, or any former, current or future equity holder, controlling Person, director, officer, employee, general or limited partner, member, manager, affiliate or agent of any of the foregoing (collectively, each of the foregoing but not including the Parties, a "**Non-Recourse Party**"), whether by or through attempted piercing of the corporate, limited partnership or limited liability company veil, by or through a claim by or on behalf of any Party against any Non-Recourse Party, by the enforcement of any assessment or by any legal or equitable proceeding, by virtue of any applicable Law, whether in contract, tort or otherwise. Without limiting the foregoing, no past, present or future director, officer, employee, incorporator, member, partner, stockholder, affiliate, agent, attorney or representative of the Parties or their respective affiliates shall have any liability for any obligations or liabilities of the Parties under this Agreement of or for any claim based on, in respect of, or by reason of, the transactions contemplated hereby.

9.5     NOTWITHSTANDING ANY OTHER PROVISION OF THIS AGREEMENT, NO PARTY SHALL HAVE ANY LIABILITY UNDER THIS AGREEMENT FOR ANY LOSS OR LIABILITY THAT CONSTITUTES AN INDIRECT OR CONSEQUENTIAL LOSS.

9.6     Without prejudice and subject to clause 9.4:

(a)     save for matters accurately, fully and fairly disclosed in the Purchase Documents, neither the Seller's liability nor the rights of the Purchaser or the Purchaser Group to indemnification or any other remedy under this Agreement shall be impacted or limited by any knowledge that a member of the Purchaser Group may have acquired, or could have acquired, whether before or after the Completion Date, nor by any investigation or diligence by the same. Notwithstanding anything to the contrary in this Agreement, the Seller hereby acknowledges that, regardless of any investigation made (or not made) by or on behalf of the Purchaser, and regardless of the results of any such investigation, the Purchaser has entered into this transaction in express reliance upon the Seller's Warranties, the Credit Bid Purchaser's

39

Warranties and Undertakings made in this Agreement and the Purchase Documents;

(b)    for the sole purpose of determining the amount of any Party's Liability for the breach of any of its respective Warranties (and not for determining whether any breach of any Warranty has occurred), the Warranties set forth in this Agreement shall not be deemed qualified by any references to materiality;

(c)    Seller and Credit Bid Purchaser (solely to the extent applicable) shall not be liable in respect of any claim if and to the extent that (and for the avoidance of doubt only to the extent of such allowance, provision or reserve) sufficient allowance, provision or reserve in respect of the fact, matter, event or circumstance giving rise to such claim has been made in the financial statements of the Mexico Companies prepared in accordance with applicable generally accepted accounting principles or disclosed in the notes thereto;

(d)    If, in respect of any matter which would give rise to a claim for breach of the Seller's Warranties, the Credit Bid Purchaser's Warranties or Undertakings (solely to the extent applicable), a Mexico Company is entitled to make a claim under any policy of insurance for such matter, then the Purchaser shall cause such Mexico Company to make claim against its insurer; *provided, however*, that nothing herein shall preclude the Purchaser or any member of the Purchaser Group from making any claim against Seller for Seller's obligations under this Agreement. Claims made under any insurance policy by the Purchaser or a Mexico Company shall only reduce the Seller's or Credit Bid Purchaser's Liability (solely to the extent applicable) hereunder to the extent any payments are actually received by the Purchaser or a Mexico Company net of any reasonable and documented costs and taxes associated with recovering such insurance proceeds;

(e)    Seller and Credit Bid Purchaser shall not be liable in respect of any claim if and to the extent that the loss or Liability to which the claim relates has otherwise been made good or has otherwise been compensated for in full without loss to any member of the Purchaser Group. If Seller or Credit Bid Purchaser pays Purchaser any amount in respect of a claim and Purchaser or any member of the Purchaser Group subsequently becomes entitled to recover from a third party a sum which is referable to that claim (including any discount, relief or credit), Purchaser shall give prompt notice to Seller or Credit Bid Purchaser, and shall use, and shall procure that any relevant member of the Purchaser's Group uses, reasonable endeavors to recover from such third party; *provided that* Seller's and Credit Bid Purchaser's obligations hereunder shall not be limited or affected by the Purchaser's claims against, or actual recovery from, any such third party. If any amount is actually recovered from such third party, then such amount (up to the

40

amount actually paid by Seller or Credit Bid Purchaser to Purchaser) shall promptly be repaid by Purchaser to Seller or Credit Bid Purchaser; and

(f)     Seller's and Credit Bid Purchaser's Liability in respect of any claim shall be limited if and to the extent that such claim would not have arisen but for, or is increased as a result of, any voluntary act or omission of Seller, Credit Bid Purchaser, any of their Affiliates, or any Mexico Company prior to Completion taken at the express written request of or with the express written consent of the Purchaser.

9.7     Purchaser shall not be entitled to recover damages or obtain payment, reimbursement, or restitution more than once in respect of the same loss or Liability, regardless of whether more than one claim arises in respect of it, and for this purpose recovery by Purchaser or any of the Mexico Companies shall be deemed to be a recovery by each of them.

9.8     The Party making a claim under this Agreement is referred to as the "**Claiming Party**", and the Party against whom such claim is asserted is referred to as the "**Responding Party**". If any Claiming Party receives notice of the assertion or commencement of any action, suit, claim or other legal proceeding made or brought by any person who is not any of Seller, Purchaser or an Affiliate or a Representative of Seller or Purchaser (a "**Third-Party Claim**") against such Claiming Party with respect to which the Responding Party is responsible under the provisions of this Agreement, the Claiming Party shall give the Responding Party prompt written notice thereof. The failure to give such prompt written notice shall not, however, relieve the Responding Party of its responsibilities hereunder, except and only to the extent that the Responding Party forfeits rights or defenses by reason of such failure. Such notice by the Claiming Party shall describe the Third-Party Claim in reasonable detail, shall include copies of all material written evidence thereof and shall indicate the estimated amount, if reasonably practicable, of the Liability that has been or may be sustained by the Claiming Party. The Responding Party shall have the right to participate in, or by giving written notice to the Claiming Party, to assume the defense of any Third-Party Claim at the Responding Party's expense and by the Responding Party's own counsel, and the Claiming Party shall cooperate in good faith in such defense. In the event that the Responding Party assumes the defense of any Third-Party Claim, it shall have the right to take such action as it deems necessary to avoid, dispute, defend, appeal or make counterclaims pertaining to any such Third-Party Claim in the name and on behalf of the Claiming Party. The Claiming Party shall have the right, at its own cost and expense, to participate in the defense of any Third-Party Claim with counsel selected by it subject to the Responding Party's right to control the defense thereof. If the Responding Party elects not to compromise or defend such Third-Party Claim or fails to notify the Claiming Party in writing of its election to defend such Third-Party within thirty (30) days following the delivery of notice by the Claiming Party, the Claiming Party may pay, compromise and defend such Third-Party Claim and seek indemnification for any and all Liabilities based upon, arising from or relating to such Third-Party Claim. Seller and Purchaser shall cooperate with each other in all reasonable

41

respects in connection with the defense of any Third-Party Claim, including making available records relating to such Third-Party Claim and furnishing, without expense (other than reimbursement of actual out-of-pocket expenses) to the defending party, management employees of the non-defending party as may be reasonably necessary for the preparation of the defense of such Third-Party Claim. If the Responding Party fails or refuses to assume the defense of a Third-Party Claim pursuant to this clause 9.8, the Claiming Party may agree to any reasonable settlement without the written consent of the Responding Party. Notwithstanding any other provision of this Agreement, the Responding Party shall not enter into settlement of any Third-Party Claim without the prior written consent of the Claiming Party (which consent shall not be unreasonably withheld, conditioned or delayed). If a firm offer is made to settle a Third-Party Claim without leading to Liability or the creation of a financial or other obligation on the part of the Claiming Party, its Affiliates, or its or their assets, and provides, in customary form, for the unconditional release of each Claiming Party from all Liabilities and obligations in connection with such Third-Party Claim and the Responding Party desires to accept and agree to such offer, the Responding Party shall give written notice to that effect to the Claiming Party. If the Claiming Party fails to consent to such firm offer within thirty (30) days after its receipt of such notice and any additional information reasonably necessary to understand the settlement offer, the Claiming Party may continue to contest or defend such Third-Party Claim and in such event, the maximum liability of the Responding Party as to such Third-Party Claim shall not exceed the amount of such settlement offer (as such liability may be further limited by this Agreement), with the understanding that the terms of this Agreement shall control the manner, timing and payment of such remedies. If the Claiming Party fails to consent to such firm offer and also fails to assume defense of such Third-Party Claim, the Responding Party may settle the Third-Party Claim upon the terms set forth in such firm offer to settle such Third-Party Claim to the extent it complies with the requirements in set forth in the in this Section 9.7.

9.9     Any claim by a Claiming Party on account of a Liability which does not result from a Third-Party Claim (a "**Direct Claim**") shall be asserted by the Claiming Party giving the Responding Party prompt written notice thereof. The failure to give such prompt written notice shall not, however, relieve the Responding Party of its indemnification or other obligations, except and only to the extent that the Responding Party forfeits rights or defenses by reason of such failure. Such notice by the Claiming Party shall describe the Direct Claim in reasonable detail, shall include copies of all material written evidence thereof and shall indicate the estimated amount, if reasonably practicable, of the Liability that has been or may be sustained by the Claiming Party. The Responding Party shall have thirty (30) days after its receipt of such notice to respond in writing to such Direct Claim. During such thirty (30)-day period, the Claiming Party shall allow the Responding Party and its professional advisors to investigate the matter or circumstance alleged to give rise to the Direct Claim, and whether and to what extent any amount is payable in respect of the Direct Claim. If the Responding Party does not so respond within such thirty (30)-day period, the Responding Party shall be deemed to have

rejected such claim.  In the event that the Responding Party is deemed to have rejected a claim or has affirmatively rejected a claim, the Claiming Party shall be free to pursue such remedies as may be available to the Claiming Party on the terms and subject to the provisions of this Agreement, with the understanding that the terms of this Agreement shall control the manner, timing and payment of such remedies.

9.10    Nothing in this Agreement shall relieve Purchaser or Seller of their common law duty to mitigate its or their loss.

## 10.    CERTAIN MATTERS

10.1    <u>Bankruptcy Court Filings</u>.

(a)    Notwithstanding any conflicting or inconsistent provision of this Agreement, Seller's obligations under this Agreement are subject to and contingent upon the entry of the Sale Order. If the Effective Date has not occurred by the Bankruptcy Outside Date, Seller and Purchaser shall cooperate to file a motion with the Bankruptcy Court to approve the Sale Order and obtain the Bankruptcy Court's entry of the Sale Order and a finding of adequate assurance of future performance by Purchaser of the Key Contracts.  Purchaser will furnish affidavits or other documents or information, if requested by Seller, for filing with the Bankruptcy Court for the purposes of, among others, providing necessary assurances of performance by Purchaser under this Agreement and the Key Contracts, and demonstrating that Purchaser is a "good faith" purchaser under section 363(m) of the Bankruptcy Code.

(b)    If the Completion Date occurs before the Effective Date, Seller shall

(i)    pay or otherwise satisfy, pursuant to section 365 of the Bankruptcy Code and the Sale Order, the Liabilities that are required to be paid or otherwise satisfied to cure all monetary defaults under the Key Contracts to the extent required by section 365(b)(1)(A) and (B) of the Bankruptcy Code in connection with the assumption and assignment of the Key Contracts ("**Cure Costs**");

(ii)    serve on all non-Debtor counterparties to Key Contracts a notice (the "**Cure Notice**") specifically stating that Seller is seeking the assumption and assignment of such Key Contract; and

(iii)    notify such non-Debtor counterparty of the deadline for objecting to the Cure Costs, if any, which deadline shall not be less than seven (7) days prior to the hearing scheduled to consider approval of the Sale Order or as otherwise determined by the Bankruptcy Court; for the avoidance of doubt, the Cure Notice shall include the Cure Schedule, substantially in the form attached hereto as <u>Schedule III</u>.

43

(c)     Each of Seller and Purchaser shall keep the other Party reasonably apprised of the status of material matters related to this Agreement, including, upon reasonable request, promptly furnishing the other Party with copies of notices or other communications received by such Party from the Bankruptcy Court or any third party or any Governmental Authority with respect to the transactions contemplated by this Agreement.

(d)     The Sale Order shall, among other things, (i) approve, pursuant to sections 105, 363 and 365 of the Bankruptcy Code, (A) the execution, delivery and performance by Seller of this Agreement, (B) the sale of the Assets to Purchaser on the terms set forth herein and free and clear of all Encumbrances and Liabilities, other than the Assumed Obligations and (C) the performance by Seller of its obligations under this Agreement, (ii) authorize and empower Seller to assume and assign to Purchaser or its designee(s) the Key Contracts, (iii) find that Purchaser is a "good faith" purchaser within the meaning of section 363(m) of the Bankruptcy Code, find that Purchaser is not a successor to Seller and grant Purchaser the protections of section 363(m) of the Bankruptcy Code, (iv) find that Purchaser shall have no Liability or responsibility for any Liability or other obligation of Seller arising under or related to the Assets (other than as expressly set forth in this Agreement or as required under applicable non-bankruptcy Law), including successor or vicarious Liabilities of any kind or character, including any theory of antitrust, successor, or transferee Liability, labor law, de facto merger, or substantial continuity, (v) find that Purchaser has provided adequate assurance (as that term is used in section 365 of the Bankruptcy Code) of future performance in connection with the assumption of the Key Contracts and (vi) find that Purchaser shall have no Liability for any Liability other than the Assumed Obligations. Without limiting Seller's obligation to take all such actions as are reasonably necessary to obtain Bankruptcy Court approval of the Sale Order, Purchaser agrees that it will promptly take reasonable actions to assist in obtaining Bankruptcy Court approval of the Sale Order, including furnishing affidavits or other documents or information for filing with the Bankruptcy Court for purposes, among others, of (x) demonstrating that Purchaser is a "good faith" purchaser under section 363(m) of the Bankruptcy Code and (y) establishing adequate assurance of future performance within the meaning of section 365 of the Bankruptcy Code. Nothing in this Agreement shall require Purchaser, Seller or their respective Affiliates to give testimony to or submit any pleading, affidavit or information to the Bankruptcy Court or to any person that is untruthful or to violate any duty of candor or other fiduciary duty to the Bankruptcy Court or their respective stakeholders.

(e)     If the Completion Date occurs prior to the Effective Date, Seller acknowledges and agrees, and the Sale Order shall provide, that on the Completion Date (to the extent that the Completion Date occurs prior to the Effective Date) and concurrently with the occurrence of the closing under

44

this Agreement and the FM Purchase Agreement, all then existing or thereafter arising obligations, Liabilities and Encumbrances of, against or created by Seller or its bankruptcy estate (other than the Assumed Obligations), to the fullest extent permitted by sections 363 and 365 of the Bankruptcy Code, shall be fully released from and with respect to the Assets. On the Completion Date, the Assets shall be transferred, in accordance with the Sale Order, to Purchaser free and clear of all obligations, Liabilities and Encumbrances, other than the Assumed Obligations to the fullest extent permitted by section 363 of the Bankruptcy Code.

(f)     After entry of the Sale Order, if applicable, Purchaser shall not take any action that is intended to, or fail to take any action the intent of which failure to act is to, result in the reversal, voiding, modification or staying of the Sale Order.

(g)     If applicable, in the event the entry of the Sale Order or any other Orders of the Bankruptcy Court relating to this Agreement or the transactions contemplated hereby shall be appealed by any person (or if any petition for certiorari or motion for reconsideration, amendment, clarification, modification, vacation, stay, rehearing or reargument shall be filed with respect to the Sale Order or such other Order), Seller shall use commercially reasonable efforts to defend such appeal. Seller shall comply with all notice requirements (i) of the Bankruptcy Code and the Federal Rules of Bankruptcy Procedure or (ii) imposed by the Bankruptcy Court or the Sale Order in connection with any pleading, notice or motion to be filed in connection herewith.

10.2    Submission to Jurisdiction; Consent to Service of Process.

(a)     If the Effective Date occurs before the Completion Date and without limiting any Party's right to appeal any Order of the Bankruptcy Court, (i) the Bankruptcy Court will retain exclusive jurisdiction to enforce the terms of this Agreement and to decide any claims or disputes, which may arise or result from, or be connected with, this Agreement, any breach or default hereunder, or the Transaction, and (ii) any and all proceedings related to the foregoing will be filed and maintained only in the Bankruptcy Court, and the Parties hereby consent to and submit to the jurisdiction and venue of the Bankruptcy Court for such purposes and will receive notices at such locations as indicated in clause 18; *provided, howeve*r, that if the Chapter 11 Cases have been closed pursuant to section 350 of the Bankruptcy Code, the Parties agree to unconditionally and irrevocably submit to the exclusive jurisdiction of the United States District Court for the Southern District of Texas and any federal appellate court therefrom within the State of Texas (or in the event (but only in the event) that such court does not have subject matter jurisdiction over such action, in a Texas state court of competent jurisdiction in Harris County, Texas) and any

45

appellate court from any thereof, for the resolution of any such claim or dispute. The Parties hereby irrevocably waive, to the fullest extent permitted by applicable Law, any objection which they may now or hereafter have to the laying of venue of any such dispute brought in any such court or any defense of inconvenient forum for the maintenance of such dispute. Each of the Parties agrees that a judgment in any such dispute may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by Law.

(b)     Each Party hereby consents to process being served by any other Party in any action by delivery of a copy thereof in accordance with the provisions of <u>clause 18.1</u>; *provided, however*, that such service will not be effective until the actual receipt thereof by the Party being served.

(c)     EACH OF THE PARTIES AND THEIR RESPECTIVE SUCCESSORS AND ASSIGNS HEREBY IRREVOCABLY WAIVES ALL RIGHT TO TRIAL BY JURY IN ANY ACTION, PROCEEDING OR COUNTERCLAIM (WHETHER BASED ON CONTRACT, TORT OR OTHERWISE) ARISING OUT OF OR RELATING TO THIS AGREEMENT, THE TRANSACTIONS CONTEMPLATED HEREBY OR THE ACTIONS OF ANY OTHER PARTY IN THE NEGOTIATION, ADMINISTRATION, PERFORMANCE AND ENFORCEMENT THEREOF.

10.3     <u>Sale Free and Clear</u>.

(a)     The Parties intend that, to the fullest extent permitted by applicable Law (including under section 363 of the Bankruptcy Code, as applicable), upon Completion, Purchaser shall not be deemed to:  (i) be the successor of Seller or Credit Bid Purchaser, as applicable, (ii) have, de facto, or otherwise, merged with or into Seller or Credit Bid Purchaser, as applicable, (iii) be a mere continuation or substantial continuation of Seller or Credit Bid Purchaser, as applicable, or the enterprise(s) of Seller or Credit Bid Purchaser, as applicable, or (iv) be liable or have any Liability for any acts or omissions of Seller or Credit Bid Purchaser, as applicable, in the conduct of its businesses or arising under or related to the Assets other than as expressly set forth and agreed in this Agreement. Without limiting the generality of the foregoing, and except as otherwise expressly provided in this Agreement, the Parties intend that Purchaser shall have no Liability for any Encumbrance or Liability (other than the Assumed Obligations) against Seller or Credit Bid Purchaser or any of Seller's or Credit Bid Purchaser's, as applicable, predecessors or Affiliates, and Purchaser shall have no successor or vicarious liability of any kind or character whether known or unknown as of the Completion Date or in connection with the transactions contemplated to occur on the Completion Date, whether now existing or hereafter arising, or whether fixed or contingent, with respect to the businesses of Seller or Credit Bid Purchaser, as applicable, the Assets or

46

any Liability of Seller or Credit Bid Purchaser, as applicable, arising prior to, or relating to any period occurring prior to, the Completion Date. To the extent that the Completion Date occurs before the Effective Date, the Parties agree that the Sale Order shall contain provisions substantially in the form set forth in this <u>clause 10.3(a)</u>.

