**<u>Exhibit F</u>**

**Credit Bid Purchase Agreement**

*Execution Version*

**PURCHASE AND SALE AGREEMENT**

**AMONG**

**FIELDWOOD ENERGY LLC**

**AND**

**ITS AFFILIATES SIGNATORY HERETO**

**AS SELLERS**

**QUARTERNORTH ENERGY LLC**

**AS BUYER**

**AND**

**MAKO BUYER 2 LLC**

**AS BUYER 2**

**DATED**

**AUGUST 27, 2021**

**TABLE OF CONTENTS**

**Page**

ARTICLE I  PURCHASE AND SALE ................................................................................2
    1.1    Purchase and Sale ................................................................................2
    1.2    Acquired Interests; Assets ................................................................2
    1.3    Excluded Assets ................................................................................8
    1.4    Effective Time ................................................................................9
    1.5    Certain Sellers ................................................................................10
    1.6    FERC and Marketing-Related Contract Matters ............................10

ARTICLE II  CONSIDERATION .................................................................................11
    2.1    Consideration ................................................................................11
    2.2    Allocation of Adjusted Consideration .........................................12
    2.3    Consents to Assign ........................................................................12
    2.4    Governmental Approvals ................................................................14
    2.5    Preferential Rights ........................................................................16
    2.6    Withholding ................................................................................17
    2.7    Assets Sold "As Is, Where Is" ......................................................17
    2.8    Presence of Wastes, NORM, Hazardous Substances and Asbestos .....................18

ARTICLE III  DUE DILIGENCE ................................................................................19
    3.1    Due Diligence ................................................................................19

ARTICLE IV  SELLERS' REPRESENTATIONS .........................................................20
    4.1    Organization/Qualification ............................................................20
    4.2    Power and Authority ......................................................................20
    4.3    Non-Contravention ........................................................................20
    4.4    Authorization and Enforceability ..................................................20
    4.5    Liability for Brokers' Fees ............................................................21
    4.6    Litigation ................................................................................21
    4.7    Governmental Approvals ................................................................21
    4.8    Preferential Rights; Applicable Consents ......................................21
    4.9    Taxes ................................................................................22
    4.10    Well Status ................................................................................23
    4.11    Compliance with Laws; Permits ....................................................23
    4.12    Environmental Matters ..................................................................23
    4.13    Payments ................................................................................24
    4.14    Material Contracts ........................................................................24
    4.15    Imbalances; Prepayments ..............................................................26
    4.16    AFEs; Cash Calls ........................................................................26
    4.17    Labor and Employment Matters ....................................................27
    4.18    Employee Benefits ........................................................................28
    4.19    Non-Consent Operations ................................................................29
    4.20    Suspense Funds ............................................................................29
    4.21    Payout Balances ............................................................................29
    4.22    Title to Acquired Interests ............................................................29
    4.23    Insurance ................................................................................30
    4.24    Related Party Transactions ............................................................30

i

# TABLE OF CONTENTS

**(continued)**

**Page**

| | | |
|---|---|---|
| 4.25 | Intellectual Property | 30 |
| 4.26 | Undue Influence | 32 |
| 4.27 | No Undisclosed Material Liabilities | 32 |
| 4.28 | Absence of Certain Changes | 33 |
| 4.29 | Equipment and Fixed Assets | 33 |
| 4.30 | Operatorship | 33 |
| 4.31 | Joint Venture | 33 |
| 4.32 | Plan of Merger | 35 |
| 4.33 | Exhibit X-1 | 35 |

ARTICLE V  BUYERS' REPRESENTATIONS ... 35

| | | |
|---|---|---|
| 5.1 | Organization; Standing; Capitalization | 36 |
| 5.2 | Power | 37 |
| 5.3 | Non-Contravention | 37 |
| 5.4 | Authorization and Enforceability | 37 |
| 5.5 | Liability for Brokers' Fees | 37 |
| 5.6 | Litigation | 37 |
| 5.7 | Governmental and Third Person Consents | 37 |
| 5.8 | Financial Capability | 38 |
| 5.9 | Qualification | 38 |
| 5.10 | Bankruptcy | 38 |
| 5.11 | Investor Status; Investigation | 38 |
| 5.12 | No Other Representations | 39 |

ARTICLE VI  COVENANTS AND AGREEMENTS ... 39

| | | |
|---|---|---|
| 6.1 | Covenants and Agreements of the Sellers | 39 |
| 6.2 | Casualty Event | 43 |
| 6.3 | Press Releases | 43 |
| 6.4 | Solicitation; Other Offers | 43 |
| 6.5 | Regulatory Matters; Cooperation | 43 |
| 6.6 | Bankruptcy Court Matters | 45 |
| 6.7 | Assumption and Assignment of Contracts | 46 |
| 6.8 | Employee Matters | 46 |
| 6.9 | [Reserved] | 49 |
| 6.10 | [Reserved] | 49 |
| 6.11 | Transfer Orders; Letters in Lieu | 49 |
| 6.12 | Taxes | 49 |
| 6.13 | Commercially Reasonable Efforts | 51 |
| 6.14 | Insurance Policies | 51 |
| 6.15 | Novation of Hedges | 52 |
| 6.16 | Qualification | 52 |
| 6.17 | Settlements with Governmental Authorities | 52 |
| 6.18 | Operator Forms | 52 |

**TABLE OF CONTENTS**

**(continued)**

**Page**

| | | |
|---|---|---|
| 6.19 | [Reserved] | 52 |
| 6.20 | Bonds and Insurance | 52 |
| 6.21 | New Equity Interests | 52 |
| 6.22 | Employment Agreements | 53 |

**ARTICLE VII  CONDITIONS PRECEDENT TO CLOSING** ...... 53
| | | |
|---|---|---|
| 7.1 | Conditions Precedent of the Parties | 53 |
| 7.2 | Sellers' Conditions Precedent | 53 |
| 7.3 | Buyers' Conditions Precedent | 54 |

**ARTICLE VIII  RIGHT OF TERMINATION AND ABANDONMENT** ...... 56
| | | |
|---|---|---|
| 8.1 | Termination | 56 |
| 8.2 | Remedies | 58 |
| 8.3 | Specific Performance | 58 |

**ARTICLE IX  CLOSING** ...... 59
| | | |
|---|---|---|
| 9.1 | Date of Closing | 59 |
| 9.2 | Closing Obligations | 59 |

**ARTICLE X  POST-CLOSING OBLIGATIONS AND COVENANTS** ...... 60
| | | |
|---|---|---|
| 10.1 | Field Data and Records | 60 |
| 10.2 | Suspense Funds; Prepaid JOA Funds | 60 |
| 10.3 | Post-Closing Asset Reconciliation | 61 |
| 10.4 | [Assignments; Operatorship] | 61 |
| 10.5 | Confidentiality | 62 |
| 10.6 | Seller Marks License | 63 |
| 10.7 | Power of Attorney | 63 |
| 10.8 | No Successor Liability | 64 |
| 10.9 | Access to Records | 64 |
| 10.10 | Payment of Assumed Liabilities | 64 |
| 10.11 | Payment of Retained Liabilities | 65 |
| 10.12 | Accounts Receivables | 65 |
| 10.13 | Directors' and Officers' Indemnification | 66 |
| 10.14 | Rights of Use | 68 |
| 10.15 | Post-Closing Agreements | 68 |
| 10.16 | Effective Date Payments | 69 |
| 10.17 | South Marsh 39 | 69 |
| 10.18 | Certain Bank Accounts | 69 |
| 10.19 | Specified Matters | 69 |

**ARTICLE XI  ASSUMPTION AND RETENTION OF LIABILITIES** ...... 69
| | | |
|---|---|---|
| 11.1 | Buyer's Assumption of Liabilities | 69 |
| 11.2 | Sellers' Retention of Liabilities | 71 |

iii

## TABLE OF CONTENTS

**(continued)**

**Page**

| | | |
|---|---|---|
| 11.3 | Reservation as to Third Persons | 73 |
| 11.4 | Certain Liens | 73 |

ARTICLE XII  MISCELLANEOUS ........................................................................ 73
| 12.1 | Expenses | 73 |
| 12.2 | Notices | 73 |
| 12.3 | Amendments | 75 |
| 12.4 | Waiver | 75 |
| 12.5 | No Third-Party Beneficiaries | 75 |
| 12.6 | Assignment | 75 |
| 12.7 | Counterparts | 76 |
| 12.8 | Governing Law; Jurisdiction; Venue; Jury Trial | 76 |
| 12.9 | Entire Agreement | 76 |
| 12.10 | Binding Effect | 77 |
| 12.11 | Time of the Essence | 77 |
| 12.12 | No Partnership; No Fiduciary Duty | 77 |
| 12.13 | Obligations of the Sellers | 77 |
| 12.14 | No Recourse | 77 |
| 12.15 | Disclosure Schedules | 77 |
| 12.16 | Other Contract Interpretation | 78 |

ARTICLE XIII  SURVIVAL AND INDEMNIFICATION ........................................ 79
| 13.1 | Survival; Limited Recourse Against Sellers | 79 |
| 13.2 | Indemnification by Buyer | 80 |
| 13.3 | Indemnification Procedures | 80 |

Annex I          Definitions

iv

**EXHIBIT LIST**

| Exhibit | Title |
|---|---|
| EXHIBIT A | Leases |
| EXHIBIT B | Easements |
| EXHIBIT C | Scheduled Wells |
| EXHIBIT D | Platforms and Facilities |
| EXHIBIT D-1 | Inventory |
| EXHIBIT E | Permits |
| EXHIBIT F | Seismic Data |
| EXHIBIT G | Form of Assignment, Bill of Sale and Conveyance for Co-Owned Assets |
| EXHIBIT H | Form of Assignment, Bill of Sale and Conveyance for Other Assets |
| EXHIBIT I | Form of Assignment and Assumption Agreement |
| EXHIBIT J | Form of Assignment of Leases and Subleases |
| EXHIBIT J-1 | Form of Quitclaim Deed and Act of Sale for Owned Real Property (Jefferson Parish) |
| EXHIBIT J-2 | Form of Quitclaim Deed and Act of Sale for Owned Real Property (100% Fee Simple) |
| EXHIBIT K | Form of Office Assets Conveyance |
| EXHIBIT L | Contract Operating Agreement |
| EXHIBIT M-1 | Owned Real Property (Jefferson Parish) |
| EXHIBIT M-2 | Owned Real Property (100% Fee Simple) |
| EXHIBIT N | [Reserved] |
| EXHIBIT O | [Reserved] |
| EXHIBIT P | Form of Transition Services Agreement |
| EXHIBIT Q | Form of SEMS Bridging Agreement |
| EXHIBIT R | Form of ST 308 Performance Bond |
| EXHIBIT S | [Reserved] |
| EXHIBIT T | Form of Farmout Agreement |
| EXHIBIT U | [Reserved] |
| EXHIBIT V | Specified Excluded Receivables |
| EXHIBIT W | Form of Funding Agreement |

**QNE EX. NO. 06**
**Page 7 of 170**

| Exhibit | Title |
|---|---|
| EXHIBIT X | Working Capital |
| EXHIBIT X-1 | Working Capital Estimate |
| EXHIBIT Y | Specified Oil and Gas Interests |
| EXHIBIT Z | Specified P&A Equipment |

## SCHEDULE LIST

| Schedule | Title |
|---|---|
| Schedule 1.2 | Applicable Shared Asset Interests |
| Schedule 1.2(rr) | Rights, Claims, Demands and Cause of Action |
| Schedule 1.3(d) | Scheduled Exclusions |
| Schedule 1.6 | FERC Matters |
| Schedule 4.6 | Litigation |
| Schedule 4.7 | Governmental Approvals |
| Schedule 4.8(a) | Preferential Rights |
| Schedule 4.8(b) | Applicable Consents |
| Schedule 4.9 | Taxes |
| Schedule 4.9(p) | Entity Classifications |
| Schedule 4.12 | Environmental Matters |
| Schedule 4.13 | Payments |
| Schedule 4.14 | Material Contracts |
| Schedule 4.14(c) | Leases and Easements |
| Schedule 4.15 | Imbalances |
| Schedule 4.16(a) | AFEs |
| Schedule 4.16(b) | Cash Calls |
| Schedule 4.18 | Employee Benefits |
| Schedule 4.19 | Non-Consent Operations |
| Schedule 4.20 | Suspense Funds |
| Schedule 4.21 | Payout Balances |
| Schedule 4.22 | Title Matters |
| Schedule 4.22(d) | Owned Real Property |

| Schedule | Title |
|---|---|
| Schedule 4.23 | Insurance |
| Schedule 4.24 | Related Party Transactions |
| Schedule 4.25(a) | Owned Intellectual Property |
| Schedule 4.27 | Material Liabilities |
| Schedule 4.28(b) | Absence of Certain Changes |
| Schedule 4.31(c) | Equity Interests of Fieldwood Mexico and Subsidiaries |
| Schedule 4.31(d) | Fieldwood U.A. Interests |
| Schedule 4.31(f) | Fieldwood U.A. Liabilities |
| Schedule 5.1(c) | Buyer Grandparent Equity Interests |
| Schedule 5.7 | Buyer Governmental and Third Person Consents |
| Schedule 6.1(a) | Sellers' Required Operations |
| Schedule 6.1(b) | Sellers' Disallowed Operations |
| Schedule 6.7(a) | Assigned 365 Contracts List |
| Schedule 6.22 | Seller Employees |
| Schedule 7.3(i) | Required Novations |
| Schedule 7.3(l) | Required Governmental Approvals |
| Schedule 10.13(a) | Existing D&O Indemnification Terms |
| Schedule 10.13(e) | D&O Indemnified Parties |
| Schedule 10.14 | Right of Use Easements (RUEs) |
| Schedule 10.17 | South Marsh 39 Assets |
| Schedule 10.18 | Certain Accounts |

[End of Table of Contents]

## PURCHASE AND SALE AGREEMENT

This Purchase and Sale Agreement (this "**Agreement**") is made as of August 27, 2021 (the "**Execution Date**") by and among (a) Fieldwood Energy LLC, a Texas limited liability company ("**Fieldwood**"), Fieldwood Energy Inc., a Delaware corporation, Dynamic Offshore Resources NS, LLC, a Texas limited liability company, Fieldwood Energy Offshore LLC, a Texas limited liability company, Fieldwood Onshore LLC, a Delaware limited liability company, Fieldwood SD Offshore LLC, a Texas limited liability company, Fieldwood Offshore LLC, a Delaware limited liability company, Bandon Oil and Gas GP, LLC, a Texas limited liability company, Bandon Oil and Gas, LP, a Texas limited partnership, Fieldwood Energy SP LLC, a Louisiana limited liability company, Galveston Bay Pipeline LLC, a Delaware limited liability company, and Galveston Bay Processing LLC, a Delaware limited liability company, (b) subject to Section 1.5, FW GOM Pipeline, Inc., a Delaware corporation ("**FW GOM Pipeline**"), and GOM Shelf LLC, a Delaware limited liability company ("**GOM Shelf**" and each of the other entities specified in clauses (a) and (b), a "**Seller**" and collectively the "**Sellers**"), and (c) QuarterNorth Energy LLC, a Delaware limited liability company ("**Buyer**"), and Mako Buyer 2 LLC, a Delaware limited liability company and a wholly-owned subsidiary of Buyer ("**Buyer 2**").  The Sellers, Buyer and Buyer 2 may be referred to individually as a "**Party**" or collectively as the "**Parties.**"  Capitalized terms used in this Agreement have the meanings referenced in **Annex I** to this Agreement.

## RECITALS

A.      The Sellers desire to sell, and Buyer desires to purchase, all of the Acquired Interests on the terms and subject to the conditions set forth below.

B.      On August 3, 2020 and August 4, 2020, the Sellers (collectively, the "**Debtors**") filed voluntary petitions (the "**Bankruptcy Cases**") under Chapter 11 of Title 11 of the United States Code, 11 U.S.C. §§ 101, et seq. (as amended from time to time, the "**Bankruptcy Code**") in the United States Bankruptcy Court for the Southern District of Texas, Houston Division (the "**Bankruptcy Court**").

C.      On June 25, 2021, the Debtors filed their *Eighth Amended Joint Chapter 11 Plan of Fieldwood Energy LLC and Its Affiliated Debtors* [ECF No. 1742] (including any exhibits and schedules thereto and as may be further amended, supplemented, or modified, the "**Plan**") and on June 25, 2021, the Bankruptcy Court entered an order confirming the Plan [ECF No. 1751] (the "**Confirmation Order**").

D.      Buyer has provided to the Sellers at or prior to the execution of this Agreement a copy of a fully executed and effective direction letter (the "**Direction Letter**") causing to be delivered at Closing such portion of the Claims arising under the Credit Agreement as is necessary to allow for payment of the Credit Bid and Release.

E.      Pursuant to the Plan, and as consideration for the transactions contemplated by the Direction Letter, each holder of Allowed FLTL Claims (as defined in the Plan) will receive its pro rata portion (as determined pursuant to the Plan and the Confirmation Order) of (a) on the Effective Date, the Credit Bid and Release New Equity Interests and (b) if and when issuable pursuant to

1

the Plan, Confirmation Order, or any other order entered by the Bankruptcy Court, the FLTL Subscription Rights.

F.      Pursuant to the Plan, each holder of Allowed SLTL Claims (as defined in the Plan) will receive its pro rata portion (as determined pursuant to the Plan and the Confirmation Order) of, if and when issuable pursuant to the Plan, Confirmation Order, or any other order entered by the Bankruptcy Court, the SLTL Subscription Rights.

G.      Following Fieldwood's receipt of the GUC Warrants and the SLTL Warrants pursuant to Section 9.2(j), Fieldwood will cause such GUC Warrants and SLTL Warrants to be distributed and received by the Persons entitled to receipt of such interests pursuant to the Plan on the Effective Date in accordance with the Plan.

H.      Upon the terms and subject to the conditions set forth herein, the Parties intend to effectuate the transactions contemplated by this Agreement through a sale of the Acquired Interests pursuant to Sections 105, 363, 365, 1123(a)(5)(D), 1129, 1141 and 1146 of the Bankruptcy Code, and Rules 4001, 6004, 6006 and 3020 of the Federal Rules of Bankruptcy Procedure of the Bankruptcy Code (as amended from time to time, the "***Bankruptcy Rules***").

I.      The execution and delivery of this Agreement and the Sellers' ability to consummate the transactions contemplated by this Agreement are subject to, among other things, the Bankruptcy Court's entry of the Confirmation Order.

## AGREEMENT

In consideration of the recitals above, the provisions below and other good and valuable cause and consideration, the receipt and sufficiency of which are hereby acknowledged, Buyer, Buyer 2 and the Sellers agree as follows:

## ARTICLE I
## PURCHASE AND SALE

1.1      Purchase and Sale.   Subject to the provisions hereof and the entry of the Confirmation Order, Buyer agrees to purchase and accept from the Sellers and the Sellers agree to sell, assign, convey, transfer and deliver, or cause to be sold, assigned conveyed, transferred and delivered to Buyer at the Closing, the Acquired Interests free and clear of any and all Encumbrances (other than Permitted Encumbrances (except that the Fieldwood U.A. Interests and the JV Interests shall not be subject to any Permitted Encumbrances other than pursuant to the Mexico PSA)); *provided* that the Fieldwood U.A. Interests currently held by Fieldwood Offshore LLC will be acquired by Buyer 2 instead of by Buyer, and all references hereto to Buyer with respect to such Fieldwood U.A. Interests shall be understood to be to Buyer 2 instead of Buyer.

1.2      Acquired Interests; Assets.   As used herein, the term "***Acquired Interests***" refers to (x) all of each Seller's right, title and interest in, to, under or derived from the Co-Owned Assets excluding the FWE I Assets and the GOM Shelf Oil and Gas Properties other than the Applicable Shared Asset Interests (which Applicable Shared Asset Interests shall be "Co-Owned Assets") and (y) all of each Seller's right, title and interest in, to, under or derived from the Other Assets.   As used herein, the term "***Assets***" means the Co-Owned Assets and Other Assets, wherever located,

real, personal or mixed, tangible or intangible, known or unknown, as the same shall exist as of the Closing.  As used herein, the term "**Co-Owned Assets**" means the assets described in clauses (a) through (o) below:

(a)     the oil and gas leases (and other agreements) described in **Part 1** of **Exhibit A**, but excluding the FWE I Assets and the GOM Shelf Oil and Gas Properties other than the Applicable Shared Asset Interests (collectively, the "**Co-Owned Leases**"), including all Working Interests, Net Revenue Interests, royalty interests, overriding royalty interests, production payments, net profits interests, carried interests, reversionary interests (including rights under non-consent provisions), possibilities of reverter, conversion rights and options, fee mineral interests and other interests of every kind and character in, to, under or derived from any Co-Owned Lease or any land subject to, covered by or included within any Co-Owned Lease (except that, solely as to each of lease OCS-00786 covering South Marsh Island 48 and lease OCS-G 1609 covering South Pass 61, the interests in such lease to be conveyed hereunder are solely the overriding royalty interests held by the Sellers in such lease);

(b)     (i) each Unit that includes any of the lands covered by or subject to any Co-Owned Lease (each, a "**Co-Owned Subject Unit**"), (ii) each pooling, unitization or communitization declaration, designation, agreement or order creating or modifying any Co-Owned Subject Unit (each, a "**Co-Owned Subject Unit Agreement**") and (iii) the oil and gas leases and lands subject to, covered by or included within each Co-Owned Subject Unit;

(c)     all servitudes, rights of way, easements, surface leases, subsurface agreements and similar rights and agreements related to or held for use in connection with (in each case, whether or not located on) any land subject to or covered by any Co-Owned Lease or Co-Owned Subject Unit (collectively, the "**Co-Owned Easements**"), including those described in **Part 1** of **Exhibit B**;

(d)     all wells (whether producing, not producing, shut-in, temporarily abandoned, injection, disposal or otherwise) owned or operated in connection with any of the Co-Owned Leases or Co-Owned Subject Units, whether or not such well is located on any land subject to or covered by any Co-Owned Lease or Co-Owned Subject Unit (collectively, the "**Co-Owned Wells**"), including those described in **Part 1** of **Exhibit C** (such wells, the "**Co-Owned Scheduled Wells**");

(e)     all equipment, machinery, structures, fixtures, inventory, vehicles, rolling stock, improvements and other movable property related to, used or held for use in connection with or held as inventory in connection with (in each case, whether or not located on) any Co-Owned Lease, Co-Owned Subject Unit, Co-Owned Easement, lands covered by or subject to any Co-Owned Lease, Co-Owned Subject Unit or Co-Owned Easement or Co-Owned Well (including well equipment; casing; rods; tanks and tank batteries; boilers; tubing; pumps; pumping units and engines; Christmas trees; production facilities; dehydration units and facilities; heater-treaters; compressors; testing and sampling equipment; sulfur recovery units and facilities; valves; gauges; supervisory control and data acquisition (SCADA) systems, equipment and related software; meters and other measurement equipment; flow lines; pipelines; gathering systems; processing systems or facilities; umbilicals; caissons; water systems (whether for source water, treatment, disposal, injection or otherwise); the platforms and facilities listed in **Part 1** of **Exhibit D**;

completion equipment (including all completion equipment held at Superior Yard); and all additions and accessions to, substitutions for and replacements of any of the foregoing, together with all attachments, components, parts, equipment, supplies, pipes, tools, casing, tubing, tubulars, fittings and accessories in connection with any of the foregoing), including the foregoing listed in **Part 1** of **Exhibit D-1** (collectively, the "*Co-Owned Inventory*");

(f)     (i) all oil, gas, minerals, condensate, distillate, natural gasoline, natural gas liquids, plant products and other liquid or gaseous hydrocarbons and all other substances produced with any of the foregoing hydrocarbons (collectively, "*Hydrocarbons*") (A) that are produced on, or the right to explore for which, or an interest in which, is granted pursuant to, any Co-Owned Lease, Co-Owned Subject Unit or Co-Owned Subject Unit Agreement or (B) that are located in any Co-Owned Inventory; and (ii) all proceeds from the sale of any such Hydrocarbons;

(g)     all Permits (and pending applications therefor) that pertain or relate in any way to any of the Co-Owned Field Assets, including the Permits listed in **Part 1** of **Exhibit E**, to the extent assignable by the Sellers to Buyer or Buyer 2;

(h)     subject to Section 6.7, all Co-Owned Assigned Contracts;

(i)     all rights (including intangible and inchoate rights), Claims, rights of set-off, rights under warranties and indemnities made by prior owners, manufacturers, vendors and Third Persons or accruing under applicable statutes of limitation or prescription, insofar only as the foregoing relate or are attributable to any of the other Co-Owned Assets or to any Assumed Liabilities, including any and all Claims of any Seller against other Persons pertaining to Imbalances attributable to the Co-Owned Assets;

(j)     [reserved];

(k)     all files, records (including reservoir, production, operation, contract, land and title records; drawings, maps, plats and surveys; abstracts of title, title insurance policies, title opinions and title curative; lease, prospect, contract, division order, marketing, correspondence, operations, environmental, production, processing, accounting, Property-Related Tax, Production Tax, Transfer Tax, regulatory compliance, facility and well records and files; supplier lists and files; customer lists and files; and reports to any Governmental Authority), databases, data and other information (in each case, whether in written or electronic format) that relate to any of the other Co-Owned Assets (collectively, the "*Co-Owned Records*");

(l)     [reserved.];

(m)     all raw materials, work-in-process, finished goods, supplies and other inventories related to, used or held for use in connection with (in each case, whether or not located on) any Co-Owned Lease, Co-Owned Subject Unit, Co-Owned Easement or Co-Owned Well;

(n)     all goodwill associated with any Co-Owned Asset; and

(o)     all credits or other rights to prepaid expenses, deposits, advances, prepayments, excess or unearned premiums, costs, and other refunds attributable to any Co-Owned Assets (excluding Excluded Prepaid JOA Funds).

4

As used herein, the term "*Other Assets*" means the assets described in clauses (p) through (uu) below:

(p)     the oil and gas leases (and other agreements) described in **Part 2** of **Exhibit A** (collectively, the "*Other Leases*"), including all Working Interests, Net Revenue Interests, royalty interests, overriding royalty interests, production payments, net profits interests, carried interests, reversionary interests (including rights under non-consent provisions), possibilities of reverter, conversion rights and options, fee mineral interests and other interests of every kind and character in, to, under or derived from any Other Lease or any land subject to, covered by or included within any Other Lease (except that, (x) solely as to lease OCS-G 12210 covering Green Canyon 201 (and, after any segregation of such lease, the lease covering the NE/4 of Block 201 Green Canyon), the interests in such lease to be conveyed hereunder exclude any record title or operating rights in the NE1/4 of Block 201, Green Canyon, (y) solely as to lease OCS-G 10794 covering Ship Shoal 301, Fieldwood's overriding royalty interest in such lease is not to be conveyed hereunder; and (z) solely as to each of OCS-G 1449 covering portions of West Delta 57, 79 and 80, OCS-G 1874 covering portions of West Delta 79 and 80 and OCS-G 1989 and OCS-G 2136 covering portions of West Delta 80, the interests in such lease to be conveyed hereunder are solely the overriding royalty interests held by the Sellers in such lease);

(q)     (i) each Unit that includes any land covered by or subject to any Other Lease (each, a "*Other Subject Unit*"), (ii) each pooling, unitization or communitization declaration, designation, agreement or order creating or modifying any Other Subject Unit (each, a "*Other Subject Unit Agreement*") and (iii) the oil and gas leases and lands subject to, covered by or included within each Other Subject Unit;

(r)     all servitudes, rights of way, easements, surface leases, subsurface agreements and similar rights and agreements located on (or related to or held for use in connection with (in each case, whether or not located on)) any land subject to or covered by any Other Lease or Other Subject Unit (collectively, the "*Other Easements*"), including those described in **Part 2** of **Exhibit B**;

(s)     all wells (whether producing, not producing, shut-in, temporarily abandoned, injection, disposal or otherwise) owned or operated in connection with any Other Lease or Other Subject Unit, whether or not such well is located on any land subject to or covered by any Other Lease or Other Subject Unit (collectively, the "*Other Wells*"), including those described in **Part 2** of **Exhibit C** (such wells, the "*Other Scheduled Wells*");

(t)     all equipment, machinery, structures, fixtures, inventory, vehicles, rolling stock, improvements and other movable property related to, used or held for use in connection with or held as inventory in connection with (in each case, whether or not located on) any Other Lease, Other Subject Unit, Other Easement, lands covered by or subject to any Other Lease, Other Subject Unit or Other Easement or Other Well (including well equipment; casing; rods; tanks and tank batteries; boilers; tubing; pumps; pumping units and engines; Christmas trees; production facilities; dehydration units and facilities; heater-treaters; compressors; testing and sampling equipment; sulfur recovery units and facilities; valves; gauges; supervisory control and data acquisition (SCADA) systems, equipment and related software; meters and other measurement equipment; flow lines; pipelines; gathering systems; processing systems or facilities; umbilicals;

5

caissons; water systems (whether for source water, treatment, disposal, injection or otherwise); the platforms and facilities listed in **Part 2** of **Exhibit D**; completion equipment (including completion equipment held at Superior Yard) and all additions and accessions to, substitutions for and replacements of any of the foregoing, together with all attachments, components, parts, equipment, supplies, pipes, tools, casing, tubing, tubulars, fittings and accessories in connection with any of the foregoing), including the foregoing listed in **Part 2** of **Exhibit D-1** (collectively, the "*Other Inventory*");

        (u)     (i) all Hydrocarbons (A) that are produced on, or the right to explore for which, or an interest in which, is granted pursuant to, any Other Lease, Other Subject Unit or Other Subject Unit Agreement or (B) that are located in any Other Inventory; and (ii) all proceeds from the sale of any such Hydrocarbons;

        (v)     all Permits (and pending applications therefor) that pertain or relate in any way to any of the Other Field Assets, including the Permits listed in **Part 2** of **Exhibit E**, to the extent assignable by the Sellers to Buyer or Buyer 2;

        (w)     all rights (including intangible and inchoate rights), Claims, rights of set-off, rights under warranties and indemnities made by prior owners, manufacturers, vendors and Third Persons or accruing under applicable statutes of limitation or prescription, insofar only as the foregoing relate or are attributable to any of the Other Assets, including any and all Claims of any Seller against other Persons pertaining to Imbalances attributable to the Other Assets;

        (x)     to the extent transferable by the Sellers to Buyer at Closing without payment of a fee or other penalty to any Third Person pursuant to any Contract (unless Buyer has, prior to the Closing, separately agreed in writing to pay such fee or penalty, and for the avoidance of doubt, Buyer has agreed to pay all such fees and penalties with respect to the licenses and agreements listed in **Exhibit F**), (i) all seismic data (conventional, three dimensional or otherwise; whether owned or licensed; and including original field tapes) (including all such data relating to those licenses and agreements listed in **Exhibit F**), log cores, geological, reserve engineering and other scientific and technical information, samples, tests, reports, maps and data that relate to any of the Acquired Interests or any land on which any Acquired Interest is located and (ii) copies of all proprietary seismic data (conventional, three dimensional or otherwise), log cores, geological, reserve engineering and other scientific and technical information, samples, tests, reports, maps and data that relate to any of the FWE I Oil and Gas Properties or any land on which any FWE I Oil and Gas Property is located (collectively, the "*Field Data*");

        (y)     all files, records (including reservoir, production, operation, contract, land and title records; drawings, maps, plats and surveys; abstracts of title, title insurance policies, title opinions and title curative; lease, prospect, contract, division order, marketing, correspondence, operations, environmental, production, processing, accounting, Property-Related Tax, Production Tax, Transfer Tax, regulatory compliance, facility and well records and files; supplier lists and files; customer lists and files; and reports to any Governmental Authority), databases, data and other information (in each case, whether in written or electronic format) that relate to any of the Other Assets (collectively, the "*Other Records*");

        (z)     subject to <u>Section 6.7</u>, all of the Other Assigned Contracts;

6

(aa)    all Working Capital Assets;

(bb)    all of the Sellers' rights, title and interest as borrowers under the Prepetition FLFO Credit Agreement (as defined in the Plan) as modified to the extent set forth in the First Lien Exit Facility Documents (as defined in the Plan);

(cc)    all raw materials, work-in-process, finished goods, supplies and other inventories located on (or related to, used or held for use in connection with (in each case, whether or not located on)) any Other Lease, Other Subject Unit, Other Easement or Other Well;

(dd)    all goodwill associated with the Other Assets;

(ee)    the Office Sublease, the Lafayette Lease Agreement, the Warehouse Lease and the Lubrizol Sublease and, in each case, the premises demised thereunder, all fixtures and appurtenances thereto, and all furniture and other personal (movable) property located therein (collectively, the "*Office Assets*");

(ff)    all credits or other rights to prepaid expenses, deposits, advances, prepayments, excess or unearned premiums, costs, and other refunds attributable to the Other Assets;

(gg)    all (i) Suspense Funds and Undisbursed Revenue related to the Acquired Interests and (ii) Prepaid JOA Funds;

(hh)    all futures, options, swaps and other derivatives with respect to the sale of Hydrocarbons described in clauses (f) or (u) of this Section 1.2 and novated to Buyer pursuant to Section 6.15 (the "*Hedges*");

(ii)    all assets relating to the Assumed Employee Plans (to the extent funded);

(jj)    all of the Sellers' economic analyses and pricing forecasts relating to any of the Assets;

(kk)    all Transferred Intellectual Property;

(ll)    all Seller IT Assets;

(mm)    all Tax refunds other than those described in Section 1.3(f);

(nn)    all collateral securing any bond provided for any of the Assets;

(oo)    all memberships (*lidmaatschap*), including all membership rights (*lidmaatschapsrechten*) of Fieldwood U.A. held by any Seller (the "*Fieldwood U.A. Interests*") and all shares in the capital of Fieldwood Mexico and any of its Subsidiaries (Fieldwood Mexico and its Subsidiaries, collectively, the "*Mexico JV*") held by any Seller (the "*JV Interests*"), and all rights, interests and title in and to such Seller's equity ownership of, and all present and future rights of such Seller as an equity holder of, Fieldwood U.A. or the Mexico JV, as applicable, both actual and contingent, including all distributions of profits, dividends, distribution of reserves,

7

repayments of capital, liquidation or dissolution proceeds and all other distributions, payments and repayments in respect of such equity ownership and any right to receive the same, and all other rights in respect of such equity ownership under or pursuant to the organizational documents of and any equity holders' agreement in respect of Fieldwood U.A. or the Mexico JV, as applicable;

(pp)    the Specified P&A Equipment;

(qq)    all proceeds recovered under the Tail Policy, but only with respect to reimbursement of D&O Indemnified Liabilities actually paid by Buyer pursuant to Section 10.13;

(rr)    all rights, claims, demands and causes of action of the Sellers (x) relating to the Acquired Interests or the Assumed Liabilities and (y) without duplication, those set forth on Schedule 1.2(rr); *provided* that this clause (rr) shall not apply with respect to or in connection with Taxes or Tax refunds;

(ss)    for clarity, and without duplication, the "Assets" (as defined in the Mexico PSA), unless the "Completion Date" (as defined in the Mexico PSA) has occurred prior to the Closing Date;

(tt)    all of Sellers' right, title and interest in the owned real property described on Exhibit M-2 and an undivided 25% interest in the real property described on Exhibit M-1; and

(uu)    all of Sellers' shares of stock of, or other equity interests in, White Shoal Pipeline Corp., a Delaware corporation (the "***White Shoal Equity***").

1.3    Excluded Assets.  The Assets and Acquired Interests do not include, and there is hereby expressly excepted and excluded therefrom and reserved to the Sellers, all assets and properties of each Seller and its Affiliates that are not described or otherwise identified as Acquired Interests in Section 1.2, including the following assets and properties (the "***Excluded Assets***"):

(a)    all corporate, financial, legal (other than title opinions) and tax records of the Sellers, but excluding Records;

(b)    other than (i) the Fieldwood U.A. Interests and the shares of capital stock or equity interests of any Person held, directly or indirectly, by Fieldwood U.A. and (ii) the JV Interests and the shares of capital stock or equity interests of any Person held, directly or indirectly, by Fieldwood Mexico and its Subsidiaries, any shares of capital stock or other equity interest held by the Sellers in any other Person;

(c)    all BOEM operator numbers;

(d)    all of the Sellers' right, title and interest in and to those interests, rights, properties and assets more particularly described on **Schedule 1.3(d)**;

(e)    all of the Sellers' right, title and interest in, to and under any of the FWE I Assets, other than any Applicable Shared Asset Interests added to the Co-Owned Assets or Other Assets by Buyer pursuant to the terms of Section 1.2;

8

(f)     all Tax refunds (other than Covered Tax Refunds) attributable to the Retained Liabilities;

(g)     all Excluded Contracts;

(h)     all assets of any Employee Plan that are not Assumed Employee Plans;

(i)     all Intellectual Property owned or purported to be owned by any Seller (other than Transferred Intellectual Property);

(j)     all insurance policies held by the Sellers;

(k)     all rights, claims, demands and causes of action of the Sellers under this Agreement;

(l)     all cash held in accounts of the Sellers, other than (i) Suspense Funds, (ii) Undisbursed Revenue and (iii) Prepaid JOA Funds;

(m)     any and all Claims of any Seller against other Persons pertaining to Imbalances attributable to the FWE I Assets;

(n)     the Specified Excluded Receivables;

(o)     all Avoidance Actions;

(p)     as to each of lease OCS-G 1449 covering portions of West Delta 57, 79 and 80, OCS-G 1874 covering portions of West Delta 79 and 80, OCS-G 1989 and OCS-G 2136 covering portions of West Delta 80, OCS-00786 covering South Marsh Island 48 and lease OCS-G 1609 covering South Pass 61, any interest other than any overriding royalty interests held by the Sellers in such lease;

(q)     solely as to lease OCS-G 12210 covering Green Canyon 201 any record title or operating rights (for the avoidance of doubt, not including any overriding royalty interests) in the NE1/4 of Block 201, Green Canyon;

(r)     solely as to lease OCS-G 10794 covering Ship Shoal 301, Fieldwood's overriding royalty interest in such lease; and

(s)     notwithstanding anything herein to the contrary, if the "Completion Date" (as defined in the Mexico PSA) occurs prior to the Closing Date, the "Assets" (as defined in the Mexico PSA) and, for the avoidance of doubt, the right of the "Seller" (as defined in the Mexico PSA) to receive the "Purchase Price" (as defined in the Mexico PSA).

1.4     <u>Effective Time</u>.  The purchase and sale of the Acquired Interests shall be effective as of 7:00 am (Central Prevailing Time) on the Closing Date (the "***Effective Time***"). For the avoidance of doubt, after the Closing, (a) all Hydrocarbons produced from the FWE I Oil and Gas Properties on or after the Effective Time and (b) the Working Capital Assets shall be owned by Buyer. To the extent Sellers receive proceeds on account of the sale of Hydrocarbons that

constitute Acquired Interests or receive proceeds on account of Working Capital Assets ("***Buyer Proceeds***"), Sellers shall deliver such proceeds to Buyer promptly following Sellers' receipt thereof.

1.5     Certain Sellers.  The Parties agree that each of FW GOM Pipeline and GOM Shelf have executed this Agreement as Sellers solely for the purpose of selling, assigning, conveying, transferring and delivering to Buyer any Acquired Interests held by such entities as of the Closing pursuant to this Article I and the applicable Transfer Documents, and without limiting the applicability of covenants and representations to the closing conditions set forth in Article VII neither FW GOM Pipeline nor GOM Shelf makes, or shall have any obligation or liability with respect to, any other covenant or representation of the Sellers made under this Agreement or any certificate delivered pursuant hereto.  For the avoidance of doubt, neither FW GOM Pipeline or GOM Shelf shall be required or obligated to sell, assign, convey, transfer or deliver to Buyer or Buyer 2 any of the GOM Shelf Oil and Gas Properties.  Notwithstanding anything to the contrary, Fieldwood Energy I, GOM Shelf, and their Subsidiaries shall have no liability under this Agreement or any Ancillary Document (including, without limitation, for breach, misrepresentation, fraud, breach of warranty, or otherwise) or relating to the sale or purchase of the Acquired Interests, the operation or business of the Acquired Interests, or any other transactions contemplated by this Agreement or any Ancillary Document, except for any breach (i) by Fieldwood Energy I of its obligations pursuant to Section 3(b)(i) of the Plan of Merger (as contemplated by Section 10.12(e)) or (ii) by FW GOM Pipeline or GOM Shelf of its obligations pursuant to Sections 9.2, 10.2, 10.3, 10.4, 10.5, 10.6, 10.7, 10.9 and, in respect of its interest in an asset which is also in part a Co-Owned Asset, 10.11.

1.6     FERC and Marketing-Related Contract Matters.  Notwithstanding anything to the contrary in this Agreement or any assignment instrument delivered pursuant hereto, the assignment to Buyer of each Delayed FERC-Regulated Asset and Marketing Contract will not be deemed effective until, and will be deemed effective upon, the Condition Precedent End Date.  With respect to the period from the Effective Date and until the Condition Precedent End Date, Fieldwood (which, following the Closing Date will be known as Fieldwood Energy III LLC) and Buyer have or shall enter into one or more hydrocarbon purchase agreements whereby Buyer will sell hydrocarbons produced from its assets to Fieldwood on mutually agreeable terms.  Further, notwithstanding anything herein to the contrary, until such time as a Delayed FERC-Regulated Asset or Marketing Contract is assigned to Buyer at the Condition Precedent End Date, Fieldwood and Buyer shall each be allocated and shall pay, pay over or reimburse to the other all costs, expenses, liabilities and benefits arising in connection with such Delayed FERC-Regulated Asset or Marketing Contract (taking into account any payments made or services received pursuant to the hydrocarbon purchase agreements described above and the Contract Operating Agreement to be entered into between Buyer and Fieldwood) such that Fieldwood, on the one hand, and Buyer on the other, each bear such costs, expenses and liabilities and receive such benefits as such parties would have borne and received had such Delayed FERC-Regulated Asset or Marketing Contract been vested with Buyer at the Effective Time (without limiting the foregoing, if Fieldwood is required to post any form of credit assurance with respect to Buyer volumes attributable to the Delayed FERC-Regulated Assets or Marketing Contracts, Buyer shall provide such credit assurance as required by such Delayed FERC-Regulated Assets or Marketing Contracts and/or applicable law).  For the avoidance of doubt, (a) Fieldwood shall have no obligation to pay or reimburse any costs, expenses, or liabilities related to any Delayed FERC-Regulated Asset or

Marketing Contract from any funds other than the funds Fieldwood receives pursuant to such Delayed FERC-Regulated Asset or Marketing Contract and (b) Buyer shall reimburse Fieldwood upon demand for any and all costs, expenses, or liabilities incurred by Fieldwood related to the defense of any claims asserted against Fieldwood related to the Delayed FERC-Regulated Assets or Marketing Contracts.

## ARTICLE II
## CONSIDERATION

2.1     Consideration.

(a)     The aggregate consideration to be paid by Buyer and Buyer 2 to the Sellers with respect to the sale to Buyer and Buyer 2 of the Acquired Interests shall consist of the following (collectively, the "***Consideration***"): (1) a credit bid and equivalent release of the Sellers and any guarantors (and their respective successors and assigns) from a portion of the Claims arising under the Credit Agreement, in an aggregate amount up to the FLTL Claims Allowed Amount (as defined in the Plan) (the "***Credit Bid and Release***"), (2) the Cash Portion, (3) the GUC Warrants, (4) the SLTL Warrants, (5) the Subscription Rights and (6) Buyer's assumption of the Assumed Liabilities (including, for the avoidance of doubt, the Liabilities set forth in Section 11.1(o)).   For the avoidance of doubt, the Credit Bid and Release will not include all of the Claims arising under the Credit Agreement, and (x) the portion of such Claims not included in the Credit Bid and Release will not be transferred to Sellers by Buyer and Buyer 2 pursuant to this Agreement and (y) the holder(s) thereof will be entitled to receive the distribution of the FLTL Subscription Rights by the Debtors pursuant to, and as contemplated by, the Plan.   The Credit Bid and Release shall be equal to at least $1.03 billion, less (i) the Cash Portion, (ii) the GUC Warrants, (iii) the SLTL Warrants, (iv) the Subscription Rights and (v) the amount of the First Lien Exit Facility on the Closing Date, subject to such other adjustments as agreed with consent of the Debtors, the Required DIP Lenders and the Requisite FLTL Lenders (each as defined in the Plan).

(b)     Prior to the Closing, the Sellers and Buyer shall in good faith endeavor to agree upon the Closing Cash Amount, the Effective Date Cash Obligations and the Effective Date Cash Obligations Amount in accordance with the definitions thereof.

(c)     The Parties hereby agree that, for U.S. federal income tax purposes, the assumption by Buyer of the remaining Allowed FLFO Claims (as such term is defined in the Plan) pursuant to Section 11.1(o) hereof shall be treated as if: (i) Buyer issues a debt instrument to the Sellers ("**Buyer Obligation**") with terms that are identical (with the exception of the obligor) to the terms of the Buyer Parent Debt (defined below) as additional consideration for the Acquired Interests, (ii) the Sellers deliver the Buyer Obligation to holders of Allowed FLFO Claims (as such term is defined in the Plan) (together with the FLFO Distribution Amount (as such term is defined in the Plan)) in satisfaction of their Allowed FLFO Claims (as such term is defined in the Plan), in a transaction that constitutes a "significant modification" within the meaning of Treasury Regulations Section 1.1001-3, and (iii) Buyer Parent issues the First Lien Exit Facility (as such term is defined in the Plan) (the "**Buyer Parent Debt**") to holders of Allowed FLFO Claims (as such term is defined in the Plan) in substitution of the Buyer Obligation, thereby assuming Buyer's obligation with respect to the Buyer Obligation. The parties further agree that (i) the issue price, within the meaning of Section 1273 of the Code, of the Buyer Obligation is equal to the issue price

11

of the Buyer Parent Debt and (ii) the Sellers shall take into account for U.S. federal income tax purposes any cancellation of debt consequences under the Code, resulting from or in connection with (including as a result of the application of Treasury Regulations Section 1.1274-5, if applicable) or arising from the transactions described in this paragraph.

2.2     <u>Allocation of Adjusted Consideration</u>.  The Parties acknowledge and agree that the Credit Bid and Release and the Cash Portion (and the Assumed Liabilities, taking into account <u>Section 2.1(c)</u>, and other relevant items, to the extent properly taken into account under the federal income Tax principles as consideration for the Acquired Interests) shall be allocated among the Acquired Interests in accordance with Section 1060 of the Code and the Treasury Regulations thereunder (and any similar provision of state, local or non-U.S. Law, as appropriate).  Buyer shall, as promptly as practicable after the Closing Date, but in no case later than one hundred twenty (120) days following the Closing Date, prepare and deliver to the Sellers a proposed allocation as described in the preceding sentence (the "***Initial Allocation***").  The Parties, for a period of no more than ninety (90) days, shall cooperate in good faith to resolve any disagreements the Sellers may have with the Initial Allocation and agree on a final allocation (the "***Final Allocation***").  The Parties agree to file all Tax Returns (including the filing of IRS Form 8594 with their U.S. federal income Tax Return for the taxable year that includes the date of the Closing) consistent with the Final Allocation unless otherwise required by applicable Law.

2.3     <u>Consents to Assign</u>.

(a)     [reserved.]

(b)     If the Sellers fail to obtain an Applicable Consent prior to Closing and (i) with respect to any Lease or Assigned Contract that is not a 365 Contract, (A) the failure to obtain such Applicable Consent would under the express terms thereof cause the assignment of the Acquired Interest affected thereby to Buyer or Buyer 2, as applicable, to be void or voidable, (B) the failure to obtain such Applicable Consent would under the express terms thereof permit the termination of such Lease or Assigned Contract under the express terms thereof upon the purported assignment of such Lease or Assigned Contract to Buyer or Buyer 2, as applicable, pursuant to this Agreement, or (C) the failure to obtain such Applicable Consent would under the express terms thereof permit a party to such Lease or Assigned Contract to impose a financial or other penalty on any Seller, Buyer or Buyer 2 or (ii) with respect to any Lease or Assigned Contract, a party holding such Applicable Consent right has objected to the assignment of the affected Acquired Interest in accordance with the terms of the relevant Applicable Consent right (each Consent as to which <u>clause (i)</u> or <u>(ii)</u> is applicable, a "***Required Consent***"), then, unless the Bankruptcy Court has entered an order approving (or in the case of <u>clause (ii)</u>, such objection is resolved to permit) the sale and assignment of the affected Acquired Interest to Buyer or Buyer 2, as applicable, pursuant to this Agreement without obtaining such Required Consent (and without Buyer or Buyer 2 being subject to the consequences set forth in <u>clauses (i)(A)</u> through <u>(i)(C)</u> of the definition of Required Consent as a result of not obtaining such Required Consent), the Acquired Interests (or portions thereof) affected by such un-obtained Required Consent shall be excluded from the Acquired Interests to be assigned to Buyer or Buyer 2 at Closing (and shall be considered Excluded Assets hereunder)  (a "***Delayed Asset***").  In the event that any such Required Consent with respect to any such Delayed Asset (or portion thereof) is obtained during the Post-Closing Consent Period (or if during the Post-Closing Consent Period the Bankruptcy Court enters

an order providing that (x) such Required Consent is not required to consummate the sale and assignment of the Delayed Asset to Buyer or Buyer 2, as applicable, pursuant to this Agreement or (y) the Delayed Asset may be sold and assigned to Buyer or Buyer 2, as applicable, pursuant to this Agreement free and clear (as applicable to the sale and assignment of the Delayed Asset to Buyer or Buyer 2, as applicable, pursuant to this Agreement) of such Required Consent) (in each case of clauses (x) and (y) without Buyer or Buyer 2 being subject to the consequences set forth in clauses (i)(A) through (i)(C) of the definition of Required Consent as a result of not obtaining such Required Consent) then, (1) the Sellers shall so notify Buyer, and (2) on or prior to the tenth (10th) Business Day after the date such Required Consent is obtained or such order referred to above is entered, the Sellers shall assign such Delayed Asset (or portions thereof) that were so excluded as a result of such previously un-obtained Required Consent to Buyer or Buyer 2, as applicable, pursuant to an instrument in substantially the same form as the Assignment, Bill of Sale and Conveyance, or the JV Assignment Agreement (in the case where the Delayed Asset is a Fieldwood U.A. Interest or a JV Interest) (and such Delayed Asset (or portions thereof) shall no longer be considered Excluded Assets hereunder) and Buyer shall assume all Assumed Liabilities with respect thereto.  Notwithstanding anything to the contrary in this Agreement, without limiting any of the rights of Buyer hereunder, including those set forth in Section 7.3, (A) Buyer in its sole discretion may elect for the Sellers not to sell, transfer, convey, assign or deliver such Delayed Assets that is an Other Asset to Buyer, and (B) from and after the Closing, Buyer and the Sellers shall reasonably cooperate in a reasonable arrangement to provide Buyer or Buyer 2, as applicable, with all of the benefits of, or under, each such Delayed Asset, including enforcement (at Buyer's cost) for the benefit of Buyer or Buyer 2, if applicable, of any and all rights of the Sellers against any party with respect to such Delayed Asset arising out of the breach or cancellation with respect to such Delayed Asset by such party; *provided*, *further*, that (i) to the extent that any such arrangement has been made to provide Buyer or Buyer 2, as applicable, with the benefits of, under or with respect to, a Delayed Asset, from and after the Closing, Buyer shall be responsible for, and shall promptly pay and perform all payment and other obligations under such Delayed Asset for the period during which Buyer or Buyer 2, as applicable, is receiving the benefits under the applicable Delayed Asset to the same extent as if such Delayed Asset had been assigned or transferred at the Closing, and (ii) the Sellers shall (or, as to any Delayed Asset that is an Other Asset, at Buyer's request the Sellers shall) sell, transfer, convey, assign and deliver such Delayed Asset to Buyer or Buyer 2, as applicable, promptly after receipt of such Required Consent or the entry of such order referred to above with respect to such Delayed Asset; *provided* that Buyer shall so request such sale, transfer, conveyance, assignment and deliverance promptly after such receipt, unless (1) the retention of such Delayed Asset by the applicable Seller would not result in such Seller retaining an incremental Liability as compared to if such Seller had transferred such Delayed Asset to Buyer (unless Buyer provides an amount in cash to the Sellers equal to the amount of such Liabilities and/or indemnification to the Sellers for any such Liabilities) or (2) the Sellers and Buyer mutually agree not to make such sale, transfer, conveyance, assignment and deliverance of such Delayed Asset; *provided further* that from and after the date that is six (6) months after the Closing, Buyer shall have no obligation to make any such request and may elect for the Sellers to retain such Delayed Asset, in which case such Delayed Asset shall be an Excluded Asset for all purposes under this Agreement and the arrangements described in clause (B)(i) shall terminate.

(c)     If the Sellers fail to obtain a Consent prior to Closing and such Consent (i) is not a Required Consent or (ii) is a Required Consent and prior to Closing the Bankruptcy Court enters an order providing that the affected Acquired Interests may be sold and assigned to Buyer

13

or Buyer 2, as applicable, pursuant to this Agreement free and clear (as applicable to the sale and assignment of the affected Acquired Interests to Buyer pursuant to this Agreement) of such Required Consent (without Buyer or Buyer 2, as applicable, being subject to the consequences set forth in clauses (i)(A) through (i)(C) of the definition of Required Consent as a result of not obtaining such Required Consent), then, in the case of each of clauses (i) and (ii), the Acquired Interests (or portions thereof) subject to such un-obtained Consent shall nevertheless be assigned by the Sellers to Buyer at Closing as part of the Acquired Interests and Buyer shall be deemed to have assumed any and all Liabilities for the failure to obtain any such Consent as part of the Assumed Liabilities hereunder and Buyer shall have no claim against the Sellers from any Liability for the failure to obtain such Consent.

(d)     Prior to Closing and until the 365th day after Closing (the "**Post-Closing Consent Period**"), with respect to any un-obtained Required Consents with respect to which the Bankruptcy Court shall not have entered an order providing that the affected Acquired Interests may be sold and assigned to Buyer or Buyer 2, as applicable, pursuant to this Agreement free and clear (as applicable to the sale and assignment of the affected Acquired Interests to Buyer or Buyer 2, as applicable, pursuant to this Agreement) of such Required Consent (without Buyer or Buyer 2, as applicable, being subject to the consequences set forth in clauses (i)(A) through (i)(C) of the definition of Required Consent as a result of not obtaining such Required Consent), the Sellers shall use their commercially reasonable efforts to obtain such Required Consents, except that such obligation of the Sellers to use their commercially reasonable efforts to obtain Required Consents shall not apply in respect of any Delayed Asset with respect to which Buyer has made the election in accordance with the final sentence of Section 2.3(b).  If Buyer so requests, the Sellers shall be required to make any payments or provide other consideration in order to obtain any such Required Consent (provided that Buyer shall reimburse Sellers for any such payment made after the Closing); *provided, however,* that without the consent of Buyer, the Sellers shall not be required to incur any Liability, pay any money or provide any other consideration in order to obtain any such Consent (other than any Liability or obligation to pay money or provide consideration that has been expressly assumed by Buyer). Buyer shall use its commercially reasonable efforts (without any obligation to incur any Liability, pay money or provide any other consideration) to assist and cooperate with the Sellers in furtherance of the Sellers' efforts pursuant to this Section 2.3(d).

(e)     The Sellers shall be deemed to have obtained all Consents required in respect of the assumption and/or assignment of any Lease or Assigned Contract if (i) the Sellers have properly served under the Bankruptcy Code notice of assumption and/or assignment on the counterparty to such Lease or Assigned Contract, (ii) any objections to assumption and/or assignment of such Lease or Assigned Contracts filed by such counterparty have been withdrawn or overruled (including pursuant to the Confirmation Order or other order of the Bankruptcy Court), and (iii) pursuant to the Confirmation Order or other order of the Bankruptcy Court, the Sellers are authorized to assume and/or assign such Lease or Assigned Contract to Buyer free and clear of such Consents, in each case without Buyer or Buyer 2, as applicable, being subject to the consequences forth in clauses (i)(A) through (i)(C) of the definition of Required Consent as a result of not obtaining such Required Consent.

2.4     Governmental Approvals.  The Sellers and Buyer shall use commercially reasonable efforts to obtain the approval of, or waiver from, each Governmental Authority

required, after giving effect to the entry of the Confirmation Order, to permit the assignment of the Acquired Interests to Buyer or Buyer 2, as applicable, pursuant to this Agreement, in accordance with Sections 6.5(a) and (b). If Buyer so requests, the Sellers shall be required to make any payments or provide any other consideration in order to obtain any Governmental Approval (provided that Buyer shall reimburse Sellers for any such payment made after the Closing); *provided*, *however*, that without the consent of Buyer, the Sellers shall not be required to incur any Liability, pay any money or provide any other consideration in order to obtain any such Governmental Approval (other than any Liability or obligation to pay money or provide consideration that has been expressly assumed by Buyer). If, as of the Closing, any Governmental Approval, other than any Governmental Approval that is required or permitted to be made or obtained after the Closing (and, if permitted, customarily made or obtained after the Closing) (each, an "***Applicable Governmental Approval***"), has not been obtained and, notwithstanding the entry of the Confirmation Order, the failure to have obtained such Applicable Governmental Approval restricts the Sellers' ability to transfer any Acquired Interest to Buyer or Buyer 2, as applicable, at Closing, then, notwithstanding anything to the contrary herein, (x) (A) without limiting any of the rights of Buyer hereunder, including those set forth in Section 7.3, Buyer in its sole discretion may elect for the Sellers not to sell, transfer, convey, assign or deliver such Acquired Interests (which shall be treated as Delayed Assets, *mutatis mutandis*) and (B) from and after the Closing, (i) the Sellers and Buyer shall reasonably cooperate in a reasonable arrangement (to the extent legally permissible) to provide Buyer or Buyer 2, as applicable, with all of the benefits of, or under, such Delayed Asset, including (at Buyer's cost) enforcement for the benefit of Buyer or Buyer 2, as applicable, of any and all rights of the Sellers against any party with respect to such Delayed Asset arising out of the breach or cancellation with respect to such Delayed Asset by such party; *provided*, that to the extent that any such arrangement has been made to provide Buyer or Buyer 2, as applicable, with the benefits of, under or with respect to, a Delayed Asset, from and after the Closing, Buyer shall be responsible for, and shall promptly pay and perform all payment and other obligations under such Delayed Asset for the period during which Buyer or Buyer 2, as applicable, is receiving the benefits under the applicable Delayed Asset to the same extent as if such Delayed Asset had been assigned or transferred at the Closing, (ii) the Sellers shall reasonably cooperate with Buyer to obtain such Applicable Governmental Approval, and (iii) subject to the immediately following proviso, the Sellers shall promptly after receipt of the Applicable Governmental Approval with respect to such Delayed Asset, sell, transfer, convey, assign and deliver such Delayed Asset to Buyer or Buyer 2, as applicable, and Buyer or Buyer 2, as applicable, shall accept such conveyance; *provided* that, with respect to any such Delayed Asset that is an Other Asset, Buyer in its sole discretion (subject to the immediately following proviso) may elect for the Sellers not to sell, transfer, convey, assign or deliver such Delayed Asset to Buyer after receipt of the Applicable Governmental Approval; *provided* however that Buyer shall so request such sale, transfer, conveyance, assignment and deliverance promptly after receipt of the Applicable Governmental Approval, unless (1) the retention of such Delayed Asset by the applicable Seller would not result in such Seller retaining any incremental Liabilities as compared to if such Seller had transferred such Delayed Asset to Buyer (unless Buyer provides an amount in cash to the Sellers equal to the amount of such Liabilities and/or indemnification to the Sellers for any such Liabilities) or (2) the Sellers and Buyer mutually agree not to make such sale, transfer, conveyance, assignment and deliverance of such Delayed Asset; *provided further* that from and after the date that is six (6) months after the Closing, Buyer shall have no obligation to make any such request and may elect for the Sellers to retain such Delayed Asset, in which case such Delayed

Asset shall be an Excluded Asset for all purposes under this Agreement and the arrangements described under clause (B)(i) shall terminate.

    2.5    <u>Preferential Rights</u>.

    (a)    [Reserved.]

    (b)    If a bona fide Preferential Right with respect to any Acquired Interest is validly exercised prior to the Closing, such Acquired Interest and the related Contracts (solely to the extent related to such Acquired Interest) shall be excluded from the Acquired Interests conveyed to Buyer or Buyer 2, as applicable, at the Closing, the affected Acquired Interest will be deemed to be an Excluded Asset, and the Sellers shall pay over to Buyer all proceeds received for the affected Acquired Interest and related Contracts (or portion thereof) from the Person exercising such Preferential Right.

    (c)    If prior to Closing (i) any Acquired Interest is burdened by a Preferential Right that has not been validly exercised or waived as of the Closing, regardless of whether the time period for the exercise of such right has expired or (ii) any Person asserts that it is the beneficiary of a Preferential Right with respect to any Acquired Interest and objects to the sale of such Acquired Interest to Buyer pursuant to this Agreement and such objection is not resolved so as to permit the sale and assignment of such Acquired Interest free and clear of such Preferential Right (as applicable to the sale and assignment to Buyer or Buyer 2, as applicable, pursuant to this Agreement) to Buyer or Buyer 2, as applicable (to Buyer's reasonable satisfaction), then, without limiting any of the rights of Buyer hereunder, including those set forth in <u>Section 7.3</u>, (A) at Buyer's option, such Acquired Interest shall be excluded from the Acquired Interests and treated as a Delayed Asset (*mutatis mutandis*), and (B) from and after the Closing, if Buyer so elects, (i) the Sellers and Buyer shall reasonably cooperate to provide a reasonable arrangement (to the extent legally permissible) to provide Buyer or Buyer 2, as applicable, with all of the benefits of, or under, such Delayed Asset, including (at Buyer's cost) enforcement for the benefit of Buyer or Buyer 2, as applicable, of any and all rights of the Sellers against any party with respect to such Delayed Asset arising out of the breach or cancellation with respect to such Delayed Asset by such party; *provided*, that to the extent that any such arrangement has been made to provide Buyer or Buyer 2, as applicable, with the benefits of, under or with respect to, a Delayed Asset, from and after the Closing, Buyer shall be responsible for, and shall promptly pay and perform all payment and other obligations under such Delayed Asset for the period during which Buyer or Buyer 2, as applicable, is receiving the benefits under the applicable Delayed Asset to the same extent as if such Delayed Asset had been assigned or transferred at the Closing, (ii) the Sellers shall reasonably cooperate with Buyer to obtain the waiver of the Preferential Right with respect to such Delayed Asset, and (iii) if such asserted Preferential Right is not validly exercised prior to its expiration or waiver, or if the dispute regarding the Preferential Right affecting such Delayed Asset is resolved to Buyer's reasonable satisfaction, such Delayed Asset, subject to the immediately following proviso, shall be promptly conveyed to Buyer or Buyer 2, as applicable; *provided* that, with respect to any such Delayed Asset that is an Other Asset, Buyer in its sole discretion (subject to the immediately following proviso) may elect for the Sellers not to sell, transfer, convey, assign or deliver such Delayed Asset to Buyer after the occurrence of the events in the preceding clause (iii); *provided* that Buyer shall so elect, unless (x) the retention of such Delayed Asset by the applicable Seller would not result in such Seller retaining any incremental Liability as compared to if such Seller

had transferred such Delayed Asset to Buyer (unless Buyer provides an amount in cash to the Sellers equal to the amount of such Liabilities and/or indemnification to the Sellers for any such Liabilities) or (y) the Sellers and Buyer mutually agree for Buyer not to so elect; *provided further* that from and after the date that is six (6) months after the Closing, Buyer shall have no obligation to make any such election and may elect for the Sellers to retain such Delayed Asset, in which case such Delayed Asset shall be an Excluded Asset for all purposes under this Agreement and the arrangements described in clause (B)(i) shall terminate.  If, for any reason, such Preferential Right is validly exercised by the holder thereof after the Closing and prior to an election by Buyer for the Sellers to retain such Delayed Asset pursuant to the second proviso in the preceding sentence, the Sellers shall pay over to Buyer all proceeds paid for the affected Acquired Interest by the holder of the relevant Preferential Right.

2.6     Withholding.  Buyer and its Affiliates shall be entitled to deduct and withhold, from any amounts payable under this Agreement, amounts required to be deducted and withheld under the Code or any other applicable Law.  To the extent any amount is so withheld and paid to the appropriate Governmental Authority pursuant to applicable Law, such withheld amounts shall be treated for all purposes of the Agreement as having been paid to the Person in respect of which such deduction or withholding was made.

2.7     Assets Sold "As Is, Where Is".

(a)     BUYER ACKNOWLEDGES AND AGREES THAT THE ACQUIRED INTERESTS SOLD PURSUANT TO THIS AGREEMENT ARE SOLD, CONVEYED, TRANSFERRED AND ASSIGNED ON AN "AS IS, WHERE IS" BASIS "*WITH ALL FAULTS*" AND THAT, EXCEPT AS SET FORTH IN ARTICLE IV OF THIS AGREEMENT AND THE CERTIFICATES DELIVERED BY THE SELLERS AT CLOSING (BUT SUBJECT TO THE TERMINATION OF REPRESENTATIONS AND WARRANTIES AT CLOSING PURSUANT TO SECTION 13.1), THE SELLERS MAKE NO REPRESENTATIONS OR WARRANTIES, TERMS, CONDITIONS, UNDERSTANDINGS OR COLLATERAL AGREEMENTS OF ANY NATURE OR KIND, EXPRESS OR IMPLIED, BY STATUTE OR OTHERWISE, CONCERNING THE ACQUIRED INTERESTS OR THE CONDITION, DESCRIPTION, QUALITY, USEFULNESS, QUANTITY OR ANY OTHER THING AFFECTING OR RELATING TO THE ACQUIRED INTERESTS, INCLUDING WITHOUT LIMITATION ANY IMPLIED WARRANTY OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE, WHICH WARRANTIES ARE ALSO HEREBY EXPRESSLY DISCLAIMED. BUYER FURTHER ACKNOWLEDGES THAT THE SELLERS HAVE MADE NO AGREEMENT OR PROMISE TO REPAIR OR IMPROVE ANY OF THE ACQUIRED INTERESTS BEING SOLD TO BUYER, AND THAT BUYER TAKES ALL SUCH ACQUIRED INTERESTS IN THE CONDITION EXISTING ON THE CLOSING DATE (SUBJECT TO SATISFACTION OR WAIVER OF THE CONDITIONS SET FORTH IN ARTICLE VII) "AS IS, WHERE IS" AND "*WITH ALL FAULTS*" AND WITHOUT WARRANTY OF TITLE. NOTHING HEREIN SHALL LIMIT BUYER'S REMEDIES IN THE EVENT OF FRAUD (AS DEFINED IN ANNEX I), EXCEPT THAT BUYER SHALL HAVE NO REMEDY IN THE EVENT OF FRAUD WITH RESPECT TO FIELDWOOD ENERGY I, FW GOM PIPELINE, GOM SHELF OR ANY OF THEIR RESPECTIVE SUBSIDIARIES.

17

(b)     EXCEPT AS AND TO THE EXTENT EXPRESSLY SET FORTH IN ARTICLE IV OF THIS AGREEMENT OR THE CERTIFICATES DELIVERED BY THE SELLERS AT CLOSING (BUT SUBJECT TO THE TERMINATION OF REPRESENTATIONS AND WARRANTIES AT CLOSING PURSUANT TO SECTION 13.1), AND WITHOUT LIMITING THE GENERALITY OF SECTION 2.8(a), THE SELLERS EXPRESSLY DISCLAIM ANY REPRESENTATION OR WARRANTY, EXPRESS, STATUTORY OR IMPLIED, AS TO (i) TITLE TO ANY OF THE ACQUIRED INTERESTS, (ii) THE CONTENTS, CHARACTER OR NATURE OF ANY REPORT OF ANY PETROLEUM ENGINEERING CONSULTANT, OR ANY ENGINEERING, GEOLOGICAL OR SEISMIC DATA OR INTERPRETATION, RELATING TO THE ACQUIRED INTERESTS, (iii) THE QUANTITY, QUALITY OR RECOVERABILITY OF HYDROCARBONS IN OR FROM THE ACQUIRED INTERESTS, (iv) ANY ESTIMATES OF THE VALUE OF THE ACQUIRED INTERESTS OR FUTURE REVENUES GENERATED BY THE ACQUIRED INTERESTS, (v) THE PRODUCTION OF HYDROCARBONS FROM THE ACQUIRED INTERESTS, (vi) THE CONDITION, QUALITY, SUITABILITY OR MARKETABILITY OF THE ACQUIRED INTERESTS, INCLUDING THE MARKETABILITY OF ANY HYDROCARBONS, (vii) THE AVAILABILITY OF GATHERING OR TRANSPORTATION FOR HYDROCARBONS FROM THE ACQUIRED INTERESTS, (viii) THE CONTENT, CHARACTER OR NATURE OF ANY INFORMATION MEMORANDUM, REPORTS, BROCHURES, CHARTS OR STATEMENTS PREPARED BY OR ON BEHALF OF THE SELLERS OR THIRD PARTIES WITH RESPECT TO THE ACQUIRED INTERESTS, AND (ix) ANY OTHER MATERIALS OR INFORMATION THAT MAY HAVE BEEN MADE AVAILABLE TO BUYER OR ANY AFFILIATE OF BUYER, OR ITS OR THEIR EMPLOYEES, AGENTS, CONSULTANTS, REPRESENTATIVES OR ADVISORS IN CONNECTION WITH THE TRANSACTIONS CONTEMPLATED BY THIS AGREEMENT OR ANY DISCUSSION OR PRESENTATION RELATING THERETO.  ANY AND ALL SUCH DATA, INFORMATION AND OTHER MATERIALS FURNISHED BY OR ON BEHALF OF THE SELLERS IS PROVIDED TO BUYER AS A CONVENIENCE, AND ANY RELIANCE ON OR USE OF THE SAME SHALL BE AT BUYER'S SOLE RISK.

2.8     Presence of Wastes, NORM, Hazardous Substances and Asbestos.  BUYER ACKNOWLEDGES THAT THE ACQUIRED INTERESTS HAVE BEEN USED TO EXPLORE FOR, DEVELOP AND PRODUCE HYDROCARBONS, AND THAT SPILLS OF WASTES, CRUDE OIL, PRODUCED WATER, HAZARDOUS SUBSTANCES AND OTHER MATERIALS MAY HAVE OCCURRED THEREON OR THEREFROM.  ADDITIONALLY, THE ACQUIRED INTERESTS, INCLUDING PRODUCTION EQUIPMENT, MAY CONTAIN ASBESTOS, HAZARDOUS SUBSTANCES OR NORM.  NORM MAY AFFIX OR ATTACH ITSELF TO THE INSIDE OF WELLS, MATERIALS AND EQUIPMENT AS SCALE OR IN OTHER FORMS, AND NORM-CONTAINING MATERIAL MAY HAVE BEEN BURIED OR OTHERWISE DISPOSED OF ON THE ACQUIRED INTERESTS.  SPECIAL PROCEDURES MAY BE REQUIRED FOR REMEDIATION, REMOVING, TRANSPORTING AND DISPOSING OF ASBESTOS, NORM, HAZARDOUS SUBSTANCES AND OTHER MATERIALS FROM THE ACQUIRED INTERESTS.

18

**ARTICLE III**
**DUE DILIGENCE**

3.1     <u>Due Diligence</u>.

(a)     From and after the date hereof until the Closing Date, the Sellers shall (i) afford to Buyer and its Representatives (at Buyer's cost) during normal business hours (A) upon the reasonable request of Buyer, reasonable access to and entry upon any specified Field Asset (subject to (1) execution of the Sellers' customary boarding agreement, (2) the terms, conditions and restrictions of agreements that are related to access to such Field Assets and to which any Seller is a party and (3) the consent of any third party operator, as applicable), including execution of agreements required by any third party with respect to access to such Field Assets for the purposes of performing onsite tests, inspections, examinations, investigations, studies and assessments of the Field Assets (including non-invasive environmental assessments of the Field Assets and, subject to the consent of the Sellers (such consent not to be unreasonably withheld, conditioned or delayed) invasive environmental assessments of the Field Assets; *provided*, that prior to conducting any invasive environmental assessments, Buyer and Sellers will cooperate in good faith to enter into a written agreement with respect to the parameters and scope of, allocation of liability with respect to, and rights to information (including samples) arising from, such assessments); and (B) at the offices of each of the Sellers, (1) reasonable access to the Sellers' title records, Leases, Easements, Contracts, environmental and legal materials, books, records, statements and operating data, information relating to the Field Assets (including all land and title records, surveys, abstracts of title, title insurance policies, title opinions, title curative and all lease, contract, division order, marketing, acquisition, correspondence, operations, environmental, insurance, production, accounting, regulatory, Property-Related Tax, Production Tax, Transfer Tax and well records and files) and any other information or documents that are in the possession or control of the Sellers and relate in any way to any Acquired Interests and (2) to the extent permitted in accordance with applicable licensing agreements, the opportunity to review the Field Data, and (ii) instruct the Sellers' representatives to reasonably cooperate with Buyer and its Representatives in their investigation of the Acquired Interests.  Notwithstanding anything in this <u>Section 3.1(a)</u> to the contrary, (x) all such information shall be held in confidence by Buyer in accordance with the terms of <u>Section 10.5</u>, and (y) in no event shall the Sellers be obligated to provide (A) access or information in violation of applicable Law, (B) any information the disclosure of which would cause the loss of any legal privilege available to any Seller relating to such information or would cause any Seller to breach a confidentiality obligation to which it is bound; *provided* that the applicable Seller shall use commercially reasonable efforts to provide such information and documents in a manner that does not violate such Law or result in such loss of privilege or breach of obligation, or (C) copies of bids, letters of intent, expressions of interest or other proposals received from other Persons in connection with the transactions contemplated by this Agreement or information and analyses relating to such communications.  For the avoidance of doubt, Buyer and its Representatives shall not be permitted to conduct any invasive environmental investigations without the Sellers' express written consent, which may be withheld by the Sellers in their sole discretion.

(b)     No investigation by Buyer or other information received by Buyer shall operate as a waiver or otherwise affect any representation, warranty or agreement given or made by any Seller hereunder.

19

## ARTICLE IV
## SELLERS' REPRESENTATIONS

Each Seller represents and warrants to Buyer and Buyer 2, subject to the Disclosure Schedules (subject to Section 12.15), as follows:

4.1     Organization/Qualification.  Each Seller is an entity duly formed, validly existing and in good standing under the Laws of the jurisdiction of its organization.  Each Seller is qualified to do business and is in good standing under the Laws of each jurisdiction where such qualification is necessary, except for those jurisdictions where failure to be so qualified would not, individually or in the aggregate, prevent, materially delay or materially impede the performance by such Seller of its obligations under this Agreement or its consummation of the transactions contemplated by this Agreement.  Each Seller has all requisite power and authority required to own and operate its properties (including the Acquired Interests) and to carry on its business as now conducted.

4.2     Power and Authority.  Subject to entry of the Confirmation Order and such other authorization as may be required by the Bankruptcy Court, each Seller has the requisite power and authority to execute and deliver this Agreement and the other Ancillary Documents to which it is (or, upon its execution and delivery, will be) a party and perform its obligations under this Agreement and such other Ancillary Documents.

4.3     Non-Contravention.  Each Seller's execution, delivery and performance of this Agreement and each Ancillary Document to which such Seller is (or, upon its execution and delivery, will be) a party and each Seller's performance of the transactions contemplated herein and therein will not (a) conflict with or result in a breach of any provisions of the organizational documents of such Seller, Fieldwood U.A. or, to the Sellers' Knowledge, the Mexico JV or (b) subject to (w) the entry of the Disclosure Statement Order and the Confirmation Order, (x) obtaining or making the Applicable Consents set forth on **Schedule 4.8(b)** in accordance with Section 2.3, (y) obtaining or making the Governmental Approvals set forth on **Schedule 4.7** and (z) obtaining waivers for the Preferential Rights set forth on **Schedule 4.8(a)** (in the case of each of the preceding clauses (x) and (z), after giving effect to the Confirmation Order), result in (i) a breach of or default under, or give rise to any right of termination, revocation, cancellation or acceleration under, any Permit, Lease, Subject Unit Agreement, Easement, Assigned Contract, credit agreement (excluding the Credit Agreement), note, bond, mortgage, indenture, license or other agreement, document or instrument to which any Seller is a party or by which any Seller or any of the Acquired Interests may be bound, or otherwise result in a loss of any benefit relating to the Acquired Interests, (ii) the creation or imposition of any Encumbrance upon any Acquired Interest other than Permitted Encumbrances (except that the Fieldwood U.A. Interests and the JV Interests shall not be subject to any Permitted Encumbrances other than pursuant to the Mexico PSA), or (iii) violate any applicable Law, except, in the case of the preceding clauses (i) and (ii), as would not reasonably be expected to result, individually or in the aggregate, in a Material Adverse Effect.

4.4     Authorization and Enforceability.  Subject to entry of the Disclosure Statement Order and the Confirmation Order, each Seller has full capacity, power and authority to enter into and perform this Agreement, each Ancillary Document to which such Seller is (or, upon its execution and delivery, will be) a party and the transactions contemplated herein and therein.  The

20

execution, delivery and performance by each Seller of this Agreement and each Ancillary Document to which such Seller is (or, upon its execution and delivery, will be) a party have been duly and validly authorized and approved by all necessary company action on the part of such Seller. Subject to entry of the Disclosure Statement Order and the Confirmation Order, this Agreement and each Ancillary Document to which each Seller is (or, upon its execution and delivery, will be) a party are, or upon their execution and delivery will be, the valid and binding obligations of such Seller and enforceable against such Seller in accordance with their respective terms, subject to the effects of bankruptcy, insolvency, reorganization, moratorium and similar Laws as well as to principles of equity (regardless of whether such enforceability is considered in a proceeding in equity or at law).

4.5    Liability for Brokers' Fees.  Other than Houlihan Lokey Capital, Inc., there is no investment banker, broker, finder or other intermediary which has been retained by or is authorized to act on behalf of any Seller who might be entitled to any fee, commission or expenses in connection with the transactions contemplated by this Agreement or any of the Ancillary Documents.

4.6    Litigation.  Other than the Bankruptcy Cases or as specified on **Schedule 4.6**, no Claim (or any basis thereof) by any Governmental Authority or other Person (including expropriation or forfeiture proceedings) nor any legal, administrative or arbitration proceeding (or any basis thereof) is pending or, to the Sellers' Knowledge, threatened against any Acquired Interest or against any Seller relating to any Acquired Interest which, individually or in the aggregate, if determined or resolved adversely in accordance with the plaintiff's demands, (x) to the extent the representation is to the existence of any basis of any Claim or any legal, administrative or arbitration proceeding, would reasonably be expected to result, individually or in the aggregate, in a Material Adverse Effect and (y) otherwise, would reasonably be expected to be material to the Acquired Interests, individually or taken as a whole, or which in any manner challenges or seeks to prevent, enjoin, alter or materially delay the transactions contemplated by this Agreement.

4.7    Governmental Approvals.  Except as set forth on **Schedule 4.7**, no Governmental Approval (other than the Disclosure Statement Order and the Confirmation Order) is required to authorize, or is otherwise required in connection with, (a) any Seller's valid execution and delivery by such Seller of this Agreement or any Ancillary Document to which such Seller is (or, upon its execution and delivery, will be) a party, (b) any Seller's performance of its obligations hereunder or thereunder or (c) the consummation of the transactions contemplated by this Agreement or any of the Ancillary Documents.

4.8    Preferential Rights; Applicable Consents.

(a)    Except as set forth on **Schedule 4.8(a)**, none of the Acquired Interests is subject to a Preferential Right.

(b)    Except as set forth on **Schedule 4.8(b)**, none of the Acquired Interests is subject to an Applicable Consent.

The inclusion of any Acquired Interest on **Schedule 4.8** shall not be construed as an admission by Buyer or Sellers that any preferential purchase right or similar right or Consent in any agreement relating to such Acquired Interest (or any express exception thereto contained in such agreement) is (or is not) applicable to the transactions contemplated hereby.

      4.9    <u>Taxes</u>.  Except as would not result, individually or in the aggregate, in a Material Adverse Effect and except as otherwise set forth on **Schedule 4.9**, (a) all Tax Returns required to be filed with respect to the Acquired Interests or any Hydrocarbon production therefrom (including Property-Related Taxes and Production Taxes) or by Fieldwood U.A. have been timely filed, and all such Tax Returns are true, complete and correct; (b) the Sellers have adequately accrued in accordance with GAAP, established adequate reserves for the payment of, and will timely pay, all Taxes which arise from or with respect to the Acquired Interests or any Hydrocarbon production therefrom or allocable thereto incurred in or attributable to all Pre-Closing Tax Periods (other than Taxes described in the preceding <u>clause (a)</u>); (c) all Taxes due and owing by the Sellers with respect to the Acquired Interests or any Hydrocarbon production therefrom (including with respect to Property-Related Taxes and Production Taxes) or by Fieldwood U.A. (whether or not shown on any Tax Return) have been paid, and no extension of time within which to file any such Tax Return is in effect; (d) there are no Encumbrances on any Acquired Interest; (e) no audits, investigations, examinations, audits, litigation, Claims or other proceedings are pending, or to the Sellers' Knowledge threatened in writing, against any Seller relating to the payment of Taxes (including Property-Related Taxes and Production Taxes) with respect to any Acquired Interests or with respect to Taxes for which Fieldwood U.A. may be liable; (f) there are no currently proposed or pending adjustments by any Governmental Authority in connection with any Tax Returns of any Seller pertaining to the Acquired Interests or of Fieldwood U.A.; (g) no waiver or extension of any statute of limitations has been granted or requested as to any Tax matter relating to any Acquired Interests or with respect to any Taxes for which Fieldwood U.A. may be liable, in each case, that is still in effect; (h) Fieldwood U.A. will not be required to include any item of income in, or exclude any item of deduction from, taxable income in any taxable period (or portion thereof) after Closing, as a result of any change in method of accounting, closing agreement, installment sale or receipt of any prepaid amount outside of the ordinary course of business, in each case, made or entered into prior to Closing; (i) no Governmental Authority responsible for the administration or imposition of Taxes in any jurisdiction in which a Seller or any of its Affiliates (in respect of the Acquired Interests) or Fieldwood U.A. has not filed a Tax Return has asserted in writing that such Seller, any of its Affiliates, or Fieldwood U.A., as the case may be, is subject to Tax or required to file a Tax Return in that jurisdiction; (j) Fieldwood U.A. has withheld and paid all Taxes required to have been withheld and paid in connection with amounts paid or owing to any employee, independent contractor, creditor, customer, shareholder or other third party; (k) Fieldwood U.A. has not been a member of any Company Group; (l) none of the Sellers or Fieldwood U.A. has engaged in a "***listed transaction***" within the meaning of Treasury Regulations Section 1.6011-4(b); (m) the Acquired Interests are not subject to, for federal income tax purposes, a partnership between any Seller and any other Person for which a partnership income tax return is required to be filed under Subchapter K of Chapter 1 of Subtitle A of the Code (other than a partnership for which an election to be excluded from such provisions is in effect pursuant to the provisions of Section 761 of the Code and the regulations thereunder); (n) Fieldwood U.A. is not, and does not own (directly or indirectly) stock or a warrant in, a corporation that is (or was at any time during the course of such ownership) a passive foreign investment company, as defined in Section 1297 of the Code; (o) Fieldwood U.A. is not a party to or bound by any Tax Sharing Agreement; and

(p) **Schedule 4.9(p)** lists (A) the entity classification of Fieldwood U.A., Fieldwood Mexico and any Subsidiary thereof for U.S. federal income Tax purposes, as of the date hereof and as of the Closing Date, and (B) each entity classification election and change in entity classification that has been made under Treasury Regulations Section 301.7701-3 with respect to Fieldwood U.A., Fieldwood Mexico and any Subsidiary thereof for U.S. federal income Tax purposes.

4.10    Well Status.  Except as set forth on **Exhibit C**, (a) the Sellers are the operators of that portion of the Lease(s) covering all Scheduled Wells; (b) all Wells that are not currently producing Hydrocarbons in paying quantities have been plugged, abandoned and decommissioned, and all related salvage, site clearance and surface restoration and decommissioning operations have been completed, in accordance with all applicable Laws in all material respects; (c) no Scheduled Well has been permanently, or is currently temporarily, plugged and abandoned; and (d) there is no Well in respect of which any Seller or any of its Affiliates has received an order from any Governmental Authority requiring that such Well be plugged and abandoned (or re-plugged), other than a Well for which such plugging and abandonment (or re-plugging) requirements have been completely satisfied.  All Wells that have not been plugged, abandoned and decommissioned are listed on **Exhibit C**.

4.11    Compliance with Laws; Permits.  Except as would not reasonably be expected to result, individually or in the aggregate, in a Material Adverse Effect, (a) each Seller, and to the Sellers' Knowledge each Third Person operator of any Lease (or portion thereof), Subject Unit or Easement, is in compliance, and since January 1, 2018 has at all times complied, with all applicable Laws and all Permits necessary or required in each case in connection with the ownership and, with respect to each Acquired Interest operated by a Seller, operation of the Acquired Interests, including the Leases, Subject Units, Easements and Wells and the production, marketing and disposition of Hydrocarbons therefrom; and (b) with respect to each Acquired Interest, the Sellers and, to the Sellers' Knowledge, each Third Person operator of such Acquired Interest, if applicable, has all Permits necessary or required in connection with the ownership and operation of such Acquired Interest, and all such Permits are in full force and effect.  Since January 1, 2018, no Seller has received written notice from any Governmental Authority that any applicable Law or Permit has been violated or not complied with by any Seller.  With respect to Suspense Funds, each Seller is in compliance with applicable Laws in all material respects.  Except as would not reasonably be expected to result, individually or in the aggregate, in a Material Adverse Effect, Fieldwood U.A. and the Mexico JV are in compliance with applicable Laws.  Other than the Bankruptcy Cases, there is no judgment, decree, injunction, rule or order of any arbitrator or Governmental Authority outstanding against any Seller, Fieldwood U.A. or the Mexico JV that has had or would reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect.  All Permits held by the Sellers that relate to the Assets are valid and in full force and effect and no Seller is in default under or in violation of any such Permit, except as would not reasonably be expected to result, individually or in the aggregate, in a Material Adverse Effect.

4.12    Environmental Matters.  Except as could not reasonably be expected to result, individually or in the aggregate, in a Material Adverse Effect or as set forth on **Schedule 4.12**, (a) each Seller, and to the Sellers' Knowledge each Third Person operator of any Acquired Interest, if applicable, has all Permits required under Environmental Laws in connection with the ownership and operation of the Acquired Interests, including the Field Assets, the production, marketing and disposition of Hydrocarbons therefrom and the ownership and use of the Office Assets and all such

Permits are in full force and effect; (b) no Seller has received, and to the Sellers' Knowledge no Third Person operator has received, any written notice of violation, assessment or incident of non-compliance or other communication that alleges any actual or potential non-compliance with or Liability under any Environmental Law or Permit required under Environmental Laws in connection with ownership or operations of the Acquired Interests, including the Field Assets and Office Assets; (c) no investigation, proceedings or other Claims resulting from any Environmental Law or Permit required under Environmental Laws is pending, or to the Sellers' Knowledge threatened in writing, against any Asset, (d) the Assets are in compliance in all respects with all applicable Environmental Laws, and (e) there has been no Release under or from any Asset or, to the Sellers' Knowledge, at any asset or property formerly owned, leased or operated by, or otherwise arising from the operations of any Seller or any of its Affiliates or predecessors, in violation of, or in a manner reasonably expected to give rise to Liability under, Environmental Laws or any Permit required under Environmental Laws. The Sellers have made available to Buyer, in written or electronic format, all environmental site assessments, studies and analyses in the possession or control of any Seller addressing potentially material Losses, Claims or obligations pertaining to Environmental Contaminants or Environmental Law in relation to the Acquired Interests.

4.13    Payments.  Except (x) as set forth on **Schedule 4.13** and (y) for the Suspense Funds listed on **Schedule 4.20**, each Seller has timely (a) paid all Lease Burdens due in respect of Hydrocarbons produced from or allocable to any Acquired Interests payable by the Sellers, (b) reported to applicable Governmental Authorities, to the extent required by applicable Law, Hydrocarbons produced from or allocable to any Lease, Subject Unit or Well required to be reported by the Sellers, and (c) paid all amounts owing by such Seller under any Easement or with respect to any Office Asset, except, in the case of this clause (c), as would not be reasonably expected to result, individually or in the aggregate, in a Material Adverse Effect.  No Seller has received written notice of any Claim that has not been resolved claiming that such Seller's disbursement of Lease Burdens or reporting of Hydrocarbon production with respect to the Acquired Interests is inaccurate, other than Claims relating to disbursements or reporting that are not, in the aggregate, material to the Acquired Interests taken as a whole.

4.14    Material Contracts.

(a)    Prior to the Execution Date, the Sellers made available to Buyer accurate and complete copies of all Material Contracts.  Except as set forth on **Schedule 4.14**, no Seller has delegated or otherwise transferred to any third party any of its material rights or obligations with respect to any Assigned Contract.  Except as set forth on **Schedule 4.14**, no Seller is a party to or bound by any of the following Contracts (other than any Contract that is an Excluded Asset or Retained Liability) (each, a "***Material Contract***"):

(i)    any Contract (excluding any purchase orders entered into in the ordinary course of business) relating to or used in connection with any Acquired Interest that could reasonably be expected to provide for either (A) annual payments by, or revenues to, the Sellers of $5,000,000 or more or (B) aggregate payments by, or revenues to, the Sellers of $10,000,000 or more;

(ii)    any Subject Unit Agreement;

24

(iii)    any Hydrocarbon purchase and sale, exchange, marketing, compression, fractionation, drilling, completion, gathering, transportation, processing, production handling, refining, treatment, storage, handling, chemicals, construction or similar Contract, in each case, that is not terminable by the Sellers without penalty on thirty (30) days' or less notice;

(iv)    any Contract to acquire, sell, lease, develop or otherwise dispose of or encumber any interest in any of the Acquired Interests after the Closing Date (other than sales of Hydrocarbons in the ordinary course of business);

(v)    any Contract with any individual person acting as an independent contractor or consultant which includes payment for services to such person in excess of $500,000 annually;

(vi)    any Contract relating to or used in connection with any Acquired Interests that limits the freedom of any Seller to engage in any line of business or in any area or to compete with any Person or which would so limit the freedom of Buyer or any of its Affiliates after the Closing Date, including any noncompetition agreement, area of mutual interest or other agreement;

(vii)    any Contract providing for any call upon, option to purchase, or similar rights with respect to the Acquired Interests or to the production therefrom or the processing thereof, or that is a dedication of production;

(viii)    any Contract relating to or used in connection with any Acquired Interest that constitutes an operating agreement, exploration agreement, joint development agreement, farmin agreement, plugging and abandonment agreement, balancing agreement, platform use agreement, farmout agreement, partnership agreement, participation agreement, joint venture agreement, or similar Contract;

(ix)    any Contract relating to or used in connection with any Acquired Interest involving any resolution or settlement or any actual or threatened Claim which imposes material continuing obligations on any Seller will not have been fully performed prior to the Closing Date;

(x)    any Contract relating to or used in connection with any Acquired Interest that requires the posting of a security deposit, letter of credit, performance bond or surety;

(xi)    any Contract relating to or used in connection with any Acquired Interest that is a seismic, engineering, geological or other geophysical acquisition agreement or license;

(xii)    any Contract pursuant to which a Seller (A) grants to a third party any license, right to use or covenant not to sue under any Owned Intellectual Property or (B) is granted by a third party any license, right to use or covenant not to sue under any Intellectual Property (excluding from clause (B), (x) licenses for commercial off-the-shelf software that are generally available on non-discriminatory pricing terms which have an

25

aggregate annual cost of $50,000 or less and (y) the licenses and agreements listed on **Exhibit F**);

> (xiii)   any lease or sublease for any personal property included in the Acquired Interests providing for annual rentals of $250,000 or more;

> (xiv)   any lease or sublease of real property; and

> (xv)   any Contract by which any Seller is obligated by virtue of a take or pay payment, advance payment, production payment or other similar payment or commitment, to deliver Hydrocarbons, or proceeds from the sale thereof, attributable to the Sellers' aggregate interest in the Assets at some future time without receiving payment therefor at or after the time of delivery.

(b)     Each Material Contract is in full force and effect and a valid and binding obligation of the Seller(s) party thereto and, to the Sellers' Knowledge, the other parties thereto, in accordance with its terms and conditions, except as such validity and enforceability may be limited by (i) bankruptcy, insolvency, or other similar Laws affecting the enforcement of creditors' rights generally, (ii) equitable principles of general applicability (whether considered in a proceeding at law or in equity), and (iii) the obligation to pay Cure Costs.  No event has occurred which, with the passage of time or the giving of notice, or both, would constitute a default under or a violation of any Material Contract or would cause the acceleration of any right or obligation of any Seller or, to the Sellers' Knowledge, any other party thereto or the creation of an Encumbrance upon any Acquired Interest, except for such events that would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect.  No Seller nor, to the Sellers' Knowledge, any other party to any Material Contract has given written notice of any action to terminate, cancel, rescind, repudiate or procure a judicial reformation of any such Material Contract or any provision thereof.

(c)     Prior to the Execution Date, the Sellers made available to Buyer accurate and complete copies of all Leases and Easements. Except as set forth on **Schedule 4.14(c)**, no Seller is a party to or bound by any Lease or Easement (other than any Lease or Easement that is an Excluded Asset or Retained Liability).

4.15   _Imbalances; Prepayments_.  Except as set forth on **Schedule 4.15**, as of July 30, 2021, (x) no Seller has a Claim constituting an Acquired Interest and (y) no Seller is subject to any Liability constituting an Assumed Liability, with respect to any Imbalance.

4.16   _AFEs; Cash Calls_.  Except as set forth on **Schedule 4.16(a)**, no authorities for expenditure or other commitments to make capital expenditures relating to any Acquired Interest for which the Sellers' liability is in excess of $200,000 is outstanding.  Except as set forth on **Schedule 4.16(b)**, no cash calls or payments due from any Seller under the terms of the Assigned Contracts or otherwise relating to the Acquired Interests are past due by more than thirty (30) days (excluding amounts being disputed in good faith).

4.17    <u>Labor and Employment Matters</u>.

(a)    The Sellers have provided the Ad Hoc Group of Secured Lenders Advisors (as defined in the Plan), on a confidential basis and for professional eyes only, with a true and complete list of the following information for all employees of the Sellers and of each of their Affiliates (such employees from time to time, and whether or not listed, the "**_Seller Employees_**"), including name, title, hire date, location, whether full- or part-time, whether active or on leave (and, if on leave, the nature of the leave and the expected return date), whether exempt from the Fair Labor Standards Act of 1938, annual salary or wage rate, most recent annual bonus received, and current annual bonus opportunity (such list, the "**_Employee List_**"), which list may not be shared with any debt or equity holders of Buyer.  In addition, the Sellers have provided Buyer with the Employee List, but excluding each Seller Employee's name and title, which can be shared with Buyer's debt and equity holders, the DIP Lenders (as such term is defined in the Plan) and the Prepetition FLTL Lenders (as such term is defined in the Plan).

(b)    The Sellers and each of their Affiliates are, and for the last three (3) years, have been, in compliance in all material respects with applicable Laws relating to labor and employment, including those relating to worker classification, labor management relations, wages and hours (including classification of independent contractors and exempt and non-exempt employees), overtime, collective bargaining, unemployment, workers' compensation, equal employment opportunity, discrimination, civil rights, affirmative action, work authorization, immigration, safety and health, continuation coverage under group health plans, information privacy and security and payment of withholding of taxes and social security.

(c)    For the last three (3) years, (i), no allegations of sexual harassment or other sexual misconduct have been made against any current or former employee or independent contractor of the Sellers or any of their Affiliates who has three or more direct reports, (ii) there are and have been no actions pending or, to the Sellers' Knowledge, threatened in writing related to any allegations of sexual harassment or other sexual misconduct by any current or former employee or independent contractor of the Sellers or any of their Affiliates who has three or more direct reports, and (iii) neither the Sellers nor any of their Affiliates have entered into any settlement agreements related to allegations of sexual harassment or other sexual misconduct by any current or former employee or independent contractor of the Sellers or any of their Affiliates.

(d)    There are no collective bargaining agreements to which any Seller or any Affiliate of any Seller is a party relating to any Seller Employee and, to the Sellers' Knowledge, threatened.  No application for certification of a collective bargaining agent involving any Seller and any Seller Employee is pending.  With respect to the Seller Employees, there are no (i) strikes, slowdowns, picketing or work stoppage by any Seller Employee pending or, to the Sellers' Knowledge, threatened or (ii) except as would not reasonably be expected to result in a material Liability, unfair labor practice charges or other employment or labor complaints pending or, to the Sellers' Knowledge, threatened in writing against any Seller or any of their Affiliates before the National Labor Relations Board or any other Governmental Authority or any current union representation questions involving any current or former employees or independent contractors of any Seller or any of their Affiliates.

4.18    Employee Benefits.

(a)    **Schedule 4.18** sets forth a true and complete list of each material (i) deferred compensation plan, (ii) incentive compensation plan, (iii) equity compensation plan, (iv) "*welfare*" plan, fund or program (within the meaning of Section 3(1) of ERISA), (v) "*pension*" plan, fund or program (within the meaning of Section 3(2) of ERISA), (vi) "*employee benefit plan*" (within the meaning of Section 3(3) of ERISA), (vii) employment (other than offer letters entered into in the ordinary course of business that do not provide for severance, transaction or retention bonuses or any guaranteed payments), termination, severance or "*change in control*" agreement and (viii) other employee benefit plan, fund, program, agreement or arrangement, in each case, that is sponsored, maintained or contributed to or required to be contributed to by any Seller or by any trade or business, whether or not incorporated, that together with any Seller would be deemed a "*single employer*" within the meaning of Section 4001(b) of ERISA (an "*ERISA Affiliate*"), or to which any Seller or any ERISA Affiliate is party, for the benefit of any Seller Employee (each an "*Employee Plan*"). Each Employee Plan that Buyer or one of its Affiliates shall assume as of the Closing will be so noted on **Schedule 4.18** (each an "*Assumed Employee Plan*").

(b)    None of the Sellers nor any of their Affiliates or ERISA Affiliates (nor any predecessor of any such entity) sponsors, maintains, administers or contributes to (or has any obligation to contribute to), or has in the past six (6) years sponsored, maintained, administered or contributed to (or had any obligation to contribute to), or has or is reasonably expected to have any direct or indirect Liability with respect to, any plan subject to Title IV of ERISA, including any "*multiemployer plan*" (as defined in Section 3(37) of ERISA or any plan described in Section 413 of the Code). No Assumed Employee Plan is a multiple employer welfare arrangement (within the meaning of Section 3(40) of ERISA).

(c)    Each Assumed Employee Plan that is intended to be qualified under Section 401(a) of the Code has received a favorable determination letter or opinion, is entitled to rely on an opinion letter from the IRS or has applied to the IRS for such a letter within the applicable remedial amendment period or such period has not expired and, to the Sellers' Knowledge, no circumstances exist that would reasonably be expected to result in the loss of such qualification.

(d)    No Assumed Employee Plan provides for any post-employment or post-retirement medical, dental, disability, hospitalization, life or similar benefits (whether insured or self-insured) to any current or former employee of the Sellers (other than coverage mandated by applicable Law, including COBRA).

(e)    Each Employee Plan has been maintained, funded and administered in compliance with its terms and all applicable Law, including ERISA and the Code, except where the failure to be so operated would not reasonably be expected to result in a material Liability. There is no action, suit, investigation, audit, proceeding or claim (other than routine claims for benefits) pending against or, to the Sellers' Knowledge, threatened against or involving any Employee Plan before any court or arbitrator or any Governmental Authority, including the IRS, the Department of Labor or the Pension Benefit Guaranty Corporation, that would reasonably be expected to result in a material Liability.

28

(f)     Neither the execution of this Agreement nor the consummation of the transactions contemplated hereby (either alone or together with any other event) will (i) entitle any current or former employee or independent contractor to any material payment or benefit, including any bonus, retention, severance, retirement or job security payment or benefit, (ii) accelerate the time of payment or vesting or trigger any payment or funding (through a grantor trust or otherwise) of compensation or benefits under, or increase the amount payable or trigger any other obligation under, any Employee Plan with respect to any current or former employee or independent contractor or (iii) result in the payment of any amount that would subject any current or former employee or independent contractor to excise taxes under Section 4999 of the Code.

4.19     Non-Consent Operations.  Except as set forth on **Schedule 4.19**, no operations are being conducted or have been conducted on any Field Assets with respect to which any Seller has elected, or been deemed, to be a non-consenting party under the applicable operating agreement and with respect to which all of such Seller's rights have not yet reverted to it.

4.20     Suspense Funds.  **Schedule 4.20** sets forth the amount of all Suspense Funds as of July 30, 2021.

4.21     Payout Balances.  To the Sellers' Knowledge, **Schedule 4.21** contains a list of the estimated status of any "*payout*" balance (on a gross Working Interest basis for all Working Interest owners affected thereby), as of the date set forth on such Schedule, for each Well, Lease or Subject Unit that is subject to a reversion or other adjustment at some level of cost recovery or payout.

4.22     Title to Acquired Interests.

(a)     The Sellers: (i) with respect to each Lease listed on **Exhibit A**, hold pursuant to such Lease a valid interest in all or a portion of the oil and gas interests leased pursuant to such Lease, (ii) with respect to each Easement listed on **Exhibit B**, have a valid easement or other limited property interest in such Easement and (iii) with respect to each Well listed on **Exhibit C**, hold pursuant to one or more of the Leases a valid interest in all or a portion of the oil and gas produced from such Well, in each case, free and clear of any Encumbrances (other than (x) Permitted Encumbrances and (y) as would not be material to such Acquired Interest).  For the avoidance of doubt, the Sellers do not make any representations or warranties pursuant to the preceding sentence with respect to holding any specific net revenue interest or working interest in any of the Wells or Leases.  Except for the Encumbrances described on **Schedule 4.22**, the Sellers have good and valid title to all Acquired Interests other than the Wells, Leases, Easements and Subject Units, and are the record and beneficial owners of the Fieldwood U.A. Interests and the JV Interests, in each case free and clear of any Encumbrances and any other limitation or restriction (including any restriction on the right to vote, sell or otherwise dispose of the Fieldwood U.A. Interests or the JV Interests), other than Permitted Encumbrances (except that the Fieldwood U.A. Interests and the JV Interests shall not be subject to any Permitted Encumbrances other than pursuant to the Mexico PSA), in each case except as would not be material to such Acquired Interest.

29

(b)     No Affiliate of Fieldwood that is not a Seller owns any asset, property or right that is an Acquired Interest or would have been an Acquired Interest if such Affiliate had been a Seller hereunder.

(c)     The Acquired Interests constitute all of the property and assets used or held for use in the business of the Sellers as it relates to the ownership and operation of the Leases and are adequate to conduct the business of the Sellers as it relates to the ownership and operation of the Leases as currently conducted.

(d)     Except as set forth on **Schedule 4.22(d)**, no Seller or any of its Affiliates owns any real property.

4.23     Insurance.   **Schedule 4.23** sets forth a true and complete list of all policies of insurance held by or maintained by the Sellers or any of their Affiliates related to any Acquired Interests or the Seller Employees, including the type of policy, the limits of the coverage and any deductible or self-retention limit with respect thereto.   Such policies of insurance are in full force and effect.   Except as set forth on **Schedule 4.23**, no Seller has received, since January 1, 2020, any written notice from any insurer under any insurance policy applicable to the Acquired Interests or the Seller Employees disclaiming or limiting coverage with respect to any particular material claim or such policy in general or canceling or amending any such policy.   All premiums payable under all such insurance policies have been timely paid and each Seller has otherwise complied in all material respects with the terms and conditions of all such insurance policies.   To the Knowledge of the Sellers, no termination of, material non-ordinary course premium increase with respect to, or material alteration of coverage under, any of such policies or bonds has been threatened.

4.24     Related Party Transactions.   Except as set forth on **Schedule 4.24**, (a) there are no Assigned Contracts by and between any Seller and (i) any Affiliates of, or holder of five percent (5%) or more of the equity of, any Seller, (ii) any director or officer of any Seller or of any Person referenced in clause (i), or (iii) any "***associate***" or "***immediate family***" member (as such terms are respectively defined in Rule 12b-2 and Rule 16a-1 of the Securities Exchange Act of 1934) of any Person referenced in clause (i) or (ii) (the Persons referenced in clauses (i), (ii) and (iii) collectively, the "***Seller Related Parties***") and (b) no Seller has otherwise entered into any transactions or other arrangements with any Seller Related Parties that will be binding on Buyer or the Acquired Interests after the Closing Date.

4.25     Intellectual Property.

(a)     **Schedule 4.25(a)** contains a true and complete list of each of the issuances, registrations and applications for issuance or registration included in the Owned Intellectual Property, specifying as to each such item, as applicable, (i) the owner of such item, (ii) each jurisdiction in which such item is issued or registered or in which any application for issuance or registration has been filed, (iii) the respective issuance, registration and/or application number of such item and (iv) the date of application and issuance or registration of such item.

(b)     The Sellers are the sole and exclusive owners of all Owned Intellectual Property, in each case free and clear of any Encumbrance (except Permitted Encumbrances).   The

Sellers own or have a valid and enforceable license or other right to use all Transferred Intellectual Property, and the Transferred Intellectual Property is all of the Intellectual Property (except Trademarks) necessary for the conduct of, or used or held for use in, the business of the Sellers as it relates to the Acquired Interests as currently conducted.

(c)     There exist no restrictions on the Sellers' disclosure, use, license or transfer of the Owned Intellectual Property, and the consummation of the transactions contemplated by this Agreement will not alter, encumber, impair or extinguish any Owned Intellectual Property or the Sellers' rights under any material Licensed Intellectual Property or impair the right of the Sellers to develop, use, sell, license or otherwise dispose of, or to bring any action for the infringement, misappropriation or other violation of, any Owned Intellectual Property.

(d)     The Sellers have not infringed, misappropriated or otherwise violated any Intellectual Property of any Person.  There is no Claim pending or threatened in writing, in each case, against any Seller (i) challenging or seeking to deny or restrict, the rights of any Seller in any of the Transferred Intellectual Property, (ii) alleging that any Transferred Intellectual Property is invalid or unenforceable, (iii) alleging that the use of any of the Transferred Intellectual Property or any services provided, processes used or products manufactured, used, imported or sold by any Seller, misappropriate, infringe or otherwise violate any Intellectual Property of any Person or (iv) otherwise alleging that any Seller has infringed, misappropriated or otherwise violated any Intellectual Property of any Person.

(e)     The Sellers have taken commercially reasonable steps to maintain, enforce and protect the Owned Intellectual Property.  None of the issuances or registrations included in the Owned Intellectual Property has been adjudged invalid or unenforceable in whole or part, all issuances and registrations included in the Owned Intellectual Property are valid, enforceable, in full force and effect and subsisting, and all registration, maintenance and renewal fees applicable to such issuances and registrations that are currently due have been paid and all documents and certificates related to such items and required to be filed with the relevant Governmental Authority for the purposes of maintaining such items have been filed with the relevant Governmental Authority.

(f)     To the Sellers' Knowledge, no Person has infringed, misappropriated or otherwise violated any material Owned Intellectual Property.  The Sellers have taken commercially reasonable steps in accordance with normal industry practice to maintain the confidentiality of all material Owned Intellectual Property the value of which to any of the Sellers is contingent upon maintaining the confidentiality thereof and no such material Owned Intellectual Property has been disclosed other than to employees, representatives, agents or partners of the Sellers or any other Persons, in each case, who are bound by written and enforceable confidentiality agreements.

(g)     The Sellers have appropriate procedures in place designed to provide that all material Intellectual Property conceived or developed by employees performing their duties for any Seller, and by Third Persons performing research and development for any Seller, have been assigned to such Seller, as applicable.  To the extent that any material Owned Intellectual Property has been developed or created by any Third Persons (including any current or former employee) for any Seller, such Seller has a written agreement with such Third Persons with respect thereto, which provides that such Seller either (i) has obtained ownership of and is the sole and exclusive

31

owner of or (ii) has obtained a valid right to exploit, sufficient for the conduct of its business as it relates to the Acquired Interests, as currently conducted, such material Owned Intellectual Property.

(h)     The Seller IT Assets operate and perform in a manner that permits each Seller to conduct its business as it relates to the Acquired Interests as currently conducted, and the Sellers have taken commercially reasonable actions, consistent with current industry standards, to protect the integrity and security of the Seller IT Assets (and the confidentiality and security of all information and transactions stored or contained therein or transmitted thereby) against unauthorized use, access, interruption, modification or corruption, including the implementation of commercially reasonable (i) data backup, (ii) disaster avoidance and recovery procedures, (iii) business continuity procedures and (iv) encryption and other security protocol technology.  There has been no unauthorized use, access, interruption, modification or corruption of any Seller IT Assets that had a material adverse impact on the Sellers.

(i)     The Sellers have at all times materially complied with all applicable Laws, policies, procedures and contractual and all other obligations governing the collection, use, storage, processing, disclosure, protection, or security of Personal Information collected, used, stored, transferred or processed by or on behalf of any Seller (collectively, the "*Data Obligations*").  There has been no material loss, theft, security breach or unauthorized or unlawful disclosure or acquisition of any such Personal Information. No Claim has been asserted or, to the Sellers' Knowledge, threatened in writing, in each case, against any Seller alleging a violation of any Data Obligation.  For purposes of this Section 4.25(i), "*Personal Information*" means, in addition to any definition for any similar term (e.g., "personal data" or "personally identifiable information") provided by applicable Law, all information that identifies or can reasonably be used to identify an individual person.

4.26     Undue Influence.  In the past five (5) years, in connection with the ownership or operation of the business of the Sellers as it relates to the Acquired Interests, neither any Seller nor, to the Sellers' Knowledge, any director, officer, agent, employee or Affiliate, in each case, of any Seller, has taken any action, directly or indirectly, with respect to the business of the Sellers as it relates to the Acquired Interests that would result in a material violation of the Foreign Corrupt Practices Act of 1977 and the rules and regulations thereunder (the "*FCPA*") or any anti-corruption or anti-bribery laws, export control laws or sanctions issued or promulgated by any Governmental Authority.  In the past five (5) years, each Seller, and, to the Sellers' Knowledge, their respective Affiliates, have conducted the business of the Sellers as it relates to the Acquired Interests in compliance with the FCPA and all anti-corruption and anti-bribery laws, export control laws and sanctions issued or promulgated by any Governmental Authority in all material respects.

4.27     No Undisclosed Material Liabilities.  Except as set forth on **Schedule 4.27**, there are no Liabilities of or relating to the business of the Sellers as it relates to the ownership or operation of the Acquired Interests that would constitute Assumed Liabilities (without taking into account any modifications requested by Sellers to the Co-Owned Assets, Other Assets or Assumed Liabilities after the Execution Date) that would be required by GAAP to be disclosed on financial statements of the Sellers as of the Execution Date, other than Liabilities (a) reflected or disclosed in the consolidated balance sheet of the Sellers for the fiscal quarter ended September 30, 2020 ("*Balance Sheet Date*"), (b) incurred in the ordinary course of business since the Balance Sheet

Date (excluding any breaches of Law or any Lease, Easement or Contract), (c) disclosed in any materials filed with the Bankruptcy Court prior to the Execution Date in connection with the Bankruptcy Cases, (d) set forth on the Disclosure Schedules or (e) that are not material, individually or in the aggregate, to the Acquired Interests.

4.28    Absence of Certain Changes.

(a)    Since the Balance Sheet date through the Execution Date, (i) except as authorized by the Bankruptcy Court prior to the date hereof, including as expressly contemplated by any orders entered in the Bankruptcy Cases from and after the Petition Date through the date hereof, the Acquired Interests have been owned and operated in the ordinary course of business in all material respects and (ii) except as disclosed on the Financial Statements, there has not been a Material Adverse Effect.

(b)    From January 1, 2020 through the Execution Date, except as set forth on **Schedule 4.28(b)**, or as expressly contemplated by any orders entered in the Bankruptcy Cases from and after the Petition Date, the Sellers have not:  (A) purchased or otherwise acquired any material properties or assets (tangible or intangible) that constitute Acquired Interests or sold, leased, licensed, transferred, abandoned or otherwise disposed of any material assets that would otherwise have constituted Acquired Interests, except for (x) purchases of materials, and sales of Hydrocarbons and surplus inventory, in each case, in the ordinary course of business and (y) purchases or sales not contemplated by the preceding clause (x) that involved consideration of less than $5,000,000 individually, and $10,000,000 in the aggregate, (B) removed any material Inventory or other Acquired Interests from any of the properties or facilities that will transfer to Buyer as a result of the transactions contemplated hereby, other than in the ordinary course of business or (C) suffered any damage or destruction to or loss of any Acquired Interest whether or not covered by insurance where the value of such damage, destruction or loss (measured by cost to the Sellers of repairing or replacing the applicable Acquired Interest) was greater than $1,000,000.

4.29    Equipment and Fixed Assets.  Except as would not reasonably be expected to result, individually or in the aggregate, in a Material Adverse Effect, all Inventory is in good operating condition and state of repair for the purposes for which they are used by the Sellers in the operation of its business, normal wear and tear excepted.

4.30    Operatorship.  The Sellers have not received written notice of any vote to have the Sellers removed as the named operator of any of the Field Assets for which any Seller is currently designated as the operator and for which such vote is pending as of the Execution Date.  From September 30, 2013 through the Execution Date, no Seller has been removed as the named operator of any material Field Asset.

4.31    Joint Venture.

(a)    Fieldwood U.A. is an entity duly formed and validly existing under the Laws of the Netherlands.  To the Sellers' Knowledge, (i) Fieldwood Mexico is an entity duly formed and validly existing under the Laws of the Netherlands and (ii) each of the Subsidiaries of Fieldwood Mexico is an entity duly formed and validly existing under the Laws of its jurisdiction

of incorporation.  Fieldwood U.A. is, and, to the Sellers' Knowledge, the Mexico JV is qualified to do business and is in good standing under the Laws of each jurisdiction where such qualification is necessary, except for those jurisdictions where failure to be so qualified would not, individually or in the aggregate, reasonably be expected to result in a Material Adverse Effect.  Fieldwood U.A. has, and, to the Sellers' Knowledge, the Mexico JV has all requisite power and authority required to own and operate their properties and to carry on their business as now conducted.

(b)     Prior to the date hereof, the Sellers have made available to Buyer all organizational documents and equity holder, stockholder, operating, membership, voting and other similar agreements of or relating to Fieldwood U.A. and, to the Sellers' Knowledge, the Mexico JV (the "***Organizational Documents***").  None of any Seller or, to the Sellers' Knowledge, any other Person, is in material breach of any Organizational Document.  Other than the Organizational Documents, there are no agreements to which any Seller is a party with respect to the voting of any JV Interests or Fieldwood U.A. Interests or which restrict the transfer of any JV Interests or Fieldwood U.A. Interests.

(c)     To the Sellers' Knowledge, Fieldwood Mexico has the following Subsidiaries, each of which are incorporated in Mexico: (1) Fieldwood Energy de Mexico, S. de R.L. de C.V.; (2) Fieldwood Energy E&P Mexico, S. de R.L. de C.V.; and (3) Fieldwood Energy Services de Mexico, S. de R.L. de C.V.  To the Sellers' Knowledge, as of the Execution Date, the equity interests of: (i) Fieldwood Mexico consists of (A) class A shares, (B) class B shares and (C) class D shares, (ii) Fieldwood Energy de Mexico, S. de R.L. de C.V. consists of two (2) equity interests (*partes sociales*), (iii) Fieldwood Energy E&P Mexico, S. de R.L. de C.V. consists of two (2) equity interests (*partes sociales*) and (iv) Fieldwood Energy Services de Mexico, S. de R.L. de C.V. consists of two (2) equity interests (*partes sociales*) (the equity interests of the Mexico JV collectively, the "***JV Shares***").  The equity interests of Fieldwood Mexico and each of its Subsidiaries that are held by the Sellers are listed on **Schedule 4.31(c)**.  To the Sellers' Knowledge, (x) the equity interests of Fieldwood Mexico, and (y) the issued and outstanding JV Shares are held of record by the Persons listed on **Schedule 4.31(c)**.

(d)     The outstanding equity interests of Fieldwood U.A., as of the Execution Date, consist of the Fieldwood U.A. Interests, and are held of record by the Persons listed on **Schedule 4.31(d)**.

(e)     All of the issued and outstanding Fieldwood U.A. Interests and, to the Sellers' Knowledge, JV Interests have been duly authorized and validly issued, and are fully paid and nonassessable and were not issued in violation of any rights of first refusal, preemptive rights or similar rights.  Except as set forth on **Schedule 4.31(c)** and **Schedule 4.31(d)**, (i) all of the outstanding securities or other similar ownership interests of any class or type of or in Fieldwood U.A. are held by Fieldwood Offshore LLC and Fieldwood, (ii) there are no outstanding securities or other similar ownership interests of any class or type of or in Fieldwood U.A. or, to the Sellers' Knowledge, the Mexico JV and (iii) there are no outstanding options, warrants, calls, purchase rights, subscription rights, exchange rights or other rights, convertible exercisable or exchangeable securities, "***phantom***" equity rights, stock appreciation rights, equity-based performance units, or similar agreements, commitments or undertakings of any kind pursuant to which Fieldwood U.A. or, to the Sellers' Knowledge, the Mexico JV is or may become obligated to (i) issue, deliver, transfer, sell or otherwise dispose of, or pay an amount relating to, any securities or other similar

ownership interests of the Mexico JV or Fieldwood U.A., or any securities convertible into or exercisable or exchangeable for any securities or other ownership interests of the Mexico JV or Fieldwood U.A., or (ii) redeem, purchase or otherwise acquire any outstanding securities of the Mexico JV or Fieldwood U.A.

(f)     Fieldwood U.A. has no employees.  Fieldwood U.A. has (i) no assets other than the JV Interests held by Fieldwood U.A. and (ii) except as set forth on **Schedule 4.31(f)**, no non *de minimis* Liabilities other than those Liabilities incident to the ownership of the JV Interests held by Fieldwood U.A. (but not any Liabilities with respect to any breach of Law or Contract with respect to the ownership of such JV Interests).

4.32    Plan of Merger.  The FWE I Oil and Gas Properties (excluding the assets listed on Exhibit I-K of the Plan of Merger) include solely "Legacy Apache Properties" (as such term is defined in the Apache Term Sheet (as such term is defined in the Restructuring Support Agreement)) and no other asset.  As of the Execution Date, there is no asset listed on Exhibit I-K of the Plan of Merger that is related to, used or held for use in connection with or held as inventory in connection with, any Lease, Easement or Well listed on **Exhibit A**, **Exhibit B** or **Exhibit C**.

4.33    Exhibit X-1.  **Exhibit X-1** sets forth an estimate of estimated Working Capital Assets (excluding clause (b) of the definition thereof) and Working Capital Liabilities (excluding clause (b) of the definition thereof) assuming an Effective Time occurring on June 30, 2021, which was prepared at the direction of the Sellers.  To the Sellers' Knowledge, when prepared in February 2021, the information in **Exhibit X-1** reflected a reasonable estimate of Working Capital Assets (excluding clause (b) of the definition thereof) and Working Capital Liabilities (excluding clause (b) of the definition thereof) assuming an Effective Time occurring on June 30, 2021, subject to (a) the assumptions described therein and (b) omission of liabilities for accrued payroll. To the Sellers' Knowledge, (x) the Fieldwood Energy I Closing Accounts Receivable do not include or exclude assets that would have resulted in a material deviation of the net amount of the Working Capital Assets described in **Exhibit X-1** if such assets had been estimated and reflected in **Exhibit X-1** when prepared and (y) the Fieldwood Energy I Closing Accounts Payable do not include or exclude liabilities that would have resulted in a material deviation of the net amount of the Working Capital Liabilities described in **Exhibit X-1** if such liabilities had been estimated and reflected in **Exhibit X-1** when prepared (assuming that all, or substantially all, pre-petition payables are excluded from the calculation of Fieldwood Energy I Closing Accounts Payable as obligations satisfied, compromised (to the extent compromised), settled, released or discharged pursuant to the Plan and Confirmation Order, including by being paid as Cure Costs), in the case of each of clause (x) and clause (y), after taking into account duplication between the accounts described in **Exhibit X-1** and in the definitions of Working Capital Assets and Working Capital Liabilities, on the one hand, and Fieldwood Energy I Closing Accounts Receivable and Fieldwood Energy I Closing Accounts Payable, on the other hand.

## ARTICLE V
## BUYERS' REPRESENTATIONS

Each of Buyer and Buyer 2 represents and warrants to the Sellers, subject to the Disclosure Schedules (subject to Section 12.15), as follows:

35

5.1   Organization; Standing; Capitalization.

(a)   At the date hereof, each of Buyer and Buyer 2 is a limited liability company duly organized, validly existing and in good standing under the laws of the State of Delaware. Each of Buyer and Buyer 2 has all requisite power and authority and all governmental licenses, authorizations, permits, consents and approvals required to carry on its business as now conducted.

(b)   At the Closing, (i) all of the issued and outstanding membership interests of Buyer are held by QuarterNorth Energy Intermediate Inc., a Delaware corporation ("***Buyer Intermediate***"), (ii) all of the issued and outstanding membership interests of Buyer 2 are held by Buyer, (iii) all of the issued and outstanding equity interests of Buyer Intermediate are held by QuarterNorth Energy Holding Inc. a Delaware corporation ("***Buyer Parent***") and (iv) all of the issued and outstanding equity interests of Buyer Parent are held by QuarterNorth Energy Inc., a Delaware corporation ("***Buyer Grandparent***").

(c)   At the Closing, except as set forth on **Schedule 5.1(c)**, the authorized and issued equity interests of Buyer Grandparent (the "***Buyer Grandparent Equity Interests***") shall consist solely of (i) the New Equity Interests to be issued pursuant to Section 4.4(a)(i) of the Plan, (ii) the Subscription Rights (including any New Equity Interests issued in connection with the exercise thereof), (iii) Backstop Commitment Premium Equity Interests, (iv) the GUC Warrants, (v) the SLTL Warrants and (vi) the New Money Warrants, in each case, issued pursuant to, and in accordance with, the Plan.  At the Closing, all of the issued and outstanding Buyer Grandparent Equity Interests, and all of the membership interests of Buyer Parent, Buyer, Buyer 2 and Buyer Intermediate, will have been duly authorized and validly issued, and will be fully paid and nonassessable and not issued in violation of any rights of first refusal, preemptive rights or similar rights.  As of the Closing Date, except as set forth in Section 5.1(b) and the first sentence of this Section 5.1(c), there are no issued and outstanding (i) securities or other similar ownership interests of any class or type of or in Buyer, Buyer 2, Buyer Intermediate, Buyer Parent or Buyer Grandparent or (ii) options, warrants, calls, purchase rights, subscription rights, exchange rights or other rights, convertible exercisable or exchangeable securities, "***phantom***" equity rights, stock appreciation rights, equity-based performance units, or similar agreements, commitments or undertakings of any kind pursuant to which Buyer, Buyer 2, Buyer Intermediate, Buyer Parent or Buyer Grandparent is or may become obligated to (A) issue, deliver, transfer, sell or otherwise dispose of, or pay an amount relating to, any securities or other similar ownership interests of Buyer, Buyer 2, Buyer Intermediate, Buyer Parent or Buyer Grandparent or any securities convertible into or exercisable or exchangeable for any securities or other ownership interests of Buyer, Buyer 2, Buyer Intermediate, Buyer Parent or Buyer Grandparent, or (B) redeem, purchase or otherwise acquire any outstanding securities of Buyer, Buyer 2, Buyer Intermediate, Buyer Parent or Buyer Grandparent.

(d)   As of immediately following the Closing, the only Liabilities of Buyer, Buyer 2, Buyer Intermediate and Buyer Parent will be: (x) liabilities under the Exit Facilities (as defined in the Plan), (y) in the case of Buyer and Buyer 2, the Assumed Liabilities and (z) Liabilities incurred in connection with this Agreement or any of the Ancillary Documents or any of the transactions contemplated hereunder or thereunder (including with respect to any surety bonds).

36

5.2     <u>Power</u>.  Each of Buyer and Buyer 2 has the requisite power and authority to execute and deliver this Agreement and the Ancillary Documents to which it is a party and perform its obligations under this Agreement and such Ancillary Documents.

5.3     <u>Non-Contravention</u>.     Buyer's execution, delivery and performance of this Agreement and each Ancillary Document to which Buyer is (or, upon its execution and delivery, will be) a party and the performance of the transactions contemplated herein and therein will not (a) conflict with or result in a breach of any provisions of the organizational documents of Buyer or (b) assuming compliance with matters referred to in <u>Section 5.7</u>, violate any material Law applicable to Buyer.  Buyer 2's execution, delivery and performance of this Agreement and each Ancillary Document to which Buyer 2 is (or, upon its execution and delivery, will be) a party and the performance of the transactions contemplated herein and therein will not (x) conflict with or result in a breach of any provisions of the organizational documents of Buyer 2 or (y) assuming compliance with matters referred to in <u>Section 5.7</u>, violate any material Law applicable to Buyer 2.

5.4     <u>Authorization and Enforceability</u>.  Each of Buyer and Buyer 2 has full capacity, power and authority to enter into and perform this Agreement, each Ancillary Document to which Buyer and Buyer 2, as applicable, is (or, upon its execution and delivery, will be) a party and the transactions contemplated herein and therein.  The execution, delivery and performance by each of Buyer and Buyer 2 of this Agreement and each Ancillary Document to which Buyer and Buyer 2, as applicable, is (or, upon its execution and delivery, will be) a party have been duly and validly authorized and approved by all necessary organizational action of Buyer and Buyer 2, as applicable.  This Agreement and each Ancillary Document to which Buyer and Buyer 2 is (or, upon its execution and delivery will be) a party are, or upon their execution and delivery will be, the valid and binding obligations of Buyer and Buyer 2, as applicable, and enforceable against Buyer and Buyer 2, as applicable, in accordance with their respective terms, subject to the effects of bankruptcy, insolvency, reorganization, moratorium and similar Laws as well as to principles of equity (regardless of whether such enforceability is considered in a proceeding in equity or at law).

5.5     <u>Liability for Brokers' Fees</u>.  Other than Rothschild & Co. US Inc. and Intrepid Partners, LLC, who have been retained by the Ad Hoc Group of Secured Lenders (as defined in the Plan), there is no investment banker, broker, finder or other intermediary which has been retained by or is authorized to act on behalf of Buyer or Buyer 2 who might be entitled to any fee, commission or expenses in connection with the transactions contemplated by this Agreement or any of the Ancillary Documents.

5.6     <u>Litigation</u>.  Neither any Claim by any Governmental Authority or other Person nor any legal, administrative or arbitration proceeding is pending or, to Buyer's Knowledge, threatened against Buyer or Buyer 2 which in any manner challenges or seeks to prevent, enjoin, alter or materially delay the transactions contemplated by this Agreement.

5.7     <u>Governmental and Third Person Consents</u>.  Except as set forth on **<u>Schedule 5.7</u>** no Governmental Approval is required to authorize, or is otherwise required in connection with, (a) Buyer's or Buyer 2's valid execution and delivery of this Agreement or any Ancillary Document to which Buyer or Buyer 2 is (or, upon its execution and delivery, will be) a party, (b) Buyer's or

37

Buyer 2's performance of their respective obligations hereunder or thereunder or (c) the consummation of the transactions contemplated by this Agreement and the Ancillary Documents.

5.8    Financial Capability.  At or prior to the Closing, Buyer has provided to the Sellers a true and complete copy of the Direction Letter.

5.9    Qualification.  At the Closing, Buyer will have met the BOEM Qualifications.

5.10    Bankruptcy.  There are no bankruptcy, reorganization, receivership or arrangement proceedings pending against or to Buyer's Knowledge, threatened against Buyer or Buyer 2.

5.11    Investor Status; Investigation.

(a)    To the extent any Acquired Interests constitute securities, the Acquired Interests are being acquired by Buyer and Buyer 2 for investment purposes only, for Buyer's and Buyer 2's own account and not with a view to, or for resale in connection with, any distribution thereof in violation of the 1933 Act.

(b)    Each of Buyer and Buyer 2 acknowledges that, to the extent any Acquired Interests constitute securities, the sale of the Acquired Interests has not been registered under the 1933 Act or any state or foreign securities laws and that the Acquired Interests, to the extent constituting securities, may not be sold, transferred, offered for sale, pledged, hypothecated or otherwise disposed of unless such transfer, sale, assignment, pledge, hypothecation or other disposition is pursuant to the terms of an effective registration statement under the 1933 Act and registered under any applicable state or foreign securities laws or pursuant to an exemption from registration under the 1933 Act and any applicable state or foreign securities laws.

(c)    Each of Buyer and Buyer 2 has such expertise, knowledge and sophistication in financial and business matters generally that it is capable of evaluating, and has evaluated, the merits and economic risks of its investment in the Acquired Interests. Each of Buyer and Buyer 2 is knowledgeable of the oil and gas business and of the usual and customary practices of oil and gas producers, including those in the areas where the Acquired Interests are located. Further, each of Buyer and Buyer 2 is capable of making such investigation, inspection, review and evaluation of the Acquired Interests as a prudent purchaser would deem appropriate under the circumstances including with respect to all matters relating to the Acquired Interests, their value, operation and suitability.

(d)    Each of Buyer and Buyer 2 has had the opportunity to examine all aspects of the Acquired Interests that Buyer and Buyer 2 have deemed relevant and has had access to all information requested by Buyer or Buyer 2 with respect to the Acquired Interests in order to enter into this Agreement. In connection with the transactions contemplated hereby, each of Buyer and Buyer 2 has had the opportunity to ask such questions of, and has received sufficient answers from, the representatives of the Sellers and obtain such additional information about the Acquired Interests as each of Buyer and Buyer 2 deems necessary to enter into this Agreement.

(e)    Each of Buyer and Buyer 2 confirms, acknowledges and agrees that Buyer and Buyer 2, as applicable, is relying entirely upon the representations and warranties of the Sellers in this Agreement, any certificates delivered hereunder and any Ancillary Document, as well as

38

Buyer's and Buyer 2's own investigations and inspections of the books, records and assets of the Sellers, including the Acquired Interests, prior to the execution of this Agreement in entering into this Agreement and proceeding with the transactions on the terms as set forth herein.  Each of Buyer and Buyer 2 acknowledges and agrees that, other than the express representations and warranties of the Sellers set forth in Article IV, in the certificates delivered by the Sellers at Closing, or any Ancillary Document, any description of the Sellers, their businesses, operations and assets (including the Acquired Interests) in this Agreement, the Disclosure Schedules or any Ancillary Document is for the sole purpose of identification only and no representation, warranty or condition is or will be given by the Sellers in respect of the accuracy of any description.  In deciding to enter into this Agreement, and to consummate the transactions contemplated hereby, other than the express representations and warranties of the Sellers set forth in Article IV, any certificates delivered hereunder and any Ancillary Document, each of Buyer and Buyer 2 has relied solely upon its own knowledge, investigation, judgment and analysis and not on any other disclosure or representation made by the Sellers or the Sellers' representatives.  Nothing herein shall limit Buyer's or Buyer 2's remedies in the event of Fraud, except that Buyer and Buyer 2 shall have no remedy in the event of Fraud with respect to Fieldwood Energy I, FW GOM Pipeline, GOM Shelf or any of their respective Subsidiaries.

5.12    No Other Representations.  No Seller nor any other Person (on behalf of any Seller or otherwise) has made or is making any representation or warranty whatsoever, express or implied, at law or in equity, with respect to the Sellers, the Acquired Interests, this Agreement or the transactions contemplated by this Agreement other than the representations and warranties expressly set forth in Article IV (as modified by the Disclosure Schedules), the certificates delivered hereunder or any Ancillary Document, and neither Buyer nor Buyer 2 is relying on and has not relied on any representation or warranty other than those representations or warranties set forth in Article IV (as modified by the Disclosure Schedules), the certificates delivered hereunder or any Ancillary Document and any reliance by Buyer or Buyer 2 on any representation or warranty other than those representations and warranties set forth in Article IV (as modified by the Disclosure Schedules), the certificates delivered hereunder or any Ancillary Document is hereby expressly disclaimed.  Nothing herein shall limit Buyer's or Buyer 2's remedies in the event of Fraud, except that Buyer and Buyer 2 shall have no remedy in the event of Fraud with respect to Fieldwood Energy I, FW GOM Pipeline, GOM Shelf or any of their respective Subsidiaries.

## ARTICLE VI
## COVENANTS AND AGREEMENTS

6.1    Covenants and Agreements of the Sellers.  The Sellers covenant and agree that, during the Interim Period (or, if earlier, until termination of this Agreement), except (u) as otherwise expressly required under this Agreement, any Ancillary Document or the Mexico PSA, (v) as required by any applicable Law or Governmental Authority (including the Bankruptcy Code, the Bankruptcy Court and any actions required to be taken (or not taken) by the Sellers in order to comply with any orders of the Bankruptcy Court), (w) to the extent related solely to Excluded Assets and/or Retained Liabilities, (x) for renewal of insurance coverage in the ordinary course of business, (y) for emergency operations to address any emergency that threatens human life, safety or the environment; *provided* that the Sellers will provide notice to Buyer of any such emergency operation prior to taking such action if practicable and, otherwise, as soon as reasonably practicable

39

thereafter or (z) otherwise with Buyer's prior written consent (not to be unreasonably withheld, conditioned or delayed):

(a)  except as set forth on **<u>Schedule 6.1(a)</u>**, each Seller shall and shall cause its Affiliates to:

(i)  carry on the business of the Sellers as it relates to the Acquired Interests in the ordinary course of business consistent with past practice and use commercially reasonable efforts to maintain, preserve and protect the Acquired Interests in the condition in which they exist on the Execution Date, except for ordinary wear and tear and except for replacements, modifications or maintenance in the ordinary course of business consistent with past practice;

(ii)  maintain and operate as a reasonably prudent operator in the ordinary course of business the Field Assets operated by the Sellers as of the Execution Date and maintain the Office Assets as a reasonably prudent lessee and owner;

(iii)  use commercially reasonable efforts to maintain their relationships with, and preserve for the business of the Sellers as it relates to the Acquired Interests, and preserve the goodwill of, their key suppliers and customers; *provided*, *however*, that (x) this <u>clause (iii)</u> will not restrict the Sellers from taking any action deemed necessary, prudent or advisable in the business judgment of the Sellers in connection with the Bankruptcy Cases, including with respect to any claim of any suppliers or customers of the Sellers that is subject to the Bankruptcy Cases, and (y) prior to taking any action (other than such action required by the Plan or an order of the Bankruptcy Court) outside the ordinary course of business that the Sellers reasonably believe will adversely affect their relationships with their key suppliers and customers, the Sellers will consult with Buyer prior to taking any such action;

(iv)  pay or cause to be paid, when due, all Taxes, Lease Burdens and development and operating expenses and other payments, in each case consistent with past practice, except (A) royalties held in suspense in good faith and (B) expenses or royalties being contested in good faith;

(v)  maintain its books, accounts and records consistent with past practice;

(vi)  pay all post-petition trade payables and use commercially reasonable efforts to collect accounts receivable, as they related to the Acquired Interests after the Petition Date, in each case in the ordinary course of business consistent with past practice but, in the case of post-petition trade payables, in no event later than the due date thereof, unless being disputed in good faith (but, for the avoidance of doubt, subject to applicable orders of the Bankruptcy Court);

(vii)  provide Buyer (promptly but in no event later than three (3) Business Days after the Sellers' receipt thereof) with copies of any written notice received from any Third Person with respect to (A) any proposed operations on any Field Asset or

40

(B) any Claim relating to any Acquired Interests (in the case of each of <u>clauses (A)</u> and <u>(B)</u>, where the Sellers' Liability (or potential Liability) is in excess of $1,000,000); and

(viii)   provide Buyer with copies of any material correspondence received from any Governmental Authority with respect to any Acquired Interests as soon as reasonably practicable, but in no event later than two (2) Business Days after the Sellers' receipt thereof; and

(b)   except as set forth on **<u>Schedule 6.1(b)</u>**, each Seller shall not and shall cause its Affiliates not to:

(i)   modify in any material respect its now existing credit, collection or payment policies, procedures or practices as they relate to the Acquired Interests, including accelerating collections of receivables or failing to pay or delaying payment of payables in a manner inconsistent with its now existing practices;

(ii)   remove any Acquired Interest from any real property or other location of the Sellers' business such that such Acquired Interest is no longer located within any property of the Sellers' business that is an Acquired Interest, except for sales of inventory in the ordinary course of business;

(iii)   subject to, and without limiting, the Sellers' rights pursuant to <u>Section 6.4</u>, transfer, convey, sell, abandon or otherwise dispose of any material Acquired Interests (other than sales of Hydrocarbons in the ordinary course of business consistent with past practice) or any interest in any of the Leases;

(iv)   create any Encumbrance on any Acquired Interests other than Permitted Encumbrances (except that the Fieldwood U.A. Interests and the JV Interests shall not be subject to any Permitted Encumbrances other than the Mexico PSA) or Encumbrances that will be released prior to Closing (including if released pursuant to the Confirmation Order);

(v)   commence, propose, commit or agree to participate in any single operation with respect to any Field Asset with an anticipated cost in excess of $1,000,000;

(vi)   amend, modify, renew or terminate any Material Contract or enter into any Contract that would be an Material Contract if it existed on the date hereof if such Material Contract would be an Assigned Contract;

(vii)   (A) hire any officers or other senior executive employees or terminate any such officer or employee (other than for "cause"); or (B) except in the ordinary course of business consistent with past practice, hire any other employees or terminate any such other employee (other than for "cause");

(viii)   (A) increase the annual rate of base salary or any target bonus opportunity of any Seller Employee, except in the ordinary course of business consistent with past practice and not in excess of 3% for any Seller Employee; (B) pay any bonus, benefit, or other direct or indirect incentive compensation (other than any such payments

41

authorized pursuant to any first or second day orders in the Bankruptcy Cases); (C) award any equity or equity-based compensation awards (whether phantom or equity) with respect to the equity of any Seller or any of its Affiliates; (D) modify, amend or terminate any Employee Plan; (E) enter into or modify any employment, compensation, severance, non-competition, or similar Contract (or amend any such Contract) to which any Seller or any of its Affiliates is a party; or (F) adopt any new severance pay, termination pay, deferred compensation, bonus, or other employee benefit plan, agreement, program, practice, arrangement or policy with respect to Seller Employees that would be an Employee Plan if it existed on the date hereof (including any employment agreement, severance agreement, change in control agreement, or transaction or retention bonus agreements), except, in the case of each of clauses (A) through (F), (1) to the extent set forth in any order of the Bankruptcy Court or as required by applicable Law; or (2) to the extent required pursuant to the terms of any Employee Plan, as in effect on the date hereof;

(ix)     relinquish its position as operator to any Person other than Buyer or Buyer 2 with respect to any Acquired Interest operated by the Sellers;

(x)     waive, release, settle or compromise any material Claim or proceeding relating to any Acquired Interest;

(xi)     subject to, and without limiting, the Sellers' rights pursuant to Section 6.4, enter into any merger or divisive merger, or liquidate or dissolve;

(xii)     sell, lease, license (except for non-exclusive licenses granted in the ordinary course of business) or otherwise transfer or dispose of, abandon or permit to lapse, fail to take any action necessary to maintain, enforce or protect, or create or incur any Encumbrance (other than Permitted Encumbrances) on, any material Owned Intellectual Property;

(xiii)     cause or allow any of its current directors and officers liability, property or casualty insurance policies that apply to any of the Acquired Interests or that apply to the business of the Sellers as it relates to the Acquired Interests to be canceled or terminated or any of the coverage thereunder to lapse unless, simultaneously with such termination, cancellation or lapse, replacement policies providing coverage equal to or greater than the coverage under the canceled, terminated or lapsed policies are in full force and effect;

(xiv)     make, change or revoke any material Tax election in respect of the Acquired Interests, settle or otherwise compromise any claim relating to Taxes of Fieldwood U.A. or with respect to the Acquired Interests, enter into any closing agreement or similar agreement relating to Taxes of Fieldwood U.A. or the Acquired Interests, surrender any right to claim a Tax refund, offset or other reduction in Tax Liability of Fieldwood U.A. or with respect to the Acquired Interests, or request any ruling or similar guidance with respect to Taxes of Fieldwood U.A. or with respect to the Acquired Interests; or

(xv)    enter into any Contract or other commitment to take, or authorize the taking of or resolve to take, any actions prohibited by this Section 6.1(b).

6.2    Casualty Event.  The Sellers shall give Buyer prompt written notice of any Casualty Event that occurs with respect to any Acquired Interest during the Interim Period, together with a description of the applicable insurance coverage and an estimate of the Sellers' exposure with respect to such Casualty Event.  If the damaged or taken Acquired Interest is not repaired or replaced on or before the Closing Date, the Sellers shall provide to Buyer an assignment of all of the Sellers' right, title and interest in and to all insurance proceeds and recoveries from Third Persons payable, in each case with respect to the Acquired Interest damaged or taken as the result of such Casualty Event.

6.3    Press Releases.  Except as required in the Bankruptcy Cases or by applicable Law (a) each Party shall consult with the other before issuing any press release or otherwise making any public statement with respect to the transactions contemplated by this Agreement and (b) no Party shall issue any press release or make any such public statement before obtaining the other Party's prior written approval, which shall not be unreasonably withheld, conditioned or delayed. To the extent such release or public statement is required by Law, the Party intending to make such release or public statement (i) shall give the other Party the opportunity (within reasonable time before any applicable deadline) to review and comment upon such release or public statement and (ii) shall consider in good faith all reasonable comments thereto received sufficiently in advance of any applicable deadline.

6.4    Solicitation; Other Offers.  The Sellers may, directly or indirectly through its Representatives, (i) engage in discussions and negotiations regarding an Alternative Transaction with any one or more Third Persons as potential bidders (each, an "*Alternative Bidder*") in connection with the solicitation of one or more proposals relating to an Alternative Transaction and (ii) furnish to any Alternative Bidder who has signed a confidentiality agreement and has made a request therefor any public or non-public information relating to the Sellers and afford to any such Alternative Bidder access to any properties, Acquired Interests, books or records of the Sellers or the business of the Sellers; *provided* that the Sellers shall not actively solicit proposals relating to an Alternative Transaction unless the failure to do so would be contrary to or inconsistent with applicable fiduciary duties.

6.5    Regulatory Matters; Cooperation.

(a)    Subject to the provisions of Section 6.5(b) and Section 6.7, including the limitations set forth therein, the Sellers, on the one hand, and Buyer, on the other hand, shall use reasonable best efforts to obtain, at the earliest practicable date, all necessary Governmental Approvals and all necessary registrations, declarations and filings (including registrations, declarations and filings with Governmental Authorities and any change in control requirements relating to any consent decrees, decisions, judgments, settlements, consent orders, stipulations, decrees or similar orders relating to the Acquired Interests, if any), in each case for the consummation of the transactions contemplated by this Agreement and the Ancillary Documents, and use its reasonable best efforts to avoid any Claim by any Governmental Authority relating to the transactions contemplated by this Agreement and the Ancillary Documents.  Subject to the provisions of Section 6.5(b) and Section 6.7, including the limitations set forth therein, in addition

43

to such actions, the Sellers, on the one hand, and Buyer, on the other hand, shall use reasonable best efforts to (i) take all acts necessary in connection with meeting with any Governmental Authority regarding the transferring of the Permits included in the Acquired Interests and (ii) execute and deliver any additional instruments reasonably necessary to consummate the transactions contemplated hereby and to fully carry out the purposes of this Agreement.

(b)     The Sellers, on the one hand, and Buyer, on the other hand, (i) to the extent permissible, shall promptly inform each other of any material communication from any Governmental Authority concerning this Agreement, the transactions contemplated hereby, and any filing, notification or request for approval by any Governmental Authority and (ii) to the extent permissible, shall permit the other to review in advance any proposed written or material oral communication or information submitted to any such Governmental Authority in response thereto. In addition, none of the Parties shall agree to participate in any meeting with any Governmental Authority in respect of any filings, investigation or other inquiry with respect to this Agreement or the transactions contemplated hereby, unless, to the extent permissible, such Party consults with the other Parties in advance and, to the extent permitted by any such Governmental Authority, gives the other Party the opportunity to attend and participate thereat, in each case to the maximum extent reasonably practicable.  Subject to restrictions under any Law, each of Buyer, on the one hand, and the Sellers, on the other hand, shall furnish the other with copies of all correspondence, filings and communications (and memoranda setting forth the substance thereof) between it and its Affiliates and their respective Representatives on the one hand, and the Governmental Authority or members of its staff on the other hand, with respect to this Agreement, the transactions contemplated hereby (excluding documents and communications which are subject to preexisting confidentiality agreements or to the attorney-client privilege or work product doctrine or which refer to valuation of the Acquired Interests) or any such filing, notification or request for approval. Each Party shall also furnish the other Party with such necessary information and assistance as such other Party and its Affiliates may reasonably request in connection with their preparation of necessary filings, registration or submissions of information to the Governmental Authority in connection with this Agreement, the transactions contemplated hereby and any such filing, notification or request for approval.  Notwithstanding anything to the contrary in this Agreement, nothing in this Agreement shall require Buyer or the Sellers, or any of their respective Affiliates to (and none of any Seller or any of its Affiliates shall, without the prior written consent of Buyer), in performing their respective obligations under this Section 6.5, (i) enter into any settlement, undertaking, consent decree, stipulation or agreement with any Governmental Authority in connection with the transactions contemplated hereby, (ii) divest or otherwise hold separate (including by establishing a trust or otherwise), or take any other action (or otherwise agree to do any of the foregoing) with respect to the Acquired Interests or any assets or business of Buyer or any of its Affiliates or (iii) defend any Claim relating to the transactions contemplated by this Agreement or any Ancillary Document, except, in the case of each of clauses (i) through (iii), actions expressly contemplated to be taken by the Sellers in accordance with the Plan.

(c)     Notwithstanding anything to the contrary contained in this Agreement, Buyer shall (or shall through its Representatives), on behalf of the Parties, control and lead all communications and strategy relating to the Antitrust Laws (*provided* that the Sellers are not constrained from complying with applicable Law), *provided*, further, that the Parties shall consult and cooperate with one another, and consider in good faith the views of one another, regarding the form and content of any analyses, appearances, presentations, memoranda, briefs, arguments,

44

opinions and proposals made or submitted by or on behalf of either Party in connection with proceedings under or relating to any Antitrust Law prior to their submission.

6.6     Bankruptcy Court Matters.

(a)     Confirmation Order.     The Sellers and Buyer covenant and agree that they will pursue the transactions contemplated by the Confirmation Order and in this Agreement.

(b)     Reasonable Efforts.  The Sellers shall use commercially reasonable efforts to consummate the Plan.

(c)     Bankruptcy Filings.

(i)     During the Interim Period, the Sellers shall deliver to Buyer copies of all pleadings, motions, notices, statements, schedules, applications, reports and other papers that relate, in whole or in part, to this Agreement and the transactions contemplated hereby at least two (2) Business Days prior to the date when the Sellers intend to file any such pleading or other document (*provided,* that if delivery of such motions, orders or materials (other than the Plan, the disclosure statement, a disclosure statement order, the Confirmation Order or adequate protection order) at least two (2) Business Days in advance is not reasonably practicable, such motion, order or material shall be delivered as soon as reasonably practicable prior to filing) for Buyer's prior review and comment, and the Sellers shall consult in good faith with Buyer regarding the form and substance of such filings to the extent they are related to the Acquired Interests, any Assumed Liabilities or the transactions contemplated hereby, including any of Buyer's rights or obligations hereunder.  The Parties shall use commercially reasonable efforts to consult and cooperate regarding (i) any such pleadings, motions, notices, statements, schedules, applications, reports or other papers, (ii) any discovery taken in connection with seeking entry of the Confirmation Order (including any depositions) and (iii) any hearings relating to the Confirmation Order, including the submission of any evidence, including witness testimony, in connection with such hearing.  During the Interim Period (subject to Section 6.4), the Sellers shall not take any action that is intended to (or is reasonably likely to), or fail to take any action the intent (or reasonably likely result) of which failure to act is to, result in the reversal, voiding, modification or staying of the Confirmation Order, or this Agreement.

(ii)     In the event the entry of the Disclosure Statement Order, the Confirmation Order, or any other order reasonably necessary in connection with the transactions contemplated by this Agreement is appealed, the Sellers shall use commercially reasonable efforts to defend such appeal.

(d)     Cooperation with Plan Administrator. In accordance with the terms of the Plan, the Parties agree that they shall use commercially reasonable efforts to cooperate with the Plan Administrator (as defined in the Plan) and each other, in relation to the Parties' respective activities and obligations under the Plan, including by providing reasonable, good-faith access to personnel, systems, and books and records and their respective personnel and consulting with each other to avoid duplication of effort.

6.7     Assumption and Assignment of Contracts.

(a)     Prior to the date hereof, Buyer has designated in writing which 365 Contracts Buyer desires to be assumed by the Sellers and assigned to Buyer (the "***Assigned 365 Contracts***" and Buyer's designated list of Assigned 365 Contracts, and as may be further amended, modified or supplemented with the mutual consent of Buyer and the Sellers, the "***Assigned 365 Contracts List***").   The Assigned 365 Contracts List is attached hereto as **Schedule 6.7(a)**.

(b)     All 365 Contracts of the Sellers which Buyer has not designated in writing for assumption and assignment shall not be considered Assigned 365 Contracts or Acquired Interests and shall automatically be deemed "***Excluded Contracts***".

(c)     Buyer and each applicable Seller shall use commercially reasonable efforts to assign or cause to be assigned, the Assigned 365 Contracts to Buyer.  If the Sellers are successful in effecting such assumption as of or before the Closing, such Lease, Easement or Contract shall become an Assigned 365 Contract and transferred and conveyed to Buyer.

(d)     On the Closing Date, immediately following payment by Buyer of the Cash Portion, the Sellers shall pay all undisputed Cure Costs with respect to the Assigned 365 Contracts.

(e)     Buyer shall provide adequate assurance of future performance of all of the Assigned 365 Contracts so that all Assigned 365 Contracts can be assumed by the Sellers and assigned to Buyer at the Closing in accordance with the provisions of Section 365 of the Bankruptcy Code and this Agreement, and Buyer acknowledges that such cooperation may require Buyer to provide reasonably necessary information regarding Buyer and its Subsidiaries, as well as a commitment of performance by Buyer and/or its Subsidiaries with respect to the Assigned 365 Contracts from and after the Closing to demonstrate adequate assurance of the performance of the Assigned 365 Contracts, and the Sellers' obligation to assume and assign such Assigned 365 Contracts is subject to Buyer providing such adequate assurance of future performance.

(f)     Notwithstanding anything to the contrary in this Agreement, no Seller (i) shall agree to, settle or compromise any dispute with respect to, the amount of Cure Costs in respect of any Assigned 365 Contract without the prior written approval of Buyer in its sole discretion or (ii) shall, without the prior written consent of Buyer in its sole discretion, reject or move to reject any Assigned 365 Contract.

6.8     Employee Matters.

(a)     Offers and Terms of Employment.  All Seller Employees (including those on leave of absence or disability) identified by the Sellers shall be offered employment by Buyer or its Affiliate no later than five (5) days prior to the Closing Date, in each case, such employment to be effective as of the Closing Date; *provided*, *however*, that neither Buyer nor any of its Affiliates shall be required to make an offer of employment to any Section 6.8 Employee unless Buyer and Seller mutually agree that Buyer shall offer employment to such Section 6.8 Employee. Each offer of employment made by Buyer or its Affiliates to a Seller Employee, as applicable, shall be effective as of the Closing Date and shall contain terms and conditions of employment substantially comparable in the aggregate to the terms and conditions of employment provided by the Sellers immediately prior to the Closing Date with respect to such Seller Employee, *provided*

46

each such offer shall include (i) at least the same level of base salary or wage rate (based on pre-COVID-19 salary or wage rate without regard to any reduction), (ii) for substantially all such Seller Employees, at least the same annual cash incentive compensation opportunity and (iii) substantially similar employee benefits.  For purposes of this Agreement, any individual who becomes employed by Buyer in accordance with this Section 6.8 is referred to as a "***Transferred Employee***."

(b)     Liabilities.  Effective as of the Closing, (i) Buyer shall, or shall cause an Affiliate of Buyer to, assume or retain, as the case may be, any and all Liabilities (contingent or otherwise) relating to, arising out of, or resulting from the employment or services, or termination of employment services, of any Transferred Employee, accrued and unpaid bonuses, accrued and unused vacation, sick days and paid time off and any workers' compensation claims against any Seller or its Affiliates, irrespective of when such claims are made (and Buyer shall or shall cause an Affiliate of Buyer to pay the applicable Transferred Employees the unpaid portion of any Transferred Employee's accrued annual bonus for the calendar year in which the Closing occurs at the time such bonuses are paid to such Transferred Employees in the ordinary course consistent with past practice) and (ii) the Sellers shall, or shall cause their Affiliates to assign to Sellers, and Buyer shall, or shall cause an Affiliate of Buyer, to assume, (A) sponsorship of the Fieldwood Energy Health & Welfare Benefit Plan, including any and all Liabilities (contingent or otherwise) relating to, arising out of, or resulting from the operation of the Fieldwood Energy Health & Welfare Benefit Plan, and Buyer shall be, or shall cause an Affiliate to be, responsible for all claims whenever incurred under the Fieldwood Energy Health & Welfare Benefit Plan, including any claims incurred prior to the Closing but not yet reported and any claims reported prior to Closing but which have not yet been processed, (B) sponsorship of the Fieldwood Energy LLC 401(k) Plan, including any and all Liabilities (contingent or otherwise) relating to, arising out of, or resulting from the operation of the Fieldwood Energy LLC 401(k) Plan, and (C) each other Assumed Employee Plan, including any and all Liabilities (contingent or otherwise) relating to, arising out of, or resulting from the operation of each Assumed Employee Plan; *provided* that except as otherwise set forth in Section 6.8(c), in no event shall Buyer or any of its Affiliates assume any Liabilities relating to bonuses, severance or workers' compensation claims for any current or former employee of any Seller or any of its Affiliates other than a Transferred Employee and all such Liabilities shall be Retained Liabilities.

(c)     Severance.  With respect to any Seller Employee who Sellers and Buyer mutually agree shall not be offered employment by Buyer and who shall not become a Transferred Employee, Sellers shall provide severance payments (subject to executing a general employment release in favor of Sellers and Buyer) in such amount as mutually determined by Sellers and Buyer, which amount shall in no event exceed two (2) months of base salary ("***Employee Severance***").  Employee Severance shall be paid by Sellers to each such Seller Employee in the ordinary course through the Closing.  Buyer shall, and shall cause its Affiliates to, be liable for and provide to each such Seller Employee any portion of the unpaid Employee Severance that otherwise becomes due and payable following the Closing.

(d)     Credit for Service.  Buyer shall, and shall cause its Affiliates to, credit Transferred Employees for service earned on and prior to the Closing Date with the Sellers and their Affiliates or predecessors to the extent that such service would be credited pursuant to the applicable Employee Plan, in addition to service earned with Buyer and its Affiliates on or after

the Closing Date to the extent that service is relevant for purposes of eligibility, vesting, paid-leave entitlement or the calculation of benefits under any employee benefit plan, program or arrangement of Buyer or any of its Affiliates for the benefit of the Transferred Employees on or after the Closing Date, but not for the purposes of benefit accrual under any defined benefit pension plan; *provided*, *however*, that nothing herein shall result in a duplication of benefits with respect to the Transferred Employees.

(e)    Pre-existing Conditions; Coordination.  Buyer shall, and shall cause its Affiliates to, waive any pre-existing condition or actively at work limitations, evidence of insurability and waiting periods for the Transferred Employees and their eligible spouses and dependents under any employee benefit plan, program or arrangement of Buyer or any of its Affiliates for the benefit of the Transferred Employees on or after the Closing Date.  Buyer shall, and shall cause its Affiliates to credit for purposes of determining and satisfying annual deductibles, co-insurance, co-pays, out-of-pocket limits and other applicable limits under the comparable health plans and arrangements offered to Transferred Employees, deductibles, co-insurance, co-pays and out-of-pocket expenses paid by Transferred Employees and their respective spouses and dependents under the Sellers or any of their respective Affiliates' health plans in the calendar year in which the Closing Date occurs.

(f)    Accrued Vacation.  Buyer or its Affiliates shall provide each Transferred Employee with credit for the same number of vacation, sick days and personal days such Transferred Employee has accrued but not used in the calendar year in which the Closing Date occurs; *provided*, that to the extent required by applicable Law, such amount shall be paid by Buyer or its Affiliates to the applicable Transferred Employee in cash.  In the event that a Transferred Employee is unable to use such carried over vacation and sick days within the calendar year in which the Closing Date occurs, Buyer or its Affiliates shall allow such Transferred Employee to carry over such vacation and sick days to be used in the subsequent calendar year solely to the extent that such Transferred Employee would have had the same right to carry over such vacation and sick days pursuant to the policies of the Seller or its Subsidiaries as of the date hereof.

(g)    COBRA.  On the Closing Date, the Sellers and their Affiliates shall cease to provide health and welfare coverage to each Seller Employee and his or her covered dependents and beneficiaries, and Buyer or its Affiliate shall commence providing such coverage to Transferred Employees and his or her covered dependents and beneficiaries.  Buyer and its "buying group" (as defined in Treasury Regulation Section 54.4980B-9, Q&A-2(c)) shall be solely responsible for providing continuation coverage under COBRA to those individuals who are or become M&A qualified beneficiaries (as defined in Treasury Regulation Section 54.490B-9, Q&A-4(a)) with respect to the transactions contemplated by this Agreement. Buyer and its Affiliates shall provide coverage required by COBRA to Transferred Employees and their eligible dependents or beneficiaries under group health plans maintained by Buyer or an Affiliate of Buyer with respect to qualifying events occurring on and after the Closing Date.

(h)    Tax Reporting.  Buyer shall adopt the "***alternate procedure***" for preparing and filing IRS Forms W-2 (Wage and Tax Statements), as described in Revenue Procedure 2004-53.  Under this procedure, Buyer as the successor employer shall provide Forms W-2 to Transferred Employees reflecting all wages paid and Taxes withheld with respect to such Transferred Employees for the calendar year in which the Closing Date occurs.  The Sellers as the

48

predecessor employer shall have no employment tax reporting responsibilities for the Transferred Employees following the Closing Date.  Buyer shall also adopt the "***alternate procedure***" of Revenue Procedure 2004-53 for purposes of IRS Forms W-4 (Employee's Withholding Allowance Certificate) and W-5 (Earned Income Credit Advance Payment Certificate).

(i)     No Third Party Beneficiaries.    Without limiting the generality of Section 12.5, no provision of this Section 6.8 shall (i) be treated as an amendment of, or undertaking to amend, any benefit plan, (ii) obligate Buyer or the Sellers to retain the employment of any particular employee or (iii) confer any rights or benefits on any Third Person beneficiary or create any Third Person beneficiary or other rights in any current or former employee, independent contractor or other service provider (including any beneficiary or dependent thereof) of any Seller in respect of continued employment (or resumed employment) with either Buyer or any of, its Affiliates and no provision of this Section 6.8 shall create any rights in any such Persons in respect of any benefits that may be provided, directly or indirectly, under any Employee Plan or any plan or arrangement that may be established by Buyer or any of its Affiliates, including as to the level or duration of compensation or benefits.  No provision of this Agreement shall constitute a limitation on rights to amend, modify or terminate after the Closing Date any such plans or arrangements of the Sellers, Buyer or any of their respective Affiliates.

6.9     [Reserved].

6.10     [Reserved].

6.11     Transfer Orders; Letters in Lieu.  Prior to the Closing, the Sellers shall deliver to Buyer completed transfer orders or letters in lieu thereof, directing all purchasers of production to make payment to Buyer of proceeds attributable to Hydrocarbons constituting Acquired Interests effective as of the Closing or make other reasonable industry arrangements with Buyer and the purchasers of production for Buyer to receive payments for production after the Closing Date.

6.12     Taxes.

(a)     To the extent not exempt under the Confirmation Order or Section 1146 of the Bankruptcy Code, Buyer shall assume responsibility for, and shall bear and pay, all Transfer Taxes (if any) incurred or imposed with respect to the conveyance of the Acquired Interests to Buyer; *provided* that if any such Transfer Taxes are due prior to the Closing the Sellers shall assume responsibility for, and shall bear and pay such Transfer Taxes.  The Party required by applicable Law to file Tax Returns with respect to Transfer Taxes shall prepare and file such Tax Returns or other documents and the non-preparing Party shall cooperate therewith.

(b)     (i) The Sellers shall timely file or cause to be timely filed when due all Tax Returns that are required to be filed by or with respect to Fieldwood U.A. on or prior to the Closing Date and all Tax Returns that are required to be filed by the Sellers under applicable Law with respect to the Acquired Interests (including any Tax Returns reporting any Property-Related Taxes and Production Taxes) and, in each case, all such Tax Returns shall be prepared and filed in a manner consistent with past practice.  In each case, the Sellers shall remit or cause to be remitted any Taxes shown as due on such Tax Returns.

(ii)    Buyer shall timely file or cause to be timely filed when due (taking into account all extensions properly obtained) all other Tax Returns that are required to be filed by or with respect to Fieldwood U.A. and the Acquired Interests after the Closing Date (including any Tax Returns reporting Straddle Period Non-Income Taxes) and shall pay any Taxes shown as due on such Tax Returns. Buyer shall timely pay in full all Straddle Period Non-Income Taxes (which will not be subject to reimbursement by Sellers). Subject to the preceding sentence, the Sellers shall reimburse Buyer for (A) Retained Taxes which are remitted in respect of any Tax Return to be filed by Buyer pursuant to this <u>Section 6.12</u> or (B) Retained Taxes in respect of any Tax Return to be filed by the Sellers under this <u>Section 6.12(b)</u> which have not been paid by the Sellers and for which a taxing authority seeks payment from Buyer, in each case, up to the amount reserved for such Retained Taxes in determining the Effective Date Cash Obligations Amount, no later than ten (10) days after Buyer's written request therefor.

(iii)    The Sellers shall prepare all Tax Returns with respect to a Covered Tax and deliver a draft of each such Tax Return to Buyer for its review at least thirty (30) days prior to the date on which such Tax Return is due, and shall reflect all reasonable comments received from Buyer prior to such due date to the extent PwC (or another nationally recognized accounting firm mutually agreed upon by Sellers and Buyer) views such comments from Buyer as "more likely than not" to be upheld in the event of an audit. With respect to any Covered Tax liability payable by the Sellers, the Sellers shall notify Buyer in writing, as soon as reasonably practicable prior to the due date of such Tax liability (including any required deposit of estimated Taxes), of the amount of Covered Taxes so payable, as reasonably determined by Sellers, together with a reasonably detailed summary of such amount, including all relevant supporting workpapers and any other information reasonably requested by Buyer, and Buyer shall pay to Fieldwood Inc. the amount of such Covered Tax no later than two (2) days before such payment is due and payable.  The Sellers shall, in turn, timely remit or cause to be remitted to the applicable taxing authority the amount paid by Buyer to Sellers in the preceding sentence.  To the extent that Sellers receive any refund (or credit in lieu of a refund that actually reduces the cash Income Taxes payable by the Sellers with respect to a Post-Closing Tax Period) of Covered Taxes (including interest thereon actually received) but net of any additional Income Taxes owed by the Sellers on account of such refund or credit  (a "**Covered Tax Refund**"), Sellers shall pay or cause to be paid to Buyer such Covered Tax Refund promptly following receipt thereof; *provided* that Buyer shall not be entitled to Covered Tax Refunds to the extent such Covered Tax Refunds, in the aggregate, exceed the amount of Covered Taxes actually paid by Buyer to Sellers, in the aggregate, pursuant to this <u>Section 6.12(b)(iii)</u>.

(c)    For purposes of this Agreement, in the case of a Straddle Period, (x) all Property-Related Taxes and any exemptions, allowances and deductions with respect to such Taxes shall be allocated between the Pre-Closing Tax Period and the Post-Closing Tax Period based on the number of days of such Straddle Period included in the Pre-Closing Tax Period and the number of days of such Straddle Period included in the Post-Closing Tax Period, (y) all Production Taxes shall be allocated between the Pre-Closing Tax Period and the Post-Closing Tax Period based upon the period during which the applicable production occurred, and (z) all other

Taxes shall be allocated between the Pre-Closing Tax Period and the Post-Closing Tax Period as if such taxable period ended as of the end of the day on the final day of the Pre-Closing Tax Period.

(d)     Property-Related Taxes and Production Taxes shall be timely paid, and all applicable filings, reports and returns shall be filed as provided by applicable Law.

(e)     All Tax Sharing Agreements between the Sellers and any Affiliates of the Sellers, on the one hand, and Fieldwood U.A., Fieldwood Mexico or any Subsidiary thereof, on the other hand, will terminate as to Fieldwood U.A., Fieldwood Mexico and any Subsidiary thereof prior to the Closing Date and Fieldwood U.A., Fieldwood Mexico and such Subsidiary will not have any liability thereunder on or after the Closing Date.

(f)     Each Seller, on the one hand, and Buyer, on the other hand, will provide each other with such cooperation and information as either of them reasonably may request of the other in filing any Tax Return, claiming any refund of Taxes, determining a Liability for Taxes or a right to a refund of Taxes, or conducting any audit or other proceeding in respect of Taxes.  Such cooperation and information shall include providing copies of relevant Tax Returns or portions thereof, together with accompanying schedules, related work papers and documents relating to rulings and other determinations by Governmental Authorities.  Any information obtained under this Section 6.12 shall be kept confidential except as may be otherwise necessary in connection with the filing of Tax Returns or claims for refund or in conducting any audit or other proceeding.

6.13     Commercially Reasonable Efforts.  Subject to the terms and conditions of this Agreement, and subject to the Bankruptcy Code and any orders of the Bankruptcy Court, and without limiting any other provision of this Agreement (including Section 6.5(b)), Buyer and the Sellers each agree to use commercially reasonable efforts to take, or cause to be taken, all actions and to do, or cause to be done, all things necessary or desirable to cause the conditions precedent to Closing set forth in Article VII to be satisfied and to consummate the transactions; *provided* that the Parties understand and agree that the commercially reasonable efforts of any Party shall not be deemed to include, except as expressly set forth in this Agreement, entering into any settlement, undertaking, consent decree, stipulation or agreement with any Governmental Authority in connection with the transactions contemplated hereby; *provided*, *further* that this Section 6.13 shall not (a) limit or affect the obligation of any Party to perform any of its other obligations and covenants expressly set forth in this Agreement or (b) require any Party to incur any obligations or pay any fees or amounts to third parties not otherwise required under this Agreement or the Plan.

6.14     Insurance Policies.  Effective at or prior to Closing, the Sellers shall cause Buyer to be named as an 'additional insured' with respect to each insurance policy held by the Sellers which provides coverage with respect to any of the Acquired Interests (excluding, for the avoidance of doubt, any director and officer insurance policies).  The Sellers shall maintain such insurance policies in full force and effect until the expiration of their terms, and shall cooperate in good faith with Buyer in connection with any claim made by Buyer under any such policy.  The Sellers shall not have any obligation to renew any such insurance policies following the expiration of their terms, and from and after such expiration, Buyer will be solely responsible for maintaining such insurance as Buyer deems reasonable with respect to the Acquired Interests.

51

6.15    Novation of Hedges.  Buyer shall use commercially reasonable efforts to cause the Hedges to be novated to Buyer at Closing, and the Sellers shall reasonably cooperate with Buyer in connection with such novation; *provided* that (a) to the extent that the total volume of production hedged as of the Closing with respect to the Hedges exceeds 45,000 Boepd, Buyer may elect to (but is not required pursuant to this Section 6.15 to) use commercially reasonable efforts to novate such excess (or any portion thereof) to Buyer at Closing; (b) Buyer shall be solely responsible for any credit support or other requirements in connection with such novation; and (c) the Sellers shall not be required to pay any consideration or undertake any obligation in connection with such novation.

6.16    Qualification.  Prior to the Closing, Sellers (and their respective officers and employees) will provide commercially reasonable assistance to Buyer with respect to Buyer obtaining such qualifications as are necessary to own and, where applicable, to assume operatorship of, the Acquired Interests in all jurisdictions where the Acquired Interests are located.

6.17    Settlements with Governmental Authorities.  From the date hereof until the Closing, none of any Seller nor any of its Affiliates shall make or enter into any material non-ordinary course stipulation, settlement or other agreement with any Governmental Authority (each, a "***Governmental Settlement Agreement***") that is not in form and substance acceptable to Buyer. For the avoidance of doubt, the August 20 Settlement is in form and substance acceptable to Buyer. The Sellers shall pay all amounts due and payable under any Governmental Settlement Agreement executed by any Seller or any of its Affiliates prior to the Closing.

6.18    Operator Forms.  By no later than ten (10) days after the Execution Date, the Sellers shall have sent all applicable Third Persons all designation of operator forms (Form BOEM – 1123) designating Buyer as operator (along with all corresponding OSFR forms) with respect to each Lease or portion thereof as to which any Seller is the designated operator as of the date hereof, and Sellers shall use reasonable best efforts to obtain such executed forms from such Third Persons prior to the Closing.

6.19    [Reserved].

6.20    Bonds and Insurance.  To the extent required by applicable state and federal Governmental Authorities (and subject to compliance by the Sellers with their respective covenants under this Agreement) in connection with the transactions contemplated by this Agreement, as of the Closing or promptly thereafter (and in any case within ten (10) Business Days of the Closing) Buyer and/or Buyer 2, as applicable, will have lease bonds, area-wide bonds and surety bonds or insurance policies to the extent required by and in accordance with the requirements of such Governmental Authorities as determined by Buyer in its sole discretion.

6.21    New Equity Interests.  The Debtors, on behalf of Buyer and with Buyer's cooperation, shall cause (a) the Credit Bid and Release New Equity Interests to be received by the Persons entitled to receipt of such interests pursuant to the Plan as of the Effective Date in accordance with the Plan, and (b) the Equity Rights Offering New Equity Interests (if and when authorized pursuant to an order of the Bankruptcy Court) to be received as of the Effective Date by the Persons entitled to receipt of such interests in accordance with the Plan, the Subscription Rights, the FLTL ERO Backstop Agreement and the SLTL ERO Backstop Agreement.

6.22    Employment Agreements.  Buyer shall, in good faith, negotiate the terms of an employment agreement (each, an "***Employment Agreement***") with each of the Seller Employees identified on **Schedule 6.22** from and after the date hereof.  If terms of an Employment Agreement are mutually agreed between Buyer and a Seller Employee prior to Closing, then at (or immediately following) the Closing Buyer shall enter into an Employment Agreement with each such Seller Employee.

## ARTICLE VII
## CONDITIONS PRECEDENT TO CLOSING

7.1    Conditions Precedent of the Parties.  The obligations of the Sellers, Buyer and Buyer 2 to consummate the transactions contemplated by this Agreement are subject to the fulfillment, at or before the Closing, of each of the following conditions:

(a)    no applicable Law shall prohibit the transactions contemplated hereby or the consummation of the Closing and no suit, action or proceeding shall be pending or threatened before any court or arbitration tribunal seeking to enjoin, restrain, prohibit or declare illegal the transactions contemplated by this Agreement;

(b)    no injunction, order, decree or judgment that restrains, enjoins or prohibits the transactions contemplated in this Agreement shall be in effect;

(c)    any applicable waiting period under the HSR Act relating to the transactions contemplated hereby shall have expired or been terminated;

(d)    the Bankruptcy Court shall have entered the Disclosure Statement Order and the Confirmation Order;

(e)    each of the conditions precedent to the Effective Date shall have been satisfied (or shall become effective concurrent with the Closing Date hereunder) or waived in accordance therewith; and

(f)    (i) the Credit Bid and Release New Equity Interests shall have been, or will be on the Effective Date, received by the holders of Allowed FLTL Claims (as defined in the Plan) in accordance with the Plan and (ii) the Equity Rights Offering New Equity Interests (if and when authorized pursuant to an order of the Bankruptcy Court) shall have been, or will be on the Effective Date, received by the Persons entitled to receipt of such interests in accordance with the Plan, the Subscription Rights, the FLTL ERO Backstop Agreement and the SLTL ERO Backstop Agreement.

7.2    Sellers' Conditions Precedent.  The obligation of the Sellers to consummate the transactions contemplated by this Agreement are subject to the fulfillment, at or before the Closing, of each of the following conditions:

(a)    the representations and warranties of Buyer and Buyer 2 set forth in this Agreement shall be true and correct, as of the date hereof and as of the Closing Date, as if made at and as of such date (other than any representation and warranty expressly made as of a specific earlier date, which shall have been true and correct as of such earlier date), except for those failures

53

**QNE EX. NO. 06**
**Page 62 of 170**

to be true and correct that, individually or in the aggregate, would not adversely affect in any material respect the ability of Buyer and Buyer 2 to consummate the transactions contemplated by this Agreement;

(b)        Each of Buyer and Buyer 2 shall have performed and fulfilled in all material respects each covenant, agreement and condition required by this Agreement to be performed or fulfilled by Buyer or Buyer 2, as applicable, at or before the Closing;

(c)        the Effective Date Cash Obligations Amount shall have been agreed in amounts acceptable to Sellers acting in good faith; and

(d)        Each of Buyer and Buyer 2 shall have executed and delivered all documents required to be executed and delivered by Buyer or Buyer 2, as applicable, as set forth in Section 9.2.

The foregoing conditions of this Section 7.2 are for the sole benefit of the Sellers and may be waived by the Sellers, in whole or in part, at any time and from time to time in the sole discretion of the Sellers. The failure by the Sellers at any time to exercise any of their rights hereunder shall not be deemed a waiver of any such right and each such right shall be deemed an ongoing right which may be asserted at any time and from time to time.

7.3    Buyers' Conditions Precedent.    The obligation of Buyer and Buyer 2 to consummate the transactions contemplated by this Agreement are subject to the fulfillment, at or before the Closing, of each of the following conditions:

(a)        (i) each of the Fundamental Representations of each Seller shall be true and correct in all respects, except for *de minimis* inaccuracies, as of the date hereof and as of the Closing Date, as if made at and as of such date (other than any representation and warranty expressly made as of a specific earlier date, which shall have been true and correct as of such earlier date), (ii) the representations and warranties of each Seller set forth in each of Section 4.22(a), Section 4.32 and Section 4.33 shall (disregarding any qualifications or exceptions set forth therein relating to Material Adverse Effect or "materiality" or any similar qualification or standard) be true and correct in all material respects, as of the date hereof and as of the Closing Date, as if made at and as of such date (other than any representation and warranty expressly made as of a specific earlier date, which shall have been true and correct in all material respects as of such earlier date), and (iii) all other representations and warranties of each Seller set forth in Article IV of this Agreement shall (disregarding any qualifications or exceptions set forth therein relating to Material Adverse Effect or "materiality" or any similar qualification or standard) be true and correct, as of the date hereof and as of the Closing Date, as if made at and as of such date (other than any representation and warranty expressly made as of a specific earlier date, which shall have been true and correct as of such earlier date) except in the case of this clause (iii), for those failures to be true and correct that would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect (excluding in the case of each of clauses (i), (ii) and (iii), if the Completion Date (as defined in the Mexico PSA) has occurred prior to the Closing Date, the representations and warranties in Section 4.31 relating to the Assets (as defined in the Mexico PSA));

54

(b)      each Seller shall have performed and fulfilled in all material respects each covenant, agreement and condition required by this Agreement to be performed or fulfilled by such Seller at or before the Closing;

(c)      each Seller shall have executed and delivered all documents required to be executed and delivered by such Seller as set forth in Section 9.2;

(d)      no Default or Event of Default (each as defined in the DIP Credit Agreement) under the DIP Credit Agreement shall have occurred and be continuing;

(e)      the Restructuring Support Agreement shall not have been terminated with respect to any party thereto;

(f)      the conditions precedent under each of the Backstop Commitment Letters shall have been satisfied or waived;

(g)      the Plan confirmed by the Confirmation Order shall be in substantially the same form and substance as the plan confirmed by the Bankruptcy Court at Docket No. 1751-1, as may be amended, modified or supplemented from time to time in accordance with the Restructuring Support Agreement or as otherwise consented to by or on behalf of Buyer;

(h)      at least five (5) Business Days prior to the Closing Date, the Bankruptcy Court shall have approved and authorized the assumption and assignment of each material Assigned 365 Contract pursuant to Section 365 of the Bankruptcy Code through entry of an order and all such material Assigned 365 Contracts shall have been duly assigned to Buyer at or prior to the Closing;

(i)      all Assigned 365 Contracts that require novation and are set forth on **Schedule 7.3(i)** will have been novated to Buyer;

(j)      the aggregate Allocated Values of all Acquired Interests treated as Delayed Assets pursuant to Section 2.3(b), Section 2.4 and Section 2.5, together with the aggregate Allocated Values of all Acquired Interests with respect to which a bona fide Preferential Right is validly exercised prior to the Closing, shall not be greater than $100,000,000;

(k)      all Governmental Approvals set forth on **Schedule 7.3(l)** shall have been obtained and delivered to Buyer and such Governmental Approvals shall be in full force and effect;

(l)      since the Execution Date, no Material Adverse Effect (or any result, event, occurrence, change, circumstance, consequence or development that, individually or in the aggregate, would reasonably be expected to result in a Material Adverse Effect) shall have occurred;

(m)      any agreements between Buyer and the Plan Administrator (as defined in the Plan) shall be reasonably acceptable to Buyer;

(n)    Buyer shall have obtained all qualifications required to assume operatorship of the Leases operated by a Seller as of immediately prior to the Closing in all jurisdictions where such Leases are located, all of which qualifications shall be in full force and effect; and

(o)    the Effective Date Cash Obligations Amount shall have been agreed in amounts acceptable to Buyer acting in good faith.

The foregoing conditions of this <u>Section 7.3</u> are for the sole benefit of Buyer and Buyer 2 and may be waived by Buyer or Buyer 2, as applicable, in whole or in part, at any time and from time to time in the sole discretion of Buyer and Buyer 2. Determination, on behalf of Buyer and Buyer 2, with respect to whether the conditions precedent set forth in <u>Section 7.1</u> and this <u>Section 7.3</u> have been satisfied shall be made by Buyer and Buyer 2 at the direction of the Required Lenders.   The failure by Buyer or Buyer 2 at any time to exercise any of its rights hereunder shall not be deemed a waiver of any such right and each such right shall be deemed an ongoing right which may be asserted at any time and from time to time.

# ARTICLE VIII
# RIGHT OF TERMINATION AND ABANDONMENT

8.1    <u>Termination</u>.  This Agreement may be terminated by written notice at any time before the Closing:

(a)    by mutual written consent of the Sellers and Buyer;

(b)    by the Sellers, on one hand, or by Buyer, on the other hand:

(i)    if the Closing shall not have been consummated on or before August 31, 2021 (as such date may be extended by mutual written agreement of the Parties, the "***End Date***"); *provided* that the right to terminate this Agreement pursuant to this <u>Section 8.1(b)(i)</u> shall not be available to any Party (A) who is then in material breach of any of its material agreements, covenants, representations or warranties contained herein or (B) whose breach of any provision of this Agreement is the proximate cause of the failure of the Closing to be consummated before the End Date;

(ii)    if there shall be any applicable Law that makes consummation of the transactions contemplated by this Agreement illegal or otherwise prohibited or if consummation of such transactions would violate any final order of any Governmental Authority having competent jurisdiction;

(iii)    for any reason, Buyer is unable, pursuant to Section 363(k) or Section 1123(a) of the Bankruptcy Code, to credit bid in payment of all or any portion of the Consideration as set forth in <u>Section 2.1</u> (other than the Assumed Liabilities);

(iv)    the Bankruptcy Court shall have entered an order dismissing, or converting into cases under Chapter 7 of the Bankruptcy Code, any of the cases commenced by the Sellers under Chapter 11 of the Bankruptcy Code and comprising part of the Bankruptcy Cases; or

56

(v)      any of the Sellers shall have entered into any agreement with respect to any Alternative Transaction (consistent with the fiduciary duties of the officers and directors of the Sellers) or if the Bankruptcy Court shall have approved any such Alternative Transaction;

(c)      by Buyer if:

(i)      the Sellers shall have breached any of their representations and warranties, or shall have failed to perform or comply with any of their covenants and agreements contained in this Agreement and such breach or failure to perform or comply (A) would result in the Sellers being unable to satisfy a condition set forth in <u>Section 7.3</u> and (B) is not cured within ten (10) Business Days after Buyer notifies the Sellers of such breach or failure to perform or comply in writing; *provided*, that Buyer shall not have a right of termination pursuant to this <u>Section 8.1(c)(i)</u> if Buyer is then in material breach of any of its material agreements, covenants, representations or warranties contained herein;

(ii)      any of the Sellers, without the prior consent of Buyer, enter into a definitive agreement with respect to the sale of any material Acquired Interests (excluding sales of Hydrocarbons in the ordinary course of business) or any interest in any of the Leases (other than, for the avoidance of doubt, the Mexico PSA);

(iii)      the Restructuring Support Agreement shall have been terminated with respect to any party thereto; *provided*, that the right to terminate this Agreement pursuant to this <u>Section 8.1(c)(iii)</u> shall not be available to Buyer if any Consenting Creditor's breach of any provision of the Restructuring Support Agreement is the proximate cause of the termination of the Restructuring Support Agreement;

(iv)      any Event of Default (as defined in the DIP Facility Credit Agreement) under the DIP Facility Credit Agreement shall have occurred and be continuing;

(v)      the Equity Rights Offerings are not consummated;

(vi)      the Disclosure Statement Order or the Confirmation Order shall have been stayed, vacated, reversed or materially modified or amended by the Bankruptcy Court or another court of competent jurisdiction at any time without the prior written consent of Buyer; or

(vii)      any Seller seeks to have the Bankruptcy Court enter an order dismissing, or converting into cases under Chapter 7 of the Bankruptcy Code, any of the cases commenced by the Sellers under Chapter 11 of the Bankruptcy Code and comprising part of the Bankruptcy Cases, or if a trustee in the Bankruptcy Cases or a responsible officer or an examiner with enlarged powers is appointed (other than a fee examiner) relating to the operation of the Sellers' businesses pursuant to Section 1104 of the Bankruptcy Code, or such an order of dismissal, conversion or appointment is entered; and

(d)      by the Sellers if:

57

(i)      Buyer or Buyer 2 shall have breached any of its representations and warranties, or shall have failed to perform or comply with any of its covenants and agreements contained in this Agreement and such breach or failure to perform or comply (A) would result in Buyer or Buyer 2, as applicable, being unable to satisfy a condition set forth in Section 7.2 and (B) is not be cured within ten (10) Business Days after the Sellers notify Buyer of such breach or failure to perform or comply in writing; *provided*, that the Sellers shall not have a right of termination pursuant to this Section 8.1(d)(i) if any Seller is then in material breach of any of its material agreements, covenants, representations or warranties contained herein;

(ii)      Any of the Backstop Commitment Letters is terminated and Buyer has not, within thirty (30) days following the termination of such Backstop Commitment Letter, entered into a definitive written agreement with respect to committed financing or other arrangement in an amount at least equal to that provided by such Backstop Commitment Letter (as of the date hereof) and otherwise in form and substance reasonably acceptable to Sellers; or

(iii)      the Equity Rights Offerings are not consummated and Buyer has not, within thirty (30) days following the failure of the Equity Rights Offerings to be consummated, entered into a definitive written agreement with respect to committed financing or other arrangement in an amount at least equal to the amount that would have been provided by the Equity Rights Offerings and otherwise in form and substance reasonably acceptable to Sellers.

Each termination trigger set forth in this Section 8.1, pursuant to which this Agreement may be terminated shall be considered separate and distinct from each other such termination trigger.  If more than one of the termination triggers set forth in this Section 8.1 are applicable, the applicable Party shall have the right to choose the termination trigger pursuant to which this Agreement is to be terminated.  Any Party desiring to terminate this Agreement pursuant to this Section 8.1 shall give written notice of such termination to the other Party.

8.2     Remedies.  In the event of termination of this Agreement by Buyer or the Sellers pursuant to this Article VIII, this Agreement shall become null and void and have no effect and all rights and obligations of the Parties under this Agreement shall terminate without any Liability of any Party to any other Party except the provisions of this Section 8.2, Section 12.1, Section 12.8 and **Annex I** (and, to the extent applicable to the interpretation or enforcement of such provisions, Article XII) shall expressly survive the termination of this Agreement.

8.3     Specific Performance.  The Parties agree that irreparable damage for which monetary damages, even if available, would not be an adequate remedy would occur in the event any provisions of this Agreement were not performed in accordance with the terms hereof (including failing to take such actions as are required hereunder in order to consummate the transactions contemplated hereby) or were otherwise breached and that the Parties shall be entitled to injunctive relief, specific performance and other equitable relief to prevent breaches (or threatened breaches) of this Agreement and to enforce specifically the performance of the provisions hereof.  Any Party seeking an injunction to prevent breaches of this Agreement and to enforce specifically the provisions of this Agreement shall not be required to provide any bond or

58

other security in connection with any such order or injunction. The rights set forth in this <u>Section 8.3</u> shall, subject to <u>Section 8.2</u>, be in addition to any other rights which a Party may have at law or in equity pursuant to this Agreement.

# ARTICLE IX
# CLOSING

9.1     <u>Date of Closing</u>.  Subject to satisfaction (or waiver by the required Party) of the conditions to Closing set forth in <u>Article VII</u> (other than those conditions that by their nature cannot be satisfied until the time of Closing, but subject to the satisfaction (or waiver by the requisite Party) of those conditions), the Closing shall occur on the Effective Date (the "***Closing Date***"). Notwithstanding the foregoing, the Parties may agree in writing to such other date or time for Closing to take place and such other date or time shall be the "***Closing Date***" as such term is defined herein.  The Closing shall take place through electronic means of communication on the Closing Date.

9.2     <u>Closing Obligations</u>.  At Closing, the Parties (as applicable) shall take, or cause to be taken, the following actions, each being a condition precedent to the others and each being deemed to have occurred simultaneously with the others:

(a)     The Sellers and Buyer shall deliver to one another duly executed counterpart signature pages to each Transfer Document to which they are a party, in sufficient numbers of duly executed and acknowledged original counterparts to facilitate, to the extent appropriate, recording in all relevant jurisdictions;

(b)     The Sellers shall deliver to Buyer the JV Assignment Agreements duly executed by the applicable Sellers;

(c)     [Reserved];

(d)     The Sellers shall deliver to Buyer a certificate, dated and effective as of the Closing Date, executed by an authorized officer of each Seller, certifying to Buyer that, on the Closing Date, the conditions set forth in <u>Section 7.3(a)</u> and <u>Section 7.3(b)</u> have been satisfied;

(e)     Buyer shall deliver to the Sellers a certificate, dated and effective as of the Closing Date, executed by an authorized officer of each of Buyer and Buyer 2, certifying to the Sellers that, on the Closing Date, the conditions set forth in <u>Section 7.2(a)</u> and <u>Section 7.2(b)</u> have been satisfied;

(f)     Each Seller shall deliver to Buyer a statement that satisfies the requirements of Treas. Reg. §1.1445-2(b)(2), certifying that such Seller is not a foreign person within the meaning of Section 1445(f)(3) or Section 1446(f)(2) of the Code;

(g)     Buyer shall deliver by wire transfer of immediately available funds an amount in cash equal to the Cash Portion, to one or more accounts designated by the Sellers (which shall be designated by the Sellers at least two (2) days prior to Closing);

59

(h)     Sellers shall pay the Cure Costs out of the Closing Cash Amount and/or the Cash Portion in accordance with an order of the Bankruptcy Court;

(i)     Buyer shall deliver to Fieldwood the GUC Warrants and the SLTL Warrants for distribution by Fieldwood pursuant to the Plan;  and

(j)     Sellers shall deliver to Buyer (i) a duly executed stock transfer power with respect to the transfer of the White Shoals Equity to Buyer and (ii) if certificated, any stock certificates in the possession of Sellers with respect to the White Shoals Equity.

## ARTICLE X
## POST-CLOSING OBLIGATIONS AND COVENANTS

10.1     Field Data and Records.  Within ten (10) Business Days after the Closing, pursuant to Buyer's reasonable instructions, the Sellers shall deliver to Buyer any Field Data or Records that are not maintained in the Office Assets.  Buyer shall be entitled to all original Field Data and Records.  Within ten (10) Business Days after the Closing, the Sellers may make and retain, at the Sellers' expense, copies of any Field Data and Records (except to the extent prohibited by Contract where Buyer obtains the originals thereof).

10.2     Suspense Funds; Prepaid JOA Funds.

(a)     To the extent that as of Closing, any Seller holds Suspense Funds or Undisbursed Revenue relating to the Acquired Interests (excluding Prepaid JOA Funds) the Sellers shall deliver to Buyer at Closing such Suspense Funds and Undisbursed Revenue and an accounting of such Suspense Funds and Undisbursed Revenue and Buyer shall from and after such time be responsible for the application of such Suspense Funds and Undisbursed Revenue under the applicable operating or other agreement governing the application of such Suspense Funds and Undisbursed Revenue.  The Sellers shall remain liable, and shall be solely responsible, for (i) the disbursement of all funds owed to Persons (including any Suspense Funds) that are not paid or disbursed to Buyer at Closing and (ii) all Liabilities with respect to any misapplication of any Suspense Funds (or any escheat or other Laws related thereto) as to any period of time at or before the Closing Date; such Liabilities and responsibilities shall be considered Retained Liabilities.

(b)     To the extent that as of Closing, any Seller holds funds received by the Sellers (in their capacity as operator of any Acquired Interests) on account of working interest owners in the Acquired Interests as prepayments for items under operating or other agreements ("***Prepaid JOA Funds***"), the Sellers shall deliver to Buyer at Closing such Prepaid JOA Funds and an accounting of each of such prepayments and Buyer shall from and after Closing be responsible for the application of such Prepaid JOA Funds under the applicable operating or other agreement pursuant to which such Prepaid JOA Funds were collected.  The Sellers shall remain liable, and shall be solely responsible, for (i) the disbursement of all funds owed to Persons (including any Prepaid JOA Funds) that are not paid or disbursed to Buyer at Closing and (ii) all Liabilities with respect to any misapplication of Prepaid JOA Funds (or any escheat or other Laws related thereto) as to any period of time at or before the Closing Date; such Liabilities and responsibilities shall be considered Retained Liabilities.

60

10.3    Post-Closing Asset Reconciliation.

(a)    After the Closing Date, Buyer and the Sellers shall execute and deliver, or shall cause to be executed and delivered, from time to time such further instruments of conveyance and transfer, and shall take such other actions as Buyer or the Sellers may reasonably request, to convey and deliver the Acquired Interests to Buyer, to perfect Buyer's title thereto and to accomplish the orderly transfer of the Acquired Interests to Buyer.

(b)    In the event that at any time, or from time to time following the Closing Date, any (i) Acquired Interest is found to have been retained by the Sellers or any of their Affiliates (each a "***Non-Transferred Asset***"), then the Sellers shall transfer, or shall cause such Affiliate to transfer, with any necessary prior consent from any Third Person or Governmental Authority, such Non-Transferred Asset to Buyer as soon as practicable, or an Affiliate thereof as designated by Buyer, and to forward or remit to Buyer, or an Affiliate thereof as designated by Buyer, any payments actually received by the Sellers on account of any such Non-Transferred Asset from the Closing until the time such Non-Transferred Asset is transferred to Buyer; *provided*, that Buyer shall pay to the Sellers the amount of any expenses or payables actually paid by the Sellers on account of any such Non-Transferred Asset from the Closing until the time such Non-Transferred Asset is transferred to Buyer (which may be netted by the Sellers against amounts received on account of such Non-Transferred Asset).  Prior to any such transfer, the Sellers shall hold such Non-Transferred Asset in trust for Buyer.

(c)    In the event of a transfer pursuant to clause (b) of this Section 10.3, Buyer or an Affiliate thereof and the Sellers or an Affiliate thereof shall execute and deliver, or cause to be executed and delivered, to the other Party as soon as practicable any conveyances, notices, assumptions, releases and acquittances and such other instruments, and shall take such further actions, as may be necessary or appropriate to fully and effectively transfer, assign and convey unto Buyer or an Affiliate thereof, all of the properties, rights, titles, interests, estates, remedies, powers and privileges intended to be conveyed to Buyer or an Affiliate thereof, and to otherwise make effective the transactions contemplated hereby, and to confirm Buyer's (or its Affiliate's) title to or interest in and to such Non-Transferred Asset, and to put Buyer or its Affiliate in actual possession and operating control thereof.

(d)    For the avoidance of doubt, this Section 10.3 does not apply to any Delayed Assets retained by a Seller at the Closing.

10.4    Assignments; Operatorship.

(a)    Sellers will prepare and execute, and Buyer will execute, at or before the Closing, all Transfer Documents necessary to convey to Buyer the Acquired Interests granted by a Governmental Authority in the form as prescribed by the applicable Governmental Authority and otherwise reasonably acceptable to Buyer and the Sellers.

(b)    At the Closing, each Seller shall, as applicable, deliver to Buyer or its Representatives (i) letters of the appointment of agent and designations of operator (Form BOEM-1123) for each portion of the Field Assets which such Seller is the designated operator, (ii) designations of applicant (Form BOEM-1017), for each Field Asset (or portion thereof) for which

61

a Seller is the Designated Applicant, (iii) Form BOEM-1125 for each Seller which is a Designated Applicant for a Field Asset. Promptly after Closing, each Seller, as applicable, shall deliver to Buyer (i) designations of operator (Form BOEM-1123) for each portion of the Field Assets (or portion thereof) for which a third party is the designated operator, (ii) designations of applicant (Form BOEM-1017), for each Field Asset (or portion thereof) for which a third party is the Designated Applicant. Upon approval of any Transfer Document submitted, in the event as part of the assignment submittal Buyer designated a Seller as the Designated Operator, Seller and Buyer shall coordinate to promptly submit designations of operator (Form BOEM-1123) to reflect QNE as the designated operator. With respect to any Field Assets operated by a Seller and as to which the Sellers do not control the selection of the successor operator ("***Operated Assets***"), promptly after Closing the applicable Seller shall notify its co-owners of its resignation as operator in accordance with the terms of the applicable operating agreement, will cast its vote in favor of Buyer (if allowed by the applicable agreement), and will use commercially reasonable efforts to obtain the votes of the other owners of Working Interests in such Field Assets, in each case in favor of the designation of Buyer as successor operator of such Field Assets effective as of the Closing Date. Within five (5) days after the later of the Closing Date or the date on which Buyer is named successor operator under the terms of the applicable Contract, the Sellers and Buyer shall make all necessary filings for the Operated Assets, including the Transfer Documents and any BOEM designation of operator (Form BOEM-1123) and designated applicant designations (Form BOEM-1017), and take all other actions necessary to cause the designation of Buyer as the successor operator of (and, as applicable, the designated applicant under OSFR for), such Operated Assets to be recognized and, if required, approved by all relevant Governmental Authorities. Upon Buyer's receipt of its Certificate of Financial Responsibility, the Parties shall cooperate so that Buyer is the Designated Applicant for all Field Assets for which as Seller is the Designated Applicant. In each case, the Sellers shall use commercially reasonable efforts to assist Buyer in assuming the timely operation and management of the Field Assets. Each of the Sellers' covenants in this Section 10.4(b) is subject to the accuracy at Closing of Buyer's representations in Section 5.9. Each of Buyer's covenants in this Section 10.4(b) is subject to Buyer's receipt from the Sellers and Third Persons of all such required designations and forms

(c)     Each Party agrees that any instruments, forms and filings (including any BOEM or BSEE assignments, change of name, change of qualification, designation of operator forms and designated applicant OSFR form designations and any instruments, forms and filings required by BSEE) that may be required by BOEM or BSEE in connection with the implementation of the Divisive Merger, any assignments by or in favor of and any other merger or name change of a Seller or Fieldwood Energy I, Fieldwood Energy III (and its affiliates and subsidiaries) or Fieldwood Energy IV LLC or any change to a Seller's qualifications with BOEM shall not be submitted to BOEM or BSEE until after BOEM or BSEE, as applicable, has approved instruments, forms and filings (including any BOEM or BSEE assignments, designation of operator forms and OSFR form designation, and any instruments, forms and filings required by BSEE) that are necessary for BOEM or BSEE, as applicable, to designate, recognize and appoint under all applicable Law, Leases, Easements and Contracts Buyer as owner of (and, as applicable, the designated operator of and/or the designated applicant under OSFR for) the Field Assets.

10.5     Confidentiality.  Following the Closing, the Sellers agree not to, and to cause their respective Affiliates and Representatives not to, use or disclose any confidential or non-public information concerning the Acquired Interests or the business affairs of Buyer and its Affiliates,

including as it relates to the Acquired Interests, or the Assumed Liabilities ("**Confidential Information**") except disclosure of Confidential Information that (a) is lawfully obtained after Closing from a source that, to the Knowledge of the Sellers, was not under an obligation of confidentiality to Buyer with respect to such information, (b) is disclosed or becomes available to the public without any breach by the Sellers of the terms of this Section 10.5, (c) is or may be necessary to wind down any of the Sellers' bankruptcy estates, or in connection with the enforcement of the rights of, or the defense of any Claim against or involving, any Seller provided that, in each case, the Confidential Information is afforded confidential treatment, (d) to the extent it relates to any Excluded Assets or (e) is or may be necessary in connection with the Bankruptcy Cases provided that the Confidential Information is afforded confidential treatment. Notwithstanding the foregoing, a Seller may disclose Confidential Information if such Seller believes (after consultation with counsel) it is legally required to make such disclosure in order to comply with Laws or legal, judicial or administrative process (including in connection with the Bankruptcy Cases).  If a Seller or any of its Representatives becomes required (including by deposition, interrogatory, request for documents, subpoena, civil investigative demand or similar process) or it becomes necessary in connection with the Bankruptcy Cases to disclose any of the Confidential Information, such Seller or Representative shall use reasonable efforts to provide Buyer with prompt notice, to the extent allowed by Law, of such requirement, and, to the extent reasonably practicable, cooperate with Buyer to obtain a protective order or similar remedy to cause such information not to be disclosed, including interposing all available objections thereto, such as objections based on settlement privilege; *provided*, that, in the event that such protective order or other similar remedy is not obtained, such Seller shall, or shall cause such Representative to, furnish only that portion of such information that has been legally compelled, and shall, or shall cause its Representative (as applicable) to, exercise its commercially reasonable efforts, at Buyer's expense, to obtain assurance that confidential treatment will be accorded such disclosed information.

10.6   Seller Marks License.  Each Seller hereby grants to Buyer and its Affiliates a limited, non-exclusive, royalty-free, worldwide license, effective as of the Closing Date and terminating one (1) year thereafter, to use the Seller Marks solely (a) in connection with the Acquired Interests in the same manner, and with the same standards of quality, as used by the Sellers immediately prior to Closing or (b) as necessary to wind down the use of, and transition away from the use of, the Seller Marks.  Buyer and its Affiliates shall use their respective commercially reasonable efforts to wind down the use of, and transition away from the use of, the Seller Marks reasonably promptly after the Closing Date.

10.7   Power of Attorney.  Each Seller hereby constitutes and appoints, effective as of the Closing Date, Buyer and its successors and assigns as the true and lawful attorney of such Seller with full power of substitution in the name of Buyer, or in the name of such Seller but for the benefit of Buyer, (a) to collect for the account of Buyer any items of Acquired Interests and (b) to institute and prosecute all proceedings which Buyer may in its sole discretion deem proper in order to assert or enforce any right, title or interest in, to or under the Acquired Interests, and to defend or compromise any and all actions, suits or proceedings in respect of the Acquired Interests.  Buyer shall be entitled to retain for its own account any amounts collected pursuant to the foregoing powers, including any amounts payable as interest in respect thereof.

10.8    No Successor Liability.  The Parties intend that, upon the Closing, Buyer shall not be deemed to:  (a) be the successor of, or related person, successor in interest or successor employer (as described under any applicable Law) to, any Seller or any of its Affiliates, predecessors, successors or assigns, including, with respect to any Employee Plans, other than the Assumed Employee Plans to the extent set forth in Section 6.8; (b) have, de facto or otherwise merged into any Seller or any of its Affiliates, predecessors, successors or assigns; (c) be a mere continuation or substantial continuation of any Seller or any of its Affiliates, predecessors, successors or assigns or the enterprise(s) of any Seller or any of its Affiliates, predecessors, successors or assigns; or (d) other than as expressly set forth in this Agreement, be liable for any acts or omissions of any Seller or any of its Affiliates, predecessors, successors or assigns in the current or former conduct of the business of the Sellers relating to the Acquired Interests or arising under or related to the Acquired Interests.  Without limiting the generality of the foregoing, and except as otherwise expressly provided in this Agreement, the Parties intend that Buyer shall not be liable for any Encumbrances (except Permitted Encumbrances (except for the Fieldwood U.A. Interests and the JV Interests, which shall not have any Permitted Encumbrances other than pursuant to the Mexico PSA)) against any Seller or any of its Affiliates, predecessors, successors or assigns, and Buyer shall have no successor or vicarious liability of any kind or character whether known or unknown as of the Closing Date, or whether fixed or contingent, whether now existing or hereafter arising, with respect to the Acquired Interests or any Liabilities of the Sellers arising prior to or after the Closing Date other than the Assumed Liabilities and Permitted Encumbrances (except for the Fieldwood U.A. interests and the JV Interests, which shall not have any Permitted Encumbrances other than pursuant to the Mexico PSA).  The Parties agree that the provisions substantially in the form of this Section 10.8 shall be reflected in the Confirmation Order.

10.9    Access to Records.

(a)    On and after the Closing Date, each Seller will, and will cause its Affiliates, successors and assigns and Representatives to, afford promptly to Buyer and its agents reasonable access to its books of account, financial and other records (including accountant's work papers), information, employees and auditors to the extent necessary or useful for Buyer in connection with any audit, investigation, dispute or litigation or any other reasonable business purpose relating to the Acquired Interests or the Assumed Liabilities; *provided* that any such access by Buyer shall not unreasonably interfere with the conduct of the business of such Seller.

(b)    Buyer agrees that, following the Closing, and subject to applicable Law and any confidentiality restrictions to third parties, and except as may be necessary to protect any applicable legal privilege, it shall (and shall cause its Subsidiaries to) give to the Sellers and their Representatives reasonable access during normal business hours to the Records pertaining to any and all periods prior to and including the Closing Date, to the extent useful or necessary for the Sellers in connection with any audit, investigation, dispute or litigation relating to the Seller's prior ownership of the Acquired Interests or the Assumed Liabilities, as the Sellers and their Representatives may reasonably request; *provided* that any such access by the Sellers shall not unreasonably interfere with the conduct of business of Buyer.

10.10    Payment of Assumed Liabilities.  If, from and after the Closing Date, any Seller or their respective Affiliates receives an invoice from a third party for payment of amounts that constitute Assumed Liabilities, such Seller may deliver such invoice to Buyer for payment and

Buyer shall pay such invoice promptly and in any event within thirty (30) days of Buyer's receipt of such invoice from such Seller; *provided*, that for the avoidance of doubt, that if any such invoice covers amounts that are not Assumed Liabilities, as well as amounts that are Assumed Liabilities, Buyer shall only be required by this <u>Section 10.10</u> to pay that portion of the amounts invoiced that constitute Assumed Liabilities.

10.11    <u>Payment of Retained Liabilities</u>.  If, from and after the Closing Date, Buyer or its Affiliates receives an invoice from a third party for payment of amounts that constitute Retained Liabilities, Buyer may deliver such invoice to the Sellers for payment and the Sellers shall pay such invoice promptly and in any event within thirty (30) days of the Sellers' receipt of such invoice from Buyer; *provided*, that (a) for the avoidance of doubt, that if any such invoice covers amounts that are not Retained Liabilities, as well as amounts that are Retained Liabilities, the Sellers shall only be required by this <u>Section 10.11</u> to pay that portion of the amounts invoiced that constitute Retained Liabilities, (b) Sellers will not be required to pay any such Retained Liability to the extent such Retained Liability has been satisfied, compromised, settled, released or discharged pursuant to the Plan and the Confirmation Order or is otherwise subject to a different specified treatment pursuant to the Plan and (c) this <u>Section 10.11</u> will not limit Sellers' right to exercise or pursue any counterclaim, right to setoff or other defense of Sellers with respect to such Retained Liability.

10.12    <u>Accounts Receivables</u>.

(a)    On the Closing Date, Fieldwood shall deliver to Buyer a statement setting forth the names of the obligor and the amount of each Closing Accounts Receivable (or amounts as known as of the Closing) (as such statement may be modified or supplemented from time to time within ninety (90) days after the Closing Date by written notice of Fieldwood to Buyer, the "***Closing Accounts Receivables Statement***").

(b)    From and after the Closing until the date that is 365 days following the Closing (the "***AR Collections Period***"), if Buyer so requests, Fieldwood shall collect the Closing Accounts Receivable for the benefit of Buyer and Fieldwood shall use the same level of efforts in the collection of the Closing Accounts Receivable that Fieldwood uses in the collection of its own accounts receivables; *provided* that (i) Fieldwood may settle any Closing Accounts Receivable by setoff (each such setoff, an "***Accounts Receivable Setoff***") of any amounts owed by the obligor thereunder against any amount that Fieldwood or any of its Subsidiaries owes to such obligor, to the extent (A) such Accounts Receivable Setoff is permitted under applicable Law and (B) Fieldwood delivers to Buyer (as set forth in <u>Section 10.12(c)</u>) an amount in cash equal to the amount of such Closing Accounts Receivable actually collected by such Accounts Receivable Setoff, (ii) Fieldwood must obtain the prior written consent of Buyer to settle (whether in cash or by way of an Accounts Receivable Setoff) any Closing Accounts Receivable for an amount less than the applicable amount set forth on the Closing Accounts Receivables Statement, (iii) without limiting Fieldwood's other obligations in this Agreement neither Fieldwood nor any of its Subsidiaries shall be required to incur any out-of-pocket expenses or admit or consent to any liability or obligation in connection with the collection of any Closing Accounts Receivable and (iv) Fieldwood shall not have any obligation to commence any litigation or other legal proceeding in connection with the collection of any Closing Accounts Receivable. Each Party acknowledges that Fieldwood is making efforts to collect the Closing Accounts Receivable hereunder solely

pursuant to a contractual relationship on an arm's length basis and that the Parties do not intend that Fieldwood act or be responsible as a fiduciary to Buyer, any holders of Claims or any other Person, and expressly disclaim any such fiduciary relationship, whether between or among Buyer, on the one hand, and Fieldwood or any Seller, on the other hand.   Buyer acknowledges that Fieldwood's obligations pursuant to this <u>Section 10.12</u> (including Fieldwood Energy I's obligations under <u>Section 10.12(e)</u>) will be undertaken by Buyer pursuant to and in accordance with the TSA.  Fieldwood shall be liable to Buyer (as set forth in <u>Section 10.12(c)</u>) for any Closing Accounts Receivable actually collected by Fieldwood (including as set off by Accounts Receivable Setoff) pursuant to this <u>Section 10.12</u>, and shall indemnify Buyer on a dollar-for-dollar basis for any Closing Accounts Receivable that are actually collected by Fieldwood (including as set off by Accounts Receivable Setoff) but not paid to Buyer pursuant to <u>Section 10.12(c)</u>. In the case of an Accounts Receivable Setoff, the date of such Accounts Receivable Setoff shall be the earlier of (i) the date notice of such Accounts Receivable Setoff is delivered to Buyer pursuant to this <u>Section 10.12(b)</u> and (ii) the date such Accounts Receivable Setoff is reflected on the books of Fieldwood or any of its Subsidiaries.

(c)     Prior to the tenth (10th) calendar day following the end of each calendar month occurring after the Closing Date and through the month in which the end of the AR Collections Period occurs, Fieldwood shall promptly deliver the amount of any and all cash collected in respect of Closing Accounts Receivables and the amount of any and all Accounts Receivable Setoffs (collectively, the "***Accounts Receivable Collections***") to Buyer, together with a statement setting forth the aggregate amount of all the Accounts Receivable Collections.

(d)     On the date that is fifteen (15) calendar days after the end of the month in which the AR Collections Period ends, Fieldwood shall (i) deliver to Buyer a statement setting forth (A) the names of the obligor and amount of each Closing Accounts Receivable that remains uncollected, whether by cash or setoff (collectively, the "***Remaining Accounts***"); and (B) the aggregate amount of all of the Remaining Accounts receivables; and (ii) from and after the AR Collections Period, Fieldwood shall have no further obligation under this <u>Section 10.12</u> to make efforts to collect the Remaining Accounts; *provided*, *however*, for the avoidance of doubt, if Buyer so requests, Fieldwood or its Subsidiaries may elect to collect any of the Remaining Accounts after the expiration of the AR Collections Period, and if Fieldwood so elects, Fieldwood shall pay such amounts over to Buyer, and Fieldwood shall be liable to Buyer for, and shall indemnify Buyer on a dollar-for-dollar basis for, any Remaining Accounts actually collected by Fieldwood pursuant to this <u>Section 10.12</u>.

(e)     Each of the Sellers and Buyer acknowledges and agrees that in connection with, and from and after, the consummation of the Divisive Merger, Fieldwood's obligations and liabilities (including indemnification obligations) under this <u>Section 10.12</u> will vest in and be allocated to (i) Fieldwood Energy I (in the case of Closing Accounts Receivable attributable to the FWE I Assets) or (ii) Fieldwood Energy III or Fieldwood Energy IV LLC, as applicable, (in the case of Closing Accounts Receivable other than those attributable to the FWE I Assets).

10.13   <u>Directors' and Officers' Indemnification</u>.

(a)     From and after Closing, Buyer shall indemnify, defend and hold harmless (i) each individual Person who is, as of the Closing Date, a director, officer or manager of any

66

Seller, and (ii) Matt McCarroll with respect to his service, prior to the Closing Date, as a director, officer or manager (as applicable) of the Sellers (the "***D&O Indemnified Parties***"), against any and all Losses (including, for the avoidance of doubt, reasonable attorneys' fees, costs and other out-of-pocket expenses) arising out of or relating to any threatened or actual Claim based in whole or in part on, or arising out of or relating in whole or in part to, the fact that such individual Person is or was a director, officer or manager of one or more of the Sellers whether based upon, arising out of or relating to any act or omission actually or allegedly committed or attempted at or prior to the Closing Date and whether asserted or claimed prior to, or at or after, the Closing Date, including all Claims based in whole or in part on, or arising in whole or in part out of, or relating to this Agreement or the transactions contemplated hereby, in each case to the full extent a Seller would be permitted under applicable Law to indemnify its own directors, officers or managers (including payment of expenses in advance of the final disposition of any such action or proceeding to each D&O Indemnified Party), but only to the extent that such Losses would be indemnifiable by the Sellers pursuant to the terms of (x) the organizational documents of the Sellers or (y) any indemnification agreement between one or more Sellers, on the one hand, and the D&O Indemnified Party(ies) seeking indemnification from Buyer pursuant to this <u>Section 10.13(a)</u>, on the other hand, set forth on **Schedule 10.13(a)**, in each case, as such organizational documents or agreements existed on the Petition Date (the "***Existing D&O Indemnification Terms***"); *provided*, *however*, that Buyer's obligation to indemnify and hold harmless the D&O Indemnified Parties pursuant to this <u>Section 10.13(a)</u> with respect to Losses associated with any Claim shall be reduced by the amount of any recovery actually received by the applicable D&O Indemnified Party(ies) under the Tail Policy with respect to such Claim (the "***D&O Indemnified Liabilities***"). A D&O Indemnified Party shall not be entitled to make a claim against Buyer for indemnification pursuant to this <u>Section 10.13(a)</u> with respect to an underlying Claim unless and until such D&O Indemnified Party has made a claim against the Tail Policy with respect to such Claim and received a determination of coverage available under the Tail Policy with respect thereto.

(b)      Buyer acknowledges that certain D&O Indemnified Parties may have rights to indemnification, advancement of expenses and/or insurance provided by the Sellers, but excluding, for purposes of the definition of "Indemnitors", the Tail Policy and the insurance providers with respect thereto (collectively, the "***Indemnitors***"). Buyer hereby agrees that as between Buyer and Sellers (i) the Tail Policy and the insurance providers with respect thereto are the indemnitors of first resort with respect to indemnity obligations to the D&O Indemnified Parties, (ii) Buyer's indemnity obligations to the D&O Indemnified Parties apply only once coverage under the Tail Policy has been exhausted upon either payment of the Tail Policy's limits of liability or a determination by the insurance providers thereof that coverage is unavailable with respect to a particular Loss, (iii) the Indemnitors' indemnity obligations to the D&O Indemnified Parties are secondary to Buyer's indemnity obligations to the D&O Indemnified Parties, (iv) Buyer shall be required to advance the full amount of expenses incurred by any D&O Indemnified Party and shall be liable for the full amount of all expenses, judgments, penalties, fines and amounts paid in settlement to the extent legally permitted and as required by the terms of this Agreement, without regard to any rights the D&O Indemnified Party may have against the Indemnitors, but only to the extent that such expenses would be advanced, and such expenses, judgments, penalties, fines and amounts paid in settlement would be payable, in each case pursuant to the Existing D&O Indemnification Terms and (v) Buyer irrevocably waives, relinquishes and releases the Indemnitors from any and all claims against the Indemnitors for contribution, subrogation or any other recovery of any kind in respect thereof in respect of the matters set forth in this <u>Section</u>

67

**QNE EX. NO. 06**
**Page 76 of 170**

10.13(b).  Buyer further agrees that no advancement or payment by an Indemnitor on behalf of a D&O Indemnified Party with respect to any claim for which a D&O Indemnified Party has sought indemnification from Buyer shall affect the foregoing and the applicable Indemnitor shall have a right of contribution and/or be subrogated to the extent of such advancement or payment to all of the rights of recovery of the D&O Indemnified Party against Buyer.  Buyer and the D&O Indemnified Parties agree that the Indemnitors are express third party beneficiaries of the terms of this Section 10.13.

(c)        Without limiting Section 10.13(a), in the event a Claim is brought against any D&O Indemnified Party (whether arising before or after the Closing Date), nothing in this Section 10.13 shall limit the D&O Indemnified Party's(ies') right, to the extent provided pursuant to the Existing D&O Indemnification Terms, to retain counsel satisfactory to him or her (and Buyer shall (to the extent such coverage would be available pursuant to the Existing D&O Indemnification Terms) pay the fees and expenses of such counsel (to the extent such fees and expenses constitute D&O Indemnified Liabilities) for the D&O Indemnified Party promptly as statements therefor are received), *provided* that, to the extent the D&O Indemnified Party(ies) would retain control of any such defense pursuant to the Existing D&O Indemnification Terms, the D&O Indemnified Party(ies) shall retain control of any such defense.

(d)        In the event that Buyer or any of its successors or assigns (i) consolidates with or merges into any other Person and is not the continuing or surviving corporation or entity of such consolidation or merger; or (ii) sells, transfers or conveys to any Person or Persons acting in concert all or substantially all of its properties and assets, or ownership of a majority of equity representing the right to control the management of Buyer, then, and in each such case, Buyer shall cause proper provision to be made so that the successors and assigns of Buyer shall assume all of the obligations of Buyer set forth in this Section 10.13.

(e)        Each manager that is included in the D&O Indemnified Parties is identified on **Schedule 10.13(e)**.

10.14    Rights of Use.  The Parties recognize that, under current BSEE policy, BSEE will recognize only a single entity as the holder of a right of use and easement (each, a "***RUE***").  The Parties agree that RUE No. OCS-G 30329 covering the South Marsh Island 132 Platform B (Complex ID 21982) shall be held by Fieldwood Energy I (upon completion of the anticipated Divisive Merger) on behalf of both itself and Buyer; the Parties agree that, as a contractual matter between themselves, Fieldwood Energy I and Buyer shall each own a one-half interest in such platform and shall each be responsible for one half of the costs and obligations (for operating, decommissioning and otherwise) relating to such platform.  The Sellers and Buyer will use commercially reasonable efforts to obtain, to the extent required by BSEE, a replacement RUE with respect to each RUE listed on **Schedule 10.14** at, or as promptly as practicable following, the Closing.  The rights of the Sellers and Buyer to use, and the obligations with respect to, any RUE listed in **Part 1** of **Schedule 10.14** shall be governed by the terms of the joint operating agreement for the Lease(s) associated with such RUE.

10.15    Post-Closing Agreements.  On the date of the consummation of the transactions contemplated by the Divisive Merger, each Seller shall, and shall cause its applicable Affiliates to (to the extent the same are identified as a party thereto), and Buyer shall, deliver counterparts to

the TSA, the SEMS Bridging Agreement, the ST 308 Performance Bond, the Farmout Agreement, the Contract Operating Agreement, each of the Joint Operating Agreement Amendments and the Funding Agreement.

10.16   <u>Effective Date Payments</u>.  On the Effective Date, the Sellers will pay, or cause to be paid, each of the Effective Date Cash Obligations that is to be paid on the Effective Date pursuant to the Plan to the applicable payees thereof.

10.17   <u>South Marsh 39</u>.  Buyer, in its sole discretion, may elect (prior to or following the Closing) by delivering written notice to Fieldwood to cause the Sellers to assign to Buyer (or Buyer's designee) the assets and properties listed on **<u>Schedule 10.17</u>** (the "*SMI 39 Assets*").  If Buyer elects to acquire the SMI 39 Assets on or prior to the date that is three (3) Business Days prior to the Closing, the SMI 39 Assets will be deemed Other Interests for all purposes hereunder and transferred to Buyer at Closing.  If Buyer timely elects to either (i) acquire the SMI 39 Assets, or (ii) cause a designee of Buyer to acquire the SMI 39 Assets, then, Sellers shall promptly (but not prior to the Closing) cause the SMI 39 Assets to be assigned to Buyer or such designee pursuant to an Assignment, Bill of Sale and Conveyance in substantially the form of **<u>Exhibit H</u>** and Buyer or such designee, as applicable, will assume the Liabilities of Sellers relating to the SMI 39 Assets to the same extent as Buyer would have assumed such Liabilities pursuant to <u>Article XI</u> had the SMI 39 Assets been Other Assets.

10.18   <u>Certain Bank Accounts</u>.   Prior to or following the Closing, Sellers will use commercially reasonable efforts to transfer each of the bank accounts listed on **<u>Schedule 10.18</u>** to Buyer and take such other actions reasonably requested by Buyer to cause Buyer Proceeds to be promptly received by, and/or paid over to, Buyer.

10.19   <u>Specified Matters</u>.  From and after the Closing, Buyer shall control and prosecute the Specified Matters on behalf of Sellers (at Buyer's expense).  If it is finally determined that Sellers have any cash liability with respect to, or arising out of, any of the Specified Matters (and such cash liability was not otherwise satisfied, released or discharged pursuant to the Plan or Confirmation Order), Buyer or Sellers (as applicable) shall notify the other in writing, as soon as reasonably practicable prior to the due date of such liability, of the amount of the liability so payable together with reasonably detailed supporting summary and documentation and any other information reasonably requested by Buyer, and Buyer shall pay to Sellers the amount of such liability, which amount Sellers will pay over to the applicable governmental authority to satisfy such liability, no later than the later of (a) two (2) Business Days after Closing or (b) five (5) Business Days, before such payment is due and payable.  The Sellers shall, in turn, timely remit or cause to be remitted to the applicable governmental authority the amount paid by Buyer to Sellers in the preceding sentence.

### ARTICLE XI
### ASSUMPTION AND RETENTION OF LIABILITIES

11.1   <u>Buyer's Assumption of Liabilities</u>.  Subject to the terms of this Agreement, if the Closing occurs, Buyer shall be deemed to have assumed (and shall pay, perform and discharge) the following Liabilities of the Sellers, as of the Closing (collectively, the "*Assumed Liabilities*"):

(a)      all Liabilities to the extent arising out of the Leases and the Assigned Contracts that are Acquired Interests, but, as to such Leases and such Assigned Contracts that constitute Other Assets, only to the extent that such Liabilities arise after the Closing;

(b)      all Liabilities to the extent arising out of the ownership, operation, use or environmental condition of the Acquired Interests (other than the Leases and Assigned Contracts), but, as to the Other Assets that are Acquired Interests, only to the extent that the acts, omissions, events or conditions giving rise thereto first arise, occur or come into existence after the Closing;

(c)      all Liabilities to assess, remediate, remove, transport or dispose as required under Environmental Law any Environmental Contaminants present as of the Closing at the Acquired Interests;

(d)      all Liabilities (whether arising before, at or after the Closing) to the extent arising out of the plugging, abandonment and decommissioning of, and all related salvage, site clearance and surface restoration activities for, any Field Assets that are Acquired Interests to the extent required under applicable Law or the terms of the applicable Leases, but, as to such Field Assets that constitute Other Assets, excluding any monetary fines and penalties to the extent that such monetary fines and penalties arise from or relate to facts or conditions existing or occurring at or before the Closing;

(e)      all Liabilities to the extent arising out of any Imbalances attributable to the Acquired Interests;

(f)      all Liabilities to the extent arising out of any Suspense Funds delivered to Buyer at the Closing but excluding Liabilities with respect to misapplication of any Suspense Funds (or any escheat or other Laws related thereto) before the Closing;

(g)      all Liabilities to the extent arising out of any Prepaid JOA Funds or Undisbursed Revenue, in each case, that is delivered to Buyer at the Closing but excluding Liabilities with respect to misapplication of Prepaid JOA Funds or Undisbursed Revenue (or any escheat or other Laws related thereto) before the Closing;

(h)      all Liabilities assumed by Buyer pursuant to Section 6.8;

(i)      all Liabilities for Taxes attributable to the Acquired Interests other than Retained Taxes;

(j)      all Liabilities relating to (i) any Seller Employee who becomes a Transferred Employee, that arise at, before or after the Closing, in each case unless such claim is (A) discharged under the Plan or (B) covered by insurance and (ii) any Employee Severance that becomes due and payable following the Closing;

(k)      all indemnities of Buyer under Section 1.2, Section 2.3, Section 2.4 and Section 2.5;

(l)      all Working Capital Liabilities;

70

(m)      the D&O Indemnified Liabilities;

(n)      all Liabilities arising out of or relating to any affirmative defenses of third parties with respect to any Claim or cause of action assigned to Buyer pursuant to Section 1.2(i), Section 1.2(w) and Section 1.2(rr) to the extent that if treated as Retained Liabilities such defenses or rights would not constitute general unsecured claims of the Sellers; and

(o)      the Allowed FLFO Claims (as defined in the Plan) remaining following distribution of the FLFO Distribution Amount (as defined in the Plan) pursuant to the Plan (as modified to the extent set forth in the First Lien Exit Facility Documents (as defined in the Plan)).

Notwithstanding anything to the contrary herein, Assumed Liabilities shall not include any surety bond premiums, indemnity obligations or other obligations on account of surety bonds that were obtained by the Sellers.

11.2      Sellers' Retention of Liabilities.  Notwithstanding anything to the contrary set forth in this Agreement or in any other document or instrument entered into in connection with this Agreement, the Parties expressly acknowledge and agree that Buyer is assuming only the Assumed Liabilities and is not assuming any other Liability of any Seller.  All other Liabilities of each Seller or any of its Affiliates (or any predecessor of any Seller or any of its Affiliates or any prior owner of all or part of their businesses and assets) shall be retained by and remain Liabilities of such Seller and its Affiliates (all such Liabilities not being assumed being herein referred to as the "***Retained Liabilities***") including the following:

(a)      all Liabilities arising out of the Leases and the Assigned Contracts except those Liabilities set forth in Section 11.1(a);

(b)      all Liabilities arising out of the plugging, abandonment and decommissioning of, and all related salvage, site clearance and surface restoration activities for, any assets, properties or leases, except those Liabilities set forth in Section 11.1(d);

(c)      all Liabilities relating to the presence of Environmental Contaminants, except those Liabilities set forth in Section 11.1(c);

(d)      [reserved];

(e)      all current liabilities of the Sellers and their Subsidiaries, including all expenses and accounts, notes and other payables (other than the Working Capital Liabilities);

(f)      all Liabilities arising out of the ownership, operation, use or environmental condition of the Acquired Interests (other than Leases and Assigned Contracts) prior to or as of the Closing, except those liabilities set forth in Section 11.1(b);

(g)      all indebtedness, whether or not encumbering all or any portion of the Acquired Interests (other than the Working Capital Liabilities);

(h)      all Liabilities arising out of any Suspense Funds, Undisbursed Revenue and Prepaid JOA Funds (except for those Liabilities described in Sections 11.1(f) and Section 11.1(g));

71

(i)      [reserved];

(j)      all Liabilities arising out of or relating to the Decommissioning Agreement and Apache PSA;

(k)      all Liabilities related to, resulting from or otherwise arising out of or relating to any Excluded Assets (other than the Working Capital Liabilities);

(l)      all Liabilities arising out of or relating to any Seller's breach of this Agreement;

(m)      all Liabilities for (a) Taxes of the Sellers or Taxes relating to the Acquired Interests (other than Fieldwood U.A. Interests) or the Assumed Liabilities with respect to any Pre-Closing Tax Period (including Property-Related Taxes and Production Taxes that are allocated to the Pre-Closing Tax Period pursuant to Section 6.12), (b) Taxes imposed on Fieldwood U.A. or Fieldwood Mexico or any Subsidiary thereof, or for which Fieldwood U.A. or Fieldwood Mexico or any Subsidiary thereof may otherwise be liable, with respect to any Pre-Closing Tax Period; (c) Taxes imposed on Fieldwood U.A. or Fieldwood Mexico or any Subsidiary thereof, or for which Fieldwood U.A. or Fieldwood Mexico or any Subsidiary thereof may otherwise be liable, as a result of having been a member of any Company Group; and (d) Transfer Taxes solely to the extent such Transfer Taxes are the responsibility of the Sellers pursuant to Section 6.12 (the "***Retained Taxes***");

(n)      all Liabilities for non-compliance by the Sellers or Buyer (or any of their respective Affiliates) with any bulk sales, bulk transfer or similar Law;

(o)      all Liabilities relating to any current or former independent contractor of any Seller or any of its Affiliates or any Seller Employee or other current or former employee of any Seller or any of its Affiliates who does not become a Transferred Employee, that arise at, before or after the Closing (except for those Liabilities assumed by Buyer pursuant to Section 6.8(c));

(p)      all Liabilities arising out of or relating to any Claim with respect to facts and circumstances existing prior to the Closing, including Liabilities for any fines or penalties relating thereto, except (i) as provided in Section 11.1(b) through Section 11.1(h) and (ii) any affirmative defenses of third parties with respect to any Claim or cause of action assigned to Buyer pursuant to Section 1.2(i), Section 1.2(w) and Section 1.2(rr) except to the extent that if treated as Retained Liabilities such defenses would constitute general unsecured claims of the Sellers;

(q)      all Liabilities relating to an Employee Plan that is not an Assumed Employee Plan;

(r)      Liabilities satisfied, compromised, settled, released or discharged pursuant to the Plan and the Confirmation Order; and

(s)      all Effective Date Cash Obligations.

72

Notwithstanding anything contained in this <u>Section 11.2</u> or elsewhere in this Agreement or any Ancillary Document, Assumed Liabilities shall include all Fieldwood Energy I Closing Accounts Payable.

11.3    <u>Reservation as to Third Persons</u>.  Nothing herein is intended to limit or otherwise waive any recourse Buyer or the Sellers may have against any Third Person for any Liabilities that may be incurred with respect to the Acquired Interests.

11.4    <u>Certain Liens</u>.  For the avoidance of doubt, nothing in this Agreement is intended to require the release of, and no Party will be in breach of this Agreement as a result of the non-release of, any pledge of the equity of the Mexico JV entities relating to a credit facility of any of the Mexico JV entities.

**ARTICLE XII**
**MISCELLANEOUS**

12.1    <u>Expenses</u>.  Except as otherwise specifically provided herein or in any order of the Bankruptcy Court, all fees, costs and expenses (including engineering, land, title, legal, accounting, consulting and other professional fees, costs and expenses) (excluding any fees, costs and expenses incurred by the Prepetition FLTL Agents (including, without limitation, the fees and disbursements of their respective counsel) and the Prepetition FLTL Agents Advisors (each as defined in the Plan)) incurred by Buyer, Buyer 2 or the Sellers in negotiating this Agreement, the Ancillary Documents or in consummating the transactions contemplated herein or therein shall be paid by the Party incurring the same whether or not the Closing shall have occurred.  Buyer shall be solely responsible and pay for all recording fees related to the transfer of the Acquired Interests; *provided* that if any such recording fees are required to be paid prior to the Closing the Sellers shall pay such recording fees when due.

12.2    <u>Notices</u>.  All notices and communications required or permitted to be given hereunder (each, a "***Notice***") shall be in writing and shall be delivered personally, or sent by certified U.S. mail, postage prepaid with return receipt requested, bonded overnight courier, by facsimile or email transmission (provided any such facsimile or email transmission is confirmed either orally or by written confirmation), addressed to the appropriate Party at the address for such Party shown below:

73

If to Buyer or Buyer 2:

c/o QuarterNorth Energy LLC
2000 W. Sam Houston Pkwy. S., Suite 1200
Houston, Texas  77042
Attention:  Mike Dane
                   Thomas R. Lamme
Email:       MDane@qnenergy.com
                   TLamme@qnenergy.com

with a copy (which will not constitute notice) to:

Davis Polk & Wardwell LLP
450 Lexington Avenue
New York, New York 10017
Attention:  Damian Schaible
                   Natasha Tsiouris
                   Cheryl Chan
Email:       damian.schaible@davispolk.com
                   natasha.tsiouris@davispolk.com
                   cheryl.chan@davispolk.com

and

Seward & Kissel LLP
One Battery Park Plaza
New York, New York 10004
Attention: John R. Ashmead
                   Gregg S. Bateman
                   Catherine LoTempio

Email: ashmead@sewkis.com
              bateman@sewkis.com
              lotempio@sewkis.com

If to the Sellers:

c/o Fieldwood Energy LLC
2000 W. Sam Houston Pkwy. S., Suite 1200
Houston, Texas  77042
Attention:  Mike Dane
                   Thomas R. Lamme
                   David Dunn
Email:       MDane@fwellc.com
                   TLamme@fwellc.com

with a copy (which will not constitute notice) to:

Weil, Gotshal & Manges LLP
200 Crescent Court, Suite 300
Dallas, Texas  75201
Attention:  Rodney L. Moore
                   Samuel C. Peca
                   Matt Barr
                   Alfredo R. Perez
                   Jessica Liou
Email:       rodney.moore@weil.com
                   samuel.peca@weil.com
                   matt.barr@weil.com
                   alfredo.perez@weil.com
                   jessica.liou@weil.com

and

David M. Dunn
2000 Sam Houston Pkwy S., Suite 1200
Houston, Texas 77042
Email: ddunn@provincefirm.com

Any Notice given in accordance herewith shall be deemed to have been given and received upon: (a) if by personal delivery, then upon receipt (except, if a Notice is received at or after 5:00 p.m. Central Time or on a day that is not a Business Day, it shall be deemed received on the next Business Day), (b) if sent by U.S. certified mail, postage prepaid, return receipt requested, then the date shown as received on the return notice, (c) if sent by facsimile or email transmission, the date such facsimile or email transmission is confirmed either orally or by written confirmation, or (d) if by bonded overnight courier, the date shown on the notice of delivery.  Any Party may change

74

the address, facsimile number or email address to which Notices are to be addressed by giving written notice to the other Party in the manner provided in this <u>Section 12.2</u>.

12.3    <u>Amendments</u>.    Except as set forth in <u>Section 1.2</u>, <u>Section 2.1</u>, <u>Section 2.3(b)</u>, <u>Section 2.4</u> and <u>Section 6.7</u>, this Agreement, including all Exhibits and Schedules hereto, may be amended or modified only by an agreement in writing executed by all of the Parties.

12.4    <u>Waiver</u>.    No Party shall be deemed to have waived or discharged any claim arising out of this Agreement, or any power, right, privilege, remedy or condition under this Agreement, unless the waiver or discharge of such claim, power, right, privilege, remedy or condition is expressly set forth in a written instrument duly executed and delivered by the Party against whom the waiver or discharge is sought to be enforced.  A waiver or discharge made on one occasion or a partial waiver or discharge of any power, right, privilege, remedy or condition shall not preclude any other or further exercise or enforcement of such power, right, privilege or remedy or requirement to satisfy such condition.  Except as expressly provided otherwise in this Agreement, the rights of each Party under this Agreement shall be cumulative, and the exercise or partial exercise of any such right shall not preclude the exercise of any other right.

12.5    <u>No Third-Party Beneficiaries</u>.    Nothing in this Agreement entitles any Person other than Buyer, Buyer 2 and the Sellers, including Fieldwood Energy I and GOM Shelf and their Subsidiaries, to any claims, remedy or right of any kind; *provided, however,* (a) the D&O Indemnified Parties are intended to be, and shall be, third party beneficiaries of <u>Section 10.13</u>, (b) the Non-Recourse Parties are intended to be, and shall be, third party beneficiaries of <u>Section 12.14</u> and (c) the Seller Indemnified Parties are intended to be, and shall be, third party beneficiaries of the rights of Seller Indemnified Parties specified in <u>Article XIII</u>.  From and after the establishment of the Liquidating Trust, the Liquidating Trustee shall be a third party beneficiary of the Sellers' rights under this Agreement.

12.6    <u>Assignment</u>.

(a)    Subject to <u>Section 12.6(b)</u>, neither this Agreement nor any rights, interests or obligations hereunder shall be assigned by any Party by operation of Law or otherwise without the other Party's express written consent (which may be granted or withheld in the sole discretion of such other Party); *provided*, *however*, that Buyer and Buyer 2 shall be permitted, upon notice to the Sellers, to assign all or part of its respective rights or obligations hereunder (including obligations related to the Assumed Liabilities) to any wholly-owned Subsidiary of NewCo (as defined in the Plan) and the Sellers may assign their respective rights and obligations under this Agreement to any liquidating trust or other similar representative of the Sellers created or appointed pursuant to a Bankruptcy Court order.  Notwithstanding the foregoing, no assignment of any rights hereunder shall relieve the assigning Party of any obligations or responsibilities hereunder.

(b)    If a Liquidating Trust is established, from and after the formation of the Liquidating Trust, subject to the terms of the Confirmation Order, all rights and obligations of the Sellers under this Agreement shall accrue to and be for the benefit of and shall be exercisable by the Liquidating Trust, as provided by any order of the Bankruptcy Court and the Liquidating Trustee shall be entitled to exercise all of the rights of the Sellers under this Agreement.

75

12.7    Counterparts.  This Agreement and any amendment hereto may be executed by Buyer, Buyer 2 and the Sellers in any number of counterparts, each of which shall be deemed an original instrument, but all of which together shall constitute but one and the same agreement. Notwithstanding anything to the contrary in Section 12.2, delivery of an executed counterpart of a signature page to this Agreement or any amendment hereto by telecopier, facsimile or email attachment that contains a portable document format (.pdf) file of an executed signature shall be effective as delivery of a manually executed counterpart of this Agreement or such amendment, as applicable.

12.8    Governing Law; Jurisdiction; Venue; Jury Trial.

(a)    Except to the extent the mandatory provisions of the Bankruptcy Code apply, this Agreement and all claims or causes of action (whether in contract or tort) that may be based upon, arise out of or relate to this Agreement or the negotiation, execution, termination, performance or non-performance of this Agreement, or any Ancillary Document (unless such Ancillary Document provides for the application of the laws of another jurisdiction) shall be governed by, and construed in accordance with, the laws of the State of New York applicable to contracts made and to be performed entirely in such state without regard to principles of conflicts or choice of laws or any other law that would make the laws of any other jurisdiction other than the State of New York applicable hereto.

(b)    Without limitation of any Party's right to appeal any order of the Bankruptcy Court, (i) the Bankruptcy Court shall retain exclusive jurisdiction to enforce the terms of this Agreement and to decide any claims or disputes which may arise or result from, or be connected with, this Agreement, any breach or default hereunder, or the transactions contemplated hereby and (ii) any and all claims relating to the foregoing shall be filed and maintained only in the Bankruptcy Court, and the Parties hereby consent and submit to the exclusive jurisdiction and venue of the Bankruptcy Court and irrevocably waive the defense of an inconvenient forum to the maintenance of any such Claim; *provided*, *however*, that, if the Bankruptcy Cases have been closed pursuant to Section 350(a) of the Bankruptcy Code (or in the event that the Bankruptcy Court determines that it does not have jurisdiction), all Claims arising out of or relating to this Agreement shall be heard and determined in a New York state court or a federal court sitting in the Borough of Manhattan, New York, New York, and the Parties hereby irrevocably submit to the exclusive jurisdiction and venue of such courts in any such Claim and irrevocably waive the defense of an inconvenient forum to the maintenance of any such Claim.  The Parties consent to service of process by mail (in accordance with Section 12.2) or any other manner permitted by Law.

(c)    THE PARTIES HEREBY IRREVOCABLY WAIVE ALL RIGHT TO TRIAL BY JURY IN ANY CLAIM OR COUNTERCLAIM (WHETHER BASED IN CONTRACT, TORT OR OTHERWISE) ARISING OUT OF OR RELATING TO THIS AGREEMENT OR THE NEGOTIATION, EXECUTION, TERMINATION, PERFORMANCE OR NON-PERFORMANCE OF THIS AGREEMENT, OR ANY ANCILLARY DOCUMENT (UNLESS SUCH ANCILLARY DOCUMENT PROVIDES OTHERWISE).

12.9    Entire Agreement.  This Agreement (including the Exhibits, Schedules and Disclosure Schedules), the Ancillary Documents and the Plan constitute the entire agreement between the Parties with respect to the subject matter hereof and supersede all negotiations, prior

discussions and prior agreements and understandings relating to such subject matter. In the event of any conflict between this Agreement, any Ancillary Document and the Plan, this Agreement will control.

12.10   <u>Binding Effect</u>.   This Agreement shall be binding in all respects against (a) the Sellers and all of their successors and permitted assigns (including, for the avoidance of doubt, any trustee, examiner or other fiduciary appointed in the Bankruptcy Case) and (b) Buyer, Buyer 2 and all of their respective successors and permitted assigns.

12.11   <u>Time of the Essence</u>.   Time is of the essence for this Agreement.

12.12   <u>No Partnership; No Fiduciary Duty</u>.   This Agreement shall not create and it is not the purpose or intention of the Parties to create any partnership, mining partnership, joint venture, general partnership or other partnership relationship and none shall be inferred. Nothing in this Agreement shall be construed to establish a fiduciary relationship between the Parties for any purpose.

12.13   <u>Obligations of the Sellers</u>.   The Liabilities, obligations, representations, warranties and covenants of the Sellers in this Agreement and in the Ancillary Documents are solidary (as that term is used under Louisiana law) and joint and several (as that phrase is used under Texas law). Fieldwood shall cause each other Seller to comply with such Seller's obligations under this Agreement, including with respect to the transfer and assignment of the Acquired Interests and Assumed Liabilities and the obligations in <u>Section 6.1</u>.

12.14   <u>No Recourse</u>.   Notwithstanding anything that may be expressed or implied in this Agreement or any Ancillary Document, each Party, on behalf of itself and its Affiliates and their representative representatives, covenants, agrees and acknowledges that no Person other than the Parties (and their respective successors or assignees, as applicable) has any obligation hereunder and that, neither any Party, their respective Affiliates or their respective representatives, shall have any right of recovery under this Agreement or any Ancillary Document against, and no personal liability under this Agreement or any Ancillary Document shall attach to, any Party's former, current or future debt or equity financing sources, equity holders, controlling Persons, directors, officers, employees, general or limited partners, members, managers, Affiliates or agents, or any former, current or future equity holder, controlling Person, director, officer, employee, general or limited partner, member, manager, Affiliate or agent of any of the foregoing (collectively, each of the foregoing but not including the Parties, a "***Non-Recourse Party***"), whether by or through attempted piercing of the corporate, limited partnership or limited liability company veil, by or through a claim by or on behalf of any Party against any Non-Recourse Party, by the enforcement of any assessment or by any legal or equitable proceeding, by virtue of any applicable Law, whether in contract, tort or otherwise. Without limiting the foregoing, no past, present or future director, officer, employee, incorporator, member, partner, stockholder, Affiliate, agent, attorney or representative of the Parties or their respective Affiliates shall have any liability for any obligations or liabilities of the Parties under this Agreement of or for any Claim based on, in respect of, or by reason of, the transactions contemplated hereby.

12.15   <u>Disclosure Schedules</u>.   All references to Schedules in <u>Article IV</u> and <u>Article V</u> of this Agreement are referred to in this <u>Section 12.15</u> as "***Disclosure Schedules***". The information

in the Disclosure Schedules constitutes exceptions, qualifications and/or supplements to particular representations or warranties of the Sellers, Buyer and Buyer 2 as set forth in this Agreement. The Disclosure Schedules shall not be construed as indicating that any disclosed information is required to be disclosed, and no disclosure shall be construed as an admission that such information is material to, outside the ordinary course of business of, or required to be disclosed by, the Sellers, Buyer or Buyer 2 or constitutes, individually or in the aggregate, a Material Adverse Effect. Capitalized terms used in the Schedules that are not defined therein and are defined in this Agreement shall have the meanings given to them in this Agreement. The captions contained in the Schedules are for the convenience of reference only, and shall not be deemed to modify or influence the interpretation of the information contained in the Disclosure Schedules or this Agreement. The statements in each Schedule of the Disclosure Schedules qualify and relate to the corresponding provisions in the Sections of this Agreement to which they expressly refer and to each other Section in <u>Article IV</u> or <u>Article V</u> of this Agreement to which the applicability of a statement or disclosure in a particular Schedule of the Disclosure Schedules is readily apparent on its face.

      12.16  <u>Other Contract Interpretation</u>.

      (a)  <u>Headings</u>. The headings of the Exhibits, Schedules, Articles, Sections, and subsections of this Agreement are for guidance and convenience of reference only and shall not limit or otherwise affect any provision of this Agreement. All references in this Agreement to any "Section," "Article," "Annex," "Exhibit," or "Schedule" are to the corresponding Section, Article, Annex, Exhibit or Schedule of this Agreement unless otherwise specified (subject to <u>Section 12.15</u>).

      (b)  <u>Severability</u>. If any provision of this Agreement is invalid, illegal or incapable of being enforced by any rule of Law or public policy, it shall not affect the validity or enforceability of the other provisions here and all other provisions of this Agreement shall nevertheless remain in full force and effect. Upon such determination that any provision is invalid, illegal or incapable of being enforced, the Parties shall negotiate in good faith to modify this Agreement so as to effect the original intent of the Parties as closely as possible in an acceptable manner to the end that the transactions contemplated hereby fulfilled to the greatest extent possible.

      (c)  <u>Agreement Not to Be Construed Against Drafter</u>. The Parties have participated jointly in negotiating and drafting this Agreement. In the event that an ambiguity or a question of intent or interpretation arises, both this Agreement and the Ancillary Documents will be construed as if drafted jointly by the Parties. No presumption or burden of proof will arise favoring or disfavoring any Party by virtue of the authorship of any provision of this Agreement or any Ancillary Document.

      (d)  <u>Miscellaneous Interpretation</u>. When calculating the period of time before which, within which or following which any act is to be done or step taken pursuant to this Agreement, the date that is the reference date in calculating such period shall be excluded. If the last day of such period is a day other than a Business Day, the period in question shall end on the next succeeding Business Day. Whenever the words "include," "***includes***" or "***including***" are used in this Agreement, they will be deemed to be followed by the words "***without limitation***" and shall not be construed to limit any general statement that it follows to the specific or similar items or

matters immediately following.  Unless the context otherwise requires, (1) "*or*" is disjunctive but not exclusive, (2) words in the singular include the plural and vice versa, (3) the words "herein," "hereof," "hereby," "*hereunder*" and words of similar nature refer to this Agreement as a whole and not to any particular subdivision unless expressly so limited, (4) the use in this Agreement of a pronoun in reference to a Party or Person includes the masculine, feminine or neuter, as the context may require, (5) reference to any Person includes the successors and permitted assigns of that Person, (6) any reference in this Agreement to "$" means United States dollars, (7) and reference in this Agreement to "*days*" (but not "*Business Days*") means to calendar days, (8) reference to any law in this Agreement means such law as amended, modified, codified, reenacted, supplemented or superseded in whole or in part, and in effect from time to time together with any rules or regulations promulgated thereunder, (9) any reference in this Agreement to "*related to*", "*relating to*" or a similar phrase, in each case, in respect of the business of the Sellers, the Acquired Interests, or any other matter means, unless the context otherwise requires, "*related in whole or in part to*", "*relating in whole or in part to*" or a similar construction in the case of a similar phrase, as applicable, and (10) any reference in this Agreement to "*transactions contemplated by this Agreement*" or words of similar import includes the transactions contemplated by the other Ancillary Documents except as the context may otherwise require.  The Annex, Schedules and Exhibits attached to this Agreement are deemed to be part of this Agreement and included in any reference to this Agreement.  If the deadline for performance falls on a day that is not a Business Day, then the actual deadline for performance will be the next succeeding day that is a Business Day.  Where this Agreement references any item being "made available" to Buyer, such item will be deemed to have been "made available" to Buyer if it was provided to Davis Polk & Wardwell LLP or any other Representative of Buyer (including through an electronic dataroom).

## ARTICLE XIII
## SURVIVAL AND INDEMNIFICATION

13.1    <u>Survival; Limited Recourse Against Sellers</u>.

(a)    The representations and warranties of the Sellers, Buyer and Buyer 2 contained herein and in any certificate or other writing delivered by the Sellers pursuant hereto, including any representation or warranty that may be deemed to be made pursuant to <u>Section 1.1</u> with respect to the Acquired Interests being acquired by Buyer or Buyer 2 free and clear of any and all Encumbrances (other than Permitted Encumbrances (except that the Fieldwood U.A. Interests and the JV Interests shall not be subject to any Permitted Encumbrances other than pursuant to the Mexico PSA)), shall terminate upon and not survive the Closing and there shall be no liability (whether arising in contract, tort or otherwise, or whether at law or in equity, and regardless of the legal theory under which any entitlement, remedy or recourse may be sought or imposed (including all rights afforded by any statute which limits the effects of a release with respect to unknown claims)) thereafter in respect thereof.  Nothing herein shall limit Buyer's or Buyer 2's remedies in the event of Fraud, except that Buyer and Buyer 2 shall have no remedy in the event of Fraud with respect to Fieldwood Energy I, FW GOM Pipeline, GOM Shelf or any of their respective Subsidiaries.  Each of the covenants of the Sellers, Buyer and Buyer 2 contained in this Agreement shall terminate upon the Closing except to the extent that performance under such covenant is to take place after Closing, in which case such covenant shall survive the Closing until the earlier of (i) performance of such covenant in accordance with this Agreement or (ii) the expiration of applicable statute of limitations with respect to any claim for any failure to perform

such covenant (for clarity, any covenant that may be deemed to be made pursuant to Section 1.1 with respect to the Acquired Interests being acquired by Buyer or Buyer 2 free and clear of any and all Encumbrances (other than Permitted Encumbrances (except that the Fieldwood U.A. Interests and the JV Interests shall not be subject to any Permitted Encumbrances other than pursuant to the Mexico PSA) shall terminate upon Closing)).  The intended effect of termination of representations, warranties, covenants and agreements is to bar, from and after the date of termination, any claim or cause of action based on (x) the alleged inaccuracy of such representation or breach of such warranty or (y) an alleged breach or failure to fulfill such covenant or agreement; *provided* that if a written notice of any claim with respect to any covenant to be performed after Closing is given prior to the expiration of such covenant then such covenant shall survive until, but only for purposes of, the resolution of such claim by final, non-appealable judgment or settlement.

(b)     Neither Buyer nor Buyer 2 shall have any recourse against any Person who is not a party to this Agreement (excluding any successor or assign of any Seller), including any Affiliate of any Seller or any lender or creditor of any Seller from and after Closing for any Losses relating to the Acquired Interests or this Agreement (including with respect to title and environmental matters) or the Sellers' breach of any representations and warranties, covenants or other provision of this Agreement.  In addition, each of Buyer and Buyer 2 agree to the terms, conditions and limitations set forth in Section 1.5.

(c)     No Seller shall have any recourse against any Person who is not a party to this Agreement (excluding any successor or assign of Buyer or Buyer 2), including any Affiliate of Buyer or Buyer 2 or any lender or creditor of Buyer or Buyer 2 from and after Closing for any Losses relating to the Acquired Interests or this Agreement (including with respect to title and environmental matters) or Buyer or Buyer 2's breach of any representations and warranties, covenants or other provision of this Agreement.

(d)     For the avoidance of doubt, nothing in this Agreement shall prohibit the Sellers from ceasing operations or winding up their respective affairs following the Closing.

13.2    Indemnification by Buyer.  From and after Closing, Buyer hereby agrees to indemnify and hold each Seller, Fieldwood Energy I, GOM Shelf, and each of their successors, their Affiliates and all of their respective officers, managers, directors, employees, equity owners and agents (collectively, the "***Seller Indemnified Parties***") harmless from and against any and all Liabilities (including reasonable attorneys' fees and costs incurred in connection therewith) based upon, attributable to or resulting from:

(a)     the Fieldwood Energy I Closing Accounts Payable; and

(b)     all Assumed Liabilities to the extent associated with the Co-Owned Assets that are Acquired Interests.

13.3    Indemnification Procedures.

(a)     In the event that any proceedings shall be instituted or that any claim or demand shall be asserted by any Indemnified Party in respect of which indemnity may be sought under this Agreement (an "***Indemnification Claim***"), the Indemnified Party shall reasonably and

promptly cause written notice of the assertion of any Indemnification Claim of which it has knowledge which is covered by such indemnity to be provided to the Indemnifying Party. Such notice shall set forth in reasonable detail such Indemnification Claim and the basis for indemnification. The failure to so notify the Indemnifying Party shall not relieve the Indemnifying Party of its obligation hereunder, except to the extent such failure shall have actually prejudiced the Indemnifying Party. The Indemnifying Party shall have the right, at its sole option and expense, to be represented by counsel of its choice, and to appoint lead counsel for and control, defend against, negotiate, settle or otherwise deal with any Indemnification Claim which relates to any Losses indemnified against hereunder. If the Indemnifying Party elects to appoint lead counsel for and control, defend against, negotiate, settle or otherwise deal with any Indemnification Claim which relates to any Losses indemnified against hereunder, it shall within thirty (30) days of receipt of the Indemnification Claim notify the Indemnified Party of its intent to do so. If the Indemnifying Party elects not to appoint lead counsel for and control, defend against, negotiate, settle or otherwise deal with any Indemnification Claim which relates to any Losses indemnified against hereunder, the Indemnified Party may control, defend against, negotiate, settle or otherwise deal with such Indemnification Claim. If the Indemnifying Party shall assume the control of the defense of any Indemnification Claim, the Indemnified Party may participate, at his or its own expense, in the defense of such Indemnification Claim; *provided*, *however*, that such Indemnified Party shall be entitled to participate in any such defense with separate counsel at the expense of the Indemnifying Party if (i) so requested by the Indemnifying Party to participate or (ii) in the reasonable opinion of counsel to the Indemnified Party a conflict or potential conflict exists between the Indemnified Party and the Indemnifying Party that would make such separate representation advisable; and *provided*, *further*, that the Indemnifying Party shall not be required to pay for more than one (1) such counsel for all Indemnified Parties in connection with any Indemnification Claim. The Parties agree to cooperate fully with each other in connection with the defense, negotiation or settlement of any such Indemnification Claim. Notwithstanding anything in this Section 13.3 to the contrary, if the Indemnifying Party shall assume the control of the defense of any Indemnification Claim, the Indemnifying Party shall not, without the written consent of the Indemnified Party (which shall not be unreasonably withheld, conditioned or delayed), settle or compromise any Indemnification Claim or consent to entry of any judgment unless the claimant provides to the Indemnified Party an unqualified release from all liability in respect of the Indemnification Claim. If the Indemnifying Party makes any payment on any Indemnification Claim, the Indemnifying Party shall be subrogated, to the extent of such payment, to all rights and remedies of the Indemnified Party to any insurance benefits or other claims of the Indemnified Party with respect to such Indemnification Claim.

(b) After any final decision, judgment or award shall have been rendered by a Governmental Authority of competent jurisdiction and the expiration of the time in which to appeal therefrom, or a settlement shall have been consummated, or the Indemnified Party and the Indemnifying Party shall have arrived at a mutually binding agreement with respect to an Indemnification Claim hereunder, the Indemnified Party shall forward to the Indemnifying Party notice of any sums due and owing by the Indemnifying Party pursuant to this Agreement with respect to such matter. In the case of an Indemnification Claim that does not involve a third-party claim, if the Indemnifying Party does not notify the Indemnified Party within thirty (30) days following the receipt of a notice with respect to any such claim that the Indemnifying Party disputes its indemnity obligation to the Indemnified Party for any Losses with respect to such claim, such Losses shall be conclusively deemed a liability of the Indemnifying Party and the Indemnifying

Party shall promptly pay to the Indemnified Party any and all Losses arising out of such claim.  If the Indemnifying Party has timely disputed its indemnity obligation for any Losses with respect to such claim, the parties shall proceed in good faith to negotiate a resolution of such dispute and, if not resolved through negotiations, such dispute shall be resolved by litigation in an appropriate court of jurisdiction determined pursuant to <u>Section 12.8</u>.

(c)     The amount of any Losses payable by the Indemnifying Party shall be net of any (i) amounts recovered or recoverable by the Indemnified Party under applicable insurance policies or from any other Person alleged to be responsible therefor, and (ii) Tax benefit actually realized by the Indemnified Party arising from the incurrence or payment of any such Losses in the taxable year such Loss was incurred.  If the Indemnified Party receives any amounts under applicable insurance policies, or from any other Person alleged to be responsible for any Losses, subsequent to an indemnification payment by the Indemnifying Party, then such Indemnified Party shall promptly reimburse the Indemnifying Party for any payment made or expense incurred by such Indemnifying Party in connection with providing such indemnification payment up to the amount received by the Indemnified Party, net of any expenses incurred by such Indemnified Party in collecting such amount.

(d)     The Indemnifying Party shall not be liable for any (i) consequential damages (but, for the avoidance of doubt, without limiting liability for direct damages), (ii) punitive damages or (iii) Losses for lost profits.

(e)     Each Indemnified Party must mitigate in accordance with applicable Law any loss for which such Indemnified Party seeks indemnification under this Agreement.  If such Indemnified Party mitigates its loss after the Indemnifying Party has paid the Indemnified Party under any indemnification provision of this Agreement in respect of that loss, the Indemnified Party must notify the Indemnifying Party and pay to the Indemnifying Party the extent of the value of the benefit to the Indemnified Party of that mitigation (less the Indemnified Party's reasonable costs of mitigation) within two (2) Business Days after the benefit is received.

(f)     Each Indemnified Party shall use reasonable efforts to collect any amounts available under insurance coverage, or from any other Person alleged to be responsible, for any Losses payable under an indemnity in this Agreement.

(g)     <u>Express Negligence</u>.  THE INDEMNIFICATION, RELEASE, ASSUMED LIABILITIES, RETAINED LIABILITIES, WAIVER AND LIMITATION OF LIABILITY PROVISIONS PROVIDED FOR IN THIS AGREEMENT SHALL BE APPLICABLE WHETHER OR NOT THE LIABILITIES, LOSSES, COSTS, EXPENSES AND DAMAGES IN QUESTION AROSE OR RESULTED SOLELY OR IN PART FROM THE SOLE, ACTIVE, PASSIVE, CONCURRENT OR COMPARATIVE NEGLIGENCE, STRICT LIABILITY OR OTHER FAULT OR VIOLATION OF LAW OF OR BY ANY INDEMNIFIED PARTY.

(h)     <u>Tax Treatment of Indemnity Payments</u>.  The Sellers, Buyer and Buyer 2 agree to treat any indemnity payment made pursuant to this Agreement as an adjustment to the Consideration for federal, state, local and foreign income tax purposes.  Any indemnity payment under this Agreement shall be treated as an adjustment to the value of the asset upon which the underlying Indemnification Claim was based, unless a final determination (within the meaning of

Section 1313 of the Code) with respect to the Indemnified Party or any of its Affiliates causes any such payment not to be treated as an adjustment to the value of the asset for United States federal income tax purposes.

(i) <u>Sole and Exclusive Remedy</u>. Except for any post-Closing payment expressly contemplated by this Agreement or any claim for a breach of a Party's covenants hereunder (to the extent not limited by <u>Section 13.1(a)</u>) or for Fraud (but not Fraud with respect to Fieldwood Energy I, FW GOM Pipeline, GOM Shelf or any of their respective Subsidiaries), the remedies provided in this <u>Article XIII</u> and in <u>Section 8.3</u> shall be the sole and exclusive legal and equitable remedies of the Parties, from and after the Closing, with respect to this Agreement and the transactions contemplated hereby, and no Person will have any other entitlement, remedy or recourse, whether in contract, tort or otherwise, or whether at law or in equity, and regardless of the legal theory under which such entitlement, remedy or recourse may be sought or imposed (including all rights afforded by any statute which limits the effects of a release with respect to unknown claims), it being agreed that all of such other remedies, entitlements and recourse are expressly waived and released by the Parties to the fullest extent permitted by law.

[*Signature pages follow*.]

83

## Annex I

### Definitions

The following terms and expressions shall have the following meanings:

"*1933 Act*" means the Securities Act of 1933, as amended, and the rules and regulations as promulgated thereunder.

"*365 Contracts*" means all Applicable Contracts and other executory contracts and unexpired leases to which a Seller is a party to the extent covering, attributable to or relating to any of the Acquired Interests or to which any of the Acquired Interests is subject or bound, in each case that may be assumed by one or more Sellers pursuant to Section 365 of the Bankruptcy Code.

"*Accounts Receivable Collections*" is defined in Section 10.12(c).

"*Accounts Receivable Setoff*" is defined in Section 10.12(b).

"*Acquired Interests*" is defined in Section 1.2.

"*Affiliate*" means, with respect to a Person, any other Person that, as of the relevant time for which the determination of affiliation is made, directly or indirectly controls, is controlled by, or is under common control with, such Person.  For purposes of this definition, the term "control" means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of a Person, whether through ownership of voting securities, contract, voting trust, membership in management or in the group appointing or electing management or otherwise through formal or informal arrangements or business relationships.

"*Agreement*" is defined in the preamble and includes all annexes, schedules and exhibits hereto, as well as all supplements, amendments and restatements hereof.

"*Allocated Value*" means the value allocated to the applicable Acquired Interest, if any, as agreed in good faith by Buyer and the Sellers.

"*Allowed Priority Tax Claim*" has the meaning set forth in the Plan.

"*Alternative Bidder*" is defined in Section 6.4.

"*Alternative Transaction*" means (a) any sale, transfer or other disposition of all or a material portion of the Acquired Interests or (b) any series of sales, transfers or other dispositions of any portion of the Acquired Interests that, when taken collectively, constitutes a disposition of all or a material portion of the Acquired Interests, in each case, to any Person or Persons other than Buyer.

"*Ancillary Documents*" means each Assignment, Bill of Sale and Conveyance, the Assignment and Assumption Agreement, the Office Assets Conveyance, the Quitclaim Deeds, the TSA, the Farmout Agreement, the ST 308 Performance Bond, the SEMS Bridging Agreement, the Assignment of Leases and Subleases, the Joint Operating Agreement Amendments, the JV

WEIL:\97751377\74\45327.0007
WEIL:\97751377\77\45327.0007
WEIL:\97751377\79\45327.0007
**Error! Unknown document property name.**
WEIL:\97751377\87\45327.0007

**QNE EX. NO. 06**
**Page 93 of 170**

Assignment Agreement, the Funding Agreement, the Contract Operating Agreement and any other agreement, document, instrument or certificate entered into or delivered pursuant to this Agreement.

"***Antitrust Law***" means, collectively, the HSR Act, Title 15 of the United States Code §§ 1 7 (the Sherman Act), Title 15 of the United States Code §§ 12-27 and Title 29 of the United States Code §§ 52-53, (the Clayton Act), the Federal Trade Commission Act (15 U.S.C. §§ 41, et seq.) and the rules and regulations promulgated thereunder and any other Laws that are designed or intended to prohibit, restrict or regulate actions having the purpose or effect of monopolization or restraint of trade or lessening of competition through merger or acquisition.

"***Apache PSA***" means that certain Purchase and Sale Agreement, dated as of July 18, 2013, by and among Apache Corporation, Apache Deepwater LLC, Apache Shelf, Inc., Apache Shelf Exploration LLC, GOM Shelf and Fieldwood, as amended from time to time, and the transaction documents executed in connection therewith.

"***Applicable Consent***" means any consent, waiver or approval that is required to be obtained from, or any notice that is required to be given to, any Third Person as a result of the assignment of the Acquired Interests by the Sellers to Buyer as contemplated by this Agreement (each, a "***Consent***") that (a) relates to an Assigned Contract, which consent, waiver or approval would be required for such Assigned Contract to be assumed and assigned to Buyer, after giving effect to Sections 365(c)(1) and 365(f)(1) of the Bankruptcy Code or (b) that relates to any Acquired Interest other than an Assigned Contract, other than, in each case, (i) for Preferential Rights and (ii) any Governmental Approvals.

"***Applicable Contracts***" means (a) all Contracts (*provided* that, for clarity, any "Operating Agreement" or "Joint Operating Agreement" identified on the Assigned 365 Contracts List shall be deemed a Contract for purposes of this definition) to which a Seller is a party or is bound to the extent covering, attributable to or relating to any of the Acquired Interests or to which any of the Acquired Interests is subject or bound, including, without limitation, operating agreements, crude oil, condensate and natural gas purchase and sale agreements, gathering agreements, transportation agreements, marketing, disposal or injection agreements, farmout and farmin agreements, unitization, pooling and communitization agreements, exploration agreements, development agreements, area of mutual interest agreements, exchange and processing contracts and agreements, partnership and joint venture agreements, confidentiality agreements and any other similar contracts, agreements and instruments, and all amendments thereto, and (b) all Easements.

"***Applicable Governmental Approval***" is defined in <u>Section 2.4.</u>

"***Applicable Shared Asset Interests***" means, with respect to each asset described on Schedule 1.2, the portion of the Sellers' right, title, and interest in each such asset that corresponds to the portion of the Sellers' right, title and interest in the Co-Owned Leases, the Co-Owned Subject Units and the Co-Owned Wells (collectively, the "<u>Co-Owned Oil and Gas Properties</u>"), as applicable, conveyed to Buyer under this Agreement.

"***AR Collections Period***" is defined in <u>Section 10.12(b).</u>

"***Assets***" is defined in <u>Section 1.2.</u>

"***Assigned 365 Contracts***" is defined in Section 6.7(a).

"***Assigned 365 Contracts List***" is defined in Section 6.7(a).

"***Assigned Contracts***" means (a) the Assigned 365 Contracts and (b) all Applicable Contracts that are not 365 Contracts (other than Excluded Assets), and any and all amendments, ratifications or extensions of the foregoing.

"***Assignment and Assumption Agreement***" means that Assignment and Assumption Agreement to be entered into at Closing by the parties thereto, in the form attached as **Exhibit I** hereto.

"***Assignment, Bill of Sale and Conveyance***" means that Bill of Sale, Assignment and Assumption Agreement to be entered into at Closing by the parties thereto in the form attached as **Exhibit G** hereto for the Co-Owned Assets and in the form attached as **Exhibit H** hereto for the Other Assets.

"***Assignment of Leases and Subleases***" means each Assignment and Assumption of Leases and Subleases to be entered into at Closing by the parties thereto for the Office Sublease, the Lafayette Lease Agreement, the Warehouse Lease and the Lubrizol Sublease, in the form attached as **Exhibit J** hereto.

"***Assumed Employee Plan***" is defined in Section 4.18(a).

"***Assumed Liabilities***" is defined in Section 11.1.

"***August 20 Settlement***" means that certain U.S. Department of the Interior Settlement Agreement entered into on August 20, 2021 between Fieldwood and its debtor affiliates and the United States Department of the Interior by and through the Bureau of Safety and Environmental Enforcement.

"***Avoidance Action***" means any avoidance, preference, recovery, claim, right or cause of action of any Seller arising under Chapter 5 of the Bankruptcy Code or under any analogous state or federal bankruptcy or non-bankruptcy laws.

"***Backstop Commitment Letters***" means the Second Lien Backstop Commitment Letter, the FLTL ERO Backstop Agreement and the SLTL ERO Backstop Agreement.

"***Backstop Commitment Premium Equity Interests***" has the meaning set forth in the Plan.

"***Balance Sheet Date***" is defined in Section 4.27.

"***Bankruptcy Cases***" is defined in the recitals.

"***Bankruptcy Code***" is defined in the recitals.

"***Bankruptcy Court***" is defined in the recitals.

"***Bankruptcy Rules***" is defined in the recitals.

"***BOEM***" means the Bureau of Ocean Energy Management or any successor agency thereto.

"***BOEM Qualifications***" means the Person has received a GOM qualification number from BOEM, and is able to bid on, own and hold a lease on the Outer Continental Shelf, Gulf of Mexico region.

"***BSEE***" means the Bureau of Safety and Environmental Enforcement or any successor agency thereto.

"***Business Day***" means any day other than a Saturday, a Sunday or any other day on which banking institutions in, New York, New York or Houston, Texas, are required or authorized by Law or executive order to be closed.

"***Buyer***" is defined in the preamble.

"***Buyer 2***" is defined in the preamble.

"***Buyer Grandparent***" is defined in Section 5.1(b).

"***Buyer Grandparent Equity Interests***" is defined in Section 5.1(c).

"***Buyer Intermediate***" is defined in Section 5.1(b).

"***Buyer Obligation***" is defined in Section 2.1(c).

"***Buyer Parent***" is defined in Section 5.1(b).

"***Buyer Parent Debt***" is defined in Section 2.1(c).

"***Buyer Proceeds***" is defined in Section 1.4.

 "***Cash Portion***" means an amount in cash (which amount shall not exceed the proceeds of (x) the Second Lien Exit Facility (as defined in the Plan) plus (y) the proceeds of the Equity Rights Offerings (as defined in the Plan), less (z) $120,000,000; *provided*, that the amount in (z) may be reduced to an amount not less than $100,000,000 in the sole and absolute discretion of the Buyer), equal to (a) the Effective Date Cash Obligations Amount, less (b) the Closing Cash Amount.  For the avoidance of doubt, $3,000,000 of the Cash Portion will be used to fund the payment referenced in the second sentence of Section 4(b) of the Eni Implementation Agreement.

"***Casualty Event***" means (a) any fire, explosion, accident, earthquake, act of the public enemy, act of God or other similar event or occurrence that results in damage to or the destruction of any Acquired Interest and (b) any taking, or threatened taking, of any Acquired Interest by condemnation or under the right of eminent domain.

"***CERCLA***" is defined in the definition of Environmental Contaminants.

"***Chevron Implementation Agreement***" means that certain Chevron Term Sheet Implementation Agreement, dated as of June 11, 2021, by and between Fieldwood and Chevron U.S.A. Inc., a Pennsylvania corporation.

"***Claims***" means any and all claims, demands, Encumbrances, notices of non-compliance or violation, notices of Liability or potential Liability, investigations, incidents of non-compliance (INCs), actions (whether judicial, administrative or arbitrational), causes of action, suits, proceedings and controversies.

"***Closing***" means the consummation of the transactions contemplated in this Agreement.

"***Closing Accounts Receivable***" means all current assets of the Sellers as of the Effective Time that are included in the Working Capital Assets, other than such current assets attributable to the Acquired Interests.

"***Closing Accounts Receivables Statement***" is defined in <u>Section 10.12(a)</u>.

"***Closing Cash Amount***" means the amount of cash in accounts of the Sellers as of immediately prior to the Effective Time, excluding all restricted cash (restricted cash includes, for the avoidance of doubt, all Suspense Funds, Excluded Suspense Funds, Prepaid JOA Funds, Excluded Prepaid JOA Funds, Undisbursed Revenue and Excluded Undisbursed Revenue), but including all cash to be returned to the Sellers on the Effective Date from the Adequate Assurance Deposit (as defined in the Utilities Order), in each case, as determined in good faith by the Sellers and Buyer in accordance with GAAP.

"***Closing Date***" is defined in <u>Section 9.1</u>.

"***COBRA***" means Section 4980B of the Code and Sections 601 through 608 of ERISA.

"***Code***" means the Internal Revenue Code of 1986, as amended.

"***Company Group***" means any group of entities filing Tax Returns on an affiliated, combined, consolidated, unitary or similar basis for Tax purposes that, at any time on or before the Closing Date, includes or has included Fieldwood U.A. or Fieldwood Mexico or any of their respective Subsidiaries.

"***Condition Precedent End Date***" means the date that is the first day of the month following the month during which the waiver requested in the FERC Petitions is granted by FERC and any underlying enabling requirements to process/handle, transport and sell the hydrocarbons subject to the Marketing Contracts and the Delayed FERC-Regulated Assets have been satisfied.

"***Confidential Information***" is defined in <u>Section 10.5</u>.

"***Confirmation Order***" is defined in the recitals.

"***Consent***" is defined in the definition of Applicable Consent.

"***Consenting Creditors***" has the meaning set forth in the Plan.

"*Consideration*" is defined in Section 2.1(a).

"*Contract Operating Agreement*" means a Contract Operating Agreement to be entered into between Buyer and Fieldwood Energy III in substantially the form attached hereto as Exhibit L.

"*Contracts*" means any agreement, license, lease, sublease, sublicense, contract, promise, obligation, sale or purchase order, service order, indenture, note, bond, loan, mortgage, deed of trust, instrument, commitment or undertaking, including any exhibits, annexes, appendices or attachments thereto, and any amendments, modifications, supplements, extension or renewals thereto, but excluding, however (a) any Lease, easement (including the Easements), right-of-way or other instrument, in each case, creating any oil and gas mineral interest or other real property interests and (b) any Permit.

"*Co-Owned Assets*" is defined in Section 1.2.

"*Co-Owned Assigned Contracts*" means the Assigned Contracts relating to any Co-Owned Lease, Co-Owned Subject Unit, Co-Owned Easement or Co-Owned Inventory.

"*Co-Owned Easements*" is defined in Section 1.2(c).

"*Co-Owned Field Assets*" means the Co-Owned Leases, Co-Owned Subject Units, Co-Owned Easements, Co-Owned Wells and Co-Owned Inventory.

"*Co-Owned Inventory*" is defined in Section 1.2(e).

"*Co-Owned Leases*" is defined in Section 1.2(a).

"*Co-Owned Records*" is defined in Section 1.2(k).

"*Co-Owned Scheduled Wells*" is defined in Section 1.2(d).

"*Co-Owned Subject Unit*" is defined in Section 1.2(b).

"*Co-Owned Subject Unit Agreement*" is defined in Section 1.2(b).

"*Co-Owned Wells*" is defined in Section 1.2(d).

"*Covered Taxes*" means any and all U.S. federal, state and local Income Taxes incurred by the Sellers, for the taxable year of the Sellers that includes the Closing, attributable to the purchase, sale or transfer of the Acquired Interests hereunder, equal to the incremental Tax liability for Income Taxes actually payable by the Sellers, determined by comparing (i) the Income Tax liability that would have been so payable without taking into account any items of income, gain, deduction, loss and credit or any receipts incurred by reason of such purchase, sale or transfer, to (ii) the actual Income Tax liability so payable by the Sellers for such taxable period (*i.e.,* applying a "with and without" methodology). For the avoidance of doubt, Covered Taxes shall be calculated (A) with the Sellers electing out of the installment method pursuant to Section 453(d) of the Code, and including as part of the consideration received for the Acquired Interests the full amount of

Covered Taxes payable by the Buyer pursuant to Section 6.12(b)(iii), (B) by utilizing elections and methods consistent with the Sellers' past practices unless otherwise required by law or with Buyer's prior consent (such consent not to be unreasonably withheld, conditioned or delayed) and (C) taking into account any available Tax assets or attributes of Sellers actually available to offset taxable income.

"**Credit Agreement**" means that certain *Amended and Restated First Lien Credit Agreement*, dated as of April 11, 2018, by and among Fieldwood, as borrower, Fieldwood Energy Inc., as holdings, Cantor Fitzgerald Securities, as the administrative agent and collateral agent, the lenders party thereto, and the other parties thereto, as amended, restated, amended and restated, supplemented, or otherwise modified.

"**Credit Bid and Release**" is defined in Section 2.1(a)(1).

"**Credit Bid and Release New Equity Interests**" means the New Equity Interests being distributed to the holders of Allowed FLTL Claims (as defined in the Plan) pursuant to the Plan.

"**Cure Costs**" means, with respect to any given 365 Contract, all monetary liabilities, including pre-petition monetary liabilities, of the Sellers that must be paid or otherwise satisfied to cure all of the Sellers' monetary defaults under such 365 Contract pursuant to Section 365 of the Bankruptcy Code in order for such 365 Contract to be assumed and assigned to Buyer (if applicable) as provided hereunder, as such amounts are determined by the Bankruptcy Court or approved pursuant to the assignment and assumption procedures provided for in the Plan, Confirmation Order, or herein.

"**D&O Indemnified Liabilities**" is defined in Section 10.13(a).

"**D&O Indemnified Parties**" is defined in Section 10.13(a).

"**Data Obligations**" is defined in Section 4.25(i).

"**Debtors**" is defined in the recitals.

"**Decommissioning**" has the meaning ascribed to such term in the Decommissioning Agreement.

"**Decommissioning Agreement**" means that Decommissioning Agreement, dated as of September 30, 2013, by and among Apache Corporation, Apache Shelf, Inc., Apache Deepwater LLC, Apache Shelf Exploration LLC, Fieldwood and GOM Shelf, as amended.

"**Delayed Asset**" is defined in Section 2.3(b).

"**Delayed FERC-Regulated Assets**" means the FERC-regulated contracts of Sellers that constitute Acquired Interests set forth on Schedule 1.6.

"**DIP Facility Credit Agreement**" means that certain *Senior Secured Debtor-in-Possession Term Loan Credit Agreement*, dated as of August 24, 2020, by and among Fieldwood, as borrower, Fieldwood Energy Inc., as holdings, Cantor Fitzgerald Securities, as the administrative agent and

collateral agent, the lenders party thereto, and the other parties thereto, as amended, restated, amended and restated, supplemented, or otherwise modified from time to time.

"***Direction Letter***" is defined in the recitals.

"***Disclosure Schedules***" is defined in <u>Section 12.15</u>.

"***Disclosure Statement***" means the Disclosure Statement For Joint Chapter 11 Plan Of Fieldwood Energy LLC And Its Affiliated Debtors, as may be amended, modified, or supplemented from time to time in form and substance acceptable to the Debtors, the Required DIP Lenders (as defined in the Plan), and the Requisite FLTL Lenders (as defined in the Plan).

"***Disclosure Statement Order***" means an order of the Bankruptcy Court approving the Disclosure Statement.

"***Divisive Merger***" has the meaning set forth in the Plan.

"***Divisive Merger Effective Time***" means the effective time of the Divisive Merger.

"***Easements***" means the Co-Owned Easements and Other Easements.

"***Effective Date***" means the "***Effective Date***" of the Plan.

"***Effective Date Cash Obligations***" means the Sellers' obligations under the Confirmation Order, the Plan, the Plan of Merger and the transactions contemplated thereby and this Agreement, including, without limitation, collectively: (i) the DIP Claims (as defined in the Plan) and related fees and expenses as provided in Section 2.4 of the Plan, (ii) the FLFO Distribution Amount (as defined in the Plan), (iii) the Professional Fee Escrow Amount (as defined in the Plan), (iv) the Restructuring Expenses (as defined in the Plan), (v) any Allowed Postpetition Hedge Claims, (vi) any Cure Amounts (as defined in the Plan), (vii) any Allowed Administrative Expense Claims (as defined in the Plan) not otherwise included in the other subsections of this definition, (viii) any Allowed Priority Tax Claims (as defined in the Plan), (ix) any Allowed Priority Non-Tax Claims (as defined in the Plan), (x) any Allowed Other Secured Claims (as defined in the Plan), (xi) the Plan Administrator Expense Reserve Amount (as defined in the Plan), (xii) the FWE I Cash Amount (as defined in the Plan of Merger), (xiii) an amount for the initial capitalization of Fieldwood Energy III as determined by the Sellers and the Majority Backstop Parties (as defined in the Second Lien Backstop Commitment Letter), (xiv) any cash distributions to holders of Allowed Unsecured Trade Claims (as defined in the Plan), (xv) any other amounts as agreed between the Sellers and the Required DIP Lenders (as defined in the Plan) and the Requisite FLTL Lenders (as defined in the Plan), (xvi) amounts due or to become due after the Closing pursuant to any Governmental Settlement Agreement, (xvii) the amounts of any Claims asserted prior to the Closing with respect to facts and circumstances existing prior to the Closing (except to the extent such amounts constitute general unsecured claims of the Sellers), including, but not limited to, (1) Claims for personal injury or damage to third party property (but with respect to such Claims that are covered by insurance policies, including for the avoidance of doubt, such Claims for personal injury or damage to third party property only to the extent of the applicable deductible or retention amount under the applicable insurance policies covering such Claims) and (2) fines and penalties related to such Claims, including Claims described in the preceding clause (1) (except to the extent

such Claims or related Liabilities (x) constitute Assumed Liabilities or (y) are satisfied, compromised (to the extent compromised), settled, released or discharged pursuant to the Plan and Confirmation Order) and (xviii) any cash obligations (including funding of accounts and reserves) arising pursuant to (A) the Chevron Implementation Agreement, (B) the Eni Implementation Agreement or (C) any other term sheet or definitive agreement entered into in connection with the Plan between any Seller and any predecessor in interest or co-working interest owner, in each case of clauses (i) through (xviii) solely to the extent not paid by the Sellers prior to Closing.

"***Effective Date Cash Obligations Amount***" means the amount of cash necessary to satisfy the Effective Date Cash Obligations, as determined in good faith by the Sellers and Buyer.

"***Effective Time***" is defined in Section 1.4.

"***Employee List***" is defined in Section 4.17(a).

"***Employee Plan***" is defined in Section 4.18(a).

"***Employee Severance***" is defined in Section 6.8(c).

"***Employment Agreements***" is defined in Section 6.22.

"***Encumbrance***" means any encumbrance, license, right of first refusal, mortgage, deed of trust, pledge, security interest, lien, privilege, charge of any kind (including any agreement to grant any of the foregoing), adverse claim of any kind, capital lease, conditional sale or title retention agreement, lease or sublease in the nature thereof or the filing of or agreement to give any financing statement under the Uniform Commercial Code of any jurisdiction.

"***End Date***" is defined in Section 8.1(b)(i).

"***Eni Implementation Agreement***" means that certain Eni Term Sheet Implementation Agreement, dated as of June 23, 2021, by and among Fieldwood (and certain of its subsidiaries), Eni Petroleum US LLC, a Delaware limited liability company, Eni US Operating Co. Inc., a Delaware corporation, and, following execution of joinders thereto, Buyer and Fieldwood Energy III.

"***Environmental Contaminants***" means "hazardous substances" and "pollutants or contaminants" as those terms are defined in Section 101 of the Comprehensive Environmental Response, Compensation and Liability Act ("***CERCLA***"), petroleum, including any fraction thereof, any "natural gas, natural liquids, liquefied natural gas, or synthetic gas usable for fuel" as those terms are used in Section 101 of CERCLA, any "solid or hazardous waste" as those terms are defined or used in the Resource Conservation and Recovery Act and any industrial or oil and gas wastes regulated by applicable rules of any relevant Governmental Authority.  The term also includes NORM concentrated, disposed of, released from or present on any Field Assets or resulting from or in association with Hydrocarbon activities on any Field Assets.

"***Environmental Law***" means all applicable Laws (including the CERCLA, the Resource Conservation and Recovery Act, the Oil Pollution Act of 1990 and such other applicable Laws relating to the Release, management or disposal of Environmental Contaminants including oilfield

waste, in each case as amended from time to time) relating to the protection of the environment or protection of human health (to the extent relating to exposure to Environmental Contaminants).

"***Equity Rights Offerings***" has the meaning set forth in the Plan.

"***Equity Rights Offering New Equity Interests***" means the New Equity Interests issuable upon exercise of the FLTL Subscription Rights and SLTL Subscription Rights in accordance with the Plan.

"***ERISA***" means the Employee Retirement Income Security Act of 1974, as amended.

"***ERISA Affiliate***" is defined in Section 4.18(a).

"***Excluded Assets***" is defined in Section 1.3.

"***Excluded Contracts***" is defined in Section 6.7(b).

"***Excluded Prepaid JOA Funds***" means any funds received by the Sellers (in their capacity as operator of any Excluded Assets) on account of working interest owners in Excluded Assets as prepayments for items under operating or other agreements.

"***Excluded Suspense Funds***" means those proceeds of production and associated penalties and interest in respect of any Excluded Assets or any Hydrocarbons produced from or attributable to any Excluded Assets that belong to one or more Third Persons and are being held in suspense by any Seller or any Affiliate thereof.

"***Excluded Undisbursed Revenue***" means those proceeds of production and associated penalties and interest in respect of any Excluded Assets or any Hydrocarbons produced from or attributable to any Excluded Assets that belong to one or more Third Persons and have been received by, and at the Closing are being held by, the Sellers on account of such Third Persons for disbursement to such Third Persons after the Closing.

"***Execution Date***" is defined in the preamble.

"***Existing D&O Indemnification Terms***" is defined in Section 10.13(a).

"***Farmout Agreement***" means that Farmout Agreement by and among Fieldwood Energy I, GOM Shelf and Buyer, in the form attached hereto as **Exhibit T**.

"***FCPA***" is defined in Section 4.26.

"***FERC***" means the Federal Energy Regulatory Commission.

"***FERC-Regulated Assets***" is defined in Section 1.6.

"***FERC Petitions***" means (i) that certain Joint Petition of Fieldwood Energy LLC, Fieldwood Energy Offshore LLC, GOM Shelf LLC and QuarterNorth Energy LLC for Limited Waiver and Request for Expedited Action and Shortened Comment Period filed with the United States of America before the Federal Energy Regulatory Commission, Docket No. RP21-1030-

000 and (ii) that certain Supplement to Joint Petition of Fieldwood Energy LLC, Fieldwood Energy Offshore LLC, Fieldwood Energy SP LLC, and QuarterNorth Energy LLC for Limited Waivers and Request for Expedited Action and Shortened Comment Period filed with the United States of America before the Federal Energy Regulatory Commission, Docket No. RP21-901-000.

"**Field Assets**" means the Leases, Subject Units, Easements, Wells and Inventory.

"**Field Data**" is defined in <u>Section 1.2(x)</u>.

"**Fieldwood**" is defined in the preamble.

"**Fieldwood Energy I**" means a Texas limited liability company to be formed pursuant to the Plan of Merger under the name Fieldwood Energy I LLC (or such other name as may be substituted therefor in the final, as filed version of the Plan of Merger).

"**Fieldwood Energy I Closing Accounts Payable**" means, whether classified on the books and records of the Sellers as an account payable or otherwise, expenses of the Sellers incurred by any Seller as of the Effective Time but not yet paid as of the Effective Time and attributable to the FWE I Oil and Gas Properties and the GOM Shelf Oil and Gas Properties, including, without limitation:

(a)       payables arising from the exploration of and production and sale of oil and gas from the FWE I Oil and Gas Properties and the GOM Shelf Oil and Gas Properties;

(b)       payables to third parties on account of third party working interest owners to the extent that there is a corresponding joint interest billing receivable included in the Fieldwood Energy I Closing Accounts Receivable;

(c)       obligations for Royalties in respect of the FWE I Oil and Gas Properties or the GOM Shelf Oil and Gas Properties payable on account of Hydrocarbons produced from the FWE I Oil and Gas Properties or the GOM Shelf Oil and Gas Properties and sold prior to and unpaid as of the Effective Time (*provided* that if a Royalty reporting, miscalculation, or underpayment claim is asserted after the Effective Time with respect to any Royalty paid prior to the Effective Time such claim or obligation shall not be deemed a Fieldwood Energy I Closing Accounts Payable except to the extent any such reporting, miscalculation, or underpayment claim (i) totals more than $1,000,000, (ii) arises out of the willful misconduct of the person or persons performing such reporting, calculations, or payments as determined by a final, non-appealable judgment of a court or other tribunal having jurisdiction) and (iii) is asserted within three (3) years of the Closing Date;

(d)       the GOM Shelf and FW GOM Pipeline Payables;

*provided*, that, Fieldwood Energy I Closing Accounts Payable shall exclude:

(i)       obligations for FWE I Suspense Funds, Excluded Suspense Funds and Excluded Prepaid JOA Funds;

(ii)       Interim Unpaid P&A Expenses;

   (iii) obligations to pay Royalties on Hydrocarbons produced from FWE I Oil and Gas Properties or GOM Shelf Oil and Gas Properties and sold from and after the Effective Date;

   (iv) payables to third parties on account of third party working interest owners other than those described in <u>clause (b)</u> above;

   (v) any Royalty reporting, miscalculation, or underpayment claim in respect of the FWE I Oil and Gas Properties or the GOM Shelf Oil and Gas Properties payable on account of Hydrocarbons produced from the FWE I Oil and Gas Properties or the GOM Shelf Oil and Gas Properties except as described in <u>clause (c)</u> above;

   (vi) any fines or penalties levied or imposed by governmental authorities prior to the Effective Time with respect to the FWE I Oil and Gas Properties or the GOM Shelf Oil and Gas Properties;

   (vii) P&A Obligations and Decommissioning expenses; and

   (viii) obligations satisfied, compromised (to the extent compromised), settled, released or discharged pursuant to the Plan and Confirmation Order.

 "***Fieldwood Energy I Closing Accounts Receivable***" means all accounts, notes and other receivables of the Sellers attributable to the FWE I Oil and Gas Properties or the GOM Shelf Oil and Gas Properties as of the Effective Time, including all accounts, notes and other receivables attributable to the sale of oil or gas produced and sold from the FWE I Oil and Gas Properties or the GOM Shelf Oil and Gas Properties prior to or as of the Effective Time and joint interest billing receivables for expenses paid by the Sellers as of the Effective Time or for which a payable is included in the Fieldwood Energy I Closing Accounts Payable; *provided* "Fieldwood Energy I Closing Accounts Receivable" shall exclude the Specified Excluded Receivables.

 "***Fieldwood Energy III***" means Fieldwood Energy III LLC, a Texas limited liability company.

 "***Fieldwood Mexico***" means Fieldwood Mexico B.V., a Dutch private company.

 "***Fieldwood U.A.***" means Fieldwood Coöperatief U.A.

 "***Fieldwood U.A. Interests***" is defined in <u>Section 1.2(oo)</u>.

 "***Final Allocation***" is defined in <u>Section 2.2</u>.

 "***Financial Statements***" means (a) the consolidated quarterly financial statements (unaudited) of Sellers for the fiscal quarter ended September 30, 2020 and the elapsed portion of the fiscal year then ended and (b) the consolidated annual financial statements of Sellers for the year ended December 31, 2019.

 "***FLTL ERO Backstop Agreement***" has the meaning set forth in the Plan.

"*FLTL Subscription Rights*" means the "FLTL Subscription Rights" as defined in the Plan.

"*Fourth Amendment to Office Sublease*" is defined in the definition of Office Sublease.

"*Fraud*" means common law fraud and requires (a) a false representation with respect to a representation or warranty made by Sellers in Article IV or any certificate delivered by Sellers hereunder, (b) knowledge or belief that the representation was false when made, (c) with intent to induce, and (d) justifiable reliance upon the representation (it being acknowledged that each of Buyer and Buyer 2 has relied on each of the representations in Article IV and the certificates delivered hereunder).

"*Fundamental Representations*" means the representations and warranties set forth in Section 4.1, Section 4.2, Section 4.3(a), Section 4.4, Section 4.5, Section 4.31(a) and Section 4.31(f).

"*Funding Agreement*" means a Funding Agreement by and between Buyer and Fieldwood, in the form attached hereto as **Exhibit W**.

"*FW GOM Pipeline*" is defined in the preamble.

"*FWE I Assets*" has the meaning set forth in Part A of Schedule I to the Plan of Merger as of the date hereof as reflected in the Plan of Merger as it exists on the date hereof but excluding the Specified Oil and Gas Interests and the Specified P&A Equipment.

"*FWE I Obligations*" has the meaning set forth in Part B of Schedule I to the Plan of Merger.

"*FWE I Oil and Gas Properties*" has the meaning set forth in Part A of Schedule I to the Plan of Merger as of the date hereof as reflected in the Plan of Merger as it exists on the date hereof but excluding the Specified Oil and Gas Interests.

"*FWE I Suspense Funds*" means all funds held in suspense (i) by Fieldwood to the extent attributable to any of the FWE I Assets and (ii) by GOM Shelf, and any interest accrued in escrow accounts for such suspended funds.

"*GAAP*" means generally accepted accounting principles in the United States of America, consistently applied.

"*GOM Shelf*" is defined in the preamble.

"*GOM Shelf and FW GOM Pipeline Payables*" means the payables of GOM Shelf and FW GOM Pipeline as of the Effective Time (as determined consistent with the definition of Fieldwood Energy I Closing Accounts Payable).

"*GOM Shelf Oil and Gas Properties*" has the meaning set forth in the Plan of Merger as of the date hereof as reflected in the Plan of Merger as it exists on the date hereof but excluding the Specified Oil and Gas Interests.

"***Governmental Approval***" means any authorization, consent, approval, exemption, franchise, permit or license of, or filing with, or notice or any other action by, any relevant Governmental Authority.

"***Governmental Authority***" means any transnational, domestic or foreign governmental or quasi-governmental federal, state, provincial, county, city, regulatory or administrative authority or other political subdivision or any officer, department, bureau, agency, commission, court or other statutory or regulatory body or instrumentality thereof.

"***Governmental Settlement Agreement***" is defined in Section 6.17.

"***GUC Warrants***" has the meaning set forth in the Plan.

"***Hedges***" is defined in Section 1.2(hh).

"***HSR Act***" means the Hart-Scot-Rodino Antitrust Improvements Act of 1976, and the rules and regulations promulgated thereunder.

"***Hydrocarbons***" is defined in Section 1.2(f).

"***Imbalance***" means (a) any imbalance between (i) the quantity of Hydrocarbons produced from any well and allocated to a Person from time to time and (ii) the share of such production to which such Person is actually entitled by virtue of its ownership interest in such well or in the lease or unit under which such well is produced and (b) any imbalance between (i) the quantity of Hydrocarbons produced from any oil and gas asset and actually delivered from a Third Person pipeline and allocated to a Person from time to time and (ii) the share of such Hydrocarbons to which such Person is actually entitled to receive from such Third Person pipeline.

"***Implementation Agreement***" means that certain Apache Term Sheet Implementation Agreement dated January 1, 2021, by and between Fieldwood, GOM Shelf, Apache Corporation, Apache Shelf, Inc., Apache Deepwater LLC, and Apache Shelf Exploration LLC.

"***Income Taxes***" means any and all Taxes imposed on, measured or determined in whole or in part by reference to net income, gross income or gross receipts.

"***Indemnification Claim***" is defined in Section 13.3(a).

"***Indemnified Party***" means a Party entitled to indemnification under this Agreement, whether on behalf of itself or, with respect to the Sellers, any of the Seller Indemnified Parties.

"***Indemnifying Party***" means a Party from whom indemnification is sought under this Agreement by an Indemnified Party.

"***Indemnitors***" is defined in Section 10.13(b).

"***Initial Allocation***" is defined in Section 2.2.

"***Intellectual Property***" means any and all intellectual property rights or industrial property rights throughout the world, including all (a) national and multinational statutory invention registrations, patents and patent applications of any type issued or applied for in any jurisdiction, including all provisionals, divisions, continuations, continuations-in-part, reissues, extensions, re-examinations and the equivalents of any of the foregoing in any jurisdiction, and all inventions disclosed in each such registration, patent or patent application, (b) trademarks, service marks, trade dress, logos, brand names, certification marks, domain names, trade names, corporate names and other indications of origin, whether or not registered, in any jurisdiction, and all registrations and applications for registration of the foregoing in any jurisdiction, and all goodwill associated with the foregoing (collectively, "***Trademarks***"), (c) copyrights (whether or not registered) and registrations and applications for registration thereof in any jurisdiction, including all derivative works, moral rights, renewals, extensions, reversions or restorations associated with such copyrights, regardless of the medium of fixation or means of expression, (d) trade secrets, information, data, specifications, processes, methods, know-how, formulae, techniques, schematics, drawings, blueprints, utility models, designs, technology, software, inventions, discoveries, ideas and improvements, including manufacturing information and processes, engineering and other manuals and drawings, standard operating procedures, flow diagrams, technical information, research records and similar data and information, (e) database rights, industrial designs and industrial property rights and (f) the right to assert, claim or sue and collect damages for the past, present or future infringement, misappropriation or other violation of any of the foregoing.

"***Interim Period***" means the period from the Execution Date through and including the Closing Date.

"***Interim Unpaid P&A Expenses***" means all incurred but unpaid expenses incurred by Fieldwood for Plugging and Abandonment costs and expenses on the FWE I Oil and Gas Properties between the filing on August 3, 2020, of the Bankruptcy Cases and the Divisive Merger Effective Time to the extent not paid as of the Divisive Merger Effective Time.

"***Inventory***" means the Co-Owned Inventory and Other Inventory.

"***IRS***" means the Internal Revenue Service of the United States.

"***Joint Operating Agreement Amendment***" means the amendments to jointly owned properties operating agreements with respect to those Co-Owned Leases (or portion thereof) that are not subject to any Assigned Contract that is a joint operating agreement or unit operating agreement with one or more Third Persons, in each case that is in form and substance acceptable to Buyer.

"***JV Assignment Agreement***" means the Assignment Agreements (or equivalent) and related instruments to be entered into at Closing by the parties thereto with respect to the transfer of the Fieldwood U.A. Interests and (unless the Completion Date (as defined in the Mexico PSA) has occurred prior to the Closing Date) the JV Interests pursuant to this Agreement, in each case that is in form and substance acceptable to Buyer.

"***JV Interests***" is defined in Section 1.2(oo).

"*JV Shares*" is defined in <u>Section 4.31(c)</u>.

"*Knowledge*" means (a) with respect to Buyer and Buyer 2, the actual knowledge of any executive officer of Buyer or Buyer 2, as applicable, and (b) with respect to the Sellers, the actual knowledge of Thomas Lamme, Mike Dane, William Swingle, Patrick Eiland and John Seeger.

"*Lafayette Lease Agreement*" means that certain Lease Agreement dated as of April 5, 2017, between Fieldwood and Ronnie White Custom Homes, L.L.C.

"*Law*" means all laws, constitutions, treaties, statutes, ordinances, rules, regulations, codes, orders, judgments, decrees, orders, writs, injunctions and decisions of any Governmental Authority, or having the effect of law in any applicable jurisdiction, including all principles of common law.

"*Lease Burdens*" means all royalties, overriding royalties, production payments, carried interests, net profits interests, reversionary interests and similar contractual burdens upon, payable out of or measured by Hydrocarbons produced from or allocated to a Lease; and all rentals, shut-in royalties, minimum royalties and bonus payments under a Lease.

"*Leases*" means the Co-Owned Leases and Other Leases.

"*Liability*" means any debt, Loss, obligation, duty, commitment, demand, responsibility, suit, judgment, undertaking, royalty, deficiency or obligation (including those arising out of any action, such as any settlement or compromise thereof or judgment or award therein), Claim or Encumbrance of any kind or nature whatsoever whether known or unknown, disclosed or undisclosed, expressed or implied, primary or secondary, direct or indirect, matured or unmatured, determined or indeterminable, disputed or undisputed, secured or unsecured, joint or several, asserted or unasserted, fixed, absolute or contingent, accrued or unaccrued, liquidated or unliquidated, whether due or to become due, whether in contract, tort or otherwise, and whether or not required to be accrued on the financial statements of any entity or individual, including those arising under any Law, or imposed by any Governmental Authority or arbitrator of any kind.

"*Licensed Intellectual Property*" means any and all Intellectual Property (a) owned by a Third Person and licensed or sublicensed to a Seller or for which a Seller has obtained a covenant not to be sued, in each case, under an Assigned Contract and (b) related to the ownership or operation of the Acquired Interests.

"*Liquidating Trust*" means a liquidating or similar trust as may be established with respect to Sellers' estates in conjunction with the Bankruptcy Cases.

"*Liquidating Trustee*" means the trustees or other representative of the Liquidating Trust.

"*Losses*" and "*Loss*" means any and all losses, judgments, damages, liabilities, injuries, costs, interest, taxes, settlements, penalties and fines or expenses (including any incidental, indirect or consequential damages, losses, liabilities or expenses, and any lost profits or diminution in value). As used herein, the term "Losses" includes reasonable attorneys' fees and other costs and expenses of any Party entitled to defense or indemnity hereunder incident to (a) the investigation

and defense of any Claim that results in litigation or the settlement of any Claim or (b) the enforcement of such defense or indemnity rights under this Agreement.

"**Lubrizol Sublease**" means that certain Sublease, dated December 22, 2018, by and between The Lubrizol Corporation, as sublandlord, and Fieldwood Energy LLC, as subtenant, for Suite 320 in the building known as One Briarlake Plaza and located at 2000 W. Sam Houston Parkway South, Houston, Texas, and that certain Consent to Sublease, effective as of January 29, 2019.

"**Marketing Contracts**" means each marketing-related contract designated in the column titled "Contract Type" on the Schedule of Assumed Contracts (as defined in the Plan) (e.g., Marketing, Sales, Gathering, Handling, Transport, Processing).

"**Material Adverse Effect**" means a result, event, occurrence, change, circumstance, development or consequence that, individually or in the aggregate, would reasonably be expected to (a) materially and adversely affect the value, condition (financial or otherwise) or results of operations of the Acquired Interests taken as a whole or (b) materially and adversely affect the ability of the Sellers to perform their obligations under this Agreement or the documents executed in connection herewith or consummate the transactions contemplated herein and therein; *provided*, that, with respect to clause (a) only, any result, event, occurrence, change, circumstance, development or consequence to the extent resulting from any of the following matters shall not be taken into account in determining whether a Material Adverse Effect has occurred: (i) changes in financial or securities markets generally; (ii) changes in general economic or political conditions in the United States or worldwide; (iii) changes in conditions or developments generally applicable to the oil and gas industry in the area where the Acquired Interests are located, including, but not limited to, changes in the market price of oil and natural gas; (iv) actions taken after the date of this Agreement as required by this Agreement or with the written consent of Buyer; (v) the commencement or pendency of the Bankruptcy Cases and any adverse effects resulting therefrom, (vi) entering into this Agreement or the announcement of the transactions contemplated hereby (provided, that this clause (vi) shall not be excluded with respect to the representations and warranties and related conditions contained in this Agreement that address the consequences of the execution, announcement or performance of this Agreement or the consummation of the transactions contemplated hereby); (vii) acts of God, including hurricanes, storms or other naturally occurring events; (viii) acts or failures to act of Governmental Authorities, except as a result of any action or inaction by or on behalf of the Sellers; (ix) matters expressly disclosed on any Exhibit or Annex to this Agreement or in the Disclosure Schedules; (x) any epidemic, pandemic or disease outbreak (including the COVID-19 virus) or hostilities, terrorist activities or war or any similar disorder and, in each case, governmental actions related thereto; (xi) matters that are cured or no longer exist by the earlier of Closing and the termination of this Agreement; (xii) any change in laws or in GAAP and any interpretations thereof from and after the Execution Date; (xiii) any reclassification or recalculation of reserves in the ordinary course of business; (xiv) natural declines in well performance; (xv) the departure of officers or directors of the Sellers after the Execution Date; (xvi) any objections in the Bankruptcy Court to (A) this Agreement and the other Ancillary Documents and the transactions contemplated hereby and thereby, (B) the reorganization of any Seller and any related plan of reorganization or disclosure statement or (C) the Plan of Merger or transactions contemplated thereby; and (xvii) any order of the Bankruptcy Court (except any such order that would preclude or prohibit the Sellers from consummating the

transactions contemplated by this Agreement) or any actions or omissions of the Sellers in compliance therewith; *provided*, that, with respect to clauses (i) through (iii), (vii), (viii), (x) and (xii) any such result, event, occurrence, change, circumstance, development or consequence shall not be disregarded to the extent that it has had a disproportionate effect on the Acquired Interests relative to similar oil and gas assets in the Gulf of Mexico held by other participants in the industries in which the Acquired Interests are operated.

"***Material Contract***" is defined in Section 4.14(a).

"***Mexico JV***" is defined in Section 1.2(oo).

"***Mexico PSA***" means that certain Purchase Agreement, dated as of July 2, 2021, by and between Fieldwood, Buyer and Lukoil International Holding GMBH, a private company with limited liability under the laws of Austria.

"***Net Revenue Interest***" means, with respect to each Lease and Scheduled Well, the interest in and to all Hydrocarbons produced and saved from or attributable to such Lease or Scheduled Well, after giving effect to all valid Lease Burdens, carried interests, reversionary interests and other similar interests constituting burdens upon, measured by or payable out of Hydrocarbons produced and saved from or attributable to such Lease or Scheduled Well.

"***New Equity Interests***" has the meaning set forth in the Plan.

"***New Money Warrants***" has the meaning set forth in the Plan.

"***Non-Recourse Party***" is defined in Section 12.14.

"***Non-Transferred Asset***" is defined in Section 10.3(b).

"***NORM***" means naturally occurring radioactive material.

"***Notice***" is defined in Section 12.2.

"***Office Assets***" is defined in Section 1.2(ee).

"***Office Assets Conveyance***" means that Bill of Sale, Assignment and Assumption Agreement to be entered into at the Closing by the parties thereto, in the form attached as **Exhibit K** hereto.

"***Office Sublease***" means that certain Sublease Agreement, dated as of September 30, 2013, between Apache Corporation, as sublessor, and Fieldwood, as sublessee, for space in the building known as One BriarLake Plaza located at 2000 West Sam Houston Parkway South, Houston, Texas, as amended by (i) First Amendment to Sublease Agreement, dated as of January 2, 2014, (ii) Second Amendment to Sublease Agreement, dated as of September 7, 2017, (iii) Third Amendment to Sublease Agreement, dated as of May 28, 2018, and (iv) Fourth Amendment to Sublease Agreement, dated as of January 1, 2021 (the "***Fourth Amendment to Office Sublease***").

"***Organizational Documents***" is defined in Section 4.31(b).

"***OSFR***" means Oil Spill Financial Responsibility.

"***Other Assets***" is defined in Section 1.2.

"***Other Assigned Contracts***" means all Assigned Contracts other than the Co-Owned Assigned Contracts.

"***Other Easements***" is defined in Section 1.2(r).

"***Other Field Assets***" means the Other Leases, Other Subject Units, Other Easements, Other Wells and Other Inventory.

"***Other Inventory***" is defined in Section 1.2(t).

"***Other Leases***" is defined in Section 1.2(p).

"***Other Records***" is defined in Section 1.2(y).

"***Other Scheduled Wells***" is defined in Section 1.2(s).

"***Other Subject Unit***" is defined in Section 1.2(q).

"***Other Subject Unit Agreement***" is defined in Section 1.2(q).

"***Other Wells***" is defined in Section 1.2(s).

"***Owned Intellectual Property***" means any and all Intellectual Property (except for Trademarks) (a) owned or purported to be owned by any Seller and (b) related to the ownership or operation of the Acquired Interests.

"***P&A Obligations***" means any and all obligations, liabilities, damages, losses, and claims arising out of or attributable to the payment or performance of all Plugging and Abandonment.

"***Parties***" and "***Party***" are defined in the preamble.

"***Permit***" means any permit, license, authorization, certificate, registration, franchise, exemptions, waiver, consent, approval or other similar rights or privileges granted by any Governmental Authority.

"***Permitted Encumbrances***" means:

(a)     easements, restrictive covenants, servitudes, permits, surface leases and other rights with respect to surface operations, and rights-of-way on, over or in respect of any of the Acquired Interests that, singularly or in the aggregate, do not prevent or materially interfere with the ownership, value or operation of the affected Acquired Interests and which are of a nature that would be reasonably acceptable to a prudent owner or operator of oil and gas properties;

(b)     all applicable Laws and all rights reserved to or vested in any Governmental Authority: (1) to control or regulate the Assets in any manner, (2) by the terms of any right, power,

franchise, grant, license or Permit issued by any Governmental Authority, or by any provision of applicable Law, to terminate such right, power, franchise, grant, license or permit or to purchase, condemn, expropriate or recapture or to designate a purchaser of any Asset; (3) to use such Asset in a manner which does not materially impair the use of such property for the purposes for which it is currently owned and operated; or (4) to enforce any obligations or duties affecting the Assets to any Governmental Authority with respect to any franchise, grant, license or permit, excluding in each case of <u>clauses (1)</u> through <u>(4)</u> any such rights or Laws resulting from any breach, default, violation or non-compliance with any Law or Permit;

(c)     the terms, conditions, restrictions, exceptions, reservations, limitations and other matters (including dedications thereof) contained in (1) the Leases, (2) the Assigned Contracts, (3) the Preferential Rights disclosed on **<u>Schedule 4.8(a)</u>**, and (4) the Easements, but excluding in each case of <u>clauses (1)</u> through <u>(4)</u> any such terms, conditions, restrictions, reservations, exceptions, limitations or other matters resulting from any breach, violation, default or non-compliance;

(d)     Encumbrances for Taxes or assessments not yet due and payable or, if due and payable, those Taxes or assessments that are being contested in good faith by proceedings diligently conducted in the normal course of business and for which adequate reserves have been established in accordance with applicable accounting principles;

(e)     mechanic's, materialmen's, carrier's, supplier's, vendor's, repairer's or other similar statutory Encumbrances arising in the ordinary course of business securing obligations that are (i) not yet delinquent or (ii) satisfied, settled, released or discharged pursuant to the Plan and Confirmation Order;

(f)     utility easements, restrictive covenants, zoning, entitlement, building, subdivision and other similar restrictions that, singularly or in the aggregate, do not prevent or materially interfere with the ownership, value or operation of the affected Acquired Interests and which are of a nature that would be reasonably acceptable to a prudent owner or operator of offshore oil and gas properties;

(g)     Encumbrances created by Buyer, Buyer 2 or any of their respective successors or assigns;

(h)     any lessor's, operator's, working interest owner's or other inchoate or undetermined Encumbrance or charge (whether statutory or contractual) constituting or securing the payment of Lease Burdens or of expenses which were or will be incurred in the ordinary course of business and incidental to the maintenance, development, production or operation of any Acquired Interest, to the extent the same are satisfied, settled, released or discharged pursuant to the Plan and Confirmation Order;

(i)     Lease Burdens, division orders, carried interests, rights to recoupment, unitization, pooling, proration and spacing designations, orders and agreements, reversionary interests, rights to take in kind, and any other similar Encumbrance;

(j)     any charge, equitable interest, privilege, lien, mortgage, deed of trust, production payment, option, pledge, collateral assignment, security interest, right of first refusal,

restriction, encroachment, defect, or other arrangement substantially equivalent thereto, or other defect or irregularity of any kind, in each case, that will be permanently and fully extinguished with respect to the Acquired Interests pursuant to the Confirmation Order;

(k)    all Governmental Approvals in connection with the conveyance of the Acquired Interests, if the same are permitted to be received after Closing and are customarily sought and received after Closing;

(l)    such other defects or irregularities of title or encumbrances as Buyer or Buyer 2 may expressly waive in writing;

(m)    any maintenance of uniform interest provision in a joint or unit operating agreement if waived by the party or parties having the right to enforce such provision;

(n)    any Encumbrance affecting the Assets that is permanently and fully discharged by the Sellers at or prior to the Closing;

(o)    non-exclusive licenses of, to or under any Intellectual Property granted in the ordinary course of business;

(p)    rights of a common owner of any interest in rights-of-way, Permits or easements (including Easements) held by the Sellers and such common owner as tenants in common or through common ownership that, singularly or in the aggregate, do not prevent or materially interfere with the ownership, value or operation of the affected Acquired Interests;

(q)    any matters set forth on **Exhibit A** or **Exhibit C**, all litigation and claims set forth on **Schedule 4.6**, and all Imbalances set forth on **Schedule 4.15**; and

(r)    all depth restrictions or limitations applicable to any Acquired Interests to the extent set forth on **Exhibit A** or **Exhibit C**.

"***Person***" means any individual, corporation, limited liability company, partnership, trust, joint stock company, joint venture, association, unincorporated organization, Governmental Authority or any other form of entity.

"***Personal Information***" is defined in Section 4.25(i).

"***Petition Date***" means August 3, 2020.

"***Plan***" is defined in the recitals.

"***Plan of Merger***" means the form of Agreement and Plan of Merger of Fieldwood into Fieldwood Energy I and Fieldwood Energy III which was filed with the Bankruptcy Court as an "Apache Definitive Document" with the *Notice of Filing of Plan Supplement with Eighth Amended Joint Chapter 11 Plan of Fieldwood Energy LLC and Its Affiliated Debtors* [Docket No. 1756].

"***Plan Supplement***" has the meaning set forth in the Plan.

"***Plugging and Abandonment***" and its derivatives mean all plugging, replugging, abandonment, re-plugging and re-abandonment, equipment removal, disposal, or restoration associated with the properties and assets included in or burdened by the FWE I Assets, including all plugging and abandonment, removal, dismantling, decommissioning, surface and subsurface restoration, site clearance, and disposal of the FWE I Oil and Gas Properties, well cellars, fixtures, platforms, caissons, flowlines, pipelines, structures, and personal property of whatever kind located on or under, related to, or associated with operations and activities conducted by whomever with respect to each of the FWE I Oil and Gas Properties, the flushing, pickling, burial, removal, and capping of all associated flowlines, field transmission and gathering lines, pit closures, the restoration of the surface, site clearance, any disposal of related waste materials and Environmental Contaminants and obligations to obtain plugging exceptions for any of the FWE I Oil and Gas Properties, with a current plugging exception, all in accordance with all applicable Laws, the terms and conditions of each of the FWE I Oil and Gas Properties, or similar leasehold interests, beneficial interests, easements and the FWE I Oil and Gas Properties.

"***Post-Closing Consent Period***" is defined in Section 2.3(d).

"***Post-Closing Tax Period***" means any taxable period beginning after the Closing Date and, with respect to a Straddle Period, the portion of such Straddle Period beginning after the Closing Date.

"***Pre-Closing Tax Period***" means any taxable period ending on or before the Closing Date and, with respect to a Straddle Period, the portion of such Straddle Period ending on and including the Closing Date.

"***Preferential Right***" means any preferential right to purchase, right of first refusal, right of first offer or similar right that is applicable to the Acquired Interests or the Assigned Contracts and the operation of which is triggered by the transactions contemplated in this Agreement.

"***Prepaid JOA Funds***" is defined in Section 10.2(b).

"***Production Taxes***" means any and all severance, production, gathering, Btu or gas, transportation, gross receipts, utility, excise and other similar taxes (other than Property-Related Taxes, Transfer Taxes and taxes based on or measured by income or gross or net worth) relating to the production, gathering or transportation of Hydrocarbons, or increases therein, and any interest or penalties thereon.

"***Property-Related Taxes***" means any and all ad valorem, property, generation, conversion, privilege, consumption, lease, transaction and other taxes, franchise fees, governmental charges or fees, licenses, fees, permits and assessments, or increases therein, and any interest or penalties thereon.

"***Quitclaim Deeds***" means each Quitclaim Deed and Act of Sale to be entered into at Closing by the parties thereto in the forms attached as **Exhibit J-1** and **Exhibit J-2** hereto.

"***Records***" means the Co-Owned Records and Other Records.

"***Release***" means any release, disposal, spilling, leaking, pouring, emission, emptying, discharge, injection, escape, transmission, leaching or dumping, or any threatened release, of any Environmental Contaminants from, or related in any way to the use, ownership or operation of, the Acquired Interests.

"***Remaining Accounts***" is defined in Section 10.12(d).

"***Representatives***" means, with respect to a Person, the directors, managers, shareholders, members, partners, officers, employees, consultants, advisors, agents or other representatives, including legal counsel, accountants, investment bankers and financial advisors of (i) such Person, (ii) such Person's Affiliates, (iii) the successors and assigns of such Person and (iv) the successors and assigns of such Person's Affiliates; *provided* however that solely with respect to Buyer and Buyer 2, the term "Representatives" shall also include Davis Polk & Wardwell LLP.

"***Required Consent***" is defined in Section 2.3(b).

"***Restructuring Support Agreement***" means that certain *Restructuring Support Agreement*, dated as of August 4, 2020, by and among Fieldwood, certain of its affiliates specified therein, the Consenting Creditors, and Apache Corporation, as the same may be amended, restated, or otherwise modified in accordance with its terms.

"***Retained Liabilities***" is defined in Section 11.2.

"***Retained Taxes***" is defined in Section 11.2(m).

"***Royalties***" means all minimum royalties, shut-in payments, royalties, overriding royalties, reversionary interests, net profits interests, production payments, carried interests, non-participating royalty interests, reversionary interests, and other royalty burdens and other interests payable out of production of Hydrocarbons from or allocated to the FWE I Oil and Gas Properties, the GOM Shelf Oil and Gas Properties, or the proceeds thereof to third parties.

"***RUE***" is defined in Section 10.14.

"***Section 6.8 Employee***" means each of those employees of Sellers specified in the email from Samuel C. Peca of Weil, Gotshal & Manges LLP to Cheryl Chan of Davis Polk & Wardwell LP on August 4, 2021 at 8:00 a.m. Eastern Time.

"***Scheduled Wells***" means the Co-Owned Scheduled Wells and Other Scheduled Wells.

"***Second Lien Backstop Commitment Letter***" has the meaning set forth in the Plan.

"***Seller***" and "***Sellers***" is defined in the preamble.

"***Seller Employees***" is defined in Section 4.17(a).

"***Seller Indemnified Parties***" is defined in Section 13.2.

"**Seller IT Assets**" means any and all computers, networks, systems, printers, software, firmware, middleware, servers, workstations, routers, hubs, switches, data communications lines, and all other information technology equipment, and all associated documentation, owned or purported to be owned by any Seller.

"**Seller Marks**" mean Trademarks owned by any Seller, including "Fieldwood," and any variations thereof.

"**Seller Related Parties**" is defined in Section 4.24.

"**SEMS Bridging Agreement**" means that Bridging Agreement by and among Buyer, Fieldwood Energy I and GOM Shelf, in the form attached hereto as **Exhibit Q**.

"**SLTL ERO Backstop Agreement**" has the meaning set forth in the Plan.

"**SLTL Subscription Rights**" has the meaning set forth in the Plan.

"**SLTL Warrants**" has the meaning set forth in the Plan.

"**Specified Excluded Receivables**" means each of the following:

(a)    all deposits with third parties, escrow accounts, guarantees, letters of credit, treasury securities and insurance policies, in each case to the extent relating to the FWE I Assets and surety bonds, all OSFR coverage (whether consisting of one or more insurance policies) and other forms of credit assurances or credit support provided by a third party for the benefit of the Sellers, in each case to the extent for financial assurance for the obligations and liabilities arising out of or related to the FWE I Assets, the GOM Shelf Oil and Gas Properties or GOM Shelf, including the P&A Obligations arising out of or related to the FWE I Assets or the GOM Shelf Oil and Gas Properties, including those items listed on **Exhibit U**;

(b)    instruments and general intangibles (as such terms are defined in the Uniform Commercial Code of the applicable jurisdictions in which the FWE I Oil and Gas Properties or the GOM Shelf Oil and Gas Properties to which such assets relate are located) and other economic benefits in each case attributable to the FWE I Oil and Gas Properties or the GOM Shelf Oil and Gas Properties (excluding any accounts, notes or other receivables attributable to the FWE I Oil and Gas Properties or the GOM Shelf Oil and Gas Properties or of GOM Shelf); *provided*, that nothing in this clause (b) shall be interpreted to limit the scope of Fieldwood Energy I Closing Accounts Receivable;

(c)    claims of indemnity, contribution, or reimbursement of the Sellers or of GOM Shelf, in each case, relating to the FWE I Obligations or obligations of GOM Shelf;

(d)    receivables of the Sellers for imbalances attributable to the FWE I Oil and Gas Properties or the GOM Shelf Oil and Gas Properties;

(e)    rights to insurance proceeds or other claims of recovery, indemnity, contribution, or reimbursement of the Sellers attributable to the FWE I Assets or the GOM Shelf

Oil and Gas Properties due to casualty or other damage or destruction of or to the FWE I Oil and Gas Properties or the GOM Shelf Oil and Gas Properties;

(f)     cash in the amount of advance payments on account of third party working interest owners in the FWE I Oil and Gas Properties or the GOM Shelf Oil and Gas Properties, to the extent such cash amounts are associated with FWE I Obligations; and

(g)     rights to receive and collect cash and advance payments, in each case pursuant to cash calls associated with the FWE I Oil and Gas Properties or the GOM Shelf Oil and Gas Properties to the extent such cash and advance payments are associated with FWE I Obligations.

"*Specified Matters*" means the civil penalties described on Exhibit D to the August 20 Settlement.

"*Specified Oil and Gas Interests*" means the assets listed on **Exhibit Y**.

"*Specified P&A Equipment*" means the equipment listed on **Exhibit Z**.

"*ST 308 Performance Bond*" means that ST 308 Performance Bond to be entered into by and among Buyer, Apache Corporation and the surety named therein, a form of which is attached as **Exhibit R** hereto.

"*Straddle Period*" means any taxable period beginning on or prior to the Closing Date and ending after the Closing Date.

"*Straddle Period Non-Income Taxes*" means any and all Property-Related Taxes, Production Taxes, or other periodic non-income Taxes relating to the Acquired Interests, in each case, attributable to a Straddle Period that are first due and payable after the Closing Date.

"*Subject Unit Agreement*" means the Co-Owned Subject Unit Agreements and Other Subject Unit Agreements.

"*Subject Units*" means the Co-Owned Subject Units and Other Subject Units.

"*Subscription Rights*" has the meaning set forth in the Plan.

"*Subsidiary*" means, with respect to any Person, any entity of which such first Person (either alone or through or together with any other Person pursuant to any contract) (a) owns, directly or indirectly, securities or other ownership interests having ordinary voting power to elect a majority of the board of directors or other governing body of such corporation, partnership, limited liability company, joint venture or other entity or other persons performing similar functions or (b) acts as the managing member or general partner of such other Person that is a partnership, limited liability company, joint venture or other entity.

"*Superior Yard*" means the property located at 203 Commission Blvd. Lafayette, LA 70508.

"*Suspense Funds*" means those proceeds of production and associated penalties and interest in respect of any Field Assets or any Hydrocarbons produced from or attributable to any Field Assets that belong to one or more Third Persons and are being held in suspense by any Seller or any Affiliate thereof.

"*Tail Policy*" means the directors and officers insurance policies of the Sellers, including that certain policy issued by Sompo International (Endurance American Insurance Company), Policy Number BLP300011112000, and each additional layer of directors and officers insurance held by the Sellers.

"*Tax*" means (i) all U.S. federal, state, local or non-U.S. taxes, including all income, gross receipts, license, payroll, employment, excise, severance, stamp, occupation, premium, environmental, customs duties, capital stock, ad valorem, value added, inventory, franchise, profits, withholding, windfall profit, social security, surcharge, impost, unemployment, disability, health, real property, personal property, mortgage, production, sales, use, occupancy, transfer, registration, alternative or add-on minimum, estimated or other similar tax of any kind whatsoever or any assessment, duty, levy, fee or charge of any kind in the nature of (or similar to) taxes imposed by any Governmental Authority, and including any interest, penalty, or addition thereto, (ii) any liability for the payment of any amounts of the type described in clause (i) as a result of any obligation to indemnify or otherwise assume or succeed to the liability of any other person, including as a transferee or successor, whether imposed by Law or Contract and (iii) in the case of Fieldwood U.A. and Fieldwood Mexico or any of their respective Subsidiaries, any liability for the payment of amounts determined by reference to amounts described in clauses (i) and (ii) as a result of being or having been a member of any Company Group (including, in each case, for any Tax purposes or by operation of Law), as a result of any obligation under any agreement or arrangement (including any Tax Sharing Agreement), as a result of being a transferee or successor, or by Contract.

"*Tax Return*" means any return, claim for refund, declaration, disclosure, election, report, statement, information return or other similar document (including any related or supporting information, amendments, schedule or supplements of any of the foregoing) filed or required to be filed with any Governmental Authority with respect to Taxes.

"*Tax Sharing Agreement*" means any agreement or arrangement, including any Tax sharing, allocation, indemnification, reimbursement, receivables or similar agreement entered into prior to the Closing binding Fieldwood U.A. or Fieldwood Mexico or any of their respective Subsidiaries that provides for the allocation, apportionment, sharing or assignment of any Tax liability or Tax benefit, or the transfer or assignment of income, revenues, receipts, or gains for the purpose of determining any Person's Tax liability (other than any customary commercial contract entered into in the ordinary course of business the principal subject matter of which is not Taxes).

"*Third Person*" means any Person other than the Sellers, Buyer or Buyer 2.

"*Trademarks*" is defined in the definition of Intellectual Property.

"*Transfer Documents*" means each Assignment, Bill of Sale and Conveyance, the Assignment and Assumption Agreement, the Office Assets Conveyance, the Assignment of Leases

and Subleases, the Quitclaim Deeds, Form-BSEE 149, Form-BOEM 150, Form-BOEM 151 and each JV Assignment Agreement.

"*Transfer Taxes*" means any sales, use, goods and services, value added, stock, stamp, document, filing, recording, registration and similar tax or charge (including any interest or penalties thereon and the cost of preparing any Tax Returns with respect thereto).

"*Transferred Employee*" is defined in Section 6.8(a).

"*Transferred Intellectual Property*" means the Owned Intellectual Property and Licensed Intellectual Property.

"*TSA*" means that Transition Services Agreement to be entered into by Buyer, Fieldwood Energy I and GOM Shelf in the form attached as **Exhibit P** hereto.

"*Undisbursed Revenue*" means those proceeds of production and associated penalties and interest in respect of any Field Assets or any Hydrocarbons produced from or attributable to any Field Assets that belong to one or more Third Persons and have been received by, and at the Closing are being held by, the Sellers on account of such Third Persons for disbursement to such Third Persons after the Closing.

"*Unit*" means a unit for the production and operation of a Hydrocarbon well created by the pooling, unitization or communitization, whether voluntary or governmental, of any or all portions of any Leases and the lands covered thereby with other oil and gas leases or lands.

"*Utilities Order*" means that certain Order of the Bankruptcy Court entered on August 5, 2020, providing for, among other things, "Approving Debtors' Proposed Form of Adequate Assurance of Payment to Utility Companies".

"*Warehouse Lease*" means that certain Lease dated as of November 15, 2019, by and between Cheyenne Services, LLC, as lessor, and Fieldwood Energy LLC, as lessee, for leased premises located at 108 Galbert Rd., Lafayette, LA, as amended by (i) First Amendment to Lease, executed April 26, 2020 and (ii) Second Amendment to Lease, executed November 10, 2020.

"*Wells*" means the Co-Owned Wells and Other Wells.

"*White Shoal Equity*" is defined in Section 1.2(uu).

"*Working Capital Assets*" means, without duplication, (a) the current assets of the Sellers as of immediately prior to the Effective Time; *provided* that this clause (a) shall include only the types of current assets set forth as line items under the header "Current Assets" on **Exhibit X**, excluding the Specified Excluded Receivables, and (b) the Fieldwood Energy I Closing Accounts Receivable.  For the avoidance of doubt, Working Capital Assets shall not include any cash, including Suspense Funds, Undisbursed Revenue and Prepaid JOA Funds.

"*Working Capital Liabilities*" means, without duplication, (a) the current liabilities of the Sellers as of immediately prior to the Effective Time; *provided* that this clause (a) shall include only the types of current liabilities set forth as line items under the header "Current Liabilities" on

**Exhibit X**, excluding any prepetition accounts, Interim Unpaid P&A Expenses, obligations for FWE I Suspense Funds, Excluded Suspense Funds or Excluded Prepaid JOA Funds, P&A Obligations and Decommissioning expenses or any obligations satisfied, compromised (to the extent compromised), settled, released or discharged pursuant to the Plan and Confirmation Order, and (b) the Fieldwood Energy I Closing Accounts Payable; *provided, further*, that in no event shall Working Capital Liabilities include Effective Date Cash Obligations.

"***Working Interest***" means, with respect to each Lease and Scheduled Well, the interest that represents the ownership of the oil and gas leasehold estate created by such Lease or Scheduled Well and that is burdened with the obligation to bear and pay costs of operations on or in respect of such Lease or Scheduled Well.

[End of Annex I]

*8/25/2021*

**EXHIBITS AND SCHEDULES**

**to the**

**PURCHASE AND SALE AGREEMENT**

**AMONG**

**FIELDWOOD ENERGY LLC**

**AND**

**ITS AFFILIATES SIGNATORY HERETO**

**AS SELLERS**

**AND**

**QUARTERNORTH ENERGY LLC**

**AS BUYER**

**AND**

**MAKO BUYER 2 LLC**

**AS BUYER 2**

**DATED**

**AUGUST 27, 2021**

WEIL:\97869848\17\45327.0007

## EXHIBIT LIST

| **Exhibit** | **Title** |
| --- | --- |
| EXHIBIT A | Leases |
| EXHIBIT B | Easements |
| EXHIBIT C | Scheduled Wells |
| EXHIBIT D | Platforms and Facilities |
| EXHIBIT D-1 | Inventory |
| EXHIBIT E | Permits |
| EXHIBIT F | Seismic Data |
| EXHIBIT G | Form of Assignment, Bill of Sale and Conveyance for Co-Owned Assets |
| EXHIBIT H | Form of Assignment, Bill of Sale and Conveyance for Other Assets |
| EXHIBIT I | Form of Assignment and Assumption Agreement |
| EXHIBIT J | Form of Assignment of Leases and Subleases |
| EXHIBIT J-1 | Form of Quitclaim Deed and Act of Sale for Owned Real Property (Jefferson Parish) |
| EXHIBIT J-2 | Form of Quitclaim Deed and Act of Sale for Owned Real Property (100% Fee Simple) |
| EXHIBIT K | Form of Office Assets Conveyance |
| EXHIBIT L | Form of Contract Operating Agreement |
| EXHIBIT M-1 | Owned Real Property (Jefferson Parish) |
| EXHIBIT M-2 | Owned Real Property (100% Fee Simple) |
| EXHIBIT N | [Reserved] |
| EXHIBIT O | [Reserved] |
| EXHIBIT P | Form of Transition Services Agreement |
| EXHIBIT Q | Form of SEMS Bridging Agreement |
| EXHIBIT R | Form of ST 308 Performance Bond |
| EXHIBIT S | [Reserved] |
| EXHIBIT T | Form of Farmout Agreement |
| EXHIBIT U | [Reserved] |
| EXHIBIT V | [Reserved] |

EXHIBIT W              Form of Funding Agreement
EXHIBIT X              Working Capital
EHIBIT X-1             Working Capital Estimate
EXHIBIT Y              Specified Oil and Gas Interests
EXHIBIT Z              Specified P&A Equipment

## SCHEDULE LIST

| **Schedule** | **Title** |
| --- | --- |
| Schedule 1.2 | Applicable Shared Asset Interests |
| Schedule 1.2(rr) | Specified Claims |
| Schedule 1.3(d) | Scheduled Exclusions |
| Schedule 1.6 | FERC Matters |
| Schedule 4.6 | Litigation |
| Schedule 4.7 | Governmental Approvals |
| Schedule 4.8(a) | Preferential Rights |
| Schedule 4.8(b) | Applicable Consents |
| Schedule 4.9 | Taxes |
| Schedule 4.9(p) | Entity Classifications |
| Schedule 4.12 | Environmental Matters |
| Schedule 4.13 | Payments |
| Schedule 4.14 | Material Contracts |
| Schedule 4.14(c) | Leases and Easements |
| Schedule 4.15 | Imbalances |
| Schedule 4.16(a) | AFEs |
| Schedule 4.16(b) | Cash Calls |
| Schedule 4.18 | Employee Benefits |
| Schedule 4.19 | Non-Consent Operations |
| Schedule 4.20 | Suspense Funds |
| Schedule 4.21 | Payout Balances |
| Schedule 4.22 | Title Matters |

| **Schedule** | **Title** |
| --- | --- |
| Schedule 4.22(d) | Owned Real Property |
| Schedule 4.23 | Insurance |
| Schedule 4.24 | Related Party Transactions |
| Schedule 4.25(a) | Owned Intellectual Property |
| Schedule 4.27 | Material Liabilities |
| Schedule 4.28(b) | Absence of Certain Changes |
| Schedule 4.31(c) | Equity Interests of Fieldwood Mexico and Subsidiaries |
| Schedule 4.31(d) | Fieldwood U.A. Interests |
| Schedule 4.31(f) | Fieldwood U.A. Liabilities |
| Schedule 5.1(c) | Buyer Grandparent Equity Interests |
| Schedule 5.7 | Buyer Governmental and Third Person Consents |
| Schedule 6.1(a) | Sellers' Required Operations |
| Schedule 6.1(b) | Sellers' Disallowed Operations |
| Schedule 6.7(a) | Assigned 365 Contracts List |
| Schedule 6.22 | Seller Employees |
| Schedule 7.3(i) | Required Novations |
| Schedule 7.3(l) | Required Governmental Approvals |
| Schedule 10.13(a) | Existing D&O Indemnification Terms |
| Schedule 10.13(e) | D&O Indemnified Parties |
| Schedule 10.14 | Right of Use Easements (RUEs) |
| Schedule 10.17 | South Marsh 39 Assets |
| Schedule 10.18 | Certain Accounts |

Case 20-33948   Document 2013   Filed in TXSB on 08/27/21   Page 192 of 1389

## Exhibit A
## Leases[1]

### Part 1. Co-Owned Leases

| Field | Block | Lease | Type | Seller | Operator | Interest in Lease[2] | Lease Status |
|---|---|---|---|---|---|---|---|
| Grand Isle 43 (GI32-52/ WD67-71, 94-96) | GI 32 (S/2) | OCS-00174 | Federal | FEO | GOM Shelf | 25% record title | |
| | | | | | GOM Shelf | 25% operating rights in S/2 of Block 32, Grand Isle Area, from 12,756' TVDSS to 18,000' subsea (TVDS) | UNIT |
| | | | | | BP E&P | 25% operating rights in S/2 of Block 32, Grand Isle Area, as to depths below 18,000 feet subsea (TVDS) to 99,999 feet subsea (TVDS) | |
| Grand Isle 43 (GI32-52/ WD67-71, 94-96) | GI 39 (E/2) | OCS-00126 | Federal | FEO | GOM Shelf | 25% record title | |
| | | | | | GOM Shelf | 25% operating rights in E/2 of Block 39, Grand Isle Area, from 12,256' TVDSS to 18,000' TVDSS | UNIT |
| | | | | | BP E&P | 25% operating rights in E/2 of Block 39, Grand Isle Area, from 18,000' feet TVDS to 99,999' TVDS | |
| Grand Isle 43 (GI32-52/ WD67-71, 94-96) | GI 39 (W/2) | OCS-00127 | Federal | FEO | GOM Shelf | 25% record title | |
| | | | | | GOM Shelf | 25% operating rights in W/2 of Block 39, Grand Isle Area, from 12,256' TVDSS to 18,000' subsea (TVDS) | UNIT |
| | | | | | BP E&P | 25% operating rights in W/2 of Block 39, Grand Isle Area, as to depths below 18,000 feet subsea (TVDS) to 99,999 feet subsea (TVDS) | |
| Grand Isle 43 (GI32-52/ WD67-71, 94-96) | GI 40 | OCS-00128 | Federal | FEO | GOM Shelf | 25% record title | |
| | | | | | GOM Shelf | 25% operating rights in all of Block 40, Grand Isle Area, from 12,469' TVDSS to 18,000' subsea (TVDS) | UNIT |
| | | | | | BP E&P | 25% operating rights in all of Block 40, Grand Isle Area, as to depths below 18,000 feet subsea (TVDS) to 99,999 feet subsea (TVDS) | |

[1] The references in this Exhibit A to Field, Seller, Operator, Interest in Lease and Lease Status are not intended to limit in any way the scope of any Assigned Interests or who is a Seller with respect to any Lease.
[2] Unless otherwise indicated on this exhibit, no operating rights for any OCS lease that is listed in either table of this exhibit as to which a Seller is listed as having a record title interest have been severed from the record title for such lease.

Exhibit A – Page 1

WEIL:\97869848\17\45327.0007

Case 20-33948   Document 2013   Filed in TXSB on 08/27/21   Page 193 of 1389

| Field | Block | Lease | Type | Seller | Operator | Interest in Lease[2] | Lease Status |
|---|---|---|---|---|---|---|---|
| Grand Isle 43 (G132-52/WD67-71, 94-96) | GI 41 (E/2) | OCS-00129 | Federal | FEO | GOM Shelf | 25% record title | UNIT |
| | | | | | GOM Shelf | 25% operating rights in E/2 of Block 41, Grand Isle Area, from 14,123' TVDSS to 18,000' subsea (TVDS) | |
| | | | | | BP E&P | 25% operating rights in E/2 of Block 41, Grand Isle Area, as to depths below 18,000 feet subsea (TVDS) to 99,999 feet subsea (TVDS) | |
| Grand Isle 43 (G132-52/WD67-71, 94-96) | GI 41 (W/2) | OCS-00130 | Federal | FEO | GOM Shelf | 25% record title | UNIT |
| | | | | | GOM Shelf | 25% operating rights in W/2 of Block 41, Grand Isle Area, from 14,123' TVDSS to 18,000' subsea (TVDS) | |
| | | | | | BP E&P | 25% operating rights in W/2 of Block 41, Grand Isle Area, as to depths below 18,000 feet subsea (TVDS) to 99,999 feet subsea (TVDS) | |
| Grand Isle 43 (G132-52/WD67-71, 94-96) | GI 42 | OCS-00131 | Federal | FEO | GOM Shelf | 25% record title | UNIT |
| | | | | | GOM Shelf | 25% operating rights in all of Block 42, Grand Isle Area, from 12,504' TVDSS to 18,000' subsea (TVDS) | |
| | | | | | BP E&P | 25% operating rights in all of Block 42, Grand Isle Area, as to depths below 18,000 feet subsea (TVDS) to 99,999 feet subsea (TVDS) | |
| Grand Isle 43 (G132-52/WD67-71, 94-96) | GI 43 | OCS-00175 | Federal | FEO | GOM Shelf | 25% record title | UNIT |
| | | | | | GOM Shelf | 25% operating rights in all of Block 43, Grand Isle Area, from 12,830' TVDSS to 18,000' subsea (TVDS) | |
| | | | | | BP E&P | 25% operating rights in all of Block 43, Grand Isle Area, as to depths below 18,000 feet subsea (TVDS) to 99,999 feet subsea (TVDS) | |
| Grand Isle 43 (G132-52/WD67-71, 94-96) | GI 44 (N/2) | OCS-00176 | Federal | FEO | GOM Shelf | 25% record title | UNIT |
| | | | | | GOM Shelf | 25% operating rights in N/2 of Block 44, Grand Isle Area, from 13,102' TVDSS to 18,000' subsea (TVDS) | |
| | | | | | BP E&P | 25% operating rights in N/2 of Block 44, Grand Isle Area, as to depths below 18,000 feet subsea (TVDS) to 99,999 feet subsea (TVDS) | |

Exhibit A – Page 2

WEIL:\97869848\17\45327.0007

Case 20-33948   Document 2013   Filed in TXSB on 08/27/21   Page 194 of 1389

| Field | Block | Lease | Type | Seller | Operator | Interest in Lease[2] | Lease Status |
|-------|-------|-------|------|--------|----------|---------------------|--------------|
| Grand Isle 43 (GI32-52/ WD67-71, 94-96) | GI 46 | OCS-00132 | Federal | FEO | GOM Shelf | 25% record title | UNIT |
| | | | | | GOM Shelf | 25% operating rights in all of Block 46, Grand Isle Area, from 12,792' TVDSS to 18,000' subsea (TVDS) | |
| | | | | | BP E&P | 25% operating rights in all of Block 46, Grand Isle Area, as to depths below 18,000 feet subsea (TVDS) to 99,999 feet subsea (TVDS) | |
| Grand Isle 43 (GI32-52/ WD67-71, 94-96) | GI 47 | OCS-00133 | Federal | FEO | GOM Shelf | 25% record title | UNIT |
| | | | | | GOM Shelf | 25% operating rights in all of Block 47, Grand Isle Area, from 15,742' TVDSS to 18,000' subsea (TVDS) | |
| | | | | | BP E&P | 25% operating rights in all of Block 47, Grand Isle Area, as to depths below 18,000 feet subsea (TVDS) to 99,999 feet subsea (TVDS) | |
| Grand Isle 43 (GI32-52/ WD67-71, 94-96) | GI 48 | OCS-00134 | Federal | FEO | GOM Shelf | 25% record title | UNIT |
| | | | | | GOM Shelf | 25% operating rights in all of Block 48, Grand Isle Area, from 16,812' TVDSS to 18,000' subsea (TVDS) | |
| | | | | | BP E&P | 25% operating rights in all of Block 48, Grand Isle Area, as to depths below 18,000 feet subsea (TVDS) to 99,999 feet subsea (TVDS) | |
| Grand Isle 43 (GI32-52/ WD67-71, 94-96) | GI 52 (N/2) | OCS-00177 | Federal | FEO | GOM Shelf | 25% record title | UNIT |
| | | | | | GOM Shelf | 0% operating rights in N/2 of Block 52, Grand Isle Area, as to all depths from the surface down to 17,651 feet TVDSS | |
| | | | | | BP E&P | 25% operating rights in N/2 of Block 52, Grand Isle Area, as to all depths below 17,651 feet TVDSS down to 99,999 feet TVDSS | |
| Grand Isle 43 (GI32-52/ WD67-71, 94-96) | WD 67 (S/2) | OCS-00179 | Federal | FEO | GOM Shelf | 25% record title | UNIT |
| | | | | | GOM Shelf | 25% operating rights in S/2 of Block 67, West Delta Area, from 11,650' TVDSS to 18,000' subsea (TVDS) | |
| | | | | | BP E&P | 25% operating rights in S/2 of Block 67, West Delta Area, as to depths below 18,000' subsea (TVDS) to 99,999' subsea (TVDS) | |

WEIL:\97869848\17\45327.0007

| Field | Block | Lease | Type | Seller | Operator | Interest in Lease[2] | Lease Status |
|---|---|---|---|---|---|---|---|
| Grand Isle 43 (GI32-52/WD67-71, 94-96) | WD 68 (S/2) | OCS-00180 | Federal | FEO | GOM Shelf | 25% record title | UNIT |
| | | | | | GOM Shelf | 25% operating rights in S/2 of Block 68, West Delta Area, from 13,225' TVDSS to 18,000' subsea (TVDS) | |
| | | | | | BP E&P | 25% operating rights in S/2 of Block 68, West Delta Area, as to depths below 18,000 subsea (TVDS) to 99,999 subsea (TVDS) | |
| Grand Isle 43 (GI32-52/WD67-71, 94-96) | WD 69 | OCS-00181 | Federal | FEO | GOM Shelf | 25% record title | UNIT |
| | | | | | GOM Shelf | 25% operating rights in all of Block 69, West Delta Area, from 13,102' TVDSS to 18,000' subsea (TVDS) | |
| | | | | | BP E&P | 25% operating rights in all of Block 69, West Delta Area, as to depths below 18,000 feet subsea (TVDS) to 99,999 feet subsea (TVDS) | |
| Grand Isle 43 (GI32-52/WD67-71, 94-96) | WD 70 | OCS-00182 | Federal | FEO | GOM Shelf | 25% record title | UNIT |
| | | | | | GOM Shelf | 25% operating rights in all of Block 70, West Delta Area, from 13,182' TVDSS to 18,000' subsea (TVDS) | |
| | | | | | BP E&P | 25% operating rights in all of Block 70, West Delta Area, as to depths below 18,000 feet subsea (TVDS) to 99,999 feet subsea (TVDS) | |
| Grand Isle 43 (GI32-52/WD67-71, 94-96) | WD 71 | OCS-00838 | Federal | FEO | GOM Shelf | 25% record title | UNIT |
| | | | | | GOM Shelf | 25% operating rights in all of Block 71, West Delta Area, from 13,357' TVDSS to 18,000' SSTVD | |
| | | | | | BP E&P | 25% operating rights in all of Block 71, West Delta Area, as to depths below 18,000 feet subsea (TVDS) to 99,999 feet subsea (TVDS) | |
| Grand Isle 43 (GI32-52/WD67-71, 94-96) | WD 94 | OCS-00839 | Federal | FEO | GOM Shelf | 25% record title | PROD |
| | | | | | GOM Shelf | 25% operating rights in all of Block 94, West Delta Area, from 13,159' SSTVD to 99,999' SSTVD | |
| Grand Isle 43 (GI32-52/WD67-71, 94-96) | WD 95 | OCS-G 01497 | Federal | FEO | GOM Shelf | 25% operating rights in the S1/2SE1/4; S1/2N1/2SE1/4; SE1/4SW1/4; S1/2SW1/4SW1/4 of Block 95, West Delta Area, from the surface of the earth down to and including 7,369 feet subsea | PROD |
| | | | | | | 25% operating rights in N1/2; N1/2N1/2SE1/4; N1/2SW1/4; N1/2SW1/4SW1/4 of Block 95, West Delta Area, from 13,601' SSTVD to 99,999' SSTVD | |

QNE EX. NO. 06
Page 128 of 170

WEIL:\97869848\17\45327.0007

| Field | Block | Lease | Type | Seller | Operator | Interest in Lease[2] | Lease Status |
|-------|-------|-------|------|--------|----------|---------------------|--------------|
| Grand Isle 43 (GI32-52/ WD67-71, 94-96) | WD 96 | OCS-G 01498 | Federal | FEO | GOM Shelf | 25% record title | |
| | | | | | GOM Shelf | 25% operating rights in all of Block 96, West Delta Area, from 13,399' TVDSS to 18,000' SSTVD | PROD |
| | | | | | BP E&P | 25% operating rights in all of Block 96, West Delta Area, from 18,000' TVDSS to 99,999' TVDSS | |
| Grand Isle 110/116 | GI 110 | OCS-G 13943 | Federal | FEO | Fieldwood | 50% record title | UNIT |
| Grand Isle 110/116 | GI 116 | OCS-G 13944 | Federal | FEO | Fieldwood | 50% operating rights as to depths from 19,402' SSTVD to 99,999' SSTVD | UNIT |
| Mississippi Canyon 109 | MC 110 | OCS-G 18192 | Federal | FEO | Fieldwood | 8.33334% record title<br><br>8.33334% operating rights in all of Block 110, Mississippi Canyon, from 6,688' TVDSS to 99,999' TVDSS | PROD |
| South Marsh Is. 39 | SM 48 | OCS-00786 | Federal | Fieldwood | Fieldwood | 3.0% ORRI as to production from the OCS 786 E002 ST1 well (API No. 17-707-20028-01), OCS 786 E003 ST1 BP1 well (API No. 17-707-20033-02), OCS 786 E004 ST1 well (API No. 17-707-20040-01) and OCS 786 E007 well (API No. 17-707-40923-00)[3] | PROD |
| South Marsh Is. 40/41/44 | SM 41 | OCS-G 01192 | Federal | FEO | FEO (in part) and Sanare Energy Partners, LLC (in part) | 100.0% operating rights in E1/2 of Block 41, South Marsh Island Area, from the surface of the earth down to 11,500' TVD | PROD |
| South Marsh Is. 136/137/149/150 | SM 149 | OCS-G 02592 | Federal | FEO | Fieldwood | 50% record title<br><br>4.2% ORRI as to production from the South Marsh Island 149 #D001 well (API 17708409401)<br><br>50% operating rights in all of Block 149, South Marsh Island Area, South Addition, from 7,386' SSTVD to 99,999' SSTVD | PROD |

---

[3] No interest—other than Sellers' interests in all overriding royalty interests—are being conveyed hereunder in this lease.

Case 20-33948   Document 2013   Filed in TXSB on 08/27/21   Page 197 of 1389

| Field | Block | Lease | Type | Seller | Operator | Interest in Lease[2] | Lease Status |
|---|---|---|---|---|---|---|---|
| South Pass 60 | SP 61 | OCS-G 01609 | Federal | FEO | Fieldwood | 18.8% ORRI[4] | UNIT |
| South Timbalier 53/67/68 | ST 53 | OCS-G 04000 | Federal | FEO | Fieldwood | 50% record title | PROD |
| | | | | | | 50% operating rights in all of Block 53, South Timbalier Area, from the surface to 6,782' SSTVD | |
| | | | | | | 50% operating rights in all of Block 53, South Timbalier Area, from 6,782' SSTVD to 99,999' SSTVD. | |
| South Timbalier 53/67/68 | ST 67 | OCS-00020 | Federal | Dynamic Offshore Resources NS | Fieldwood | 20.334% contractual working interest in all of Block 67, South Timbalier Area | UNIT |

**Part 2.  Other Leases**

| Field | Block | Lease | Type | Seller | Operator | Interest in Lease | Lease Status |
|---|---|---|---|---|---|---|---|
| Breton Sound 25 | BS 25 (portion) | 19718 | SL–LA | FEO | -- | 25% working interest | Active |
| | | | | | | recorded in Plaquemines Parish, Louisiana at COB 1190, Page 672, File No. 2008-00005015 | |
| Breton Sound 25 | BS 25 (portion) | OCS-G 31442 | Federal | FEO | Tana Exploration | 25% record title | UNIT |
| Breton Sound 52/53 Fed / SL La | BS 45 (portion) | 15683 | SL–LA | FEO | -- | 37.5% working interest in that portion of the lease within the boundary of the UV B RA VUA from the depths between 10,596' MD and 10,822' MD in the electric log for the Century—SL 17675 #1 well | Active |
| | | | | | | recorded in Plaquemines Parish, Louisiana at COB 908, Page 425, Entry No. 80 | |
| Breton Sound 52/53 Fed / SL La | BS 52 (portion) | 17675 | SL–LA | FEO | -- | 37.5% working interest insofar and only insofar as said lease covers depths between 10,596' measured depth and 10,822' measured depth in the electric log for the Century–UV B RA VUA; SL 17675 #1 well | Active |
| | | | | | | recorded in Plaquemines Parish, Louisiana at COB 1038, Page 318, File No. 03000546 | |
| Breton Sound 52/53 Fed / SL La | BS 52 (portion) | 17860 | SL–LA | FEO | -- | 15% working interest from the base of the UV3 B1 Sand and below within the confines of the VUC 387.59 acres | Active |
| | | | | | | recorded in Plaquemines Parish, Louisiana at COB 1055, Page 632, File No. 03007020 | |

---

[4] No interest—other than Sellers' interests in all overriding royalty interests—are being conveyed hereunder in this lease.

WEIL:\97869848\17\45327.0007

| Field | Block | Lease | Type | Seller | Operator | Interest in Lease | Lease Status |
|-------|-------|-------|------|--------|----------|-------------------|--------------|
| East Cameron 345 | EC 345 | OCS-G 15156 | Federal | FEO | Talos ERT LLC | 0.8% ORRI | PROD |
| Green Canyon 64/65/108/109/243 | GC 243 | OCS-G 20051 | Federal | FEO | Hess (in part) and Walter (in part) | 4.655% ORRI insofar as the lease covers (i) the NW1/4SW/4 and S/2S/2 of Block 243, Green Canyon, from the surface to a total vertical depth of 20,500' subsea and (ii) the N1/2, NE1/4SW1/4 and N1/2SE1/4 of Block 243, Green Canyon, from the surface to a total vertical depth of 24,000' subsea (other than for the well specified below) | PROD |
| | | | | | | 3.92% ORRI in the Green Canyon 243 SS 005 ST01 BP00 (API #60811404570I), increasing to 4.655% upon the production of 5.8 million barrels of oil equivalent from this well | |
| High Island 176 | HI 176 | OCS-G 27509 | Federal | FEO | Castex Offshore | 2.5% ORRI | PROD |
| Onshore/State Lease | - | 23017 | SL-MS | FW SD | Tellus Operating Group LLC | 0.5% ORRI | |
| | | | | | recorded in Wayne County, Mississippi | | |
| Onshore/State Lease | - | 170650 | SL-MS | FW SD | Whiting Oil & Gas | 0.7% ORRI | |
| | | | | | recorded in Jasper County, Mississippi | | |
| Onshore/State Lease | - | 230140 | SL-MS | FW SD | Black Jack Oil Co | 0.5% ORRI | |
| | | | | | recorded in Franklin County, Mississippi | | |
| Onshore/State Lease | - | 230150 | SL-MS | FW SD | Wilcox Energy Co | 0.5% ORRI | |
| | | | | | recorded in Franklin County, Mississippi | | |
| Onshore/State Lease | - | 231240 | SL-MS | FW SD | Wilcox Energy Co | 0.5% ORRI | |
| | | | | | recorded in Franklin County, Mississippi | | |
| Ship Shoal 79/80 | SS 79 | OCS-G 15277 | Federal | FEO | ANKOR Energy (in part) and FEO (in part) | 33% record title | PROD |
| | | | | | | 51% operating rights in all of Block 79, Ship Shoal Area, from the surface to one hundred feet below the stratigraphic equivalent of 11,318' true vertical depth as seen in the electric log for the electric log dated March 7, 2001 for the OCS-G 15277 Well No. 2 | |
| Ship Shoal 301[5] | SS 301 | OCS-G 10794 | Federal | FEO | FEO | 65% record title | SOP thru 1/31/2021 |
| | | | | | | 100% operating rights in all of Block 301, Ship Shoal Area, from the surface down to and including a depth of | |

[5] Fieldwood's overriding royalty interest in this lease is not being conveyed hereunder.

Exhibit A – Page 7

WEIL:\97869848\17\45327.0007

| Field | Block | Lease | Type | Seller | Operator | Interest in Lease | Lease Status |
|---|---|---|---|---|---|---|---|
| Vermilion 78 | VR 78 | OCS-G 04421 | Federal | Fieldwood | | 13,000' total vertical depth | |
| | | | | FEO | | 37.5% record title | PROD |
| | | | | Fieldwood | Fieldwood | 62.5% record title | |
| | | | | FEO | | 18.75% operating rights in all of Block 78, Vermilion Area, from 11,953' TVDSS to 99,999' TVDSS | |
| | | | | | | 62.5% operating rights in all of Block 78, Vermilion Area, from 11,953' TVDSS to 99,999' TVDSS | |
| Vermilion 229 | VR 229 | OCS-G 27070 | Federal | FEO | FEO | 50.0% record title as to E1/2; E1/2W1/2 of Block 229, Vermilion Area | PROD |
| | | | | | Tana Exploration | 50.0% record title as to W1/2W1/2 of Block 229, Vermilion Area | |
| Vermilion 362/371 | VR 362 | OCS-G 10687 | Federal | Fieldwood | FEO | 33.33333% record title | UNIT |
| | | | | Bandon | | 66.66667% record title | |
| | | | | Fieldwood | | 16.66667% operating rights in all of Block 362, Vermilion Area, South Addition, from 11,535' TVDSS to 99,999' TVDSS | |
| | | | | Bandon | | 66.66667% operating rights in all of Block 362, Vermilion Area, South Addition, from 11,535' TVDSS to 99,999' TVDSS | |
| Vermilion 362/371 | VR 363 | OCS-G 09522 | Federal | Fieldwood | (see below) | 100% record title | UNIT |
| | | | | Fieldwood | FEO | 33.33333% operating rights in the SE/4 of Block 363, Vermilion Area, South Addition | |
| | | | | Bandon | | 66.66667% operating rights in the SE/4 of Block 363, Vermilion Area, South Addition | |
| | | | | Fieldwood | Fieldwood | 100% operating rights in the N1/2; SW1/4 of Block 363, Vermilion Area, South Addition, from the surface to 10,180' SSTVD | |
| | | | | Fieldwood | Fieldwood | 50% operating rights in the N1/2, SW1/4 of Block 363, Vermilion Area, South Addition, from 10,180' SSTVD to 99,999' SSTVD | |
| Vermilion 362/371 | VR 371 | OCS-G 09524 | Federal | Fieldwood | FEO | 33.33333% record title | UNIT |
| | | | | Bandon | | 66.66667% record title | |
| | | | | Fieldwood | | 16.66667% operating rights in all of Block 371, Vermilion Area, South Addition, from 11,820' SSTVS to 99,999' SSTVD | |

| Field | Block | Lease | Type | Seller | Operator | Interest in Lease | Lease Status |
|---|---|---|---|---|---|---|---|
| West Delta 79/80 | WD 57, WD 79, WD 80 | OCS-G 01449 | Federal | Bandon | FEO | 66.66667% operating rights in all of Block 371, Vermilion Area, South Addition, from 11,820' SSTVS to 99,999' SSTVD | UNIT |
| West Delta 79/80 | WD 79, WD 80 | OCS-G 01874 | Federal | Fieldwood | FEO | 2.5% ORRI[6] | UNIT |
| West Delta 79/80 | WD 80 | OCS-G 01989 | Federal | Fieldwood | FEO | 2.5% ORRI[7] | UNIT |
| West Delta 79/80 | WD 80 | OCS-G 02136 | Federal | Fieldwood | FEO | 2.5% ORRI[8] | UNIT |
| - | - | 5749 | SL-TX | Fieldwood | FEO | 2.5% ORRI[9] | UNIT |
| - | - | 5797 | SL-TX | Fieldwood SD Offshore | Fieldwood SD Offshore | 100.0% working interest (lease recorded in Chambers County, Texas) | TERMIN |
| - | - | 24318 | SL-TX | Fieldwood Onshore | Fieldwood Onshore | 100% working interest (lease recorded in Galveston County, Texas) | TERMIN |
| High Island 30/31 L (SL TX) | - | 106158 | SL-TX | FEO | FEO | 100% working interest (lease recorded in Jefferson County, Texas) | TERMIN |
| High Island 30/31 L (SL TX) | - | 106159 | SL-TX | FEO | FEO | 100% working interest (lease recorded in Jefferson County, Texas) | TERMIN |
| High Island 30/31 L (SL TX) | - | 114921 | SL-TX | FEO | FEO | 100% working interest (lease recorded in Jefferson County, Texas) | TERMIN |
| - | | 172915 | SL-TX | Fieldwood SD Offshore | Fieldwood SD Offshore | 100.0% working interest (lease recorded in Chambers County, Texas) | ACTIVE |
| - | | 172916 | SL-TX | Fieldwood SD Offshore | Fieldwood SD Offshore | 100.0% working interest (lease recorded in Chambers County, Texas) | ACTIVE |
| - | | 178537 | SL-TX | Fieldwood Onshore | Fieldwood Onshore | 100% working interest (lease recorded in Galveston County, Texas) | TERMIN |
| - | | 183756 | SL-TX | Fieldwood Onshore | Fieldwood Onshore | 100% working interest (lease recorded in Galveston County, Texas) | TERMIN |
| - | | 185633 | SL-TX | Fieldwood | Fieldwood Onshore | 100% working interest (lease recorded in Galveston County, Texas) | TERMIN |

[6] No interest—other than Sellers' interests in all overriding royalty interests—are being conveyed hereunder in this lease.
[7] No interest—other than Sellers' interests in all overriding royalty interests—are being conveyed hereunder in this lease.
[8] No interest—other than Sellers' interests in all overriding royalty interests—are being conveyed hereunder in this lease.
[9] No interest—other than Sellers' interests in all overriding royalty interests—are being conveyed hereunder in this lease.

Exhibit A – Page 9

WEIL:\97869848\17\45327.0007

| Field | Block | Lease | Type | Seller | Operator | Interest in Lease | Lease Status |
|---|---|---|---|---|---|---|---|
| - | | 186891 | SL-TX | Fieldwood Onshore | Fieldwood Onshore | 100% working interest (lease recorded in Galveston County, Texas) | ACTIVE |
| - | | 191681 | SL-TX | Fieldwood Onshore | Fieldwood Onshore | 100% working interest (lease recorded in Galveston County, Texas) | ACTIVE |
| - | | 207398 | SL-TX | Fieldwood Onshore | Fieldwood Onshore | 100% working interest (lease recorded in Galveston County, Texas) | ACTIVE |
| - | | 227360 | SL-TX | Fieldwood Onshore | Fieldwood Onshore | 100% working interest (lease recorded in Galveston County, Texas) | ACTIVE |
| - | | 234082 | SL-TX | Fieldwood Onshore | Fieldwood Onshore | 100% working interest (lease recorded in Galveston County, Texas) | TERMIN |
| - | | 255675 | SL-TX | Fieldwood Onshore | Fieldwood Onshore | 100% working interest (lease recorded in Galveston County, Texas) | TERMIN |
| Annapolis Valley | MC 380 | OCS-G 36544 | Federal | Fieldwood | Fieldwood | 100% record title | PRIMARY |
| Annapolis Valley | MC 424 | OCS-G 36545 | Federal | Fieldwood | Fieldwood | 100% record title | PRIMARY |
| Bartolome | MC 563 | OCS-G 21176 | Federal | Fieldwood | Fieldwood | 23.25% operating rights in all of Block 563, Mississippi Canyon, as to depths from below 19,000' down to 99,999' TVDSS | PROD |
| | | | | Fieldwood | Kosmos Energy GOM Operations | 0.465% ORRI insofar as the lease covers all of Block 563, Mississippi Canyon, limited to depths from the surface to 19,000' TVDSS | |
| Boris | GC 282 | OCS-G 16727 | Federal | Fieldwood | BHP Billiton Petroleum (GOM) | 25% operating rights in all of Block 282, Green Canyon, from 16,700' TVD to 99,999' TVD | PROD |
| | | | | Fieldwood | Energy Resource Technology GOM | 1.75% ORRI insofar as the lease pertains to depths from 0 to 16,699' TVD | |
| | | | | | Fieldwood | 37.5% record title | |
| Deep Blue | GC 679 | OCS-G 21811 | Federal | Fieldwood | Anadarko Petroleum Corporation | 0% operating rights in E1/2 of Block 679, Green Canyon Area, limited in depth from the surface down to the stratigraphic equivalent of 16,048' TVD (17,315' MD) as seen in the Kerr-McGee OCS-G 21811 No. 1 (ST#I) well | PROD |
| | | | | | Eni US Operating Co. Inc. | 0% operating rights in W1/2 of Block 679, Green Canyon Area, limited in depth from the surface down to 16,048' TVD | |
| | | | | | Fieldwood | 43.125% operating rights in all of Block 679, Green Canyon, below 16,048' TVD to 99,999' TVD | |
| Emory Peak | MC 743 | OCS-G 36401 | Federal | Fieldwood | Chevron USA | 25% record title | PRIMARY |

WEIL:\97869848\17\45327.0007

Exhibit A – Page 10

QNE EX. NO. 06
Page 134 of 170

| Field | Block | Lease | Type | Seller | Operator | Interest in Lease | Lease Status |
|---|---|---|---|---|---|---|---|
| Ewing Bank 834 (Coelacanth) | EW 789 | OCS-G 35805 | Federal | Fieldwood | Walter O&G | 1.3% ORRI insofar as the lease cover the SE/4 of Block 789, Ewing Bank, from the surface to 26,000' SSTVD | UNIT |
| Ewing Bank 834 (Coelacanth) | EW 790 | OCS-G 33140 | Federal | Fieldwood | Fieldwood | 100.0% operating rights in SW1/4SW1/4; S1/2SE1/4SW1/4; S1/2SW1/4SE1/4 and NW1/4SE1/4SW1/4 of Block 790, Ewing Bank, limited to depths from below 26,000' TVDSS to 99,999' TVDSS | UNIT |
| | | | | | | 100.0% operating rights in N1/2; N1/2S1/2; SE1/4SE1/4; N1/2SW1/4SE1/4 and NE1/4SE1/4SW1/4 of Block 790, Ewing Bank, from the surface to 99,999' TVDSS | |
| | | | | | | 1.3% ORRI insofar as the lease covers SW1/4SW1/4; S1/2SE1/4SW1/4; S1/2SW1/4SE1/4; NW1/4SE1/4SW1/4 of Block 790, Ewing Bank, from surface down to and including 26,000' TVDSS | |
| Ewing Bank 834 (Coelacanth) | EW 834 | OCS-G 27982 | Federal | Fieldwood | Walter O&G | 1.3% ORRI insofar as the lease covers NE1/4 NE1/4, NW1/4NE1/4 and N/2NE1/4 of Block 834, Ewing Bank, from the surface down to 17,000' TVDSS | UNIT |
| | | | | | | 1.3% ORRI insofar as the lease covers NE1/4NE1/4, NW1/4NE1/4, N1/2NE1/4NW1/4 of Block 790, Ewing Bank, from 17,000' TVDSS down to 21,400' TVDSS | |
| | | | | | | 1.3% ORRI insofar as the lease covers NE1/4 NE1/4, NW1/4NE1/4 of Block 834, Ewing Bank, from 21,400' TVDSS down to 26,000' TVDSS | |
| | | | | | | 1.3% ORRI insofar as the lease covers S/1/2NE1/4, NW1/4NW1/4, N1/2SE1/4NW1/4 and S1/2NE1/4NW1/4 of Block 834, Ewing Bank, from the surface down to 26,000' TVDSS | |
| Ewing Bank 834 (Coelacanth) | EW 835 | OCS-G 33707 | Federal | Fieldwood | Walter O&G | 1.3% ORRI insofar as the lease covers the North 7800' of Block 835, Ewing Bank, from the surface down to 26,000' TVDSS | UNIT |
| Ewing Bank 834 (Coelacanth) | MC 793 | OCS-G 33177 | Federal | Fieldwood | Walter O&G | 1.3% ORRI insofar as the lease covers the W1/2W1/2NW1/4 of Block 793, Mississippi Canyon, from the surface down to 26,000' TVDSS | UNIT |
| Fandango | MC 297 | OCS-G 34434 | Federal | Fieldwood | Fieldwood | 70% record title | PRIMARY |

WEIL:\97869848\17\45327.0007

| Field | Block | Lease | Type | Seller | Operator | Interest in Lease | Lease Status |
|---|---|---|---|---|---|---|---|
| Galapagos | MC 519 | OCS-G 27278 | Federal | Fieldwood | BP E&P (in part) and Fieldwood (in part) | 65.0% record title | PROD |
| | | | | | | 49% operating rights in SW1/4 of Block 519, Mississippi Canyon, from the surface down to and including 19,300' TVDSS | |
| | | | | | | 49% operating rights in S1/2NW1/4 of Block 519, Mississippi Canyon, from the surface down to and including 14,000' | |
| | | | | | | 25.75% operating rights in S1/2; S1/2SE1/4NE1/4 of Block 519, Mississippi Canyon, from depths below 19,300' TVDSS down to and including 99,999' TVDSS | |
| | | | | | | 25.75% operating rights in S1/2NW1/4 of Block 519, Mississippi Canyon, from depths below 14,000' TVDSS down to and including 99,999' TVDSS | |
| | | | | | | 25.75% operating rights in N1/2NW1/4; N1/2NE1/4; SW1/4NE1/4 and N1/2SE1/4NE1/4 of Block 519, Mississippi Canyon, from the surface down to and including 99,999' TVDSS | |
| Green Canyon 39/40 (Katmai) | EW 1009 | OCS-G 34878 | Federal | Fieldwood | Fieldwood | 50% record title | UNIT |
| Green Canyon 39/40 (Katmai) | EW 1010 | OCS-G 34879 | Federal | Fieldwood | Fieldwood | 50% record title | UNIT |
| Green Canyon 39/40 (Katmai) | EW 1011 | OCS-G 34880 | Federal | Fieldwood | Fieldwood | 50% record title | UNIT |
| Green Canyon 39/40 (Katmai) | GC 39 A | OCS-G 34966 | Federal | Fieldwood | Fieldwood | 50% record title | UNIT |
| Green Canyon 39/40 (Katmai) | GC 39 B | OCS-G 36476 | Federal | Fieldwood | Fieldwood | 50% record title | PRIMARY |
| Green Canyon 39/40 (Katmai) | GC 040 | OCS-G 34536 | Federal | Fieldwood | Fieldwood | 50% record title | UNIT |
| Green Canyon 39/40 (Katmai) | GC 041 | OCS-G 34537 | Federal | Fieldwood | Fieldwood | 50% record title | UNIT |
| Green Canyon 64/65/108/109/243 | GC 064 | OCS-G 34539 | Federal | FEO | FEO | 49% record title | PROD |
| Green Canyon 64/65/108/109/243 | GC 065 | OCS-G 05889 | Federal | FEO | FEO | 49% operating rights in all of Block 65, Green Canyon, from the surface of the earth down to and including the depth of 99,999 feet | UNIT |

QNE EX. NO. 06
Page 136 of 170

WEIL:\97869848\17\45327.0007

| Field | Block | Lease | Type | Seller | Operator | Interest in Lease | Lease Status |
|---|---|---|---|---|---|---|---|
| Green Canyon 64/65/108/109/243 | GC 108 | OCS-G 14668 | Federal | FEO | FEO | 49% operating rights in all of Block 108, Green Canyon, from the surface of the earth down to and including the depth of 99,999 feet | UNIT |
| Green Canyon 64/65/108/109/243 | GC 109 | OCS-G 05900 | Federal | FEO | FEO | 49% operating rights in all of Block 109, Green Canyon, from the surface of the earth down to and including the depth of 99,999 feet | UNIT |
| Green Canyon 200 (Troika & Orlov) | GC 200 | OCS-G 12209 | Federal | FEO | FEO | 100% record title 53.33333% operating rights in NW1/4SE1/4; SW1/4NE1/4; E1/2SE1/4NW1/4; S1/2NE1/4NW1/4; W1.2E1/2SE1/4; NE1/4SW1/4SE1/4, SW1/4NW1/4NE1/4 of Block 200, Green Canyon, as to all depths from surface to 17,518' TVDSS | UNIT |
| Green Canyon 200 (Troika) | GC 201 | OCS-G 12210 (and any further lease created from the segregation of OCS-G 12210) | Federal | FEO | FEO | 100% record title in the S1/2 and NW1/4 of Block 201, Green Canyon | UNIT |
| | | | | | LLOG Exploration | 4.874999% ORRI insofar as the lease covers the NE1/4 of Block 201, Green Canyon | |
| Green Canyon 200 (Troika) | GC 244 | OCS-G 11043 | Federal | FEO | FOE (in part) and Deepwater Abandonment Alternatives, Inc. (in part) | 100% record title 0% operating rights as to all of Block 244, Green Canyon, as to those depths from 16,000 feet true vertical depth subsea down to 24,000 feet true vertical depth subsea | UNIT |
| Gunflint | MC 904 | OCS-G 36566 | Federal | Fieldwood | Fieldwood | 58.9363% record title | PRIMARY |
| Gunflint | MC 905 | OCS-G 36405 | Federal | Fieldwood | Fieldwood | 58.9363% record title | PRIMARY |
| Hagerman | MC 789 | OCS-G 36557 | Federal | Fieldwood | Fieldwood | 100% record title | PRIMARY |
| Isabela N (Miocene) | MC 474 | OCS-G 35825 | Federal | Fieldwood | BP E&P | 24.33333% record title 0% operating rights in all of Block 474, Mississippi Canyon, from depths below 20,000' TVDSS down to and including 99,999' TVDSS | PRIMARY |

WEIL:\97869848\17\45327.0007

| Field | Block | Lease | Type | Seller | Operator | Interest in Lease | Lease Status |
|---|---|---|---|---|---|---|---|
| Isabela N (Miocene) | MC 518 | OCS-G 35828 | Federal | Fieldwood | BP E&P | 24.3333% record title | PRIMARY |
| Little Burn | GC 238 | OCS-G 26302 | Federal | Fieldwood | BHP Billiton Petroleum (GOM) | 0% operating rights in all of Block 518, Mississippi Canyon, from depths below 19,500' TVDSS down to and including 99,9999 TVDSS | PROD |
| | | | | | | 40% operating rights in all of Block 238, Green Canyon, from 16,700 TVD to 99,999 TVD | |
| | | | | Fieldwood | Talos ERT LLC | 2.8% ORRI insofar as the lease pertains to depths from 0 to 16,699 TVD | |
| Mississippi Canyon 562 (Isabela) | MC 562 | OCS-G 19966 | Federal | Fieldwood | BP E&P | 12.5% record title | PROD |
| | | | | | | 0% operating rights in N/2 of Block 562, Mississippi Canyon, from the surface to 19,500' TVDSS | |
| | | | | | | 0% operating rights in N/2 of Block 562, Mississippi Canyon, from depths below 19,500' TVDSS down to and including 99,999' TVDSS | |
| | | | | | | 0% operating rights in S/2 of Block 562, Mississippi Canyon, from depths below 20,000 TVDSS down to and including 99,999' TVDSS | |
| Mississippi Canyon 698 (Big Bend) | MC 697 A | OCS-G 28021 | Federal | Fieldwood | Fieldwood | 54% record title | UNIT |
| Mississippi Canyon 698 (Big Bend) | MC 698 | OCS-G 28022 | Federal | Fieldwood | Fieldwood | 54% record title | UNIT |
| Mississippi Canyon 698 (Big Bend) | MC 742 | OCS-G 32343 | Federal | Fieldwood | Fieldwood | 100% record title in NE1/4, S1/2 of Block 742, Mississippi Canyon | UNIT |
| | | | | | | 54% record title in NW1/4 of Block 742, Mississippi Canyon | |
| Mississippi Canyon 782 (Dantzler) | MC 782 | OCS-G 33757 | Federal | Fieldwood | Fieldwood | 45% record title | PROD |
| Mississippi Canyon 948/949/992/993 (Gunflint) | MC 948 | OCS-G 28030 | Federal | Fieldwood | Fieldwood | 58.9363% record title | UNIT |
| Mississippi Canyon 948/949/992/993 (Gunflint) | MC 949 | OCS-G 32363 | Federal | Fieldwood | Fieldwood | 58.9363% record title | UNIT |
| Mississippi Canyon 948/949/992/993 (Gunflint) | MC 992 | OCS-G 24133 | Federal | Fieldwood | Fieldwood | 58.9363% record title in N1/2 of Block 992, Mississippi Canyon | UNIT |
| | | | | | | 52.94% record title in S1/2 of Block 992, Mississippi Canyon | |

Exhibit A – Page 14

**QNE EX. NO. 06**
**Page 138 of 170**

WEIL:\9786984817\45327.0007

| Field | Block | Lease | Type | Seller | Operator | Interest in Lease | Lease Status |
|---|---|---|---|---|---|---|---|
| Mississippi Canyon 948/949/992/993 (Gunflint) | MC 993 | OCS-G 24134 | Federal | Fieldwood | Fieldwood | 58.9363% record title in N1/2 of Block 993, Mississippi Canyon | UNIT |
|  |  |  |  |  |  | 45% record title in S1/2 of Block 993, Mississippi Canyon |  |
| Mt. Driskill | MC 691 | OCS-G 36400 | Federal | Fieldwood | Fieldwood | 50% record title | PRIMARY |
| Murrayfield | MC 118 | OCS-G 35963 | Federal | Fieldwood | Chevron USA | 5.45% record title | PRIMARY |
| Murrayfield | MC 119 | OCS-G 36537 | Federal | Fieldwood | Chevron USA | 5.45% record title | PRIMARY |
| Murrayfield | MC 162 | OCS-G 36880 | Federal | Fieldwood | Chevron USA | 5.45% record title | PRIMARY |
| Murrayfield | MC 163 | OCS-G 36538 | Federal | Fieldwood | Chevron USA | 5.45% record title | PRIMARY |
| Murrayfield | MC 206 | OCS-G 36540 | Federal | Fieldwood | Chevron USA | 5.45% record title | PRIMARY |
| Scaramanga | MC 171 | OCS-G 34428 | Federal | Fieldwood | Fieldwood | 100% record title | PRIMARY |
| Scaramanga | MC 172 | OCS-G 34429 | Federal | Fieldwood | Fieldwood | 100% record title | PRIMARY |
| Schooner | MC 435 | OCS-G 36772 | Federal | Fieldwood | Fieldwood | 100% record title | PRIMARY |
| Schooner | MC 436 | OCS-G 36773 | Federal | Fieldwood | Fieldwood | 100% record title | PRIMARY |
| South Marsh Is. 40/41/44 | SM 40 | OCS-G 13607 | Federal | FEO | FEO | 100% record title | TERMIN |
| South Timbalier 308 / Ewing Bank 873 | ST 287 | OCS-G 24987 | Federal | Fieldwood | Fieldwood | 100% record title | PROD |
|  |  |  |  |  |  | 100% operating rights in all of Block 287, South Timbalier Area, South Addition, from the surface to 13,852' SSTVD |  |
|  |  |  |  |  |  | 50% operating rights in all of Block 287, South Timbalier Area, South Addition, from 13,852' SSTVD to 99,999' SSTVD |  |
| South Timbalier 308 / Ewing Bank 873 | ST 308 | OCS-G 21685 | Federal | Fieldwood | Fieldwood | 100% record title | PROD |
|  |  |  |  |  |  | 100% operating rights in all of Block 308, South Timbalier Area, South Addition, from the surface to 18,571' SSTVD |  |
|  |  |  |  |  |  | 50% operating rights in all of Block 308, South Timbalier Area, South Addition, from 18,571' SSTVD to 99,999' SSTVD |  |
| Steamboat | GC 153 | OCS-G 36814 | Federal | Fieldwood | Fieldwood | 100% record title | PRIMARY |
| Talon | GC 198 | OCS-G 36021 | Federal | FEO | FEO | 100% record title | PRIMARY |

WEIL:\97869848\17\45327.0007

| Field | Block | Lease | Type | Seller | Operator | Interest in Lease | Lease Status |
|---|---|---|---|---|---|---|---|
| Ticonderoga | GC 768 | OCS-G 21817 | Federal | Fieldwood | (see below) | 100% record title | PROD |
| | | | | | Anadarko | 50% operating rights in all of Block 768, Green Canyon, from the surface to the stratigraphic equivalent of 13,370' subsea TVD in the OCS-G 21817 #1 Well | |
| | | | | | Fieldwood | 43.125% operating rights in all of Block 768, Green Canyon, below the stratigraphic equivalent of 13,370' subsea TVD in the OCS-G 21817 #1 Well down to a depth of 40,000' subsea TVD | |
| Umbrella Point | - | 5752 | SL - TX | Fieldwood Onshore | Fieldwood Onshore | 100% record title | TERMIN |
| Umbrella Point | - | 140960 | SL - TX | Fieldwood SD Offshore | Fieldwood SD Offshore | 100% record title | TERMIN |
| WILDCAT - ACOM O.H. ESTATE | - | 165888 | SL - TX | Fieldwood Onshore | Fieldwood Onshore | 100% record title | TERMIN |
| EAGLE BAY | - | 186892 | SL - TX | Fieldwood Onshore | Fieldwood Onshore | 100% record title | TERMIN |
| EAGLE BAY | - | 176012 | SL - TX | Fieldwood Onshore | Fieldwood Onshore | 100% record title | TERMIN |
| EAGLE BAY | - | 179673 | SL - TX | Fieldwood Onshore | Fieldwood Onshore | 100% record title | TERMIN |
| EAGLE BAY | - | 188919 | SL - TX | Fieldwood Onshore | Fieldwood Onshore | 100% record title | TERMIN |
| EAGLE BAY | - | 188921 | SL - TX | Fieldwood Onshore | Fieldwood Onshore | 100% record title | TERMIN |
| EAGLE BAY | - | 269151 | SL - TX | Fieldwood Onshore | Fieldwood Onshore | 100% record title | TERMIN |
| - | MP 316 | OCS-G 36231 | Federal | FEO | FEO | 50.0% record title | PRIMRY |
| - | SS 313 | OCS-G 36362 | Federal | Fieldwood | Fieldwood | 100.0% record title | PRIMRY |
| - | SS 358 | OCS-G 36122 | Federal | FEO | FEO | 100% record title | PRIMRY |

[End of Exhibit A]

Exhibit A – Page 16

**QNE EX. NO. 06**
**Page 140 of 170**

WEIL:\9786984817\45327.0007

## Exhibit B
### Easements

### Part 1. Co-Owned Easements

| ROW Number | Seller | Segment Number | Originating Area | Originating Block | Originating Name | Receiving Area | Receiving Block | Receiving Name | Size (inch) | Product | Status | Associated Lease | Undivided interest to be assigned to Buyer |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| G03432 | Fieldwood | 4647 | SM | 149 | 6"SSTI | SM | 132 | B | 6 | BLKO | Active | G02592 | 50% |
| G09319 | FEO | 5890 | ST | 53 | A | ST | 52 | A | 6 | OIL | Active | G04000 | 50% |
| G12304 | GOM Shelf | 9084 | GI | 43 | AS | GI | 19 | F/S | 10 | OIL | Active | 00175 | 25% |
| G28385 | Fieldwood | 17265 | ST | 68 | Caisson No. 1 | ST | 53 | A | 6 | BLKO | Active | 00020 | 20.334% |

### RUEs related to Co-Owned Leases

| RUE Number | Area | Block No. | Structure | Complex ID No. | FW Lease | Operator | Approval Date | Associated Assets | Party to hold RUE on behalf of Buyer and Fieldwood Energy I | Undivided interest for which Buyer is to be responsible |
|---|---|---|---|---|---|---|---|---|---|---|
| G30267 | ST | 68 | CAISS. #1 | 24108 | 00020 | Fieldwood | 03/09/18 | ST 67 #6 | Buyer | 20.334% |
| G30329 | SM | 132 | B | 21982 | G02592 G02588 | Fieldwood | 5/06/19 | SM 136 C 007, SM 149 C001, C002 & C004 | Fieldwood Energy I | 50% |

### Part 2. Other Easements

| ROW Number | Seller | Segment Number | Originating Area | Originating Block | Originating Name | Receiving Area | Receiving Block | Receiving Name | Size (inch) | Product | Status | Associated Lease |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| G09330 | FEO | 8204 | SS | 80 | A | EI | 125 | 30 SSTI | 6 | G/C | Active | G15277 |
| G15047 | Bandon | 10675 | VR | 371 | A | VR | 350 | 08 SSTI | 6 | OIL | Active | G09524 |
| G16055 | FEO | 11050 | SS | 301 | A | SS | 300 | B | 8 | BLKO | Active | G10794 |
| G23712 | FEO | 13736 | SS | 79 | #2 | SS | 80 | A | 4 | BLKO | Active | G15277 |
| G23713 | FEO | 13737 | SS | 79 | #2 | SS | 80 | A | 4 | BLKO | Active | G15277 |

Exhibit B – Page 1

WEIL:97869848\17\45327.0007

| ROW Number | Seller | Segment Number | Originating Area | Originating Block | Originating Name | Receiving Area | Receiving Block | Receiving Name | Size (inch) | Product | Status | Associated Lease |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| G28816 | FEO | 14292 | SM | 40 | JA | SM | 40 | 10"SSTI | 6 | OIL | Active | G13607 |
| G28817 | FEO | 14293 | SM | 40 | B | SM | 40 | JA | 6 | BLKO | Active | G13607 |
| G28818 | FEO | 14294 | SM | 40 | B | SM | 40 | JA | 6 | BLKO | Active | G13607 |
| G28819 | FEO | 14295 | SM | 40 | JA | SM | 40 | B | 2 | LIFT | Active | G13607 |
| G09349 | FEO | 8255 | GC | 65 | A | GC | 19 | A | 12 | OIL | Active | G05889 |
| G17737 | FEO | 11393 | GC | 200 | SS Manifold | GC | 65 | A | 10 | BLKO | Active | G12210 |
| | | 11394 | GC | 200 | SSMANIFO | GC | 65 | A | 24 | CSNG | Active | G12210 |
| | | 11395 | GC | 200 | SSMANIFO | GC | 65 | A | 5 | UMB | Active | G12210 |
| | | 11959 | GC | 200 | SSMANIFO | GC | 65 | A | 2 | UMB | Active | G12210 |
| | | 11396 | GC | 200 | SSMANIFO | GC | 65 | A | 10 | BLKG | Active | G12210 |
| G17738 | FEO | 11397 | GC | 200 | SSMANIFO | GC | 65 | A | 24 | CSNG | Active | G12210 |
| | | 11410 | GC | 200 | SSMANIFO | GC | 65 | A | 5 | UMB | Active | G12210 |
| | | 12141 | GC | 200 | SSMANIFO | GC | 65 | A | 5 | UMB | Proposed | G12210 |
| G17685 | FEO | 11260 | GC | 65 | A | GC | 19 | A | 16 | OIL | Active | G05889 |
| G28736 | Fieldwood | 19154 | MC | 948 | PLET NPL3 HUB | MC | 724 | Gulfstar 1 SPAR | 8 | BLKO | Active | G28030 |
| | | 19365 | MC | 948 | PLET NPL3 HUB | MC | 767 | ILS NPL1 | 12 | CSNG | Active | G28030 |
| | | 19374 | MC | 948 | PLET NPL3 HUB | MC | 948 | PLET SPL2 HUB | 8 | BLKO | Active | G28030 |
| G28809 | FEO | 20222 | GC | 244 | PLEM A | GC | 156 | Mid-Line PLET A-1 | 8 | BLKO | Proposed | G11043 |
| G28820 | FEO | 20197 | GC | 156 | PLET 2 | GC | 156 | A-2 PLET | 8 | BLKO | Active | G12209 |
| G29287 | Fieldwood | 19155 | MC | 948 | PLET SPL2 HUB | MC | 724 | Gulfstar 1 SPAR | 8 | BLKO | Active | G28030 |
| | | 19362 | MC | 724 | Gulfstar 1 Spar | MC | 948 | UTA1 | 8 | UMB | Active | G28030 |
| | | 19432 | MC | 948 | PLET SPL2 | MC | 768 | ILS SPL1 | 12 | CSNG | Active | G28030 |
| G29294 | Fieldwood | 19282 | MC | 736 | A Thunderhawk | MC | 782 | Dan 1 STUA 1 | 6 | UBEH | Active | G33757 |
| | | 19149 | MC | 698 | RGL PLET 1 | MC | 736 | A Thunderhawk | 8 | BLKO | Active | G28022 |
| | | 19296 | MC | 698 | RGI PLET 1 | MC | 736 | A Thunderhawk | 12 | CSNG | Active | G28022 |

WEIL:\97869848\17\45327.0007

| ROW Number | Seller | Segment Number | Originating Area | Originating Block | Originating Name | Receiving Area | Receiving Block | Receiving Name | Size (inch) | Product | Status | Associated Lease |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| G29295 | Fieldwood | 19097 | MC | 698 | RGL PLET 1 | MC | 736 | A Thunderhawk | 8 | BLKO | Active | G28022 |
|  |  | 19283 | MC | 736 | A Thunderhawk | MC | 698 | BBD SUTA | 6 | UMB | Active | G28022 |
|  |  | 19364 | MC | 698 | RGL PLET 1 | MC | 736 | A | 12 | CSNG | Active | G28022 |
| G29299 | Fieldwood | 19297 | MC | 736 | A Thunderhawk | MC | 692 | North Plet | 1 | LIFT | Active | G28022 |
|  |  | 19334 | MC | 736 | A Thunderhawk | MC | 692 | SUTA | 5 | UMBH | Active | G28022 |
| G29417 | FEO | 20155 | GC | 156 | Mid-Line PLET A-2 | GC | 65 | A | 8 | BLKO | Proposed | G12209 |
| G29420 | FEO | 20183 | GC | 200 | SUTA | GC | 244 | TROJKA SUTA | 5 | UMB | Proposed | G11043 |
| G29424 | FEO | 20195 | GC | 65 | A | GC | 200 | SUTA | 3 | UMB | Proposed | G12209 |
| G29425 | FEO | 20196 | GC | 200 | PLET-1 | GC | 156 | PLET-2 | 8 | BLKO | Proposed | G12210 |
| G29427 | Fieldwood | 20202 | GC | 40 | K1 PLET | ST | 308 | A | 8 | BLKO | Proposed | G34966 |
|  |  | 20203 | GC | 40 | K1 PLET | ST | 308 | Start Up Flange | 12 | CSNG | Proposed | G34966 |
|  |  | 20278 | ST | 308 | A | GC | 39 | K2 SUTA | 5 | UBEH | Proposed | G34966 |
| G29427 | Fieldwood | 20200 | GC | 39 | K2 SUTA | GC | 40 | K1 SUTA | 5 | UBEH | Active | G34966 |

**RUEs related to Other Leases**

| RUE Number | Area | Block No. | Structure | Complex ID No. | FW Lease No. | Operator | Approval Date | Associated Assets |
|---|---|---|---|---|---|---|---|---|
| G30201 | SS | 80 | A | 23548 | G15277 | FEO | 02/07/13 | SS79A002 |

WEIL:\97769884\17\45327.0007

| RUE Number | Area | Block No. | Structure | Complex ID No. | FW Lease | Operator | Approval Date | Associated Assets |
|---|---|---|---|---|---|---|---|---|
| G30342 | SM | 40 | B | 1266 | G1 3607 | FEO | 06/21/18 | SM 41 B2, B3, B4, B6 & SM 40 B5 |
| G30352 | SM | 40 | JA | 27017 | G1 3607 | FEO | | SM 41 B PF and wells |

| RUE Number | Area | Block No. | Structure | Complex ID No. | FW Lease | Operator | Approval Date | Associated Assets |
|---|---|---|---|---|---|---|---|---|
| G30354 | MC | 736 | A (Thunder Hawk) | 2045 | G28022 | Fieldwood | 07/03/18 | MC698001, MC734 SS002, SS004, SS005, SS006, MC782001 & 002 |

[End of Exhibit B]

**Exhibit C**
**Scheduled Wells**

**Part 1.  Co-Owned Wells**

| Asset Name | FWE Acct. Code | Lease Number | API |
|---|---|---|---|
| GRAND ISLE 032 #U012 ST1 | GI032U1201 | 00174 | 177192014502 |
| GRAND ISLE 039 #P002 ST2 | GI039P0202 | 00127 | 177174097802 |
| GRAND ISLE 040 #E007D | GI040E07D0 | 00128 | 177170077500 |
| GRAND ISLE 040 #E009 | GI040E0900 | 00128 | 177170078700 |
| GRAND ISLE 040 #G001 | GI040G0100 | 00128 | 177170070400 |
| GRAND ISLE 040 #G002 | GI040G0200 | 00128 | 177170076200 |
| GRAND ISLE 040 #G006 | GI040G0600 | 00133 | 177174012600 |
| GRAND ISLE 040 #G010 | GI040G1000 | 00128 | 177174037200 |
| GRAND ISLE 040 #G011 | GI040G1100 | 00128 | 177174037300 |
| GRAND ISLE 040 #M001 | GI040M0100 | 00128 | 177174037000 |
| GRAND ISLE 040 #M002D | GI040M02D0 | 00128 | 177174038600 |
| GRAND ISLE 040 #M003 | GI040M0300 | 00128 | 177174043600 |
| GRAND ISLE 040 #O005 | GI040O0500 | 00128 | 177174097100 |
| GRAND ISLE 041 #D002 | GI041D0200 | 00129 | 177170075300 |
| GRAND ISLE 041 #D003 | GI041D0300 | 00129 | 177170076700 |
| GRAND ISLE 041 #D004 | GI041D0400 | 00130 | 177170080500 |
| GRAND ISLE 041 #D007 | GI041D0700 | 00129 | 177172000000 |
| GRAND ISLE 041 #D008 ST | GI041D0801 | 00130 | 177172000801 |
| GRAND ISLE 041 #D009 | GI041D0900 | 00129 | 177172001500 |
| GRAND ISLE 041 #D010ST | GI041D1000 | 00129 | 177174017801 |
| GRAND ISLE 041 #D011E | GI041D1100 | 00129 | 177174018400 |
| GRAND ISLE 041 #E001 ST1 | GI041E0101 | 00130 | 177170069401 |
| GRAND ISLE 041 #E002 ST1 | GI041E0201 | 00130 | 177170074701 |
| GRAND ISLE 041 #E003D | GI041E03D0 | 00130 | 177170075000 |
| GRAND ISLE 041 #E004 ST1 | GI041E0401 | 00130 | 177170075201 |
| GRAND ISLE 041 #E005 | GI041E0500 | 00129 | 177170075400 |
| GRAND ISLE 041 #E006D | GI041E06D0 | 00130 | 177170077300 |
| GRAND ISLE 041 #E008 | GI041E0800 | 00130 | 177170079800 |
| GRAND ISLE 041 #E010 | GI041E1001 | 00130 | 177172000301 |
| GRAND ISLE 041 #E012D | GI041E12D0 | 00130 | 177174011500 |
| GRAND ISLE 041 #E013 | GI041E1300 | 00130 | 177174012900 |
| GRAND ISLE 041 #F003 ST1 | GI041F0301 | 00129 | 177174006401 |
| GRAND ISLE 041 #F005 ST2 | GI041F0502 | 00129 | 177174017302 |
| GRAND ISLE 041 #G007 | GI041G0700 | 00130 | 177174022400 |
| GRAND ISLE 041 #G008 | GI041G0800 | 00130 | 177174026400 |

Exhibit C – Page 1

| Asset Name | FWE Acct. Code | Lease Number | API |
|---|---|---|---|
| GRAND ISLE 041 #H001 | GI041H0100 | 00130 | 177174020300 |
| GRAND ISLE 041 #H002 | GI041H0200 | 00129 | 177174028100 |
| GRAND ISLE 041 #H003 ST | GI041H0301 | 00130 | 177174028601 |
| GRAND ISLE 041 #H004 | GI041H0400 | 00130 | 177174038000 |
| GRAND ISLE 041 #H005 | GI041H0500 | 00129 | 177174038100 |
| GRAND ISLE 041 #H006 ST1 | GI041H0601 | 00129 | 177174098301 |
| GRAND ISLE 041 #H007 | GI041H0700 | 00130 | 177174098400 |
| GRAND ISLE 042 #C001 | GI042C0100 | 00131 | 177170067000 |
| GRAND ISLE 042 #C002 | GI042C0200 | 00131 | 177170072100 |
| GRAND ISLE 042 #F001 | GI042F0100 | 00131 | 177174005100 |
| GRAND ISLE 042 #F002 | GI042F0200 | 00131 | 177174006000 |
| GRAND ISLE 042 #F004 | GI042F0400 | 00131 | 177174007100 |
| GRAND ISLE 046 #001 ST1 | GI04600101 | 00132 | 177174042801 |
| GRAND ISLE 046 #G009 ST1 | GI046G0901 | 00132 | 177174026101 |
| GRAND ISLE 047 #E006 | GI047E0600 | 00133 | 177170078100 |
| GRAND ISLE 047 #E008 | GI047E0800 | 00133 | 177170079500 |
| GRAND ISLE 047 #E017 | GI047E1700 | 00133 | 177174039900 |
| GRAND ISLE 047 #G004 ST | GI047G0401 | 00133 | 177170079601 |
| GRAND ISLE 047 #G005 ST | GI047G0501 | 00133 | 177170080301 |
| GRAND ISLE 047 #G012 | GI047G1200 | 00133 | 177174037500 |
| GRAND ISLE 047 #L001 | GI047L0100 | 00133 | 177174012800 |
| GRAND ISLE 047 #L002 ST | GI047L0201 | 00133 | 177174015901 |
| GRAND ISLE 047 #L003 | GI047L0300 | 00133 | 177174020500 |
| GRAND ISLE 047 #L004 | GI047L0400 | 00133 | 177174017000 |
| GRAND ISLE 047 #L005 | GI047L0500 | 00133 | 177174017900 |
| GRAND ISLE 047 #L006D | GI047L0600 | 00133 | 177174036300 |
| GRAND ISLE 047 #L007 ST | GI047L0701 | 00177 | 177174039101 |
| GRAND ISLE 047 #L009 ST1 | GI047L0901 | 00133 | 177174039201 |
| GRAND ISLE 047 #L011 ST2 | GI047L1102 | 00133 | 177174039602 |
| GRAND ISLE 047 #O001 BP2 | GI047O01D3 | 00133 | 177174096102 |
| GRAND ISLE 047 #O002 | GI047002D1 | 00133 | 177174096600 |
| GRAND ISLE 047 #O004 | GI047O0400 | 00133 | 177174096900 |
| GRAND ISLE 047 #O006 | GI047O0600 | 00133 | 177174097200 |
| GRAND ISLE 047 #O007 ST1 | GI047O0701 | 00133 | 177174097301 |
| GRAND ISLE 047 #O008 | GI047O0800 | 00133 | 177174097600 |
| GRAND ISLE 047 #O009 | GI047O09D1 | 00133 | 177174097700 |
| GRAND ISLE 048 #E001 | GI048E0100 | 00134 | 177170045400 |
| GRAND ISLE 048 #E014 | GI048E1400 | 00134 | 177172003900 |
| GRAND ISLE 048 #E018 ST | GI048E1801 | 00134 | 177174043501 |
| GRAND ISLE 048 #J002 ST1 | GI048J0201 | 00134 | 177174003201 |

Exhibit C – Page 2

| Asset Name | FWE Acct. Code | Lease Number | API |
|---|---|---|---|
| GRAND ISLE 048 #J003 ST | GI048J0302 | 00134 | 177174004502 |
| GRAND ISLE 048 #J004 ST2 | GI048J0403 | 00134 | 177174004803 |
| GRAND ISLE 048 #J005 ST | GI048J0501 | 00134 | 177174011601 |
| GRAND ISLE 048 #J006 | GI048J0600 | 00134 | 177174012000 |
| GRAND ISLE 048 #J007 | GI048J0700 | 00134 | 177174012200 |
| GRAND ISLE 048 #J008 | GI048J0800 | 00134 | 177174016900 |
| GRAND ISLE 048 #J009 | GI048J0900 | 00134 | 177174044200 |
| GRAND ISLE 048 #J010 ST | GI048J1001 | 00134 | 177174044401 |
| GRAND ISLE 048 #P001 FKA #14 | GI048P0100 | 00134 | 177174015300 |
| GRAND ISLE 110 #A002 | GI110A0200 | G13943 | 177184008900 |
| GRAND ISLE 110 #A005 BP2 | GI110A0502 | G13943 | 177184010402 |
| GRAND ISLE 116 #A001 | GI116A0100 | G13944 | 177184008700 |
| GRAND ISLE 116 #A003 | GI116A0300 | G13944 | 177184009200 |
| GRAND ISLE 116 #A004 | GI116A0401 | G13944 | 177184009501 |
| GRAND ISLE 116 #A006 | GI116A0601 | G13944 | 177184010601 |
| GRAND ISLE 116 #A007 | GI116A0700 | G13944 | 177184011100 |
| MISSISSIPPI CANYON 110 #001 | MC1100100 | G18192 | 608174060500 |
| MISSISSIPPI CANYON 110 #A009 | MC110A0900 | G18192 | 608174042501 |
| MISSISSIPPI CANYON 110 #A011ST | MC110A1101 | G18192 | 608174042801 |
| MISSISSIPPI CANYON 110 #A031 | MC110A3100 | G18192 | 608174087900 |
| SOUTH MARSH IS 048 #E002 (ORRI) | SM048E0201 | 00786 | 177072002801 |
| SOUTH MARSH IS 048 #E003 ST1BP (ORRI) | SM048E0302 | 00786 | 177072003302 |
| SOUTH MARSH IS 048 #E004 (ORRI) | SM048E0401 | 00786 | 177072004001 |
| SOUTH MARSH IS 048 #E007 (ORRI) | SM048E07 | 00786 | 177074092300 |
| SOUTH MARSH IS 149 #C001 ST1 | SM149C0101 | G02592 | 177084088901 |
| SOUTH MARSH IS 149 #C002 | SM149C0200 | G02592 | 177084089100 |
| SOUTH MARSH IS 149 #C004 | SM149C0400 | G02592 | 177084090300 |
| SOUTH MARSH IS 149 #C005 | SM149C0500 | G02592 | 177084090400 |
| SOUTH MARSH IS 149 #D001 (ORRI) | SM149D0101 | G02592 | 177084094401 |
| SOUTH PASS 061 #D004 ST2 (ORRI) | SP061D0402 | G01609 | 177234006302 |
| SOUTH PASS 061 #D023 (ORRI) | SP061D2300 | G01609 | 177234008200 |
| SOUTH PASS 061 #D024 ST1 (ORRI) | SP061D2401 | G01609 | 177234007701 |
| SOUTH PASS 061 #D025 (ORRI) | SP061D2500 | G01609 | 177234008300 |
| SOUTH PASS 061 #D026 (ORRI) | SP061D2600 | G01609 | 177234008400 |
| SOUTH PASS 061 #D033 ST2 (ORRI) | SP061D3302 | G01609 | 177234008702 |
| SOUTH PASS 061 #D035 ST2 (ORRI) | SP061D3502 | G01609 | 177234009102 |
| SOUTH PASS 061 #D036 ST1 (ORRI) | SP061D3601 | G01609 | 177234009201 |
| SOUTH PASS 061 #D039 ST1 (ORRI) | SP061D3901 | G01609 | 177234009801 |
| SOUTH PASS 061 #D040 ST2 (ORRI) | SP061D4002 | G01609 | 177234009502 |
| SOUTH PASS 061 #D043 ST2 (ORRI) | SP061D4302 | G01609 | 177234009602 |

Exhibit C – Page 3

| Asset Name | FWE Acct. Code | Lease Number | API |
|---|---|---|---|
| SOUTH TIMBALIER 053 #004 | ST05300401 | G04000 | 177154043101 |
| SOUTH TIMBALIER 053 #006 | ST05300601 | G04000 | 177154083500 |
| SOUTH TIMBALIER 053 #A001 | ST053A0101 | G04000 | 177154034402 |
| SOUTH TIMBALIER 053 #A002 | ST053A0201 | G04000 | 177154037601 |
| SOUTH TIMBALIER 053 #A003 | ST053A0301 | G04000 | 177154038401 |
| SOUTH TIMBALIER 053 #A004 | ST053A0400 | G04000 | 177154038500 |
| SOUTH TIMBALIER 053 #A006 | ST053A0601 | G04000 | 177154039201 |
| SOUTH TIMBALIER 053 #A007 | ST053A0700 | G04000 | 177154040400 |
| SOUTH TIMBALIER 053 #A008 | ST053A0800 | G04000 | 177154040500 |
| SOUTH TIMBALIER 053 #A009 | ST053A0900 | G04000 | 177154041500 |
| SOUTH TIMBALIER 053 #A010 | ST053A1001 | G04000 | 177154043501 |
| SOUTH TIMBALIER 053 #A011 | ST053A1100 | G04000 | 177154042400 |
| SOUTH TIMBALIER 053 #A012 | ST053A1201 | G04000 | 177154042301 |
| SOUTH TIMBALIER 053 #A013 | ST053A1300 | G04000 | 177154044000 |
| SOUTH TIMBALIER 053 #A014 | ST053A1400 | G04000 | 177154042900 |
| SOUTH TIMBALIER 053 #A015 | ST053A1501 | G04000 | 177154076901 |
| SOUTH TIMBALIER 053 #A016 | ST053A1601 | G04000 | 177154043601 |
| SOUTH TIMBALIER 053 #A017 | ST053A1701 | G04000 | 177154061101 |
| SOUTH TIMBALIER 053 #A018 | ST053A1801 | G04000 | 177154061201 |
| SOUTH TIMBALIER 053 #A019 | ST053A1900 | G04000 | 177154077200 |
| SOUTH TIMBALIER 053 #A020 | ST053A2001 | G04000 | 177154077101 |
| SOUTH TIMBALIER 053 #A021 | ST053A2100 | G04000 | 177154111000 |
| SOUTH TIMBALIER 053 #C001 | ST053C0100 | G04000 | 177154067200 |
| SOUTH TIMBALIER 053 #C002 | ST053C0200 | G04000 | 177154107300 |
| SOUTH TIMBALIER 053 #I001 | ST053I0100 | G04000 | 177154031200 |
| SOUTH TIMBALIER 067 #006 | ST06700602 | 00020 | 177154078404 |
| WEST DELTA 068 #U001 | WD068U0100 | 00180 | 177190136200 |
| WEST DELTA 068 #U004 | WD068U0400 | 00180 | 177192007000 |
| WEST DELTA 068 #U005 ST2 | WD068U0502 | 00180 | 177192007502 |
| WEST DELTA 068 #U006 | WD068U0600 | 00180 | 177192008600 |
| WEST DELTA 068 #U009 | WD068U0900 | 00180 | 177192011401 |
| WEST DELTA 068 #U011 | WD068U11 | 00180 | 177192013603 |
| WEST DELTA 068 #U013 ST2 | WD068U1302 | 00180 | 177194065102 |
| WEST DELTA 068 #U014 | WD068U1400 | 00180 | 177194065300 |
| WEST DELTA 069 #D007 ST2 | WD069D0702 | 00181 | 177190063802 |
| WEST DELTA 070 #D001D | WD070D0100 | 00182 | 177190063300 |
| WEST DELTA 070 #D005 | WD070D0500 | 00182 | 177190063600 |
| WEST DELTA 070 #D008 | WD070D0800 | 00182 | 177190063900 |
| WEST DELTA 070 #D009 | WD070D0900 | 00182 | 177190064000 |
| WEST DELTA 070 #D010 | WD070D1000 | 00182 | 177190066700 |

Exhibit C – Page 4

| Asset Name | FWE Acct. Code | Lease Number | API |
|---|---|---|---|
| WEST DELTA 070 #D011 | WD070D1100 | 00182 | 177194036800 |
| WEST DELTA 070 #D012 | WD070D1200 | 00182 | 177194037200 |
| WEST DELTA 070 #D013 | WD070D1300 | 00182 | 177194057000 |
| WEST DELTA 070 #D014 | WD070D1400 | 00182 | 177194057200 |
| WEST DELTA 070 #E001 ST1 | WD070E0101 | 00182 | 177190108201 |
| WEST DELTA 070 #E002 | WD070E0200 | 00182 | 177190067800 |
| WEST DELTA 070 #E003 | WD070E0300 | 00182 | 177190066500 |
| WEST DELTA 070 #FF001 | WD070FF100 | 00182 | 177194084200 |
| WEST DELTA 070 #FF002 | WD070FF200 | 00182 | 177194084300 |
| WEST DELTA 070 #FF003 | WD070FF300 | 00182 | 177194084400 |
| WEST DELTA 070 #I003 ST1 | WD070I0301 | 00182 | 177190091301 |
| WEST DELTA 070 #I004 | WD070I0400 | 00182 | 177190091500 |
| WEST DELTA 070 #I005 ST1 | WD070I0501 | 00182 | 177190095001 |
| WEST DELTA 070 #I006 ST | WD070I0601 | 00182 | 177190095101 |
| WEST DELTA 070 #I008 ST1 | WD070I0801 | 00182 | 177190102101 |
| WEST DELTA 070 #I010 ST1 | WD070I1001 | 00182 | 177190105701 |
| WEST DELTA 070 #I012 STBP2 | WD070I1202 | 00182 | 177194010702 |
| WEST DELTA 070 #I013 | WD070I1300 | 00182 | 177194038400 |
| WEST DELTA 070 #I014 | WD070I1400 | 00182 | 177194061100 |
| WEST DELTA 070 #I015 | WD070I1500 | 00182 | 177194061300 |
| WEST DELTA 070 #I016 ST | WD070I1601 | 00182 | 177194064201 |
| WEST DELTA 070 #I017 | WD070I1700 | 00182 | 177194064600 |
| WEST DELTA 070 #L003 | WD070L0300 | 00182 | 177190113800 |
| WEST DELTA 070 #L004 | WD070L0400 | 00182 | 177190115100 |
| WEST DELTA 070 #L005 | WD070L0500 | 00182 | 177190115500 |
| WEST DELTA 070 #L006 | WD070L0600 | 00182 | 177190115000 |
| WEST DELTA 070 #L010 | WD070L1000 | 00182 | 177190119500 |
| WEST DELTA 070 #L011 | WD070L1100 | 00182 | 177190121400 |
| WEST DELTA 071 #E006 | WD071E0600 | 00838 | 177190073200 |
| WEST DELTA 071 #E007 ST1 | WD071E0701 | 00838 | 177190095601 |
| WEST DELTA 071 #E009 ST1 | WD071E0901 | 00838 | 177190091701 |
| WEST DELTA 071 #E010 | WD071E1000 | 00838 | 177190095700 |
| WEST DELTA 071 #O003 | WD071O0300 | 00838 | 177190121500 |
| WEST DELTA 071 #O005 | WD071O0501 | 00838 | 177190125001 |
| WEST DELTA 071 #O006 | WD071O0601 | 00838 | 177190127101 |
| WEST DELTA 071 #O007 | WD071O0702 | 00838 | 177190129602 |
| WEST DELTA 071 #O009 | WD071O0900 | 00838 | 177190133600 |
| WEST DELTA 071 #O010 | WD071O1000 | 00838 | 177194002500 |
| WEST DELTA 071 #O013 | WD071O1303 | 00838 | 177192001102 |
| WEST DELTA 079 #A019 (ORRI) | WD079A19 | G01449 | 177192006800 |

Exhibit C – Page 5

| Asset Name | FWE Acct. Code | Lease Number | API |
|---|---|---|---|
| WEST DELTA 079 #A021 (ORRI) | WD079A21 | G01449 | 177192012700 |
| WEST DELTA 079 #C017 (ORRI) | WD079C17 | G01874 | 177192013800 |
| WEST DELTA 079 #C025 (ORRI) | WD079C25 | G01874 | 177194008701 |
| WEST DELTA 079 #C032 (ORRI) | WD079C32 | G01874 | 177194019400 |
| WEST DELTA 079 #C033 (ORRI) | WD079C33 | G01874 | 177192009101 |
| WEST DELTA 079 #D020 (ORRI) | WD079D20 | G01449 | 177192023101 |
| WEST DELTA 079 #D023 (ORRI) | WD079D23 | G01449 | 177194006600 |
| WEST DELTA 079 #D024 (ORRI) | WD079D24 | G01449 | 177194007300 |
| WEST DELTA 079 #D031 (ORRI) | WD079D31 | G01449 | 177194037800 |
| WEST DELTA 079 #D035 (ORRI) | WD079D35 | G01449 | 177194046200 |
| WEST DELTA 079 #D036 (ORRI) | WD079D36 | G01449 | 177194047400 |
| WEST DELTA 079 #F002 (ORRI) | WD079F02 | G01449 | 177194038300 |
| WEST DELTA 080 #A010 (ORRI) | WD080A10 | G01874 | 177190136300 |
| WEST DELTA 080 #A016 (ORRI) | WD080A16 | G01874 | 177192004600 |
| WEST DELTA 080 #B016 (ORRI) | WD080B16 | G01874 | 177192018200 |
| WEST DELTA 080 #D019 (ORRI) | WD080D19 | G01449 | 177192021703 |
| WEST DELTA 080 #D029 (ORRI) | WD080D29 | G01874 | 177194036501 |
| WEST DELTA 080 #D032 (ORRI) | WD080D32 | G01449 | 177194038500 |
| WEST DELTA 080 #D034 (ORRI) | WD080D34 | G01874 | 177192019501 |
| WEST DELTA 094 #V001 | WD094V001 | 00839 | 177192005700 |
| WEST DELTA 094 #V002 | WD094V0200 | 00839 | 177192011600 |
| WEST DELTA 094 #V003 | WD094V0300 | 00839 | 177192014900 |
| WEST DELTA 094 #V004 | WD094V0400 | 00839 | 177192015500 |
| WEST DELTA 094 #V014 | WD094V1400 | 00839 | 177194039000 |
| WEST DELTA 094 #V015 | WD094V1500 | 00839 | 177194064000 |
| WEST DELTA 094 #V016 | WD094V1602 | 00839 | 177194063902 |
| WEST DELTA 095 #S005 ST1BP1 | WD095S0502 | G01497 | 177190126202 |
| WEST DELTA 095 #S006 | WD095S0600 | G01497 | 177190135400 |
| WEST DELTA 095 #S008 | WD095S0800 | G01497 | 177190127700 |
| WEST DELTA 095 #S010 ST1 | WD095S1001 | G01497 | 177192000101 |
| WEST DELTA 095 #S012 ST | WD095S1201 | G01497 | 177192002301 |
| WEST DELTA 095 #X001 ST | WD095X0101 | G01497 | 177194002901 |
| WEST DELTA 095 #X003 | WD095X0300 | G01497 | 177194003200 |
| WEST DELTA 095 #X007 ST1 | WD095X0701 | G01497 | 177194003701 |
| WEST DELTA 095 #X011 | WD095X1100 | G01497 | 177194055700 |
| WEST DELTA 095 #X012D | WD095X12D0 | G01497 | 177194055900 |
| WEST DELTA 096 #S002 ST1BP1 | WD096S0202 | G01498 | 177190123402 |
| WEST DELTA 096 #S007 ST1 | WD096S0701 | G01498 | 177190132901 |
| WEST DELTA 096 #X004 ST1 | WD096X0401 | G01498 | 177194003301 |
| WEST DELTA 096 #X006 ST2 | WD096X0602 | G01498 | 177194003502 |

Exhibit C – Page 6

| Asset Name | FWE Acct. Code | Lease Number | API |
|---|---|---|---|
| WEST DELTA 096 #X009 | WD096X0900 | G01498 | 177194004000 |

## Part 2.  Other Wells

| Asset Name | FWE Acct. Code | Lease Number | API |
|---|---|---|---|
| BLOWFISH GU AKA ST TR 329 #2 | BLOWFISH2 | ST-TX 227360 | 421673142600 |
| BRETON SOUND 025 #A001 | BS02501 | G31442 | 177264005300 |
| BRETON SOUND 052 #002 SL17860 | SL1786002 | ST-LA 17860 | 17726205670000 |
| BRETON SOUND 053 #001 SL17675 | SL1767501 | ST-LA 17675 | 177262055100 |
| BRETON SOUND 053 #003 SL15683 | SL1568303 | ST-LA 15683 | 177262053100 |
| BRETON SOUND 53 #UV 3-8 RA VUA (ORRI) | SL1905101 | ST-LA 19051 | 177262058300 |
| EAGLE BAY GU AKA ST TR 329 1 | EAGLEBAYGU | ST-TX 186891 | #N/A |
| EAST CAMERON 345 #A001 (ORRI) | EC345A01 | G15156 | 177044100800 |
| EWING BANKS 789 #A006 (ORRI) | EW789A06 | G35805 | 608104015500 |
| EWING BANKS 789 #A007 (ORRI) | EW789A07 | G35805 | 608104015401 |
| EWING BANKS 790 A-2 (ORRI) | EW790A02 | G33140 | 608104015100 |
| EWING BANKS 790 A-3 (ORRI) | EW790A03 | G33140 | 608104015300 |
| EWING BANKS 790 #A009 (ORRI) | EW790A09 | G33140 | 608104015700 |
| EWING BANKS 834 A-1 (ORRI) | EW834A01 | G27982 | 608105010300 |
| GREEN CANYON 40 #1 | GC04001 | G34536 | 608114062300 |
| GREEN CANYON 39 #2 | GC04002 | G34966 | 608114066500 |
| GREEN CANYON 064 #A026 | GC064A26 | G34539 | 608114063101 |
| GREEN CANYON 065 #A004 | GC065A04 | G05889 | 608114011600 |
| GREEN CANYON 065 #A006 | GC065A06 | G05889 | 608114014800 |
| GREEN CANYON 065 #A008 | GC065A08 | G05889 | 608114015800 |
| GREEN CANYON 065 #A009 | GC065A09 | G05889 | 608114017000 |
| GREEN CANYON 065 #A020 | GC065A20 | G05889 | 608114059902 |
| GREEN CANYON 065 #A023 | GC065A23 | G05889 | 608114064200 |
| GREEN CANYON 065 #A024 | GC065A24 | G05889 | 608114061900 |
| GREEN CANYON 065 #A038 | GC065A38 | G05889 | 608114015501 |
| GREEN CANYON 065 #A043 | GC065A43 | G05889 | 608114017100 |
| GREEN CANYON 065 #A044 | GC065A44 | G05889 | 608114017701 |
| GREEN CANYON 065 #A059 | GC065A59 | G05889 | 608114015900 |
| GREEN CANYON 065 #A060 | GC065A60 | G05889 | 608114015300 |
| GREEN CANYON 108 #A017 | GC108A17 | G14668 | 608114045202 |
| GREEN CANYON 108 #A021 | GC108A21 | G14668 | 608114060701 |
| GREEN CANYON 109 #A001 | GC109A01 | G05900 | 608114010000 |
| GREEN CANYON 109 #A002 | GC109A02 | G05900 | 608114010600 |
| GREEN CANYON 109 #A003 | GC109A03 | G05900 | 608114011200 |

| Asset Name | FWE Acct. Code | Lease Number | API |
|---|---|---|---|
| GREEN CANYON 109 #A005 | GC109A05 | G05900 | 608114012100 |
| GREEN CANYON 109 #A010 | GC109A10 | G05900 | 608114017300 |
| GREEN CANYON 109 #A011 | GC109A11 | G05900 | 608114017800 |
| GREEN CANYON 109 #A015 | GC109A15 | G05900 | 608114039502 |
| GREEN CANYON 109 #A018 | GC109A18 | G05900 | 608114047603 |
| GREEN CANYON 109 #A031 | GC109A31 | G05900 | 608114011900 |
| GREEN CANYON 109 #A032 | GC109A32 | G05900 | 608114012303 |
| GREEN CANYON 109 #A033 | GC109A33 | G05900 | 608114012401 |
| GREEN CANYON 109 #A034 | GC109A34 | G05900 | 608114014401 |
| GREEN CANYON 109 #A035 | GC109A35 | G05900 | 608114014700 |
| GREEN CANYON 109 #A036 | GC109A36 | G05900 | 608114015000 |
| GREEN CANYON 109 #A037 | GC109A37 | G05900 | 608114015200 |
| GREEN CANYON 109 #A039 | GC109A39 | G05900 | 608114016000 |
| GREEN CANYON 109 #A041 | GC109A41 | G05900 | 608114016500 |
| GREEN CANYON 109 #A042 | GC109A42 | G05900 | 608114016701 |
| GREEN CANYON 200 # TA 1 TROIKA | GC200TA01 | G12209 | 608114021600 |
| GREEN CANYON 200 # TA 2 TROIKA | GC200TA02 | G12209 | 608114021702 |
| GREEN CANYON 200 #T A 3 TROIKA | GC200TA03 | G12209 | 608114021800 |
| GREEN CANYON 200 TA3 ST1TROIKA | GC200TA03S | G12209 | 608114021801 |
| GREEN CANYON 200 # TA 4 TROIKA | GC200TA04 | G12209 | 608114021901 |
| GREEN CANYON 200 # TA 5 TROIKA | GC200TA05 | G12209 | 608114020501 |
| GREEN CANYON 200 # TA 9 ORLOV | GC200TA09 | G12209 | 608114071603 |
| GREEN CANYON 201 # TA 6 TROIKA | GC201TA06 | G12210 | 608114027501 |
| GREEN CANYON 201 #002 ST1 (ORRI) | GC201002 | G12210 | 608114037101 |
| GREEN CANYON 201 #001 ST3 (ORRI) | GC20101ST3 | G12210 | 608114043803 |
| GREEN CANYON 238 SS01 (ORRI) | GC238SS01 | G26302 | 608114044304 |
| GREEN CANYON 243 #SS001 (ORRI) | GC243SS01 | G20051 | 608114027608 |
| GREEN CANYON 243 #SS002 (ORRI) | GC243SS02 | G20051 | 608114034000 |
| GREEN CANYON 243 #SS004 (ORRI) | GC243SS04 | G20051 | 608114041600 |
| GREEN CANYON 243 #SS005 (ORRI) | GC243SS05 | G20051 | 608114045701 |
| GREEN CANYON 244 # T001 | GC244001 | G11043 | 608114019700 |
| GREEN CANYON 282 #1ST3 (ORRI) | GC2820103 | G16727 | 608114030804 |
| GREEN CANYON 282 #2ST1 (ORRI) | GC2820201 | G16727 | 608114033701 |
| GREEN CANYON 282 #SS003 (ORRI) | GC282SS003 | G16727 | 608114070701 |
| GREEN CANYON 768 SS02 | GC768SS02 | G21817 | 608114044700 |
| GREEN CANYON 768 SS03 | GC768SS03 | G21817 | 608114050200 |
| GREEN CANYON 768 SS04 | GC768SS04 | G21817 | 608114060900 |
| GREEN CANYON 768 SS01 ST4 | GC768SS104 | G21817 | 608114041705 |
| HIGH ISLAND 031 #L001 SL106158 | SL10615801 | ST-TX 106158 | 427083037900 |
| HIGH ISLAND 031 #L001 SL106159 | SL10615901 | ST-TX 106159 | 427083037800 |

Exhibit C – Page 8

| Asset Name | FWE Acct. Code | Lease Number | API |
|---|---|---|---|
| HIGH ISLAND 031 #L001 SL114921 | SL11492101 | ST-TX 114921 | UNKNOWN |
| HIGH ISLAND 176 # 2 (ORRI) | HI176002 | G27509 | 427084063900 |
| LAKE COMO UNIT (ORRI) | LAKECOMO | SL-MS 170650 | UNKNOWN |
| MILEY 1-43 (ORRI) | MILEY143 | 17009 | UNKNOWN |
| MISSISSIPPI CANYON 519 #1 BP1 | MC5190101 | G27278 | 608174116201 |
| MISSISSIPPI CANYON 519 #2 BP1 | MC5190201 | G27278 | 608174118401 |
| MISSISSIPPI CANYON 519 #3 | MC51903 | G27278 | 608174141100 |
| MISSISSIPPI CANYON 563 SS01(ORRI) | MC563SS01 | G21176 | 608174130000 |
| MISSISSIPPI CANYON 698 #1 | MC69801 | G28022 | 608174123300 |
| MISSISSIPPI CANYON 782 #1 | MC78201 | G33757 | 608174126600 |
| MISSISSIPPI CANYON 782 #2 | MC78202 | G33757 | 608174128200 |
| MISSISSIPPI CANYON 793 A-4 (ORRI) | MC793A04 | G33177 | 608104015200 |
| MISSISSIPPI CANYON 793 A-8 (ORRI) | MC793A08 | G33177 | 608104015900 |
| MISSISSIPPI CANYON 948 #2 ST2 | MC94802 | G28030 | 608174114902 |
| MISSISSIPPI CANYON 948 #3 | MC94803 | G28030 | 608174118801 |
| MISSISSIPPI CANYON 948 #4 | MC94804 | G28030 | 608174129900 |
| MISSISSIPPI CANYON 992 #1 | MC99201 | G24133 | 608174125200 |
| RF FEDERAL 1 (ORRI) | RFFEDERAL1 | ST-MS 230150 | 230372096200 |
| RF FEDERAL 2 (ORRI) | RFFEDERAL2 | ST-MS 231240 | 2303720983 |
| SAN LEON GAS UNIT 1-ST2 | SANLEONG2 | ST-TX 185633 | 421673134500 |
| SAN LEON GAS UNIT A 2 | SANLEONGA2 | ST-TX 234082 | UNKNOWN |
| SAN LEON GAS UNIT B-1 | SANLEONGB1 | ST-TX 255675 | 421673145400 |
| SAN LEON UNIT SWD 1 | SANLEONU1 | ST-TX 24318 | 421673131900 |
| SOUTH MARSH IS 040 #B001 | SM040B01 | G13607 | 177074083600 |
| SOUTH MARSH IS 040 #B005 (D01) | SM040B05 | G13607 | 177074085700 |
| SOUTH MARSH IS 040 #B007 (D01) | SM040B07 | G13607 | 177074089800 |
| SOUTH MARSH IS 040 #JA001 | SM040J01 | G13607 | 177074063602 |
| SOUTH MARSH IS 040 #JA002 | SM040J02 | G13607 | 177074069100 |
| SOUTH MARSH IS 041 #016 | SM04116 | G01192 | 177074091800 |
| SOUTH MARSH IS 041 #B002 | SM041B02 | G01192 | 177074084901 |
| SOUTH MARSH IS 041 #B003 | SM041B03 | G01192 | 177074085300 |
| SOUTH MARSH IS 041 #B004 | SM041B04 | G01192 | 177074085400 |
| SOUTH MARSH IS 041 #B006 | SM041B06 | G01192 | 177074087600 |
| SOUTH MARSH 87 I-2 (ORRI) | | G24870 | 1764097900 |
| SHIP SHOAL 079 #A002 | SS079A02 | G15277 | 177114134300 |
| SHIP SHOAL 301 #A001 | SS301A0100 | G10794 | 177124044301 |
| SHIP SHOAL 301 #A002 | SS301A02 | G10794 | 177124053200 |
| SHIP SHOAL 301 #A004 | SS301A0400 | G10794 | 177124063100 |
| SHIP SHOAL 301 #A005 | SS301A0500 | G10794 | 177124068500 |
| SOUTH TIMBALIER 287 #A008 ST2 | ST287A0802 | G24987 | 177164034802 |

Exhibit C – Page 9

| Asset Name | FWE Acct. Code | Lease Number | API |
|---|---|---|---|
| SOUTH TIMBALIER 308 #A001 | ST308A0100 | G21685 | 177164028000 |
| SOUTH TIMBALIER 308 #A002 ST1 | ST308A0101 | G21685 | 177164028701 |
| SOUTH TIMBALIER 308 #A003 | ST308A0300 | G21685 | 177164030600 |
| SOUTH TIMBALIER 308 #A004 | ST308A0400 | G21685 | 177164030900 |
| SOUTH TIMBALIER 308 #A005 ST1 | ST308A0501 | G21685 | 177164032901 |
| SOUTH TIMBALIER 308 #A006 BP1 | ST308A0601 | G21685 | 177164033301 |
| SOUTH TIMBALIER 308 #A007 BP1 | ST308A0701 | G21685 | 177164033804 |
| STATE TRACT 086 R1L | STTR86R1L | ST-TX 172916 | 420713213700 |
| STATE TRACT 086 R1U | STTR86R1U | ST-TX 172915 | 420713213700 |
| STATE TRACT 087-10 U (F-12 SD) | STTR8710U | ST-TX 5797 | 420713194600 |
| STATE TRACT 087-11 U (F-8 SD) | STTR8711U | ST-TX 5797 | 42071319761 |
| STATE TRACT 087-12 | STTR8712 | TX Onshore | 420713216700 |
| STATE TRACT 087-8 (F-5 SD) | STTR8708 | TX Onshore | 4207102787 |
| STATE TRACT 088-12B (F-5 SD) | STTR8812B | TX Onshore | 420713029900 |
| STATE TRACT 088-5B-L (F-5 SD) | STTR8805B | ST-TX 5749 | 420710276702 |
| STATE TRACT 088-7B-L (F-8 SD) | STTR8807BL | TX Onshore | 420710276602 |
| STATE TRACT 088-7B-U (F-5 SD) | STTR8807BU | TX Onshore | 420710276601 |
| STATE TRACT 330 2R | STTR3302R | ST-TX 234082 | 421673132400 |
| STATE TRACT 330-01 | STTR33001 | ST-TX 24318 | 421673131400 |
| STATE TRACT 331-05 | STTR33105 | ST-TX 178537 | 4216731320 |
| STATE TRACT 331-06 | STTR33106 | ST-TX 183756 | 4216731342 |
| STATE TRACT 331-08 | STTR33108 | ST-TX 207398 | 421673140500 |
| STATE TRACT 331-09 | STTR33109 | ST-TX 191681 | 4216731304 |
| SUE FULLER #2 (ORRI) | SUEFUL2 | 13911 | 42734663 |
| VAUGHEY 1 (ORRI) | VAUGHEY1 | ST-TX 230140 | 230372095400 |
| VERMILION 078 #A001 | VR078A0100 | G04421 | 177054077800 |
| VERMILION 078 #A002 ST2 | VR078A0202 | G04421 | 177054077903 |
| VERMILION 078 #A003 ST2 | VR078A0302 | G04421 | 177054102402 |
| VERMILION 229 #A001 | VR229A01 | G27070 | 177054127100 |
| VERMILION 362 #005 | VR36205 | G10687 | 177064073900 |
| VERMILION 362 #A003 | VR362A0300 | G10687 | 177064070400 |
| VERMILION 362 #A007 | VR362A07 | G10687 | 177064089501 |
| VERMILION 362 #B001 | VR362B0100 | G10687 | 177064072800 |
| VERMILION 362 #B002 | VR362B0200 | G10687 | 177064073600 |
| VERMILION 362 #B005 | VR362B0500 | G10687 | 177064087901 |
| VERMILION 363 #B003 | VR363B0301 | G09522 | 177064074101 |
| VERMILION 371 #A001 | VR371A0100 | G09524 | 177064068100 |
| VERMILION 371 #A002 | VR371A0200 | G09524 | 177064068800 |
| VERMILION 371 #A004 | VR371A0400 | G09524 | 177064070800 |
| VERMILION 371 #A005 | VR371A0500 | G09524 | 177064072500 |

Exhibit C – Page 10

| Asset Name | FWE Acct. Code | Lease Number | API |
|---|---|---|---|
| VERMILION 371 #A006 | VR371A0600 | G09524 | 177064089101 |
| VERMILION 371 #B004 | VR371B0400 | G09524 | 177064074801 |
| WEST YELLOW CREEK UNIT (ORRI) | WYELLOWCRE | SL-MS 23017 | UNKNOWN |

There are no depth restrictions or limitations applicable to any Acquired Interests set forth in this Exhibit.

[End of Exhibit C]

Case 20-33948   Document 2013   Filed in TXSB on 08/27/21   Page 224 of 1389

**Exhibit D**
**Platforms and Facilities**

## Part 1. Co-Owned Platforms and Facilities

### Platforms

| Asset Name | FWE Acct. Code | Complex ID | Lease Number | Area/Block | WI |
|---|---|---|---|---|---|
| GRAND ISLE 039 P/F-Q | GI39QPLT | 24255 | 00127 | GI039 | 25.0% |
| GRAND ISLE 040 P/F-G | GI40GPLT | 20043 | 00128 | GI040 | 25.0% |
| GRAND ISLE 040 P/F-M | GI40MPLT | 24214 | 00128 | GI040 | 25.0% |
| GRAND ISLE 041 P/F-D | GI041PFD | 20020 | 00129 | GI041 | 25.0% |
| GRAND ISLE 041 P/F-B | GI41BPLT | 20575 | 00129 | GI041 | 25.0% |
| GRAND ISLE 041 P/F-E | GI41EPLT | 20032 | 00130 | GI041 | 25.0% |
| GRAND ISLE 041 P/F-H | GI41HPLT | 23557 | 00130 | GI041 | 25.0% |
| GRAND ISLE 041 P/F-I | GI41ICAS | 766 | 00132 | GI041 | 25.0% |
| GRAND ISLE 042 P/F-C | GI42CPLT | 20018 | 00131 | GI042 | 25.0% |
| GRAND ISLE 042 P/F-F | GI42FPLT | 21859 | 00131 | GI042 | 25.0% |
| GRAND ISLE 043 P/F-AC-CMP | GI043PFAC | 20021 | 00175 | GI043 | 25.0% |
| GRAND ISLE 043 P/F-AP-QRT | GI43APPLT | 20221 | 00175 | GI043 | 25.0% |
| GRAND ISLE 043 P/F-AQ-QRT | GI43AQPLT | 20021 | 00175 | GI043 | 25.0% |
| GRAND ISLE 043 P/F-AR-RSR | GI43ARPLT | 20021 | 00175 | GI043 | 25.0% |
| GRAND ISLE 043 P/F-AS-SEP | GI43ASPLT | 20021 | 00175 | GI043 | 25.0% |
| GRAND ISLE 047 P/F-A | GI47APLT | 20046 | 00133 | GI047 | 25.0% |
| GRAND ISLE 047 P/F-AP | GI47APPLT | 20046 | 00133 | GI047 | 25.0% |
| GRAND ISLE 047 P/F-AQ-QTRS | GI47AQPLT | 20046 | 00133 | GI047 | 25.0% |
| GRAND ISLE 047 P/F-AX (BRACE) | GI47AXPLT | 20046 | 00133 | GI047 | 25.0% |
| GRAND ISLE 047 P/F-L | GI47LPLT | 22847 | 00133 | GI047 | 25.0% |
| GRAND ISLE 047 P/F-O | GI47OPLT | 2006 | 00133 | GI047 | 25.0% |
| GRAND ISLE 048 P/F-E | GI48EPLT | 20194 | 00134 | GI048 | 25.0% |
| GRAND ISLE 048 P/F-J | GI48JPLT | 20673 | 00134 | GI048 | 25.0% |
| GRAND ISLE 048 P/F-P | GI48PPLT | 22891 | 00134 | GI048 | 25.0% |
| GRAND ISLE 116 P/F-A | GI116APLT | 686 | G13944 | GI116 | 50.0% |
| SOUTH MARSH IS 149 P/F-C | SM149CPLT | 1027 | G02592 | SM149 | 50.0% |
| SOUTH TIMBALIER 053 P/F-4 | ST053PF4 | 22768 | G04000 | ST053 | 50.0% |

WEIL:\97869848\17\45327.0007

| Asset Name | FWE Acct. Code | Complex ID | Lease Number | Area/Block | WI |
|---|---|---|---|---|---|
| SOUTH TIMBALIER 053 P/F-6 | ST053PF6 | 24184 | G04000 | ST053 | 50.0% |
| SOUTH TIMBALIER 053 P/F-A | ST053PFA | 22421 | G04000 | ST053 | 50.0% |
| SOUTH TIMBALIER 053 P/F-A-AUX | ST053PFAAX | 22421 | G04000 | ST053 | 50.0% |
| SOUTH TIMBALIER 053 P/F-C (5) | ST053PFC5 | 23534 | G04000 | ST053 | 50.0% |
| SOUTH TIMBALIER 053 P/F-I | ST053PFI | 22512 | G04000 | ST053 | 50.0% |
| WEST DELTA 068 P/F-U | WD68UPLT | 29935 | 00180 | WD068 | 25.0% |
| WEST DELTA 070 P/F-D | WD070PFD | 20015 | 00182 | WD070 | 25.0% |
| WEST DELTA 070 P/F-I | WD070PFI | 21805 | 00182 | WD070 | 25.0% |
| WEST DELTA 070 P/F-L | WD070PFL | 21805 | 00182 | WD070 | 25.0% |
| WEST DELTA 070 P/F-FF | WD070PFFF | 2035 | 00182 | WD070 | 25.0% |
| WEST DELTA 071 P/F-E | WD71EPLT | 20047 | 00838 | WD071 | 25.0% |
| WEST DELTA 071 P/F-O | WD071OPLT | 20510 | 00838 | WD071 | 25.0% |
| WEST DELTA 094 P/F-V | WD094PFV | 20036 | 00839 | WD094 | 25.0% |
| WEST DELTA 095 P/F-S | WD095PFS | 21270 | G01497 | WD095 | 25.0% |
| WEST DELTA 095 P/F-X | WD095PFX | 21270 | G01497 | WD095 | 25.0% |

| Asset Name | FWE Acct. Code | Complex ID | RUE Number | Area/Block | WI |
|---|---|---|---|---|---|
| SOUTH MARSH ISLAND 132 P/F B | | 21982 | G30329 | SM 132 | 50% |
| SOUTH TIMBALIER 68 CAISS. #1 | ST681CAS | 24108 | G30267 | ST 68 | 20.334% |

**Part 2.  Other Platforms and Facilities**

**Platforms**

| Asset Name | FWE Acct. Code | Complex ID | Lease Number | Area/Block | WI |
|---|---|---|---|---|---|
| BRETON SOUND 025 P/F-A | BS025CAS | 2532 | G31442 | BS025 | 25.0% |
| BRETON SOUND 052 P/F-A | BS052PFA | | SL-LA 17860 | BS052 | 50.0% |
| BRETON SOUND 053 P/F-CF | BS053PFCF | | Onshore | BS053 | 50.0% |
| GREEN CANYON 065 P/F-A | GC065PFA | 23552 | G05889 | GC065 | 49.0% |
| HIGH ISLAND 030 P/F-L | HI030PFL | | SL-TX 11408 | HI030 | 100.0% |
| SHIP SHOAL 079 P/F-A | SS79PFA | 913 | G15277 | SS079 | 100.0% |

Exhibit D – Page 2

**QNE EX. NO. 06**
**Page 158 of 170**

| Asset Name | FWE Acct. Code | Complex ID | Lease Number | Area/Block | WI |
|---|---|---|---|---|---|
| SHIP SHOAL 301 P/F-A | SS301PFA | 32027 | G10794 | SS301 | 100.0% |
| SOUTH TIMBALIER 308 P/F-A | ST308APLT | 1500 | G21685 | ST308 | 100.0% |
| VERMILION 078 P/F-A | VR78APLT | 23674 | G04421 | VR078 | 100.0% |
| VERMILION 229 P/F-A | VR229PFA | 2261 | G27070 | VR229 | 50.0% |
| VERMILION 362 P/F-B | VR362PFB | 27064 | G10687 | VR362 | 100.0% |
| VERMILION 371 P/F-A | VR371PFA | 27021 | G09524 | VR371 | 100.0% |

| Asset Name | FWE Acct. Code | Complex ID | RUE Number | Area/Block | WI |
|---|---|---|---|---|---|
| SOUTH MARSH ISLAND 40 P/F B | SM040PSB | 1266 | G13607 | SM 40 | 100% |
| SOUTH MARSH ISLAND 40 P/F JA | SM040PFJA | 27017 | G13607 | SM 40 | 100% |
| SHIP SHOAL 80 P/F A | SS080PFA | 23548 | G30201 | SM 40 | 100% |

**Facilities**

| Name | State | County/Parish | Seller | Associated Assets |
|---|---|---|---|---|
| FIELDWOOD NORTH CARENCRO | Louisiana | Lafayette | Fieldwood | Warehouse for P&A |
| EAGLE BAY ST 331 MAIN PLATFORM | Texas | Galveston | Fieldwood Onshore | Scheduled Wells with API numbers of 4216731345 and 421631500 |
| SAN LEON PROD FACILITY | Texas | Galveston | Fieldwood Onshore | ST-TX 24318 ST-TX 185633 ST-TX 234082 ST-TX 255675 |
| GRAND ISLE TANK BAT | Louisiana | Jefferson | FEO | the Co-Owned Leases in the Grand Isle unit and in the Grand Isle/West Delta unit |

[End of Exhibit D]

Exhibit D – Page 3

**QNE EX. NO. 06
Page 159 of 170**

WEIL:\97869848\17\45327.0007

**Exhibit D-1**
**Inventory**

[Attached]

WEIL:\97869848\17\45327.0007

**Exhibit E**
**Permits**

**Part 1.  Co-Owned Permits**

| Block | Lease | Permit |
|---|---|---|
| GI 32 | 00174 | No active/pending permits at this time |
| GI 39 | 00126 | No active/pending permits at this time |
| GI 39 | 00127 | No active/pending permits at this time |
| GI 40 | 00128 | No active/pending permits at this time |
| GI 41 | 00129 | APM Well No. M001 - Recomp to PI E1 |
| GI 41 | 00130 | Segment 17191 - Pipeline Repair; In Review |
| GI 42 | 00131 | No active/pending permits at this time |
| GI 43 | 00175 | No active/pending permits at this time |
| GI 44 | 00176 | No active/pending permits at this time |
| GI 46 | 00132 | No active/pending permits at this time |
| GI 47 | 00133 | No active/pending permits at this time |
| GI 48 | 00134 | No active/pending permits at this time |
| GI 52 | 00177 | No active/pending permits at this time |
| GI 110 | G13943 | No active/pending permits at this time |
| GI 116 | G13944 | No active/pending permits at this time |
| MC 110 | G18192 | No active/pending permits at this time |
| SM 41 | G01192 | No active/pending permits at this time |
| SM 48 | 00786 | No active/pending permits at this time |
| SM 149 | G02592 | C001 (APM for CT Cleanout/Modify Perfs) |
| SP 61 | G01609 | No active/pending permits at this time |
| ST 53 | G04000 | No active/pending permits at this time |
| ST 67 | 00020 | No active/pending permits at this time |
| WD 67 | 00179 | No active/pending permits at this time |
| WD 68 | 00180 | No active/pending permits at this time |
| WD 69 | 00181 | No active/pending permits at this time |

Exhibit E – Page 1

WEIL:\97686848\17\45327.0007

| Block | Lease | Permit |
|-------|-------|--------|
| WD 70 | 00182 | APMs for Well Nos. WD70 I002, I007 & L005 - Conductor Repairs<br>Well No. I014 - Install Lower PB Valve<br>Well No. O004 - TTRC to JR Sand |
| WD 71 | 00838 | APMs for PA Well Nos. E006 & E009<br>WD71 Well Nos. O002 & O007- Conductor Repairs<br>WD71 Well No. O008 - APM for PA |
| WD 94 | 00839 | No active/pending permits at this time |
| WD 95 | G01497 | No active/pending permits at this time |
| WD 96 | G01498 | No active/pending permits at this time |

**Part 2.  Other Permits**

| Block | Lease | Permits |
|-------|-------|---------|
| AT 023 | G35015 | No active/pending permits at this time |
| BS 025 | G31442 | No active/pending permits at this time |
| EC 345 | G15156 | No active/pending permits at this time |
| EW 789 | G35805 | No active/pending permits at this time |
| EW 790 | G33140 | No active/pending permits at this time |
| EW 834 | G27982 | No active/pending permits at this time |
| EW 835 | G33707 | No active/pending permits at this time |
| EW 1009 | G34878 | Nothing filed under FW yet (previous Noble submittals need to be re-permitted under FW when operations determined) |
| EW 1010 | G34879 | Nothing filed under FW yet (previous Noble submittals need to be re-permitted under FW when operations determined) |
| EW 1011 | G34880 | Nothing filed under FW yet (previous Noble submittals need to be re-permitted under FW when operations determined) |
| GC 39 A | G34966 | Approved Revised EP Control No.R-6837 to drill/complete well B |
| GC 39 B | G36476 | No active/pending permits at this time |
| GC 040 | G34536 | Revised DWOP in-review w/BSEE; approved Revised EP Control No.R-6837 to drill/complete wells C, F, I, J |
| GC 041 | G34537 | Nothing pending for any Seller |
| GC 064 | G34539 | No permits are pending |

Exhibit E – Page 2

**QNE EX. NO. 06**
**Page 162 of 170**

WEIL\97869848\17\45327.0007

| Block | Lease | Permits |
|-------|-------|---------|
| GC 065 | G05889 | GC65 A - Proposed Helideck Repair Plan in review. GC65 A037 - Casing Departure Request; pending |
| GC 108 | G14668 | No active/pending permits at this time |
| GC 109 | G05900 | No active/pending permits at this time |
| GC 153 | G36814 | No active/pending permits at this time |
| GC 198 | G36021 | No active/pending permits at this time |
| GC 200 | G12209 | Supplemental EP Control No.S-7931 approved to drill TA010, TA012, TA014, TA016, TA017, TA018 |
| GC 201 | G12210 | No active/pending permits at this time |
| GC 238 | G26302 | No active/pending permits at this time |
| GC 243 | G20051 | No active/pending permits at this time |
| GC 244 | G11043 | No active/pending permits at this time |
| GC 282 | G16727 | No active/pending permits at this time |
| GC 679 | G21811 | No active/pending permits at this time |
| GC 768 | G21817 | No active/pending permits at this time |
| HI 176 | G27509 | APM to PA Well No.'s 002 & 003 |
| MC 118 | G35963 | No active/pending permits at this time |
| MC 119 | G36537 | No active/pending permits at this time |
| MC 162 | G36880 | No active/pending permits at this time |
| MC 163 | G36538 | No active/pending permits at this time |
| MC 171 | G34428 | No active/pending permits at this time |
| MC 172 | G34429 | No active/pending permits at this time |
| MC 206 | G36540 | No active/pending permits at this time |
| MC 297 | G34434 | No active/pending permits at this time |
| MC 380 | G36544 | No active/pending permits at this time |
| MC 424 | G36545 | No active/pending permits at this time |
| MC 435 | G36772 | No active/pending permits at this time |
| MC 436 | G36773 | No active/pending permits at this time |
| MC 474 | G35825 | MC519 #2 - Casing Departure Request; pending |
| MC 518 | G35828 | No active/pending permits at this time |

Exhibit E – Page 3

**QNE EX. NO. 06**
**Page 163 of 170**

WEIL\97869848\17\45327.0007

Case 20-33948   Document 2013   Filed in TXSB on 08/27/21   Page 231 of 1389

| Block | Lease | Permits |
|-------|-------|---------|
| MC 519 | G27278 | Preparing RDOCD to capture new flowline installation |
| MC 562 | G19966 | No active/pending permits at this time |
| MC 563 | G21176 | No active/pending permits at this time |
| MC 691 | G36400 | No active/pending permits at this time |
| MC 697 A | G28021 | Nothing filed under FW yet (previous Noble submittals need to be re-permitted under FW when operations determined) |
| MC 698 | G28022 | Nothing filed under FW yet (previous Noble submittals need to be re-permitted under FW when operations determined) |
| MC 742 | G32343 | Nothing filed under FW yet (previous Noble submittals need to be re-permitted under FW when operations determined) |
| MC 743 | G36401 | No active/pending permits at this time |
| MC 782 | G33757 | Active departure for #002 well for cycling zones (will continue to be renewed every 4 months) |
| MC 789 | G36557 | No active/pending permits at this time |
| MC 793 | G33177 | No active/pending permits at this time |
| MC 904 | G36566 | No active/pending permits at this time |
| MC 905 | G36405 | No active/pending permits at this time |
| MC 948 | G28030 | Approved SDOCD Control No. S-8000 for #001 well (SHL in MC948/BHL in MC992) to sidetrack & produce well + install 2 LT pipelines |
| MC 949 | G32363 | Nothing filed under FW yet (previous Noble submittals need to be re-permitted under FW when operations determined) |
| MC 992 | G24133 | Approved SDOCD Control No. S-8000 for #001 well (SHL in MC948/BHL in MC992) to sidetrack & produce well + install 2 LT pipelines |
| MC 993 | G24134 | Nothing filed under FW yet (previous Noble submittals need to be re-permitted under FW when operations determined) |
| SM 040 | G13607 | No active/pending permits at this time |
| SS 079 | G15277 | No active/pending permits at this time |
| SS 301 | G10794 | SOP Approved with contingency that the A004 recompletion will need to begin by January 31, 2021 Segment  11050 - Temp Cessation; In Review |
| ST 287 | G24987 | No active/pending permits at this time |
| ST 308 | G21685 | ST308 A002 - Casing Departure Request; pending |
| VR 078 | G04421 | No active/pending permits at this time |
| VR 229 | G27070 | No active/pending permits at this time |
| VR 362 | G10687 | APM for VR362 A003 - Conductor Repair |
| VR 363 | G09522 | No active/pending permits at this time |

Exhibit E – Page 4

**QNE EX. NO. 06**
**Page 164 of 170**

WEIL\97869848174S327.0007

| Block | Lease | Permits |
|---|---|---|
| VR 371 | G09524 | RPM for VR 371 A001 (TA)<br>Segment 10675 - Temp Cessation; In Review |
| WD 57,<br>WD 79,<br>WD 80 | G01449 | No active/pending permits at this time |
| WD 79,<br>WD 80 | G01874 | No active/pending permits at this time |
| WD 80 | G01989 | No active/pending permits at this time |
| WD 80 | G02136 | No active/pending permits at this time |

| Onshore Lease | Permits |
|---|---|
| SL-LA 15683 | No active/pending permits at this time |
| SL-LA 17675 | No active/pending permits at this time |
| SL-LA 17860 | No active/pending permits at this time |
| SL-LS 19051 | No active/pending permits at this time |
| SL-LA 19718 | No active/pending permits at this time |
| SL-MS 23017 | No active/pending permits at this time |
| SL-MS 170650 | No active/pending permits at this time |
| SL-MS 230140 | No active/pending permits at this time |
| SL-MS 230150 | No active/pending permits at this time |
| SL-MS 231240 | No active/pending permits at this time |
| SL-TX 5749 | No active/pending permits at this time |
| SL-TX 5797 | No active/pending permits at this time |
| SL-TX 24318 | No active/pending permits at this time |
| SL-TX 106158 | No active/pending permits at this time |
| SL-TX 106159 | No active/pending permits at this time |
| SL-TX 114921 | No active/pending permits at this time |
| SL-TX 172915 | No active/pending permits at this time |
| SL-TX 172916 | No active/pending permits at this time |
| SL-TX 178537 | No active/pending permits at this time |

Exhibit E – Page 5

**QNE EX. NO. 06**
**Page 165 of 170**

WEIL\97869848\17\45327.0007

| Onshore Lease | Permits |
|---|---|
| SL-TX 183756 | No active/pending permits at this time |
| SL-TX 185633 | No active/pending permits at this time |
| SL-TX 186891 | No active/pending permits at this time |
| SL-TX 191681 | No active/pending permits at this time |
| SL-TX 207398 | No active/pending permits at this time |
| SL-TX 227360 | No active/pending permits at this time |
| SL-TX 234082 | No active/pending permits at this time |
| SL-TX 255675 | No active/pending permits at this time |

[End of Exhibit E]

Exhibit E – Page 6

WEIL:\97869848\17\45327.0007

**Exhibit F**
**Seismic Data**

[Attached]

Exhibit F – Page 1

WEIL:\97758759\3\04327.0007

| Company | Master License Agreement | Supplements and Product Description | | Product Description | | |
|---|---|---|---|---|---|---|
| TGS-NOPEC Geophysical Company | HL073-200 | 9/26/2013 | I1403 | Cameron SAD 3D PSTM | 3D | |
| | HL073-200 | 9/26/2013 | I1403 | Cameron SAD 3D PSDM | 3D | |
| | HL073-200 | 10/18/2018 & 8/30/2018 | I1402, H-0428 | Declaration WAZ 3D (PSDM) | 3D | |
| | HL073-200 | 8/20/2018 & 11/17/2017 | I0401, H-0419 | Eugene Delta 3D PSTM | 3D | |
| | HL073-200 | 8/8/2013 & 11/17/2017 | I0401, H-0417 | Eastern Delta 3D PSDM | 3D | |
| | HL073-200 | 4/10/2018 & 8/23/2018 | I1421, 25, 26 &H-0427 | Freedom and Liberty WAZ 3D (PSDM | 3D | |
| | HL073-200 | 8/1/2018 & 8/23/2018 | H-0426, H-0427 | Fusion M WAZ 3D | 3D | |
| | HL073-200 | 4/10/2018 | I1402 | GOM Deep Water Velocity Volumes Interpretation | Interp | |
| | HL073-200 | 4/10/2018 & 8/30/2018 | I1422, H-0428 | Justice W AZ 3D (PSDM) | 3D | |
| | HL073-200 | 4/10/2018 & 8/30/2018 | I1422, H-0428 | Justice W AZ 3D (PSDM) | 3D | |
| | HL073-200 | 4/10/2018 & 8/30/2018 | I1422, H-0428 | Justice W AZ RR Kirchhoff 3E | 3D | |
| | HL073-200 | 8/8/2013 & 10/04/2018 | I1401, H-0422 | MC TT RTM 3D | 3D | |
| | HL073-200 | 8/8/2013 & 10/04/2018 | I1401, H-0422 | MC Revival 3D PSTM | 3D | |
| | HL073-200 | 8/8/2013 & 10/04/2018 | I1401, H-0422 | MC TT RTM 3D | 3D | |
| | HL073-200 | 8/8/2013 & 10/04/2018 | I1401, H-0422 | MC Revival 3D PSTM | 3D | |
| | HL073-200 | 8/23/2018 | I1427 | Patriot M-WAZ 3D | 3D | |
| | HL073-200 | 8/28/2013 & 2/21/2018 | I1401,6,8,9,10,13,15,17, H-0420 | Sophex Resolve 3D (PSTM) | 3D | |
| | HL073-200 | 8/28/2013 & 2/21/2018 | I1401,6,8,9,10,13,15,17, H-0420 | Sophex Resolve 3D (PSDM) | 3D | |
| | HL073-200 | 8/28/2013 & 2/21/2018 | I1401,6,8,9,10,13,15,17, H-0420 | Sophex Resolve 3D (PSDM) | 3D | |
| | HL073-200 | 8/28/2013 & 2/21/2019 | I1401,6,8,9,10,13,15,17, H-0421 | Sophex Resolve TT RTM 3E | 3D | |
| | HL073-201 | 8/28/2013 | I1402 | Vooka Knoll 3D | 3D | |
| WesternGeco | HL073-201 | 9/30/2013 | J1309016 | 3393 Mega-Louisiana ORC (PSTM | 361.9.05 Sq Kms | 178,65364 Blocks |
| b/b Western and Fieldwood | | 9/10/2013 | J1309017 | 3291-40 EMerge-Louisiana Streamer (PSTM | 3020.4 Sq Kms | 149,26651 Blocks |
| | | 9/10/2013 | J1309018 | 3291-40 EMerge-Louisiana Streamer (PSTM | 1785.79 Sq Kms | 76,614232 Blocks |
| | | 9/10/2013 | J1309019 | 329106 High Island South Phase | 603.63 Sq Kms | 1,087156 Blocks |
| | | 9/10/2013 | J1309020 | 329099 High Island South Phase II | 2029.01 Sq Kms | 100,16494 Blocks |
| | | 9/10/2013 | J1309021 | 964 Mississippi Delta - Depth 1 Phase IV | 1401.56 Sq Kms | 68,9807 Blocks |
| | | 9/10/2013 | J1309022 | 297 WC29 | 290.73 Sq Kms | 14,36768 Blocks |
| | | 9/10/2013 | J1309023 | 5024 High Island Pass Phase III | 1208.1 Sq Kms | 59,70367 Blocks |
| | | 9/19/2013 | J1309039 | 329094 High Island Phase 9 (G) | 1911.61 Sq Kms | 82,103271 Blocks |
| | | 9/19/2013 | J1309040 | 329091 East Breaks Phase 6 (G) | 1277.65 Sq Kms | 54,813794 Blocks |
| | | 9/19/2013 | J1309041 | 329024 High Island Phase 7 (G) | 704.31 Sq Kms | 30,21461 Blocks |
| | | 9/19/2013 | J1309042 | 329025 High Island Phase 8 (G) | 358.86 Sq Kms | 15,427033 Blocks |
| | | 9/19/2013 | J1309043 | 329022 High Island Phase 5 (G) | 362.5 Sq Kms | 15,532066 Blocks |
| | | 9/19/2013 | J1309044 | 329018 High Island Phase 1 (G) | 1080.25 Sq Kms | 46,345092 Blocks |
| | | 9/19/2013 | J1309045 | 2404 Garden Banks Phase OBT | 792.51 Sq Kms | 34,000427 Blocks |
| | | 9/19/2013 | J1309046 | 50558 High Island - West Cameron | 458.96 Sq Kms | 19,692254 Blocks |
| | | 9/19/2013 | J1309047 | 50246 High Island - West Cameron N. Ext | 252.7 Sq Kms | 10,841347 Blocks |
| | | 9/20/2013 | J1309049 | 3291-40 EMerge-Louisiana Streamer (PSTM | 353.65 Sq Kms | 17,419447 Blocks |
| | | 9/20/2013 | J1309050 | 5062 Main Pass Phase III | 411.3 Sq Kms | 20,41577 Blocks |
| | | 9/20/2013 | J1309051 | 252 Mississippi Canyon Phase VE | 461.06 Sq Kms | 19,780577 Blocks |
| | | 9/20/2013 | J1309052 | 373 Main Pass EMerge I | 560.53 Sq Kms | 18,213784 Blocks |
| | | 9/20/2013 | J1309053 | 251 South Pass Phase II | 607.94 Sq Kms | 3,001984 Blocks |
| | | 9/20/2013 | J1309054 | 946 Mississippi Delta - Depth 1 Phase | 1031.1 Sq Kms | 50,8665 Blocks |
| | | 9/27/2013 | J1309055 | 95900 Cameron Merge X (G) | 283.25 Sq Kms | 40,01756 Blocks |
| | | 9/27/2013 | J1310001 | 95900 OBC REMIGRATION | 810.88 Sq Kms | 40,072953 Blocks |
| | | 9/27/2013 | J1310002 | 800 Mega (1st Year) | 53.01 Sq Kms | 2,6199148 Blocks |
| | | 9/27/2013 | J1310003 | 325 SS15 | 60.85 Sq Kms | 3,009546 Blocks |
| | | 10/1/2013 | J1310005 | 32903 Ship Shoal Area 1 (G) | 578.25 Sq Kms | 27,84 Blocks |
| | | 10/1/2013 | J1310006 | 329038 West Cameron Area 5 (G) | 510.55 Sq Kms | 158,77982 Blocks |
| | | 10/1/2013 | J1310007 | 329042 Vermilion Area 1 (G) | 334.63 Sq Kms | 40,072953 Blocks |
| | | 10/1/2013 | J1310008 | 329036 South Marsh Island Area 3 (G) | 721.88 Sq Kms | 35,674868 Blocks |
| | | 10/1/2013 | J1310009 | 329034 South Marsh Island Area 1 (G) | 362.56 Sq Kms | 17,917642 Blocks |
| | | 10/1/2013 | J1310010 | 329044 Vermilion Area 3 (G) | 520.91 Sq Kms | 2,6199148 Blocks |
| | | 10/1/2013 | J1310011 | 329043 Vermilion Area 2 (G) | 660.8 Sq Kms | 32,656185 Blocks |
| | | 10/1/2013 | J1310012 | 329015 South Timbalier 21 | 333.22 Sq Kms | 16,467582 Blocks |
| | | 10/1/2013 | J1310013 | 78220 South Timbalier 21 | 230.76 Sq Kms | 1,003819 Blocks |
| | | 10/2/2013 | J1310014 | 99303023 Grand Isle/Bay Marchand (G) | 356.31 Sq Kms | 17,543 Blocks |
| | | 10/2/2013 | J1310015 | 78218 Bay Marchand 1986 | 197.56 Sq Kms | 9,727 Blocks |
| | | 10/2/2013 | J1310016 | 78217 Timbalier Trend 943 | 773.32 Sq Kms | 38,104659 Blocks |
| | | 10/2/2013 | J1310017 | 50245 South Timbalier Bay Cable | 464.81 Sq Kms | 22,970723 Blocks |
| | | 10/2/2013 | J1310018 | 373 Main Pass EMerge I | 242.06 Sq Kms | 11,965453 Blocks |
| | | 10/2/2013 | | 373 Main Pass EMerge I - ALL WG | 154.73 Sq Kms | 7,6268568 Blocks |
| | | 10/2/2013 | | Main Pass Phase II | 55.72 Sq Kms | 2,753674 Blocks |
| | | 10/2/2013 | J1310019 | 50244 Main Pass Phase II | 136.16 Sq Kms | 6,728947 Blocks |
| | | 10/2/2013 | J1310020 | 251 South Pass Phase II | 603.28 Sq Kms | 29,813783 Blocks |
| | | 10/2/2013 | J1310021 | 229 West Delta - South Pass | 185.36 Sq Kms | 8,635459 Blocks |
| | | 10/2/2013 | J1310022 | 252 Mississippi Canyon Phase VE | 63.6 Sq Kms | 2,7369537 Blocks |
| | | 10/2/2013 | J1310023 | 99298 SW Pass I, II, III | 298.48 Sq Kms | 14,759457 Blocks |
| | | 11/14/2013 | J1310116 | 3393 Mega-Louisiana ORC (PSTM | 375.48 Sq Kms | 18,557633 Blocks |
| | | 11/14/2013 | J1310117 | 95900 OBC REMIGRATION | 375.48 Sq Kms | 18,555763 Blocks |
| | | 11/14/2013 | J1311018 | 239 South Timbalier Section I & I | 139.18 Sq Kms | 6,878166 Blocks |

QNE EX. NO. 06
Page 168 of 170

| Company | Master License Agreement | Supplements and Product Description | | | | | | |
|---|---|---|---|---|---|---|---|---|
| CGG | b/h CGG and Fieldwood | | 11/14/2013 | J1311019 | 9982-Ship Shoal/South Timbalier - Depth 2 | 115.64 Sq Kms | 5.7148636 Blocks | Cameron Merge 5 |
| | | | 11/14/2013 | J1311020 | 339-Merge-Louisiana OBC (PSTM) | 111.07 Sq Kms | 5.4887744 Blocks | Cameron-Vermilion EMerge1 |
| | | | 11/14/2013 | J1311021 | 95800-OBC REMIGRATION | 114 Sq Kms | 5.6336937 Blocks | Vermilion I-III |
| | | | 2/18/2014 | J1402042 | 234-Galveston | 177.1 Sq Kms | 7.6066585 Blocks | East Cameron 01/02 - Mega (3rd Year) |
| | | | 2/18/2014 | J1402043 | 385-GC WAZ Q-Marine | 133.74 Sq Kms | 5.7378491 Blocks | West Cameron 30 |
| | | | 2/18/2014 | J1402044 | 99150-Outcapes Phases I-V Merge | 136.81 Sq Kms | 5.8695151 Blocks | West Cameron 31 |
| | | | 2/18/2014 | J1402045 | 90391-U-Wave | 136.81 Sq Kms | 5.8695177 Blocks | West Cameron 30+31 Emerge 1 |
| | | | 2/18/2014 | J1402046 | 3290M-Green Canyon Area 3 (G) | 139.82 Sq Kms | 5.9987601 Blocks | West Cameron 32 |
| | | | 2/18/2014 | J1402047 | 150-NW GC WAZ Q-Marine | 2.91 Sq Kms | 0.1246519 Blocks | |
| | | | 2/18/2014 | J1402049 | 3290M-West Cameron Area 1 (G) | 20.48 Sq Kms | 1.0118923 Blocks | |
| | | | 8/6/2014 | J1402050 | 3290M-Vosca Knoll | 23.55 Sq Kms | 1.1626472 Blocks | |
| | | | 2/18/2014 | J1402051 | 50054-Eugene Island Nsetl | 34.29 Sq Kms | 1.6946304 Blocks | |
| | | | 2/18/2014 | J1402052 | 3294.60-Merge-Louisiana Streamer (PSTM) | 536.8 Sq Kms | 26.528161 Blocks | |
| | | | 2/18/2014 | J1402053 | 82-Ngabre Island - Depth 2 | 150.47 Sq Kms | 7.4384292 Blocks | |
| | | | 2/18/2014 | J1402054 | 182-Vermilion-South Marsh Island-Depth | 491.7 Sq Kms | 24.299722 Blocks | |
| | | | 2/18/2014 | J1402055 | 339-Merge-Louisiana OBC (PSTM) | 1069.88 Sq Kms | 52.872804 Blocks | |
| | | | 2/18/2014 | J1402056 | 9982-Ship Shoal/South Timbalier - Depth 2 | 40.71 Sq Kms | 2.0116678 Blocks | |
| | | | 2/18/2014 | J1402073 | 339-Merge-Louisiana OBC (PSTM) | 602.15 Sq Kms | 29.757626 Blocks | |
| | | | 2/20/2014 | J1402074 | 95800-OBC REMIGRATION | 621.96 Sq Kms | 30.737113 Blocks | |
| | | | 2/24/2014 | J1402075 | 99315-E-Wave & Fifth Wave Merge | 136.81 Sq Kms | 5.87 Blocks | |
| | | | 6/3/2014 | J1406041 | 146-East Breaks Depth 1 | 119.5 Sq Kms | 5.1263771 Blocks | |
| | | | 8/6/2014 | J1408007 | 385-GC WAZ Q-Marine | 256.42 Sq Kms | 11.00074 Blocks | |
| | | | 8/6/2014 | J1408008 | 99315-E-Wave & Fifth Wave Merge | 256.42 Sq Kms | 11.000744 Blocks | |
| | | | 8/6/2014 | J1408009 | 99150-Outcapes Phases I-V Merge | 256.42 Sq Kms | 11.00074 Blocks | |
| | | | 8/6/2014 | J1408010 | 90391-U-Wave | 256.42 Sq Kms | 11.000744 Blocks | |
| | | | 8/27/2014 | J1408221 | 93-Jeanerette Reprocessing | 235.67 Sq Kms | Blocks | |
| | | | 8/27/2014 | J1408222 | 30901-Jeanerette (G) | 216.05 Sq Kms | Blocks | |
| | | | 12/5/2014 | J1412062 | 95800-OBC REMIGRATION | 1069.88 Sq Kms | 52.872804 Blocks | |
| | | | 4/23/2015 | J1504095 | 220-West Delta - South Pass | 10.45 Sq Kms | 0.5165767 Blocks | |
| | | | 6/26/2015 | J1506009 | 32912O-East Breaks Phase 2 (G) | 64.43 Sq Kms | 2.7641909 Blocks | |
| | | | 3/21/2017 | J1703053 | 339-EMerge-Louisiana OBC (PSTM) | 51.17 Sq Kms | 2.5286143 Blocks | |
| | | | 8/21/2018 | J1808033 | 412-Revolution XII | 1227.51 Sq Kms | 5.662556 Blocks | |
| | | | 11/2/2018 | J1811003 | 412-Revolution XII | 259.9 Sq Kms | 11.15014 Blocks | |
| | | | 2/18/2020 | J2002157 | 412-Revolution XII - | 46.45 Sq Kms | 1.992919 Blocks | |
| | | 2014 | CGG-GOM-001 | | CGG-BAG (WEIk) (Final Velocity Model) | | 330.31 OCS Blocks | |
| | | | | | CGG-BAG (WEIk) (Gathers Kirchhoff PSDM) (wo RMO) | | 11.79 OCS Blocks | |
| | | | | | CGG-BAG (WEIk) (Migration Kirchhoff PSDM) (Final) | | 330.31 OCS Blocks | |
| | | | | | CGG-BAG (WEIk) (Migration WEM PSDM) (Final) | | 13.02 OCS Blocks | |
| | | | | | CGG-BAG (WEIk) (Sediment Velocity Model) | | 271.75 OCS Blocks | |
| | | | | | CGG-Green Canyon I-II-III (Gathers PSTM) (wo NMO) (Infors Divided by 2) | | 8.06 OCS Blocks | |
| | | | | | CGG-Green Canyon I-II-III (Migration PSTM) (Raw | | 184 OCS Blocks | |
| | | | | | CGG-Green Canyon I-II-III (Stacking Velocity - ASCII) | | 3.27 OCS Blocks | |
| | | | | | CGG-Green Canyon I-II-III (Stacking Velocity- SEGY) | | 3.27 OCS Blocks | |
| | | | | | CGG-Green Canyon IV (Gathers PSTM) (wo NMO) | | 1.12 OCS Blocks | |
| | | | | | CGG-Green Canyon IV (Migration PSTM) (Final) (6GC4 + GC5 | | 6 OCS Blocks | |
| | | | | | CGG-Green Canyon IV (Migration PSTM) (Raw | | 119 OCS Blocks | |
| | | | | | CGG-Green Canyon V (Migration PSTM) (Final) | | 76 OCS Blocks | |
| | | | | | CGG-Green Canyon - Atwater Valley (Migration PSTM) (Final) | | 74.46 OCS Blocks | |
| | | | | | CGG-Green Canyon - Atwater Valley (Gathers PSTM | | 3.35 OCS Blocks | |
| | | | | | CGG-Mississippi Canyon - Atwater Valley (Migration PSTM Final | | 126.5 OCS Blocks | |
| | | | | | CGG-Phase C (PSDM) (Final Velocity Model - Cut | | 10.5 OCS Blocks | |
| | | | | | CGG-Phase C (PSDM) (Kirchhoff PSDM Migration) (Final | | 10.5 OCS Blocks | |
| | | | | | CGG-Phase D) (WEIk) (Final Velocity Model) | | 19 OCS Blocks | |
| | | | | | CGG-Phase D) (WEIk) (Kirchhoff Gathers without RMC | | 3.31 OCS Blocks | |
| | | | | | CGG-Phase D) (WEIk) (Kirchhoff PSDM Migration) (Final) | | 19 OCS Blocks | |
| | | | | | CGG-Phase D) (WEIk) (Kirchhoff Sediment Flood Velocity Mode | | 3 OCS Blocks | |
| | | | | | CGG-Phase D) (WEIk) (Migration PSTM) (Raw | | 16 OCS Blocks | |
| | | | | | CGG-Phase D) (WEIk) (Sediment Flood Velocity Mode | | 19 OCS Blocks | |
| | | | | | CGG-Phase D) (WEIk) (WEM PSDM Migration) | | | |
| Geophysical Pursuit, Inc. | Master Geophysical Data-Use License Agreement effective August 6, 2013 by and between Geophysical Pursuit, Inc. and Fieldwood Energy LLC | Supplement No. 1 9/4/2013 | | | Cameron-Vermilion Depth1+Freshwater Bayou PSTM Anisotropic Volumes & Gathers (2012) | Geometry field shots & Legacy PoSTM & PoSTM volumes & gathers | 18.0993 blks (5K acre) | |
| Fairfield Geotechnologies | Master License Agreement dated July 9, 2013 by and between Fairfield Energy LLC | Supplement Agreement No. 1 dated September 26,2013 | | Product Re: | 3D Pre-Stack Curved Ray Time Migrated Data delivered in the form of in-line all-offset stacks (55' mil568 blocks line x 55' cross-line bin spacing). (Offsets up to 20,000'). In-line corridor 1 stacks and in-line corridor 2 stacks. | | | |

| Company | Master License Agreement | Supplements and Product Description | |
|---|---|---|---|
| | | Product C: Deep Shelf Data | 3D Pre-Stack Curved Ray Time Migrated Data delivered in the form of in-line all-offset stacks (55' in-line x 55' cross-line bin spacing) (Offsets up to 30,000'). In-line corridor 1 stacks, in-line corridor 2 stacks and in-line corridor 3 stacks |
| | | Product C2010 Reprocessed Pre-Stack Time Data (Product C2010) | 3D Pre-Stack Curved Ray Time Migrated Data with updated geometry, improved dual sensor summation techniques and updated deconvolution applied in the form of in-line all-offset stacks (55' in-line x 55' cross-line bin spacing) (Offsets up to 30,000'). In-line corridor 1 stacks, in-line corridor 2 stacks and in-line corridor 3 stacks     1615 blocks |
| | | Product D: | Isotropic 3D Kirchhoff Pre-stack Depth Migrated data delivered in the form of in-line all-offset stacks 4929 blocks (55' in-line x 55' bin spacing) Product DB Peripherals Covering Product BC Data (Offsets up to 20,000'); In-line corridor 1 stacks and in-line corridor 2 stacks (55' x 55' bin spacing). Product DC Peripherals Covering Product C Data (Offsets up to 30,000'): In-line corridor 1 stacks, in-line corridor 2 stacks and in-line corridor 3 stacks (55' x 55' bin spacing). |
| | | Product DAK: | Anisotropic 3D Kirchhoff Pre-Stack Depth Migration applied in the form of in-line all-offset stacks   780 blocks (55' in-line x 55' cross-line bin spacing). Product DAK Peripherals Covering Product BC Data (Offsets up to 20,000') In-line corridor 1 stacks and in-line corridor 2 stacks (55' x 55' bin spacing). Product DAK Peripherals Covering Product C Data (Offsets up to 30,000') In-line corridor 1 stacks, in-line corridor 2 stacks and in-line corridor 3 stacks (55' x 55' bin spacing). |
| | | October 28, 2013 election for Additional Product Re: Data Products | |
| | | May 27, 2014 SA1 Amended to inlcude 22 blocks of migrated raw gathers to be selected within one (1) year("Firstbrood released from any future OBIP used for H1 S2 orignally obligated by Gryphon Exploration Company) | 3D Pre-Stack Curved Ray Time Migrated Data delivered in the form of in-line all-offset stacks (55' in&3.2 blocks of migrated raw gathers line x 55' cross-line bin spacing) (Offsets up to 20,000'). In-line corridor 1 stacks and in-line corridor 2 stacks. |
| Multiklient Invest AS | Master Geophysical Data Use License Number QNE-2021-01-GLA effective July 30, 2021 | Supplement dated 7/30/2021<br><br>Flex Vision<br><br>Gulf of Mexico, Multi-Clien<br>Non-Exclusive 3-D Survey<br>3-D Pre-Stack Depth Migrated Data | 50 OCS Blocks |

[End of Exhibit I]