10.4    <u>Implementation of Plan or Other Transfers</u>.

(a)    To the extent that, prior to the Completion Date, Seller transfers the Interests to the Credit Bid Purchaser or any third party, pursuant to the Plan or otherwise, Seller shall cause the Credit Bid Purchaser or such third party to also accept the assignment of (A) all of the Assets (including the Key Contracts) and (B) this Agreement (except for <u>clauses 2.1</u>, <u>3.1(e)</u>, <u>3.3(b)</u> and <u>10.1</u>) such that the Credit Bid Purchaser, or such third party who becomes a party to this Agreement, is bound hereby to the same extent as Seller, whose obligations hereunder shall thereupon be released; provided that it is understood and agreed that Credit Bid Purchaser does not assume, and shall not have any liability for, the representations and warranties of Seller set forth in <u>clause 6.1 or the covenants of Seller under</u> clause 10.1.

(b)    Unless in conjunction with a transfer of the other Assets as described in <u>clause 10.4(a)</u> above, Seller shall not assign any of the Key Contracts to any third party.

(c)    At least five (5) Business Days prior to any contemplated consummation of the Plan (or of any other plan of reorganization or liquidation confirmed by the Bankruptcy Court or other sale or disposition of the Assets and/or Fieldwood U.A. Interests authorized by the Bankruptcy Court), Seller shall provide Purchaser with notice of such contemplated consummation, which notice shall include (i) confirmation of the expected treatment of the Interests, Key Contracts, and Fieldwood U.A. Interests, as well as all other Assets, (ii) the identity of any person or persons to whom the Interests, Key Contracts, Fieldwood U.A. Interests, and other Assets are to be transferred or assigned, as applicable, and (iii) the proposed forms of assignment (which shall be in form and substance reasonably acceptable to Purchaser) to be given by the transferee and assignee, as applicable, to Purchaser on the date of consummation in accordance with <u>clause 10.4(a)</u>.

## 11.    CONFIDENTIALITY

11.1    For a period of two (2) years after the earlier of the Completion Date or the termination of this Agreement, Purchaser undertakes to Seller and Credit Bid Purchaser, and Seller and Credit Bid Purchaser undertake to Purchaser, to treat as confidential and to keep separate, the provisions of this Agreement, all information received or obtained as a result of entering into or performing this Agreement which relates to the negotiation of, or the provisions or subject matter of, any of the Purchase Documents, and any claim or potential claim thereunder or which relates

47

to (in the case of Seller only) the Purchaser Group and the businesses carried on by each member of them and (in the case of Purchaser only) any information received or held by Purchaser or any of its Representatives which relates to Seller or its Affiliates or, prior to Completion any of the Mexico Companies or the business carried on by any Mexico Company ("**Confidential Information**"). Each Party undertakes to cause its Affiliates and its and their respective directors, employees and Representatives to comply with this <u>clause 11</u> as if they were a Party.

11.2    Any Party may disclose Confidential Information:

(a)    if such disclosure is required by applicable law or for the purpose of any Actions, including the Chapter 11 Cases;

(b)    if such disclosure is required by any securities exchange or regulatory body or Governmental Authority having jurisdiction over it and whether or not the requirement for information has the force of law;

(c)    on a strictly confidential basis to its Representatives or to its Affiliates, which in each case shall have a legitimate need to know the same and which are aware of and accept the restrictions in the terms of this <u>clause 11</u> (and in relation to whom the disclosing Party shall be liable for any breach of those terms);

(d)    if the Confidential Information concerned was lawfully in its possession prior to its being obtained or received;

(e)    in connection with the process to obtain the Required Approvals (as defined in the FM Purchase Agreement);

(f)    to the extent the information has come into the public domain through no fault of that Party or any person to whom such Confidential Information has been disclosed; or

(g)    if the other Party has given prior written approval to the disclosure.

## 12.    EFFECT OF COMPLETION

Except as otherwise provided in the Purchase Documents, any provision of the Purchase Documents which is capable of being performed after but which has not been performed at or before Completion and all Assurances contained in or entered into pursuant to this Agreement shall remain in full force and effect notwithstanding Completion.

## 13.    REMEDIES AND WAIVERS

13.1    Except as otherwise provided in the Purchase Documents, no delay or omission by any Party in exercising any right, power or remedy provided by law or under this Agreement shall affect that right, power or remedy or operate as a waiver of it.

48

13.2    The single or partial exercise of any right, power or remedy provided by law or under this Agreement shall not preclude any other or further exercise of it or the exercise of any other right, power or remedy.

13.3    No waiver of any right, power or remedy provided by law or under this Agreement shall take effect unless it is in writing and signed by authorized representatives of the Party giving the waiver.

13.4    Except as otherwise provided in this Agreement, the rights, powers and remedies contained in this Agreement are cumulative and not exclusive of any rights, powers and remedies provided by applicable law.

13.5    Seller, Credit Bid Purchaser and Purchaser acknowledge that the rights of Purchaser to consummate the Transaction are unique and recognize and affirm that in the event of a breach of this Agreement by Seller or, after the Effective Date, Credit Bid Purchaser, money damages may be inadequate and Purchaser may have no adequate remedy at law.  Accordingly, the Parties agree that Purchaser shall have the right, in addition to any other rights and remedies existing in its favor at law or in equity, to enforce its rights and Seller's and, after the Effective Date, Credit Bid Purchaser's, obligations hereunder by an Action or Actions for specific performance, injunctive and/or other equitable relief (without posting of bond or other security).  Seller and Credit Bid Purchaser further agrees not to assert and waive (a) any defense in any action for specific performance that a remedy at Law would be adequate and (b) any requirement under any Law to post security or provide indemnity as a prerequisite to obtaining equitable relief.

## 14.    ASSIGNMENT

Prior to Completion, except as provided for in clause 10.4, neither rights nor obligations under this Agreement shall be assignable by any Party except that Purchaser shall have the right to (a) assign any of its rights or obligations hereunder to any Affiliate or member of the Purchaser Group after providing prior written notice to Seller and/or (b) appoint any Affiliate as its designee to receive any of the Assets; *provided that* Purchaser shall, notwithstanding such assignment, remain liable to perform all the obligations of Purchaser under this Agreement.

## 15.    ENTIRE AGREEMENT

15.1    For the purpose of this Agreement, "**Pre-contractual Statement**" means any Assurance relating to the subject matter of the Purchase Documents or any of them made or given by a Party to any of the Purchase Documents or any other person at any time prior to the date of this Agreement.

15.2    This Agreement and the Purchase Documents constitute the whole and only agreement between the Parties relating to the Transaction and accordingly, save in the case of fraud and to the extent permitted by applicable Law, all other Assurances

or Pre-contractual Statements made or given by any Party, its Affiliates, or any of their respective employees, agents or representatives are expressly excluded.

15.3   Except to the extent repeated in this Agreement or as otherwise provided hereunder, this Agreement supersedes and extinguishes any Pre-contractual Statement.

15.4   Except as otherwise provided in the Purchase Documents, in entering into this Agreement no Party is relying upon, and none has been induced to enter into this Agreement by any Pre-contractual Statement that is not expressly set out in this Agreement.

15.5   No Party shall have any right of action (except in the case of fraud) against any other Party arising out of or in connection with any Pre-contractual Statement except as otherwise provided in the Purchase Documents or to the extent that such Pre-contractual Statement is expressly repeated by the latter Party.

## 16.   INVALIDITY

If at any time any provision of this Agreement, other than the provisions of this clause 16, is or becomes illegal, invalid or unenforceable in any respect under the law of any relevant jurisdiction, that shall not affect or impair:

(a)   the legality, validity or enforceability in that jurisdiction of any other provision of this Agreement; or

(b)   the legality, validity or enforceability under the Law of any other jurisdiction of that or any other provision of this Agreement.

## 17.   NOTICES

17.1   Any notice given under or in connection with this Agreement shall only be effective if given in writing in English by one of the methods specified in clause 17.2. Service of notice by other means shall not be effective.

17.2   A notice shall be addressed as provided in clause 17.3 and shall be:

(a)   personally delivered, in which case it shall be deemed to have been given upon delivery at the relevant address;

(b)   if within the same jurisdiction, sent by first class pre-paid post in which case it shall be deemed to have been given two (2) Business Days after the date of posting;

(c)   sent by internationally-recognized courier in which case it shall be deemed to have been given at the time of actual recorded delivery; or

(d)   sent by electronic mail to the address specified for such purpose in clause 17.3 in which case such notice shall be deemed to have been given

50

when the recipient transmits a manual written acknowledgment of successful receipt, which the recipient shall have an affirmative duty to furnish promptly after successful receipt.

Any notice given or deemed to have been given after 5:00 p.m. on any Business Day or at any time on a day which is not a Business Day shall be deemed to have been given at 9:00 a.m. on the next Business Day in the jurisdiction where it was received.

17.3   The addresses and other details referred to in this <u>clause 17.3</u> are subject to <u>clause 17.4</u>:

For Seller:
Fieldwood Energy LLC
2000 W. Sam Houston Pkwy S., Suite 1200,
Houston, Texas 77042
United States
Attn: Thomas R. Lamme, Senior Vice President, General Counsel and Secretary
Email:TLamme@fwellc.com

With a copy to:
Thompson & Knight LLP
811 Main St., Suite 2500
Houston, Texas 77002
United States
Attn: Timothy T. Samson
Email: timothy.samson@tklaw.com

For Credit Bid Purchaser:

Seward & Kissel LLP
One Battery Park Plaza
New York, NY 10004
United States
Attn: Gregg S. Bateman and John R. Ashmead
Email: bateman@sewkis.com; ashmead@sewkis.com
Tel: (212) 574-1436; (212) 574-1366

Drivetrain, LLC
410 Park Avenue, Suite 900
New York, NY 10022
Attn: Tim Daileader
Email: tdaileader@drivetrainllc.com

With a copy to:
Davis Polk and Wardwell LLP
450 Lexington Avenue

New York, NY 10017
United States
Attn: Damian Schaible, Esq. and Natasha Tsiouris, Esq.
Email: damian.schaible@davispolk.com; natasha.tsiouris@davispolk.com
Tel: (212) 450-4000

For Purchaser:
LUKOIL International Holding GmbH
11, Sretensky blvd.
101000, Moscow, Russian Federation
Attention: Mr. Dmitry Timoshenko, Vice-President for Business
Development
Email: Dmitriy.Timoshenko@lukoil.com
Tel.: +7 (495) 981-77-02

17.4   A Party may notify the other Party of a change to the address or any of the other
details specified in clause 17.3. Such notification shall only be effective on the later
of the date specified in such notice or five (5) Business Days after the notice is
given.

## 18.   COSTS AND EXPENSES

Except as otherwise stated in any provision of this Agreement, each Party shall bear its
own costs arising out of or in connection with the preparation, negotiation and
implementation of this Agreement and all other documents referred to in it.

## 19.   COUNTERPARTS

This Agreement may be executed in any number of counterparts, and by the Parties on
separate counterparts, but shall not be effective until each Party has executed at least one
counterpart. Each counterpart shall constitute an original of this Agreement but all
counterparts shall together constitute one and the same instrument.  Delivery of an executed
signature page of this Agreement in portable document format (.pdf) or by facsimile
transmission shall be effective as delivery of a manually executed original counterpart of
this Agreement.

## 20.   AMENDMENTS AND VARIATION

This Agreement may not be amended or modified orally and no amendment or variation
shall be effective unless it is in writing and signed by the authorized representatives of each
of the Parties.

## 21.   GOVERNING LAW

This Agreement and any non-contractual rights or obligations arising out of or in
connection with it, shall be governed, construed and enforced in accordance with the laws
of the State of Texas and, as applicable, U.S. federal law.

22.    **FURTHER ASSURANCES**

For a period of twenty four (24) months following the Completion Date, each of the Parties shall, and shall cause its respective Affiliates to, at its sole cost and expense, promptly execute and deliver all such documents and do all such things and provide all such information and assistance, as may be reasonably required from time to time for purposes of giving full effect to the transfer of the Assets and the consummation of the Transaction under this Agreement.

[*remainder of page intentionally left blank.*]

526786.000002 24561360.32

EXECUTED by the Parties on the date above mentioned.

**SELLER:**

**FIELDWOOD ENERGY LLC**

By: _____

Name: Thomas R. Lamme

Title: Senior Vice President and General
Counsel, Secretary

Signature Page – Side Purchase Agreement

EXECUTED by the Parties on the date above mentioned.

**SELLER:**

**FIELDWOOD ENERGY LLC**

By: _____
Name: _____
Title: _____


**CREDIT BID PURCHASER:**

**MAKO BUYER LLC**

By: _____
Name:  Timothy Daileader _____
Title:   July 2, 2021 _____


**PURCHASER:**

**LUKOIL INTERNATIONAL HOLDING GMBH**

By: _____
Name: _____
Title: _____

Signature Page – Side Purchase Agreement

#94727578v13

EXECUTED by the Parties on the date above mentioned.

> **PURCHASER:**
>
> **LUKOIL INTERNATIONAL HOLDING GMBH**
>
> By: _____
> Name: Robert Gulla          _A4SM+F_
> Title: Managing Director

Signature Page – Side Purchase Agreement

*Final*

# SCHEDULE I
## ASSETS

## Interests

| | |
|---|---|
| Fieldwood Energy de Mexico, S. de R.L. de C.V. | 1 equity interest |
| Fieldwood Energy E&P Mexico, S. de R.L. de C.V. | 1 equity interest |
| Fieldwood Energy Services de Mexico, S. de R.L. de C.V. | 1 equity interest |

## Key Contracts

1. Sublease (LX#G1854231) dated December 22, 2018, by and among One Briarlake Plaza Owner, LLC, as the landlord, The Lubrizol Corporation, as sublandlord and Fieldwood Energy LLC, as subtenant.
2. Category 1 Services Agreement, by and between Fieldwood Energy LLC and Fieldwood Energy E&P Mexico, S. de R.L. de C.V., dated as of January 7, 2016.
3. Category 2 Services Agreement, by and between Fieldwood Energy LLC and Fieldwood Energy E&P Mexico, S. de R.L. de C.V., dated as of January 7, 2016.
   a. First Amendment effective as of the 1st day of April, 2020
4. Category 2 Engineering, Procurement, Construction and Installation Services Agreement by and between Fieldwood Energy LLC and Fieldwood Energy E&P Mexico, S. de R.L. de C.V., dated as of February 21, 2018.
   a. First Amendment effective as of the 1st day of April, 2020

## Records

Books, records, files, documents, information, contract files, work orders, operational and technical records, invoices and data (including tax records, lease files and accounting records), whether stored physically or electronically, pertaining or relating to the Interests or the Key Contracts.

## Equipment

| OFFICE FURNITURE | | |
|---|---|---|
| **Description** | **Qty** | **Notes** |
| Geiger Standard Office - Cherry | 24 | U-Shape desk w/overhead cabinets, desk chair, bookcase, 2-drawer lateral, 2 guest chairs, white board, trash can, recycle bin |
| Geiger Manager Office - Cherry (1 set purchased after sublease) | 3 | U-Shape desk w/overhead cabinets, desk chair,  bookcase, 2-drawer lateral, 2 guest chairs, table w/4 chairs, white board, trash can, recycle bin |
| High Panel Cubicles | 19 | U-shape, desk chair, 2 u/c file cabinets |
| **CONFERENCE ROOM FURNITURE** | | |
| **Description** | **Qty** | **Notes** |
| *Room 3701 Large Conference Room* | | |

| | | |
|---|---|---|
| 26' Geiger Table | 1 | |
| Conference Room Chairs - Leather high back | 20 | |
| Geiger Credenza | 1 | |
| Geiger AV cabinet | 1 | |
| Folding Table | 1 | |
| | | |
| *Room 3811 Small Conference Room* | | |
| 8' Geiger Conference Room table | 1 | |
| Conference Room Chairs - Leather high back | 8 | |
| Folding Table | 1 | |
| Quartet Magnetic Whiteboard, Porcelain, White Board, Dry Erase Board, 4 x 6 feet, Aluminum Frame (PPA406) | 1 | |
| | | |
| *Room 3605 War Room* | | |
| 8' Conference Table | 1 | |
| Conference Room High back chairs | 8 | |
| Flip Chart with Stand | 1 | |
| 4 high file cabinets (black) | 4 | |
| 2 high file cabinets (black) | 2 | |
| Wall mounted key box | 1 | |
| Quartet Magnetic Whiteboard, Porcelain, White Board, Dry Erase Board, 4 x 6 feet, Aluminum Frame (PPA406) | 1 | |
| | | |
| *Huddle Room* | | |
| Flip table | 1 | |
| Desk chairs | 4 | |
| 4 high file cabinet (Black) | 1 | |
| | | |
| **AV EQUIPMENT** | | |
| **Description** | **Qty** | **Notes** |
| *Room 3701 Large Conference Room* | | |
| Yealink VCM34 Video conferencing Microphone Array | 1 | Not included in sublease |
| YEALINK Wired Presentation KIT | 1 | Not included in sublease |
| Yealink VC800 Video Conferencing System w/ 2 Expansion Microphones | 2 | Not included in sublease |
| Yealink WPP20 IEEE 802.11ac - USB 2.0 Wi-Fi Adapter | 2 | Not included in sublease |
| Samsung 85-inch Class Crystal UHD TU-8000 Series - 4K UHD HDR | 1 | Not included in sublease |

| Smart TV with Alexa Built-in (UN85TU8000FXZA, 2020 Model) | | |
| --- | --- | --- |
| Remote Control Security Lock | 1 | Not included in sublease |
| Logitech Conference Cam BCC950 Video Conference Webcam, HD 1080p Camera with Built-In Speakerphone | 1 | Not included in sublease |
| Wall mounted projection screen (removed from wall) | 1 | |
| | | |

*Room 3811 Small Conference Room*

| | | |
| --- | --- | --- |
| 65" LG Class UV340C LED TV-4K UHD & Creston Scaler w/wall mount | 1 | Not included in sublease |
| Yealink WPP20 IEEE 802.11ac - USB 2.0 Wi-Fi Adapter | 2 | Not included in sublease |
| Yealink Video Conference Endpoint VC500 | 1 | Not included in sublease |
| Yealink Microsoft Teams Room System for Focus and Small Rooms | 1 | Not included in sublease |
| | | |

*Room 3605 War Room*

| | | |
| --- | --- | --- |
| OPTOMA EH500 / 1080p, 4700 ANSI Lumens, 10,000:1 Contrast, Full 3D, 2x HDMI, 1x DisplayPort, 2x VGA-in 1x VGA-out, 3D Vesa Sync port | 1 | Not included in sublease |
| Polycom Phone | 1 | Not included in sublease |
| | | |

| IT EQUIPMENT | | |
| --- | --- | --- |
| **Description** | **Qty** | **Notes** |
| Dell Laptop | 46 | Not included in sublease |
| Dell Desktops | 2 | Not included in sublease |
| Dell 24" Monitors | 92 | Not included in sublease |
| Dell docking stations | 46 | Not included in sublease |
| Logitech Keyboard/Mouse Combo | 48 | Not included in sublease |
| Cisco 8851/7965 Desk Phones | 46 | Not included in sublease |
| Rack mounted UPS | 2 | IDF closet - Not included in sublease |
| Fiber and cable connections | | IDF closet - fiber from L12  - Not included in sublease |
| Cisco Switch in IDF closet | 5 | IDF closet  - Not included in sublease |
| Patch panels and cables in IDF closet | 9 | IDF closet - Fieldwood network  - Not included in sublease |
| Floor mounted racks | 2 | IDF closet |
| AT&T Box | 1 | IDF closet |
| | | |

| KITCHEN | | |
| --- | --- | --- |
| **Description** | **Qty** | **Notes** |
| Coffee Brewers (LEASED ) | 2 | Leased through First Choice Coffee |
| Coffee Carafes (LEASED) | 5 | Leased through First Choice Coffee |
| Coffee Supply Trays | 2 | Not included in sublease |

| Paper Towel Holder and Supplies | 1 | Not included in sublease |
|---|---|---|
| First Aid Cabinet | 1 | Not included in sublease |
| AED Defibrillator | 1 | Not included in sublease |
| Breakroom tables | 2 | Not included in sublease |
| Breakroom chairs | 8 | Not included in sublease |
| GE Profile Microwave Model # PEM315F | 1 | Not included in sublease |
| Metal Mexico Rig Photo | 1 | Not included in sublease |
| Framed Mexico Platform Photo | 1 | Not included in sublease |
| Wall mounted clock | 1 | Not included in sublease |
| Trash can and recycle bin | 2 | Not included in sublease |
| Undercounter Ice Maker | 1 | |
| GE Dishwasher Model #GLDA696F | 1 | |
| GE Upright Refrigerator | 1 | |
| 4x6 Wall mounted tack board | 1 | |
| | | |

| COPY AREA | | |
|---|---|---|
| **Description** | **Qty** | **Notes** |
| Canon IR ADV C7565I Copy Machine (LEASED Term 12.1.2021) | 1 | Leased through ImageNet |
| Executive Shred Bin (LEASED) | 1 | Leased through Shred-It |
| 44" DesignJet T1200 Plotter | 1 | Not included in sublease |
| TCL 55S425 55 inch 4K Smart LED Roku TV (2019) | 1 | Not included in sublease |
| Wall mounted clock | 1 | Not included in sublease |
| Quartet Magnetic Whiteboard, Porcelain, White Board, Dry Erase Board, 4 x 6 feet, Aluminum Frame (PPA406) | 1 | Not included in sublease |
| Xerox Printer | 1 | copy area west side  Not included in sublease |
| 4 high file cabinets - Black | 3 | |
| | | |

| MISC/STORAGE | | |
|---|---|---|
| **Description** | **Qty** | **Notes** |
| TCL 55S425 55 inch 4K Smart LED Roku TV (2019) | 1 | reception area - Not included in sublease |
| Rubbermaid Commercial Products Heavy-Duty Utility Cart, Flat Handle, 2 Lipped Shelves, Small, Black (FG450089BLA) | 1 | Not included in sublease |
| Standing Handsanitizer stations | 3 | located at each entrance - Not included in sublease |
| Access Control System - S2 with four card readers | 1 | **Tied into Fieldwood security system; Not included in sublease** |
| Guest seating | 2 | area outside office 3608 Not included in sublease |
| Video Cameras | 4 | **Tied into Fieldwood security system** |

| | | |
|---|---|---|
| Extra furniture and file cabinets | 20+ | Various chairs, file cabinets, cubicle pieces, artwork, misc boxes |
| Extra guest chairs | 10 | located in various offices a seating area |
| 2 high file cabinets (black) | 6 | |
| Folding Tables | 2 | |
| 5H cabinets  Silver | 4 | |
| 4H cabinets Black | 8 | |
| | | |

**ITEMS NOT OTHERWISE INDICATED AS LEASED OR "NOT INCLUDED IN THE SUBLEASE" ARE PROVIDED THROUGH THE SUBLEASE**

**NOT PART OF SUBLEASE FURNITURE**

**LEASED**

*Final*

## SCHEDULE II
## AVAILABLE EMPLOYEES

| First Name | Last Name | Title |
|---|---|---|
| Cesar | Ortega | Production Operations Manager – Mexico |
| Wilson | Rodriguez | Senior Reservoir Engineer |
| James ("Mike") | Hill | Pipeline and Subsea Delivery Manager – Mexico |
| Ignacio | Rodon | Manager – Completions Engineering – Mexico |
| Carlos | Buenrostro Gutierrez | Petrophysicist Advisor |
| Tave | Peruzzi | Subsurface Engineering Manager – Mexico |
| Narciso | Aguilar | Lead Development/Process Engineer – Mexico |
| James ("Bart") | Neighbors | VP – Development, FW Mexico Project |
| Jeffrey | Nutter | Senior Reservoir Engineer |
| Hugo | Rodriguez | Geophysicist |
| Bryson | Mayronne | Offshore Operator II |
| James | Henry | Offshore Operator II |
| Shawn | Herpin | Operations Lead |
| Mitch | Boudreaux | Offshore Operations |
| Forrest | Schrader | Offshore Operator |
| Stacey | Corley | Lead Offshore Operator III |
| Max | Tibiletti | Production Engineer |
| Stephen | Griesbach | Completions Engineering Advisor |
| Terry | Thibodeaux | Manager – Geosciences – Mexico |
| Mark | Magner | Drilling Manager |
| Jack | Shelledy | Drilling Advisor – Mexico and Shallow Water |
| Gary | Janik | SVP – Reservoir Engineering, Acquisitions & Mexico |

*Final*

**SCHEDULE III**
**FORM OF CURE SCHEDULE**

| Contract Date | Contract Description | Counterparties | Debtor Entity | Cure Amount |
|---|---|---|---|---|
| 12/1/2018 | Sublease - One Briar Lake Plaza- - Suite 320 | THE LUBRIZOL CORPORATION | Fieldwood Energy LLC | $1,858.38 |

*Final*

## SCHEDULE IV

## CONDUCT OF BUSINESS BEFORE COMPLETION

For the period commencing on the date of this Agreement and ending at Completion (the "**Transition Period**"), the Seller shall do the following:

1.  Together with Purchaser and its relevant Affiliates, form and hold, on as needed basis, meetings of a committee (the "**Coordination Committee**") consisting of heads of each functional department within Purchaser Group organizations in Mexico and Seller's Mexico team, and their counterparts within Sellers' relevant organizations, who shall be nominated by each Party to the other Party in writing within five (5) Working Days following the date of this Agreement. Each Party shall also appoint a Co-chairman of the Coordination Committee, being a general representative for such Party during the Transition Period and authorized to take final decisions for the relevant Party that appointed such Co-chairman, with respect to the issues under the Coordination Committee review and discussion. The Coordination Committee shall discuss and resolve any operational, technical issues and other issues related to day-to-day operations under the CNH Contract (as defined in the FM Purchase Agreement) and the Petrobal JOA (as defined in the FM Purchase Agreement), arising in the course of the parties cooperation the Transition Period. For the purposes of this Schedule IV, the term "**Working Day**" shall mean a day where banks and state authorities are open for business in Mexico City, Houston (Texas, USA) and Moscow.

2.  Hold a series of kick off / introduction meetings by each functional discipline in accordance with Purchaser Group requests including relevant topics, questions and proposed timing.

3.  Allow the Purchaser Group representatives to attend the meetings of personnel and management of Seller's Mexico team listed in the Annex to this Schedule IV, and invite them to participate in peer reviews, DWOP's/CWOP's, after action reviews, lessons learnt reviews, risk assessments, incident investigations. Agenda and applicable meeting materials shall be made available to the Purchaser Group representatives at least one (1) Working Day prior to each meeting, and the Purchaser Group representatives shall have the right to ask follow up questions through a mechanism agreed by the Coordination Committee.

4.  Allow physical presence of Purchaser Group representatives during reaming hook-up and commissioning of the Mexico Companies facilities in Mexico, *provided that* such Purchaser Group representatives satisfy reasonable HSE and legal requirements applying to the persons attending such activities in accordance with Mexican laws.

5.  Allow physical presence of Purchaser Group representatives in the offices and facilities of Seller in Houston for meetings agreed and coordinated through the Coordination Committee Co-chairmen.

6.  In accordance with Purchaser Group representatives' request, provide access to certain existing technical and contractual documents of Seller, in order to facilitate understanding of operational processes by the Purchaser Group. Such documents may include: company instructions, project progress invoices, milestone achievement certificates, design documents, calculations and drawings, construction dossiers including redline and as-built drawings; project baseline and actual schedules native files in Primavera (*xer) or other used format; project deliverables from current and past contractors including future phases of project; procurement records including unpriced copy of purchase orders; mechanical completion and commissioning dossiers; punch lists; commissioning and start-up documentation; change requests / change orders database; technical

queries and / or technical deviations requests from contractors / vendors; non-conformity reports, quality observation reports; inspection and test reports; inspection requests for third parties; weekly and monthly progress reports by contractors; contracts (with all annexes) and contract closeout reports; approvals, licenses, and permits; lessons learned database, risk registers; HSE reports and statistics; historical/existing daily reports and operational updates; drilling and completion programs and procedures; drilling and completion schedules; feasibility studies, basis of design and material selection studies; contractor and operational performance assessments; end of well reports and summaries; DWOP/CWOP presentations; MOC's; cost estimates and AFE's; up-to-date inventory of D&C equipment and materials and list of open orders.

**ANNEX TO THE SCHEDULE IV**
**CONDUCT OF BUSINESS BEFORE COMPLETION**

1. Mexico Team Regular Meetings

**Morning Drilling Operations Meeting**
Organizer – Mark Magner
Participants – Houston based drilling personnel, Drilling Supt (CdC) and Engineers
Frequency – Daily at 6:30 AM
Location – Teams Meeting
Purpose – Discuss current and forward operations and plans
Length – 30 minutes to 1 hour

**PMT Meeting**
Organizer – Bart Neighbors
Participants, Bart Neighbors direct staff (Delivery Managers, Contract Manager, HSE, Project Controls, etc.)
Frequency – Every Monday at 10:30 AM
Location – Teams Meeting
Purpose – Weekly Staff Meeting, action item review and closure
Length – 1.5 hours

**Weekly Operational & Administrative Update**
Organizer – Andrés Brügmann
Participants –FWM Managers + Representatives from Drilling, Completions, Construction and Operations
Frequency – Every Monday at 10:00 AM
Location – Teams and main conference on 3 (CdMX)
Purpose – Update progress of the project and relevant cross functional requirements
Length – One hour

**Weekly Construction Update**
Organizer – Bart Neighbors
Participants – SVP Mexico, VP Developments, Ops Manager
Frequency – Every Tuesday at 10:00 AM
Location – Offices on 3 and Teams Meeting
Purpose – Update on construction, installations and operations
Length – 30 minutes to 1 hour

**Weekly Managers Update**
Organizer – Tave Peruzzi
Participants – SVP Mexico, VP Developments, Ops Manager, G&G Manager, and Subsurface Manager
Frequency – Every Tuesday at 1:30 PM
Location – Offices on 3 or via Teams
Purpose – Update on construction, G&G, subsurface engineering and operations
Length – ~30 minutes

**Subsurface/Geology & Geophysics/Completions**
Organizer – Tave Peruzzi
Participants – 10 people from Terry and Tave's teams
Frequency – Every Tuesday 2:30
Location – Teams Meeting

Purpose – Review deadlines, tasks, priorities
Length – 30 to 45 minutes

**Weekly Mexico Project Coordination Meeting**
Organizer – Bart Neighbors
Participants – All interested parties including Mexico City office people, onsite construction managers, and Houston Office team
Frequency – Every Thursday at 1:15 PM
Location – Teams and main conference room on 3
Purpose – Update from every group involved in the project including HSE and Security
Length – One to 1.5 hours

**Bi-Weekly All Hands Meeting**
Organizer – Bart Neighbors
Participants – Houston based employees and contractors
Frequency – Every other Monday at 1:15 PM (next meeting 06/07/21)
Location – Open area on 3
Purpose – Update from Houston managers
Length – 30 minutes to 1 hour

**Geoscience Group Meeting**
Organizer – Terry Thibodeaux
Participants –Hugo Rodriguez, Carlos Buenrostro
Frequency – Daily @ 9 am
Location – Teams Meeting Houston
Purpose – Daily operational/monitoring updates/general tasks
Length – 30 minutes to 1 hour

**ION Fieldwood Ichalkil 3D Reprocessing Meeting**
Organizer - Ika Novianti ION
Participants – Hugo Rodriquez, Chuan Yin, Terry Thibodeaux/ ION team/ PetroBal Team
Frequency- Weekly, Every Thursday afternoon @ 2:00 pm
Location- Teams Meeting Houston
Purpose- Update Reprocessing progress and review critical elements of the project
Length- 1.5 hours to 3 hours

**Monthly Production Forecast Update Meeting (Nominations)**
Organizer – Aser Montiel
Participants - Garrett Galloway, Tave Peruzzi, Cesar Ortega, Jim Brysch, Christian Di Giovanni, Enoch Carrasco
Frequency – Monthly @ To be defined
Location – Teams & CdMX
Purpose – Update production nominations for Pemex
Length – 30-60 minutes

2. Other disciplines meetings

Parties representatives for non-technical (support) functions, including, without limitation, Finance and Accounting, Human Resources, Legal, Supply, Contracts and Procurement, Government Relations and Compliance, etc., shall hold meetings as needed, and in a form agreed through the Coordination Committee, either in person or remotely.

**Exhibit A**
**Form of Sale Order**

*Attached.*

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | § | |
|---|---|---|
| In re: | § | Chapter 11 |
| | § | |
| **FIELDWOOD ENERGY LLC**, *et al.,* | § | Case No. 20-33948 (MI) |
| | § | |
| Debtors.[1] | § | (Jointly Administered) |
| | § | |

**ORDER[2] (I) AUTHORIZING AND APPROVING SIDE PURCHASE
AGREEMENT, INCLUDING (A) SALE OF DEBTORS' ASSETS FREE AND CLEAR
OF ALL LIENS, CLAIMS, ENCUMBRANCES, AND OTHER INTERESTS AND
(B) ASSUMPTION AND ASSIGNMENT OF CERTAIN EXECUTORY CONTRACTS
AND UNEXPIRED LEASES, (II) APPROVING FORM AND MANNER OF NOTICE
OF SIDE PURCHASE AGREEMENT, AND (III) GRANTING RELATED RELIEF**

Upon the motion, dated [●], 2021 (the "**Motion**"),[3] of Fieldwood Energy LLC and

its debtor affiliates, as debtors and debtors in possession (collectively, the "**Debtors**"), pursuant to

sections 105(a), 363, and 365 of title 11 of the United States Code (the "**Bankruptcy Code**"),

Rules 2002, 6004, 6006, 9007, 9013, and 9014 of the Federal Rules of Bankruptcy Procedure

(the "**Bankruptcy Rules**"), and Rules 2002-1 and 9013-1 of the Local Bankruptcy Rules for the

United States Bankruptcy Court for the Southern District of Texas (the "**Local Rules**") seeking

entry of an order (i) authorizing and approving that certain *Purchase Agreement* (together with all

ancillary documents, as may be amended, modified, or supplemented, the "**Side Purchase**

---

[1]    The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, as applicable, are:  Dynamic Offshore Resources NS, LLC (0158); Fieldwood Energy LLC (6778); Fieldwood Energy Inc. (4991); Fieldwood Energy Offshore LLC (4494); Fieldwood Onshore LLC (3489); Fieldwood SD Offshore LLC (8786); Fieldwood Offshore LLC (2930); FW GOM Pipeline, Inc. (8440); GOM Shelf LLC (8107); Bandon Oil and Gas GP, LLC (9172); Bandon Oil and Gas, LP (9266); Fieldwood Energy SP LLC (1971); Galveston Bay Pipeline LLC (5703); and Galveston Bay Processing LLC (0422).  The Debtors' primary mailing address is 2000 W. Sam Houston Parkway S., Suite 1200, Houston, TX  77042.

[2]    [NTD: The Sale Order shall only be filed in the event the [Sale Toggle] has occurred.]

[3]    Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to such terms in the Motion or the Side Purchase Agreement (as defined below), as applicable.

Agreement" and, all transactions contemplated thereby, collectively, the "**Mexico Transaction**")

by and between Fieldwood Energy LLC (the "**Seller**"), LUKOIL International Holding GMBH

(the "**Purchaser**"), and Credit Bid Purchaser, a copy of which is attached hereto as __**Exhibit A**__,

including (a) the sale of the Debtors' Assets free and clear of all Encumbrances and Liabilities

(each as defined in Paragraph 6 below), other than the Assumed Obligations and as set forth in the

Side Purchase Agreement, and other interests, and (b) the assumption and assignment of the Key

Contracts; (ii) approving the form and manner of notice of the Mexico Transaction; and

(iii) granting related relief, all as more fully set forth in the Motion; and this Court having

jurisdiction to consider the Motion and the relief requested therein pursuant to 28 U.S.C. § 1334;

and consideration of the Motion and the requested relief being a core proceeding pursuant to 28

U.S.C. § 157(b); and it appearing that venue is proper before this Court pursuant to

28 U.S.C. §§ 1408 and 1409; and due and proper notice of the Motion having been provided; and

such notice having been adequate and appropriate under the circumstances, and it appearing that

no other or further notice need be provided; and this Court having reviewed the Motion, and upon

the Purchaser and the Debtors having agreed to the terms of the Side Purchase Agreement; and

this Court having reviewed the [●] Declaration; and this Court having conducted a hearing on [●],

2021 (the "**Sale Hearing**") to consider the relief requested in the Motion as set forth in this order

(the "**Sale Order**"); and all parties in interest having been heard or having had the opportunity to

be heard regarding the Motion, the Mexico Transaction, Side Purchase Agreement, and all relief

set forth herein; and all objections, if any, to the Motion having been withdrawn, resolved, or

overruled on the merits except as set forth herein; and upon the record of the Sale Hearing and all

of the proceedings had before this Court; and this Court having determined that the legal and

factual bases set forth in the Motion establish just cause for the relief granted herein; and it

appearing that the relief requested in the Motion is in the best interest of the Debtors and their respective estates and creditors; and upon all of the proceedings had before this Court and after due deliberation and sufficient cause appearing therefor,

**IT IS HEREBY FOUND AND DETERMINED THAT:**

A. **Fed. R. Bankr. P. 7052**.  The findings and conclusions set forth herein constitute this Court's findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052, made applicable to this proceeding pursuant to Bankruptcy Rule 9014.  To the extent any of the following findings of fact constitute conclusions of law, they are adopted as such.  To the extent any of the following conclusions of law constitute findings of fact, they are adopted as such.

B. **Jurisdiction**.  The Court has jurisdiction to hear and determine the Motion and to grant the relief requested in the Motion pursuant to 28 U.S.C. § 1334.  Without limiting the generality of the foregoing, this Court has exclusive *in rem* jurisdiction over the Assets pursuant to 28 U.S.C. § 1334(e), as such Assets are property of the Debtors' chapter 11 estates and, as a result of such jurisdiction, this Court has all necessary power and authority to grant the relief contained herein.  This is a core proceeding within the meaning of 28 U.S.C. § 157(b) and, as such, this Court has the authority to enter a final order.

C. **Venue**.  Venue of these chapter 11 cases and the Motion in this district is proper under 28 U.S.C. §§ 1408 and 1409.

D. **Statutory Predicates**.  The statutory and legal predicates for the relief requested in the Motion are sections 105, 363, and 365 of the Bankruptcy Code, Rules 2002, 6004, 6006, 9007, and 9014 of the Bankruptcy Rules, Rule 2002-1 of the Local Rules, and the *Procedures for Complex Cases in the Southern District of Texas.*

E.      **Notice and Opportunity to Object**.  As evidenced by the certificates of service previously filed with the Court, proper, timely, adequate, and sufficient notice of the Motion, the Side Purchase Agreement, the Sale Hearing, the Mexico Transaction, and the deadlines related thereto, was provided in accordance with sections 102(1), 105(a), 363 and 365 of the Bankruptcy Code, Bankruptcy Rules 2002, 6004, 6006, and 9007, and Local Rules 2002-1 and 9013-1(d).  The Debtors also posted the Motion and the Side Purchase Agreement on the case website (https://cases.primeclerk.com/fieldwoodenergy/).  The notice described above was good, sufficient, and appropriate under the circumstances, provided a reasonable and adequate opportunity to object, and no other or further notice of the Motion, the Side Purchase Agreement, the Sale Hearing, or the Mexico Transaction is or shall be required.

F.      The Debtors have served and posted on the case website (https://cases.primeclerk.com/fieldwoodenergy/) the notice of potential assumption and assignment of the Key Contracts, which identifies that, in the event the Completion Date occurs prior to the Effective Date of the *Eighth Amended Joint Chapter 11 Plan of Fieldwood Energy LLC and Its Affiliated Debtors* (ECF No. 1731) (the "**Plan**"), the Key Contracts will be assumed and assigned to the Purchaser (the "**Assumption Notice**"),[4] which notice identified the amount required to cure any and all defaults and actual pecuniary losses to the non-Debtor counterparty to the Key Contracts resulting from such defaults, including, but not limited to, all claims, demands, charges, rights to refunds, and monetary and non-monetary obligations that the non-Debtor counterparties can assert under the Key Contracts, whether legal or equitable, secured or unsecured, matured or unmatured, contingent or non-contingent, liquidated or unliquidated, senior

---

[4]      [NTD: In the event the Effective Date occurs prior to the Completion Date, the cure notices and the Schedule of Assumed Contracts will control.]

or subordinate, relating to money now owing or owing in the future, arising under or out of, in connection with, or in any way relating to, the Key Contracts (the foregoing Liabilities, collectively as stated in the Assumption Notice, the "**Mexico Transaction Cure Costs**") upon each non-Debtor counterparty to a Key Contract.  The service and provision of the Assumption Notice was good, sufficient, and appropriate under the circumstances, and no further notice need be given in respect of assumption and assignment of the Key Contracts or establishing the Mexico Transaction Cure Cost for any respective Key Contract.  Non-Debtor counterparties to the Key Contracts have had or will have, as applicable, an adequate opportunity to object to assumption and assignment of the applicable Key Contract and the Mexico Transaction Cure Cost set forth in the Assumption Notice (including objections related to the adequate assurance of future performance and objections based on whether applicable law excuses the non-Debtor counterparty from accepting performance by, or rendering performance to, the Purchaser for purposes of section 365(c)(1) of the Bankruptcy Code).  The deadline for a non-Debtor counterparty to file an objection to the stated Mexico Transaction Cure Costs in the Assumption Notice (a "**Cure Objection"**) has expired and, to the extent any such party timely filed a Cure Objection, all such Cure Objections have been resolved, withdrawn, overruled, or continued to a later hearing by agreement of the parties.  To the extent that any non-Debtor counterparty does not timely file a Cure Objection by the applicable objection deadline listed in the Assumption Notice (the "**Cure Objection Deadline**"), such party shall be deemed to have consented to the (x) assumption and assignment of the Key Contract and (y) proposed Mexico Transaction Cure Cost set forth on the Assumption Notice.

G.     The notice described in the foregoing paragraphs is good, sufficient, and appropriate under the circumstances, and no other or further notice of the Motion, the Side

Purchase Agreement, the assumption and/or assignment to the Purchaser of the Assets (including the Key Contracts), the Sale Hearing, the Mexico Transaction, the Mexico Transaction Cure Costs, the deadlines to submit an objection, and all other deadlines related thereto, is or shall be required.

        H.      **Assets Property of the Estate**.  The Assets sought to be sold and/or assigned by the Seller to the Purchaser pursuant to the Side Purchase Agreement are property of the Seller's estate and title thereto is vested in the Seller's estate.

        I.      **Sufficiency of Marketing**.  The Assets were marketed as set forth in, and in accordance with, the process described in the Motion and a fair and open marketing and sale process was conducted.

        J.      **Side Purchase Agreement**.  On [●], 2021, the Seller and the Purchaser agreed to the terms of the Side Purchase Agreement, attached hereto as **Exhibit A**.

        K.      **Corporate Authority**.  In the event the Effective Date of the Plan and the Credit Bid Transaction Closing (as defined in the Plan) have not occurred, subject to and giving effect to the entry of this Sale Order, the Seller (i) has full corporate power and authority to execute, deliver and perform its obligations under the Side Purchase Agreement and all other documents contemplated thereby and by this Sale Order, and the Seller's sale of the Assets has been duly and validly authorized by all necessary corporate or similar action, (ii) has all of the power and authority necessary to consummate the Mexico Transaction, and (iii) has taken all corporate action necessary to authorize and approve the Side Purchase Agreement and any actions required to be performed by the Seller or the other Debtors to consummate the Mexico Transaction.  No consents or approvals of the Seller or the other Debtors, other than those expressly provided for in the Side Purchase Agreement or this Sale Order are required for the Seller or the other Debtors to consummate the Mexico Transaction.

L.      The Side Purchase Agreement was not entered into for the purpose of hindering, delaying, or defrauding creditors under the Bankruptcy Code or under the laws of the United States, any state, territory, possession, or the District of Columbia.  Neither the Seller nor Purchaser is entering into the transactions contemplated by the Side Purchase Agreement fraudulently, including but not limited to, for the purpose of statutory and common law fraudulent conveyance and fraudulent transfer claims.

M.      The Seller is the sole and lawful owner of the Assets.  Subject to sections 363(f) and 365(a) of the Bankruptcy Code, the transfer of each of the Assets to Purchaser, in accordance with the Side Purchase Agreement and this Sale Order will be, as of the Completion Date, a legal, valid, binding and effective transfer of the Assets, which transfer vests or will vest Purchaser with all right, title, and interest to the Assets free and clear of all Encumbrances and Liabilities (other than the Assumed Obligations and as set forth in the Side Purchase Agreement). Encumbrances and Liabilities (other than the Assumed Obligations and as set forth in the Side Purchase Agreement), shall include, but not be limited to, all debts arising under, relating to, or in connection with any act of the Seller or another Debtor or claims, liabilities, obligations, demands, guaranties, options, rights, contractual commitments, restrictions, restrictive covenants, covenants not to compete, rights to refunds, escheat obligations, interests, and matters of any kind and nature, whether arising prior to or subsequent to the commencement of these chapter 11 cases, and whether imposed by agreement, applicable law, equity, or otherwise (including, without limitation, rights with respect to claims, Encumbrances and Liabilities (i) that purport to give to any party a right of setoff or recoupment against, or a right or option to effect any forfeiture, modification, profit sharing interest, right of first refusal, purchase or repurchase right or option, or termination of, any of the Debtors' or Purchaser's interests in the Assets, or any similar rights, (ii) in respect of taxes

owed by the Debtors for periods prior to the Completion Date, including, but not limited to, sales, income, use, or any other type of tax, or (iii) in respect of restrictions, rights of first refusal, charges, or interests of any kind or nature, if any, including, without limitation, any restriction of use, voting, transfer, receipt of income, or other exercise of any attributes of ownership relating to, accruing, or arising any time prior to the Completion Date, with the exception of the Assumed Obligations).

N.     **Sound Business Purpose; Sale Highest or Best Offer**.  Entry into the Side Purchase Agreement and consummation of the Mexico Transaction constitutes the exercise by the Seller of sound business judgment, and such acts are in the best interests of the Seller, its estate, creditors, and all parties in interest.  This Court finds that, in the event the Effective Date of the Plan and the Credit Bid Transaction Closing have not occurred, good and sufficient business reasons justifying the sale of the Assets to the Purchaser pursuant to the terms and conditions set forth in the Side Purchase Agreement have been articulated.

O.     The Seller has demonstrated compelling circumstances and a good, sufficient, and sound business purpose and justification for consummating the Mexico Transaction prior to the Effective Date of the Plan, as confirmed by this Court pursuant to the *Findings of Fact, Conclusions of Law, and Order (I) Confirming Eighth Amended Joint Chapter 11 Plan of Fieldwood Energy LLC and Its Affiliated Debtors and (II) Granting Related Relief* (ECF No. 1750) (the "**Confirmation Order**").  The Seller's decision to enter into the Side Purchase Agreement and consummate the Mexico Transaction constitutes a proper exercise of the fiduciary duties of the Seller and its directors, managers, and officers.  Because the entry into the Side Purchase Agreement and consummation of the Mexico Transaction constitutes the exercise by the Seller of sound business judgment, the Seller, its current and former members, managers, officers, directors,

employees, advisors, professionals or agents, shall have or incur no liability to the Seller's estate or any holder of a claim against or interest in the Seller for any act or omission in connection with, related to, or arising out of the negotiations of the Side Purchase Agreement or the consummation of the Mexico Transaction contemplated thereunder, other than liability of the Seller or the other Debtors arising out of or relating to any act or omission that constitutes a breach of the Side Purchase Agreement, gross negligence, or willful misconduct, in each case as determined by a court of competent jurisdiction.

P.     The consummation of the Mexico Transaction and the assumption and assignment of the Key Contracts on the terms set forth in the Side Purchase Agreement are legal, valid, and properly authorized under all applicable provisions of the Bankruptcy Code, including, without limitation, sections 105(a), 363(b), 363(f), 363(m), and 365 of the Bankruptcy Code, and all of the applicable requirements of such sections have been complied with in respect of the Side Purchase Agreement and the transactions contemplated thereby.

Q.     **Arm's-Length Sale and Purchaser's Good Faith**.  The Side Purchase Agreement was negotiated, proposed, and entered into by the Seller and the Purchaser, their management and their respective boards of directors or equivalent governing bodies, officers, directors, employees, agents, professionals, and representatives, without collusion or fraud, in good faith within the meaning of section 363(m) of the Bankruptcy Code, and as the result of arm's length bargaining positions and is substantively and procedurally fair to all parties.  The Purchaser is not an "insider" of any of the Debtors, as that term is defined in section 101(31) of the Bankruptcy Code.   All payments to be made by the Purchaser and other agreements or arrangements entered into by the Purchaser in connection with the Mexico Transaction have been disclosed and the Purchaser has not engaged in any conduct that would cause or permit the Mexico

Transaction or the Side Purchase Agreement to be avoided or subject to monetary damages under section 363(n) of the Bankruptcy Code.  Specifically, the Purchaser has not acted in a collusive manner with any person and the Purchase Price was not controlled by any agreement among potential purchasers.  The Purchaser is purchasing the Assets, in accordance with the Side Purchase Agreement, in good faith, and is a "good faith purchaser" within the meaning of section 363(m) of the Bankruptcy Code and is therefore entitled to all of the protections afforded thereby, including in the event this Sale Order or any portion thereof is reversed or modified on appeal, and the Purchaser has proceeded in good faith in all respects in connection with the Mexico Transaction specifically and these chapter 11 cases generally.

        R.    **No Fraudulent Transfer**.  The total consideration provided by the Purchaser pursuant to the Side Purchase Agreement constitutes reasonably equivalent value and fair consideration under the Bankruptcy Code, the Uniform Fraudulent Transfer Act, the Uniform Fraudulent Conveyance Act, the Texas Uniform Fraudulent Transfer Act, Tex. Bus. & Com. Code Ann. § 24.004-006 (West 2019), and any other applicable law and may not be avoided under section 363(n) of the Bankruptcy Code or any other applicable law.  The Side Purchase Agreement was not entered into, and the Mexico Transaction is not being consummated, for the purpose of hindering, delaying, or defrauding creditors of the Debtors under the Bankruptcy Code or under the laws of the United States, any state, territory, possession thereof, or the District of Columbia, or any other applicable law.  Neither the Debtors nor the Purchaser have entered into the Side Purchase Agreement or is consummating the Mexico Transaction with any fraudulent or otherwise improper purpose.

        S.    **Free and Clear Transfer Required by Purchaser**.  Without selling the Assets free and clear of all Encumbrances and Liabilities (other than the Assumed Obligations and

as set forth in the Side Purchase Agreement), the Purchaser would not have entered into the Side Purchase Agreement and would not consummate the Mexico Transaction.

T.    **Vesting of Assets**.  As of the Completion Date, pursuant and subject to the terms of the Side Purchase Agreement and this Sale Order, the Mexico Transaction will effect a legal, valid, enforceable, and effective transfer of the Assets and will vest the Purchaser with all rights, title, and interests in the Assets free and clear of all Encumbrances and Liabilities of any kind or nature whatsoever (other than the Assumed Obligations and as set forth in the Side Purchase Agreement) with such Encumbrances and Liabilities attaching to the proceeds with the same nature, validity, priority, extent, perfection, force and effect that such Encumbrances and Liabilities encumbered the Assets immediately prior to the entry of this Sale Order.

U.    **Satisfaction of Section 363(f) Standards**.  The Debtors are authorized to sell the Assets free and clear of all Encumbrances and Liabilities (other than Assumed Obligations and as set forth in the Side Purchase Agreement) (with such Encumbrances and Liabilities attaching to the proceeds with the same nature, validity, priority, extent, perfection, and force and effect that such Encumbrances or Liabilities encumbered the Assets immediately prior to the entry of this Sale Order) because, with respect to each creditor or other person or entity asserting an Encumbrance or Liability, one or more of the standards set forth in section 363(f)(l)-(5) of the Bankruptcy Code has been satisfied.  Each creditor or other person or entity asserting an Encumbrance or Liability in the Assets (i) has, subject to the terms and conditions of this Sale Order, consented to the Mexico Transaction or is deemed to have consented to the Mexico Transaction,[5] (ii) could be compelled in a legal or equitable proceeding to accept money satisfaction of such Encumbrances or Liabilities, or (iii) otherwise falls within the provisions of

---

[5]    [NTD:  lender consent to be obtained.]

section 363(f) of the Bankruptcy Code.  Those holders of Encumbrances or Liabilities who did not object (or who ultimately withdrew their objections, if any) to the Mexico Transaction or the Motion are deemed, subject to the terms of this Sale Order, to have consented to the Motion and the Mexico Transaction pursuant to section 363(f)(2) of the Bankruptcy Code.  All holders of Encumbrances or Liabilities (other than the Assumed Obligations and as set forth in the Side Purchase Agreement) are adequately protected by having their Encumbrances or Liabilities, if any, attach to the proceeds received by the Debtors (if any) that are ultimately attributable to the Assets against or in which such Encumbrances or Liabilities are asserted, subject to the terms of such Encumbrances or Liabilities, with the same nature, validity, priority, extent, perfection, and force and effect that such Encumbrances or Liabilities encumbered the Assets immediately prior to the entry of this Sale Order, subject to any claims and defenses the Debtors or their estates, as applicable, may possess with respect thereto.

V.    **Personally Identifiable Information**.  The sale, conveyance, assignment and transfer of any personally identifiable information pursuant to the terms of the Side Purchase Agreement and this Sale Order complies with the terms of the Debtors' policy regarding the transfer of such personally identifiable information as of the Petition Date and, as a result, consummation of the Mexico Transaction is permitted pursuant to section 363(b)(1)(A) of the Bankruptcy Code.  Accordingly, appointment of a consumer privacy ombudsman in accordance with sections 363(b)(1) or 332 of the Bankruptcy Code is not required with respect to the Mexico Transaction.

W.    **No Successor Liability**.  Neither the Purchaser nor any of its Affiliates are successors to the Debtors or their estates by reason of any theory of law or equity, and neither the Purchaser nor any of its Affiliates shall assume, or in any way be responsible for, any liability or

obligation of any of the Debtors and/or their estates, other than the Assumed Obligations, to the extent provided in the Side Purchase Agreement; *provided* that nothing in this Sale Order or the Side Purchase Agreement:  releases, nullifies, precludes, or enjoins the enforcement of any police or regulatory liability to a Governmental Authority that any entity would be subject to as the post-sale owner or operator of property after the date of entry of this Sale Order; authorizes the transfer or assignment of any governmental (a) license, (b) permit, (c) registration, (d) authorization, or (e) approval, or the discontinuation of any obligation thereunder, without compliance with all applicable legal requirements and approvals under police or regulatory law; or divests any tribunal of any jurisdiction it may have under police or regulatory law to interpret this Sale Order or to adjudicate any defense asserted under this Sale Order.

X.      **Assigned Contracts**.  Each and every provision of the Key Contracts or applicable non-bankruptcy law that purports to prohibit, restrict, or condition, or could be construed as prohibiting, restricting, or conditioning assignment of any Key Contract has been satisfied or is otherwise unenforceable under section 365 of the Bankruptcy Code.  All counterparties of the Key Contracts that did not timely file an objection to the assumption and/or assignment of the Key Contract(s) to which they are a counterparty are deemed to consent to the assumption and/or assignment by the Debtors of their Key Contract to the Purchaser or its designee(s), and the Purchaser shall enjoy all of the rights and benefits under each such Key Contract as of the applicable date of assumption and assignment without the necessity of obtaining such non-Debtor party's written consent to the assumption or assignment thereof.  Upon the assignment and sale to the Purchaser or its designee(s) in accordance with the terms of the Side Purchase Agreement, the Key Contracts shall be deemed valid and binding, in full force and effect in accordance with their terms, subject to the provisions of this Sale Order, and shall be assigned

13

and transferred to the Purchaser or its designee(s), notwithstanding any provision in the Key Contracts prohibiting or otherwise restricting assignment or transfer, and the Debtors, their estates, or any of their predecessors, successors, or assigns, shall have no further liability or obligation under the Key Contracts other than as to any Retained Obligations thereunder.  The Debtors have demonstrated that it is an exercise of their sound business judgment to assume and/or assign the Key Contracts to the Purchaser or its designee(s) in connection with the consummation of the Mexico Transaction, and the assumption and/or assignment of the Key Contracts is in the best interests of the Debtors, their estates, their creditors, and other parties in interest.  The Key Contracts being assigned to the Purchaser or its designee(s) are an integral part of the Mexico Transaction and, accordingly, their assumption and/or assignment is reasonable.

Y.     **Cure/Adequate Assurance**.  The assumption and assignment of the Key Contracts is integral to the Mexico Transaction and the transactions contemplated by the Side Purchase Agreement, and is in the best interests of the Debtors and their estates, their creditors, and all other parties in interest, and represents a reasonable exercise of sound and prudent business judgment by the Debtors.  Pursuant to the Side Purchase Agreement, the Mexico Transaction Cure Costs, if any, will be paid by the Debtors in accordance with the terms of the Side Purchase Agreement.  The Purchaser or its designee(s) has demonstrated adequate assurance of future performance of each Key Contract within the meaning of section 365 of the Bankruptcy Code, by the Purchaser or any of its permitted designee(s) to which such Key Contract is assumed and assigned by the Seller, including a commitment of performance with respect to the Key Contracts from and after the Completion Date.  The Mexico Transaction Cure Costs are deemed the amounts necessary to "cure" (within the meaning of section 365(b)(l) of the Bankruptcy Code) all "defaults" (within the meaning of section 365(b) of the Bankruptcy Code) under such Key Contracts.  Except

as set forth herein, any objections to the Mexico Transaction Cure Costs with respect to the Key Contracts are hereby overruled. The Debtors are authorized to resolve any pending disputes with respect to any Mexico Transaction Cure Cost without need for further order of the Court. To the extent that any counterparty failed to timely object to its Mexico Transaction Cure Cost or to raise any other alleged default or breach of contract, such counterparty is deemed to have consented to such Mexico Transaction Cure Cost and to the assignment of its respective Key Contract(s) to the Purchaser or its designee(s) and to have waived any other defaults or breaches. The Court finds that with respect to all Key Contracts, the payment of the Mexico Transaction Cure Costs as provided in the Side Purchase Agreement is reasonable and appropriate and is deemed to fully satisfy the Debtors' obligations under sections 365(b) and 365(f) of the Bankruptcy Code. Accordingly, all of the requirements of sections 365(b) and 365(f) of the Bankruptcy Code have been satisfied for the assumption by the Debtors, and the assignment to the Purchaser or its designee(s), of each Key Contract to be assumed and assigned to the Purchaser or its designee(s) as of the Completion Date.

Z. **Assets Assignable**. Each and every provision of the documents governing the Assets or applicable non-bankruptcy law (other than this Sale Order and the Side Purchase Agreement) that purports to prohibit, restrict, or condition, or could be construed as prohibiting, restricting, or conditioning assignment of any of the Assets, if any, have been, or will be, satisfied or are otherwise unenforceable under section 365 of the Bankruptcy Code.

AA. **Final Order**. This Sale Order constitutes a final order within the meaning of 28 U.S.C. § 158(a). Notwithstanding Bankruptcy Rules 6004(h) and 6006(d), and to any extent necessary under Bankruptcy Rule 9014 and Rule 54(b) of the Federal Rules of Civil Procedure, as made applicable by Bankruptcy Rule 7054, this Court expressly finds that there is no just reason

for delay in the implementation of this Sale Order, waives any stay, and expressly directs entry of judgment as set forth herein.  Purchaser, being a good faith purchaser under section 363(m) of the Bankruptcy Code, may close the transactions contemplated by the Side Purchase Agreement at any time subject to the terms and conditions of the Side Purchase Agreement.

**IT IS THEREFORE ORDERED, ADJUDGED AND DECREED THAT:**

1.      **Objections Overruled**.  All objections, if any, to the entry of this Sale Order or with regard to the relief granted herein and requested in the Motion that have not been withdrawn, waived, settled, or otherwise resolved as expressly provided herein, on the record at the Sale Hearing (the full record of which is incorporated herein by reference), by stipulation filed with the Court, or by representation by the Debtors in a separate pleading, and all reservations of rights included therein, if any, are hereby overruled on the merits, with prejudice.  All objections to the entry of this Sale Order or to the relief granted herein that were not timely filed are hereby forever barred.

2.      **Approval**.  Pursuant to sections 105, 363, and 365 of the Bankruptcy Code, the Side Purchase Agreement, the other Purchase Documents, the sale, assignment, conveyance and deliverance of all right, title, and interest in and to the Assets to the Purchaser as of the Completion Date are hereby approved, and the Debtors are authorized and directed to consummate the Mexico Transaction, including the sale, assignment, conveyance and deliverance of all of the Seller's right, title, and interest in, to, and under the Assets to the Purchaser free and clear of any and all Encumbrances or Liabilities (other than the Assumed Obligations and as set forth in the Side Purchase Agreement) in accordance with the terms of and subject to the satisfaction or waiver of the conditions to the Seller's obligations to consummate the Mexico Transaction set forth in the Side Purchase Agreement, with such Encumbrances or Liabilities attaching to the proceeds with

the same nature, validity, priority, extent, perfection, and force and effect that such Encumbrances or Liabilities encumbered the Assets immediately prior to the entry of this Sale Order.  Pursuant to sections 105, 363, and 365 of the Bankruptcy Code, the Debtors and the Purchaser are each hereby authorized and directed to take any and all actions necessary or appropriate to (i) consummate the Mexico Transaction, (ii) enter into the Purchase Documents, (iii) assume and/or assign the Key Contracts, (iv) perform the obligations of the Debtors under the Side Purchase Agreement, the other Purchase Documents, and any and all additional instruments and documents that may be contemplated by or reasonably necessary or desirable to implement the Side Purchase Agreement and consummate, implement, and close fully the Mexico Transaction and the other transactions contemplated by the Side Purchase Agreement prior to or after the Completion Date without further order of this Court, and (v) enforce the terms of this Sale Order. The Purchaser and the Debtors shall have no obligation to consummate the Mexico Transaction except as is contemplated by and provided for in the Side Purchase Agreement.  The Purchaser shall not be required to seek or obtain relief from the automatic stay under section 362 of the Bankruptcy Code to enforce any of its remedies under the Side Purchase Agreement or any other Purchase Document.  The automatic stay imposed by section 362 of the Bankruptcy Code is modified solely to the extent necessary to implement the provisions of this Sale Order.

3.      **Binding Effect of Sale Order**.  This Sale Order and the Side Purchase Agreement shall be binding in all respects, subject to Paragraph 4 below, upon the Debtors, their estates, all creditors of, and holders of equity interests in, the Debtors, any holders of Encumbrances or Liabilities in, against, or on all or any portion of the Assets (whether known or unknown), the Purchaser and respective successors and permitted assigns of the Purchaser notwithstanding the dismissal of any of the Debtors' cases or any subsequent appointment of any

trustees, examiners, "responsible persons," or other fiduciaries in these chapter 11 cases or upon a conversion to a case under chapter 7 of the Bankruptcy Code, and the Side Purchase Agreement shall not be subject to rejection or avoidance under any circumstances.  If any order under section 1112 of the Bankruptcy Code is entered, such order shall provide, or be deemed to provide (in accordance with sections 105 and 349 of the Bankruptcy Code) that this Sale Order, including the rights granted to the Purchaser hereunder, shall remain effective and, notwithstanding such dismissal, shall remain binding on parties in interest.  This Sale Order and the Side Purchase Agreement shall inure to the benefit of the Debtors, their estates and creditors, the Purchaser, and the respective successors and assigns of each of the foregoing.

4.      In the event the Completion Date occurs prior to the Effective Date of the Plan and the Credit Bid Transaction Closing, the Confirmation Order, the Plan, and the Credit Bid Purchase Agreement shall be subject to the terms of this Sale Order and the Side Purchase Agreement.  In the event the Effective Date of the Plan and the Credit Bid Transaction Closing occurs prior to the Completion Date of the Side Purchase Agreement, and therefore the Credit Bid Purchaser becomes the owner of, among other things, the Assets, this Sale Order shall be null and void, and the Confirmation Order, the Plan, and the Credit Bid Purchase Agreement shall control. Except as provided in Paragraphs 4 and 31, the Side Purchase Agreement, this Sale Order, and obligations therein and herein shall not be altered, impaired, amended, rejected, discharged, or otherwise affected by any subsequent order of this Court, except as specifically provided for in the Side Purchase Agreement, without the prior written consent of the Purchaser; *provided* that nothing herein (including the nullification of this Sale Order) shall effect the validity or the enforceability of the Side Purchase Agreement as between Purchaser and the Credit Bid Purchaser.

5.     **No Material Modifications**.  The Side Purchase Agreement and any related agreements, documents, or other instruments in effect as of the date hereof may be modified, amended, or supplemented through a written document signed by the parties thereto in accordance with the terms thereof without further order of this Court; *provided* that any such modification, amendment, or supplement does not have a material adverse effect on the Debtors or their estates.

6.     **Transfer of Assets Free and Clear**.  Pursuant to sections 105(a), 363(b), and 363(f) of the Bankruptcy Code, the Seller is authorized to transfer the Assets to Purchaser in accordance with the Side Purchase Agreement, and such transfer shall constitute a legal, valid, binding, and effective transfer of such Assets and shall vest Purchaser with title in and to the Assets and, other than the Assumed Obligations, Purchaser shall take title to and possession of the Assets free and clear of all Encumbrances, Liabilities and other interests of any kind or nature whatsoever (other than the Assumed Obligations and as set forth in the Side Purchase Agreement.  For purposes of this Sale Order, "Encumbrance," and "Liability" shall mean:

(i)     with respect to any property or asset, any charge, lien (including a "lien" as defined in section 101(37) of the Bankruptcy Code), claim (including a "claim" as defined in section 101(5) of the Bankruptcy Code), mortgage, lease, sublease, hypothecation, deed of trust, pledge, security interest, option, attachment, security interest, right to acquire, right of usufruct, right of use or possession, right of first offer or first refusal, drag-along or tag-along right, preemptive right, easement, right of way, servitude, restrictive covenant, encroachment, encumbrance, community property interest, third party interest or other restriction or limitation of any kind (including any restriction on use, voting, transfer, receipt of income, or exercise of any other attribute of ownership), whether arising prior to or after the commencement of the chapter 11 cases and whether voluntarily incurred or arising by operation of Law (each, an "**Encumbrance**" and collectively, "**Encumbrances**");

(ii)     any debt, obligation, duty, commitment or liability of any nature (including any unknown, undisclosed, unliquidated, unmatured, unaccrued, unasserted, contingent, indirect, conditional, implied, vicarious, derivative, joint, several or secondary liability), regardless of whether such debt, obligation, duty, commitment or liability would be required to be disclosed on in financial statements prepared in accordance with applicable generally

19

accepted accounting principles or disclosed in the notes thereto and regardless of whether such debt, obligation, duty or liability is immediately due and payable (each a "**Liability**" and collectively, "**Liabilities**");

in each case, whether in law or in equity, known or unknown, choate or inchoate, filed or unfiled, scheduled or unscheduled, noticed or unnoticed, recorded or unrecorded, perfected or unperfected, allowed or disallowed, contingent or non-contingent, liquidated or unliquidated, matured or unmatured, material or non-material, disputed or undisputed, direct or indirect, and whether arising by agreement, understanding, law, equity or otherwise, and whether occurring or arising before, on or after the Petition Date, or occurring or arising prior to the Completion Date and including, but not limited to, successor or successor-in-interest liability.  Any and all Encumbrances and Liabilities (other than the Assumed Obligations and as set forth in the Side Purchase Agreement) shall attach to the proceeds with the same nature, validity, priority, extent, perfection, and force and effect that such Encumbrances or Liabilities encumbered the Assets immediately prior to the entry of this Sale Order, subject to any claims, defenses, and objections, if any, that the Debtors or their estates may possess with respect thereto.

7.     All persons and entities that are in possession of some or all of the Assets on the Completion Date are directed to surrender possession of such Assets to Purchaser in accordance with the Side Purchase Agreement on the Completion Date or at such time thereafter as Purchaser may request.  On the Completion Date, each of the Debtors' creditors is authorized to execute such documents and take all other actions as may be reasonably necessary to release its Encumbrances, Liabilities or other interests in the Assets, if any, other than Assumed Obligations, as such Encumbrances or Liabilities may have been recorded or may otherwise exist.

8.     If any person or entity that has filed statements or other documents or agreements evidencing Encumbrances or Liabilities (other than Assumed Obligations) on, against, or in, all or any portion of the Assets (other than statements or documents with respect to the

20

Assumed Obligations) shall not have delivered to the Debtors prior to the Completion Date, in proper form for filing and executed by the appropriate parties, termination statements, instruments of satisfaction, releases of liens and easements, and any other documents necessary for the purpose of documenting the release of such Encumbrances, Liabilities, liens, claims, interests, or other interests that the person or entity has or may assert with respect to all or any portion of the Assets, the Debtors are hereby authorized, and Purchaser is hereby authorized, to execute and file such statements, instruments, releases, and other documents on behalf of such person or entity with respect to the Assets and otherwise seek relief from the Court pursuant to this Sale Order, if necessary.

9.  **No Bulk Sales**.  No bulk sales laws or any similar law of any state or other jurisdiction shall apply in any way to the Mexico Transaction, the Motion, or this Sale Order.

10.  **Valid Transfer**.  Effective upon the Completion Date, the transfer to the Purchaser of the Debtors' right, title, and interest in the Assets pursuant to the Side Purchase Agreement shall be, and hereby is deemed to be, a legal, valid, and effective transfer of the Debtors' right, title, and interest in the Assets, and vests with, or will vest in, the Purchaser all right, title, and interest of the Debtors in the Assets, free and clear of all Encumbrances and Liabilities (other than the Assumed Obligations as set forth in the Side Purchase Agreement).

11.  **Transfer of Title**.  On the Completion Date, this Sale Order shall be construed and shall constitute for any and all purposes a full and complete general assignment, conveyance, and transfer of all of the Seller's right, title, and interest in the Assets (as of the date hereof) pursuant to the terms of the Side Purchase Agreement.  This Sale Order is and shall be effective as a determination that, on the Completion Date, all Encumbrances, Liabilities or other interests of any kind or nature whatsoever existing as to the Assets prior to the Completion Date,

other than the Assumed Obligations, shall have been unconditionally released, discharged, and terminated, and that the conveyances described herein have been effected.  This Sale Order shall be binding upon and govern the acts of all persons and entities, including, without limitation, all filing agents, filing officers, title agents, title companies, recorders of mortgages, recorders of deeds, registrars of deeds, administrative agencies, governmental departments, secretaries of state, federal, state, and local officials, and all other persons and entities who may be required by operation of law, the duties of their office, or contract, to accept, file, register, or otherwise record or release any documents or instruments, or who may be required to report or insure any title or state of title in or to any lease, and each of the foregoing persons and entities is hereby directed to accept for filing any and all of the documents and instruments necessary and appropriate to consummate the transactions contemplated by the Side Purchase Agreement.  A certified copy of this Sale Order may be filed with the appropriate clerk and/or recorded with the recorder to act to cancel any Encumbrances, Liabilities and other interests of record except those assumed as Assumed Obligations.

12.     **<u>Governmental Authorization to Effectuate Sale and Assignments</u>**.
[Each and every federal, state, and governmental agency or department, and any other person or entity, is hereby authorized to accept any and all documents and instruments in connection with or necessary to consummate the Mexico Transaction.  Except as otherwise provided in this Sale Order, to the greatest extent available under applicable law upon the Completion Date, the Purchaser shall be authorized, as of the Completion Date, to operate under any license, permit, registration, and governmental authorization or approval of the Debtors with respect to the Assets, and all such licenses, permits, registrations, and governmental authorizations and approvals are deemed to have been, and hereby are, deemed to be transferred to the Purchaser as of the

Completion Date.  No Governmental Authority may revoke or suspend any lawful right, license, trademark, or other permission relating to the use of the Assets sold, transferred, or conveyed to the Purchaser on account of the filing or pendency of these chapter 11 cases or the consummation of the Mexico Transaction.  For the avoidance of doubt, the Mexico Transaction authorized herein shall be of full force and effect, regardless of whether the Debtors or any of their Affiliates lack good standing in any jurisdiction in which such entity is formed or is authorized to transact business.][6]

13.    **Authorization to Assign**.  Notwithstanding any provision of any contract governing the Assets, including any Key Contract to be assumed and/or assigned to the Purchaser or its designee(s) as of the Completion Date, pursuant to section 365(f) of the Bankruptcy Code or applicable non–bankruptcy law that prohibits, restricts, or conditions the assignment of the Assets, including any Key Contract, at or after the Completion Date, the Debtors are authorized to (i) assign the Assets to the Purchaser and (ii) assume and/or assign the Key Contracts to the Purchaser or its designee(s) as of the Completion Date, in each case, which assignments shall take place on and be effective as of the Completion Date or such other date after the Completion Date, in each case, as provided in the Side Purchase Agreement or as otherwise provided by a separate order of this Court.

(i)    With respect to the Key Contracts:  (a) each Key Contract is an executory contract or unexpired lease under section 365 of the Bankruptcy Code; (b) the Debtors may assume each of the Key Contracts in accordance with section 365 of the Bankruptcy Code; (c) the Debtors may assign each Key Contract in accordance with sections 363 and 365 of the Bankruptcy Code, and any provisions in any Key Contract that prohibit or condition the assignment of such Key Contract or allow the party to such Key Contract to terminate, recapture, impose any penalty, condition, renewal, or extension, or modify any term or condition upon the assignment of such Key Contract, constitute unenforceable anti-assignment provisions which are void and of

---

[6]    [Akin NTD:  To discuss with Mexican and Dutch counsel.]

no force and effect; (d) all other requirements and conditions under sections 363 and 365 of the Bankruptcy Code for the assumption by the Debtors and assignment to Purchaser of each Key Contract, in accordance with the Side Purchase Agreement, have been satisfied; (e) the Key Contracts shall be transferred and assigned to, and following the Completion Date, remain in full force and effect for the benefit of Purchaser in accordance with the Side Purchase Agreement, notwithstanding any provision in any such Key Contract (including those of the type described in sections 365(b)(2) and (f) of the Bankruptcy Code) that prohibits, restricts, or conditions such assignment or transfer and, pursuant to section 365(k) of the Bankruptcy Code, the Debtors shall be relieved from any further liability with respect to the Key Contracts after such assignment to and assumption by the Purchaser in accordance with the Side Purchase Agreement; and (f) upon the Completion Date, in accordance with sections 363 and 365 of the Bankruptcy Code, the Purchaser shall be fully and irrevocably vested in all right, title, and interest of each Key Contract.

(ii)     There shall be no accelerations, assignment fees, increases, or any other fees charged to the Purchaser or the Debtors as a result of the assignment of the Assets or the assumption and/or assignment of the Key Contracts.

(iii)    The Debtors have met all of the requirements of section 365(b) of the Bankruptcy Code for each of the Key Contracts to be assumed and assigned to the Purchaser as of Completion Date.  Notwithstanding the foregoing, unless required by the Purchaser under the Side Purchase Agreement for the Debtors to assume and/or assign any Key Contract, no Debtor shall be required by the Court to assume and/or assign any Key Contract, and, if no such assumption and assignment occurs, no Mexico Transaction Cure Costs shall be due and no adequate assurance of future performance shall be required with respect to any such Key Contract.

(iv)    In respect of the assignment pursuant to the Mexico Transaction, any provisions in any of the Key Contracts that prohibit or condition the assignment of such Key Contract on the consent of a non-Debtor counterparty to such Key Contract thereto or allow the non-Debtor counterparty to such Key Contract to terminate, recapture, impose any penalty, condition, renewal or extension, or modify any term or condition upon the assignment of such Key Contract, shall constitute unenforceable anti-assignment provisions which are expressly preempted under section 365 of the Bankruptcy Code and be void and of no force or effect.

(v)     The Debtors' assumption and/or assignment of the Key Contracts is subject to the consummation of the Mexico Transaction with the Purchaser.  To the extent that an objection by a counterparty to any Key Contract related to the applicable Mexico Transaction Cure Cost, is not resolved prior to the Completion Date, the Purchaser may, without any further approval of the Court or notice to any party, elect to (a) not have the Debtors assume and/or

24

assign such Key Contract to it, or (b) have the Debtors postpone the assumption and/or assignment of such Key Contract until the resolution of such objection; *provided*, *however,* that the Debtors, the Purchaser, and the relevant non-debtor counterparty under each Key Contract shall have authority to compromise, settle, or otherwise resolve any objections to proposed Mexico Transaction Cure Costs without further order of, or notice to, this Court, with any such agreed upon Mexico Transaction Cure Costs being paid to the appropriate counterparty by the Debtors as a condition subsequent to such assumption and/or assignment of the relevant Key Contract.

14.     **Assigned Contracts**.  Subject to the provisions of this Sale Order and in accordance with the Side Purchase Agreement and sections 105(a) and 365 of the Bankruptcy Code, the Seller is authorized to (a) assume and assign to the Purchaser, in accordance with the Side Purchase Agreement, effective upon the Completion Date, all Key Contracts and other Assets, including Assets constituting real property interests (including any and all interests, rights, and related agreements with respect to the Sublease Agreement), free and clear of all Encumbrances or Liabilities (other than any Assumed Obligations) and (b) execute and deliver to the Purchaser such documents or other instruments as Purchaser deems may be reasonably necessary to assign and transfer the Key Contracts and Assumed Obligations to the Purchaser in accordance with the Side Purchase Agreement.  As of the Completion Date, the Purchaser shall succeed to the entirety of the Debtors' rights and obligations in the Key Contracts to be assumed and assigned to the Purchaser first arising and attributable to the time period occurring on or after the Completion Date and shall have all rights thereunder.

(i)     Upon the Completion Date, (a) all defaults (monetary and non-monetary) arising or accruing prior on or prior to the Completion Date (without giving effect to any acceleration clauses or any default provisions of the kind specified in section 365(b)(2) of the Bankruptcy Code) under the Key Contracts shall be deemed cured and satisfied in full through the payment of the Mexico Transaction Cure Costs in accordance with the Side Purchase Agreement, (b) no other amounts will be owed by the Debtors, their estates, or, other than the Assumed Obligations, the Purchaser with respect to amounts first arising or accruing, during, or attributable or related to, the period before Completion Date with respect to such Key Contracts, and

25

(c) any and all persons or entities shall be forever barred and estopped from asserting a claim against the Debtors, their estates, the Purchaser, or the Assets that any additional amounts are due or defaults exist under such Key Contracts that arose or accrued, or relate to or are attributable to the period before the Completion Date (other than claims against Purchaser with respect to the Assumed Obligations).

(ii)     Upon assumption of those Key Contracts to be assumed by the Debtors and/or assigned to the Purchaser as of the Completion Date, such Key Contracts shall be deemed valid and binding, in full force and effect in accordance with their terms, subject to the provisions of this Sale Order, and shall be assigned and transferred to the Purchaser, notwithstanding any provision in such Key Contract or other restrictions prohibiting assignment or transfer.  To the extent any Key Contract is assumed and/or assigned to the Purchaser under this Sale Order, such assumption and/or assignment will not take effect until the Completion Date.  Furthermore, other than the Key Contracts, no other contract shall be deemed assumed by the Debtors and/or assigned to the Purchaser pursuant to section 365 of the Bankruptcy Code under this Sale Order.  The failure of the Debtors or the Purchaser to enforce at any time one or more terms or conditions of any Key Contract shall not be a waiver of such terms or conditions, or of the Debtors' and the Purchaser's rights to enforce every term and condition of such Key Contract.

(iii)    All counterparties to the Key Contracts to be assumed and assigned to Purchaser as of the Completion Date shall cooperate and expeditiously execute and deliver, upon the reasonable request of the Purchaser, and shall not charge the Debtors or the Purchaser for, any instruments, applications, consents, or other documents which may be required or requested by any public or quasi-public authority or other party or entity to effectuate the applicable transfers in connection with the Mexico Transaction.

(iv)     Upon the Debtors' assignment of the Key Contracts to the Purchaser under the provisions of this Sale Order and any additional orders of this Court and payment of any Mexico Transaction Cure Costs by the Debtors, no default shall exist under any Key Contract, and no counterparty to any Key Contract shall be permitted (a) to declare a default by Purchaser under such Key Contract or (b) otherwise take action against the Purchaser as a result of Debtors' financial condition, bankruptcy, or failure to perform any of their obligations under the relevant Key Contract.  Each non-Debtor party to a Key Contract hereby is also forever barred, estopped, and permanently enjoined from (x) asserting against the Debtors or Purchaser, or the property of any of them, any default or claim arising out of any indemnity obligation or warranties for acts or occurrences arising prior to or existing as of the Completion Date, including those constituting Retained Obligations or, against Purchaser, any counterclaim, defense, setoff, recoupment, or any other Claim asserted or assertable against the Debtors, and (y) imposing or

charging against Purchaser any rent accelerations, assignment fees, increases, or any other fees as a result of the Debtors' assumption and assignment to Purchaser of any Key Contract in accordance with the Side Purchase Agreement. The validity of such assumption and assignment of each Key Contract shall not be affected by any dispute between the Debtors and any non-Debtors party to a Key Contract relating to such contract's respective Mexico Transaction Cure Costs.

15. **No Successor Liability**. Neither the Purchaser nor any of its Affiliates are or shall be deemed, as a result of the consummation of the Mexico Transaction, to (i) be legal successors to the Seller or any of the other Debtors or their respective estates by reason of any theory of law or equity, (ii) have, de facto or otherwise, merged with or into the Seller or any of the other Debtors, (iii) be an alter ego or a mere continuation or substantial continuation or successor of the Seller or any of the other Debtors in any respect, or (iv) be liable or have any Liability for any acts or omissions of Seller or any of the other Debtors in the conduct of their businesses or arising under or related to the Assets other than as expressly set forth and agreed in the Side Purchase Agreement. Neither the Purchaser nor any of its Affiliates shall assume or in any way be responsible for any liability or obligation of any of the Debtors or their estates, other than the Assumed Obligations, to the extent provided in the Side Purchase Agreement. Without limiting the generality of the foregoing, and except as otherwise expressly provided in the Side Purchase Agreement, the Parties intend that Purchaser shall have no Liability for any Encumbrance (other than the Assumed Obligations) against Seller or any of Seller's predecessors or Affiliates, and Purchaser shall have no successor or vicarious liability of any kind or character whether known or unknown as of the Completion Date or in connection with the transactions contemplated to occur on the Completion Date, whether now existing or hereafter arising, or whether fixed or contingent, with respect to the businesses of Seller, the Assets or any Liability of Seller arising prior to, or relating to any period occurring prior to, the Completion Date.

16.     **Release of Interests**.  Effective upon the Completion Date, this Sale Order (i) is and shall be effective as a determination that all Encumbrances or Liabilities (other than the Assumed Obligations) of any kind or nature whatsoever existing as to the Assets prior to the Completion Date have been unconditionally released, discharged, and terminated (with such Encumbrances or Liabilities, if any, attaching to the proceeds with the same nature, validity, priority, extent, perfection, force and effect that such Encumbrances or Liabilities encumbered the Assets immediately prior to the entry of this Sale Order) and that the conveyances described herein have been effected, (ii) is and shall be binding upon and shall govern the acts of all entities, including all filing agents, filing officers, title agents, title companies, recorders of mortgages, recorders of deeds, registrars of deeds, administrative agencies or units, governmental departments or units, secretaries of state, federal, state and local officials and all other persons and entities who may be required by operation of law, the duties of their office, or contract, to accept, file, register or otherwise record or release any documents or instruments, or who may be required to report or insure any title or state of title in or to the Assets conveyed to the Purchaser, and all recorded Encumbrances or Liabilities (other than the Assumed Obligations) against the Assets shall be deemed stricken from such entities records, official and otherwise.

17.     **Approval to Release Interests**.  If any person or entity that has filed financing statements, mortgages, mechanic's liens, or other documents or agreements evidencing Encumbrances or Liabilities against or on the Assets shall not have delivered to the Debtors before the Completion Date, in proper form for filing and executed by the appropriate parties, termination statements, instruments of satisfaction, releases of liens and easements, and any other documents necessary for the purpose of documenting the release of all Encumbrances or Liabilities (other than Assumed Obligations) that the person or entity has or may assert with respect to the Assets,

the Debtors and the Purchaser are each hereby authorized to execute and file such statements, instruments, releases, and other documents on behalf of such person or entity with respect to the Assets.  The Purchaser is hereby authorized to file, register, or otherwise record a certified copy of this Sale Order, which, once filed, registered, or otherwise recorded, shall constitute conclusive evidence of the release of all Encumbrances or Liabilities against the Assets (other than the Assumed Obligations).  This Sale Order is deemed to be in recordable form sufficient to be placed in the filing or recording system of each and every federal, state, or local government agency, department, or office.

18.     **Surrender of Possession**.  Any and all Assets in the possession or control of any person or entity, including any vendor, supplier, or employee of the Debtors shall be transferred to the Purchaser free and clear of all Encumbrances [or Liabilities], except for the Assumed Obligations, with such Encumbrances [or Liabilities] attaching to the proceeds with the same nature, validity, priority, extent, perfection, and force and effect that such Encumbrances [or Liabilities] encumbered the Assets immediately prior to the entry of this Sale Order, and shall be delivered to the Purchaser and deemed delivered at the time of Completion Date (or such other time as provided in the Side Purchase Agreement).

19.     **Exculpation**.  Because the entry into the Side Purchase Agreement and the other Purchase Documents, and the consummation of the Mexico Transaction constitute the exercise by the Debtors of sound business judgment, the Debtors, their respective current and former members, managers, officers, directors, employees, advisors, professionals or agents, shall neither have, nor incur, any liability to the estates or any holder of a claim against or interest in the Debtors for any act or omission in connection with, related to, or arising out of the negotiations of the Side Purchase Agreement or the consummation of the Mexico Transaction contemplated

thereunder, other than liability of the Debtors arising out of or relating to any act or omission that constitutes a breach of the Side Purchase Agreement, gross negligence, or willful misconduct, in each case as determined by a court of competent jurisdiction pursuant to a final order.

20.     **Governmental Liabilities**.  Nothing in this Sale Order or the Side Purchase Agreement releases, nullifies, precludes or enjoins the enforcement of any police or regulatory liability to a governmental unit that any entity would be subject to as the post-sale owner or operator of property after the date of entry of this Sale Order.  Nothing in this Sale Order or the Side Purchase Agreement authorizes the transfer or assignment of any governmental (a) license, (b) permit,  (c) registration,  (d) authorization,  or  (e) approval,  or  the  discontinuation  of  any obligation thereunder, without compliance with all applicable legal requirements and approvals under police or regulatory law.  Nothing in this Sale Order divests any tribunal of any jurisdiction it may have under police or regulatory law to interpret this Sale Order or to adjudicate any defense asserted under this Sale Order.

21.     **Prohibition of Actions Against Purchaser**.  Except for the Assumed Obligations, or as expressly permitted or otherwise specifically provided for in the Side Purchase Agreement or this Sale Order, the Purchaser and its Affiliates shall have no liability or responsibility for any liability or other obligation of the Debtors arising under or related to the Assets, the Retained Obligations or otherwise, including, but not limited to, any liability for any Encumbrances or Liabilities (other than the Assumed Obligations).  Without limiting the generality of the foregoing, and except as otherwise expressly provided herein and in the Side Purchase Agreement, the Purchaser and its Affiliates shall not be liable for any claims against the Debtors or any of their predecessors or Affiliates, and the Purchaser and its Affiliates shall have no successor or vicarious liabilities of any kind or character including, without limitation, any theory

30

of antitrust, warranty, product liability, environmental, successor or transferee liability, labor law, ERISA, *de facto* merger, mere continuation, or substantial continuity, whether known or unknown as of the Completion Date, now existing or hereafter arising, whether fixed or contingent, with respect to the Debtors or any obligations of the Debtors, including, without limitation, liabilities on account of any taxes arising, accruing, or payable under, out of, in connection with, or in any way relating to the operation of the Debtors' business prior to the Completion Date or any claims under the WARN Act or any claims related to wages, benefits, severance or vacation pay owed to employees or former employees of the Debtors.  Effective upon the Completion Date, with the sole exception of any enforcement of rights related to the Assumed Obligations, all persons and entities shall be, and hereby are, forever barred, estopped and permanently enjoined from asserting against the Purchaser, its successors and assigns, its property or the Assets from (i) taking any action that would adversely affect or interfere with the transfer of the Assets to the Purchaser in accordance with the terms of this Sale Order and the Side Purchase Agreement and (ii) asserting, prosecuting, or otherwise pursuing, whether in law or in equity, in any judicial, administrative, arbitral or other proceeding, any Encumbrances or Liabilities of any kind or nature whatsoever against the Purchaser and its successors, designees, assigns, or property, or the Assets conveyed under this Sale Order in accordance with the Side Purchase Agreement.

22.     The consideration given by the Purchaser shall constitute valid and valuable consideration for the releases of any potential Encumbrances or Liabilities pursuant to this Sale Order, which releases shall be deemed to have been given in favor of the Purchaser by all holders of Encumbrances, Liabilities or liens against or interests in, or claims against, any of the Debtors or any of the Assets, other than with respect to the Assumed Obligations.  The consideration

provided by the Purchaser for the Assets under the Side Purchase Agreement is fair and reasonable and may not be avoided under section 363(n) of the Bankruptcy Code.

23.     None of the Purchaser or its Affiliates, successors, assigns, equity holders, employees or professionals shall have or incur any liability to, or be subject to any action by any of the Debtors or any of their estates, predecessors, successors or assigns, arising out of the negotiation, investigation, preparation, execution, delivery of the Side Purchase Agreement and the entry into and consummation of the sale of the Assets, except as expressly provided in the Side Purchase Agreement and this Sale Order.

24.     **No Interference**.   Following the Completion Date, no holder of an Encumbrance or Liability in or against the Debtors or the Assets shall interfere with the Purchaser's title to or use and enjoyment of the Assets based on or related to such Encumbrance or Liability.

25.     **Retention of Jurisdiction**.   This Court retains exclusive jurisdiction prior to, on, and after Completion Date to, among other things, interpret, enforce and implement the terms and provisions of this Sale Order and the Side Purchase Agreement, all amendments thereto, any waivers and consents thereunder, and each of the agreements executed in connection therewith in all respects, including retaining jurisdiction to (i) compel delivery of the Assets or performance of other obligations owed to the Purchaser, (ii) compel performance of obligations owed to the Debtors, (iii) resolve any disputes arising under or related to the Side Purchase Agreement or the Mexico Transaction, (iv) interpret, implement, and enforce the provisions of this Sale Order, (v) compel delivery of any waivers, releases, or other related documentation reasonably requested by the Debtors or the Purchaser to evidence the release of any Encumbrances or Liabilities in the Assets, (vi) protect the Purchaser and its Affiliates against (a) any Encumbrances or Liabilities in

or against the Debtors or the Assets of any kind or nature whatsoever and (b) any creditors, equity interest holders, or other parties in interest regarding the turnover of the Assets that may be in their possession, and (vii) protect the Debtors and their Affiliates against any liabilities (other than any liabilities retained by the Debtors under the Side Purchase Agreement) in any way relating to the Assets arising on or after the Completion Date other than to the Purchaser pursuant to the Side Purchase Agreement.

26.     **Immediate Effect**.  Notwithstanding the provisions set forth in Rules 6004(h) and 6006(d) of the Bankruptcy Rules, this Sale Order shall be immediately effective and enforceable and its provisions shall be self-executing.  The Debtors and the Purchaser are free to close the Mexico Transaction under the Side Purchase Agreement at any time in accordance with the terms of the Side Purchase Agreement.

27.     **Good Faith Purchaser**.  The transactions contemplated by the Side Purchase Agreement are undertaken by the Purchaser in good faith, as that term is used in section 363(m) of the Bankruptcy Code, and the Purchaser has acted without collusion in undertaking the transactions contemplated by the Side Purchase Agreement.  Accordingly, the reversal or modification on appeal of the authorization provided herein to consummate the Mexico Transaction shall not affect the validity of the sale of the Assets to the Purchaser (including the assumption and assignment of any of the Key Contracts), unless such authorization is duly stayed pending such appeal.  The Purchaser is a good faith purchaser of the Assets, and is entitled to all of the benefits and protections afforded by section 363(m) of the Bankruptcy Code.

28.     There has been no showing that the Debtors or the Purchaser engaged in any action or inaction that would cause or permit either the Mexico Transaction or any of the

underlying transactions contemplated by the Side Purchase Agreement to be avoided or costs or damages to be imposed under section 363(n) of the Bankruptcy Code.

29.      **Further Assurances**.  From time to time, as and when requested by the Seller or Purchaser, the Seller or Purchaser shall execute and deliver, or cause to be executed and delivered, all such documents and instruments as provided for in the Side Purchase Agreement and shall take, or cause to be taken, all such further or other actions as provided for in the Side Purchase Agreement that the Seller or Purchaser may reasonably deem necessary or desirable to consummate the transactions contemplated by the Side Purchase Agreement, including such actions as may be necessary to vest, perfect, or confirm, of record or otherwise, in Purchaser its right, title, and interest in and to the Assets.

30.      **Excluded Assets Held in Trust**.  The Assets sold pursuant to this Sale Order and the terms of the Side Purchase Agreement shall not include unclaimed property held in trust by the Seller, as defined pursuant to Texas state unclaimed property laws, including Texas Property Code, Title 6, Chapter 72-76, and other applicable Texas laws.

31.      **Inconsistencies with Agreements**.  To the extent of any conflict between the Side Purchase Agreement and this Sale Order, the terms of this Sale Order shall govern.  In the event the Effective Date of the Plan and the Credit Bid Transaction Closing occurs prior to the Completion Date of the Side Purchase Agreement, and therefore the Credit Bid Purchaser becomes the owner of, among other things, the Assets, the terms of the Confirmation Order, the Plan, and the Credit Bid Purchase Agreement, in that order, shall control and this Sale Order shall be null and void; *provided* that nothing herein (including the nullification of this Sale Order) shall effect the validity or the enforceability of the Side Purchase Agreement as between Purchaser and the Credit Bid Purchaser.  In the event the Completion Date of the Side Purchase Agreement occurs

prior to the Effective Date of the Plan, the terms of this Sale Order and the Side Purchase Agreement shall control to the extent of any conflict with the Confirmation Order, the Plan, and the Credit Bid Purchase Agreement.

32. **Subsequent Orders and Plan Provisions**.  Unless otherwise agreed to by the Debtors and the Purchaser, this Sale Order shall not be modified by any subsequent order(s) of this Court, except as specifically provided in the Side Purchase Agreement.

33. **Failure to Specify Provisions**.  The failure to specifically reference any particular provisions of the Side Purchase Agreement or other related documents in this Sale Order shall not diminish or impair the effectiveness of such provisions, it being the intent of the Court that the Side Purchase Agreement and other related documents be authorized and approved in their entirety.

34. **Satisfaction of Conditions Precedent**.  Neither the Purchaser nor the Seller shall have an obligation to close the Mexico Transaction until all conditions precedent in the Side Purchase Agreement to each of their respective obligations to close the Mexico Transaction have been satisfied or waived in accordance with the terms of the Side Purchase Agreement.

35. **Provisions Non-Severable**.  The provisions of this Sale Order are non-severable and mutually dependent.

Dated: _____, 2021
      Houston, Texas

                              _____
                              THE HONORABLE MARVIN ISGUR
                              UNITED STATES BANKRUPTCY JUDGE

## Exhibit A

**Side Purchase Agreement**

**Exhibit B**
**Form of Assignment and Assumption of Services Agreements**

*Attached.*

*Final*

# FORM OF
## ASSIGNMENT AND ASSUMPTION
### OF
## SERVICES AGREEMENTS

THIS ASSIGNMENT AND ASSUMPTION OF SERVICES AGREEMENTS (this "**Assignment**") is made as of the [●] day of [●], 20__ (the "**Assignment Date**"), by and between [Credit Bid Purchaser LLC], a Delaware limited liability company ("**Service Provider**"), [●], a [●] ("**Assignee**"), and Fieldwood Energy E&P Mexico, S. de R.L. de C.V., a Mexico company ("**Mexico E&P**").

RECITALS:

WHEREAS, Fieldwood Energy III LLC (f/k/a Fieldwood Energy LLC) ("**FEIII**") and Mexico E&P, have heretofore entered into those certain services agreements described on Schedule A (as amended, the "**Services Agreements**");

WHEREAS, pursuant to (a) the chapter 11 cases commenced by Fieldwood Energy LLC and its debtor affiliates and jointly administered under lead case number 20-33948 in the United States Bankruptcy Court for the Southern District of Texas, Houston Division (the "**Bankruptcy Court**") and the Bankruptcy Court's *Findings of Fact, Conclusions of Law, and Order (I) Confirming Eighth Amended Joint Chapter 11 Plan of Fieldwood Energy LLC and Its Affiliated Debtors and (II) Granting Related Relief*, dated June 25, 2021 (Docket No. 1751) and the *Eighth Amended Joint Chapter 11 Plan of Fieldwood Energy LLC and its Affiliated Debtors*, dated June 25, 2021 (Docket No. 1742) and (b) that certain *Purchase and Sale Agreement*, dated as of [●], 2021, by and between the Service Provider and FEIII (and certain of FEIII's affiliates), the closing of which occurred on [●], 2021, FEIII sold, transferred and assigned to the Service Provider, and the Service Provider accepted and assumed, all of FEIII's (and its affiliates') right, title and interest in and to and obligations arising under, each of the Services Agreements;

WHEREAS, FEIII, Service Provider and [LUKOIL International Holding GmbH, an Affiliate of Assignee]/[Assignee] are parties to that certain Purchase Agreement, dated as of [●], 2021 ("**Purchase Agreement**"), pursuant to which, among other things, Service Provider has agreed to transfer and assign to Assignee, and Assignee has agreed to assume, all of Service Provider's rights, title and interest in, and obligations arising under, each of the Services Agreements, in case, effective as of the Assignment Date;

WHEREAS, Service Provider is permitted to assign the Services Agreements to Assignee pursuant to Clause 15 of each of the Services Agreements;

WHEREAS, Service Provider wishes to assign to Assignee and Assignee wishes to assume all of Service Provider's right, title and interest under the Service Agreements effective as of the Assignment Date, pursuant to the terms and conditions set forth hereunder;

WHEREAS, the Assignee's representative and the Service Provider's representative, respectively, have sufficient authority, in terms of powers of attorney duly executed and formalized, to enter into and execute this Assignment; and

WHEREAS, Mexico E&P's representative has sufficient authority, in terms of a power of attorney duly executed by Mexico E&P, to agree and consent to, and to be deemed notified of, the assignment to Assignee in accordance with Clause 15 of each of the Service Agreements.

526786.000002 26730414.4

NOW, THEREFORE, in consideration of the premises hereof, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Service Provider, Assignee and Mexico E&P hereby agree as follows:

AGREEMENT:

1.      <u>Assignment and Assumption</u>. Service Provider hereby transfers and assigns to Assignee all of its right, title, and interest to and under each of the Services Agreements effective as of the Assignment Date, to have and to hold the same for and during the remainder of the term of each of the Services Agreements, subject to the covenants and conditions therein mentioned. Assignee hereby accepts all of Service Provider's right, title and interest in and to each of the Services Agreements, and assumes and agrees to be bound by and perform each and all of the obligations, terms, covenants and agreements of the Service Provider under each of the Services Agreements and from and after the Effective Date Assignee will carry out all the duties and be obligated as the "Contractor" under the Services Agreements. Capitalized terms not defined in this Agreement shall have the meaning ascribed to them in the Purchase Agreement.

2.      <u>Retained and Assumed Obligations</u>.  Any and all Liabilities arising from, related to, or associated with, the Service Agreements, incurred or accrued on or prior to the Assignment Date are excluded from this Assignment and shall remain for Service Provider's account ("**Retained Obligations**"). Any and all Liabilities arising from, related to, or associated with, the Service Agreements, incurred or accrued after the Assignment Date are included in this Assignment and shall be for Assignee's account ("**Assumed Obligations**"). This Assignment is in all respects subject to the provisions of the Purchase Agreement and is not intended in any way to supersede, limit or qualify any provision of the Purchase Agreement. Accordingly, in the event of any conflict or inconsistency between the terms of the Purchase Agreement and the terms hereof, the terms of the Purchase Agreement shall govern.

3.      <u>Consent</u>.  By its execution below, Mexico E&P hereby agrees and consents to, and is deemed notified of, the assignment to Assignee in accordance with Clause 15 of each of the Service Agreements.

4.      <u>Governing Law</u>. THIS ASSIGNMENT SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE UNITED MEXICAN STATES.

5.      <u>Dispute Resolution</u>.  ANY DISPUTE, CONTROVERSY OR CLAIM ARISING OUT OF OR IN RELATION TO OR IN CONNECTION WITH THIS ASSIGNMENT WILL BE EXCLUSIVELY AND FINALLY SETTLED BY ARBITRATION IN ACCORDANCE WITH CLAUSE 11 OF THE APPLICABLE SERVICES AGREEMENT.

6.      <u>Notices.</u> All notices and other communications provided for or permitted hereunder shall be made in writing by hand delivery, first class mail (registered or certified, return receipt requested), electronic transmission, or air courier guaranteeing overnight delivery:

Service Provider:

Assignee:

7.      <u>Counterparts</u>.  This Assignment will not become effective nor enforceable by or against any party unless and until executed and delivered by all parties. This Assignment may be executed in counterparts, with each counterpart being deemed to be an original instrument, but all such counterparts together constituting but one agreement.

8.      <u>Entire Agreement</u>.  The Schedules to this Assignment are hereby incorporated by reference and constitute a part of this Assignment. If any provision of this Assignment is found by a court of competent jurisdiction to be invalid or unenforceable, that provision will be deemed modified to the extent necessary to make it valid and enforceable and if it cannot be so modified, it shall be deemed deleted and the remainder of this Agreement shall continue and remain in full force and effect.

9.      <u>Further Assurances</u>. The Service Provider and Assignee agree to execute and deliver such further agreements, stipulations, and/or instruments of conveyance and transfer as may be necessary to accomplish the intent and purpose of this Assignment and the Purchase Agreement.

<em>Remainder of page intentionally left blank;<br>Signature page follows</em>

EXECUTED EFFECTIVE as of the _____ day of _____, 20__ (the "**Effective Date**").

*Service Provider:*

**[CREDIT BID PURCHASER]**

By: _____

Name: _____

Title: _____

*Assignee:*

**LUKOIL   INTERNATIONAL   HOLDING GMBH**

By: _____

Name: _____

Title: _____

## ACKNOWLEDGMENT, CONSENT TO ASSIGN, AND RELEASE

Mexico E&P hereby consents to and is hereby deemed notified of the assignment by Service Provider to, and the assumption by, Assignee of all rights and obligations of Service Provider under the Services Agreements (as provided above), and Mexico E&P agrees to release of the Released Claims (as such term is defined in the Purchase Agreement) and the covenants set forth above.

**FIELDWOOD   ENERGY   E&P   MEXICO, S. DE R.L. DE C.V.**

By: _____

Name: _____

Title: _____

## WITNESSED

By: _____

Name: _____

By: _____

Name: _____

SCHEDULE A

Services Agreements

1.  Category 1 Services Agreement (Administrative Services) dated January 7, 2016, by and
    between Fieldwood Energy E&P Mexico, S. de R.L. de C.V., and Fieldwood Energy
    LLC.

2.  Category 2 Services Agreement (Technical Services) dated January 7, 2016, by and
    between Fieldwood Energy E&P Mexico, S. de R.L. de C.V., and Fieldwood Energy
    LLC.
    a.  First Amendment effective as of the 1st day of April, 2020

3.  Category 2 Services Agreement (Engineering, Procurement, Construction and Installation
    Services) dated February 21, 2018, by and between Fieldwood Energy E&P Mexico, S.
    de R.L. de C.V., and Fieldwood Energy LLC.
    a.  First Amendment effective as of the 1st day of April, 2020

**Exhibit C**
**Form of Assignment, Assumption and Bill of Sale**

*Attached.*

*Final*

## FORM OF
## ASSIGNMENT, ASSUMPTION AND BILL OF SALE
(Sublease and Equipment)

THIS ASSIGNMENT, ASSUMPTION AND BILL OF SALE (this "**Agreement**") is made as of the [●] day of [●], 20__, by and among **ONE BRIARLAKE PLAZA OWNER, LLC**, a Delaware limited liability company ("**Landlord**"); **[CREDIT BID PURCHASER LLC]**, a Delaware limited liability company ("**Assignor**"); [●], a [●] ("**Assignee**"); and **THE LUBRIZOL CORPORATION**, an Ohio corporation ("**Tenant**").

## RECITALS:

WHEREAS, Landlord and Tenant have made and entered into that certain Office Lease dated as of May 27, 2016, as amended by that certain First Amendment to Office Lease, dated October 13, 2017 (collectively, the "**Lease**"), respecting to certain premises containing approximately 50,208 rentable square feet known as Suite 300, Suite 320 and Suite 400 (collectively, the "**Premises**") in the building located at One BriarLake Plaza, 2000 West Sam Houston Parkway South, Houston, Texas 77042 as more particularly described in the Lease;

WHEREAS, Tenant and Fieldwood Energy III LLC (f/k/a Fieldwood Energy LLC) ("**FEIII**") have entered into the Sublease dated December 22, 2018 (the "**Sublease**") pursuant to which Tenant agreed to sublet to Fieldwood Energy LLC a portion of the Premises comprised of Suite 320, for a total of 13,029 rentable square feet (as further described in the Sublease, the "**Subleased Premises**") as provided in the Sublease;[1]

WHEREAS, pursuant to (a) the chapter 11 cases commenced by Fieldwood Energy LLC and its debtor affiliates and jointly administered under lead case number 20-33948 in the United States Bankruptcy Court for the Southern District of Texas, Houston Division (the "**Bankruptcy Court**") and the Bankruptcy Court's *Findings of Fact, Conclusions of Law, and Order (I) Confirming Eighth Amended Joint Chapter 11 Plan of Fieldwood Energy LLC and Its Affiliated Debtors and (II) Granting Related Relief*, dated June 25, 2021 (Docket No. 1751) and the *Eighth Amended Joint Chapter 11 Plan of Fieldwood Energy LLC and its Affiliated Debtors*, dated June 25, 2021 (Docket No. 1742); and (b) that certain *Purchase and Sale Agreement*, dated as of [__], 2021, by and between the Assignor and FEIII (and certain of FEIII's affiliates), the closing of which occurred on [___], 2021, FEIII sold, transferred and assigned to the Assignor, and the Assignor accepted, all of FEIII's (and its affiliates') right, title and interest in and to the Sublease and the Subleased Premises;

WHEREAS, FEIII, Assignor and [LUKOIL International Holding GmbH, an Affiliate of Assignee]/[Assignee] are parties to that certain Purchase Agreement dated as of [●] ("**Purchase Agreement**"), pursuant to which, among other things, Assignor has agreed to transfer, convey, assign and deliver to Assignee, and Assignee has agreed to acquire and accept from Assignor, the Sublease and the assets listed in <u>Schedule A</u> hereto (the "**Equipment**"), in each case, effective as of the Assignment Date;

---

[1] NTD: Recitals to be updated for any extensions of the Sublease.

1

WHEREAS, effective as of [●], 20__ (the "**Assignment Date**"), Assignor wishes to assign to Assignee and Assignee wishes to assume from Assignor all of Assignor's right, title and interest under the Sublease and the Equipment, pursuant to the terms and conditions set forth hereunder; and

WHEREAS, Assignor has asked Landlord and Tenant to consent to the assignment of the Sublease ("**Assignment to Sublease**") to Assignee.

NOW, THEREFORE, in consideration of the premises hereof, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Landlord, the Tenant, Assignor and Assignee hereby agree as follows:

1.    <u>Assignment and Assumption of Sublease and Equipment</u>. Subject to <u>Section 2</u> below, Assignor hereby transfers and assigns to Assignee all of its right, title, and interest to and under the Sublease and the Equipment (including the Assumed Obligations but excluding the Retained Obligations), in each case, free and clear of any Encumbrances effective as of the Assignment Date. Assignee hereby accepts all of Assignor's right, title and interest in and to the Sublease and the Equipment (including the Assumed Obligations), and assumes and agrees to be bound by and perform each and all of the obligations (excluding the Retained Obligations), terms, covenants and agreements of the Assignor under the Sublease arising after the Assignment Date. Capitalized terms not defined in this Agreement shall have the meaning ascribed to them in the Purchase Agreement.

2.    <u>Retained and Assumed Obligations</u>.  Any and all Liabilities arising from, related to, or associated with, the Equipment or the Sublease, incurred or accrued on or prior to the Assignment Date, including the Cure Costs, are excluded from this Agreement and shall remain for Assignor's account ("**Retained Obligations**"). Any and all Liabilities arising from, related to, or associated with, the Equipment or the Sublease, incurred or accrued after the Assignment Date are included in this Agreement and shall be for Assignee's account ("**Assumed Obligations**"). This Agreement is in all respects subject to the provisions of the Purchase Agreement and is not intended in any way to supersede, limit or qualify any provision of the Purchase Agreement. Accordingly, in the event of any conflict or inconsistency between the terms of the Purchase Agreement and the terms hereof, the terms of the Purchase Agreement shall govern.

3.    <u>Consent to Assignment and Assumption of Sublease</u>.  Landlord and Tenant each hereby consents to the Assignment to Sublease by Assignor to Assignee as provided herein. Landlord and Tenant each hereby agree and acknowledge that (a) the Assignor is currently not in default or breach under the Sublease, (b) the Assignor has paid all amounts due and payable through the Assignment Date, and (c) there are no amounts that were incurred or accrued prior to the Assignment Date due and payable by Assignee after the Assignment Date.  Effective as of the Assignment Date, Landlord and Tenant each acknowledge that Assignor shall have no further obligations or responsibilities under the Sublease arising from and after the Assignment Date, and waive and release any claims against Assignee for any claim, event or breach that occurred prior to the Assignment Date.

4.    <u>No Waiver</u>. Except as provided in <u>Section 3</u>, neither the entry into this Agreement or anything herein shall be construed to modify, waive, impair or affect any of the covenants,

526786.000002 26730471.9

agreements, terms, provisions, obligations or conditions contained in the Lease or Sublease (except as may be herein expressly provided), or to waive any breach thereof, or any rights of Landlord or Tenant against any person or entity liable or responsible for the performance thereof or to increase the obligations or diminish the rights of Landlord under the Lease, or to increase rights or diminish the obligations of Tenant thereunder, or to, in any way, be construed as giving Assignee any greater rights than the Tenant would be entitled to under the Lease, and all covenants, agreements, terms, provisions and conditions of the Lease and Sublease are hereby mutually declared to be in full force and effect.

5.    No Further Consent. This Agreement shall not be construed either as a consent by Landlord or Tenant to, or as permitting any other or further subletting of the Subleased Premises, whether in whole or in part, or any further assignment of the Sublease or Lease, or as a waiver of the requirement of obtaining Landlord's and Tenant's consent thereto, and notwithstanding anything to the contrary contained in the Lease or Sublease, Assignee shall not, without the prior written consent of Landlord and Tenant, which consent shall not be unreasonably withheld, assign the Lease, Sublease, or this Agreement or sublet the Subleased Premises or any part thereof. Landlord's and Tenant's consent to any future assignment or sublease shall be conditioned and subject to the rights, obligations, restrictions and conditions that are applicable to an assignment or sublease by Tenant pursuant to the Lease.

6.    Assignee's Obligation. Subject to Section 2, Assignee, for Assignee and its successors and assigns hereby (a) accepts the Sublease for the Subleased Premises (except for the Retained Obligations), (b) recognizes all of the covenants, agreements, terms, provisions, obligations and conditions contained in the Lease (except for the Retained Obligations), and hereby assumes all of said terms, provisions, agreements, covenants, obligations and conditions of the Lease on the part of the Tenant to be kept, observed and performed with respect to the Subleased Premises (including the Assumed Obligations), and (c) agrees to keep and perform, and to permit no violation beyond the expiration of applicable periods of notice and grace of, each and every covenant, agreement, term, provision, obligation and condition therein set forth on the part of Tenant with respect to the Subleased Premises to be kept, observed and performed.

7.    Notices. All notices and other communications provided for or permitted hereunder shall be made in writing by hand delivery, first class mail (registered or certified, return receipt requested), electronic transmission, or air courier guaranteeing overnight delivery:

| | |
|---|---|
| If to Landlord: | In accordance with the Sublease. |
| If to Tenant: | In accordance with the Sublease. |
| If to Assignor: | In accordance with the Sublease. |
| If to Assignee: | [] |
| | [] |
| | [] |
| | Attn: [] |
| | Email: [] |

3

8.      <u>Execution of Consent</u>. The parties hereto agree that this Agreement may be signed and delivered by electronic signature and counterparts.

9.      <u>Governing Law</u>.   This Agreement shall be governed by the laws of State of Texas without giving effect to the conflicts of laws principles thereof. Each party irrevocably agrees that any action, suit or proceeding arising out of or in connection with this Agreement may be brought in any state court located in Harris County, Texas or in the United States District Court for the Southern District of Texas (or in any court in which appeal from such courts may be taken), and each party hereby expressly and irrevocably submits to the jurisdiction of such courts and agrees not to assert, by way of motion, as a defense, or otherwise, in any such action, suit or proceeding, any claim that it is not subject personally to the jurisdiction of such court, that the action, suit or proceeding is brought in an inconvenient forum, that the venue of the action, suit or proceeding is improper or that this Agreement or the subject matter hereof may not be enforced in or by such court, and hereby agrees not to challenge such jurisdiction or venue by reason of any offsets or counterclaims in any such action, suit or proceeding. THE PARTIES HERETO HEREBY KNOWINGLY, VOLUNTARILY AND INTENTIONALLY WAIVE THE RIGHT ANY MAY HAVE TO A TRIAL BY JURY IN RESPECT TO ANY LITIGATION BASED HEREON, OR ARISING OUT OF, UNDER, OR IN CONNECTION WITH THIS AGREEMENT, THE TRANSACTIONS OR ANY COURSE OF CONDUCT, COURSE OF DEALING, STATEMENTS (WHETHER VERBAL OR WRITTEN) OR ACTIONS OF ANY PARTY IN CONNECTION WITH THE TRANSACTIONS.

10.      <u>Entire Agreement</u>.   The Exhibits to this Agreement are hereby incorporated by reference and constitute a part of this Agreement. If any provision of this Agreement is found by a court of competent jurisdiction to be invalid or unenforceable, that provision will be deemed modified to the extent necessary to make it valid and enforceable and if it cannot be so modified, it shall be deemed deleted and the remainder of this Agreement shall continue and remain in full force and effect.

11.      <u>Further Assurances</u>. The Assignor and Assignee agree to execute and deliver such further agreements, stipulations, and/or instruments of conveyance and transfer as may be necessary to accomplish the intent and purpose of this Agreement and the Purchase Agreement.

526786.000002 26730471.9

IN WITNESS WHEREOF, the parties have executed this Agreement as of the date first written above.

TENANT:

THE LUBRIZOL CORPORATION


By:_____
Name:
Title:


LANDLORD:

ONE BRIARLAKE PLAZA OWNER, LLC


By:_____
Name:
Title:


ASSIGNOR:

[CREDIT BID PURCHASER]


By:_____
Name:
Title:


ASSIGNEE:

[●]


By:_____
Name:
Title:

526786.000002 26730471.9

## SCHEDULE A
## EQUIPMENT

| AV EQUIPMENT | | |
|---|---|---|
| **Description** | **Qty** | **Notes** |
| *Room 3701 Large Conference Room* | | |
| Yealink VCM34 Video conferencing Microphone Array | 1 | |
| YEALINK Wired Presentation KIT | 1 | |
| Yealink VC800 Video Conferencing System w/ 2 Expansion Microphones | 2 | |
| Yealink WPP20 IEEE 802.11ac - USB 2.0 Wi-Fi Adapter | 2 | |
| Samsung 85-inch Class Crystal UHD TU-8000 Series - 4K UHD HDR Smart TV with Alexa Built-in (UN85TU8000FXZA, 2020 Model) | 1 | |
| Remote Control Security Lock | 1 | |
| Logitech Conference Cam BCC950 Video Conference Webcam, HD 1080p Camera with Built-In Speakerphone | 1 | |
| | | |
| *Room 3811 Small Conference Room* | | |
| 65" LG Class UV340C LED TV-4K UHD & Creston Scaler w/wall mount | 1 | |
| Yealink WPP20 IEEE 802.11ac - USB 2.0 Wi-Fi Adapter | 2 | |
| Yealink Video Conference Endpoint VC500 | 1 | |
| Yealink Microsoft Teams Room System for Focus and Small Rooms | 1 | |
| | | |
| *Room 3605 War Room* | | |
| OPTOMA EH500 / 1080p, 4700 ANSI Lumens, 10,000:1 Contrast, Full 3D, 2x HDMI, 1x DisplayPort, 2x VGA-in 1x VGA-out, 3D Vesa Sync port | 1 | |
| Polycom Phone | 1 | |
| | | |
| IT EQUIPMENT | | |
| **Description** | **Qty** | **Notes** |
| Dell Laptop | 46 | |
| Dell Desktops | 2 | |
| Dell 24" Monitors | 92 | |
| Dell docking stations | 46 | |
| Logitech Keyboard/Mouse Combo | 48 | |
| Cisco 8851/7965 Desk Phones | 46 | |
| Rack mounted UPS | 2 | IDF closet |
| Fiber and cable connections | | IDF closet |
| Cisco Switch in IDF closet | 5 | IDF closet |
| Patch panels and cables in IDF closet | 9 | IDF closet |
| | | |
| KITCHEN | | |

6

| Description | Qty | Notes |
|---|---|---|
| Coffee Supply Trays | 2 | |
| Paper Towel Holder and Supplies | 1 | |
| First Aid Cabinet | 1 | |
| AED Defibrillator | 1 | |
| Breakroom tables | 2 | |
| Breakroom chairs | 8 | |
| GE Profile Microwave Model # PEM315F | 1 | |
| Metal Mexico Rig Photo | 1 | |
| Framed Mexico Platform Photo | 1 | |
| Wall mounted clock | 1 | |
| Trash can and recycle bin | 2 | |
| **COPY AREA** | | |
| **Description** | **Qty** | **Notes** |
| 44" DesignJet T1200 Plotter | 1 | |
| TCL 55S425 55 inch 4K Smart LED Roku TV (2019) | 1 | |
| Wall mounted clock | 1 | |
| Quartet Magnetic Whiteboard, Porcelain, White Board, Dry Erase Board, 4 x 6 feet, Aluminum Frame (PPA406) | 1 | |
| Xerox Printer | 1 | copy area west side |
| - | | |
| **MISC/STORAGE** | | |
| **Description** | **Qty** | **Notes** |
| TCL 55S425 55 inch 4K Smart LED Roku TV (2019) | 1 | reception area |
| Rubbermaid Commercial Products Heavy-Duty Utility Cart, Flat Handle, 2 Lipped Shelves, Small, Black (FG450089BLA) | 1 | |
| Standing Handsanitizer stations | 3 | located at each entrance |
| Access Control System - S2 with four card readers | 1 | **Tied into Fieldwood security system** |
| Guest seating | 2 | area outside office 3608 |
| | | |

526786.000002 26730471.9

**Exhibit D**
**Form of Assignment Deed**

*Attached.*

*Final*

**CONTRATO DE CESIÓN DE PARTE SOCIAL DE [FIELDWOOD ENERGY E&P MÉXICO, S. DE R.L. DE C.V.]**

**EQUITY INTEREST ASSIGNMENT AGREEMENT OF [FIELDWOOD ENERGY E&P MÉXICO, S. DE R.L. DE C.V]**[1]

Contrato de cesión de parte social (el "***Contrato***") que celebran este día [•] de [•] de 2021, por una parte **[CREDIT BID PURCHASER LLC]**, representada en esta acto por [•] (en lo sucesivo el "***Cedente***"), y por la otra parte la sociedad [•], representada en este acto por [•], (en lo sucesivo el "***Cesionario***") (el Cedente y el Cesionario serán referidos conjuntamente como las "***Partes***"), con la comparecencia de [•], al tenor de las siguientes declaraciones y cláusulas:

Equity interest assignment agreement (the "***Agreement***") entered on [•] [•], 2021, by **[CREDIT BID PURCHASER LLC]**, represented by [•] (hereinafter referred to as the "***Assignor***") and [•], represented by [•], (hereinafter the "***Assignee***") (the Assignor and Assignee hereinafter jointly referred to as the "***Parties***") with the appearance of [•], pursuant to the following recitals and clauses:

## ANTECEDENTE

## RECITALS

CONSIDERANDO QUE, [•],[•] y [•] celebraron el [*] de julio de 2021, un *Purchase Agreement* (el "Side SPA") donde se acordó, entre otras cuestiones al Cierre, adoptar todos los actos que sean necesarios para que la Parte Social sea efectivamente vendida, cedida y transferida libre de todo gravamen por el Cedente al Cesionario de conformidad con lo previsto en el Side SPA, y para que esa cesión sea perfeccionada.

WHEREAS, [•],[•] and [•] are parties to that certain Purchase Agreement dated July [*], 2021 (the "Side SPA") where it was agreed, among other matters at Completion, to adopt all necessary acts in order for the Equity Interest to be effectively sold, assigned and transferred free and clear from any and all Encumbrances by the Assignor to the Assignee as provided in the Side SPA, with all rights attached or accruing to them together at or after the Completion of the Side SPA.

CONSIDERANDO QUE, de conformidad con (a) los casos del capítulo 11 iniciados por Fieldwood Energy LLC y sus deudores afiliados y conjuntamente administrados bajo el caso principal número 20-33948 en el Tribunal de Concurso Mercantil de los Estados Unidos para el Distrito Sur de Texas, División de Houston (el "**Tribunal de Quiebras**") y las *conclusiones de hecho y de derecho del Tribunal de Quiebras y la orden (I) de confirmación del octavo plan conjunto modificado del capítulo 11 de Fieldwood Energy LLC y sus deudores afiliados y (II) de concesión de las medidas de reparación correspondientes,* de fecha 25 de junio de 2021 (Docket No. 1751) (la "**Orden de Confirmación**") del Tribunal de Quiebras y el Octavo Plan Conjunto Modificado del Capítulo 11 de Fieldwood Energy LLC y sus Deudores Afiliados, de fecha 25 de junio de 2021 (Docket No. 1742) (incluidos los anexos y los programas de los mismos y tal como puedan ser

WHEREAS, pursuant to (a) the chapter 11 cases commenced by Fieldwood Energy LLC and its debtor affiliates and jointly administered under lead case number 20-33948 in the United States Bankruptcy Court for the Southern District of Texas, Houston Division (the "**Bankruptcy Court**") and the Bankruptcy Court's *Findings of Fact, Conclusions of Law, and Order (I) Confirming Eighth Amended Joint Chapter 11 Plan of Fieldwood Energy LLC and Its Affiliated Debtors and (II) Granting Related Relief,* dated June 25, 2021 (Docket No. 1751) (the "**Confirmation Order**") and the *Eighth Amended Joint Chapter 11 Plan of Fieldwood Energy LLC and its Affiliated Debtors,* dated June 25, 2021 (Docket No. 1742) (including any exhibits and schedules thereto and as may be further amended, supplemented, or modified, the "**Plan**"); and (b) that certain *Purchase and Sale Agreement,* dated as of [___], 2021, by and between the Assignor and Fieldwood Energy III LLC (f/k/a Fieldwood

---

[1] NTD: Other equity interest assignment agreements will be duplicated from this form.

*Final*

enmendados, complementados o modificados, el "**Plan**"); y (b) ese cierto *Acuerdo de Compra y Venta*, de fecha [___], de 2021, celebrado entre el Cedente y Fieldwood Energy III LLC (f/k/a Fieldwood Energy LLC) ("**FEIII**") (y algunas de las filiales de FEIII), cuyo cierre tuvo lugar el [___] de 2021, FEIII vendió, transfirió y cedió a la Cedente, y ésta aceptó, todos los derechos, títulos e intereses de FEIII (y sus filiales) sobre la Parte Sociale; y

CONSIDERANDO que las Partes desean formalizar y perfeccionar la transferencia de la Parte Social bajo la ley mexicana.

Energy LLC) ("**FEIII**") (and certain of FEIII's affiliates), the closing of which occurred on [___], 2021, FEIII sold, transferred and assigned to the Assignor, and the Assignor accepted, all of FEIII's (and its affiliates') right, title and interest in and to the Equity Interest; and

WHEREAS, the Parties desire to formalize and perfect the transfer of the Equity Interest under Mexican law.

### DECLARACIONES

### REPRESENTATIONS AND WARRANTIES

I.  El Cedente declara a través de su representante legal que:

I.  The Assignor represents and warrants through its legal representative that:

a)  Es propietario de una parte social con valor de $30.00 (treinta pesos 00/100 M.N.) (en lo sucesivo la "***Parte Social***") del capital social fijo suscrito y pagado de la sociedad [Fieldwood Energy E&P México, S. de R.L. de C.V.] (la "***Sociedad***").

a)  It is sole, registered and legitimate owner of an equity interest with a value of $30.00 (thirty pesos 00/100 National Currency) (hereinafter referred to as the "***Equity Interest***") of the subscribed and paid-in fixed corporate capital of [Fieldwood Energy E&P México, S. de R.L. de C.V.] (the "***Company***").

b)  Se encuentra inscrito como socio de la Sociedad en el libro de registro de socios que para tal efecto lleva la Sociedad.

b)  It is registered as a member of the Company in the Company's Members' Registry Book.

c)  La Parte Social ha sido debidamente suscrita y pagada.

c)  The Equity Interest has been duly subscribed and paid.

d)  Tiene (i) una titularidad valida de la Parte Social y (ii) facultades legales para transferir la Parte Social al Cesionario.

d)  It has (i) good and valid title to the Equity Interest and (ii) the legal authority to transfer the Equity Interest to the Assignee.

e)  La Parte Social está libre de cualquier gravamen y limitaciones de propiedad, y no existe ningún Gravamen (tal y como se define en el Side SPA) que pueda limitar la transferencia o venta de la Parte Social, u otros derechos concedidos en virtud de la misma.

e)  The Equity Interest is free and clear of any liens and ownership limitations, and there are no Encumbrances (as defined in the Side SPA) that may limit its transfer or sale of the Equity Interest, or other rights granted thereunder.

f)  No existe ninguna disposición, ya sea legal, estatutaria o contractual, que le impida (i) celebrar el presente Contrato

f)  There is no provision whatsoever, either statutory, bylaw or contractual, that restricts it from (i) entering into this

o (ii) cumplir con las obligaciones asumidas en el mismo.

**g)** Ha obtenido la aprobación unánime de la Asamblea General de Socios de la Sociedad para llevar a cabo la cesión de la Parte Social a favor del Cesionario, y la admisión del Cesionario como nuevo socio de la Sociedad, sin requerir autorización adicional para tal efecto.

**h)** [FIELDWOOD ENERGY DE MÉXICO, S. DE R.L. DE C.V.] en su calidad de socio registrado de la Sociedad renunció a cualquier derecho que le pudiera corresponder, ya sea conforme a la Ley General de Sociedades Mercantiles o a los estatutos de la Sociedad, en relación con la cesión de la Parte Social conforme a este Contrato a favor del Cesionario, según consta en el acta de las resoluciones antes mencionadas.

**i)** Designa como su domicilio a efectos del presente Contrato el situado en [●].

**a)** Su representante tiene las facultades necesarias para obligar a su representada, mismas que no le han sido revocadas o modificadas de forma alguna.

**II.** El Cesionario declara a través de su representante legal que:

**b)** Es su voluntad adquirir del Cedente la Parte Social, libre de gravamen o limitación de dominio de cualquier naturaleza, bajo los términos del presente Contrato;

**c)** A la fecha de firma del presente Contrato, tiene pleno conocimiento de la situación legal y financiera de la Sociedad; y

**d)** Su representante tiene las facultades necesarias para obligar a su representada, mismas que no le han sido revocadas o modificadas de forma alguna.

Agreement or (ii) fulfilling the obligations assumed hereunder.

**g)** It has obtained the unanimous approval of the Members' Meeting of the Company to execute the assignment of the Equity Interest in favor of the Assignee and the admission of the Assignee as a new member of the Company, without requiring any additional authorizations for such purpose.

**h)** [FIELDWOOD ENERGY DE MÉXICO, S. DE R.L. DE C.V.] as registered member of the Company waived any right to which it may be entitled either pursuant to the General Law of Business Organizations or the by-laws of the Company, in connection with the assignment of the Equity Interest pursuant to this Agreement in favor of the Assignee, as evidenced in the minutes of the resolutions mentioned above.

**i)** It designates as its domicile for purposes of this Agreement the one located at [●.]

**j)** Its representative has the necessary authorities to bind its principal, authorities which have not been revoked or modified in any manner.

**II.** The Assignee represents through its legal representative that:

**a)** It wishes to acquire from the Assignor, the Equity Interest free and clear of any Encumbrances, liens or ownership limitations of any nature, under the terms of this Agreement;

**b)** On the date of execution of this Agreement, it has full knowledge of the legal and financial status of the Company; and

**c)** Its representative has the necessary authorities to bind its principal, authorities which have not been revoked or modified in any manner.

*Final*

**III.** <u>Ambas Partes declaran que:</u>

    a) En la celebración del presente Contrato, no ha existido error, dolo, violencia o mala fe que vicie su consentimiento; y

    b) En virtud de las declaraciones anteriores, las Partes someten su voluntad al tenor de las siguientes:

**CLÁUSULAS**

**PRIMERA.** Salvo que se estipule lo contrario, los términos en mayúsculas utilizados, pero no definidos en el presente Contrato tendrán el significado que se les asigna en el Side SPA.

**SEGUNDA.** El Cedente, en este acto, cede, traspasa, y transmite irrevocablemente a favor del Cesionario, todos los derechos, títulos e intereses de la Parte Social, incluidos todos los derechos accesorios libres de todo Gravamen, sin limitación de dominio alguna.

**TERCERA.** Con sujeción a los términos del presente Contrato y del Side SPA, el Cesionario acepta, recibe y adquiere de forma irrevocable la Parte Social, incluidos todos los derechos accesorios, de la Cedente, libre de todo Gravamen y sin limitación de propiedad.

**CUARTA.** Las Partes acuerdan como precio de compra de la Parte Social, la cantidad de $_____.00 (_____ pesos 00/100 M.N.) (el "***Precio***"). El Cedente manifiesta recibir en este mismo acto, a su entera satisfacción, del Cesionario, el Precio total, extendiendo mediante el presente Contrato, el recibo más amplio que en derecho proceda.

**QUINTA.** El Cedente se compromete a dar instrucciones a la Sociedad para que lleve a cabo todos los actos necesarios para que el Cesionario se registre como nuevo socio de la Sociedad y como único propietario de la Parte Social, incluyendo, pero sin limitarse a ello, el registro de las inscripciones pertinentes en el Libro de Registro de Socios de la Sociedad.

**SEXTA.** Las Partes acuerdan que todos los impuestos derivados de la transmisión de la Parte

**III.** <u>Both Parties represent that:</u>

    a) In the execution of this Agreement, there has been no error, duress, violence or bad faith that may affect their will hereunder; and

    b) In accordance with the foregoing recitals, representations and warranties, the Parties agree to be bound to the following:

**CLAUSES**

**FIRST.** Unless otherwise provided herein, capitalized terms used but not defined in this Agreement shall have the meaning assigned to such terms in the Side SPA.

**SECOND.** The Assignor hereby irrevocably assigns, transfers and conveys in favor of the Assignee, all right, title and interest to the Equity Interest, including all accessory rights, free and clear of all Encumbrances, liens or any ownership limitation whatsoever.

**THIRD.** Subject to the terms of this Agreement and the Side SPA, the Assignee hereby accepts, receives and acquires in an irrevocable manner, the Equity Interest, including all accessory rights, from the Assignor, free and clear of all Encumbrances, liens or any ownership limitation.

**FOURTH.** The Parties agree that the purchase price of the Equity Interest is $____.00 (_____ pesos 00/100 National Currency) (the "***Price***"). The Assignor hereby states to have received the total Price from the Assignee at its own satisfaction, thus hereby granting the utmost lawful receipt.

**FIFTH.** The Assignor hereby agrees to instruct the Company to carry out any and all acts necessary in order for the Assignee to be registered as a new member of the Company and as sole owner of the Equity Interest, including but not limited to recording the relevant entries into the Members' Registry Book of the Company.

**SIXTH.** The Parties hereto agree that all the taxes arising from the transfer of the Equity Interest and

*Final*

Social y el perfeccionamiento de las operaciones aquí previstas, deberán ser pagados por la Cedente, de acuerdo con el Side SPA.

the perfection of the transactions hereunder, shall have to be paid by the Assignor, pursuant to the Side SPA.

**SEPTIMA.** Cualquier aviso, notificación, petición, demanda, reclamo y cualesquier otras comunicación en relación con el presente Contrato, se realizarán por escrito y se considerarán debidamente entregadas, si se entregan personalmente o se envían mediante servicio de mensajería con acuse de recibo de la Parte que se pretenda notificar.

**SEVENTH.**   Any notice, notification, petition, lawsuit, claim and any other communication related with this Agreement, shall be in writing and shall be deemed as delivered, if delivered personally or sent by courier service with acknowledgement receipt from the recipient party.

Para efectos de esta Cláusula, las Partes designan los siguientes domicilios:

For purposes of this Clause, the Parties designate their addresses as follows:

Cedente: [•]

Assignor: [•]

Cesionario: [•]

Assignee: [•]

**OCTAVA.** Para la interpretación y cumplimiento del presente Contrato, las Partes se someten a las leyes aplicables, jurisdicción y competencia de los tribunales en Monterrey, Nuevo León. Cualquier controversia en relación con el presente Contrato o cualquier documento relacionado con el mismo, se resolverá de conformidad con lo establecido en la cláusula 10.2 del Side SPA.

**EIGHTH.** For the interpretation and fulfillment of this Agreement, the Parties agree to be subject to the applicable laws, jurisdiction and competence of the courts of Monterrey, Nuevo León. Any dispute in connection with this Agreement or any document related hereto shall be resolved in accordance with the provisions set forth in clause 10.2 of the Side SPA.

**NOVENA.** Cada una de las Partes del presente acuerda suscribir los documentos e instrumentos adicionales que se consideren necesarios y apropiados para hacer efectiva la transferencia de la Parte Social y llevar a cabo la intención de este Contrato, incluida la modificación de los libros y registros de la Sociedad para reflejar al Cesionario como socio registrado de la Sociedad.

**NINTH**. Each of the Parties hereto agree to enter into such further documents and instruments as may be deemed necessary and appropriate to give effect to the transfer of the Equity Interest and carry out the intent of this Agreement, including the amendment of the books and records of the Company to reflect the Assignee as a registered member of the Company.

**DÉCIMA**. El presente Contrato se celebra de conformidad con el Side SPA, y la transferencia en virtud del mismo se realiza con sujeción a los términos y condiciones establecidos en el mismo. En caso de conflicto entre el presente Contrato y el Side SPA, el Side SPA prevalecerá en la medida de dicho conflicto. La ejecución de este Contrato por parte de la Cedente, y la ejecución y aceptación de este Contrato por parte de la Cesionaria, no eximirán ni menoscabarán los derechos u obligaciones subsistentes de cualquiera de dichas Partes en virtud del Side SPA.

**TENTH**. This Agreement is executed and delivered pursuant to the Side SPA, and the transfer hereunder is made subject to the terms and conditions set forth therein. In the event of a conflict between this Agreement and the Side SPA, the Side SPA shall control to the extent of such conflict. The execution and delivery of this Agreement by Assignor, and the execution and acceptance of this Agreement by Assignee, shall not operate to release or impair any surviving rights or obligations of any such party under the Side SPA.

*Final*

**DÉCIMA PRIMERA.** Todas las notificaciones y comunicaciones que se requieran o se realicen en virtud del presente Contrato se harán de acuerdo con la cláusula 17.3 del Side SPA.

**DÉCIMA SEGUNDA.** El presente Contrato y el Side SPA constituyen el contrato completo entre las Partes en relación con la transferencia de la Parte Social.

**DÉCIMA TERCERA**. El presente Contrato se celebra en los idiomas inglés y español, en el entendido de que en caso de cualquier discrepancia que surja en el mismo, prevalecerá la versión en español.

**DÉCIMA CUARTA**. El presente Contrato podrá ser ejecutado con una o más contrapartes, cada una de las cuales se considerará un original, pero todas ellas constituirán un mismo instrumento.

Enteradas las Partes del contenido y alcance del presente Contrato, lo firman el día [•] de [•] de 2021.

**ELEVENTH**. All of the notices and communications that are required or served pursuant to this Agreement shall be done in accordance with Clause 17.3 of the Side SPA.

**TWELFTH.** This Agreement and the Side SPA constitute the entire agreement between the Parties pertaining to the transfer of the Equity Interest.

**THIRTEENTH.** This Agreement is executed in both the English and Spanish languages, in the understanding that in case of any discrepancy arising hereunder, the Spanish version shall prevail.

**FOURTEENTH**.   This Agreement may be executed in one or more counterparts, each of which will be deemed an original, but all of which will constitute one and the same instrument

Aware of the content and scope of this Agreement, the Parties hereby execute it on [•] [•] , 2021.

El Cedente/The Assignor
**[SELLER]**

_____
**Por / By:** [•]
Representante Legal / Legal Representative

El Cesionario/The Assignee
**[•]**

_____
**Por / By:** [•]
Representante Legal / Legal Representative

526786.000002 26745065.3